# APPENDIX 3

# REDACTED

**APPENDIX 3**

**C.    STIPULATIONS AND UNCONTESTED FACTS AND LAW**

     **1.  The following material facts are admitted by the parties and require no proof:[1][2]**

**Background**

     1.    Plaintiffs represent the class of all prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of ADC and a subclass of all prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in certain housing units.

     2.    At the time this lawsuit was filed, Defendant Richard Pratt was the Interim Assistant Director, following the retirement of Dr. Michael Adu-Tutu in February 2012.

     3.    Art Gross took over as Assistant Director in October 2012.

     4.    Pratt was renamed the Interim Assistant Director on March 1, 2013.

     5.    Director Ryan ("Director") is ultimately responsible for the health care provided to inmates and for the conditions of their confinement.

     6.    Defendant Charles Ryan is the Director for the Department of Corrections, and has been the Director since January 30, 2009.

**ADC Facilities**

     7.    The Arizona Department of Corrections ("ADC") has 10 different facilities (or Arizona State Prison Complexes ("ASPCs")), which are the subject of this lawsuit: Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma.

---

     [1] Defendants claim these are material facts.  Plaintiffs claim the vast majority are not material and reserve the right to dispute their relevance at trial if Defendants attempt to introduce them, so the insertion of "material" into heading C.1. is not an edit Plaintiffs authorized, but Defendants inserted unilaterally.

     [2] The language contained above was taken directly from this Court's form Pre Trial Order.

8.     Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma are considered corridor facilities because of their proximity to Phoenix and Tucson.

9.     Douglas, Safford, and Winslow are not corridor facilities, and are intended to house generally healthier, low custody inmates.

10.     Florence and Eyman house condemned inmates, Security Threat Groups ("STG") inmates, sex offenders, and some general population inmates.   Lewis houses primarily protective custody inmates.

11.     ASPC-Perryville houses all female inmates.

12.     ASPC-Phoenix is the intake and reception center for all male inmates.

13.     On March 31, 2014, ADC facilities total population was 34,073:

- Phoenix: 651 inmates.
- Winslow:  1,718 inmates.
- Douglas: 2,330 inmates.
- Eyman: 5,069 inmates.
- Florence: 3,983 inmates.
- Lewis: 5,451 inmates.
- Tucson:  4,942 inmates.
- Safford:  1,701 inmates.
- Perryville:  3,719 inmates.
- Yuma:  4,509 inmates.

**ADC's Budget, Award of Contract, and Contract**

14.     ADC's healthcare budget for fiscal year 2014 is $131,500,000: $125,000,000 paid to Corizon and $6,500,000 devoted to monitoring.

15.     On September 3, 2009, the Governor signed H.B. 2010.

16.     H.B. 2010 required ADC to "issue a request for information for the privatization of all correctional health services, including all medical and dental services, that are provided in a state owned and operated facility," by October 1, 2009.

2

17.   H.B. 2010 required the ADC to "award a contract to a private provider of correctional health services that will provide such services, including all medical and dental services, at a cost below the fiscal year 2007-2008 total cost to the state for such services."

18.   Wexford began its tenure on July 1, 2012.

19.   After ADC issued its Cure Notice and Sanction Letter, Wexford was requested to put together a plan of action and present it to ADC.

20.   Corizon was awarded the contract and began its tenure on March 4, 2013.

21.   The correctional health services contract (the "Contract") incorporates ADC's October 21, 2011 RFP No. ADOC12-001105 as well as the Contractor's proposals and supplemental proposals.

22.   Pursuant to the Contract, the Contractor agrees to provide medical, dental, pharmaceutical, and mental health services at all Arizona state prison complexes.

23.   It also agrees to provide routine, urgent and emergency healthcare to all inmates and establish preventative healthcare practices.

24.   The Contract establishes requirements for, among other things: (1) urgent and emergency care; (2) timely access to care; (3) medical provider staffing; (4) chronic illness and infectious disease care; (5) medical diets; (6) a telemedicine program; (7) segregated or isolated inmate care; (8) medication management; (9) dental care; (10) mental health services; (11) suicide prevention; and (12) responding to inmate grievances.

**ADC Contract Monitoring**

25.   The Contract allows ADC to appoint a Contract Monitor and conduct regular audits and reports.

26.   There are over two hundred performance measures.

27.   The Medical Green Amber Red Report ("MGAR"), which is taken from DO 703, is a tool used to assess the performance outcomes and measures set forth in the contract.

3

28.    If the contract monitor believes, based on that contract monitor's review, that a facility meets the performance measure's compliance level in a given month, it receives a green rating.

29.    These ratings are memorialized in the MGAR report.

30.    The Health Services Contract Monitoring Bureau, including the contract compliance monitors and the Assistant Director, review the MGARs for deficiencies.

31.    The monitors are responsible for determining, in their professional judgment, whether Corizon is complying with a specific performance measure.

**Corizon Reporting to ADC.**

32.    Additionally, Corizon prepares and submits various reports, including: Quarterly Statewide Chronic Condition/DM Program Reports; monthly HNR Appointment Reports; monthly Inmate Formal Grievance Reports; monthly Inmate Wait Times Report; monthly statewide Intake Report; monthly Staffing Reports; and quarterly statewide Utilization Review Reports.

33.    Corizon also submits additional or ad hoc reports that may be needed to respond to grievances, inquiries, complaints or other questions raised by inmates or others.

34.    Corizon produces monthly reports, many of which are required under the contract with ADC.

35.    Contested and Uncontested Facts regarding the types and frequency of these reports are contained in Exhibit N.

36.    Contested and Uncontested Facts regarding graphs and charts which exhibit the statistical data contained in these reports from April 2013-April 2014 are contained in Exhibit N.

**Health Needs Requests**

37.    ADC inmates (including maximum custody inmates) may advise prison medical personnel of non-emergency medical requests or requests for appointments by submission of a written form called a Health Needs Request ("HNR") form.

38.    After completion of the HNR, the inmate must drop the HNR in the appropriately labeled drop box located in the housing unit.

**Intake Screening and Transfer**

39.    An inmate may cancel an appointment that was created by his/her HNR for limited medical attention on the Nurses' line (e.g., cold symptoms that have improved since submitting the HNR).

40.    Corizon was also required to propose a staffing plan for onsite specialty services, such as dialysis, optometry and ultrasound.

41.    All staff are subject to ADC's review and approval, and Corizon is required to notify and consult the Warden and Contract Monitor before terminating any professional staff.

**Specialty Care**

42.    Consultations may be performed in-house, at an outside location, or by way of videoconferencing/telemedicine.

43.    The Medical Review Board (MRB) consists of the Medical Program manager, clinical program managers, and the Health Services Coordinator.

44.    The Medical Record Scheduled Appointment Form is used for Outside Referrals.

45.    The Clinical Coordinator ("CC") serves as the facilitator for the Medical Review Committee.  ADC written policy provides that the CC forward requests that have been approved by the MRC to the Central Office Medical Review Board ("MRB") for final decision on any request.

46.    The Medical Review Committee consists of the Facility Health Administrator and the Key Contact Physician, all medical providers, and the clinical coordinator.

47.    It is the responsibility of the individual Provider staff per policy to monitor their orders and to ensure successful coordination of local and regional access to community providers for specialty care.

48.     It is the responsibility of the attending Physician or Mid-Level provider per policy to follow their requests for specialty care to ensure that the needs of the patient are met.

49.     It is the responsibility of the Correctional Registered Nurse Supervisor II per policy to monitor nursing staff compliance.

50.     It is the responsibility of the FHA per policy to ensure that all requests for medical services submitted to the Medical Review Committee (MRC) are accurate and complete; the FHA neither approves nor denies any requests for medical services.

**Telemedicine**

51.     ADC policy authorizes telemedicine services in its major facilities to reduce the need for outside send-outs for medical attention, thus minimizing security issues, escort requirements, and saving money.

52.     ADC written policy calls for telemedicine appointments to be prescheduled each month, similar to offsite medical appointments.

53.     ADC written policy states that appointments for telemedicine services may only be refused at the telemedicine location to permit full disclosure to the inmate by the medical specialist of the medical consequences of his refusal.

54.     A telemedicine program can be beneficial in a correctional setting because it has the potential to decrease transportation costs, increases community and staff safety, and improves the quality, coordination and efficiency of health care services through improved access and availability of specialty services.

**Emergency Care**

55.     ADC written policy provides for staff to activate the Incident Command System ("ICS"), which is intended to notify supervisory staff and medical responders, issue ▮Security▮ loud orders for inmate response, conduct a visual sweep of the area ▮Security▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and, if an inmate's ▮Security▮ cannot be seen, to make an immediate judgment to determine whether the inmate's condition outweighs the potential risk involved in entering the cell.

6

56.    Annual documentation and demonstration of skills and knowledge in regards to the Nursing Assessment/Procedures, Emergency Response Orders is required by ADC written policy of all licensed nurses.

57.    ADC written policy provides that the Chief of Security and shift commanders be given written instructions about the appropriate intervention for each medical emergency which may arise from a chronic condition existing in the institution.

58.    ADC written policy requires that correctional officers who work with inmates receive health-related training every two years so that they can recognize when to refer an inmate to healthcare staff and to be able to provide emergency care until healthcare staff arrives.

59.    ADC written policy provides that training include administration of first aid, recognizing the need for emergency care and intervention in life threatening situations (e.g., heart attack), recognizing acute manifestations of certain chronic illness (e.g., asthma, seizures), adverse reactions to medications, recognizing signs and symptoms of mental illness, knowledge of procedures for suicide prevention, appropriate referral of healthcare complaints, and procedures and precautions with respect to infectious and communicable diseases, and cardiopulmonary resuscitation.

60.    Hospital admissions can be prescheduled, direct (for urgent situations), or emergent (emergency room).

**Chronic Care**

61.    A chronic condition is an illness or condition that affects an individual's well-being for an extended interval, and generally is not curable, but can be managed to provide optimum functioning within any limitations the condition imposes on the individual.

62.    Chronic conditions include diabetes, hypertension, cardiac disease, asthma, seizure, HIV/AIDs, tuberculosis, hepatitis C, and cancer.

63.    ADC written policy requires that physicians, physician's assistants, the director of nursing and nurses re-order medications and treatments for inmates with

chronic conditions in a timely manner so the inmates receive the necessary treatment for their chronic conditions without interruption or delay

64.     The  RFP provided that Corizon was to develop and implement Chronic Condition Disease Management programs, identify chronically ill inmates, ensure these inmates are visited by a medical provider at least twice a year or more often as clinically indicated, develop treatment plans for these inmates, and assign a case manager (such as a RN, behavioral health or other clinical staff) to work with inmates with complex, high cost conditions.

**Medical Devices**

65.     Orthotics, prosthetic devices, and mechanical aids are specialized mechanical devices used chronically to support or supplement joints or limbs, or are artificial devices to replace missing body parts.

66.     In determining whether to issue an elective medical device, ADC written policy requires that medical staff consider the urgency of the need, time left on sentence, overall necessity, morbidity, mortality, functional disability and expected improvement, alternatives, risk/benefit, cost/benefit, and security concerns.

67.     ADC written policy provides that medical aids issued as part of acute treatment for a limited medical condition such as casts, splints, ace wraps, and canes/crutches/braces, be routinely authorized and not generally charged to the inmate.

68.     ADC written policy provides that hardware that is an essential part of a medically necessary procedure such as heart valves, cardiac stent, and inter-occular lens implants, be routinely authorized and not generally charged to the inmate.

**Self-Catheterization and Colostomy Care**

69.     Intermittent catheterization is the temporary placement of a catheter (tube) to remove urine from the body.

70.     Patients who are unable to see the urethra should be taught how to feel for the proper location of the urethral opening.

**Medication Distribution**

71.     ADC written policy provides that prescription medications be administered to individuals only upon the order of a physician, dentist, psychiatrist, or other legally authorized individual.

72.     If an inmate simply needs a refill of a prescription that is still current, ADC written policy does not require that inmate to be seen by a medical provider.

**Infectious Diseases**

73.     There are specific precautions and procedures found in ADC written policy for controlling, managing, investigating, and treating airborne infections, waterborne and foodborne infections, tuberculosis, and HIV.

**Medical Grievances**

74.     D.O. 802 governs ADC inmate grievances and sets forth the procedures that inmates must follow to complete the prison administrative grievance process.

75.     ADC written policy requires that any ADC inmate, regardless of disciplinary status, housing location, or classification, be allowed to use the Inmate Grievance System.

76.     This policy by its terms includes inmates in a complex detention unit, segregation unit, or suicide watch cell.

77.     The ADC Inmate Grievance System provides a separate review process for medical-related grievances, including medical, dental, and mental health grievances/issues ("Medical Grievance Process").

78.     The Medical Grievance Process is a three-step review process for inmates seeking resolution of medical issues encountered while incarcerated.

79.     The first step is the Informal Complaint Resolution: an inmate must attempt to informally resolve a medical complaint by submitting an Inmate Letter ("Informal Complaint" or "Informal Resolution") to the inmate's counselor/assigned CO III within ten (10) work days from the date of the action that caused the inmate's complaint.

80.     The second step is the Formal Grievance to the Facility Health Administrator ("FHA"): if an inmate is unsatisfied with the CO III's Informal Resolution

Response, the inmate may initiate a "Formal Grievance" by submitting to the CO IV/Grievance Coordinator an Inmate Grievance within five (5) work days from receipt of the CO III's Informal Resolution Response.

81.     The third and final step is the Appeal to the Director of the ADC: if an inmate is unsatisfied with the FHA's Formal Grievance Response, the inmate may initiate a "Director's-Level Appeal" to the Director of the ADC by submitting to the Unit Grievance Coordinator an Inmate Grievance Appeal (Form 802-3) within five (5) work days from receipt of the Formal Grievance Response.

82.     Pursuant to ADC written policy, Corizon healthcare staff is responsible for handling inmate grievances regarding correctional health services and forwarding a copy of formal grievances to the ADC Contract Monitor.

83.     Contested and Uncontested facts regarding ADC's implementation of an electronic medical record system are set forth in Exhibit Q.

**Dental Care**

84.     Dental care at ADC is provided by Smallwood Prison Dental Services ("SPDS"), a private company owned by Dr. William Smallwood, who subcontracts with Corizon to provide dental care.

85.     SPDS has been providing dental care at ADC since March 4, 2013 after taking over from Wexford, which provided dental care at ADC from July 1, 2012 to March 3, 2013.

86.     SPDS provides dental services to inmates in the states of Georgia (over 40,000 inmates), Florida (90,000 inmates), Virginia, and Arizona (36,000 inmates).

87.     Inmates at ADC submit a Health Needs Request (HNR) form to request dental care.

88.     Dental clinics will often schedule inmates by yard to maximize efficiency and minimize security concerns.

**Dentures**

10

89.    Dentures are provided according to a priority system, with first priority given to inmates requiring full dentures in order to be able to chew, and second priority given to inmates requiring partial dentures due to not being able to properly chew because of a large number of missing or non-occluding teeth.

90.    Most steps of the denture process require sending materials to an outside lab and waiting for other materials to be mailed back.

91.    While undergoing the process of obtaining full or partial dentures, inmates may be prescribed mechanical soft diets.

92.    Outside dental treatment for a dental emergency does not require prior approval from the Statewide Dental Director.

93.    The Dental Services Technical Manual ("DSTM") establishes four levels of dental priorities.

94.    Priority 1 (Emergency Care) includes conditions requiring immediate assessment, such as postoperative uncontrolled bleeding, facial swelling of a life-threatening nature or causing severe facial deformity, fracture of the mandible, maxilla, or zygomatic arch, avulsed dentition, extreme pain that is not responsive to dental treatment guidelines, and intra-oral lacerations that require suturing to include the vermillion border of the lips.

95.    Priority 2 (Urgent Care) includes conditions such as fractured dentition with pulp exposure, acute dental abscess, an oral pathological condition that may severely compromise the general health of the inmate, and acute necrotizing ulcerative gingivitis.

96.    Priority 3 (Routine Care) includes conditions that require treatment to restore the form and function of an inmate's oral tissues and are not solely elective or cosmetic, such as caries, chronic periodontal conditions, non-restorable teeth, edentulous and partially edentulous patients requiring replacement, temporary, sedative, or immediate restorations, and non-functional broken prosthetic appliances (if the inmate qualifies), TMJ disorders, periodic examinations, gingival recession/root sensitivity, and routine dental prophylaxsis.

97.    Priority 4 (Exempt Conditions) are not treated at ADC and include fixed prosthodontics (crown and bridge), orthodontics, removal of asymptomatic third molars or impactions without pathology, treatment of discoloration, stains, and cosmetic defects, ridge augmentations, and vestibular extensions/implants.

98.    Priority 1 (emergency) and 2 (urgent care) are available to all inmates regardless of the length of their sentence.

99.    A dentist performing a chart review upon transfer should evaluate the medical record problem list to determine if any high priority dental procedures are in process and/or if any medical holds relating to dental treatment are in place; evaluate the treatment plan and if the inmate is undergoing prosthetics, serial extractions, or root canal, schedule the inmate for continuing treatment; and evaluate the dental history to see if premedication is indicated.

100.    The DSTM includes policies regarding infection control during pre-treatment, post-treatment, and laboratory procedures, and a hazard communication plan.

101.    If the preliminary dental screening indicates an urgent status, the inmate should be given an appointment as soon as possible.

102.    If the inmate has not been seen/treated for an outstanding routine care HNR at the previous facility, the inmate's name should be inserted on the routine care waiting list at the receiving facility by the date of submission of the HNR.

103.    Inmates undergoing continuation of treatment, such as root canal therapy, prosthetics, or serial extractions should be re-scheduled for an appointment by the dentist.

104.    Inmates requiring routine dental work, such as fillings, are required to submit an HNR for each visit if they wish to continue treatment.

105.    An inmate is eligible for a full denture under the following circumstances: medically compromised patients who as a result of missing teeth are exhibiting a significant medical condition that can be ameliorated by return to adequate masticatory function (first priority); patients needing full upper or lower dentures or both as a result of extractions performed as part of an ongoing treatment plan or who have lost teeth while in

ADC (second priority); and inmates who entered ADC with missing teeth and are edentulous upper and/or lower (third priority).

106.   The dental assistant's clinical evaluation includes the collecting and recording of information regarding an inmate's complaint of pain, oral bleeding, or facial swelling.

107.   The dental assistant also reviews the inmate's health history, performs an oral evaluation, and takes dental x-rays to assist the dentist in determining the severity of the dental condition.

108.   If a dental assistant is unsure whether to classify an HNR as urgent care, he or she can ask the supervising dentist.

109.   Dental assistants can look in the mouth to see if there is an obvious problem, such swelling or a large hole in a tooth.

110.   Dental assistants can also look for swelling on the outside of an inmate's cheek.

111.   The ADA states that dental assistants may perform the following work: assisting the dentist during a variety of treatment procedures; taking and developing dental radiographs (x-rays); asking about the patient's medical history and taking blood pressure and pulse; serving as an infection control officer, developing infection control protocol and preparing and sterilizing instruments and equipment; helping patients feel comfortable before, during, and after dental treatment; providing patients with instructions for oral care following surgery or other dental treatment procedures, such as the placement of a restoration (filling); teaching patients appropriate oral hygiene strategies to maintain oral health (e.g., tooth brushing, flossing and nutritional counseling); taking impressions of patients' teeth for study casts (models of teeth); performing office management tasks that often require the use of a personal computer; communicating with patients and suppliers (e.g., scheduling appointments, answering the telephone, billing and ordering supplies); and helping to provide direct patient care in all dental specialties, including orthodontics, pediatric dentistry, periodontics and oral surgery.

112.   A broken or lost filling is classified as routine care at ADC.

113.   If there is also pain, swelling, or other signs of infection present, the tooth should be evaluated as urgent care.

114.   According to ADC policy, if an inmate with a lost or fractured filling who has been placed on the routine care list begins experiencing pain or swelling while waiting, he or she can submit an HNR for pain and should  be seen according to urgent care guidelines.

115.   ADC policy provides that inmates should be seen within 90 days for routine care requests.

116.   During this period, dentists at ADC performed 10,263 fillings, 11,275 simple extractions, and 2,330 surgical extractions.

117.   There were also 7,339 cleanings performed and 1,298 full and partial dentures completed.

118.   Whether a tooth should be extracted is a matter of clinical judgment.

119.   Conditions in which a tooth cannot be restored include cavities well below the gum line, periapical pathology in a patient who cannot have root canal therapy, severe periodontitis, severe mobility, and acute inflammation in the area that is destructive to the apex of the tooth.

120.   It is not malpractice for a dentist to extract a tooth with reasonable, informed consent by the patient, when the dentist determines that the long-term prognosis of a tooth is poor.

121.   If an inmate has meth mouth, extractions are usually required.

122.   Every dental case is different, and a number of factors influence whether a tooth becomes non-restorable, including oral health care, the inmate's past history, and how often he or she has been to the dentist in the past.

123.   Most dental clinics at ADC are open Monday through Friday from 8:00 to 5:00.

14

124.    If an inmate submits an HNR on a weekend indicating pain and/or swelling, the inmate can be evaluated by nursing staff using dental protocols.

125.    Having nursing staff evaluate after-hours pain complaints using dental protocols is within the standard of care.

126.    The National Commission on Correctional Health Care (NCCHC) publishes standards for what it considers the proper management of a correctional health services delivery system.

127.    Correctional facilities that comply with these standards may be accredited by the NCCHC through an external peer review process.

128.    The NCCHC standard for oral care states: "Oral care under the direction and supervision of a dentist licensed in the state is provided to each inmate.  Care is timely and includes immediate access for urgent or painful conditions.  There is a system of established priorities for care when, in the dentist's judgment, the inmate's health would otherwise be adversely affected."

129.    The NCCHC has established wait times for intakes and urgent care:  the NCCHC standards require that inmates receive an oral screening within seven days of intake and an oral examination by a dentist within 30 days.

130.    The NCCHC also recommends that urgent care requests be seen within 72 hours.

131.    ADC policy complies with NCCHC standards for timeliness of intake and urgent care.

132.    The Contract provides that Smallwood is to have dental practitioners available 24 hours a day, seven days a week, including after-hours and weekend for emergency consultation and direction.

133.    SPDS inherited a backlog of dental requests from Wexford.

134.    Private dental offices generally schedule cleanings six months in advance.

**Dental Software – Correctional Dental Software**

15

135.   Correctional Dental Software ("CDS") includes a real-time wait list and monthly and daily reporting capabilities.

136.   Correctional Dental Software includes transfer reports, which track inmate movements across ADC facilities for continuity of care.

137.   Correctional Dental Software also includes a scheduling inquiry, which shows each dentist's schedule and the types of procedures scheduled for that dentist.

138.   CDS includes a utilization management report which shows each facility's production.

139.   Prior to Correctional Dental Software, dental appointments were tracked manually.

140.   If an inmate submitted multiple HNRs, the inmate might be on the routine care list multiple times.

141.   Correctional Dental Software is linked to ADC's inmate management system (AIMS) and is updated daily.

142.   If an inmate on the routine care list transfers to a different complex, the inmate is automatically placed on the routine care list at the new complex in the order in which he submitted his HNR.

143.   The routine care wait list at each complex is organized in Correctional Dental Software from longest to shortest wait time from the date of receipt of an HNR.

144.   The Correctional Dental Software software automatically calculates the number of days an inmate has been waiting.

145.   Inmates who are out to court are noted in CDS.

146.   An inmate who is out to court is out of ADC custody and cannot be brought into the dental clinic for treatment.

147.   Inmates who are out to court remain on the wait list and are included in average wait times.

148.   Inmates who miss appointments due to security issues remain on the wait list and are included in average wait times.

16

149.     If an inmate has an urgent dental issue during a facility lock-down the facility health administrator in conjunction with nursing and security staff can determine whether the inmate should be brought to the dental clinic for treatment.

150.     The ratio of dentists to inmates is not the only factor in determining appropriate dental staffing at a correctional facility.

151.     Multiple factors affect dental staffing needs at a correctional facility, including type of facility, inmate population, demand for dental services, proximity of other dental facilities, and security level.

152.     SPDS began to hire part time dental hygienists (less than 2.0 FTE total) in approximately June 2013.

153.     Dental hygienists at ADC can provide gross debridement, scaling and root planning, take bite wing x-rays, and enter SOAP notes.

154.     Dental assistants are trained to take x-rays, and it does not take a dental degree to perform that function.

155.     All ADC dental assistants have taken an exam and received a certificate to take dental x-rays.

156.     Dr. Chu is ADC's dental monitor.

157.     ADC also employs facility contract monitors at each complex who evaluate contract compliance using the MGAR tool, which includes oral care metrics.

158.     The ADC facility contract monitors evaluate contract compliance.

159.     Dr. Chu evaluates clinical dentistry.

160.     Dr. Chu performs site visits at ADC dental clinics.

161.     Dr. Chu also reviews the adequacy and quality of the dental equipment and coordinates purchase of new equipment, including over $300,000 worth of new equipment purchased by ADC since SPDS took over the contract.

162.     Dr. Chu, Mr. Pratt, the ADC contract monitors, and Mark Jansen from Corizon all have access to CDS to monitor wait times and other dental statistics.

**Conditions of Confinement within the Maximum Custody Units.**

**Cell Configuration (Eyman)**

    Browning Unit

163.   Browning Unit, South Side has two wings.

164.   Browning Unit, South Side - Wing 1 has ▇ clusters totaling ▇ cells.

165.   Browning Unit, South Side - Wing 2 has ▇ clusters totaling ▇ cells.

166.   The total cells for Browning Unit, South Side - Wings 1 and 2 are ▇ cells which includes ▇ double-bunked cells – South  Side only.

167.   Browning Unit, North Side also has two wings.

168.   Browning Unit, North Side - Wing 4 has ▇ clusters totaling ▇ cells.

169.   Browning Unit, North Side - Wing 3 has ▇ clusters totaling ▇ cells.

170.   The total cells for Browning unit, North Side – Wings 4 and 3 total ▇ cells.

171.   The cells in Browning unit measure ▇ (80 square feet).

    **SMU I**

172.   SMU I contains a total of ▇ cells, including ▇ cells that are equipped with double bunks, so that two inmates may be housed in each of these ▇ double-bunk cells.

173.   The cells in SMU I measure ▇ (82 square feet).

174.   BMU cells are illuminated at night with a ▇ watt bulb security light.

175.   The SMU Watch pods are illuminated 24 hours with ▇ watt bulbs (total of ▇ watts).

176.   The wattage of the night security lights installed in the ceiling of the walkways is ▇ watts.

**ASPC-FLORENCE**

177.   ADC's Florence prison complex operates the following maximum custody units:  Cell Blocks 1, 2, 3, 4, 5, 7, and Kasson.

    Cell Block 1

178.   Cell Block 1 ("CB1") contains ▇ single occupancy cells.

179.   The cells in CB1 measure ▇ (54 square feet).

Cell Blocks 3 and 4

180. Cell Block 3 ("CB3") contains [Security] single occupancy cells.

181. Cell Block 4 ("CB4") contains [Security] single occupancy cells.

182. The cells in both CB3 and CB4 are [Security] (54 square feet).

183. CB4 also has [Security].

Cell Blocks 5 and 7

184. Cell Block 5 ("CB5") contains [Security] single occupancy cells.

185. Cell Block 7 ("CB7") contains [Security] single occupancy cells.

186. The cells in both CB5 and CB7 are [Security] (67.3 square feet).

Cell Block 2

187. The cells in CB2 measure [Security] (40 square feet).

Cell Block – Kasson

188. All cells in all Kasson Wings are [Security] (60 square feet).

**ASPC-PERRYVILLE**

**Lumley Unit**

189. The maximum custody Lumley Unit at the Perryville complex contains [Security] pods of [Security] cells each.

190. The cells are [Security]

**Food Service**

191. Medical diets are special diets ordered for temporary or permanent health conditions that restrict the types, preparation, and/or amounts of food.

**Recreation**

192. It is an undeniable fact that some inmates are violent, difficult to manage, and, if permitted access to another human being – be it correctional personnel, medical personnel or another inmate, are likely to assault another person.

**Description of Max Custody Recreation Yards**

**ASPC-EYMAN**

193. The size of each end-of-pod recreation enclosure is [Security].

19

194.    The wall heights for these end-of-the-pod enclosures range from ▮ at the lowest point to ▮ at the highest point.

195.    Additionally, there are ▮ outside recreation enclosures and a basketball court between Wings ▮ of Browning and SMU.

196.    The ten outdoor recreation enclosures are ▮.

197.    The ▮ enclosures are made from ▮ metal and ▮.

**ASPC-PERRYVILLE**

198.    The Step I recreation enclosures have the following dimensions: four enclosures are ▮; four enclosures are ▮; and one enclosure is ▮.

199.    The Step II and III recreation enclosure measures ▮.

200.    It is constructed of ▮.

**Cell Illumination**

**ASPC EYMAN**

**Browning Unit**

201.    Browning Unit cells, including Browning Unit Mental Health Watch cells, are illuminated 24 hours.

202.    Daytime wattage of the cell light is ▮ watt bulbs.

203.    Inmates cannot control the cell illumination.

**SMU-1**

204.    Total wattage of the cell light is ▮ watts.

205.    The wattage of the night security lights installed ▮ of the walkways is ▮ watts.

**ASPC FLORENCE**

**CB-1**

206.    Wattage of the cell light is ▮ watts

**CB-2**

207.    The cell light is affixed ▮ of the cell.

208.    Wattage of the cell light is ▮ watts.

20

209.    The wattage of the night security lights installed in the ceiling of the pod is ███ watts (florescent ███).

### CB-3

210.    The cell light is affixed ███████ of the cell.

211.    Wattage of the cell light is ███ watts.

### CB-4

212.    The cell light is affixed ████████ of the cell.

213.    Wattage of the cell light is ███ watts.

### CB 5 and 7

214.    The cell light is affixed █████████.

215.    Wattage of the cell light is ██ watts (florescent ███).

### CB-Kasson

216.    CB-Kasson Watch Pod cells have a ███ light affixed █████████ in the cell, ███████.

217.    The Watch cells are illuminated 24 hours.

218.    Watch cells are illuminated with ███ watt bulbs for a total of ██ watts.

219.    Watch Pod security lighting is illuminated 24 hours with lights installed in the ceiling of the pod (██ watt florescent ███).

220.    CB-Kasson non-watch cells have a ███ light affixed █████████ in the cell ███████.

221.    The wattage of the Watch cell light located inside the cell is ██ watts (florescent ███) and is staff controlled.

### ASPC-PERRYVILLE

### Lumley

222.    Wattage of the cell light is ██ watts (bulb).

223.    The wattage of the night security lights installed in Lumley SMA cell runs is ███ watts (florescent ███).

224.    The cell run night security lights are officer controlled.

225.   Wattage of the cell light is ▮▮ watts (bulb).

226.   The wattage of the night security lights installed in Lumley Reception/Assessment cell runs is ▮▮ watts (florescent ▮▮▮▮).

227.   The cell run night security lights are officer controlled.

228.   Wattage of the watch cell light is ▮▮ watts (bulb).

229.   The wattage of the night security lights installed in Lumley SMA cell runs is ▮▮ watts (florescent ▮▮▮▮).

## Suicide and Mental Health Watch

230.   Contested and Uncontested Facts regarding the type, length, and variety of suicide prevention training ADC staff undergo are set forth in Exhibit O.

231.   The United States Department of Justice, Bureau of Justice Statistics collects data from each state Department of Corrections, as well as the Federal Bureau of Prisons as to each inmate death in custody.

232.   Survey reports are received, the data is verified, and mortality rates are calculated as a national average, and periodically published, based upon calendar year data.

233.   To permit comparison based upon the different size of state and federal corrections departments, that Bureau of Justice Statistics calculates a mortality rate, based upon the number of deaths per 100,000 prisoners.

234.   ADC has four custody levels: minimum, medium, close, and maximum.

235.   Eyman-SMU 1 Unit, Eyman-Browning Unit, and Florence-Central Unit house all of the male-general population inmates that are classified as maximum custody.

236.   Several other units are used to house exclusively non-general population inmates classified as maximum custody (e.g., protective custody, sexual offenders, and mental health inmates), including Eyman-▮▮▮▮▮▮, Phoenix-▮▮▮▮▮, Phoenix-▮▮▮▮▮, and Lewis-▮▮▮▮▮.

237.   Validated STG members are generally assigned to Eyman-Browning Unit.

22

238.    Maximum custody inmates (except death row inmates, inmates convicted of first degree murder in their first 180 days review period, and [Security]

[ ]) may be celled with another inmate if they meet certain criteria.

Staff considers the following in determining whether to cell two maximum custody inmates together: history of institutional violence, the inmates' convictions, disciplinary history, [Security], and physical and mental conditions.

239.    A non-contact visit is a visit between an inmate and visitor conducted with a barrier between them, thereby preventing any physical contact.

240.    Contested and Uncontested Facts relating to the D.I. 326 step program are contained in Exhibit P.

241.    All maximum custody female inmates are housed at Yard 30 at ASPC-Perryville, Lumley Unit.

242.    Inmates who commit one of ADC's Forbidden Three Acts may be placed in RSHP by the RSHP Independent Review Committee, Complex Warden, receiving Complex Warden, and/or Regional Operations Director.

243.    The Forbidden Three Acts include serious assaults on staff, serious inmate on inmate assaults with weapons and multiple inmates assaulting an inmate with a serious injury.

244.    Disputed and Undisputed Facts regarding the step program incentives and programming for ASPC-Eyman Browning Unit, ASPC-Eyman SMU-1 Unit, ASPC-Florence Central Unit, ASPC-Florence Kasson and ASPC-Perryville Lumley are outlined in Exhibit P.

245.    The following ADC prison complexes operate maximum custody inmate housing units within the complex: ASPC-Eyman, ASPC-Florence, ASPC-Lewis, ASPC-Perryville, and ASPC-Phoenix.

246.    Chemical agents may be used to avoid the use of additional force, to prevent injury to employees and inmates, or to stop imminent danger to staff or inmates.

247.   The Inmate Grievance System for non-medical issues has five levels: (1) the inmate must first try to resolve his issue through informal means, such as discussion with staff in the area most responsible for the complaint or by the submission of Inmate Letters (2) if the inmate is unable to resolve the issue through informal means, within ten working days after he becomes aware of the specific issue, he may submit an Informal Complaint or an Inmate Letter to his assigned CO III; (3) if the inmate is not satisfied with the Response of the CO III, within five working days from receipt of the Response he may submit a Formal Grievance to which the Deputy Warden responds; (4) if the inmate is not satisfied with the Deputy Warden's Response, within five working days from receipt of the Response he may submit an Inmate Grievance Appeal to the Warden; and (5) if the inmate is not satisfied with the Warden's Response to the Grievance Appeal, he may Appeal to the ADC Director within five working days from the receipt of the Response.

248.   Plaintiff Parsons was dismissed from this lawsuit on March 6, 2013, and Plaintiff Brislan was dismissed from this lawsuit on August 7, 2014.

**D.   CONTESTED ISSUES OF FACT**

**1. The following are issues of fact that <u>Defendants Contend</u> should be tried and decided:[3]**

      **Issue:  Whether ADC Provides Constitutionally Adequate Medical Care to the Class.**

**<u>ADC Facilities</u>**

1.   <u>Defendants Contend</u>:  The following facilities are currently accredited by The National Commission on Correctional Health Care ("NCCHC"):  Douglas, Florence, Lewis, Yuma, Phoenix, Perryville, Winslow, Safford, and Tucson.

      <u>Plaintiffs Contend</u>:  This is not a material fact because the evidence will

---

[3]   Defendants have included all of these facts as facts that they claim are material and to be tried and are responsible for the grouping of the facts.  Plaintiffs believe that many of these facts are not relevant and will object to Defendants' effort to introduce them at trial.  Nor do Plaintiffs agree that any given fact is material to the topic under which Defendants have grouped it.

show that even if the ADC has maintained its accreditation, it does not meet the NCCHC standards as written.

2.   <u>Defendants Contend</u>:  It is the mission of ADC's Health Services Division to "provide constitutionally mandated health care to the offenders of the Arizona Department of Corrections," and Health Services Staff "hold to the basic tenets of the modern Hippocratic Oath" as guiding principles.

> <u>Plaintiffs Contend</u>: The actions of the ADC's Health Service Division demonstrate that it is not their mission to provide constitutionally mandated health care, but rather to minimize costs.  A basic tenet of the Hippocratic Oath is to apply "all measures which are required."  The ADC's Health Services Staff does not do this, with dire consequences for prisoners, such as prisoners with cancer who receive no timely, appropriate intervention for the cancer and die as a consequence.  The policies and practices of the ADC with respect to health care put prisoners at substantial risk of serious harm and that is inconsistent with the modern Hippocratic Oath.

3.   <u>Defendants Contend</u>:  The Director delegates oversight of inmate healthcare to the Division Director of ADC's Health Services Contract Monitoring Bureau ("Assistant Director").

> <u>Plaintiffs Contend</u>:  Oversight of the inmate healthcare system at the ADC is a non-delegable duty of Defendant Ryan and while Assistant Director Pratt also bears responsibility for the delivery of constitutional adequate healthcare, he does not in fact provide the oversight that Defendant Ryan contends is delegated to him.

4.   <u>Defendants Contend</u>:  One of ADC's goals for FY 2013-2017 is to "provide cost effective constitutionally mandated correctional health care," which includes providing for the health care of the inmate population committed to the Department of Corrections" "in accordance with the laws of the state of Arizona and in accordance with the state constitution and the constitution of the United States."

> **Plaintiffs Contend**:  ADC's actions indicate that it is not the goal of the ADC to provide constitutionally mandated care because the ADC routinely denies prisoners adequate and timely care.  Instead, the ADC's emphasis seems to be more on saving money, even if that sacrifices constitutionally adequate care, as illustrated by, inter alia, the failure to provide timely specialty care, unnecessary cancelation of and refusals to timely provide medication, etc.

5.     **Defendants Contend**:   The Director asked Wexford's CEO if he was interested in continuing the contract, and Wexford indicated that they were and would develop a plan of action.

> **Plaintiffs Contend**:  This is Ryan's version of events but it is contrary to other evidence Plaintiffs obtained.

6.     **Defendants Contend**:  The next day, Wexford informed ADC that it wanted to sever the contract; ADC agreed because Wexford did not want to continue.

> **Plaintiffs Contend**:  This is Ryan's version of events but it is contrary to other evidence Plaintiffs obtained.

7.     **Defendants Contend**: To ensure continuity of healthcare, ADC went back to Corizon and Centurion, who bid on the original contract, as possible vendor successors to Wexford.

> **Plaintiffs Contend**:  Plaintiffs will stipulate to the fact that ADC returned to Corizon and Centurion as possible vendor successors, but cannot stipulate to the first clause, which purports to describe ADC's intentions in so doing.

8.     **Defendants Contend**:  The Contract requires that the Contractor provide all inmates with constitutionally mandated care and must comply with all ADC orders, instructions and procedures.

> **Plaintiffs Contend**: **Plaintiffs Contend**:  Plaintiffs object to this paragraph because it is inaccurate and inconsistent with the evidence.   Plaintiffs requested that the word "required" be changed to "purports to require" but

Defendants refused.

9.      Defendants Contend:  The Contract requires that the Contractor to comply with NCCHC standards for health and mental health services, "which address general areas of care and treatment, health records, administration, personnel and medical-legal issues."

> Plaintiffs Contend:  Plaintiffs object to this paragraph because it is inaccurate and inconsistent with the evidence.  Plaintiffs requested that the word "required" be changed to "purports to require" but Defendants refused.

**Corizon Reporting to ADC**

10.     Defendants Contend:  The Health Services Contract Monitoring Bureau oversees contract compliance and quality/clinical care.

> Plaintiffs Contend: Defendants are primarily responsible for overseeing the quality of care that is provided to ADC inmates and that is a non-delegable duty.  The Health Service Contract Bureau may assist them in doing that, but Defendants are ultimately responsible.  Further, this paragraph suggests there is contract compliance and Corizon has not achieved that.  The Health Services Contract Monitoring Bureau has also failed to provide adequate oversight for quality of care.

11.     Defendants Contend:  Each facility has a contract monitor that oversees Corizon's compliance with its duties relating to health care under the ADC-Corizon contract.

> Plaintiffs Contend:  Plaintiffs Contend: Plaintiffs object to this paragraph because the contention reflects what the ADC is supposed to do, not what actually happens.

12.     Defendants Contend:  The contract monitor conducts random and routine reviews, quarterly audits and meetings with Corizon staff (to:  (1) "review inmate access to care, compliance with NCCHC Standards, and adherence to required [ADC] policies, procedures and regulatory directives" to assure that inmates' health service needs are

adequately met, and (2) review the terms of the Contract to assure the needs of the State and ADC are adequately met.

> Plaintiffs Contend:   Plaintiffs object to this paragraph because the contention reflects what the ADC is supposed to do, not what actually happens.   Plaintiffs requested that the words "is supposed to conduct" replace the word "conducts" but Defendants refused.

13.   Defendants Contend:  The contract monitor reviews multiple performance outcomes and measures, such as timeliness of providing medical services and mental health assessments and the accuracy of medical records.

> Plaintiffs Contend:   Plaintiffs object to this paragraph because the contention reflects what the ADC is supposed to do, not what actually happens.  Plaintiffs requested that the words "is supposed to review" replace the word "reviews" but Defendants refused.

14.   Defendants Contend:   Each month, ADC contract monitors evaluate a selected number of these performance measures at each facility.

> Plaintiffs Contend:   Plaintiffs object to this paragraph because the contention reflects what the ADC is supposed to do, not what actually happens.  Plaintiffs requested that the words "are supposed to" be added in front of the word "evaluate" but Defendants refused.

15.   Defendants Contend:   The contract monitors at each facility measure the same performance measures that are selected for that month.

> Plaintiffs Contend:   Plaintiffs object to this paragraph because the contention reflects what the ADC is supposed to do, not what actually happens.  Plaintiffs requested that the words "are supposed to" be added in front of the word "measure" but Defendants refused.

16.   Defendants Contend:   Sanctionable performance measure results are computed based upon quarterly results tallied by the months in that specific quarter.

> Plaintiffs Contend:   Plaintiffs object to this paragraph because the

contention reflects what the ADC is supposed to do, not what actually happens.  Plaintiffs requested that the words "supposed to be" be added in front of the word "computed" but Defendants refused.

17.    Defendants Contend:  Appropriate measures are in place to allow for health care screening and transfer.

Plaintiffs Contend:  Appropriate measures are not in place to allow for adequate health care screening and transfer.

18.    Defendants Contend:  The quality/clinical care component of the Bureau focuses on the clinical aspect of the care provided.

Plaintiffs Contend:  There is no evaluation of the actual clinical services, instead all analysis is done on paper.

19.    Defendants Contend:  ADC and Corizon representatives meet weekly for approximately one to two hours to discuss items revealed in the MGARs.

Plaintiffs Contend:  Plaintiffs cannot stipulate as to the content of these discussions.

20.    Defendants Contend:  The Health Services Technical Manual ("HSTM") provides "guidance for Health Services Division staff to ensure access to, and provision of, high quality and well organized Health Services to inmates that are incarcerated in facilities that are under the medical auspices of the Arizona Department of Corrections."

Plaintiffs Contend:  Plaintiffs Contend:  Plaintiffs object to this paragraph because the contention reflects what the ADC is supposed to do, not what actually happens.  Plaintiffs requested that the words "is supposed to provide" replace the word "provides" but Defendants refused.

**Intake Screening and Transfer**

21.    Defendants Contend:  Upon arrival at each facility, inmates are given written information, in English and Spanish, about how to access emergency and routine medical, mental health, and dental services, including instruction regarding the purpose, use, and preparation of an HNR form, the fee for service program, the grievance process

for health-related complaints; this information is also supposed to be given verbally during intake.

>Plaintiffs Contend:  This is an ADC policy re-phrased as a fact.  The policy, however, is not reliably adhered to, so Plaintiffs contest it

22.   Defendants Contend: Receiving medical screening takes place upon arrival at ASPC-Phoenix (Alhambra), the intake facility for all ADC inmates. Inmates who present with a possible life-threatening condition are immediately referred for care.

>Plaintiffs Contend:  Intake/receiving screenings of prisoners are often delayed at ASPC-Phoenix (adult male reception center), ASPC-Tucson (minor male reception center) and ASPC Perryville (adult and minor female reception center), including for prisoners with serious medical, dental, and mental health needs.

23.   Defendants Contend: Staff complete a medical history questionnaire, based on the inmate's responses, observe the inmate's appearance and behavior, assess for communicable diseases, perform a nursing physical exam, including blood pressure, pulse, respiration, temperature, eye exam, urinalysis, and TB symptomology, and perform a nursing dental screening (visual inspection of the mouth).

>Plaintiffs Contend: Intake assessments are often incomplete and delayed.

24.   Defendants Contend: When clinically indicated, inmates are immediately referred to an appropriate health care service; immediate health needs are identified and addressed, and potentially infectious inmates are isolated.

>Plaintiffs Contend: Intake assessments do not always take place in a timely manner and newly arrived patients do not always receive necessary care in a timely manner.

25.   Defendants Contend: Nursing staff review the intake record of an inmate within 12 hours of his arrival to the facility to ensure that medications and emergent/urgent needs are met in a timely manner. (HSTM, Ch. 5, Sec. 2.0, Para. 3.0; 137-KK: ADC010818)

Plaintiffs Contend: Intake records are not always reviewed timely and appropriate care is not always timely provided to newly arriving patients.

26.     Defendants Contend: A medical provider physically examines the inmate by the end of the second full day of an inmate's arrival at a facility.

Plaintiffs Contend: Medical providers do not always physically examine patients in a timely manner on their arrival at a facility.

27.     Defendants Contend: After initial intake at ASPC-Phoenix (Alhambra), and when the inmate is moved to a housing facility, nursing staff perform a chart review of the inmate within 12 hours of his arrival to a unit from another unit, and physically assesses the inmate within 24 hours of his or her arrival.( HSTM, Ch. 5, Sec. 2.1, Para. 2.1)

Plaintiffs Contend: Chart reviews are not always timely performed and appropriate care is not always timely provided to newly arriving patients

28.     Defendants Contend: Upon an inmate's arrival to a new unit, the nursing staff also complete a medical work-up form and verify that the inmate has all required medical equipment, medication and supplies.

Plaintiffs Contend: Medical work-ups, medical equipment, medication and supplies are not consistently timely provided.

29.     Defendants Contend: The policies and procedures for intake screening and inmate transfers comport with the applicable standard of care and are constitutionally adequate.

Plaintiffs Contend: The ADC's policies and procedures for intake screening and inmate transfers do not afford prisoners in the Arizona Department of Corrections constitutionally adequate care.

**Facility Inspections**

30.     Defendants Contend: Documented clinic inspections are conducted to ensure a clean and sanitary working environment; areas are inspected include nurses' stations, storage areas, exam rooms, pharmacy/medication rooms, x-rays, lab, medical records office, and other administrative clinic office areas.

Plaintiffs Contend:  That sufficient clinic inspections are not conducted such that the ADC ensures clean and sanitary clinic facilities.

31.  Defendants Contend:  Each facility also has regularly scheduled environmental inspections, which include cleanliness and safety of all inmate housing, laundry and housekeeping practices, pest control measures, equipment inspection and maintenance, and occupational and environmental safety measures.

Plaintiffs Contend:  That the environmental inspections at the ADC facilities are insufficient to ensure the cleanliness and safety of the ADC prisoner population.

32.  Defendants Contend:  Wardens, deputy wardens, and associate deputy wardens conduct frequent, unannounced formal inspections of the facility, at varying hours of the day and night, including casual interviews of staff and inmates.

Plaintiffs Contend:  That ADC wardens, deputy wardens, and associate deputy wardens do not conduct sufficiently frequent, unannounced inspections of ADC facilities. Moreover, the existence of a policy requiring frequent, unannounced formal inspections does not necessarily mean that such inspections occur.

33.  Defendants Contend:  In addition to formal inspections, deputy wardens, associated deputy wardens, correctional officer IVs and chiefs of security spend a minimum of ██████ hours per week, at varying hours of the day and night, touring housing units and health units, with attention given to sanitation issues and overall attitude of staff and inmates.

Plaintiffs Contend:  Defendants fail to provide persuasive support for this statement, and the extremely poor sanitation and attitudes observed in some areas by the experts calls into question the reliability of this assertion.

34.  Defendants Contend:  Line supervisory staff conduct daily inspections of their areas of responsibility to assess inmate morale and the quality of their care and supervision, and provide them the opportunity for informal access to key staff.

Plaintiffs Contend: Defendants fail to provide persuasive support for this statement, and the extremely poor sanitation and attitudes observed in some areas by the experts calls into question the reliability of this assertion.

35.    Defendants Contend:  Documented clinic inspections ensure a clean and sanitary working environment; areas inspected include nurse's stations, storage areas, exam rooms, pharmacy/medication rooms, x-rays, lab, medical records office, and other administrative clinic office areas.

Plaintiffs Contend:  Clinical inspections have not ensured clean and sanitary working environments and areas as they relate to the provision of health care.

**Inmate Access To Care**

36.    Defendants Contend:  Clinical encounters are conducted in private, without being observed or overheard by security personnel, to the extent safety and security can be maintained.

Plaintiffs Contend:  Clinical encounter are frequently not conducted in such settings.

37.    Defendants Contend:  Inmates have timely access to health care.

Plaintiffs Contend:  Inmates do not have timely access to health care.

38.    Defendants Contend:  Access to healthcare signs are posted throughout the complexes in both English and Spanish.

Plaintiffs Contend:  Plaintiffs object to this paragraph because the contention reflects what the ADC is supposed to do, not what actually happens.  Plaintiffs requested that the words "supposed to be" be added in front of the word "posted" but Defendants refused.

39.    Defendants Contend:  An HNR that requests only information may be returned to the inmate with the appropriate response without the need for making an appointment.

Plaintiffs Contend: Just because they may be does not mean that they are or

33

that prisoners get the necessary information.

40. <u>Defendants Contend</u>:   Missed appointments can occur for a variety of reasons, including inmate refusal or security-generated complications.

>  <u>Plaintiffs Contend</u>:   Dental appointments are more often missed because Defendants fail to properly manage them.

41. <u>Defendants Contend</u>:   In the event an HNR requests a serious mental health or dental emergency, nursing staff contacts available mental health or dental staff, including on-call staff, after-hours, weekends, and holidays.

>  <u>Plaintiffs Contend</u>:   Plaintiffs object to this paragraph because the contention reflects what the ADC is supposed to do, not what actually happens.

42. <u>Defendants Contend</u>:   Under the Contract, Corizon "employ[s] sufficient staffing and utilize[s] appropriate resources to achieve contractual compliance."

>  <u>Plaintiffs Contend</u>:   Corizon does not employ sufficient staffing and use appropriate resources to achieve contractual compliance and even if it did, the requirements of the contract were relaxed to allow for provision of substandard care.

43. <u>Defendants Contend</u>:   ADC written policy provides that all licensed registered nurses are trained in providing emergency nursing care to the patient in need of those services.

>  <u>Plaintiffs Contend</u>:   Plaintiffs object to this paragraph because the contention reflects what the ADC is supposed to do, not what actually happens.   Plaintiffs requested that the paragraph be modified to read "Within three minutes of responding to an emergency, ADC written policy requires staff to activate the Incident Command System ("ICS"), which is intended to notify supervisory staff and medical responders, issue [Security] loud orders for inmate response, conduct a visual sweep of the area [Security] [Security], and, if an inmate's [Security] cannot

34

be seen, to make an immediate judgment to determine whether the inmate's condition outweighs the potential risk involved in entering the cell" but Defendants refused.[4]

44.   Defendants Contend:  ADC written policy provides that nurses are provided emergency response orders, which are step-by-step written instructions from a provider on providing emergency acute care to an inmate during a life-threatening event.

Plaintiffs Contend:   Plaintiffs object to this paragraph because the contention reflects what the ADC is supposed to do, not what actually happens.  Plaintiffs requested that the paragraph be modified to read "ADC written policy requires that all licensed registered nurses are supposed to be trained in providing emergency nursing care to the patient in need of those services" but Defendants refused.

**Confidentiality**

45.    Defendants Contend: Clinical encounters are conducted in private, without being observed or overheard by security personnel, to the extent safety and security can be maintained.

Plaintiffs Contend: Clinical encounters are not always conducted in private and the resulting lack of privacy is detrimental to the appropriate provision of necessary healthcare.

46.   Defendants Contend: Security personnel are present (in the same room) only if the patient poses a probable risk to the safety of the health care provider or others.

Plaintiffs Contend: Defendants do not always appropriately provide safe and confidential space for healthcare encounters.

47.   Defendants Contend: When safety is a concern and full visual privacy cannot be afforded, alternative strategies for partial privacy, such as a privacy screen, will be utilized.

---

[4] Defendants maintain that reference to the negotiations of the parties regarding the facts and issues to be included in the JPTO is inappropriate.

35

Plaintiffs Contend: Defendants do not always appropriately provide safe and confidential space for healthcare encounters.

48.      Defendants Contend: When triage is required to be conducted at the inmate's cell, health services staff will take extra precautions to promote private communication between health staff and the patient

Plaintiffs Contend: Plaintiffs Contend: Defendants do not always appropriately provide safe and confidential space for healthcare encounters.

**HNR Process**

49.      Defendants Contend: Health Needs Requests forms are used to request care.

Plaintiffs Contend: HNR forms are not always available or timely collected or timely answered.

50.      Defendants Contend:  Inmates access non-emergency health care by making an appointment, which is done by completing a non-emergency Health Needs Request (HNR).

Plaintiffs Contend:  Although the HNR is the vehicle for accessing health care in the ADC, prisoners who attempt to use the HNR process do not all access the health care they need through that process.

51.      Defendants Contend: Inmates are instructed how to use HNR forms.

Plaintiffs Contend: HNR forms are not always available or timely collected or timely answered.

52.      Defendants Contend:  Completed HNRs are deposited in a labeled box and picked up daily by health staff.

Plaintiffs Contend:  Not all HNRs are picked up daily.

53.      Defendants Contend:  ADC facilities do not refuse requests for health care simply because the request is not on the approved form for such a request.

Plaintiffs Contend:  It is frequently the practice of the facilities to refuse requests for health care simply because the request is not on the approved form for such a request.

54.     Defendants Contend:  HNR requests are not ignored simply because they are not made in an HNR form or because they are made on photocopies of an HNR form.

Plaintiffs Contend:  HNR requests are ignored for these reasons.

55.     Defendants Contend:  Healthcare staff accept and resolve verbal requests for healthcare treatment.

Plaintiffs Contend:  Healthcare staff routinely refuses to accept and resolve verbal requests for healthcare treatment.

56.     Defendants Contend:  Healthcare staff accept and resolve HNR Forms that are filled out by another inmate.

Plaintiffs Contend:  Sometimes healthcare staff will do this, but not always. Sometimes healthcare staff requires the prisoner himself or herself to complete the HNR.

57.     Defendants Contend: Authorized personnel collect the HNRs from the drop boxes daily.

Plaintiffs Contend: HNR forms are not always available or timely collected or timely answered.

58.     Defendants Contend: HNRs are available in each housing unit and accessible to inmates

Plaintiffs Contend: HNR forms are not always available or timely collected or timely answered.

59.     Defendants Contend: For those maximum custody inmates who may not come out of cell without restraints for safety and security reasons, authorized personnel collect HRNs from those inmates during their daily rounds in the unit when they pass out medications.

Plaintiffs Contend:  HNR forms are not always available or timely collected or timely answered.

60.   Defendants Contend: HNRs are also available to maximum custody inmates on daily basis when correctional personnel make rounds passing out various Departmental forms.

Plaintiffs Contend: HNR forms are not always available or timely collected or timely answered.

61.   Defendants Contend: If an inmate does not have an HNR form, he or she can simply write their medical request on a piece of paper and submit it via the drop box or authorized personnel methods noted above.

Plaintiffs Contend: Defendants provide no persuasive support that this policy or practice exists in ADC and the failure of the HNR system overall calls it into question.

62.   Defendants Contend: ADC written policy forbids inmates from being disciplined or prohibited from assisting another inmate in filling out an HRN.

Plaintiffs Contend: HNR forms are not always available or timely collected or timely answered.  Further, the fact that a policy exists does not mean that the policy is enforced or followed.

63.   Defendants Contend: Inmates who are illiterate or may require assistance in completing an HNR are entitled under ADC written policy to request assistance from medical personnel when the medical personnel do their rounds/tours in the maximum custody units to pass out medications.

Plaintiffs Contend: HNR forms are not always available or timely collected or timely answered.  Further, the fact that a policy exists does not mean that the policy is enforced or followed.

64.   Defendants Contend: Correctional personnel are not tasked with assisting illiterate or inmates requiring assistance to complete HNRs where medical personnel are available daily to do so and to require correctional personnel to perform this task would divert correctional personnel from their assigned security duties.  HIPPA concerns are

also implicated as correctional personnel do not have access to inmate personal medical information.

> Plaintiffs Contend: Defendants provide no persuasive support that the statement is true, and the overwhelming evidence that defendants fail to provide a reliable and effective means for ADC prisoners to obtain timely and necessary health care calls into question its reliability.

65.   Defendants Contend: Inmates also have the option to advise administrative, programming or supervisory personnel who make regular rounds in housing units that the inmate needs direction or assistance with filling out HNRs. Such personnel would then advise appropriate medical personnel that a particular inmates needs assistance in completing an HNR.

> Plaintiffs Contend: Defendants provide no persuasive support that the statement is true, and the overwhelming evidence that defendants fail to provide a reliable and effective means for ADC prisoners to obtain timely and necessary health care calls into question its reliability.

66.   Defendants Contend: If an inmate makes a verbal non-emergency health needs request to correctional personnel, correctional personnel will instruct the inmate on the HRN process for non-emergency matters as explained above.

> Plaintiffs Contend: Defendants provide no persuasive support that the statement is true, and the overwhelming evidence that defendants fail to provide a reliable and effective means for ADC prisoners to obtain timely and necessary health care calls into question its reliability.

67.   Defendants Contend: If an inmate makes a verbal request for emergency health needs, the correctional officer will notify the shift commander who will then notify medical personnel that an inmate is in need of emergency assistance.

> Plaintiffs Contend: Defendants provide no persuasive support that the statement is true, and the overwhelming evidence that defendants fail to

39

provide a reliable and effective means for ADC prisoners to obtain timely and necessary health care calls into question its reliability.

68.   Defendants Contend: If correctional personnel detect on their own that an inmate may need emergency medical assistance, the correction personnel are trained to immediately call for an ICS medical response.

Plaintiffs Contend: Defendants provide no persuasive support that the statement is true, and the overwhelming evidence that defendants fail to provide a reliable and effective means for ADC prisoners to obtain timely and necessary health care calls into question its reliability.

69.   Defendants Contend:  Nursing staff reviews and triages the HNR within hours of receiving the HNR, and schedules the inmate for an appointment.

Plaintiffs Contend:  Nursing staff frequently fail to do this.

70.   Defendants Contend:  Triaging of HNRs is performed to sort and classify the inmates' health requests to determine priority of need and the proper place for inmate care to be rendered.

Plaintiffs Contend:  Triaging is not always done and not always done on a timely basis.

71.   Defendants Contend:  If an inmate misses a scheduled appointment, it is reviewed to determine whether it needs to be rescheduled. This review performed on a comparative priority basis to determine whether the inmate should be seen prior to existing appointments or the appointment should be cancelled altogether.

Plaintiffs Contend:   that prisoners do not generally get this kind of thoughtful follow up following a missed appointment, even when the reason for missing the appointment is beyond the prisoner's control.

72.   Defendants Contend:  Mental health staff review HNRs requesting mental health services upon receipt, and review HNRs requesting mental health services.

Plaintiffs Contend:  Although this is ADC's written policy it is not always observed.

40

73.   <u>Defendants Contend</u>:  Dental staff review HNRs requesting dental services upon receipt, and review of HNRs requesting dental services.

>   <u>Plaintiffs Contend</u>:  Although this is the policy, dental staff fails to comply with it.

74.   <u>Defendants Contend</u>:  Medical staff, as the Contract requires, conducts an intake medical, dental and mental health assessment, assign each inmate a medical score and mental health score, and then develop treatment plans, as necessary for each inmate within 72 hours after an inmate is incarcerated.

>   <u>Plaintiffs Contend</u>:  Although this is the policy, medical staff does not routinely comply.

**Medical Grievances**

75.   <u>Defendants Contend</u>: ADC educates inmates about the Inmate Grievance System by providing both written and oral explanations of the Inmate Grievance Procedure at reception centers and again as part of the orientation process each time an inmate is transferred to another facility.

>   <u>Plaintiffs Contend</u>:  The evidence suggests that this policy is not well implemented in practice.

76.   <u>Defendants Contend</u>: A copy of the Inmate Grievance System policy is kept at each prison facility's inmate resource library and is available for inmates to use.

>   <u>Plaintiffs Contend</u>:  Plaintiffs have no objection to this statement if it is clarified as a statement of policy, but cannot agree, without meaningful supporting evidence, that it is ADC's actual practice.

77.   <u>Defendants Contend</u>: The Grievance Coordinator log in (the Formal Grievance, assign it a number, and then forward it to the FHA for review, investigation, and response.

>   <u>Plaintiffs Contend</u>:  The evidence suggests that this policy is not well-implemented in practice.

78.   <u>Defendants Contend</u>: Inmates are allowed to use the Inmate Grievance System to grieve issues related to any aspect of institutional life or condition of confinement that directly and personally affects the inmate grievant.

> <u>Plaintiffs Contend</u>:  In practice, the dysfunctional grievance system often is not available or presents barriers to prisoners who attempt to use it.

79.   <u>Defendants Contend</u>: Appropriate provisions have been made to ensure that all inmates have access to the Inmate Grievance System.

> <u>Plaintiffs Contend</u>: All inmates do not have meaningful access to the grievance system.

80.   <u>Defendants Contend:</u> Under ADC policy, an inmate must appeal to the Director to exhaust the medical grievance procedure, and the failure to properly appeal through to the Director's Decision constitutes a failure to exhaust available administrative remedies.

> <u>Plaintiffs Contend</u>: This statement is contrary to extensive caselaw finding exhaustion of administrative remedies even in the absence of an appeal to the highest level of a prison's grievance system.

81.   <u>Defendants Contend</u>: The Grievance Coordinator logs in the Director's-Level Appeal and within five (5) work days of receipt of the Director's Appeal from the inmate, forward it to the Grievance Appeals Investigator, who is required to review it in consultation with ADC physicians as necessary and prepare a draft response for the Health Services Director's review, and then forward to the Director for his signature, either affirming, partially affirming or reversing the FHA's decision.

> <u>Plaintiffs Contend</u>:  The evidence suggests that this policy is not well-implemented in practice.

82.   <u>Defendants Contend</u>: A computerized Inmate Medical Grievance Appeal Log of appeals to the Director ("Medical Appeal Log") is electronically maintained at the ADC's Central Office; the Medical Appeal Log  records and tracks any Director's-Level Appeals that are submitted.

Plaintiffs Contend:   The evidence suggests that this policy is not well-implemented in practice.

**Specialty Care**

83.   Defendants Contend:   ADC provides specialty care to inmates in compliance with its duty to provide constitutionally adequate health care to certified class members.

Plaintiffs Contend:   ADC does not provide specialty care to inmates in compliance with its duty to provide constitutionally adequate health care to certified class members.

84.   Defendants Contend:   Corizon provides routine specialty care within appropriate time periods.

Plaintiffs Contend:   Corizon does not provide routine specialty care within appropriate time periods

85.   Defendants Contend:   The rates that ADC can pay outside providers is set by statute; some providers refuse to accept the statutory rate, but this is not something ADC can control.

Plaintiffs Contend:   Defendants have failed to provide persuasive support for this statement that they are helpless in the fact of outside providers who initially refuse to accept the statutory rate, and unable to negotiate a workable solution with these providers.

**Staffing**

86.   Defendants Contend:   ADC provides staffing in levels which satisfy its obligation to provide constitutionally adequate medical, mental and dental care to certified class members.

Plaintiffs Contend: ADC does not provide for staffing levels sufficient to satisfy its obligation to provide constitutionally adequate medical, mental health and dental care to certified class members.

43

87.    <u>Defendants Contend</u>:  Medical staff track important diagnostic reports and consultation requests.

        <u>Plaintiffs Contend</u>:   Plaintiffs object to this paragraph because the contention reflects what the ADC is supposed to do, not what actually happens.  To make Defendants' statement accurate,  Plaintiffs requested that the words " "are supposed to be required by ADC written policy to" be inserted before "track," but Defendants refused.

88.    <u>Defendants Contend</u>:   Nursing staff follow through with orders from providers to assure that the order is completed as ordered.

        <u>Plaintiffs Contend</u>:   Plaintiffs object to this paragraph because the contention reflects what the ADC is supposed to do, not what actually happens.  To make Defendants' statement accurate,  Plaintiffs requested that the words "Nursing staff are required" be replaced by the words "Nursing staff are supposed to be required by ADC written policy" but Defendants refused.

89.    <u>Defendants Contend</u>:   ADC has a long history of utilizing telemedicine services and has made significant investments in an infrastructure to support such services in each ASPC location.

        <u>Plaintiffs Contend</u>:   Defendants have produced no evidence establishing that ADC "has a long history of utilizing telemedicine services" and/or that it has made "significant" investments in such services at each ASPC location.

90.    <u>Defendants Contend</u>:   Per the RFP, the vender developed a telemedicine program, according to NCCHC position statement, and submit a plan to expand telemedicine services.

        <u>Plaintiffs Contend</u>:  Defendants have not pointed to persuasive evidence in the record that the program was developed according to these specifications.

91.   Defendants Contend:  Per the Contract, a telemedicine program exists to provide telemedicine services.

Plaintiffs Contend:  Corizon has not fulfilled the requirements for such a program.

**Emergency Care**

92.   Defendants Contend: Staff assesses and renders aid to all medical emergencies, including suicide attempts, within three minutes of becoming aware of a non-responsive inmate.

Plaintiffs Contend:  Staff does not assess and render aid to all medical emergencies, including suicide attempts, within three minutes of becoming aware of a non-responsive inmate.

93.   Defendants Contend:  In the event that an inmate is found non-responsive, in a state of medical emergency, or in the act of attempting suicide, staff assesses the situation and renders in-cell aid as soon as possible.

Plaintiffs Contend:  Staff does not render in-cell aid as soon as possible when an inmate is found non-responsive, in a state of medical emergency, or in the act of attempting suicide.

94.   Defendants Contend:  ADC contracts with local hospitals for emergency care, trauma, intensive care, and routine hospitalized care for all anticipated medical conditions.

Plaintiffs Contend:  For individual inmates, ADC often refused to provide treatment in local hospitals when emergency care, trauma, intensive care and routine hospitalized care for anticipated medical conditions is required.

95.   Defendants Contend: Pursuant to the RFP, Corizon provides emergency medical or mental health care 24 hours a day, seven days a week and maintain continual onsite nursing staff, who "may contact medical, dental, and mental health practitioners by telephone for consultation and direction."

Plaintiffs Contend:   Corizon does not reliably provide the type of care described in this paragraph.

96.   Defendants Contend: Pursuant to the RFP, Corizon also established a network of off-site medical providers and coordinate inmate transportation for emergency and non-emergency care.

Plaintiffs Contend: Plaintiffs will stipulate to the fact that Corizon has established some off-site medical providers, and that some transportation is done for emergency and non-emergency care, but the severe deficiencies in these areas make it inappropriate to describe the off-site providers as a "network" and the off-site transportation as "coordinated."

97.   Defendants Contend:  ADC provides access and emergency care to inmates in compliance with its duty to provide constitutionally adequate health care to certified class members.

Plaintiffs Contend:  ADC does not provide adequate access and emergency care to prisoners in compliance with its duty to provide constitutionally adequate health care to certified class members.

98.   Defendants Contend:  Staff is trained and available to render aid in medical emergencies, including suicide attempts, for inmates. .

Plaintiffs Contend:  Staff does not routinely comply with this requirement.

99.   Defendants Contend:  An Incident Command System ("ICS") is in place in the event of a medical emergency.

Plaintiffs Contend:  Staff does not always comply with this requirement.

100.   Defendants Contend:  The Chief of Security and shift commanders are given written instructions about the appropriate intervention for medical emergencies.

Plaintiffs Contend:   They are not because situations have arisen where medical emergencies have not been properly handled.

101.   <u>Defendants Contend</u>:   Correctional officers receive health-related training every two years, including in the area of providing emergency care until healthcare staff arrives, and calling 911.

    <u>Plaintiffs Contend</u>:  Correctional officers have not received this training as regularly as they should and they have not all achieved the objective of the training.

### **Off-Site and Hospital Visits**

102.   <u>Defendants Contend</u>: The CC is also responsible for all travel arrangements and appropriate documentation preparation to accompany the inmate for any consultations.

    <u>Plaintiffs Contend</u>: The evidence demonstrates serious deficits in the provision of outside consultations to patients who need them, strongly suggesting that the responsibilities for essential tasks related to this function are not clearly understood or effectively carried out.

103.   <u>Defendants Contend</u>:  The MRC meets every two weeks to discuss requests for consultation or services.

    <u>Plaintiffs Contend</u>:   The evidence demonstrates serious deficits in the provision of outside consultations to patients who need them, strongly suggesting that such meetings do not take place or function as intended.

104.   <u>Defendants Contend</u>: Upon returning from an offsite appointment, medical staff will review the medical information, assess the inmate, and determine if any additional medications and/or interventions are required.

    <u>Plaintiffs Contend</u>: Patients who have offsite appointments are routinely denied continuity of care and appropriate assessment and follow-up to those appointments.

105.   <u>Defendants Contend</u>: Refusal of appointments for off-site medical care by specialists must be completed by the inmate, in person, at the inmate's unit whenever possible based on availability of health staff to take the refusal.

Plaintiffs Contend: Defendants fail to provide persuasive support for this position, and the paucity of appropriate and timely care and oversight in the healthcare system renders it unreliable.

106.   Defendants Contend: Inmates' serious medical needs are met by providing specialty care beyond the medical capabilities of the prison staff by providing a system of efficient management of requesting, deliberation, monitoring, and tracking proposals for specialty services via outside consultations.

Plaintiffs Contend: Necessary specialty care is routinely delayed or denied.

107.   Defendants Contend: The process of providing off-site specialty care  aids in ADC's delivery of medical services that are comparable with a community standard of care.

Plaintiffs Contend: Necessary specialty care is routinely delayed and denied; ADC's medical delivery falls far below community standard of care in multiple areas.

108.   Defendants Contend: A Facility Health Administrator ("FHA") is assigned to each prison.   Their job responsibilities include,  developing the process for the management of specialty clinical support, including transportation and appointment management .

Plaintiffs Contend: Specialty clinical support is not smoothly managed in ADC.

109.   Defendants Contend: The Medical Review Committee ("MRC") ensures that all requests for approval of medical services is based upon sound medical necessity.

Plaintiffs Contend: Requests for approval of medical services are routinely inappropriately delayed, denied, and mishandled.

110.   Defendants Contend: The Key Contract Provider ensures that the request for approval of medical services are brought before the Medical Review Committee and discussed for medical necessity.

> **Plaintiffs Contend**: Requests for approval of medical services are routinely inappropriately delayed, denied, and mishandled.

111.    **Defendants Contend**: Requests that are approved by MRC following discussion are entered into a database by the CC.

> **Plaintiffs Contend**: Requests for approval of medical services are routinely inappropriately delayed, denied, and mishandled.

112.    **Defendants Contend**: The database is reviewed periodically (at least weekly) by the CC for review of decisions made by MRB and assurance that appropriate result feedback is received and provided to the appropriate complex health services staff.

> **Plaintiffs Contend**: Requests for approval of medical services are routinely inappropriately delayed, denied, and mishandled.

113.    **Defendants Contend**: The CC then follows up with Central Office on any outstanding Consultation Requests that remain in a "pending approval" status after five business days and report on those outstanding consult requests at the next Medical Review Committee meeting.

> **Plaintiffs Contend**: Requests for approval of medical services are routinely inappropriately delayed, denied, and mishandled.

114.    **Defendants Contend**: The HROD ensures each complex MRC complies with Department Orders and Health Services Division Technical Manual guidance and ensures further consistency in the procurement of health related goods and services delivered to the inmate population among complexes within the region.

> **Plaintiffs Contend**: Requests for approval of medical services are routinely inappropriately delayed, denied, and mishandled, demonstrating the inefficacy of any oversight measures defendants claim exist.

115.    **Defendants Contend**: The review is accomplished by utilization review, ratio of referrals to inmate population, prison comparisons and the review of current monthly reports, which are produced at the facility level.

49

> Plaintiffs Contend: Requests for approval of medical services are routinely inappropriately delayed, denied, and mishandled, demonstrating the inefficacy of any oversight measures defendants claim exist.

116.   Defendants Contend: The statistics are then compiled and distributed to the Facility Health Administrator by the Health Services Division Administrator.

> Plaintiffs Contend: Requests for approval of medical services are routinely inappropriately delayed, denied, and mishandled, demonstrating the inefficacy of any oversight measures defendants claim exist.

117.   Defendants Contend: Only the medical program manager may deny any request that has been approved by MRC.

> Plaintiffs Contend: Requests for approval of medical services are routinely inappropriately delayed, denied, and mishandled, demonstrating the inefficacy of any oversight measures defendants claim exist.

118.   Defendants Contend: Medical records and documentation requirements are set to ensure that pending appointment is transferred from the sending facility to the receiving facility.

> Plaintiffs Contend: Appointments are routinely missed and continuity of care on transfers routinely denied.

119.   Defendants Contend: The correctional Registered Nurse Supervisor II (CRNSII) monitors nursing staff and ensures that systems are in place and followed to inform and convey inmates to specialty appointment.

> Plaintiffs Contend: Necessary specialty care is routinely delayed or denied.

120.   Defendants Contend: Additionally CRNSII coordinate the necessary in-service training to accomplish this process in an accurate and timely manner

> Plaintiffs Contend: Necessary specialty care is routinely delayed or denied.

121.   Defendants Contend: Inmates are scheduled for appointments as indicated by the specific discipline providing the requirement service or exam.

> Plaintiffs Contend: Necessary specialty care is routinely delayed or denied.

50

122.  Defendants Contend: Upon completion of the scheduled appointment any subsequent appointment that is scheduled shall be noted in the appropriate health unit appointment book and shall be noted on the "Scheduled Appointment" form.

Plaintiffs Contend: Necessary specialty care, including subsequent or follow-up appointments, is routinely delayed or denied, demonstrating the inefficacy of any tracking processes defendants claim exist.

123.  Defendants Contend: In the event that an appointment is to be scheduled and there are compelling reasons for why it cannot be scheduled at the time of the initial appointment, columns as noted above, shall be completed.

Plaintiffs Contend: Necessary specialty care, including subsequent or follow-up appointments, is routinely delayed or denied, demonstrating the inefficacy of any tracking processes defendants claim exist.

124.  Defendants Contend: The author of the initial appointment or the staff member noting the order shall document in the progress note the reason for the postponement of the next scheduled appointment.

Plaintiffs Contend: Necessary specialty care, including subsequent or follow-up appointments, is routinely delayed or denied, demonstrating the inefficacy of any tracking processes defendants claim exist.

125.  Defendants Contend: When the determination has been made that the appointment, as noted above, is to be made; a member from the respective discipline places the appointment date in the unit appointment book and on the Schedule Appointment form.

Plaintiffs Contend: Necessary specialty care, including subsequent or follow-up appointments, is routinely delayed or denied, demonstrating the inefficacy of any tracking processes defendants claim exist.

126.  Defendants Contend: Upon completion of the scheduled appointment the actual date the inmate was seen is then noted in the "date seen" column

51

<u>Plaintiffs Contend</u>: Necessary specialty care, including subsequent or follow-up appointments, is routinely delayed or denied, demonstrating the inefficacy of any tracking processes defendants claim exist.

127.   <u>Defendants Contend</u>: If the initial date of the scheduled appointment is changed, the unit appointment book reflects the rescheduled date.

<u>Plaintiffs Contend</u>: Necessary specialty care, including subsequent or follow-up appointments, is routinely delayed or denied, demonstrating the inefficacy of any tracking processes defendants claim exist.

128.   <u>Defendants Contend</u>: In addition, "rescheduled" shall be noted in the "date seen" column of the Scheduled Appointment form and a new total entry is completed.

<u>Plaintiffs Contend</u>: Necessary specialty care, including subsequent or follow-up appointments, is routinely delayed or denied, demonstrating the inefficacy of any tracking processes defendants claim exist.

129.   <u>Defendants Contend</u>: Upon the Clinical Coordinator's receipt of the Medical Review Board's approval of an outside consultation, the clinical coordinator arranges for the outside appointment as directed by local posts orders and contacts the sending medical unit nursing staff with the specific information as outlined in herein.

<u>Plaintiffs Contend</u>: Necessary specialty care, including subsequent or follow-up appointments, is routinely delayed or denied, demonstrating the inefficacy of any tracking processes defendants claim exist.

130.   <u>Defendants Contend</u>: The unit nursing staff are responsible for the completion of this form.

<u>Plaintiffs Contend</u>:   Necessary specialty care, including subsequent or follow-up appointments, is routinely delayed or denied, demonstrating the inefficacy of any tracking processes defendants claim exist.

131.   <u>Defendants Contend</u>: The nurse noting the orders of the medical provider is responsible to enter the proper information into the column noting the actual date the inmate was seen upon the inmate's return from the outside consultation; subsequent

follow-up appointments on or off the prison complex must be documented as directed herein.

> Plaintiffs Contend: Necessary specialty care, including subsequent or follow-up appointments, is routinely delayed or denied, demonstrating the inefficacy of any tracking processes defendants claim exist.

132.   Defendants Contend: When a health care provider determines an outside specialist appointment is requirement for diagnoses or treatment of an inmate the health care stall shall: (1) explain the clinical need to the inmate; (2) complete the Inmate Outside Consultation Appointment Agreement, Form 1101-74; and (3) ask the inmate to sign the Inmate Outside Consultation Appointment Agreement form.

> Plaintiffs Contend: Necessary specialty care, including subsequent or follow-up appointments, is routinely delayed or denied, demonstrating the inefficacy of any tracking processes defendants claim exist.

133.   Defendants Contend: If an inmate refuses to sign the Inmate Outside Consultation Appointment Agreement form (e.g., chooses not to go to a specialty appointment): (1) the health staff informs the inmate no specialty appointment will be made; and (2) an informed refusal is documented in the medical record.

> Plaintiffs Contend: Necessary specialty care, including subsequent or follow-up appointments, is routinely delayed or denied, demonstrating the inefficacy of any tracked processes defendants claim exist.

134.   Defendants Contend: If the inmate agrees and signs the Inmate Outside Consultation Appointment Agreement form, the appointment shall be made and scheduling shall proceed according to routine procedures.

> Plaintiffs Contend: Necessary specialty care, including subsequent or follow-up appointments, is routinely delayed or denied, demonstrating the inefficacy of any tracked processes defendants claim exist.

135.   Defendants Contend: If, on the scheduled appointment day, the inmate refuses to go to the appointment or refuses to be seen by the consultant at the specialty

clinic, the security staff will issue a disciplinary ticket to the inmate utilizing the Inmate Disciplinary Report, Form 803-1, in accordance with DO 803, Inmate Discipline System.

> Plaintiffs Contend: Necessary specialty care, including subsequent or follow-up appointments, is routinely delayed or denied, demonstrating the inefficacy of any tracked processes defendants claim exist.

136.   Defendants Contend: A CISC catheter may be reused for 2 weeks.

> Plaintiffs Contend: These catheters may not be re-used, based on manufacturer requirements.

**Chronic Conditions**

137.   Defendants Contend:  ADC provide care for chronic conditions compliant with its duty to provide constitutionally adequate health care.

> Plaintiffs Contend: ADC does not provide care for chronic conditions compliant with its duty  to provide constitutionally adequate health care.

138.   Defendants Contend:  Inmates are screened at intake for chronic conditions, and provided a treatment plan that includes the frequency of follow-up examinations, type and frequency of diagnostic testing, therapeutic medications and modalities, and patient education.

> Plaintiffs Contend:  Patients are not always timely screened and are not always provided meaningful or complete treatment plans.

139.   Defendants Contend:  There is no healthcare fee for chronic conditions examinations and treatment.

> Plaintiffs Contend:  Defendants do not always appropriately waive healthcare fees, including for chronic condition care.

140.   Defendants Contend:   A chronic condition tracking system is used to identify inmates with chronic conditions so they can be  routinely monitored.

> Plaintiffs Contend:  Chronic care patients are routinely denied necessary and ordered examinations, evaluations, and follow-up; any purported system for tracking their care are ineffective.

141.   <u>Defendants Contend</u>:   ADC written policy provides that inmates with chronic or monitored conditions examined at least every six months and diabetic inmates be seen at least once a quarter.

> <u>Plaintiffs Contend</u>:   Plaintiffs object to this paragraph because the contention reflects what the ADC is supposed to do, not what actually happens and because it is inaccurate.  Plaintiffs requested that the statement be amended to read as follows: "ADC written policy requires that inmates with chronic or monitored conditions are supposed to be examined at least every six months and diabetic inmates be seen at least once a quarter" but Defendants refused.

142.   <u>Defendants Contend</u>:  All inmates over 55 years of age are offered an annual physical examination, and inmates with chronic or other monitored conditions are given an annual physical.

> <u>Plaintiffs Contend</u>:  Defendants routinely fail to provide routine care for chronic care patients and those with other monitored conditions, including preventive examinations.

**Infirmary Care**

143.   <u>Defendants Contend</u>:  ADC operates an infirmary in satisfaction with its obligation to provide constitutionally compliant health care.

> <u>Plaintiffs Contend</u>: The infirmary the ADC operates does not satisfy its obligation to provide constitutionally compliant health care.

144.   <u>Defendants Contend</u>:  Inmates that require more definitive and supportive care than an inmate can receive in general housing areas are placed in specially designed and staffed areas known as IPC (Inpatient Components), which function like a medical infirmary with overnight bed accommodations, to provide for this level of care.

> <u>Plaintiffs Contend</u>:  Defendants routinely fail to move patients requiring a higher level of care from general housing areas to IPCs.

145.   <u>Defendants Contend</u>: ADC operates an In Patient Components ("IPC") at Florence, Tucson, Perryville, and Lewis.

<u>Plaintiffs Contend</u>:  ADC does not operate an IPC at Lewis.

146.   <u>Defendants Contend</u>:  The level of care provided in an IPC includes: acute care (any combination of frequent observation, assistance with care activities, dressing changes, IV fluids or medications, self-care instructions, or pain management); complete care (unable to perform any self-care, needs to be turned, may need suctioning, oxygen-dependent, bowel and bladder care, tube feedings); supportive (able to perform own care but needs constant supervision and verbal cueing); and convalescent (can do own care but lacks stamina to function in general population).

<u>Plaintiffs Contend</u>: Plaintiffs object to this paragraph because the contention reflects what the ADC is supposed to do, not what actually happens.  Plaintiffs requested that the words "ADC written policy requires that" be added in the beginning of the paragraph but Defendants refused.

**X-Ray Procedures**

147.   <u>Defendants Contend</u>: All X-rays are reviewed by medical staff at the facility upon taking them; this is known as a "wet read."

<u>Plaintiffs Contend</u>: Orders for x-rays are routinely not timely fulfilled and results are routinely not timely reviewed or acted on.

148.   <u>Defendants Contend</u>: If something is visible based on that "wet read," treatment is immediately provided.

<u>Plaintiffs Contend</u>: Orders for x-rays are routinely not timely fulfilled and results are routinely not timely reviewed or acted on.

149.   <u>Defendants Contend</u>: The X-ray is then packaged and sent off site to a contract radiologist to interpret the X-ray.

<u>Plaintiffs Contend</u>: Orders for x-rays are routinely not timely fulfilled and results are routinely not timely reviewed or acted on.

56

150.   <u>Defendants Contend</u>: The contract radiologist reviews the X-ray, issues a written report, and then returns the X-ray and report to medical staff for review and any further action if necessary.

>   <u>Plaintiffs Contend</u>: Orders for x-rays are routinely not timely fulfilled and results are routinely not timely reviewed or acted on.

151.   <u>Defendants Contend</u>: If an emergent interpretation is needed, the X-ray is taken to the outside radiologist or hospital.

>   <u>Plaintiffs Contend</u>: Orders for x-rays are routinely not timely fulfilled and results are routinely not timely reviewed or acted on.

152.   <u>Defendants Contend</u>: If an urgent interpretation is needed, medical staff will call the outside radiologist and request an expedited interpretation.

>   <u>Plaintiffs Contend</u>: Orders for x-rays are routinely not timely fulfilled and results are routinely not timely reviewed or acted on.

153.   <u>Defendants Contend</u>: Medical staff maintains  a "tracking log of x-rays sent to the radiologist contractor" and "follow up with the contractor if reports are not received within the amount of time specified in the contract."

>   <u>Plaintiffs Contend</u>: The evidence demonstrates serious deficits and delays in the processing of x-rays, strongly suggesting the failure of any system purporting to track them or to ensure that reports are received in a timely manner.

**<u>Medication</u>**

154.   <u>Defendants Contend</u>:  HSTM Ch. 2, Sec. 5.0, and DO 1102 provide the procedure for the surveillance, prevention, diagnosis and treatment of suspected or confirmed communicable diseases.

>   <u>Plaintiffs Contend</u>: The ADC does not adhere to these procedures for the surveillance, prevention, diagnosis and treatment of suspected or confirmed communicable diseases, which has resulted in multiple outbreaks.

155.   Defendants Contend:  HSTM Ch. 2, Section 3.0 outlines the procedure for the safe and effective handling, control and disposal of potentially dangerous items and materials.

Plaintiffs Contend: The ADC does not adhere to these procedures for the safe and effective handling, control and disposal of potentially dangerous items and materials.

156.   Defendants Contend:  Nursing staff observe, visit, and assess IPC inmates on a daily basis, and a medical provider is required to visit an IPC inmate no more than every 72 hours.

Plaintiffs Contend:  IPC inmates are routinely denied appropriate examinations and assessments from nursing staff and medical providers.

157.   Defendants Contend:  If an inmate is in need of terminal care, they are placed in an infirmary setting or taken to the hospital.

Plaintiffs Contend:  Patients in need of terminal care are not always appropriately placed.

158.   Defendants Contend:  Hospice care is provided for inmates who are in the last stages of a diagnosed terminal illness, and focuses on the achievements the patient is able to make in face of physical deterioration.

Plaintiffs Contend:  Hospice care is not available to all patients who need it.

159.   Defendants Contend:  Medical devices are available to inmates with a medical necessity and where the security needs of the institution can be maintained.

Plaintiffs Contend:  The evidence demonstrates that medical devices are not always provided to patients who need them, even in the absence of a valid security risk.

160.   Defendants Contend:  ADC provides medical devices to inmates in satisfaction of its duty to provide constitutionally compliant healthcare.

Plaintiffs Contend:  ADC does not provide medical devices to inmates in satisfaction of its duty to provide constitutionally compliant healthcare.

58

161.   Defendants Contend:  Appropriate but elective orthotics, prostheses, and aids to impairment are those services/devices which are not essential to prevent significant deterioration in the essential health of an inmate, but nevertheless are reasonably expected to significantly improve the quality of life for the patient as it relates to a proven chronic or ongoing medical condition, and include, for example, dentures, dental prosthetics (partials), glasses, contact lenses, artificial eyes, artificial limbs, certain knee/ankle/foot braces, hernia support belts, hearing aids, special support hose, footwear, and suspenders.

Plaintiffs Contend:  Plaintiffs disagree that health care appliances that significantly improve the patient's quality of life or serve as accommodations for a disability are "elective."

**Self-Catheterization & Colostomy Care**

162.   Defendants Contend:  The minimum amount of medical supplies for a catheterization is a two-week supply.

Plaintiffs Contend:  The evidence shows serious problems with defendants' provision of appropriate supplies for patients who self-catheterize, including the failure to provide a minimum of a two-week supply.

163.   Defendants Contend:  The two week supply includes: 2 urinary catheters; 1 catheter lubricant (frequency quantity-dependent); two bottles of liquid anti-bacterial soap; 1 packet of paper towels; 1 catheter storage container (denture cup or laboratory bag); absorbent pads(one for day usage); a basin for catheter cleaning purposes; and a urinary receptacle for urinary collection.

Plaintiffs Contend:  The evidence shows serious problems with defendants' provision of appropriate supplies for patients who self-catheterize, including the failure to provide the listed items.

164.   Defendants Contend:  Inmates are provided with instructions on how to insert their CISC.

Plaintiffs Contend:   The evidence shows that the proper procedures, including patient education, are not always followed.

165. <u>Defendants Contend</u>:   Inmates who need to perform intermittent self-catheterization or maintain and manage a colostomy, are given access to a semi-private area, been provided the necessary supplies and instruction.

<u>Plaintiffs Contend</u>:   Not all patients who perform intermittent self-catheterization or have a colostomy have access to appropriate privacy and provided necessary supplies.

166. <u>Defendants Contend</u>:  ADC provides a reasonable and appropriate method of delivery of medication and medication management in compliance with its obligation to provide constitutionally adequate healthcare, mental healthcare and dental care.

<u>Plaintiffs Contend</u>:   ADC does not provide a reasonable and appropriate method of delivery of medication and medication management in compliance with its obligation to provide constitutionally adequate healthcare, mental healthcare and dental care.

167. <u>Defendants Contend</u>:   ADC's policy on medication management and distribution provides for a consistent and uniform system of delivery of prescription medications to the inmate population.

<u>Plaintiffs Contend</u>:  Medications in ADC are not consistently and uniformly provided to patients who need them.

168. <u>Defendants Contend</u>:   Prescriptions for chronic care conditions are automatically refilled.

<u>Plaintiffs Contend</u>:  Medications in ADC are not consistently and uniformly provided to patients who need them, including refills for chronic care patients.

169. <u>Defendants Contend</u>:   Health staff are trained in the management of communicable diseases, including preventative measures and contact investigation.

<u>Plaintiffs Contend</u>:  Defendants fail to provide persuasive support for this statement and the paucity of oversight and care in the healthcare system overall seriously undermines its credibility.

170.   Defendants Contend:  Nursing staff screen inmates for tuberculosis at intake or no later than 7 days from admission.

Plaintiffs Contend:  Intake processes are delayed and incomplete.

171.   Defendants Contend:   Health staff is notified within one hour after an inmate is placed in detention, and immediately if the inmate is injured or appears to be ill.

Plaintiffs Contend:  Defendants fail to provide persuasive support for this statement and the paucity of oversight and timely care in the healthcare system overall seriously undermines its credibility.

172.   Defendants Contend: ADC written policy requires that upon notification, nursing staff review the inmate's medical records to determine if any health issues exist that would be impacted by his detention status.

Plaintiffs Contend:  This paragraph is incoherent because it does not say "notification" of what.   It previously said "of detention" and Defendants struck that language.   Plaintiffs therefore contest this paragraph because they do not know what it means.

**Issue: Whether ADC Provides Constitutionally Adequate Dental Services to the Class.**

**Dental Care**

173.   Defendants Contend:   At intake, inmates are educated on proper oral hygiene and are supposed to review a video designed for that purpose.

Plaintiffs Contend:  Inmates are not educated on proper oral hygiene and do not routinely review the video.

174.   Defendants Contend:   At intake, inmates are also instructed on how to access dental care within ADC.

Plaintiffs Contend:  Inmates do not receive adequate instruction on or access to dental care within ADC.

175.   Defendants Contend:  Dental assistants triage the HNRs and classify the inmate's request as urgent, routine, or exempt based on the priorities defined in the DSTM.

> Plaintiffs Contend:  Dental assistants routinely do not do appropriate triage of HNRs.

176.   Defendants Contend:  According to ADC policy, inmate refusals of dental appointments and no shows are documented in their dental charts.

> Plaintiffs Contend:  Although this may be ADC policy, it is not routinely observed in practice.

177.   Defendants Contend:  All inmates are classified according to the dental classification system upon initial examination.

> Plaintiffs Contend:  Not all inmates are so classified.

178.   Defendants Contend: Inmates on the routine care list are generally seen in the order in which they submit their HNRs, but the order may vary slightly based on security issues.

> Plaintiffs Contend:  This is not true because of the way HNRs are processed and triaged.

179.   Defendants Contend:  DSTM Dental Procedure 771.5 establishes the criteria used to determine an inmate's eligibility for dental prostheses and the priorities by which they will be provided.

> Plaintiffs Contend:  The ADC does not routinely follow these criteria when making decisions about what to provide to prisoners.

180.   Defendants Contend: According to ADC policy, Inmates at ADC are scheduled for appointments based on the priorities defined in the DSTM.  Inmates with urgent care needs are supposed to be scheduled first, then inmates on the routine care list.

> Plaintiffs Contend:  This is how prisoners are supposed to be scheduled, but what is supposed to happen in terms of scheduling is not what reliably happens because of the way HNRs are processed and triaged.

181.   Defendants Contend: A patient may report that a tooth is "painful" because it is sensitive to hot and cold.

Plaintiffs Contend: Undisputed only that a patient may describe pain as sensitivity to hot and cold; disputed that such descriptions of dental care are invalid or may be ignored.

182.   Defendants Contend: Tooth sensitivity is a common problem, and does not usually involve treatment, or if it does, is not an urgent matter that needs to be seen within 72 hours.

Plaintiffs Contend: Dental pain should be treated as urgent care. Tooth sensitivity may be a form of, or indicative of, dental pain or other issues requiring urgent dental care, , and this cannot be determined without an examination Thus whether or not tooth sensitivity needs to be treated is not indicative of whether the patient needs to be seen.

183.   Defendants Contend: An inmate who reports transient "pain" when exposed to hot or cold is experiencing tooth sensitivity, not odontogenic pain.

Plaintiffs Contend: Tooth sensitivity may be a form of, or indicative of, dental pain or other issues requiring urgent dental care. Defendants offer an unsupported, generalized, expert dental conclusion without support. Plaintiffs' expert will explain that ADC policy should require that inmates complaining of pain be triaged as urgent care.

184.   Defendants Contend: Placing an inmate who complains of hot or cold sensitivity, on the routine care list is appropriate and within the standard of care.

Plaintiffs Contend: Placing an inmate complaining of pain on the routine care list is inappropriate and falls below the standard of care.

185.   Defendants Contend: "Sensitive teeth" are not the same as having odontogenic pain.

Plaintiffs Contend: Duplicative of 50 ("An inmate who reports transient "pain" when exposed to hot or cold is experiencing tooth sensitivity, not

odontogenic pain."). Tooth sensitivity may be a form of, or indicative of, dental pain or other issues requiring urgent dental care. Defendants offer an unsupported, generalized, expert dental conclusion without support. Plaintiffs' expert will explain that ADC policy should require that inmates complaining of pain be triaged as urgent care.

186.  Defendants Contend: Odontogenic pain is caused by infection or irreversible pulpitis.

Plaintiffs Contend: Undisputed only that odontogenic pain can be caused by infection or irreversible pulpitis; disputed that ADC is in a position to second-guess inmates' complaints of pain or to fail to triage pain HNRs as urgent care.

187.  Defendants Contend: Odontogenic pain may be classified as urgent care and seen on an expedited basis.

Plaintiffs Contend: Undisputed that odontogenic pain should be classified as urgent care and seen on an expedited basis, but whether or not pain is odontogentic cannot necessarily be determined without an evaluation. All complaints of dental pain should be classified as urgent care and seen on an expedited basis.

188.  Defendants Contend: ADC's practice of classifying odontogenic pain as urgent care is appropriate.

Plaintiffs Contend: ADC does not have a practice of classifying all pain as urgent care, and prisoners with pain often are not triaged into urgent care. While it is true in theory that classifying odontogentic pain as urgent care might be appropriate in some circumstances, pain complaints cannot be definitively determined to be odontogentic pain based on an HNR without an examination.

64

189.   <u>Defendants Contend</u>:  Dentists at ADC practice quadrant dentistry, meaning that multiple teeth in one quadrant of the mouth can be treated in a single appointment if clinically appropriate.

> <u>Plaintiffs Contend</u>:  This reflects a policy, but <u>Plaintiffs Contend</u> that the policy is not regularly followed in practice.  Defendants have produced no evidence regarding when this policy was introduced, or how it is applied. Evidence suggests quadrant dentistry was not regularly practiced during most of the relevant time period.

190.   <u>Defendants Contend</u>: ADC dental policy, as set forth in the DSTIM,  is being routinely followed at all dental clinics statewide.

> <u>Plaintiffs Contend</u>: Undisputed that dental practice at ADC is consistent across ADC facilities. However, ADC has a practice of failing to enforce and monitor compliance with certain written policies.

191.   <u>Defendants Contend</u>:  From April 2013 through March 2014, ADC inmates submitted 46,112 HNRs, resulting in 60,440 dental appointments and 6,342 refusals of dental care.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute these numbers because Defendants ability to track HNRs is not reliable and refusals of dental care are often misleading because Plaintiff class members are not given acceptable alternatives for dental care.

192.   <u>Defendants Contend</u>:  SPDS allows facilities the discretion to permit an inmate to have more than one HNR at a time.

> <u>Plaintiffs Contend</u>:   Whether this capability exists in CDS is not determinative of whether the practice is condoned by management. Further, dental assistants frequently tell prisoners that they are allowed only one HNR at a time.

193.   <u>Defendants Contend</u>: Elective dentistry, including fixed prosthodontics (crown and bridge), cosmetic defects, ridge augmentations, and vestibular extensions/implants, which is not available at ADC, is a luxury even for the private sector.

<u>Plaintiffs Contend</u>: Plaintiffs' expert will testify that at least some of this work is clinically necessary.

**Emergency Care**

194.   <u>Defendants Contend</u>:  Each complex maintains a schedule of on-call dentists for emergency dental care.

<u>Plaintiffs Contend</u>:  Dentists have not routinely been available for on-call emergencies at this contention suggests they should be.

195.   <u>Defendants Contend</u>:  If a dental emergency arises outside of regular clinic hours, health care staff notifies the on-call dentist to arrange for the provision of necessary dental treatment.

<u>Plaintiffs Contend</u>:  This represents a policy, but there is no evidence this represents the routine practice at the ADC or that prisoners experiencing dental emergencies in fact receive "provision of necessary dental treatment."

196.   <u>Defendants Contend</u>:  True dental emergencies are rare.

<u>Plaintiffs Contend</u>:  Defendants have not provided data regarding this issue, to the extent that it can be defined and Plaintiffs do not agree that in a prison setting dental emergencies are rare.

197.   <u>Defendants Contend</u>: Inmates with emergency dental needs are seen within 24 hours.

<u>Plaintiffs Contend</u>:  Prisoners with emergency dental needs are not always seen within 24 hours for their dental needs.

198.   <u>Defendants Contend</u>:   Inmates experiencing dental emergencies are generally transported to local hospitals.

<u>Plaintiffs Contend</u>:  Defendants have not provided data regarding this issue. The statement is vague as to what is meant by "generally."

199.   Defendants Contend:   Most ADC complexes have only a few dental emergencies a year, and the most common dental emergencies at ADC are broken jaws.

Plaintiffs Contend:  Defendants have not provided data regarding this issue. The statement is vague as to what is meant by "most" or "a few."

200.   Defendants Contend:   Other dental emergencies include uncontrolled bleeding and airway restriction.

Plaintiffs Contend:  Defendants have not provided data regarding this issue.

201.   Defendants Contend:  Inmates requiring emergency dental care are generally brought to the medical or dental clinic by security staff and do not submit HNRs.

Plaintiffs Contend:  Defendants have not provided data regarding this issue. The statement is vague as to what is meant by "generally."

202.   Defendants Contend:  After dental clinic hours, nursing staff review dental HNRs.

Plaintiffs Contend:  Nursing staff do not routinely review dental HNRs after hours.

**Dentists and Dental Assistants**

203.   Defendants Contend:  Individual dentists have latitude to make clinical decisions based on their knowledge, skill, and judgment.

Plaintiffs Contend:  This latitude is limited by what is reasonable and what is required to afford a prisoner a constitutionally mandated level of care.

204.   Defendants Contend:  Dentists at ADC facilities orally explain the risks, benefits, and alternatives of dental procedures to the patient.

Plaintiffs Contend: dentists at ADC often fail to explain the risks, benefits, and all alternatives of dental procedures to the patient in a way that the patient can understand and obtain informed consent. Even if risks, benefits and alternatives are explained orally, they discussion must be documented in writing.

67

205.   Defendants Contend: ADC inmates, treated in the on-site dental clinic, also sign a written informed consent form for dental procedures, confirming that the dentist explained the risks, benefits, and any treatment alternatives.

Plaintiffs Contend: Undisputed that only ADC provides a written consent form; a signature on the form, however, does not necessarily mean that dental professionals adequately explained the risks, benefits, and treatment alternatives, or that the prisoner understood them.

206.   Defendants Contend: An inmate does not need to be advised of treatment options that are not clinically appropriate.

Plaintiffs Contend: Defendants' asserted fact presupposes an expert conclusion about what treatment options are or are not clinically appropriate. Prisoners often are not given a fair opportunity to weigh all available treatment options.

207.   Defendants Contend: The ADC Informed Consent form complies with NCCHC standards.

Plaintiffs Contend: the ADC informed consent form is inadequate; compliance with NCCHC standards is not the equivalent of constitutionally adequate standards of care.

208.   Defendants Contend: According to ADC policy, nursing staff is trained on protocols for dental emergencies.

Plaintiffs Contend: This paragraph suggests that staff training is performed pursuant to ADC policy in the way that it should be and Plaintiffs Contend that it is not.

209.   Defendants Contend: Dentists spot-check HNRs to check whether dental assistants are properly classifying HNRs regarding pain as urgent care.

Plaintiffs Contend: Defendants have provided no evidence that this practice is universal or comprehensive. Furthermore, any such spot-checking has

failed to prevent frequent categorization of HNRs regarding pain as routine care.

210.   <u>Defendants Contend</u>:  Arizona Administrative Code Section R4-11-701(B) provides that "a dental assistant may perform the following procedures and functions under the general supervision of a licensed dentist:  (1) Train or instruct patients in oral hygiene techniques, preventive procedures, dietary counseling for caries and plaque control, and provide pre-and post-operative instructions relative to specific office treatment; (2) Collect and record information pertaining to extra-oral conditions; and (3) Collect and record information pertaining to existing intra-oral conditions."

> <u>Plaintiffs Contend</u>:  This is a correct statement of law, but it is not an issue of fact to be decided at trial.   Plaintiffs contend that ADC dental assistants operate outside these permissions.

211.   <u>Defendants Contend</u>:   Arizona law prohibits a dental assistant from classifying a patient's dental needs as either urgent or routine.

> <u>Plaintiffs Contend</u>:  This is a legal conclusion, not an issue of fact to be decided at trial.   Moreover, compliance with Arizona law is not determinative of whether prisoners are subject to a substantial risk of serious harm.

212.   <u>Defendants Contend</u>:   Arizona Administrative Code Section R4-11-702 provides that a dental assistant shall not perform the following procedures or functions: (1) A procedure which by law only licensed dentists, licensed dental hygienists, or certified denturists can perform; (2) Intraoral carvings of dental restorations or prostheses; (3) Final jaw registrations; (4) Taking final impressions for any activating orthodontic appliance, fixed or removable prosthesis; (5) Activating orthodontic appliances; or (6) An irreversible procedure.

> <u>Plaintiffs Contend</u>:  This is a correct statement of law, but it is not an issue of fact to be decided at trial.   Plaintffs contend that ADC dental assistants operate outside these permissions .

69

213.   Defendants Contend:   General supervision as used in the Arizona dental regulations and statutes means that the dentist is not required to be physically present.

Plaintiffs Contend:  This is a correct statement of law, but it is not an issue of fact to be decided at trial.   Moreover, compliance with Arizona law is not determinative of whether prisoners are subject to a substantial risk of serious harm.

214.   Defendants Contend:   Dental assistants receive on-the-job training with an experienced dental assistant and the dentist on how to triage HNRs.

Plaintiffs Contend:   Any such training is insufficient, as dental assistants lack the education to effectively triage HNRs, and in fact do so incorrectly frequently.   Although Plaintiffs have requested evidence of training, no such evidence has been provided.

215.   Defendants Contend:   Arizona law permits dental assistants to collect information pertaining to intra-oral conditions, which includes looking inside the patient's mouth and taking x-rays.

Plaintiffs Contend:   This is a legal conclusion not an issue of fact to be decided at trial.   Moreover, compliance with Arizona law is not determinative of whether prisoners are subject to a substantial risk of serious harm.

216.   Defendants Contend: Arizona law (A.R.S. § 32-1291(A)) expressly permits dental assistants to take x-rays under the general supervision of a dentist.

Plaintiffs Contend: This is a legal conclusion and immaterial to whether dental assistants perform appropriately at ADC. Dental assistants often are not under sufficient supervision of a dentist when performing tasks.

217.   Defendants Contend: Dental assistants may take x-rays without direct supervision from a dentist if there is a standing order from a dentist.

Plaintiffs Contend: undisputed that dental assistants at ADC are allowed to take x-rays without supervision from a dentist if there is a standing order; disputed that this falls within the standard of care.

218.   Defendants Contend: Each dentist at ADC has a standing order for the dental assistants he or she supervises to take x-rays.

Plaintiffs Contend: ADC has not identified those standing orders, and the existence of a standing order does not mean that dental assistants should take x-rays without clinical evaluation by a dentist.

219.   Defendants Contend: Having a standing order to take x-rays is permissible under Arizona law (A.R.S. 32-1291 and  A.R.S. 32-1281(I)(2) and is within the standard of care.

Plaintiffs Contend: Defendants' assertion is a legal and expert conclusion. Having a standing order to take x-rays is not within the standard of care.

220.   Defendants Contend: Standing orders are routinely used in private dental practices.

Plaintiffs Contend: Defendants have not presented admissible evidence of the common practice in private dental practices. That standing orders may be used in private practice does not mean their use is appropriate or within the standard of care at ADC.

221.   Defendants Contend: In private practice, a dental assistant takes and records a patient's dental health history, looks inside the patient's mouth, and takes x-rays, if needed, all before the dentist sees the patient.

Plaintiffs Contend: Defendants have not presented admissible evidence of the common practice in private dental practices. Tasks appropriately undertake by dental assistants in private practice may not be appropriate for dental assistants in a correctional setting, and Defendants attempt at a direct comparison is inaccurate and flawed. Defendants have failed to establish that allowing dental assistants at ADC to undertake the same duties as dental

71

assistants in private practice does not expose prisoners to a substantial risk of serious harm.

222.   Defendants Contend: Dental assistants are capable of deciding which teeth to x-ray.

Plaintiffs Contend: dental assistants lack the education, training, and clinical judgment to make sound decisions regarding which teeth should be radiographed.  Asking them to do so falls below the standard of care in a correctional setting and places the inmates at a substantial risk of serious harm.

223.   Defendants Contend: If a patient points to a tooth that is causing pain, the dental assistant can take an x-ray of that tooth.

Plaintiffs Contend: dental assistants lack the education, training, and clinical judgment to make sound decisions regarding which teeth should be radiographed..  Asking them to do so falls below the standard of care in a correctional setting and places the inmates at a substantial risk of serious harm.

224.   Defendants Contend:  ADC policy regarding dental assistant triage complies with Arizona law.

Plaintiffs Contend:   This is a legal question, not an issue of fact to be decided at trial.   Moreover, compliance with Arizona law is not determinative of whether prisoners are subject to a substantial risk of serious harm.

225.   Defendants Contend:  All dentists at ADC are licensed in Arizona.

Plaintiffs Contend:  Plaintiffs do not believe that Defendants have provided comprehensive evidence regarding this question one way or the other, and certain reports suggest this has not been true at all times since the Complaint was filed.   Plaintiffs do not believe that the licensing of individual dentists

affects their contentions regarding why prisoners are subject to a substantial risk of serious harm.

226. <u>Defendants Contend</u>:  ADC policy is consistent with the American Dental Association's (ADA) literature regarding dental assistant job functions.

<u>Plaintiffs Contend</u>:  Compliance with a description on the ADA website regarding what dental assistants do is irrelevant to constitutionality of care provided.   Further, nothing on the ADA literature that Defendants have provided permits dental assistants to triage patients, conduct clinical examinations, or decide to take and interpret x-rays.

227. <u>Defendants Contend</u>:  Dentists at ADC save a tooth if it can be saved.

<u>Plaintiffs Contend</u>:  ADC dentists offer to extract teeth when prisoners complaint of pain, even though the tooth is restorable.   Further, whether or not a dentist will save a tooth in the patient in front of him at the time of appointment is not determinative of whether ADC's policies are such that they increase the likelihood that the patient will present to the dentist with a tooth, originally identified as restorable, that is now non-restorable.

228. <u>Defendants Contend</u>:  All dental staff have current CPR certification.

<u>Plaintiffs Contend</u>:  Plaintiffs are unaware of evidence supporting this fact. Further, whether or not dental staff have CPR certification is irrelevant to plaintiffs' claims in this case.

**CDS**

229. <u>Defendants Contend</u>: Correctional Dental Software provides information on aspects of corrections dentistry, including wait times, dentures, restorations, extractions, emergency care, urgent care, routine care, medical diets, and dental grievances.

Plaintiffs Contend: CDS cannot provide information on all aspects of corrections dentistry. Defendants were unable to generate certain reports and information from CDS in discovery.

230.   Defendants Contend:  Correctional Dental Software includes a management summary, which shows in red any inmate who has been waiting 90 days or longer for routine care.

Plaintiffs' Contend:  This fact duplicates facts Plaintiffs contested in Appendix 3.  As Plaintiffs stated in Appendix 3:  Defendants have not provided CDS for testing or documentation for review. Dental staff have stated this, but given that wait times are  not otherwise calculated correctly, and that CDS  allegedly measures wait times only from the time of receipt of an HNR (as opposed to when the request was filed), plaintiffs are not prepared to stipulate that CDS correctly  displays alerts at the stated times.

231.   Defendants Contend: Correctional Dental Software includes alerts when an inmate submits multiple HNRs for the same reason.

Plaintiffs Contend: Defendants' assertion presupposes that ADC or CDS properly determines when prisoners submit multiple HNRs for the same reason and that a person qualified to make such a determination is in fact the person making it. ADC has a practice of removing prisoners from the routine care list when they submit another dental HNR.  Whether or not CDS includes alerts when an inmate submits duplicate HNRs does not affect whether the system adequately deals with either duplicate or non-duplicative requests.

232.   Defendants Contend:  If an inmate has been waiting on the routine care list for 90 days or longer, the record turns red to alert dental staff.

Plaintiffs Contend:  This fact duplicates facts Plaintiffs contested in Appendix 3.  As Plaintiffs stated in Appendix 3:  Defendants have not provided CDS for testing or documentation for review. Dental staff have

74

stated this, but given that wait times are  not otherwise calculated correctly, and that CDS  allegedly measures wait times only from the time of receipt of an HNR (as opposed to when the request was filed), plaintiffs are not prepared to stipulate that CDS correctly  displays alerts at the stated times.

233.   Defendants Contend: Correctional Dental Software produces an alert for urgent care requests that have not been seen within 72 hours.

Plaintiffs Contend: ADC does not adequately track urgent care wait times, and Defendants have not proven that CDS always alerts dentists of urgent care requests waiting for more than 72 hours. Further, ADC prisoners often are not appropriately treated within 72 hours for urgent care.

234.   Defendants Contend: These alerts, generated by Correctional Dental Software, allow the regional dental directors and Dr. Smallwood to reallocate staff resources if needed.

Plaintiffs Contend: ADC fails to accurately track or respond to any information it receives regarding inmates reaching the limits set for timely routine or urgent care. That it is possible to reallocate staff does not mean that ADC dental clinics are sufficiently staffed to provide adequate care.

235.   Defendants Contend:  CDS also includes alerts when an inmate has been on the routine care list for 90 days or longer or has been waiting for urgent care for 72 hours or longer.

Plaintiffs Contend:  Defendants have not provided CDS for testing or documentation for review. Dental staff have stated this, but given that wait times are  not otherwise calculated correctly, and that CDS  allegedly measures wait times only from the time of receipt of an HNR (as opposed to when the request was filed), plaintiffs are not prepared to stipulate that CDS correctly  displays alerts at the stated times.

236.   Plaintiffs ContendDefendants Contend:  If a dental hygienist is not available at a facility, the dentists perform cleanings.

Plaintiffs Contend:  Not necessarily, another possibility is that the cleanings are delayed and there is evidence this has happened at ADC.

237.   Defendants Contend:   ADC dental clinics are in compliance with ADC policy and NCCHC compliance indicators for intake procedures.

Plaintiffs Contend:  Plaintiffs Contend they are not.

**Dentures**

238.   Defendants Contend: DSTM Dental Procedure 771.6 provides the protocol for the replacement of full or partial dentures supplied to inmates by ADC.

Plaintiffs Contend: Plaintiffs are willing to stipulate only that the DTSM includes a provision on this issue, but not that the provision necessarily determines the dental care provided at ADC facilities.

239.   Defendants Contend: Pursuant to the Dental Services Technical Manual, inmates must have at least six months left on their sentence to qualify for dentures to make sure there is sufficient time to complete the device before the inmate is released from ADC custody.

Plaintiffs Contend: the statement is irrelevant because Plaintiffs do not contend that ADC does not approve dentures per their policy.

240.   Defendants Contend: Preparatory treatment for dentures may include extractions, fillings, and periodontal treatment.

Plaintiffs Contend: the fact is irrelevant because the need for preparatory work does not an explanation or justification for the inadequacies in dental care identified by Plaintiffs' expert.

241.   Defendants Contend: Once the preparatory work is completed and the process of making dentures starts, an inmate will likely have between five and seven appointments.

Plaintiffs Contend: this fact is irrelevant because the number of appointments needed is not an issue in the case; Defendants' duty is to

provide however many appointments are needed in a timely and adequate way.

242.   Defendants Contend: Other dental treatment should not be initiated when there is insufficient time to achieve completion of denture treatment.

Plaintiffs Contend: ADC has a duty to ensure that appropriate and constitutionally adequate dental care is provided in a timely manner and often fails to do so.

**Dental Wait Times**

243.   Defendants Contend:  A wait time of three months for routine dental care is becoming the industry standard in correctional dentistry.

Plaintiffs Contend:  Defendants have not provided data that support this assertion and Plaintiffs contest it.

244.   Defendants Contend:  Wait times for routine dental treatment are 45 days or less.

Plaintiffs Contend:  Defendants do not properly calculate wait times so their data is not reliable to establish this contention..

245.   Defendants Contend:  Inmates with routine dental needs are  seen within 90 days of receipt of an HNR.

Plaintiffs Contend:  Although this is the policy, it is not followed in practice, in part because of the manner in which Defendants calculate wait times.

246.   Defendants Contend: Inmates with urgent dental needs are seen within 72 hours.

Plaintiffs Contend:  Inmates with urgent dental needs are not routinely seen within 72 hours.

247.   Defendants Contend: Wait times for dental treatment may be extended due to inmates being away at court,  inmate health issues that prevent provision of dental care, and security issues.  These inmates are noted in CDS.

Plaintiffs Contend:   These are not the only reasons that wait times may be extended and Plaintiffs do not have sufficient information to stipulate that extension for such reasons are properly noted in CDS.

248.   Defendant Contend:  Inmates who are out to court are usually gone for weeks or months.

Plaintiffs Contend:  Plaintiffs are unaware of evidence supporting this point, but do not believe it to be true based on general experience.  The time that inmates are gone to court is irrelevant, as their number is too small to affect a properly calculated average wait time.

249.   Defendants Contend:  In September, 2013, the longest average wait time for routine dental care statewide 1.7 months at Phoenix and Perryville, and the shortest wait time for routine dental care was 0.5 months at Winslow.

Plaintiffs Contend:  Defendants calculate reported wait times based on those who are currently waiting on the list, not how long prisoners generally wait for care.

250.   Defendants Contend:  The latest wait time reports available for March 2014 show that average wait times for routine dental care ranged between 0.6 and 1.5 months statewide.

Plaintiffs Contend:  Defendants calculate reported wait times based on those who are currently waiting on the list, not how long prisoners generally wait for care.

251.   Defendants Contend:  SPDS brought wait times for routine dental treatment within contract compliance at 8 out of 10 complexes, and in less than four months, SPDS brought wait times for routine dental treatment within contract compliance at all 10 complexes, within less than two months.

Plaintiffs Contend:  Defendants calculate reported wait times based on those who are currently waiting on the list, not how long prisoners generally wait for care.

252.   Defendants Contend:  In September 2013, the longest average intake wait time was 0.9 months at Safford, and three complexes had no wait at all for intakes.

Plaintiffs Contend:  Defendants calculate reported wait times based on those who are currently waiting on the list, not how long prisoners generally wait for care.

253.   Defendants Contend:  By March 2014, the longest average intake wait time 0.7 months at Lewis, and three complexes had no wait for intakes.

Plaintiffs Contend:  Defendants calculate reported wait times based on those who are currently waiting on the list, not how long prisoners generally wait for care, so these wait time computations are not accurate.

254.   Defendants Contend:  The average wait time for an urgent-type issue in private practice is approximately 5.4 days.

Plaintiffs Contend:  Plaintiffs Contend that this is not true and that patients in private practice have an array of options to obtain care more promptly than 5.4 days in urgent situations.

**Dental Monitoring**

255.   Defendants Contend:  ADC monitors the timeliness of dental intakes and dental treatment on a monthly basis.

Plaintiffs Contend:  There is no evidence that Plaintiffs are aware of that reflect that ADC engages in such regular monitoring.  Furthermore, the measures for  timeliness used for dental care do not accurately reflect wait times and ADC does not have an alternative tracking measure that adequate reflects true wait times.

256.   Defendants Contend:   ADC also monitors dental utilization statistics, including the numbers and types of dental procedures performed, the numbers of HNRs

for dental treatment submitted, and the number of dental treatment refusals on a monthly basis.

> Plaintiffs Contend:  No one at ADC actively reviews reports on these issues sent by SPDS.

257.  Defendants Contend:  ADC also reviews dental staffing on a regular basis.

> Plaintiffs Contend:  No one at ADC actively reviews reports on these issues sent by SPDS.

258.  Defendants Contend:  Dr. Smallwood and the regional directors monitor productivity of dentists and the numbers and types of dental procedures performed by each dentist.

> Plaintiffs Contend:  Given the systemic issues with policies at ADC, the ability of supervisors to monitor productivity to unspecified standards is irrelevant to whether ADC provides constitutional dental care.  Further, Dr. Smallwood and the regional directors do not effectively monitor or supervise dental staff to ensure that quality dental care is provided in an appropriately-timely manner.

259.  Defendants Contend:  Dr. Smallwood and the regional directors monitor wait times for routine and urgent care and they reallocate staff if necessary to address inmate demand.

> Plaintiffs Contend:  For reasons explained above, wait times are calculated incorrectly.   SPDS witnesses also have explained that it is impossible to produce a report showing the urgent care wait times for a given period. Plaintiffs also dispute that ADC and its agents have effectively monitored wait times, as Plaintiffs' expert identified numerous examples of wait times exceeding even ADC's own standards.   As a result, Plaintiffs cannot confirm that Defendants reallocate staff appropriately to ensure quality and timely care.

260.   Defendants Contend:  SPDS has an appropriate number of dentists, dental hygienists, and dentist assistants to properly treat all inmates within the ADC guidelines as evidenced by average wait times for dental treatment.

> Plaintiffs Contend:  For reasons stated above, average wait times as reported by ADC are misleading.   In addition, the types of procedures performed by ADC, and the practices in which they engage to maintain lower routine wait times, indicate that they have an insufficient number of staff to provide proper dental care.

261.   Defendants Contend:  ADC provides constitutionally adequate dental services to the class.

> Plaintiffs Contend:  ADC does not provide constitutionally adequate dental services to the class.

**Issue: Whether ADC Provides Constitutionally Adequate Mental-Health Care to the Class.**

**Administration of Mental Health Care**

262.   Defendants Contend: The Arizona Department of Corrections Mental Health Services is administrated through its vendor, Corizon, to provide health services.

> Plaintiffs Contend:   Plaintiffs' object to responding to these contentions which come from a document Defendants' called Exhibit O until they attempted to integrate that document into this document late in the day on September 30 and did not show Plaintiffs a redline of the change until after 9 p.m. on September 30.[5]  When Defendants exchanged drafts of the Pre-Trial Statement on September 8, 2014 Plaintiffs noted Exhibit O was missing and on September 11, 2014 asked Defendants to provide it. Defendants did not provide it until 10:10 p.m. on September 18, 2014, the day before the deadline for the filing of the Joint Pre-Trial Order.  By that

---

[5] The original Exhibit O as receive from Defendants on September 18 is appended to the originally filed JPTO (Dkt. No. 1143 ).

time, it was too late for Plaintiffs to meaningfully review the 19 pages with 110 facts. Accordingly, Plaintiffs contest these facts as untimely served. To the extent proposed facts in Exhibit O come from the recently-revised Mental Health Services Technical Manual, the Court has already ruled that those facts are inadmissible. [See Doc. 871 at 2 "[T]he Court will not permit reliance on the forthcoming changes to the Mental Health Services Technical Manual."] To the extent the facts simply restate terms from admissible written policies, the written policies speak for themselves and, in any event, cannot serve as evidence that ADC follows, enforces, or effectively monitors those policies and Plaintiffs intend to cross-examine the witness sponsoring this exhibit on the basis of all objections set forth in this paragraph. The true practices at ADC facilities will be proven by Plaintiffs at trial (Hereafter this objection is referred to as "Plaintiffs' Mental Health Objection.").

263. Defendants Contend: The mental health services are monitored by the Health Services Monitoring Bureau. The day-to-day operation of mental health services is assigned to the local Facility Health Administrator, who operates within ADC Department Orders and under the provisions of the Mental Health Technical Manual (MHTM).

Plaintiffs Contend: Plaintiffs' Mental Health Objection.

264. Defendants Contend: The Mental Health Program Director (MHPD) is the person designated to plan and direct mental health services provided to all inmates of the Arizona Department of Corrections.

Plaintiffs Contend: Plaintiffs' Mental Health Objection.

265. Defendants Contend: The Director of Psychiatry is the person designated to provide clinical supervision to staff Psychiatrists and Psychiatric Nurse Practitioners (P/PNP), or any other provider prescribing psychotropic medications. This individual develops policy related to the delivery of psychiatric services and psychotropic medication use.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

266.    Defendants Contend: The Director of Nursing (DON) is the person designated to plan and direct nursing services provided to all inmates of the Arizona Department of Corrections.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

267.    Defendants Contend: The facility Health Administrator (FHA) is the person designated to provide day-today direction to all health services at an ADC complex/facility.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

268.    Defendants Contend: The Clinical Director is the  person designated to coordinates the day-to-day operation of the licensed mental health facility (to include all units located at ASPC-Phoenix) and reports to the MHPD.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

269.    Defendants Contend: The Lead Psychologist is the  person designated to coordinates the day-to-day operation of all mental health services and provides clinical services at the ADC complex(es) under his/her responsibility and reports to the FHA and MHPD.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

270.    Defendants Contend: The Psychiatric Nurse Coordinator is the person(s) designated to provide supervision of psychiatric nursing services at ASPC-Phoenix.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

271.    Defendants Contend: The Facility Director of Nursing is the he person designated to the supervision of nursing services, including psychiatric nursing services, at all other complexes.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

272.    Defendants Contend: Qualified Mental Health staff includes Psychologists, P/PNP, Psychology Associates, Psychology Assistants, Mental Health Therapists, Registered Nurses, Recreational Therapists, Occupational Therapists, and Psychiatric

Technicians.   The Alhambra Behavioral Treatment Facility (ABHTF) includes Baker Ward, and Flamenco (King, John, Ida, George, Quiet Units).

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

273.   Defendants Contend: ABHTF is accredited by The Joint Commission, an independent, not-for-profit organization that accredits and certifies more than 20,500 health care organizations and programs in the United States. Joint Commission accreditation and certification is recognized nationwide as a symbol of quality that reflects an organization's commitment to meeting certain performance standards.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Monthly Mental Health Statistics**

274.   Defendants Contend: The Lead Psychologist (or designated staff at non-corridor complexes) at each ADC complex is responsible for completing, compiling, and forwarding the monthly mental health statistics.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Psychology Peer Reviews**

275.   Defendants Contend: Lead Psychologist (or designee) conduct a peer review annually on mental health staff.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Inmate arriving on Unit**

276.   Defendants Contend: Upon arrival at a new complex, an inmate's records are reviewed to alert mental health staff about significant issues for each new inmate on-unit.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

277.   Defendants Contend: Mental health/medical personnel completing the medical record reviews consist of the following: Problem List - if the below information is not on the Problem list the reviewer will add the information –  current mental health score and need level, SMI status, Suicide history (if any), Diagnosis; Initial (intake) mental health assessment; Mental health section.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Movement of Mental Health Inmates**

278.   Defendants Contend: The purpose of moving mental health inmates is to facilitate the timely transfer of inmates, in a manner consistent with their mental health needs.  Movement into and out of specialized mental health programs (e.g., ABHTF, MTU/ WTU, BMU) is requested by the Lead Psychologist, or designee, at that specialized mental health program and these requests for movement to and from specialized mental health programs shall also be copied to relevant Offender Operations staff (e.g., Deputy Warden for Operations, Deputy Warden, Major, and Captain) and to the FHAs at the sending and receiving complexes.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

279.   Defendants Contend: Movement of inmates from non-corridor to corridor complexes (e.g., for placement on precautionary watch or because of a change in mental health score) is e requested by the Lead Psychologist, or designee, responsible for the noncorridor complex.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Mental Health Urgent Responder Protocols**

280.   Defendants Contend: Mental Health Urgent Responder Protocols exist to provide guidance and procedure regarding the operation of after hours, nights, and holiday Mental Health Urgent Response.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

281.   Defendants Contend: Each eligible mental health staff member receives training from their supervisor in urgent response procedures, which is documented in their personnel file.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Initial Mental Health Assessment**

282.   Defendants Contend: The purpose of the Initial Mental Health Assessment is to ensure that all inmates, upon their arrival in the Arizona Department of Corrections,

have a mental health assessment completed. This assessment will be used to assist in decisions regarding classification, placement and need level for further mental health services and/or programming.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

283.   Defendants Contend: Mental health staff assigned to the Alhambra and Perryville reception centers specifically, as well as mental health staff at all complexes where inmates are received directly from the community or county, federal and other facilities are responsible to assess and determine individual mental health needs.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Levels of Mental Health Services Delivery**

284.   Defendants Contend: The purpose of the Levels of Mental Health Services Delivery is to provide a standardized system of inmate mental health need identification that is consistent with both established standards of mental health care and the mental health needs of incarcerated individuals.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

285.   Defendants Contend:  Inmates who have no history of mental health issue or treatment will not be regularly monitored by mental health staff, but may request mental health services in accordance with the HNR protocols. The inmate's mental health score may be increased when clinically indicated based upon the treating clinician's assessment of the quality of the inmate's current functioning. Inmates designated as MH-1 are able to eligible for all movement and occupations.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

286.   Defendants Contend: Inmates who do not currently have mental health needs and are not currently in treatment but have had treatment in the past will not be regularly monitored by mental health staff, but may request mental health services in accordance with the HNR protocols. The inmate's mental health score may be increased when clinically indicated based upon the treating clinician's assessment of the quality of the inmate's current functioning. Inmates classified as MH-2 must have demonstrated

behavioral and psychological stability for at least six (6) months. Inmates with suicide attempt histories shall be evaluated on a case-by-case basis as well. Inmates with verified serious suicide attempts shall be classified as MH-2 or greater. Inmates designated as MH-2 are able to eligible for all movement and occupations.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

287.  Defendants Contend: Inmates with Mental Health needs, who require current outpatient treatment will be divided into four (4) categories. These categories will be notated in the record used for AIMS classification, and may change during each interaction with the inmate as their condition warrants: Category A: Inmates in acute distress who may require substantial intervention in order to remain stable (Example: A floridly psychotic or delusional inmate with current or frequent suicidal ideation, or currently under a PMRB.) All inmates classified as SMI in ADC and/or the community will remain a Category A (or MH-4 and MH-5 if in specialized mental health program. Category B: Inmates who may need regular intervention but are generally stable and participate with psychiatric and psychological interventions. (Example: An inmate with a major depressive or other affective disorder who benefits from routine contact with both psychiatry and psychology staff.).  Category C: Inmates who need infrequent intervention and have adequate coping skills to manage their mental illness effectively and independently. (Example: An inmate with a general mood or anxiety disorder who has learned to manage their symptoms effectively through the use of medication and infrequent contact with mental health staff.) If an inmate is determined to be in this category, the mental health clinician must include a detailed note indicating the justification for the C Category. No inmate currently placed in detention or Maximum Custody shall be classified as 3C. Category D: Inmates who have been recently taken off of psychotropic medications require follow up to ensure stability over time. For inmates who are admitted to a specialized mental health program outside of inpatient treatment areas (MTU/WTU, BMU, Rincon Mental Health Program, SMA, Florence and Eyman Maximum Custody programs), a new treatment plan is developed for all inmates. This

treatment plan will be updated minimally every ninety (90) days, or more often as clinically indicated. A Mental Health Treatment Staffing as clinically indicated, and documented on a staffing note. Inmates are to participate in structured program activities on a weekly basis. The mental health clinician will provide services consistent with description of the program the inmate is participating in. Upon discharge, these inmates require placement in a corridor facility. Inmate's score is to remain an MH-4 until he/she is transferred to the receiving unit. The receiving unit's clinician will change the mental health score to reflect his/her current placement and level of functioning. Inmates participating in a structured mental health program will be seen by a P/PNP a minimum of every ninety (90) days.

All inmates designated as Seriously Mentally Ill (SMI) will be designated a MH-3A, MH-4, or MH-5 based on their current program placement. All inmates who have been confirmed as SMI in the community will also be maintained as SMI in ADC, and have a treatment plan in the medical record.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Determination and Management of Seriously Mentally Ill (SMI) Inmates**

288.   Defendants Contend: The determination and management of SMI inmates is formalized to provide a standardized system of identifying inmates who do or do not possess SMI needs while incarcerated in ADC.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

289.   Defendants Contend: An inmate will be denied the SMI in ADC designation if he/she fails to satisfy all the criteria identified in the MHSM, but can receive an additional SMI screening as clinically indicated.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

290.   Defendants Contend: All inmates previously determined to be SMI in the community, as   verified with the community provider, will also be designated as SMI in ADC.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Triage for Health Needs Requests**

291.   Defendants Contend: The purpose of the Triage for Health Needs Requests is to provide direction regarding the assessment and immediacy of mental health issues submitted via Health Needs Requests (HNRs). This also includes requests made at reception areas.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

292.   Defendants Contend: Medical staff triaging HNRs are responsible for making necessary referrals to mental health staff when appropriate.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.


**Mental Health Service Delivery for Minors**

293.   Defendants Contend: The purpose of the Mental Health Service Delivery for Minors is to outline protocols for the management and mental health services provision to minor inmates (younger than 18 years of age) charged to the custody of ADC.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

294.   Defendants Contend: Mental health staff assigned to a Minor Reception area are responsible for the mental health care needs of such inmates in accordance with the procedures identified below.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

295.   Defendants Contend: Within two (2) business days of a minor inmate's arrival at a reception facility, the assigned mental health clinician meets with the minor inmate.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

296.   Defendants Contend: Mental health staff conducts a clinical interview and an intellectual assessment to determine if mental health or substance abuse problems are present and may require intervention. The clinical interview includes a Mental Status Exam. The findings from the clinical interview and assessment shall be documented

immediately in the mental health section of the minor inmate's medical record. When appropriate, the mental health clinician shall promptly refer minor inmates to the P/PNP for assessment.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

297.   Defendants Contend: In the event that a minor inmate is non-English speaking, an accommodation will be made to conduct the interview and psychological testing in the minor's native language, to the extent feasible.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

298.   Defendants Contend: Minor inmates with a Mental Health Score of 3 will be seen every thirty (30) days by a mental health clinician, regardless of their current Category.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

299.   Defendants Contend: Minor inmates on psychiatric medications will be seen a minimum of every ninety (90) days by a P/PNP.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Mental Health Watch Protocol**

300.   Defendants Contend: The purpose of the Mental Health Watch Protocol is to provide direction regarding assigning and movement between the appropriate level of mental health watch to inmates displaying suicidal ideation, suicidal gestures, and/or bizarre behavior.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

301.   Defendants Contend: It is the responsibility of all health staff to assign the appropriate level of mental health watch to inmates in crisis.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

302.   Defendants Contend: Continuous Watch:  Mental health staff will order a Continuous Watch when an inmate has demonstrated signs or symptoms of significant mental disorder and is acting in a manner indicating imminent suicide risk or risk to others due to a mental illness. This watch is for inmates whose mental status has deteriorated and

are considered actively suicidal. Any gesture or attempt to self-harm will necessitate a continuous watch for a minimum of twenty-four (24) hours.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

303.   Defendants Contend: Ten (10) Minute Watch:  Mental health staff will order a Ten (10) Minute Watch when an inmate has demonstrated signs or symptoms of significant mental disorder and is acting in a manner indicating high suicide risk and/or risk to others due to a mental illness. Any verbal or written communication indicating suicidal ideation by the inmate shall, at a minimum, necessitate a Ten (10) Minute Watch.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

304.   Defendants Contend: Thirty (30) Minute Watch:  Mental health will order a Thirty (30) Minute Watch when an inmate has demonstrated acute signs or symptoms of significant mental health disorder, but is not acting in a manner indicating significant suicide risk. Thirty (30) Minute Watch shall not be used on urgent response protocols.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

305.   Defendants Contend: Only licensed mental health staff can reduce the level of observation and/or discontinue a watch. Any health care staff can increase the level of observation based on safety concerns.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

306.   Defendants Contend: At a minimum, inmates will remain on each level of watch for a minimum of twenty-four (24) hours, and will be reduced from a higher to a lower level of observation in the following manner: continuous watch, 10" watch, 30" watch, then discontinue watch.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

307.   Defendants Contend: If at any time an inmate's behavior deteriorates or suicidal ideation or gestures increases, the level of watch will be increased according to the policy outlined above.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

91

308. <u>Defendants Contend</u>: Inmates receive mental health follow-up after discharge from watch.

<u>Plaintiffs Contend:</u> Plaintiffs' Mental Health Objection.

**<u>Additional Delivery of Services</u>**

309. <u>Defendants Contend</u>: If an inmate decides to go on a hunger strike, a Psychiatrist or Psychologist shall administer a mental health assessment as to the inmate's capacity to made decisions about his/her health care. There will also be an interdisciplinary clinical staffing panel determine any potential issues and attempt to resolve them.

<u>Plaintiffs Contend:</u> Plaintiffs' Mental Health Objection.

310. <u>Defendants Contend</u>: All inmates new to a maximum custody complex (Florence, Eyman, Perryville, Lewis) are evaluated by a mental health clinician within seventy-two (72) hours of their arrival. All inmates placed in the Restrictive Status Housing Program will be evaluated by a mental health clinician within seventy-two (72) hours of placement (even if they originated from a maximum custody unit).

<u>Plaintiffs Contend:</u> Plaintiffs' Mental Health Objection.

**<u>Men's Treatment Unit (MTU) / Women's Treatment Unit (WTU)</u>**

311. <u>Defendants Contend</u>: Corizon operates the Men's Treatment Unit to provide mental health programming and housing to male inmates who demonstrate a mental disorder and who meet specific admission criteria. Mental health programming at the facility shall include, but not be limited to, individual and group therapies.

<u>Plaintiffs Contend:</u> Plaintiffs' Mental Health Objection.

312. <u>Defendants Contend</u>: The Clinical Director of ABHTF, Lead Psychologist at Perryville, or through a designee shall ensure that referrals for MTU / WTU admission are limited to those inmates who have a Mental Disorder as defined by current version of the Diagnostic and Statistical Manual of Mental Disorders

<u>Plaintiffs Contend:</u> Plaintiffs' Mental Health Objection.

313.   <u>Defendants Contend</u>: In regards to MTU / WTU admission criteria, the inmate must exhibit emotional or behavioral functioning which would benefit from an increased level of services, have a Mental Health Score of 3 or higher, and a Public Risk Score of 3 or lower and an Institutional Risk Score of 4 or lower. MTU / WTU placement and treatment is voluntary. If an inmate's P/I scores are higher than 3/4, but the inmate is otherwise appropriate for MTU / WTU admission, an Administrative Reclassification will need to be completed by security/operations staff at the referring complex.

<u>Plaintiffs Contend</u>:  Plaintiffs' Mental Health Objection.

314.   <u>Defendants Contend</u>: Inmate Admission to the MTU / WTU program may be denied if the inmate has presented with violent or assaultive behavior during the previous year, as evidenced by a disciplinary action, has attempted/completed an escape from a secure perimeter facility less than three (3) years ago, or multiple such escapes/attempted escapes within the past ten (10) years, has a current or past history of active membership in a security threat group (STG), and/or as received a minor disciplinary ticket in the last six (6) months, or a major disciplinary ticket in the last twelve (12) months.

<u>Plaintiffs Contend</u>:  Plaintiffs' Mental Health Objection.

315.   <u>Defendants Contend</u>: The mental health clinician at the referring facility will verify that the information contained in the Department's AIMS system is up-to-date, and submit the Prescreening Referral Packet to the MTU / WTU Program Coordinator.

<u>Plaintiffs Contend</u>:  Plaintiffs' Mental Health Objection.

316.   <u>Defendants Contend</u>: Discharge of an inmate from the MTU / WTU may be initiated when an inmate meets any one of the following criteria: (i) the inmate reached maximum treatment benefit, and/or has completed all program elements; (ii) the inmate fails to participate actively and in a positive fashion in programming; (iii) the inmate has exhibited behavior that threatens the safe and secure operation of the unit, the inmate's own personal safety, or the safety of others; (iv) such behaviors will be documented in

accordance with DO 105 (Information Reporting); and/or (v) the inmate requests to end programming and transfer from MTU / WTU.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Maximum Custody Mental Health Specialized Programs**

317.   Defendants Contend: The purpose of Maximum Custody Mental Health Specialized Programs is to provide direction regarding the intake, admission, treatment and discharge processes for Specialized Mental Health Programs located in Maximum Custody units.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

318.   Defendants Contend: To be assigned to a Specialized Program an inmate must have a mental health diagnosis as defined in the current version of the Diagnostic and Statistical Manual of Mental Disorders, be motivated to participate in a structured mental health program.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

319.   Defendants Contend: If the Program Coordinator determines that an inmate is no longer appropriate for placement in the specialized program, mental health staff working in maximum custody units will discuss appropriate placement of the inmate.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Behavioral Management Unit (BMU)**

320.   Defendants Contend: The purpose of the Behavioral Management Unit (BMU) is to provide direction regarding the intake, admission, treatment and discharge processes for the Behavioral Management Unit (BMU) located at ASPC-Eyman.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

321.   Defendants Contend: To be admitted to the BMU program an inmate must have a persistent personality disorder as defined in the current version of the Diagnostic and Statistical Manual of Mental Disorders, a history of a problematic adjustment to

incarceration as evidenced by a persistent and ongoing inability to self-regulate assaultive, destructive, and/or self-injurious behaviors. If an additional diagnosis is present, it must be well controlled.

<u>Plaintiffs Contend:</u>  Plaintiffs' Mental Health Objection.

322.   <u>Defendants Contend</u>: Upon admission to the BMU, a face-to-face interview is conducted and an individualized behavior plan will be developed that addresses  the inmate's mental health issues and establishes realistic goals specific to the management of the inmate's behavior.

<u>Plaintiffs Contend:</u>  Plaintiffs' Mental Health Objection.

323.   <u>Defendants Contend</u>: Upon completion of the BMU program, the inmate will receive a certification of completion and be officially discharged from the Program.

<u>Plaintiffs Contend:</u>  Plaintiffs' Mental Health Objection.

324.   <u>Defendants Contend</u>: If the BMU Program Coordinator determines that an inmate is no longer appropriate for placement in BMU, that inmate shall be presented on the statewide teleconference for notification and discussion of appropriate treatment and placement. Documentation of this presentation shall be placed in the inmate's record, and shall include recommendations from the teleconference.

<u>Plaintiffs Contend:</u>  Plaintiffs' Mental Health Objection.

**<u>Rincon Mental Health Program</u>**

325.   <u>Defendants Contend</u>: The purpose of the Rincon Mental Health Program is to provide direction regarding the placement, treatment and discharge processes for the Rincon Mental Health Program (formerly BHU) at ASPC-Tucson.

<u>Plaintiffs Contend:</u>  Plaintiffs' Mental Health Objection.

326.   <u>Defendants Contend</u>: To be considered for placement, an inmate must have a mental health diagnosis as defined in the current version of the Diagnostic and Statistical Manual of Mental Disorders, be motivated to participate in a structured mental health program, and have a history of problematic adjustment to incarceration as evidenced by a

persistent and ongoing inability to self-regulate assaultive, destructive and/or self-injurious behaviors.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Mental Health, Limits of Confidentiality (Consents)**

327.   Defendants Contend: Inmates participating in ongoing mental health treatment (classified as an MH-3 or above), are advised by the clinician assigned to that unit of the following: the limits of confidentiality with the Arizona Department of Corrections, including threats of harm to self or others, threats to the safe secure and orderly function of the institution (e.g., escape, disturbances, drug trafficking), information related to abuse, neglect or molestation of a minor, vulnerable or developmentally disabled adult, or elder adult, legal proceedings that requires that records be opened/released pursuant to state statute or a court order, discussion of a supervisory or treatment planning nature among inmate health services staff, and information related to an unsolved capital offense (e.g. unsolved murder). Inmates are also advised of alternatives to proposed treatments, advantages and benefits of proposed treatment, and disadvantages and risks of proposed treatment.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

328.   Defendants Contend: If the proposed treatment is medication, the P/PNP will have the inmate sign the appropriate Psychiatric Medication Informed Consent Form.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

329.   Defendants Contend: If an inmate refuses to sign a Mental Health Consent Form, the content of the form must be read and explained to the inmate (with another staff member as a witness) to ensure that the inmate's questions have been answered. On the inmate signature line, write "refused to sign." Place provider's signature on the mental health staff signature line. Include position, date and printed name or name stamp. Below this have the witness place signature, position, date and printed name or name stamp.

96

After verbal presentation of the Consent Form, and signatures completed, proceed to see the inmate unless he/she is refusing to be seen.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.


**Mental Health Treatment Plans**

330.   Defendants Contend: Inmates with a Mental Health score of 3 or above are provided a mental health treatment plan.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

331.   Defendants Contend: A treatment plan is  developed upon a diagnosis being given and added into their medical record.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

332.   Defendants Contend: When an inmate's score is lowered to a MH-2, the mental health treatment plan is marked "Cancelled".

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Psychological Autopsy**

333.   Defendants Contend: A psychological autopsy is completed on all deaths of inmates with a MH score of 3 or above, and all inmates who complete suicide regardless of MH score. A psychological autopsy is the retrospective review of an inmate's life with an emphasis on factors which may have contributed to the inmate causing his/her own death.  A psychological autopsy is considered a QUALITY ASSURANCE REVIEW and is confidential.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

334.   Defendants Contend: A psychological autopsy is completed on each inmate suicide.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

335.   Defendants Contend: The purposes of a psychological autopsy includes assisting medical personnel in determining the inmate's mode of death in cases where the cause of death is equivocal, providing a clear understanding of the inmate's state of mind

prior to death, providing a written account of collateral information provided by inmate and staff first responders, fellow inmates who were friends with the deceased, and family members, providing insights regarding how best to address the clinical needs of future suicidal inmates, and identifying deficiencies in institutional policies and procedures

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

336.   Defendants Contend: The PAC shall consist of the FHA, Unit Deputy Warden, MHPD, Director of Psychiatry, and any additional staff that the Lead Psychologist deems pertinent, review the inmate's medical/mental health record, including autopsy and toxicology reports if available, review any relevant source of data (e.g., Information Reports, investigation reports, and Department documents, etc.) relevant to the incident, and make recommendations concerning policy or procedural changes, as necessary, to the Lead Psychologist for consideration and inclusion in the psychological autopsy.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Psychiatric Prescription Duration**

337.   Defendants Contend: Prescriptions for medication by a P/PNP may be written for duration of up to six (6) months.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

338.   Defendants Contend: For inmates on multiple medications, when the provider changes the dosage of one medicine the new expiration date should match the expiration date of the other previously written medications. The other medications which are not being changed do not need to be rewritten until necessary.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Continuation of Psychiatric Medications for Reception Inmates**

339.   Defendants Contend: For Alhambra Reception Treatment Center and Perryville Reception, inmates who arrive with active prescriptions for psychiatric medications: medications can be continued on inmates who are not seen, provided that the RN has verified that the inmate is currently taking the medications through one of the

following: (i) receipt of a continuity of care form from the referring facility, or (ii) documentation from a pharmacy, or (iii) current, properly labeled prescription bottles, or (iv) verification with outside medical records.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

340.   Defendants Contend: All medications, including those which are non-formulary (excluding controlled substances), can be continued for up to forty-two (42) days without a nonformulary request.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

341.   Defendants Contend: Non-formulary medications can be continued on inmates who are seen, without a non-formulary request, provided that the RN has verified that the inmate is currently taking the medications through one of the following: (i) receipt of a continuity of care form from the referring facility, or (ii) documentation from a pharmacy, or (iii) current, properly labeled prescription bottles, or (iv) verification with outside medical records.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

342.   Defendants Contend: The medications can be continued at the same or reduced dosage for up to ninety (90) days. Reducing the dose will not require a non-formulary request. Prescription duration in excess of ninety (90) days will require a non-formulary request form be completed.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Protocols for Psychiatric Services at Non-Corridor Complexes**

343.   Defendants Contend: The mental health provider at a non-corridor facility, or other health services provider as necessary, is responsible for initiating/coordinating the psychiatric services/referral/transfer of the mentally disordered inmate to an appropriate corridor facility in accordance with the protocols of this section.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

344.   Defendants Contend: Each non-corridor facility has a   corridor facility with which they are affiliated for purposes of psychiatric coverage.

99

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

345.   Defendants Contend: An inmate identified by mental health staff as needing a psychiatric evaluation or psychiatric care is scheduled for the next P/PNP's appointment line.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

346.   Defendants Contend: Each corridor facility providing psychiatric services to a non-corridor facility establishes, in conjunction with the Facility Warden and Deputy Warden, a regularly scheduled day and time for these services.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Inmate Follow-up After Discontinuation Of Psychiatric Medication**

347.   Defendants Contend: Following the planned discontinuation of psychiatric medication an inmate  receives  a follow-up assessment to determine whether further need for medication services exists which will be provided by a RN, Psychology Associate, Psychologist, or as indicated by the P/PNP.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Management of Photosensitivity Reactions to Medications**

348.   Defendants Contend: All cases of inmate reported photosensitivity shall be verified by direct clinical examination by the medical staff. In all cases there shall be documentation of an unequivocal diagnosis of significant sunburn (to include erythema at a minimum), in the medical record or mental health progress notes.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

349.   Defendants Contend: If the P/PNP determines that the inmate's psychotropic medication is contributing to their photosensitivity, the P/PNP  meets with the inmate and discusses treatment alternatives including medications having less marked photosensitizing effects.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

350.   Defendants Contend: For cases in which the P/PNP and inmate agree that switching psychotropic medications is not desirable, the inmate will be counseled as to proper use of sunscreen. The P/PNP will order sunscreen minimum SPF 30.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

**Management of Heat Intolerance Reactions to Medications**

351.   Defendants Contend: It is the responsibility of the P/PNP and/or RN to assess any heat intolerance reactions and duly act

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

352.   Defendants Contend: All cases shall be verified by direct clinical examination by the medical staff and in all cases, medical staff will document the direct clinical examination and the unequivocal diagnosis of hyperthermia or orthostatic hypotension.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

353.   Defendants Contend: If the P/PNP determines that the inmate's psychotropic medication is contributing to their heat intolerance, the P/PNP shall meet with the inmate and discuss treatment alternatives including medications having less marked effects on heat tolerance.

Plaintiffs Contend:  Plaintiffs' Mental Health Objection.

354.   Defendants Contend: For cases in which the P/PNP and inmate agree that switching psychotropic medications is not in the inmate's best interest, the P/PNP shall consult with the medical provider regarding a duty status, including issuing special clothing, to minimize heat exposure.

Plaintiffs Contend:   Plaintiffs' Mental Health Objection.   Suicide and Mental Health Watch

355.   Defendants Contend:  Any staff member who becomes aware of an inmate who is at risk of a suicidal gesture/acute mental health issue to notify the shift commander or mental health staff so appropriate measures to protect the inmate can be initiated.

Plaintiffs Contend:  This is a policy and does not establish the ADC's practice, even though        this fact is phrased to suggest that it is the practice.  Plaintiffs Contend that it is not the practice.

356.   Defendants Contend:  Inmates are placed on suicide watch when their behavior is self-destructive, the inmate is displaying suicidal behavior, or the inmate attempts suicide and/or has a documented history of attempting suicide and there are warnings indicating an impending suicide attempt, or the inmate verbally threatens to commit suicide and/or to cause self-inflicted wounds.

Plaintiffs Contend:  These are not the only circumstances under which inmates are placed on suicide watch.

357.   Defendants Contend:  Inmates are placed on mental health watch when an inmate is demonstrating acute signs or symptoms of significant mental disorder but is not acting in a manner indicating significant suicide risk. Plaintiffs Contend:   Inmates exhibiting such symptoms are not always placed on mental health watch.

358.   Defendants Contend:  Only a licensed mental health provider is authorized to cancel or remove a mental health watch.

Plaintiffs Contend:  It is not true that only a licensed mental health provider is authorized to remove an inmate from suicide watch.

359.   Defendants Contend:  When an inmate remains on a watch, a staff member on each shift is assigned the responsibility of conducting the timed watch.

Plaintiffs Contend:  Staff are not always assigned to conduct timed watches in an appropriate and timely manner.

360.   Defendants Contend:   Watch cells are approved by a mental health professional, and generally have no fixtures, appliances, or bars which could be used with the inmate's clothing in a self-harm attempt.

Plaintiffs Contend:  All watch cells are not approved by mental health professionals and are not free of fixtures that can be used for self-harm.

361.   <u>Defendants Contend</u>:   Inmates on watch are ▮Security▮ searched, and all objects that may be used as a weapon for self-harm are removed.

<u>Plaintiffs Contend</u>:   Staff searches do not remove all objects that may be used as a weapon for self-harm.

362.   <u>Defendants Contend</u>:  A combination of health services staff, security staff, and mental health staff ▮Security▮ check the inmate for his welfare at ordered specified intervals.

<u>Plaintiffs Contend</u>:  ▮Security▮ checks are not conducted in an appropriate and timely manner.

363.   <u>Defendants Contend</u>:  Visits by health staff are documented, and the medical staff member performing a welfare check ensures that the inmate responds verbally or is seen moving purposefully.

<u>Plaintiffs Contend</u>:  All visits by health staff are not accurately documented and medical staff members do not perform adequate welfare checks to ensure the inmate responds verbally or are seen moving purposefully.

364.   <u>Defendants Contend</u>:  All watch cells are cleaned at least weekly or when the inmate comes off watch.

<u>Plaintiffs Contend</u>:  All watch cells are not cleaned at least weekly or when the inmate comes off watch.

365.   <u>Defendants Contend</u>:   Corizon provides comprehensive mental health services, including suicide and mental health watches, initial and ongoing evaluations and assessments, development and periodic review of individual treatment plans, psychiatric services,  psychotropic medication evaluations, administration and follow-ups, individual and group psychotherapy, specialized psycho-educational groups and other special programs, psychological autopsies, discharge and transitional planning, proper documentation, and consultation with medical, support and custodial staff on treatment and programming concerns.

<u>Plaintiffs Contend</u>:   It is not true that Corizon is required to and does

103

provide the services listed.

366.   <u>Defendants Contend</u>:   All staff receive training in the identification and management of suicidal inmates.

> <u>Plaintiffs Contend</u>:  Staff do not receive appropriate and adequate training in the management of suicidal prisoners.

367.   Mortality rates are calculated by multiplying the number of deaths in custody by 100,000 and then dividing by the mid-year or end-year state prison population, based upon available data.  The BJS recognizes that while there is no sampling error, there may be random error with a small number of deaths in custody, less than 100, as well as various short-term fluctuations and irregularities.

> <u>Plaintiffs Contend</u>:   This explanation does not accurately describe the methodology.

**Issue: Whether the conditions of confinement within the maximum custody units meet constitutional standards. History/Evolution of Max Custody**

368.   <u>Defendants Contend</u>: Implementation of modifications of maximum custody conditions of confinement has been an evolving and progressing process since 2009.

> <u>Plaintiffs Contend</u>: Implementation of modifications has not been an evolving and progressing process since 2009.

369.   <u>Defendants Contend</u>: As examples, in mid-2009, ASPC-Florence started a WIPP work crew assignment program for maximum custody inmates from Central Unit to work out of cell in education, maintenance, shoeshine, laundry, library, barber and porter positions.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that the program described was started in 2009, as well as its availability to most of the prisoners in the unit. Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

370.   <u>Defendants Contend</u>: Approved Central Unit maximum custody inmates were also permitted recreation in groups of ▉ and communal chow in the same numbers.

1
2
3
4
5

Plaintiffs Contend:  Plaintiffs dispute that the program described was started in 2009.  Plaintiffs dispute that most prisoners in the Unit were permitted group recreation and meals.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

6
7
8
9
10
11

371.  Defendants Contend: In July 2009, a pilot program was also started for ASPC-Florence, Central Unit – CB-2 maximum custody inmates that permitted [Security] escorts to recreation and showers and group recreation for ▪ inmates at a time.  Maximum custody inmates were also screened and selected for work and education programs providing increased out of cell time and interaction with inmates and prison personnel.

12
13
14
15
16

Plaintiffs Contend:  Plaintiffs dispute that the program described was started in 2009.  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

17
18
19
20
21

372.  Defendants Contend: Likewise in July 2009 ASPC-Florence implemented the Walking Max Program in Central Unit – CB-2 which permitted increased out of cell time for screened and approved inmates to include increased contact visitation, some meals in the chow hall, unescorted movement to recreation and showers, group recreation for ▪ inmates at a time and WIPP work programs.

22
23
24
25
26

Plaintiffs Contend:  Plaintiffs dispute that the program described was started in 2009.  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

27
28

373.  Defendants Contend: In 2010 ASPC-Florence implemented the ETV Block Daily Broadcast behavioral series program for Central Unit maximum custody inmates

that permitted inmates to self-study courses that were also broadcast on televisions located in certain units where inmates could watch the programs from their cell fronts.  Programs included Living a Better Way, Domestic Violence – Broken Wings, Victim Awareness, Conflict Resolution, Commitment to Change, Substance Abuse, Resources for Change.

> Plaintiffs Contend:  Plaintiffs dispute that the program described was started in 2010.  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

374.   Defendants Contend: In May 2012, mental health inmates were selected to participate in a mental health program in CB1 receiving 1:1 individual therapy, group therapy and psycho-educational therapy.

> Plaintiffs Contend:  Plaintiffs dispute that the program described was started in 2012.  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners. Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

375.   Defendants Contend: In August 2012, a psychiatric tech was assigned to CB-1 to develop recreational activities to include basketball and kickball tournaments, hobby craft and a CB-1 inmate newsletter.  Release preparation groups were also formed.

> Plaintiffs Contend:  Plaintiffs dispute that these recreational activities and groups were developed and are available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

376.   Defendants Contend: In May 2012, inmates were also selected to participate in a mental health program in CB Kasson, Wing 1 that also included 1:1 individual therapy, group therapy and psycho-educational therapy.

> Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

377.   Defendants Contend: In the fall of 2013, group therapy started to take place in the recreation facilities at the Kasson Unit allowing small groups to program uncuffed.

> Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

378.   Defendants Contend: In December 2012, a psychiatric tech was assigned to Kasson Wing 1 to develop recreational activities and psycho-educational programs such as meditation, poetry, Kasson newsletter and "Doing All Day" Lifer's Group.

> Plaintiffs Contend:  Plaintiffs dispute that these recreational activities and groups were developed and are available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

379.   Defendants Contend: ASPC- Florence Central Unit – CB-1, CB-2 and CB-3 has also added group religious services as of early 2013 allowing inmates not presenting a safety and security risk to gather for 1 to 1.5 hours once a week for communal worship. Cell side services are also offered.

> Plaintiffs Contend: Plaintiffs dispute that these activities and groups were developed and are available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

380.   Defendants Contend: ADC maximum custody inmates are not subjected to "isolation", but instead are provided ample opportunity to interaction with others, out of cell time and programming necessary to not only facilitate the necessary restricted living

and movement measures designed to keep ADC's prisons safe from inmate assault, staff assault, escape, disturbance, uprisings, and self-harm, but also provide maximum custody inmates the opportunity to progress to increased privileges and for some, progression back to general population.

> Plaintiffs Contend:  Plaintiffs dispute that these prisoners are not subjected to "isolation" and that the opportunities discussed are available to most prisoners.

381.   Defendants Contend: The expansion of maximum custody programs is in line with national initiatives to modify conditions of confinement for maximum custody inmates – those inmates that for prison officials are the most challenging to manage because of demonstrated criminal and institutional behavior that poses significant risk to prison safety and security.

> Plaintiffs Contend:   Plaintiffs dispute that all of the prisoners in ADC isolation units are the "most challenging" to manage and pose "significant risk" to prison safety and security if not housed in isolation.   Plaintiffs dispute that ADC's isolation programs are in line with national initiatives.

382.   Defendants Contend: The modification of conditions of confinement for ADC's maximum custody inmates and increase in programs was not a result of the Parsons litigation.

> Plaintiffs Contend:  To the extent that any changes have occurred (which Plaintiffs also dispute), Plaintiffs dispute that these changes were not a result of the Parsons litigation.

383.   Defendants Contend: Rather, the changes are consistent with corrections industry progression that started in 2009.

> Plaintiffs Contend:  Plaintiffs dispute that ADC's isolation programs are in line with national corrections industry standards.

384.   Defendants Contend: The initial program started in 2009 in the CB 2 program.

> Plaintiffs Contend:   Plaintiffs cannot respond to this fact because it is unclear what it means or refers to.

385.   Defendants Contend: Screening inmates into a privilege based behavioral modification program is effective to allow many maximum custody inmates to earn time out of cell and increased privileges, leading to behavior modification and transition preparation for reduction in custody.

> Plaintiffs Contend:   Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.   Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

386.   Defendants Contend: The CB-2 program started in 2009 provided a behavioral modification and earned incentives program for general population maximum custody inmates as well as inmates identified as mental health inmates.

> Plaintiffs Contend:   Plaintiffs dispute that the program described was started in 2009.  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners. Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

387.   Defendants Contend: In September 2009 the Walking I5 Program started in CB- 2.

> Plaintiffs Contend:   Plaintiffs dispute that the program described was started in 2009.  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

388.   Defendants Contend: This program was developed for male maximum custody inmates who qualified for integration to a lower custody level based on good behavior.

> Plaintiffs Contend: Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

389.   Defendants Contend: As part of the program, these inmates were permitted more time out of cell and opportunity to participate in WIPP inmate porter jobs as well as recreate as a group on the recreation field.

> Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

390.   Defendants Contend: In January 2012, ASPC-Florence, Central Unit implemented CB-1 Behavioral Health and Kasson –Wing 1 Mental Health Programs that provided a three stage program where as inmates progressed through the stages, the inmates were afforded opportunities for eating dinner in communal chow halls (stage 2), attend group recreation one day a week (in addition to two other individual recreation periods) (stage 2 or 3), attend group therapy sessions, work as WIPP porter jobs where eligible (stage 3), participate in contact visits (stage 3).

> Plaintiffs Contend: Plaintiffs dispute that the program described was started in 2012.  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

391.   Defendants Contend: In 2012, Perryville-Lumley Unit also began group recreation, communal dining and eligibility for WIPP porter jobs where female maximum custody inmates demonstrated positive behavior.

> Plaintiffs Contend: Plaintiffs dispute that the program described was started in 2012.  Plaintiffs dispute that the programs and opportunities discussed are

available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

392.   Defendants Contend:  In September, 2013, ADC Northern Region Operations Director C. McWilliams prepared a Position Paper – Maximum Custody Population Management.

Plaintiffs Contend:  Immaterial.  That a position paper was published is irrelevant, by itself, to the actual conditions of confinement for prisoners housed in isolation.

393.   Defendants Contend: The purpose of the Position Paper was to further develop a comprehensive system of classification and housing for maximum custody inmates using a progression of movement to allow inmates to progress through maximum custody units based upon positive behavior modification and programming.

Plaintiffs Contend:  Plaintiffs dispute that the purpose of the paper was as described or that it has had the effect supposedly intended.

394.   Defendants Contend:  A multi-disciplined committee was formed to assess and make recommendations on ways to provide increased programming and out of cell activities to ADC maximum custody inmates.

Plaintiffs Contend:  Plaintiffs dispute that such a committee was formed, made the recommendations listed, or took any action that ameliorated the degree of isolation most inmates in isolation experience.

395.   Defendants Contend: Input was gathered from security, programs, mental health, classification, policy, information technology, training and administrative staff.

Plaintiffs Contend:  Plaintiffs dispute that  meaningful input was gathered from each of the categories of individuals listed.

396.   Defendants Contend: ADC also incorporated portions of successful programs in past and current behavioral modification programs from other states, including the state of Washington.

111

> Plaintiffs Contend:  Plaintiffs dispute that ADC incorporated substantive or meaningful portions of programs from other states, including the state of Washington.

397.   Defendants Contend: Under the proposal and pilot program, which was already in progress as of September 2013, ADC maximum custody inmates were provided the opportunity to progress through maximum custody units, earning more privileges and obtaining more out of cell opportunities to prepare the inmates for lowered classification or release from custody.

> Plaintiffs Contend:  Plaintiffs dispute that the program described was underway in September 2013.  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

398.   Defendants Contend: The proposed program provided for step progression through the program based upon positive behavior modification and programming, with increased privileges providing an incentive for maximum custody inmates to demonstrate behavioral change and motivation in order to increase inmates' chance of success both in the prison setting as well as in the community, once released.

> Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed operate as described and have the effects stated.  Plaintiffs further dispute that such programs are available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

399.   Defendants Contend:  In addition, the proposed program provided opportunity for positive inmate-staff interactions as well as inmate-inmate positive interactions which in turn creates a more positive and professional prison environment, leading to positive inmate behavior changes and less recidivism.

> Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed operate as described and have the effects stated.  Plaintiffs further dispute that such programs are available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

400.  Defendants Contend: To prepare for implementation of the proposed program, ADC trained all COIIIs working with mental health inmates to run groups and all line staff working in mental health pods to have awareness in handling mental health issues, as well as interacting with mental health inmates.

> Plaintiffs Contend:  Plaintiffs dispute that all COIIIs were trained, as well as the appropriateness and sufficiency of the training.

401.  Defendants Contend: Hundreds of staff were trained before the end of 2013.

> Plaintiffs Contend:  Plaintiffs dispute that "hundreds" of staff were trained, as well as the appropriateness and sufficiency of the training.

402.  Defendants Contend: The September 6, 2013 Position Paper – Maximum Custody Population Management, culminated in ADC Director's Instruction #326, Maximum Custody Population Management dated March 27, 2014.

> Plaintiffs Contend:  Immaterial.  Regardless of what is stated in the position paper or DI 326, unless Defendants are able to show that the policies and programs are being implemented in isolation units, they are irrelevant to the actual conditions of confinement in these units.

403.  Defendants Contend: As illustration, in 2014, ADC will host all state directors of departments of corrections conference in Arizona for tours of ADC facilities to educate other departments of corrections as to Arizona's progressive maximum custody inmate management protocols, programs, policies and procedures, including as implemented in Director's Instruction #326.

> Plaintiffs Contend: Irrelevant.  Plaintiffs' dispute that ADC's policies are "progressive."   That ADC is hosting a conference regarding its alleged

programs and policies says nothing about the constitutionality of the policies or whether the policies in place are in fact being implemented.

**Step-Program Incentives**

**ASPC-Eyman, Browning Unit Step Program Incentives and Programming**

404.   <u>Defendants Contend:</u> Browning Unit general population, ██████ and ██████ maximum custody inmates must participate in a three step behavioral modification program.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs also dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

405.   <u>Defendants Contend:</u> Each step requires a minimum 30 day participation period and adherence to program expectations.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

406.   <u>Defendants Contend:</u> An inmate may be reduced to a prior step based upon program non-compliance, certain disciplinary violations or demonstration of poor socialization skills and/or non-cooperative behavior.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute that a prisoner may be reduced to a prior step only for the reasons described.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation

114

most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

407.  <u>Defendants Contend:</u> Incentives provided to Step I inmates include:  Store - $60/week and $80 at Christmas; Phone – once 15 minute call/month; Visitation – one non-contact visit block per week; Recreation – 3 two hour periods per week – individual enclosures; Library services; TV and personal property per DO 909; Securepack – once per quarter within security limitations on certain items.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

408.  <u>Defendants Contend:</u> Incentives provided to Step II inmates include: Store - $80/week and $120 at Christmas; Phone – two 15 minute calls per month; Visitation – two non-contact visit blocks per week; Recreation – 3 two hours periods per week, one of which can be in the Security interactive enclosures; Library services; TV and personal property per DO 909; Securepak – once every other month within security limitations on certain items; Fundraisers – participate in inmate fundraisers; Hobby Craft – origami and pencil drawing.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled

the stated requirements and are provided additional privileges and programs as a result.

409.   Defendants Contend: Incentives provided to Step III inmates include: Store - $100/week and $160 at Christmas; Phone – three 15 minute calls per month; Visitation – three non-contact visit blocks per week; Recreation – 4 two hours periods per week, all can be in the ▉Security interactive enclosures; In-pod recreation; Library services; TV and personal property per DO 909; Securepak – once every month within security limitations on certain items; Fundraisers – participate in inmate fundraisers; Hobby Craft – origami and drawing; WIPP – eligible for job as pod porter.

Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

**ASPC-Eyman, Browning Unit Programming**

410.   Defendants Contend: Prior to April 2014, maximum custody inmates at ASPC-Eyman, Browning Unit were employed as porters, working outside their cells (approximately ▉ positions).

Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

411.   Defendants Contend: Prior to April 2014, the Browning Unit already ran 8 inmate programs for maximum custody inmates to include: Cultural Diversity, Money Management, Responsible Thinking, Self-Control, Social Values, Substance Abuse, Thinking for a Change and Re-Entry.

Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed operate as described and are available to most prisoners. Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

412.   Defendants Contend: Each program session runs 8 weeks and meets once per week for one hour.

Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed operate as described and are available to most prisoners. Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

413.   Defendants Contend: Each program can accommodate ▮ inmate students.

Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed operate as described and are available to most prisoners. Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

414.   Defendants Contend: The Thinking for a Change and Re-Entry programs each run two sessions concurrently (▮ inmates per session for a total of ▮ at one time for Thinking for a Change and Re-Entry programs).

Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed operate as described and are available to most prisoners. Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

415.   Defendants Contend: Accordingly, Browning Unit provides the potential for 80 maximum custody inmates to spend an additional one hour out of cell each week to attend program classes assuming no inmate is taking more than one class at a time.

Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed operate as described and are available to most prisoners.

Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.

## ASPC-Eyman, SMU I Step Program Incentives

416.   <u>Defendants Contend:</u> SMU I Unit maximum custody inmates must participate in a three step behavioral modification program.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

417.   <u>Defendants Contend:</u> Each step requires a minimum 30 day participation period and adherence to program expectations.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

418.   <u>Defendants Contend:</u> An inmate may be reduced to a prior step based upon program non-compliance, certain disciplinary violations or demonstration of poor socialization skills and/or non-cooperative behavior.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute that a prisoner may be reduced to a prior step only for the reasons described.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation

most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

419.  <u>Defendants Contend:</u> Incentives provided to Step I inmates include: Store - $60/week and $80 at Christmas; Phone – once 15 minute call per week; Visitation – one non-contact visit block per week (2 hours); Recreation – six hours per week to include one-time per month in Security enclosure (two SMU inmates); Library services; TV and personal property per DO 909; Securepack – once per quarter within security limitations on certain items.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

420.  <u>Defendants Contend:</u> Incentives provided to Step II inmates include: Store - $80/week and $120 at Christmas; Phone – one 15 minute calls per week; Visitation – two non-contact visit blocks per week; Recreation – six hours per week to include one-time per month in Security enclosure (up to four inmates) and one time per month in Security basketball enclosure (up to four inmates); Library services; TV and personal property per DO 909; Securepak – once every other month within security limitations on certain items; Fundraisers – participate in inmate fundraisers; Hobby Craft – origami and pencil drawing.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in

isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

421.  Defendants Contend: Incentives provided to Step III inmates include: Store - $100/week and $160 at Christmas; Phone – one  15 minute call per week; Visitation – three non-contact visit blocks per week; Recreation – six hours per week to include one time per month in [Security] enclosure (up to four inmates), one time per month in [Security] basketball enclosure (up to eight inmates), and one time per month recreation on par course field; Library services; TV and personal property per DO 909; Securepak – once every other month within security limitations on certain items; Fundraisers – participate in inmate fundraisers; Hobby Craft – origami and pencil drawing; Unrestricted escorts – may be eligible on case by case basis; WIPP – eligible for jobs as pod porter and kitchen worker.

Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

**ASPC-Eyman, SMU I Programming**

422.  Defendants Contend: Prior to April 2014, maximum custody inmates at ASPC-Eyman, SMU I Unit were employed as porters, working outside their cells in WIPP positions (approximately 120 positions).

Plaintiffs Contend:  Plaintiffs dispute that the employment described was available to prisoners prior to April 2014.  Plaintiffs also dispute the availability of the employment described to most prisoners currently in

isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

423.   Defendants Contend: Prior to April 2014, the SMU I Unit already ran 7 inmate programs for maximum custody inmates to include: Feelings, Responsible Thinking, Self-Control, Social Values, CORE Skills, Substance Abuse and Mental Health Group.

> Plaintiffs Contend:   Plaintiffs dispute that the program described was available to prisoners prior to April 2014.  Plaintiffs also dispute that the program operates as described and the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

424.   Defendants Contend: With the exception of the Mental Health Group, each program session runs 8 weeks and meets once per week for one hour.

> Plaintiffs Contend:  Plaintiffs dispute that the program operates as described and the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

425.   Defendants Contend: With the exception of the Mental Health Group, each program can accommodate 16 inmate students.

> Plaintiffs Contend:  Plaintiffs dispute that the program operates as described and the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

426.   Defendants Contend: With the exception of the Mental Health Group, all above referenced programs each run two sessions concurrently, thereby providing the potential for 32 inmate students to participate in each of the programs thus translating to a total of 192 maximum custody inmates offered the opportunity to spend an additional one

hour out of cell each week to attend program classes assuming no inmate is taking more than one class at a time.

> Plaintiffs Contend:  Plaintiffs dispute that the program operates as described and the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

427.   Defendants Contend: The Mental Health Group session runs 4 weeks and the subjects of the mental health groups change monthly (i.e., Relaxation Techniques, Sleep Hygiene, Anger Management, Self-Esteem, Depression, Triggers, Regulating Emotion, Stages of Change, Effective Coping Skills, Anxiety, Impulsivity and Healthy Communication sessions scheduled for 2014).

> Plaintiffs Contend:  Plaintiffs dispute that the program operates as described and the  availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

428.   Defendants Contend: Mental Health Group runs of two classes per day, Monday through Friday for a total of 10 classes per week.

> Plaintiffs Contend:  Plaintiffs dispute that the program operates as described and the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

429.   Defendants Contend: Each Mental Health Group program runs one hour each session and can accommodate 11 inmates per class.

> Plaintiffs Contend:  Plaintiffs dispute that the program operates as described and the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

430.   Defendants Contend: At any one time, 110 inmates may participate in the Mental Health Group.

Plaintiffs Contend:  Plaintiffs dispute that the program operates as described and the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

431.   Defendants Contend: Accordingly, there is the potential for 302 inmates to participate in SMU I programming.

Plaintiffs Contend:  Plaintiffs dispute that the program operates as described and the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

432.   Defendants Contend: Inmate demand for participation in the programs, however, is less than the available openings in the Feelings, Responsible Thinking, Self-Control, Social Values, CORE Skills, Substance Abuse programs.

Plaintiffs Contend:  Plaintiffs dispute Defendants' contentions regarding the lack of inmate demand. Plaintiffs also dispute the regular availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

433.   Defendants Contend: While there is availability for 16 participants in each class, only an average of approximately 11 to 14 inmate students actually participate.

Plaintiffs Contend:  Plaintiffs dispute Defendants' contentions regarding the lack of inmate demand. Plaintiffs also dispute the regular availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

**ASPC-Florence, Central Unit Step Program Incentives**

434.   <u>Defendants Contend:</u> Central Unit maximum custody inmates must participate in a three step behavioral modification program.

Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

435.   <u>Defendants Contend:</u> Each step requires a minimum 30 day participation period and adherence to program expectations.

Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

436.   <u>Defendants Contend:</u> An inmate may be reduced to a prior step based upon program non-compliance, certain disciplinary violations or demonstration of poor socialization skills and/or non-cooperative behavior.

Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute that a prisoner may be reduced to a prior step only for the reasons described.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they

have fulfilled the stated requirements and are provided additional privileges and programs as a result.

437.   Defendants Contend: Incentives provided to Step I inmates include: Store - $60/week and $80 at Christmas; Phone – one 15 minute call per week; Visitation – one non-contact visit block per week (2 hours); Recreation – 3 two hour periods each week in the standard individual recreation enclosure; Library Service; TV and personal property per DO 909; Loaner TV for those that do not currently have a TV for use with ETV programming; Securepak may be purchased once per quarter within security imitations on certain items.

Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

438.   Defendants Contend: Incentives provided to Step II inmates include: Store - $80/week and $120 at Christmas; Phone – one 15 minute call per week; Visitation – one 2 hour non-contact visit block per week/ once a month inmates may receive a two hour contact visit; Recreation – one hour, six times a week on recreation field; Meals in chow hall; Library service – with access to special library materials; TV and personal property per DO 909;  Securepak – once every other month within security limitations on certain items; Hobby Craft – origami and pencil drawing; WIPP – eligible for select jobs.

Plaintiffs Contend:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled

the stated requirements and are provided additional privileges and programs as a result.

439.   <u>Defendants Contend:</u> Incentives provided to Step III inmates include: Store - $100/week and $160 at Christmas; Phone – one 15 minute call per week; Visitation – one 2 hour contact visit block per week; Recreation – two hours, three times a week on recreation field; Library service; TV and personal property per DO 909; Securepak – once every month within security limitations on certain items; Hobby Craft – origami and pencil drawing; WIPP – eligible for select jobs; Special Fundraisers.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

**ASPC-Florence, Central Unit – CB-1**

440.   <u>Defendants Contend:</u> Prior to April 2014, maximum custody inmates at ASPC-Florence, Central Unit – CB-1 were employed working outside their cells (approximately 30 positions for 75 inmates).

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that the employment described was available to prisoners prior to April 2014.  Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the employment described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

441.   <u>Defendants Contend:</u> Prior to April 2014, CB-1 already ran a Social Values program that is open to 8-12 student inmates.

> Plaintiffs Contend:   Plaintiffs dispute that the program described was available to prisoners prior to April 2014.   Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.   Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

442.   Defendants Contend: The program session runs 8 weeks and meets once per week for one hour.

> Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.  Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

443.   Defendants Contend: While the Social Values program can accommodate 8-12 student inmates, actual participation is traditionally less than class capacity.

> Plaintiffs Contend:  Plaintiffs dispute Defendants' contentions regarding the lack of inmate demand. Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the regular availability of the program described to most prisoners currently in isolation.   Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

444.   Defendants Contend: CB-1 also provided prior to April 2014, Lifers, Arts and Crafts, Tournaments, Psychotherapy and Psych Education programs.

> Plaintiffs Contend:   Plaintiffs dispute that the program described was available to prisoners prior to April 2014.   Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.   Plaintiffs

dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

445.   Defendants Contend: These continuous programs run once a week for 45 minutes.

Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

446.   Defendants Contend: The Lifers, Psychotherapy and Psych Education programs can accommodate 15 inmates.

Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

447.   Defendants Contend: The Arts and Crafts and Tournaments programs can accommodate 10 inmates.

Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.  Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

448.   Defendants Contend: The Lifers, Arts and Crafts and Tournaments program all run one session, meeting once a week.

Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to

which the program ameliorates the degree of isolation most inmates in isolation experience.

449.   Defendants Contend: The Psychotherapy and Psych Education programs all run six sessions concurrently.

Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

450.   Defendants Contend: In all, 227 CB-1 inmates are provided the opportunity for an additional 45 minutes to one hour out of cell a week if an inmate is participating only in one program.

Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

**ASPC-Florence, Central Unit Programming – CB-2 and CB-3**

451.   Defendants Contend: Prior to April 2014, maximum custody inmates at ASPC-Florence, Central Unit – CB-2 and CB-3 were employed working outside their cells (approximately 170 positions for 285 inmates).

Plaintiffs Contend:  Plaintiffs dispute that the employment described was available to prisoners prior to April 2014.  Plaintiffs also dispute the availability of the employment described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

452.   Defendants Contend: Prior to April 2014, CB-2 and CB-3 already ran (or were already in the process of implementing) three inmate programs for maximum

129

custody inmates to include:  Self Control, Responsible Thinking and Social Values (Social Values for CB-2 and CB-3 were already in the implementation process before April 2014 and went "on-line" with inmate attendance before the end of April 2014).

> Plaintiffs Contend:    Plaintiffs dispute that the program described was available to prisoners prior to April 2014.    Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.    Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

453.   Defendants Contend: Each program session runs 8 weeks and meets once per week for one hour.

> Plaintiffs Contend:    Plaintiffs dispute that the program operates as described.  Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

454.   Defendants Contend: Each program can accommodate 8-12 inmate students.

> Plaintiffs Contend:    Plaintiffs dispute that the program operates as described.  Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

455.   Defendants Contend: The Self Control program runs two sessions concurrently so total, 24 inmates can participate in this program per session.

> Plaintiffs Contend:    Plaintiffs dispute that the program operates as described.  Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which

the program ameliorates the degree of isolation most inmates in isolation experience.

456.   Defendants Contend: While the programs can accommodate 8-12 student inmates, actual participation is traditionally less than class capacity.

Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.   Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.   Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

457.   Defendants Contend: Prior to April 2014, CB-2 and CB-3 provided the opportunity for 36 inmates to spend an additional hour out of cell each week for programming (with programming increased for CB2 in April for the Social Values program).

Plaintiffs Contend:   Plaintiffs dispute that the program described was available prior to April 2014.   Plaintiffs dispute that the program operates as described.   Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.   Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

458.   Defendants Contend: In addition to the above, the following self-paced, self-study classes were provided to CB-3 maximum custody inmates in 2012 and started again in March of 2013:  Conflict Resolution, Substance Abuse, Living a Better Way, Broken Wings, Causes and Cure, Victim Awareness, Commitment to Change and Resources for Change.

Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.   Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.   Plaintiffs dispute the extent to which

the program ameliorates the degree of isolation most inmates in isolation experience.

**ASPC-Florence, Central Unit Programming – CB Kasson (CB-5)**

459.   Defendants Contend: Prior to April 2014, maximum custody inmates at ASPC-Florence, Central Unit – CB Kasson (CB-5) were employed working outside their cells (approximately 12 positions for 43 inmates).

> Plaintiffs Contend:   Plaintiffs dispute that the program described was available prior to April 2014.  Plaintiffs dispute that the program operates as described.  Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

460.   Defendants Contend: Prior to April 2014, Kasson already ran a Social Values program.

> Plaintiffs Contend:   Plaintiffs dispute that the program described was available prior to April 2014.  Plaintiffs dispute that the program operates as described.  Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

461.   Defendants Contend: The program session runs 8 weeks and meets once per week for one hour.

> Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.  Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

462.   Defendants Contend: While the program can accommodate 8-12 inmate students per session, actual participation is traditionally less than class capacity.

> Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.   Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.   Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

463.   Defendants Contend: CB Kasson provides 12 inmates the opportunity to spend an additional hour out of cell each week for programming.

> Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.   Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.   Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

**ASPC-Florence, Central Unit Programming – Restricted Housing (CB-7)**

464.   Defendants Contend: Restricted housing inmates are not afforded work programs because of attendant safety and security risks presented by these inmates who have committed one of the Forbidden Three Acts (serious assaults on staff, serious inmate on inmate assaults with a weapon and multiple inmates assaulting an inmate with serious injury).

> Plaintiffs Contend:  Plaintiffs dispute that all prisoners in restricted housing create such a safety and security risk that none can be afforded access to work programs.

465.   Defendants Contend: Prior to April 2014, Central Unit Restricted Housing (CB-7) already ran 3 inmate programs to include:  Self Control, Responsible Thinking and Social Values.

> Plaintiffs Contend:   Plaintiffs dispute that the program described was available to prisoners prior to April 2014.   Plaintiffs dispute that the

133

program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

466.  Defendants Contend: Each program session runs 4 weeks and meets twice per week for one hour.

Plaintiffs Contend:  Plaintiffs dispute that the program operates as described.  Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

467.  Defendants Contend: Each program can accommodate 3-5 inmate students.

Plaintiffs Contend:  Plaintiffs dispute that the program operates as described.  Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

468.  Defendants Contend: The Self Control program runs two sessions concurrently (3-5 inmates per session for a total of 6-10 inmates participating at one time).

Plaintiffs Contend:  Plaintiffs dispute that the program operates as described.  Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

469.  Defendants Contend: The Responsible Thinking and Social Values programs each run four sessions concurrently (3-5 inmates per session for a total of 12-20 inmates participating in each program at a time).

> Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.   Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.   Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

470.   Defendants Contend: Accordingly, 50 Restricted Housing inmates are afforded the opportunity to spend an additional hour out of cell each week for programming.

> Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.   Plaintiffs dispute the availability of the program described to most prisoners currently in isolation.   Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

471.   Defendants Contend: Actual inmate participation in the programming is traditionally less than total available occupancy in the program sessions.

> Plaintiffs Contend:  Plaintiffs dispute Defendants' contentions regarding the lack of inmate demand. Plaintiffs dispute that the program operates as described.   Plaintiffs also dispute the regular availability of the program described to most prisoners currently in isolation.   Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

**ASPC-Perryville, Lumley Unit Step Program Incentives**

472.   Defendants Contend: Lumley Unit female maximum custody inmates must participate in a three step behavioral modification program.   All condemned female inmates participate in all incentives and stages with the exception of non-contact visits, separately from non-condemned inmates.

> Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.   Plaintiffs dispute that the programs and opportunities discussed

135

are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

473.   Defendants Contend: Each step requires a minimum 30 day participation period and adherence to program expectations.

Plaintiffs Contend:  Plaintiffs dispute that the program operates as described.  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

474.   Defendants Contend: An inmate may be reduced to a prior step based upon program non-compliance, certain disciplinary violations or demonstration of poor socialization skills and/or non-cooperative behavior.

Plaintiffs Contend:  Plaintiffs dispute that the program operates as described.  Plaintiffs dispute that a prisoner may be reduced to a prior step only for the reasons described.  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

475.   Defendants Contend: Incentives provided to Step I inmates include: Store - $60/week and $80 at Christmas; Phone – one 15 minute call per week (same for condemned inmates); Visitation – one non-contact visit block per week (2 hours); Recreation – one hour, six times a week; Library Service; TV and personal property per DO 909; Securepak may be purchased once per quarter within security imitations on certain items.

Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

476.   Defendants Contend: Incentives provided to Step II inmates include: Store - $80/week and $120 at Christmas; Phone – one 15 minute call per week (condemned inmates receive two 15 minute calls per week); Visitation – one 3 hour non-contact visit block per week; Recreation – one hour, six times a week in 12 inmate groups; Library service; TV and personal property per DO 909; Securepak – once every other month within security limitations on certain items; Hobby Craft – origami and pencil drawing; WIPP – eligible for select jobs; Movement – unrestrained out of cell; Dining room access – breakfast and dinner meals; Photos – inmate only on New Year's Day, Valentine's Day, Mother's Day and Father's Day.

Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.  Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.  Plaintiffs also dispute that inmates participating in these

programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

477.   Defendants Contend: Incentives provided to Step III inmates include: Store - $100/week and $160 at Christmas; Phone – one 15 minute call per week (condemned inmates receive three 15 minute calls per week); Visitation – one 3 hour non-contact visit block per week; after 180 days in Step II, shall be granted contact visits in four hour blocks and utilize vending machines; Recreation – one hour, six times a week in 14 inmate groups; Library service; TV and personal property per DO 909; Securepak – once every month within security limitations on certain items; Hobby Craft – origami and pencil drawing; WIPP – eligible for select jobs; Movement – unrestrained out of cell; Dining room access – all meals; Photos – families on New Year's Day, Valentine's Day, Mother's Day and Father's Day; Loaner appliances – television, music player and fans when available; Group activities – televised sport and entertainment programs.

Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.   Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners.   Plaintiffs dispute the extent to which the program ameliorated the degree of isolation most inmates in isolation experience.   Plaintiffs also dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs as a result.

**ASPC-Perryville, Lumley Unit Programming**

478.   Defendants Contend: Prior to April 2014, female maximum custody inmates at ASPC-Perryville – Lumley Unit were employed in positions to include the following: porter, construction (remodeling of kitchen), kitchen deep cleaning, watering shrubbery and working in the library (approximately ▮ positions for ▮ maximum custody inmates).

1
2
3
4
5
6

   Plaintiffs Contend:  Plaintiffs dispute that the employment described was available to prisoners prior to April 2014.  Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the employment described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

7
8
9
10

  479.  Defendants Contend: Prior to April 2014, the Lumley Unit already ran 6 out of cell programs for Stage II and III maximum custody inmates:  Self Control, Responsible Thinking, Domestic Violence, Merging Two Worlds, Thinking for a Change and Social Values.

11
12
13
14
15
16

   Plaintiffs Contend:  Plaintiffs dispute that the program described was available to prisoners prior to April 2014.  Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

17
18

  480.  Defendants Contend: Self-Control, Responsible Thinking and Social Values programs run 8 weeks per session.

19
20
21
22
23

   Plaintiffs Contend:  Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

24
25

  481.  Defendants Contend: Domestic Violence, Merging Two Worlds and Thinking for a Change programs run 10 weeks per session.

26
27
28

   Plaintiffs Contend:  Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to

which the program ameliorates the degree of isolation most inmates in isolation experience.

482.   Defendants Contend: Self-Control, Responsible Thinking and Social Values programs meet once each week for one hour.

Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

483.   Defendants Contend: Domestic Violence, Merging Two Worlds and Thinking for a Change programs meet once each week for 1.5 hours.

Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

484.   Defendants Contend: Self-Control and Responsible Thinking programs can accommodate 5 inmate students per session.

Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

485.   Defendants Contend: Domestic Violence, Merging Two Worlds and Thinking for a Change programs can accommodate 5-8 inmate students per session.

Plaintiffs Contend:   Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to

which the program ameliorates the degree of isolation most inmates in isolation experience.

486.  Defendants Contend: The Social Values program can accommodate 6-8 inmate students per session.

Plaintiffs Contend:  Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

487.  Defendants Contend: Stage I maximum custody inmates may participate in the Self Control and Responsible Thinking programs, but participate on a self-study basis, in cell.

Plaintiffs Contend:  Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

488.  Defendants Contend: In addition to the above, prior to April 2014, Perryville-Lumley already  offered the following additional activities to Step II and/or Step III maximum custody female inmates:  yoga (one class per week for 1.5 hours – accommodation of 2 separate groups of 5 inmates); Step III social activity (one class per week for 1.5 hours – educational movies); religious services (1.5 hours twice a month – accommodation of 8-10 inmates with separate services provided for condemned inmates); Step III therapeutic class – "Relationships" (one class per week for one hour – accommodation of 5 inmates).

Plaintiffs Contend:  Plaintiffs dispute that the program described was available prior to April 2014.  Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described

to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

489.   <u>Defendants Contend:</u> Finally, Perryville-Lumley female maximum custody inmates are offered one-on-one therapy, as needed and determined by mental health providers.

<u>Plaintiffs Contend</u>:   Plaintiffs dispute that the program operates as described.  Plaintiffs also dispute the availability of the program described to most prisoners currently in isolation.  Plaintiffs dispute the extent to which the program ameliorates the degree of isolation most inmates in isolation experience.

490.   <u>Defendants Contend:</u> In the last five years, more than 100 female maximum custody inmates have been released from maximum custody by completing programming.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute this fact as Defendants have presented no underlying evidence to support it.  Plaintiffs further dispute that this fact is relevant to conditions of confinement of prisoners currently held in isolation.

**Cell-Cleanliness**

491.   <u>Defendants Contend</u>: Inmates are given  trash containers in all living areas, which must be emptied daily.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that all prisoners are provided [Security] trash containers and that they are emptied daily.

492.   <u>Defendants Contend</u>: Cells are cleaned prior to an inmate being newly assigned to the cell, including bunk mattress cleaning/exchange/replacement depending on the cleanliness or condition of the previously used mattress.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that cells are cleaned as described.

493.   <u>Defendants Contend</u>: [Security] clean the cell and paint it if necessary, before a newly assigned inmate moves into a cell.

Plaintiffs Contend:  Plaintiffs dispute that cells are painted and cleaned as described.

494.   Defendants Contend: [Security] clean the run areas and showers.

Plaintiffs Contend:  Plaintiffs dispute that showers and run areas are cleaned as described.

495.   Defendants Contend: Upon assignment to a new cell, the newly assigned inmate may request and be provided cleaning supplies to clean the cell again, if the inmate wishes; this includes inmates placed in watch cells.

Plaintiffs Contend:  Plaintiffs dispute that prisoners are provided cleaning supplies upon request.

496.   Defendants Contend: Inmates are issued cleaning supplies a minimum of once a week in order to clean their cells.

Plaintiffs Contend:  Plaintiffs dispute that prisoners are provided cleaning supplies as described.

497.   Defendants Contend: Each cell has running water and thus inmates are permitted to use the water and any soap available in their cells to clean their cells between the weekly issuance of cleaning supplies.

Plaintiffs Contend:  Plaintiffs dispute that all cells consistently have running water and that prisoners have sufficient soap to clean their own bodies as well as their cells.

498.   Defendants Contend: All common areas and showers in inmate housing units are cleaned by inmate porters on a daily basis.

Plaintiffs Contend:  Plaintiffs dispute that common areas and showers are cleaned as described.

499.   Defendants Contend: ADC contracts with extermination companies to spray cells, showers, and housing unit common areas on a monthly basis.

Plaintiffs Contend:  Plaintiffs dispute that extermination is carried out  as described.

500.   <u>Defendants Contend</u>: These policies and operational practices apply equally to general population and maximum custody cells.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute these policies and practices are applied in either general population or maximum custody.

501.   <u>Defendants Contend</u>: Inmates are prohibited from covering cell windows as such conduct impedes correctional personnel's ability to conduct safety and welfare checks and allows inmates the opportunity to engage in self-harm, contraband use or exchange, destruction of property, arson, assault, escape or other prohibited conduct.

> <u>Plaintiffs Contend</u>: Plaintiffs do not dispute the existence of this policy, but dispute the appropriateness of the policy in the case of female inmates at Perryville-Lumley who seek to shield themselves from male correctional staff for short periods of time to change or use the bathroom.

502.   <u>Defendants Contend</u>: Socialization between inmates is permitted on their own runs or rooms.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that socialization between inmates is consistently permitted on their own runs or rooms.

503.   <u>Defendants Contend</u>: Inmates are authorized one pillow, one mattress, one blanket for summer and two blankets for winter; they may receive additional items with written authorization from medical or administrative staff.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute this fact given the poor state of the items found in the cells of many inmates.

504.   <u>Defendants Contend</u>: Cell property may be restricted upon determination by medical or administrative staff in order to prevent the inmate from engaging in self-harm.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that these are the only circumstances in which cell property is restricted.

505.   <u>Defendants Contend</u>: ADC has been making capital improvements to its maximum security units since 2009, including opening up cell fronts for better

observation and communication of/between inmates, and installing also windows ▓▓ so that inmates can see other inmates ▓▓▓▓ .

> Plaintiffs Contend:  Plaintiffs dispute that any changes that have been made affect the majority of prisoners in isolation or ameliorate the experience of isolation for prisoners in isolation.

## Cell-Configuration

### ASPC-EYMAN

#### Browning Unit

506.   Defendants Contend: While there are no outside facing windows in the Browning Unit, South and North Side Wing cells, skylights in each pod provide inmates exposure to natural sunlight.

> Plaintiffs Contend:  Plaintiffs dispute that "skylights" described provide exposure to natural sunlight or significantly decrease the experience of isolation for most prisoners in isolation.

507.   Defendants Contend: Each Browning Unit cell door is constructed of ▓▓ steel, which permits the inmate to see out into the pod from the door and also lets in sunlight.

> Plaintiffs Contend:  Plaintiffs dispute that the cell doors allow exposure to sunlight or allow prisoners to see into the pod.

508.   Defendants Contend: Each cell is equipped with a bed, stool, desk, toilet, and sink with hot and cold running water.

> Plaintiffs Contend:  Plaintiffs dispute this fact given the poor state of the items found in the cells of many inmates.

#### SMU I

509.   Defendants Contend: While there are no outside facing windows in the SMU I cells, skylights in each pod provide inmates exposure to natural sunlight.

1
2
3

        Plaintiffs Contend:  Plaintiffs dispute that "skylights" described provide exposure to natural sunlight or significantly decrease the experience of isolation for most prisoners in isolation.

4
5
6

    510.   Defendants Contend: Each SMU I cell door is constructed of ████████ steel, which permits the inmates to see out into the pod from the door and also lets in sunlight.

7
8

        Plaintiffs Contend:  Plaintiffs dispute that the cell doors allow exposure to sunlight or allow prisoners to see into the pod.

9
10
11

    511.   Defendants Contend: Each cell is equipped with a bed (or two beds if double bunked), stool, desk, toilet, and sink with hot and cold running water (mixer, one button).

12
13
14

        Plaintiffs Contend:  Plaintiffs dispute this fact given the poor state of the items found in the cells of many inmates. In many cells, the "bed" is simply a slab.

15

### ASPC-FLORENCE

16

### Cell Block 1

17
18

    512.   Defendants Contend: Of the ████ cells in this building, ████ face exterior windows of the building.

19
20

        Plaintiffs Contend: Plaintiffs dispute that ████ of the cells face exterior windows of the building.

21
22
23

    513.   Defendants Contend: All cells in CB1 have a ████████ steel opening ████████ of the cell ███████████████████ design of the cell block such that ████ of the cell is exposed to ██████.

24
25

        Plaintiffs Contend: Plaintiffs dispute all cells are exposed to ████████ as described.

26

    514.   Defendants Contend: This opening allows natural light to enter the cell.

27
28

        Plaintiffs Contend: Plaintiffs dispute that significant amounts of natural light enters each cell.

515.  <u>Defendants Contend:</u> The cell doors are an open cell front setting constructed with steel bars such that the cell fronts are open allowing visual observation of surroundings by the inmates.

<u>Plaintiffs Contend</u>: Plaintiffs dispute that prisoners have significant ability to visually observe their surroundings outside their cell.

516.  <u>Defendants Contend:</u> Each cell is equipped with a bed, shelving, toilet, and sink.

<u>Plaintiffs Contend</u>: Plaintiffs dispute this fact given the poor state of the items found in the cells of many inmates. In many cells, the "bed" is simply a slab.

**Cell Block 2**

517.  <u>Defendants Contend:</u> Cell Block 2 ("CB2") contains ███ [Security] single occupancy cells.

<u>Plaintiffs Contend</u>: Plaintiffs dispute that CB2 contains ███ [Security] single occupancy cells.

518.  All cells in CB2 have a ████ [Security] steel opening ████ [Security] of the cell ████ [Security] a bank of exterior windows which allows natural light into the cells.

<u>Plaintiffs Contend</u>: Plaintiffs dispute that all cells have an opening ████ [Security] ██ of the cell that allows significant natural light into the cell. Plaintiffs also dispute that any such opening significantly ameliorates the experience of isolation for prisoners in isolation.

519.  <u>Defendants Contend:</u> The cell doors are an open cell-front setting constructed with steel bars such that the cell fronts are open allowing visual observation of surroundings by the inmates.

<u>Plaintiffs Contend</u>: Plaintiffs dispute that prisoners have significant ability to visually observe their surroundings outside their cell.

520.  <u>Defendants Contend:</u> Each cell is equipped with a bed, shelving, toilet, and sink.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs Contend: Plaintiffs dispute this fact given the poor state of the items found in the cells of many inmates. In many cells, the "bed" is simply a slab.

**Cell Blocks 3 and 4**

521.   Defendants Contend: All cells in both CB3 and CB4 face  windows.

Plaintiffs Contend: Plaintiffs dispute that all cells face windows.

522.   Defendants Contend: The cell doors are an open cell-front setting constructed with steel bars such that the cell fronts are open allowing visual observation of surroundings by the inmates.

Plaintiffs Contend: Plaintiffs dispute that prisoners have significant ability to visually observe their surroundings outside their cell.

523.   Defendants Contend: The cells fronts face a bank of exterior windows allowing natural light to enter the cells.

Plaintiffs Contend: Plaintiffs dispute that significant natural light enters the cells or that the amount of light ameliorates the experience of isolation for prisoners in isolation.

524.   Defendants Contend: The cells doors in CB4's lower ground floor are also an open cell-front setting constructed with steel bars such that the cell fronts are open allowing visual observation of surroundings by the inmates.

Plaintiffs Contend: Plaintiffs dispute that prisoners have significant ability to visually observe their surroundings outside their cell.

525.   Defendants Contend: The CB4 lower ground floor cells fronts face a bank of exterior windows located at the top of the wall, allowing natural light to enter the cells.

Plaintiffs Contend: Plaintiffs dispute that significant natural light enters the cells or that the amount of light ameliorates the experience of isolation for prisoners in isolation.

526.   <u>Defendants Contend:</u> Each cell in CB3 and CB4 is equipped with a bed, a table with an attached stool, shelving, toilet, and sink.

<u>Plaintiffs Contend</u>: Plaintiffs dispute this fact given the poor state of the items found in the cells of many inmates. In many cells, the bed is simply a slab.

527.   <u>Defendants Contend:</u> All cells in CB5 and CB7 have an outside-facing window ▮▮▮▮ of the cell.

<u>Plaintiffs Contend</u>: Plaintiffs dispute that each cell has an out-side facing window ▮▮▮▮ as described.

528.   <u>Defendants Contend:</u> The CB5 and CB7 cell doors contain a window that faces the pod area to allow inmates to look out of the cell from the door.

<u>Plaintiffs Contend</u>: Plaintiffs dispute that each cell has an out-side facing window ▮▮▮▮ as described.

529.   <u>Defendants Contend:</u> All cells are equipped with a bed, a table/desk with a seat, shelving, toilet, and sink.

<u>Plaintiffs Contend</u>: Plaintiffs dispute that each cell has an out-side facing window ▮▮▮▮ as described.

**Cell Block Kasson**

530.   <u>Defendants Contend:</u> Cell Block Kasson has ▮▮ single occupancy cells and ▮▮ observation cells for a total of ▮▮ cells.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that Cell Block Kasson has ▮▮ single occupancy cells and ▮▮ observation cells for a total of ▮▮ cells.

531.   <u>Defendants Contend:</u> All cells have a window ▮▮▮▮ of the cell to the outside which allows natural light into the cell.  The window to the outside is covered with a ▮▮▮▮ on the interior for security purposes.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that significant natural light enters the cells or that the amount of light ameliorates the experience of isolation for prisoners in isolation.

149

532.   Defendants Contend: All Kasson maximum custody cells have been retrofitted with a window in the steel cell door to allow inmates to look out of the cell from the door.

> Plaintiffs Contend: Plaintiffs dispute that cells in all wings have been retrofitted as described and that that prisoners have significant ability to visually observe their surroundings.

533.   Defendants Contend: Moreover, all Kasson maximum custody cells with the exception of Wing █ ( ███████ ), have two windows in the cell door, ███████ ██████████████████████████████████████████████ .

> Plaintiffs Contend: Plaintiffs dispute that all cell doors referred to have the openings described.

534.   Defendants Contend: All cells are equipped with a bed, a table with an attached stool, a TV shelf (the mental health watch cells do not have the TV shelf), toilet, and sink.

> Plaintiffs Contend:  Plaintiffs dispute this fact given the poor state of the items found in the cells of many inmates. In many cells, the "bed" is simply a slab.

**ASPC-PERRYVILLE**

**Lumley Unit**

535.   Defendants Contend: Each cell has ████ outside-facing windows that allow natural light into the cell.

> Plaintiffs Contend:  Plaintiffs dispute that significant natural light enters the cells through the small, ████████ referred to or that the amount of light ameliorates the experience of isolation for prisoners in isolation.

536.   Defendants Contend: Each cell is constructed with a solid metal cell door that contains a window that allows inmates to look out of their cells from the door.

> Plaintiffs Contend:  Plaintiffs dispute that prisoners have significant ability to visually observe their surroundings outside their cell.

537.   <u>Defendants Contend</u>: Each cell is equipped with a bed, chair, desk, waste basket, sink with hot and cold running water, shelving, open closet, and a toilet, with the exception of ▮ mental health watch cells which consist of a bed, sink, and toilet.

<u>Plaintiffs Contend</u>: Plaintiffs dispute this fact given the poor state of the items found in the cells of many inmates. In many cells, the "bed" is simply a slab.

**Recreation**

538.   <u>Defendants Contend</u>: Maximum custody inmates are provided water during exercise periods.  Outdoor enclosures are covered to provide shade and have either a mister system or evaporative cooler system that is turned on when the outdoor temperature exceeds 100 degrees.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that prisoners are provided water during recreation, that outdoor recreation enclosures are covered and that a mister or evaporative system is used in such areas.

539.   <u>Defendants Contend</u>: Mental health unit inmates' access to exercise areas is determined by mental health staff.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that prisoners in mental health units are provided regular access to recreation and that their access is determined solely by mental health staff.

540.   <u>Defendants Contend</u>: Inmates must be clean shaven at all times; beards are not permitted, except for medical or religious reasons.

<u>Plaintiffs Contend</u>: Undisputed, but irrelevant.  It is not clear how prisoners' shaving habits are relevant to recreation, the conditions of confinement, or Plaintiffs' claims in this case.

541.   <u>Defendants Contend</u>: Recreation time is in addition to other out-of-cell time, including showers.

<u>Plaintiffs Contend</u>: Plaintiffs dispute that prisoners in isolation are provided regular access to recreation or other out-of-cell time.

542.  <u>Defendants Contend</u>: Inmates are provided water during exercise period, and outdoor enclosures are covered to provide shade and have either a mister system or evaporative cooler system.

    <u>Plaintiffs Contend</u>: Plaintiffs dispute that prisoners are provided water during recreation, that outdoor recreation enclosures are covered and that a mister or evaporative system is used in such areas.

543.  <u>Defendants Contend</u>: Inmates housed in mental health units are afforded the same number of hours for exercise weekly as general population inmates.

    <u>Plaintiffs Contend</u>: Plaintiffs dispute that prisoners in mental health units are provided regular access to recreation or the same number of hours for exercise as general population prisoners.

544.  <u>Defendants Contend</u>: Inmates must keep their identification card on their person at all times when out of cell, including recreation, except during a work or recreational activity where the supervising staff member holds the identification card.

    <u>Plaintiffs Contend</u>: It is not clear how the fact alleged is relevant to recreation, the conditions of confinement, or Plaintiffs' claims in this case.

545.  <u>Defendants Contend</u>: An inmate's current physical appearance must match his or her inmate identification card at all times.  The purpose of this policy is to protect against inmates changing their appearance (hair length, facial hair, etc.) in order to impede or prevent inmate counts, impede or prevent officer verification of inmate identity, and to thwart or control escape attempts and resulting escape detection and apprehension.

    <u>Plaintiffs Contend</u>: Undisputed, but irrelevant.  It is not clear how the fact alleged is relevant to recreation, the conditions of confinement, or Plaintiffs' claims in this case.

546.  <u>Defendants Contend</u>: In order to control contraband, prevent assaults and/or self-harm, and thwart escape attempts, inmates are subject to reasonable searches when electing to participate in out of cell recreation and other activities.

**Plaintiffs Contend**: Plaintiffs dispute the reasonableness of the searches described and dispute that they are conducted solely for the reasons alleged.

547.   **Defendants Contend**: Maximum custody inmates in Central Unit, SMU I, and Browning Unit are closely monitored and, as a result, are subjected to ███████ search coming out of cell on the way to recreation and other activities.

**Plaintiffs Contend**: Plaintiffs dispute that these prisoners are subjected only to ███████ search.

548.   **Defendants Contend**: Returning from recreation back to cell, these inmates are subject to ███████████████ and ████████ search.

**Plaintiffs Contend**: Plaintiffs dispute that these prisoners are subject only to ███████████████ and ████████ search."

549.   **Defendants Contend**: All other maximum custody inmates are subject to ███████████████ and ████████ search when returning from recreation back to cell.

**Plaintiffs Contend**: Plaintiffs dispute that  these prisoners are subject only to ███████████████ and ████████ search."

550.   **Defendants Contend**: All of the recreation enclosures provide the inmates with access to fresh air and sunlight, allow for communication between inmates in adjoining enclosures, and allow inmates to exercise.

**Plaintiffs Contend**: Plaintiffs dispute that "recreation enclosures" provide access to fresh air and sunlight, allow for communication between prisoners in adjoining enclosures, and allow prisoners to exercise.

551.   **Defendants Contend**: As to exercise, the individual recreation enclosures provide ample space for inmates to engage in stretching, cardiovascular exercise, and strength training.

**Plaintiffs Contend**:  Plaintiffs dispute that "recreation enclosures" provide "ample space" for the activities described.

552.   <u>Defendants Contend</u>: For safety and security purposes, exercise in individual recreation enclosures is limited to the use of a ██████, ██████, and calisthenics, with an emphasis on large muscle exercise, including walking, jogging in place, and isometrics.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that safety and security require exercise to be as limited as it is for prisoners in isolation.  Plaintiffs dispute that each of the items mentioned is made available to prisoners and that adequate space is provided to perform the activities mentioned.

553.   <u>Defendants Contend</u>: The provision of a ██████ or ██████ to an inmate in an individual recreation enclosure upon request, allows the inmate an object to entertain himself with while at the same time preventing the inmate from using a recreation object for the purpose of self-harm or assault upon personnel.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that provision of a ██████ or ██████ allows sufficient exercise, and that the provision of any other item would permit "self-harm or assault upon personnel."

554.   <u>Defendants Contend</u>: Inmates who are limited to individual enclosure recreation have proven, by their criminal, institutional or disciplinary history, that they present significant risks of harm to self, other inmates or prison personnel.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that all prisoners limited to individual "recreation enclosures" present the "significant risks" described.

555.   <u>Defendants Contend</u>: The recreation enclosures, including the individual recreation enclosures, allow ample space to engage in stretching, tai chi or yoga.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that the "recreation enclosures" allow "ample space" for the activities described.

556.   <u>Defendants Contend</u>: The recreation enclosures, including the individual recreation enclosures, allow ample space for inmates to engage in cardiovascular exercise, including, but not limited to, marching in place, jogging in place,

jogging/walking/marching the perimeter of the enclosure or back and forth, jumping an imaginary rope or doing "burpees" or "up-downs".

> Plaintiffs Contend:  Plaintiffs dispute that the "recreation enclosures" allow "ample space" for the activities described.

557.  Defendants Contend: The recreation enclosures, including the individual recreation enclosures, allow ample space for inmates to engage in strength training, including, but not limited to, pushups, sit-ups, planks, triceps dips, lunges, squats, etc. – all plyometric exercises often performed by non-incarcerated individuals in their own homes.

> Plaintiffs Contend:  Plaintiffs dispute that the "recreation enclosures" allow "ample space" for the activities described.

558.  Defendants Contend: Individual recreation enclosures are warranted in the maximum custody classification prison environment based upon inmate criminal history, disciplinary history, and institutional behavior.

> Plaintiffs Contend:  Plaintiffs dispute that individual "recreation enclosures" are warranted for all prisoners in isolation.

559.  Defendants Contend: Inmates with such demonstrated criminal, disciplinary or institutional history cannot be placed in a recreation enclosure with another inmate.

> Plaintiffs Contend:   Plaintiffs dispute that all prisoners with "such demonstrated criminal, disciplinary or institutional history" are incapable of safely exercising with other prisoners.

560.  Defendants Contend: Such individual recreation, however, does not deprive the inmate of the opportunity to converse with other inmates, ask questions of prison personnel, recreate, lounge, breath fresh air, enjoy sunshine, and engage in exercise.

> Plaintiffs Contend:   Plaintiffs dispute that  individual "recreation enclosures" allow prisoners to converse with others, ask questions of prison personnel, recreate, lounge, breathe fresh air, engage in exercise, and enjoy sunshine.

561.   <u>Defendants Contend</u>: Open cell blocks in ASPC Florence Central Unit (CB-1, 2 and 3) are ███████ searched when returning back to the living unit from the kitchen or visitation only as these locations provide the greatest opportunity for inmates to conceal weapons or contraband obtained while working in the kitchen or participating in visitation.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that these prisoners are subjected only to ███████ searches.

562.   <u>Defendants Contend</u>: ███████ search is the least intrusive means of detecting dangerous contraband or weapons obtained in the kitchen where utensils and tools can serve as weapons, or obtained during visitation from a non-incarcerated person bringing dangerous contraband or weapons into the prison facility.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that ███████ search is the least intrusive means of detecting dangerous contraband or weapons.

563.   <u>Defendants Contend</u>: When going to and returning from recreation, CB-1, 2 and 3 and ASPC Perryville-Lumley inmates are either ███████ or subject to an ███████ – they are ███████.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that these prisoners are subjected only to ███████ or ███████.

564.   <u>Defendants Contend</u>: ███████ and ███████ when going to or returning from recreation is the least intrusive means of detecting the transport and exchange of items used as weapons obtained while at recreation.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that ███████ are the least intrusive means of detecting weapons.

565.   <u>Defendants Contend</u>: ADC inmates are not compelled to attend recreation – it is their choice to participate or not.

> <u>Plaintiffs Contend</u>:   Plaintiffs dispute that prisoners have a "choice" regarding recreation,  as recreation is frequently cancelled and not made up.

566.   <u>Defendants Contend</u>: It is also not unusual for inmates to elect not to go to recreation based upon personal preference, activity level, etc.

  <u>Plaintiffs Contend</u>:  Plaintiffs dispute that it is "not unusual" for prisoners to refuse recreation.  Plaintiffs further dispute that such refusals are based upon "personal preference" rather than upon the harsh, inadequate, and sometimes dangerous exercise areas provided.

567.   <u>Defendants Contend</u>: Inmates who refuse the opportunity for recreation are nevertheless still offered the option to shower.

  <u>Plaintiffs Contend</u>:  This fact is irrelevant.  Plaintiffs further dispute this fact as Defendants have provided no underlying data to support this assertion.

568.   <u>Defendants Contend</u>: Generally, recreation for ASPC Eyman and ASPC Florence maximum custody inmates is scheduled in three day per week, two hour per session blocks in order that approximately 3,000 male maximum custody inmates are provided equal access to recreation on a weekly basis.

  <u>Plaintiffs Contend</u>:  Plaintiffs dispute that ADC provides prisoners in isolation recreation consistent with its own policy.  Recreation is frequently cancelled and not made up.

569.   <u>Defendants Contend</u>: Photographs illustrate the recreation facilities for ASPC-Eyman, ASPC-Florence and ASPC-Perryville.

  <u>Plaintiffs Contend</u>:  Plaintiffs dispute this fact as it is unclear what photos Defendants refer to.  No photos were attached to the proposed stipulation.

**<u>Recreation – Description of Yards at Each Maximum Custody Unit</u>**

ASPC-EYMAN

570.   <u>Defendants Contend</u>: The Eyman complex provides maximum custody individual recreation enclosures at the end of every pod except for two pods.

  <u>Plaintiffs Contend</u>:  Plaintiffs dispute that these small, ███Security███ cells provide an adequate environment for recreation or exercise.

571.   <u>Defendants Contend</u>: Each enclosure is constructed of ██████ with a window in the door leading into the pod.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that there exists a window in the door of sufficient size to ameliorate the conditions of isolation in the enclosure, and that the window allows views out of the cell or air circulation.

572.   <u>Defendants Contend</u>: The top of each recreation enclosure is covered with ██████ which allows exposure to natural light.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that significant natural light is able to enter the exercise cell, particularly early in the morning or late at night, and that the minimal amount of light significantly ameliorates the experience of isolation for prisoners in isolation.

573.   <u>Defendants Contend</u>: Maximum custody inmates in Eyman individual recreation enclosures have access to ██████ and ██████ for entertainment and exercise.

> <u>Plaintiffs Contend</u>:   Plaintiffs dispute that prisoners have access to this equipment.

574.   <u>Defendants Contend</u>:  Additionally,  there  are  ██  outside  recreation enclosures and a basketball court between Wings ██ of Browning and SMU.

575.   <u>Defendants Contend</u>: These outdoor recreation enclosures are situated side by side so that inmates may converse with each other if they wish to do so.

> <u>Plaintiffs Contend</u>:   Plaintiffs  dispute  that  prisoners  may  engage  in meaningful communication while in the "recreation enclosures" and that any  such  communication  significantly  ameliorates  the  experience  of isolation for prisoners in isolation.

576.   <u>Defendants Contend</u>: There is a shade screen on top of these enclosures, along with a misting system.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that a misting system is used in each enclosure.

158

577.   Defendants Contend: The Eyman basketball court is ████████ where multiple inmates may play basketball at once at Browning Unit outside Wing ████.

   Plaintiffs Contend:   Plaintiffs dispute the relevance of this fact as most prisoners in isolation do not have access to the larger recreation areas.

578.   Defendants Contend: Eyman has another ████████ basketball court outside Wing███.

   Plaintiffs Contend:   When Plaintiffs experts toured, Eyeman did not have a ████████ basketball court outside Wing███ and any later development, if any, are not admissible.   Plaintiffs dispute the relevance of this fact as most prisoners in isolation do not have access to the larger recreation areas.

579.   Defendants Contend: SMU I has two ████████ basketball courts outside Wings ████████.

   Plaintiffs Contend:   Plaintiffs dispute the relevance of this fact as most prisoners in isolation do not have access to the larger recreation areas.

580.   Defendants Contend: The basketball courts are fenced in with ████████ ████████.

   Plaintiffs Contend:   Plaintiffs dispute the relevance of this fact as most prisoners in isolation do not have access to the larger recreation areas.

581.   Defendants Contend: The ten outdoor recreation enclosures (████████) and basketball courts are also used by mental health inmates moved to SMU I who are housed in Wings ████████.

   Plaintiffs Contend:   Plaintiffs dispute the relevance of this fact as most "mental health inmates" in isolation do not have access to the larger recreation areas.

582.   Defendants Contend: SMU I has a large recreation enclosure outside Wing███ measuring ████████.

   Plaintiffs Contend:   Plaintiffs dispute the relevance of this fact as most prisoners in isolation do not have access to the larger recreation areas.

583.   Defendants Contend: SMU I additionally has one ▮ recreation enclosure outside of Wing ▮.

Plaintiffs Contend:  Plaintiffs dispute the relevance of this fact as most prisoners in isolation do not have access to the larger recreation areas.

584.   Defendants Contend: Water is provided to inmates in Eyman maximum recreation facilities via water jugs attached to the individual recreation enclosures for inmate self-service.

Plaintiffs Contend:  Plaintiffs dispute that water is provided to prisoners in these "recreation enclosures".

585.   Defendants Contend: Group recreation enclosures offer self-service water to recreating inmates via large water jugs available in the enclosure.

Plaintiffs Contend:  Plaintiffs dispute that water is provided to prisoners in these "recreation enclosures."

ASPC-FLORENCE

586.   Defendants Contend: Inmates in maximum custody at the Florence Complex are allowed individual recreation in outdoor expanded metal enclosures.

Plaintiffs Contend:  Plaintiffs dispute the availability of this recreation, as recreation is frequently cancelled and not made up.

587.   Defendants Contend: These individual enclosures measure approximately ▮, have a sunscreen cover over the top, and have a misting system that is turned on when the outdoor temperature reaches 100 degrees.

Plaintiffs Contend:  Plaintiffs dispute that the misting system is consistently turned on.

588.   Defendants Contend: Inmates in the Max Phase Program (CB-2 and CB-3), Behavioral Health Program (CB-1), and Mental Health Program (Kasson/Wing ▮ are provided group recreation privileges at the Step 2 and 3 levels.

Plaintiffs Contend:  Plaintiffs dispute the availability of this recreation, as recreation is frequently cancelled and not made up.  Plaintiffs also dispute that most prisoners in isolation have access to group recreation.

589.   Defendants Contend: At Step 2, the inmates are offered one day of group recreation, along with two days of individual recreation.

Plaintiffs Contend:  Plaintiffs dispute the availability of this recreation, as recreation is frequently cancelled and not made up.  Plaintiffs also dispute that most prisoners in isolation have access to group recreation.

590.   Defendants Contend: Step 3 inmates are offered three days of group recreation.

Plaintiffs Contend:  Plaintiffs dispute the availability of this recreation, as recreation is frequently cancelled and not made up.  Plaintiffs also dispute that most prisoners in isolation have access to group recreation.

591.   Defendants Contend: The group recreation for the CB-1, CB-2, and CB-3 inmates is on the Central Unit recreation field with potentially up to ▇ inmates (all Step 1 and 2 inmates) per turn.

Plaintiffs Contend:  Plaintiffs dispute the availability of this recreation, as recreation is frequently cancelled and not made up.  Plaintiffs also dispute that most prisoners in isolation have access to group recreation.

592.   Defendants Contend: The Central Unit recreation field provides a variety of recreation equipment and facilities to include a basketball court, volleyball court, track, par exercise course and equipment, covered tables, all-purpose recreation field, water fountain, and thermos jugs for water.

Plaintiffs Contend:  Plaintiffs dispute the availability of this recreation, as recreation is frequently cancelled and not made up.  Plaintiffs also dispute that most prisoners in isolation have access to the facilities described. Plaintiffs also dispute the availability of the equipment described and water.

593.   <u>Defendants Contend</u>: Inmates at Kasson Wing ▮ are offered recreation in ▮ recreation enclosures with four inmates permitted in each enclosure.

       <u>Plaintiffs Contend</u>:  Plaintiffs dispute the availability of this recreation, as recreation is frequently cancelled and not made up.  Plaintiffs also dispute that most prisoners in isolation have access to group recreation.

594.   <u>Defendants Contend</u>: The Kasson Wing ▮ group enclosures are outfitted with basketball hoops and backboards, and one has multi-station exercise equipment.

       <u>Plaintiffs Contend</u>:  Plaintiffs dispute the availability of this recreation, as recreation is frequently cancelled and not made up.  Plaintiffs also dispute that most prisoners in isolation have access to group recreation.  Plaintiffs also dispute the availability of the equipment described.

595.   <u>Defendants Contend</u>: Inmates recreating in individual recreation enclosures at the Florence Complex may take up to two large water bottles with them to recreation, and officers check on the inmates every ▮ minutes and replenish their water bottles upon request from thermos jugs on carts.

       <u>Plaintiffs Contend</u>:  Plaintiffs dispute that officers replenish inmate water bottles upon request and check on inmates every ▮ minutes.

596.   <u>Defendants Contend</u>: Group recreation enclosures have water jugs available in the enclosures for inmate self-service of water.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute the availability of water as described.

597.   <u>Defendants Contend</u>: The Central Unit recreation field provides a water fountain for inmates to drink from.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute the availability of water as described.

ASPC-PERRYVILLE

598.   <u>Defendants Contend</u>: Female maximum custody inmates assigned to the Perryville Lumley Unit receive one hour of outdoor recreation, six days per week.

       <u>Plaintiffs Contend</u>:  Plaintiffs dispute the availability of this recreation, as recreation is frequently cancelled and not made up.

599.   <u>Defendants Contend</u>: There are three different steps of recreation enclosures provided at Perryville for recreation of female maximum security inmates.

<u>Plaintiffs Contend</u>:   Plaintiffs dispute that most prisoners have access to Steps 2 and 3.

600.   <u>Defendants Contend</u>: Step I is the first phase of recreation a maximum custody female inmate is eligible for and is individual recreation in an individual recreation enclosure.

<u>Plaintiffs Contend</u>:   Plaintiffs dispute the availability of this recreation, as recreation is frequently cancelled and not made up.

601.   <u>Defendants Contend</u>: Each Step I enclosure is constructed of ███████ topped with a shade screen cover and is cooled by a misting system.

<u>Plaintiffs Contend</u>:   Plaintiffs dispute that the enclosure is cooled by a misting system and includes a shade cover.

602.   <u>Defendants Contend</u>: Each Step I enclosure has a bench seat, and inmates have access to ███████ and ███████ for entertainment and exercise.

<u>Plaintiffs Contend</u>:   Plaintiffs dispute that prisoners have access to the ███████ and ███████ mentioned.

603.   <u>Defendants Contend</u>: Step I individual recreation enclosures are situated side by side so inmates may converse with each other.

<u>Plaintiffs Contend</u>:   Plaintiffs dispute that the arrangement of the enclosures allows for meaningful communication and that any communication that does occur significantly ameliorates the experience of isolation for prisoners in isolation.

604.   <u>Defendants Contend</u>: This recreation enclosure provides ███████ and two shaded structures with four tables for socializing.

<u>Plaintiffs Contend</u>:   Plaintiffs dispute that the enclosure has two shaded structures.  Plaintiffs dispute that most prisoners have access to Steps 2 and 3.

163

605.   <u>Defendants Contend</u>: Step II and III inmates have access to ▮Security▮, ▮Security▮, and ▮Security▮ for entertainment and exercise.

    <u>Plaintiffs Contend</u>:  Plaintiffs dispute that prisoners have access to the ▮Security▮, ▮Security▮, and ▮Security▮ mentioned.  Plaintiffs dispute that most prisoners have access to Steps 2 and 3.

606.   <u>Defendants Contend</u>: Water is provided to inmates in Perryville individual maximum custody recreation enclosures via water jugs attached to the enclosures for inmate self-service.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute the availability of water as described.

607.   <u>Defendants Contend</u>: The Step II and III recreation enclosure offers self-service water to recreating inmates via large water jugs available in the enclosure or on the field.

    <u>Plaintiffs Contend</u>:  Plaintiffs dispute the availability of water as described.  Plaintiffs dispute that most prisoners have access to Steps2 and 3.

## **Showers**

608.   <u>Defendants Contend</u>: ADC maximum custody inmates (including detention status) are offered showers (and shave for males) three days each week.

    <u>Plaintiffs Contend</u>:  Plaintiffs dispute that showers and shaving are offered three days a week.

609.   <u>Defendants Contend</u>: Inmates are allotted 30 minutes for each shower/shave.

    <u>Plaintiffs Contend</u>:  Plaintiffs dispute that inmates are offered 30 minutes for each shower.

610.   <u>Defendants Contend</u>: Shower/shave time is in addition to the six hours of recreation offered to maximum custody inmates per week.

    <u>Plaintiffs Contend</u>:  Plaintiffs dispute that such time is offered in addition to the six hours allotted by ADC policy, and that prisoners actually receive the six hours allotted by policy

611.   <u>Defendants Contend</u>: Accordingly, considering three opportunities per week for two hours of recreation each period, plus three 30 minute showers per week, maximum custody inmates are permitted, at a minimum, 7.5 hours of out of cell time per week.

 <u>Plaintiffs Contend</u>:  Plaintiffs dispute this fact, as recreation is frequently cancelled and not made up.

612.   <u>Defendants Contend</u>: Close custody inmates on watch status are also permitted three showers per week, 30 minutes per shower.

 <u>Plaintiffs Contend</u>:  Plaintiffs dispute that prisoners are actually afforded three showers per week that are 30 minutes each.

**Human Interaction**

613.   <u>Defendants Contend</u>: Maximum custody inmates are free to send and receive letters to and from incarcerated family and friends.

 <u>Plaintiffs Contend</u>:  Plaintiffs dispute that prisoners are free to correspond with incarcerated family and friends.

614.   <u>Defendants Contend</u>: Maximum custody inmates may send and receive inter-facility mail to incarcerated family upon application and ADC approval of the same where such communication would not compromise safety and security of prison operations – for example, risk of escape planning, exchange of contraband or STG activity communication.

 <u>Plaintiffs Contend</u>:   Contradicting evidence: Ex. 138, ¶459 – Plaintiffs dispute that such approval is given, and that any such correspondence ameliorates the effects of isolation.

615.   <u>Defendants Contend</u>: Maximum custody inmates may also be afforded two telephone calls per year with an incarcerated family member upon application and ADC approval of the same where such communication would not compromise safety and security of prison operations – for example, risk of escape planning, exchange of contraband or STG activity communication.

> Plaintiffs Contend:  Plaintiffs dispute that such approval is given, and that two telephone calls per year ameliorates the effects of isolation.

616.   Defendants Contend: Maximum custody inmates may converse with cellmates where double bunked.

> Plaintiffs Contend:  Plaintiffs dispute that all prisoners in isolation are double-bunked, and that this limited communication is sufficient to ameliorate the experience of isolation for prisoners in isolation.

617.   Defendants Contend: Maximum custody inmates also communicate with each other by talking through ventilation systems or talking to inmates in the cells on either side of them.

> Plaintiffs Contend:  Plaintiffs dispute that all prisoners in isolation are double-bunked, and that this limited communication is sufficient to ameliorate the experience of isolation for prisoners in isolation.

618.   Defendants Contend: In addition, maximum custody inmates may converse with each other during recreation, whether recreating in individual enclosures, in group enclosures or on open recreation yards.

> Plaintiffs Contend:  Plaintiffs dispute that "talking through ventilation systems" is either feasible or permitted, and that any such communication ameliorates the effects of isolation.

619.   Defendants Contend: Maximum custody inmates who participate in programming, communal chow or inmate work programs as part of Director's Instruction #326 Maximum Custody Population Management Step Program (discussed below) may converse with other inmates, correctional personnel and programming personnel.

> Plaintiffs Contend:  Plaintiffs dispute that such communication is either feasible or permitted, and that any such communication ameliorates the effects of isolation.

620.   <u>Defendants Contend</u>: Maximum custody inmates may converse with mental health and medical personnel as associated with mental health and medical needs, interviews, examinations and treatment.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners in isolation.  Plaintiffs also dispute that these programs ameliorate the effects of isolation.

621.   <u>Defendants Contend</u>: Maximum custody inmates may participate in visitation and telephone calls commiserate with custody level with minimum telephone call and visitation opportunities increasing for maximum custody inmates participating in Director's Instruction #326 Maximum Custody Population Management Step Program (discussed below).

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that mental health and medical personnel interact with prisoners with the frequency required by ADC policy, and that these infrequent encounters ameliorate the effects of isolation.

622.   <u>Defendants Contend</u>: Furthermore, maximum custody inmates have the opportunity for interaction with correctional personnel as they perform irregular safety and security checks.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that the programs and opportunities discussed are available to most prisoners in isolation.  Plaintiffs also dispute that these programs ameliorate the effects of isolation.

623.   <u>Defendants Contend</u>: Pursuant to ADC DO 804, Inmate Behavior Control, correctional officers conduct inmate welfare checks at random, periodic intervals, no less than ■■■■ per hour.

> <u>Plaintiffs Contend</u>:  Plaintiffs dispute that correctional personnel conduct safety and security checks with the frequency required by ADC policy, and dispute that any such checks ameliorate the effects of isolation.

624.  <u>Defendants Contend</u>: Therefore, maximum custody inmates have the opportunity to speak to correctional personnel at least ■ times per 24 hours.

    <u>Plaintiffs Contend</u>:  Plaintiffs dispute that DO 804 requires that welfare checks be performed no less than ■Security per hour, and that such checks are performed no less than ■Security per hour.

625.  <u>Defendants Contend</u>: At any one time, however, there may be several correctional personnel in a unit (including rover correctional officers) performing a variety of functions such as security and welfare checks, delivery of mail or commissary, performing escorts, etc., providing inmates with additional opportunity to speak to correctional personnel.

    <u>Plaintiffs Contend</u>:  Plaintiffs dispute that DO 804 requires that welfare checks be performed no less than ■Security per hour, and that such checks are performed no less than ■Security per hour.  Plaintiffs further dispute that any such checks ameliorate the effects of isolation

626.  <u>Defendants Contend</u>: In September 2013, ASPC-Eyman, Browning and SMU I Units, ASPC-Florence, Central Unit, and ASPC-Perryville, Lumley Unit, implemented  correctional officers serving in a rover position.

    <u>Plaintiffs Contend</u>:  Plaintiffs dispute that these checks are conducted regularly, in a timely manner.  Plaintiffs also dispute that separate correctional personnel perform each of these functions.

627.  <u>Defendants Contend</u>: ASPC-Eyman, Browning Unit implemented ■rovers; ASPC-Eyman, SMU I Unit implemented ■rovers; ASPC-Florence, Central Unit implemented ■rovers and ASPC-Perryville, Lumley Unit implemented ■rover.

    <u>Plaintiffs Contend</u>:  Plaintiffs dispute that these units assigned new officers who fulfilled new responsibilities related to their role as "rovers."  Plaintiffs also dispute that the "rover" position is adequate to ameliorate conditions of social isolation in the isolation units.

628.   Defendants Contend: The implementation of the rover position was not because of the Parsons litigation.

Plaintiffs Contend:  Plaintiffs dispute that these units assigned new officers who fulfilled new responsibilities related to their role as "rovers." Plaintiffs also dispute that the "rover" position is adequate to ameliorate conditions of social isolation in the isolation units.

629.   Defendants Contend: The rover position was implemented to allow floor officers to perform security tasks and assist in timely security checks.

Plaintiffs Contend:  Plaintiffs dispute that the "implementation of the rover position" was not because of the Parsons litigation.

630.   Defendants Contend: The implementation of the rover position ensures that inmate safety and welfare checks are completed at an appropriate frequency.

Plaintiffs Contend:  Plaintiffs dispute that rovers fulfill the functions described.

631.   Defendants Contend: The task of the rover correctional officers is to remain in constant motion, going cell to cell to check the safety and welfare of the inmates.

Plaintiffs Contend:  Plaintiffs dispute that these functions are conducted in a timely and appropriate manner or with sufficient frequency.

632.   Defendants Contend: The rover correctional officers are tasked to randomly engage various inmates in conversation.

Plaintiffs Contend:  Plaintiffs dispute that rovers actually fulfill these tasks.

633.   Defendants Contend: The addition of the rover correctional officers permits assigned floor correctional officers to continue to complete numerous other functions of the day to include feeding the inmates, recreating the inmates, showering the inmates and escorting the inmates to appointments.

Plaintiffs Contend:  Plaintiffs dispute that rovers actually fulfill these functions. Plaintiffs dispute that any communications with correctional staff

in the context described are sufficient to ameliorate the degree of isolation most inmates in isolation experience.

634.   Defendants Contend: The addition of the rover correctional officers greatly increases the frequency of security and welfare checks, increasing the frequency to on average, security and welfare checks performed irregularly at approximately ██████ minute intervals.

> Plaintiffs Contend:  Plaintiffs dispute that the addition of the rover allows assigned floor correctional officers to sufficiently complete such tasks and that these units assigned new officers who fulfilled new responsibilities related to their role as "rovers."

635.   Defendants Contend: Since implementation of the rover correctional officer positions, a rover discovered an inmate in Central Unit in cardiac arrest.  Discovery enabled medical personnel to revive the inmate and facilitate emergency hospital transport.

> Plaintiffs Contend:  Plaintiffs dispute that the frequency of the checks describe has "greatly" increased since the "implementation" of the rover program.

636.   Defendants Contend: A rover correctional officer also discovered an inmate in SMU attempting to hang himself.  Detection enabled correctional personnel to intervene and prevent the attempted suicide.

> Plaintiffs Contend:  Plaintiffs dispute that such incident occurred without additional evidence; Defendants have failed to provide any information regarding this incident other than the statement of an ADC official. Accordingly, Plaintiffs have no means to assess the veracity of this claim.

637.   Defendants Contend: At the Lumley Unit, a rover correctional officer discovered an inmate with red marks around her neck.  A cell search uncovered a sheet tied into a noose and the inmate admitted she stopped her suicide attempt when she heard the rover correctional officer making security and welfare checks.

> Plaintiffs Contend:  Plaintiffs dispute that such incident occurred without additional evidence; Defendants have failed to provide any information regarding this incident other than the statement of an ADC official. Accordingly, Plaintiffs have no means to assess the veracity of this claim.

638.   Defendants Contend: These examples of additional correctional officer presence in maximum custody units preventing or saving inmates from self-harm or medical emergency all occurred in the fall of 2013.

> Plaintiffs Contend:  Plaintiffs dispute that such incident occurred without additional evidence; Defendants have failed to provide any information regarding this incident other than the statement of an ADC official. Accordingly, Plaintiffs have no means to assess the veracity of this claim.

639.   Defendants Contend: For those maximum custody inmates who eat in their cells, these inmates have the opportunity for two additional correctional personnel interactions in addition to at least ▇ interactions via inmate safety and welfare checks.

> Plaintiffs Contend:  Plaintiffs dispute that such incident occurred without additional evidence; Defendants have failed to provide any information regarding this incident other than the statement of an ADC official. Accordingly, Plaintiffs have no means to assess the veracity of this claim.

640.   Defendants Contend:  In addition, Correctional Officer III or IV, Lieutenants, and/or Captain level correctional personnel perform daily maximum custody unit rounds.

> Plaintiffs Contend:  Plaintiffs dispute that such communications take place and further dispute that such communications with staff in the context described ameliorate the degree of isolation most inmates in isolation experience.

641.   Defendants Contend: In addition, facility Chaplains make ▇Security▇ per week rounds in maximum custody units in addition to the religious volunteers that are permitted

to minister to maximum custody inmates on an almost daily basis (on an individual cell front visit basis (if the inmate is confined to cell depending on security status).

Plaintiffs Contend:  Plaintiffs dispute that such personnel perform daily maximum custody unit rounds and further dispute that any communications with correctional staff in the context described ameliorate the degree of isolation most inmates in isolation experience.

642.  Defendants Contend: Either librarians or designated correctional personnel also make rounds in maximum custody units ██ per week to deliver books requested by inmates, providing yet another opportunity for contact with a person.

Plaintiffs Contend:  Plaintiffs dispute that Chaplains make ██ per week rounds in the maximum custody units and that religious volunteers minister to inmates in these units. Defendants have failed to provide any information regarding these rounds other than the statement of an ADC official. Accordingly, Plaintiffs have no means to assess the veracity of this claim.

643.  Defendants Contend: Maximum custody inmates are permitted to purchase watches or calendars to keep track of time.

Plaintiffs Contend:  Plaintiffs dispute that librarians or designated correctional personnel make rounds ██ per week to deliver books requested by inmates in maximum custody units and further dispute that any such interaction is sufficient to ameliorate the degree of isolation most inmates in isolation experience Defendants have failed to provide any information regarding this incident other than the statement of an ADC official.  Accordingly, Plaintiffs have no means to assess the veracity of this claim.

644.  Defendants Contend: Correctional personnel also closely interact with close custody inmates on watch status as needed; specifically, correctional officers must conduct constant watch, or 10 or 30 minute watches depending on inmate watch status

which may include medical watch, security watch, suicide watch, and mental health watch.

> Plaintiffs Contend:   Plaintiffs dispute that correctional staff "closely interact" with prisoners on watch, and always conduct watch as this fact describes.

645.   Defendants Contend: While an inmate on watch status is not required to verbally interact with correctional personnel, if an inmate does not respond to an officer during watch checks with either a verbal or non-verbal response, the officer will still ensure status and safety of the inmate via a visual check inmate welfare through the cell door to determine that the inmate is breathing.

> Plaintiffs Contend:  Plaintiffs dispute that these safety checks are conducted in a timely and appropriate manner.

**Cell-Illumination**

646.   Defendants Contend:  Run and dormitory lights are turned on no later than 6:30 am and turned off no later than 10:00 p.m., daily.

> Plaintiffs Contend:  Run and dormitory lights in isolation cells and units are not turned on only during the hours listed.

647.   Defendants Contend:   Some maximum custody cells have night security lights in the cells that can be controlled by the inmate or by staff.

> Plaintiffs Contend:  Inmates in isolation cells cannot control the lights in their cells.

648.   Defendants Contend:  Other maximum custody cells have ▮▮▮ Security located in-cell, but have night security lighting running along the cell runs that provide correctional officers sufficient light to perform safety and security checks while also allowing inmates to sleep.

> Plaintiffs Contend:  Illumination at the current level is not required to meet the security needs described. Plaintiffs Contend that the illumination level does not permit inmates to sleep.

649.   <u>Defendants Contend</u>:  The in-cell constant night security lights used for nighttime lighting of maximum custody cells (non-watch cells) are low-level, ▮watt bulbs that enhance security at the facility, yet are dim enough to provide an adequate sleeping environment for the inmates.

    <u>Plaintiffs Contend</u>:  Some cells have nocturnal illumination significantly brighter than ▮ watts.  Plaintiffs Contend that illumination at the current level is not required to meet the needs described.  Plaintiffs Contend that the illumination level does not permit inmates to sleep.

650.   <u>Defendants Contend</u>:  The nightlights are very different from the much brighter security lights and the regular fluorescent lights that are used in the cells during the day. Nightlights emit light that is comparable to a nightlight that persons may use in their home.

    <u>Plaintiffs Contend</u>:  Nocturnal illumination in isolation is not "comparable to a nightlight that persons may use in their home."  Plaintiffs Contend that nocturnal illumination in the isolation units interferes with sleep.

651.   <u>Defendants Contend</u>:  The use of low-level nightlights is standard practice for correctional facilities across the country.

    <u>Plaintiffs Contend</u>:  The level of illumination employed by ADC during the hours which it is employed is not standard practice for correctional facilities around the country.

652.   <u>Defendants Contend</u>:  The level of illumination used is the minimum amount necessary to sufficiently address security concerns and to allow correctional staff to observe inmates during the night and regular sleeping hours.

    <u>Plaintiffs Contend</u>:  Illumination at the current level is not required to meet the needs described.  Plaintiffs Contend that the illumination level does not permit inmates to sleep.

653.   <u>Defendants Contend</u>:  Specifically, the nightlights enable correctional personnel to observe the wellbeing of an inmate at night, including detecting illness,

medical emergency, ensuring suicide precautions, and detecting physical or sexual assaults, and ensure that inmates are not attempting to escape or engage in other illicit activities, such as use or exchange of contraband.

> Plaintiffs Contend:  Illumination at the current level is not required to meet the needs described.

654.   Defendants Contend:    The level of illumination used also permits correctional personnel to make regularly required security checks, as described above, without having to turn on the daytime fluorescent lighting (and wake sleeping inmates) each time a security check is made.

> Plaintiffs Contend:  Illumination at the current level is not required to meet the needs described.

655.   Defendants Contend:  Security checks are performed at frequent and random intervals throughout the day and night to monitor and protect the safety and security of the inmates and the facility, and officers must be able to observe skin and detect whether an inmate appears to be breathing.

> Plaintiffs Contend:   Security checks are not performed in a regular and timely manner.  Plaintiffs Contend that illumination at the current level is not required to meet the needs described.

656.   Defendants Contend:   Some cell illumination during sleeping hours is essential to adequately check safety and security of inmates.  (Ex. 138, ¶245.)

> Plaintiffs Contend:  Plaintiffs Contend that illumination at the current level is not required to meet the needs described.

657.   Defendants Contend:   While flashlights are used in some instances to conduct security checks, it is more efficient and desirable to employ illumination either in-cell or on the cell runs to enable officers to perform regular safety and security checks during sleeping hours.

> Plaintiffs Contend:   Alternatives exist to ADC's use of nocturnal illumination in the isolation units.  Plaintiffs Contend that illumination at the current level is not required to meet the needs described.

658.   Defendants Contend:   The sole use of flashlights to conduct night time safety and security checks enables inmates to detect when officers are making rounds and thus plan instances of assault, contraband use/exchange, and escape plans around those security checks.

> Plaintiffs Contend:   Alternatives exist to ADC's use of nocturnal illumination in the isolation units.

659.   Defendants Contend:  Additionally, an officer may have to stop and shine a flashlight in a cell for extended time in order to confirm the safety and security of an inmate.

> Plaintiffs Contend:   Alternatives exist to ADC's use of nocturnal illumination in the isolation units.

660.   Defendants Contend:   A flashlight alternative runs the risk of creating conflict between inmates and staff because inmates may view the use of a flashlight as harassment.  The current illumination practice eliminates staff discretion and control over how long to shine the light and how often to do so.

> Plaintiffs Contend:   Alternatives exist to ADC's use of nocturnal illumination in the isolation units.

661.   Defendants Contend:  Maximum custody watch cells require illumination at a higher wattage than the ██ watt nightlights in order to allow officers to maintain a visual on the inmates for safety and security reasons.

> Plaintiffs Contend:   Undisputed that maximum custody watch cells have illumination brighter than ██ watts.  Plaintiffs Contend that this higher level of illumination is not required to meet the needs described.

176

662.   <u>Defendants Contend</u>:  The wattage of lighting in all maximum custody cells allows inmates to sleep while enabling correctional officers to perform appropriate safety and security checks.

 <u>Plaintiffs Contend</u>:  Illumination at the current level is not required to meet the needs described.  Plaintiffs also contend that the illumination level does not permit inmates to sleep.

663.   <u>Defendants Contend</u>:  In addition, inmates are permitted to cover their eyes with small cloths if they wish to when they sleep as long as correctional personnel conducting safety and welfare checks are able to see flesh and determine that the inmate is breathing.

 <u>Plaintiffs Contend</u>:  Inmates are not permitted to cover their eyes as described.

**ASPC Eyman**

 **Browning Unit**

664.   <u>Defendants Contend</u>: The cell light is a ▇ light affixed to the wall ▇ ▇, located at a distance of approximately ▇ feet from the top bunk and ▇ feet from the bottom bunk.

 <u>Plaintiffs Contend</u>:  Plaintiffs dispute the location and distance of the cell light.

665.   <u>Defendants Contend</u>: Daytime security lights are illuminated from 6:30 a.m. to 10 p.m. on weekdays and 6:30 a.m. to midnight on weekends.

 <u>Plaintiffs Contend</u>:  Plaintiffs dispute that daytime lights are illuminated only for the hours listed.

666.   <u>Defendants Contend</u>: Nighttime wattage of the cell lights is one ▇ watt bulb.

 <u>Plaintiffs Contend</u>:  Plaintiffs dispute the wattage of the bulb.

667.   <u>Defendants Contend</u>: Nighttime cell security lights are illuminated from 10 p.m. to 6:30 a.m. on weekdays and midnight to 6:30 a.m. on weekends.

Plaintiffs Contend:  Plaintiffs dispute that nighttime lights are illuminated for the hours listed.

**SMU I**

668.   Defendants Contend: SMU I maximum custody cells, including SMU I, SMU I East, SMU I Protective Custody, and SMU I Detention cells, are not illuminated 24 hours.

Plaintiffs Contend:  Plaintiffs dispute that these cells are not illuminated 24 hours day.

669.   Defendants Contend: Inmates in these cells may turn their cell light on or off at their preference – the exception being SMU Behavioral Management Unit and Watch cells discussed below.

Plaintiffs Contend:  Plaintiffs dispute that inmates may control these lights.

670.   Defendants Contend: The cell light is a ███ light affixed to the wall ███ ████████████████████████, located at a distance of approximately ███ feet from the top bunk and ███ feet from the bottom bunk.

Plaintiffs Contend:  Plaintiffs dispute the location of these lights.

671.   Defendants Contend: Inmates may purchase reading lamps at their own expense that clip to the shelving above the head of their bunks.

Plaintiffs Contend:  That inmates may purchase reading lamps is irrelevant to the number of hours that cells are illuminated.

672.   Defendants Contend: Bulbs provided for the for-purchase reading lamps are ███ watts.

Plaintiffs Contend:  The wattage of these bulbs is irrelevant to Plaintiffs' claims regarding ADC's illumination of isolation cells.

673.   Defendants Contend: Night security lights are installed on the walkways outside the cells to illuminate the housing units at night at a level that permits officers to perform required safety and security checks, but also permits inmates to sleep.

1

2
　　　　Plaintiffs Contend:   Plaintiffs dispute that the illumination level permits inmates to sleep.

3
674.   Defendants Contend: The distance from the night security lights installed in

4
the ceiling of the walkways to cell doors on the top tiers of the SMU pods ranges from ██

5
feet to ██ feet from the light in the ceiling to the cell door.

6
　　　　Plaintiffs Contend:  Plaintiffs dispute the location of the light.

7
675.   Defendants Contend: The distance from the night security lights installed in

8
the ceiling of the walkways to cell doors on the bottom tiers of the SMU pods ranges from

9
██ feet to ██ feet from the light in the ceiling to the cell door.

10
　　　　Plaintiffs Contend:  Plaintiffs dispute the location of the light.

11
676.   Defendants Contend: SMU I cells in BMU (Behavioral Management Unit)

12
and Mental Health Watch are illuminated 24 hours for security purposes as these

13
categories of maximum custody inmates require a higher level of visual observation in

14
order to verify inmate welfare and safety.

15
　　　　Plaintiffs Contend:  Plaintiffs dispute that these cells must be illuminated 24

16
hours a day at the current level of illumination.

17
677.   Defendants Contend: For these BMU and Watch cells, the ██ light affixed

18
to the wall ████████████████, located at a distance of ██

19
feet is controlled by correctional personnel in these locations.

20
　　　　Plaintiffs Contend:  Plaintiffs dispute the location of the light.

21
678.   Defendants Contend: These BMU and Watch cells are illuminated 24 hours

22
for inmate safety, so that officers can maintain a constant visual on the inmate in order to

23
protect inmate safety and security and protect the inmate from engaging in self-harm.

24
　　　　Plaintiffs Contend:  Plaintiffs dispute that 24 hour illumination at the current

25
level is required to meet inmate safety and security needs.

26
679.   Defendants Contend: Inmates in both the BMU and Watch cells may cover

27
their eyes with a cloth while sleeping as long as correctional personnel can verify the

28
safety and welfare of the inmates and determine the inmates are breathing.

179

> Plaintiffs Contend:  Plaintiffs dispute that inmates are permitted to cover their eyes with a cloth as described.

680.   Defendants Contend: Continuous lighting for inmates assigned to BMU and Mental Health watch cells serves the legitimate penological objective of keeping inmates on watch status safe and facilitating correctional officer ability to carry out frequent visual observation of the inmate without having to enter the cell or disturb the inmate to verify safety and security of the inmate.

> Plaintiffs Contend:  Plaintiffs dispute that 24 hour illumination at the current level is required to meet the needs described.

681.   Defendants Contend: Watch status duration varies based upon the specific circumstances necessitating the watch status in the first place but is designed to be a more temporary condition.

> Plaintiffs Contend:  Plaintiffs dispute that prisoners are placed on a level of watch commiserate with the circumstances necessitating the watch.

682.   Defendants Contend: Night security lights are also installed on the walkways outside the BMU and Watch cells to illuminate the housing units at night at a level that permits officers to perform required safety and security checks, but also permits inmates to sleep.

> Plaintiffs Contend:  Plaintiffs dispute that the illumination level permits inmates to sleep.

683.   Defendants Contend: The distance from the night security lights installed in the ceiling of the walkways to cell doors on the top tiers of the SMU pods ranges from ▮ feet to ▮ feet from the light in the ceiling to the cell door.

> Plaintiffs Contend:  Plaintiffs dispute the location of the light.

684.   Defendants Contend: The distance from the night security lights installed in the ceiling of the walkways to cell doors on the bottom tiers of the SMU pods ranges from ▮ feet to ▮ feet from the light in the ceiling to the cell door.

> Plaintiffs Contend:  Plaintiffs dispute the location of the light.

**ASPC FLORENCE**

**CB-1**

685.   Defendants Contend: CB-1 maximum custody cells are ████████ Security ████.

Plaintiffs Contend:  Plaintiffs dispute that these cells are ████████ Security ████.

686.   Defendants Contend: CB-1 cells are ████████ Security ████████.

Plaintiffs Contend:  Plaintiffs dispute that these cells are ████████ Security ████████.

687.   Defendants Contend: Inmates may turn their cell light on or off at their preference.

Plaintiffs Contend:  Plaintiffs dispute that inmates may control these lights.

688.   Defendants Contend: The cell light is affixed to the wall ████████ Security ████.

Plaintiffs Contend:  Plaintiffs dispute the location of the light.

689.   Defendants Contend: Night security lights are installed on the sides of the tiers outside the cells to illuminate the housing unit at night at a level that permits officers to perform required safety and security checks, but also permits inmates to sleep.

Plaintiffs Contend:  Plaintiffs dispute the location of the light.  Plaintiffs dispute that the illumination level permits inmates to sleep.

690.   Defendants Contend: The wattage of the night security lights installed on the sides of the tiers is ██ watts (florescent ██ Security ██) and the lights are placed at intervals, approximately every few cells.

Plaintiffs Contend:  Plaintiffs dispute the location of the light.

**CB-2**

691.   Defendants Contend: CB-2 maximum custody cells are ████████ Security ████.

**Plaintiffs Contend**:  Plaintiffs dispute that these cells are ████ Security ████.

692.   **Defendants Contend**: CB-2 cells are ████ Security ████.

**Plaintiffs Contend**:  Plaintiffs dispute that these cells are ████ Security ████.

693.   **Defendants Contend**: Inmates may turn their cell light on or off at their preference.

**Plaintiffs Contend**:  Plaintiffs dispute that inmates may control these lights.

694.   **Defendants Contend**: Night security lights are installed in the middle of the ceiling of the pod to illuminate the housing unit at night at a level that permits officers to perform required safety and security checks, but also permits inmates to sleep.

**Plaintiffs Contend**:  Plaintiffs dispute that the illumination level permits inmates to sleep.

695.   **Defendants Contend**: The distance between the floor of the two-tiered pod and the night security lights in the ceiling is ██ feet.

**Plaintiffs Contend**:  Plaintiffs dispute the location of the light.

**CB-3**

696.   **Defendants Contend**: CB-3 maximum custody cells are ████ Security ████.

**Plaintiffs Contend**:  Plaintiffs dispute that these cells are ████ Security ████.

697.   **Defendants Contend**: CB-3 cells are ████ Security ████.

**Plaintiffs Contend**:  Plaintiffs dispute that these cells are ████ Security ████.

698.   **Defendants Contend**: Inmates may turn their cell light on or off at their preference.

**Plaintiffs Contend**:  Plaintiffs dispute that inmates may control these lights.

699. <u>Defendants Contend</u>: Night security lights are installed on the wall across from the cell runs to illuminate the housing unit at night at a level that permits officers to perform required safety and security checks, but also permits inmates to sleep.

       <u>Plaintiffs Contend</u>:  Plaintiffs dispute the location of the light.  Plaintiffs dispute that the illumination level permits inmates to sleep.

700. <u>Defendants Contend</u>: The wattage of the night security lights installed on the wall across from the cell runs is ██ watts (florescent ████).

       <u>Plaintiffs Contend</u>:  Plaintiffs dispute the location of the light.

## CB-4

701. <u>Defendants Contend</u>: CB-4 maximum custody cells are ████ ██.

       <u>Plaintiffs Contend</u>:  Plaintiffs dispute that these cells are ████ ████.

702. <u>Defendants Contend</u>: CB-4 cells are ████.

       <u>Plaintiffs Contend</u>:  Plaintiffs dispute that these cells are ████ ████.

703. <u>Defendants Contend</u>: Inmates may turn their cell light on or off at their preference.

       <u>Plaintiffs Contend</u>:  Plaintiffs dispute that inmates may control these lights.

704. <u>Defendants Contend</u>: Night security lights are installed on the wall across from the cell runs to illuminate the housing unit at night at a level that permits officers to perform required safety and security checks, but also permits inmates to sleep.

       <u>Plaintiffs Contend</u>:  Plaintiffs dispute the location of the light.  Plaintiffs dispute that the illumination level permits inmates to sleep.

705. <u>Defendants Contend</u>: The wattage of the night security lights installed on the wall across from the cell runs is ██ watts (florescent ████).

       <u>Plaintiffs Contend</u>:  Plaintiffs dispute the location of the light.

706. <u>Defendants Contend</u>: The distance between the closest top tier cell and the night security light is ███ feet; the distance between night security light and the nearest bottom cell is ██ feet.

     <u>Plaintiffs Contend</u>:  Plaintiffs dispute the location of the light.

**<u>CB-5 and CB-7</u>**

707. <u>Defendants Contend</u>: CB-5 and CB-7 maximum custody cells are ███████████████████.

     <u>Plaintiffs Contend</u>:  Plaintiffs dispute that these cells are ██████████████.

708. <u>Defendants Contend</u>: CB-5 and CB-7 cells are ██████████████████████████.

     <u>Plaintiffs Contend</u>:  Plaintiffs dispute that these cells are ████████████████.

709. <u>Defendants Contend</u>: Inmates may turn their cell light on or off at their preference.

     <u>Plaintiffs Contend</u>:  Plaintiffs dispute that inmates may control these lights.

710. <u>Defendants Contend</u>: Night security lights are installed on the wall across from the cell runs to illuminate the housing unit at night at a level that permits correctional personnel to perform required safety and security checks, but also permits inmates to sleep.

     <u>Plaintiffs Contend</u>:  Plaintiffs dispute the location of the light.  Plaintiffs dispute that the illumination level permits inmates to sleep.

711. <u>Defendants Contend</u>: The wattage of the night security lights installed on the wall across from the cell runs is ██ watts (florescent ████).

     <u>Plaintiffs Contend</u>:  Plaintiffs dispute that continuous illumination at the current level is required to meet the needs described.

712.   <u>Defendants Contend</u>: The distance between the closest top tier cell and the night security light is ▮ feet; the distance between night security light and the nearest bottom cell is ▮ feet.

  <u>Plaintiffs Contend</u>:  Plaintiffs dispute that prisoners are placed on a level of watch commiserate with the circumstances necessitating the watch.

**<u>CB-Kasson</u>**

713.   <u>Defendants Contend</u>: CB- Kasson Watch Pods are illuminated 24 hours for inmate safety, so that officers can maintain a visual on the inmate in order to protect inmate safety and security and protect the inmate from engaging in self-harm.

  <u>Plaintiffs Contend</u>:  Plaintiffs dispute that continuous illumination at the current level is required to meet the needs described

714.   <u>Defendants Contend</u>: These Watch cells are illuminated 24 hours for inmate safety, so that officers can maintain a constant visual on the inmate in order to protect inmate safety and security and protect the inmate from engaging in self-harm.

  <u>Plaintiffs Contend</u>:  Plaintiffs dispute that continuous illumination at the current level is required to meet the needs described.

715.   <u>Defendants Contend</u>: Inmates in these Watch cells may cover their eyes with a cloth while sleeping as long as correctional personnel can verify the safety and welfare of the inmates and determine the inmates are breathing.

  <u>Plaintiffs Contend</u>:  Plaintiffs dispute that inmates are permitted to cover their eyes with a cloth as described.

716.   <u>Defendants Contend</u>: Continuous lighting for inmates assigned to the Kasson Watch cells serves the legitimate penological objective of keeping inmates on watch status safe and facilitating correctional officer ability to carry out frequent visual observation of the inmate without having to enter the cell or disturb the inmate to verify safety and security of the inmate.

  <u>Plaintiffs Contend</u>:  Plaintiffs dispute that continuous illumination at the current level is required to meet the needs described.

717.   <u>Defendants Contend</u>: Watch status duration varies based upon the specific circumstances necessitating the watch status in the first place but is designed to be a more temporary condition.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that prisoners are placed on a level of watch commiserate with the circumstances necessitating the watch.

718.   <u>Defendants Contend</u>: Night security lights are installed on the walkways outside the Watch cells to illuminate the housing units at night at a level that permits officers to perform required safety and security checks, but also permits inmates to sleep.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that the illumination level permits inmates to sleep.

719.   <u>Defendants Contend</u>: CB-Kasson non-watch cells are ███████Security███████ .

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that these cells are ███████Security███████ .

720.   <u>Defendants Contend</u>: The CB-Kasson non-watch cells also provide an in-cell night security light that is both inmate and staff controlled.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that the night security light is inmate controlled.

721.   <u>Defendants Contend</u>: Inmates in the non-watch maximum security cells may turn the ██watt night security light on and off at the inmate's preference throughout the night.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that the night security light is inmate controlled.

722.   <u>Defendants Contend</u>: The in-cell ██watt night security light may also be controlled by correctional personnel utilizing a switch outside of each cell that allows correctional personnel to quickly activate the ██watt night security light when necessary to conduct safety and security checks if the night time pod lighting does not permit enough light for an officer to determine inmate safety and welfare during a security check.

186

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs Contend:   Plaintiffs dispute that the light is always used as described in the assertion.

723.   Defendants Contend: The distance of the cell light ■ to the cell bunk is approximately ■ feet.

Plaintiffs Contend:  Plaintiffs dispute the location of the light.

724.   Defendants Contend: CB-Kasson non-watch cell pods also provide ■watt florescent ■ lighting located in the ceiling outside of the cells approximately ■ feet from the nearest cell.

Plaintiffs Contend:  Plaintiffs dispute the location of the light.

725.   Defendants Contend: The cell run/tier lighting provides lighting necessary for correctional personnel to perform cell safety and security checks.

Plaintiffs Contend:   Plaintiffs dispute that continuous illumination at the current level is required to meet the needs described.

**ASPC PERRYVILLE**

**Lumley Unit**

726.   Defendants Contend: Lumley maximum custody non-watch cells are ■ ■.

Plaintiffs Contend:  Plaintiffs dispute that these cells are ■ ■.

727.   Defendants Contend: Inmates may turn their cell light on or off at their preference.

Plaintiffs Contend:  Plaintiffs dispute that inmates may control these lights.

728.   Defendants Contend: The cell light is a ■ light affixed in the ceiling or wall of the cell and is located approximately ■ feet from the cell bunk for Lumley SMA cells.

Plaintiffs Contend:  Plaintiffs dispute the location of the light.

729.   Defendants Contend: Night security lights are installed on the ceiling or wall along the cell runs to illuminate the housing unit at night at a level that permits officers to perform required safety and security checks, but also permits inmates to sleep.

> Plaintiffs Contend:  Plaintiffs dispute that illumination at the current level is required to meet the needs described. Plaintiffs dispute that the illumination level permits inmates to sleep.

730.   Defendants Contend: The distance between the cell and the cell run night security light is between ███ and ███ feet.

> Plaintiffs Contend:  Plaintiffs dispute the location of the light.

731.   Defendants Contend: The cell light is a ███ light affixed in the ceiling or wall of the cell and is located approximately ███ feet from the cell bunk for Lumley Reception/Assessment cells.

> Plaintiffs Contend:  Plaintiffs dispute the location of the light.

732.   Defendants Contend: Night security lights are installed on the ceiling or wall along the cell runs to illuminate the housing unit at night at a level that permits officers to perform required safety and security checks, but also permits inmates to sleep.

> Plaintiffs Contend:  Plaintiffs dispute that illumination at the current level is required to meet the needs described. Plaintiffs dispute that the illumination level permits inmates to sleep.

733.   Defendants Contend: The distance between the cell and the cell run night security light is between ███ and ███ feet.

> Plaintiffs Contend:  Plaintiffs dispute the location of the light.

734.   Defendants Contend: Lumley maximum custody watch cells are illuminated 24 hours for inmate safety so that officers can maintain a visual on the inmate.

> Plaintiffs Contend:  Plaintiffs dispute that continuous illumination at the current level is required to meet the needs described.

735.   Defendants Contend: The watch cell light is a ███ light affixed in the ceiling or wall of the cell and is located approximately ███ feet from the cell bunk.

Plaintiffs Contend:  Plaintiffs dispute the location of the light.

736.   Defendants Contend: Night security lights are installed on the ceiling or wall along the cell runs to illuminate the housing unit at night at a level that permits officers to perform required safety and security checks, but also permits inmates to sleep.

Plaintiffs Contend:  Plaintiffs dispute that illumination at the current level is required to meet the needs described. Plaintiffs dispute that the illumination level permits inmates to sleep.

737.   Defendants Contend: The distance between the cell and the cell run night security light is between ▮▮ and ▮▮ feet.

Plaintiffs Contend:  Plaintiffs dispute the location of the light.


**Food Service**

738.   Defendants Contend:  DO 912 addresses health and sanitation requirements and restricted diets and "ensures that inmates are provided nutritious meals."

Plaintiffs Contend:  Prisoners in isolation are provided only two meals a day and are not provided adequate nutrition, resulting in weight loss and other adverse health effects.

739.   Defendants Contend:  The goal for ADC's food service is "to have a quality food service program that provides the most nutritious, appetizing and cost effective meal possible."

Plaintiffs Contend:  Prisoners in isolation are provided only two meals a day and are not provided adequate nutrition, resulting in weight loss and other adverse health effects.

740.   Defendants Contend:   The Contract Food Service Staff is required to provide "regular and restricted diets that are nutritionally adequate, regularly monitored and compatible with the needs of inmates."

189

> Plaintiffs Contend:  Prisoners in isolation are provided only two meals a day and are not provided adequate nutrition, resulting in weight loss and other adverse health effects.

741.   Defendants Contend: Food is prepared in a manner that is efficient and sanitary, including safe food preparation practices and operation to preclude spreading of communicable diseases.

> Plaintiffs Contend:  Plaintiffs dispute that Defendants citation of the relevant policy conclusively establishes that food is actually prepared and served as described.

742.   Defendants Contend: ADC staff provides dietary consultations for inmates with specific medical diagnosis.

> Plaintiffs Contend:  Plaintiffs dispute that prisoners are provided food of a type and in a manner that accords with their medical diagnoses.

743.   Defendants Contend: Each facility is required to adhere to the procedures and standards in the Food Service Technical Manual ("FSTM") and the Diet Reference Manual ("DRF").

> Plaintiffs Contend:  Regardless of what is required by policy, Plaintiffs dispute that each facility actually complies with the standards in the standards referred to in the fact.

744.   Defendants Contend: The FSTM provides health guidelines, sanitation requirements, inspections, financial responsibilities, meal schedules, restricted diet guidelines, food service operations, training, security protocol, safety standards, and food preparation and transportation guidelines.

> Plaintiffs Contend:  Regardless of what is required by policy, Plaintiffs dispute that each facility actually complies with the standards in the standards referred to in the fact.

745.   Defendants Contend: The DRF provides a list of, and procedure for providing, medical and religious diets available (restricted diets), and dietary guidelines

and protocols for the general population, inmates with restricted movement, and inmates on suicide/mental health watch.

> Plaintiffs Contend:   Regardless of what is required by policy, Plaintiffs dispute that each facility actually complies with the standards in the procedures referred to in the fact.

746.   Defendants Contend: The DRF requires that the menu for general population inmates provide approximately 2900 (+/- 200) calories per day for men and 2200 (+/- 200) calories per day for women, and provide adequate but not excessive calories, adequate fiber, moderate sodium, limited saturated fats (< 10% calories, total fat to 20-35% calories), and a decrease in added sugars.

> Plaintiffs Contend:   Regardless of what is required by policy, Plaintiffs dispute that each facility actually complies with the standards in the standards referred to in the fact.

747.   Defendants Contend: Maximum custody inmates receive – Monday thru Sunday – two meals per day: a Mega Sack meal consisting of breakfast and lunch, and a hot dinner.

> Plaintiffs Contend:  Plaintiffs dispute that the sack meals always consists of sufficient food to constitute breakfast and lunch.

748.   Defendants Contend: The caloric intake for inmates in maximum custody is reduced to compensate for decreased energy needs and to account for security issues (no hot liquid items.

> Plaintiffs Contend:   Plaintiffs dispute that the calories in the meal are sufficient and that the reduction in meals furthers security interests. Plaintiffs also note that the reduced caloric intake, as well as the reduction in meals further the sense of isolation inmates in isolation experience.

749.   Defendants Contend: The DRF requires that the menu for maximum custody inmates provide approximately 2600 calories per average per day for males, and 2200 calories per average per day for females.

Plaintiffs Contend:  Regardless of what is required by policy, Plaintiffs dispute that each facility actually complies with the standards in the standards referred to in the fact.

750.   Defendants Contend: This diet is adequate in all nutrients according to the Recommended Daily Allowance standards of the National Academies of Science–National Research Council if all the foods are eaten.

Plaintiffs Contend:  Regardless of what is required by policy, Plaintiffs dispute that each facility actually complies with the standards in the standards referred to in the fact.

751.   Defendants Contend: ADC's private food vendor has six weekly menus.

Plaintiffs Contend:  The number of weekly menus ADC's private food vendor has is irrelevant to the quality of food prisoners are provided, the number of meals they receive, as well as the caloric content of the meals.

752.   Defendants Contend: For maximum custody male inmates, the Week 1 menu provides 2626 calories per day; the Week 2 menu provides 2706 calories per day; the Week 3 menu provides 2608 calories per day; the Week 4 menu provides 2726 calories per day; the Week 5 menu provides 2604 calories per day; and the Week 6 menu provides 2670 calories a day; for an average of 2657 calories per day.

Plaintiffs Contend:  Regardless of what is required by policy, Plaintiffs dispute that the meals served each prisoner actually comply with the standards in the standards referred to in the fact.  Plaintiffs additionally note that regardless of the caloric content of the meals, many of the meals contain insufficient amounts of vitamins, minerals and nutrition.

753.   Defendants Contend: For all other male inmates, the six weekly menus average 2805 calories per day.

Plaintiffs Contend:  Regardless of what is required by policy, Plaintiffs dispute that the meals served each prisoner actually comply with the standards in the standards referred to in the fact.  Plaintiffs additionally note

192

that regardless of the caloric content of the meals, many of the meals contain insufficient amounts of vitamins, minerals and nutrition.

754. Defendants Contend: Maximum custody female inmates receive the same six weekly menus as non-maximum custody female inmates; the Week 1 menu provides 2280 calories per day; the Week 2 menu provides 2229 calories per day; the Week 3 menu provides 2332 calories per day; the Week 4 menu provides 2260 calories per day; the Week 5 menu provides 2260 calories per day; and the Week 6 menu provides 2235 calories a day; for an average of 2266 calories per day.

Plaintiffs Contend:  Regardless of what is required by policy, Plaintiffs dispute that the meals served each prisoner actually comply with the standards in the standards referred to in the fact.  Plaintiffs additionally note that regardless of the caloric content of the meals, many of the meals contain insufficient amounts of vitamins, minerals and nutrition.

755. Defendants Contend: These menus meet or exceed the recommended nutrient amounts as specified by Recommended Dietary Allowances from the National Academy of Sciences.

Plaintiffs Contend:  Plaintiffs dispute that the meals served actually meet or exceed the nutritional standards specified.

756. Defendants Contend: Inmates on watch are provided the same meals (including special medical diets), in frequency and nutritional quality, as meals served to general population inmates, but served free of items that can be used for self-harm (e.g., ████████ Security ████████ ).

Plaintiffs Contend:  Plaintiffs dispute this fact to the extent Defendant's fact implies that prisoners on watch are provided sufficient meals.  Meals provided prisoners on suicide watch suffer from many of the same problems, regarding lack of caloric content and nutritional value, identified above.

757.   <u>Defendants Contend</u>: Inmates with a medical diagnosis are provided a restricted diet appropriate for their medical condition.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that inmates with a medical diagnosis are provided a diet appropriate to their medical condition.

758.   <u>Defendants Contend</u>: Inmates with diabetes are provided the general population menu, which incorporates the principles endorsed by the ADA for diabetes care in correctional institutions regarding carbohydrates, protein, fat, and fiber amounts.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that inmates with a medical diagnosis are provided a diet appropriate to their medical condition.

759.   <u>Defendants Contend</u>: Inmates with diabetes are also provided prescribed snacks, three times a day, which are handed out during regular meal times.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that inmates with a medical diagnosis are provided a diet appropriate to their medical condition.

760.   <u>Defendants Contend</u>: Inmates with hypertension are provided the general population menu, which incorporates the nutritional principles for hypertension management outlined by the NCCHC.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that inmates with a medical diagnosis are provided a diet appropriate to their medical condition.

761.   <u>Defendants Contend</u>: Medical diets are available when medically necessary.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that inmates with a medical diagnosis are provided a diet appropriate to their medical condition.

762.   <u>Defendants Contend</u>: Per the Contract, Corizon is responsible for prescribing and coordinating the ordering and delivery of restricted medical diets, according to ADC's Diet Reference Manual.

<u>Plaintiffs Contend</u>:   Regardless of what is required by policy, Plaintiffs ispute that each facility actually complies with the standards in the standards referred to in the fact.

763.   <u>Defendants Contend</u>: Inmates that require medical diets are identified either at intake, by exam, or by changes in physical condition.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that all prisoners identified as needing a medical diet are later provided them.

764.   <u>Defendants Contend</u>: A medical diet must be supported by medical documentation from the prescribing practitioner.

<u>Plaintiffs Contend</u>:  That medical documentation is required for a medical diet is irrelevant to whether prisoners prescribed such diets actually receive them.

765.   <u>Defendants Contend</u>: Special medical diets are available for inmates undergoing renal dialysis (renal dialysis diet), or that have chronic conditions of the liver or acute kidney disorders (controlled protein diet), wasting syndrome, pregnant, allergies, gluten intolerant, stomach illness (liquid diets), cancer or HIV with tissue wasting (liquid supplements), or undergoing chemotherapy.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that inmates with a medical diagnosis are provided a diet appropriate to their medical condition.

766.   <u>Defendants Contend</u>: A clinician's decision to stop a medical diet is a therapeutic decision.

<u>Plaintiffs Contend</u>:   Whether a decision to stop a medical diet is a therapeutic decision is irrelevant to the appropriateness of each decision to do so, as well as to whether prisoners prescribed such diets, actually receive them.

767.   <u>Defendants Contend</u>: A mechanical/dental soft diet is provided for inmates who have difficulty in chewing due to illness, injury, recent dental procedure, or that may be edentulous, and it consists of foods that do not require mastication and are easily swallowed.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that all prisoners identified as needing a medical "soft" diet are later provided them.

768.   Defendants Contend: The mechanical/dental soft diet is based on the general population menu, and regular items are used whenever possible; items are chopped, ground or mashed to the inmate's ability to chew.

Plaintiffs Contend:  Plaintiffs dispute that all prisoners identified as needing a medical "soft" diet are later provided them.

769.   Defendants Contend: Food service employees are responsible for ensuring sanitary standards in all food service operations and for training staff and inmates on personal cleanliness/hygiene, as well as sanitary preparation of food, food storage, serving meals, and the care and maintenance of equipment.

Plaintiffs Contend:  Regardless of what is required by policy, Plaintiffs dispute that each facility actually complies with the standards in the standards referred to in the fact.

770.   Defendants Contend: ADC utilizes the Mega Sack meal plan that includes breakfast and lunch served simultaneously.

Plaintiffs Contend:  Plaintiffs dispute that the sack meals always consists of sufficient food to constitute breakfast and dinner.

771.   Defendants Contend: Utilization of the Mega Sack meal plan offers the inmates individual control over when they would like to eat breakfast and lunch.

Plaintiffs Contend:  Plaintiffs dispute that the sack meals always consists of sufficient food to constitute breakfast and dinner.  Plaintiffs also dispute the fact that Defendants' fact implies that prisoners prefer the Mega Sack meal of food service.

772.   Defendants Contend: Additionally, with the exception of some Step 2 and 3 inmates in the Director's Instruction #326 Maximum Custody Population Step Program (discussed below), most maximum custody inmates at ASPC Eyman and ASPC Florence are fed in-cell.

Plaintiffs Contend:  Plaintiffs dispute this fact to the extent that Defendants suggest that conditions are significantly better for prisoners at step 2 or step

196

3 of the relevant program.  In particular, Plaintiffs dispute that inmates participating in these programs advance through the steps outlined once they have fulfilled the stated requirements and are provided additional privileges and programs, as a result.

773.   <u>Defendants Contend</u>: The Mega Sack meal plan lessens the burden on prison operations associated with the necessary personnel required to serve meals cell to cell.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute this fact to the extent that Defendants argue that it justifies the use of the Mega Sack program.

774.   <u>Defendants Contend</u>: The Mega Sack meal plan thereby frees up correctional personnel in the afternoon hours to provide for necessary inmate movement and escorts, safety and welfare checks along with movement of inmates to showers, recreation, programming, visitation, medical appointments, etc.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute this fact to the extent that Defendants argue that it justifies the use of the Mega Sack program.  Plaintiffs also dispute that correctional personnel provide sufficient and timely safety and welfare checks along with movement of inmates to showers, recreation, programming, visitation, medical appointments.

775.   <u>Defendants Contend</u>: Maximum custody female inmates at ASPC Perryville-Lumley unit receive three meals a day, Monday through Friday.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that prisoners at ASPC Perryville-Lumley unit always receive three meals a day, Monday through Friday.

776.   <u>Defendants Contend</u>: On weekends, the ASPC Perryville-Lumley unit maximum custody inmates receive a brunch meal providing both breakfast and lunch, and a dinner meal – with the caloric total being the same as a three meal per day plan.

<u>Plaintiffs Contend</u>:  Plaintiffs dispute that the "brunch meal" prisoners at Perryville-Lumley receive is adequate for breakfast and lunch and nutritionally equivalent to having three meals a day.

**Maximum Custody Classification**

777.  Defendants Contend:  ADC employs a custody classification system in order to safely manage the inmate population, reasonably restricting activity for those inmates who constitute a risk to self, the public, prison personnel or other inmates based upon analysis of the inmate's crime, time to serve, institutional behavior and/or membership in a security threat group (STG).

>    Plaintiffs Contend:  The ADC's custody classification does not fulfill the purpose described.  In particular, Plaintiffs dispute that it safely manages the population, and reasonably restricts activity based on the factors listed.

778.  Defendants Contend:  ADC custody classification employs an objective, standardized rating system that is based on factual data gathered from factual documentation.

>    Plaintiffs Contend:  The ADC's classification process does not employ an objective, standardized system based on facts, as described.

779.  Defendants Contend:  The custody classification assessment is based on an in-depth interview, and a detailed evaluation of court documents and information acquired from other agencies concerning the inmate's background and criminal history.

>    Plaintiffs Contend:  Plaintiffs dispute that the assessment is based on the factors listed.

780.  Defendants Contend:  ADC does not recognize or use the terms "isolation" or "isolation cell." (Ex. 138, ¶37.)

>    Plaintiffs Contend:  ADC  recognizes and/or uses the term "isolation" and "isolation cell."

781.  Defendants Contend:  The word "isolation" implies that an inmate has no ability to communicate, interact, or socialize with other humans and does not leave his or her cell.

>    Plaintiffs Contend:  Defendants' characterization of the term isolation is inaccurate, and contend that conditions in ADC's isolation units constitute

"isolation" within any reasonable meaning of the term.

782.   Defendants Contend:   While depending on custody classification level, some ADC inmates are required to remain in their cells for an average of approximately 22 hours per day because of the risk the inmates presents to self, the public, prison personnel or other inmates, this applies only to certain inmates that are classified as maximum or close custody and certain inmates who are on detention status.

> Plaintiffs Contend:  Not all prisoners housed in isolation are there because they have been determined to pose a risk of harm to self, the public, prison personnel, or other prisoners.

783.   Defendants Contend:   The appropriate general nomenclature in the ADC system used to define inmates who are confined to their cells on average, approximately 22 hours a day, is "maximum custody inmates" or "maximum custody cells."

> Plaintiffs Contend:  Although "maximum custody" may accurately describe their classification, these prisoners are subjected to isolated confinement in ADC's isolation units.

784.   Defendants Contend:  Maximum custody inmates represent the highest risk to the public and staff and require frequent monitoring.

> Plaintiffs Contend:  Prisoners in isolation do not necessarily "represent the highest risk to the public and require frequent monitoring;" some are placed there automatically by virtue of their sentence, without any individualized risk assessment.

785.   Defendants Contend:  Certain criteria require an inmate to be classified as maximum custody, including inmates sentenced to death, inmates sentenced to a life sentence for the first two years served, inmates who are validated and un-renounced members of a Security Threat Group ("STGs"), and inmates with an internal risk score of 5.

> Plaintiffs Contend:   Some prisoners are automatically classified as maximum custody by virtue of their sentence, without any individualized

risk assessment.

786.   <u>Defendants Contend</u>:  Generally, an inmate can be classified as "maximum custody" if they committed a serious underlying offense (e.g.., first degree murder), if they committed violent, disruptive, or riotous acts while incarcerated, if they escaped or attempted to escape, or if they pose a serious threat to the security of the institution.

> <u>Plaintiffs Contend</u>:   Some prisoners are automatically classified as maximum custody by virtue of their sentence, without any individualized risk assessment.

787.   <u>Defendants Contend</u>:  An inmate's classification can be increased whenever the inmate's behavior or new information becomes known that indicates increased security measures are appropriate to ensure the safety of the public, staff, and/or other inmates.

> <u>Plaintiffs Contend</u>:  A prisoner's classification can be increased for reasons unrelated to an individualized risk assessment.

788.   <u>Defendants Contend</u>:   Upon formal classification review and except for condemned row inmates, an inmate's classification can also be decreased if inmate behavior and information indicates that the inmate is likely to successfully be assigned to a less secure environment and is not a threat to the safety of the public, staff, and/or other inmates at the recommended level of supervision.

> <u>Plaintiffs Contend</u>:  This is an ADC policy, but does not establish the actual practice.

789.   <u>Defendants Contend</u>:   To become eligible for a custody reduction, a validated STG member must either successfully renounce STG membership and debrief or satisfactorily complete the STG Step-Down Program.  <u>Plaintiffs Contend</u>:  This is an ADC policy, but does not establish the actual practice and that eligibility alone does not allow such prisoners to enter these programs in an expeditious manner due to the severe constraints on program size.

790.   <u>Defendants Contend</u>:  Inmates approved for maximum custody are reviewed 180 days from maximum custody approval and annually thereafter, unless the approval for maximum custody was an override, in which case the inmate's classification is reviewed every 180 days.

> <u>Plaintiffs Contend</u>:  This is an ADC policy, but does not establish the actual practice or prove a meaningful review occurs.

791.   <u>Defendants Contend</u>:  The most dangerous male maximum custody inmates are housed in Eyman-Browning Unit, which is exclusively death row and STG inmates.

> <u>Plaintiffs Contend</u>:  Not all prisoners housed in Eyman-Browning are "the most dangerous," as many are assigned there automatically by virtue of their sentence or alleged STG affiliation, without any individualized risk assessment.

792.   <u>Defendants Contend</u>:  Adult male inmates sentenced to life imprisonment are housed at Eyman-SMU 1 Unit, Eyman-Browning Unit, and Florence-Central Unit (including Kasson Unit).

> <u>Plaintiffs Contend</u>:  Not all prisoners sentenced to life imprisonment are housed in these units.

793.   <u>Defendants Contend</u>:  SMU 1 is exclusively for maximum custody sex offenders or protective custody inmates.

> <u>Plaintiffs Contend</u>:  SMU I does not exclusively house maximum custody sex offenders or protective custody inmates.

794.   Mental health staff is notified before an inmate is placed in a maximum custody cell, and the inmate is evaluated within 72 hours of being placed in a maximum custody cell.

> <u>Plaintiffs Contend</u>:  Mental health staff are not consistently notified and that an evaluation does not consistently occur as described.

795.   <u>Defendants Contend</u>:  Generally, maximum custody inmates are allowed to place one telephone call per week, up to fifteen minutes in duration.  <u>Plaintiffs Contend</u>: Many prisoners in isolation are not allowed weekly telephone access.

796.   <u>Defendants Contend</u>:  Generally, inmates on detention status are allowed one call of ten minutes per week.

<u>Plaintiffs Contend</u>:  Many prisoners in detention are not provided weekly telephone access.

**<u>D.I. 326</u>**

797.   <u>Defendants Contend</u>:  Maximum custody inmates participating in ADC's Maximum Custody Population Management Step Program as provided by Director's Instruction #326 are afforded increased telephone privileges as they progress through the three step behavioral modification program.

<u>Plaintiffs Contend</u>:  Many prisoners in isolation are not provided increased telephone access pursuant to DI 326.

798.   <u>Defendants Contend</u>:  Generally, maximum custody inmates are permitted non-contact visitations.

<u>Plaintiffs Contend</u>:  Some prisoners in isolation are not allowed visits.

799.   <u>Defendants Contend</u>:  Generally, maximum custody inmates are allowed one, 2-hour non-contact visit per week.  <u>Plaintiffs Contend</u>:  Many prisoners in isolation are not provided weekly visits.

800.   <u>Defendants Contend</u>:  Maximum custody inmates participating in ADC's Maximum Custody Population Management Step Program as provided by Director's Instruction #326 are afforded increased visitation privileges as they progress through the three step behavioral modification program.

<u>Plaintiffs Contend</u>:  Many prisoners in isolation not provided increased visiting pursuant to DI 326.

801.   <u>Defendants Contend</u>:  ADC's management of its maximum custody inmates has evolved greatly over the last several years.

> Plaintiffs Contend:  ADC's management of prisoners in isolation has not significantly evolved, and lags behind the mainstream of modern corrections.

802.   Defendants Contend:  ADC has added programs, initiated individual and group programming in housing units, improved recreation facilities, built new and larger recreation facilities to allow side by side individual recreation and group recreation, expanded privileges, implemented expanded inmate worker programs, expanded out of cell time, and created a behavioral incentive step program to reinforce positive inmate behavior, leading to increased privileges and for some, progression back to general population.

> Plaintiffs Contend:  The programs and opportunities described are largely cosmetic, adopted in response to this litigation, and unlikely to endure, given ADC's failure to hire any staff to implement them.  They are also entirely inadequate to the need, unavailable to most prisoners in isolation, and fail to significantly mitigate the isolation and other damaging effects of isolated confinement.

803.   Defendants Contend:  Maximum custody inmates may also participate in the Work Incentive Paid Program ("WIPP").

> Plaintiffs Contend:  Plaintiffs deny that this program is as widely available as Defendants suggest.  Further, Exhibit M is inadmissible and objected to by Plaintiffs, including for the late identification of the documents it purports to summarize.  Contested Facts regarding data on this program is contained in Exhibit M

804.   Defendants Contend:  Director's Instruction #326 is progressive and in line with similar states undergoing modification of conditions of confinement for maximum custody inmates, programs and movement of high risk inmates.

> Plaintiffs Contend:  DI 326 is largely cosmetic, adopted in response to this litigation, and unlikely to endure, given ADC's failure to hire any staff to

implement it.  It is also entirely inadequate to the need, unavailable to most prisoners in isolation – particularly those with serious mental illness -- and fails to significantly mitigate the isolation and other damaging effects of isolated confinement.

805.   <u>Defendants Contend</u>:  Director's Instruction #326 officially went into in effect on March 27, 2014 – although many programs were already running prior to issuance of the Instruction.

<u>Plaintiffs Contend</u>:  Many of these programs were not running prior to April 1, 2014.  Plaintiffs contend that the programs and opportunities discussed are not available to most prisoners.  Plaintiffs contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.  Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.

806.   <u>Defendants Contend</u>:   Director's Instruction #326 serves to facilitate a process that requires inmates in maximum custody to work through a program utilizing a step system providing the opportunity to participate in jobs, programs and other out of cell activities.  (Attachment U, Director's Instruction #326, Purpose).

<u>Plaintiffs Contend</u>:  Programs and opportunities discussed are not available to most prisoners.  <u>Plaintiffs Contend</u> that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.   Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.

807.   <u>Defendants Contend</u>:  Director's Instruction #326 culminates from changes that began in 2009 as ADC embarked on increasing maximum custody inmates' out of cell time and programming.

> Plaintiffs Contend:  DI 326 was adopted in response to this litigation, and ADC has not increased out of cell time and programming for the large majority of prisoners in isolation.

808.   Defendants Contend:    Pursuant to Director's Instruction #326, ADC maximum custody inmates who demonstrate program compliance and positive behavior may progress from controlled housing to open privilege based housing where inmates may move outside a cell without restraints.

> Plaintiffs Contend:   The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.   Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.

809.   Defendants Contend:   Inmates classified to maximum custody units are assigned to specific housing areas using a system of steps for managing the inmates in the least restrictive ways necessary to carry out ADC's Mission.

> Plaintiffs Contend:  Programs and opportunities discussed are not available to most prisoners.  In particular, prisoners with mental illness are very rarely able to progress through "step" programs and become stuck at the lowest level, where the isolating conditions aggravate their illness.   Plaintiffs contend that prisoners in isolation are not housed in the least restrictive ways necessary.

810.   Defendants Contend:  This applies to general population maximum custody inmates as well as specialty maximum custody population inmates:   mental health, validated STG, Step Down Program for STG, inmates who debrief from STG, sex offenders, protective custody, and condemned row.

> Plaintiffs Contend:   The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in

205

these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.   Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.

811.   Defendants Contend:  In the Step Program, maximum custody inmates start at a base level and progress through the three step program by actively participating in a variety of offered programs, obeying facility rules, socializing well with inmates and personnel, not engaging in self harm, demonstrating positive work ethic, not engaging in STG activity and genuinely showing interest in self-improvement.

Plaintiffs Contend:  Programs and opportunities discussed are not available to most prisoners.   Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.   Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.

812.   Defendants Contend:  Within five days of arrival to maximum custody, inmates are reviewed by an Assessment Team consisting of a Correctional Officer III, security supervisor and Associate Deputy Warden or designee to determine appropriate maximum custody housing location.

Plaintiffs Contend:   These assessments do not occur within five days. Plaintiffs also contend that the fact by itself does not establish the quality or comprehensiveness of the review.

813.   Defendants Contend:  The review includes analysis of a face to face inmate interview, the maximum custody placement instrument; seriousness of incident resulting in maximum custody placement; inmate interview demeanor and attitude; AIMS and file review; special security concerns and mental health review conducted within 72 hours of arrival.  (Attachment U, Director's Instruction #326).

Plaintiffs Contend:  The review does not include each of the elements stated. Plaintiffs also contend that a mental health review is not conducted within 72 hours.

814.   Defendants Contend:  The inmate is then assigned a maximum custody housing location that based upon the above review factors, allows the inmate to begin with the appropriate three level step system to afford the inmate appropriate privileges and out of cell time while at the same time protecting the safety and security of the inmate, facility personnel and other inmates.

Plaintiffs Contend:  The housing location assigned does not always accurately and reasonably reflect the factors listed.

815.   Defendants Contend:  Advancement through the step levels and movement to a less controlled housing location requires the inmate to complete all programs identified in the Step Program Matrixes for each housing location.

Plaintiffs Contend:  Programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.   Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.

816.   Defendants Contend:  Maximum custody inmates must follow all program requirements on a daily basis for a minimum of 30 consecutive days in order to qualify for advancement to the next step.

Plaintiffs Contend:  Programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.   Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.

817.   <u>Defendants Contend</u>:  Inmates in the step program must comply with the following requirements to remain eligible for step advancement:  grooming and hygiene in accordance with Department Order 704, Inmate Regulations; shower two times per week; remain compliant with medication orders if prescribed by a mental health provider; participate in designated classes/programs; refrain from creating excessive noise, banging or yelling at others; refrain from disrespectful or insulting behavior along with the use of profanity; refrain from throwing any substance at facility personnel or other inmates; and maintain cell cleanliness in accordance with Department Order 704, Inmate Regulations.

<u>Plaintiffs Contend</u>:  Programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.

818.   <u>Defendants Contend</u>:  Any violations of the above requirements or engaging in assault, destruction of property or other behavior determined by the Program Team to require corrective action may result in forfeiture of time in Step I and placement back to the beginning of Step 1.

<u>Plaintiffs Contend</u>:  Programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.  Plaintiffs Contend that not only the prisoners identified     in the fact fail to advance in the program.

819.   <u>Defendants Contend</u>:  Inmates in Steps II and III must also comply with the above requirements and also complete programs and requirements provided in the Step Program Matrixes.

<u>Plaintiffs Contend</u>:   The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in

these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.

820.   Defendants Contend:  The Program Team meets monthly to review any potential step advancement/regression cases and may convene prior to the monthly meeting to determine regression or removal from the Step Program.

Plaintiffs Contend:  Prisoners are regressed or removed for arbitrary reasons and that not all regressions or removals are timely or meaningfully reviewed.

821.   Defendants Contend:  Inmates who complete Step III for a minimum of 30 consecutive days, without incident, may be eligible for consideration for custody reduction or placement in a less controlled housing location.

Plaintiffs Contend:   The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.

822.   Defendants Contend:   Under Director's Instruction #326, ASPC-Eyman, Browning Unit has the least amount of out of cell activities and ASPC-Florence, Central Unit has the most.

Plaintiffs Contend:   In practice prisoners confined at ASPC-Florence Central are not provided out of cell activities to a significantly greater extent than prisoners at ASPC-Eyman Browning.

823.   Defendants Contend:   Browning Unit houses the maximum custody population that includes the most problematic and security threat inmates:  condemned row, validated STG and STG Step Down inmates (who have their own step down program).

Plaintiffs Contend:   Not all prisoners confined in Browning Unit are the

"most problematic and security threat inmates" as some are placed there automatically based upon their sentence without any individualized risk assessment.

824.   Defendants Contend:  The progression for general population, to include general population mental health inmates, starts at ASPC-Eyman, Browning Unit and ends at ASPC-Florence, Central Unit.

Plaintiffs Contend:  The progression described actually does not occur. Plaintiffs also contend it does not occur as described in DI#326.

825.   Defendants Contend:  Maximum custody sex offender progression begins at ASPC-Eyman, SMU I and ends at ASPC-Eyman, ███████ (with most, if not all, maximum custody inmates at ███████ in Step III of the program).

Plaintiffs Contend:  The progression described actually does not occur. Plaintiffs also contend it does not occur as described in DI#326.

826.   Defendants Contend:  Maximum custody protective custody progression begins at ASPC-Eyman, SMU I and ends at ASPC-Lewis, ███████ (with most if not all, maximum custody inmates at ███████ in Step III of the program).

Plaintiffs Contend:  The progression described actually does not occur. Plaintiffs also contend it does not occur as described in DI#326.

827.   Defendants Contend:  Location of the step assignments were decided based upon physical plant of the facilities hosting maximum custody units and recreation facilities.

Plaintiffs Contend:  The Step assignments do not result in significantly different conditions of confinement in isolation.

828.   Defendants Contend:  As of April 2014, there were 291 Eyman-Browning maximum custody inmates participating in Step I of DI 326; 278 Eyman-SMU I maximum custody inmates participating in Step I of DI 326; 58 Florence – Central maximum custody inmates participating in Step I of DI 326; and 32 Perryville-Lumley (female) maximum custody inmates participating in Step I of DI 326.

Plaintiffs Contend:   The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.  Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.  In particular, Plaintiffs Contend that Defendants have failed to provide the underlying data substantiating the functioning of the programs.  This alleged fact is irrelevant as it describes alleged conditions after the April 1, 2014 evidentiary cutoff.

829.   Defendants Contend:  As of July 2014, there were 297 Eyman-Browning maximum custody inmates participating in Step I of DI 326; 307 Eyman-SMU I maximum custody inmates participating in Step I of DI 326; 530 Florence – Central maximum custody inmates participating in Step I of DI 326; and 44 Perryville-Lumley (female) maximum custody inmates participating in Step I of DI 326.

Plaintiffs Contend:   The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.  Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.  In particular, Plaintiffs Contend that Defendants have failed to provide the underlying data substantiating the functioning of the programs.  This alleged fact is irrelevant as it describes alleged conditions after the April 1, 2014 evidentiary cutoff.

830.   Defendants Contend:  As of September 3, 2014, there were 326 Eyman-Browning maximum custody inmates participating in Step I of DI 326; 231 Eyman-SMU I maximum custody inmates participating in Step I of DI 326; 301 Florence – Central

maximum custody inmates participating in Step I of DI 326; and 43 Perryville-Lumley (female) maximum custody inmates participating in Step I of DI 326.

> Plaintiffs Contend:   The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.   Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.  In particular, Plaintiffs Contend that Defendants have failed to provide the underlying data substantiating the functioning of the programs.  This alleged fact is irrelevant as it describes alleged conditions after the April 1, 2014 evidentiary cutoff.

831.   Defendants Contend:  As of April 2014, there were 148 Eyman-Browning maximum custody inmates participating in Step II of DI 326; 196 Eyman-SMU I maximum custody inmates participating in Step II of DI 326; 155 Florence – Central maximum custody inmates participating in Step II of DI 326; and 11 Perryville-Lumley (female) maximum custody inmates participating in Step II of DI 326.

> Plaintiffs Contend:   The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.   Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.  In particular, Plaintiffs Contend that Defendants have failed to provide the underlying data substantiating the functioning of the programs.  This alleged fact is irrelevant as it describes alleged conditions after the April 1, 2014 evidentiary cutoff.

832.   <u>Defendants Contend</u>:   As of July 2014, there were 84 Eyman-Browning maximum custody inmates participating in Step II of DI 326; 97 Eyman-SMU I maximum custody inmates participating in Step II of DI 326; 70 Florence – Central maximum custody inmates participating in Step II of DI 326; and 19 Perryville-Lumley (female) maximum custody inmates participating in Step I of DII 326.

<u>Plaintiffs Contend</u>:   The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.   Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.  In particular, Plaintiffs Contend that Defendants have failed to provide the underlying data substantiating the functioning of the programs. This alleged fact is irrelevant as it describes alleged conditions after the April 1, 2014 evidentiary cutoff.

833.   <u>Defendants Contend</u>:   As of September 3, 2014, there were 81 Eyman-Browning maximum custody inmates participating in Step II of DI 326; 169 Eyman-SMU I maximum custody inmates participating in Step II of DI 326; 40 Florence – Central maximum custody inmates participating in Step II of DI 326; and 26 Perryville-Lumley (female) maximum custody inmates participating in Step II of DI 326.

<u>Plaintiffs Contend</u>:   The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.   Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.  In particular, Plaintiffs Contend that Defendants have failed to provide the underlying data substantiating the functioning of the programs. This alleged

fact is irrelevant as it describes alleged conditions after the April 1, 2014 evidentiary cutoff.

834.    Defendants Contend:  As of April 2014, there were 349 Eyman-Browning maximum custody inmates participating in Step III of DI 326; 353 Eyman-SMU I maximum custody inmates participating in Step III of DI 326; 138 Florence – Central maximum custody inmates participating in Step III of DI 326; and 18 Perryville-Lumley (female) maximum custody inmates participating in Step III of DI 326.

Plaintiffs Contend:  The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.  Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.  In particular, Plaintiffs Contend that Defendants have failed to provide the underlying data substantiating the functioning of the programs.  This alleged fact is irrelevant as it describes alleged conditions after the April 1, 2014 evidentiary cutoff.

835.    Defendants Contend:  As of July 2014, there were 323 Eyman-Browning maximum custody inmates participating in Step III of DI 326; 585 Eyman-SMU III maximum custody inmates participating in Step III of DI 326; 226 Florence – Central maximum custody inmates participating in Step III of DI 326; and 14 Perryville-Lumley (female) maximum custody inmates participating in Step III of DI 326.

Plaintiffs Contend:  The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.  Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.  In

particular, Plaintiffs Contend that Defendants have failed to provide the underlying data substantiating the functioning of the programs.  This alleged fact is irrelevant as it describes alleged conditions after the April 1, 2014 evidentiary cutoff.

836.   Defendants Contend:   As of September 3, 2014, there were 346 Eyman-Browning maximum custody inmates participating in Step III of DI 326; 535 Eyman-SMU I maximum custody inmates participating in Step III of DI 326; 364 Florence – Central maximum custody inmates participating in Step III of DI 326; and 85 Perryville-Lumley (female) maximum custody inmates participating in Step III of DI 326.

Plaintiffs Contend:   The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.  Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.  In particular, Plaintiffs Contend that Defendants have failed to provide the underlying data substantiating the functioning of the programs.  This alleged fact is irrelevant as it describes alleged conditions after the April 1, 2014 evidentiary cutoff.

837.   Defendants Contend:   As of April 2014, there were 349 Eyman-Browning maximum custody inmates participating in Step III of DI 326; 353 Eyman-SMU I maximum custody inmates participating in Step III of DI 326; 138 Florence – Central maximum custody inmates participating in Step III of DI 326; and 18 Perryville-Lumley (female) maximum custody inmates participating in Step III of DI 326.

Plaintiffs Contend:   The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges

and programs as a result.  Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.  In particular, Plaintiffs Contend that Defendants have failed to provide the underlying data substantiating the functioning of the programs.  This alleged fact is irrelevant as it describes alleged conditions after the April 1, 2014 evidentiary cutoff.

838.  <u>Defendants Contend</u>:  As of July 2014, there were 323 Eyman-Browning maximum custody inmates participating in Step III of DI 326; 585 Eyman-SMU III maximum custody inmates participating in Step III of DI 326; 226 Florence – Central maximum custody inmates participating in Step III of DI 326; and 14 Perryville-Lumley (female) maximum custody inmates participating in Step III of DI 326.

<u>Plaintiffs Contend</u>:  The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.  Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.  In particular, Plaintiffs Contend that Defendants have failed to provide the underlying data substantiating the functioning of the programs.  This alleged fact is irrelevant as it describes alleged conditions after the April 1, 2014 evidentiary cutoff.

839.  <u>Defendants Contend</u>:  As of September 3, 2014, there were 346 Eyman-Browning maximum custody inmates participating in Step III of DI 326; 535 Eyman-SMU I maximum custody inmates participating in Step III of DI 326; 364 Florence – Central maximum custody inmates participating in Step III of DI 326; and 85 Perryville-Lumley (female) maximum custody inmates participating in Step III of DI 326.

<u>Plaintiffs Contend</u>:  The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in

these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.  Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.  In particular, Plaintiffs Contend that Defendants have failed to provide the underlying data substantiating the functioning of the programs.  This alleged fact is irrelevant as it describes alleged conditions after the April 1, 2014 evidentiary cutoff.

840.   Defendants Contend:  As of April, 2014, there were 68 Eyman-Browning maximum custody inmates participating in Work Incentive Pay Plan jobs under DI 326; 74 Eyman-SMU I maximum custody inmates participating in Work Incentive Pay Plan jobs under DI 326; 172 Florence – Central maximum custody inmates participating in Work Incentive Pay Plan jobs under DI 326; and 15 Perryville-Lumley (female) maximum custody inmates participating in Work Incentive Pay Plan jobs under DI 326.

Plaintiffs Contend:  The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.  Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.  In particular, Plaintiffs Contend that Defendants have failed to provide the underlying data substantiating the functioning of the programs.  This alleged fact is irrelevant as it describes alleged conditions after the April 1, 2014 evidentiary cutoff.

841.   Defendants Contend:  As of August 2014, there were 22 Eyman-Browning maximum custody inmates participating in Work Incentive Pay Plan jobs under DI 326; 88 Eyman-SMU I maximum custody inmates participating in Work Incentive Pay Plan jobs under DI 326; 241Florence – Central maximum custody inmates participating in

Work Incentive Pay Plan jobs under DI 326; and 15 Perryville-Lumley (female) maximum custody inmates participating in Work Incentive Pay Plan jobs under DI 326.

> Plaintiffs Contend:  The programs and opportunities discussed are not available to most prisoners.  Plaintiffs Contend that inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.  Plaintiffs also contend the program has not ameliorated the degree of isolation most inmates in isolation experience.  In particular, Plaintiffs Contend that Defendants have failed to provide the underlying data substantiating the functioning of the programs.  This alleged fact is irrelevant as it describes alleged conditions after the April 1, 2014 evidentiary cutoff.

842.   Defendants Contend:  Since 2004, correctional officers posted in maximum custody housing units have been specifically trained on tactical communication to ensure that correctional personnel are able to effectively communicate with those inmates that have the lesser contact with inmates and personnel without a barrier between them as compared to general population inmates; ensure that correctional personnel recognize verbal and non-verbal cues from inmates that indicate ensuing safety and security concerns; ensure that correctional personnel verbally control an escalating situation in order to quell the escalation by means of verbal communication; and ensure that correctional personnel engage in conflict resolution between inmates.

> Plaintiffs Contend:  Correctional officers are not adequately or appropriately trained to fulfill the functions described.

843.   Defendants Contend:  Additionally since 2004, correctional officers posted in maximum custody housing units have also been trained in flexible supervision strategies as well as officer role in influencing behavior to enable correctional personnel to supervise inmates effectively and adjust supervision and treatment of inmates based

upon inmate individual personality and behavior in order to get positive results from the inmates.

> Plaintiffs Contend:  Correctional officers are not adequately or appropriately trained to fulfill the functions described.

844.   Defendants Contend:   Furthermore, since 2008, correctional personnel posted in maximum custody housing units have been trained in crisis intervention and conflict resolution to ensure the ability of correctional personnel to use skill sets beyond command and control tactics to include effective verbal communication; continuous supervision of behaviors and detection of cues indicative of ensuing self-harm, assaults, unexpected medical emergencies and inmate dissention; and utilization of communication response tools to manage a crisis, keep order and teach inmates accountability – all leading to a more constructive correctional environment.

> Plaintiffs Contend:  Correctional officers are not adequately or appropriately trained to fulfill the functions described.

845.   Defendants Contend:   In January 2014, ADC initiated training of Correctional Officer IIIs working in maximum and close custody housing unit in group dynamics in order to further develop skills for these personnel to conduct quality inmate programs in ADC maximum custody housing units to include:  giving groups and individuals increasing responsible tasks; facilitating communication; managing group conflict and tension; establishing group agreement; facilitating the learning process; effectively communicating; facilitating group discussions and exercises; enhancing problem solving skills; encouraging inmate participation; and control of inmates engaging in intimidation or class disruption.

> Plaintiffs Contend:  Correctional officers are not adequately or appropriately trained to fulfill the functions described.

846.   Defendants Contend:   In addition to Steps I, II and III, each maximum custody housing unit also contains a designated housing area for Restrictive Status Housing Program (RSHP) inmates.

Plaintiffs Contend:   "Each maximum custody housing unit" does not "contain[] a designated housing area for Restrictive Status Housing Program (RSHP) inmates."

847.   Defendants Contend:   Inmates placed in RSHP are reviewed by mental health staff within 72 hours of placement.

Plaintiffs Contend:   Inmates placed in RSHP are not reviewed by mental health staff within 72 hours.

848.   Defendants Contend:   RSHP inmates are reviewed by the Program Team at a minimum of every 30 days for program participation and step progression.

Plaintiffs Contend:   Inmates placed in RSHP are not reviewed by the Program Team at a minimum of every 30 days for program participation and step progression.

849.   Defendants Contend:   RSHP inmate property is limited to hygiene items, towel, wash cloth; two jumpsuits, two sets of underwear and socks (clean set exchange provided after every shower); legal materials; religious materials; reading and writing materials; one pair each of shower shoes and deck shoes.

Plaintiffs Contend:   Each of these items is not made available to all prisoners in RSHP.

850.   Defendants Contend:   RSHP inmate property and privileges are earned back by demonstration of positive behavior and participation in mandatory programs.

Plaintiffs Contend:   Inmates are not provided the additional privileges stated once they have fulfilled the stated requirements.

851.   Defendants Contend:   Visitation is restricted for the first 30 days and restrictions may be extended based upon disciplinary violation sanctions or program non-compliance.

Plaintiffs Contend:   These are not the only bases for visitation restriction.

852.   Defendants Contend:   Phone calls are restricted for the first 90 days but inmates are still permitted to send and receive letters.

Plaintiffs Contend:   The possibility of receiving mail is insufficient to ameliorate the conditions of extreme social isolation and environmental deprivation in ADC's isolation units.  So the fact that inmates can receive mail while they are unable to receive phone calls is not material to Plaintiffs' claims.

853.   Defendants Contend:   RSHP inmates are offered recreation a minimum of six hours per week and must shower three times per week like all other maximum custody inmates.

Plaintiffs Contend:  RSHP inmates are not regularly offered recreation and showers as described.

854.   Defendants Contend:   RSHP has three steps, requiring a minimum stay in Step I for 30 days, Step II for 60 days and Step III for 30 days.

Plaintiffs Contend:  Inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.

Plaintiffs also contend that the program does not significantly ameliorate the degree of isolation most inmates in isolation experience.

855.   Defendants Contend:   RSHP inmates may revert back to a prior step or stay in a current step for more than the minimum period of time for violation of program rules.

Plaintiffs Contend:  Inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result.  Plaintiffs also contend that the program does not significantly ameliorate the degree of isolation most inmates in isolation experience.  Plaintiffs Contend that prisoners may be reverted or maintained at a given Step for reasons in addition to those stated.

856.   <u>Defendants Contend</u>:   Step II property and privileges are increased to possession of a television in cell (loaner if available); non-contact visits (once per month for two hours); and limited commissary (new hygiene and food purchase only).

> <u>Plaintiffs Contend</u>:  Inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result. Plaintiffs also contend that the program does not significantly ameliorate the degree of isolation most inmates in isolation experience.  <u>Plaintiffs Contend</u> that not all prisoners are provided the privileges described.

857.   <u>Defendants Contend</u>:  Step III property and privileges are increased to two non-contact visits per month for two house each; one phone call per month for 15 minutes; and increased commissary.

> <u>Plaintiffs Contend</u>:  Inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result. Plaintiffs also contend that the program does not significantly ameliorate the degree of isolation most inmates in isolation experience.  <u>Plaintiffs Contend</u> that not all prisoners are provided the privileges described.

858.   <u>Defendants Contend</u>:   All living areas are inspected daily by staff to promote  cell cleanliness.

> <u>Plaintiffs Contend</u>:  All living areas are not inspected daily as described.

859.   <u>Defendants Contend</u>:  Correctional personnel make daily cell inspections to promote  cell cleanliness.

> <u>Plaintiffs Contend</u>:  All living areas are not inspected daily as described.

860.   <u>Defendants Contend</u>:   Inmates are required to sweep and neatly maintain their cells.

> <u>Plaintiffs Contend</u>:  Inmates are not required to sweep and neatly maintain their cells and are not provided the equipment necessary to do so.

861.   <u>Defendants Contend</u>:   Maximum custody inmates represent the highest safety and security risk to the public, other inmates and facility personnel because they have the greatest risk of violence, predatory conduct, assaultive conduct or escape.

> <u>Plaintiffs Contend</u>:   Not all inmates in isolation present the level of risk described in the fact; some are automatically assigned to isolation based upon their sentence, without any individualized risk assessment.

862.   <u>Defendants Contend</u>:  Because of maximum custody inmates' criminal and institutional history as described above, prison officials must assign these inmates to the most secure and closely monitored housing units, providing the highest level of monitoring and controlled movement.

> <u>Plaintiffs Contend</u>:   Not all prisoners in isolation require the level of monitoring described; some are automatically assigned to isolation based upon their sentence, without any individualized risk assessment.

863.   <u>Defendants Contend</u>:   ASPC-Lewis houses primarily ███Security███ inmates.

> <u>Plaintiffs Contend</u>:   ASCP-Lewis houses prisoners other than male ███Security███ prisoners and that mental health prisoners are housed in prison complexes outside of ASPC-Phoenix.

864.   <u>Defendants Contend</u>:   Many of ADC's "maximum custody" cells have double bunks and house two inmates in one cell, thereby providing the inmates with constant opportunity for interaction with another inmate.

> <u>Plaintiffs Contend</u>:   Most prisoners are not double bunked as the fact implies.   Plaintiffs additionally contend that double celling does not necessarily result in "constant opportunity for interaction" or significantly ameliorate the conditions of confinement for most prisoners in isolation.

865.   <u>Defendants Contend</u>:  While cell configurations among the complexes vary based upon year built and design, all maximum custody cells provide sufficient ventilation

(either through open cell fronts fixed with metal bars, ▮Security▮ metal cell front doors or individual cell ventilation).

Plaintiffs Contend:  Not all isolation cells provide sufficient ventilation.

866.   Defendants Contend:  Additionally, all maximum custody housing units and cell configurations provide exposure to natural light via in-cell windows, cell fronts that face windows or skylights in the housing units.

Plaintiffs Contend:  Not all isolation cells allow exposure to natural light.

867.   Defendants Contend:   Moreover, all maximum custody cells provide inmates the opportunity to see others and to speak to other inmates, correctional personnel, medical personnel, and programming personnel through either a ▮Security▮ steel cell front, a vision panel in the door or cell wall or an open cell front – metal bar configuration.

Plaintiffs Contend:   The number, length and substance of these communications does not significantly ameliorate the experience of isolation for prisoners in isolation units.

868.   Defendants Contend:  All ADC maximum custody cells provide sufficient space for inmates to engage in stretching, tai chi or yoga in their cells and such exercise is permitted as long as the activity does not disrupt operations or risk the safety or security of the inmate(s) residing in the cell.

Plaintiffs Contend:  ADC isolation cells do not provide sufficient space for exercise necessary to preserve health.

869.   Defendants Contend:  All ADC maximum custody cells provide sufficient space for inmates to engage in cardiovascular exercise, including, but not limited to, marching in place, jogging in place, jumping an imaginary rope or doing "burpees" or "up-downs" in their cells and such exercise is permitted as long as the activity does not disrupt operations or risk the safety or security of the inmate(s) residing in the cell.

Plaintiffs Contend:  ADC isolation cells do not provide sufficient space for exercise necessary to preserve health.

870.   Defendants Contend:  All ADC maximum custody cells provide sufficient space for inmates to engage in strength training, including, but not limited to, pushups, sit-ups, planks, triceps dips, lunges, squats, etc. – all plyometric exercises often performed by non-incarcerated individuals in their own homes.

Plaintiffs Contend:  ADC isolation cells do not provide sufficient space for exercise necessary to preserve health.

871.   Defendants Contend:  Such in-cell strength training exercise is permitted as long as the activity does not disrupt operations or risk the safety or security of the inmate(s) residing in the cell.

Plaintiffs Contend:  ADC isolation cells do not provide sufficient space for exercise necessary to preserve health.

872.   Defendants Contend:  The amount of time that an ADC maximum custody inmate is permitted to be out of his or her cell varies widely depending upon the inmate's classification, custody level and reason(s) for his or her placement in a particular maximum custody unit.

Plaintiffs Contend:  All or virtually all prisoners in isolation units receive very limited out of cell time.  Recreation is frequently cancelled and not made up and limited, if any, programs are made available to prisoners confined in these units.

873.   Defendants Contend:  Depending on classification and program status, maximum custody inmates are permitted to leave their cells, as more specifically set forth below, for numerous reasons including not limited to shower time, out of cell recreation, programming opportunities, medical appointments, communal chow service, commissary trips, visitation and inmate job assignments.

Plaintiffs Contend:  Prisoners in isolation are not permitted to leave their cells for "numerous" reasons as alleged.

874.   Defendants Contend:   Work opportunities are offered to all inmates, including select inmates in maximum custody.

Plaintiffs Contend:  Work opportunities are not offered to "all inmates."

875.   Defendants Contend:   In addition to personal telephone calls and visits, maximum custody inmates are permitted legal calls and legal visits where the inmate has ongoing criminal or civil litigation matters.

Plaintiffs Contend:  Legal calls are not available to all prisoners in isolation and do not mitigate the damaging effects of isolated confinement.

876.   Defendants Contend: Legal calls for telephonic court hearings are paid for by ADC.  (Ex. 138, ¶366.)

Plaintiffs Contend:  Defendants have not produced evidence to Plaintiffs establish this fact and therefore Plaintiffs cannot stipulate to it.  It also appears immaterial to the issues in this litigation.

877.   Defendants Contend: Attorney visits are permitted subject to security clearance of the attorney or attorney's agent.  Attorney visits may be contact visits or non-contact visits depending on the custody level of the inmate or any other safety or security concerns that may preclude a contact visit.

Plaintiffs Contend:  This is the policy but it is not always observed in practice and other impediments to lawyers' visits besides security clearance exist.

878.   Defendants Contend:   Per ADC Department Order 902, Inmate Legal Access to the Courts, ADC inmates including maximum custody inmates are permitted 30 minute outgoing collect call legal calls as well as telephone access for court ordered telephonic hearing.

Plaintiffs Contend:  Legal calls are not available to all prisoners in isolation and do not mitigate the damaging effects of isolated confinement.

879.   Defendants Contend:  Legal calls are not monitored or recorded.

Plaintiffs Contend:   Legal calls are sometimes monitored because staff improperly deny prisoners confidential legal calls, or insist that they must sit in the room with the prisoner while he or she speaks to the attorney.

880.   <u>Defendants Contend</u>:  Inmates can request legal calls 24 hours in advance by submitting a Legal/Emergency Telephone Call Request form and upon approval the phone calls shall be scheduled.

       <u>Plaintiffs Contend</u>:   Such requests are not always granted by staff. Furthermore, legal calls are not available to all prisoners in isolation and do not mitigate the damaging effects of isolated confinement.

881.   <u>Defendants Contend</u>:  Legal phone calls may be denied or suspended only due to security concerns and may not be denied as a form of discipline.

       <u>Plaintiffs Contend</u>:  Legal calls are denied for other reasons.  Furthermore, legal calls are not available to all prisoners in isolation and do not mitigate the damaging effects of isolated confinement.

882.   <u>Defendants Contend</u>:   Incoming legal calls from attorneys may also be facilitated but ADC personnel must first contact the inmate to determine if the inmate wishes to receive the call and the inmate must complete the Legal/Emergency Telephone Call Request form to accept or refuse an attorney initiated legal call.

       <u>Plaintiffs Contend</u>:  There are other reasons that ADC staff choose not to facilitate such calls.  Furthermore, legal calls are not available to all prisoners in isolation and do not mitigate the damaging effects of isolated confinement.

883.   <u>Defendants Contend</u>:  Attorney visits for ADC inmates, including maximum custody inmates, are permitted where the attorney requests the visit at least 48 hours in advance of the visit (waivers of this advance request period may be waived in emergency situations).

       <u>Plaintiffs Contend</u>:  Visits are not always permitted under the circumstances described.  Furthermore, only a tiny number of prisoners in isolation receive legal visits and such visits do not mitigate the damaging effects of isolated confinement.

884.   <u>Defendants Contend</u>:  Maximum custody inmates are afforded six hours of outdoor exercise weekly, generally in two hour blocks, three times per week.

> <u>Plaintiffs Contend</u>:  Inmates in isolation are not regularly provided six hours of outdoor exercise, as stated.  Recreation sessions are frequently cancelled and not made up.

885.   <u>Defendants Contend</u>:  The two-hour block, three times per week schedule facilitates efficient operations and scheduling so that each maximum custody inmate is provided equal opportunity for meaningful out of cell recreation time considering the number of maximum custody inmates that ADC incarcerates.

> <u>Plaintiffs Contend</u>:  Inmates in isolation are not regularly provided six hours of outdoor exercise, as stated.  Recreation sessions are frequently cancelled and not made up.

886.   <u>Defendants Contend</u>:  Inmates housed in mental health units at the Lumley and Alhambra Units are afforded the same number of hours weekly for exercise as general population inmates – one hour in duration, six times a week.

> <u>Plaintiffs Contend</u>:  Inmates in isolation are not regularly provided six hours of outdoor exercise, as stated.  Recreation sessions are frequently cancelled and not made up.

887.   <u>Defendants Contend</u>:  However, inmates that are on mental health or suicide watch may be offered less than six hours per week of out of cell recreation time at the clinical discretion of the mental health provider in order to protect the health and safety of the particular inmate.

> <u>Plaintiffs Contend</u>:   These are not the only circumstances under which prisoners on watch may be offered less than six hours of recreation per week.

888.   <u>Defendants Contend</u>:   If recreation must be cancelled for legitimate operational or safety and security reasons such as a staffing shortage, inclement weather

or facility emergency lockdown, recreation time will be made up for those inmates who missed recreation if time permits.

> Plaintiffs Contend:  Recreation is not regularly made up when cancelled.

889.   Defendants Contend:  ADC maximum custody inmates (including detention status) are offered showers (and shave for males) three days each week.

> Plaintiffs Contend:  Prisoners in isolation are not regularly offered showers three times a week.

890.   Defendants Contend:   ADC maximum custody inmates have ample opportunity for daily human interaction.

> Plaintiffs Contend:  Prisoners in isolation do not have "ample opportunity for daily human interaction" and are instead subject to extreme and damaging levels of social isolation.

891.   Defendants Contend:  All inmates are authorized to possess property as outlined in the Inmate Property List.

> Plaintiffs Contend:  Not all inmates are authorized to possess the property indicated.   Not all prisoners can afford to purchase allowed property. Additionally, Plaintiffs Contend that allowance of the limited property indicated does not significantly ameliorate the damaging effects of isolation for prisoners in isolation.

892.   Defendants Contend:  Inmates in maximum custody are permitted to have appliances such as televisions, cassette players, and headphones.

> Plaintiffs Contend:  Not all inmates are authorized to possess the property indicated, and not all prisoners have the appliances listed, as they cannot afford to purchase them.  Additionally, Plaintiffs Contend that allowance of the limited property indicated does not significantly ameliorate the damaging effects of isolation for prisoners in isolation.

893.   Defendants Contend:  Inmates may not possess any property item in excess of the total amount allowed.

Plaintiffs Contend:  This is not the only reason property may be restricted.

894.   Defendants Contend:  Cell property may be restricted upon determination by medical or administrative staff in order to prevent the inmate from engaging in self-harm.

Plaintiffs Contend:  This is not the only reason property may be restricted.

895.   Defendants Contend:   Access to these appliances may be restricted for maximum custody inmates based upon disciplinary sanction.

Plaintiffs Contend:   This is not the only reason that access to such appliances is restricted.

896.   Defendants Contend:   Restricting access to these appliances constitutes a reasonable behavioral modification sanction as the restriction is based upon a formal disciplinary sanction finding and is limited in time.

Plaintiffs Contend:  The severe property restrictions in the isolation units are not reasonable.

897.   Defendants Contend:   Maximum custody inmates participating in ADC's Director's Instruction #326 Maximum Custody Population Management Step Program as are afforded increased property allowances as they progress through the three step behavioral modification program.

Plaintiffs Contend:  Inmates participating in these programs do not advance through the steps outlined once they have fulfilled the stated requirements and are not provided additional privileges and programs as a result. Plaintiffs Contend that most prisoners in isolation do not receive additional property as a result of participation in DI 326.  Plaintiffs also contend that the program does not significantly ameliorate the degree of isolation most inmates in isolation experience.

898.   Defendants Contend:  Property afforded to inmates placed on watch status is an individualized determination made by mental health personnel and correctional personnel depending on the circumstances requiring the watch status.

Plaintiffs Contend:  Property afforded each inmate on watch status is not the

result of an individualized determination involving mental health staff, and that such prisoners remain subject to the severe property restrictions in the isolation units.

899.   Defendants Contend:   Property restrictions may be imposed in order to eliminate inmate access to property items that the inmate may use for purposes of self-harm or a weapon used as against mental health, medical or correctional personnel.

Plaintiffs Contend:  Property in the isolation units is restricted for reasons in addition to those stated.

**Use of Force**

900.   Defendants Contend:   Force is used only after every other reasonable attempt to neutralize the real or potential danger has been considered and determined ineffectual.

Plaintiffs Contend:  Force is used at the ADC before every other reasonable attempt to neutralize the real or potential danger has been considered and determined ineffectual.

901.   Defendants Contend:  The use of force is reserved for situations where no other reasonable alternative is available to prevent escape, imminent death, serious bodily harm, or the taking of hostages.

Plaintiffs Contend:  Force is used at the ADC before every other reasonable attempt to neutralize the real or potential danger has been considered and determined ineffectual.

902.   Defendants Contend:   The use of force is never used as punishment or retaliation.

Plaintiffs Contend:  The use of force is used as punishment and retaliation.

903.   Defendants Contend:   Staff only uses physical force when persuasion, counseling, warnings, and direct order are found to be insufficient to obtain cooperation from the inmate.

Plaintiffs Contend:  Staff do not always exhaust these other methods before

resorting to force to obtain cooperation.

904.   <u>Defendants   Contend</u>:      Correctional   staff   restrict   the   use   of reactionary/planned less-than-lethal physical force to situations when it is necessary to maintain control and order or prevent the commission of a crime, prevent suicide or serious self-inflicted injury, protect against another's use or attempted use of unlawful physical force, protect a third person against another's use or attempted use of unlawful physical force, prevent an inmate from taking a hostage or causing serious bodily harm to another person, and maintain control or restore order, including the use of physical force to move an unwilling inmate.

> <u>Plaintiffs Contend</u>:  Correctional staff do not adhere to the protocol of this paragraph.

905.   <u>Defendants Contend</u>:  Less-than-lethal physical force may also be used to ensure compliance with Department Orders and/or written instructions, and to ensure the health, hygiene, and well-being of an inmate.

> <u>Plaintiffs Contend</u>:    Correctional   staff   use   physical   force   to   ensure compliance when other, less severe means of obtaining compliance are available and do so without regard to the limitations of the prisoners against who force is being used.

906.   <u>Defendants Contend</u>:   In mental health care facilities, correctional staff notify and/or request intervention by mental health staff if the inmate or staff are not in imminent danger.

> <u>Plaintiffs Contend</u>:  Correctional staff in mental health care facilities do not routinely ask or request intervention by mental health staff if an inmate or staff are not in imminent danger.

907.   <u>Defendants Contend</u>:   Less-than-lethal physical force is deployed on a progressive continuum, from the least amount of force possible to the maximum level permitted, commensurate with the circumstances of the incident.

Plaintiffs Contend:  Correctional guard do not adhere to the progressive continuum and use physical force prematurely.

908.   Defendants Contend:  When possible, staff should use progressive force as follows:  psychological ████████████████████████████████████████; aerosol sprays (████████████████); stun devices (██████); non-lethal weapons/munitions ████████████████████████████████████████); service dogs; cell extraction teams; and lethal force.

Plaintiffs Contend:  Progressive force is not used as described.

909.   Defendants Contend:  When utilizing progressive force, staff must consider: (1) each situation is different and generally the escalation for use-of-force should be planned; and (2) situations may not always allow for the straight-line progression when force is initiated.

Plaintiffs Contend:  Staff do not always consider these factors.

910.   Defendants Contend:  In all applications involving the use of force, patience is emphasized and consideration must be given to alternative solutions, such as waiting the inmate out, before initiating or escalating the use of force.

Plaintiffs Contend:  Patience is not emphasized and consideration is not given to the alternatives listed in all applications involving use of force.

911.   Defendants Contend:  Only a warden, deputy warden, or designee may authorize a use of force when the sole reason for the use of force is due to the ██████████████████████████████████████████████████████████████████████████.

Plaintiffs Contend:  ADC staff do not only use such force when they receive authorization from the warden, deputy warden or designee.

912.   Defendants Contend:  When a use of force is planned, staff must ensure that they have used every reasonable effort possible to resolve the situation, and a shift commander or supervisor is present.

233

Plaintiffs Contend:  Staff do not "use[] every reasonable effort possible to resolve the situation" before using force as described.

913.   Defendants Contend:  In a planned use of force, staff must consider the physical and mental characteristics of the inmate (including mental health score), the inmate's mental impairment, proximity of the inmate to weapons, the seriousness of the offense, availability of other options, and any other exigent circumstances.

Plaintiffs Contend:  Staff do not always consider the factors listed for planned uses of force, and this states the policy and not the actual practice.

914.   Defendants Contend:  Staff using OC spray must complete ADC approved training before using OC spray.

Plaintiffs Contend:  Not all staff using OC spray are so trained or comply with the training when using OC spray.

915.   Defendants Contend:  After chemical agents are deployed, the inmate cannot be detained in the contaminated area, if decontamination procedures are not effective, medical is notified for further evaluation, all affected areas must be decontaminated to remove and neutralize any chemical agents, hard non-porous surfaces must be cleaned with water, food and water exposed to contamination must be disposed of, and all items of cloth material are aired out.

Plaintiffs Contend:  The decontamination procedures described are not followed.

916.   Defendants Contend:  Decontamination procedures are employed as soon as possible following the use of chemical agents on an inmate.

Plaintiffs Contend:  Such decontamination does not occur as soon as possible.

917.   Defendants Contend:  Cell extractions are only conducted after all other methods to remove the inmate from the cell have been exhausted, including Security ████████████████████████████████████████████████.

Plaintiffs Contend:  It is not true that cell extractions are conducted only after all other methods have been exhausted.

918.   Defendants Contend:  Prior to scheduling a planned cell extraction in a mental health unit or for a known mental health inmate, the shift commander contacts mental health staff or a psychologist for special handling instructions, if any, unless the situation dictates otherwise.

Plaintiffs Contend:  It is not true that cell extractions are conducted only after mental health staff are contacted as described.

919.   Defendants Contend:  Within three days after a use-of-force incident, the use of force is evaluated by a review committee.

Plaintiffs Contend:  All incidents are not evaluated as described within three days, and Plaintiffs dispute that any such evaluation is adequate and appropriate.

920.   Defendants Contend:  A use-of-force report is created for each use-of-force incident.

Plaintiffs Contend:  A use of force report is not always created, and Plaintiffs also dispute the adequacy and appropriateness of such reports.

921.   Defendants Contend:  ADC employs the use of a ▮▮▮Security▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to gain compliance from Mental Health inmates who will not respond to orders issued by correctional personnel to uncover the inmate's head or body so that the correctional personnel can complete a safety and welfare check to determine that the inmate is alive, breathing and not injured.

Plaintiffs Contend:  Plaintiffs dispute that an ▮▮Security▮▮ is used in the situations described, and that such use would always be appropriate in those situations.

922.   Defendants Contend:  In circumstances where a Mental Health inmate refuses repeated verbal orders to uncover his or her body or head so that correctional

personnel can determine the inmate's safety and welfare, the ████████ Security device is deployed upon the inmate.

Plaintiffs Contend:  Plaintiffs dispute that an ████████ Security is used in the situations described, and dispute that such use would always be appropriate in those situations.

923.  Defendants Contend:  The uncomfortable but non-lethal deployment of a ████████ Security most often simply annoys the inmate to the point that the inmate will uncover his or her body or head in order that a safety and welfare check can be completed.

Plaintiffs Contend:  The ████████ Security does not "simply annoys" the inmate and is not an appropriate response from ADC staff.

924.  Defendants Contend:  As above with the use of chemical agents, a supervisor must authorize the use of the ████████ Security device and the use of the ████████ Security is videotaped.

Plaintiffs Contend:  :  Such use is not always authorized and videotaped as described.

925.  Defendants Contend:  Additionally, the use of the ████████ Security must be documented in an Incident Report.

Plaintiffs Contend:  Such use is not always documented in an incident report.

**Detention**

926.  Defendants Contend:  Inmates may be placed in detention status as necessary to ensure the safe, secure, and orderly operation of a facility, to ensure the integrity, and pending completion, of an ongoing investigation, while determining eligibility for protective segregation, for observation status to identify, minimize, and intervene in the possibility of self-destructive behaviors, pending institutional review and

classification placement (such as pending transfer to a higher custody level), pending revocation of parole, work furlough, home arrest, or temporary, mandatory, or provisional release, or to fulfill disciplinary sanctions.

> Plaintiffs Contend:  This is not an exhaustive list of the reasons prisoners are placed in detention.

927.   Defendants Contend:  Not all inmates who receive a disciplinary sanction and thus are placed on "detention status" are required to be moved to a maximum custody cell; instead, they may be allowed to stay in their existing cell with limited privileges while their disciplinary sanction is carried out.

> Plaintiffs Contend:  Many prisoners on detention status are held in isolated confinement, locked in their cells for 22 hours or more each day.

928.   Defendants Contend:  Inmates on detention status are offered showers and a shave three different days each week.

> Plaintiffs Contend:  Inmates on detention status are not regularly offered showers and a shave three times a week.

929.   Defendants Contend:  Inmates on detention status are offered exercise outside their cell for at least two hours on three different days of each week.

> Plaintiffs Contend:  These prisoners are not regularly provided exercise outside their cell for at least two hours on three different days of each week.

930.   Defendants Contend:  Inmates on detention status have access to personal property and access to commissary purchases, except when precluded by disciplinary sanctions, as outlined in DO 909.

> Plaintiffs Contend:  Not all prisoners have access to personal property as described.

931.   Defendants Contend:  Inmates on detention status can have visits by counseling/mental health staff upon request or as needed.

> Plaintiffs Contend:  Inmates on detention status do not receive regular visits by counseling/mental health staff or within a reasonable time upon request.

932.   <u>Defendants Contend</u>:  Inmates on detention status have telephone privileges, except when precluded by disciplinary sanctions.

<u>Plaintiffs Contend</u>:   Many prisoners in detention are denied telephone access.

933.   <u>Defendants Contend</u>:  The Warden/Deputy Warden, in conjunction with an investigation, may restrict or curtail the above items (except meals) and all other inmate contact when objective evidence demonstrates such items or contact would impede or nullify an investigation, cause the destruction of evidence, or lead to the commission of a crime or violation of facility rules.

<u>Plaintiffs Contend</u>:   Many prisoners in detention are allowed extremely limited property for reasons other than those listed.

934.   <u>Defendants Contend</u>:  Detention logs for inmates on detention status track acceptance/refusal of scheduled meals, shower times, exercise times, and telephone times.

<u>Plaintiffs Contend</u>:   Detention logs do not reliably or accurately record meals, showers, exercise, and telephone use.

935.   <u>Defendants Contend</u>:   Correctional officers conduct random, periodic welfare checks, in addition to checks at specifically timed intervals.

<u>Plaintiffs Contend</u>:  Periodic welfare checks are not conducted in a timely and regular manner.

936.   <u>Defendants Contend</u>: The conditions of confinement within the maximum custody units meet constitutional standards.

<u>Plaintiffs Contend</u>:   The conditions of confinement within the maximum custody do not meet constitutional standards.

937.   <u>Defendants Contend</u>: The conditions of confinement within the maximum custody units meet constitutional standards.

<u>Plaintiffs Contend</u>:   The conditions of confinement within the maximum custody  do not meet constitutional standards.

**<u>Mental Health Care</u>**

938.   <u>Defendants Contend</u>: ADC provides constitutionally adequate mental health care to the Plaintiff class.

    <u>Plaintiffs Contend</u>:  ADC does not provide constitutionally adequate mental health care to the Plaintiff class.

**<u>Plaintiffs' Grievance History</u>**

939.   <u>Defendants Contend</u>:  The named Plaintiffs failed to comply with the grievance policy and exhaust all appeals prior to pursuing their claims.

    <u>Plaintiffs Contend</u>:  Defendant Ryan waived Plaintiffs obligation to do so in a tolling agreement, as this Court has previously ruled.

940.   <u>Defendants Contend</u>:  Under ADC policy, an inmate must appeal to the Director to exhaust the non-medical grievance procedure, and the failure to properly appeal through to the Director's Decision constitutes a failure to exhaust available administrative remedies.

    <u>Plaintiffs Contend</u>:  Exhaustion is irrelevant to this case because the Court previously found that the ADC has waived any exhaustion requirement.

941.   <u>Defendants Contend</u>: DO 802 – effective as of July 13, 2009 – applies to all inmate grievances submitted after July 13, 2009 through the present.

    <u>Plaintiffs Contend</u>:  For the purposes of this litigation, DO 802 does not apply to all inmate grievances submitted after July 13, 2009 through the present because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation.

942.   <u>Defendants Contend</u>:  Plaintiff Jensen did not submit a Director's-Level Appeal with respect to the following claims he raises in the Complaint: Did not receive biopsy (for prostate cancer) recommended by prison doctor in January 2007 until October 2009, and did not have surgery until July 2010; did not receive chemotherapy medication prescribed by outside specialist for two months; staff performed medical procedures that they were not qualified to perform; Nurse's assistant improperly irrigated catheter in July 2010 following prostate surgery and he was not seen for three days; Given insufficient

number of catheters forcing him to re-use old ones; Waited more than two years to have biopsy of mass on prostate because contracts with outside specialists were cancelled.

> Plaintiffs Contend:  For purposes of this litigation, Jensen was not required to exhaust administrative remedies before filing the lawsuit because  the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

943.   Defendants Contend:  Plaintiff Swartz did not submit a Director's-Level Appeal with respect to the following claims he raises in the Complaint: Waited months to receive neuropathic pain medication; received inadequate mental health care while on suicide watch; denied a filling for two years to fix a cracked molar (only offered extraction); Told to "be patient" in response to HNRs; In September 2011, he swallowed metal spring and wire and staff joked, used a metal detector, and told him he would need to let it "pass"; x-ray the next day revealed metal in his stomach and prison doctor told him the same thing and did not refer him for an endoscopy; in December 2011 after transfer from Phoenix to Lewis, he had to file multiple HNRs and waited several weeks before receiving his psychotropic medications; not given interim formulary medication for facial injuries for six weeks pending approval of physician's prescription of Tramadol; in position of deciding between tooth extraction or saving tooth and enduring pain; only saw lower level mental health staff at his cell front and did not see a psychiatrist for over a year despite changes in medication; did not receive psychotherapy for more than two months in summer 2011 while on suicide watch; after swallowing glass and taken to hospital, not removed to inpatient unit for three months after hospital recommendation; complained about "unhygienic conditions" in suicide watch cell; mental health notes reflect he was "bitching about cleanliness – germs and disease"; able to acquire and use

███████████████████████████████████ Security ███████████████████████████████████

██████████████████████████████████████████ to hurt himself in suicide watch cell; psychotropic

prescriptions renewed without any contact with a psychiatrist; attempted to commit suicide in isolation cell.

> Plaintiffs Contend:  For purposes of this litigation, Swartz was not required to exhaust administrative remedies because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

944.   Defendants Contend:  Plaintiff Rodriguez did not submit a Director's-Level Appeal with respect to the following claims she raises in the Complaint: medication abruptly discontinued or changed and dosage adjusted without explanation or monitoring; lack of therapeutic treatment; medications switched multiple times from Risperdal to Haldol to treat psychosis but with no explanation for changes; prescribed high doses of Haldol without any documentation for basis of decision; have not received inpatient mental health care.

> Plaintiffs Contend:  For purposes of this litigation, Rodriguez was not required to exhaust administrative remedies because  the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

945.   Defendants Contend:  Plaintiff Verduzco did not submit a Director's-Level Appeal with respect to the following claims she raises in the Complaint: after submitting HNR, told by staff she would be "put on the waiting list"; went months without seeing psychiatrist despite symptoms of severe psychological distress; have not received inpatient mental health care.

> Plaintiffs Contend:  For purposes of this litigation, Verduzco was not required to exhaust administrative remedies because  the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the

Court has previously ruled.

946.   <u>Defendants Contend</u>:  Plaintiff Thomas did not submit a Director's-Level Appeal with respect to the following claims he raises in the Complaint: improper cessation and initiation of, failure to administer, and use of ineffective psychotropic medications while on suicide watch; delays in follow up and psychiatric evaluation; no medical attention for November 2011 overdose; second-hand cigarette smoke has triggered asthma attacks: did not see a psychiatrist for almost a year despite being moved to suicide watch several times; did not see a psychiatrist for eleven months despite being placed on suicide watch; dental and physical state deteriorated after being put in isolation cell.

> <u>Plaintiffs Contend</u>:  For purposes of this litigation, Thomas was not required to exhaust administrative remedies because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

947.   <u>Defendants Contend</u>:   Plaintiff Smith did not submit a Director's-Level Appeal with respect to the following claims he raises in the Complaint: Psychotropic medications abruptly discontinued and restarted at inappropriate times after lengthy delays and without proper evaluation by a psychologist; prescribed medication in April 2008 without explanation; prescribed Celexa in June 2008, but did not receive it for nearly a year; prescribed Lithium, but not seen by a doctor for three months to monitor; renewed after six months without seeing a doctor; submitted HNR in November 2009 reporting vomiting from Lithium, and was given tums; symptoms persisted and after submitting another HNR in January 2010 he was not seen by a doctor until March 2010; reported mental health problems on January 5, 2010 while housed in isolation, but was not seen because of shortage in staff.

> <u>Plaintiffs Contend</u>:  For purposes of this litigation, Smith was not required to exhaust administrative remedies because the Director has entered a tolling

agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

948.   Defendants Contend:   Plaintiff Gamez did not submit a Director's-Level Appeal with respect to the following claims he raises in the Complaint: delays in responses to HNRs; delays in receiving and abruptions in medication; inadequate monitoring, services and follow up visits for mental health; in August 2009, he submitted multiple HNRs for paranoia, anxiety, panic, and requested to be taken off of medications and out of isolation, but not seen for 5 months, not seen by a psychiatrist from 2007 to 2011 despite referrals from staff and multiple HNRs, and care managed by a nurse practitioner; told to "be patient" in response to HNRs; psychotropic medications abruptly started, stopped, and restarted; prescribed antipsychotic and anti-epileptic medications for off-label treatment of mood disorder even though other drugs were more effective; second-hand cigarette smoke has triggered asthma attacks; did not see a psychiatrist from 2007 to 2011 despite deteriorating mental health condition; instead a nurse practitioner prescribed medication; did not see a psychiatrist while in SMU for two years; did not have blood regularly drawn to test for medication side effects.

Plaintiffs Contend:   For purposes of this litigation, Gamez was not required to exhaust administrative remedies because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

949.   Defendants Contend:   Plaintiff Chisholm did not submit a Director's-Level Appeal with respect to the following claims she raises in the Complaint: not referred to a cardiologist for eight months despite being diagnosed with hypertension and experiencing chest pains and shortness of breath; delays and interruptions in psychotropic medication; in April 2011, she reported experiencing a nervous breakdown and requested an adjustment of her medications, but did not see psychiatrist for a month and did not receive

a follow up appointment; only offered tooth extraction for broken tooth and another tooth with a missing crown.

> Plaintiffs Contend:   For purposes of this litigation, Chisholm was not required to exhaust administrative remedies because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

950.   Defendants Contend:   Plaintiff Licci did not submit a Director's-Level Appeal with respect to the following claims she raises in the Complaint: despite multiple masses growing on her breasts, mouth, and arms and discomfort in cervix in 2010, requesting testing in December 2010, and a prison doctor referring her to an oncologist in April 2011, she was not sent for a CT scan until September 2011 or MRI until December 2011, nor was she ever seen by an oncologist; nothing in file indicates whether port-a-cath implanted in chest was properly flushed out in November 2011; despite multiple masses growing on her breasts, mouth, and Told by FHA that she was "hindering her own care" by filing grievances and HNRs regarding outside specialists; did not receive CT scan until September 2011 and MRI in December 2011 for masses in breasts, mouth, and arms, and discomfort in cervix, despite complaining and a prison doctor referral in December 2010.

> Plaintiffs Contend:  For purposes of this litigation, Licci was not required to exhaust administrative remedies because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

951.   Defendants Contend:   Plaintiff Hefner did not submit a Director's-Level Appeal with respect to the following claims he raises in the Complaint: in 2006 and 2008, he did not timely receive prescribed eye medication following eye surgery; requests for medical diet for gastroesophageal reflux disease denied; request for medical diet (gastroesophageal reflux) denied.

1
2
3
4
5

> Plaintiffs Contend:  For purposes of this litigation, Hefner was not required to exhaust administrative remedies because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

6
7
8
9
10
11
12

952.  Defendants Contend:  Plaintiff Polson did not submit a Director's-Level Appeal with respect to the following claims he raises in the Complaint: waited three years to receive partial dentures for missing teeth; waited five months to see a dentist for broken front tooth and it was not extracted until a year after it had broken; must file multiple HNRs and wait three to six weeks for antibiotics for ear infections; not fitted for dentures for broken teeth until April 2011 despite qualifying in April 2008; did not have blood regularly drawn to test for medication side effects.

13
14
15
16
17

> Plaintiffs Contend:  For purposes of this litigation, Polson was not required to exhaust administrative remedies because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

18
19
20
21
22
23
24
25
26
27

953.  Defendants Contend:  Plaintiff Wells did not submit a Director's-Level Appeal with respect to the following claims she raises in the Complaint: not evaluated by cardiologist for chronic chest pains, dizziness, and high blood pressure for four months; no follow-up appointment with cardiologist after receiving stent and reporting continued chest pains after returning from hospital; gynecologist evaluated her chest symptoms; in 2010, fillings in two teeth were broken and not repaired for months; dentist cracked adjacent tooth in November 2011 when those fillings were replaced and it has not been repaired; refused tooth extraction and endured pain for several months before her filling were replaced; but in the process, another tooth was cracked and she has not received treatment/repair.

28

> Plaintiffs Contend:  For purposes of this litigation, Wells was not required to

exhaust administrative remedies because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

954.  Defendants Contend:   Plaintiff Swartz did not submit an Appeal to the Director with respect to the following claims he raises in the Complaint:

- Complained about "unhygienic conditions" in suicide watch cell and mental health notes reflect he was "bitching about cleanliness – germs and disease." (¶ 84)

- Acquired and used ███████████ Security ███████████ ███████████████████████████████ ███████████ to hurt himself in suicide watch cell.

- No supervision of medication administration in isolation cell.

- Attempted to commit suicide in isolation cell.

Plaintiffs Contend:  For purposes of this litigation, Swartz was not required to exhaust administrative remedies because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

955.  Defendants Contend:  Former ADC inmate Dustin Brislan did not submit an Appeal to the Director with respect to the following claims he raises in the Complaint:

- Spent several weeks in a frigid suicide cell with no mattress.

- Placed in suicide watch cell with broken glass and given a razor blade during another stay, which he used to cut himself.

- Attempted to commit suicide in isolation cell.

**Plaintiffs Contend**:  For purposes of this litigation, Brislan was not required to exhaust administrative remedies because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

956.   **Defendants Contend**:  Plaintiff Rodriguez did not submit an Appeal to the Director with respect to the following claims she raises in the Complaint:

- Excessive use of pepper spray and prolonged isolation in SMU and suicide watch cell.
- Suicide smock barely comes to top of thighs so that legs are exposed to cold air.
- Pepper sprayed when delusional or hallucinating while in suicide watch cell.

**Plaintiffs Contend**:   For purposes of this litigation, Rodriguez was not required to exhaust administrative remedies because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

957.   **Defendants Contend**:  Plaintiff Verduzco did not submit an Appeal to the Director with respect to the following claims she raises in the Complaint:

- Forced to endure cold temperatures while in suicide watch cell (short smock with cold air), no way to turn off the lights, subjected to safety checks every 10-30 minutes, minimal human contact, and cannot go outside, brush her teeth, or bathe regularly; conditions in SMU include extended isolation, limited exercise, limited therapeutic treatment, excessive pepper spray.

- Suicide smock barely comes to top of thighs so that legs are exposed to cold air.
- Pepper sprayed in suicide watch cell after jerking awake when awoken by staff on "safety check" for allegedly attempting to assault an officer.
- Pepper sprayed when delusional or hallucinating while in suicide watch cell, and then dragged to shower, stripped naked, and sprayed with cold water, then left naked to wait for a new vest and blanket.
- Mental health worsened in isolation cell.

Plaintiffs Contend:   For purposes of this litigation, Verduzco was not required to exhaust administrative remedies because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

958.    Defendants Contend:   Plaintiff Thomas did not submit an Appeal to the Director with respect to the following claims he raises in the Complaint:

- Exposed to prolonged periods of isolation while in SMU.
- Unable to sleep because of 24-hour lighting in isolation cell.
- Lost 30 pounds while in isolation cell because of inadequate nutrition.
- Mental and physical state deteriorated after being put in isolation cell.

Plaintiffs Contend:   For purposes of this litigation, Verduzco was not required to exhaust administrative remedies because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the

Court has previously ruled.

959.   <u>Defendants Contend</u>:   Plaintiff Smith did not submit an Appeal to the Director with respect to the following claims he raises in the Complaint:

- Extreme isolation in SMU; denied transfer out of SMU despite ████████ Security ████████.
- Cannot eat food he is given in isolation cell because it is tampered with by kitchen workers who target him.
- Mental health worsened in isolation cell.

<u>Plaintiffs Contend</u>:   For purposes of this litigation, Smith was not required to exhaust administrative remedies because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

960.   <u>Defendants Contend</u>:   Plaintiff Gamez did not submit an Appeal to the Director with respect to the following claims he raises in the Complaint:

- Mental health worsened in isolation cell.

<u>Plaintiffs Contend</u>:   For purposes of this litigation, Gamez was not required to exhaust administrative remedies because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

961.   <u>Defendants Contend</u>:   Plaintiff Chisholm did not submit an Appeal to the Director with respect to the following claims she raises in the Complaint:

- Subjected to three aggressive room searches in October 2011 and February 2012 (and confiscated a book of art and art supplies).

<u>Plaintiffs Contend</u>:   For purposes of this litigation, Chisholm was not required to exhaust administrative remedies because the Director has entered

249

a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

962.   Defendants Contend:   Plaintiff Polson did not submit an Appeal to the Director with respect to the following claims he raises in the Complaint:

- Minimal human contact in suicide watch cells.

Plaintiffs Contend:   For purposes of this litigation, Polson was not required to exhaust administrative remedies because the Director has entered a tolling agreement and agreed not to assert exhaustion of remedies as a defense in litigation, so exhaustion is irrelevant to this litigation, as the Court has previously ruled.

**Issue: care Claims by Named Plaintiffs[6]**

**Issue:   Whether the health care provided to Shawn Jensen Satisfies the Constitutional Minima Under the Eighth Amendment.**

963.   Contested and Uncontested Facts relating to the treatment provided to Jensen during his incarceration at ADC are set forth in Exhibit D.

964.   Defendants Contend:   The medical, dental, and mental health care Jensen received was constitutionally adequate and within the applicable standard of care.

Plaintiffs Contend:   The medical, dental, and mental health care Jensen received is not constitutionally adequate and within the applicable standard of care.

**Issue:   Whether the Health Care Provided to Charlotte Wells Satisfies the Constitutional Minima Under the Eighth Amendment**

965.   Contested and Uncontested Facts relating to treatment provided to Wells during her incarceration at ADC are contained in Exhibit L.

---

[6] All of the headings in this section have been unilaterally added by Defendants without Plaintiffs agreement.   Plaintiffs objected to the phraseing of this questions because they are written to bias the Court in Defendants favor.

966.   <u>Defendants Contend</u>:  The medical, dental, and mental health care Wells received was constitutionally adequate and within the applicable standard of care.

<u>Plaintiffs Contend</u>:  The medical, dental, and mental health care Wells received was not constitutionally adequate and not within the applicable standard of care.

**Whether the Health Care Provided to Sonia Rodriguez Satisfies the Constitutional Minima Under the Eighth Amendment.**

967.   Contested and Uncontested Facts relating to the treatment provided to Rodriguez during her incarceration at ADC are set forth in Exhibit G.

968.   <u>Defendants Contend</u>: The medical, dental, and mental health care Rodriguez received was constitutionally adequate and within the applicable standard of care.

<u>Plaintiffs Contend</u>:  The medical, dental, and mental health care Rodriguez received was not constitutionally adequate and not within the applicable standard of care.

**Whether the Conditions of Confinement for Sonia Rodriguez Satisfies the Constitutional Minima Under the Eighth Amendment.**

969.   Contested and uncontested facts relating to the treatment provided to Rodriguez during her incarceration at ADC is contained in Exhibit G.

970.   <u>Defendants Contend</u>: The conditions of confinement Rodriguez is subjected to at ADC satisfies the constitutional minima under the Eighth Amendment.

<u>Plaintiffs Contend</u>: The conditions of confinement Rodriguez is subjected to at ADC do not satisfy the Eighth Amendment.

**Whether the Health Care Provided to Christina Verduzco Satisfies the Constitutional Minima Under the Eighth Amendment.**

971.   Contested and uncontested facts relating to the treatment provided to Verduzco during her incarceration at ADC are contained in Exhibit K.

972.   <u>Defendants Contend</u>:  The medical, dental, and mental health care Verduzco received was constitutionally adequate and within the applicable standard of care.

Plaintiffs Contend:  The medical, dental, and mental health care Verduzo received was not constitutionally adequate and not within the applicable standard of care.

**Whether the Conditions of Confinement for Christina Verduzco Satisfies the Constitutional Minima Under the Eighth Amendment.**

973.   Contested and uncontested facts relating to the treatment provided to Verduzco during her incarceration at ADC are contained in Exhibit K.

974.   Defendants Contend:  The conditions of confinement Verduzco is subjected to at ADC satisfies the constitutional minima under the Eighth Amendment.

Plaintiffs Contend:  The conditions of confinement Verduzco is subject to at ADC do not satisfy the Eighth Amendment.

**Whether the Health Care Provided to Jackie Thomas Satisfies the Constitutional Minima Under the Eighth Amendment.**

975.   Contested and uncontested facts relating to the treatment provided to Thomas during his incarceration at ADC is contained in Exhibit J.

976.   Defendants Contend: The medical, dental, and mental health care Thomas received was constitutionally adequate and within the applicable standard of care.

Plaintiffs Contend:  The medical, dental, and mental health care Thomas received was not constitutionally adequate and not within the applicable standard of care.

**Whether the Conditions of Confinement for Jackie Thomas Satisfies the Constitutional Minima Under the Eighth Amendment.**

977.   Contested and uncontested facts relating to the treatment provided to Thomas during his incarceration at ADC is contained in Exhibit J.

978.   Defendants Contend: The conditions of confinement Thomas is subjected to at ADC satisfies the constitutional minima under the Eighth Amendment.

<u>Plaintiffs Contend</u>:  The conditions of confinement Thomas is subjected to at ADC do not satisfy the Eighth Amendment.

**Whether the Health Care Provided to Maryanne Chisholm Satisfies the Constitutional Minima Under the Eighth Amendment.**

979.   Contested and uncontested facts relating to the treatment provided to Chisholm during her incarceration at ADC is contained in Exhibit A.

980.   <u>Defendants Contend</u>:  The medical, dental, and mental health care Chisholm received was constitutionally adequate and within the applicable standard of care.

<u>Plaintiffs Contend</u>:  The medical, dental, and mental health care Chisholm received was not constitutionally adequate and not within the applicable standard of care.

**Whether the Health Care Provided to Desiree Licci Satisfies the Constitutional Minima Under the Eighth Amendment.**

981.   Contested and uncontested facts relating to the treatment provided to Licci during her incarceration at ADC are contained in Exhibit E.

982.   <u>Defendants Contend</u>: The medical, dental, and mental health care Licci received was constitutionally adequate and within the applicable standard of care.

<u>Plaintiffs Contend</u>: The medical, dental, and mental health care Licci received was not constitutionally adequate and not within the applicable standard of care.

**Whether the Health Care Provided to Robert Gamez Satisfies the Constitutional Minima Under the Eighth Amendment.**

983.   Contested and uncontested facts relating to the treatment provided to Gamez during his incarceration at ADC are contained in Exhibit B.

984.   <u>Defendants Contend</u>: The medical, dental, and mental health care Gamez received was constitutionally adequate and within the applicable standard of care.

> Plaintiffs Contend:   The medical, dental, and mental health care Licci received was not constitutionally adequate and not within the applicable standard of care.

**Whether the Conditions of Confinement for Robert Gamez Satisfies the Constitutional Minima Under the Eighth Amendment.**

985.   Contested and uncontested facts relating to the treatment provided to Gamez during his incarceration at ADC are contained in Exhibit B.

986.   Defendants Contend: The conditions of confinement Gamez is subjected to at ADC satisfies the constitutional minima under the Eighth Amendment.

**Whether the Health Care Provided to Jeremy Smith Satisfies the Constitutional Minima Under the Eighth Amendment.**

987.   Contested and uncontested facts relating to the treatment provided to Smith during his incarceration at ADC are contained in Exhibit H.

988.   Defendants Contend: The medical, dental, and mental health care Smith received was constitutionally adequate and within the applicable standard of care.

> Plaintiffs Contend:   The medical, dental, and mental health care Smith received was not constitutionally adequate and not within the applicable standard of care.

**Whether the Conditions of Confinement for Jeremy Smith Satisfies the Constitutional Minima Under the Eighth Amendment.**

989.   Contested and uncontested facts relating to the treatment provided to Smith during his incarceration at ADC are contained in Exhibit H.

990.   Defendants Contend: The conditions of confinement Smith is subjected to at ADC satisfies the constitutional minima under the Eighth Amendment.

> Plaintiffs Contend: The conditions of confinement Smith is subjected to at ADC does not satisfy the Eighth Amendment.

**Whether the Health Care Provided to Joseph Hefner Satisfies the Constitutional Minima Under the Eighth Amendment.**

991.    Contested and uncontested facts relating to Hefner during his incarceration at ADC are contained in Exhibit C.

992.    <u>Defendants Contend</u>: The medical, dental, and mental health care Hefner received was constitutionally adequate and within the applicable standard of care.

> <u>Plaintiffs Contend</u>:  The medical, dental, and mental health care Hefner received was not constitutionally adequate and not within the applicable standard of care.

**Whether the Health Care Provided to Joshua Polson Satisfies the Constitutional Minima Under the Eighth Amendment.**

993.    Contested and uncontested facts relating to the treatment provided to Polson during his incarceration at ADC are contained in Exhibit F.

994.    <u>Defendants Contend</u>:  The medical, dental, and mental health care Polson received was constitutionally adequate and within the applicable standard of care.

> <u>Plaintiffs Contend</u>: The medical, dental, and mental health care Polson received was not constitutionally adequate and not within the applicable standard of care.

**Whether the Conditions of Confinement for Joshua Polson Satisfies the Constitutional Minima Under the Eighth Amendment.**

995.    Contested and uncontested facts relating to the treatment provided to Polson during his incarceration at ADC are contained in Exhibit F.

996.    <u>Defendants Contend</u>: The conditions of confinement Polson is subjected to at ADC satisfies the constitutional minima under the Eighth Amendment.

> <u>Plaintiffs Contend</u>: The conditions of confinement Polson is subjected to at ADC do not satisfy the Eighth Amendment.

**Whether the Health Care Provided to Stephen Swartz Satisfies the Constitutional Minima Under the Eighth Amendment.**

997.    Contested and uncontested facts relating to the treatment provided to Swartz during his incarceration at ADC are contained in Exhibit I.

998.   <u>Defendants Contend</u>: The medical, dental, and mental health care Swartz received was constitutionally adequate and within the applicable standard of care.

<u>Plaintiffs Contend</u>: The medical, dental, and mental health care Swartz received was not constitutionally adequate and not within the applicable standard of care.

**Whether the Conditions of Confinement for Stephen Swartz Satisfies the Constitutional Minima Under the Eighth Amendment.**

999.   Contested and uncontested facts relating to the treatment provided to Swartz during his incarceration at ADC are contained in Exhibit I.

1000.  <u>Defendants Contend</u>: The conditions of confinement Swartz is subjected to at ADC satisfies the constitutional minima under the Eighth Amendment.

<u>Plaintiffs Contend</u>:  The conditions of confinement Swartz is subjected to at ADC do not satisfy the Eighth Amendment.

1001.  <u>Defendants Contend</u>:   The conditions of confinement Rodriguez experienced during her incarceration at ADC were constitutionally adequate.

<u>Plaintiffs Contend</u>:  The conditions of confinement Rodriguez experienced during her incarceration at ADC have not been constitutionally adequate.

1002.  <u>Defendants Contend</u>:  The medical, dental, and mental health care Verduzco received was constitutionally adequate and within the applicable standard of care.

<u>Plaintiffs Contend</u>:   The health care Verduzco received was not constitutionally adequate or within the applicable standard of care. Verduzco is exposed to a substantial risk of serious harm as a result of Defendants' policies and practices.

1003.  <u>Defendants Contend</u>:  The conditions of confinement Verduzco experienced during her incarceration at ADC were constitutionally adequate.

<u>Plaintiffs Contend</u>:  The conditions of confinement Verduzco experienced during her incarceration at ADC have not been constitutionally adequate..

1004.  <u>Defendants Contend</u>:  The medical, dental, and mental health care Thomas received constitutionally was adequate and within the applicable standard of care.

<u>Plaintiffs Contend</u>:    The  health  care  Thomas  received  was  not constitutionally adequate or within the applicable standard of care.  Thomas is exposed to a substantial risk of serious harm as a result of Defendants' policies and practices.

1005.  <u>Defendants Contend</u>:  The conditions of confinement Thomas experienced during his incarceration at ADC was constitutionally adequate.

<u>Plaintiffs Contend</u>:  The conditions of confinement experienced during his confinement at ADC have not been constitutionally adequate.

1006.  <u>Defendants Contend</u>:  The medical, dental, and mental health care Chisholm received was constitutionally adequate and within the applicable standard of care.

<u>Plaintiffs  Contend</u>:    The  health  care  Chisholm  received  was  not constitutionally  adequate  or  within  the  applicable  standard  of  care. Chisholm  is  exposed  to  a  substantial  risk  of  serious  harm  as  a  result  of Defendants' policies and practices.

1007.  <u>Defendants Contend</u>:  The medical, dental, and mental health care Licci received was constitutionally adequate and within the applicable standard of care.

<u>Plaintiffs Contend</u>:  The health care Licci received was not constitutionally adequate or within the applicable standard of care. Licci is exposed to a substantial  risk  of  serious  harm  as  a  result  of  Defendants'  policies  and practices.

1008.  <u>Defendants Contend</u>:  The medical, dental, and mental health care Gamez received was constitutionally adequate and within the applicable standard of care.

<u>Plaintiffs  Contend</u>:    The  health  care  Gamez  received  was  not constitutionally adequate or within the applicable standard of care.  Gamez is exposed to a substantial risk of serious harm as a result of Defendants' policies and practices.

1009.  <u>Defendants Contend</u>:   The conditions of confinement Gamez experienced during his incarceration at ADC were constitutionally adequate.

 <u>Plaintiffs Contend</u>:   The conditions of confinement Gamez experienced during his incarceration at ADC have not been constitutionally adequate.

1010.  <u>Defendants Contend</u>:   The medical, dental, and mental health care Smith received was constitutionally adequate and within the applicable standard of care.

 <u>Plaintiffs Contend</u>:  The health care Smith received was not constitutionally adequate or within the applicable standard of care.  Smith is exposed to a substantial risk of serious harm as a result of Defendants' policies and practices.

1011.  <u>Defendants Contend</u>:   The conditions of confinement Smith experienced during his incarceration at ADC was constitutionally adequate.

 <u>Plaintiffs Contend</u>:  The conditions of confinement that Smith experienced during his incarceration at ADC have not been constitutionally adequate.

C. **CONTESTED QUESTIONS OF LAW.**

**The following issues of law are contested and to be determined by the Court:**

Issue # 1:  Whether, at the time they filed their Complaint, each of the Named Plaintiffs had standing under Article III to raise each of the five claims raised in the Complaint.

<u>Defendants Contend</u>: that the Named Plaintiffs did not have standing to raise their claims at the time they filed their Complaint.

<u>Plaintiffs Contend</u>:  The Named Plaintiffs had standing to raise their claims at the time they filed their Complaint, as previously ruled by this Court. [Docs. 175 at 4; 1065 at 5].

Issue # 2:  Whether, at the time of trial, each of the Named Plaintiffs have suffered actual injury and have standing under Article III to raise each of the certified practices and the claims in their Complaint?

<u>Defendants Contend</u>: that the Named Plaintiffs do not have standing now to raise

each of the certified practices and the claims in their Complaint.

Plaintiffs Contend:   The Named Plaintiffs have standing now to raise each of the certified practices and the claims in their Complaint.   The Court ruled that Plaintiffs have standing in the order denying Defendants' motion for summary judgment.   [Doc. 1065 at 5]

Issue # 3:  Whether each of the Named Plaintiffs received constitutionally adequate healthcare (medical care, dental care, and/or mental health care) prior to the filing of the Complaint.

Defendants Contend: that the Named Plaintiffs received constitutionally adequate healthcare prior to the filing of the Complaint.

Plaintiffs Contend:   The Named Plaintiffs received constitutionally inadequate healthcare prior to the filing of the Complaint.

Issue # 4:  Whether each of the Named Plaintiffs received constitutionally adequate healthcare (medical care, dental care, and/or mental health care) between the time they filed their Complaint and the time of trial.

Defendants Contend: that the Named Plaintiffs received constitutionally adequate healthcare between the time they filed their Complaint and the time of trial.

Plaintiffs Contend:   The Named Plaintiffs continued to receive constitutionally inadequate healthcare between the time they filed their Complaint and the time of trial.

Issue # 5:  Whether each of the Named Plaintiffs were exposed to constitutionally acceptable conditions of confinement prior to the filing of the Complaint.

Defendants Contend: that the conditions of the Named Plaintiffs' confinement prior to the filing of the Complaint was constitutional.

Plaintiffs Contend:  The conditions of the Named Plaintiffs' confinement prior to the filing of the Complaint were unconstitutional.

Issue # 6:  Whether each of the Named Plaintiffs were exposed to constitutionally acceptable conditions of confinement between the time they filed the Complaint and the time of trial.

**Defendants Contend:** that the conditions of the Named Plaintiffs' confinement between the time they filed the Complaint and the time of trial was constitutional.

**Plaintiffs Contend:** The conditions of the Named Plaintiffs' confinement between the time they filed the Complaint and the time of trial continued to be unconstitutional.

**Issue # 7:** Whether each of the certified healthcare practices actually exist and reflect ADC policy or custom at all 10 ADC facilities.

**Defendants Contend:** that none of the certified healthcare practices actually exist or reflect ADC policy or custom at any of the ADC facilities.

**Plaintiffs Contend:** All of the certified healthcare practices actually exist and reflect ADC policy or custom at all of the ADC facilities. Defendants previously raised the "all 10 facilities" issue in their summary judgment motion [Doc. 902 at 4], which the Court found unpersuasive [Doc. 1065].

**Issue # 8:** Whether each of the certified conditions practices actually exist and reflect ADC policy or custom at all 10 ADC facilities.

**Defendants Contend:** that none of the certified conditions practices, except for (1) use of chemical agents against inmates on psychotropic medications, and (2) constant cell illumination in some maximum custody cells, actually exist or reflect ADC policy or custom at any of the ADC facilities.

**Plaintiffs Contend:** All of the certified conditions practices actually exist and reflect ADC policy or custom at all of the ADC facilities. Defendants previously raised the "all 10 facilities" issue in their summary judgment motion [Doc. 902 at 4], which the Court found unpersuasive [Doc. 1065].

**Issue # 9:** Whether any of the Named Plaintiffs' prior injuries or present/future risks were or are the result of a systemwide deficiency in ADC healthcare or conditions of confinement.

**Defendants Contend:** that none of the Named Plaintiffs' prior injuries or present/future risks were or are the result of a systemwide deficiency in ADC healthcare or conditions of confinement.

Plaintiffs Contend: The Named Plaintiffs' prior injuries or present/future risks were or are the result of, or were made worse by, systemwide deficiencies in ADC healthcare or conditions of confinement.

Issue # 10:  Whether any of the certified practices exposed or expose each of the Named Plaintiffs to a substantial risk of serious harm, under the objective and subjective components of *Farmer v. Brennan*, 511 U.S. 825, 838 (1994).

Defendants Contend: that none of the certified practices exposed or expose any of the Named Plaintiffs to a substantial risk of serious harm.

Plaintiffs Contend:  All of the certified practices exposed or expose each of the Named Plaintiffs to a substantial risk of serious harm.

Issue # 11:  Whether ADC was or is deliberately indifferent to each of the Named Plaintiffs in their healthcare treatment or conditions of confinement, under the objective and subjective components of *Farmer v. Brennan*, 511 U.S. 825, 838 (1994).

Defendants Contend: that ADC was not and is not deliberately indifferent to any of the Named Plaintiffs in their healthcare treatment or conditions of confinement.

Plaintiffs Contend:  ADC was and is deliberately indifferent to the Named Plaintiffs in their healthcare treatment or conditions of confinement.

Issue # 12:  Whether statistically significant evidence or gross statistical disparities, rather than anecdotal evidence, is required to prove systemic deficiencies on behalf of a class under the Eighth Amendment, particularly in light of the Rules Enabling Act, 8 U.S.C. § 2072(b).

Defendants Contend: that statistically significant evidence and gross statistical disparities are required to prove systemic deficiencies on behalf of a class raising an Eighth Amendment claim.

Plaintiffs Contend:  Statistically significant evidence and gross statistical disparities are not required to prove systemic deficiencies on behalf of a class raising an Eighth Amendment claim.

Issue # 13:  Whether ADC's provision of medical care, as narrowed by the

allegations in the Complaint and the Court's class certification order, exposes every class member to a substantial risk of serious harm, under the objective and subjective components of *Farmer v. Brennan*, 511 U.S. 825, 838 (1994), in violation of the Eighth Amendment.

Defendants Contend: that ADC's provision of medical care does not expose every class member to a substantial risk of serious harm in violation of the Eighth Amendment.

Plaintiffs Contend:   ADC's provision of medical care does expose every class member to a substantial risk of serious harm in violation of the Eighth Amendment.

Issue # 14: Whether ADC's provision of dental care, as narrowed by the allegations in the Complaint and the Court's class certification order, exposes every class member to a substantial risk of serious harm, under the objective and subjective components of *Farmer v. Brennan*, 511 U.S. 825, 838 (1994), in violation of the Eighth Amendment.

Defendants Contend: that ADC's provision of dental care does not expose every class member to a substantial risk of serious harm in violation of the Eighth Amendment.

Plaintiffs Contend: ADC's provision of dental care does expose every class member to a substantial risk of serious harm in violation of the Eighth Amendment.Issue # 15:  Whether ADC's provision of mental health care, as narrowed by the allegations in the Complaint and the Court's class certification order,  exposes every class member to a substantial risk of serious harm, under the objective and subjective components of *Farmer v. Brennan*, 511 U.S. 825, 838 (1994), in violation of the Eighth Amendment.

Defendants Contend: that ADC's provision of mental health care does not expose every class member to a substantial risk of serious harm in violation of the Eighth Amendment.

Plaintiffs Contend:  ADC's provision of mental health care does expose every class member to a substantial risk of serious harm in violation of the Eighth Amendment.

Issue # 16:  Whether ADC's provision of mental health care, as narrowed by the allegations in the Complaint, exposes every inmate with a serious mental illness, to a substantial risk of serious harm, under the objective and subjective components of *Farmer*

*v. Brennan*, 511 U.S. 825, 838 (1994), in violation of the Eighth Amendment.

Defendants Contend: that ADC's provision of mental health care does not expose every inmate with a serious mental illness to a substantial risk of serious harm in violation of the Eighth Amendment.

Plaintiffs Contend:  ADC's provision of mental health care does expose every inmate with a serious mental illness to a substantial risk of serious harm in violation of the Eighth Amendment.

Issue # 17:  Whether ADC healthcare staffing levels must be shown to have caused constitutionally deficient wait times and/or constitutionally inadequate care to the class.

Defendants Contend: that healthcare staffing levels must be shown to have caused constitutionally deficient wait times and/or constitutionally inadequate care to the class.

Plaintiffs Contend:  Healthcare staffing levels need not be shown to have caused constitutionally deficient wait times and/or constitutionally inadequate care to the class.

Issue # 18:  Whether any of ADC's actual conditions practices, as narrowed by the allegations in the Complaint and the Court's class certification order, considered individually, expose every subclass member to a substantial risk of serious harm in violation of the Eighth Amendment.

Defendants Contend: that none of ADC's conditions practices, considered individually, expose every subclass member to a substantial risk of serious harm.

Plaintiffs Contend:  All of ADC's conditions practices, considered individually, expose every subclass member to a substantial risk of serious harm, but this Court has previously ruled that the conditions will be considered collectively, [Doc. 1065 at 10 (citing Dec. 372 at 17)].

Issue # 19:  Whether *Wilson v. Seiter*, 501 U.S. 294 (1991), permits consideration of ADC's conditions practices "in combination" in determining whether there was an Eighth Amendment violation.

Defendants Contend: that *Wilson v. Seiter* does not permit consideration of ADC's conditions practices "in combination" in determining whether there was an Eighth

263

Amendment violation.

Plaintiffs Contend:  *Wilson v. Seiter* permits consideration of ADC's conditions practices "in combination" in determining whether there was an Eighth Amendment violation, as previously ruled by this Court. [Doc. 1065 at 10 (citing Doc. 372 at 17]

Issue # 20:  If so, whether any of ADC's conditions practices, as narrowed by the allegations in the Complaint and the Court's class certification order, considered collectively, expose every subclass member to a substantial risk of serious harm in violation of the Eighth Amendment.

Defendants Contend:  that ADC's conditions practices, even considered collectively, do not expose every subclass member to a substantial risk of serious harm in violation of the Eighth Amendment.

Plaintiffs Contend:  ADC's conditions practices, considered collectively, expose every subclass member to a substantial risk of serious harm in violation of the Eighth Amendment.

Issue # 21: Whether any of ADC's conditions practices, as narrowed by the allegations in the Complaint, either individually or collectively, expose every inmate with a serious mental illness to a substantial risk of serious harm in violation of the Eighth Amendment.

Defendants Contend: that none of ADC's conditions practices, considered individually or in collectively, expose every inmate with a serious mental illness to a substantial risk of serious harm.

Plaintiffs Contend:  All of ADC's conditions practices, considered individually or collectively, expose every inmate with a serious mental illness to a substantial risk of serious harm.  This Court previously ruled that ADC's conditions practices will be considered collectively, not individually.  [Doc. 1065 at 10 (citing Doc. 372 at 17)]

Issue # 22:  Whether ADC, as a matter of State of Arizona policy or custom, is deliberately indifferent to the health and safety of the class and subclass in violation of the Eighth Amendment.

Defendants Contend: that ADC is not deliberately indifferent to the health and safety of the class and subclass in violation of the Eighth Amendment.

Plaintiffs Contend:  ADC is deliberately indifferent to the health and safety of the class and subclass in violation of the Eighth Amendment.

Issue # 23:  Whether any of the certified practices are the moving force, as set forth in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), behind any alleged constitutional violation.

Defendants Contend: that none of the certified practices were or are the moving force behind any alleged constitutional violation.

Plaintiffs Contend:  *Monell* does not apply, but regardless of whether it does, all of the certified practices were or are the moving force behind alleged constitutional violations.  Defendants previously raised this issue in their summary judgment motion [Doc. 902 at 4-5], which the Court found unpersuasive [Doc. 1065].

Issue # 24:  Whether the "reasonable relationship" standard of *Turner v. Safley*, 482 U.S. 78, 89 (1987), as clarified in *Norwood v. Vance*, 591 F.3d 1062 (9th Cir. 2009), applies to Eighth Amendment claims.

Defendants Contend: that the standard set forth in *Turner v. Safley* applies to Eighth Amendment claims.  Defendants previously raised this issue in their summary judgment motion [Doc. 902 at 45], which the Court found unpersuasive [Doc. 1065].

Plaintiffs Contend:  The standard set forth in *Turner v. Safley* does not apply to Eighth Amendment claims.

Issue # 25:  If so, whether there is a reasonable relationship between ADC's actual policies or practices and those legitimate penological justifications cited to advance such policies or practices.

Defendants Contend: that there is a reasonable relationship between ADC's alleged policies or practices and those legitimate penological justifications cited to advance such policies or practices.

Plaintiffs Contend:  Turner v. Safley does not apply to Eighth Amendment claims,

but in any case, there is not a reasonable relationship between ADC's alleged policies or practices and any legitimate penological justifications cited to advance such policies or practices.

Issue # 26:  Whether the separation of powers doctrine, independent of *Turner* balancing, warrants judicial deference to executive branch functions and the daily operations of prisons.

Defendants Contend: that the separation of powers doctrine, independent of *Turner* balancing, warrants judicial deference to executive branch functions and the daily operations of prisons.

Plaintiffs Contend:  The separation of powers doctrine, independent of Turner balancing, does not warrant judicial deference to executive branch functions and the daily operations of prisons in Eighth Amendment claims.

Issue # 27:  Whether the class and/or subclass should be decertified because the Named Plaintiffs lack standing.

Defendants Contend: that the class and subclass should be decertified because the Named Plaintiffs lack standing.

Plaintiffs Contend:  The class and subclass should not be decertified, because the Named Plaintiffs do not lack standing.  This Court declined to decertify the class and subclass in its order denying Defendants' motion for summary judgment. [Doc. 1065 at 11-12]

Issue # 28:  Whether the class and/or subclass should be decertified because they lack commonality and/or typicality under Rule 23(a)(2) and 23(a)(3).

Defendants Contend: that the class and subclass should be decertified because they lack commonality and typicality.

Plaintiffs Contend:  The class and subclass should not be decertified because the commonality and typicality requirements of Federal Rule of Civil Procedure 23 are met. This Court and the Ninth Circuit have found that the class and subclass have commonality and typicality.  [Doc. 372]; *Parsons v. Ryan*, 754 F.3d 657, 674-686 (9th Cir. 2014).  This

Court also declined to decertify the class and subclass in its order denying Defendants' motion for summary judgment. [Doc. 1065 at 11-12]

Issue # 29:  Whether the class and/or subclass should be decertified because there is not significant proof that the certified practices are systemwide.

Defendants Contend: that the class and subclass should be decertified because there is not significant proof that the certified practices are systemwide.

Plaintiffs Contend:  No requirement of "significant proof" applies to this case, but, in any event, the class and subclass should not be decertified, and that there is significant proof that the certified practices are systemwide.  This Court also declined to decertify the class and subclass in its order denying Defendants' motion for summary judgment. [Doc. 1065 at 11-12]

Issue # 30:  Whether Plaintiffs' proposed declaratory and injunctive relief complies with Rule 23(b)(2).

Defendants Contend: that Plaintiffs' proposed declaratory and injunctive relief do not comply with Rule 23(b)(2).

Plaintiffs Contend:  Plaintiffs' proposed declaratory and injunctive relief comply with Rule 23(b)(2), as previously ruled by this Court and the Ninth Circuit. [Doc. 372 at 19-21]; *Parsons v. Ryan*, 754 F.3d 657, 689 (9th Cir. 2014).

Issue # 31:  Whether Plaintiffs' proposed injunctive relief complies with 18 U.S.C. § 3626(a)(1)(A).

Defendants Contend: that Plaintiffs' proposed injunctive relief does not comply with 18 U.S.C. § 3626(a)(1)(A).

Plaintiffs Contend:  18 U.S.C. § 3626(a)(1)(A) has no application at this stage of the litigation, but, in any event, contend that Plaintiffs' proposed injunctive relief complies with 18 U.S.C. § 3626(a)(1)(A), as previously ruled by the Ninth Circuit. *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014)..

Issue # 32:  Whether Named Plaintiffs Verduzco, Gamez, Thomas, Wells are adequate class and/or subclass representatives under Fed.R.Civ.P. 23(a)(4).

**Defendants Contend:** that Named Plaintiffs Verduzco, Gamez, Thomas, Wells are not adequate class and/or subclass representatives.

**Plaintiffs Contend:** Named Plaintiffs Verduzco, Gamez, Thomas, and Wells are adequate class and/or subclass representatives.  Defendants previously raised this issue in their summary judgment motion [Doc. 902 at 1-2], which the Court found unpersuasive [Doc. 1065].

**Issue # 33:**  Whether any claims arising prior to March 22, 2010 are untimely under A.R.S. § 12-542, 42 U.S.C. § 1988, and *Wilson v. Garcia*, 471 U.S. 261 (1985).

**Defendants Contend:** that any claims arising prior to March 22, 2010 are untimely.

**Plaintiffs Contend:**  All claims asserted by Plaintiffs in this litigation are timely.

**Issue # 34:**  Whether Plaintiffs abandoned any claims for lack of prosecution.

**Defendants Contend:** that any claims that have not been raised and proven at trial should be deemed abandoned.

**Plaintiffs Contend:**  Plaintiffs agree that any claims that have not been raised at trial should be deemed abandoned, but do not agree that any claims have been abandoned.  To the extend Defendants are arguing that Plaintiffs' claims should be subdivided, that argument has been previously rejected by this Court.  [Doc. 175 at 4-5]  Defendants raised the argument again in their summary judgment motion [Doc. 902 at 27-33], which the Court found unpersuasive [Doc. 1065].

**Exhibit A – Maryanne Chisholm**

**UNCONTESTED FACTS**

## I.   **DENTAL ALLEGATIONS**

1.      Chisholm submitted an additional HNR on November 20, 2012 stating: "I wrote an HNR back in March asking for help.  I now have 3 teeth at least that need to be rebuilt or filled.   I've been here roughly 7 years, and I've never had routine care. Seriously, could I be seen now?  My HNR in August was not my original request. It was a follow up to a March letter when I was told I'd be seen in 4-6 months. It's been 8 months.  Help."

## II.   **MEDICAL ALLEGATIONS**

2.      On June 25, 2009, Chisholm submitted an HNR requesting that her Naproxen medication be refilled.

3.      On February 9, 2010, Chisholm submitted an HNR alleging her Naproxen was seized during a search.

4.      On May 19, 2011, Chisholm was seen by Dr. Lockhart.

5.      On May 19, 2011, Chisholm's blood pressure was 112/80.

6.      On May 19, 2011, Chisholm reported waking up three times a week gasping for air.

7.      On August 15, 2011, Chisholm was seen by K. Colon, CNA and R. Rodriguez, PA for an evaluation of possible pulmonary HTN.

8.      On August 22, 2011, Chisholm was seen by K. Colon, CNA and R. Rodriguez for trigger point injections into her left scapular area.

9.      On October 12, 2011, Chisholm was seen by Dr. Lockhart.

10.      On December 14, 2011, Chisholm was seen by E. Aurelus, FNP-BC.

11.     On February 3, 2012, Chisholm was sent for a follow – up at Cardiac Arrhythmia Institute.

12.     On February 23, 2012, Chisholm was seen by E. Aurelus, FNP-BC.

13.     On April 17, 2012, Chisholm was sent to Chest and Sleep Diseases Center.

14.     A consultant report shows that Chisholm was seen by the pulmonologist on April 17, 2012, and he recommended Qvar and Ventolin.

15.     The pulmonary function report done on April 17, 2012 determined there was a mild restrictive ventilatory defect.

16.     On May 29, 2012, at the request of the pulmonologist, Chisholm had an X-ray.

17.     On August 17, 2012, Chisholm was seen by Dr. Lockhart and the pulmonology report was discussed with her.

18.     In response to Chisholm's November 20, 2012 HNR referring to a March 2012 HNR, an ADC representative wrote:  "I find no HNR from March.  Please provide me with a copy of that HNR and you will be placed on the list as of that date."

19.     On December 5, 2012, Chisholm's hypertension had a fair response.

20.     On February 24, 2014, Chisholm was placed in the IPC after possible smoke inhalation.

## CONTESTED FACTS

## I.     BACKGROUND AND DISCIPLINARY

1.     Defendants Contend: In 2001, Chisholm was charged with 58 counts relating to a fraudulent scheme to defraud investors of her company.

    Plaintiffs Contend: This is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This does not make it more or less

likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.  Plaintiffs also contend that this statement is inaccurate and unclear with respect to "relating to" and her actual charges.

1.    Defendants Contend: On June 12, 2002, Chisholm began her sentence for fraudulent schemes (multiple) in violation of A.R.S. §§13-2310(A), 13-702.02(A)(B)(3); and  sale of unregistered securities (multiple) in violation of A.R.S. §44-1841.

Plaintiffs Contend: This is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.  Plaintiffs are unable to confirm or deny the accuracy of this statement in view of the record.

2.    Defendants Contend: On November 23, 2005, Chisholm began her sentence for illegal control enterprise in violation of A.R.S. § 13-2312(A)(B)(D).

Plaintiffs Contend: This is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This does not make it more or less

likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

3.    <u>Defendants Contend</u>: Chisholm forged documents purporting to show that her company was being audited in anticipation of a merger with a large Japanese tech company.

<u>Plaintiffs Contend</u>: This is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.  Plaintiffs also contend that this statement is inaccurate because it assumes the basis of her criminal charges to be true, and Plaintiffs contend that this statement should be changed to state that Chisholm was accused of these actions.

4.    <u>Defendants Contend</u>: She then illegally sold stock of her company at a $1 per share to several hundred investors, claiming that it will be worth $33 per share after the merger.

> <u>Plaintiffs Contend</u>: This is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.  Plaintiffs also contend that this statement is inaccurate because it assumes the basis of her criminal charges to be true, and Plaintiffs contend that this statement should be changed to state that Chisholm was accused of these actions.

5.    <u>Defendants Contend</u>: She insured her company for millions of dollars using forged financial statements that showed her company was earning millions of dollars in revenue.

> <u>Plaintiffs Contend</u>: This is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under

Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.  Plaintiffs also contend that this statement is inaccurate because it assumes the basis of her criminal charges to be true, and Plaintiffs contend that this statement should be changed to state that Chisholm was accused of these actions.

6.   <u>Defendants Contend</u>: The court awarded the victims $21,794,552.54 in restitution.

<u>Plaintiffs Contend</u>: This is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.  Plaintiffs also contend that Defendants' statement is inaccurate because her record indicates that the Court awarded $21,794,552.45 in restitution.

7.   <u>Defendants Contend</u>: Chisholm was sentenced to a term of 22 years' imprisonment.

<u>Plaintiffs Contend</u>: This is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the

healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.  Plaintiffs also contend that this statement is inaccurate.  Defendants have not shown how they calculated 22 years' imprisonment and Chisholm's record does not appear to support this number.

8.    Defendants Contend: While incarcerated, Chisholm pleaded guilty to concealing assets in bankruptcy, and received a sentence that expired during the time she served her other sentences.

Plaintiffs Contend: This is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.  Plaintiffs also contend that this statement is inaccurate at least because documents provided by Defendants are unclear as to whether her 36 month federally supervised release period expired during the time she served her other sentences.

6.    Defendants Contend: Chisholm is currently incarcerated at ASPC-Perryville.

Plaintiffs Contend: This is irrelevant and should be excluded pursuant to

Federal Rules of Evidence 401 and 402.  This does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.  Plaintiffs also lack immediate firsthand knowledge to confirm or deny this statement.

## II.   <u>DENTAL ALLEGATIONS</u>

8.   <u>Defendants ContendDefendants Contend</u>: Chisholm contends she has not had a tooth cleaning in more than 6½ years.

<u>Plaintiffs Contend</u>: This allegation is unclear and non-specific as to the beginning or end of any alleged time period.  Consequently, Plaintiffs can neither confirm nor deny this allegation.

9.   <u>Defendants Contend</u>: Chisholm was in federal custody from (May 12, 2006-September 5, 2008).

<u>Plaintiffs Contend</u>: This is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed

by their prejudicial nature.  Thus, the facts should be excluded under Federal Rule of Evidence 403.   Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

10.   <u>Defendants Contend</u>: Once she arrived back at ASPC-Perryville, Chisholm submitted an HNR on September 7, 2008 for a cleaning, stating: "I've not seen dental in 3 years (I was away at court). Could you please schedule a cleaning?"

> <u>Plaintiffs Contend</u>:   The language "Once she arrived back at ASPC-Perryville" lacks context.

11.   <u>Defendants Contend</u>: Chisholm was placed on the routine care list and, when scheduled for a cleaning December 9, 2008, Chisholm refused.

> <u>Plaintiffs Contend</u>: This statement is misleading.  Chisholm was deemed to have refused a dental cleaning on December 9, 2008 because the cleaning conflicted with a medical appointment that ADC scheduled on the same day.

12.   <u>Defendants Contend</u>: Chisholm was warned of the consequence of her refusal ("plaque build-up will continue"), but despite submitting 22 HNRs requesting medical and mental health care for a variety of symptoms (*e.g*., lower bunk assignment, numerous prescription refills, a skin allergy, vision loss, cortisone injections, fibromyalgia, pulmonary hypertension, problems with stress, anxiety, and pressure, blood pressure, and medication adjustment), she failed to submit any HNRs seeking dental care for more than three years thereafter.  ("No, I didn't think that would be necessary.  No one told me that was necessary.").

> <u>Plaintiffs Contend</u>: This statement is misleading and lacks foundation, including, for example, for "submitting 22 HNRs" and failure "to submit

any HNRs seeking dental care."  A dental nurse told Chisholm that she would be placed on the routine care list.  Portions of this statement, which comprises multiple individual statements, are irrelevant and immaterial, including any alleged warning about the consequences of refusal (because she was deemed to have refused because of a scheduling conflict), the number of HNRs for unrelated issues, and her alleged failure to submit an HNR seeking dental care.

13.    Defendants Contend: On December 23, 2011, Chisholm submitted a dental-related HNR but was silent on the issue of cleaning, stating: "I lost a filling in my back left molar. Half of my tooth is open and exposed. I am in pain. Please help."

Plaintiffs Contend:  This statement is misleading and lacks foundation. Plaintiffs instead contend that Chisholm submitted a dental-related HNR on December 23, 2011 stating: "I lost a filling in my back left molar. Half of my tooth is open and exposed. I am in pain. Please help."

14.    Defendants Contend: Chisholm was seen by Dr. Hanstad one week later (12/30/2011), when he diagnosed recurrent decay well below the gum line.

Plaintiffs Contend: Chisholm was seen by Dr. Hanstad one week later (12/30/2011), when he diagnosed recurrent decay well below the gum line, and recommended that Chisholm be scheduled for extraction of tooth #18.

15.    Defendants Contend: Chisholm was given an antibiotic for infection control and rescheduled for an extraction in two weeks.

Plaintiffs Contend: This statement lacks foundation and is misleading.  This allegation is also unclear, for example, as to who provided an antibiotic, when it was provided, and what infection is at issue, among other undefined aspects. Consequently, Plaintiffs are unable to confirm this allegation.

Defendants previously cited a document that does not show that she was given an antibiotic, that she actually received one, or that an extraction was actually rescheduled.

16.    Defendants Contend: When she returned on January 12, 2012, Chisholm refused the extraction, stating "I don't want anything pulled."

Plaintiffs Contend: This statement is vague and misleading in its narrative form.  A record indicates that Chisholm refused extraction of tooth #18 on January 12, 2012.

17.    Defendants Contend: The refusal form Chisholm signed indicates she refused because she was afraid of her jaw breaking from past surgery, and she was not in any pain.

Plaintiffs Contend: This statement lacks foundation and is misleading.  It is also unclear as to what refusal form is described.   Also, a document Defendants previously cited merely appears to say "no pain" without additional context.

18.    Defendants Contend: There is no evidence in Chisholm's medical records to support her claim that her jaw was previously broken.

Plaintiffs Contend: This statement lacks foundation.  It is also irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. This does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the healthcare provided by the ADC.  It is also incorrect. For example, Ms. Chisholm described a problem with her jaw during her deposition.

19.   Defendants Contend: Chisholm submitted an HNR on August 13, 2012 indicating she still required replacement of two missing crowns, reiterating she was not in any pain, did not want her teeth pulled, and claiming that she had not been scheduled for a cleaning in over 6 ½ years.

> Plaintiffs Contend: This statement is misleading and lacks foundation. Chisholm submitted an HNR on August 13, 2012 indicating that she still required attention to her dental issues, and that she had not been scheduled for a cleaning in over 6 ½ years.

20.   Defendants Contend: Chisholm was seen by Dr. Hanstad on January 15, 2013, who noted signs of "extreme tampering with a foreign object" on tooth #14 and that Chisholm had sheared the enamel off the tooth.

> Plaintiffs Contend:  This is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the care provided by the ADC. In the alternative, this is unfairly prejudicial, and the probative value is substantially outweighed by its prejudicial nature. Thus, this should be excluded under Federal Rule of Evidence 403.   This statement also lacks foundation, for example, as to at least "Chisholm had sheared the enamel off the tooth."

21.   Defendants Contend: Chisholm stated she picked at the tooth due to her OCD.

> Plaintiffs Contend: This is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This does not make it more or less likely that Defendants were deliberately indifferent and caused the

substantial risk of serious harm Ms. Chisholm faces as a result of the care provided by the ADC. In the alternative, this is unfairly prejudicial, and the probative value is substantially outweighed by its prejudicial nature. Thus, this should be excluded under Federal Rule of Evidence 403. This statement also lacks foundation. A document Defendants previously cited to support this claim does not expressly indicate that a reason for picking at the tooth was OCD. This statement is also confusing as to what tooth is discussed, when Chisholm allegedly made this statement, and to whom she made the statement, among other unclear aspects. It is also hearsay to the extent it is offered to prove that she picked at her tooth or the reason.

22. <u>Defendants Contend</u>: Dr. Hanstad noted that the area near the gingival margins was too inflamed to obtain a dry field.

  <u>Plaintiffs Contend</u>: This statement is incorrect, incomplete, and/or lacks foundation. It is also unclear as to when and where Dr. Hanstad allegedly noted this.

23. <u>Defendants Contend</u>: Dr. Hanstad placed a temporary sedative filling on the tooth.

  <u>Plaintiffs Contend</u>: This statement lacks foundation. The statement is unclear as to what tooth is being referenced and when this allegedly happened.

24. <u>Defendants Contend</u>: He instructed Chisholm not to use foreign metal objects to clean her teeth and to allow the area to heal so that he could place a permanent filling in a week.

  <u>Plaintiffs Contend</u>: This statement lacks foundation and is incorrect. The statement is unclear as to what area or tooth is being referenced, who "he"

is, and when this alleged instruction took place, for example.  There is no foundation for at least the word "metal" or the phrase "so that he could place a permanent filling in a week."   Reference to foreign objects is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  In the alternative, the reference to foreign objects is unfairly prejudicial, and the probative value is substantially outweighed by its prejudicial nature.  Thus, reference to foreign objects should be excluded under Federal Rule of Evidence 403.

25.   <u>Defendants Contend</u>: Chisholm was scheduled for a follow-up one week later, on January 22, 2013, when Dr. Hanstad noted continued inflammation in the area and placed a permanent filling.

<u>Plaintiffs Contend</u>:  This statement is misleading and lacks foundation.  For example, there is no foundation for "permanent filling." The statement is also unclear and lacks foundation as to "continued inflammation" and "one week later."

26.   <u>Defendants Contend</u>: He again advised Chisholm not to use foreign metal objects to clean/floss her teeth.

<u>Plaintiffs Contend</u>:  This statement lacks foundation and is incorrect.  The statement is unclear as to who "he" is, the context of "again," and when this allegedly happened, for example.  There is no foundation or evidence to support at least the word "metal." Reference to foreign objects is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This statement does not have any tendency to make it more or less probable that Chisholm received adequate care and it is not of consequence in determining the adequacy of her care.  In the alternative, the reference to foreign objects is unfairly prejudicial, and the probative value is

substantially outweighed by its prejudicial nature. Thus, reference to foreign objects should be excluded under Federal Rule of Evidence 403.

27.   <u>Defendants Contend</u>: Chisholm has not submitted any HNRs requesting any dental treatment, including a cleaning, since November 2012.

<u>Plaintiffs Contend</u>: This statement lacks foundation.  It is also misleading because Defendants cite nothing showing why Chisholm would have to request a cleaning again after doing so at least once, and because she filed at least one grievance.

28.   <u>Defendants Contend</u>: Chisholm's dental treatment was appropriate and within the standard of care.

<u>Plaintiffs Contend</u>:   This statement is misleading, incorrect, and lacks foundation.  For example, as of August 13, 2012, Ms. Chisholm had not been scheduled for a cleaning for several years.  On December 23, 2011, Ms. Chisholm filed an HNR indicating that she lost a filling and that she was in pain.  A plan of action was not created until five days later on December 28, 2011.  On December 30, 2011, despite defendants' claims that pain is addressed within 72 hours, a week passed before Dr. Hanstad conducted a pain evaluation.   Ms. Chisholm also experienced the "prisoner's dilemma" of having to choose between having a tooth pulled or waiting months for a filling: On August 16, 2012, Ms. Chisholm submitted an HNR requesting attention to her need for fillings, but the response from dental staff was that she could submit a "pain HNR" to have it pulled if she had a major toothache, and that wait times for fillings were 4-6 months.

29.   <u>Defendants Contend</u>: Chisholm claims she had not had her teeth cleaned for more than six years from her initial HNR, but Chisholm was away at court for years, failed to show for dental appointments, and refused care.

> <u>Plaintiffs Contend</u>:   This statement is misleading, vague, and lacks foundation.  For example, being away "at court" did not cause insufficient dental treatment while at ADC. Being away at court for two years six years ago did not cause ADC to have extended wait times, nor did her inability to attend a dental appointment because of a conflicting medical appointment. Her refusal was unrelated to her cleaning requests.

30.   <u>Defendants Contend</u>: Chisholm's August 12, 2012 HNR request for a cleaning—several months into litigation—is the only request for a cleaning made by Chisholm within the two year statute of limitations.

> <u>Plaintiffs Contend</u>: This is misleading, incomplete, incorrect, and lacks foundation.  For example, this does not account for a grievance filed on 12/14/2012 requesting a cleaning and that a tooth be filled and rebuilt.  The date in this "fact" is also wrong.   The phrase "several months into litigation" is irrelevant and should be excluded under FRE 401 and 402, and in the alternative, it is unfairly prejudicial and should be excluded under FRE 403.

31.   <u>Defendants Contend</u>: Chisholm claims that dentists refused to perform fillings and would only extract her teeth.

> <u>Plaintiffs Contend</u>:  This statement is vague, overbroad, and misleading.

32.   <u>Defendants Contend</u>: On January 22, 2013 Chisholm received a filling on tooth #14, and her x-rays from December 30, 2011 revealed that tooth #18 had decay well below the gum line.

> Plaintiffs Contend: Plaintiffs are unable to confirm or deny whether "x-rays" revealed decay related to tooth #18.  It is also unclear as to who allegedly learned this information from any supposed x-rays.  It is also unclear whether x-rays were taken on December 30, 2011.

33.   Defendants Contend: Dr. Hanstad's recommendation of extraction of tooth #18 was reasonable and within the standard of care.

> Plaintiffs Contend:  This statement is vague and lacks foundation.

34.   Defendants Contend: Chisholm also claims she experienced problems with her fillings, but her records show she experienced normal post-operative sensitivity following a filling and caused pain in her gums and tooth by excessively picking at them with foreign objects.

> Plaintiffs Contend: This statement is vague, misleading, and lacks foundation.  For example, her record does not support this statement.  Specifically, there is no support for "excessively," among other issues.  This statement is argumentative.  The statement is also vague and unclear as to which fillings were allegedly picked and it is misleading as to cause and effect of pain and problems.  Reference to foreign objects is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Foreign objects do not have any tendency to make it more or less probable that Chisholm received adequate care and it is not of consequence in determining the adequacy of her care.  In the alternative, the reference to foreign objects is unfairly prejudicial, and the probative value is substantially outweighed by its prejudicial nature. Thus, reference to foreign objects should be excluded under Federal Rule of Evidence 403.

35.   Defendants Contend: Although warned of the consequence of her refusal ("plaque build-up will continue"), Chisholm did not submit another HNR seeking dental care for more than three (3) years thereafter. ("No, I didn't think that would be necessary. No one told me that was necessary.").

Plaintiffs Contend:  This statement is misleading and unclear at least as to when an alleged refusal occurred.  According to documents previously cited by Defendants, a dental nurse assured Chisholm that she would be rescheduled, and Chisholm did not indicate that she did not want any treatment at all.  Also, this statement lacks foundation for "Although warned of the consequence of her refusal ("plaque build-up will continue")."  After a diligent search, Plaintiffs have been unable to locate a record with that information, and thus contests that portion of the statement at this time.

## III.   **MEDICAL ALLEGATIONS**

36.   Defendants Contend: Chisholm alleges: "I had to wait approximately six months to receive the inhaler I was prescribed by a pulmonologist."

Plaintiffs Contend: This statement is unclear as to when Chisholm made this allegation and in what form.

37.   Defendants Contend: Chisholm testified, however, that the pulmonologist prescribed her two inhalers, Albuterol and Qvar, to open her lungs and help with her difficulty breathing, and that she did not receive them until six or more weeks later.

Plaintiffs Contend: This statement is inaccurate, but may be fixed.  Remove "however" from the statement and change "lungs" to "airways/passageways."

38.   <u>Defendants Contend</u>: Chisholm testified in her deposition that it only took "weeks and weeks" or "six weeks" – not six months – to receive her inhalers.

> <u>Plaintiffs Contend</u>: This misstates the evidence and mischaracterizes Ms. Chisholm's testimony.  Also, Ms. Chisholm did not testify that it did not take six months to receive inhalers.

39.   <u>Defendants Contend</u>: A medical record dated May 8, 2012, shows that Dr. Lockhart then ordered Chisholm to take Beclomethasone (Qvar), starting May 18, 2012.

> <u>Plaintiffs Contend</u>:  This misstates the evidence.

40.   <u>Defendants Contend</u>: Her prescription was filled on May 18, 2012, only 10 days later.

> <u>Plaintiffs Contend</u>: This misstates the evidence.  For example, as to "filled." It is also argumentative, as to "only."

41.   <u>Defendants Contend</u>: Chisholm alleges that she reported chronic chest pains and shortness of breath in April 2011, but was not referred to a cardiologist until December 2011.

> <u>Plaintiffs Contend</u>: This statement is unclear, for example, as to when and where Chisholm made this allegation.

42.   <u>Defendants Contend</u>: On April 18, 2011, Chisholm submitted an HNR complaining that stress and anxiety from her job was driving up her blood pressure.

> <u>Plaintiffs Contend</u>:  This does not accurately summarize the evidence.

43.   <u>Defendants Contend</u>: She also reported that she was feeling numbness and tingling in her arms, legs, and face.

Plaintiffs Contend:  This does not accurately summarize the evidence and is vague as to "she" and the context of "also." It is also unclear as to when she allegedly reported this.

44.  Defendants Contend: On April 18, 2011, Chisholm was seen for a blood pressure check.

Plaintiffs Contend:  This is vague and incomplete as to who allegedly saw her for a blood pressure check.

45.  Defendants Contend: On April 18, 2011, Chisholm's  blood pressure check read as follows; left arm – 110/72; right arm – 112/74.

Plaintiffs Contend:  This is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the care provided by the ADC.

46.  Defendants Contend: On April 20, 2011, Chisholm was seen by Dr. Lockhart for a chronic care follow-up.

Plaintiffs Contend:  This statement is inaccurate, but fixable.  Change "chronic care follow-up" to "previously scheduled chronic condition follow-up care."

47.  Defendants Contend: On April 20, 2011 Chisholm  complained of chest tightness and shortness of breath in the afternoons.

Plaintiffs Contend:  This statement is inaccurate and misstates the evidence. Plaintiffs contend that Ms. Chisholm complained of chest tightness in the afternoons and also shortness of breath.

48.   <u>Defendants Contend:</u> On April 18, 2011, a chest x-ray and EKG were done.

<u>Plaintiffs Contend:</u>  This allegation is incomplete, for example, as to who performed a chest x-ray and EKG, and who received these examinations. The alleged date is also incorrect.  Consequently, Plaintiffs are unable to confirm this allegation.

49.   <u>Defendants Contend</u>: On April 20, 2011, Chisholm had a chest X-ray that revealed no active pulmonary disease.

<u>Plaintiffs Contend</u>:  This does not accurately summarize the evidence.

50.   <u>Defendants Contend</u>: On April 20, 2011,  an X-ray also revealed her cardiovascular silhouette was within normal limits.

<u>Plaintiffs Contend:</u> This allegation is unclear, for example, as to who analyzed the X-ray, and who "her" represents.  The alleged date of the x-ray is also incorrect.  Consequently, Plaintiffs are unable to confirm this allegation.  Plaintiffs further contend that this allegation is misleading, incomplete, and does not accurately summarize the evidence:  A document shows that an x-ray was requested on April 20, but the same document shows that the x-ray was not performed on April 20.  A preliminary reading of the x-ray did not occur until April 28, and findings were not reported until May 3.  It also appears that Dr. Lockhart did not review the findings until June 3, 2011.

51.   <u>Defendants Contend</u>: From April 20, 2011 through July 20, 2011, Chisholm had a duty/special needs order for not lifting over ten pounds, no repetitive bending/twisting left hip/low back; no climbing; no off-complex work assignments; and no strenuous activity.

Plaintiffs Contend:   This does not accurately summarize the evidence. Plaintiffs contend that the duty/special needs order also states that Chisholm is "[a]t risk of [increased] dehydration due to medication use."

52.   Defendants Contend: On May 19, 2011, she denied shortness of breath.

Plaintiffs Contend: This misstates the evidence.  This statement is unclear at least as to who "she" is and to whom she allegedly denied shortness of breath.  Ms. Chisholm "[d]oes admit to waking up 3 x wk gasping for air."

53.   Defendants Contend: On May 19, 2011, Dr. Lockhart noted this is a symptom of sleep apnea which is a common cause of pulmonary hypertension.

Plaintiffs Contend:   This misstates the evidence.  Plaintiffs contend that Dr. Lockhart noted that Ms. Chisholm "may have sleep apnea which is one of the common causes of pulmonary hypertension."

54.   Defendants Contend: On July 6, 2011, Chisholm was seen by Dr. Lockhart for a chronic care follow-up.

Plaintiffs Contend:   This is inaccurate, but fixable.  Change "a chronic care follow-up" to "previously scheduled chronic condition follow-up care."

55.   Defendants Contend: On May 19, 2011, her blood pressure was 129/86.

Plaintiffs Contend: This allegation is unclear, for example, as to who "her" represents.  Also, either the alleged date is incorrect, or the blood pressure in this statement is incorrect.  Consequently, Plaintiffs are unable to confirm this allegation.

56.   Defendants Contend: A follow-up was scheduled in thirty days to discuss plan of care.

Plaintiffs Contend:  This is inaccurate and lacks foundation, but is fixable. It does not accurately summarize the evidence.  A document previously cited by Defendants shows only that a follow-up was recommended.  It is also unclear as to when a follow-up was scheduled and what is allegedly being followed up.

57.   Defendants Contend: On August 15, 2011, Chisholm  requested that the testing be put off for one month.

Plaintiffs Contend:  The statement is vague as to what "testing" is involved. Consequently, Plaintiffs are unable to confirm this allegation.

58.   Defendants Contend: Her blood pressure was 128/87.

Plaintiffs Contend:  This allegation is unclear, for example, as to when her blood pressure was at this level and who "her" represents.  This is also irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the care provided by the ADC.

59.   Defendants Contend: Her LDL (bad cholesterol) had increased to 166.

Plaintiffs Contend:  This does not accurately summarize the evidence.  This allegation is also unclear, for example, as to when her LDL was at this level and who "her" represents.  Consequently, Plaintiffs are unable to confirm this allegation.  Moreover, a document previously cited by Defendants merely indicates increased cholesterol and lists LDL as 166 and HDL as 46.

60.   Defendants Contend: A follow-up was scheduled for three weeks.

Plaintiffs Contend:  This is inaccurate and lacks foundation, but is fixable. It does not accurately summarize the evidence.  It is also unclear as to what

is being followed-up and when (there is no context for "three weeks"). A document previously cited by Defendants shows only that a follow-up was recommended.

61.   Defendants Contend: On December 14, 2011, her blood pressure was 122/68.

Plaintiffs Contend: This allegation is unclear, for example, as to who "her" represents. Consequently, Plaintiffs are unable to confirm this allegation. This is also irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. This does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the care provided by the ADC.

62.   Defendants Contend: On December 14, 2011, she complained of shortness of breath and palpitations.

Plaintiffs Contend: This is unclear at least as to who "she" is and the record is not clear whether she complained of this or whether it was observed.

63.   Defendants Contend: Her exam was within normal limits and showed no distress or signs/symptoms.

Plaintiffs Contend: This misstates the evidence. A document previously cited by Defendants does not show that her exam was within normal limits or that it showed no distress or signs/symptoms. For example, the document also lists shortness of breath and palpitations.

64. <u>Defendants Contend</u>: On December 14, 2011, E. Aurelus, FNP-BC submitted an outside consult request to cardiology due to Chisholm's increased cholesterol and complaints of shortness of breath.

>   <u>Plaintiffs Contend</u>:  This misstates the evidence.  A document previously cited by Defendants does not explicitly list reasons for any outside cardiologist visit, and the document does not show that an outside consult request was submitted.  The document also lists hypertension, heart palpitations, and hyperlipidemia.

65. <u>Defendants Contend</u>: Chisholm also alleges that there was no follow up, and tests ordered by the specialist were never conducted.

>   <u>Plaintiffs Contend</u>:  This misstates the evidence and is unclear as to when and where these allegations were made.

66. <u>Defendants Contend</u>: On January 27, 2012, Chisholm was sent to the Cardiac Arrhythmia Institute and seen by Dr. Bartres.

>   <u>Plaintiffs Contend</u>:  The doctor's name is Dr. Batres.

67. <u>Defendants Contend</u>:  During this visit, Chisholm denied any lightheadedness, dizziness, palpitations, chest pain, shortness of breath, PND, orthopnea, or edema.

>   <u>Plaintiffs Contend</u>:  This misstates the evidence.  Ms. Chisholm complained of at least chest pain and shortness of breath.  Moreover, this statement is unclear as to the context of "this visit," for example, it is unclear as to when, where, and with whom.

68. <u>Defendants Contend</u>: Chisholm stated she had chest discomfort in the middle of her chest and her left arm and that the pain is provoked by exertion, emotion, and position, but it relieved by rest.

Plaintiffs Contend:  This is inaccurate. On January 30, 2012, Chisholm reported discomfort in the middle of her chest and her left arm, which was provoked by exertion, emotion, and position.

69.  Defendants Contend: Her exam was within normal limits and no acute distress was noted.

Plaintiffs Contend:  This misstates the evidence.  It is also unclear as to what exam and who "her" represents.  A document previously cited by defendants does not expressly indicate that her exam was within normal limits.  She reported several issues of pain, discomfort, and shortness of breath, among other problems.

70.  Defendants Contend: With respect to her cardiac health, no murmur or rubs, bruit, cyanosis, edema, or clubbing was found.

Plaintiffs Contend:  This is incomplete and unclear as to when and where this conclusion was made, and by whom.  Plaintiffs contend that she was assessed with hypothyroidism, hypertension, hyperlipidemia, dyspnea on exertion, and chest pain.

71.  Defendants Contend: Her EKG was with normal sinus rhythm and there was no ischemic changes.   The plan was to continue her medications and follow up with Dr. Bartres.

Plaintiffs Contend:  This misstates the evidence and is unclear at least as to who "her" represents, what EKG is being described, and what plan is described.  Documents previously cited by Defendants do not show that an EKG was within normal sinus rhythm and that there were no ischemic changes.  These appeared to be planned tests.  Also, the record does not

indicate that the plan "was to continue her medications."  Additionally, it is Dr. Batres – not Dr. Bartres.

72.    Defendants Contend: Her cardiac tests were all negative, including ECHO, Lexiscan, and Carotid ultrasound.

Plaintiffs Contend:   This misstates the evidence.   For example, "all negative" does not accurately reflect the test results.  It is also unclear, for example, as to who "her" represents and when these tests allegedly occurred.

73.    Defendants Contend: On February 3, 2012, Chisholm was educated regarding the importance of taking aspirin daily.

Plaintiffs Contend: This allegation is hearsay, and it is also unclear as to who allegedly educated Chisholm regarding aspirin.  This is also irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. This does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the healthcare provided by the ADC.

74.    Defendants Contend: Chisholm was referred to pulmonology for consultation and it was recommended that if the pulmonary workup is inconclusive or negative for pathology, they will consider left and right heart catheterization with selective coronary angiography and possible PCI.

Plaintiffs Contend: This statement is unclear as to who allegedly made the recommendation.  Also, the context of "they" is unclear.  Plaintiffs contend that "they" should be "the cardiologist."  This statement is also unclear as to when this allegedly occurred.

75.   Defendants Contend: On February 14, 2012, it was noted that Chisholm's cardiology workup was negative and a pulmonology consultation was submitted.

Plaintiffs Contend: This allegation is unclear, for example, as to who noted this and what cardiology workup is referenced.  Consequently, Plaintiffs are unable to confirm this allegation. This allegation is also hearsay.

76.   Defendants Contend: Her blood pressure was 120/70.  Her respirations were normal.

Plaintiffs Contend:   This allegation is unclear, for example, as to when her blood pressure was at this level and who "her" represents.  Consequently, Plaintiffs are unable to confirm this allegation. Also, this does not accurately summarize the evidence.  Ms. Chisholm complained that it hurts when breathing.

77.   Defendants Contend: There were no signs/symptoms of distress.

Plaintiffs Contend:  This misstates the evidence and is unclear as to when this was allegedly observed and who observed it, and in what context.  Ms. Chisholm experienced at least shortness of breath, diaphoretic, and hypertension.

78.   Defendants Contend: The only abnormality was her diminished breath sounds in lungs, but no distress was noted.

Plaintiffs Contend:  This misstates the evidence and is unclear as to when this was allegedly observed and in what context.  Ms. Chisholm's record indicates other abnormalities such as, for example, weak radial pulses.

79.   Defendants Contend: She was short of breath as a result of smoke in her area the day prior, but reported there were no more issues when she was seen on the 24th and she advised she wanted to return to her yard.

> Plaintiffs Contend:  This is incomplete and unclear as to who "she" is, when this allegedly occurred, how this was allegedly reported, and to whom.  For example, change "issues" to "medical issues."  Also, Ms. Chisholm requested that her medications be refilled.

80.   Defendants Contend: On March 15, 2012, Chisholm refused to submit to treatment stating she "need second opinion per ACLU legal action."

> Plaintiffs Contend:  This misstates the evidence.  Chisholm's medical record does not show that treatment was refused.  This is irrelevant because it is unclear what was refused, and the reason regarding the ACLU is also irrelevant.

81.   Defendants Contend: On March 22, 2012, Chisholm was seen again for follow-up at the Cardiac Arrhythmia Institute.

> Plaintiffs Contend:  The date in this statement is incorrect and should be March 14, 2012.  The statement is also vague and confusing as to the context of "again."

82.   Defendants Contend: It was noted that she had a recently echocardiogram and stress test which were unremarkable suggesting a very low probability that her symptoms are cardiac.

> Plaintiffs Contend:  This does not accurately summarize the evidence.  For example, Chisholm's record also shows that "consideration for cardiac catheterization may be given" if there are no lung problems.  This statement is also vague as to who allegedly noted this and when.

83.   Defendants Contend: This was indicated by the finding of a mildly reduced forced vital capacity.

> Plaintiffs Contend: This allegation is unclear, for example, as to what "this" is, who made this alleged finding, and when.  Consequently, Plaintiffs are unable to confirm this allegation.

84.   Defendants Contend: It was also noted that there was a possibility of sub-optimal patient effort and/or an adverse reaction to continued bronchodilator therapy.

> Plaintiffs Contend:  This is inaccurate.  Plaintiffs contend that that the record shows that the interpretation of sub-optimal patient effort and/or adverse reaction "is valid only upon physician review and signature."  This statement is also vague as to who allegedly noted this and when.

85.   Defendants Contend: On May 17, 2012, Chisholm was scheduled for a three month pulmonary follow-up to take place on July 25, 2012.

> Plaintiffs Contend:  This statement is inaccurate as to the scheduled date for the follow-up and it is vague as to who scheduled the follow-up.

86.   Defendants Contend: There was no acute pulmonary disease noted or any changes from previous films.

> Plaintiffs Contend:  This statement is entirely unclear.  For example, it is unclear as to time and context.

87.   Defendants Contend:  On May 22, 2012, Chisholm was seen by pulmonology.

> Plaintiffs Contend:  This misstates the evidence.  Chisholm's record merely indicates a chart review of Chisholm and a note that she was seen by a pulmonologist – not that she was seen by pulmonology on May 22, 2012.

88.   Defendants Contend: On June 29, 2012, Chisholm was seen for complaints of hypertension, fibromyalgia, valley fever, cardio-pulmonary difficulties, tachycardia.

Plaintiffs Contend:  This statement is misleading.  Plaintiffs contend that Chisholm requested renewal of her 1-year old chrono "[d]ue to claims of hypertension, fibromyalgia, valley fever, cardio-pulmonary difficulties, tachycardia."

89.   Defendants Contend: Chisholm's lungs were clear and there were no signs of any of her claims.

Plaintiffs Contend:  This misstates the evidence and is unclear as to when and where this conclusion was made, and by whom.  Ms. Chisholm's appointment was due to renewal of her 1-year old chrono for hypertension, fibromyalgia, valley fever, cardio-pulmonary difficulties, tachycardia – it is not indicated that the visit was because she was currently experiencing symptoms related to those medical issues.  In addition, the statement is incomplete, because a document previously cited by Defendants indicates that there was "diminished T/O."

90.   Defendants Contend: On July 25, 2012, Chisholm was seen for her hypertension chronic care follow-up care.

Plaintiffs Contend: This allegation is unclear, for example, as to who she was allegedly "seen" with. Consequently, Plaintiffs are unable to confirm this allegation.

91.   Defendants Contend: Her hypertension was stable and controlled and it was decided to continue her hypertension medications as needed.

Plaintiffs Contend:  This is inaccurate and unclear as to when and where this conclusion was made, and by whom.  It does not accurately summarize the evidence.

92.   Defendants Contend: It was also noted that her cardiac workup was negative.

   Plaintiffs Contend:  This statement is unclear as to its meaning, who noted this, when, where, and in what context.

93.   Defendants Contend: On approximately August 8, 2012, Chisholm received a chest x-ray at inter-radiology.

   Plaintiffs Contend:  This does not accurately summarize the evidence. August 8 appears to be date of a report – not the approximate date of the x-ray.

94.   Defendants Contend: There was no evidence of an active pulmonary parenchymal or pleural disease process.

   Plaintiffs Contend:  This does not accurately summarize the evidence.  For example, on August 8 the doctor noted that there was no evidence of an active pulmonary parenchymal or pleural disease process.

95.   Defendants Contend: The cardiovascular silhouette was within normal limits.

   Plaintiffs Contend:  This does not accurately summarize the evidence and is unclear at least as to when, where, and in what context this conclusion was made.  For example, on August 8 the doctor noted that the cardiovascular silhouette was within normal limits.

96.   Defendants Contend: There was no evidence of active TB and no pulmonary nodules were identified.

   Plaintiffs Contend:  This does not accurately summarize the evidence and is unclear at least as to when, where, and in what context this conclusion was

made.   For example, on August 8, the doctor noted that there was no evidence of active TB and no pulmonary nodules were identified.

97.   Defendants Contend: On August 8, 2012, Chisholm submitted an HNR stating "honestly, I don't need to be seen, I just need my chrono."

> Plaintiffs Contend:  This statement is misleading and inaccurate in that it fails to state that Chisholm was requesting that her limited-duty chrono be renewed and that she had not been seen by a provider regarding the chrono. At the end of the HNR, she merely indicated that "honestly, I don't need to be seen, I just need my chrono."

98.   Defendants Contend: On September 19, 2012, Chisholm was seen for a chronic-care follow-up for her hypertension.  She reported no new symptoms.

> Plaintiffs Contend:  Plaintiffs are unable to confirm whether she reported no new symptoms.  This statement is also unclear at least as to who saw Chisholm.

99.   Defendants Contend: On September 19, 2012, her hypertension and asthma were controlled.

> Plaintiffs Contend:  This statement misstates the evidence and is unclear at least as to who "her" represents and in what context this conclusion was made.   Evidence previously cited by Defendants does not show that hypertension and asthma were controlled.

100.  Defendants Contend: On September 25, 2012, Chisholm was seen again for a chronic-care follow up.

> Plaintiffs Contend:  This is misleading as to "again."  It is also inaccurate. A document previously cited by defendants does not establish that Chisholm was seen on September 25, 2012 for chronic care follow up.

101.   Defendants Contend: On September 25, 2012, her hypertension was controlled.

> Plaintiffs Contend:  This does not accurately summarize the evidence and is unclear at least as to any context in which this conclusion was made. Evidence previously cited by Defendants indicates the degree of control for hypertension is "F" for fair, and that the date of September 25, 2012 is incorrect.  It is unclear when this alleged conclusion was made.

102.   Defendants Contend: On December 5, 2012, Chisholm was seen for a chronic care follow-up.

> Plaintiffs Contend:  Plaintiffs are unable to confirm whether any alleged appointment on December 5, 2012 was a follow-up.

103.   Defendants Contend: On February 12, 2013, Chisholm refused medical treatment.

> Plaintiffs Contend:  This statement is inaccurate and misleading.

104.   Defendants Contend: On March 6, 2013, Chisholm was seen for a chronic care follow-up for her hypertension.

> Plaintiffs Contend:  This is inaccurate.  A document previously cited by Defendants indicated the reason for a March 6, 2013 visit was asthma and hyperlipidemia.

105.   Defendants Contend: On March 6, 2013, her hypertension was mild and controlled.

> Plaintiffs Contend:  Plaintiffs are unable to confirm or deny this.  It is unclear whether a document previously cited by defendants shows this.

106.   Defendants Contend: On March 29, 2010, Chisholm refused treatment.

> Plaintiffs Contend:  This statement is inaccurate and misleading and is not an accurate summary of the evidence.  To the extent Chisholm's record shows a refusal, it does not indicate that Chisholm refused treatment – only that she did not want to be seen that day.  The reason for the appointment was to change medication but Chisholm noted that "I've been told I will keep all KOP's, which makes this visit moot."

107.  Defendants Contend: On June 26, 2013, it was noted Chisholm refuses Albuterol and her inhaler.

> Plaintiffs Contend:  This statement is misleading.  Ms. Chisholm indicated that she uses Albuterol and QVAR PRN (i.e., as needed) and did not need to use them at the time.

108.  Defendants Contend: While Chisholm claims she was not sent to a cardiologist for eight months, she admitted at her deposition that she has never been diagnosed with a heart problem by any provider.

> Plaintiffs Contend:  This statement is misleading and inaccurate.  She received a diagnosis of mild restrictive ventilatory defect.  Her claims at her deposition do not negate her need for proper diagnosis and care.

109.  Defendants Contend: Nevertheless, she believes she has a heart condition because she feels easily winded, her face sweats profusely with minimal exertion, and she has difficulty doing physical things that are easy for other people.

> Plaintiffs Contend:  This statement is irrelevant and argumentative.  Ms. Chisholm's belief is immaterial to her need for proper diagnosis and care.  Moreover, Ms. Chisholm has received a diagnosis of mild restrictive ventilator defect.

110. <u>Defendants Contend</u>: Chisholm admitted the cardiologist's tests did not reveal she had a heart problem.

> <u>Plaintiffs Contend</u>:   This statement is inaccurate.   Ms. Chisholm's testimony was that the doctor did not know why her quality of life has been compromised "because the tests didn't reveal why…"

111. <u>Defendants Contend</u>: Chisholm also alleges that in June 2009, she had to file an HNR after the pharmacy refused to refill her Naproxen.

> <u>Plaintiffs Contend</u>:  This statement is unclear at least as to when and where Chisholm made this allegation.

112. <u>Defendants Contend</u>: On June 30, 2009, E. Mitchell, CRN advised Chisholm that this medication was not a chronic care medication and thus she needed to be scheduled on the nurses line.

> <u>Plaintiffs Contend</u>: This allegation is unclear, for example, as to what "this medication" is. Consequently, Plaintiffs are unable to confirm this allegation.

113. <u>Defendants Contend</u>: Ms. Mitchell further advised that if Chisholm wanted to be placed on nurse's line she would need to submit another HNR.

> <u>Plaintiffs Contend</u>: This allegation is unclear, for example, as to the context of "further."  Consequently, Plaintiffs are unable to confirm this allegation.

114. <u>Defendants Contend</u>: Chisholm waited until August 19, 2009, two months after her original request, to submit another HNR on this issue.

> <u>Plaintiffs Contend</u>:  This statement is misleading and does not accurately summarize the evidence.  It is also unclear as to what constitutes "this issue."  To the extent "this issue" is related to allegations that the pharmacy

refused to refill Naproxen, the record does not indicate when Chisholm actually received a signed response in order to know when to resubmit an HNR to get attention to her problem. For example, the HNR was not signed until June 30.

115. <u>Defendants Contend</u>: Chisholm's Naproxen  prescription was refilled on September 9, 2009.

<u>Plaintiffs Contend</u>:  This statement is misleading and lacks foundation as to when a prescription was allegedly refilled.  For example, a response to an HNR dated August 27, 2009 indicates that the *plan of action* is to refill on 9/2.

116. <u>Defendants Contend</u>: Chisholm also alleges that in February 2010, she had to file an HNR to obtain a refill of Naproxen following its confiscation during a cell search.

<u>Plaintiffs Contend</u>:  This statement is unclear at least as to when and where Chisholm made this allegation. In addition, "also" is vague and lacks context.

117. <u>Defendants Contend</u>: The request was referred to pharmacy the same day and her prescription was refilled on February 10, 2010.

<u>Plaintiffs Contend</u>:  This allegation is unclear, for example, as to when and what alleged request is at issue ("The request").  Consequently, Plaintiffs are unable to confirm this allegation.  A document previously cited by Defendants does not indicate that a prescription was actually refilled.

118. <u>Defendants Contend</u>: Chisholm did not file any grievances prior to November 13, 2013.

Plaintiffs Contend: Plaintiffs contend that this is irrelevant based at least on the Court's Order denying Defendant's Motion to Dismiss (Dkt. 175, p. 9) ("In short, the Tolling Agreement's exhaustion waiver applies to the claims presented in Plaintiffs' Complaint. The Court therefore need not consider whether Plaintiffs were prevented from exhausting their claims and the motion to dismiss on this basis will be denied.").  Also, Plaintiffs contend that this statement is incorrect at least because Chisholm filed a grievance on 12/14/2012.

119.  Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Chisholm submitted 18 HNRs.

Plaintiffs Contend: Plaintiffs contend that the number of HNRs Ms. Chisholm submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Ms. Chisholm received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Ms. Chisholm did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Ms. Chisholm received healthcare or to the quality of that healthcare.  Further, Plaintiffs contest the substance of this statement because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

120.  Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Chisholm submitted 12 HNRs.

Plaintiffs Contend: Plaintiffs contend that the number of HNRs Ms. Chisholm submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Ms. Chisholm received constitutionally adequate healthcare, that defendants were not deliberately

indifferent, or that Ms. Chisholm did not face a substantial risk of serious harm. The filing of an HNR does not speak to whether Ms. Chisholm received healthcare or to the quality of that healthcare. Further, Plaintiffs contest the substance of this statement because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

121. Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Chisholm submitted 13 HNRs.

Plaintiffs Contend: Plaintiffs contend that the number of HNRs Ms. Chisholm submitted is immaterial to the substance of this litigation. The filing of an HNR does not ensure that Ms. Chisholm received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Ms. Chisholm did not face a substantial risk of serious harm. The filing of an HNR does not speak to whether Ms. Chisholm received healthcare or to the quality of that healthcare. Further, Plaintiffs contest the substance of this statement because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

122. Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Chisholm submitted 43 HNRs.

Plaintiffs Contend: Plaintiffs contend that the number of HNRs Ms. Chisholm submitted is immaterial to the substance of this litigation. The filing of an HNR does not ensure that Ms. Chisholm received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Ms. Chisholm did not face a substantial risk of serious harm. The filing of an HNR does not speak to whether Ms. Chisholm

received healthcare or to the quality of that healthcare.  Further, Plaintiffs contest the substance of this statement because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

123.   <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Chisholm had 16 encounters with a nurse.

<u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

124.   <u>Defendants Contend</u>: Between July 1, 2012 and March 3, 2013, Plaintiff Chisholm had 2 encounters with a nurse.

<u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

125.   <u>Defendants Contend</u>: Between March 4, 2013 and April 1, 2014, Plaintiff Chisholm had 10 encounters with a nurse.

<u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other

healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

126. <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Chisholm had 28 encounters with a nurse.

> <u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

127. <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Chisholm had 9 encounters with a mid-level provider.

> <u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

128. <u>Defendants Contend</u>: Between July 1, 2012 and March 3, 2013, Plaintiff Chisholm had 9 encounters with a mid-level provider.

> <u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms.

Chisholm ultimately received and whether defendants were deliberately indifferent.

129. <u>Defendants Contend</u>: Between March 4, 2013 and April 1, 2014, Plaintiff Chisholm had 9 encounters with a mid-level provider.

> <u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

130. <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Chisholm had 27 encounters with a mid-level provider.

> <u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

131. <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Chisholm had 23 encounters with a physician.

> <u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms.

Chisholm ultimately received and whether defendants were deliberately indifferent.

132.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Chisholm had 3 encounters with a physician.

> Plaintiffs Contend: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

133.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Chisholm had 1 encounter with a physician.

> Plaintiffs Contend: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

134.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Chisholm had 27 encounters with a physician.

> Plaintiffs Contend: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms.

Chisholm ultimately received and whether defendants were deliberately indifferent.

135.   <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Chisholm had 82 encounters with medical staff.

> <u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

136.   <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Chisholm had 4 encounters with a psych associate.

> <u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.   Moreover, Defendants previously cited records that show 3 interactions and a "chart review" that was apparently performed several hours before the actual interaction.   There is no evidence that the "chart review" involved Ms. Chisholm's presence or involvement.

137.   <u>Defendants Contend</u>: Between March 4, 2013 and April 1, 2014, Plaintiff Chisholm had 2 encounters with a psych associate.

> <u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions,

appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

138.  <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Chisholm had 6 encounters with a psych associate.

<u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

139.  <u>Defendants Contend</u>: Between July 1, 2012 and March 3, 2013, Plaintiff Chisholm had 1 encounter with a psychologist.

<u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

140.  <u>Defendants Contend</u>: Between March 4, 2013 and April 1, 2014, Plaintiff Chisholm had 1 encounter with a psychologist.

<u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other

healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

141.   <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Chisholm had 2 encounters with a psychologist.

> <u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

142.   <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Chisholm had 8 encounters with psychology staff.

> <u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

143.   <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Chisholm had 2 encounters with a psychiatric nurse.

> <u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms.

Chisholm ultimately received and whether defendants were deliberately indifferent.

144.   <u>Defendants Contend</u>: Between March 4, 2013 and April 1, 2014, Plaintiff Chisholm had 2 encounters with a psychiatric nurse.

> <u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

145.   <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Chisholm had 4 encounters with a psychiatric nurse.

> <u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

146.   <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Chisholm had 4 encounters with a psychiatric mid-level.

> <u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms.

Chisholm ultimately received and whether defendants were deliberately indifferent.

147.  Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Chisholm had 3 encounters with a psychiatric mid-level.

> Plaintiffs Contend: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

148.  Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Chisholm had 7 encounters with a psychiatric mid-level.

> Plaintiffs Contend: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

149.  Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Chisholm had 2 encounters with a psychiatrist.

> Plaintiffs Contend: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms.

Chisholm ultimately received and whether defendants were deliberately indifferent.

150.  Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Chisholm had 3 encounters with a psychiatrist.

> Plaintiffs Contend: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

151.  Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Chisholm had 5 encounters with a psychiatrist.

> Plaintiffs Contend: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

152.  Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Chisholm had 16 encounters with psychiatry staff.

> Plaintiffs Contend: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms.

Chisholm ultimately received and whether defendants were deliberately indifferent.

153. <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Chisholm had 106 encounters with healthcare staff.

<u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

154. <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Chisholm had 10 chronic care appointments.

<u>Plaintiffs Contend</u>: Plaintiffs contend that the term "appointment" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

155. <u>Defendants Contend</u>: Between July 1, 2012 and March 3, 2013, Plaintiff Chisholm had 3 chronic care appointments.

<u>Plaintiffs Contend</u>: Plaintiffs contend that the term "appointment" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms.

Chisholm ultimately received and whether defendants were deliberately indifferent.

156.   <u>Defendants Contend</u>: Between March 4, 2013 and April 1, 2014, Plaintiff Chisholm had 3 chronic care appointments.

<u>Plaintiffs Contend</u>: Plaintiffs contend that the term "appointment" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

157.   <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Chisholm had 16 chronic care appointments.

<u>Plaintiffs Contend</u>: Plaintiffs contend that the term "appointment" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

158.   <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Chisholm had 8 outside specialty care consultations.

<u>Plaintiffs Contend</u>: Plaintiffs contend that the term "consultation" is vague in this particular statement.  Plaintiffs further contend that the number of encounters, interactions, appointments, consultations, or meetings Ms. Chisholm had with dental, mental, or other healthcare professionals is

immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

159. <u>Defendants Contend</u>: Chisholm also concedes that she has never been diagnosed with a heart problem by any provider, and that the cardiologist's tests did not reveal any heart problems.

> <u>Plaintiffs Contend</u>: This statement is irrelevant. These statements do not negate her medical needs and they are immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether Defendants were deliberately indifferent. It is also unclear at least as to when and where Chisholm allegedly concedes this.

160. <u>Defendants Contend</u>: During Chisholm's deposition defense counsel explored her extensive prescription regime – which includes no fewer than eight prescriptions for various psychiatric, heart, thyroid, pain and cholesterol ailments, and Chisholm acknowledged that some drugs are promptly renewed.

> <u>Plaintiffs Contend</u>: This statement is misleading. Chisholm stated that sometimes she does not get prompt renewals and that delays can last weeks, and the fact that some drugs are renewed promptly does not mean delays can never exist. Chisholm stated "And sometimes I get a prompt renewal and sometimes I don't and that can be weeks." Moreover, the amount of prescriptions is immaterial to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent, so this statement is irrelevant.

161. <u>Defendants Contend</u>: Two of Chisholm's prescriptions, Gabapentin and Naproxen, are both pain medications designed to treat her fibromyalgia.

Plaintiffs Contend:  This is misleading and lacks foundation:  There is no foundation for whether Chisholm received Gabapentin.

162.  Defendants Contend: The unfilled prescription for Gabapentin prescribed by Dr. Lockhart in April 2012 resulted in Chisholm's HNR in August complaining about delay, yet Chisholm acknowledged that when this drug went to committee, it was available only as a "watch swallow" option, and could only be obtained via the daily "pill call."

Plaintiffs Contend: This statement lacks foundation.  Also, according to her deposition, Chisholm was not even given the "watch swallow" option. [Chisholm Depo. 109:17 to 110:3.]   This statement is also vague, argumentative, and unclear about what it attempts to show, which makes it confusing.  That Chisholm acknowledged the alleged dispensing options in her deposition is irrelevant as to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.

163.  Defendants Contend: Chisholm has anxiety about standing in line for this pill call; indeed, it was this anxiety that caused her to refuse Elavil (which she conceded completely alleviated her pain from fibromyalgia), because it was available only via the pill call line.

Plaintiffs Contend:  This statement is irrelevant as to the adequacy of the healthcare Ms. Chisholm ultimately received and whether defendants were deliberately indifferent.  Moreover, this statement lacks foundation as to all the reasons for refusing Elavil.

164.   <u>Defendants Contend:</u> Chisholm was placed on the routine dental care list and, when scheduled for a cleaning on December 9, 2008, Chisholm refused, asserting she was double-booked for medical/dental appointments.

> <u>Plaintiffs Contend</u>:  This allegation is misleading.  Chisholm was deemed to have refused a dental cleaning on December 9, 2008 because the cleaning conflicted with a medical appointment that ADC scheduled on the same day.  This allegation is also unclear as to when she was allegedly placed on the routine dental care list.  It is also unclear as to when she allegedly refused the cleaning: For example, it is unclear whether she is alleged to have refused at scheduling or at the alleged appointment.  It is also unclear as to whether such refusal was voluntary.

## IV.   <u>MENTAL HEALTH CLAIMS</u>

173.   <u>Defendants Contend</u>: Chisholm claims that she has only been seen by a psychiatrist and a psychologist a few times each while at ADC.

> <u>Plaintiffs Contend</u>: This statement lacks foundation and is vague, for example, at least as to "a few" and "seen."  It is unclear what being "seen" involves, or how many is "a few."  It is also unclear as to when and in what context Chisholm made these claims.

174.   <u>Defendants Contend</u>: Chisholm's claim that she has only been seen by a psychiatrist and a psychologist a few times each while at ADC is unfounded.

> <u>Plaintiffs Contend</u>: This statement lacks foundation and is vague, for example, at least as to "a few" and "seen."  It is unclear what being "seen" involves, or how many is "a few," or what claim Defendants are referencing.  It is also unclear what is meant by "unfounded."  This statement is incorrect.

175.   <u>Defendants Contend</u>: Chisholm admits that she was seen by a psychiatrist up to six times in the two-year period preceding her deposition in 2013.

> <u>Plaintiffs Contend</u>: This statement is misleading as to Chisholm's actual testimony.   Plaintiffs contend that Chisholm made statements during her deposition to the best of her recollection.   This statement is also unclear as to what constitutes being "seen."   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with mental healthcare professionals is immaterial to the adequacy of the mental healthcare Ms. Chisholm ultimately received and whether or not defendants were deliberately indifferent.

176.   <u>Defendants Contend</u>: Chisholm admits that she saw psychologist Dr. Katz approximately four times in 2013.

> <u>Plaintiffs Contend</u>: This statement is misleading as to Chisholm's actual testimony.  Plaintiffs contend that Chisholm said "no more than four times, probably less."  This statement is also unclear as to what constitutes being seen.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with mental healthcare professionals is immaterial to the adequacy of the mental healthcare Ms. Chisholm ultimately received and whether or not defendants were deliberately indifferent.

177.   <u>Defendants Contend</u>: Chisholm admits that in 2012 she saw Dr. Katz several days in a row following a nervous breakdown and again five or six months later.

> <u>Plaintiffs Contend</u>: This statement lacks foundation and is misleading as to Chisholm's actual testimony.  Plaintiffs contend that Chisholm said "There was a brief period of time where I saw Dr. Katz for several days in a row

because I had that breakdown, and she was trying to help me adjust. And then I saw her once, approximately, five or six months later, to the best of my recollection." Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with mental healthcare professionals is immaterial to the adequacy of the mental healthcare Ms. Chisholm ultimately received and whether or not defendants were deliberately indifferent.

178. <u>Defendants Contend</u>: Chisholm's records show that between March 22, 2010 and April 1, 2014, Chisholm had 5 encounters with a psychiatrist, 7 encounters with a psychiatric midlevel provider, 4 encounters with a psychiatric nurse, 2 encounters with a psychologist, and 6 encounters with a psych associate.

<u>Plaintiffs Contend</u>: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Chisholm had with mental healthcare professionals is immaterial to the adequacy of the mental healthcare Ms. Chisholm ultimately received and whether or not defendants were deliberately indifferent.

**Exhibit B – Health Care Treatment of Robert Gamez**
**UNCONTESTED FACTS**

## I.      MEDICAL ALLEGATIONS

1.      Gamez alleges that, after Wexford took over, he was denied his inhaler "for about a month" and then was given "a different one with less effective medication."

2.      An HNR dated August 13, 2012 shows that he received Albuterol, the same inhaler he had been using previously.

3.      While he claims his nasal spray was stopped entirely with no substitution, an HNR shows that he requested, among numerous other medications, a refill on "nasal spray" for the first time on September 20, 2012.

4.      Gamez refused a medical record review without reason on September 21, 2012.

5.      On October 7, 2012, he submitted another request for a refill of "nasal spray," among an inhaler and other medications; the response shows that inhalers were delivered the next day.

6.      Gamez submitted no other HNR about a nasal spray until December 10, 2012, when he stated that he was enclosing a money distribution form for items that he has received, including "nasal spray."

## II.      CONDITIONS CLAIMS

7.       Gamez testified that he refuses showers because they are dirty, and that it had been months since he showered and instead just washes up inside his cell.

8.      Gamez testified that he exercises with a ball during recreation and can jog inside the recreation enclosure, and that he can do push-ups (200 to 300 hundred a day), squats, and sit-ups in the recreation enclosure and inside his cell.

## III.      MENTAL HEALTH CLAIMS

9.      Gamez alleges he has medications abruptly started, stopped and restarted.

10. Gamez further alleges:  In June 2007, his Thorazine was abruptly stopped. In February 2008, Celexa dose was adjusted and Thorazine started again. At end of April 2008, started on Tegretol for mood swings.  In March 2009, Thorazine was changed to Navane because the formulary was changed, but he did not see anyone for another four months to explain the medication.

11. Gamez alleges that Thorazine was abruptly stopped in June 2007 and did not resume again until February 2008.

12. At his deposition, Gamez testfied that, while all medications gave him side effects, Thorazine was the worst because it made him "feel real groggy, foggy and . . . out of it."

13. He further explained that he was unable to do anything on Thorazine because it made him "sleep all day" and put his "mind in a cloud."

14. Gamez testified that he did not like these side effects, so he asked medical personnel to take him off Thorazine.

15. Gamez alleges that his dose of Celexa was abruptly adjusted in February 2008.

16. Gamez claims his Thorazine was abruptly switched to Navane (Thiothixene) and that no one explained the new medication to him for four months.

17. Gamez alleges he has been treated with mental health medications that he has struggled to manage because they are less effective and have uncomfortable and stressful side effects, like Zoloft, which causes twitching.

18. With respect to his Zoloft medication, Gamez believes there is a "more effective medication" that he could use.

19. Gamez alleges he did not see a psychiatrist from 2007 to 2011, despite worsening mental health; rather, a NP prescribed a variety of psychotropic medications, including ones not indicated for his diagnosis or behavior.

20. In October 2009, Gamez was seen regarding his refusal to have blood drawn to test his glucose and lipids, and labs were reordered.

21. On February 25, 2011, Gamez requested to see a psychologist regarding possible brain damage because he was feeling light headed and had speech and balance problems.

22. Gamez alleges that on March 8, 2011 he was seen "by a Psychiatric Nurse Practitioner who noted possible post-traumatic stress disorder from childhood trauma and mood disorder due to traumatic brain injury.

23. On March 8, 2011, a Psychiatric Nurse Practitioner, who is trained and licensed to prescribed medication, noted that Gamez presented symptoms of a mood disorder, including depression, anxiety and irritability.

24. On April 30, 2008 the provider ordered lab tests and directed him to follow up with medical regarding his physical symptoms of dizziness and blurry vision. She prescribed him Tegretol 200mg for 180 days as KOP to treat all his symptoms, including anxiety, irritability and mood disorder.

25. Dr. Leclerc visited Gamez two more times on May 22 and 29, 2012.

26. On May 31, 2012, Gamez was seen by Dr. Bishop.

27. At a July 10, 2012 cell visit, Gamez reported doing "fine."

28. On October 4, 2012, Gamez was seen by Dr. Bishop; Gamez stated he has stopped taking Risperdol and wanted to substitute his medication.

29. Gamez alleges he experienced hallucinations and his mental health deteriorated due to medication interruptions, but for two years never saw a psychiatrist while in Eyman's SMU.

30. Gamez alleges he did not have regular blood draws to test for side effects of medications.

## CONTESTED FACTS

## I.    BACKGROUND AND DISCIPLINARY HISTORY

1.    <u>Defendants Contend</u>: On March 4, 1996, Gamez began his sentence for assisting in a criminal syndicate in violation of A.R.S § 13-2308.

> <u>Plaintiffs Contend</u>:  These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Gamez faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending.

2.    <u>Defendants Contend</u>: On June 13, 2002, Gamez began his sentence for armed robbery (multiple) in violation of A.R.S. §§ 13-1904, 13-604; aggravated assault (multiple) in violation of A.R.S. § 13-1204; criminal damage in violation of A.R.S. 13-602; theft of means of transportation (multiple) in violation of A.R.S. 13-1814;murder in the first degree (multiple) in violation of A.R.S. §§13-1105, 13-604 and kidnapping in violation of A.R.S. §§13-1204, 13-604.

> <u>Plaintiffs Contend</u>:  These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Gamez faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal

Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending.

3.  <u>Defendants Contend</u>: On May 17, 2003, Gamez began his sentence for aggravated assault (multiple) in violation of A.R.S. 13-1204; and promoting prison contraband in violation of A.R.S 13-2505.

> <u>Plaintiffs Contend</u>:  These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Gamez faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending.

4.  <u>Defendants Contend</u>: On June 23, 2003, Gamez began his sentence for destruction of public property in violation of A.R.S. §§13-130, 13-604; and attempted escape in the first degree in violation of A.R.S. §§13-2504, 13-604.

> <u>Plaintiffs Contend</u>:  These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Gamez faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending.

5.      Defendants Contend: On June 25, 2003, Gamez began his sentence for endangerment in violation of A.R.S. § 13-1202; aggravated assault (multiple) in violation of A.R.S. §13-1204; kidnapping in violation of A.R.S. §§13-1204, 13-604; and dangerous/deadly assault in violation of A.R.S. 13-1204.

> Plaintiffs Contend:   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Gamez faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending.

6.      Defendants Contend: Gamez testified at his deposition that he did not know what a class action was or how it differed from a regular lawsuit, the current status of the case, or what he wanted out of the case.

> Plaintiffs Contend:   This fact does not accurately portray Mr. Gamez's deposition testimony.  Mr. Gamez testified that he understands the nature of a class action, knows that the case seeks injunctive relief, that he communicates with and trusts his attorneys, and that he understands the nature of the suit.

7.      Defendants Contend: Gamez testified at his deposition that he did not think he was "part of the medical services" claims in the complaint, and did not know what "inadequate medical services" he was alleging.

> Plaintiffs Contend:   This does not accurately portray Mr. Gamez's deposition testimony.  Mr. Gamez testified that he represents the mental health (and not medical services) claims in the suit.

8.     <u>Defendants Contend</u>: On May 7, 2011, Gamez broke free from his escort and struck an officer in the right cheek.

<u>Plaintiffs Contend</u>:  Although documents show that Gamez was accused of this conduct, he does not admit that the underlying alleged conduct occurred.   Further this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Mr. Gamez's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Gamez faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

9.     <u>Defendants Contend</u>: On September 7, 2011, Gamez was involved in an inmate-on-inmate assault, and refused directives to comply with orders.

<u>Plaintiffs Contend</u>:  Although documents show that Gamez was accused of this conduct, he does not admit that the underlying alleged conduct occurred.   Further this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Mr. Gamez's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Gamez faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

10.    <u>Defendants Contend</u>: On February 14, 2013, Gamez covered his cell window and refused to remove the covering for formal count when ordered.

<u>Plaintiffs Contend</u>:  Although documents show that Gamez was accused of

this conduct, he does not admit that the underlying alleged conduct occurred. Further this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. Mr. Gamez's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Gamez faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

11. <u>Defendants Contend</u>: In 2003, Gamez was convicted of attempted murder, attempted escape, armed robbery, and kidnapping – for events surrounding his taking of a corrections officer hostage while detained at the Pima County Jail – and sentenced to a term of 156 years' imprisonment.

<u>Plaintiffs Contend</u>: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Gamez faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403. Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending.

12. <u>Defendants Contend</u>: In 2009, Gamez was accused of assaulting another person with the intention to riot.

<u>Plaintiffs Contend</u>: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. Mr. Gamez's disciplinary record is not at issue in this litigation and does not make it more or less

likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Gamez faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

13.   Defendants Contend: In October 2011, Gamez was accused of threatening a psychology associate.

Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Mr. Gamez's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Gamez faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403..

14.   Defendants Contend: On October 7, 2011, Gamez was disciplined for refusing to submit to restraints and attempting to start his cell on fire.

Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Mr. Gamez's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Gamez faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal

Rule of Evidence 403..

15.   <u>Defendants Contend</u>: In May 2012, Gamez stabbed his cellmate.

   <u>Plaintiffs Contend</u>:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Mr. Gamez's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Gamez faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

16.   <u>Defendants Contend</u>:  Gamez is currently incarcerated at ASPC-Eyman.

   <u>Plaintiffs Contend</u>:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Mr. Gamez faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court. Plaintiffs also lack immediate firsthand knowledge to confirm or deny this statement.

17.   <u>Defendants Contend</u>: Gamez admits he did not prepare his declaration in support of Plaintiffs' Motion for Class Certification.

   <u>Plaintiffs Contend</u>:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  It is immaterial who prepared the first draft of the declaration when Mr. Gamez verified the final, filed

version.

## II.   <u>MEDICAL ALLEGATIONS</u>

18.   <u>Defendants Contend</u>: Gamez admitted in response to discovery requests that a document exists from April 15, 2010, showing that Gamez was overusing his inhalers.

> <u>Plaintiffs Contend</u>:  The discovery response states only that Mr. Gamez was *advised* that he was overusing his inhalers.  The discovery responses do not show that he was *in fact* overusing his inhalers.

19.   <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Gamez submitted 206 HNRs.

> <u>Plaintiffs Contend</u>: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The number and nature of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.

20.   <u>Defendants Contend</u>: Between July 1, 2012 and March 3, 2013, Plaintiff Gamez submitted 64 HNRs.

> <u>Plaintiffs Contend</u>: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The number and nature of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious

harm.   The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.

21.     <u>Defendants Contend</u>: Between March 4, 2013 and April 1, 2014, Plaintiff Gamez submitted 74 HNRs.

<u>Plaintiffs Contend</u>: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The number and nature of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm.   The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.

22.     <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Gamez submitted 350 HNRs.

<u>Plaintiffs Contend</u>: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The number and nature of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm.   The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.

23.     <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Gamez had 63 encounters with a nurse.

<u>Plaintiffs Contend</u>: The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the

adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

24.   <u>Defendants Contend</u>: Between July 1, 2012 and March 3, 2013, Plaintiff Gamez had 28 encounters with a nurse.

<u>Plaintiffs Contend</u>: The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

25.   <u>Defendants Contend</u>: Between March 4, 2013 and April 1, 2014, Plaintiff Gamez had 29 encounters with a nurse.

<u>Plaintiffs Contend</u>: The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

26.   <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Gamez had 120 encounters with a nurse.

<u>Plaintiffs Contend</u>: The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

27.   <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Gamez had 3 encounters with a mid-level provider.

<u>Plaintiffs Contend</u>: The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or

meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

28.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Gamez had 3 encounters with a mid-level provider.

Plaintiffs Contend: The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

29.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Gamez had 9 encounters with a mid-level provider.

Plaintiffs Contend: The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

30.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Gamez had 15 encounters with a mid-level provider.

Plaintiffs Contend: The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

31.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Gamez had 32 encounters with a physician.

Plaintiffs Contend: The term "encounter" is vague.   Plaintiffs further

contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

32.    Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Gamez had 5 encounters with a physician.

Plaintiffs Contend: The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

33.    Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Gamez had 1 encounter with a physician.

Plaintiffs Contend: The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

34.    Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Gamez had 38 encounters with a physician.

Plaintiffs Contend: The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

35.    Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Gamez had 174 encounters with medical staff.

<u>Plaintiffs Contend</u>: The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

36.   <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Gamez had 257 encounters with healthcare staff.

<u>Plaintiffs Contend</u>: The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

37.   <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Gamez had 3 chronic care appointments.

<u>Plaintiffs contend:</u>  This fact is contested because the term "appointments" is vague.  Plaintiffs further contend that the number of encounters Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

38.   <u>Defendants Contend</u>: Between July 1, 2012 and March 3, 2013, Plaintiff Gamez had 1 chronic care appointments.

<u>Plaintiffs contend:</u>  This fact is contested because the term "appointments" is vague.  Plaintiffs further contend that the number of encounters Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

39.    Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Gamez had 5 chronic care appointments.

> Plaintiffs contend:  This fact is contested because the term "appointments" is vague.  Plaintiffs further contend that the number of encounters Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

40.    Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Gamez had 9 chronic care appointments.

> Plaintiffs contend:  This fact is contested because the term "appointments" is vague.  Plaintiffs further contend that the number of encounters Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

41.    Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Gamez had 3 outside specialty care consultations.

> Plaintiffs contend:  This fact is contested because the term "consultation" is vague.  Plaintiffs further contend that the number of encounters Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

42.    Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Gamez had 2 outside specialty care consultations.

> Plaintiffs contend:  This fact is contested because the term "consultation" is vague.  Plaintiffs further contend that the number of encounters Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants

were deliberately indifferent.

43.    <u>Defendants Contend</u>: Between March 4, 2013 and April 1, 2014, Plaintiff Gamez had 1 outside specialty care consultations.

> <u>Plaintiffs contend:</u>  This fact is contested because the term "consultation" is vague.  Plaintiffs further contend that the number of encounters Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

44.    <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Gamez had 6 outside specialty care consultations.

> <u>Plaintiffs contend:</u>  This fact is contested because the term "consultation" is vague.  Plaintiffs further contend that the number of encounters Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

45.    <u>Defendants Contend</u>: Gamez testified that the 24-hour lighting is equivalent to a night light.

> <u>Plaintiffs Contend</u>:  Gamez testified only that he wouldn't disagree if others characterized 24-hour lighting as a night light.

## III.    <u>MENTAL HEALTH CLAIMS</u>

46.    <u>Defendants Contend</u>: Gamez cannot say whether any changes or cessation in his medications caused him any physical or serious harm.

> <u>Plaintiffs Contend</u>:   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. It is irrelevant whether changes or cessation of Mr. Gamez caused him actual physical or serious harm.  Mr. Gamez's personal assessment of his own well being does not

implicate whether Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm.

47.     Defendants Contend: On June 1, 2007, Dr. Harrison prescribed 50 mg of Thorazine to be taken daily for one week.

Plaintiffs Contend:  These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Merely because the doctor prescribed dosages does not ensure that those medications were accurately and timely administered.

48.     Defendants Contend: On September 18, 2007, another doctor prescribed Thorazine 100 mg to be taken daily for 120 days, which was administered to Gamez until December 18, 2007.

Plaintiffs Contend:  These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Merely because the doctor prescribed dosages does not ensure that those medications were accurately and timely administered.

49.     Defendants Contend: An HNR dated 1/5/08 shows that Gamez requested a refill of Citalopram HBR 40mg tablets (Celexa).

Plaintiffs Contend:  These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The number and nature of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.

50.     Defendants Contend: Staff responded that Gamez refused his mental health appointment on December 19, 2007, when he was supposed to obtain a new prescription for the medication.

> Plaintiffs Contend:   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The number and nature of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm.   The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.

51.     Defendants Contend: A psychiatric follow-up note dated November 26, 2008, shows that the nurse practitioner discussed with Gamez the need to change his medication due to changes in the formulary.  ADC0001043.  She specifically discussed the plan to cross-taper his current antipsychotic drug (presumably, Thorazine) to Navane, noting that Gamez was "agreeable to [the] plan."

> Plaintiffs Contend:   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The medical records do not demonstrate the truth of the underlying alleged facts.

52.     Defendants Contend: She thus prescribed him Navane 5mg for seven days, then Navane 10mg for 180 days, and ordered tapering Thorazine 50mg for 7 days before discontinuing it altogether.

> Plaintiffs Contend:   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The medical records do not demonstrate the truth of the underlying alleged facts, or that the medications were administered as prescribed.

53.     Defendants Contend: On November 5, 2012, Gamez submitted another HNR reporting mental health symptoms.  He was seen at his cell-front.

Plaintiffs Contend:  These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The number and nature of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.

54.     Defendants Contend: Gamez admits he does not know whether or not there were delays and interruptions in his medications.

Plaintiffs Contend:  Mr. Gamez's declaration sets forth ways in which his medications have been delayed and interrupted, and he will testify regarding the same at trial.

55.     Defendants Contend: Gamez cannot remember any instance in which his medication was abruptly changed or stopped.

Plaintiffs Contend:  Mr. Gamez's declaration sets forth ways in which his medications have been abruptly changed or stop, and he will testify regarding the same at trial.

56.     Defendants Contend: On August 29, 2009, Gamez submitted an HNR requesting to speak to mental health about obtaining laxative.  On September 17, 2009, he submitted an HNR for a general complaint that long-term isolation is detrimental to one's health and requesting removal.  On December 5, 2009, he submitted an HNR requesting placement in a mental health yard because he was depressed about severity of his sentence and desired to focus on declining mental health.

Plaintiffs Contend: These facts are irrelevant and should be excluded

pursuant to Federal Rules of Evidence 401 and 402. The number and nature of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.

57.  Defendants Contend: On February 24, 2010, Gamez submitted an HNR requesting removal from maximum custody for mental health treatment.  On February 26, 2010, he submitted an HNR requesting removal from maximum custody because of paranoia, anxiety, tense, and anger problems and requesting treatment for brain damage and hallucinations..

Plaintiffs Contend: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The number and nature of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.

58.  Defendants Contend: On August 23, 2010, Gamez submitted an HNR requesting mental health treatment for deteriorating physical and mental health and complaining that medication is making him always sleepy.

Plaintiffs Contend: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The number and nature of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Gamez received

constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm.   The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.

59.   Defendants Contend: On September 7, 2010, Gamez submitted an HNR complaining of panic attacks, depression, anxiety, losing weight from not eating, refusing shots, but requesting refills of medication. .

Plaintiffs Contend: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The number and nature of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm.   The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.

60.   Defendants Contend: On December 14, 2010, Gamez submitted an HNR requesting to attend programs because of depression, sleep deprivation, and paranoia.

Plaintiffs Contend: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The number and nature of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm.   The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.

61.   Defendants Contend: On February 6, 2011, Gamez submitted an HNR requesting to see a doctor for anxiety, difficulty breathing, paranoia, schizophrenia,

delusions and weight loss.   On February 7, 2011, he submitted an HNR requesting removal from maximum custody and placement in "special program unit," alleging retaliation, and requesting to be screened and diagnosed by "adequate staff."   On February 25, 2011, he submitted an HNR requesting an evaluation by a "certified psychologist" for brain damage using the "most effective methods," and requesting to be seen by doctor for eye and head aches, balance and speech problems, difficulty breathing and panic attacks.

> Plaintiffs Contend: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The number and nature of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm.   The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.

62.   Defendants Contend: On June 2, 2011, Gamez submitted an HNR requesting a prescription for Effexor for anxiety, depression and cognitive repair.   On June 22, 2011, he submitted an HNR requesting the Effexor that he alleged an unidentified doctor had promised to prescribe, group therapy, and change of cell.   On June 23, 2011, he submitted an HNR requesting transfer to medical or mental health unit due to difficulty breathing.  On June 25, 2011, he submitted an HNR complaining that his medication was making him sick due to lack of nutrition.  On July 1, 2011, he submitted an HNR again requesting Effexor.  The response to the HNR noted he was given a 28-day supply of the medication on June 20, 2011.  On July 16, 2011, he submitted an HNR again requesting Effexor, group counseling, and one-on-one counseling.

> Plaintiffs Contend: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The number and nature

of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation. The filing of an HNR does not ensure that Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm. The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.

63. <u>Defendants Contend</u>: Gamez has no recollection of the events asserted in his declaration.

<u>Plaintiffs Contend</u>:  Mr. Gamez intends to testify at trial regarding the events at issue in his declaration.

64. <u>Defendants Contend</u>: His medical records show that the medication was administered as prescribed by doctors.

<u>Plaintiffs Contend</u>:  The record contains no support for the broad proposition that all medication administration was done accurately, timely, and in accordance with prescription.

65. <u>Defendants Contend</u>: Gamez later reported difficulty sleeping without taking Thorazine.

<u>Plaintiffs Contend</u>:  Although Mr. Gamez reported difficult sleeping, it is vague was is intended by "without taking Thorazine."

66. <u>Defendants Contend</u>: The psychiatric nurse practitioner again discussed with him the formulary and the risks of taking anti-psychotic drugs as a sleep-aide. She further discussed with him the long term risks of taking antipsychotic drugs, before increasing his dosage of Navane to 15mg for 180 days, noting that it should be decreased in the future to the lowest dosage necessary.

<u>Plaintiffs Contend</u>:  After a diligent search for documents supporting this fact, Plaintiffs were unable to verify the facts. Plaintiffs therefore contest this fact at this time.

67.    <u>Defendants Contend</u>: On February 5, 2009 Gamez signed a form acknowledging this discussion and his awareness of the side possible effects of taking Navane.

> <u>Plaintiffs Contend</u>:  After a diligent search for documents supporting this fact, Plaintiffs were unable to verify the facts.  Plaintiffs therefore contest this fact at this time.

68.    <u>Defendants Contend</u>: Gamez stated at his deposition that he did not notice or recall any difference from changing his medicine to Navane instead of Thorazine.

> <u>Plaintiffs Contend</u>: Mr. Gamez did not recall how he felt when taking or not taking Navane, and Gamez did not understand the vague question posed (whether he felt different between taking Thorazine and the Navane).

69.    <u>Defendants Contend</u>: Gamez does not remember any instance in which his medication was abruptly changed or stopped.

> <u>Plaintiffs Contend</u>: Mr. Gamez testified that he could not remember the name of the medications that were abruptly stopped however he knew that this was so because he "experienced it."

70.    Gamez testified in his deposition that he was merely speculating that other drugs might be more effective with fewer side effects.

> <u>Plaintiffs Contend</u> that Gamez was not merely speculating but, as he testified, he had asked psych Carter 2 weeks prior about a more effective medication; he simply could not recall her response

71.    <u>Defendants Contend</u>: When asked about the assertion that he struggled to manage the side effects of various mediations, Gamez did not identify any.

> <u>Plaintiffs Contend</u>: Gamez identified several side effects to Zoloft including trouble sleeping and twitching; Gamez further testified that the twitching was uncomfortable and

72.     Defendants Contend: When asked what medication was more effective, Gamez testified that he did not know.

> Plaintiffs Contend: When Gamez was asked what medication was more effective, he testified that "[t]hat's for a doctor to decide," not that he did not know

73.     Defendants Contend: Gamez further admitted that no doctor or anyone else ever told him that a more effective medication exists, that he in fact does not know whether one exists.

> Plaintiffs Contend: Gamez testified that no doctor had prescribed more effective medication, not that no doctor or anyone else had ever told him that a more effective medication existed; Gamez testified that he did not know how he knew that there was more effective medication, not that he did not know whether or not a more effective medication existed; in fact, Gamez acknowledged that there may be a more effective medication; Gamez testified that he may have spoken to a doctor about a more effective medication but could not recall the doctor's response

74.     Defendants Contend: He claims he was prescribed Tegretol for irritability and mood, but Tegretol is not indicated for the irritability and emotional dysregulation associated with traumatic brain injury or frontal lobe dysfunction, and he had a prior negative response to Tegretol.

> Plaintiffs Contend:  After a diligent search for documents supporting this fact, Plaintiffs were unable to verify the facts.  Plaintiffs therefore contest this fact at this time.

75.     Defendants Contend: He showed her court documents that he may have suggested a possible history of sex abuse and various traumas. Although they discussed Tegretol to treat his symptoms, Gamez did not inform her he had an adverse reaction to Tegretol in the past.

> Plaintiffs Contend: The Psychiatric Follow-Up note only claims that they discussed used of Tegretol but not whether such discussion actually took place.

76.   Defendants Contend: On April 9, 2012, Gamez submitted an HNR requesting to see a psychiatrist.  The next day, Gamez was seen by a PsychD, who noted that Gamez was cooperative though anxious, but with normal affect, and that Gamez will continue testing and monitoring for further treatment and medications.

> Plaintiffs Contend only that HNR indicates that Gamez was seen on 4/10/12 and that "all concerns addressed" but unclear whether he was actually seen. Plaintiffs further contend that regardless all his concerns were not in fact addressed

77.   Defendants Contend: On April 26, 2012, Gamez received follow-up treatment from another PsychD, and they discussed relaxation techniques for his panic attacks.

> Plaintiffs Contend:  After a diligent search for documents supporting this fact, Plaintiffs were unable to verify the facts.  Plaintiffs therefore contest this fact at this time.

78.   Defendants Contend: On April 26, 2012, Gamez was seen by Dr. Bishop and reported that he wanted to continue his medications because they were working well.

> Plaintiffs Contend: This "fact" mischaracterizes Gamez' deposition testimony.  Mr. Gamez stated that his medications were helping, not that they were working well.

79.   Defendants Contend: On May 9, 14, and 16, 2012, Dr. Leclerc, a psychologist attempted to administer additional tests despite Gamez's refusals to complete them.

> Plaintiffs Contend: Leclerc administered a single, lengthy test, the MMPI-2, not additional "tests" and Mr. Gamez did not refuse to complete the test but

stopped when he became tired and later resumed the test.

80.   <u>Defendants Contend</u>: On May 17, 2012, Dr. Leclerc noted that he could not see Gamez because he had assaulted his cellmate and then refused treatment.

<u>Plaintiffs Contend</u> that this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.   Mr. Gamez' disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Gamez faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

81.   <u>Defendants Contend</u>: On June 28, 2012, Gamez was seen by Dr. Leclerc, who noted that he encouraged Gamez to be more truthful about his symptoms so that he can be adequately tested and treated; Gamez refused further testing.

<u>Plaintiffs Contend</u>: Leclerc encouraged Mr. Gamez to be more truthful about his test responses.   Additionally, rather than Mr. Gamez refusing further testing, Leclerc informed Mr. Gamez there would be no further testing.

82.   <u>Defendants Contend</u>: On August 30, 2012, Gamez submitted a HNR requesting counseling for feeling tense, irritable, agitation, extreme anxiety, schizophrenia, and paranoia.  He was seen that same day and instructed to submit a HNR to see Dr. Biship. Instead, Gamez submitted another HNR on September 9, 2012, again requesting counseling for those symptoms.  He was seen that same day and complained about symptoms he had from past medications.

<u>Plaintiffs Contend</u>: It is unclear whether Mr. Gamez submitted an HNR to see Bishop in response to the August 30, 2012 counseling; accordingly,

"instead" should be removed. Moreover, these facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The number and nature of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.

83.   <u>Defendants Contend</u>: On September 20, 2012, Gamez submitted a third HNR complaining of the same symptoms and accusing staff of poisoning his food. He was seen that day and asked to fill out a HNR to see Dr. Bishop.

<u>Plaintiffs Contend</u>:  Mr. Gamez did not directly accuse staff of poisoning food (he, did however, "wonder" if a particular CO was poisoning his food).  Moreover, these facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The number and nature of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.  Additionally, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

84.   <u>Defendants Contend</u>: On September 27, 2012, Gamez submitted another HNR complaining about depression for the past five days.  Staff informed him he has

been scheduled to see a psychiatrist.   Dr. Bishop performed a psychiatric follow-up with Gamez on October 4, 2012.

> Plaintiffs Contend: Medical staff informed Mr. Gamez that he was scheduled to see psychiatry per an HNR filed on September 24, 2012 not that he was scheduled as a result of his September 27, 2012 HNR Moreover, these facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The number and nature of HNRs Mr. Gamez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Gamez received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Gamez did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Gamez received healthcare or the quality of that healthcare.

## IV.   CONDITIONS CLAIM

85.   Defendants Contend: Gamez claims that isolation caused him to become delusional and hallucinate.

> Plaintiffs Contend: Mr. Gamez claims ADC's policies and practices relation to the isolation of prisoners violates the Eighth Amendment of the United States Constitution

86.   Defendants Contend: Gamez admitted that his hallucinations (hearing voices) started when he "was a little kid" and that he never had treatment for it before entering ADOC custody.

> Plaintiffs Contend:  Mr. Gamez testified that his hearing of voices started when he "was a little kid."  This "fact" mischaracterizes Mr. Gamez' testimony as an admission.

87.   Defendants Contend: There is no evidence in the medical or mental health records that Gamez requested, but was denied regular blood draws to test for the side effects of medications.

Plaintiffs Contend: Plaintiffs' expert will testify that in his expert opinion this fact does not show the provision of adequate medical care;  blood should be drawn regularly to test for side effects of medications irrespective of an inmate request.

88.   Defendants Contend: When Gamez made requests for blood tests to treat other concerns, they were administered.  In April 2008, Gamez requested, and received, a blood test for diabetes with negative results.

Plaintiffs Contend: While Mr. Gamez made requests for blood test to treat other concerns, they were not always administered.

89.   Defendants Contend: In January 2009, medical staff discussed Gamez's request for a blood draw because he was concerned he had a STD or virus.

Plaintiffs Contend: Staff responded to Mr. Gamez' HNR by notifying him that such a blood draw would be discussed.

90.   Defendants Contend: A HNR dated July 5, 2013 requests bloodwork to test for infectious diseases, claiming that his last one was in August 9, 2012.  Labs were ordered in response.

Plaintiffs Contend: Mr. Gamez claimed his last draw was August 10, 2012.

91.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Gamez had 1 encounter with a psych tech.

Plaintiffs Contend: The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

92.    Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Gamez had 9 encounters with a psych associate.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

93.    Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Gamez had 1 encounter with a psych associate.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

94.    Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Gamez had 12 encounters with a psych associate.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

95.    Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Gamez had 22 encounters with a psych associate.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or

not defendants were deliberately indifferent.

96.   <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Gamez had 15 encounters with a psychologist.

<u>Plaintiffs Contend</u>:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

97.   <u>Defendants Contend</u>: Between July 1, 2012 and March 3, 2013, Plaintiff Gamez had 1 encounter with a psychologist.

<u>Plaintiffs Contend</u>:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

98.   <u>Defendants Contend</u>: Between March 4, 2013 and April 1, 2014, Plaintiff Gamez had 6 encounters with a psychologist.

<u>Plaintiffs Contend</u>:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

99.   <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Gamez had 22 encounters with a psychologist.

<u>Plaintiffs Contend</u>:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the

adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

100.   <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Gamez had 45 encounters with psychology staff.

> <u>Plaintiffs Contend</u>:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

101.   <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Gamez had 6 encounters with a psychiatric nurse.

> <u>Plaintiffs Contend</u>:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

102.   <u>Defendants Contend</u>: Between July 1, 2012 and March 3, 2013, Plaintiff Gamez had 3 encounters with a psychiatric nurse.

> <u>Plaintiffs Contend</u>:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

103.   <u>Defendants Contend</u>: Between March 4, 2013 and April 1, 2014, Plaintiff Gamez had 11 encounters with a psychiatric nurse.

> <u>Plaintiffs Contend</u>:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or

meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

104.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Gamez had 20 encounters with a psychiatric nurse.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

105.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Gamez had 3 encounters with a psychiatric mid-level.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

106.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Gamez had 2 encounters with a psychiatric mid-level.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

107.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Gamez had 5 encounters with a psychiatric mid-level.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further

contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

108.    Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Gamez had 8 encounters with a psychiatrist.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

109.    Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Gamez had 4 encounters with a psychiatrist.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

110.    Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Gamez had 2 encounters with a psychiatrist.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

111.    Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Gamez had 14 encounters with a psychiatrist.

<u>Plaintiffs Contend</u>:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

112.   <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Gamez had 38 encounters with psychiatry staff.

<u>Plaintiffs Contend</u>:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Gamez had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Gamez ultimately received and whether or not defendants were deliberately indifferent.

## UNCONTESTED FACTS
### Exhibit C – Joseph Hefner

**I.      BACKGROUND**

1.      Hefner was in ADC custody from March 2006 to February 2009, and again from July to December 2009.

2.      Hefner is currently incarcerated at ASPC-Lewis.

**II.      MEDICAL ALLEGATIONS**

3.      Hefner was hit in the right eye by a weed while working on a crew outside at the stables on September 11, 2006.

4.      Hefner claims that Defendants failed to provide necessary medication because he was given an expired eye medication that caused him to develop iritis and his vision to dramatically worsen. Specifically, Hefner claims that, on September 12, 2006, an ADC nurse gave him neomycin/bacitracin cream that had expired three months earlier. He claims he was seen two days later and was diagnosed with iritis, an inflammation of the iris, allegedly told that it was in reaction to the expired cream.

5.      Consult reports from the ophthalmologists at the Southwest Eye Center confirm that he is positive for HLA B27.

6.      Hefner also received Special Needs Orders ("SNO") to treat his eye problems, including permission to wear sunglasses and a hat outdoors, wear an eye patch, take eye medication to work, stay indoors, have limited work duties, have a lower bunk bed, wear dark glasses all the time, and be immediately seen at the health unit the same day he complains of an eye problem.

7.      On September 12, 2006, the day after  the injury, Hefner was seen by Dr. Coons, who noted that his eye was slightly red, prescribed him neomycin/bacitracin ointment, gave him a Special Need Order for limited work duty, and ordered a follow-up in 1 to 2 days.  The request for offsite consult was approved the same day.

8.     Hefner was seen by nurse Smith upon his return from the consult on September 14, 2006, and placed on Pred Forte 1% eye drops.

9.     On September 17, 2006, Hefner was again seen by medical staff for pain in his eye, neck, and ear.

10.    On September 18, 2006, he was again seen by medical staff for a follow-up and sent to Southwest Eye Center.

11.    On September 25, 2006, Hefner received a Special Needs Order for limited work duty.

12.    On September 26, 2006, Hefner was again seen for his one-week follow-up visit with Dr. Walker at the Southwest Eye Center.

13.    Hefner was seen on September 26 and 27, 2006, by a registered nurse at medical, who noted that he had "no swelling" and "no severe redness of check or right eye."

14.    On October 11, 2006, Hefner was again treated by Dr. Walker at the Southwest Eye Center.

15.    On October 11, 2006, Dr. Walker continued Hefner on the Pred Forte medication and recommended a follow-up in two weeks.

16.    On October 26, 2006, Hefner returned to the Southwest Eye Center for follow-up, and he reported swelling and some pain in the last two days, so his medication was continued and a return to the clinic in one week was recommended.

17.    On November 7, 2006, Hefner returned to the Southwest Eye Center for his follow-up, and reported he was still having blurry vision despite being allowed to use sunglasses, so Dr. Walker continued him on Pred Forte and recommended a follow-up in two weeks.

18.    Hefner was seen by a registered nurse on November 8 and 9, 2006, who noted that his iritis had slowly improved, but that he needed to continue taking Pred Forte and follow up with the ophthalmologist.

19.     On November 9, 2006, another request for offsite treatment at the Southwest Eye Center was placed, noting that there was decreased redness in the eye; approval was given the same day, for a two-week follow-up appointment on November 21, 2006.

20.     Also on November 9, 2006, PA Underwood gave him a SNO to permit him to wear sunglasses and a hat.

21.     On November 23, 2006, Hefner told a nurse that his "right eye just got red all of a sudden," and reported more blurry vision than usual and was taken to the HU for further evaluation.

22.     On November 25, 2006, his condition had not improved, and he was taken to St. Mary's Hospital ER.

23.     Hefner alleges that he did not receive timely doctor-prescribed eye medication following eye surgery. Specifically, he claims he was not given eye medication that the hospital doctor prescribed for two days after his return from the hospital.

24.     On November 28, 2006, he was seen by P.A. Underwood, who prescribed him Alphagen Opth solution, Pred Forte drops and Diamox 500 mg.

25.     On November 30, 2006, P.A. Underwood saw Hefner for a follow-up, continued him on those medications, and scheduled a follow-up evaluation with the ophthalmologist, Dr. Levine, the following week.

26.     On December 5, 2006, Hefner saw Dr. Levine for a consult, and he recommended continuing the Pred Forte and Alphagen medication and stopping the Diamox.

27.     On December 5, 2006, Dr. Levine suggested starting Cyclogel, and requested a follow-up in six weeks.

28.     On January 31, 2007, Hefner followed up at the Southwest Eye Center with Dr. Lewis, and stated that he did not receive his cyclopentolate.

29.     A progress report dated August 28, 2007 shows that Hefner was called in to discuss the proper dose of his eye medications.

30.     Hefner also claims that he had a one-week delay in receiving prescribed medications after cataracts surgery on August 21, 2008, and he suffered eye problems throughout the fall of 2008, but was not seen by a specialist until January 29, 2009, when the specialist diagnosed iritis and prescribed eye drops, which then took a week to be ordered and delivered to him.

31.     On August 22, 2008, Hefner returned from Dr. Levine's office with a prescription for a one-week supply of Prednisone, and medical staff contacted the pharmacy and ordered the medication, picked it up, and delivered it to Hefner.

32.     On August 26, 2009, Hefner asked to see an eye specialist regarding pain in his right eye, stating that the Tylenol he received has not helped; although he referred to it has his "second" request, his previous HNR shows that he did not make any prior request to see a specialist.

33.     Hefner was not in ADC custody from December 2009 until March 14, 2011.

34.     Hefner claims he has gastroesophageal reflux disease (GERD) and needs a special diet.

35.     Hefner testified that, in 2010, while in ADC custody, either Dr. Merchant or Dr. Macaboui, told him that he had a gastrointestinal problem and should avoid certain foods that will upset his stomach, such as peanut butter, beans, oily foods, coffee, sodas and spicy foods.

36.     On December 20, 2011, Hefner told Dr. Macabuhay that he had allergies to onion, peanuts and peas.

37.     Dr. Macabuhay noted that Hefner had reported a history of chronic GERD, prescribed medication, and planned to test his allergies to onion and peanut.

38.     He was taken to the hospital for treatment on March 26, 2011, after being involved in an altercation with other inmates.

39.     The ER hospital consult from March 26, 2011 shows that Hefner had a history of shoulder rotator cuff repair in 2002 and right-knee arthroscopy in 1988.

40.     On March 26, 2011, Hefner complained of pain in his left jaw, right lower back, left lower chest/rib area, pain with deep breathing, pain below right knee.

41.     On March 26, 2011, the doctor assessed swelling, abrasions on left side of the face, pain with palpation right flank and left lower chest, and abrasions and swelling right knee.

42.     A progress report shows that Dr. Milazzo followed up with Hefner on March 30, 2011, just three days after he was discharged from the hospital.

43.     On March 31, 2011, a progress report shows that Hefner was ambulating in his cell without difficulty and had no visible sign of distress; his only complaint was that his "back is still sore."

44.     Hefner was seen by Dr. Bell on June 29, 2011.

45.     Hefner met with a provider on November 23, 2011, and a request was submitted for an ophthalmology consult; this request was approved on December 5, 2011, and the appointment was scheduled for December 22, 2011.

46.     Hefner alleged in the Complaint that, as of January 2012, he still had not seen an ophthalmologist.

47.     Hefner testified that he was seen by an ophthalmologist many times, and recently seen by an ophthalmologist for eye surgery in June 2013.

48.     A progress report dated April 29, 2013, shows that Hefner complained of shooting pains across his left side of neck and down his left arm, and numbness below his left knee.

49.     On April 29, 2013, he was seen by Dr. Bell, who assessed that Hefner had full range of motion in his left shoulder, he was able to touch the back of his head, his left leg gait was normal, and the rotator hip was intact.

50.     On April 29, 2013, Dr. Bell reviewed his CT chart and requested an x-ray of his left shoulder.

**CONTESTED FACTS**

I.   <u>BACKGROUND & DISCIPLINARY HISTORY</u>

1.   <u>Defendants Contend:</u>   On November 28, 2005, Hefner was convicted of forgery and taking identity in violation of A.R.S. § 13-2002 and A.R.S. § 13-2008.  His sentence for his forgery conviction began on February 9, 2005.  His sentence for his taking identity conviction began on April 12, 2005.

> <u>Plaintiffs Contend:</u>   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

2.   <u>Defendants Contend:</u>   On November 28, 2005, Hefner was convicted of a dangerous drug violation in violation of A.R.S. §13-3401.   His sentence began on November 23, 2009.

> <u>Plaintiffs Contend:</u>   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the

criminal history of the class is currently pending before the Court.

3.     Defendants Contend:   When Hefner was not in ADC custody between December 2009 and March 14, 2011, he was either released on parole or detained by the Maricopa County Sheriff's Office awaiting sentence.

> Plaintiffs contend:   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.   These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.   Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

4.     Defendants Contend:   On September 30, 2010, Hefner was convicted of theft in violation of A.R.S. §§13-801, 13-802. His sentence began on May 12, 2010.

> Plaintiffs Contend:   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.   These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.   Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

5.     Defendants Contend:   On September 30, 2010, Hefner pled guilty to Burglary in the 3rd degree in violation of A.R.S.  13-506.  His sentence began on March 10, 2011.

Plaintiffs Contend:   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.   These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.   Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

6.   Defendants Contend: Plaintiff Joseph Hefner is a dangerous criminal with a history of over twenty years of community victimization, property crimes, drug abuse, and failures to comply with Court orders and actions.

Plaintiffs Contend:  This is argumentative and an improper opinion.   These facts are also irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.   These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC.   In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.   Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

7.   Defendants Contend: Hefner pleaded guilty to theft, and was sentenced to a term of 7.5 years' imprisonment

Plaintiffs Contend:   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.   These facts do not make it more or less likely that defendants were deliberately indifferent and

caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

8.      Defendants Contend: In February 2009, Hefner was released on parole, but absconded.

Plaintiffs Contend: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

9.      Defendants Contend: In 2009, Hefner was arrested for car theft and burglary, and police discovered he had an arrest warrant for violating parole.

Plaintiffs Contend: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the

criminal history of the class is currently pending before the Court.

10.   Defendants Contend: The hearing officer noted that it was his "6th related offense for disrespecting staff."

Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Mr. Hefner's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

11.   Defendants Contend: Hefner has received the following verbal/written reprimands while at ADC:  September 20, 2011 – disrespectful to staff, guilty of a minor violation, and verbally reprimanded; March 23, 2012 – violated grooming, guilty of minor violation, verbal and written reprimand; March 23, 2012 – disrespect to staff, informally resolved;  June 7, 2012 – aggravated refusal and disorderly conduct (both major violations), verbally reprimanded; April 12, 2013 – disruptive conduct; guilty of minor violation, verbally reprimanded; May 21, 2013 – disruptive conduct; informally resolved.

Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Mr. Hefner's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed

by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

12.      <u>Defendants Contend</u>: Hefner testified at his deposition that he has had difficulty and "words" with medical staff.

> <u>Plaintiffs Contend</u>:  The quoted word of "words" was stated by counsel for the defendants, not Mr. Hefner, during the deposition.    This fact is also irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.   Mr. Hefner's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

13.      <u>Defendants Contend</u>: On March 20, 2012, Hefner went to medical to ask if he was scheduled for the doctor line, and accosted a nurse, demanding that he be seen even if he was not scheduled.

> <u>Plaintiffs Contend</u>:  This is hearsay as it is only according to a third-hand disciplinary report.  This fact is also irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.   Mr. Hefner's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

14.     <u>Defendants Contend</u>: The nurse advised him that she did not have his chart and will schedule him for a later date, but Hefner became angry and yelled, "You people are all cocksuckers and bitches, and I'm gonna go call my lawyer!"

> <u>Plaintiffs Contend:</u> This is hearsay as it is only according to a third-hand disciplinary report.  This fact is also irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Mr. Hefner's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

15.     <u>Defendants Contend</u>: The nurse advised him that medical would see him if his corrections officer requests it, and the officer requested it, but added, "it would be nice if you apologize for what he said."

> <u>Plaintiffs Contend</u>:  This is hearsay as it is only according to a third-hand disciplinary report.  This fact is also irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Mr. Hefner's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

16.     <u>Defendants Contend</u>: Hefner became angry again, and "stormed off," saying "No, I will not apologize!" and left without seeing medical.

> <u>Plaintiffs Contend:</u>  This is hearsay as it is only according to a third-hand disciplinary report.  This fact is also irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.   Mr. Hefner's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

17.     <u>Defendants Contend</u>: On May 17, 2012, Hefner received a disciplinary report for using profanity and derogatory language at a contractor, his worker, and a corrections officer, because he was upset that he was not first in line at the store, and as discipline he was placed on 60 days' parole, 30 hours' of extra duty, and lost 30 days of privileges and visitation.

> <u>Plaintiffs Contend</u>:  Hefner stated that he only used profanity with an inmate worker and not staff.   This fact is also irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Mr. Hefner's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

18. <u>Defendants Contend</u>: On May 26, 2012, Hefner received a disciplinary report for refusing to follow orders to return to the yard and his assigned unit, insisting on being taken off the yard, and as discipline he was placed on 30 days' parole with 30 hours' extra duty, and loss of 30 days of privileges.

> <u>Plaintiffs Contend</u>:  We are not aware of evidence that Hefner was placed on 30 days' parole.  Hefner also stated that he had been threatened by others, and could no longer house on this yard.  This fact is also irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. Mr. Hefner's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Mr. Hefner faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

## II.    MEDICAL ALLEGATIONS

19. <u>Defendants Contend</u>: Hefner alleges he reported his September 12, 2006 eye  injury  the next day, and was immediately seen by the doctor.

> <u>Plaintiffs Contend:</u> There is nothing in the record that shows when Hefner reported the accident.  It is also unclear what "immediately" means.  This statement is true to the extent that Hefner was first seen by a nurse and then a doctor on September 12, 2006.

20. <u>Defendants Contend</u>: Soon after the onset of ocular problems, Hefner's condition was diagnosed as narrow angle glaucoma and iritis.

> <u>Plaintiffs Contend:</u> This statement is disputed as to any characterization that Hefner's ocular problems arose only in September 2006.  The statement is

undisputed to the extent that Hefner was diagnosed with acute angle closure glaucoma as early as December 19, 2006, and with Iritis as early as September 14, 2006.

21.   Defendants Contend: There is no medical literature to support Hefner's claim that iritis can be caused by expired eye drops and subsequent records show that this condition was more likely related to a genetic pre-disposition to develop iritis.

Plaintiffs Contend:  This statement is disputed as additional evidence in the record supports a connection between the medication and his iritis.

22.   Defendants Contend:  On September 14, 2006, he was prescribed Pred Forte and scheduled for a follow-up visit on September 18, 2006.

Plaintiffs Contend:  Plaintiffs are unaware of evidence that Mr. Hefner was scheduled for a follow-up visit on September 18, 2006.

23.   Defendants Contend:  Upon his return from the Southwest Eye Center on September 14, 2006, he was seen by Dr. Coons, who ordered him the medication Dr. Walker prescribed, Homatrophine 5%.

Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes this fact and therefore do not stipulate that it is uncontested.

24.   Defendants Contend: A hospital consult record on November 25, 2006 shows that Hefner's eye problems were also not caused by expired medication, but attributable either to an allergic reaction to neomycin or, possibly, acute angle glaucoma.

Plaintiffs Contend:   Hospital consult record only states that Hefner "was put on neomycin eye drops for [eye issues] and then developed an iritis."

25.   Defendants Contend: A lab report dated July 20, 2007, also shows that Hefner is positive for HLA B27, indicating a disease that predisposes him to iritis.

Plaintiffs Contend:  This fact is undisputed to the extent that the lab report notes that Hefner is positive for HLA B27.  The record, however, does not indicate the meaning of this test result nor have the defendants identified

the source of this assertion.

26.     Defendants Contend: Despite his claim that his iritis developed because he received expired eye cream, Hefner testified that he was not sure whether his iritis was caused by a reaction to the medication itself, or because it had expired.

> Plaintiffs Contend:  This fact is disputed because other evidence, including Mr. Hefner's own testimony, suggests that the medication was the cause of the iritis.

27.     Defendants Contend: Subsequent to the onset of symptoms, Hefner received appropriate specialty evaluation and care.

> Plaintiffs Contend:  This fact is disputed based on contrary evidence. Hefner has had ongoing problems with his eyes, and experienced multiple instances of confused and delayed care.

28.     Defendants Contend: The iritis has now resolved and ophthalmologic appraisals note no long-term complications, and Hefner had cataracts in both eyes that were successfully removed.

> Plaintiffs Contend:  This fact is disputed based on contrary evidence. Hefner has had ongoing problems with his eyes, and experienced multiple instances of confused and delayed care.

29.     Defendants Contend: Surgery was completed on Hefner's right eye in November 2008 and his vision is now 20/20.

> Plaintiffs Contend:  This fact is disputed based on contrary evidence. Hefner has had ongoing problems with his eyes, and experienced multiple instances of confused and delayed care.

30.     Defendants Contend: Vision in the left eye was 20/50 in October of 2012, 20/60 in March of 2013.

> Plaintiffs Contend:  This fact is disputed based on contrary evidence.  In May 2013, the vision in his right eye was 20/70.

31.   Defendants Contend: Hefner was treated frequently and adequately, by facility providers, offsite specialists, and at the hospital.

Plaintiffs Contend: Mr. Hefner has identified multiple instances of inadequate or delayed care.

32.   Defendants Contend: On September 14, 2006, Hefner was again seen by Dr. Coons, who noted a possible "chemical reaction" to the neomycin, and submitted an outside consult request for an evaluation for iritis and appropriate medications; Hefner neither reported that the eye cream had expired; nor did the doctor so note.

Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes this fact and therefore do not stipulate that it is uncontested.

33.   Defendants Contend: That same day, Hefner was seen by a specialist at the Southwest Eye Center, where Dr. Walker diagnosed iritis, noting that Hefner may have had an allergic reaction to the plant that went into his right eye.

Plaintiffs Contend:   The comments on the records do not appear to be in Dr. Walker's handwriting.

34.   Defendants Contend: The consult report suggests that the reaction might also have been caused by an allergy to the plant that brushed his right eye.

Plaintiffs Contend: The comments on the records do not appear to be written in the doctor's handwriting, nor do they explicitly address causation.

35.   Defendants Contend: On September 18, 2006, Hefner was seen by Dr. Walker at the Southwest Eye Center for his follow-up, who again diagnosed iritis, adjusted his prescription for Pred Forte 1%, and ordered a follow-up visit in a week.

Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes this fact and therefore do not stipulate that it is uncontested.

36.   Defendants Contend: On October 3, 2006, Hefner was seen for a scheduled follow-up at the Southwest Eye Center, and prescribed Pred Forte 1%.

Plaintiffs Contend:  Evidence suggests that the consult was requested on October 3, 2006, not that he had the appointment that day.

37.    Defendants Contend: On October 3, 2006, upon his return to the facility, he was seen by a registered nurse and a physician's assistant for his right eye, and scheduled for a follow-up at the Southwest Eye Center.

Plaintiffs Contend:   Mr. Hefner was seen on Oct. 13, 2006 by the physician's assistant.   The nurse did not see him, she signed off the instructions.  .

38.    Defendants Contend: On October 4, 2006, PA Underwood requested an outside consult at the Southwest Eye Center with three to four follow-ups for iritis; the request was approved the same day.

Plaintiffs Contend: The referral was approved on Oct. 5, 2006, not the same day as the request.

39.    Defendants Contend: On October 5, 2006, Dr. Coons noted that the ophthalmologist at the Southwest Eye Center found decreased redness in Hefner's eyes.

Plaintiffs Contend: It is unclear from the record as to whether Dr. Coons, or any doctor, noted the decreased redness.  The request is stamped by PA Underwood.

40.    Defendants Contend: Dr. Coons October 4, 2006 request for Hefner to follow-up at the Southwest Eye Center was approved.

Plaintiffs Contend: The requesting physician's signature is not legible and the request is stamped by PA Underwood.

41.    Defendants Contend: On October 11, 2006 Dr. Walker noted that Hefner reported no pain and that the iritis has "slowly resolved," but noted that Hefner continued to have blurred vision and diagnosed posterior Synechiae and "early cataract" in his right eye.

Plaintiffs Contend: The evidence states that iritis is slowly "resolving" not

"resolved."

42.     Defendants Contend: Hefner was then seen by medical staff for his right eye condition twice on November 15, 2006.

> Plaintiffs Contend: It is not clear that these are two distinct appointments; cited document shows notes by nursing assistant and registered nurse 12 minutes apart.

43.     Defendants Contend: On November 24, 2006, the nurse contacted Mount Graham Regional ER, but was informed that there was no ophthalmologist there to treat him, so she telephoned Dr. Walker, who ordered that his eye medications be increased and for him to check back in 24 hours; if his condition had not improved by then, Dr. Walker recommended that he be taken to the ER at St. Mary's Hospital for further evaluation.

> Plaintiffs Contend: Notes in the evidence on this point indicate that Dr. Walker communicated orders through another doctor.

44.     Defendants Contend: He was then taken to St. Joseph's Hospital for emergency laser surgery, and admitted back to St. Mary's for post-operative care.

> Plaintiffs Contend: The evidence Plaintiffs have identified include a third-hand report from a security officer referencing emergency laser surgery, and treatment records from St. Mary's Hospital that do not reference surgery.

45.     Defendants Contend: On November 28, 2006, the day after his discharge from the hospital, a facility progress report shows that Hefner reported he had not received any of his eye drops of medications for "today," and medical staff immediately gave him Alphagan and Pred Forte and referred him to a provider.

> Plaintiffs Contend:  Overstates record. SOAP notes indicate that inmate has not received "any of his eye drops or PO meds today" and that "Inmate to

see provider."

46.     <u>Defendants Contend</u>: On January 31, 2007, Dr. Lewis did not note anything remarkable, and wrote Hefner prescriptions for Alphagan, Pred Forte, and Neosynephrine drops, but not cyclopentolate.

> <u>Plaintiffs Contend</u>:  Name of treating physician unclear; notes record that Hefner stated he did not receive cyclopentolate, indicating the doctor considered that a noteworthy fact.

47.     <u>Defendants Contend</u>: During a search of Hefner's cell on August 27, 2007, staff found cycloplentolate, showing that he had in fact received the medication that he told Dr. Lewis he did not receive.

> <u>Plaintiffs Contend</u>: Defendant overstates record. Presence of medication seven months later does not demonstrate when or how it was prescribed or received.

48.     <u>Defendants Contend</u>: He also had Pred Forte Ophth, and Prednisone, and Ranitidine in his cell.

> <u>Plaintiffs Contend</u>: The document written by the guard says this.

49.     <u>Defendants Contend</u>: On August 26, 2007, a progress report noted that a full bottle of <u>Pred</u> Forte Ophth 1% that expired on 6/14/07 had been confiscated as contraband.

> <u>Plaintiffs Contend</u>:  Evidence suggests the bottle was issued on 6/14/07.

50.     <u>Defendants Contend</u>: A day after his August 21, 2008 cataracts surgery, Dr. Levine recommended that Hefner take Zymar Onimpred, Nevanae QID, gave him samples of them, and prescribed Prednisone.

> <u>Plaintiffs Contend</u>:  Plaintiffs are unaware of any evidence that establishes this fact and therefore do not stipulate that it is uncontested.

51.     <u>Defendants Contend</u>: A SNO dated August 22, 2008, shows that Hefner was permitted to take his eye drops to work with him, showing that he had received his eye medications.

> <u>Plaintiffs Contend:</u>  It is unclear whether Mr. Hefner had received all appropriate eye medications.  A progress note from August 22 indicates he had not received his prescription from August 5, which was for prednisone.

52.     <u>Defendants Contend</u>: Hefner also submitted an HNR on September 4, 2008, that stated he was almost out of Zymar and Nevanac, further showing that he had in fact received these prescribed medications.

> <u>Plaintiffs Contend:</u>  It is disputed whether a refill request demonstrates that Mr. Hefner timely received all previously prescribed medications.

53.     <u>Defendants Contend</u>: In response, he received prescriptions for Zymar that same day, and Nevenac the next day.

> <u>Plaintiffs Contend:</u>  The relevant documents indicate Zymar was filled on 9/5/2008, and do not indicate if or when Nevenac was filled

54.     <u>Defendants Contend</u>: Hefner claims that there was a one-week delay in receiving his medication after his January 29, 2009 consult visit, a progress report shows that he did not bring it to the attention of medical staff until February 5, 2009.  The day after he brought it to their attention, medical staff contacted Dr. Lewis to obtain the prescription order by fax.  Hefner received his medication on February 6, 2009.

> <u>Plaintiffs Contend:</u>  Undisputed that Hefner received his medication on Feb. 6, one week after his January 29 consultation. But, Plaintiffs have not identified anything in the record as to how or when Hefner raised the issue.

55.     <u>Defendants Contend</u>: Hefner further alleges that he has been waiting for three years to see an ophthalmologist despite receiving two referrals from the optometrist and submitting numerous HNRs for recurring eye pain.  Specifically, he claims that he

submitted HNRS between August 2009 and October 2011 describing pain and eye problems, but was not seen by an ophthalmologist and sent to an optometrist instead.

> Plaintiffs Contend:  Hefner's declaration does not say he was sent to an optometrist, but rather he was "on a wait list to see optometry."

56.   Defendants Contend: On August 31, 2009, Hefner was seen by Dr. Polonco, who recommended evaluation by "Opthometric (sic) Mohave building," not ophthalmology.

> Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes this fact and therefore do not stipulate that it is uncontested.

57.   Defendants Contend: He was seen by Optometry the next day.

> Plaintiffs Contend:  The record does not contain evidence of causation.

58.   Defendants Contend: On September 17 and 23, 2009, Hefner was seen by medical, but he did not request to see an ophthalmologist.

> Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes this fact and therefore do not stipulate that it is uncontested.

59.   Defendants Contend: On September 28, 2009, Hefner submitted an HNR complaining of eye pain and incorrectly claiming that the doctor he saw on August 31 (Dr. Polonco) had recommended that he see an eye specialist.

> Plaintiffs Contend:   Plaintiffs dispute any inconsistencies implied by Defendants.

60.   Defendants Contend: He requested a follow-up with Dr. Polonco, and staff responded that the clinical coordinator has been contacted about a referral to ophthalmology and that he would be put in the eye line to be seen again.

> Plaintiffs Contend:  Hefner requested a "follow up."  Evidence Plaintiffs have identified indicates only: "Clinical coordinator for follow-up on referral to ophthalmologist - Pt. seen by provider on 8/31/09."

61.  <u>Defendants Contend</u>: On October 22, 2009, Hefner was seen by the doctor, who recommended a follow-up consultation with "opth."

>  <u>Plaintiffs Contend</u>:  Evidence Plaintiffs have identified indicates only: F/u…ophthalmologist?"

62.  <u>Defendants Contend</u>: The next day, on October 23, 2009, Hefner was seen by optometry for further evaluation, and prescribed new glasses and referred for a consultation evaluation for glaucoma.

>  <u>Plaintiffs Contend</u>:  The evidence Plaintiffs have been able to identify does not reference new glasses.

63.  <u>Defendants Contend</u>: On October 23, 2009, Hefner submitted an HNR, falsely claiming that he had yet to be seen by a doctor despite having submitted numerous HNRs to be seen by a doctor for severe pain in his right eye, blurriness and lightheadedness.

>  <u>Plaintiffs Contend</u>:  Plaintiffs dispute the "falsity" of this request. Undisputed that Hefner filed the cited HNR requesting to be seen by a doctor for severe pain, blurriness and lightheadedness.

64.  <u>Defendants Contend</u>: On November 2, 2009, Dr. Polonco performed an overview report and requested an ophthalmology consult, which was approved on November 20, 2009.

>  <u>Plaintiffs Contend</u>:  The date of Polonco's review is not clear from this document, nor is the date or fact of approval of ophthalmology consult.

65.  <u>Defendants Contend</u>: On December 2, 2009, Hefner submitted a HNR requesting a follow-up visit regarding eye pain, but again he did not request to see an ophthalmologist.

>  <u>Plaintiffs Contend</u>:  This is largely illegible.

66.     <u>Defendants Contend</u>: Dr. Polonco continued to treat Hefner, seeing him twice in December, prescribing him medications and giving him a SNO for a lower bunk bed.

> <u>Plaintiffs Contend</u>: The documents Plaintiffs have been able to identify only show one visit with Dr. Polonco.

67.     <u>Defendants Contend</u>: Hefner never signed an Inmate Outside Consultation Appointment Agreement, and before he could be scheduled with an ophthalmologist, he was released from ADC custody.

> <u>Plaintiffs Contend</u>:  The documents Plaintiffs have been able to identify do not show that Mr. Hefner "never signed" an Outside Consultation Agreement, nor does it discuss Hefner's incarceration history.

68.     <u>Defendants Contend</u>: Hefner did not request to see an eye specialist for his eye pain until August 21, 2011, and in that HNR, he stated that he had problems since 2006 with his right eye, and that it is "now causing me problems" again; staff responded that he is on the list to be scheduled.

> <u>Plaintiffs Contend</u>:  The documents Plaintiffs have been able to identify do not include history of Hefner's previous requests, and the fact that Hefner says his "right eye is now causing [him] problems," does not mean that it is causing him problems for the first time.

69.     <u>Defendants Contend</u>: Hefner submitted an HNR on October 11, 2011, demanding to see an eye specialist, and falsely claiming that he had been told for the past five months that he was on a list, even though he only requested to see an eye specialist on August 21, 2011; staff responded that he is waiting to be scheduled.

> <u>Plaintiffs Contend</u>:  The documents Plaintiffs have been able to identify do not include evidence of the "falsity" of Mr. Hefner's claim and say nothing of Mr. Hefner's previous requests.

70.     Defendants Contend: On December 22, 2011, Hefner was seen by Dr. Patel, who diagnosed acute glaucoma.

      Plaintiffs Contend:  Records are unclear as to the type of glaucoma.

71.     Defendants Contend: He followed up with the ophthalmologist on December 30, 2011.

      Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes this fact and therefore do not stipulate that it is uncontested.

72.     Defendants Contend: Hefner testified that he never refused treatment for his eye, but on January 26, 2012, he refused an eye examination.

      Plaintiffs Contend:  The sentence itself describes a disputed issue of fact. The evidence Plaintiffs have been able to identify is from an outside medical practice not otherwise found in Mr. Hefner's records and does not contain Mr. Hefner's signature or other indication that Mr. Hefner knew of and refused the appointment, nor do Defendants cite an ADC refusal form that would have been signed by Mr. Hefner had he refused the appointment.

73.     Defendants Contend: In response to discovery requests, Hefner later withdrew this claim.

      Plaintiffs Contend:  This fact is misleading because it mischaracterizes Mr. Hefner's response to defendants' discovery requests and because it purports to indicate that the sole reason for any alleged withdrawal of Mr. Hefner's claim was to avoid discovery.  In addition, the evidence cited by Defendants does not support this fact.

74.     Defendants Contend: Hefner's medical records also show that he was seen by an ophthalmologist on March 23, 2012, for problems he allegedly began having with his left eye.

      Plaintiffs Contend: There is no evidence that he "allegedly" had problems; documents state he was having problems with his eye.

75.     Defendants Contend: Hefner was seen by an ophthalmologist on April 13, 2012; April 27, 2012; May 10, 2012; June 14, 2012; September 27, 2012; October 5, 2012; and November 12, 2012.

    Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that Mr. Hefner had appointments on 9/27/2012 or 11/12/2012.

76.     Defendants Contend: Hefner testified that, since 2006, he has seen the doctor numerous times regarding the problem with his right eye and glaucoma.

    Plaintiffs Contend: The number of times Mr. Hefner saw the doctor is immaterial to the adequacy of the healthcare he ultimately received.

77.     Defendants Contend: Hefner does not dispute the medical records that show he was taken to the Southwest Eye Clinic for specialty care eight times in 2006 alone.

    Plaintiffs Contend: The number of times Mr. Hefner saw the doctor is immaterial to the adequacy of the healthcare he ultimately received.

78.     Defendants Contend: Hefner testified that he would not be surprised that he was seen a total of 91 times since 2006 for medical treatment of his eyes.

    Plaintiffs Contend: The number of times Mr. Hefner saw the doctor is immaterial to the adequacy of the healthcare he ultimately received.

79.     Defendants Contend: On March 26, 2011, Hefner was assaulted by three or four inmates, and suffered cuts and abrasions all over his body.

    Plaintiffs Contend:  This statement is disputed as to the number of inmates responsible, but it is undisputed that Mr. Hefner was assaulted by other inmates on March 26, 2011, suffering cuts, abrasions, and injuries causing swelling.

80.     Defendants Contend: Hefner testified that he received a chest x-ray, MRI, and CT scan, all of which were negative for any broken bones or internal injuries.

    Plaintiffs Contend:  Plaintiffs are not aware of evidence establishing that the scans were related to the assault or whether they came out negative.

Hefner was asked generally if he had "ever" had a CT, and he said he did not recall being advised that all tests turned out negative.

81.     Defendants Contend: Hefner claims that after he was treated at the emergency room for injuries from an assault on March 26, 2011, he continued to feel pain and submitted HNRs on April 3, May 3 and May 27, 2011, but did not see a physician for three months, until June 29, 2011, despite submitting "multiple" HNRs. Hefner claims that he was told to be patient in response to these HNRs.s

Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes the dates of the HNRs, but it is undisputed that the Complaint states that Hefner filed multiple HNRs related to pain in the spring of 2011 before seeing a doctor, and that he and other prisoners were told to "be patient" in response to HNRs alleging pain.

82.     Defendants Contend: Hefner testified that after he was released from the hospital, he received follow-up care from medical staff on March 27, 28, 30 and 31, 2011.

Plaintiffs Contend:  Hefner testified only that he remembered going to medical after returning from the hospital, and that a nurse came to his cell. He did not recall the dates or remember four appointments. Further disputed as to the use of "however," as this fact does not conflict with the fact above, which relates to subsequent requests to see medical.

83.     Defendants Contend: On March 30, 2011, Hefner told the doctor he was doing "a lot better," that the x-rays of his ribs and back were negative, and that he was told to watch his urine for bleeding, but that it has been okay.

Plaintiffs Contend:  The record attributes these statements to Hefner.

84.     Defendants Contend: Dr. Milazzo planned to get reports and x-rays from the ER and order a non-contrast CT scan of his abdomen to rule out a spleen injury or fractured ribs.

> Plaintiffs Contend:  The record contains handwritten statements that appear consistent with this fact.

85.    Defendants Contend: On April 3, 2011, Hefner requested a follow-up with the doctor he saw on March 30, and a lower bunk pass, until his injuries healed, but he did not complain of any pain, nor did he describe his ailment; he was scheduled for the nurse line.

> Plaintiffs Contend:  The relevant record does not include reference to any complaints by Mr. Hefner.

86.    Defendants Contend: On May 3, 2011, Hefner submitted a HNR falsely claiming that he had submitted "several" HNRs to be seen and was only placed on the nurse line, and asked to be seen for a follow-up with the doctor he saw on March 31, 2011.

> Plaintiffs Contend:  Plaintiffs have not identified evidence of the "falsity" of Mr. Hefner's claim.

87.    Defendants Contend: Hefner did not submit another HNR as instructed to do on May 3, 2011,  and was transferred to another unit on or around May 24, 2011.

> Plaintiffs Contend:  Record indicates HNRs found at time of intake.

88.    Defendants Contend: On May 27, 2011, Hefner submitted an HNR requesting to have his blood drawn for blood work and to be sent for a CT scan, MRI, or other test to treat severe pain from injuries he received on March 26, 2011; he did not request to see a doctor, but asked for a follow-up.

> Plaintiffs Contend:  This fact is disputed to the extent defendants suggest this statement and a request for follow up on previous doctor's visits constitute not requesting to "see a doctor."  It is undisputed that Hefner submitted an HNR with these requests, stating "I am still in severe pain and have not received proper medical care."

89.     Defendants Contend: In response, he was scheduled for the next available medical appointment.

>       Plaintiffs Contend:  The HNR defendants are referring to notes "scheduled next available," but doesn't confirm that the scheduling actually occurred.

90.     Defendants Contend: On May 3, 2011, Hefner submitted an HNR stating that he brought Prilosec with him for his "acid reflux" and was told that he would receive that medication and a wedge pillow; he did not mention that he had been on a medical diet or needed one.

>       Plaintiffs Contend:  This statement is disputed as to any implication that it was necessary or appropriate for Hefner to raise any diet issues in this HNR.

91.     Defendants Contend: A progress note dated October 25, 2011, shows that Hefner told Dr. Macabuhay that he has problems with GERD and had been taking Prilosec for years;  Hefner did not request a medical diet, and Dr. Macabuhay did not recommend one.

>       Plaintiffs Contend:  This statement is disputed as to any implication that it was necessary or appropriate for Hefner's diet to be addressed on this visit. The remainder of the progress notes appear to address only Hefner's assault injuries.   It is undisputed that the cited document contains a subjective patient history in which Hefner reported his GERD issues to Dr. Macabuhay.

92.     Defendants Contend: Again, there was no request or recommendation for a medical diet to treat his GERD.

>       Plaintiffs Contend:  This statement is disputed as to any implication that it was necessary or appropriate for Hefner's diet to be addressed on this visit.

93.     Defendants Contend: Upon his return to ADC custody on March 14, 2011, he reported no problems of GERD or need for a medical diet.

<u>Plaintiffs Contend</u>:  The records plaintiffs have identified do not establish the source of the problems listed or whether GERD or a medical diet would be properly listed were it reported or note.

94.   <u>Defendants Contend</u>: The Physical Examination Report and Reception Center Screening, and Medical History Report, all dated March 14, 2011, also noted no GERD problem or need for a medical diet.

<u>Plaintiffs Contend</u> :   This statement is disputed to the extent it implies that it was necessary or appropriate to include GERD in these documents.

95.   <u>Defendants Contend</u>: On March 18, 2011, Hefner's Medical Record Review likewise showed no evidence of a GERD condition or need for a medical diet.

<u>Plaintiffs Contend</u>:   Plaintiffs are unaware of the identified medical review that establishes this fact and therefore do not stipulate that it is uncontested.

96.   <u>Defendants Contend</u>: Hefner testified  he bought spicy and oily foods from the commissary.

<u>Plaintiffs Contend</u>:   Undisputed as to the purchases, but disputed as to whether Hefner consumed the food.  He testified he traded these foods.

97.   <u>Defendants Contend</u>: The record of his purchases at the commissary include butter popcorn, spicy refried beans, chili with beans, hot and spicy ramen, spicy beef ramen, and peanut butter.

<u>Plaintiffs Contend</u>:   There is no reference to spicy beef ramen in the document.

98.   <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Hefner had 16 encounters with a nurse.

<u>Plaintiffs Contend</u>:   The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or

not defendants were deliberately indifferent.

99.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Hefner had 2 encounters with a nurse.

Plaintiffs Contend: The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent.

100.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Hefner had 6 encounters with a nurse.

Plaintiffs Contend: The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent.

101.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Hefner had 24 encounters with a nurse.

Plaintiffs Contend: The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent.

102.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Hefner had 4 encounters with a mid-level provider.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the

adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent.

103.   <u>Defendants Contend</u>: Between July 1, 2012 and March 3, 2013, Plaintiff Hefner had 1 encounter with a mid-level provider.

> <u>Plaintiffs Contend:</u> The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent.

104.   <u>Defendants Contend</u>: Between March 4, 2013 and April 1, 2014, Plaintiff Hefner had 2 encounters with a mid-level provider.

> <u>Plaintiffs Contend:</u> The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent.

105.   <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 20 (DSOF ¶¶ 3741-43.)

> Plaintiffs contest this fact because it is incomplete.

106.   <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Hefner had 34 encounters with a physician.

> <u>Plaintiffs Contend:</u> The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent..

107.    <u>Defendants Contend</u>: Between July 1, 2012 and March 3, 2013, Plaintiff Hefner had 5 encounters with a physician.

Plaintiffs Contend: The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent..

108.    <u>Defendants Contend</u>: Between March 4, 2013 and April 1, 2014, Plaintiff Hefner had 7 encounters with a physician.

<u>Plaintiffs Contend:</u> The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent..

109.    <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Hefner had 46 encounters with a physician.

<u>Plaintiffs Contend:</u> The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent..

110.    <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Hefner had 77 encounters with medical staff.

<u>Plaintiffs Contend:</u> The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or

not defendants were deliberately indifferent..

111.   <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Hefner had 2 encounters with a psych associate.

>   <u>Plaintiffs Contend:</u> The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent..

112.   <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Hefner had 2 encounters with a psych associate.

>   <u>Plaintiffs Contend:</u> The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent..

113.   <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Hefner had 4 encounters with a psychologist.

>   <u>Plaintiffs Contend:</u> The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent..

114.   <u>Defendants Contend</u>: Between March 22, 2010 and April 1, 2014, Plaintiff Hefner had 83 encounters with healthcare staff.

>   <u>Plaintiffs Contend:</u> The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the

adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent..

115.    Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Hefner had 9 outside specialty care consultations.

Plaintiffs Contend: The term "consultation" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent.

116.    Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Hefner had 2 outside specialty care consultations.

Plaintiffs Contend: The term "consultation" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent.

117.    Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Hefner had 7 outside specialty care consultations.

Plaintiffs Contend: The term "consultation" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent.

118.    Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Hefner had 18 outside specialty care consultations.

Plaintiffs Contend: The term "consultation" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or

meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not defendants were deliberately indifferent.

119.   <u>Defendants Contend</u>: Between March 22, 2010 and June 30, 2012, Plaintiff Hefner submitted 18 HNRs.

> <u>Plaintiffs Contend:</u>   The number of HNRs Mr. Hefner submitted is immaterial   The filing of an HNR does not ensure that Mr. Hefner received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Hefner did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Hefner received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

120.   <u>Defendants Contend</u>: Between July 1, 2012 and March 3, 2013, Plaintiff Hefner submitted 6 HNRs.

> <u>Plaintiffs Contend:</u>   The number of HNRs Mr. Hefner submitted is immaterial   The filing of an HNR does not ensure that Mr. Hefner received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Hefner did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Hefner received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

121.   <u>Defendants Contend</u>: Between March 4, 2013 and April 1, 2014, Plaintiff Hefner submitted 56 HNRs.

Plaintiffs Contend:   The number of HNRs Mr. Hefner submitted is immaterial.  The filing of an HNR does not ensure that Mr. Hefner received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Hefner did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Hefner received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

122.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Hefner submitted 80 HNRs.

Plaintiffs Contend:   The number of HNRs Mr. Hefner submitted is immaterial.  The filing of an HNR does not ensure that Mr. Hefner received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Hefner did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Hefner received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

123.   Defendants Contend:  Between March 22, 2010 and June 30, 2012, Plaintiff Hefner had 16 encounters with a nurse.

Plaintiffs Contend: The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Hefner had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Hefner ultimately received and whether or not Defendants were deliberately indifferent.

124.   <u>Defendants Contend</u>: Hefner acknowledged that he was treated on the day of the assault at a Yuma hospital, released to a lock-down (protective custody) unit the same day, and then repeatedly seen by ADC medical staff on March 27, 28, 29, 30, and 31 for treatment for injuries from the assault.

<u>Plaintiffs Contend:</u>   Hefner testified that he went to lock-down, not protective custody.  His testimony is unclear whether he remembers going back to medical.  He remembers going back to his cell.  He does not identify dates.

**Exhibit D – Shawn Jensen**
**UNCONTESTED FACTS**

## I.   BACKGROUND

1.     Jensen is currently incarcerated at ASPC-Tucson.

## II.   MEDICAL ALLEGATIONS

4.     Jensen admitted in discovery that between January 3, 2007 and August 11, 2009, he did not submit an HNR requesting a urology consultation.

5.     Jensen did not submit any grievances regarding his medical care between November 2009 and June 2012.

6.     Jensen testified at his deposition that Richard Pratt has intervened to help him with his medical treatment, he regrets that Pratt has been named as a Defendant in this lawsuit, and he agrees that Pratt personally believes that every inmate deserves adequate medical care.

7.     Jensen did not first show an elevated PSA level until August 30, 2006, when his PSA was 7.1.

8.     The initial PSA elevation was followed by a pelvic ultrasound on November 21, 2006.

9.     On November 29, 2006, Jensen's PSA went up to 8.4.

10.     Jensen had labs drawn on January 19, 2007, and his PSA dropped to 7.7.

11.     On June 12, 2009, an outside consult was placed for urology.

12.     On June 22, 2009 Jensen had labs drawn, and his PSA was 9.1.

13.     On August 11, 2009, an outside consult request was placed for a transrectal ultrasound and prostatic needle biopsy.

14.     On August 20, 2009, Jensen was seen by Dr. Lockhart.

15.     Jensen was informed about his lab results and advised of plan of action going forward.

16.     Jensen admits that between January 3, 2007 and August 11, 2009, he did not submit an HNR requesting a urology consultation.

17.     On October 26, 2009, Jensen was sent to his outside appointment for his transurethral ultrasound with prostate needle biopsy.

18.     The pathology result noted an elevated PSA, but it was negative for malignancy.

19.     Jensen returned to ADC on October 27, 2009.

20.     On November 19, 2009, Jensen was seen to discuss the results of his prostate biopsy.

21.     Jensen was informed he had prostate cancer, and advised that the outside consult request for prostatic adenocarcinoma had already been sent.

22.     Jensen conducted research and consulted with an urologist prior to having his prostate removed regarding other treatment options, including using radiation therapy.

23.     Jensen claims that Dr. Cord told him it was too late for radiation treatment to work, but admits that he had a choice with respect to treating the prostate cancer with radiation or having his prostate removed.

24.     Jensen was informed that the radical prostatectomy is an invasive procedure with risks, but claims he was not informed of the risk of incontinence and impotence.

25.     Jensen admits that he did his own research regarding a radical prostatectomy as opposed to radiation therapy and decided to go with the more aggressive form of treatment.

26.     On December 16, 2009, Plaintiff was seen by Dr. Robertson.

27.     His labs and care plan were discussed, and his urology consult was resubmitted.

28.     On February 16, 2010, Jensen had a consult with Advanced Urology Specialists.

29.     Dr. Robertson requested medical staff to come up with a treatment plan for Jensen.

30.     Labs were also drawn on February 16, 2010  to check PSA levels.

31.     On February 16, 2010 Jensen voiced interest in a radical prostatectomy.

32.     On February 17, 2010, his lab results came back and his PSA was at 12.0.

33.     On March 17, 2010, Jensen had labs drawn, and his PSA dropped to 5.0.

34.     A bone scan was conducted on March 30, 2010.

35.     On April 8, 2010, Jensen was seen by Dr. Robertson.

36.     On February 26, 2010, his urology consult was reviewed, a prescription for Degarelix 240 mg was written, and a nuclear scan was ordered.

37.      Degarelix is the GnrH antagonist therapy intended to lower testosterone levels.

38.     Jensen claims that his PSA had been as high as 12 prior to his surgery, but admits that he was unaware that the chemo and hormone therapy he received reduced his PSA level to 1.9 in April 2010 prior to his prostatectomy.

39.     On June 9, 2010, Jensen received another injection of Degarelix.

40.     On July 14, 2010, Jensen received Degarelix subcutaneously.


41.     Jensen had a prostatectomy on July 15, 2010, at Mountain Vista Medical Center with Dr. Cord, who utilized the Da Vinci robotic surgery method.

42.     Upon discharge, he was taught how to take care of his indwelling Foley catheter.

43.     On July 18, 2010, while at Mountain Vista Medical Center, he was seen.

44.     He had no complaints and it was noted that his catheter was draining well.

45.     It was determined that his catheter be maintained for three weeks.

46.     On July 19, 2010, while at Mountain Vista Medical Center, he was seen and had no complains and it was noted his catheter was draining well.

47.     Dr. Cord requested he follow up in three weeks for Foley removal.

48.     Again on July 19, 2010, Jensen was taught how to care for his catheter, and how to use his leg and drainage bag.

49.     On July 30, 2010, Jensen submitted an HNR stating he needs help with his catheter because it is leaking and he cannot control its effects.

50.     Jensen alleges that he experienced extreme difficulty with his catheter and was leaking urine. Additionally, he alleges Assistant Cordova could not ascertain what was causing the leakage and attempted to push the catheter further into Plaintiff Jensen's urethra, which resulted in permanent catastrophic damage to his urethra and bladder, requiring six additional surgeries.

51.     On July 31, 2010, Jensen submitted an HNR alleging his catheter was leaking.

52.     On August 5, 2010, Jensen was sent to Mountain Vista Medical Center.

53.     A cystogram was performed and showed that the catheter was now located anterior and outside the bladder.

54.     He informed doctors that several days prior, one of the nurses at the facility twisted the catheter, manipulated the catheter, and pushed it in further.

55.     On August 5, 2010, at Mountain Vista Medical Center, Dr. Cord replaced Jensen's Foley catheter.

56.     On August 6, 2010, it was noted that Jensen was doing well and the Foley was on traction with clear amber urine.

57.     Jensen returned to ASPC-Tucson on August 9, 2010.

58.     His catheter was draining clear yellow urine and no leakage was noted.

59.     On August 23, 2010, he had a follow up at Accurate Urology.

60.     On August 24, 2010, he was seen at ADC for a follow-up.

61.     On September 9, 2010, Jensen received a cystogram.

62.     He was provided with blue pads in his boxers to keep dry, as some incontinence was expected.

63.     On September 29, 2010, he was seen on the nurse's line for different size catheters.

64.     He stated that he was experiencing some pain urinating.

65.     A urine sample was sent to the lab.

66.     On October 18, 2010, Jensen's labs came back revealing he had a urinary tract infection.

67.     It was determined he had a testicular infection.

68.     At University Physicians Hospital, he received a scrotum ultrasound, and a questionable abscess was found.

69.     It was recommended that he receive a follow up and a biopsy.

70.     He was seen again on October 26, 2010, and stated he felt better and had less pain.

71.     He was seen again on October 27, 2010 for a follow-up.

72.     He stated he had some twinges of pain in his right groin, but they resolved.

73.     Labs were drawn to check his PSA, which was <0.1.

74.     The ultrasound findings were consistent with right epididymoorchitis.

75.     No testicular masses were seen.

76.     On November 4, 2010, Jensen was seen at Accurate Urology complaining of testicle pain.

77.     A call was placed to Mountain Vista radiology for a repeat of the scrotal ultrasound, but there were no openings that day.

78.     It was noted that Jensen would be sent to UMC Tucson to repeat the ultra sound.

79.     On November 17, 2010 Jensen's PSA level was <0.1.

80.     On November 29, 2010, Jensen was seen and complained of right groin pain.

81.     It was noted that Jensen should see urology as soon as possible.

82.     On January 26, 2011, Jensen submitted an HNR and stated his infection may have returned.

83.     He was seen on January 28, 2011 and it was noted his urinary tract infection may be back.

84.     On February 3, 2011, Jensen was seen at Dr. Cord's office.

85.     On February 16, 2011, Jensen's PSA level was <0.1.

86.     The biopsy was negative for malignancy.

87.     On March 14, 2011, an outside consult request was placed for a follow up with Dr. Cord.

88.     Jensen was seen in Dr. Cord's office on March 17, 2011.

89.      It was determined that Jensen had a urinary tract infection and a bladder neck obstruction, and a genital culture was collected.

90.     On April 16, 2011, Jensen submitted an HNR, which stated that subsequent to his last surgery on March 3, there was a series of spasms that originated in his bladder.

91.     On April 18, 2011, he was seen for his bladder spasms.

92.     A follow up was scheduled to ensure the urinary tract infection was resolved.

93.     Jensen was seen again on April 21, 2011, for his spasms.

94.     An outside consult request for urology was sent.

95.     It was determined Plaintiff had a urinary tract infection.

96.     The next day, Plaintiff was seen at Accurate Urology.

97.     Jensen complained of pain in his bladder, reduced urine output, and bladder spasms.

98.     During the cystoscopy, it was noted that the bladder was severely trabeculated.

99.     The bladder was irrigated and chips of tissue were sent to the pathology lab.

100.    The pathology noted evidence of ulceration and marked chronic inflammation.

101.    Jensen returned to ADC on April 23, 2011.

102.    He was instructed not to aggravate the Foley and that it will remain for two weeks.

103.    On April 25, 2011, Jensen was seen for a follow-up.

104.    On May 4, 2011, he was seen for a follow up and his Foley catheter was removed.

105.    On May 19, 2011, Jensen was seen by Christy Smith, A-NP Accurate Urology.

106.    On June 9, 2011, Jensen submitted an HNR, which stated his bladder spasms were occurring again.

107.    He was seen that same day.

108.    A non-formulary drug request was also submitted that day by Dr. Robertson.

109.    On June 20, 2011, a non-formulary drug request for flavaxate was submitted.

110.    It was determined he needed urgent urology surgery and was taken to Mountain Vista Medical Center.

111.    At Mountain Vista Medical Center, he underwent a cystoscopy, transureathral resection and incision of bladder neck.

112.    The finding was a pinpoint bladder neck contracture.

113.    A specimen was taken of bladder neck chips.

114.    The pathology report noted fibromuscular tissue with chronic inflammation and focal multinucleated giant cells.

115.    On June 28, 2011, an outside urology consult was requested for a two week follow up with Dr. Cord.

116.    Jensen was also seen on this date to discuss his last urology visit.

117.    Jensen advised he did not want depends and refused when ADC tried to provide him with them.

118.    On July 5, 2011, Jensen submitted an HNR requested that his catheter be removed.

119.    On July 11, 2011, Jensen's catheter was removed.

120.    He was educated on kegel exercises and bladder training.

121.    On July 22, 2011, Jensen attended a follow-up appointment with Dr. Cord.

122.    During the visit, Jensen stated that his urinary stream had dramatically improved and that he enjoyed using the condom catheter as it prevented leakage.

123.    He no longer had pain related to bladder spasms or incomplete bladder emptying and he felt well.

124.    Symptoms of bladder neck contractures were discussed with Jensen and he was advised to let the clinic know if he began to experience any of those symptoms.

125.    On August 4, 2011, Jensen was seen by medical after reporting bladder spams.

126.    He was diagnosed with a urinary tract infection and Dr. Robertson was notified.

127.    He was prescribed Rocephin and scheduled for a follow up on August 22, 2011.

128.    Jensen was seen on August 8, 2011, and reported he had not had a bladder spasm for two days.

129.    On August 17, 2011, Jensen's PSA level was <0.1.

130.   On August 22, 2011, Jensen was seen regarding the spasms.

131.   On August 28, 2011, Jensen was seen regarding his bladder spasms and sent to University Physicians Hospital for an ultrasound.

132.   Once at the hospital, an ultrasound and bladder scan were done.

133.   The nurse was unable to evidence any abnormal bladder fullness on bladder scan and a bedside ultrasound did not show bladder distention.

134.   Jensen was then transferred to University Medical Center to see urology.

135.   Jensen was admitted to the ER at University Medical Center on August 28, 2011.

136.   On August, 29, 2011, Dr. Fiorello at University Medical Center determined it was unnecessary to admit Jensen at that time, and Jensen was discharged.

137.   On August 29, 2011, Jensen returned to ADC.

138.   On August 30, 2011, Jensen presented at medical complaining of bladder spasms.

139.   Jensen was offered palliative treatment, both for spasms and pain, but Jensen refused.

140.   On September 9, 2011, Jensen was seen at Accurate Urology for a follow up to his ER visit.

141.   On September 15, 2011, Jensen was prescribed Cipro.

142.   On October 15, 2011, Jensen submitted an HNR stating he had an infection in his bladder.

143.   He was seen on October 28, 2011, and it was determined he needed a cystoscopy incision of urethral stricture in six weeks.

144.   Jensen was started on Oxybutinin for his bladder spasms.

145.   Jensen was seen again on October 31, 2011.

146.   Jensen was sent to University Physicians Hospital.

147.   At the hospital, Jensen received a bladder scan and Foley irrigation.

148.   A follow up was scheduled the following week with urology, and he was discharged the same day.

149.   On November 2, 2011 Jensen returned to ADC.

150.   It was determined that his Foley catheter was not functioning, and he was given briefs.

151.   On November 3, 2011, Jensen was seen again and instructed to not manipulate his Foley.

152.   On November 23, 2011, Jensen was seen for a urology consult.

153.   On November 28, 2011, his Foley catheter was removed by the urologist.

154.   He voided 200 cc while in medical.

155.   Jensen was seen on January 10, 2012, and stated he felt good and that the antibiotics were working well.

156.    On February 9, 2012, Jensen was seen at University Physicians Hospital.

157.   A cystoscopy was performed which demonstrated an almost complete occlusion of the anastomotic stricture.

158.   A plan was developed for an augmentation cystoplasty and creation of catheterizable stoma.

159.   On February 29, 2012, an outside consult request was done for an augmentation cystoplasty and creation of a catherizable stoma.

160.   He was interviewed regarding the refusal and reported that he wanted more time to heal before receiving surgery.

161.   Jensen claims that his PSA had been as high as 12 prior to his surgery.  But he admits that he was unaware that the chemo and hormone therapy he received reduced his PSA level to 1.9 in April 2010 prior to his prostatectomy.

162.   Jensen admitted in discovery that between January 3, 2007 and August 11, 2009, he did not submit an HNR requesting a urology consultation.

163.     Jensen did not submit any grievances regarding his medical care between November 2009 and June 2012.

## CONTESTED FACTS

## I.     BACKGROUND

1.     <u>Defendants Contend:</u>   On April 3, 1973, Jensen began his sentence for murder in violation of A.R.S §13-453.

> <u>Plaintiffs Contend:</u>   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.   The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Jensen faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.   See also Plaintiffs' pending motion in limine on this subject matter.

2.     <u>Defendants Contend:</u> On April 11, 1973, Jensen began his sentence for murder in violation of A.R.S. 13-453.

> Plaintiffs Contend:   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.   The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Jensen faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.   See also Plaintiffs' pending motion in limine on this subject matter.

3.      <u>Defendants Contend:</u> Jensen was convicted in 1973 of murdering two teenagers at Saguaro Lake.

> <u>Plaintiffs Contend:</u>  These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Jensen faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.  See also Plaintiffs' pending motion in limine on this subject matter.

4.      <u>Defendants Contend:</u> Jensen claims he was having a Vietnam flashback at the time he shot the two teenagers.

> <u>Plaintiffs Contend:</u> These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Jensen faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

5.      <u>Defendants Contend:</u> Jensen received a life sentence on 4/11/73 for two counts of murder.

> <u>Plaintiffs Contend:</u> These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Jensen faces as a result of the

healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

6.   <u>Defendants Contend:</u> On October 31, 2011, an information report was prepared noting that Jensen was engaging in medical self-care, manipulating staff, and leaving his housing unit to go to another housing unit. (2)

<u>Plaintiffs Contend:</u>  This fact is based on a hearsay statement made by an individual who did not witness the event.  The percipient witness declined to file a report.  Plaintiffs contend that this fact is not accurate or true.

## II.   <u>MEDICAL CLAIMS</u>

5.   <u>Defendants Contend:</u> Jensen testified at his deposition that he submitted a grievance sometime in 2012 regarding receipt of catheters, but other than that one grievance he did not submit any other grievances regarding his treatment for cancer.

<u>Plaintiffs Contend:</u>  This fact does not accurately reflect the testimony Mr. Jensen gave.  Mr. Jensen testified that he did not recall submitting grievances other than the one regarding receipt of catheters but that he could not be sure.

6.   <u>Defendants Contend:</u> Jensen alleges he had six years of highly elevated PSA tests, but was not diagnosed with prostate cancer until October 2009 when it had progressed to Stage 2.

<u>Plaintiffs Contend:</u> This fact does not accurately characterize Mr. Jensen's statements in his declaration.  Nor does this fact accurately reflect the progression of Mr. Jensen's disease, and Plaintiffs' medical expert will refute this characterization.

7.      Defendants Contend: A November 26, 2006 ultrasound showed no prostate masses, and it was noted that the prostate was within normal limits, but that there was a questionable small nodule left pole.

Plaintiffs Contend:  The evidence cited by Defendants does not support the accuracy or veracity of this fact, and Plaintiffs' contest both.

8.      Defendants Contend: Although he was seen on November 29, 2006, the ultrasound results from  two days prior were not yet available.

Plaintiffs Contend:  The evidence cited by Defendants does not support the accuracy or veracity of this fact, and Plaintiffs' contest both.  The document Defendants cite in support of this fact is an undated continuation page.

9.      Defendants Contend: It was noted that if PSA was still high, a consult to urology would be completed.

Plaintiffs Contend: The evidence cited by Defendants does not support the accuracy or veracity of this fact, and Plaintiffs' contest both.  The document Defendants cite in support of this fact is an undated continuation page.

10.      Defendants Contend: On January 3, 2007, Jensen was seen for a follow-up for his elevated PSA levels, and he did not complain of any symptoms.

Plaintiffs Contention: This fact is inaccurate and incomplete, and it does not accurately reflect the contents of Mr. Jensen's medical records.

11.      Defendants Contend: An outside consult request to urology was submitted on January 3, 2007, and  was approved a week later.

Plaintiffs Contend:  This fact inaccurately states the contents of Mr. Jensen's medical record.  While an outside consult requested was "submitted" on January 3, 2007, the same form indicates that it was not even sent to the Control Office until January 15, 2007.

12.     Defendants Contend: On June 12, 2009, Jensen was seen again regarding status of his urology consult, and it was noted that he needed to follow up on elevated PSA levels.

Plaintiffs Contend: This fact inaccurately states the contents of Mr. Jensen's medical record.  In addition, this fact cherry-picks a single fact from a series of facts that when taken as a whole reflect poorly on Defendants.

13.     Defendants Contend: On August 5, 2009, Jensen had a consultation at St. Mary's Hospital for his elevated PSA, and it was determined to proceed with a transrectal ultrasound with prostate needle biopsy.

Plaintiffs Contend:  This fact inaccurately states the contents of Mr. Jensen's medical record and is not supported by the evidence cited by Defendants.

14.     Defendants Contend: It was also noted that Dr. Lockhart asked Jensen why he never advised medical staff that he never went for his urology consult that was scheduled two years ago.

Plaintiffs Contend:  This fact inaccurately states the contents of Mr. Jensen's medical record.

15.     Defendants Contend: On November 10, 2009, the pathology report came back revealing adenocarcinoma.

Plaintiffs Contend:  This fact inaccurately states the contents of Mr. Jensen's medical record. Mr. Jensen was not informed of the results of the pathology report until November 19.

16.     Defendants Contend: On November 19, 2009, Jensen's prostate biopsy for cancer was approved.

Plaintiffs Contend:  Plaintiffs contest this fact because it is unclear to what approval Defendants refer.  The document cited by Defendants in support

of this fact is dated 2009 and does not support this fact as written.   In addition, Plaintiffs contest this fact because it is incomplete.

17.   <u>Defendants Contend:</u> An urgent outside consult request was placed for a prostatic adenocarcinoma.

<u>Plaintiffs Contend:</u>   This fact inaccurately states the contents of Mr. Jensen's medical record and is misleading as to the actual events that occurred. The documents cited by Defendants indicate that, while the request was submitted on November 10, 2009, that request was never acted on and had to be resubmitted on December 16, 2009.

18.   <u>Defendants Contend:</u> At the time of his surgery, his PSA was 1.9.

<u>Plaintiffs Contend:</u>   This fact inaccurately states the contents of Mr. Jensen's medical record.  In addition, this fact cherry-picks a single fact from a series of facts that when taken as a whole reflect poorly on Defendants.

19.   <u>Defendants Contend:</u> Jensen's prostatectomy was successful and the cancer was removed using state of the art da Vinci robotic surgical process.

<u>Plaintiffs Contend:</u>  Plaintiffs' expert will testify that in his expert opinion this fact is false, incomplete, inaccurate.

20.   <u>Defendants Contend:</u> At the time of his deposition, Jensen expressed no complaints or concerns that the surgery had been unsuccessful.

<u>Plaintiffs Contend:</u> This fact is not supported by the evidence Defendants cite, and Plaintiffs contest the accuracy, completeness and veracity of this fact.

21.   <u>Defendants Contend:</u> Jensen alleges he experienced delays in receiving GnrH antagonist therapy (to lower testosterone levels) and did not receive surgery until July 2010.

<u>Plaintiffs Contend:</u>  This fact inaccurately states a causal link between two

events and Plaintiffs dispute its accuracy, foundation and completeness.

22.     <u>Defendants Contend:</u> On April 7, 2010, Jensen received another dose of Degarelix.

> <u>Plaintiffs Contend:</u>   This fact inaccurately states the contents of Mr. Jensen's medical record. There is no indiciation in Mr. Jensen's record about whether this was the first or second dose of this drug.

23.     <u>Defendants Contend:</u> Jensen claims that his third and final injection of GnrH antagonist therapy was two months overdue, despite his submission of multiple HNRs (dated April 5, 2010 and May 5, 2010) and repeated phone calls from his wife.  He further claims that "by the time he had a prostatectomy on July 15, 2010, it was too late for chemotherapy and radiation treatment to work."

> <u>Plaintiffs Contend:</u>   This fact presents an incomplete and inaccurate description of events, and instead presents a version of events cherry-picked by Defendants.

24.     <u>Defendants Contend:</u> On May 5, 2010, medical staff were informed by the pharmacy that Degarelix had been recalled, and as a result, Jensen did not receive this dose.

> <u>Plaintiffs Contend:</u>   This fact is based upon hearsay and Plaintiffs are unaware of any evidence that establishes this fact.

25.     <u>Defendants Contend:</u>  On May 13, 2010, Jensen was administered Degarelix.

> <u>Plaintiffs Contend:</u>   This fact inaccurately states the contents of Mr. Jensen's medical record. Mr. Jensen's medical record indicates that Degrelix was ordered on May 13, 2010, but the chart gives no indication that Mr. Jensen actually received this dose.  To the contrary, the chart note on May 13, 2010 state "to HCP review."

26.     Defendants Contend: On May 19, 2010, Dr. Robertson called the pharmacy related to recall of Degarelix Acetate.

> Plaintiffs Contend:   This fact inaccurately states the contents of Mr. Jensen's medical record. J. Struebing, R.N. called the pharmacy, not Dr. Robertson.

27.     Defendants Contend: The product was not available from the manufacturer due to the recall.

> Plaintiffs Contend:   This fact is based upon hearsay and Plaintiffs are unaware of any evidence that establishes this fact.

28.     Defendants Contend: On May 20, 2010, the pharmacy reported the earliest they could deliver the Degarelix injection is mid-June.

> Plaintiffs Contend:   This fact is based upon hearsay and Plaintiffs are unaware of any evidence that establishes this fact.

29.     Defendants Contend: Jensen was seen regularly prior to being scheduled for his prostatectomy.

> Plaintiffs Contend:   This fact contains conclusory speculation concerning ultimate adjudicative fact.  In addition, the word "regularly" is not defined and is vague.  Plaintiffs further contest this statement to the extent that it sets forth an opinion rather than a fact.

30.     Defendants Contend: Jensen claims that he was unable to walk when he returned to ADC after his prostatectomy, but he admitted that he walked around at the hospital.

> Plaintiffs Contend:    This fact inaccurately summarizes Mr. Jensen's deposition testimony.

31.     Defendants Contend: Jensen also claims that ADC brings inmates back from the hospital sooner than they would be released in the outside world, but he

admitted that he did not know that the average hospital stay for someone undergoing the DaVinci procedure is one night, and that he was in the hospital for longer than one night.

> Plaintiffs Contend:  This fact lacks foundation and inaccurately states Mr. Jensen's deposition testimony.

32.   Defendants Contend: Jensen further claims that he did not receive medical care between his return from the hospital from his July 15, 2010 surgery and August 1, 2010.

> Plaintiffs Contend:  This fact is inaccurate and incomplete.  It is also not supported by the evidence Defendants cite.

33.   Defendants Contend: Jensen's leaking bag was replaced after he submitted and HNR on July 30, 2010.

> Plaintiffs Contend:  This fact is not supported by the evidence Defendants cite, and Plaintiffs contest its accuracy and veracity.  In addition the allegation is vague insofar as Defendants do not specify when, after July 30, 2010, the alleged event took place.

34.   Defendants Contend: Jensen's leaking bag was replaced after he submitted an HNR on July 31, 2010.

> Plaintiffs Contend:  This fact is not supported by the evidence Defendants cite, and Plaintiffs contest its accuracy and veracity.  In addition the allegation is vague insofar as Defendants do not specify when, after July 30, 2010, the alleged event took place.

35.   Defendants Contend: On August 1, 2010, Jensen was seen for his allegations that urine was leaking from his catheter.

> Plaintiffs Contend:  This fact fails to indicate who saw Mr. Jensen regarding his leaking catheter and is therefore incomplete and inaccurate.

36.   Defendants Contend: During this visit, Jensen stated that he "just wanted to take it out."

Plaintiffs Contend:  Plaintiffs dispute the accuracy and veracity of this fact.

37.    Defendants Contend: On August 2, 2010, Jensen was seen for his leaking Foley catheter.

Plaintiffs Contend:  This fact fails to indicate who saw Mr. Jensen regarding his leaking catheter and is therefore incomplete and inaccurate.

38.    Defendants Contend: An irrigation order was obtained and completed.

Plaintiffs Contend:  This fact is vague and fails to identify from whom the order to irrigate was received and by whom it was carried out.  This appointment was when Nursing Assistant Cordova catastrophically injured Mr. Jensen by twisting his urinary catheter and ripping apart his surgery site.  Plaintiffs contest the accuracy, completeness and veracity of this fact.

39.    Defendants Contend: On August 4, 2010, Jensen was seen at Dr. Cord's office.

Plaintiffs Contend:  The evidence cited by Defendants does not support this fact.  Plaintiffs contest its accuracy, completeness, and veracity.

40.    Defendants Contend: This is no objective evidence that a nurse incorrectly manipulated Jensen's catheter.

Plaintiffs Contend:  Plaintiffs dispute this fact as misleading.  There is objective evidence regarding Nursing Assistant Cordova's injurious conduct:  Mr. Jensen's own testimony and Defendants continued inability to identify any other intervening cause that would explain how Mr. Jensen's urinary catheter ended up free-floating in his abdomen with his surgery site completely destroyed.  Nursing Assistant Cordova's failure to note this incident in Mr. Jensen's medical record further supports Plaintiffs Contend that Defendants have exposed Mr. Jensen to a substantial risk of serious harm.  Plaintiffs further dispute this fact because "objective evidence" is undefined and vague.  Plaintiffs do admit that Nursing Assistant Cordova

was not a nurse.

41.    Defendants Contend: There is no documentation that the irrigation of Jensen's catheter was done by an unqualified individual.

Plaintiffs Contend:  Plaintiffs dispute this fact as untrue and unsupported by the evidence in the case, including that evidence Defendants cite in support of this fact.

42.    Defendants Contend: Irrigation of a Foley catheter is within the scope of practice for an R.N. in most jurisdictions.

Plaintiffs Contend:  This fact is misleading and irrelevant.  The individual who performed the irrigation on Mr. Jensen is not a registered nurse.  She is a nursing assistant.  In addition, Plaintiffs dispute this fact because it is a matter of expert opinion, not fact, what is and is not included in the scope of a given professional's practice.  Furthermore, Plaintiffs contest this fact on the ground that the scope of practice "in most jurisdictions"  is irrelevant.

43.    Defendants Contend: Regardless, ADC arranged for a proper surgical procedure to correct the displacement of the Foley catheter.

Plaintiffs Contend: This fact is not supported by the evidence cited by Defendants, and Plaintiffs contest this fact as inaccurate and untrue. There is no evidence that ADC played any role in arranging Mr. Jensen's surgical procedure.  The cited evidence refers only to Dr. Cord's surgery report.

44.    Defendants Contend: On August 9, 2010, Dr. Cord taught Jensen how to care for the Foley, and then he was discharged.

Plaintiffs Contend: The evidence cited by Defendants does not support this fact, and Plaintiffs contest is accuracy. The cited evidence does not indicate who instructed Mr. Jensen on catheter care.

45.     Defendants Contend: On August 23, 2010, it was noted that he was doing very well and the catheter was draining well.

> Plaintiffs Contend:    This fact is incomplete and misleading.  Although a medical chart does state that Jensen was doing well on August 23, 2010, it also states that he was being seen for follow-up care after manipulation of his Foley catheter.

46.     Defendants Contend: No leakage was noted, and an outside consult request to return to Dr. Cord was placed.

> Plaintiffs Contend:  The evidence cited by Defendants does not support this fact, and Plaintiffs contest its accuracy, completeness, and veracity.

47.     Defendants Contend: The September 10, 2010 cystogram was negative for leakage and the catheter was removed.

> Plaintiffs Contend:  This fact is inaccurate and incomplete; further, it is not supported by the evidence that Defendants cite in support. The cited evidence states that "Much of the contrast [dye fluid] leaked around the catheter throughout the filling"  Impression reads: "The exam is somewhat limited due to the inability to distend the bladder and for the patient to actively void.  No evidence of extravasation is seen."

48.     Defendants Contend: On September 29, 2010 he was given ibuprofen and new catheters.

> Plaintiffs Contend:  This fact is inaccurate and untrue.  It is not supported by the evidence Defendants cite in support.

49.     Defendants Contend: On October 14, 2010, Jensen was seen in Dr. Cord's office and expressed that he recently began to experience pain in his right testicle.

> Plaintiffs Contend:  This fact does not accurately reflect the contents of Mr. Jensen's medical records, and Plaintiffs contest it as inaccurate and incomplete. The notes in the evidence cited by Defendants actually state

that the pain "begins in the urethra and radiates to the right testicle."

50.    Defendants Contend: He was provided with condoms and bags and a follow up was scheduled for one month.

Plaintiffs Contend:   This fact is inaccurate and not supported by the evidence Defendants cite in support.

51.    Defendants Contend: On October 18, 2010 he was prescribed Macrobid and Nubain.

Plaintiffs Contend: This fact is incomplete because it does not, nor does the underlying document cited in support, identify the date of these prescriptions.

52.    Defendants Contend: On October 20, 2010, Jensen was seen by Dr. Cord for a follow up to his prostate surgery.

Plaintiffs Contend:   This fact is inaccurate and not supported by the evidence Defendants cite in support.

53.    Defendants Contend: On October 21, 2010, after complaining of testicular pain, he was sent to the emergency room.

Plaintiffs Contend:   This fact does not accurately and completely recount the events surrounding Mr. Jensen's visit to the emergency room.

54.    Defendants Contend: He returned to ADC on October 22, 2010 and was prescribed Cipro and Bactrium.

Plaintiffs Contend:   Plaintiffs contend that this fact is inaccurate and does not correctly recount the contents of Mr. Jensen's medical record. Mr. Jensen's medical record indicates that while Cipro was prescribed on October 22, 2010, ADC did not place an order for the drug until October 25, 2010.

55.    Defendants Contend: He was seen again on October 25, 2010, and he advised he refused to take the Bactrim because he thought he had an allergy.

> Plaintiffs Contend:   Plaintiffs contend that this fact is unnecessarily inflammatory and is untrue.  It is not supported by the evidence cited by Defendants nor is it supported by Mr. Jensen's medical record. Mr. Jensen's external provider charts prior to this date indicate a sulfa allergy. Bactrim does contain sulfamethoxazole.

56.   Defendants Contend:  On October 31, 2011, Jensen was written up for engaging in medical self-care, manipulating staff, and leaving his housing unit to go to another housing unit.

> Plaintiffs Contend:  Plaintiffs dispute the accuracy of this fact given that it is hearsay and based upon a report written by a person who did not witness the event.  The percipient witness declined to write a report.

57.   Defendants Contend:  Plaintiff was seen at Accurate Radiology on November 4, 2010, for right scrotal pain and mass.

> Plaintiffs Contend:  This fact is untrue because it references a facility found nowhere in the document Defendants cited in support.  Mr. Jensen was seen at Accurate Urology.  Moreover, this fact is incomplete and cherry-picks from multiple facts surrounding this event.  Omitted facts include:  a provider's note that he will "will call in Rx for Percocet; he is taking too much Tylenol for pain relief" and that an "Rx for latex-free condom catheters [was] again given to officers to that his wife can be reimbursed for the cost of those she purchased."

58.   Defendants Contend:  On November 4, 2010 an STAT scrotal Ultrasound was sent to Tucson University Medical Center Emergency Department.

> Plaintiffs Contend:   This fact is inaccurate and not supported by the evidence Defendants cite.  Mr. Jensen, not the ultrasound, was sent to Tucson University Medical Center Emergency Department.

59.  <u>Defendants Contend:</u> He was provided with a new prescription for condom catheters.

    <u>Plaintiffs Contend:</u>  This fact is inaccurate and not supported by the evidence Defendants cite. This was not a new prescription, but rather was a replacement prescription because the initial prescription was never acted upon.

60.  <u>Defendants Contend:</u> On November 8, 2010, Jensen was seen for a follow up after University Medical Center and visit to Dr. Cord.

    <u>Plaintiffs Contend:</u>  This fact is inaccurate and not supported by the evidence Defendants cite. Mr. Jensen saw an ADC provider on this date, not Dr. Cord.

61.  <u>Defendants Contend:</u> Jensen reported no added stress.

    <u>Plaintiffs Contend:</u>  Plaintiffs contend that this fact is untrue, inaccurate, incomplete and is not supported by the evidence cited by Defendants. While the nurse noted that Mr. Jensen was able to ambulate with a smooth gait, she also noted that Mr. Jensen's right testicle was "very tender to the touch."

62.  <u>Defendants Contend:</u> On December 28, 2010, Jensen was seen and reported less pain and decreased swelling.

    <u>Plaintiffs Contend:</u>  This fact is inaccurate and is not supported by the evidence Defendants cite. The evidence cited by Defendants refers to an appointment on January 18, 2011.  The notes state only the Mr. Jensen is off pain medication and that his scrotum size is decreased.  There are no other notations regarding pain or decreased swelling.

63.  <u>Defendants Contend:</u> A follow up was scheduled for two months. (139)

    <u>Plaintiffs Contend:</u>  This fact is inaccurate and not supported by the evidence Defendants cite.

64.     Defendants Contend: On January 28, 2011 he was prescribed Cipro and Bactrium DS. (142)

Plaintiffs Contend:  This fact is inaccurate and incomplete, as shown by the evidence Defendants cite. The document cited by Defendants indicates that a nurse originally ordered Bactrim until Mr. Jensen's UA results were in, but subsequently realized that Jensen was allergic to sulfa and then received orders from Dr. Lewis for Cipro instead.

65.     Defendants Contend:  On February 17, 2011, Jensen underwent a cystoscopy at Accurate Urology.

Plaintiffs Contend:  This fact is incomplete and inaccurate as demonstrated by the evidence Defendants cited. Mr. Jensen's medical records include the following full description of the care Mr. Jensen received:  a cystoscopy was attempted, but that the scope "met with a stricture in the very distal urethra."  The doctor then dilated the distal half of the urethra using sounds, but when the scope was reintroduced "it was met with an almost total obstruction at the bladder neck.  Attempts to pass the 16 of 14 F Van Buren sound were unsuccessful."  Due to the obstruction, Dr. Cord planned "an operative intervention with cystoscopy with incision and resection of the bladder neck," a procedure that carried risk of bleeding, infection, adverse anesthesia reaction, injury to organs, and the possibility that it may produce no benefit.

66.     Defendants Contend: On February 25, 2011, Jensen was approved to have an outpatient cystoscopy for bladder neck contracture/urethral stricture at Mountain Vista Medical Center on March 3, 2011.

Plaintiffs Contend: This fact is fact because it fails to specify to what approval it refers.  In addition, the document cited as evidence of this fact by Defendants is undated and of unclear origin.

67.    Defendants Contend: On March 3, 2011, Jensen underwent the surgery and bladder neck chips were sent to pathology.

Plaintiffs Contend:  This fact is vague because it fails to specify what surgery Mr. Jensen underwent. The cited document indicates that Mr. Jensen underwent: (1) cystoscopy, (2) urethral dilation, and (3) transurethral incision and resection of bladder neck.

68.    Defendants Contend: On March 30, 2011, an outside consult request was submitted for a urology follow-up in June.

Plaintiffs Contend:  The evidence cited by Defendants does not fully support the fact as written.

69.    Defendants Contend: Jensen requested tramadol for spasm relief, but admitted the spasms caused no pain.

Plaintiffs Contend:  Plaintiffs contend this fact is inaccurate and incomplete and is not supported by the evidence Defendants cite.

70.    Defendants Contend: On April 18, 2011 his request for tramadol was denied because the drug is not warranted for this condition.

Plaintiffs Contend:  This fact lacks foundation and is contradicted by other evidence contained in Mr. Jensen's medical records.

71.    Defendants Contend: On April 21, 2011 Jensen was sent to University Physicians Hospital for a catheter placement.

Plaintiffs Contend:  This fact is not supported by the evidence cited by Defendants, and Plaintiffs contest its accuracy and completeness. The document cited by Defendants indicates instead that Jensen was seen in UPH emergency department, but chief complaint is "Urinary retention and spasms x3 weeks," and there is no mention of catheterization.

72.    Defendants Contend: The ER doctor did a bladder scan and the PVR was 0.

Plaintiffs Contend:  This fact is not supported by the evidence cited by

Defendants, and Plaintiffs contest its accuracy and completeness.

73.   <u>Defendants Contend:</u> On April 22, 2011 he was sent to Mountain Vista Medical Center for a cystoscopy. (165)

> <u>Plaintiffs Contend:</u>  This fact is inaccurate and incomplete, and it is not supported by the evidence Defendants cite. In addition to the cystoscopy, the document cited by Defendants indicates that Mr. Jensen underwent a "transurethral resection of bladder neck."

74.   <u>Defendants Contend:</u> On April 22, 2011 a French Foley catheter was inserted.

> <u>Plaintiffs Contend:</u>  This fact inaccurately restates the contents of Mr. Jensen's medical record, and Plaintiffs contend that it is inaccurate and incomplete. French indicates the size of a catheter.  There is no such thing as a French Foley catheter.

75.   <u>Defendants Contend:</u> Jensen's April 25, 2011  assessment was within normal limits, and he was scheduled to follow up with uro-surgery in two weeks.

> <u>Plaintiffs Contend:</u>  This fact is inaccurate and is not supported by the evidence Defendants cite. The document cited by Defendants actually indicates that Mr. Jensen was seen by a CNA who was "not able to discern what exact procedure was" because no surgical report was available.

76.   <u>Defendants Contend:</u> On April 25, 2011, Dr. Cord instructed Jensen to remove the catheter on May 4, 2011, if no other complications existed.

> <u>Plaintiffs Contend:</u>  This fact is inaccurate and is not supported by the evidence Defendants cite. The cited evidence does not indicate any contact between Mr. Jensen and Dr. Cord.

77.   <u>Defendants Contend:</u> On May 19, 2011 Jensen was feeling well without dysuria or pain, and he was scheduled for a follow-up in three months.

> <u>Plaintiffs Contend:</u>  This fact is incomplete and inaccurate, and it is not

supported by the evidence cited by Defendants. The proposed treatment plan included a follow-up in three months.  There is no indication this follow-up was scheduled or occurred.

78.    Defendants Contend: On June 23, 2011, Jensen was seen by Dr. Cord at Accurate Urology.

Plaintiffs Contend:  This fact is inaccurate and is not supported by the evidence Defendants cite. Mr. Jensen was seen by Elizabeth Braham, A-NP at Accurate Urology, but was only seen by Dr. Cord when Dr. Cord performed surgery at Mountain Vista Medical Center.

79.    Defendants Contend: Jensen was seen for a follow-up on June 24, 2011; he was doing well and the Foley was draining well.

Plaintiffs Contend:  The term "follow-up" is undefined and vague. Mr. Jensen was seen by Dr. Cord at his discharge.

80.    Defendants Contend: On July 3, 2011, Paul Bosseler, FNP discussed Jensen's care via telephone with Dr. Cord. (

Plaintiffs Contend:  This fact is inaccurate and not supported by the evidence Defendants cite.

81.    Defendants Contend: Jensen admits that on July 22, 2011, he reported that he was no longer having any pain or incomplete bladder emptying.

Plaintiffs Contend:  This fact is inaccurate and incomplete.  It cherry-picks a day when Mr. Jensen did not have bladder spasms but omits the fact that shortly after this date, Mr. Jensen had five days during which he did experience bladder spasms.

82.    Defendants Contend: On August 7, 2011, Jensen submitted an HNR stating that his bladder spasms began again.

Plaintiffs Contend:  This fact is inaccurate and incomplete as it omits the full text of Mr. Jensen's HNR. Mr. Jensen's spasms began again on August

2, 2011.

83.   Defendants Contend: On August 8, 2011 A UA specimen was collected.

Plaintiffs Contend:   This fact is inaccurate and incomplete as it omits the fact that the UA was not analyzed because it was sent to the lab in the wrong container.

84.   Defendants Contend: On August 9, 2011, Jensen submitted an HNR complaining of bladder spasms.

Plaintiffs Contend:   This fact is inaccurate and incomplete as it omits the full text of Mr. Jensen's HNR.

85.   Defendants Contend: On August 22, 2011 it was noted he was not doing his kegel exercises as previously directed, and he was prescribed Oxybutynin.

Plaintiffs Contend:   This fact is inaccurate and incomplete as it omits the full text of Mr. Jensen's HNR.

86.   Defendants Contend: On August 29, 2011 ADC consulted with Dr. Cord, and Jensen was scheduled for urosurgery in one week.

Plaintiffs Contend:   This fact is not supported by the evidence Defendants cite, and Plaintiffs contest is accuracy.

87.   Defendants Contend: On September 9, 2011 it was determined that Jensen had a bladder neck obstruction, microscopic hematuria, and a malignant neoplasm of prostate.

Plaintiffs Contend: The fact does not accurately reflect Mr. Jensen's diagnosis because it omits slowing of urinary stream, which was one Mr. Jensen's four diagnoses.

88.   Defendants Contend: He was instructed to increase his fluids and not drink caffeine, and a follow-up was scheduled for two months.

Plaintiffs Contend:   This fact is inaccurate and untrue, and it is not supported by the evidence Defendant cite.

89.    Defendants Contend: Jensen was seen on September 19, 2011, and he
stated he was feeling well and had not had any spasms since he was in the hospital.

>    Plaintiffs Contend:  The phrase "since he was in the hospital" is undefined
>    and vague, and Plaintiffs dispute the accuracy of this statement.

90.    Defendants Contend: Jensen was having difficulty voiding for a few days
prior to his October 31, 2011 appointment, but did not notify nursing and instead asked
another inmate to use his catheter to "unclog" his own without medical assistance.

>    Plaintiffs Contend:  Plaintiffs' contest this fact as inaccurate, incomplete,
>    and untrue.

91.    Defendants Contend: On November 1, 2011, Jensen presented at medical
stating that there was no urine coming out of the bag and it was leaking around his
catheter.

>    Plaintiffs Contend:  This fact inaccurately reflects the contents of Mr.
>    Jensen's medical record. There is no indication that Mr. Jensen was seen at
>    medical, only that he was interviewed.

92.    Defendants Contend: He was sent to University Physicians Hospital for a
CT scan.

>    Plaintiffs Contend:  This fact inaccurately reflects the contents of Mr.
>    Jensen's medical record.

93.    Defendants Contend: On November 2, 2011 he was instructed to stop doing
"self-medicine," and he responded, "Oh, well."

>    Plaintiffs Contend:  Plaintiffs contest this fact as inaccurate, untrue and
>    lacking foundation.

94.    Defendants Contend: On November 3, 2011 the urologist, Dr. Funk,
informed him that leakage is to be expected, and he would be seen for a follow-up in a
month.

>    Plaintiffs Contend:  This fact inaccurately reflects the contents of Mr.

Jensen's medical record. Based on the evidence cited by Defendants, this fact relates to an appointment Mr. Jensen had with ADC provider Dr. Robertson, not Dr. Funk.

95.     Defendants Contend: A new Foley catheter was inserted, and Jensen was encouraged to drink more fluid.

Plaintiffs Contend:  This fact is inaccurate and incomplete, and does not accurately reflect the contents of Mr. Jensen's medical record. Mr. Jensen underwent surgery, during which a catheter was placed; he did not simply go in for catheter placement as indicated by Defendants.

96.     Defendants Contend: On November 23, 2011, Jensen underwent an incision of stricture at University Physicians Hospital.

Plaintiffs Contend:  This fact is inaccurate and incomplete, and does not accurately reflect the contents of Mr. Jensen's medical record. The proper procedure name, as reflected by Defendants' evidence, is cystourethroscopy, transurethral laser incision of bladder neck, and anastomotic stricture.

97.     Defendants Contend: On December 1, 2011, Jensen reported his output was good.

Plaintiffs Contend:  This fact is inaccurate and lacks foundation.  It is not supported by the evidence Defendants cite. .  The medical record reflects that Mr. Jensen had a good output, but not that he reported that to the provider.

98.     Defendants Contend: On December 6, 2011, Jensen was seen at University Physicians Hospital because he had constant dribbling and was wearing a condom catheter.

Plaintiffs Contend:  This fact is inaccurate and incomplete, and does not accurately reflect the contents of Mr. Jensen's medical record. Defendants'

fact  implies that Mr. Jensen was seen *because* he was wearing a condom cath.  Rather, he was seen because he had trouble urinating; the issues with the condom catheter was simply noted as part of patient history.

99.   Defendants Contend: A repeat cystoscopy was scheduled for six weeks.

Plaintiffs Contend:  This fact is inaccurate and incomplete, and does not accurately reflect the contents of Mr. Jensen's medical record. A repeat cystoscopy was recommended.  There is no evidence that that the procedure was actually scheduled.

100.   Defendants Contend: On December 6, 2011, Jensen attended a urology consult with Dr. Funk.

Plaintiffs Contend:  Plaintiffs' dispute the accuracy and foundation of this statement, and they contest whether the cited document supports the fact as written.

101.   Defendants Contend: On December 9, 2011 a consult for urodynamics and cystoscopy was submitted for 6-8 weeks.

Plaintiffs Contend:  This fact is inaccurate and incomplete, and does not accurately reflect the contents of Mr. Jensen's medical record. There is no evidence that this consult was ever submitted.

102.   Defendants Contend: Jensen was seen by Dr. Robertson on December 15, 2011, and had no complaints.

Plaintiffs Contend:  Plaintiffs' dispute the accuracy and foundation of this statement, and they contest whether the cited document supports the fact as written.

103.   Defendants Contend: On December 16, 2011, he was transferred out of IPC housing and back to general population.

Plaintiffs Contend:  This fact is inaccurate and incomplete, and does not accurately reflect the contents of Mr. Jensen's medical record. Nothing in

the cited evidence indicates when and if this transfer actually occurred.

104.   Defendants Contend: On December 29, 2011, Jensen was seen by Dr. Funk, who recommended a urodynamic study and cystoscopy in 6-8 weeks.

>   Plaintiffs Contend:  This fact is inaccurate and incomplete, and does not accurately reflect the contents of Mr. Jensen's medical record.

105.   Defendants Contend: On January 2, 2012, Jensen presented at medical with complaints of bladder spasms.

>   Plaintiffs Contend:  This fact is inaccurate and incomplete, and does not accurately reflect the contents of Mr. Jensen's medical record.

106.   Defendants Contend: On January 2, 2012 he was diagnosed with a urinary tract infection.

>   Plaintiffs Contend:  This fact is inaccurate and incomplete, and does not accurately reflect the contents of Mr. Jensen's medical record.

107.   Defendants Contend: Jensen was informed that only a urologist should straight cath him.

>   Plaintiffs Contend:  This fact is inaccurate and untrue, and it is not supported by the evidence Defendants cite. Jensen informed the provider that only a urologist should straight cath him, rather than being informed.

108.   Defendants Contend:  Jensen was prescribed Belladonna/Opium and Oxybutynin Chloride for his bladder spasms.

>   Plaintiffs Contend:  This fact is inaccurate and incomplete, and does not accurately reflect the contents of Mr. Jensen's medical record. The cited evidence makes no mention of what the drugs were prescribed for, only that they were prescribed.

109.   Defendants Contend: On January 9, 2012 Jensen acknowledged he was interested in proceeding with the augmentation cystoplasty surgery.

>   Plaintiffs Contend:   The word "interested" is undefined and vague.

Plaintiffs' dispute the foundation and accuracy of this fact.

110. <u>Defendants Contend:</u> On March 14, 2012, Jensen refused the surgery.

<u>Plaintiffs Contend:</u>   Plaintiffs' dispute this fact as inaccurate and inflammatory.  While Jensen choose not to have the surgery, it was based on sound reason and was communicated in advance to ADC.

111. <u>Defendants Contend:</u> Jensen testified at his deposition that he submitted a grievance sometime in 2012 regarding receipt of catheters, but other than that one grievance he did not submit any other grievances regarding his treatment for cancer.

<u>Plaintiffs Contend:</u>   This fact misstates Mr. Jensen's testimony and is inaccurate and incomplete.

112. <u>Defendants Contend:</u> Beginning on November 2, 2010, Jensen received one catheter every other day until November 12, 2010.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

113. <u>Defendants Contend:</u> On November 12, 2010, Jensen received seven catheters every Thursday and then as needed.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices

necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

114.   <u>Defendants Contend:</u> Seven condom catheters were provided to Jensen on November 25, 2010.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

115.   <u>Defendants Contend:</u> On December 17, 2010, seven condom catheters were provided to Jensen.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

116.   <u>Defendants Contend:</u> On January 28, 2010, Jensen was provided with 8 condom catheters.

      <u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

117.   <u>Defendants Contend:</u> On February 1, 2011, Jensen was provided with 7 condom catheters.

      <u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

118.   <u>Defendants Contend:</u> On February 4, 2011, Jensen was provided with nine condom catheters.

      <u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not

account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

119.   <u>Defendants Contend:</u> On February 8, 2011, Jensen was provided with 9 condom catheters.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

120.   <u>Defendants Contend:</u> On February 15, 2011, Jensen was provided with 10 condom catheters.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide

them to him.

121.   <u>Defendants Contend:</u> On February 18, 2011, Jensen was provided with eight condom catheters.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

122.   <u>Defendants Contend:</u> On February 22, 2011, Jensen was provided with 9 condom catheters.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

123.   <u>Defendants Contend:</u> On February 25, 2011, Jensen was provided with 9 condom catheters.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement

containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

124.    Defendants Contend: On March 18, 2011, Jensen was provided with 5 condom catheters.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

125.    Defendants Contend: On March 22, 2011, Jensen was provided with 6 condom catheters.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced

to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

126.   <u>Defendants Contend:</u> On March 29, 2011, Jensen was provided with 6 condom catheters.

> <u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

127.   <u>Defendants Contend:</u> On April 1, 2011, Jensen was provided with 6 condom catheters.

> <u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

128.   <u>Defendants Contend:</u> On April 3, 2011, Jensen was provided with 6 condom catheters.

> <u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr.

Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

129.   Defendants Contend:  On April 8, 2011, Jensen was provided with 8 condom catheters.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

130.   Defendants Contend:  On April 14, 2011, Jensen was provided with 8 condom catheters.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the

number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

131.   Defendants Contend: On April 19, 2011, Jensen was provided with 8 condom catheters.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

132.   Defendants Contend: On May 6, 2011, Jensen received 5 condom catheters.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

133.   Defendants Contend: On May 11, 2011, Jensen received 6 condom catheters.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr.

Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

134.   <u>Defendants Contend:</u> On May 20, 2011, Jensen was provided with 6 condom catheters.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

135.   <u>Defendants Contend:</u> On May 27, 2011, Jensen was provided with 8 condom catheters.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the

number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

136.  Defendants Contend: On June 1, 2011, Jensen was provided with 8 condom catheters.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

137.  Defendants Contend: On June 21, 2011, Jensen was provided with 6 condom catheters.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

138.  Defendants Contend: On November 11, 2010, Jensen verbalized that he had an adequate supply of condom catheters.

> Plaintiffs Contend:  This fact is incomplete and inaccurate based on the totality of the circumstances surrounding Mr. Jensen's supply of catheters.

139.   Defendants Contend: On July 3, 2011, Jensen was prescribed one catheter daily.

> Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

140.   Defendants Contend: On July 28, 2011, Jensen was prescribed catheters biweekly (every 14 days).

> Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

141.   Defendants Contend: On August 25, 2011, Jensen was prescribed condom catheters bi-weekly.

> Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr.

Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

142.    <u>Defendants Contend:</u>  On September 8, 2011, Jensen was prescribed condom catheters biweekly.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

143.    <u>Defendants Contend:</u>  On September 23, 2011, Jensen was prescribed condom catheter supplies biweekly.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the

number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

144.   <u>Defendants Contend:</u> On October 6, 2011, Jensen was prescribed condom catheters biweekly.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

145.   <u>Defendants Contend:</u> On October 20, 2011, Jensen was prescribed condom catheters biweekly.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

146.   <u>Defendants Contend:</u> On December 19, 2011, Jensen was provided two condom catheters.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

147.   Defendants Contend: On December 24, 2011, Jensen was provided with three condom catheters.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

148.   Defendants Contend: On December 28, 2011, Jensen was provided with two condom catheters.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following

his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

149.  Defendants Contend: On January 2, 2012, Jensen was provided with two condom catheters.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

150.  Defendants Contend: On January 5, 2012, Jensen was provided with 7 condom catheters.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

151.   <u>Defendants Contend:</u> On January 12, 2012, Jensen received two condom catheters.

>    <u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

152.   <u>Defendants Contend:</u> On January 19, 2010, Jensen received seven condom catheters.

>    <u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

153.   <u>Defendants Contend:</u> On January 26, 2012, Jensen received seven condom catheters.

>    <u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not

account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete. Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

154. <u>Defendants Contend:</u> On February 21, 2012, Jensen was provided with 7 condom catheters.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them. A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete. Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

155. <u>Defendants Contend:</u> On February 27, 2012, Jensen was prescribed condom catheters biweekly.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them. A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete. Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide

them to him.

156.   <u>Defendants Contend:</u> On March 26, 2012, Jensen was prescribed condom catheters every 14 days.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

157.   <u>Defendants Contend:</u> On April 9, 2012, Jensen was prescribed condom catheters every 14 days.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

158.   <u>Defendants Contend:</u> On April 23, 2012, Jensen was prescribed condom catheters every fourteen days.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement

containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

159.    <u>Defendants Contend:</u> On May 5, 2012, Jensen was provided with condom catheters every 14 days.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

160.    <u>Defendants Contend:</u> On May 21, 2012, Jensen was prescribed condom catheters every 14 days.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced

to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

161.   Defendants Contend: On June 4, 2012, Jensen was prescribed condom catheters every 14 days.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

162.   Defendants Contend: On June 18, 2012, Jensen was prescribed condom catheters every 14 days.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

163.   Defendants Contend: On July 2, 2012, Jensen was prescribed condom catheters every 14 days.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr.

Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

164.   <u>Defendants Contend:</u> On July 6, 2012, Jensen was prescribed condom catheters every 14 days.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

165.   <u>Defendants Contend:</u> On July 30, 2012, Jensen was prescribed condom catheters every 14 days.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the

number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

166. <u>Defendants Contend:</u> On August 14, 2012, Jensen was prescribed condom catheters every fourteen days.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

167. <u>Defendants Contend:</u> On August 28, 2012, Jensen was prescribed condom catheters every 14 days.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

168. <u>Defendants Contend:</u> On September 12, 2012, Jensen was prescribed condom catheters every 14 days.

> Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

169.   Defendants Contend: On September 26, 2012, Jensen was prescribed condom catheters every 14 days.

> Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

170.   Defendants Contend: On October 11, 2012, Jensen was prescribed condom catheters every 14 days.

> Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following

his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

171.   Defendants Contend: On October 24, 2012, Jensen was prescribed condom catheters every 14 days.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

172.   Defendants Contend: On November 6, 2012, Jensen was prescribed with condom catheters every fourteen days.

Plaintiffs Contend:  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

173.   <u>Defendants Contend:</u> On November 21, 2012, Jensen was prescribed condom catheters every 14 days.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

174.   <u>Defendants Contend:</u> On December 4, 20120, Jensen was prescribed with condom catheters every 14 days.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

175.   <u>Defendants Contend:</u> On December 18, 2012, Jensen was prescribed with condom catheters every 14 days.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not

account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

176.  <u>Defendants Contend:</u> Thereafter, Jensen was prescribed with condom catheters every fourteen days.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

177.  <u>Defendants Contend:</u> On January 2, 2013, Jensen was prescribed with condom catheters every 14 days.

<u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide

them to him.

178.   <u>Defendants Contend:</u> On January 29, 2013, Jensen was prescribed with condom catheters every 14 days.

> <u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

179.   <u>Defendants Contend:</u> On February 27, 2013, Jensen received a two-week supply of condom catheters.

> <u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

180.   <u>Defendants Contend:</u> On March 13, 2013, Jensen received a two week supply of condom catheters.

> <u>Plaintiffs Contend:</u>  Mr. Jensen's wife supplied many of the catheters Mr. Jensen used because ADC refused or failed to provide them.  A statement

containing only the number of catheters Mr. Jensen received does not account for ADC's failure to provide Mr. Jensen with the medical devices necessary to recover from his surgery and to continue to survive following his recovery and is inaccurate and incomplete.  Plaintiffs also dispute the number of catheters Mr. Jensen was provided, as he frequently was forced to re-use unsterile catheters as a result of ADC's failure to timely provide them to him.

181.    Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Jensen submitted 22 HNRs.

Plaintiffs Contend:  Plaintiffs contend that the number of HNRs Mr. Jensen submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Jensen received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Jensen did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Jensen received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

182.    Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Jensen submitted 1 HNR.

Plaintiffs Contend:  Plaintiffs contend that the number of HNRs Mr. Jensen submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Jensen received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Jensen did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Jensen received healthcare or the quality of

that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

183.  Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Jensen submitted 10 HNRs.

Plaintiffs Contend:  Plaintiffs contend that the number of HNRs Mr. Jensen submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Jensen received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Jensen did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Jensen received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

184.  Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Jensen submitted 33 HNRs.

Plaintiffs Contend:  Plaintiffs contend that the number of HNRs Mr. Jensen submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Jensen received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Jensen did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Jensen received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated

previously filed HNRs.

185.    Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Jensen had 123 encounters with a nurse.

>    Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

186.    Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Jensen had 18 encounters with a nurse.

>    Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

187.    Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Jensen had 9 encounters with a nurse.

>    Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

188.    Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Jensen had 150 encounters with a nurse.

>    Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is

immaterial to the adequacy of the healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

189.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Jensen had 7 encounters with a mid-level provider.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

190.   <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Jensen had 20 encounters with a mid-level provider.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

191.   <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Jensen had 27 encounters with a mid-level provider.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

192.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Jensen had 26 encounters with a physician.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions,

appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

193.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Jensen had 4 encounters with a physician.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

194.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Jensen had 5 encounters with a physician.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

195.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Jensen had 35 encounters with a physician.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

196.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Jensen had 212 encounters with medical staff.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague.

Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

197.    <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Jensen had 1 chronic care appointments.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

198.    <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Jensen had 4 chronic care appointments.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "chronic care appointment" is vague as it fails to identify a facility, provider, date of appointment, or treatment received.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

199.    <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Jensen had 5 chronic care appointments.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "chronic care appointment" is vague as it fails to identify a facility, provider, date of appointment, or treatment received.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the

healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

200.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Jensen had 20 outside specialty care consultations.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "outside specialty consultations" is vague as it fails to identify a facility, provider, date of appointment, or treatment received.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

201.   <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Jensen had 18 outside specialty care consultations.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "outside specialty consultations" is vague as it fails to identify a facility, provider, date of appointment, or treatment received.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

202.   <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Jensen had 38 outside specialty care consultations.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "outside specialty consultations" is vague as it fails to identify a facility, provider, date of appointment, or treatment received.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Jensen had with healthcare professionals is immaterial to the adequacy of the

healthcare Mr. Jensen ultimately received and whether or not defendants were deliberately indifferent.

203.   Defendants Contend: Between 2007 and March 12, 2009 (when he was seen regarding his elevated PSA levels), Jensen failed to submit any HNRs regarding the urology consultation and never advised medical staff of the fact that he never had gone to his urology consult.

> Plaintiffs Contend:  This fact inappropriately places the onus for directing his own healthcare on Mr. Jensen rather than on qualified medical professionals.  Mr. Jensen has routinely stated that he did not understand, nor was he told by an ADC provider, the import of his elevated PSA levels. To that extent, this fact is inaccurate and lacks foundation.

204.   Defendants Contend: Jensen concedes that "for the last 21 months compared to the previous 16 months of suffering and repeated operations, I'm functional, I'm healthy…."

> Plaintiffs Contend:  This fact is inappropriately inflammatory and omits context that gives it full meaning.  Plaintiffs therefore dispute this fact on the basis that it is inaccurate and incomplete.

**Exhibit E – Desiree Licci**
**UNCONTESTED FACTS**

## I.      BACKGROUND

1.      Licci is currently incarcerated at ASPC-Perryville.

## II.      MEDICAL ALLEGATIONS

2.      During that time she was tested for breast cancer.

3.      On November 9, 2010, Licci had labs drawn.

4.      On November 30, 2010, Dr. Lockhart reviewed Licci's labs and noted her ammonia levels were elevated.

5.      She was seen on December 14, 2010.

6.      She was seen by a nurse on January 6, 2011.

7.      On February 13, 2011, Licci submitted an HNR regarding pain and continuous ringing in her ears.

8.      On February 23, 2011, Licci had labs drawn.

9.      On March 3, 2011, Licci was seen for a follow up on her ears.

10.      Licci also complained of diarrhea on this date, and so her lactulose was increased and she was given extra toilet paper and briefs.

11.      On May 18, 2011, Dr. Lockhart submitted an outside consult request to oncology.

12.      On May 24, 2011, Licci was seen by Dr. Enciso and a pap smear was done.

13.      On May 24, 2011, Dr. Enciso placed an outside consult for mammography.

14.      On May 26, 2011, Licci's pap smear came back negative for intraepithelial lesion and malignancy.

15.      Within an HNR dated June 16, 2011, she noted, "Thanks for all you are doing."

16.      On June 17, 2011, Licci received a mammogram that revealed a mod fibroglandular pattern within the corpora of both breasts.

17.     On June 21, 2011, Licci had labs drawn.

18.     On July 31, 2011, Licci submitted an HNR for trouble with nausea, not eating, and vomiting.

19.     On August 23, 2011, Dr. Irving also placed an outside consult for an abdominal ultrasound, which was approved two days later.

20.     She was scheduled to see the provider on August 4, and was seen by a nurse on August 3, 2011 and Dr. Lockhart on August 4, 2011.

21.     On August 30, 2011, Licci was seen for intractable nausea and vomiting.

22.     On August 30, 2011, a non-formulary drug request was also placed for Ondanesetron, which was approved.

23.     On September 6, 2011, Licci had an ultrasound of her abdomen at Insight Imaging and the impression was negative.

24.     On September 13, 2011, Licci was seen again and it was noted her CT scan did not reveal rectal lesion and that it needed to be repeated with contrast.

25.     The same day, an outside consult request was placed for Licci to have a port-a-cath because she had no venous access.

26.     On September 27, 2011, Licci was sent to St. Luke's Medical Center for a CT of her abdomen and pelvis.

27.     On September 27, 2011, Licci also received a chest port placement while at St. Luke's.

28.     On September 29, 2011, Licci was sent to Affiliated Southwest Surgeons for a consultation.

29.     It was noted there was a cervical mass on the CT and an anterior submucosal mass on the rectal exam.

30.     A colonoscopy was recommended for further evaluation of colon and rectum.

31.     A GYN consult was also recommended.

32.     On October 18, 2011, Licci was seen by Dr. Enciso for a follow up to her CT of her abdomen and pelvis.

33.     The pelvic scan showed heterogeneous enlarged uterus and an enlarged ovarian cyst; both ovaries were within normal size.

34.     A request for a pelvic ultrasound was placed.

35.     On November 21, 2011, Licci was sent to Arrowhead hospital for a colonoscopy.

36.     On December 6, 2011, medical staff met with Licci to determine what imaging was needed to identify a pelvic mass if there is one.

37.     On December 28, 2011, Licci submitted an HNR noting that Banner Imaging did not have anyone who was certified to access an IV port and they did not have the proper equipment to do so.

38.     On January 6, 2012, Licci was seen by Dr. Lockhart and he noted an MRI with contrast was necessary to further define the cervical mass and that Licci should have an OBGYN exam to feel the mass.

39.     On January 13, 2012, Licci received an MRI of her pelvis with and without contrast.

40.     On January 20, 2012, Licci was seen for a follow up by Dr. Lockhart regarding her "various concerns related to her cancer history."

41.     He ordered a mammogram and dermatology consult, and noted they are awaiting the MRI results from last week and that there was a variegated lesion on her med right back.

42.     On February 3, 2012, Licci was seen by Dr. Lockhart for a follow-up regarding her general medical concerns associated with her pelvic mass.

43.     Dr. Lockhart noted that he called radiology at Tempe St. Luke's and discussed the MRI report with Licci.

44.     On February 7, 2012, Licci had labs drawn.

45.     On February 21, 2012, an outside consult was placed for an ultrasound of Licci's pelvis.

46.     On February 28, 2012, Licci was seen by Dr. Enciso for possible gynecological problems.

47.     Dr. Enciso noted that Licci requested a biopsy, hysterectomy, and removal of her ovaries.

48.     No discrete or dominant masses were felt in her breasts, and no vaginal mass could be appreciated.

49.      There was a healed incision scar on the inner surface of the right thigh, but no mass could be felt around it.

50.     Her GYN and colonoscopy were also negative for any mass.

51.     On March 5, 2012 the provider, R. Rodriguez, noted that although a mass had been ruled out, Licci was still not convinced.

52.     On April 11, 2012, Licci had a pelvic ultrasound at Insight Imaging.

53.     On May 14, 2012, Licci was seen regarding nausea, abdominal bloating, cramping and problems with bowel movements.

54.     There was a soft mass at the 4 o'clock position.

55.     On May 29, 2012, Licci was seen for a follow up on her pelvic ultrasound.

56.     On August 9, 2012, Licci submitted an HNR complaining she had not had a bowel movement in 10 days, itchy skin, bad taste in her mouth, extreme fatigue, and abdominal pain.

57.     On August 15, 2012, Licci was seen for her constipation.

58.     On October 8, 2012, Licci had labs drawn.

59.     On November 29, 2012, an outside consult request was written for a pelvic ultrasound due to her constipation issues.

60.     On March 28, 2013, an outside consult was placed for OB/GYN Surgery.

61.     It was denied on April 1, 2014, because "there is no clear indication for surgery of a 'pelvic mass.'  Ultrasound shows simple cyst."

62.     On June 10, 2013, it was noted she has a long history of possible rectal mass and constipation, but inconsistent findings have been found on ultrasound, CT, MRI, and colonoscopy.

63.     On June 12, 2013, Licci was referred to GYN surgery evaluation.

## CONTESTED FACTS

## I.     BACKGROUND AND DISCIPLINARY HISTORY

1.      <u>Defendants Contend:</u>   On August 11, 1999, Licci began serving her sentence for theft (multiple) in violation of A.R.S. §§ 13-801, 13-802.

> <u>Plaintiffs Contend:</u> This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact has no tendency to make it more or less probable that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Licci faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and its probative value is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

2.      <u>Defendants Contend:</u> On November 24, 1999 Licci began serving her sentence for trafficking stolen property in violation of A.R.S. § 13-610.

> <u>Plaintiffs Contend:</u> This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact has no tendency to make it more or less probable that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Licci faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial,  and  its  probative  value  is  substantially  outweighed  by  its

prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403. Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

3.      Defendants Contend:  On May 4, 2004, Licci began serving her sentence for theft in violation of A.R.S. §§ 13-801, 13002.

Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact has no tendency to make it more or less probable that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Licci faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and its probative value is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

4.      Defendants Contend:  On July 22, 2009, Licci pled guilty to armed robbery in violation of A.R.S. § 13-1904.  She was sentenced on August 26, 2009.

Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact has no tendency to make it more or less probable that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Licci faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and its probative value is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

5.      <u>Defendants Contend:</u> Although Licci has been incarcerated multiple times for various theft-related convictions, she is currently serving a 7-year sentence for her armed robbery conviction in 2009.

> <u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact has no tendency to make it more or less probable that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Licci faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and its probative value is substantially outweighed by is prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

6.      <u>Defendants Contend:</u> On December 5, 2009, Licci was given a verbal reprimand for failing to appear at pill call.

> <u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Licci's disciplinary record is not at issue in this litigation and does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Licci faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and its probative value is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

7.      <u>Defendants Contend:</u> On February 16, 2010, Licci was disciplined for threatening another person with harm in the kitchen.

> <u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Licci's disciplinary record is not at issue in this litigation and does not make it more or less likely that

Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Licci faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and its probative value is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

## II.    <u>MEDICAL ALLEGATIONS</u>

8.    <u>Defendants Contend:</u> Licci was in and out of prison from 2004 and 2009.

<u>Plaintiffs Contend:</u>  That this fact is inaccurate because Ms. Licci was not in and out of prison between 2004 and 2009. Plaintiffs also contend that this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact has no tendency to make it more or less probable that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Licci faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and its probative value is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

9.    <u>Defendants Contend:</u> She was not tested for ovarian cancer or for any masses in her body while she was in and out of prison from 2004-2009.

<u>Plaintiffs Contend:</u>  That this fact is inaccurate to the extent that it implies that Ms. Licci was out of prison between 2004 and 2009.  Plaintiffs also contend that this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact has no tendency to make it more or less probable that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Licci faces as a result of the healthcare provided by the ADC.

10.     Defendants Contend: Licci admits that she is bringing suit because she disagrees with the type of medical treatment that is being provided to her.

> Plaintiffs Contend:   That this fact is inaccurate to the extent it mischaracterizes Ms. Licci's deposition testimony.  Ms. Licci testified that three doctors agreed that she needed surgery and wrote consults, but ADC did not honor them.

11.     Defendants Contend: For example, Licci believes that biopsies should have been done on her cysts, even though her doctors do not believe they are necessary.

> Plaintiffs Contend:   That this fact is inaccurate to the extent it mischaracterizes Ms. Licci's deposition testimony.

12.     Defendants Contend: Throughout her time in custody, Licci has been seen on a regular basis by the facility providers.

> Plaintiffs Contend:  That the phrase "regular basis" is undefined and vague. Plaintiffs further contest this statement to the extent that it sets forth an opinion rather than a fact.  Plaintiffs further contend that the number of times she was seen by providers is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants were deliberately different.

13.     Defendants Contend: Extensive efforts have been made to diagnose Licci's medical conditions and address her concern about possible recurrence of her cancer from 2001.

> Plaintiffs Contend:  That the phrase "extensive efforts" is undefined and vague.  Plaintiffs further contest this statement to the extent that it sets forth an opinion rather than a fact.

14.     Defendants Contend: On December 12, 2010, Licci submitted an HNR complaining of pain in her stomach.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the HNR Ms. Licci submitted on December 12, 2010.

15.    Defendants Contend: On January 4, 2011, Licci submitted an HNR complaining of ringing in her ears.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the HNR Ms. Licci submitted on January 4, 2011.

16.    Defendants Contend: She was treated the same day for her ear problem.

Plaintiffs Contend:  That this fact is inaccurate because Ms. Licci was not treated on January 6, 2011 for her ear problem.

17.    Defendants Contend: On April 13, 2011, Licci was seen by Dr. Lockhart after she reported a breast mass from her own self-exam.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe why Ms. Licci was seen by Dr. Lockhart.

18.    Defendants Contend: On May 10, 2011, Licci was seen after complaining of a "lump in neck."

Plaintiffs Contend:  That this fact is inaccurate because Ms. Licci was not seen on May 10, 2011 for a "lump in neck."

19.    Defendants Contend: Nurse Bankson noted that it was difficult to find what Licci was describing, but  Licci insisted she needed an immediate biopsy.

Plaintiffs Contend:  That this fact is inaccurate because Nurse Bankson did not see Ms. Licci  on May 10, 2011.

20.    Defendants Contend: On May 14, 2011, Licci submitted five HNRs complaining of a growth in her cervix, lump in her upper right arm, lumps in her breast, problems with her ammonia levels, and dermatofibrosarcoma.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the HNRs Ms. Licci submitted on May 14, 2011.

21.   Defendants Contend: In response, she was scheduled to see Dr. Enciso, advised her ammonia levels were normal, written a consult for oncology, and advised that although she never brought up her lumps in her left breast, she would be seen by Dr. Enciso.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the responses to Ms. Licci's HNRs.

22.   Defendants Contend: On May 18, 2011, Licci was seen by Dr. Lockhart who addressed all five of her HNRs.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of Dr. Lockhart's notes in Ms. Licci's medical record.

23.   Defendants Contend: Dr. Lockhart also noted that "she writes these as if we ignore her problems, there are certain issues to be addressed (next) visit due to time constraints, as priority."

> Plaintiffs Contend:  That this fact is inaccurate because it misquotes Dr. Lockhart's notes.

24.   Defendants Contend: On May 18, 2011, labs were ordered, and a follow up on dermatofibrosarcoma was done.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of Dr. Lockhart's notes in Ms. Licci's medical record.

25.   Defendants Contend: On May 24, 2011, Dr. Enciso noted Licci has had negative pap smears since 1989, there was no discrete or dominant mass and no axillary nodes were felt, and an otherwise unremarkable finding on exam.

>Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of Dr. Enciso's notes in Ms. Licci's medical record.

26.    Defendants Contend: On June 15, 2011, Dr. Lockhart placed outside consults for ophthal for enlarging lesion in her right eye lid, audiology for ringing in her ears, oncology because Licci was concerned there had been incomplete follow up on her cancer, and an outside request for oral surgery to excise and biopsy lesion in lingual area of her left mandible.

>Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the consults requested by Dr. Lockhart and Dr. Davis.

27.    Defendants Contend: On June 16, 2011, Licci submitted an HNR stating the lump the doctor could not feel had come back and that it was not visible at the time of her exam because her arm was in a different position.

>Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the HNR Ms. Licci submitted on June 16, 2011.

28.    Defendants Contend: On June 16, 2011, Licci was seen by Dr. Lockhart for a follow up.

>Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe what occurred when Ms. Licci saw Dr. Lockhart on June 16, 2011.

29.    Defendants Contend:  On August 8, 2011, Licci submitted an HNR regarding nausea and was scheduled for a follow-up.

>Plaintiffs Contend:  That this fact is inaccurate because Ms. Licci submitted the HNR on August 7, 2011.  Plaintiffs further contend that this fact is

misleading because it does not indicate that Ms. Licci was scheduled to be seen by a nurse.

30.   Defendants Contend: On August 12, 2011, Licci was seen on the nurse's line, and stated she was feeling better and able to keep food down.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the nurse's notes in Ms. Licci's medical record.

31.   Defendants Contend: On August 16, 2011, Licci was seen by Dr. Rodriguez after complaining of abdominal pain.

Plaintiffs Contend:  That this fact is inaccurate because it states that Rodriguez is a physician rather than a physician's assistant.  Plaintiffs further contend that this fact is misleading because it does not fully and accurately describe the content of PA Rodriguez's notes in Ms. Licci's medical record.

32.   Defendants Contend: On August 17, 2011, Licci submitted an HNR requesting a status on her lab work.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the HNR Ms. Licci submitted on August 17, 2011.  Plaintiffs further contend that this fact is misleading because it does not provide the response to Ms. Licci's HNR.

33.   Defendants Contend: On August 23, 2011, Licci was seen by Dr. Irving and labs were drawn that day.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe why Ms. Licci was seen by Dr. Irving and what lab work was done.

34.   Defendants Contend:  On August 30, 2011, it was noted she had a rectovaginal mass on her rectal exam and a golf ball size nodual at her rectovaginal area.

Plaintiffs Contend:  That this fact is inaccurate because it does not fully and accurately describe the content of PA Rodriguez's notes in Ms. Licci's medical record.

35. Defendants Contend: As a result, her consults were expedited.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of PA Rodriguez's notes in Ms. Licci's medical record.

36. Defendants Contend: A CT scan of her pelvis with contrast and a surgical evaluation was placed the same day.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the requests for consultations.

37. Defendants Contend: On October 4, 2011, Licci was seen by Dr. Lockhart.

Plaintiffs Contend:  That this fact is inaccurate because Licci was seen by PA Rodriguez rather than Dr. Lockhart on October 4, 2011.

38. Defendants Contend: During the exam, he wrote a consult for a colonoscopy, discussed the results of her CT, checked her port, and followed up on consults for oncology, oral surgery, and ophthalmology.

Plaintiffs Contend:  That this fact is misleading to the extent that it implies that Dr. Lockhart saw Ms. Licci on October 4, 2011.  Plaintiffs further contend that this fact is misleading because it does not fully and accurately describe the content of the notes in Ms. Licci's medical record.

39. On October 16, 2011, Licci submitted an HNR requesting the results of her August 27, 2011 CT and results of her mammogram.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the HNR Ms. Licci submitted on October 16, 2011.

40.    Defendants Contend: On October 26, 2011, Licci had a pelvic ultrasound at insight imaging.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the results of the pelvic ultrasound performed on October 26, 2011.

41.    Defendants Contend: On November 8, 2011, Licci was seen by Dr. Enciso for a follow up of her pelvic ultrasound.

Plaintiffs Contend:  that they have conducted a diligent search of the record and have found no indication that Ms. Licci saw Dr. Enciso on November 8, 2011.

42.    Defendants Contend: On November 22, 2011, Licci presented at medical complaining of abdominal extension minutes after eating.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe why Ms. Licci was seen on November 22, 2011.

43.    Defendants Contend: She was sent to Tempe St. Luke's for further evaluation, where three X-rays were done for abdominal pain.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe why Ms. Licci was sent to the hospital.

44.    Defendants Contend: The findings were negative, and a CT of the pelvis revealed no stones.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the x-ray findings and the type of CT that was performed.

45.    Defendants Contend: On January 23, 2011, Licci returned from Tempe St. Luke's.

Plaintiffs Contend:  That this fact is inaccurate because Ms. Licci did not return from the hospital on January 23, 2011.

46.     Defendants Contend: She was evaluated on January 23, and it was noted that the abdominal swelling had gone back down to normal.

> Plaintiffs Contend:  That this fact is inaccurate because Ms. Licci did not return from the hospital on January 23, 2011.  Plaintiffs further contend that the fact is misleading because it does not fully and accurately describe the content of PA Rodriguez's notes in Ms. Licci's medical record.

47.     Defendants Contend: On December 6, 2011, they determined an MRI was necessary and a consult was written.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of PA Rodriguez's notes in Ms. Licci's medical record.

48.     Defendants Contend: On December 21, 2011, Licci was informed that her colonoscopy result was normal.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of a nurse practitioner's notes in Ms. Licci's medical record.

49.     Defendants Contend: On December 22, 2011, an MRI of Licci's pelvis was done at Insight Imaging.

> Plaintiffs Contend:  That this fact is inaccurate because it does not state the type of MRI performed by Insight Imaging.

50.     Defendants Contend: No cervical mass was found.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the findings of the MRI without contrast.

51.     Defendants Contend: On December 27, 2011, PAC Rodriguez noted Licci had a pelvis without contrast due to lack of venous access, but because Licci had a port a cath, a consult was resubmitted for an MRI of her pelvis with contrast.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of PA Rodriguez's notes in Ms. Licci's medical record.

52.   Defendants Contend: Staff responded on December 28, 2011 and noted the problem would be fixed in the future.

> Plaintiffs Contend:  That this fact is inaccurate because the staff did not respond on the same day.  Plaintiffs further contend that the fact is misleading because it does not fully and accurately describe the notes in Ms. Licci's medical records.

53.   Defendants Contend: On January 6, 2012, Dr. Lockhart  also called RN Miller, consult coordinator, to check status of pending consults, and put in an oncology consult.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of Dr. Lockhart's notes in Ms. Licci's medical record.  Plaintiffs further contend that this fact is misleading to the extent that it implies that Dr. Lockhart submitted a new request for an oncology consult rather than inquiring on the status of the consult submitted on May 18, 2011.

54.   Defendants Contend: On January 11, 2012, Licci was seen by Facility Health Administrator Kinton, Dr. Lockhart, and CRN Headstream.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the participants and purpose of the meeting on January 11, 2012.

55.   Defendants Contend: Licci complained of pain, but didn't describe it; she just stated she has two tumors inside her.

> Plaintiffs Contend:  That this fact is misleading because it does not indicate that it summarizes a note written by Dr. Lockhart in Ms. Licci's medical record.

56.   Defendants Contend: An MRI had already been scheduled to rule out any mass suggested by prior imagining.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the notes in Ms. Licci's medical record.

57.   Defendants Contend: The impression, from a January 13, 2012 MRI, noted nabothian cysts of the cervix, but cervix neoplasm was not convincingly demonstrated on the exam.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the findings and content of the MRI report.

58.   Defendants Contend: It was also noted that small uterine fundal lesions may represent fibroids and multi prob ovarian cysts.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the findings and content of the MRI report.

59.   Defendants Contend: The results of her MRI were discussed, a PAP was done on February 28, 2012, and a mammography was requested.

> Plaintiffs Contend:  That this fact is misleading because it does not indicate that it summarizes a note written by Dr. Enciso in Ms. Licci's medical record.

60.   Defendants Contend: On March 5, 2012, Licci was seen by PA R. Rodriguez.

> Plaintiffs Contend:  That this fact is misleading because PA Rodriguez's note does not indicate that Ms. Licci was actually present.

61.   Defendants Contend: It was noted that she has had a CT scan with and without contrast which showed no gross evidence of mass in rectum.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the type of CT scan performed or the findings of that scan.

62.   Defendants Contend: The impression was a simple decreasing right ovarian cyst.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the findings of the pelvic ultrasound.

63.   Defendants Contend: She had both a pelvic and rectal exam; no external lesions or hemorrhoids were noted, and good anal sphincter tone was noted.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the findings of the pelvic and rectal exam.

64.   Defendants Contend: Because Licci was diagnosed with prolapsed uterus, her complaints in changes in bowel habits can be attributed to her prolapse.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the notes in Ms. Licci's medical record.

65.   Defendants Contend: On March 14, 2012, she was scheduled to a female practitioner for evaluation.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the notes in Ms. Licci's medical record.

66.   Defendants Contend: On May 18, 2012, Licci was seen again complaining of constipation, and she was prescribed magnesium citrate.

> Plaintiffs Contend:   That this fact is misleading because it does not fully and accurately describe why Ms. Licci was seen by the nurse practitioner or the content of the nurse practitioner's notes in Ms. Licci's medical record.

67.   Defendants Contend: On May 29, 2012, she was shown a copy of the report and the finding of the small simple right cyst was explained to her.

> Plaintiffs Contend:   That this fact is misleading because it does not indicate that it summarizes a note written by Dr. Enciso in Ms. Licci's medical record.

68.   Defendants Contend: Her mammogram report of April 6, 2012 was also reviewed with her – the report was negative.

> Plaintiffs Contend:   That this fact is misleading because it does not indicate that it summarizes a note written by Dr. Enciso in Ms. Licci's medical record.

69.   Defendants Contend: Licci appeared to have understood the explanation on the findings and had no further questions.

> Plaintiffs Contend:   That this fact is misleading because it does not indicate that it summarizes a note written by Dr. Enciso in Ms. Licci's medical record.

70.   Defendants Contend: On August 9, 2012, Licci submitted an HNR stating the position of her cervix blocks her anal passage and that it needs to be fixed.

> Plaintiffs Contend:   That this fact is misleading because it does not fully and accurately describe the content of the HNR Ms. Licci submitted on August 9, 2012.

71.   Defendants Contend: She also stated that she was still having abdominal pain, but no longer constipation.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the notes in Ms. Licci's medical record.

72.   Defendants Contend: She was advised to increase fiber and stay hydrated.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the notes in Ms. Licci's medical record.

73.   Defendants Contend:  On October 9, 2012, Licci submitted an HNR regarding constipation.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the HNR Ms. Licci submitted on October 9, 2012.

74.   Defendants Contend:  She attributed it to her Hepatitis C, and believed it was damaging her liver.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the HNR Ms. Licci submitted on October 9, 2012.

75.   Defendants Contend:  The next day, October 10, Licci was seen for her constipation and asthma.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the notes in Ms. Licci's medical record.

76.   Defendants Contend: On January 16, 2013, Licci was seen and the result of her ultrasound was discussed.

> Plaintiffs Contend:  That this fact is misleading because it does not indicate that it summarizes a note written by PAC Johnson in Ms. Licci's medical record.

77.    <u>Defendants Contend:</u> The ultrasound showed cysts, but no masses.

    <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the findings of the ultrasound.

78.    <u>Defendants Contend:</u> On January 16, 2013, Licci noted that her constipation is being helped by Miralax.

    <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not indicate that it summarizes a note written by PAC Johnson in Ms. Licci's medical record.

79.    <u>Defendants Contend:</u> On May 29, 2013, her pap smear report came back negative for lesion and malignancy.

    <u>Plaintiffs Contend:</u>  That this fact is inaccurate because there is no indication that Ms. Licci's pap smear came back on May 29, 2013.

80.    <u>Defendants Contend:</u> On April 23, 2013, Licci was seen and still complained of constipation and "feelings of mass."

    <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe Ms. Licci's appointment for chronic care.

81.    <u>Defendants Contend:</u> On June 10, 2013, Licci was seen again by Dr. A. Irving.

    <u>Plaintiffs Contend:</u>  That this fact is misleading to the extent that it implies that Ms. Licci was recently seen by Dr. Irving.

82.    <u>Defendants Contend:</u> Dr. Irving recommended a more aggressive exam to determine need for more aggressive management of symptoms.

    <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the content of Dr. Irving's notes in Ms. Licci's medical record.

83.    <u>Defendants Contend:</u> On June 27, 2013, Licci's lab report on her biopsy came back with normal endometrium.

> Plaintiffs Contend:   That this fact is misleading because there is no indication that Ms. Licci's lab report came back on June 27, 2013.

84.   Defendants Contend: She stated mineral oil has been helping her with constipation.

> Plaintiffs Contend:  That this fact is misleading because it does not indicate that it summarizes a note written in Ms. Licci's medical record.

85.   Defendants Contend: On July 10, 2013, Licci's biopsy results were reviewed with her.

> Plaintiffs Contend:  That this fact is misleading because it does not indicate that it summarizes a note written in Ms. Licci's medical record.

86.   Defendants Contend: Licci alleges she was treated at ADC for cancer in 2001 and began experiencing troubling symptoms in fall 2010. Licci further alleges that despite several referrals to an oncologist, she waited for over a year to see a specialist and has not received a biopsy to rule out cancer despite numerous masses evident on CT scans.

> Plaintiffs Contend:   That this statement is an allegation rather than a fact about Ms. Licci. Plaintiffs further contend that this fact is misleading because it does not fully and accurately describe the content of Ms. Licci's declaration.

87.   Defendants Contend: Licci's records indicate that the prior cancer history in 2001 was for dermatofibrosarcoma.  The prison physician discussed this condition with the surgeon who treated Licci and was advised that this particular condition rarely metastasizes.

> Plaintiffs Contend:  That Dr. Mendel's report  contains opinions rather than facts about the care provided to Ms. Licci.

88.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Licci submitted 69 HNRs.

Plaintiffs Contend: The number of HNRs Ms. Licci submitted is immaterial to the substance of this litigation. The filing of an HNR does not ensure that Ms. Licci received constitutionally adequate healthcare, that Defendants were not deliberately indifferent, or that Ms. Licci did not face a substantial risk of serious harm. The filing of an HNR does not speak to whether Ms. Licci received healthcare or the quality of that healthcare. Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

89. Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Licci submitted 9 HNRs.

Plaintiffs Contend: The number of HNRs Ms. Licci submitted is immaterial to the substance of this litigation. The filing of an HNR does not ensure that Ms. Licci received constitutionally adequate healthcare, that Defendants were not deliberately indifferent, or that Ms. Licci did not face a substantial risk of serious harm. The filing of an HNR does not speak to whether Ms. Licci received healthcare or the quality of that healthcare. Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

90. Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Licci submitted 3 HNRs.

Plaintiffs Contend: The number of HNRs Ms. Licci submitted is immaterial to the substance of this litigation. The filing of an HNR does not ensure that Ms. Licci received constitutionally adequate healthcare, that

Defendants were not deliberately indifferent, or that Ms. Licci did not face a substantial risk of serious harm. The filing of an HNR does not speak to whether Ms. Licci received healthcare or the quality of that healthcare. Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

91. <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Licci submitted 81 HNRs.

<u>Plaintiffs Contend:</u> The number of HNRs Ms. Licci submitted is immaterial to the substance of this litigation. The filing of an HNR does not ensure that Ms. Licci received constitutionally adequate healthcare, that Defendants were not deliberately indifferent, or that Ms. Licci did not face a substantial risk of serious harm. The filing of an HNR does not speak to whether Ms. Licci received healthcare or the quality of that healthcare. Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

92. <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Licci had 37 encounters with a nurse.

<u>Plaintiffs Contend:</u> The term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

93.     Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Licci had 15 encounters with a nurse.

>       Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

94.     Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Licci had 35 encounters with a nurse.

>       Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

95.     Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Licci had 87 encounters with a nurse.

>       Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

96.     Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Licci had 13 encounters with a mid-level provider.

>       Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the

adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

97.     Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Licci had 6 encounters with a mid-level provider.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

98.     Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Licci had 8 encounters with a mid-level provider.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

99.     Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Licci had 27 encounters with a mid-level provider.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

100.    Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Licci had 30 encounters with a physician.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or

meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

101.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Licci had 3 encounters with a physician.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

102.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Licci had 33 encounters with a physician.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

103.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Licci had 147 encounters with medical staff.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

104.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Licci had 3 encounters with a psych associate.

> Plaintiffs Contend:  The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

105.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Licci had 2 encounters with a psych associate.

> Plaintiffs Contend:  The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

106.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Licci had 5 encounters with a psych associate.

> Plaintiffs Contend:  The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

107.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Licci had 5 encounters with a psychiatric nurse.

> Plaintiffs Contend:  The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

108.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Licci had 1 encounter with a psychiatric nurse.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

109.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Licci had 4 encounters with a psychiatric nurse.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

110.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Licci had 10 encounters with a psychiatric nurse.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

111.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Licci had 1 encounter with a psychiatric mid-level.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the

adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

112.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Licci had 1 encounter with a psychiatric mid-level.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

113.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Licci had 2 encounters with a psychiatric mid-level.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

114.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Licci had 2 encounters with a psychiatrist.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

115.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Licci had 14 encounters with psychiatry staff.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or

meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

116.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Licci had 166 encounters with healthcare staff.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

117.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Licci had 11 chronic care appointments.

Plaintiffs Contend:   The number of chronic care appointments Ms. Licci had is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the type of chronic care or whether any treatment was provided at the appointments.

118.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Licci had 5 chronic care appointments.

Plaintiffs Contend:   The number of chronic care appointments Ms. Licci had is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the type of chronic care or whether any treatment was provided at the appointments.

119.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Licci had 2 chronic care appointments.

Plaintiffs Contend:  The number of chronic care appointments Ms. Licci had is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the type of chronic care or whether any treatment was provided at the appointments.

120.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Licci had 18 chronic care appointments.

Plaintiffs Contend:  The number of chronic care appointments Ms. Licci had is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the type of chronic care or whether any treatment was provided at the appointments.

121.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Licci had 16 outside specialty care consultations.

Plaintiffs Contend:  The number of specialty care consultations Ms. Licci had is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the purpose of these consultations or whether any treatment was provided at the consultations.   Plaintiffs further contest the substance of this fact because there is no indication whether more than one request was made for the same consultation.

122.   <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Licci had 1 outside specialty care consultations.

> <u>Plaintiffs Contend</u>:  The number of specialty care consultations Ms. Licci had is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the purpose of these consultations or whether any treatment was provided at the consultations.   Plaintiffs further contest the substance of this fact because there is no indication whether more than one request was made for the same consultation.

123.   <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Licci had 4 outside specialty care consultations.

> <u>Plaintiffs Contend</u>:  The number of specialty care consultations Ms. Licci had is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the purpose of these consultations or whether any treatment was provided at the consultations.   Plaintiffs further contest the substance of this fact because there is no indication whether more than one request was made for the same consultation.

124.   <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Licci had 21 outside specialty care consultations.

> <u>Plaintiffs Contend</u>:  The number of specialty care consultations Ms. Licci had is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the purpose of these consultations or whether any treatment was provided at

the consultations.   Plaintiffs further contest the substance of this fact because there is no indication whether more than one request was made for the same consultation.

125.   Defendants Contend: Licci candidly admits that she joined this lawsuit because she disagrees with the type of medical treatment she has received at ADC.

Plaintiffs Contend:   That this fact is inaccurate to the extent it mischaracterizes Ms. Licci's deposition testimony.  Ms. Licci testified that three doctors agreed that she needed surgery and wrote consults, but ADC did not honor them.

126.   Defendants Contend: Licci's cancer was present in 2001, she was out of prison from 2004-2009 and never sought treatment or testing of ovarian cancer or masses in her body during that period, and her post-2009 incarceration has resulted in her frequently being seen by facility providers and outside specialists – more than 147 medical visits from 2010-2014 – with Licci merely questioning why biopsies have not been done on her cysts that all her doctors do not believe are necessary.

Plaintiffs Contend:  That this fact is inaccurate because it states that Ms. Licci was out of prison from 2004 to 2009 and mischaracterizes Ms. Licci's deposition testimony.  Plaintiffs also contend that "frequently been seen" is vague and undefined.  Plaintiffs further contend that the number of medical visits Ms. Licci had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Licci ultimately received and whether or not Defendants are deliberately indifferent.

127.   Defendants Contend: The medical, dental, and mental health care Licci received was constitutionally adequate and within the applicable standard of care.

Plaintiffs Contend:  That Plaintiffs' experts and evidence will show that the medical, dental, and mental health care Ms. Licci received was ***not***

constitutionally adequate or within the applicable standard of care. Plaintiffs further contend that this statement is an opinion rather than a fact.

## Exhibit F – Health Care Treatment of Joshua Polson
## UNCONTESTED FACTS

### I.   BACKGROUND

1.      Polson is currently incarcerated in ASPC-Eyman.

### II.   MEDICAL ALLEGATIONS

2.      Polson alleges he had multiple ear infections while in custody.    He further claims that he submitted multiple health needs requests (HNRs) complaining of pain from the infections but "it is days or weeks before I am seen by someone from medical staff and given ear drops or antibiotics."

3.      Polson submitted an HNR on May 28, 2008, complaining of a "severe ear ache" and "fluid and blood coming out of right ear."

4.      He was seen by a Physician's Assistant (PA) that same day.

5.      The PA noted that Polson complained of right ear pain for four days that was worsening and observed, "(Right) ear no obvious inflammation, mild hyperemic inner canal. ~50% blockage canal (with) black cerumen…"

6.      In response to his HNR, he was told that "HCP (health care provider) ordered ear drops" and he may "purchase Tylenol or Ibuprofen at the inmate store."

7.       Polson was seen again on the nurse line on June 9, 2008.

8.      His Continuous Progress Record notes that he was seen to follow up on his ear and there was "no redness or drainage noted," and no reports of pain.  Polson also reported "it's much better."

9.      Polson was directed to continue treatment as ordered and return to the clinic if pain increased or there are signs of infection.

10.      Over a year later, on June 30, 2009, Polson submitted an HNR stating he needs to "see a doctor for ear aches" and itchy skin.

11.     In response to this HNR, he was told an appointment would be scheduled with a health care provider.

12.     Polson was seen by a Licensed Practical Nurse (LPN) on July 21, 2009, for "ear pain" and the nurse observed, "unable to see ear drums due to wax build up" and Polson reported pain of "5 on a 10 scale."

13.     Polson was given Debrox ear drops and instructed to follow up on the nurse's line in 7-10 days.

14.     Polson was seen again by an LPN on July 29, 2009, for a follow up appointment.

15.     The nurse noted that Polson stated he had "ear pain in his left ear and both ears feel like water is stuck," and also observed that his left ear was "swollen, red ear drum seen, appears to be grossly intact" and right ear was "clear of wax, no redness, no c/o (complaints of) pain."

16.     The nurse called Dr. Wohler who prescribed "(ear drops) Neo/Poly susp otic 1% 4 drops four times a day x 10 days."

17.     Polson's medical records also noted that he had an appointment with a health care provider scheduled for September 18, 2009.

18.     Polson submitted another HNR on August 9, 2009, about his ear infection and was told he already had an appointment scheduled.

19.     Polson submitted another HNR on August 14, 2009, noting that he was seen by a nurse 2-3 weeks ago and was given a 10-day prescription for antibiotics for his ear infection, but that the prescription had now expired and "nothing is being done about my ears."

20.     In response to this HNR, he was told a follow up appointment was scheduled for the Doctor's line.

21.     He was also given additional antibiotics for his ears.

22.     Polson submitted another HNR on September 15, 2009, complaining of "severe ear aches again."

23.     In response, he was sent to the nurse line.

24.     Polson told the PA he has had "chronic ear infections since he was little."

25.     The PA observed that Polson's left ear had "no erythema seen in canal, TM clear," and that Polson's right ear has "tenderness… Red spot on superior TM (Tympanic Membrane), typical landmarks cannot be seen. Dry white crust around external canal, slight impaired hearing."

26.     His progress record from September 23, 2009 also notes that he has a chronic care visit in 6 months and an appointment scheduled for November 11, 2009.

27.     A doctor reviewed his lab report on November 9, 2009.

28.     Polson submitted an HNR on November 7, 2009, again complaining of ear aches in both his ears and that his "right ear has lost hearing."

29.     In response, he was seen by nursing and referred to a health care provider.

30.     The same day he submitted his HNR, on November 7, 2009, Polson was seen by a nurse (LPN) to evaluate his complaints of ear pain.

31.     The nurse observed that his right ear has "erythema also dry white crust to upper canal. TM visible. Grey bulging matter."

32.     He was then referred to a health care provider to re-evaluate for need for more antibiotics (ABTs) or referral to an Ear, Nose and Throat (ENT) specialist.

33.     Polson submitted another HNR on November 11, 2009, stating he was "pulled out on 11/6/09 by the nurse to check out my ear" but complaining he had not seen a doctor yet.

34.     He complained his ear "has no hearing now" and he has been through "two cycles of antibiotics ear drops and nothing has worked."

35.     In response, he was told on November 12, 2009, that he is "already scheduled to see the HCP."

36.     Prescriptions were ordered the same day, on December 7, 2009.

37.     Polson was seen by an LPN on January 8, 2010, for complaints of "bilateral ear pain."

38.     He was prescribed "Rocephin 1 gm IM x 3 days" and instructed to return if no improvement.

39.     The LPN also noted: "Will consider referral to ENT (ear, nose and throat specialist)."

40.     Polson was given the medication, Rocephin, for his ear infection on January 12, 2010, January 13, 2010, and January 14, 2010,

41.     Polson submitted another informal HNR on February 5, 2010, complaining of, among other things, "major ear infections."

42.     Polson alleges that a hearing test in March 2010 found he was deaf in his right ear.

43.     On March 19, 2010, Polson received a hearing test, and according to that test, his right ear failed and left ear passed.

44.     A health care provider reviewed the test results on March 23, 2010, and then requested an outside consult with an audiology specialist that same day.

45.     The ENT noted that Polson's primary complaints were hearing loss and tinnitus.

46.     The ENT reported that Polson's right ear has no hearing, but otherwise his ears were clear, had good motion, had no redness, and had no fluid.

47.     The ENT discussed his observations with Polson and explained no treatment was needed and noted he should to return to office (RTO) as needed.

48.     Polson's hearing test was reviewed by an ADC health care provider on June 4, 2010, and his continuous progress record notes that his right ear "is essentially 'dead'" and there is "no therapy available."

49.     Polson admitted in his deposition that he was seen by an ENT for an ear infection, and claimed the ENT looked at his ears, eyes and did a hearing test and determined his "right ear was dead."

50.     Soon after he was seen by an ENT, Polson submitted an HNR on June 8, 2010, requesting copies of his medical records "for evidence."

51.     In response to a grievance Polson filed regarding his ears, the Regional Health Administrator informed Polson that he had reviewed his medical file and that: "My review revealed you were seen by the Audiologist on June 1, 2010.  He found there was no response in your right ear and is essentially a dead ear.  By copy of this response to your Facility Health Administrator, I am directing you be seen by your local provider to ensure you understand the findings."

52.     Polson submitted a dental HNR on August 5, 2010, requesting a mechanical soft diet, a mental health HNR on August 15, 2010, requesting to be taken off his medications, and a medical HNR on August 18, 2010, requesting renewal of certain prescriptions.

53.     Polson alleges he submitted HNRs on August 12 and 19, 2010, complaining that he had been told he would see a doctor about his ear infections.

54.     None of these HNRs mention his alleged ear infection.

55.     On August 19, 2010, Polson submitted an HNR asking, "I want to know how or when is (sic) my right ear going to be treated?"

56.     He mentioned he was seen by an ENT specialist on June 1, 2010, but now wanted to know "what is going to be done."

57.     Polson alleges that on August 30, 2010, he had blood running from his left ear and was in pain, but when he was seen by a physician's assistant on September 10, 2010, he was told he had a scratch.

58.     On the same day Polson complained of "blood oozing from his (left) ear," a nurse evaluated Polson at his cell front.

59.     Polson also asked to see a Doctor and stated he lost hearing in his right ear from infection that was not treated and he did not want to also lose hearing in his left ear.

60.     Polson was examined again the next day, on August 31, 2010, by an LPN at his cell front.

61.     Polson again complained of bleeding from his ear and was pulled out of his cell by security for an examination.

62.     The LPN observed that there was dry blood in his left ear canal, but there were no signs or symptoms of infection and hearing was within normal limits.

63.     The next day, on September 1, 2010, Polson submitted another HNR asking what is going to be done about the loss of hearing in his right ear.

64.     In response, he was told he was "provided regular timely treatment and (is) again on doctor's line."

65.     A Physician's Assistant (PA) examined Polson on September 10, 2010.

66.     The PA noted that Polson's left ear had dried blood in the canal, but that he "has a scratch, appears to be site of blood."

67.     The PA also noted that Polson had been using Q-tips to clean his ear, and that "may have caused irritation/scratch."

68.     The PA concluded that Polson merely had a scratched ear and no medication was needed.

69.     A second PA reviewed and agreed with the diagnosis.

70.     Polson was seen three times, on August 30, 2010, August 31, 2010, and September 10, 2010, for his complaint that his left ear was bleeding.

71.     He  acknowledged  he was previously seen by a hearing specialist (ENT).

72.     On September 11, 2010, Polson submitted another HNR asking "what treatment or corrective action DOC plans on doing for (his) loss of hearing in right ear while incarcerated…"

73.     He also noted that he saw a PA on September 10, 2010, for bleeding in his left ear, "not the corrective action on the loss of hearing in right ear."

74.     In response, an RN told him on September 24, 2010, that his "right ear is essentially non-functioning and there is no therapy available."

75.     On September 30, 2010, Polson submitted another Inmate Grievance requesting to see another ENT, and asking about treatment or some other compensation for his hearing loss.

76.     In response, Polson was told he was seen by an ENT specialist on June 1, 2010, and was diagnosed with a "dead ear / central hearing loss" and no further evaluation was recommended.

77.     On February 13, 2011, Polson submitted another HNR complaining of ear aches in both ears.

78.     The same day he was told that he was placed on the nurse line to see a health care provider.

79.     On February 15, 2011, Polson submitted another HNR for his ear aches.

80.     He stated that he had spoken to the nurses who distribute medications and claimed they offered to "pull me in and check my ears."

81.     On May 13, 2011, Polson submitted another HNR complaining of "problems with my ears again they're hurting."

82.     The same day he was told that he was placed on the nurse line.

83.     Polson alleges that he filed HNRs on May 26, June 15, 22 and 23, 2011, about ear pain but was not seen until June 28, 2011.

84.     The following day he was told he had been placed on the nurse line.

85.     In response, he was told he is on the Doctor's line.

86.     On June 13, 2011, Polson reported to a mental health provider in a cell front visit that he had no issues and was "happy."

87.     On June 15, 2011, Polson submitted another HNR for his ear aches.

88.     The following day, he was told that he was on the doctor's line.

89.     On June 22, 2011, Polson submitted another HNR for his ear aches and was again told he was on the doctor's line.

90.     On June 22, 2012, a physician ordered that he be given Ibuprofen.

91.     On June 23, 2011, Polson submitted another HNR for his ear aches and was told "Nurse Cook has seen your Health Needs Request and you are scheduled to see the Dr."

92.     On June 28, 2011, Polson was seen by a doctor for chronic condition follow-up care.

93.     The doctor referred Polson to an ENT specialist and submitted an Outside Consult Request for an ENT for ear pain and asthma.

94.     On January 12, 2012, Polson was seen by a doctor for chronic condition follow up care, and he did not make any complaints regarding ear aches.

95.     On February 13, 2012, Polson was seen by a doctor for a mental health follow up visit, and did not make any complaints regarding ear aches

96.     Polson's medical records were reviewed by a nurse on April 12, 2012, after he was transferred to the Eyman facility.

97.     Polson was seen by a doctor on August 7, 2012, to follow up on his asthma, and did not make any complaints regarding ear problems.

98.     On August 31, 2013, Polson complained in a HNR that he was not receiving his medication and the "(l)ast time this place made me deaf in my right ear."

99.     In response, he was told that his prescriptions had expired and there are no new orders.

100.    He was also told that he was seen on "8/6/13 for chronic conditions and there was no order for the (Ibuprofen) written."

101.    Polson's last HNR referring to his ear problems was on November 23, 2013.

102.    This HNR alleged he had submitted three HNRs but had not received his allergy pills for his "cronic (sic) ear infections."

103.    In response to a November 23, 2013 HNR complaining of not receiving allergy pills, he was told that the pharmacy filled his Claritin on November 5, 2013, for 30 pills and he should have received them and should not be out of them.

104.    Polson was seen by a doctor on January 19, 2014, for severe coughing and was given medication that resolved his issues; he did not make any complaints regarding ear problems.

105.    Polson alleges that he tested positive for MRSA (methicillin-resistant staph aureus).

106.    Polson alleges that the antibiotics provided to him do not help his ear infections.

## III.   DENTAL ALLEGATIONS

107.    Polson had a pano x-ray and dental screening on February 21, 2008.

108.    Polson was seen by a dentist on April 9, 2008 and was placed on a mechanical soft diet.

109.    Polson's soft diet was renewed on October 8, 2008.

110.    Polson submitted an HNR on July 22, 2008 complaining of delay in getting scheduled for dentures while acknowledging that he needed "teeth pulled for the dentures," and another HNR October 8, 2008 indicating he needed "every thing in my mouth fixed cavitys (sic) teeth pulled what ever."

111.    Polson submitted an HNR on November 1, 2008 that stated that one of his front teeth "was dead broke off a copple (sic) days ago" and that he would like his teeth fixed as soon as possible "so I can get the partails (sic)."

112.    Polson's soft diet was renewed on April 9, 2009.

113.    Polson submitted an HNR on July 20, 2009 stating: "I would like to prosead (sic) on getting my dentures and or partials…I know theirs (sic) a lot so let's start pulling the teeth that need to be pulled and fix the diet if we half to a liquid for a while."

114.    This new HNR put Polson on the routine care list, and he was seen by a dentist November 17, 2009, when he had tooth #9 and #10 extracted.

115.    Polson's soft diet was renewed on November 17, 2009.

116.    Polson was then scheduled for an appointment December 9, 2009 for more extractions, which he refused.

117.    Polson submitted a December 23, 2009 HNR indicating that he had refused due to his extraction holes not healing, but was prepared to "go head and rescedual (sic) to get my work done, before I get a partials."

118.    Polson was placed on the waiting list and had #30 extracted on March 23, 2010.

119.    After Polson complained of pain and a dry socket from the extraction, he was seen on an urgent basis by the dentist March 30, 2010 and again on April 1, 2010, given gauze and dry socket paste, ibuprofen, and a prescription for Penicillin V.

120.    Polson was seen by the dentist on May 13, 2010 and June 16, 2010 and had fillings for cavities on #4 and #5.

121.    Polson was seen again July 2, 2010 for continued treatment with a diagnosis of gingivitis.

122.    He had a cleaning was also given oral hygiene instructions.

123.    On August 12, 2010, Polson had preliminary impressions made for his partial dentures, with his next visit for final PVS impressions on October 14, 2010.

124.    Polson was thereafter given his bite registration by the dentist on December 9, 2010, a preliminary fit was taken January 27, 2011 with the partials returned to the lab for finishing, and delivery of the partials with care and use instructions on April 26, 2011.

125.    Polson dropped and broke the denture into 2-3 pieces two days later, necessitating further appointments and repair work.

126.    When Polson complained of chewing difficulty in an October 24, 2011 HNR, the response stated: "Your partial was repaired and you are able to function. Therefore your (mechanical soft diet) will not be renewed."

127.    Polson disagreed with the discontinuation of his soft diet.

128.    Regardless, Polson was placed back on the soft diet after a dental examination on April 25, 2012 concluded he had a loose partial, and the partial was adjusted.

129.    His soft diet was renewed on October 24, 2012 and February 13, 2013.

130.    The standard of care does not allow for impressions for long-term partials to be made until preparatory dental work has been completed.

131.    After his preparatory work was completed, it took approximately 8.5 months to complete the process of making his partials from taking preliminary impressions to delivering the final device.

## IV.    MENTAL HEALTH CLAIMS

132.    Polson claims he has done so in order to get the attention of the psychiatrist so that he could speak to him or her.

133.    Plaintiffs claim that Defendants fail to provide adequate mental healthcare staffing and treatment.

134.    Polson alleges, generally, he does not receive "regular" therapy from a psychiatrist or psychologist.

135.    Polson submitted an HNR on October 5, 2010 asking to be put back on lithium. He was seen by Dr. Bishop the next day, who wrote a new lithium prescription and noted that Polson was to be seen by the psychiatric nurse in three months and the psychiatrist in six months.

## CONTESTED FACTS

## I.   <u>BACKGROUND AND DISCIPLINARY HISTORY</u>

1.   <u>Defendants Contend:</u>  On May 27, 2003 Polson was convicted of a dangerous drug violation in violation of A.R.S. § 13-3401.  His sentence began on January 29, 2005.

> <u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.  Mr. Polson's convictions are not at issue in this litigation.

2.   <u>Defendants Contend:</u>  On June 24, 2003, Polson was convicted of aggravated assault in violation of A.R.S. § 13-1204. He sentence began on December 9, 2002.

> <u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.  Mr. Polson's convictions are not at issue in this litigation. Moreover, ADC's records indicate that Polson was convicted of attempt to

commit aggravated assault, not aggravated assault, and it is unlikely that Polson's sentence began before he was convicted.

3.   <u>Defendants Contend:</u> On May 14, 2004, Polson was convicted of a dangerous drug violation in violation of A.R.S. § 13-3401; misconduct involving weapon(s) (multiple) in violation of A.R.S §13-3102; and escape in the 2nd degree in violation of A.R.S. §§13-2501, 13-2503.

<u>Plaintiffs Contend:</u> This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403. Mr. Polson's convictions are not at issue in this litigation.

4.   <u>Defendants Contend:</u> On February 15, 2008, Polson began his sentence of possession of drug paraphernalia in violation of A.R.S. §§13-3407,13-3415, and 13-3418.

<u>Plaintiffs Contend:</u> This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403. Mr. Polson's convictions are not at issue in this litigation.

5.   <u>Defendants Contend:</u> Polson was first incarcerated at ADC between 2004 and 2006 for forgery, possession of dangerous drugs, and attempted aggravated assault

for shoplifting and pulling a butterfly knife on an employee who confronted him, and attempting to use a forged check to purchase a gift card.

>Plaintiffs Contend:  Polson does not recall using a forged check to purchase a gift card.  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.  Mr. Polson's convictions are not at issue in this litigation.

6.   Defendants Contend:  During Polson's first incarceration, he was disciplined at least six times, including for smoking cigarettes in his cell, arguing with staff and being disruptive during programming, refusing to comply with orders, and fighting with another inmate.

>Plaintiffs Contend:  Plaintiffs contend that although Polson was disciplined for the listed actions, he did not commit all of the actions.  In particular, Polson does not smoke and did not smoke cigarettes in his cell.  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.  Mr. Polson's disciplinary record while incarcerated is not at issue in this litigation.

7.      Defendants Contend: He was also convicted in 2009 for possession of dangerous drugs for sale and drug paraphernalia, misconduct involving a weapon, and escape.

Plaintiffs Contend:  Plaintiffs contend that these convictions were in 2008. In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.  Mr. Polson's convictions are not at issue in this litigation.

8.      Defendants Contend: He is currently serving a 15.75-year sentence for those convictions.

Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.  Mr. Polson's sentence length is not at issue in this litigation.

9.      Defendants Contend: Polson is ███████ Security ███████.

Plaintiffs Contend:  Plaintiffs contend that Polson is not ████ Security ████, and was ████████ Security ████████. In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence

401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.

10.     Defendants Contend: On August 16, 2008, Polson "projected an unknown liquid substance" on another inmate, and said "he will continue to do this until he gets his way."

Plaintiffs Contend:  Plaintiffs contend that this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.  Mr. Polson's disciplinary record while incarcerated is not at issue in this litigation.

11.     Defendants Contend: On August 17, 2008, Polson refused to house in a certain unit and also stated that he refused to be housed with anyone.

Plaintiffs Contend:  Plaintiffs contend that Polson refused to house in a particular cell, because his prospective cellmate was an inmate that had previously assaulted him.  In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.  In the alternative, this fact is

unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.   Mr. Polson's disciplinary record while incarcerated is not at issue in this litigation.

12.   <u>Defendants Contend:</u> On September 12, 2008, Polson hit and broke a shower light fixture.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that a disciplinary report exists that states Polson hit and broke a shower light fixture.  Plaintiffs contend that Polson broke the shower light fixture after he was told by prison staff that he would be left in the shower overnight.  In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.   In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.   Mr. Polson's disciplinary record while incarcerated is not at issue in this litigation.

13.   <u>Defendants Contend:</u> On January 20, 2009, Polson told an officer that "if he did not end up getting ███████ Security ███████, he has some plans in place in order to escape from ███ Security ███," including "faking ███ Security ███ and escaping from there," ███████ Security ███████," and ███████ Security ███████."

<u>Plaintiffs Contend:</u>  Plaintiffs contend that Polson's ███████ Security ███████ ███████ Security ███████.  Plaintiffs contend that the description of Polson's statements is inaccurate.  In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The fact does not make it more or less likely that defendants were

deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.   In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.   Mr. Polson's disciplinary record while incarcerated is not at issue in this litigation.

14.     Defendants Contend: On February 5, 2009, Polson was disciplined for assaulting another inmate and possessing a homemade weapon, when he jumped on another inmate after his restraints were removed and hit him with closed fist, and officers searched his property and found a ███████████Security███████████ ███████████████████████████████████████████████ in his sock.

Plaintiffs Contend:  Plaintiffs contend that the disciplinary records state that officers searched Polson in the shower, and did not search "his property." In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.   In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.  Mr. Polson's disciplinary record while incarcerated is not at issue in this litigation.

15.     Defendants Contend:  On July 7, 2009, Polson was reprimanded for attempting to send an "indigent" letter with the return address to another inmate.

Plaintiffs Contend:  Plaintiffs acknowledge that Polson was reprimanded, but Polson did not commit the underlying action.  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.

The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.   In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.   Mr. Polson's disciplinary record while incarcerated is not at issue in this litigation.

16.   <u>Defendants Contend:</u> On July 23, 2009, Polson refused a direct order to return his breakfast tray and then threatened the officer "to be careful when removing him from his cell."

<u>Plaintiffs Contend:</u>   Polson does not remember making this statement.  In addition, Plaintiffs contend that if Polson did make the statement, Polson "told" the officer to be careful, not "threatened."   In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.   In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.   Mr. Polson's disciplinary record while incarcerated is not at issue in this litigation.

17.   <u>Defendants Contend:</u> On August 15, 2010, when officers were attempting to deliver Polson his medication, he "grabbed the trap with both hands and stated he did not want the medications" and then attempted to ▇▇▇Security▇▇▇.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that this fact is inaccurate.  Polson held his trap in an effort to be allowed to use the phone, which was improperly denied to him at the time.  Polson's actions had nothing to do

with a desire to refuse medication, and Polson did not attempt to ███████ ███████.  In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.  Mr. Polson's disciplinary record while incarcerated is not at issue in this litigation.

18.  <u>Defendants Contend:</u> On January 4, 2013, staff found a handwritten letter from Polson to an inactive inmate instructing him "how to mail in narcotics."

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the letter was not from Nr, Polson.  Mr. Polson denied writing the letter at the time, and the letter was not in his handwriting.  In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.  Mr. Polson's disciplinary record while incarcerated is not at issue in this litigation.

19.  <u>Defendants Contend:</u> On February 16, 2013, Polson was disciplined for assaulting staff when he "kicked" a staff member in the head and took a "deliberate swing" at another officer's face after he attempted to place him in handcuffs.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that Mr. Polson did not assault staff.

In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.  Mr. Polson's disciplinary record while incarcerated is not at issue in this litigation.

20.  <u>Defendants Contend:</u> On January 26, 2014, Polson was disciplined for disobeying a verbal order when he refused to hand over his feeding trays to staff during tray pick up.

<u>Plaintiffs Contend:</u>   Plaintiffs contend that this ticket was dismissed because the sergeant ultimately found that Polson's actions were justified, because Polson had not been receiving his prescribed medical resource as part of his medical diet.  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus the fact should be excluded under Federal Rule of Evidence 403.  Mr. Polson's disciplinary record while incarcerated is not at issue in this litigation.

## II.   MEDICAL ALLEGATIONS

21.   Defendants Contend: Polson was prescribed antibiotics for his ear infection. Polson submitted another HNR on June 4, 2008, noting he saw a doctor on May 30 for his ear ache and he received antibiotics but needs Ibuprofen.

> Plaintiffs Contend:  Plaintiffs contend that although Mr. Polson's HNR stated that he thought he had seen a doctor on May 29 or May 30, that statement is incorrect.   Unbeknownst to Polson, he actually saw a physician's assistant on May 28, as Defendants' own medical records and proposed facts indicate, and did not see a doctor.  The response to Polson's HNR, which was marked "EMERGENCY," did not come until 8 days later.

22.   Defendants Contend: Polson submitted another HNR on July 19, 2009 complaining of ear aches mainly in his left ear and sometimes in his right ear.

> Plaintiffs Contend:  Plaintiffs contend that Polson did submit an HNR on July 19, 2009, complaining of "very bad ear aches right now" and noting that he had submitted three previous HNRs on that issue.  Nothing in the document says that Polson was "complaining of ear aches mainly in left ear and sometimes in his right ear," as defendants claim.

23.   Defendants Contend: In response, he was told he had an appointment with a doctor in September 2009.

> Plaintiffs Contend:   Polson did submit an HNR on July 19, 2009, complaining of "very bad ear aches right now" and noting that he had submitted three previous HNRs on that issue.  Nothing in the document says that Polson was "had an appointment with a doctor in September 2009," as defendants claim.  And in any case, if Polson had an appointment, Defendants neglected to keep it, as Defendants' facts show that Polson was not seen by a physician at any time from July 19, 2009, when he reported his ear aches, until June 1, 2010, when an ENT found that Mr. Polson's

right ear had become a "dead ear."

24.  Defendants Contend: Polson's records were reviewed by a doctor (Kantor, MD) the following day on July 22, 2009, who ordered Nasolide spray twice a day as necessary.

> Plaintiffs Contend:  Plaintiffs contend that the record does not indicate that Dr. Kanter reviewed Polson's record on July 22, 2009.  Although there is a notation on the left side of the record that says "next cci 7/22/09," the date does not appear to correspond with the entry on the right side of the page, which says "Noted 3/25/09."  In addition, Dr. Kanter's stamp is on the entry ABOVE the Nasolide spray prescription.   Furthermore, Nasolide spray treats nasal inflammation, not ear aches.

25.  Defendants Contend: Polson's Continuous Progress Record notes that on August 18, 2009, he was again seen by a nurse who noted persistent ear ache primarily in his right ear "in spite of ear drops."

> Plaintiffs Contend:  Plaintiffs contend that Polson's ear drops had run out eleven days prior to this appointment, so it is inaccurate to suggest that the ear drops were not working, as Polson had no ear dropsIn addition, the record does not appear to say "ear drops."  However, the word after ear is unintelligible.

26.  Defendants Contend: Polson was examined by a Physician's Assistant (PA) on September 23, 2009, who noted that Polson was complaining of, among other things, a left ear ache.

> Plaintiffs Contend:  Plaintiffs contend that the record states in two separate places that Polson was complaining of a right ear ache, not a left ear ache. (top of page: "ear aches ®"; second line of text - "® ear ache").

27.   <u>Defendants Contend:</u> The PA also prescribed "(ear drops) Cipro Opth 4 drops in right ear twice a day x 14 days," and ordered lab work and a follow up evaluation after his labs were completed.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that Defendants insert "ear drops" in brackets, but the medication "Cipro Opth" is eye drops.  In addition, the lab work was not connected to Polson's ear issues (Polson was also being seen for his chronic asthma, his hypertension, and his weight loss)

28.   <u>Defendants Contend:</u> Polson submitted another HNR on October 4, 2009, acknowledging he was seen by a doctor about his ear infection on September 23, 2009, but complaining he had not yet received his prescription ear drops.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that this HNR was produced by Defendants in a virtually unreadable form (except for the response section). Plaintiffs contend that if Mr. Polson's HNR stated that he recently saw a doctor, that statement is incorrect.  Unbeknownst to Polson, he actually saw a physician's assistant, as Defendants' own medical records and proposed facts indicate.  Defendants' facts show that Polson was not seen by a physician at any time from July 19, 2009, when he reported his ear aches, until June 1, 2010, when an ENT found that Mr. Polson's right ear had become a "dead ear."

29.   <u>Defendants Contend:</u> In response to this HNR, he was told that his prescription was relayed to the Pharmacy and he "should be getting it in a couple of days."

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that this HNR was produced by Defendants in a virtually unreadable form (except for the response section). One HNR does state "should be getting it in a couple of days," but it is unclear whether this was stating that Polson should be getting it in a couple

of days, or whether medical personnel should be getting it in a couple of days.

30.    <u>Defendants Contend:</u> This prescription was filled on October 7, 2009.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the document lists a "start date" of October 7, 2009, but this does not mean that the prescription was "filled" on that day, or that Polson began receiving the medication on that day.  In addition, note the document cited says these are "eye drops."

31.    <u>Defendants Contend:</u> Polson had lab work performed on October 16, 2009, and the lab results returned "normal."

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the lab work was unrelated to Polson's ear issues, and was in fact connected to Polson's chronic care issues.

32.    <u>Defendants Contend:</u> On November 7, 2009 Polson stated, "I've taken 2 sets of antibiotics for my ear and now my left ear is starting to hurt. I can't hear out of my right year."

<u>Plaintiffs Contend:</u>  Plaintiffs contend that Polson stated he could not hear out of his "right ear," not "right year."

33.    <u>Defendants Contend:</u> On November 10, 2009, he was scheduled for a follow-up evaluation for his ears.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that Mr. Polson was told on this date and on other dates that he was scheduled for a follow-up evaluation with a physician that was to take place on November 27, 2009, but that evaluation never occurred.

34.    <u>Defendants Contend:</u> Polson was seen by an LPN on December 7, 2009, for complaints of ear pain.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that Polson was actually seen by a CRN.

35.    Defendants Contend: The LPN noted Polson reported pain in both ears, right worse than left.

Plaintiffs Contend:  Plaintiffs contend that Polson was actually seen by a CRN.

36.    Defendants Contend: The LPN also observed no drainage, redness or swelling but noted she could not see ear drum due to black/brown wax and noted white/yellow patches.

Plaintiffs Contend:  Plaintiffs contend that Polson was actually seen by a CRN.  Plaintiffs contend that the CRN observed both ears, and made separate findings, which Defendants' fact improperly lumps together.  For the left ear, she reported "no drainage, redness, or swelling."  But for the right ear, she reported that she was "unable to see ear drum, black/brown wax? noted, white/yellow patches noted, [increase] in pain durning examine [sic]"

37.    Defendants Contend: The LPN called the doctor, who ordered "1 gram Ceftiaxone IM (intramuscular)," "SMZ one tab BID (twice a day)" and "Neo/Poly susp otic 1% 4 drops three times a day."

Plaintiffs Contend:  Plaintiffs contend that Polson was seen by a CRN, not an LPN.  The record says "Ceftriaxone," and says it should be given "now."

38.    Defendants Contend: A follow up was scheduled for 7-10 days.

Plaintiffs Contend:  Plaintiffs contend that although the document notes "follow-up 7-10 days," that does not mean a follow-up was actually scheduled, and no records indicate that a follow-up appointment occurred.

39.    Defendants Contend: Polson received the Ceftrizxone Sodium injections on December 9, 2009 and December 11, 2009.

Plaintiffs Contend:  Plaintiffs contend that the record says "Ceftriaxone." Plaintiffs contend that Defendants have not produced a document showing

this.  The document previously cited by Defendants for this point shows an order on December 7, and has nothing relating to injections on December 9 and 11.  The only references to December 9 and 11 are in the "fill date" column, and are for injections given on January 8, 12, 13, and 14.

40.   <u>Defendants Contend:</u> Polson submitted another HNR on January 4, 2010, complaining of a "serious ear infection," and that the antibiotics were not working and he has "been 'put off' as if it was not a big deal. (I can't hear out of right ear)."

<u>Plaintiffs Contend:</u>  Plaintiffs contend that Polson stated in the HNR that this was an "ongoing problem," and stated his concerns in the present tense.  Polson stated that antibiotics "haven't been working," not that they "were not working."  (The last round of prescribed antibiotics ran out prior to this request.)  Polson stated that medical was acting "as if it's no big deal," not "as if it was not a big deal."

41.   <u>Defendants Contend:</u> In response, he was told that he would be referred to a health care provider and his HNR notes he was seen by a doctor on January 8, 2010.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that although Mr. Polson's HNR stated that he recently saw a doctor, that statement is incorrect.  Unbeknownst to Polson, he actually saw an LPN, as Defendants' own medical records and proposed facts indicate.  Defendants' facts show that Polson was not seen by a physician at any time from July 19, 2009, when he reported his ear aches, until June 1, 2010, when an ENT found that Mr. Polson's right ear had become a "dead ear."

42.   <u>Defendants Contend:</u> The LPN noted that Polson has a history of ear infections and his last treatment was on December 9, and observed: "Red, ear canal purulent, TM is bulging."

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the record does say Polson's last treatment was 12/09, but that likely refers to December 2009.  If it does

refer to December 9, 2009, this contradicts Defendants' previous fact about Polson's injections.   Defendants' quoted language omits and misstates words (® means Right, not Red - note circled L for other ear) - correct quote is as follows: "® ear canal has purulent d/c [discharge] and TM is red and buldging [sic]"

43.     Defendants Contend: Polson acknowledged he had been seen by nurses and one doctor in the last six months and was given four different antibiotics but complained it "is not working."

> Plaintiffs Contend:  Plaintiffs contend (and Defendants' facts reveal) that Polson had not been seen by a doctor in the last six months.  Polson had also not received "four different antibiotics" - he had received three: neo/poly, ceftriaxone, and Cipro Opth.

44.     Defendants Contend: Polson threatened that he will "become a security risk and problem… among other things as well" if he goes "deaf due to medical neglect," although he admitted he had been told "you're scheduled" but complained he was supposed to have "follow ups sooner on a severe infection that could cause permanent damage to a human being."

> Plaintiffs Contend:  Plaintiffs contend that Polson did not "threaten," but "stated" the quotes shown above.  In addition, Polson did not "admit" that he was told he had been scheduled - he "reported" in his HNR that he had waited months to see a physician.  Polson was repeatedly assured that he would see a physician regarding his ear issues, but that evaluation never occurred, as Defendants' own facts reveal.  Defendants' facts show that Polson was not seen by a physician at any time from July 19, 2009, when he reported his ear aches, until June 1, 2010, when an ENT found that Mr. Polson's right ear had become a "dead ear."

45.   <u>Defendants Contend:</u> On June 1, 2010, Polson was transported to Adobe ENT & Allergy, was seen by an ear, nose and throat specialist (ENT) and Audiologist, and given a hearing test.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that Defendants have not produced records stating that Polson was seen by an audiologist.

46.   Defendants Contend: The hearing test, performed by an outside ENT specialist, found that Polson's left ear "is normal" and his right ear "has no response - essentially a 'dead ear.'"

> <u>Plaintiffs Contend: Plaintiffs contend that Defendants have not produced records stating that the hearing test was actually performed by an outside ENT specialist.</u>

47.   <u>Defendants Contend:</u> Polson testified in his deposition that he requested a correctional procedure and hearing aid but that ADC does not provide hearing aids or surgeries.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that Polson requested a hearing aid, not a correctional procedure.  Polson did not testify in his deposition that he requested a correctional procedure.  Plaintiffs contend that to the extent this fact relies on Polson's deposition, Plaintiffs contest the accuracy of statements made during that deposition.  Polson twice informed defense counsel on the record that he did not feel he could give accurate answers due to Defendants' decision to move Polson to a different complex days before the deposition, and to deprive him of his property, his legal materials, his soft diet, and multiple doses of his mental health medications in the days leading up to the deposition.  Defense counsel elected to take the entire deposition anyway.

48.     Defendants Contend: In response to an HNR submitted on June 8, 2010, he was told he has been placed on the medical care provider review list and would remain on the list until he is seen.

> Plaintiffs Contend:  Plaintiffs contend that Polson had asked to review his records, was referred to the Medical Records department, and was "placed on the review list" and was told the "wait may be awhile" before he could review his records.  Nothing in the document suggests that Polson was "placed on the medical care provider review list."

49.     Defendants Contend: Polson did not mention any new ear infections or request to be seen by a health care provider again.

> Plaintiffs Contend:  Plaintiffs contend that although Polson may have not explicitly "request[ed] to be seen by a health care provider again," he did ask for an update on his ear treatment.

50.     Defendants Contend: Polson submitted two more HNRs on August 22, 2010, and one more HNR on August 24, 2010, but he did not make any complaints of an ear ache or ear infection.

> Plaintiffs Contend:   Plaintiffs contend that Polson did not make any complaints of an ear ache or ear infection *in these HNRs*, which were both directed to the mental health department, not the medical department.  All three HNRs are checked "mental health" and are regarding Polson's mental health needs.  The HNR form states that inmates may only "describe one problem or issue at a time," and HNRs have been rejected for raising more than one issue or area of concern.

51.     Defendants Contend: The nurse examined Polson on August 30, 2010 but did not see any blood.

> Plaintiffs Contend:  Plaintiffs contend that the record indicates that the nurse saw "2 blood-soaked 2x2s."

52. <u>Defendants Contend:</u> On August 30, 2010, Polson then "produced 2 blood-soaked 2x2s reporting they were in his ear."

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that the medical record does not state that Polson "then" produced the blood-soaked 2x2s, and this word should be omitted.

53. <u>Defendants Contend:</u> He was told that a health care provider would follow up.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that a health care provider did not follow up, despite these assurances to Polson.

54. <u>Defendants Contend:</u> On August 31, 2010 the LPN also noted a "superficial scratch to canal."

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that the "superficial scratch to canal" is under the A in SOAP, which stands for "assessment," showing the LPN's conclusion, not something she "noted" in her examination.

55. <u>Defendants Contend:</u> On September 10, 2010, Polson submitted an Inmate Grievance asking about treatment or "compusation (sic)" for his hearing loss.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that Polson also asked for "resolution" of the issue.

56. <u>Defendants Contend:</u> Polson was seen by a physician on November 30, 2010, and an LPN on December 1, 2010, and made no reports of ear problems.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that Polson was seen by a physician's assistant, not a physician, and was seen on November 30 for his chronic asthma issues.  The only December 1 notation in Polson's record is an LPN writing "noted."

57. <u>Defendants Contend:</u> Although he claims this was the second HNR he had submitted in the last four weeks, his last HNR was on December 30, 2010, for asthma and did not include any reference to ear aches.

> Plaintiffs Contend:  Plaintiffs contend that the HNR states that it is the second HNR he submitted in the last four weeks.  The next HNR Polson submitted stated that it was the third or fourth HNR he had submitted. Defendants' inability to find or retain the first HNR does not prove that Polson's last HNR was on December 30.

58.   Defendants Contend: The same day he submitted this HNR, he was seen by a health care provider.

> Plaintiffs Contend: Plaintiffs contend that Polson was not seen by an LPN, not a health care provider, which refers to staff with high levels of training: to wit, a physician, psychiatrist, nurse practitioner, or a PA.

59.   Defendants Contend: Polson's chief complaint was asthma but he also complained of ear pain/pressure.

> Plaintiffs Contend:  Plaintiffs contend that the document states that Polson complained of ear pain/pressure for three weeks, and it was getting worse. The document does not state that Polson's "chief complaint" was asthma - although there is a notation that appears to say "CL asthma," or perhaps "CC asthma," this is more likely a reference to "chronic care," as Polson was on chronic care for his asthma issues.

60.   Defendants Contend: On May 18, 2011, Polson submitted another HNR complaining of "super ear aches."

> Plaintiffs Contend:  Plaintiffs contend that Polson's HNR states that he had "severe ear aches" not "super ear aches."

61.   Defendants Contend: He also noted that he woke up to something crawling in his ear and believed that "some bug or something (is) stuck in (his) left ear."

> Plaintiffs Contend:  Plaintiffs contend that Polson's HNR did not state that he believed a bug was stuck in his ear, but instead stated that he was "not sure but there could be some bug or something stuck in my left ear."

62. <u>Defendants Contend:</u> Unlike Polson's prior ear complaints regarding infections and blood, Polson reported that his ear aches in May and June 2011 were being caused by his allergies.

> <u>Plaintiffs Contend:</u> Plaintiffs contend that Polson submitted multiple HNRs in May and June 2011 that did not reference allergies. Even in the documents that come closest to Defendants' description, the fact is not correct. Polson did not state that his ear aches "were being caused by his allergies." Rather, he stated that he was having ear aches and he was "wondering if it's due to allergies again." Polson noted that he had previously been given allergy tabs, but was no longer getting the tabs and was having ear aches. He did state that his allergies cause ear aches, but did not claim to know what was causing his current ear aches.

63. <u>Defendants Contend:</u> Polson submitted an HNR on May 26, 2011, complaining of an "ear ache and possible infection."

> <u>Plaintiffs Contend:</u> Plaintiffs contend that Polson's HNR was marked "EMERGENCY" and he complained of a *severe* ear ache and possible infection, asked to see the doctor, and mentioned that he had lost his hearing in his right ear due to inattention.

64. <u>Defendants Contend:</u> On May 30, 2011, Polson submitted another HNR requesting allergy medication for his ear aches.

> <u>Plaintiffs Contend:</u> Plaintiffs contend that Polson's HNR did not ask for allergy medication for his ear aches. He reported having ear aches, and mentioned that he had "put 2 other kit[e]s in about my ears." He also reported that this was the "second kite I've put in for the allergey tablets I was prescribed." Although Polson "wonder[ed]" if the two were "connected," he did not "request allergy medication for his ear aches."

65.   Defendants Contend: Polson explained that the allergy medication was previously prescribed when he saw a Doctor about his ear aches, and that he thought the ear aches may be the result of his "allergeys (sic) again."

Plaintiffs Contend:  Plaintiffs contend that Defendants' records indicate that in Polson's most recent appointment three months earlier, he saw an LPN, not a doctor.

66.   Defendants Contend: On June 8, 2011, Polson submitted another HNR regarding his "cronic (sic) illness."

Plaintiffs Contend:   Plaintiffs contend that Polson referred to his "illnesses," not his "illness."

67.   Defendants Contend: Polson stated that he gets allergies "bad" and "they cause ear (aches) and infections," and that last time he saw a doctor he was prescribed allergy medication and "they did work."

Plaintiffs Contend:  Plaintiffs contend that Defendants' records indicate that in Polson's most recent appointment three months earlier, he saw an LPN, not a doctor.  In addition, although Polson said the tabs did work, he also said "I no longer get those."

68.   Defendants Contend: In a June 23, 2011 HNR, Polson stated that "a while back" he saw a Doctor who "prescribed some allergy tabs for my chronic ear aches" because he said the allergies caused the ear aches.

Plaintiffs Contend:  Plaintiffs contend that Defendants' records indicate that in Polson's most recent appointment three months earlier, he saw an LPN, not a doctor.  In addition, Polson did not say that "the allergies caused the ear aches," he said that a doctor gave him allergy tabs "cause he said it's the allergies or what not."  Polson reported that his ears had been hurting for two months.

69.    Defendants Contend: The doctor evaluated Polson's asthma and ears, noted that Polson reported ear pain and hearing loss in his right ear a year ago, and observed that there were no signs of infection.

Plaintiffs Contend:  Plaintiffs contend that the record does not say that Polson reported hearing loss "a year ago," it says that Polson has had "hearing loss x 1 yr."  The document also states "no evidence of prior ENT eval."

70.    Defendants Contend: The outside consult was approved and an appointment was scheduled for March 19, 2012.

Plaintiffs Contend:  Plaintiffs contend that the record does not state that an appointment was scheduled for March 19, 2012.  In addition, Defendants have presented no evidence showing that Polson was ever seen in March 2012, or at any later time, by an ENT.

71.    Defendants Contend: He also threatened, "Now I'm involved in a civil rights lawsuit. I will be notifying my lawyers right away of this cause its chronic care you're neglecting to treat."

Plaintiffs Contend:  Plaintiffs contend that Polson's HNR "stated" those words, but did not "threaten" ADC.  Polson was reporting that he would notify his lawyers that he was continuing to receive inadequate care.

72.    Defendants Contend: Although Polson tested positive for MRSA on September 5, 2008, the infection was on his buttocks, not in his ear.

Plaintiffs Contend:  Plaintiffs contend that although the tested sample was from Polson's buttocks, that does not prove that the infection was not colonized and was "not in his ear."

73.    Defendants Contend: The MRSA was also quickly treated after Polson's complaint.

Plaintiffs Contend  Plaintiffs contend that Polson complained of a "severe

wound" that was "making him sick" on August 17, and was told on August 18 that he would be referred to the Nurse's Line "ASAP," but was not seen on the Nurse's Line until over two weeks later, which is hardly "quickly." Further, defendants have cited no document indicating that Polson received treatment after the positive MRSA test.

74.   <u>Defendants Contend:</u> Although Polson complained on December 22, 2008, that he had MRSA in his nose, a lab report reported "no abnormality."

<u>Plaintiffs Contend:</u>  Plaintiffs contend that Polson did not "complain[] … that he had MRSA."  He stated that he "might have mersa or stuff inside of my nose," and asked to be seen because it had been "hurting very badly and bleeding a lot."  The cited test occurred 8 days later and it's not clear that the test had anything to do with Polson's complaint.  The only notation is "ALD - LBC - no abnormality."

75.   <u>Defendants Contend:</u> Polson asserted in multiple HNRs that the antibiotics and allergy medication he was given worked and he requested refills of these medications.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that none of the HNRs state that antibiotics helped Polson.  Only one of the documents cited says any medications "worked," and that document says that Polson got allergies bad and allergy tabs "did work" (in other words, helped with his allergies). Only one of the documents mentions antibiotics, and in that document, Polson asks that if he cannot be seen for his ear aches, that he get antibiotics.

76.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Polson submitted 77 HNRs.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the number of HNRs Mr. Polson submitted is immaterial to the substance of this litigation.  The filing of an

HNR does not ensure that Mr. Polson received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Polson did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Polson received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

77.     Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Polson submitted 4 HNRs.

Plaintiffs Contend:  Plaintiffs contend that the number of HNRs Mr. Polson submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Polson received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Polson did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Polson received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

Moreover, Defendants cite 7 HNRs in their uncontested facts for this time frame, but claim that Polson only submitted 4 HNRs.  In addition, Polson submitted at least one HNR that Defendants have omitted, bringing the total to at least 8.  Polson also submitted at least one inmate letter during this time regarding diet issues.

78.     Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Polson submitted 35 HNRs.

Plaintiffs Contend:  Plaintiffs contend that the number of HNRs Mr. Polson submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Polson received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Polson did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Polson received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

Moreover, Defendants cite 36 HNRs in their facts, but claim that Polson only submitted 35 HNRs.   In addition, Defendants appear to be missing some HNRs, as noted above.

79.     Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Polson submitted 116 HNRs.

Plaintiffs Contend:  Plaintiffs contend that the number of HNRs Mr. Polson submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Polson received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Polson did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Polson received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.   Moreover, as demonstrated above, Defendants' numbers do not match their own alleged facts.

80.    Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Polson had 19 encounters with a nurse.

      Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

81.    Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Polson had 1 encounter with a nurse.

      Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

82.    Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Polson had 3 encounters with a nurse.

      Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

83.    Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Polson had 23 encounters with a nurse.

      Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received

and whether or not defendants were deliberately indifferent.

84.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Polson had 3 encounters with a mid-level provider.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.
>
> Plaintiffs also contend that the term "mid-level provider" is vague.

85.   <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Polson had 2 encounters with a mid-level provider.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.  Plaintiffs also contend that the term "mid-level provider" is vague.

86.   <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Polson had 5 encounters with a mid-level provider.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent. Plaintiffs also contend that the term "mid-level provider" is vague.

87.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Polson had 7 encounters with a physician.

> Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

88.     Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Polson had 2 encounters with a physician.

> Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

89.     Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Polson had 3 encounters with a physician.

> Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

90.     Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Polson had 12 encounters with a physician.

> Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

91.     Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Polson had 40 encounters with medical staff.

      Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

92.     Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Polson had 144 encounters with healthcare staff.

      Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

93.     Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Polson had 4 chronic care appointments.

      Plaintiffs Contend:  Plaintiffs contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

94.     Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Polson had 3 outside specialty care consultations.

      Plaintiffs Contend:  Plaintiffs contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately

indifferent.  In particular, Polson's visit to the ENT came long after it was needed and after Polson's ear had become a "dead ear."

## III.   DENTAL ALLEGATIONS

95.   <u>Defendants Contend:</u> Polson's initial dental screening noted no urgent dental issues.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that the "dental screening" was done by an unknown individual, and only six items were on the checklist: (1) bleeding, (2) swelling/trauma, (3) obvious abnormalities, (4) unable to open or close mouth, (5) dentures present, (6) braces or fixation wires present. An inmate may have "urgent dental issues" that do not fall into these categories.

96.   <u>Defendants Contend:</u> Polson claims half his teeth were knocked during a prison assault.

> <u>Plaintiffs Contend:</u> Polson estimated in his deposition that "probably at least half" of his teeth were knocked out in a prison assault.  To the extent this fact relies on Polson's deposition, Plaintiffs contest the accuracy of statements made during that deposition.  Polson twice informed defense counsel on the record that he did not feel he could give accurate answers due to Defendants' decision to move Polson to a different complex days before the deposition, and to deprive him of his property, his legal materials, his soft diet, and multiple doses of his mental health medications in the days leading up to the deposition.  Defense counsel elected to take the entire deposition anyway.

97.   <u>Defendants Contend:</u> Polson submitted an HNR on May 13, 2008, stating: "I would like to go head and get partials and any other care that needs to be done with my teeth. I have talked to my dentist on streets and she says partials would be best."

> Plaintiffs Contend:   Plaintiffs contend that Polson's HNR states that he wants to "get the partials," not "get partials."  Polson was told on May 14, 2008 that he would be placed on the routine care list,  and was not called to dental until April 9, 2009.

98.   Defendants Contend: Polson was scheduled for dental treatment on April 9, 2009 but refused, stating "I, feel, fine with my teeth right now."

> Plaintiffs Contend:   Plaintiffs contend that Polson told the dentist that he did not want his top teeth extracted at that time because he was not receiving his soft diet, and he needed the teeth he had left to try to chew what was being given to him.

99.   Defendants Contend: On April 30, 2010, Polson's extraction work was completed with the removal of #24 and #23.

> Plaintiffs Contend:   Plaintiffs contend that these removals were performed on April 13, not April 30.   Nine days after these extractions, Polson submitted an HNR complaining of pain after the extractions, and reported that he extractions were not healing well and were sometimes bleeding. Polson also reported that he was not receiving his proper diet.   His complaint of pain was answered 12 days letter, with an instruction to "be patient." Polson was not seen until May 13, 2010, three weeks after he complained of pain.

100.   Defendants Contend: Polson's remaining HNRs related to dental involve efforts to stay on the soft diet, which he eventually persuaded the dentist to allow despite his partial denture.

> Plaintiffs Contend:   Plaintiffs contend that Polson submitted numerous HNRs and grievances in which he reported that he was not receiving the soft diet that was prescribed to him.  In addition to the other diet issues, after Polson received his partial dentures, four months later he asked for his

soft diet to be renewed.  In response to his HNR, a dental assistant told Polson that his soft diet would not be renewed, without any examination of Polson.

101.    Defendants Contend: Polson also complains that his partial dentures do not fit well and hurt, but he admits that he uses them when eating and does not recall ever filing an HNR complaining about the fit of the dentures.

Plaintiffs Contend:  Plaintiffs contend that Polson said he tried to eat with the dentures, but couldn't.  Polson repeatedly asked for his dentures to be adjusted and for his soft diet to be provided because of his difficulty in chewing.

To the extent this fact relies on Polson's deposition, Plaintiffs contest the accuracy of statements made during that deposition.  Polson twice informed defense counsel on the record that he did not feel he could give accurate answers due to Defendants' decision to move Polson to a different complex days before the deposition, and to deprive him of his property, his legal materials, his soft diet, and multiple doses of his mental health medications in the days leading up to the deposition.  Defense counsel elected to take the entire deposition anyway.

102.    Defendants Contend: Polson claims that he waited three years for dentures, but he fails to mention that he required extensive preparatory dental work before the process of making dentures could be started, including filling cavities, extracting non-restorable/abscessed teeth, and bringing his oral hygiene to an acceptable level, all before partials could be started.

Plaintiffs Contend:  Plaintiffs contend that the delay in Polson's dentures is not due to "extensive preparatory dental work," especially considering that Polson waited almost a year from his initial request for partial dentures to even see the dentist.  (Polson was told on May 14, 2008 that he would be

placed on the routine care list,  and was not called to dental until April 9, 2009)

103.   Defendants Contend: Polson who had allegedly lost several teeth from an assault, and had several other teeth that were irreversibly diseased, required extraction work that he continually postponed.

Plaintiffs Contend:   Plaintiffs contend that Polson did not "continually postpone[]" extraction work.   Polson asked for treatment, including extractions, as early as May 2008. He refused treatment on one occasion due to ADC's inability to provide his soft diet, and on another occasion, declined treatment because of problems in healing from a prior extraction. Once his mouth healed, he submitted another HNR asking for more treatment so that he could get his partials.   Polson underwent many extractions.

To the extent this fact relies on Polson's deposition, Plaintiffs contest the accuracy of statements made during that deposition.   Polson twice informed defense counsel on the record that he did not feel he could give accurate answers due to Defendants' decision to move Polson to a different complex days before the deposition, and to deprive him of his property, his legal materials, his soft diet, and multiple doses of his mental health medications in the days leading up to the deposition.  *See, e.g.*, Polson Dep. 9:14-25; 15:11-15:23; 23:9-23:22; 30:24-33:22.  Defense counsel elected to take the entire deposition anyway.

104.   Defendants Contend: Polson admitted to heavy usage of methamphetamine during his deposition and very likely had "meth mouth."

Plaintiffs Contend:  Plaintiffs contend that Polson denied that he had meth mouth and maintained that although he had used methamphetamine, he did not smoke it.  Polson Dep. 95:12-95:17.

Plaintiffs contend that to the extent this fact relies on Polson's deposition, Plaintiffs contest the accuracy of statements made during that deposition. Polson twice informed defense counsel on the record that he did not feel he could give accurate answers due to Defendants' decision to move Polson to a different complex days before the deposition, and to deprive him of his property, his legal materials, his soft diet, and multiple doses of his mental health medications in the days leading up to the deposition. *See, e.g.*, Polson Dep. 9:14-25; 15:11-15:23; 23:9-23:22; 30:24-33:22. Defense counsel elected to take the entire deposition anyway.

105. <u>Defendants Contend:</u> Many patients have misgivings about wearing dentures for the first time, and there are some patients who will never comfortably accommodate a partial, regardless of how well made the device is.

<u>Plaintiffs Contend:</u> This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The fact that "many patients have misgivings about wearing dentures for the first time" and "some patients will never comfortably accommodate a partial" does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Polson as a result of the healthcare provided by the ADC.

106. <u>Defendants Contend:</u> While he may have expected to receive dentures immediately after requesting them, Polson needed to arrest his cavities, remove abscessed teeth, and have all of his dental treatment completed prior to beginning impressions for a partial.

<u>Plaintiffs Contend:</u> Plaintiffs contend that what Polson "expected" is pure speculation, and that there is no need for "all" dental treatment to be completed before impressions for a partial can be done.

107.   Defendants Contend: Polson further added to the length of time required by refusing dental treatment in April 2009 and December 2009.   After each refusal, he eventually submitted a new HNR and was placed back on the routine care list to again wait for the treatment that he had previously refused.

Plaintiffs Contend:   Plaintiffs contend that Polson refused extractions on April 9, 2009, because ADC was not delivering his diet, and thus he needed the teeth in order to try to chew the food.   On the other occasion, Polson declined treatment because of problems in healing from a prior extraction. Once his mouth healed, he submitted another HNR asking for more treatment so that he could get his partials.   Thus, for the two cited refusals, one was a result of ADC failing to deliver Polson's diet, and the other was a result of Polson's mouth not healing properly.   Defendants have not contended that Polson should have undergone treatment in December 2009, when his mouth had not healed from the previous extraction, and admit that a time for healing is needed after extractions.   Defendants have also not claimed that Polson should have had teeth pulled even if doing so would prevent him from chewing the food that Defendants gave him.   Defendants have also failed to quantify what "length of time" was purportedly added.

108.   Defendants Contend: The 3.5 month period between his last extractions on April 30, 2010 and his August 12, 2010 visit to start the denture process by taking preliminary impressions was occupied by two separate visits in June and July for fillings and gingivitis treatment.

Plaintiffs Contend:   Plaintiffs contend that Defendants state that two other appointments "occupied" a three and a half-month period and imply that dental impressions could not have been taken during this time, or at either appointment.   But neither appointment involved extractions or alterations to Polson's dental structure, DSOF 845, 846.   Notably, their expert offers no

opinion on this point.  He does state that oral hygiene must be brought "to an acceptable level," but the records from Polson's May and July visits both indicate that his oral health was good.

109.   <u>Defendants Contend:</u> Polson was prescribed a mechanical soft diet from April 2008 until it came up for renewal in November, 2011, when it was denied based on Polson's receipt of a partial denture in April 2011.

<u>Plaintiffs Contend:</u>   Plaintiffs contend that in August 2010, Polson requested a renewal of his soft diet.  A dental assistant denied his request, because his plan did not expire until November 5, and told Polson to submit another HNR in October.  Id.  In October 2010, Polson requested a renewal of his soft diet, and was seen, but the response again stated that his diet did not expire until November 5.  Polson submitted three HNRs after November 5 reporting that his soft diet was expired and had not been renewed, which prevented him from being able to take his mental health medications, which are required to be taken with food.  On November 20, Polson was told that his diet was finally renewed on November 18, almost two weeks after it expired.  But Polson still did not receive his soft diet, and submitted another HNR on November 27 reporting this issue and stating that because he had not been given his diet card, the guards would not give him the diet.  An LPN responded to Polson's HNR by stating "All diet request [sic] need to made [sic] to Chaplin [sic]."  It is unclear when Polson eventually received his diet card, but it was at least three weeks after the diet expired, despite his repeated requests for renewal before and after the expiration date.  In addition, even when Polson was "prescribed" a soft diet, he often did not receive it.

110.  <u>Defendants Contend:</u> The length of time between Polson's request for dentures and his final receipt of them was the result of his need for extensive preparatory dental work based on the poor condition of his teeth and his own refusals of the necessary treatment.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that Polson first requested dentures on May 13, 2008, and was told he was on the waiting list. Yet he was not seen by any dental personnel until April 9, 2009 - a gap of eleven months after his initial HNR requesting treatment.  This gap cannot possibly be attributed to Polson.  On this basis alone, defendants cannot claim that the "length of time between Polson's request for dentures and his final receipt of them was the result" of Polson's teeth and refusals.  In addition, defendants claim that "three months of delay was due to the lab," which also cannot be attributable to Polson.  As for Polson's refusals, he refused treatment on one occasion due to ADC's inability to consistently give him his prescribed diet, and on another occasion, declined treatment because of problems in healing from a prior extraction.  Once his mouth healed, he submitted another HNR asking for more treatment so that he could get his partials.  Defendants have not contended that Polson should have undergone treatment in December 2009, when his mouth had not healed from the previous extraction, and admit that a time for healing is needed after extractions.  The gap between the April 9 refusal and Polson's next HNR was about three months.  The time gap between Polson's December 9 refusal and Polson's December 23 HNR was two weeks.  Thus, the vast majority of the delays in Polson's denture process is plainly attributable to defendants.

111.  <u>Defendants Contend:</u> Given the number of steps required, many of which require sending materials to an outside lab and waiting for materials to be sent back, and

the number of appointments required to make impressions, take measurements, and adjust the fit, 8.5 months is reasonable.

> Plaintiffs Contend:  Plaintiffs contend that 8.5 months is not reasonable, even with the number of steps required.

112.  Defendants Contend: Throughout the process of completing his preparatory work and making his dentures, Polson was prescribed a soft diet, and he even persuaded the dentist to put him back on the soft food diet after he received his partials.

> Plaintiffs Contend:   Plaintiffs contend that in August 2010, Polson requested a renewal of his soft diet.  A dental assistant denied his request, because his plan did not expire until November 5, and told Polson to submit another HNR in October.  Id.  In October 2010, Polson requested a renewal of his soft diet, and was seen, but the response again stated that his diet did not expire until November 5.   Polson submitted three HNRs after November 5 reporting that his soft diet was expired and had not been renewed, which prevented him from being able to take his mental health medications, which are required to be taken with food.  On November 20, Polson was told that his diet was finally renewed on November 18, almost two weeks after it expired.  But Polson still did not receive his soft diet, and submitted another HNR on November 27 reporting this issue and stating that because he had not been given his diet card, the guards would not give him the diet.  An LPN responded to Polson's HNR by stating "All diet request [sic] need to made [sic] to Chaplin [sic]."  It is unclear when Polson eventually received his diet card, but it was at least three weeks after the diet expired, despite his repeated requests for renewal before and after the expiration date.  In addition, even when Polson was "prescribed" a soft diet, he often did not receive it.

IV.   **MENTAL HEALTH CLAIMS**

113.   <u>Defendants Contend</u>: Polson regularly refuses to take his psychotropic medications.

> <u>Plaintiffs Contend</u>:   Plaintiffs contend that "regularly" is vague and undefined.  Plaintiffs contend that Polson has not regularly refused to take his psychotropic medications.   Polson has refused his medications on occasion, but has usually stated at the time that this is due to the side effects.  Defendants omit Polson's stated reasons for refusing medications, such as the side effects created by the medications (for example: one HNR stated that Polson was refusing meds because he "need[s] to speak to mental health about the meds and side effects, preferabl[y] in private It hard to expl[ain] without other Inmates listen[]ing.  Also I would like to be put back on Haldol please I'm getting paranoid of others again pretty bad, this has to do with my solitary confinements and isolation."  One week later, Polson received a response from his HNR that said he had an appointment scheduled.).  Despite these side effects, Polson often had to wait weeks or months to see a provider.
>
> Defendants also ignore Mr. Polson's inability to take psychotropic medications that must be taken with food when his diet was not being delivered to him (for example: one HNR stated "Doc, I'm refusing my meds for as long as they can't get my diet right.  Without being able to eat I can't take my meds because of my meds need me to eat and I can't do that if I can't get my diet.  I've tried to solve it other ways ... I need the diet fix so I can eat and take my meds that are very necessary to my mental stability, other wise I can very much become a behavior problem I don't want that and neither do you.")

114.   <u>Defendants Contend:</u> Polson claims he has been diagnosed with bipolar disorder, substance-induced psychotic disorder, post-traumatic stress disorder, and psychosis, for which he takes multiple medications, including lithium.

      <u>Plaintiffs Contend:</u>  Plaintiffs contend that Polson does not currently take lithium.

115.   <u>Defendants Contend:</u> Polson claims he has not had regular blood draws to test for dangerous side effects from these medications since 2009.

      <u>Plaintiffs Contend:</u>  Plaintiffs contend that Polson has claimed he has not had these draws to test his lithium blood levels.

116.   <u>Defendants Contend:</u> Polson's regular dosage of lithium is 300 mg, twice per day. During his deposition, Polson claimed that he had only received two doses of lithium that week (his deposition was taken on a Friday) – on the previous afternoon (Thursday), and one on either Monday or Tuesday morning.

      <u>Plaintiffs Contend:</u>  Plaintiffs contend that to the extent this fact relies on Polson's deposition, Plaintiffs contest the accuracy of statements made during that deposition.  Polson twice informed defense counsel on the record that he did not feel he could give accurate answers due to Defendants' decision to move Polson to a different complex days before the deposition, and to deprive him of his property, his legal materials, his soft diet, and multiple doses of his mental health medications in the days leading up to the deposition.  Defense counsel elected to take the entire deposition anyway.

      Moreover, it is unclear when "that week" began and ended - the questions and answers at Polson's deposition revolved around the time since he had been unexpectedly and inexplicably moved to a different complex, just days prior to the deposition (on either Monday or Tuesday).  Polson stated he had received one dose Tuesday morning before being

moved, and one Thursday afternoon, and his other doses had been missed. One question did ask Polson what medication he had "this week," but he later clarified that he had received his medication at his previous complex before he was unexpectedly moved, and that he had gotten his last dose before the move on Tuesday morning.   This matches the medication administration record almost exactly.

117.   Defendants Contend: Polson's Medication Administration Record indicates he received both daily doses from August 1-19, 2013, that he received his morning dose on August 20, 2013 (the Tuesday prior to his deposition), that he may have received both doses on August 21, 2013, and that he received both doses on August 22, 2013 (the day before his deposition). Polson also received his morning dose on the date of his deposition.

Plaintiffs Contend:  Plaintiffs contend that the Medication Administration Record clearly shows the letters "N/A" written on August 21, 2013, and thus, it is inaccurate to say that Polson "may have received both doses." Polson did not receive his morning dose on the date of his deposition until after he had reported the issue, defense counsel had conferred with ADC officials, and it had then been delivered during a break.

118.   Defendants Contend: Polson has been on lithium for several years.

Plaintiffs Contend:  Plaintiffs contend that to the extent this fact relies on Polson's deposition, Plaintiffs contest the accuracy of statements made during that deposition.   Polson twice informed defense counsel on the record that he did not feel he could give accurate answers due to Defendants' decision to move Polson to a different complex days before the deposition, and to deprive him of his property, his legal materials, his soft diet, and multiple doses of his mental health medications in the days leading up to the deposition.   Defense counsel elected to take the entire

deposition anyway.

Moreover, Polson is not currently on lithium.

119.   <u>Defendants Contend:</u> He admits that, during the time he was on lithium, he has refused his lithium, but cannot say how often or when.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that to the extent this fact relies on Polson's deposition, Plaintiffs contest the accuracy of statements made during that deposition.  Polson twice informed defense counsel on the record that he did not feel he could give accurate answers due to Defendants' decision to move Polson to a different complex days before the deposition, and to deprive him of his property, his legal materials, his soft diet, and multiple doses of his mental health medications in the days leading up to the deposition.  Defense counsel elected to take the entire deposition anyway.
>
> Moreover, in his deposition, Polson did state several times in which he had refused his lithium, how he did it, and why he did it.

120.   <u>Defendants Contend:</u> Polson told prison staff that he did not want his afternoon doses in July 2011, and refused almost half of his lithium doses in August 2011. Polson contends the August 2011 documentation was forged.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that to the extent this fact relies on Polson's deposition, Plaintiffs contest the accuracy of statements made during that deposition.  Polson twice informed defense counsel on the record that he did not feel he could give accurate answers due to Defendants' decision to move Polson to a different complex days before the deposition, and to deprive him of his property, his legal materials, his soft diet, and multiple doses of his mental health medications in the days leading up to the deposition.  Defense counsel elected to take the entire deposition anyway.

Polson stated in his deposition that he did not know if he refused any lithium doses in August 2011, and pointed out to defense counsel a proven instance of past forgery in response to her assertion that the document showing his refusals must be accurate.

121.   Defendants Contend: Polson has a history of refusing his medications.

Plaintiffs Contend:  Plaintiffs contend that the word "history" is vague. Plaintiffs admit that Polson has refused his medications on occasion in the past, sometimes due to side effects, and sometimes due to ADC's inability to consistently deliver Polson's soft diet, which is needed in order for Polson to take psychotropic medications that can only be taken with food.

122.   Defendants Contend: Polson's lithium levels were checked on May 14, 2010; September 20, 2010; November 1, 2010; February 7, 2012; May 23, 2012; November 14, 2012; May 13, 2013; and June 12, 2013.

Plaintiffs Contend:  Plaintiffs contend that Defendants have not produced records sufficient to prove this point.  Even if Polson's lithium levels were measured as part of other blood work, that does not mean that his levels were "checked" by any ADC personnel.  Moreover, Defendants' records indicate that Polson's lithium levels were too low on at least one occasion, and little appears to have been done.

123.   Defendants Contend: Plaintiff further claims that, at most, a psychology assistant comes by and asks him how he is doing every other week, and that during this "isolation" his mental state deteriorates, to the point that he becomes paranoid and hears voices.

Plaintiffs Contend:  Plaintiffs contend that Polson made this claim in November 2012.

124.   Defendants Contend: On June 14, 2013, Polson reported no mental health issues, had no complaints, and was stable and low risk.

Plaintiffs Contend:  Plaintiffs contend that a document created by a psych associate states this, but as Polson has stated, psych associate cellfront interviews are often extremely short and consist of nothing more than a general "how are you" question.

125.   Defendants Contend:  On June 28, 2013, Polson was seen by a psych associate.

Plaintiffs Contend:  Plaintiffs contend that a document created by a psych associate states this, but as Polson has stated, psych associate cellfront interviews are often extremely short and consist of nothing more than a general "how are you" question.

126.   Defendants Contend:  On July 18, 2013, Polson was seen by a psych associate.

Plaintiffs Contend:  Plaintiffs contend that a document created by a psych associate states this, but as Polson has stated, psych associate cellfront interviews are often extremely short and consist of nothing more than a general "how are you" question.

127.   Defendants Contend:  Polson often reported doing well, with no mental health-related issues or complaints during contacts with mental health providers.

Plaintiffs Contend:   Plaintiffs contend that the term "mental health providers" is vague.  Plaintiffs contend that a documents created by a psych associates state this, but as Polson has stated, psych associate cellfront interviews are often extremely short and consist of nothing more than a general "how are you" question.

128.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Polson had: 4 encounters with a psych tech; 36 encounters with a psych associate; 7 encounters with a psychologist; 36 encounters with a psychiatric nurse and 21 encounters with a psychiatrist.

> Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent. As Polson has stated, psych associate cellfront interviews are often extremely short and consist of nothing more than a general "how are you" question.

129.  Defendants Contend: Between March 22, 2010 and April 1, 2014, Polson had a total of 104 encounters with psychology and psychiatry staff.

> Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.  As Polson has stated, psych associate cellfront interviews are often extremely short and consist of nothing more than a general "how are you" question.

130.  Defendants Contend: Polson submitted an HNR on August 15, 2010 stating that a nurse "put [him] on report" for refusing his medications that morning. Although he did not specifically request any particular action, including an appointment, the response indicated that an appointment was scheduled. Polson was seen by a psychiatric nurse on August 20, 2014, at which time he informed the nurse that he had been refusing his medications for the past five days, but refused to sign the form.

> Plaintiffs Contend:  Plaintiffs contend that Polson did request action, as he reported in the HNR that he had been refusing his medications, said he was afraid to even get meds, and asked mental health staff to "please take me off my meds ASAP." Plaintiffs contend that Defendants' description of the August 20 appointment is incorrect, and that Polson was not seen on that

date.

131.   <u>Defendants Contend:</u> Polson submitted two more mental health HNRs on August 22, 2014, claiming that he had put in several requests since August 15, but received no response. The response to the first HNR indicated that Polson had been seen. Polson was seen by Dr. Bishop on August 25, 2010, who noted that Polson continued to refuse his medications.  Dr. Bishop discontinued Polson's Haldol and Benzepine, but continued his lithium prescription, and noted that Polson was to be seen by the psychiatric nurse in three months to check his lithium levels, and by the psychiatrist in six months.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that Polson did not submit two more HNRs on that date, and did not claim that he had put in several requests since August 15 and received no response.  Moreover, there is no indication that the follow-up appointments ordered by Dr. Bishop ever occurred.

132.   <u>Defendants Contend:</u> Polson submitted an HNR on September 22, 2010, asking to be taken off all of his medications so that he could get a lower mental health score. An appointment was scheduled in response. Polson was seen the next day by a nurse, who noted that Polson refused all of his medications. Additionally, Dr. Tenneiro responded to Polson's HNR in a separate letter to Polson, informing him of the reasons why she though he should remain on his medications. Dr. Bishop followed up with Polson on September 30, 2010 and noted that Polson still was not taking his medications, at which point Dr. Bishop discontinued Polson's lithium as well.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that there is no indication that an appointment was scheduled "in response" to Polson's September 22 HNR. In addition, Dr. Tenrrerio's letter did not tell Polson "why she though[t] he should remain on his medications."  Instead, it focused on the fact that getting off of his medications would not reduce his score.

133.   Defendants Contend: Polson submitted an HNR on November 8, 2010 asking why his blood was being taken if he was not going to consistently receive his medications. The response was that nursing would be consulted to ensure that he received his medications.  Polson was seen by Dr. Tenrreiro on November 19, 2010 in response to the HNR and reported that he was taking his lithium.

> Plaintiffs Contend:  Plaintiffs contend that Polson reported that he had not been getting his medications and that the nurses "just flat out don't bring them."  The response stated that the person would "check with nursing," but does not say that anyone would "ensure that he received his medications," and the medication issues continued.

134.   Defendants Contend: Polson submitted two HNRs on March 12, 2011 complaining that he did not receive his medications that day. The response was that nursing had been consulted to correct the issue. Polson made a similar complaint in an HNR submitted on April 6, 2011, but the medication administration record showed that he was given his medications on that date. Polson claimed the record was falsified.

> Plaintiffs Contend:  Plaintiffs contend that Polson's HNRs did not complain that "he did not receive his medications that day," and instead reported a continuing problem in medication delivery.  Moreover, the response to his March 12, 2011 HNRs did not state that nursing would "correct the issue."

135.   Defendants Contend: Polson submitted an HNR on August 2, 2011 stating that he was refusing his medications in the morning because his dose was too high, apparently under the belief that his dosage was 600 mg twice a day. He was seen by Dr. Bishop on August 22, 2011, at which time he again requested a lower dosage. Dr. Bishop renewed his lithium prescription for 300 mg twice a day. Polson was also seen by the psych associate on August 23, 2011, who provided Polson with a new journal and word puzzles. MHC 27

> Plaintiffs Contend:  Plaintiffs contend that Polson's prescription at the time

was 300 mg twice per day.  Plaintiffs disagree that Polson's belief was that "his dosage was 600 mg twice a day."  Despite Polson's requests, Dr. Bishop renewed Polson's lithium at the exact same dosage he was previously receiving.

To the extent this fact relies on Polson's deposition, Plaintiffs contest the accuracy of statements made during that deposition.  Polson twice informed defense counsel on the record that he did not feel he could give accurate answers due to Defendants' decision to move Polson to a different complex days before the deposition, and to deprive him of his property, his legal materials, his soft diet, and multiple doses of his mental health medications in the days leading up to the deposition.  *See, e.g.*, Polson Dep. 9:14-25; 15:11-15:23; 23:9-23:22; 30:24-33:22.  Defense counsel elected to take the entire deposition anyway.

136.  <u>Defendants Contend:</u> Polson submitted an HNR on November 30, 2011, asking to have his lithium reduced to once per day at 300 mg. An appointment was scheduled with psychiatry, and Polson was seen by Dr. Bishop on December 14, 2011, at which time he reported that he was taking his medications, and that they were effective. Polson was seen by Dr. Tenrreiro on December 15, 2011, at which time he again reported no issues. MHC 28

<u>Plaintiffs Contend:</u>  Plaintiffs contend that Polson "reported he was doing okay" on December 15, 2011, according to Dr. Tenrreiro.

137.  <u>Defendants Contend:</u> Polson submitted an HNR on January 31, 2012 asking to have his lithium adjusted back to twice per day, and requesting to see the psychiatrist. Polson was seen by the psych associate on February 7, 2012, and by Dr. Bishop on February 13, 2012. MHC 29

<u>Plaintiffs Contend:</u>  Plaintiffs contend that prior to the HNR cited, Polson submitted an HNR on January 13, 2012 asking to have his lithium adjusted

back to twice per day, because the nurses were not bringing it once per day, so his 'chances of getting [his] meds' were better with twice a day." Polson was not seen until after he submitted another HNR on January 31.

138.   Defendants Contend: Polson submitted an HNR on August 21, 2013 asking to speak to a "psych." He submitted a second HNR asking to speak to a "psych" on August 19, 2013, claiming it was now his third HNR for this issue. He was seen on September 11, 2013.

> Plaintiffs Contend:  Plaintiffs contend that Polson's HNR on August 19, 2013 could not have been the "second HNR" if the first HNR was on August 21, 2013.  After a diligent search, Plaintiffs have not been able to locate all of the HNRs referred to in this fact.

139.   Defendants Contend: Polson submitted an HNR on November 7, 2013 asking to see a "psych doctor" about getting back on his medications. He was referred to psychology on November 11, 2013. Polson was seen by a psych tech on November 18, 2013, who referred him to psychiatry. He was again seen by the psych tech on November 28, 2013 and December 9, 2013. He was seen by the psychiatrist on December 11, 2013. MHC 31 et seq.

> Plaintiffs Contend:  Plaintiffs contend that to the extent the fact states "Polson was seen by a psych tech on November 18, 2013, who referred him to psychiatry. He was again seen by the psych tech on November 28, 2013 and December 9, 2013. He was seen by the psychiatrist on December 11, 2013," after a diligent search, Plaintiffs have been unable to locate these records, and thus contest that portion of the fact at this time.

140.   Defendants Contend: Polson submitted two HNRs on January 13, 2014 asking to be put on Wellbutrin and complaining about not being seen enough. He was seen by a psych associate on January 14, 2014. Polson then attended the "Relaxation Group" with a psych associate on January 21, 2014. He was seen by another psych

associate on February 4, 2014. He was seen by the psychiatrist on February 11, 2014, who prescribed Remeron.

>Plaintiffs Contend:   Plaintiffs contend that to the extent the fact states "Polson submitted two HNRs on January 13, 2014 asking to be put on Wellbutrin and complaining about not being seen enough. He was seen by a psych associate on January 14, 2014," after a diligent search, Plaintiffs have been unable to locate these records, and thus contest that portion of the fact at this time.

141.   Defendants Contend: Polson submitted an HNR on March 1, 2014 complaining about the Remeron and again asking to put on Wellbutrin. He was seen by Dr. Tenrreiro on March 5, 2014.  Polson submitted additional HNRs on March 13, March 17, and March 19, 2014 reiterating his complaints about the Remeron. The psychiatrist saw Polson on March 19, 2014, discontinued the Remeron, and prescribed Wellbutrin.

>Plaintiffs Contend:   Plaintiffs contend that Polson's HNRs complained about the side effects of the Remeron.

142.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Polson had 4 encounters with a psych tech.

>Plaintiffs Contend:   Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

143.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Polson had 12 encounters with a psych associate.

>Plaintiffs Contend:   Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is

immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

144.   <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Polson had 1 encounter with a psych associate.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

145.   <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Polson had 23 encounters with a psych associate.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

146.   <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Polson had 36 encounters with a psych associate.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

147.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Polson had 4 encounters with a psychologist.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions,

appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

148.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Polson had 3 encounters with a psychologist.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

149.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Polson had 7 encounters with a psychologist.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

150.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Polson had 47 encounters with psychology staff.

Plaintiffs Contend: Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

151.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Polson had 5 encounters with a psychiatric nurse.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague.

Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

152.   <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Polson had 1 encounter with a psychiatric nurse.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

153.   <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Polson had 30 encounters with a psychiatric nurse.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

154.   <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Polson had 36 encounters with a psychiatric nurse.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

155.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Polson had 13 encounters with a psychiatrist.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

156.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Polson had 1 encounter with a psychiatrist.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

157.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Polson had 7 encounters with a psychiatrist.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

158.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Polson had 21 encounters with a psychiatrist.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

159.   <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Polson had 57 encounters with psychiatry staff.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Polson had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Polson ultimately received and whether or not defendants were deliberately indifferent.

**Exhibit G – Sonia Rodriguez**

## I.      BACKGROUND

1.      On April 15, 2009, Rodriguez pled guilty to aggravated assault in violation of A.R.S. § 13-1204; misconduct involving weapons in violation of A.R.S. §13-3102; possession or use of marijuana in violation of A.R.S. § 13-3405.  Her sentence for these crimes began May 29, 2009.

2.      Rodriguez is currently incarcerated at ASPC-Perryville.

## II.     <u>MEDICAL ALLEGATIONS</u>

3.      Rodriguez alleges: "I filed a health needs request ("HNR") on July 10, 2012 asking for help with the shaking and tremors I was experiencing. The response I got two weeks later, on July 24, 2012, was: 'You will be scheduled, there is a waiting list.' I have still not been seen for this issue."

4.      On June 25, 2012 the nurse observed that Rodriguez appeared weak and shaky, and her breathing sounded wheezy and slightly diminished.

5.      The provider also advised Rodriguez to submit a HNR requesting a replacement inhaler.

6.      On July 10, 2012, Rodriguez  submitted an HNR stating  she needs "something" to help her with her shaking.

7.      Staff responded that she will be scheduled and there was a waiting list.

## III.    <u>MENTAL HEALTH CLAIMS</u>

8.      Rodriguez went to Flamenco a second time as well, where she again enjoyed the groups. Although she could not recall the doctor's name, Rodriguez also liked a doctor at Flamenco, who Rodriguez described as "consistent and helped (her) out."

9.      Additionally, there is always an officer in front of her door while she is on suicide watch. Rodriguez receives the same number of meals on watch as off of it, and at the same times of the day. She is allowed to shower every two to three days.

1

**CONTESTED FACTS**

## I.   <u>BACKGROUND</u>

1.   Defendants Contend: On October 27, 1993, Rodriguez pled guilty to attempted child abuse in violation of A.R.S. § 13-3623(A)(B). Her sentence began on May 28, 1993.

> <u>Plaintiffs Contend</u>: The information is inadmissible under Fed. R. Evid. 609(b), so no further response is necessary.

2.   <u>Defendants Contend</u>: Rodriguez has been incarcerated in ADC twice – once in 1993 and again in 2005.

> <u>Plaintiffs Contend</u>:   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Ms. Rodriguez faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

3.   <u>Defendants Contend</u>: Rodriguez is currently serving an 18-year sentence, beginning on January 20, 2008, after pleading guilty to aggravated assault on a peace officer, misconduct involving weapons, and possession or use of marijuana.

> <u>Plaintiffs Contend</u>:   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Ms. Rodriguez faces as a result of

2

the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

## II.   MEDICAL ALLEGATIONS

4.   <u>Defendants Contend:</u> On June 25, 2012, Rodriguez reported that she lost her inhaler and requested one "ASAP."

> <u>Plaintiffs Contend:</u>  Uncontested that Rodriguez reported that she lost her inhaler and needed one as soon as possible, but contested as the statement is misleading because it does not fully and accurately describe the content of Ms. Rodriguez's medical records regarding the lost inhaler on June 25, 2012. Rodriguez also tried reporting the loss of her inhaler in person so that she could receive her emergency breathing treatment more quickly, but she was not given an inhaler and instead was told to fill out an HNR.

5.   <u>Defendants Contend:</u> She was seen by a provider that same day, who noted that Rodriguez had complained about difficulty breathing and that she lost her inhaler

> <u>Plaintiffs Contend:</u>  Undisputed that ADC became aware that Rodriguez had difficulty breathing; disputed that any treatment that day provided adequate treatment.

6.   <u>Defendants Contend:</u> While she claims she was never treated, Rodriguez was actually seen the next day, on July 11, 2012, by a provider who prescribed Albuterol, which had helped before.

> <u>Plaintiffs Contend:</u>  The temporary inhaler solution was not a complete solution to Rodriguez's need for an inhaler. Despite showing severe

symptoms, such as being weak and shaky with wheezy and diminished breathing, Rodriguez was not given a replacement inhaler.

7.    <u>Defendants Contend:</u> Although Rodriguez submitted HNRs on August 27, 2012 regarding dental, September 13, 2012 regarding new glasses, and in October 2012, six other HNRs complaining of other issues, she did not again report or request a problem with "shaking" or "tremors," as she now alleges.

> <u>Plaintiffs Contend:</u> Although the records say that there is a prescription dated July 11, 2012, it is unclear whether Rodriguez was actually fully treated by a provider. Rodriguez's wait time also was not simply one day; she waited several weeks from the time she first needed and requested an inhaler until the time she received one.

8.    <u>Defendants Contend:</u> Although Rodriguez submitted HNRs on August 27, 2012 regarding dental, September 13, 2012 regarding new glasses, and in October 2012, six other HNRs complaining of other issues, she did not again report or request a problem with "shaking" or "tremors," as she now alleges.

> <u>Plaintiffs Contend:</u> Rodriguez has suffered from shaking and tremors, which was inadequately addressed. To the extent Rodriguez did not use Defendants' "magic words" in her HNRs, that does not negate the presence of her symptoms. Further, Rodriguez did request refills of medications multiple times, stated that the requests were urgent, yet suffered delays in care.

9.    <u>Defendants Contend:</u> She reported to providers in September and October 2012, that she had no problems, and a progress report dated November 5, 2012, shows that her vital signs were normal and she had no symptoms.

> <u>Plaintiffs Contend:</u> Rodriguez has suffered from health care and mental health symptoms that have been treated in an inadequate and untimely manner. To the extent Rodriguez reported on any particular day that she

4

had only minor or no symptoms, symptoms can vary from day to day, but the overall need for care remains. This is underscored by the fact that the "daily isolation health check" was not actually conducted every day, and nothing in the records proves that Rodriguez was given a fair opportunity to fully report symptoms.

10.     Defendants Contend: Rodriguez has asthma necessitating the use of an inhaler, and claims she has had multiple asthma attacks and breathing problems due to "regular" use of pepper spray in the women's suicide watch unit. Rodriguez further claims that she has had to have breathing treatments following the use of pepper spray in adjacent cells.

Plaintiffs Contend: Undisputed that Rodriguez has asthma, needs an inhaler, and has been exposed to pepper spray and threats of pepper spray while at ADC, which worsens her breathing problems. Otherwise, this is not a material fact or issue to be determined at trial, but instead is Defendants' interpretation of a portion of Rodriguez's complaints. This fact, therefore, does not require a response.

11.     Defendants Contend: Rodriguez claims she submitted an HNR on July 10, 2012 asking for help with the shaking and tremors from the Haldol. Rodriguez further claims she was told on July 24, 2012 that she would be scheduled and put on the waiting list, but that as of November 3, 2012, she still had not been seen for that issue.

Plaintiffs Contend: This is not a material fact or issue to be determined at trial, but instead is Defendants' interpretation of a portion of Rodriguez's complaints. This fact, therefore, does not require a response.

12.     Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Rodriguez submitted 33 HNRs.

Plaintiffs Contend:  The number of HNRs Ms. Rodriguez submitted is immaterial to the substance of this litigation.  The filing of an HNR does

5

not ensure that Ms. Rodriguez received constitutionally adequate healthcare, that Defendants were not deliberately indifferent, or that Ms. Rodriguez did not face a substantial risk of serious harm. The filing of an HNR does not speak to whether Ms. Rodriguez received healthcare or the quality of that healthcare. Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

13.    Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Rodriguez submitted 18 HNRs.

Plaintiffs Contend:  The number of HNRs Ms. Rodriguez submitted is immaterial to the substance of this litigation. The filing of an HNR does not ensure that Ms. Rodriguez received constitutionally adequate healthcare, that Defendants were not deliberately indifferent, or that Ms. Rodriguez did not face a substantial risk of serious harm. The filing of an HNR does not speak to whether Ms. Rodriguez received healthcare or the quality of that healthcare. Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

14.    Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Rodriguez submitted 12 HNRs.

Plaintiffs Contend:  The number of HNRs Ms. Rodriguez submitted is immaterial to the substance of this litigation. The filing of an HNR does not ensure that Ms. Rodriguez received constitutionally adequate healthcare, that Defendants were not deliberately indifferent, or that Ms. Rodriguez did not face a substantial risk of serious harm. The filing of an

HNR does not speak to whether Ms. Rodriguez received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

15.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Rodriguez submitted 63 HNRs.

Plaintiffs Contend:  The number of HNRs Ms. Rodriguez submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Ms. Rodriguez received constitutionally adequate healthcare, that Defendants were not deliberately indifferent, or that Ms. Rodriguez did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Ms. Rodriguez received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

16.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Rodriguez had 115 encounters with a nurse.

Plaintiffs Contend:  The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

17.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Rodriguez had 32 encounters with a nurse.

Plaintiffs Contend:  The term "encounter" is vague.  Plaintiffs further

7

contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

18.     Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Rodriguez had 23 encounters with a nurse.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

19.     Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Rodriguez had 170 encounters with a nurse.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

20.     Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Rodriguez had 4 encounters with a mid-level provider.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

21.     Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Rodriguez had 1 encounter with a mid-level provider.

8

    <u>Plaintiffs Contend:</u>  The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

  22.  <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Rodriguez had 2 encounters with a mid-level provider.

    <u>Plaintiffs Contend:</u>  The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

  23.  <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Rodriguez had 7 encounters with a mid-level provider.

    <u>Plaintiffs Contend:</u>  The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

  24.  <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Rodriguez had 13 encounters with a physician.

    <u>Plaintiffs Contend:</u>  The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

9

25.    Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Rodriguez had 9 encounters with a physician.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

26.    Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Rodriguez had 9 encounters with a physician.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

27.    Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Rodriguez had 31 encounters with a physician.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

28.    Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Rodriguez had 208 encounters with medical staff.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and

whether or not Defendants are deliberately indifferent.

29.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Rodriguez had 367 encounters with healthcare staff.

   Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

30.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Rodriguez had 4 chronic care appointments.

   Plaintiffs Contend:   The number of chronic care appointments Ms. Rodriguez had is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.   Plaintiffs also contest the substance of this fact because it does not indicate the type of chronic care or whether any treatment was provided at the appointments.

31.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Rodriguez had 2 chronic care appointments.

   Plaintiffs Contend:   The number of chronic care appointments Ms. Rodriguez had is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.   Plaintiffs also contest the substance of this fact because it does not indicate the type of chronic care or whether any treatment was provided at the appointments.

32.   Between March 4, 2013 and April 1, 2014, Plaintiff Rodriguez had 2 chronic care appointments.

   Plaintiffs Contend:   The number of chronic care appointments Ms.

11

Rodriguez had is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the type of chronic care or whether any treatment was provided at the appointments.

33.  <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Rodriguez had 8 chronic care appointments.

<u>Plaintiffs Contend:</u>   The number of chronic care appointments Ms. Rodriguez had is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the type of chronic care or whether any treatment was provided at the appointments.

34.  <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Rodriguez had 4 outside specialty care consultations.

<u>Plaintiffs Contend:</u>  The number of outside specialty care appointments Ms. Rodriguez had is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the type of chronic care or whether any treatment was provided at the appointments.

35.  <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Rodriguez had: 170 encounters with a medical nurse; 7 encounters with a mid-level medical provider; 31 encounters with a physician; 51 encounters with a psych associate; 32 encounters with a psychologist; 54 encounters with a psychiatric nurse; 5 encounters with a psychiatric mid-level; and 17 encounters with a psychiatrist.

<u>Plaintiffs Contend:</u> The term "encounter" is vague.  Plaintiffs further

12

contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

36.    <u>Defendants Contend:</u> Thus, from March 22, 2010 to April 1, 2014, Rodriguez had a total of 367 encounters with healthcare staff alone.

<u>Plaintiffs Contend:</u> The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

37.    <u>Defendants Contend:</u> Rodriguez did not submit any grievances between March 2010 and the present.

<u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The filing of grievances does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Ms. Rodriguez faces as a result of the healthcare provided by the ADC. The ADC is not permitted to violate Ms. Rodriguez's constitutional rights whether or not she files grievances.

## III.    <u>DISCIPLINARY</u>

38.    <u>Defendants Contend:</u> In May 2013, Rodriguez was disciplined for having another inmate's psychiatric medications in her possession.

<u>Plaintiffs Contend:</u>  These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Rodriguez's disciplinary record is not at issue in this litigation and does not bear on the

question of whether Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Rodriguez faces as a result of the healthcare provided by the ADC.  In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

39.     Defendants Contend: On April 3, 2010, Rodriguez was verbally counseled for failing to report to medical for pill call.

Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The filing of grievances does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Ms. Rodriguez faces as a result of the healthcare provided by the ADC. The ADC is not permitted to violate Ms. Rodriguez's constitutional rights whether or not she files grievances.

40.     Defendants Contend: On December 15, 2010, Rodriguez was out of her cell when the yard was on lockdown, and she was verbally reprimanded for disrupting count.

Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The filing of grievances does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Ms. Rodriguez faces as a result of the healthcare provided by the ADC. The ADC is not permitted to violate Ms. Rodriguez's constitutional rights whether or not she files grievances.

41.     Defendants Contend: On February 23, 2011, Rodriguez was verbally reprimanded for refusing to comply with several directives to leave the yard office and return to her yard.

14

Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The filing of grievances does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Ms. Rodriguez faces as a result of the healthcare provided by the ADC. The ADC is not permitted to violate Ms. Rodriguez's constitutional rights whether or not she files grievances.

42.    Defendants Contend:  On August 7, 2011, Rodriguez was verbally reprimanded for refusing to go to pill call.

Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The filing of grievances does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Ms. Rodriguez faces as a result of the healthcare provided by the ADC. The ADC is not permitted to violate Ms. Rodriguez's constitutional rights whether or not she files grievances.

43.    Defendants Contend: On February 1, 2012, Rodriguez was found guilty of possession of drugs; her discipline included loss of privileges and extra duty hours.

Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The filing of grievances does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Ms. Rodriguez faces as a result of the healthcare provided by the ADC. The ADC is not permitted to violate Ms. Rodriguez's constitutional rights whether or not she files grievances.

44.    <u>Defendants Contend:</u> On March 22, 2012, Rodriguez was found guilty of possession of drugs; her discipline included loss of privileges and extra duty hours; her discipline included loss of privileges and extra duty hours.

> <u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The filing of grievances does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Ms. Rodriguez faces as a result of the healthcare provided by the ADC. The ADC is not permitted to violate Ms. Rodriguez's constitutional rights whether or not she files grievances.

45.    <u>Defendants Contend:</u> On March 23, 2012, Rodriguez was found guilty of disrupting count; her discipline included loss of privileges and extra duty hours.

> <u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The filing of grievances does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Ms. Rodriguez faces as a result of the healthcare provided by the ADC. The ADC is not permitted to violate Ms. Rodriguez's constitutional rights whether or not she files grievances.

46.    <u>Defendants Contend:</u> On June 13, 2012, Rodriguez was found guilty of possession of drugs; her discipline included verbal and written reprimands, loss of privileges, extra duty hours, and loss of days of good behavior.

> <u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The filing of grievances does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Ms. Rodriguez faces as a result of the healthcare provided by the ADC. The ADC is not permitted to

violate Ms. Rodriguez's constitutional rights whether or not she files grievances.

47.    Defendants Contend: On July 10, 2012, Rodriguez was found guilty of disrupting count, and she received a verbal reprimand.

        Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The filing of grievances does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Ms. Rodriguez faces as a result of the healthcare provided by the ADC. The ADC is not permitted to violate Ms. Rodriguez's constitutional rights whether or not she files grievances.

48.    Defendants Contend: On September 19, 2012, Rodriguez was found guilty of disrespect to staff; her discipline included loss of privileges.

        Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The filing of grievances does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Ms. Rodriguez faces as a result of the healthcare provided by the ADC. The ADC is not permitted to violate Ms. Rodriguez's constitutional rights whether or not she files grievances.

49.    Defendants Contend: On October 3, 2012, Rodriguez was found guilty of possession of drugs; her discipline included loss of privileges, extra duty hours, and monetary restitution.

        Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The filing of grievances does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Ms. Rodriguez faces as a

17

result of the healthcare provided by the ADC. The ADC is not permitted to violate Ms. Rodriguez's constitutional rights whether or not she files grievances.

50.    Defendants Contend: On October 25, 2012, Rodriguez was found guilty of possession of drugs; her discipline included loss of privileges and extra duty hours.

Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The filing of grievances does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Ms. Rodriguez faces as a result of the healthcare provided by the ADC. The ADC is not permitted to violate Ms. Rodriguez's constitutional rights whether or not she files grievances.

51.    Defendants Contend: On May 14, 2013, Rodriguez was found guilty of possession of drugs; her discipline included loss of privileges and extra duty hours.

Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The filing of grievances does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Ms. Rodriguez faces as a result of the healthcare provided by the ADC. The ADC is not permitted to violate Ms. Rodriguez's constitutional rights whether or not she files grievances.

52.    Defendants Contend: On August 6, 2013, Rodriguez was found guilty of obstructing staff; her discipline included loss of privileges.

Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. The filing of grievances does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Ms. Rodriguez faces as a

18

result of the healthcare provided by the ADC. The ADC is not permitted to violate Ms. Rodriguez's constitutional rights whether or not she files grievances.

## IV.    **MENTAL HEALTH CLAIMS**

53.    <u>Defendants Contend:</u> Rodriguez claims she is one of over 1,300 ADC inmates who are "severely mentally ill" and require inpatient mental health care, but have not received it. Rodriguez further claims her mental health care has primarily involved medications rather than therapy, and that when psychology staff meet with her, it is usually only at her cell front for a few minutes. She claims that these sessions are not sufficiently private, as there are other prisoners and guards "standing around listening," and she has to speak with the providers through the food slot and over the background noise.

> <u>Plaintiffs Contend:</u> This is not a material fact or issue to be determined at trial, but instead is Defendants' interpretation of a portion of Rodriguez's complaints. This fact, therefore, does not require a response.

54.    <u>Defendants Contend:</u> Rodriguez claims she was prescribed high doses of Haldol despite a history of long QTc measurements and side effects (which she claims were caused by the Haldol) including lack of spontaneous speech, muscle and jaw stiffness, involuntary movements, and grimacing.   Rodriguez further claims she submitted an HNR on July 10, 2012 asking for help with the shaking and tremors from the Haldol, that she was told on July 24, 2012 that she would be scheduled and put on the waiting list, and that as of November 3, 2012, she still had not been seen for that issue. Rodriguez claims she began refusing the Haldol because of the side effects, which then aggravated her mental health symptoms.

> <u>Plaintiffs Contend:</u> This is not a material fact or issue to be determined at trial, but instead is Defendants' interpretation of a portion of Rodriguez's

19

complaints. This fact, therefore, does not require a response.

55.    <u>Defendants Contend:</u> Rodriguez was taking her own medications at the same time she was taking the other inmate's medications.

    <u>Plaintiffs Contend:</u>   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact does not bear on the question of whether Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Rodriguez faces as a result of the healthcare provided by the ADC.

56.    <u>Defendants Contend:</u> The HNR Rodriguez submitted on July 10, 2012 actually did not mention Haldol, and stated only that "I need something to help me from shacking (sic)."  Moreover, Rodriguez was then seen the next day, on July 11, 2012, by a provider who prescribed Albuterol.  Rodriguez was previously seen by a provider on June 25, 2012 after losing her inhaler, at which time the nurse observed that Rodriguez appeared weak and shaky.  The nurse administered Albuterol, which appeared to treat Rodriguez's problems.

    <u>Plaintiffs Contend:</u> The temporary inhaler Rodriguez received was not adequate to resolve need for an inhaler. Despite showing severe symptoms, such as being weak and shaky with wheezy and diminished breathing, Rodriguez was not given a replacement inhaler. She was forced to complete an HNR instead. Although the records say that there is a prescription dated July 11, 2012, it is unclear whether Rodriguez was actually fully treated by a provider. Rodriguez's wait time also was not simply one day; she waited several weeks from the time she first needed and requested an inhaler until the time she received one.

57.    <u>Defendants Contend:</u> During her time at Phoenix's Flamenco Inpatient Mental Health Unit for Women ("Flamenco"), Rodriguez took her medications fairly consistently.  When she takes her medications, Rodriguez feels good.  When Rodriguez

20

does not take her psychiatric medications regularly, she sometimes becomes violent and angry at both staff and other inmates.

> Plaintiffs Contend: Although Rodriguez did receive better care at Flamenco than she has otherwise received at ADC, Rodriguez on the whole has not received appropriate medication treatment. Her medications often give her severe side effects, which ADC has failed to remedy, and at other times her medications have not resolved her mental health symptoms.

58.   Defendants Contend:   Additionally, in May 2013, Rodriguez was disciplined for having another inmate's psychiatric medications in her possession. Rodriguez was taking her own medications at the same time she was taking the other inmate's medications.  She does not remember whether she experienced any side effects from the other inmate's medications, or whether she felt any different after taking them. Importantly, Rodriguez took the other inmate's medications because she felt "depressed, stressed, (and) anxiety," and she thought that she needed additional medications, and that the other inmate's medications could help her. Specifically, Rodriguez felt that she needed additional medications for her anxiety. Her Buspar prescription for anxiety has since been increased, and it has helped with her anxiety.

> Plaintiffs Contend: That Rodriguez felt that she had no other outlet but to take other psychiatric medications underscores ADC's failure to properly treat Rodriguez's mental health symptoms. Further, the Buspar prescription has not resolved her anxiety.

59.   Defendants Contend:   Rodriguez knew that it was not safe to take another inmate's medications, but she took them anyway.  Rodriguez had asked her medical provider to increase her own dosages, but her request was denied because she was "taking enough medication already." At the time, Rodriguez was receiving 200 mg of Haldol.

> Plaintiffs Contend: Although Rodriguez was told that taking other

21

medication could be unsafe, there is no evidence Rodriguez fully understood that in the context of her need to get *some* treatment for her mental health symptoms, which ADC had not been able to resolve. While Rodriguez's requests to have her medication changed were denied, it is unclear that the reason for the denial was clinically sound.

60.    Defendants Contend: Rodriguez testified in her deposition, however, that she has been treated at Flamenco several times during her incarceration. Rodriguez enjoyed the group treatment offered at Flamenco, and believed that it helped with her mental health illness. There was nothing Rodriguez did not like about Flamenco. Rodriguez stayed at Flamenco for approximately eight months the first time, and left because she had completed the program and received the help she needed.

Plaintiffs Contend: While Rodriguez did receive better treatment at Flamenco than she otherwise received, her temporary stays there did not resolve her mental health needs. Even there, her medication dosages were not always correct or adequate. Rodriguez has not "received the help she [has] needed" from ADC.

61.    Defendants Contend: During her deposition, Rodriguez testified that she feels her medication dosages are "too much," and cause side effects of muscle stiffness and shaking.  In particular, Rodriguez feels that her Haldol prescription dosage is too high.  No one, however, including a doctor, has ever told her that her dosage is in fact too high.

Plaintiffs Contend: The fact that Rodriguez could not recall a time that a doctor told her that her medication dosage was too high is immaterial because Rodriguez explained that she dosage of the medication gives her severe side effects. The failure of any doctor to acknowledge those side effects in connection with the prescription dosage merely illustrates ADC's failures.

22

62.    Defendants Contend: In her deposition, Rodriguez testified she has experienced delays in seeing a psychiatrist two or three times, but she does not recall the dates, or even the years, that this happened. She also does not recall why she asked to see the psychiatrist, or how long any of the alleged delays lasted. Mental health records show that Rodriguez had 159 encounters with psychology and psychiatry staff from March 22, 2010 to April 1, 2014.

> Plaintiffs Contend: The relative accuracy or inaccuracy Defendants' purported summary of Rodriguez's deposition testimony is not a fact to be determined at trial, and thus this fact requires no response. In any event, Rodriguez has suffered numerous delays in receiving psychiatric and psychological care while at ADC. ADC has repeatedly failed to prescribe her mental health medication that resolves her mental health symptoms and accounts for severe side effects. Rodriguez's memory at the time of the deposition of the exact lengths of delays or the exact number of problems is immaterial.

63.    Defendants Contend: Rodriguez was placed on suicide watch multiple times because she wanted to hurt herself. While on suicide watch, a nurse comes around to the suicide watch cells to administer medications. Rodriguez is able to ask either the nurse or the regular correctional officer to be seen by a healthcare provider when she needs it. Mental health providers come "automatically … every day." During the mental health providers' visits, they speak with Rodriguez regarding how she feels, whether she is ready to move on to another phase, etc. These visits usually last approximately 15 minutes each, which Rodriguez believes is sufficient time for her to talk to them and give them her feelings for the day. The consultation is one-on-one, and Rodriguez feels that she is able to talk and communicate effectively with the provider.

> Plaintiffs Contend: Prisoners like Rodriguez are not able to have sufficient access to nurses or other healthcare providers when needed. Nurses and

23

other providers do not always come around when needed, and their interactions are usually not substantive. Mental health providers often do not provide substantive care, and most visits do not last 15 minutes. Rather, mental health providers simply circulate every 15 minutes. Each conversation does not last 15 minutes, and any limited conversation takes place through a trap door where no meaningful help can be provided.

64.   Defendants Contend: While Rodriguez is on suicide watch, a nurse comes around to the suicide watch cells to administer medications. Rodriguez is able to ask either the nurse or the regular correctional officer to be seen by a healthcare provider when she needs it. Mental health providers come "automatically … every day." During the mental health providers' visits, they speak with Rodriguez regarding how she feels, whether she is ready to move on to another phase, etc. These visits usually last approximately 15 minutes each, which Rodriguez believes is sufficient time for her to talk to them and give them her feelings for the day.

Plaintiffs Contend: Prisoners like Rodriguez are not able to have sufficient access to nurses or other healthcare providers when needed. Nurses and other providers do not always come around when needed, and their interactions are usually not substantive. Mental health providers often do not provide substantive care, and most visits do not last 15 minutes. Rather, mental health providers simply circulate every 15 minutes. Each conversation does not last 15 minutes, and any limited conversation takes place through a trap door where no meaningful help can be provided.

65.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Rodriguez had 30 encounters with a psych associate.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to

24

the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

66.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Rodriguez had 5 encounters with a psych associate.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

67.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Rodriguez had 16 encounters with a psych associate.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

68.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Rodriguez had 51 encounters with a psych associate.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

69.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Rodriguez had 17 encounters with a psychologist.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or

meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

70.    Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Rodriguez had 6 encounters with a psychologist.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

71.    Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Rodriguez had 9 encounters with a psychologist.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

72.    Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Rodriguez had 32 encounters with a psychologist.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

73.    Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Rodriguez had 83 encounters with psychology staff.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further

contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

74. Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Rodriguez had 36 encounters with a psychiatric nurse.

Plaintiffs Contend: The term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

75. Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Rodriguez had 7 encounters with a psychiatric nurse.

Plaintiffs Contend: The term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

76. Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Rodriguez had 11 encounters with a psychiatric nurse.

Plaintiffs Contend: The term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

77. Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Rodriguez had 54 encounters with a psychiatric nurse.

<u>Plaintiffs Contend:</u>  The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

78.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Rodriguez had 5 encounters with a psychiatric mid-level.

<u>Plaintiffs Contend:</u>  The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

79.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Rodriguez had 2 encounters with a psychiatrist.

<u>Plaintiffs Contend:</u>  The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

80.   <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Rodriguez had 3 encounters with a psychiatrist.

<u>Plaintiffs Contend:</u>  The term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

81.     Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Rodriguez had 12 encounters with a psychiatrist.

> Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

82.     Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Rodriguez had 17 encounters with a psychiatrist.

> Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

83.     Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Rodriguez had 76 encounters with psychiatry staff.

> Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Rodriguez had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Rodriguez ultimately received and whether or not Defendants are deliberately indifferent.

## V.     CONDITIONS CLAIMS

84.     Defendants Contend: Plaintiffs claim inmates in segregation "often go months or years without any meaningful human interaction," and that they are "isolated from virtually all human contact." Rodriguez claims her only human contact while on suicide watch consists of the guards checking on her and "an occasional quick visit by a

psychology assistant at the cell door." She further claims there is nothing to do while on suicide watch, and that she has seen how "being alone like that" can make a person's mental health condition worse.

> Plaintiffs Contend: This is not a material fact or issue to be determined at trial, but instead is Defendants' interpretation of a portion of Rodriguez's complaints. This fact, therefore, does not require a response.

85. Defendants Contend: Rodriguez claims the watch cells are too cold, and that while in watch, she was stripped of everything but a "stiff suicide smock" and a thin blanket. According to Rodriguez, the smock is sleeveless, held together with Velcro, and only comes to her thighs, exposing her arms and legs to the cold air. Rodriguez did not submit an Appeal to the Director regarding these complaints. Rodriguez did not submit any grievances at all between March 2010 and the present.

> Plaintiffs Contend: This is not a material fact or issue to be determined at trial, but instead is Defendants' interpretation of a portion of Rodriguez's complaints. This fact, therefore, does not require a response. This fact also is immaterial because Defendants have waived any argument related to exhaustion of administrative remedies, and the fact that Rodriguez may not have continued to file grievances does not mean the conditions did not exist.

86. Defendants Contend: Rodriguez testified that she has never been sprayed with OC spray while at Perryville.

> Plaintiffs Contend: That Rodriguez has not actually been sprayed while at Perryville is immaterial and misleading.. Rodriguez has been sprayed with OC spray while in ADC custody, has been threatened with being sprayed multiple times, has observed others being sprayed, and has been exposed to spray herself when others were sprayed.

30

87.   Defendants Contend: Rodriguez was threatened with OC spray "just a couple of times" in 2013, but she has never been sprayed with OC spray while at Perryville. The only time she recalls personally being sprayed while in ADOC custody was during her first incarceration in 1993 for "(p)robably refusing a lockdown or something, needing to talk to a sergeant and they won't let me."

> Plaintiffs Contend: Undisputed that Rodriguez has been threatened with OC spray multiple times and was actually sprayed at least once. Rodriguez has been threatened with OC sprayed at least a couple of times just while at Perryville, not counting her time at other facilities. Testimony regarding the reason for any OC sprays was objected to at the deposition for speculation; Rodriguez cannot know what was going through the officers' heads when they chose to spray her. ADC also has not presented any evidence that there is any justification for OC spraying women in Rodriguez's unit.

88.   Defendants Contend: When OC spray is used on another inmate, the spray enters Rodriguez's cell through the vent. When the spray comes through the vent, Rodriguez has to be taken out of her cell until the room airs out and she can go back in. Rodriguez is only affected by the spray if it is used in the cell right next to hers; sprays occurring two cells down does not affect her. Rodriguez estimated she has been affected by spray used against another inmate "(j)ust a couple" of times during the year prior to her deposition (i.e., 2012.)

> Plaintiffs Contend: Undisputed only that OC spray has been used near Rodriguez on other inmates, that the spray has come through the vent, and that the spray has negatively affected Rodriguez. Before being taken out of her cell, Rodriguez has been exposed to the OC spray multiple times, which caused gagging and breathing problems and exacerbated her asthma. Defendants lack evidence with foundation to conclude that prisoners are not at risk of spray contamination simply because the victim of the spray is

31

more than one cell away. Counsel objected to that line of questioning at the deposition for lack of foundation.

89.     Defendants Contend: When a neighboring inmate was sprayed with OC spray and the spray went through the vent into her cell, Rodriguez was taken out of her cell until it was aired out and she could go back in.

Plaintiffs Contend: Before being taken out of her cell, Rodriguez was exposed to the OC spray, which caused gagging and breathing problems and exacerbated her asthma.

90.     Defendants Contend: Rodriguez testified that she has only been affected by the spray from a neighboring spray just "a couple" of times in the year prior to her deposition.

Plaintiffs Contend: Rodriguez clarified that this has happened two or three times, or a number "around there." Further, that Rodriguez has not noticed spray coming through the vents more than several times does not mean Rodriguez was not placed at risk of being exposed to spray, as ADC frequently threatens prisoners with OC spray.

91.     Defendants Contend: Rodriguez was allegedly only threatened with the use of pepper spray "just a couple of times" in 2012 for arguing with correctional officers.

Plaintiffs Contend: Rodriguez has been threatened with OC sprayed at least a couple of times just while at Perryville, not counting her time at other facilities. Testimony regarding the reason for the OC spray was objected to at the deposition for speculation; Rodriguez cannot know what was going through the officers' heads when they chose to spray her multiple times. ADC also has not presented any evidence that there is any justification for OC spraying women in Rodriguez's unit.

32

92.     Defendants Contend: Rodriguez acknowledged that 24-hour lighting was a condition she experienced while on suicide watch, where officers clearly have heightened responsibilities to monitor the welfare of the inmate.

>   Plaintiffs Contend: Undisputed that suicide watch cells have 24-hour lighting. Defendants cannot prove, however, that officers have "heightened responsibilities," much less that those supposed responsibilities would justify 24-hour lighting. Rodriguez would lack foundation to speculate on officers' responsibilities in any event.

93.     Defendants Contend: When Rodriguez is not on suicide watch, she is allowed to go to recreation. At Flamenco, Rodriguez participated in group treatment, which she enjoyed, and which she considered beneficial.

>   Plaintiffs Contend: Undisputed that Rodriguez may be "allowed" to attend recreation, in that she is not generally prohibited from attending, but disputed that the recreation is frequent enough or set up so that prisoners like Rodriguez actually enjoy the needed benefits of exercise. Undisputed that Rodriguez has participated in limited group treatment, but ADC in general has failed to provide Rodriguez and other prisoners with access to quality group treatment.

**Exhibit H – Health Care Treatment of Jeremy Smith**
**UNCONTESTED FACTS**

## I.    MEDICAL ALLEGATIONS

1.    Smith testified that he was diagnosed with Hepatitis C in 2008, and that he has "no problems" with Hepatitis C and does not take any medications for it.

2.    Smith testified that it is "very seldom" that his hand injury prevents him from writing.

3.    Smith testified that there has only been "like one time, per time period while I've been here" when he was unable to write an HNR request "because, usually there's other people around that help me if I need help."

4.    Smith testified in his deposition that he was prescribed Acetaminophen, Ibuprofen, and Excedrin for his wrist pain.

5.    Other inmates would type up requests for Smith.

## II.    MENTAL HEALTH CLAIMS

6.    Smith alleges that in April 2008, he did not get his Tegretol or Celexa for a week, and instead of eventually getting those prescriptions he was given Chlorpromazine without any evaluation or consultation; this medication was changed to Lithium in July 2008 without consultation until September 2008; this prescription needed to be refilled in March 2009, which it was but without a consultation or evaluation; in late November 2009, he experienced stomach pain and vomiting from Lithium, but was given Tums; he submitted an HNR in January 2010 because he was not getting any food with his Lithium dose, which caused vomiting; his stomach pains continued through July 2010 and he submitted another HNR because he had not gotten Tums for two months; his stomach pains continued until late August 2011; and since arriving at ASPC-Lewis, he has had "problems consistently obtaining my Lithium."

7.      On April 28, 2008 Smith was prescribed Celexa.

8.      Smith signed a consent form for Lithium on June 9, 2008.

9.      On December 14, 2009 Smith was also advised to remain upright after meals.

10.     On January 11, 2010 he complained, however, that the Lithium is given to him before dinner.

11.     In response, staff explained that he is on an extended release Lithium which does not cause upset stomach, and was already given Tums.

12.     The March 30, 2010 and July 29, 2010 reports also show that Smith continued taking calcium carbonate (Tums).

13.     Smith also submitted no HNRs regarding the Tums during those months, but submitted an HNR on July 18, 2010, asking whether Lithium would affect his performance on a polygraph test.

14.     On November 7, 2012, Smith was prescribed Lithium and ordered to follow up in 6 weeks.

15.     On October 28, 2013, Smith submitted another HNR requesting to be placed back on Lithium.

16.     He was then re-prescribed it on November 13, 2013.

17.     Mental health records dated January 24, 2014, show that Smith was refusing to take Lithium and wanted Tums for an upset stomach.

18.     He was prescribed both upon request.

III.    **CONDITIONS CLAIMS**

19.     In 2011, Smith testified that he was "curling 40 pounds in peanut butter."

**CONTESTED FACTS**

## I.   BACKGROUND AND DISCIPLINARY HISTORY

1.     Defendants Contend: On February 11, 1997, Smith began serving his sentence for theft in violation of A.R.S. §§13-801, 13-802. On March 13, 1997, Smith began his sentence for trafficking stolen property in violation of A.R.S. §13-610.

> Plaintiffs Contend: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Smith faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

2.     Defendants Contend:   On February 14, 2008, Smith was convicted of attempted first degree burglary in violation of A.R.S. §13-1508.  He was sentenced  on March 10, 2009.

> Plaintiffs Contend: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Smith faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to

exclude the criminal history of the class is currently pending before the Court.

3.  <u>Defendants Contend</u>:  On January 6, 2009, Smith was convicted of second degree burglary in violation of A.R.S. §§ 13-1507, 13-604; trafficking stolen property in violation of A.R.S. § 13-610; and theft in violation of A.R.S. §§ 13-801, 13-802 .  He was sentenced on March 10, 2009.

> <u>Plaintiffs Contend</u>: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Smith faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

4.  <u>Defendants Contend</u>:  Smith is currently incarcerated at ASPC-Eyman.

> <u>Plaintiffs Contend</u>:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Mr. Smith faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court. Plaintiffs also lack immediate firsthand knowledge to confirm or deny this statement

5.      <u>Defendants Contend:</u> Smith has accrued 9 felony convictions between Michigan and Arizona.

> <u>Plaintiffs Contend:</u>   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Smith faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

6.      <u>Defendants Contend:</u> Smith testified at his deposition that he is aggressive "whenever I'm in a bad mood and something triggers me" and sometimes he can become physical.

> <u>Plaintiffs Contend:</u> This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Mr. Smith's behavior is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and caused the substantial risk of serious harm Mr. Smith faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

7.      <u>Defendants Contend:</u> Smith also testified at his deposition that he experiences "revenge fantasies" when housed at SMU; he explained that when his "neighbor pisses me off or something, which has happened a lot, and I can't do

anything," he has a "revenge fantasy" where he thinks about "getting out of the cell and actually fighting, if it's come to that point."

> Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. Mr. Smith's behavior is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and caused the substantial risk of serious harm Mr. Smith faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

8.   Defendants Contend: Smith has also been found guilty of: disorderly conduct on August 11, 2011; obstructing staff on August 31, 2011; tampering with security on February 27, 2012; possession of drugs on January 16, 2013; and criminal damage on August 22, 2013.

> Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. Neither Mr. Smith's conduct nor his disciplinary record is at issue in this litigation and neither makes it more or less likely that defendants were deliberately indifferent and caused the substantial risk of serious harm Mr. Smith faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

9.   Defendants Contend: Smith is ███████████ Security ███████████. On May 11, 2010, Smith was disciplined for assaulting an officer "with bodily fluids" while being escorted to the shower.

Plaintiffs Contend: Mr. Smith was the victim of the assault, not the perpetrator. In any event, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. Neither Mr. Smith's alleged ██████ Security ██████ nor his disciplinary record is at issue in this litigation and neither makes it more or less likely that defendants were deliberately indifferent and caused the substantial risk of serious harm Mr. Smith faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

## II.   MEDICAL ALLEGATIONS

10.   Defendants Contend: Smith testified that, in 2010 and 2011, he was doing three to four hundred push-ups over a 15-20 minute period, and that today he does about 1,500 push-ups in that time.

Plaintiffs Contend: This fact mischaracterizes Mr. Smith's statements about the types of exercises he does in his cell by omitting sections of his testimony in which he explains that he sometimes cannot do these exercises because of his wrist injury.

11.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Smith submitted 80 HNRs.

Plaintiffs Contend: Plaintiffs contend that the number of HNRs Mr. Smith submitted is immaterial to the substance of this litigation. The filing of an HNR does not ensure that Mr. Smith received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Smith did not face a substantial risk of serious harm. The filing of an HNR does not speak to whether Mr. Smith received healthcare or the quality of

that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

12.   <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Smith submitted 20 HNRs.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the number of HNRs Mr. Smith submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Smith received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Smith did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Smith received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

13.   <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Smith submitted 27 HNRs.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the number of HNRs Mr. Smith submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Smith received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Smith did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Smith received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number

of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

14.     Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Smith submitted 127 HNRs.

> Plaintiffs Contend:  Plaintiffs contend that the number of HNRs Mr. Smith submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Smith received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Smith did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Smith received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

15.     Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Smith had 21 encounters with a nurse.

> Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

16.     Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Smith had 3 encounters with a nurse.

> Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is

immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

17.     Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Smith had 9 encounters with a nurse.

        Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

18.     Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Smith had 33 encounters with a nurse.

        Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

19.     Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Smith had 2 encounters with a mid-level provider.

        Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

20.     Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Smith had 4 encounters with a mid-level provider.

        Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague.

Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

21.     <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Smith had 6 encounters with a mid-level provider.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

22.     <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Smith had 16 encounters with a physician.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

23.     <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Smith had 2 encounters with a physician.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

24.    <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Smith had 18 encounters with a physician.

    <u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

25.    <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Smith had 57 encounters with medical staff.

    <u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

26.    <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Smith had 89 encounters with healthcare staff.

    <u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

27.    <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Smith had 1 outside specialty care consultation.

    <u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is

immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

28.     Defendants Contend: Smith refused exercise on multiple occasions between January 2011 and May 2013, including on:  1/19/2011 1/23, 1/28, 1/30, 3/1, 4/29, 5/1, 5/6, 6/8, 7/1, 7/10, 9/11, 9/25, 10/9, 10/11, 10/16, 10/25, 10/28, 10/30, 11/1, 11/6, 11/8, 11/15, 11/24, 11/25, 11/27, 12/16; 3/3/2012, 5/22, 5/24, 5/27, 5/29, 6/3, 6/5, 6/10, 6/12, 6/14, 6/17, 6/19, 6/21,  6/24, 6/26, 7/1; 5/20/2013.

Plaintiffs Contend:  While Mr. Smith did sometimes decline exercise, Mr. Smith did not refuse to exercise on all of these dates.

## III.   MENTAL HEALTH CLAIMS

29.     Defendants Contend: A progress report dated April 8, 2008 shows that Smith did not appear for his scheduled one-on-one psychiatric session, so he was rescheduled.

Plaintiffs Contend: The progress report does not state why Mr. Smith did not appear for his session.  Plaintiffs will show that inadequate staffing of ADC facilities frequently prevented proper medical care.

30.     Defendants Contend: On April 22, 2008, an intake medical record notes that Smith reported he had not had his medications since April 14, 2008, explaining that he was about to be switched from Tegretol to Lithium, and that he needs to either get the Tegretol or see someone about taking Lithium; he did not mention Celexa at the time.

Plaintiffs Contend: The medical record does not reference Celexa or show that Mr. Smith "did not mention Celexa at the time."

31.     Defendants Contend: On April 25, 2008, he received his psychiatric follow-up, reporting that he had not received his medications in two weeks, without identifying which medications, but that he was stable on his medications.

Plaintiffs Contend: Mr. Smith's medical records show that Mr. Smith was

not receiving his medications and, at the psychiatric follow-up, prescriptions were written for several medications. Mr. Smith was able to describe his medication in sufficient detail that prescriptions were written.

32.   <u>Defendants Contend:</u> On June 9, 2008, Smith submitted an HNR requesting medical treatment for his cholesterol and blood sugar levels, but he did not mention anything about his medications.

<u>Plaintiffs Contend:</u> Mr. Smith repeatedly raised issues he had in obtaining his medications. The fact that he did not also mention ADC's failure to provide medication in an HNR concerning an unrelated issue is irrelevant.

33.   <u>Defendants Contend:</u> While Smith claims that he did not receive Tegretol and that it was switched to Lithium without consultation or consent, a progress report dated June 9, 2008 shows that Smith reported that Tegretol was not working for him; as a result, the doctor discontinued the Tegretol, substituted Lithium, and continued him on Celexa.

<u>Plaintiffs Contend:</u> This fact improperly links Mr. Smith's claims that he did not receive Tegretol with a change in medication. It is not contested that Mr. Smith's prescriptions were changed.

34.   <u>Defendants Contend:</u> A mental health progress report dated July 1, 2008, shows that Smith continued to take Lithium and Celexa.

<u>Plaintiffs Contend:</u> The progress report shows that Mr. Smith was prescribed Lithium and Celexa, not that he received/took the medications.

35.   <u>Defendants Contend:</u> Despite his claims that his prescription for Lithium was refilled without his consent in March 2009, a progress report dated March 13, 2009 shows that his prescription for Lithium and Celexa were expiring, and he wanted to continue taking them.

<u>Plaintiffs Contend:</u> This fact misstates the evidence. An HNR shows that

Mr. Smith wanted his medications renewed.  Mr. Smith does not state which medications.

36.   Defendants Contend: Regarding the November 2009 Lithium incident, Smith submitted an HNR on November 29, 2011, stating that he was getting sick because he was taking the Lithium on an empty stomach.

Plaintiffs Contend: "Lithium incident" is vague and unclear and the date of the referenced HNR is actually November 29, 2009.

37.   Defendants Contend: Upon consultation with the doctor, Smith was prescribed Tums because the doctor suspected the problem was not the Lithium, but likely due to an acid reflux problem.

Plaintiffs Contend: The doctor's reasoning for prescribing the Lithium is unknown.

38.   Defendants Contend: On January 11, 2010, Smith submitted an HNR stating that the Tums was not working, requesting to keep the Lithium on his person, and acknowledging that he should not be taking it on an empty stomach.

Plaintiffs Contend:  This fact mischaracterizes Mr. Smith's statement.  Mr. Smith's HNR stated that his medications were given to him before dinner, sometimes by hours, and he had to take the medications when he received them, which made him sick.

39.   Defendants Contend: Staff changed the time his Lithium was administered to the morning so that he would not have to take it on an "empty" stomach.

Plaintiffs Contend: The staff's reasoning for changing the time of administration of Mr. Smith's Lithium is not evident.

40.   Defendants Contend: Contrary to his claim that he was not getting Tums, his records from March 3, 2010, May 12, 2010, and July 29, 2010, show that his medications (including Lithium) were working well.

>   Plaintiffs Contend: The records showing that Mr. Smith's medications were working well are not incompatible/"contrary" to Mr. Smith's claim that he was not getting Tums.

41.   Defendants Contend: With regard to Smith's claim that he did not receive Lithium after arriving at Lewis, the intake form dated October 10, 2012, shows that Smith was taking Lithium.

>   Plaintiffs Contend: A medical intake form shows that Mr. Smith was prescribed Lithium, not that he received the medication and was taking it.

42.   Defendants Contend: A medical administration record shows that Smith received Lithium on November 1, 2012.

>   Plaintiffs Contend: A medical administration record indicates that Mr. Smith did not receive Lithium on November 1, 2012.

43.   Defendants Contend: A mental health treatment plan dated November 7, 2012, shows that Smith was having mood problems because he was not complying with his prescribed medications.

>   Plaintiffs Contend:  This is not what the mental health treatment plan shows.  In any event, Mr. Smith's inability to take his prescribed medications was a direct result of ADC's failure to provide adequate medical and mental health care.

44.   Defendants Contend: In a November 7, 2012 progress report , Smith falsely stated that he had not received his Lithium since arriving at Lewis.

>   Plaintiffs Contend: To the extent that Mr. Smith made any statement that may be reflected in the progress report (Mr. Smith did not author the report

himself), Mr. Smith's statement was not false.

45.   <u>Defendants Contend:</u> On November 29, 2012, Smith refused a test to measure the Lithium level in his body, falsely claiming that his medications were stopped "weeks" ago; the doctor thus discontinued the prescription for Lithium.

> <u>Plaintiffs Contend:</u> According to his medical records, Mr. Smith "advised RN stopped meds week ago."  In his deposition, Mr. Smith stated that because he was receiving the Lithium so inconsistently in this period, he eventually just stopped taking it.  Accordingly, Mr. Smith did not claim that his medications were stopped, but rather Smith truthfully claimed that he stopped taking them.

46.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Smith had 1 encounter with a psych associate.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

47.   <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Smith had 4 encounters with a psych associate.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

48.   <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Smith had 4 encounters with a psyche associate.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

49.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Smith had 9 encounters with a psych associate.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

50.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Smith had 10 encounters with a psychologist.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent

51.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Smith had 1 encounter with a psychologist.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

52.    <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Smith had 11 encounters with a psychologist.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

53.    <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Smith had 20 encounters with psychology staff.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

54.    <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Smith had 3 encounters with a psychiatric nurse.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent

55.    <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Smith had 1 encounter with a psychiatric nurse.

> <u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is

immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

56.   <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Smith had 4 encounters with a psychiatric nurse.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

57.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Smith had 4 encounters with a psychiatrist.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

58.   <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Smith had 1 encounter with a psychiatrist.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

59.   <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Smith had 3 encounters with a psychiatrist.

<u>Plaintiffs Contend:</u>  Plaintiffs contend that the term "encounter" is vague.

Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

60.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Smith had 8 encounters with a psychiatrist.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

61.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Smith had 12 encounters with psychiatry staff.

Plaintiffs Contend:  Plaintiffs contend that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Smith had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Smith ultimately received and whether or not defendants were deliberately indifferent.

## IV.   **CONDITIONS CLAIMS**

62.   Defendants Contend: Smith testified that, at the end of 2010, he started exercising and really started exercising hard in April or May of 2011.

Plaintiffs Contend: This fact mischaracterizes Mr. Smith's statements about the types of exercises he does in his cell by omitting sections of his testimony in which he explains that he sometimes cannot do these exercises because of his wrist injury.

63.     <u>Defendants Contend:</u> [Original Fact 3] Smith testified that he would exercise in his cell, doing "step-ups off the stool," curls, shoulder presses, and push-ups.

> <u>Plaintiffs Contend:</u> This fact mischaracterizes Mr. Smith's statements about the types of exercises he does in his cell by omitting sections of his testimony in which he explains that he sometimes cannot do these exercises because of his wrist injury.

64.     <u>Defendants Contend:</u> [Original Fact 4] He testified that he regularly does push-ups every day and "different variants in push-ups depending on how … (his) hand is actually feeling that day."

> <u>Plaintiffs Contend:</u> This fact mischaracterizes Mr. Smith's statements about the types of exercises he does in his cell by omitting sections of his testimony in which he explains that he sometimes cannot do these exercises because of his wrist injury.

**Exhibit I – Stephen Swartz**
**UNCONTESTED FACTS**

## I.   <u>BACKGROUND</u>

1.      Swartz is currently incarcerated at ASPC-Lewis.

## II.   <u>CRIMINAL BACKGROUND AND DISCIPLINARY HISTORY</u>

2.      On July 27, 2011, Swartz was caught cutting on himself and was verbally placed on report.

3.      On July 28, 2011, Swartz intentionally swallowed an ink pen and was verbally placed on report.

4.      On June 16, 2011, a Use of Force report was completed after Swartz attempted self-harm by cutting himself with a piece of plastic. Swartz was restrained and taken out of the cell for medical treatment.

5.      One June 22, 2011, a Use of Force report was completed after Swartz attempted self-harm by swallowing a pill in front of staff. Swartz was stripped out by staff and escorted to medical for treatment.

6.      On July 27, 2011, a Use of Force report was completed after Swartz attempted self-harm by cutting the top of his left hand with a staple. Swartz was restrained and removed from his cell and escorted to medical.

7.      On July 28, 2011, a Use of Force report was completed after Swartz attempted self-harm by informing officers that he had swallowed an ink pen. Swartz was strip searched, restrained and removed from his cell and escorted to medical.

8.      On July 27, 2011, a Use of Force report was completed after Swartz attempted self-harm by cutting the top of his left hand with a staple. Swartz was restrained and removed from his cell and escorted to medical.

9.      On July 28, 2011, a Use of Force report was completed after Swartz attempted self-harm by informing officers that he had swallowed an ink pen. Swartz was strip searched, restrained and removed from his cell and escorted to medical.

## III.   DENTAL CLAIMS

10.      Swartz had an intake dental exam December 18, 2009, and informed the dentist "no pains."

11.      Swartz was seen one week later on January 24, 2012, when the dentist found gingival recession, decay into the pulp, and concluded tooth #13 was non-restorable due to irreversible pulpitis.

12.      The dentist recommended extraction of #13, and gave Swartz ibuprofen.

13.      Swartz later returned to the dentist on August 13, 2012 for a pain evaluation, but refused treatment.

14.      During an August 31, 2012 visit, the dentist noted that #31 had lost a restoration and had deep decay.

15.      The dentist also noted that #32 was malposed and causing a food trap distal to #31.

16.      Swartz opted to try a filling on #31, although the dentist advised him that the prognosis on #31 was poor and that he may need an extraction at the oral surgeon's office.

17.      Swartz submitted an HNR on September 2, 2012 complaining of unbearable pain, stating "I think I need the tooth pulled."

18.      Swartz was seen two days later on September 4, 2012, diagnosed with irreversible pulpitis on #31, with both #31 and #32 impacted near the nerve, and referred to an oral surgeon, Dr. Barlow for extractions.

19.    Once at Dr. Barlow's office on September 24, 2012, Swartz refused extractions on #31 and #32, but stated that he wanted #13 extracted.

20.    Swartz claimed that Dr. Barlow told him that #32 should not be pulled and #31 could have a crown.

21.    Swartz submitted an HNR on October 5, 2012 for pain on his upper left molar and was scheduled for an October 10, 2012 pain evaluation, which he refused.

22.    Another HNR for pain submitted February 19, 2013 resulted in a February 25, 2013 dental appointment, which Swartz again refused.

23.    A March 17, 2013 HNR complaining of a cracked tooth resulted in a March 27, 2013 appointment for an evaluation of tooth #19.

24.    Swartz submitted an HNR on May 12, 2013 complaining of wisdom tooth pain and was scheduled for an appointment on May 22, 2013, which Swartz refused, claiming that he had not submitted any HNR on the issue.

25.    Swartz submitted an HNR on May 27, 2013, complaining of a cracked filling on his rear molar.

26.    Swartz was scheduled for an exam June 5, 2013 but again refused treatment, claiming he did not submit an HNR.

27.    Swartz believes his surgery was performed "in the back of a dental office" and that it was done by an orthodontist.

28.    Swartz states in his Declaration that he was treated by an oral surgeon in March 2010 for broken facial bones after an attack by other inmates.

29.    He claims there was not an anesthesiologist present, the oral surgeon gave him too much anesthesia, and an ADC nurse had to administer Narcan to wake him up.

## IV.   <u>MEDICAL CLAIMS</u>

30.   Swartz alleges that in February 2010, while housed at ADC's Lewis Complex, he suffered eye injuries and extensive facial fractures as a result of an inmate assault.  He further alleges he did not receive timely follow-up with a plastic surgeon or ophthalmologist, and was instead referred to an oral surgeon to treat his facial fractures. Additionally, he alleges that despite multiple referrals from prison doctors for specialty care, he did not see an ophthalmologist until January 2011, almost a year after he was assaulted, and has permanent partial paralysis to his face.

31.   On February 26, 2010, Swartz was housed at ASPC-Lewis at the Barchey unit.

32.   He was assaulted by several inmates with a mesh laundry bag filled with padlocks.

33.   At the hospital, Swartz received multiple CT scans – brain, left maxillofacial area, cervical spine, and chest.

34.   The brain scan did not show any acute findings of brain injury, but the scan of his maxillofacial area revealed several facial fractures.

35.   Maricopa Medical Center providers determined that Swartz's "condition at this juncture appears stable" and Swartz was released back to ADC custody the same day.

36.   Upon discharge from the hospital, the treating physician noted that Swartz suffered from multiple left-sided facial fractures.

37.   The hospital physician recommended Swartz be seen in the plastic surgery clinic next door.

38.   When Swartz returned from the hospital, he was stable and was provided medical ice, ibuprofen, and Tylenol with codeine.

39.     On March 2, 2010, Swartz was seen by Dr. Macabuhay at complex medical for a follow up visit.

40.     On March 3, 2010, a non-formulary request for Tylenol with codeine was placed and approved by ADC.

41.     On March 4, 2010, an outside consult request was put in by Dr. Vinluan for Swartz to have oral surgery to correct his left facial fracture.

42.     A non-formulary request was sent on April 19, 2010.

43.     Swartz also believes he had surgery without an anesthesiologist present, but admitted during his deposition there were other people in the room and he did not know who they were.

44.     When Swartz returned to ASPC- Lewis after the surgery, he was non-responsive.

45.     During his deposition, Swartz testified that he flatlined when he returned to ADC, but admits he does not recall the incident.

46.     ADC providers placed a call into Dr. Thorpe's office who advised the non-responsiveness was likely a reaction to the anesthesia.

47.     Dr. Thorpe, the oral surgeon who treated Swartz, holds a current 1301 anesthesia permit to administer general anesthesia in the State of Arizona.

48.     Dr. Thorpe advised ADC providers to administer Narcan to Swartz.

49.     It is possible Swartz was required to be heavily sedated due to his high tolerance for prescription pain medications.

50.     Once Swartz was given the Narcan, he became alert and responsive.

51.     Swartz had his vital signs taken every four hours for three days, and then every six hours for three days.

52.     Swartz was placed on a liquid diet.

53.     Approximately two hours later after returning to ADC, Swartz began banging on his cell door; he was angry and screaming, pulling his post-surgical packing out of his nose, and verbally abusive to staff.

54.     As a result of Swartz pulling out the surgical packing, ADC sent him to West Valley Hospital, via ambulance, to be evaluated.

55.     X-rays and an MRI was done on Swartz at the hospital.

56.     On March 5, 2010, Plaintiff returned to ASPC-Lewis from the hospital.

57.     West Valley Hospital informed ADC that Swartz's facial swelling had greatly diminished, he was able to open his eyes, and he was eating and drinking.

58.     When he arrived back at ADC, the on-call health provider called in an order for Tylenol #3.

59.     Swartz was seen the next day, March 6, 2010, and he had no complaints and stated, "I'm getting better."

60.     Swartz was seen again on March 7, 2010, and had no complaints.

61.     His swelling was improving and he was able to open his eye more than he had the previous day.

62.     Swartz was seen again on March 8, 2010, and had no complaints.

63.     His swelling had improved from the day prior.

64.     On March 11, 2010 Swartz had no complaints, no changes were observed to his mental or physical status, and only a small amount of swelling remained on his face.

65.     Swartz was eating 100% of his meals and complying with his medication orders.

66.     Swartz was seen again on March 9, 2010, by Dr. E. Vinluan, M.D., for a follow-up from his post oral maxillofacial surgery.

67.     Swartz was able to open his mouth and eat.

68.     Swartz was seen again on March 10, 2010.

69.     Swartz stated his pain was being controlled with his current pain medication.

70.     He was told to contact medical for any additional needs.

71.     He further conceded that the Tramadol initially was effective in managing his pain for a period of 6-7 months, but that his subsequent request for an increase in its dosage was not approved for five or six months.

72.     Swartz was seen again on March 11, 2010, and he inquired about his suture removal date.

73.     Swartz again stated that his pain was being controlled with his current medications.

74.     Swartz was seen again on March 12, 2010, and he had no complaints and no changes were observed in his current condition.

75.     On March 15, 2010, Swartz was sent back to Dr. Thorpe's office to have his sutures removed.

76.     On March 18, 2010, Swartz submitted an HNR for new glasses, which was the first HNR he submitted since the assault.

77.     On March 25, 2010, Swartz submitted another HNR alleging he was experiencing dizziness and that he was having trouble closing his eye, but he did not complain of numbness, paralysis, or nerve damage.

78.     As a result of this HNR, he was seen by a provider the same day.

79.     During the month of March 2010, Swartz received codeine/acetamin from March 3 through March 31, and ibuprofen 600 mg 3 x a day from March 6 through March 13.

80.     Swartz was seen again on April 8, 2010, and was instructed not to blow his nose.

81.     On April 15, 2010, Swartz requested stronger pain medication.

82.     The non-formulary request requested Tramadol 50 mg for eight weeks.

83.     The request also noted that Swartz was on Tylenol #3 for six weeks, but that Swartz is still complaining about sharp pain and notes that Tylenol #3 helps ease the pain, but does not relieve it completely.

84.     Dr. Macabuhay wrote a non-formulary prescription for Tramadol.

85.     On April 28, 2010, Swartz was seen after he complained about pain in the left side of his face, but he could smile properly.

86.     On April 29, 2010, the pharmacy informed ADC they needed labs before they could issue the prescription for Tramadol, and labs were ordered.

87.     Plaintiff submitted an HNR on May 1, 2010, alleging he was never seen for his April 28, 2010 appointment, but his medical records show he was in fact seen.

88.     On May 4, 2010, Swartz submitted an HNR complaining about pain in the left side of his face.

89.     On May 14, 2010, Swartz was seen for his complaints of pain on the left side of his face.

90.     His smile was even, his extra ocular movement was intact, and his pupils were equal, round and reacted to light and accommodation.

91.     On May 26, 2010, Swartz's lab results came back.

92.     On May 28, 2010, Swartz submitted an HNR complaining of "nerve pain" on the left side of his face.

93.     On June 1, 2010, Swartz's non-formulary was approved for eight weeks.

94.     On June 3, 2010, Swartz submitted an HNR complaining of sharp pain on the left side of his face.

95.     On June 10, 2010, Swartz submitted an HNR complaining of pain on the left side of his face.

96.     On June 13, 2010, Swartz submitted an HNR alleging it was the first day he received his Tramadol, and he requested the medication information and inquired into how many days he can receive the medication and when it was first prescribed.

97.     On June 19, 2010 – four months after the surgery – Swartz submitted an Inmate Letter regarding his facial reconstruction surgery with Dr. Thorpe.

98.     But on June 21, 2010, he inquired into whether he had been scheduled for a follow-up appointment with Dr. Thorpe.

99.     Staff responded that he has a scheduled appointment.

100.    On June 30, 2010, Swartz was seen regarding his pain in his left cheek.

101.    During the month of June 2010, Swartz received Tramadol 50 mg twice daily from June 13 through June 30, 2010.

102.   On July 3, 2010, Swartz was assaulted again.

103.   He was seen at medical and complained of pain to his left cheek and lower orbit.

104.   On July 16, 2010, Swartz received an x-ray of the left side of his face.

105.   On July 19, 2010, Swartz submitted an HNR requesting unidentified "treatment" for his facial reconstructive surgery.

106.   On July 20, 2010, Swartz had labs taken.

107.   On July 26, 2010, Swartz had a follow-up appointment with Dr. Thorpe.

108.   It was determined that Swartz did not need any additional surgery, but additional x-rays were taken.

109.   Dr. Thorpe did not recommend that Swartz have an ophthalmology consult for his left eye until July 26, 2010.

110.   On July 27, 2010, Swartz submitted an HNR stating he spent 90 minutes with Dr. Thorpe, but Dr. Thorpe determined he did not need further treatment.

111.   On July 28, 2010, Swartz submitted an HNR stating his Tramadol had been stopped and inquired into the reason.

112.   On July 30, 2010, he was seen in response to his HNR regarding Tramadol, and prescribed an additional 6 months of Tramadol.

113.   During the month of July 2010, Swartz received Tramadol 50 mg twice a day from July 1 through July 31.

114.   On August 9, 2010, Swartz submitted an HNR asking for an increase in his Tramadol dosage.

115.    On August 14, 2010, Swartz submitted an HNR complaining about his facial reconstructive surgery and alleging he could not chew his food or open his mouth all the way, and he inquired into the status of his "eye doctor" consult.

116.    On August 18, 2010, Swartz submitted an HNR requesting an increase in his Tramadol and inquiring into the status of his ophthalmologist consult.

117.    On August 23, 2010, Swartz submitted an HNR requesting an increase in his Tramadol medication.

118.    During the month of August 2010, Swartz received Tramadol 50 mg twice a day from August 1 through August 27.

119.    On September 1, 2010, Swartz submitted an HNR requesting an increase in his Tramadol medication.

120.    On September 1, 2010, mental health notified Dr. Rowe of a possible interaction with Swartz's Celexa medication.

121.    It was approved, but psych was to closely monitor for interactions.

122.    On September 2, 2010, Swartz submitted an HNR requesting an increase in his Tramadol for his facial reconstructive surgery, "broken shoulder", and arthritis, and further requesting additional pain medication for "nerve pain."

123.    On September 8, 2010, Swartz wrote a handwritten letter to Dr. Macabuhay requesting an increase in his Tramadol.

124.    On September 28, 2010, staff responded that central office must approve the increase.

125.    On September 23, 2010, Swartz wrote a handwritten note inquiring about when he would be seen for his injuries from February 26, 2010.

126.    During the month of September 2010, Swartz received Tramadol 50 mg twice a day from September 1 through September 30.

127.    On October 14, 2010, Swartz submitted an HNR requesting a Tramadol increase and stating he still was having pain in his face.

128.    On October 27, 2010, Swartz was seen by Dr. Macabuhay.

129.    On October 27, 2010, Dr. Macabuhay put in a non-formulary drug request to increase Swartz's Tramadol to 100 mg.

130.    On October 27, 2010, an outside consult request was put in for Swartz to see an ophthalmologist.

131.    Swartz admits seeing the ophthalmologist on January 14, 2011.

132.    During the month of October 2010, Swartz received Tramadol 50 mg from October 1 through October 31 twice a day.

133.    On November 21, 2010, Swartz submitted an HNR inquiring into the status of his Tramadol increase.

134.    During the month of November 2010, Swartz received Tramadol 50 mg twice a day from November 1 through November 30.

135.    On December 10, 2010, Swartz submitted an HNR inquiring into the status of his Tramadol increase.

136.    During the month of December 2010, Swartz received Tramadol 50 mg twice a day from December 1 through December 31.

137.    On January 1, 2011, Swartz submitted an HNR inquiring into the status of his Tramadol increase and "outside specialist" consult.

138.    On January 13, 2011, Swartz submitted an HNR advising he is now receiving his Tramadol twice a day, but wants to make sure his prescription does not expire and goes without being interrupted.

139.    On January 14, 2011 Swartz received his "eye consult."

140.    On January 16, 2011, Swartz submitted an HNR admitting he has been receiving tramadol twice a day since February 26, 2010, and requesting an increase in Tramadol and a prescription for Neurontin.

141.    On January 20, 2011, Swartz submitted an HNR requesting Neurontin or Gabapentin for "nerve damage," which he claimed he received on the streets.

142.    During the month of January 2011, Swartz received Tramadol 50 mg twice a day from January 1 through January 31.

143.    During the month of February 2011, Swartz received Tramadol 50 mg twice a day from February 1 through February 28.

144.    During the month of March 2011, Swartz received Tramadol 50 mg twice a day from March 1 through March 31.

145.    On April 5, 2011, Swartz submitted an HNR requesting a prescription for Neurontin for "pain and nerve damage."

146.    On April 28, 2011, Swartz submitted an HNR requesting Neurontin for "severe pain, nerve type pain, in my left side face and upper life.  I am having severe pain from my left side groin area.  Also I am experiencing pain from my previous shoulder injury and my arthritis is giving me a worse time than usual."

147.    During the month of April 2011. Swartz received Tramadol 50 mg twice a day from April 1 through April 30.

148.    On May 28, 2011, Swartz returned from the hospital.

149.   During the month of May 2011, Swartz received Tramadol 50 mg twice a day from May 1 through May 31.

150.   On June 7, 2011, Swartz submitted an HNR to "ensure" that his prescription for Tramadol would continue uninterrupted.

151.   During the month of June 2011, Swartz received Tramadol 50 mg twice a day from June 1 through June 30.

152.   On July 6, 2011, Dr. Macabuhay put in a non-formulary drug request for Tramadol.

153.   On July 22, 2011, Swartz submitted an HNR regarding damage to his left eye as a result of his facial reconstructive surgery.

154.   During the month of July 2011, Swartz received Tramadol 50 mg twice a day from July 1 through July 31.

155.   On approximately August 9, 2011, the Tramadol was approved for another four weeks.

156.   On August 10, 2011, Swartz submitted an HNR regarding his expired Tramadol prescription.

157.   On August 12, 2011, Swartz submitted an HNR to renew his Tramadol prescription.

158.   During the month of August 2011, Swartz received Tramadol 50 mg twice a day from August 1 through August 8.

159.   On September 21, 2011, Dr. Epstein placed a non-formulary drug request for Tramadol.

160.   During the month of September 2011, Swartz received Tramadol 50 mg twice a day from September 28 through September 30.

161.    Swartz also received Acetaminophen 325 mg from September 17 through September 20.

162.    Swartz also received ibuprofen 400 mg from September 4 through September 6.

163.    During the month of October 2011, Swartz received Tramadol 50 mg twice a day from October 1 through October 31.

164.    Swartz also received Tylenol #3 from October 21 through October 25.

165.    During the month of November 2011, Swartz received Tramadol 50 mg twice a day from November 1 through November 30.

166.    Swartz also received Acetaminophen on November 28.

167.    On December 22, 2011, Swartz submitted an HNR for pain in his upper back and left should and left side of face.

168.    He admitted he was receiving 100 mg of Tramadol 2x a day, but claimed it was now ineffective and requested an increase of Gabapentin.

169.    On December 25, 2011, Swartz submitted an HNR stating he was recently transferred from Baker, but has not yet received his 100 mg of Tramadol twice a day.

170.    On December 30, 2011, a non-formulary drug request for Tramadol was submitted.

171.    During the month of December 2011, Swartz received Tramadol 50 mg twice a day from December 1 through December 20.

172.    On January 12, 2012, Swartz was seen by Dr. Bell and requested Gabapentin along with Tramadol.

173.    On January 12, 2012, a non-formulary drug request was placed for Gabapentin.

174.    On January 26, 2012, the medical review committee denied the request for Gabapentin finding no medical indication for the medication.

175.    During the month of January 2012, Swartz received Tramadol 50 mg twice a day from January 13 through January 31.

176.    On February 1, 2012, Swartz requested an increase in his Tramadol.

177.    On February 24, 2012, Swartz submitted an inmate letter requesting an increase in his Tramadol or Neurontin (Gabapentin).

178.    During the month of February 2012, Swartz received Tramadol 50 mg twice a day from February 1 through February 29.

179.    During the month of March 2012, Swartz received Tramadol 50 mg twice a day from March 1 through March 31.

180.    During the month of April 2012, Swartz received Tramadol 50 mg twice a day from April 1 through April 30.

181.    On May 12, 2012, Swartz submitted an HNR requesting follow up treatment to his facial reconstructive surgery.

182.    On June 5, 2012, Swartz submitted an HNR alleging his Tramadol prescription expires in July and he wants to have the prescription renewed for another six months.

183.    During the month of June 2012, Swartz received Tramadol 50 mg twice a day from June 1 through June 30.

184.    On July 1, 2012, Swartz submitted an HNR regarding eye drops and a new script for Tramadol.

185.    On July 13, 2012, Swartz submitted an HNR stating his Tramadol stopped that morning.

186.    Staff responded that his medication was renewed on February 20, 2012, and did not expire until October 19, 2012.

187.    On July 18, 2012, Swartz was seen for renewal of Gabapentin, Naproxen, Tramadol, and eye drops.

188.    Swartz's Gabapentin was discontinued, but the remaining medications were all renewed.

189.    During the month of July 2012, Swartz received Tramadol 50 mg twice a day from July 1 through July 12.

190.    Swartz received Tramadol 100 mg twice a day from July 23 through July 31.

191.    On August 19, 2012, Swartz submitted an HNR requesting plastic surgery.

192.    He was seen on October, 25, 2012.

193.    During the month of August 2012, Swartz received Tramadol 50 mg twice a day from August 1 through August 31, 2012.

194.    During the month of September 2012, Swartz received Tramadol 50 mg twice a day from September 1 through September 30, 2012.

195.    On October 25, 2012, Swartz was seen to evaluate his pain medication.

196.    During the month of October 2012, Swartz received Tramadol 50 mg twice a day from October 1 through October 19.

197.    On November 27, 2012, a non-formulary drug request was submitted for Tramadol.

198.    On March 20, 2013, Swartz submitted an HNR giving ADC notice that his Tramadol prescription expired on April 23.

199.    During the month of March 2013, Swartz received Tramadol 50 mg twice a day from March 1 through March 31.

200.    On April 27, 2013, Swartz was seen at medical and complained he was not receiving his Tramadol.

201.    On April 28, 2013, Swartz was seen at medical complaining of chest discomfort because his Tramadol expired.

202.    During the month of April 2013, Swartz received Tramadol 50 mg twice a day from April 1 through April 24.

203.    During the month of August 2013, Swartz received Tramadol 50 mg twice a day from August 1 through August 31.

204.    During the month of September 2013, Swartz received Tramadol 50 mg twice a day from September 1 through 30.

205.    During the month of October 2013, Swartz received Tramadol 50 mg from October 1 through October 24.

206.    During the month of March 2014, Swartz received Tramadol 50 mg twice a day from March 1 through March 31.

207.    Swartz testified that he uncontrollably bites his lip as a result of the surgery, but admits this is only his personal opinion and no medical professional has ever confirmed this.

208.    Swartz also alleges he suffers from seizures and states an unknown doctor informed him of this at Lewis between 2011 and 2012.

209.    Swartz alleges he "went for more than six weeks without medication for his pain while awaiting central office approval of Tramadol."

210.    Swartz did not request Tramadol until April 15, 2010.

211.   On April 19, 2010 ADC put in a non-formulary drug request.

212.   Swartz's prescription for Tramadol was sent to the pharmacy the same day.

213.   On November 10, 2010, the outside consult was approved.

214.   Swartz alleges that in September 2011, he swallowed metal and medical and mental health staff did not obtain an X-ray, CT scan, or endoscopy, but rather used a metal detector and told him to wait to pass the pieces of metal. He further alleges that the following day he swallowed more items, and again he was told to wait to pass the objects.

215.   On September 3, 2011, Swartz was sent to the hospital after he ingested a spring and wire.

216.   On September 4, 2011, Swartz was again sent to the hospital after he ingested a steal bolt.

217.   On September 3, 2011, Swartz underwent an endoscopy in which Dr. Panetta removed two wires and one "bolt" successfully.

218.   He returned from the hospital on September 5, 2011.

219.   On September 7, 2011, Swartz complained of swallowing a metal spring a copper wire.

220.   Dr. Bell advised that Swartz was to be placed on a metal detecting chair or wanded and if no metal was present, he was to be sent back to his cell.

221.   Swartz was then x-rayed on September 8, 2011 and September 21, 2011, and received a follow-up visit on September 28, 2011.

222.   Swartz admitted at his deposition that he did receive x-rays showing multiple pieces of metal, but claims that he painfully passed over the course of the next several weeks.

223.   His next complaints of pain were in February 2012, but those were also regarding pain in his spine and eyes, not his stomach.

224.   Swartz alleges that in December 2011, he was transferred from Phoenix to Lewis, but had to file multiple HNRs and wait "several weeks" before he began to receive psychotropic meds prescribed by physicians at ASPC-Phoenix.

225.   Swartz was transferred from Baker Ward back to Lewis on December 22, 2011.

226.   A mental health progress report shows that he was then seen on January 11, 2012, when he reported needing a referral to psychiatry for evaluation, and that he was currently taking Prozac.

227.   In response, he was scheduled and seen on January 23, 2012 (four days later), and the doctor prescribed Risperdal (an antipsychotic drug), as well as Benadryl, Prozac and CaCO3.

228.   A progress report dated January 31, 2012, shows no complaint about his medications, and notes that he was feeling "well," and had denied any suicidal or homicidal ideations.

229.   A psychiatric follow-up report dated February 22, 2012 proves that he was in fact taking Risperdal, and Celexa, which helped with his depression.

230.   Between March 4, 2013 and April 1, 2014, Plaintiff Swartz had 1 chronic care appointment.

231.   Between March 22, 2010 and April 1, 2014, Plaintiff Swartz had 1 chronic care appointment.

232.   Between March 22, 2010 and June 30, 2012, Plaintiff Swartz had 1 outside specialty care consultations.

233.    Between July 1, 2012 and March 3, 2013, Plaintiff Swartz had 1 outside specialty care consultation.

234.    Between March 4, 2013 and April 1, 2014, Plaintiff Swartz had 2 outside specialty care consultations.

235.    In addition, Swartz claimed during his deposition that he "flat lined" during oral surgery and again when he returned to ADC.

236.    Swartz admitted at his deposition that he received x-rays showing multiple pieces of metal, claiming he painfully passed a paperclip over the course of the next several weeks.

## V.    MENTAL HEALTH CLAIMS

237.    During his deposition, Swartz admitted he saw a psychiatrist in 2011 while he was housed at the Phoenix facility.

238.    Plaintiff Swartz alleges that in late June 2011, one of the times he swallowed glass, he was taken to an outside hospital and the hospital psychiatrist said that he should be taken to an inpatient mental health unit, but ADC did not send him to the inpatient unit until September 2011.

239.    Swartz alleges he did not receive psychotherapy for more than two months in the summer of 2011.

240.    Swartz alleges he did not receive any sort of regular therapy from a psychiatrist or psychologist for his depression or anxiety following the 2010 assault.

**CONTESTED FACTS**

## I.   CRIMINAL BACKGROUND AND DISCIPLINARY HISTORY

1.     <u>Defendants Contend</u>:  On June 21, 1995, Swartz pled guilty to trafficking stolen property in violation of A.R.S. 13-2307(A)(C). His sentence began on September 19, 1994.

> <u>Plaintiffs Contend</u>:   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Swartz faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.  See also Plaintiffs' pending motion in limine on this subject matter.

2.     <u>Defendants Contend</u>:  On June 18, 2001, Swartz pled guilty to attempt to commit unlawful use of means of transportation in violation of A.R.S. §§ 13-001, 13-1803(A)(1)(B); solicitation of narcotics in violation of A.R.S. §§13-1002, 13-3408(A)(2),(B)(2). His sentence began April 23, 2001.

> <u>Plaintiffs Contend</u>:   These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Swartz faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal

Rule of Evidence 403.  See also Plaintiffs' pending motion in limine on this subject matter.

3.     <u>Defendants Contend</u>:  On May 7, 2002, Swartz pled guilty to burglary in the third degree in violation of A.R.S. §§13-1506, 13-604(A).  His sentence began on May 10, 2001.

> <u>Plaintiffs Contend</u>:  These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Swartz faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.  See also Plaintiffs' pending motion in limine on this subject matter.

4.     <u>Defendants Contend</u>:  On November 5, 2009, Swartz pled guilty to misconduct involving weapons in violation of A.R.S. §§ 13-1302, 13-604.  His sentence began on August 30, 2008,

> <u>Plaintiffs Contend</u>:  These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Swartz faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.  See also Plaintiffs' pending motion in limine on this subject matter.

5. <u>Defendants Contend</u>:  On July 7, 2012, Swartz began his sentence for burglary in the 2nd degree in violation of A.R.S 13-1507

>Plaintiffs Contend:  These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  The fact does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Mr. Swartz faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.  See also Plaintiffs' pending motion in limine on this subject matter.

6. <u>Defendants Contend</u>: Prior to his incarceration, Swartz never saw a psychologist or psychiatrist.

>Plaintiffs Contend: Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested.

7. <u>Defendants Contend</u>: One July 4, 2011, a Use of Force report was completed after Swartz became verbally abusive with correctional officers while his cell was being searched. He came towards the correctional officers in an aggressive manner so the officers placed Swartz against the wall and held him there until they gained control and then cuffed him.

>Plaintiffs Contend: Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is   uncontested.

## II.   <u>DENTAL CLAIMS</u>

8. <u>Defendants Contend</u>: Swartz claims he had a cracked molar for two years, implying that he had to wait that long to be treated by a dentist.

    <u>Plaintiffs Contend:</u>  Mr. Swartz did testify that he had a cracked molar for two years.  *See* Declaration of Stephen Swartz, signed Nov. 1, 2012 at ¶ 14 (Dkt. No. 292 Ex. L [filed 12/12/12]).  Plaintiffs do not agree to the stated implication, as it does not encompass all of the possibilities suggested by Mr. Swartz's testimony.

9.    <u>Defendants Contend:</u> Swartz' dental records,  do not support this claim.

    <u>Plaintiffs Contend:</u> Mr. Swartz reported a cracked tooth in an HNR dated January 17, 2012.  *See* ADC001915.  Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and therefore do not stipulate that it is uncontested.

10.    <u>Defendants Contend:</u> He was instructed to submit an HNR if he wanted dental treatment.

    <u>Plaintiffs Contend:</u> Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

11.    <u>Defendants Contend:</u> Swartz did not submit an HNR requesting dental treatment until more than two years later on January 17, 2012, in which he stated: "My remaining upper left molar is giving (me) extreme pain. The tooth is cracked open, so far it is not infected. But the pain is intense. May I please be seen by dental ASAP."

    <u>Plaintiffs Contend:</u> Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

12.    <u>Defendants Contend:</u> When Swartz returned one week later for an appointment on February 1, 2012 to extract #13, he refused treatment and requested more ibuprofen.

> Plaintiffs Contend: Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

13. <u>Defendants Contend:</u> He also was seen by the dentist on August 31, 2012, complaining of pain, indicating his filling had come out, and stating that tooth #31 was hot/cold sensitive.

> Plaintiffs Contend: Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

14. <u>Defendants Contend:</u> On August 31, 2012 the dentist put a temporary filling on #31.

> Plaintiffs Contend: Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

15. <u>Defendants Contend:</u> There is no evidence in Dr. Barlow's consult report to support Swartz' claims regarding tooth #31 or #32.

> Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

16. <u>Defendants Contend:</u> The dentist found no visible decay on #19 and that the pulpitis was reversible.

> Plaintiffs Contend: Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

17.     Defendants Contend: Swartz was advised that the tooth was restorable and he needed to submit an HNR if he wanted a filling.

> Plaintiffs Contend: Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

18.     Defendants Contend: Contrary to Swartz' claim that he was denied dental treatment for a cracked molar for two years, he was seen by a dentist within one week of his submission of an HNR requesting treatment for the tooth, and he refused the treatment recommended by the dentist a week later.

> Plaintiffs Contend: Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

19.     Defendants Contend: He was seen again seven months later and again refused treatment.

> Plaintiffs Contend: Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

20.     Defendants Contend: Swartz has submitted HNRs requesting dental treatment for other teeth and has refused dental treatment on at least eight separate occasions.

> Plaintiffs Contend: Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

21.     Defendants Contend: Each of Swartz' pain-expressing HNRs submitted in January, August, September and October of 2012, and February and March of 2013, were

greeted with a dentist visit within one week, with several of those resulting in appointments the same day or within 48 hours.

> Plaintiffs Contend: Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

## III.   MEDICAL CLAIMS

22.   Defendants Contend: There is no indication of any "flat line" or loss of consciousness in his records.

> Plaintiffs Contend: Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

23.   Defendants Contend: It is normal practice for oral surgeons, such as Dr. Thorpe, to administer general anesthesia in their office.

> Plaintiffs Contend: Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

24.   Defendants Contend: After the assault, Swartz was immediately Airevac'd to the Maricopa Medical Center ("MMC").

> Plaintiffs Contend: Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

25.   Defendants Contend: Swartz does not recall much of what happened at the hospital.

> Plaintiffs Contend: Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

26.     Defendants Contend: On March 3, 2010 Dr. Macabuhay put in an outside consult for plastic surgery because his hospital discharge records indicated that is what he needed.

> Plaintiffs Contend: Dr. Macabuhay did not state in the chart why he or she submitted the consult request.

27.     Defendants Contend: On March 4, 2010 Swartz underwent facial reconstructive surgery by Dr. Thorpe, M.D.

> Plaintiffs Contend: It is undisputed that Dr. Thorpe performed *oral surgery* on Mr. Swartz.  Mr. Swartz's injuries, however, were much more extensive and along the entire left side of Mr. Swartz's face.  Multiple doctors made recommendations that Mr. Swartz be seen for a plastic surgery consult at Maricopa Medical Center. Instead, ADC provided a consult to an oral surgeon who was not qualified to provide the full range of medically necessary care.  The surgeon failed to address the extensive damage Mr. Swartz suffered.  ADC's failure to provide the proper surgery consultations, contrary to the advice of multiple physicians, shows a failure to provide timely access to medically necessary specialty care.

28.     Defendants Contend: Dr. Thorpe is an oral surgeon, not an orthodontist.

> Plaintiffs Contend:  It is undisputed that Dr. Thorpe is an oral surgeon, however oral surgeon and orthodontist are not mutually exclusive. Regardless, an oral surgeon is not a plastic surgeon and does not provide the type of medical care that multiple third party doctors recommended Mr. Swartz receive.

29.     Defendants Contend: Swartz admits he received facial reconstructive surgery from Dr. Thorpe.

Plaintiffs Contend:  It is undisputed that Dr. Thorpe performed *oral surgery* on Mr. Swartz.  Mr. Swartz's injuries, however, were much more extensive and along the entire left side of Mr. Swartz's face.  Multiple doctors made recommendations that Mr. Swartz be seen for a plastic surgery consult at Maricopa Medical Center. Instead, ADC provided a consult to an oral surgeon who was not qualified to provide the full range of medically necessary care.  The surgeon failed to address the extensive damage Mr. Swartz suffered.  ADC's failure to provide the proper surgery consultations, contrary to the advice of multiple physicians, shows a failure to provide timely access to medically necessary specialty care.

30. Defendants Contend: An anesthesiologist was present during the surgery.

Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

31. Defendants Contend: Upon arriving back to his housing unit after the surgery, staff were unable to get through his cell door due to his aggressive behavior.

Plaintiffs Contend: Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

32. Defendants Contend: Although Plaintiff Swartz alleges a doctor at West Valley Hospital "demanded to have the Doctor's name that performed the surgery", Swartz could not give the doctor's name and testified that no other medical professional has ever informed him that anything was wrong with the surgery performed by Dr. Thorpe.

Plaintiffs Contend:  This is misleading. Although he did not recall his name, Mr. Swartz testified that the doctor who demanded to know who

performed the surgery was the Emergency Room doctor who treated him at West Valley Hospital.

33.   <u>Defendants Contend:</u> Swartz testified that following the March, 2010 surgery on his face, "(t)hey tried a whole slew of medications on me," yet insisted that in the first five weeks after surgery he was only given Motrin or Ibuprofen, which he claims was not effective.

> <u>Plaintiffs Contend:</u> Misconstrues Mr. Swartz's testimony.  Mr. Swartz testified that he couldn't really remember, but best as he could recall, he was only given Ibuprofen.

34.   <u>Defendants Contend:</u> When he returned to ADC on March 15, 2010  he had no complaints and he was provided with medical ice for 72 hours.

> <u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

35.   <u>Defendants Contend:</u> On April 19, 2010, Swartz was seen in response to an HNR where he complained about pain in his left cheek and upper lip.

> <u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested. The medical record does not show that Mr. Swartz was seen on April 19, 2010.  At most, it shows that a prescription was written that date.

36.   <u>Defendants Contend:</u> On May 14, 2010 he was given an eye patch to hold his left eye closed at night and with Lacri-lube ophthalmic for six months.

> <u>Plaintiffs Contend:</u>  Although the eye patch and Lacri-lube ophthalmic were ordered, plaintiffs are unaware of evidence that establishes these were given to Mr. Swartz.

37.     Defendants Contend: On May 16, 2011, Swartz was found to be in possession of drugs on his yard.

Plaintiffs Contend: These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused the substantial risk of harm Mr. Swartz faces as a result of the health care provided by the ADC.  In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

38.     Defendants Contend: On May 27, 2011, Swartz overdosed on 45 pills of Buspar and Celexa, and was transported to West Valley Hospital via ambulance.

Plaintiffs Contend:  These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused the substantial risk of harm Mr. Swartz faces as a result of the health care provided by the ADC.  In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus the facts should be excluded under Federal Rule of Evidence 403.

39.     Defendants Contend: Swartz testified he suffers from neuropathic brain seizures, but admits no medical professional has ever diagnosed him with this condition.

Plaintiffs Contend:  Mr. Swartz testified that a doctor at Lewis prison told him that he suffers from brain seizures several years ago.

40.    Defendants Contend: Swartz alleges he was denied pain medication for his facial fractures from April 26, 2013 – July 2013 and that this interruption has occurred approximately every six months.

Plaintiffs Contend:   Misstates Mr. Swartz's testimony that he has had repeated interruptions in his tramadol.

41.    Defendants Contend: From June 10, 2010- July 19, 2010 he did not submit any HNRs for pain regarding his facial reconstructive surgery.  From January 2011- April 2011, he was okay with his medications and did not submit any HNRs saying he was in pain.

Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested. Plaintiffs further contend that this statement is misleading.  It is undisputed that Dr. Thorpe performed *oral surgery* on Mr. Swartz.   Mr. Swartz's injuries, however, were much more extensive and along the entire left side of Mr. Swartz's face.  Multiple doctors made recommendations that Mr. Swartz be seen for a plastic surgery consult at Maricopa Medical Center. Instead, ADC provided a consult to an oral surgeon who was not qualified to provide the full range of medically necessary care.  The surgeon failed to address the extensive damage Mr. Swartz suffered.

42.    Defendants Contend: The hospital record shows that Swartz was being very manipulative during the interview and made several gestures to the counselor as to what he wanted to counselor to recommend to ADC.

Plaintiffs Contend:   Misleading.   The record shows that the person interviewing Mr. Swartz characterizing him as manipulative, based on his desire to be housed safely.

43.     <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Swartz submitted 116 HNRs.

    <u>Plaintiffs Contend:</u>  <u>Plaintiffs contend</u> that the number of HNRs Mr. Swartz filed is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Swartz received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Swartz does not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Swartz received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

44.     <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Swartz submitted 37 HNRs.

    <u>Plaintiffs Contend:</u>  Plaintiffs contend that the number of HNRs Mr. Swartz filed is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Swartz received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Swartz does not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Swartz received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

45.     <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Swartz submitted 26 HNRs.

Plaintiffs Contend:  Plaintiffs contend that the number of HNRs Mr. Swartz filed is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Swartz received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Swartz does not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Swartz received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

46.    Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Swartz submitted 181 HNRs.

Plaintiffs Contend:  Plaintiffs contend that the number of HNRs Mr. Swartz filed is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Swartz received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Mr. Swartz does not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Swartz received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

47.    Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Swartz had 68 encounters with a nurse.

Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested.

Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

48.  Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Swartz had 4 encounters with a nurse.

Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

49.  Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Swartz had 11 encounters with a nurse.

Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

50.  Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Swartz had 83 encounters with a nurse.

Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes

that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

51.     <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Swartz had 5 encounters with a mid-level provider.

<u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

52.     <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Swartz had 2 encounters with a mid-level provider.

<u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

53.     <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Swartz had 5 encounters with a mid-level provider.

> Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

54.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Swartz had 12 encounters with a mid-level provider.

> Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

55.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Swartz had 36 encounters with a physician.

> Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

56.     Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Swartz had 6 encounters with a physician.

>           Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

57.     Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Swartz had 4 encounters with a physician.

>           Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

58.     Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Swartz had 46 encounters with a physician.

>           Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or

not Defendants were deliberately indifferent.

59.    <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Swartz had 141 encounters with medical staff.

    <u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

60.    <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Swartz had 464 encounters with healthcare staff.

    <u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

## IV.    <u>MENTAL HEALTH CLAIMS</u>

61.    <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Swartz had 55 encounters with a psych tech.

    <u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or

meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

62.   <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Swartz had 1 encounter with a psych tech.

<u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

63.   <u>Defendants Contend:</u> Plaintiff Swartz alleges he did not see a psychiatrist in 2011.

<u>Plaintiffs Contend:</u>  Mr. Swartz makes no such blanket allegation and defendants provide no citation to the record to support their assertion.  Mr. Swartz stated he did not see a psychiatrist for over a year, which "could have been part of 2010 and part of 2011."   Swartz Depo. 205:14-20 (August 22, 2013).   He attempted to narrow the time frame that this deprivation occurred by saying "I'd say for the second half of 2010, for sure and all of 2011 here at Lewis complex" but "I'd have to go back and check my logs. . . ."  *Id.* at 205:25-206:5.   Mr. Swartz transferred from Lewis complex to the Phoenix inpatient unit from September through December 2011. *Id.* at 147:22-148:2.

64.   <u>Defendants Contend:</u> On June 29, 2011, Plaintiff was sent to the hospital after he cut his arm and ingested glass. He informed staff he did this because he hadn't

had dairy or fruit in seven weeks.  He received an X-ray at the hospital and there was no evidence of a foreign object.  Plaintiff also received an Esophagogastroduodenoscopy with biopsy. No foreign objects were found in upper G.I. tract. Swartz was discharged as the provider believed a colonoscopy would yield low yield given Swartz swallowed a small piece of transparent glass.  s

> Plaintiffs Contend:  Plaintiffs agree that Mr. Swartz was sent to the hospital on June 29, 2011, after he cut his arm and ingested glass.  Plaintiffs dispute the statement that he informed staff he took these steps because of dietary deprivations.  Plaintiffs do not contest the statements regarding his x-ray and EGD and the findings.

65.   Defendants Contend: At the hospital, he informed hospital staff that he would prefer to be moved to an inpatient facility for inmates to deal with his current depression and anxiety.   He admits that his self-harm was done to obtain different housing.  The medical records clearly state that the hospital's recommendation was that Swartz should be on suicide watch or moved to a secure inpatient facility for inmates.  Swartz was placed on suicide watch when he returned to the ASPC-Lewis.

> Plaintiffs Contend:  This statement is incomplete and misleading.  The hospital records clearly state that he "is on suicide watch currently and on protective custody but denies that this is actually safe, pt admits that he was still able to harm himself while on suicide watch and also reports that protective custody  units are not safe.  Pt reports that he would prefer to be moved to an in-pt psychiatric facility for inmates to deal with his current depression and anxiety which are exacerbated by his current psychosocial and environmental stressors. . . .  Additionally, pt reports that he would rather die by his own hand tha[n] by another and reports that he has been repeatedly assaulted while in prison and was put back in the same housing

area with the same people that assaulted him previously.  Pt reports that he just wants to finish out his sentence without being threatened or harmed or have to 'look over his shoulder all of the time' in fear that` someone is going to harm or kill him."  ADC001681.

66.   <u>Defendants Contend:</u> Swartz admitted during his deposition that he was given both tests (he was placed on a metal detecting chair and wanded), which came back negative, so he was sent back to his cell.

<u>Plaintiffs Contend:</u> Defendants mischaracterize Mr. Swartz's testimony. Mr. Swartz testified that he believed the metal detecting chair was not functioning as it did not register the metal plate in his face.

67.   <u>Defendants Contend:</u> This was the only time Swartz was forced to pass an object, as he admitted that "(a)ny other time, it was removed, any of the objects were removed, with endoscopy."

<u>Plaintiffs Contend:</u>  Misstates Mr. Swartz's testimony.  He testified that he may also have had to pass broken glass.

68.   <u>Defendants Contend:</u> When asked what psychotherapy meant to him, Swartz testified "laying on a couch for an hour, talking to a psychiatrist."

<u>Plaintiffs Contend:</u> This statement is incomplete and misleading.  Mr. Swartz testified in his deposition that psychotherapy "would be intense or extensive interaction between a patient and a psychiatrist."  Swartz Depo. 206:15-21 (August 22, 2013).  When asked for an example, he replied with the above quote.  *Id.* 206:23-207:1.

69.   <u>Defendants Contend:</u> Swartz had mental health encounters nearly every day from June – August 2011.

<u>Plaintiffs Contend:</u> The term "encounter" is vague and undefined; defendants do not even state with whom Mr. Swartz had the alleged

encounters, and whether they were even mental health staff.  Defendants do not contend that any of the "encounters" involved treatment.  Plaintiffs further contend that the number of non-treatment interactions Mr. Swartz had is immaterial to the adequacy of the healthcare he ultimately received and whether defendants were deliberately indifferent to his needs.

70.   Defendants Contend: Swartz was had an encounter with mental health staff almost every day for the months of July and August 2010.

Plaintiffs Contend:   The term "encounter" is vague and undefined; defendants do not even state with whom Mr. Swartz had the alleged encounters.   Defendants do not contend that any of the "encounters" involved treatment.   Plaintiffs further contend that the number of non-treatment interactions Mr. Swartz had with unnamed staff is immaterial to the adequacy of the healthcare he ultimately received and whether defendants were deliberately indifferent to his needs.

71.   Defendants Contend: On September 7, 2011 Swartz admitted he was given both tests to detect for metal, which came back negative, so he was sent back to his cell.

Plaintiffs Contend: Defendants mischaracterize Mr. Swartz's testimony. Mr. Swartz testified that he believed the metal detecting chair was not functioning as it did not register the metal plate in his face.

72.   Defendants Contend: Swartz testified that he has no damage other than pain he allegedly felt at the time he was passing the objects.

Plaintiffs Contend:  Whether Mr. Swartz contradicted himself is a matter of opinion, but in any event, defendants' characterization of his testimony is simply wrong.  Mr. Swartz testified that he had pain, mental anguish, and wounds to his backside as a result of being forced to pass the objects.

73.   <u>Defendants Contend:</u> Between September and December 2011, Swartz submitted only one HNR complaining about pain, and regarding his left shoulder.

<u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

74.   <u>Defendants Contend:</u> Swartz admitted that he often received endoscopies to remove metal objects that he swallowed.

<u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested. Defendants again mischaracterize Mr. Swartz's testimony.  He did not testify that he received endoscopies often.

75.   <u>Defendants Contend:</u> Swartz submitted his first HNR requesting a mental health evaluation on January 19, 2012, falsely claiming that he had submitted two previous requests; he stated only that he had questions about his medications.

<u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that Defendants' contention is true and Defendants have failed to specify any; Plaintiffs therefore do not stipulate that it is uncontested.

76.   <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Swartz had 56 encounters with a psych tech.

<u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or

not Defendants were deliberately indifferent.

77.     Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Swartz had 89 encounters with a psych associate.

> Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

78.     Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Swartz had 3 encounters with a psyche associate.

> Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

79.     Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Swartz had 92 encounters with a psych associate.

> Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the

adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

80.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Swartz had 78 encounters with a psychologist.

Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

81.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Swartz had 2 encounters with a psychologist.

Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

82.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Swartz had 80 encounters with a psychologist.

Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or

meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

83.   <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Swartz had 228 encounters with psychology staff.

<u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

84.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Swartz had 65 encounters with a psychiatric nurse.

<u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

85.   <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Swartz had 5 encounters with a psychiatric nurse.

<u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further

contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

86.     <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Swartz had 70 encounters with a psychiatric nurse.

<u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

87.     <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Swartz had 2 encounters with a psychiatric mid-level.

<u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

88.     <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Swartz had 20 encounters with a psychiatrist.

<u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested.

Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

89.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Swartz had 2 encounters with a psychiatrist.

Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

90.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Swartz had 1 encounter with a psychiatrist.

Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

91.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Swartz had 23 encounters with a psychiatrist.

Plaintiffs Contend:  Plaintiffs are unaware of any evidence that establishes

that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

92.  <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Swartz had 95 encounters with psychiatry staff.

<u>Plaintiffs Contend:</u>  Plaintiffs are unaware of any evidence that establishes that this is true and therefore do not stipulate that it is uncontested. Plaintiffs contend that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Mr. Swartz had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Swartz ultimately received and whether or not Defendants were deliberately indifferent.

**Exhibit J – Jackie Thomas**

**UNCONTESTED FACTS**

## I.    MEDICAL CLAIMS

1.    In the Complaint, Thomas alleged he suffered from second-hand smoke that triggered asthma attacks, but Thomas testified at his deposition that he has not suffered any problems due to second-hand smoke at the facility.

2.    Thomas also testified at his deposition that he walks passed smokers when he goes to medical, but admitted he suffers no injury as a result.

3.    Thomas alleges he reported an inability to sleep and requested Ambien, but was not prescribed a sleep aid.

## II.    CONDITIONS OF CONFINEMENT

4.    Thomas testified at his deposition that his weight fluctuates – he gains weight and then he loses weight.

5.    Thomas alleges he has been pepper sprayed by guards, who sprayed his cell, including the toilet, bedding and food.

6.    Thomas testified at his deposition that he has a radio and will soon get a television through the TV loaner program.

7.    The Complaint alleges that Thomas did not suffer from suicidal ideation when he was put in isolation, but as time went on, his mental and physical state deteriorate and he developed suicidal ideation and physically harmed himself several times.

## III.    MENTAL HEALTH CLAIMS

8.    Thomas alleges he did not see a psychiatrist for 11 months despite being placed on suicide watch multiple times, but, Thomas cannot recall what date or year this

allegedly occurred. Thomas alleges when he arrived from the county jail in November 2006, the ADC mental health staff suddenly took him off Seroquel.

9.      He has been informed he cannot be on Seroquel because it is a class 2 narcotic.

10.     Thomas alleges he is prescribed Prozac even though he has told ADC doctors it does not work for him.

11.     Thomas alleges he was prescribed Haldol even though he told the doctor he has bad side effects.

12.     Thomas alleges that when he puts in an HNR for mental health, it sometimes takes many days, weeks or even months before he is seen.

13.     Thomas alleges in November 2011 he overdosed on Diclofenac and that he didn't receive any medical care for this even though he told staff he was constipated and throwing up.

14.     During his deposition, he alleged that he did not go to the hospital as a result of this overdose.  Thomas' medical records, however, indicate he was sent to the hospital for this incident.  Thomas was shown this record during his deposition, and he testified he did not remember going to the hospital.

15.     Thomas alleges, generally, his mental health has gotten worse since he has been in isolation in SMU 1.

16.     When asked how Thomas' mental health conditions have gotten worse, he stated "because I don't get the right help I want and they don't give me the right medication."

17.     Thomas admitted to telling a guard he was going to kill himself just so he could be moved to another unit.

18.     At the time of his deposition, Thomas was being treated by a psych-associate, Williams, every Friday.

**CONTESTED FACTS**

## I.   BACKGROUND AND DISCIPLINARY HISTORY

1.     Defendants Contend:   On September 25, 2006, Thomas was convicted of molestation of a child in violation of A.R.S. §13-1410; attempted molestation of a child in violation of A.R.S. § 13-1410; and aggravated assault in violation of A.R.S. §§ 13-1204(A)(4), 13-1203, 13-118.  His sentence for these crimes began on October 25, 2006.

> Plaintiffs Contend:   This fact is irrelevant and immaterial and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact does not make it more or less likely or less likely than not that Defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Thomas as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and any probative value of the fact is substantially outweighed by its prejudicial nature.  Accordingly, the fact should be excluded under Federal Rule of Evidence 403.  Moreover, Plaintiffs' motion in limine seeking to exclude the criminal history of the class members is currently pending before the Court.

2.     Defendants Contend:   Thomas is currently incarcerated at ASPC-Eyman.

> Plaintiffs contend:  This is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. This does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Chisholm faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded under Federal Rule of Evidence 403. Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the

Court. Plaintiffs also lack immediate firsthand knowledge to confirm or deny this statement.

3.    Defendants Contend:    On October 26, 2006, Thomas was convicted of molestation of a child, attempted molestation of a child, and aggravated assault for penetrating a 7-year-old boy's anus with his finger and fondling his penis on March 16, 2005, and for threatening to hurt a woman if she did not date him, forcing himself on her on several occasions, and writing on her stomach with a marker, "Don't fuck with me or I will you kill." He signed it "Jackie the criminal."

Plaintiffs Contend:  This fact is irrelevant and immaterial and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact does not make it more or less likely or less likely than not that Defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Thomas as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and any probative value of the fact is substantially outweighed by its prejudicial nature.  Accordingly, the fact should be excluded under Federal Rule of Evidence 403.  Moreover, Plaintiffs' motion in limine seeking to exclude the criminal history of the class members is currently pending before the Court.

4.    Defendants Contend: Thomas testified that the harm he allegedly suffers while incarcerated at ADC is comparable (both a 10 on a scale of 1–10) to his own childhood abuse.

Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact does not make it more or less likely or less likely than not that Defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Thomas as a result of the healthcare provided by the ADC.

5.     <u>Defendants Contend:</u> On July 29, 2009, Thomas was disciplined for starting a fire in his cell, resulting in one officer being taken to the hospital for smoke inhalation.

          <u>Plaintiffs Contention</u>:  This fact is irrelevant and immaterial and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact does not make it more or less likely or less likely than not that Defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Thomas as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and any probative value of the fact is substantially outweighed by its prejudicial nature.  Accordingly, the fact should be excluded under Federal Rule of Evidence 403.

6.     <u>Defendants Contend:</u> On December 9, 2009, Thomas was disciplined after advising staff that he was suffering from a seizure but later admitting that he was faking it.

          <u>Plaintiffs Contend</u>:  This fact is irrelevant and immaterial and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact does not make it more likely than not or less likely than not that Defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Thomas as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and any probative value of the fact is substantially outweighed by its prejudicial nature.  Accordingly, the fact should be excluded under Federal Rule of Evidence 403.

7.     <u>Defendants Contend:</u> On September 13, 2010, Thomas was disciplined for forging an officer's name indicating a check had been deposited into Thomas' account, and then claiming the funds were never made available to him in an attempt to get the check issued to him again.

          <u>Plaintiffs Contend</u>:  This fact is irrelevant and immaterial and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact

does not make it more likely than not or less likely than not that Defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Thomas as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and any probative value of the fact is substantially outweighed by its prejudicial nature.  Accordingly, the fact should be excluded under Federal Rule of Evidence 403.

8.     Defendants Contend: On February 11, 2011, Thomas was disciplined after he threw a liquid substance on another inmate.

Plaintiffs Contend:  This fact is irrelevant and immaterial and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact does not make it more likely than not or less likely than not that Defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Thomas as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and any probative value of the fact is substantially outweighed by its prejudicial nature.  Accordingly, the fact should be excluded under Federal Rule of Evidence 403.

9.     Defendants Contend: On January 22, 2012, Thomas was disciplined after he tried to pull away from an escorting officer several times while being transported back to his cell from the shower.

Plaintiffs Contend:  This fact is irrelevant and immaterial and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact does not make it more likely than not or less likely than not that Defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Thomas as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and any probative value of the fact is substantially outweighed by its prejudicial nature.  Accordingly, the fact should be excluded under Federal Rule of Evidence 403.

10. <u>Defendants Contend:</u> On September 19, 2012, Thomas was disciplined after he was uncooperative during a mental health assessment – he refused to answer questions, cooperate in his treatment, and consistently referred to the provider as a "bitch."

> <u>Plaintiffs Contend::</u>  This fact is irrelevant and immaterial and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact does not make it more likely than not or less likely than not that Defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Thomas as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and any probative value of the fact is substantially outweighed by its prejudicial nature.  Accordingly, the fact should be excluded under Federal Rule of Evidence 403.

11. <u>Defendants Contend:</u> Thomas testified at his deposition that he did not know who Richard Pratt was or that Pratt was a defendant in this lawsuit, and he was unaware of what he needed to prove to establish the claims in this lawsuit or that there was an appeal pending.

> <u>Plaintiffs Contend:</u> This fact is contested to the extent that it does not fully and accurately describe Thomas' disposition testimony. Mr. Thomas immediately clarified that he, as a class representative for and a plaintiff in this lawsuit, he has sued Richard Pratt.   Moreover, the fact is inaccurate to the extent that Mr. Thomas' deposition testimony does not support the contention that he was "unaware of what he needed to prove to establish the claims in this lawsuit or that there was an appeal pending."   Moreover, Mr. Thomas' personal understanding of the role the defendants played in the administration of healthcare to ADC prisoners or the legal basis for challenging the constitutional adequacy of that healthcare is immaterial as to whether Defendants were deliberately indifferent and caused substantial

risk of serious harm to Mr. Thomas as a result of the healthcare provided by the ADC.

12.    <u>Defendants Contend:</u>    Thomas did not file any grievances during the relevant time period.

       <u>Plaintiffs Contend:</u>  This fact is contested where the terms "grievances" and "relevant time period" are vague.  Further, the fact is inaccurate as Mr. Thomas has previously filed grievances during his incarceration. Moreover, the number of grievances Mr. Thomas filed, or whether he filed such grievances at all, is immaterial to whether defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Thomas as a result of the healthcare provided by the ADC.

13.    <u>Defendants Contend:</u>  On August 20, 2009, Thomas was disciplined after he threw an unknown liquid substance on another inmate.

       <u>Plaintiffs Contend:</u>  This fact is contested to the extent it does not fully and accurately describe the content of Thomas' disciplinary record.  Further, Mr. Thomas' disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Thomas faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature.  Accordingly, the fact should be excluded under Federal Rule of Evidence 403.

14.    <u>Defendants Contend:</u>   On April 8, 2011, Thomas was disciplined for physically assaulting another inmate in his cell.

       <u>Plaintiffs Contend:</u>  This fact is contested to the extent it is inaccurate and misleadingly suggests that Mr. Thomas initiated a physical assault on another inmate.  At most, the record suggests that on April 8, 2011, Thomas

and another inmate were involved in a physical altercation in their cell. Additionally, Mr. Thomas' disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Thomas as a result of the healthcare provided by the ADC.   In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature.  Accordingly, the fact should be excluded under Federal Rule of Evidence 403.

15.   <u>Defendants Contend</u>:   On January 28, 2011, Thomas was disciplined for faking unconsciousness.

<u>Plaintiffs Contend</u>:  This fact is contested to the extent it does not fully and accurately describe the content of Thomas' disciplinary record.  Tellingly, Mr. Thomas feigned unconsciousness in order to be taken to the health unit to request treatment for a boil on his ankle, and was disciplined. Additionally, Mr. Thomas' disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Thomas as a result of the healthcare provided by the ADC.   In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature.  Accordingly, the fact should be excluded under Federal Rule of Evidence 403.

16.   <u>Defendants Contend</u>:   On March 24, 2011, staff had to intervene when Thomas assaulted another inmate.

<u>Plaintiffs Contend</u>:  This fact is contested to the extent it is inaccurate and misleadingly suggests that Mr. Thomas initiated a physical assault on another inmate.  At most, the record suggests that on March 24, 2011, staff intervened when Thomas and another inmate were involved in a physical

altercation.  Additionally, Mr. Thomas' disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Thomas as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature.  Accordingly, the fact should be excluded under Federal Rule of Evidence 403.

17.  <u>Defendants Contend</u>:  Thomas has been disciplined on three separate occasions (June 22, 2013, September 7, 2013, and December 19, 2013) for hanging a t-shirt to his cell light which obscured security's ability to see into the cell clearly

<u>Plaintiffs Contend</u>: This fact is contested because it does not fully and accurately describe the content of Thomas' disciplinary record.  Further, Mr. Thomas' disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm to Mr. Thomas faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature.  Accordingly, the fact should be excluded under Federal Rule of Evidence 403.

## II.   MEDICAL CLAIMS

18.  <u>Defendants Contend</u>:  Between March 22, 2010 and June 30, 2012, Plaintiff Thomas submitted 89 HNRs.

<u>Plaintiffs Contend</u>:  This fact is contested because the number of HNRs Mr. Thomas submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Thomas received constitutionally adequate healthcare, that Defendants were not deliberately indifferent, or that Mr. Thomas did not face a substantial risk of serious harm.  The filing

of an HNR does not speak to whether Mr. Thomas received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

19.　Defendants Contend:  Between July 1, 2012 and March 3, 2013, Plaintiff Thomas submitted 20 HNRs.

Plaintiffs Contend:  Plaintiffs' Contention:  This fact is contested because the number of HNRs Mr. Thomas submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Thomas received constitutionally adequate healthcare, that Defendants were not deliberately indifferent, or that Mr. Thomas did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Thomas received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs..

20.　Defendants Contend:  Between March 4, 2013 and April 1, 2014, Plaintiff Thomas submitted 13 HNRs.

Plaintiffs Contend:  Plaintiffs' Contention:  This fact is contested because the number of HNRs Mr. Thomas submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Thomas received constitutionally adequate healthcare, that Defendants were not deliberately indifferent, or that Mr. Thomas did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Thomas received healthcare or the quality of that healthcare.  Further,

Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs..

21.   Defendants Contend:  Between March 22, 2010 and April 1, 2014, Plaintiff Thomas submitted 122 HNRs.

Plaintiffs Contend:  Plaintiffs' Contention:  This fact is contested because the number of HNRs Mr. Thomas submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Mr. Thomas received constitutionally adequate healthcare, that Defendants were not deliberately indifferent, or that Mr. Thomas did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Thomas received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs..

22.   Defendants Contend:  Between March 22, 2010 and June 30, 2012, Plaintiff Thomas had 56 encounters with a nurse.

Plaintiffs Contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

23.   Defendants Contend:  Between July 1, 2012 and March 3, 2013, Plaintiff Thomas had 35 encounters with a nurse.

Plaintiffs Contend:  This fact is contested because the term "encounter" is

vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

24.     <u>Defendants Contend:</u>  Between March 4, 2013 and April 1, 2014, Plaintiff Thomas had 9 encounters with a nurse.

<u>Plaintiffs Contend:</u>  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

25.     <u>Defendants Contend:</u>  Between March 22, 2010 and April 1, 2014, Plaintiff Thomas had 100 encounters with a nurse.

<u>Plaintiffs Contend:</u>  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

26.     <u>Defendants Contend:</u>  Between March 22, 2010 and June 30, 2012, Plaintiff Thomas had 3 encounters with a mid-level provider.

<u>Plaintiffs Contend:</u>  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

27.     <u>Defendants Contend:</u>  Between July 1, 2012 and March 3, 2013, Plaintiff Thomas had 5 encounters with a mid-level provider.

> Plaintiffs Contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

28.    Defendants Contend:  Between March 4, 2013 and April 1, 2014, Plaintiff Thomas had 4 encounters with a mid-level provider.

> Plaintiffs Contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

29.    Defendants Contend:  Between March 22, 2010 and April 1, 2014, Plaintiff Thomas had 12 encounters with a mid-level provider.

> Plaintiffs Contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

30.    Defendants Contend:  Between March 22, 2010 and June 30, 2012, Plaintiff Thomas had 28 encounters with a physician.

> Plaintiffs Contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

31.　　Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Thomas had 2 encounters with a physician.

　　　　Plaintiffs Contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

32.　　Defendants Contend:  Between March 4, 2013 and April 1, 2014, Plaintiff Thomas had 3 encounters with a physician.

　　　　Plaintiffs Contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

33.　　Defendants Contend:  Between March 22, 2010 and April 1, 2014, Plaintiff Thomas had 33 encounters with a physician.

　　　　Plaintiffs Contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

34.　　Defendants Contend:  Between March 22, 2010 and April 1, 2014, Plaintiff Thomas had 145 encounters with medical staff.

　　　　Plaintiffs contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether

or not defendants were deliberately indifferent.

35.   <u>Defendants Contend:</u>  Between March 22, 2010 and April 1, 2014, Plaintiff Thomas had 447 encounters with healthcare staff.

> <u>Plaintiffs contend:</u>  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

36.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Thomas had 2 chronic care appointments.

> <u>Plaintiffs contend:</u>  This fact is contested because the term "appointments" is vague.  Plaintiffs further contend that the number of encounters Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

37.   <u>Defendants Contend:</u>  Between March 4, 2013 and April 1, 2014, Plaintiff Thomas had 2 chronic care appointments.

> <u>Plaintiffs contend:</u>  This fact is contested because the term "appointments" is vague.  Plaintiffs further contend that the number of encounters Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

38.   <u>Defendants Contend:</u>  Between March 22, 2010 and April 1, 2014, Plaintiff Thomas had 4 chronic care appointments.

> <u>Plaintiffs contend:</u>  This fact is contested because the term "appointments" is vague.  Plaintiffs further contend that the number of encounters Mr. Thomas had with healthcare professionals is immaterial to the adequacy of

the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

39.   <u>Defendants Contend:</u>  Between March 22, 2010 and April 1, 2014, Plaintiff Thomas had 3 outside specialty care consultations.

<u>Plaintiffs contend:</u>  This fact is contested because the term "consultations" is vague.  Plaintiffs further contend that the number of encounters Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

40.   <u>Defendants Contend:</u>  Thomas only requested Ambien in 2007 and hasn't done so since.

<u>Plaintiffs contend:</u>  This fact is contested to the extent that it lacks foundation, and is misleading because it does not fully and accurately describe the content of Thomas' medical records.

41.   <u>Defendants Contend:</u>  Thomas testified that, prior to being incarcerated, he had problems sleeping prior and suffered from insomnia at least four times a week.

<u>Plaintiffs contend:</u>  This fact is contested to the extent that it lacks foundation, and is misleading because it does not fully and accurately describe the content of Thomas' medical records.

## III.   <u>CONDITIONS OF CONFINEMENT</u>

42.   <u>Defendants Contend:</u> Thomas testified in his deposition that the only way he will be happy with his housing is if he gets to handpick an individual to be his cellmate.

<u>Plaintiffs Contend:</u>  This fact is irrelevant and immaterial and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Mr. Thomas' choice of roommate does not make it more likely than not or less likely than not that Defendants were deliberately indifferent and caused

substantial risk of serious harm to Mr. Thomas as a result of the healthcare provided by the ADC and/or the conditions of Mr. Thomas' confinement.

43.    Defendants Contend: Thomas alleges he has lost 30 pounds since being in "isolation."

Plaintiffs Contend:: This fact is irrelevant and immaterial and should be excluded pursuant to Federal Rules of Evidence 401 and 402.

44.    Defendants Contend: Thomas admitted in his deposition he doesn't know why he gains and loses weight.

Plaintiffs Contend: This fact is irrelevant and immaterial and should be excluded pursuant to Federal Rules of Evidence 401 and 402. Moreover, this fact is duplicative of other facts.

45.    Defendants Contend: When asked how he knows he has lost weight Thomas testified in his deposition, "Because I'm skinny. I used to be a little bit chunkier, so now I'm skinny."

Plaintiffs Contend:: This fact is irrelevant and immaterial and should be excluded pursuant to Federal Rules of Evidence 401 and 402. Moreover, this fact is duplicative of other facts.

46.    Defendants Contend: Thomas testified that he refused a shower two weeks ago because he was too tired and wanted to go to bed.

Plaintiffs Contend: This fact is contested because the phrase "two weeks ago" is undefined and vague. Plaintiffs further contest this fact because it is immaterial to the extent whether Mr. Thomas voluntarily chose to forgo a single shower is irrelevant to whether the conditions of his confinement are constitutional and whether defendants were deliberately indifferent and caused Mr. Thomas to face a substantial risk of serious harm.

47.    Defendants Contend: Thomas testified that if he wanted to go to recreation, he is able to, he just chooses not to go.

Plaintiffs Contend:  This fact is contested to the extent it is inaccurate and mischaracterizes Mr. Thomas' testimony as to whether he "just chooses not to go."  Plaintiffs further contest this fact because it is immaterial to the extent whether Mr. Thomas voluntarily chose to forgo recreation is irrelevant to whether the conditions of his confinement are constitutional and whether defendants were deliberately indifferent and caused Mr. Thomas to face a substantial risk of serious harm.

48.  Defendants Contend:  Thomas testified that he does not get along with other people because "they like to fight me and argue and think they're better and stronger than me."

Plaintiffs Contend:  This fact is contested to the extent it is inaccurate and mischaracterizes Mr. Thomas' testimony.  Mr. Thomas testified that he gets along with some people, but that he does not get along with other individuals for the reasons stated.  Plaintiffs further contest this fact because it is irrelevant to whether the conditions of his confinement are constitutional and whether defendants were deliberately indifferent and caused Mr. Thomas to face a substantial risk of serious harm.

49.  Defendants Contend:  At his deposition, Thomas could not explain or point to any proof that he has lost weight as a result of being placed in segregation.

Plaintiffs Contend:  This fact is contested to the extent it is inaccurate and mischaracterizes Mr. Thomas' testimony.  Mr. Thomas testified that he lost weight because he only receives two meals a day.

50.  Defendants Contend:  Thomas testified that he lost weight because he "works out a lot and it burns a lot of fat."

Plaintiffs Contend:  This fact is contested to the extent it is inaccurate and mischaracterizes Mr. Thomas' testimony.  Mr. Thomas testified that his weight loss was not necessarily attributable to his workout regimen.

51.   Defendants Contend:  Thomas testified at his deposition that he had been pepper-sprayed once in the past, and that he was sprayed because he "threw" a concoction of "urine" "mixed up water, salsa, pepper, salt, and a glass light bulb mixed" with "hot grease."

> Plaintiffs Contend:  This fact is contested to the extent it is inaccurate and mischaracterizes Mr. Thomas' testimony.  Mr. Thomas testified to being pepper sprayed more than 20 times at SMU-1.

52.   Defendants Contend:  Plaintiff Thomas acknowledged ADC officials have assisted segregation inmates to obtain loaner TVs made available through charitable programs.

> Plaintiffs Contend:  This fact is contested to the extent it is inaccurate and mischaracterizes Mr. Thomas' testimony.  Mr. Thomas testified only that CO III Radford helped him get a radio, and offered no testimony about whether other ADC officials have assisted other segregation inmates to obtain loaner TVs.

53.   Defendants Contend:   When asked if he was still experiencing weight loss he stated, "I've gained some weight and I lose wait[sic].  I gain weight; I lost weight.  I don't know what it is."

> Plaintiffs Contend:  This fact is contested to the extent it is inaccurate and misquotes Mr. Thomas's deposition testimony.  This fact is also irrelevant and duplicative of other facts and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Moreover, this fact has unnecessary and inconsistent internal numbering.

54.   Defendants Contend:  Thomas contended he lost weight because he "works out a lot and it burns a lot of fat."

> Plaintiffs Contend:  This fact is contested to the extent it is inaccurate and mischaracterizes Mr. Thomas' testimony.  Mr. Thomas testified that his

weight loss was not necessarily attributable to his workout regimen. This fact is also irrelevant and duplicative of other facts and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Moreover, this fact has unnecessary and inconsistent internal numbering.

55.   <u>Defendants Contend:</u>     Thomas admitted in his deposition that he had previously had thoughts of suicide before being housed in maximum custody.

<u>Plaintiffs Contend:</u> This fact is contested to the extent it is vague, misleading, and inaccurate.  At most, Thomas acknowledged in his deposition that he had previously had thoughts of suicide prior to incarceration.

56.   <u>Defendants Contend:</u>     Additionally, he admitted that he has had "ADD, ADHD, bipolor, paranoia, schizophrenic, multiple personality disorder, manic explosive, anger aggression, and hearing voices and delusional" since he was a child.

<u>Plaintiffs Contend:</u> This fact is contested to the extent it misquotes Mr. Thomas's deposition testimony.

## IV.   <u>MENTAL HEALTH CLAIMS</u>

57.   <u>Defendants Contend:</u> Thomas admitted in his deposition to having suicidal thoughts "every day" prior to being incarcerated and to attempting to commit suicide prior to being incarcerated by cutting himself, attempting to hang himself, banging his head on the wall, trying to cut off his fingers, and trying to overdose on drugs like Seroquel and Strattera.

<u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Mr. Thomas' suicidal ideations prior to being imprisoned are not at issue in this litigation.  In the alternative, these facts are unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Accordingly,

the fact should be excluded under Federal Rule of Evidence 403.

58.    Defendants Contend:   Thomas alleges while in Eyman's SMU, he did not see a psychiatrist for almost a year (between January 12, 2007 and March 16, 2007) and even though he had been moved to the suicide watch unit multiple times.

Plaintiffs Contend:    This fact is contested to the extent that it mischaracterizes Mr. Thomas' allegations and testimony, lacks foundation, and does not fully and accurately describe Thomas' allegations.

59.    Defendants Contend:   Although Thomas alleges it was "almost a year", the time frame was only 2 months and he was seen by psychologists during this time.

Plaintiffs Contend:   This fact is contested to the extent that it is inaccurate, mischaracterizes Mr. Thomas' allegations and testimony, and lacks foundation.

60.    Defendants Contend:    On January 12, 2007 Thomas was seen by Psychiatrist William J. Crowly, MD. Thomas's medications were adjusted during this visit.   Specifically, his Tegretol was increased due to low levels and his Prozac was increased from 20 mg to 60 mg.   Thomas was also prescribed an anti-psychotic (Prolixin).

Plaintiffs Contend:  This fact is contested to the extent it is inaccurate and mischaracterizes the evidence. The record indicates that while his Prozac was increased, there is no indication it was from 20mg to 60mg, and there is no indication that Prolixin is an anti-psychotic.   Moreover, there are inconsistent "Id" placements in this fact that are unsupported by actual record evidence.

61.    Defendants Contend:   On January 17, 2007, Thomas was seen by Sheri Anjeikovich, PsyD. During this encounter, Thomas advised that his medications were okay and he was not experiencing any side effects.  Moreover, he denied any current suicidal ideations or homicidal ideation.

Plaintiffs Contend:  This fact is contested to the extent it is inaccurate and lacks foundation, including that Thomas indicated that his medications were "alright", but did not help with his symptoms.  Moreover, the record does not support that Thomas "advised" that he was not experiencing side effects, as the record is unclear as to whether this was merely the observation made by mental health staff.   Additionally, this fact is inaccurate to the extent it mischaracterizes Thomas' visit, which provides a litany of mental problems that Thomas suffers from and demonstrates that the mental health staff was seriously concerned about Thomas' mental health.

62.   Defendants Contend:   On January 24, 2007, Plaintiff refused an appointment with a health care provider. On February 8, 2007, Plaintiff was seen by Joanne Smith, PhD.

Plaintiffs Contend:  This fact is contested to the extent is inaccurate, and unsupported by the record, lacks foundation, incomplete, and where the term "appointment" and "health care provider" are undefined and vague. This fact is also irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402, as Mr. Thomas' refusal of any individual appointment is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

63.   Defendants Contend:  Thomas also cannot be prescribed Seroquel because he attempted to overdose on it.

Plaintiffs Contend: This fact is contested to the extent that there is no support in Mr. Thomas' deposition or the record to suggest that he cannot be prescribed Seroquel because he had previously attempted to overdose on it.

64.    Defendants Contend:  Thomas alleges ADC started him on Tegretol even though he told an ADC doctor when he arrived at ADC in 2006 that it made him angry in the past.

> Plaintiffs Contend:  This fact is contested to the extent it does not accurately reflect what Thomas has alleged.  Moreover, the fact is inaccurate to the extent it misleadingly suggests that Thomas told the ADC doctor that Tegretol made him angry in the past when he arrived at ADC in 2006.

65.    Defendants Contend:  Thomas thinks he is angry when he takes Tegretol because his cellmate told him Tegretol made him angry in 2009.

> Plaintiffs Contend:  This fact is contested to the extent it does not accurately reflect what Thomas has alleged.  Moreover, the fact is inaccurate to the extent it misleadingly suggests that Thomas told the ADC doctor that Tegretol made him angry in the past when he arrived at ADC in 2006 after a cellmate told him Tegretol made him angry in 2009.

66.    Defendants Contend:  On February 7, 2011, Thomas submitted an HNR and specifically requested to "get restarted on my Prozac" "which seems to do the best for me."  During his deposition Thomas denied ever submitting this HNR, alleging someone forced his signature.

> Plaintiffs Contend:  This fact is contested to the extent that it is inaccurate and mischaracterizes the evidence.  At most, the evidence suggests that on February 7, 2011, an HNR was submitted in Thomas's name that specifically requested to "get restarted on my Prozac" "which seemed to do the best for me," and that, during his deposition, Thomas denied ever submitting this HNR, alleging someone forced his signature.

67.    Defendants Contend:  Thomas alleges he attributes several "bad symptoms" to the Haldol.  Namely, being fidgety, drinking a lot of water, and having to move around

a lot. He admitted, however, that no one has ever informed him these symptoms are the result of taking Haldol.

> Plaintiffs Contend:  This fact is contested to the extent it is inaccurate and mischaracterizes Thomas' allegations and testimony. At most, Thomas alleges he attributes several "bad symptoms" to the Haldol.  Namely, being fidgety, drinking a lot of water, and having to move around a lot. He acknowledged that no one has ever told him that those symptoms are typically the result of taking Haldol, but that these are the symptoms he's endured after taking Haldol in the past.

68.   Defendants Contend:  When asked for a specific example when that has happened to him, Thomas could not provide one or provide a date. All he could state was that it was regarding "chest pains" – a claim he failed to bring in the Complaint.

> Plaintiffs Contend:  This fact is contested to the extent it uses terms that are undefined and overbroad, inaccurate, and mischaracterizes Thomas' disposition testimony.  Moreover, this fact is immaterial to the extent that the filing of an HNR does not ensure that Mr. Thomas received constitutionally adequate healthcare, that Defendants were not deliberately indifferent, or that Mr. Thomas did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Mr. Thomas received healthcare or the quality of that healthcare.

69.   Defendants Contend:  From June 2010 – June 2011 Thomas had no suicide attempts while housed in "isolation."

> Plaintiffs Contend:  This fact is contested to the extent the term "attempts" is overbroad, and where it does not fully and accurately reflect the medical record evidence.

70.   Defendants Contend:  During his deposition Thomas testified that Dr. Williams and Nurse McGowan are helpful to him, listen to him, teach him how to stay

calm, and puts him on the doctor's line when needed.  He further testified that Dr. Williams makes him laugh, brings a smile to his face, and that he looks forward to seeing her every week.

> Plaintiffs Contend: This fact is contested to the extent it is unclear, unsupported, and lacks foundation that Psych Associate Williams is a doctor.  Further, this fact is inaccurate because it mischaracterizes Thomas' deposition testimony related to McGowan and Williams. At most, the record supports that, during his deposition, Thomas testified that Ms. Williams and Ms. McGowan are helpful to him, and that Ms. McGowan listens to him, teaches him how to stay calm, and puts him on a doctor's line when needed. He further testified that Ms. Williams makes him laugh, brings a smile to his face, and that he looks forward to seeing her during their group visits.

71.   Defendants Contend:  Thomas testified that "sometimes" he thinks he has improved.

> Plaintiffs Contend:  This fact is contested to the extent it is vague, overbroad, lacks foundation, inaccurate, and is unsupported by—and mischaracterizes—Thomas' testimony.  At most, Thomas acknowledged that his behavior has sometimes improved since he was moved to "2 Baker".

72.   Defendants Contend:  Between March 22, 2010 and June 30, 2012, Plaintiff Thomas had 71 encounters with a psych associate.

> Plaintiffs contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

73.    Defendants Contend:  Between July 1, 2012 and March 3, 2013, Plaintiff Thomas had 71 encounters with a psych associate.

> Plaintiffs contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

74.    Defendants Contend:  Between March 4, 2013 and April 1, 2014, Plaintiff Thomas had 19 encounters with a psyche associate.

> Plaintiffs contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

75.    Defendants Contend:  Between March 22, 2010 and April 1, 2014, Plaintiff Thomas had 161 encounters with a psych associate.

> Plaintiffs contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

76.    Defendants Contend:  Between March 22, 2010 and June 30, 2012, Plaintiff Thomas had 42 encounters with a psychologist.

> Plaintiffs contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether

or not defendants were deliberately indifferent.

77.   Defendants Contend:   Between July 1, 2012 and March 3, 2013, Plaintiff Thomas had 30 encounters with a psychologist.

> Plaintiffs contend:   This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

78.   Defendants Contend:   Between March 22, 2010 and April 1, 2014, Plaintiff Thomas had 72 encounters with a psychologist.

> Plaintiffs contend:   This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

79.   Defendants Contend:   Between March 22, 2010 and April 1, 2014, Plaintiff Thomas had 233 encounters with psychology staff.

> Plaintiffs contend:   This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

80.   Defendants Contend:     Between March 22, 2010 and June 30, 2012, Plaintiff Thomas had 34 encounters with a psychiatric nurse.

> Plaintiffs contend:   This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to

the adequacy of the healthcare Mr. Thomas ultimately received and whether
or not defendants were deliberately indifferent.

81.   Defendants Contend:   Between July 1, 2012 and March 3, 2013, Plaintiff
Thomas had 20 encounters with a psychiatric nurse.

> Plaintiffs contend:   This fact is contested because the term "encounter" is
> vague.  Additionally, the number of encounters, interactions, appointments,
> or meetings Mr. Thomas had with healthcare professionals is immaterial to
> the adequacy of the healthcare Mr. Thomas ultimately received and whether
> or not defendants were deliberately indifferent.

82.    Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff
Thomas had 6 encounters with a psychiatric nurse.

> Plaintiffs contend:   This fact is contested because the term "encounter" is
> vague.  Additionally, the number of encounters, interactions, appointments,
> or meetings Mr. Thomas had with healthcare professionals is immaterial to
> the adequacy of the healthcare Mr. Thomas ultimately received and whether
> or not defendants were deliberately indifferent.

83.   Defendants Contend:   Between March 22, 2010 and April 1, 2014, Plaintiff
Thomas had 60 encounters with a psychiatric nurse.

> Plaintiffs contend:   This fact is contested because the term "encounter" is
> vague.  Additionally, the number of encounters, interactions, appointments,
> or meetings Mr. Thomas had with healthcare professionals is immaterial to
> the adequacy of the healthcare Mr. Thomas ultimately received and whether
> or not defendants were deliberately indifferent.

84.   Defendants Contend:     Between March 22, 2010 and June 30, 2012,
Plaintiff Thomas had 8 encounters with a psychiatrist.

> Plaintiffs contend:   This fact is contested because the term "encounter" is
> vague.  Additionally, the number of encounters, interactions, appointments,

or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

85.    Defendants Contend:  Between March 4, 2013 and April 1, 2014, Plaintiff Thomas had 1 encounter with a psychiatrist.

Plaintiffs contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

86.    Defendants Contend:  Between March 22, 2010 and April 1, 2014, Plaintiff Thomas had 9 encounters with a psychiatrist.

Plaintiffs contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

87.    Defendants Contend:  Between March 22, 2010 and April 1, 2014, Plaintiff Thomas had 69 encounters with psychiatry staff.

Plaintiffs contend:  This fact is contested because the term "encounter" is vague.  Additionally, the number of encounters, interactions, appointments, or meetings Mr. Thomas had with healthcare professionals is immaterial to the adequacy of the healthcare Mr. Thomas ultimately received and whether or not defendants were deliberately indifferent.

## Exhibit K – Christina Verduzco
## UNCONTESTED FACTS

### I.   BACKGROUND AND DISCIPLINARY HISTORY

1.      Verduzco testified at her deposition that she does not recall the status of this lawsuit, she does not know when the last hearing was or what it was about, she does not know who her attorneys were for this lawsuit, and that she believed the attorneys who attended her deposition (Amy Fettig, Ajmel Quereshi, and Sarah Kader) are representing her in her criminal case.

2.      Verduzco testified at her deposition that she had eight invisible friends and "play(s) with them every time they come by."

3.      Verduzco testified at her deposition that she believed Osama Bin Laden was the President of the United States.

4.      Verduzco testified that she does not recall ever filing a grievance.

5.      Verduzco testified at her deposition that she has assaulted two of her cellmates.

### II.   CONDITIONS OF CONFINEMENT

6.      Verduzco admits that pepper spray has been used on her when she failed to respond to officers' calls to show her face.

7.      Thereafter, Verduzco remained secure in 10-minute watch for several more days until November 15, 2011, when Dr. Katz removed her from mental-health watch and returned her to her regular cell.

8.      On December 6, 2011, Verduzco was again on 10 minute mental-health watch for making multiple statements to staff of wanting to engage in self-harm.

9.      She was then returned to the cell, where she remained secure.

10. Staff noticed blood smeared on the walls, and because she had a history of mental health issues and behavioral non-compliance, they entered into her cell.

11. Verduzco was removed from the cell.

12. The blood smeared on the wall was determined to have been Verduzco's menstrual blood.

13. Staff contacted Dr. Shaw, who then placed Verduzco on constant mental-health watch.

14. Lieutenant Richards directed Officer Sands to retrieve a camera and record the incident.

15. Lieutenant Richards deployed a one-second burst of OC chemical spray into the cell.

16. She was escorted to a different cell, where she was examined by a nurse.

17. The nurse determined she had no injuries, checked her vitals, and released her back to her cell.

18. Verduzco remained secure in her cell for the next eight days.

19. Dr. Gaskill removed her from mental-health watch on December 30, 2011.

20. On March 29, 2012, while on constant mental-health watch for having made scratches on her left wrist, Verduzco completely covered herself with blankets.

21. Sergeant Christian initiated ICS, assumed command, and requested a camera to record the incident.

22. Sergeant Christian thus deployed a one-second burst of OC spray through the food trap door.

23. A nurse examined Verduzco and found no injuries.

24.     On May 22, 2012, Corrections Officers Hines witnessed two inmates arguing loudly in the group recreation area.

25.     The first inmate summoned the other inmate to the middle of the enclosure.

26.     As they approached each other, Officers Hines and Thomas ordered them to "stop and cuff up."

27.     Verduzco suddenly ran past the first inmate and assaulted the other one, hitting her in the face with closed fists and pulling her hair.

28.     Officer Hines initiated ICS, and Officers Thomas and Bowman entered the enclosure.

29.     Officer Bowman deployed a one-second burst of chemical agent and directives were given to Verduzco and the two other inmates to "get down, get on the ground."

30.     Verduzco continued to sit on the other inmate while striking her face with closed fists.

31.     After more directives were given, Verduzco eventually complied, but the other two inmates continued assaulting each other.

32.     Officer Bowman yelled another directive to stop, but they did not comply, and a second spray was deployed on the other inmates as one of them simultaneously kicked the other in the head.

33.     Officer Bowman continued to yell directives to "get down on the ground now."

34.     When the other two inmates complied, all of them were restrained.

35.     Supervisors were notified and Sergeant Fachi arrived on site.

36.     A nurse arrived and examined Verduzco.

37.     Verduzco refused further medical attention and was returned to her  cell.

## III.   <u>MENTAL HEALTH CLAIMS</u>

38.     Verduzco contends that she does not receive regular therapy or help with her mental health symptoms.

39.     Verduzco claims that she experiences bad side effects from her medications.

40.     Verduzco has  received inpatient mental health treatment at the Arizona State Hospital.

# CONTESTED FACTS

## I.    CRIMINAL BACKGROUND AND DISCIPLINARY HISTORY

1.    Defendants Contend: On November 5, 2004 Verduzco pled guilty to murder in the 2nd degree in violation of A.R.S. §13-1104; unlawful flight in violation of A.R.S. §§ 28-622.01, 28-624(c); theft of means of transportation in violation of A.R.S. § 13-1814.

> Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact does not make it more or less likely than not that defendants were deliberately indifferent and caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

2.    Defendants Contend: On July 17, 2003, Verduzco stole a vehicle, collided with a police car, fled, ran several red lights, and t-boned another vehicle, killing the driver.  She also collided with two other vehicles.

> Plaintiffs Contend:  These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely that defendants were deliberately indifferent and caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should be excluded

under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

3.      Defendants Contend: She had swallowed a "balloon" of drugs and was believed to be impaired.

Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact does not make it more or less likely than not that defendants were deliberately indifferent and caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

4.      Defendants Contend: Verduzco pleaded guilty to second degree murder, unlawful flight, and theft of means of transportation, and was sentenced to a term of 22 years' imprisonment.  Verduzco testified at her deposition that she does not recall seeing the Complaint or helping her attorneys answer written questions, and that she does not know what a class action is or what her role in the lawsuit is.

Plaintiffs Contend:  These facts are irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  These facts do not make it more or less likely than not that defendants were deliberately indifferent and caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, these facts are unfairly prejudicial, and the probative value of the facts is substantially outweighed by their prejudicial nature. Thus, the facts should

be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

5.   <u>Defendants Contend</u>: Verduzco testified at her deposition that she has been written up for exposing herself to correctional officers.

<u>Plaintiffs Contend</u>: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Verduzco's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

6.   <u>Defendants Contend:</u> On January 15, 2010, Verduzco was found guilty of assaulting staff (throwing water on the nurse delivering her medication), and as discipline she received loss of 30 days of earned release credits, 30 days of Parole Class III, and 30 days of loss of privileges.

<u>Plaintiffs Contend:</u> The date found guilty is Feb. 2, 2010.  In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Verduzco's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of

the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

7.      Defendants Contend: On January 17, 2010, was found guilty of attempting to commit a felony (throwing an unknown substance at the nurse attempting to give her medication), and as discipline she received loss of 30 days of earned release credits.

Plaintiffs Contend: The case numbers provided on referenced documents do not match, rendering this fact incorrect.   In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. Ms. Verduzco's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

8.      Defendants Contend: On January 17, 2010, Verduzco was found guilty of assaulting staff (throwing a cup of juice on the officer delivering her breakfast), and as discipline she received loss of 30 days of earned release credits, 30 days of Parole Class III, and 30 days of loss of privileges.

Plaintiffs Contend: The date found guilty is Feb. 2, 2010.  In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Verduzco's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of

the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

9.   Defendants Contend: On April 10, 2010, Verduzco was found guilty of assaulting staff while on watch (throwing water on the officer assigned to watch her), and as discipline she received 90 days of Parole Class III and 30 days of loss of privileges.

Plaintiffs Contend: The date found guilty is May 11, 2010.  In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Verduzco's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

10.   Defendants Contend: On April 17, 2010, Verduzco was found guilty of attempting to commit a felony (she was observed exposing herself from the waist down and masturbating during a security check), and as discipline she received a forfeiture of 30 days of earned release credits.

Plaintiffs Contend: The case numbers provided on referenced documents do not match, rendering this fact incorrect.  In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. Ms. Verduzco's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially

outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

11.    <u>Defendants Contend</u>: On August 2, 2011, Verduzco was found guilty of assaulting her inmate (she hit her cellmate in the head with a plastic chair and punched her), and as discipline she received 60 days of Parole Class III, 30 hours of extra duty, 30 days of loss of privileges, and 30 days of loss of visits.

<u>Plaintiffs Contend</u>: The date found guilty is August 10, 2011.  In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Verduzco's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

12.    <u>Defendants Contend</u>: On August 2, 2011, Verduzco was issued an information report for inappropriate behavior – during a search, Verduzco reached toward an officer with both hands as if she was going to grab the officer's face, and stated, "Your so beautiful I just want to touch your face."

<u>Plaintiffs Contend</u>:  There is no dispute that the record exists, but no admission to the underlying conduct.  In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Verduzco's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is

unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

13. <u>Defendants Contend</u>: On September 27, 2011, Verduzco was found guilty of criminal damage (destroying facility-issued clothes and sheets), and as discipline she received 15 days of loss of privileges.

> <u>Plaintiffs Contend:</u> The date found guilty is unknown, Sept. 27, 2011 is the date of violation in the report.  In addition, this fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Verduzco's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

14. <u>Defendants Contend</u>: On May 21, 2012, Verduzco received a disciplinary report for inappropriately touching another inmate on the group recreation yard (rubbing the inmate's backside while she was bent over).

> <u>Plaintiffs Contend</u>: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Verduzco's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed

by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

15.     Defendants Contend:   On May 22, 2012, Verduzco and another inmate were involved in an assault against a third inmate in the group recreation enclosure – Verduzco charged one of the other inmates and hit her and pulled her hair – and Verduzco initially refused to comply with multiple verbal directives to stop fighting.

> Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Verduzco's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

16.     Defendants Contend:   On August 19, 2012, Verduzco received a disciplinary report for indecent exposure (exposing her breast to an officer).

> Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Verduzco's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

17. <u>Defendants Contend</u>: On October 22, 2012, Verduzco was issued an information report for possessing "piggy back mail" from another inmate.

Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. Ms. Verduzco's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

18. <u>Defendants Contend</u>: On November 1, 2012, Verduzco received a disciplinary report for striking another inmate with a closed fist in the group recreation enclosure.

<u>Plaintiffs Contend</u>: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. Ms. Verduzco's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

19. <u>Defendants Contend</u>: On November 13, 2012, Verduzco received a disciplinary report after she was observed kissing another inmate's open mouth through the recreation fence, a violation of ADC policy.

Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Verduzco's disciplinary record is not at issue in this litigation and does not make it more or less likely that defendants were deliberately indifferent and the caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

20.   Defendants Contend: Verduzco is currently incarcerated ASPC-Perryville.

Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact does not make it more or less likely than not that defendants were deliberately indifferent and caused substantial risk of serious harm Ms. Verduzco faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and the probative value of the fact is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

## II.   MEDICAL  CARE CLAIMS

21.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Verduzco submitted 136 HNRs.

Plaintiffs Contend: that the number of HNRs Ms. Verduzco submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Ms. Verduzco received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Ms. Verduzco did

not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Ms. Verduzco received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

22.    <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Verduzco submitted 12 HNRs.

<u>Plaintiffs Contend:</u> that the number of HNRs Ms. Verduzco submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Ms. Verduzco received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Ms. Verduzco did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Ms. Verduzco received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

23.    <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Verduzco submitted 29 HNRs.

<u>Plaintiffs Contend:</u> that the number of HNRs Ms. Verduzco submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Ms. Verduzco received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Ms. Verduzco did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Ms. Verduzco received healthcare or the quality of that

healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

24.   <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Verduzco submitted 177 HNRs.

<u>Plaintiffs Contend:</u> that the number of HNRs Ms. Verduzco submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Ms. Verduzco received constitutionally adequate healthcare, that defendants were not deliberately indifferent, or that Ms. Verduzco did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Ms. Verduzco received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

25.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Verduzco had 186 encounters with a nurse.

<u>Plaintiffs Contend:</u> that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

26.   <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Verduzco had 38 encounters with a nurse.

> Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

27.    Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Verduzco had 67 encounters with a nurse.

> Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

28.    Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Verduzco had 291 encounters with a nurse.

> Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

29.    Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Verduzco had 6 encounters with a mid-level provider.

> Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to

the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

30.     Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Verduzco had 10 encounters with a physician.

> Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

31.     Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Verduzco had 10 encounters with a physician.

> Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

32.     Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Verduzco had 14 encounters with a physician.

> Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

33.     Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Verduzco had 34 encounters with a physician.

<u>Plaintiffs Contend:</u> that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

34.   <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Verduzco had 502 encounters with medical staff.

<u>Plaintiffs Contend:</u> that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

## III.   <u>CONDITIONS OF CONFINEMENT</u>

35.   <u>Defendants Contend:</u> On November 9, 2011, at 6:27 am, while on 10 minute watch for making multiple statements that she was intending self-harm, Verduzco covered her head and hands, refusing to show them to staff.

<u>Plaintiffs Contend:</u> This fact misstates the evidence.  Ms. Verduzco's statement was not that she intended to engage in self-harm, but that she "felt like" it.  Also, no evidence that Ms. Verduzco actually heard commands.

36.   <u>Defendants Contend:</u> Out of concern for her safety, officers made several verbal requests and directives to uncover and show them her head and hands.

<u>Plaintiffs Contend:</u> There is no evidence of the officer's intent.

37.   Defendants Contend: After Verduzco repeatedly refused to comply with those directives, Lieutenant Richards deployed a one-second burst of OC chemical spray into the cell.

Plaintiffs Contend: This fact misstates the evidence.  There is no evidence that Ms. Verduzco heard, understood, or could comply with the commands.

38.   Defendants Contend: After refusing to comply with orders on November 9, 2011, pepper spray was utilized and she then complied with directives and was safely restrained.

Plaintiffs Contend: This fact misstates the evidence.  There is no evidence that Ms. Verduzco heard, understood, or could comply with the commands.

39.   Defendants Contend: was escorted out of her cell for decontamination and placed in a different cell.

Plaintiffs Contend: The only way to decontaminate is with soap and there is no evidence soap was used.

40.   Defendants Contend: On December 6, 2011 at approximately 1:35 a.m., Verduzco was hiding her hands and face under a blanket.

Plaintiffs Contend: This fact misstates the evidence.  The documents do not show that Ms. Verduzco was "hiding" but only that she was under a blanket.

41.   Defendants Contend: She was moving around beneath the blanket and repeatedly refused to respond to staff's directives to show herself.

Plaintiffs Contend: This fact misstates the evidence.  There is no evidence that Ms. Verduzco heard, understood, or could comply with the commands.

42.    Defendants Contend: Staff became concerned for her mental health and welfare, and deployed a one-second burst of OC spray.

Plaintiffs Contend: There is no evidence of staff's thought process.

43.    Defendants Contend: Verduzco was then removed from the cell and decontaminated.

Plaintiffs Contend: The only way to decontaminate is with soap.

44.    Defendants Contend:]   The entire incident lasted approximately fifteen minutes.

Plaintiffs Contend:  There is no evidence of how long the incident lasted,

45.    Defendants Contend: On December 21, 2011, Verduzco failed to respond to a cell-front pill call.

Plaintiffs Contend: This fact misstates the evidence.  There is no evidence that Ms. Verduzco heard, understood, or could comply with the commands.

46.    Defendants Contend: On December 21, 2011, after Verduzco failed to respond, the Incident Command System ("ICS") was initiated, and Sergeant Voogt deployed a single burst of chemical spray.

Plaintiffs Contend: This fact misstates the evidence.  There is no evidence that Ms. Verduzco heard, understood, or could comply with the commands.

47.    Defendants Contend: Her hands and head were covered, and she refused to respond to verbal commands to show them.

Plaintiffs Contend: This fact misstates the evidence.  There is no evidence that Ms. Verduzco heard, understood, or could comply with the commands.

48.    Defendants Contend: Sergeant Voogt gave numerous loud commands for Verduzco to respond, but she repeatedly refused.

Plaintiffs Contend: This fact misstates the evidence.  There is no evidence that Ms. Verduzco heard, understood, or could comply with the commands.

49.   Defendants Contend: He continued giving her loud orders to respond, but she continued to refuse.

Plaintiffs Contend: This fact misstates the evidence.  There is no evidence that Ms. Verduzco heard, understood, or could comply with the commands.

50.   Defendants Contend:]  She was by then responding, but still not complying with orders.

Plaintiffs Contend: This fact misstates the evidence.  There is no evidence that Ms. Verduzco heard, understood, or could comply with the commands.

51.   Defendants Contend: She was immediately examined by medical.

Plaintiffs Contend: This fact is misleading.  The medical examination only occurs at the conclusion of the incident and it was not an emergency.

52.   Defendants Contend: On December 22, 2011, Verduzco again hid her head and hands from staff while on constant watch.

Plaintiffs Contend: This fact misstates the evidence.  There is no evidence that Ms. Verduzco heard, understood, or could comply with the commands.

53.   Defendants Contend: Lieutenant Richards gave Verduzco several directives to uncover her head and hands, but she refused all of them.

Plaintiffs Contend: This fact misstates the evidence.  There is no evidence that Ms. Verduzco heard, understood, or could comply with the commands.

54.   Defendants Contend: Verduzco then complied with the orders to show her head and hands.

Plaintiffs Contend:   There is no causal link between use of spray and compliance.

55.     Defendants Contend: She was removed from her cell and decontaminated with copious amounts of water.

Plaintiffs Contend: The only way to decontaminate is with soap and there is no evidence soap was used.

56.     Defendants Contend: Verduzco did not move on March 29, 2012 and continued to refuse to respond to Sergeant Christian's  verbal directives.

Plaintiffs Contend: This fact misstates the evidence.  There is no evidence that Ms. Verduzco heard, understood, or could comply with the commands.

57.     Defendants Contend: Sergeant Christian gave a loud verbal order to show her face and hands.

Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  There is no evidence that Ms. Verduzco heard, understood, or could comply with commands.  Thus, the fact should be excluded under Federal Rule of Evidence 403.

58.     Defendants Contend: When he saw no movement and heard no response, he asked Corrections Officer Santiago to open the food trap.

Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  There is no evidence that Ms. Verduzco heard, understood, or could comply with commands.  Thus, the fact should be excluded under Federal Rule of Evidence 403.

59.     Defendants Contend: He again ordered Verduzco to show her face and hands, and warned her that she will be sprayed if she did not comply.

Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant

to Federal Rules of Evidence 401 and 402.  There is no evidence that Ms. Verduzco heard, understood, or could comply with commands.  Thus, the fact should be excluded under Federal Rule of Evidence 403.

60.    <u>Defendants Contend</u>:  Verduzco then complied with directives, got up, put on a mental health smock and submitted to mechanical restraints.

<u>Plaintiffs Contend</u>:  There is no causal link between use of spray and compliance.

61.    <u>Defendants Contend</u>: Verduzco was escorted to the shower, where she was decontaminated and given a clean smock.

<u>Plaintiffs Contend</u>: The only way to decontaminate is with soap and there is no evidence soap was used.

62.    <u>Defendants Contend</u>: The cell was also cleaned before she was returned to it.

<u>Plaintiffs Contend</u>: No evidence that cell was properly cleaned.

63.    <u>Defendants Contend</u>: Verduzco was escorted to the showers for decontamination using "copious" amount of water after being involved in an altercation with other inmates on May 22, 2012.

<u>Plaintiffs Contend</u>: The only way to decontaminate is with soap and there is no evidence soap was used.

64.    <u>Defendants Contend</u>: Verduzco testified that she has blankets when it is cold in the watch cells.

<u>Plaintiffs Contend</u>: There is no evidence that blankets are provided whenever needed or that the blankets provide adequate protection from the cold.

65.     Defendants Contend: Verduzco testified that she talks through her cell walls to the inmate in the cell next to her, and they read scripture, pray, and sing together.

> Plaintiffs Contend:  Ms. Verduzco's deposition testimony was taken despite the fact that she testified that she was "real foggy" that day and that her medication had her "feeling weird."  Thus, Ms. Verduzco's testimony is not admissible evidence.

66.     Defendants Contend: Verduzco testified that she has refused recreation.

> Plaintiffs Contend:  Ms. Verduzco's deposition testimony was taken despite the fact that she testified that she was "real foggy" that day and that her medication had her "feeling weird."  Thus, Ms. Verduzco's testimony is not admissible evidence.

67.     Defendants Contend: Verduzco testified that she has a television and access to reading material.

> Plaintiffs Contend:  Ms. Verduzco's deposition testimony was taken despite the fact that she testified that she was "real foggy" that day and that her medication had her "feeling weird."  Thus, Ms. Verduzco's testimony is not admissible evidence.

68.     Defendants Contend: Verduzco testified that she does not eat breakfast or lunch because she does not like the food, although she admitted that she ate pancakes for breakfast the day of her deposition.

> Plaintiffs Contend:  Ms. Verduzco's deposition testimony was taken despite the fact that she testified that she was "real foggy" that day and that her medication had her "feeling weird."  Thus, Ms. Verduzco's testimony is not admissible evidence.

69.   <u>Defendants Contend:</u> Verduzco admits that pepper spray was used on her as a consequence of her failing to follow facility rules, such as failing to respond to officer calls to see the inmate awake when on watch status, and refusing to stop assaulting another inmate.

<u>Plaintiffs Contend:</u>  Ms. Verduzco's deposition testimony was taken despite the fact that she testified that she was "real foggy" that day and that her medication had her "feeling weird."  Thus, Ms. Verduzco's testimony is not admissible evidence.

## IV.   <u>MENTAL HEALTH CLAIMS</u>

70.   <u>Defendants Contend:</u> Verduzco admits that she has received one-on-one counseling at Perryville-Lumley.

<u>Plaintiffs Contend</u>:  This fact does not provide the full context of Ms. Verduzco's testimony.  When asked if she received one-on-one counseling, Ms. Verduzco testified "[o]nce in a long -- I have before in the past."  In addition, Ms. Verduzco's deposition testimony was taken despite the fact that she testified that she was "real foggy" that day and that her medication had her "feeling weird."  Thus, Ms. Verduzco's testimony is not admissible evidence.

71.   <u>Defendants Contend:</u>  Verduzco prefers group counseling over one-on-one sessions.

<u>Plaintiffs Contend:</u>  Ms. Verduzco's deposition testimony was taken despite the fact that she testified that she was "real foggy" that day and that her medication had her "feeling weird."  Thus, Ms. Verduzco's testimony is not admissible evidence.

72.     Defendants Contend: Verduzco admits that she sees Dr. St. Clair while she is on watch at Perryville.

> Plaintiffs Contend:  Ms. Verduzco's deposition testimony was taken despite the fact that she testified that she was "real foggy" that day and that her medication had her "feeling weird." Thus, Ms. Verduzco's testimony is not admissible evidence.

73.     Defendants Contend: Verduzco admits that Haldol works.

> Plaintiffs Contend:  This fact does not accurately reflect Ms. Verduzco's testimony.  At one point, when asked directly if Haldol helps her, Ms. Verduzco answered "I'm -- I honestly don't know."  In addition, Ms. Verduzco's deposition testimony was taken despite the fact that she testified that she was "real foggy" that day and that her medication had her "feeling weird."  Thus, Ms. Verduzco's testimony is not admissible evidence.

74.     Defendants Contend: Verduzco admits that she has cheeked her medications.

> Plaintiffs Contend:  Ms. Verduzco's deposition testimony was taken despite the fact that she testified that she was "real foggy" that day and that her medication had her "feeling weird." Thus, Ms. Verduzco's testimony is not admissible evidence.

75.     Defendants Contend: Verduzco admits that she was treated for Depakote toxicity because she kept asking for more Depakote.

> Plaintiffs Contend:  This fact misstates the evidence.  Depakote was prescribed to Ms. Verduzco and taken under the guidance of doctors at the ADC.  In addition, Ms. Verduzco's deposition testimony was taken despite

the fact that she testified that she was "real foggy" that day and that her medication had her "feeling weird." Thus, Ms. Verduzco's testimony is not admissible evidence.

76.   <u>Defendants Contend:</u> Verduzco admits that she does not follow the doctor's recommendations to drink water.

<u>Plaintiffs Contend:</u> Ms. Verduzco's deposition testimony was taken despite the fact that she testified that she was "real foggy" that day and that her medication had her "feeling weird." Thus, Ms. Verduzco's testimony is not admissible evidence.

77.   <u>Defendants Contend:</u> Verduzco has numerous documented refusals of her mental health medications.

<u>Plaintiffs Contend:</u> This "fact" is too broad and vague in using the term "numerous". A listing of the dates and the medications refused is needed to properly analyze this fact.

78.   <u>Defendants Contend:</u> Verduzco claims that she needs inpatient mental health treatment but has not received it.

<u>Plaintiffs Contend:</u> This fact misstates Ms. Verduzco's claim. Ms. Verduzco requests treatment designed to address her mental health problems and to meet with a psychiatrist more often so that she can get better and stabilize.

79.   <u>Defendants Contend:</u> Verduzco admits that she has sent for inpatient mental health treatment three times while at ADC.

<u>Plaintiffs Contend:</u> This fact misstates the evidence. Ms. Verduzco testified that she went to Flamenco three times (which has inpatient medical care), but did not specifically testify to inpatient care. Also, Ms.

Verduzco's deposition testimony was taken despite the fact that she testified that she was "real foggy" that day and that her medication had her "feeling weird."    Thus, Ms. Verduzco's testimony is not admissible evidence.

80.    <u>Defendants Contend:</u> Verduzco has received inpatient mental health treatment at ASPC Phoenix in 2006, 2010, 2012, and 2013.

<u>Plaintiffs Contend:</u> This fact is misleading because Ms. Verduzco's treatment was limited to cell front visits at least part of the time, thus she was not provided the <u>full</u> "inpatient mental health treatment."

81.    <u>Defendants Contend:</u> Verduzco contends that when she was sent to ASPC Phoenix for inpatient treatment, she was told after a few weeks that she could not stay there because of her classification level and behavioral problems.

<u>Plaintiffs Contend:</u> This fact is inaccurate, but fixable.    Change "for inpatient treatment" to "in June 2012."

82.    <u>Defendants Contend:</u> Verduzco's claim that she could not remain in inpatient treatment in 2012 because of her classification level and behavioral problems is unfounded.

<u>Plaintiffs Contend:</u>  The treatment of Ms. Verduzco at ASPC Phoenix was limited to via cell front because of her custody level.  Cell front visits are not long enough for meaningful mental treatment.

83.    <u>Defendants Contend:</u> Verduzco was released from inpatient treatment in February 2010 because her mental health had stabilized.

<u>Plaintiffs Contend:</u> This fact is not supported by the evidence.  A follow-up SOAP for 2/24/10 indicates treatment was partially effective and Ms. Verduzco states she still hears voices.

84.   Defendants Contend: A psychiatric follow up note from February 17, 2010, when Verduzco was released from ASPC Phoenix back to Perryville states "Taking meds with no side effects.   No sleep or appetite disturbance.   No mood disturbance," "all mental factors within normal limits," and "psychiatric symptoms stable."

> Plaintiffs Contend:  This fact is inaccurate, but fixable.  Ms. Verduzco was not released to Perryville on 2/17/10.  Also, follow-up SOAP for 2/24/10 indicates treatment was partially effective and Ms. Verduzco states she still hears voices.

85.   Defendants Contend: Verduzco was returned to ASPC Phoenix in 2012 for diagnosis clarification and stabilization.

> Plaintiffs Contend:  This fact is inaccurate, but fixable.  Change "returned to" to "referred to."

86.   Defendants Contend: Verduzco wanted to return from inpatient treatment to Perryville in June 2012.

> Plaintiffs Contend.  This fact is inaccurate, but fixable.  Change "inpatient treatment" to "ASPC Phoenix."  Ms. Verduzco did not get the full inpatient treatment at ASPC Phoenix due to her custody level.

87.   Defendants Contend: Verduzco's progress records from ASPC Phoenix in 2012 note potential malingering of symptoms.

> Plaintiffs Contend: This fact is irrelevant.   "Potential malingering of symptoms" appears in an isolated SOAP record with a recommendation to conduct a SIRS test.  There is no evidence that Ms. Verduzco does not have serious mental health issues.  Indeed, all evidence is to the contrary.

88.  <u>Defendants Contend:</u> While at ASPC Phoenix in 2012, Verduzco was noted to engage in normal conversation during treatment sessions and then exhibit bizarre behavior or make bizarre statements when told that the session is coming to an end.

> <u>Plaintiffs Contend:</u>  This fact is irrelevant.  This contention appears in an isolated SOAP record.  There is no evidence that Ms. Verduzco does not have serious mental health issues.  Indeed, all evidence is to the contrary.  Also, the treatment of Ms. Verduzco was limited to via cell front because of her custody level.  Cell front visits are not long enough for meaningful mental treatment.

89.  <u>Defendants Contend:</u> Verduzco's progress records from ASPC Phoenix state "Need to consider discharge back to Perryville.  Appears manipulative."

> <u>Plaintiffs Contend:</u>  This fact is irrelevant.  This contention appears in an isolated SOAP record.  There is no evidence that Ms. Verduzco does not have serious mental health issues.  Indeed, all evidence is to the contrary.  Also, the treatment of Ms. Verduzco was limited to via cell front because of her custody level.  Cell front visits are not long enough for meaningful mental treatment.

90.  <u>Defendants Contend:</u> While at ASPC Phoenix in 2012, Verduzco stated "I came here because I thought you all could get me out and I wouldn't have to do my remaining 13 years."

> <u>Plaintiffs Contend:</u>  This fact is irrelevant.  This contention appears in an isolated cell front visit record and Ms. Verduzco appears to have made the statement because she was frustrated with having to do DBT homework.  There is no evidence that Ms. Verduzco does not have serious mental health issues.  Indeed, all evidence is to the contrary. Also, the treatment of Ms. Verduzco was limited to via cell front because of her custody level.

Cell front visits are not long enough for meaningful mental treatment.

91.     <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Verduzco had 32 encounters with a psych tech.

<u>Plaintiffs Contend:</u> that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

92.     <u>Defendants Contend:</u> Between March 4, 2012 and April 1, 2014, Plaintiff Verduzco had 2 encounters with a psych tech.

<u>Plaintiffs Contend:</u> that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

93.     <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Verduzco had 34 encounters with a psych tech.

<u>Plaintiffs Contend:</u> that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

94.     <u>Defendants Contend:</u> Between March 22, 2010 and June30, 2012, Plaintiff Verduzco had 67 encounters with a psych associate.

Plaintiffs Contend: that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

95.    Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Verduzco had 4 encounters with a psych associate.

Plaintiffs Contend: that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

96.    Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Verduzco had 54 encounters with a psych associate.

Plaintiffs Contend: that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

97.    Defendants Contend:  Between March 22, 2010 and April 1. 2014, Plaintiff Verduzco had 125 encounters with a psych associate.

Plaintiffs Contend: that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to

the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

98.    Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Verduzco had 47 encounters with a psychologist.

Plaintiffs Contend: that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

99.    Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Verduzco had 6 encounters with a psychologist.

Plaintiffs Contend: that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

100.    Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Verduzco had 33 encounters with a psychologist.

Plaintiffs Contend: that the term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

101.    Defendants Contend: Between March 22, 2010 and April 4, 2014, Plaintiff Verduzco had 86 encounters with a psychologist.

Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

102.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Verduzco had 245 encounters with psychology staff.

Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

103.   Defendants Contend:  Between March 22, 2010 and June 30, 2012, Plaintiff Verduzco had 15 encounters with a psychiatric nurse.

Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

104.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Verduzco had 15 encounters with a psychiatric nurse.

Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to

the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

105.  Defendants Contend:  Between March 4. 2013 and April 1, 2014, Plaintiff Verduzco had 68 encounters with a psychiatric nurse.

Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

106.  Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Verduzco had 98 encounters with a psychiatric nurse.

Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

107.  Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Verduzco had 15 encounters with a psychiatrist.

Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

108.  Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Verduzco had 1 encounter with a psychiatrist.

Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

109.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Verduzco had 5 encounters with a psychiatrist.

Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

110.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Verduzco had 21 encounters with a psychiatrist.

Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

111.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Verduzco had 119 encounters with psychiatry staff.

Plaintiffs Contend: that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to

the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

112.    <u>Defendants Contend:</u>  Between March 22, 2010 and April 1, 2014, Plaintiff Verduzco had 866 encounters with healthcare staff.

<u>Plaintiffs Contend:</u> that the term "encounter" is vague.  Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Verduzco had with healthcare professionals is immaterial to the adequacy of the healthcare Ms. Verduzco ultimately received and whether or not defendants were deliberately indifferent.

**Exhibit L – Charlotte Wells**
**UNCONTESTED FACTS**

## I.   BACKGROUND

1.     Wells is currently incarcerated at ASPC-Perryville.

## II.   DENTAL CLAIMS

2.     On November 13, 2009, Wells received an intake exam.

3.     She was instructed to submit an HNR if she wanted dental treatment.

4.     The dentist noted that she could be scheduled for a filling on tooth #13 sometime after August 15, 2010.

5.     On September 17, 2010, Wells was seen by a dentist but could not undergo treatment because she had uncontrolled blood pressure and was not feeling well.

6.     The dentist filed a medical consult seeking advice on when Wells could resume dental treatment and whether any precautions were necessary.

7.     On September 23, 2010, the dentist had a medical consult with Dr. Lockhart, who advised that Wells should not undergo dental treatment until Dr. Lockhart was on-site.

8.     Wells was cleared by medical to have dental treatment following review of her cardiologist's report, and she received a filling on tooth #13 on November 3, 2010.

9.     On January 24, 2011, Wells submitted a new HNR for fillings.

10.     On May 9, 2011, Wells had tooth #18 filled.

11.     On May 24, 2011, the dentist examined her, checked the injection site, and found no treatment needed.

12.     On July 28, 2011, Wells submitted an HNR stating that her new filling broke and the nerve was exposed on two fillings.

13.     On August 7, 2011, Wells submitted an HNR requesting fillings in two upper teeth.

14.     On November 7, 2011, Wells received a filling on tooth #14.

1

15.     Wells was out to court in the custody of the Maricopa County Sheriff's Office from November 9, 2012 to November 28, 2012.

16.     On February 7, 2013, Wells was seen for a fracture on tooth #13 and received a filling on that tooth.

17.     On February 28, 2013, Wells submitted an HNR for pain on the recently filled tooth.

18.     On March 6, 2013, Wells refused dental treatment.

19.     On June 9, 2013, Wells submitted an HNR requesting a filling on a bottom tooth.

20.     On August 9, 2013, Wells was seen and complained of pain on tooth #13.

21.     The dentist determined that the pain was likely due to either traumatic occlusion or necrosis.

22.     Wells was given ibuprofen and told to return to the clinic for an extraction if her symptoms persisted.

23.     On August 29, 2013, Wells submitted an HNR for pain.

24.     On August 30, 2013, Wells was seen for a pain appointment.

## III.    MEDICAL CLAIMS

25.     On October 14, 2009, Wells was seen at medical.

26.     Wells had her vital signs taken on October 16, 2009 – 100/63.

27.     Wells had her vital signs taken on October 19, 2009 – 142/86.

28.     Wells had her vital signs taken on October 21, 2009 – 150/92.

29.     Wells had her vital signs taken on October 23, 2009 – 118/76.

30.     Wells had her vital signs taken on October 26, 2009 – 145/94.

31.     Wells had her vital signs taken on October 28, 2009 – 154/96.

32.     Wells had her vital signs taken on November 2, 2009 – 142/88.

33.     Wells had her vital signs taken on November 4, 2009 – 158/98.

34.     Wells had her vital signs taken on November 6, 2009 – 152/90.

35.     On November 6, 2009, Wells submitted an HNR regarding high blood pressure and complaining of pain in her arm, neck, head, and stomach.

36.     Wells had her vital signs taken on November 10, 2009 – 150/98.

37.      Wells had her vital signs taken on November 12, 2009 – 156/98.

38.     On January 8, 2010, Wells was seen by Dr. Lockhart regarding her cardiac and hypertension issues.

39.     On January 28, 2010, Wells had her vital signs checked – 132/90.

40.     It was noted that she continued to refuse her hypertension medications, and she was educated on the importance of compliance.

41.     On January 14, 2010, Wells had her vital signs taken – 144/89.

42.     On January 19, 2010, Wells was seen at medical for an EKG, but the power went out and she was rescheduled for the following day.

43.     On January 20, 2010, Wells was seen at medical.

44.     She denied headaches or chest pain, and stated, "I don't like taking my pills."

45.     She was instructed to go take her medication and to return in an hour, which she did and an EKG was performed.

46.     Wells was put on watch swallow for her blood pressure medications.

47.     On January 21, 2010, Wells had her vital signs taken – 162/98.

48.     On January 24, 2010, Wells submitted an HNR – on an inmate letter form – stating she has pain in her lower back and kidneys, upper stomach, feels lightheaded, and is having heart palpitations.

49.     On January 25, 2010, Wells was seen at medical for her blood pressure after her watch swallow blood pressure medication was administered.

50.     On January 25, 2010 her blood pressure  was 180/114; it was checked again ten minutes later and was 154/102.

3

51.    Wells was seen again on January 26, 2010, after complaining of being dizzy and increased blood pressure.

52.    On January 26, 2010, Wells had her vital signs checked – 152/100.

53.    On January 27, 2010, Wells had her vital signs checked – 160/98.

54.    On January 28, 2010, Wells was seen by Dr. Lockhart to follow-up on her blood pressure.

55.    Noticeable improvement was noted since she was placed on watch-swallow.

56.    A follow up was scheduled for March 31, 2010.

57.    On January 29, 2010, Wells had labs drawn, her LDL cholesterol was 115(0-99).

58.    On February 2, 2010, Wells had her vital signs checked – 154/97.

59.    On February 4, 2010, Wells had her vital signs checked – 142/96-150/90.

60.    On February 8, 2010, Wells had her vital signs checked – 145/90.

61.    On February 9, 2010, Wells had her vital signs checked – 146/95.

62.    On February 12, 2010, Wells had her vital signs checked – 150/90.

63.    On February 15, 2010, Wells had her vital signs checked – 138/98.

64.    On February 15, 2010, Wells presented at medical with stabbing, throbbing chest pain.

65.    On February 17, 2010, Wells underwent a left heart catheterization.

66.    She was found to have an 80% lesion of the mid-LAD and a stent was placed to the LAD artery.

67.    She was discharged back to ADC on February 18, 2010.

68.    On February 20, 2010, Wells presented with a complaint of chest pain and an EKG was also done.

69.    Dr. Enciso was called again and gave a second instruction to administer another dose of Nitroglycerin.

4

70.    As subsequent entry shows that the pain resolved soon after and that Dr. Enciso was once again notified.

71.    Wells also alleges she continues to suffer from an irregular heartbeat, a leaky valve, problems with blood pressure, and chest pain.

72.    On February 19, 2010, an outside consult request for cardiology was submitted.

73.    On February 24, 2010, Wells' vital signs were taken – 132/87.

74.    On March 1, 2010, Wells' vital signs were taken – 134/84.

75.    On March 3, 2010, Wells' vital signs were taken.

76.    On March 5, 2010, Dr. Lockhart prescribed Nitrostat 0.4 mg for onset of chest pain and labs were also drawn this day.

77.    On March 6, 2010, Wells presented to medical stating her left arm felt numb.

78.    Her vital signs were:  Weight: 158, BP 155/90, P 57, R 12, T 98.2, O2 sat 99%.

79.    She was sent back to the yard with instructions to submit an HNR if numbness continued.

80.    On March 9, 2010, Wells was seen at medical complaining of pain near her old femoral artery.

81.    She was referred to Dr. Lockhart for an evaluation and was seen on March 19, 2010.

82.    On March 7, 2010, Wells submitted an HNR stating she had two blood clots – in her right upper arm and lower left foot.

83.    On March 19, 2010, Wells was seen by Dr. Lockhart for a full follow up exam.

84.    On March 23, 2010, Wells submitted an HNR complaining of chest pain.

85.    Wells was seen by Dr. Lockhart on March 24, 2010.

5

86.     Dr. Lockhart noted that while she has had several complaints since the angioplasty and stent placement at West Valley Hospital, he could not find objective evidence of a problem except for a small slight rash on her neck.

87.     Dr. Lockhart reassured Wells that her complaints do not relate to the angioplasty.

88.     On March 29, 2010, Wells refused her medications.

89.     On April 2, 2010 Wells vital signs were 134/88-60-16-98.  WT 157.

90.     On April 16, 2010, Wells was seen by Dr. Lockhart for complaints of chest pain.

91.     On April 16, 2010, Wells had an X-ray of her chest taken and no active disease was found.

92.     On April 19, 2010, an EKG was performed on Wells by Dr. Lockhart.

93.     On April 27, 2010, Wells complained of chest pain, her vital signs were 130/100-64-14-98% and two doses of Nitro were administered.

94.     Her blood pressure was checked an hour later and was 140/90.

95.     On April 28, 2010, Wells was seen again by Dr. Lockhart.

96.     This was her third full exam in April alone, and no other findings were found.

97.     On May 4, 2010, Wells was seen by Dr. Lockhart.

98.     On May 9, 2010, her vital signs were taken – 124/80.

99.     On May 17, 2010, her vital signs were taken – 122/80.

100.    On May 25, 2010, Wells had her vital signs taken – 122/80.

101.    On June 1, 2010, Wells was seen by Dr. Lockhart, and Wells complained that medical was not seeing her.

102.     Dr. Lockhart advised he had seen her approximately nine separate times and that nurses have also seen her numerous times.

103.    On June 2, 2010, Wells had her vital signs taken – 160/100.

6

104.     On June 3, 2010, Wells had her vital signs taken – 140/92-174/108.

105.     On June 8, 2010, Wells was seen for complaints of headaches.

106.     She was again educated on possible consequences for refusing her medications including stroke and heart attack.

107.     On June 8, 2010, Wells was seen pursuant to ADC's Hypertension Nursing Protocol.

108.     On June 8, 2010, an outside consult was submitted for her elevated blood pressure.

109.     On June 8, 2010 her vitals were:  BP 189/106, 66, 17, 97% room air.

110.     On June 8, 2010, Wells presented to medical with complaints of chest pain.

111.     She was given an EKG, and again educated on the importance of taking her blood pressure medications.

112.     Wells was taken to the hospital on June 8, 2010; at the hospital, she received a CT scan of her brain, a chest X-ray and an EKG.

113.     The CT scans and chest X-ray were normal, but the EKG was abnormal.

114.     On June 10, 2010, Wells had her vital signs taken – 132/86.

115.     On June 11, 2010, Wells was seen for a follow-up by Dr. Lockhart after her hospital visit as a result of her refusal to take her blood pressure medications.

116.     On June 11, 2010, Wells was seen by the psych nurse practitioner.

117.     On June 14, 2010, Wells had her vitals taken –138/98.

118.     On June 15, 2010, Wells had her vitals taken – 142/86.

119.     On June 18, 2009 her blood pressure was 162/99, and she was advised to drink fluids and recheck; her blood pressure was then 130/90.

120.     On June 21, 2010, Wells had her vitals checked – 140/86.

121.     On June 22, 2010, Wells had her vitals checked – 120/82.

122.     On June 23, 2010, Wells had her vitals checked – 130/80.

123.     On June 29, 2010, her vitals were taken – 122/86.

7

124.    On July 7, 2010, Wells was sent to Affiliated Cardiologists of Arizona for an initial cardiac evaluation.

125.    The echo noted good LV function, no wall motion abnormalities, no ischemia.

126.    On July 20, 2010, Dr. Lockhart submitted an outside consult request for Wells to see the cardiologist again in three months.

127.    On August 2, 2010, Wells had her vitals taken – 142/102.

128.    On August 24, 2010, Wells was seen by Dr. Lockhart and her blood pressure was checked.

129.    On August 26, 2010 Wells had her vital signs checked – 164/108.

130.    On August 27, 2010, Wells had her vital signs checked – 164/102.

131.    On August 28, 2010, Wells had her vital signs checked – 150/88.

132.    On August 30, 2010, Wells had her vital signs checked – 142/86.

133.    On August 30, 2010, Wells reported to medical with complaints of tight, squeezing chest pain.

134.    On August 30, 2010 her vitals were 170/107-79-16-96%.  WT: 158.

135.    She was given nitro and her vital signs were repeated – 156/95-94-16-98%.

136.    On August 31, 2010, Wells presented to medical with chest pains and  was sent to West Valley Hospital.

137.    An outside consult request was placed for her abnormal EKG.

138.    Wells' vital signs were taken on September 1, 2010 – 136/90.

139.    On September 1, 2010, she was seen at a follow-up appointment by Dr. Lockhart and she stated that she was okay.

140.    On September 21, 2010, Wells submitted an HNR alleging she had several blood clots.

141.    On October 2, 2010, Wells submitted an HNR stating she has blood clots.

142.    On October 6, 2010, Affiliated Cardiologists of Arizona noted that the stent placement should undergo stress testing soon and further treatment may be needed based on those results.

143.    On October 13, 2010, Wells was seen again at Affiliated Cardiologists of Arizona for an exercise myocardial perfusion study.

144.    Her left ventricle was found to be normal size.

145.    On October 20, 2010, Wells was seen for a follow-up with Dr. Lockhart.

146.    Wells talked about bumps and bruises on her ankle, and she was reassured they were just scar tissue.

147.    On October 25, 2010, Wells presented to medical with chest pain.

148.    Wells presented again the same day, but refused Nitro.

149.    She presented again an hour later and consented to a Nitro tablet.

150.    The pain persisted, but she refused additional Nitro.

151.    She was then transported to Maryvale Hospital.

152.    At the hospital, it was determined that it was "very doubtful" that her chest pain was cardiac related "given her recent stress test and left heart catheterization.

153.    She was also given instruction to stop smoking.

154.    Wells returned to ADC on October 27, 2010, and stated she felt better.

155.    On October 29, 2010, Wells was seen to check her blood pressure – 149/93.

156.    On November 10, 2010, Wells was seen for another follow-up appointment with Affiliated Cardiologists of Arizona.

157.    On January 10, 2011, Wells had her vitals taken – 149/88.

158.    On January 18, 2011, Wells had her vitals taken – 159/106.

159.    On January 26, 2011, Wells had her vitals taken – 143/90.

160.    On February 2, 2011, Wells presented at medical with complaints of chest pain.

161.    She took nitro twice and slight relief was reported.

9

162.   On February 3, 2011, Wells had her blood pressure reviewed – 145/76, 149/88, 159/106, 143/90.

163.   On March 9, 2011, Wells was seen at a follow-up appointment with Affiliated Cardiologists of Arizona and her EKG showed an abnormality.

164.   On March 29, 2011, Wells was seen by Dr. Encisco as a result of her refusal to take her medications.

165.   On March 29, 2010, all of her meds were switched to watch swallow.

166.   On March 30, 2011, Wells submitted an HNR alleging she had high blood pressure.

167.   She was instructed to take her medications to alleviate these symptoms.

168.   On April 6, 2011, Wells presented to medical with chest pain, but her vital signs were within normal limits and there was no acute distress.

169.   It was also documented that Wells had stopped taking her medications.

170.   She also refused medications on that day.

171.   On April 12, 2011, she claimed her chest pains were gone.

172.   Wells had her vitals taken on May 11, 2011 – 135/84.

173.   On May 11, 2011, Wells was seen for a follow-up visit at Affiliated Cardiologists of Arizona.

174.   A carotid ultrasound was performed, and it showed no significant carotid stenosis.

175.   Wells had her vitals taken on May 13, 2011 – 138/78.

176.   Wells had her vitals taken on May 16, 2011 – 141/95.

177.   Wells had her vitals taken on May 18, 2011 – 145/87.

178.   Wells had her vitals taken on May 20, 2011 – 150/84.

179.   On June 20, 2011, Wells was seen for her hypertension chronic care appointment and she complained of having chest pains 3x a week.

180.   On June 20, 2011, an outside consult request was completed for cardiology.

10

181.   On August 10, 2011, Wells was seen for a follow-up at Affiliated Cardiologists of Arizona, she had a negative stress cardiolite and her carotid ultrasound showed no significant stenosis.

182.   Wells returned the holter monitor to nursing 24 hours later, but had already taken the monitor off before she arrived.

183.   ADC provided the monitor to the clinical coordinator for follow up.

184.   An outside consult request was submitted for a four week follow up with the cardiologist.

185.   On August 26, 2011, Wells was seen again by Affiliated Cardiologists of Arizona regarding her 24 hour holter monitor.

186.   The findings reported no significant ventricular ectopy, no ventricular tachycardia, and no EKG abnormalities seen.

187.   On October 1, 2011, Wells submitted an HNR complaining of chest pain.

188.   Wells was seen on October 3, 2011, she complained of "fluttering" of her pulse – every day.

189.   On October 12, 2011, Wells was seen again by Affiliated Cardiologists of Arizona.

190.   She underwent a cardiolite stress test which was negative for ischemia.

191.   Dr. Askari determined that HTN should be treated medically for now and continue on her current treatment.

192.   On October 25, 2011, an outside consult request was submitted for a three month follow-up with Dr. Askari.

193.   On November 8, 2011, Wells was seen at medical regarding her holder monitor.

194.   On November 17, 2011, Wells was seen for her chronic care appointment, her vitals were:  123/71-64-20.

195.    On January 18, 2012, Wells was seen at Affiliated Cardiologists of Arizona for a follow-up appointment.

196.    On February 1, 2012, she was seen at Affiliated Cardiologists of Arizona for a follow up to her holder monitor.

197.    On February 14, 2012, Wells was seen at a chronic-care follow up appointment.

198.    Her vitals were: 125/74, HR 59, R 16, WT 188.

199.    On February 29, 2012, an outside consult request was submitted to a cardiologist for a 24 hour holter monitor.

200.    On March 7, 2012, Wells submitted an HNR complaining of chest pain.

201.    On March 13, 2012, Wells submitted an HNR complaining of "chest flutters."

202.    On May 30, 2012, Wells was seen at a chronic-care follow-up for her hypertension.

203.    On June 6, 2012, Wells was seen by Dr. Askari at Affiliated Cardiologists of Arizona.

204.    On June 12, 2012, an outside consult was submitted for Wells to have a four-month follow up at Affiliated Cardiologists of Arizona.

205.    On June 21, 2012, Wells had her blood pressure taken – 112/78.

206.    On August 21, 2012, Wells was seen after complaining of heart flutters.

207.    Dr. Palmer prescribed her Hychalazyne for chest pain.

208.    On September 13, 2012, Wells had her blood pressure checked –162/118.

209.    On October 25, 2012, Wells was seen for her chronic-care appointment, her blood pressure was 140/85.

210.    On May 23, 2013, Wells was seen to evaluate her cardiac symptoms.

211.    An EKG was performed and showed a heart rate at 50 bpm.

212.    On June 10, 2013, Wells was seen at medical regarding chest pain.

12

213.    An EKG was done, and no abnormal findings were found.

214.    On June 13, 2013, she denied chest pain.

**CONTESTED FACTS**

**IV.** **BACKGROUND AND DISCIPLINARY**

1. Defendants Contend: On September 3, 2009, Wells was convicted of marijuana violation/conspiracy in violation of A.R.S. §§ 13-3405, 13-701. Her sentence began on March 6, 2009.

> Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. This fact has no tendency to make it more or less probable that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Wells faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and its probative value is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403. Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

2. Defendants Contend: On October 9, 2009, Wells began her sentence for transportation of marijuana for sale in violation of A.R.S. §§ 13-3405, 13-701.

> Plaintiffs Contend: This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402. This fact has no tendency to make it more or less probable that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Wells faces as a result of the healthcare provided by the ADC. In the alternative, this fact is unfairly prejudicial, and its probative value is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403. Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

3.       Defendants Contend: Wells was convicted of conspiracy to commit possession of marijuana for sale, and transportation of marijuana, after police found bales of marijuana in her car during a traffic stop in March 2009, and sentenced to a term of 9.25 years' imprisonment.

>    Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact has no tendency to make it more or less probable that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Wells faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and its probative value is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.  Plaintiffs' motion in limine seeking to exclude the criminal history of the class is currently pending before the Court.

4.       Defendants Contend: Wells did not read any portion of the Complaint before it was filed.

>    Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Wells faces as a result of the healthcare provided by the ADC.

5.       Defendants Contend: At the time of her deposition, Wells was aware that she was a class representative, but did not know the status of the case or when the last hearing was.

>    Plaintiffs Contend:  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  This fact does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Wells faces as a result of the healthcare

15

provided by the ADC.

6.     <u>Defendants Contend:</u> On December 29, 2010,  Wells was disciplined for verbally attacking a medical provider, storming out of his office, slamming the door open and screaming that she did not want to see him again, and twice screamed that he was a liar.

> <u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Wells' disciplinary record is not at issue in this litigation and does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Wells faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and its probative value is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

7.     <u>Defendants  Contend:</u> Wells'  discipline  for  attacking  a  medical  care provider included 30 hours of extra duty and 30 days of loss privileges.

> <u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Wells' disciplinary record is not at issue in this litigation and does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Wells faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and its probative value is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

8.     <u>Defendants Contend:</u> On June 2, 2011, Wells was verbally reprimanded for allowing another inmate to make an authorized visit to her cell at night, the second time this had happened.

> <u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant

to Federal Rules of Evidence 401 and 402.  Ms. Wells' disciplinary record is not at issue in this litigation and does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Wells faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and its probative value is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

9.   <u>Defendants Contend:</u> On June 3, 2011, Wells was in the medical line and told the officer who had written her up the day before that she was going to submit a grievance against him every time she saw him talking to another inmate, accusing him of "Cripa," and would submit a grievance every time she sees him "not doing (his) job."

<u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Wells' disciplinary record is not at issue in this litigation and does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Wells faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and its probative value is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

10.   <u>Defendants Contend:</u> Wells was later observed telling other inmates for the rest of the evening that the officer was a liar and wrote "false" tickets.

<u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Wells' disciplinary record is not at issue in this litigation and does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Wells faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and its probative

value is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

11.　<u>Defendants Contend:</u> On December 29, 2010, Wells verbally attacked Dr. Lockhart, stormed out of his office, and slammed the door stating that she did not want to see him again.

　　<u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Wells' disciplinary record is not at issue in this litigation and does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Wells faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and its probative value is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

12.　<u>Defendants Contend:</u> She was issued a disciplinary ticket and reprimanded.

　　<u>Plaintiffs Contend:</u>  This fact is irrelevant and should be excluded pursuant to Federal Rules of Evidence 401 and 402.  Ms. Wells' disciplinary record is not at issue in this litigation and does not make it more or less likely that Defendants were deliberately indifferent and caused the substantial risk of serious harm Ms. Wells faces as a result of the healthcare provided by the ADC.  In the alternative, this fact is unfairly prejudicial, and its probative value is substantially outweighed by its prejudicial nature. Thus, the fact should be excluded under Federal Rule of Evidence 403.

## V.　<u>DENTAL CLAIMS</u>

13.　<u>Defendants Contend:</u> Wells contends she had fillings from two teeth broken in 2010 without any repair for months, that a dentist cracked an adjacent tooth in

18

November 2011, and that she has refused tooth extractions and endured pain for several months before her fillings were replaced.

>    Plaintiffs Contend:  That this statement is an allegation rather than a fact about Ms. Wells.  Plaintiffs further contend that this fact is misleading because it does not fully and accurately describe the content of Ms. Wells' declaration.

14.   Defendants Contend: On July 29, 2010, Wells was seen by a dentist who advised her that per protocol, she could not undergo dental treatment for six months after her heart attack.

>    Plaintiffs Contend:  That this statement is misleading because it does not fully and accurately describe the content of the dentist's notes in Ms. Wells' dental record.

15.   Defendants Contend: On October 14, 2010, Wells was seen by the dentist and Dr. Lockhart, who advised that Wells should not undergo dental treatment until she was cleared based upon his review of her cardiologist's report.

>    Plaintiffs Contend:  That this statement is misleading because it does not fully and accurately describe the content of the dentist's notes in Ms. Wells' dental record.  Plaintiffs further contest this fact as hearsay to the extent that the dentist is simply reporting what Dr. Lockhart told him.

16.   Defendants Contend: On December 19, 2010, Wells submitted an HNR for pain in the new filling.

>    Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the HNR Ms. Wells submitted on December 19, 2010.

17.   Defendants Contend: On December 22, 2010, Wells was seen by a dentist and was diagnosed with normal post-operative sensitivity.

>    Plaintiffs Contend:  That this statement is misleading because it does not

19

fully and accurately describe the content of the dentist's notes in Ms. Wells' dental record.

18.   Defendants Contend: On December 22, 2010, Wells  complained of pain in tooth #18, and refused extraction.

Plaintiffs Contend:  That this statement is misleading because it does not fully and accurately describe the content of the dentist's notes in Ms. Wells' dental record.

19.   Defendants Contend: On May 20, 2011, Wells submitted an HNR for jaw and ear pain and an abscess.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the HNR Ms. Wells submitted on May 20, 2011.

20.   Defendants Contend: On August 1, 2011, Wells was seen for a chipped tooth on #14 and diagnosed with recurrent caries.  She was also diagnosed with irreversible pulpitis on tooth #13 and refused an extraction on that tooth.

Plaintiffs Contend:  That this statement is misleading because it does not fully and accurately describe the content of the dentist's notes in Ms. Wells' dental record.

21.   Defendants Contend: On September 16, 2012, Wells submitted an HNR regarding a chipped tooth and stating that she would be going out to court in November.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the HNR Ms. Wells submitted on September 16, 2012.

22.   Defendants Contend: On August 8, 2013, Wells submitted an HNR regarding pain on an upper tooth.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the content of the HNR Ms. Wells submitted on

August 8, 2013.

23.    Defendants Contend:  On September 11, 2013, Wells was seen for an extraction of tooth #13.

> Plaintiffs Contend:  That this statement is misleading because it does not fully and accurately describe the content of the dentist's notes in Ms. Wells' dental record.

24.    Defendants Contend: Because Wells had heart attacks with continued chest pain in 2010 while requesting dental care, the treating dentist properly referred her back to her physician to be cleared before initiating dental treatment.

> Plaintiffs Contend:  That the term "properly" is vague and undefined. Plaintiffs also contend that this statement is an opinion rather than a fact. Plaintiffs further contend that that this statement is misleading because it does not fully and accurately describe what occurred to Ms. Wells.

25.    Defendants Contend:  In addition, despite Wells' claim that a dentist cracked her tooth in November 2011, there is no evidence in Wells' chart that this occurred in November 2011 or at any other time.

> Plaintiffs Contend:  That Plaintiffs' expert will testify that the dental care provided to Ms. Wells was constitutionally inadequate.

26.    Defendants Contend: Another dentist later performed a filling on tooth #18, but whether to extract a tooth is a matter of clinical discretion based on the dentist's knowledge, skill, and experience.

> Plaintiffs Contend:  That this statement is an opinion rather than a fact and that Plaintiffs' expert will testify that the dental care provided to Ms. Wells was constitutionally inadequate.

27.    Defendants Contend: Wells' tooth #13 was diagnosed with irreversible pulpitis and recommended for extraction in August 2011 by one dentist, filled by another dentist in February 2013, and eventually extracted in September 2013.

> Plaintiffs Contend:  That this statement is an opinion rather than a fact and that Plaintiffs' expert will testify that the dental care provided to Ms. Wells was constitutionally inadequate.

## VI.   MEDICAL CLAIMS

28.   Defendants Contend: Wells alleges that she had a history of heart problems and chronic chest pain, but did not see a heart specialist until she was sent to the hospital.

> Plaintiffs Contend:  That this statement is an allegation rather than a fact about Ms. Wells.

29.   Defendants Contend: Wells presented with chest pains, but she admitted to not taking her blood pressure medication while at the County Jail, and she refused blood pressure medication when offered by ADC and informed of hypertension and possible other consequences of refusing follow-up treatment and blood pressure medication.

> Plaintiffs Contend:  That this statement is misleading because it does not fully and accurately describe the content of the notes in Ms. Wells' medical record.

30.   Defendants Contend: On October 14, 2009, she was also seen for a chronic care appointment regarding her hypertension, and labs were drawn.

> Plaintiffs Contend:  That this statement is misleading because it does not fully and accurately the content of the notes in Ms. Wells' medical record.

31.   Defendants Contend: On October 14, 2009, Dr. Lockhart requested Wells' medical records from the County Jail.

> Plaintiffs Contend:  That this statement is misleading because it does not fully and accurately describe the content of Ms. Wells' medical record.

32.   Defendants Contend: On January 26, 2010, she had no complaints of chest pain and no complaints of shortness of breath.

> Plaintiffs Contend:  That this fact is misleading because it does not indicate

22

that it summarizes a note written in Ms. Wells' medical record.

33.     <u>Defendants Contend:</u>  On February 15, 2010, she was administered nitroglycerine and taken to West Valley Hospital where she was subsequently admitted.

<u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe Ms. Wells' medical record.

34.     <u>Defendants Contend:</u> She did well and her chest pains resolved.

<u>Plaintiffs Contend:</u>  That this fact is misleading because it does not indicate that it summarizes a note written in Ms. Wells' medical record.

35.     <u>Defendants Contend:</u> The facility providers were working to manage her blood pressure during this time, and there was no urgent need for a cardiology consultation during that time period.

<u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

36.     <u>Defendants Contend:</u> Dr. Enciso, the on-call physician, was called and issued an order for Nitroglycerin to be administered.

<u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

37.     <u>Defendants Contend:</u> Ten minutes later, the same nurse noted that the pain had diminished to a level of 4 and that Wells appeared relaxed.

<u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

38.     <u>Defendants Contend:</u> On February 15, 2010, Wells was admitted to West Valley Hospital for heart attack symptoms and had a stent placed.

<u>Plaintiffs Contend:</u>  That this statement is misleading because it does not fully and accurately describe what occurred when Ms. Wells was at West Valley Hospital.

23

39.     Defendants Contend: On February 23, 2010, Wells was seen by Dr. Lockhart for a follow up check regarding her chest pains and hospital stay.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

40.     Defendants Contend: Lockhart followed up with the cardiologist referral and scheduled a follow up appointment for Wells in four weeks.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

41.     Defendants Contend: A follow up was scheduled with him for the following week.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

42.     Defendants Contend: On March 19, 2010 her vitals were:  Weight: 155, BP 138/80, P 62, R 20.  Id.  She has a follow up appointment with a cardiologist.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

43.     Defendants Contend: On April 2, 2010, Wells was seen by Dr. Lockhart for complaints of dry skin.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

44.     Defendants Contend: On April 16, 2010 Lockhart consulted cardiology to follow up.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

45.     Defendants Contend: Lockhart noted her noncompliance with meds, and on April 28, 2010 also that she was not likely to have another blocked artery this soon after an angiogram.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

46. Defendants Contend: Wells was argumentative and the exam had to be deferred.

> Plaintiffs Contend:  That this fact is misleading because it does not indicate that it summarizes a note written in Ms. Wells' medical record.

47. Defendants Contend: She was very demanding during this visit.

> Plaintiffs Contend:  That this fact is misleading because it does not indicate that it summarizes a note written in Ms. Wells' medical record.

48. Defendants Contend: On May 6, 2010, Wells was seen at medical after complaining of chest pains.

> Plaintiffs Contend:  This fact is misleading because it does not fully and accurately reflect the contents of Ms. Wells' medical record.

49. Defendants Contend: On May 7, 2010 her blood pressure was checked – 120/60, and she had no complaints.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

50. Defendants Contend: On May 18, 2010, Wells refused treatment.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

51. Defendants Contend: On May 18, 2010, Wells refused all her medications.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

52. Defendants Contend: On May 19, 2010, Wells refused treatment.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

53.   Defendants Contend: On May 20, 2010, Wells reported to a psychology associate that she had stopped taking all of her medication except Plavix and ASA.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

54.   Defendants Contend: Wells refused treatment on May 20, 21, 22, 23, 24, and 25, 2010.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

55.   Defendants Contend: On May 26, 2010, Wells refused her medications.
> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

56.   Defendants Contend: Wells refused her medications on May 27, 29, 30, 31 and June 1, 2010.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

57.   Defendants Contend: On June 1, 2010 it was also noted that Wells was making false claims about medical refusing to see her.

> Plaintiffs Contend:  That this fact is misleading because the medical records do not establish that Ms. Wells made false claims.

58.   Defendants Contend: Wells was belligerent.
> Plaintiffs Contend:  That this fact is misleading because it does not indicate that it summarizes a note written in Ms. Wells' medical record.

59.   Defendants Contend: Wells refused her medications on June 3, 4, 5, 6, 7, and 8, 2010.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

60.     Defendants Contend: She stated that she takes her medications  when she feels it is necessary and puts in an HNR to see health care providers.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

61.     Defendants Contend: On June 8, 2010, Wells was transported to West Valley Hospital for complaints of headache.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

62.     Defendants Contend: On June 11, 2010 Lockhart advised Wells that they are there to help her and to get her blood pressure under control.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

63.     Defendants Contend: She stated that her recent episode of hypertension was uncontrolled because she bumped her head.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

64.     Defendants Contend: On June 11, 12, 13, and 14, 2010, Wells refused her medications.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

65.     Defendants Contend: On June 18, 2010, Wells presented at medical with chest pains.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

66.     Defendants Contend: On June 20, 2010, Wells refused her medications.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

27

67.   <u>Defendants Contend:</u> On June 25 and 27 2010, Wells refused her medications.

   <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

68.   <u>Defendants Contend:</u> On June 29, 2010, Wells refused to submit to treatment for her blood pressure.

   <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

69.   <u>Defendants Contend:</u> On July 2, 2010, Wells was seen for complaints about her blood pressure medication; she stated she was only taking ½ of the tablet.

   <u>Plaintiffs Contend:</u>  That this fact requires expert testimony to establish whether Ms. Wells was taking blood pressure medication.

70.   <u>Defendants Contend:</u> No abnormalities were noted on the July 7, 2010 stress test.

   <u>Plaintiffs Contend:</u>  That this fact requires expert testimony to establish whether the stress test results showed any abnormalities.

71.   <u>Defendants Contend:</u> On July 7, 2010 Dr. Askari noted that although Wells complained of mild chest pain, there was no EKG abnormality or ischemic noted.

   <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

72.   <u>Defendants Contend:</u> On August 11, 2010, Wells refused her blood pressure medications.

   <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

73.   <u>Defendants Contend:</u> On August 23, 2010, Wells refused her medications.
   <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

74.   Defendants Contend: On August 24, 2010, she was verbally abusive.

Plaintiffs Contend:  That this fact is misleading because it does not indicate that it summarizes a note written in Ms. Wells' medical record.

75.   Defendants Contend: On August 24, and 25, 2010, Wells refused her medications.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

76.   Defendants Contend: At the hospital on August 31, 2010, her EKG was normal and her chest X-ray revealed no evidence of active cardiopulmonary disease.

Plaintiffs Contend:  That this fact requires expert testimony to interpret the EKG results.

77.   Defendants Contend: She was diagnosed with inflammation of the cartilage that connects to her ribs and discharged on September 1, 2010.

Plaintiffs Contend:  That this fact requires expert testimony to establish what "costochondritis" is.

78.   Defendants Contend: On September 18 and 19, 2010, Wells refused her blood pressure medications.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

79.   Defendants Contend: There is no evidence of blood clots in Wells' prior medical history.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

80.   Defendants Contend: On September 25 and 26, 2010, Wells refused her blood pressure medications.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

81.   <u>Defendants Contend:</u> On October 3, 2010, Wells was seen after complaining of bumps and bruising to her right leg and right thigh.

>   <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

82.   Defendants Contend: On October 3, 2010, there were no signs/symptoms of infection.

Plaintiffs Contend:  That this statement is misleading because it does not fully and accurately describe the content of the notes in Ms. Wells' medical record.

83.   <u>Defendants Contend:</u> On October 5, 2010, Wells refused her blood pressure medications.

>   <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

84.   <u>Defendants Contend:</u> ADC placed an outside consult for a cardiolyte on this same date.

>   <u>Plaintiffs Contend:</u>  That this fact cannot be verified because the medical record is illegible.

85.   <u>Defendants Contend:</u> On October 8, 2010, Wells refused treatment.
>   <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

86.   <u>Defendants Contend:</u> It was noted that she had been refusing to take her blood pressure medications.

>   <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

87.   <u>Defendants Contend:</u> On October 8, 9, and 10, 2010, Wells refused her blood pressure medications.

>   <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully

30

and accurately describe the contents of Ms. Wells' medical record.

88.    Defendants Contend: On October 14, 17, 18, and 19, 2010, Wells refused her blood pressure medications.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

89.    Defendants Contend: On October 23 and 24, 2010, Wells refused her blood pressure medications.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

90.    Defendants Contend: On October 25, 2010, she was administered oxygen via NRB mask and NTG and ASA chewable.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

91.    Defendants Contend: She was put on Plavix, beta blocker and statin, and placed on Norvasc for high blood pressure.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

92.    Defendants Contend:  On November 3, 2010, Wells refused her medications.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

93.    Defendants Contend: On November 8, 2010, Wells refused treatment.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

94.    Defendants Contend: On November 10, 2010 her stress test was negative.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

95.     <u>Defendants Contend:</u> On December 29, 2010, Wells was seen by Dr. Lockhart.

> <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

96.     <u>Defendants Contend:</u> Dr. Lockhart advised Wells that he noticed several refusals in her chart, but that her blood pressure readings have been normal.

> <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

97.     <u>Defendants Contend:</u> He also advised that she had a follow-up appointment with cardiology in March and was not due for a cardiac follow-up until early February.

> <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

98.     <u>Defendants Contend:</u> No further intervention was recommended by cardiology.

> <u>Plaintiffs Contend:</u>  That this fact is hearsay because Dr. Lockhart is simply reporting the cardiologist's recommendation.

99.     *<u>Defendants Contend:</u> On February 3, 2011, Wells was agitated and angry.

> <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not indicate that it summarizes a note written in Ms. Wells' medical record.

100.    <u>Defendants Contend:</u> On February 8, 2011, Wells was seen by Dr. Encisco for a chronic care appointment for her hypertension.

> <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

101.    <u>Defendants Contend:</u> On March 9, 2011, Dr. Askari determined Wells needed a stress test and further treatment would be determined based on those results.

> <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

32

102.   Defendants Contend: Wells refused her medications on March 14, 15, 16, 21, 22, 23, 24, 25, 26, 27, and 29, 2011.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

103.   Defendants Contend: On March 29, 2011, Dr. Encisco submitted an outside consult request for a stress test.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

104.   Defendants Contend: Wells refused her medications on April 1, 2, and 3, 2011.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

105.   Defendants Contend: Wells was seen by Dr. Encisco on April 7, 2010, regarding her chest pain.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

106.   Defendants Contend: Wells denied any difficulty breathing, and her pain was partially relieved by Nitro.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

107.   Defendants Contend: On April 7, 2010, Dr. Encisco submitted an outside consultant request for a carotid Doppler.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

108.   Defendants Contend: Wells was seen by Dr. Encisco for a follow-up on April 12, 2011.

> Plaintiffs Contend:  That this fact is misleading because it does not fully

33

and accurately describe the contents of Ms. Wells' medical record.

109.   Defendants Contend: On May 11, 2011, her recent stress test was okay.

Plaintiffs Contend:  That this fact requires expert testimony to evaluate her stress test.

110.   Defendants Contend: On June 3, 2011, Wells held up the medical line after she verbally assaulted and threatened officers.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

111.   Defendants Contend: On August 10, 2011, her stress test was ok, and she was switched from Nitroglycerin to Nitrostat p.rn.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

112.   Defendants Contend: A holter monitor was placed on Wells to see what shows in a few months.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

113.   Defendants Contend: On August 26, 2011, it was noted that Well's symptomology does not correlate with the EKG findings.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

114.   Defendants Contend: On September 6, 2011, Wells had her vitals taken – 150/85.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

115.   Defendants Contend: On September 8, 2011, Wells had her vitals taken – 146/82.

Plaintiffs Contend:  That this fact is misleading because it does not fully

and accurately describe the contents of Ms. Wells' medical record.

116.   <u>Defendants Contend:</u> On September 12, 2011, Wells had her vitals taken – 144/80.

>   <u>Plaintiffs Contend:</u>   That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

117.   <u>Defendants Contend:</u> On September 14, 2011, Wells had her vitals taken – 151/90.

>   <u>Plaintiffs Contend:</u>   That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

118.   <u>Defendants Contend:</u> On September 16, 2011, Wells had her vitals taken – 157/89.

>   <u>Plaintiffs Contend:</u>   That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

119.   <u>Defendants Contend:</u> A follow-up with the cardiologist was scheduled on October 3, 2011.

>   <u>Plaintiffs Contend:</u>   That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

120.   <u>Defendants Contend:</u> On October 12, 2011, a follow-up appointment was scheduled for three months.

>   <u>Plaintiffs Contend:</u>   That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

121.   <u>Defendants Contend:</u> A follow-up regarding her monitor was scheduled with the cardiologist.

>   <u>Plaintiffs Contend:</u>   That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

122.    Defendants Contend: On January 18, 2012, she was provided a holter monitor, and additional treatment was determined based on how she did with the holder monitor.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

123.    Defendants Contend: On January 18, 2012, a consult report was submitted to follow up after her 24/hour holter monitor was submitted.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

124.    Defendants Contend: The holter monitor "did not show much."

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

125.    Defendants Contend: Her cardiac status was determined to be stable and she was ordered to continue on her current treatments.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

126.    Defendants Contend: On March 9, 2012, Wells was seen for her complaints of chest pain.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

127.    Defendants Contend: On March 27, 2012, Dr. Palmer submitted an outside consult request for Wells to see a cardiologist.

Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

128.    Defendants Contend: On June 6, 2012, the assessment was that she is now better.

Plaintiffs Contend:  That this fact is misleading because it does not fully

36

and accurately describe the contents of Ms. Wells' medical record.

129.   Defendants Contend: On August 8, 2012, Dr. Palmer submitted an outside consult request for a six month follow-up with cardiology.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

130.   Defendants Contend: An EKG was done and she was referred to the provider for review.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

131.   Defendants Contend: The results of the August 21, 2010 EKG report were normal.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

132.   Defendants Contend:  On January 24, 2013, Wells was prescribed pravastatin for heart disease and to lower her cholesterol.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

133.   Defendants Contend:  On January 29, 2013, Wells was prescribed Amlodipine for chest pain and high blood pressure.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

134.   Defendants Contend: On June 13, 2013, Wells was seen for knee pain.

> Plaintiffs Contend:  That this fact is misleading because it does not fully and accurately describe the contents of Ms. Wells' medical record.

135.   Defendants Contend: Her blood pressure was taken again on June 19, 2013, July 3, 2013, and July 10, 2013, and it was in fair to good control.

> Plaintiffs Contend:  That this fact requires expert testimony to establish

37

whether Ms. Wells' blood pressure was in fair to good control.

136.   *Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Wells submitted 57 HNRs.

> Plaintiffs Contend: The number of HNRs Ms. Wells submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Ms. Wells received constitutionally adequate healthcare, that Defendants were not deliberately indifferent, or that Ms. Wells did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Ms. Wells received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

137.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Wells submitted 6 HNRs.

> Plaintiffs Contend: The number of HNRs Ms. Wells submitted is immaterial to the substance of this litigation.  The filing of an HNR does not ensure that Ms. Wells received constitutionally adequate healthcare, that Defendants were not deliberately indifferent, or that Ms. Wells did not face a substantial risk of serious harm.  The filing of an HNR does not speak to whether Ms. Wells received healthcare or the quality of that healthcare.  Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

138.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Wells submitted 22 HNRs.

Plaintiffs Contend: The number of HNRs Ms. Wells submitted is immaterial to the substance of this litigation. The filing of an HNR does not ensure that Ms. Wells received constitutionally adequate healthcare, that Defendants were not deliberately indifferent, or that Ms. Wells did not face a substantial risk of serious harm. The filing of an HNR does not speak to whether Ms. Wells received healthcare or the quality of that healthcare. Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

139.    Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Wells submitted 85 HNRs.

Plaintiffs Contend: The number of HNRs Ms. Wells submitted is immaterial to the substance of this litigation. The filing of an HNR does not ensure that Ms. Wells received constitutionally adequate healthcare, that Defendants were not deliberately indifferent, or that Ms. Wells did not face a substantial risk of serious harm. The filing of an HNR does not speak to whether Ms. Wells received healthcare or the quality of that healthcare. Further, Plaintiffs contest the substance of this fact because no differentiation has been made to determine whether the alleged number of filed HNRs complained of unique medical complaints or duplicated previously filed HNRs.

140.    Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Wells had 122 encounters with a nurse.

Plaintiffs Contend: The term "encounter" is vague. Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Wells had with healthcare professions is immaterial to the

39

adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent.

141.   <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Wells had 9 encounters with a nurse.

> <u>Plaintiffs Contend:</u>   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Wells had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent.

142.   <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Wells had 31 encounters with a nurse.

> <u>Plaintiffs Contend:</u>   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Wells had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent.

143.   <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Wells had 162 encounters with a nurse.

> <u>Plaintiffs Contend:</u>   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Wells had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent.

144.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Wells had 14 encounters with a mid-level provider.

> <u>Plaintiffs Contend:</u>   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or

meetings Ms. Wells had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent.

145.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Wells had 3 encounters with a mid-level provider.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Wells had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent.

146.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Wells had 17 encounters with a mid-level provider.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Wells had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent.

147.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Wells had 53 encounters with a physician.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Wells had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent.

148.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Wells had 10 encounters with a physician.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further

contend that the number of encounters, interactions, appointments, or meetings Ms. Wells had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent.

149.   <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Wells had 14 encounters with a physician.

   <u>Plaintiffs Contend:</u>   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Wells had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent.

150.   <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Wells had 77 encounters with a physician.

   <u>Plaintiffs Contend:</u>   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Wells had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent.

151.   <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Wells had 256 encounters with medical staff.

   <u>Plaintiffs Contend:</u>   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Wells had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent.

152.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Wells had 13 encounters with a psych associate.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Wells had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent.

153.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Wells had 2 encounters with a psychiatric mid-level.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Wells had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent.

154.   Defendants Contend: Between March 22, 2010 and April 1, 2014, Plaintiff Wells had 271 encounters with healthcare staff.

Plaintiffs Contend:   The term "encounter" is vague.   Plaintiffs further contend that the number of encounters, interactions, appointments, or meetings Ms. Wells had with healthcare professions is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent.

155.   Defendants Contend: Between March 22, 2010 and June 30, 2012, Plaintiff Wells had 5 chronic care appointments.

Plaintiffs Contend:   The number of chronic care appointments Ms. Wells had is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the type of chronic care or whether any treatment was provided at the appointments.

156.   <u>Defendants Contend:</u> Between July 1, 2012 and March 3, 2013, Plaintiff Wells had 2 chronic care appointments.

> <u>Plaintiffs Contend:</u>  The number of chronic care appointments Ms. Wells had is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the type of chronic care or whether any treatment was provided at the appointments.

157.   <u>Defendants Contend:</u> Between March 4, 2013 and April 1, 2014, Plaintiff Wells had 4 chronic care appointments.

> <u>Plaintiffs Contend:</u>  The number of chronic care appointments Ms. Wells had is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the type of chronic care or whether any treatment was provided at the appointments.

158.   <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Wells had 11 chronic care appointments.

> <u>Plaintiffs Contend:</u>  The number of chronic care appointments Ms. Wells had is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the type of chronic care or whether any treatment was provided at the appointments.

159.   <u>Defendants Contend:</u> Between March 22, 2010 and June 30, 2012, Plaintiff Wells had 16 outside specialty care consultations.

> <u>Plaintiffs Contend:</u>  The number of outside specialty care appointments

Ms. Wells had is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent.  Plaintiffs also contest the substance of this fact because it does not indicate the type of chronic care or whether any treatment was provided at the appointments.

160.   Defendants Contend: Between July 1, 2012 and March 3, 2013, Plaintiff Wells had 2 outside specialty care consultations.

Plaintiffs Contend:  The number of specialty care consultations Ms. Wells had is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the purpose of these consultations or whether any treatment was provided at the consultations.   Plaintiffs further contest the substance of this fact because there is no indication whether more than one request was made for the same consultation.

161.   Defendants Contend: Between March 4, 2013 and April 1, 2014, Plaintiff Wells had 6 outside specialty care consultations

Plaintiffs Contend:  The number of specialty care consultations Ms. Wells had is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the purpose of these consultations or whether any treatment was provided at the consultations.   Plaintiffs further contest the substance of this fact because there is no indication whether more than one request was made for the same consultation.

162.    <u>Defendants Contend:</u> Between March 22, 2010 and April 1, 2014, Plaintiff Wells had 24 outside specialty care consultations.  Between March 22, 2010 and June 30, 2012, Plaintiff Wells had 16 outside specialty care consultations.

> <u>Plaintiffs Contend:</u>  The number of specialty care consultations Ms. Wells had is immaterial to the adequacy of the healthcare Ms. Wells ultimately received and whether or not Defendants are deliberately indifferent. Plaintiffs also contest the substance of this fact because it does not indicate the purpose of these consultations or whether any treatment was provided at the consultations.   Plaintiffs further contest the substance of this fact because there is no indication whether more than one request was made for the same consultation.

163.    <u>Defendants Contend:</u> Wells concedes her blood pressure is now under control, particularly since 2012.

> <u>Plaintiffs Contend:</u>  That this fact is misleading because it does not fully and accurately describe Ms. Wells' testimony at her deposition.

## Exhibit M - Max Custody Workers[1]

### WORK INCENTIVE PAY PLAN
### Inmates Assigned

<u>Defendants Contend:</u>

#### ASPC-EYMAN, BROWNING UNIT

|  | Jan 2014 | Feb 2014 | Mar 2014 | April 2014 | May 2014 | June 2014 | July 2014 | Aug 2014 |
|---|---|---|---|---|---|---|---|---|
| Educ Aide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Floor Crew | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Garden | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kitchen Worker | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Landscaper | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Library   Aide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Painter | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pod Porter | 20 | 20 | 20 | 68 | 89 | 75 | 67 | 22 |

#### ASPC-EYMAN, RYNNING UNIT

|  | Jan 2014 | Feb 2014 | Mar 2014 | April 2014 | May 2014 | June 2014 | July 2014 | Aug 2014 |
|---|---|---|---|---|---|---|---|---|
| Educ Aide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Floor Crew | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Garden | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kitchen Worker | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Landscaper | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Library Aide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Painter | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pod Porter | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 4 |
| Shower Porter | 0 | 0 | 0 | 6 | 4 | 6 | 6 | 6 |

#### ASPC-EYMAN, SMU I

|  | Jan 2014 | Feb 2014 | Mar 2014 | April 2014 | May 2014 | June 2014 | July 2014 | Aug 2014 |
|---|---|---|---|---|---|---|---|---|
| Educ Aide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Floor Crew | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Garden | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kitchen Worker | 0 | 0 | 60 | 44 | 36 | 34 | 34 | 35 |
| Landscaper | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Library Aide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Painter | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pod Porter | 27 | 41 | 41 | 30 | 24 | 47 | 58 | 53 |

---

[1] Plaintiffs object to this exhibit, see page 4 of Exhibit M below for the basis of Plaintiffs' objection.

### ASPC-FLORENCE, CENTRAL UNIT

|  | Jan 2014 | Feb 2014 | Mar 2014 | April 2014 | May 2014 | June 2014 | July 2014 | Aug 2014 |
|---|---|---|---|---|---|---|---|---|
| Educ Aide | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 3 |
| Floor Crew | 6 | 6 | 6 | 6 | 15 | 12 | 13 | 19 |
| Garden | 0 | 0 | 0 | 0 | 0 | 9 | 8 | 6 |
| Kitchen Worker | 95 | 95 | 81 | 81 | 83 | 99 | 85 | 70 |
| Landscaper | 17 | 17 | 24 | 24 | 25 | 21 | 32 | 14 |
| Library Aide | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 4 |
| Maintenance | 5 | 5 | 7 | 7 | 6 | 8 | 4 | 8 |
| Painter | 3 | 4 | 6 | 6 | 3 | 2 | 3 | 1 |
| Other | 0 | 0 | 0 | 0 | 34 | 25 | 36 | 67 |
| Pod Porter | 15 | 22 | 42 | 42 | 41 | 45 | 38 | 49 |

### ASPC-FLORENCE, CENTRAL UNIT (KASSON)

|  | Jan 2014 | Feb 2014 | Mar 2014 | April 2014 | May 2014 | June 2014 | July 2014 | Aug 2014 |
|---|---|---|---|---|---|---|---|---|
| Educ Aide | 0 | 0 | 0 | 0 | 2 | 1 | 1 | 3 |
| Floor Crew | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 |
| Garden | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kitchen Worker | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Landscaper | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Library Aide | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Painter | 1 | 1 | 2 | 2 | 1 | 1 | 0 | 0 |
| Laundry | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Shoe Shine | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 |
| Pod Porter | 10 | 10 | 10 | 10 | 11 | 10 | 12 | 11 |

### ASPC-LEWIS, RAST UNIT

|  | Jan 2014 | Feb 2014 | Mar 2014 | April 2014 | May 2014 | June 2014 | July 2014 | Aug 2014 |
|---|---|---|---|---|---|---|---|---|
| Educ Aide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Floor Crew | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Garden | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kitchen Worker | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Landscaper | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Library Aide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Painter | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pod Porter | 0 | 0 | 0 | 4 | 8 | 9 | 10 | 10 |

### ASPC-PERRYVILLE, LUMLEY UNIT

|  | Jan 2014 | Feb 2014 | Mar 2014 | April 2014 | May 2014 | June 2014 | July 2014 | Aug 2014 |
|---|---|---|---|---|---|---|---|---|
| Educ Aide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Floor Crew | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 3 |
| Garden | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 |
| Kitchen Worker | 0 | 0 | 0 | 4 | 2 | 2 | 0 | 1 |
| Landscaper | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Library Aide | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 1 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Painter | 0 | 0 | 0 | 0 | 2 | 2 | 1 | 0 |
| Pod Porter | 8 | 8 | 8 | 8 | 8 | 8 | 9 | 9 |

### ASPC-PHOENIX, BAKER WARD

|  | Jan 2014 | Feb 2014 | Mar 2014 | April 2014 | May 2014 | June 2014 | July 2014 | Aug 2014 |
|---|---|---|---|---|---|---|---|---|
| Educ Aide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Floor Crew | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Garden | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kitchen Worker | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Landscaper | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Library Aide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Painter | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pod Porter | 0 | 0 | 4 | 3 | 3 | 5 | 5 | 5 |

### ASPC-PHOENIX, KING WARD

|  | Jan 2014 | Feb 2014 | Mar 2014 | April 2014 | May 2014 | June 2014 | July 2014 | Aug 2014 |
|---|---|---|---|---|---|---|---|---|
| Educ Aide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Floor Crew | 0 | 0 | 4 | 3 | 1 | 0 | 0 | 0 |
| Garden | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kitchen Worker | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Landscaper | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Library Aide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Painter | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pod Porter | 19 | 20 | 15 | 17 | 12 | 11 | 12 | 9 |

**ASPC-PHOENIX, GEORGE WARD**

| | Jan 2014 | Feb 2014 | Mar 2014 | April 2014 | May 2014 | June 2014 | July 2014 | Aug 2014 |
|---|---|---|---|---|---|---|---|---|
| Educ Aide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Floor Crew | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Garden | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kitchen Worker | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Landscaper | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Library Aide | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maintenance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Painter | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pod Porter | 8 | 6 | 8 | 8 | 5 | 4 | 2 | 5 |

Plaintiffs Contend: Plaintiffs object to this exhibit on the grounds that it is hearsay, lacks foundation, has not been authenticated, and is argumentative.  Plaintiffs have had no opportunity to examine the sponsoring witnesses about the preparation of this chart and intend to do so at the time of its introduction.  Plaintiffs object that Defendants waited until today to specify which documents this exhibit purports to summarize and they were too voluminous for Plaintiffs to review and comply with the other pre-trial deadlines scheduled today.   Plaintiffs object to Defendants conduct as inconsistent with Federal Rule of Evidence 1006.  Plaintiffs also object on the ground that Exhibit M relates to events occurring after the April 1, 2014 and the Court has previously precluded Defendants from introducing such evidence.

**Exhibit N – Corizon Reports**

**Uncontested Facts**

1.     Corizon generates ten reports on a monthly basis:

2.     The Corizon monthly reports include a staffing report, which lists – for each facility – the full time equivalent ("FTE") positions that are required under the Corizon contract and filled, which positions are filled, and the percentage of contractually required positions that are filled, including positions for medical directors, staff physicians, administrators, nurse practitioners, registered nurses ("RNs"), licensed practical nurses ("LPNs"), nursing assistants, lab technicians, x-ray technicians, pharmacy technicians, medical records staff, dentists, dental hygienists and assistants, psychiatrists, psychologists, psychological associates and technicians, and other medical staff.

3.     The Corizon monthly reports include an HNR/appointment report, which lists – for each facility – the number of medical, dental, and mental health HNRs received, appointments scheduled, no shows, refusals, and appointments completed, and the average wait time for a completed appointment.

4.     The Corizon monthly reports include an inmate wait time report, which lists – for each facility – the number of scheduled appointments and corresponding average wait times for provider, nursing, dental, and mental health appointments.

5.     The Corizon monthly reports include a dental wait time report, which lists – for each facility – the wait times for routine dental treatment and treatment upon intake. This report is created by Smallwood Prison Dental Services, who provides dental care for ADC inmates.

6.     The Corizon monthly reports include a dental utilization report, which lists – for each facility – the number of dental HNRs submitted, dentist patient visits, hygienist patient visits, intake exams, comprehensive exams, x-rays, fillings, simple extractions, surgical extractions, cleanings, dentures completed, prescriptions, no shows, and refusals,

and the routine and intake wait times.  This report is created by Smallwood Prison Dental Services.

7.      The Corizon monthly reports include an emergency transportation report, which lists – for each facility – the number of medical emergency off-site transports by ambulance, van, or life flight. It also lists those inmates who were transported, the date and mode of transportation, why they were transported, and where they were transported to.

8.      The Corizon monthly reports include an outpatient/specialty consultation transportation report, which lists – for each facility – the number of off-site outpatient transports, and a list of those inmates who were transported.

9.      The Corizon monthly reports include a medication report, which lists – for each facility – the number/percentage of inmates who are prescribed medication, the number/percentage of those inmates who are taking psychotropic medications, and the number of prescriptions issued (medical, psychotropic, and non-formulary).

10.     The Corizon monthly reports include a grievance report, which lists – for each facility – the number of grievances received regarding the quality of medical care, dental care, and mental health care, delay in care, medication, requests to be seen, staff conduct, and requests for off-site treatment, and for each grievance, it lists the inmate's name, the date the grievance was received, the date it was responded to, and the nature of the response.

11.     The Corizon monthly reports include a CAG (Corrections at a Glance), FAQ (Frequently Asked Questions), and PBMS (Performance Based Measures System) report, which is a compilation of measures that reports the number of:  hospital admissions; inmates admitted to hospitals for medical conditions (for each facility), inmates with and receiving treatment for HIV, AIDS, MRSA (for each facility), Tuberculosis, and Hepatitis C; inmate medical deaths; inmates treated for an emergency condition (for each facility); van, ambulance, and air emergency transports; specialty consults ordered (for each facility); specialty consult appointments completed (for each facility); AHCCCS applications completed; medical grievances received (for each

facility); health needs requests received; inmates attending peer education groups; inmate prescriptions; inmates currently undergoing dialysis; inmates assessed by a mental health professional; and inmates diagnosed with an Axis I mental health disorder receiving treatment.

12.     The wait times in these reports are calculated by comparing the date an HNR was received and the date the corresponding appointment or encounter with healthcare staff was completed.

### **Contested Facts**

1.     <u>Defendants Contend:</u>  These reports are summarized under FRE 1006.

   <u>Plaintiffs Contend:</u>  Plaintiffs object to the admissibility of Defendants FRE 1006 exhibits and that the exhibits contain accurate summaries of the data they purport to reflect.  Plaintiffs full objection is set forth in Appendix 6-B.

**Exhibit O – Suicide Policies and Prevention**

**UNCONTESTED FACTS**

1.      The shift commander, mental health or medical health care staff may order a Thirty Minute Watch when an inmate is considered a possible risk to engage in self-destructive or suicidal behavior.

2.      When pre-approved by both security and mental health staff, inmates on all levels of watch may be ███Security███, in accordance with the Health Services Technical Manual.

3.      The shift commander or health care staff may order this watch when an inmate is considered a possible risk to engage in self-destructive or suicidal behavior.

4.      The shift commander or health care staff may order this watch when an inmate is considered to be actively engaged in self-harm or considered by mental health staff to be at high imminent risk for suicide or self-harm and is presenting with significant risk factors and signs of suicidal intent.

5.      Mental health inmates who are not suicidal and who have been placed on a one officer to multiple inmate continuous watch because they cannot be placed in a designated watch cell may be directly and completely discontinued from watch.

## CONTESTED FACTS

### I.    SUICIDE TRAINING

1.    <u>Defendants Contend:</u>  ADC's suicide prevention training includes eight hours of suicide prevention/mental health instruction, which includes mock drills, information presentation, and practice ███████████████ Security ███████████████ ███████ .

<u>Plaintiffs Contend:</u>  Plaintiffs dispute that such training is actually provided to all staff, that it constitutes appropriate and sufficient suicide prevention training, and that it results in a constitutionally adequate suicide prevention system.

2.    <u>Defendants Contend:</u> Mock drills for suicide training consist of: ████ Security ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████ ; notification of medical and mental health staff.

<u>Plaintiffs Contend:</u>  Plaintiffs dispute that such drills are regularly carried out by relevant staff, that they constitute appropriate and sufficient suicide prevention training, and that they result in a constitutionally adequate suicide prevention system.

3.    <u>Defendants Contend:</u> Staff also receives training on how to identify inmates who may be at risk for suicide; how to identify how risk times, locations, and methods for suicide; how to identify incidents and situations that may trigger a suicide attempt; how to identify possible signs of suicidal intent; the role of the Department staff in preventing inmate suicide and the Department's policy on inmate suicide prevention.

<u>Plaintiffs Contend:</u>  Plaintiffs dispute that such training is actually provided

to all staff, that it constitutes appropriate and sufficient suicide prevention training, and that it results in a constitutionally adequate suicide prevention system.

4.    <u>Defendants Contend:</u> Additionally, all staff keep a Department issued Suicide Prevention Card on their person.  Staff are familiar with the four sections of the card and refer to the card as an aide in the identification of suicide warning signs.

<u>Plaintiffs Contend:</u>  Plaintiffs dispute that all staff "are familiar with the four sections of the card and refer to the card as an aide [sic] in the identification of suicide warning signs," and that such a card results in a constitutionally adequate suicide prevention system.

5.    <u>Defendants Contend:</u> Additionally, staff are educated on staff conduct required in the event of a suicide attempt, after an inmate death by suicide, and the liability issues associated with inmate suicide.

<u>Plaintiffs Contend:</u>  Plaintiffs dispute that such education is actually provided to all staff, that it constitutes appropriate and sufficient suicide prevention training, and that it results in a constitutionally adequate suicide prevention system.

6.    <u>Defendants Contend:</u> Staff are also provided with detailed information about ███████████████████████████████ and  practice ███ ████████████ , including guiding principles for ████████████████ ██████ ; procedural  and  safety  issues;  and  practice  in  the ████████████ ███████████████████████ .

<u>Plaintiffs Contend:</u>  Plaintiffs dispute that such information and practice is actually provided to all staff and that it results in a constitutionally adequate

suicide prevention system.

7.     Defendants Contend: All non-correctional series staff are trained in the identification and management of suicidal inmates.

> Plaintiffs Contend:  Plaintiffs dispute that such training is actually provided to all staff, that it constitutes appropriate and sufficient suicide prevention training, and that it results in a constitutionally adequate suicide prevention system.

8.     Defendants Contend: This includes two hours of suicide prevention/mental health instruction.

> Plaintiffs Contend:  Plaintiffs dispute that such training is actually provided to all staff, that it constitutes appropriate and sufficient suicide prevention training, and that it results in a constitutionally adequate suicide prevention system.

9.     Defendants Contend: Additionally, non-correctional series staff are trained on detailed information regarding inmate suicide and suicide prevention including:  how to identify inmates who may be at risk for suicide; how to identify high risk times, locations, and methods for suicide; how to identify incidents and situations that may trigger a suicide attempt; how to identify possible signs of a suicidal intent; the role of the department staff in preventing inmate suicide and the Department's policy on inmate suicide prevention; conduct required in the event of a suicide attempts; conduct required after an inmate death by suicide; liability issues associated with inmate suicide.

> Plaintiffs Contend:  Plaintiffs dispute that such training is actually provided to all staff, that it constitutes appropriate and sufficient suicide prevention training, and that it results in a constitutionally adequate suicide prevention

system.

10.    <u>Defendants Contend:</u> Health and mental health staff are instructed on ███████Security███████ and participate in mock drill training.

      <u>Plaintiffs Contend:</u>  Plaintiffs dispute that such instruction is actually provided to all staff, that it constitutes appropriate and sufficient suicide prevention training, and that it results in a constitutionally adequate suicide prevention system.

11.    <u>Defendants Contend:</u> All correctional series staff and staff assigned to institutional units receive annual Refresher Suicide Prevention training including:  two hours of annual training; how to identify inmates who may be a risk for suicide; how to identify high risk times, locations, and methods for suicide; how to identify incidents and situations that may trigger suicide attempt; how to identify possible signs of suicidal intent; review of all changes to the Department's suicide prevention policy or procedures; discussion of experiences learned from any recent suicides and/or attempts in the Department.

      <u>Plaintiffs Contend:</u>  Plaintiffs dispute that such training is actually provided to all staff at the intervals stated, that it constitutes appropriate and sufficient suicide prevention training, and that it results in a constitutionally adequate suicide prevention system.

12.    <u>Defendants Contend:</u> All staff who apply maximum behavioral control restraints must successfully complete annual refresher training in the application of Maximum Behavioral Control Restraints.

      <u>Plaintiffs Contend:</u>  Plaintiffs dispute that such training is actually provided

to all staff at the intervals stated, that it constitutes appropriate and sufficient suicide prevention training, and that it results in a constitutionally adequate suicide prevention system.

13.    <u>Defendants Contend:</u> All staff that have regular contact with inmates must successfully complete basic first aid and CPR training and refresher training as needed to remain certified.

<u>Plaintiffs Contend:</u>  Plaintiffs dispute that such training is actually provided to all staff at the intervals stated, that it constitutes appropriate and sufficient suicide prevention training, and that it results in a constitutionally adequate suicide prevention system.

14.    <u>Defendants Contend:</u> Whenever an inmate is identified as at a significant risk for suicide by any means, including ███████████ Security ███████████ ███████████████████████████████, the inmate is referred to mental health staff for ██████████ Security ██████████████.

<u>Plaintiffs Contend:</u>  Plaintiffs dispute that such prisoners are regularly or timely referred to mental health staff for further assessment, treatment, and/or placement on a watch.

15.    <u>Defendants Contend:</u> Suicide risk assessment includes, but is not limited to:

████████████████ Security ████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████



Plaintiffs Contend:  Plaintiffs dispute that ADC's suicide risk assessments include all these variables.

16.    Defendants Contend: Additional suicide assessment includes ▇▇▇▇ ; mental status examination; current medications; current psychiatric diagnosis; recommendations/treatment plan.

Plaintiffs Contend:  Plaintiffs dispute that ADC's suicide risk assessments include all these variables.

17.    Defendants Contend: Suicide risk assessments are documented in the mental health section of the medical record.

Plaintiffs Contend:  Plaintiffs dispute that suicide risk assessments are documented in the mental health section of the medical record.

18.    Defendants Contend: All housing units/blocks/living areas, with and without precautionary watch cells, contain emergency equipment, including ▇▇▇▇ .

Plaintiffs Contend:  That some housing units/blocks/living areas have emergency equipment that is not useable and is sometimes missing altogether.

19.    Defendants Contend: Inmates placed on all levels of watch are housed in designed watch cells that have high visibility to staff.

Plaintiffs Contend:  Plaintiffs dispute that all prisoners placed on watch are

housed in designed watch cells that have high visibility to staff.

20.     Defendants Contend: All designed watch cells are as suicide-resistant as reasonably possible, free of all obvious ███████████████, and provide full visibility.

>   Plaintiffs Contend:  Plaintiffs dispute that all designed watch cells are as suicide-resistant as reasonably possible, free of all ████████████ ████████, and provide full visibility.

21.     Defendants Contend: Designated cells are inspected quarterly by the responsible Key Contact Psychologist, and Deputy Warden or designee(s) to ensure they continue to be as suicide-resistant as is reasonably feasible.

>   Plaintiffs Contend:  Regardless of any such inspections, Plaintiffs dispute that watch cells are as suicide-resistant as is reasonably feasible.

22.     Defendants Contend: Prior to inmate placement in or return to a watch cell, ██████ staff searches ████████████ for any items which could potentially be used for self-harm and remove all such items and extraneous objects.

>   Plaintiffs Contend:  Plaintiffs dispute that ██████ staff searches ████████ ████████ for any items which could potentially be used for self-harm and remove all such items and extraneous objects; prisoners in watch cells have obtained access to such objects and used them to harm themselves.

23.     Defendants Contend: Inmates on a Continuous Watch, One Officer to Multiple Inmate Continuous Watch and Ten Minute Watch are provided with a minimum of ██████████████████████████████████████████ ██████████████████████████████████████████.

<u>Plaintiffs Contend:</u>   Plaintiffs dispute that prisoners on watch are consistently provided these items.

24.   <u>Defendants Contend:</u> Whenever clothing is removed from a suicidal inmate, ██████████ is issued; no inmate is placed in a cell naked.

<u>Plaintiffs Contend:</u>  That prisoners are sometimes placed in a cell naked.

25.   <u>Defendants Contend:</u> Any additional items provided to the inmate are pre-approved by mental health staff.

<u>Plaintiffs Contend:</u>  Plaintiffs dispute that any additional items provided to the prisoner are pre-approved by mental health staff.

26.   <u>Defendants Contend:</u> The maximum allowed items for a continuous watch, one officer to multiple inmate continuous watch, and ten minute watch include: ████████ ████████████████████████████████████████████ ██████████ .

<u>Plaintiffs Contend:</u>  Plaintiffs dispute that these are the only items provided to prisoners on watch.

27.   <u>Defendants Contend:</u> ████████████████████████████ ████████████████ shall not be approved for a Continuous Watch, One Officer to Multiple Inmate Continuous Watch, or Ten Minute watch, and mental health staff approves additional items only when deemed safe and clinically appropriate.

<u>Plaintiffs Contend:</u>  Plaintiffs dispute that these items are not provided to prisoners on watch.

28.   <u>Defendants Contend:</u> ████████████ are avoided whenever possible and used only as a last resort when the inmate is ██████████████████ ████████ .

Plaintiffs Contend:  Plaintiffs dispute that ███████████ are avoided whenever possible and used only as a last resort when the inmate ███ ███████████████████████████.

29.    Defendants Contend: ███████████ are never utilized as a restraint.

Plaintiffs Contend:  Plaintiffs dispute that ███████████ are never used to restrain a prisoner.

30.    Defendants Contend: Unless contraindicated by mental health staff, each inmate on a Continuous Watch, One Officer to Multiple Inmate Continuous Watch, and Ten Minute Watch is afforded showers, telephone privileges, recreation, and visitation all in accordance with his/her custody level.

Plaintiffs Contend:  Plaintiffs dispute that prisoners on watch are consistently provided showers, telephone privileges, recreation, and visitation.

31.    Defendants Contend: Inmates on Thirty Minute Watch are provided with a minimum of ███████████ (excluding ███████████), ███████ ███████████ (excluding ███████████), ███████████ ███████████.

Plaintiffs Contend:  Plaintiffs dispute that prisoners on watch a consistently provided these items.

32.    Defendants Contend: Any additional items provided to the inmate are pre-approved by mental health staff only when deemed safe and clinically appropriate.

Plaintiffs Contend:  Plaintiffs dispute that any additional items provided to the prisoner are pre-approved by mental health staff.

10

33.     <u>Defendants Contend:</u> The maximum allowed items for Thirty Minute Watch include: ██████████████Security██████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████.

    <u>Plaintiffs Contend:</u>  Plaintiffs dispute that these are the only items provided to prisoners on watch.

34.     <u>Defendants Contend:</u> ████████Security████████ are not approved for Thirty Minute Watches.

    <u>Plaintiffs Contend:</u>  Plaintiffs dispute that these items are not provided to prisoners on watch.

35.     <u>Defendants Contend:</u> Unless contraindicated by mental health staff, each inmate on Thirty Minute Watch is afforded showers, telephone privileges, recreation, and visitation in accordance with his/her custody level.

    <u>Plaintiffs Contend:</u>   Plaintiffs dispute that prisoners on watch are consistently provided showers, telephone privileges, recreation, and visitation.

36.     <u>Defendants Contend:</u> Inmates are not placed on a Continuous Watch, One Officer to Multiple Inmates Continuous Watch, Ten Minute Watch, or Thirty Minute Watch as a disciplinary sanction or as a means to address problematic inmate behavior unrelated to mental health issues.

    <u>Plaintiffs Contend:</u>  Plaintiffs dispute that prisoners are not placed on watch as a disciplinary sanction or as a means to address problematic inmate

behavior unrelated to mental health issues.

37.    <u>Defendants Contend:</u> Only the mental health or medical health care staff are authorized to cancel a 30 minute watch.

      <u>Plaintiffs Contend:</u>  Plaintiffs dispute that only mental health or medical care staff are authorized to cancel a watch.

38.    <u>Defendants Contend:</u> Security shall conduct visual welfare checks of inmates on Thirty Minute Watch at staggered intervals not to exceed every ▮ minutes.

      <u>Plaintiffs Contend:</u>  Plaintiffs dispute that security staff conduct these checks within the timeframes alleged.

39.    <u>Defendants Contend:</u> Only the mental health care staff are authorized to cancel a 10 minute watch.

      <u>Plaintiffs Contend:</u>  Plaintiffs dispute that only mental health care staff are authorized to cancel this watch.

40.    <u>Defendants Contend:</u> Mental health order a One Officer to Multiple Inmate Continuous Watch when an inmate demonstrates signs or symptoms of significant mental disorder and is acting in a manner indicating imminent suicide risk or risk to others due to a mental illness.

      <u>Plaintiffs Contend:</u>  Plaintiffs dispute that this watch is consistently ordered under these circumstances.

41.    <u>Defendants Contend:</u> This watch is for inmates whose mental health status has deteriorated and are considered actively suicidal or a risk to others due to a mental illness.

12

> Plaintiffs Contend:  Plaintiffs dispute that this watch is consistently ordered under these circumstances.

42.    Defendants Contend: When evaluating inmates on watch during normal waking hours, mental health and health care staff interact with and do not just observe inmates.

> Plaintiffs Contend:  That mental health and health care staff do not consistently interact with prisoners on watch.

43.    Defendants Contend: Inmates on any watch do not have their watch status downgraded or discontinued until mental health staff has: (1) assessed the inmate (2) thoroughly reviewed the inmate's medical and mental health record, any other relevant documentation; and (3) conferred with security staff about the inmate's observed behavior on watch.

> Plaintiffs Contend:  That mental health staff do not consistently carry out these steps prior to downgrading or discontinuing a watch.

44.    Defendants Contend: Upon an in-person evaluation by the licensed medical health staff, inmates on watch may be downgraded as clinically indicated.

> Plaintiffs Contend:  That prisoners on watch are sometimes downgraded without in-person evaluation by licensed mental health staff.

45.    Defendants Contend: In all instances, a minimum of [Security], including [Security], are present before accessing the cell to respond and initiate aid.

> Plaintiffs Contend:  That there have been delays in entering the cell even when [Security] were present.

46.    Defendants Contend: For all emergency responses, staff assess the situation and proceed as follows within the three minute time frame: (1) activate incident command system (ICS) – inherent in the ICS is the notification to supervisory staff and

medical responders as required; (2) in the case of a non-responsive inmate, issue ▮ loud orders for inmate response; (3) conduct a visual sweep of the area ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. If an inmate's ▮▮▮▮ cannot be seen and the inmate is non-responsive, an immediate judgment must be made by a first responder to determine whether inmate's condition outweighs the potential risk involved in entering the cell/living area; (4) videotape the entry whenever possible. However, the availability or arrival or a video camera may never delay entry into a cell/living area or the initiation of aid to an inmate.

> Plaintiffs Contend:  That these actions are not consistently taken within the stated timeframe in case of suicides or suicides attempts.

47.    Defendants Contend: ADC is doing things to help prevent suicide such as training staff, enhancing social interaction, double celling, treatment programs for mentally ill, enhanced programs for SMI, and the step programs.  ADC also has good watch programs.

> Plaintiffs Contend:  That ADC is deliberately indifferent to the risk of suicide, as evidenced by its failure to exclude the seriously mentally ill from the isolation units, where the overwhelming majority of suicides occur; by failing to mitigate the harsh and damaging conditions in those units; and by its persistent failure to provide adequate numbers of qualified mental health staff.

48.    Defendants Contend: Corizon staff is required to collaborate with Security Personnel and develop a suicide prevention strategy.

> Plaintiffs Contend:  That there is no meaningful collaboration between health care and security staff in suicide prevention efforts.

# Exhibit P - DI 326 STEP PROGRESSION[1]

Defendants Contend:

## STEP I

|          | Jan 2014 | Feb 2014 | Mar 2014 | April 2014 | May 2014 | June 2014 | July 2014 | Aug 2014 |
|----------|----------|----------|----------|------------|----------|-----------|-----------|----------|
| Browing  | 0        | 0        | 192      | 291        | 415      | 476       | 297       | 383      |
| Rynning  | 0        | 0        | 46       | 19         | 12       | 10        | 7         | 5        |
| SMU      | 0        | 0        | 0        | 378        | 177      | 98        | 307       | 239      |
| Central  | 22       | 29       | 138      | 58         | 58       | 96        | 530       | 438      |
| Kasson   | 15       | 18       | 13       | 15         | 10       | 13        | 13        | 12       |
| Lumley   | 26       | 32       | 31       | 32         | 33       | 40        | 44        | 47       |
| Rast     | 0        | 0        | 0        | 0          | 3        | 4         | 7         | 22       |
| Baker    | 6        | 5        | 7        | 7          | 8        | 9         | 12        | 9        |
| George   | 0        | 0        | 0        | 4          | 4        | 3         | 4         | 4        |
| King     | 0        | 0        | 0        | 8          | 8        | 7         | 1         | 2        |

## STEP II

|          | Jan 2014 | Feb 2014 | Mar 2014 | April 2014 | May 2014 | June 2014 | July 2014 | Aug 2014 |
|----------|----------|----------|----------|------------|----------|-----------|-----------|----------|
| Browing  | 0        | 0        | 139      | 148        | 171      | 52        | 84        | 92       |
| Rynning  | 0        | 0        | 22       | 36         | 0        | 8         | 5         | 13       |
| SMU      | 0        | 0        | 0        | 196        | 338      | 185       | 97        | 146      |
| Central  | 25       | 27       | 130      | 155        | 68       | 88        | 70        | 200      |
| Kasson   | 16       | 9        | 11       | 9          | 9        | 4         | 3         | 7        |
| Lumley   | 17       | 17       | 15       | 11         | 15       | 21        | 19        | 22       |
| Rast     | 0        | 0        | 1        | 0          | 0        | 4         | 0         | 0        |
| Baker    | 11       | 13       | 14       | 13         | 11       | 13        | 10        | 11       |
| George   | 0        | 0        | 0        | 8          | 3        | 3         | 1         | 2        |
| King     | 0        | 0        | 0        | 0          | 0        | 0         | 4         | 1        |

## STEP III

|          | Jan 2014 | Feb 2014 | Mar 2014 | April 2014 | May 2014 | June 2014 | July 2014 | Aug 2014 |
|----------|----------|----------|----------|------------|----------|-----------|-----------|----------|
| Browing  | 0        | 0        | 441      | 349        | 234      | 249       | 323       | 322      |
| Rynning  | 0        | 0        | 6        | 17         | 0        | 7         | 19        | 32       |
| SMU      | 0        | 0        | 0        | 353        | 462      | 668       | 585       | 509      |
| Central  | 193      | 200      | 134      | 138        | 239      | 233       | 226       | 203      |
| Kasson   | 19       | 19       | 18       | 18         | 21       | 12        | 15        | 16       |
| Lumley   | 22       | 19       | 17       | 18         | 10       | 11        | 14        | 12       |
| Rast     | 7        | 7        | 17       | 24         | 38       | 36        | 36        | 25       |
| Baker    | 1        | 1        | 2        | 3          | 3        | 2         | 3         | 3        |
| George   | 0        | 0        | 0        | 0          | 0        | 0         | 0         | 1        |
| King     | 0        | 0        | 0        | 15         | 8        | 6         | 8         | 9        |

---

[1] Plaintiffs objection to this exhibit.  Please refer to page 2 of Exhibit N for the basis of Plaintiffs' objection.

# MAXIMUM CUSTODY BED

Population as of September 3, 2014

| Complex | Unit | Female | Male | Operating Capacity | Total Population | Step 1 | Step 2 | Step 3 | Total Enrolled in Shm |
|---------|------|--------|------|--------------------|------------------|--------|--------|--------|------------------------|
| Eyman | Browning* | | X | 888 | 803 | 326 | 81 | 346 | 753 |
| | Rynnning | X | | 78 | 51 | 6 | 13 | 32 | 51 |
| | SMU I* | | X | 1056 | 969 | 231 | 169 | 535 | 935 |
| Total | | | | 2022 | 1823 | 563 | 263 | 913 | 1739 |
| | | | | | | | | | |
| Florence• | Central | | X | 516 | 445 | 301 | 40 | 23 | 364 |
| | | | | | | | | | |
| Lewis | Rast | | X | 48 | 47 | 22 | 0 | 25 | 47 |
| | | | | | | | | | |
| Perryville | Lumley | X | | 132 | 85 | 43 | 26 | 16 | 85 |
| | | | | | | | | | |
| Phoenix* | | | X | 83 | 38 | 6 | 2 | 0 | 8 |
| | | | | | | | | | |
| Tucson | Minors• | | X | 36 | 19 | 0 | 0 | 0 | 0 |
| | | | | | | | | | |
| TOTAL | | | | 2837 | 2457 | 935 | 331 | 977 | 2243 |

•Total en rolled in step program excludes infirmaries, Browning intake, Browning 805, Central 805,
   mental health watches, minors and non-maximum custody at Phoenix-Alhambra

**To date, 63 inmates enrolled in RSHP (4 inmates from Kasson) with 24 inmates graduating

| Complex | Female | Male | Total Population |
|---------|--------|------|------------------|
| Eyman | | x | 1823 |
| Florence | | x | 445 |
| Lewis | | x | 47 |
| Perryville | x | | 85 |
| Phoenix | | x | 38 |
| Tucson | | x | 19 |
| TOTAL | | | 2457 |

<u>Plaintiffs Contend</u>: Plaintiffs object to this exhibit on the grounds that it is hearsay, lacks foundation, has not been authenticated, and is argumentative.  The chart is also vague and ambiguous as to the data is purports to report.  Further, Plaintiffs have had no opportunity to depose anyone about the preparation of this version of the chart and expressly reserve the right to do so at trial.  Plaintiffs further object to and contest any and all substantive facts Exhibit N purports to establish and/or represent because Defendants have failed to provide the underlying data substantiating the information listed in Exhibit N in the manner required by Federal Rule of Evidence 1006.  Finally, Plaintiffs also object on the ground that Exhibit N relates to events occurring after the April 1, 2014 and the Court has previously precluded Defendants from introducing such evidence.

Exhibit Q – Electronic Health Records[12]

Medical Health Care – Whether Plaintiffs have proven that Defendants were deliberately indifferent to the medical health care needs of the certified class members by failing to employ an Electronic Health Record system ("EHR").

Defendants Contend:

1. Plaintiffs contest each fact in this exhibit, asserting they did not have time to "meaningfully review" the facts.  Despite, however, being afforded an additional thirteen days to respond pursuant to the parties' agreement to file an errata, Plaintiffs still neglected to review these facts.  The Court should consider their facts uncontested by Plaintiffs as they have waived any substantial objections.
2. In 2009, the Governor approved Arizona House Bill ("H.B.") 2010 requiring ADC to privatize all correctional health services provided at ADC's ten (10) statewide correctional complexes.
3. ADC's 2011 RFP for privatized correctional health services contract, which was awarded to Wexford Health Sources, Inc., in 2012, required implementation of Electronic Health Record system ("EHR").
4. ADC's contract with Wexford approved implementation of the ███████ Security ██████████ .
5. Wexford began its contract tenure on July 1, 2012 and informed ADC of its intent to sever the contract on November 8, 2012.
6. In December 2012, Corizon, Inc. submitted its Supplemental Proposal for the Provision of Inmate Correctional Health Services to ADC in response to ADC's

---

[1] Defendants' Note:  Plaintiffs contest each fact in this exhibit, asserting they did not have time to "meaningfully review" the facts.  Despite, however, being afforded an additional thirteen days to respond pursuant to the parties' agreement to file an errata, Plaintiffs still neglected to review these facts.  Plaintiffs did, however, find time to add numerous new objections, new contentions, and new designations to other sections and exhibits of the Joint Pre-Trial Order .  The Court should consider these  facts uncontested by Plaintiffs as they have waived any substantial objections.

[2] Plaintiffs' Response to Defendants' Note: Plaintiffs dispute Defendants' characterization that there were an additional 13 days to review the facts in this Exhibit.  The 11 days that the parties were provided for purposes of filing an errata was intended to provide the parties an opportunity to review the Joint Pretrial Order submission and correct the document to ensure that it accurately reflected both parties' contentions and positions.  The errata was not intended to provide additional time to add new contested facts and/or cure Defendants' untimely submission of the facts listed in Exhibit Q.

goal to procure a substitute vendor to transition the Wexford health services contract.

7. In January 2013, ADC awarded Corizon the contract for privatization of all correctional health services with a contract term date of March 4, 2013 through March 3, 2016, plus two annual one-year renewals.

8. Corizon assumed Wexford's contractual obligation to implement an EHR system throughout ADC's ten (10) statewide complexes.

9. Beginning in January 2013 and immediately upon contract award, Corizon began action to implement an EHR system throughout ADC's ten (10) statewide complexes.

10. Upon award of the contract, in January 2013, Corizon proposed to establish an EHR committee to develop a comprehensive project plan for implementation of EHR system ███████████Security███████████ with a target to implement the EHR within the initial 9-15 months of the contract start term.

11. Amendment No. 3 to the ADC-Corizon contract was signed by ADC on February 28, 2014 and by Corizon on March 18, 2014 and established a time plan to roll out the EHR throughout ADC's ten (10) statewide complexes.

12. Perryville was the first complex to go on-line with EHR in April 2014, within the 9-15 month implementation target set by Corizon in January 2013.

13. ADC's Perryville, Tucson and Florence-Central complexes currently employ an electronic medical records system with Corizon working to implement the EHR at ADC's remaining seven (7) complexes in December of 2014 per Amendment No. 3 to the ADC-Corizon contract per Amendment Nos. 3 and 5 to the ADC-Corizon contract.

14. Hard copy medical records generated prior to implementation of EHR are maintained and permit medical personnel access to prior medical records as well as prior admissions, diagnosis, treatments, lab results, etc. to effect continuity of care.

15. Implementing an EHR and thus reducing paper medical records increases administrative efficiency and results in more effective and timely clinical care, including electronic medication/ lab/radiology test ordering, and electronic maintenance of sick calls, chronic care clinic data, consult requests, continuity of care, lab/radiology/medication orders, SOAP progress notes, diagnosis, problem lists, intake assessments, treatment plans, discharge plans, provider orders, scheduling/follow-up systems, referral management, AIMS interface and other specific tasks, including also maintenance of dental and mental health records in searchable format.

Plaintiffs' Contend:

Plaintiffs object to responding to Exhibit Q.  First, this exhibit was only disclosed to Defendants at 10:41 am, on September 19, 2014, the day the parties' joint Pre-Trial Statement is due.  Despite the Court's order that the parties exchange drafts on September 8, Defendants waited two full weeks to disclose this exhibit.  Plaintiffs were still reviewing the thousands of facts Defendants forced upon them, leaving insufficient time to scour the record to determine the veracity of Plaintiffs' assertions relating to EHR. More importantly, the Court has already informed Defendants that it "will not permit reliance on the forthcoming . . . implementation of Electronic Health Records" because Defendants "may not rely on future events or events that are in process of being implemented."  ECF No. 871.  To the extent the above facts simply restate terms from admissible written policies, the written policies speak for themselves and, in any event, cannot serve as evidence that ADC follows, enforces, or effectively monitors those policies. The true practices at ADC facilities will be proven by Plaintiffs at trial. Specifically reserving, and without waiving these rights, Plaintiffs respond that these facts, if relevant at all may indicate substandard care because ADC is allegedly just now implementing a system purported to result in accurate document management and "effective and timely clinical care."