John C. Musselman #143882
Arizona State Prison Complex Lewis Barchey Unit
PO Box 3200
Buckeye AZ 85326-0302



☒ FILED      ☐ LODGED

# Jan 14 2015

CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA

## UNITED STATES DISTRICT COURT
### DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, et al.<br><br>PLATIFFS<br><br>vs,<br><br>Charles Ryan, et al.<br><br>DEFENDANTS | No. CIV 12-00601-PHX-DKD<br>OPINION OF CLASS MEMBER,<br>John C. Musselman,<br>IN RE: PARSONS V. RYAN PROPOSED<br>STIPULATION AGREEMENT |

COMES NOW, CLASS MEMBER, IN THE ABOVE ENTITLED ACTION, JOHN C. MUSSELMAN (PRO PER), PURSUANT TO DOCKET NUMBER 1204, HEREIN SUBMITTING THE FOLLOWING OPINION REFERENCE THE PROPOSED SETTLEMENT.

MOST IMPORTANTLY, MUSSELMAN WISHES TO EXPRESS EXTREME GRATITUDE TO ALL OF THE PLANTIFFS' LAWYERS, AND THEIR STAFF, FOR ALL OF THEIR PAINSTAKING DILIGENCE TO HELP THOSE CLASS MEMBERS, SUCH AS MYSELF, WHO HAVE REPEATEDLY SUFFERED AT THE HANDS OF ADOC HEALTH SERVICES AND THEIR SUBSEQUENT CONTRACTORS. WE FEEL EXTREMELY FORTUNATE THAT YOU CHOSE TO FIGHT FOR OUR CONSTITUTIONAL RIGHT FOR PROPER, ADEQUATE MEDICAL CARE WITHOUT THE DELIBERATE INDIFFERENCE I'VE SUFFERED FOR ALMOST 16 YEARS! WORDS COULD NEVER EXPRESS THE DEPTH OF MY

GRATITUDE FOR ALL OF YOUR DEVOTION TO OUR CAUSE! THANK YOU SO MUCH!

## MEDICAL PROBLEMS CONCERNING CLASS MEMBER JOHN C. MUSSELMAN

I AM A SERIOUSLY ILL FORTY-ONE YEAR OLD ADOC PRISONER, SERVING A TWENTY-SIX YEAR SENTENCE, SINCE 1999. I HAVE HAD TYPE I (INSULIN-DEPENDENT) DIABETES SINCE 1985. I SUFFER FROM MANY SERIOUS COMPLICATIONS OF DIABETES, BELIEVED TO BE CAUSED BY THE FACT THAT MY MEDICAL CARE FALLS BELOW THE MINIMAL STANDARDS CONTAINED WITHIN THE AMERICAN DIABETES ASSOCIATION's POSITION STATEMENT, "DIABETES MANAGEMENT IN CORRECTIONAL INSTITUTIONS" (SEE EXHIBIT 1).

I CURRENTLY SUFFER FROM THE FOLLOWING DIABETES-RELATED COMPLICATIONS:
1) ORTHOSTATIC HYPOTENSION: THE LOSS OF THE ABILITY TO REGULATE BLOOD PRESSURE WHEN GOING FROM A LYING TO A STANDING POSITION, AND THIS CAN RESULT IN A DROP IN BLOOD PRESSURE AND POSSIBLY FAINTING. THIS IS ONE OF THE MANIFESTATIONS OF AUTONOMIC NEUROPATHY — A DISORDER AFFECTING THE PERIPHERAL NERVES THAT PARTICULARLY DAMAGE NERVES THAT AUTOMATICALLY REGULATE BODY PROCESSES.
2) GLAUCOMA: OPTIC NERVE DAMAGE THAT LEADS TO PROGRESSIVE, IRREVERSIBLE LOSS OF VISION.
3) PERIPHERAL NEUROPATHY: DAMAGE OF PERIPHERAL NERVES CAUSING BURNING SENSATIONS IN THE HANDS AND FEET.
4) NON-PROLIFERATIVE DIABETIC RETINOPATHY: DAMAGE TO THE RETINA CAUSING BLOOD VESSELS IN THE RETINA TO LEAK, WHICH EVENTUALLY CAN CAUSE SIGNIFICANT LOSS OF VISION.
5) HYPOGLYCEMIA UNAWARENESS: A STATE IN WHICH A PERSON DOES NOT FEEL OR RECOGNIZE THE SYMPTOMS OF HYPOGLYCEMIA. THIS IS ANOTHER MANIFESTATION OF AUTONOMIC NEUROPATHY. DUE TO MY FREQUENT EPISODES OF HYPOGLYCEMIA,

WITHOUT WARNING, AND ADOC MEDICAL PROVIDERS (AND THEIR AGENTS) REPEATEDLY REFUSING TO PROPERLY ADDRESS THIS SITUATION WHICH HAS CAUSED FREQUENT LIFE-THREATENING EPISODES, I HIRED A LAWYER AND A DOCTOR. (SEE EXHIBIT 2). STILL, DESPITE RECOMMENDATIONS FROM MY DOCTOR AND THE ENDOCRINOLOGIST THEY SENT ME TO ON 12/29/14, CORIZON HAS YET TO PROVIDE THE NECESSARY EQUIPMENT (INSULIN PUMP & CONTINUOUS GLUCOSE MONITOR) RECOMMENDED BY TWO DIABETES SPECIALISTS!

6) NEUROLOGICAL BLADDER: THE LOSS OF THE BLADDER'S ABILITY TO CONTRACT COMPLETELY, IN A TIMELY MANNER, LEADING TO DELAYED AND INCOMPLETE EMPTYING. THIS IS ANOTHER MANIFESTATION OF AUTONOMIC NEUROPATHY.

OTHER CHRONIC MEDICAL PROBLEMS CONCERNING CLASS MEMBER MUSSELMAN
1) HYPERTENSION: ABNORMALLY HIGH PRESSURE IN THE ARTERIES.
2) HYPERLIPIDEMIA: Abnormal LEVELS OF LIPIDS (CHOLESTEROL, TRIGLYCERIDES, OR BOTH) CARRIED BY LIPOPROTEINS IN THE BLOOD.

IN SUM, THE SETTLEMENT PROPOSED BY THE PARTIES IN PARSONS IS VERY IMPORTANT, FOR OBVIOUS REASONS. I HAVE READ THE PROPOSED SETTLEMENT IN ITS ENTIRETY (DATED 10/14/14), ALONG WITH ITS EXHIBITS AND 103 HEALTH CARE PERFORMANCE MEASURES. IF IT PLEASES THE COURT AND THOSE OFFICERS IN INTEREST, I HAVE SOME CONCERNS.

LEWIS COMPLEX PRISON REFUSES TO PERMIT INMATES TO COPY STIPULATION AND ASSOCIATE DECLARATION AND MOTION

THE LIBRARIANS ON OUR UNIT, LIBRARIAN WARTZELL AND LIBRARIAN PADILLA, ARE REFUSING TO PERMIT INMATES TO MAKE THEIR OWN COPIES OF THE STIPULATION AGREEMENT,

THE DECLARATION OF DONALD SPECTER, AND THE RELATED MOTION TO DISPOSE OF THE CASE. THIS MEANS THAT IF THE LIBRARIANS CHOOSE TO REMOVE THEIR REFERENCE ONLY COPIES OF THESE DOCUMENTS, WE WON'T BE ABLE TO REVIEW THE MEASURES FOR WHICH THEY MUST COMPLY, ONCE ENTERED WITH THE COURT, THIS STIPULATION WILL BE FOLLOWED FOR YEARS TO COME. INMATES SHOULD BE ABLE TO COPY THIS DOCUMENT AND ITS ATTACHMENTS, THE DECLARATION OF DONALD SPECTER, AND THE MOTION TO DISPOSE OF THE CASE IN ACCORDANCE WITH ADOC DEPARTMENT ORDER 902.07, INMATE LEGAL ACCESS TO THE COURTS (SEE EXHIBIT 3, DO 902.07, SECT. 1.3.1) THESE LIBRARIANS ARE TELLING INMATES THEY MUST CONTACT ADOC CENTRAL OFFICE FOR A COPY. WE NEED THESE COPIES TO BE MADE AVAILABLE FOR COPYING AT OUR UNIT, IN ACCORDANCE WITH ADOC'S DEPARTMENT ORDER. REFUSING TO PERMIT US TO MAKE COPIES IS AN ATTEMPT BY ADOC TO RESTRICT OUR ACCESS TO THESE MEASURES, FOR WHICH MANY INMATES, LIKE MYSELF, WILL WANT TO MONITOR COMPLIANCE. PERHAPS YOUR HONOR COULD ORDER ADOC TO PERMIT US TO COPY THESE DOCUMENTS, IN ACCORDANCE WITH ADOC DEPARTMENT ORDER 902.07, AT OUR OWN EXPENSE.

HEALTH CARE MEASURE #25, "EMERGENCY RESPONSE"

AS THE HYPOGLYCEMIA UNAWARENESS I SUFFER FROM HAS CAUSED FREQUENT HYPOGLYCEMIC (LOW BLOOD SUGAR) EVENTS REQUIRING EMERGENCY MEDICAL RESPONSE, MEASURE #25 IS WHOLLY INSUFFICIENT. DURING 2014, CORRECTIONAL OFFICERS ACTIVATED INCIDENT COMMAND SYSTEM ("ICS") 5 TIMES FOR MEDICAL EMERGENCIES RELATED TO MY SEVERE EPISODES OF HYPOGLYCEMIA. IN ALMOST EVERY CASE, THE FIRST RESPONDER WAS UNABLE TO RENDER TREATMENT. THIS RESULTED IN A 20-30 MINUTE WAIT TIME FOR MEDICAL STAFF TO RESPOND AND ATTEND TO ME, AS NECESSARY. QUITE

OFTEN THE ONLY ROLE THE FIRST RESPONDERS PLAYED WAS SIMPLY RELAYING UPDATES ON THEIR RADIOS ABOUT MY CONDITION, AS IT CONTINUED TO DETERIORATE WHILE WAITING UP TO 30 MINUTES FOR MEDICAL TO ARRIVE TO ME.

IF IT PLEASES THE COURT, I PROPOSE ANOTHER MEASURE BE ADDED TO THE "EMERGENCY RESPONSE" CATEGORY, WHICH LIMITS RESPONSE TIME BY MEDICAL PERSONEL TO 5-10 MINUTES, IN LIFE-THREATENING EMERGENCIES. THIS IS NOT AN UNREASONABLE EXPECTATION, GIVEN THE DIRE POSITIONS I'VE BEEN WHERE MINUTES MEANT THE DIFFERENCE BETWEEN CONSCIOUS OR UNCONSCIOUS! EVERY MINUTE IN ONE OF THESE SITUATIONS FOR ME COULD MEAN THE DIFFERENCE BETWEEN RECOVERY, COMA, OR EVEN DEATH!

HEALTHCARE MEASURE #55, "CHRONIC CARE"

THIS MEASURE CALLS FOR DISEASE MANAGEMENT GUIDELINES TO BE IMPLEMENTED FOR CHRONIC DISEASES. TO ALLOW ADOC'S MEDICAL PROVIDERS (I.E. CORIZON HEALTHCARE) TO IMPLEMENT THEIR OWN SET OF GUIDELINES IS A MEASURE IN WHICH THEIR ESTABLISHED GUIDELINES MAY VERY WELL FALL BELOW THE STANDARDS SET FORTH IN POSITION STATEMENTS LIKE THE AMERICAN DIABETES ASSOCIATION'S GUIDELINES IN THEIR POSITION STATEMENT, "DIABETES MANAGEMENT IN CORRECTIONAL INSTITUTIONS" (SEE EXHIBIT 1). THIS POSITION STATEMENT, WHICH CORIZON DOESN'T MEET, WAS DEVELOPED BY THE AMERICAN DIABETES ASSOCIATION ("ADA") ALONG WITH THE NATIONAL CORRECTION HEALTH CARE COMMITTEE, SO THE STANDARDS WERE DEVELOPED WITH THE LIMITATIONS OF THE CORRECTIONAL SETTING IN MIND. IF CORIZON IS PERMITTED TO CREATE THEIR OWN DISEASE MANAGEMENT GUIDELINES, IT MOST LIKELY WILL NOT COME CLOSE TO THE ADA'S POSITION STATEMENT, WHICH OUTLINES MINIMAL ACCEPTABLE CARE FOR THOSE WITH DIABETES, WHICH THEY CURRENTLY DO NOT MEET!

THIS HEALTHCARE MEASURE SHOULD BE EXPANDED TO SAY THAT TREATMENT GUIDELINES SHALL BE DEVELOPED IN ACCORDANCE WITH THE ASSOCIATIONS, LIKE THE AMERICAN DIABETES ASSOCIATION, WHERE THEIR POSITION STATEMENTS HAVE BEEN DESIGNED WITH THE LIMITATIONS OF THE PRISON TAKEN INTO ACCOUNT.

SO ULTIMATELY THIS MEASURE SHOULD BE WORDED AS SUCH: "Where APPROPRIATE PREFERRED PRACTICE PATTERNS AND POSITION STATEMENTS HAVE BEEN DEVELOPED SPECIFICALLY FOR CORRECTIONAL INSTITUTIONS, TREATMENT GUIDELINES FOR CHRONIC CARE CONDITIONS SHALL BE DEVELOPED IN ACCORDANCE WITH THOSE APPROPRIATE POSITION STATEMENTS." THIS WILL PREVENT THE ADOC MEDICAL PROVIDER FROM SETTING THE BAR LOW ON TREATMENT GUIDELINES, JUST BECAUSE THEY ARE ABLE AS THE MEASURE CURRENTLY ALLOWS.

LANGUAGE SHOULD ALSO BE SPECIFICALLY INCLUDED IN THIS MEASURE WHICH WILL SPECIFICALLY STATE THAT THESE ESTABLISHED TREATMENT GUIDELINES WILL BE MADE AVAILABLE FOR REFERENCE AND COPYING AT THE INMATE LEGAL LIBRARIES. IF WE DON'T KNOW WHAT IS CONTAINED WITHIN THESE GUIDELINES, WE CANNOT TAKE ACTION WHEN THESE GUIDELINES ARE NOT FOLLOWED, AS TREATMENT PROTOCOLS ARE OFTEN IGNORED BY HEALTHCARE STAFF!

## IN CONCLUSION

I GENUINELY THANK THE HONORABLE COURT AND ALL THOSE WHO FOUGHT ON OUR BEHALF. I PRAY THIS COURT WILL CONSIDER MY RECOMMENDATIONS AND ADOPT THE RECOMMENDED CHANGES

IN THE STIPULATION AGREEMENT WHICH IS ULTIMATELY ENTERED WITH THIS HONORABLE COURT.

RESPECTFULLY —

John C. Musselman   1/9/15

EXHIBIT # 1


**Park Nicollet**

**International Diabetes Center**

3800 Park Nicollet Blvd.
Minneapolis, MN 55416
952-993-3143

June 19, 2005

Debra A. Hill
Attorney at Law
Osborn Maledon
Phoenix Plaza – 21st Floor
2929 North Central Ave.
Phoenix, AZ 85012

**Re:     Review of Case Documents – John Musselman**

Dear Ms. Hill,

I have reviewed the current Department of Corrections medical records for Mr. John Mussellman. In this review, I have focused specifically on documentation of care for his diabetes in an effort to determine if this individual's current care has been in compliance with the current standards of diabetes care for patients in correctional facilities recommended the American Diabetes Association. (Clinical Practice Guidelines, *Diabetes Care* 2005). I was pleased to be a member of this ADA committee during the development of these guidelines. As both a committee member and an active diabetes care provider, I would note that these guidelines (developed along with the National Correction Health Care Committee (NCCHC)) represent the minimum standards for care of inmates with diabetes.

Based on my review of Mr. Musselman's current records, it is my opinion that that the Arizona Department of Corrections (DOC) is not currently in compliance with these treatment recommendations. Key deficiencies are as outlined below:

1.  MEDICAL MANAGEMENT PLAN - No management plan for diabetes care is provided.
2.  SELF-MONITORING OF BLOOD GLUCOSE – is not generally performed at the recommended frequency for individuals receiving insulin therapy and represents a significant medical risk to the inmate.
3.  INSULIN MANAGEMENT – numerous changes in therapy are noted although most of these insulin dose changes were reactive (to either hypo or hyperglycemia). In addition, insulin treatment following incarceration was change drastically from that used by the inmate prior to incarceration.
4.  MEAL PLAN – MEAL TIMING – On several occasions, meal times for this inmate were delayed significantly following insulin administration. Such a change in schedule significantly increases the risk of severe hypoglycemia.
5.  INSULIN OMISSION - often documented as "by patient request" although several circumstances occurred at the time of a skipped/delayed meal. Insulin omission also occurred at the time of hypoglycemic events. In such circumstance, elimination of short-acting insulin may be appropriate, although in several cases omission of intermediate acting insulin also occurred. Such an action substantially increases the risk of subsequent hyperglycemia. Such changes can lead to fluid loss and the development of DKA.

The inmates management plan resulted in widely variable blood glucose values from May 1999 through October 1999 with values ranging from 42 to greater than 500 mg/dl. In addition, the inmate made repeated requests for insulin adjustment to reduce the risk of recurrent hypoglycemia. Treatment of hypoglycemia was also inconsistent with no specific plan put in place to reduce either frequency or severity of these events or address the underlying causes. It is unclear to what degree staff had been trained on insulin use and adjustment.

Other areas of care that are not consistent with the minimum standard for care for type 1 diabetes include the following

- o   Limitations on frequency of self monitored blood glucose results – for interval at or around Oct 99 no specific orders in place for use of SMBG although prior insulin/SMBG orders had been documented as "discontinued"
- o   No changes insulin dose in the interval prior to the occurrence of diabetic ketoacidosis (DKA) – a disorder associated with hospital mortality rates of > 5%

It should be noted that this review did not identify a clear association between either the client's activities or the care delivered by DOC staff that clearly account for the episode of DKA. Nor were any specific causal features identified that clearly lead to the profound weight loss experienced during this interval.

Overall, the care of Mr. Musselman does not, in my opinion, meet even minimum standards for care of diabetes in a correctional facility. My review of the available records confirm that he did not consistently receive "usual and customary" care including regular SMBG, appropriate insulin therapy, proper treatment of hypoglycemia or appropriate interval screening for microvascular complications of diabetes. It should be noted that the care recommendations outlined in the ADA position statement is by no means comprehensive, but rather identifies the minimal acceptable care for those with diabetes.

Thank you for the opportunity to review these records.  Please feel free to contact me with any additional questions or concerns.   I would be happy to provide additional comments or provide further review if needed.

With kind regards,

David M. Kendall, MD
*Chief of Clinical Services and Medical Director*
*International Diabetes Center*
*Park Nicollet Clinic – Minneapolis, MN*

**POSITION STATEMENT**

# Diabetes Management in Correctional Institutions

AMERICAN DIABETES ASSOCIATION

At any given time, over 2 million people are incarcerated in prisons and jails in the U.S (1). It is estimated that nearly 80,000 of these inmates have diabetes, a prevalence of 4.8% (2). In addition, many more people pass through the corrections system in a given year. In 1998 alone, over 11 million people were released from prison to the community (1). The current estimated prevalence of diabetes in correctional institutions is somewhat lower than the overall U.S. prevalence of diabetes, perhaps because the incarcerated population is younger than the general population. The prevalence of diabetes and its related comorbidities and complications, however, will continue to increase in the prison population as current sentencing guidelines continue to increase the number of aging prisoners and the incidence of diabetes in young people continues to increase.

People with diabetes in correctional facilities should receive care that meets national standards. Correctional institutions have unique circumstances that need to be considered so that all standards of care may be achieved (3). Correctional institutions should have written policies and procedures for the management of diabetes and for training of medical and correctional staff in diabetes care practices. These policies must take into consideration issues such as security needs, transfer from one facility to another, and access to medical personnel and equipment, so that all appropriate levels of care are provided. Ideally, these policies should encourage or at least allow patients to self-manage their diabetes. Ultimately, diabetes management is dependent upon having access to needed medical personnel and equipment. Ongoing diabetes therapy is important in order to reduce the risk of later complications, including cardiovascular events, visual loss, renal failure, and amputation. Early identification and intervention for people with diabetes is also likely to reduce short-term risks for acute complications requiring transfer out of the facility, thus improving security.

This document provides a general set of guidelines for diabetes care in correctional institutions. It is not designed to be a diabetes management manual. More detailed information on the management of diabetes and related disorders can be found in the American Diabetes Association (ADA) Clinical Practice Recommendations, published each year in January as the first supplement to *Diabetes Care*, as well as the "Standards of Medical Care in Diabetes" (4) contained therein. This discussion will focus on those areas where the care of people with diabetes in correctional facilities may differ, and specific recommendations are made at the end of each section.

## INTAKE MEDICAL ASSESSMENT

### Reception screening

Reception screening should emphasize patient safety. In particular, rapid identification of all insulin-treated persons with diabetes is essential in order to identify those at highest risk for hypo- and hyperglycemia and diabetic ketoacidosis (DKA). All insulin-treated patients should have a capillary blood glucose (CBG) determination within 1–2 h of arrival. Signs and symptoms of hypo- or hyperglycemia can often be confused with intoxication or withdrawal from drugs or alcohol. Individuals with diabetes exhibiting signs and symptoms consistent with hypoglycemia, particularly altered mental status, agitation, combativeness, and diaphoresis, should have finger-stick blood glucose levels measured immediately.

### Intake screening

Patients with a diagnosis of diabetes should have a complete medical history and physical examination by a licensed health care provider with prescriptive authority in a timely manner. If one is not available on site, one should be consulted by those performing reception screening. The purposes of this history and physical examination are to determine the type of diabetes, current therapy, alcohol use, and behavioral health issues, as well as to screen for the presence of diabetes-related complications. The evaluation should review the previous treatment and the past history of both glycemic control and diabetes complications. It is essential that medication and medical nutrition therapy (MNT) be continued without interruption upon entry into the correctional system, as a hiatus in either medication or appropriate nutrition may lead to either severe hypo- or hyperglycemia that can rapidly progress to irreversible complications, even death.

### Intake physical examination and laboratory

All potential elements of the initial medical evaluation are included in Table 5 of the ADA's "Standards of Medical Care in Diabetes," referred to hereafter as the "Standards of Care" (4). The essential components of the initial history and physical examination are detailed in Fig. 1. Referrals should be made immediately if the patient with diabetes is pregnant.

### Recommendations

- Patients with a diagnosis of diabetes should have a complete medical history and undergo an intake physical examination by a licensed health professional in a timely manner. (E)
- Insulin-treated patients should have a CBG determination within 1–2 h of arrival. (E)
- Medications and MNT should be continued without interruption upon entry into the correctional environment. (E)

## SCREENING FOR DIABETES—

Consistent with the ADA Standards of Care, patients should be evaluated for diabetes risk factors at the intake physical and at appropriate times thereafter. Those

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Originally approved 1989. Most recent review, 2006.

**Abbreviations:** CBG, capillary blood glucose; DKA, diabetic ketoacidosis; GDM, gestational diabetes mellitus; MNT, medical nutrition therapy.

DOI: 10.2337/dc07-S077

© 2007 by the American Diabetes Association.

*Correctional Institutions*

Within 1-2 hrs.



RECEPTION SCREENING

·Identify all inmates with diabetes currently using insulin therapy or at high risk for hypoglycemia
· ALL insulin treated patients: screening CBG and urine ketone test (as clinically indicated)
· Any patient exhibiting signs/symptoms consistent with hypoglycemia: immediate CBG
·Continue usual meal schedule and medication administration

Within 2-24 hrs.

INTAKE SCREENING

·Type and duration of diabetes          ·Assess alcohol use
·Confirm current therapy                ·Identify behavioral health issues
·Presence of complications                such as depression, distress, suicidal ideation
·Family history                         ·Assess prior diabetes educa
·Pregnancy screen in all female patients
  of childbearing age with diabetes

*All subjects with diabetes should have physician evaluation. If no physician available, physician should be consulted.*

Within 2 hrs. – 2 weeks

INTAKE PHYSICAL EXAM
LABORATORY/COMPLICATIONS SCREENING

Complete exam including:          Laboratory studies:
·Height, weight                   ·A1C and glucose
·Blood pressure                   ·Lipid Profile
·Eye (retinal) exam               ·Microalbumin screen (Alb/Cr ratio)
·Cardiac                          ·Urine ketones (as clinically indicated)
·Peripheral pulses                ·AST/ALT (as clinically indicated)
·Foot and neurologic exam         ·Creatinine (as clinically indicated)

**Figure 1**—*Essential components of the initial history and physical examination. Alb/Cr ratio, albumin-to-creatinine ratio; ALT, alanine aminotransferase; AST, aspartate aminotransferase.*

who are at high risk should be considered for blood glucose screening. If pregnant, a risk assessment for gestational diabetes mellitus (GDM) should be undertaken at the first prenatal visit. Patients with clinical characteristics consistent with a high risk for GDM should undergo glucose testing as soon as possible. High-risk women not found to have GDM at the initial screening and average-risk women should be tested between 24 and 28 weeks of gestation. For more detailed information on screening for both type 2 and gestational diabetes, see the ADA Position Statement "Screening for Type 2 Diabetes" (5) and the Standards of Care (4).

**MANAGEMENT PLAN**— Glycemic control is fundamental to the management of diabetes. A management plan to achieve normal or near-normal glycemia with an A1C goal of <7% should be developed for diabetes management at the time of initial medical evaluation. Goals should be individualized (4), and less stringent treatment goals may be appropriate for patients with a history of severe hypoglycemia, patients with limited life expectancies, elderly adults, and individuals with comorbid conditions (4). This plan should be documented in the patient's record and communicated to all persons involved in his/her care, including security staff. Table 1, taken from the ADA Standards of Care, provides a summary of recommendations for setting glycemic control goals for adults with diabetes.

People with diabetes should ideally receive medical care from a physician-coordinated team. Such teams include, but are not limited to, physicians, nurses, dietitians, and mental health professionals with expertise and a special interest in diabetes. It is essential in this collaborative and integrated team approach that individuals with diabetes assume as active a role in their care as possible. Diabetes self-management education is an integral component of care. Patient self-management should be emphasized, and the plan should encourage the involvement of the patient in problem solving as much as possible.

It is helpful to house insulin-treated patients in a common unit, if this is possible, safe, and consistent with providing access to other programs at the correctional institution. Common housing not only can facilitate mealtimes and medication administration, but also potentially provides an opportunity for diabetes self-management education to be reinforced by fellow patients.

**NUTRITION AND FOOD SERVICES**— Nutrition counseling and menu planning are an integral part of the multidisciplinary approach to diabetes management in correctional facilities. A combination of education, interdisciplinary communication, and monitoring food intake aids patients in understanding their medical nutritional needs and can facilitate diabetes control during and after incarceration.

Nutrition counseling for patients with diabetes is considered an essential component of diabetes self-management. People with diabetes should receive individualized MNT as needed to achieve treatment goals, preferably provided by a registered dietitian familiar with the components of MNT for persons with diabetes.

Table 1—*Summary of recommendations for adults with diabetes*

| | |
|---|---|
| **Glycemic control** | |
| A1C | <7.0%* |
| Preprandial capillary plasma glucose | 90–130 mg/dl (5.0–7.2 mmol/l) |
| Peak postprandial capillary plasma glucose† | <180 mg/dl (<10.0 mmol/l) |
| Blood pressure | <130/80 mmHg |
| | |
| **Lipids‡** | |
| LDL | <100 mg/dl (<2.6 mmol/l) |
| Triglycerides | <150 mg/dl (<1.7 mmol/l) |
| HDL | >40 mg/dl (>1.0 mmol/l)§ |

Key concepts in setting glycemic goals:
- A1C is the primary target for glycemic control
- Goals should be individualized
- Certain populations (children, pregnant women, and elderly) require special consideration
- More stringent glycemic goals (i.e., a normal A1C, <6%) may further reduce complications at the cost of increased risk of hypoglycemia
- Less intensive glycemic goals may be indicated in patients with severe or frequent hypoglycemia
- Postprandial glucose may be targeted if A1C goals are not met despite reaching preprandial glucose goals

*Referenced to a nondiabetic range of 4.0–6.0% using a DCCT-based assay. †Postprandial glucose measurements should be made 1–2 h after the beginning of the meal, generally peak levels in patients with diabetes. ‡Current NCEP/ATP III guidelines suggest that in patients with triglycerides ≥200 mg/dl, the "non-HDL cholesterol" (total cholesterol minus HDL) be utilized. The goal is ≤130 mg/dl (121). §For women, it has been suggested that the HDL goal be increased by 10 mg/dl.

Educating the patient, individually or in a group setting, about how carbohydrates and food choices directly affect diabetes control is the first step in facilitating self-management. This education enables the patient to identify better food selections from those available in the dining hall and commissary. Such an approach is more realistic in a facility where the patient has the opportunity to make food choices.

The easiest and most cost-effective means to facilitate good outcomes in patients with diabetes is instituting a heart-healthy diet as the master menu (6). There should be consistent carbohydrate content at each meal, as well as a means to identify the carbohydrate content of each food selection. Providing carbohydrate content of food selections and/or providing education in assessing carbohydrate content enables patients to meet the requirements of their individual MNT goals. Commissaries should also help in dietary management by offering healthy choices and listing the carbohydrate content of foods.

The use of insulin or oral medications may necessitate snacks in order to avoid hypoglycemia. These snacks are a part of such patients' medical treatment plans and should be prescribed by medical staff.

Timing of meals and snacks must be coordinated with medication administration as needed to minimize the risk of hypoglycemia, as discussed more fully in the MEDICATION section of this document. For further information, see the ADA Position Statement "Nutrition Principles and Recommendations in Diabetes" (7).

## URGENT AND EMERGENCY ISSUES —
All patients must have access to prompt treatment of hypo- and hyperglycemia. Correctional staff should be trained in the recognition and treatment of hypo- and hyperglycemia, and appropriate staff should be trained to administer glucagon. After such emergency care, patients should be referred for appropriate medical care to minimize risk of future decompensation.

Institutions should implement a policy requiring staff to notify a physician of all CBG results outside of a specified range, as determined by the treating physician (e.g., <50 or >350 mg/dl).

### Hyperglycemia
Severe hyperglycemia in a person with diabetes may be the result of intercurrent illness, missed or inadequate medication, or corticosteroid therapy. Correctional institutions should have systems in place to identify and refer to medical staff all patients with consistently elevated blood glucose as well as intercurrent illness.

The stress of illness in those with type 1 diabetes frequently aggravates glycemic control and necessitates more frequent monitoring of blood glucose (e.g., every 4–6 h). Marked hyperglycemia requires temporary adjustment of the treatment program and, if accompanied by ketosis, interaction with the diabetes care team. Adequate fluid and caloric intake must be ensured. Nausea or vomiting accompanied with hyperglycemia may indicate DKA, a life-threatening condition that requires immediate medical care to prevent complications and death. Correctional institutions should identify patients with type 1 diabetes who are at risk for DKA, particularly those with a prior history of frequent episodes of DKA. For further information see "Hyperglycemic Crisis in Diabetes" (8).

### Hypoglycemia
Hypoglycemia is defined as a blood glucose level <60 mg/dl. Severe hypoglycemia is a medical emergency defined as hypoglycemia requiring assistance of a third party and is often associated with mental status changes that may include confusion, incoherence, combativeness, somnolence, lethargy, seizures, or coma. Signs and symptoms of severe hypoglycemia can be confused with intoxication or withdrawal. Individuals with diabetes exhibiting signs and symptoms consistent with hypoglycemia, particularly altered mental status, agitation, and diaphoresis, should have their CBG levels checked immediately.

Security staff who supervise patients at risk for hypoglycemia (i.e., those on insulin or oral hypoglycemic agents) should be educated in the emergency response protocol for recognition and treatment of hypoglycemia. Every attempt should be made to document CBG before treatment. Patients must have immediate access to glucose tablets or other glucose-containing foods. Hypoglycemia can generally be treated by the patient with oral carbohydrates. If the patient cannot be relied on to keep hypoglycemia treatment on his/her person, staff members should have ready access to glucose tablets or equivalent. In general, 15–20 g oral glucose will be adequate to treat hypoglycemic events. CBG and treatment should be re-

*Correctional Institutions*

peated at 15-min intervals until blood glucose levels return to normal (>70 mg/dl).

Staff should have glucagon for intramuscular injection or glucose for intravenous infusion available to treat severe hypoglycemia without requiring transport of the hypoglycemic patient to an outside facility. Any episode of severe hypoglycemia or recurrent episodes of mild to moderate hypoglycemia require reevaluation of the diabetes management plan by the medical staff. In certain cases of unexplained or recurrent severe hypoglycemia, it may be appropriate to admit the patient to the medical unit for observation and stabilization of diabetes management.

Correctional institutions should have systems in place to identify the patients at greater risk for hypoglycemia (i.e., those on insulin or sulfonylurea therapy) and to ensure the early detection and treatment of hypoglycemia. If possible, patients at greater risk of severe hypoglycemia (e.g., those with a prior episode of severe hypoglycemia) may be housed in units closer to the medical unit in order to minimize delay in treatment.

**Recommendations**
- Train correctional staff in the recognition, treatment, and appropriate referral for hypo- and hyperglycemia. (E)
- Train appropriate staff to administer glucagon. (E)
- Train staff to recognize symptoms and signs of serious metabolic decompensation, and immediately refer the patient for appropriate medical care. (E)
- Institutions should implement a policy requiring staff to notify a physician of all CBG results outside of a specified range, as determined by the treating physician (e.g., <50 or >350 mg/dl). (E)
- Identify patients with type 1 diabetes who are at high risk for DKA. (E)

**MEDICATION** — Formularies should provide access to usual and customary oral medications and insulins necessary to treat diabetes and related conditions. While not every brand name of insulin and oral medication needs to be available, individual patient care requires access to short-, medium-, and long-acting insulins and the various classes of oral medications (e.g., insulin secretagogues, biguanides, α-glucosidase inhibitors, and thiazolidinediones) necessary for current diabetes management.

Patients at all levels of custody should have access to medication at dosing frequencies that are consistent with their treatment plan and medical direction. If feasible and consistent with security concerns, patients on multiple doses of short-acting oral medications should be placed in a "keep on person" program. In other situations, patients should be permitted to self-inject insulin when consistent with security needs. Medical department nurses should determine whether patients have the necessary skill and responsible behavior to be allowed self-administration and the degree of supervision necessary. When needed, this skill should be a part of patient education. Reasonable syringe control systems should be established.

In the past, the recommendation that regular insulin be injected 30–45 min before meals presented a significant problem when "lock downs" or other disruptions to the normal schedule of meals and medications occurred. The use of multiple-dose insulin regimens using rapid-acting analogs can decrease the disruption caused by such changes in schedule. Correctional institutions should have systems in place to ensure that rapid-acting insulin analogs and oral agents are given immediately before meals if this is part of the patient's medical plan. It should be noted however that even modest delays in meal consumption with these agents can be associated with hypoglycemia. If consistent access to food within 10 min cannot be ensured, rapid-acting insulin analogs and oral agents are approved for administration during or immediately after meals. Should circumstances arise that delay patient access to regular meals following medication administration, policies and procedures must be implemented to ensure the patient receives appropriate nutrition to prevent hypoglycemia.

Both continuous subcutaneous insulin infusion and multiple daily insulin injection therapy (consisting of three or more injections a day) can be effective means of implementing intensive diabetes management with the goal of achieving near-normal levels of blood glucose (9). While the use of these modalities may be difficult in correctional institutions, every effort should be made to continue multiple daily insulin injection or continuous subcutaneous insulin infusion in people who were using this therapy before incarceration or to institute these therapies as indicated in order to achieve blood glucose targets.

It is essential that transport of patients from jails or prisons to off-site appointments, such as medical visits or court appearances, does not cause significant disruption in medication or meal timing. Correctional institutions and police lockups should implement policies and procedures to diminish the risk of hypo- and hyperglycemia by, for example, providing carry-along meals and medication for patients traveling to off-site appointments or changing the insulin regimen for that day. The availability of prefilled insulin "pens" provides an alternative for off-site insulin delivery.

**Recommendations**
- Formularies should provide access to usual and customary oral medications and insulins to treat diabetes and related conditions. (E)
- Patients should have access to medication at dosing frequencies that are consistent with their treatment plan and medical direction. (E)
- Correctional institutions and police lock-ups should implement policies and procedures to diminish the risk of hypo- and hyperglycemia during off-site travel (e.g., court appearances). (E)

**ROUTINE SCREENING FOR AND MANAGEMENT OF DIABETES COMPLICATIONS** — All patients with a diagnosis of diabetes should receive routine screening for diabetes-related complications, as detailed in the ADA Standards of Care (4). Interval chronic disease clinics for persons with diabetes provide an efficient mechanism to monitor patients for complications of diabetes. In this way, appropriate referrals to consultant specialists, such as optometrists/ophthalmologists, nephrologists, and cardiologists, can be made on an as-needed basis and interval laboratory testing can be done.

The following complications should be considered.

- Foot care: Recommendations for foot care for patients with diabetes and no history of an open foot lesion are described in the ADA Standards of Care. A comprehensive foot examination is recommended annually for all patients with diabetes to identify risk factors predictive of ulcers and amputations. Persons with an insensate foot, an open foot lesion, or a history of such a lesion should be referred for evaluation by an appropriate licensed health profes-

sional (e.g., podiatrist or vascular surgeon). Special shoes should be provided as recommended by licensed health professionals to aid healing of foot lesions and to prevent development of new lesions.

- Retinopathy: Annual retinal examinations by a licensed eye care professional should be performed for all patients with diabetes, as recommended in the ADA Standards of Care. Visual changes that cannot be accounted for by acute changes in glycemic control require prompt evaluation by an eye care professional.
- Nephropathy: An annual spot urine test for determination of microalbumin-to-creatinine ratio should be performed. The use of ACE inhibitors or angiotensin receptor blockers is recommended for all patients with albuminuria. Blood pressure should be controlled to <130/80 mmHg.
- Cardiac: People with type 2 diabetes are at a particularly high risk of coronary artery disease. Cardiovascular disease risk factor management is of demonstrated benefit in reducing this complication in patients with diabetes. Blood pressure should be measured at every routine diabetes visit. In adult patients, test for lipid disorders at least annually and as needed to achieve goals with treatment. Use aspirin therapy (75–162 mg/day) in all adult patients with diabetes and cardiovascular risk factors or known macrovascular disease. Current national standards for adults with diabetes call for treatment of lipids to goals of LDL ≤100, HDL >40, triglycerides <150 mg/dl and blood pressure to a level of <130/80 mmHg.

## MONITORING/TESTS OF GLYCEMIA — Monitoring of CBG is a strategy that allows caregivers and people with diabetes to evaluate diabetes management regimens. The frequency of monitoring will vary by patients' glycemic control and diabetes regimens. Patients with type 1 diabetes are at risk for hypoglycemia and should have their CBG monitored three or more times daily. Patients with type 2 diabetes on insulin need to monitor at least once daily and more frequently based on their medical plan. Patients treated with oral agents should have CBG monitored with sufficient frequency to facilitate the goals of glycemic control, assuming that there is a program for medical review of these data on an

ongoing basis to drive changes in medications. Patients whose diabetes is poorly controlled or whose therapy is changing should have more frequent monitoring. Unexplained hyperglycemia in a patient with type 1 diabetes may suggest impending DKA, and monitoring of ketones should therefore be performed.

Glycated hemoglobin (A1C) is a measure of long-term (2- to 3-month) glycemic control. Perform the A1C test at least two times a year in patients who are meeting treatment goals (and who have stable glycemic control) and quarterly in patients whose therapy has changed or who are not meeting glycemic goals.

Discrepancies between CBG monitoring results and A1C may indicate a hemoglobinopathy, hemolysis, or need for evaluation of CBG monitoring technique and equipment or initiation of more frequent CBG monitoring to identify when glycemic excursions are occurring and which facet of the diabetes regimen is changing.

In the correctional setting, policies and procedures need to be developed and implemented regarding CBG monitoring that address the following.

- Infection control
- Education of staff and patients
- Proper choice of meter
- Disposal of testing lancets
- Quality control programs
- Access to health services
- Size of the blood sample
- Patient performance skills
- Documentation and interpretation of test results
- Availability of test results for the health care provider (10)

### Recommendations
- In the correctional setting, policies and procedures need to be developed and implemented to enable CBG monitoring to occur at the frequency necessitated by the individual patient's glycemic control and diabetes regimen. (E)
- A1C should be checked every 3–6 months. (E)

## SELF-MANAGEMENT EDUCATION — Self-management education is the cornerstone of treatment for all people with diabetes. The health staff must advocate for patients to participate in self-management as much as possible. Individuals with diabetes who learn

self-management skills and make lifestyle changes can more effectively manage their diabetes and avoid or delay complications associated with diabetes. In the development of a diabetes self-management education program in the correctional environment, the unique circumstances of the patient should be considered while still providing, to the greatest extent possible, the elements of the "National Standards for Diabetes Self-Management Education" (11). A staged approach may be used depending on the needs assessment and the length of incarceration. Table 2 sets out the major components of diabetes self-management education. Survival skills should be addressed as soon as possible; other aspects of education may be provided as part of an ongoing education program.

Ideally, self-management education is coordinated by a certified diabetes educator who works with the facility to develop polices, procedures, and protocols to ensure that nationally recognized education guidelines are implemented. The educator is also able to identify patients who need diabetes self-management education, including an assessment of the patients' medical, social, and diabetes histories; diabetes knowledge, skills, and behaviors; and readiness to change.

## STAFF EDUCATION — Policies and procedures should be implemented to ensure that the health care staff has adequate knowledge and skills to direct the management and education of persons with diabetes. The health care staff needs to be involved in the development of the correctional officers' training program. The staff education program should be at a lay level. Training should be offered at least biannually, and the curriculum should cover the following.

- What is diabetes
- Signs and symptoms of diabetes
- Risk factors
- Signs and symptoms of, and emergency response to, hypo- and hyperglycemia
- Glucose monitoring
- Medications
- Exercise
- Nutrition issues including timing of meals and access to snacks

### Recommendations
- Include diabetes in correctional staff education programs. (E)

*Correctional Institutions*

Table 2—*Major components of diabetes self-management education*

| Survival skills | Daily management issues |
|---|---|
| • Hypo-/hyperglycemia | • Disease process |
| • Sick day management | • Nutritional management |
| • Medication | • Physical activity |
| • Monitoring | • Medications |
| • Foot care | • Monitoring |
| | • Acute complications |
| | • Risk reduction |
| | • Goal setting/problem solving |
| | • Psychosocial adjustment |
| | • Preconception care/pregnancy/gestational diabetes management |

**ALCOHOL AND DRUGS**— Patients with diabetes who are withdrawing from drugs and alcohol need special consideration. This issue particularly affects initial police custody and jails. At an intake facility, proper initial identification and assessment of these patients are critical. The presence of diabetes may complicate detoxification. Patients in need of complicated detoxification should be referred to a facility equipped to deal with high-risk detoxification. Patients with diabetes should be educated in the risks involved with smoking. All inmates should be advised not to smoke. Assistance in smoking cessation should be provided as practical.

**TRANSFER AND DISCHARGE**— Patients in jails may be housed for a short period of time before being transferred or released, and it is not unusual for patients in prison to be transferred within the system several times during their incarceration. One of the many challenges that health care providers face working in the correctional system is how to best collect and communicate important health care information in a timely manner when a patient is in initial police custody, is jailed short term, or is transferred from facility to facility. The importance of this communication becomes critical when the patient has a chronic illness such as diabetes.

Transferring a patient with diabetes from one correctional facility to another requires a coordinated effort. To facilitate a thorough review of medical information and completion of a transfer summary, it is critical for custody personnel to provide medical staff with sufficient notice before movement of the patient.

Before the transfer, the health care staff should review the patient's medical record and complete a medical transfer summary that includes the patient's current health care issues. At a minimum, the summary should include the following.

• The patient's current medication schedule and dosages
• The date and time of the last medication administration
• Any recent monitoring results (e.g., CBG and A1C)
• Other factors that indicate a need for immediate treatment or management at the receiving facility (e.g., recent episodes of hypoglycemia, history of severe hypoglycemia or frequent DKA, concurrent illnesses, presence of diabetes complications)
• Information on scheduled treatment/ appointments if the receiving facility is responsible for transporting the patient to that appointment
• Name and telephone/fax number of a contact person at the transferring facility who can provide additional information, if needed

The medical transfer summary, which acts as a quick medical reference for the receiving facility, should be transferred along with the patient. To supplement the flow of information and to increase the probability that medications are correctly identified at the receiving institution, sending institutions are encouraged to provide each patient with a medication card to be carried by the patient that contains information concerning diagnoses, medication names, dosages, and frequency. Diabetes supplies, including diabetes medication, should accompany the patient.

The sending facility must be mindful of the transfer time in order to provide the patient with medication and food if needed. The transfer summary or medical record should be reviewed by a health care provider upon arrival at the receiving institution.

Planning for patients' discharge from prisons should include instruction in the long-term complications of diabetes, the necessary lifestyle changes and examinations required to prevent these complications, and, if possible, where patients may obtain regular follow-up medical care. A quarterly meeting to educate patients with upcoming discharges about community resources can be valuable. Inviting community agencies to speak at these meetings and/or provide written materials can help strengthen the community link for patients discharging from correctional facilities.

Discharge planning for the patients with diabetes should begin 1 month before discharge. During this time, application for appropriate entitlements should be initiated. Any gaps in the patient's knowledge of diabetes care need to be identified and addressed. It is helpful if the patient is given a directory or list of community resources and if an appointment for follow-up care with a community provider is made. A supply of medication adequate to last until the first postrelease medical appointment should be provided to the patient upon release. The patient should be provided with a written summary of his/her current health care issues, including medications and doses, recent A1C values, etc.

**Recommendations**
• For all interinstitutional transfers, complete a medical transfer summary to be transferred with the patient. (E)
• Diabetes supplies and medication should accompany the patient during transfer. (E)
• Begin discharge planning with adequate lead time to insure continuity of care and facilitate entry into community diabetes care. (E)

**SHARING OF MEDICAL INFORMATION AND RECORDS**— Practical considerations may prohibit obtaining medical records from providers who treated the patient before arrest. Intake facilities should implement policies that *1)* define the circumstances under which prior medical records are obtained (e.g., for patients who have an extensive history of treatment for complications); *2)* identify person(s) responsible for contacting the prior

provider; and 3) establish procedures for tracking requests.

Facilities that use outside medical providers should implement policies and procedures for ensuring that key information (e.g., test results, diagnoses, physicians' orders, appointment dates) is received from the provider and incorporated into the patient's medical chart after each outside appointment. The procedure should include, at a minimum, a means to highlight when key information has not been received and designation of a person responsible for contacting the outside provider for this information.

All medical charts should contain CBG test results in a specified, readily accessible section and should be reviewed on a regular basis.

## CHILDREN AND ADOLESCENTS WITH DIABETES

Children and adolescents with diabetes present special problems in disease management, even outside the setting of a correctional institution. Children and adolescents with diabetes should have initial and follow-up care with physicians who are experienced in their care. Confinement increases the difficulty in managing diabetes in children and adolescents, as it does in adults with diabetes. Correctional authorities also have different legal obligations for children and adolescents.

### Nutrition and activity

Growing children and adolescents have greater caloric/nutritional needs than adults. The provision of an adequate amount of calories and nutrients for adolescents is critical to maintaining good nutritional status. Physical activity should be provided at the same time each day. If increased physical activity occurs, additional CBG monitoring is necessary and additional carbohydrate snacks may be required.

### Medical management and follow-up

Children and adolescents who are incarcerated for extended periods should have follow-up visits at least every 3 months with individuals who are experienced in the care of children and adolescents with diabetes. Thyroid function tests and fasting lipid and microalbumin measurements should be performed according to recognized standards for children and adolescents (12) in order to monitor for autoimmune thyroid

disease and complications and comorbidities of diabetes.

Children and adolescents with diabetes exhibiting unusual behavior should have their CBG checked at that time. Because children and adolescents are reported to have higher rates of nocturnal hypoglycemia (13), consideration should be given regarding the use of episodic overnight blood glucose monitoring in these patients. In particular, this should be considered in children and adolescents who have recently had their overnight insulin dose changed.

## PREGNANCY

Pregnancy in a woman with diabetes is by definition a high-risk pregnancy. Every effort should be made to ensure that treatment of the pregnant woman with diabetes meets accepted standards (14,15). It should be noted that glycemic standards are more stringent, the details of dietary management are more complex and exacting, insulin is the only antidiabetic agent approved for use in pregnancy, and a number of medications used in the management of diabetic comorbidities are known to be teratogenic and must be discontinued in the setting of pregnancy.

## SUMMARY AND KEY POINTS

People with diabetes should receive care that meets national standards. Being incarcerated does not change these standards. Patients must have access to medication and nutrition needed to manage their disease. In patients who do not meet treatment targets, medical and behavioral plans should be adjusted by health care professionals in collaboration with the prison staff. It is critical for correctional institutions to identify particularly high-risk patients in need of more intensive evaluation and therapy, including pregnant women, patients with advanced complications, a history of repeated severe hypoglycemia, or recurrent DKA.

A comprehensive, multidisciplinary approach to the care of people with diabetes can be an effective mechanism to improve overall health and delay or prevent the acute and chronic complications of this disease.

**Acknowledgments**— The following members of the American Diabetes Association/ National Commission on Correctional Health Care Joint Working Group on Diabetes Guide-

lines for Correctional Institutions contributed to the revision of this document: Daniel L. Lorber, MD, FACP, CDE (chair); R. Scott Chavez, MPA, PA-C; Joanne Dorman, RN, CDE, CCHP-A; Lynda K. Fisher, MD; Stephanie Guerken, RD, CDE; Linda B. Haas, CDE, RN; Joan V. Hill, CDE, RD; David Kendall, MD; Michael Puisis, DO; Kathy Salomone, CDE, MSW, APRN; Ronald M. Shansky, MD, MPH; and Barbara Wakeen, RD, LD.

## References

1. National Commission on Correctional Health Care: *The Health Status of Soon-to-Be Released Inmates: A Report to Congress.* Vol. 1. Chicago, NCCHC, 2002
2. Hornung CA, Greifinger RB, Gadre S: *A Projection Model of the Prevalence of Selected Chronic Diseases in the Inmate Population.* Vol. 2. Chicago, NCCHC, 2002, p. 39–56
3. Puisis M: Challenges of improving quality in the correctional setting. In *Clinical Practice in Correctional Medicine.* St. Louis, MO, Mosby-Yearbook, 1998, p. 16–18
4. American Diabetes Association: Standards of medical care in diabetes—2007 (Position Statement). *Diabetes Care* 30 (Suppl. 1):S4–S41, 2007
5. American Diabetes Association: Screening for type 2 diabetes (Position Statement). *Diabetes Care* 27 (Suppl. 1):S11–S14, 2004
6. Krauss RM, Eckel RH, Howard B, Appel LJ, Daniels SR, Deckelbaum RJ, Erdman JW Jr, Kris-Etherton P, Goldberg IJ, Kotchen TA, Lichtenstein AH, Mitch WE, Mullis R, Robinson K, Wylie-Rosett J, St Jeor S, Suttie J, Tribble DL, Bazzarre TL: American Heart Association Dietary Guidelines: revision 2000: a statement for healthcare professionals from the Nutrition Committee of the American Heart Association. *Stroke* 31:2751–2766, 2000
7. American Diabetes Association: Nutrition recommendations and interventions for diabetes (Position Statement). *Diabetes Care* 30 (Suppl. 1):S48–S65, 2007
8. American Diabetes Association: Hyperglycemic crisis in diabetes (Position Statement). *Diabetes Care* 27 (Suppl. 1):S94–S102, 2004
9. American Diabetes Association: Continuous subcutaneous insulin infusion (Position Statement). *Diabetes Care* 27 (Suppl. 1):S110, 2004
10. American Diabetes Association: Tests of glycemia in diabetes (Position Statement). *Diabetes Care* 27 (Suppl. 1):S91–S93, 2004
11. American Diabetes Association: National standards for diabetes self-management education (Standards and Review Criteria). *Diabetes Care* 30 (Suppl. 1):S96–S103, 2007
12. International Society for Pediatric and Adolescent Diabetes: *Consensus Guidelines 2000: ISPAD Consensus Guidelines for the*

*Correctional Institutions*

*Management of Type 1 Diabetes Mellitus in Children and Adolescents.* Zeist, Netherlands, Medical Forum International, 2000, p. 116, 118

13. Kaufman FR, Austin J, Neinstein A, Jeng L, Halyorson M, Devoe DJ, Pitukcheewanont

P: Nocturnal hypoglycemia detected with the continuous glucose monitoring system in pediatric patients with type 1 diabetes. *J Pediatr* 141:625–630, 2002

14. American Diabetes Association: Gestational diabetes mellitus (Position State-

ment). *Diabetes Care* 27 (Suppl. 1):S88–S90, 2004

15. Jovanovic L (Ed.): *Medical Management of Pregnancy Complicated by Diabetes.* 3rd ed. Alexandria, VA, American Diabetes Association, 2000

EXHIBIT #2

November 26, 2014

**VIA FACSIMILE AND U.S. MAIL TO:**

Michael E. Gottfried
Assistant Attorney General
1275 West Washington
Phoenix, AZ 85007
Fax: (602) 542-7670

      Re:    *Inmate John Musselman - Request for a Continuous Glucose Monitor and*
               *Insulin Pump*

Dear Mr. Gottfried:

    As you are aware, this firm represents John Musselman who is an inmate in the Arizona Department of Corrections ("ADOC"). We have previously sought for ADOC to provide Mr. Musselman with a continuous glucose monitor ("CGM"). As previously explained, Mr. Musselman has a condition called "hypoglycemic unawareness" that no longer allows him to recognize the symptoms of low blood glucose even when it reaches dangerous levels. This has resulted in Mr. Musselman experiencing life threatening episodes of hypoglycemia.

    Attached as Exhibit 1 is an analysis performed by Dr. Amir Harari, a Board Certified Endocrinologist.[1] Dr. Harari confirms that Mr. Musselman suffers from hypoglycemic unawareness. He also concludes that a CGM is the only adequate way to significantly reduce the risk of Mr. Musselman experiencing future episodes of hypoglycemia. He further recommends that an insulin pump be provided to Mr. Mussleman so that his blood glucose levels remain stable.

    As you are aware, the Director of ADOC has a duty to provide adequate medical care to the inmates in his custody. Here, Mr. Musselman faces serious energy or death every time his blood sugar falls below safe levels. The only real medical solution is the CGM. Further, an insulin pump allows Mr. Musselman to maintain stable blood glucose levels.

---

[1] Dr. Harari's CV is attached as Exhibit **A**

fowler|st.clair

We did not receive an answer to our client's prior request for a CGM. Instead, we were simply told that ADOC and Corizon would look into the issue. As such, we need to have an answer to our client's request for a CGM and insulin pump within thirty days from the date of this letter. If we do not receive an answer in this time, our client will assume that ADOC will not be providing the items that are necessary for his medical care and will proceed accordingly.

Sincerely,

Sean P. St. Clair
stclair@fowlerstclair.com
480.359.7206

12

21

# EXHIBIT A

November 10, 2014

Sean St. Clair

Fowler St. Clair, PLLC

1201 S Alma School Rd

Suite 10850

Mesa, AZ  85210


Mr. St. Clair,


I had the opportunity to review Mr. John Musselman's medical records going back to 2007 as well as interview him on October 21, 2014.  I am summarizing the findings of my interview, records review, and literature review in this letter.

Mr. Musselman was diagnosed with type 1 Diabetes Mellitus in 1985 at the age of 11 when he presented with significant weight loss, frequent thirst and urination, and was found to have a condition called Diabetic Ketoacidosis, the result of his pancreas losing the ability to produce insulin.  He was started on 2 types of insulin at that time: regular and Neutral Protamine Hagedorn (NPH).  Early on in his disease process he did not have good control and would often have high blood sugars.  However, over time and with changes in his eating habits, insulin dosing, and more knowledge of his disease, he was able to attain better control.  His most recent Hemoglobin A1c (A1c) which is a 3 month average of blood sugar control was very good at 6.5.  However, this is misleading as frequent low blood sugars will often make the A1c appear low and this does not necessarily mean that a patient's blood sugar control is good.

His current insulin regimen consists of a dose of 8 units regular insulin at approximately 7 AM, plus extra units of regular if his sugar is elevated, and a dose of 35 units Lantus insulin sometime between 2 and 5 PM, plus additional regular insulin if his sugar is high.  Recently he was admitted to the prison's IPC unit for close observation.  During this time he had his blood sugars checked 6 times a day.  I was able to review this data and a very clear pattern is evident.  His morning sugars range from 44-220, but most are less than 180.  His bedtime sugars are in the 250-350 range.  He also had 5 episodes of low blood sugars ranging from 35-59, all occurring between 2 AM and noon.  This issue of hypoglycemia is my main concern regarding his diabetes management.

Mr. Musselman has lost the ability to detect when his blood sugar is going dangerously low.  This is called hypoglycemic unawareness.  Early on in his disease, when his blood sugar would go less than 70, he would experience the typical symptoms of hypoglycemia: sweats, shakes, confusion, heart racing,

1

and hunger, and he would be able to treat himself with some form of glucose and cause his symptoms to stop. In 2006 he started losing the ability to detect hypoglycemia (hypoglycemic unawareness), a common manifestation of injury to the nervous system from longstanding poorly controlled diabetes and from having frequent episodes of hypoglycemia. Because of this, his blood sugar could continue to drop without him being aware of it, and he may not have any recognizable symptoms until his sugar would drop to the 30's. This is quite dangerous as a blood sugar this low can cause seizures and coma before any other symptoms arise. He reports he has had seizures on multiple occasions and one time was taken to a local emergency room to treat a severe low blood sugar followed by a seizure. He notes that he has low blood sugars about 2-3 times a week, often when he is more active, has misjudged the amount of carbohydrates in a meal, or is late in having a meal. He states he requires assistance from others to treat his low sugars about 3-4 times a month. Requiring the assistance of others to treat a low blood sugar is how the American Diabetes Association defines a hypoglycemic episode to be "severe." He states he has been taken to the local medical facility at the prison about 4 times a year. He now has to rely on a close friend to observe him and the friend can tell when Mr. Musselman is starting to display low blood sugar symptoms and will prompt him to take some sugar to prevent a more severe low. Obviously relying on another person to detect subtle personality changes is not an optimal way to prevent low blood sugars.

In addition to his hypoglycemic unawareness, Mr. Musselman has also developed other complications of his long term diabetes and these include:

1. Orthostatic Hypotension: the loss of the ability to regulate blood pressure when going from a lying to a standing position, and this can result in a drop in blood pressure and possible fainting. This is a manifestation of autonomic neuropathy.

2. Neurogenic Bladder: the loss of the bladder's ability to contract completely and in a timely manner leading to delayed and incomplete emptying. This is a manifestation of autonomic neuropathy.

3. Peripheral Neuropathy: damage to the small nerves of the feet which leads to false signals from the nerves being relayed to the brain. This causes multiple symptoms including numbness, tingling, pain, and loss of sensation. He is currently being treated with tegretol and nortriptyline for this.

4. Non-proliferative diabetic retinopathy: Damage to the retinas of the eyes that can lead to bleeding, detachment, and potentially blindness.


Hypoglycemic unawareness is a common complication of type 1. It usually occurs after at least 5 years of treatment, and is more common in people who have frequent low blood sugars. Typically when a person's blood sugar falls low, the body will produce more epinephrine (adrenaline) and this will cause the typical symptoms of low blood sugar. The pancreas will also produce more of a hormone called glucagon which goes to the liver to tell the liver to release more sugar into the blood stream. In patients with hypoglycemic unawareness, both of these normal responses are blunted and they will not get the typical warning signs, and they are also unable to raise their blood sugar normally. Their body also gets

2

used to the feeling of a low blood sugar, and the first symptom they may have is a result of the brain being deprived of sugar, and this can manifest as a seizure or becoming unresponsive. Frequent and recurrent episodes of hypoglycemia can lead to brain damage, and there is newer information that suggests that recurrent hypoglycemia can also increase the risk for dementia. This is why it is very crucial to prevent recurrent hypoglycemia.

Hypoglycemic unawareness can be partially reversed by decreasing the frequency of hypoglycemia. However, in Mr. Musselman's case, it is more complex than just avoiding hypoglycemia. Because of his underlying autonomic neuropathy, just preventing hypoglycemia will not restore the adrenal and pancreatic response to hypoglycemia back to the normal.

One way to prevent recurrent hypoglycemia is more frequent blood glucose monitoring. It is not unusual for a patient on multiple injections of insulin a day to check their blood sugar 4-8 times a day. This sometimes is difficult or not practical. Another option for close monitoring of blood sugars is continuous glucose monitoring using a sensor device such as the Dexcom G4 or the Medtronic Enlite sensor. This is a device that has 3 components:

1. A soft catheter that is placed under the skin and stays in place for 6-7 days.

2. A plastic transmitter that is attached to the catheter and is applied to the skin and affixed with an adhesive tape.

3. A wireless receiver that will display the actual blood sugar in real-time and show a graph of the glucose trend. This unit can also alarm when a blood sugar is going to low or too high.


The CGM device will measure a blood sugar every 5 minutes and relay that information to the receiver. The device can also be downloaded and information for the last 1-2 weeks can be reviewed to look for trends in blood sugars and help manage insulin regimens. One of the most valuable features of the CGM for patients with hypoglycemic unawareness is the alarm system which can be set to vibrate or beep once the sugar has passed a certain threshold. For example, if the sugar is dropping and goes below a preset level of 70, the device will alarm notifying the patient that their sugar is dropping and allow them to take corrective action prior to having a potentially severe hypoglycemic episode. There is also a similar alarm that can be set if the sugar is going too high, or if the rate of rise or fall is very rapid. Traditional blood sugar monitoring is still required but it only needs to be done 2-3 times a day.

Insertion of the sensor is a very simple procedure and can be done by the patient or a healthcare provider with minimal training. The sensors are changed every 6-7 days, although some patients wear them longer with good results. The life of a transmitter is 6-12 months, and the life of a receiver is approximately 4 years.







The utility of using CGMS to detect hypoglycemic unawareness was documented in an article by Streja in 2005 [1]. They used a CGMS in patients with and without hypoglycemic unawareness and concluded that self-monitoring of glucose with finger-sticks could not detect hypoglycemia as well as a CGMS. Their conclusion was that CGMS is superior to self-monitoring of glucose in quantifying hypoglycemia, and that it was an objective method for identification of patients with hypoglycemic unawareness.

In another study by Battelino, et al [2], type 1 diabetic patients were studied using or not using a CGMS and they concluded that "the results of the current study demonstrated significantly shorter time spent in hypoglycemia in children and adults with type 1 diabetes who used continuous glucose monitoring compared with standard self-monitoring of glucose, with a concomitant significant decrease of HbA1c. " They also saw an increased amount of time spent with normal blood sugars and an improvement in overall blood sugar control as shown by a decrease in A1c.

Finally, the American Association of Clinical Endocrinologists (AACE) recommends personal CGM for the following patients:
• Those with type 1 DM and the following characteristics:
– Hypoglycemic unawareness or frequent hypoglycemia judged to be excessive, potentially disabling, or life-threatening
-- Excess glycemic variability
– Requiring HbA1c reduction without increased hypoglycemia.  [3]

To gain even better control of diabetes, a CGM system can be combined with an insulin pump.  This allows a continuous infusion of insulin instead of requiring multiple daily injections of insulin through the day.  This combination represents the cutting edge of diabetes management technology at the current time.  It allows for variation in insulin dosing throughout the day, and can help prevent morning high and low blood sugars, make it easier to take multiple doses of insulin through the day to correct highs, and some systems can automatically stop infusion of insulin when a low blood sugar is detected on a CGMS and help prevent further lowering of blood sugar and avoid a severe hypoglycemic reaction.

4

In conclusion, Mr. Musselman has had type 1 diabetes for 29 years and has developed multiple complications that make his diabetes management very difficult.  The biggest threat to his health is his recurrent episodes of hypoglycemia, especially when they require assistance from other inmates or medical personnel.  His severe hypoglycemic unawareness coupled with his insulin regimen that only gives him 2 injections a day puts him at very high risk for recurrent episodes.  I believe the use of a continuous glucose monitoring system would give him much greater personal control of his diabetes and substantially decrease the risk of these episodes, and this conclusion is supported by the medical literature. The American Diabetes Association and the Endocrine Society issued a joint statement on hypoglycemia in 2013 and stated:  "Recent technological developments have provided patients with new tools for glucose monitoring. Real-time CGM, by virtue of its ability to display the direction and rate of change, provides helpful information to the wearer leading to proactive measures to avoid hypoglycemia, e.g., when to think about having a snack or suspending insulin delivery on a pump. The CGM's audible and/or vibratory alarms may be particularly helpful in avoiding severe hypoglycemia at night." [6]

If I had a patient with the severe hypoglycemic unawareness that Mr. Musselman has, I would recommend that they use an insulin pump and a continuous glucose monitor.  It is not only a matter of good and appropriate medical care, but more significantly a matter of safety.  Guidelines from the ADA, the Endocrine Society, and AACE all list CGMS as a valuable and effective tool in managing severe hypoglycemia. [5] Not providing one to Mr. Musselman in light of his hypoglycemic unawareness fails to meet well recognized standards of care.  I think a CGMS would be easy to use while he is incarcerated as it only needs to be inserted once a week, takes minimal training of medical staff to learn how to do this, and contains no parts that I think would be a threat to him or others.  Additionally, it is my understanding that there are inmates who are using insulin pumps.  The Federal Bureau of Prisons Clinical Practice Guideline for Management of Diabetes published in 2012 recognizes the importance of insulin pump therapy and makes the following recommendation for new inmates already on pump therapy:  "Newly incarcerated type 1 diabetics who are already on insulin pumps should usually be maintained on the pump." [4] Additionally, the ADA Standards of Medical Care in Diabetes states: "People with diabetes in correctional facilities should receive care that meets national standards." [5] Therefore I see no basis or reason for not having a continuous glucose monitor issued to him.  If one seizure or other severe hypoglycemic event that would require him being transported to an outside medical facility could be avoided, the cost of the device would be covered.  It is my opinion that making him rely on other inmates to notice subtle cues in his behavior that indicate hypoglycemia does not constitute adequate care, and since this technology is available, he should be provided with a continuous glucose monitor.

Amir Harari, MD
Board Certified Endocrinologist
FACP, FACE, ECNU

5

# EXHIBIT B

Amir Ephraim Harari, M.D., F.A.C.P., F.A.C.E.
27308 N 152nd St
Scottsdale, AZ 85262
Mobile: 619-813-4778
E-mail: aeharari99@gmail.com

Personal Data: Birthday  October 3, 1964
Raised in Berkeley, California
Married to Tia Lisa Harari


Education:  U.C. Berkeley, 1982-1986
B.A. in Biology

Uniformed Services University of the Health Sciences, 1986-1990, M.D.

Training:  Naval Hospital Oakland, 1990-1991
Internship in Internal Medicine

Naval Hospital Oakland, 1993-1995
Residency in Internal Medicine

National Naval Medical Center, 1998-2000
Fellowship in Endocrinology

Certifications: Board Certified in Endocrinology and Metabolism, November, 2000, recertified
2010
Board Certified in Internal Medicine, September, 1995
Clinical Densitometry Interpretation, ISCD, February 2003

Medical License: California  G 73086
Arizona  44799

Awards:  Selected Outstanding Medical Resident, 1994-1995
Naval Hospital Oakland

Recipient of ACP Navy Governor's Award for Clinical and
Academic Excellence, Naval Hospital Oakland, 1995

Top 5 Navy Endocrinologists in Patient Satisfaction, 2011

Positions Held:  General Medical Officer, 1991-1993
USS ARKANSAS CGN-41
Attained Surface Warfare Medical Department Qualification

Head, Internal Medicine, 1995-1998

Naval Hospital, Twentynine Palms

Staff Endocrinologist, 2000-2001
Naval Medical Center San Diego

Head, Endocrinology Division, 2001-2005
Naval Medical Center San Diego

Senior Medical Officer, USS PELELIU LHA-5  2005-2007

Endocrinology Specialty Leader, 2006-2009

Head, Endocrinology Division, 2007-2011
Naval Medical Center San Diego

Acting Department Head, Internal Medicine, December 2009-June 2010,
Naval Medical Center San Diego

Endocrinologist, Endocrinology Associates, Phoenix, AZ
January, 2012-present

Medical Editor, e-Medicine online medical publication


Professional Associations:  Fellow, American College of Physicians
Fellow, American College or Endocrinology
Member, Endocrine Society

Elected to Alpha Omega Alpha, Medical Honor Society

Presentations at National Meetings:  Guest Lecturer, Clinical Directors Program, Federal Bureau
of      Prisons Annual Conference

Guest Lecturer, San Diego Ultrasound Society

Guest Lecturer, Navy Chapter ACP Meeting

Guest Lecturer, Sharp Health Care System Annual Physicians Retreat

Guest Lecturer, Alvarado Medical Center


Bibliography:

Publications: <u>Medullary Thryoid Cancer Arising in an Adenoma</u>  A.E.Harari, C. Ferreri, K.M.M. Shakir.  Thyroid August 1, 2000;  Vol 10, No. 8, pp.725-2

Letter to the Editor:  <u>Glycemic Control and Quality of Life in Patients with Type 2 Diabetes</u> A.E. Harari, C. Iudica  JAMA June 2, 1999 Vol 281, No.21, pp.1985-6

<u>Combined Levothyroxine Plus Liothyronine Compared With Levothyroxine Alone in Primary Hypothyroidism.</u>  P.W. Clyde, A.E. Harari, E.J. Getka, K.M.M. Shakir.  JAMA 2003, Vol.290, No. 22,  pp.2952-8

Abstracts:  <u>Hyperprolactinemia after Reduction Mammoplasty</u>  A.E. Harari, A.J. Drake, K.M.M. Shakir.  82nd Annual Endocrine Society Meeting

<u>Pancreatitis Secondary to Clomiphene-Induced Hypertriglyceridemia</u>  A.E. Harari, A.J. Drake, K.M.M. Shakir.  82nd Annual Endocrine Society Meeting

<u>Combined Levothyroxine Plus Liothyronine Compared to Levothyroxine Alone in the Treatment of Primary Hypothyroidism</u>  P. Clyde, A.E. Harari  Abstract OR9-1, 2002 Endocrine Society Meeting

EXHIBIT # 3

1.6      The charge for any document is $.10 per printed side (excluding those provided at no charge as outlined in 1.2.3 of this section), including copies of court forms listed on Attachment B, a photocopy of a document or form, or any other form published by another agency or court (normally available and provided by the Department).

1.7      The charge for notary public services shall be $1.00 per notarized document, pursuant to A.R.S. 41-316. Notaries related to statute or court required purposes shall be treated the same as qualified legal claims. The contract paralegal or Legal Access Monitor can assist in determining these types of notaries.

1.8      The price charged for individual services, forms or copies shall be subject to periodic review and adjustment by the Director.

**902.07**      **NON-QUALIFIED LEGAL CLAIMS SERVICES** - (See Attachment F, Non-Qualified Legal Claims Copying Process.) Inmates shall be charged for all non-qualified legal claim photocopies as well as other services provided for in this section. Non-legal copying shall be done in accordance with Department Order # 910, Inmate Education and Resource Center Services.

1.1      Inmates who do not have sufficient funds to pay for the copies/service at the time requested shall be denied the service or copies.

1.2      All documents submitted for copying shall be in compliance with Department Order #909, Inmate Property, and are not to violate any other written instructions.

1.3      Chargeable items include:

     1.3.1      Non-qualified legal claim photocopies.

     1.3.2      Qualified legal claims photocopies that were not copied, in accordance with the Paralegal's notation on the request.

     1.3.3      Names and address lists for federal or state courts. (See Attachment C for federal courts. State courts are available in the Legal Resource Center.)

     1.3.4      Notary Services related to non-qualified claims.

1.4      An inmate who wishes to purchase non-qualified claim photocopies or other immediately chargeable services shall complete an Inmate Request for Withdrawal form and request that the assigned Correctional Officer III verify that funds are available.

1.5      The Correctional Officer III shall verify the availability of funds and sign and date the Inmate Request for Withdrawal form in accordance with Department Order #905, Inmate Banking/Money System.

1.6      The inmate shall deliver the Inmate Request for Withdrawal form to designated staff within two work days of verification by the Correctional Officer III, together with the material to be photocopied. An inmate who wishes to copy non-qualified legal material shall complete a Request for Non-Qualified/Non-Legal Copying, Form 902-7, as well as the Inmate Request for Withdrawal form, and deliver the Request for Non-Qualified/Non-Legal Copying form, the Inmate Request for Withdrawal form and the documents to be photocopied to designated staff.

1.7      Designated staff shall determine if the copies are authorized in accordance with Department Order #909, Inmate Property, or other written instructions. If there is any question about the suitability of the copies, designated staff may consult with:

     1.7.1      His/her supervisor, the Unit Deputy Warden or the Unit Chief of Security.