Carlton J. Lewis, 039295
ASPC- Florence / South Unit
Post Office Box 8400
Florence, Arizona  85132-8400
Member of Plaintiff Class



Office of the Clerk
United States District Court
401 West Washington Street, SPC-1
Phoenix, Arizona  85003-2118

                          RE:  PARSONS v. RYAN
                               CIV-12-00601-PHX-DKD

January 20, 2015

TO WHOM IT MAY CONCERN,

    As a member of the Class Action in the above entitled cause number I would like to respectfully bring to this Court's attention my objections and concerns regarding certain stipulations, along with some suggested stipulations for this Court's consideration.

## I.   <u>HealthCare Substantive Provisions (A) (7)</u>

    In regards to the stipulation under <u>HealthCare Substantive Provisions (A) (7)</u>, I am requesting that this Court will allow for an enhancement of this stipulation for the following reasons:

    This stipulation requires the defendant to request that the Arizona Legislature approve a budget to allow ADC and its Contracted Health Care Services Provider, Corizon Health, Inc. to modify the Health Services Contract to increase staffing and mental health positions.

    I adamantly object to this stipulation in its present form because it is highly unlikely that the Arizona Legislature will approve additional funding to accommodate the ADC and its Contract Health Services Provider, primarily due to a budget deficit of over $500 million which is expected to increase to around 1.5 Billion dollars by July 2015.  If the Legislature were to allocate the requested funds, for the present Contracted Health Care Services Provider for ADC, these

funds would be spent in vain, and against the greater public interest.  The Contracted Health Care Services Provider for ADC is Corizon, Inc, and that corporation, harbors an extensive history of inmate litigation due to blatant disregard and deliberate indifference to inmates serious medical and mental health needs.  Numerous Courts throughout the United States have repeatedly cited Corizon for violations of the Eighth Amendment of the United States Constitution by Corizon's policy and custom driven practice of delaying and denying treatment for inmate's serious medical and mental health needs.  As the past has shown, Corizon would rather spend the money on out of Court settlements than comply with any requirements of the Eight Amendment of the United States Constitution.

Upon further investigation and research it appears that Corizon has a wide spread Custom, Policy and practice of discouraging Medical Staff from referring prisoners to outside medical practitioners which could possibly save human lives. (Please refer to Exhibit "A"- *"Corizon Needs A Checkup: Problems with Privatized Correctional Health Care"- Prison Legal News*, March 2014)

It is most apparent that Corizon Health, Inc., has little or no interest in wanting to provide adequate medical and mental health care to prisoners with serious medical and mental health needs, and respectfully begs the question: How will Corizon be able to abide by the Stipulations, as agreed by the Parties, if Corizon's policies, customs, and mode of operation is potentially unconstitutional?

Therefore, based on Corizon's past and present history, I am compelled to ask this Court to give serious consideration to include additional stipulations to require ADC and it's Contracted Health Care Provider to provide this Court with a complete copy of its internal operations policy, which will enable this Court to render a strong factual assessment as to whether Corizon Health, Inc. can fully comply with any and all stipulations ordered by this Court.  The previous history of Corizon indicates its willingness to side step the serious medical and mental health needs of prisoners, and there is nothing in any of the stipulations as proposed to compel Corizon Health, Inc., to provide proof of accountability.

Currently, Corizon Health, Inc. has discontinued needed pain medications for inmates with chronic medical conditions that cause extreme pain, such as cancer, back problems, MS, and other chronic pain situations.  Corizon even went further by requiring its health care staff to inform prisoners with the above conditions to purchase pain medications from the inmate store.  There are many prisoners who suffer excruciating pain from cancer and are being forced to suffer for no other reason than Corizon wants to save a few dollars.

The inmate store does not provide any type of over-the-counter medication that will even touch the pain associated with conditions such as cancer and MS. There is simply no accountability by Corizon Health, Inc., for their denial of prescription pain medications. My question for this Court to ponder is: *How many more prisoners must die in midst of extreme pain, or suffer needlessly before someone in authority will say enough is enough?* We, as a Class, desperately need this Court to intercede on our behalf to protect the prisoner population by the implementation of further stipulations that will help alleviate the unconstitutional practices of ADC's Contracted Health Care Provider. This Class-Action suit provides inmates with a voice that has been quiet for many years. However, if the voice remains unheard what good does this stipulation really do for the inmate population of ADC?

In considering the information being provided to this Court, it would be in the best interest of all prisoners who suffer from serious medical needs if this Court would consider an additional stipulation to ensure that ADC and it's Contracted Health Care Provider expand the list of Chronic Conditions pursuant to U.S.C.A. §12101-12213, Title 42 to allow prisoners with chronic conditions to receive regular medical attention. ADC's Policy on Inmate Access to Health Care Chapter 1100, Department Order 1101 the chronic conditions listed fails to comply with Federal Law governing chronic conditions. Under 42 U.S.C. 12102 the definition of disability should be favorably construed in favor of the Class, in broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of the stipulation. ADC Department Order 1101 speaks of ADA qualified inmates requiring regular examinations and treatment as defined under 42 U.S.C. 12102 (2) of the American's with Disabilities Act. (See Exhibit "D" *Inmate Health Services, Chapter 1100, Department Order 1101*, Pages 22 & 23; Exhibit "C" **Inmate Health Services, Chapter 1100, Department Order 1101**, Pages 22 & 23) (See also **Corizon Health, Inc.**, *Definition-Alternate Treatment Plan- Chronic Disease*) Neither of these exhibits addresses Chronic Conditions pursuant to Federal Law, under the ADA Statutes.

For many years ADC has been plagued by policies, Medical Privatations, and prisoner deaths, and with the facts being currently presented to this Court, this Court should see substantial facts of the egregious conduct of ADC Medical and Medical Services Vendors. ADC's system is dysfunctional and does nothing more than warehouse people for profit and at the same time, ADC does not take the responsibility to provide adequate medical and mental health care to those incarcerated. The ADC response to the severely overcrowded population is to ask

the Arizona Legislature for additional funds to build more prisons often ran by for profit prison corporations. (See Exhibit "B-1", *"Arizona Prison System Plagued by Politics, Privatization, and Prisoner Deaths"*, **Prison Legal News** July 2013)

## II.   VETERAN's WITH SERVICE CONNECTED DISABILITIES

As a party to this Class-Action I am respectfully requesting an additional stipulation to ensure that all Veterans with *Service Connected Disabilities* be added to the list of chronic conditions as set forth pursuant to 42 U.S.C. §12101-12213, Public Health & Welfare, Chapter 126, Equal Opportunity for Individuals with Chronic Disabilities.

For this Court's edification, I have been incarcerated in ADC for many years and I am a Veteran with Chronic *Service Connected Disabilities*. The ADC and its Contracted Health Care Provider, does not recognize my *Service Connected Disability* as a chronic condition, and based on that failure to acknowledge this condition, ADC and its Health Care Provider charges Veterans a fee for seeking medical treatment and medication relating to *Service Connected Disabilities*. ADC and it's Contracted Health Care Provider refuses to adequately  provide medical and mental health treatment to Veterans with *Service Connected Disabilities* and this fact can be substantiated by review of Exhibit "D" and my Inmate Letters and requests for treatment of my *Service Connected Disabilities*. To date, Corizon has not responded to my request for Medical Treatment for these *Service Connected Disabilities*. Every time I submit a request for medical treatment, I am charged a $4.00 fee, whether treatment is provided or not. Corizon's policy allows for a Health Care Provider ("HCP") to write prescriptions for only three (3) months at a time. So every three (3) months I get charged for my *Service Connected Disability* medical treatment. The Federal Government passed a law several years ago which allows for incarcerated service Veterans to receive ten percent (10%) of their *Service Connected Disability* payments and out of that 10% the State of Arizona mandates that all Veterans must pay for their healthcare and medications. In addition to being charged for seeing a HCP, all inmates are required to pay additional costs for clothing, etc.

I have recently discovered that the Veterans Administration ("VA") entered into an agreement with the State of Arizona to ensure that Service Connected Veterans receive adequate medical and mental health treatment by ADC, and sadly this agreement is not being honored, and for this reason I implore this Court to add an additional stipulation to include all Veterans with *Service Connected*

*Disability* to be added to the ADC Chronic Care List, and to order ADC and it's Contracted Health Care Provider to be prohibited from charging *Service Connected Disability Veterans* for treatment and medications. I ask that this additional stipulation mandates that Disabled Veterans be afford the same medical treatment as other similarly situated inmates. We, as Veterans, with *Service Connected Disabilities*, regardless of our status of incarceration should be entitled to receive adequate treatment for our disabilities. This matter is of grave concern to all Veterans with *Service Connected Disabilities*. No human being, who suffered for the freedoms of this Country, should be disregarded by that same Country just because they are incarcerated, especially considering the disabilities were a result of honorably defending this Country. There is a lot that can be said about how ADC has put incarcerated Veterans in a rather precarious position and due to the facts of this circumstance, we as Veterans ask this Court to seriously consider additional stipulations to protect the Veterans that have for many years protected this Country. Further, ADC and its Contracted Health Care Services Provider will not allow Veterans to have surgery for any *Service Connected Disability* due to the cost, nor will they allow Veterans to receive treatment at a VA Hospital.

## III. __CONCLUSION__

In closing we are respectfully requesting an addition to the current stipulation #5- Termination of the Agreement, #37, which allows time for the remedial measures set forth in this stipulation to be fully implemented, the parties shall not move to terminate this stipulation for a period of four (4) years from the date of its approval by the Court.

In the Proposed Order the Court stated that it "finds that the relief set forth therein is narrowly drawn, extends no further than necessary to correct the violations of the Federal Right and is the least intrusive means necessary to correct the violations of the Federal right of the Plaintiffs."

This Court is well aware of the egregious and malicious misconduct perpetrated against prisoners by ADC and its Contracted Health Care Provider, which caused many deaths, along with pain and suffering of many prisoners, and this outlandish conduct by State Authorities is unacceptable pursuant to the Eighth Amendment of the United States Constitution.

Based on the foregoing, we all have some serious concerns about whether ADC through its Contracted Health Care Provider will comply with the Stipulations

implemented and approved by this Court, especially considering their egregious disregard for the Prisoner population's constitutional rights under the Eighth Amendment to be free from cruel and unusual treatment.  As stated within this correspondence ADC suffers from extreme overcrowding and the State of Arizona will have a budget deficient of over 1.5 Billion dollars in July.

We would like to request this Court to extend the four (4) years time limit for termination to eight (8) years to fully ensure that ADC complies with the stipulation.  This request is predicated upon all of the facts and circumstances presented to this Court and with the knowledge that human lives were lost needlessly and many more prisoners suffer everyday at the hands of ADC officials. The Contract for the ADC Health Care Services Provider, Corizon Health, Inc., has built policies and procedures that could circumvent this Court's Ruling, thus requiring this Court's intervention once again.

Thank you for any and all consideration this Court may give to the suggestions set forth in this correspondence.

Sincerely,

Carlton J. Lewis

CC:

    Plaintiff Class Counsels

# EXHIBIT NUMBER

## "A"

Corizon Needs a Check IIP: Problems with

Privatized Correctional Health Care

# Prison Legal News

VOL. 25  No. 3
ISSN 1075-7678

*Dedicated to Protecting Human Rights*

**March 2014**

# Corizon Needs a Checkup: Problems with Privatized Correctional Healthcare

## by Greg Dober

Corizon, the nation's largest for-profit medical services provider for prisons, jails and other detention facilities, was formed in June 2011 through the merger of Prison Health Services (PHS) and Correctional Medical Services (CMS).

In April 2013, the debt-rating agency Moody's downgraded Corizon's nearly $360 million worth of debt to a rating of B2 – an indication the company's debt is highly speculative and a high credit risk. According to Moody's, the rating downgrade was due to an "expectation of earnings volatility following recent contract losses, margin declines from competitive pricing pressure on new and renewed contracts, and Moody's belief that Valitás [Corizon's parent corporation] will be unable to restore metrics to levels commensurate with the prior B1 rating over the near to intermediate term."

Valitás Health Services is majority owned by Beecken Petty O'Keefe & Company, a Chicago-based private equity management firm. Beecken's other holdings are primarily in the healthcare industry.

On September 23, 2013, Moody's again downgraded Corizon's debt rating and changed the company's rating outlook from "stable" to "negative." The following month Corizon announced that it had replaced CEO Rich Hallworth with Woodrow A. Myers, Jr., the former chief medical officer at WellPoint Health. Hallworth, who had been appointed Corizon's CEO in 2011, previously served as the president and CEO of PHS. At the same time that Hallworth was replaced, Corizon president Stuart Campbell also stepped down.

## Prison Medical Care for Profit

According to Corizon's website, the company provides healthcare services at over 530 correctional facilities serving approximately 378,000 prisoners in 28 states. In addition, Corizon employs around 14,000 staff members and contractors. The company's corporate headquarters is located in Brentwood, Tennessee and its operational headquarters is in St. Louis, Missouri.

The 2011 merger that created Corizon involved Valitás Health Services, the parent company of CMS, and America Service Group, the parent company of PHS. The *Nashville Business Journal* reported the deal was valued at $250 million.

"Corizon's vision is firmly centered around service – to our clients, our patients and our employees," Campbell said at the time. "To that we add the insight of unparalleled experience assisting our client partners, and caring professionals serving the unique healthcare needs of [incarcerated] patients."

Corizon has around $1.5 billion in annual revenue and contracts to provide medical services for the prison systems in 13 states. The company also contracts with numerous cities and counties to provide healthcare to prisoners held in local jails; some of Corizon's larger municipal clients include Atlanta, Philadelphia and New York City (including the Rikers Island jail). Additionally, the company has its own in-house pharmacy division, PharmaCorr, Inc.

The prison healthcare market has flourished as state Departments of Corrections and local governments seek ways to save money and reduce exposure to litigation. [See: *PLN*, May 2012, p.22]. Only a few major companies dominate the industry. Corizon's competitors include Wexford Health Sources, Armor Correctional Health Services, NaphCare, Correct Care Solutions and Centurion Managed Care – the latter being a joint venture of MHM Services and Centene Corporation. Around 20 states outsource all or some of the medical services in their prison systems.

As Corizon is privately held, there is little transparency with respect to its internal operations and financial information, including costs of litigation when prisoners (or their surviving family members) sue the company, often alleging inadequate medical care.

For example, when Corizon was questioned by the news media in Florida during

## INSIDE

| | |
|---|---|
| From the Editor | 18 |
| Private Prison Racial Disparities | 20 |
| When Victims Speak for Criminals | 24 |
| Texas Criminal Court Fees | 28 |
| CA Female Prisoners Sterilized | 32 |
| Michigan Parole Scrutinized | 42 |
| Introduction to the FTCA | 44 |
| Execution Drugs Hard to Find | 46 |
| A Look Inside Maine's Supermax | 48 |
| Video Visitation in Jails | 50 |
| UNICOR Faces Criticism | 52 |
| Oregon Jail Death Lawsuits | 54 |
| News in Brief | 56 |

# Prison Legal News

*a publication of the*
*Human Rights Defense Center*
www.humanrightsdefensecenter.org

**EDITOR**
Paul Wright

**MANAGING EDITOR**
Alex Friedmann

**COLUMNISTS**
Michael Cohen, Kent Russell,
Mumia Abu Jamal

**CONTRIBUTING WRITERS**
Matthew Clarke, John Dannenberg,
Derek Gilna, Gary Hunter,
David Reutter, Mark Wilson,
Joe Watson, Christopher Zoukis

**RESEARCH ASSOCIATE**
Mari Garcia

**ADVERTISING DIRECTOR**
Susan Schwartzkopf

**LAYOUT**
Lansing Scott

**HRDC LITIGATION PROJECT**
Lance Weber—General Counsel
Robert Jack—Staff Attorney

*PLN is a monthly publication.*

A one year subscription is $30 for prisoners, $35 for individuals, and $90 for lawyers and institutions. Prisoner donations of less than $30 will be pro-rated at $3.00/issue. Do not send less than $18.00 at a time. All foreign subscriptions are $100 sent via airmail. PLN accepts Visa and Mastercard orders by phone. New subscribers please allow four to six weeks for the delivery of your first issue. Confirmation of receipt of donations cannot be made without an SASE. PLN is a section 501 (c)(3) non-profit organization. Donations are tax deductible. Send contributions to:

Prison Legal News
PO Box 1151
Lake Worth, FL 33460
561-360-2523
info@prisonlegalnews.org
www.prisonlegalnews.org

PLN reports on legal cases and news stories related to prisoner rights and prison conditions of confinement. PLN welcomes all news clippings, legal summaries and leads on people to contact related to those issues.

Article submissions should be sent to - The Editor - at the above address. We cannot return submissions without an SASE. Check our website or send an SASE for writer guidelines.

Advertising offers are void where prohibited by law and constitutional detention facility rules.

PLN is indexed by the *Alternative Press Index, Criminal Justice Periodicals Index* and the *Department of Justice Index.*

## Privatized Healthcare Problems (cont.)

a contract renewal, the company initially tried to prevent the release of its litigation history, claiming it was a "trade secret."

In 2012, Corizon agreed to settle a lawsuit filed against PHS – one of its predecessor companies – by *Prison Legal News,* seeking records related to the resolution of legal claims against the firm in Vermont. Based on the records produced pursuant to that settlement, PHS paid out almost $1.8 million in just six cases involving Vermont prisoners from 2007 to 2011. [See: *PLN,* Dec. 2012, p.16].

Companies like Corizon provide healthcare in prisons and jails under the HMO model, with an emphasis on cutting costs – except that prisoners have no other options to obtain medical treatment except through the contractor.

## Arizona DOC

A FORMER CORIZON NURSE HAD HER license suspended and is currently under investigation by the Arizona State Board of Nursing for incompetence. In January 2014, nurse Patricia Talboy was accused of contaminating vials of insulin at three units at the ASPC-Lewis prison, potentially exposing two dozen prisoners to HIV or hepatitis.

Talboy reportedly used a needle to stick prisoners' fingers to check their blood sugar levels. She then used the same needle to draw insulin from vials of the medication utilized for multiple prisoners, possibly contaminating the insulin in the vials. After placing the vials back into inventory, other staff members may have unknowingly used them to dispense insulin.

"Every indication is that the incident is the result of the failure by one individual nurse to follow specific, standard and well-established nursing protocols when dispensing injected insulin to 24 inmates," Arizona Department of Corrections (ADC) director Charles L. Ryan said in a January 9, 2014 statement.

Talboy's failure to follow procedures was discovered after a prisoner told a different nurse about the issue. Corizon reportedly delayed three days before publicly reporting the incident; in a press release, the company admitted that one of its nurses had been involved in "improper procedures for injections." Talboy received her nursing license in August 2012 and became an RN in June 2013; as a rookie nurse, Corizon likely paid her less than more experienced nurses.

Following the insulin-related incident, the company was ordered to develop a comprehensive plan that includes "supplemental training and competency testing procedures for blood glucose testing and administration of insulin," as well as "nurse-peer reporting education to ensure professional accountability" and "patient awareness education on injection protocols."

Granted, Corizon isn't alone with respect to such incidents. In August 2012, a nurse employed by the ADC's previous medical services contractor, Wexford Health Sources, contaminated the insulin supply at ASPC-Lewis through improper injection protocols, potentially exposing 112 prisoners to hepatitis C. [See: *PLN,* July 2013, p.1].

Corizon has a three-year, approximately $370 million contract to provide medical care in Arizona state prisons, which began in March 2013. The contract award generated controversy because former ADC director Terry Stewart was hired by Corizon as a consultant; current director Charles Ryan had previously worked under Stewart, raising a potential conflict of interest. Ryan denied any improprieties.

According to a report by the American Friends Service Committee released in October 2013, titled "Death Yards: Continuing Problems with Arizona's Correctional Health Care," medical services in Arizona prisons did not improve after Corizon replaced Wexford as the ADC's healthcare contractor. "Correspondence from prisoners; analysis of medical records, autopsy reports, and investigations; and interviews with anonymous prison staff and outside experts indicate that, if anything, things have gotten worse," the report stated.

## Florida DOC

IN 2013, THE FLORIDA DEPARTMENT OF Corrections (FDOC) awarded Corizon a five-year, $1.2 billion contract to provide medical services to state prisoners in north and central Florida. Wexford Health Sources was contracted to provide similar services in the southern region of the state for $240 million. [See: *PLN,* June 2013, p.24]. The wholesale privatization of healthcare in Florida's prison system followed a 2011 legislative decision to disband the state's

## Privatized Healthcare Problems (cont.)

Correctional Medical Authority, which had oversight over prison medical care. [See: *PLN*, May 2012, p.30].

The contracts were part of the Republican administration's initiative to expand privatization of government services, including prison management and healthcare, in spite of previous setbacks. In 2006, PHS withdrew two months into an almost $800 million contract to provide medical care to Florida prisoners; at that time, the company said the contract was not cost-effective and claimed it would lose money.

The 2013 contract awards to Corizon and Wexford followed a two-year legal fight. In 2011, AFSCME Florida and the Federation of Physicians and Dentists/Alliance of Healthcare and Professional Employees filed suit challenging the prison healthcare contracts, in an effort to protect the jobs of nearly 2,600 state workers.

On June 21, 2013 the First District Court of Appeals approved the privatization of medical care in FDOC facilities,

overturning a ruling by the Leon County Circuit Court. The appellate court noted in its decision that "The LBC [Legislative Budget Committee] simply moved funds from different line items within the Department's Health Services' program, providing additional funds for contracts that the Department otherwise had the authority to enter." See: *Crews v. Florida Public Employers Council 79*, 113 So.3d 1063 (Fla. Dist. Ct. App. 1st Dist. 2013).

Under the terms of the FDOC's contract with Corizon, the company must provide medical care to Florida state prisoners for 7% less than it cost the FDOC in 2010. When entering into the contract, state officials apparently had few concerns about the numerous lawsuits previously filed against Corizon, and no hard feelings when it terminated its 2006 contract to provide medical services to Florida prisoners because it wasn't profitable.

"Most people feel, as long as they achieve their 7 percent savings who cares how they treat inmates?" noted Michael Hallett, a professor of criminology at the University of North Florida.

## Florida Counties

IN A SEPTEMBER 6, 2012 UNPUBLISHED ruling, the Eleventh Circuit Court of Appeals affirmed a $1.2 million Florida jury verdict that found Corizon – when it was operating as PHS – had a policy or custom of refusing to send prisoners to hospitals. The Court of Appeals held it was reasonable for jurors to conclude that PHS had delayed medical treatment in order to save money. See: *Fields v. Corizon Health*, 490 Fed.Appx. 174 (11th Cir. 2012).

The jury verdict resulted from a suit filed against Corizon by former prisoner Brett A. Fields, Jr. In July 2007, Fields was being held in the Lee County, Florida jail on two misdemeanor convictions. After notifying PHS staff for several weeks that an infection was not improving, even with antibiotics that had been prescribed, Fields was diagnosed with MRSA. PHS did not send him to a hospital despite escalating symptoms, including uncontrolled twitching, partial paralysis and his intestines protruding from his rectum. A subsequent MRI scan revealed that Fields had a severe spinal compression; he was left partly para-

lyzed due to inadequate medical care.

The Eleventh Circuit wrote that PHS "enforced its restrictive policy against sending prisoners to the hospital," and noted that a PHS nurse who treated Fields at the jail "testified that, at monthly nurses' meetings, medical supervisors 'yelled a lot about nurses sending inmates to hospitals.'" Further, PHS "instructed nurses to be sure that the inmate had an emergency because it cost money to send inmates to the hospital."

At trial, the jury found that PHS had a custom or policy of deliberate indifference that violated Fields' constitutional right to be free from cruel and unusual punishment. The jurors concluded that Fields had a serious medical need, PHS was deliberately indifferent to that serious medical need, and the company's actions proximately caused Fields' injuries. The jury awarded him $700,000 in compensatory damages and $500,000 in punitive damages. [See: *PLN*, March 2013, p.54; Aug. 2011, p.24].

More recently, the estate of a 21-year-old prisoner who died at a jail in Manatee County, Florida filed a lawsuit in October 2013 against the Manatee County Sheriff's Office and Corizon, the jail's healthcare provider. The complaint accuses the defendants of deliberate indifference to the serious medical needs of Jovon Frazier and violating his rights under the Eighth Amendment.

In February 2009, Frazier was incarcerated at the Manatee County Jail; at the time of his medical intake screening, staff employed by Corizon, then operating as PHS, noted that his health was unremarkable. Frazier submitted a medical request form in July 2009, complaining of severe pain in his left shoulder and arm, and a PHS nurse gave him Tylenol.

Throughout August and September 2009, Frazier submitted five more medical requests seeking treatment for his arm and shoulder. "It really hurts! HELP!" he wrote in one of the requests. PHS employees saw him and recorded his vital signs. Despite the repeated complaints, Frazier was never referred to a doctor or physician assistant; on September 9, 2009 his treatment was documented as routine but he was placed on the "MD's list."

An X-ray was taken on September 17, 2009 to rule out a shoulder fracture. The X-ray was negative for a fracture, and Frazier was not referred to a doctor. He submitted two more medical requests that month and five requests in October 2009 seeking treatment for his increasingly painful condition. The complaint alleges that in total, Frazier submitted 13 medical request forms related to pain over a period of three months; he was seen by a nurse each time but not examined by a physician.

On October 29, 2009, Frazier received an X-ray to determine if he had a tendon injury. An MRI was recommended and he was transported to a hospital where an MRI scan revealed a large soft tissue mass on his shoulder. A doctor at the hospital, concerned that the mass was cancerous, recommended additional tests.

After being diagnosed with or sarcoma, a form of bone cancer, [] was returned to the jail and subsequently treated at the Moffitt Cancer Center, where he received chemotherapy, medication and surgery. Despite this aggressive treatment the cancer progressed and Frazier's left arm was amputated. The cancer continued to spread, however, and he was diagnosed with lung cancer in June 2011. He died

### Privatized Healthcare Problems (cont.)

within three months of that diagnosis, on September 18, 2011.

In a letter to the attorney representing Frazier's estate, Florida oncologist Howard R. Abel wrote that the lack of treatment provided by Corizon at the Manatee County Jail constituted "gross negligence and a reckless disregard to Mr. Frazier's right to timely and professionally appropriate medical care."

The lawsuit filed by Frazier's estate claims that Corizon was aware of his serious medical condition but failed to provide adequate treatment. In addition, the complaint contends the company has a widespread custom, policy and practice of discouraging medical staff from referring prisoners to outside medical practitioners and from providing expensive medical tests and procedures. Finally, the lawsuit states that "Corizon implemented these widespread customs, policies and practices for financial reasons and in deliberate indifference to [the] serious medical needs of Frazier and other inmates incarcerated at Manatee County Jail."

On January 10, 2014, U.S. District Court Judge James Moody denied Corizon's motion to dismiss the case. The company had argued that the allegations in the lawsuit failed to assert sufficient facts to establish deliberate indifference, amounted only to medical negligence and were insufficient to establish gross negligence, and

failed "to adequately allege a policy or custom that violated Frazier's rights." Judge Moody disagreed, finding the claims set forth in the complaint were "sufficient to establish a constitutional violation."

The Manatee County Sheriff's Office had better luck with its motion to dismiss. The Sheriff argued the complaint did not establish facts indicating that the jail had a similar practice – like Corizon – of providing deliberately indifferent medical care to prisoners. The court agreed and dismissed the claims against the Sheriff's Office; the claims against Corizon remain pending. See: *Jenkins v. Manatee County Sheriff*, U.S.D.C. (M.D. Fla.), Case No. 8:13-cv-02796-JSM-TGW.

### Idaho DOC

In February 2013, the Idaho Department of Corrections (IDOC) announced it had reached a one-year extended agreement with Corizon to provide medical care in the state's prison system. However, the *Idaho Business Review* reported that the extension also resulted in a rate increase. Then-Corizon president Stuart Campbell informed the IDOC Board of Correction that the company wouldn't sign an extension for less money, stating the current contract had become too costly. During the preceding three years of the contract the IDOC had incurred approximately 20% in cumulative rate increases.

Both sides agreed that the contract would run through December 2013 and the IDOC would pay an additional $250,000.

It seems odd that Idaho was willing to continue contracting with the company, though, as the relationship between the IDOC and Corizon has been a rocky one.

The quality of medical care at the Idaho State Correctional Institution (ISCI) in Boise has been an ongoing issue for nearly three decades. The prison was the focus of a class-action lawsuit filed on behalf of prisoners alleging a variety of problems, including inadequate healthcare. The lawsuit was known as the *Balla* litigation after plaintiff Walter Balla.

In July 2011, after new complaints were filed regarding medical care at ISCI, U.S District Court Judge B. Lynn Winmill appointed a special master, Dr. Marc F. Stern, to assess the situation at the facility. The court wanted Stern to confirm whether ISCI was in compliance with the temporary agreements established in the *Balla* case, and to investigate and report on "the constitutionality of healthcare" at the facility.

Dr. Stern, a former health services director for the Washington Department of Corrections who also had previously worked for CMS, one of Corizon's predecessor companies, issued a scathing report in February 2012. With the aid of psychiatrist Dr. Amanda Ruiz, Stern and his team reviewed ISCI over a six-day period and met with dozens of prisoners, administrators and Corizon employees.

Stern stated in the report's executive summary: "I found serious problems with the delivery of medical and mental health care. Many of these problems have either

resulted or risk resulting in serious harm to prisoners at ISCI. In multiple ways, these conditions violate the rights of prisoners at ISCI to be protected from cruel and unusual punishment. Since many of these problems are frequent, pervasive, long-standing, and authorities are or should have been aware of them, it is my opinion that authorities are deliberately indifferent to the serious health care needs of their charges."

The report found that prisoners who were terminally ill or in long-term care were sometimes left in soiled linens, given inadequate pain medication and went for long periods without food or water. The findings regarding sick call noted instances in which prisoners' requests either resulted in no care, delayed care or treatment that was deemed dangerous. Emergency care situations had insufficient oversight, delays or no response; inadequately trained medical staff operated independently during emergencies without oversight from an RN or physician. The report also found problems with the pharmacy and medication distribution at ISCI.

In one case, a prisoner with a "history of heart disease was inexplicably dropped from the rolls of the heart disease Chronic Care Clinic." As a result, medical staff stopped conducting regular check-ups and assessments related to the prisoner's heart condition. A few years later the prisoner went in for a routine visit, complaining of occasional chest pain. No evaluation or treatment was ordered and the prisoner died four days later due to a heart attack. In another case, Corizon staff failed to notify a prisoner for seven months that an X-ray indicated he might have cancer.

Dr. Stern's report not only reviewed processes but also staff competency and adequacy. The report cited allegations that a dialysis nurse at ISCI overtly did not like prisoners, and routinely "failed to provide food and water to patients during dialysis, prematurely aborted dialysis sessions or simply did not provide them [dialysis] at all and failed to provide ordered medications resulting in patients becoming anemic." Stern concluded that prison officials were aware of this issue and the danger it presented to prisoners, but "unduly delayed taking action."

The mental health care provided by Corizon at ISCI was found to be deficient by Dr. Ruiz, who conducted the psychiatric portion of the court-ordered review. The report noted that the facility had 1) inadequate "screening of and evaluating prisoners to identify those in need of mental health care," 2) "significant deficiencies in the treatment program at ISCI" which was "violative of patients' constitutional right to health care," 3) an "insufficient number of psychiatric practitioners at ISCI," 4) incomplete or inaccurate treatment records, 5) problems with psychotropic medications, which were prescribed with no face-to-face visits or follow-up visits with prisoners and 6) inadequate suicide prevention training.

The report concluded: "The state of guiding documents, the inmate grievance system, death reviews and a mental health CQI [continuous quality improvement] system at ISCI is poor. While not in and of themselves unconstitutional, it is important for the court to be aware of this and its possible contribution to other unconstitutional events."

In March 2012, shortly after Dr. Stern's report was released over the objection of state officials, Corizon disagreed with its findings. The company retained

---

## Privatized Healthcare Problems (cont.)

the National Commission on Correctional Health Care (NCCHC) to review the report. Corizon described the review as an "independent assessment," even though it was paying NCCHC accreditation fees.

The NCCHC review consisted of a three-person team assessing the facility over a two-day period in April 2012. Unlike Stern's assessment of medical and mental health care, the NCCHC team did not interview prisoners or include a psychiatrist. Regardless, the agency concluded that "The basic structure of health services delivery at ISCI meets NCCHC's standards."

Corizon stated in a press release that Dr. Stern's report was "incomplete, mislead-ing and erroneous," and then-CEO Rich Hallworth appeared in a video defending the company. The NCCHC had previously accredited Corizon's healthcare services at ISCI, thus in essence the NCCHC's review was self-validating the organization's prior accreditation findings. Also, according to NCCHC's website, two Corizon officials sit on the agency's health professionals certification board of trustees.

Corizon's criticism of Dr. Stern's report is just one example where the company has objected to an independent, third-party as-sessment of its medical services. The *Balla* case settled in May 2012 after 30 years of litigation. [See: *PLN*, Feb. 2013, p.40].

### Indiana DOC

FOLLOWING A COMPETITIVE BIDDING process, Corizon was selected to continue providing medical care to Indiana state prisoners under a three-year contract effec-tive January 1, 2014. The contract has a cap of $293 million, based on a per diem fee of $9.41 per prisoner.

Three weeks later, a lawsuit filed in fed-eral court named Corizon and the Indiana Department of Correction as defendants in connection with the wrongful death of prisoner Rachel Wood. Wood, 26, a first-time drug offender, died in April 2012; the suit, filed on behalf of her family, claims she was transferred from prison to prison and denied care for her serious medical condi-tions, which included lupus and a blood clotting disorder.

"Notwithstanding the duty of the prison medical staff to provide adequate medical care to Rachel and to treat her very serious life threatening conditions, prison medical staff willfully and callously disre-garded her condition, and allowed Rachel to deteriorate and die," the complaint stated.

"That is just the attitude of these guys, is saving money rather than providing health care," said Michael K. Sutherlin, the attorney representing Wood's family.

Prison officials reportedly moved Wood among several different prisons and hospitals, and at one point lost track of her and claimed she had escaped even though she was still incarcerated.

"She died a horrible death and she died alone," stated her father, Claude Wood. The lawsuit remains pending. See: *Williams v. In-diana DOC*, Marion County Superior Court (IN), Case No. 49D05-1401-CT-001478.

### Maine DOC

IN AN OCTOBER 2013 *BANGOR DAILY NEWS* article, Steve Lewicki, coordinator of the Maine Prisoner Advocacy Coalition, dis-cussed the state of healthcare in Maine's prison system. "Complaints by prisoners are less," he said, noting that while medical ser-vices provided to prisoners are better than in the past, there are still concerns. This relative improvement coincided with the end of the state's contract with Corizon. The contract, valued at approximately $19.5 million, was awarded to another company in 2012.

A year earlier, the Maine legislature's Office of Program Evaluation and Govern-ment Accountability (OPEGA) completed a review of medical services in state prisons. The agency contracted with an independent consultant, MGT of America, to conduct most of the fieldwork, and the review in-cluded services provided under Corizon's predecessor company, CMS.

The OPEGA report, issued in No-vember 2011, cited various deficiencies in medical care at Maine prisons – including medications not always being properly

administered and recorded by CMS staff. Although the company was notified of the problem, no corrective action was taken. CMS employees did not follow policies related to medical intake and medical records; OPEGA reported that 38% of prisoners' medical files had inadequate or inaccurate documentation regarding annual physical assessments, and that files were not complete or consistently maintained. The report found 11% of sick calls reviewed were either not resolved timely or had no documented resolution. OPEGA also criticized CMS for inadequate staff training.

At a January 2012 legislative committee hearing, state Senator Roger Katz asked Corizon regional vice president Larry Amberger, "My question to you is in light of this history, why should the state seriously be considering any proposal your company might make to get this contract back again?"

In response, Amberger criticized the methodology used by MGT during the assessment and said he believed Corizon provided quality medical care. Questioning and challenging the findings of an independent reviewer is the same tactic the company used in Idaho. Regardless, Corizon's contract to provide medical care to Maine state prisoners is now a part of history.

### Louisville, Kentucky

WHILE SOME JURISDICTIONS, LIKE MAINE, have chosen not to renew their contracts with Corizon due to performance-related problems, in 2013 the Metro Department of Corrections in Louisville, Kentucky (LMC) offered the company a chance to rebid for its $5.5 million contract to provide medical care at the LMC jail. This time, however, it was Corizon that said "no thanks."

The rebid offer was made even though seven healthcare-related prisoner deaths occurred in a seven-month period in 2012 during Corizon's prior contract, which expired in February 2013. Nevertheless, LMC and Corizon agreed to extend the contract through July 30, 2013 on a month-to-month basis pending a formal rebid.

After the expiration of the month-to-month contract extension, Corizon notified LMC that it was no longer interested in providing services to the corrections department and would not seek to rebid the contract. LMC director Mark Bolton told the *Courier Journal* he was "surprised" by the company's decision. What seems more surprising is that LMC wanted to continue contracting with Corizon to provide medical services in spite of the number of prisoner deaths.

In April 2012, Savannah Sparks, 27, a heroin addict and mother of three, was arrested and held on shoplifting charges at the LMC jail. While withdrawing from heroin she vomited, sweat profusely, could not sit up, could not eat or drink, and defecated and urinated on herself. Six days later she was dead. According to the medical examiner, her death was due to "complications of chronic substance abuse with withdrawal."

A subsequent wrongful death suit alleged that Corizon and LMC employees were negligent in failing to provide treatment for Sparks' opiate addiction and withdrawal. Corizon settled the suit under confidential terms. See: *May v. Corizon*, Jefferson County Circuit Court (KY), Case No. 13-CI-001848.

Four months after Sparks' death, on August 8, 2012, another LMC prisoner, Samantha George, died. A lawsuit filed in Jefferson County Circuit Court claimed that George was moved from the Bullitt County Jail to the LMC facility on a charge of buying a stolen computer. According to the complaint, she told a Corizon nurse that she was a severe diabetic, needed insulin, and was feverish and in pain from a MRSA infection.

The nurse notified an on-call Corizon physician, who was not located at the facility and thus could not examine George in person, to decide if she should be taken to an emergency room. The doctor recommended monitoring George and indicated he would see her the next day. George's condition rapidly deteriorated while she was monitored by staff at the jail; she was found unresponsive a few hours after being admitted to the facility and pronounced dead a short time later.

An autopsy concluded that George died due to complications from a severe form of diabetes compounded by heart disease. According to the lawsuit, the Corizon doctor never saw George; among other defendants, the suit named Corizon and LMC director Mark Bolton as defendants.

## Privatized Healthcare Problems (cont.)

The case was removed to federal court, then remanded to the county circuit court in October 2013. See: *George v. Corizon*, U.S.D.C. (W.D. Ky.), Case No. 3:13-cv-00822-JHM-JDM.

A few weeks after George's death, Kenneth Cross was booked into the LMC jail on a warrant for drug possession. According to a subsequent lawsuit, upon Cross' arrival at the jail a nurse documented that he had slurred speech and fell asleep numerous times during the medical interview. Several hours later he was found unconscious, then died shortly thereafter due to a drug overdose. The lawsuit filed by Cross' estate alleged that employees at the LMC jail were deficient in recognizing and treating prisoners' substance abuse problems and that the facility was inadequately staffed for such medical care.

After the deaths of Sparks, George, Cross and four other prisoners in 2012, LMC director Bolton said he believed Corizon took too long to evaluate and treat prisoners at the jail. According to the *Courier-Journal*, Bolton sent an email to his staff in December 2012 regarding the prisoners' deaths, stating, "Mistakes were made by Corizon personnel and their corporation has acknowledged such missteps." He further indicated that Corizon employees – not LMC staff members – were responsible for the care of the prisoners who died. Six Corizon employees at the LMC jail resigned in December 2012 during an internal investigation; they were not identified.

Bolton's criticism was too little, too late to prevent the deaths of the seven LMC prisoners, though the jail has since made improvements to its medical services, including a full-time detox nurse and new protocols for prisoners experiencing withdrawal. One could speculate that LMC's critique of Corizon might be a litigation tactic, to deflect responsibility. The fact remains that seven deaths occurred under Corizon's watch and, notwithstanding those deaths, LMC was willing to renew its contract with the company.

In January 2014, the Louisville Metro Police's Public Integrity Unit concluded investigations into three of the deaths at the jail, and criticized both Corizon and LMC. The Commonwealth Attorney's Office found that Sparks' and George's deaths were preventable; however, no criminal charges were filed. Dr. William Smock, a forensic examiner who served as a consultant during the investigations, stated with respect to George's death: "There is compelling evidence of a significant deviation from the standard of care and medical negligence on the part of the medical providers."

"I'm glad to see that the government's investigation matches exactly what our investigation showed, which is that her death and others like hers is easily preventable," said Chad McCoy, the attorney representing George's estate.

## Minnesota DOC

AFTER PROVIDING MEDICAL CARE TO Minnesota state prisoners for 15 years, Corizon was not selected when the contract was rebid in 2013 – despite having submitted the lowest bid. Instead, competitor Centurion Managed Care was to begin providing healthcare services in Minnesota's prison system effective January 1, 2014 under a two-year, $67.5 million contract.

Corrections Commissioner Tom Roy said the contract with Centurion was expected to "deliver significant savings to taxpayers while improving the quality of care for offenders."

According to the *Star-Tribune*, nine prisoners died and another 21 suffered serious or critical injuries in Minnesota correctional facilities due to delay or denial of medical care under the state's previous contract, which had been held by Corizon or its predecessor, CMS, since 1998.

That contract was for a fixed annual flat fee of $28 million. A flat fee contract provides an incentive for the contractor to tightly control costs, as a reduction in expenses results in an increase in profit. The *Star-Tribune* found that many of the staffing arrangements negotiated in the contract played a role in the deaths and injuries. For example, the contract allowed Corizon physicians to leave at 4:00pm daily and did not require them to work weekends. During off-hours there was only one doctor on call to serve the state's entire prison system, and many of the off-hour consultations were done telephonically without the benefit of the prisoner's medical chart. Under the

contract, Corizon was not required to staff most facilities overnight.

The Minnesota Department of Corrections was held liable for nearly $1.8 million in wrongful death and medical negligence cases during the period when the state contracted with Corizon or CMS.

In October 2012, a jury in Washington County awarded Minnesota prisoner Stanley Riley more than $1 million after finding a Corizon contract physician, Stephen J. Craane, was negligent in providing medical treatment. The *Star-Tribune* reported that Riley suffered from what turned out to be cancer and had written a series of pleading notes to prison officials. One read, "I assure you that I am not a malingerer. I only want to be healthy again."

In May 2013, the state paid $400,000 to settle a lawsuit over the death of a 27-year-old prisoner at MCF-Rush City. Xavius Scullark-Johnson, a schizophrenic, suffered at least seven seizures in his cell on June 28, 2010. Nurses and guards didn't provide him with medical care for nearly eight hours. According to documents obtained by the *Star-Tribune*, Scullark-Johnson was found "soaked in urine on the floor of his cell"

and was "coiled in a fetal position and in an altered state of consciousness that suggested he had suffered a seizure." An ambulance was called several hours later but a nurse at the prison turned it away, apparently due to protocols to cut costs. Corizon settled the lawsuit for an undisclosed sum in June 2013. See: *Scullark v. Garin*, U.S.D.C. (D. Minn.), Case No. 0:12-cv-01505-RHK-FLN.

## Philadelphia, Pennsylvania

IN PHILADELPHIA, MAYOR MICHAEL A. Nutter has been accused of being too loyal to his campaign contributors, including Corizon. The company donated $1,000 to Nutter's 2012 campaign committee several months before the city renewed Corizon's contract to provide medical care to 9,000 prisoners in Philadelphia's prison system. Further, PHS donated $5,000 to Nutter's mayoral campaign in 2008.

The contract renewal would have

been routine except for the fact that Corizon's performance in Philadelphia has been far from stellar. In July 2012 the company agreed to pay the city $1.85 million following an investigation that found Corizon was using a minority-owned subcontractor that did no work, which was a sham to meet the city's requirements for contracting with minority-owned businesses.

The renewed year-to-year Corizon contract, worth $42 million, began in March 2013. Nutter's administration was accused of using the year-to-year arrangement to avoid having the contract scrutinized by the city council; the city's Home Rule Charter requires all contracts of more than one year to be reviewed by

## Privatized Healthcare Problems (cont.)

the council. Further infuriating opponents of the contract, Corizon was not the lowest bidder. Correctional Medical Care (CMC), a competitor, submitted a bid that would have cost the city $3.5 million less per year than Corizon. Philadelphia Prison Commissioner Louis Giorla defended the city's decision to award the contract to Corizon at a council hearing; however, he declined to answer questions as to why the administration considered Corizon's level of care to be superior to that provided by CMC.

Three union contracts with Corizon covering 270 of the company's workers in Philadelphia's prison system expired on November 26, 2013. Corizon demanded benefit cuts, including changes in employee healthcare programs, to offset wage increases promised under the company's contract with the city. A strike was averted in December 2013 when the mayor's office intervened and both sides reached a settlement. The *Philadelphia Daily News* reported that the new union contracts provide wage increases but also include a less-generous health insurance plan for Corizon employees.

Since 1995, Corizon and its predecessor, PHS, have received $196 million in city contracts. The company's contract was terminated for several months in 2002 as a result of complaints that a diabetic prisoner had died after failing to receive insulin. The city renewed the contract anyway, cit-

ing affordability and pledging increased oversight. The city's law department estimates that Philadelphia has paid over $1 million to settle lawsuits involving claims of deficient prison healthcare; the largest settlement to date is $300,000, paid to a prisoner who did not receive eye surgery and is now partially blind.

Based upon the number of lawsuits filed against Corizon alleging inadequate medical care, its use of a sham subcontractor and the company's treatment of its own employees, it appears that maintaining the status quo – not best practices – may be the controlling factor in Philadelphia's continued relationship with Corizon.

## Allegheny County, Pennsylvania

ON SEPTEMBER 30, 2013, A PRISONER jumped from the top tier of a pod at the Allegheny County Jail. Following an investigation, authorities refused to make public their findings and declined to disclose the prisoner's injuries, citing medical privacy laws. The prisoner, Milan Karan, 38, was not transported to the hospital until the following day.

A spokesperson for Corizon, which provides medical care at the 2,500-bed jail, defended the nearly 24-hour delay by noting the prisoner "was under observation" before being sent to a hospital.

In December 2013, the *Pittsburgh Post-Gazette* reported that Corizon was having difficulty staffing the Allegheny County Jail. When the newspaper requested a comment from Corizon vice president

Lee Harrington, Harrington claimed he had no knowledge of staffing problems – despite having previously received emails from the facility's warden about that exact issue.

The staffing problems resulted in prisoners not receiving their medication in a timely manner. In emails obtained by the *Post-Gazette*, Warden Orlando Harper wrote to Harrington in October 2013, noting, "We are continuing to experience issues pertaining to the following: 1. Staffing, 2. Medication distribution." Also, on November 17, 2013, Deputy Warden Monica Long sent an email to Corizon and jail staff. "I was just informed by the Captain on shift, the majority of the jail has not received medication AT ALL," she stated, adding, "Staffing is at a crisis."

That crisis had been ongoing since Corizon assumed the medical services contract at the facility on September 1, 2013. Before the $62.55 million, five-year contract was awarded, Corizon vice president Mary Silva wrote in an email that it was imperative the jail have "adequate staffing on ALL shifts." That promise was made despite Corizon laying off many of the former employees of Allegheny Correctional Health Services, the jail's previous healthcare provider.

Allegheny Correctional had provided four full-time and one part-time physician during its contract tenure. Corizon reduced the number of doctors to one full-time and one part-time physician. Allegheny Correctional also employed three psychiatrists and one psychologist. Corizon's contract

requires that it provide one full-time psychiatrist and a part-time psychologist.

In January 2014, the United Steelworkers union (USW) filed a petition with the National Labor Relations Board to unionize Corizon employees at the Allegheny County Jail, including nurse practitioners, RNs, physician assistants and psychiatric nurses. USW representative, Randa Ruge indicated that the Corizon workers had approached the union for representation due to intolerable working conditions.

"Our folks [Corizon employees] are in danger of losing their licenses to practice by some of the things that the company has them doing," she said. Ruge told the *Post-Gazette* that the jail had run out of insulin for more than a week and Corizon supervisors had "countermanded doctors' orders."

Several weeks after the USW filed the labor petition, a Catholic nun who worked as an RN at the jail was fired by Corizon, allegedly for union organizing activities. Sister Barbara Finch was dismissed after she openly expressed concerns about staffing, patient care and safety at the facility. The USW filed an unfair labor complaint against Corizon regarding Finch's dismissal, claiming she was terminated in retaliation for her union activities.

"This is a clear case of intimidation and union-busting at its worst," said USW President Leo W. Gerard. "Sister Barbara has been an outspoken advocate of change for these courageous workers and their patients, and this kind of illegal and unjust action, unfortunately, is par for the course with Corizon."

On February 14, 2014, Corizon employees at the Allegheny County Jail voted overwhelmingly to unionize. "The next step is getting to the bargaining table and getting Corizon to bargain in good faith and get some changes made in the health system at the jail," said Ruge.

The previous week, Allegheny County Controller Chelsa Wagner stated she had "grave and serious concerns" about medical care at the facility, including issues related to staffing and treatment for prisoners with certain mental health conditions. "I regard the current situation as intolerable and outrageous, and I fully expect necessary changes to be urgently implemented," she wrote in a letter to Corizon.

## Polk County, Iowa

On August 29, 2013, Ieasha Lenise Meyers, incarcerated at the jail in Polk County, Iowa on a probation violation, gave birth on a mattress on the floor of her cell. Her cellmates assisted with the delivery. Earlier, when Meyers, 25, had complained of contractions, a Corizon nurse called an offsite medical supervisor and was told to monitor the contractions and check for water breaking.

Despite Meyers having been twice sent to a hospital earlier the same day, and pleading that she was about to give birth, the nurse did rounds in other parts of the jail. Guards reportedly did not check on Meyers as required, even though the birth could be seen on a nearby security monitor. Only after the baby was born was medical care provided. Sheriff Bill McCarthy defended the actions of jail staff.

## Corizon Employee Misconduct

Like most private contractors that provide prison-related services, Corizon tends to cut costs in terms of staffing and operational expenses. As noted above, this includes paying lower wages, providing fewer or inferior benefits and hiring less qualified workers who can be paid less. Sometimes, however, these practices result in employees more likely to engage in misconduct.

At the Pendleton Correctional Facility in Indiana, a Corizon nurse was arrested and charged with sexual misconduct, a Class C felony. The *Herald Bulletin* reported that in April 2013, when Colette Ficklin was working as a contract nurse for Corizon, she convinced a prisoner to fake chest pains so they could be alone in an exam room. A guard told internal affairs officers that he witnessed Ficklin and the prisoner engaging in sex acts in the prison's infirmary. [See: *PLN*, Sept. 2013, p.17].

In March 2013 at the Indiana State Prison in Michigan City, a Corizon practical nurse was charged with drug trafficking and possession with intent to distribute. Phyllis Ungerank, 41, was arrested and booked into the LaPort County Jail after attempting to smuggle marijuana into the facility. [See: *PLN*, July 2012, p.50].

A Corizon nurse at the Volusia County Branch Jail in Daytona Beach, Florida

## Privatized Healthcare Problems (cont.)

was fired after officials learned she was having sex with and giving money to a prisoner. Valerie Konieczny was terminated on December 18, 2012 when the jail was contacted by the brother of prisoner Randy Joe Schimp, who had written in a letter that a nurse was having sex with him and depositing money into his jail account. Investigators determined that Konieczny was the nurse who had sex with Schimp at both the Volusia County facility and another branch jail in 2011.

In New Mexico, Corizon physician Mark Walden was accused of fondling prisoners' genitals and performing prostrate exams that were "excessive and inappropriate in terms of length and method." At times, Walden reportedly did not wear gloves during the prostate exams. He was accused of sexually abusing 25 or more male prisoners while employed as a doctor at two privately-operated facilities, the Guadalupe County Correctional Facility in Santa Rosa and Northeast New Mexico Detention Facility in Clayton.

Lawsuits were filed against Walden, Corizon and private prison operator GEO Group, and Walden's medical license was suspended in December 2013. The suits claim that Corizon allowed Dr. Walden to work at the Clayton prison "despite knowing of the risk of sexual abuse and having the ability to know that [he] was repeatedly sexually abusing patients" at the Santa Rosa facility. [See: *PLN*, Sept. 2013, p.47].

## The Privatization Model

Economics professors Kelly Bedard and H.E Frech III at the University of California at Santa Barbara examined the privatization of correctional medical services in their research study, "Prison Health Care: Is Contracting Out Healthy?," published in *Health Economics* in November 2009.

They concluded: "We find no evidence to support the positive rhetoric regarding the impact of prison health care contracting out on inmate health, at least as measured by mortality. Our findings of higher inmate mortality rates under contracting out are more consistent with recent editorials raising concerns about this method of delivering health care to inmates."

Today, five years after the Bedard-Frech report was published, it has the benefit of hindsight. Since the report was written, its findings and conclusions have been reaffirmed in prisons and jails across the nation that have contracted with private companies to provide medical care to prisoners. Cost reductions in the provision of correctional healthcare tend to result in greater inefficiencies that lead to poorer outcomes. Consequently, for-profit medical contractors may actually be increasing morbidity and mortality in prison and jail populations.

Many governmental entities are willing to outsource correctional healthcare to private companies; reasons for doing so include cutting costs, risk management and removing healthcare duties from corrections departments. If Corizon's record with respect to providing medical care to prisoners seems dismal, the company can always defend its actions by stating it does what it has been hired to do: Cut costs for its customers. And those costs have been rising due to an increasingly aging, and thus medically-needy, prison population. [See: *PLN*, Nov. 2012, p.22; Dec. 2010, p.1].

With respect to risk management, litigation is not a compelling issue within the prison healthcare industry and Corizon views lawsuits as simply a cost of doing business. "We get sued a lot, but 95% or 97% of cases were self-represented cases," ex-CEO Rich Hallworth was quoted in an August 2013 article. He added that most lawsuits settle for an average of less than $50. Of course it is difficult for prisoners to obtain representation to pursue litigation – unless it's a wrongful death case, and then usually their family or estate is doing the suing.

Nor are the public agencies that contract with private medical providers greatly concerned about their litigation records. In fact, when Florida contracted with Corizon and Wexford Health Sources to provide medical care for the state's entire prison system, the Florida Department of Corrections didn't ask the companies about their litigation histories – such as lawsuits raising claims of deliberate indifference, negligence and medical malpractice.

"What really troubles me about this is the fact that the department didn't ask these very basic, elemental questions any system would ask," observed ACLU National Prison Project staff attorney Eric Balaban. "These two vendors were taking

over Florida's massive health care system and you'd think they would have asked hard questions to determine if these companies can provide these services within constitutional requirements."

Even worse, the downgrading of Corizon's debt rating by Moody's in 2013 creates a potential problem for the company's service delivery model. The majority of Corizon's revenue is derived from contracts with state and local agencies that are trying to reduce their budgetary expenses. Given those fiscal pressures and competition from Wexford, Armor, Centurion and other prison healthcare companies, Corizon cannot easily increase its revenue through contractual price increases. But the company's expenses are largely within its control.

Unfortunately for prisoners, in order to reduce costs Corizon will likely have to curtail the quality or quantity of healthcare services it provides. As noted above, this can be done by reducing employee wages or benefits; the company can also cut costs through understaffing and by limiting prescription medications or providing fewer referrals to hospitals and specialists. A growing trend is to use off-site medical staff who consult with prisoners through tele-medicine. [See: *PLN*, Dec. 2013, p.34].

The correctional healthcare industry, comprised of only a few large companies, is highly competitive. When one company loses a contract, another is more than will-ing to step in and submit a bid. What really matters for most government agencies and policymakers is the bottom line cost.

According to Dr. Marc Stern, the court-appointed special master in Idaho, "whoever delivers prison healthcare is doing it on less than adequate funding because that's how much municipalities, state legislatures and county commissions are allocating." He noted that privatization can be good in some cases and bad in others, depending on the level of oversight by the contracting public agency.

When Corizon compromises medical care to save money, such as curtailing the use of ambulances for emergency transports, reducing the number of on-site doctors or sending fewer prisoners to outside hospitals for needed treatment, government officials typically fail to take corrective action and deny responsibility for the resultant deaths and injuries. Indeed, as with the Idaho Department of Corrections and LMC in Kentucky, they sometimes want to reward the company with renewed contracts.

Why? Because continuity maintains

**Privatized Healthcare Problems (cont.)**

cost control, which is the driving force behind privatization of prison and jail medical services.

## Conclusion

THE INTENT OF THIS ARTICLE WAS TO REVIEW Corizon's performance and practices based on publicly-available information, including news reports and court records. Although the company was formed in June 2011, its two predecessor firms, PHS and CMS, littered the news and judicial dockets over the years with lawsuits and articles involving cases of inadequate healthcare. Thus, the sins of Corizon's parents, CMS and PHS, are forever linked with the progeny of their merger.

Such past misdeeds could be explained away had Corizon adopted a new, post-merger culture that was removed from prior practices under PHS and CMS. However, many of Corizon's mid-level and top executives – including ex-CEO Rich Hallworth, former president Stuart Campbell, chairman Richard H. Miles and a number of vice presidents – were previously executives with PHS or CMS. It was during their tenure at those companies that numerous cases involving deficient medical care occurred.

The corporate culture of Corizon, as well as its business model, appears to be largely the same as those of its predecessors. Therefore, the only thing that may have changed as a result of the merger that created Corizon is the company's name. ∎

*Gregory Dober is a freelance writer in healthcare and ethics. He has been a contributing writer for PLN since 2007 and co-authored*

Against Their Will: The Secret History of Medical Experimentation on Children in Cold War America, *published by Palgrave in 2013. [See: PLN, Nov. 2013, p.36].*

Sources: *Bloomberg News, Forbes, www. businessweek.com, Philadelphia Inquirer, Philadelphia Daily News, The American Independent, Pittsburgh Tribune-Review, St. Louis Business Journal, www.broward-bulldog.org, Miami Herald, WHAS-TV, The Tennessean, Courier-Journal, Idaho Business Review, Associated Press, The Arizona Republic, Maine Public Broadcasting Network, Bangor Daily News, WANE-TV, Raton Range, Des Moines Register, Star-Tribune, The Nation, The Florida Current, www.usw. org, KPHO-TV, WANE-TV, Tucson Citizen, WCAV-TV, www.wdrb.com, www.modern-healthcare.com, www.cochs.org, www.wndu. com, www.afsc.org, www.americanownews. com*

# Florida County Agrees to Pay $4 Million to Deceased Prisoner's Estate

### by Derek Gilna

NICHOLAS T. CHRISTIE, INCARCERATED at the Lee County jail in Ft. Myers, Florida, died on March 31, 2009 after being repeatedly pepper sprayed by deputies while strapped to a restraint chair. Following three years of litigation, Lee County officials agreed in May 2013 to pay a record settlement of $4 million to Christie's estate.

The jail's for-profit medical contractor, Prison Health Services (PHS), now known as Corizon, was named as a defendant in the federal lawsuit and included in the settlement agreement.

The § 1983 suit raised claims related to Christie's death under the "Fourth, Eighth and/or Fourteenth Amendments to the United States Constitution, the laws of the United States, and the laws of the State of Florida."

The complaint alleged that Christie was "restrained to a chair with a hood over his head and face for several hours in the custody of the Lee County Sheriff, while being detained on a misdemeanor trespass charge," and that medical staff at the jail failed to provide him with adequate care after he showed signs of respiratory distress during and after that incident. Medical personnel, the lawsuit stated, "acted willfully, wantonly, maliciously, and with reckless and callous disregard for and deliberate indifference to the serious medical and mental health needs of Nick Christie, and in a manner that shocks the conscience and offends traditional notions of decency, all of which led to his wrongful and untimely death."

According to the complaint, prior to and during his placement in the restraint chair, Christie disclosed to jail staff that he had "certain serious medical conditions..., including, but not limited to, Chronic Obstructive Pulmonary Disease (COPD), a heart condition, cardiovascular disease, atrial fibrillation, obesity, gout, back pain, constipation, and umbilical hernia, all of which was recorded and documented in Mr. Christie's PHS medical chart/record."

# EXHIBIT NUMBER

## B-1

_Arizona Prison System Plagued by Politics_

_Privatization and Prisoner Deaths_

By: Prison Legal News

Dedicated to the memory of William Van Poyck

# Prison Legal News

**VOL. 24  No. 7**
**ISSN 1075-7678**

*Dedicated to Protecting Human Rights*

**July 2013**

## Arizona Prison System Plagued by Politics, Privatization and Prisoner Deaths

### by Joe Watson

**B**Y THE TIME JAN BREWER REPLACED Janet Napolitano as Arizona's governor in 2009, it had been 22 years since the Arizona Department of Corrections (ADC) built the first prison in the United States designed exclusively for permanent lockdown – a prison that became the prototype for supermax facilities across the country.

Even before Brewer assumed the governorship and brought Charles L. Ryan out of retirement to run the ADC, Arizona's prisons were known to be ruthless and inhumane. Few other prison systems can claim the dubious distinction of leaving a mentally ill prisoner in an outdoor cage for hours in scorching summer heat until she literally baked to death. [See: *PLN*, Feb. 2010, p.32].

Yet by playing politics, contracting with for-profit prison healthcare companies and kowtowing to private prison firms, Governor Brewer and ADC Director Ryan have taken a prison system already infamous for its draconian conditions and unfettered incompetence and made it deadlier and even more vindictive and profit-driven than ever before.

The ADC, with a $1.1 billion budget in 2012, will soon open a new maximum-security facility with 500 solitary confinement cells at a prison complex in Buckeye, at a cost of $50 million. In doing so, state officials ignored warnings by the American Civil Liberties Union (ACLU), Amnesty International, American Friends Service Committee (AFSC) and other human rights groups about the lasting, negative effects of long-term isolation.

On June 11, 2013, *Prison Legal News* sent copies of *PLN*'s October 2012 cover story on solitary confinement to members of the Arizona legislative Joint Committee on Capital Review, noting that "budget expenditures are a zero-sum game and money spent on prison beds is money not spent on health care, education, affordable housing, infrastructure and other services for the state's citizens." *PLN* observed that solitary confinement has an adverse impact both in terms of fiscal costs and higher recidivism rates for prisoners released after being held in solitary.

"These conditions are gratuitously cruel," David Fathi, director of the ACLU's National Prison Project, said of the ADC's Secure Management Units (SMUs), where prisoners are held in solitary confinement.

"There [is] no penological nor security justification for those kinds of conditions."

But ADC Director Ryan testified before the Joint Committee on Capital Review that "there are no solitary confinement cells in Arizona prisons," apparently based on his own peculiar notion of what constitutes solitary confinement. The Committee duly approved the 500-bed maximum-security facility, which is scheduled to open in October 2014.

"Director Ryan saying that ADC's maximum-security units aren't solitary confinement is like the CIA claiming waterboarding is not torture," observed Caroline Isaacs, program director for the AFSC's office in Tucson. "Whatever you want to call them, the conditions in these facilities are harmful to people's physical and mental health."

Since Governor Brewer took office, the suicide rate in Arizona's prison system has increased while drug overdoses, homicides and untreated medical conditions are responsible for other prisoner deaths. The ADC reported that 81 prisoners died in 2012 while 36 deaths occurred in the first half of 2013; most of the deaths were described as being due to "apparent natural causes" or "unknown causes."

Even after being sued by the ACLU for failing to provide adequate medical treatment to the state's more than 40,000 prisoners, the ADC has continued to contract prisoner healthcare to a for-profit company with a reputation for neglect and incompetence.

And to punctuate Arizona's merciless criminal justice system under Governor Brewer's leadership, she has granted only a handful of commutations and has not is-

## INSIDE

| | |
|---|---|
| From the Editor | 14 |
| PA Hepatitis C Lawsuit Filed | 16 |
| Slow Pace of Executions | 22 |
| OK DOC Employees Disciplined | 26 |
| Valley Fever in CA Prisons | 28 |
| Congress Amends PLRA | 30 |
| Prison Phone Justice Update | 34 |
| CCA Loses Four Contracts | 38 |
| PLN Sues CCA in Vermont | 42 |
| Jails Turn to Video Visits | 44 |
| VA DOC Changes Grooming Policy | 46 |
| MS Mayor Goes to Prison | 54 |
| News in Brief | 56 |

**Prison Legal News**

*a publication of the*
*Human Rights Defense Center*
www.humanrightsdefensecenter.org

**EDITOR**
Paul Wright

**MANAGING EDITOR**
Alex Friedmann

**COLUMNISTS**
Michael Cohen, Kent Russell,
Mumia Abu Jamal

**CONTRIBUTING WRITERS**
Mike Brodheim, Matthew Clarke,
John Dannenberg, Derek Gilna,
Gary Hunter, David Reutter, Mike Rigby,
Brandon Sample, Mark Wilson,
Joe Watson, Christopher Zoukis

**RESEARCH ASSOCIATE**
Mari Garcia

**ADVERTISING DIRECTOR**
Susan Schwartzkopf

**LAYOUT**
Lansing Scott

**HRDC LITIGATION PROJECT**
Lance Weber—General Counsel

*PLN* is a monthly publication.

A one year subscription is $30 for prisoners,
$35 for individuals, and $90 for lawyers and
institutions. Prisoner donations of less than
$30 will be pro-rated at $3.00/issue. Do not
send less than $18.00 at a time. All foreign
subscriptions are $100 sent via airmail.
PLN accepts Visa and Mastercard orders by
phone. New subscribers please allow four
to six weeks for the delivery of your first
issue. Confirmation of receipt of donations
cannot be made without an SASE. PLN is
a section 501 (c)(3) non-profit organiza-
tion. Donations are tax deductible. Send
contributions to:

**Prison Legal News**
PO Box 1151
Lake Worth, FL 33460
561-360-2523
info@prisonlegalnews.org
www.prisonlegalnews.org

*PLN* reports on legal cases and news stories
related to prisoner rights and prison condi-
tions of confinement. *PLN* welcomes all news
clippings, legal summaries and leads on
people to contact related to those issues.

Article submissions should be sent to - The
Editor - at the above address. We cannot
return submissions without an SASE. Check
our website or send an SASE for writer
guidelines.

Advertising offers are void where prohib-
ited by law and constitutional detention
facility rules.

*PLN* is indexed by the *Alternative Press Index,
Criminal Justice Periodicals Index* and the
*Department of Justice Index.*

## AZ Prisons: Politics, Privatization, and Prisoner Death (cont.)

sued a single pardon – a dismal record that is unlikely to change during the remainder of her tenure.

With Brewer as governor and Ryan as director of Arizona's prison system, condi- tions for the state's prisoners have steadily deteriorated – though private prison com- panies have profited handsomely.

### Calls to Privatize More Prisons

To replace Dora Schriro – the state's prison chief under former Governor Na- politano before they both left for positions with the U.S. Department of Homeland Security – Brewer appointed Charles Ryan, who had retired as the ADC's director in 2003. Since his return, Ryan has parroted Brewer's calls for expanding prison privati- zation in Arizona.

At the time of his reappointment, five of the state's 15 prison complexes were already operated by private compa- nies: two by Utah-based Management & Training Corporation (MTC), including a medium-security facility in Kingman, and three by Florida-based GEO Group, the nation's second-largest for-profit prison firm. Collectively those complexes house over 6,000 prisoners, or 15% of the state's prison population.

Around the same time, Corrections Corporation of America (CCA) and the American Legislative Exchange Council were collaborating with then-state Sena- tor Russell Pearce to draft a xenophobic anti-immigration bill, SB1070, which was introduced in the state legislature in December 2009 and enacted into law the following year. [See: *PLN*, Nov. 2010, p.1].

SB1070 was expected to increase the number of people arrested due to immigration-related violations; this would potentially benefit CCA, which operates immigration detention facilities in Ari- zona.

Within Brewer's first year in office, she and Ryan called for privatization of the state's entire prison system. The leg- islature obliged but CCA, GEO Group and other for-profit prison companies shied away from wholesale privatization. [See: *PLN*, Sept. 2010, p.42]. Therefore, in January 2010, shortly after Senator Pearce

introduced SB1070, Ryan proposed a more modest addition of 5,000 new private prison beds to be opened within three years. To justify the estimated $585 million cost, the ADC used a combination of deceptive data and the anticipated impact of SB1070 to project a need for an additional 8,500 prison beds by 2017.

Not only were the projections wrong, the department never bothered to compare the costs and quality of services of privately- operated prison complexes with those run by the ADC, in violation of state law. Ac- cording to the *Arizona Republic*, "Arizona statutes require [the ADC] to carry out a biannual performance study for every con- tract. The study analyzes costs, the security and safety of each prison, how inmates are managed and controlled, inmate discipline, programs, health and food services, staff training, administration and other factors and then compares these factors to other facilities."

The ADC had not conducted a private prison performance study since a state stat- ute requiring such studies was enacted in 1987. Undeterred, prison officials proceeded with a request for proposals for 5,000 new private prison beds.

### Deadly Private Prison Escape

Governor Brewer and ADC Director Ryan's efforts to expand prison privatization in Arizona went mostly unchallenged until July 30, 2010, when prisoners John Charles McCluskey, Daniel Renwick and Tracy Province – with the help of McCluskey's cousin, Casslyn Mae Welch – escaped from a medium-security prison in King- man operated by MTC. Over the following three weeks the escapees kidnapped a pair of truck drivers, had a shootout with police and evaded authorities during a multistate manhunt throughout the western U.S.

While on the run, McCluskey mur- dered two retirees, Gary and Linda Haas, in the back of their camper off an old ranch road in New Mexico. He and Welch then doused the bodies with an accelerant and torched the camper.

Five days after the escape, a team of state investigators fanned out across the Kingman prison complex to determine how it happened. They discovered that MTC staff had ignored a malfunctioning alarm – which had been going off hundreds of times a day for over two years – that sounded when the escapees cut through a fence.

The ADC also discovered eight burned-out perimeter lights, more broken security equipment and, according to the *Republic*, "a lax, high-turnover culture in which MTC's green, undertrained staff and rookie supervisors ignored alarms, left long gaps between patrols of the perimeter, left doors leading out of some buildings open and unwatched, didn't alert the state or local police until hours after the escape, and failed in all manner of basic security practices."

A report issued by state prison officials cited those and other problems at the MTC-run facility. [See: *PLN*, March 2011, p.24]. The ADC's on-site monitor at Kingman, who was later fired, admitted that he had failed to address security problems and had never even read the state's contract with MTC.

McCluskey, Province and Welch were ultimately captured and charged with the Haas' murders (Renwick was arrested after he split from the group a few days after the escape). Province pleaded guilty and received five life sentences, Welch pleaded guilty and awaits sentencing, Renwick was sentenced to 60 years and capital murder charges against McCluskey remain pending.

Following the escape and nationwide manhunt, Ryan and the ADC did damage control and made cosmetic changes to prison security statewide. Ryan temporarily suspended all prisoner transfers to Kingman and moved 238 supposedly high-risk prisoners out of the facility, and the complex's population dropped to 80% of capacity.

This presumably would result in financial losses for MTC but the company threatened to sue, citing its contract that guaranteed a minimum 97% bed occupancy, and state officials ended up paying over $3 million to MTC for empty prison beds. The company continues to operate the Kingman facility.

"It's disgusting but not surprising," said Caroline Isaacs. "Arizona is strapped for cash, and we don't have the political will or the legal muscle to go up against a corporation like that, so they can operate with something close to impunity." She added, "We're so desperate because of prison overcrowding. These companies have got the state over a barrel. When things go wrong, is [ADC Director] Ryan really going to cancel the contract? Probably not, and they know that."

In 2011, once the escape had faded from the headlines, Brewer and Ryan reintroduced their plan to privatize an additional 5,000 prison beds – even though the ADC's daily prisoner count had fallen in the previous year due to fewer felony arrests in Maricopa County (the state's population center) and fewer probation violations statewide, among other factors.

ADC officials downplayed their blatantly exaggerated earlier prison population estimates and instead projected 3,800 more prisoners entering the state's prison system by June 2015, though they failed to provide hard data to support those projections. The plan to privatize more prison beds was met with bipartisan, if not broad, criticism.

"The fact we're moving forward with this outdated plan is mind-boggling to me," said Democratic state Rep. Chad Campbell, Arizona's House minority leader. "I don't think there's a need for it," agreed state Rep. Cecil Ash, a Republican who had unsuccessfully pushed for sentencing reforms in the previous legislative session.

Regardless, Brewer and Ryan pressed ahead and four private prison companies responded to the ADC's request for proposals.

In the summer of 2011, ADC officials and representatives from CCA, GEO Group, MTC and LaSalle Corrections – the companies bidding on the 5,000-bed contract – went on a tour around the state, holding town hall-style meetings in communities from Winslow to Eloy to Coolidge. At each meeting the companies deflected criticism about escapes and costs, focusing instead on the promise of jobs and trotting out business leaders and loyal employees.

"I work with wonderful people," said Linda Gibson, an antique shop owner who

is also employed by CCA, during a public meeting in Eloy, where CCA operates a facility that houses prisoners from other states. "We have a lot of single mothers who work at CCA, making good money, who have homes they wouldn't have if it wasn't for CCA."

Some communities, however, rejected the private prison dog-and-pony show, with GEO Group's proposal to build a facility in the City of Goodyear, outside Phoenix, running into a "buzz saw" of opposition according to the *Arizona Republic*. Mayor Thomas Schoaf of nearby Litchfield Park called the proposal "a slap in the face to our residents" and "a threat to the public welfare of our communities."

### Prisoners Driven to Suicide

MEANWHILE, AN APRIL 2012 REPORT from Amnesty International, titled "Cruel Isolation," examined Arizona's draconian Special Management Units at the Arizona State Prison Complex (ASPC) in Eyman and other maximum-security ADC facilities. Citing prisoner advocates, current and former prison staff and the ADC's own written policies, the report found that the ADC, which houses over 2,900 prisoners in maximum-security facilities, was "in violation of international law."

Amnesty concluded that "the cumulative effects of the conditions [in SMUs], particularly when imposed for a prolonged or indefinite period, constitutes cruel, inhuman, or degrading treatment." Even those prisoners considered especially dangerous, Amnesty argued, should be treated "with humanity and respect for the inherent dignity of the human person," pursuant to international standards related to the treatment of prisoners.

"Amnesty International recognizes that it may sometimes be necessary to segregate prisoners for disciplinary or security purposes. However, all measures must be consistent with international standards for humane treatment," Amnesty stated. "Article 10 of the International Covenant on Civil and Political Rights, which the USA has ratified, provides that 'all persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person,' a standard which the United Nations (UN) Human Rights Committee, the treaty monitoring body, has stressed is a 'fundamental and universally applicable rule.'"

But according to Amnesty's report, the ADC's Special Management Units – intended for prisoners who pose the greatest physical threat to prison employees and the public – are too often filled with mentally ill, nonviolent and vulnerable offenders.

Most prisoners held in SMUs have little to no human interaction. With just one or two hours out of their windowless cells each day, they must choose to either bathe themselves or spend their limited out-of-cell time in a small cage with 20-foot walls and a sliver of sky, which the ADC contends is sufficient "outdoor recreation." SMU prisoners cannot participate in work, rehabilitative or educational programs. If they protest their living conditions, guards ignore them or sometimes deliberately deny them food.

It is little surprise then, but no less tragic, that Arizona's prison suicide rate, according to a U.S. Bureau of Justice Statistics report released in December 2012, is higher than the national average. Meanwhile, Amnesty found that at least 14 of 43 suicides recorded in Arizona prisons

**AZ Prisons: Politics, Privatization, and Prisoner Death (cont.)**

between October 2005 and April 2011 – almost 33% – occurred in SMUs, even though those units housed less than 9% of the state's total prison population.

"High rates of suicide in solitary units is a widespread problem; that's why many states no longer house mentally ill inmates in solitary," said Craig Haney, a psychologist at the University of California-Santa Cruz. "The severity of the conditions in those units ... most mentally healthy people who go in are adversely affected. People can become so despairing, so desperate that they take their own lives."

According to the ADC's critics, prisoner suicides are likely underreported. And of those that state prison officials publicly disclose, they do not specify whether a suicide occurred in an SMU or other solitary confinement unit.

A major deficiency in the SMUs is a lack of treatment for seriously mentally ill prisoners. Amnesty International found that "one prisoner diagnosed with [serious mental illness] spent two years in SMU without once seeing a psychiatrist despite his repeated requests and referrals by staff." Another prisoner had completed a seven-day mental health treatment program, Amnesty reported, "after which he was returned to isolation in SMU where he hanged himself the following day."

Approximately 10,000 state prisoners require ongoing mental health services, according to the ADC, including prisoners in SMUs and general population units.

As part of an investigative series into the state's prison system, the *Arizona Republic* found there were 470 attempts of self-harm or suicide by ADC prisoners statewide over an 11-month period ending in May 2012.

In one earlier incident, Anthony Lester, 26, a mentally ill prisoner who had been diagnosed with schizophrenia, bled to death in his two-man cell at ASPC-Tucson in July 2010 after slashing his neck, wrist and groin with a razor blade. Prison staff stood by and watched him die without providing medical assistance. One of the guards, Orlando Pope, said he didn't help because he had never been trained on how to apply pressure to a wound.

"When Tony was on his meds, he was our Tony," said Lester's aunt, Patti Jones. "If he'd had access to care, he would have lived." Lester had been on suicide watch, but was removed two days before he killed himself. A guard had mistakenly given him shaving razors.

Just before the ADC provided suicide prevention training to 8,806 prison employees in March 2012, Lester's family filed a wrongful death claim against the state, seeking $3 million. Pope and four other guards received unpaid suspensions for failing to properly respond while Lester was bleeding to death.

More recent suicides in Arizona state prisons – three in one month – include the May 10, 2013 suicide of death row prisoner Milo Stanley, 50, who hung himself; Paul Henderson, 22, who died from "an apparent suicide" on May 1, 2013; and prisoner Joaquin Tamayo, 41, serving a five-year sentence, who killed himself on April 22, 2013. All three deaths occurred at ASPC-Eyman. On February 12, 2013, ADC prisoner Christina Black, 52, serving a life sentence for murder, committed suicide at the Perryville prison complex in Goodyear.

### Other Deaths Due to Violence, "Gratuitous Cruelty"

SUICIDES, WHETHER IN SMUs OR OTHER units, aren't the only cause of unnecessary deaths in Arizona's prison system. Other prisoners have overdosed on drugs, been killed by fellow prisoners or died because they received inadequate medical care.

"Arizona's prison system has two death rows," the *Arizona Republic* proclaimed in its investigative series. "One is made up of the 126 inmates officially sentenced to death ... [and] the other death row, the unofficial one, reaches into every prison in Arizona's sprawling correctional system. No judge or jury condemned anyone in this group to death. They die as victims of prison violence, neglect and mistreatment."

Between 2010 and mid-2012, 37 Arizona prisoners died on Arizona's "other death row" – more than five times the number of condemned prisoners executed during the same time period, the *Republic* reported. The ADC conducts its own investigations into prisoners' deaths rather than an outside agency, and typically releases scanty information.

According to Carl ToersBijns, a re-

tired former ADC deputy warden who worked at ASPC-Eyman, the lack of full disclosure with respect to prisoners' deaths is intentional.

"The cleanup starts the moment the incident is reported: eliminating flag words, eliminating individuals who may be relevant to the situation, cut back the witness list," ToersBijns said. "By the time it's finalized, the incident report is so clean and sterile you won't know what happened. The direction is given ... was it deliberate, accidental, suicide, homicide? They try to fix and create a summary for that report that they can defend.

"A lot of drug overdoses are [reported as] suicides," ToersBijns continued. "A lot of 'natural deaths' are people who have been suffering medical conditions but finally just expired. It's not reflected on those reports and never will be reflected in the news reports. Only the ones who were there know what happened."

But the *Republic* did manage to identify some of the causes of the 37 deaths, by filing public records requests. At least seven prisoners died after overdosing on heroin, for example.

"Nobody ever told me he could die in prison of illegal drugs," stated Cynthia Krakoff, whose 36-year-old son, Carlo, died from a heroin overdose at a Tucson prison on July 31, 2011. "If they can't clean up the prisons, they need to find a different way to treat the drug addicts."

Unfortunately, substance abuse treatment programs in Arizona prisons are lacking. While around 75% of ADC prisoners report having drug and/or alcohol problems, only 1 in 13 of those prisoners received substance abuse treatment in fiscal year 2011.

Other deaths were due to homicides. Seven prisoners were killed by fellow prisoners between 2010 and mid-2012, including Eduardo Martinez, who was beaten to death by gang members at ASPC-Yuma in December 2011. He had been serving time for writing bad checks. Christian Frost, 38, was killed at ASPC-Tucson on February 22, 2013, while ASPC-Lewis prisoner John Jones, 63, was murdered on June 17, 2013. An investigation into Jones' death by the ADC's Criminal Investigation Unit is reportedly pending.

According to the Bureau of Justice Statistics, based on data from 2001-2010, Arizona has a prison homicide rate 25% higher than the national average.

With respect to deaths due to substandard medical care, on March 6, 2012 the ACLU – joined by the Berkeley, California-based Prison Law Office, the Arizona Center for Disability Law, and the law firms of Perkins Coie LLP and Jones Day – filed suit against the ADC for unconstitutionally denying prisoners adequate medical and mental health treatment. [See: *PLN*, Sept. 2012, p.34].

The federal lawsuit, which seeks declaratory and injunctive relief and calls for the state to improve prison healthcare and address conditions in SMUs, alleges that Arizona prisoners have suffered "serious, preventable injuries, disfigurements and death."

The complaint cites a prisoner who was ignored for two years until he died due to liver cancer. A pregnant prisoner was told by prison staff that her medical symptoms were "all in your head"; she was then left alone in her cell, where she miscarried. One prisoner was punished for administering CPR to another prisoner suffering a heart attack while guards stood by and refused to summon medical assistance.

"In recent years," the lawsuit claims, "Defendants ignored repeated warnings of the inadequacies of the healthcare system and of the dangerous conditions in their isolation units that they received from inmate grievances, reports from outside groups, and complaints from prison personnel, including their own staff."

The lawsuit also describes a prisoner who was denied treatment for a cancerous growth on his penis over a two-year period. His penis was eventually amputated, but not before the cancer had spread to his stomach. Another prisoner had most of his lip and mouth removed after waiting seven months for medical care.

"In two decades of prison litigation, this is one of the most broken systems I've

**AZ Prisons: Politics, Privatization, and Prisoner Death (cont.)**

## Privatizing the Healthcare Problem

seen," said ACLU National Prison Project director David Fathi. "The indifference to the needs of desperately ill people is shocking. And the gratuitous cruelty we see in Arizona's SMUs is unlike anything we've ever seen in other states' supermax prisons."

On March 5, 2013, the district court granted the plaintiffs' motion for class certification in the lawsuit. The court certified a class consisting of "All prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the ADC," and a subclass of "All prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day" or confinement in specified maximum-security units, including SMUs.

The case remains pending. See: *Parsons v. Ryan*, U.S.D.C. (D. Ariz.), Case No. 2:12-cv-00601-PHX-NVW.

GIVEN THE ADC'S KNOWN DEFICIENCIES in providing adequate medical and mental health care to prisoners, and having been criticized by human rights groups, targeted by the news media and hit with a class-action lawsuit, one would expect the ADC to make efforts to at least modestly improve its dysfunctional medical system.

Instead, in April 2012, state prison officials awarded Wexford Health Sources – a for-profit company with a history of incompetence and medical neglect – a three-year, $349 million contract to provide healthcare to Arizona prisoners. The Wexford contract went into effect in June 2012. [See: *PLN*, May 2012, p.36].

Less than four months later the company had made quite a first impression. On August 27, 2012, a vocational nurse employed by Wexford exposed more than 100 prisoners at ASPC-Lewis to hepatitis C by contaminating the prison's insulin supply.

Nurse Nwadiuto Jane Nwaohia, who was already under investigation by Arizona's Board of Nursing for undisclosed reasons, administered a routine dose of insulin to a diabetic prisoner who had hepatitis C, then inserted the same needle into another vial to draw more insulin for the same prisoner. The vial was placed among other vials of insulin in a medication refrigerator and used later that day to dispense insulin to 103 diabetic prisoners.

Medical staff quickly discovered the contamination and destroyed all the vials of insulin, and Nwaohia, according to a Wexford statement, was suspended for violating "basic infection-control protocols while

administering medication that day."

However, Wexford didn't notify the state or Maricopa County officials until eight days after the incident.

"It's extremely disturbing that something like this could happen. It calls for a thorough investigation to determine all of the surrounding causes of the mistake or the negligence," said Don Specter, director of the Prison Law Office.

Wexford tried to deflect responsibility for the insulin contamination by blaming a local staffing agency for assigning Nwaohia to the prison complex. But Ken Kopczynski, executive director of the Private Corrections Working Group, which opposes prison privatization, criticized state officials who contracted prisoner healthcare to Wexford and then failed to maintain proper oversight.

"This is a problem with privatization," Kopczynski noted. "[The ADC is] just accepting who Wexford will hire."

State prison officials threatened to fine Wexford a paltry $10,000 after the hepatitis C contamination incident, which followed other disturbing incidents.

A prisoner at ASPC-Florence attempted to commit suicide on August 23, 2012 after not receiving his psychotropic medication for an entire month. According to the ADC, Wexford's failure to provide the medication to the prisoner, who was found hanging from a sheet in his cell, was a "significant, non-compliance issue."

Ten days earlier, ADC mental health contract monitor Ben Shaw had issued a memo that described significant shortages among Wexford's mental health staff.

"Wexford's current level of psychiatry staffing is grossly insufficient to meet [its] contractual requirement," he wrote. "Further, this staffing level is so limited that patient safety and orderly operation of ADOC facilities may be significantly compromised.... Wexford currently has 14.85 psychiatry FTE's [full time employees] allocated to address the clinical needs of 8,891 patients who are prescribed psychotropic medications. Wexford now employs a total of 5.95 FTE psychiatry providers (approximately 33% of their allocation) [with] 8.9 FTE's vacant (leaving a vacancy rate of 66%)."

Also in August 2012, a Wexford nurse at the women's prison in Perryville administered medication to a prisoner by having her "lick the powdered medication from her

own hand" rather than putting the meds in a cup of water, in violation of policy. Further, a number of prisoners at the facility, the state learned, "may not have been receiving their medications as prescribed due to expired prescription[s] and inappropriate renewals or refills."

On September 21, 2012 the ADC issued a "Written Cure Notification" to Wexford that detailed a litany of contract violations – including inadequate staffing levels, a decrease in routine institutional care, incorrect or incomplete medication prescriptions and refill procedures, inconsistent medical records documentation, lack of responsiveness to incident urgency and reporting requirements, and an unresponsive approach to prisoners' grievances.

ADC officials ordered Wexford to fix the staffing problems, properly distribute and document medication for prisoners and communicate more effectively when problems arise. ADC Director Ryan later said in a written statement that Wexford was being afforded a chance to "improve communications and ensure [that] the healthcare needs of the inmates incarcerated by the State of Arizona are being met."

Wexford, on the other hand, shifted blame back to the state. In a letter to Ryan the company stated the ADC "must recognize that the system that was in place" before Wexford's contract began was "extremely weak."

"This is more proof that privatization is not saving us money, not providing better services and is not any more efficient," said Caroline Isaacs with the AFSC. "While the state clearly had its problems, just inserting another layer to the bureaucracy is no way to address the problems, and it complicates the matter."

Doris Marie Provine, a justice studies professor at Arizona State University, noted that "When the state locks someone up, it assumes responsibility to provide safe and humane conditions of confinement. No amount of outsourcing will change that."

The ADC apparently thought otherwise; after terminating its contract with Wexford in January 2013 due to "both parties encountering unforeseeable challenges," state prison officials instead contracted with Corizon, another for-profit prison healthcare company with a history of abuses and neglect. Corizon began providing medical

care to prisoners on March 4, 2013.

"Merely replacing one for-profit prison contractor with another will only prolong the crisis in Arizona's prisons," said Dan Pochoda, legal director of the ACLU of Arizona. "There is no reason to think that anything will change under Corizon, Inc."

### Shutting the Safety Valve of Justice

Unfortunately, Arizona prisoners with life-threatening medical conditions who apply for commutations of their sentences are largely out of luck, as Governor Brewer apparently doesn't like making clemency decisions. Or perhaps she simply doesn't like justifying them.

In April 2012, Brewer replaced three of the five members of Arizona's Board of Executive Clemency – board chairman Duane Belcher; Marilyn Wilkens, who was appointed in 2010; and Ellen Stenson, appointed by former Governor Napolitano in 2007.

According to Belcher, Governor Brewer was displeased by the board's 2009 majority recommendation to grant clemency to convicted murderer William Macumber, who had raised a strong claim

## AZ Prisons: Politics, Privatization, and Prisoner Death (cont.)

of innocence. Wilkens also indicated that Brewer was dissatisfied with the way she had voted in a clemency case.

"It was expressed clearly that there was dissatisfaction with my vote on a particular issue, and that I had not voted the way they wished that I would have voted," she said. According to one source, that case was most likely the clemency board's January 26, 2012 unanimous recommendation to reduce 74-year-old Robert Flibotte's 90-year sentence for possession of child porn to five years plus lifetime supervision.

Governor Brewer overruled both clemency recommendations.

The clemency board's new members include Brian Livingston, a retired police officer and executive director of the Arizona Police Association; Melvin Thomas, a former Arizona warden who was employed by private prison firm GEO Group after working for the ADC for 21 years; and new board chairman Jesse Hernandez.

Hernandez had worked on some of Arizona's more recent high-profile conservative political campaigns, including leading a Republican Latino group's support for anti-immigrant legislation SB1070. Hernandez was also chairman of a group that tried to help state Senator Russell Pearce win his recall election in November 2011.

The replacement of the clemency board members didn't go smoothly, however. An attorney for death row prisoner Samuel Lopez challenged Brewer's appointment of the new board members in court, claiming the committee that had conducted interviews and made recommendations did not comply with the Open Meetings Law and other state statutes, and that the new members had not received required training before they began conducting hearings. Lopez's attorney refused to participate in an initial clemency hearing, saying the board wasn't authorized to act on clemency petitions. Lopez was executed on June 27, 2012.

Brewer's three new clemency board members, as gatekeepers to the clemency process, will help determine whether prisoners' commutation and pardon petitions are sent to her office for consideration.

"It's clear to me now that they are trying in any way they can to manipulate the outcome of clemency hearings," said Belcher. "If the cases don't go before the governor, she doesn't have to say yes or no."

Not that prisoners seeking clemency have much of a chance anyway.

Between January 2009 and June 2013, Governor Brewer granted just 28 commutations due to prisoners' life-threatening medical conditions and 6 for non-medical reasons. Her poor record on granting clemency petitions mirrors that of prior Arizona governors, but she is the first governor in at least 35 years to not issue a single pardon, denying all of the board's pardon recommendations. She has never commuted a death sentence.

One noteworthy exception to Brewer's stingy clemency policy was her decision to commute the life without parole sentence of ADC prisoner Betty Smithey in August 2012, resulting in Smithey's immediate release after serving 49 years. [See: *PLN*, Dec. 2012, p.50].

In a state where the prison population has increased eight-fold over the past 30 years; where budget cuts have created a two-year backlog for the clemency board; and where more than 90% of Arizona's 76,000 felony criminal cases each year are settled by plea bargains driven by harsh mandatory minimums, the clemency process is considered the criminal justice system's safety valve.

Yet Brewer continues to deny most clemency applications, even those that apparently have merit. One particularly egregious case involved William Macumber, who was convicted of a double homicide in 1975 and sentenced to life.

Former state judge and public defender Thomas O'Toole told the clemency board in 2009 that another man, Ernest Valenzuela, had confessed the killings to him in 1967, but due to attorney-client privilege he didn't disclose the confession until after his client died in a prison fight. "There is no doubt in my mind that Ernesto Valenzuela committed those crimes," O'Toole said. However, the judge over Macumber's criminal case refused to allow O'Toole to testify about his client's confession, and the Arizona Supreme Court agreed that the trial court could assert attorney-client privilege on behalf of Valenzuela even though he was deceased.

In 2009, based on O'Toole's testimony and other evidence in the case – including evidence suggesting that Macumber had been framed by his ex-wife, who worked at the Maricopa County Sheriff's Office – the clemency board recommended that his sentence be commuted.

The board, then chaired by Duane Belcher, found not only that Macumber had served an excessive amount of time in prison and was not a threat to society, but that his conviction was a miscarriage of justice, stating, "the evidence that now exists certainly casts serious doubt on Mr. Macumber's conviction."

Regardless, Governor Brewer denied the board's recommendation without explanation.

"Sometimes the law has a disproportionate impact and may be too rigid. That's what the pardon power is for," said P.S. Ruckman, an Illinois political science professor who runs a blog about clemency and pardons. "Brewer has the power and discretion to have a larger sense of justice and to do something about it. That's her duty."

But with Brewer failing in that duty the Arizona courts stepped in, scheduling an evidentiary hearing after Macumber filed a petition for post-conviction relief. Prosecutors offered a plea deal rather than proceed with the hearing, and on November 7, 2012, Macumber, now 77 years old, pleaded no contest to second-degree murder and was released on time served – over Brewer's public objection. He had spent 37 years in prison.

## Private Prison Contract Awarded

THE ADC'S LONG-DELAYED PERFORMANCE study of the state's private prisons was finally released in December 2011, and predictably found, in a self-serving manner, that the state's private and publicly-operated prisons were comparable in both cost and quality of services. Yet according to the American Friends Service Committee, the ADC's study included "very little methodological information or supporting data, suffers from inconsistent data collection procedures, and overlooks important measures of prison safety."

The AFSC had filed a lawsuit challenging the state's proposed 5,000-bed private prison contract on September 12, 2011, seeking an injunction prohibiting the ADC from awarding the contract, but the suit was dismissed due to lack of standing.

The organization also filed an unsuccessful administrative challenge that served to delay the contracting process.

The ADC canceled its contract proposal for 5,000 new private prison beds in December 2011 and issued a revised proposal for 2,000 beds, which was later reduced to 1,000.

Never mind that Arizona's prison population had declined over the previous year, which indicated that additional prison beds were not needed. Never mind that, according to the ADC's own records, there were around 2,000 empty beds in the state's prison system at the time the ADC was soliciting a contract for 1,000 more private prison beds.

And never mind that a September 2010 report by the Arizona State Auditor's office, based on ADC data, noted that minimum- and medium-security private prisons in the state actually cost *more* to operate than government-run prisons, when comparable costs were taken into account. [See: *PLN*, July 2012, p.45].

In February 2012, the AFSC released a report titled "Private Prisons: The Public's Problem," which provided a quality assessment of privately-operated prisons in Arizona. The report found that the state did not need additional prison beds and was wasting money on prison privatization; that private prisons had "serious security flaws" and "serious staffing problems," and did not measure recidivism rates; and that private prison companies were "buying influence" through lobbying and political campaign contributions, and were not accountable to Arizona taxpayers. Overall, the report revealed "widespread and persistent problems in private facilities around safety, lack of accountability, and cost."

On August 31, 2012, the ADC announced that its 1,000-bed private prison

contract, worth $21.5 million annually, had been awarded to Corrections Corporation of America. The contract, for an initial period of ten years with options for two 5-year renewals, includes a 90% bed occupancy guarantee.

In fairness, CCA had worked hard to win the contract. The company employed a cadre of lobbyists, including Paul Senseman, Governor Brewer's one-time spokesman before leaving her administration in 2011, who worked for a lobbying firm hired by CCA, Policy Development Group. His wife, Kathryn Senseman, was also a CCA lobbyist. Additionally, CCA hired lobbying firm HighGround Public Affairs Consultants, a company founded by Chuck Coughlin, Brewer's former campaign manager and policy advisor. [See: *PLN*, July 2012, p.45].

"If you place two of your lobbyists at the right and left hand of the governor of the state and she has final say and oversight of the Department of Corrections, I would say that's a pretty smart business strategy," said Caroline Isaacs.

According to the AFSC, CCA had also made at least $35,000 in campaign contributions to Arizona candidates during the 2010 election cycle and donated $10,000 to Brewer's "Yes on 100" sales tax initiative. CCA's other political connections included former Arizona U.S. Senator Dennis DeConcini, who serves on CCA's board of directors; additionally, Governor Brewer

**AZ Prisons: Politics, Privatization, and Prisoner Death (cont.)**

had appointed former CCA employee and lobbyist Mark Brnovich as chairman of the state's Commission on Privatization and Efficiency.

CCA will open the first 500 contract beds at its prison complex in Eloy by January 2014, and the remaining 500 beds should be on line a year later. All of the beds are for medium-security prisoners.

The contract also gives CCA an option to operate another 1,000 prison beds after 2015 provided that there is an increase in the state's medium-security prison population, which – based on the ADC's classification system – can be easily manipulated by arbitrarily increasing scores on prisoners' security-risk assessments.

State Rep. Chad Campbell joined a group of Democrats, clergy members and civil rights organizations in asking Governor Brewer to rescind the state's private prison contract. Of course she declined.

"The bottom line is we need to protect safety while protecting taxpayer dollars," said Rep. Campbell, "and expansion of private prisons does neither."

The AFSC was more blunt, concluding in its February 2012 report that either "our state leaders are so ideologically wedded to the idea of privatization that they are unable or unwilling to face reality," or that "they are beholden to the for-profit prison industry and that this industry has such unmitigated power in Arizona that it has simply hijacked the democratic process."

## Conclusion

GOVERNOR BREWER AND ADC DIRECTOR Ryan's negative influence on Arizona's prison system will persist long after they depart from office unless criminal justice advocates, human rights groups and Arizona voters take action.

There have been some glimmers of hope, including an unprecedented recall campaign against former state Senator Russell Pearce, the author of SB1070, who was removed from office in November 2011. SB1070 was largely struck down by the federal courts after the U.S. Justice Department sued the state of Arizona, although the bill's "show me your papers" provision, which allows law enforcement officers to question people about their citizenship status based on reasonable suspicion, was upheld by the U.S. Supreme Court on June 25, 2012. See: *Arizona v. United States*, 132 S.Ct. 2492 (2012).

Also, in November 2012 the ADC released video of the events surrounding the 2010 suicide of Anthony Lester at ASPC-Tucson, resulting in public outrage. Prison officials had fought for two years against the release of the video, which showed multiple guards standing around for 23 minutes, doing nothing to help Lester as he bled to death. Channel 12 News KPNX had to file suit in state court to obtain the video foot-

age; the court found the ADC had wrongly refused a reporter's request for the video and ordered the ADC to pay $26,000 in attorney's fees to the news station.

After seeing the video, state Rep. Chad Campbell called for Ryan's resignation as ADC director. Predictably, that hasn't happened.

The class-action lawsuit filed by the ACLU and Prison Law Office over inadequate medical treatment in Arizona's prison system remains pending and hopefully will result in improved medical and mental health care, although the state still contracts with Corizon.

Neither Brewer nor Ryan is expected to be out of a job until at least January 2015, when Arizona's next governor is inaugurated. At least until then, the state's prison system will continue to suffer under their leadership.

More prisoners will needlessly die due to suicide, violence and medical neglect. The state's prison system will expand its use of solitary confinement. Private prison companies will continue to profit at the expense of taxpayers. And prisoners' clemency petitions will be largely ignored by the clemency board's new members appointed by Governor Brewer.

All of this should matter to Arizonans.

"This matters," according to a June 9, 2012 *Arizona Republic* editorial, "because tax dollars should buy secure prisons. It matters because inmates who survive a brutal system are unlikely to become good neighbors when they return to our communities. It matters because assuring the basic needs and safety of prisoners says a great deal more about us than it does about them."

It matters, but apparently not to most Arizona lawmakers who presumably have the power to improve the state's prison system. ◼

Sources: *Arizona Republic; "Cruel Isolation: Amnesty International's Concerns About Conditions in Arizona Maximum Security Prison," Amnesty International (April 2012); Center for Media and Democracy; www.prwatch.org; Rolling Stone; www.azfamily.com; http://tucsoncitizen.com; www.kpho.com; Phoenix New Times; Huffington Post; www.afsc.org; http://arizonaprisonwatch.blogspot.com; www.thinkprogress.org; www.pardonpower.com; www.businessinsider.com; http://azcapitoltimes.com; www.azcorrections.gov; www.kgun9.com*

# EXHIBIT NUMBER

## "C"

Corizon Health Services, Inc;
Definition - Alternate treatment Plan -
Chronic Disease.

For purposes of the performance measures, the following definitions will be used:

| TERM | DEFINITION |
|------|------------|
| Active labor & delivery | Contractions lasting 45-60 seconds and being 3 to 4 minutes apart |
| ASPC | Arizona State Prison Complex. ASPC- Safford includes Ft Grant. ASPC-Florence includes Globe. ASPC-Winslow includes Apache. |
| ATP | Alternate Treatment Plan |
| Chronic Disease | Chronic diseases include the following:<br>• diabetes<br>• HIV/AIDs<br>• cancer<br>• hypertension<br>• Respiratory disease (for example, COPD / asthma / cystic fibrosis)<br>• Seizure Disorder<br>• heart disease<br>• sickle cell disease<br>• Hepatitis C<br>• Tuberculosis<br>• Neurological disorders (Parkinson's, multiple sclerosis, myasthenia gravis, etc.)<br>• Cocci (Valley Fever)<br>• End-Stage Liver Disease<br>• Hyperlipidemia<br>• Renal Diseases<br>• Blood Diseases (including those on anticoagulants (or long term >six months))<br>• Rheumatological Diseases (including lupus, rheumatoid arthritis)<br>• Hyperthyroidism<br>• Crohn's Disease |
| Contracted Vendor | For purposes of this agreement, contracted vendor refers directly to Corizon Health and its subcontractors, or any successor contractor/subcontractor. |
| CQI | Continuous Quality Improvement |
| Diagnostic Service | Lab draws and specimen collections, X-rays, vision testing, and hearing testing |
| DOT | Direct-observation therapy (watch-swallow) (medications) |

# EXHIBIT NUMBER

## "D-1"

A.D.O.C. Inmate Health Services, Chapter 1100, Department
ORDER 1101, Pgs. 22 & 23

1.1.2.4.3   The Contract Health Site Manager shall reconvene the Committee after 24 hours to record the inmate's decision. If the inmate agrees to cooperate the physician's examination shall be conducted.  If the inmate continues to refuse, a refusal form shall be completed and a forced examination shall be scheduled to determine the inmate's gender.

# IMPLEMENTATION

Within 90 days of the effective date of this Department Order, the ADC Assistant Director for Health Services Contract Monitoring Bureau shall update the following Technical Manuals, which shall address, at a minimum:

- Intermittent Self-Catheterization and Self-Colostomy Management.

- Dental Services.

  - Routine and Emergency Care.

  - Orthodontics.

  - Protheses.

  - Fractures of Facial Bones.

  - Outside Services.

- Nursing Operations and Seasonal Nursing Pools.

- Pharmacy Services.

# DEFINITIONS

**ANTERIOR FLIPPER** - A plastic partial replacing one or more missing anterior teeth.

**APPOINTMENT LIST** - A roster prepared daily by Health Services staff indicating all scheduled inmate appointments for medical, mental and/or dental health care.

**BRIDGE** - A partial denture anchored to adjacent teeth which fill a gap.

**CHRONIC CONDITION** - One of the following health conditions, which are coded as shown the Medical Record file:

- ADA Qualified Inmates Requiring Regular Examinations and/or Treatment (Universal Handicapped Sticker) - An inmate who has a disability, as defined by 42 U.S.C.' 12102(2) of the Americans with Disabilities Act, for which regular examinations and/or treatment are related to a qualifying disability under the Act. Health care providers shall determine whether such examinations and/or treatment are related to the qualifying disability.

- Allergies (Red) - An abnormal response to any substance.

- Cancer (Yellow) - A current or past malignancy.

- Developmentally Disabled (Brown with White stripe) - An inmate whose mental retardation, cerebral palsy, epilepsy, or autism results in substantial functional limitations in the areas of self-care, ability to communicate, and mobility, making necessary the ongoing provision of special Health Services.

- Diabetes (Dark Blue) - Diabetes mellitus.

- Heart Disease (Light Blue) - Current or past disease which requires on-going treatment and/or supervision.

- Hypertension (Dark Green) - High blood pressure which requires treatment and/or dietary intervention.

- Mental Illness (Brown) - Serious mental illness, as defined in Department Order #1103, Inmate Mental Health Care, Treatment and Programs.

- Mentally Impaired (Brown With White Dot) - An intelligence quotient (IQ) of less than 70.

- Positive Purified Protein Derivative Skin Test (PPD) (Black with White dot) - A positive tuberculosis skin test.

- Respiratory Disease (Orange) - An asthmatic condition, emphysema, chronic bronchitis and/or chronic obstructive pulmonary disease.

- Seizure Disorder (Purple) - A generalized tonic-clonic seizure (grand mal), a partial seizure (psychomotor) or an absence seizure (petit mal).

- Seriously Mentally Ill (Brown) - Emotional or behavioral functioning in adults which meets criteria established by the Arizona Department of Health Services, Division of Behavioral Health Services checklist.

- Tuberculosis (Black) - Active and/or inactive tuberculosis.

**CHRONIC CONDITIONS REQUIRING REGULAR EXAMINATIONS AND/OR TREATMENT** - Cancer, diabetes, hypertension, seizure disorder, heart disease, respiratory disease, tuberculosis, HIV/AIDs, serious mental illness (and other mental illnesses of inpatients at the Alhambra Special Psychiatric Hospital and the Flamenco Mental Health Center,) or any condition requiring regular examinations and/or treatment which are directly related to a qualifying disability, as defined by 42 U.S.C. '12102(2) of the Americans with Disabilities Act. Arizona Department of Corrections health care providers shall determine whether regular examinations and/or treatment are directly related to a qualifying disability. There is no health care fee for these conditions.

**CROWN** - Artificial substitute for portion of tooth external to the gum.

**DECLARATION** - A "Declaration of Intent to Limit Extraordinary Life-Support Procedures," Form 1101-9, signed by an inmate and two witnesses. A completed declaration establishes the inmate's intent to limit extraordinary life support procedures intended only to prolong the dying process would otherwise be administered for an incurable and terminal medical condition.

**EMERGENCY** - An inmate's current health condition which receives immediate attention.

**FIXED BRIDGE** - Bridge cemented in place and non-removable.

# EXHIBIT NUMBER

## "D-2"

My Inmate Letters and Requests
for treatment of my Service Connected Disabilities

ARIZONA DEPARTMENT OF CORRECTIONS

Inmate Letter

(1 of 3)

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

| Inmate Name  (Last, First M.I.) | ADC Number | Institution/Unit | Date |
|---|---|---|---|
| Lewis, Carlton J. | 039295 | A.S.P.C, Florence /South | 12/10/14 |

TO: Dr. ARNOLD — Associate Regional Medical Director

Location: CORIZON — Medical Administration

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

ON 12/05/14 Dr. Sharp submitted a consult for me to undergo an M.R.I. for the following Chronic Medical impairments as set forth within this communication. I have been incarcerated in this prison for over 18 years and during this time I have been treated by several Health Care Providers for service connected disabilities. I have also been evaluated by E.N.T. Specialists, and have been diagnosed with Chronic Eustachian Tube dysfunction and Chronic Sinusitis. I was examined by Dr. Justin F. Weiss - E.N.T. Specialist and he ordered a CT Scan of my sinuses, and inner ears. The CT Scan was done on 10/09/02 At Southwest M.R.I & Ct, LLC - Tucson, AZ. DIAGNOSIS: ① Chronic Sinusitis, And Polyposis, ② Chronic Eustachian Tube dys-function. Polyps were removed At a later date. I was also examined by Dr. Johnathan Wig-genhorn, D.O. from ESTRELLA E.N.T. located in Litchfork Park, AZ. Diagnosis: ① Saddle nose de-formity, ② Chronic Rhinitis ③ Eustachian tube dysfunction. I was Advised by some E.N.T. Specialists that surgery on my inner ears may be required to correct this Chronic impairment. For many years I have constantly suffered from chronic pain & discomfort resulting from the Eustachian Tube dysfunction (Bothears) and Chronic Sinusitis. Both Conditions are getting worse, which gravely impeds my ability to Peform Daily Activities. In conjunction with the inner ear problems, I constantly suffer significant pain & discomfort caused by the Implant At the base of my nose which was the result of Nasal Surgery done by the VA in 1990 in Tucson, AZ. Please refer to my I/m letter Addressed to Dr. Lavoy on 6/23/14. This Implant At the base of my nose constantly swells up from exposure to dust, strong oders, such As Perfume, Chemicals, paints, Bleach etc... Once I am exposed to these ir-ritants I experience a sever reaction such lots of pain & discomfort swelling in my sinuses my Eustachian Tubes become erratic, burning sensation in my throat, my toung goes numb etc... I experience severe headaches, lightheadedness, dizzyness - All of the Above has a significant impact on my ability to Perform daily Activities. Another reason why this Consult for an...

| Inmate Signature | Date |
|---|---|
| Carlton J. Lewis | 12/10/14 |

Have You Discussed This With Institution Staff?  ☐ Yes  ☐ No

If yes, give the staff member's name:

**Inmate Letter**    *(2 of 3)*

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

| Inmate Name *(Last, First M.I.)* | ADC Number | Institution/Unit A.S.P.C. | Date |
|---|---|---|---|
| Lewis, Carlton J. | 039295 | Florence /South | 12/10/14 |

| To: Associate | Location CORIZON - |
|---|---|
| Dr. ARNOLD - Regional Medical Director | Medical Administration |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

M.R.I. should BE given serious Consideration is to Ascertain whether the ABNORMAL GROWTH BEHIND BOTH EYES are MALIGNANT and life threating. To date I haven't received ANY Medical treatment for this Medical Condition which is getting worse, especially in the Rt. Eye. Please refer to my I/m dated 11/02/14 This Abnormal Growth Behind (BOTH EYES) is very Aggrevating where I have to constantly Rub & Blink my eyes Frequently, when I was evaluated At Southwest EYE Clinic on 10/31/14 the eye Doctor was unaware of the ABnormal Growth behind my eyes and he told me something like this can be seen only by AN M.R.I. The EYE Doctor couldn't recommend an M.R.I. Because there was NO Medical documentation to support This Medical Condition. This Medical issue REMAINS UNRESOLVED. IN 2009 I was assulted by another inmate and as a result of this ASSULT I suffered from a Subdural Hematoma - At the same time of this assult my face was kicked Against A wall which caused A NERVE on the Rt. Side of my face to be displaced. This nerve is painful & Aggreavating affecting my UPPER GUMS. I AM UNABLE TO USE MY UPPER DENTURES DUE TO THIS NERVE & the IMPLANT at the base of my nose. A CT SCAN was done in 2010 showing This NERVE to be displaced, BUT NO FURTHER TREATMENT was Rendered to CORRECT This Problem. After Sustaining the Subdural Hemotoma I noticed that I may have sustained some Cognitive impairments such as short & long term memmory problems, my inability to Visuallize ANY IMAGES in my MIND, and my INABILITY to solve problems in my mind due to the fact that I am UNABLE to Visuallize the Problem. ALL OF THESE im-PAIRMENTS COMBINED SIGNIFICANTLY IMPEAD my ABILITY TO CONCENTRATE and think With A Clear MiNd. THESE Cognitive impairments have a GRAVE affect on my entire well Being which limits my Ability to function Normally. PLEASE refer to a Copy of MY I/m letter Addressed to Dr. LAVOY on 4/22/14 I was evaluated by Dr. Reed - Neurology - Phx. Baptist Hosp. (27) He recommended a follow up for symptoms described above. No further treatment

| Inmate Signature | Date |
|---|---|
| Carlton J. Lewis | 12/10/14 |

Have You Discussed This With Institution Staff?    ☐ Yes    ☐ No

If yes, give the staff member's name:

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Inmate Letter**

(3 of 3)

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Unit A.S.P.C. | Date |
|---|---|---|---|
| Lewis, Carlton J. | 039295 | Florence /South | 12/10/14 |

To: Dr. Arnold Regional Medical Director    Associate    Location Corizon    Medical Administration

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

has been provided for this Medical Condition. It appears with the facts stated within this Correspondence that it would be cost effective for me to undergo an M.R.I. rather than be evaluated by other medical specialists. An M.R.I. will cover all of my medical impairments; some of which are Chronic service connected disabilities. The only treatment provided to me for these medical conditions consist of Medications to help alleviate the Pain; discomfort for short periods of time. I have requested to be treated by the VA for these service connected disabilities, and my request has fallen on deaf ears; in spite of the fact that the VA and the STATE of Arizona have an agreement to medically treat service connected disabilities, and this agreement is not being honored. I am in need of Corrective Medical treatment to correct some of these impairments, possibly surgery for my inner ear chronic condition and possibly surgery to repair the nerve damage and implant at the base of my nose. In all due respects, in concluding this Correspondence and for the record, I believe I have established a reasonable basis for Corizon Health Services to approve the requested consult for an M.R.I. As you process the seriousness of my medical impairments please keep in mind that the medical information stated within this Correspondence can be found in the 4 volumes of my medical Records; also please keep in mind that my service connected disabilities are getting worse, which significantly affects my ability to perform daily activities. Should Corizon deny the consult for an M.R.I. then I am again requesting that I be permitted to seek medical treatment at the VA for the service connected disabilities. Based on the foregoing it is most apparent that I suffer with pain & discomfort daily which can easily be ascertained by allowing me to undergo an M.R.I. Thank you for your time, and any Consideration you may give to the matters at hand. PLEASE SEE Medical Documents submitted with this Correspondence.

| Inmate Signature | Date |
|---|---|
| Carlton J. Lewis | 12/10/14 |

Have You Discussed This With Institution Staff?  ☐ Yes  ☐ No

If yes, give the staff member's name:

Distribution:  White - Master Record File      Canary - Inmate

916-1
4/15/04

Inmate Letter ~~Copy~~

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Unit A.S.P.C. | Date |
|---|---|---|---|
| Lewis, Carlton J. | 039295 | Florence /South | 06-23-14 |

| To: DR. LAVOY, Director Medical Services | Location |
|---|---|
| Florence Complex | Florence Complex - Medical Director |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

IN REFERENCE TO OUR CONVERSATION ON MAY 19, 2014 I ASKED IF YOU WOULD look into the Possibility FOR me to Receive MEDICAL TREATMENT AT THE VA Hospital, Tucson for my SERVICE CONNECTED disabilities, and you indicated you would look into this matter. AT This time I AM FORMALLY REQUESTING A CONSULT which would Allow me to BE TREATED AT The VA HOSPITAL FOR SERVICE CONNECTED disabilities PURSUANT TO Chapter 1100 - I/m Health Services - D.O.1101.11. MY REQUEST FOR This CONSULT is For The Following REASONS AS SET Forth BELOW: (1) OVER THE PAST 35 to 40 YEARS I HAVE HAD 3 separate NASAL RECONSTRUCTIVE SURGERY done BY THE VA in an effort to correct my BREATHING PROBLEMS. I Also had A P.E. TUBE INSERTED into my Right EAR by THE VA-TUCSON IN 1990. To date I CONTINUE TO SUFFER daily from AN UNUSUAL EUSTACHIAN TUBE DysFUNCTION - (Both EARs) FOR MANY YEARS; and FOR SEVERAL YEARS TREATMENT for This disorder CONSISTED of PRESCRIBED MEDICATIONS SUCH AS IBUPROFEN. OTHER MEDICATIONS HAVE BEEN PERSCRIBED BUT FAILED to ALLEVIATE THE SEVERE SYMPTOMS Associated WITH This INNER EAR CONDITION. I HAVE SEEN E.N.T. SPECIALISTS OVER THE YEARS and was TOLD THAT SURGERY MAY BE THE ONLY WAY to RECTIFY This MEDICAL disorder. THE CONSTANT PAIN's discomfort caused by this disorder IS CONSTANT ON A Daily BASIS. AND RELIEF IS UN - AVAILABLE BY PRESCRIBED MEDICATIONS. IN 1990 THE VA - TUCSON PERFORMED ANOTHER SURGERY ON MY NOSE in their attempt to improve my BREATHING ABILITY. AS PART OF This SURGERY I had to provide the DONOR cites FROM THE CRANIUM and CARTILAGE from my Right EAR - THE CARTILAGE was implanted AT THE BASE OF MY NOSE. IN 2009 (or) There abouts my teeth WERE EXTRACTED BY D.O.C. dental and in the process, the implant at the lower BASE of my NOSE WAS dislodged. This implant CONSTANTLY SWELLS UP from EXPOSURE TO DUST - STRONG ODERS SUCH AS PERFUMES, CHEMICALS, PAINTS, BLEACH etc. After encountering this reaction I have difficulty speaking properly. I HAVE BEEN UNABLE TO USE my DENTURES since having my teeth EXTRACTED. This MEDICAL CONDITION is A SERVICE Connected disa- bility which may require Additional SURGERY to Remove, AND Replace THE CARTILAGE AT THE BASE OF MY NOSE. I HAVE MADE SEVERAL ATTEMPTS to SEEK MEDICAL TREATMENT for This Condition, BUT MY REQUESTS HAVE FALLEN ON DEAF EARS. AT this point in time AND AFTER suffering for many YEARS with BOTH MEDICAL conditions, I BELIEVE it would be IN MY BEST INTEREST TO HAVE THESE SERVICE CONNECTED disabilities Treated AT THE VA FOR POSSIBLE SURGERY especially since NO OTHER VIABLE TREATMENTs ARE AVAILABLE TO CORRECT THESE MEDICAL CONDITIONS. BEFORE RENDERING your DECISION FOR MY REQUEST TO OBTAIN MEDICAL TREATMENT AT THE VA PLEASE KEEP IN MIND I HAVE SUFFERED WAY TOO LONG AND Nothing CONSTRUCTIVE HAS BEEN DONE TO RECTIFY THESE disorders TO date - simply - THERE ARE NO CORRECTIVE PROCEDURES AVAILABLE TO ME. PRESCRIBED MEDICATIONS ARE EQUAL TO PUTTING A BAND AID ON AN OPEN WOUND IN hopes that it will CURE itself. Thank you For your Time, and ANY CONSIDERATION you may GIVE TO my REQUEST FOR A MEDICAL CONSULT For VA TREATMENT.

| Inmate Signature | Date |
|---|---|
| Carlton J. Lewis | 06-23-14 |

Have You Discussed This With Institution Staff? ☐ Yes ☐ No

If yes, give the staff member's name:

Distribution: Original - Master Record File
Copy - Inmate

CC MY FILE

916-1
5/14/12

**Inmate Letter**

Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

8-B-6 - Housing

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Unit | Date |
|---|---|---|---|
| Carlton J. Lewis | 039295 | A.S.P.C. Florence / South | 6.23.14 |

| To: | Location |
|---|---|
| DR. LAVOY - Director of Medical Health Services | Florence Complex - Medical Director |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

I AM REQUESTING RECONSIDERATION OF CORIZON's DENIAL REGARDING MY REQUEST TO UNDERGO A NEUROPSYCHOLOGICAL EVALUATION FOR THE FOLLOWING REASONS: ON JUNE 17 2014 I WAS SEEN BY Doctor VULKCEVIC FOR RENEWAL OF MY MEDICATIONS, AND I ASKED him TO CHECK MY MEDICAL FILE TO ASCERtain WHAT CORIZON's DECISION WAS REGARDING MY REQUEST FOR A NEUROPSYCHOLOGICAL EVALUATION, THE Doctor Said THAT MY REQUEST WAS DENIED, A COUPLE OF MONTHS PRIOR TO THIS I SPOKE WITH NURSE Joi DURTSCHI REGARDING THIS MATTER, AND SHE INDICATED THAT THE M.C.P. SUBMITTED A CONSULT REQUESTING THAT THE Psych. DEPT. PERFORM THE NEUROPSYCHOLOGICAL EVALUATION - THE Psych. DEPT. Claims they are UNABLE TO PERFORM THIS SPECIFIC EVALUATION. MY REQUEST FOR A FOLLOW UP (/OR) RECONSIDERATION TO HAVE THIS EVALUATION DONE WOULD BE IN MY BEST INTERESTS FOR THE FOLLOWING REASONS: (1) I SUFFER daily FROM COGNITIVE IMPAIRMENTS SUCH AS MY INABILITY TO VISUALIZE ANY IMAGES IN MY MIND. (2) MY INABILITY TO SOLVE PROBLEMS IN MY HEAD BASED ON THE FACT THAT I AM UNABLE TO VISUALIZE TO SEE BEYOND THE FACT (3) SOME long / Short Term MEMORY LOSS. (4) MANY SLEEPLESS NIGHTS, etc. ALL OF THESE COGNITIVE IMPAIRMENTS / FUNCTIONS ARE EXTREMELY IMPORTANT FUNCTIONS FOR HUMAN SURVIVAL, EXPECIALLY WHEN IT COMES TO MY ABILITY TO CONCENTRATE, Thinking out PROBLEMS IN MY MIND, LEARNING, AND COMMUNICATION SKILLS, AND MY OVERALL EMOTIONAL STABILITY. THESE COGNITIVE IMPAIRMENTS HAVE A GRAVE IMPACT ON MY ENTIRE WELLBEING, I AM UNABLE TO SLEEP PROPERLY, WHICH INTURN HAS A PROFOUND AFFECT ON MY ABILITY TO do much OF ANYTHING CONSTRUCTIVE OTHER THAN SUFFER. THESE COGNITIVE IMPAIRMENTS HAVE BEEN ONGOING FOR MANY YEARS, BUT APPEARS TO HAVE INCREASED IN SEVERITY AFTER I SUFFERED FROM A SUBDURAL HEMATOMA IN 2009. DUE TO THE FACT THAT I AM A WARD OF THE STATE OF ARIZONA - D.O.C. THESE MAJOR COGNITIVE IMPAIRMENTS SHOULD BE GIVEN SERIOUS CONSIDERATION. NO ONE SHOULD HAVE TO SUFFER IN THIS MANNER REGARDLESS OF THEIR CIRCUMSTANCES. MY ABILITY TO VISUALIZE ANY IMAGES IN MY MIND IS A MAJOR IMPAIRMENT THAT SUBSTANTIALLY LIMITS MY ABILITY'S AS A HUMAN BEING TO FUNCTION ADEQUATELY ON A DAILY BASIS. A MAJOR IMPAIRMENT OF THIS NATURE FALLS WELL WITHIN THE DEFINITION OF A DISABILITY THAT LIMITS ONE OR MORE MAJOR LIFE ACTIVITIES, AND BASED ON THE SEVERITY OF THE COGNITIVE IMPAIRMENTS STATED HERE IN SHOULD QUALIFY ME TO UNDERGO THE REQUESTED EVALUATION TO ASCERTAIN AND ACCURATELY MEASURE ALL OF THESE AREAS OF COGNITIVE FUNCTIONS, IF FOR NO OTHER REASON, THEN THIS EVALUATION SHOULD BE GRANTED TO ASCERTAIN WHETHER MY COGNITIVE IMPAIRMENTS FALL UNDER THE REQUIREMENTS AS SET FORTH PURSUANT TO THE FEDERAL & STATE LAWS THAT GOVERN A.D.A. STATUS. IF CORIZON FAILS TO GRANT MY REQUEST FOR A NEUROPSYCHOLOGICAL EVAL, THEN IT IS MY BELIEF THEY WILL BE IN VIOLATION OF THE LAWS THAT GOVERN THE AMERICAN WITH DISABILITIES ACT - REGARDLESS OF MY STATUS AS AN INCARCERATED PERSON. Thank you in ADVANCE FOR ANY CONSIDERATION YOU MAY GIVE TO THIS FORMAL REQUEST FOR A NEUROPSYCHOLOGICAL EVALUATION.

| Inmate Signature | Date |
|---|---|
| | 6.23.14 |

Have You Discussed This With Institution Staff?  ☐ Yes   ☐ No

If yes, give the staff member's name:

Inmate Letter

ATTACHMENTS PERMITTED. Please print all information.

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Unit A.S.P.C. | Date |
|---|---|---|---|
| Lewis, Carlton J. | 039295 | Florence /South | 06.23.14 |

To: DR. LAVOY, Director Medical Services Florence Complex

Location: Florence Complex - Medical Director

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

IN REFERENCE TO OUR CONVERSATION ON MAY 19, 2014 I ASKED IF YOU WOULD lOOK INTO the Possibility FOR me To Receive MEDICAL TREATMENT AT THE VA Hospital, Tucson for my SERVICE CONNECTED disabilities, and you indicated you would lOOK INTO this matter. AT This time I am FORMALLY REQUESTING A CONSULT which WOULD Allow me to BE TREATED AT THE VA Hospital FOR SERVICE CONNECTED disabilities PURSUANT TO Chapter 1100 — I/m Health Services — D.O. 1101.11. MY REQUEST FOR This CONSULT IS FOR The FOllowing REASONS AS SET FORTH BELOW: (1) OVER THE PAST 35 to 40 YEARS I have had 3 SEPERATE NASAL Reconstructive SURGERY DONE BY THE VA In an effort to CORRECT MY BREATHING PROBLEMS. I AlSO had A P.E TUBE INSERTED into my Right EAR By THE VA-Tucson IN 1990. To date I CONTINUE TO SUFFER daily FROM AN UNUSUAL EUSTACHIAN TUBE DYSFUNCTION — (BOTH EARS) FOR MANY YEARS; and FOR SEVERAL YEARS TREATMENT for this DISORDER CONSISTED OF PRESCRIBED Medications, SUCH AS IBUPROFEN. OTHER MEDICATIONS have BEEN PRESCRIBED BUT FAILED to Alleviate THE SEVERE SYMPTOMS Associated WITH THIS INNER EAR CONDITION. I HAVE SEEN E.N.T. SPECIALISTS OVER THE YEARS AND was TOLD that SURGERY MAY BE THE ONLY WAY to RECTIFY This MEDICAL DISORDER. THE CONSTANT PAIN's discomfort CAUSED BY this disorder IS CONSTANT ON A DAILY BASIS AND RELIEF IS UN-AVAILABLE BY PRESCRIBED MEDICATIONS. IN 1990 THE VA-Tucson PERFORMED ANOTHER SURGERY ON MY NOSE in their Attempt to improve my BREATHING ABILITY. AS PART OF This SURGERY I had to provide the DONOR cites FROM THE CRANIUM and CARTILAGE FROM my Right EAR - THE CARTILAGE was IMPLANTED AT THE BASE OF MY NOSE. IN 2009 (OR) THERE ABOUTS MY TEETH WERE EXTRACTED BY D.O.C. dental AND IN THE PROCESS, THE IMPLANT AT THE lower BASE OF MY NOSE was dislodged. This IMPLANT CONSTANTLY SWELLS UP FROM EXPOSURE TO DUST - STRONG ODERS, SUCH AS PERFUMES, CHEMICALS, PAINTS, BLEACH etc. After encountering This REACTION I have difficulty speaking properly. I HAVE BEEN UNABLE TO USE my DENTURES since having my teeth EXTRACTED. This MEDICAL CONDITION IS A SERVICE Connected disa-bility which may require Additional SURGERY to REMOVE, AND REPLACE the CARTILAGE AT THE BASE OF my NOSE. I have made SEVERAL ATTEMPTS TO SEEK MEDICAL TREATMENT for This CONDITION, BUT MY REQUESTS have FALLEN ON DEAF EARS. AT This POINT in time AND AFTER SUFFERING For many YEARS WITH BOTH MEDICAL conditions, I BELIEVE it would BE IN MY BEST INTEREST TO HAVE THESE SERVICE Connected disabilities TREATED AT THE VA FOR POSSIBLE SURGERY Especially SINCE NO OTHER VIABLE TREATMENT ARE AVAILABLE TO CORRECT THESE MEDICAL conditions. BEFORE RENDERING YOUR DECISION FOR MY REQUEST TO OBTAIN MEDICAL TREATMENT AT THE VA, PLEASE KEEP IN MIND I have SUFFERED WAY too long, AND NOTHING CONSTRUCTIVE has BEEN DONE TO RECTIFY These disorders to date - Simply - There ARE NO CORRECTIVE PROCEDURES AVAILABLE to ME. PRESCRIBED MEDICATIONS ARE EQUAL TO PUTTING A BAND AID ON AN OPEN WOUND IN hopes That it will CURE itself. Thank You FOR your TIME, And ANY CONSIDERATION YOU may GIVE TO MY REQUEST FOR A MEDICAL CONSULT FOR VA TREATMENT.

| Inmate Signature | Date |
|---|---|
| Carlton J. Lewis | 06.23.14 |

Have You Discussed This With Institution Staff? ☐ Yes ☐ No

If yes, give the staff member's name:

Distribution: Original - Master Record File
Copy - Inmate    CC MY FILE

916-1
5/14/12

**Inmate Letter**

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Unit A.S.P.C. | Date |
|---|---|---|---|
| Lewis, Carlton T. | 039295 | Florence /South | 10-14-13 |

| To: NURSING SUPERVISOR | Location |
|---|---|
| Doi e. Durtschi | South Unit Medical Unit |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

I Recently requested an independent assessment of the Ct scans of my head obtained in 2009 at St. Mary's Hospital. MY REASON for requesting this independent assessment is primerly due to cognitive difficulties I am experiencing which HAVE AN ADVERSE effect on my overall Ability to function Adequately on a daily basis. THE COGNITIVE difficulties IAM experiencing are As follows: (1) IMPAIRed MEMORY-long And Short term (2). MY INABILITY to solve problems IN MY head (3) MY INABILITY to visualize ANY IMAGES IN MY MIND. These cognitive difficulties hAve been ongoing for a long time which hAs made my Life a living hell. BAsed on Doctor Theodore's Professional Assessment he recommended that I BE evaluated BY A NEUROPSYChologist IN order to Ascertain and accurately measure all of those areas of COGNITIVE Functions. BASED ON Doctor Theodore's recommENDATION, I Am Requesting that I Be affected an evaluation by A NEUROPSYChologist.

I have Also been in COMMUNICATION with Doctor H. DANIEL Blackwood Ph.D. from NEUROPSYCHology Associates, Pc. located at 6232 N.7th Street Ste.100 Phoenix, Az 85014; Phone # (602) 230-8324; And requested his Professional opinion if such an evaluation would be warranted due to the cognitive difficulties I am experiencing. His Response Should be forthcoming Shortly.

Thankyou for your time and Any consideration you may give to This FORMAL Request for an evaluation to ascertain my COGNITIVE complications.

| Inmate Signature | Date |
|---|---|
| Carlton T. Lewis | 10-14-13 |

Have You Discussed This With Institution Staff?  ☐ Yes    ☐ No

If yes, give the staff member's name:

ARIZONA DEPARTMENT OF CORRECTIONS

Inmate Letter

Case 2:12-cv-00601-ROS   Document 1355   Filed [illegible]   Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Unit A.S.P.C. | Date |
|---|---|---|---|
| Lewis, C.J. | 039295 | Florence / South | 6/15/09 |

| To: DR. ROWE - MEDICAL DIRECTOR | Location CENTRAL OFFICE |
|---|---|

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

ON JAN. 01, 2009 I SUBMITTED AN HNR TO MEDICAL REQUESTING AN E.N.T. CONSULT FOR SEVERE PROBLEMS WITH THE IMPLANT IN MY NOSE. THIS CAME ABOUT AFTER ALL OF MY TEETH WERE EXTRACTED. THIS IMPLANT IS LOCATED AT THE BASE OF THE NOSE AND WAS SOMEHOW CONNECTED TO THE NERVES AND ROOTS OF MY UPPER FRONT TEETH, SO WHEN THE TEETH WERE EXTRACTED, IT APPARENTLY CAUSED THE IMPLANT TO BE DISLODGED. PURSUANT TO YOUR REQUEST, MY VA MEDICAL FILE WAS FORWARDED TO YOUR OFFICE A FEW WEEKS AGO. YOUR LAST RESPONSE TO MY REQUEST FOR AN E.N.T. CONSULT WAS THAT YOU DIDN'T FEEL ANOTHER OPERATION ON MY NOSE WAS WARRANTED. WELL SIR, THIS MAY OR MAY NOT BE THE CASE, BUT THIS MEDICAL CONDITION DOES INDEED WARRENT CORRECTIVE ACTION TO REPAIR THE DAMAGE TO THE DISLOCATED IMPLANT. THIS CONDITION IS CONSTANTLY UNCOMFORTABLE AND PAINFUL. IN CONNECTION WITH THIS PROBLEM, I DESPERATELY NEED MEDICAL TREATMENT FOR MY EUSTACHIAN TUBE DYSFUNCTION (BOTH EARS). I AM IN CONSTANT PAIN - HEADACHES ETC. AND DISCOMFORT WHICH HAS AN ADVERSE AFFECT ON MY DAILY PERFORMANCE. FOR SEVERAL YEARS, I HAVE BEEN PRESCRIBED 1800mg OF IBUPROFEN ON A DAILY BASIS FOR THIS CONDITION - WHICH HELPED ME MAKE IT THROUGH THE DAY. PLEASE ADVISE ME AS TO HOW D.O.C. WANTS TO HANDLE THESE MEDICAL PROBLEMS - IF NECESSARY, I AM WILLING TO CONTACT THE VA IN TUCSON, AND REQUEST AN E.N.T. CONSULT AS LONG AS THE MEDICAL STAFF AT D.O.C. AGREES TO THIS. I BELIEVE D.O.C. POLICY ALLOWS FOR THIS TO HAPPEN IN CERTAIN CASES. PLEASE KEEP IN MIND THIS IS A MILITARY SERVICE DISABILITY. THANK YOU

| Inmate Signature | Date |
|---|---|
| Carl S. Lewis | 6/15/09 |

Have You Discussed This With Institution Staff?  ☐ Yes  ☐ No

If yes, give the staff member's name:

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Health Needs Request (HNR)**

*As of 2.25.14*
*4th Request !!*

Time:
Initials:

| Inmate Name/Nombre (Last, First M.I.) (Apellido, Nombre, Inicial) | ADC Number/Número de ADC | Date/Fecha |
|---|---|---|
| Lewis Carlton F | 039295 | 03.12.14 |

| Cell/Bed Number/Celda/Número de Cama | Unit/Unidad | P.O. Box/Apartado Postal | Institution/Facility/Instalación: ASPC |
|---|---|---|---|
| 8-C-6 | | | Florence /South |

You are required to be truthful. Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action (Use this form to describe only one problem or issue at one time). [Se le exige diga la verdad. La falta de cooperación y cualquier abuso del sistema del cuidado de la salud o del personal podría retrasar la asistencia de este cuidado para usted y para otros y puede dar lugar a una acción disciplinaria (Use este formulario para describir un problema a la vez!]

**AREA OF INTEREST** (Check only one block below)/**AREA DE INTERES** (MARQUE UN ESPACIO SOLAMENTE) ☐ Medical/Médica ☐ Dental ☐ FHA
☒ Pharmacy/Farmacia ☐ Mental Health/Salud Mental ☐ Eyes/Ojos ☐ Other (specify)/Otros (especifique)

PLEASE PRINT! Describe your medical/dental treatment/issue need in the space below. Be clear and specific. NO ADDED PAGES. [¡POR FAVOR, ESCRIBA EN IMPRENTA! Describa su tratamiento o necesidad médica/dental en el espacio de abajo. Describa claramente y sea específico. ¡NO USE MAS HOJAS!]

This is my 4th Request since 2/25/14 for PAIN Medication - Rx# 28097203 - Ibuprofen 800 MG - 3x's per day - This Rx expires on 5/14/14. The H.C.P. ordered this pain Medication for a service Connected disibility - Chronic Eustachian Tube dysfunction - (Both ears) - EXTENSIVE pressure in inner ears, Constant headaches lightheadness, dizzyness along with Constant pain - also I continue to suffer pain's discomfort from a Subdural Hemetoma. PLEASE ORDER THESE MEDS. I'm out OF pain medication

I understand that, per ARS 31-201.01, I will be charged a $4.00 Health Service fee (excluding exemptions granted by statute) for the visit that I am herein requesting. I further understand that by paying this fee I do not have the right to dictate treatment or who provides treatment. [Entiendo que de acuerdo con ARS 31-201.01 se me cobrará una cuota por el servicio médico de $4.00 por la cita que aquí estoy pidiendo (excluyendo las exenciones otorgadas por la ley). Además entiendo qué al pagar esta cuota no tengo el derecho a imponer el tratamiento o quien lo proporcione.]

Inmate's Signature/Firma del prisionero

*Carlton F Lewis*

**REMOVE THE GOLDENROD COPY AND PLACE THE REMAINDER IN THE HEALTH NEEDS REQUEST DROP BOX[SEPARE LA COPIA DE COLOR AMARILLO OBSCURO Y DEJE LAS DEMAS EN EL BUZON PETICION DE NECESIDADES MEDICAS]**

**REFERRAL BY MEDICAL STAFF/REFERENCIA MEDICA** ☐ Medical/Médica ☐ Dental ☐ Pharmacy/Farmacia ☐ FHA
☐ Mental Health/Salud Mental ☐ Eyes/Ojos ☐ Other/Otros (specify) (especifique)

Comments/Comentarios

We do not refill Ibuprofen 800mg
Ibuprofen can be purchased at the store

| Staff Signature Stamp/Firma del empleado | Date/Fecha | Time/Hora |
|---|---|---|
| | 3/13/14 | |

**PLAN OF ACTION/PLAN DE ACCION**

If you would like to be seen in the clinic, we can schedule an appt. Tx $4.00

| Staff Signature Stamp/Firma del empleado | Date/Fecha | Time/Hora |
|---|---|---|
| | 3/13/14 | |

Distribution: White/Blanca - Health Unit/Unidad de Salud, Canary, Pink & Goldenrod - Inmate/Amarillo Canario, Rosa y Amarillo Obscur - Prisonero

This document is a translation from original text written in English. This translation is unofficial and is not binding on this state or a political subdivision of this state. [Este documento es una traducción de texto original escrito en inglés. Esta traducción no es oficial ni compromete a este estado ni una subdivisión política de este estado.]

1101-10ES
12/19/12

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Health Needs Request (HNR)**

Date: _____
Time: _____
Initials: _____

5th Request for Pain meds

| Inmate Name/Nombre *(Last, First M.I.)* *(Apellido, Nombre, Inicial)* | ADC Number/Número de ADC | Date/Fecha |
|---|---|---|
| Lewis, Coltin J. | 039295 | 03.13.14 |

| Cell/Bed Number/Celda/Número de Cama | Unit/Unidad | P.O. Box/Apartado Postal | Institution/Facility/Instalación: ASPC |
|---|---|---|---|
| B-8-0 | South | 8410 | Florence South |

You are required to be truthful. Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action (Use this form to describe only one problem or issue at one time). *[Se le exige diga la verdad. La falta de cooperación y cualquier abuso del sistema del cuidado de la salud o del personal podría retrasar la asistencia de este cuidado para usted y para otros y puede dar lugar a una acción disciplinaria (Use este formulario para describir un problema a la vez)]*

AREA OF INTEREST *(Check only one block below)*/AREA DE INTERES*(MARQUE UN ESPACIO SOLAMENTE)* ☒ Medical/Médica ☐ Dental ☐ FHA ☐ Pharmacy/Farmacia ☐ Mental Health/Salud Mental ☐ Eyes/Ojos ☐ Other *(specify)*/Otros *(especifique)* _____

PLEASE PRINT! Describe your medical/dental treatment issue need in the space below. Be clear and specific. NO ADDED PAGES. *[¡POR FAVOR, ESCRIBA EN IMPRENTA! Describa su tratamiento o necesidad médica/dental en el espacio de abajo. Describa claramente y sea específico. ¡NO USE MAS HOJAS!]*

I HAVE MADE SEVERAL Requests for you to Re-fill Rx 28017248 Ibuprofen 600MG 8X's day for CHRONIC PAIN - This medication was prescribed by DR. STATION - I CANNOT PURCHASE this amount of Ibuprofen at the inmate store. I suffer daily from headaches, high blood illness etc for MANY YEARS. It is WRONG for you NOT to follow Doctors Orders and Deny me pain medication - I have already been Prescribed for my CHRONIC PAIN - SEE my medical files. This Rx for Ibuprofen is good until 5/14/14

I understand that, per ARS 31-201.01, I will be charged a $4.00 Health Service fee *(excluding exemptions granted by statute)* for the visit that I am herein requesting. I further understand that by paying this fee I do not have the right to dictate treatment or who provides treatment. *[Entiendo que de acuerdo con ARS 31-201.01 se me cobrará una cuota por el servicio médico de $4.00 por la cita que aquí estoy pidiendo (excluyendo las exenciones otorgadas por la ley). Además entiendo que al pagar esta cuota no tengo el derecho a imponer el tratamiento o quien lo proporcione.]*

Inmate's Signature/Firma del prisionero

**REMOVE THE GOLDENROD COPY AND PLACE THE REMAINDER IN THE HEALTH NEEDS REQUEST DROP BOX[SEPARE LA COPIA DE COLOR AMARILLO OBSCURO Y DEJE LAS DEMAS EN EL BUZON PETICION DE NECESIDADES MEDICAS]**

REFERRAL BY MEDICAL STAFF/REFERENCIA MEDICA ☐ Medical/Médica ☐ Dental ☐ Pharmacy/Farmacia ☐ FHA ☐ Mental Health/Salud Mental ☐ Eyes/Ojos ☐ Other/Otros *(specify)* *(especifique)* _____

Comments/Comentarios

| Staff Signature Stamp/Firma del empleado | Date/Fecha | Time/Hora |
|---|---|---|
| | | |

**PLAN OF ACTION/PLAN DE ACCIÓN**

| Staff Signature Stamp/Firma del empleado | Date/Fecha | Time/Hora |
|---|---|---|
| | | |

Distribution: White/Blanca - Health Unit/Unidad de Salud, Canary, Pink & Goldenrod - Inmate/Amarillo Canario, Rosa y Amarillo Obscur - Prisonero

This document is a translation from original text written in English. This translation is unofficial and is not binding on this state or a political subdivision of this state. [Este documento es una traducción de texto original escrito en inglés. Esta traducción no es oficial y no compromete a este estado ni una subdivisión política de este estado.]

1101-10ES

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Health Needs Request (HNR)**

Date:
Time:
Initials:

*TO: NURSE DURTSCHI (ONLY)*

SECTION I / SECCION I

| Inmate Name/Nombre *(Last, First M.I.) (Apellido, Nombre, Inicial)* | ADC Number/Número de ADC | Date/Fecha |
|---|---|---|
| Lewis Carlton J. | 039295 | 03.14.14 |

| Cell/Bed Number/Celda/Número de Cama | Unit/Unidad | P.O. Box/Apartado Postal | Institution/Facility/Instalación: ASPC |
|---|---|---|---|
| 8-B-6 | South | 8400 | Florence /South |

You are required to be truthful. Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action (Use this form to describe only one problem or issue at one time). *[Se le exige diga la verdad. La falta de cooperación y cualquier abuso del sistema del cuidado de la salud o del personal podría retrasar la asistencia de este cuidado para usted y para otros y puede dar lugar a una acción disciplinaria (Use este formulario para describir un problema a la vez!]*

**AREA OF INTEREST** *(Check only one block below)* **/ÁREA DE INTERÉS** *(MARQUE UN ESPACIO SOLAMENTE)*   Medical/Médica ☐   Dental ☐   FHA ☐
☐ Pharmacy/Farmacia   ☐ Mental Health/Salud Mental   ☐ Eyes/Ojos   ☐ Other *(specify)*/Otros *(especifique)*

PLEASE PRINT! Describe your medical/dental treatment issue need in the space below. Be clear and specific. NO ADDED PAGES. [¡POR FAVOR, ESCRIBA EN IMPRENTA! Describa su tratamiento o necesidad médica/dental en el espacio de abajo. Describa claramente y sea específico. ¡NO USE MAS HOJAS!]

*TO: NURSE SUPERVISOR DURTSCHI; I AM REQUESTING TO SPEAK WITH YOU concerning DENIAL OF MEDICAL TREATMENT and DENIAL OF CHRONIC PAIN MEDICATION BEFORE I File AN INFORMAL & GRIEVANCE which will lead to FURTHER Action... I followed your ADVISE to PUT in an HIR requesting to see the M.C.P. only to be told I have to purchase IBUPROFEN at the INMATE Store. WE Both know I CANNOT purchase ENOUGH pain medication from the store for this Chronic Condition.*

I understand that, per ARS 31-201.01, I will be charged a $4.00 Health Service fee *(excluding exemptions granted by statute)* for the visit that I am herein requesting. I further understand that by paying this fee I do not have the right to dictate treatment or who provides treatment. [Entiendo que de acuerdo con ARS 31-201.01 se me cobrará una cuota por el servicio médico de $4.00 por la cita que aquí estoy pidiendo *(excluyendo las exenciones otorgadas por la ley)*. Además entiendo que al pagar esta cuota no tengo el derecho a imponer el tratamiento o quien lo proporcione.] *THANK you!*

Inmate's Signature/Firma del prisionero      *Carlton J. Lewis*

**REMOVE THE GOLDENROD COPY AND PLACE THE REMAINDER IN THE HEALTH NEEDS REQUEST DROP BOX [SEPARE LA COPIA DE COLOR AMARILLO OBSCURO Y DEJE LAS DEMAS EN EL BUZON PETICION DE NECESIDADES MÉDICAS]**

SECTION III / SECCION III

**REFERRAL BY MEDICAL STAFF/REFERENCIA MEDICA**   Medical/Médica ☐   Dental ☐   Pharmacy/Farmacia ☐   FHA ☐
☐ Mental Health/Salud Mental   ☐ Eyes/Ojos   ☐ Other/Otros *(specify) (especifique)* _____
Comments/Comentarios

| Staff Signature Stamp/Firma del empleado | Date/Fecha | Time/Hora |
|---|---|---|
| | | |

SECTION IV / SECCION IV

**PLAN OF ACTION/PLAN DE ACCION**

| Staff Signature Stamp/Firma del empleado | Date/Fecha | Time/Hora |
|---|---|---|
| | | |

Distribution: White/Blanca - Health Unit/Unidad de Salud, Canary, Pink & Goldenrod - Inmate/Amarillo Canario, Rosa y Amarillo Obscur - Prisonero

This document is a translation from original text written in English. This translation is unofficial and is not binding on this state or a political subdivision of this state. [Este documento es una traducción de texto original escrito en inglés. Esta traducción no es oficial y no compromete a este estado ni una subdivisión política de este estado.]

1101-10ES
12/19/12

## ARIZONA DEPARTMENT OF CORRECTIONS
**Health Needs Request (HNR)**

Date:
Time:
Initials:

| Inmate Name/Nombre *(Last, First M.I.) (Apellido, Nombre, Inicial)* | ADC Number/Número de ADC | Date/Fecha |
|---|---|---|
| Lewis, C. J | 039295 | 04.13.14 |

| Cell/Bed Number/Celda/Número Cama | Unidad | P.O. Box/Apartado Postal | Institution/Facility/Instalación: ASPC |
|---|---|---|---|
| 8-8-6 | South | 8400 | Florence /South |

You are required to be truthful. Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action (Use this form to describe only one problem or issue at one time). *[Se le exige diga la verdad. La falta de cooperación y cualquier abuso del sistema del cuidado de la salud o del personal podría retrasar la asistencia de este cuidado para usted y para otros y puede dar lugar a una acción disciplinaria (Use este formulario para describir un problema a la vez!]*

**SECTION/SECCION I**

**AREA OF INTEREST** *(Check only one block below)*/**AREA DE INTERES** *(MARQUE UN ESPACIO SOLAMENTE)* X Medical/Médica ☐ Dental ☐ FHA
☐ Pharmacy/Farmacia ☐ Mental Health/Salud Mental ☐ Eyes/Ojos ☐ Other *(specify)*/Otros *(especifique)* _____

PLEASE PRINT! Describe your medical/dental treatment issue need in the space below. Be clear and specific. NO ADDED PAGES. [¡POR FAVOR, ESCRIBA EN IMPRENTA! Describa su tratamiento o necesidad médica/dental en el espacio de abajo. Describa claramente y sea específico. ¡NO USE MAS HOJAS!]

ON 3.15.14 I WAS SEEN ON NURSE'S line BECAUSE CORIZON without NOTICE decided 3x's per day They were No longer going to re-fill my PRESCRIPTION for IBUPROFEN 800mg for CHRONIC PAIN & discomfort. I have been without Adequate PAIN medications since 2.15.14. The best I can do is purchase the Allowable limit of IBUProfen from the I/m store which 48 TABLETS - 200MG's ea. Will you please check to see when I will be seen by the H.C.P. Thankyou! (CC-MY FILE)

**SECTION/SECCION II**

I understand that, per ARS 31-201.01, I will be charged a $4.00 Health Service fee *(excluding exemptions granted by statute)* for the visit that I am herein requesting. I further understand that by paying this fee I do not have the right to dictate treatment or who provides treatment. [Entiendo que de acuerdo con ARS 31-201.01 se cobrará una cuota por el servicio médico de $4.00 por la cita que aquí estoy pidiendo *(excluyendo las exenciones otorgadas por la ley)*. Además entiendo que al pagar esta cuota no tengo el derecho a imponer el tratamiento o quien lo proporcione.]

Inmate's Signature/Firma del prisionero

**REMOVE THE GOLDENROD COPY AND PLACE THE REMAINDER IN THE HEALTH NEEDS REQUEST DROP BOX[SEPARE LA COPIA DE COLOR AMARILLO OBSCURO Y DEJE LAS DEMAS EN EL BUZON PETICION DE NECESIDADES MÉDICAS]**

**SECTION/SECCION III**

REFERRAL BY MEDICAL STAFF/REFERENCIA MEDICA ☐ Medical/Médica ☐ Dental ☐ Pharmacy/Farmacia ☐ FHA
☐ Mental Health/Salud Mental ☐ Eyes/Ojos ☐ Other/Otros *(specify) (especifique)*
Comments/Comentarios

Staff Signature Stamp/Firma del empleado | Date/Fecha | Time/Hora

**SECTION/SECCION IV**

PLAN OF ACTION/PLAN DE ACCION

Staff Signature Stamp/Firma del empleado | Date/Fecha | Time/Hora

Distribution: White/Blanca - Health Unit/Unidad de Salud, Canary, Pink & Goldenrod - Inmate/Amarillo Canario, Rosa y Amarillo Obscur - Prisonero

This document is a translation from original text written in English. This translation is unofficial and is not binding on this state or a political subdivision of this state. [Este documento es una traducción de texto original escrito en inglés. Esta traducción no es oficial y no compromete a este estado ni una subdivisión política de este estado.]

de Unit/

1101-10ES
12/19/12

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Health Needs Request (HNR)**

Date: JUN 20 2014
Time: 14:28
Initials:

| Inmate Name/Nombre (Last, First M.I.) (Apellido, Nombre, Inicial) | ADC Number/Número de ADC | Date/Fecha |
|---|---|---|
| Lewis, Carlton J. | 039295 | 06.19.14 |

| Cell/Bed Number/Celda/Número de Cama | Unit/Unidad | P.O. Box/Apartado Postal | Institution/Facility/Instalación: ASPC |
|---|---|---|---|
| 8-B-6 | South | 8400 | Florence /South |

You are required to be truthful. Failure to be cooperative and any abuse of the health care system or its staff could cause a delay in delivery of care to you and others, and may result in disciplinary action (Use this form to describe only one problem or issue at one time). [Se le exige diga la verdad. La falta de cooperación y cualquier abuso del sistema del cuidado de la salud o del personal podría retrasar la asistencia de este cuidado para usted y para otros y puede dar lugar a una acción disciplinaria [Use este formulario para describir un problema a la vez!]

**AREA OF INTEREST**(Check only one block below)/**AREA DE INTERES** (MARQUE UN ESPACIO SOLAMENTE) ☒ Medical/Médica ☐ Dental ☐ FHA ☒ Pharmacy/Farmacia ☐ Mental Health/Salud Mental ☐ Eyes/Ojos ☐ Other (specify)/Otros (especifique)

PLEASE PRINT! Describe your medical/dental treatment issue need in the space below. Be clear and specific. NO ADDED PAGES. [¡POR FAVOR, ESCRIBA EN IMPRENTA! Describa su tratamiento o necesidad médica/dental en el espacio de abajo. Describa claramente y sea específico. ¡NO USE MAS HOJAS!]

ON 06.17.14 I WAS SEEN BY DR. VULKCEVIC REGARDING RENEWAL OF MEDICATIONS. THE Doctor PRESCRIBED Ibuprofen 600 MG - 3X's day. This is THE ONLY MEDICATION that helps to ALLEVIATE THE symptoms associated with Chronic Eustachian TUBE Dysfunction. I HAVE NOT RECEIVED This medication - PLEASE contact the Pharmacy to fill this NEW PRESCRIPTION - I AM PRESENTLY OUT of PAIN MEDS FOR This Specific Medical Condition -

I understand that, per ARS 31-201.01, I will be charged a $4.00 Health Service fee (excluding exemptions granted by statute) for the visit that I am herein requesting. I further understand that by paying this fee I do not have the right to dictate treatment or who provides treatment. [Entiendo que de acuerdo con ARS 31-201.01 se me cobrará una cuota por el servicio médico de $4.00 por la cita que aquí estoy pidiendo (excluyendo las exenciones otorgadas por la ley). Además entiendo que al pagar esta cuota no tengo el derecho a imponer el tratamiento o quien lo proporcione.]

C.C. MY FILE

Inmate's Signature/Firma del prisionero

Carlton J. Lewis

**REMOVE THE GOLDENROD COPY AND PLACE THE REMAINDER IN THE HEALTH NEEDS REQUEST DROP BOX[SEPARE LA COPIA DE COLOR AMARILLO OBSCURO Y DEJE LAS DEMAS EN EL BUZON PETICION DE NECESIDADES MÉDICAS]**

**REFERRAL BY MEDICAL STAFF/REFERENCIA MEDICA** ☐ Medical/Médica ☐ Dental ☐ Pharmacy/Farmacia ☐ FHA ☐ Mental Health/Salud Mental ☐ Eyes/Ojos ☐ Other/Otros (specify) (especifique)

Comments/Comentarios

0 refills. You are required to purchase Ibuprofen from Commissary per Corizon

| Staff Signature Stamp/Firma del empleado | Date/Fecha | Time/Hora |
|---|---|---|
| | 6/20/14 | 0630 |

**PLAN OF ACTION/PLAN DE ACCION**

| Staff Signature Stamp/Firma del empleado | Date/Fecha | Time/Hora |
|---|---|---|
| | | |

Distribution: White/Blanca - Health Unit/Unidad de Salud, Canary, Pink & Goldenrod - Inmate/Amarillo Canario, Rosa y Amarillo Obscur - Prisonero

This document is a translation of the original text written in English. This translation is unofficial and is not binding on this state or a political subdivision of this state. [Este documento es una traducción de texto original escrito en ingles. Esta traducción no es oficial y no compromete a este estado ni una subdivisión política de este estado.]

1101-10ES
12/19/12

# EXHIBIT NUMBER

## "E"

Arizona Republic - Article - Dated: November 28, 2014
State Wants to Build more Prisons - Critic says
it Can't afford them



ARIZONA REPUBLIC

# Valley&State

REACH US | MARIAN FRANK, VALLEY & STATE EDITOR, MARIAN.FRANK@ARIZONAREPUBLIC.COM | NEWS.AZCENTRAL.COM

WWW.AZCENTRAL.COM | FRIDAY, NOVEMBER 28, 2014 | PAGE A3

Lottery, A4
Opinions, A18, 19
Letters, A19
Obituaries, A16

# State wants more prison beds; critic says it can't afford them

**CRAIG HARRIS**
THE REPUBLIC | AZCENTRAL.COM

The Arizona Department of Corrections is bucking a national trend by asking the Governor's Office to continue its prison expansion into the next few years, citing an anticipated uptick in inmates.

The department is expected to hire a private-prison contractor to provide additional beds in order to ease the strain on a state budget facing a $1.52 billion shortfall for the current and next fiscal years, according to a key lawmaker.

A contractor is required to pay all upfront costs to build a prison, saving the state tens of millions of dollars in the short term. However, the state eventually pays the full cost of the prison or more, by paying the contractor to house inmates over a long period.

The Corrections Department wants Gov.-elect Doug Ducey and the Arizona Legislature, which convenes in January,

to grant permission to add 3,000 new medium-custody beds to the system by fiscal 2018.

Medium-custody male inmates are scattered throughout Arizona prisons and account for the largest chunk — about 40 percent — of the system's roughly 42,000 inmates.

A medium-custody inmate represents a moderate risk to the public and

**See PRISONS, Page A8**

# Prisons

Continued from Page A3

staff. These inmates are not allowed to work outside the secure perimeter of a prison and are allowed only limited, controlled movement within any institution.

The Corrections Department already opened two new prison sites this year, adding 500 maximum-security and 1,000 medium-security beds. The medium-security beds are at private prisons in Eloy.

The state relies on private contractors to house about one-sixth of its population.

Corrections Director Charles Ryan declined to be interviewed for this story. In his response to the Governor's Office, Ryan cited a current bed shortage, future population growth and a need to prepare for a "specialized entry house" as reasons requiring 3,000 more medium-custody beds.

Ryan in his request did not put a price tag on the proposal. He also did not say whether inmates would be housed in state facilities or with a private contractor.

A spokesman said Ryan is deferring commment during a transition period for Ducey, who

takes office in January. Ducey's spokesman did not respond to The Arizona Republic's questions about Ryan's request.

But Sen.-elect John Kavanagh, R-Fountain Hills, a key lawmaker who spent eight years in the Arizona House as a budget writer, said the Republican-controlled Legislature likely will accommodate Ryan.

"When the Department of Corrections tells me they need 3,000 beds, I know they need them for serious offenders," Kavanagh said. "I'm inclined to give them the funds for public safety."

Kavanagh said the expects the Legislature to lean toward using a private-prison contractor to supply the new beds because the new state policy would assume the cost of building the facility, saving the state tens of millions of dollars in upfront cost. He said that route is less costly for taxpayers.

But a critic of prison expansion points to state data showing it actually has been more expensive to house inmates in private prisons than to house them in Arizona facilities.

Caroline Isaacs, program director of the American Friends Service Committee, said the state does not have the money for a prison expan-

sion.

"We can't afford to fund K-12 education," Isaacs said. "The last thing we need are more prison beds. We need to take a cue from the rest of the country and look at alternatives to incarceration.

The Sentencing Project, a Washington, D.C., group whose goal is to work for a fair and effective U.S. criminal-justice system said it found that since 2011, at least 17 states have reduced pris-

---

ON THE BEAT

**Craig Harris** covers public pensions and state agencies.

**How to reach him**
craig.harris@arizona
republic.com
**Phone:** 602-444-8478.
**Twitter:** @charrisazrep

## More prison beds

The Arizona Department of Corrections wants to add more than 3,000 medium-security prison beds to the prison system to ease overcrowding. Medium-security inmates are scattered throughout Arizona's system. Figures below are current as of Nov. 21.

| | |
|---|---|
| Douglas: 1,006 |
| Florence: 4,670 |
| Phoenix: 149 |
| Buckeye: 2,640 |
| Safford: 316 |
| Tucson: 2,594 |
| Winslow: 374 |
| Yuma: 2,129 |
| Florence*: 1,282 |
| Kingman*: 1,508 |
| Eloy*: 499. |
| **Total**: 17,167 |

*Denotes private prison
State facilities include inmates in detention units

SOURCE: ARIZONA DEPARTMENT OF CORRECTIONS

---

on capacity by a total of more than 35,000 beds.

As of Nov. 21, the Department of Corrections reported that it had 329 more medium-custody inmates than beds in its system. To deal with overcrowding, the department houses inmates in dorms in temporary bunks.

Only medium- and minimum-security inmates can be housed in private prisons. However, private prisons will take only the healthiest inmates, which lowers their housing cost.

Nicole Porter, director of advocacy, said many states lowered incarceration rates by getting problems and found alternatives to long sentences for non-violent offenders.

Porter said Arizona has trended in the other direction because of its "truth-in-sentencing" law, which requires inmates to serve 85 percent of their sentence before being considered for release.

Isaacs said Arizona needs to reconsider its truth-in-sentencing law, which Corrections Department records show has significantly increased the prison population since it went into effect in 1994. At that time, there were slightly fewer than 19,000 inmates. The state inmate population has more than doubled since then.

Ryan's request says Arizona's inmate population grew by 809 during fiscal 2013 and 1,087 in fiscal 2014. The Corrections Department projects the number of inmates will grow by roughly 960 inmates per year through fiscal 2018.

Ryan's spokesman, Doug Nick, declined to answer questions about why the state's inmate population is projected to increase despite declining

or flat growth the past several years.

# EXHIBIT NUMBER

## "F"

Article from the Arizona Republic— Dated: 12/08/14,

OPINIONS: Let's Say 'No' to more Prisons

1 of 2

# Opinions

**THE ARIZONA REPUBLIC**
Founded in 1890 • A Gannett newspaper

JOHN ZIDICH, CEO and Publisher

**REPUBLIC EDITORIAL BOARD**

John Zidich, Joanna Allhands, Steve Benson, Phil Boas,
Robert Leger, Randy Lovely, Doug MacEachern,
Robert Robb and Linda Valdez

OPINIONS.AZCENTRAL.COM

PAGE A18 || MONDAY, DECEMBER 8, 2014 || **THE ARIZONA REPUBLIC**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

ARIZONA REPUBLIC

**REACH US** || ROBERT LEGER, OPINIONS EDITOR, ROBERT.LEGER@ARIZONAREPUBLIC.COM

**EDITORIALS** THE REPUBLIC EDITORIAL BOARD

2 of 2
12/08/14



CHARLIE LEIGHT/THE REPUBLIC

The Corrections Department has asked for permission to build more prisons. For Gov.-elect Doug Ducey and the Legislature to allow that would reveal misplaced priorities.

# Let's say 'no' to more Ariz. prisons

Arizona faces a $1.52 billion budget deficit over the next two years. Yet here comes the Corrections Department, asking for permission to build more prisons.

Gov.-elect Doug Ducey and the Legislature should deliver a firm "no." Anything else would reveal misplaced priorities.

The Corrections request does not list the cost of adding 3,000 beds. Its apologists say it wouldn't be that much because a private company would front the costs of construction. But the state would make a costly, long-term commitment to fill those prisons.

There are better solutions. At least 17 other states have cut their prison capacity by 35,000 beds through sentencing reform.

Arizona, meanwhile, stubbornly sticks to a "truth in sentencing" law that requires inmates to serve 85 per-

*Arizona is struggling to pay for education, child safety, roads, water quality and so many other things vital to a thriving, growing state. Putting the addition of prison beds ahead of those priorities makes no sense.*

cent of their sentences, which contributed to more than doubling the prison population over the past 20 years.

Legislators show little interest in exploring alternative sentencing, such as in-home confinement, that can keep the community safe at a much lower cost.

Arizona is struggling to pay for education, child safety, roads, water quality and so many other things vital to a thriving, growing state. Putting the addition of prison beds ahead of those priorities makes no sense.

"No" isn't just the right answer. It's the only answer.

# TABLE OF CONTENTS

## EXHIBITS:

EXHIBIT "A" – Corizon Needs a Check UP: Problems with Privatized Correctional Health Care
By: Prison Legal News – Date: 3/2014

EXHIBIT – B-1 – Arizona Prison System Plagued by Politics, Privatization and Prisoner Deaths
By: Prison Legal News – Date: July, 2013

EXHIBIT – "C" – Corizon Health Services, Inc., Definition – Alternate Treatment Plan – Chronic Disease

EXHIBIT – "D-1" – A.D.O.C. Inmate Health Services, Chapt. 1100, Dept. ORDER 1101, pgs. 22 & 23

EXHIBIT – "D-2" – My Inmate Letter and Request for Treatment of my Service Connected Disabilities

EXHIBIT – "E" – Arizona Republic – Article – Dated: 11/28/14
State wants to build more Prisons – Critic say's it can't afford them.

(1 of 2)

EXHIBIT-"F"- Article from the Arizona Republic -
Date: 12/08/14 - OPINIONS:
Let's say 'NO' to more Prisons