1  Daniel Pochoda (Bar No. 021979)
   James Duff Lyall (Bar No. 330045)*
2  **ACLU FOUNDATION OF ARIZONA**
   3707 North 7th Street, Suite 235
3  Phoenix, Arizona 85013
   Telephone:  (602) 650-1854
4  Email: dpochoda@acluaz.org
           jlyall@acluaz.org
5  *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

6  *Attorneys for Plaintiffs Shawn Jensen, Stephen*
   *Swartz, Sonia Rodriguez, Christina Verduzco,*
7  *Jackie Thomas, Jeremy Smith, Robert Gamez,*
   *Maryanne Chisholm, Desiree Licci, Joseph*
8  *Hefner, Joshua Polson, and Charlotte Wells, on*
   *behalf of themselves and all others similarly*
9  *situated*

   **[ADDITIONAL COUNSEL LISTED ON**
10 **SIGNATURE PAGE]**

11            UNITED STATES DISTRICT COURT

12                DISTRICT OF ARIZONA

13 Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-DKD
   Sonia Rodriguez; Christina Verduzco; Jackie
14 Thomas; Jeremy Smith; Robert Gamez; Maryanne
   Chisholm; Desiree Licci; Joseph Hefner; Joshua      **PRISONER PLAINTIFFS'**
15 Polson; and Charlotte Wells, on behalf of           **BRIEF IN SUPPORT OF THE**
   themselves and all others similarly situated; and   **PARTIES' STIPULATION**
16 Arizona Center for Disability Law,                  **[DOC. 1185] PURSUANT TO**
                                                       **THE COURT'S ORDER**
17               Plaintiffs,                           **[DOC. 1205]**

18         v.

19 Charles Ryan, Director, Arizona Department of
   Corrections; and Richard Pratt, Assistant Director,
20 Health Services Contract Monitoring Bureau,
   Arizona Department of Corrections, in their official
21 capacities,

22               Defendants.

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

**Page**

3

I.     BACKGROUND ................................................................................. 1

4

II.    PROPOSED SETTLEMENT ............................................................... 5

5

III.   ARGUMENT .................................................................................... 6

6

       A.    The Risk, Expense, and Duration of More Litigation of
Plaintiffs' Case Favors Approval of the Stipulation ........................ 7

7

       B.    The Risk of Maintaining Class Action Status Throughout the
Trial Favors Approval of the Stipulation ......................................... 9

8

9

       C.    The Amount Offered Favors Approval of the Stipulation .............. 10

10

       D.    The Extent of Discovery Completed and Stage of the
Proceedings Favors Approval of the Settlement ............................ 11

11

       E.    The Opinions of Counsel Favor Approval of the Stipulation ......... 11

12

       F.    The Reaction of Class Members to the Proposed Settlement
Favors Approval of the Stipulation ................................................. 12

13

14

             1.    The Scope of the Stipulation and Performance
Measures ............................................................................... 13

15

16

                  a.     Health Care Performance Measures .......................... 14

17

                  b.     Isolation Performance Measures ............................... 16

18

             2.    Areas Not Covered By the Stipulation That Have No
Merit at This Time or Are Outside the Scope of the
Case ...................................................................................... 19

19

20

             3.    Concerns About Transparency and Monitoring of
Compliance ........................................................................... 20

21

22

             4.    Class Members Wanting Their Day in Court....................... 22

             5.    The Fairness of Attorneys' Fees and Costs.......................... 23

23

IV.   CONCLUSION ............................................................................... 23

24

25

26

27

28

1

# <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

CASES

4

*Arnold v. Ariz. Dept. of Public Safety*,

5
    2006 WL 2168637 (D. Ariz. July 31, 2006) .......................................... 9, 11, 12

6

*Casey v. Lewis*,

7
    834 F. Supp. 1477 (D. Ariz. 1993) .................................................................... 7

8

*Churchill Village, L.L.C. v. General Electric*,
    361 F.3d 566 (9th Cir. 2004) ............................................................................. 6

9

*Dennis v. Kellogg Co.*,

10
    697 F.3d 858 (9th Cir. 2012) ........................................................................... 12

11

*Estelle v. Gamble*,

12
    429 U.S. 97 (1976) ............................................................................................ 7

13

*Farmer v. Brennan*,
    511 U.S. 825 (1994) .......................................................................................... 7

14

*Hanlon v. Chrysler Corp.*,

15
    150 F.3d 1011 (9th Cir. 1998) .................................................................. passim

16

*In re HP Inkjet Printer Lit.*,

17
    716 F.3d 1173 (9th Cir. 2013) ......................................................................... 13

18

*In re Pac. Enters. Sec. Litig.*,

19
    47 F.3d 373 (9th Cir. 1995) ............................................................................. 11

20

*Jeff D. v. Andrus*,
    899 F.2d 753 (9th Cir. 1989) ............................................................................. 6

21

*Lane v. Facebook, Inc.*,

22
    696 F.3d 811 (9th Cir. 2012) ............................................................................. 6

23

*Lewis v. Casey*,

24
    518 U.S. 343 (1996) .......................................................................................... 8

25

*Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco*,

26
    688 F.2d 615 (9th Cir. 1982) ............................................................................. 7

27

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ......................................................................... 8, 9

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Pride v. Correa,*
719 F.3d 1130 (9th Cir. 2013)............................................................................................ 7, 22

*Rodriguez v. West Publ'g Corp.,*
563 F.3d 948 (9th Cir. 2009)............................................................................................ 9, 11

**STATUTES AND OTHER AUTHORITIES**

18 U.S.C. § 3626(a)(3)(A)(i)............................................................................................ 19

A.R.S. § 31-201.01(12).................................................................................................... 14

Fed. R. Evid. 706 .......................................................................................................... 20

1    Plaintiffs, by and through their undersigned counsel submit this brief in support of

2    the Stipulation [Doc. 1185] and pursuant to this Court's Order [Doc. 1205].  As discussed

3    below, the Stipulation is fair, reasonable, and adequate as required by Rule 23(e) of the

4    Federal Rules of Civil Procedure.

5    **I.      BACKGROUND**

6    Plaintiffs sought declaratory and injunctive relief on behalf of all prisoners in the

7    custody of the Arizona Department of Corrections ("ADC") pursuant to 42 U.S.C. § 1983

8    to remedy class-wide constitutional violations.  [Doc. 1]  Plaintiffs alleged Defendants put

9    prisoners at substantial risk of serious harm due to ADC's systemic failure to provide

10   basic medical, mental health, and dental care (hereinafter "health care"), and that

11   Defendants exposed prisoners to a substantial risk of serious harm by housing them in

12   isolation units where they are locked in their cells for 22 or more hours per day.  Plaintiffs

13   alleged that Defendants were aware of and deliberately indifferent to the fact that ADC's

14   systemic deficiencies placed all prisoners at substantial risk of serious harm, in violation

15   of the Eighth Amendment.

16   Following the defeat of Defendants' summary judgment motion, and shortly before

17   the start of trial, the parties began negotiating in an attempt to reach a satisfactory

18   settlement of the case.  After difficult and time-consuming arms-length negotiations, the

19   parties reached a settlement that will result in substantial relief to the Plaintiff class.

20   [Declaration of Donald Specter ("Specter Decl.") ¶ 2]  The parties' Stipulation was filed

21   on October 14, 2014.  [Doc. 1185]  On December 16, 2014, the Court ordered Defendants

22   to provide Plaintiff class members with notice of the settlement and make copies of the

23   Stipulation available to them.  [Doc. 1205 at 1-2]  As of February 6, 2015, 235 comments

24   had been filed with the Court by class members and/or their family members.[1]

25   [Docs. 1208-38, 1240-41, 1243-94, 1296-1431, 1433-36, 1438-44]

26

27   _____

     [1]  Out of all of these comments, only two prisoners formally moved to withdraw as
28   class members.  [Docs. 1224, 1277]  Additionally, multiple prisoners informed the Court
     that ADC and/or Corizon were not yet complying with the terms of the Stipulation.

1    The comments provide overwhelming support for the need to settle the case to

2    provide timely relief to address the widespread and shocking inadequacies in the health

3    care system and conditions in the isolation units.  Class members described for the Court

4    in excruciating detail how they had been harmed by ADC and its contractors due to the

5    systematic abdication of any responsibility to provide health care to class members.

6    Subclass members housed in isolation units provided extensive documentation of the

7    impact upon their bodies and minds from living for years in conditions of extreme social

8    isolation and deprivation.

9    For example, a prisoner with a family history of stomach cancer wrote the Court to

10   say that he has been experiencing severe abdominal pain for a long time but has not seen a

11   provider for 7 or 8 months, and that nursing staff only provided him with "acid reflux"

12   medication.  [Doc. 1280 at 1][2]  He writes, "I have been spitting up blood I'm having chest

13   pain because this pain in my abdominal is causing havoc to my days and nights.  I am

14   trying to be patient but the medical system here at Browning Unit is so understaffed that

15   the nurse told me it will be months until you see the provider because he is so far behind."

16   [*Id.*]  A prisoner who fought ADC for three years to receive colon cancer treatment

17   reported to the Court that he is not receiving the proper toileting and cleaning supplies to

18   remove human waste from his body.  [Doc. 1354]  A prisoner with juvenile rheumatoid

19   arthritis and multiple gastro-intestinal disorders reported that, despite months of requests,

20   she has not seen a doctor or dentist regarding her unexplained massive weight loss and

21   damaged teeth due to excessive vomiting.  [Doc. 1372]  Another prisoner detailed how at

22   the time of writing the Court, she still had not received proper treatment for an extremely

23

24   However, these complaints are premature, as the Stipulation has not yet been approved.
     [*See* Doc. 1185, Ex. A (defining "effective date of the Stipulation" as "The date on which
25   the Court grants final approval to the Stipulation")]
     [2]  This account is reminiscent of one recounted in the report of Plaintiffs' expert
26   Dr. Robert Cohen, who described in detail a prisoner at Lewis complex who had been
     repeatedly told by nurses that he had acid reflux and was only given Tums when he
27   reported similarly alarming symptoms; by the time this prisoner was finally seen by an
     outside specialist, he had untreatable end-stage lung cancer.  [Doc. 1104, Ex. 1 ¶¶ 62-65
28   (11/8/13 Report of Dr. Robert Cohen)]

1  painful case of shingles she had had for three months, and that despite numerous requests

2  for the results of a November 2013 blood test, she was not told until December 2014 that

3  the tests showed that she had end-stage kidney failure and Valley Fever.[3]  [Doc. 1376 at

4  1-3]

5       A Spanish-speaking prisoner housed at Eyman's Meadows Unit wrote the Court to

6  report that for more than four years he has endured lesions in his mouth, on his tongue,

7  and on his head; rashes on his body that were so widespread and severe that they bled; and

8  that in 2013 he developed unexplained tremors and was told at the time by health care

9  staff that it might be the onset of Parkinson's Disease, but that he has not received any

10  specialty treatment for Parkinson's.  [Doc. 1278 at 1-3]  Another prisoner, diagnosed with

11  Postural Orthostatic Tachycardia Syndrome (a nervous system disease in which a person

12  experiences an elevated heart rate and low blood pressure upon standing), is not getting

13  appropriate medication for this disorder.   [Doc. 1352 at 2]   He reported that he

14  experienced a fainting episode due to the disorder early in the morning on December 24,

15  was passed out for more than 7 minutes, and that no medical staff responded to custody

16  officers' request for emergency medical assistance because, according to security staff, no

17  nurse was on-site at the entire Eyman complex and no provider was on call.[4]  [*Id.* at 4]

18       A prisoner who has been waiting since 2005 for the surgical repair of a hole in his

19  heart reported that a nurse told him that "Corizon [] is not going to spend any money on

20  my heart because a heart surgery will cost a lot of money.  So they just are waiting for me

21  to die or so I'll get out, and they'll save all of this money."  [Doc. 1246 at 1-2]  A prisoner

22  with multiple sclerosis commented that his medications are not being provided to him on

23

24       [3] Valley Fever, or coccidioidomycos, is a fungal infection of the lungs common to
the Southwest and Central Valley of California.  In approximately one-third of cases the

25  individual develops a respiratory illness. [*See*
https://www.vfce.arizona.edu/GeneralInfo/WhatIsValleyFever.aspx]

26       [4] This prisoner also reported having itching, burning, painful spots on his face that
are changing in shape, and a family history of skin cancer, but the Corizon provider has

27  refused to refer him to a dermatologist for further testing, and the doctor allegedly told the
prisoner that "skin cancer is not treated by Corizon unless and until parts of the body, such

28  as ears, etc., need to be removed as a life-threatening measure."  [Doc. 1352 at 5]

the strict schedule ordered by the MS specialist, that he has suffered injury as a result, and a prison doctor callously told him that he would die in custody.[5]  [Doc. 1319 at 1-2; *see also* Doc. 1250 at 1 (prisoner's cancer medications cut off for one month because nurse practitioner wanted to find cheaper alternative); Doc. 1258 at 1 (prisoner with PTSD and bipolar disorder had all psychiatric medications abruptly cut off); Doc. 1256 at 1-3 (prisoner with grand mal seizures and spinal cord injuries had baclofen and Neurontin abruptly discontinued, with the result that he is suffering from seizures and spasticity); Doc. 1288 (prisoner who suffered delays in refills of psychotropic medication)]

A prisoner housed at SMU-I, one of ADC's isolation units at the Eyman complex, wrote that "I'm in a wheelchair due to my seizures. … A while back the CO's took my wheelchair from me claiming medical told them it was for long distances only.  That was a few months ago.  I am now in a so-called A.D.A. cell and have been having a lot more seizures lately."  [Doc. 1235]  He goes on to describe the conditions in SMU-I where he is housed next to a prisoner who "never takes showers at all.  He spits, throws his feces, and spreads it under his bed and walls. … The [staff] won't clean his cell.  It is so bad it is hard to eat.  Plus it makes your eyes sting and water."  [*Id.*]  Another prisoner housed at SMU-I detailed the abusive treatment suicidal and mentally ill prisoners endure, and asks the Court:  "There has been two suicides over here in the past [three] days, how many more of us have to die before there are changes made by A.D.O.C.?" [Doc. 1321 at 3][6]

---

[5] This is the same doctor named by the prisoner at Docket 1352.  [*See* n.4, *supra*]

[6] According to ADC's website, Bernard Stewart, ADC #277366, committed suicide on January 3, 2015, and Justin Reif, ADC #244623, committed suicide on January 5.    [*See*   https://corrections.az.gov/article/inmate-death-notification-stewart   and https://corrections.az.gov/article/inmate-death-notification-reif]  Both men were housed at ASPC-Eyman.  In addition, Donald Condra, ADC #233190, committed suicide at the maximum detention unit at Lewis complex on January 1, 2015; thus ADC experienced three prisoner suicides in the span of five days.  By contrast, ADC had ten prisoner suicides in all of 2013.  [*See* https://corrections.az.gov/article/inmate-death-notification-condra; Doc. 1104-6, Ex. 8 at 5-6; *see also* Doc. 1337 (comments to the Court from Katherine Condra, mother of Mr. Condra)]

## II.    PROPOSED SETTLEMENT

The proposed settlement agreement is comprehensive and addresses the numerous claims certified by the Court for the health care class and the isolation subclass. [Doc. 372 at 22-23]  With regard to the claims of the health care class, the parties agreed to 103 separate performance measures.  [Doc. 1185, Ex. B]  Compliance will be measured and reported monthly at each of ADC's ten prison complexes.  [Doc. 1185 ¶ 9]  In the first 12 months after the approval of the settlement, each complex must meet or exceed 75% compliance with each performance measure; in the second 12 months after approval, each complex must meet or exceed 80% compliance with each performance measure; and after the first 24 months after approval, each complex must meet or exceed 85% compliance with each outcome measure.  [*Id*. ¶ 10]  The performance measures address such areas as: staffing; medical records; pharmacy/medication; medical equipment; emergency response; health care provided at on-site infirmaries; medical diets; quality improvement; and timely access to diagnostic services and medical, dental, and mental health care at the prison complexes; specialty care; chronic disease care; prenatal care; and preventive services.  [Doc. 1185, Ex. B]  Among other things, the Stipulation requires Defendants to implement an industry-standard utilization management program to review requests for specialty services; provide prisoners with preventive immunizations and screening; develop and implement a training program for dentists; provide language interpretation for all health care encounters by prisoners who are not fluent in English; and transfer prisoners who have heat reactions to psychotropic medications to housing where the temperature is below 85 degrees.  [Doc. 1185 ¶¶ 11-15]

For the subclass of prisoners housed in isolation, Defendants agreed to comply with nine separate performance measures at isolation units, as defined in the class certification order.  [Doc. 1185, Ex. D]  The methodology for determining compliance with these measures is identical to that used with the health care measurements. [Doc. 1185 ¶ 20]  Defendants agreed to increase out-of-cell time and programming for all maximum custody prisoners, and to provide additional out-of-cell time for seriously

1   mentally ill (SMI) prisoners housed in these units.  [*Id*. ¶¶ 21-26]  Defendants also agreed

2   to restrict the use of pepper spray and other chemical agents on any maximum custody

3   prisoner classified as SMI [*Id*. ¶ 27] and to provide subclass members with meals

4   equivalent in caloric and nutritional content to those served to prisoners in non-maximum

5   custody units.  [*Id*. ¶ 28]

6       Plaintiffs' counsel will monitor Defendants' compliance with the Stipulation by

7   reviewing documents and reports, by conducting on-site tours of the institutions, and by

8   interviewing prisoners and staff.  [Doc. 1185 ¶¶ 29-34]

9   **III.   ARGUMENT**

10      The Ninth Circuit has instructed district courts to consider and balance multiple

11  factors when assessing the fairness of the settlement of a case.  These factors may include

12          [t]he strength of the plaintiffs' case; the risk, expense,
            complexity, and likely duration of further litigation; the risk of
13          maintaining class action status throughout the trial; the amount
            offered in settlement; the extent of discovery completed and
14          the stage of the proceedings; the expertise and views of
            counsel; the presence of a governmental participant; and the
15          reaction of the class members to the proposed settlement.

16  *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1026 (9th Cir. 1998) (citations omitted).  These

17  factors are "non-exclusive."  *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566,

18  576 n.7 (9th Cir. 2004).

19      Additionally, "[i]t is the settlement taken as a whole, rather than the individual

20  component parts, that must be examined for overall fairness," and the Court cannot

21  "delete, modify or substitute certain provisions. The settlement must stand or fall in its

22  entirety."  *Hanlon*, 150 F.3d at 1026 (citations omitted); *see also Jeff D. v. Andrus*,

23  899 F.2d 753, 758 (9th Cir. 1989) ("[C]ourts are not permitted to modify settlement terms

24  or in any manner to rewrite agreements reached by parties.").  Finally, "the question of

25  whether a settlement is fundamentally fair within the meaning of Rule 23(e) is different

26  from the question whether the settlement is perfect…"  *Lane v. Facebook, Inc*., 696 F.3d

27

28

811, 819 (9th Cir. 2012) (*citing Hanlon*, 150 F.3d at 1027).[7]  The proposed settlement should be approved when considering the applicable *Hanlon* factors.

### A.    The Risk, Expense, and Duration of More Litigation of Plaintiffs' Case Favors Approval of the Stipulation

Courts should evaluate the strength of the Plaintiffs' claims and likelihood of success at trial, and the risk, expense, and duration of more litigation, when determining whether the choice to settle the case is fair to the class.  *Hanlon*, 150 F.3d at 1026.  But the Court need not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of the outcome of litigation and avoidance of wasteful and expensive litigation that induce consensual settlements."  *Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982); *Hanlon*, 150 F.3d at 1026.

An Eighth Amendment violation requires both an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To satisfy the objective component, plaintiffs must establish that they are "incarcerated under conditions posing a substantial risk of serious harm."  *Id*.  To satisfy the subjective component, plaintiffs must show prison officials acted with "deliberate indifference," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), which occurs when officials know of and disregard "a substantial risk of serious harm."  *Farmer*, 511 U.S. at 837.  "Deliberate indifference to the serious medical needs of prisoners may also be 'evidenced by repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff' or by 'proving there are such systemic and gross deficiencies in staffing, facilities, equipment or procedures that the inmate population is effectively denied access to adequate medical care.'"  *Casey v.*

---

[7]  Moreover, the Stipulation does not foreclose an individual prisoner's future right to litigate alleged violations of his or her constitutional right to adequate health care and/or any unconstitutional conditions of confinement he or she experiences in isolation units.  *See, e.g., Pride v. Correa*, 719 F.3d 1130, 1137 (9th Cir. 2013) (Prisoner's suit under 42 U.S.C. § 1983 seeking injunctive relief to improve his individual medical care was not barred by the statewide class action regarding medical care in the California prison system) (citations omitted).

1    *Lewis*, 834 F. Supp. 1477, 1543 (D. Ariz. 1993), *quoting Wellman v. Faulkner*, 715 F.2d

2    269, 272 (7th Cir.1983).

3         Therefore, to prove their case, Plaintiffs would have to present evidence that the

4    conduct of Defendants created a substantial risk of serious harm that affected

5    approximately 34,000 prisoners housed at ten institutions across the state. Plaintiffs

6    would need to offer proof that Defendants were aware of this substantial risk of serious

7    harm and disregarded that risk. Finally, Plaintiffs would have to show this systemwide

8    substantial risk of harm "can be alleviated for every class member by uniform changes in

9    statewide ADC policy and practice." *Parsons v. Ryan*, 754 F.3d 657, 689 (9th Cir. 2014).

10   While Plaintiffs had comprehensive facts and evidence they believed were more than

11   sufficient to prevail at trial, there always is a risk that some evidence could be excluded,

12   or that the fact-finder would not find the evidence comprehensive or compelling enough

13   to meet the legal standard of proof for Eight Amendment claims.

14         Furthermore, the duration and expense of continued litigation weighs heavily in

15   favor of approving the Stipulation. Had the case gone to trial, and Plaintiffs had prevailed

16   on all claims, the time to actually implement any substantive changes in ADC policy and

17   practice would have dragged out much longer than what will occur under the Stipulation.

18   On the eve of trial, the parties indicated that 74 witnesses would be called at trial (27 by

19   Plaintiffs and 47 by Defendants), and the Court had ruled that expert witnesses could not

20   provide direct testimony by declaration [Doc. 1107], so a full trial would likely have taken

21   months. Then, after months of trial, the Court would have needed adequate time to digest

22   all of the evidence, to draft and issue its findings of facts and conclusions of law, and if it

23   found in favor of Plaintiffs, to make an order regarding the proper scope of relief.

24   Although Plaintiffs requested certain injunctive remedies in their complaint, the Court

25   would have had to give Defendants the first opportunity to develop a plan to propose

26   remedies addressing the Court's findings of constitutional violations. *See Lewis v. Casey*,

27   518 U.S. 343, 362 (1996) ("[C]onsiderations of comity . . . require giving the States the

28   first opportunity to correct the errors made in the internal administration of their

1  prisons."); *Parsons*, 754 F.3d at 689 n.35 (noting that "prison officials must play a role in
2  shaping injunctions").  It would again take months for Defendants to develop such a plan
3  and submit it to the Court for approval.[8]  It would take yet more time for the Court to
4  consider the proposed plan and to issue a final order directing Defendants to implement
5  their plan.  Defendants also would have the opportunity to seek a stay pending appeal,
6  which if granted, would delay relief for years.

7          This Court previously held in an injunctive civil rights class action, that when
8  evaluating the fairness of a settlement, it should consider "the number of named Plaintiffs,
9  the enormous size of the proposed class, the significant cost of continued litigation, and
10 the inordinate delay that has already occurred" as well as Rule 1 of the Federal Rules of
11 Civil Procedure, which encourages the "just, speedy, and inexpensive determination of
12 every action."  *Arnold v. Ariz. Dept. of Public Safety*, 2006 WL 2168637 at *8, CV-01-
13 1463-PHX-LOA (D. Ariz. July 31, 2006).

14         Given the amount of time and money expended to date, the amount that would
15 have been expended had the parties not settled, and the amount that will be expended if
16 the settlement is not approved and litigation resumed, these *Hanlon* factors weigh strongly
17 in favor of approving the Stipulation.

18
19     **B.    The Risk of Maintaining Class Action Status Throughout the Trial
              Favors Approval of the Stipulation**

20         The risk that a class action may be decertified at any time generally weighs in favor
21 of approving a settlement.  *Rodriguez v. West Publ'g Corp*., 563 F.3d 948, 966 (9th Cir.
22 2009).  In light of the Ninth Circuit's unanimous opinion in this case affirming the Court's
23 class certification order, the risk of decertification by this Court during trial is low.  That

24
25         [8] Of course, to posit that Defendants would immediately start to develop such a
   plan assumes that Defendants would not seek a stay of the Court's findings and order,
26 pending an appeal of the Court's decision to the Ninth Circuit and/or to the Supreme
   Court.  Given Defendants' history of vigorously defending this case, including the
27 interlocutory appeal of class certification and petition for rehearing en banc, it is highly
   probable that they would seek a stay of any order and appeal.  Such appeals would take
28 years to complete, thus pushing resolution and relief even farther off into the future.

1    said, two conditions of the Stipulation are that Defendants withdraw their Petition for

2    Rehearing En Banc with the Ninth Circuit, and agree to not file a Petition for Writ of

3    Certiorari with the Supreme Court seeking review of the Ninth Circuit's judgment

4    affirming class certification.[9]  [Doc. 1185 ¶ 34]

5         If the Court does not approve the Stipulation and litigation resumes, it is likely that

6    Defendants would continue to litigate the issue of class certification to higher courts.

7    Therefore, this *Hanlon* factor also weighs in favor of approval of the settlement.

8              **C.      The Amount Offered Favors Approval of the Stipulation**

9         Plaintiffs' purpose in bringing this lawsuit was to obtain injunctive relief to correct

10   systemwide deficiencies in ADC's provision of medical, mental health, and dental care,

11   and in conditions of confinement in ADC's isolation units.  The Court should find that the

12   Stipulation, by its terms, resolves Plaintiffs' claims and provides the class and subclass

13   with the injunctive relief sought.

14        Through the terms of the settlement agreement, Defendants are offering Plaintiffs a

15   substantial benefit by committing to reach compliance at each prison institution with more

16   than 100 performance measures designed to further the goal of correcting the systemic

17   deficiencies in health care and in the conditions of maximum custody units.  The entire

18   class will benefit from the implementation of the terms of the Stipulation, and reaching

19   compliance will require a commitment of ADC to correct the deficiencies.  Furthermore,

20   the role of Plaintiffs' counsel in providing ongoing and independent monitoring of

21   Defendants' progress will benefit the class.

22        Finally, the Stipulation envisions an independent role for the Court under certain

23   circumstances to order ADC to develop and implement specific plans to remedy

24   deficiencies.  The parties agreed that "[i]n the event the Court subsequently determines

25   that the Defendants' plan did not remedy the deficiencies, the Court shall retain the power

26

27   _____

28        [9]  The Stipulation also states that Defendants shall not move to decertify the class
     for the duration of the Stipulation.  [Doc. 1185 ¶ 36]

1    to enforce this Stipulation through all remedies provided by law, except that the Court

2    shall not have the authority to order Defendants to construct a new prison or to hire a

3    specific number or type of staff unless Defendants propose to do so…." [Doc. 1185 ¶ 36]

4        In sum, Defendants have agreed to "dedicate human and financial resources" to

5    come into compliance with the Stipulation, a factor that weighs in favor of approval of the

6    settlement. *Arnold*, 2006 WL 2168637 at *8.

7
8
       **D.    The Extent of Discovery Completed and Stage of the Proceedings
               Favors Approval of the Settlement**

9        This matter has been litigated for almost three years.  Plaintiffs successfully

10   opposed Defendants' motion for summary judgment, and the parties have engaged in

11   extensive discovery, with two extensions of the discovery cut-off date. [*See* 12/16/14

12   Declaration of Donald Specter, Doc. 1207, ¶¶ 4, 9-14].  At the time of the court-ordered

13   mediation, and certainly by the time settlement talks resumed in September 2014, all

14   parties had a firm understanding of the merits of their cases.  In the weeks leading up to

15   the beginning of trial, the parties filed an extensive joint pretrial statement of more than

16   4,000 pages detailing these merits.  The Ninth Circuit has ruled that this *Hanlon* factor

17   favors approval of a class action settlement when "[e]xtensive discovery has been

18   conducted, and the parties had gone through one round of summary judgment

19   proceedings" and as a result, "counsel had a good grasp on the merits of their case before

20   settlement talks began." *Rodriguez*, 563 F.3d at 967.

21       Given the stage of the case at the time of negotiations, this factor weighs strongly

22   in favor of approval of the Stipulation.

23       **E.    The Opinions of Counsel Favor Approval of the Stipulation**

24       Another relevant factor that may be considered is the experience of counsel who

25   determined that settlement was appropriate in this matter.  The Ninth Circuit has held that

26   "[p]arties represented by competent counsel are better positioned than courts to produce a

27   settlement that fairly reflects each party's expected outcome in litigation." *In re Pac.*

28   *Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).

1    Donald Specter and David Fathi are Plaintiffs' lead class counsel in this case, and

2    together led the negotiation of the settlement on behalf of the class and subclass.  They

3    have a combined experience of more than 55 years of litigating prisoners' civil rights

4    cases.  [*See* Doc. 239 ¶ 5 (11/9/12 Declaration of Donald Specter) *and* Doc. 240 ¶ 6

5    (11/9/12 Declaration of David Fathi)]  They, and the attorneys who work with them, have

6    considerable experience in the applicable area of the law and in litigating similar actions

7    [Doc. 239 ¶¶ 5-7; Doc. 240 ¶¶ 5-9], and the Court should find that they have "significant

8    knowledge and experience to appropriately assess the legal and factual issues in this

9    matter and determine whether the Settlement Agreement herein serves the interest of the

10   class members." *Arnold*, 2006 WL 2168637 at *10.  Mr. Specter and Mr. Fathi agree that

11   the Stipulation is fair, reasonable, and adequate, and will bring class members relief much

12   more quickly than if litigation had continued.  [Specter Decl. ¶¶ 3-5]

13      Therefore, this *Hanlon* factor also weighs in favor of approval of the settlement.

14
15   **F.    The Reaction of Class Members to the Proposed Settlement Favors Approval of the Stipulation**

16      When determining whether settlement is fair under Rule 23(e), the Court also may

17   consider the response of class members after they have been given proper notice and the

18   opportunity to comment on the proposed settlement.  *Hanlon*, 150 F.3d at 1026.  The

19   Court is required to "give a reasoned response to all non-frivolous objections" raised by

20   class members.  *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012).

21      In this case, more than 200 comments were provided to the Court by class

22   members, out of a class of approximately 34,000 prisoners.[10]  Approximately 85 of the

23   comments only detailed the prisoners' individual problems with the health care system or

24   described the conditions in the isolation unit in which they were living, or were regarding

25   unrelated issues such as their access to the law library or their criminal case, and did not

26

27   [10] Family members of three current class members filed comments [Docs. 1232, 1362, 1419], and the mother of a class member who died on January 1, 2015 by suicide

28   filed comments with the Court.  [Doc. 1337]

provide substantive comments on the terms of the Stipulation.[11]  Approximately 65 other comments were mixed, with descriptions of the individual's personal needs and experiences as well as comments on the settlement itself.[12]  The remainder of the comments focused on the substance of the Stipulation.  Substantive comments regarding settlement of the case can be grouped into several broad categories:

(1)   The scope of the Stipulation and performance measures, including
    (a)   The health care performance measures and class members' proposed changes or additions, and
    (b)   The isolation performance measures and class members' proposed changes or additions and/or comments on the conditions in the isolation units;
(2)   Provisions that class members thought should have been included in the Stipulation that are legally impossible or outside the scope of the case;
(3)   Class members' concerns regarding transparency and the process of monitoring compliance with the Stipulation;
(4)   Whether the case should have gone to trial instead of settling; and
(5)   The fairness of Plaintiffs' attorneys' fees and costs.

More details regarding each category, and Plaintiffs' responses, follow.

### 1.   The Scope of the Stipulation and Performance Measures

First, some class members expressed their belief that the settlement terms do not go far enough to address the deficiencies identified in the case.  However, as the Ninth Circuit has observed, this alone is not a basis for rejecting a settlement:

> Of course it is possible, as many of the objectors' affidavits imply, that the settlement could have been better.  But this possibility does not mean the settlement presented was not fair, reasonable or adequate.  Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion.

---

[11]  *See* Docs. 1209, 1211-12, 1216-19, 1223, 1226, 1227-1, 1227-2, 1227-3, 1231, 1235, 1238, 1245-46, 1250-51, 1253, 1256, 1258-60, 1262, 1265, 1268, 1278-82, 1286, 1296, 1298-99, 1301-02, 1310, 1312-13, 1316, 1318-22, 1324, 1331-32, 1335-36, 1338-39, 1341, 1345, 1348, 1352, 1356, 1359-60, 1362, 1366-67, 1370-71, 1374-76, 1382, 1385, 1388, 1397-98, 1403-04, 1416-17, 1419, 1428, 1433-36.  *See In re HP Inkjet Printer Lit.*, 716 F.3d 1173, 1176 (9th Cir. 2013) (distinguishing "informal comments" from "formal objections.")

[12]  *See* Docs. 1208, 1210, 1213, 1222, 1233, 1236-37, 1240, 1248-49, 1252, 1254, 1269-70, 1272-74, 1276-77, 1283, 1285, 1287-88, 1290, 1293-94, 1297, 1300, 1303-05, 1309, 1314, 1317, 1328, 1333-34, 1340, 1349, 1351, 1353-55, 1363, 1365, 1368, 1378, 1382-83, 1387-1389, 1391, 1393, 1395-96, 1400, 1402, 1418, 1420, 1423-24, 1429, 1430.

1 | *Hanlon*, 150 F.3d at 1027.

2 | **a.      Health Care Performance Measures**

3 The prisoners' comments on the health care performance measures were focused in
4 several areas.  Sixteen class members believed that the settlement needs to require higher
5 levels of health care staff (medical, dental, and/or mental health) and that the performance
6 measure requirements are inadequate.[13]  However, the ADC budget proposal currently
7 before the Legislature requests funding that would allow 91 additional health care staff to
8 be     hired.     [*See*     FY     2016     Budget     Request,     available     at
9 http://www.azgovernor.gov/file/1370/download?token=R1ClAj_p, at p. 92]

10 Seven class members commented that the settlement does not include enough
11 diseases as chronic conditions.[14]  However, the list of chronic conditions listed at
12 Exhibit A of the Stipulation is more expansive than the list of diseases that ADC
13 previously considered chronic diseases pursuant Department Order 1101, "Inmate Access
14 to     Health     Care."     [*See*     Dept.     Order     1101     at     23,     available     at
15 https://corrections.az.gov/sites/default/files/policies/1100/1101.pdf]   Additionally, the list
16 of chronic diseases in the Stipulation does not negate ADC's separate obligation to
17 provide regular treatment without a charge for any condition that requires regular
18 examinations and/or treatment and is the direct result of a qualifying disability, as defined
19 by 42 U.S.C. § 12102(2) of the Americans with Disabilities Act.  [*See id.*; *see also* A.R.S.
20 § 31-201.01(12)]

21 Eight class members also commented that the settlement does not explicitly require
22 the treatment of non-emergent but nonetheless serious conditions (i.e. hernia repairs, joint
23 replacements) that adversely affect an individual's quality of life, ability to independently
24 perform activities of daily living, or cause ongoing pain.[15]  While the Stipulation does not

---

26  [13] *See* Docs. 1222, 1240, 1283, 1294, 1303, 1328, 1334, 1340-41, 1344, 1347,
27 1365, 1405, 1410, 1423, 1429.
     [14] *See* Docs. 1272, 1285, 1294, 1309, 1353, 1355, 1410.
28   [15] *See* Docs. 1211, 1244, 1253, 1286, 1323, 1326, 1330, 1430.

explicitly spell out these sorts of conditions that would necessitate specialty treatment, it does require that "Defendants or their contracted vendor(s) will approve or deny all requests for specialty health care services using InterQual or another industry standard utilization management program.   Any override of the recommendation must be documented in the prisoner's health care chart, including the reason for the override." [Doc. 1185 ¶ 11]

Eight prisoners also stated that the settlement should have included a timeframe for health care staff to provide a written response to Health Needs Requests (HNRs) filed by prisoners.[16]   Such a provision is not in the performance measures, as it would be redundant in light of Health Care Outcome Measure # 37, which requires that prisoners be seen by a Registered Nurse within 24 hours after the HNR is received, or immediately if the prisoner is identified with an emergent or urgent health care need.  [Doc. 1185, Ex. B] Additionally, Health Care Outcome Measure # 98 requires that mental health HNRs be responded to within the timeframes set forth in the April 2014 Mental Health Technical Manual, Chapter 2, Section 5.0, for prisoners to be seen when reporting emergency, urgent, and serious mental health symptoms.

With regard to the performance measures for pharmacy and medication administration, 10 prisoners stated that the settlement should have addressed the fact that ADC/Corizon have a new policy of no longer providing any over-the-counter ("OTC") medications or creams to prisoners, such that prisoners have to buy the items at the commissary and indigent prisoners must go without them.[17]   However, it is unclear if the provision of OTC medication free of charge is constitutionally required, and Plaintiffs' claims centered around prescription medication.  [*See* Doc. 1 ¶¶ 44-49]

Seven comments stated that the settlement does not concretely address the fact that there are gaps in the refill and renewal of medications.[18]   Plaintiffs believe that no

---

[16] *See* Docs. 1240, 1244, 1290, 1292, 1307, 1341, 1373, 1430.
[17] *See* Docs. 1254, 1268, 1297, 1307, 1310, 1317, 1321, 1394, 1422, 1429.
[18] *See* Docs. 1222, 1288, 1290, 1298, 1303, 1328, 1352.

1    additional measures are needed at this time given there are 12 separate outcome measures

2    regarding pharmacy care, eleven of which are geared toward ensuring the timeliness of

3    refill and renewal of all medications, including non-formulary medications.

4        Nine comments addressed the performance measures for dental care.  Three stated

5    that the settlement does not address the policy of dental providers to only fill one cavity

6    per visit, even if the patient has more than one cavity.[19]  Defendants' dental expert

7    Dr. Dovgan testified that upcoming revisions to the Dental Services Technical Manual

8    ("DSTM") will include a written policy mandating quadrant dentistry, making a

9    performance measure requiring quadrant dentistry unnecessary.[20]  [Deposition of John W.

10   Dovgan, D.D.S., Oct. 3, 2014, at 103:15-23]

11       Six comments stated that the settlement does not explicitly require that dental

12   treatment such as fillings, root canals, or crowns be attempted prior to pulling teeth.[21]

13   However, dentists are required to adhere to the DSTM, which provides for fillings, and

14   more rarely root canals, when indicated.  [Deposition of Karen L. Chu, D.M.D., May 15,

15   2013, at 25:12-26:7; Deposition of William Smallwood, D.D.S., Aug. 20, 2013, at 53:15-

16   55:2]   In some cases root canals and crowns are specialty treatments that are not

17   constitutionally mandated and, thus, outside the scope of this lawsuit.

18                  **b.    Isolation Performance Measures**

19       The Court received more than 90 comments from isolation subclass members

20   housed in maximum custody units, out of a subclass of approximately 3,000 prisoners.

21       Close to 40 comments described inadequate conditions of confinement that they

22   believe are not thoroughly addressed through the performance measures.[22]  For example,

23   one prisoner described the isolation units as "incubators of psychosis" [Doc. 1274], and a

24

25       [19] *See* Docs. 1333, 1344, 1391.
         [20] When practicing quadrant dentistry, dentists address all cavities in a single
26   quadrant at the same time, whenever feasible.
         [21] *See* Docs. 1211, 1244, 1273, 1333, 1344, 1347.
27       [22] *See* Docs. 1208, 1212, 1216-17, 1235, 1236, 1264, 1269, 1273, 1274, 1301,
     1305-06, 1311, 1313-15, 1321, 1325, 1333, 1335, 1343-45, 1348-50, 1364, 1383, 1386-
28   87, 1395, 1402, 1404, 1420, 1424, 1427, 1429, 1433, 1435-36.

1    prisoner moved to the recently-opened Maximum Detention Unit at ASPC-Lewis Rast

2    informed the Court that there are no educational services or programs available.

3    [Doc. 1345]  Others described the unavailability of cleaning supplies, a lack of clothing

4    and bedding, and other environmental concerns.  Six prisoners stated that the settlement

5    should have included performance measures calling for increased levels of correctional

6    officers in the units, because they identified inadequate custody staffing as one of the

7    causes of subclass members not receiving programming or out of cell time.[23]

8         The comments regarding cleaning supplies, clothing, and bedding in the isolation

9    units are beyond the scope of this litigation.  [*See* Doc. 1 ¶ 148]  The Stipulation addresses

10   the isolation and idleness in these units by requiring increased out of cell time and group

11   programming.   [Doc. 1185 ¶¶ 22, 24-25]   And it leaves to Defendants the initial

12   determination of how many correctional staff are needed to comply with the requirements.

13        The performance measure that received the most comments was Maximum

14   Custody Outcome Measure # 4, "[a]ll maximum custody prisoners receive meals with the

15   same caloric and nutritional content as meals served to other ADC prisoners."

16   [Doc. 1185, Ex. D]  At least 45 comments were received by the Court regarding the

17   adequacy of the meals in isolation units, and/or expressing subclass members' concerns

18   that the diet served to general population prisoners is inadequate, does not include any

19   fruits or potatoes, and that they believed that ADC would achieve compliance by adding

20   highly-caloric non-nutritious sweets or cookies to the meals.[24]  (Many of these prisoners

21   also informed the Court that this requirement had not yet been implemented at their

22   maximum custody living unit.)  This case does not generally challenge the adequacy of

23   ADC food service for all prisoners, but alleges that the reduced calorie meals provided to

24   prisoners in the isolation units are nutritionally insufficient.  [*See* Doc. 1 ¶¶ 95, 148]  The

25

26   _____

27   [23]  *See* Docs. 1285-86, 1305, 1344, 1429-30.
     [24]  *See* Docs. 1212, 1221-22, 1225, 1229, 1236-37, 1262, 1264, 1285, 1301, 1305,
28   1311, 1313-15, 1331, 1333, 1344, 1350, 1361, 1364, 1366-67, 1370, 1381, 1386-87, 1392,
     1395, 1399, 1401-02, 1406-09, 1411-15, 1427, 1429, 1435.

settlement directly addresses that claim by providing that subclass members will be provided meals with the same nutritional and caloric content as prisoners in the general population.

Subclass members also expressed concern with the way in which Director's Instruction 326 ("DI 326") is being implemented.[25]  Some prisoners noted that they were being made to do recreation very early in the morning, or that being locked in a shower was being counted as out-of-cell time.[26]  These are compliance issues that will be addressed once the settlement is in force, rather than complaints about the fairness of the terms of the settlement itself.

Eight commenters noted that the Stipulation does not address the lack of due process protections for prisoners when they are placed in isolation (or that an administrative override keeps them in isolation despite no disciplinary infractions, *see*, *e.g.* Doc. 1220 (no infractions in four years)), nor are there due process protections within DI 326 if a prisoner is denied a step level change or is removed from the program.[27] Similarly, two prisoners serving natural life sentences commented that they thought the settlement should have addressed the ADC policy, Department Order 801, Inmate Classification, 801.03,[28] requiring that all life-sentenced prisoners serve their sentence in isolation units for a minimum of two years.  [Docs. 1264, 1349]  But this action challenged the conditions of confinement in the isolation units, not the procedures by which prisoners are placed or retained in those units.  [*See* Doc. 1 ¶ 148]

Finally, 19 death-sentenced prisoners housed in Death Row at Eyman's Browning Unit commented that provisions of DI 326 conflict with Arizona state law, and that they are being forced to do mental health and/or other group programming under threat of discipline even though they believe that participating in such programming could

---

[25]  *See* Docs. 1220, 1236, 1273-74, 1305, 1313, 1315, 1343-44, 1361, 1364, 1381, 1383, 1387, 1389, 1427, 1429.
[26]  *See* Docs. 1210, 1275, 1289, 1311.
[27]  *See* Docs. 1210, 1220, 1237, 1266, 1275, 1315, 1344, 1361.
[28]  Available at https://corrections.az.gov/sites/default/files/policies/800/0801.pdf.

1   compromise their capital appeals.[29]   [Docs. 1343, 1364]  While the Stipulation requires

2   programming be offered, it does not call for the discipline of prisoners who decline to

3   participate.

**2.      Areas Not Covered By the Stipulation That Have No Merit at This Time or Are Outside the Scope of the Case**

6       Class members also identified other requirements that they believed should have

7   been addressed in the settlement.  Eleven stated that the Stipulation should have addressed

8   overcrowding at the prisons, and, for example, required the release of nonviolent and/or

9   elderly prisoners.[30]  Such a provision in the settlement would be contrary to the Prison

10  Litigation Reform Act, which provides that a court cannot order the release of prisoners

11  unless a prior court order has not been effective in remedying the constitutional violations.

12  18 U.S.C. § 3626(a)(3)(A)(i).  There is no such order in this case.

13      Six prisoners stated that the settlement needed provisions to ensure the rights of

14  elderly and disabled prisoners under the Americans with Disabilities Act ("ADA");[31] and

15  12 comments stated that the settlement should apply to Arizona prisoners housed in for-

16  profit private prisons and/or the settlement should have required the State of Arizona to

17  terminate the Corizon contract and undo the privatization of health care.[32]  There also

18  were 13 comments that the settlement should have overhauled the entire broken ADC

19  grievance system.[33]

20      However, such provisions would have been outside the scope of this case.  The

21  case did not raise any claims pursuant to the ADA or Section 504 of the Rehabilitation

22  Act; the class was certified to include only prisoners housed at the ADC-operated Arizona

---

[29]  *See* Docs. 1343, 1368.  *See also* Doc. 1433 (prisoner concerned about personal safety not wanting additional out-of-cell time and asking that he not be punished for not leaving his cell).
[30]  *See* Docs. 1215, 1247-48, 1283, 1328, 1334, 1344, 1346, 1358, 1421, 1423.
[31]  *See* Docs. 1234-35, 1247, 1257, 1303, 1423.
[32]  *See* Docs. 1244, 1267, 1272-73, 1294, 1302, 1307, 1329, 1354-55, 1358, 1363.
[33]  *See* Docs. 1254-55, 1257, 1271, 1276, 1285, 1291, 1305, 1323, 1341-42, 1400, 1429.

1   State Prison Complexes; and ADC's grievance process encompasses all aspects of prison

2   life, not just the provision of health care and the conditions in isolation units.[34]

3               **3.     Concerns About Transparency and Monitoring of Compliance**

4        The largest number of substantive comments received from prisoners concerned

5   the accountability of ADC and Corizon, and the monitoring of Defendants' compliance

6   with the terms of the Stipulation.  At least 31 of the comments expressed prisoners'

7   concern with the self-monitoring component of the agreement, or whether Defendants

8   would be forthcoming in their monitoring or in their reports to the Court.[35]   Sixteen

9   comments urged the Court to appoint an independent monitor to measure Defendants'

10  compliance,[36] including three prisoners who invited the Court to personally visit the

11  isolation units.  [*See, e.g.*, Docs. 1313, 1317, 1370]

12       Plaintiffs believe the Stipulation should be sufficient with good faith efforts by

13  ADC.  And if good faith efforts are not made, the Stipulation provides this Court with

14  jurisdiction to enter additional orders to ensure compliance.  Since under the Stipulation

15  the Court has continuing jurisdiction, it is within the Court's discretion to make further

16  enforcement orders to ensure compliance with the Stipulation, and there is nothing that

17  forbids the Court from visiting the institutions or choosing to appoint its own independent

18  expert(s).  *See* Fed. R. Evid. 706.  Furthermore, Plaintiffs' counsel will closely monitor

19  compliance through monitoring tours, confidential interviews with prisoners, interviews

20

21

22

23          [34] With respect to health care grievances, Health Care Outcome Measure # 26
24  requires that "[r]esponses to health care grievances will be completed within 15 working
    days of receipt (by health care staff) of the grievance."  [Doc. 1185, Ex. B]  In order to
25  measure compliance with this outcome, "[a]t each facility, a minimum of 10 grievances
    per month are randomly selected from the grievance logs" to review for timeliness of
26  response.  [Doc. 1185, Ex. C]
            [35] *See* Docs. 1208-09, 1215, 1217, 1241, 1247, 1249, 1252, 1287-91, 1303-04,
27  1313, 1330, 1334, 1349, 1353, 1355, 1357-58, 1368-69, 1377-78, 1380, 1383, 1402, 1405.
            [36] *See* Docs. 1241, 1248, 1288, 1291, 1313, 1317, 1329-30, 1333, 1357, 1369-70,
28  1379-80, 1418, 1423.

1   with staff, and reviewing documents, including the underlying documents relied upon by

2   ADC in self-monitoring.[37]

3       Eight comments stated the class members' belief that the 85% compliance

4   threshold was too low,[38] and six expressed concern that the Stipulation does not provide

5   specifics about how prison officials and health care staff will be held accountable for

6   failure to comply with the Stipulation.[39]  However, an 85% compliance rate is one that has

7   been used in similar litigation.  [*See* Specter Decl., Ex. 1 (*Plata v. Davis*, Stipulation for

8   Injunctive Relief, No. C-01-1351-TEH, ¶ 22 (N.D. Cal. June 13, 2002))]  And the Court

9   has retained jurisdiction and will be able to issue further enforcement orders against

10  prison officials and ADC for failure to comply with the Stipulation.

11      There also appeared to be a misunderstanding of paragraphs 7 and 17 of the

12  Stipulation, which refer to appropriations from the Arizona Legislature.  Seven comments

13  expressed concern that if the Legislature refused to appropriate money to fund the

14  reforms, then any settlement would be derailed or nullified.[40]   There is no such

15  contingency in the Stipulation.  The State's obligation to comply with the Stipulation is

16  not contingent on the Legislature's appropriation of funds.  [Doc. 1185 ¶¶ 8, 18]

17      Finally, six comments expressed concern that the Stipulation does not include any

18  provisions regarding how class members can receive individualized assistance or

19  responses to their health care needs or problems in isolation units,[41] or that there is no

20  provision in the Stipulation for how prisoners can participate and provide input to

21

22      [37]  At least nine comments expressed concern that Plaintiffs' counsel would have a
    limit of 10 tours per year, no more than two days each, and that the tours would be

23  scheduled with at least two weeks' notice.  [*See* Docs. 1244, 1294, 1303, 1307, 1344,
    1353, 1364, 1368, 1387]  They informed the Court that they thought that some or all of

24  the tours should be surprise inspections, so that Defendants could not attempt to
    whitewash or hide problems.  However, in counsel's experience during discovery and

25  expert tours in this case, and in monitoring settlements with other prison systems, it is not
    possible to hide violations and inadequacies that are systemic and long-standing.  [Specter

26  Decl. ¶ 8]
        [38]  *See* Docs. 1241, 1244, 1272, 1293, 1303, 1307, 1353, 1355.

27      [39]  *See* Docs. 1236, 1241, 1255, 1303, 1346, 1369.
        [40]  *See* Docs. 1234, 1257, 1272, 1334, 1353, 1355, 1358.

28      [41]  *See* Docs. 1276, 1337, 1361, 1373, 1410, 1414.

1   Plaintiffs' counsel in the monitoring process.[42]  However, class members will be able to

2   provide input to counsel via confidential interviews and legal mail.  In terms of obtaining

3   individual assistance with their health care needs, prisoners are not foreclosed from

4   seeking injunctive relief individually, [*see Pride*, 719 F.3d at 1137], and Plaintiffs'

5   counsel notify counsel for Defendants when they learn of prisoners who have critical

6   health care needs, and plan to continue to make such notifications.  [Specter Decl. ¶¶ 6-8]

7                   **4.      Class Members Wanting Their Day in Court**

8          Six class members stated that they thought that the case should have gone to trial

9   so that prisoners would have had their "day in court" so that everyone could hear about

10  the harm and suffering they have experienced while in ADC custody.[43]  As described

11  above at pages 7-11, there are risks inherent in going to trial, and further litigation would

12  have taken substantially longer to obtain any relief.  Plaintiffs' counsel believe that the

13  relief provided for in the settlement is more specific and comprehensive than if the case

14  had gone to trial and Plaintiffs had prevailed on all counts.   [Specter Decl. ¶¶ 3-5]

15  Additionally, if Plaintiffs had prevailed at trial, Defendants would have been given a long

16  period of time to develop a plan to address the constitutional inadequacies and to

17  implement the plan.  [*See supra* pages 8-9]  In the case of the settlement, monitoring by

18  Plaintiffs' counsel will start as soon as the effective date of the Stipulation, which the

19  parties defined as the date on which the Court grants final approval of the Stipulation.

20  [Doc. 1185, Ex. A]

21         To the extent class members wanted a public airing of the harm and suffering they

22  and other prisoners have experienced, Plaintiffs' redacted expert reports are publicly

23  available, and were the subject of media coverage.[44]  The news of the settlement of the

24  case also resulted in a great deal of media coverage regarding the constitutional violations

25

26

27       [42] *See* Docs. 1255, 1307, 136, 1372.
         [43] *See* Docs. 1213, 1234, 1241, 1327, 1334, 1421.
28       [44] *See* http://goo.gl/DM8leY; *see also* Specter Decl., Ex. 2.

1   at ADC facilities.[45]   Finally, the more than 200 comments were publicly filed with the

2   Court, which means they did have the opportunity to tell their stories to the Court.

3                    **5.     The Fairness of Attorneys' Fees and Costs**

4        Thirty-seven comments were received by the court about the fairness of the agreed-

5   upon attorneys' fees and costs.   Of the comments, only four stated that they thought

6   Plaintiffs' counsel was receiving too much money.[46]   Nine comments included questions

7   as to why prisoners were not receiving monetary damages or court-ordered medical care.[47]

8   Seventeen comments stated that they thought the fees award was fair,[48] and an additional

9   seven commented that they believed Plaintiffs' counsel was entitled to more money than

10  they were receiving.[49]

11  **IV.    CONCLUSION**

12       Plaintiffs respectfully move the Court to grant final approval of the parties'

13  settlement, including the agreed-upon attorneys' fees and costs, and issue an order finding

14  that the Stipulation is fair, reasonable, and adequate as required by Rule 23(e) of the

15  Federal Rules of Civil Procedure.   Accordingly, Plaintiffs request that the Court sign the

16  proposed order submitted by the parties.  [Doc. 1185-2]

17

18

19

20

21       _____

22       [45] The settlement received national and state media attention.   [Specter Decl.,
     Ex. 3]

23       [46] *See* Docs. 1233, 1283, 1363, 1394.   Docket 1394, written by a prisoner at
     Eyman-Cook Unit, and apparently signed by 105 other prisoners, misunderstands the fees.
24   This comment objects to the lawyers "collect[ing] their 3.9 million profit on their
     investment" of $1 million, and a "$250,000 per year bonus from their investment" on the
25   basis that the Plaintiffs' lawyers "are not in compliance with the agreement" because the
     monitoring has not yet occurred, and asks the Court to wait until the lawyers "follow
26   through with the part of the settlement and monitor Adoc's [sic] compliance with the
     agreement before payment is addressed."  [Doc. 1394 at 1, 4]
         [47] *See* Docs. 1208, 1211, 1225, 1308, 1314, 1357, 1393, 1397, 1422.
27       [48] *See* Docs. 1214, 1228, 1247, 1255, 1264, 1269, 1270, 1291, 1309, 1311, 1330,
     1333, 1346-47, 1378, 1380, 1418.
28       [49] *See* Docs. 1237, 1241, 1300, 1304, 1354, 1364, 1381.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

February 11, 2015

**PRISON LAW OFFICE**

By: _/s/ Corene Kendrick_

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:      dspecter@prisonlaw.com
              ahardy@prisonlaw.com
              snorman@prisonlaw.com
              ckendrick@prisonlaw.com

*Admitted _pro hac vice_

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Ajmel Quereshi (Md. 28882)**
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:      dfathi@npp-aclu.org
              afettig@npp-aclu.org
              aquereshi@npp-aclu.org

*Admitted _pro hac vice_.  Not admitted in
  DC; practice limited to federal courts.
**Admitted _pro hac vice_

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Jerica L. Peters (Bar No. 027356)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
              agerlicher@perkinscoie.com
              keidenbach@perkinscoie.com
              jhgray@perkinscoie.com
              jpeters@perkinscoie.com

Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    dpochoda@acluaz.org
              jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct.
R. 38(f)

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
Dara Levinson (Cal. 274923)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com
              aamiri@jonesday.com
              daralevinson@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com
              tfreeman@jonesday.com

*Admitted *pro hac vice*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:    kmamedova@jonesday.com
             jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on February 11, 2015, I electronically transmitted the above

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

Sarah Kader
Asim Varma
Brenna Durkin
J.J. Rico
Jessica Jansepar Ross
ARIZONA CENTER FOR DISABILITY LAW
skader@azdisabilitylaw.org
avarma@azdisabilitylaw.org
bdurkin@azdisabilitylaw.org
jrico@azdisabilitylaw.org
jross@azdisabilitylaw.org

s/ D. Freouf
_____

LEGAL125013723.1

-27-