Index of Exhibits to the Declaration of Donald Specter Prisoner Plaintiffs'
Brief in Support of the Parties' Stipulation [Doc. 1185]
Pursuant to the Court's Order [Doc. 1205]


Exhibit 1:    Stipulation for Injunctive Relief from *Plata v. Davis*, No. C-01-1351-TEH
              (N.D. Cal. June 13, 2002)

Exhibit 2:    Copies of media coverage of the findings of Plaintiffs' experts

Exhibit 3:    Copies of media coverage regarding the settlement of this case

# Exhibit 1

6|13

1  BILL LOCKYER, Attorney General
   of the State of California
2  PETER J. SIGGINS,
   Chief Deputy Attorney General
3  ROBERT R. ANDERSON
   Chief Assistant Attorney General
4  PAUL D. GIFFORD
   Senior Assistant Attorney General
5  JOHN M. APPELBAUM, SBN 149643
   Supervising Deputy Attorney General
6      1300 I Street, Suite 125
       P.O. Box 944255
7      Sacramento, CA 94244-2550
       Telephone: (916) 445-2389
8      Fax: (916) 324-5205

9  Attorneys for Defendants Davis, Gage, Presley,
   Alameida, and Pickett
10 CA2001CS0001



FILED

FEB ⁄ 4 2002

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

FILED

JUN 1 3 2002

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DOCKETED

JUN 1 9 2002

By L. ROWBAL

NO.

11     UNITED STATES DISTRICT COURT

12     NORTHERN DISTRICT OF CALIFORNIA

13

14

15 ·MARCIANO PLATA, et al.,                    No. C-01-1351 TEH

16                              Plaintiffs,     **STIPULATION FOR
                                                INJUNCTIVE RELIEF**
17            v.

18 GRAY DAVIS, et al.

19                              Defendants.

20                    **INTRODUCTION**

21        1. The parties enter into this stipulation to address issues pertaining to

22 medical care services provided by the California Department of Corrections (CDC).  The

23 plaintiffs are California state prisoners who have serious medical needs.  The defendants

24 include the Governor, Director of Finance, Youth and Adult Correctional Agency

25 Secretary, Director of Corrections, and Deputy Director, Health Care Services Division,

26 and are sued in their official and individual capacities as state officials responsible for the

27 operation of the CDC and its health care delivery system.

28        2. This action was filed by plaintiffs on April 5, 2001, and an amended

1

 COPY

1  complaint was filed on August 20, 2001.  The action alleges that plaintiffs are not

2  receiving constitutionally adequate medical care as required by the Eighth Amendment to

3  the U.S. Constitution and that defendants are not complying with the Americans with

4  Disabilities Act (ADA) and § 504 of the Rehabilitation Act.

5       **3.** The parties have conducted informal negotiations since July 1999, in an

6  effort to resolve plaintiffs' demand that medical services be improved.  Those

7  negotiations have been undertaken at arm's length and in good faith between plaintiffs'

8  counsel and high ranking state officials and their counsel.  The parties have reached

9  agreement on procedures that the parties will follow in this case for resolving disputes

10  concerning the constitutional adequacy of medical services.  The parties freely,

11  voluntarily, and knowingly with the advice of counsel enter into this Stipulation for that

12  purpose.

13       WHEREAS, a dispute exists between the parties as to the extent to which

14  CDC's provision of inmate-medical care meets constitutionally-mandated minimum

15  standards;

16       WHEREAS, this dispute arose over the course of the last fifteen years, and

17  culminated in plaintiffs filing this statewide-medical class action;

18       WHEREAS, the Governor of the State of California over the past three

19  years has allocated substantial new resources to improve the medical system and is

20  committed to continuing the improvements to meet applicable standards;

21       WHEREAS, this stipulation is intended to be narrowly drawn to meet those

22  applicable standards.

23

24      **A.  Terms and Conditions**

25       **4.** The CDC shall implement Health Care Services Division Policies and

26  Procedures (Policies and Procedures), to be filed with the Court on February 15, 2002.

27  Defendants shall make all reasonable efforts to secure the funding necessary to implement

28  the Policies and Procedures.  The Policies and Procedures are designed to meet or exceed

2

1  the minimum level of care necessary to fulfill the defendants' obligation to plaintiffs

2  under the Eighth Amendment of the United States Constitution.  It is the intent of this

3  Stipulation to require defendants to provide only the minimum level of medical care

4  required under the Eighth Amendment.  Nothing in this stipulation shall be construed to

5  require more of the defendants than is necessary to enforce the Eighth Amendment of the

6  United States Constitution.  Any disputes as to whether defendants' Policies and

7  Procedures and the Audit Instrument will satisfy their obligations under the Eighth

8  Amendment shall be resolved pursuant to the dispute resolution procedures set forth in ¶¶

9  26-28

10       5.  The CDC shall implement the Policies and Procedures at each prison

11  pursuant to the following schedule, which may be rearranged for the purpose of grouping

12  or clustering improvements pursuant to ¶ 24 below:

13

14  Calendar Year[1] 2003:        Northern California Women's Facility, Valley State Prison for
                                 Women, California State Prison - Corcoran; High Desert State
15                               Prison, California State Prison - Sacramento, and Salinas
                                 Valley State Prison.[2]
16

17  Calendar Year 2004:          California Correctional Institution, Mule Creek State Prison,
                                 San Quentin State Prison, Substance Abuse Treatment
18                               Facility, and California State Prison - Solano.

19  Calendar Year 2005:          Centinela State Prison, California Institute for Men,
                                 California Men's Colony, California Medical Facility, and
20                               North Kern State Prison - II (Delano II).

21  Calendar Year 2006:          California Rehabilitation Center, Deuel Vocational Center,
                                 Folsom State Prison, California State Prison - Los Angeles
22                               County, and Pleasant Valley State Prison.

23

24  _____

25       1.  The Calendar Year begins on January 1st and ends on December 31st.

26       2.  If, pursuant to ¶ 8, below, the district court determines that prisoners at the
27  California Institution for Women and the Central California Women's Facility are part of
    the plaintiff class, the Policies and Procedures shall be implemented at these prisons in
28  Calendar Year 2003.

3

| | | |
|---|---|---|
| 1 | Calendar Year 2007: | California Correctional Center, Calipatria State Prison, Chuckawalla Valley State Prison, North Kern State Prison, and Richard J. Donovan Correctional Facility. |
| 2 | | |
| 3 | Calendar Year 2008: | Avenal State Prison, Correctional Training Facility, Ironwood State Prison, Sierra Conservation Center, and California State Prison - Wasco. |
| 4 | | |

5        Prior to Calendar Year 2003, CDC shall initiate appropriate hiring

6  procedures to hire medical staff for employment beginning January 1st.

7        6.     Beginning January 1, 2003 defendants shall implement the following

8  practices or procedures at each institution:

9        a.     Registered Nurses shall staff the emergency clinics 24 hours

10         per day every day.

11        b.     Inter-institution transfers shall occur pursuant to the protocol

         established in the Policies and Procedures.

        c.     Treatment protocols set forth in the Policies and Procedures

         will be implemented at all institutions subject to the

         availability of additional resources.

        d.     A priority ducat system consistent with CDC regulations shall

         be instituted.

18        e.     Outpatient special diets will be available for patients with

19         liver and kidney end-stage organ failure.

20        7. The parties understand and agree that the 602/inmate-grievance

21  procedure is an integral part of the provision of essential medical care and is integrated

22  into the Policies and Procedures. Accordingly, the parties agree that, in the first instance,

23  all complaints regarding medical care to an individual inmate, except those requiring

24  urgent medical care, shall be submitted to defendants after utilizing the inmate grievance

25  procedure.  If after the appeal has reached the third director's level of review and all

26  administrative relief has been exhausted, or the CDC has not responded to the inmate's

27  appeal within 30 days at the Director's level of review and plaintiffs contend that the

28  grievance process has failed to adequately address the problem, plaintiffs may bring the

4

1   medical care concern to the attention of defense counsel, who shall respond in writing

2   within 30 days.  Plaintiffs' counsel may also contact the Chief Medical Officers at the

3   institutions to inquire about the care furnished to particular inmates on a monthly basis.

4   Defendants' counsel shall be notified about such contacts.

5   **8.** The parties agree that this action shall be maintained as a class action

6   pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure and that the class

7   consists of all prisoners in the custody of the CDC with serious medical needs, except

8   those incarcerated at Pelican Bay State Prison.  The parties disagree about whether

9   prisoners incarcerated at the California Institution for Women (CIW) and the Central

10   California Women's Facility (CCWF), previously litigated in a class action entitled

11   *Shumate v. Wilson* (E.D. Cal.) CIV S-95-0619 WBS JFM P, should be members of the

12   class.  To resolve this dispute defendants shall move within sixty days after this

13   Stipulation is approved by the Court for an order determining whether prisoners at CCWF

14   and CIW should be excluded from the class on the sole ground that they are not similarly

15   situated to plaintiffs because of the previously litigated class action entitled.   The motion

16   will not otherwise alter the burden of proof under Rule 23 or create a presumption

17   concerning their inclusion.

18

19   **B.  Access to Information**

20   **9.** Subject to the limitations set forth in this Stipulation, plaintiffs' counsel

21   and the experts shall have reasonable access to the institutions, staff, inmates and

22   documents necessary to properly evaluate the adequacy of the medical care delivery

23   system and the proposed remedies therefor, including the Policies and Procedures and the

24   Audit Instrument, the schedule and other items required by this Stipulation.  The parties

25   shall cooperate so that plaintiffs' counsel and the experts have reasonable access to

26   information reasonably necessary to perform their responsibilities required by this

27   Stipulation without unduly burdening defendants.

28

5

1    **10.** Plaintiffs' counsel and defendants shall negotiate a discovery plan for

2    informal discovery that shall provide to plaintiffs' counsel information from the

3    Department of Corrections' headquarters and from individual institutions about the

4    medical services available to members of the plaintiffs' class, the adequacy of any

5    remedial measures proposed or undertaken by defendants, and defendants' compliance

6    with this Stipulation.  Periodic monthly meetings will be scheduled between defendants'

7    and plaintiffs' counsel to discuss stipulation implementation and access to information.

8    **11.** The discovery plan shall include, but not be limited to, access to the

9    following documents and other material subject to a protective order agreed to by the

10   parties:

11   **a.** The complete medical files of members of the plaintiff class as

12   reasonably necessary;

13   **b.** Internal reviews and audits of the medical services provided to

14   members of the plaintiffs' class, including QMAT and 602 survey;

15   **c.** Non-privileged documents that relate to the amount budgeted for

16   providing medical care to prisoners.  No documents reflecting the budget for any

17   particular upcoming budget year shall be discoverable until after the release of the

18   Governor's Budget.  This is not intended to prohibit the production of policy and

19   planning documents.

20   **d.** Documents maintained at individual institutions and memoranda

21   transmitted to CDC headquarters from individual institutions that are reasonably relevant

22   to assessing defendants' compliance, including but not limited to;

23   (1)  All audits of medical care,

24   (2)  Emergency Response Drill Reports,

25   (3)  Summary of Emergency Responses,

26   (4)  Medical Staff Vacancy Reports,

27   (5)  Medical Staff Training Statistics,

28   (6)  Inter-institution Transfer Log for medical transfers,

6

Stipulation For Injunctive Relief                                C-01-1351 TEH

(7)  Key indicator reports as are available,

(8)  Medical related inmate appeals (602's) and responses, and

(9)  Medical Log Books

e.  Plaintiffs shall not have access to personnel files.

f.  The parties have been unable to agree on whether plaintiffs must be provided with the minutes of continuous quality improvement meetings, including attachments, and death reviews, utilization management data logs, and other peer review documents.  The parties agree the Court will decide this issue.

g.  Plaintiffs' counsel shall be given access to CDC training related to implementation of this Stipulation for the first year that any such training is offered on any medical topic.

12.  Plaintiffs' counsel and their medical consultants shall have the opportunity to conduct no more than one tour at an institution per calendar quarter, with a maximum of 40 tours in total for all institutions each calendar year.  Tours shall be scheduled in a manner consistent with the requirements of this Stipulation and generally in accordance with the priorities established by the schedule promulgated pursuant to ¶ 5. Plaintiffs' counsel may resume tours based upon a finding of substantial noncompliance pursuant to ¶ 15 .

13.  Tours by plaintiffs' counsel shall include reasonable access to housing units and all facilities where medical services are provided.  Defendants shall make reasonable efforts to make available for interview departmental, custodial, clinical and program staff that have direct or indirect responsibility for providing medical services to class members.  Defendants shall direct institution staff to reasonably cooperate with plaintiffs' counsel and the experts in obtaining the necessary information.  Plaintiffs' counsel shall be able to have reasonable brief discussions with inmates during the tours and shall be able to provide business cards with their name and address for distribution to specified individual inmates.  Defendants will also continuously post notices informing

7

1  all inmates at each institution that complaints regarding the provision of medical care may

2  be sent to counsel for the plaintiff class in this case.  Defendants also shall provide

3  plaintiffs' counsel reasonable access to confidential interviews with inmates before or

4  after the tours, during regular business hours without regard to regular visiting hours and

5  days.  Upon a request by plaintiffs' counsel at least two weeks prior to the tour,

6  defendants shall make available for inspection and/or copying the medical files of

7  specified inmates.  If the need arises within one week prior to the tour, plaintiffs counsel

8  may designate additional medical files for inspection and/or copying.

9      **14.**  If any party fails to make himself or herself, an employee, or an agent

10  reasonably available for interview and the parties agree, the other party may depose the

11  party, the employee, or agent who has not been made available.  If the parties are unable

12  to agree, the court may order such deposition of the party, employee, or agent if such

13  deposition is reasonably necessary to the conduct of the litigation.

14      **15.**  Plaintiffs' counsel and their medical consultants will cease tours at an

15  institution after a particular institution has been found to be in substantial compliance as

16  set forth in ¶ 22, below.  Tours may resume at a particular institution if the experts find,

17  or in the event a party disagrees with the experts, the Court finds there has not been

18  substantial compliance on the part of defendants, provided that such tours shall be limited

19  to the issue or components not found to be in substantial compliance.  Non-compliance

20  may be corrected by substantial compliance with the existing Policies and Procedures or

21  by modifying the Policies, Procedures and Audit Instrument pursuant to ¶ 24 and

22  complying with the Policies and Procedures as modified.  Any disputes about whether an

23  institution is in substantial compliance shall be resolved pursuant to the procedures set

24  forth in ¶¶ 26-28, below.

25

26      **C. Independent Court Experts**

27      **16.**  The parties agree to jointly request that the Court appoint experts

28  pursuant to Federal Rules of Evidence, Rule 706 to advise the Court on the adequacy and

8

implementation of defendants' Policies and Procedures and any other matter that appropriately may be the subject of the experts' testimony. The parties shall propose to the Court that the experts' duties specified in Exhibit A shall be provided to the experts pursuant to Rule 706(a). The experts shall be entitled to reasonable compensation in an amount approved by the Court and the costs for each expert shall be borne by defendants.

17. The parties agree that the Court should appoint Joe Goldenson, M.D., Michael Puisis and Maddie LaMarre as Rule 706 experts. In the event that any of these experts can no longer serve, the parties shall attempt to agree on a replacement(s) within 30 days. In the event the parties cannot agree, they shall nominate experts in accordance with Rule 706 of the Federal Rules of Evidence. The parties understand and agree that the court may appoint a mutually agreeable fourth expert in the future. In the event that the parties are unable to agree on a fourth expert, the court may appoint a fourth expert in accordance with Rule 706 of the Federal Rules of Evidence.

18. With reasonable notice and subject to the limitations set forth in this Stipulation, the Court experts shall have reasonable access to all parts of any institution, all relevant documents, all individuals (including unprivileged interviews with staff or inmates), medical meetings, proceedings and programs to the extent that such access is reasonably needed to fulfill his or her obligations. If both parties agree, the court experts may hire additional personnel, at defendants' expense, to assist them in performing their duties. If both parties cannot agree, the court may authorize the hiring of additional personnel, at defendants' expense, upon a showing by the court experts that such additional personnel are reasonably necessary to the performance of their duties.

D. **Compliance**

19. Defendants shall audit each prison's compliance with the Policies and Procedures consistent with the schedule set forth in ¶ 5, above.

20. Compliance with the Policies and Procedures shall be audited by using an Audit Instrument which will be filed on February 15, 2002. This Audit Instrument

9

1   will be developed by the CDC in consultation with the independent court experts and

2   plaintiffs' counsel.  The parties recognize that this instrument has not been tested and may

3   need to be modified to properly reflect the degree of actual compliance.  No later than

4   January 15, 2004, the parties and the independent court experts shall meet and confer

5   about the need to modify the audit instrument.  If all parties agree, the instrument shall be

6   modified.  Any dispute about the need for modification shall be resolved pursuant to

7   paragraph 18 of the Stipulation for Injunctive Relief.

8       **21.**    The audit shall be conducted as follows:

9           a.   No less than 180 Unit Health Records will be reviewed.

10          b.   The records shall be selected at random, but the selection shall

11             be stratified so that each category in the audit instrument is

12             adequately represented.

13          c.   If defendants disagree with the appropriateness of an expert's

14             answer to any question(s) in the audit instrument relating to the

15             quality of medical care, the question(s) shall be reviewed by

16             both expert physicians and shall only count against compliance

17             if both experts agree.

18      **22.** A prison is in substantial compliance when all of the following

19  conditions are satisfied:

20          a.   The prison receives a score of 85% or higher on an audit

21             conducted by the Court experts of the implementation of the

22             Policies and Procedures using the Audit Instrument identified in

23             ¶ 20.  No score less than 85% shall be considered to satisfy this

24             requirement, except that the experts shall have the discretion to

25             find a prison providing adequate medical care in compliance if

26             it achieves a score of no less than 75%.  The score shall be

27             calculated by averaging all of the indicators in the audit

28             instrument.

10

b. In determining substantial compliance, the experts will have to ascertain whether medical assessments or treatment plans provided to inmates comply with the Policies and Procedures. The medical assessment or treatment plan provided to the inmate shall be deemed adequate and appropriate under these policies and procedures only under any one of the following conditions:

(1) The assessment or treatment plan is consistent with guidelines specifically adopted in the policies and procedures; or

(2) The practitioner documents in the medical notes that he/she is deviating from adopted policies and procedures and that such deviation is consistent with the community standard; or

(3) Where no treatment guidelines are specifically adopted in these policies and procedures, the assessment or plan is consistent with the community standard.[3/]

In those instances in which a court expert finds that an assessment or treatment plan does not comply with community standards, defendants may request that the question(s) be reviewed by both expert physicians and shall only count against compliance if both experts agree.

c. The prison is conducting minimally adequate death reviews and quality management proceedings.

---

3. As it is used here and throughout the policies and procedures, the phrase "community standard" means the standard of care imposed under the laws of the State of California upon health care providers licensed to practice in California.

11

d.   The prison generally has tracking, scheduling and medication administration systems adequately in place.

e.   At least two experts have not concluded that there is a pattern or practice that is likely to result in serious problems and those problems are not being adequately addressed.

**23.**   Defendants shall notify plaintiffs and the court experts in writing when they believe an institution has achieved substantial compliance.  Within 60 days of such notification, the experts shall conduct an audit to determine substantial compliance.  If the experts find substantial compliance, the experts shall return a year later, or as soon thereafter as possible, to determine whether the institution has maintained substantial compliance.

### E.   Modification

**24.**   Defendants may modify the Policies and Procedures, and the Audit Instrument at any time, provided that as modified the Policies and Procedures and the Audit Instrument will meet or exceed the minimum level of care necessary to fulfill defendants' obligation to plaintiffs under the Eighth Amendment of the United States Constitution.  Defendants will provide plaintiffs' attorneys with a copy of the original Policies and Procedures or the Audit Instrument, the modified version and a strikeout version with the changes at least 30 days prior to implementation.  In an emergency or when such delay will adversely affect the provision of medical care, notice will be provided as soon as possible, but no later than the date the policy is implemented.   If the plaintiffs determine that the modifications conflict with any of the provisions of this Stipulation, they shall cooperate with the defendants to reconcile the conflict.  Any disputes about whether the modifications will satisfy defendants' obligations under the Eighth Amendment shall be resolved pursuant to the dispute resolution procedures set forth in ¶¶ 26-28.

12

25. Plaintiffs also may seek to modify the Policies and Procedures and the Audit Instrument at any time to secure the minimum level of medical care necessary to fulfill the defendants' obligation to plaintiffs under the Eighth Amendment of the United States Constitution. Plaintiffs must submit the proposed modification to defendants. Any disputes as to whether defendants' Policies and Procedures, and the Audit Instrument must be modified to satisfy their obligations under the Eighth Amendment shall be resolved pursuant to the dispute resolution provisions set forth in ¶¶ 26-28.

## F. **Dispute Resolution**

26. If plaintiffs contend that the Policies, Procedures and Audit Instrument, as written or as modified, or any component thereof will not provide for the minimum level of medical care necessary to fulfill the defendants' obligations to plaintiffs under the Eighth Amendment of the United States Constitution, plaintiffs shall provide defendants with a brief description of the perceived deficiencies and a request that the parties enter into negotiations to resolve the question as to whether defendants' Policies, Procedures and Audit Instrument satisfies the minimum requirements of the Eighth Amendment. Upon receipt of plaintiffs' request for negotiations, any party may inform the Court's experts of the area of disagreement and request that the experts evaluate the issue and prepare a report.

27. At the option of any party, the parties shall conduct negotiations on any issue in dispute. Such negotiations may include the Court's experts, and a person satisfactory to the parties may at the election of either party, mediate any unresolved issues. If the parties cannot agree on a mediator, the administrator of a private dispute resolution service, such as JAMS will choose a mediator. Defendants shall pay the cost of any private mediator. The substance of the mediation and any statements made by a party, an employee of a party, or an agent of a party are confidential and not admissible in any subsequent proceeding. The Experts' report(s) shall be admissible as evidence at the request of any party in any judicial proceeding in this case.

13

1     **28.** If the process set forth in the preceding paragraph fails to resolve the

2   issue of whether defendants' Policies and Procedures and Audit Instrument, either as

3   written or as modified, provides for a level of medical care sufficient to meet the

4   minimum requirements of the Eighth Amendment of the United States Constitution,

5   either party shall have the option of seeking relief from the Court.  If the court determines

6   that defendants' Policies and Procedures and the Audit Instrument either as written or as

7   modified, does not provide a level of medical care sufficient to meet the minimum

8   requirements of the Eighth Amendment of the United States Constitution, the Court may

9   grant relief as authorized under the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. §

10   3626(a), which provides, in pertinent part:  "The court shall not grant or approve any

11   prospective relief unless the court finds that such relief is narrowly drawn, extends no

12   further than necessary to correct the violation of the Federal right, and is the least

13   intrusive means necessary to correct the violation of the Federal right."

14

15     **G.   Enforcement**

16     **29.** The Court shall find that this Stipulation satisfies the requirements of

17   18 U.S.C. § 3626(a)(1)(A) and shall retain jurisdiction to enforce its terms.  The Court

18   shall have the power to enforce the Stipulation through specific performance and all other

19   remedies permitted by law.  Neither the fact of this stipulation nor any statements

20   contained herein may be used in any other case or administrative proceeding, except

21   defendants, CDC, or employees thereof reserve the right to use this Stipulation and the

22   language herein to assert issue preclusion and res judicata in other litigation seeking class

23   or systemic relief.  When these legal defenses are raised, defendants will send copies of

24   such complaints to plaintiffs' counsel at the Prison Law Office.

25     **30.** If plaintiffs believe that defendants are not complying with some or all

26   of the Stipulation, or any of the acts required by the Policies and Procedures produced

27   pursuant to Stipulation, they shall notify defendants of the perceived problems.

28   Defendants shall investigate the allegations and respond within 30 calendar days.  If

14

Stipulation  For Injunctive Relief                                          C-01-1351 TEH

1  plaintiffs are not satisfied with defendants' response, the parties shall conduct negotiations

2  to resolve the issue. The negotiations may include the Court's experts, and a person

3  satisfactory to the parties may at the election of either party, mediate any unresolved

4  issues. If the parties cannot agree on a mediator, the administrator of a private dispute

5  resolution service, such as JAMS, will choose a mediator. Defendants shall pay the cost

6  of any private mediator. The substance of the mediation and any statements made by a

7  party, an employee of a party, or an agent of a party shall be confidential and not

8  admissible in any subsequent proceeding. The Experts' report(s) shall be admissible as

9  evidence at the request of either party in any judicial proceeding in this case. If the

10  parties are unable to resolve the issue by negotiation or mediation, the court shall

11  determine whether defendants are substantially complying with some or all of the

12  Stipulation, or any of the acts required by the Policies and Procedures.

13

14  **H. Termination**

15  **31.** Notwithstanding the Prison Litigation Reform Act or any other law,

16  defendants may move to vacate this Stipulation and dismiss the case on the ground that

17  each institution subject to this stipulation has been found to be in substantial compliance

18  under ¶¶ 22-23. Non-compliance may be corrected by compliance with the existing

19  Policies and Procedures or by modifying the Policies and Procedures pursuant to ¶ 24 and

20  complying with the Policies and Procedures as modified. The parties shall attempt to

21  negotiate any disputes about defendants' compliance pursuant to ¶¶ 26-28, and either

22  party may invoke the enforcement process set forth in ¶ 29-30. The final determination

23  of such a dispute shall rest with the Court.

24

25  **I. Attorneys Fees and Costs**

26  **32.** Plaintiffs may apply for reasonable attorney's fees to which they are

27  entitled. Defendants shall pay plaintiffs for 90% of the work performed in connection

28  with this Stipulation at hourly rates set forth under the PLRA, 42 USC § 1997e(d).

15

1  Defendants shall pay plaintiffs for 10% of the work performed in connection with this
2  Stipulation at hourly rates set forth under the ADA and §504 of the Rehabilitation Act.

3

4  **J. Construction of Stipulation.**

5       **33.** This Stipulation reflects the entire agreement of the parties and
6  supersedes any prior written or oral agreements between them.   No extrinsic evidence
7  whatsoever may be introduced in any judicial proceeding to provide the meaning or
8  construction of this Stipulation.  Any modification to the terms of this Stipulation must be
9  in writing and be signed by a representative of the Department of Corrections and
10  attorneys for the plaintiffs to be effective or enforceable.

11       **34.** This Stipulation shall be governed by and be construed according to
12  California law.  The parties waive any common law or statutory rule of construction that
13  ambiguity should be construed against the drafter of this Stipulation, and agree that the
14  language in all parts of this Stipulation shall in all cases be construed as a whole,
15  according to its fair meaning.

16       **35.** This Stipulation shall be valid and binding upon, and faithfully kept,
17  observed, performed and be enforceable by and against the parties, their successors and
18  assigns and the plaintiff class.

19       **36.** The obligations governed by this Stipulation are severable.  If for any
20  reason a part of this Stipulation is determined to be invalid or unenforceable, such a
21  determination shall not affect the remainder.

22  //
23  //
24  //
25  //
26  //
27  //
28  //

16

1

2

37. The waiver by one party of any provision or breach of this Stipulation

shall not be deemed a waiver of any other provision or breach of this Stipulation.

**IT IS SO STIPULATED AND AGREED.**

Dated: _1 – 25 – 02_

DONALD SPECTER
Attorney for plaintiffs

Dated: _1 – 2 – 02_

ROBERT PRESLEY
Secretary for the Youth and Adult
Correctional Agency

Dated: _1/2/02_

EDWARD S. ALAMEIDA, JR.
Director, California Department
of Corrections

Dated: _1 · 2 · 02_

PETER J. SIGGINS
Chief Deputy Attorney General
Attorney for Defendants Davis and Gage

17

1    Dated: ___1·2·02___                BILL LOCKYER, Attorney General
                                        of the State of California
2                                       PETER J. SIGGINS, Chief
                                        Deputy Attorney General
3                                       ROBERT R. ANDERSON, Chief
                                        Assistant Attorney General
4                                       PAUL D. GIFFORD, Senior
                                        Assistant Attorney General

5

6                                       PETER J. SIGGINS
7                                       Chief Deputy Attorney General

8                                       Attorneys for Defendants Davis, Gage,
                                        Presley, Alameida, and Pickett
9

10

11        THE COURT SO FINDS AND IT IS SO ORDERED.

12        6/13/02

13   Dated: _____

14                                      THELTON E. HENDERSON
                                        United States District Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Stipulation For Injunctive Relief                           C-01-1351 TEH

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **MARCIANO PLATA, et al. v. GRAY DAVIS, et al.**

No.:   **USDC-Northern District, C-01-1351 TEH**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar which member's direction this service is made. I am 18 years of age and older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **June 21, 2002**, I served the attached **ORDER APPROVING STIPULATION FOR INJUNCTIVE RELIEF FILED JUNE 13, 2002** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 1300 I Street, P.O. Box 944255, Sacramento, California 94244-2550, addressed as follows:

**DONALD SPECTER**
**STEVEN FAMA**
**Prison Law Office**
**General Delivery**
**San Quentin, CA 94964-0001**

**WARREN E. GEORGE**
**McCutchen, Doyle, Brown & Enersen**
**Three Embarcadero Center**
**San Francisco, CA 94111-4066**

**CAROLINE MITCHELL**
**Pillsbury Winthrop**
**50 Fremont Street**
**San Francisco, CA 94105**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **June 21, 2002**, at Sacramento, California.

| C. Bain | |
| --- | --- |
| Declarant | Signature |

# Exhibit 2

# ACLU report calls prison medical care inadequate



SEPTEMBER 11, 2014 7:00 PM • BY PATRICK MCNAMARA

A collection of reports the American Civil Liberties Union commissioned has cast Arizona's prison system as one of the worst in the country in terms of medical care for inmates.

The ACLU commissioned the reports to support a suit it has filed against the prison system on behalf of 13 inmates.

Dr. Robert L. Cohen wrote in his Nov. 2013 report for the ACLU that, based on his extensive background in correctional system medicine and the conditions he found in the Arizona prisons, "my opinion is that the ADC (Arizona Department of Corrections) health care delivery system is fundamentally broken and is among the worst prison health care systems I have encountered."

State prison officials declined to comment in detail on the case and the recent release of the ACLU reports because the matter remains in the courts. But a spokesman did provide a brief statement disputing the ACLU's claims.

"While the plaintiffs have sought to try their case in the media, the ADC will present its evidence and arguments in Court, where it will offer its own expert opinions that paint an accurate and realistic picture of inmate health care and conditions of confinement," ADC spokesman Doug Nick said.

Cohen said he visited the Arizona Department of Corrections facilities at Eyman and Lewis in writing his report, one of seven such reports the ACLU commissioned in preparation for a class-action lawsuit against the Arizona Department of Corrections.

In June, a federal appeals court judge allowed the plaintiffs to pursue the class-action suit, expanding the case from the original 13 inmates who filed the complaint to include all 34,000 inmates in state prisons.

Plaintiffs claim the Arizona Department of Corrections and its contracted health care provider routinely delay or simply deny medical care to inmates. It accuses the state of presiding over a system of inadequate medical, dental and mental health care.

Cohen, who worked as a health care provider in New York's Rikers Island jail and served on the National Commission on Correctional Health Care, wrote the prison health care systems in Arizona lack the capacity to care for inmates suffering from severe medical conditions.

"As a result, prisoners are denied basic and necessary health care for their serious medical

needs, and they are suffering substantial harm as a result," Cohen wrote.

His report documents cases of numerous inmates whose medical care he believes was delayed or needs ignored as result of inadequate oversight and insufficient staffing.

In one case, he says an inmate who complained of severe throat pains waited months for medical staff to provide antibiotics.

The inmate later underwent a tonsillectomy but several months later was diagnosed with throat cancer. The report says the inmate still did not receive treatment for four months after the diagnosis.

Another inmate with a broken hand had to wait nearly a month for an x-ray, which the doctor did not review for another ten days. Even though his broken bone was documented at that time, the patient did not see the orthopedic specialist until three months after the initial injury, according to the report.

In addition to claims of insufficient care, Cohen's report says the prisons he visited also had deficient medical facilities.

"Medical equipment was broken, covered in dust, and in some cases based on logs attached to them, had not been repaired or checked in more than a decade," he wrote.

In another instance, Cohen described a prison medical facility as having "clinics and equipment on display, but curiously, neither clinical staff nor patients."

Sara Norman, an attorney with the California-based Prison Law Office who is working for the plaintiffs, said the purpose of the lawsuit was not to force the state to provide "Cadillac care" for inmates.

"We're talking about people who are begging for care for cancers that are growing inside their bodies," she said.

---

Archives | RSS

Blog Categories: Politics | News | Music | Chow | Do This! | Media | Cinema | Fun in General | TV |
Sports | Arts and Culture | Weird Stuff | more categories»

« Remembering Sept. 11, 2001, with Jo…           | Jimi Giannatti's Nine Questions Has… »

## THURSDAY, SEPTEMBER 11, 2014

NEWS
### ACLU: "Widespread Problems" With Health Care Inside Arizona Prison
POSTED BY MARI HERRERAS ON THU, SEP 11, 2014 AT 2:30 PM

The ACLU released a report this week that condemns the healthcare provided
to prisoners in Arizona Department of Corrections facilities. The report and the
expert testimony is part of a clas– action lawsuit, Parsons v. Ryan, with
plaintiffs represented by the ACLU's National Prison Project, the ACLU of
Arizona, the Prison Law Office, Jones Day, Perkins Coie LLP and the Arizona
Center for Disability Law. A trial is scheduled to begin Tuesday, Oct. 21.

From the ACLU:

> Nearly two dozen expert reports that detail widespread problems with
> the Arizona Department of Corrections' healthcare system, as well as
> its use of solitary confinement, were made public late Monday.
>
> "I observed locked, dark and empty rooms that I was told were exam
> rooms, but lacked basic medical equipment," wrote Dr. Robert Cohen,
> an expert in correctional medicine, in one of his reports (11/8/13
> report, page 5). "Medical equipment was broken, covered in dust, and
> in some cases based on logs attached to them, had not been repaired
> or checked in more than a decade."
>
> Dr. Cohen found that almost half of people who died "natural deaths"
> while in ADC's care over a six-month period received "grossly
> deficient" medical care (2/24/14 report, pages 1-2). Every week, on
> average, a patient who has been neglected or mistreated dies in the
> Arizona prison system, according to these expert reports.
>
> "In some of these cases, the poor care clearly caused or hastened their
> death," Dr. Cohen wrote (2/24/14 report, page 1-2). "It is alarming
> that almost half of the natural deaths occurring during the brief half
> year period under review would reveal such significant problems with
> delivery of basic medical services."
>
> Dr. Cohen uncovered shocking delays in treatment including the case
> of a 38-year-old prisoner whose death from cancer was avoidable
> according to ADC's own documents (2/24/14 report, pages 19-25).
> Another prisoner died of untreated lung cancer after being accused by
> nurses of lying about his medical condition; they said in his medical
> records that he was "playing games" and "seeking attention" (2/24/14
> report, pages 25-32). A 24-year-old man died of AIDS-related
> pneumonia after his AIDS went undiagnosed and untreated for a year,
> despite his pleas for HIV tests and treatment, Dr. Cohen found

(2/24/14 report, page 52).

These are not isolated cases. Dr. Cohen's findings, and the findings of the plaintiffs' other experts, point to systemic deficiencies in ADC's healthcare.

"[T]here were multiple cases in which the lapses were so shocking and dangerous that I felt ethically obligated as a medical professional to bring them to the immediate attention of the ADC and Corizon staff," Dr. Cohen said (11/8/13 report, page 4). Corizon is the company contracted by the state to provide healthcare to prisoners.

The other experts made equally damning discoveries. The 23 expert reports, which were previously confidential, were made public yesterday pursuant to a court order in anticipation of an October trial relating to ADC's failure to provide more than 33,000 prisoners in 10 prisons healthcare and conditions of confinement that meet constitutional standards.

"[T]he chronic shortage of mental health staff, delays in providing or outright failure to provide mental health treatment, the gross inadequacies in the provision of psychiatric medications, and the other deficiencies identified in this report are statewide systemic problems, and prisoners who need mental health care have already experienced, and will experience, a serious risk of injury to their health if these problems are not addressed," wrote Dr. Pablo Stewart, another expert hired by plaintiffs' counsel to tour ADC's prisons and review prisoners' medical records, in one of his reports (11/8/13 report, page 10).

Dr. Stewart, a psychiatry professor with expertise in prison mental health care, uncovered numerous preventable suicides by prisoners, lengthy and serious delays in care, insufficient and unlicensed staff and inadequate medication protocols. One prisoner hanged himself after ADC neglected to give him his prescribed mood stabilizing drugs for more than three weeks, Dr. Stewart found (11/8/13 report, pages 21-23).

The reports also detail significant, dangerous problems with ADC's use of solitary confinement. Some people, for instance, are put in isolation simply because other beds are full (Vail 11/8/13 report, page 9). Mentally ill prisoners are often isolated because ADC does not have treatment alternatives, according to one expert (Vail 11/9/13 report, page 13).

"[T]he ADC health care delivery system is fundamentally broken and is among the worst prison health care systems I have encountered," Dr. Cohen wrote (11/8/13 report, page 3). "[U]nless ADC dramatically reverses its course, it will continue to operate in a way that harms patients by denying them necessary care for serious medical conditions."

Plaintiffs in the class action lawsuit, Parsons v. Ryan, are represented by the American Civil Liberties Union's National Prison Project, the ACLU of Arizona, the Prison Law Office, Jones Day, Perkins Coie LLP and the Arizona Center for Disability Law.

A trial is scheduled to begin Oct. 21. More expert reports will be made public prior to the trial.

Tags: American Civil Liberties Union, ACLU, Arizona Department of Corrections, healthcare, Parsons v. Ryan, National Prison Project, the ACLU of Arizona, the Prison Law Office, Jones Day, Perkins Coie LLP and the Arizona Center for Disability Law



 TRENDING

# THINKPROGRESS

FRONT   CLIMATE   ECONOMY   HEALTH   JUSTICE   LGBT   WORLD   CULTURE

SPORTS   ELECTION

TRENDING:   ABORTION   ABORTION   PUBLIC HEALTH   PUBLIC HEALTH

Search:

# Doctors Say Arizona Prisons Mocked Sick Inmates, Left Stroke Victims In Soiled Diapers For Weeks

BY **AVIVA SHEN** 🐦 POSTED ON SEPTEMBER 11, 2014 AT 1:28 PM



CREDIT: AP PHOTO/RICH PEDRONCELLI

Arizona's privatized prison healthcare system routinely abuses and ignores sick and mentally ill inmates, according to newly released confidential reports from doctors who visited prisons and reviewed inmates' medical records. The experts are serving as witnesses in a class-action lawsuit brought by the American Civil Liberties Union and expected to go to trial this fall.

The physicians described a dysfunctional health care system that withheld important medications, ignored serious warning signs and denied inmates' pleas for medical care. Many inmates became seriously ill and even died of treatable diseases. One patient who repeatedly complained of intense pain and disorientation was allegedly mocked for "faking" his symptoms. He eventually died of lung cancer, which was not diagnosed until a few days before his death. Another prisoner died of AIDS-related pneumonia after prison staff ignored his requests for an HIV test. Others waited months for vital surgeries or prescriptions.

One sick inmate said he fell and was left on the floor for three to five hours. "I would just like to feel safe and not fall. That's all," he told one of the visiting doctors.

"In my more than three decades of doing this work, I have never seen such callous disregard demonstrated over and over again," Dr. Robert Cohen wrote in his report.

One 55-year-old stroke victim told doctors he had developed multiple ulcers and sores from sitting in an unchanged diaper in a wheelchair. Medical staff "treat him as if he is lying" about being unable to get from the wheelchair to a toilet, Cohen said, and leave him sitting in his own urine and feces.

Other experts focused on the prison system's treatment of mentally ill prisoners, warning that mental health services are "in a state of disarray, and have been for some time." Some facilities had no psychiatrists on staff at all, while others were so understaffed that some doctors were handling more than 500 patients at a time.

Corizon, Inc., the nation's largest private prison healthcare provider, took over management of Arizona prisons from another for-profit company, Wexford, in March of 2013. Wexford was ousted after charges of incompetence and multiple deaths. But conditions haven't changed much under Corizon. Another report last year found that instead of treating ailing inmates, staffers told them to "be patient" or "pray."

Corizon is facing a slew of lawsuits and investigations in other states that have privatized prison medical care. A 73-year-old New Mexico woman recently sued, saying she was put

into solitary confinement for over a month because she complained that Corizon was
denying her and other women medical care. Lawsuits following the deaths of two
inmates in Kentucky forced several Corizon workers to resign, while an investigation in
Idaho charged the company with "inhumane treatment" of inmates. Corizon was also
caught using a sham contractor to run its prisons in Philadelphia, and lost contracts in
Maine and Maryland after charges of negligence.

---

**24 comments**

---



Add a comment...

Comment using...

---

**Robert Johnson** ·     Top Commenter (signed in using Hotmail)
"Other experts focused on the prison system's treatment of mentally ill prisoners, warning that mental
health services are "in a state of disarray, and have been for some time.".

Sadly enough, prisons are our Nation's largest mental health facilities. That doesn't make them qualified,
but, regardless of all the lip service paid to mental health after mass killings at schools, our dysfunctional
congress has yet to initiate any comprehensive mental health reform / funding.

Reply · Like ·     29 · September 11, 2014 at 11:00am



Judith Hammond ·     Top Commenter
Thank St. Ronnie.
Reply · Like ·     18 · September 11, 2014 at 4:57pm

---

View 19 more

---

# Prison Health Care Horror Stories Emerge From ACLU's Lawsuit Over Arizona Prison Conditions

**By Matthew Hendley**

Published Wed., Sep. 10 2014 at 6:00 AM



Dozens of allegations of widespread problems in the Arizona

**Matthew Hendley**

Department of Corrections' health care system were made public yesterday.

The claims come from the American Civil Liberties Union of Arizona's big class-action lawsuit against the state prison system, which claims that the ADC's health care services are wholly inadequate (to say the least), and is slated to go to trial this fall.

These new reports are from ACLU witnesses in the case, including several doctors and a longtime prison administrator, who got an up-close look at specific health-care issues in the prison system.

"The state is claiming that these are isolated incidents and these don't reflect the system as a whole, but these experts reports show that's simply untrue," ACLU of Arizona executive director Alessandra Soler tells *New Times*.

As one of the experts, Dr. Robert Cohen, described it in one of his reports, "[T]he ADC health care delivery system is fundamentally broken and is among the worst prison health care systems I have encountered."

**See also:**

-*[ACLU Lawsuit Over Arizona Prison Health Care, Conditions Likely Headed to Trial](#)*

Cohen is a doctor with an extensive history of medicine in correctional settings, including time serving as a court-appointed federal monitor in prison health care systems in other states.

He came to his conclusion of Arizona having one of "worst prison health care systems [he's] encountered" during an evaluation of the health care system that including tours of two of the prison complexes and reviews of medical records and autopsies of some prisoners who died in ADC custody.

Cohen found that at least 13 of the 28 prisoners in the cases he reviewed received "grossly deficient" care. The newly released reports explain many of these problems in great detail.

In one case, a prisoner requested HIV testing twice while in ADC custody, which he didn't receive, but he later died from an AIDS-related illness.

In another case, a prisoner died of untreated Hodgkin's lymphoma. Dr. Cohen's review of the medical records points to delay after delay in his care, calling his death "shocking."

Although the ADC eventually turned over its health care to a private company, Wexford, then another private company, Corizon, and amazingly, the ACLU's experts contend that the systemic problems extend through all phases.

The lawsuit against ADC isn't just related to deaths, either. Far from it, in fact -- the class-action lawsuit was filed on behalf of about 33,000 prisoners, and much of this allegedly poor medical care is ongoing.

"[T]here were multiple cases in which the lapses were so shocking and dangerous that I felt ethically obligated as a medical professional to bring them to the immediate attention of the ADC and Corizon staff," Cohen wrote in one report.

And there's more. The lawsuit isn't just limited to deaths and potential deaths, but also over other prison conditions, including the ADC's use of isolation, prisoner nutrition, and more.

Until now, the allegations that were made public were of a more general sense. These new reports, released as a result of a court order in the case, identify some very specific things that the ACLU's experts found to support the allegations, and they found plenty wrong.

In all, 23 such reports have been made public -- ACLU officials say more will be coming -- and are [all hosted online](#) by the Prison Law Center, which is also involved in the lawsuit.

"It's a level of suffering that is unprecedented," Soler says. "The degree of suffering and the degree of harm to these patients is really the result of a system that is extremely, extremely

broken."

**Got a tip? Send it to: Matthew Hendley.**

**Follow Valley Fever on Twitter at @ValleyFeverPHX.**
**Follow Matthew Hendley at @MatthewHendley.**

# Reasons why we should treat prison inmates like dogs



**EJ Montini, The Republic | azcentral.com**   *12:07 p.m. MST September 10, 2014*



*(Photo: Michael Schennum/The Republic)*

If there is any justice left in this world the state of Arizona will begin treating its prison inmates like dogs.

Two cases working their way through the system prove the state's contractual responsibility to do this, the legal justification for it, and our unquestioned, absolute moral obligation.

The cases are nearly identical except for the fact that one involves humans and one involves, well, dogs.

The canine case you're familiar with.

Maricopa County sheriff's detectives investigated the deaths of 20 animals at the Green Acre Dog Boarding facility near Gilbert, and recommended felony and misdemeanor charges against owners and caretakers.

Maricopa County Attorney Bill Montgomery said Wednesday his office will take a few weeks to decide whether to prosecute.

It's a matter of custodial neglect.

Once a kennel owner agrees to house the dog and to care for it he or she has a legal obligation to do so, barring some unforeseen accident. (Which is what the owners claim.)

The same is true in a state prison.

Very few of the inmates we send to the penitentiary receive the death penalty. And even if they are the state is obligated to take care of them until the sentence is carried out.

In 2012 a lawsuit was filed alleging that the DOC has not done that, to a horrifying degree.

This week the plaintiffs in the case, who are represented by the American Civil Liberties Union's National Prison Project, the ACLU of Arizona, the Prison Law Office, Jones Day, Perkins Coie LLP and the Arizona Center for Disability Law, released some of the reports they have to back up their case.

One of their experts, Dr. Rober Cohen, claimed that many inmates who were said to die of natural causes actually had received "grossly deficient" medical care. A press release from the group says an inmate dies each week in Arizona prisons because of such neglect.

To which the first reader to leave a message about this on my voicemail will say:

"So what?"

I understand the sentiment.

I have heard it again and again over the years.

The argument goes that if a convict does something bad enough to send him to prison then anything that happens to him while behind bars is no one's fault but his own. Whereas as the dogs who were confined at Green Acre were innocent victims.

I get the rationale. But it's wrong.

When we send someone to prison we are accepting responsibility not only for that person's incarceration but for his or her well-being. The punishment we hand out is confinement, not medical neglect that can lead to death.

The state tried to have the lawsuit tossed and failed. The case is scheduled for trial in October. In a written statement a while back Department of Corrections officials said, "The allegations are not accurate, and the Department of Corrections looks forward to vigorously challenging them and presenting our case at trial."

We'll see.

Some of the examples of inmates suffering from inadequately treated illnesses like cancer are gruesome. We're better than that. At least we should be.

If we don't treat human beings at least as well as we treat canines then our justice system has gone to the dogs.

Read or Share this story: http://azc.cc/1txO8Cd

**MORE STORIES**



**AZ lawmakers hoping to put a pistol in every pocket**

(/story/ejmontini/2015/02/06/gun-control-arizona-legislature-gun-bills-doug-ducey-gabrielle-giffords/22977849/) **(/story/ejmontini/2015/02/06/gun-control-arizona-legislature-gun-bills-doug-ducey-gabrielle-giffords/22977849/)**

Feb. 6, 2015, 9:47 a.m.



**USS Arizona's oldest survivor dies at 100**

(/story/news/local/arizona/2015/02/05/pearl-harbor-uss-arizona-survivor-langdell/22953077/) **(/story/news/local/arizona/2015/02/05/pearl-harbor-uss-arizona-survivor-langdell/22953077/)**

Feb. 5, 2015, 5:57 p.m.



**Benson 'Faces': Suns' rookie guard Tyler Ennis**

(/story/news/local/arizona/2015/02/06/benson-faces-suns-rookie-guard-tyler-ennis/22940783/) **(/story/news/local/arizona/2015/02/06/benson-faces-suns-rookie-guard-tyler-ennis/22940783/)**

Feb. 6, 2015, 7:38 a.m.

# Exhibit 3



at Valley markets FOOD & DINING, D1

# ARIZONA REPUBLIC

**WEDNESDAY,** OCTOBER 15, 2014   azcentral.com   A GANNETT COMPANY

## Settlement to improve care, treatment for Ariz. inmates

**BOB ORTEGA**
THE REPUBLIC • AZCENTRAL.COM

Arizona must significantly improve health care and mental health care for about 33,000 prison inmates under a proposed settlement of a class-action lawsuit brought in 2012 by prison-rights groups.

That suit charged that the state unconstitutionally denies adequate care to inmates in state prisons and routinely keeps mentally ill prisoners in solitary confinement under brutal conditions. Under the settlement announced Tuesday, the state does not admit any wrongdoing.

The settlement would reduce the amount of time mentally ill inmates spend in solitary confinement and would restrict guards' use of pepper spray to control those inmates. Spray could be used only to prevent serious injury or escape.

Corrections also agreed to meet more than 100 separate health-care performance measures and to allow attorneys for the prisoners to monitor compliance.

"This has been a broken system for a long time," said David Fathi, director of the American Civil Liberties Union's Na-

**See INMATES, Page A16**

**Online series:** Read the original reporting on prison medical issues at **prisons .azcentral .com.**

### GOVERNOR'S RACE

## How they stand on child welfare, Medicaid

**MARY JO PITZL**
THE REPUBLIC • AZCENTRAL.COM

Gov. Jan Brewer too steps in recent years restore Arizona's safe net by expanding hea care for low-income / zonans and beefing funding for child fare.

Whether those pieces of Brewer's cy remain intact year hinges in large on the next gove who will face an im ate budget defic more than a half-

## SURE, IT'S SCARY –
## BUT IS IT SAFE?

# DOC agrees to major improvements in prison health care

A settlement agreement has been reached in a class-action lawsuit. The lawsuit alleges prisoners are not receiving adequate mental-health care, dental care and medical care, which led to deaths.

**Wendy Halloran, 12 News | azcentral.com**   *6:22 p.m. MST October 14, 2014*

*New developments in a continuing 12 News investigation amount to a win for prisoners and their families in Arizona*



*(Photo: 12 News)*

At first, the Arizona Department of Corrections refused to admit there was a dire problem with regards to the administering of health care to state prisoners. Today, a settlement agreement has been reached in a

class-action lawsuit.

The lawsuit was filed by the American Civil Liberties Union of Arizona, ACLU's National Prison Project, the Prison Law Office, Perkins Coie, Jones Day and the Arizona Center for Disability Law against the Arizona Department of Corrections on behalf of 33,000 prisoners.

**PREVIOUSLY :** Costs up, no improvement in prison health care quality (/story/news/investigations/2014/08/01/12news-another-death-sentence/13494875/)

The landmark case, filed in 2012, was scheduled to go to trial next week in federal court in U.S. District Judge Neil Wake's courtroom. The lawsuit alleges prisoners are not receiving adequate mental-health care, dental care and medical care, which led to deaths. It also alleges excessive use of solitary confinement.

According to the terms of the settlement agreement (http://www.acluaz.org/sites/default/files/documents/Stipulation.pdf), the Arizona Department of Corrections agrees to better monitor prisoners with diabetes, hypertension and other chronic conditions.

The settlement also requires DOC to overhaul the rules for prisoners with serious mental illnesses in solitary confinement. Instead of spending all but six hours a week in their cells, these prisoners will now have a minimum of 19 hours a week outside the cell, and this time must include mental-health treatment.

Restrictions will be placed on corrections staff when it comes to the use of pepper spray on specific inmates. Chemical agents shall be used only on inmates deemed seriously mentally ill, referred to as "SMI," in case of an "imminent threat." That means, if a severely mentally ill inmate tries to escape or poses a threat to security or himself, pepper spray can be used but should be considered a last resort.

Prisoners' attorneys will monitor the care their clients are receiving by the contracted private health-care provider, Corizon, to make sure the state is in compliance. Attorneys and experts for the plaintiffs will be given access to the prisons and documentation to make sure DOC is complying with the settlement agreement. They will be allowed 20 "tour days" per year inside Arizona's 10 prisons.

According to the settlement terms, the DOC will be required to recommend a certain budget to the Arizona Legislature that will allow it to modify the current health-care contract it has with Corizon, to increase staffing and mental-health-care positions.

DOC is to ensure that all prisoners will be offered a yearly influenza vaccination. All inmates with chronic diseases will be given the required immunizations in accordance with the Centers for Disease Control and Prevention.

All female prisoners age 50 and older will be offered mammogram screenings, and again every 24 months unless more frequent screening is indicated on the inmate's medical chart.

"The Arizona Department of Corrections has agreed to changes that will save lives," said Don Specter, director of the Prison Law Office. "This settlement will bring more humane treatment for prisoners with serious health-care needs, and the potential for their conditions to improve rather than worsen."

In the settlement paperwork, DOC denies all of the allegations in the complaint and maintains the settlement is not an admission of wrongdoing or liability. The settlement agreement is to remain in effect for at least four years before either party moves to terminate the agreement.

The DOC has agreed to pay attorneys' fees, totaling $4.9 million, to the ACLU of Arizona and the other parties that brought the suit.

Our investigation revealed the state farmed out the defense of this lawsuit to private law firm Struck, Wieneke & Love in Chandler. Legal billing records obtained by 12 News show the private law firm has previously billed the state more than $3 million for its work, and that doesn't take into account the past few months.

When done, legal fees for both sides will cost Arizona taxpayers more than $8 million.

Read or Share this story: http://azc.cc/1xOYfFo

**MORE STORIES**

**John F. Kennedy wedding negatives being auctioned (/story/news/nation-now/2014/10/15/john-f-kennedy-wedding-negatives-jackie-kennedy/17297243/)**
Oct. 15, 2014, 8:25 a.m.

(/story/news/nation-now/2014/10/15/john-f-kennedy-wedding-negatives-jackie-kennedy/17297243/)



# Arizona settles class-action lawsuit over prison health care

By Bob McClay
Reporter

Updated 2 hours, 37 minutes ago.



(AP Photo)

PHOENIX -- The state of Arizona agreed to settle a lawsuit filed on behalf of 33,000 inmates over the quality of health care in its prisons.

The agreement ended the class-action case just days before it was to go to trial, officials said Tuesday.

As part of the settlement, the state agreed to seek more money from the legislators to increase staffing for medical and mental health care workers and offer all prisoners between ages 50 and 75 colon cancer screenings.

The American Civil Liberties Union said health care inside of the Arizona Department of Corrections' prisons was horrible.

"I personally have been involved in prison litigation for over 40 years, and I have never seen a worse example of inadequate medical and mental health care," said Dan Pachoda, legal director for the ACLU in Arizona.

Pachoda said that critically ill patients died because they weren't treated in time. Some who wanted to see a doctor were allegedly told to pray for a cure. He said that the corrections department settled the lawsuit by agreeing to over 100 "benchmark" changes.

"There are specific treatment requirements for certain diseases, including Hepatitis C and others," Pachoda said. He said that the state will be required to provide medical treatment within "two to three months" of the prisoner's request.

Also representing the plaintiffs was a group called the Prison Law Office. That group's attorney, Corene Kendrick, is also happy with the settlement.

"They've also agreed to make a number of changes to the isolation units," Kendrick said. Those changes include letting prisoners with mental conditions who are in solitary confinement out of their cells for 19 hours a week. Currently they are only allowed six hours per week.

The department said all of the talk about solitary confinement was misleading, claiming there is no solitary confinement.

"This term of 'solitary confinement' is antiquated and not applicable, and hasn't been for years to the Arizona Department of Corrections," agency spokesman Doug Nick said.

"There are single-cell environments that do fall into nationally accredited standards that require a certain amount of natural daylight for every inmate. They have the ability to have contact with others, and have out-of-cell time."

The department said it's done nothing wrong. Still, Nick called the settlement a positive development.

"We're very happy to have come to an agreement," he said.

Nick said that settling the lawsuit will avoid a costly trial and save resources that can be used to provide "constitutional health care" to inmates.

Pachoda said that the state has agreed to pay $4.9 million in legal fees as part of the settlement.

*The Associated Press contributed to this report.*

# Arizona to improve inmate health care

4 HOURS AGO • HOWARD FISCHER CAPITOL MEDIA SERVICES

PHOENIX -- Facing a lawsuit they appeared to be losing, state prison officials have agreed to improve health care for the more than 34,000 inmates in their custody.

The stipulation filed Tuesday in federal court here requires the Department of Corrections to live up to more than 80 specific performance standards for how it handles medical issues. These range from staffing requirements and emergency response times to ensuring that inmates get their medications in a timely fashion.

Potentially more significant for those affected, the stipulation also requires the state to revamp its rules on solitary confinement of inmates -- the department calls it "isolation" -- with serious mental illness.

Where current regulations keep those prisoners in their cells all but six hours a week, they will now have at least 19 hours a week elsewhere. And that time also must include mental health treatment and other programs.

And the Department has also agreed to use chemical agents like pepper spray on inmates classified as seriously mentally ill "only in case of imminent threat."

That is defined as situations that jeopardize safety or security like an attempt to escape or active physical resistance. But it specifically precludes pepper spray for things like "passive resistance to placement in restraints or refusal to follow orders."

Don Specter, an attorney with the Prison Law Office, said this deal, which must be approved by U.S. District Court Judge Diane Humetewa, is more than just his organization and the American Civil Liberties Union accepting on faith that things will get better.

"We will be able to tour the prisons to check ourselves to see whether they're providing adequate care," he said. "And we will also get a lot of documentation."

The deal comes four months after the 9th U.S. Circuit Court of Appeals gave the go-ahead for the case, alleging inadequate health care, to be handled as a class-action lawsuit.

Judge Stephen Reinhardt, writing for the appellate court, said the attorneys for the inmates provided detailed allegations of everything from "outright denials of health care" to improper isolation policies. And they also had information on how spending on certain services dropped by more than a third over a two-year period even as inmate population did not.

But Reinhardt, in refusing to require each inmate to prove his or her rights were violated, said the claims alleged "systemic failures" in the prison's health care system "that expose all inmates to a substantial risk of serious harm." And if that is the case, Reinhardt said that would require a wholesale revamp of the agency's policies -- and not simply correcting the problems of the 13 inmates who filed the original 2012 lawsuit.

That paved the way for a trial to begin Monday.

No one from the Department of Corrections would agree to be interviewed about the decision to settle after two years of disputing the allegations. Instead, the agency issued a prepared statement from Director Charles Ryan calling the deal "positive news" for his agency -- and essentially claiming victory.

"On the eve of trial, the plaintiffs in this case have essentially agreed that the department's current policies and practices, along with recent enhancements to programming opportunities, adequately addresses the plaintiffs' concerns relating to constitutional healthcare and conditions of confinement for maximum custody mentally ill inmates," the statement read.

But agency spokesman Doug Nick refused to detail what changes the department has made since the lawsuit was filed and why, if there were no problems, it took two years to settle.

The department's statement, however, suggests that money was a consideration in opting not to go to trial where a judge might have ordered some more extensive -- and expensive -- changes in inmate health care.

It says that California is spending nearly $18,000 per inmate for health care following two decades of litigation brought by the same organizations who are representing inmates here. "By contrast, Arizona spends nearly $3,800 per inmate in health care costs," the statement says.

The allegations made -- ones that Nick will not address -- were serious.

They include "lengthy and dangerous delays" and "outright denials of health care," failure to provide necessary medication, a practice of "`employing insufficient health care staff," substandard dental care and denial of basic mental health care to suicidal and self-harming prisoners. The lawsuit also said that inmates in isolation units were denied adequate recreation and nutrition, constant cell illumination and inadequate mental health care staffing and treatment.

To prove their case, the inmates presented evidence of the agency's policies, internal communications and reports from four experts in prison medical care and conditions of confinement. And they provided specific incidents.

One involves an inmate who collapsed in his cell from a heart attack but where the lawsuit says officers told prisoners who asked for help to "wait and see what happens." While the inmate was taken, eventually, to the medical unit, he was told he had a medical appointment in a few days.

But the inmate, according to the lawsuit, had another heart attack the next day and died.

The legal papers also cite a prison, four months pregnant who experienced painful contractions and spotting blood. But a staffer at the medical unit told her it was nothing serious and "all in her head," refusing to allow her to see someone for evaluation.

She eventually miscarried.

# THE WALL STREET JOURNAL.
WSJ.com

October 14, 2014, 4:53 PM ET

# Arizona Agrees to Improve Prison Health Care in ACLU Settlement

ByAlejandro Lazo



The settlement covers Arizona's state prison system. Above, the state prison in Florence, Ariz.

Associated Press

Arizona agreed to improve prison conditions in a settlement of a class-action lawsuit brought by the American Civil Liberties Union.

The state Department of Corrections will take more than 100 measures to change its practices on providing prisoners with medical and mental-health care, according to terms of the deal, filed Tuesday in the U.S. District Court of Arizona. The settlement covers Arizona's state prison system, which holds more than 33,000 inmates.

The new measures, according to the agreement, will allow mentally ill prisoners who are held in isolation to have better access to treatment and 19 hours a week outside their cells; will provide more medical and dental care for the overall prison population; and will restrict the use of pepper spray to situations that jeopardize the safety of prisoners or guards or compromise prison security.

"The Arizona Department of Corrections worked with us on a settlement that shows a commitment to protecting prisoners' physical and mental health," said David Fathi, the lead attorney in the case and director of the ACLU's National Prison Project. "We hope other states will now find ways to provide adequate medical, mental health, and dental care to their prisoners."

The settlement comes as isolation practices in state prison systems are receiving greater scrutiny, with more states changing their confinement practices.

States are also dealing with large populations of mentally ill prisoners. Neighboring California has been involved in a decadeslong court battle over mental-health care and overcrowding. The litigation, initiated in 1991, led to a 2009 ruling by a panel of federal judges to trim the state prison population.

The Arizona deal was reached ahead of an expected trial date next Tuesday. Charles Ryan, director of the Arizona Department of Corrections, called the settlement "positive news" in a statement, saying it avoided litigation costs.

"The plaintiffs in this case have essentially agreed that the department's current policies and practices, along with recent enhancements to programming opportunities, adequately address the plaintiffs' concerns," Mr. Ryan said.

The settlement didn't include any financial compensation for prisoners, although the state agreed to pay legal fees totaling $4.9 million related to the lawsuit.

Continue reading on WSJ.com.

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit

www.djreprints.com

**Must Reads:** How Judges Humiliate Pregnant Teens Who Want Abortions | Is Your Dentist Ripping You Off?

Search

**POLITICAL MOJO (/MOJO)**

PREVIOUS (/MOJO/2014/10/WERE-STILL-WAR-PHOTO-DAY-OCTOBER-14-2014/) | NEXT (/MOJO/2014/10/SCOTT-WALKER-MINIMUM-WAGE-WISCONSIN-GOVERNOR/)
› Crime and Justice (/topics/crime-and-justice) , Prisons (/topics/prisons)

# Prison Guards Can't Pepper Spray Just Any Schizophrenic Inmates in Arizona Anymore

—By **Shane Bauer** (/authors/shane-bauer) | Tue Oct. 14, 2014 2:52 PM EDT

✉ Email (/FORWARD?PATH=NODE/262441)　　　**5** (#disqus_thread)



Arizona prisons just got a little better. A class action lawsuit by the ACLU, the Prison Law Office, and others reached a settlement with the Arizona Department of Corrections today to improve health care and solitary confinement conditions in the state.

"This is one of the largest--if not the largest--prisoner settlements in recent years," said David Fathi, Director of the ACLU's National Prison Project.

The lawsuit, which has been going on for two years, won concessions that would seem to be common sense. Prison guards, for example, now can't pepper spray severely mentally ill prisoners unless they are preventing serious injury or escape. And while these types of inmates were previously let out of their solitary cells for just six hours a week, the settlement requires Arizona to let them out for at least 19 hours a week. With some exceptions for the most dangerous, this time will now be shared with other prisoners, and will include mental health treatment and other programming.

People like this—the schizophrenic, the psychotic, the suicidal—are not a small portion of the 80,000 people we have in solitary confinement in the US today. According to the National Alliance on Mental Illness (http://www.nami.org/Template.cfm?Section=Issue_Spotlights&Template=/ContentManagement/ContentDisplay.cfm&ContentID=147299) , 45 percent of people in solitary have severe mental illnesses. The country's three largest mental health care providers are jails.

The _Parsons v. Ryan_ (http://caselaw.findlaw.com/us-9th-circuit/1668864.html) settlement also requires the Arizona prison system to make more than 100 health care improvements. Prison staff now has to monitor people with hypertension or diabetes. Pregnant women have to get more care. Prisoners whose psych meds make them sensitive to heat now have to be kept in cells that are no hotter than 85 degrees. Those not on anti-psychotic meds though, can keep baking.



| HOME | ABOUT US | BACK ISSUES | COLUMNS | ENVIRONMENTAL | DARKROOM | ALMANAC | ENTERTAINMENT | SECURITIES | APPELLATE | MASTHEAD |

<span style="color:red">Subscribers</span>

# Courthouse News Service

Tuesday, October 14, 2014   Last Update: 2:08 PM PT

### Arizona Agrees to Fix Prison Health System
By TIM HULL

    (CN) - Arizona must reform its prison health care system and pay more than $5 million in attorneys' fees under a class action settlement announced Tuesday.

    The stipulation of settlement filed in Federal Court in Phoenix cancels a trial that was set to start this month in a class action against the Arizona Department of Corrections (ADC) by inmates at 10 state prisons.

    The plaintiffs in *Parsons v. Ryan* in 2012 that critically inadequate medical, dental and mental health care in the state's prisons had exposed them to "preventable injury, amputation, disfigurement, and death," in violation of the Eighth Amendment.

    The inmates and the Arizona Center for Disability Law were represented by the ACLU and the Prison Law Office. They alleged that emergency treatment and other medical care in ADC prisons was often delayed or denied, and that it was difficult to secure medications and medical devices.

    They also claimed that dental care in the prisons was substandard and focused largely on extracting diseased teeth.

    In addition they complained that some prisoners were kept in isolation units with constant illumination and given inadequate exercise and nutrition.

    The settlement requires the Corrections Department to request more funding from the Arizona Legislature to increase staffing of medical and mental health positions, which has been a ongoing problem for the ADC.

    However, an ACLU spokesman told Courthouse News on Tuesday the department cannot not use a lack of funding by the legislature as an excuse for noncompliance.

    Arizona currently spends nearly $3,800 per inmate in health care costs, according to the department.

    Under the settlement, the ADC must increase the amount of time it allows inmates out of their cells, and change the criteria for the use of pepper spray by guards. A "cool down" period is now required in tense, potentially violent situations involving inmates with mental health issues, which "shall include clinical intervention ... by a mental health clinician," the agreement says.

    The settlement also requires prison officials to provide "a qualified health care practitioner who is proficient in the prisoner's language, or by a language line interpretation service," for inmates who don't speak English.

    The state agreed to pay the plaintiffs' attorneys $4.9 million in fees and costs, plus up to $250,000 per year for a minimum of four years to ensure compliance.

    "The Arizona Department of Corrections has agreed to changes that will save lives," said Don Specter, Director of the Prison Law Office, in a statement. "This settlement will bring more humane treatment for prisoners with serious health care needs, and the potential for their conditions to improve rather than worsen."

    In September, the ALCU released several previously sealed expert reports on conditions at the prisons at issue in the settlement.

    In one, Dr. Pablo Stewart, a prison mental health care specialist, "uncovered numerous preventable suicides by prisoners, lengthy and serious delays in care, insufficient and unlicensed staff and inadequate medication protocols," the ACLU said. "One prisoner hanged himself after ADC neglected to give him his prescribed mood stabilizing drugs for more than three weeks."

    Admitting no wrongdoing, ADC Director Charles Ryan called the settlement "positive news" in a statement on Tuesday.

    "On the eve of trial, the plaintiffs in this case have essentially agreed that the department's current policies and practices, along with recent enhancements to programming opportunities, adequately addresses the plaintiffs' concerns relating to constitutional healthcare and conditions of confinement for maximum custody and mentally ill inmates," Ryan said.

    He stressed that the department has "always followed nationally-accredited standards for housing single-cell inmates that include requirements for natural daylight and contact with others, and out-of-cell time," and said that the state's inmate mortality rates are "within the national average for corrections departments."

    "By avoiding a costly trial, the department saves significant resources that can be further directed towards continuing to provide constitutional healthcare and structured programming to support successful community reintegration," Ryan said.

---

# Arizona prisons settle suit, promise better health care



9 HOURS AGO • BY HOWARD FISCHER CAPITOL MEDIA SERVICES

PHOENIX — State prison officials have agreed to settle a lawsuit by agreeing to improve health care for the more than 34,000 inmates in their custody.

The stipulation filed Tuesday in federal court here requires the Department of Corrections to live up to more than 80 specific performance standards for how it handles medical issues. These range from staffing requirements and emergency response times to ensuring inmates get their medications in a timely fashion.

The stipulation also requires the state to revamp its rules on solitary confinement, or "isolation," of inmates with serious mental illness.

Where current regulations keep those prisoners in their cells all but six hours a week, they will now have at least 19 hours a week elsewhere. And that time also must include mental-health treatment and other programs.

The department also agreed to use chemical agents like pepper spray on inmates classified as seriously mentally ill "only in case of imminent threat."

That is defined as situations that jeopardize safety or security, like an attempt to escape or active physical resistance. But it specifically precludes pepper spray for things like "passive resistance to placement in restraints or refusal to follow orders."

Don Specter, an attorney with the Prison Law Office, said this deal, which must be approved by U.S. District Judge Diane Humetewa, is more than just his organization and the American Civil Liberties Union accepting on faith that things will get better.

"We will be able to tour the prisons to check ourselves to see whether they're providing adequate care," he said. "And we will also get a lot of documentation."

The deal comes four months after the 9th U.S. Circuit Court of Appeals gave the go-ahead for the case, alleging inadequate health care, to be handled as a class-action lawsuit.

Judge Stephen Reinhardt, writing for the appellate court, said the attorneys for the inmates provided detailed allegations of everything from "outright denials of health care" to improper isolation policies. And they also had information on how spending on certain services dropped by more than a third over a two-year period even as inmate population did not.

But Reinhardt, in refusing to require each inmate to prove his or her rights were violated,

said the claims alleged "systemic failures" in the prison's health care system "that expose all inmates to a substantial risk of serious harm." And if that is the case, Reinhardt said that would require a wholesale revamp of the agency's policies — and not simply correcting the problems of the 13 inmates who filed the original 2012 lawsuit.

That paved the way for a trial to begin Monday.

The Department of Corrections would not answer questions about the settlement but issued a prepared statement from Director **Charles Ryan** calling the deal "positive news" for his agency — and essentially claiming victory.

"On the eve of trial, the plaintiffs in this case have essentially agreed that the department's current policies and practices, along with recent enhancements to programming opportunities, adequately addresses the plaintiffs' concerns relating to constitutional healthcare and conditions of confinement for maximum custody mentally ill inmates," the statement read.

Agency spokesman Doug Nick refused to detail what changes the department has made since the lawsuit was filed.

The allegations made include "lengthy and dangerous delays" and "outright denials of health care," failure to provide necessary medication, a practice of "'employing insufficient health care staff," substandard dental care and denial of basic mental-health care to suicidal and self-harming prisoners.

The lawsuit also said that inmates in isolation units were denied adequate recreation and nutrition, constant cell illumination and inadequate mental-health-care staffing and treatment.

Incidents cited to prove their case include an inmate who collapsed in his cell from a heart attack, but after he was taken to medical unit, he was told he had a medical appointment in a few days. However, he had another heart attack the next day and died.

An inmate who was four months pregnant was allegedly told her painful contractions and spotting blood were nothing serious, only to miscarry.



Schedules

- [NPR 89.1](#)
- [Classical 90.5](#)

- [PBS 6](#)
- [PBS World](#)
- [PBS Kids](#)

- [ReadyTV](#)
- [VME](#)
- [UA Channel](#)

- [Home](#)
- [News](#)
- [TV](#)
- [Radio](#)
- [On Demand](#)
- [Originals](#)
- [Education](#)
- [About](#)
- [Community](#)
- [Support](#)

- [Live Events](#)
- [Video Shorts](#)

- [News](#)
- [All Stories](#)
- Parties File Settlement Agreement in Arizona Prisons ...



# Parties File Settlement Agreement in Arizona Prisons Health Care Suit

**Story by AZPM Staff**

**last updated October 14, 2014**



PHOTO: AZPM Staff

*Updates on this story will be posted throughout the day.*

A settlement agreement was filed Tuesday between Arizona prison officials and representatives of more than 33,000 state prison inmates over the quality of health care.

Officials with the American Cilvil Liberties Union of Arizona said in a press release that the federal court case will lead to improved health care, including mental health treatment for prisoners in solitary confinement.

"The Arizona Department of Corrections worked with us on a settlement that shows a commitment to protecting prisoners' physical and mental health," said David Fathi, director of the ACLU's National Prison Project, in a statement. "We hope other states will now find ways to provide adequate medical, mental health, and dental care to their prisoners."

The case originated in 2012 and was expanded to cover all inmates at 10 state prisons.

Under the settlement, the state Department of Corrections must ask the Legislature for funding to increase service staffing in the prisons.

Read settlement : View at Google Docs | Download File

MORE: Arizona, Civil Rights, Government, Health & Medicine, News

# Comment

### Comments are closed

To prevent spam, comments are no longer allowed after thirty days.