1                      UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF ARIZONA

3

4    Victor Parsons; Shawn Jensen;          )
     Stephen Swartz; Sonia Rodriguez;       )
5    Christina Verduzco; Jackie Thomas;     )
     Jeremy Smith; Robert Gamez;            )
6    Maryanne Chisholm; Desiree Licci;      )
     Joseph Hefner; Joshua Polson; and      )
7    Charlotte Wells, on behalf of          )
     themselves and all others              )
8    similarly situated; and Arizona        )
     Center for Disability Law,             )
9                                           )
                   Plaintiffs,              )  No. CV 12-601-PHX-DKD
10                                          )
                   vs.                      )  Phoenix, Arizona
11                                          )  February 18, 2015
     Charles Ryan, Director, Arizona        )  1:34 p.m.
12   Department of Corrections; and         )
     Richard Pratt, Assistant Director,     )
13   Health Services Contract               )
     Monitoring Bureau, Arizona             )
14   Department of Corrections, in          )
     their official capacities,             )
15                                          )
                   Defendants.              )
16   _____)

17

18            REPORTER'S TRANSCRIPT OF PROCEEDINGS

19         BEFORE U.S. MAGISTRATE JUDGE DAVID K. DUNCAN

20                      (Fairness Hearing)

21

22   Court Reporter:            Gary Moll
                                401 W. Washington Street, SPC #38
23                              Phoenix, Arizona  85003
                                (602) 322-7263

24

     Proceedings taken by stenographic court reporter
25   Transcript prepared by computer-aided transcription

1                          A P P E A R A N C E S

2

3    For the Plaintiffs:           David C. Fathi, Esq.
                                    ACLU - Washington, D.C.
4                                   915 15th St. N.W., 7th Floor
                                    Washington, D.C.  20005
5                                   (202) 548-6609

6                                   Daniel J. Pochoda, Esq.
                                    ACLU - Phoenix, Arizona
7                                   3707 N. 7th Street, Suite 205
                                    Phoenix, Arizona  85014
8                                   (602) 650-1854

9                                   Donald Specter, Esq.
                                    Corene T. Kendrick, Esq.
10                                  PRISON LAW OFFICE
                                    1917 5th Street
11                                  Berkeley, California  94710
                                    (510) 280-2621

12
     For the Defendants:           Daniel P. Struck, Esq.
13                                  Nicholas D. Acedo, Esq.
                                    Timothy J. Bojanowski, Esq.
14                                  STRUCK WIENEKE & LOVE, P.L.C.
                                    3100 W. Ray Road
15                                  Suite 300
                                    Chandler, Arizona  85226
16                                  (480) 420-1600

17                                  Michael E. Gottfried
                                    Assistant Attorney General
18                                  OFFICE OF THE ATTORNEY GENERAL
                                    1275 W. Washington Street
19                                  Phoenix, Arizona  85007
                                    (602) 542-7693

20

21

22

23

24

25

1                         P R O C E E D I N G S

2

3            THE CLERK:  Civil case number 12-601, Parsons, et al.,

4    versus Ryan, et al., on for fairness hearing.

5            THE COURT:  Would counsel please state their                    13:33:54

6    appearances for the record.

7            MR. SPECTER:  Certainly.  Donald Specter from the

8    prison law office, and with me is my colleagues David Fathi,

9    Corene Kendrick, and other folks, a multitude of other lawyers.

10           THE COURT:  Unnamed individuals, but for the record,           13:34:12

11   they certainly are noted.

12           MR. STRUCK:  Your Honor, Dan Struck, Tim Bojanowski,

13   Nick Acedo, from Struck Wieneke & Love, and Mike Gottfried from

14   the Attorney General's Office, and we also have some folks,

15   other folks here.                                                       13:34:27

16           THE COURT:  All right.  Thank you very much.

17           So this matter has been set pursuant to a stipulated

18   agreement between the parties in this action to resolve it.

19   The Court set a timetable for the consideration of comments on

20   the settlement and has received many, many comments, all of            13:34:43

21   which I have read through.  I've also read what the -- what the

22   parties have submitted throughout most of this litigation,

23   especially after the time that I became involved in it.  And I

24   think I should take just a moment to comment about that fact,

25   that the judge who was originally the settlement judge, or the         13:35:10

 1    mediator in the case, is now, by the parties' consent, the

 2    presiding judge in the case.

 3         I think at one level one could question whether or not

 4    a judge who had participated in the settlement could be the

 5    appropriate person to consider the fairness of the settlement.          13:35:32

 6    There is, I think, an argument that could be made that perhaps

 7    somebody who was involved in the process would have a vested

 8    interest in the settlement.  I hear sometimes that comment.  I

 9    do conduct a large number of settlement conferences and I

10    sometimes hear people say, "Well, Judge, you're just invested          13:35:55

11    in the settlement."

12         The truth of it is I'm not invested.  I get paid the

13    same whether I settle the case or not.  But almost always what

14    is evident in any kind of mediation is that settlement is in

15    both parties' interests, and so that reality seems to override          13:36:14

16    that other concern.

17         The other aspect that overrides this concern of a

18    judge being vested in it is I think that something that has

19    certainly become clear to me over the almost 14 years that I

20    have done this is that judging well is not accidental.  You            13:36:36

21    just don't avoid problems by staying out of places where you

22    might run into problems.  In fact, it's just the opposite.  You

23    have to be studied and careful to make sure that you follow the

24    rules, the canons that apply to judges with respect to their

25    ethical conduct, and that you make sure that you comport with          13:36:52

1    expectations of due process and fairness.

2           In the consideration of whether or not a settlement

3    meets the standard for a class action, whether it is fair to

4    all of the parties, it's the same kind of studied process.

5    There are factors that the Ninth Circuit has enumerated that        13:37:14

6    the Court must consider in deciding whether or not the

7    settlement is fair, and those criteria can be applied in a

8    careful and explained way such that a reviewing court could see

9    whether or not the standard had been complied with and could

10   see whether or not there was an unreasonable application of        13:37:35

11   decision-making in the process.

12          I have also had the benefit of the comments in my

13   process of applying the law, the factors that the Ninth Circuit

14   has told me that a judge should apply in considering the

15   fairness of a settlement.  I have my ability to read the          13:37:59

16   applicable law and to look at the elements of the settlement

17   and to consider the situation that is before me, in part

18   greatly informed by the fact that I participated in the

19   mediation process.  I learned many things about the relative

20   status of the respective views of the case because of my          13:38:24

21   participation in that process that I believe better equips me,

22   actually, to decide whether or not the settlement is fair.

23          But even if I had not had that benefit, what I do also

24   have the benefit is the comments that have been produced by

25   many of the -- by the class of plaintiffs which inform me about   13:38:49

1  their views on the settlement, and allow me to have the benefit

2  of what they think that I should be thinking about in case I

3  wasn't thinking about those things because of some reason.  And

4  I think that that, combined with the knowledge that I had in

5  the mediation process, reduces any untoward risk that there            13:39:11

6  would be some kind of participant bias that would vest me in

7  finding that the settlement was fair without applying the

8  standard.

9        I do actually think it's the opposite.  I think I am

10 in a better position because of the fortuity of the parties         13:39:28

11 deciding to consent to have the mediating judge preside in the

12 case, and I have the benefit of that knowledge that I acquired,

13 and so as a preamble I make that statement.

14       The next step here will be that I will turn to the

15 lawyers with respect to anything that they would like to say on    13:39:48

16 the record, and also give anyone here in the courtroom who

17 would like to address the Court on the subject of the

18 settlement an opportunity to do that, but first I'll turn to

19 the lawyers.

20       Mr. Struck?                                                     13:40:02

21       I'm sorry, misspoke.  It's because you all are at the

22 wrong tables.

23       MR. SPECTER:  My opposing counsel pointed that out to

24 me.

25       THE COURT:  Is it a California rule, or something like       13:40:14

1   that?

2           MR. SPECTER:  This is Donald Specter for the

3   plaintiffs.  Most of what we believe is true is set forth in

4   our moving papers so I won't belabor this proceeding by

5   repeating all of those arguments.  I just wanted to make a few    13:40:39

6   brief comments, and then it will be followed by my colleague

7   and co-counsel, Mr. Fathi, will address some of the issues in

8   the case.

9           So the first question the Court has to answer is

10  whether under Rule 23 the stipulation is fair, adequate, and    13:40:55

11  reasonable, and plaintiffs and their counsel submit that that's

12  the case, that this stipulation is abundantly fair, adequate,

13  and reasonable.  So we are going to ask the Court, if it so

14  concludes, to sign the proposed order that the parties agreed

15  to as well, which is found in docket 1185-2.    13:41:18

16          The second question before the Court is whether the

17  Court should grant plaintiffs' motion for attorney fees, and we

18  believe the Court should grant that motion, and Mr. Fathi will

19  explain why briefly after I get done.

20          As far as the stipulation goes, the stipulation    13:41:40

21  represents a compromise reached by the parties.  It's a

22  comprehensive document that aims to cure what plaintiffs

23  believe and were prepared to prove were unconstitutional

24  conditions of confinement.  It has six separate parts.

25          The first one provides over a hundred different    13:42:02

1   performance measures that the ADC and its contractor, Corizon,

2   must meet, and it also provides restrictions on the use of

3   force and improvements in the conditions in the isolation

4   units.  Mr. Fathi will address those last two measures in more

5   detail.                                                          13:42:22

6           The performance measures are very comprehensive.  They

7   address staffing, medical records, pharmacy, medication,

8   medical equipment, emergency response, timely access to

9   diagnostic services, specialty care, clinician quality, chronic

10  disease; the whole panoply, essentially, of what a             13:42:39

11  health care -- medical health care system must have in order to

12  perform its functions and reduce the risk of harm which we

13  believe is now present in the Arizona Department of

14  Corrections' facilities.

15          It's my belief, and our belief as plaintiffs' counsel,  13:42:55

16  that any fair review of these performance measures must

17  conclude that they are detailed, comprehensive, and if properly

18  implemented, will substantially improve the quality and the

19  amount of care that the class members receive.

20          The second part of the stipulation provides a detailed  13:43:15

21  mechanism for determining whether in fact these performance

22  measures are being met by ADC's contractor, Corizon, and ADC

23  itself.

24          The third part is it sets -- the stipulation sets a

25  threshold for compliance, which increases gradually as          13:43:35

1    the three years go by.

2              Fourth, to ensure that these improvements are being

3    implemented, or to determine if they're not, the stipulation

4    provides for plaintiffs' counsel to monitor ADC's performance

5    and to tour the prisons to view the conditions in the units.        13:43:57

6              Fifth, it provides that for dispute resolution, in the

7    event that the parties disagree about whether the ADC or its

8    contractor are in compliance with the provisions of the decree.

9              And finally, and perhaps most importantly in the long

10   run for its prophylactic effect and, if needed, for other --        13:44:20

11   for enforcement purposes, it provides that the disputes that

12   can't be resolved by the parties are able to be resolved

13   through the Court, and the Court retains jurisdiction to

14   enforce the provisions of the stipulation in all respects

15   provided by law, with two discrete exceptions, which are set        13:44:42

16   forth in the stipulation.

17             So we believe, if implemented in good faith by the ADC

18   and Corizon, the stipulation will provide the plaintiff class

19   and the subclass with very substantial benefit, and in a very

20   relatively short time frame compared to what would have             13:45:02

21   happened if the case had gone to trial.  And if the stipulation

22   doesn't do that with the good faith efforts by the ADC and

23   Corizon, then we will take all needed and legally sound efforts

24   to enforce that compliance through the enforcement mechanisms

25   of the decree.                                                      13:45:29

1          As far as the comments go, the plaintiff class members

2     submitted over 200 comments, as you well know.  Even though

3     it's less than 1 percent of the 33,000 prisoners, we believe

4     that many of the comments represent a very accurate picture of

5     the suffering that has gone on through the -- through the years          13:45:50

6     for prisoners in isolation; for prisoners who can't receive

7     adequate medical, mental health, and dental care.  And some of

8     those comments describe with particular accuracy, and we

9     believe credibly, the types of results that happen when -- and

10    harm that occurs when prisoners have to live under those          13:46:15

11    conditions.

12          One of the reasons we believe the stipulation should

13    be approved by the Court and is necessary to improve care is

14    because of the fact that it would go into effect immediately

15    upon approval by the Court.  If this case had dragged out          13:46:37

16    through trial, the proceedings there would have taken many

17    months.

18          For all we know, we would have still possibly been in

19    trial; it would have taken many more months for the Court to

20    issue findings of fact and conclusions of law; then there could          13:46:54

21    have been appeals and stays and development of plans and

22    objections to those plans.  So we believe that the stipulation

23    has the ability to provide much quicker relief to our clients

24    than if we had taken the litigation road in this case, and

25    that's why we believe the Court should approve it.          13:47:19

1          And Mr. Fathi will now -- unless the Court has any

2   questions, Mr. Fathi will now address some of the other

3   subjects.

4          THE COURT:  Thank you.

5          MR. FATHI:  Good afternoon, Your Honor.                    13:47:31

6          THE COURT:  Good afternoon.

7          MR. FATHI:  The Supreme Court has said that there is

8   no Iron Curtain drawn between the Constitution and the prisons

9   of this country.  This case, and the settlement that is before

10  the Court today, are an important reminder of that fundamental    13:47:50

11  truth.

12          Mr. Specter has discussed the medical and dental care

13  provisions of the settlement.  I will briefly review the

14  provisions governing mental health care and conditions in ADC's

15  isolation units.                                                  13:48:08

16          Many of the medical care provisions -- for example,

17  those governing medical records, pharmacy, and health care

18  staffing -- will also improve the delivery of mental

19  health care.  But there are also a number of provisions

20  specifically addressing mental health care, such as mental        13:48:23

21  health treatment plans, the frequency with which prisoners are

22  seen by a mental health clinician, and access to individual and

23  group therapy.

24          The settlement also includes several provisions aimed

25  at preventing prisoner suicides.  And these are particularly      13:48:37

1   critical in light of the fact that ADC continues to struggle

2   with prisoner suicide, and, indeed, just last month experienced

3   three suicides in a five-day period.

4          For prisoners in the isolation subclass, the

5   settlement provides for additional out-of-cell time and access      13:48:57

6   to programming, it provides that those in isolation will

7   receive food of the same nutritional value as other ADC

8   prisoners, and it provides special protections for those with

9   serious mental illness who are particularly vulnerable to the

10  damaging effects of isolated confinement.                           13:49:16

11         Subclass members with serious mental illness are

12  guaranteed a minimum of 19 hours out of cell per week,

13  including at least three hours of out-of-cell programming.

14  There are also restrictions on the use of chemical agents on

15  prisoners with serious mental health illness and in housing        13:49:33

16  units that hold the mentally ill.

17         Is the settlement perfect?  Like any settlement, it is

18  the offspring of compromise.  But Mr. Specter and I agree that

19  it is in the best interests of the plaintiff class and accords

20  our clients more relief and quicker relief than if we had gone      13:49:56

21  to trial and prevailed on all issues.

22         We believe that the defendants are genuinely committed

23  to the improvements required by this settlement, but if they

24  fall short for whatever reason, the Court retains the power and

25  the duty to enforce compliance.  President Reagan famously          13:50:15

1   counseled that one should trust but verify.  I can assure the

2   Court that we, as counsel for the plaintiff class, will do

3   both.

4          I'd like to briefly address the motion for attorney

5   fees that is also before the Court today.  As the Court is            13:50:34

6   aware, the parties have agreed both on the amount of fees and

7   on the schedule for payment.  Under the case law, the parties'

8   agreement is entitled to great weight, and the Court's task is

9   simply to determine whether the negotiated fee is facially fair

10  and reasonable.                                                        13:50:53

11         In light of the extraordinary amount of work required

12  to successfully represent this class of 34,000 over the three

13  years of this litigation, and for all the other reasons set

14  forth in our brief, the fee agreement is fair and reasonable

15  and the motion should be granted.                                      13:51:10

16         Thank you, Your Honor.  And again, we are, of course,

17  happy to answer any questions the Court has.

18         THE COURT:  Thank you.

19         Mr. Struck.

20         MR. STRUCK:  Thank you, Your Honor.                             13:51:20

21         The defendants also support the stipulation and

22  request that the Court grant an order finding that the

23  settlement is fair and reasonable.

24         We believe that the stipulation essentially codifies

25  what was already in the policies and procedures at A DC with          13:51:44

1   respect to medical, mental health, and dental care, with a few

2   exceptions.  It's something that ADC has all along strived to

3   do, to follow their policies and procedures and their technical

4   manuals, and will continue to do.

5        With respect to the attorneys' fees motion, it's the          13:52:08

6   defendants' position that the Court does not have to grant

7   plaintiffs' motion for attorneys' fees.  I think under Rule

8   23(h) the Court would be required to grant it if there was some

9   operation of law which required it to do so.  In this case, the

10  Court simply has to find that the fees that are already -- have    13:52:25

11  already been negotiated are fair and reasonable, and the

12  parties agree and stipulate that the fees were fair and

13  reasonable and a negotiated amount.

14       You had mentioned earlier at the beginning of the

15  hearing that you were inviting members of the audience to          13:52:42

16  speak.  The defendants object to that unless -- we don't

17  believe that there are any actual parties here.  Typically, in

18  fairness hearings parties are welcome to come up and testify

19  with respect to that.  We've already had 200 or plus comments

20  that have been submitted to the Court with respect to -- from      13:53:02

21  parties mostly with respect to the stipulation, and we don't

22  believe that the individuals who are in the audience who might

23  want to speak about the stipulation have any standing to do so.

24       Finally, we wanted to point out or let the Court know

25  that the defendants are taking action even before the              13:53:26

1    settlement has been approved by the Court.  There has been a

2    request in the Legislature for 91 additional medical/mental

3    health/dental positions within -- to include with the current

4    contract with the -- with the provider, which is Corizon.

5         Thank you.                                          13:53:47

6         THE COURT:  Thank you, Mr. Struck.

7         Regarding the objection to the ability of members of

8    the gallery who may wish to address the Court, the objection's

9    overruled because the matter is one that is of significant

10   public concern.  And because of the circumstances of the class   13:54:04

11   plaintiffs being confined, and the difficulty in arranging

12   for them to have an ability to be present in open court,

13   whether by physical means or electronic means, the comments, I

14   think, do address the opportunity for the class plaintiffs to

15   be heard, but with respect to an action that affects the         13:54:27

16   community in a larger sense, I do think it is appropriate to

17   allow people to be heard if they wish.

18        And so we'll turn to that portion now, and I'll ask if

19   there are those who would like to speak, if you'd raise your

20   hand so that I could get a sense about how many people would      13:54:42

21   like to.

22        So I see one, two, three, four, five, looks to me to

23   five hands.

24        And so, ma'am, if you would please approach the

25   lectern -- yes, ma'am -- and state your name for the record.     13:54:54

1        You'll be next.

2        Thank you, ma'am.  If you could just come forward to

3   the lectern and give your name, and spell it also for the

4   record.

5        MS. DONNA FIRRELLO:  Donna Firrello, F-i-r-r-e-l-l-o.    13:55:11

6        THE COURT:  Thank you.

7        MS. DONNA FIRRELLO:  My husband is currently

8   incarcerated in Lewis on the Barchey Unit, and the medical

9   issues, I have -- I have to fight to get him care.  He has to

10  fight to get care.  It's -- it's horrible.                    13:55:29

11       He has multiple medical issues, and I have been in

12  touch with Chuck Ryan, Mr. Pratt, Corizon, to no avail.

13  It's -- he's possibly facing prostate cancer right now.  This

14  has been going on for a year that we've tried to get him

15  treated for it.                                               13:55:52

16       He had possibly pneumonia and he put in an HNR two

17  weeks ago, still has not seen a doctor.  And he had a stroke

18  while he was in prison, and we have been trying for two years

19  to get him to a cardiologist, which that is supposed to happen

20  this month, but whether it does or not.  It's -- it's horrible 13:56:10

21  the care they're getting.  They're treated worse than animals.

22       And it's just horrible that they have the lack of

23  care, or possibly the lack of funds, I'm not sure what it is,

24  or, you know, if it's just they don't care.  And then the ones

25  that are in -- you know, in confinement, that's -- it's even   13:56:31

```
 1   worse.  And I think something needs to be done.  I really think
 2   something needs to be done.
 3          And my husband is in there for nonviolent.  He's
 4   bipolar and he was -- that's not getting treated.  And the
 5   reason he's in there is because he was out of control for his      13:56:50
 6   bipolar.
 7          And it's just a vicious battle that I have to fight on
 8   a daily basis with DOC and Corizon, and something needs to be
 9   done about the medical and mental issues with the prisoners,
10   and that's all I have to say.                                      13:57:11
11          THE COURT:  Thank you very much.
12          MS. DONNA FIRRELLO:  Thank you.
13          (Pause in proceedings to clarify spellings for the
14   court reporter.)
15          THE COURT:  Thank you.  Ma'am?                              13:57:23
16          MS. DONNA LEONE HAMM:  Good afternoon, Your Honor.  My
17   name is Donna Leone Hamm, and I'm the Executive Director of
18   Middle Ground Prison Reform.  Middle Ground is the oldest
19   continuous prisoner rights organization in the state of
20   Arizona.  We've been here since 1983.                             13:57:53
21          We had an opportunity to review the settlement offer
22   when it was first published, and we certainly agree with both
23   sides in this matter that it clearly has to be a matter of
24   compromise.  We are pleased that overall, there will clearly be
25   some improvement in the delivery of medical services.  The        13:58:19
```

1    treatment, the conditions of confinement for solitary

2    confinement, the Department can call it whatever they want, but

3    if you're in your cell the vast majority of hours per day seven

4    days a week, that is solitary confinement.  And we know that

5    there are psychological studies which demonstrate the harm that        13:58:44

6    comes for anyone who is subjected to those conditions,

7    especially when you exacerbate the problem with a verified

8    mental illness.

9        We did have some concerns about the threshold after

10   three years being only at 85 percent -- we wish it could be           13:59:07

11   95 percent -- for compliance with the performance requirements.

12   But we understand that whatever will happen, if in three years

13   there is 85 percent compliance, that that, in itself, will be a

14   tremendous improvement over what is occurring at present.

15       We also express concern -- and I think some of the              13:59:34

16   inmates who've written to you, members of the class, may have

17   done the same thing -- that the site inspections are required

18   to have a two-week notice.  We think that at least some of

19   those inspections by the plaintiffs' lawyers should be

20   unannounced, so that there can be an opportunity for them to         14:00:01

21   see firsthand what is happening without advance notice and

22   preparation by the Department for a visit.

23       I heard the lawyers for the Department make a

24   remarkable comment today that really this settlement represents

25   merely a codification of the policies that are already in            14:00:28

1    existence in the technical manuals, and I find that astounding,

2    because what it tells me is this settlement is really the

3    Kool-Aid of mandatory compliance that is needed to get these

4    folks to be in compliance with their own written policies.

5    That hasn't happened.  That's why we're here.                    14:00:54

6            So to echo what I think, and I hear from inmates'

7    families or inmates themselves easily a dozen times a week

8    about serious medical problems, we're not talking about

9    sniffles or ingrown toenails.  We're talking about cancer that

10   has gone undiagnosed and untreated for months at a time; we're   14:01:24

11   talking about serious heart conditions, diabetes that's

12   untreated properly.

13           So I think that most of the inmates, if they were here

14   today, would tell you that any improvement, or anything that

15   happens as a result of this settlement, is going to be an        14:01:43

16   improvement over what is currently happening.

17           THE COURT:  Thank you, Ms. Hamm.

18           MS. DONNA LEONE HAMM:  Thank you very much.

19           THE COURT:  Please, sir.

20           Is it -- or, is it -- I'm sorry, ma'am, you may.  Yes.    14:01:59

21           MS. PATRICIA BORDEN:  Thank you for allowing me the

22   time to -- to speak with you.  I really don't want to waste

23   your time, and the only reason that I'm coming up is because

24   this gentleman said that they have already started doing

25   things?                                                          14:02:22

```
 1              Well, my son is in the Cook unit, or was in the Cook

 2   unit --

 3              THE COURT:  Can I interrupt just for a moment --

 4              MS. PATRICIA BORDEN:  Sure.

 5              THE COURT:  -- so that you can state your name, and --     14:02:28

 6              MS. PATRICIA BORDEN:  Oh.

 7              THE COURT:  -- spell it for the record --

 8              MS. PATRICIA BORDEN:  Okay.

 9              THE COURT:  -- too, please.

10              MS. PATRICIA BORDEN:  It's Patricia Borden,              14:02:32

11   B-o-r-d-e-n.

12              THE COURT:  Thank you.  Please go ahead.

13              MS. PATRICIA BORDEN:  I'm sorry.  And so there has

14   been no -- nothing in the past year has shown that they're

15   moving in this direction.  Hopefully now, with this signed,        14:02:43

16   there will be.

17              My son is now in a private prison so he's not entitled

18   to the -- the same agreement that's in place.  But I am a

19   Registered Nurse, the Mayo Hospital, and I diagnosed one of his

20   inmate -- one of his -- one of the inmates at the prison where     14:03:03

21   my son was with lymphoma, and it only took nine months for him

22   to be seen by a doctor, finally then to have scans, and he

23   didn't -- and to get a port was another couple of months, and

24   then finally the chemo.  And if he was a patient on the outside

25   world he would have been diagnosed, the port would have been       14:03:25
```

1    placed, the chemo would have been started within 10 days, not

2    within 14 months.  So I thank you for allowing me to speak.

3              THE COURT:  Thank you, ma'am.

4              Yes, sir.

5              MR. JAMES NEUMAN:  Good afternoon, Your Honor.          14:03:50

6              THE COURT:  Good afternoon.

7              MR. JAMES NEUMAN:  My name is James Neuman.  Neuman is

8    spelled N-e-u-m-a-n, for the record.  I was not planning on

9    speaking today so bear with me in that regard.

10             I'm here on behalf of my father, who is incarcerated    14:04:01

11   currently, and some of the personal experiences I have.  He has

12   a pain pump that was installed prior to his incarceration that

13   ran empty while he was incarcerated.  This caused his blood

14   pressure to skyrocket to nearly fatal levels, and since that

15   time Corizon, the DOC, have done nothing to refill this pain      14:04:22

16   pump or remove it, both of which could have serious

17   ramifications.

18             I've written Corizon and the DOC almost on a weekly

19   basis now just advocating and lobbying for basic health care in

20   the meantime for prescriptions that he needs, and coming here     14:04:42

21   today and seeing all these folks that are here supporting this

22   I realize that I'm definitely not alone in this struggle, and I

23   know that there's other individuals here that would probably

24   like to get up and speak and maybe don't have the courage to do

25   so.                                                               14:04:58

1          I hope that you will take into account all of the hard

2    work that these attorneys have done and Mrs. Hamm and everybody

3    else that's worked hard to try and get more successful

4    health care for the inmates there, not just for my father but

5    for everybody.  You know, nonviolent, violent, I don't think          14:05:13

6    that matters; what I think matters is that we treat them

7    humanely.  And as one of the -- the ladies said earlier, it is

8    worse than animals in some regard, and it's a shame.

9          So, you know, I really hope that you'd look at all the

10   facts that are presented to you, and I want to thank you for          14:05:31

11   the opportunity to speak here today, so thank you.

12          THE COURT:  Thank you, Mr. Neuman.

13          Yes, sir.

14          MR. JAMES HAMM:  Good afternoon, Your Honor.  My name

15   is James Hamm, H-a-m-m.  I don't really have anything to add to       14:05:53

16   what other people have said on the subjects, but I'd like to

17   say something about the Court's role in the future, because

18   there are a couple of issues that I think are hidden underneath

19   this settlement.

20          One of them has to do with long-term confinement in            14:06:09

21   isolation.  We all know that the current state of affairs in

22   terms of our understanding of what happens is in a state of

23   flux.  There are new reports that are coming out all the time.

24   So when we settle things today with regard to how long people

25   are going to be in there, what's going to happen while they are       14:06:29

1   in there, how many hours they're going to be out of their cell,

2   whether they get medication and whether they get treatment, we

3   are putting a band-aid on something that we don't really

4   understand today.

5           And so I just want to caution us all that the state of     14:06:43

6   affairs is going to change and we are learning that there are

7   long-term almost irreversible effects from this sort of

8   confinement.

9           And in the ADC we have this confinement on multiple

10  levels.  We have it because people are mentally ill and they     14:06:57

11  are unable to conform to the rules and so they get written up

12  and their classification changes and eventually they get to the

13  highest possible custody; we get it because they have been

14  involved in security threat group activities, and so they're

15  classified to these kinds of situations, and they stay there     14:07:15

16  essentially for an exceedingly long time unless they are

17  willing to put their lives at risk by informing on other

18  inmates, and this creates a question where the -- a situation

19  where the person has to either put his own life at danger in

20  order to obtain some kind of relief from the confinement that     14:07:34

21  he subjected to.

22          We also have a question about medication when it is

23  given to people in long-term confinement, because what we are

24  learning from medical professionals is that many of the

25  medications that are given for things like mental health and     14:07:49

1    depression, including clinical depression, really have effects

2    that we don't really understand today, and that what's

3    happening today is that beneath the surface of these

4    medications, which are masking the problems, there are more

5    serious long-term mental health issues that are coming -- that          14:08:09

6    are still being developed.

7         So although there's nothing that you can do about it

8    and there's nothing that this settlement can do about it, we

9    applaud the settlement in terms of it being quicker than

10   litigation, better than litigation in many ways, and certainly         14:08:24

11   a significant improvement.  We just want to put it on the

12   record that there are some issues involved in this settlement

13   that really don't -- can't possibly be resolved between these

14   two groups of people today by this Court, and that we may be

15   back here dealing with these situations in the future.                 14:08:44

16        And it isn't just a matter of settling things legally,

17   because this type of confinement what is being learned is that

18   it is a risk to public safety.  Not everyone who goes into

19   long-term confinement in the prison -- and I should say

20   long-term, close custody, isolation custody, solitary                  14:09:02

21   confinement; that's the kind of confinement I'm talking

22   about -- when those people are -- not all of those people are

23   going to be there.  It's just not natural life people who go

24   there.  It's not just death penalty people who go there.  When

25   those people are released, we are essentially creating                 14:09:20

1  time bombs and then releasing them into the community.  And

2  there are other ways to deal with these problems, and I

3  understand that the prison system has the right to make its own

4  decisions about how it's going to manage its population.

5         But it still is worth putting on the record that this        14:09:35

6  settlement still does not resolve some of the underlying more

7  serious issues that are going to face us all with regard to how

8  we're dealing with solitary confinement for a long time in the

9  Department of Corrections regardless of medication; regardless

10  of mental health; regardless of the reason why they're there.        14:09:52

11  It is just the fact that they are there and for the length of

12  time that they are there, and ultimately there needs to be some

13  kind of resolution to that.

14         Obviously, all of the people who live in prison and

15  who have serious medical conditions will be pleased if there is        14:10:07

16  an improvement if it comes as a result of this, and all of us

17  will be in support of both sides as they attempt to comply with

18  this settlement as it is currently written.

19         But there is a -- there's still a -- there are still

20  issues that are not resolved by this, and we just do -- we just        14:10:26

21  want to put on the record that some of these things are of

22  exceeding importance.  Thank you.

23         THE COURT:  Thank you, Mr. Hamm.

24         Yes, ma'am.  Please.

25         MS. DAWN BIGELOW-INGRAM:  My name is Dawn        14:10:46

1   Bigelow-Ingram, and my brother, Jimmy, was incarcerated and

2   diagnosed -- he had a heart attack right after -- while he was

3   still at Fourth Avenue Jail, and then he was diagnosed with

4   liver failure.

5          Jimmy was learning disabled.  He wasn't able to speak          14:11:01

6   for himself or fill out papers.  And with the help of Donna, I

7   was able to get clemency for him, but before that happened it

8   took a very long time.

9          Jimmy wasn't getting his medications in a timely

10  manner, and because of that he was being taken by ambulance to     14:11:24

11  the hospital.  No one would let us know that Jimmy was in the

12  hospital and that's why he wasn't calling.

13         Jimmy, because he was not receiving his medications in

14  a timely manner, was sent to Housing Unit 9, and if you say

15  that to any prisoner it strikes terror in their eyes.  It is       14:11:47

16  nothing more than solitary confinement.

17         Jimmie's risk level was almost nonexistent.  He was

18  placed in solitary confinement for no other reason than there

19  wasn't enough staff to see to it that he got his medication

20  around the clock.                                                   14:12:09

21         Each time I would visit Jimmy -- and most of the time

22  I went once a week at that stage -- his mental health

23  deteriorated to the point where the last couple of visits I

24  left sobbing.  My brother would sit in a chair and say:  "I'm

25  going home today.  I'm going home today."  He was living in his    14:12:33

1    head.

2         He had a television set that he was allowed to bring

3    with him, but during the move his headset, the earphones were

4    lost.  No one would get him another pair.  They wouldn't let me

5    buy him a pair, I couldn't bring him a pair.                    14:12:49

6         So he was in this filthy cell with a bed, linens that

7    had holes in it; cold; filthy plastic cup to drink out of with

8    a TV set that just flickered pictures.  It sounds like

9    something out of Charles Dickens and it's happening down in

10   Tucson.  It's heartbreaking.  My brother passed away three     14:13:17

11   years ago.  I did manage, he got clemency, but he didn't live

12   for very long after.

13        Please, we can do more.  These are human beings.

14   Jimmy was learning disabled.  He had an alcohol problem.  He

15   probably should have been programmed out, not sent to jail.    14:13:45

16        Thank you for hearing me.

17        (Pause in proceedings to clarify spellings for the

18   court reporter.)

19        MS. DAWN BIGELOW-INGRAM:  And thank you for hearing

20   me.                                                            14:14:10

21        THE COURT:  Thank you, ma'am.

22        Is there anyone else who would like to speak?

23        I don't see -- oh, yes.  Ma'am, please.

24        MS. PATTY JONES:  Good afternoon, Your Honor.

25        THE COURT:  Good afternoon.                               14:14:33

1          MS. PATTY JONES:  My name is Patty Jones.  I'm the

2     aunt to the late Anthony Clayton Lester -- "Tony" -- who lost

3     his life on July 12th, 2010.

4          Tony was not able to be here because he was driven to

5     sheer madness.  Left in a detention cell.  Could not fend for          14:14:48

6     his own mental health needs.  I was his advocate.  I was his

7     voice.  I come here today after five -- almost five long,

8     agonizing years, feeling a sense of justice and vindication

9     from the settlement.

10          This has given everybody in Arizona a fight to fight          14:15:08

11     through legislation to ensure that Tony's tragic story will

12     never happen to any other severely mentally ill individual

13     within the Department of Corrections.  Thank you.

14          THE COURT:  Thank you very much.

15          And any other hands?  I don't see any.          14:15:26

16          Thank you all for your comments.  And unless the

17     lawyers have anything else to say, I'll speak for a moment

18     about the matters that I need to address.

19          The fundamental question of whether or not the

20     settlement is fair, adequate, and reasonable is one that, as I          14:15:47

21     indicated earlier, is addressed by enumerated questions that

22     need to be answered.  And I will track through each one of

23     those, but I will also start out by saying that one of the most

24     compelling features of this settlement is that it provides for

25     a rapid corrective action of problems that were identified by          14:16:14

 1    the plaintiffs in a way that affords the opportunity for

 2    constructive relief.

 3            The first question that the Court's required to

 4    analyze is the strength of the plaintiffs' case.  It's fair to

 5    say that this was a hotly contested battle between two sides          14:16:37

 6    who believed that they had the law on each of their sides.

 7            The plaintiffs presented compelling incidences of

 8    demonstrated harm.  However, the defendants fought back with a

 9    belief that the law, as defined by the Eighth Amendment

10    jurisprudence, would have meant that they would have succeeded       14:17:07

11    at trial.

12            The difficulty that overlays every -- every prison

13    health care case is that it's not the standard that is

14    applicable to care that is afforded to people under the civil

15    law outside of the arena of confinement.  It's spoken in plain       14:17:29

16    and very general terms.  One comes to a notion of what is

17    essentially malpractice and inappropriate conduct that would

18    affect someone's rights such that you would think at the end of

19    the day the jury would find in your favor if you brought this

20    attention -- to the attention through the court process.             14:17:49

21            But that's not the standard that applies in a -- in a

22    case necessarily that is in the court for the status of

23    health care and issues of confinement.  It's the standard as

24    defined by the Eighth Amendment, and there are arguments about

25    whether or not that's inclusive or exclusive of the common           14:18:11

 1   notion that people have.  But it's certainly an argument that

 2   the defendants could make, and it's an argument the defendants

 3   believed that would prevail at trial.

 4        I cannot and do not have a crystal ball, so I can't

 5   foresee what would have happened at trial, but it's fair to say      14:18:28

 6   that in this greatly contested battle there was litigation risk

 7   on both sides.  And what that, I think, counseled the parties

 8   to consider seriously was the benefit of settlement,

 9   understanding that no one would accomplish their highest and

10   best expectations for the case.                                      14:18:48

11        And in that compromise there was always one looming

12   advantage to everyone who had an interest in this case.  It

13   would be a diversion from the litigation road to a road that

14   would work toward addressing what is, I think, in everyone's

15   interest on both sides of the case, and that is providing for       14:19:11

16   the needs of the people that are in custody in the State of

17   Arizona's correction system.

18        And no one on the defendants' side would disagree with

19   that.  They had disagreements about exactly what was necessary

20   to do.  The plaintiffs had very strongly held views that the        14:19:31

21   defendant -- that the Arizona Department of Corrections was

22   falling below the standard that was required.

23        But by diverting from this litigation track, we do

24   focus on what is the principal attraction of the settlement,

25   and that is addressing harms that can certainly be ameliorated      14:19:55

1    by the measures set forth in the stipulation; not only by the

2    injunctive provisions that will be put in place pursuant to the

3    parties' agreement and the Court's order, but also the

4    monitoring mechanism that will ensure going forward that there

5    is compliance with the stipulation, and in that monitoring          14:20:13

6    there will be identification of issues that will arise that in

7    certain -- to a certain extent will be assisted by the

8    mechanism that is in place because it is the hope of the

9    stipulation, I think it's fair to say this, that the mechanism

10   that will result in the monitoring will be one of cooperation       14:20:37

11   between the monitoring plaintiffs' counsel and the Department

12   of Corrections staff with respect to identifying needs and

13   working toward resolving those needs.  And so the settlement

14   does afford a more rapid redressing of these needs and an

15   implementation of a monitoring program.                             14:21:00

16          If the case were not settled, I think it's fair to say

17   that the past record of litigation would be a fair prologue for

18   what would be expected down the road, and that is a very hotly

19   contested pretrial period even yet, the trial would likely have

20   been offset in light of the change of judge, and the litigation     14:21:19

21   itself would consume a great number of resources.

22          Even in this very small way, it would divert people

23   who are tasked with a very important job, and that is providing

24   for the proper care of people within the custody of the

25   Department of Corrections.  If they are in court preparing to       14:21:42

1    testify or waiting to testify or testifying, they're not doing

2    their job, and that takes away from the ultimate goal.

3          And then the resolution that would occur at the trial,

4    if the past is the predictor, would not be the end.  This case

5    knows the way to the court of appeals, and it could travel that          14:22:04

6    road again.  If that happened, there would be further delay,

7    and it is not unreasonable to conclude that this case that was

8    started in March three years ago would be continuing for

9    another two years past this time period.  And so the settlement

10   affords for a much more expeditious mechanism for addressing          14:22:25

11   these needs.

12         The second point -- the first being the strength of

13   the plaintiffs' case; the second being the risk, expense,

14   complexity, and likely duration of further litigation -- is one

15   that's so closely linked to the first point that you see that          14:22:42

16   I've already alluded to many of the points that one would have

17   to consider.

18         And that is that it is a hotly contested case, both

19   sides with different views, expert opinions on both sides of

20   the case, and a fair and reasonable expectation that it would          14:22:54

21   take a long time to conclude; again, at each time expending

22   more money on battle rather than redressing needs.

23         And that financial aspect of it is not one that can be

24   lost on anybody who's aware of the circumstances in the state

25   of Arizona just by reading the newspaper and what appears to be          14:23:18

 1    the reality that the Arizona state budget is 10 to 20 percent

 2    off of where -- the revenue is 10 to 20 percent off of where

 3    they need to be to maintain the current budget.  So what that

 4    means is dramatic cuts.  And what that means is that there will

 5    be fewer dollars to do things that need to be done.          14:23:36

 6          The litigation is expensive, and the settlement of the

 7    litigation means that those dollars can be used to redress the

 8    need.  If the dollars are lost in litigation, it's reasonable

 9    to conclude that there are less dollars available to address

10    what needs to be done.                                       14:23:56

11          The third factor, the risk of maintaining class status

12    throughout the trial, is one that the plaintiffs,

13    understandably, say in their memorandum is a low risk because

14    the class status has already been before the court of appeals,

15    but it is always a looming risk that something can happen at a   14:24:13

16    trial where the -- the dissimilarities appear to predominate

17    and -- and so that there is a risk I'll agree -- agree that it

18    is -- is low.

19          The fourth factor, the consideration offered in

20    settlement, this is one in which there is a plan that has been   14:24:29

21    put in place to provide for particular benchmarks to be

22    achieved, particular changes to be made, and for a monitoring

23    program to enforce those first two.  This is a remedy that some

24    of the commentators objected to because of its limited --

25    limited scope, and perhaps because it did not provide any      14:24:56

1   financial relief to any of the individuals who believe they

2   suffered damages associated with the conduct.

3          This has never been a case, though, about those

4   issues.  It's been a case that has been addressing substantive

5   and systemic changes in the mechanism of providing for the care      14:25:16

6   and confinement of the class plaintiffs.  And so like many of

7   the objections, they are a little bit off of what was even

8   within the realm of this case.

9          And I will say also that some good number of the

10  objections are ones that seem reasonable to be made in light of      14:25:39

11  the circumstances that brought the case about, but are also the

12  kinds of things that one would reasonably believe could be

13  addressed by the stipulation and the compromise settlement.

14         It may well be that they are the kinds of things

15  that -- that are objections that perhaps are -- are premature,       14:26:03

16  because they may reflect a prior status that is hoped to be

17  addressed by the settlement and that would only be fair to use

18  as -- as criticisms of the settlement if they were indeed

19  situations that arose during the time that the settlement was

20  in place.  And so I think it's fair to say that a good            14:26:25

21  number of the -- of the objections do articulate that point,

22  and it is my hope that the settlement will address those very

23  concerns.

24         The fifth factor, the extent of discovery completed

25  and the state of the proceedings, it's fair to say that this      14:26:46

 1    case was, on the one hand, regrettably, completely discovered

 2    and prepared for trial, meaning that both sides' lawyers knew

 3    virtually every thing about what was to go forward.

 4          And I say "regrettably" because that meant that a

 5    great deal of energy and resources and time were devoted to          14:27:07

 6    this.  But on the other hand, perhaps it was necessary.

 7    Perhaps it was only in that climate where the lawyers could

 8    fully evaluate the respective cases and decide that a

 9    compromise was the best way to proceed.

10          The sixth factor is linked to this somewhat, the             14:27:26

11    experience and views of counsel, because if you have a fully

12    discovered case that provides this information, it's probably

13    of limited use if you don't have people who are skilled and

14    able to take in this information.

15          That's not the case we have here.  We have                   14:27:46

16    accomplished counsel on both sides of the case.  Both sides'

17    counsel have national reputations with respect to litigating

18    these kinds of cases, and have the experience of being able to

19    evaluate the circumstances that were presented in this case

20    against their backgrounds and experiences in other cases, and       14:28:03

21    their backgrounds and experiences in other states.  I think

22    that that's helpful as they evaluated how best to proceed in

23    this case.

24          The seventh factor, the reaction of the class to the

25    proposed settlement, is set forth in the comments, which I --       14:28:20

1    and I have considered, but I fundamentally believe that they do

2    not suggest that this settlement should be deemed to not

3    satisfy the standard that the Court must follow.

4            And I do that for two reasons.  One, I've already

5    mentioned, and that is I do believe that many of the objections    14:28:41

6    are objections to the current status of affairs, not the status

7    of affairs that we hope will be in place once this settlement

8    and the stipulation is active.

9            The second point that is one that I would echo that

10   was made by plaintiffs' counsel, and that is that the -- that    14:29:01

11   the proportion of criticism is, although each of the opinions

12   is important, the overall number against those for whom the

13   notice was provided is low.  It is 1 percent, and so it would

14   seem that it is not fair to say that there was an overriding

15   outcry of protest.  It's fair to say that there are people with    14:29:31

16   significant concerns who raised those concerns in a process

17   that the Court provided.

18           I will also say that with respect to those who

19   provided the information in the Spanish language, those were

20   interpreted for the Court and I reviewed them after they were    14:29:44

21   interpreted into English.

22           And so I think, taken together, all of these factors

23   do establish that the settlement that the parties reached --

24   albeit, as Mr. Fathi said, no settlement is perfect -- it is,

25   in light of the circumstances that were present, presented to    14:30:05

1    both of the parties in how best to proceed, one that for the

2    class plaintiffs resulted in achievement of many measures that

3    will resolve issues that have been identified in this lawsuit

4    and have been presented.

5          And against the risk of going forward that they could          14:30:26

6    lose the case, the compromise makes sense; and against the risk

7    of even if the case could be won, the loss of perhaps life and

8    injury and mental and physical damage that can occur to

9    individuals over the life of the case as it worked its way

10   through trial and through appeal, compellingly mandates that          14:30:52

11   the settlement be approved, approved at this instant, so that

12   the parties can move forward as expeditiously as possible, with

13   no further delay interposed by the Court.

14         And so I will sign an order finding that the

15   settlement is fair, adequate, and reasonable.  I will provide          14:31:12

16   written findings that will augment what I have said here on the

17   record, but I do believe what I have said on the record does

18   support the conclusion that the Court has made.  I will sign

19   the proposed order that is on the docket at 1185-2, and I will

20   approve the motion for attorneys' fees.                                14:31:33

21         The motion for attorneys' fees mirrors the agreement

22   that the parties reached in the settlement, in the stipulation.

23   It is a fair attorney fee amount in light of, I think, two

24   overwhelming factors that evidence it.

25         One, the affidavit in support of it demonstrates that           14:31:55

1   it is a number about half the number that was expended by the

2   plaintiffs in terms of costs and fees associated with the case.

3   If the case had proceeded to trial, it would have even been a

4   more robust figure.

5           And the other factor is that the amount of the fee                    14:32:17

6   award is approximately the same amount of money that the

7   defendants expended to their outside counsel, even assisted by

8   in-house counsel to a significant extent.

9           And so that benchmark seems to answer conclusively

10  that this is a fair and reasonable attorneys' fees amount and      14:32:35

11  also a necessary attorneys' fees amount, an attorneys' fees

12  provision that the Congress has established because of its

13  understanding that class plaintiffs can only oftentimes

14  accomplish representation if there is a fee mechanism in place.

15  And so consistent with the congressional authority for the        14:32:54

16  awarding of fees in a case like this and the parties' agreement

17  to it, I will approve the attorneys' fees order.

18          Turning now to counsel, if there's anything else that

19  I need to address I look first to you, Mr. Struck, since you're

20  closer to the jury.                                               14:33:14

21          MR. STRUCK:  No, Your Honor.

22          THE COURT:  All right.

23          Anything further, Mr. Specter?

24          MR. SPECTER:  The proposed order had a blank in it for

25  the document number for the stipulation, so we had another        14:33:24

```
 1   order prepared.

 2            THE COURT:  You can tender that to me now, if you

 3   please.

 4            MR. SPECTER:  Yes.

 5            THE COURT:  Thank you.                              14:33:40

 6            And then there's one final matter, two final matters

 7   that I would like to address.  I will need to identify and

 8   exclude from the settlement those who indicated their wish to

 9   be excluded from the settlement.  I believe that number is

10   presently two, is that correct, counsel?                    14:33:59

11            MR. SPECTER:  Yes, Your Honor.

12            THE COURT:  And so just so the record's clear, I want

13   to make sure that that is noted here.

14            And then the second factor --

15            Mr. Struck, I'll turn to you, perhaps.             14:34:12

16            What I would like to do is arrange for the transcript

17   of this proceeding to be made available at the prison libraries

18   in a way that the settlement was also made available.

19            Is that possible to do?

20            MR. STRUCK:  Yes, Your Honor.                      14:34:26

21            THE COURT:  Okay.  So the transcript would be prepared

22   and tendered to the State of Arizona for that purpose as well.

23            So the proposed order regarding the stipulation is no

24   longer a proposed order, it will be entered on the docket as an

25   order of this Court, and the stipulation will be approved as   14:34:44
```

1    well.

2            Anything further?

3            MR. SPECTER:  No, Your Honor.

4            MR. STRUCK:  No, Your Honor.

5            THE COURT:  All right.  Thank you all.                    14:34:52

6            (Proceedings concluded at 2:34 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                  C E R T I F I C A T E

3

4

5

6

7         I, GARY MOLL, do hereby certify that I am duly

8   appointed and qualified to act as Official Court Reporter for

9   the United States District Court for the District of Arizona.

10        I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15

16

17        DATED at Phoenix, Arizona, this 20th day of February,

18  2015.

19

20

21                        ___s/Gary Moll_____

22

23

24

25