**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| VICTOR ANTONIO PARSONS; SHAWN JENSEN; STEVE SWARTZ; DUSTIN BRISLAN; SONIA RODRIGUEZ; CHRISTINA VERDUZCO; JACKIE THOMAS; JEREMY SMITH; ROBERT CARRASCO GAMEZ, JR.; MARYANNE CHISHOLM; DESIREE LICCI; JOSEPH HEFNER; JOSHUA POLSON; CHARLOTTE WELLS; ARIZONA CENTER FOR DISABILITY LAW, *Plaintiffs-Appellees*, v. CHARLES L. RYAN; RICHARD PRATT, *Defendants-Appellants*. | No. 13-16396 D.C. No. 2:12-cv-00601-NVW OPINION |

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
November 6, 2013—San Francisco, California

Filed June 5, 2014

Before: Stephen Reinhardt, John T. Noonan, and
Paul J. Watford, Circuit Judges.

Opinion by Judge Reinhardt

# SUMMARY[*]

## Prisoner Civil Rights/Class Action

The panel affirmed the district court's order certifying a class and a subclass of inmates in Arizona's prison system who alleged that they were subjected to systemic Eighth Amendment violations.

The panel held that the district court acted well within its broad discretion in concluding that the putative class of inmates challenging Arizona Department of Corrections' health care policies and practices and the subclass of inmates challenging the isolation unit polices and practices satisfied the requirements for class certification set forth in Federal Rule of Civil Procedure 23.

The panel held that certification of the class and subclass was appropriate with respect to Rule 23(a)(2)'s requirement of commonality because plaintiffs' claims set forth common contentions whose truth or falsity could be determined in one stroke: whether the specified statewide policies and practices exposed them to a substantial risk of harm.

The panel also held that the district court did not abuse its discretion in determining that the named plaintiffs, inmates in Arizona custody who alleged that they were exposed to a substantial risk of harm by the challenged polices and practices, satisfied the typicality requirement of Rule 23(a)(3).

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel held that considering the nature and contours of the relief sought by the plaintiffs, the district court did not abuse its discretion in concluding that a single injunction and declaratory judgment could provide relief to each member of the proposed class and subclass and therefore that plaintiffs satisfied Rule 23(b)(2).

## COUNSEL

Nicholas D. Acedo (argued) and Daniel P. Struck, Struck Wieneke & Love, P.L.C., Chandler, Arizona; Thomas C. Horne, Arizona Attorney General, and Michael E. Gottfried, Assistant Attorney General, Phoenix, Arizona, for Defendants-Appellants.

David C. Fathi (argued), ACLU National Prison Project, Washington, D.C.; Daniel Pochada, ACLU Foundation of Arizona, Phoenix, Arizona; Daniel C. Barr, Amelia M. Gerlicher, Kirstin T. Eidenbach, Perkins Coie LLP, Phoenix, Arizona; Caroline Mitchell, Jones Day, San Francisco, California; Donald Specter and Corene Kendrick, Prison Law Office, Berkeley, California; John Laurens Wilkes, Jones Day, Houston, Texas; Jennifer K. Messina, Jones Day, New York, New York, for Plaintiffs-Appellees.

Catherine Weiss, Michael Hahn, Jason Halper, and Monica Perrette, Lowenstein Sandler LLP, Roseland, New Jersey; Mark A. Chavez, Chavez & Gertler LLP, Mill Valley, California, for Amici Curiae American Friends Service Committee, Center for Children's Law and Policy, Children's Rights, Impact Fund, National Alliance on Mental Illness (NAMI), NAMI-Arizona, National Center for Youth Law, National Disability Rights Network, National Immigrant

4                    PARSONS V. RYAN

Justice Center, National Juvenile Defender Center, Pacific
Juvenile Defender Center, The ARC of the United States, and
Youth Law Center.

---

## OPINION

REINHARDT, Circuit Judge:

The defendants, senior officials of the Arizona
Department of Corrections ("ADC"), appeal an order
certifying a class and a subclass of inmates in Arizona's
prison system who claim that they are subject to systemic
Eighth Amendment violations.  The inmates allege that
numerous policies and practices of statewide application
governing medical care, dental care, mental health care, and
conditions of confinement in isolation cells expose them to a
substantial risk of serious harm to which the defendants are
deliberately indifferent.  The inmates seek declaratory and
injunctive relief from the alleged constitutional violations.
After reviewing the substantial record compiled by the
plaintiffs, which includes four expert reports, hundreds of
internal ADC documents, depositions of ADC staff, and
inmate declarations, the district court determined that the
plaintiffs meet the standard for class certification set forth in
Federal Rule of Civil Procedure 23.  It therefore certified a
class of inmates challenging ADC health care policies and
practices, and a subclass of inmates challenging ADC
isolation unit policies and practices.  We conclude that the
district court did not abuse its discretion in certifying the
class and subclass, and therefore affirm the order of the
district court.

# BACKGROUND

## I

Arizona law requires the Director of the ADC to "provide medical and health services" for the approximately 33,000 inmates in ten prison facilities who depend on the state for all basic needs.[1]  Ariz. Rev. Stat. Ann. § 31-201.01; *see also id.* at § 41-1604 (providing that "the director shall be responsible for the overall operations and policies for the department"). To satisfy the duty imposed by statute on its director, ADC has promulgated extensive statewide policies governing health care and conditions of confinement that apply to all of the inmates in its custody, all of its staff, and all of its facilities.[2]

Since July 2012, ADC has contracted with private entities to provide medical, dental, and mental-health care services to inmates.  Specifically, ADC hired Wexford Health Services from July 1, 2012 through March 3, 2013, at which point it replaced Wexford with Corizon, Inc., its current partner. ADC's private contractors are required by the plain terms of their agreements to follow all ADC policies, and work with ADC to implement additional policies governing such matters as health care staffing, access to prescriptions, emergency care, and dental care.  The contractors' full compliance with

---

[1] Defendant Charles Ryan is the Director of ADC and Defendant Richard Pratt is ADC's former Interim Division Director of Health Services.  Ryan and Pratt have both been sued in their official capacities.

[2] The ten ADC facilities are Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford/Ft. Grant, Tucson, Winslow, and Yuma.

statewide ADC policy is constantly monitored by ADC officials.

The plaintiffs are thirteen inmates in ADC custody and the Arizona Center for Disability Law, Arizona's authorized protection and advocacy agency. *See* 42 U.S.C. § 10801. They filed this suit in March 2012, claiming that ADC's policies and practices governing medical care, dental care, and mental health care expose all inmates "to a substantial risk of serious harm, including unnecessary pain and suffering, preventable injury, amputation, disfigurement, and death." The plaintiffs support these general allegations with detailed references to nearly a dozen specific ADC policies and practices, including inadequate staffing, outright denials of care, lack of emergency treatment, failure to stock and provide critical medication, grossly substandard dental care, and failure to provide therapy and psychiatric medication to mentally ill inmates.

The plaintiffs also claim that conditions in ADC isolation units constitute cruel and unusual punishment.[3] They allege, for example, that prisoners in isolation often go months or years without any meaningful interaction with other persons, that these inmates are frequently denied adequate nutrition, that some receive no outdoor exercise at all for months or years on end, and that most inmates held in isolation are confined to cells with 24-hour-a-day illumination. The plaintiffs add that "[t]he predictable outcomes of these cruel

---

[3] The plaintiffs and the district court use the term "isolation cells," while the defendants refer to the same cells as "maximum custody cells." Although we adopt the district court's terminology, that decision does not amount to an opinion about the substance of the plaintiffs' conditions of confinement claims relating to the isolation cells.

conditions of isolation are psychiatric deterioration, self-injury, and death."

With respect to both the health care and isolation unit claims, the plaintiffs allege that ADC is aware of these constitutionally defective conditions and has deliberately ignored the resulting risk to which it has exposed inmates. For example, the plaintiffs allege that, in 2009, the ADC Director of Medical Services responded to a prison physician's complaint that ADC was failing to provide adequate care by agreeing that ADC was "probably" violating inmates' rights and stating that "I do think that there would be numerous experts in the field that would opine that deliberate indifference has occurred."

The plaintiffs seek declaratory and injunctive relief to eliminate identified systemic deficiencies in ADC's statewide health care system and isolation units.

## II

After the district court denied a motion to dismiss, the plaintiffs moved for class certification. They supported their motion with the detailed factual allegations in the Complaint, hundreds of documents that they had obtained from the defendants in discovery, expert reports by four specialists in prison medical care and conditions of confinement, and declarations by the named plaintiffs. The discovery materials included assessments of ADC staffing, reports by contractor monitors, internal communications between ADC officials, and letters exchanged between ADC and Wexford. In their response, the defendants relied on a few declarations by some ADC officials in which those officials summarized formal ADC policies—several of which had been modified mere

days before the defendants filed their brief in the district
court.   The defendants did not submit rebuttal expert
declarations, nor did they offer evidence that the newly
revised written statements of ADC policy reflected the actual
policy and practice of the ADC facilities.   Further, the
defendants did not address the individual policies and
practices complained of by the plaintiffs nor present evidence
meant to deny their existence.  Rather, the defendants argued
in a general fashion that ADC written policies are the only
statewide policies and practices.[4]

## A.  Factual Allegations in the Complaint

The 74-page complaint in this case contains detailed
factual allegations concerning the existence of uniform,
statewide policies and practices in all ADC facilities.  In the
plaintiffs' view, these policies and practices expose all ADC
inmates to a substantial risk of harm.  With respect to their
health care claims, the plaintiffs allege the existence of the
following policies and practices: (1) creation of "lengthy and
dangerous delays in receiving" care and "outright denials of
health care"; (2) failure to "provide prisoners with timely
emergency treatment"; (3) failure to "provide necessary
medication and medical devices to prisoners"; (4) a practice
of "employ[ing] insufficient health care staff"; (5) failure to
"provide prisoners with care for chronic diseases and
protection from infectious diseases"; (6) failure to "provide
timely access to medically necessary specialty care"; (7)
provision of "substandard dental care"; (8) provision of
"substandard mental health care"; (9) denial of "medically

---

[4] Of course, this argument is ineffective as to the several policies and
practices complained of by the plaintiffs that reflect formal ADC written
policy.

necessary mental health treatment," including "psychotropic medication, therapy, and inpatient treatment," to mentally ill prisoners; and (10) denial of "basic mental health care" to "suicidal and self-harming prisoners." With respect to the isolation units claims, the plaintiffs allege the existence of the following policies and practices: (1) denial of adequate recreation; (2) constant cell illumination; (3) extreme social isolation; (4) denial of adequate nutrition; and (5) failure to provide adequate mental health care staffing and treatment.

For each of these alleged policies and practices, the Complaint contains several paragraphs or pages of particularized factual allegations. For example, with regard to the alleged policy and practice of failing to provide necessary medication and medical devices, the Complaint alleges that the "[d]efendants have a policy and practice of not providing prisoners with the full course of their medication, not providing prisoners medication as prescribed or in a timely fashion, and inappropriately starting and stopping medication." The Complaint further alleges that "psychotropic medications that are to be taken daily regularly go undelivered, without explanation or warning," prisoners "are given expired medication or incorrect dosages of medication," the defendants "routinely substitute doctor-approved drug regimens with drugs on the ADC-approved formulary," and the defendants fail to provide "medically necessary devices, thus depriving . . . prisoners of basic sanitation." The Complaint also includes factual allegations that demonstrate the kinds of serious harm to which members

of the proposed class are exposed by ADC policies and practices.[5]

To take another example of the medical care claims, the Complaint alleges the existence of a policy and practice of "failing to provide prisoners with specialty care, or doing so only after extensive and unreasonable delays, often resulting in unnecessary pain and suffering, permanent injuries, and death." The Complaint further alleges that, even though ADC sends prisoners to contracted outside specialists, "[f]or much of 2009 and 2010, Defendants had no contracts in place with outside providers, and even today have few outside specialists under contract to treat ADC prisoners." The

---

[5] Thus, with respect to the policy and practice of failing to provide prisoners with necessary medication and medical devices, the Complaint alleges the following examples, among others:

- "A prisoner at the Tucson complex was given the incorrect dosage of medication to treat his seizures in September 2011. He suffered a stroke, and despite pleas for help from his fellow inmates, waited more than a day before medical staff saw him and referred him to an outside hospital's Intensive Care Unit. Now, due to the stroke, he slurs his speech, has difficulty walking and relies on a wheelchair, and is incontinent."

- "When [a named plaintiff] [suffered an] eye injury, a nurse at the Safford prison gave him eye medication that had expired more than three months previously. When he used the medication, his vision dramatically worsened, and he developed iritis."

- "[A named plaintiff] and other prisoners who need catheters are given fewer clean catheters than they need, and thus have to re-use the catheters, putting them at risk of bladder and urinary tract infections . . . Prisoners who need incontinence briefs or wipes often go without them, or are told they only are allowed one diaper per day."

Complaint elaborates that from FY 2009 to FY 2011, "spending on specialty services had plummeted by 38% . . . while there was no corresponding decline in the number of prisoners in ADC's custody." The Complaint quotes ADC physicians who stated that "the referral system has broken down" and that specialist referrals are "falling through the cracks," and alleges that the defendants "have a policy and practice of failing to order or approve outside diagnostic testing, including biopsies of suspicious tumors and growths."[6]

---

[6] The plaintiffs' examples of the kinds of serious harm to which they are exposed by this ADC policy and practice include the following:

1. "In late February 2010, [a named plaintiff] was attacked by other inmates and suffered eye injuries and fractures of his cheek bone, orbital bone around his eye, and upper jaw bone – fractures that, if not treated, result in the person's face caving in, and in permanent disfigurement. Outside emergency room doctors advised that he be seen within a week by an ophthalmologist and plastic surgeon. Prison doctors submitted these referrals to the review committee, but they were not approved. Instead, [the named plaintiff] was sent to an oral surgeon, who operated on his face without an anesthesiologist present. [The named plaintiff] was over-sedated and had to have an antidote to be revived. His face was partially paralyzed due to nerve damage from the botched surgery and over-sedation, and his eyelid drooped, causing dryness to his cornea."

2. "[A named plaintiff] waited more than two years to have a biopsy of [a] mass in his prostate, because contracts with outside providers were cancelled. By the time he was finally seen and treated, the cancer was much worse, resulting in more invasive surgery and the need to permanently use a catheter."

3. "Beginning in 2010 [a named plaintiff] observed multiple masses growing on her breasts, mouth, and arms, and reported discomfort in her cervix. The masses were observable in

A third example of the Complaint's medical care allegations is the alleged statewide ADC policy and practice of "not providing prisoners with timely emergency responses and treatment, and [failing to provide] an adequate system for responding to health care emergencies."   The Complaint further alleges that "there is not an adequate number of on-duty health care staff to respond to possible emergencies," "[d]efendants have not adequately trained security and health care staff on how to handle health care emergencies," "[l]ower level medical staff, who serve as the first line of response to prisoners' requests for medical assistance, often do not recognize when a prisoner is experiencing an emergency," and "even when properly responding to an emergency, medical staff face barriers to providing timely emergency assistance."[7]

---

physical examinations.   She began experiencing frequent diarrhea, nausea, exhaustion, weight loss, pain, and other alarming systems. [She] has a family history of cancer and was treated for cancer in 2001.   Starting in December 2010 she requested testing and a prison doctor ordered a referral to an oncologist.   However, [she] was not sent to an oncologist and did not receive a CT scan until late September 2011.   At that time the masses were described as 'lighting [the CT scan] up like a Christmas tree,' and the specialist orders biopsies and a colonoscopy . . . .   She still has not seen an oncologist or had biopsies."

[7] Here, the plaintiffs' examples include the following:

1.   "In July 2010, correctional officers at the Tucson prison stood by and watched a severely mentally ill prisoner . . . bleed to death after his second suicide attempt . . . .   When an internal investigator asked one officer, 'So you guys just stood around for 23 minutes and watched this guy bleed to death?', the officer stated that his response was to call [the inmate's] name and to try to elicit a reaction."

Turning to the dental care claims, the Complaint alleges that the defendants "have a policy and practice of failing to provide medically necessary dental services."   It further alleges that "prisoners wait months or years for basic dental treatment and suffer significant pain and other harm," "the primary service provided by Defendants is tooth extraction, even if a much less invasive procedure . . . is medically appropriate and necessary," and "prisoners who are fortunate enough to get fillings are not given permanent fillings, but rather temporary fillings that are not designed to last more than a few months at most."   The Complaint contains allegations concerning several inmates who have faced "the horrible dilemma of saving a tooth and suffering pain, or ending the pain and losing a tooth that otherwise could be saved."

---

2.   "In October 2011, a prisoner at the Eyman prison collapsed in his living unit from a heart attack.   Other prisoners yelled for security staff to contact medical staff.  Officers told the prisoners to 'wait and see what happens,' and did not summon help or provide assistance to the stricken prisoner.   In desperation, another inmate checked the prisoner's pulse, and finding none, began to perform CPR.  After a few minutes, the prisoner began breathing again.  Only then did officers summon medical staff. Three hours later, the prisoner was sent from the medical unit back to his living unit and told he had a medical appointment in a few days.  The prisoner had another heart attack the next day and died."

3.   "In May 2011, a prisoner who was four months pregnant began experiencing painful contractions and spotting blood, and went to Perryville's medical unit.  The staff person on duty told her it was nothing serious, that her problems were 'all in your head,' and that she could not see a clinician for evaluation or treatment. She was sent back to her living unit, and she continued to experience great pain and cramping for an hour and a half, until she miscarried."

With respect to the mental health care claims, the Complaint alleges that the defendants systematically "fail[] to provide prisoners with adequate mental health care." It first alleges that the defendants have a policy and practice of "denying treatment to or providing inadequate treatment to prisoners with serious mental health needs." It elaborates that the defendants lack sufficient staff to treat mentally ill inmates; that the defendants fail to monitor and provide follow-up treatment after prescribing psychotropic medications; that prisoners who are on psychotropic medications that increase heat sensitivity are exposed to dangerous levels of heat; and that the defendants rely on unqualified nurses and medical assistants for ongoing monitoring of prisoners on psychotropic drugs.[8]

The Complaint then separately alleges that the defendants "deprive suicidal and self-harming prisoners of basic mental health care." In support of this allegation, it charges that the

---

[8] Here, the plaintiffs' examples include the following:

- "On two separate occasions when [a named plaintiff] was placed in suicide watch for engaging in self-harming behavior and suffering severe side effects from a variety of psychotropic medications, he did not see a psychiatrist for stretches of five and seven months."

- "In June 2008, [a named plaintiff] was prescribed Celexa, but did not receive it for nearly a year. He was also prescribed lithium; however, despite the need for close monitoring for side effects from the lithium, he was not seen by a doctor for three months. His lithium was renewed without [the named plaintiff] having seen a doctor for six months. In November 2009, [he] submitted a [health needs request] reporting that he was vomiting when given lithium without food. He was given Tums and was not seen by a doctor."

defendants "have a policy and practice of housing prisoners with serious mental health needs in unsafe conditions that heighten their risk of suicide," and reports that ADC prisoners have a suicide rate double the national average in state prisons.  The Complaint adds that, as a matter of statewide policy and practice, ADC suicide watch facilities "offer no meaningful treatment"; "suicide watch cells are often filthy, with walls and food slots smeared with other prisoners' blood and feces, reeking of human waste"; suicide watch cells are maintained at "very cold temperatures" while prisoners "are stripped of all clothing and given only a stiff suicide smock and a thin blanket, making the extreme cold even harder to tolerate"; the defendants unjustifiably use chemical agents on suicidal inmates; and the defendants provide inadequate nutrition to inmates on suicide watch, force them awake every ten to 30 minutes around the clock, and leave bright lights on 24 hours a day.[9]

Finally, the Complaint alleges that the defendants have a policy and practice "of confining thousands of prisoners in isolation . . . in conditions of enforced idleness, social isolation, and sensory deprivation."  It further alleges as

---

[9] Here, the plaintiffs' examples include the following:

- "[A named plaintiff] did not see a psychitratist for 11 months despite being placed on suicide watch multiple times."

- "[Two named plaintiffs] have asthma and rely upon inhalers, and they have had asthma attacks from the regular use of pepper spray in the women's suicide watch unit.  On multiple occasions after she was pepper sprayed in the eyes, nose, and mouth, [one named plaintiff] was dragged to a shower, stripped naked, and sprayed with extremely cold water to rinse away the pepper spray; she was then left naked to wait for a new vest and blanket."

follows: "prisoners in isolation leave their cells no more than three times a week, for a brief shower and no more than two hours of 'exercise' in the 'rec pen' – a barren, windowless concrete cell with high walls [and] no exercise equipment"; "some prisoners in isolation receive no outdoor exercise at all for months or years on end; others receive insufficient exercise to preserve their physical and mental health"; "most or all of these prisoners are held in cells with a solid steel door and no window to the outside"; "cells are often illuminated 24 hours a day"; "chronic sleep deprivation is common"; "property is extremely limited"; "prisoners in isolation often go months or years without any meaningful human interaction"; and the defendants "deny[] prisoners in isolation adequate nutrition."  The Complaint adds that the harm to inmates' mental and physical health from these conditions is "exacerbated by the policy and practice of Defendants of failing to provide adequate mental health care staffing and treatment."

In sum, the lengthy and comprehensive complaint in this case alleges that there exist a number of statewide, uniform ADC policies and practices concerning health care and isolation units, and that these policies and practices expose all members of the proposed class and subclass to a substantial risk of serious harm.

**B. Discovery Material**

The plaintiffs also supported their motion for class certification with documents obtained from the defendants during discovery.  For example, they submitted a letter from ADC to Wexford dated September 21, 2012 in which ADC identified serious and systemic deficiencies in Wexford's provision of health care to ADC inmates.  In this letter, the

ADC Contract Beds Operations Director stated that an ADC review had revealed that "a significant number of inmates may not have been receiving their medications as prescribed [in July and August 2012] due to expired prescription(s) and inappropriate renewals or refills," describing these "8,358" prescriptions as a "critical issue" and "grave concern to the ADC." After surveying other compliance concerns, the letter proceeded to identify a number of "non-compliance issues" regarding Wexford's provision of health care in ADC facilities, such as:

- "Inadequate staffing levels in multiple program areas at multiple locations," resulting in "inappropriate scheduling gaps in on-site medical coverage, including In-Patient Component" and "[s]taffing levels forcing existing staff to work excessive hours, creating fatigue risks";

- "Incorrect, incomplete, inconsistent medication administration or documentation of care provided," including a "backlog of prescription medication expiration review," "incorrect or incomplete pharmacy prescriptions," "inappropriate discontinuation/change of medication," "inconsistent or contradictory medication refill and/or return procedures," and "inconsistent provision of release, transfer, and/or renewal medications"; and

- A "quantitative decrease in routine institutional care," including a "backlog of provider line appointments," "untimely handling of Health Needs Requests," and "backlog/cancellation of outside specialty consultations"

On October 1, 2012, Wexford replied with a letter in which it condemned the low quality of ADC's preexisting programs. It described "long-standing issues, embedded into ADC health care policy and philosophy," and noted that ADC's health care system was "extremely poor," "dysfunctional," "sub-standard," and rife with "deficiencies."

This assessment of ADC policies and practices governing the provision of health care to inmates is echoed by other discovery materials. For example, a February 2011 e-mail from the psychiatrist supervisor at one ADC complex warned of "abysmal staffing" and cautioned that he was "circling the drain." In a similar vein, an August 2012 ADC memo concluded that psychiatry staffing was "grossly insufficient" and "so limited that patient safety and orderly operation of [ADC] facilities may be significantly compromised." Dozens of other contract monitor reports from August 2012 offered similar assessments, as did a Wexford staffing review undertaken in November 2012, five months after Wexford had taken over the provision of health care services in ADC facilities. Wexford's comprehensive review concluded that, of 762 budgeted full time employee positions, only 567 positions had been filled. It also revealed that, for higher-level providers, such as physicians, psychiatrists, dentists, nurse practitioners, and management-level health care staff, the overall vacancy rate across ADC facilities exceeded 50%.

A survey of the quality of health care provision at ADC facilities, also completed in November 2012, bristled with criticism: "Insufficient coverage which only allows for basically emergency care . . . now reaching a critical state for both routine visits and chronic care follow-ups . . . no filled dentist positions at this complex"; "There is no nurses line being conducted in Central Unit"; "The [Health Needs

Requests for mental health services] are not being triaged by qualified mental health professionals during the required time frame . . . [Inmates referred to a psychiatric provider] are not being seen as required due to limited staffing"; "Staffing continues to be of primary concern. In nursing alone, the Lewis complex is 5.9 RN's below staffing expectations and 8 LPN's below staffing expectations"; "Nurseline is back-logged out three weeks . . . Provider line is back-logged out 2 months . . . Charts requiring Provider review total roughly 70 charts"; and "At the current level there [are] not enough providers to serve an inmate population of 4200+." The rest of the ADC and Wexford documents submitted by the plaintiffs paint an equally grim picture of ADC's operations from 2009 through the time this case was filed.

## C. Expert Reports

The plaintiffs submitted four expert reports, none of which was rebutted by the defendants. Each of these experts based his report on an examination of major portions of the evidentiary record that the parties compiled in the district court.

Dr. Robert L. Cohen, an expert in prison health care, court-appointed monitor in several other similar cases, and member of the New York City Board of Corrections, concluded that the defendants have placed prisoners "at serious risk of harm, and in some cases, death" by "failing to manage, support, supervise, and administer medical care to prisoners in the ten state facilities." The defendants, he stated, "operate a top-down centralized health care system" and "any local policies developed at the prison level must be consistent with departmental policies." Cohen noted that this centralized system is nonetheless "highly dysfunctional,"

adding that "there is a system-wide practice of not following the [ADC's formal] policies and procedures because, among other things, [the] defendants have failed to provide adequate staffing, supervision and resources to promote compliance." He elaborated that "written policies and procedures are often viewed by providers and their supervisors as setting unrealistic requirements, and therefore are ignored."

Cohen reported that, instead of following their formal procedures, ADC's prison facilities maintain "a policy and practice of not providing adequate medical professional staffing," "a practice of not complying with [ADC's] requirement that health care records be reviewed within 12 hours of an inmate's arrival," "a practice and unwritten policy of delaying and/or denying prisoners access to necessary care for serious medical needs," "a practice and unwritten policy of not providing sufficient, trained staff to competently respond to emergencies," a "practice and unwritten policy of failing to supervise, manage and support medication distribution," and a "practice of keeping chaotic, inaccurate, and disorganized records throughout the state." These "extensive problems," he opined, "are systemic, and are similar to problems [he has] encountered in other prison class action lawsuits where [he has] been an expert." As a result of these statewide policies and practices, Cohen concluded, "medical care delivery in [ADC] poses a substantial risk of serious harm to prisoners who require medical care."

Dr. Jay D. Shulman, a dentist with extensive experience practicing in and examining military, educational, and correctional dentistry programs, reviewed the ADC's dental system and offered a highly critical assessment: "[T]he consistently inadequate care documented in the records I reviewed is attributable to systemic problems caused by

inadequate and poorly monitored policies and procedures in the ADC's Dental Department." Shulman carefully summarized and then broadly criticized ADC's policies and practices "with regard to staffing, inmate health requests, pain management, dental appliances, tooth extraction, and informed consent," explaining that they "combine into a system that fails to adequately identify, or properly and timely treat, dental issues experienced by inmates." These failures, he remarked, "place all inmates at risk not only of preventable pain, but also of tooth decay and unnecessary loss of teeth." Shulman added that ADC policies "themselves [fall] below the standard of care" and that "regular practices often fall even further short."

In his report, Shulman singled out for particularly strong criticism ADC's "de facto [tooth] extraction only policy," its "policy or practice of failing to employ sufficient dental staffing,"[10] its failure to "ensure appropriate classification and treatment of patients reporting dental issues," its absence of "timelines for routine treatment,"[11] and its failure adequately to treat "chewing difficulty" that can cause pain and nutritional problems. These and the other issues he identified, Schulman concluded, are "attributable to systemic problems, primarily, inadequate staffing and inadequate and poorly monitored policies and procedures."

---

[10] Shulman noted that the systemwide ADC ratio as of October 2012 was 1,384 inmates per dentist. He explained that the recommended ratio is 1,000:1, assuming that dental hygienist support is provided. ADC does not employ any dental hygienists.

[11] Shulman expressed grave concern that the treatment time to fill a cavity in ADC facilities ranges from 85 to 292 days, with an average of 225 days.

Dr. Pablo Stewart, a professor of psychiatry with extensive experience in correctional mental health care, offered his "preliminary opinion" that "mental health care services at ADC are in a state of disarray, and have been for some time." Observing that "all relevant policies and procedures . . . are centralized with statewide application," Stewart opined that ADC's "lack of a functioning mental health program poses a substantial risk of serious harm to prisoners with mental health needs." He described a "shortage of mental health staff, delays in providing or outright failure to provide mental health treatment, and [] gross inadequacies in the provision of psychiatric medications" as "statewide systemic problems," noting that "prisoners who need mental health care have already experienced, or will experience, a serious risk of injury to their health if these problems are not addressed." Stewart offered detailed analysis of these issues, as well as statewide problems involving policies and practices of medication management, continuity of care, and protection of prisoners on psychotropic medication from heat injury.[12]

Stewart also addressed the issues of isolated confinement and care for suicidal inmates. With respect to isolation, he noted that ADC regularly houses mentally ill inmates in

---

[12] Stewart noted that "there have been and continue to be severe systemwide shortages of mental health staff in ADC," that ADC "lacks a reliable system for ensuring the delivery of prescribed medications," that "ADC does not have a reliable means for prisoners to make their mental health needs known in a timely manner to qualified staff," and that "ADC lacks a reliable system to ensure that prisoners needing a higher level of mental health care are transferred in a timely fashion to appropriate facilities." He supported each of these observations with references to the voluminous evidentiary record—including, in many cases, references to statements by ADC staff, officials, and contractors.

isolation units—in accordance with ADC policy—even though isolated confinement can be "devastating" to inmates with "mental illness, such as psychotic disorders and major mood disorders," and can cause "severe deterioration in mental health, self-harm, or suicide." Turning to suicide prevention, Stewart agreed with a senior ADC official who admitted in his deposition that ADC maintains "a serious gap in [its] ability to provide suicide prevention." Stewart then discussed what he characterized as serious flaws in ADC's policies and practices governing suicide watch, including the absence of a requirement that inmates on suicide watch be evaluated face-to-face by a psychiatrist and the policy of allowing inmates to be removed from suicide watch by unlicensed mental health staff members. He added that ADC policies permitting the use of chemical agents on suicidal inmates, and its practice of failing to ensure that its correctional staff conducts regular security checks on inmates, exacerbate the risk to which mentally ill inmates are exposed in ADC facilities. Stewart ultimately concluded that "the current state of mental health care services in [ADC] poses a substantial risk of serious harm to prisoners who require mental health care." He explained that, although "not all ADC prisoners will be harmed by these deficiencies in exactly the same way—some will die, some will suffer injury short of death, and some will be lucky enough to escape permanent injury altogether," the problems that he had discovered in ADC's "highly centralized" mental health care system "are systemic in nature, and require systemic solutions."

Dr. Craig Haney, a professor of social psychology with extensive experience studying the psychological effects of imprisonment and the consequences of solitary confinement, assessed ADC's isolation units. He first described, in detail,

"a reasonably large and growing literature on the many ways that solitary or so-called 'supermax' confinement can very seriously damage the overall mental health of prisoners." He also emphasized that "mentally ill prisoners are particularly at risk in these environments," and that, as a result, "mental health staff in most prison systems with which [he is] familiar are charged with the responsibility not only of screening prisoners in advance of their possibly being placed in isolation (so that the mentally ill can be excluded) but also of monitoring prisoners who are currently housed in solitary confinement for signs of emerging mental illness (so that they, too, can be removed)."

Turning to ADC's policies and practices, Haney opined that "the failure of [ADC] to exclude categorically prisoners who suffer from [severe mental illness] from its isolation units is inconsistent with sound corrections and mental health practice and places all such prisoners at substantial risk of harm." He added: "[T]he policies, practices and admissions of ADC regarding conditions of confinement in its isolation units . . . reflect the type of conditions that my own experience and research—which is also supported by decades of scientific research and study by others—have found to be potentially detrimental to all human beings, regardless of pre-existing mental illness. As such, all ADC prisoners are at risk of substantial psychological harm under ADC's current isolation policy and practice." Haney described the "stark conditions of isolation" imposed by ADC as "harsh and severe and precisely the kind that create a risk of substantial harm for all the prisoners who are subjected to them."[13] He

---

[13] Here, Haney emphasized ADC "policies that allow for 24 hour illumination in some isolation cells; limited property, including lack of

voiced particular alarm concerning ADC policies that allow seriously mentally ill inmates to be housed in isolation, ADC's practice of inadequately monitoring those inmates due to "policy shortfalls and chronic mental health understaffing," and ADC policies authorizing the use of chemical agents against seriously mentally ill inmates (including those who are on psychotropic medications). Haney concluded by opining that "ADC's apparent failure to put in place careful mental health monitoring policies for all prisoners subject to the extremely isolated conditions in their [isolation units] places all prisoners subject to such conditions at an unreasonable risk of harm." "These harms," he warned, "are extremely serious and sometimes irreversible, including loss of psychological stability, impaired mental functioning, self-mutilation, and even death."

### D. Declarations by the Named Plaintiffs

In addition to the allegations in their complaint, the documents obtained from ADC and Wexford in discovery, and the expert reports, the plaintiffs also submitted declarations describing their experiences with ADC's policies and practices governing health care and conditions of confinement. These declarations by the named plaintiffs were not submitted to support individual Eighth Amendment claims; rather, the plaintiffs submitted these declarations as evidence of the defendants' unlawful policies and practices, and as examples of the serious harm to which all inmates in ADC custody are allegedly exposed. For example, Plaintiffs Swartz, Licci, Jensen, Hefner, Wells, and Polson described significant delays in receiving vital medical care, including

---

access to TVs or radios; infrequent, reduced calorie meals; and the years and years that many prisoners spend in such conditions."

emergency and specialist care, as well as experiences in
which they were treated by nurses rather than doctors for
serious conditions, forced to wait months or years for
diagnostic tests, and denied timely access to medication.
Each of these plaintiffs reported suffering terrible pain—and
some also declared that these lengthy delays in and denials of
care led to permanent disfigurement or a need for more
radical, high-risk treatments.   Each of the other named
plaintiffs submitted a sworn declaration attesting to his or her
experiences with ADC dental care, mental health care, or
isolation units.

### III

In a careful, thorough, and rigorous opinion, the district
court, considering all of this evidence, granted the plaintiffs'
motion for certification of a class and subclass.  It then denied
a motion for reconsideration.  It certified a class consisting of
"[a]ll prisoners who are now, or will in the future be,
subjected to the medical, mental health, and dental care
policies and practices of the ADC."   It also certified a
subclass consisting of "[a]ll prisoners who are now, or will in
the future be, subjected by the ADC to isolation, defined as
confinement in a cell for 22 hours or more each day or
confinement in [certain housing units]."

In the district court, as in this court, the parties' main
dispute concerned the requirement of commonality.   The
district court determined that the plaintiffs could show
commonality, explaining that "the question common to all
members of the Class and the Subclass is whether
Defendants' practices are deliberately indifferent to inmates'
health and safety in violation of the Eighth Amendment and
subjection to unconstitutional conditions of confinement in

isolation units."   The district court emphasized that "the problems identified in the provision of health care are not merely isolated instances but, rather, examples of systemic deficiencies that expose all inmates to a substantial risk of serious harm."   In other words, it found that "the evidence here suggests that the root cause of the injuries and threats of injuries suffered by Plaintiffs is the systemic failures in the provision of health care generally."   The district court deemed this evidence to be "'significant proof' that ADC is operating under a policy of providing deficient health care," and concluded that "the allegations of systemic deficiencies in ADC's provision of health care are sufficient to establish 'a system-wide practice or policy that affects all of the putative class members.'"   The district court then identified ten specific ADC health care practices that allegedly expose all members of the certified class to a substantial risk of harm to which the defendants are deliberately indifferent, and seven specific ADC isolation unit practices that allegedly do so the same.   These 17 statewide ADC practices, it concluded, create the commonality required for the plaintiffs to proceed by class and subclass form.

After the district court denied a motion for reconsideration, the defendants filed a Rule 23(f) petition seeking interlocutory review of the district court's class certification order.   *See Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005) (per curiam) (describing the legal standard applicable to discretionary authorization of appeals under Rule 23(f)).   This court granted that petition on July 10, 2013 and the defendants perfected their appeal in a timely manner.[14]

---

[14] Both the district court and this court have denied motions filed by the defendants to stay proceedings pending the outcome of this appeal.

**STANDARD OF REVIEW**

We review a district court's decision to certify a class under Rule 23 for abuse of discretion and we review for clear error any findings of fact upon which the district court relied in its certification order.  *Hester v. Vision Airlines, Inc.*, 687 F.3d 1162, 1171–72 (9th Cir. 2012).  "When reviewing a grant of class certification, we accord the district court noticeably more deference than when we review a denial of class certification."  *Abdullah v. U.S. Sec. Associates, Inc.*, 731 F.3d 952, 956 (9th Cir. 2013) (citing *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1171 (9th Cir. 2010)).  "An abuse of discretion occurs when the district court, in making a discretionary ruling, relies upon an improper factor, omits consideration of a factor entitled to substantial weight, or mulls the correct mix of factors but makes a clear error of judgment in assaying them."  *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1018 (9th Cir. 2011) (citing *Wolin*, 617 F.3d at 1171).  Under the applicable clearly erroneous standard of review, we reverse the district court's findings of fact only if they are "(1) illogical, (2) implausible, or (3) without 'support in inferences that may be drawn from the record.'" *Abdullah*, 731 F.3d at 956 (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009)).  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Working*, 224 F.3d 1093, 1102 (9th Cir. 2000) (en banc) (citations and quotation marks omitted).

# DISCUSSION

## I

Class certification is governed by Federal Rule of Civil Procedure 23.  Under Rule 23(a), a party seeking certification of a class or subclass must satisfy four requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.[15]  "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied."  *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542–43 (9th Cir. 2013) (quoting *Wal-Mart Stores, Inc, v. Dukes*, 131 S. Ct. 2541, 2551 (2011)).  The proposed class or subclass must also satisfy the requirements of one of the sub-sections of Rule 23(b), "which defines three different types of classes." *Leyva*

---

[15] The full text of the subsection is as follows:

> (a) Prerequisites.  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
>> (1) the class is so numerous that joinder of all members is impracticable;
>>
>> (2) there are questions of law or fact common to the class;
>>
>> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>>
>> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

*v. Medline Industries, Inc.*, 716 F.3d 510, 512 (9th Cir. 2013). In this case, the plaintiffs contend that their proposed class and subclass meet the requirements of Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

In evaluating whether a party has met the requirements of Rule 23, we recognize that "Rule 23 does not set forth a mere pleading standard." *Wal-Mart*, 131 S. Ct. at 2551. We therefore require a party seeking class certification to "affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* Similarly a party must affirmatively prove that he complies with one of the three subsections of Rule 23(b).

The defendants do not dispute that the plaintiffs meet the requirements of numerosity and adequacy of representation under Rule 23(a). They argue only that the district court abused its discretion in concluding that the plaintiffs have demonstrated commonality and typicality. The defendants also contend that the plaintiffs have not met the requirements of Rule 23(b)(2). They argue that the district court abused its discretion in concluding that, assuming the plaintiffs prevail on the merits, injunctive relief will be appropriate for the whole class and subclass. We address each of these arguments in turn and conclude that the district court did not err in certifying the plaintiffs' proposed class and subclass.

## II

Rule 23(a)(2) requires "questions of law or fact common to the class."  In *Wal-Mart v. Dukes*, the Supreme Court announced that this provision requires plaintiffs to "demonstrate that the class members 'have suffered the same injury,'" not merely violations of "the same provision of law."  131 S. Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147,157 (1982)).  Accordingly, plaintiffs' claims "must depend upon a common contention" such that "determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 2551.  "What matters to class certification . . . is not the raising of common 'questions'—even in droves— but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Plaintiffs need not show, however, that "every question in the case, or even a preponderance of questions, is capable of class wide resolution.  So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Wang*, 737 F.3d at 544 (quoting *Wal-Mart*, 131 S. Ct. at 2556); *see also Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 589 (9th Cir. 2012) (noting that "commonality only requires a single significant question of law or fact").  Thus, "[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Evon v. Law Offices of Sidney*

*Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012) (quotation marks and citation omitted).[16]

Here, the defendants argue that the district court erred in concluding that the plaintiffs satisfied Rule 23(a)(2).  Their principal argument is that the district court abused its discretion in concluding that the plaintiffs have identified questions of law or fact common to the class.  In their view, "Eighth Amendment healthcare and conditions-of-confinement claims are inherently case specific and turn on many individual inquiries.  That fact is an insurmountable hurdle for a commonality finding because *Wal-Mart* instructs that dissimilarities between class members 'impede the generation of common answers.'"  Reply Br. at 4 (quoting *Wal-Mart*, 131 S. Ct. at 2551, 2556).  In other words—also from the defendants—the plaintiffs fail Rule 23(a)(2)'s commonality test because "a systemic constitutional violation [of the sort alleged here] is a collection of individual constitutional violations," each of which hinges on "the

---

[16] The defendants assert that the district court applied an incorrect, pre-*Wal-Mart* legal standard to the class certification issue.  That assertion is incorrect.  Although the district court did, at one point, cite a pre-*Wal-Mart* case that no longer states the law, *see Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 268 (D.D.C. 1990), its analysis otherwise fully recognized and addressed *Wal-Mart* and post-*Wal-Mart* cases.  Its conclusion, moreover, reflects a proper application of current law.  *Cf. D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1200 (10th Cir. 2010) ("We refuse to find an abuse of discretion where the district court is accused of not talismanically reciting [Rule 23's] exact language in applying the law to the facts when it clearly understood the law it was required to apply and accurately applied it.").

particular facts and circumstances of each case."[17] *Id.* at 9–10. This position amounts to a sweeping assertion that, after *Wal-Mart*, Eighth Amendment claims can *never* be brought in the form of a class action.[18] The defendants' view rests, however, on a fundamental misunderstanding of *Wal-Mart*, Eighth Amendment doctrine, and the plaintiffs' constitutional claims.

In this case, as in all class actions, commonality cannot be determined without a precise understanding of the nature of the underlying claims. *See Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013) ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." (citation omitted)); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("[T]he merits of the class members' substantive claims are often highly relevant when determining whether to certify a class.").[19] As we recently

---

[17] The cases cited in the defendants' briefs, many of which involve individuals challenging particular instances of medical treatment or conditions of confinement, confirm that they (erroneously) view the plaintiffs' claims as ultimately little more than a conglomeration of many such individual claims, rather than as a claim that central policies expose all inmates to a risk of harm.

[18] As the defendants put it, "[t]he very individualized nature of inadequate health care and conditions-of-confinement claims makes it very difficult, if not impossible, to satisfy *Wal-Mart*'s 'one stroke' standard." Opening Br. at 25.

[19] Of course, this does *not* mean that the plaintiffs must show at the class certification stage that they will *prevail* on the merits. *See, e.g., Amgen*, 133 S. Ct. at 1194–95 ("Although we have cautioned that a court's class-certification analysis must be 'rigorous' and may 'entail some overlap

observed, "[t]o assess whether the putative class members
share a common question, the answer to which 'will resolve
an issue that is central to the validity of each one of the [class
members's] claims,' we must identify the elements of the
class members's case-in-chief." *Stockwell*, 2014 WL
1623736, at *6 (quoting *Wal-Mart*, 131 S. Ct. at 2551). Here,
the defendants describe the plaintiffs' claims as little more
than an aggregation of many claims of individual
mistreatment. *See, e.g.*, *Jett v. Penner*, 439 F.3d 1091, 1096
(9th Cir. 2006). That description, however, rests upon a
misunderstanding of the plaintiffs' allegations. The
Complaint does not allege that the care provided on any
particular occasion to any particular inmate (or group of
inmates) was insufficient, *see, e.g.*, *Estelle v. Gamble*,
429 U.S. 97, 104–05 (1976), but rather that ADC policies and
practices of statewide and systemic application expose all
inmates in ADC custody to a substantial risk of serious harm.

This kind of claim is firmly established in our
constitutional law. As the Supreme Court recognized in
1993, "[t]hat the Eighth Amendment protects against future
harm to inmates is not a novel proposition." *Helling v.*

---

with the merits of the plaintiff's underlying claim,' Rule 23 grants courts
no license to engage in free-ranging merits inquiries at the certification
stage." (quoting *Wal-Mart*, 131 S. Ct. at 2551); *Stockwell v. City & Cnty.
of San Francisco*, No. 12-15070, 2014 WL 1623736, at *4 (9th Cir. Apr.
24, 2014) ("[D]emonstrating commonality does not require proof that the
putative class will prevail on whatever common questions it identifies.");
*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir.
2012) ("[T]he court should not turn the class certification proceedings into
a dress rehearsal for the trial on the merits."); *Ellis*, 657 F.3d at 983 n.8
(emphasizing that "whether class members could actually prevail on the
merits of their claims" is not a proper inquiry in determining "whether
common questions exist.").

*McKinney*, 509 U.S. 25, 33 (1993). Noting that it "would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them," *Helling* squarely rejected the proposition, hinted at by the defendants here, that "only deliberate indifference to current serious health problems of inmates is actionable under the Eighth Amendment." *Id.* at 33, 34; *see also id.* at 33 ("We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year."). The Court then emphasized that "[w]e would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery," and that prison officials may not be "deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms." *Id.* In *Farmer v. Brennan*, the Court elaborated on *Helling*'s recognition that a "remedy for unsafe conditions need not await a tragic event," *id.*, by holding that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment," 511 U.S. 825, 828 (1994).

Since *Helling* and *Farmer*, we have repeatedly recognized that prison officials are constitutionally prohibited from being deliberately indifferent to policies and practices that expose inmates to a substantial risk of serious harm. *See, e.g.*, *Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010) (substantial risk of harm from exposure of pre-trial detainees on psychotropic medication to extreme heat); *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (substantial risk

of harm from sustained exposure to asbestos). In fact, we have recently reminded a district court of the difference between a claim that an inmate has already suffered harm and a claim that he has been exposed to a substantial risk of serious harm. *See Thomas v. Ponder*, 611 F.3d 1144, 1151 n.5 (9th Cir. 2010) ("In its order, the district court erroneously considers whether the prison officials were aware that Thomas was 'suffering serious harm from the deprivation' of exercise. The correct issue for consideration is, however, whether the prison officials were subjectively aware of a 'serious *risk* of substantial harm.'" (citing *Farmer*, 511 U.S. at 837; *Helling*, 509 U.S. at 32)).

In *Brown v. Plata*, the Supreme Court distinguished the kind of systemic, future-oriented Eighth Amendment claim at issue here from claims in which a past instance of mistreatment is alleged to have violated the Constitution:

> Because plaintiffs do not base their case on deficiencies in care provided on any one occasion, this Court has no occasion to consider whether these instances of delay—or any other particular deficiency in medical care complained of by the plaintiffs—would violate the Constitution under *Estelle v. Gamble*, 429 U.S. 97, 104–105 (1976), if considered in isolation. Plaintiffs rely on systemwide deficiencies in the provision of medical and mental health care that, taken as a whole, subject sick and mentally ill prisoners in California to "substantial risk of serious harm" and cause the delivery of care in the prisons to fall below the evolving standards of decency that mark the progress of

a maturing society. *Farmer v. Brennan*,
511 U.S. 825, 834 (1994).

*Brown v. Plata*, 131 S. Ct. 1910, 1925 n.3 (2011). Since
*Plata*, we have relied on this fundamental distinction to hold
that "where a California prisoner brings an independent claim
for injunctive relief solely on his own behalf for specific
medical treatment denied to him, *Plata* does not bar the
prisoner's claim for injunctive relief." *Pride v. Correa*,
719 F.3d 1130, 1137 (9th Cir. 2013). As we explained,
"[i]ndividual claims for injunctive relief related to medical
treatment are discrete from the claims for systemic reform
addressed in *Plata*." *Id.*

As the district court correctly recognized, the Eighth
Amendment claims in this case are of the same basic kind as
the claims in *Helling*, *Farmer*, *Plata*, and several of our own
precedents, including *Graves* and *Wallis*. In those cases,
courts have asked only whether the plaintiffs were exposed to
a substantial risk of harm to which prison officials were
deliberately indifferent—and have recognized that many
inmates can simultaneously be endangered by a single policy.
*See Helling*, 509 U.S. at 33 (unsafe drinking water); *Graves*,
623 F.3d at 1049 (heat exposure); *Wallis*, 70 F.3d at 1076
(asbestos); *Hoptowit v. Spellman*, 753 F.2d 779, 783–84 (9th
Cir. 1985) (substandard fire prevention).

Here, a proper understanding of the nature of the
plaintiffs' claims clarifies the issue of commonality. What all
members of the putative class and subclass have in common
is their alleged exposure, as a result of specified statewide
ADC policies and practices that govern the overall conditions
of health care services and confinement, to a substantial risk
of serious future harm to which the defendants are allegedly

deliberately indifferent. As the district court recognized, although a presently existing risk may ultimately result in different future harm for different inmates—ranging from no harm at all to death—every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide ADC policy or practice that creates a substantial risk of serious harm. *See, e.g.*, *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 33; *cf. Plata*, 131 S. Ct. at 1923 ("For years the medical and mental health care provided by California's prisons has fallen short of minimum constitutional requirements and has failed to meet prisoners' basic health needs. Needless suffering and death have been the well-documented result.").

The putative class and subclass members thus all set forth numerous common contentions whose truth or falsity can be determined in one stroke: whether the specified statewide policies and practices to which they are all subjected by ADC expose them to a substantial risk of harm. *See Dukes*, 131 S. Ct. at 2551. The district court identified 10 statewide ADC policies and practices to which all members of the class are subjected, and seven statewide ADC policies and practices which affect all members of the subclass. These policies and practices are the "glue" that holds together the putative class and the putative subclass; either each of the policies and practices is unlawful as to every inmate or it is not. That inquiry does not require us to determine the effect of those policies and practices upon any individual class member (or class members) or to undertake any other kind of individualized determination.

The district court thus did not abuse its discretion in deciding to structure the litigation in the form of a class of "all prisoners who are now, or will in the future be, subjected

to the medical, mental health, and dental care policies and practices of the ADC."  After all, every inmate in ADC custody is necessarily subject to the same medical, mental health, and dental care policies and practices of ADC.  And any one of them could easily fall ill, be injured, need to fill a prescription, require emergency or specialist care, crack a tooth, or require mental health treatment.  It would indeed be surprising if any given inmate did *not* experience such a health care need while serving his sentence.  Thus, every single ADC inmate faces a substantial risk of serious harm if ADC policies and practices provide constitutionally deficient care for treatment of medical, dental, and mental health needs.[20]  As Justice Kennedy explained in *Plata*, inadequate health care in a prison system endangers every inmate: "Even prisoners with no present physical or mental illness may become afflicted, and all prisoners in California are at risk so long as the State continues to provide inadequate care . . . . [P]risoners who are not sick or mentally ill . . . [are] in no sense [] remote bystanders in California's medical care system.  They are that system's next potential victims." 131 S. Ct. at 1940.

Critically, the district court also identified 10 policies and practices to which all members of the certified class are exposed.  In so doing, it confirmed that the class members are as one in their exposure to a particular and sufficiently well-defined set of allegedly illegal policies and practices, rather than only in their advancement of a general Eighth

---

[20] The same analysis applies to the part of the district court's order certifying the isolation subclass, which it defined with respect to seven policies and practices.

Amendment legal theory.[21]  Each of these 10 policies and practices affords a distinct basis for concluding that members of the putative class satisfy commonality, as all members of the class are subject identically to those same policies and practices, and the constitutionality of any given policy and practice with respect to creating a systemic, substantial risk of harm to which the defendants are deliberately indifferent can be answered in a single stroke.[22]

For example, with respect to the putative class, the plaintiffs allege that they are placed at risk of serious harm by a policy and practice of severe under-staffing across all ADC medical care facilities.  As a result of this statewide policy and practice, they allege, the quality and availability of care across all ADC facilities is constitutionally deficient.  This allegation presents questions of law and fact common to all members of the putative class.  While no inmate can know in

---

[21] Of course, district courts must be wary of framing common questions so generally that they encompass myriad, distinct claims.  Here, the district court complied with that requirement: there is a single claim—exposure to substantial risk of serious harm due to systemic policies and practices—that can be proven (or not) in a single stroke with respect to any or all of the certified policies.  The district court might also, in the alternative, have certified numerous separate classes or subclasses, separating out groups of policies and practices, but we cannot say that it abused its discretion in deciding that a single class and a single subclass would be the most efficacious and appropriate structure for this litigation.

[22] The defendants devote little effort to challenging the policies and practices one at a time.  They devote nearly all of their argument to a broad attack on the certification of *any* class in this case, saying relatively little about the propriety of certifying a class as to any particular policy and practice.  In any event, we have reviewed each of the 17 policies and practices and conclude that certification is appropriate as to each of them with respect to commonality.

advance whether he will receive adequate and timely care in the event that he falls ill or is injured, or know exactly what form of harm he will suffer from the absence of such care, every single inmate has allegedly been placed at substantial risk of future harm due to the general unavailability of constitutionally adequate care. The question whether ADC's staffing policies pose a risk of serious harm to all ADC prisoners can thus be answered as to the entire class "in one stroke." *Wal-Mart*, 131 S. Ct. at 2551. Either ADC employs enough nurses and doctors to provide adequate care to all of its inmates or it does not do so; there is no need for an inmate-by-inmate inquiry to determine whether all inmates in ADC custody are exposed to a substantial risk of serious harm by ADC staffing policies. *See M.D. v. Perry*, 294 F.R.D. 7, 45 (S.D. Tex. 2013) (holding, in a prisoner class action suit, that "[t]he fact of whether [prison] policies subject class members to an unreasonable risk of harm, and whether that risk is so unreasonable as to rise to a constitutional violation, can be proven on the basis of classwide evidence without individualized inquiries."). As exemplified by *Plata*, claims of this kind, involving detailed factual and legal allegations of specified systemic deficiencies in prison conditions giving rise to a substantial risk of serious harm, have long been brought in the form of class actions lawsuits.[23] *See also, e.g.*, *Armstrong v. Davis*,

---

[23] The defendants' insistence that commonality is defeated by individual variations in preexisting conditions, demand for medical care, and response to treatment is incorrect. Even if some inmates are exposed to a *greater* or *idiosyncratic* risk of harm by the policy and practice of not hiring enough staff to provide adequate medical care to all inmates, that single policy and practice allegedly exposes every single inmate to a serious risk of the same basic kind of harm. Thus, while *Wal-Mart* instructs that "[d]issimilarities within the proposed class . . . have the potential to impede the generation of common answers," 131 S. Ct. at

275 F.3d 849 (9th Cir. 2001). In fact, without such a means of challenging unconstitutional prison conditions, it is unlikely that a state's maintenance of prison conditions that violate the Eighth Amendment could ever be corrected by legal action.

The same is true of the plaintiffs' allegations concerning conditions of confinement in the isolation units. For example, the plaintiffs allege that it is the policy and practice of ADC to provide inmates in isolation with constitutionally deficient food and nutrition. *See Foster v. Runnels*, 554 F.3d 807, 814 (9th Cir. 2009) ("The sustained deprivation of food can be cruel and unusual punishment when it results in pain without any penological purpose." (citation omitted)). They support that claim with references to formal ADC policies, admissions by ADC officials in discovery documents, declarations by the named plaintiffs, allegations in the Complaint, and Dr. Haney's expert report. This claim will not stand or fall based on variations in how hungry each member of the putative subclass is, or on each individual's particular dietary needs (e.g., some may be kosher, others may be vegetarians). While those variations undoubtedly exist and affect how particular inmates experience and respond to ADC policies and practice, they do not defeat commonality because the plaintiffs' claim is that ADC, as a matter of formal policy and systemic practice, regularly provides a level of nutrition that is so inadequate that it

_____

2551, the acknowledged dissimilarities here between members of the proposed class do not in any way bear on or disrupt what they allegedly have in common, and it is that common exposure to ADC policies that constitutes the core factual predicate of their shared legal claim. In other words, ADC staffing policies for all of its facilities are either constitutional or unconstitutional as to all inmates—that legal contention can be answered in one stroke.

exposes *any* inmate who is presently in ADC isolation or will in the future be placed in isolation to a substantial risk of serious harm. Some inmates may not actually be harmed, but they are all allegedly exposed to a risk of harm that is, in its own right, a constitutional injury amenable to resolution in a class action.[24]

*Wal-Mart*, decided shortly after *Plata*, clarified that class certification is appropriate only where the plaintiffs' claims rest on a "common contention" whose "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551. Although the defendants assert that *Wal-Mart* prohibits class certification here, a comparison of *Wal-Mart* and this case strongly supports affirmance. *Wal-Mart* concluded that a proposed Title VII class of 1.5 million female employees, challenging discretionary decisions made by managers in 3,400 stores across the country, failed Rule 23(a)(2). *Id.* at 2551–57. It reasoned that the plaintiffs, who alleged a general corporate policy of allowing discretion by local managers, lacked "a common answer to the crucial question

---

[24] To take another example from the isolation subclass, the plaintiffs allege that they are exposed to a substantial risk of harm by inadequate psychiatric monitoring due to chronic understaffing. They support this claim with detailed allegations in the Complaint; declarations from several named plaintiffs; internal ADC documents in which ADC staff psychiatrists warn of dangerous understaffing and ADC accuses Wexford of failing properly to provide mental health care staff; Wexford reports that reveal gross understaffing of psychiatric positions; and the expert reports of Dr. Haney and Dr. Stewart. For this claim, too, the question is whether all inmates in isolation units—all of whom are at high risk of mental health issues by the very fact of their confinement in isolation—are placed at risk of harm by the absence of enough mental health care providers to treat them. This question can be answered as to every member of the subclass in one stroke.

*why was I disfavored*." *Id.* at 2552. It ultimately concluded that the plaintiffs' effort to "sue about literally millions of employment decisions at once" thwarted commonality because "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's." *Id.* at 2252, 2254. This case is different than *Wal-Mart* in every respect that matters. It involves uniform statewide practices created and overseen by two individuals who are charged by law with ultimate responsibility for health care and other conditions of confinement in all ADC facilities, not a grant of discretion to thousands of managers. It involves 33,000 inmates in the custody of a single state agency, not millions of employees scattered throughout the United States. It looks to whether current conditions in ADC facilities create a risk of future harm, not to the varied reasons for millions of decisions made in the past. Whereas there may have been many answers in *Wal-Mart* to the question "why was I disfavored?," here there is only a single answer to questions such as "do ADC staffing policies and practices place inmates at a risk of serious harm?"

It is therefore not surprising that, in deciding analogous class certification motions since *Wal-Mart*, numerous courts have concluded that the commonality requirement can be satisfied by proof of the existence of systemic policies and practices that allegedly expose inmates to a substantial risk of harm. *See, e.g.*, *Chief Goes Out v. Missoula Cnty.*, No. 12 Civ. 155, 2013 WL 139938, at *5 (D. Mont. Jan. 10, 2013) ("[C]ourts have long recognized that, in prison condition cases like this one, the injury is the [deprivation] itself, not just the negative effects resulting from the [deprivation] . . . . [O]ther courts have certified classes of inmates claiming unconstitutional deprivation of outdoor exercise, and scores of courts have certified classes of prisoners claiming other

unconstitutional prison conditions."); *Butler v. Suffolk Cnty.*, 289 F.R.D. 80, 98 (E.D.N.Y. 2013) ("Whether the County was aware of and deliberately indifferent to the conditions at the [prison] is a common question subject to class-wide resolution."); *Hughes v. Judd*, No. 12 Civ. 568, 2013 WL 1821077, at *23 (M.D. Fla. Mar. 27, 2013) *report and recommendation adopted as modified*, No. 12 Civ. 568, 2013 WL 1810806 (M.D. Fla. Apr. 30, 2013) ("Plaintiffs' claims related to these [prison] conditions are capable of class-wide resolution: Plaintiffs seek permanent injunctive and declaratory relief that would enjoin allegedly unconstitutional behavior as applied to the entire class.   Importantly, the questions of law are applicable in the same manner to each potential class member . . . .   Each class member, if proceeding separately against Defendants, would need to meet the same test under the Eighth and Fourteenth Amendments to prevail."); *Rosas v. Baca*, No. 12 Civ. 428, 2012 WL 2061694, at *3 (C.D. Cal. June 7, 2012) (Pregerson, J.) ("In a civil rights suit such as this one . . . commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members. Under such circumstances, individual factual differences among class members pose no obstacle to commonality."); *Indiana Prot. & Advocacy Servs. Comm'n v. Comm'r, Indiana Dep't of Correction*, No. 08 Civ. 1317, 2012 WL 6738517, at *18 (S.D. Ind. Dec. 31, 2012) ("The mentally ill prisoners here, have demonstrated through a wealth of evidence, that the class is united by the common question of whether the lack of treatment and isolated living conditions in IDOC facilities violate the Eighth Amendment."); *see also Armstrong*, 275 F.3d at 868.

In the related context of suits challenging a state's provision of social services to children in its protection,

courts have employed similar logic while concluding that
Rule 23(a)(2) is satisfied.  As the Tenth Circuit explained
while affirming certification of a class challenging
Oklahoma's foster care system:

> Named Plaintiffs presented more than
> conclusory statements that OKDHS's agency-
> wide monitoring policies and practices, or
> lack thereof, create a risk of harm shared by
> the entire class.  All class members, by virtue
> of being in OKDHS's foster care, are subject
> to the purportedly faulty monitoring policies
> of OKDHS, regardless of their individual
> differences; therefore, all members of the
> class are allegedly exposed to the same
> unreasonable risk of harm as a result of
> Defendants' unlawful practices.  Though each
> class member may not have actually suffered
> abuse, neglect, or the risk of such harm,
> Defendants' conduct allegedly poses a risk of
> impermissible harm to all children in OKDHS
> custody.

*DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1196 (10th
Cir. 2010); *see also, e.g.*, *M.D.*, 294 F.R.D. at 44 ("To what
extent caseworkers are overworked, whether this overwork is
significant enough to subject the members of the General
Class to an unconstitutionally unreasonable risk of harm, and
whether the State has sufficient mechanisms in place to
mitigate those risks are the issues central to the Plaintiffs'
claim.  Resolving them will determine the validity of the
common General Class Fourteenth Amendment claim in 'one
stroke.'  If, for example, it is proven at trial that caseworkers
are  not  so  overworked  that  they  fail  to  provide

constitutionally adequate care, then that will resolve all of the class members' claims at once; the State's policies regarding caseworker workloads would be found not to violate the Fourteenth Amendment."); *D.G. ex rel. Strickland v. Yarbrough*, 278 F.R.D. 635, 644 (N.D. Okla. 2011) ("[P]laintiffs have presented 'significant proof' that DHS has a policy or practice of failing to adequately monitor the safety of plaintiff children causing significant harm and risk of harm to their safety."); *Connor B., ex rel. Vigurs v. Patrick*, 278 F.R.D. 30, 34 (D. Mass. 2011) ("Plaintiffs have alleged specific and overarching systemic deficiencies . . . that place children at risk of harm. These deficiencies, rather than the discretion exercised by individual case workers, are the alleged causes of class members' injuries, because they undermine [the Department of Children and Family's] ability to timely and effectively implement case workers' decisions. These systemic shortcomings provide the 'glue' that unites Plaintiffs' claims.").[25]

---

[25] One court has used similar logic to conclude that a putative class of mentally ill individuals who are unnecessarily institutionalized in state hospitals or who are at serious risk of unnecessary institutionalization in those facilities satisfied Rule 23(a)(2)'s commonality requirement. *See Kenneth R. ex rel. Tri-Cnty. CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 267 (D.N.H. 2013), *appeal dismissed* (Mar. 14, 2014) ("The plaintiffs have also shown that common questions susceptible to common answers are present. For instance, whether there is a systemic deficiency in the availability of community-based services, and whether that deficiency follows from the State's policies and practices, are questions central to plaintiffs' theory of the case. These questions will, necessarily, be answered similarly for every class member. And, whether the systemic conditions, if shown to exist, expose all class members to a serious risk of unnecessary institutionalization, including continued unnecessary institutionalization, is a central and common contention whose resolution will defeat or advance the claims of all class members, whether institutionalized or not. In short, these common questions can be answered

To be sure, this line of precedent does not hold that utterly threadbare allegations that a group is exposed to illegal policies and practices are enough to confer commonality. As *Wal-Mart* made clear, Rule 23(a) is not a pleading standard; rather, it requires proof that there are "*in fact* . . . common questions of law or fact." 131 S. Ct. at 2551; *see also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (noting that "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question" (quotation marks and citations omitted)); *DL v. District of Columbia*, 713 F.3d 120, 126 (D.C. Cir. 2013) (concluding that commonality had not been shown where the plaintiffs in a putative IDEA class action had not identified a "single or uniform policy or practice that bridges all their claims"); *M.D. v. Perry*, 675 F.3d 832, 844 (5th Cir. 2012) (cautioning that "mere allegations of systemic violations of the law . . . will not automatically satisfy Rule 23(a)'s commonality requirement" (quotation marks and citations omitted)).

Here, however, the plaintiffs have met, and indeed far exceeded, that requirement.[26] The materials that they submitted to the district court—which included four thorough and unrebutted expert reports, the detailed allegations in the 74-page complaint, hundreds of internal ADC documents, and declarations by the named plaintiffs—constituted more

---

either 'yes' or 'no' for the entire class, and the answers will not vary by individual class members." (quotation marks and citations omitted)).

[26] We emphasize that our conclusions concerning the adequacy of the plaintiffs' evidence and arguments at this early stage in the litigation do not constitute judgments concerning the ultimate merits of the plaintiffs' allegations. *See Amgen*, 133 S. Ct. at 1194–95; *Messner*, 669 F.3d at 811.

than sufficient evidence at this stage in the litigation of the existence of the statewide ADC policies and practices that allegedly expose all members of the putative class to a substantial risk of serious harm.[27]   Those policies and practices, moreover, are defined with sufficient precision and specificity; they involve particular and readily identifiable conduct on the part of the defendants, such as failing to hire enough medical staff, failing to fill prescriptions, denying inmates access to medical specialists, adopting a *de facto* "extraction only" policy for dental issues, and depriving suicidal and mentally ill inmates access to basic mental health care.[28]   *Compare M.D.*, 675 F.3d at 844 (noting that commonality is not shown when plaintiffs allege an amorphous claim of undefined and unspecified systemic misconduct).  Accordingly, the district court did not abuse its

---

[27] As the district court observed, many of these documents, including the expert reports and the internal ADC and Wexford memos and staffing reviews, demonstrate that the challenged ADC policies and practices are uniform across facilities and statewide in their scope.

[28] The defendants argue that a few of the "practices" identified by the district court are not defined with sufficient precision.  The district court carefully considered this argument and firmly rejected it, reasoning that, unlike in cases where "there was simply insufficient evidence propelling the plaintiffs' isolated allegations of mistreatment into a plausible claim of systemic deficiencies," "the evidence here suggests that the root cause of the injuries and threats of injuries suffered by Plaintiffs is the systemic failures in the provision of health care generally."  The district court added that "Plaintiffs' expert declarations, largely unrebutted at this juncture, are sufficient to establish that ADC's practices or customs in the provision of health care rise to the level of deliberate indifference that places inmates at a substantial risk of serious harm."  We conclude that the district court did not clearly err in making these factual findings concerning practices across all ADC facilities, nor did it abuse its discretion in concluding that those factual findings are sufficient under Rule 23(a)(2) to establish the existence of the complained of ADC-wide policies and practices.

considerable discretion in finding that, for purposes of Rule 23(a)(2), the evidence submitted by the plaintiffs adequately demonstrated the existence of the challenged statewide policies and practices.[29]

In sum, we conclude that the district court did not abuse its discretion in determining that the plaintiffs' claims depend upon common questions of law or fact that are answerable in one stroke. A clear line of precedent, stretching back long before *Wal-Mart* and unquestionably continuing past it, firmly establishes that when inmates provide sufficient evidence of systemic and centralized policies or practices in a prison system that allegedly expose all inmates in that system to a substantial risk of serious future harm, Rule 23(a)(2) is satisfied. Here, the plaintiffs' Eighth Amendment claims satisfy all of those criteria. The factual and legal

---

[29] The parties dispute whether the "significant proof" standard, described in *Wal-Mart* as the standard applicable to one means of bridging a "gap" in evidence of systemic discrimination, applies to the plaintiffs' arguments here that the alleged uniform ADC policies and practices exist. Courts have taken different views of whether *Wal-Mart*'s significant proof standard applies to all class certification decisions or only to claims alleging systemic discrimination. *Compare Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 498 (7th Cir. 2012) (applying "significant proof" requirement to an alleged policy of violating the requirements of the IDEA) *with Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167, 172 (S.D.N.Y. 2011) (holding that "these additional requirements are designed for and unique to the context of employment discrimination"). We need not resolve that dispute, however, because under either a "significant proof" standard or any lesser evidentiary standard, we would conclude that "the breadth and consistency of class counsel's initial evidence places the district court's finding of commonality well within that court's discretion." *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003). That conclusion is required both by the strength of the plaintiffs' evidence and by the defendants' near-utter failure to respond to it with evidence of their own, such as expert reports or internal studies.

questions that they present can be answered "yes" or "no" in one stroke as to the entire class, dissimilarities among class members do not impede the generation of common answers to those questions, and the capacity of classwide proceedings to drive the resolution of this litigation cannot be doubted. *See Wal-Mart*, 131 S. Ct. at 2551–52. The claims, defenses, relevant facts, and substantive law are all common across the class. Accordingly, certification of the class and subclass was appropriate with respect to Rule 23(a)(2)'s requirement of commonality.

### III

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). The test of typicality is "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Thus, "[t]ypicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Id.*

As the Supreme Court recognized in *Wal-Mart*, Rule 23(a)'s commonality and typicality requirements occasionally merge: "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim

and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." 131 S. Ct. at 2551 n.5. We expressed a similar point over a decade earlier in *Armstrong v. Davis*, a case in which we also clarified how to analyze typicality in cases like this one:

> Where the challenged conduct is a policy or practice that affects all class members, the underlying issue presented with respect to typicality is similar to that presented with respect to commonality, although the emphasis may be different. In such a case, because the cause of the injury is the same—here, the [Board of Prison Term's] discriminatory policy and practice—the typicality inquiry involves comparing the injury asserted in the claims raised by the named plaintiffs with those of the rest of the class. We do not insist that the named plaintiffs' injuries be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct.

275 F.3d at 868–69.

Here, the named plaintiffs are all inmates in ADC custody. Each declares that he or she is being exposed, like all other members of the putative class, to a substantial risk of

serious harm by the challenged ADC policies and practices.[30]
*See Hanon*, 976 F.2d at 508.  The named plaintiffs thus allege
"the same or [a] similar injury" as the rest of the putative
class; they allege that this injury is a result of a course of
conduct that is not unique to any of them; and they allege that
the injury follows from the course of conduct at the center of
the class claims.[31]  *See id.*  Further, given that *every* inmate in
ADC custody is highly likely to require medical, mental
health, and dental care, each of the named plaintiffs is
similarly positioned to all other ADC inmates with respect to
a substantial risk of serious harm resulting from exposure to
the defendants' policies and practices governing health care.
*Cf. Hanlon*, 150 F.3d at 1020 (holding that "the broad
composition of the representative parties" can "vitiate[] any
challenge founded on atypicality").  It does not matter that the
named plaintiffs may have in the past suffered varying
injuries or that they may currently have different health care
needs; Rule 23(a)(3) requires only that their claims be
"typical" of the class, not that they be identically positioned
to each tother or to every class member.  *See Ellis*, 657 F.3d
at 985 n.9 ("Differing factual scenarios resulting in a claim of
the same nature as other class members does not defeat

---

[30] With respect to the subclass, several of the named plaintiffs have been
held in the isolation units whose conditions, as a matter of policy and
practice, allegedly violate the Eighth Amendment.  The analysis of
typicality for the class in this paragraph is equally applicable to typicality
for the subclass.

[31] The defendants' argument that each named plaintiffs' description of
past injuries must be treated as its own claim for Eighth Amendment
relief, potentially subject to unique defenses, rests on the same
misunderstanding of the nature of the plaintiffs' claims that infected their
objections to commonality.  The named plaintiffs allege that they are all
exposed to a substantial risk of serious harm, not that their particular
experiences in the past violated the Eighth Amendment.

typicality."). Accordingly, we conclude that the district court did not abuse its discretion in determining that the plaintiffs have satisfied the typicality requirement of Rule 23(a).

## IV

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Although we have certified many different kinds of Rule 23(b)(2) classes, the primary role of this provision has always been the certification of civil rights class actions. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997) ("Rule 23(b)(2) permits class actions for declaratory or injunctive relief where 'the party opposing the class has acted or refused to act on grounds generally applicable to the class.' Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples." (citations omitted)); *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) ("Rule 23(b)(2) was adopted in order to permit the prosecution of civil rights actions."); *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 63 (3d Cir. 1994) ("The writers of Rule 23 intended that subsection (b)(2) foster institutional reform by facilitating suits that challenge widespread rights violations of people who are individually unable to vindicate their own rights." (citations omitted)). As Wright and Miller have explained:

> [S]ubdivision (b)(2) was added to Rule 23 in 1966 in part to make it clear that civil-rights suits for injunctive or declaratory relief can be brought as class actions . . . [T]he class suit is a uniquely appropriate procedure in civil-

rights cases, which generally involve an allegation of discrimination against a group as well as the violation of rights of particular individuals. By their very nature, civil-rights class actions almost invariably involve a plaintiff class, although they may also be brought against a defendant class . . .

Wright & Miller, 7AA *Fed. Prac. & Proc. Civ.* § 1776 (3d ed.). Of course, we do not interpret Rule 23(b)(2) in a manner that would prevent certification of the kinds of civil rights class action suits that it was intended to authorize.

Thus, following Rule 23(b)(2)'s text and purpose, courts have repeatedly invoked it to certify classes of inmates seeking declaratory and injunctive relief for alleged widespread Eighth Amendment violations in prison systems:

[I]t should be noted that a common use of Rule 23(b)(2) is in prisoner actions brought to challenge various practices or rules in the prisons on the ground that they violate the constitution. For example, Rule 23(b)(2) class actions have been utilized to challenge prison policies or procedures alleged to . . . violate the prisoners' Eighth Amendment rights to be free from cruel and unusual punishment.

*Id.* at § 1776.1; *see also, e.g.*, *Butler*, 289 F.R.D. at 101 (certifying Rule 23(b)(2) class of prisoners alleging systemic Eighth Amendment violations); *Hughes*, 2013 WL 1821077, at *20 (same); *Rosas*, 2012 WL 2061694, at *5 (same); *Indiana Prot. & Advocacy Servs. Comm'n*, 2012 WL 6738517 at *18 (same).

Here, the plaintiffs seek declaratory and injunctive remedies.  In their prayer for relief, the plaintiffs request that the defendants be ordered "to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that prisoner Plaintiffs and members of the Plaintiff Class suffer due to Defendants' inadequate medical, mental health, and dental care, and due to Defendants' isolation policies."  The plaintiffs then specify 10 separate issues that the defendants should be required to address in any court-enforced plan designed to satisfy their alleged remedial obligations.  These issues include staffing, screening, chronic care, emergency response, and medication and supplies.[32] The plaintiffs' expert reports also include descriptions of the kinds of court-ordered changes in ADC policy and practice that could alleviate the alleged systemic Eighth Amendment violations, as well as affirmations by all four experts that, in their experience, court-ordered injunctive relief could effectively alleviate the deficiencies in ADC policies and practices identified in their reports.

The district court concluded that the plaintiffs' claims "for injunctive relief stemming from allegedly unconstitutional conditions of confinement are the quintessential type of claims that Rule 23(b)(2) was meant to address."   It explained that "the claims of systemic deficiencies in ADC's health care system and unconstitutional conditions of confinement in isolation units apply to all proposed class members," and firmly rejected the

---

[32] Under "Staffing," for example, the plaintiffs request that the defendants be required to ensure that "Staffing shall be sufficient to provide prisoner Plaintiffs and the Plaintiff Class with timely access to qualified and competent clinicians who can provide routine, urgent, emergent, and specialty health care."

defendants' contention that "any proposed injunction here would be crafted at a stratospheric level of abstraction." It added that "the remedy in this case would not lie in providing specific care to specific inmates," but rather "the level of care and resources would be raised for all inmates." "Thus," it concluded, "if successful, a proposed injunction addressing those [policies and] practices would . . . prescribe a standard of conduct applicable to all class members." In other words, "relief for some inmates would necessarily result in injunctive relief for all inmates."

The district court did not abuse its broad discretion in determining that the plaintiffs have satisfied Rule 23(b)(2). In *Wal-Mart*, the Supreme Court summarized Rule 23(b)(2)'s requirements as follows:

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant . . . .

131 S. Ct. at 2557 (citation omitted). These requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole.

*See Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010). That inquiry does not require an examination of the viability or bases of the class members' claims for relief, does not require that the issues common to the class satisfy a Rule 23(b)(3)-like predominance test, and does not require a finding that all members of the class have suffered identical injuries.[33]  *See id.*; *Walters v. Reno*, 145 F.3d 1032, 1047 (9th

---

[33] As Wright & Miller observe:

> The term 'generally applicable' has been said to signify that the party opposing the class does not have to act directly against each member of the class.  The key is whether the party's actions would affect all persons similarly situated so that those acts apply generally to the whole class . . . .

> [C]ourts have interpreted this requirement to mean that the party opposing the class either has acted in a consistent manner toward members of the class so that the opposing party's actions may be viewed as part of a pattern of activity, or has established or acted pursuant to a regulatory scheme common to all class members. This is consistent with the intention of the Advisory Committee, which stated in its Note to the 1966 amendment of Rule 23 that: "Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class."  All the class members need not be aggrieved by or desire to challenge defendant's conduct in order for some of them to seek relief under Rule 23(b)(2).  What is necessary is that the challenged conduct or lack of conduct be premised on a ground that is applicable to the entire class.

*Fed. Prac. & Proc. Civ.* at § 1775 (quotation marks and footnotes omitted).

Cir. 1998).  Rather, as the text of the rule makes clear, this inquiry asks only whether "the party opposing the class has acted or refused to act on grounds that apply generally to the class."  Rule 23(b)(2).

In this case, all members of the putative class and subclass are allegedly exposed to a substantial risk of serious harm by a specified set of centralized ADC policies and practices of uniform and statewide application.  While each of the certified ADC policies and practices may not affect every member of the proposed class and subclass in exactly the same way, they constitute shared grounds for all inmates in the proposed class and subclass.  *See Rodriguez*, 591 F.3d at 1125–26; *Walters*, 145 F.3d at 1047.[34]  In sum, by allegedly

---

[34] *See also, e.g.*, *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 847–48 (5th Cir. 2012) ("[T]he [Rule (b)(2)] class claims could conceivably be based on an allegation that the State engages in a pattern or practice of agency action or inaction—including a failure to correct a structural deficiency within the [child protective services] agency, such as insufficient staffing—'with respect to the class,' so long as declaratory or injunctive relief settling the legality of the [State's] behavior with respect to the class as a whole is appropriate." (citations omitted)); *D.G.*, 594 F.3d at 1201 ("Here the 'grounds' that have general application to the class are that all class members have been placed in [the Oklahoma Department of Human Services's] foster care program and, as such, caseworkers monitor all class members in a system that allegedly fails to ensure they do not carry caseloads so demanding that they cannot monitor class members adequately."); *Baby Neal*, 43 F.3d at 64 ("Plaintiffs have alleged that systemic failure causes the DHS to violate various mandates under federal statutory and constitutional provisions.  Because the children in the system are comparably subject to the injuries caused by this systemic failure, even if the extent of their individual injuries may be affected by their own individual circumstances, the challenge to the system constitutes a legal claim applicable to the class as a whole.  An order forcing the [Department of Human Services] to comply with their statutory and

establishing systemic policies and practices that place every inmate in ADC custody in peril, and by allegedly doing so with deliberate indifference to the resulting risk of serious harm to them, the defendants have acted on grounds that apply generally to the proposed class and subclass, rendering certification under Rule 23(b)(2) appropriate.

The relief requested by the plaintiffs also conforms with Rule 23(b)(2)'s requirement that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *See Wal-Mart*, 131 S. Ct. at 2557 (stating that Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant"). Contrary to the defendants' assertion that each inmate's alleged injury is amenable only to individualized remedy, every inmate in the proposed class is allegedly suffering the same (or at least a similar) injury and that injury can be alleviated for every class member by uniform changes in statewide ADC policy and practice. *See, e.g.*, *D.G.*, 594 F.3d at 1201 ("Named Plaintiffs allege the same injury on behalf of all class members as a result of excessive caseloads—exposure to an impermissible risk of harm . . . . To remedy this alleged harm, Named Plaintiffs propose an injunction requiring OKDHS assign no more than 15 foster children to each caseworker . . . . As the district court noted, such an injunction applies to the proposed class as a whole without requiring differentiation between class members."); *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) ("Defendants argue that because the plaintiffs have alleged differing harms requiring individual remedies, no injunction

---

constitutional mandates would constitute relief generally applicable to the entire putative class.").

will be appropriate for the entire class . . . .  We disagree. Insofar as the deficiencies of the child welfare system stem from central and systemic failures, the district court did not abuse its discretion in certifying a 23(b)(2) class at this stage of the litigation." (citations omitted)).  For example, every inmate in ADC custody is allegedly placed at risk of harm by ADC's policy and practice of failing to employ enough doctors—an injury that can be remedied on a class-wide basis by an injunction that requires ADC to hire more doctors, with the exact number of necessary additional hires to be determined by the district court if, after a trial, it ultimately concludes that the defendants engaged in unlawful conduct. Thus, considering the nature and contours of the relief sought by the plaintiffs, the district court did not abuse its discretion in concluding that a single injunction and declaratory judgment could provide relief to each member of the proposed class and subclass.[35]

---

[35]    Remarkably, the defendants do not cite a single Ninth Circuit case in support of their argument that the district court erred in certifying the class and subclass under Rule 23(b)(2).  Instead, they rely on a Tenth Circuit case suggesting that, at the class certification stage, plaintiffs seeking certification under Rule 23(b)(2) might be required to offer a fairly detailed description of the injunctive relief that they seek.  *See Shook v. Board of County Commissioners of County of El Paso*, 543 F.3d 597 (10th Cir. 2008) ("*Shook II*").  In that case, while noting that "we very well may have made a different decision had the issue been presented to us as an initial matter," and that the plaintiffs had "eschewed any effort to give content" to the terms of their proposed injunction, the court held that a district court had not abused its discretion in declining to certify a Rule 23(b)(2) class where the proposed injunction had been formulated at "a stratospheric level of abstraction" and required inmate-by-inmate assessments.  *Id.* at 603, 604, 606.  The court also noted a few reasons why district courts, exercising their discretion, might require more detailed descriptions of systemic reform injunctions.  *See id.* at 604–07.

## CONCLUSION

The district court acted well within its broad discretion in concluding that the putative class and subclass satisfy the

---

The defendants' reliance on that case here is ill-founded.  First, we seriously doubt that the degree of specificity suggested in *Shook II*'s wide-ranging dicta is properly required at the class certification stage for a Rule 23(b)(2) class.  That is particularly true in prison cases, given that an injunction in any such case must closely track the violations established by the evidence at trial, that any such relief must comply with the PLRA's extensive requirements, that prison officials must play a role in shaping injunctions, that ultimate proof of some violations but not others might easily change the structure of a remedial plan, that conditions in prisons might change over the course of litigation, and that the class certification hearing is not a dress rehearsal of the trial on the merits (let alone a dress rehearsal of the remedy proceedings).  The better approach in a prison conditions case is for the district court, exercising its discretion and following Rule 23, to ask whether the plaintiffs' proposed relief "is appropriate respecting the class as a whole."  That requirement ordinarily will be satisfied when plaintiffs have described the general contours of an injunction that would provide relief to the whole class, that is more specific than a bare injunction to follow the law, and that can be given greater substance and specificity at an appropriate stage in the litigation through fact-finding, negotiations, and expert testimony.  Second, since *Shook II*, several courts, including the Tenth Circuit, have observed that certification of a Rule 23(b)(2) class is warranted under circumstances highly analogous to those present here.  *See, e.g.*, *M.D.*, 675 F.3d at 847 (Fifth Circuit); *D.G.*, 594 F.3d at 1188 (Tenth Circuit).  Finally, even if we were to apply *Shook II* and all of its dicta, we would still affirm.  After all, we are reviewing for abuse of discretion a *grant* of class certification—unlike the *Shook II* court, which took pains to emphasize that it might well have certified the class before it on *de novo* review and that the level of detail that it described merely explained why the lower court opinion was not "beyond the pale."  543 F.3d at 604.  Further, here the plaintiffs have described their injunction in more specific terms than did the plaintiffs in *Shook II*, and they have fleshed out that description by introducing four expert reports that explain which policies are deficient and what sorts of policy remedies could alleviate the alleged violations.

requirements of Rule 23.  We therefore affirm the district court's certification order.

**AFFIRMED.**