**Index of Exhibits to**
**Joint Motion Directing that Redacted Deposition Transcripts of**
**Joseph Penn, M.D. Are Not Subject to the Protective Order**


Exhibit 1:    April 11, 2014 deposition transcript of Joseph V. Penn, MD, CCHP, FAPA **[REDACTED]**

Exhibit 2:    September 30, 2014 deposition transcript of Joseph V. Penn, MD, CCHP, FAPA **[REDACTED]**

# EXHIBIT 1

## In The Matter Of:

*Parsons vs.*
*Ryan*

---

*Joseph V. Penn, MD, CCHP, FAPA - videotaped*
*April 11, 2014*
*Confidential - Subject to Protective Order*

---

*7330 North 16th Street, Suite A100*
*Phoenix, Arizona  85020*
*602.266.6535 Office    877.266.6535 Toll Free*
*www.glennie-reporting.com*
*office@glennie-reporting.com*



Original File 041114JP.txt
Min-U-Script® with Word Index

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 4 of 157

Parsons vs.                          Confidential          Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                        Subject to Protective Order                              April 11, 2014

Page 3

```
                                              1        INDEX TO EXHIBITS (Cont.)
        UNITED STATES DISTRICT COURT
                                              2   Description                        Page
           DISTRICT OF ARIZONA
                                              3   Exhibit 550 Psychiatric Services in Jails and    137
Victor Parsons; Shawn Jensen;   )  No. CV12 00601                Prisons
Stephen Swartz; Dustin Brislan; )  PHX-NVW (MEA)  4             A Task Force of the American
Sonia Rodriguez; Christina Verduzco;)                          Psychiatric Association
Jackie Thomas; Jeremy Smith; Robert )         5                Second Edition
Gamez; Maryanne Chisholm; Desiree )
Licci; Joseph Hefner; Joshua Polson;)         6   Exhibit 551 Observation Record of              166
and Charlotte Wells, on behalf of )                          ▮▮▮▮▮ 3/24/14
themselves and all others similarly )         7             ADC261951
situated; and Arizona Center for )
Disability Law,                 )             8
                                )
          Plaintiffs,           )             9
                                )
             vs.                )            10   QUESTIONS WITNESS WAS INSTRUCTED NOT TO ANSWER
                                )
Charles Ryan, Director, Arizona )            11             Page  Line
Department of Corrections; and )
Richard Pratt, Interim Division )            12               20    14
Director, Division of Health )                                59    14
Services, Arizona Department of )            13               60     6
Corrections, in their official )                             127    19
capacities,                     )            14              127    29
                                )                            128     3
          Defendants.           )            15              128    17
                                                             129    14
                                             16              129    22
                                                             129    25
                                             17              130     5
        VIDEOTAPE DEPOSITION OF                              130    13

     JOSEPH V. PENN, MD, CCHP, FAPA          18

          April 11, 2014                     19
           9:32 a.m.
          Phoenix, Arizona                   20

                                             21

Glennie Reporting Services, LLC              22
7330 North 16th Street
Suite A100                                   23
Phoenix, Arizona 85020-5275
                    Prepared by:             24
602.266.6535         Carolyn T. Sullivan, RPR
www.glennie-reporting.com  Arizona CR No. 50528  25
```

Page 2

```
 1        I N D E X

 2   WITNESS                          PAGE

 3   JOSEPH V. PENN, MD, CCHP, FAPA

 4      Examination by Mr. Fathi       7

 5

 6

 7

 8

 9

10      All exhibits are designated CONFIDENTIAL
     INFORMATION - SUBJECT TO PROTECTIVE ORDER
11   with the exception of Exhibit No. 550

12          INDEX TO EXHIBITS

13   Description                     Page

14   Exhibit 544 Confidential Expert Report of    37
               Joseph V. Penn MD CCHP FAPA,
15             December 18, 2013
               ADC203372-203515
16
17   Exhibit 545 Confidential Supplemental Expert 37
               Report of Joseph V. Penn MD CCHP FAPA,
18             March 26, 2014

19   Exhibit 546 Handwritten Notes of Dr. Penn    48
               PENN000001-118
20
21   Exhibit 547 Handwritten Notes of Dr. Penn    48
               PENN000348-365
22   Exhibit 548 Material from binders with Tabs 1-32  75
               (Various Bates numbers)
23   Exhibit 549 Arizona Monthly Staffing Report  95
24             Roll-Up - May 2013
               (Excludes Regional Office)
25             ADC117064
```

Page 4

```
 1        VIDEOTAPE DEPOSITION OF

 2      JOSEPH V. PENN, MD, CCHP, FAPA

 3

 4        The videotape deposition of JOSEPH V. PENN,

 5   MD, CCHP, FAPA, was taken on April 11, 2014, commencing

 6   at 9:32 a.m., at the law office of PERKINS COIE LLP, 2901

 7   North Central Avenue, Suite 2000, Phoenix, Arizona,

 8   before CAROLYN T. SULLIVAN, a Certified Reporter,

 9   Certificate No. 50528, for the State of Arizona.

10

11   APPEARANCES:

12   For all Plaintiffs except Arizona Center for Disability
     Law:

13
        AMERICAN CIVIL LIBERTIES UNION FOUNDATION
14      National Prison Project
        David C. Fathi, Esq.
15      Director
        Amy Fettig, Esq.
16      Senior Staff Counsel
        915 15th Street, NW
17      7th Floor
        Washington, DC 20005-2112
18
19   For Plaintiff Arizona Center for Disability Law:

20      ARIZONA CENTER FOR DISABILITY LAW
        Sarah E. Kader, Esq.
21      Asim Varma, Esq.
        Staff Attorneys
22      5025 East Washington Street
        Suite 202
23      Phoenix, Arizona 85034

24

25
```

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 5

1  APPEARANCES:

2  For Defendants:

3      STRUCK WIENEKE & LOVE, P.L.C.
       Kathleen L. Wieneke, Esq.
4      3100 West Ray Road
       Suite 300
5      Chandler, Arizona 85226

6

7  Also Present:

8      Chris Eichler, CLVS
       Forensic Video Deposition Services
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1      THE VIDEOGRAPHER: We're on the record at
2  9:32 a.m.  This is the videotape deposition of Dr. Joseph
3  Penn taken by the plaintiffs in the matter of Victor
4  Parsons, et al. v. Charles Ryan, et al., Case No.
5  CV12-00601-PHX-NVW, held in the law offices of Perkins
6  Coie, 2901 North Central Avenue, Suite 2000, Phoenix,
7  Arizona 85012, on Friday, April 11, 2014.
8      The court reporter is Carolyn Sullivan from
9  the firm of Glennie Reporting Services, located in
10  Phoenix, Arizona.
11      The certified legal video specialist is
12  Chris Eichler in association with Forensic Video
13  Deposition Services, located in Phoenix, Arizona.
14      Counsel, would you please identify yourself
15  for the record at this time, starting with the noticing
16  counsel first, please.
17      MR. FATHI: David Fathi of the ACLU National
18  Prison Project for the plaintiffs.
19      MS. FETTIG: Amy Fettig from the ACLU
20  National Prison Project for the plaintiffs.
21      MS. KADER: Sarah Kader from the Arizona
22  Center for Disability Law.
23      MR. VARMA: Asim Varma from the Arizona
24  Center for Disability Law.
25      MS. WIENEKE: Kathleen Wieneke for the

Page 7

1  defendants.
2      THE VIDEOGRAPHER: Thank you, Counsel.
3      The court reporter may swear in the witness,
4  please.
5
6      JOSEPH V. PENN, MD, CCHP, FAPA,
7  called as a witness herein, having been first duly sworn
8  by the Certified Reporter to speak the whole truth and
9  nothing but the truth, was examined and testified as
10  follows:
11
12              EXAMINATION
13  BY MR. FATHI:
14    Q.   Good morning, Dr. Penn.
15    A.   Good morning.
16    Q.   We have met before, but for the record, my name
17  is David Fathi.  And with my co-counsel, I represent the
18  plaintiffs in this case.  I know you've been deposed
19  before, but just to refresh your recollection, let me go
20  over a few of the ground rules.
21      The court reporter is trying to take down
22  every word that's said here, so that has a couple of
23  implications.
24      First, we can't talk over one another.  So
25  even if you think you know what I am going to ask, please

Page 8

1  wait for me to finish my question.  And by the same
2  token, I will wait for you to finish your answer.  You
3  need to answer audibly and verbally.  So no nods of the
4  head or shakes of the head.  Don't say "uh-huh" or
5  "huh-uh" because those are easy to confuse.  Please
6  answer, as I say, audibly and verbally.
7      If you ever don't understand a question that
8  I'm asking, please ask me to clarify it.  If you do
9  answer a question, I will assume that you understood that
10  question.
11      Your counsel may from time to time make
12  objections.  In most cases, those are simply for the
13  record, and you still need to answer the question.  The
14  only exception is that if she instructs you not to
15  answer.
16      We can take a break at any time that you
17  would like.  The only exception to that is that if
18  there's a question pending, you need to answer that
19  question before we take a break.
20      Finally, even though we are here in the
21  informality of this conference room, you are testifying
22  under oath under penalty of perjury just as if you were
23  testifying in court.
24      I have read some of your depositions and
25  your trial testimony, and I know that sometimes you have

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 9

1 a lot to say. But I'm going to ask that you please
2 listen to my questions and answer only the question I'm
3 asking. And if you do that, then this process will go
4 much more quickly and much more smoothly.
5       Do you have any questions before we begin?
6   A.   No, I don't.
7   Q.   What did you do to prepare for your deposition
8 today?
9   A.   I read my report from December of 2013, and
10 then I read my supplemental report, I don't recall the
11 exact date. And then I looked over some of the
12 materials. And then I met with Ms. Wieneke yesterday.
13   Q.   And about for how long did you meet with
14 Ms. Wieneke?
15   A.   Probably like two and a half to three hours.
16   Q.   And about how much time did you spend reviewing
17 the documents that you described?
18   A.   Probably -- well, let me think. Do you mean
19 yesterday or in sum?
20   Q.   Anything that you consider preparation for this
21 deposition.
22   A.   I would say somewhere seven to eight hours.
23   Q.   Okay. And I notice that you brought some
24 documents with you today. What are those?
25   A.   Sure. The first document is a one-page. It's

Page 10

1 titled State Prison Capabilities for Medical, Mental
2 Health and Dental Treatment Services as of October 1,
3 2013.
4   Q.   Doctor, is there a Bates number in the -- the
5 lower left-hand corner?
6   A.   I'm sorry. Would -- would you like me just to
7 give the Bates number for any of the --
8   Q.   If you could do both.
9   A.   Sure. It's ADC_M, like mom, 000192. And then
10 the second document is the ADC Mental Health Technical
11 Manual Revised 1/1/14, Appendix G of the Health Services
12 Technical Manual. And the Bates is ADC21556 -- 60.
13 Sorry, ADC215560. And it goes through --
14   Q.   That's all right. Just the first page is --
15   A.   Okay. Sure. And then the last document is
16 the -- excuse me, ADC Locator Codes, and it says
17 confidential. And it's -- the Bates number is ADC121159.
18 So those --
19   Q.   May I see those, Doctor.
20   A.   Sure. So those are the three documents I have.
21   Q.   All right. We may copy these at a break, so
22 please keep them at hand if you would.
23   A.   Sure.
24   Q.   Doctor, what is your current occupation?
25   A.   Okay, sure. So I'm a physician, psychiatrist

Page 11

1 particularly, and my title is I'm the director of Mental
2 Health Services for the University of Texas Medical
3 Branch, Correctional Managed Care, in Conroe, Texas,
4 C-o-n-r-o-e, Texas.
5   Q.   And how long have you held that position?
6   A.   Approximately six years and maybe a month or
7 two. Six years.
8   Q.   Is that a full-time job?
9   A.   Yes.
10   Q.   Do you have any other paid employment?
11   A.   I don't have any other jobs full-time or --
12 that's a full-time job. I do occasional part-time
13 consulting, correctional and forensic psychiatry
14 consultations, but it's kind of on a -- I don't know how
15 to refer to it, but it's -- it's like a -- it's separate.
16 It's -- it's totally separate from that employment.
17   Q.   And about how much have you earned in the last
18 year doing that kind of consulting?
19   A.   I don't have my IRS return with me. I would
20 have to estimate it. I don't know the exact number. And
21 I'm actually working on my income tax return as we speak.
22 So I would say -- if I were just to give a rough
23 estimate, somewhere approximately 40 to $50,000.
24   Q.   Okay. And obviously you also sometimes work as
25 an expert consultant in litigation, correct?

Page 12

1       MS. WIENEKE: Form.
2       THE WITNESS: Could you -- sorry, could you
3 repeat the question.
4   Q.   BY MR. FATHI: You sometimes work as an expert
5 consultant in litigation as you are doing in this case,
6 correct?
7   A.   I wouldn't say that. I -- what -- what I'm --
8 what I'm asked to do is to review records as a forensic
9 psychiatrist or as a correctional psychiatrist and to
10 give my opinion. And so my role is as a forensic or
11 correctional psychiatrist, but not specifically as
12 litigation.
13   Q.   Well, you are consulting in the context of
14 litigation in this case, correct, in Parsons v. Ryan?
15   A.   My understanding, it's a civil case that's in
16 federal court. But when they contacted me originally,
17 I -- I feel like I'm a referee. I tell them what I see
18 or what I -- the strengths or weaknesses, and then they
19 either choose to keep me or they choose to say, we'll
20 find somebody else.
21   Q.   Okay. So approximately how much have you
22 earned from that kind of work in the last year?
23       MS. WIENEKE: Form.
24       THE WITNESS: Well, that's what I said
25 earlier. If -- if you took everything in -- sorry.

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 13

1  Could you -- are you saying this case in particular or --
2  Q.   BY MR. FATHI:  No.  I'm asking -- let me ask it
3  a different way.  How much have you earned working for
4  lawyers in the last year?
5  A.   I don't know if I can answer that question
6  because some of what I do is I'm the court-appointed
7  expert, too.  So working for lawyers or for the courts,
8  that would be a better way -- the totality of what I do
9  as a consultant would be both working for lawyers and for
10 the courts.  And that would be that number that I gave
11 earlier, the 40 to $50,000.
12 Q.   In which case are you the court expert?
13 A.   Well, I just did a case in Rhode Island two
14 weeks ago.  It was -- and I'm blanking on the name of the
15 case right now.  It was State v. -- it had to do with the
16 competency to stand trial.  And I was the court-appointed
17 expert to do that because there were different opinions
18 from the prosecution and the defense experts.
19 Q.   Okay.  That's fine.  How much have you billed
20 on this case so far?
21 A.   And I'm sorry, I -- I didn't finish the answer
22 to that question.  So you asked me the court-appointed
23 expert.  So that was that one in Rhode Island, and it was
24 Michael Komrowski.  It's K-o-m-r-o-w-s-k-i.  State of
25 Rhode Island v. Michael Komrowski.  And then also I was

Page 14

1  recently, as of December, the court-appointed expert as
2  part of the state of California consulting to the Special
3  Master Matthew Lopes, L-o-p-e-s, and the -- the -- I
4  think it's a judge in that.  So I was asked to serve as a
5  consultant to the court in -- in the California
6  litigation that's going on.
7  Q.   Okay.  Approximately how much have you billed
8  on this case so far?
9  A.   This case?
10 Q.   Yes.
11 A.   I would have to review the -- the document.  I
12 think I submitted an invoice, and I saw a copy of one
13 yesterday.  I would have to look at that to refresh my
14 memory.
15 Q.   You're not able to give me an answer?
16     MS. WIENEKE:  Object to form.
17     THE WITNESS:  Yeah, I'd have to look at the
18 number.
19 Q.   BY MR. FATHI:  Do you currently hold any
20 medical licenses?
21 A.   Yes.
22 Q.   In what states?
23 A.   My only current medical license is -- is in
24 Texas.
25 Q.   Have you ever been licensed in Arizona?

Page 15

1  A.   No.
2  Q.   Have you ever had a medical license revoked,
3  suspended, or limited in any way?
4  A.   No.
5  Q.   Your job with the UT Medical Branch, is that
6  your first full-time job in adult corrections?
7  A.   In adult corrections, yes.
8  Q.   Okay.  Are you currently board certified?
9  A.   Yes.
10 Q.   And in what specialties?
11 A.   Okay.  So I'm board certified in both general
12 psychiatry, general adult psychiatry, and my second board
13 certification is in forensic psychiatry, both by the
14 American Board of Psychiatry and Neurology.
15 Q.   And both of those are current?
16 A.   Yes.
17 Q.   Do you have a law degree?
18 A.   No.
19 Q.   Have you ever attended law school?
20 A.   I never attended law school, but as part of my
21 forensic psychiatry fellowship training, which was one
22 year at Yale University, we went to the disabilities
23 clinic and attended some law school classes at the Yale
24 Law School.  But I was not formally enrolled in the law
25 school nor did I -- so -- so I -- I attended classes, but

Page 16

1  I wasn't -- it wasn't part of a degree or anything like
2  that.
3  Q.   Other than what you've just mentioned, do you
4  have any legal training?
5  A.   No.
6  Q.   Do you consider yourself qualified to opine on
7  whether ADC's mental health services violate the Eighth
8  Amendment to the Constitution?
9  A.   That's -- I can't answer that question in a yes
10 or no.  I think my -- my answer to that question would be
11 as a forensic psychiatrist, I think that would be very
12 presumptuous of me to answer the ultimate issue.  That's
13 for a judge or for a jury.  I can give an opinion to a
14 reasonable degree of medical or psychiatric certainty
15 about psychiatric diagnoses or treatment or standards of
16 care within a correctional or -- or free world facility,
17 but I -- I think I can't answer that question because
18 that's a judge or jury type of question.
19 Q.   Are you a custody professional?
20     MS. WIENEKE:  Form.
21     THE WITNESS:  I -- I'm not sure I know what
22 you mean when you say "custody professional."
23 Q.   BY MR. FATHI:  Have you ever been employed on
24 the custody side of any prison or jail or juvenile
25 facility?

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 17

1    A.   No. I've never worked as a custody -- like a
2  warden or sheriff or correctional officer, no.
3    Q.   Do you consider yourself qualified to opine on
4  when a use of force is appropriate from a security or a
5  custody perspective?
6         MS. WIENEKE: Form.
7         THE WITNESS: I would say I can -- I feel
8  I'm qualified to give an opinion from -- again, from a
9  medical and psychiatric standard of care and risk of
10  harm, medical, or, you know, health or sequelae. But
11  with regard to purely security and operations, no, I
12  don't believe I can give an opinion to that.
13    Q.   BY MR. FATHI: Are you an expert on statistics?
14        MS. WIENEKE: Form.
15        THE WITNESS: I'm not sure I know what you
16  mean when you say "statistics."
17    Q.   BY MR. FATHI: Are you an expert on sampling
18  methodology?
19        MS. WIENEKE: Form.
20        THE WITNESS: Again, I'm not sure what you
21  mean when you -- I mean, I -- I wouldn't consider myself
22  an expert, but I did have training as part -- part of my
23  undergraduate degree, part of my medical school training
24  as part of my residency training, I've gotten repeated
25  training and exposure to statistics, biostatistics, and

Page 18

1  research methodology and how to look at things with a --
2  with a -- with a skeptical or research basis to look at
3  when something was collected, was it collected in an
4  appropriate way or under appropriate conditions. And so
5  I -- I wouldn't say I consider myself to be an expert
6  in -- in statistics, but I have had background and
7  training in -- in statistics.
8    Q.   BY MR. FATHI: Have you had any background or
9  training in statistics other than what you just
10  described?
11    A.   Other than undergraduate coursework, medical
12  school courses or training and residency and fellowship
13  training, no.
14    Q.   Okay. Has a court ever qualified you as an
15  expert either in statistics or sampling methodology?
16        MS. WIENEKE: Form.
17        THE WITNESS: No.
18    Q.   BY MR. FATHI: Okay. How many times have you
19  acted as an expert witness in a lawsuit challenging the
20  adequacy of mental health care in a prison or jail or
21  other custodial setting?
22        MS. WIENEKE: Form.
23        THE WITNESS: Sorry, could you repeat that,
24  please. Sorry.
25    Q.   BY MR. FATHI: How many times have you acted as

Page 19

1  an expert witness or a consultant in a lawsuit
2  challenging the adequacy of mental health care in a
3  prison or jail or other custodial setting?
4         MS. WIENEKE: Form.
5         THE WITNESS: This would be the second case.
6    Q.   BY MR. FATHI: Only the second?
7    A.   Yes.
8    Q.   Let -- let me clarify my -- my question. I'm
9  not asking just about systemic challenges. I'm also
10  including individual cases in which the quality of mental
11  health care is at issue. So with that clarification, is
12  your answer still two?
13    A.   I guess I'm still not clear what -- what you're
14  asking. I'm not sure if you're asking about medical
15  malpractice, about suicides, about standard of care.
16  What I heard you to say or to ask was about conditions.
17  And my response to that would be, I've only been involved
18  in two cases that had to do with conditions of
19  confinement and their effect on medical or mental health
20  care.
21    Q.   No. My question was any case in which the
22  adequacy of mental health care was an issue, including an
23  individual suicide case, an individual case about a bad
24  outcome. So how many cases of that nature have you been
25  involved in?

Page 20

1    A.   Well, if you could kind of -- it would be
2  helpful to me if you just went, you know, through each of
3  those, I could -- I could give you a better answer rather
4  than just lumping it all in one number. But if you ask
5  me specifically how many suicide cases have you been
6  involved that were correctional related, I could answer
7  that, or how many medical malpractice cases that were
8  correction related, I could answer that.
9    Q.   Okay. I'm asking for a total number.
10    A.   I wouldn't be able to answer that without kind
11  of going through them and kind of breaking that down.
12    Q.   More than ten?
13    A.   I would say less than ten.
14    Q.   In any of those cases, have you ever been a
15  witness or a consultant for the plaintiffs?
16        MS. WIENEKE: Object to the form. He's not
17  required to disclose those times when he's acted as a
18  consultant which was not disclosed under 26(b)(3).
19        So you don't have to disclose those times
20  when you were a consultant who was not disclosed because
21  that's protected by the work product privilege.
22        MR. FATHI: Are you instructing him not to
23  answer?
24        MS. WIENEKE: I'm instructing him under
25  26(b)(3) because those attorneys who retained him as a

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 21

1  26(b)(3) have that protection.  And so yes, I'm
2  instructing him not to disclose that information.  You're
3  only entitled to discover those times in which he's been
4  disclosed.
5     Q.   BY MR. FATHI:  Doctor, how many -- in how many
6  cases have you been either deposed or testified in court
7  total?
8     A.   I wouldn't be able to answer that.  I --
9  I have -- I think we -- it was turned in as part of my
10  report, a list of my testimony.  I wouldn't be able to
11  give -- I want to be able to answer your question, but I
12  couldn't just give you a rough number.  I'd have to refer
13  to that document that has a list -- it's a list -- as I
14  understand it, and again, I'm not a lawyer, but I think
15  there's some rule about federal law that you have to
16  maintain your current -- for the last -- I forget, the
17  last three years or five years, something like that.  So
18  I have -- I have a document that lists all the cases that
19  I've either been deposed or testified in state or federal
20  courts.  And I -- I would be happy to refer to that.
21     Q.   And in any of those cases, have you ever
22  testified on behalf of the plaintiff?
23     A.   Yes.
24     Q.   What -- what case was that?
25     A.   There was a case in Rhode Island, and it was

Page 22

1  a -- the name of the case was Anthony...
2     Q.   Why don't you just describe the nature of the
3  case.
4     A.   The name will come to me.  Anthony v. --
5  Anthony blank, I forget the last name, versus the
6  Archdiocese of Providence in Rhode Island.  It was
7  basically a clergy sexual abuse case where a young man
8  was sexually abused -- or claimed that he'd been sexually
9  abused by a -- a Roman Catholic priest, and he was
10  seeking -- he was filing litigation for psychologic harm
11  and PTSD, post-traumatic stress disorder, in that case.
12     Q.   And you testified on behalf of the plaintiff in
13  that case?
14     A.   Yes.
15     Q.   In any prison or jail or juvenile facility
16  case, have you testified on behalf of the plaintiffs?
17     A.   To date, I have not testified on behalf of any
18  plaintiffs in correctional cases to date.
19     Q.   Okay.  How many times have you evaluated mental
20  health care in a state prison system in the context of
21  litigation?
22     A.   I'm not sure if I can answer that question
23  because I've -- I've -- as part of my -- part of my role,
24  I -- and it's not a paid role, but as part of my work for
25  the National Commission on Correctional Health Care, I'm

Page 23

1  a surveyor, and so I've surveyed jails and prisons,
2  juvenile facility and other facilities.  And when I
3  survey a facility, I am not necessarily aware if they're
4  currently involved in litigation or not.  So I can't
5  answer your question.
6     Q.   How many times have you been retained by a
7  party to litigation to evaluate mental health care in a
8  state prison system?
9     A.   If I'm not mistaken, I believe this is the
10  first case.
11     Q.   Okay.
12     A.   But, sorry, could you repeat the question
13  again.  I just want to make sure I heard it right.
14          MR. FATHI:  Can you read the question back,
15  please.
16          (The requested portion of the record was
17  read by the reporter.)
18          THE WITNESS:  So it would actually be two.
19  This case and then the case in California where I was
20  asked to -- well, I was -- I was approached, and then I
21  was -- my name was put forward by Matthew Lopes, and it
22  was approved, as I understand it.  And so those are the
23  two cases, state of Arizona and state of California.
24     Q.   BY MR. FATHI:  And the Arizona case -- or
25  excuse me, the California case, is that the Coleman

Page 24

1  litigation?
2     A.   I -- I believe that's the name of the -- the
3  litigation, yes.
4     Q.   Okay.  And you said you were approached by the
5  special master in that case, correct?
6     A.   Yes.  He contacted me.
7     Q.   All right.  Has any court ever refused to
8  qualify you as an expert?
9     A.   I'm not sure I know -- I can answer the
10  question.  When you say "an expert," what -- could you
11  clarify what you mean by expert?  Expert in what?
12     Q.   In anything.  Has there ever been a case in
13  which a court declined to allow you to give expert
14  testimony?
15     A.   No.
16     Q.   When did you begin to work on this case,
17  Parsons v. Ryan?
18     A.   I -- if I'm not mistaken, I think I was first
19  contacted in the spring of 2013.  Excuse me.  And so it
20  would have been about that time, spring of 2013.
21     Q.   Okay.  And who contacted you?
22     A.   I don't know how to spell his last name, but I
23  believe it was Tim or Timothy Bojanowski.  I think it's
24  B-o-j-a-n-s-k-i or something like that.  But he's with
25  the law firm of Struck, Love & Wieneke.

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 25

1  Q.   And what were you asked to do?
2  A.   What I was asked to do was basically to review
3  records and to render an opinion of my professional
4  opinion regarding the mental health care and mental
5  health services within the Arizona Department of
6  Corrections.
7  Q.   And did you undertake to do that?
8  A.   Yes, I did.
9  Q.   And when you did that, what time period were
10  you looking at?
11  A.   I -- I'm not sure if I can answer that
12  question.  I don't -- I don't know specifically the time
13  period that -- that was allowed to be looked at, but I
14  did request the ability to be able to look at all
15  available records.  And as I was reading records, I would
16  say, is it possible to look at this.  And I believe that
17  there was some time frame, and I don't recall the exact
18  time frames of when, of which the -- the -- the records
19  could have been the start and end, if you will, of the --
20  the time frame.  I -- I don't recall that.
21  Q.   What I'm trying to get at here is -- is to what
22  time period do your opinions in this case pertain?  For
23  example, are you able to express any opinion about the
24  adequacy of ADC mental health care as of the time this
25  case was filed in March of 2012?

Page 26

1  A.   I can't answer that.  I'd have to look at my
2  records and see what the dates were of the first set of
3  documents that I reviewed.  If I'm not mistaken, I looked
4  at some records that went back to 2012.  I believe some
5  of the psychological autopsies were from 2012.  So I
6  would hypothesize that I could probably give an opinion
7  about the health care, mental health care in particular,
8  from at least 2012 through 2013.
9  Q.   Is it your opinion that ADC mental health care
10  met community standards as of March 2012?
11  A.   It would be my professional opinion that yes,
12  the ADC did meet the standards of -- of -- of community
13  back to 2012.
14  Q.   March 2012?
15  A.   Yes.
16  Q.   And is it your opinion that ADC mental health
17  care met community standards at the time that the private
18  provider switched from Wexford to Corizon in March of
19  2013?
20  A.   Yes, I would say that they still met the
21  standard of community care.
22  Q.   Is it your opinion that ADC mental health care
23  has continuously met the community standard of care from
24  March of 2012 to the present time?
25  A.   It would be my opinion that not only have they

Page 27

1  met the standard of care, in -- in many instances they
2  have actually exceeded the standard of care.
3  Q.   And that -- your testimony is that that has
4  been the case continuously from March of 2012 to the
5  present time?
6  A.   What -- what I would say is -- I can't answer
7  that question.  Any correctional system, be it a jail or
8  prison or juvenile facility, there's transition and
9  change and multiple variables and factors, staffing,
10  correctional staff.  There's so many variables, and it's
11  like a small city in the infrastructure.  So I would say
12  that things change, but the end result is over that
13  period of time, it's my professional opinion that they
14  did meet the standard of care from 2012 through 2013,
15  community standard of care.
16  Q.   From March 2012 to the present day?
17  A.   Yes.
18  Q.   Okay.
19  A.   And -- and -- sorry, and -- and at certain
20  times exceeded it.  In certain situations or examples,
21  not only met the standard of care but actually exceeded
22  that.
23  Q.   Now, the Court has ruled in this case that the
24  cutoff date for evidence is September 27th, 2013.  So I'm
25  going to be asking you about conditions in the Arizona

Page 28

1  prison system as they existed on or before September
2  27th, 2013.
3       I understand that you may have acquired your
4  knowledge after that date, but I'm not asking you about
5  any changes in conditions or practices or developments
6  that occurred after September 27th, 2013.  Do you
7  understand?
8  A.   Yes.
9  Q.   Thank you.
10       MS. WIENEKE:  For the record, that is an
11  issue that is pending with the Court for consideration as
12  to whether up until April 1st, the Court will allow
13  evidence acquired up until that date.  So to the extent
14  that you don't inquire of this witness who's prepared to
15  answer those questions as of April 1st, 2014, you do so
16  at your peril.
17       MR. FATHI:  We are complying with the
18  existing order of the Court in this case, which sets the
19  cutoff date for evidence in Sepember -- as September
20  27th, 2013.  If the Court at some point alters that date,
21  we will cross that bridge when we come to it.
22       MS. WIENEKE:  Understood.  I just wanted to
23  make the record clear that that is an issue that is
24  currently pending.  Thank you.
25  Q.   BY MR. FATHI:  Doctor, are you able to express

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 29

1  opinions about the state of ADC mental health care as of
2  September 27th, 2013?
3    A.   Yes.
4    Q.   At any point during your evaluation of ADC's
5  mental health care, did you speak with any prisoners?
6    A.   I'm not sure how I can answer the question did
7  I speak.  Could you clarify when you say "speak."
8    Q.   Did words come out of your mouth directed to an
9  ADC prisoner?
10   A.   Yes.
11   Q.   Tell me about that.
12   A.   Okay.  Well, just to clarify, first of all, I
13  believe all prisoners, be they -- be they jail, ICE
14  facility, juvenile, whatever, they're human beings, and I
15  firmly believe that they're afforded due dignity and
16  respect.  And so when I'm walking down a run, regardless
17  if I'm in Texas or California or wherever I am, if I make
18  eye contact with an offender or state prisoner or jail
19  person, I typically am cordial, say good morning or hello
20  or I nod.  So to literally answer your question, I did
21  speak to them and said hello and greeted them, hello,
22  good morning.  Or occasionally if -- if I see somebody
23  doing manual labor or a -- a job or duty and they're --
24  you know, the facility is clean or they're doing
25  something -- and I can explain more about Arizona in

Page 30

1  particular.
2         But like I'll give you an example.  When we
3  toured one of the facilities in Phoenix, several of
4  the -- sorry, several of the offenders had been painting
5  murals and -- as part of their recreational therapy or
6  art therapy, and I commented, wow, that looks really
7  great, good job.  And so I intend to be complimentary of
8  people when they are doing manual labor or doing a task.
9  And I think they should feel good and get positive
10  reinforcement for what they're doing, even if it's
11  something as simple as sweeping or mopping or cleaning.
12  So to literally answer your question, do I speak to them,
13  yes, the answer is yes.
14   Q.   Did you speak with any prisoners about the
15  mental health care they were receiving in prison?
16   A.   No.  And -- and the reason I couldn't, I
17  specifically asked to be able to do that, but I was told
18  was that -- and I'm not a lawyer, as I understand it,
19  because there's the named plaintiffs in the case, anyone
20  else who is ADC prisoner could hypothetically be part of
21  the class.
22         So it was my understanding that because it's
23  not -- we're not able to know who -- who would be in the
24  class and who wouldn't be in the class that I was
25  specifically instructed by counsel that I wasn't allowed

Page 31

1  to interview or conduct interviews of anyone of
2  prisoners.
3    Q.   Were you told that there were no circumstances
4  under which you would -- could possibly interview
5  prisoners?
6    A.   I was told that I was not allowed to interview
7  or ask questions of them or -- or conduct any kind of
8  psychiatric evaluations or interviews.
9    Q.   Is it possible to conclude that a patient's
10  mental illness is adequately being treated without
11  speaking to that patient?
12   A.   Sorry.  Could you repeat that, please.
13   Q.   Is it possible to conclude that a patient's
14  mental illness is being adequately treated without
15  speaking to that patient?
16   A.   I believe so, yes.
17   Q.   In all cases?
18   A.   Well, in medicine, nothing is absolute.
19  There's no -- there's never a always or never.  So no,
20  I -- I don't think that it's always the case.
21   Q.   Okay.  Would it have been helpful to your
22  evaluation of ADC's mental health care system to
23  interview prisoners?
24   A.   It would have been helpful to be able to review
25  videotaped recordings or audio recordings that

Page 32

1  Dr. Stewart conducted of -- of the prisoners that he
2  interviewed --
3    Q.   Doctor, please listen to my question and answer
4  my question.  Would it have been helpful to your
5  evaluation of ADC's mental health care system to
6  interview prisoners?
7         MS. WIENEKE: Object to the form.  Did
8  plaintiffs allow those interviews?  The plaintiffs did
9  not allow those interviews, so this line of questioning
10  is irrelevant.
11         MR. FATHI: Would you please not coach the
12  witness.
13         MS. WIENEKE: I'm not coaching the witness.
14         MR. FATHI: Yes, you are.
15         MS. WIENEKE: I'm stating for the record
16  that the plaintiffs did not allow --
17         MR. FATHI: Plaintiffs --
18  plaintiffs were willing --
19         MS. WIENEKE: You're interrupting me.
20         MR. FATHI: -- plaintiffs were willing to
21  allow interviews with the presence of counsel.
22  Defendants declined that.
23   Q.   BY MR. FATHI:  Doctor, would you answer the
24  question.  I apologize for the interruption.
25   A.   Sorry, can you repeat the question, please.

Parsons vs.                                    Confidential       Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                    Subject to Protective Order                              April 11, 2014

Page 33

1    Q.   Would it have been useful to your evaluation of
2    ADC's mental health care system to interview prisoners?
3    A.   I think I -- I'm not sure if I can answer
4    that as a yes or no.  I -- I reviewed such a tremendous
5    amount of records.  This is hands down the case that I've
6    reviewed the most amount of records ever in -- in any
7    kind of forensic or correctional psychiatry role.  Not
8    only did I review a lot of records, I had the opportunity
9    to watch the videotape depositions of several of the --
10   I'm sorry, of all the named plaintiffs and -- and review
11   the notes of Dr. Stewart, Pablo Stewart, being as
12   thorough and complete and trying to strive to do the best
13   I can, yes.
14        I mean, if time were no limit and -- and if
15   there were no legal maneuvering or objections, I would
16   have been happy to have evaluated all of the named
17   plaintiffs or any other prisoners within the system.
18   But based on what I did, I feel that I have enough data
19   and information to give a reasonable -- to give an
20   opinion to a reasonable degree of medical or psychiatric
21   certainty.
22   Q.   Okay, Doctor.  I -- I'm going to ask you,
23   again, to listen to my question and answer the question
24   I'm asking.
25   A.   Okay.

Page 34

1    Q.   I wasn't asking about the adequacy of the data.
2    I wasn't asking about how many charts you reviewed.  My
3    question is, would it have been useful to your evaluation
4    of ADC's mental health care system to interview
5    prisoners?
6         MS. WIENEKE:  Objection; asked and answered.
7         THE WITNESS:  Sure, it would have been
8    useful, yes.
9    Q.   BY MR. FATHI:  Now, in the opinions that you
10   express in -- in your reports and that you will express
11   today, what is the standard of -- of care that you're
12   applying?
13   A.   Well, there's really two standards of care.  I
14   mean, we can talk about this a long time, the standard of
15   care within correctional settings and also the standard
16   of care within the community.  So correctional standard
17   of care and a community standard of care, and I'm
18   prepared to comment or answer to both.
19   Q.   Well, first, describe how those two standards
20   different -- differ.
21   A.   Could you clarify when you say "differ," in
22   what way or what -- what are you -- I'm not sure I
23   understand the question.
24   Q.   Let me ask a different question.  When you
25   offer opinions that various aspects of mental health care

Page 35

1    in the Arizona prison system are adequate, are you
2    applying the community standard of care?
3    A.   I'm applying both the community and a
4    correctional standard of care.
5    Q.   Are you applying a different standard that
6    would apply in, for example, a secure state hospital?
7         MS. WIENEKE:  Object to the form.
8         THE WITNESS:  When -- when I'm referring to
9    community standard of care, I'm talking about anything
10   outside of corrections.  So private, you know, people
11   with insurance, uninsured, Medicaid, Medicare, VA
12   Hospitals, community mental health centers, community
13   health centers, state hospitals, anything that's outside
14   of corrections, that's what I would call to be community
15   standard of care.
16   Q.   BY MR. FATHI:  And what is the difference
17   between the correctional standard of care and the
18   community standard of care?
19   A.   Well, there's -- this is probably -- I'm not
20   sure if I can answer that question because that -- that's
21   something that I think a lot of people disagree about.
22   And in other words, correct -- correctional health care
23   should at least meet community standard of care ideally,
24   but many times it's my opinion that because of the
25   efforts and initiatives that are taken in place as a

Page 36

1    result of that, many times correctional health care
2    actually exceeds the community standard of care.  So it's
3    hard to answer that because we're talking about two
4    separate entities, each with their own unique challenges
5    and limitations.  And so it's -- it's hard to compare
6    apples and oranges and give you -- I'd -- I'd like to be
7    able to answer your question, but it -- it's a -- it's a
8    hypothetical, abstract concept to explain this within
9    a -- within a legal setting.
10   Q.   Well, but you're expressing opinions here.
11   You're expressing the opinion that mental health care in
12   the Arizona Department of Corrections meets the standard
13   of care, correct?
14   A.   I think I said it met both the community
15   standard and also the correctional standard, yes.
16   Q.   So I'm entitled to know what standard you're
17   applying.  And so your testimony is that health care in
18   the -- mental health care in the Arizona Department of
19   Corrections meets both the community standard of care and
20   the correctional standard of care, correct?
21   A.   That's my opinion, yes.
22        MR. FATHI:  Let's mark this next in order.
23        (Exhibit 544 was marked.)
24        MS. WIENEKE:  Thank you.
25        THE WITNESS:  Thank you.

Page 37

1      MS. WIENEKE:  What's the number?

2      THE WITNESS: 544.  Is that right?

3      THE REPORTER: Yes.

4      MR. FATHI: And then this one.

5      (Exhibit 545 was marked.)

6      MS. WIENEKE: Thank you.

7      THE WITNESS: Thanks.

8  Q.  BY MR. FATHI: Doctor, showing you Exhibit 544,

9  Confident -- Confidential Expert Report of Joseph V.

10  Penn, MD, dated December 18th, 2013, pages ADC203372 to

11  203515.  And Exhibit 545, Confidential Supplemental

12  Expert Report of Joseph V. Penn, MD, dated March 26th,

13  2014, pages ADC261843 to 261883.

14      Doctor, would you identify these documents,

15  please.

16  A.  Sure.  It's double-sided.  That's why I'm just

17  kind of going through it.

18  Q.  Are you checking every page, Doctor?

19  A.  Yes.

20      MR. FATHI: Let's go off the record.

21      THE VIDEOGRAPHER: Off the record at 10:18.

22      (A recess was taken from 10:18 a.m. to

23  10:19 a.m.)

24      THE VIDEOGRAPHER: Back on the record at

25  10:19 a.m.

Page 38

1  Q.  BY MR. FATHI: Doctor, would you please

2  identify Exhibits 544 and 545.

3  A.  Sure.  It's copies of my -- my report dated

4  December 18, 2013, and then -- that's Exhibit 544.  And

5  then Exhibit 545 is a copy of my supplemental report

6  dated March 26, 2014.

7  Q.  Do these reports contain all the opinions that

8  you intend to express in this case?

9  A.  I don't know if I can answer that.  I mean,

10  I -- I've had it happen where I've written a report, not

11  in this case, but then at trial, the judge may ask

12  additional questions or -- so I -- I'm prepared to answer

13  questions that are asked of me.  Hopefully I covered

14  everything in the report.  But if -- if additional

15  questions were raised, I'd -- I would be happy to try to

16  answer those questions.

17  Q.  Well, Doctor, one of the purposes of today's

18  deposition is for me to know what you are going to

19  testify to at trial --

20  A.  Uh-huh.

21  Q.  -- so if you're planning to express opinions at

22  trial that are not contained in those reports, then you

23  need to tell me about them now.

24      MS. WIENEKE: Object to the form.

25      THE WITNESS: I -- I don't plan or have a

Page 39

1  strategy to -- to give other opinions.  But if -- if at

2  trial I were asked a question by the judge or by one of

3  you or whoever, again, I would be happy to try to answer

4  that.

5  Q.  BY MR. FATHI:  Putting aside questioning from

6  the judge, are you planning to testify to any opinions at

7  trial that are not in either of your two reports?

8  A.  As we're -- as we sit here today, I don't have

9  anything else up my sleeve, so to speak.  I -- there's

10  nothing else -- whatever's here, that -- that's -- it

11  appears that's what I'll -- I'll be testifying on.

12  Q.  Okay.  Would you turn to page 4 of your

13  original report, please.

14  A.  Sure.

15  Q.  Now, according to page 4 of your report, you

16  visited ASPC-Phoenix on November 4th, 2013, correct?

17  A.  Yes, that's correct.

18  Q.  And how much time did you spend on site at

19  ASPC-Phoenix?

20  A.  I can't tell you the exact amount of time, but

21  it was -- I believe it was a half day.  I think we got

22  there at like 8 in the morning and finished up like noon

23  or 1.

24  Q.  And what did you do at ASPC-Phoenix?

25  A.  Well, I've kind of listed it in the report, but

Page 40

1  I'd be happy to summarize.  I met with the staff, the

2  correctional staff, and the health care leadership.  And

3  they briefed me on the facility, the different units, the

4  different functions or purposes or goals of those units.

5  And -- and told me about kind of the unique mission of

6  the different units.  And I had an opportunity to ask

7  questions.  And then conducted a tour, a walking tour of

8  the facility, going to all the units and the clinic

9  areas.  And then at the end of the day, had an additional

10  opportunity to -- to meet with all the leadership staff

11  again and, again, ask questions of things that I

12  identified or observed throughout the day.

13  Q.  Okay.  Did you review any prisoner health

14  records on site that day?

15  A.  I don't believe I did.  I think most of what I

16  did that day was mainly tour the facility and -- and

17  observe the housing and the unit activities.  So no, I

18  didn't -- I don't recall looking through health care

19  records on that day.

20  Q.  Okay.  And according to page 4 of your report,

21  you also visited ASPC-Perryville on the same day,

22  November 4th, 2013; is that correct?

23  A.  Yes, that's correct.

24  Q.  And how much time did you spend at Perryville?

25  A.  Probably about the same amount of time, half a

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 41

1  day. I think we started about 1 and went till about 5.
2  Q.   And did you visit the Lumley Special Management
3  Area?
4  A.   Yes, I did.
5  Q.   And about how much time did you spend at the
6  Lumley Special Management Area?
7  A.   I don't know. I don't recall exactly, but I
8  would -- my best estimate would be at least half an hour.
9  Q.   Did you review any prisoner health records on
10 site at Perryville that day?
11 A.   No, I did not.
12 Q.   Okay. Would you turn to page 5, please.
13 A.   Sure.
14 Q.   Now, according to page 5 of your report, you
15 visited ASPC-Eyman on November 5th, 2013, correct?
16 A.   Yes, that's correct.
17 Q.   And how long did you spend at ASPC-Eyman?
18 A.   The same, probably half a day. Started first
19 thing in the morning, like at 8, and went till about noon
20 or 12:30 or 1.
21 Q.   Did you visit the Special Management Unit?
22 A.   Yes.
23 Q.   And about how much time did you spend there?
24 A.   I don't know the exact amount of time, but I --
25 my estimate would be at least half an hour.

Page 42

1  Q.   Did you visit Browning Unit?
2  A.   Yes.
3  Q.   And about how much time did you spend there?
4  A.   Again, I don't know the exact number. I didn't
5  write that down. I -- I didn't like log down -- you
6  know, walking into a prison, I'm always wary of my
7  physical safety within. So I'm trying to take it all in
8  all at once while being cognizant of the fact that it's a
9  dangerous place to be. And so I'm trying to write notes
10 to myself while also being attune to physical
11 surroundings and -- and things that could happen. So I
12 didn't keep specific detailed log-in/log-out of units,
13 but I would say it was probably 30 minutes.
14 Q.   Did you visit the death row area of Browning
15 Unit?
16 A.   Yes.
17 Q.   Did you review any prisoner health records on
18 site at Eyman that day?
19 A.   No, I did not.
20 Q.   According to page 5 of your report, you visited
21 ASPC-Florence on that same day, November 5th, 2013; is
22 that correct?
23 A.   Yes.
24 Q.   And about how long did you spend at
25 ASPC-Florence?

Page 43

1  A.   Approximately half a day.
2  Q.   Okay. Did you visit CB 1?
3  A.   CB 1, is that cell block 1?
4  Q.   Yes.
5  A.   Yes.
6  Q.   CB 2?
7  A.   Cell block 2, yes.
8  Q.   CB 3?
9  A.   I believe that I toured all of the housing
10 areas, so yes, I believe so.
11 Q.   Okay. I'm just going to go through them one by
12 one.
13 A.   Okay.
14 Q.   CB 4?
15 A.   I'm sorry, we're talking about Florence?
16 Q.   Florence.
17 A.   Okay.
18 Q.   And could you identify for the record the
19 document you're looking at, Doctor.
20 A.   Sure. I'm looking at the ADC locator codes. I
21 don't recall -- and as I -- I look at this document, I
22 see a CB 1, but I'm not seeing a CB -- did you say 3?
23 I -- I'm -- I'm not seeing that on here.
24 Q.   I'm actually asking now about CB 4.
25 A.   So I -- I'm not seeing that on here, so I don't

Page 44

1  recall -- without my notes from the tour, I wouldn't be
2  able to answer that question.
3  Q.   Okay. Did you go to CB 5?
4  A.   I don't remember.
5  Q.   Did you go to CB 6, also known as Kasson Unit,
6  K-a-s-s-o-n?
7  A.   Yes. That I -- I distinctly remember going to
8  that unit, yes.
9  Q.   Did you go to CB 7?
10 A.   I don't know what CB 7 is. If you could refer
11 to it in a different way. I have the -- the names of the
12 units here, and it only goes CB 1, and then it has CB 6
13 for Kasson. My recollection is that there's a CB 1 and a
14 CB 2, cell block 1 and 2, but I don't know about the 3,
15 4, and 5 that you mentioned earlier.
16 Q.   I'm not asking you if they exist. I'm just
17 asking if you went there. So did you go to CB 7?
18 A.   I don't remember.
19 Q.   Did you review any prisoner health records on
20 site at ASPC-Florence that day?
21 A.   I don't believe I did, no.
22 Q.   And, again, according to page 5 of your report,
23 you visited ASPC-Lewis on December 2nd of 2013, correct?
24 A.   That's correct.
25 Q.   And about how long did you spend at Lewis?

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 45

1    A.   I would have to refer to my notes to answer
2  that.  But if -- my estimate would be I believe I spent
3  pretty much the whole day there.  It was a pretty big
4  facility.
5    Q.   Okay.  Okay.  And I gather on page 6 of your
6  report, there are a number of prisoner files listed under
7  ASPC-Lewis.  Did you review those files on site at
8  ASPC-Lewis that day?
9    A.   I'm having trouble remembering which facility
10  it was where I physically reviewed the records on site.
11  In an effort to maximize my time, because I have a
12  full-time day job, I thought it would be beneficial to
13  have records sent to me and be able to review them off
14  site.  But I do recall that one of the facilities -- if
15  I'm not mistaken, I think it was Tucson, was a
16  facility -- or it could have been Lewis, where I -- I
17  reviewed records on site.  But I apologize, I can't
18  recall which facility.  It was one of the facilities I
19  definitely looked at records on site.  But right now
20  today, I'm having trouble remembering which one that was.
21    Q.   Okay.  So you just don't recall if you reviewed
22  records on site at Lewis on December 2nd; is that
23  correct?
24    A.   That's fair.
25    Q.   Okay.  And according to your report, going back

Page 46

1  to page 5, you visited ASPC-Tucson on December 3rd, 2013;
2  is that correct?
3    A.   Yes.
4    Q.   And how long did you spend approximately at
5  ASPC-Tucson?
6    A.   I believe it was -- it was over half a day and
7  then another two hours in the afternoon.  So we -- we --
8  if I recall, we got there about 8 in the morning and left
9  about 2 or 2:30 or 3 in the afternoon.
10    Q.   And did you review any prisoner health records
11  on site at Tucson on that day?
12    A.   That's the one where I'm struggling to
13  remember.  If I'm not mistaken, I think I looked at
14  records on site -- bless you -- on site at Lewis.  I -- I
15  don't want to give misinformation.  I don't -- I don't
16  recall which unit it was that I actually looked at
17  records on site.  I'm confused.  I can't remember if it
18  was Lewis or Tucson.
19    Q.   But you think it was only one?
20    A.   I think that's fair, yes.
21    Q.   Okay, thank you.  And finally, this is not in
22  your original report, it's in your supplemental report,
23  but you visited ASPC-Yuma on March 24th, 2014, correct?
24    A.   Yes, March 24, 2014.
25    Q.   And about how long did you spend at the Yuma

Page 47

1  facility on that day?
2    A.   I think it was most of the day.  We got there
3  like at 8 in the morning, and I think we left -- I left
4  about 3 or 4 in the afternoon.
5    Q.   And did you review any prisoner health records
6  on site at Yuma on March 24th?
7    A.   No, I don't think so.
8    Q.   Now, when you were doing these facility visits,
9  how did you record your observations?  Did you take
10  handwritten notes?
11    A.   Yes.
12    Q.   Did you record them in any other way?
13    A.   No.
14    Q.   Did you bring a laptop or other device with you
15  on any of your tours?
16    A.   No.
17    Q.   Did you bring a dictating machine with you?
18    A.   No.
19    Q.   So the only way you recorded what you were
20  seeing and learning was your handwritten notes, correct?
21    A.   The only way that I recorded it in writing was
22  via my handwritten notes.  But I -- I'm a very visual
23  person.  And so I -- I made mental notes in my mind.  But
24  as far as transcribing either in writing or video or
25  audio, the only thing that I did was the handwritten

Page 48

1  notes.
2    Q.   Okay.
3         MR. FATHI:  This will be next in order.
4         (Exhibit 546 was marked.)
5         THE WITNESS:  Would it be possible to take a
6  break?
7         MR. FATHI:  Sure.  How long do you need?
8         THE WITNESS:  Five or ten minutes.
9         MR. FATHI:  Okay.
10         THE WITNESS:  Is that okay?
11         MR. FATHI:  Sure.
12         THE VIDEOGRAPHER:  Going off the record.
13  The time is 10:34 a m.  This is the end of video No. 1.
14         (A recess was taken from 10:34 a m. to
15  10:48 a.m.)
16         (Exhibit 547 was marked.)
17         THE VIDEOGRAPHER:  We're back on the record.
18  The time is 10:48 a m.  This begins video No. 2.
19    Q.   BY MR. FATHI:  Dr. Penn, Exhibit 546 is what
20  appears to be handwritten notes Bates stamped PENN 1
21  through PENN 118.  Exhibit 547 is handwritten notes Bates
22  stamped PENN 348 to  PENN 365.  Doctor, are these the
23  notes you made during your inspection of ADC facilities
24  in this case?
25    A.   Yes, they are.

Page 49

1   Q.   Are they -- are these all the notes you made
2  during your inspections of ADC facilities?
3     A.   Well, I'm -- I'm not sure if I can answer that.
4  I -- these are -- look to be photocopies of the notes,
5  but I notice unfortunately on some of the bottoms of some
6  of these, it looks like some things have gotten cut off.
7  But to answer your question, I don't -- this is all the
8  copies of the notes, yes, that I made.  But -- but just
9  to make the point to the bottom, so there's certain
10  things at the bottoms of some of these that got cut off.
11    Q.   Okay.  Putting aside the fact that some
12  portions of pages might have been cut off in copying --
13    A.   Right.
14    Q.   -- this is the totality of the notes that you
15  made during your inspection tours of ADC facilities,
16  correct?
17    A.   That's fair, yes.
18    Q.   Okay.  Have you made any other notes at any
19  time during your work on this case?
20    A.   I've made notes to myself, for example, when I
21  reviewed a videotape or reviewed a record and wrote a
22  note to myself, something to the effect of include this
23  in the report or don't forget -- like -- kind of like
24  to-dos or -- but those have all been destroyed.  So this
25  is the -- these are the records that exist that I've

Page 50

1  written.
2    Q.   And about how many pages of those notes to
3  yourself were there?
4    A.   A handful.  I mean, like -- for the first
5  report, probably more, maybe four or five pages, and then
6  for the supplemental, maybe three or four -- two to three
7  pages, something like that.
8    Q.   And why did you destroy them?
9    A.   Well, it's scribble.  It's basically, you know,
10  a box, something like a particular named plaintiff to --
11  it's like a note -- I put the -- the named plaintiff and
12  put psychosis, and then that jogs me, okay, I need to
13  write something about the psychotic symptoms that I
14  noticed or -- or be aware of that.  So it's like a
15  reminder to myself.
16    Q.   My -- my question is, why did you destroy them?
17    A.   Well, because they were -- they were basically
18  notes to myself to help me remember what to put, like a
19  prompt -- like a sticky.  I think of it like a -- for me,
20  and my wife would attest to this, I'm very -- I'm kind of
21  a disorganized person.  So by putting a sticky note to
22  myself to remember to do something, I actually do it.  So
23  that's why -- so I don't keep sticky notes I guess is
24  what I am trying to say.
25    Q.   Did your counsel not instruct you that you

Page 51

1  needed to preserve all of your notes in this case?
2         MS. WIENEKE: Object to the form.
3         Don't answer the question.  That invades
4  communications protected by 26(b)(4).
5         MR. FATHI:  No.  It has to do with the
6  information that was conveyed to him regarding his work.
7         MS. WIENEKE: No.
8    Q.   BY MR. FATHI:  Doctor, did your counsel not
9  instruct you that you were to preserve all notes in this
10  case?
11         MS. WIENEKE: No.  You don't have to answer
12  that question.
13    Q.   BY MR. FATHI:  Doctor, was it your
14  understanding that you were to preserve all of your notes
15  in this case?
16         MS. WIENEKE: You don't have to answer that.
17         MR. FATHI: Yes.  That is not about
18  communications with counsel.
19         WIENEKE: Well, if the information came from
20  counsel, then it is about that.  So --
21         MR. FATHI: The communi- --
22         MS. WIENEKE: -- if -- if you --
23         MR. FATHI: -- the communications are not
24  protected --
25         MS. WIENEKE.  If you would allow me to speak

Page 52

1  and not interrupt me.  It is rude and unprofessional.
2  He's not going to answer questions about what
3  communications he had with counsel except for those
4  allowed under 26(b)(4), which pertains to the facts upon
5  which he based his report.  He's already told you what
6  the content of the scribbles were.  You are now asking
7  him questions that invade the work product privilege that
8  are protected.
9         If you want to terminate the deposition and
10  we can get Judge Wake on the phone and you can raise this
11  issue, we can do that.  But he's not going to answer
12  those questions.  I've asserted the objection based on
13  privilege, and I've instructed him not to answer.  Move
14  on to something else.
15    Q.   BY MR. FATHI:  Doctor, I'm not asking about any
16  communications with your counsel.  Was it or was it not
17  your understanding that you were to preserve your notes
18  in this case?
19         MS. WIENEKE: Do not answer it to the extent
20  that it invades information and communications with
21  counsel in this case.
22    Q.   BY MR. FATHI:  I'm not asking about your
23  communications with counsel, Doctor.
24         MS. WIENEKE: I'm providing you instructions
25  as to how to answer the question based on the privilege.

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 53

1    THE WITNESS: I've -- I've produced or
2  turned over everything that I wrote with regard to this
3  case except for a scribbly note that said something like
4  ▮▮▮▮ psychosis, or ▮▮▮▮,
5  antisocial, Arian Brotherhood, or, you know, just notes
6  to myself to -- for -- that way I could remember, and it
7  was a way for me to learn more about the case and --
8  Q.   BY MR. FATHI: Excuse me, Doctor, but you need
9  to answer the question I asked.
10    MR. FATHI: Would you read the question
11  back, please.
12    (The requested portion of the record was
13  read by the reporter.)
14    MS. WIENEKE: Same instruction, Dr. Penn.
15    THE WITNESS: I don't recall ever being told
16  specifically by anyone or in the retainer letter or by
17  anybody to -- to keep or retain everything.  I don't
18  recall that, no.
19  Q.   BY MR. FATHI:  Other than what we've already
20  discussed, did you take any other notes whatsoever in
21  connection with your work in this case?
22  A.   No.
23  Q.   Did you visit ASPC-Douglas, Doctor?
24  A.   No, I did not.
25  Q.   Did you visit ASPC-Winslow?

Page 54

1  A.   No, I did not.
2  Q.   Did you visit ASPC-Safford?
3  A.   No, I did not.
4  Q.   Did you review records from any prisoners
5  housed at those facilities?
6  A.   I don't believe I did.
7  Q.   Are you planning to express at the trial of
8  this case any opinion on the mental health care provided
9  at any of those three facilities?
10  A.   Yes.
11  Q.   And that is despite the fact that you have not
12  visited any of those facilities?
13    MS. WIENEKE: Form.
14  Q.   BY MR. FATHI:  Correct?
15  A.   I'm sorry, what -- what's the question?  I'm
16  sorry.
17  Q.   You are going to express opinions about the
18  health care -- mental health care at Douglas, Winslow,
19  and Safford, despite the fact that you have not visited
20  those facilities, correct?
21  A.   Yes.
22  Q.   And you are going to express opinions about the
23  mental health care at those facilities despite the fact
24  that you have not reviewed records from any prisoners at
25  those facilities, correct?

Page 55

1    MS. WIENEKE: Form.
2    THE WITNESS: I have reviewed NCCHC
3  accreditation reports of all three of those facilities --
4  Q.   BY MR. FATHI:  Doctor, you need to answer my
5  question.
6  A.   Okay.
7    MR. FATHI: Would you read the question
8  back, please.
9    (The requested portion of the record was
10  read by the reporter.)
11    MS. WIENEKE: The question was to records.
12  You can answer the question.
13    THE WITNESS: That's correct.  I -- I am
14  prepared to an -- to give an opinion about -- medical and
15  mental health care at those facilities even -- even
16  though not having gone there or reviewed specific
17  individual records, yes.
18  Q.   BY MR. FATHI: I'm sorry, you just said medical
19  care.  Are -- are you going to be providing opinions on
20  medical care also?
21  A.   If I were to be asked.  As a physician, as a
22  psychiatrist, as a medical doctor, I -- I believe that I
23  could answer questions about medical conditions.  I think
24  many psychiatric conditions have an overlap or overlay
25  with medical conditions, and I actually just presented a

Page 56

1  lecture last -- this -- this Monday of this week on that
2  very issue at a national conference.
3    Even though I have not been specifically
4  retained in this case to be the medical expert, I believe
5  Dr. Mendel is the medical expert for the defense, if I
6  were asked a question about the medical and psychiatric
7  interface, I would be happy to try to answer that.
8  Q.   But I believe you testified you were not
9  planning to offer any opinions at trial that are not
10  contained in one of your two reports, correct?
11  A.   If the judge or anybody else asks me a
12  question, I will do my best to answer it.  If -- but I'm
13  not planning on sneaking anything in I guess is what I am
14  hearing you say.  But if I were asked at trial to give an
15  opinion, I would -- I would do the best I could to answer
16  that question.
17  Q.   Doctor, let me be very clear.  The purpose of
18  this proceeding today is for me to find out what opinions
19  you're going to offer at trial.  And that's also the
20  purpose of the reports that you have written as
21  required --
22  A.   Sure.
23  Q.   -- by the federal rules.  So if -- if there are
24  any opinions that you are going to be offering at trial
25  that aren't in one of your two reports, you need to tell

Parsons vs.                                    Confidential       Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                     Subject to Protective Order                              April 11, 2014

Page 57

1   me about them.
2       A.   Okay.  So as I sit here today, I believe that
3   all of my opinions are contained in my first report of
4   December and my supplemental report.  I -- I think that's
5   a fair statement, yes.
6       Q.   Okay, thank you.  Have you visited any other
7   ADC institutions other than the visits we've just
8   discussed?
9       A.   I don't believe so, no.
10      Q.   Do you plan to visit any ADC institutions in
11  connection with this case between now and the trial of
12  this case?
13      A.   I'm not sure if I can answer that.  I -- I
14  would like to.  I mean, I think it would be nice to be
15  able to go back and -- either do a more focused study
16  or survey of facilities where there was a question or a
17  concern.  Again, in a perfect world, I would be able to
18  go to those three facilities that you mentioned.  But
19  it -- it basically boils down to -- to time.  And so I
20  can request it, but whether it can happen in the time
21  frame, that's a -- that's the ultimate question.
22      Q.   So your answer is you don't know?
23      A.   I think that's fair.  I don't know.
24      Q.   Okay.  During your tours of ADC institutions,
25  did you speak with ADC staff?

Page 58

1       A.   Yes.
2       Q.   And did you speak with Corizon staff?
3       A.   Yes.
4       Q.   And did you rely on some of the information you
5   gained in those conversations in forming your opinions?
6       A.   Yes.
7       Q.   Who is Dr. Nicole Taylor?
8       A.   Dr. Nicole Taylor, to -- to the best of my
9   knowledge, is a psychologist.  I think she's a Ph.D. and
10  also I think she has a JD.  And my understanding, her
11  current role is she is an audit monitor and works for the
12  Arizona Department of Corrections but previously was a
13  staff psychologist.  I -- I don't recall if she was with
14  ADC or if she was with Wexford or maybe even Corizon.
15  But I believe that she's moved from being a staff
16  psychologist clinical role and now to a leadership
17  administrative audit role.
18      Q.   Did you speak with Dr. Taylor?
19      A.   Yes.
20      Q.   Did you find her to be credible?
21           MS. WIENEKE: Object to the form.
22           THE WITNESS: I'm not sure I know what you
23  mean when you use the word "credible."  I don't know if I
24  can answer that.
25      Q.   BY MR. FATHI:  Did you take the information

Page 59

1   that you learned from her into account in forming your
2   opinions?
3       A.   Yes.
4       Q.   Who is Dr. Ben Shaw?
5       A.   I believe he is a staff psychologist.  I don't
6   know if he -- what specific title he has, but I do recall
7   seeing his name, and he's a Ph.D., so I would assume he's
8   a psychologist.  And I saw his name on several of the
9   psychological autopsies.  I don't know specifically if
10  he's ADC or Corizon or what his title is.  But I -- I do
11  believe he's a psychologist somehow in that system.
12      Q.   Did you speak with Dr. Shaw?
13      A.   I don't believe so, no.
14      Q.   Describe for me the process by which your
15  initial report dated December 18th, 2013, was written.
16           MS. WIENEKE: Object to the form.
17           Instruct the witness not to answer.  The
18  preparation of reports and draft reports is protected by
19  26(b).
20           MR. FATHI: The process is not protected.
21           MS. WIENEKE: I don't know what you mean by
22  "the process."  The writing of the report, including
23  draft reports, the back and forth, the communication is
24  protected, and he's instructed not to answer about that.
25      Q.   BY MR. FATHI: Okay.  Doctor, I'm not asking

Page 60

1   you about the content of the report.  I'm asking -- let
2   me ask a more specific question.
3           When did you begin to draft your report
4   dated December 18th?
5       A.   I don't recall.
6       Q.   Who wrote the first draft?
7           MS. WIENEKE: He's not going to answer the
8   questions about the writing of the draft.  And for the
9   record, this is the exact same process that you refused
10  to allow Dr. Stewart to talk about in terms of the
11  process of writing the report with respect to his site
12  visit at Tucson.  And so we are merely making a
13  consistent position that you made for Dr. Stewart and
14  would not allow inquiry into.  So he's not going to talk
15  about --
16           MR. FATHI: That -- this is not accurate.
17  And, Kathy, I would ask you to please refrain from your
18  lengthy speeches that are simply eating up time.
19           Let's go off the record.
20           THE VIDEOGRAPHER: We're off the record at
21  11:04 a.m.
22           (A recess was taken from 11:04 a.m. to
23  11:05 a.m.)
24           THE VIDEOGRAPHER: We're back on the record.
25  The time is 11:05 a.m.

Page 61

1      MR. FATHI: In Tessera, Inc. v. Sony Corp,
2  2013 WESTLAW, 5692109, Northern District of California,
3  October 18th, 2013, the court held that the protection of
4  Rule 26(b)(4)(B) applies narrowly to the drafts
5  themselves and not to questions about the drafting
6  process. For example, such as whether the expert typed
7  the report himself.
8      I will invite counsel to consult that case
9  over the lunch hour, and we'll return to these questions
10 after lunch.
11     MS. WIENEKE: What's the citation, please?
12     MR. FATHI: 2013 WESTLAW 5692109.
13     MS. WIENEKE: What is the jurisdiction?
14     MR. FATHI: Northern District of California.
15     MS. WIENEKE: And the name of the case?
16     MR. FATHI: Tessera, Inc. v. Sony Corp.
17     MS. WIENEKE: Spelling?
18     MR. FATHI: T-e-s-s-e-r-a.
19     I want to be clear that on the record, you
20 are instructing him not to answer any questions about the
21 drafting process, correct?
22     MS. WIENEKE: Correct.
23  Q.   BY MR. FATHI: I'm going to ask the questions
24 for the record.
25     Doctor, who wrote the first draft of your

Page 62

1  December 18th report?
2      MS. WIENEKE: Hold on. I thought you had
3  just said that you were going to allow me to look at the
4  case over the lunch hour and then go back to that. Are
5  you going back on that now?
6      MR. FATHI: I'm not going back on anything,
7  Kathy. If you prefer to do it after lunch, we'll do
8  that.
9      MS. WIENEKE: Well, that's what you just
10 said that you were going to do. So I thought you were
11 going to continue on with that and then give me the
12 courtesy of looking at the case that you just gave me.
13  Q.   BY MR. FATHI: Doctor, would you turn to page 5
14 of your report, please. Doctor, on page 5 of your
15 report, about two-thirds of the way down, you write,
16 quote: The following charts were randomly pulled. End
17 of quote. Do you see that language?
18  A.   Yes.
19  Q.   And then you list seven charts from Tucson and
20 continuing on onto page 6, ten charts from Lewis.
21 Describe for me the process by which these 17 charts were
22 selected.
23  A.   Sorry. I'm counting. You said seven and then,
24 sorry, 10. Yes, right. 10 -- seven and 10, 17.
25 Correct.

Page 63

1  Q.   Describe the process by which these 17 charts
2  were selected.
3  A.   I asked the health information services
4  director or staff, I don't know if they were the director
5  or the staff member, basically, this is how I would like
6  charts pulled because I want to get a random sampling
7  of -- of charts, specifically offenders identified as
8  having a serious mental illness. And so that's what I
9  asked them to do. I asked them to pull a random sample
10 of offenders, ADC offenders with serious mental illness.
11  Q.   And how did they do that?
12  A.   I don't work in health information systems, so
13 I don't know how they would have done that.
14  Q.   And is your answer the same for the Tucson
15 charts and the Lewis charts?
16  A.   What I did was -- I basically said the same
17 thing. I'd like the same methodology of, you know, run a
18 caseload of all the mentally ill -- offenders with mental
19 illness and then do a random -- and I forget specifically
20 if they were doing it like every third or every fourth
21 person or every other person. I -- I don't know how they
22 did that. But I -- I did ask them for it to be a random
23 sample. And I -- I certainly could speak more to a
24 random sampling with regard to NCCHC accreditations and
25 how that's an important process rather than hand

Page 64

1  selecting certain records.
2  Q.   Okay, Doctor, but I'm just asking in this case,
3  did you observe the process by which these records were
4  selected?
5  A.   No.
6  Q.   And then on page 5, you write that you reviewed
7  the most current volume of the charts indicated with an
8  asterisk. Do you see that?
9  A.   Yes.
10  Q.   How was it decided out of the seven Tucson
11 charts which five you would review?
12     MS. WIENEKE: Form.
13     THE WITNESS: I don't recall.
14  Q.   BY MR. FATHI: And going over onto page 6, how
15 was it decided under -- of the ten Lewis charts which
16 five you would review?
17  A.   I don't recall.
18  Q.   And at the time that you wrote your initial
19 report dated December 18th, had you done this kind of
20 chart review at any facility other than Tucson and Lewis?
21  A.   I'm sorry, I didn't -- I'm not following the
22 question. Before December...
23  Q.   On pages 5 and 6 --
24  A.   Uh-huh.
25  Q.   -- you describe reviewing charts at Tucson and

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 65

1   Lewis, correct?
2     A.   Yes.
3     Q.   My question is, at the time that you wrote your
4   initial report, had you done this kind of chart review at
5   any other facility besides Tucson and Lewis?
6           MS. WIENEKE: Object to the form.
7           THE WITNESS: I was sent a tremendous amount
8   of records, and right now I can't recall -- and I think
9   they're listed -- they're referenced in my report as
10  Exhibit A.  And I apologize that I can't -- I don't
11  recall what records I reviewed because I -- I -- I also
12  reviewed, you know, the named plaintiffs.  And I don't
13  recall -- and I apologize, I can't recall if any of the
14  named plaintiffs, what facilities they were housed at.
15  So I can't -- I -- I'm sorry, I can't answer that.  I
16  can't answer your question for sure.
17    Q.   BY MR. FATHI:  I just want to make sure you
18  understand my question.  At pages 5 and 6 of your report,
19  you describe what you described as a random record review
20  that you did at Tucson and Lewis, correct?
21          MS. WIENEKE: Form.
22          THE WITNESS: It wasn't a -- a random record
23  review.  Basically I -- I wanted the opportunity not just
24  to review the records that Dr. -- your expert,
25  Dr. Stewart, had reviewed, but also to ensure that it

Page 66

1   wasn't a selection bias, that it was more of a random
2   sample.  And so it was a way for me, on my own, to review
3   records that I had obtained directly from the health
4   information systems people and not through plaintiffs or
5   defense.
6     Q.   BY MR. FATHI:  And my question is, did you do
7   that kind of record review at any other facility besides
8   Tucson and Lewis prior to writing your December 18th
9   report?
10          MS. WIENEKE: Form.
11          THE WITNESS: I -- I can't recall
12  specifically because I -- I reviewed so many records, I
13  don't recall the specific dates of when I reviewed what
14  record, what sets of records.  So I -- I can't answer
15  that.  I'm sorry.
16    Q.   BY MR. FATHI:  Let me ask a different question.
17  At the time you wrote your initial report --
18    A.   Yes.
19    Q.   -- the date of your report, December 18th,
20  2013, putting aside the death records and putting aside
21  the named plaintiffs, how many ADC prisoner health
22  records have you -- you reviewed?
23    A.   I don't know.
24    Q.   Well, on page 5 of your report, you list five
25  records from Tucson that you reviewed, correct?

Page 67

1     A.   That's fair, yes.
2     Q.   And on page 6 of your report, you list five
3   records from Lewis that you reviewed, correct?
4     A.   Yes, that's fair.
5     Q.   And would you turn, please, to page 11 of
6   Appendix A, which is Bates number 203477.  And at the top
7   of that page, you list six medical records from Yuma
8   prisoners, correct?
9     A.   Yes.
10    Q.   So my question is, as of December 18th, 2013,
11  putting aside the named plaintiffs and deceased
12  prisoners, had you reviewed any other prisoner medical
13  records besides the ones we've just discussed from
14  Tucson, Lewis, and Yuma?
15    A.   I can't recall.  Again, I -- I had a lot going
16  on in December, and I'd be happy to answer more about
17  that.  But basically, I -- I don't recall specifically
18  when I reviewed what sets of records before the report or
19  the supplemental report.  That's kind of -- it's -- it's
20  a big blur to me right now.
21    Q.   Well, is it fair to say that if you reviewed a
22  given medical record, it would be identified either in
23  your report or in Appendix A?
24    A.   I think that's fair.
25    Q.   Okay.

Page 68

1     A.   I just don't recall specifically when I
2   reviewed it, if it was before December, after December,
3   before March, or -- you know, so I don't recall
4   specifically when I reviewed it.
5     Q.   Okay.  Now, when you reviewed prisoner medical
6   records, did you take notes on your review?
7     A.   On some I did.  Like, for example -- and I -- I
8   wanted to clarify, I figured out from my review of this,
9   it looks like the record review that I did was at Tucson
10  on site, and I did write notes on those.  But those are
11  the only records that I have written notes on that I
12  reviewed.
13    Q.   Why did you write notes on some but not on
14  others?
15    A.   I'm not really sure.  I think -- I -- I think I
16  was -- I think, given that I had been writing notes to
17  myself all day during the tour, I just thought I should
18  go ahead and write some notes on this.  But looking back
19  in hindsight, it probably would have been better if I
20  took more detailed notes to myself of -- you know,
21  hindsight is 20/20.  I think in a perfect world, I -- it
22  would have been better if I would have written down and
23  kept almost like a -- a detailed log of the name of the
24  prisoner, the facility, the inmate number, and the date
25  that I reviewed it and the notes that I took.  But I

Glennie Reporting Services, LLC
602.266.6535  www.glennie-reporting.com

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 69

1    didn't do that in this case.
2    Q.   Well, when you reviewed a medical record and
3    you didn't take notes on your review --
4    A.   Uh-huh.
5    Q.   -- how did you record what you learned from
6    that record?
7    A.   Well, this gets to the whole NCCHC
8    accreditation survey training that I have.  I -- I'm
9    certified as a correctional health professional and also
10   have gone through and received training and ongoing
11   training as a -- as a surveyor for the NCCHC, National
12   Commission on Correctional Health Care.  So when we go
13   and survey facilities, our -- our standard process is not
14   to take handwritten notes on every single chart we review
15   but to look at the totality of the records and the health
16   care that's being delivered, access to care, looking at
17   all the records.
18         So that -- I -- I think the real reason is
19   just the shear volume of records in this case and my
20   time, which I have a full-time daytime job, and so I'm
21   doing this after hours and on weekends, and I try to
22   squeeze this kind of work in when I can.  And so the
23   short answer is, I learn from things that I do.  And --
24   and I applied more of an NCCHC accreditor/surveyor
25   methodology to this process rather than detailed notes on

Page 70

1    every single patient or offender as would be -- if this
2    were an individual plaintiff case as opposed to several
3    hundred, you know, thousand offenders.
4    Q.   Now, if I want to ask you about a record that
5    you've reviewed and you didn't take notes on and if I
6    want to know how often did this person see the
7    psychiatrist, are you able to answer that from memory?
8    A.   No.  I would need to re -- refer to the
9    records.
10   Q.   Now, I've gone through your notes, Dr. Penn,
11   and the only notes I can find that appear to be from a
12   record review are at PENN pages 85 to 89.
13   A.   Sorry, which set is this?  Is this the --
14   sorry, what --what was the number again?
15   Q.   PENN 85 to 89.
16   A.   Thank you.  Yes.
17   Q.   And that appears to be five prisoners from the
18   Lewis Complex, correct?
19   A.   Yes.
20   Q.   And then if you look at PENN pages 110 to 118.
21   Are you there, Doctor?
22   A.   Well, and -- and thank you for -- you -- you
23   helped correct me.  I -- I -- it wasn't the Tucson.  It
24   was definitely the -- the facility before that was when I
25   did the record review.

Page 71

1    Q.   Okay.  And would you turn to PENN 110 to 118,
2    please.
3    A.   Yes.  Okay.  And, again, that helps correct my
4    memory.  It looks like I reviewed records at the Tucson
5    facility, also.
6    Q.   Yes.  PENN 110 to 118 appears to be five
7    records from the Tucson facility.  Do you agree with
8    that?
9    A.   Yes, that's fair.
10   Q.   All right.  And is it your testimony that those
11   are the only notes you took based on your review of
12   prisoner records in this case?
13   A.   Yes, that's fair.
14   Q.   As we sit here today, putting aside the named
15   plaintiffs and putting aside deceased prisoners, how many
16   charts of ADC prisoners have you reviewed?
17   A.   I -- I don't know.  I'd have to count up the
18   list.
19   Q.   Okay.  Well, let me tell you what I've found,
20   and then you can tell me --
21   A.   Sure.
22   Q.   -- of if I'm wrong.  There are the 16 that we have
23   just discussed in your original report.  And then would
24   you turn to your supplemental report, please.  And on --
25   in Appendix A, on page 4, you list ten prisoners from

Page 72

1    Eyman.  Then on pages 4 and 5, you list 19 prisoners from
2    Florence.  And then further down on page 5, you list 21
3    prisoners whose institution is not specified.  Do you see
4    that?
5          MS. WIENEKE:  Object to the form.
6          THE WITNESS:  Well, there's -- it says
7    inmate medical records, and then there's 21, right?
8    Q.   BY MR. FATHI:  Right.  So adding all that up,
9    and, again, putting aside the named plaintiffs and
10   deceased prisoners --
11   A.   Uh-huh.
12   Q.   -- I count a total of 65 ADC prisoners whose
13   records you've reviewed.  Does that -- does that sound
14   about right?
15         MS. WIENEKE:  Form.
16         THE WITNESS:  That sounds about right.
17   Q.   BY MR. FATHI:  Okay.  And my next question is
18   focusing now on the records that you list in Appendix A
19   to your supplemental report.  How were these records
20   selected for review?
21   A.   If I'm not mistaken, I believe -- because these
22   occurred after the fact that I had already toured.  And
23   it probably is -- is confusing to the reader because it
24   says:  Inmate medical records reviewed during Eyman site
25   tour.  And you asked this earlier.  I didn't actually

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 73

1  review these during the site tour, but they were
2  collected after the fact and sent to me afterwards.
3  So -- but it would have been the same methodology.
4  Whoever was seen has a serious mental illness, is on the
5  mental health caseload, a random sampling, and that's
6  what I asked for.
7      Q.   And who actually carried out your instructions
8  and made that selection, do you know?
9      A.   I can't tell you specifically, but I distinctly
10  recall speaking to -- it was either Mark -- Mike
11  Giardina, I think it's G-i-a-r-d-i-n-a, from the firm,
12  from the defense firm.  But I'm not sure who from that
13  firm spoke to the Department of Corrections people and if
14  it involved multiple people or not or if they were able
15  to just -- I don't understand enough about would that
16  have had to have gone to the Department of Corrections or
17  if they could have contacted Corizon, the health care
18  vendor, directly or if it had to go through the
19  Department of Corrections first.  That, I don't
20  understand.
21      Q.   So how was the sample generated?  How did they
22  come up with, for example, these ten records from Eyman?
23      A.   It's my understanding per what I asked for, I
24  requested, I want anyone that's been -- that is currently
25  on the mental health caseload with an identified serious

Page 74

1  mental illness who's been seen -- if I'm not mistaken,
2  seen recently or in the last month.  And I asked that
3  those charts be randomly pulled.
4      Q.   So the -- the population from which you were
5  sampling was limited to people who had been seen in the
6  last month?
7      A.   No.  I mean, I -- I think -- I don't recall
8  specifically if it was just people on the mental health
9  caseload, people with serious mental illness, or people
10  that had been seen recently or people in the last month.
11  That, I don't recall.
12      Q.   And how concretely was this sample of ten
13  generated?
14      A.   Sorry, I'm not sure I understand your question.
15  How concretely?
16      Q.   How did they come up with these ten names?
17      A.   I have no idea.
18      Q.   Okay.  Now, let's move on to some of your
19  opinions.
20          What is your overall opinion as to ADC's
21  mental health care as it existed on September 27th, 2013?
22      A.   Well, I've -- I've listed all my opinions in
23  the report.  I -- it's my opinion that based on my review
24  of records, touring, speaking to people, and reviewing
25  NCCHC accreditation reports, looking at policies and

Page 75

1  procedures, staffing ratios, that basically the mental
2  health and psychiatric care services met the community
3  standard and met the correctional standard of care.
4      Q.   As of September 27th, 2013?
5      A.   I'm not sure if I could say any specific drop
6  dead date, but I would say generally speaking within the
7  year of 2013 and the previous year of 2012, because it's
8  a accumulation of -- it's not like one day they meet it,
9  the next day they don't, the following month they do.
10  But looking at the totality of everything within the year
11  of 2012-2013, based on the totality of everything I
12  reviewed, it's my opinion that they met the community and
13  correctional standard of care.
14      Q.   Okay.  Next in order -- excuse me.
15          (Exhibit 548 was marked.)
16          THE REPORTER: 548.
17      Q.   BY MR. FATHI:  Doctor, Exhibit 548 consists of
18  two three-ring binders containing various documents, Tab
19  Nos. 1 through 32.  And we'll identify them specifically
20  for the record as -- as we discuss them.
21          For now, would you turn to Tab No. 10,
22  please.
23      A.   Sure.
24      Q.   Tab No. 10 is a document on the letterhead of
25  Wexford Health Sources, Inc., titled Meeting With the

Page 76

1  Arizona Governor's Office, November 8th, 2012.  The first
2  page is stamped Wexford 001.
3          Doctor, have you seen this document before?
4      A.   I don't believe -- I don't believe so.
5      Q.   Are you familiar with Wexford Health Sources?
6      A.   I would say generally.  I know who they are and
7  what they do, but I don't have any other -- I don't --
8  I'd say generally.
9      Q.   Well, they were the contract health care
10  provider for the Arizona Department of Corrections,
11  correct?
12      A.   Right, they were the past.  Right, correct.
13      Q.   Have you had any interactions with Wexford in
14  your professional capacity?
15      A.   I think I sat through a lecture that
16  Dr. Neil -- Neil Fisher, who's listed here on this
17  report, I think he talked about hepatitis B and C and
18  HIV, and I think I've sat through his lecture maybe, I
19  don't know, two or three times at correctional health
20  meetings.  I've seen Dr. Thomas Lehman or Lehman,
21  L-e-h-m-a-n's name, but I probably couldn't pick him out
22  of a room if I saw him.  I know what Neil Fisher looks
23  like.
24      Q.   Okay.
25      A.   But to answer your question, the correctional

Page 77

1 health community is pretty small, so pretty much
2 everybody knows everybody. But the short answer is, I
3 know who they are and what they do. But other than that,
4 I don't have a detailed knowledge of -- of their
5 services.
6 Q. Okay. Do you recall the -- what is the date on
7 which Wexford took over health care for the Arizona
8 Department of Corrections?
9 A. I -- I don't know.
10 Q. If I tell you it was July 1st, 2012, does that
11 sound about right?
12 A. July 1st. I'd have to look. And I'm sure
13 there's probably a contract somewhere or memorandum of
14 understanding or there's probably some firsthand
15 document. And I have no reason not to trust you, but
16 I -- that sounds reasonable. That sounds within a fair
17 amount of time.
18 Q. Would you turn to page Wexford 003, please.
19 A. Sure.
20 Q. And look at the section headed Conclusions.
21 And there, it is written, quote: After working within
22 the ADC inmate health care system for four months,
23 Wexford Health finds the current class action lawsuits to
24 be accurate. End of quote.
25 Doctor, were you aware of this statement

Page 78

1 before today?
2 A. Well, I -- I think it's kind of unfair to be
3 asking me about something that I have never actually had
4 a chance to read. I -- I would need to read this and --
5 Q. Well, Doctor, just if you could answer my
6 question. Were you aware of the statement before today?
7 A. Well, I wasn't aware of this document or the
8 statement that you just said to me right now.
9 Q. Okay.
10 A. And I -- I would just add that I don't know who
11 generated the statement or what it's based on, so I don't
12 take it as being anything more than something written
13 down on a piece of paper.
14 Q. Does this statement that I've just read have
15 any effect on your opinion as to the adequacy of ADC's
16 mental health care system?
17 MS. WIENEKE: Form and foundation.
18 THE WITNESS: I would need an opportunity to
19 review this document and -- and better understand
20 specifically who these people are. Like there's a --
21 several other people listed on this --
22 Q. BY MR. FATHI: Could you answer my question,
23 Doctor?
24 MS. WIENEKE: He's answering the question.
25 You asked if this has an impact on his opinion, and he's

Page 79

1 giving you an explanation as to whether it will or not.
2 He has to review it. That's what he's telling you. If
3 you don't like his answer, then don't interrupt him.
4 MR. FATHI: Please don't coach the witness.
5 MS. WIENEKE: I'm not coaching the witness.
6 Don't interrupt the witness when he's answering the
7 question. You asked him an open-ended question --
8 MR. FATHI: No.
9 MS. WIENEKE: -- as to whether it had an
10 impact on his opinion, and he's explaining it to you.
11 MR. FATHI: The question was a yes-or-no
12 question.
13 MS. WIENEKE: He doesn't need to answer a
14 question yes or no.
15 Q. BY MR. FATHI: Does the statement have any
16 effect on your opinion as to the adequacy of ADC's mental
17 health care system?
18 A. I can't answer that with a yes or no.
19 Q. Okay. Also, in the same section is written,
20 quote: The ADC system is broken and does not provide a
21 constitutional level of care. End of quote.
22 Were you aware of this statement before
23 today, Doctor?
24 MS. WIENEKE: Objection; form and
25 foundation.

Page 80

1 THE WITNESS: I think -- and I could be
2 wrong, but I think I've seen some reference to this
3 before in a deposition. I think, if I'm -- and I can't
4 recall whose deposition it was, but I thought I saw some
5 reference to that terminology of being broken. And,
6 again, broken, aside from fractures and orthopedic
7 injuries, isn't really a medical term.
8 Q. BY MR. FATHI: Doctor, my question was whether
9 you were aware of the statement before today. And you've
10 answered the question. Thank you.
11 A. Well, I -- what I -- what I answered was I
12 vaguely recall some reference to this in a deposition,
13 but this is the first time I'm looking at this document.
14 I'd really like -- to be able to answer your questions,
15 I'd really like to be able to actually read the document
16 and understand better -- again, as a a -- as a medical
17 doctor, I -- I need to be able to review something and
18 understand, one, who wrote this, what -- what their
19 qualifications are. Was this a press release? Was this
20 written by a lay person? Was it written by a media
21 person?
22 Q. Okay. Doctor, with all due respect, you are
23 running down the clock. You've answered my question.
24 Let me ask you my next question.
25 Does this statement have any effect on your

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 81

1  opinion as to the adequacy of ADC's mental health care
2  system?
3       MS. WIENEKE: Form.
4       THE WITNESS: I can't answer that with a yes
5  or no.
6    Q.   BY MR. FATHI:  Would you turn to Tab 8, please.
7    A.   Sure.
8    Q.   And this is the deposition of Dr. Nicole Taylor
9  taken September 5th, 2013.  And you reviewed Dr. Taylor's
10 deposition, correct?
11   A.   Yes.
12   Q.   Would you turn to page 277, please.  And on
13 that page at lines 13 to 25, Dr. Taylor testifies that as
14 of that date, September 5th, 2013, she cannot testify
15 that the care provided -- the mental health care provided
16 to ADC prisoners meets constitutional requirements.
17      Do you see that language?
18      MS. WIENEKE: Object to the form.
19   Q.   BY MR. FATHI:  Have you had a chance to read
20 it, Doctor?
21   A.   Yes.  And what I would --
22   Q.   Okay.  You've had a chance to read it.
23   A.   Yes.
24   Q.   Please wait for the question.
25   A.   Okay.

Page 82

1    Q.   Did you take this testimony by Dr. Taylor
2  into -- into account in forming your opinions?
3    A.   Yes, I did.
4    Q.   And nevertheless, you conclude that as of
5  September 2013, ADC mental health services were adequate,
6  correct?
7       MS. WIENEKE: Form.
8       THE WITNESS: It's my professional opinion
9  that yes, they were.  And I have several reasons I can
10 explain how I find that they were.
11   Q.   BY MR. FATHI:  Okay.  We'll -- we'll get to
12 that later.
13   A.   Sure.
14   Q.   So you agree -- you disagree with Dr. Taylor's
15 testimony?
16      MS. WIENEKE: Object to the form.  Misstates
17 her testimony.
18      THE WITNESS: No, I'm not disagreeing with
19 her.  I -- I think this probably is being taken out of
20 context.  The way it's written, it says:  I think you
21 testified that you anticipate being able to testify a
22 year from now that the care provided to ADC inmates meets
23 constitutional requirements.  Is that correct?
24      That doesn't clarify to me, are they saying
25 it's currently constitutional and will be constitutional

Page 83

1  in a year or it's unconstitutional now and it will be
2  constitutional in a year.
3       And I think the other piece of that is that,
4  whoever decides or defines what constitutional is, that's
5  an opinion for a judge or jury.  That's not -- my opinion
6  would be that's not an opinion for a health care
7  professional.  That's a -- that's a legal decision or
8  legal interpretation.  That would be my opinion.
9    Q.   BY MR. FATHI:  Do you agree or disagree with
10 Dr. Taylor's testimony here?
11      MS. WIENEKE: Form, foundation.
12      THE WITNESS: I think this is being taken
13 out of context, so I can't answer yes or no to that.
14   Q.   BY MR. FATHI:  And what context would you need,
15 Doctor?
16   A.   Well, I would probably want to be able to speak
17 to her directly and -- and get a better understanding of
18 what she was trying to convey in her response.  What -- I
19 think it's -- anything, if you take one little line or
20 sentence out of context, I think it's easy to -- to twist
21 it or put a different spin on it.  And I think that's
22 what's happening with this statement.
23   Q.   I see.  You reviewed Dr. Taylor's deposition,
24 correct?
25   A.   Yes.

Page 84

1    Q.   Did you review the entire deposition?
2    A.   Yes.
3    Q.   Let's talk about staffing.  Doctor, what is
4  your opinion as to ADC's mental health care staffing as
5  it existed on September 27th, 2013?
6       MS. WIENEKE: Form.
7       THE WITNESS: It's my professional opinion
8  that their -- their staffing was sufficient to meet
9  community and correctional standards.
10   Q.   BY MR. FATHI:  Turn to page 30 of your report,
11 please.  Doctor, on page 30 of your report, there's a
12 chart that purports to show Corizon's ADC mental health
13 staffing.  Did you create this chart?
14   A.   I wish I had those skills.  I'm -- I'm not very
15 good at creating PowerPoint graphs, so no, I did not
16 create that chart.
17   Q.   Did you have any role in creating it?
18   A.   I asked -- I specifically asked the legal team
19 that had retained me, I said, I want a copy of their --
20 of Corizon's mental health staffing.  Can you get that
21 data for me.  And that's what they did.  They got that
22 data for me.
23   Q.   Okay.  Now, below the graphic, there are --
24 there's a table with numbers that apparently show the
25 numbers of various kinds of mental health staff month by

Parsons vs.                                    Confidential        Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                    Subject to Protective Order                                   April 11, 2014

Page 85

1  month.  Now, do these numbers represent FTEs, Doctor?
2        MS. WIENEKE:  Object to the form.
3        THE WITNESS:  I'm -- I -- I'm not sure.
4  Q.   BY MR. FATHI:  Okay.  Do these numbers include
5  only Corizon employees or agency staff as well?
6  A.   I'm not sure how to -- I don't know the answer
7  to that.
8  Q.   Can you tell by looking at this chart how many
9  of the psychiatrists are Corizon employees and how many
10 are agency or temporary staff?
11 A.   I would say probably not, and that would be
12 something -- that would be a useful data or metric to
13 have.  That would be -- that would be interesting to look
14 at.
15 Q.   Now, the first category of staff listed are
16 group facilitators.  Do you see that?
17 A.   Yes.
18 Q.   What are group facilitators?
19 A.   I don't know the specific definition or job
20 description.  I would -- to answer your question
21 accurately and to the best I could, I would say it would
22 be nice to have a copy of the job description, you know,
23 level of training or qualification, what are the job
24 requirements.  I mean, I can tell you a group -- a group
25 -- facilitator would be somebody who runs groups.  But

Page 86

1  other than that, I can't tell you any more specifics, if
2  they're Bachelor's level or Master's level or if they're
3  licensed or unlicensed.  I wouldn't be able to answer
4  that today.
5  Q.   Could some of them be COs?
6  A.   I don't believe so because it says Corizon
7  mental health staffing.  So I -- unless they -- I -- I
8  don't think a correctional officer would be able to
9  moonlight as a Corizon staff employee, also.  I don't
10 know if that would be possible.  But I guess,
11 hypothetically, if they were -- you know, had a Master's
12 or were licensed as a mental health professional or
13 unlicensed and they did it on their own time, I -- I
14 guess that's possible.  But according to the chart, it
15 says Corizon ADC Mental Health Staffing, so I would
16 interpret that to mean that these were all Corizon mental
17 health staff.
18 Q.   Now, these numbers that are listed in the
19 table, for example, April 13 under psychiatrists, it says
20 9.67.  Where did you get those numbers?
21 A.   Again, as I answered earlier, I -- I didn't get
22 the numbers.  I asked for the data, and so it was sent to
23 me as a composite.  In other words, I said, can you send
24 me your staffing information, and they sent it to me.
25 And, I mean, I could hypothesize why the numbers are

Page 87

1  like -- like you said 9.67, I can tell you a couple of
2  reasons why I think that might be that kind of an odd
3  number.
4  Q.   Well, I'm not asking for you to hypothesize,
5  Doctor.
6  A.   Sure.
7  Q.   My question was where did you get these
8  numbers?
9  A.   Okay.  So I asked the law firm to get that from
10 either ADC or from Corizon, and that's what they turned
11 over.
12 Q.   And what steps, if any, did you take to verify
13 that these numbers accurately reflect the number of
14 mental health staff providing services to ADC prisoners?
15 A.   I spoke with Dr. Tom Fulks.  I think it's
16 F-u-l-k-s, and I don't know if he's a Ph.D. or Psy.D., S
17 -- sorry, P-s-y-D, Doctor of Psychology.  And I also
18 spoke to Dr. Nicole Taylor about their staffing and where
19 they are.  And so yes.  So not only did I get this, I
20 also discussed it directly with the Corizon leadership
21 and also with Dr. Mark Fleming, who is another Corizon
22 psychology leader.  So I spoke with them, and then I've
23 had additional conversations with them about their
24 staffing and what their vision is for mental health
25 services --

Page 88

1  Q.   Excuse me, Doctor.  I don't think you
2  understood my question.
3  A.   Sure.
4  Q.   My -- my question was, what steps, if any, did
5  you take to verify that these specific numbers on page 30
6  accurately reflect the number of ADC -- the number of
7  mental health staff providing services to ADC prisoners?
8        MS. WIENEKE:  Objection; form, asked and
9  answered.
10       THE WITNESS:  I mean, I didn't specifically
11 say, are these numbers right.  I just basically said,
12 hey, you guys sent me the data.  Do you have anything you
13 want to add to that or what are your comments on that?
14 So I think -- I had no reason to suspect that they
15 wouldn't be honest or truthful with the data that they
16 produced.
17       And also Dr. Nicole Taylor has no allegiance
18 or vested interest for Corizon.  She works for Department
19 of Corrections.  If anything, she's in an audit and
20 oversight role.  So I would say that she's probably
21 looked at these under a fine-tooth comb and probably not
22 even just looked at what Corizon reports, but maybe even
23 looked at sign-in logs and sign-out logs and at other
24 ways to verify that Corizon is actually delivering what
25 they say they're delivering.

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 89

1    Q.   BY MR. FATHI:  And how do you know that she's
2   done that, Doctor?
3    A.   Well, I spoke to her.
4    Q.   And she told you that she has verified these
5   specific numbers?
6    A.   No.  But I -- I asked her specifics about
7   staffing, and -- I could say more about that if you'd
8   like, but basically --
9    Q.   What I'd like, Doctor, is for you to listen to
10  my question and answer it.
11   A.   Okay.
12   Q.   What steps, if any, did you take to verify
13  these numbers -- and I'm asking specifically about these
14  numbers --
15   A.   Uh-huh.
16   Q.   -- appearing on the bottom of page 30 of your
17  report, accurately reflect the number of mental health
18  staff providing services to ADC prisoners in the months
19  indicated?
20   A.   I spoke with Dr. Taylor, Dr. Fulks, and
21  Dr. Fleming about their staffing patterns previous when
22  it was Wexford, most recently when it was Corizon taking
23  over, and as recently as my most recent visit at Yuma.  I
24  had a discussion with Dr. Fleming about their staffing
25  ratios and staffing.

Page 90

1    Q.   And you asked all three of those people
2   specifically about the accuracy of these numbers that
3   appear on page 30 of your report?
4    A.   No.  I mean, I don't really have any reason to
5   suspect or doubt that they would give false or misleading
6   information.  So -- but I did speak to them about their
7   staffing.
8    Q.   Doctor, if it turns out that these numbers on
9   page 30 of your report are not accurate, would that have
10  any effect on your opinion as to the adequacy of ADC's
11  mental health staffing?
12        MS. WIENEKE:  Object to the form,
13  foundation.
14        THE WITNESS:  I mean, anything's possible.
15  If -- if there was a direct shortage of staff and there
16  was a bad outcome or a pattern of bad outcomes, sure,
17  it's hypothetical or possible that that could have a
18  bearing on my opinion, yes.
19   Q.   BY MR. FATHI:  So is it your testimony that
20  staffing is only inadequate if there's a bad outcome?
21        MS. WIENEKE:  Object to the form.
22        THE WITNESS:  No.  That -- you're -- you're
23  putting words in my mouth.  What I'm saying is -- you
24  asked me a hypothetical, if -- if -- if this weren't
25  accurate number -- accurate numbers and there were less

Page 91

1   numbers, as a leader within correctional systems and
2   somebody who has familiarity and 20 years in corrections,
3   we recognize that from time to time, you can have a
4   shortage of staff or staff can have health issues or have
5   a death in the family or be out for vacation or
6   conferences.  So I fully understand that sometimes you
7   have shortages and staff and weather conditions and other
8   things that happen that people can't go to work.  But at
9   the end of the day, you have other staff at the facility
10  of correctional staff that are trained.  You have nursing
11  staff that are trained --
12   Q.   BY MR. FATHI:  Doctor, you need to listen to my
13  question and answer my question.
14   A.   But I'm trying to answer your question.
15   Q.   My question is -- my question is, if it turns
16  out that these numbers on page 30 are inaccurate, would
17  that have any effect on your opinion as to the adequacy
18  of ADC's mental health care staffing?
19        MS. WIENEKE:  Hold on, Doctor.
20        Carolyn, could you please read back the
21  question that Mr. Fathi asked Dr. Penn, which is not the
22  question that he just asked him that Dr. Penn was trying
23  to answer, please.
24        (The requested portion of the record was
25  read by the reporter.)

Page 92

1        MR. FATHI:  No.  That was -- I was asking --
2   my prior question is what I am asking him to answer.
3        MS. WIENEKE:  No, no.  He's answering that
4   question, which he's entitled to answer fully, and you
5   cut him off and interrupted him.
6        So please, Dr. Penn, if you can recall your
7   train of thought -- your train of thought, please answer
8   and finish completing that question before you then
9   answer the next question that Mr. Fathi has proposed to
10  you.
11        MR. FATHI:  I'm withdrawing the question
12  about bad outcomes.
13        MS. WIENEKE:  You can't withdraw a question
14  when he's in mid answer, so he's entitled to answer the
15  question while he has started it.  You can't withdraw it
16  mid question so -- mid answer.
17        So, Doctor, please go ahead and answer the
18  question.
19   Q.   BY MR. FATHI:  Doctor, I'm asking you, if it
20  turns out that the numbers on page 30 are inaccurate,
21  would that have any effect on your assessment of the
22  adequacy of ADC's mental health staff?
23        MS. WIENEKE:  David, you're being rude to
24  the witness.  You've interrupted him, and he's entitled
25  to answer the question.  He's going to answer the

Parsons vs.                          Confidential        Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                          Subject to Protective Order                                  April 11, 2014

Page 93

1   question that you asked him before you go on to the next
2   one, which the next one you just asked is the same one
3   that you asked before and then tried to put words in his
4   mouth, as he has tried to explain to you.
5        So the doctor is going to answer the
6   question that you asked him before. So we can be here
7   all day arguing about this, but he gets to answer that
8   question.
9        MR. FATHI: We are only --
10       MS. WIENEKE: That's what the rules say that
11   he gets to do.
12       MR. FATHI: Which rule is that, Kathy?
13       MS. WIENEKE: The rule that you cannot
14   conduct the witness in a way that it's harassing,
15   oppressive, and annoying. Interrupting a witness based
16   on a question that you asked him and then trying to
17   withdraw the question when you don't like the answer is
18   oppressive, annoying, and harassing.
19       MR. FATHI: He is not answering my question,
20   Kathy.
21       MS. WIENEKE: He is answering the question
22   that you asked. And because you don't like it, you're
23   trying to withdraw the question and ask a new one. And
24   you don't get to do that. He gets to answer the question
25   that you asked him.

Page 94

1        MR. FATHI: Kathy, you can run out the clock
2   as much as you want --
3        MS. WIENEKE: I'm not trying to do that,
4   David.
5        MR. FATHI: -- but we are going to be here
6   for another day.
7        MS. WIENEKE: I'm not trying to do that.
8   That's the tactics that you guys did with Cohen and you
9   guys did with other witnesses. I'm not trying to do
10   that. I don't care about the clock. I finished
11   Dr. Stewart's deposition early. I don't care about the
12   clock. I'm here with this witness who's here trying to
13   answer the questions that you ask. You're the only one
14   making reference to the clock. He's here to answer your
15   questions. We'll be here all day to do that. He's not
16   leaving till tomorrow. So you can ask him the questions,
17   but once you do, he gets to answer the questions that you
18   ask.
19       So, Dr. Penn, if you remember what it was,
20   go ahead and finish the answer. Thank you.
21       THE WITNESS: So what I was saying, in
22   corrections, aside from purely numbers and positions,
23   correctional leadership has to make split-second
24   decisions when you have staffing shortages, either short
25   or long term. And so sometimes you may ask staff to

Page 95

1   pitch in or help out or help cross cover. You can be
2   creative and do things via telemedicine or
3   telepsychiatry. There's a lot of different ways.
4   Nursing, there's a term called WRECK, W-R-E-C-K, where
5   you WRECK nurses in where you don't let them leave. They
6   stay in and -- and kind of do double shift or -- or extra
7   time or overtime.
8        So there's a lot of different creative
9   strategies that when you have shortages, you -- it's all
10   about access to care and maintaining access to care. And
11   I think just to say a number is correct or inaccurate,
12   you also have to look at what's going on clinically at
13   the unit level and at the individual level, too. And if
14   you had clear-cut data of bad outcomes, I'd be happy to
15   look at that and, sure, hypothetically it could change my
16   opinion. But barring that, just changes in numbers,
17   that -- that probably won't change my opinion.
18       MR. FATHI: Next in order, please.
19       (Exhibit 549 was marked.)
20       THE REPORTER: 549.
21       THE WITNESS: Thank you.
22       MR. FATHI: I'm sorry, I gave you the wrong
23   document. Make this 549.
24   Q.   BY MR. FATHI: Okay. Doctor, on this chart on
25   page 30 of your report, for May of 2013, you list 10.81

Page 96

1   psychiatrists, correct?
2   A.   Sorry, I list this?
3   Q.   Yes. In your report, on page 30, it says --
4   A.   I'm sorry, page 30.
5   Q.   Page 30 of your report.
6   A.   Okay.
7   Q.   Under May of 2013, under psychiatrists, it says
8   10.81. Do you see that?
9   A.   Yes.
10   Q.   And then down below under source, the second
11   line, it says for May, the source is ADC117064. Do you
12   see that?
13   A.   Yes.
14   Q.   So Exhibit 549 is page ADC117064.
15   A.   Okay.
16   Q.   And my question is, can you walk me through
17   this document and tell me how you came up with 10.81
18   psychiatrists?
19   A.   Well, just for the record, I've never seen this
20   document before, this Arizona Monthly Staffing Report
21   Roll-Up May 2013, Excludes Regional Office, Exhibit 549.

22   I don't know what roll-up means. I don't know who
23   created this document. I think I already answered your
24   question about how it was that this chart on page 30, or
25   this table, which looks actually better in color, it's

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 97

1 easier to see or read, how that was produced to me or
2 collected and forwarded to me.  This other document is
3 new to me, and I -- I would need to look it over
4 carefully to get a better understanding and --
5 Q.   Well, Doctor, you cite this document in your
6 report on page 30.  Is it your testimony that you have
7 not seen this document before?
8 A.   Well, again, I -- I -- I think I answered this.
9 I -- I included this chart or table that I obtained from
10 Corizon by way of the legal team.  And it looks like
11 they -- they reference this, but I've never seen this
12 staffing report that you handed me, Exhibit 549.
13 Q.   Okay.  Well, can you look at this document,
14 Exhibit 549, and tell me how this adds up to 10.81
15 psychiatrists?
16 A.   Probably not.  I mean, I could give you a
17 hypothetical of how it might, because it looks like it
18 says 10 here, and then it's 10.81 on that.  So my
19 question would be -- or my answer to your question would
20 be, could it be agency psychiatrists, could it be locums,
21 l-o-c-u-m-s, psychiatrists, could it be part-time or --
22 we have a thing in Texas called PBL, paid by letter,
23 where you have somebody who is a full-time employee, and
24 they kind of moonlight or do additional work.  So it's
25 possible that the 10 to 10.81 is being made up by any

Page 98

1 combination of those different ways of getting more staff
2 or more hours.
3 Q.   Well, Doctor, this is your report, correct?
4 A.   This report --
5 Q.   Yes.
6 A.   -- the -- Exhibit 544, yeah that's my --
7 Q.   That's your report?
8 A.   Yes, correct.
9 Q.   And in your report, you provide these numbers,
10 correct, on page 30?
11 A.   Yes, that's fair.
12 Q.   And as the source for the May numbers, you cite
13 ADC117064, correct?
14 A.   Yes, correct.
15 Q.   But your testimony is that you have never seen
16 ADC117064 before today, correct?
17 A.   That's fair, yes.
18 Q.   Okay.  As you sit here today, would you say
19 that you are highly confident that this chart on page 30
20 accurately reflects ADC's mental health staffing for the
21 months indicated?
22 A.   I'm not sure what -- when you say "highly
23 confident," I'm sorry, I don't want to be a pain, but, I
24 mean, I have no reason to suspect the validity of this.
25 You know, you -- I think you certainly could ask somebody

Page 99

1 from Corizon why there's a discrepancy between those
2 numbers.  But to be quite frank, the difference between
3 10 and 10.81, we're -- we're -- we're -- you know,
4 we're -- we're splitting hairs.  That's not a big
5 difference.  If it was like 10 and 20 or 10 and 30 or 10
6 and 40, that would be a big difference.  But 10 to 10.81
7 is not a significant difference in my opinion.
8 Q.   And what's the 10 that you're looking at,
9 Doctor?
10 A.   Well, right here, it says contract Corizon,
11 contract SCD, and it says 10.
12 Q.   I'm -- what does it say on the left?
13 A.   I'm sorry, medical director.  I'm sorry, I'm
14 looking at the wrong spot.  Psychiatric director.  I'm
15 sorry, so we're talking about psychiatrists.  Again, I'm
16 looking at this because this is the first time I've
17 looked at this document.  It looks like they have it as
18 7.5.  They have a psychiatric director at a .5.  I assume
19 that's an FTE, full-time equivalent, and 7.5
20 psychiatrists.  So I don't know, again, if they use
21 locums or agency or part-time or paid by letter -- I
22 don't know how you would call that in Arizona -- but to
23 come up with the psychiatrists -- I think that's what you
24 were asking about, of 10.81 in May.
25 Q.   So, Doctor, you don't know if these numbers on

Page 100

1 page 30 of your report are accurate, do you?
2 A.   I have no reason to suspect that they're not
3 accurate.  But with regard to a breakdown of whether they
4 were full-time psychiatrists, part-time psychiatrists,
5 locums or agency, that's not broken out in this chart.
6 Q.   You didn't check these numbers, did you?
7 A.   I wasn't really asked to check.  I mean, I
8 think this --
9 Q.   Doctor, you didn't check these numbers, did
10 you?
11 A.   I -- I don't see that as being my role to -- to
12 look to see -- if somebody reports --
13 Q.   Doctor, you didn't check these numbers, did
14 you?
15 A.   That's fair.
16 Q.   Would you turn to page 20 of your report,
17 please.
18 A.   Page 20.
19 Q.   At the top of page 20, you write, quote:  there
20 were only 720 SMI inmates held in maximum custody
21 conditions and 720 inmates held in maximum custody
22 conditions with current medical needs.  End of quote.  Do
23 you see that?
24 A.   Yes.
25 Q.   Why were you looking at prisoners with current

Page 101

1 medical needs?
2 A. Why am I looking at that?
3 Q. Yes.
4 A. I'd have to re -- rereview this. It's possible
5 this is a typo and maybe this should say mental needs
6 rather than medical. So if that's the case, I would need
7 to amend or -- or change the report.
8 Q. Uh-huh. And is it accurate, as you say on the
9 first line of page 20, that -- and this is speaking about
10 the Eyman Complex -- there are 720 SMI inmates held in
11 maximum custody conditions?
12 A. I'm sorry, could -- could you repeat the
13 question, please.
14 Q. Yes. At the top of page 20 --
15 A. Uh-huh.
16 Q. -- first line, you write that there were 720
17 SMI inmates held in maximum custody conditions. Is that
18 accurate?
19        MS. WIENEKE: Form.
20        THE WITNESS: It's my understanding that I
21 was referring or -- or basing that on the ADC Wells
22 Report on page 19 earlier in the paragraph. So I would
23 have to look at that report. But I have no reason to --
24 to -- I think those numbers are accurate. If you have
25 something that dispels that or proves that wrong, I'd be

Page 102

1 happy to look at it.
2 Q. BY MR. FATHI: Now, I believe you testified
3 earlier that you are on the staff of the special master
4 in the Coleman litigation in California.
5        MS. WIENEKE: Form.
6        THE WITNESS: I'm not on the staff. What
7 happened was I was contacted by Matthew Lopes, and he
8 said he was putting together a team to look at the --
9 specifically focused more on the psychiatric inpatient
10 services and care for the California Department of
11 Corrections, and that they were going to do a statewide
12 looking at all the facilities. And I told him I'd be
13 happy to -- to be involved. So I really wasn't a staff
14 employee. It was more like a consultant. I think that's
15 what the term was, forensic or correctional consultant or
16 psychiatric consultant. And I think the team was made up
17 of attorneys and psychiatrists and maybe a couple of
18 psychologists, too.
19 Q. BY MR. FATHI: Are you still involved in some
20 capacity with the Coleman monitoring?
21 A. No.
22 Q. When did that end?
23 A. If -- if I'm not mistaken, I think it ended in
24 early January. And it -- I don't really think it ended.
25 It -- it's -- it's my understanding, and hopefully I

Page 103

1 don't say anything out of turn here, that attorney Lopes
2 let me know that there had been some concerns because of
3 my work in the Arizona litigation that the California --
4 I believe it's the PLO, the -- and I don't know what
5 that -- Prison -- I forget what that acronym stands for.
6 But that they were objecting that they -- they didn't
7 want me involved in that because of my defense work in
8 this case.
9        So if I could just -- what I understand is
10 I've kind of recused myself. I'm not currently active on
11 that group or team of people that are involved. So
12 that's my understanding of where my -- my role or my
13 agency at the present time is with that -- with that
14 work.
15        But I'd be happy -- I mean, if -- if that
16 can all get worked out, I -- I have no bias. I have
17 no -- I have no skin in the game, and I'm happy to help
18 consult and help systems get better wherever they are.
19 Q. Okay. Would you turn to page 11 of your
20 report, please.
21 A. Sure.
22 Q. And on page 11, going onto page 12, you cite
23 various NCCHC accreditation letters pertaining to ADC
24 facilities. Do you see that?
25 A. Yes.

Page 104

1 Q. Now, as of the time of your December 18th
2 report, Lewis had last been accredited in 2010, correct?
3 This is at the top of page 12.
4 A. That's according to this, but I don't know if
5 there's been any subsequent documentation or additional
6 reviews by NCCHC, but --
7 Q. Doctor, my -- my question --
8 A. Yeah.
9 Q. -- specifically asked at the time of this
10 report.
11 A. That's the -- November 17, 2010, is the last
12 accreditation letter that I cited in this report, yes.
13 Q. Okay. And as of the time of -- of your report,
14 the Yuma and Florence facilities had last been accredited
15 in 2011, correct?
16 A. Yes.
17 Q. Okay. Did you rely on these reports from 2010
18 and 2011 in assessing ADC's mental health care as of
19 December 2013?
20 A. Yes.
21 Q. Okay. Is the Eyman facility accredited by
22 NCCHC?
23 A. It's my understanding that they are not.
24 Q. Has the Eyman facility ever been accredited by
25 NCCHC?

Parsons vs.                    Confidential        Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                    Subject to Protective Order                        April 11, 2014

Page 105

1    A.   You would probably have to ask NCCHC. I don't
2  know, you know, the 20- or 30-year history or however
3  long that facility has been there.  But I -- I don't
4  believe they're currently accredited, no.
5    Q.   And you don't know if they've ever been
6  accredited?
7    A.   Correct.
8    Q.   Would you turn to Tab 10, please.  And would
9  you turn to page Wexford 064, please.  The heading at the
10  top of the page is Dysfunctional Culture.  And the last
11  bullet point on page Wexford 064 is, quote:  Staff
12  shortages have existed for so long that site level
13  employees have become complacent with operating below
14  industry standards.  End of quote.
15        Doctor, did you take the statement by
16  Wexford Health Sources into account in forming your
17  opinions?
18        MS. WIENEKE: Object to the form,
19  foundation.
20        THE WITNESS: No.  Because this is the first
21  time that I've seen this document.  I mean, I can try to
22  explain the interface of private -- private vendors and
23  correctional systems --
24    Q.   BY MR. FATHI:  Doctor, you've -- you've
25  answered the question.

Page 106

1    A.   Okay.
2    Q.   And my next question is, now that this
3  statement has been brought to your attention, does it
4  have any effect on your opinion as to the adequacy of
5  ADC's mental health staffing?
6        MS. WIENEKE: Foundation.
7        THE WITNESS: No, it does not.  But I -- and
8  I'd like to answer -- I'd like to clarify my response.
9    Q.   BY MR. FATHI:  Fine.
10    A.   Okay.  The reason why this doesn't hold weight
11  to me is -- no disrespect to for-profit vendors, but
12  their job there is basically sales people.  They're
13  trying to -- to get contracts and take over correctional
14  systems, be they jails, prisons, or other facilities.
15  And so without knowing more of the context of what these
16  specific statements and what they're based on, I mean,
17  this looks like a PowerPoint presentation that somebody
18  wrote.  I don't know who wrote this or what it's based
19  on.  It just is somebody's opinion.
20        I don't know if they're coming in, trying to
21  pitch that, oh, we can do things better or we're the
22  best.  Or alternatively, they're trying to get out, and
23  this is an exit strategy where they're basically saying
24  that the care or the system is so bad, and it -- it
25  occurred before we got here, and they're trying to save

Page 107

1  face.  Because nationally, once the word gets out that a
2  for-profit private vendor doesn't do a good job, it
3  makes -- it gives them a black eye and it makes them look
4  bad.
5        So I -- I could speak much more to the
6  politics and the business of correctional health care
7  that probably people that don't work in corrections or
8  prisons on a day-to-day basis wouldn't understand, but --
9  but that's the reality of how many of these systems work.
10    Q.   So this statement has no effect on your opinion
11  as to the adequacy of ADC mental health care?
12    A.   Correct.
13    Q.   Okay.  Would you turn to Tab 11, please.  This
14  is an August 13th, 2012, memo from Dr. Ben Shaw to Joe
15  Profiri.  The first page is ADC27770.  And on this first
16  page, Dr. Shaw writes, quote:  Wexford's current level of
17  psychiatry staffing is grossly insufficient to meet this
18  contractual requirement.  Further, this staffing level is
19  so limited that patient safety and orderly operation of
20  ADOC facilities may be significantly compromised.  End of
21  quote.
22        Have you seen this document before, Doctor?
23    A.   I believe so, yes.
24    Q.   Did you take that statement by Dr. Shaw into
25  account in forming your opinion as to the adequacy of

Page 108

1  ADC's mental health staff?
2    A.   Yes, I did.
3    Q.   And you continue to believe that it has been
4  continuously adequate from March 2012 to the present?
5        MS. WIENEKE: Form.
6        THE WITNESS: Well, I think it's -- my
7  answer to your question is that there's been a
8  significant change because Wexford is no longer in the
9  picture.  I think going from the state Department of
10  Corrections to Wexford and now to Corizon, it's expected
11  and understandable that there's going to be staff changes
12  and staff turnover.  And so it's almost -- I mean, I hate
13  to be disrespectful, but it's almost like we're talking
14  about yesterday's news, and we're -- I'm looking at the
15  health care system currently as we speak today as of this
16  past fall.  And as of -- we sit here in this room today,
17  I'm speaking about current real world, how -- how is the
18  correctional health care system, not how it was, what,
19  two years ago or close to two years ago.
20    Q.   BY MR. FATHI: So you're not going to be
21  offering any testimony at trial as to the adequacy of ADC
22  mental health care as of August of 2012, correct?
23        MS. WIENEKE: Object to the form.  Misstates
24  testimony.
25        THE WITNESS: No, that's not accurate.  I --

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 109

1    and I said earlier today that I would be happy to render
2    an opinion about the care and the services from
3    2012-2013.  And I -- I certainly believe that they had
4    some challenge -- some staffing challenges and had
5    transition and turnover.
6            And I also, having worked within
7    correctional systems specifically with contract monitors
8    and with operational people and business and money people
9    and state, understand that sometimes things have to be
10   written in a certain way.  Otherwise, things go to
11   inertia and lack of activity.  So I understand that
12   things have to be written in kind of an inflammatory or,
13   you know, dire way to get people's attention.  So I think
14   all of this needs to be taken into account from a big
15   picture operational level.
16   Q.    BY MR. FATHI:  I see.  So you think Dr. Shaw
17   didn't mean what he wrote here?
18           MS. WIENEKE:  Form.
19           THE WITNESS:  That's not what I said.
20   What -- what I'm saying is that Dr. Shaw obviously is
21   expressing some concerns about staffing challenges within
22   the system with Wexford and transitioning to Corizon and
23   that he clearly has identified some issues and concerns.
24   I -- I'd be happy to testify and answer questions or --
25   or give an opinion about this.

Page 110

1    Q.    BY MR. FATHI:  But your opinion, as you stated
2    earlier, is that as of August 13th, 2012, ADC's mental
3    health care system met the community standard of care,
4    correct?
5    A.    That's what I said earlier, yes.
6    Q.    Do you disagree with Dr. Shaw's statement that
7    as of August 13th, 2012, ADC's current level of
8    psychiatry staffing is so limited that patient safety and
9    orderly operation of ADOC facilities may be significantly
10   compromised?
11           MS. WIENEKE:  Form and foundation.
12           THE WITNESS:  That's what it says here in
13   the letter, that's correct.
14   Q.    BY MR. FATHI:  And my question is, do you
15   disagree with that statement?
16           MS. WIENEKE:  Same.
17           THE WITNESS:  I agree that that's what
18   Dr. Shaw wrote to this contract person.  And just to
19   clarify --
20   Q.    BY MR. FATHI:  No.  I'm sorry, Doctor, I think
21   you misunderstood my question.
22   A.    Okay.
23   Q.    Dr. Shaw is making a statement about conditions
24   in ADC as of August 12th, 2012.  Do you disagree with the
25   statement he is making here?

Page 111

1    A.    I have no reason to disagree with Dr. Shaw.
2    What I'm saying is you have to take this into perspective
3    of the totality of they're trying to make changes and
4    improvements to their system.  They still are remaining
5    NCCHC accredited.  If -- if things were as bad or as dire
6    as it appears in this memo, I think NCCHC could have
7    easily put them on probation or -- or taken away their
8    accreditation.  So, again, I -- I -- I have no reason to
9    dispute what Dr. Shaw wrote here in this memorandum.
10   Q.    Okay.  And further down the page, the same
11   page, Dr. Shaw writes, quote:  Wexford's psychiatry
12   staffing is insufficient to provide a safe level of
13   services.  End quote.  Do you disagree with that
14   statement by Dr. Shaw?
15           MS. WIENEKE:  Form.
16           THE WITNESS:  I don't disagree with
17   Dr. Shaw's statement.  That was his -- in his role as the
18   contract monitor, that's what he's saying, so I have no
19   reason to -- to dispute that because I don't have any
20   firsthand knowledge.  But the point is, and I really want
21   to be able to answer this, that when you're short on
22   psychiatrists, often your medical staff will help out and
23   help renew medications.  Nurses will identify which
24   offenders -- which medications are about to run out.  So
25   there's the capability within a correctional system,

Page 112

1    you're short on psychiatrists, you can have medical
2    staff, medical doctors renew psychotropic medications.
3    That's within -- that's within the standard of care.
4    Q.    BY MR. FATHI:  And your testimony is that
5    that's what happened in ADC in August of 2012?
6    A.    That is not my testimony.  I'm just saying that
7    within a correctional system, people look at different
8    strategies and resources to make sure that there's access
9    to care and that you do what you've got to do to get the
10   job done is -- is -- is the bottom line.
11   Q.    But you don't know what happened in ADC in
12   August of 2012, correct?
13           MS. WIENEKE:  Object to the form.
14           THE WITNESS:  Well, I -- I have this memo
15   from Ben -- Dr. Shaw.  And have -- and having spoken to
16   many staff involved, it -- it's pretty clear to me that
17   there was a period of transition when Wexford was in
18   place, they -- they did a less-than-ideal job and lost a
19   lot of staff.  And now Corizon's in place, and they've
20   really improved significantly.
21           So I'm not going to sit here and say that
22   Wexford was awful or they did a terrible job.  But it's
23   my opinion that I believe Corizon has made significant
24   improvements since inheriting or taking over from
25   Wexford.  I'm prepared to testify to that.

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 113

1    Q.   BY MR. FATHI:  Uh-huh.  And you will testify
2    that ADC's mental health care was -- met community
3    standards as of August of 2012, correct?
4         MS. WIENEKE:  Form, asked and answered.
5         THE WITNESS:  I -- I already said that, yes.
6    Q.   BY MR. FATHI:  Okay.  Would you turn to Tab 12,
7    please.  Tab 12 is a September 21st, 2012, letter from
8    Joe Profiri to Karen Mullenix.  First page is ADC27854.
9    Doctor, did you review this document?
10   A.   Sorry, it's kind of cut off at the bottom.
11   What was the number again?  7 --
12   Q.   27854.
13   A.   Okay.  My -- my thing is cut off at the bottom.
14   Like I -- I just see the top half of the numbers.  But
15   it -- it looks like it's dated September 21st, 2012?
16   Q.   Correct.  And my question is, did you review
17   this document?
18   A.   I don't believe so.
19   Q.   Okay.
20   A.   I -- I'm not -- sorry, I'm not sure.  It --
21   some of it -- the content looks familiar, but I'm -- I'm
22   not sure.  And I apologize, I could look at my report to
23   see if I reference it in my report.  I reviewed so many
24   materials, I -- I -- I don't recall specifically.
25   Q.   Okay.  Would you turn to page 5 of the letter,

Page 114

1    please.
2    A.   Sure.
3    Q.   And on page 5, Mr. Profiri, who is the
4    contracts bed -- contract beds operations director for
5    ADC, refers to, quote:  Inadequate staffing levels in
6    multiple program areas at multiple locations.  Close
7    quote.  He also refers to, quote:  Staffing levels
8    creating inappropriate scheduling gaps in on-site medical
9    coverage, including In-Patient Component.  Close quote.
10   He also refers to, quote:  Staffing levels forcing
11   existing staff to work excessive hours, creating fatigue
12   risks.  Close quote.
13        Doctor, do these statements have any effect
14   on your opinion as to the adequacy of ADC's mental health
15   staffing?
16        MS. WIENEKE:  Form and foundation.
17        THE WITNESS:  I think this is important
18   information, but it doesn't change my opinion.  It
19   doesn't specifically go into details about mental health
20   staff, psychiatry evaluation and treatment, or negative
21   outcomes or bad outcomes.
22   Q.   BY MR. FATHI:  Doctor, it's a recurrent theme
23   in your reports and in your testimony today that you
24   weren't able to find any prisoners who suffered injury or
25   death as a result of a challenged procedure.  Is it your

Page 115

1    testimony that unless an identifiable prisoner suffers
2    injury or death, the standard of care is met?
3         MS. WIENEKE:  Form and foundation.
4         THE WITNESS:  I'm not sure when you say
5    "challenged" -- your question, I didn't understand what
6    you refer -- refer to.
7    Q.   BY MR. FATHI:  Your -- in your report, you talk
8    about the allegations plaintiffs are making about the
9    medication system, about the risk of heat injury, about a
10   range of things.  And you repeatedly say that you were
11   not able to find a prisoner who suffered injury or death
12   as a result of any deficiency in this system.  And so my
13   question is, is it your testimony that unless an
14   identifiable prisoner suffers injury or death, then the
15   standard of care is met?
16        MS. WIENEKE:  Form and foundation.
17        THE WITNESS:  No, that's not what I'm
18   saying.  What -- what I'm saying is within a correctional
19   system, you have to have a system in place that provides
20   access to care, and you identify patients at risk for
21   particular outcomes, like you mentioned heat stress or
22   suicide or chronic disease states, like chronic medical
23   or mental illnesses.  It's my opinion that -- and I think
24   what you're trying to get me to say is that you have to
25   have bad outcomes, and that's not what I'm saying.

Page 116

1         What I'm saying is it's my opinion that they
2    have -- they had a system in -- of care in place when it
3    was Department of Corrections, ADC Arizona, when it was
4    Wexford, and now Corizon.  And clearly, there have been
5    changes in the system, both staffing, staffing ratios,
6    patient acuity, all that.  I'm prepared to testify to --
7    as someone who works within correctional systems, that
8    yes, ideally, you -- you want to maintain access to care
9    and you want to avoid bad outcomes, but sometimes you
10   have staffing shortages that are beyond anybody's
11   control.  But you -- that in turn has an effect on your
12   leadership to work together with custody -- I've seen
13   systems of care where you have too many staff or you --
14   you could be fully staffed, but if you can't get patients
15   transported from -- from -- to the unit clinic, your
16   doctors are sitting around twiddling their thumbs, so --
17   Q.   BY MR. FATHI:  Okay, Doctor, I think this goes
18   beyond the scope of my question.
19   A.   Well, I'm trying to --
20   Q.   I'm -- I'm simply asking, is it possible for a
21   practice, say, the medication distribution system, to
22   fall below the standard of care even if you can't
23   identify a particular prisoner who's -- who's suffered
24   injury as a result?
25        MS. WIENEKE:  Object to the form.

Glennie Reporting Services, LLC
602.266.6535  www.glennie-reporting.com

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 117

1    THE WITNESS: Sorry, could you repeat the
2 question again.  Sorry.
3    Q.   BY MR. FATHI:  All right.  Is it possible to
4 have an inadequate medication distribution system that
5 falls below the community standard of care even if you
6 can't find a specific prisoner who suffered injury or
7 death as a result?
8    MS. WIENEKE: Object to the form.
9    THE WITNESS: I -- I would disagree.  I
10 think if you have an inadequate system, there's going to
11 be sequelae.  There's going to be outcomes.  If you don't
12 have enough nurses, people are going to get sick.  And
13 then ultimately at some point, they're going to have to
14 be transported off site for medical emergencies or for
15 conditions.  So I think whether it be medical or pharmacy
16 or psychiatry, you're going to have sequelae if your
17 system doesn't provide access to care and ongoing
18 monitoring and additional ways to access health care.
19    Q.   BY MR. FATHI:  I see.  So if you can't find
20 prisoners who have suffered injury or death, then that
21 means the system is -- is adequate?
22    MS. WIENEKE: Object to the form.
23    THE WITNESS: No, that's not what I am
24 saying at all.  If I could just sum it up, the
25 shortest -- every correctional system in the country

Page 118

1 struggles with providing appropriate care and services to
2 offenders and balancing that with the physical plant
3 issues where the prisons are located and jails --
4    Q.   BY MR. FATHI:  Okay.  Again, Doctor, I really
5 think this is beyond the scope of my question.  Let me
6 ask it another way.
7    A.   Okay.
8    Q.   If a given practice, say, intermittent and
9 unreliable medication delivery, creates a risk of harm,
10 can that fall below the standard of care even if it turns
11 out that no prisoners were actually harmed?
12    MS. WIENEKE: Form.
13    THE WITNESS: It's my understanding that --
14 if you're talking about standard of care, for medical
15 malpractice, it has to be there was a duty -- there was a
16 dereliction of the duty resulting in direct harm.  So
17 part of what you're asking about has an inference that
18 there had to be some bad harm or sequelae.
19    So I'm struggling with -- I think you can
20 have situations where you have a health care system that
21 doesn't provide appropriate services, but you have a
22 healthy patient population with no medical or mental
23 health issues and you don't have bad outcomes because
24 they're healthy.  So it's -- I -- I think it's just too
25 complicated because you have healthy patients and then

Page 119

1 you have sick patients.  You have patients that require
2 dialysis and medical stuff and -- and psychiatric stuff.
3 I -- I -- I think corrections, there's no absolute yes or
4 nos.  It's -- there's too many variations for me to
5 answer that in a yes or no.
6    MR. FATHI: Could you read my question back,
7 please.
8    (The requested portion of the record was
9 read by the reporter.)
10    THE WITNESS: I can't answer your question
11 without giving a much more detailed response.  So I can't
12 give a yes/no response to that.
13    Q.   BY MR. FATHI:  Okay, thank you.
14    Doctor, what are MGAR reports?
15    A.   That's an acronym that I've seen, and I don't
16 recall what it stands for.
17    Q.   That's fine.  But what are they generally?
18    A.   I don't know.  I'd have to -- I've -- I've seen
19 it referenced.  And, again, I would assume it's some sort
20 of classification system.  But I -- without having it or
21 knowing it, I wouldn't be able to answer your question.
22    Q.   Did you review any MGAR reports as part of your
23 work in this case?
24    A.   I believe so.  But I -- I mean, I reviewed a
25 lot of stuff and classifications systems and codes and

Page 120

1 acronyms.  So, again, for me to answer your question,
2 I'd -- I'd really like to be able to -- if you have
3 something to show me what -- what MGAR is, I -- I could
4 probably give a better answer, and I'd be happy to do
5 that.
6    Q.   But your recollection is that it's a
7 classification document?
8    A.   No.  I mean, I don't -- I -- I don't recall
9 specifically what it is.
10    Q.   Okay.  Would you look at Tab 3, please.  And
11 the first document under Tab 3, which is the July 2013
12 Lewis Complex MGAR report.
13    A.   I'm sorry.  Am I looking at the right thing?
14    Q.   Yes.  Now, if these are MGAR reports, Doctor,
15 did you review any of these?
16    A.   I'm sorry, what -- what document are you
17 referring to again?
18    Q.   I'm referring to the document titled at the top
19 July 2013 Lewis Complex.  The Bates number on the first
20 page is ADC137268.
21    A.   Oh, sorry, that's a different one.
22    Q.   Are you looking under Tab 3, Doctor?
23    A.   Okay, that would help.  Got it.  So it's July
24 2013 Lewis Complex, ADC137268?
25    Q.   Yes.

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 121

1  A.  Okay.

2  Q.  Now, if I represent to you that this is an MGAR

3  report, did you review MGAR reports as part of your work

4  in this case?

5  A.  I can't recall.  I mean, these look -- I'd have

6  to refer to my report.  I reviewed so many documents.  So

7  I don't recall specifically if I did or didn't.

8  Q.  Okay.  And who was the contract provider in

9  July of 2013?

10  A.  I don't know when Corizon started.  I -- I

11  don't know the specific dates of when Corizon came on

12  board.

13  Q.  Would you look at your supplemental report,

14  please.

15  A.  Sure.

16  Q.  Page 26.  On page 26 of your supplemental

17  report, three lines up from the bottom, you say that

18  Corizon took over on March 4th, 2013.  Is that your

19  understanding?

20  A.  That's fair, yes.

21  Q.  Okay.  So as of July of 2013, who was the

22  contract health care provider in ADC?

23  A.  So if they took over on March 4th of 2013, it

24  probably would have been Corizon still for July, right?

25  Yeah, it would have been Corizon.

Page 122

1  Q.  Who is your understanding of who the current

2  provider is?

3  A.  It's my understanding Corizon is still the

4  current provider.

5  Q.  Okay.

6  A.  Are we going to break for lunch or could I have

7  a break or --

8  Q.  Yes.  After I finish this line of questioning,

9  which should be about three minutes.

10  A.  Okay.

11  Q.  Back to Tab 3, please.

12  A.  Uh-huh.

13  Q.  Would you turn to page ADC137285.

14  A.  Sorry, 137 --

15  Q.  285.

16  A.  285.  Okay.

17  Q.  Okay.  And this page is titled Staffing.  Do

18  you see that?

19  A.  It says July 2013 Lewis Complex.  And then the

20  next line, it says Staffing.

21  Q.  Correct.

22  A.  Okay.

23  Q.  And in the second box from the top on the

24  right, it says the following, quote:  Though efforts at

25  increasing current staffing levels continue, the

Page 123

1  shortages in all areas to include providers for medical

2  and psychiatry and in areas of nursing clearly compromise

3  the ability of current staff to manage the extensive

4  medical needs of the population.  End of quote.

5  Doctor, does that have any effect on your

6  opinion of the adequacy of ADC's mental health staffing?

7  MS. WIENEKE:  Form.

8  THE WITNESS:  It has -- it has an effect,

9  but it doesn't change my opinion.

10  Q.  BY MR. FATHI:  Okay.

11  A.  And the reason being, I don't know who Terry

12  Allred is.  I don't know, is that a he or she or their

13  qualifications.  And I don't know what their role is in

14  filling out this form, if this is a contract auditor or

15  monitor.  I -- I don't know the context of this report.

16  Q.  Okay.  So you haven't seen these reports

17  before.  Is that what you're saying?

18  MS. WIENEKE:  Object to the form.

19  THE WITNESS:  I'm not -- I don't recall if

20  I've seen these before.

21  Q.  BY MR. FATHI:  Okay.  I'm asking you to assume

22  that Terry Allred is an ADC employee who monitors

23  Corizon's compliance with the contract.  Now, if you

24  assume that information, does this statement by

25  Mr. Allred have any effect on your opinion as to the

Page 124

1  adequacy of ADC's mental health care staffing?

2  MS. WIENEKE:  Form.

3  THE WITNESS:  No, it does not.

4  Q.  BY MR. FATHI:  Okay.  Would you turn to Tab 6,

5  please.

6  MS. WIENEKE:  Is this a new area?  Can we

7  take the break that Dr. Penn requested?

8  MR. FATHI:  Okay.  One more question, and

9  then we can break.

10  THE WITNESS:  Sorry, Tab 6, you said?

11  Q.  BY MR. FATHI:  Yes.

12  A.  Okay.

13  Q.  And the first document is the July 2013 Tucson

14  Complex MGAR.

15  A.  Yes.

16  Q.  Bates number of the first page ADC137360.

17  Would you please turn to page 137395.

18  A.  Sorry, 137 --

19  Q.  395.

20  A.  Okay.

21  Q.  And this page is titled Staffing.  And in the

22  second box from the top on the right, it says, quote:

23  The staffing continues to be insufficient to meet the

24  needs of the inmate population at this complex, due to

25  the backlog of processes that need to be caught up as

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 35 of 157

Parsons vs.                                    Confidential        Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                    Subject to Protective Order                              April 11, 2014

Page 125

1 witnessed by backlog charts needing provider reviews,
2 inmates continuing to wait to see both nursing and/or
3 provider. End of quote.
4        Now, assuming, again, that this was written
5 by an ADC contract monitor, does this statement have any
6 effect on your opinion of the adequacy of ADC's mental
7 health staffing?
8    A.   Well, first of all, the answer is no. This
9 doesn't specifically reference mental health or
10 psychiatrists. And two, this is July of 2013. And
11 things change from day to day or from week to week to
12 month to year. So I would take this into account. But
13 you really have to look at the big picture, the big scope
14 of everything. So no, it doesn't change my opinion.
15        MR. FATHI: Okay. Why don't we take a lunch
16 break.
17        THE VIDEOGRAPHER: Going off the record.
18 The time is 12:44 p.m. This is the end of video No. 2.
19        (A recess was taken from 12:44 p m. to
20 1:37 p m.)
21        THE VIDEOGRAPHER: We're back on the record.
22 The time is 1:37 p.m. This begins video No. 3.
23    Q.   BY MR. FATHI: Doctor, did you speak with
24 anyone over the break?
25    A.   Yes, I did.

Page 126

1    Q.   And who was that?
2    A.   Attorney Wieneke.
3    Q.   Anyone else?
4    A.   The -- the real nice lady there at the
5 restaurant that helped prepare my food. She was very
6 nice.
7    Q.   That's good. Did you review any documents?
8    A.   Just right now, I looked in my report.
9    Q.   Anything else?
10    A.   No.
11    Q.   Okay. Before the break, you testified that you
12 had destroyed some of the notes that you made in this
13 case. When did you destroy those notes?
14    A.   And, again, to -- well, I wouldn't call them
15 notes. They were like reminders to myself, like don't
16 forget this or strengthen this or -- like a reference,
17 NCCHC or something like that. So they weren't notes,
18 they were basically like outline points to add to the
19 report, to include in the report.
20    Q.   Can you answer my question, Doctor?
21    A.   Probably as soon as I finished my report of
22 December 18, that's when I would have destroyed it was
23 like maybe one or two pages of notes to self, and then
24 similarly, the supplemental report, like the day of.
25    Q.   Okay. I am now going to ask you some questions

Page 127

1 about the process of drafting your report. And your
2 counsel may instruct you not to answer, but I need to ask
3 these questions on the record to -- for a motion to
4 compel.
5    A.   Sure.
6    Q.   Who wrote the first draft of your December 18th
7 report?
8        MS. WIENEKE: And just to be clear, my
9 instruction is -- not to answer is that you are
10 instructed not to answer insofar as it -- except insofar
11 as it relates to any questions pertaining to your
12 compensation, facts or data relied upon in creating or
13 reporting your opinions, and assumptions you relied upon
14 in forming your opinions for the record. Go ahead.
15        THE WITNESS: So I wrote the first draft in
16 its entirety.
17    Q.   BY MR. FATHI: Uh-huh. And when was that?
18    A.   Probably early December 2013.
19    Q.   How many drafts were there total?
20        MS. WIENEKE: I don't think you're entitled
21 to know how many drafts there were, so I'm going to
22 instruct him not to answer.
23    Q.   BY MR. FATHI: Did any of the lawyers on this
24 case edit or modify your initial draft and send it back
25 to you?

Page 128

1        MS. WIENEKE: I'm not going to allow him to
2 answer that. Instruct him not to answer.
3    Q.   BY MR. FATHI: Did any of the lawyers in this
4 case have any role at all in the drafting or editing of
5 your report?
6        MS. WIENEKE: I'm going to instruct him not
7 to answer.
8    Q.   BY MR. FATHI: Did any other person besides
9 counsel on this case write or edit or comment on any
10 portion of this report?
11        MS. WIENEKE: You can answer that --
12        THE WITNESS: No --
13        MS. WIENEKE: -- with --
14        THE WITNESS: Sorry.
15        MS. WIENEKE: Go ahead.
16        THE WITNESS: No.
17    Q.   BY MR. FATHI: Did you cut and paste any
18 portion of this report from another report?
19        MS. WIENEKE: I'm going to instruct you not
20 to answer.
21        MR. FATHI: On what ground?
22        MS. WIENEKE: That goes into the drafting of
23 his report, including whether it's a draft. You can ask
24 him about what facts he relied upon in the preparation of
25 his report, the assumptions that he relied upon.

Page 129

1   Q.   BY MR. FATHI:  Did you have an assistant or any
2   other person besides counsel playing any role in the
3   drafting of this report?
4   A.   No.
5   Q.   Okay.  Now I'm going to ask you about your
6   March 26, 2014, report.  When did you begin to draft that
7   report?
8   A.   Probably like early March 2014.
9   Q.   So you began drafting it before your trip to
10  Yuma?
11  A.   Yes.
12  Q.   Who wrote the first draft?
13  A.   I did in its entirety.
14  Q.   How many drafts were there?
15      MS. WIENEKE:  Same objections.  Same
16  instruction.
17      MR. FATHI:  You're instructing him not to
18  answer?
19      MS. WIENEKE:  That being -- same
20  instruction, that's what it means.
21  Q.   BY MR. FATHI:  Did counsel ever edit or comment
22  on or revise your draft and return it to you?
23      MS. WIENEKE:  Same instruction not to
24  answer.
25  Q.   BY MR. FATHI:  Did lawyers in this case have

Page 130

1   any role in the preparation of your March 26, 2014,
2   report?
3       MS. WIENEKE:  Same instruction not to
4   answer.
5   Q.   BY MR. FATHI:  How many drafts were there?
6       MS. WIENEKE:  Same instruction not to
7   answer.
8   Q.   BY MR. FATHI:  Did any other person besides
9   counsel write or edit or comment on any portion of this
10  report?
11      MS. WIENEKE:  You can answer.
12      THE WITNESS:  No.
13  Q.   BY MR. FATHI:  Did you cut and paste any
14  portion of this report from another report?
15      MS. WIENEKE:  Same instruction not to
16  answer.
17  Q.   BY MR. FATHI:  Okay.  Doctor, would you turn to
18  Tab 4, the third document, please.  This is the September
19  2013 MGAR for Perryville.  And would you turn, please, to
20  page 154210.
21  A.   1542 --
22  Q.   10.
23  A.   Oh, sorry, 210.  Okay.  154210.
24  Q.   And this page is titled Staffing.  And at the
25  bottom of the page it says the fooling, quote:  Mental

Page 131

1   health staff at San Carlos have caseloads in excess of
2   500.  A large amount of time is spent just noting orders.
3   There is one psychiatrist onsite at Perryville.  The
4   number of patients he can see is limited, given the
5   travel between yards and other duties he has.  There are
6   vacancies throughout the Complex that affect the ability
7   of existing staff to meet the needs of all the inmates.
8   End of quote.
9       Doctor, does this statement by Mr. Haldane,
10  assuming he is an ADC monitor, have any effect on your
11  opinion as to the adequacy of ADC mental health staff?
12  A.   It does have an effect, but it doesn't change
13  any opinion.
14  Q.   What effect did it have?
15  A.   This data that I relied on -- and I neglected
16  to mention that I rechecked my report, and I actually did
17  review all of the MGARs.  So I just want to correct my
18  testimony earlier that I hadn't recalled, but I did look
19  at all these MGAR reports.
20  Q.   So is your testimony that you took this
21  statement into account in reaching your opinion that ADC
22  mental health staffing is adequate?
23  A.   Yes.
24  Q.   Would you turn to Tab 5, please, the third
25  document.  And would you please turn to page 154251.

Page 132

1   A.   Sorry, which set of documents is it?
2   Q.   Tab 5, the third document --
3   A.   Okay.
4   Q.   -- September 2013 Phoenix MGAR.
5   A.   And I'm sorry, the Bates number is --
6   Q.   154251.
7   A.   Thank you.  Okay.
8   Q.   And on this page, it says -- one moment.
9   Quote:  Aspen (MTU) did not have a psychiatrist last
10  week, 9/23/13 through 9/27/13.  The medical provider is
11  going to MTU approximately once a week.  This is limiting
12  inmate access to medical and psychiatric care.  End of
13  quote.
14      Did you take this statement into account in
15  reaching your opinion that ADC mental health staffing is
16  adequate?
17  A.   Yes.
18  Q.   Doctor, is it your testimony that you reviewed
19  the staffing portions of these MGARs?
20      MS. WIENEKE:  Object to the form.
21      THE WITNESS:  According to my report dated
22  December 18, 2013, I've listed all of the MGAR reports
23  that I reviewed.  And I think they're listed --
24  Q.   BY MR. FATHI:  I'm looking at Appendix A, page
25  5, of your December report.

Parsons vs.                              Confidential         Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                            Subject to Protective Order                              April 11, 2014

Page 133

1    A.   Right.  Page 4 and 5.  It has the compliance
2  reports, MGARs starting with April 2013, includes some
3  from 2012.  So basically 2012 and 2013.  And I have them
4  listed what -- what I did review.
5    Q.   But it says, Doctor, that you reviewed the
6  mental health and medication administration sections
7  only.  Do you see that?
8    A.   That's what it says for three sections of that.
9    Q.   For July and August and September, correct?
10   A.   Actually, no.  July 2013, May 2013, and
11  September 2013.
12   Q.   Would you look at the bottom of page 4, please.
13   A.   Right.  April 2013 and August 2013, correct.
14   Q.   Okay.  So for the July, August, and September
15  2013 MGAR reports, did you not review the staffing
16  sections, correct?
17   A.   I don't have them listed on my report, so --
18  but I'd be happy to look at them to answer any additional
19  questions you have.
20   Q.   Would you answer my question, please, Doctor.
21   A.   Sure.  I don't have them listed, so it appears
22  that I did not review them.
23   Q.   Thank you.
24   A.   But, again, I'd be happy to look at them.
25   Q.   Would you turn to Tab 8, please.  Tab 8 is the

Page 134

1  September 5th, 2013, deposition of Nicole Taylor, which
2  you reviewed in its entirety, correct?
3    A.   Yes.
4    Q.   Would you turn to page 149, please.  On page
5  49, at lines 6 to 13, Dr. Taylor testifies that she has
6  expressed the view to various people, including the
7  defendants in this case, that Corizon needs to provide
8  additional mental health staff.  Do you see that?
9    A.   Yes.
10   Q.   Do you disagree with Dr. Taylor that Corizon
11  need to provide additional mental health staff?
12        MS. WIENEKE:  Form, foundation.
13        THE WITNESS:  I don't agree or disagree with
14  that statement.
15   Q.   BY MR. FATHI:  I'm sorry, I don't understand
16  that answer.
17   A.   Basically it's my opinion that the only people
18  that really know what the appropriate staffing for the
19  Arizona Department of Corrections system are Corizon and
20  Department of Corrections staff.  So they would be the
21  ones who would be able to give the best estimation of
22  what kind of staffing they need at a particular unit at a
23  particular time.  So I don't agree with it, I don't
24  disagree with it.
25   Q.   So Dr. Taylor, as the mental health monitor, is

Page 135

1  not qualified to express an opinion on what mental health
2  staff is needed.  Is that your testimony?
3        MS. WIENEKE:  Object to the form.
4        THE WITNESS:  I believe Dr. Taylor is more
5  than qualified.  I have a lot of respect for Dr. Taylor.
6  I think the statement -- I don't understand the context
7  in which it's being asked, if they're talking about a
8  particular unit, if they're talking about several units.
9  This is taken out of context.  So without knowing the
10  context, I can't answer the question.
11   Q.   BY MR. FATHI:  I'm asking you to assume that
12  she's referring to the entire system.  Do you agree or
13  disagree with Dr. Taylor's statement that Corizon needs
14  to provide additional mental health staff?
15        MS. WIENEKE:  Object to the form.  Assumes
16  facts not in evidence.
17        THE WITNESS:  I'm going to say something,
18  and it's probably going to get me in trouble, but it's my
19  belief that every jail, prison, or correctional facility
20  in the country could use more staff.  Medical, nursing,
21  dental, and mental health.  That there's never enough
22  staff.  There's always going to be staffing issues or
23  shortages and --
24   Q.   BY MR. FATHI:  Doctor --
25   A.   Sorry, I'm still -- so you asked me the

Page 136

1  question -- I think if that's my working belief system,
2  that I think all facilities can use more health care
3  staff, then I don't disagree with what Dr. Taylor wrote
4  in this statement that's taken out of context.
5    Q.   And why is it taken out of context, Doctor?
6    A.   Well, because I've already said earlier that I
7  don't -- I'm not sure what specifically -- if she's
8  talking about a particular unit or the entire system.
9    Q.   So you agree with Dr. Taylor's statement that
10  Corizon needs to provide additional mental health staff?
11        MS. WIENEKE:  Form.
12        THE WITNESS:  I don't agree with that, and I
13  need to clarify my response to that.  Basically it's my
14  understanding that there are staffing patterns and
15  there's an established number.  And so the Department of
16  Corrections audits Corizon to see their compliance with
17  that staffing model.  And it's possible or it's likely
18  that she's saying that they either need to increase their
19  model and have more staff or, alternately, if they're not
20  meeting their percentages, they need to recruit or retain
21  more staff.  So, again, I think -- I can't really answer
22  this because it's taken out of context.
23   Q.   BY MR. FATHI:  Would you look at your
24  supplemental report, please, page 12.
25   A.   Sure.

Parsons vs.                           Confidential          Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                           Subject to Protective Order                                April 11, 2014

Page 137

1    Q.   Now, on page 12 of your supplemental report,
2    toward the top of the page you mention the American
3    Psychiatric Association, the American Academy of
4    Psychiatry and the Law, and some other organizations.  Do
5    you see that?
6    A.   Yes.
7    Q.   And then further down the same page, on the
8    second full paragraph, you write, quote:  None of the
9    above listed national psychiatric organizations nor the
10   NCCHC, ACA or the Joint Commission have promulgated
11   psychiatric staffing ratios or recommendations to date.
12   Close quote.
13        Do you see that language?
14   A.   Yes.
15   Q.   And then on pages 12 and 13, you quote some
16   language from an APA publication titled Psychiatric
17   Services in Jails and Prisons, correct?
18   A.   Yes.
19   Q.   Okay.
20        MR. FATHI:  Next in order.
21        (Exhibit 550 was marked.)
22        THE REPORTER:  550.
23   Q.   BY MR. FATHI:  Doctor, Exhibit 550 is an
24   excerpt from Psychiatric Services in Jails and Prisons.
25   And if you look on pages 7 and 8 of the book, you'll see

Page 138

1    that that's where the text quoted on pages 12 and 13 of
2    your supplemental report appears.  Do you see that,
3    Doctor?
4    A.   Yes.
5    Q.   But you've omitted some text from the section
6    that you quote on pages 12 and 13 of your report, haven't
7    you?
8    A.   I'm sorry, say it again, please.
9    Q.   You have omitted some text from the section of
10   this book that you quote on pages 12 and 13 of your
11   report.
12   A.   I don't know if I omitted them.  I just didn't
13   include them in this -- that's fair, yes.
14   Q.   And is there a difference between omitting and
15   not including, Doctor?
16   A.   Well, I wasn't an English major, so if you want
17   me to give a definition of omitting and including, I
18   probably couldn't give you that.
19   Q.   Okay.  So if looking at page 7 of the APA
20   book --
21   A.   Which, by the way, I'm actually in the process
22   of re -- I'm on the committee that's rewriting this book.
23   Q.   That's very nice, Doctor, but I'd ask you to
24   just answer my questions.
25   A.   Sure.

Page 139

1    Q.   Looking at page 7 of this book, you omit the
2    language about a third of the way down starting with the
3    word "Moreover" and carrying over onto page 8, ending
4    with the phrase "psychotropic medication," correct?
5    A.   I'm sorry, "Moreover" -- but what was the
6    sentence that starts "Moreover"?
7    Q.   About a third of the way down page 7 --
8    A.   Yes.
9    Q.   -- the sentence beginning:  Moreover, licensure
10   varies.
11   A.   Right.
12   Q.   You omit from there all the way through the end
13   of the carryover paragraph on page 8, correct?
14   A.   Yes.
15   Q.   And in the section that you omitted, the
16   following language appears, quote:  It is suggested that
17   in jails, for every 75 to 100 inmates with serious mental
18   illnesses who are receiving psychotropic medication,
19   there be one full-time psychiatrist or equivalent.  In
20   prisons, with fewer admissions, the caseload of each
21   full-time psychiatrist or equivalent can rise to a
22   maximum of 150 patients on psychotropic medication.  End
23   of quote.
24        Do you see that language, Doctor?
25   A.   Yes.

Page 140

1    Q.   Now, on page 13 of your report, you didn't
2    insert an ellipses or any other indication to show that
3    you were omitting some text, did you?
4    A.   I'm not sure what that is, did you say --
5    Q.   Yes, three dots, the symbol that is usually
6    used to indicate where text has been omitted.
7    A.   I've never -- I wasn't aware of that.  I've
8    never -- so that's -- that's good information.  That's
9    good to know.
10   Q.   You're not aware of the fact that when you are
11   quoting a source and you omit some language in the middle
12   of the quote, you're supposed to indicate that in some
13   way?
14   A.   Okay.  I didn't know that.
15   Q.   You didn't know that.
16   A.   No.
17   Q.   Why did you omit this language, Doctor?
18   A.   It's not really a thing of omitting.  It's
19   basically I thought that -- well, a couple of things.
20   First of all, this is something that's actually being
21   disputed even as we speak.  This -- the committee that
22   I'm on, which is basically several national experts in
23   prisons and jails, we're struggling with this very issue.
24   So the -- and the key is --
25   Q.   Excuse me, Doctor, my question was very

Page 141

1  specifically about your quotation of this language.
2     A.   Right.
3     Q.   Now, you quoted some language from this book.
4  You omitted a section in the middle of the quotation, and
5  you didn't indicate in any way that you were doing so.
6  And my question is, why did you omit that language?
7           MS. WIENEKE: Answer the question that he
8  was -- finish answering the question that he asked you,
9  which is why you omitted the language.  And feel free to
10  take as much time as you need to to fully answer the
11  question that he asked, which was a wide open-ended
12  question.  It's not a yes or no.  He can answer it as
13  much as he wants, even if you don't like the answer.
14           Go ahead, Doctor.
15           THE WITNESS: Thank you.
16           MS. WIENEKE: And please don't interrupt the
17  doctor as he's answering your question.
18           MR. FATHI: He is not answering my
19  questions.
20           MS. WIENEKE: You asked why he omitted the
21  language.  He is explaining it to you, and he will
22  continue to explain it to you uninterrupted.
23           MR. FATHI: I will thank you to minimize
24  your speaking objections, which serve no other purpose
25  than running out the clock.

Page 142

1           MS. WIENEKE: I don't care about the clock.
2  You are the one who's interrupting the witness.  Please
3  let him finish his answer.  Stop interrupting him and
4  we'll get through this faster.
5           THE WITNESS: There's a couple of reasons
6  why I did not include that in the letter.  I'm sorry, in
7  my report.  First of all, if you notice the language,
8  it's "It is suggested."  And then those numbers are
9  given.  There's no reference to that.  So basically, "it
10  is suggested" is not an empirically studied or validated
11  number.  It's something that the work group that put it
12  together in the first place, which I think was like 15
13  years ago or 20 years ago, they -- somehow somebody came
14  up with that number.  But you'll notice that that number
15  is not referenced anywhere.  There's no reference,
16  there's no citation.
17           So being a medical physician that believes
18  on using data and evidence and evidence-based medicine, I
19  felt that I could not, within using scientific method and
20  to a reasonable degree of medical and psychiatric
21  certainty, this is just one person's opinion about this
22  75 to 100 and 150 numbers that is not universally agreed
23  upon nor is it published or cited anywhere, and that's
24  why I did not include it in my report.  Furthermore, this
25  is an issue that we're currently trying to get a

Page 143

1  consensus on as we write the third edition, which I'm one
2  of the authors of, of this task force report.
3     Q.   BY MR. FATHI: I'm sorry, Doctor, your
4  testimony is that book Psychiatric Services in Jails and
5  Prisons is written by one person?
6     A.   No.  What I'm saying is that basically this
7  paragraph, the one where you asked about the numbers,
8  that which was included, the wording in that paragraph,
9  there's no reference or citation.  And, therefore -- and
10  that's one issue.
11           No. 2 is, we're currently debating the issue
12  of staffing ratios, this expert panel that's been put
13  together.  And so that's why I didn't include it, because
14  there's not -- there's no consensus in the field, so it
15  would be inappropriate to put that in a report within
16  a -- for a judge or a fact finder.  I think if there's no
17  consensus in the field, it just further confuses or makes
18  it even blurrier.
19     Q.   So your testimony is that you didn't put
20  anything in your report that didn't represent a consensus
21  in the field?
22           MS. WIENEKE: Object to the form.
23           THE WITNESS: No, that's not what I'm
24  saying.
25     Q.   BY MR. FATHI: Okay.  Well, you said that this

Page 144

1  staffing ratio is one person's opinion.  My question is,
2  who is that one person?
3     A.   I don't think I said it's one person's opinion.
4           MR. FATHI: Would you read the testimony
5  back, please.
6           (The requested portion of the record was
7  read by the reporter.)
8     Q.   BY MR. FATHI: And so my question, Doctor, is
9  who is the one person whose opinion this represents?
10     A.   I don't know the answer to that.  I can tell
11  you -- I can tell you who was on this task force that
12  wrote this report.
13     Q.   No, I don't need to know that, Doctor.  You
14  said it was one person's opinion, and you don't know who
15  that one person was?
16     A.   Well, what happens -- I mean, I can tell you
17  the process of how these task force reports are written
18  because --
19     Q.   No, that's all right.
20     A.   Well, you're asking me to answer -- what I'm
21  saying is sometimes you'll get one person on a task force
22  report that is very passionate about a certain issue.
23  And I'm not going to say -- you'll get a Jeff Metzner or
24  you get a Henry Weinstein or you'll get somebody who's
25  another expert in correctional health care, who will say,

Parsons vs.                                    Confidential         Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                    Subject to Protective Order                                    April 11, 2014

Page 145

1  I really think we need to take a position on this
2  issue and --
3      Q.   Doctor, you're not answering my question.
4      A.   But you asked me --
5      Q.   I asked you who was the one person whose
6  opinion this is, and you said you don't know.
7      A.   I don't know that.
8      Q.   Doctor, returning to page 12 of your report.
9      A.   Sure.
10     Q.   Where you write:  None of the above listed
11 national psychiatric organizations have promulgated
12 psychiatric staffing ratios or recommendations to date.
13 That's not true, is it, Doctor?
14     A.   No, that actually is true.
15     Q.   So it's your testimony that when the APA's
16 Psychiatric Services in Jails and Prisons says, quote:
17 It is suggested that in jails, for every 75 to 100
18 inmates with serious mental illness who are receiving
19 psychotropic medication, there be one full-time
20 psychiatrist or equivalent, close quote, that is not a
21 psychiatric staffing ratio or recommendation?
22     A.   You asked me to comment on, and you just said
23 it, none of the above listed national psychiatric
24 organization nor NCCHC -- this -- again, the way that the
25 wording on this is, "it has been suggested."  It doesn't

Page 146

1  say "you shall" or "you must" or "you" -- all it says is
2  "it has been suggested."  So that's -- "it is suggested"
3  is not a definitive standard of care.  And this is just a
4  task force report.  And, you know, we're in the process
5  of rewriting it or revising it.  So hopefully we'll get
6  more clarity on this issue.
7      Q.   So it's your testimony that that is not a
8  psychiatric staffing ratio?
9           MS. WIENEKE:  Object to the form.
10          THE WITNESS:  It's my opinion that that is a
11 recommendation, but it is not widely agreed upon within
12 the correctional community.
13     Q.   BY MR. FATHI:  Is it your opinion that that is
14 not a psychiatric staffing ratio?
15          MS. WIENEKE:  Form.
16          THE WITNESS:  It is a suggestion about
17 psychiatric staffing ratios.  And just to be very clear,
18 NCCHC, ACA, and Joint Commission do not have that.  This
19 is one document, the APA, that you're citing.  But
20 there's nothing in the NCCHC, which accredits
21 correctional facilities, or the ACA --
22     Q.   BY MR. FATHI:  Doctor, there is no question
23 pending.  I'm going to ask you again to please not answer
24 non-existence questions.
25          Does ADC have one FTE psychiatrist for every

Page 147

1  150 patients on psychotropic medications?
2      A.   I don't know the answer to that question.
3      Q.   Now, would you turn to page 14 of your
4  supplemental report, please.
5      A.   Sure.
6      Q.   And about halfway down the page, you say that
7  you're quoting the book Psychiatric Services in Jails and
8  Prisons.  The section titled Identification, Screening,
9  and Referral, and Receiving Mental Health Screening and
10 Referral.  Correct?
11     A.   Yes.
12     Q.   And then you quote some language.
13     A.   Yes.
14     Q.   Would you look at page 40 of Psychiatric
15 Services in Prisons and Jails.
16     A.   Okay.
17     Q.   And on page 40 begins the section titled
18 Identification, Screening and Referral, Receiving Mental
19 Health Screening and Referral.  Can you show me where the
20 language you quote on page 14 of your report appears in
21 this section.  Is it there, Doctor?
22     A.   I'm not sure if this is the right section from
23 the book.  I'm looking on page 41 --
24          MS. WIENEKE:  Is there something funny that
25 you need to laugh, Mr. Fathi?  Why don't you look at page

Page 148

1  41.  Direct him to the right section.
2      Q.   BY MR. FATHI:  So is it your testimony that the
3  language you quote on page 14 appears on page 41?
4      A.   No.  What I'm saying is on page 41, No. 7, it
5  says:  The psychiatrist may have a limited role in the
6  direct provision of this service.  The psychiatrist's
7  three primary roles in this regard -- and then it lists
8  (a), (b), and (c).
9           I'm wondering if this is the entire
10 document.  I think this is a longer document because it's
11 broken down in different sections.  And so I'm
12 wondering -- I quoted it directly from the book.  And I'd
13 be happy -- if you have a copy of the entire book, I
14 could find the entire citation.  But I quoted it directly
15 from the book.
16     Q.   Well, what I'm suggesting to you, Doctor, is
17 that you did not quote it correctly from the book.  Would
18 you look at page 39.  39 says Prisons, correct?
19     A.   Yes.
20     Q.   And page 40 says Identification, Screening and
21 Referral, and Receiving Mental Health Screening and
22 Referral, correct?
23     A.   Yes.
24     Q.   And that's what you purport to be quoting on
25 page 14 of your report, right?

Page 149

1    MS. WIENEKE: Object to the form.
2    Look at page 42. If you're not going to
3 give him the full thing.
4    MR. FATHI: No, he needs to answer my
5 question.
6    MS. WIENEKE: You're saying "you're
7 purporting to quote."
8    MR. FATHI: Kathy, he needs to answer my
9 question.
10    MS. WIENEKE: Okay.
11    THE WITNESS: You're trying to get me to
12 answer something that's clearly on page 42, where I've
13 taken it directly verbatim from page 42, where it says
14 Essential Services, and I've listed -- and I have not
15 misquoted anything. If I -- if there's a typo in my
16 report, I'd be happy to change it. But on page 42, it's
17 very clearly: The psychiatrist generally has a limited
18 role in the direct provision of this service. The
19 psychiatrist's four primary roles are (a), (b), (c), and
20 (d). And that's what -- what is listed in my report on
21 page 14.
22    Q.  BY MR. FATHI: And your testimony is that
23 paragraph 5(c) on page 42 is the same as the paragraph
24 (c) you quote on page 14 of your report?
25    A.  I'm sorry, could you say that again, please. I

Page 150

1 didn't follow that.
2    Q.  Look at page 14 of your report, paragraph (c).
3    A.  Paragraph (c)? You said page 14 of my report?
4    Q.  Yes, paragraph (c).
5    A.  There's not a paragraph (c). It's like a
6 paragraph, but then it's like an indentation (c). Is
7 that what you're talking about?
8    Q.  Yes. That's what I'm talking about.
9    A.  Okay.
10    Q.  Now, look at page 42 of Psychiatric Services in
11 Prisons and Jails. Are they the same?
12    A.  Participate in the development of
13 appropriate...
14    I wonder if I --
15    Q.  Answer my question, please, Doctor. Are they
16 the same?
17    A.  No, they're not the same.
18    Q.  Okay. What you did here, Doctor, is that you
19 quoted from the section of this book dealing with jails
20 rather than prisons, correct? Is that what you did?
21    A.  I don't think so. I mean, unless if I made a
22 mistake. But I -- I think -- it would be -- it would be
23 very helpful for me if I could have the entire document,
24 like actual book, and I could look at it. I have a copy
25 of this book on my laptop, and when I prepared my report,

Page 151

1 I probably cut and paste, and it's possible that maybe I
2 cut and paste the wrong part from the jails as opposed to
3 the prisons. I'm a human, I make mistakes. But this
4 does not change my opinion in any way.
5    Q.  Now, this book has different recommendations
6 for prisons and jails, correct?
7    A.  It probably has some differences, yes.
8    Q.  And jails are different than prisons, correct?
9    A.  In some ways, that's a fair statement.
10    Q.  And would you agree with me that this case
11 involves prisons rather than jails?
12    A.  The Arizona case, yes, is prisons, correct.
13    Q.  So the appropriate portion of the book to quote
14 would have been the portion dealing with prisons,
15 correct?
16    A.  Not necessarily. I mean, if you're talking
17 staffing ratios, the principles -- well, I don't have an
18 answer to that.
19    Q.  Is it your testimony that in this case, it
20 would have been appropriate to quote from this book the
21 sections regarding jails rather than prisons?
22    MS. WIENEKE: Form.
23    THE WITNESS: If it was a relevant issue
24 that -- that applies to both jails and prisons, I think
25 it would be reasonable to quote from because some of the

Page 152

1 principles are the same within jails and prisons.
2 They're both correctional facilities.
3    Q.  BY MR. FATHI: And why would you quote from the
4 jails section rather than the prisons section in this
5 case?
6    A.  I think I already answered that. It's possible
7 I made a mistake in the copying or the cutting and
8 pasting from a document. And, again, I'm a human being,
9 and humans make mistakes.
10    Q.  Look at page 45 of psychiatric treatment in
11 prisons and jails.
12    A.  I'm sorry, page...
13    Q.  45.
14    A.  Okay.
15    Q.  And this is from the portion of the book
16 dealing with prisons rather than jails. And it says,
17 quote: Psychotropic medication should be prescribed and
18 monitored by a psychiatrist. End of quote.
19    Is it your testimony that as of September
20 27th, 2013, psychotropic medications in ADC were being
21 prescribed only by psychiatrists?
22    A.  No, that's not my testimony.
23    Q.  Okay. Let's talk about medical records. What
24 is your opinion as to ADC's medical records as they
25 existed on September 27, 2013?

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 42 of 157

Parsons vs.          Confidential     Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan        Subject to Protective Order       April 11, 2014

Page 153

1      MS. WIENEKE: Form.
2      THE WITNESS: I think I have an entire
3  section on that in my first report.
4   Q.  BY MR. FATHI: We'll get to your report in a
5  moment. I'm just asking you to state your opinion. The
6  section begins on page 32.
7   A.  Generally speaking it's my opinion that the
8  medical records within the Arizona Department of
9  Corrections met applicable community and/or correctional
10  standards.
11   Q.  Okay. Now, on page 32, with regard to medical
12  records, you write, quote: I did not identify any of
13  Dr. Stewart's concerns regarding the medical records.
14  End of quote.
15      Now, Dr. Stewart, in his report, identified
16  a number of records of specific prisoners that he cites
17  as exemplifying deficiencies in the medical records. Did
18  you review any of those records?
19      MS. WIENEKE: Form.
20      THE WITNESS: Yes. I actually have it cited
21  in my report.
22   Q.  BY MR. FATHI: Your testimony is that you
23  reviewed the records --
24   A.  I'm sorry, I haven't finished my answer.
25   Q.  Your testimony is that you reviewed the records

Page 154

1  cited by Dr. Stewart as exemplifying problems with the
2  medical records?
3      MS. WIENEKE: Form.
4      THE WITNESS: I was looking to see -- I
5  believe that I had an opportunity to review the records
6  that Dr. Stewart reviewed. And I know for a fact that I
7  had the opportunity to review all the named plaintiffs,
8  which I assume Dr. Stewart also reviewed. So yes, I had
9  an opportunity to review many of the same records that
10  Dr. Stewart did.
11   Q.  BY MR. FATHI: One moment.
12      Doctor, I'm showing you Dr. Stewart's
13  report. We don't need to mark this as an exhibit. On
14  page 20 of his report, Dr. Stewart identifies a number of
15  records that he cites as exemplifying deficiencies in the
16  medical records. Do you see those on page 20?
17   A.  Yes.
18   Q.  Did you review any of the records identified on
19  page 20 of Dr. Stewart's report?
20   A.  I believe I asked the law firm to forward me
21  all of the reports -- I'm sorry, all the records that
22  Dr. Stewart reviewed because I wanted to be able to
23  review the same records. And -- I'm just looking through
24  my list.
25   Q.  Just so the record is clear, the names of the

Page 155

1  prisoners cited by Dr. Stewart are ▮▮▮▮▮▮,
2  ▮▮▮▮▮▮, ▮▮▮▮▮▮, and ▮▮▮▮▮▮,
3  ▮▮▮. Can you show me, Dr. Penn, where in your
4  report it indicates that you reviewed those records?
5   A.  I'm not finding it in my report, but I would
6  definitely like the opportunity to review these records.
7   Q.  Okay. But is it your testimony that you have
8  not yet reviewed these records?
9   A.  I think that's fair.
10   Q.  Okay. So you're not in a position to agree
11  with or disagree with Dr. Stewart about those records,
12  correct?
13   A.  I think that's fair.
14   Q.  In your review, Doctor, did you see any medical
15  records with the problem list either missing or misfiled
16  or incomplete?
17      MS. WIENEKE: Form.
18      THE WITNESS: I saw some records that the
19  problem list didn't include all diagnoses, so yeah,
20  that's fair.
21   Q.  BY MR. FATHI: And is it consistent with the
22  standard of care for the problem list not to include all
23  diagnoses?
24   A.  Sorry, could you repeat that again.
25   Q.  Is it consistent with the community standard of

Page 156

1  care for the problem list not to include all diagnoses?
2   A.  First, no. No. First of all, most community
3  standards of care in doctors' offices, they don't even
4  fill out a problem list. So problem lists are typically
5  moore seen in more inpatient hospital settings, medical
6  or psychiatric, or if you have a patient that's a chronic
7  long-standing patient. Whether a problem list is filled
8  out in its entirety or accurately, it's my professional
9  opinion that that's basically a documentation function or
10  role. At the end of the day, it's all about patients
11  getting seen. Do you want people spending time filling
12  out records or do you want them seeing patients. And I
13  would vote for the latter. I want them to see patients.
14   Q.  In a state psychiatric hospital, is it
15  consistent with the standard of care for the problem list
16  not to list all diagnoses?
17      MS. WIENEKE: Objection; asked and answered.
18      THE WITNESS: No, because you said the key
19  word "all." If somebody has a toe fungus or athlete's
20  foot or acne or some other health condition, you know,
21  you're not going to include that because that's not a
22  significant health issue. I think if somebody has a
23  significant psychiatric disorder, it would be important
24  to list that on the problem list or a significant medical
25  issue, but you don't have to list every single toenail

Page 157

1  infection or fungal infection.  I think that's -- that
2  would burden the health care system if we did that.
3      Q.   BY MR. FATHI:  What was -- what were some of
4  the diagnoses you saw that were omitted from the problem
5  lists?
6      A.   Well, when you say "omitted," you're making it
7  sound like people consciously avoided filling out a
8  problem list.
9      Q.   No, I'm not saying that at all.  "Omitted"
10  simply means not included.
11      A.   Okay.  So I'll answer there were some problem
12  lists that were not filled out, and I would need to ask a
13  question of either the Arizona Department of Corrections
14  audit people to look at their policies of whose role or
15  job is it to fill out those problem lists.  Because,
16  unfortunately, unless if you tell a health care provider
17  you must do this by day whatever, a lot of times things
18  don't get done with regard to documentation.  With regard
19  to seeing patients, the providers see the patients, but
20  they may not fill out a problem list or treatment plan.
21      Q.   And is it your testimony that not filling out
22  the problem list is consistent with the community
23  standard of care?
24          MS. WIENEKE:  Object to the form.
25          THE WITNESS:  What -- what I'm saying is the

Page 158

1  most important thing in health care is to make sure that
2  patients are seen, that their health care needs are
3  met --
4      Q.   BY MR. FATHI:  Doctor, would you please answer
5  my question.
6      A.   No, I don't agree with what you said earlier.
7      Q.   So not filling out the problem list is
8  consistent with the standard of care?
9          MS. WIENEKE:  Form.
10          THE WITNESS:  My answer to that is, there
11  are occasions where people may fail to fill out a problem
12  list, but whether they fill out a problem list or not,
13  that doesn't cause a deviation from the standard of care.
14      Q.   BY MR. FATHI:  Did you see any medical records
15  with documents filed under the wrong tab within the
16  record?
17      A.   I did not, no.
18      Q.   Did you see any medical records with
19  duplicative tabs, for example, two tabs that said mental
20  health or two tabs that said HNRs?
21      A.   I don't recall any charts that had that.
22      Q.   Did you see any medical records with any of the
23  medication administration records or MARs missing?
24      A.   Yes.
25      Q.   And is it consistent with the community

Page 159

1  standard of care for the MARs to be missing?
2          MS. WIENEKE:  Object to the form.
3          THE WITNESS:  The reason why the MARs were
4  missing was because in that particular month, the MARs
5  was being used to give medications in that month.  So
6  we're here what, April.  The MARs for April would still
7  be with the medication cart -- and I'm not a nurse, so I
8  can't speak to this or I'm not a pharmacist, but it would
9  make sense and be within the standard of care in a
10  correctional system for the MAR to be missing from the
11  medical chart because it's being used to help administer
12  medications to offenders at their unit.
13      Q.   BY MR. FATHI:  Okay.  Here we are in April.
14      A.   Yes.
15      Q.   If the February 2014 MAR was missing from the
16  record, would that be consistent with the standard of
17  care?
18          MS. WIENEKE:  Form.
19          THE WITNESS:  Again, I would say it is --
20  it's possible and likely to have records missing from a
21  health care record.  And when the system moves to
22  electronic medical record, many of these will improve or
23  get better.  But --
24      Q.   BY MR. FATHI:  Doctor, I'm not asking you about
25  the electronic medical record system.  I'm giving you a

Page 160

1  very specific question.  As of April 11th, if the
2  February 2014 MAR is missing from the record, is that
3  consistent with the standard of care?
4      A.   It can be.
5      Q.   If the January and February MAR are missing
6  from the medical record, would that be consistent with
7  the standard of care?
8          MS. WIENEKE:  Form.
9          THE WITNESS:  It can be.
10      Q.   BY MR. FATHI:  If all of the MARs for calendar
11  2013 were missing from the record, would that be
12  consistent with the standard of care?
13          MS. WIENEKE:  Form and foundation.
14          THE WITNESS:  It can be.
15          I'd like to be able to clarify my answer.
16      Q.   BY MR. FATHI:  You've answered -- answered my
17  question.
18          Did you see any medical records in which the
19  mental health treatment plan was either missing or
20  misfiled or incomplete?
21          MS. WIENEKE:  Form.
22          THE WITNESS:  I may have, but I don't recall
23  specifically, yes.
24      Q.   BY MR. FATHI:  Did you see any medical records
25  with loose, unfiled documents stuck in the folder?

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 161

1    MS. WIENEKE: Form.
2    THE WITNESS: The records that I reviewed,
3  specifically at Yuma and at -- I'm sorry, not Yuma,
4  sorry -- Tucson and Eyman, I did not find any records
5  misfiled or sticking out. The records that were sent to
6  me electronically, because they were sent to me on a
7  CD-ROM -- excuse me -- I don't think I would have been
8  able to detect if a record was sticking out or misfiled
9  or loose because of the nature of the electronic media in
10 which it was sent to me.
11   Q.   BY MR. FATHI: Did you see any medical records
12 containing a document pertaining to a different prisoner?
13   A.   In the records I reviewed either in -- on site,
14 in person, or via the CD-ROM, I did not see any misfiled
15 or incorrect filings, no.
16   Q.   Okay. Would you turn to page -- or rather Tab
17 10, please. And would you turn to page Wexford 117,
18 please.
19   A.   Sure.
20   Q.   And at the top of page WEXFORD 117, Wexford
21 Health Sources notes a, quote: History of poor or
22 non-existence documentation in medical records. End
23 quote.
24        Does this finding by Wexford have any effect
25 on your opinion as to the adequacy of ADC's mental health

Page 162

1  records?
2    MS. WIENEKE: Form and foundation.
3    THE WITNESS: Could you say it again,
4  please.
5    Q.   BY MR. FATHI: Does this statement by Wexford
6  Health Sources have any effect on your opinion as to the
7  adequacy of ADC's mental health records?
8    MS. WIENEKE: Form and foundation.
9    THE WITNESS: No, it does not.
10   Q.   BY MR. FATHI: Okay. Would you turn to Tab 14,
11 please. Tab 14 is an August 13th, 2012, memo from Helena
12 Valenzuela, ADC Phoenix Complex Compliance Monitor, to
13 Joe Profiri, Monitoring Team Leader, Bates numbers 28140
14 to 41.
15        First, Dr. Penn, what's your understanding
16 of the role of the Phoenix Complex in ADC's mental health
17 care system?
18   A.   Sorry, mine doesn't have Bates numbers or it's
19 cut off. I just want to make sure I'm looking at the
20 right document to answer your question.
21   Q.   Yes, they are cut off a little bit, but it is
22 28140 and 28141.
23   A.   So it's dated 8/13/12. It's a memo from Helena
24 Valenzuela to Joe Profiri.
25   Q.   Correct.

Page 163

1    A.   And it looks like it's two-sided.
2    Q.   So my question, Doctor, is what is the role of
3  the Phoenix Complex in ADC's mental health care system?
4    MS. WIENEKE: Form.
5    THE WITNESS: Well, I believe the Phoenix
6  system has multiple functions aside from mental health.
7  As I understand it --
8    Q.   BY MR. FATHI: Again, Doctor, my question was,
9  what is the role within the mental health system?
10   MS. WIENEKE: He's answering the question.
11 He's saying it's got multiple functions.
12   MR. FATHI: No, he said, aside from the
13 mental health function, which was not my question.
14   THE WITNESS: The Phoenix Complex has
15 medical and intake medical, nursing, and other functions.
16 With regard to the mental health functions, the facility
17 has a licensed inpatient psychiatric unit. It also has a
18 step-down or maybe more than one step-down unit. It also
19 has a unit -- and I've toured all these units. It has a
20 unit for special need offenders who either have cognitive
21 limitations or other developmental disabilities. It has
22 several units like that. So --
23   Q.   BY MR. FATHI: Okay.
24   A.   -- it has -- it has multiple units with
25 different functions, including an acute inpatient unit

Page 164

1  which is licensed by the state of Arizona, a step-down
2  unit, and then they also have a separate housing area for
3  females that are acutely mentally ill.
4    Q.   Would it be fair to say that it is a -- it is
5  ADC's main mental health facility?
6    MS. WIENEKE: Form.
7    THE WITNESS: I don't know -- I wouldn't
8  agree with that, no.
9    Q.   BY MR. FATHI: Okay. Would you look at page 2
10 of this document where Ms. Valenzuela writes, quote:
11 Inmate Medical Records are disorganized and incorrectly
12 completed. End of quote.
13        Doctor, does that statement by
14 Ms. Valenzuela have any effect on your opinion as to the
15 quality of ADC's medical records?
16   MS. WIENEKE: Form.
17   THE WITNESS: It's something I took into
18 consideration, but ultimately, it doesn't change my
19 opinion.
20        Would it be possible to take a break?
21   MR. FATHI: Sure. How long do you need?
22   THE WITNESS: Five minutes.
23   THE VIDEOGRAPHER: Going off the record.
24 The time is 2:33 p.m.
25        (A recess was taken from 2:33 p.m. to

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 165

1 2:41 p.m.)
2          THE VIDEOGRAPHER: We're back on the record.
3 The time is 2:41 p.m.
4     Q.   BY MR. FATHI:  Doctor, what is your opinion as
5 to ADC's psychotropic medication system as of September
6 27th, 2013?
7          MS. WIENEKE: Form.
8          THE WITNESS: Well, I've described it in
9 detail in my report December 18, 2013.  Basically it's my
10 professional opinion that their system meets acceptable
11 community standards and correctional standards of care.
12    Q.   BY MR. FATHI:  Would you agree with me that if
13 a person with mental illness is prescribed psychotropic
14 and doesn't receive that medication, that can create a
15 risk of harm?
16          MS. WIENEKE: Form.
17          THE WITNESS: If they don't receive it for a
18 period of time and they have a -- and they clearly have a
19 psychiatric disorder -- a lot of people have been
20 misdiagnosed or perhaps don't -- aren't on the correct
21 medication or the right combination.  So I think just
22 missing a medication in and of itself doesn't mean that
23 they're going to decompensate or have substantial risk or
24 something like that.
25    Q.   BY MR. FATHI:  Would you agree with me that

Page 166

1 missing one's psychotropic medication can be a trigger
2 for self-harm or suicide?
3          MS. WIENEKE: Form and foundation.
4          THE WITNESS: No, I do not agree with that.
5     Q.   BY MR. FATHI:  Can you turn to Tab 18, please.
6 Tab 18 is suicide prevention training material provided
7 by the ADC to some of its staff.  Would you please turn
8 to page S -- S 523.
9     A.   The Bates numbers are cut off, so if you could
10 just tell me the page number of the slides.
11    Q.   No, they're not cut off, they're in the upper
12 portion of the page.
13    A.   Oh, thank you.  So what was the number?
14    Q.   523.
15    A.   Thank you.
16    Q.   And according to this suicide prevention
17 training document, suicide triggers include, quote:
18 Failure to receive or take prescribed psychiatric
19 medication.  End of quote.
20          Doctor, I take it you disagree with this
21 statement?
22          MS. WIENEKE: Object to the form.
23          THE WITNESS: You're trying to take
24 something out of context.  As a board certified
25 psychiatrist, first of all, I'd want to know who wrote

Page 167

1 this and what it's based on.
2     Q.   BY MR. FATHI:  Do you agree or disagree that
3 failure to receive or take prescribed psychiatric
4 medication can be a trigger for suicide?
5     A.   It's my opinion that there are multiple other
6 variables.  That medications alone -- taking medications
7 or not taking medications alone in and of itself is not a
8 cause and effect -- it's not that black and white.  It's
9 much more complicated.
10    Q.   So if this is ADC's suicide prevention training
11 materials, this contains inaccurate information in your
12 view?
13          MS. WIENEKE: Object to the form.
14          THE WITNESS: No, that's not what I'm
15 saying.
16    Q.   BY MR. FATHI:  This document says that failure
17 to receive or take prescribed psychiatric medication can
18 be a trigger for suicide.  Do you agree with that
19 statement?
20          MS. WIENEKE: Form.
21          THE WITNESS: That, in combination with
22 multiple other factors, could potentially be a trigger
23 for suicide.
24    Q.   BY MR. FATHI:  So failure to receive or take
25 prescribed psychiatric medication by itself is not a

Page 168

1 trigger for suicide?
2     A.   It could be.
3     Q.   In your review of ADC medical records, did you
4 see any cases where the patient was not provided his or
5 her prescribed psychiatric medication as prescribed?
6     A.   Yes.
7     Q.   About how many times did you see that?
8     A.   I don't know an answer to that.
9     Q.   What was the longest period for which you saw a
10 prisoner not provided his or her prescribed psychiatric
11 medication?
12    A.   I can't answer when you say "not provided"
13 because many times people are provided medications and
14 they refuse medications.  Or they will be doing something
15 else, they'll be at rec or they'll be in transport or
16 they'll be in -- so I'm not sure I can answer your
17 question with regard to "not provided" because that's
18 kind of vague to me.  I can't answer that.
19    Q.   I'm talking about cases in which ADC or Corizon
20 staff do not provide the prisoner his or her medication
21 as prescribed.
22          MS. WIENEKE: Object to the form.
23    Q.   BY MR. FATHI:  How many times did you see that?
24    A.   When you say "prescribe medications," are
25 you -- I can't -- again, are you talking about

Page 169

1  psychotropic medications or medical medications or both?
2  Q.   I am talking about psychotropic medications.
3  A.   I've seen, through reading the MGARs, that
4  there have been cases of offenders claiming that they
5  didn't receive their medications or, alternatively, the
6  auditors reviewing -- finding that doses were missed or
7  that medication doses fell off.
8  Q.   But it's your testimony that you've never seen
9  any example of ADC or Corizon or Wexford failing to
10 provide prescribed medication?
11      MS. WIENEKE: Object to the form.
12      THE WITNESS: No.  And I would say that I
13 don't know of any system in the country that can -- can
14 achieve 100 percent compliance with medications.
15 Inevitably, a system, be it a small jail, juvenile
16 prison, ICE facility, what have you, that's an -- that's
17 an unattainable goal.  Similar to suicide, it's almost
18 impossible to meet 100 percent medication compliance at
19 all times with all of your offenders.
20 Q.   BY MR. FATHI: Would you turn to Tab 12,
21 please.  This is the September 21, 2012, letter from Joe
22 Profiri to Karen Mullenix.  Would you turn to page --
23 page 5 of the letter, please.  There at the bottom of the
24 page, Mr. Profiri notes, quote:  Incorrect, incomplete,
25 inconsistent medication administration or documentation

Page 170

1  of care provided.  End of quote.
2        He also notes, quote:  Incorrect or
3  incomplete pharmacy prescriptions (medication not
4  matching chart order, wrong dosage).
5        Continuing on to page 6, he notes, quote:
6  Inappropriate discontinuation/change of medication.
7  Close quote.
8        Quote:  Inconsistent non-formulary
9  medication approval process.  Close quote.
10       Doctor, did you review this document?
11 A.   Yes.
12 Q.   Did you take these statements by Mr. Profiri
13 into account in formulating your opinion as to the
14 adequacy of ADC's medication system?
15 A.   Yes, I did.
16 Q.   And do they have any effect on that opinion?
17 A.   Yes, they do.
18 Q.   And do you continue to believe that ADC's
19 medication system has continuously met community
20 standards of care from March of 2012 to the present?
21 A.   Yes, I do.  And I'd like to clarify my
22 response.
23 Q.   No, you've answered my question, Doctor.
24       Would you look at Tab 14, please.
25       MS. WIENEKE: Can you please mark that in

Page 171

1  the transcript.  Thank you.
2  Q.   BY MR. FATHI:  Would you look at Tab 13,
3  please.  Tab 13 is an August 17th, 2012, memo from
4  Paulette Boothby, ADC Pharmacy Monitor, to Joe Profiri.
5  Would you turn to page 3 of the letter, please.  Do you
6  have it, Doctor?
7  A.   Yes.
8  Q.   At the bottom of page 3, Ms. Boothby is quoting
9  Dr. Nicole Taylor as saying that many inmates have gone
10 without psych meds for 30 days or more.  Do you see that,
11 Doctor?
12 A.   Yes.
13 Q.   Did you review this document?
14 A.   Yes, I did.
15 Q.   Did you take this statement into account in
16 formulating your opinions as to the adequacy of ADC's
17 medication system?
18 A.   Yes, I did.
19 Q.   Would you turn to Tab 3, please.  Second
20 document.  This is the August 2013 MGAR report for Lewis.
21 Would you turn to page 137547, please.
22 A.   You said August?
23 Q.   Yes.
24 A.   The second document is July.  This is Tab 3,
25 right?

Page 172

1  Q.   Tab 3.
2  A.   I have July 2013 Lewis.  What was the number,
3  please?
4  Q.   137525 is the first page.
5  A.   Okay.  That's the third section.
6  Q.   All right.
7  A.   So third section.  137525.  August 2013 Lewis
8  Complex, yes.
9  Q.   Would you turn to page 137547.
10 A.   Okay.
11 Q.   Okay.  Under the item which asks, quote:  Are
12 there any unreasonable delays in inmate reviewing
13 prescribed medications?  End of quote.
14       The reviewer writes the following, quote:
15 Eagle Point.  Review of MARs indicates non compliance.
16 Close quote.
17       Quote:  Barchey.  Review of MARs indicates
18 non compliance.  Close quote.
19       Quote:  Stiner.  Unable to substantiate
20 compliance due to excessive "holes" in MAR not indicating
21 availability of medication.  Close quote.
22       Quote:  Buckley.  Review of MARs indicates
23 non compliance.  Close quote.
24       Quote:  Rast.  Review of MARs indicates non
25 compliance.  Close quote.

Parsons vs.                                        Confidential        Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                      Subject to Protective Order                                        April 11, 2014

Page 173

1    Did you review this document, Doctor?
2    A.   I believe so, yes.
3    Q.   And did you take these statements by the ADC
4    contract monitor into account in formulating your opinion
5    as to ADC's medication system?
6    A.   Yes, I did.
7    Q.   And you nevertheless conclude that ADC's
8    medication system meets community standards, correct?
9    A.   Community and correctional standards, yes.
10   Q.   Would you turn to Tab 5, please.  The second
11   document.  This is the August 2013 MGAR from Phoenix
12   Complex.  First page is ADC137583.  Would you please turn
13   to page --
14   A.   Sorry, 137 --
15   Q.   583.
16   A.   Okay.
17   Q.   Would you please turn to page 137591.
18   A.   Okay.
19   Q.   Do you know who Martin Winland is, Doctor?
20   A.   Not off the top of my head, no.
21   Q.   Okay.  Martin Winland is ADC's pharmacy
22   monitor.
23   A.   Uh-huh.
24   Q.   And he writes, quote:  Medications must be
25   filled/refilled in a timelier manner.  Close quote.

Page 174

1    About two-thirds of the way down the page,
2    he writes, quote:  Medication is being administered with
3    no readily retrievable record of the recipient.
4    A.   I'm sorry.  I don't see that.  Where do you see
5    that?
6    Q.   It is about two-thirds of the way down the
7    page.  Do you see that, Doctor?  Do you have it, Doctor?
8    A.   No.  137591?
9    Q.   Yes.  Two-thirds of the way down the page,
10   quote:  Medication is being administered with no readily
11   retrievable record of the recipient.  Close quote.
12   Two-thirds of the way down the page.
13   A.   Oh, got it.  Thank you.
14   Q.   And over onto page 137592, Mr. Winland writes
15   at the very bottom of the page, quote:  We continue to
16   gather evidence of inmates being transferred from Phoenix
17   to other complexes without medications.  Close quote.
18   Did you review these statements, Doctor?
19   A.   Yes.
20   Q.   Did you take them into account when formulating
21   your opinion as to the adequacy of ADC's medication
22   system?
23   A.   Yes.
24   Q.   And you conclude that that medication system
25   has met the community standard of care continuously since

Page 175

1    March of 2012, correct?
2    A.   Yes.
3    Q.   Would you turn to page -- or Tab 12, please.
4    This is the September 21, 2012, letter from Joe Profiri
5    to Karen Mullenix.  Would you turn to page 3 of the
6    letter, please.
7    A.   Okay.
8    Q.   And on page -- page 3 of the letter, in the
9    first paragraph, this refers to a prisoner who had been
10   prescribed lithium carbonate but did not receive his
11   medication for 23 days and then hanging himself.  Do you
12   see that, Doctor?
13   A.   Yes.
14   Q.   Did you review this document?
15   A.   Yes, I did.
16   Q.   Is it your opinion that medication
17   administration in this case met the standard of care?
18            MS. WIENEKE:  Form.
19            THE WITNESS:  It's not clear to me -- I
20   can't answer the question because it's not clear to me
21   the way you asked it if the medications were offered to
22   him and he refused or, alternatively, the medicines were
23   not administered as prescribed.  From this document --
24   I'd have to look at his medical chart and also the
25   psychological autopsy and the morbidity reviews to give

Page 176

1    an opinion to that.  If you have information that there
2    was a successful malpractice suit regarding this case,
3    I'd be happy to look at that, too.
4             But this doesn't change my opinion the
5    totality that basically this health care system has an
6    effective medication administration system.  And, in
7    fact, when Wexford wasn't in compliance with the
8    monitoring, they were fired from their -- their contract
9    was terminated.  So I think -- you're asking me all these
10   things about Wexford, but they're not even in the
11   picture, they're gone.  So it's a whole different ball
12   field -- ballgame now.
13   Q.   BY MR. FATHI:  But correct me if I'm wrong,
14   Doctor, you're testifying that ADC's mental health care
15   system was constitutional and met community standards of
16   care throughout Wexford's tenure, correct?
17   A.   It's my professional opinion that Wexford had
18   significant staffing challenges and significant
19   operational and systems challenges in meeting their
20   fulfilled role.  And as a result, they were terminated.
21   They were fired.
22   Q.   Would you answer my question, please, Doctor.
23   A.   Sure.  Would you read the question back,
24   please.
25            (The requested portion of the record was

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 177

1    read by the reporter.)
2         THE WITNESS: It's my opinion that ADC
3    implemented -- they hired -- they contracted with a
4    vendor that promised they would do something.  The vendor
5    was unable to fulfill those obligations.  ADC made a
6    reasonable effort to alert the vendor of we expect
7    this --
8    Q.   Excuse me, Doctor, you need to answer my
9    question.
10   A.   I'm trying to answer --
11   Q.   No, the question is -- will you read it back,
12   please.
13        (The requested portion of the record was
14   read by the reporter.)
15        THE WITNESS: It's my opinion that they had
16   an effective medication system in place.  Whether
17   Wexford's inability to administer medications was
18   independent of their -- it's my opinion that there was an
19   effective medication system, but due to Wexford's
20   inability to recruit and retain and have enough staff,
21   that posed challenges to that.  But it's still my opinion
22   that they met the community and the correctional standard
23   of care.
24   Q.   BY MR. FATHI:  So it is your testimony that
25   ADC's medication system met the community standard of

Page 178

1    care throughout Wexford's tenure?
2    A.   Yes.
3    Q.   Okay.  Returning to page 3 of Tab 12, the
4    September 21, 2012, letter from Mr. Profiri to
5    Ms. Mullenix, Mr. Profiri writes, quote:  ADC determined
6    that this inmate had not received his psychotropic
7    medication --
8    Q.   Sorry.  Sorry, where --
9    Q.   I'm reading about a quarter of the way down,
10   page 3.  Quote:  ADC determined that this inmate had not
11   received his psychotropic medication for the first 23
12   days of August 2012, as evidenced by the fact that no MAR
13   had been generated.  End of quote.
14        Now, is it your testimony that this could
15   have been the prisoner refusing his medication?
16   A.   And I'm sorry, I don't find where you are.
17   You're on page 3, right?
18   Q.   Yes.
19   A.   Page 3.  What paragraph, is it, the --
20   Q.   It's the first paragraph.
21   A.   Okay.  Okay.  And I'm sorry, the question was?
22   Q.   The question was:  Is it your testimony that
23   you believe this may have been the prisoner refusing the
24   medication?
25        MS. WIENEKE: Form.

Page 179

1         THE WITNESS: I would need to have the
2    prisoner's entire record and an opportunity to review the
3    MARs and review the record to answer your question.
4    Q.   BY MR. FATHI:  So the fact that no MAR had been
5    generated, you don't find that to be inconsistent with
6    the standard of care?
7         MS. WIENEKE: Object to the form, asked and
8    answered.
9         THE WITNESS: I -- I'm not sure if I can
10   answer your question because it looks like MARs were
11   completed in May, June, and July.  So I'm not sure if I
12   agree or can answer.  You're saying that the MAR was
13   never generated.
14   Q.   BY MR. FATHI:  I'm reading the letter that says
15   the MAR was not generated.
16        MS. WIENEKE: Form.
17        THE WITNESS: So I would need -- again, I
18   can't answer your question.  I'd want to be able to look
19   at the chart and look at the record to understand to be
20   able to answer your question.  This is an auditor who
21   never treated this patient who basically is just going
22   strictly by the record review.  I'd want an opportunity
23   to do the same thing and actually review the record to be
24   able to answer your question.
25   Q.   BY MR. FATHI:  Did you review this document

Page 180

1    during your --
2    A.   Yes.
3    Q.   Did you ask for the record so that you could
4    resolve the questions you now raise?
5    A.   No, but I'd be -- again would be happy to look
6    at the chart.
7    Q.   Why did you not ask for it?
8    A.   I don't know.
9    Q.   Did this seem to you to be a significant
10   incident?
11   A.   I kind of feel insulted by your question,
12   because any kind of suicide is a significant incident.  I
13   take that very seriously.  And yeah, this is a serious
14   incident.  But in health care, and not even corrections,
15   we learn from improving our processes and making things
16   better.  And at the end of the day, these are humans that
17   are doing these care and services, and we don't have a
18   perfect human being.  So it's my opinion that they have a
19   system in place that affords offenders access to care.
20   And, unfortunately, this was an adverse -- this was a bad
21   outcome, so...
22   Q.   And you didn't ask to see this prisoner's
23   medical record when you read about this, correct?
24   A.   Correct.
25   Q.   And you didn't ask for any more documentation

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 181

1  on this incident, correct?
2      A.   Correct.
3      Q.   Is it your testimony that this prisoner did not
4  suffer harm?
5          MS. WIENEKE: Object to the form.
6          THE WITNESS: Again, I feel kind of insulted
7  by your question. I mean, obviously he complete -- he
8  successfully completed suicide. That's, you know, a
9  horrible thing for him and his family. So of course he
10 suffered harm.
11     Q.   BY MR. FATHI: Doctor, would you turn to page
12 35 of your report. In the carryover paragraph, you were
13 discussing prisoners missing their medications, and you
14 conclude, quote: I found no undue delay or that anyone
15 was harmed as a result of the delay. End of quote.
16         Do you see that testimony?
17         MS. WIENEKE: Form. You've left out --
18 object to the form.
19     Q.   BY MR. FATHI: Do you see that language,
20 Doctor?
21     A.   I see you're reading one line out of a
22 multiple-page report.
23     Q.   Did you accurately read that line?
24         MS. WIENEKE: Object to the form. Misstates
25 the -- misstates the record.

Page 182

1          THE WITNESS: You're correctly reading. I
2  found no undue delay or that anyone was harmed as a
3  result of the delay.
4      Q.   BY MR. FATHI: Okay. So in light of that
5  statement in your report, I ask you now: Was this
6  prisoner on page 3 of the September 21st letter harmed as
7  a result of a delay in receiving his medication?
8          MS. WIENEKE: Object to the form and
9  foundation.
10         THE WITNESS: As I said earlier, missing
11 medications, there's not a direct cause and effect
12 between that and suicide. There's probably other
13 variables, stressors. I've presented lectures and
14 written and published in that area of suicide prevention.
15 So you're trying again to say, he missed his medications,
16 he suicided. It's not that simple. There's multiple
17 other issues that could have happened. So it's my
18 opinion that what I wrote in my report, I stand by what I
19 wrote in my report.
20     Q.   BY MR. FATHI: So in your opinion this prisoner
21 was not harmed by missing his medication for 23 days,
22 correct?
23         MS. WIENEKE: Form.
24         THE WITNESS: I would not be able to answer
25 that without having the chart and an opportunity to

Page 183

1  review the chart, and I would want to know specifically
2  when you say "harm," I'm not sure what you're referring
3  to with regard to --
4      Q.   BY MR. FATHI: I'm referring to death.
5      A.   Okay. Yes, I'd want the opportunity to look at
6  his chart.
7      Q.   But you have not requested his chart, correct?
8      A.   I'm requesting it now.
9      Q.   The last sentence of that paragraph,
10 Mr. Profiri writes, quote: Failing to deliver
11 psychotropic medication as prescribed is a significant
12 non-compliance issue. End of quote.
13         Do you agree with that statement?
14         MS. WIENEKE: Form and foundation.
15         THE WITNESS: I don't agree with that
16 because when you say "deliver" -- using the word
17 "deliver," from a pharmacy perspective, that's
18 transportation of the medication from point A to point B.
19 "Administer" would be to give the medication, you know,
20 from a health care person to the patient or offender.
21         So I think the person that's writing this
22 letter is more of a compliance operations person. So I
23 don't agree with what you're asking me to -- without
24 having the chart and having a more -- better detail of
25 what were the circumstances of why this person missed his

Page 184

1  medications or did he refuse his medications or was it a
2  combination of both or some other issue, I wouldn't be
3  able to give an opinion. But I don't agree with that
4  statement.
5      Q.   BY MR. FATHI: Doctor, is it your testimony
6  that temperatures in excess of 85 degrees Fahrenheit do
7  not pose a risk of harm to prisoners taking -- to persons
8  taking psychotropic medication?
9          MS. WIENEKE: Form.
10         THE WITNESS: Sorry, could you repeat that
11 again.
12     Q.   BY MR. FATHI: Is it your opinion that
13 temperatures in excess of 85 degrees Fahrenheit do not
14 pose a risk of harm to persons taking psychotropic
15 medications?
16     A.   No, I don't agree with that.
17     Q.   I'm sorry. It's your opinion that temperatures
18 in excess of 85 degrees do not pose a risk of harm to
19 persons taking psychotropic medication? Let me just ask
20 the question --
21     A.   Okay.
22     Q.   -- in a different way.
23         Do temperatures in excess of 85 degrees
24 Fahrenheit pose a risk of harm to persons taking
25 psychotropic medication?

Glennie Reporting Services, LLC
602.266.6535  www.glennie-reporting.com

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 185

1    A.   I would say they pose a risk of harm to anyone.
2  Temperature extremes pose risk of harm to everyone,
3  correctional officers, correctional health care staff,
4  offenders, you and I in the free world.  So I think
5  temperature extremes pose a risk to everybody.
6    Q.   Are persons on some psychotropic medications
7  more sensitive to extreme heat than others?
8    A.   The key word is "some."  Some medications.
9  Some psychotropic medications are associated with
10 possible risk of heat-related complications.  That's
11 fair.  Some.
12   Q.   Do temperatures in excess of 90 degrees
13 Fahrenheit pose a risk of harm to persons taking
14 psychotropic medication?
15   A.   They may.
16   Q.   Do temperatures in excess of 100 degrees
17 Fahrenheit pose a risk of harm to persons taking
18 psychotropic medication?
19   A.   They may.
20   Q.   Have you ever seen a bottle or container of
21 psychotropic medication with a printed warning that the
22 patient should avoid exposure to heat while taking this
23 medication?
24   A.   I have not, no.
25   Q.   You've never seen that?

Page 186

1    A.   No.
2    Q.   Have you reviewed the cell temperature records
3  produced by the defendants in this case?
4    A.   I know that I've discussed the cell temperature
5  issue, but I don't recall reviewing the specific records.
6    Q.   So you don't know what temperatures those --
7  what cell temperatures those records showed?  It's on
8  page 67 of your report.
9         Can you answer the question, Doctor?
10   A.   Where are you referencing in my report?  You
11 said page 67?
12   Q.   Yes.  You discuss heat on page 67 of your
13 report.
14   A.   Heat precautions.  I discuss heat precautions,
15 that's correct.
16   Q.   Okay.
17   A.   And I'm sorry, what was it about --
18   Q.   My question is, have you reviewed the cell
19 temperature records that have been produced in this
20 litigation?
21   A.   I don't believe so.
22   Q.   So you don't know what cell temperatures those
23 records show?
24   A.   I don't consider myself to be a custody or a
25 cell temperature expert, and so no, I didn't review that.

Page 187

1    Q.   Is it your testimony that cell temperatures are
2  not relevant to the risk of harm to persons on
3  psychotropic medications?
4    A.   No, that's not my testimony.
5    Q.   On page 67, the third paragraph from the
6  bottom, in the last sentence, you write, quote:  I do not
7  believe that temperature readings measured in this manner
8  above 90 degrees pose an undue risk of harm.
9         Do you see that?
10   A.   I'm sorry, page 67?
11   Q.   Yes.  Six lines from the bottom.
12   A.   Yes.  That's accurate.
13   Q.   So your testimony is that cell temperatures in
14 excess of 90 degrees do not pose an undue risk of harm to
15 prisoners taking psychotropic medications?
16   A.   Well, first of all, there's several things that
17 staff at the facility do to --
18   Q.   Could you just answer the question, Doctor?
19        MS. WIENEKE:  Could you read it back,
20 please.
21        (The requested portion of the record was
22 read by the reporter.)
23        THE WITNESS:  And that's accurate because of
24 the preventative steps and the educational procedures
25 that staff are trained about hydration and about misting

Page 188

1  systems and about ambient temperatures to keep the
2  facilities cool.
3    Q.   BY MR. FATHI:  Do you believe that temperatures
4  above 100 degrees Fahrenheit pose an undue risk of harm
5  to ADC taking psychotropic medications?
6    A.   I guess I'm not clear when -- the term "undue."
7  How do you define "undue?"
8    Q.   Do they pose any elevated risk of harm compared
9  to temperatures of, say, 70 degrees Fahrenheit?
10        MS. WIENEKE:  Object to the form.
11        THE WITNESS:  As I said earlier, any
12 elevated temperature can pose risk.  But the staff are
13 trained, and there's measures put in place, and there's
14 classification systems to alert staff of offenders that
15 are on psychotropic medication.  So all those are
16 protective strategies to avoid or mitigate a risk.
17   Q.   BY MR. FATHI:  You write in your report on page
18 67 that temperatures, quote:  are appropriately monitored
19 by trained correctional staff.  Close quote.  Is that
20 your testimony?
21   A.   I'm sorry.  I'm trying to find that.  You
22 said --
23   Q.   About the middle of the page.
24   A.   Yes.  Temperatures are appropriately monitored
25 by trained correctional staff, yes.  And they receive

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 189

1    training and training materials, yes.
2        Q.    And is it your testimony that temperatures are
3    appropriately monitored by trained correctional staff at
4    every complex?
5        A.    I'm not a custody or corrections expert.  I can
6    only comment on health care.  So I think you would need
7    to ask a custody expert on that issue.
8        Q.    Doctor, you wrote in your report that
9    temperatures are appropriately monitored by trained
10   correctional staff.  So I need to ask what you meant by
11   that.  And my question is, is it your testimony that
12   temperatures are appropriately monitored by trained
13   correctional staff at all ADC complexes?
14       A.    That's my understanding of -- of this issue.
15   But, again, at the end of the day, this is a custody
16   issue and not a health care issue.
17       Q.    So housing a prisoner taking antipsychotic
18   medication in a temperature -- a cell where the
19   temperature reaches 100 degrees is not a health care
20   issue?
21           MS. WIENEKE:  Form.
22           THE WITNESS:  It's -- it's a classification
23   issue, which ultimately is a custody issue.  Health care
24   staff does not determine where people are housed in a
25   correctional setting.  That's purely a custody and

Page 190

1    correctional decision based on multiple variables or
2    factors.  So health care staff can make recommendations
3    and can monitor and intervene when somebody's having
4    health -- or heat-related problems, but ultimately that's
5    a custody decision, a custody function.
6        Q.    BY MR. FATHI:  So exposure of a prisoner on
7    antipsychotic medication to cell temperatures exceeding
8    100 degrees Fahrenheit is not, in your view, a health
9    care issue?
10           MS. WIENEKE:  Object to the form.
11           THE WITNESS:  I think I already answered
12   that, that basically any medical or health care sequelae
13   is a health care issue.  But the decision of where
14   somebody is housed in a prison system, that is not a
15   health care decision.  That's a custody/security issue
16   which is decided by classification, it's based on gang
17   affiliation, disciplinary history.  There's multiple
18   variables.  So we as health care professionals have no
19   control over where people are housed.  That's up to
20   custody.  We can make recommendations, but ultimately,
21   it's up to custody to make that decision.
22       Q.    BY MR. FATHI:  Would you recommend that a
23   prisoner taking an antipsychotic medication not be
24   exposed to temperatures exceeding 100 degrees Fahrenheit?
25           MS. WIENEKE:  Form.

Page 191

1           THE WITNESS:  In a correctional setting or
2    in a free world setting?
3        Q.    BY MR. FATHI:  In the Arizona Department of
4    Corrections.
5        A.    If asked, I would say, if possible, to house
6    that individual wherever they can be safely monitored or
7    maintained.  And if that's not possible to afford them
8    hydration and cooling systems like fans or swamp coolers
9    or other things to help them stay cool.  But this is --
10   this is an ongoing issue when you have a correctional
11   facility in the desert.
12       Q.    I want to make sure I understand your
13   testimony.  Is it your testimony that housing a prisoner
14   on antipsychotic medication in a temperature -- in a cell
15   where the temperature exceeds 100 degrees Fahrenheit does
16   not create a risk of harm?
17           MS. WIENEKE:  Object to the form.
18           THE WITNESS:  Any person being housed in a
19   correctional facility, that is a potential risk of harm.
20   In other words, anytime somebody's in a prison, they can
21   be assaulted --
22       Q.    BY MR. FATHI:  Doctor, you need to answer my
23   question.
24       A.    I am answering your question.
25       Q.    I'm not asking about assault.  Okay.

Page 192

1           MR. FATHI:  Would you read the question
2    back.
3           (The requested portion of the record was
4    read by the reporter.)
5           THE WITNESS:  It's my professional opinion
6    that it could hypothetically cause a risk of harm, but
7    facilities are trained to and staff are trained to take
8    measures to avoid that risk or to reduce the risk.  So it
9    doesn't pose an excessive risk of harm.
10       Q.    BY MR. FATHI:  How are cell temperatures
11   monitored at the Florence Complex?
12       A.    I don't know.
13       Q.    But you're confident that they are
14   appropriately monitored by trained correctional staff,
15   correct?
16           MS. WIENEKE:  Form.
17           THE WITNESS:  Well, the facilities are NCCHC
18   accredited, and typically NCCHC looks at all those
19   different issues.  The accreditation team that would come
20   out and survey them would look at all of those different
21   variables.  I'm not a corrections or custody expert.  If
22   you had documentation showing that there have been
23   multiple fatalities due to hyperthermia heat-related
24   death, I would be happy to review that, but I'm not aware
25   of any cases to date where there's a clear cause and

Glennie Reporting Services, LLC
602.266.6535  www.glennie-reporting.com

Page 193

1  effect between a high temperature psychotropic medication
2  treatment and resulting death in the Arizona system.
3     Q.   BY MR. FATHI:  Are you aware -- are you
4  familiar with the death of ▮▮▮▮▮ at the
5  Perryville facility?
6     A.   Yes.
7     Q.   Was ▮▮▮▮▮ a prisoner taking psychotropic
8  medication?
9     A.   I don't know the specifics of her case, but
10  it's my understanding that based on that outcome, the
11  Department statewide took significant efforts to
12  implement misting systems and to begin checking
13  temperatures.  I don't -- I wasn't asked to review her
14  case, and I haven't looked at her medical chart, so I
15  don't know what medication she was on or she was
16  prescribed.
17     Q.   Well, you testified that you're not aware of
18  any heat-related death of a person on psychotropic
19  medication in the Arizona prison system.
20     A.   Right.
21     Q.   And I'm asking, are you including ▮▮▮▮▮
22  in that?
23          MS. WIENEKE: Objection.  Misstates his
24  testimony.
25          THE WITNESS: I am not aware if ▮▮▮▮▮

Page 194

1  had a psychiatric diagnosis, was or was not on
2  psychotropic medications.  What I'm saying is in the
3  records that I've reviewed in this case in the pending
4  litigation, I'm not aware of any medical examiner reports
5  showing a distinct cause of death as being hyperthermia
6  or death related to heat.
7     Q.   BY MR. FATHI: So absent a death directly
8  attributable to heat, you're not concerned about risk
9  caused by heat to ADC prisoners; is that correct?
10          MS. WIENEKE: Object to the form.
11          THE WITNESS: That's not what I am saying.
12  What I said, and I actually just testified to this, is
13  that it's my understanding that there was a bad outcome
14  with that woman.  And as a result of that, the entire
15  system has implemented misting systems, water cooling
16  stations.
17          And that's one of the things that I spent a
18  significant amount of time -- every facility and every
19  housing area and every recreational yard that I went to,
20  I looked, and there was water, there was misting systems,
21  and there was -- I think I reference in my report, there
22  was -- every bathroom that I went into, there were
23  visuals saying, if the color of your urine is this, you
24  need to drink more water.  So it seems to me from that
25  unfortunate outcome, the system learned and is now

Page 195

1  implementing protective measures to avoid excessive or
2  unreasonable risk of heat-related complications.
3     Q.   BY MR. FATHI: Is it your testimony that all
4  the recreation areas have misting systems?
5     A.   I don't want to go on the record as saying all
6  of them.  It's my understanding the ones that I toured, I
7  did see misting systems.
8     Q.   Did you see misting systems at Browning Unit?
9     A.   I'd have to review my report.
10     Q.   I'm just asking for your recollection.
11     A.   Again, I'd probably have to look at my report.
12          MR. FATHI: Let's go off the record.
13          THE VIDEOGRAPHER: Going off the record.
14  The time is 3:25 p.m.
15          (A recess was taken from 3:25 p.m. to
16  3:32 p.m.)
17          THE VIDEOGRAPHER: We're back on the record.
18  The time is 3:32 p.m.  This begins video No. 4.
19     Q.   BY MR. FATHI: Doctor, did you see misters in
20  the recreation areas at Browning Unit?
21     A.   I wrote a note to myself in my notes,
22  specifically on -- it's Bates PENN, P-E-N-N, 000046.  And
23  it's my tour of the Browning facility at Eyman.  And I
24  wrote a note to myself that there was a 10-foot by
25  10-foot recreational -- well, it's an abbreviation, rec

Page 196

1  enclosure, recreational enclosure, and that I observed
2  the offenders there to be communicating with one other,
3  talking, joking, smiling --
4     Q.   Excuse me, Doctor.  My question was about
5  misting systems.  Did you observe a misting system at
6  Browning?
7     A.   Right, and that's what I'm getting to.  I wrote
8  my note to myself with a -- with an arrow going downwards,
9  that's the medical abbreviation for deceased, on
10  ▮▮▮▮▮
11     Q.   Doctor, I'm asking you a yes-or-no question.
12  Did you see misting systems at Browning Unit?
13     A.   Well, that's what I'm trying to get to.
14     Q.   Yes or no, Doctor?
15     A.   I have a note here to myself:  Misting system,
16  cover and H2O.  I don't recall specifically seeing it.
17  But in reviewing my report, it says that outdoor
18  recreation enclosures are under construction at Browning
19  between Wings 3 and 4.
20     Q.   Doctor, that's not responsive to my question.
21  Did you see misting systems at Browning Unit?
22     A.   I don't recall.
23     Q.   Is it your understanding that as of the time
24  you toured Browning, there were misting systems there?
25     A.   I don't recall.

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014



Page 197

1    Q.   Thank you.
2         MS. WIENEKE:  What page --
3    Q.   BY MR. FATHI:  Did you review any articles --
4         THE WITNESS:  45.
5    Q.   BY MS. WIENEKE:  Did you review any of the
6    articles on heat risk cited in Dr. Stewart's report?
7    A.   I'm sorry, say that again.
8    Q.   Did you review any of the articles on heat risk
9    cited by Dr. Stewart in his report?
10   A.   I don't recall which articles you're referring
11   to.
12   Q.   Well, did you review any articles at all about
13   heat risk in conjunction with your work on this case?
14   A.   I reviewed heat-related issues because
15   that's an issue we -- you know, we face the same
16   challenges in Texas, so I'm pretty up on that literature,
17   also.
18   Q.   Okay.  My question was, Doctor, did you review
19   any articles on heat risk in conjunction with your work
20   on this case?
21   A.   I don't recall specifically doing a literature
22   review.  PubMed, looking to see what articles.  And I --
23   I don't recall articles that Dr. Stewart referenced in
24   his report.  But, again, I would be happy if you tell me
25   the articles, I could look at them and tell me if I've

Page 198

1    looked at them before.
2    Q.   Okay.  Doctor, you need to answer my question.
3    Did you review any articles on heat risk in conjunction
4    with your work in this case?
5    A.   I don't recall.
6    Q.   Is it your testimony that [redacted]
7    has not suffered any heat-related health effects?
8         MS. WIENEKE:  Form.
9         THE WITNESS:  I don't know the answer to
10   that.  I haven't looked at her medical chart in a while.
11   I know she's still alive, and I don't recall if, in
12   reviewing her chart, I saw any notation about
13   heat-related problems.
14   Q.   BY MR. FATHI:  Is it your testimony that [redacted]
15   [redacted] has not suffered any heat-related health effects?
16   A.   I similarly reviewed his chart and don't recall
17   at this time.
18   Q.   Is it your testimony that [redacted] has
19   not suffered any heat-related health effects?
20        MR. FATHI:  Let's go off the record.
21        THE VIDEOGRAPHER:  We're off the record at
22   3:37 p.m.
23        (A recess was taken from 3:37 p.m. to
24   3:38 p.m.)
25        THE VIDEOGRAPHER:  We're back on the record

Page 199

1    at 3:38 p.m.
2         THE WITNESS:  I recall reviewing [redacted]
3    record, but I don't recall specific heat-related
4    complications with regard to her chart.
5    Q.   BY MR. FATHI:  [redacted] is male.  Is it
6    your testimony that [redacted] has not suffered any
7    heat-related health effects?
8    A.   I can't recall at this time without looking at
9    the chart.
10   Q.   Is it your testimony that [redacted] has
11   not suffered any heat-related health effects?
12   A.   Same answer.  I reviewed her chart, but I --
13   and I apologize, that's how I confused them when you said
14   [redacted] and [redacted] I would need to look
15   at his -- both of their charts to be able to comment on
16   that.
17   Q.   Have there been heat-related prisoner deaths in
18   the Texas prison system since you have been employed
19   there?
20        MS. WIENEKE:  Object to the form.
21        THE WITNESS:  It's my understanding that
22   there is pending litigation, which I'm not involved in,
23   where that is being asserted.  That's a claim that's
24   being made, that were deaths related to heat in Texas.
25   Q.   BY MR. FATHI:  My question was, have there been

Page 200

1    heat-related prisoner deaths in the Texas prison system
2    since you've been employed there?
3    A.   And that's what I'm saying.  Not having
4    reviewed any of those records, the coroner reports or
5    their actual medical records or charts, I'm not prepared
6    to answer that question because -- but I am aware that
7    there's litigation regarding that.
8    Q.   So the answer is, you don't know?
9    A.   Well, no, the answer is, you're asking me if
10   there have been heat-related deaths.  I'm telling you
11   there is litigation where they're claiming that there
12   were heat-related deaths.  But because I'm not involved
13   in that and haven't reviewed these charts, one of our
14   medical directors is involved in that, and that's not me.
15   So that's what I'm saying.
16   Q.   So you don't know if there have been
17   heat-related deaths in the Texas prison system since you
18   have been employed there?
19   A.   What I'm saying is that there's litigation
20   regarding that issue, but it hasn't been decided -- it's
21   actively being litigated even as we speak.
22   Q.   Have there been heat-related prisoner deaths in
23   the Texas prison system since you've been employed there?
24   A.   It's the same answer.  It's the same exact
25   thing.  That there's litigation and there's -- there's a

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 201

1    lawsuit about that going on as we speak.
2        Q.   So you don't know if there have been
3    heat-related prisoner deaths in the Texas prison system
4    since you've been employed there?
5            MS. WIENEKE: Objection; asked and answered.
6            THE WITNESS: It's my understanding there
7    have been some deaths of offenders, and the issue that's
8    being litigated whether the State of Texas, Texas Forum
9    of Criminal Justice, and UTMB Correctional Managed Care
10   failed to intervene appropriately with that.
11       Q.   BY MR. FATHI: Doctor, you really need to
12   answer my question. The question of who is liable is
13   entirely separate from the question of whether there have
14   been heat-related prisoner deaths in the Texas system.
15           So I ask you once again, have there been any
16   heat-related prisoner deaths in the Texas prison system
17   since you have been employed there? If you don't know
18   the answer, just say so.
19       A.   I don't have firsthand knowledge of that.
20       Q.   Okay. If in fact there were 14 heat-related
21   prisoner deaths in the Texas prison system since 2007,
22   would that affect your opinion on the risk of heat injury
23   or death to ADC prisoners?
24           MS. WIENEKE: Object to the form.
25           THE WITNESS: I think any number of

Page 202

1    heat-related deaths, if that's actually what happened, is
2    significant. And in Texas, we're committed to prevention
3    of bad outcomes and providing a constitutional and
4    appropriate access to care.
5        Q.   BY MR. FATHI: Please listen to my question,
6    Doctor, and answer the question. If in fact there were
7    14 heat-related prisoner deaths in the Texas prison
8    system since 2007, would that affect your opinion on the
9    risk of heat injury or death to ADC prisoners?
10           MS. WIENEKE: Same objections.
11           THE WITNESS: If it can be verified that
12   they were in fact heat-related deaths, it would be
13   something that I would take into consideration, and it
14   would have some impact on my review of the pending
15   Arizona litigation.
16       Q.   BY MR. FATHI: Thank you.
17           Are you aware of any court decisions ruling
18   that exposing prisoners taking psychotropic medications
19   to temperatures above 85 degrees Fahrenheit violates the
20   Constitution?
21       A.   No, I'm not aware, but I would be interested if
22   there are articles on that.
23       Q.   Now, as you say, the Texas prison system is
24   currently being sued over the risk of heat injury and
25   death to prisoners, correct?

Page 203

1        A.   Yes.
2        Q.   Are you named as a defendant in any of those
3    lawsuits?
4        A.   No.
5        Q.   Have you provided any testimony in any of those
6    lawsuits?
7        A.   No.
8        Q.   Have you provided any affidavits or
9    declarations or reports in any of those lawsuits?
10       A.   No.
11       Q.   Have you been involved in those lawsuits in any
12   way?
13       A.   No.
14       Q.   What is your opinion on ADC's system of
15   monitoring prisoners taking psychotropic medications as
16   it existed on September 27th, 2013?
17       A.   It's my opinion that their system for
18   monitoring patient offenders on psychotropic medications
19   is within the standard of community and correctional
20   health care systems.
21       Q.   How often does the Corizon contract require
22   that a prisoner on psychotropic medication be seen by a
23   psychiatrist?
24       A.   It depends on their MH classification. If
25   they're MH 1, 2, 3, 4, or 5, that will determine the

Page 204

1    frequency with which they're seen.
2        Q.   Okay. Well, tell me how often a prisoner --
3    the Corizon contract requires that a prisoner on
4    psychotropic medications be seen by a psychiatrist.
5        A.   I would need to review my -- this form. But to
6    the best of my recollection, I believe it's every -- I
7    believe it's every 90 days for someone at MH-3 or MH-4.
8    If they're an MH-5, I believe they have to be seen at
9    least once every 30 days.
10       Q.   And is it your testimony that that was
11   happening consistently throughout the ADC system as of
12   September 27th, 2013?
13           MS. WIENEKE: Object to the form.
14           THE WITNESS: It's my understanding that
15   there were some situations where the psychiatrist wasn't
16   seeing somebody every 90 days, and it was sometimes
17   exceeding that. But on the flip side, there were
18   situations, and I spoke directly to Dr. Harrison, a
19   psychiatrist at the Tucson facility, who told me that she
20   would actually see offenders even more frequently than
21   the 90 days that's needed.
22           So yes and no. There were some situations
23   where people were being seen longer than 90 days, but
24   also situations where people -- and my record review
25   revealed this -- that there were cases where people were

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 205

1    seen more frequently than 90 days.
2        Q.   BY MR. FATHI:  And if patient A is seen more
3    frequently than 90 days, does that help patient B who was
4    seen less frequently than every 90 days?
5            MS. WIENEKE: Object to the form,
6    foundation, incomplete hypothetical.
7            THE WITNESS: It -- it totally depends upon
8    the acuity and presentation of the patient.  I think you
9    -- again, medicine is very different from the law.
10       Q.   BY MR. FATHI:  I'm sorry, I don't think you
11   understood my question.  My question is, if prisoner A is
12   seen more frequently than every 90 days, does that
13   somehow help prisoner B, who was seen less frequently
14   than every 90 days?
15           MS. WIENEKE: Same objections.
16           THE WITNESS: The point is that -- my answer
17   to that is, this is a good example of this system is a
18   clinical necessity -- clinically driven decision.  There
19   are parameters for 30 days or 90 days.  But at the end of
20   the day, it's up to the medical judgment of a licensed
21   psychiatrist or other health care professional to make a
22   decision of how often do I need to see this patient.  If
23   you have somebody who's acutely psychotic, you're not
24   going to see them day 1 and then wait 90 days to see them
25   again.  That makes no sense.  So the point is, it's a

Page 206

1    clinically driven decision rather than an arbitrary zero,
2    30, 90-day thing.
3        Q.   BY MR. FATHI:  Can you answer my question,
4    Doctor?
5        A.   I think I did.
6        Q.   No, you did not.
7        A.   What was the question, please?
8        Q.   If prisoner A is seen by a psychiatrist more
9    frequently than every 90 days, does that help prisoner B
10   who was seen less frequently than every 90 days?
11           MS. WIENEKE: Same objections and asked and
12   answered.
13           THE WITNESS: If prisoner B does not have
14   any acute psychiatric disturbance or psychiatric
15   symptoms, there's no reason for them to be seen more
16   frequently than 90 days.
17       Q.   BY MR. FATHI:  Will you answer my question,
18   please, Doctor.
19       A.   That's my answer to your question.
20       Q.   Would you turn to Tab 1, please, second
21   document, August 2013 MGAR for Eyman Complex.  And will
22   you please turn to page ADC137480.
23       A.   Sorry.  The first tab?
24       Q.   Tab 1, second document --
25       A.   Oh, second document.  Okay.  137 --

Page 207

1        Q.   480.
2        A.   480.  Thank you.  Okay.
3        Q.   Okay.  The second half of the page is a note
4    written on August 29th, 2013, by Dr. Nicole Taylor.  And
5    she's answering the question, quote:  Are inmates
6    prescribed psychotropic meds seen by a Psychiatrist or
7    Psychiatric Mid-level Provider at a minimum of every
8    three months (90 days)?
9            And Dr. Taylor notes a number of prisoners,
10   including several who are SMI or seriously mentally ill
11   who are past due for a psychiatry visit.  Do you see
12   that?
13       A.   Yes.
14       Q.   And about two inches from the bottom,
15   Dr. Taylor writes the following about a prisoner
16   No.▮▮▮▮▮  quote: Inmate was last seen 5/8/13 when
17   psych meds were DC'd.  Since that date, inmate has sent 4
18   HNRs asking for help and reporting he wants back on his
19   psych meds.  Inmate has yet to be seen.  Close quote.
20           Do these findings by Dr. Taylor have any
21   effect on your opinion as to ADC's medication monitoring
22   practices?
23           MS. WIENEKE: Form.
24           THE WITNESS: Yes, they do.
25       Q.   BY MR. FATHI:  And what is that effect?

Page 208

1        A.   Well, and I'd like to be able to answer with my
2    -- give a full response here.  ADC has set a very high
3    standard of seeing these people every 90 days.  In Texas,
4    our frequency is every six months.  So basically Arizona
5    exceeds the free world standard, which -- free world
6    seriously mentally ill in a community mental health
7    center would be seen every six months.  So Arizona has
8    imposed on itself a higher frequency for people to be
9    seen.
10           And it appears from this random selection
11   that they are not achieving that.  I would want to know,
12   if they were being seen every six months or on a less
13   frequent basis, would they be in better compliance with
14   that.  So it's strictly an auditing function by the
15   Department of Corrections is the issue here.
16       Q.   So your testimony is that a seriously mentally
17   ill person on psychotropic medications does not need to
18   be seen by a psychiatrist every 90 days; is that correct?
19       A.   If they're clinic --
20           MS. WIENEKE: Object to the form.
21           THE WITNESS: Sorry.
22           If they're clinically stable, no, they do
23   not need to be seen every 90 days.
24       Q.   BY MR. FATHI:  Are there some prisoners who are
25   seriously mentally ill on psychotropic medications who do

Page 209

1   need to be seen every 90 days by a psychiatrist?
2         MS. WIENEKE: Form.
3         THE WITNESS: Yes.
4   Q.   BY MR. FATHI: And can you tell that the
5   prisoners who were not seen who were overdue for their
6   psychiatrist visit were clinically stable?
7         MS. WIENEKE: Form.
8         THE WITNESS: I'm sorry, I'm not
9   understanding the question.
10  Q.   BY MR. FATHI: The notions that we just
11  discussed where Dr. Taylor noted that a number of
12  prisoners, including several who were seriously mentally
13  ill --
14  A.   Yes.
15  Q.   -- were not seen by the psychiatrist every 90
16  days.
17  A.   Right.
18  Q.   Can you tell from that document that all of
19  those prisoners were clinically stable?
20        MS. WIENEKE: Form.
21        THE WITNESS: No, and --
22  Q.   BY MR. FATHI: Will you turn to Tab 7, please.
23  A.   I would like to clarify that there's multiple
24  reasons why --
25  Q.   Doctor, my question was a yes-or-no question.

Page 210

1   Can you tell by looking at that document if those
2   prisoners who were overdue for a psychiatry visit were
3   clinically stable? Your answer is no. If your counsel
4   thinks that you need to talk further about that topic,
5   she has a chance to ask you questions later. But you've
6   answered my question.
7   A.   Okay.
8   Q.   So we're going to move on, please, to Tab No.
9   7.
10        MS. WIENEKE: Could you please mark that in
11  the transcript, please. Thank you.
12  Q.   BY MR. FATHI: Tab 7, third document, the
13  September 2013 MGAR for Yuma. Would you please turn to
14  page 154398.
15  A.   I'm sorry. You said Tab 7?
16  Q.   Tab 7, third document.
17  A.   Okay.
18  Q.   September 2013 Yuma MGAR.
19  A.   That's not what I have in here. I have three
20  sets of documents. The first set is September.
21  Q.   Okay. September 2013 Yuma?
22  A.   Okay.
23  Q.   Okay. Would you please turn to page 154398.
24  And please let me know when you're there, Doctor.
25  A.   Okay.

Page 211

1   Q.   At the top of page 154398 is a note written by
2   Dr. Nicole Taylor on September 30th, 2013, and she
3   writes, quote:  many of the inmates' medications expired
4   because they were not seen by Psychiatry to be renewed.
5   Many of the inmates were also SMI. This poses a
6   potential risk of serious harm to the inmate.
7         Do you see that language, Doctor?
8   A.   Yes.
9   Q.   Does this --
10  A.   And, I'm sorry, actually, there is a typo
11  there. It says many -- inmates is a typo. It's like
12  inamtes, i-n-a-m-t-e-s. It's -- there's a typo there.
13  Q.   Does this finding by Dr. Taylor have any effect
14  on your view of the adequacy of ADC's medication
15  monitoring system?
16  A.   Yes, it does.
17  Q.   Do you agree with Dr. Taylor's finding that the
18  situation poses a potential risk of serious harm to the
19  inmate?
20        MS. WIENEKE: Form.
21        THE WITNESS: I'm not sure if I agree with
22  the "serious." It does pose a potential risk, but I
23  think it's important to note that there's correctional
24  officers watching offenders 24/7. And if somebody were
25  to decompensate or have clinical symptoms, they could be

Page 212

1   referred to medical or psychiatry on a more timely basis.
2   So I agree that there's a potential risk, but I don't
3   know if I would agree with the serious harm.
4   Q.   BY MR. FATHI: How many suicides were there in
5   ADC in 2013, Doctor?
6   A.   I don't know the exact number. I have in my
7   report I think through August or September of 2013, but I
8   don't know the final number of 2013.
9   Q.   Okay. Would you please turn to Tab 6, third
10  document, which should be the September 2013 MGAR for the
11  Tucson Complex.
12  A.   Okay.
13  Q.   Would you please turn to page 154317.
14  A.   I'm sorry, 1543 --
15  Q.   317.
16  A.   Okay.
17  Q.   This is a September 30th, 2013, note by
18  Dr. Nicole Taylor, and she writes, quote:  there were
19  many SMI inmates that had not been seen by their Return
20  to Clinic date. Some of the dates were from as early as
21  last March and still had not been seen. This poses a
22  potential risk of serious harm to the inmate. Close
23  quote.
24  A.   I'm sorry. Where is --
25  Q.   This is -- this is starting about halfway down

Page 213

1 page 154317.
2   A.   Okay.
3   Q.   Do you see the language I just quoted?
4   A.   The 9/30/13?
5   Q.   Yes, the note dated 9/30/13 by Dr. Nicole
6 Taylor.
7   A.   Yes, I see that.
8   Q.   Do you agree with Dr. Taylor that the situation
9 she describes poses a potential risk of serious harm to
10 the inmate?
11      MS. WIENEKE: Form.
12      THE WITNESS: I believe that -- my opinion
13 is there's a potential risk, but I don't know if I would
14 agree with the serious harm.
15   Q.   BY MR. FATHI:  Would you look at page 31 of
16 Dr. Stewart's report, please.
17   A.   Okay.
18   Q.   On page 31 and 32 of his report, Dr. Stewart
19 cites some cases that he believed showed deficient
20 monitoring of patients on psychotropic medication.  And
21 my question is, did you review any of the records that
22 Dr. Stewart cites on page 31 of his report?
23   A.   Not to date, no.
24   Q.   So you're not in a position to agree or
25 disagree with Dr. Stewart about those particular cases,

Page 214

1 correct?
2   A.   That's fair.
3   Q.   Would you turn to page 40 of your report,
4 please.
5      Now, on page 40 of your report, you write --
6 this is about halfway down the page, quote:  I did not
7 deserve any -- I did not observe any patients to have
8 extra-pyramidal symptoms (EPS), over-sedation or other
9 psychotropic medication side effects as alleged by
10 Dr. Stewart.
11      Do you see that language, Doctor?
12   A.   Yes.
13   Q.   Now, on pages 32 and 33 of Dr. Stewart's
14 report, he identifies some prisoners in whom he observed
15 EPS and akathesia.  Do you see that?  Do you see that,
16 Doctor?
17   A.   Yeah, I'm reading it.
18      There are five patients that he references,
19 yes.
20   Q.   Did you ask to see any of these prisoners
21 during your tour?
22   A.   This -- the particular units with which
23 these -- remember I couldn't -- I wasn't allowed to
24 evaluate prisoners.  I wasn't allowed to interview them
25 or talk to them.  So -- I mean, I suppose I could have

Page 215

1 asked to have them brought up and I could have looked at
2 that, but the ability to evaluate for EPS or
3 extra-pyramidal symptoms, it's not just something where
4 you just visually -- you also want to do a hand --
5 there's a -- where you actually have to lay hands on and
6 do a motoric functioning and have them do certain tasks.
7 So just to do a visual inspection as Dr. Stewart did
8 would not be enough to really clearly identify if
9 somebody had extra-pyramidal symptoms.
10   Q.   So it's your testimony that it is impossible to
11 observe extra-pyramidal symptoms without physically
12 touching the patient?
13   A.   That's not what I'm saying.  What I'm saying
14 is, to definitively identify if somebody's having
15 extra-pyramidal symptoms requires a combination of both
16 visual observation, interview, discussion, and history
17 taking with the patient and often a physical examination
18 of the patient to look for cogwheeling, rigidity, have
19 them do rapid tests.  There's multiple neurologic tests
20 you can do.  It's not something where you can just go
21 cell side and just -- you can make the diagnosis by just
22 looking at them.
23   Q.   Did you ask to see any of these prisoners?
24   A.   No, I did not.
25   Q.   What is your opinion as to access to mental

Page 216

1 health care for ADC prisoners with mental illness as of
2 September 27th, 2013?
3   A.   What's my opinion?
4   Q.   Yes.
5   A.   It's my professional opinion that the access to
6 mental health care is within the standard of -- community
7 standard and correctional standard.
8   Q.   And that was the case as of September 27th,
9 2013?
10   A.   Yes.
11   Q.   Under the Corizon contract, how soon after
12 receipt are HNRs for mental health services required to
13 be triaged?
14      MS. WIENEKE: Object to the form.
15      THE WITNESS: I would have to refer to their
16 policy.  I don't know that off the top of my head.
17   Q.   BY MR. FATHI:  If a patient is referred to a
18 mental health provider, how soon does the Corizon
19 contract require that the patient be seen by a provider
20 after the referral?
21      MS. WIENEKE: Form.
22      THE WITNESS: I'd have to refer to the
23 Corizon contract.  I remember -- I distinctly recall
24 reviewing that, but given the volume of records that I
25 reviewed, I don't recall that off the top of my head.

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 217

1    Q.   BY MR. FATHI:  Would you please turn to Tab 6,
2    second document.  This is the August 2013 MGAR for
3    Tucson.
4    A.   Okay.
5    Q.   Will you please turn to page 137647.
6    A.   Okay.
7    Q.   And this is an August 29th, 2013, note by
8    Dr. Nicole Taylor answering the question, quote:  Are
9    inmates referred to a Psychiatrist or Psychiatric
10   Mid-level Provider seen within 7 days of referral?  Close
11   quote.
12        And Dr. Taylor writes, quote:  Many of the
13   delays between referral date and date seen were extremely
14   lengthy.  Close quote.  And then further down the page,
15   she notes examples of delays of one or two months or
16   more.
17        Doctor, in your opinion is this consistent
18   with the community standard of care?
19        MS. WIENEKE:  Object to the form.
20        THE WITNESS:  I would say yes, that there is
21   often extensive delays.  I know of communities where it
22   takes six months to a year to get in to see a
23   psychiatrist.  So it's my opinion that there are often
24   delays in getting -- after referral to a psychiatrist,
25   there are often delays in the community and often within

Page 218

1    correctional settings.
2    Q.   BY MR. FATHI:  Okay.  Would you please turn to
3    Tab 3, third document.  This is the September 2013 MGAR
4    for Lewis.  Please turn to page 154160.
5    A.   I'm sorry, you said September -- you said the
6    third set of documents?
7    Q.   Yes.  September 2013 MGAR for Lewis Complex.
8    A.   I don't have that.
9    Q.   You don't have it at all?
10   A.   Tab 6?
11   Q.   Tab 3.
12   A.   Sorry, I thought you said 6.  3.  Okay.  So the
13   first set of documents?
14   Q.   It should be the third set of documents,
15   September 2013.
16   A.   Mine's the fourth set of documents.  September
17   2013 Lewis Complex.  Okay.  What number, please?
18   Q.   154160.
19   A.   Okay.
20   Q.   And here again, Dr. Taylor is assessing whether
21   inmates referred to a psychiatrist or psychiatric
22   mid-level provider are seen within seven days of
23   referral.
24   A.   Uh-huh.
25   Q.   And she writes on September 30th, 2013, quote:

Page 219

1    there were many inmates who had still not been seen after
2    being referred in June and July.  The delay was often
3    well beyond the 7 day standard stated in this performance
4    measure.  End of quote.
5        Is this consistent with the community
6    standard of care?
7    A.   Yes.
8        MS. WIENEKE:  Form.
9    Q.   BY MR. FATHI:  Would you please turn to Tab 6.
10   Third document, which is the September 2013 MGAR for
11   Tucson Complex.  Would you please turn to page 154315.
12   A.   15 -- sorry, 1543 --
13   Q.   315.
14   A.   Okay.
15   Q.   And here again, Dr. Taylor is assessing whether
16   inmates referred to a psychiatrist or psychiatric
17   mid-level provider are seen within seven days of
18   referral.  And she writes on September 30th, 2013:
19   Many of the -- quote:  many of the referrals are from
20   June and July.  There is potential for serious harm to
21   the inmate.  Close quote.
22        Is this situation consistent with the
23   standard of care?
24        MS. WIENEKE:  Form.
25        THE WITNESS:  Yes.

Page 220

1    Q.   BY MR. FATHI:  Do you agree with Dr. Taylor
2    that there is a potential for serious harm to the inmate?
3    A.   No, I agree that there's a potential for harm,
4    but I don't agree with serious harm.
5    Q.   Could I take a break?
6        MR. FATHI:  Sure.
7        THE VIDEOGRAPHER:  Going off the record.
8    The time is 4:10 p.m.
9        (A recess was taken from 4:10 p.m. to
10   4:19 p.m.)
11        THE VIDEOGRAPHER:  We're back on the record.
12   The time is 4:19 p.m.
13   Q.   BY MR. FATHI:  Doctor, would you turn to page
14   89 of your report, please.  Doctor, page 89 of your
15   report, you begin a section titled Monitoring and
16   Oversight.  And on page 90 in the first full paragraph,
17   you write, quote:  When the contracted healthcare vendor
18   fails to meet or comply with duties and expectations, it
19   is subject to financial penalties.  Close quote.
20        How do you know that?
21   A.   From speaking to the different health care
22   leaders involved in this case, Dr. Taylor, Dr. Fulks,
23   F-u-l-k-s, Dr. Mark Fleming.  I'm trying to remember who
24   else.
25   Q.   And as of the time that you wrote your December

Parsons vs.                                    Confidential        Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                  Subject to Protective Order                                        April 11, 2014

Page 221

1   18th report, how many times had Corizon been assessed
2   financial penalties by ADC?
3      A.   I don't know the answer to that.
4      Q.   As we sit here today, how many times has
5   Corizon been assessed financial penalties by ADC?
6      A.   I don't know.
7      Q.   Has Corizon ever been assessed financial
8   penalties by ADC?
9      A.   I don't think they've been in the contract that
10  long. I don't -- I believe, if I'm not mistaken, this is
11  their first year renewal, so we're talking about a short
12  amount of time. But to the best of my knowledge, I don't
13  know how much they've been assessed.
14     Q.   Okay. My question, Doctor, was, has Corizon
15  ever been assessed financial penalties by ADC?
16     A.   In the year that they've been the contracted
17  health care provider, I'm not aware of any assessed
18  financial penalties.
19     Q.   Thank you.
20          Now, you also write in the following
21  sentence on page 90, quote:  Additional examples of
22  monitoring processes include monthly MGAR (medical green
23  amber red) reports and corrective action reports. Close
24  quote.
25          What is the source of your knowledge about

Page 222

1   corrective action reports?
2      A.   Again, speaking to Dr. Taylor, speaking to
3   Jessica Raak, R-a-a-k, her -- one of her staff members.
4   And Dr. Fulks again and Dr. Fleming. Those are the main
5   people that I've spoken to directly about corrective
6   action reports.
7      Q.   As of the time that you wrote your December
8   18th report, how many corrective action reports have you
9   reviewed?
10     A.   I'd have to look through my supplemental
11  report.
12     Q.   Well, no, I'm asking -- for now, my question is
13  about -- at the time you wrote your initial report
14  December 18, how many corrective action reports have you
15  reviewed?
16          Let's go off the record.
17          THE VIDEOGRAPHER: We're off the record at
18  4:23.
19          MS. WIENEKE: You know what, I don't agree
20  to go off the record. So we're going to stay on the
21  record. If he needs time to look at his report, it's on
22  the clock. So I don't agree to go off --
23          MR. FATHI: Well, we need to go off the
24  record while he is reading through his report.
25          MS. WIENEKE: Sorry, but I'm not stipulating

Page 223

1   to go off the record. So you require a stipulation to go
2   off the record, and I don't agree.
3          MR. FATHI: I'm requesting that we go off
4   the record.
5          MS. WIENEKE: And I disagree.
6          MR. FATHI: And what's the reason for that,
7   Kathy?
8          MS. WIENEKE: Because you're asking him a
9   question, and he's looking at his report to answer your
10  question. This is part of the deposition process. Just
11  like Dr. Cohen looked at his materials, that was on the
12  record, and we didn't go off the record for that. So
13  we're going to apply the same standards for Dr. Cohen as
14  we are for Dr. Penn.
15          So we're on the record, and we'll remain on
16  the record while he's answering your questions. And
17  we'll go off the record for breaks. But this isn't a
18  break, and so we're on the record.
19          THE VIDEOGRAPHER: Back on the video,
20  Counsel?
21          MS. WIENEKE: Yes.
22          THE VIDEOGRAPHER: Back on the video record
23  at 4:25.
24          THE WITNESS: So in reviewing my report of
25  December 18, 2013, I'm not finding specific corrective

Page 224

1   action reports that I reviewed.
2      Q.   BY MR. FATHI: So the answer to my question is
3   none?
4      A.   I think you asked as of December -- my December
5   report. I don't see any -- that I reviewed any
6   corrective action reports.
7      Q.   As of your December 18th report?
8      A.   Correct.
9      Q.   All right. Would you turn to Tab 8, please.
10  Would you turn to Tab 8, please.
11     A.   Sure. But I thought you asked me up till now,
12  too.
13     Q.   No, I did not. I asked you as of the date of
14  your December 18th report.
15     A.   Because --
16     Q.   Would you turn to Tab 8, please, Doctor.
17     A.   Tab 8?
18     Q.   Yes.
19     A.   Okay.
20     Q.   Tab 8 is the September 5th, 2013, deposition of
21  Dr. Nicole Taylor.
22     A.   Uh-huh.
23     Q.   And on pages 123 and 124, starting at line 16
24  on 123, Dr. Taylor testifies that she has never received
25  a mental health Corrective Action Plan from Corizon for

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 225

1  any facility except Yuma and Phoenix.
2      Do you see that testimony, Doctor?
3  A.  Sorry.  You said line 16 --
4  Q.  Beginning on page 123, line 16.
5  A.  Uh-huh.  Okay.
6  Q.  So Dr. Taylor testifies that she has never
7  received a Corrective Action Plan on mental health from
8  any facility except Yuma and Phoenix.  Do you see that
9  testimony?
10  A.  That's what's recorded here, yes.
11  Q.  And does that have any effect on your opinion
12  as to the adequacy of ADC's monitoring and oversight of
13  the mental health contract?
14      MS. WIENEKE:  Form.
15      THE WITNESS:  It's something I take into
16  consideration, but it doesn't change my opinion.
17  Q.  BY MR. FATHI:  And what is your opinion?
18  A.  That basically they have a monitoring system in
19  place that's similar to other state prisons nationwide
20  with an audit and oversight role or function.  And that
21  it meets the standard within correctional health care
22  systems.
23  Q.  Does it meet the community standard of care?
24  A.  I would actually say it exceeds the community
25  standard of care because most community agencies don't

Page 226

1  have somebody auditing what they're doing.  The only
2  audit functions are typically in private insurance
3  companies where you have managed care people seeing if --
4  a way to save money.  But basically most community
5  systems of care don't have somebody auditing what doctors
6  and nurses and other health care staff are doing.  So I
7  would say it exceeds the standard in the community.
8  Q.  Despite the fact that Dr. Taylor has never
9  received a Corrective Action Plan from eight of the ten
10  facilities?
11      MS. WIENEKE:  Object to the form.  Misstates
12  the testimony.
13  Q.  BY MR. FATHI:  Is that your testimony?
14  A.  Yes.
15  Q.  Let's look at your notes, PENN 1 through 118.
16  A.  Sorry.
17  Q.  And -- the exhibit number?
18  A.  546.
19  Q.  Would you please turn to page PENN 6.  And on
20  the lower half of the page on the right-hand side, you
21  wrote, quote:  Have not hit the threshold for compliance.
22  End quote.  Do you see that?
23  A.  Yes.
24  Q.  What does that refer to?
25  A.  Those are notes that I wrote to myself where

Page 227

1  basically what I'm -- my documentation of my phone call,
2  conference call, with the law firm that I was retained,
3  and Dr. Nicole Taylor is on the call.  And what
4  Dr. Taylor communicated to me was that Corizon was
5  required to be in compliance.  And if they have not hit
6  the threshold for compliance, then there is monetary
7  fines could be imposed.
8  Q.  So was Dr. Taylor telling you that Corizon, as
9  of that time, had not hit the threshold for compliance?
10  A.  No.  What she was -- what she told me was that
11  Corizon was required to be in compliance with dental,
12  medical, and mental health.  And if they have not hit the
13  threshold for compliance, they were subject to monetary
14  fines.
15  Q.  So where you wrote, quote:  Have not hit the
16  threshold for compliance, close quote, you're not
17  referring to Corizon not meeting the threshold for
18  compliance?
19  A.  Right.  It was a hypothetical.  If they have
20  not hit the threshold, then they are subject to monetary
21  fines.
22  Q.  I see.  Would you turn to page 8, please.
23  A.  Sure.
24  Q.  And there you write, quote:  Medication
25  administration, automatic refills expiring/falling off,

Page 228

1  not getting renewed.  Close quote.  What does that refer
2  to?
3  A.  What I was writing a note to myself had to do
4  with auto-refill and that -- this is something that's a
5  challenge for many correctional systems --
6  Q.  Excuse me, Doctor, my question was just what
7  does the note refer to?
8  A.  Okay.  Sure.  Okay.  Sure.  So in our
9  discussion, we were talking about strengths and
10  weaknesses in the system and that one of the challenges
11  was what they were finding was that sometimes medication
12  refills were expiring or falling off and not getting
13  renewed.  And so that was something they were looking
14  into to try to fix or make better.
15  Q.  And this was Dr. Taylor who told you that?
16  A.  Yes.
17  Q.  Okay.  On page 9, about halfway down the page,
18  you write, quote:  Charts not following them plus meds
19  falling off.  Close quote.
20  A.  Yes.
21  Q.  What does that refer to?
22  A.  Well, earlier in the note, it says that there's
23  a lot of movement.  In other words, offenders get moved
24  from facility to facility.  And unfortunately, because
25  they have a paper record, and this happens -- and

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 229

1  happened to us in Texas before we had an electronic
2  medical record, the charts don't follow patients and that
3  sometimes medications can fall off when you have patient
4  moving from point A to point B.  So that was one of the
5  challenges that they were facing, and they were working
6  together with Corizon to try to make that better.
7     Q.   Okay.  And going back to page 1, it looks like
8  the date of this conversation was October 22nd of 2013?
9     A.   Yes, that's fair.
10    Q.   Okay.  Would you turn to page 13, please.  And
11 about a third of the way down the page, you write, quote:
12 3 and then a symbol -- I don't know if it's minutes or
13 inches -- even if use OC.  Close quote.
14          First of all, can you tell me what that
15 symbol after the digit 3 means?
16    A.   I don't recall specifically the context of
17 this.
18    Q.   First, again, if you could just tell me what
19 that symbol means.
20    A.   Well, I'm trying to figure out -- this is
21 something I wrote back in November.  We're now in April.
22 So I'm trying to figure out what...
23    Q.   If you don't recall, that's fine.
24    A.   This is when I was meeting with the Warden
25 Ramos, a deputy warden who I don't recall his name -- his

Page 230

1  or her name, and Dr. Fulks and some other people.  And
2  what they were basically telling me was that they
3  appreciated that any delay in getting to a cell is a
4  challenge.  And that -- the little quotation marks, it's
5  an abbreviation for minutes.  That 3 minutes is a long
6  time to get into a cell.  And what they were telling me
7  is that they try to do the searches every day.  And I
8  don't recall specifically what I meant here by 3 minutes
9  even if you use OC.
10          I think what I was trying to document to
11 myself was that custody -- custody is always first and
12 paramount.  You can't have health care staff rushing into
13 a cell because health care staff could get injured or
14 hurt.  So basically custody was saying, we try to do
15 everything we can to get into the cell in a timely
16 manner.  But even given that, it typically takes up to 3
17 minutes, even if we're using OC spray.
18    Q.   Okay.  Would you turn to page 31, please.
19    A.   Sure.
20    Q.   And in the upper right-hand corner of page PENN
21 31, you write, quote:  Area of vulnerability.  And then
22 about halfway down the page on the left side, you write:
23 Delay and then an arrow.  It looks like decomp MH.
24          Am I reading that correctly?
25    A.   Yes.  You're actually pretty good at reading my

Page 231

1  scribble.
2     Q.   Could you tell me what you were referring to
3  here, please.
4     A.   Sure.  I don't really remember the context of
5  this.  I was writing a note to myself about the
6  medication of the pharmacy.  PharmaCore.  I think that's
7  the company that does their -- and I think what -- if I
8  recall from the team that I was rounding with or doing
9  the site visit was that they were trying to figure out
10 what medication should be stock medications, like kept on
11 site, either on site in the pharmacy and that they were
12 trying to identify like at their corridor units, should
13 they just routinely stock -- have stock meds, like
14 psychotropic medications as stock meds.  And how they
15 realize cost savings.
16          But to have -- it was kind of like a
17 risk-benefit ratio that if you have stock meds, it costs
18 more because meds expire so you have to be constantly
19 updating your inventory.  So it results in more expenses,
20 but the flip side if you don't have those stock meds and
21 people move from unit to unit, the medications can fall
22 off.  And you could have a resulting possibility of delay
23 and possible decompensation.  So they've -- they've been
24 talking about more onsite pharmacy presence and stock
25 medications.  And they said that having an electronic

Page 232

1  medical record would also help that process.  So they
2  were talking about their challenges, but some strategies
3  short and long term that they were going to implement to
4  make it -- and that's why I put this was an area of
5  vulnerability for them.
6     Q.   Was that your phrase or someone else's?
7     A.   That was mine.
8     Q.   Okay.  Would you turn to page 35, please.  And
9  about two-thirds of the way down the page, you write,
10 quote:  Need increased staff psychiatrists, psychiatric
11 nurse.  Close quote.  Am I reading that correctly?
12    A.   Yes.
13    Q.   Are those your words or someone else's?
14    A.   Those are mine.  And I'm trying to remember the
15 context of what I was trying to write myself.
16    Q.   First, which facility is this?
17    A.   Sure.  This is Perryville.
18    Q.   Thank you.
19    A.   Yeah, that's Perryville.  And...
20    Q.   Did you conclude that Perryville needed an
21 increase in staff?
22    A.   I think -- I think what I wrote to myself,
23 starting at the top -- well, not all the way to the top,
24 but I have there the frequency anyone on psych meds is
25 seen q 90 days.  SMI seen every 30 days.  And then I have

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 233

1  mental health psychologist and/or psychiatrist. And I
2  made a comment to myself I was really impressed by how
3  creative they were with regard to MH-3 levels and above,
4  they were getting group therapies. And that they had
5  identified -- and this is across the nation where we're
6  seeing more mentally ill and more females with mental
7  health issues. And as a result, they felt the need to
8  have more psychiatrists and psychiatric nurses to deal
9  with females with mental health issues. So --
10  Q. And who conveyed that to you?
11  A. Well, I met with several of the staff. There
12  was a Dr. -- I think it's in my report. Dr. St. Clair.
13  And there was at least one or two wardens that day,
14  Captain -- anyways, it's in my report. Yeah, Dr. John
15  St. Clair, licensed psychologist, a deputy warden, and --
16  so anyways, what they conveyed to me was that they
17  realized that the females were getting sicker and that
18  they had taken steps to try to get more psychiatry and
19  psychiatric nurse staffing.
20  Q. But they told you they needed more
21  psychiatrists and psychiatric nurse staffing, correct?
22  A. Well, no, what that was, was they had
23  recognized the need within females for more staff, that
24  having especially in particular psychiatric nurses -- and
25  I don't want to be gender insensitive here, but female

Page 234

1  offenders tend to be more needy. And so by having
2  psychiatric nurses, they could monitor and assess side
3  effects and report those side effects to the
4  psychiatrist. So that's what they were trying to
5  communicate with me.
6  Q. Now, is it your testimony that they said as of
7  this date they needed more staff or that they had already
8  added more staff?
9      MS. WIENEKE: Form.
10      THE WITNESS: It's my understanding they had
11  already identified the need for staff, and they were
12  working with Corizon to increase their staffing numbers.
13  Q. BY MR. FATHI: Had they increased their staff
14  numbers as of this date?
15  A. I don't know.
16  Q. Would you turn to page 36, please. And toward
17  the bottom of the page, you've written: MH weaknesses.
18  Do you see that?
19  A. Yes.
20  Q. MH stands for mental health?
21  A. Yes.
22  Q. Whose phrase is that, "MH weaknesses"?
23  A. I think those are mine. It could have been
24  Dr. Fulks's, but I think those are mine.
25  Q. And then you also write to the right of that,

Page 235

1  quote: They cut MH staffing 38% as a whole. Close
2  quote.
3  A. Yes.
4  Q. Correct?
5  A. Yes.
6  Q. And who told you that?
7  A. Let's see. I'm not sure if Dr. Fulks was still
8  with -- this is the Perryville tour. I don't recall if
9  it was Dr. Fulks or Dr. St. Clair, but -- and I
10  specifically don't recall if it was in the transition
11  from ADC to Wexford or from Wexford to Corizon or if it
12  was -- I don't believe it was subsequent to Corizon being
13  on board. But what I learned was that the patient load
14  had gone up, and I have that here in my notes, patient
15  load had gone up and staffing had gone down. So that was
16  a concern verbalized. But I don't recall when that
17  alleged cutting or reduction in staffing, when that had
18  occurred, if it had gone from ADC to Wexford or Wexford
19  to Corizon.
20  Q. Okay. Will you turn to page 40, please. These
21  appear to be your notes from Florence, and you write on
22  page 40, quote: Previously a lot of isolation and
23  restriction. And then there's an arrow, and you write:
24  Few suicides. Am I reading that correctly?
25  A. Yes.

Page 236

1  Q. What are you referring to when you write
2  "previously a lot of isolation and restriction"?
3  A. Right. So there were two things, to answer
4  your question. And I don't recall the specifical --
5  sorry, the specific layout of the facility. But that the
6  system itself, the correctional system had identified
7  that previously they had a lot of isolation and
8  restriction, and they had had suicides, in particular
9  folks that had mental health scores of 3 and higher.
10      And so they did two things: One was, by
11  trying to co-locate all of their watches or people at
12  risk in a certain location so they could be more visual
13  and more directly observed. So that was one. The other
14  thing they did was they -- and they showed me some of the
15  cells that they were fixing where the doors -- to where
16  before, instead of having this tiny little window to look
17  in the cell, it was like pretty much a ginormous -- by
18  prison standards, it was a pretty big size window several
19  feet to be able to look through the window. And that the
20  offenders -- it's called an open bar window design. And
21  that they made a leadership decision not to house any in
22  cell block 5 or 7. And I don't recall specifically what
23  that means, but that they tried to move people into more
24  visible locations, and they had done that as recently as
25  the last month. That's what my notes reflect.

Parsons vs.                          Confidential        Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                          Subject to Protective Order                              April 11, 2014

Page 237

1   Q.   And you took these notes on November 5th, 2013,
2   correct?
3        I'm looking at page 38.
4   A.   Yes.  November 5th, 2013, yes.
5   Q.   So is it your testimony that as of November
6   13th -- excuse me, November 5th, 2013, there were no
7   prisoners housed in cell blocks 5 and 7?
8   A.   No, that's not my testimony.  I think my
9   recollection from my notes is that they were making an
10  effort to avoid housing people in that cell block 5 or 7.
11  Q.   Well, in your note, you write, quote:  They
12  made a leadership decision to not house any #5 or #7.
13  A.   Right.
14  Q.   Do you see that?
15  A.   Yes.
16  Q.   But your testimony is that as of this date,
17  there were still prisoners in cell block 5 and cell block
18  7?
19  A.   I don't recall.  I would have to -- I don't
20  want to misstate or give misinformation.  What I recall
21  from my notes is they identified that they had a concern,
22  and they made a decision with custody and the wardens and
23  such that they were going to avoid putting people in
24  those cell blocks and instead move them -- and they were
25  in the process of changing the -- they were retrofitting

Page 238

1   some of the doors to that design that I mentioned.  So it
2   was a work in progress I guess is what I am trying to
3   say.
4   Q.   So you don't know if there were, as of November
5   5th, 2013, still prisoners in cell block 5 and cell block
6   7?
7   A.   That's fair.  Well, there were prisoners, but
8   they -- whether they were mentally ill MH-3s or higher,
9   that, I don't know.
10  Q.   Now, when you write on page 40:  Previously a
11  lot of isolation and restriction --
12  A.   Uh-huh.
13  Q.   -- few suicides, what time frame were you
14  referring to there?
15  A.   I'm just writing down what the staff -- what
16  their perspective was, and I can't remember if it was a
17  correctional staff, the wardens, or the mental health
18  staff.  But that was their report -- or their perception
19  over the past.  And that they were now trying to take
20  proactive steps and not being deliberately indifferent.
21  They were trying to make things better in their system.
22  Q.   But what time frame were they talking about
23  when they said there was a lot of isolation and
24  restriction?
25  A.   That, I don't know.

Page 239

1   Q.   Would you turn to page 49, please.  And these
2   appear to be your notes from Eyman SMU?
3   A.   Right.
4   Q.   And you write about two-thirds of the way down
5   the page, quote:  They aren't able to do what they are
6   doing at Florence due to 1, physical plant.  2,
7   size/volume of offenders.  Close quote.  Am I reading
8   that correctly?
9   A.   Uh-huh, that's right.
10  Q.   What are they doing at Florence that they're
11  not able to do at SMU?
12  A.   Well, I think I have it listed below, and I
13  would have to confirm this, but it's my belief, it says:
14  Because of above, they're doing more psychoeducational
15  groups rather than psychotherapy groups.  Excuse me.
16        So again, they're making a reasonable effort
17  to try to provide some sort of psychotherapeutic
18  component or psychoeducational component.  But because of
19  those challenges, they -- Eyman it's more difficult than
20  what's going on at the Florence Unit.
21  Q.   On page 50, you write:  Huge number PC 4,000
22  out of 34,000.  Disproportionate.  Am I reading that
23  correctly?
24  A.   That's fair, yes.
25  Q.   And what does that refer to?

Page 240

1   A.   Sure.  So basically PC, as I understand, is
2   protective custody.  And I wrote at the top:  Sex
3   offenders very needy.  And what I mean by that was -- and
4   you all probably know this, but if you don't, within a
5   prison setting, sex offenders are kind of like the bottom
6   person of the pyramid scheme.  They're kind of like --
7   they're very -- especially sex offenders that offend
8   against children, they would be the lowest men on the
9   totem pole.  So they're very anxious, they're worried
10  about their physical safety, about getting beaten up and
11  that sort of thing.  What -- the PC, the protective
12  custody, I wrote to myself here that they're very anxious
13  because they run up debts.  And if they run up debts in
14  PC, you can't asked for PC in PC.
15        So, in other words, you're in general
16  population, and you run up a gambling debt, then you'll
17  say, oh, I don't feel safe, you file a life endangerment
18  claim or whatever and get moved to PC, protective
19  custody.  But once you're in protective custody, if you
20  run up additional gambling debts or get in trouble or
21  have consequences or whatever, you can't really get
22  additional protective custody --
23  Q.   Excuse me, Doctor.  I was just asking about the
24  words that I --
25  A.   I was just trying to explain --

Page 241

1    Q.   Okay.
2    A.   -- so you understood the context.  So that's
3    what the huge number of PC is because there's a lot of
4    offenders that make bad choices, and they end up in
5    protective custody because of that.
6    Q.   And the characterization of that as a huge
7    number.  Is that your word or someone else's?
8    A.   That was somebody else's word.
9    Q.   Do you remember who?
10   A.   No.  I mean, I assume it was somebody that was
11   on the tour with me, but I don't recall who.
12   Q.   And the word "disproportionate," was that your
13   word or someone else's?
14   A.   Probably somebody else's, because I wouldn't
15   speak that quickly.  So yeah, it was probably somebody
16   else's.
17   Q.   Okay.  On page 51, you write, quote: Death
18   row.  Some challenges re MH programs.  Close quote.  Do
19   you see that?
20   A.   Yes.
21   Q.   Are those your words or someone else's?
22   A.   I'm pretty sure those are mine.
23   Q.   And what does that refer to?
24   A.   I don't recall.  I mean, I could give you some
25   hypotheticals or I could tell you what the challenges are

Page 242

1    within death row nationally and within Texas, but I don't
2    recall specifically with regard to the Arizona death row.
3    Q.   Okay, that's fine.
4         Okay.  Would you turn to page 83, please.
5    A.   Sure.
6    Q.   These appear to be your notes from Lewis
7    Complex, correct?
8    A.   Yes.
9    Q.   And on page 83, about halfway down on the
10   right-hand side, you write, quote: Need 4 RNs 24/7.
11   Close quote.
12   A.   Yes.
13   Q.   Do you see that?
14   A.   Yes.
15   Q.   Are those your words or someone else's?
16   A.   I believe I was writing a note to myself from
17   what I got from others who were leading the tour.  I
18   was -- and I can explain more what I meant by that.
19   Q.   Well, let me just ask, did someone tell you
20   that they needed four RNs 24/7?
21   A.   I don't recall.
22   Q.   Okay.  Would you turn to page 99, please.  And
23   these -- looking at page 91, it appears that these are
24   your notes from Tucson on December 3rd, 2013, correct?
25   A.   Yes, that's fair.

Page 243

1    Q.   And it appears that on page 99, these are notes
2    from your conversation with Dr. Jessica Harrison,
3    correct?
4    A.   Yes.
5    Q.   And Dr. Harrison is a psychiatrist?
6    A.   Correct.
7    Q.   And in the middle of the page, you write:
8    Critically understaffed.  Do you see that?
9    A.   I see that, but I don't recall if that's
10   something she told me or if that's something that I got
11   from discussing with her.  She was pretty frustrated as I
12   recall.
13   Q.   Okay.  Did Dr. Harrison tell you that the
14   Tucson facility was critically understaffed?
15   A.   No.  And actually, I wrote a note to myself, I
16   don't know if you can see it to the left there.  It says:
17   Quality of care is not an issue, but the expanding
18   demands on time were an issue.  And I think what she was
19   frustrated with was -- she was worried because there was
20   this doctor -- and you can see it at the bottom left.
21   Dr. Caramachi -- I think, is that how you pronounce it --
22   is about to leave.  And a Dr. Martinez had left.  So she
23   -- I think she was worried that if Caramachi leaves and
24   Corizon doesn't get additional psychiatrists, she was
25   worried about her ability -- she basically said, I love

Page 244

1    what I do, I enjoy what I do.  I've been here -- she told
2    me 17 years.  And she had previously worked at the state
3    hospital, so she obviously is a bright lady, was an
4    MD/Ph.D. but I think she was concerned about her demands
5    on her time.  That she was worried, will they be able to
6    get more staff in here.
7    Q.   So did the phrase "critically understaffed"
8    come from her or from you?
9    A.   I don't know.  That's a good question.
10   Q.   And immediately above there, you write:
11   Eliminated a number of staff.
12   A.   Yes.
13   Q.   Did that come from Dr. Harrison or from you?
14   A.   That was from her.  She told me that when
15   Wexford -- and I have it here.  She said -- sorry.  July
16   of 2012, Wexford had been on board.  And during that
17   nine-month period, she said they eliminated a lot of
18   staff.  And that Corizon came on March of 2013, and their
19   staff had been reduced.  So that -- I think that's what
20   she was getting to about the critically understaffed
21   issue.
22   Q.   Okay.  Will you look at page 103, please.
23   A.   Sure.
24   Q.   Are these still notes from your discussion with
25   Dr. Harrison?  I notice on page 103, you write: Done

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 245

1   meeting with Dr. Jessica Harrison.
2   A.   Sure, what -- 103?
3   Q.   Page 103.
4   A.   Oh, yeah, thank you.
5   Q.   Okay.  And immediately above there, you write,
6   and you put in quotation marks:  I'm so glad you are
7   going to get us more people.  Close quotation marks.
8   A.   Uh-huh.
9   Q.   Did Dr. Harrison say that to you?
10  A.   Yes, she did, because I wouldn't have quoted it
11  otherwise.
12  Q.   And did you understand by "more people," she
13  was referring to more mental health staff?
14  A.   Recalling my meeting with her and interview,
15  that was my perception, that she -- she viewed this
16  litigation as an opportunity to get more staffing.
17  Q.   Okay.  Thank you, Doctor.
18       Now, we're going to talk next about
19  segregated or isolated housing.
20  A.   Okay.
21  Q.   And for that purpose, I need to define a term.
22  The Court in this case has decided to refer -- to use the
23  term isolation units to refer to Eyman SMU,
24  Eyman-Browning Unit, Florence-Central Unit,
25  Florence-Kasson Unit, Perryville-Lumley Special

Page 246

1   Management Area, and any unit where prisoners are
2   confined to their cells for 22 or more hours a day.
3   A.   I'm sorry.  I want to make sure I have this
4   right.  You said Eyman SMU, Eyman-Browning,
5   Florence-Central, Florence-Kasson, and Florence-Lumley
6   SMU?
7   Q.   SMA.
8   A.   Sorry, SMA.
9   Q.   And any setting where prisoners are held in
10  their cells for more than 22 hours a day.
11  A.   Okay.
12  Q.   So if I talk about isolation or isolation
13  units, that's what I'm referring to.
14  A.   Okay.
15  Q.   What is the mean length of stay for prisoners
16  in ADC's isolation units?
17  A.   I don't know.  I don't recall -- I'd have to
18  look at my report and see if I wrote anything about that.
19       MR. FATHI: Okay.  Let's go off the record.
20       MS. WIENEKE: I don't agree.
21       THE WITNESS: I'm sorry, could you repeat
22  your question, please.
23  Q.   BY MR. FATHI:  What is the mean length of stay
24  for prisoners in ADC's isolation units?
25  A.   I don't think I can answer that because it's my

Page 247

1   understanding, as I've put on page 77 of my report, that
2   the use of isolation does not occur within Arizona DOC as
3   there are opportunities for outside recreation, showers,
4   and the like.  So I'm not sure if there's --
5   Q.   Doctor, I just defined the isolation units as
6   these specific facility.  And so my question is, what is
7   the mean length of stay for prisoners in ADC's isolation
8   units?
9        MS. WIENEKE: Form.
10       THE WITNESS: But, again, it's my
11  understanding from reviewing the policies and procedures
12  and standards that -- unless if you have something to
13  show me that that's the definition of isolation, it's my
14  understanding that because they're afforded rec, showers,
15  and the like, that they wouldn't be necessarily in
16  isolation.
17  Q.   BY MR. FATHI:  Do you not understand the
18  definition I just provided you of isolation units?
19  A.   No, I understand, and you listed off several
20  units.  But I'm not -- as of my report, as of December of
21  2013, based on all the records that I reviewed, unless if
22  there's something that you have different that you'd like
23  me to review or in writing, it's my understanding that
24  Arizona doesn't use isolation.
25  Q.   I'd like you to answer my question.  What is

Page 248

1   the mean length of stay in ADC's isolation units?
2        MS. WIENEKE: Form.
3        THE WITNESS: So I'm not able to answer that
4   question because I don't believe the offenders are housed
5   within isolation units.  So, therefore, it would be -- it
6   would be non-existent.
7   Q.   BY MR. FATHI:  What is the mean length of stay
8   in Eyman SMU?
9        MS. WIENEKE: Form.
10       THE WITNESS: I don't know the answer to
11  that.
12  Q.   BY MR. FATHI:  What is the mean length of stay
13  in Eyman-Browning Unit?
14       MS. WIENEKE: Form.
15       THE WITNESS: I don't know the answer to
16  that.
17  Q.   BY MR. FATHI:  What is the mean length of stay
18  in Florence-Central Unit?
19       MS. WIENEKE: Form.
20       THE WITNESS: I don't know the answer to
21  that.
22  Q.   BY MR. FATHI:  What is the mean length of stay
23  in Florence-Kasson Unit?
24       MS. WIENEKE: Form.
25       THE WITNESS: I don't know the length -- I

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 249

1    don't know the length of stay.
2    Q.   BY MR. FATHI:  What is the mean length of stay
3    in Perryville Special Management Area?
4         MS. WIENEKE: Form.
5         THE WITNESS: I don't know the answer to
6    that.
7    Q.   BY MR. FATHI:  What is the median length of
8    stay in Eyman-Special Management Unit?
9         MS. WIENEKE: Form.
10        THE WITNESS: I don't know the length -- I
11   don't know the answer to that.
12   Q.   BY MR. FATHI:  What is the median length of
13   stay in Eyman-Browning Unit?
14        MS. WIENEKE: Form.
15        THE WITNESS: I don't know.
16   Q.   BY MR. FATHI:  What is the median length of
17   stay in Florence-Central Unit?
18        MS. WIENEKE: Form.
19        THE WITNESS: I don't know that.
20   Q.   BY MR. FATHI:  What is the median length of
21   stay in Florence-Kasson Unit?
22        MS. WIENEKE: Form.
23        THE WITNESS: I don't know.
24   Q.   BY MR. FATHI:  What is the median length of
25   stay in Perryville Special Management Area?

Page 250

1    A.   I don't know.
2    Q.   Would knowing the length of stay, either the
3    mean or median, be at all relevant to determining whether
4    confinement in those units posed a risk of harm to
5    prisoners with serious mental illness?
6         MS. WIENEKE: Form.
7         THE WITNESS: I would -- I think having any
8    additional information would certainly help me better
9    understand the system, so sure, it would be helpful.
10   Q.   BY MR. FATHI:  Would it be relevant to
11   determining whether confinement in those units posed a
12   risk of harm to prisoners with serious mental illness?
13        MS. WIENEKE: Form.
14        THE WITNESS: I think it would be useful.
15   Whether it would -- I don't believe it would -- I'm
16   sorry, could you repeat the question again.
17   Q.   BY MR. FATHI:  Would knowing the mean or median
18   length of stay in those units be relevant to whether
19   confinement in those units posed a risk of harm to
20   prisoners with serious mental illness?
21        MS. WIENEKE: Form.
22        THE WITNESS: I think it would be useful
23   information, yes.
24   Q.   BY MR. FATHI:  Now, I'm going to define
25   segregation as confinement in a cell for 22 or more hours

Page 251

1    a day.  Is it your opinion that segregation does not pose
2    an increased risk of harm to prisoners with serious
3    mental illness?
4         MS. WIENEKE: Form.
5         THE WITNESS: Is it my opinion that it does
6    or does not?
7    Q.   BY MR. FATHI:  Is it your opinion that
8    segregation does not pose an increased risk of harm to
9    prisoners with serious mental illness?
10   A.   No, that is not my opinion.
11   Q.   Is it your opinion that segregation does pose
12   an increased risk of harm to prisoners with serious
13   mental illness?
14        MS. WIENEKE: Form and foundation.
15        THE WITNESS: I can't answer that.  What it
16   -- my opinion would be that segregation may potentially
17   cause a risk to offenders with serious mental illness.
18   May.  "May" is the key word.
19   Q.   BY MR. FATHI:  Is it your opinion that
20   confinement in Eyman SMU poses an increased risk of harm
21   to prisoners with serious mental illness?
22        MS. WIENEKE: Form and foundation.
23        THE WITNESS: No.
24   Q.   BY MR. FATHI:  Is it your opinion that
25   confinement in Eyman-Browning Unit poses a risk of harm

Page 252

1    to prisoners with serious mental illness?
2         MS. WIENEKE: Same objection.
3         THE WITNESS: No.
4    Q.   BY MR. FATHI:  Is it your opinion that
5    confinement in Florence cell block 7 poses a risk of harm
6    to prisoners with serious mental illness?
7         MS. WIENEKE: Same objection.
8         THE WITNESS: No.
9    Q.   BY MR. FATHI:  Is it your opinion that
10   confinement in Florence cell block 5 poses a risk of harm
11   to prisoners with serious mental illness?
12        MS. WIENEKE: Same objection.
13        THE WITNESS: No.
14   Q.   BY MR. FATHI:  Is it your opinion that
15   confinement in Eyman-Browning Unit poses an increased
16   risk of harm to prisoners with serious mental illness?
17        MS. WIENEKE: Same objection.
18        THE WITNESS: No.
19   Q.   BY MR. FATHI:  Is it your opinion that
20   confinement in the Lumley Special Management Area poses
21   an increased risk of harm to prisoners with serious
22   mental illness?
23        MS. WIENEKE: Same objection.
24        THE WITNESS: No.
25   Q.   BY MR. FATHI:  Are you aware that the federal

Parsons vs.                                    Confidential       Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                  Subject to Protective Order                            April 11, 2014

Page 253

1   court in the Ruiz case ruled that the Texas prison
2   system's practice of holding prisoners with serious
3   mental illness in segregation violated the Eighth
4   Amendment?
5           MS. WIENEKE: Form and foundation.
6           THE WITNESS: I would need to review the
7   case itself. I'm -- I'm not intimately familiar with the
8   Ruiz case. It was before my time in Texas.
9   Q.   BY MR. FATHI: So could you answer the
10  question.
11  A.   Can you repeat it, please.
12          MR. FATHI: Could you read it back, please.
13  Q.   BY MR. FATHI: I'll reask it. Are you aware
14  that the federal court in the Ruiz case ruled that the
15  Texas prisons system's practice of holding prisoners with
16  serious mental illness in segregation violated the Eighth
17  Amendment?
18          MS. WIENEKE: Form and foundation.
19          THE WITNESS: I was not aware of that.
20  Q.   BY MR. FATHI: Are you aware that the federal
21  court in the Ruiz case ruled that the Texas prison
22  system's segregation units violated the Eighth Amendment
23  even as to prisoners without serious mental illness?
24          MS. WIENEKE: Same objection.
25          THE WITNESS: I was not aware of that.

Page 254

1   Q.   BY MR. FATHI: Are you aware that the federal
2   court in the Coleman case issued an order yesterday
3   restricting the placement of California state prisoners
4   with serious mental illness in segregated confinement?
5           MS. WIENEKE: Same objection.
6           THE WITNESS: I saw some -- I got an email
7   message, something about the Coleman and something
8   about -- but I didn't read it, so -- so the short answer
9   is no, I wasn't aware of that.
10  Q.   BY MR. FATHI: Does the Texas prison system
11  have any restrictions on the segregation of prisoners
12  with serious mental illness?
13          MS. WIENEKE: Form.
14          THE WITNESS: You probably need to ask
15  the -- their department. We do the health care. We
16  don't get involved in housing and custody and
17  classification. So I certainly don't want to speak for
18  the Texas Department of Criminal Justice.
19  Q.   BY MR. FATHI: So the answer is you don't know?
20  A.   I don't know.
21  Q.   Is there any category of prisoners who -- in
22  your opinion, is there any category of prisoners with
23  mental illness who should be excluded from segregation?
24          MS. WIENEKE: Form.
25          THE WITNESS: Well, what I would say, and I

Page 255

1   would agree with the -- both the American Psychiatric
2   Association's position statement, similarly the Society
3   of Correctional Physicians, which have a very clearly
4   defined scope of what defines a serious mental illness.
5   And then what can be done to try to divert people who
6   might be acutely mentally ill to try to divert them away
7   from restrictive housing settings, which that's what we
8   do in Texas.
9           So I think if somebody's acutely psychotic,
10  we, as mental health professionals, do our best to try to
11  keep them out of restrictive housing settings. But end
12  of the day, it's a custody decision of where somebody is
13  housed based on their classification, their
14  dangerousness, and all those other issues. So we can
15  again recommend, but custody at the end of the day makes
16  the final decision.
17  Q.   BY MR. FATHI: Does the Arizona Department of
18  Corrections have a written policy excluding any category
19  of prisoners with mental illness from segregated housing?
20          MS. WIENEKE: Form.
21          THE WITNESS: I don't know.
22  Q.   BY MR. FATHI: Would you look at Tab 20,
23  please.
24  A.   Yes.
25  Q.   Tab 20 is Bates number PLTF-PARSONS-32346. The

Page 256

1   American Psychiatric Association Position Statement on
2   Segregation of Prisoners with Serious Mental Illness.
3   A.   Yes.
4   Q.   And the first line reads, quote: Prolonged
5   segregation of adult inmates with serious mental illness,
6   with rare exceptions, should be avoided due to the
7   potential for harm to such inmates. End of quote.
8           Do you agree with that position, Doctor?
9   A.   Yes, I do.
10  Q.   Would you turn to page 21 -- or Tab 21, please.
11  Tab 21 begins on page PLTF-PARSONS-32361. It is the
12  Society of Correctional Physicians Position Statement on
13  Restricted Housing of Mentally Ill Inmates. Doctor, what
14  is the Society of Correctional Physicians?
15  A.   Sure. It's a correctional physicians
16  membership group. They are -- they're separate from the
17  National Commission on Correctional Health Care, but
18  basically they're a member organization of physicians.
19  They could be psychiatrists, they could be medical
20  doctors or specialists. And now we actually have
21  mid-levels, like PAs, nurse practitioners. I'm on the
22  board of SCP, so we -- we've opened it up to where it's
23  not just physicians. It also includes mid-level
24  professionals. But basically it's a membership
25  organization of physicians that practice within

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 257

1    correctional settings.
2        Q.   And you said that you were on the board of
3    directors?
4        A.   Yes.
5        Q.   On the page PLTF-PARSONS-32362, the first line
6    of the Position Statement reads, quote:  The Society for
7    Correctional Physicians acknowledges that prolonged
8    segregation of inmates with serious mental illness, with
9    rare exceptions, violates basic tenets of mental health
10   treatment.  End of quote.  Do you agree with that
11   statement, Doctor?
12       A.   Yes.
13       Q.   And if you look onto the next page, there is a
14   definition of serious mental illness.  And it lists a
15   number of conditions.  Do you see that, Doctor?
16       A.   Yes.
17       Q.   Would you agree with that definition of serious
18   mental illness?
19       A.   Yes.
20       Q.   Does confinement in Eyman SMU constitute
21   segregation as that term is used in the APA position
22   statement?
23            MS. WIENEKE:  Form.
24            THE WITNESS:  No, because remember, I
25   already answered that question about isolation and

Page 258

1    segregation that -- the operative word is "prolonged"
2    segregation.
3        Q.   BY MR. FATHI:  And the APA statement on page
4    32347 says, quote:  In general, prolonged segregation
5    means duration of greater than 3 to 4 weeks.  Close
6    quote.
7        A.   Right.
8        Q.   Do you agree with that definition of prolonged
9    segregation?
10       A.   I don't see that.  Where -- where do you see
11   the three to six --
12       Q.   On page 32347 near the bottom of the first
13   column, it says, quote:  In general, prolonged
14   segregation means duration of greater than 3 to 4 weeks.
15   Close quote.
16       A.   Well, the -- the sentence in front of that is
17   what I would testify to.  The definition of prolonged
18   segregation will in part depend on the conditions of
19   confinement.  So it really depends on not just the
20   length, but whether they are afforded recreation,
21   out-of-cell activities, what are they allowed to have in
22   their cell, how much stimulation, how much interaction do
23   they have with staff and with other offenders.  So I
24   think it's really hard just to have a black-and-white
25   definition for this.

Page 259

1        Q.   So is it your testimony that SMU does not
2    constitute segregation as that term is used in the APA
3    policy statement?
4        A.   I don't have an opinion about that.
5        Q.   Is it your position that Browning Unit does not
6    constitute segregation as used in the APA position
7    statement?
8        A.   I don't have an opinion about that.
9        Q.   Is it your opinion that Florence-Central Unit
10   does not constitute segregation as that term is used in
11   the APA position statement?
12       A.   I don't have an opinion about that.
13       Q.   Is it your opinion that Florence-Kasson Unit
14   does not constitute segregation as that term is used in
15   the APA position statement?
16       A.   I don't have an opinion.
17       Q.   Is it your position that Perryville Special
18   Management Area does not constitute segregation as that
19   term is used in the APA position statement?
20       A.   I don't have an opinion.
21            MR. FATHI:  Let's take a short break.
22            THE VIDEOGRAPHER:  We're going off the
23   record.  The time is 5:19 p.m.
24            (A recess was taken from 5:19 p.m. to
25   5:27 p.m.)

Page 260

1            THE VIDEOGRAPHER:  We're back on the record.
2    The time is 5:27 p.m.  This begins video No. 5.
3            THE WITNESS:  I -- I said earlier that I
4    didn't have an opinion, but I've been thinking about it
5    more.  From having toured all of those facilities, it's
6    my professional opinion that all of the facilities you
7    mentioned, in my professional opinion would not qualify
8    for segregation status because of the numerous activities
9    and things that they're allowed to do and afforded and
10   meaningful human interactions that they have, they would
11   not qualify for segregation status in my opinion.
12       Q.   BY MR. FATHI:  They would not qualify as
13   segregation as that term is used in the APA policy,
14   correct?
15       A.   Or the SCP, the Society of Correctional
16   Physicians.
17       Q.   Did you speak to Ms. Wieneke during the break,
18   then?
19       A.   Yes, I did.
20       Q.   What is your opinion of ADC's suicide
21   prevention program as it existed on September 27th, 2013?
22       A.   It's my opinion that their suicide prevention
23   program -- policy and program meets correctional and
24   community standards of care.
25       Q.   How many suicides were there in ADC in 2012?

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 261

1   A.   I'd have to review my report.
2   Q.   I'm just asking for your recollection.
3   A.   I wouldn't know it off the top of my head, but
4   I could certainly look at my report because --
5   Q.   If you don't know, that's -- that's fine.
6        How many suicides were there in ADC in 2013?
7   A.   So -- sorry, what was the first year, 2012?
8   Q.   Yes.
9   A.   There were six.  And then in 2013, up until the
10  date of my report, October -- sorry, up until October
11  31st, 2013, was seven.
12  Q.   Your testimony is that through October 31st of
13  2013, there were seven suicides in ADC?
14  A.   I don't know the exact date of the cutoff.  But
15  as of the date of my report, of December 18th, the number
16  that I have that was provided by Department of
17  Corrections and by Corizon was seven.  And I have that
18  has an "est" for estimated.  So I don't know if that's
19  the actual number in 2013 or not.
20  Q.   So how many suicides occurred in ADC in 2013?
21  A.   I don't know.
22  Q.   Will you turn to Tab 19, please.  Tab 19 begins
23  on page ADC _S 535 titled Arizona Department of
24  Corrections Staff Development Bureau Curriculum.  Course
25  title:  Suicide Prevention.  This is a -- curriculum for

Page 262

1   a course for ADC staff on suicide prevention.
2        Will you turn to page 540, please.
3   A.   Okay.
4   Q.   About halfway down the page on the right-hand
5   side it reads, quote:  For a system the size of ADC , an
6   "average" suicide rate would be 4 to 5 per year.  Close
7   quote.
8        Do you agree with that, Doctor?
9   A.   I don't agree with quotation marks around
10  "average."  It's my understanding that the Bureau of --
11  I'm sorry, BJS, Bureau of Justice Statistics.  I think
12  that's what the acronym is.  That they have a running
13  tally.  But I don't think that putting "average" is a --
14  is something that I would necessarily agree with.
15  Q.   Okay.  So this training document for ADC staff
16  contains in your view incorrect information?
17       MS. WIENEKE:  Object to the form.
18       THE WITNESS:  Not at all.  I mean, I
19  think -- the point is, this is -- it says here,
20  instructor notes.  What they're trying to do is get
21  perspective.  I think, as I understand it, they've --
22  they have a zero -- zero tolerance, so they don't want
23  any suicides.  But they're basically just trying to get a
24  perspective of how Arizona compares to other states.
25  Q.   BY MR. FATHI:  How many suicides were there in

Page 263

1   the Eyman prison in 2013?
2   A.   I don't know.  I'd have to look that up.
3   Q.   If I told you that there were six suicides at
4   the Eyman prison in a seven-month period in 2013, would
5   that have any effect on your opinion of ADC's suicide
6   prevention program?
7   A.   It would -- it's something I would want to take
8   into consideration, but I -- I don't believe it would
9   change my opinion.
10  Q.   How many suicides would there have to be at a
11  single prison in a seven-month period to raise questions
12  in your mind about the efficacy of ADC's suicide
13  prevention program?
14       MS. WIENEKE:  Form.
15       THE WITNESS:  I would say one suicide is
16  more than -- anytime you have one suicide or a near or
17  lethal attempt -- I mean, I think people really look at
18  suicide -- collected suicide, but I think you also need
19  to look at near misses or -- you know, aborted or
20  incomplete attempts.  So I would say one would be
21  something that it should -- it should result in
22  administrative review, as is what they do, Arizona DOC
23  looks at all of these through psychological autopsies and
24  morbidity and mortality reviews.
25  Q.   BY MR. FATHI:  If I told you that there were

Page 264

1   six suicides at the Eyman prison in a seven-month period,
2   would that have any impact on your opinion of ADC's
3   suicide prevention program?
4        MS. WIENEKE:  Object to the form of the
5   question.  Asked and answered a minute ago.
6        THE WITNESS:  It's something that I think is
7   concerning and would -- I'd want to know more specifics
8   about that.  But it doesn't change my opinion.
9   Q.   BY MR. FATHI:  Are you familiar with ADC's
10  practice of placing some prisoners on ten-minute watch?
11  A.   Ten-minute suicide watch, yes.
12  Q.   And is it your testimony that prisoners on
13  ten-minute suicide watch are in fact checked a minimum of
14  every ten minutes?
15  A.   From actually going and reviewing the logs and
16  the documents that the correctional officers were filling
17  out, it appeared that they were doing it in an
18  irregularly -- irregular manner, which means it wasn't
19  ten minutes on the ten minutes.  It was staggered suicide
20  watch, which is in keeping with national standards.
21  Q.   But is it your testimony that they are checked
22  a minimum of once every ten minutes?
23  A.   It's my understanding that -- that that's
24  what's expected.  Whether individual correctional
25  officers followed that absolutely 100 percent, I don't

Parsons vs.                                    Confidential        Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                    Subject to Protective Order                                April 11, 2014

Page 265

1    know the answer to that.
2      Q.   Is it your opinion that a prisoner who is
3    placed on a ten-minute suicide watch should be checked at
4    a minimum of every ten minutes?
5      A.   Whenever possible.  Or alternatively, if
6    they're housed in an area where there's a lot of high
7    visibility -- so, in other words, if they're in a day
8    room and there's people in the day room walking around
9    and there's activity and there's high visibility, as long
10   as there's activity and people viewing or in a dorm
11   setting, my opinion would be ten minutes would be ideal.
12   But if it falls below ten minutes, that's probably okay.
13     Q.   So if someone is placed on a ten-minute suicide
14   watch, it would be okay if they in fact weren't checked
15   every ten minutes?
16         MS. WIENEKE:  Form.
17     Q.   BY MR. FATHI:  Is that what you said?
18     A.   No.  What I said was if they were in a high
19   visibility area outside of their cell in a day room or
20   another area where correctional officers are -- are
21   placed -- I guess what I am trying to say is if ten
22   minutes is what is ordered or recommended by health care
23   staff, then that's what correctional staff should do.
24   Unfortunately, correctional staff often get pulled into
25   other tasks or duties or there's emergencies or there's

Page 266

1    assaults or there's riots.  So best case scenario is yes,
2    they would check them every ten minutes.
3         MR. FATHI:  Please mark this as next in
4    order.
5         (Exhibit 551 was marked.)
6         THE WITNESS:  Thank you.
7         THE REPORTER:  551.
8      Q.   BY MR. FATHI:  Showing you, Doctor, Exhibit
9    551, observation record for a prison named -- prisoner
10   named                , Bates stamped ADC261951, on March
11   24th, 2014, at the Yuma complex.
12         Now, according to your supplemental report
13   at page 10, you reviewed the watch logs for this prisoner
14   on this date, correct?
15     A.   Yes.
16     Q.   And would you look about halfway down the
17   second column where the time goes from 12:47 to 13:06.
18   Do you see that?
19     A.   Yes.
20     Q.   And how many minutes is that, Doctor?
21     A.   I would say 19 minutes if I add right.
22     Q.   And if you look up in close to the upper
23   right-hand corner,              was placed on a to be
24   checked every ten minutes, correct?
25     A.   Yes.

Page 267

1      Q.   In light of that fact, is it consistent with
2    the standard of care that he was not checked for 19
3    minutes?
4      A.   Well, I think what's important here is this is
5    a continuous watch, which basically means he was -- there
6    was a correctional officer seated outside his cell --
7      Q.   Can you answer my question, Doctor?
8      A.   Well, you asked me if this is within the
9    standard of care and --
10     Q.   Yes.
11     A.   -- I'm trying to explain to you that even
12   though this says a ten-minute watch, he was actually on a
13   continuous watch, which basically means direct and
14   constant observation by a correctional officer.  So
15   whether the correctional officer did the suicide watch
16   five minutes, ten minutes, 15 minutes, the correctional
17   officer was seated outside the cell watching this
18   offender 24/7.
19     Q.   Would you answer my question, please, Doctor?
20     A.   So sorry, what was the question?
21     Q.   If you would listen to the question and answer
22   it, then it might not be necessary to repeat it.  The
23   question is, is it consistent with the standard of care
24   for a prisoner who is placed on a ten-minute watch not to
25   be checked for 19 minutes?

Page 268

1         MS. WIENEKE:  Objection; misstates the
2    evidence.
3         THE WITNESS:  And I don't appreciate your
4    sarcasm.  I'm a professional.  I think I'm owed the
5    dignity of a physician as a board certified psychiatrist.
6    So I don't really respect --
7      Q.   BY MR. FATHI:  I'm simply asking you to listen
8    to my question and answer the that question I ask.
9      A.   Well, you're saying it in a sarcastic manner.
10         MS. WIENEKE:  And he's interrupting you.
11   And he's misstating the record.  It's not a ten-minute
12   watch.  It's a continuous watch.  And you're misstating
13   the record.
14     Q.   BY MR. FATHI:  Would you answer the question,
15   please, Doctor.
16     A.   Would you restate the question, please.
17     Q.   Is it consistent with the standard of care for
18   a prisoner who has been ordered to be checked every ten
19   minutes not to be checked for 19 minutes?
20         MS. WIENEKE:  Object to the form.
21         THE WITNESS:  No, because I'm not sure if he
22   was ordered to be on a ten-minute watch or a continuous
23   watch.  I'd like to look at his medical chart to be able
24   to answer your question.  So regardless of whether he
25   was -- let's say he was ordered to be on a ten-minute

Page 269

1　watch, he's being watched direct and constant by a
2　correctional officer who's immediately outside his cell.
3　So if you're saying ten minutes, 19 minutes is a problem.
4　If you're purely black and white, sure, 19 minutes
5　exceeds ten minutes, but the correctional officer is
6　seated outside the cell with visual at 24/7 on this
7　offender the whole time.
8　　Q.　BY MR. FATHI:　Is it consistent with the
9　standard of care, Doctor?
10　　　MS. WIENEKE:　Form.
11　　　THE WITNESS:　The totality of this case is
12　that this offender was watched on a suicide watch -- if
13　you have a suicide autopsy report, I'd be happy to look
14　at it.　But basically, it's my opinion that the totality
15　of this offender was that he was watched appropriately
16　and is -- did not attempt or complete suicide during this
17　time period.
18　　Q.　BY MR. FATHI:　Would you turn to Tab 30,
19　please.　This is a mortality review on the ▮▮▮▮▮,
20　▮▮▮▮ suicide by hanging of ▮▮▮▮▮.　The first page
21　is Bates number is 138451.　Now, you reviewed this
22　document, correct, Doctor?　It's listed on page 9 of
23　Appendix A of your original report.　Page 9 of Appendix
24　A.
25　　A.　I reviewed the mortality review.

Page 270

1　　Q.　So you reviewed the document at Tab 30,
2　correct?
3　　A.　Yes.
4　　Q.　And on the first page, 138451, the reviewer
5　concludes that ▮▮▮▮ death was avoidable.　Do you see
6　that?
7　　A.　Yes.
8　　Q.　Do you disagree with that conclusion?
9　　A.　Well, I think all suicides are potentially
10　avoidable.　So I'm not sure if that -- I'm not sure
11　having a designation breakdown between avoidable or
12　unavoidable is a useful designation.　I certainly haven't
13　seen it anywhere in NCCHC or ACA standards, so I'm not
14　sure if I agree with that categorization.
15　　Q.　So you disagree with the reviewer's conclusion
16　that the suicide was avoidable?
17　　A.　No.　I'm just saying that I don't find that a
18　very useful -- I mean, like I said earlier, all suicides
19　are avoidable or potentially avoidable.
20　　Q.　So you disagree with the reviewer's conclusion
21　that the suicide was avoidable?
22　　A.　No, I don't disagree with what the reviewer did
23　or wrote.　All I'm saying is I don't find this to be a
24　useful criteria or characteristic.
25　　Q.　My question, Doctor, isn't whether you find it

Page 271

1　to be a useful criterion or characteristic.　My question
2　is, do you agree or disagree with the reviewer's
3　conclusion that the patient's death could have been
4　prevented or delayed by more timely intervention?
5　　　MS. WIENEKE:　Form.
6　　　THE WITNESS:　I think that's fair.　It's
7　fair to say that this, as any other suicide, is
8　potentially avoidable.
9　　Q.　BY MR. FATHI:　Now, on the last page, about
10　halfway down, page 138454, the reviewer writes, quote:
11　Although ten minute watches were ordered and documented,
12　it is the opinion of the reviewer that watches were not
13　being done as ordered.　End of quote.　Do you see that?
14　　A.　Yes, I do.
15　　Q.　Is that consistent with the community standard
16　of care?
17　　　MS. WIENEKE:　Form.
18　　　THE WITNESS:　Well, first of all, suicide
19　watches aren't typically done in the community.　They're
20　only done within a free world or -- free world
21　psychiatric hospital or a VA psychiatric hospital or
22　state hospital.　So when you say community, do you
23　mean --
24　　Q.　BY MR. FATHI:　I mean the standard that would
25　apply in a psychiatric hospital or other free world

Page 272

1　hospital.
2　　A.　Yeah, I think that's fair.　I think -- it's my
3　opinion that this reviewer found that the watches weren't
4　done as ordered, so that's a potentially preventable or
5　avoidable suicide.　But it's my opinion that ADC's
6　suicide prevention policy training and their suicide
7　prevention policy falls within the community and
8　correctional standard of care.
9　　Q.　That wasn't my question, Doctor.　The reviewer
10　writes:　Although ten minute watches were ordered and
11　documented, it is the opinion of the reviewer that
12　watches were not being done as ordered.
13　　　Is that consistent with the community
14　standard of care?
15　　A.　I can't answer that because basically, if it's
16　ordered and a correctional officer doesn't follow that,
17　then that's -- it's not a -- it's not a health standard
18　of care.　It is a human error or -- what am I trying to
19　say -- when somebody is being -- like somebody doesn't
20　report to work and they don't show up, and they leave
21　work without permission, that's being -- and I'm sorry,
22　I'm blanking on the term.　But basically the correctional
23　officer didn't do what he or she was supposed to do.　So
24　they were -- they need disciplinary and/or termination.
25　But that doesn't fall within a standard of care.

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 273

1  That's -- because that's -- that's not a health care
2  issue, it's a custody issue.
3  Q.   In a state psychiatric hospital, if ten-minute
4  watches were ordered and documented and not done, would
5  that be consistent with the standard of care?
6       MS. WIENEKE:  Form.
7       THE WITNESS:  I think the same exact thing
8  would happen.  The person would be disciplined or
9  terminated or get coaching or training.
10  Q.   BY MR. FATHI:  The question -- Doctor, my
11  question wasn't what would happen.
12  A.   Right.
13  Q.   My question is, would it be consistent with the
14  standard of care?  If ten-minute watches were ordered and
15  documented and not done and somebody successfully
16  committed suicide, would that be consistent with the
17  standard of care?
18  A.   It would be my opinion on both scenarios that
19  that would be a dereliction of duty.  That the
20  correctional officer had a duty to carry out that order.
21  But it would not be a deviation in the standard of care
22  because the correctional -- sorry, the correctional
23  health professional ordered the watch, but the correction
24  officer didn't follow it.  So it was a dereliction of
25  their duty but not a deviation from the standard of care.

Page 274

1  Q.   Would you look at Tab 32, please.  This is the
2  criminal investigative report on the ███████████,
3  suicide by hanging of ███████.  It is pages
4  ADC193394 to 498.  You reviewed this document, correct?
5  A.   Yes.
6  Q.   Would you turn to page 193395.  And about a
7  third of the way down the page, the investigator writes,
8  quote:  Nurse Shaw admitted she and other Nurses did not
9  adhere to the "watch-swallow" mandate because it took
10  them too long to complete their medication rounds.  She
11  said she would slide the medication packet under the cell
12  door of those inmates.  She also stated she was the Nurse
13  responsible for dispensing medication on the afternoon of
14  3-4-12.  She said she marked inmate ███████ as refusing
15  his medication, when in fact she made no attempt to
16  deliver meds to him.  End of quote.
17       Doctor, is disregarding -- is a nurse
18  disregarding watch swallow orders consistent with the
19  community standard of care?
20  A.   Again, it's my opinion that this is one
21  individual who chose to not follow nursing protocols or
22  nursing orders.  So she's derelict in her nursing duties.
23  But no, it would not be falling below the standard of
24  community or correctional care.
25  Q.   Let me make sure I understand your testimony.

Page 275

1  Your testimony is that for a nurse to disregard watch
2  swallow orders for medication is consistent with the
3  community standard of care?
4  A.   It is -- no, it is a disciplinary offense.  She
5  should be disciplined and/or terminated, but it is not
6  a -- it's my opinion that it would not be a departure
7  from the standard of care or not meet the standard of
8  care.  Sorry.  It would -- the nursing standard of care,
9  this falls below the nursing standard of care for this
10  individual nurse to -- or nurses to have done this.  But
11  from a correctional and free world standard of care, it's
12  my opinion that they don't fall below that standard.
13  Q.   For a nurse to mark a prisoner as refusing
14  medications when in fact those medications were not
15  offered to him, is that consistent with the community
16  standard of care?
17  A.   I would have the same exact answer.  That's a
18  disciplinary dereliction of the nurse's duty and
19  deviation, and that's kind of a nursing board sort of
20  thing.  It's falsification of information, so that nurse
21  should be disciplined.  But no, it's not a -- it -- it
22  wouldn't depart from the standard of care.
23  Q.   Further up on the same page, the investigator
24  writes, quote:  On 3-13-12 while reviewing ███████
25  medical file at the Facilities Health Administrators

Page 276

1  Office at ASPC-F, it was noticed from the Medication
2  Administration Record (MAR) for the dates of March 1, 2,
3  3, & 4 had been altered.  Close quote.
4       Is altering a prison -- prisoner's medical
5  records after his suicide consistent with the community
6  standard of care?
7  A.   Same answer.  That -- that's actually a
8  disciplinary nursing board falsification sort of thing.
9  I don't know if that would be a criminal -- a criminal
10  offense or not, but I think falsifying a medical record
11  would -- would be a nursing -- and if a doctor, it would
12  be the same, it would be a medical board issue.  But it's
13  my opinion it doesn't demonstrate a deviation or falling
14  below the standard of care.
15  Q.   What corrective action was taken as a result of
16  this incident?
17  A.   I don't know.
18  Q.   Does this incident in your opinion suggest any
19  problems with ADC's suicide prevention program?
20  A.   Well, it suggests that you have one or two
21  nurses that didn't follow their orders.  What they should
22  have done is spoken to their nursing director if they
23  weren't able to do what was ordered to find out what
24  could be done to change the nursing protocols or the
25  nursing orders that they were carrying out.  So -- but

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 277

1 no, in the totality of it's my opinion that this doesn't
2 show problems with the suicide prevention program.
3 Q. How many suicides were there in the Texas
4 prison system in 2013?
5 A. You would have to ask them. I don't know that
6 actual number off the top of my head.
7 Q. Do you work for the -- do you provide services
8 in the Texas prison system?
9 A. I'm one of two providers -- well, I work for
10 the University of Texas Medical Branch Correctional
11 Managed Care. We provide services to approximately 80
12 percent of the state. Texas Tech University Health
13 Sciences Center provides to the other 20 percent of the
14 state. So off the top of my head, I could not answer
15 that question. I'd have to -- I'd have to look into
16 that.
17 Q. Okay. Would you turn to page 28, please, Tab
18 28. This is the psychological autopsy for ▮▮▮▮▮
19 First page is ADC257124. And as indicated on the first
20 page, ▮▮▮▮▮▮▮ committed suicide on ▮▮▮▮▮▮▮.
21 And on the last page, this psychological autopsy was
22 signed by Dr. Richard Rowe on March 19th, 2014. So my
23 question, Doctor, is, is it consistent with the standard
24 of care for it to take more than two years to complete a
25 psych autopsy after a suicide?

Page 278

1      MS. WIENEKE: Form and foundation.
2      THE WITNESS: I'm sorry. Could you repeat
3 the question, please.
4 Q. BY MR. FATHI: Is it consistent with the
5 community standard of care for it to take more than two
6 years to complete a psych autopsy after a prisoner
7 suicide?
8      MS. WIENEKE: Same objection.
9      THE WITNESS: What I have here -- what I
10 ever here is the date of death was -- this is
11 ▮▮▮▮▮
12 Q. BY MR. FATHI: Yes.
13 A. I have the date of death ▮▮▮▮▮▮▮. And
14 the date of the report as being April 24th, 2012. So I'm
15 not sure I follow when you say two years.
16 Q. On the last page, it was signed by Dr. Rowe,
17 Richard Rowe, on March 19th, 2014.
18 A. I'm not sure what to make of that. I don't
19 know who that person is or what their role is. But it
20 appears that Dr. Taylor completed the psychological
21 autopsy...
22 Q. And what's the date Dr. Taylor signed it?
23 A. Well, the date of the report is 4/24/12. And
24 the date she signed it according to the last page is
25 12/13/13.

Page 279

1 Q. All right. Is it consistent with the standard
2 of care for it to take more than a year and a half to
3 complete a psych autopsy after a prisoner commits
4 suicide?
5      MS. WIENEKE: Form and foundation.
6      THE WITNESS: I mean, I think -- to answer
7 your question, this report is dated 4/24/12, but it
8 wasn't signed until December 13th, 2013. It's not clear
9 to me if this report was circulated unsigned. The
10 important point is psychological autopsies is a process.
11 It's not necessarily the finished document that's the
12 important part. It's the process for reviewing what was
13 preventable, what was avoidable, what could have been
14 done to prevent the suicide.
15 Q. BY MR. FATHI: So the fact that it took more
16 than a year and a half for anyone to sign this was
17 consistent with the standard of care in your view?
18      MS. WIENEKE: Form.
19      THE WITNESS: You have to look at the
20 totality. As I understand it, when you have a private
21 vendor involved and you have a state system, there's
22 probably a lot more medical-legal involvement,
23 probably -- the short answer is, I don't know why it took
24 so long. But it's my opinion the fact that they did the
25 psychological autopsy, that meets the standard of care.

Page 280

1 Whether there were delays in signatures or co-signatures,
2 that doesn't change my opinion about the standard of
3 care.
4 Q. BY MR. FATHI: So is it your testimony that a
5 psych autopsy is complete as of the earliest date that
6 appears on the document?
7      MS. WIENEKE: Form.
8      THE WITNESS: I'm not sure if I can answer
9 your question. Are you talking about Arizona or are you
10 talking about other states?
11 Q. BY MR. FATHI: I'm talking about Arizona. It
12 seems to be your testimony that this document was
13 completed on 4/24/12 even though it wasn't signed until
14 two years later, correct?
15 A. Well, that's what it's dated. The date of the
16 report is 4/24/12. And it's completed by Nicole Taylor,
17 and that's how it's typed on the report. So I would have
18 no reason to believe that this document wasn't presented
19 or submitted even though it wasn't signed until later.
20 Q. What's the purpose of having a psych autopsy
21 signed by health care staff?
22 A. What's the purpose of having it signed. Well,
23 to be honest, I don't really know the answer to that. I
24 think -- I've never seen anywhere where it says a
25 psychological autopsy must be co-signed or alternatively

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 281

1   within a certain period of time.  Everything that I've
2   ready in the area of psychological autopsies, basically
3   it's a process that should be undertaken and completed
4   after a suicide attempt -- or sorry, after a suicide.  I
5   would think that the co-signature is strictly more from a
6   medical-legal perspective in case the case were to go to
7   litigation.  That's the only thing I can think of why it
8   would have to be signed.  I think in medicine, we
9   co-sign -- we sign things when we write a progress note
10  or when we do a history and physical.  It's just kind of
11  habit.  We do that to show that we are the author of
12  that -- of that document.
13  Q.   Okay.  Would you turn to page -- Tab 26,
14  please.
15  A.   Sure.
16  Q.   This is the psychological autopsy on ▮▮▮▮
17  ▮▮▮ who died by suicide by hanging on ▮▮▮▮▮▮▮ of
18  ▮▮▮ ADC257115.  Did you review this document, Doctor?
19  A.   Yes.
20  Q.   And on the first page -- excuse me.  I'm sorry.
21  Would you turn to page 22, please.  This is the wrong
22  document.
23  A.   You mean section 22?
24  Q.   No -- yes, Tab 22.
25  A.   Okay.

Page 282

1   Q.   This is the Mortality Review Committee Report
2   for ▮▮▮▮▮▮▮▮▮▮
3   A.   Okay.
4   Q.   ADC211629?
5   A.   Yes.
6   Q.   Did you review this document?
7   A.   Yes.
8   Q.   On the first page, for the item:  Was
9   sufficient care offered/provided regarding mental health
10  issues.  The reviewer answers no.  Do you agree with that
11  statement?
12  A.   My recollection of this case was there were
13  some -- there was some breakdown in the way that scores
14  were entered into the system.  So I would agree -- I
15  would agree that additional care could have been offered
16  or provided.
17  Q.   Do you agree with the reviewer's conclusion
18  that sufficient care was not offered or provided
19  regarding mental health issues?
20  A.   I would agree --
21       MS. WIENEKE:  Form.
22       THE WITNESS:  Sorry.  I would agree that
23  based on errors from some of the staff at -- the mental
24  health intake score and other things not being acted upon
25  in a timely manner that there was some breakdowns in the

Page 283

1   system but that the system has now implemented a bunch of
2   different process and strategies to improve that.
3   Q.   BY MR. FATHI:  Did the mental health care that
4   ▮▮▮ received meet the community standard of
5   care?
6   A.   It's my opinion that he was seen and evaluated
7   and received a mental health score of 1.  But due to
8   staff error or failure to identify him or put him --
9   classify him correctly, that through those -- through
10  those errors, that -- it's my opinion the care could have
11  been better for him.  I think this is one where there
12  were some human errors that affected the overall care.
13  But I think overall, my opinion would be the totality
14  that this falls within the standard of care within a
15  correctional system.
16  Q.   Your opinion is that the mental health care
17  that ▮▮▮▮▮▮▮ received meets the community standard
18  of care?
19  A.   Yes.
20  Q.   So you disagree with the reviewer's conclusion
21  that he was not offered sufficient care?
22  A.   Well, I disagree with that because at any
23  point, ▮▮▮▮▮▮ could have submitted a sick call
24  request -- I'm sorry, a Health Needs Request, could have
25  alerted staff that he was feeling suicidal or depressed.

Page 284

1   So health care -- mental health -- mental health staff
2   can try to prevent suicide, but many times it's up to the
3   offender themselves to seek out treatment and to alert
4   people if they're feeling suicidal.
5   Q.   Doctor, have you ever seen a suicide in which
6   you believed the treatment the person received did not
7   meet the standard of care?
8   A.   Yes.
9   Q.   Where was that?
10  A.   Well, you asked me generally.  So you're
11  referring to this case?
12  Q.   I'm asking ever in your entire career, have you
13  encountered a suicide in which you believed that the
14  mental health treatment the person received did not meet
15  the standard of care?
16  A.   Yes.  I mean, I -- I haven't been involved as a
17  plaintiffs expert, but I've reviewed cases or discussed
18  cases where there were breakdowns or lapses or things
19  that deviated from the standard of care, yes.
20  Q.   That fell below the community standard of care?
21  A.   Yes.
22  Q.   Have you seen any suicides in the Arizona
23  Department of Corrections where you believe the mental
24  health treatment received by the decedent fell below the
25  community standard of care?

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 285

1    A.   Again, I mean, I think I've already said this,
2  and I hate to belabor the point, but there's so many
3  variables with regard to correctional suicide.  It's my
4  opinion that Arizona has an appropriate suicide
5  prevention program, staff training, staff education,
6  monitoring, the suicide cards --
7    Q.   That's not my question, Doctor.
8    A.   Okay.
9    Q.   My question is, have you ever seen in the
10  Arizona Department of Corrections a suicide in which you
11  believe the decedent did not receive mental health care
12  that meets the standard of care?
13    A.   I would say of all the cases, ▓▓▓▓▓▓▓▓▓▓▓
14  probably is the most problematic case.  And, again, I
15  think it -- I can't definitively say yes or no.  I would
16  say this is one case where there was some process and
17  program issues that could be improved.  So I would say
18  probably the ▓▓▓▓▓▓ case would be the only one.
19    Q.   So is it your opinion that the mental health
20  care received by ▓▓▓▓▓▓▓▓▓▓▓▓ fell below the community
21  standard of care?
22    A.   I would say it fell below a correctional
23  standard.  I'm not sure if it fell below a community
24  standard.
25    Q.   Okay.  Under Contributing Cause Analysis on

Page 286

1  ▓▓▓▓▓▓▓▓▓▓ mortality review, the reviewer checks:
2  Failure to recognize symptoms or signs.  Do you agree
3  that that was a contributing cause to ▓▓▓▓▓▓▓▓▓▓
4  suicide?
5    A.   I think there was a delay in identification of
6  his symptoms, yes.
7    Q.   So do you agree that that was a contributing
8  cause to his suicide?
9    A.   I would say it was one of multiple variables
10  but not the sole contributing factor.
11    Q.   Do you agree that it was a contributing cause
12  to his suicide?
13    A.   I would say that's fair.
14    Q.   The reviewer also checks:  Delay in access to
15  care.  Do you agree that that was a contributing factor
16  to ▓▓▓▓▓▓▓▓▓▓ suicide?
17    A.   I -- what I would say is unfortunately, there
18  were some human staff errors with regard to coding and
19  entering mental health scores.  So in a way, it was
20  different steps along the process that -- so, yeah, I
21  would say yes.
22    Q.   Okay.  The reviewer also checks:  Failure to
23  follow up/identify abnormal test results.  Do you agree
24  that that was a contributing factor to ▓▓▓▓▓▓▓▓▓▓
25  suicide?

Page 287

1    A.   I don't recall any test results.  I'd have to
2  look at his chart to be able to answer that question.
3    Q.   The reviewer also checks:  Failure of provider
4  to assume responsibility for patient as a contributing
5  factor.  Do you agree that that was a contributing factor
6  to ▓▓▓▓▓▓▓▓▓▓ suicide?
7    A.   I don't know if I agree with that because I
8  don't think it was a conscious or volitional failure to
9  assume responsibility.  I think it was an error.  They
10  coded him wrong, and they didn't follow through on the
11  Health Needs Request.  He showed depressive symptoms, but
12  he wasn't referred.  So no, I don't know if I would agree
13  with that.
14    Q.   Okay.  Going on to the next page, the reviewer
15  writes -- this is in the block quote under Comments.
16  That ▓▓▓▓▓▓▓▓ quote:  was taken off of watch on
17  12/28/12 and was not seen by mental health again prior to
18  his suicide.  End quote.  And his suicide was ▓▓▓▓▓ of
19  ▓▓▓▓▓
20          Do you agree with that statement?
21    A.   Well, I agree that that's what it says here.
22    Q.   Do you agree with the truth of that statement?
23    A.   I have no reason to not believe what it says
24  here.
25    Q.   Okay.  Now, you said a moment ago that if

Page 288

1  ▓▓▓▓▓▓▓▓▓▓ was feeling suicidal, he could have put in
2  an HNR, correct?
3    A.   Yes.
4    Q.   On page 211631, under Mental Health, the
5  reviewer writes, quote:  HNR requests for mental health
6  services at Phoenix not acted upon.  Close quote.  Do you
7  see that?
8    A.   Yes, I do.
9    Q.   So apparently, ▓▓▓▓▓▓▓▓▓▓ did put in HNRs,
10  and they were not responded to, correct?
11    A.   Correct.
12    Q.   And the reviewer also concludes that
13  ▓▓▓▓▓▓▓▓▓▓ quote:  was not seen every 30 days as
14  required by policy.  End of quote.
15          Do you agree with that statement?
16    A.   I agree that's what it says here, yes.
17    Q.   Do you agree with the truth of that statement?
18    A.   I think that's fair, yes.
19    Q.   And finally, at the bottom, the reviewer
20  writes, quote:  There were signs of suicide present that
21  were not acted upon.  Close quote.  Do you agree with
22  that statement?
23    A.   No, I wouldn't say there were signs of suicide.
24  I would -- and there is wordsmithing, but I would say
25  there were signs of suicide risk.  So there were

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 76 of 157

Parsons vs.                          Confidential         Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                          Subject to Protective Order                              April 11, 2014

Page 289

1    potentially preventable suicide factors that were not
2    acted upon.
3        Q.    And what's --
4        A.    So that's -- that's just -- I think the key is
5    suicide risk is what really should be documented there
6    and not just suicide.
7        Q.    What's the difference between signs of suicide
8    risk and signs of suicide?
9        A.    Well, because this is a gentleman that has a
10   chronic history of suicide risk.  If you read the notes,
11   he had two prior suicide attempts, one by hanging, one by
12   shooting.  And I've written and published in the area of
13   suicide.  I think it's just important to know that
14   there's predictive or -- there's risk factors and there's
15   also preventive factors.  So I think just to say suicide,
16   that's just a very black and white.  There's many
17   variables that need to be considered and weighed for
18   suicide risk identification and prevention.
19       Q.    Doctor, in the entirety of your review of the
20   Arizona Department of Corrections mental health system,
21   did you ever find anything that you believe fell below
22   the community standard of care?
23       A.    I would say this isolated case, which could be
24   potentially a medical malpractice type of case.  The
25   ████████  case I would say is the one case that shows

Page 290

1    signs of repeated departures from processes or from
2    policies or procedures that unfortunately had a negative
3    outcome.  But I would say this is the only case that I'm
4    aware of.
5        Q.    And I want to make sure my question is clear.
6    I'm asking not about just suicides.  I'm asking about
7    everything you've looked at.  Watch procedures,
8    medication, medical records, access to care.  Except for
9    this one case, did you find anything that you believe
10   fell below the community standard of care?
11       A.    No.
12             MR. FATHI:  Let's take a break.
13             THE VIDEOGRAPHER:  Going off the record.
14   The time is 6:13 p.m.
15             (A recess was taken from 6:13 p.m. to
16   6:14 p.m.)
17             THE VIDEOGRAPHER:  Back on the record.  The
18   time is 6:14 p.m.
19       Q.    BY MR. FATHI:  Doctor, is it your opinion that
20   the use of pepper spray on a person with a serious mental
21   illness poses no risk of aggravating that person's
22   illness?
23             MS. WIENEKE:  Form.
24             THE WITNESS:  That's not -- no, that's not
25   my opinion.

Page 291

1        Q.    BY MR. FATHI:  What is your opinion with regard
2    to the risk of -- use of pepper spray on a person with
3    serious mental illness?
4        A.    It's my opinion that within the Arizona
5    Department of Corrections, the use of OC and pepper
6    spray, when used, it's used as a last resort after
7    everything else has failed and only -- it's only being
8    used when a person is at imminent risk of harm to self or
9    others and isn't complying with all of the interventions
10   verbal and non-verbal, interventions by trained
11   correctional officers who are trained in how to
12   deescalate.  If an officer has to resort to pepper spray,
13   even for an offender with mental illness, that the
14   offender would be referred to nursing, would have
15   decontamination, be seen in medical.  And if the person
16   was demonstrating psychotic symptoms or mental illness,
17   would be preferred to mental health.
18             So it's my opinion that the use of pepper
19   spray, the Department actively avoids using it.  They use
20   it as a last resort.  And when they do use it, they have
21   safety mechanisms to prevent adverse consequences or
22   events.  So that's my opinion regarding that.
23       Q.    Does the use of pepper spray on a person with
24   serious mental illness pose a risk of aggravating that
25   person's illness?

Page 292

1             MS. WIENEKE:  Same objection.
2             THE WITNESS:  To the best of my knowledge,
3    I'm not aware of any studies that have been published in
4    a peer-reviewed journal that show a distinct
5    cause-and-effect relationship between the use of pepper
6    spray and aggravation or precipitation of mental illness
7    or clear-cut medical sequelae.  That's my review --
8    that's recent -- as of December, I did a literature
9    review looking at that issue.
10       Q.    BY MR. FATHI:  Was that in connection with your
11   work on this case?
12       A.    With this case, yes, but I was involved in a
13   case that I'm sure you're aware I was in Florida with a
14   different case, and that was one of the issues.
15       Q.    Can you show me where in your report the
16   literature you reviewed, the articles you reviewed are
17   listed?
18       A.    I don't think I have it listed in my report,
19   but I did do a PubMed review.  And I didn't find any
20   articles that showed a distinct cause and effect
21   correlation.
22       Q.    Did you review any articles on this general
23   subject?
24       A.    There was one article from the Journal of
25   Correctional Health Care.  I don't know if I cited it in

Parsons vs.                          Confidential       Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                        Subject to Protective Order                              April 11, 2014

Page 293

1    my report.  It was about 20 years old.  And the author
2    wrote about a hypothetical or theoretical risk of pepper
3    spray causing asthma attacks or causing anaphylactic
4    reactions or other emergency issues.  But to the best of
5    my knowledge, that's the only study that I found that's
6    been published in the medical literature.
7        Q.   Are you aware of any case in which a person
8    died shortly after being pepper sprayed?
9            MS. WIENEKE:  Form.
10           THE WITNESS:  I'm aware of cases where
11   people have asserted that there was a cause and effect.
12   But because of other medical variables, congenital heart
13   defects, other health care issues, sickle cell anemia,
14   use of illicit drugs or substances like cocaine or crack
15   cocaine or methamphetamines, they weren't able to opine
16   that it was a direct correlation.  But there have been
17   cases of police using pepper spray where people in the
18   free world have had cardiac arrest and have ultimately
19   died, but there wasn't a direct correlation to the best
20   of my knowledge between pepper pray and that death.
21       Q.   BY MR. FATHI:  Again, Doctor, my question
22   wasn't about causation.  My question was, are you aware
23   of any case in which a person died shortly after being
24   pepper sprayed?
25       A.   No.  I'm not aware of anything else.

Page 294

1        Q.   You're not aware of that ever happening?
2        A.   Not to the best of my knowledge, no.
3        Q.   Are you aware of any prison or jail or juvenile
4    agency that restricts the use of pepper spray on persons
5    with mental illness?
6        A.   I'm aware in the Texas system, the juvenile
7    justice system, they've really tried to reduce or
8    eliminate the use of pepper spray in general, not just
9    with juveniles with mental illness, but in general.  And
10   I think there have been other states that have followed
11   that, too.
12       Q.   But the Texas juvenile justice system had
13   specific restrictions on the use of pepper spray on youth
14   with mental illness, correct?
15       A.   I think they previously had that.  I'm not sure
16   if that's still the case now.  So I'm not sure -- I know
17   that happened a couple of years ago, but I'm not sure if
18   that's still the case.
19       Q.   Okay.  So you are aware that the Texas juvenile
20   justice agency at least had in the past a policy
21   restricting the use of pepper spray on youth with mental
22   illness?
23       A.   I don't know if it was -- it may have been a
24   policy or, alternatively, there could have been certain
25   expectations of staff of things they had to do before

Page 295

1    resorting to pepper spray.
2        Q.   Just so the record is clear, are you aware of
3    that policy or not?
4        A.   Well, it's my understanding that the Texas
5    system has very clear rules about who in the system can
6    use pepper spray and when they can use it.  I don't know
7    if there's a per se prohibition against the use of pepper
8    spray with youth that have mental illness because, quite
9    frankly, most of the kids in the juvenile justice system
10   in Texas have mental illness.  Whether that's a serious
11   mental illness, that's a whole different issue.
12       Q.   Are you aware that the Corsicana facility,
13   until it closed, had a policy against the use of pepper
14   spray on youth with mental illness?
15           MS. WIENEKE:  Form.
16           THE WITNESS:  I'm not aware of that, no.
17       Q.   BY MR. FATHI:  Are you aware of the federal
18   court order yesterday in the Coleman case requiring the
19   California state prison system to restricts its use of
20   pepper spray on prisoners with mental illness?
21           MS. WIENEKE:  Form.
22           THE WITNESS:  No, I'm not aware of that.
23       Q.   BY MR. FATHI:  What is your opinion of ADC's
24   written mental health treatment plans for prisoners with
25   mental illness as of September 27th, 2013?

Page 296

1            MS. WIENEKE:  Form.
2            THE WITNESS:  It's my opinion that their
3    treatment plans fall within the standard of care within
4    community and correctional settings.
5        Q.   BY MR. FATHI:  How often are treatment plans
6    required to be updated under the Corizon contract?
7        A.   If -- if an offender is mental health level 5,
8    the treatment plan will be updated minimally every 90
9    days or more often as clinically indicated.
10       Q.   And what document are you reading from, Doctor?
11       A.   Sure.  This is from the ADC Mental Health
12   Technical Manual revised 1/1/14, Appendix G.  So that's
13   for 5, for mental health 5.
14           Seriously mentally ill offenders.  Treatment
15   plan shall be reviewed and updated every 90 days.
16           Mental health level 4, it says:  Mental
17   health treatment staff -- sorry.  This treatment plan
18   will be updated minimally every 90 days or more often as
19   clinically indicated.
20           And then level 3:  A new treatment plan is
21   developed for all categories upon their arrival at their
22   receiving facility.  If a treatment plan already exists,
23   then it will be updated upon their arrival.  This
24   treatment plan will be updated at a minimum of every 12
25   months or as the inmate's condition warrants.  And then

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 297

1  it refers the reader to a different section.

2  Q.  That's fine, Doctor.

3  A.  Okay.

4  Q.  Is it your testimony that as of September 27th

5  of 2013, treatment plans were consistently being updated

6  as required by the Corizon contract?

7      MS. WIENEKE: Form.

8      THE WITNESS: It's my opinion that there was

9  an effort to follow the policy to generate and update

10  treatment plans, but it's possible that they weren't

11  updated as frequently as per policy.

12  Q.  BY MR. FATHI: Is it your testimony that they

13  were consistently being updated per policy or you just

14  don't know?

15  A.  I don't know.

16  Q.  Would you turn to Tab 6, please.

17      MS. WIENEKE: Chris, what's the time?

18      THE VIDEOGRAPHER: Seven hours, 11 minutes.

19      MS. WIENEKE: How much more do you have?

20      MR. FATHI: Quite a bit.

21      MS. WIENEKE: Well, we're over the time

22  period. So...

23      MR. FATHI: Well, let's go off the record.

24      THE VIDEOGRAPHER: We're off the record at

25  6:25 p m.

Page 298

1      (A recess was taken from 6:25 p m. to

2  6:35 p m.)

3      THE VIDEOGRAPHER: Back on the record. The

4  time is 6:35 p.m.

5      MS. WIENEKE: All right. So according to

6  your videographer, who's been keeping running track of

7  time, we are at seven hours and 12 minutes. And, David,

8  you have indicated to me that you have about another two

9  hours. That's your good faith estimate, give or take. I

10  also have additional questions that I would want to --

11  that doesn't go against your time, of course.

12      And because of the time, it's 6:36 p m.,

13  what we've agreed to do is terminate the deposition. And

14  then I will confer with my people, and then we will

15  discuss with you on Monday whether we will allow

16  additional time for Dr. Stewart beyond the seven hours.

17  And if we do allow additional time, we will try do it in

18  a way that minimizes the inconvenience to all parties,

19  including considering videoconferencing or telephonic

20  deposition for the continuation.

21      And also in light of the pending motion,

22  there may be the need to redepose Dr. Stewart on

23  additional issues anyway. So those are part of the

24  consideration -- those are the factors that went into the

25  consideration for the decision. So hopefully I've

Page 299

1  adequately stated what we discussed.

2      MR. FATHI: Except that you said Dr. Stewart

3  when I think you meant Dr. Penn.

4      MS. WIENEKE: I'm so sorry. Dr. Penn. It

5  is obviously very late. I apologize.

6      MR. FATHI: We acknowledge that the

7  presumptive seven-hour limit has -- we've taken our

8  presumptive seven hours. We do need to reserve the right

9  to seek additional time from the Court. But as

10  Ms. Wieneke said, we will discuss this on Monday, and I'm

11  hopeful that we'll be able to resolve this among counsel

12  without -- without the need to go to the Court.

13      So we consent to adjourning the deposition

14  with the understanding that we reserve the right to seek

15  additional time from the Court.

16      MS. WIENEKE: Thank you.

17      MR. FATHI: Thank you.

18      THE VIDEOGRAPHER: This concludes today's

19  videotape deposition of Dr. Joseph Penn, and we're off

20  the record at 6:38 p.m.

21      (The deposition concluded at 6:38 p m.)

22

23

24

25

Page 300

1      SIGNATURE PAGE

2      I, JOSEPH V. PENN, MD, CCHP, FAPA, a deponent
exercising my right to read and sign my deposition taken

3  on April 11, 2014, place my signature hereon and make the
following changes on this _____ day of _____,

4  2014.

5      (IF THERE ARE NO CHANGES, WRITE "NONE.")

6

7      _____
       JOSEPH V. PENN, MD, CCHP, FAPA

8  PAGE  LINE    READS         CHANGE TO        REASON

9  ____ ____  _____

10 ____ ____  _____

11 ____ ____  _____

12 ____ ____  _____

13 ____ ____  _____

14 ____ ____  _____

15 ____ ____  _____

16 ____ ____  _____

17 ____ ____  _____

18 ____ ____  _____

19 ____ ____  _____

20 ____ ____  _____

21 ____ ____  _____

22 ____ ____  _____

23 ____ ____  _____

24 ____ ____  _____

25 ____ ____  _____

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

Page 301

1  STATE OF ARIZONA   )
                      )
2  COUNTY OF MARICOPA )

3

4           I, CAROLYN T. SULLIVAN, a Certified

5  Reporter, Certificate No. 50528, in the State of Arizona,

6  do hereby certify that the foregoing witness was duly

7  sworn to tell the whole truth; that the foregoing pages

8  constitute a full, true, and accurate transcript of all

9  proceedings had in the foregoing matter, all done to the

10 best of my skill and ability.  Pursuant to request,

11 notification was provided that the deposition is

12 available for review and signature.

13

14          I FURTHER CERTIFY that I am not related to

15 nor employed by any of the parties hereto, and have no

16 interest in the outcome.

17

18          WITNESS my hand this 13th day of April,

19 2014.

20

21

22                    Carolyn T. Sullivan, RPR
                      Arizona Certified
23                    Reporter No. 50528

24

25

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 80 of 157

Parsons vs.                                    Confidential                    Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                   Subject to Protective Order                                                April 11, 2014

**#**

**#5 (1)**
    237:12
**#7 (1)**
    237:12

**$**

**$50,000 (2)**
    11:23;13:11

**_**

**_S (1)**
    261:23

**A**

**abbreviation (3)**
    195:25;196:9;230:5
**ability (5)**
    25:14;123:3;131:6;
    215:2;243:25
**able (51)**
    14:15;20:10;21:8,10,
    11;25:14,23;28:25;
    30:17,23;31:24;36:7;
    44:2;45:13;57:15,17;
    70:7;73:14;80:14,15,
    17;82:21;83:16;86:3,8;
    111:21;114:24;115:11;
    119:21;120:2;134:21;
    154:22;160:15;161:8;
    179:18,20,24;182:24;
    184:3;199:15;208:1;
    236:19;239:5,11;
    244:5;248:3;268:23;
    276:23;287:2;293:15;
    299:11
**abnormal (1)**
    286:23
**aborted (1)**
    263:19
**above (10)**
    137:9;145:10,23;
    187:8;188:4;202:19;
    233:3;239:14;244:10;
    245:5
**absent (1)**
    194:7
**absolute (2)**
    31:18;119:3
**absolutely (1)**
    264:25
**abstract (1)**
    36:8
**abuse (1)**
    22:7
**abused (2)**
    22:8,9
**ACA (4)**

137:10;146:18,21;
    270:13
**Academy (1)**
    137:3
**acceptable (1)**
    165:10
**access (15)**
    69:16;95:10,10;
    112:8;115:20;116:8;
    117:17,18;132:12;
    180:19;202:4;215:25;
    216:5;286:14;290:8
**according (13)**
    39:15;40:20;41:14;
    42:20;44:22;45:25;
    86:14;104:4;132:21;
    166:16;266:12;278:24;
    298:5
**account (12)**
    59:1;82:2;105:16;
    107:25;109:14;125:12;
    131:21;132:14;170:13;
    171:15;173:4;174:20
**accreditation (7)**
    55:3;69:8;74:25;
    103:23;104:12;111:8;
    192:19
**accreditations (1)**
    63:24
**accredited (8)**
    104:2,14,21,24;
    105:4,6;111:5;192:18
**accreditor/surveyor (1)**
    69:24
**accredits (1)**
    146:20
**accumulation (1)**
    75:8
**accuracy (1)**
    90:2
**accurate (13)**
    60:16;77:24;90:9,25,
    25;100:1,3;101:8,18,
    24;108:25;187:12,23
**accurately (7)**
    85:21;87:13;88:6;
    89:17;98:20;156:8;
    181:23
**achieve (1)**
    169:14
**achieving (1)**
    208:11
**acknowledge (1)**
    299:6
**acknowledges (1)**
    257:7
**ACLU (2)**
    6:17,19
**acne (1)**
    156:20
**acquired (2)**
    28:3,13
**acronym (3)**

103:5;119:15;262:12
**acronyms (1)**
    120:1
**across (1)**
    233:5
**acted (7)**
    18:19,25;20:17;
    282:24;288:6,21;289:2
**action (2)**
    77:23;221:23;222:1,
    6,8,14;224:1,6,25;
    225:7;226:9;276:15
**active (1)**
    103:10
**actively (2)**
    200:21;291:19
**activities (3)**
    40:17;258:21;260:8
**activity (3)**
    109:11;265:9,10
**actual (4)**
    150:24;200:5;
    261:19;277:6
**actually (35)**
    11:21;23:18;27:2,21;
    36:2;43:24;46:16;
    50:22;55:25;72:25;
    73:7;78:3;80:15;88:24;
    96:25;118:11;131:16;
    133:10;138:21;140:20;
    145:14;153:20;179:23;
    194:12;202:1;204:20;
    211:10;215:5;225:24;
    230:25;243:15;256:20;
    264:15;267:12;276:7
**acuity (2)**
    116:6;205:8
**acute (2)**
    163:25;206:14
**acutely (4)**
    164:3;205:23;255:6,
    9
**ADC (89)**
    10:10,16;25:24;26:9,
    12,16,22;29:1,9;30:20;
    43:20;48:23;49:2,15;
    57:7,10,24,25;58:14;
    59:10;63:10;66:21;
    71:16;72:12;77:22;
    79:20;81:16;82:5,22;
    84:12;86:15;87:10,14;
    88:6,7;89:18;101:21;
    103:23;107:11;108:21;
    110:24;112:5,11;
    114:5;116:3;121:22;
    123:22;125:5;131:10,
    11,21;132:15;146:25;
    152:20;162:12;166:7;
    168:3,19;169:9;171:4;
    173:3;177:2,5;178:5,
    10;188:5;189:13;
    194:9;201:23;202:9;
    204:11;208:2;212:5;

216:1;221:2,5,8,15;
    235:11,18;260:25;
    261:6,13,20,23;262:1,
    5,15;296:11
**ADC_M (1)**
    10:9
**ADC117064 (4)**
    96:11,14;98:13,16
**ADC121159 (1)**
    10:17
**ADC137268 (2)**
    120:20,24
**ADC137285 (1)**
    122:13
**ADC137360 (1)**
    124:16
**ADC137480 (1)**
    206:22
**ADC137583 (1)**
    173:12
**ADC193394 (1)**
    274:4
**ADC203372 (1)**
    37:10
**ADC211629 (1)**
    282:4
**ADC21556 (1)**
    10:12
**ADC215560 (1)**
    10:13
**ADC257115 (1)**
    281:18
**ADC257124 (1)**
    277:19
**ADC261843 (1)**
    37:13
**ADC261951 (1)**
    266:10
**ADC27770 (1)**
    107:15
**ADC27854 (1)**
    113:8
**ADC's (59)**
    16:7;29:4;31:22;
    32:5;33:2;34:4;74:20;
    78:15;79:16;81:1;84:4;
    90:10;91:18;92:22;
    98:20;104:18;106:5;
    108:1;110:2,7;113:2;
    114:14;123:6;124:1;
    125:6;152:24;161:25;
    162:7,16;163:3;164:5,
    15;165:5;167:10;
    170:14,18;171:16;
    173:5,7,21;174:21;
    176:14;177:25;203:14;
    207:21;211:14;225:12;
    246:16,24;247:7;
    248:1;260:20;263:5,
    12;264:2,9;272:5;
    276:19;295:23
**add (4)**
    78:10;88:13;126:18;

266:21
**added (1)**
    234:8
**adding (1)**
    72:8
**additional (24)**
    38:12,14;40:9;87:23;
    97:24;104:5;117:18;
    133:18;134:8,11;
    135:14;136:10;221:21;
    240:20,22;243:24;
    250:8;282:15;298:10,
    16,17,23;299:9,15
**adds (1)**
    97:14
**adequacy (27)**
    18:20;19:2,22;25:24;
    34:1;78:15;79:16;81:1;
    90:10;91:17;92:22;
    106:4;107:11,25;
    108:21;114:14;123:6;
    124:1;125:6;131:11;
    161:25;162:7;170:14;
    171:16;174:21;211:14;
    225:12
**adequate (6)**
    35:1;82:5;108:4;
    117:21;131:22;132:16
**adequately (3)**
    31:10,14;299:1
**adhere (1)**
    274:9
**adjourning (1)**
    299:13
**administer (3)**
    159:11;177:17;
    183:19
**administered (3)**
    174:2,10;175:23
**administration (7)**
    133:6;158:23;
    169:25;175:17;176:6;
    227:25;276:2
**administrative (2)**
    58:17;263:22
**Administrators (1)**
    275:25
**admissions (1)**
    139:20
**admitted (1)**
    274:8
**ADOC (2)**
    107:20;110:9
**████████ (1)**
    266:10
**adult (4)**
    15:6,7,12;256:5
**adverse (2)**
    180:20;291:21
**affect (3)**
    131:6;201:22;202:8
**affected (1)**
    283:12

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

**affidavits (1)**
203:8

**affiliation (1)**
190:17

**afford (1)**
191:7

**afforded (4)**
29:15;247:14;
258:20;260:9

**affords (1)**
180:19

**afternoon (4)**
46:7,9;47:4;274:13

**afterwards (1)**
73:2

**again (68)**
17:8,20;21:14;23:13;
33:23;39:3;40:11,11;
42:4;44:22;57:17;
67:15;70:14;71:3;72:9;
80:6,16;86:21;97:8;
99:15,20;111:8;
113:11;117:2;118:4;
119:19;120:1,17;
125:4;126:14;133:24;
136:21;138:8;145:24;
146:23;149:25;152:8;
155:24;159:19;162:3;
163:8;168:25;179:17;
180:5;181:6;182:15;
184:11;189:15;195:11;
197:7,24;201:15;
205:9,25;218:20;
219:15;222:2,4;
229:18;239:16;247:10;
250:16;255:15;274:20;
285:1,14;287:17;
293:21

**against (4)**
240:8;295:7,13;
298:11

**agencies (1)**
225:25

**agency (8)**
85:5,10;97:20;99:21;
100:5;103:13;294:4,20

**aggravating (2)**
290:21;291:24

**aggravation (1)**
292:6

**ago (8)**
13:14;108:19,19;
142:13,13;264:5;
287:25;294:17

**agree (69)**
71:7;82:14;83:9;
110:17;134:13,23;
135:12;136:9,12;
151:10;155:10;158:6;
164:8;165:12,25;
166:4;167:2,18;
179:12;183:13,15,23;
184:3,16;211:17,21;

212:2,3;213:8,14,24;
220:1,3,4;222:19,22;
223:2;246:20;255:1;
256:8;257:10,17;
258:8;262:8,9,14;
270:14;271:2;282:10,
14,15,17,20,22;286:2,
7,11,15,23;287:5,7,12,
20,21,22;288:15,16,17,
21

**agreed (3)**
142:22;146:11;
298:13

**ahead (6)**
68:18;92:17;94:20;
127:14;128:15;141:14

**akathesia (1)**
214:15

**al (2)**
6:4,4

**alert (3)**
177:6;188:14;284:3

**alerted (1)**
283:25

**alive (1)**
198:11

**allegations (1)**
115:8

**alleged (2)**
214:9;235:17

**allegiance (1)**
88:17

**allow (13)**
24:13;28:12;32:8,9,
16,21;51:25;60:10,14;
62:3;128:1;298:15,17

**allowed (8)**
25:13;30:25;31:6;
52:4;214:23,24;
258:21;260:9

**Allred (3)**
123:12,22,25

**almost (4)**
68:23;108:12,13;
169:17

**alone (2)**
167:6,7

**along (1)**
286:20

**altered (1)**
276:3

**altering (1)**
276:4

**alternately (1)**
136:19

**alternatively (6)**
106:22;169:5;
175:22;265:5;280:25;
294:24

**alters (1)**
28:20

**Although (2)**
271:11;272:10

**always (5)**
31:19,20;42:6;
135:22;230:11

**amber (1)**
221:23

**ambient (1)**
188:1

**amend (1)**
101:7

**Amendment (4)**
16:8;253:4,17,22

**American (5)**
15:14;137:2,3;255:1;
256:1

**among (1)**
299:11

**amount (10)**
33:5,6;39:20;40:25;
41:24;65:7;77:17;
131:2;194:18;221:12

**Amy (1)**
6:19

**Analysis (1)**
285:25

**anaphylactic (1)**
293:3

**and/or (6)**
33:17;125:2;153:9;
233:1;272:24;275:5

**▇▇▇▇ (2)**
266:10,23

**Andrew (1)**
155:2

**anemia (1)**
293:13

**annoying (2)**
93:15,18

**answered (22)**
34:6;80:10,11,23;
86:21;88:9;96:23;97:8;
105:25;113:4;152:6;
156:17;160:16,16;
170:23;179:8;190:11;
201:5;206:12;210:6;
257:25;264:5

**Anthony (3)**
22:1,4,5

**anticipate (1)**
82:21

**antipsychotic (4)**
189:17;190:7,23;
191:14

**antisocial (1)**
53:5

**anxious (2)**
240:9,12

**anything's (1)**
90:14

**anyways (2)**
233:14,16

**APA (11)**
137:16;138:19;
146:19;257:21;258:3;

259:2,6,11,15,19;
260:13

**APA's (1)**
145:15

**apologize (7)**
32:24;45:17;65:10,
13;113:22;199:13;
299:5

**apparently (2)**
84:24;288:9

**appear (5)**
70:11;90:3;235:21;
239:2;242:6

**appeared (1)**
264:17

**appearing (1)**
89:16

**appears (15)**
39:11;48:20;70:17;
71:6;111:6;133:21;
138:2;139:16;147:20;
148:3;208:10;242:23;
243:1;278:20;280:6

**Appendix (9)**
10:11;67:6,23;71:25;
72:18;132:24;269:23,
23;296:12

**apples (1)**
36:6

**applicable (1)**
153:9

**applied (1)**
69:24

**applies (2)**
61:4;151:24

**apply (3)**
35:6;223:13;271:25

**applying (5)**
34:12;35:2,3,5;36:17

**appreciate (1)**
268:3

**appreciated (1)**
230:3

**approached (2)**
23:20;24:4

**appropriate (11)**
17:4;18:4,4;118:1,
21;134:18;150:13;
151:13,20;202:4;285:4

**appropriately (8)**
188:18,24;189:3,9,
12;192:14;201:10;
269:15

**approval (1)**
170:9

**approved (1)**
23:22

**Approximately (8)**
11:6,23;12:21;14:7;
43:1;46:4;132:11;
277:11

**April (12)**
6:7;28:12,15;86:19;

133:2,13;159:6,6,13;
160:1;229:21;278:14

**arbitrary (1)**
206:1

**Archdiocese (1)**
22:6

**Area (19)**
41:3,6;42:14;124:6;
164:2;182:14;194:19;
230:21;232:4;246:1;
249:3,25;252:20;
259:18;265:6,19,20;
281:2;289:12

**areas (7)**
40:9;43:10;114:6;
123:1,2;195:4,20

**arguing (1)**
93:7

**Arian (1)**
53:5

**Arizona (47)**
6:7,10,13,21,23;
14:25;23:23,24;25:5;
27:25;29:25;35:1;
36:12,18;58:12;76:1,
10;77:7;96:20;99:22;
103:3;116:3;134:19;
151:12;153:8;157:13;
164:1;191:3;193:2,19;
202:15;208:4,7;242:2;
247:2,24;255:17;
261:23;262:24;263:22;
280:9,11;284:22;
285:4,10;289:20;291:4

**around (3)**
116:16;262:9;265:8

**arrest (1)**
293:18

**arrival (2)**
296:21,23

**arrow (3)**
196:8;230:23;235:23

**art (1)**
30:6

**article (1)**
292:24

**articles (14)**
197:3,6,8,10,12,19,
22,23,25;198:3;
202:22;292:16,20,22

**aside (12)**
39:5;49:11;66:20,20;
67:11;71:14,15;72:9;
80:6;94:22;163:6,12

**Asim (1)**
6:23

**ASPC-Douglas (1)**
53:23

**ASPC-Eyman (2)**
41:15,17

**ASPC-F (1)**
276:1

**ASPC-Florence (3)**

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 82 of 157

Parsons vs.                          Confidential            Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                          Subject to Protective Order                           April 11, 2014

42:21,25;44:20
**ASPC-Lewis (3)**
  44:23;45:7,8
**ASPC-Perryville (1)**
  40:21
**ASPC-Phoenix (3)**
  39:16,19,24
**ASPC-Safford (1)**
  54:2
**ASPC-Tucson (2)**
  46:1,5
**ASPC-Winslow (1)**
  53:25
**ASPC-Yuma (1)**
  46:23
**aspects (1)**
  34:25
**Aspen (1)**
  132:9
**assault (1)**
  191:25
**assaulted (1)**
  191:21
**assaults (1)**
  266:1
**asserted (3)**
  52:12;199:23;293:11
**assess (1)**
  234:2
**assessed (6)**
  221:1,5,7,13,15,17
**assessing (3)**
  104:18;218:20;
  219:15
**assessment (1)**
  92:21
**assistant (1)**
  129:1
**associated (1)**
  185:9
**association (3)**
  6:12;137:3;256:1
**Association's (1)**
  255:2
**assume (11)**
  8:9;59:7;99:18;
  119:19;123:21,24;
  135:11;154:8;241:10;
  287:4,9
**Assumes (1)**
  135:15
**assuming (2)**
  125:4;131:10
**assumptions (2)**
  127:13;128:25
**asterisk (1)**
  64:8
**asthma (1)**
  293:3
**athlete's (1)**
  156:19
**attacks (1)**
  293:3

**attempt (4)**
  263:17;269:16;
  274:15;281:4
**attempts (2)**
  263:20;289:11
**attended (4)**
  15:19,20,23,25
**attention (2)**
  106:3;109:13
**attest (1)**
  50:20
**attorney (2)**
  103:1;126:2
**attorneys (2)**
  20:25;102:17
**attributable (1)**
  194:8
**attune (1)**
  42:10
**audibly (2)**
  8:3,6
**audio (2)**
  31:25;47:25
**audit (6)**
  58:11,17;88:19;
  157:14;225:20;226:2
**auditing (3)**
  208:14;226:1,5
**auditor (2)**
  123:14;179:20
**auditors (1)**
  169:6
**audits (1)**
  136:16
**August (23)**
  107:14;108:22;
  110:2,7,24;112:5,12;
  113:3;133:9,13,14;
  162:11;171:3,20,22;
  172:7;173:11;178:12;
  206:21;207:4;212:7;
  217:2,7
**author (2)**
  281:11;293:1
**authors (1)**
  143:2
**automatic (1)**
  227:25
**autopsies (5)**
  26:5;59:9;263:23;
  279:10;281:2
**autopsy (13)**
  175:25;269:13;
  277:18,21,25;278:6,21;
  279:3,25;280:5,20,25;
  281:16
**auto-refill (1)**
  228:4
**availability (1)**
  172:21
**available (1)**
  25:15
**Avenue (1)**

6:6
**average (3)**
  262:6,10,13
**avoid (7)**
  116:9;185:22;
  188:16;192:8;195:1;
  237:10,23
**avoidable (10)**
  270:5,10,11,16,19,
  19,21;271:8;272:5;
  279:13
**avoided (2)**
  157:7;256:6
**avoids (1)**
  291:19
**aware (41)**
  23:3;50:14;77:25;
  78:6,7;79:22;80:9;
  140:7,10;192:24;
  193:3,17,25;194:4;
  200:6;202:17,21;
  221:17;252:25;253:13,
  19,20,25;254:1,9;
  290:4;292:3,13;293:7,
  10,22,25;294:1,3,6,19;
  295:2,12,16,17,22
**away (2)**
  111:7;255:6
**awful (1)**
  112:22

---

**B**

**Bachelor's (1)**
  86:2
**back (38)**
  23:14;26:4,13;37:24;
  45:25;48:17;53:11;
  55:8;57:15;59:23;
  60:24;62:4,5,6;68:18;
  91:20;119:6;122:11;
  125:21;127:24;144:5;
  165:2;176:23;177:11;
  187:19;192:2;195:17;
  198:25;207:18;220:11;
  223:19,22;229:7,21;
  253:12;260:1;290:17;
  298:3
**background (2)**
  18:6,8
**backlog (2)**
  124:25;125:1
**bad (18)**
  19:23;90:16,16,20;
  92:12;95:14;106:24;
  107:4;111:5;114:21;
  115:25;116:9;118:18,
  23;180:20;194:13;
  202:3;241:4
**balancing (1)**
  118:2
**ball (1)**
  176:11

**ballgame (1)**
  176:12
**bar (1)**
  236:20
**Barchey (1)**
  172:17
**barring (1)**
  95:16
**based (18)**
  33:18;52:5,12,25;
  71:11;74:23;75:11;
  78:11;93:15;106:16,
  18;167:1;190:1,16;
  193:10;247:21;255:13;
  282:23
**basic (1)**
  257:9
**basically (44)**
  22:7;25:2;50:9,17;
  57:19;63:5,16;65:23;
  67:17;75:1;88:11;89:8;
  106:12,23;126:18;
  133:3;134:17;136:13;
  140:19,22;142:9;
  143:6;156:9;165:9;
  176:5;179:21;190:12;
  208:4;225:18;226:4;
  227:1;230:2,14;240:1;
  243:25;256:18,24;
  262:23;267:5,13;
  269:14;272:15,22;
  281:2
**basing (1)**
  101:21
**basis (4)**
  18:2;107:8;208:13;
  212:1
**Bates (17)**
  10:4,7,12,17;48:20,
  21;67:6;120:19;
  124:16;132:5;162:13,
  18;166:9;195:22;
  255:25;266:10;269:21
**bathroom (1)**
  194:22
**bearing (1)**
  90:18
**beaten (1)**
  240:10
**become (1)**
  105:13
**bed (1)**
  114:4
**beds (1)**
  114:4
**began (1)**
  129:9
**begin (6)**
  9:5;24:16;60:3;
  129:6;193:12;220:15
**beginning (2)**
  139:9;225:4
**begins (8)**

48:18;125:22;
  147:17;153:6;195:18;
  256:11;260:2;261:22
**behalf (1)**
  21:22;22:12,16,17
**beings (1)**
  29:14
**belabor (1)**
  285:2
**belief (3)**
  135:19;136:1;239:13
**believes (1)**
  142:17
**below (19)**
  84:23;96:10;105:13;
  116:22;117:5;118:10;
  239:12;265:12;274:23;
  275:9,12;276:14;
  284:20,24;285:20,22,
  23;289:21;290:10
**Ben (4)**
  59:4;107:14;112:15;
  269:20
**beneficial (1)**
  45:12
**Ben's (1)**
  270:5
**besides (6)**
  65:5;66:7;67:13;
  128:8;129:2;130:8
**best (16)**
  33:12;41:8;56:12,15;
  58:8;85:21;106:22;
  134:21;204:6;221:12;
  255:10;266:1;292:2;
  293:4,19;294:2
**better (21)**
  13:8;20:3;68:19,22;
  78:19;80:16;83:17;
  96:25;97:4;103:18;
  106:21;120:4;159:23;
  180:16;183:24;208:13;
  228:14;229:6;238:21;
  250:8;283:11
**beyond (5)**
  116:10,18;118:5;
  219:3;298:16
**bias (2)**
  66:1;103:16
**big (8)**
  45:3;67:20;99:4,6;
  109:14;125:13,13;
  236:18
**billed (2)**
  13:19;14:7
**binders (1)**
  75:18
**biostatistics (1)**
  17:25
**bit (2)**
  162:21;297:20
**BJS (1)**
  262:11

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 83 of 157

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

**black (4)**
107:3;167:8;269:4;
289:16
**black-and-white (1)**
258:24
**blank (1)**
22:5
**blanking (1)**
13:14;272:22
**bless (1)**
46:14
**block (12)**
43:3,7;44:14;236:22;
237:10,17,17;238:5,5;
252:5,10;287:15
**blocks (2)**
237:7,24
**blur (1)**
67:20
**blurrier (1)**
143:18
**board (14)**
15:8,11,12,14;
121:12;166:24;235:13;
244:16;256:22;257:2;
268:5;275:19;276:8,12
**boils (1)**
57:19
**Bojanowski (1)**
24:23
**B-o-j-a-n-s-k-i (1)**
24:24
**book (20)**
137:25;138:10,20,
22;139:1;141:3;143:4;
147:7,23;148:12,13,15,
17;150:19,24,25;151:5,
13,20;152:15
**Boothby (2)**
171:4,8
**both (19)**
10:8;13:9;15:11,13,
15;34:18;35:3;36:14,
19;116:5;125:2;
151:24;152:2;169:1;
184:2;199:15;215:15;
255:1;273:18
**bottle (1)**
185:20
**bottom (19)**
49:9;89:16;112:10;
113:10,13;121:17;
130:25;133:12;169:23;
171:8;174:15;187:6,
11;207:14;234:17;
240:5;243:20;258:12;
288:19
**bottoms (2)**
49:5,10
**box (3)**
50:10;122:23;124:22
**Branch (3)**
11:3;15:5;277:10

**break (17)**
8:16,19;10:21;48:6;
122:6,7;124:7,9;
125:16,24;126:11;
164:20;220:5;223:18;
259:21;260:17;290:12
**breakdown (3)**
100:3;270:11;282:13
**breakdowns (2)**
282:25;284:18
**breaking (1)**
20:11
**breaks (1)**
223:17
**bridge (1)**
28:21
**briefed (1)**
40:3
**bright (1)**
244:3
**bring (2)**
47:14,17
**broken (5)**
79:20;80:5,6;100:5;
148:11
**Brotherhood (1)**
53:5
**brought (3)**
9:23;106:3;215:1
**Browning (11)**
42:1,14;195:8,20,23;
196:6,12,18,21,24;
259:5
**Buckley (1)**
172:22
**bullet (1)**
105:11
**bunch (1)**
283:1
**burden (1)**
157:2
**Bureau (3)**
261:24;262:10,11
**business (2)**
107:6;109:8**

---

**C**

**calendar (1)**
160:10
**California (13)**
14:2,5;23:19,23,25;
29:17;61:2,14;102:4,
10;103:3;254:3;295:19
**call (7)**
35:14;99:22;126:14;
227:1,2,3;283:23
**called (4)**
7:7;95:4;97:22;
236:20
**came (5)**
51:19;96:17;121:11;
142:13;244:18

**can (113)**
8:16;13:5;16:13;
17:7,12;22:22;23:14;
24:9;25:11;29:6,25;
32:25;33:3,13;34:14;
35:20;38:9;49:3;52:10,
10,11;55:12;57:13,20,
20;58:24;69:22;70:11;
71:20;82:9;84:20;85:8,
24;86:23;87:1;91:3,4;
92:6;93:6;94:1,16;
95:1;96:16;97:13;
103:16;105:21;106:21;
112:1;118:10,19;
124:6,9;126:20;
128:11,23;130:11;
131:4;136:2;139:21;
141:12;144:10,11,16;
147:19;155:3;160:4,9,
14;165:14;166:1,5;
167:4,17;168:16;
169:13,13;170:25;
179:9,12;186:9;
188:12;189:5;190:2,3,
20;191:6,20;202:11;
206:3;209:4,18;210:1;
215:20,20,21;229:3,14;
230:15;231:21;242:18;
243:16,20;246:25;
253:11;255:5,14;
267:7;280:8;281:7;
284:2;292:15;295:5,6
**Capabilities (1)**
10:1
**capability (1)**
111:25
**capacity (2)**
76:14;102:20
**Captain (1)**
233:14
**Caramachi (2)**
243:21,23
**carbonate (1)**
175:10
**cardiac (1)**
293:18
**cards (1)**
285:6
**Care (259)**
11:3;16:16;17:9;
18:20;19:2,11,15,20,
22;22:20,25;23:7;25:4,
24;26:7,7,9,17,21,22,
23;27:1,2,14,15,21;
29:1,5;30:15;31:22;
32:5;33:2;34:4,11,13,
15,16,17,17,25;35:2,4,
9,15,17,18,22,23;36:1,
2,11,13,17,18,19,20;
40:2,18;54:8,18,18,23;
55:15,19,20;69:12,16,
16;73:17;74:21;75:2,3,
13;76:9;77:7,22;78:16;

79:17,21;81:1,15,15;
82:22;83:6;84:4;91:18;
94:10,11;95:10,10;
102:10;104:18;106:24;
107:6,11;108:15,18,22;
109:2;110:3,3;112:3,9;
113:2;115:2,15,20;
116:2,8,13,22;117:5,
17,18;118:1,10,14,20;
121:22;124:1;132:12;
136:2;142:1;144:25;
146:3;155:22;156:1,3,
15;157:2,16,23;158:1,
2,8,13;159:1,9,17,21;
160:3,7,12;162:17;
163:3;165:11;170:1,
20;174:25;175:17;
176:5,14,16;177:23;
178:1;179:6;180:14,
17,19;183:20;185:3;
189:6,16,19;190:2,
9,12,13,15,18;201:9;
202:4;203:20;205:21;
216:1,6;217:18;219:6,
23;220:21;221:17;
225:21,23,25;226:3,5,
6;230:12,13;243:17;
254:15;256:17;260:24;
265:22;267:2,9,23;
268:17;269:9;271:16;
272:8,14,18,25;273:1,
5,14,17,21,25;274:19,
24;275:3,7,8,8,9,11,16,
22;276:6,14;277:11,
24;278:5;279:2,17,25;
280:3,21;282:9,15,18;
283:3,5,10,12,14,16,18,
21;284:1,7,15,19,20,
25;285:11,12,20,21;
286:15;289:22;290:8,
10;292:25;293:13;
296:3
**career (1)**
284:12
**carefully (1)**
97:4
**Carlos (1)**
131:1
**Carolyn (2)**
6:8;91:20
**carried (1)**
73:7
**carry (1)**
273:20
**carrying (2)**
139:3;276:25
**carryover (2)**
139:13;181:12
**cart (1)**
159:7
**Case (121)**
6:4;7:18;12:5,14,15;
13:1,12,13,15,20;14:8,

9;19:5,21,23,23;21:24,
25;22:1,3,7,11,13,16;
23:10,19,19,24,25;
24:5,12,16;25:22,25;
27:4,23;28:18;30:19;
31:20;33:5;38:8,11;
48:24;49:19;51:1,10,
15;52:18,21;53:3,7,21;
54:8;56:4;57:11,12;
61:8;15;62:4,12;64:2;
69:1,19;70:2;71:12;
101:6;103:8;119:23;
121:4;126:13;127:24;
128:4,9;129:25;134:7;
151:10,12,19;152:5;
175:17;176:2;186:3;
193:9,14;194:3;
197:13,20;198:4;
216:8;220:22;245:22;
253:1,7,8,14,21;254:2;
266:1;269:11;281:6,6;
282:12;284:11;285:14,
16,18;289:23,24,25,25;
290:3,9;292:11,12,13,
14;293:7,23;294:16,
18;295:18
**caseload (5)**
63:18;73:5,25;74:9;
139:20
**caseloads (1)**
131:1
**cases (25)**
8:12;19:10,18,24;
20:5,7,14;21:6,18,21;
22:18;23:23;31:17;
168:4,19;169:4;
192:25;204:25;213:19,
25;284:17,18;285:13;
293:10,17
**categories (1)**
296:21
**categorization (1)**
270:14
**category (4)**
85:15;254:21,22;
255:18
**Catholic (1)**
22:9
**caught (1)**
124:25
**causation (1)**
293:22
**cause (13)**
158:13;167:8;
182:11;192:6,25;
194:5;251:17;285:25;
286:3,8,11;292:20;
293:11
**cause-and-effect (1)**
292:5
**caused (1)**
194:9
**causing (2)**

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 84 of 157

Parsons vs.                                    Confidential                    Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                    Subject to Protective Order                                    April 11, 2014

293:3,3
**CB (17)**
43:2,3,6,8,14,22,22,
24;44:3,5,9,10,12,12,
13,14,17
**CCHP (1)**
7:6
**CD-ROM (2)**
161:7,14
**cell (40)**
43:3,7;44:14;186:2,
4,7,18,22,25;187:1,13;
189:18;190:7;191:14;
192:10;215:21;230:3,
6,13,15;236:17,22;
237:7,10,17,17,24;
238:5,5;250:25;252:5,
10;258:22;265:19;
267:6,17;269:2,6;
274:11;293:13
**cells (3)**
236:15;246:2,10
**Center (4)**
6:22,24;208:7;
277:13
**centers (2)**
35:12,13
**Central (1)**
6:6
**certain (10)**
27:19,20;49:9;64:1;
109:10;144:22;215:6;
236:12;281:1;294:24
**certainly (7)**
63:23;98:25;109:3;
250:8;254:17;261:4;
270:12
**certainty (3)**
16:14;33:21;142:21
**certification (1)**
15:13
**certified (7)**
6:11;7:8;15:8,11;
69:9;166:24;268:5
**challenge (3)**
109:4;228:5;230:4
**challenged (2)**
114:25;115:5
**challenges (14)**
19:9;36:4;109:4,21;
176:18,19;177:21;
197:16;228:10;229:5;
232:2;239:19;241:18,
25
**challenging (2)**
18:19;19:2
**chance (4)**
78:4;81:19,22;210:5
**change (20)**
27:9,12;95:15,17;
101:7;108:8;114:18;
123:9;125:11,14;
131:12;149:16;151:4;

164:18;176:4;225:16;
263:9;264:8;276:24;
280:2
**changes (5)**
28:5;95:16;108:11;
111:3;116:5
**changing (1)**
237:25
**characteristic (2)**
270:24;271:1
**characterization (1)**
241:6
**Charles (1)**
6:4
**chart (32)**
64:20;65:4;69:14;
84:12,13,16;85:8;
86:14;95:24;96:24;
97:9;98:19;100:5;
159:11;170:4;175:24;
179:19;180:6;182:25;
183:1,6,7,24;193:14;
198:10,12,16;199:4,9,
12;268:23;287:2
**charts (23)**
34:2;62:16,19,20,21;
63:1,6,7,15,15;64:7,11,
15,25;71:16;74:3;
125:1;158:21;199:15;
200:5,13;228:18;229:2
**check (5)**
100:6,7,9,13;266:2
**checked (9)**
264:13,21;265:3,14;
266:24;267:2,25;
268:18,19
**checking (2)**
37:18;193:12
**checks (4)**
286:1,14,22;287:3
**children (1)**
240:8
**choices (1)**
241:4
**choose (2)**
12:19,19
**chose (1)**
274:21
**Chris (2)**
6:12;297:17
█████████ (2)
53:4;198:6
**chronic (4)**
115:22,22;156:6;
289:10
**circulated (1)**
279:9
**circumstances (2)**
31:3;183:25
**citation (4)**
61:11;142:16;143:9;
148:14
**cite (3)**

97:5;98:12;103:22
**cited (8)**
104:12;142:23;
153:20;154:1;155:1;
197:6,9;292:25
**cites (4)**
153:16;154:15;
213:19,22
**citing (1)**
146:19
**city (1)**
27:11
**civil (1)**
12:15
**claim (2)**
199:23;240:18
**claimed (1)**
22:8
**claiming (2)**
169:4;200:11
**Clair (3)**
233:12,15;235:9
**clarification (1)**
19:11
**clarify (14)**
8:8;19:8;24:11;29:7,
12;34:21;68:8;82:24;
106:8;110:19;136:13;
160:15;170:21;209:23
**clarity (1)**
146:6
**class (4)**
30:21,24,24;77:23
**classes (2)**
15:23,25
**classification (8)**
119:20;120:7;
188:14;189:22;190:16;
203:24;254:17;255:13
**classifications (1)**
119:25
**classify (1)**
283:9
**clean (1)**
29:24
**cleaning (1)**
30:11
**clear (16)**
19:13;28:23;56:17;
61:19;112:16;127:8;
146:17;154:25;175:19,
20;188:6;192:25;
279:8;290:5;295:2,5
**clear-cut (2)**
95:14;292:7
**clearly (8)**
109:23;116:4;123:2;
149:12,17;165:18;
215:8;255:3
**clergy (1)**
22:7
**clinic (5)**
15:23;40:8;116:15;

208:19;212:20
**clinical (3)**
58:16;205:18;211:25
**clinically (9)**
95:12;205:18;206:1;
208:22;209:6,19;
210:3;296:9,19
**clock (8)**
80:23;94:1,10,12,14;
141:25;142:1;222:22
**close (41)**
108:19;114:6,9,12;
137:12;145:20;170:7,
9;172:16,18,21,23,25;
173:25;174:11,17;
188:19;207:19;212:22;
217:10,14;219:21;
220:19;221:23;227:16;
228:1,19;229:13;
232:11;235:1;239:7;
241:18;242:11;245:7;
258:5,15;262:6;
266:22;276:3;288:6,21
**closed (1)**
295:13
**coach (2)**
32:11;79:4
**coaching (3)**
32:13;79:5;273:9
**cocaine (2)**
293:14,15
**co-counsel (1)**
7:17
**coded (1)**
287:10
**Codes (3)**
10:16;43:20;119:25
**coding (1)**
286:18
**cognitive (1)**
163:20
**cognizant (1)**
42:8
**cogwheeling (1)**
215:18
**Cohen (3)**
94:8;223:11,13
**Coie (1)**
6:6
**Coleman (6)**
23:25;102:4,20;
254:2,7;295:18
**collected (5)**
18:3,3;73:2;97:2;
263:18
**co-locate (1)**
236:11
**color (2)**
96:25;194:23
**column (2)**
258:13;266:17
**comb (1)**
88:21

**combination (5)**
98:1;165:21;167:21;
184:2;215:15
**coming (1)**
106:20
**comment (8)**
34:18;128:9;129:21;
130:9;145:22;189:6;
199:15;233:2
**commented (1)**
30:6
**comments (2)**
88:13;287:15
**Commission (5)**
22:25;69:12;137:10;
146:18;256:17
**commits (1)**
279:3
**committed (3)**
202:2;273:16;277:20
**committee (3)**
138:22;140:21;282:1
**communi- (1)**
51:21
**communicate (1)**
234:5
**communicated (1)**
227:4
**communicating (1)**
196:2
**communication (1)**
59:23
**communications (7)**
51:4,18,23;52:3,16,
20,23
**communities (1)**
217:21
**community (72)**
26:10,12,17,21,23;
27:15;34:16,17;35:2,3,
9,12,12,14,18,23;36:2,
14,19;75:2,12;77:1;
84:9;110:3;113:2;
117:5;146:12;153:9;
155:25;156:2;157:22;
158:25;165:11;170:19;
173:8,9;174:25;
176:15;177:22,25;
203:19;208:6;216:6;
217:18,25;219:5;
225:23,24,25;226:4,7;
260:24;271:15,19,22;
272:7,13;274:19,24;
275:3,15;276:5;278:5;
283:4,17;284:20,25;
285:20,23;289:22;
290:10;296:4
**companies (1)**
226:3
**company (1)**
231:7
**compare (1)**
36:5

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 85 of 157

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

**compared (1)**
188:8

**compares (1)**
262:24

**compel (1)**
127:4

**compensation (1)**
127:12

**competency (1)**
13:16

**complacent (1)**
105:13

**complete (8)**
33:12;181:7;269:16;
274:10;277:24;278:6;
279:3;280:5

**completed (7)**
164:12;179:11;
181:8;278:20;280:13,
16;281:3

**completing (1)**
92:8

**Complex (24)**
70:18;101:10;
120:12,19,24;122:19;
124:14,24;131:6;
162:12,16;163:3,14;
172:8;173:12;189:4;
192:11;206:21;212:11;
218:7,17;219:11;
242:7;266:11

**complexes (2)**
174:17;189:13

**compliance (22)**
123:23;133:1;
136:16;162:12;169:14,
18;172:15,18,20,23,25;
176:7;183:22;208:13;
226:21;227:5,6,9,11,
13,16,18

**complicated (2)**
118:25;167:9

**complications (3)**
185:10;195:2;199:4

**complimentary (1)**
30:7

**comply (1)**
220:18

**complying (2)**
28:17;291:9

**Component (3)**
114:9;239:18,18

**composite (1)**
86:23

**compromise (1)**
123:2

**compromised (2)**
107:20;110:10

**concept (1)**
36:8

**concern (3)**
57:17;235:16;237:21

**concerned (2)**

194:8;244:4

**concerning (1)**
264:7

**concerns (4)**
103:2;109:21,23;
153:13

**conclude (7)**
31:9,13;82:4;173:7;
174:24;181:14;232:20

**concluded (1)**
299:21

**concludes (3)**
270:5;288:12;299:18

**conclusion (6)**
270:8,15,20;271:3;
282:17;283:20

**Conclusions (1)**
77:20

**concretely (2)**
74:12,15

**condition (2)**
156:20;296:25

**conditions (17)**
18:4;19:16,18;27:25;
28:5;55:23,24,25;91:7;
100:21,22;101:11,17;
110:23;117:15;257:15;
258:18

**conduct (3)**
31:1;7;93:14

**conducted (2)**
32:1;40:7

**confer (1)**
298:14

**conference (3)**
8:21;56:2;227:2

**conferences (1)**
91:6

**Confident (4)**
37:9;98:19,23;
192:13

**confidential (3)**
10:17;37:9,11

**confined (1)**
246:2

**confinement (14)**
19:19;250:4,11,19,
25;251:20,25;252:5,10,
15,20;254:4;257:20;
258:19

**confirm (1)**
239:13

**confuse (1)**
8:5

**confused (2)**
46:17;199:13

**confuses (1)**
143:17

**confusing (1)**
72:23

**congenital (1)**
293:12

**conjunction (3)**

197:13,19;198:3

**connection (3)**
53:21;57:11;292:10

**Conroe (1)**
11:3

**C-o-n-r-o-e (1)**
11:4

**conscious (1)**
287:8

**consciously (1)**
157:7

**consensus (4)**
143:1,14,17,20

**consent (1)**
299:13

**consequences (2)**
240:21;291:21

**consider (6)**
9:20;16:6;17:3,21;
18:5;186:24

**consideration (7)**
28:11;164:18;
202:13;225:16;263:8;
298:24,25

**considered (1)**
289:17

**considering (1)**
298:19

**consistent (31)**
60:13;155:21,25;
156:15;157:22;158:8,
25;159:16;160:3,6,12;
217:17;219:5,22;
267:1,23;268:17;
269:8;271:15;272:13;
273:5,13,16;274:18;
275:2,15;276:5;
277:23;278:4;279:1,17

**consistently (3)**
204:11;297:5,13

**consists (1)**
75:17

**constant (2)**
267:14;269:1

**constantly (1)**
231:18

**constitute (6)**
257:20;259:2,6,10,
14,18

**Constitution (2)**
16:8;202:20

**constitutional (9)**
79:21;81:16;82:23,
25,25;83:2,4;176:15;
202:3

**construction (1)**
196:18

**consult (2)**
61:8;103:18

**consultant (11)**
11:25;12:5;13:9;
14:5;19:1;20:15,18,20;
102:14,15,16

**consultations (1)**
11:14

**consulting (4)**
11:13,18;12:13;14:2

**contact (1)**
29:18

**contacted (6)**
12:16;24:6,19,21;
73:17;102:7

**contain (1)**
38:7

**contained (3)**
38:22;56:10;57:3

**container (1)**
185:20

**containing (2)**
75:18;161:12

**contains (2)**
167:11;262:16

**content (3)**
52:6;60:1;113:21

**context (19)**
12:13;22:20;82:20;
83:13,14,20;106:15;
123:15;135:6,9,10;
136:4,5,22;166:24;
229:16;231:4;232:15;
241:2

**continuation (1)**
298:20

**continue (6)**
62:11;108:3;122:25;
141:22;170:18;174:15

**continues (1)**
124:23

**continuing (3)**
62:20;125:2;170:5

**continuous (4)**
267:5,13;268:12,22

**continuously (5)**
26:23;27:4;108:4;
170:19;174:25

**contract (24)**
76:9;77:13;99:10,11;
109:7;110:18;111:18;
114:4;121:8,22;
123:14,23;125:5;
173:4;176:8;203:21;
204:3;216:11,19,23;
221:9;225:13;296:6;
297:6

**contracted (3)**
177:3;220:17;221:16

**contracts (2)**
106:13;114:4

**contractual (1)**
107:18

**Contributing (9)**
285:25;286:3,7,10,
11,15,24;287:4,5

**control (2)**
116:11;190:19

**conversation (2)**

229:8;243:2

**conversations (2)**
58:5;87:23

**convey (1)**
83:18

**conveyed (3)**
51:6;233:10,16

**cool (2)**
188:2;191:9

**coolers (1)**
191:8

**cooling (2)**
191:8;194:15

**copies (2)**
38:3;49:8

**copy (7)**
10:21;14:12;38:5;
84:19;85:22;148:13;
150:24

**copying (2)**
49:12;152:7

**cordial (1)**
29:19

**Corizon (63)**
26:18;58:2,14;59:10;
73:17;85:5,9;86:6,9,15,
16;87:10,20,21;88:18,
22,24;89:22;97:10;
99:1,10;108:10;
109:22;112:23;116:4;
121:10,11,18,24,25;
122:3;134:7,10,19;
135:13;136:10,16;
168:19;169:9;203:21;
204:3;216:11,18,23;
221:1,5,7,14;224:25;
227:4,8,11,17;229:6;
234:12;235:11,12,19;
243:24;244:18;261:17;
296:6;297:6

**Corizon's (4)**
84:12,20;112:19;
123:23

**corner (3)**
10:5;230:20;266:23

**coroner (1)**
200:4

**Corp (2)**
61:1,16

**correction (2)**
20:8;273:23

**Correctional (110)**
11:3,13;12:9,11;
16:16;17:2;20:6;22:18,
25;27:7,10;33:7;34:15,
16;35:4,17,22;36:1,15,
20;40:2;69:9,12;75:3,
13;76:19,25;84:9;86:8;
91:1,10;94:23;102:15;
105:23;106:13;107:6;
108:18;109:7;111:25;
112:7;115:18;116:7;
117:25;135:19;144:25;

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

146:12,21;152:2;
153:9;159:10;165:11;
173:9;177:22;185:3,3;
188:19,25;189:3,10,13,
25;190:1;191:1,10,19;
192:14;201:9;203:19;
211:23;216:7;218:1;
225:21;228:5;236:6;
238:17;255:3;256:12,
14,15,17;257:1,7;
260:15,23;264:16,24;
265:20,23,24;267:6,14,
15,16;269:2,5;272:8,
16,22;273:20,22,22;
274:24;275:11;277:10;
283:15;285:3,22;
291:11;292:25;296:4
**corrections (38)**
15:6,7;25:6;35:10,
14;36:12,19;58:12;
73:13,16,19;76:10;
77:8;88:19;91:2;94:22;
102:11;107:7;108:10;
116:3;119:3;134:19,
20;136:16;153:9;
157:13;180:14;189:5;
191:4;192:21;208:15;
255:18;261:17,24;
284:23;285:10;289:20;
291:5
**corrective (11)**
221:23;222:1,5,8,14;
223:25;224:6,25;
225:7;226:9;276:15
**correctly (8)**
148:17;182:1;
230:24;232:11;235:24;
239:8,23;283:9
**correlation (3)**
292:21;293:16,19
**corridor (1)**
231:12
**Corsicana (1)**
295:12
**COs (1)**
86:5
**co-sign (1)**
281:9
**co-signature (1)**
281:5
**co-signatures (1)**
280:1
**co-signed (1)**
280:25
**cost (1)**
231:15
**costs (1)**
231:17
**Counsel (23)**
6:14,16;7:2;8:11;
30:25;32:21;50:25;
51:8,18,20;52:3,16,21,
23;61:8;127:2;128:9;

129:2,21;130:9;210:3;
223:20;299:11
**count (2)**
71:17;72:12
**counting (1)**
62:23
**country (3)**
117:25;135:20;
169:13
**couple (6)**
7:22;87:1;102:17;
140:19;142:5;294:17
**course (4)**
181:9;261:24;262:1;
298:11
**courses (1)**
18:12
**coursework (1)**
18:11
**court (27)**
6:8;7:3,21;8:23;
12:16;13:12;14:5;
18:14;21:6;24:7,13;
27:23;28:11,12,18,20;
61:3;202:17;245:22;
253:1,14,21;254:2;
295:18;299:9,12,15
**court-appointed (4)**
13:6,16,22;14:1
**courtesy (1)**
62:12
**courts (3)**
13:7,10;21:20
**cover (2)**
95:1;196:16
**coverage (1)**
114:9
**covered (1)**
38:13
**crack (1)**
293:14
**create (4)**
84:13,16;165:14;
191:16
**created (1)**
96:23
**creates (1)**
118:9
**creating (5)**
84:15,17;114:8,11;
127:12
**creative (3)**
95:2,8;233:3
**credible (2)**
58:20,23
**Criminal (5)**
201:9;254:18;274:2;
276:9,9
**criteria (1)**
270:24
**criterion (1)**
271:1
**Critically (4)**

243:8,14;244:7,20
**cross (2)**
28:21;95:1
**Culture (1)**
105:10
**current (16)**
10:24;14:23;15:15;
21:16;58:11;64:7;
77:23;100:22,25;
107:16;108:17;110:7;
122:1,4,25;123:3
**currently (12)**
14:19;15:8;23:4;
28:24;73:24;82:25;
103:10;105:4;108:15;
142:25;143:11;202:24
**Curriculum (2)**
261:24,25
**custodial (2)**
18:21;19:3
**custody (35)**
16:19,22,24;17:1,5;
100:20,21;101:11,17;
116:12;186:24;189:5,
7,15,23,25;190:5,5,20,
21;192:21;230:11,14,
14;237:22;240:2,12,19,
19,22;241:5;254:16;
255:12,15;273:2
**custody/security (1)**
190:15
**cut (15)**
49:6,10,12;92:5;
113:10,13;128:17;
130:13;151:1,2;
162:19,21;166:9,11;
235:1
**cutoff (5)**
27:24;28:19;261:14
**cutting (2)**
152:7;235:17
**CV12-00601-PHX-NVW (1)**
6:5

**D**

**dangerous (1)**
42:9
**dangerousness (1)**
255:14
**data (12)**
33:18;34:1;84:21,22;
85:12;86:22;88:12,15;
95:14;127:12;131:15;
142:18
**date (38)**
9:11;22:17,18;27:24;
28:4,13,19,20;66:19;
68:24;75:6;77:6;81:14;
137:11;145:12;192:25;
207:17;212:20;213:23;
217:13,13;224:13;
229:8;234:7,14;

237:16;261:10,14,15;
266:14;278:10,13,14,
22,23,24;280:5,15
**dated (13)**
37:10,12;38:3,6;
59:15;60:4;64:19;
113:15;132:21;162:23;
213:5;279:7;280:15
**dates (5)**
26:2;66:13;121:11;
212:20;276:2
**David (5)**
6:17;7:17;92:23;
94:4;298:7
**day (49)**
27:16;39:21;40:9,12,
14,16,19,21;41:1,10,
18;42:18,21;43:1;
44:20;45:3,8,12;46:6,
11;47:1,2;68:17;75:8,
9;91:9;93:7;94:6,15;
125:11,11;126:24;
156:10;157:17;180:16;
189:15;205:20,24;
219:3;230:7;233:13;
246:2,10;251:1;
255:12,15;265:7,8,19
**days (35)**
171:10;175:11;
178:12;182:21;204:7,
9,16,21,23;205:1,3,4,
12,14,19,19,24;206:9,
10,16;207:8;208:3,18,
23;209:1,16;217:10;
218:22;219:17;232:25,
25;288:13;296:9,15,18
**daytime (1)**
69:20
**day-to-day (1)**
107:8
**DC'd (1)**
207:17
**dead (1)**
75:6
**deal (1)**
233:8
**dealing (3)**
150:19;151:14;
152:16
**death (28)**
42:14;66:20;91:5;
114:25;115:2,11,14;
117:7,20;183:4;
192:24;193:2,4,18;
194:5,6,7;201:23;
202:9,25;241:17;
242:1,2;270:5;271:3;
278:10,13;293:20
**deaths (15)**
199:17,24;200:1,10,
12,17,22;201:3,7,14,
16,21;202:1,7,12
**debating (1)**

143:11
**debt (1)**
240:16
**debts (3)**
240:13,13,20
**deceased (4)**
67:11;71:15;72:10;
196:9
**decedent (2)**
284:24;285:11
**December (40)**
9:9;14:1;37:10;38:4;
44:23;45:22;46:1;57:4;
59:15;60:4;62:1;64:19,
22;66:8,19;67:10,16;
68:2,2;104:1,19;
126:22;127:6,18;
132:22,25;165:9;
220:25;222:7,14;
223:25;224:4,4,7,14;
242:24;247:20;261:15;
279:8;292:8
**decided (5)**
64:10,15;190:16;
200:20;245:22
**decides (1)**
83:4
**decision (15)**
83:7;190:1,5,13,15,
21;205:18,22;206:1;
236:21;237:12,22;
255:12,16;298:25
**decisions (2)**
94:24;202:17
**declarations (1)**
203:9
**declined (2)**
24:13;32:22
**decomp (1)**
230:23
**decompensate (2)**
165:23;211:25
**decompensation (1)**
231:23
**decontamination (1)**
291:15
**deescalate (1)**
291:12
**defects (1)**
293:13
**defendant (1)**
203:2
**defendants (4)**
7:1;32:22;134:7;
186:3
**defense (5)**
13:18;56:5;66:5;
73:12;103:7
**deficiencies (2)**
153:17;154:15
**deficiency (1)**
115:12
**deficient (1)**

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 87 of 157

Parsons vs.                          Confidential            Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                          Subject to Protective Order                              April 11, 2014

213:19
**define (3)**
    188:7;245:21;250:24
**defined (2)**
    247:5;255:4
**defines (2)**
    83:4;255:4
**definitely (3)**
    45:19;70:24;155:6
**definition (9)**
    85:19;138:17;
    247:13,18;257:14,17;
    258:8,17,25
**definitive (1)**
    146:3
**definitively (2)**
    215:14;285:15
**degree (6)**
    15:17;16:1,14;17:23;
    33:20;142:20
**degrees (15)**
    184:6,13,18,23;
    185:12,16;187:8,14;
    188:4,9;189:19;190:8,
    24;191:15;202:19
**delay (11)**
    181:14,15;182:2,3,7;
    219:2;230:3,23;
    231:22;286:5,14
**delayed (1)**
    271:4
**delays (7)**
    172:12;217:13,15,
    21,24,25;280:1
**deliberately (1)**
    238:20
**deliver (4)**
    183:10,16,17;274:16
**delivered (1)**
    69:16
**delivering (2)**
    88:24,25
**delivery (1)**
    118:9
**demands (2)**
    243:18;244:4
**demonstrate (1)**
    276:13
**demonstrating (1)**
    291:16
**Dental (3)**
    10:2;135:21;227:11
**depart (1)**
    275:22
**Department (31)**
    25:5;36:12,18;58:12;
    73:13,16,19;76:10;
    77:8;88:18;102:10;
    108:9;116:3;134:19,
    20;136:15;153:8;
    157:13;191:3;193:11;
    208:15;254:15,18;
    255:17;261:16,23;

284:23;285:10;289:20;
    291:5,19
**departure (1)**
    275:6
**departures (1)**
    290:1
**depend (1)**
    258:18
**depends (3)**
    203:24;205:7;258:19
**deposed (3)**
    7:18;21:6,19
**deposition (22)**
    6:2,13;9:7,21;38:18;
    52:9;80:3,4,12;81:8,
    10;83:23;84:1;94:11;
    134:1;223:10;224:20;
    298:13,20;299:13,19,
    21
**depositions (2)**
    8:24;33:9
**depressed (1)**
    283:25
**depressive (1)**
    287:11
**deputy (2)**
    229:25;233:15
**derelict (1)**
    274:22
**dereliction (4)**
    118:16;273:19,24;
    275:18
**describe (7)**
    22:2;34:19;59:14;
    62:21;63:1;64:25;
    65:19
**described (4)**
    9:17;18:10;65:19;
    165:8
**describes (1)**
    213:9
**description (2)**
    85:20,22
**desert (1)**
    191:11
**deserve (1)**
    214:7
**design (2)**
    236:20;238:1
**designation (2)**
    270:11,12
**despite (4)**
    54:11,19,23;226:8
**destroy (3)**
    50:8,16;126:13
**destroyed (3)**
    49:24;126:12,22
**detail (2)**
    165:9;183:24
**detailed (6)**
    42:12;68:20,23;
    69:25;77:4;119:11
**details (1)**

114:19
**detect (1)**
    161:8
**determine (2)**
    189:24;203:25
**determined (2)**
    178:5,10
**determining (2)**
    250:3,11
**developed (1)**
    296:21
**development (2)**
    150:12;261:24
**developmental (1)**
    163:21
**developments (1)**
    28:5
**deviated (1)**
    284:19
**deviation (5)**
    158:13;273:21,25;
    275:19;276:13
**device (1)**
    47:14
**diagnoses (6)**
    16:15;155:19,23;
    156:1,16;157:4
**diagnosis (2)**
    194:1;215:21
**dialysis (1)**
    119:2
**dictating (1)**
    47:17
**died (4)**
    281:17;293:8,19,23
**differ (2)**
    34:20,21
**difference (7)**
    35:16;99:2,5,6,7;
    138:14;289:7
**differences (1)**
    151:7
**different (33)**
    13:3,17;34:20,24;
    35:5;40:3,4,6;44:11;
    66:16;83:21;95:3,8;
    98:1;112:7;120:21;
    148:11;151:5,8;
    161:12;163:25;176:11;
    184:22;192:19,20;
    205:9;220:21;247:22;
    283:2;286:20;292:14;
    295:11;297:1
**difficult (1)**
    239:19
**digit (1)**
    229:15
**dignity (2)**
    29:15;268:5
**dire (2)**
    109:13;111:5
**direct (10)**
    90:15;118:16;148:1,

6;149:18;182:11;
    267:13;269:1;293:16,
    19
**directed (1)**
    29:8
**directly (11)**
    66:3;73:18;83:17;
    87:20;148:12,14;
    149:13;194:7;204:18;
    222:5;236:13
**director (8)**
    11:1;63:4,4;99:13,
    14,18;114:4;276:22
**directors (2)**
    200:14;257:3
**disabilities (2)**
    15:22;163:21
**Disability (2)**
    6:22,24
**disagree (27)**
    35:21;82:14;83:9;
    110:6,15,24;111:1,13,
    16;117:9;134:10,13,
    24;135:13;136:3;
    155:11;166:20;167:2;
    213:25;223:5;270:8,
    15,20,22;271:2;283:20,
    22
**disagreeing (1)**
    82:18
**disciplinary (5)**
    190:17;272:24;
    275:4,18;276:8
**disciplined (3)**
    273:8;275:5,21
**disclose (3)**
    20:17,19;21:2
**disclosed (3)**
    20:18,20;21:4
**discontinuation/change (1)**
    170:6
**discover (1)**
    21:3
**discrepancy (1)**
    99:1
**discuss (5)**
    75:20;186:12,14;
    298:15;299:10
**discussed (9)**
    53:20;57:8;67:13;
    71:23;87:20;186:4;
    209:11;284:17;299:1
**discussing (2)**
    181:13;243:11
**discussion (4)**
    89:24;215:16;228:9;
    244:24
**disease (1)**
    115:22
**disorder (3)**
    22:11;156:23;165:19
**disorganized (2)**
    50:21;164:11

dispels (1)
    101:25
**dispensing (1)**
    274:13
**Disproportionate (2)**
    239:22;241:12
**dispute (2)**
    111:9,19
**disputed (1)**
    140:21
**disregard (1)**
    275:1
**disregarding (2)**
    274:17,18
**disrespect (1)**
    106:11
**disrespectful (1)**
    108:13
**distinct (3)**
    194:5;292:4,20
**distinctly (3)**
    44:7;73:9;216:23
**distribution (2)**
    116:21;117:4
**District (2)**
    61:2,14
**disturbance (1)**
    206:14
**divert (2)**
    255:5,6
**DOC (2)**
    247:2;263:22
**Doctor (188)**
    10:4,19,24;21:5;
    28:25;32:3,23;33:22;
    37:8,14,18;38:1,17;
    43:19;48:22;51:8,13;
    52:15,23;53:8,23;55:4,
    22;56:17;59:25;61:25;
    62:13,14;64:2;70:21;
    75:17;76:3;77:25;78:5,
    23;79:23;80:8,17,22;
    81:20;83:15;84:3,11;
    85:1;87:5,17;88:1;
    89:2,9;90:8;91:12,19;
    92:17,19;93:5;95:24;
    97:5;98:3;99:9,25;
    100:9,13;104:7;
    105:15,24;107:22;
    110:20;113:9;114:13,
    22;116:17;118:4;
    119:14;120:14,22;
    123:5;125:23;126:20;
    130:17;131:9;132:18;
    133:5,20;135:24;
    136:5;137:23;138:3,
    15,23;139:24;140:17,
    25;141:14,17;143:3;
    144:8,13;145:3,8,13;
    146:22;147:21;148:16;
    150:15,18;154:12;
    155:14;158:4;159:24;
    163:2,8;164:13;165:4;

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 88 of 157

Parsons vs.                              Confidential             Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                              Subject to Protective Order                              April 11, 2014

166:20;170:10,23;
171:6,11;173:1,19;
174:7,7,18;175:12;
176:14,22;177:8;
181:11,20;184:5;
186:9;187:18;189:8;
191:22;195:19;196:4,
11,14,20;197:18;
198:2;201:11;202:6;
206:4,18;209:25;
210:24;211:7;212:5;
214:11,16;217:17;
220:13,14;221:14;
224:16;225:2;228:6;
240:23;243:20;245:17;
247:5;256:8,13;
257:11,15;262:8;
266:8,20;267:7,19;
268:15;269:9,22;
270:25;272:9;273:10;
274:17;276:11;277:23;
281:18;284:5;285:7;
289:19;290:19;293:21;
296:10;297:2
doctors (4)
  112:2;116:16;226:5;
  256:20
doctors' (1)
  156:3
document (80)
  9:25;10:10,15;14:11;
  21:13,18;43:19,21;
  75:24;76:3;77:15;78:7,
  19;80:13,15;95:23;
  96:17,20,23;97:2,5,7,
  13;99:17;105:21;
  107:22;113:9,17;
  120:7,11,16,18;124:13;
  130:18;131:25;132:2;
  146:19;148:10,10;
  150:23;152:8;161:12;
  162:20;164:10;166:17;
  167:16;170:10;171:13,
  20,24;173:1,11;175:14,
  23;179:25;206:21,24,
  25;209:18;210:1,12,
  16;212:10;217:2;
  218:3;219:10;230:10;
  262:15;269:22;270:1;
  274:4;279:11;280:6,
  12,18;281:12,18,22;
  282:6;296:10
documentation (8)
  104:5;156:9;157:18;
  161:22;169:25;180:25;
  192:22;227:1
documented (5)
  271:11;272:11;
  273:4,15;289:5
documents (17)
  9:17,24;10:20;26:3;
  37:14;75:18;121:6;
  126:7;132:1;158:15;

160:25;210:20;218:6,
13,14,16;264:16
done (20)
  63:13;64:19;65:4;
  89:2;112:10;157:18;
  236:24;244:25;255:5;
  271:13,19,20;272:4,12;
  273:4,15;275:10;
  276:22,24;279:14
door (1)
  274:12
doors (2)
  236:15;238:1
dorm (1)
  265:10
dosage (1)
  170:4
doses (2)
  169:6,7
dots (1)
  140:5
double (1)
  95:6
double-sided (1)
  37:16
doubt (1)
  90:5
Douglas (1)
  54:18
down (39)
  7:21;20:11;29:16;
  33:5;42:5,5;57:19;
  62:15;68:22;72:2;
  78:13;80:23;96:10;
  111:10;137:7;139:2,7;
  147:6;148:11;174:1,6,
  9,12;178:9;212:25;
  214:6;217:14;228:17;
  229:11;230:22;232:9;
  235:15;238:15;239:4;
  242:9;262:4;266:16;
  271:10;274:7
downwards (1)
  196:8
Dr (148)
  6:2;7:14;32:1;33:11;
  48:19;53:14;56:5;58:7,
  8,18;59:4,12;60:10,13;
  65:24,25;70:10;76:16,
  20;81:8,9,13;82:1,14;
  83:10,23;87:15,18,21;
  88:17;89:20,20,21,24;
  91:21,22;92:6;94:11,
  19;107:14,16,24;
  109:16,20;110:6,18,23;
  111:1,9,11,14,17;
  112:15;124:7;134:5,
  10,25;135:4,5,13;
  136:3,9;153:13,15;
  154:1,6,8,10,12,14,19,
  22;155:1,3,11;162:15;
  171:9;197:6,9,23;
  204:18;207:4,9,15,20;

209:11;211:2,13,17;
212:18;213:5,8,16,18,
22,25;214:10,13;
215:7;217:8,12;
218:20;219:15;220:1,
22,22,23;222:2,4,4;
223:11,13,14;224:21,
24;225:6;226:8;227:3,
4,8;228:15;230:1;
233:12,12,14;234:24;
235:7,9,9;243:2,5,13,
21,22;244:13,25;245:1,
9;277:22;278:16,20,
22;298:16,22;299:2,3,
4,19
draft (13)
  59:18,23;60:3,6,8;
  61:25;127:6,15,24;
  128:23;129:6,12,22
drafting (7)
  61:5,21;127:1;128:4,
  22;129:3,9
drafts (5)
  61:4;127:19,21;
  129:14;130:5
drink (1)
  194:24
driven (2)
  205:18;206:1
drop (1)
  75:5
drugs (1)
  293:14
due (10)
  29:15;80:22;124:24;
  172:20;177:19;192:23;
  207:11;239:6;256:6;
  283:7
duly (1)
  7:7
duplicative (1)
  158:19
duration (2)
  258:5,14
during (14)
  29:4;48:23;49:2,15,
  19;57:24;68:17;72:24;
  73:1;180:1;214:21;
  244:16;260:17;269:16
duties (4)
  131:5;220:18;
  265:25;274:22
duty (7)
  29:23;118:15,16;
  273:19,20,25;275:18
Dysfunctional (1)
  105:10

E

Eagle (1)
  172:15
earlier (18)

12:25;13:11;44:15;
72:25;86:21;101:22;
102:3;109:1;110:2,5;
131:18;136:6;158:6;
182:10;188:11;228:22;
260:3;270:18
earliest (1)
  280:5
early (5)
  94:11;102:24;
  127:18;129:8;212:20
earned (3)
  11:17;12:22;13:3
easier (1)
  97:1
easily (1)
  111:7
easy (2)
  8:5;83:20
eating (1)
  60:18
edit (4)
  127:24;128:9;
  129:21;130:9
editing (1)
  128:4
edition (1)
  143:1
education (1)
  285:5
educational (1)
  187:24
effect (33)
  19:19;49:22;78:15;
  79:16;80:25;90:10;
  91:17;92:21;106:4;
  107:10;114:13;116:11;
  123:5,8,25;125:6;
  131:10,12,14;161:24;
  162:6;164:14;167:8;
  170:16;182:11;193:1;
  207:21,25;211:13;
  225:11;263:5;292:20;
  293:11
effective (3)
  176:6;177:16,19
effects (8)
  198:7,15,19;199:7,
  11;214:9;234:3,3
efficacy (1)
  263:12
effort (5)
  45:11;177:6;237:10;
  239:16;297:9
efforts (3)
  35:25;122:24;193:11
Eichler (1)
  6:12
eight (2)
  9:22;226:9
Eighth (4)
  16:7;253:3,16,22
either (19)

12:19;18:15;21:6,19;
39:7;47:24;57:15;
67:22;73:10;87:10;
94:24;136:18;155:15;
157:13;160:19;161:13;
163:20;231:11;250:2
electronic (5)
  159:22,25;161:9;
  229:1;231:25
electronically (1)
  161:6
elevated (2)
  188:8,12
eliminate (1)
  294:8
Eliminated (2)
  244:11,17
ellipses (1)
  140:2
else (12)
  12:20;30:20;39:9,10;
  52:14;56:11;126:3,9;
  168:15;220:24;291:7;
  293:25
else's (9)
  232:6,13;241:7,8,13,
  14,16,21;242:15
email (1)
  254:6
emergencies (2)
  117:14;265:25
emergency (1)
  293:4
empirically (1)
  142:10
employed (7)
  16:23;199:18;200:2,
  18,23;201:4,17
employee (4)
  86:9;97:23;102:14;
  123:22
employees (3)
  85:5,9;105:13
employment (2)
  11:10,16
enclosure (2)
  196:1,1
enclosures (1)
  196:18
encountered (1)
  284:13
end (45)
  25:19;27:12;40:9;
  48:13;62:16;77:24;
  79:21;91:9;100:22;
  102:22;105:14;107:20;
  111:13;123:4;125:3,
  18;131:8;132:12;
  139:12,22;152:18;
  153:14;156:10;161:22;
  164:12;166:19;170:1;
  172:13;178:13;180:16;
  181:15;183:12;189:15;

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 89 of 157

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

205:19;219:4;226:22;
241:4;255:11,15;
256:7;257:10;271:13;
274:16;287:18;288:14
**endangerment (1)**
240:17
**ended (2)**
102:23,24
**ending (1)**
139:3
**English (1)**
138:16
**enjoy (1)**
244:1
**enough (6)**
33:18;73:15;117:12;
135:21;177:20;215:8
**enrolled (1)**
15:24
**ensure (1)**
65:25
**entered (1)**
282:14
**entering (1)**
286:19
**entire (11)**
84:1;135:12;136:8;
148:9,13,14;150:23;
153:2;179:2;194:14;
284:12
**entirely (1)**
201:13
**entirety (5)**
127:16;129:13;
134:2;156:8;289:19
**entities (1)**
36:4
**entitled (6)**
21:3;36:16;92:4,14,
24;127:20
**EPS (3)**
214:8,15;215:2
**equivalent (4)**
99:19;139:19,21;
145:20
**error (3)**
272:18;283:8;287:9
**errors (4)**
282:23;283:10,12;
286:18
**especially (2)**
233:24;240:7
**Essential (1)**
149:14
**est (1)**
261:18
**established (1)**
136:15
**estimate (6)**
11:20,23;41:8,25;
45:2;298:9
**estimated (1)**
261:18

**estimation (1)**
134:21
**et (2)**
6:4,4
**evaluate (3)**
23:7;214:24;215:2
**evaluated (3)**
22:19;33:16;283:6
**evaluation (6)**
29:4;31:22;32:5;
33:1;34:3;114:20
**evaluations (1)**
31:8
**even (29)**
7:25;8:20;30:10;
55:15,15;56:3;58:14;
88:22,22;116:22;
117:5;118:10;140:21;
141:13;143:18;156:3;
176:10;180:14;200:21;
204:20;229:13;230:9,
16,17;253:23;267:11;
280:13,19;291:13
**events (1)**
291:22
**everybody (3)**
77:2,2;185:5
**everyone (1)**
185:2
**evidence (7)**
27:24;28:13,19;
135:16;142:18;174:16;
268:2
**evidence-based (1)**
142:18
**evidenced (1)**
178:12
**exact (12)**
9:11;11:20;25:17;
39:20;41:24;42:4;60:9;
200:24;212:6;261:14;
273:7;275:17
**exactly (1)**
41:7
**EXAMINATION (2)**
7:12;215:17
**examined (1)**
7:9
**examiner (1)**
194:4
**example (11)**
25:23;30:2;35:6;
49:20;61:6;68:7;73:22;
86:19;158:19;169:9;
205:17
**examples (3)**
27:20;217:15;221:21
**exceeded (3)**
27:2,20,21
**exceeding (3)**
190:7;24;204:17
**exceeds (6)**
36:2;191:15;208:5;

225:24;226:7;269:5
**except (7)**
52:3;53:3;127:10;
225:1,8;290:8;299:2
**exception (2)**
8:14,17
**exceptions (2)**
256:6;257:9
**excerpt (1)**
137:24
**excess (8)**
131:1;184:6,13,18,
23;185:12,16;187:14
**excessive (4)**
114:11;172:20;
192:9;195:1
**excluded (1)**
254:23
**Excludes (1)**
96:21
**excluding (1)**
255:18
**excuse (15)**
10:16;23:25;24:19;
53:8;75:14;88:1;
140:25;161:7;177:8;
196:4;228:6;237:6;
239:15;240:23;281:20
**exemplifying (3)**
153:17;154:1,15
**Exhibit (25)**
36:23;37:5,8,11;
38:4,5;48:4,16,19,21;
65:10;75:15,17;95:19;
96:14,21;97:12,14;
98:6;137:21,23;
154:13;226:17;266:5,8
**Exhibits (1)**
38:2
**exist (2)**
44:16;49:25
**existed (7)**
28:1;74:21;84:5;
105:12;152:25;203:16;
260:21
**existing (3)**
28:18;114:11;131:7
**exists (1)**
296:22
**exit (1)**
106:23
**expanding (1)**
243:17
**expect (1)**
177:6
**expectations (2)**
220:18;294:25
**expected (2)**
108:10;264:24
**expenses (1)**
231:19
**expert (32)**
11:25;12:4;13:7,12,

17,23;14:1;17:13,17,
22;18:5,15,19;19:1;
24:8,10,11,11,13;37:9,
12;56:4,5;61:6;65:24;
143:12;144:25;186:25;
189:5,7;192:21;284:17
**experts (2)**
13:18;140:22
**expire (1)**
231:18
**expired (1)**
211:3
**expiring (1)**
228:12
**expiring/falling (1)**
227:25
**explain (9)**
29:25;36:8;82:10;
93:4;105:22;141:22;
240:25;242:18;267:11
**explaining (2)**
79:10;141:21
**explanation (1)**
79:1
**exposed (1)**
190:24
**exposing (1)**
202:18
**exposure (3)**
17:25;185:22;190:6
**express (10)**
25:23;28:25;34:10,
10;38:8,21;54:7,17,22;
135:1
**expressed (1)**
134:6
**expressing (3)**
36:10,11;109:21
**extensive (2)**
123:3;217:21
**extent (2)**
28:13;52:19
**extra (1)**
95:6
**extra-pyramidal (5)**
214:8;215:3,9,11,15
**extreme (1)**
185:7
**extremely (1)**
217:13
**extremes (2)**
185:2,5
**eye (2)**
29:18;107:3
**Eyman (20)**
42:18;72:1,24;73:22;
101:10;104:21,24;
161:4;195:23;206:21;
239:2,19;245:23;
246:4;248:8;251:20;
257:20;263:1,4;264:1
**Eyman-Browning (6)**
245:24;246:4;

248:13;249:13;251:25;
252:15
**Eyman-Special (1)**
249:8

**F**

**face (2)**
107:1;197:15
**facilitator (1)**
85:25
**facilitators (2)**
85:16,18
**facilities (35)**
23:2;30:3;45:14,18;
48:23;49:2,15;54:5,9,
12,20,23,25;55:3,15;
57:16,18;65:14;69:13;
102:12;103:24;104:14;
106:14;107:20;110:9;
136:2;146:21;152:2;
188:2;192:7,17;
226:10;260:5,6;275:25
**facility (49)**
16:16,25;22:15;23:2,
3;27:8;29:14,24;40:3,
8,16;45:4,9,16,18;47:1,
8;64:20;65:5;66:7;
68:24;70:24;71:5,7;
91:9;104:21,24;105:3;
135:19;163:16;164:5;
169:16;187:17;191:11,
19;193:5;194:18;
195:23;204:19;225:1,
8;228:24,24;232:16;
236:5;243:14;247:6;
295:12;296:22
**facing (1)**
229:5
**fact (24)**
42:8;49:11;54:11,19,
23;72:22;73:2;140:10;
143:16;154:6;176:7;
178:12;179:4;201:20;
202:6,12;226:8;
264:13;265:14;267:1;
274:15;275:14;279:15,
24
**factor (5)**
286:10,15,24;287:5,
5
**factors (7)**
27:9;167:22;190:2;
289:1,14,15;298:24
**facts (4)**
52:4;127:12;128:24;
135:16
**Fahrenheit (11)**
184:6,13,24;185:13,
17;188:4,9;190:8,24;
191:15;202:19
**fail (1)**
158:11

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

**failed (2)**
    201:10;291:7
**failing (1)**
    169:9;183:10
**fails (1)**
    220:18
**Failure (9)**
    166:18;167:3,16,24;
    283:8;286:2,22;287:3,
    8
**fair (33)**
    45:24;46:20;49:17;
    57:5,23;67:1,4,21,24;
    71:9,13;77:16;98:11,
    17;100:15;121:20;
    138:13;151:9;155:9,
    13,20;164:4;185:11;
    214:2;229:9;238:7;
    239:24;242:25;271:6,
    7;272:2;286:13;288:18
**faith (1)**
    298:9
**fall (8)**
    108:16;116:22;
    118:10;229:3;231:21;
    272:25;275:12;296:3
**falling (4)**
    228:12,19;274:23;
    276:13
**falls (5)**
    117:5;265:12;272:7;
    275:9;283:14
**false (1)**
    90:5
**falsification (2)**
    275:20;276:8
**falsifying (1)**
    276:10
**familiar (5)**
    76:5;113:21;193:4;
    253:7;264:9
**familiarity (1)**
    91:2
**family (2)**
    91:5;181:9
**Fancy (1)**
    155:2
**F-a-n-c-y (1)**
    155:2
**fans (1)**
    191:8
**FAPA (1)**
    7:6
**far (3)**
    13:20;14:8;47:24
**faster (1)**
    142:4
**fatalities (1)**
    192:23
**FATHI (321)**
    6:17,17;7:13,17;
    12:4;13:2;14:19;16:23;
    17:13,17;18:8,18,25;

19:6;20:22;21:5;23:14,
24;28:17,25;32:11,14,
17,20,23;34:9;35:16;
36:22;37:4,8,20;38:1;
39:5;48:3,7,9,11,19;
51:5,8,13,17,21,23;
52:15,22;53:8,10,19;
54:14;55:4,7,18;58:25;
59:20,25;60:16;61:1,
12,14,16,18,23;62:6,
13;64:14;65:17;66:6,
16;72:8,17;75:17;
78:22;79:4,8,11,15;
80:8;81:6,19;82:11;
83:9,14;84:10;85:4;
89:1;90:19;91:12,21;
92:1,9,11,19;93:9,12,
19;94:1,5;95:18,22,24;
102:2,19;105:24;
106:9;108:20;109:16;
110:1,14,20;112:4;
113:1,6;114:22;115:7;
116:17;117:3,19;
118:4;119:6,13;
123:10,21;124:4,8,11;
125:15,23;127:17,23;
128:3,8,17,21;129:1,
17,21,25;130:5,8,13,
17;132:24;134:15;
135:11,24;136:23;
137:20,23;141:18,23;
143:3,25;144:4,8;
146:13,22;147:25;
148:2;149:4,8,22;
152:3;153:4,22;
154:11;155:21;157:3;
158:4,14;159:13,24;
160:10,16,24;161:11;
162:5,10;163:8,12,23;
164:9,21;165:4,12,25;
166:5;167:2,16,24;
168:23;169:20;171:2;
176:13;177:24;179:4,
14,25;181:11,19;182:4,
20;183:4;184:5,12;
188:3,17;190:6,22;
191:3,22;192:1,10;
193:3;194:7;195:3,12,
19;197:3;198:14,20;
199:5,25;201:11;
202:5,16;205:2,10;
206:3,17;207:25;
208:24;209:4,10,22;
210:12;212:4;213:15;
216:17;217:1;218:2;
219:9;220:1,6,13;
222:23;223:3,6;224:2;
225:17;226:13;234:13;
246:19,23;247:17;
248:7,12,17,22;249:2,
7,12,16,20,24;250:10,
17,24;251:7,19,24;
252:4,9,14,19,25;

253:9,12,13,20;254:1,
10,19;255:17,22;
258:3;259:21;260:12;
262:25;263:25;264:9;
265:17;266:3,8;268:7,
14;269:8,18;271:9,24;
273:10;278:4,12;
279:15;280:4,11;
283:3;290:12,19;
291:1;292:10;293:21;
295:17,23;296:5;
297:12,20,23;299:2,6,
17
**fatigue (1)**
    114:11
**February (3)**
    159:15;160:2,5
**federal (9)**
    12:16;21:15,19;
    56:23;252:25;253:14,
    20;254:1;295:17
**feel (8)**
    12:17;17:7;30:9;
    33:18;141:9;180:11;
    181:6;240:17
**feeling (3)**
    283:25;284:4;288:1
**feet (1)**
    236:19
**fell (8)**
    169:7;284:20,24;
    285:20,22,23;289:21;
    290:10
**fellowship (2)**
    15:21;18:12
**felt (2)**
    142:19;233:7
**female (1)**
    233:25
**females (5)**
    164:3;233:6,9,17,23
**Fettig (2)**
    6:19,19
**few (3)**
    7:20;235:24;238:13
**fewer (1)**
    139:20
**field (4)**
    143:14,17,21;176:12
**figure (3)**
    229:20,22;231:9
**figured (1)**
    68:8
**file (2)**
    240:17;275:25
**filed (2)**
    25:25;158:15
**files (2)**
    45:6,7
**filing (1)**
    22:10
**filings (1)**
    161:15

**fill (5)**
    156:4;157:15,20;
    158:11,12
**filled (2)**
    156:7;157:12
**filled/refilled (1)**
    173:25
**filling (6)**
    123:14;156:11;
    157:7,21;158:7;264:16
**final (2)**
    212:8;255:16
**Finally (3)**
    8:20;46:21;288:19
**financial (6)**
    220:19;221:2,5,7,15,
    18
**find (21)**
    12:20;56:18;58:20;
    70:11;82:10;114:24;
    115:11;117:6,19;
    148:14;161:4;178:16;
    179:5;188:21;270:17,
    23,25;276:23;289:21;
    290:9;292:19
**finder (1)**
    143:16
**finding (7)**
    155:5;161:24;169:6;
    211:13,17;223:25;
    228:11
**findings (1)**
    207:20
**finds (1)**
    77:23
**fine (7)**
    13:19;106:9;119:17;
    229:23;242:3;261:5;
    297:2
**fines (3)**
    227:7,14,21
**fine-tooth (1)**
    88:21
**finish (8)**
    8:1,2;13:21;92:8;
    94:20;122:8;141:8;
    142:3
**finished (5)**
    39:22;94:10;126:21;
    153:24;279:11
**fired (2)**
    176:8,21
**firm (8)**
    6:9;24:25;73:11,12,
    13;87:9;154:20;227:2
**firmly (1)**
    29:15
**first (69)**
    6:16;7:7,24;9:25;
    10:14;15:6;23:10;
    24:18;26:2;29:12;
    34:19;41:18;50:4;57:3;
    60:6;61:25;73:19;76:1;

80:13;85:15;99:16;
101:9,16;105:20;
107:15,15;113:8;
120:11,19;124:13,16;
125:8;127:6,15;
129:12;140:20;142:7,
12;153:3;156:2,2;
162:15;166:25;172:4;
173:12;175:9;178:11,
20;187:16;206:23;
210:20;218:13;220:16;
221:11;229:14,18;
230:11;232:16;256:4;
257:5;258:12;261:7;
269:20;270:4;271:18;
277:19,19;281:20;
282:8
**firsthand (3)**
    77:14;111:20;201:19
**Fisher (2)**
    76:16,22
**five (12)**
    21:17;48:8;50:5;
    64:11,16;66:24;67:2;
    70:17;71:6;164:22;
    118:4;318:267:16
**fix (1)**
    228:14
**fixing (1)**
    236:15
**Fleming (5)**
    87:21;89:21,24;
    220:23;222:4
**flip (2)**
    204:17;231:20
**Florence (11)**
    43:15,16;72:2;
    104:14;192:11;235:21;
    239:6,10,20;252:5,10
**Florence-Central (5)**
    245:24;246:5;
    248:18;249:17;259:9
**Florence-Kasson (5)**
    245:25;246:5;
    248:23;249:21;259:13
**Florence-Lumley (1)**
    246:5
**Florida (1)**
    292:13
**focused (2)**
    57:15;102:9
**focusing (1)**
    72:18
**folder (1)**
    160:25
**folks (1)**
    236:9
**follow (10)**
    150:1;229:2;272:16;
    273:24;274:21;276:21;
    278:15;286:23;287:10;
    297:9
**followed (2)**

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 91 of 157

Parsons vs.                                           Confidential                    Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                          Subject to Protective Order                                              April 11, 2014

264:25;294:10
**following (9)**
  62:16;64:21;75:9;
  122:24;139:16;172:14;
  207:15;221:20;228:18
**follows (1)**
  7:10
**food (1)**
  126:5
**fooling (1)**
  130:25
**foot (1)**
  156:20
**force (6)**
  17:4;143:2;144:11,
  17,21;146:4
**forcing (1)**
  114:10
**Forensic (9)**
  6:12;11:13;12:8,10;
  15:13,21;16:11;33:7;
  102:15
**forget (6)**
  21:16;22:5;49:23;
  63:19;103:5;126:16
**Form (176)**
  12:1,23;14:16;16:20;
  17:6,14,19;18:16,22;
  19:4;20:16;32:7;35:7;
  38:24;51:2;54:13;55:1;
  58:21;59:16;64:12;
  65:6,21;66:10;72:5,15;
  78:17;79:24;81:3,18;
  82:7,16;83:11;84:6;
  85:2;88:8;90:12,21;
  101:19;102:5;105:18;
  108:5,23;109:18;
  110:11;111:15;112:13;
  113:4;114:16;115:3,
  16;116:25;117:8,22;
  118:12;123:7,14,18;
  124:2;132:20;134:12;
  135:3,15;136:11;
  143:22;146:9,15;
  149:1;151:22;153:1,
  19;154:3;155:17;
  157:24;158:9;159:2,
  18;160:8,13,21;161:1;
  162:2,8;163:4;164:6,
  16;165:7,16;166:3,22;
  167:13,20;168:22;
  169:11;175:18;178:25;
  179:7,16;181:5,17,18,
  24;182:8,23;183:14;
  184:9;188:10;189:21;
  190:10,25;191:17;
  192:16;194:10;198:8;
  199:20;201:24;204:5,
  13;205:5;207:23;
  208:20;209:2,7,20;
  211:20;213:11;216:14,
  21;217:19;219:8,24;
  225:14;226:11;234:9;

247:9;248:2,9,14,19,
  24;249:4,9,14,18,22;
  250:6,13,21;251:4,14,
  22;253:5,18;254:13,
  24;255:20;257:23;
  262:17;263:14;264:4;
  265:16;268:20;269:10;
  271:5,17;273:6;278:1;
  279:5,18;280:7;
  282:21;290:23;293:9;
  295:15,21;296:1;297:7
**formally (1)**
  15:24
**forming (6)**
  58:5;59:1;82:2;
  105:16;107:25;127:14
**formulating (4)**
  170:13;171:16;
  173:4;174:20
**for-profit (2)**
  106:11;107:2
**forth (1)**
  59:23
**Forum (1)**
  201:8
**forward (2)**
  23:21;154:20
**forwarded (1)**
  97:2
**found (5)**
  71:19;181:14;182:2;
  272:3;293:5
**foundation (24)**
  78:17;79:25;83:11;
  90:13;105:19;106:6;
  110:11;114:16;115:3,
  16;134:12;160:13;
  162:2,8;166:3;182:9;
  183:14;205:6;251:14,
  22;253:5,18;278:1;
  279:5
**four (5)**
  50:5,6;77:22;149:19;
  242:20
**fourth (2)**
  63:20;218:16
**fractures (1)**
  80:6
**frame (5)**
  25:17,20;57:21;
  238:13,22
**frames (1)**
  25:18
**frank (1)**
  99:2
**frankly (1)**
  295:9
**free (11)**
  16:16;141:9;185:4;
  191:2;208:5,5;271:20,
  20,25;275:11;293:18
**frequency (4)**
  204:1;208:4,8;

232:24
**frequent (1)**
  208:13
**frequently (10)**
  204:20;205:1,3,4,12,
  13;206:9,10,16;297:11
**Friday (1)**
  6:7
**front (1)**
  258:16
**frustrated (2)**
  243:11,19
**FTE (2)**
  99:19;146:25
**FTEs (1)**
  85:1
**fulfill (1)**
  177:5
**fulfilled (1)**
  176:20
**Fulks (7)**
  87:15;89:20;220:22;
  222:4;230:1;235:7,9
**F-u-l-k-s (2)**
  87:16;220:23
**Fulks's (1)**
  234:24
**full (4)**
  137:8;149:3;208:2;
  220:16
**full-time (12)**
  11:8,11,12;15:6;
  45:12;69:20;97:23;
  99:19;100:4;139:19,
  21;145:19
**fully (4)**
  91:6;92:4;116:14;
  141:10
**function (5)**
  156:9;163:13;190:5;
  208:14;225:20
**functioning (1)**
  215:6
**functions (7)**
  40:4;163:6,11,15,16,
  25;226:2
**fungal (1)**
  157:1
**fungus (1)**
  156:19
**funny (1)**
  147:24
**further (8)**
  72:2;107:18;111:10;
  137:7;143:17;210:4;
  217:14;275:23
**Furthermore (1)**
  142:24

## G

**gained (1)**
  58:5

**gambling (2)**
  240:16,20
**game (1)**
  103:17
**■■■■ (4)**
  198:15;199:5,6,14
**■■■■ (1)**
  199:2
**gang (1)**
  190:16
**gaps (1)**
  114:8
**gather (2)**
  45:5;174:16
**gave (3)**
  13:10;62:12;95:22
**gender (1)**
  233:25
**general (8)**
  15:11,12;240:15;
  258:4,13;292:22;
  294:8,9
**generally (7)**
  75:6;76:6,8;119:17;
  149:17;153:7;284:10
**generate (1)**
  297:9
**generated (7)**
  73:21;74:13;78:11;
  178:13;179:5,13,15
**gentleman (1)**
  289:9
**gets (6)**
  69:7;93:7,11,24;
  94:17;107:1
**Giardina (1)**
  73:11
**G-i-a-r-d-i-n-a (1)**
  73:11
**ginormous (1)**
  236:17
**given (7)**
  67:22;68:16;118:8;
  131:4;142:9;216:24;
  230:16
**gives (1)**
  107:3
**giving (3)**
  79:1;119:11;159:25
**glad (1)**
  245:6
**Glennie (1)**
  6:9
**goal (1)**
  169:17
**goals (1)**
  40:4
**goes (5)**
  10:13;44:12;116:17;
  128:22;266:17
**Good (5)**
  7:14,15;29:19,22;
  30:7,9;84:15;107:2;

126:7;140:8,9;205:17;
  230:25;244:9;298:9
**Governor's (1)**
  76:1
**graphic (1)**
  84:23
**graphs (1)**
  84:15
**great (1)**
  30:7
**greater (2)**
  258:5,14
**green (1)**
  221:22
**greeted (1)**
  29:21
**grossly (1)**
  107:17
**ground (2)**
  7:20;128:21
**group (8)**
  85:16,18,24,24;
  103:11;142:11;233:4;
  256:16
**groups (3)**
  85:25;239:15,15
**guess (8)**
  19:13;50:23;56:13;
  86:10,14;188:6;238:2;
  265:21
**guys (5)**
  88:12;94:8,9

## H

**H2O (1)**
  196:16
**habit (1)**
  281:11
**hairs (1)**
  99:4
**Haldane (1)**
  131:9
**half (13)**
  9:15;39:21;40:25;
  41:8,18,25;43:1;46:6;
  113:14;207:3;226:20;
  279:2,16
**halfway (9)**
  147:6;212:25;214:6;
  228:17;230:22;242:9;
  262:4;266:16;271:10
**hand (3)**
  10:22;63:25;215:4
**handed (1)**
  97:12
**handful (1)**
  50:4
**hands (2)**
  33:5;215:5
**handwritten (2)**
  47:10,20,22,25;
  48:20,21;69:14

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 92 of 157

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

**hanging (5)**
175:11;269:20;
274:3;281:17;289:11
**happen (6)**
38:10;42:11;57:20;
91:8;273:8,11
**happened (7)**
102:7;112:5,11;
182:17;202:1;229:1;
294:17
**happening (3)**
83:22;204:11;294:1
**happens (2)**
144:16;228:25
**happy (24)**
21:20;33:16;38:15;
39:3;40:1;56:7;67:16;
95:14;102:1,13;
103:15,17;109:1,24;
120:4;133:18,24;
148:13;149:16;176:3;
180:5;192:24;197:24;
269:13
**harassing (2)**
93:14,18
**hard (3)**
36:3,5;258:24
**harm (50)**
17:10;22:10;118:9,
16,18;165:15;181:4,
10;183:2;184:7,14,18,
24;185:1,2,13,17;
187:2,8,14;188:4,8;
191:16,19;192:6,9;
211:6,18;212:3,22;
213:9,14;219:20;
220:2,3,4;250:4,12,19;
251:2,8,12,20,25;
252:5,10,16,21;256:7;
291:8
**harmed (5)**
118:11;181:15;
182:2,6,21
**Harrison (8)**
204:18;243:2,5,13;
244:13,25;245:1,9
**hate (2)**
108:12;285:2
**head (8)**
8:4,4;173:20;216:16,
25;261:3;277:6,14
**headed (1)**
77:20
**heading (1)**
105:9
**Health (237)**
10:2,10,11;11:2;
16:7;17:10;18:20;19:2,
11,19,22;22:20,25;
23:7;25:4,5,24;26:7,7,
9,16,22;29:1,5;30:15;
31:22;32:5;33:2;34:4,
25;35:12,13,22;36:1,

11,17,18;40:2,13,18;
41:9;42:17;44:19;
46:10;47:5;54:8,18,18,
23;55:15;63:3,12;66:3,
21;69:9,12,15;73:5,17,
25;74:8,21;75:2,25;
76:5,9,19;77:1,7,22,23;
78:16;79:17;81:1,15;
82:5;83:6;84:4,12,20,
25;86:7,12,15,17;
87:14,24;88:7;89:17;
90:11;91:4,18;92:22;
98:20;104:18;105:16;
106:5;107:6,11;108:1,
15,18,22;110:3;113:2;
114:14,19;117:18;
118:20,23;121:22;
123:6;124:1;125:7,9;
131:1,11,22;132:15;
133:6;134:8,11,25;
135:1,14,21;136:2,10;
144:25;147:9,19;
148:21;156:20,22;
157:2,16;158:1,2,20;
159:21;160:19;161:21,
25;162:6,7,16;163:3,6,
9,13,16;164:5;176:5,
14;180:14;183:20;
185:3;189:6,16,19,23;
190:2,4,8,12,13,15,18;
198:7,15,19;199:7,11;
203:20;205:21;208:6;
216:1,6,12,18;220:21;
221:17;224:25;225:7,
13,21;226:6;227:12;
230:12,13;233:1,7,9;
234:20;236:9;238:17;
245:13;254:15;255:10;
256:17;257:9;265:22;
272:17;273:1,23;
275:25;277:12;280:21;
282:9,19,24;283:3,7,
16,24;284:1,1,1,14,24;
285:11,19;286:19;
287:11,17;288:4,5;
289:20;291:17;292:25;
293:13;295:24;296:7,
11,13,16,17
**healthcare (1)**
220:17
**healthy (3)**
118:22,24,25
**heard (2)**
19:16;23:13
**hearing (1)**
56:14
**heart (1)**
293:12
**heat (19)**
115:9,21;185:7,22;
186:12,14,14;194:6,8,
9;197:6,8,13,19;198:3;
199:24;201:22;202:9,

24
**heat-related (26)**
185:10;190:4;
192:23;193:18;195:2;
197:14;198:7,13,15,19;
199:3,7,11,17;200:1,
10,12,17,22;201:3,14,
16,20;202:1,7,12
**held (8)**
6:5;11:5;61:3;
100:20,21;101:10,17;
246:9
**Helena (2)**
162:11,23
**hello (3)**
29:19,21,21
**help (16)**
50:18;95:1,1;103:17,
18;111:22,23;120:23;
159:11;191:9;205:3,
13;206:9;207:18;
232:1;250:8
**helped (2)**
70:23;126:5
**helpful (6)**
20:2;31:21,24;32:4;
150:23;250:9
**helps (1)**
71:3
████████████ **(13)**
281:17;282:2;283:4,
17,23;285:13,18,20;
287:16;288:1,9,13;
289:25
████████████ **(5)**
286:1,3,16,24;287:6
**Henry (1)**
144:24
**hepatitis (1)**
76:17
**herein (1)**
7:7
**hey (1)**
88:12
**high (5)**
193:1;208:2;265:6,9,
18
**higher (3)**
208:8;236:9;238:8
**highly (2)**
98:19,22
**himself (2)**
61:7;175:11
**hindsight (2)**
68:19,21
**hired (1)**
177:3
**history (6)**
105:2;161:21;
190:17;215:16;281:10;
289:10
**hit (6)**
226:21;227:5,9,12,

15,20
**HIV (1)**
76:18
**HNR (2)**
288:2,5
**HNRs (4)**
158:20;207:18;
216:12;288:9
**hold (4)**
14:19;62:2;91:19;
106:10
**holding (2)**
253:2,15
**holes (1)**
172:20
**honest (2)**
88:15;280:23
**hopeful (1)**
299:11
**Hopefully (4)**
38:13;102:25;146:5;
298:25
**horrible (1)**
181:9
**hospital (10)**
35:6;156:5,14;244:3;
271:21,21,22,25;272:1;
273:3
**Hospitals (2)**
35:12,13
**hour (4)**
41:8,25;61:9;62:4
**hours (14)**
9:15,22;46:7;69:21;
98:2;114:11;246:2,10;
250:25;297:18;298:7,
9,16;299:8
**house (3)**
191:5;236:21;237:12
**housed (10)**
54:5;65:14;189:24;
190:14,19;191:18;
237:7;248:4;255:13;
265:6
**housing (13)**
40:17;43:9;164:2;
189:17;191:13;194:19;
237:10;245:19;254:16;
255:7,11,19;256:13
**Huge (3)**
239:21;241:3,6
**huh-uh (1)**
8:5
**human (8)**
29:14;151:3;152:8;
180:18;260:10;272:18;
283:12;286:18
**humans (2)**
152:9;180:16
**hundred (1)**
70:3
**hurt (1)**
230:14

15,20
**hydration (2)**
187:25;191:8
**hyperthermia (2)**
192:23;194:5
**hypothesize (3)**
26:6;86:25;87:4
**hypothetical (7)**
36:8;90:17,24;97:17;
205:6;227:19;293:2
**hypothetically (4)**
30:20;86:11;95:15;
192:6
**hypotheticals (1)**
241:25

# I

**ICE (2)**
29:13;169:16
**idea (1)**
74:17
**ideal (1)**
265:11
**ideally (2)**
35:23;116:8
**identifiable (2)**
115:1,14
**Identification (5)**
147:8,18;148:20;
286:5;289:18
**identified (11)**
40:12;63:7;67:22;
73:25;109:23;153:15;
154:18;233:5;234:11;
236:6;237:21
**identifies (2)**
154:14;214:14
**identify (13)**
6:14;37:14;38:2;
43:18;75:19;111:23;
115:20;116:23;153:12;
215:8,14;231:12;283:8
**ill (12)**
63:18;164:3;207:10;
208:6,17,25;209:13;
233:6;238:8;255:6;
256:13;296:14
**illicit (1)**
293:14
**illness (55)**
31:10,14;63:8,10,19;
73:4;74:1,9;145:18;
165:13;216:1;250:5,
12,20;251:3,9,13,17,
21;252:1,6,11,16,22;
253:3,16,23;254:4,12,
23;255:4,19;256:2,5;
257:8,14,18;290:21,22;
291:3,13,16,24,25;
292:6;294:5,9,14,22;
295:8,10,11,14,20,25
**illnesses (2)**
115:23;139:18

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 93 of 157
Parsons vs.                                    Confidential              Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                    Subject to Protective Order                              April 11, 2014

**immediately (3)**
244:10;245:5;269:2

**imminent (1)**
291:8

**impact (4)**
78:25;79:10;202:14;
264:2

**implement (2)**
193:12;232:3

**implemented (3)**
177:3;194:15;283:1

**implementing (1)**
195:1

**implications (1)**
7:23

**important (9)**
63:25;114:17;
156:23;158:1;211:23;
267:4;279:10,12;
289:13

**imposed (2)**
208:8;227:7

**impossible (2)**
169:18;215:10

**impressed (1)**
233:2

**improve (2)**
159:22;283:2

**improved (2)**
112:20;285:17

**improvements (2)**
111:4;112:24

**improving (1)**
180:15

**inability (2)**
177:17,20

**inaccurate (4)**
91:16;92:20;95:11;
167:11

**inadequate (4)**
90:20;114:5;117:4,
10

**inamtes (1)**
211:12

**i-n-a-m-t-e-s (1)**
211:12

**inappropriate (3)**
114:8;143:15;170:6

**Inc (3)**
61:1,16;75:25

**inches (2)**
207:14;229:13

**incident (6)**
180:10,12,14;181:1;
276:16,18

**include (14)**
49:22;85:4;123:1;
126:19;138:13;142:6,
24;143:13;155:19,22;
156:1,21;166:17;
221:22

**included (3)**
97:9;143:8;157:10

**includes (2)**
133:2;256:23

**including (13)**
19:10,22;59:22;
114:9;128:23;134:6;
138:15,17;163:25;
193:21;207:10;209:12;
298:19

**income (1)**
11:21

**incomplete (6)**
155:16;160:20;
169:24;170:3;205:6;
263:20

**inconsistent (3)**
169:25;170:8;179:5

**inconvenience (1)**
298:18

**incorrect (4)**
161:15;169:24;
170:2;262:16

**incorrectly (1)**
164:11

**increase (3)**
136:18;232:21;
234:12

**increased (8)**
232:10;234:13;
251:2,8,12,20;252:15,
21

**increasing (1)**
122:25

**indentation (1)**
150:6

**independent (1)**
177:18

**indicate (3)**
140:6,12;141:5

**indicated (7)**
64:7;89:19;98:21;
277:19;296:9,19;298:8

**indicates (5)**
155:4;172:15,17,22,
24

**indicating (1)**
172:20

**indication (1)**
140:2

**indifferent (1)**
238:20

**individual (10)**
19:10,23,23;55:17;
70:2;95:13;191:6;
264:24;274:21;275:10

**industry (1)**
105:14

**inertia (1)**
109:11

**Inevitably (1)**
169:15

**infection (2)**
157:1,1

**inference (1)**

118:17

**inflammatory (1)**
109:12

**informality (1)**
8:21

**information (21)**
21:2;33:19;51:6,19;
52:20;58:4,25;63:3,12;
66:4;86:24;90:6;
114:18;123:24;140:8;
167:11;176:1;250:8,
23;262:16;275:20

**infrastructure (1)**
27:11

**inheriting (1)**
112:24

**initial (6)**
59:15;64:18;65:4;
66:17;127:24;222:13

**initiatives (1)**
35:25

**injured (1)**
230:13

**injuries (1)**
80:7

**injury (11)**
114:24;115:2,9,11,
14;116:24;117:6,20;
201:22;202:9,24

**inmate (20)**
68:24;72:7,24;77:22;
124:24;132:12;164:11;
172:12;178:6,10;
207:16,17,19;211:6,19;
212:22;213:10;219:21;
220:2;274:14

**inmates (24)**
82:22;100:20,21;
101:10,17;125:2;
131:7;139:17;145:18;
171:9;174:16;207:5;
211:5,11;212:19;
217:9;218:21;219:1,
16;256:5,7,13;257:8;
274:12

**inmates' (1)**
211:3

**inmate's (1)**
296:25

**inpatient (4)**
102:9;156:5;163:17,
25

**In-Patient (1)**
114:9

**inquire (1)**
28:14

**inquiry (1)**
60:14

**insensitive (1)**
233:25

**insert (1)**
140:2

**insofar (2)**

127:10,10

**inspection (3)**
48:23;49:15;215:7

**inspections (1)**
49:2

**instances (1)**
27:1

**instead (2)**
236:16;237:24

**institution (1)**
72:3

**institutions (3)**
57:7,10,24

**instruct (8)**
50:25;51:9;59:17;
127:2,22;128:2,6,19

**instructed (4)**
30:25;52:13;59:24;
127:10

**instructing (5)**
20:22,24;21:2;61:20;
129:17

**instruction (8)**
53:14;127:9;129:16,
20,23;130:3,6,15

**instructions (2)**
52:24;73:7

**instructor (1)**
262:20

**instructs (1)**
8:14

**insufficient (3)**
107:17;111:12;
124:23

**insulted (2)**
180:11;181:6

**insurance (2)**
35:11;226:2

**intake (2)**
163:15;282:24

**intend (2)**
30:7;38:8

**interaction (1)**
258:22

**interactions (2)**
76:13;260:10

**interest (1)**
88:18

**interested (1)**
202:21

**interesting (1)**
85:13

**interface (2)**
56:7;105:22

**intermittent (1)**
118:8

**interpret (1)**
86:16

**interpretation (1)**
83:8

**interrupt (4)**
52:1;79:3,6;141:16

**interrupted (2)**

92:5,24

**interrupting (5)**
32:19;93:15;142:2,3;
268:10

**interruption (1)**
32:24

**intervene (2)**
190:3;201:10

**intervention (1)**
271:4

**interventions (2)**
291:9,10

**interview (10)**
31:1,4,6,23;32:6;
33:2;34:4;214:24;
215:16;245:14

**interviewed (1)**
32:2

**interviews (5)**
31:1,8;32:8,9,21

**intimately (1)**
253:7

**into (32)**
42:6;59:1;60:14;
82:2,2;105:16;107:24;
109:14;111:2;114:19;
125:12;128:22;131:21;
132:14;164:17;170:13;
171:15;173:4;174:20;
194:22;202:13;225:15;
228:14;230:6,12,15;
236:23;263:8;265:24;
277:15;282:14;298:24

**invade (1)**
52:7

**invades (2)**
51:3;52:20

**inventory (1)**
231:19

**investigative (1)**
274:2

**investigator (2)**
274:7;275:23

**invite (1)**
61:8

**invoice (1)**
14:12

**involved (19)**
19:17,25;20:6;23:4;
73:14;102:13,19;
103:7,11;112:16;
199:22;200:12,14;
203:11;220:22;254:16;
279:21;284:16;292:12

**involvement (1)**
279:22

**involves (1)**
151:11

**irregular (1)**
264:18

**irregularly (1)**
264:18

**irrelevant (1)**

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 94 of 157

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

32:10
**IRS (1)**
  11:19
**Island (5)**
  13:13,23,25;21:25;
  22:6
**isolated (2)**
  245:19;289:23
**isolation (20)**
  235:22;236:2,7;
  238:11,23;245:23;
  246:12,12,16,24;247:2,
  5,7,13,16,18,24;248:1,
  5;257:25
**issue (43)**
  16:12;19:11,22;
  28:11,23;52:11;56:2;
  140:23;142:25;143:10,
  11;144:22;145:2;
  146:6;151:23;156:22,
  25;183:12;184:2;
  186:5;189:7,14,16,16,
  20,23,23;190:9,13,15;
  191:10;197:15;200:20;
  201:7;208:15;243:17,
  18;244:21;273:2,2;
  276:12;292:9;295:11
**issued (1)**
  254:2
**issues (18)**
  91:4;109:23;118:3,
  23;135:22;182:17;
  192:19;197:14;233:7,
  9;255:14;282:10,19;
  285:17;292:14;293:4,
  13;298:23
**item (2)**
  172:11;282:8

**J**

**jail (10)**
  16:24;18:20;19:3;
  22:15;27:7;29:13,18;
  135:19;169:15;294:3
**jails (24)**
  23:1;106:14;118:3;
  137:17,24;139:17;
  140:23;143:4;145:16,
  17;147:7,15;150:11,
  19;151:2,6,8,11,21,24;
  152:1,4,11,16
**January (2)**
  102:24;160:5
**JD (1)**
  58:10
**Jeff (1)**
  144:23
**Jessica (3)**
  222:3;243:2;245:1
**job (17)**
  11:8,12;15:5,6;
  29:23;30:7;45:12;

69:20;85:19,22,23;
106:12;107:2;112:10,
18,22;157:15
**jobs (1)**
  11:11
**Joe (7)**
  107:14;113:8;
  162:13,24;169:21;
  171:4;175:4
**jogs (1)**
  50:12
**John (1)**
  233:14
**Joint (2)**
  137:10;146:18
**joking (1)**
  196:3
**Joseph (5)**
  6:2;7:6;37:9,12;
  299:19
**█████ (1)**
  53:4
**journal (2)**
  292:4,24
**judge (10)**
  14:4;16:13,18;38:11;
  39:2,6;52:10;56:11;
  83:5;143:16
**judgment (1)**
  205:20
**July (20)**
  77:10,12;120:11,19,
  23;121:9,21,24;
  122:19;124:13;125:10;
  133:9,10,14;171:24;
  172:2;179:11;219:2,
  20;244:15
**June (3)**
  179:11;219:2,20
**jurisdiction (1)**
  61:13
**jury (3)**
  16:13,18;83:5
**Justice (7)**
  201:9;254:18;
  262:11;294:7,12,20;
  295:9
**juvenile (11)**
  16:24;22:15;23:2;
  27:8;29:14;169:15;
  294:3,6,12,19;295:9
**juveniles (1)**
  294:9

**K**

**Kader (2)**
  6:21,21
**Karen (3)**
  113:8;169:22;175:5
**Kasson (2)**
  44:5,13
**K-a-s-s-o-n (1)**

44:6
**Kathleen (1)**
  6:25
**Kathy (7)**
  60:17;62:7;93:12,20;
  94:1;149:8;223:7
**keep (7)**
  10:22;12:19;42:12;
  50:23;53:17;188:1;
  255:11
**keeping (2)**
  264:20;298:6
**kept (2)**
  68:23;231:10
**key (5)**
  140:24;156:18;
  185:8;251:18;289:4
**kids (1)**
  295:9
**kind (35)**
  11:14,18;12:22;20:1,
  10,11;31:7;33:7;37:17;
  39:25;40:5;49:23;
  50:20;64:15;64:4;66:7;
  67:19;69:22;78:2;87:2;
  95:6;97:24;103:10;
  109:12;113:10;134:22;
  168:18;180:11,12;
  181:6;231:16;240:5,6;
  275:19;281:10
**kinds (1)**
  84:25
**knowing (2)**
  106:15;119:21;
  135:9;250:2,17
**knowledge (11)**
  28:4;58:9;77:4;
  111:20;201:19;221:12,
  25;292:2;293:5,20;
  294:2
**known (1)**
  44:5
**knows (1)**
  77:2
**Komrowski (2)**
  13:24,25
**K-o-m-r-o-w-s-k-i (1)**
  13:24

**L**

**labor (2)**
  29:23;30:8
**lack (1)**
  109:11
**lady (2)**
  126:4;244:3
**language (22)**
  62:17;81:17;137:13,
  16;139:2,16,24;140:11,
  17;141:1,3,6,9,21;
  142:7;147:12,20;
  148:3;181:19;211:7;

213:3;214:11
**lapses (1)**
  284:18
**laptop (2)**
  47:14;150:25
**large (1)**
  131:2
**last (28)**
  10:15;11:17;12:22;
  13:4;21:16,17;22:5;
  24:22;56:1;74:2,6,10;
  104:2,11,14;105:10;
  132:9;183:9;187:6;
  207:16;212:21;236:25;
  271:9;277:21;278:16,
  24;291:6,20
**late (1)**
  299:5
**later (4)**
  82:12;210:5;280:14,
  19
**latter (1)**
  156:13
**laugh (1)**
  147:25
**law (7)**
  6:5,22,24;15:17,19,
  20,23,24,24;21:15;
  24:25;87:9;137:4;
  154:20;205:9;227:2
**lawsuit (3)**
  18:19;19:1;201:1
**lawsuits (5)**
  77:23;203:3,6,9,11
**lawyer (2)**
  21:14;30:18
**lawyers (6)**
  13:4,7,9;127:23;
  128:3;129:25
**lay (2)**
  80:20;215:5
**layout (1)**
  236:5
**leader (3)**
  87:22;91:1;162:13
**leaders (1)**
  220:22
**leadership (8)**
  40:2,10;58:16;87:20;
  94:23;116:12;236:21;
  237:12
**leading (1)**
  242:17
**learn (3)**
  53:7;69:23;180:15
**learned (4)**
  59:1;69:5;194:25;
  235:13
**learning (1)**
  47:20
**least (7)**
  26:8;35:23;41:8,25;
  204:9;233:13;294:20

**leave (3)**
  95:5;243:22;272:20
**leaves (1)**
  243:23
**leaving (1)**
  94:16
**lecture (3)**
  56:1;76:15,18
**lectures (1)**
  182:13
**left (9)**
  46:8;47:3,3;99:12;
  181:17;230:22;243:16,
  20,22
**left-hand (1)**
  10:5
**legal (8)**
  6:11;16:4;33:15;
  36:9;83:7,8;84:18;
  97:10
**Lehman (2)**
  76:20,20
**L-e-h-m-a-n's (1)**
  76:21
**length (20)**
  246:15,23;247:7;
  248:1,7,12,17,22,25;
  249:1,2,7,10,12,16,20,
  24;250:2,18;258:20
**lengthy (2)**
  60:18;217:14
**less (6)**
  20:13;90:25;205:4,
  13;206:10;208:12
**less-than-ideal (1)**
  112:18
**lethal (1)**
  263:17
**letter (18)**
  53:16;97:22;99:21;
  104:12;110:13;113:7,
  25;142:6;169:21,23;
  171:5;175:4,6,8;178:4;
  179:14;182:6;183:22
**letterhead (1)**
  75:24
**letters (1)**
  103:23
**level (15)**
  79:21;85:23;86:2,2;
  95:13,13;105:12;
  107:16,18;109:15;
  110:7;111:12;296:7,
  16,20
**levels (5)**
  114:5,7,10;122:25;
  233:3
**Lewis (28)**
  44:25;45:16,22;
  46:14,18;62:20;63:15;
  64:15,20;65:1,5,20;
  66:8;67:3,14;70:18;
  104:2;120:12,19,24;

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 95 of 157

Parsons vs.                                    Confidential                   Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                  Subject to Protective Order                              April 11, 2014

122:19;171:20;172:2,
7;218:4,7,17;242:6
**liable (1)**
201:12
**license (2)**
14:23;15:2
**licensed (7)**
14:25;86:3,12;
163:17;164:1;205:20;
233:15
**licenses (1)**
14:20
**licensure (1)**
139:9
**life (1)**
240:17
**light (3)**
182:4;267:1;298:21
**likely (2)**
136:17;159:20
**limit (2)**
33:14;299:7
**limitations (2)**
36:5;163:21
**limited (7)**
15:3;74:5;107:19;
110:8;131:4;148:5;
149:17
**limiting (1)**
132:11
**line (15)**
32:9;83:19;96:11;
101:9,16;112:10;
122:8,20;181:21,23;
224:23;225:3,4;256:4;
257:5
**lines (4)**
81:13;121:17;134:5;
187:11
**list (32)**
21:10,13,13;62:19;
66:24;67:2,7;71:18,25;
72:1,2,18;95:25;96:2;
154:24;155:15,19,22;
156:1,4,7,15,16,24,24,
25;157:8,20,22;158:7,
12,12
**listed (23)**
39:25;45:6;65:9;
74:22;76:16;78:21;
85:15;86:18;132:22,
23;133:4,17,21;137:9;
145:10,23;149:14,20;
239:12;247:19;269:22;
292:17,18
**listen (8)**
9:2;32:3;33:23;89:9;
91:12;202:5;267:21;
268:7
**lists (7)**
21:18;148:7;156:4;
157:5,12,15;257:14
**literally (2)**

29:20;30:12
**literature (5)**
197:16,21;292:8,16;
293:6
**lithium (1)**
175:10
**litigated (2)**
200:21;201:8
**litigation (23)**
11:25;12:5,12,14;
14:6;22:10,21;23:4,7;
24:1,3;102:4;103:3;
186:20;194:4;199:22;
200:7,11,19,25;202:15;
245:16;281:7
**little (4)**
83:19;162:21;230:4;
236:16
**load (2)**
235:13,15
**located (2)**
6:9,13;118:3
**location (1)**
236:12
**locations (2)**
114:6;236:24
**Locator (2)**
10:16;43:20
**locums (3)**
97:20;99:21;100:5
**l-o-c-u-m-s (1)**
97:21
**log (2)**
42:5;68:23
**log-in/log-out (1)**
42:12
**logs (4)**
88:23,23;264:15;
266:13
**long (19)**
9:13;11:5;34:14;
41:17;42:24;44:25;
46:4,25;48:7;94:25;
105:3,12;164:21;
221:10;230:5;232:3;
265:9;274:10;279:24
**longer (3)**
108:8;148:10;204:23
**longest (1)**
168:9
**long-standing (1)**
156:7
**look (81)**
14:13,17;18:1,2;
25:14,16;26:1;43:21;
49:4;62:3;69:15;70:20;
77:12,20;85:13;95:12,
15;97:3,13;100:12;
101:23;102:1,8;107:3;
112:7;113:22;120:10;
121:5,13;125:13;
131:18;133:12,18,24;
136:23;137:25;147:14,

25;148:18;149:2;
150:2,10,24;152:10;
157:14;164:9;170:24;
171:2;175:24;176:3;
179:18,19;180:5;
183:5;192:20;195:11;
197:25;199:14;213:15;
215:18;222:10,21;
226:15;236:16,19;
244:22;246:18;255:22;
257:13;261:4;263:2,
17,19;266:16,22;
268:23;269:13;274:1;
277:15;279:19;287:2
**looked (18)**
9:11;25:13;26:3;
45:19;46:13,16;88:21,
22,23;99:17;126:8;
193:14;194:20;198:1,
10;215:1;223:11;290:7
**looking (36)**
25:10;40:18;43:19,
20;62:12;68:18;69:16;
74:25;75:10;80:13;
85:8;99:8,14,16;
100:25;101:2;102:12;
108:14;120:13,22;
132:24;138:19;139:1;
147:23;154:4,23;
162:19;197:22;199:8;
210:1;215:22;223:9;
228:13;237:3;242:23;
292:9
**looks (18)**
30:6;49:6;68:9;71:4;
76:22;96:25;97:10,17;
99:17;106:17;113:15,
21;163:1;179:10;
192:18;229:7;230:23;
263:23
**loose (2)**
160:25;161:9
**Lopes (4)**
14:3;23:21;102:7;
103:1
**L-o-p-e-s (1)**
14:3
**lost (1)**
112:18
**lot (21)**
9:1;33:8;35:21;
67:15;95:3,8;112:19;
119:25;135:5;157:17;
165:19;228:23;235:22;
236:2,7;238:11,23;
241:3;244:17;265:6;
279:22
**Love (2)**
24:25;243:25
**lower (2)**
10:5;226:20
**lowest (1)**
240:8

**Lumley (3)**
41:2,6;252:20
**lumping (1)**
20:4
**lunch (6)**
61:9,10;62:4,7;
122:6;125:15

**M**

**machine (1)**
47:17
**main (2)**
164:5;222:4
**mainly (1)**
40:16
**maintain (2)**
21:16;116:8
**maintained (1)**
191:7
**maintaining (1)**
95:10
**major (1)**
138:16
**makes (5)**
107:3,3;143:17;
205:25;255:15
**making (9)**
60:12;94:14;110:23,
25;115:8;157:6;
180:15;237:9;239:16
**male (1)**
199:5
**malpractice (5)**
19:15;20:7;118:15;
176:2;289:24
**man (1)**
22:7
**manage (1)**
123:3
**Managed (4)**
11:3;201:9;226:3;
277:11
**Management (9)**
41:2,6,21;246:1;
249:3,8,25;252:20;
259:18
**mandate (1)**
274:9
**maneuvering (1)**
33:15
**manner (6)**
173:25;187:7;
230:16;264:18;268:9;
282:25
**Manual (5)**
10:11,12;29:23;30:8;
296:12
**many (61)**
18:18,25;19:24;20:5,
7;21:5,5;22:19;23:6;
27:1,10;34:2;35:24;
36:1;50:2;55:24;66:12,

21;71:15;85:8,9;107:9;
112:16;113:23;116:13;
119:4;121:6;127:19,
21;129:14;130:5;
154:9;159:22;168:7,
13,23;171:9;211:3,5,
11;212:4,19;217:12;
219:1,19,19;221:1,4;
222:8,14;228:5;
260:25;261:6,20;
262:25;263:10;266:20;
277:3;284:2;285:2;
289:16
**MAR (10)**
159:10,15;160:2,5;
172:20;178:12;179:4,
12,15;276:2
**March (30)**
25:25;26:10,14,18,
24;27:4,16;37:12;38:6;
46:23,24;47:6;68:3;
108:4;121:18,23;
129:6,8;130:1;170:20;
175:1;212:21;244:18;
266:10;274:2;276:2;
277:20,22;278:13,17
**mark (9)**
36:22;73:10;87:21;
154:13;170:25;210:10;
220:23;266:3;275:13
**marked (9)**
36:23;37:5;48:4,16;
75:15;95:19;137:21;
266:5;274:14
**marks (4)**
230:4;245:6,7;262:9
**MARs (12)**
158:23;159:1,3,4,6;
160:10;172:15,17,22,
24;179:3,10
**_____ (3)**
193:4;21;196:9
**Martin (2)**
173:19,21
**Martinez (1)**
243:22
**Master (3)**
14:3;24:5;102:3
**Master's (2)**
86:2,11
**matching (1)**
170:4
**material (1)**
166:6
**materials (5)**
9:12;113:24;167:11;
189:1;223:11
**matter (1)**
6:3
**Matthew (3)**
14:3;23:21;102:7
**maximize (1)**
45:11

Case 2:12-cv-00601-ROS Document 1480-1 Filed 05/26/15 Page 96 of 157

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

**maximum (5)**
100:20,21;101:11,
17;139:22
**may (32)**
7:3;8:11;10:19,21;
28:3;38:11;94:25;
95:25;96:7,11,21;
98:12;99:24;107:20;
110:9;127:2;133:10;
148:5;157:20;158:11;
160:22;178:23;179:11;
185:15,19;251:16,18,
18;281:17;287:18;
294:23;298:22
**maybe (11)**
11:6;50:5,6;58:14;
76:18;88:22;101:5;
102:17;126:23;151:1;
163:18
**MD (3)**
7:6;37:10,12
**MD/PhD (1)**
244:4
**mean (60)**
9:18;16:22;17:16,21,
21;24:11;33:14;34:14;
38:9;50:4;57:14;58:23;
59:21;74:7;85:24;
86:16,25;88:10;90:4,
14;97:16;98:24;100:7;
103:15;105:21;106:16;
108:12;109:17;119:24;
120:8;121:5;144:16;
150:21;151:16;165:22;
181:7;214:25;240:3;
241:10,24;246:15,23;
247:7;248:1,7,12,17,
22;249:2;250:3,17;
262:18;263:17;270:18;
271:23,24;279:6;
281:23;284:16;285:1
**meaningful (1)**
260:10
**means (12)**
96:22;117:21;
129:20;157:10;229:15,
19;236:23;258:5,14;
264:18;267:5,13
**meant (4)**
189:10;230:8;
242:18;299:3
**measure (1)**
219:4
**measured (1)**
187:7
**measures (3)**
188:13;192:8;195:1
**mechanisms (1)**
291:21
**media (2)**
80:20;161:9
**median (7)**
249:7,12,16,20,24;

250:3,17
**Medicaid (1)**
35:11
**Medical (110)**
10:1;11:2;14:20,23;
15:2,5;16:14;17:9,10,
23;18:11;19:14,19;
20:7;33:20;55:14,18,
20,22,23,25;56:4,5,6;
67:7,12,22;68:5;69:2;
72:7,24;80:7,16;99:13;
100:22;101:1,6;
111:22;112:1,2;114:8;
115:22;117:14,15;
118:14,22;119:2;
123:1,4;132:10,12;
135:20;142:17,20;
152:23,24;153:8,11,13,
17;154:2,16;155:14;
156:5,24;158:14,18,22;
159:11,22,25;160:6,18,
24;161:11,22;163:15,
15;164:11,15;168:3;
169:1;175:24;180:23;
190:12;193:14;194:4;
196:9;198:10;200:5,
14;205:20;212:1;
221:22;227:12;229:2;
232:1;256:19;268:23;
275:25;276:4,10,12;
277:10;289:24;290:8;
291:15;292:7;293:6,12
**medical-legal (2)**
279:22;281:6
**Medicare (1)**
35:11
**medication (88)**
115:9;116:21;117:4;
118:9;133:6;139:4,18,
22;145:19;152:17;
158:23;159:7;165:5,
14,21,22;166:1,19;
167:4,17,25;168:5,11,
20;169:7,10,18,25;
170:3,6,9,14,19;
171:17;172:21;173:5,
8;174:2,10,21,24;
175:11,16;176:6;
177:16,19,25;178:7,11,
15,24;182:7,21;183:11,
18,19;184:8,19,25;
185:14,18,21,23;
188:15;189:18;190:7,
23;191:14;193:1,8,15,
19;203:22;207:21;
211:14;213:20;214:9;
227:24;228:11;231:6,
10;274:10,11,13,15;
275:2;276:1;290:8
**medications (50)**
111:23,24;112:2;
147:1;152:20;159:5,
12;167:6,6,7;168:13,

14,24;169:1,1,2,5,14;
172:13;173:24;174:17;
175:21;177:17;181:13;
182:11,15;184:1,1,15;
185:6,8,9;187:3,15;
188:5;194:2;202:18;
203:15,18;204:4;
208:17,25;211:3;
229:3;231:10,14,21,25;
275:14,14
**medicine (4)**
31:18;142:18;205:9;
281:8
**medicines (1)**
175:22
**meds (12)**
171:10;207:6,17,19;
228:18;231:13,14,17,
18,20;232:24;274:16
**meet (17)**
9:13;26:12;27:14;
35:23;40:10;75:8;84:8;
107:17;124:23;131:7;
169:18;220:18;225:23;
275:7;283:4;284:7,14
**Meeting (7)**
75:25;136:20;
176:19;227:17;229:24;
245:1,14
**meetings (1)**
76:20
**meets (11)**
36:12,19;81:16;
82:22;165:10;173:8;
225:21;260:23;279:25;
283:17;285:12
**member (2)**
63:5;256:18
**members (1)**
222:3
**membership (2)**
256:16,24
**memo (6)**
107:14;111:6;
112:14;162:11,23;
171:3
**memorandum (2)**
77:13;111:9
**memory (3)**
14:14;70:7;71:4
**men (1)**
240:8
**Mendel (1)**
56:5
**Mental (199)**
10:1,10;11:1;16:7;
18:20;19:2,10,19,22;
22:19;23:7;25:4,4,24;
26:7,9,16,22;29:1,5;
30:15;31:10,14,22;
32:5;33:2;34:4,25;
35:12;36:11,18;47:23;
54:8,18,23;55:15;63:8,

14,24;169:1,1,2,5,14;
172:13;173:24;174:17;
175:21;177:17;181:13;
182:11,15;184:1,1,15;
185:6,8,9;187:3,15;
188:5;194:2;202:18;
203:15,18;204:4;
208:17,25;211:3;
229:3;231:10,14,21,25;
275:14,14
**medicine (4)**
31:18;142:18;205:9;
281:8
**medicines (1)**
175:22
**meds (12)**
171:10;207:6,17,19;
228:18;231:13,14,17,
18,20;232:24;274:16
**meet (17)**
9:13;26:12;27:14;
35:23;40:10;75:8;84:8;
107:17;124:23;131:7;
169:18;220:18;225:23;
275:7;283:4;284:7,14
**Meeting (7)**
75:25;136:20;
176:19;227:17;229:24;
245:1,14
**meetings (1)**
76:20
**meets (11)**
36:12,19;81:16;
82:22;165:10;173:8;
225:21;260:23;279:25;
283:17;285:12
**member (2)**
63:5;256:18
**members (1)**
222:3
**membership (2)**
256:16,24
**memo (6)**
107:14;111:6;
112:14;162:11,23;
171:3
**memorandum (2)**
77:13;111:9
**memory (3)**
14:14;70:7;71:4
**men (1)**
240:8
**Mendel (1)**
56:5
**Mental (199)**
10:1,10;11:1;16:7;
18:20;19:2,10,19,22;
22:19;23:7;25:4,4,24;
26:7,9,16,22;29:1,5;
30:15;31:10,14,22;
32:5;33:2;34:4,25;
35:12;36:11,18;47:23;
54:8,18,23;55:15;63:8,

10,18;73:4,5,25;74:1,8,
9,21;75:1;78:16;79:16;
81:1,15;82:5;84:4,12,
20,25;86:7,12,15,16;
87:14,24;88:7;89:17;
90:11;91:18;92:22;
98:20;101:5;104:18;
106:5;107:11;108:1,
22;110:2;113:2;
114:14,19;115:23;
118:22;123:6;124:1;
125:6,9;130:25;
131:11,22;132:15;
133:6;134:8,11,25;
135:1,14,21;136:10;
139:17;145:18;147:9,
18;148:21;158:19;
160:19;161:25;162:7,
16;163:3,6,9,13,16;
164:5;165:13;176:14;
208:6;215:25;216:1,6,
12,18;224:25;225:7,
13;227:12;233:1,6,9;
234:20;236:9;238:17;
245:13;250:5,12,20;
251:3,9,13,17,21;
252:1,6,11,16,22;
253:3,16,23;254:4,12,
23;255:4,10,19;256:2,
5;257:8,9,14,18;282:9,
19,23;283:3,7,16;
284:1,1,14,23;285:11,
19;286:19;287:17;
288:4,5;289:20;
290:20;291:3,13,16,17,
24;292:6;294:5,9,14,
21;295:8,10,11,14,20,
24,25;296:7,11,13,16,
16
**mentally (12)**
63:18;164:3;207:10;
208:6,16,25;209:12;
233:6;238:8;255:6;
256:13;296:14
**mention (2)**
131:16;137:2
**mentioned (6)**
16:3;44:15;57:18;
115:21;238:1;260:7
**merely (1)**
60:12
**message (1)**
254:7
**met (26)**
7:16;9:12;26:10,17,
20,23;27:1,21;36:14;
40:1;75:2,3,12;110:3;
113:2;115:2,15;153:9;
158:3;170:19;174:25;
175:17;176:15;177:22,
25;233:11
**methamphetamines (1)**
293:15

**method (1)**
142:19
**methodology (6)**
17:18;18:1,15;63:17;
69:25;73:3
**metric (1)**
85:12
**Metzner (1)**
144:23
**MGAR (24)**
119:14,22;120:3,12,
14;121:2,3;124:14;
130:19;131:19;132:4,
22;133:15;171:20;
173:11;206:21;210:13,
18;212:10;217:2;
218:3,7;219:10;221:22
**MGARs (4)**
131:17;132:19;
133:2;169:3
**MH (8)**
203:24,25;230:23;
234:17,20,22;235:1;
241:18
**MH-3 (2)**
204:7;233:3
**MH-3s (1)**
238:8
**MH-4 (1)**
204:7
**MH-5 (1)**
204:8
**Michael (2)**
13:24,25
**mid (3)**
92:14,16,16
**middle (4)**
140:11;141:4;
188:23;243:7
**Mid-level (5)**
207:7;217:10;
218:22;219:17;256:23
**mid-levels (1)**
256:21
**might (5)**
49:12;87:2;97:17;
255:6;267:22
**Mike (2)**
73:10;155:2
**mind (3)**
47:23;263:12
**mine (6)**
162:18;232:7,14;
234:23,24;241:22
**Mine's (1)**
218:16
**minimally (2)**
296:8,18
**minimize (1)**
141:23
**minimizes (1)**
298:18
**minimum (5)**

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 97 of 157

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

207:7;264:13,22;
265:4;296:24
**minute (1)**
264:5;271:11;272:10
**minutes (35)**
42:13;48:8;122:9;
164:22;229:12;230:5,
5,8,17;264:14,19,19,
22;265:4,11,12,15,22;
266:2,20,21,24;267:3,
16,16,16,25;268:19,19;
269:3,3,4,5;297:18;
298:7
**misdiagnosed (1)**
165:20
**misfiled (5)**
155:15;160:20;
161:5,8,14
**misinformation (2)**
46:15;237:20
**misleading (1)**
90:5
**misquoted (1)**
149:15
**missed (3)**
169:6;182:15;183:25
**misses (1)**
263:19
**missing (16)**
155:15;158:23;
159:1,4,10,15,20;
160:2,5,11,19;165:22;
166:1;181:13;182:10,
21
**mission (1)**
40:5
**misstate (1)**
237:20
**Misstates (7)**
82:16;108:23;
181:24,25;193:23;
226:11;268:1
**misstating (2)**
268:11,12
**mistake (2)**
150:22;152:7
**mistaken (9)**
23:9;24:18;26:3;
45:15;46:13;72:21;
74:1;102:23;221:10
**mistakes (2)**
151:3;152:9
**misters (1)**
195:19
**misting (13)**
187:25;193:12;
194:15,20;195:4,7,8;
196:5,5,12,15,21,24
**misunderstood (1)**
110:21
**mitigate (1)**
188:16
**model (2)**

136:17,19
**modify (1)**
127:24
**mom (1)**
10:9
**moment (4)**
132:8;153:5;154:11;
287:25
**Monday (3)**
56:1;298:15;299:10
**monetary (3)**
227:6,13,20
**money (2)**
109:8;226:4
**monitor (12)**
58:11;111:18;
123:15;125:5;131:10;
134:25;162:12;171:4;
173:4,22;190:3;234:2
**monitored (9)**
152:18;188:18,24;
189:3,9,12;191:6;
192:11,14
**monitoring (14)**
102:20;117:18;
162:13;176:8;203:15,
18;207:21;211:15;
213:20;220:15;221:22;
225:12,18;285:6
**monitors (2)**
109:7;123:22
**month (11)**
11:6;74:2,6,10;75:9;
84:25;85:1;125:12;
159:4,5;236:25
**Monthly (2)**
96:20;221:22
**months (10)**
77:22;89:18;98:21;
207:8;208:4,7,12;
217:15,22;296:25
**moonlight (2)**
86:9;97:24
**moore (1)**
156:5
**mopping (1)**
30:11
**morbidity (2)**
175:25;263:24
**more (86)**
9:4,4,20:12;29:25;
50:5;53:7;57:15;60:2;
63:23;66:1;67:16;
68:20;69:24;78:12;
86:1;89:7;98:1,2;
102:9,14;106:15;
107:5;119:11;124:8;
135:4,20;136:2,19,21;
146:6;156:5;163:18;
167:9;171:10;180:25;
183:22,24;185:7;
194:24;204:20;205:1,
2,12;206:8,15;212:1;

217:16;231:18,19,24;
233:6,6,8,18,20,23;
234:1,7,8;236:12,13,
23;239:14,19;242:18;
244:6;245:7,12,13,16;
246:2,10;250:25;
260:5;263:16;264:7;
271:4;277:24;278:5;
279:2,15,22;281:5;
296:9,18;297:19
**Moreover (4)**
139:3,5,6,9
**morning (8)**
7:14,15;29:19,22;
39:22;41:19;46:8;47:3
**mortality (5)**
263:24;269:19,25;
282:1;286:1
**most (13)**
8:12;33:6;40:15;
47:2;64:7;89:22,23;
156:2;158:1;225:25;
226:4;285:14;295:9
**motion (2)**
127:3;298:21
**motoric (1)**
215:6
**mouth (3)**
29:8;90:23;93:4
**Move (6)**
52:13;74:18;210:8;
231:21;236:23;237:24
**moved (3)**
58:15;228:23;240:18
**movement (1)**
228:23
**moves (1)**
159:21
**moving (1)**
229:4
**MTU (2)**
132:9,11
**much (26)**
9:4,4,16;11:17;
12:21;13:3,19;14:7;
39:18;40:24;41:5,23;
42:3;45:3;77:1;94:2;
107:5;119:11;141:10,
13;167:9;221:13;
236:17;258:22,22;
297:19
**Mullenix (4)**
113:8;169:22;175:5;
178:5
**multiple (16)**
27:9;73:14;114:6,6;
163:6,11,24;167:5,22;
182:16;190:1,17;
192:23;209:23;215:19;
286:9
**multiple-page (1)**
181:22
██████████ **(5)**

274:3,14;277:18,20;
278:11
██████████ **(1)**
275:24
**murals (1)**
30:5
**must (4)**
146:1;157:17;
173:24;280:25
**myself (28)**
17:21;18:5;42:10;
49:20,22;50:15,18,22;
53:6;68:17,20;103:10;
126:15;186:24;195:21,
24;196:8,15;226:25;
228:3;230:11;231:5;
232:15,22;233:2;
240:12;242:16;243:15

## N

**name (15)**
7:16;13:14;22:1,4,5;
23:21;24:2,22;59:7,8;
61:15;68:23;76:21;
229:25;230:1
**named (15)**
30:19;33:10,16;
50:10,11;65:12,14;
66:21;67:11;71:14;
72:9;154:7;203:2;
266:9,10
**names (3)**
44:11;74:16;154:25
**narrowly (1)**
61:4
**nation (1)**
233:5
**National (11)**
6:17,20;22:25;56:2;
69:11;137:9;140:22;
145:11,23;256:17;
264:20
**nationally (2)**
107:1;242:1
**nationwide (1)**
225:19
**nature (3)**
19:24;22:2;161:9
**NCCHC (21)**
55:2;63:24;69:7,11,
24;74:25;103:23;
104:6,22,25;105:1;
111:5,6;126:17;
137:10;145:24;146:18,
20;192:17,18;270:13
**near (3)**
258:12;263:16,19
**necessarily (5)**
23:3;151:16;247:15;
262:14;279:11
**necessary (1)**
267:22

**necessity (1)**
205:18
**need (64)**
8:3,13,18;38:23;
48:7;50:12;53:8;55:4;
56:25;70:8;78:4,18;
79:13;80:17;83:14;
91:12;97:3;101:6;
124:25;127:2;134:11,
22;136:13,18,20;
141:10;144:13;145:1;
147:25;154:13;157:12;
163:20;164:21;177:8;
179:1,17;189:6,10;
191:22;194:24;198:2;
199:14;201:11;204:5;
205:22;208:17,23;
209:1;210:4;222:23;
232:10;233:7,23;
234:11;242:10;245:21;
253:6;254:14;263:18;
272:24;289:17;298:22;
299:8,12
**needed (7)**
51:1;135:2;204:21;
232:20;233:20;234:7;
242:20
**needing (1)**
125:1
**needs (16)**
100:22;101:1,5;
109:14;123:4;124:24;
131:7;134:7;135:13;
136:10;149:4,8;158:2;
222:21;283:24;287:11
**needy (2)**
234:1;240:3
**negative (2)**
114:20;290:2
**neglected (1)**
131:15
**Neil (3)**
76:16,16,22
**neurologic (1)**
215:19
**Neurology (1)**
15:14
**nevertheless (2)**
82:4;173:7
**new (4)**
93:23;97:3;124:6;
296:20
**news (1)**
108:14
**next (17)**
36:22;48:3;72:17;
75:9,14;80:24;92:9;
93:1,2;95:18;106:2;
122:20;137:20;245:18;
257:13;266:3;287:14
**nice (3)**
57:14;85:22;126:4,6;
138:23

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 98 of 157

Parsons vs.                          Confidential                    Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                          Subject to Protective Order                                    April 11, 2014

**Nicole (15)**
58:7,8;81:8;87:18;
88:17;134:1;171:9;
207:4;211:2;212:18;
213:5;217:8;224:21;
227:3;280:16
**nine-month (1)**
244:17
**nod (1)**
29:20
**nods (1)**
8:3
**non (4)**
172:15,18,23,24
**non-compliance (1)**
183:12
**None (4)**
137:8;145:10,23;
224:3
**non-existence (2)**
146:24;161:22
**non-existent (1)**
248:6
**non-formulary (1)**
170:8
**non-verbal (1)**
291:10
**noon (2)**
39:22;41:19
**nor (4)**
15:25;137:9;142:23;
145:24
**North (1)**
6:6
**Northern (2)**
61:2,14
**Nos (2)**
75:19;119:4
**notation (1)**
198:12
**note (23)**
49:22;50:11,21;53:3;
195:21,24;196:8,15;
207:3;211:1,23;
212:17;213:5;217:7;
228:3,7,22;231:5;
237:11;242:16;243:15;
281:9;289:10
**noted (1)**
209:11
**notes (68)**
33:11;42:9;44:1;
45:1;47:10,20,22,23;
48:1,20,21,23;49:1,4,8,
14,18,20;50:2,18,23;
51:1,9,14;52:17;53:5,
20;68:6,10,11,13,16,
18,20,25;69:3,14,25;
70:5,10,11;71:11;
126:12,13,15,17,23;
161:21;169:24;170:2,
5;195:21;207:9;
217:15;226:15,25;

235:14,21;236:25;
237:1,9,21;239:2;
242:6,24;243:1;
244:24;262:20
**notice (5)**
9:23;49:5;142:7,14;
244:25
**noticed (2)**
50:14;276:1
**noticing (1)**
6:15
**noting (1)**
131:2
**notions (1)**
209:10
**November (13)**
39:16;40:22;41:15;
42:21;76:1;104:11;
229:21;237:1,4,5,6;
238:4;269:19
**number (53)**
10:4,7,17;11:20;
13:10;14:18;20:4,9;
21:12;37:1;42:4;45:6;
67:6;68:24;70:14;87:3,
13;88:6,6;89:17;90:25;
95:11;113:11;120:19;
124:16;131:4;132:5;
136:15;142:11,14,14;
153:16;154:14;166:10,
13;172:2;201:25;
207:9;209:11;212:6,8;
218:17;226:17;239:21;
241:3,7;244:11;
255:25;257:15;261:15,
19;269:21;277:6
**numbers (40)**
84:24,25;85:1,4;
86:18,20,22,25;87:8,
13;88:5,11;89:5,13,14;
90:2,8,25;91:1,16;
92:20;94:22;95:16;
98:9,12;99:2,25;100:6,
9,13;101:24;113:14;
142:8,22;143:7;
162:13,18;166:9;
234:12,14
**numerous (1)**
260:8
**nurse (12)**
159:7;232:11;
233:19,21;256:21;
274:8,12,17;275:1,10,
13,20
**nurses (10)**
95:5;111:23;117:12;
226:6;233:8,24;234:2;
274:8;275:10;276:21
**nurse's (1)**
275:18
**nursing (10)**
91:10;95:4;123:2;
125:2;135:20;163:15;

274:21,22,22;275:8,9,
19;276:8,11,22,24,25;
291:14

**O**

**oath (1)**
8:22
**Object (54)**
14:16;20:16;32:7;
35:7;38:24;51:2;58:21;
59:16;65:6;72:5;81:18;
82:16;85:2;90:12,21;
105:18;108:23;112:13;
116:25;117:8,22;
123:18;132:20;135:3,
15;143:22;146:9;
149:1;157:24;159:2;
166:22;167:13;168:22;
169:11;179:7;181:5,
18,24;182:8;188:10;
190:10;191:17;194:10;
199:20;201:24;204:13;
205:5;208:20;216:14;
217:19;226:11;262:17;
264:4;268:20
**objecting (1)**
103:6
**Objection (17)**
34:6;52:12;79:24;
88:8;156:17;193:23;
201:5;252:2,7,12,17,
23;253:24;254:5;
268:1;278:8;292:1
**objections (7)**
8:12;33:15;129:15;
141:24;202:10;205:15;
206:11
**obligations (1)**
177:5
**observation (3)**
215:16;266:9;267:14
**observations (1)**
47:9
**observe (5)**
40:17;64:3;196:5;
214:7;215:11
**observed (4)**
40:12;196:1;214:14;
236:13
**obtained (2)**
66:3;97:9
**obviously (5)**
11:24;109:20;181:7;
244:3;299:5
**OC (4)**
229:13;230:9,17;
291:5
**occasional (1)**
11:12
**occasionally (1)**
29:22
**occasions (1)**

158:11
**occupation (1)**
10:24
**occur (1)**
247:2
**occurred (5)**
28:6;72:22;106:25;
235:18;261:20
**October (6)**
10:2;61:3;229:8;
261:10,10,12
**odd (1)**
87:2
**off (54)**
37:20,21;45:13;
48:12;49:6,10,12;
60:19,20;92:5;113:10,
13;117:14;125:17;
162:19,21;164:23;
166:9,11;169:7;
173:20;195:12,13;
198:20,21;216:16,25;
220:7;222:16,17,20,22,
23;223:1,2,3,12,17;
227:25;228:12,19;
229:3;231:22;246:19;
247:19;259:22;261:3;
277:6,14;287:16;
290:13;297:23,24;
299:19
**offend (1)**
240:7
**offender (11)**
29:18;70:1;183:20;
267:18;269:7,12,15;
284:3;291:13,14;296:7
**offenders (32)**
30:4;63:7,10,10,18;
70:3;111:24;118:2;
159:12;163:20;169:4,
19;180:19;185:4;
188:14;196:2;201:7;
203:18;204:20;211:24;
228:23;234:1;236:20;
239:7;240:3,5,7;241:4;
248:4;251:17;258:23;
296:14
**offense (2)**
275:4;276:10
**offer (3)**
34:25;56:9,19
**offered (3)**
175:21;275:15;
282:15,18;283:21
**offered/provided (1)**
282:9
**offering (2)**
56:24;108:21
**Office (3)**
76:1;96:21;276:1
**officer (13)**
17:2;86:8;267:6,14,
15,17;269:2,5;272:16,

23;273:20,24;291:12
**officers (6)**
185:3;211:24;
264:16,25;265:20;
291:11
**offices (2)**
6:5;156:3
**often (15)**
70:6;111:22;203:21;
204:2;205:22;215:17;
217:21,23,25,25;219:2;
265:24;296:5,9,18
**old (1)**
293:1
**omit (5)**
139:1,12;140:11,17;
141:6
**omitted (11)**
138:5,9,12;139:15;
140:6;141:4,9,20;
157:4,6,9
**omitting (4)**
138:14,17;140:3,18
**once (8)**
42:8;94:17;107:1;
132:11;201:15;204:9;
240:19;264:22
**one (78)**
7:24;13:23;14:12;
15:21;20:4;30:3;37:4;
38:17;39:2;43:11,12;
45:14,18,20;46:12,19;
56:10,25;75:8;80:18;
83:19;93:2,2,2,23;
94:13;120:21;124:8;
126:23;131:3;132:8;
139:19;142:2,21;
143:1,5,7,10;144:1,2,3,
9,14,15,21;145:5,19;
146:19,25;154:11;
163:18;181:21;194:17;
196:2;200:13;217:15;
222:3;228:10;229:4;
233:13;236:10,13;
263:15,16,20;274:20;
276:20;277:9;283:11;
285:16,18;286:9;
289:11,11,25;290:9;
292:14,24
**one-page (1)**
9:25
**ones (3)**
67:13;134:21;195:6
**one's (1)**
166:1
**ongoing (5)**
69:10;117:17;191:10
**only (36)**
8:14,17;9:2;14:23;
19:6;17;21:3;26:25;
27:21;33:8;44:12;
46:19;47:19,21,25;
68:11;70:11;71:11;

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 99 of 157

Parsons vs.                         Confidential              Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                          Subject to Protective Order                                    April 11, 2014

85:5;87:19;90:20;93:9;
94:13;100:20;133:7;
134:17;152:21;189:6;
226:1;271:20;281:7;
285:18;290:3;291:7,7;
293:5
**onsite (2)**
131:3;231:24
**on-site (1)**
114:8
**onto (6)**
62:20;64:14;103:22;
139:3;174:14;257:13
**open (1)**
236:20
**opened (1)**
256:22
**open-ended (2)**
79:7;141:11
**operating (1)**
105:13
**operation (2)**
107:19;110:9
**operational (2)**
109:8,15;176:19
**operations (3)**
17:11;114:4;183:22
**operative (1)**
258:1
**opine (3)**
16:6;17:3;293:15
**opinion (179)**
12:10;16:13;17:8,12;
25:3,4,23;26:6,9,11,16,
22,25;27:13;33:20;
35:24;36:11,21;54:8;
55:14;56:15;74:20,23;
75:12;78:15,25;79:10,
16;81:1;82:8;83:5,5,6,
8;84:4,7;90:10,18;
91:17;95:16,17;99:7;
106:4,19;107:10,25;
109:2,25;110:1;
112:23;114:14,18;
115:23;116:1;123:6,9,
25;125:6,14;131:11,13,
21;132:15;134:17;
135:1;142:21;144:1,3,
9,14;145:6;146:10,13;
151:4;152:24;153:5,7;
156:9;161:25;162:6;
164:14,19;165:4,10;
167:5;170:13,16;
173:4;174:21;175:16;
176:1,4,17;177:2,15,
18,21;180:18;182:18,
20;184:3,12,17;192:5;
201:22;202:8;203:14,
17;207:21;213:12;
215:25;216:3,5;
217:17,23;225:11,16,
17;251:1,5,7,10,11,16,
19,24;252:4,9,14,19;

254:22;259:4,8,9,12,
13,16,20;260:4,6,7,11,
20,22;263:5,9;264:2,8;
265:2,11;269:14;
271:12;272:3,5,11;
273:18;274:20;275:6,
12;276:13,18;277:1;
279:24;280:2;283:6,
10,13,16;285:4,19;
290:19,25;291:1,4,18,
22;295:23;296:2;297:8
**opinions (26)**
13:17;25:22;29:1;
34:9,25;36:10;38:7,21;
39:1,6;54:17,22;55:19;
56:9,18,24;57:3;58:5;
59:2;74:19,22;82:2;
105:17;127:13,14;
171:16
**opportunities (1)**
247:3
**opportunity (14)**
33:8;40:6,10;65:23;
78:18;154:5,7,9;155:6;
179:2,22;182:25;
183:5;245:16
**opposed (2)**
70:2;151:2
**oppressive (2)**
93:15,18
**oranges (1)**
36:6
**order (11)**
28:18;36:22;48:3;
75:14;95:18;137:20;
170:4;254:2;266:4;
273:20;295:18
**ordered (14)**
265:22;268:18,22,
25;271:11,13;272:4,10,
12,16;273:4,14,23;
276:23
**orderly (2)**
107:19;110:9
**orders (6)**
131:2;274:18,22;
275:2;276:21,25
**organization (3)**
145:24;256:18,25
**organizations (3)**
137:4,9;145:11
**original (4)**
39:13;46:22;71:23;
269:23
**originally (1)**
12:16
**orthopedic (1)**
80:6
**others (4)**
68:14;185:7;242:17;
291:9
**Otherwise (2)**
109:10;245:11

■■■ (1)
274:3
**out (56)**
29:8;56:18;64:10;
68:8;73:7;76:21;82:19;
83:13,20;90:8;91:5,16;
92:20;94:1;95:1;100:5;
103:1,16;106:22;
107:1;111:22,24;
118:11;123:14;135:9;
136:4,5,22;141:25;
156:4,8,12;157:7,12,
15,20,21;158:7,11,12;
163:5;8;166:24;
181:17,21;192:20;
229:20,22;231:9;
239:22;255:11;264:17;
273:20;276:23,25;
284:3
**outcome (8)**
19:24;90:16,20;
180:21;193:10;194:13,
25;290:3
**outcomes (11)**
90:16;92:12;95:14;
114:21,21;115:21,25;
116:9;117:11;118:23;
202:3
**outdoor (1)**
196:17
**outline (1)**
126:18
**out-of-cell (1)**
258:21
**outside (8)**
35:10,13;247:3;
265:19;267:6,17;
269:2,6
**over (24)**
7:20,24;9:11;27:12;
46:6;53:2;61:9;62:4;
64:14;77:7;87:11;
89:23;97:3;106:13;
112:24;121:18,23;
125:24;139:3;174:14;
190:19;202:24;238:19;
297:21
**overall (3)**
74:20;283:12,13
**overdue (2)**
209:5;210:2
**overlap (1)**
55:24
**overlay (1)**
55:24
**over-sedation (1)**
214:8
**oversight (4)**
88:20;220:16;
225:12,20
**overtime (1)**
95:7
**owed (1)**

268:4
**own (3)**
36:4;66:2;86:13

**P**

**Pablo (1)**
33:11
**packet (1)**
274:11
**page (252)**
10:14;37:18;39:12,
15;40:20;41:12,14;
42:20;44:22;45:5;46:1;
62:13,14,20;64:6,14;
66:24;67:2,5,7;71:25;
72:2;76:2;77:18;81:12,
13;84:10,11;88:5;
89:16;90:3,9;91:16;
92:20;95:25;96:3,4,5,
14,24;97:6;98:10,19;
100:1,16,18,19;101:9,
14,22;103:19,22,22;
104:3;105:9,10,11;
107:15,16;111:10,11;
113:8,25;114:3;
120:20;121:16,16;
122:13,17;124:16,17,
21;130:20,24,25;
131:25;132:8,24;
133:1,12;134:4,4;
136:24;137:1,2,7;
138:19;139:1,3,7,13;
140:1;145:8;147:3,6,
14,17,20,23,25;148:3,
3,4,18,20,25;149:2,12,
13,16,21,23,24;150:2,
3,10;152:10,12;153:6,
11;154:14,16,19;
161:16,17,20;164:9;
166:8,10,12;169:22,23,
24;170:5;171:5,8,21;
172:4,9;173:12,13,17;
174:1,7,9,12,14,15;
175:3,5,8,8;178:3,10,
17,19;181:11;182:6;
186:8,11,12;187:5,10;
188:17,23;197:2;
206:22;207:3;210:14,
23;211:1;212:13;
213:1,15,18,22;214:3,
5,6;217:5,14;218:4;
219:11;220:13,14,16;
221:21;225:4;226:19,
20;227:22;228:17,17;
229:7,10,11;230:18,20,
22;232:8,9;234:16,17;
235:20,22;237:3;
238:10;239:1,5,21;
241:17;242:4,9,22,25;
243:1,7;244:22,25;
245:3;247:1;256:10,
11;257:5,13;258:3,12;

261:23;262:2,4;
266:13;269:20,22,23;
270:4;271:9,10;274:6,
7;275:23;277:17,19,20,
21;278:16,24;281:13,
20,21;282:8;287:14;
288:4
**pages (20)**
37:10,13;49:12;50:2,
5,7;64:23;65:18;70:12,
20;72:1;126:23;
137:15,25;138:1,6,10;
214:13;224:23;274:3
**paid (4)**
11:10;22:24;97:22;
99:21
**pain (1)**
98:23
**painting (1)**
30:4
**panel (1)**
143:12
**paper (2)**
78:13;228:25
**paragraph (19)**
101:22;137:8;
139:13;143:7,8;
149:23,23;150:2,3,4,5,
6;175:9;178:19,20;
181:12;183:9;187:5;
220:16
**parameters (1)**
205:19
**paramount (1)**
230:12
**Parsons (3)**
6:4;12:14;24:17
**part (21)**
14:2;15:20;16:1;
17:22,22,23,24;21:9;
22:23,23,24;30:5,20;
118:17;119:22;121:3;
151:2;223:10;258:18;
279:12;298:23
**Participate (1)**
150:12
**particular (15)**
13:1;26:7;30:1;
50:10;115:21;116:23;
134:22,23;135:8;
136:8;159:4;213:25;
214:22;233:24;236:8
**particularly (1)**
11:1
**parties (1)**
298:18
**part-time (4)**
11:12;97:21;99:21;
100:4
**party (1)**
23:7
**PAs (1)**
256:21

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 100 of 157

Parsons vs.                                          Confidential                    Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                         Subject to Protective Order                                          April 11, 2014

passionate (1)
144:22
past (5)
76:12;108:16;
207:11;238:19;294:20
paste (4)
128:17;130:13;
151:1,2
pasting (1)
152:8
patient (27)
31:11,15;70:1;
107:19;110:8;116:6;
118:22;156:6,7;168:4;
179:21;183:20;185:22;
203:18;205:2,3,8,22;
215:12,17,18;216:17,
19;229:3;235:13,14;
287:4
patients (18)
115:20;116:14;
118:25;119:1,1;131:4;
139:22;147:1;156:10,
12,13;157:19,19;
158:2;213:20;214:7,
18;229:2
patient's (3)
31:9,13;271:3
pattern (1)
90:16
patterns (2)
89:21;136:14
▇▇▇ (1)
281:16
Paulette (1)
171:4
PBL (1)
97:22
PC (8)
239:21;240:1,11,14,
14,14,18;241:3
peer-reviewed (1)
292:4
penalties (6)
220:19;221:2,5,8,15,
18
penalty (1)
8:22
pending (8)
8:18;28:11,24;
146:23;194:3;199:22;
202:14;298:21
Penn (32)
6:3;7:6,14;37:10,12;
48:19,20,21,22,22;
53:14;70:10,12,15,20;
71:1,6;91:21,22;92:6;
94:19;124:7;155:3;
162:15;195:22;223:14;
226:15,19;230:20;
299:3,4,19
P-E-N-N (1)
195:22

people (56)
30:8;35:10,21;66:4;
73:13,14;74:5,8,9,9,10,
24;78:20,21;90:1;91:8;
103:11;106:12;107:7;
109:8,8;112:7;117:12;
134:6,17;156:11;
157:7,14;158:11;
165:19;168:13;189:24;
190:19;204:23,24,25;
208:3,8;222:5;226:3;
230:1;231:21;236:11,
23;237:10,23;245:7,
12;255:5;263:17;
265:8,10;284:4;
293:11,17;298:14
people's (1)
109:13
pepper (21)
290:20;291:2,5,12,
18,23;292:5;293:2,8,
17,20,24;294:4,8,13,
21;295:1,6,7,13,20
per (5)
73:23;262:6;295:7;
297:11,13
percent (5)
169:14,18;264:25;
277:12,13
percentages (1)
136:20
perception (2)
238:18;245:15
perfect (3)
57:17;68:21;180:18
performance (1)
219:3
perhaps (1)
165:20
peril (1)
28:16
period (14)
25:9,13,22;27:13;
112:17;165:18;168:9;
244:17;263:4,11;
264:1;269:17;281:1;
297:22
perjury (1)
8:22
Perkins (1)
6:5
permission (1)
272:21
Perryville (12)
40:24;41:10;130:19;
131:3;193:5;232:17,
19,20;235:8;249:3,25;
259:17
Perryville-Lumley (1)
245:25
person (39)
29:19;47:23;50:21;
63:21,21;70:6;80:20,

21;110:18;128:8;
129:2;130:8;143:5;
144:2,9,15,21;145:5;
161:14;165:13;183:20,
21,22,25;191:18;
193:18;208:17;240:6;
273:8;278:19;284:6,
14;290:20;291:2,8,15,
23;293:7,23
persons (9)
184:7,14,19,24;
185:6,13,17;187:2;
294:4
person's (6)
142:21;144:1,3,14;
290:21;291:25
perspective (7)
17:5;111:2;183:17;
238:16;262:21,24;
281:6
pertain (1)
25:22
pertaining (3)
103:23;127:11;
161:12
pertains (1)
52:4
pharmacist (1)
159:8
PharmaCore (1)
231:6
pharmacy (8)
117:15;170:3;171:4;
173:21;183:17;231:6,
11,24
PhD (3)
58:9;59:7;87:16
Phoenix (15)
6:6,10,13;30:3;
132:4;162:12,16;
163:3,5,14;173:11;
174:16;225:1,8;288:6
phone (2)
52:10;227:1
photocopies (1)
49:4
phrase (4)
139:4;232:6;234:22;
244:7
physical (7)
42:7,10;118:2;
215:17;239:6;240:10;
281:10
physically (2)
45:10;215:11
physician (4)
10:25;55:21;142:17;
268:5
Physicians (9)
255:3;256:12,14,15,
18,23,25;257:7;260:16
pick (1)
76:21

picture (4)
108:9;109:15;
125:13;176:11
piece (2)
78:13;83:3
pitch (2)
95:1;106:21
place (11)
35:25;42:9;112:18,
19;115:19;116:2;
142:12;177:16;180:19;
188:13;225:19
placed (5)
265:3,13,21;266:23;
267:24
placement (1)
254:3
placing (1)
264:10
plaintiff (5)
21:22;22:12;50:10,
11;70:2
plaintiffs (26)
6:3,18,20;7:18;
20:15;22:16,18;30:19;
32:8,8,16,17,18,20;
33:10,17;65:12,14;
66:4,21;67:11;71:15;
72:9;115:8;154:7;
284:17
plan (13)
38:25;57:10;157:20;
160:19;224:25;225:7;
226:9;296:8,15,17,20,
22,24
planning (5)
38:21;39:6;54:7;
56:9,13
plans (5)
295:24;296:3,5;
297:5,10
plant (2)
118:2;239:6
playing (1)
129:2
please (152)
6:14,16;7:4,25;8:5,8;
9:1;10:22;18:24;23:15;
31:12;32:3,11,25;
37:15;38:1;39:13;
41:12;53:11;55:8;
60:17;61:11;62:14;
67:5;71:2,24;75:22;
77:18;79:4;81:6,12,24;
84:11;91:20,23;92:6,7,
17;95:18;100:17;
101:13;103:20;105:8,
9;107:13;113:7;114:1;
119:7;120:10;121:14;
122:11;124:5,17;
130:18,19;131:24,25;
133:12,20,25;134:4;
136:24;138:8;141:16;

142:2;144:5;146:23;
147:4;149:25;150:15;
158:4;161:17,18;
162:4,11;166:5,7;
169:21,23;170:24,25;
171:3,5,19,21;172:3;
173:10,12,17;175:3,6;
176:22,24;177:12;
187:20;202:5;206:7,
18,20,22;209:22;210:8,
10,11,13,23,24;212:9,
13;213:16;214:4;
217:1,5;218:2,4,17;
219:9,11;220:14;
224:9,10,16;226:19;
227:22;229:10;230:18;
231:3;232:8;234:16;
235:20;239:1;242:4,
22;244:22;246:22;
253:11,12;255:23;
256:10;261:22;262:2;
266:3;267:19;268:15,
16;269:19;274:1;
277:17;278:3;281:14,
21;297:16
PLO (1)
103:4
PLTF-PARSONS-32346 (1)
255:25
PLTF-PARSONS-32361 (1)
256:11
PLTF-PARSONS-32362 (1)
257:5
plus (1)
228:18
pm (35)
125:18,19,20,22;
164:24,25;165:1,3;
195:14,15,16,18;
198:22,23,24;199:1;
220:8,9,10,12;259:23,
24,25;260:2;290:14,15,
16,18;297:25;298:1,2,
4,12;299:20,21
point (17)
28:20;29:4;49:9;
105:11;111:20;117:13;
172:15;183:18,18;
205:16,25;229:4,4;
262:19;279:10;283:23;
285:2
points (1)
126:18
pole (1)
240:9
police (1)
293:17
policies (4)
74:25;157:14;
247:11;290:2
policy (15)
216:16;255:18;
259:3;260:13,23;

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

272:6,7;288:14;
294:20,24;295:3,13;
297:9,11,13
**politics (1)**
107:6
████████ **(1)**
53:4
**poor (1)**
161:21
**population (5)**
74:4;118:22;123:4;
124:24;240:16
**portion (18)**
23:16;53:12;55:9;
91:24;119:8;128:10,
18;130:9,14;144:6;
151:13,14;152:15;
166:12;176:25;177:13;
187:21;192:3
**portions (2)**
49:12;132:19
**pose (20)**
184:7,14,18,24;
185:1,2,5,13,17;187:8,
14;188:4,8,12;192:9;
211:22;251:1,8,11;
291:24
**posed (4)**
177:21;250:4,11,19
**poses (11)**
211:5,18;212:21;
213:9;251:20,25;
252:5,10,15,20;290:21
**position (17)**
11:5;60:13;145:1;
155:10;213:24;255:2;
256:1,8,12;257:6,21;
259:5,6,11,15,17,19
**positions (1)**
94:22
**positive (1)**
30:9
**possibility (1)**
231:22
**possible (23)**
25:16;31:9,13;48:5;
86:10,14;90:14,17;
97:25;101:4;116:20;
117:3;136:17;151:1;
152:6;159:20;164:20;
185:10;191:5,7;
231:23;265:5;297:10
**possibly (1)**
31:4
**post-traumatic (1)**
22:11
**potential (12)**
191:19;211:6,18,22;
212:2,22;213:9,13;
219:20;220:2,3;256:7
**potentially (8)**
167:22;251:16;
270:9,19;271:8;272:4;

289:1,24
████████ **(5)**
193:4,7,21,25;
196:10
**PowerPoint (2)**
84:15;106:17
**practice (6)**
116:21;118:8;253:2,
15;256:25;264:10
**practices (2)**
28:5;207:22
**practitioners (1)**
256:21
**pray (1)**
293:20
**precautions (2)**
186:14,14
**precipitation (1)**
292:6
**predictive (1)**
289:14
**prefer (1)**
62:7
**preferred (1)**
291:17
**preparation (4)**
9:20;59:18;128:24;
130:1
**prepare (2)**
9:7;126:5
**prepared (8)**
28:14;34:18;38:12;
55:14;112:25;116:6;
150:25;200:5
**prescribe (1)**
168:24
**prescribed (18)**
152:17,21;165:13;
166:18;167:3,17,25;
168:5,5,10,21;169:10;
172:13;175:10,23;
183:11;193:16;207:6
**prescriptions (1)**
170:3
**presence (2)**
32:21;231:24
**present (7)**
26:24;27:5,16;
103:13;108:4;170:20;
288:20
**presentation (2)**
106:17;205:8
**presented (3)**
55:25;182:13;280:18
**preserve (4)**
51:1,9,14;52:17
**press (1)**
80:19
**presumptive (2)**
299:7,8
**presumptuous (1)**
16:12
**pretty (11)**

45:3,3;77:1,1;
112:16;197:16;230:25;
236:17,18;241:22;
243:11
**prevent (3)**
279:14;284:2;291:21
**preventable (3)**
272:4;279:13;289:1
**preventative (1)**
187:24
**prevented (1)**
271:4
**prevention (18)**
166:6,16;167:10;
182:14;202:2;260:21,
22;261:25;262:1;
263:6,13;264:3;272:6,
7;276:19;277:2;285:5;
289:18
**preventive (1)**
289:15
**previous (2)**
75:7;89:21
**previously (7)**
58:12;235:22;236:2,
7;238:10;244:2;294:15
**priest (1)**
22:9
**primary (2)**
148:7;149:19
**principles (2)**
151:17;152:1
**printed (1)**
185:21
**prior (4)**
66:8;92:2;287:17;
289:11
**Prison (44)**
6:18,20;10:1;16:24;
18:20;19:3;22:15,20;
23:8;27:8;28:1;30:15;
35:1;42:6;103:5;
135:19;169:16;190:14;
191:20;193:19;199:18;
200:1,17,23;201:3,16,
21;202:7,23;236:18;
240:5;253:1,21;
254:10;263:1,4,11;
264:1;266:9;276:4;
277:4,8;294:3;295:19
**prisoner (59)**
29:9,18;30:20;40:13;
41:9;42:17;44:19;45:6;
46:10;47:5;66:21;
67:12;68:5,24;71:12;
115:1,11,14;116:23;
117:6;161:12;168:10,
20;175:9;178:15,23;
181:3;182:6,20;
189:17;190:6,23;
191:13;193:7;199:17;
200:1,22;201:3,14,16,
21;202:7;203:22;

204:2,3;205:11,13;
206:8,9,13;207:15;
265:2;266:9,13;
267:24;268:18;275:13;
278:6;279:3
**prisoners (87)**
29:5,13;30:14;31:2,
5,23;32:1,6;33:2,17;
34:5;54:4,24;67:8,12;
70:17;71:15,16,25;
72:1,3,10,12;81:16;
87:14;88:7;89:18;
100:25;114:24;117:20;
118:11;153:16;155:1;
181:13;184:7;187:15;
194:9;201:23;202:9,
18,25;203:15;207:9;
208:24;209:5,12,19;
210:2;214:14,20,24;
215:23;216:1;237:7,
17;238:5,7;246:1,9,15,
24;247:7;250:5,12,20;
251:2,9,12,21;252:1,6,
11,16,21;253:2,15,23;
254:3,11,21,22;255:19;
256:2;264:10,12;
295:20,24
**prisoner's (3)**
179:2;180:22;276:4
**prisons (29)**
23:1;106:14;107:8;
118:3;137:17,24;
139:20;140:23;143:5;
145:16;147:8,15;
148:18;150:11,20;
151:3,6,8,11,12,14,21,
24;152:1,4,11,16;
225:19;253:15
**private (7)**
26:17;35:10;105:22,
22;107:2;226:2;279:20
**privilege (4)**
20:21;52:7,13,25
**proactive (1)**
238:20
**Probably (42)**
9:15,18;26:6;35:19;
40:25;41:18;42:13;
50:5;68:19;72:23;
76:21;77:13,14;82:19;
83:16;85:11;88:20,21;
95:17;97:16;105:1;
107:7;120:4;121:24;
126:21;127:18;129:8;
135:18;138:18;151:1,
7;182:12;195:11;
240:4;241:14,15;
254:14;265:12;279:22,
23;285:14,18
**probation (1)**
111:7
**problem (19)**
155:15,19,22;156:1,

4,4,7,15,24;157:4,8,11,
15,20,22;158:7,11,12;
269:3
**problematic (1)**
285:14
**problems (5)**
154:1;190:4;198:13;
276:19;277:2
**procedure (1)**
114:25
**procedures (5)**
75:1;187:24;247:11;
290:2,7
**proceeding (1)**
56:18
**process (28)**
9:3;59:14,20,22;
60:9,11;61:6,21;62:21;
63:1,25;64:3;69:13,25;
127:1;138:21;144:17;
146:4;170:9;223:10;
232:1;237:25;279:10,
12;281:3;283:2;
286:15;286:20
**processes (4)**
124:25;180:15;
221:22;290:1
**produced (4)**
53:1;88:16;97:1;
186:3,19
**product (2)**
20:21;52:7
**professional (21)**
16:19,22;25:3;26:11;
27:13;69:9;76:14;82:8;
83:7;84:7;86:12;156:8;
165:10;176:17;192:5;
205:21;216:5;260:6,7;
268:4;273:23
**professionals (3)**
190:18;255:10;
256:24
**Profiri (13)**
107:15;113:8;114:3;
162:13,24;169:22,24;
170:12;171:4;175:4;
178:4,5;183:10
**program (11)**
114:6;260:21,23,23;
263:6,13;264:3;
276:19;277:2;285:5,17
**programs (1)**
241:18
**progress (2)**
238:2;281:9
**prohibition (1)**
295:7
**Project (2)**
6:18,20
**Prolonged (7)**
256:4;257:7;258:1,4,
8,13,17
**promised (1)**

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 102 of 157

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

177:4
**prompt (1)**
50:19
**promulgated (2)**
137:10;145:11
**pronounce (1)**
243:21
**proposed (1)**
92:9
**prosecution (1)**
13:18
**protected (7)**
20:21;51:4,24;52:8;
59:18,20,24
**protection (2)**
21:1;61:3
**protective (8)**
188:16;195:1;240:2,
11,18,19,22;241:5
**protocols (2)**
274:21;276:24
**proves (1)**
101:25
**provide (14)**
79:20;98:9;111:12;
117:17;118:21;134:7,
11;135:14;136:10;
168:20;169:10;239:17;
277:7,11
**provided (17)**
54:8;81:15,15;82:22;
166:6;168:4,10,12,13,
17;170:1;203:5,8;
247:18;261:16;282:16,
18
**Providence (1)**
22:6
**provider (18)**
26:18;76:10;121:8,
22;122:2,4;125:1,3;
132:10;157:16;207:7;
216:18,19;217:10;
218:22;219:17;221:17;
287:3
**providers (3)**
123:1;157:19;277:9
**provides (2)**
115:19;277:13
**providing (7)**
52:24;55:19;87:14;
88:7;89:18;118:1;
202:3
**provision (2)**
148:6;149:18
**psych (9)**
171:10;207:17,19;
232:24;277:25;278:6;
279:3;280:5,20
**psychiatric (63)**
16:14,15;17:9;31:8;
33:20;55:24;56:6;75:2;
99:14,18;102:9,16;
119:2;132:12;137:3,9,

11,16,24;142:20;
143:4;145:11,12,16,21,
23;146:8,14,17;147:7,
14;150:10;152:10;
156:6,14,23;163:17;
165:19;166:18;167:3,
17,25;168:5,10;194:1;
206:14,14;207:7;
217:9;218:21;219:16;
232:10;233:8,19,21,24;
234:2;255:1;256:1;
271:21,21,25;273:3
**psychiatrist (37)**
10:25;12:9,9,11;
16:11;55:22;70:7;
131:3;132:9;139:19,
21;145:20;146:25;
148:5;149:17;152:18;
166:25;203:23;204:4,
15,19;205:21;206:8;
207:6;208:18;209:1,6,
15;217:9,23,24;
218:21;219:16;233:1;
234:4;243:5;268:5
**psychiatrists (23)**
85:9;86:19;96:1,7,
18;97:15,20,21;99:15,
20,23;100:4,4;102:17;
111:22;112:1;125:10;
152:21;232:10;233:8,
21;243:24;256:19
**psychiatrist's (2)**
148:6;149:19
**psychiatry (19)**
11:13;15:12,12,13,
14,21;33:7;107:17;
110:8;111:11;114:20;
117:16;123:2;137:4;
207:11;210:2;211:4;
212:1;233:18
**psychoeducational (2)**
239:14,18
**psychologic (1)**
22:10
**psychological (12)**
26:5;59:9;175:25;
263:23;277:18,21;
278:20;279:10,25;
280:25;281:2,16
**psychologist (8)**
58:9,13,16;59:5,8,
11;233:1,15
**psychologists (1)**
102:18
**Psychology (2)**
87:17,22
**psychosis (2)**
50:12;53:4
**psychotherapeutic (1)**
239:17
**psychotherapy (1)**
239:15
**psychotic (4)**

50:13;205:23;255:9;
291:16
**psychotropic (44)**
112:2;139:4,18,22;
145:19;147:1;152:17,
20;165:5,13;166:1;
169:1,2;178:6,11;
183:11;184:8,14,19,25;
185:6,9,14,18,21;
187:3,15;188:5,15;
193:1,7,18;194:2;
202:18;203:15,18,22;
204:4;207:6;208:17,
25;213:20;214:9;
231:14
**PsyD (1)**
87:16
**P-s-y-D (1)**
87:17
**PTSD (1)**
22:11
**publication (1)**
137:16
**published (5)**
142:23;182:14;
289:12;292:3;293:6
**PubMed (2)**
197:22;292:19
**pull (1)**
63:9
**pulled (4)**
62:16;63:6;74:3;
265:24
**purely (4)**
17:11;94:22;189:25;
269:4
**purport (1)**
148:24
**purporting (1)**
149:7
**purports (1)**
84:12
**purpose (6)**
56:17,20;141:24;
245:21;280:20,22
**purposes (2)**
38:17;40:4
**put (18)**
23:21;50:11,12,18;
83:21;93:3;111:7;
142:11;143:12,15,19;
188:13;232:4;245:6;
247:1;283:8;288:1,9
**Putting (3)**
39:5;49:11;50:21;
66:20,20;67:11;71:14,
15;72:9;90:23;102:8;
237:23;262:13
**pyramid (1)**
240:6

**Q**

**qualification (1)**
85:23
**qualifications (2)**
80:19;123:13
**qualified (6)**
16:6;17:3,8;18:14;
135:1,5
**qualify (4)**
24:8;260:7,11,12
**quality (3)**
19:10;164:15;243:17
**quarter (1)**
178:9
**quickly (2)**
9:4;241:15
**quite (3)**
99:2;295:8;297:20
**quotation (6)**
141:1,4;230:4;245:6,
7;262:9
**quote (161)**
62:16,17;77:21,24;
79:20,21;100:19,22;
105:11,14;107:16,21;
111:11,13;114:5,7,7,9,
10,12;122:24;123:4;
124:22;125:3;130:25;
131:8;132:9,13;137:8,
12,15;138:6,10;139:16,
23;140:12;145:16,20;
147:12,20;148:3,17;
149:7,24;151:13,20,25;
152:3,17,18;153:12,14;
161:21,23;164:10,12;
166:17,19;169:24;
170:1,2,5,7,8,9;172:11,
13,14,16,17,18,19,21,
22,23,24,25;173:24,25;
174:2,10,11,15,17;
178:5,10,13;181:14,15;
183:10,12;187:6;
188:18,19;207:5,16,19;
211:3;212:18,23;
214:6;217:8,11,12,14;
218:25;219:4,19,21;
220:17,19;221:21,24;
226:21,22;227:15,16,
24;228:1,18,19;229:11,
13;230:21;232:10,11;
235:1,2,22;237:11;
239:5,7;241:17,18;
242:10,11;256:4,7;
257:6,10;258:4,6,13,
15;262:5,7;271:10,13;
274:8,16;275:24;
276:3;287:15,16,18;
288:5,6,13,14,20,21
**quoted (7)**
138:1;141:3;148:12,
14;150:19;213:3;
245:10
**quoting (4)**
140:11;147:7;

148:24;171:8

**R**

**Raak (1)**
222:3
**R-a-a-k (1)**
222:3
**raise (3)**
52:10;180:4;263:11
**raised (1)**
38:15
**Ramos (1)**
229:25
**random (10)**
63:6,9,19,22,24;
65:19,22;66:1;73:5;
208:10
**randomly (2)**
62:16;74:3
**range (1)**
115:10
**rapid (1)**
215:19
**rare (2)**
256:6;257:9
**Rast (1)**
172:24
**rate (1)**
262:6
**rather (12)**
20:3;63:25;69:25;
101:6;150:20;151:11,
21;152:4,16;161:16;
206:1;239:15
**ratio (5)**
144:1;145:21;146:8,
14;231:17
**ratios (8)**
75:1;89:25;116:5;
137:11;143:12;145:12;
146:17;151:17
**re (4)**
70:8;101:4;138:22;
241:18
**reaches (1)**
189:19
**reaching (2)**
131:21;132:15
**reactions (1)**
293:4
**read (35)**
8:24;9:9,10;23:14,
17;53:10,13;55:7,10;
78:4,4,14;80:15;81:19,
22;91:20,25;97:1;
119:6,9;144:4,7;
176:23;177:1,11,14;
180:23;181:23;187:19,
22;192:1,4;253:12;
254:8;289:10
**reader (2)**
72:23;297:1

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 103 of 157

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

**readily (2)**
174:3,10

**reading (15)**
25:15;169:3;178:9;
179:14;181:21;182:1;
214:17;222:24;230:24,
25;232:11;235:24;
239:7,22;296:10

**readings (1)**
187:7

**reads (3)**
256:4;257:6;262:5

**ready (1)**
281:2

**real (3)**
69:18;108:17;126:4

**reality (1)**
107:9

**realize (1)**
231:15

**realized (1)**
233:17

**really (31)**
30:6;34:13;68:15;
80:7,14,15;90:4;100:7;
102:13,24;111:20;
112:20;118:4;120:2;
125:13;134:18;136:21;
140:18;145:1;201:11;
215:8;231:4;233:2;
240:21;258:19,24;
263:17;268:6;280:23;
289:5;294:7

**reask (1)**
253:13

**reason (18)**
30:16;69:18;77:15;
88:14;90:4;98:24;
100:2;101:23;106:10;
111:1,8,19;123:11;
159:3;206:15;223:6;
280:18;287:23

**reasonable (8)**
16:14;33:19,20;
77:16;142:20;151:25;
177:6;239:16

**reasons (4)**
82:9;87:2;142:5;
209:24

**rec (3)**
168:15;195:25;
247:14

**recall (79)**
9:10;25:17,20;40:18;
41:7;43:21;44:1;45:14,
18,21;46:8,16;53:15,
18;58:13;59:6;60:5;
64:13,17;65:8,11,13,
13;66:11,13;67:15,17;
68:1,3;73:10;74:7,11;
77:6;80:4,12;92:6;
113:24;119:16;120:8;
121:5,7;123:19;

158:21;160:22;186:5;
196:16,22,25;197:10,
21,23;198:5,11,16;
199:2,3,8;216:23,25;
229:16,23,25;230:8;
231:8;235:8,10,16;
236:4,22;237:19,20;
241:11,24;242:2,21;
243:9,12;246:17;287:1

**recalled (1)**
131:18

**Recalling (1)**
245:14

**receipt (1)**
216:12

**receive (10)**
165:14,17;166:18;
167:3,17,24;169:5;
175:10;188:25;285:11

**received (13)**
69:10;178:6,11;
224:24;225:7;226:9;
283:4,7,17;284:6,14,
24;285:20

**receiving (8)**
30:15;139:18;
145:18;147:9,18;
148:21;182:7;296:22

**recent (2)**
89:23;292:8

**recently (6)**
14:1;74:2,10;89:22,
23;236:24

**recess (11)**
37:22;48:14;60:22;
125:19;164:25;195:15;
198:23;220:9;259:24;
290:15;298:1

**rechecked (1)**
131:16

**recipient (2)**
174:3,11

**recognize (2)**
91:3;286:2

**recognized (1)**
233:23

**recollection (8)**
7:19;44:13;120:6;
195:10;204:6;237:9;
261:2;282:12

**recommend (2)**
190:22;255:15

**recommendation (2)**
145:21;146:11

**recommendations (5)**
137:11;145:12;
151:5;190:2,20

**recommended (1)**
265:22

**record (116)**
6:1,15;7:16;8:13;
23:16;28:10,23;32:15;
37:20,21,24;43:18;

47:9,12;48:12,17;
49:21;53:12;55:9;60:9,
19,20,24;61:19,24;
65:19,22;66:7,14;
67:22;68:9;69:2,5,6;
70:4,12,25;75:20;
91:24;96:19;119:8;
125:17,21;127:3,14;
144:6;154:25;158:16;
159:16,21,22,25;160:2,
6,11;161:8;164:23;
165:2;174:3,11;
176:25;177:13;179:2,
3,19,22,23;180:3,23;
181:25;187:21;192:3;
195:5,12,13,17;198:20,
21,25;199:3;204:24;
220:7,11;222:16,17,20,
21,24;223:1,2,4,12,12,
15,16,17,18,22;228:25;
229:2;232:1;246:19;
259:23;260:1;266:9;
268:11,13;276:2,10;
290:13,17;295:2;
297:23,24;298:3;
299:20

**recorded (3)**
47:19,21;225:10

**recordings (2)**
31:25,25

**records (116)**
12:8;25:3,15,15,18;
26:2,4;33:5,6,8;40:14,
19;41:9;42:17;44:19;
45:10,13,17,19,22;
46:10,14,17;47:5;
49:25;54:4,24;55:11,
17;64:1,3;65:8,11,24;
66:3,12,14,20,22,25;
67:3,7,13,18;68:6,11;
69:15,17,19;70:9;71:4,
7,12;72:7,13,18,19,24;
73:22;74:24;152:23,
24;153:8,12,13,16,17,
18,23,25;154:2,5,9,15,
16,18,21,23;155:4,6,8,
11,15,18;156:12;
158:14,18,22,23;
159:20;160:18,24;
161:2,4,5,11,13,22;
162:1,7;164:11,15;
168:3;186:2,5,7,19,23;
194:3;200:4,5;213:21;
216:24;247:21;276:5;
290:8

**recreation (5)**
195:4,20;196:18;
247:3;258:20

**recreational (4)**
30:5;194:19;195:25;
196:1

**recruit (2)**
136:20;177:20

**recurrent (1)**
114:22

**recused (1)**
103:10

**red (1)**
221:23

**redepose (1)**
298:22

**reduce (2)**
192:8;294:7

**reduced (1)**
244:19

**reduction (1)**
235:17

**refer (19)**
11:15;21:12,20;
44:10;45:1;70:8;115:6,
6;121:6;216:15,22;
226:24;228:1,7,21;
239:25;241:23;245:22,
23

**referee (1)**
12:17

**reference (12)**
80:2,5,12;94:14;
97:11;113:23;125:9;
126:16;142:9,15;
143:9;194:21

**referenced (4)**
65:9;119:19;142:15;
197:23

**references (1)**
214:18

**referencing (1)**
186:10

**Referral (12)**
147:9,10,18,19;
148:21,22;216:20;
217:10,13,24;218:23;
219:18

**referrals (1)**
219:19

**referred (8)**
212:1;216:17;217:9;
218:21;219:2,16;
287:12;291:14

**referring (15)**
35:8;101:21;120:17,
18;135:12;183:2,4;
197:10;227:17;231:2;
236:1;238:14;245:13;
246:13;284:11

**refers (5)**
114:5,7,10;175:9;
297:1

**refills (2)**
227:25;228:12

**reflect (4)**
87:13;88:6;89:17;
236:25

**reflects (1)**
98:20

**refrain (1)**

60:17

**refresh (2)**
7:19;14:13

**refuse (2)**
168:14;184:1

**refused (3)**
24:7;60:9;175:22

**refusing (4)**
178:15,23;274:14;
275:13

**regard (17)**
17:11;53:2;63:24;
100:3;148:7;153:11;
157:18,18;163:16;
168:17;183:3;199:4;
233:3;242:2;285:3;
286:18;291:1

**regarding (10)**
25:4;51:6;151:21;
153:13;176:2;200:7,
20;282:9,19;291:22

**regardless (2)**
29:16;268:24

**Regional (1)**
96:21

**reinforcement (1)**
30:10

**related (4)**
20:6,8;194:6;199:24

**relates (1)**
127:11

**relationship (1)**
292:5

**release (1)**
80:19

**relevant (5)**
151:23;187:2;250:3,
10,18

**relied (5)**
127:12,13;128:24,
25;131:15

**rely (2)**
58:4;104:17

**remain (1)**
223:15

**remaining (1)**
111:4

**remember (17)**
44:4,7,18;46:13,17;
50:18,22;53:6;94:19;
214:23;216:23;220:23;
231:4;232:14;238:16;
241:9;257:24

**remembering (2)**
45:9,20

**reminder (1)**
50:15

**reminders (1)**
126:15

**render (2)**
25:3;109:1

**renew (2)**
111:23;112:2

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 104 of 157

Parsons vs.                          Confidential          Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                        Subject to Protective Order                              April 11, 2014

**renewal (1)**
221:11
**renewed (3)**
211:4;228:1,13
**repeat (14)**
12:3;18:23;23:12;
31:12;32:25;101:12;
117:1;155:24;184:10;
246:21;250:16;253:11;
267:22;278:2
**repeated (2)**
17:24;290:1
**repeatedly (1)**
115:10
**report (207)**
9:9,10;21:10;37:9,
12;38:3,5,10,14;39:13,
15,25;40:20;41:14;
42:20;44:22;45:6,25;
46:22,22;49:23;50:5;
52:5;57:3,4;59:15,22;
60:1,3,11;61:7;62:1,14,
15;64:19;65:4,9,18;
66:9,17,19,24;67:2,18,
19,23;71:23,24;72:19;
74:23;76:17;84:10,11;
89:17;90:3,9;95:25;
96:3,5,20;97:6,12;98:3,
4,7,9;100:1,16;101:7,
22,23;103:20;104:2,10,
12,13;113:22,23;
115:7;120:12;121:3,6,
13,17;123:15;126:8,19,
19,21,24;127:1,7;
128:5,10,18,18,23,25;
129:3,6,7;130:2,10,14,
14;131:16;132:21,25;
133:17;136:24;137:1;
138:2,6,11;140:1;
142:7,24;143:2,15,20;
144:12,22;145:8;
146:4;147:4,20;
148:25;149:16,20,24;
150:2,3,25;153:3,4,15,
21;154:13,14,19;155:4,
5;165:9;171:20;
181:12,22;182:5,18,19;
186:8,10,13;188:17;
189:8;194:21;195:9,
11;196:17;197:6,9,24;
212:7;213:16,18,22;
214:3,5,14;220:14,15;
221:1;222:8,11,13,21,
24;223:9,24;224:5,7,
14;233:12,14;234:3;
238:18;246:18;247:1,
20;261:1,4,10,15;
266:12;269:13,23;
272:20;274:2;278:14,
23;279:7,9;280:16,17;
282:1;292:15,18;293:1
**reporter (19)**
6:8;7:3,8,21;23:17;

37:3;53:13;55:10;
75:16;91:25;95:20;
119:9;137:22;144:7;
177:1,14;187:22;
192:4;266:7
**Reporting (3)**
6:9;127:13;207:18
**reports (38)**
34:10;38:7,22;39:7;
55:3;56:10,20,25;
59:18,18,23;74:25;
88:22;100:12;104:17;
114:23;119:14,22;
120:14;121:3;123:16;
131:19;132:22;133:2,
15;144:17;154:21;
194:4;200:4;203:9;
221:23,23;222:1,6,8,
14;224:1,6
**represent (4)**
7:17;85:1;121:2;
143:20
**represents (1)**
144:9
**request (5)**
25:14;57:20;283:24,
24;287:11
**requested (13)**
23:16;53:12;55:9;
73:24;91:24;119:8;
124:7;144:6;176:25;
177:13;183:7;187:21;
192:3
**requesting (2)**
183:8;223:3
**requests (1)**
288:5
**require (4)**
119:1;203:21;
216:19;223:1
**required (8)**
20:17;56:21;216:12;
227:5,11;288:14;
296:6;297:6
**requirement (1)**
107:18
**requirements (3)**
81:16;82:23;85:24
**requires (2)**
204:3;215:15
**requiring (1)**
295:18
**rereview (1)**
101:4
**research (2)**
18:1,2
**reserve (2)**
299:8,14
**residency (2)**
17:24;18:12
**resolve (2)**
180:4;299:11
**resort (3)**

291:6,12,20
**resorting (1)**
295:1
**resources (1)**
112:8
**respect (5)**
29:16;60:11;80:22;
135:5;268:6
**responded (1)**
288:10
**response (8)**
19:17;83:18;106:8;
119:11,12;136:13;
170:22;208:2
**responsibility (2)**
287:4,9
**responsible (1)**
274:13
**responsive (1)**
196:20
**restate (1)**
268:16
**restaurant (1)**
126:5
**Restricted (1)**
256:13
**restricting (2)**
254:3;294:21
**restriction (5)**
235:23;236:2,8;
238:11,24
**restrictions (2)**
254:11;294:13
**restrictive (2)**
255:7,11
**restricts (2)**
294:4;295:19
**result (14)**
27:12;36:1;114:25;
115:12;116:24;117:7;
176:20;181:15;182:3,
7;194:14;233:7;
263:21;276:15
**resulting (3)**
118:16;193:2;231:22
**results (3)**
231:19;286:23;287:1
**retain (3)**
53:17;136:20;177:20
**retained (5)**
20:25;23:6;56:4;
84:19;227:2
**retainer (1)**
53:16
**retrievable (2)**
174:3,11
**retrofitting (1)**
237:25
**return (5)**
11:19,21;61:9;
129:22;212:19
**returning (2)**
145:8;178:3

**revealed (1)**
204:25
**review (103)**
12:8;14:11;25:2;
31:24;33:8,10;40:13;
41:9;42:17;44:19;45:7,
13;46:10;47:5;54:4;
64:11,16,20;65:4,19,
23,24;66:2,7;68:6,8,9;
69:3,14;70:12,25;
71:11;72:20;73:1;
74:23;78:19;79:2;
80:17;84:1;113:9,16;
119:22;120:15;121:3;
126:7;131:17;133:4,
15,22;153:18;154:5,7,
9,18,23;155:6,14;
168:3;170:10;171:13;
172:15,17,22,24;173:1;
174:18;175:14;179:2,
3,22,23,25;183:1;
186:25;192:24;193:13;
195:9;197:3,5,8,12,18,
22;198:3;202:14;
204:5,24;213:21;
247:23;253:6;261:1;
263:22;269:19,25;
281:18;282:1,6;286:1;
289:19;292:7,9,19,22
**reviewed (77)**
26:3;33:4,6;34:2;
45:10,17,21;49:21,21;
54:24;55:2,16;64:6;
65:11,12,25;66:12,13,
22,25;67:3,12,18,21;
68:2,4,5,12,25;69:2;
70:5;71:4,16;72:13,24;
75:12;81:9;83:23;
113:23;119:24;121:6;
132:18,23;133:5;
134:2;153:23,25;
154:6,8,22;155:4,8;
161:2,13;186:2,18;
194:3;197:14;198:16;
199:12;200:4,13;
216:25;222:9,15;
224:1,5;247:21;
266:13;269:21,25;
270:1;274:4;284:17;
292:16,16;296:15
**reviewer (27)**
172:14;270:4,22;
271:10,12;272:3,9,11;
282:10;286:1,14,22;
287:3,14;288:5,12,19
**reviewer's (5)**
270:15,20;271:2;
282:17;283:20
**reviewing (15)**
9:16;64:25;74:24;
169:6;172:12;186:5;
196:17;198:12;199:2;
216:24;223:24;247:11;

264:15;275:24;279:12
**reviews (4)**
104:6;125:1;175:25;
263:24
**revise (1)**
129:22
**Revised (2)**
10:11;296:12
**revising (1)**
146:5
**revoked (1)**
15:2
**rewriting (2)**
138:22;146:5
**Rhode (5)**
13:13,23,25;21:25;
22:6
**Richard (2)**
277:22;278:17
**right (59)**
10:14,21;13:15;
23:13;24:7;37:2;45:19;
49:13;62:24;65:8;
67:20;71:10;72:7,8,14,
16;76:12,12;77:11;
78:8;88:11;99:10;
117:3;120:13;121:24;
122:24;124:22;126:8;
133:1,13;139:11;
141:2;144:19;147:22;
148:1,25;162:20;
165:21;171:25;172:6;
178:17;193:20;196:7;
209:17;224:9;227:19;
234:25;236:3;237:13;
239:3,9;246:4;258:7;
266:21;273:12;279:1;
298:5;299:8,14
**right-hand (5)**
226:20;230:20;
242:10;262:4;266:23
**rigidity (1)**
215:18
**riots (1)**
266:1
**rise (1)**
139:21
**risk (71)**
17:9;115:9,20;118:9;
165:15,23;184:7,14,18,
24;185:1,2,5,10,13,17;
187:2,8,14;188:4,8,12,
16;191:16,19;192:6,8,
8,9;194:8;195:2;197:6,
8,13,19;198:3;201:22;
202:9,24;211:6,18,22;
212:2,22;213:9,13;
236:12;250:4,12,19;
251:2,8,12,17,20,25;
252:5,10,16,21;288:25;
289:5,8,10,14,18;
290:21;291:2,8,24;
293:2

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 105 of 157

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

**risk-benefit (1)**
231:17
**risks (1)**
114:12
**RNs (2)**
242:10,20
███████ **(4)**
198:14;199:5,6,14
███████ **(3)**
198:18;199:10,14
**role (26)**
12:10;22:23,24;33:7;
58:11,16,17;84:17;
88:20;100:11;103:12;
111:17;123:13;128:4;
129:2;130:1;148:5;
149:18;156:10;157:14;
162:16;163:2,9;
176:20;225:20;278:19
**roles (2)**
148:7;149:19
**Roll-Up (2)**
96:21,22
**Roman (1)**
22:9
**room (6)**
8:21;76:22;108:16;
265:8,8,19
**rough (2)**
11:22;21:12
**rounding (1)**
231:8
**rounds (1)**
274:10
**routinely (1)**
231:13
**row (4)**
42:14;241:18;242:1,
2
**Rowe (3)**
277:22;278:16,17
**rude (2)**
52:1;92:23
**Ruiz (4)**
253:1,8,14,21
**rule (4)**
21:15;61:4;93:12,13
**ruled (4)**
27:23;253:1,14,21
**rules (4)**
7:20;56:23;93:10;
295:5
**ruling (1)**
202:17
**run (8)**
29:16;63:17;94:1;
111:24;240:13,13,16,
20
**running (4)**
80:23;141:25;
262:12;298:6
**runs (1)**
85:25

**rushing (1)**
230:12
**Ryan (3)**
6:4;12:14;24:17

**S**

**safe (2)**
111:12;240:17
**safely (1)**
191:6
**safety (5)**
42:7;107:19;110:8;
240:10;291:21
**Safford (1)**
54:19
**sales (1)**
106:12
**same (53)**
8:1;40:21,25;41:18;
42:21;53:14;60:9;
63:14,16,17;73:3;
79:19;93:2;110:16;
111:10;129:15,15,19,
23;130:3,6,15;137:7;
149:23;150:11,16,17;
152:1;154:9,23;
179:23;197:15;199:12;
200:24,24;202:10;
205:15;206:11;223:13;
252:2,7,12,17,23;
253:24;254:5;273:7;
275:17,23;276:7,12;
278:8;292:1
**sample (5)**
63:9,23;66:2;73:21;
74:12
**sampling (6)**
17:17;18:15;63:6,24;
73:5;74:5
**San (1)**
131:1
**Sarah (1)**
6:21
**sarcasm (1)**
268:4
**sarcastic (1)**
268:9
**sat (2)**
76:15,18
**save (2)**
106:25;226:4
**savings (1)**
231:15
**saw (9)**
14:12;59:8;76:22;
80:4;155:18;157:4;
168:9;198:12;254:6
**saying (41)**
13:1;82:24;90:23;
94:21;106:23;109:20;
111:2,18;112:6;
115:18,18,25;116:1;

117:24;123:17;136:18;
143:6,24;144:21;
148:4;149:6;157:9,25;
163:11;167:15;171:9;
179:12;194:2,11,23;
195:5;200:3,15,19;
215:13,13;230:14;
268:9;269:3;270:17,23
**SCD (1)**
99:11
**scenario (1)**
266:1
**scenarios (1)**
273:18
**scheduling (1)**
114:8
**scheme (1)**
240:6
**school (7)**
15:19,20,23,24,25;
17:23;18:12
**Sciences (1)**
277:13
**scientific (1)**
142:19
**scope (4)**
116:18;118:5;
125:13;255:4
**score (2)**
282:24;283:7
**scores (3)**
236:9;282:13;286:19
**SCP (2)**
256:22;260:15
**Screening (6)**
147:8,9,18,19;
148:20,21
**scribble (2)**
50:9;231:1
**scribbles (1)**
52:6
**scribbly (1)**
53:3
**se (1)**
295:7
**searches (1)**
230:7
**seated (3)**
267:6,17;269:6
**second (17)**
10:10;15:12;19:5,6;
96:10;122:23;124:22;
137:8;171:19,24;
173:10;206:20,24,25;
207:3;217:2;266:17
**section (21)**
77:20;79:19;138:5,9;
139:15;141:4;147:8,
17,21,22;148:1;
150:19;152:4,4;153:3,
6;172:5,7;220:15;
281:23;297:1
**sections (5)**

133:6,8,16;148:11;
151:21
**secure (1)**
35:6
**security (2)**
17:4,11
**seeing (12)**
43:22,23,25;47:20;
59:7;156:12;157:19;
196:16;204:16;208:3;
226:3;233:6
**seek (3)**
284:3;299:9,14
**seeking (1)**
22:10
**seem (1)**
180:9
**seems (2)**
194:24;280:12
**segregated (3)**
245:19;254:4;255:19
**segregation (28)**
250:25;251:1,8,11,
16;253:3,16,22;254:11,
23;256:2,5;257:8,21;
258:1,2,4,9,14,18;
259:2,6,10,14,18;
260:8,11,13
**selected (4)**
62:22;63:2;64:4;
72:20
**selecting (1)**
64:1
**selection (3)**
66:1;73:8;208:10
**self (2)**
126:23;291:8
**self-harm (1)**
166:2
**send (2)**
86:23;127:24
**sense (2)**
159:9;205:25
**sensitive (1)**
185:7
**sent (10)**
45:13;65:7;73:2;
86:22,24;88:12;161:5,
6,10;207:17
**sentence (7)**
83:20;139:6,9;183:9;
187:6;221:21;258:16
**separate (6)**
11:15,16;36:4;164:2;
201:13;256:16
**Sepember (1)**
28:19
**September (50)**
27:24;28:1,6,19;
29:2;74:21;75:4;81:9,
14;82:5;84:5;113:17;
130:18;132:4;133:9,
11,14;134:1;152:19,

25;165:5;169:21;
175:4;178:4;182:6;
203:16;204:12;210:13,
18,20,21;211:2;212:7,
10,17;216:2,8;218:3,5,
7,15,16,25;219:10,18;
224:20;260:21;295:25;
297:4
**sequelae (6)**
17:10;117:11,16;
118:18;190:12;292:7
**serious (46)**
63:8;10;73:4,25;
74:9;139:17;145:18;
180:13;211:6,18,22;
212:3,22;213:9,14;
219:20;220:2,4;250:5,
12,20;251:2,9,12,17,
21;252:1,6,11,16,21;
253:2,16,23;254:4,12;
255:4;256:2,5;257:8,
14,17;290:20;291:3,
24;295:10
**seriously (7)**
180:13;207:10;
208:6,16,25;209:12;
296:14
**serve (2)**
14:4;141:24
**service (2)**
148:6;149:18
**Services (33)**
6:9,13;10:2,11;11:2;
16:7;25:5;63:3;75:2;
77:5;82:5;87:14,25;
88:7;89:18;102:10;
109:2;111:13;118:1,
21;137:17,24;143:4;
145:16;147:7,15;
149:14;150:10;180:17;
216:12;277:7,11;288:6
**set (9)**
26:2;70:13;132:1;
208:2;210:20;218:6,
13,14,16
**sets (4)**
28:18;66:14;67:18;
210:20
**setting (9)**
18:21;19:3;36:9;
189:25;191:1,2;240:5;
246:9;265:11
**settings (7)**
34:15;156:5;218:1;
255:7,11;257:1;296:4
**seven (14)**
9:22;62:19,23,24;
64:10;218:22;219:17;
261:11,13,17;297:18;
298:7,16;299:8
**seven-hour (1)**
299:7
**seven-month (3)**

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 106 of 157

Parsons vs.              Confidential      Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan           Subject to Protective Order            April 11, 2014

263:4,11;264:1

**several (16)**
30:3,4;33:9;59:8;
70:2;78:21;82:9;135:8;
140:22;163:22;187:16;
207:10;209:12;233:11;
236:18;247:19

**Sex (8)**
240:2,5,7

**sexual (1)**
22:7

**sexually (2)**
22:8,8

**shakes (1)**
8:4

**shall (2)**
146:1;296:15

**Shaw (15)**
59:4,12;107:14,16,
24;109:16,20;110:18,
23;111:1,9,11,14;
112:15;274:8

**Shaw's (2)**
110:6;111:17

**shear (1)**
69:19

**sheriff (1)**
17:2

**shift (1)**
95:6

**shooting (1)**
289:12

**short (10)**
69:23;77:2;94:24;
111:21;112:1;221:11;
232:3;254:8;259:21;
279:23

**shortage (2)**
90:15;91:4

**shortages (7)**
91:7;94:24;95:9;
105:12;116:10;123:1;
135:23

**shortest (1)**
117:25

**shortly (2)**
293:8,23

**show (13)**
84:12,24;120:3;
140:2;147:19;155:3;
186:23;247:13;272:20;
277:2;281:11;292:4,15

**showed (5)**
186:7;213:19;
236:14;287:11;292:20

**showers (2)**
247:3,14

**showing (5)**
37:8;154:12;192:22;
194:5;266:8

**shows (1)**
289:25

**sick (3)**

**sicker (1)**
233:17

**sickle (1)**
293:13

**side (11)**
16:24;204:17;214:9;
215:21;226:20;230:22;
231:20;234:2,3;
242:10;262:5

**sign (2)**
279:16;281:9

**signatures (1)**
280:1

**signed (10)**
277:22;278:16,22,
24;279:8;280:13,19,21,
22;281:8

**significant (14)**
99:7;108:8;112:23;
156:22,23,24;176:18,
18;180:9,12;183:11;
193:11;194:18;202:2

**significantly (1)**
107:20;110:9;112:20

**sign-in (1)**
88:23

**sign-out (1)**
88:23

**signs (7)**
286:2;288:20,23,25;
289:7,8;290:1

**Similar (2)**
169:17;225:19

**similarly (3)**
126:24;198:16;255:2

**simple (2)**
30:11;182:16

**simply (5)**
8:12;60:18;116:20;
157:10;268:7

**single (4)**
69:14;70:1;156:25;
263:11

**sit (7)**
39:8;57:2;71:14;
98:18;108:16;112:21;
221:4

**site (26)**
39:18;40:14;41:10;
42:18;44:20;45:7,10,
14,17,19,22;46:11,14,
14,17;47:6;60:11;
68:10;72:24;73:1;
105:12;117:14;161:13;
231:9,11,11

**sitting (1)**
116:16

**situation (3)**
211:18;213:8;219:22

**situations (6)**
27:20;118:20;
204:15,18,22,24

**six (12)**
11:6,7;67:7;187:11;
208:4,7,12;217:22;
258:11;261:9;263:3;
264:1

**size (2)**
236:18;262:5

**size/volume (1)**
239:7

**skeptical (1)**
18:2

**skills (1)**
84:14

**skin (1)**
103:17

**sleeve (1)**
39:9

**slide (1)**
274:11

**slides (1)**
166:10

**SMA (2)**
246:7,8

**small (3)**
27:11;77:1;169:15

**SMI (7)**
100:20;101:10,17;
207:10;211:5;212:19;
232:25

**smiling (1)**
196:3

**smoothly (1)**
9:4

**SMU (9)**
239:2,11;245:23;
246:4,6;248:8;251:20;
257:20;259:1

**sneaking (1)**
56:13

**Society (5)**
255:2;256:12,14;
257:6;260:15

**sole (1)**
286:10

**somebody (27)**
12:20;29:22;85:25;
91:2;97:23;98:25;
100:12;106:17;142:13;
144:24;156:19,22;
190:14;204:16;205:23;
211:24;215:9;226:1,5;
241:8,10,14,15;255:12;
272:19,19;273:15

**somebody's (5)**
106:19;190:3;
191:20;215:14;255:9

**somehow (3)**
59:11;142:13;205:13

**someone (10)**
116:7;204:7;232:6,
13;241:7,13,21;242:15,
19;265:13

**sometimes (11)**

8:25;11:24;12:4;
91:6;94:25;109:9;
116:9;144:21;204:16;
228:11;229:3

**somewhere (3)**
9:22;11:23;77:13

████ **(3)**
198:18;199:10,14

**Sony (2)**
61:1,16

**soon (3)**
126:21;216:11,18

**sorry (109)**
10:6,13;12:2,25;
13:21;18:23,24;23:12;
27:19;30:4;31:12;
32:25;33:10;43:15;
54:15,16;55:18;62:23,
24;64:21;65:15;66:15;
70:13,14;74:14;87:17;
95:22;96:2,4;98:23;
99:13,13,15;101:12;
110:20;113:10,20;
117:1,2;120:13,16,21;
122:14;124:10,18;
128:14;130:23;132:1,
5;134:15;135:25;
138:8;139:5;142:6;
143:3;149:25;152:12;
153:24;154:21;155:24;
161:3,4;162:18;
173:14;174:4;178:8,8,
16,21;184:10,17;
186:17;187:10;188:21;
197:7;205:10;206:23;
208:21;209:8;210:15;
211:10;212:14,24;
218:5,12;219:12;
222:25;225:3;226:16;
236:5;244:15;246:3,8,
21;250:16;261:7,10;
262:11;267:20;272:21;
273:22;275:8;278:2;
281:4,20;282:22;
283:24;296:17;299:4

**sort (5)**
119:19;239:17;
240:11;275:19;276:8

**sound (3)**
72:13;77:11;157:7

**sounds (5)**
72:16;77:16,16

**source (5)**
96:10,11;98:12;
140:11;221:25

**Sources (5)**
75:25;76:5;105:16;
161:21;162:6

**speak (27)**
7:8;11:21;29:5,7,7,
21;30:12,14;39:9;
51:25;57:25;58:2,18;
59:12;63:23;83:16;

90:6;107:5;108:15;
125:23;140:21;159:8;
200:21;201:1;241:15;
254:17;260:17

**speaking (12)**
31:11,15;73:10;
74:24;75:6;101:9;
108:17;141:24;153:7;
220:21;222:2,2

**Special (12)**
14:2;24:5;41:2,6,21;
102:3;163:20;245:25;
249:3,25;252:20;
259:17

**specialist (1)**
6:11

**specialists (1)**
256:20

**specialties (1)**
15:10

**specific (20)**
42:12;55:16;59:6;
60:2;66:13;75:5;85:19;
88:5;89:5;106:16;
117:6;121:11;153:16;
160:1;186:5;199:3;
223:25;236:5;247:6;
294:13

**specifical (1)**
236:4

**specifically (43)**
12:11;20:5;25:12;
30:17,25;53:16;56:3;
59:9;63:7,19;66:12;
67:17;68:1,4;73:9;
74:8;75:19;78:20;
84:18;88:10;89:13;
90:2;102:9;104:9;
109:7;113:24;114:19;
120:9;121:7;125:9;
136:7;141:1;160:23;
161:3;183:1;195:22;
196:16;197:21;229:16;
230:8;235:10;236:22;
242:2

**specifics (4)**
86:1;89:6;193:9;
264:7

**specified (1)**
72:3

**speeches (1)**
60:18

**spell (1)**
24:22

**Spelling (1)**
61:17

**spend (11)**
9:16;39:18;40:24;
41:5,17,23;42:3,24;
44:25;46:4,25

**spending (1)**
156:11

**spent (3)**

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 107 of 157

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

45:2;131:2;194:17
**spin (1)**
  83:21
**split-second (1)**
  94:23
**splitting (1)**
  99:4
**spoke (3)**
  73:13;87:15,18,22;
  89:3,20;204:18
**spoken (3)**
  112:15;222:5;276:22
**spot (1)**
  99:14
**spray (19)**
  230:17;290:20;
  291:2,6,12,19,23;
  292:6;293:3,17;294:4,
  8,13,21;295:1,6,8,14,
  20
**sprayed (1)**
  293:8,24
**spring (2)**
  24:19,20
**squeeze (1)**
  69:22
**St (3)**
  233:12,15;235:9
**stable (4)**
  208:22;209:6,19;
  210:3
**staff (113)**
  27:10;40:1,2,10;
  57:25;58:2,13,15;59:5;
  63:4,5;84:25;85:5,10,
  15;86:9,17;87:14;88:7;
  89:18;90:15;91:4,4,7,9,
  10,11;92:22;94:25;
  98:1;102:3,6,13;
  105:11;108:1,11,12;
  111:22;112:2,16,19;
  114:11,20;116:13;
  123:3;131:1,7,11;
  134:8,11,20;135:2,14,
  20,22;136:3,10,19,21;
  166:7;168:20;177:20;
  185:3;187:17,25;
  188:12,14,19,25;189:3,
  10,13,24;190:2;192:7,
  14;222:3;226:6;
  230:12,13;232:10,21;
  233:11,23;234:7,8,11,
  13;238:15,17,18;244:6,
  11,18,19;245:13;
  258:23;261:24;262:1,
  15;265:23,23,24;
  280:21;282:23;283:8,
  25;284:1;285:5,5;
  286:18;294:25;296:17
**staffed (1)**
  116:14
**staffing (73)**
  27:9;75:1;84:3,4,8,

13,20;86:7,15,24;
87:18,24;89:7,21,24,
25;90:7,11,20;91:18;
94:24;96:20;97:12;
98:20;106:5;107:17,
18;109:4,21;110:8;
111:12;114:5,7,10,15;
116:5,5,10;122:17,20,
25;123:6;124:1,21,23;
125:7;130:24;131:22;
132:15,19;133:15;
134:18,22;135:22;
136:14,17;137:11;
143:12;144:1;145:12,
21;146:8,14,17;
151:17;176:18;233:19,
21;234:12;235:1,15,
17;245:16
**staggered (1)**
  264:19
**stamped (1)**
  48:20,22;76:2;
  266:10
**stand (2)**
  13:16;182:18
**standard (123)**
  17:9;19:15;26:21,23;
  27:1,2,14,15,21;34:11,
  14,15,16,17;35:2,4,5,9,
  15,17,18,23;36:2,12,
  15,15,16,19,20;69:13;
  75:3,3,13;110:3;112:3;
  115:2,15;116:22;
  117:5;118:10,14;
  146:3;155:22,25;
  156:15;157:23;158:8,
  13;159:1,9,16;160:3,7,
  12;174:25;175:17;
  177:22,25;179:6;
  203:19;208:3,5;216:6,
  7,7;217:18;219:3,6,23;
  225:21,23,25;226:7;
  267:2,9,23;268:17;
  269:9;271:15,24;
  272:8,14,17,25;273:5,
  14,17,21,25;274:19,23;
  275:3,7,7,8,9,11,12,16,
  22;276:6,14;277:23;
  278:5;279:1,17,25;
  280:2;283:4,14,17;
  284:7,15,19,20,25;
  285:12,21,23,24;
  289:22;290:10;296:3
**standards (23)**
  16:15;26:10,12,17;
  34:13,19;84:9;105:14;
  113:3;153:10;156:3;
  165:11,11;170:20;
  173:8,9;176:15;
  223:13;236:18;247:12;
  260:24;264:20;270:13
**stands (3)**
  103:5;119:16;234:20

**start (1)**
  25:19
**started (4)**
  41:1,18;92:15;
  121:10
**starting (6)**
  6:15;133:2;139:2;
  212:25;224:23;232:23
**starts (1)**
  139:6
**State (28)**
  10:1;13:15,24;14:2;
  21:19;22:20;23:8,23,
  23;29:1,18;35:6,13;
  108:9;109:9;153:5;
  156:14;164:1;201:8;
  225:19;244:2;254:3;
  271:22;273:3;277:12,
  14;279:21;295:19
**stated (4)**
  110:1;219:3;274:12;
  299:1
**statement (58)**
  57:5;77:25;78:6,8,
  11,14;79:15,22;80:9,
  25;83:22;105:15;
  106:3;107:10,24;
  110:6,15,23,25;111:14,
  17;123:24;125:5;
  131:9,21;132:14;
  134:14;135:6,13;
  136:4,9;151:9;162:5;
  164:13;166:21;167:19;
  171:15;182:5;183:13;
  184:4;255:2;256:1,12;
  257:6,11,22;258:3;
  259:3,7,11,15,19;
  282:11;287:20,22;
  288:15,17,22
**statements (5)**
  106:16;114:13;
  170:12;173:3;174:18
**states (5)**
  14:22;115:22;
  262:24;280:10;294:10
**statewide (2)**
  102:11;193:11
**stating (1)**
  32:15
**stations (1)**
  194:16
**statistics (8)**
  17:13,16,25;18:6,7,9,
  15;262:11
**status (2)**
  260:8,11
**stay (20)**
  95:6;191:9;222:20;
  246:15,23;247:7;
  248:1,7,12,17,22;
  249:1,2,8,13,17,21,25;
  250:2,18
**step-down (3)**

163:18,18;164:1
**steps (7)**
  87:12;88:4;89:12;
  187:24;233:18;238:20;
  286:20
**Stewart (25)**
  32:1;33:11,11;60:10,
  13;65:25;153:15;
  154:1,6,8,10,14,22;
  155:1,11;197:9,23;
  213:18,22,25;214:10;
  215:7;298:16,22;299:2
**Stewart's (7)**
  94:11;153:13;
  154:12,19;197:6;
  213:16;214:13
**sticking (2)**
  161:5,8
**sticky (3)**
  50:19,21,23
**still (20)**
  8:13;19:12,13;26:20;
  102:19;111:4;121:24;
  122:3;135:25;159:6;
  177:21;198:11;212:21;
  219:1;235:7;237:17;
  238:5;244:24;294:16,
  18
**stimulation (1)**
  258:22
**Stiner (1)**
  172:19
**stipulating (1)**
  222:25
**stipulation (1)**
  223:1
**stock (7)**
  231:10,13,13,14,17,
  20,24
**Stop (1)**
  142:3
**strategies (5)**
  95:9;112:8;188:16;
  232:2;283:2
**strategy (2)**
  39:1;106:23
**strengthen (1)**
  126:16
**strengths (2)**
  12:18;228:9
**stress (2)**
  22:11;115:21
**stressors (1)**
  182:13
**strictly (3)**
  179:22;208:14;281:5
**strive (1)**
  33:12
**Struck (1)**
  24:25
**struggles (1)**
  118:1
**struggling (3)**

46:12;118:19;140:23
**stuck (1)**
  160:25
**studied (1)**
  142:10
**studies (1)**
  292:3
**study (2)**
  57:15;293:5
**stuff (3)**
  119:2,2,25
**subject (4)**
  220:19;227:13,20;
  292:23
**submitted (3)**
  14:12;280:19;283:23
**subsequent (2)**
  104:5;235:12
**substances (1)**
  293:14
**substantial (1)**
  165:23
**substantiate (1)**
  172:19
**successful (1)**
  176:2
**successfully (2)**
  181:8;273:15
**sued (1)**
  202:24
**suffer (1)**
  181:4
**suffered (11)**
  114:24;115:11;
  116:23;117:6,20;
  181:10;198:7,15,19;
  199:6,11
**suffers (2)**
  115:1,14
**sufficient (4)**
  84:8;282:9,18;
  283:21
**suggest (1)**
  276:18
**suggested (7)**
  139:16;142:8,10;
  145:17,25;146:2,2
**suggesting (1)**
  148:16
**suggestion (1)**
  146:16
**suggests (1)**
  276:20
**suicidal (3)**
  283:25;284:4;288:1
**suicide (87)**
  19:23;20:5;115:22;
  166:2,6,16,17;167:4,
  10,18,23;168:1;
  169:17;180:12;181:8;
  182:12,14;260:20,22;
  261:25;262:1,6;263:5,
  12,15,16,18,18;264:3,

Case 2:12-cv-00601-ROS    Document 1480-1    Filed 05/26/15    Page 108 of 157

Parsons vs.                                          Confidential              Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                         Subject to Protective Order                              April 11, 2014

11,13,19;265:3,13;
267:15;269:12,13,16,
20;270:16,21;271:7,
18;272:5,6,6;273:16;
274:3;276:5,19;277:2,
20,25;278:7;279:4,14;
281:4,4,17;284:2,5,13;
285:3,4,6,10;286:4,8,
12,16,25;287:6,18,18;
288:20,23,25;289:1,5,
6,7,8,10,11,13,15,18
**suicided (1)**
182:16
**suicides (19)**
19:15;212:4;235:24;
236:8;238:13;260:25;
261:6,13,20;262:23,25;
263:3,10;264:1;270:9,
18;277:3;284:22;290:6
**suit (1)**
176:2
**Suite (1)**
6:6
**Sullivan (1)**
6:8
**sum (2)**
9:19;117:24
**summarize (1)**
40:1
**supplemental (18)**
9:10;37:11;38:5;
46:22;50:6;57:4;67:19;
71:24;72:19;121:13,
16;126:24;136:24;
137:1;138:2;147:4;
222:10;266:12
**suppose (1)**
214:25
**supposed (2)**
140:12;272:23
**Sure (111)**
9:25;10:9,15,20,23,
25;16:21;17:15,20;
19:14;22:22;23:13;
24:9;25:11;29:6;33:3;
34:7,22;35:20;37:16;
38:3;39:14;41:13;
43:20;48:7,11;49:3;
56:22;57:13;58:22;
65:16,17;68:15;71:21;
73:12;74:14;75:5,23;
77:12,19;81:7;82:13;
85:3,6;87:6;88:3;
90:16;95:15;98:22;
103:21;112:8;113:20,
22;114:2;115:4;
121:15;127:5;133:21;
136:7,25;138:25;
140:4;145:9;147:5,22;
158:1;161:19;162:19;
164:21;168:16;176:23;
179:9,11;183:2;
191:12;211:21;220:6;

224:11;227:23;228:8,
8;230:19;231:4;
232:17;235:7;240:1;
241:22;242:5;244:23;
245:2;246:3;247:4;
250:9;256:15;268:21;
269:4;270:10,10,14;
274:25;278:15,18;
280:8;281:15;285:23;
290:5;292:13;294:15,
16,17;296:11
**surroundings (1)**
42:11
**survey (5)**
23:3;57:16;69:8,13;
192:20
**surveyed (1)**
23:1
**surveyor (2)**
23:1;69:11
**suspect (4)**
88:14;90:5;98:24;
100:2
**suspended (1)**
15:3
**swallow (2)**
274:18;275:2
**swamp (1)**
191:8
**swear (1)**
7:3
**sweeping (1)**
30:11
**switched (1)**
26:18
**sworn (1)**
7:7
**symbol (4)**
140:5;229:12,15,19
**symptoms (12)**
50:13;206:15;
211:25;214:8;215:3,9,
11,15;286:2,6;287:11;
291:16
**system (113)**
22:20;23:8;27:7;
28:1;31:22;32:5;33:2,
17;34:4;35:1;59:11;
77:22;78:16;79:17,20;
81:2;106:24;108:15,
18;109:22;110:3;
111:4,25;112:7;115:9,
12,19,19;116:2,5,21;
117:4,10,17,21,25;
118:20;119:20;134:19;
135:12;136:1,8;157:2;
159:10,21,25;162:17;
163:3,6,9;165:5,10;
169:13,15;170:14,19;
171:17;173:5,8;
174:22,24;176:5,6,15;
177:16,19,25;180:19;
190:14;193:2,19;

194:15,25;196:5,15;
199:18;200:1,17,23;
201:3,14,16,21;202:8,
23;203:14,17;204:11;
205:17;211:15;225:18;
228:10;236:6,6;
238:21;250:9;254:10;
262:5;277:4,8;279:21;
282:14;283:1,1,15;
289:20;294:6,7,12;
295:5,5,9,19
**systemic (1)**
19:9
**systems (29)**
63:12;66:4;91:1;
103:18;105:23;106:14;
107:9;109:7;116:7,13;
119:25;176:19;188:1,
14;191:8;193:12;
194:15,20;195:4,7,8;
196:5,12,21,24;203:20;
225:22;226:5;228:5
**system's (3)**
253:2,15,22

---

## T

**Tab (67)**
75:18,21,24;81:6;
105:8;107:13;113:6,7;
120:10,11,22;122:11;
124:4,10;130:18;
131:24;132:2;133:25,
25;158:15;161:16;
162:10,11;166:5,6;
169:20;170:24;171:2,
3,19,24;172:1;173:10;
175:3;178:3;206:20,
23,24;209:22;210:8,12,
15,16;212:9;217:1;
218:3,10,11;219:9;
224:9,10,16,17,20;
255:22,25;256:10,11;
261:22,22;269:18;
270:1;274:1;277:17;
281:13,24;297:16
**table (4)**
84:24;86:19;96:25;
97:9
**tabs (3)**
158:19,19,20
**Tacho (1)**
155:2
**T-a-c-h-o (1)**
155:3
**tactics (1)**
94:8
**talk (11)**
7:24;34:14;60:10,14;
84:3;115:7;152:23;
210:4;214:25;245:18;
246:12
**talked (1)**

76:17
**talking (24)**
35:9;36:3;43:15;
99:15;108:13;118:14;
135:7,8;136:8;150:7,8;
151:16;168:19,25;
169:2;196:3;221:11;
228:9;231:24;232:2;
238:22;280:9,10,11
**tally (1)**
262:13
**task (6)**
30:8;143:2;144:11,
17,21;146:4
**tasks (2)**
215:6;265:25
**tax (1)**
11:21
**Taylor (45)**
58:7,8,18;81:8,13;
82:1;87:18;88:17;
89:20;134:1,5,10,25;
135:4,5;136:3;171:9;
207:4,9,15,20;209:11;
211:2,13;212:18;
213:6,8;217:8,12;
218:20;219:15;220:1,
22;222:2;224:21,24;
225:6;226:8;227:3,4,8;
228:15;278:20,22;
280:16
**Taylor's (7)**
81:9;82:14;83:10,23;
135:13;136:9;211:17
**team (8)**
84:18;97:10;102:8,
16;103:11;162:13;
192:19;231:8
**Tech (1)**
277:12
**Technical (3)**
10:10,12;296:12
**telemedicine (1)**
95:2
**telephonic (1)**
298:19
**telepsychiatry (1)**
95:3
**telling (5)**
79:2;200:10;227:8;
230:2,6
**Temperature (13)**
185:2,5;186:2,4,19,
25;187:7;188:12;
189:18,19;191:14,15;
193:1
**temperatures (24)**
184:6,13,17,23;
185:12,16;186:6,7,22;
187:1,13;188:1,3,9,18,
24;189:2,9,12;190:7,
24;192:10;193:13;
202:19

**temporary (1)**
85:10
**ten (27)**
20:12,13;48:8;62:20;
64:15;71:25;73:22;
74:12,16;226:9;
264:14,19,19,22;265:4,
11,12,15,21;266:2,24;
267:16;268:18;269:3,
5;271:11;272:10
**tend (1)**
234:1
**tenets (1)**
257:9
**ten-minute (12)**
264:10,11,13;265:3,
13;267:12,24;268:11,
22,25;273:3,14
**tenure (2)**
176:16;178:1
**term (15)**
80:7;94:25;95:4;
102:15;188:6;232:3;
245:21,23;257:21;
259:2,10,14,19;260:13;
272:22
**terminate (2)**
52:9;298:13
**terminated (4)**
176:9,20;273:9;
275:5
**termination (1)**
272:24
**terminology (1)**
80:5
**terms (1)**
60:10
**terrible (1)**
112:22
**Terry (3)**
123:11,22;155:1
**Tessera (2)**
61:1,16
**T-e-s-s-e-r-a (1)**
61:18
**test (2)**
286:23;287:1
**testified (13)**
7:9;21:6,19,22;
22:12,16,17;56:8;
82:21;102:2;126:11;
193:17;194:12
**testifies (4)**
81:13;134:5;224:24;
225:6
**testify (9)**
38:19;39:6;81:14;
82:21;109:24;112:25;
113:1;116:6;258:17
**testifying (4)**
8:21,23;39:11;
176:14
**testimony (82)**

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 109 of 157

Parsons vs.
Ryan

Confidential
Subject to Protective Order

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

8:25;21:10;24:14;
27:3;36:17;71:10;82:1,
15,17;83:10;90:19;
97:6;98:15;108:21,24;
112:4,6;114:23;115:1,
13;131:18,20;132:18;
135:2;143:4,19;144:4;
145:15;146:7;148:2;
149:22;151:19;152:19,
22;153:22,25;155:7;
157:21;169:8;177:24;
178:14,22;181:3,16;
184:5;187:1,4,13;
188:20;189:2,11;
191:13,13;193:24;
195:3;198:6,14,18;
199:6,10;203:5;
204:10;208:16;215:10;
225:2,9;226:12,13;
234:6;237:5,8,16;
259:1;261:12;264:12,
21;274:25;275:1;
280:4,12;297:4,12

**tests (2)**
215:19,19

**Texas (40)**
11:2,3,4;14:24;
29:17;97:22;197:16;
199:18,24;200:1,17,23;
201:3,8,8,14,16,21;
202:2,7,23;208:3;
229:1;242:1;253:1,8,
15,21;254:10,18;
255:8;277:3,8,10,12;
294:6,12,19;295:4,10

**Thanks (1)**
37:7

**theme (1)**
114:22

**theoretical (1)**
293:2

**therapies (1)**
233:4

**therapy (2)**
30:5,6

**therefore (2)**
143:9;248:5

**thinking (1)**
260:4

**third (19)**
63:20;130:18;
131:24;132:2;139:2,7;
143:1;172:5,7;187:5;
210:12,16;212:9;
218:3,6,14;219:10;
229:11;274:7

**Thomas (1)**
76:20

**thorough (1)**
33:12

**though (7)**
8:20;55:16;56:3;
122:24;267:12;280:13,

19

**thought (10)**
45:12;62:2,10;68:17;
80:4;92:7,7;140:19;
218:12;224:11

**thousand (1)**
70:3

**three (18)**
9:15;10:20;21:17;
50:6,6;54:9;55:3;
57:18;76:19;90:1;
121:17;122:9;133:8;
140:5;148:7;207:8;
210:19;258:11

**three-ring (1)**
75:18

**threshold (7)**
226:21;227:6,9,13,
16,17,20

**throughout (5)**
40:12;131:6;176:16;
178:1;204:11

**thumbs (1)**
116:16

**till (4)**
41:1,19;94:16;
224:11

**Tim (1)**
24:23

**timelier (1)**
173:25

**timely (4)**
212:1;230:15;271:4;
282:25

**times (19)**
18:18,25;20:17,19;
21:3;22:19;23:6;27:20;
35:24;36:1;76:19;
157:17;168:7,13,23;
169:19;221:1,4;284:2
■■■■■■■■ (2)
24:23;269:20

**tiny (1)**
236:16

**title (4)**
11:1;59:6,10;261:25

**titled (11)**
10:1;75:25;120:18;
122:17;124:21;130:24;
137:16;147:8,17;
220:15;261:23

**today (20)**
9:8,24;34:11;39:8;
45:20;56:18;57:2;
71:14;78:1,6;79:23;
80:9;86:4;98:16,18;
108:15,16;109:1;
114:23;221:4

**today's (2)**
38:17;299:18

**to-dos (1)**
49:24

**toe (1)**

156:19

**toenail (1)**
156:25

**together (5)**
102:8;116:12;
142:12;143:13;229:6

**token (1)**
8:2

**told (18)**
30:17;31:3,6;40:5;
52:5;53:15;89:4;
102:12;204:19;227:10;
228:15;233:20;235:6;
243:10;244:1,14;
263:3,25

**tolerance (1)**
262:22

**Tom (1)**
87:15

**tomorrow (1)**
94:16

**took (14)**
12:25;68:20,25;
71:11;77:7;121:18,23;
131:20;164:17;193:11;
237:1;274:9;279:15,23

**top (21)**
67:6;100:19;101:14;
104:3;105:10;113:14;
120:18;122:23;124:22;
137:2;161:20;173:20;
211:1;216:16,25;
232:23,23;240:2;
261:3;277:6,14

**topic (1)**
210:4

**total (4)**
20:9;21:7;72:12;
127:19

**totality (12)**
13:8;49:14;69:15;
75:10,11;111:3;176:5;
269:11,14;277:1;
279:20;283:13

**totally (2)**
11:16;205:7

**totem (1)**
240:9

**touching (1)**
215:12

**tour (12)**
40:7,7,16;44:1;
68:17;72:25;73:1;
195:23;214:21;235:8;
241:11;242:17

**toured (7)**
30:3;43:9;72:22;
163:19;195:6;196:24;
260:5

**touring (1)**
74:24

**tours (3)**
47:15;49:15;57:24

**toward (2)**
137:2;234:16

**track (1)**
298:6

**train (2)**
92:7,7

**trained (14)**
91:10,11;187:25;
188:13,19,25;189:3,9,
12;192:7,7,14;291:10,
11

**training (23)**
15:21;164:4;17:22,23,
24,25;18:7,9,12,13;
69:8,10,11;85:23;
166:6,17;167:10;
189:1,1;262:15;272:6;
273:9;285:5

**transcribing (1)**
47:24

**transcript (2)**
171:1;210:11

**transferred (1)**
174:16

**transition (4)**
27:8;109:5;112:17;
235:10

**transitioning (1)**
109:22

**transport (1)**
168:15

**transportation (1)**
183:18

**transported (2)**
116:15;117:14

**travel (1)**
131:5

**treated (3)**
31:10,14;179:21

**Treatment (24)**
10:2;16:15;114:20;
152:10;157:20;160:19;
193:2;257:10;284:3,6,
14,24;295:24;296:3,5,
8,14,17,17,20,22,24;
297:5,10

**tremendous (2)**
33:4;65:7

**triaged (1)**
216:13

**trial (14)**
8:25;13:16;38:11,19,
22;39:2,7;54:7;56:9,
14,19,24;57:11;108:21

**tried (4)**
93:3,4;236:23;294:7

**trigger (2)**
166:1;167:4,18,22;
168:1

**triggers (1)**
166:17

**trip (1)**
129:9

**trouble (4)**
45:9,20;135:18;
240:20

**true (2)**
145:13,14

**trust (1)**
77:15

**truth (4)**
7:8,9;287:22;288:17

**truthful (1)**
88:15

**try (16)**
38:15;39:3;56:7;
69:21;105:21;228:14;
229:6;230:7,14;
233:18;239:17;255:5,
6,10;284:2;298:17

**trying (48)**
7:21;25:21;33:12;
42:7,9;50:24;83:18;
91:14,22;93:16,23;
94:3,7,9,12;106:13,20,
22,25;111:3;115:24;
116:19;142:25;149:11;
166:23;177:10;182:15;
188:21;196:13;220:23;
229:20,22;230:10;
231:9,12;232:14,15;
234:4;236:11;238:2,
19,21;240:25;262:20,
23;265:21;267:11;
272:18

**Tucson (26)**
45:15;46:11,18;
60:12;62:19;63:14;
64:10,20,25;65:5,20;
66:8,25;67:14;68:9;
70:23;71:4,7;124:13;
161:4;204:19;212:11;
217:3;219:11;242:24;
243:14

**turn (84)**
39:12;41:12;62:13;
67:5;71:1,24;75:21;
77:18;81:6,12;84:10;
100:16;103:1,19;
105:8,9;107:13;113:6,
25;116:11;122:13;
124:4,17;130:17,19;
131:24,25;133:25;
134:4;147:3;161:16,
17;162:10;166:5,7;
169:20,22;171:5,19,21;
172:9;173:10,12,17;
175:3,5;181:11;
206:20,22;209:22;
210:13,23;212:9,13;
214:3;217:1,5;218:2,4;
219:9,11;220:13;
224:9,10,16;226:19;
227:22;229:10;230:18;
232:8;234:16;235:20;
239:1;242:4,22;

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 110 of 157

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

256:10;261:22;262:2;
269:18;274:6;277:17;
281:13,21;297:16
**turned (3)**
21:9;53:2;87:10
**turnover (2)**
108:12;109:5
**turns (4)**
90:8;91:15;92:20;
118:10
**twiddling (1)**
116:16
**twist (1)**
83:20
**two (36)**
9:15;11:7;13:13;
19:12,18;23:18,23;
34:13,19;36:3;39:7;
46:7;50:6;56:10,25;
75:18;76:19;108:19,
19;125:10;126:23;
158:19,20;207:14;
217:15;233:13;236:3,
10;276:20;277:9,24;
278:5,15;280:14;
289:11;298:8
**two-sided (1)**
163:1
**two-thirds (7)**
62:15;174:1,6,9,12;
232:9;239:4
**type (2)**
16:18;289:24
**typed (2)**
61:6;280:17
**typically (6)**
29:19;156:4;192:18;
226:2;230:16;271:19
**typo (5)**
101:5;149:15;
211:10,11,12

**U**

**ultimate (2)**
16:12;57:21
**ultimately (6)**
117:13;164:18;
189:23;190:4,20;
293:18
**Unable (2)**
172:19;177:5
**unattainable (1)**
169:17
**unavoidable (1)**
270:12
**unconstitutional (1)**
83:1
**under (25)**
8:22,22;18:4;20:18,
24;31:4;45:6;52:4;
64:15;86:19;88:21;
96:7,7,10;120:11,22;

158:15;172:11;196:18;
216:11;274:11;285:25;
287:15;288:4;296:6
**undergraduate (2)**
17:23;18:11
**understaffed (2)**
243:8,14;244:7,20
**understandable (1)**
108:11
**understood (5)**
8:9;28:22;88:2;
205:11;241:2
**undertake (1)**
25:7
**undertaken (1)**
281:3
**undue (7)**
181:14;182:2;187:8,
14;188:4,6,7
**unfair (1)**
78:2
**unfiled (1)**
160:25
**unfortunate (1)**
194:25
**unfortunately (7)**
49:5;157:16;180:20;
228:24;265:24;286:17;
290:2
**uninsured (1)**
35:11
**uninterrupted (1)**
141:22
**unique (2)**
36:4;40:5
**unit (42)**
40:17;41:21;42:1,15;
44:5,8;46:16;95:13;
116:15;134:22;135:8;
136:8;159:12;163:17,
18,19,20,25;164:2;
195:8;20;196:12,21;
231:21,21;239:20;
245:24,24,25;246:1;
248:13,18,23;249:8,13,
17,21;251:25;252:15;
259:5,9,13
**units (27)**
40:3,4,6,8;42:12;
44:12;135:8;163:19,
22,24;214:22;231:12;
245:23;246:13,16,24;
247:5,8,18,20;248:1,5;
250:4,11,18,19;253:22
**universally (1)**
142:22
**University (4)**
11:2;15:22;277:10,
12
**unless (7)**
86:7;115:1,13;
150:21;157:16;247:12,
21

**unlicensed (2)**
86:3,13
**unprofessional (1)**
52:1
**unreasonable (2)**
172:12;195:2
**unreliable (1)**
118:9
**unsigned (1)**
279:9
**up (41)**
28:12,13;39:9,22;
60:18;71:17;72:8;
73:22;74:16;96:17;
97:14,25;99:23;
102:16;117:24;121:17;
124:25;142:14;190:19,
21;197:16;205:20;
215:1;224:11;230:16;
235:14,15;240:10,13,
13,16,20;241:4;
256:22;261:9,10;
263:2;266:22;272:20;
275:23;284:2
**up/identify (1)**
286:23
**update (1)**
297:9
**updated (9)**
296:6,8,15,18,23,24;
297:5,11,13
**updating (1)**
231:19
**upon (14)**
52:4;127:12,13;
128:24,25;142:23;
146:11;205:7;282:24;
288:6,21;289:2;
296:21,23
**upper (3)**
166:11;230:20;
266:22
**urine (1)**
194:23
**use (28)**
17:4;58:23;99:20;
135:20;136:2;229:13;
230:9;245:22;247:2,
24;290:20;291:2,5,18,
19,20,23;292:5;
293:14;294:4,8,13,21;
295:6,6,7,13,19
**used (13)**
140:6;159:5,11;
257:21;259:2,6,10,14,
19;260:13;291:6,6,8
**useful (10)**
33:1;34:3,8;85:12;
250:14,22;270:12,18,
24;271:1
**using (6)**
142:18,19;183:16;
230:17;291:19;293:17

**usually (1)**
140:5
**UT (1)**
15:5
**UTMB (1)**
201:9

**V**

**VA (2)**
35:11;271:21
**vacancies (1)**
131:6
**vacation (1)**
91:5
**vague (1)**
168:18
**vaguely (1)**
80:12
**Valenzuela (4)**
162:12,24;164:10,14
**validated (1)**
142:10
**validity (1)**
98:24
**variables (11)**
27:9,10;167:6;
182:13;190:1,18;
192:21;285:3;286:9;
289:17;293:12
**variations (1)**
119:4
**varies (1)**
139:10
**various (5)**
34:25;75:18;84:25;
103:23;134:6
**Varma (2)**
6:23,23
**vendor (7)**
73:18;107:2;177:4,4,
6;220:17;279:21
**vendors (2)**
105:22;106:11
**verbal (1)**
291:10
**verbalized (1)**
235:16
**verbally (2)**
8:3,6
**verbatim (1)**
149:13
**▮▮▮▮▮ (2)**
53:4;198:6
**verified (2)**
89:4;202:11
**verify (4)**
87:12;88:5,24;89:12
**versus (1)**
22:5
**vested (1)**
88:18
**via (3)**

47:22;95:2;161:14
**Victor (1)**
6:3
**video (11)**
6:11,12;47:24;48:13,
18;125:18,22;195:18;
223:19,22;260:2
**videoconferencing (1)**
298:19
**VIDEOGRAPHER (30)**
6:1;7:2;37:21,24;
48:12,17;60:20,24;
125:17,21;164:23;
165:2;195:13,17;
198:21,25;220:7,11;
222:17;223:19,22;
259:22;260:1;290:13,
17;297:18,24;298:3,6;
299:18
**videotape (4)**
6:2;33:9;49:21;
299:19
**videotaped (1)**
31:25
**view (6)**
134:6;167:12;190:8;
211:14;262:16;279:17
**viewed (1)**
245:15
**viewing (1)**
265:10
**violate (1)**
16:7
**violated (3)**
253:3,16,22
**violates (2)**
202:19;257:9
**visibility (3)**
265:7,9,19
**visible (1)**
236:24
**vision (1)**
87:24
**visit (15)**
41:2,21;42:1,14;
43:2;53:23,25;54:2;
57:10;60:12;89:23;
207:11;209:6;210:2;
231:9
**visited (10)**
39:16;40:21;41:15;
42:20;44:23;46:1,23;
54:12,19;57:6
**visits (2)**
47:8;57:7
**visual (5)**
47:22;215:7,16;
236:12;269:6
**visually (1)**
215:4
**visuals (1)**
194:23
**volitional (1)**

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 111 of 157

Parsons vs.                                Confidential              Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                 Subject to Protective Order                                    April 11, 2014

287:8
**volume (3)**
64:7;69:19;216:24
**vote (1)**
156:13
**vulnerability (2)**
230:21;232:5

**W**

**wait (5)**
8:1,2;81:24;125:2;
205:24
**Wake (1)**
52:10
**walk (1)**
96:16
**walking (4)**
29:16;40:7;42:6;
265:8
**wants (2)**
141:13;207:18
**warden (4)**
17:2;229:24,25;
233:15
**wardens (3)**
233:13;237:22;
238:17
**warning (1)**
185:21
**warrants (1)**
296:25
**wary (1)**
42:6
**watch (24)**
33:9;264:10,11,13,
20;265:3,14;266:13;
267:5,12,13,15,24;
268:12,12,22,23;269:1,
12;273:23;274:18;
275:1;287:16;290:7
**watched (3)**
269:1,12,15
**watches (9)**
236:11;271:11,12,
19;272:3,10,12;273:4,
14
**watching (2)**
211:24;267:17
**watch-swallow (1)**
274:9
**water (3)**
194:15,20,24
**way (44)**
13:3,8;15:3;18:4;
34:22;44:11;47:12,19,
21;53:6,7;62:15;66:2;
82:20;93:14;97:10;
109:10,13;118:6;
138:21;139:2,7,12;
140:13;141:5;145:24;
151:4;174:1,6,9,12;
175:21;178:9;184:22;

203:12;226:4;229:11;
232:9,23;239:4;274:7;
282:13;286:19;298:18
**ways (5)**
88:24;95:3;98:1;
117:18;151:9
**weaknesses (4)**
12:18;228:10;
234:17,22
**weather (1)**
91:7
**week (5)**
56:1;125:11,11;
132:10,11
**weekends (1)**
69:21
**weeks (3)**
13:14;258:5,14
**weighed (1)**
289:17
**weight (1)**
106:10
**Weinstein (1)**
144:24
**Wells (1)**
101:21
**weren't (8)**
90:24;114:24;
126:17;265:14;272:3;
276:23;293:15;297:10
**WESTLAW (2)**
61:2,12
**Wexford (35)**
26:18;58:14;75:25;
76:2,5,13;77:7,18,23;
89:22;105:9,11,16;
108:8,10;109:22;
112:17,22,25;116:4;
161:17,20,20,24;162:5;
169:9;176:7,10,17;
235:11,11,18,18;
244:15,16
**Wexford's (6)**
107:16;111:11;
176:16;177:17,19;
178:1
**whatever's (1)**
39:10
**What's (19)**
37:1;54:15;61:11;
83:22;95:12;99:8;
162:15;216:3;223:6;
225:10;239:20;264:24;
267:4;278:22;280:20,
22;289:3,7;297:17
**whatsoever (1)**
53:20
**Whenever (1)**
265:5
**wherever (3)**
29:17;103:18;191:6
**white (3)**
167:8;269:4;289:16

**whole (7)**
7:8;45:3;69:7;
176:11;235:1;269:7;
295:11
**who's (11)**
28:14;74:1;76:16;
94:12;116:23,23;
142:2;144:24;205:23;
269:2;298:6
**whose (7)**
72:3,12;80:4;144:9;
145:5;157:14;234:22
**wide (1)**
141:11
**widely (1)**
146:11
**Wieneke (284)**
6:25,25;9:12,14;
12:1,23;14:16;16:20;
17:6,14,19;18:16,22;
19:4;20:16,24;24:25;
28:10,22;32:7,13,15,
19;34:6;35:7;36:24;
37:1,6;38:24;51:2,7,11,
16,19,22,25;52:19,24;
53:14;54:13;55:1,11;
58:21;59:16,21;60:7;
61:11,13,15,17,22;
62:2,9;64:12;65:6,21;
66:10;72:5,15;78:17,
24;79:5,9,13,24;81:3,
18;82:7,16;83:11;84:6;
85:2;88:8;90:12,21;
91:19;92:3,13,23;
93:10,13,21;94:3,7;
101:19;102:5;105:18;
106:6;108:5,23;
109:18;110:11,16;
111:15;112:13;113:4;
114:16;115:3,16;
116:25;117:8,22;
118:12;123:7,18;
124:2,6;126:2;127:8,
20;128:1,6,11,13,15,
19,22;129:15,19,23;
130:3,6,11,15;132:20;
134:12;135:3,15;
136:11;141:7,16,20;
142:1;143:22;146:9,
15;147:24;149:1,6,10;
151:22;153:1,19;
154:3;155:17;156:17;
157:24;158:9;159:2,
8;160:8,13,21;161:1;
162:2,8;163:4,10;
164:6,16;165:7,16;
166:3,22;167:13,20;
168:22;169:11;170:25;
175:18;178:25;179:7,
16;181:5,17,24;182:8,
23;183:14;184:9;
187:19;188:10;189:21;
190:10,25;191:17;

192:16;193:23;194:10;
197:2,5;198:8;199:20;
201:5,24;202:10;
204:13;205:5,15;
206:11;207:23;208:20;
209:2,7,20;210:10;
211:20;213:11;216:14,
21;217:19;219:8,24;
222:19,25;223:5,8,21;
225:14;226:11;234:9;
246:20;247:9;248:2,9,
14,19,24;249:4,9,14,
18,22;250:6,13,21;
251:4,14,22;252:2,7,
12,17,23;253:5,18,24;
254:5,13,24;255:20;
257:23;260:17;262:17;
263:14;264:4;265:16;
268:1,10,20;269:10;
271:5,17;273:6;278:1,
8;279:5,18;280:7;
282:21;290:23;292:1;
293:9;295:15,21;
296:1;297:7,17,19,21;
298:5;299:4,10,16
**wife (1)**
50:20
**willing (2)**
32:18,20
**window (4)**
236:16,18,19,20
**Wings (1)**
196:19
**Winland (3)**
173:19,21;174:14
**Winslow (1)**
54:18
**wish (1)**
84:14
**withdraw (4)**
92:13,15;93:17,23
**withdrawing (1)**
92:11
**within (53)**
16:16;25:5;33:17;
34:15,16;36:8,9;42:7;
75:6,10;77:16,21;91:1;
109:6,21;111:25;
112:3,3,7;115:18;
116:7;142:19;143:15;
146:11;152:1;153:8;
158:15;159:9;163:9;
203:19;216:6;217:10,
25;218:22;219:17;
225:21;233:23;240:4;
242:1,1;247:2;248:5;
256:25;267:8;271:20;
272:7,25;281:1;
283:14,14;291:4;
296:3,3
**without (18)**
20:10;31:10,14;44:1;
106:15;119:11,20;

135:9;171:10;174:17;
182:25;183:23;199:8;
215:11;253:23;272:21;
299:12,12
**witness (231)**
7:3,7;12:2,24;14:17;
16:21;17:7,15,20;
18:17,19,23;19:1,5;
20:15;23:18;28:14;
32:12,13;34:7;35:8;
36:25;37:2,7;38:25;
48:5,8,10;53:1,15;55:2,
13;58:22;59:17;64:13;
65:7,22;66:11;72:6,16;
78:18;79:4,5,6;80:1;
81:4;82:8,18;83:12;
84:7;85:3;88:10;90:14,
22;92:24;93:14,15;
94:12,21;95:21;
101:20;102:6;105:20;
106:7;108:6,25;
109:19;110:12,17;
111:16;112:14;113:5;
114:17;115:4,17;
117:1,9,23;118:13;
119:10;123:8,19;
124:3,10;127:15;
128:12,14,16;130:12;
132:21;134:13;135:4,
17;136:12;141:15;
142:2,5;143:23;
146:10,16;149:11;
151:23;153:2,20;
154:4;155:18;156:18;
157:25;158:10;159:3,
9;160:9,14,22;161:2;
162:3,9;163:5,14;
164:7,17,22;165:8,17;
166:4,23;167:14,21;
169:12;175:19;177:2,
15;179:1,9,17;181:6;
182:1,10,24;183:15;
184:10;187:23;188:11;
189:22;190:11;191:1,
18;192:5,17;193:25;
194:11;197:4;198:9;
199:2,21;201:6,25;
202:11;204:14;205:7,
16;206:13;207:24;
208:21;209:3,8,21;
211:21;213:12;216:15,
22;217:20;219:25;
223:24;225:15;234:10;
246:21;247:10;248:3,
10,15,20,25;249:5,10,
15,19,23;250:7,14,22;
251:5,15,23;252:3,8,
13,18,24;253:6,19,25;
254:6,14,25;255:21;
257:24;260:3;262:18;
263:15;264:6;266:6;
268:3,21;269:11;
271:6,18;273:7;278:2,

Case 2:12-cv-00601-ROS   Document 1480-1   Filed 05/26/15   Page 112 of 157

Parsons vs.                                    Confidential          Joseph V. Penn, MD, CCHP, FAPA - videotaped
Ryan                                  Subject to Protective Order                              April 11, 2014

9;279:6,19;280:8;
282:22;290:24;292:2;
293:10;295:16,22;
296:2;297:8
**witnessed (1)**
125:1
**witnesses (1)**
94:9
**Wolkow (1)**
155:1
**W-o-l-k-o-w (1)**
155:2
**woman (1)**
194:14
**wonder (1)**
150:14
**wondering (2)**
148:9,12
**word (13)**
7:22;58:23;107:1;
139:3;156:19;183:16;
185:8;241:7,8,12,13;
251:18;258:1
**wording (2)**
143:8;145:25
**words (13)**
29:8;35:22;86:23;
90:23;93:3;191:20;
228:23;232:13;240:15,
24;241:21;242:15;
265:7
**wordsmithing (1)**
288:24
**work (33)**
11:24;12:4,22;20:21;
22:24;24:16;49:19;
51:6;52:7;53:21;63:12;
69:22;91:8;97:24;
103:3,7,14;107:7,9;
114:11;116:12;119:23;
121:3;142:11;197:13,
19;198:4;238:2;
272:20,21;277:7,9;
292:11
**worked (4)**
17:1;103:16;109:6;
244:2
**working (8)**
11:21;13:3,7,9;
77:21;136:1;229:5;
234:12
**works (3)**
58:11;88:18;116:7
**world (13)**
16:16;57:17;68:21;
108:17;185:4;191:2;
208:5,5;271:20,20,25;
275:11;293:18
**worried (5)**
240:9;243:19,23,25;
244:5
**wow (1)**
30:6

**WRECK (2)**
95:4,5
**W-R-E-C-K (1)**
95:4
**write (43)**
42:5,9;50:13;62:15;
64:6;68:10,13,18;
100:19;101:16;128:9;
130:9;137:8;143:1;
145:10;153:12;187:6;
188:17;214:5;220:17;
221:20;227:24;228:18;
229:11;230:21,22;
232:9,15;234:25;
235:21,23;236:1;
237:11;238:10;239:4,
21;241:17;242:10;
243:7;244:10,25;
245:5;281:9
**writes (22)**
107:16;111:11;
164:10;172:14;173:24;
174:2,14;178:5;
183:10;207:15;211:3;
212:18;217:12;218:25;
219:18;271:10;272:10;
274:7;275:24;287:15;
288:5,20
**writing (13)**
47:21,24;59:22;60:8,
11;66:8;68:16;183:21;
228:3;231:5;238:15;
242:16;247:23
**written (24)**
38:10;50:1;56:20;
59:15;68:11,22;77:21;
78:12;79:19;80:20,20;
82:20;109:10,12;
125:4;143:5;144:17;
182:14;207:4;211:1;
234:17;255:18;289:12;
295:24
**wrong (11)**
71:22;80:2;95:22;
99:14;101:25;151:2;
158:15;170:4;176:13;
281:21;287:10
**wrote (39)**
49:21;53:2;60:6;
61:25;64:18;65:3;
66:17;80:18;106:18,
18;109:17;110:18;
111:9;127:6,15;
129:12;136:3;144:12;
166:25;182:18,19;
189:8;195:21,24;
196:7;220:25;222:7,
13;226:21,25;227:15;
229:21;232:22;240:2,
12;243:15;246:18;
270:23;293:2

**Y**

**Yale (2)**
15:22,23
**yard (1)**
194:19
**yards (1)**
131:5
**year (18)**
11:18;12:22;13:4;
15:22;75:7,7,10;82:22;
83:1,2;125:12;217:22;
221:11,16;261:7;
262:6;279:2,16
**years (16)**
11:6,7;21:17,17;
91:2;108:19,19;
142:13,13;244:2;
277:24;278:6,15;
280:14;293:1;294:17
**yes/no (1)**
119:12
**yes-or-no (3)**
79:11;196:11;209:25
**yesterday (5)**
9:12,19;14:13;254:2;
295:18
**yesterday's (1)**
108:14
**young (1)**
22:7
**youth (4)**
294:13,21;295:8,14
**Yuma (15)**
46:25;47:6;67:7,14;
89:23;104:14;129:10;
161:3,3;210:13,18,21;
225:1,8;266:11

**Z**

**zero (3)**
206:1;262:22,22

**0**

**000046 (1)**
195:22
**000192 (1)**
10:9
**001 (1)**
76:2
**003 (1)**
77:18
**064 (2)**
105:9,11

**1**

**1 (23)**
10:2;39:23;41:1,20;
43:2,3,3,22;44:12,13,

14;48:13,20;75:19;
203:25;205:24;206:20,
24;226:15;229:7;
239:6;276:2;283:7
**1/1/14 (2)**
10:11;296:12
**1:37 (2)**
125:20,22
**10 (18)**
62:24,24,24;75:21,
24;97:18,25;99:3,5,5,5,
6,8,11;105:8;130:22;
161:17;266:13
**10.81 (9)**
95:25;96:8,17;97:14,
18,25;99:3,6,24
**10:18 (2)**
37:21,22
**10:19 (2)**
37:23,25
**10:34 (2)**
48:13,14
**10:48 (2)**
48:15,18
**100 (12)**
139:17;142:22;
145:17;169:14,18;
185:16;188:4;189:19;
190:8,24;191:15;
264:25
**103 (4)**
244:22,25;245:2,3
**10-foot (2)**
195:24,25
**11 (6)**
6:7;67:5;103:19,22;
107:13;297:18
**11:04 (2)**
60:21,22
**11:05 (2)**
60:23,25
**110 (3)**
70:20;71:1,6
**117 (2)**
161:17,20
**118 (5)**
48:21;70:20;71:1,6;
226:15
**119566 (1)**
207:16
**11th (1)**
160:1
**12 (16)**
103:22;104:3;113:6,
7;136:24;137:1,15;
138:1,6,10;145:8;
169:20;175:3;178:3;
296:24;298:7
**12/13/13 (1)**
278:25
**12/28/12 (1)**
287:17
**12:30 (1)**

41:20
**12:44 (2)**
125:18,19
**12:47 (1)**
266:17
**123 (3)**
224:23,24;225:4
**124 (1)**
224:23
**12th (1)**
110:24
**13 (11)**
81:13;86:19;134:5;
137:15;138:1,6,10;
140:1;171:2,3;229:10
**13:06 (1)**
266:17
**137 (4)**
122:14;124:18;
173:14;206:25
**137395 (1)**
124:17
**137525 (2)**
172:4,7
**137547 (2)**
171:21;172:9
**137591 (2)**
173:17;174:8
**137592 (1)**
174:14
**137647 (1)**
217:5
**138451 (2)**
269:21;270:4
**138454 (1)**
271:10
**13th (6)**
107:14;110:2,7;
162:11;237:6;279:8
**14 (13)**
147:3,20;148:3,25;
149:21,24;150:2,3;
162:10,11;170:24;
201:20;202:7
**149 (1)**
134:4
**15 (3)**
142:12;219:12;
267:16
**150 (3)**
139:22;142:22;147:1
**154160 (2)**
218:4,18
**1542 (1)**
130:21
**154210 (2)**
130:20,23
**154251 (2)**
131:25;132:6
**1543 (2)**
212:14;219:12
**154315 (1)**
219:11

Parsons vs.
Ryan

Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

**154317 (2)**
212:13;213:1
**154398 (3)**
210:14,23;211:1
**16 (4)**
71:22;224:23;225:3,
4
**17 (5)**
62:21,24;63:1;
104:11;244:2
**17th (1)**
171:3
**18 (8)**
38:4;126:22;132:22;
165:9;166:5,6;222:14;
223:25
**18th (16)**
37:10;59:15;60:4;
61:3;62:1;64:19;66:8,
19;67:10;104:1;127:6;
221:1;222:8;224:7,14;
261:15
**19 (10)**
72:1;101:22;261:22,
22;266:21;267:2,25;
268:19;269:3,4
**193395 (1)**
274:6
**19th (2)**
277:22;278:17
**1st (5)**
28:12,15;77:10,12;
287:18

## 2

**2 (12)**
43:6,7;44:14,14;
46:9;48:18;125:18;
143:11;164:9;203:25;
239:6;276:2
**2:30 (1)**
46:9
**2:33 (2)**
164:24,25
**2:41 (2)**
165:1,3
**20 (15)**
91:2;99:5;100:16,18,
19;101:9,14;142:13;
154:14,16,19;255:22,
25;277:13;293:1
**20- (1)**
105:2
**20/20 (1)**
68:21
**2000 (1)**
6:6
**2007 (2)**
201:21;202:8
**2010 (3)**
104:2,11,17
**2011 (2)**

104:15,18
**2012 (43)**
25:25;26:4,5,8,10,13,
14,24;27:4,14,16;75:7;
76:1;77:10;107:14;
108:4,22;110:2,7,24;
112:5,12;113:3,7,15;
133:3,3;162:11;
169:21;170:20;171:3;
175:1,4;178:4,12;
244:16;260:25;261:7;
269:20;274:2;277:20;
278:13,14
**2012-2013 (2)**
75:11;109:3
**2013 (118)**
9:9;10:3;24:19,20;
26:8,19;27:14,24;28:2,
6,20;29:2;37:10;38:4;
39:16;40:22;41:15;
42:21;44:23;46:1;
59:15;61:2,3,12;66:20;
67:10;74:21;75:4,7;
81:9,14;82:5;84:5;
95:25;96:7,21;104:19;
120:11,19,24;121:9,18,
21,23;122:19;124:13;
125:10;127:18;130:19;
132:4,22;133:2,3,10,
10,11,13,13,15;134:1;
152:20,25;160:11;
165:6,9;171:20;172:2,
7;173:11;203:16;
204:12;206:21;207:4;
210:13,18,21;211:2;
212:5,7,8,10,17;216:2,
9;217:2,7;218:3,7,15,
17,25;219:10,18;
223:25;224:20;229:8;
237:1,4,6;238:5;
242:24;244:18;247:21;
260:21;261:6,9,11,13,
19,20;263:1,4;277:4;
279:8;281:18;287:19;
295:25;297:5
**2014 (14)**
6:7;28:15;37:13;
38:6;46:23,24;129:6,8;
130:1;159:15;160:2;
266:11;277:22;278:17
**203477 (1)**
67:6
**203515 (1)**
37:11
**21 (8)**
72:2,7;169:21;175:4;
178:4;256:10,10,11
**210 (1)**
130:23
**211631 (1)**
288:4
**21st (3)**
113:7,15;182:6

**22 (6)**
246:2,10;250:25;
281:21,23,24
**22nd (1)**
229:8
**23 (3)**
175:11;178:11;
182:21
**24 (1)**
46:24
**24/7 (5)**
211:24;242:10,20;
267:18;269:6
**24th (4)**
46:23;47:6;266:11;
278:14
**25 (1)**
81:13
**26 (6)**
38:6;121:16,16;
129:6;130:1;281:13
**261883 (1)**
37:13
**26b (1)**
59:19
**26b3 (3)**
20:18,25;21:1
**26b4 (2)**
51:4;52:4
**26b4B (1)**
61:4
**26th (1)**
37:12
**27 (1)**
152:25
**277 (1)**
81:12
**27854 (1)**
113:12
**27th (17)**
27:24;28:2,6,20;
29:2;74:21;75:4;84:5;
152:20;165:6;203:16;
204:12;216:2,8;
260:21;295:25;297:4
**28 (2)**
277:17,18
**28140 (2)**
162:13,22
**28141 (1)**
162:22
**285 (2)**
122:15,16
**2901 (1)**
6:6
**29th (2)**
207:4;217:7
**2nd (3)**
44:23;45:22;281:17

## 3

**3 (37)**

43:8,22;44:14;46:9;
47:4;120:10,11,22;
122:11;125:22;171:5,
8,19,24;172:1;175:5,8;
178:3,10,17,19;182:6;
196:19;203:25;218:3,
11,12;229:12,15;230:5,
8,16;236:9;258:5,14;
276:3;296:20
**3:25 (2)**
195:14,15
**3:32 (2)**
195:16,18
**3:37 (2)**
198:22,23
**3:38 (2)**
198:24;199:1
**30 (27)**
42:13;84:10,11;88:5;
89:16;90:3,9;91:16;
92:20;95:25;96:3,4,5,
24;97:6;98:10,19;99:5;
100:1;171:10;204:9;
205:19;206:2;232:25;
269:18;270:1;288:13
**30th (4)**
211:2;212:17;
218:25;219:18
**30-year (1)**
105:2
**31 (5)**
213:15,18,22;
230:18,21
**3-13-12 (1)**
275:24
**315 (1)**
219:13
**317 (1)**
212:15
**31st (2)**
261:11,12
**32 (6)**
75:19;153:6,11;
213:18;214:13;274:1
**32347 (2)**
258:4,12
**33 (1)**
214:13
**34,000 (1)**
239:22
**3-4-12 (1)**
274:14
**348 (1)**
48:22
**35 (2)**
181:12;232:8
**36 (1)**
234:16
**365 (1)**
48:22
**38 (1)**
237:3
**38% (1)**

235:1
**39 (2)**
148:18,18
**395 (1)**
124:19
**3rd (2)**
46:1;242:24

## 4

**4 (23)**
39:12,15;40:20;
43:14,24;44:15;47:4;
71:25;72:1;130:18;
133:1,12;195:18;
196:19;203:25;207:17;
242:10;258:5,14;
262:6;276:3;278:13;
296:16
**4,000 (1)**
239:21
**4/24/12 (4)**
278:23;279:7;
280:13,16
**4:10 (2)**
220:8,9
**4:19 (2)**
220:10,12
**4:23 (1)**
222:18
**4:25 (1)**
223:23
**40 (11)**
11:23;13:11;99:6;
147:14,17;148:20;
214:3,5;235:20,22;
238:10
**41 (5)**
147:23;148:1,3,4;
162:14
**42 (6)**
149:2,12,13,16,23;
150:10
**45 (3)**
152:10,13;197:4
**480 (2)**
207:1,2
**49 (2)**
134:5;239:1
**498 (1)**
274:4
**4th (6)**
39:16;40:22;121:18,
23;274:2;277:20

## 5

**5 (37)**
41:1,12,14;42:20;
44:3;15,22;46:1;62:13,
14;64:6,23;65:18;
66:24;72:1,2;99:18;
113:25;114:3;131:24;

Parsons vs.
Ryan
Confidential
Subject to Protective Order
Joseph V. Penn, MD, CCHP, FAPA - videotaped
April 11, 2014

132:2,25;133:1;
169:23;173:10;203:25;
236:22;237:7,10,17;
238:5;252:10;260:2;
262:6;296:7,13,13
**5/8/13 (1)**
  207:16
**5:19 (2)**
  259:23,24
**5:27 (2)**
  259:25;260:2
**50 (1)**
  239:21
**500 (1)**
  131:2
**51 (1)**
  241:17
**523 (2)**
  166:8,14
**535 (1)**
  261:23
**540 (1)**
  262:2
**544 (6)**
  36:23;37:2,8;38:2,4;
  98:6
**545 (4)**
  37:5,11;38:2,5
**546 (3)**
  48:4,19;226:18
**547 (2)**
  48:16,21
**548 (3)**
  75:15,16,17
**549 (7)**
  95:19,20,23;96:14,
  21;97:12,14
**550 (3)**
  137:21,22,23
**551 (3)**
  266:5,7,9
**5692109 (2)**
  61:2,12
**583 (1)**
  173:15
**5c (1)**
  149:23
**5th (11)**
  41:15;42:21;81:9,14;
  134:1;224:20;237:1,4,
  6;238:5;269:19

### 6

**6 (19)**
  44:5,12;45:5;62:20;
  64:14,23;65:18;67:2;
  124:4,10;134:5;170:5;
  212:9;217:1;218:10,
  12;219:9;226:19;
  297:16
**6:13 (2)**
  290:14,15

**6:14 (2)**
  290:16,18
**6:25 (2)**
  297:25;298:1
**6:35 (2)**
  298:2,4
**6:36 (1)**
  298:12
**6:38 (2)**
  299:20,21
**60 (1)**
  10:12
**65 (1)**
  72:12
**67 (6)**
  186:8,11,12;187:5,
  10;188:18

### 7

**7 (22)**
  44:9,10,17;113:11;
  137:25;138:19;139:1,
  7;148:4;209:22;210:9,
  12,15,16;217:10;
  219:3;236:22;237:7,
  10,18;238:6;252:5
**7.5 (2)**
  99:18,19
**70 (1)**
  188:9
**720 (4)**
  100:20,21;101:10,16
**75 (3)**
  139:17;142:22;
  145:17
**77 (1)**
  247:1

### 8

**8 (16)**
  39:22;41:19;46:8;
  47:3;81:6;133:25,25;
  137:25;139:3,13;
  224:9,10,16,17,20;
  227:22
**8/13/12 (1)**
  162:23
**80 (1)**
  277:11
**83 (2)**
  242:4,9
**85 (7)**
  70:12,15;184:6,13,
  18,23;202:19
**85012 (1)**
  6:7
**89 (4)**
  70:12,15;220:14,14
**8th (1)**
  76:1

### 9

**9 (3)**
  228:17;269:22,23
**9.67 (2)**
  86:20;87:1
**9/23/13 (1)**
  132:10
**9/27/13 (1)**
  132:10
**9/30/13 (2)**
  213:4,5
**9:32 (1)**
  6:2
**90 (29)**
  185:12;187:8,14;
  204:7,16,21,23;205:1,
  3,4,12,14,19,24;206:9,
  10,16;207:8;208:3,18,
  23;209:1,15;220:16;
  221:21;232:25;296:8,
  15,18
**90-day (1)**
  206:2
**91 (1)**
  242:23
**99 (2)**
  242:22;243:1

# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Victor Parsons; Shawn Jensen; | ) | No. CV12-00601- |
| Stephen Swartz; Dustin Brislan; | ) | PHX-NVW (MEA) |
| Sonia Rodriguez; Christina Verduzco; | ) | |
| Jackie Thomas; Jeremy Smith; Robert | ) | |
| Gamez; Maryanne Chisholm; Desiree | ) | |
| Licci; Joseph Hefner; Joshua Polson; | ) | |
| and Charlotte Wells, on behalf of | ) | |
| themselves and all others similarly | ) | |
| situated; and Arizona Center for | ) | |
| Disability Law, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| Charles Ryan, Director, Arizona | ) | |
| Department of Corrections; and | ) | |
| Richard Pratt, Interim Division | ) | |
| Director, Division of Health | ) | |
| Services, Arizona Department of | ) | |
| Corrections, in their official | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DEPOSITION OF JOSEPH V. PENN, MD, CCHP, FAPA

September 30, 2014
10:03 a.m.
Phoenix, Arizona

Glennie Reporting Services, LLC
7330 North 16th Street
Suite A100
Phoenix, Arizona 85020-5275

Prepared by:
602.266.6535                        Carolyn T. Sullivan, RPR
www.glennie-reporting.com           Arizona CR No. 50528

Page 2

                    I N D E X
WITNESS                                    PAGE
JOSEPH V. PENN, MD, CCHP, FAPA
    Examination by Mr. Fathi              4

        All exhibits are designated CONFIDENTIAL
INFORMATION - SUBJECT TO PROTECTIVE ORDER
with the exception of Exhibit No. 705

            INDEX TO EXHIBITS
Description                               Page
Exhibit 703 Confidential Second Supplemental      9
        Expert Report of Dr. Penn,
        September 19, 2014
        ADC448454-448555

Exhibit 704 Exhibit B                122
        Handwritten notes of Dr. Penn
        ADC448580-448638

Exhibit 705 9/25/14 letter to all counsel from   146
        Tim Bojanowski, Struck Wieneke & Love
        Re: Parsons, et al. v. Ryan and Pratt
        U.S. District Court of Arizona;
        2:12-cv-00601
        (No Bates)
Exhibit 706 Exhibit A:  List of Documents      158
        Reviewed
        ADC448556-448579

Page 3

DEPOSITION OF JOSEPH V. PENN, MD, CCHP, FAPA

        The deposition of JOSEPH V. PENN, MD,
FAPA, was taken on September 30, 2014, commencing at
10:03 a.m., at the law office of PERKINS COIE LLP, 2901
North Central Avenue, Suite 2000, Phoenix, Arizona,
before CAROLYN T. SULLIVAN, a Certified Reporter,
Certificate No. 50528, for the State of Arizona.

APPEARANCES:
For all Plaintiffs except Arizona Center for Disability
Law:

    AMERICAN CIVIL LIBERTIES UNION FOUNDATION
    National Prison Project
    David C. Fathi, Esq.
    Director
    915 15th Street, NW
    7th Floor
    Washington, DC 20005-2112

For Plaintiff Arizona Center for Disability Law:
    ARIZONA CENTER FOR DISABILITY LAW
    Sarah E. Kader, Esq.
    Staff Attorney
    5025 East Washington Street
    Suite 202
    Phoenix, Arizona 85034

For Defendants:
    STRUCK WIENEKE & LOVE, P.L.C.
    Rachel Love, Esq.
    3100 West Ray Road
    Suite 300
    Chandler, Arizona 85226

Page 4

        JOSEPH V. PENN, MD, CCHP, FAPA,
called as a witness herein, having been first duly sworn
by the Certified Reporter to speak the whole truth and
nothing but the truth, was examined and testified as
follows:

            EXAMINATION
BY MR. FATHI:
    Q.   Good morning, Dr. Penn.
    A.   Good morning.
        MR. FATHI:  Before we begin the deposition,
I just need to make a statement for the record, and then
Ms. Love can, of course, respond if she would like.
        The Court has, by order, established April
1st of 2014 as the cutoff date for evidence in this case.
Defendants apparently disagree and have provided their
experts, including Dr. Penn, with information about
events subsequent to April 1st of 2014.  And the experts,
including Dr. Penn, have expressed opinions about events
occurring subsequent to April 1st.
        Given the proximity of the trial, I will be
questioning Dr. Penn today about his opinions on matters
occurring after April 1st, but this is without waiving
and without prejudice to our argument that April 1st is
the cutoff date, and evidence of subsequent events is not

Page 5

admissible.
        Rachel.
        MS. LOVE:  And for the record, and as we've
discussed our positions through email over the weekend,
we do disagree that April 1st is the cutoff.  Defendants
believe that information related to DI-326 as implemented
and additional information reviewed is subject to being
admitted at trial and subject to discovery in this case
and also appropriate for Dr. Penn to opine on.
        The Order Document 923 did not preclude
defense experts from doing further tours to look at same
evidence that Mr. Vail and Dr. Haney also looked in
August when they did their tours of the max custody
facilities.  In addition, Dr. Seiter, who is defendants'
corrections expert, did attend those tours, and there was
no objection to him attending the tours.
        Additionally, both the plaintiffs' experts
in this case have done supplemental opinions that do
include information related to happenings at ADC
facilities post April 1st, 2014.  So our position is that
information comes in, and there has been a waiver as to
any objection to that.
        We'll obviously take our positions up with
the Court at a later date.
        MR. FATHI:  And we respectfully disagree.

1   But now let us proceed.
2      Q.   BY MR. FATHI:  Dr. Penn, have you had your
3   deposition taken since your last deposition in this case?
4      A.   Sorry.  Have I had --
5      Q.   Have you been deposed since your last
6   deposition in this case?
7      A.   Yes.
8      Q.   When was that?
9      A.   That would have been approximately two weeks
10  ago.  I don't know the exact date, but it was about two
11  or three weeks ago, yes.
12     Q.   Is that the only time you have been deposed
13  since your last deposition in this case?
14     A.   Yes.
15     Q.   And in what case were you deposed two or three
16  weeks ago?
17     A.   Sure.  So that was the Estate of LaPadula,
18  L-a-P-a-d-u-l-a.  I believe his first name is Michael.
19  Michael LaPadula v. Dr. Jordan Lieberman.  I think it's
20  L-i-e-b-e-r-m-a-n.  Right.  That's the case.
21     Q.   And in what court is that pending?
22     A.   That is in a New Jersey state court.  Yes, New
23  Jersey state court.  I believe it's Mercer County if I'm
24  not mistaken.
25     Q.   And does that involve a prison or jail?

1      A.   It involves a state prison system, yes.
2      Q.   I assume you are somewhat familiar with the
3   deposition rules, but let me just go over some of them
4   very briefly.
5           First of all, to help the court reporter,
6   please don't interrupt me, and I will try not to
7   interrupt you.  Please listen to my questions and answer
8   only the question that I'm asking.
9           If you don't understand my question, please
10  ask for clarification.  If you answer a question, I will
11  assume that you understood it.
12          Finally, and most importantly, you are
13  testifying under oath under penalty of perjury just as if
14  you were testifying in court.  Do you have any questions?
15     A.   No questions.
16     Q.   When you do consulting work like you are doing
17  for this case, what is your normal billing practice?
18     A.   My normal billing practice would be is to add
19  up the hours that I was involved in the case and then to
20  submit an invoice for any work -- any time that I spent
21  involved in the case.
22     Q.   And on an ongoing matter like this case, how
23  often do you bill?
24     A.   I think -- I don't really have a standard
25  policy or practice.  I just -- whenever -- it seems to me

1   whenever I come to a good point in time, like, for
2   example, a deposition or the submission of a report or a
3   trial date, it seems to me that's a good period of time
4   to say, okay, I should probably go ahead and submit a
5   bill for that.  But I don't have any standard way or
6   practice of doing it.  And I do it myself.  I don't have
7   an assistant that helps me with my billing.
8      Q.   When did you last submit a bill to the
9   defendants for your work on this case?
10     A.   If I'm not mistaken, and I would be happy to
11  look at the invoice, I think it was May 1st of 2014 would
12  have been the last bill that I submitted.
13     Q.   How much time have you spent working on this
14  case since May 1st of 2014?
15     A.   I don't know.  I don't know the exact number.
16  I haven't added it up or else I would have submitted a
17  bill.  So I don't know the answer to that.
18     Q.   Can you give me an estimate?
19     A.   Probably not a reliable estimate.  I would have
20  to go through my -- I would have to go through and add
21  them up manually, and I haven't done that.
22     Q.   Is it more than 100 hours?
23     A.   I don't know.  That's a good question.
24     Q.   Where do you record the time that you spend on
25  this case as you do the work?

1      A.   Well, typically what I do is I have a notebook,
2   and I just write like the date and the number of hours
3   spent.  And that's usually how I do that.
4      Q.   So if we were to want to know how much time you
5   have spent on this case since May 1st, will you look in
6   that notebook?
7      A.   Probably that would be the easiest way, yes.
8      Q.   Is there any other place where you record the
9   time that you spend on this case?
10     A.   No, that would be it.
11          MR. FATHI:  Let's mark this next in order.
12          (Exhibit 703 was marked.)
13     Q.   BY MR. FATHI:  Doctor, showing you what's been
14  marked Exhibit 703, this appears to be your Confidential
15  Second Supplemental Expert Report in this case dated
16  September 19th, 2014.  Is that correct?
17     A.   Yes.  It looks like it's double sided, so I'm
18  just going through to make sure the pages are right.
19          Yes, this looks like a copy of my report.
20     Q.   From that report, Doctor, I understand that you
21  toured the Eyman, Florence, and Perryville facilities in
22  June of 2014; is that correct?
23     A.   That's correct.  June 19 and 20 of 2014.
24     Q.   And did you speak to ADC and Corizon staff
25  during those tours?

Page 10

1    A.   Yes.
2    Q.   And did you take those conversations into
3  account in reaching the opinions that are set forth in
4  your report?
5    A.   I'm not sure I'm clear on the question.  Could
6  you repeat it again or rephrase it.  You're asking me
7  again...
8    Q.   Did you take what you were told in those
9  conversations into account in reaching the opinions that
10  are set forth in your report?
11    A.   I took those into account, but also I based it
12  on previous discussions with them, previous conversations
13  and also subsequent interviews of them subsequent to the
14  tour.  So it wasn't just confined to the June 19th and
15  20th tour date.
16    Q.   And during those tours, you observed various
17  things, like cells, like exercise areas, correct?
18    A.   That's correct, yes.
19    Q.   And did you take those observations into
20  account in reaching the opinions that are set forth in
21  your report?
22    A.   I did.  But to clarify that, again, I took into
23  account my previous tours of those facilities.  So it
24  wasn't just what happened on June 19th and 20th, it was
25  also my previous tours of those same three facilities

Page 11

1  that I had took into account also.
2    Q.   Would you turn to page 5 of your report,
3  please.
4    A.   Sure.
5    Q.   And on that page, you refer to some records
6  that you reviewed, correct?
7    A.   Yes.
8    Q.   And how many records did you review?
9    A.   I'm not sure where you're referring to.
10    Q.   On -- do you see on page 5, you talk about
11  referring to some mental health records?
12    A.   On page 5 it says:  My notes attached as
13  Exhibit B.  And then it says Facility Maps.  And then
14  Dr. Dolny -- I'm not sure about the records.  I'm not
15  sure where it's referring to that.
16    Q.   You don't see any reference on this page to
17  inmates' mental health records?
18    A.   On page 5?
19    Q.   Yes.  Would you please read the sentence to
20  yourself after item 26.
21    A.   Okay.  Yes, I read it.
22    Q.   Okay.  My question is how many prisoner mental
23  health records did you review in preparing this report?
24    A.   At this time I can't recall the specific
25  number.  And I'm having trouble answering just the mental

Page 12

1  health records because when I reviewed the records,
2  typically it was the medical -- the EMR, the medical
3  chart.  So there was also entries for things like
4  allergies and medications and medical issues and dental
5  issues too.  But to answer your question, I don't -- at
6  this time I can't recollect the exact number of records I
7  reviewed, but it was a lot, I can tell you that.
8    Q.   Was it more than 100?
9    A.   I think it was somewhere on the order of 80 to
10  100.  But, again, I would want to be able to refer to my
11  report and maybe go through the list.  And the Attachment
12  C I think has all the records that I reviewed, has a
13  listing of all those.
14    Q.   So if I were to want to know which records you
15  reviewed, those would be listed in the attachment to your
16  report?
17    A.   If I'm not mistaken, that's what I did.  I put
18  an attachment or I referred -- and I'm just referring to
19  my report here.  Right.  It would have been Exhibit A on
20  page 4 of my report, reference No. 24, documents
21  identified on the list attached as Exhibit A to this
22  report.  And if I'm not mistaken, I think it has a
23  listing of all the records and the ADC prison numbers and
24  their names.
25    Q.   Okay.  But without referring to Exhibit A,

Page 13

1  you're not able to tell me how many prisoner medical
2  records you reviewed.  Is that correct?
3    A.   I'm not understanding the question.  Are you
4  saying for the purpose of the supplemental report or in
5  total in cumulative to date?
6    Q.   For purposes of the supplemental report.
7    A.   Well, I believe it was at least 80, because
8  there were four 20-inmate samples, but I would want to be
9  able to count through the appendix and add those up to be
10  definitive.
11    Q.   And when you reviewed prisoner medical records,
12  did you review the entire medical record for each
13  prisoner or just a portion?
14    A.   Whatever record was sent to me, I made an
15  effort to go through the entire record.  It's possible
16  that some records were only containing the mental health
17  portion, but I made an effort to read the entire record
18  from page 1 to the end of the document.  They were sent
19  to me electronically, and so, again, like I said earlier,
20  they could have contained nursing or medical or dental or
21  consultation information.
22        So I didn't just look at the mental health
23  portion of the record.  I tried to look at the entire
24  record in its totality.
25    Q.   If a prisoner had been in ADC for ten years,

Page 14

1  did you look at his entire record covering that ten
2  years?
3      A.   What I did was I tried to focus more on the
4  mental health evaluation and treatment component.
5  Certainly some inmates had been there for longer periods
6  of time.  But I did attempt to look at their mental
7  health evaluation and treatment even from the time they
8  came in, even if it was 10 or 15 or 20 years ago.
9      Q.   When did you review these records?
10     A.   I would have reviewed the records between the
11  time that they were sent to me and the time that I
12  prepared my report.
13     Q.   And when was that?
14     A.   Sorry, the time that I prepared the report or
15  the time that the records were sent to me?
16     Q.   Please listen to my question, Doctor.  When did
17  you review those records?
18     A.   Like I said earlier, they were sent to me over
19  a period of time.  So they weren't all sent to me at
20  once.  So the records, as I recall, I believe they
21  started coming to me as soon as -- I think my last
22  deposition was in either end of April or early May.  And
23  records started coming in I believe May of 2014 and then
24  every two to three weeks subsequent to that up until as
25  recent as maybe early September, I believe.

Page 15

1      Q.   How much time did you spend on your review of
2  these records?
3      A.   I don't know the exact number of hours, but
4  I've tried to track that and keep a running tally of
5  that.  It's a lot of hours.
6      Q.   Was it more than 100 hours?
7      A.   I don't know the answer to that.
8      Q.   Did you make any notes while you were reviewing
9  these records?
10     A.   No, I did not.
11     Q.   Would you turn to page 8, please.
12     A.   Sure.
13     Q.   On page 8 in the first full paragraph, you
14  refer to the mental health services provided to the named
15  plaintiffs in this case.  Do you see that?
16     A.   Sorry.  You said in the first full paragraph?
17     Q.   Yes.
18     A.   Yes.
19     Q.   Did you review the mental health care provided
20  to ▇▇▇▇▇▇?
21     A.   I believe I did.  I reviewed their records.  I
22  can't recall this morning specifically any particular
23  details or things that drew my attention, but I believe
24  that I had an opportunity to review his mental health
25  evaluation and treatment records, yes.

Page 16

1      Q.   Did you review the mental health care provided
2  to ▇▇▇▇▇?
3      A.   Again, the same thing.  I believe I recollect
4  reviewing a significant number of records, and I recall
5  reviewing her records and I do believe seeing evaluation
6  and treatment records of mental health nature.
7      Q.   Did you review the mental health care provided
8  to ▇▇▇▇▇▇?
9      A.   Again, I recall -- I recollect having the
10  opportunity to review all of their electronic medical
11  records.  I want to clarify that it's possible that the
12  evaluation and treatment records may have been sparse or
13  not extensive, but an evaluation could have included a
14  mental health screening, a mental health evaluation, or
15  other -- that would have incorporated what is a mental
16  health evaluation and offered treatment services that
17  perhaps somebody declined or refused to follow or comply
18  with.
19     Q.   Doctor, I'm going to ask you to listen to my
20  question and answer the question I ask.  The question is
21  did you review the mental health care provided to ▇▇▇▇
22  ▇▇▇? I believe your answer was yes.
23     A.   Yes.
24     Q.   Did you review the mental health care provided
25  to ▇▇▇▇▇▇?

Page 17

1      A.   Yes, I did.
2      Q.   And you've referred a couple times to EMRs,
3  electronic medical records.  Is it your testimony that
4  all of the records that you reviewed were in electronic
5  form?
6          MS. LOVE:  Form.
7          Go ahead.
8          THE WITNESS:  Thank you for clarifying that.
9  I apologize.  In Texas, we're EMR, so I refer to that all
10  the time.  You're bringing up a great point.  I want to
11  clarify my responses that when I got the records, they
12  were sent to me in DVD format.  And so when I looked at
13  them, they looked like they may have been in electronic
14  medical record form.  But as I understand now, that
15  basically ADC is beginning to roll out and utilize
16  electronic medical record, but the majority of these
17  records were in fact paper records.  So thank you for
18  clarifying that for me.
19     Q.   BY MR. FATHI:  Would you turn to page 10,
20  please.
21     A.   Sure.
22     Q.   In the first full paragraph of page 10, there
23  is an indented paragraph that purports to be a quotation
24  from the American Psychiatric Association's Psychiatric
25  Services in Jails and Prisons:  A Task Force Report of

Page 18

1  the American Psychiatric Association (2000) Second
2  Edition.  Do you see that, Doctor?
3      A.   Yes.
4      Q.   Is that indented paragraph a verbatim quotation
5  from that book?
6      A.   I believe so.  I was the one that typed that.
7  If I have a typo or something that's incorrect, I would
8  certainly be happy to review that.  But I was the one
9  that wrote -- that typed that manually.  So to the best
10  of my recollection, that would be a verbatim section or
11  portion from that book.
12      Q.   Did you omit any language from this quotation?
13      A.   I don't believe so.  I would be happy to
14  look -- I don't actually have a copy of that book with me
15  here today as we speak, but I would be happy to refer to
16  that book to see if I got that quote or citation
17  correctly.
18      Q.   So if I look in this book, I will find that
19  exact language just as you've written it on page 10,
20  correct?
21      A.   I believe so.
22      Q.   Why did you not provide a page citation for
23  this quotation?
24      A.   I usually -- I could be mistaken, but typically
25  I don't write page numbers when I write a report.  I just

Page 19

1  put the reference, the article reference.  And I don't
2  have a bibliography, so typically I just write the
3  citation with the article or source, but I don't
4  typically write the page numbers.
5      Q.   Would you turn to page 23 of your report,
6  please.  Now, the second half of page 23 consists of a
7  number of indented paragraphs, and you say that the
8  following is an example from the NCCHC standards.  Do you
9  see that, Doctor?
10      A.   Yes.
11      Q.   What is the source of the language quoted in
12  these indented paragraphs?
13      A.   I believe that's either the NCCHC prison
14  standards or the NCCHC mental health standards where
15  that's cited from.
16      Q.   Why did you not provide the title of the work
17  that you were citing?
18      A.   Well, a couple of things.  I mean, I could have
19  been a little more precise in that.  It's my
20  understanding that all -- all three different sets of
21  standards -- actually, there's four different standards.
22  There's the jail, the prison, the mental health, and then
23  there's the opioid treatment standard.  So there's four
24  different standards.  If I'm not mistaken, I believe that
25  all four of the standards would include that language

Page 20

1  verbatim.  But, sure, I probably could have put prison
2  standards or mental health standards, if I'm not
3  mistaken.
4      Q.   Well, whatever the source turns out to be, is
5  the language on page 23 of your report a verbatim
6  quotation from that source?
7      A.   Unless if I made a mistake in typing it or got
8  a typo or misspelled a word, yes, it's very much
9  verbatim.
10      Q.   Did you omit any language from this quotation?
11      A.   Not intentionally, no.
12      Q.   Now, immediately before that indented quotation
13  begins, you write, quote:  NCCHC has consistently not
14  made staffing recommendations.  End of quote.
15          Do you see that, Doctor?
16      A.   Yes, I see that.
17      Q.   Is it your testimony that NCCHC has
18  consistently not made staffing recommendations?
19      A.   I think that's fair, yes.
20      Q.   And is that your testimony just with regard to
21  mental health care or with regard to any kind of health
22  care staffing?
23      A.   I would say that NCCHC has taken that position
24  and made that recommendation across correctional health
25  care, be it medical, dental, nursing, or mental health

Page 21

1  care, yes.
2      Q.   So it's your testimony that NCCHC has
3  consistently not made staffing recommendations for any
4  kind of correction health care, correct?
5      A.   Well, I wanted to be clear that they -- they
6  basically clarify -- they provide guidance or language
7  about that you have to provide services, you know,
8  sufficient numbers and types of staff to care.  But as
9  far as giving a number or percentage or ratios, they
10  don't go that far.
11      Q.   For any kind of correctional health care?
12      A.   Not to the best of my knowledge, no.
13      Q.   Doctor, in preparing this report, did you
14  review the MGAR reports?
15      A.   Yes, I did.
16      Q.   For which facilities?
17      A.   Well, and I'd need to refer to my -- the
18  Appendix A that has all the documents that I reviewed.  I
19  can't really answer that question because, as I
20  understand it, ADC prisoners typically move from facility
21  to facility.  So I reviewed -- I reviewed MGAR reports.
22  I'm not sure if I can answer specifically by facility.
23  But the short answer is yes, I reviewed MGAR reports.
24      Q.   But you're not able to tell me for which
25  facilities?

Page 22

1    A.   Well, the ones -- for all the ones that were
2    sent to me, I reviewed those for ADC prison facilities.
3        Q.   But you're not able to tell me which ones those
4    are?
5        A.   Well, as I understand it, and I tried to
6    emphasize on the ones that had to do with mental health
7    offenders, Perryville, Eyman, Central, Florence, and
8    Lewis and Tucson and Yuma where they're referred to as
9    corridor facilities.  I mean, I looked at Safford and
10   Winslow and the others.  But because there's not as much
11   of a mental health percentage or population, I didn't --
12   I emphasized the review more on the main corridor
13   facilities, but I did review all of the facilities, the
14   MGARs that were sent to me.
15       Q.   So your testimony is that you reviewed MGARs
16   for all of the facilities you just named?
17       MS. LOVE:  Form.
18       THE WITNESS:  I can't recall specifically
19   which facilities.  And, again, it's referenced in my
20   appendix.  You know, to be very frank, I was sent a
21   tremendous amount of information.  As we sit here today,
22   I can't recall of the top of my head specifically which
23   facilities I reviewed and which I didn't.  But I can tell
24   you that if information was sent to me, specifically
25   MGARs, that I reviewed them and reviewed them in their

Page 23

1    entirety.
2        Q.   BY MR. FATHI:  For what months did you review
3    MGAR reports?
4        A.   I would need to refer to the appendix to be
5    able to answer the question.  But it's my understanding
6    that there is some question or issue about the time
7    period of the information, and as I understand it, and I
8    could be incorrect, I was asked to look in particular
9    over the period of time up to April of -- April 1 of 2014
10   and back to I believe it was August of 2013.  That that
11   was additional information that I was able to review.
12       Q.   So your testimony is that you reviewed MGARs
13   for every month during that period?
14       A.   I don't recall specifically, but, you know,
15   the -- I think the safest answer or the best answer that
16   I can give is whatever MGAR reports were sent to me, I
17   reviewed those.
18       Q.   When you reviewed an MGAR report for a specific
19   facility for a specific month, did you review that report
20   in its entirety?
21       A.   Yes.
22       Q.   Would you look at page 11, please.  In the
23   first full paragraph on page 11, toward the end of that
24   paragraph, you're discussing DI-326.  And you write,
25   quote:  ADC and Corizon agreed to increase the number of

Page 24

1    mental health staff to support these changes.  End of
2    quote.
3            Do you see that language, Doctor?
4        A.   Yes.
5        Q.   And when did that happen?
6        A.   I would need to refer to some additional
7    documents that I was provided.  It's my understanding
8    that -- there were several ways that I came to that
9    information or that I came to that data.
10       Q.   Excuse me, Doctor, the question again is when
11   did that happen?
12       A.   When did that happen?
13       MS. LOVE:  Form.  When as to the increase or
14   when as to his review?
15       Q.   BY MR. FATHI:  You write, quote:  ADC and
16   Corizon agreed to increase the number of mental health
17   staff to support these changes.  End of quote.
18           When did that happen?
19       A.   It's my understanding that there were verbal
20   communications between ADC and Corizon that predated the
21   contractual -- the signing of an amendment to the
22   contract, which, if I'm not mistaken, occurred in March
23   of 2014.  But it's my understanding that staff -- mental
24   health staff were recruited and hired prior to that.  And
25   according to the Corizon staffing reports that I

Page 25

1    reviewed, it appeared that there was an increase in 20
2    staff, mental health staff, I believe starting at the end
3    of 2013.  Either November or December, I believe, was
4    when 20 additional mental health staff were added.  But
5    I'd need to refer to those documents to be definitive.
6    But that's my best recollection this morning.
7        Q.   So your testimony is that as a result of this
8    agreement between ADC and Corizon, 20 additional mental
9    health staff were added?
10       A.   Were added as of the current period in time,
11   yes.
12       Q.   And at what facilities were those mental health
13   staff added?
14       A.   I don't know specifically which facilities, but
15   I do know what the position -- you know, the job
16   description or the -- I'm sorry, the position, like
17   whether it was a psychology associate or an LVN or nurse.
18   I recall that.  But I don't recall what specific
19   facilities they were added to.
20       Q.   What is the breakdown of those 20 additional
21   staff by job title?
22       A.   I would need to refer to the documents that
23   have that listed.  I believe there was a contract
24   amendment that would have those listed.  And then -- or I
25   could refer to the Corizon monthly staffing reports that

Page 26

1  I reviewed that's referenced in my report.  And I could
2  give you a complete listing of those positions by job
3  title.
4      Q.   As you sit here today, can you tell me what the
5  breakdown was of those 20 additional staff?
6      A.   Not without referring to the document.  I
7  wouldn't want to give you misinformation.  I want to be
8  able to answer your question, but I need to be able to
9  refer to the document.
10     Q.   How many additional mental health staff are
11 actually on duty in ADC as of April 1st of this year as a
12 result of this contract, this agreement?
13     A.   I would need to refer to the Corizon monthly
14 staffing report to be able to add that up and answer that
15 question.
16     Q.   Would you turn to page 12, please.  At the
17 bottom of page 12 is a table that purports to list mental
18 health staffing levels in ADC.  Do you see that, Doctor?
19     A.   Yes, I do.
20     Q.   What is the source of the information that's
21 set forth in this table?
22     A.   And actually, by looking at this table, this
23 helps recollect my memory on the dates that the 20
24 positions were included or added in the Corizon medical
25 staffing reports.

Page 27

1      Q.   If you would like to change your answer, please
2  go ahead.
3      A.   So it looks like basically up until the end of
4  April of 2014, there were 118, 118.4 positions budgeted
5  or allotted.  And as of May 1st, 2014, it looks like the
6  positions were increased to 138.4.  So I just want to
7  clarify that, that I had -- I think I had told you
8  November or December of 2013.  So that's incorrect.  It
9  was April/May of 2014 that the 20 positions were added.
10          I'm sorry, could you repeat your question,
11 please.
12     Q.   Yes.  My question is what is the source of the
13 data that is set forth on the table on page 12?
14     A.   I was provided with monthly staffing reports
15 from Corizon, the contracted vendor, and those were
16 provided on a monthly basis.  And that's how that
17 information is included in my report.
18     Q.   Did you construct this table?
19     A.   I wish.  I'm not very good with tables or
20 graphs.  I did not construct that table, no.
21     Q.   Did you take any steps to verify the accuracy
22 of the information on the table that is set forth on page
23 12?
24     A.   Yes, I did.
25     Q.   What did you do?

Page 28

1      A.   So what I did was I took the monthly Corizon
2  mental health staffing reports, and I started off looking
3  at the first page, which has psychiatric director, then
4  it has psychiatrist, psychiatric nurse practitioner,
5  psychologist, psych tech.  It has a listing of all the
6  different positions.  And it has both the contracted or
7  allotted numbers of full time equivalents, FTEs, on the
8  left-hand side.  And then on the right-hand side, it had
9  the actual fail rates, which included overtime or locums
10 or other.  So I manually added those up and verified that
11 the 118.4 was correct, and then I went by each month and
12 added up to confirm and corroborate that those numbers
13 are accurate.
14     Q.   Other than the Corizon documents that you just
15 described, did you look at any other documents or source
16 to verify the accuracy of this information?
17     A.   Yes.
18     Q.   What was that?
19     A.   I spoke both with Dr. Mark Fleming, who's the
20 basically mental health director for Corizon, and I also
21 spoke with Mark Jensen, who's their operations director.
22 I also spoke with a Corizon -- I'm not sure what her
23 title is, but she's their lead attorney.  And then I also
24 spoke with Dr. Taylor, Nicole Taylor, the ADC mental
25 health monitor, and discussed and asked questions about

Page 29

1  the staffing levels.
2      Q.   So you asked all four of those people
3  specifically about the numbers that are set forth on page
4  12?
5      A.   I asked them about staffing, how Corizon was
6  doing with regard to recruiting and retaining staff, the
7  implementation of DI-326, and where they had vacancies,
8  what they were doing to recruit additional staff.  So
9  yes, I spoke with all four of them about these.
10     Q.   Again, Doctor, you need to listen to my
11 question and answer my question.  My question is
12 specifically about the numbers that are set forth on --
13 at the bottom of page 12.  Did you ask any of the four
14 individuals that you just mentioned specifically about
15 the accuracy of these numbers?
16     A.   I spoke to Dr. Taylor, and we had a discussion
17 specifically about Corizon staffing.  But I don't recall
18 specifically if we went through the numbers, you know, in
19 detail.  But we spoke generally about the statistics and
20 numbers and their staffing levels.
21     Q.   Okay.  Would you turn to page 15, please.
22     A.   Sure.
23     Q.   Now, on page 15, toward the middle of the page,
24 there's a small table that purports to list mental
25 health -- excuse me, health care staff positions that

Page 30

1    have been added in order to implement DI-326.  Do you see
2    that, Doctor?
3        A.   Yes.
4        Q.   And what is the source of the information in
5    this table?
6        A.   Well, I believe there were two sources.  One
7    was -- there was a contract amendment between Corizon and
8    ADC where it listed this as an amendment to the contract.
9    And then it had a separate attachment or listing of all
10   these different positions and the hourly rates, the fees,
11   or whatever, and what would be the cost of that.
12       Q.   When were these positions added?
13       A.   It's my understanding, as I mentioned earlier,
14   I believe that they were added as of either the end of
15   April of 2014 or May 1 of 2014.
16       Q.   How many of these positions listed on page 15
17   are currently filled?
18       A.   How many are currently filled as of today or --
19       Q.   Yes.
20       A.   I don't know as of today, but I can tell you as
21   of July 2014.
22       Q.   Okay.  How many were filled as of July 2014?
23       A.   According to the data or information that I
24   have -- well, let me backtrack.  I don't have a separate
25   breakout by those positions --

Page 31

1        Q.   And that's what I'm asking about.  Of those
2    positions on page 15, how many of those positions are
3    currently filled?
4        A.   I don't know the answer, but I think I could go
5    back and look through the monthly staffing reports and
6    figure that out.  I believe I could do that.  And if I
7    could, I would probably rely on somebody like Dr. Taylor
8    to help me if it's not clarified like you asked me
9    earlier what units they're designated.  But that's really
10   an operational type of question.  But the short answer is
11   I don't know the exact number as of today.
12       Q.   Are any of these positions listed on page 15
13   filled as of today?
14       A.   I don't know the answer to that.
15       Q.   Would you turn to page 18, please.  Now, on the
16   second full paragraph on page 18 about four lines down,
17   you write that if Corizon doesn't provide adequate staff,
18   ADC can deduct from its monthly payment to Corizon.  Do
19   you see that language, Doctor?
20       A.   Deduct from its monthly payment to Corizon for
21   the net of all uncovered hours by Complex.  Yes.
22       Q.   Correct.  Has that ever happened?
23       A.   I believe so, yes.
24       Q.   How many times has that happened?
25       A.   Well, I asked those questions of Dr. Taylor and

Page 32

1    also of Mr. Jensen from Corizon, and I could be mistaken,
2    but I thought there was one time that it occurred, and it
3    was like $160,000.  But when I started to ask additional
4    questions, as I recall, it was either Mr. Jensen or the
5    lead attorney for Corizon said that that was proprietary
6    or confidential -- I'm sorry, not confidential.  It was
7    proprietary, and Corizon wouldn't be able to discuss
8    that.  So I asked the question, but they weren't able to
9    answer my question.  That's the best of my knowledge as
10   we sit here today.
11       Q.   Okay.  I just want to make sure I understand
12   your testimony.  Is your testimony that it has happened
13   once or that you don't know?
14       A.   It's my belief or my recollection from
15   discussing with Dr. Taylor on a separate occasion that
16   they were -- that funds were withheld, and I believe it
17   was something in the order $160,000.  But when I tried to
18   ask Mr. Jensen and that group, and I believe Dr. Taylor
19   was on the call during that discussion, they said that it
20   was protected or proprietary under Corizon, and so they
21   weren't at liberty to discuss that.
22       Q.   So your understanding that it's happened once,
23   but you're not sure?
24       A.   I think that's fair, yes.
25       Q.   Okay.  You also say a little bit further down

Page 33

1    in the same paragraph that:  if certain staffing
2    vacancies persist and these positions are not filled
3    within a certain mutually agreed upon period of time,
4    that there are staffing payback "offsets."
5            Do you see that language, Doctor?
6        A.   Yes.
7        Q.   How many times has that happened?
8        A.   That would be the same answer to the previous
9    question.  I tried to clarify that information, but I was
10   told that that was proprietary and they couldn't answer
11   that.  So I don't know the answer to that.
12       Q.   Do you know if it's ever happened?
13       A.   I don't know the answer to that.
14       Q.   Would you agree that there are some aspects of
15   the correctional mental health care that should be
16   performed by a psychiatrist rather than a nurse
17   practitioner or other mental health practitioner?
18           MS. LOVE:  Form and foundation.
19           THE WITNESS:  Sorry, could you rephrase or
20   help me understand the question.
21       Q.   BY MR. FATHI:  Sure.  What I'm trying to
22   understand is are there certain tasks in correctional
23   mental health care that should be performed only by a
24   psychiatrist or anything a psychiatrist can do can also
25   be done by another kind of mental health practitioner?

Page 34

1        MS. LOVE:  Form.
2        THE WITNESS:  I can't answer your question
3   in a yes or no, and I'll explain why.  In some states,
4   Texas, for example, to do a civil commitment of a
5   patient, and that involves corrections, like when we have
6   somebody that we want to send to the state hospital, we
7   want to civilly commit them, by state law, it requires a
8   medical doctor, an MD.  It doesn't specify that it has to
9   be a psychiatrist, but typically in our system in Texas,
10  only psychiatrists are the ones that do those civil
11  commitments to the state mental hospital.
12        So if you want to use the word "task," that
13  would be a task that, by statute, only a psychiatrist
14  could do.  A nurse practitioner could not do that.  If
15  you want to clarify when you say "tasks," I'd be happy to
16  try to answer your question.  I definitely believe
17  there's a difference in the level of training and
18  expertise of a psychiatrist from a nurse practitioner or
19  physician assistant.  But when you ask about tasks, it's
20  hard for me to answer your question.
21        Q.   BY MR. FATHI:  The psychiatrist has more
22  training than the nurse practitioner or the physician
23  assistant, correct?
24        MS. LOVE:  Form.
25        THE WITNESS:  When you say "training," I'm

Page 35

1   not sure because you could have some nurse practitioners
2   that get a Ph.D. or spend a lot of years studying.  I
3   would say training in psychiatry and medical school
4   training, I would say psychiatrists obviously have more
5   training in that.  But it's possible you have a nurse
6   practitioner that gets a Ph.D. and is a psychologist and
7   then becomes a nurse practitioner.  He or she may
8   actually have more years of training than the
9   psychiatrist.  So I guess I need more clarification when
10  you're asking me to answer about training.
11        Q.   BY MR. FATHI:  Okay.  Let me ask it a different
12  way.  And I'm not asking about state law.  I'm asking
13  about your expert opinion.  Are there some tasks in
14  correctional mental health care that should be performed
15  only by a psychiatrist?
16        A.   See, we don't really refer to -- in health care
17  we don't really have tasks.  So it's semantics, so if you
18  could rephrase your question again, I'd be happy to try
19  to answer it.
20        Q.   Are there any forms of correctional mental
21  health care that should be provided only by a
22  psychiatrist?
23        A.   It's my opinion that psychiatrists have
24  additional knowledge, experience, and training that
25  exceeds that of psychiatric nurse practitioners or

Page 36

1   psychiatric physician assistants and, therefore, when a
2   patient is beyond -- when the complexity of a patient's
3   care or their acuity exceeds that of the knowledge base
4   and training of a psychiatric nurse practitioner or
5   physician assistant, that's when a psychiatrist should be
6   consulted or somehow involved in their care.
7        Q.   Would you turn to page 24, please.  At the top
8   of page 24, second line down, you write that:  Corizon
9   health care has implemented competitive salary ranges --
10  and then you mention some other benefits -- for mental
11  health staff.  Do you see that?
12        A.   Yes.
13        Q.   What is the Corizon salary range for a
14  psychiatrist working in ADC?
15        A.   I can't tell you the exact salary range, and I
16  did ask that question.  So as we sit here today, I don't
17  know the answer to that.
18        Q.   What is the Corizon salary range for a
19  psychiatric nurse practitioner working in ADC?
20        A.   Could I clarify my answer to the question
21  before.
22        Q.   Please answer the pending question, and then
23  you can clarify.
24        A.   Okay, sure.  Again, I don't know as we sit here
25  today what the salary ranges are for a psychiatric nurse

Page 37

1   practitioner or for psychiatrist, but based on the
2   document that I reviewed and the contract amendment that
3   has an hourly rate or hourly fee for psychiatrists, I was
4   able to calculate what a salary would be.  So I can tell
5   you based on that hourly fee or hourly rate what that
6   number would be.
7        Q.   Well, you are referring in your report to
8   competitive salary ranges --
9        A.   Yes.
10        Q.   -- so that's what I'm asking you about, is
11  salary ranges.
12        A.   Sure.
13        Q.   Are you able to tell me the Corizon salary
14  range for any category of mental health staff working in
15  ADC?
16        A.   Yes.
17        Q.   And which category is that?
18        A.   When I reviewed the amendment to the contract
19  for the additional mental health staff for DI-326, there
20  were actually listed for some of the psychologists and
21  psych tech and LVN positions that there were salaries
22  listed, and I recall those salaries.
23        Q.   What are they?
24        A.   As I recall, the psychologist associate was
25  76,000.  The LVN, as I recall, was 56,000.  And those are

Page 38

1   the only two that I immediately recall here and now. I
2   would need the actual document to tell you, but I do
3   recall those salary numbers from reviewing those
4   documents.
5       Q.   And since we're talking about ranges, is that
6   the low end of the range you just gave me?
7       A.   That is -- as I understand it, that would be
8   the budgeted or the allotted amount. I don't know if
9   that would include a range, if that would be the low, the
10  middle, or the high of that. But that's -- per my read
11  of the contract amendment, that's how the positions were
12  budgeted for, based on those hourly rate and that salary.
13      Q.   Now, is that what the position is budgeted for
14  or is that what the person's actual salary would be?
15      A.   I can't answer that question because it came to
16  my knowledge from speaking with Corizon that they offer
17  additional incentives, and I've listed them in my report.
18  So I think that would be a really good question to ask
19  the Corizon people. To the best of my knowledge from my
20  review of the data, the contract amendments and talking
21  to the Corizon staff, that could just be the base salary
22  and maybe they have additional incentives on top of that.
23      Q.   But you don't know, do you?
24      A.   I don't know definitively, but I can say that
25  within corrections, those are standard practices within

Page 39

1   for-profit vendors. But I don't know definitively, yes.
2       Q.   Okay. Would you turn to page 26, please. On
3   page 26, about three-quarters of the way down, you write,
4   quote: I find the use of telepsychiatry by ADC and
5   Corizon to be appropriate, within the standard of care,
6   and constitutionally sufficient. End of quote.
7            Do you see that, Doctor?
8       A.   Yes.
9       Q.   Is it your intention at the trial of this
10  matter to offer opinions on the constitutionality of
11  ADC's mental health care?
12      A.   I think it would be presumptuous of me to give
13  legal opinions. But it's my understanding that the issue
14  in this case has to do with constitutional issues. I
15  think I can give an opinion with regard to psychiatry and
16  correctional psychiatry in particular and administrative
17  psychiatry. But I probably would not want to insult or
18  step on toes of the fact finder by trying to give a legal
19  opinion. I think that's for the fact finder to decide.
20      Q.   Okay. So are you planning to offer opinions on
21  the constitutionality of ADC mental health care?
22      A.   If I were asked, I would attempt to answer the
23  question. But I'm not planning on commenting because I
24  think, again, that would be presumptuous for a
25  correctional or forensic psychiatrist to be giving a

Page 40

1   legal opinion. That's, again, for the judge or the jury.
2       Q.   Which ADC complexes use telepsychiatry?
3       A.   As we sit here this morning, I can't recollect
4   in particular which one or which one does not. To the
5   best of my knowledge, from discussion with Corizon, I
6   think there's a long-term plan to have telemedicine and
7   to have that videoconferencing capability to all the
8   units. But as we sit here today, I can't tell you
9   specifically which unit does and does not have that
10  capability.
11      Q.   Are the psychiatrists who provide
12  telepsychiatry to ADC prisoners all licensed in Arizona?
13      A.   I'm not sure I understand your question.
14  Licensed -- what do you mean licensed?
15      Q.   Are they licensed as physicians in Arizona?
16      A.   I don't know the answer to that.
17      Q.   What have you done since May 1st of this year
18  to evaluate ADC's use of telepsychiatry?
19      A.   When I conducted the tours in June, June 19 and
20  June 20th, I toured the medical clinic areas and saw the
21  equipment. As I recall, I believe that one of the
22  facilities, there was actually a clinic going on via
23  telepsychiatry. And at another unit, there was the
24  equipment there, but's there was not -- no one was
25  actually using the equipment.

Page 41

1            I discussed with Dr. Mark Fleming if they
2   were having any issues or problems with psychiatrists,
3   and I distinctly recall that we talked about that they
4   are planning on expanding the use of their
5   telepsychiatry, especially at the difficult-to-recruit
6   units. But as far as any kind of additional quality
7   assessment of their telepsychiatry, I did not do that.
8       Q.   Have you ever observed a telepsychiatry session
9   in ADC?
10      A.   I don't know if I can answer that without
11  clarifying my answer.
12      Q.   Well, why don't you answer it and then clarify
13  your answer.
14      A.   Sorry, could you repeat the question, please.
15      Q.   Have you ever observed a telepsychiatry session
16  in ADC? And what I mean by that is watched and observed
17  a telepsychiatry session occurring.
18      A.   No, I have not. And can I clarify why?
19      Q.   Please.
20      A.   Okay, thank you. Well, as I understand it, I'm
21  not allowed to have direct communication with any of the
22  ADC inmates or the named plaintiffs. It's my
23  understanding, I was told by counsel, that any potential
24  ADC inmate could potentially be a participant in this
25  class.

Page 42

1        And I think, furthermore, for me to sit and
2   observe a session without consent from the inmate -- and
3   I assume because there's pending litigation, approval
4   from your group, from the plaintiffs' legal group, again,
5   I think that that would cause problems because I would be
6   basically like sitting in on somebody's appointment with
7   a doctor, and that's confidential information.  So I
8   think that would be -- again, that would be a no-no.  I
9   shouldn't do that without approval because of my role and
10  ethical obligations and such.
11       Q.   Did you ever seek approval to observe a
12  telepsychiatry session?
13       A.   No, because I knew from the very beginning that
14  I was told that I was not allowed to speak to anyone.
15  And so if that would have been the case, I would have
16  tried to interview all the people that Dr. Stewart
17  interviewed, and I certainly would have sat in on a
18  telepsychiatry and observed that.
19       Q.   Were you ever informed that you would have been
20  allowed to speak with prisoners with the presence of
21  plaintiffs' counsel?
22       A.   I believe that that was shared with me.  I
23  think the problem with that is --
24       Q.   Again, Doctor, my question is just were you
25  given that information?

Page 43

1        A.   I was given that information, but there's
2   literature that the presence of an attorney during an
3   interview or evaluation can contaminate or affect the
4   evaluation process.  So I didn't think it would be
5   worthwhile.
6        Q.   Okay.  Turn to page 27, please.  On page 27, on
7   the sixth line down, and this is discussing responses to
8   HNRs.  You write, quote:  In March 2014, the average wait
9   time was seven days.  End of quote.
10       Do you see that?
11       A.   Yes.
12       Q.   Is that a mean or a median?
13       A.   I don't know the answer to that.  I used to
14  know -- I used to be able to recite the differences
15  between a mean and a median, but as we sit here today,
16  I'm a little rusty in that area.  And so I don't -- first
17  of all, I can't tell you what a mean or median is, and I
18  can't tell you if that was -- seven days was a mean or
19  median.
20       Q.   Okay.  Would you turn to page 30, please.  On
21  page 30, beginning on the seventh line from the bottom or
22  the eighth line you write, quote:  the following ADC
23  units have fully implemented a new EHR and phased out
24  paper/written records:  Perryville, Tucson, and Florence.
25  End of quote.

Page 44

1        Do you see that language, Doctor?
2        A.   Yes.
3        Q.   When was the electronic health record
4   implemented at Perryville?
5        A.   I don't recall the specific date, but if I'm
6   not mistaken, I think it was one of the earlier
7   facilities.  Per my previous report, I believe that I put
8   in there that there was a plan for starting in January of
9   2014, but I believe that that date got pushed back a
10  little bit.  I'd have to refer -- so I don't -- the short
11  answer is, I don't know the answer to when it was
12  actually implemented full.
13       Q.   When was the EHR implemented at Tucson?
14       A.   I don't know the exact date.
15       Q.   When was the EHR implemented at Florence?
16       A.   Again, I don't know the exact date, but I know
17  where I could get that information.
18       Q.   Okay.  Would you turn to page 32, please.  On
19  page 32, which is all one paragraph, you mention nurses
20  who smuggled medication and failed to administer
21  medications as ordered.  And then you write that, quote:
22  Doctor Stewart did not identify if the individual
23  employee received discipline/corrective action and other
24  corrective action.  End of quote.
25       Do you see that language, Doctor?

Page 45

1        A.   When you said nurses, you said in kind of a
2   plural tense.  So I was under the impression that this
3   was just an isolated case.  Sorry, could you repeat the
4   question, please.
5        Q.   Okay.  My question is, do you see the language
6   I just quoted?
7        A.   Yes.
8        Q.   Were the nurses involved in those incidents
9   disciplined?
10       A.   I don't know the answer to that, but I believe
11  that I know where I could find that information out.
12       Q.   Okay.
13       A.   Actually, if I could clarify.  It's my
14  understanding from working in the role that I do in
15  Texas, many times when there's an HR, human resources,
16  issue that that information is somehow protected or not.
17  So I'm not -- I'm not sure if that information would be
18  readily available or not.
19       Q.   So you're not sure whether it would be readily
20  available to you or to Dr. Stewart, correct?
21       A.   Well, what I'm saying is I would think that if
22  this were -- if this had occurred and there were -- my
23  understanding is that there were -- there was an
24  investigation or there was documentation, I believe that
25  that information would be available.  Whether the

Page 46

1  individual employee records of that particular nursing
2  staff were available, that, I don't know.  Or if I would
3  be able to review that, I don't know the answer to that.
4      Q.  So you don't know whether the nurses involved
5  in these incidents were disciplined or received any other
6  corrective action; is that correct?
7      A.  That's fair, yes.
8      Q.  Page 33.  In the final paragraph on page 33,
9  you write that the standard of care for monitoring
10 patients on psychotropic medications is once every six
11 months.  Do you see that?
12     A.  I'm sorry, where are you, please?
13     Q.  I'm in the final paragraph on page 33.
14     A.  Okay.
15     Q.  And you write that the standard of care for
16 monitoring patients on psychotropic medications is once
17 every six months.  Do you see that?
18     A.  I don't -- I don't say it's the standard of
19 care.  I said -- I give examples of certain situations
20 where that's the typical time frame.
21     Q.  Okay.  Let me ask it a different way.
22     A.  Sure.
23     Q.  You write, quote:  It is my opinion that the
24 routine practice of seeing patients every three months
25 exceeds the national free-world, community mental health

Page 47

1  care standards, and correctional health care standards
2  for outpatient level of care, which is a visit every 6
3  months.  End of quote.
4          Do you see that language?
5      A.  Yes.
6      Q.  Is that your testimony?
7      A.  Yes.
8      Q.  Is it your testimony that in all cases, it is
9  sufficient to monitor a patient on psychotropic
10 medication once every six months?
11     A.  No.  And that's why I've very clearly inserted
12 the language of "routine practice."  When I'm saying
13 every six months, we're talking about somebody who is
14 clinically stable and is not having acute symptoms or
15 acute deterioration.  So that's basically somebody that's
16 stable, doing well, no problems, no issues, and has
17 reached the period of clinical stability.
18     Q.  So someone who is not stable might need to be
19 seen more often than every six months, correct?
20     A.  That's fair, yes.
21     Q.  Is it your testimony that all ADC prisoners who
22 are on psychotropic medications actually have a visit
23 with a psychiatric provider at least every six months?
24         MS. LOVE:  Form.
25         THE WITNESS:  Sorry, could you rephrase or

Page 48

1  repeat that so I understand it.
2      Q.  BY MR. FATHI:  Is it your testimony that all
3  ADC prisoners who are on psychotropic medications
4  actually receive a visit with a psychiatrist or
5  psychiatric nurse practitioner at least every six months?
6          MS. LOVE:  Form and foundation.
7          THE WITNESS:  No, that is not my testimony.
8          Could I clarify that?
9      Q.  BY MR. FATHI:  Sure.
10     A.  My opinion would be that there's, of course, a
11 variety of reasons why somebody may not be seen.  There's
12 a recommended time frame for seeing somebody per their
13 policy and procedure.  But within corrections, things
14 change.  People get moved.  Somebody may refuse to come
15 down to clinic or they may have a visit or something else
16 going on.  So those are generally recommended time
17 frames.
18         But it's also my opinion and from the data
19 and people I spoke with, like the psychiatrist down in
20 Tucson, that they routinely will see somebody more
21 frequently freely if there's clinical need or indication.
22 And I reviewed the data, for example, the psychiatric
23 encounters where even like at the Phoenix facility,
24 people are seen on a daily basis.
25     Q.  Doctor, I'm going to ask you to confine your

Page 49

1  answers to my question.  My question wasn't are people
2  seen more often.
3          Would you turn to page 34, please.
4      A.  Sure.
5      Q.  On the very first line, you write, quote:  My
6  review of charts (detailed in my report).  End of quote.
7          What report are you referring to?
8      A.  Well, I apologize.  What I probably should have
9  put is the appendix.  The documents that I reviewed for
10 this time period for the supplemental report.  That's
11 probably what I should have written.
12     Q.  Okay.  And you write further down in this
13 paragraph that you observed appropriate monitoring,
14 evaluation, and assessment, quote:  of a majority of ADC
15 inmates.  End of quote.  Do you see that language?
16     A.  Yes.
17     Q.  Did you find any cases in which the monitoring
18 and management of medication, therapeutic effects, or
19 side effects fell below the standard of care?
20         MS. LOVE:  Form.
21         THE WITNESS:  No, I did not.
22     Q.  BY MR. FATHI:  Okay.  Would you turn to page
23 35, please.
24     A.  Sure.
25     Q.  The first full paragraph, this is about a

Page 50

1  number of things that Deputy Warden Morris told you about
2  you write Eyman Unit. And I just want to clarify. This
3  applies to all housing units within the Eyman Complex?
4      A.  It's my understanding or my recollection that
5  any new intake or transfer, anybody that's admitted to
6  the Eyman facility, regardless of the housing unit, they
7  would be assessed by mental health staff within three
8  days.
9      Q.  And what steps did you take to verify that that
10  actually happens within three days?
11      A.  Well, I did not take steps to do that. I think
12  it would be extremely difficult to do that because -- and
13  I could comment more on that, but I'm sure you don't want
14  to hear the whole answer. But it's complicated within
15  prisons or jails to know when somebody hits the door and
16  the clock starts to the time that they're seen by health
17  care staff. But it is their policy and procedure that
18  they're seen within a timely manner. And that's the best
19  of my knowledge, that they're seen within that three-day
20  time period.
21      Q.  And your testimony is that you did not take any
22  steps to verify that that actually happens within three
23  days, correct?
24      A.  Actually, as I'm sitting here, it dawns on me
25  that I spoke with Dale about that, and that that's one of

Page 51

1  their -- not the three days. There's an audit tool or an
2  audit question that they have or had that had to do with
3  that very issue. And that they were having difficulty --
4  Dr. Taylor and I spoke, and that was the pivotal issue,
5  was how do you know when they actually arrived and were
6  now available for evaluation by mental health staff.
7      Q.  Were you able to verify that this actually
8  happens within three days in all cases?
9      A.  I didn't verify this, but it's my understanding
10  that that's the whole role and function or purpose of the
11  mental health monitoring staff. That that's what they
12  do. They routinely audit and measure compliance of
13  Corizon, the vendor, to see if they're doing what they're
14  supposed to be doing.
15      Q.  Did you look at the compliance measure for this
16  particular item?
17      A.  I looked at the monitoring measures, the MGARs,
18  and the other things that Dr. Taylor and her group do.
19      Q.  Did you look at the monitoring measures for
20  this particular item?
21      A.  As we sit here this morning, without being able
22  to look at the actual monitoring measures, I don't
23  recollect. I don't have a recollection of that.
24      Q.  Further down in the same paragraph, you say
25  that Deputy Warden Morris told you that certain

Page 52

1  prisoners, quote: receive a same day clinical
2  assessment, referral and transfer to the Baker Ward. End
3  of quote.
4          Do you see that?
5      A.  Yes.
6      Q.  And what steps did you take to verify that that
7  actually occurs on the same day?
8      A.  I took several steps to verify that. I
9  spoke -- I asked the same question of Warden Credio. And
10  I believe I asked one of the unit staff I believe later
11  referenced in the report, one of the correctional
12  officers, and I'm not finding it immediately here. But
13  basically I asked that officer, what would happen if
14  somebody was psychotic, what would you do. And they
15  explained that they would let their senior higher ranking
16  people know, and that they would get them moved to
17  Phoenix to the Baker facility. So I verified that with
18  both the leadership and also with the unit staff. And
19  also I verified that with Dr. Taylor, the ADC monitor.
20      Q.  Okay. So your testimony is that you were able
21  to verify that these transfers to Baker Ward always
22  happen on the same day; is that correct?
23      A.  No, that's not what I'm saying. As is the case
24  of any state hospital or inpatient psychiatric prison or
25  facility, often there's a shortage of beds. So what they

Page 53

1  clarified for me, and it's in my report, is that if a bed
2  is not available, that person could be watched or kept on
3  a constant observation until a bed became available.
4          So the best practice or the intent is to get
5  them transferred to Baker as soon as possible. And they
6  do whatever they can to -- they'll do an independent van
7  transfer and they'll make that happen. But if there's
8  not a bed available that they will keep that person safe
9  until a bed is available, which would be a day or two at
10  the most.
11      Q.  So the transfers to Baker Ward do not in fact
12  always occur on the same day, correct?
13          MS. LOVE: Form and foundation.
14          THE WITNESS: Well, in medicine, like we --
15      Q.  BY MR. FATHI: Yes or no, Doctor?
16          MS. LOVE: Same objections.
17          THE WITNESS: There's never an "always." So
18  I would say that it's likely that there may have been
19  cases where a transfer did not occur within the same day,
20  yes, that's fair.
21      Q.  BY MR. FATHI: Okay, thank you.
22          Would you turn to page 36, please. The
23  first full paragraph on page 36, you write, quote: ADC
24  has also achieved and maintained NCCHC accreditation.
25  End of quote.

Page 54

1        Do you see that, Doctor?
2    A.   Yes.
3    Q.   Is it your testimony that ADC as a system is
4    accredited by NCCHC?
5    A.   I can try to answer that, but I think the
6    people that would be able to answer that question better
7    would be the ADC leadership or NCCHC leadership.  I can
8    tell you my understanding --
9    Q.   Well, let me just clarify.  You wrote in your
10   report:  ADC has also achieved and maintained NCCHC
11   accreditation.
12   A.   Yes.
13   Q.   Is it your testimony that ADC, as a system, is
14   accredited by the NCCHC?
15   A.   It's my understanding that all of the units
16   except for Eyman have NCCHC accreditation.  So as I sit
17   here today, I can't say the entire system, but I can say
18   the majority or all but one unit have achieved and
19   maintained NCCHC accreditation.
20   Q.   Further down the page, you -- second full
21   paragraph, you are writing about Warden Fizer.  And you
22   write that he, quote:  described his belief that there
23   are sufficient mental health staff available for high
24   acuity inmates available at the Central Unit.  End of
25   quote.

Page 55

1        Do you see that, Doctor?
2    A.   Yes.
3    Q.   Is Warden Fizer a mental health professional?
4    A.   I don't know Warden Fizer's training.  I don't
5    believe he's a mental health professional, but I could be
6    wrong.
7    Q.   What is Warden Fizer's mental health training?
8    A.   I don't know the answer to that.
9    Q.   Would you look at page 37, please.  In the
10   first full paragraph, you are relating a conversation
11   with Deputy Warden Morris, and you have some lengthy
12   quotations from him which you put inside quotation marks.
13   My first question is when and where did this conversation
14   take place?
15   A.   It would have occurred during my tour of the
16   Eyman facility on June 19th, 2014.  And yes.
17   Q.   And Deputy Warden Morris' words that you put
18   inside quotation marks, are those verbatim quotes of what
19   he said?
20   A.   I believe so.  I have my notes from the --
21   actually, I don't have the notes, but I would think that
22   if I had a copy of the notes, I could refer to them and
23   confirm or clarify that.  But I quoted him in my report
24   to the best of my ability based on my interview of him
25   during that tour of the facility.

Page 56

1    Q.   So if I look in your notes, I should find these
2    words set down verbatim.  Is that what you're saying?
3    A.   Probably not because, similar to what the court
4    reporter here is doing, I have my own way of writing
5    things down and recollecting.  So it's possible that it's
6    not written verbatim, but that's the best of my knowledge
7    of what he said when I spoke with him and asked him those
8    questions.
9    Q.   I'm sorry.  You put these quotations in
10   quotation marks, correct?
11   A.   Yes.
12   Q.   Is it your testimony that this is or is not a
13   verbatim account of what Deputy Warden Morris told you?
14   A.   To answer your question, I would need to refer
15   to my handwritten notes from the tour on June 19th, 2014.
16   Q.   And you're confident that your handwritten
17   notes are a verbatim account of what Deputy Warden Morris
18   told you?
19   A.   Sorry, could you say that again, please.
20   Q.   Are you confident that your handwritten notes
21   would contain a verbatim account of what Deputy Warden
22   Morris told you?
23        MS. LOVE:  Form.
24        THE WITNESS:  I'm not sure, like I said
25   earlier, if I quoted him verbatim in this.  What I may

Page 57

1    have is notes to myself.  But to the best of my
2    knowledge, what I've included in my report is my best
3    recollection of my discussion with him on that day.
4    Q.   BY MR. FATHI:  And are you able to remember
5    verbatim what he said?
6    A.   What I put here is the themes or content of
7    what he's told me, which is that they made a conscious
8    effort to move mental health offenders to a different
9    facility and that they have a few left.  So that core
10   content of what I'm putting here, maybe if I left a "the"
11   or an "a" out of my quote or whatever.  But I believe if
12   I could have an opportunity to look at my notes, I could
13   answer your question.  I believe that anything that is
14   written in this report, there is something in my
15   handwritten notes that prompted me to include this in my
16   report.
17   Q.   Do you understand the meaning of the word
18   "verbatim," Doctor?
19   A.   No.  If I could tell me.  Because you seem to
20   be a pretty smart guy.  If you could tell me "verbatim,"
21   that would be very helpful.
22   Q.   Verbatim means word for word.  It means that
23   every word is taken down exactly as it was spoken.  The
24   court reporter here is preparing a verbatim transcript of
25   what is said.  So my question is, these words of Deputy

Page 58

1  Warden Morris that you put in quotation marks, are these
2  a verbatim account of what he told you?
3     A.  I'm not sure.
4     Q.  On the fifth line down, inside of the quotation
5  from Deputy Warden Morris, there are three dots.  Do you
6  see that?
7     A.  Right after the SMU?
8     Q.  Yes.
9     A.  Yes.
10    Q.  What do those three dots mean?
11    A.  I think you taught me this in our previous
12 deposition.  Is it ellipsis?  No.  I think it was
13 ellipsis.  And that you put that -- I'm trying to
14 remember.
15    Q.  If you don't know the answer, that's fine.
16    A.  I thought I had learned something from you, and
17 I wanted to impress you.  But I think you made a big
18 point of ellipsis in the first deposition, that if I
19 didn't include something that I should use that to
20 designate that.
21       So, anyways, I think the reason why it's not
22 just a period and it's the three dots is because there
23 was other discussion that we had that was not really
24 relevant to the issue that I was trying to make in the
25 report.

Page 59

1     Q.  Okay.  When you took your tours in June of this
2  year, did you have any recording device with you?
3     A.  Well, I had a pen and a pad of paper.  That's
4  all I had.
5     Q.  You didn't have any electronic device with you
6  on your tour?
7     A.  No.
8     Q.  Okay.  Still on page 37, the beginning of the
9  last paragraph, you write, quote:  This evaluator
10 clarified that the most common health diagnoses of the
11 remaining inmates housed at the Eyman Browning Unit are
12 anxiety and depression as opposed to more serious mental
13 disorders such as psychotic disorders.  End of quote.
14       Do you see that, Doctor?
15    A.  Yes.
16    Q.  And what was the source of that information?
17    A.  That would have been my discussion with
18 Dr. Taylor, and I remember there was another -- yeah,
19 Dr. Fleming was not on that tour.  It was just
20 Dr. Taylor.  And I asked her specifically -- she is a
21 licensed psychologist and worked in the system and now
22 audits the system.  She was the one that clarified that.
23    Q.  Did you take any steps to independently verify
24 that information?
25    A.  I don't recall as of this morning.  I don't

Page 60

1  recall if -- yeah, I'm not recalling at this moment.
2     Q.  Is it your testimony that anxiety and
3  depression cannot constitute serious mental disorders?
4        MS. LOVE:  Form, foundation.
5        THE WITNESS:  Can I answer that?
6     Q.  BY MR. FATHI:  Yes.
7        MS. LOVE:  Uh-huh.
8        THE WITNESS:  Sorry, could you rephrase that
9  again.
10    Q.  BY MR. FATHI:  Is it your testimony that
11 anxiety and depression cannot constitute serious mental
12 disorders?
13       MS. LOVE:  Form and foundation.
14       THE WITNESS:  No, that's not my opinion at
15 all.
16    Q.  BY MR. FATHI:  Okay.  Page 38.  And the second
17 full paragraph continues what appears to be a
18 conversation with Deputy Warden Morris, and he is
19 describing the Step Program.  And you write, quote:  As
20 the date of my tours, approximately 180 inmates are
21 receiving this behavioral incentive treatment program at
22 the Browning unit.  End of quote.
23       Do you see that?
24    A.  Yes.
25    Q.  What is the source of that information?

Page 61

1     A.  That was information that Deputy Warden Morris
2  provided to me and also Warden Credio -- I think it's
3  C-r-e-d-i-o -- and the other staff that were on the tour
4  shared with me.
5     Q.  What steps did you take to independently verify
6  that information?
7     A.  Well, I mean, I toured the facility, and I
8  observed the facility and the unit and the staff and the
9  programming.  But I didn't -- I mean, I looked at --
10 additional data that was provided to me included the logs
11 for the daily program, the programming.  I also reviewed
12 a lot of documents that had the name of the offender, a
13 listing of what programs they had -- were either in
14 the -- in process, had completed, or had had some
15 administrative removal.  So I looked at all those logs.
16       But as far as a running tally or adding up,
17 I did not verify the 180.  But I did look at the quality
18 and the fact that this was up and running and they were
19 doing it, but I didn't verify that 180, that specific
20 number.
21    Q.  Is it your testimony that the Step Program
22 constitutes mental health treatment?
23       MS. LOVE:  Form, foundation.
24       THE WITNESS:  I would say that the Step
25 Program is a component of mental health treatment, but I

Page 62

1  wouldn't say that it's a specific mental health treatment
2  program.
3      Q.   BY MR. FATHI:  Okay.  Page 39.  At the end of
4  the carryover paragraph, you write, quote:  (ADC inmates)
5  with current or recent treatment for mental illness are
6  employed as unit porters.  Close quote.
7          Do you see that language, Doctor?
8      A.   I'm sorry, the --
9      Q.   The phrase beginning with:  80 ADC inmates.
10     A.   Yes.
11     Q.   Now, you put that in quotation marks.  Who are
12  you quoting here?
13     A.   That would have been Deputy Warden Morris.
14     Q.   And what steps did you take to independently
15  verify this information?
16     A.   Well, as I said earlier, I was provided with
17  data that had -- actually, I was provided a lot of
18  information that included the inmates, their work
19  assignment, what they had done, and then how much they
20  had earned.  Like there were actual logs that had -- I
21  think they earn 30 cents an hour for the work.  And how
22  many hours they've worked in a given week and what it had
23  added up to.
24          But to answer your question, I did not
25  specifically go back and look to see who had mental

Page 63

1  health and who did not.  But I will say that in reviewing
2  the named plaintiff cases, I was impressed by the number
3  of employment opportunities that several of the named
4  plaintiffs had had.
5      Q.   Okay.  Doctor, that is completely
6  non-responsive to my question.
7          What does working as a unit porter consist
8  of?
9      A.   I can't give you specific breakdown of what all
10  the jobs or responsibilities would include, but I can
11  give you some general thoughts of what I understand it
12  would include doing any kind of assistance, for example,
13  with bringing out the food trays or helping prepare --
14  like once the kitchen people bring in the food, preparing
15  the tables or the food trays and helping distribute --
16  helping set up and distribute food, helping put away
17  trays after that or do other food-related functions just
18  on the unit, not going back and forth to the kitchen.
19  Helping with any kind of sweeping or cleaning or mopping,
20  janitorial sort of things.
21          But with regard to specifics of how that
22  would be done within a maximum security setting, I don't
23  have -- I'm not a correctional -- a custody person, so I
24  wouldn't be able to tell you specifically of what they do
25  and don't do from a custody and safety perspective.  But

Page 64

1  I would say that a porter is able to do several functions
2  that assist and help the unit and that they derive a
3  significant amount of satisfaction for being active and
4  out of their cell to do that.
5      Q.   So your testimony is that you know for a fact
6  that unit porters at ASPC Eyman do all of the activities
7  that you just stated; is that correct?
8          MS. LOVE:  Form, foundation.
9          THE WITNESS:  No, you asked me what a porter
10  did, and I'm telling --
11     Q.   BY MR. FATHI:  No, I asked you what does
12  working as a unit porter at Eyman facility involve.
13         MS. LOVE:  Form, foundation.
14         THE WITNESS:  So I can't give you specifics
15  because of whatever the custody limitations would be on a
16  unit porter within that setting versus a regular general
17  population setting and specifically how it is in Arizona
18  versus other states.  But I certainly can give an opinion
19  with regard to what the mental health benefits would be
20  to being employed as a unit porter.
21     Q.   BY MR. FATHI:  Doctor, that's not my question.
22  Please listen to my question and answer my question.
23         When an inmate works as a unit porter at
24  ASPC Eyman, how many hours a week is that job?
25         MS. LOVE:  Form and foundation as to

Page 65

1  complex.
2          THE WITNESS:  It's my recollection from
3  reviewing records that the amount of hours is variable.
4  It varies from inmate to inmate and week to week.
5  Because when I look at the work assignments, they seem to
6  have varying numbers.  So I don't know the specific
7  answer to that.
8      Q.   BY MR. FATHI:  What's the largest number of
9  hours that you ever saw a unit porter working in a single
10  week at ASPC Eyman?
11         MS. LOVE:  Form and foundation.
12         THE WITNESS:  I don't want to guess.  I
13  would have to refer to the document to answer your
14  question.
15     Q.   BY MR. FATHI:  Okay.  Still on page 39, in the
16  first full paragraph near the bottom of that paragraph,
17  you write, quote:  From Step 3 an offender could graduate
18  to close custody status, and eventually be removed from
19  maximum custody.  End of quote.
20         Do you see that, Doctor?
21     A.   Yes.
22     Q.   How many times has that actually happened?
23         MS. LOVE:  Foundation.
24         THE WITNESS:  Sorry, how many times has that
25  happened in this particular program, the Step Program?

Page 66

1    Q.   BY MR. FATHI:  Yes.
2         MS. LOVE:  Same objection.
3         THE WITNESS:  I don't know the answer to
4    that.
5    Q.   BY MR. FATHI:  Has it ever happened?
6         MS. LOVE:  Same objection.
7         THE WITNESS:  It's my understanding that the
8    is a new program, and I believe that there's time periods
9    or time frames upon which somebody has to complete to
10   advance.  If I'm not mistaken, I believe that Warden
11   Fizer did confirm that some people had graduated, but I
12   don't want to give misinformation.  I believe some people
13   have graduated and moved out of maximum custody.
14   Q.   BY MR. FATHI:  How many?
15   A.   I don't know the answer to that.
16   Q.   Page 40.  In the second full paragraph on page
17   40, you describe in Browning Unit you observed a class
18   that was called Responsible Thinking.  Do you see that,
19   Doctor?
20   A.   Yes.
21   Q.   Is it your testimony that this class
22   constitutes mental health treatment?
23        MS. LOVE:  Form, foundation.
24        THE WITNESS:  Similar to my answer before, I
25   believe that this class would be a component or a part of

Page 67

1    mental health treatment and rehabilitation, but it's not
2    specifically solely mental health treatment related.
3    Q.   BY MR. FATHI:  Again, Doctor, I want to be very
4    clear.  I did not ask about rehabilitation.  My question
5    is is this class called Responsible Thinking mental
6    health treatment?
7         MS. LOVE:  Form, foundation.
8         THE WITNESS:  Actually, I'd like to clarify
9    my response.  I think -- I believe that within
10   correctional settings, these educational classes, which
11   are more akin to group therapy, are actually mental
12   health -- are forms of mental health treatment.  So, yes,
13   I think this and the one that you asked me about earlier,
14   my opinion would be that they are a form of mental health
15   treatment, yes.
16   Q.   BY MR. FATHI:  Who was the instructor for the
17   Responsible Thinking class?
18   A.   I believe it's a CO III, a correctional officer
19   Level III.
20   Q.   And what are his or her mental health
21   qualifications?
22   A.   I received the training materials that -- the
23   didactic or the training curriculum that the staff had to
24   review that were trained to do the DI-326, and then
25   also -- I think the short answer to your question is they

Page 68

1    are not mental health professionals, but they do receive
2    mental health training by mental health staff.
3    Q.   Other than training that they might have
4    received as part of the DI-326 program, did the
5    instructor for this Responsible Thinking class have any
6    mental health training?
7    A.   It's my understanding that Dr. Taylor was
8    involved in some of the curriculum and training.  I think
9    I've referenced it in my report in a separate section
10   that Dr. Taylor is involved in the new officer academy.
11   I'm having trouble recollecting right now if Dr. Taylor
12   was involved in the training for the DI-326 and these
13   educational or psychoeducational training programs.  I
14   believe that most of them were done by correctional
15   leadership.
16   Q.   Other than training that he or she may have
17   received in ADC, what mental health training does the
18   instructor for this Responsible Thinking class have?
19        MS. LOVE:  Form and foundation.
20        THE WITNESS:  Well, that's a difficult
21   question to answer because I don't know if any of the
22   officers involved are currently or have been involved in
23   undergraduate or Master's level, you know, psychology or
24   other -- other types of educational training.  So I don't
25   know the answer to that.

Page 69

1    Q.   BY MR. FATHI:  Page -- move to page 41, please.
2    Four lines from the bottom, you are describing classes
3    on, quote:  responsible thinking, social values,
4    substance abuse, and self-control.  Close quote.
5         Do you see that, Doctor?
6    A.   Yes.
7    Q.   I take it it is your testimony that these
8    classes constitute mental health treatment?
9    A.   Yes.
10        MS. LOVE:  Form and foundation.
11        THE WITNESS:  Sorry, yes.
12   Q.   BY MR. FATHI:  What are the mental health
13   qualifications of the instructor for these classes,
14   putting aside any training they might have received in
15   ADC?
16        MS. LOVE:  Form and foundation.
17        THE WITNESS:  Well, as I mentioned earlier,
18   it's my understanding that there is some mental health
19   training as part of the correctional officer academy for
20   new officers, and then there's annual training for
21   current correctional officers that includes mental health
22   training and suicide prevention and suicide risk
23   identification.  And then I believe there's additional
24   training for certain correctional officers.  So I think
25   you're right, they're not mental health treatment

Page 70

1   professionals, but they are correctional officers --
2   actually, they're experienced correctional officers
3   because they're at the highest level, Level III, and with
4   a lot of experience and they've been identified to be
5   facilitators or leaders for these treatment programs.
6        Q.   BY MR. FATHI:  Okay.  Doctor, I'm going to ask
7   you once again to listen to my question and answer the
8   question that I asked.
9        A.   Okay.
10            MR. FATHI:  Will you read the question back.
11            (The requested portion of the record was
12   read by the reporter.)
13            MS. LOVE:  Form, foundation.
14            THE WITNESS:  As I sit here today, based on
15   my recollection, I'm not aware of any additional mental
16   health training that they would have had except for that
17   that I mentioned earlier that they received as part of
18   their correctional officer training.
19        Q.   BY MR. FATHI:  Which the question specifically
20   excluded.
21        A.   Right.
22        Q.   Okay.  Would you turn to page 43, please.  On
23   the fourth line, you're writing about SMU, and you say,
24   quote:  I noted that the recreational areas had a new 20
25   by 40 foot enclosure with a built in basketball court.

Page 71

1   End quote.
2        Do you see that, Doctor?
3        A.   Yes.
4        Q.   I've never seen a 20x40 basketball court, so
5   can you explain what you mean by basketball court.
6            MS. LOVE:  Form and foundation.
7            THE WITNESS:  I am having trouble right now
8   as we speak visualizing the dimensions of the enclosure.
9   And as I understand it, and I would have to refer -- I
10  think I've been provided some aerial photographs and some
11  other schematic diagrams of the facility, and I think
12  those would be very helpful to refer to those to be able
13  to answer your question.
14            But as I recall, I think that you could
15  mark -- you know, put tape or paint a basketball court
16  where you designate just a certain portion of the area to
17  be the court, and then the other area would be where
18  people could just walk around or sit or congregate.  So
19  that's my recollection.  But, again, I would want to look
20  at the visual to make sure that I'm giving you correct
21  information.
22        Q.   BY MR. FATHI:  So you're not saying it's a
23  full-size basketball court?
24            MS. LOVE:  Form and foundation.
25            THE WITNESS:  I don't know what constitutes

Page 72

1   a full-size or regulation basketball court.  All I can
2   tell you is the inmates were playing basketball, and it
3   looked to be a regulation size ten-foot net.  And they
4   were playing competitive basketball, but I don't know if
5   it was a regulation high school or college or NBA
6   basketball court.
7        Q.   BY MR. FATHI:  Okay.  Do all prisoners in SMU
8   use this new 20x40 foot enclosure?
9        A.   It's my understanding that only the ones that
10  have achieved that level of privileges would be allowed
11  to use that.
12        Q.   And what level of privileges is that?
13        A.   If I'm not mistaken, I think you have to be --
14  and I have it in my report farther down on page 43 -- I
15  think inmates who are Step III are allowed to have
16  recreation in the 20x40 separate recreation enclosure,
17  which included a basketball court.  So you have to be at
18  least Step II to be able to have that privilege of being
19  in that larger recreational space.
20        Q.   Step II or Step III?
21        A.   Step II.  And just to clarify, if I'm not
22  mistaken, I think you could be Step III, which I believe
23  they have even a bigger basketball court or recreation
24  space.  But if you wanted to be with your friends or
25  colleagues or whatever, I think you could request to be

Page 73

1   in the smaller space.  But that's per my understanding,
2   but I could be wrong on that.
3        Q.   Okay.  Further down the same paragraph on page
4   43, you write, quote:  Inmates who are Step I are allowed
5   to have recreation in a 10 by 10 foot separate recreation
6   enclosure, alone or with requested friends.
7        A.   I'm sorry, where are you, please?
8        Q.   Halfway down the page.  Inmates who are Step I.
9   Do you see that sentence?
10       A.   Yes.
11       Q.   Now, when you say "with requested friends," you
12  don't mean they're in the same enclosure, do you?
13            MS. LOVE:  Form.
14            THE WITNESS:  If I'm not mistaken, and I
15  would need to review their records, but I believe if a
16  Step II or a Step III wants to visit a Step I person, I
17  believe that they can go into that enclosure with them.
18  Again, I could be incorrect on that, but it's my
19  understanding that they would be allowed to recreate in
20  that enclosure if the Step II or Step III person wanted
21  to do that.
22       Q.   BY MR. FATHI:  So there could be two prisoners
23  together in that 10x10 enclosure?
24       A.   If I'm not mistaken, that's correct.
25       Q.   Do all SMU prisoners who are Step I receive

Page 74

1  recreation in these 10x10 foot enclosures?
2         MS. LOVE:  Form and foundation.
3         THE WITNESS:  It's my understanding they are
4  offered the opportunity to go out for rec, but it's an
5  individual decision every time that they're offered to do
6  it.  That's my understanding.
7     Q.   BY MR. FATHI:  Are all SMU prisoners who are
8  Step I offered recreation in these 10x10 foot enclosures?
9     A.   It's my understanding that unless if there's a
10 temperature issue or something else like, for example, if
11 the unit is in lockdown or there's some other custody
12 unitwide or leadership-driven decision, so weather or
13 lockdown or excessive -- it's too hot, it's my
14 understanding that they are offered this on a regular
15 basis, yes.
16    Q.   How many times a week?
17    A.   I don't know.  I would have to look at -- and I
18 have copies, and I did review them of the weekly
19 programming schedule that they get to go out -- if I'm
20 not mistaken, I think they get to go out at least three
21 times a week or more, but I would need to be able to
22 refer to the collateral documents to make sure that I'm
23 giving a correct response.
24    Q.   Three times a week in these 10x10 enclosures?
25    A.   I would want to look at the documents to be

Page 75

1  able to answer your question.
2     Q.   So you don't know?
3     A.   I mean, I vaguely recollect that it was
4  something in the order of nine hours a week or something,
5  nine to ten hours a week, but I don't recall
6  specifically, so I would have to refer to the documents
7  to be able to answer your question.  And as I understand
8  it, they're allowed to recreate at different times of the
9  day, either early in the morning or even late at night or
10 in the afternoon.  But the short answer, I don't recall
11 as we sit here today.
12    Q.   And how many times a week are -- excuse me, for
13 how long, for what duration each time are Step I
14 prisoners offered access to these 10x10 foot enclosures?
15    A.   I believe that I have that written in my
16 handwritten notes of my tour, but I'm having trouble
17 recalling right now.
18         Could we take a break?
19    Q.   Okay.  Have you finished your answer?  You need
20 to finish your answer.
21    A.   So the short answer is I don't recall the
22 specific lengths of time that they're allowed to be in
23 the recreational enclosures or the frequency.  But for
24 some reason it's kind of sticking in my head, and, again,
25 it could be incorrect, that it's somewhere in the order

Page 76

1  of nine or ten hours a week.
2         MR. FATHI:  Okay.  Let's take a break.
3         (A recess was taken from 11:59 a.m. to
4  12:09 p.m.)
5     Q.   BY MR. FATHI:  Would you turn to page 45,
6  please.
7     A.   Sure.
8     Q.   And in the final paragraph on page 45, you're
9  discussing OC spray, and you write, quote:  I learned
10 from Warden Credio and Deputy Warden Morris that there
11 have been changes to post orders.  Close quote.
12         Do you see that?
13    A.   Yes.
14    Q.   What steps did you take to independently verify
15 that information?
16    A.   I've looked at the -- and I'm sorry if I'm not
17 saying it right, the -- there's several policies and
18 procedures about what correctional officers should do and
19 not do, kind of their -- maybe there's an acronym.  I
20 apologize.  It's --
21    Q.   I just want to be clear, I'm asking
22 specifically about this statement that there have been
23 changes to Post Orders.
24    A.   Right.  I vaguely recall that there was some --
25 as we sit here today, I'm having trouble recalling if I

Page 77

1  recall if there was any written memo or changes to the
2  policy or directives regarding OC spray.  So as we sit
3  here today, I'm having trouble recollecting that.
4     Q.   Did you see the new Post Orders?
5     A.   I looked at a lot of records, and I vaguely
6  recall something about using the water canister prior to
7  resorting or using OC spray, but I'm having trouble
8  recollecting where that was, if it was the use of force
9  policies or if it was the other procedures and policies.
10 So, again, I apologize, but as we sit here today, I'm
11 having trouble remembering.
12    Q.   Further down, you write, quote:  I learned from
13 Warden Fizer that at the Kasson Unit there has been a
14 reduction in the use of force as a result of the use of
15 water canisters.  End of quote.
16         Do you see that?
17    A.   Yes.
18    Q.   And what steps did you take to independently
19 verify that there has been a reduction in the use of
20 force?
21    A.   I don't recall independently verifying that.
22    Q.   Is use of the water canister not considered a
23 use of force in ADC?
24         MS. LOVE:  Foundation.
25         THE WITNESS:  I don't know what their

Page 78

1   specific policies or procedures are with regard to that,
2   but it's my understanding that the OC -- sorry, that the
3   water canister, it's an additional intervention to
4   attempt to prevent having to resort to a use of force.
5   So it's one more step that they've -- it's an additional
6   step that they've included to avoid having to resort to
7   use of force.  So the answer to your question is I don't
8   believe that it is in and of itself a use of force.
9       Q.   BY MR. FATHI:  Assuming that there has been a
10  reduction in the use of force, how do you know that it's
11  as a result of the use of water canisters?
12      A.   Well, this is what I learned from Warden Fizer,
13  who I believe has, I can't recall, 30 plus years of
14  experience in the ADC system.  So I have no reason to not
15  believe what he told me.  But from what his vantage point
16  of what he's seen, that there's been a reduction.
17          Certainly there could be other factors like
18  training of staff or maybe offenders are on their own not
19  engaging in aggressive or assaultive behavior that would
20  require use of force.  But the short answer is there is
21  the possibility of other variables or explanations why
22  there was a reduction in the use of force.  But Warden
23  Fizer, per him, with his correctional expertise, shared
24  with me that it was his belief that there had been a
25  reduction because of the water canisters.

Page 79

1       Q.   But you don't know that there's any causal
2   relationship there, do you?
3       A.   My hypothesis would be that it probably is.
4       Q.   You don't know that there's any causal
5   relationship there, do you?
6       A.   I believe that it's probably a significant
7   variable.  Whether it's a cause and effect, I can't
8   answer definitively to that today.
9       Q.   Okay.  Page 46.  The very top of the page, you
10  write, quote:  Warden Fizer reporter that previously
11  there were 4 psychology associates from 2010-2013 but
12  there are currently 6 psychological associates assigned
13  to Florence.  End quote.
14          Do you see that, Doctor?
15      A.   Yes.
16      Q.   What steps did you take to independently verify
17  that information?
18      A.   Well, I reviewed the Corizon staffing reports.
19  And now that I -- it's refreshed my memory now that the
20  Corizon staffing reports include a systemwide analysis of
21  position and vacancies and such, and they also have a
22  unit breakdown.  I would need to refer to the document
23  that has the most current data on staffing of psychology
24  associates.  I don't believe that I was provided any
25  information from 2010 to 2013, but I could -- with that

Page 80

1   additional information, I could look at the Corizon
2   monthly staffing reports and be able to verify how many
3   psychology associates there were during those months.
4       Q.   Doctor, my question wasn't what could you do.
5   My question was what steps did you take to independently
6   verify that information?
7       A.   I reviewed all of the Corizon staffing reports,
8   but I did not seek out to independently verify an
9   increase from four to six over this time period.
10      Q.   Are all six of these psychology associates full
11  time?
12      A.   Again, I would need to refer to the Corizon
13  staffing reports to be able to answer your question
14  definitively if they were full time or half time.
15      Q.   To what unit are these six psychology
16  associates assigned?
17      A.   Well, if I was talking to Warden Fizer, it
18  would be the Central Unit.  But whether they were
19  assigned to a certain cell block or the Kasson building,
20  what have you, I would have to look at the Corizon
21  staffing reports and additional Corizon documentation to
22  answer your question.
23      Q.   Okay.  Further down on page 46, you're talking
24  about CB 7.  And you are talking about some courses.  You
25  write:  The current courses include:  "conflict

Page 81

1   resolution, substance abuse education, resources for
2   change, attitudes and beliefs, social values, responsible
3   thinking, living a better way."
4           Is it your testimony that each of those
5   courses constitutes mental health treatment?
6       A.   Yes, that would be my professional opinion.
7       Q.   And aside from any training he might have
8   received in ADC, what are the mental health
9   qualifications of the instructor?
10      A.   Well, and I have it listed here in my report on
11  page 46:  who function in a manner that is similar to
12  psych techs in other correctional settings nationally.
13  So it's very common to have correctional officers with
14  appropriate training to function -- to use the analogy
15  like the military, it would be like a medic or a
16  paramedic where you can get them trained.  So --
17      Q.   You're not answering my question, Doctor.
18          MR. FATHI:  Will you read the question back,
19  please.
20          (The requested portion of the record was
21  read by the reporter.)
22          MS. LOVE:  Form and foundation.
23          THE WITNESS:  Again, I answered this
24  earlier.  I don't know the specific educational
25  background of the correctional officers, if any of them

Page 82

1   have coursework or Bachelor's or Master's degree in
2   social work or psychology or other mental health
3   training.  But -- so the answer to your question is I'm
4   not certain if any of them have additional mental health
5   training.
6       Q.  BY MR. FATHI:  Okay.  On pages 47 and 48, you
7   have the heading Maximum Custody Programming, and you
8   write, quote:  The following programs, activities or
9   treatments are offered to mental health inmates.  End of
10  quote.
11          And then on page 48, you write, quote:  I
12  personally observed some of these programs, activities
13  and treatments during my tours of Eyman, Florence and
14  Perryville.  End of quote.
15          Do you see that, Doctor?
16      A.  Yes.
17      Q.  So I take it that you did not personally
18  observe any of the activities at Tucson, Phoenix, or
19  Lewis that you list on pages 47 and 48; is that correct?
20      A.  No, that's not accurate.  I had previously
21  toured Tucson and Lewis and Yuma.  I think the purpose,
22  as I understand it, of this supplemental report was
23  because your experts Vail, Haney, and Stewart had the
24  opportunity to conduct additional tours --
25      Q.  Excuse me.  Is it your testimony that

Page 83

1   Dr. Stewart conducted additional tours?
2       A.  I'm not certain.  I could be incorrect.  I
3   haven't looked at -- I hadn't finished answer the
4   question, though.  I would have to refer to Dr. Stewart's
5   report, which I did review, his supplemental report.  I
6   think it was the second supplemental report.  As we sit
7   here today, I don't recall if Dr. Stewart conducted an
8   additional tour, but I am aware that Mr. Veil and
9   Dr. Haney did conduct a second tour.
10          Sorry, back to the question that I was
11  answering.  What I was saying was that it was my
12  understanding that I was only supposed to give additional
13  information with regard to that time frame subsequent to
14  my previous supplemental report.  So, yes, in fact, I had
15  observed the Mental Health Program, activities, and
16  treatments at Tucson, Lewis, and Yuma previously during
17  my tours at those facilities.
18      Q.  So is it your testimony that you have
19  personally observed all of the programs, treatments, or
20  activities listed on pages 47 and 48?
21      A.  I wouldn't be able to say "all" because when I
22  toured Eyman, for example -- well, let me backtrack.  I
23  don't know if I can answer "all" because "all" is
24  inclusive of everything.  And, for example, the Tucson,
25  the organized religious services, maybe they only have

Page 84

1   those on weekends and I didn't tour on a weekend.  I
2   could go through all of these, but --
3       Q.  Please don't, Doctor.  Please answer my
4   question.
5       A.  Okay.  So the short answer to your question is
6   I can't say definitively that I observed all of these,
7   but I can say that based on my tours of all of these
8   units, it's my professional opinion that I was able to
9   either observe or gather data or information from others
10  or from record review of materials provided to me that
11  these activities were actually occurring.
12      Q.  That wasn't my question, Doctor.
13          MR. FATHI:  Rachel, will you please instruct
14  your expert to answer the questions that are asked.
15          MS. LOVE:  I believe he's answering the
16  questions the way he understands they're being asked.
17          MR. FATHI:  He's answering the questions he
18  wants to answer.
19      Q.  BY MR. FATHI:  Doctor, is it your testimony
20  that all of the activity that you've listed on pages 47
21  and 48 constitute mental health treatment?
22      A.  Yes, that would be my professional opinion.
23      Q.  And is it your testimony that all of the
24  activities that you've listed at pages 47 and 48 are
25  provided to all mental health inmates at these

Page 85

1   facilities?
2           MS. LOVE:  Form and foundation.
3           THE WITNESS:  No, that would not be my
4   opinion.  If somebody refuses to participate or someone
5   is not a certain level where they can -- there's certain
6   programs or activities that are based on their security
7   status or, you know, if they're death row, CR, or
8   whatever the -- there's different things that different
9   offenders -- sorry, inmates can do depending on their
10  custody and classification.  So you can't say "all" to
11  all of this.
12      Q.  BY MR. FATHI:  So all of the activities listed
13  at pages 47 and 48 are not available to all mental health
14  inmates at these prisons, correct?
15          MS. LOVE:  Form and foundation.
16          THE WITNESS:  That's not what I wrote in my
17  report.  I wrote "are offered."  "The following are
18  offered."  I didn't say all of the following are offered.
19  I think you're trying to get me to say more.  These are
20  all determined based on their custody and classification
21  and their compliance, whether they want to participate or
22  not.
23      Q.  BY MR. FATHI:  I think you said that their
24  eligibility may also be determined by their step level,
25  correct?

Page 86

1      A.   That would be correct.
2      Q.   Turn to page 48, please.  About halfway down
3   the page, you write, quote:  ADC has formed a
4   multi-disciplined committee.  End of quote.
5           When did that happen?
6      A.   And, actually, I believe that's a typo.  I
7   think that should be a multi-disciplinary, a-r-y.  I
8   apologize for that.  I don't know the specific date of
9   when that happened.
10     Q.   Who are the members of this committee?
11     A.   I don't recall the specific members by name or
12  title, but it's my recollection from my discussion with
13  Dr. Taylor and Dr. Fleming that it included a combination
14  of ADC wardens and operational leaders and also Corizon
15  leadership and then Dr. Taylor in her monitoring
16  function.  So I believe it included at least
17  representatives from custody, health care, and auditing
18  and oversight.
19     Q.   How often does this committee meet?
20     A.   I don't know the specific name of the specific
21  committee or their charge or task or how often they do
22  meet, but that would be something that I would be happy
23  to review and comment on.  So I don't know the answer to
24  that.
25     Q.   How many times has this committee met?

Page 87

1      A.   It's my understanding the committee has met at
2   least once, because they made recommendations, and DI-326
3   was recommended and approved by ADC's leadership.  So I
4   would -- I believe that the committee has met.  I don't
5   have a copy of the meeting minutes or action items but,
6   again, I would be happy to look at those and answer any
7   other questions you have on that.
8      Q.   Would you turn to page 51, please.  Actually,
9   let's go to page 52.
10          Now, about two-thirds of the way down the
11  page, you say, quote:  According to Dr. Taylor, ADC's
12  "current completed suicide rate of 16-17 per 100,000
13  inmates is near the national average."  End of quote.
14          Do you see that?
15     A.   Yes.
16     Q.   And what steps did you take to independently
17  verify that fact?
18     A.   Well, I did a couple of things.  The first
19  thing that I did, I looked at the Corizon monthly reports
20  and looked at the reported numbers of suicides by month
21  and by facility.  And I'm having trouble right now as we
22  sit here today in this meeting room recalling the exact
23  number, but I do recall distinctly that I looked at
24  August of 2013 through December of 2013 and found a
25  number from that time period.  But I'm having trouble

Page 88

1   recall from January 2013 through August of 2013.
2      Q.   So is it your testimony that you independently
3   verified that ADC's current completed suicide rate of 16
4   to 17 per 100,000 inmates is near the national average?
5      A.   No, that's not what I'm saying.  What I'm
6   saying is I -- that whole national average thing,
7   that's -- I mean, that's a whole separate discussion, and
8   I would be happy to comment on that or answer any
9   questions about that.
10          What I'm saying is I took steps to try to on
11  my own independently verify what was the number of
12  completed suicides within the ADC system statewide and
13  also by facility.  So I went through, and I looked at the
14  Corizon reports.  And per my review, I distinctly recall
15  that there were five suicides from August of 2013 through
16  December of 2013 in those reports.
17     Q.   How many suicides were there in ADC in calendar
18  year 2013?
19     A.   And that's what I was alluding to earlier.  I
20  don't recall the specific number.  I recall in our
21  previous deposition you asked me some questions about
22  some numbers.  But I don't have or I don't recall being
23  given that specific number by ADC or Corizon, and so the
24  only way that I've been able to independently corroborate
25  it is for me personally to go through the Corizon monthly

Page 89

1   report, I believe it's the PBMS, and tally it up on the
2   suicide by month and by facility.
3      Q.   On pages 52 and 53, you quote extensively from
4   an email from Will Barnow, ADC legislative liaison to
5   Charles Ryan, and you say it's dated December 17th, 2003.
6   First of all, is that date correct?
7      A.   Oh, that's a typo.  Thank you.  It should be
8   December 17, 2013.
9      Q.   Have you reviewed that email?
10     A.   Yes.
11     Q.   The subject line of that email reads:  Inmate
12  health talking points.  Correct?
13     A.   Yes.
14     Q.   And on pages 52 and 53, you quote six different
15  statistics about prison suicide rates.  Do you see that?
16     A.   I think I just have five.
17     Q.   Okay.  There are five.  Do you see those five
18  different statistics?
19     A.   Yes, I do.
20     Q.   And what steps did you take to independently
21  verify the accuracy of those statistics?
22     A.   What I did was I looked at the website -- and I
23  apologize, I'm blanking on the acronym.  It's the -- oh,
24  BJS.  The Bureau of Justice and Statistics.  I think
25  that's the acronym.  They keep -- as you know, they keep

Page 90

1  data on suicides nationally and by state. And so I went
2  to that website and looked up where Arizona ranked. And
3  so that's how I verified that is by looking at the Bureau
4  of Justice and Statistics, which I understand is a
5  federal government -- their role and function is to look
6  at the morbidity and mortality for states, and they keep
7  a running inventory of that.
8      Q.  So is it your testimony that you were able to
9  independent verify the accuracy of these five statements
10  by consulting the BJS website?
11     A.  Yes, that's fair.
12     Q.  Page 55. The very last sentence of that page
13  reflects that Dr. Taylor told you that, quote:  acts of
14  self harm and non-suicidal self-injury was "trending
15  down." End of quote.
16         Do you see that, Doctor?
17     A.  Yes.
18     Q.  And what steps did you take to verify that
19  these acts are trending down?
20     A.  As we sit here today, I'm having trouble
21  recollecting doing anything to verify that.
22     Q.  What is the magnitude of the decrease in acts
23  of self-harm and non-suicidal self-injury?
24         MS. LOVE:  Form, foundation. I'm sorry,
25  what it is the "what," please?

Page 91

1      Q.  BY MR. FATHI:  You say here that acts of
2  self-harm and non-suicidal self-injury were trending
3  down. My question is what is the magnitude of the
4  decrease? Is it down 10 percent, 50 percent, 80 percent?
5         MS. LOVE:  Form and foundation.
6         THE WITNESS:  I don't recall having any
7  firsthand records or data that show -- and I could be
8  wrong, maybe I'm just not recollecting this morning --
9  statistics on self-injury, self-harm, non-suicidal
10  self-injury. So as we sit here today, I did not clarify
11  from Dr. Taylor what percentage of decrease it was. But
12  if provided with that information, I would be happy to
13  review it and comment on that.
14     Q.  BY MR. FATHI:  And what was the time period
15  being referred to here?
16     A.  I would have to review my notes. I took some
17  notes during this phone call from Dr. Taylor, I believe.
18  I'm having trouble remembering or recollecting the exact
19  time frame. I think that would be a great question for
20  Dr. Taylor, given that she worked for ADC before and then
21  for Wexford and -- I'm sorry, not for Wexford. She's
22  been in the system before, during, and after, and I think
23  she could definitely answer that question better than I
24  could.
25     Q.  So your answer to my question is you don't

Page 92

1  know?
2      A.  I don't know, but I would be happy to look at
3  data and comment on that and try to answer your question.
4      Q.  Page 57. Let's talk about the suicide of ▮▮▮
5  ▮▮▮▮▮▮▮▮▮. Did you review ▮▮▮▮▮▮▮ medical record?
6      A.  Is that how it's pronounced, ▮▮▮▮.
7      Q.  Yes. ▮▮▮▮
8      A.  Yes. I did review his medical record.
9      Q.  And how did that come about?
10     A.  I'm not sure I understand the question.
11     Q.  Did you review the entire record or just a
12  portion of his record?
13     A.  I believe or I recall that I was sent his
14  entire medical record and also the morbidity and
15  mortality report and/or the psychological autopsy also.
16     Q.  But to answer my question, is it your testimony
17  that you reviewed his entire medical record?
18     A.  As we sit here today, I have his -- whatever
19  materials were sent to me by the legal team was sent to
20  me on a DVD and I reviewed it. I can't -- I'm not
21  certain whether the record that was sent to me was a
22  portion or his entire medical record. I believe that he
23  had only been in the prison for a relatively short amount
24  of time. So I believe that I was sent the entire record,
25  but I'd be willing to concede that if there was

Page 93

1  additional information or records that wasn't sent to me,
2  I'd be happy to review those also.
3      Q.  On what date did you first review ▮▮▮▮▮▮▮▮▮
4  record?
5      A.  I don't recall the specific date, but I'm
6  certain there's probably a letter from Ms. Love's legal
7  team office that has:  We would like you to review this,
8  and it has the inmate name, the record, and the date.
9  And that would have been the date that I would have
10  received it. When I would have reviewed the record would
11  have probably been a week or two or three after receiving
12  that, depending on my schedule.
13     Q.  Did you take any notes on your review of ▮▮▮
14  ▮▮▮▮▮▮▮ record?
15     A.  No, I did not.
16     Q.  Would you turn to page 59, please. You write
17  the psychologist -- this is about middle of the page.
18  You write that the psychologist recommended MH-3R
19  classification for ▮▮▮▮▮▮▮; is that correct?
20     A.  According to my review of the record, I believe
21  that -- the note was handwritten, and I could have -- you
22  know, without having the record in front of me, I think
23  if I had the record in front of me, I could definitely
24  tell you. But I'm not certain if it was a recommendation
25  or if that was the final decision of what the

Page 94

1  psychologist put on that note. But I distinctly remember
2  MH-3R is what was written.
3      Q.   But ▮▮▮▮▮ was instead designated an MH-2,
4  correct?
5      A.   My understanding -- well, that's per
6  Dr. Stewart's report. I don't know what ▮▮▮▮▮ was
7  actually classified as. I thought I saw in his record
8  that there were two different classifications. I thought
9  I saw an MH-2 and also an MH-3R, but I'm not sure of the
10 specific dates of when that changed or who made that
11 determination.
12     Q.   Well, it's my understanding that upon intake,
13 the psychologist recommended MH-3R, and ▮▮▮▮▮ was
14 instead classified as an MH-2. Is it your testimony that
15 that's not correct?
16         MS. LOVE: Form and foundation.
17         THE WITNESS: I would need to look at the
18 record to refresh my memory to be able to answer your
19 question.
20     Q.   BY MR. FATHI: Would you turn to page 61,
21 please. In the first full paragraph, this is about an
22 incident on August 3rd, 2013, where ▮▮▮▮▮ swallowed
23 some pills. Is it your opinion that this was not a
24 suicide attempt?
25         MS. LOVE: Form.

Page 95

1          THE WITNESS: Is it my opinion?
2      Q.   BY MR. FATHI: That this was not a suicide
3  attempt.
4          MS. LOVE: Same objection.
5          THE WITNESS: Based on the records that I
6  reviewed in this case and based on the psychology
7  autopsy -- and, actually, I did review the progress notes
8  where staff wrote, and I quoted it here, from the
9  psychology autopsy but also from the progress notes in
10 the chart, it would appear that this was more substance
11 abuse rather than a true suicide attempt. So, yes, I
12 think my opinion would be that this was not in fact a
13 suicide attempt.
14     Q.   BY MR. FATHI: Is it your testimony that this
15 incident could not have resulted in ▮▮▮▮▮ death?
16         MS. LOVE: Form.
17         THE WITNESS: It's my professional opinion
18 that anything in medicine is possible. Quite frankly,
19 the most likely resulting -- sorry, could you repeat the
20 question, please.
21     Q.   BY MR. FATHI: Is it your opinion that this
22 incident could not have resulted in ▮▮▮▮▮ death?
23         MS. LOVE: Form and foundation.
24         THE WITNESS: Again, like I said earlier, I
25 think in medicine, there's no absolutes, "nevers" or

Page 96

1  "nos." It's certainly possible it could have resulted in
2  his death. I think correctional officers 24/7, having
3  nursing staff, having a suicide prevention policy, if
4  ▮▮▮▮▮ would have experienced any symptoms or side
5  effects, he would have -- and he did in fact receive
6  medical attention and treatment.
7          And I'm not sure if 36 milligrams of
8  Risperdal could result in death. I think probably would
9  have resulted in some muscle stiffness. But that could
10 be readily treated in a medical setting or in a
11 correctional setting with medicines.
12     Q.   BY MR. FATHI: Is it your opinion that the
13 mental status examination performed on ▮▮▮▮▮ after the
14 August 3rd incident met the standard of care?
15         MS. LOVE: Form and foundation.
16         THE WITNESS: I would need to have a copy
17 of -- or be able to review that mental status examination
18 and also the progress note to be able to answer your
19 question. So without that in hand, I'm having trouble --
20 I would not be able to answer your question without
21 having that in hand.
22     Q.   BY MR. FATHI: Is it your opinion that placing
23 ▮▮▮▮▮ on suicide watch for less than 24 hours after
24 the August 3rd incident met the standard of care?
25         MS. LOVE: Form and foundation.

Page 97

1          THE WITNESS: It would be my professional
2  opinion that if mental health staff conducted a suicide
3  risk assessment and at the time that they evaluated
4  ▮▮▮▮▮ did not find him to have imminent risk of harm
5  to himself or others, that it would have been clinically
6  appropriate to discontinue the suicide precautions and,
7  therefore, that would meet the standard of care, yes.
8      Q.   BY MR. FATHI: Is it your opinion that placing
9  ▮▮▮▮▮ on suicide watch for less than 24 hours after
10 the August 3rd incident met the standard of care?
11         MS. LOVE: Form and foundation.
12         THE WITNESS: My opinion would be yes, it
13 met the standard of care.
14     Q.   BY MR. FATHI: Page 62. In the second full
15 paragraph, you refer to, quote: alleged failure to refer
16 him to a psychiatrist. End of quote.
17         And the "him" is ▮▮▮▮▮. Do you see that
18 language, Doctor?
19     A.   Yes.
20     Q.   And why do you use the word "alleged"?
21     A.   Well, a couple of things.
22     Q.   Again, my question is why do you use the word
23 "alleged"?
24     A.   The reason why I use the word "alleged" was
25 because during the -- and I don't have the progress note

Page 98

1   in front of me, but during the initial mental health
2   intake screening or mental health evaluation, on page 59
3   of my report, about halfway down, I put:  the doctorate
4   level psychologist wrote a plan, "inmate was referred to
5   mental health services intake, follow-up on old RX --
6   that's shorthand for prescription -- and since has not
7   been -- so what I'm saying there is Dr. Stewart alleges
8   that he was never referred to a psychiatrist.
9        Q.   Is it your testimony that [redacted] actually was
10   referred to a psychiatrist?
11             MS. LOVE:  Form and foundation.
12             THE WITNESS:  What my read of the chart
13   was --
14        Q.   BY MR. FATHI:  Is it your testimony that
15   [redacted] actually was referred to a psychiatrist?
16             MS. LOVE:  Form and foundation.  Time
17   period.
18             THE WITNESS:  I'm sorry.  You asked another
19   question.  I was starting to answer that, and then you
20   asked me a different question.  I'm confused.  Which
21   question should I be answering right now?
22        Q.   BY MR. FATHI:  The question that I've asked a
23   couple of times now.  Is it your testimony that [redacted]
24   actually was referred to a psychiatrist?
25             MS. LOVE:  Form and foundation.

Page 99

1             THE WITNESS:  But I thought you had asked me
2   about Dr. Stewart and the "alleged."  I thought that was
3   the original question.  That's the question I was trying
4   to answer, and then you asked me a separate question.
5        Q.   BY MR. FATHI:  You answered the question as to
6   why you used the word "alleged."
7        A.   Actually, I was starting to answer the
8   question, and then you interrupted me, but I hadn't
9   finished -- I was starting to answer that the reason I
10   put "alleged" was because a psychologist at intake wrote:
11   Follow-up on old prescription for depression.  And so I'm
12   wondering, and I don't have it here, but if in fact this
13   person had -- [redacted] had been on antidepressants
14   recently, if they would have discovered that information,
15   it's possible they could have referred him back to the
16   psychiatrist.  Or if he had submitted a sick call
17   request, an HNR.
18             But short answer to your question is I don't
19   have any evidence on my review that he was ever referred
20   to a psychiatrist.
21        Q.   Was [redacted] seen by a psychiatrist in the last
22   year of his life?
23        A.   To the best of my recollection, after reviewing
24   the chart, no.
25        Q.   Also on page 62, a little bit further down, you

Page 100

1   refer to, quote:  custody's alleged failure to monitor
2   him and prevent his completed suicide.  End of quote.
3             Again, why do you use the word "alleged"?
4        A.   Well, the reason I put "alleged" in all these
5   is because that's what Dr. Stewart is asserting.  And I
6   don't agree with Dr. Stewart.  I don't think he has the
7   background or experience to give opinions about
8   correctional suicide because he doesn't work in
9   corrections.  He doesn't have the background and training
10   that I feel that I do or real world experience.  So
11   that's why I included the word "alleged."
12        Q.   Is it your testimony that custody staff acted
13   appropriately on the day of [redacted] suicide?
14             MS. LOVE:  Form and foundation.
15             THE WITNESS:  It's my opinion that after
16   reviewing the records, custody staff, upon identifying
17   that [redacted] had self-injured or engaged in a suicide
18   attempt, serious suicide attempt, they engaged the
19   emergency response system.  I think it's called incident
20   command something, ICS.  Something like that.  And
21   alerted medical and intervened and tried to respond and
22   provided him with life-saving measures but were
23   unsuccessful.
24        Q.   BY MR. FATHI:  Is it your testimony that
25   custody staff acted appropriately on the day of

Page 101

1   [redacted] suicide?
2             MS. LOVE:  Form and foundation.
3             THE WITNESS:  I don't know enough specifics
4   about the particular custody review of the individual
5   custody staff that were assigned to that unit, the
6   frequency of their checks, whether they adhered to
7   policies or procedures, so I can't answer your question.
8        Q.   BY MR. FATHI:  Did you review the
9   administrative investigation report on [redacted]
10   suicide?
11        A.   I believe I did.
12        Q.   Is it your testimony that that report found
13   that custody staff had acted appropriately on the day of
14   [redacted] suicide?
15             MS. LOVE:  Form, foundation, goes beyond the
16   scope of the report where he's not offering an opinion in
17   this report regarding custody staff.
18             Go ahead, answer.
19             THE WITNESS:  Okay.  So I would -- I would
20   need that document to be able to review it to give an
21   opinion about their monitoring, suicide monitoring,
22   whether they adhered to their policy and procedure about
23   suicide checks.
24        Q.   BY MR. FATHI:  That's not my question, Doctor.
25   Is it your testimony that the administrative

Page 102

1    investigation report found that custody staff acted
2    appropriately on the day of ███████ suicide?
3              MS. LOVE:  Form and foundation.
4              THE WITNESS:  I would need to be able to
5    review the document to answer your question.
6        Q.   BY MR. FATHI:  Page 64.  The suicide of ████
7    ███.  Did you review ████████ ' medical record?
8        A.   Yes.
9        Q.   Did you review his entire record or just a
10   portion?
11       A.   Similar to my responses -- or response to your
12   question about █████████ earlier, I reviewed all of the
13   materials that were sent to me by the law firm of Struck
14   Wieneke & Love with regard to ████████ suicide.
15       Q.   Did you review his entire record or just a
16   portion?
17       A.   I don't recall specifically.  I believe he was
18   in ADC for 20 plus years.  I know that I reviewed at
19   least all of the mental health, and I reviewed some of
20   the medical records that I've included in my report.  I'm
21   not certain that I reviewed every single note --
22   actually, no, I take that back.  I do recall going
23   through the progress notes and his intake when he came in
24   like 20 years ago because I was struck by that really
25   things haven't changed much in 20 years with regard to

Page 103

1    documentation.
2        Q.   So your testimony is that you reviewed his
3    entire medical record?
4        A.   My testimony would be that I recall reviewing
5    his intake screening, his progress notes, his mental
6    health treatment, and emergency response from nursing and
7    medical subsequent to his suicide attempt.
8        Q.   You reviewed those portions for the entire 20
9    years of his incarceration?
10       A.   Sorry, that's not what I'm saying.  I'm saying
11   I distinctly recall reviewing all of those records.
12   Whether I reviewed the whole 20 years of his record I
13   can't recall as we sit here this morning.
14       Q.   Is it your testimony that there are no
15   psychiatric symptoms noted in ████████ ' medical
16   record?
17       A.   I'm not sure I know -- when you say psychiatric
18   symptoms, that's not really a term that I'm familiar
19   with, so I'm not sure what you're saying.  That's
20   something Dr. Stewart wrote, psychiatric symptoms.  I
21   know what signs and symptoms are, but when you say
22   psychiatric symptoms...
23       Q.   Looking at your report on page 64, you write,
24   quote:  these symptoms are not clearly mental health or
25   psychiatric in nature.  End of quote.

Page 104

1              Do you see that, Doctor?
2        A.   Yes.
3        Q.   So my question is, is it your testimony that
4    there are no psychiatric symptoms noted in ████████ '
5    medical record?
6              MS. LOVE:  Form and foundation.
7              THE WITNESS:  The problem I'm having is your
8    use of the terminology "psychiatric symptoms."  That's
9    something Dr. Stewart wrote.  It's obvious ████████
10   had signs, symptoms, and behaviors that were problematic.
11   But whether they would be related to a psychiatric
12   disorder such as in the DSM, that's what I'm struggling
13   with to answer your question.
14       Q.   BY MR. FATHI:  Do you dispute that it was noted
15   in Mr. Stewart's -- excuse me, ████████ ' medical
16   record that he was "moody and anxious"?
17       A.   I believe that was in the record, yes.
18       Q.   Do you dispute that it was noted in
19   ████████ ' medical record that he was "angry, loud,
20   demanding"?
21       A.   I recall that in the record.
22       Q.   Do you dispute that it was noted in
23   ████████ ' medical record "paranoia? psychosis"?
24       A.   Yes.  That was in the record.
25       Q.   Is it your testimony that ████████ did not

Page 105

1    suffer from any medical conditions during his
2    incarceration in ADC?
3              MS. LOVE:  Form.
4              THE WITNESS:  Sorry, could you say that
5    again.
6        Q.   BY MR. FATHI:  Is it your testimony that
7    ████████ did not suffer from any serious medical
8    conditions during his incarceration in ADC?
9              MS. LOVE:  Form and foundation.
10             THE WITNESS:  According to my record review
11   of ████████ , he had some chronic medical health
12   issues, and I've listed these in my report on page 66.
13   He had basal cell carcinoma that was resolved, eczema,
14   which was resolved.  Hypertension, high blood pressure,
15   which was stable.
16       Q.   BY MR. FATHI:  Could you answer the question,
17   please, Doctor?
18       A.   Well, you've asked me about serious medical
19   conditions, and I'm telling you these are chronic health
20   conditions.  Whether you want to call them serious or
21   not, that's a tough one because I'm telling you the
22   difference between -- I'm trying to clarify between
23   chronic and serious.  So, sorry, could you repeat the
24   question.
25       Q.   Is it your testimony that ████████ did not

Page 106

1  suffer from any serious medical conditions during his
2  incarceration in ADC?
3        MS. LOVE:  Form and foundation.
4        THE WITNESS:  It's my understanding from
5  reviewing ██████████ chart and it's my professional
6  opinion that he had some post -- after an accident, he
7  had some physical sequelae from a head injury but that he
8  suffered this before he came to ADC.  So the question of
9  serious medical conditions while he was in ADC, he had
10  physical challenges or mobility probably because of an
11  injury that happened before ADC.  But I don't see
12  anywhere that he had serious medical problems while he
13  was in ADC, no.
14        Q.   BY MR. FATHI:  Is it your testimony that
15  ██████████ never complained of medical conditions that
16  were causing him physical discomfort?
17        A.   Sorry, could you repeat that, please.
18        Q.   Is it your testimony that ██████████ never
19  complained of medical conditions that were causing him
20  physical discomfort?
21        MS. LOVE:  Form.
22        THE WITNESS:  It's my understanding that he
23  never complained of pain, chronic pain, but he did
24  complain of the health care that he was receiving.  But
25  I'm not aware, my review of the records, where he

Page 107

1  complained of physical pain or discomfort.
2        Q.   BY MR. FATHI:  Is it your testimony that
3  ██████████ never sought treatment for medical conditions
4  that were causing him pain?
5        MS. LOVE:  Form.
6        THE WITNESS:  I would have to review his
7  medical chart to see what the subjective complaints were,
8  what his chief complaints were when he was seen by
9  medical over the 21 years he was there.  He may have
10  complained of a stomachache or backache or some other
11  physical pain as all of us do.  So I would need to review
12  his chart to be able to answer your question.
13        Q.   BY MR. FATHI:  Is it your testimony that no
14  physician ever recommended a psychiatric referral for
15  ██████████?
16        MS. LOVE:  Form and foundation.
17        THE WITNESS:  My review of the chart or the
18  records that were provided to me, I did not see that any
19  medical staff had ordered or recommended a psychiatric
20  evaluation.  But if you have any other records to
21  contradict that, I would be happy to look at them.
22        Q.   BY MR. FATHI:  Page 67.  The suicide of
23  ██████████ Did you review ██████████ medical
24  record?
25        A.   Yes.

Page 108

1        Q.   Did you review his entire ADC medical record or
2  just a portion?
3        A.   I reviewed the entirety of the record that was
4  provided to me.  I'm not certain if it was the entire
5  record or just the mental health and current health
6  issues.
7        Q.   At the bottom of page 67 and continuing onto
8  the next page, you write the following, quote:  I am
9  unaware of hypothyroidism being associated with or
10  resulting in any "profound effects on an individual's
11  mental functioning."  I am similarly unaware of any
12  patients with untreated or unstable hypothyroidism
13  requiring psychiatric inpatient hospitalization or the
14  hypothyroidism causing them to have imminent risks of
15  harm to themselves.  End of quote.
16        Do you see that, Doctor?
17        A.   Yes.
18        Q.   And is that your testimony?
19        A.   That is my testimony, but I want to clarify
20  that your expert, Dr. Stewart, asserts that the
21  hypothyroidism is a cause and effect.  And what I'm
22  trying to explain is based on my training, practice,
23  clinical work, and administrative work that
24  hypothyroidism is a medical condition that's commonly
25  evaluated and treated and managed as an outpatient by

Page 109

1  medical staff.
2        And I can't recall in my -- I graduated
3  medical school in '92.  I can't recall ever seeing a
4  patient -- you know, some patients had hypothyroidism and
5  were on supplements, but I've never seen a patient that
6  was referred because of the hypothyroidism for an
7  inpatient hospitalization or had a suicide attempt for
8  untreated hypothyroidism.
9        So if you have literature -- again, I
10  certainly am wanting to learn and be a better doctor.  So
11  if you have studies or case reports, obviously
12  hypothyroidism can be associated with depression.  But a
13  cause and effect with hypothyroidism and inpatient
14  psychiatric hospitalization or suicide, I'm not aware of
15  any cause-and-effect relationship.
16        Q.   So the language I just quoted from pages 67 and
17  68 of your report, that is your testimony, correct?
18        A.   Yes, that's fair.
19        Q.   All right.  Further down on page 68, you go on
20  to say -- this is about halfway down the page.  Quote:  I
21  am unaware of any scientific literature supporting a
22  direct association between hypothyroidism and suicide
23  attempt/completed suicide, and similarly am unaware of
24  any association between hypothyroidism and psychosis.
25  End of quote.

Page 110

1     Do you see that language, Doctor?
2   A.   Yes.
3   Q.   Is that your testimony?
4   A.   Yes.
5   Q.   Is it your opinion that ████████
6   hypothyroidism was appropriately managed?
7     MS. LOVE:  Form and foundation.
8     THE WITNESS:  I don't believe that I have
9   the -- I mean, I did a one-month rotation of
10  endocrinology in medical school, but I'm not trained as
11  an internal medicine or family medicine doctor.  I'm not
12  trained as an endocrinologist.  So I don't feel that I
13  can give an opinion about his medical treatment.  I think
14  that would be a question for the medical experts in this
15  case.  So I don't have an opinion.
16  Q.   BY MR. FATHI:  Further down on page 68, you're
17  discussing the fact that ████████ was described Haldol
18  and Amandatine.  Do you see that discussion, Doctor?
19  A.   Yes.
20  Q.   Did the psychiatrist document in the chart that
21  he or she had discussed the risks and benefits of this
22  course of treatment with ████████ and obtained informed
23  consent?
24  A.   I would need to look at the chart to verify
25  that to answer yes or no to that.  It's my recollection

Page 111

1   that in reviewing a lot of charts that there was standard
2   verbiage about informed consent process.
3     But as we sit here this morning, I can't
4   recall if there was specific informed consent, either
5   verbal or a signed consent form, in this inmate's chart,
6   in ████████ chart.
7   Q.   On page 69 at the top, you quote Dr. Stewart's
8   statement that ████████ medications were, quote:
9   "abruptly discontinued in January 2013 without any
10  follow-up by a psychiatrist."  End of quote.
11    Do you see that, Doctor?
12  A.   Yes.
13  Q.   Do you disagree that ████████ medications
14  were discontinued in January of 2013?
15  A.   I would have to review the chart.  This was a
16  very complicated patient who had extensive mental health
17  interface or evaluations or attempts at treatment.  I
18  would need to be able to review the document to answer
19  your question intelligently.
20  Q.   After January of 2013, when did ████████ next
21  see a psychiatrist?
22  A.   I don't know the specific date, if he had
23  another one, but it appears that he had one at least on
24  June 17th of 2013.  But I don't know from -- without
25  having the record in front of me, I don't know if he had

Page 112

1   scheduled appointments or refusal of appointments between
2   January 2013 and June of 2013.
3   Q.   Okay.  On page 70, the first full paragraph,
4   you quote Dr. Stewart's statement that, quote:  "PTSD was
5   never considered as a diagnosis."  End of quote.
6     Do you see that language?
7   A.   Yes.
8   Q.   Do you disagree with that statement?
9   A.   Well, I'm sorry, I'm not understanding your
10  question.  Could you rephrase it, please.
11  Q.   Dr. Stewart writes, and you quote this in your
12  report, quote:  "PTSD was never considered as a
13  diagnosis."  End of quote.
14    Do you see that language?
15  A.   Yes.
16  Q.   Do you disagree with that statement?
17  A.   I don't disagree that that's what Dr. Stewart
18  wrote in his report.
19  Q.   No, I'm not asking you what Dr. Stewart wrote
20  in his report.  Do you disagree with Dr. Stewart's
21  assertion that PTSD was never considered as a diagnosis?
22  A.   Well, I can't answer that in a yes or no
23  because the medicine that -- and I've written in my
24  report, the medicine that he's on, the Paxil, P-a-x-i-l,
25  that's FDA approved for the treatment of PTSD, so I'm

Page 113

1   not sure how a psychiatrist would prescribe a medicine
2   that has an FDA approval and indication for a condition,
3   how they would never have considered that diagnosis.  So
4   I do disagree with Dr. Stewart's assertion.
5   Q.   Is it your testimony that Paxil is only used to
6   treat PTSD?
7   A.   I'm sorry, say that again.
8   Q.   Is it your testimony that Paxil is only used to
9   treat PTSD?
10  A.   No, that's not accurate.
11  Q.   So you disagree that -- with Dr. Stewart's
12  statement that PTSD never considered as a diagnosis,
13  correct?
14  A.   Correct.
15  Q.   Is it your testimony that it is documented in
16  the chart that PTSD was considered as a diagnosis?
17  A.   I would have to be able to refer to the chart
18  to see if the treating psychiatrist wrote any description
19  about PTSD symptoms or diagnosis.  As we sit here this
20  morning, I don't recall seeing a diagnosis of PTSD in the
21  chart.
22  Q.   Did you see any notation that it was even
23  considered as a diagnosis?
24  A.   I don't recall seeing "rule out PTSD" or
25  "consider PTSD" in the chart.  But that doesn't mean that

Page 114

1  the psychiatrist didn't consider it but didn't document
2  it. In other words, we're talking about mind reading
3  here. As a doctor -- I'll give you an example. As a
4  doctor in the emergency room --
5      Q.  You've answered my question, Doctor. I asked
6  if it was documented in the chart, and you answered my
7  question.
8      A.  No, I was trying to answer your --
9      Q.  No, you've answered my question.
10         Also on page 70, you write that -- I'm
11 sorry, Doctor, if there was something else you wanted to
12 say, go ahead.
13     A.  Thank you. That's very kind of you.
14         Well, the point I was trying to make is in
15 the emergency room, if somebody comes in complaining of
16 chest pain, the emergency room doctor is not going to
17 write out every single possible differential diagnosis.
18 They're probably going to put, rule out MI, for
19 myocardial infarction, which is probably the most serious
20 and life threatening, but they're not going to write 10
21 or 15 different differential diagnoses of other medical
22 or GI or orthopedic or neurological -- I mean, there's a
23 lot of different -- so just because a doctor, a
24 psychiatrist, doesn't write down, you can't say because
25 they didn't write it down, they didn't consider it. They

Page 115

1  just didn't document that they didn't consider it. So I
2  think Dr. Stewart is making a mountain out of a molehill.
3  I mean, obviously many inmates have had traumas or bad
4  things happen.
5         Anyway, I just wanted to clarify that it's
6  not an absolute. The doctor may have considered it but
7  didn't document it. That's the point I'm trying to make.
8      Q.  At the bottom of page 70, you write, quote:
9  Dr. Stewart asserts that ▉▉▉▉▉ should have been
10 considered for transfer to a higher level of care such as
11 an inpatient facility. End of quote.
12         Do you see that language?
13     A.  Yes.
14     Q.  Do you disagree with Dr. Stewart on that point?
15     A.  It's my opinion -- well, I disagree with that
16 because -- and I would want to review the chart. In a
17 perfect situation, you would actually want to be able to
18 speak to the staff that treated this patient because my
19 hypothesis would be --
20     Q.  Again, Doctor, I'm going to ask you again to
21 please answer my questions and limit your answer to the
22 question I actually asked you.
23     A.  Okay.
24     Q.  So you do disagree with Dr. Stewart's statement
25 that ▉▉▉▉▉ should have been considered for transfer

Page 116

1  to a higher level of care, such as an inpatient facility?
2      A.  What my response to that is, it's likely and
3  possible that he was considered for transfer. But every
4  time that you see someone, you have to make a clinical
5  decision, do they warrant a higher level of services. In
6  other words, when you have -- it's based on the clinical
7  acuity and clinical presentation of the patient, so --
8      Q.  Doctor, I'm really going to ask you to limit
9  your editorializing. You've answered the question.
10     A.  Well, the short answer is I don't agree with
11 Dr. Stewart because it's likely that it was considered,
12 but a decision was made by an independently licensed,
13 qualified mental health professional that he did not need
14 transfer.
15     Q.  And is it your testimony that that was
16 documented in the chart?
17         MS. LOVE:  Form.
18         THE WITNESS:  Every time that a patient is
19 seen, you don't have to --
20     Q.  BY MR. FATHI:  Is it your testimony that that
21 was documented in the chart?
22         MS. LOVE:  Form.
23         THE WITNESS:  I don't recall seeing that in
24 the chart, but -- and I can explain. And obviously
25 you're going to want to cut me off. But you don't

Page 117

1  routinely document every time you see somebody why you
2  don't refer them or send them to inpatient. That's not a
3  standard clinical practice in the free world or within a
4  correctional setting.
5         MR. FATHI:  Let's take a break.
6         (A recess was taken from 1:18 p.m. to
7  1:20 p.m.)
8      Q.  BY MR. FATHI:  Would you look at page 69,
9  please.
10     A.  Sure.
11     Q.  Now, in the indented quotation, there's a
12 reference to ▉▉▉▉▉ having his medication changed on
13 October 23rd, 2013. Do you see that?
14     A.  Yes.
15     Q.  And at that point he was scheduled for a
16 follow-up appointment 30 days later, correct?
17     A.  I don't have the notes in front of me, but that
18 sounds fair.
19     Q.  And that follow-up appointment didn't happen,
20 correct?
21     A.  Without the record, I wouldn't be able to
22 answer that question.
23     Q.  You just don't remember?
24     A.  Well, I would need the record to fresh my
25 recollection because there are so many cases and charts I

Page 118

1 reviewed.
2    Q. Turn to page 71, please. Toward the bottom of
3 the page, and now you're referring to the three prisoners
4 whose suicides we've discussed, you write, quote: None
5 of these three inmates made any verbal or written
6 requests to ADC or Corizon staff. End of quote.
7      Do you see that language?
8    A. Yes.
9    Q. Is that your testimony?
10    A. Well, you're taking us out of context. What I am
11 trying to say is verbal or written request immediately
12 prior to their actual suicide attempt.
13    Q. And by "immediately prior," what do you mean?
14    A. In the last week or two before their suicide
15 attempt.
16    Q. So when you say none of these three inmates
17 made any verbal or written requests to ADC or Corizon
18 staff, you're referring only to the seven days prior to
19 their suicide. Correct?
20     MS. LOVE: Form.
21     THE WITNESS: No. I said one or two weeks.
22 And I'm generalizing. I'm just saying within a period of
23 time predating their suicide, they didn't make any effort
24 to communicate to anybody, like submit a Health Needs
25 Request or I need to see the doc or I'm feeling suicidal

Page 119

1 or anything of that thing.
2    Q. BY MR. FATHI: I'm asking you about this first
3 statement: None of these three inmates made any verbal
4 or written requests to ADC or Corizon staff. End of
5 quote.
6     Is that your testimony?
7    A. And what I'm trying to clarify is I'm not
8 saying over the entire period of their incarceration or
9 health care while they were incarcerated. I'm saying in
10 the period of time immediately predating their suicide
11 attempt.
12    Q. And by immediately predating, what do you mean?
13    A. The period of time leading up to their suicide
14 attempt, which could have been a week or two weeks.
15    Q. I'm asking what you mean by that, Doctor.
16     MS. LOVE: Form. He just told you.
17     THE WITNESS: Right. One to two weeks
18 before their suicide attempt. And that's not hard in
19 stone. I'm just saying a reasonable period of time
20 before their suicide attempt.
21    Q. BY MR. FATHI: And you also write: nor did any
22 submit any requests via readily available HNR. End of
23 quote.
24     Do you see that language, doctor?
25    A. Yes.

Page 120

1    Q. Is it your testimony that neither ▇▇▇▇▇▇
2 ▇▇▇▇▇▇▇▇▇ nor ▇▇▇▇ ever submitted any HNRs?
3     MS. LOVE: Form, foundation.
4     THE WITNESS: Again, it's the same thing.
5 I'm not talking about their whole period of time of
6 incarceration. I'm saying shortly before -- the week or
7 two before their suicide attempt, they could have easily
8 submitted "I feel suicidal" or "I'm feeling unsafe,"
9 which is something we routinely have inmates, offenders,
10 do that.
11    Q. BY MR. FATHI: And then in the next sentence,
12 you write, quote: none of them communicated any
13 recent/current suicidal ideation or self-injury plans to
14 their peers, family members, ADC staff, Corizon staff, or
15 anyone else. End of quote.
16     Do you see that language?
17    A. Yes. And again --
18    Q. The question was, do you see that language?
19    A. Yes, I do.
20    Q. Is that your testimony, Doctor?
21    A. Again, the same caveat or point that I'm
22 referring to recent or current, like in the -- with a
23 letter to family, it would have been in the last month.
24 So I'd like to expand that from one or two weeks. The
25 period from their last visit.

Page 121

1    Q. How do you know that none of them communicated
2 this to their peers?
3    A. It's my understanding during the part of the
4 morbidity and mortality review process that results in
5 the psychological autopsy, there's a form where the
6 psychologist who completes that, there's particular
7 questions that have to do with the -- if I had the form
8 here, I could explain it better. But basically it goes
9 through different dimensions or measures. And I don't
10 recall on any of these three offenders -- I'm sorry,
11 inmates -- where there was any description of a letter to
12 the family or telling their cellmate or telling their
13 neighbor or telling a correctional officer that they
14 wanted to hang it up or they were suicidal or anything
15 like that.
16    Q. So your testimony is that in the months before
17 their suicide, none of these prisons communicated any
18 recent/current suicidal ideation or self-injury plans to
19 any other prisoners?
20    A. I said one to two weeks with regard to
21 communication verbally. But with regard to letters, I
22 would say a month.
23    Q. Okay. And you know that none of these
24 prisoners said anything about this to other prisoners,
25 correct?

Page 122

1     A.   I haven't reviewed any records that have
2  documentation where they communicated suicidal thoughts
3  immediately prior to their suicide attempt to other
4  correctional --
5     Q.   That wasn't my question, Doctor.  You know that
6  none of these prisoners discussed suicidal ideation with
7  other prisoners?  Because that's what you say here.
8          MS. LOVE:  Form and foundation.
9          THE WITNESS:  What I wrote in my report I
10 think is true.  That's my opinion, that based on the
11 information available to me, I'm unaware of any of these
12 three unfortunate inmates that ended up committing
13 suicide, I'm not aware of them communicating anything to
14 their peers, family members, other staff, or anyone else.
15    Q.   BY MR. FATHI:  And you know that, correct?
16    A.   Well, I'm telling you based on the information
17 I reviewed.  If you have information contrary to that, I
18 would be happy to look at that, and I would be happy to
19 consider that and maybe even change my opinion.
20         MR. FATHI:  Let's mark this as next in
21 order.
22         (Exhibit 704 was marked.)
23    Q.   BY MR. FATHI:  Doctor, would you identify
24 Exhibit 704, please.
25         MR. FATHI:  Let's go off the record.

Page 123

1          (Discussion off the record.)
2          THE WITNESS:  Okay, got it.
3     Q.   BY MR. FATHI:  What is Exhibit 704, Doctor?
4     A.   The first 13 pages are my notes from my
5  interview of Dr. Dolny and then a separate interview with
6  Dr. Taylor, Elizabeth -- sorry, Nicole Taylor and Mark
7  Jensen from Corizon, and then that lawyer -- I'm sorry,
8  I'm blanking on her last name.
9     Q.   Who is she by role?
10    A.   She's chief legal counsel I think for Corizon,
11 Jennifer something.  I forget her last name.  So that's
12 the first 13 pages.
13         Then the next 27 pages are my handwritten
14 notes from my tour of Eyman and then the Central Unit on
15 June 19th, 2013.
16         And then the last set of documents are 18
17 pages of my handwritten notes from my tour of Perryville
18 on gin 20th, 2013.
19         And those are the three sets of documents
20 that are Exhibit B.
21    Q.   Okay.  Would you please turn to the page that's
22 Bates stamped ADC448589.
23         And can you please tell me what these notes
24 consist of beginning on 448589 and continuing on to
25 448592.

Page 124

1     A.   Sure.  So this is my interview of Dr. Taylor.
2  And what she provided to me was her comments on
3  Dr. Stewart's report.  Do you want me to read through
4  this or --
5     Q.   No, I'm just asking you what it is.
6     A.   Okay.  So Dr. Taylor basically is sharing with
7  me the concerns or what she identifies to be incorrect or
8  faults with Dr. Stewart's report and his assertion
9  specifically regarding to the suicides of these ADC
10 offenders.  I'm sorry, inmates.
11    Q.   What was the date of this conversation?
12    A.   Sure.  It would have been September 16, 2014.
13    Q.   Now, let's first talk about ████████ on page
14 448589.  You write his name as ████████.
15    A.   Right.  That's a typo.
16    Q.   Was this before or after you had reviewed
17 ████████ medical record?
18    A.   This would have been -- this would have been
19 after.  But then I also went back and rereviewed it again
20 because I wanted to make sure that it was my opinion and
21 not Dr. Taylor's opinion.  So I had reviewed it before,
22 and then Dr. Taylor shared her concerns with me.  And
23 then I subsequently rereviewed ████████ his
24 records.
25    Q.   Did you have ████████ medical record in front

Page 125

1  of you when you were having this conversation with
2  Dr. Taylor?
3     A.   Probably not, no.
4     Q.   So were you essentially writing down what
5  Dr. Taylor was saying about ████████ suicide?
6     A.   Well, I was writing down her opinions or her
7  assessment in her role as the monitor.
8     Q.   Okay.
9     A.   But I certainly didn't -- I mean, I took this
10 into consideration, but my report is my opinion, it's not
11 Dr. Taylor's opinion.  It's my opinion.
12    Q.   I see.
13         Will you turn to page 448591, please.  And
14 this appears to be your notes about the suicide of
15 ████████, at least the first half of that page,
16 correct?
17    A.   Yes.
18    Q.   And was this before or after you had reviewed
19 ████████ medical record?
20    A.   Same thing as before.  I had already reviewed
21 his record.  I spoke to Dr. Taylor.  And then based on
22 her comments or her concerns, I went and rereviewed his
23 chart.
24    Q.   Did you have ████████ medical record in
25 front of you while you were having this conversation with



Page 126

1  Dr. Taylor?
2      A.  No.
3      Q.  And, again, it seems that you were writing down
4  what Dr. Taylor told you about ███████████' suicide,
5  correct?
6      A.  No.  I was writing down what her concerns were
7  with regard to Dr. Stewart's assertions.
8      Q.  Okay.  Further down the same page, you write
9  ████████████        I assume that is a misspelling of
10 ███████████  name, ███████  correct?
11     A.  Yes.
12     Q.  And this is the same conversation with
13 Dr. Taylor on September 16th, correct?
14     A.  Yes.
15     Q.  And was this before or after you had reviewed
16 ███████████  medical record?
17     A.  Same exact thing.  I had reviewed ███████████
18 record and then spoken to Dr. Taylor.  And then based on
19 the concerns or comments she had, I went back and
20 rereviewed it.
21     Q.  Did you have ███████████  record in front of you
22 as you were having this conversation?
23     A.  No.
24     Q.  And, again, here it appears that you were
25 writing down things Dr. Taylor was telling you about

Page 127

1  ███████████  suicide, correct?
2      A.  No.  I was writing down what Dr. Taylor -- the
3  things that she disagreed with Dr. Stewart's assertions
4  or allegations in his report.
5      Q.  On the next page, 592, you write:  Seen 10/23.
6  And then you write:  11/27 4 days outside of 30 day mark.
7      Can you tell me what that's referring to?
8      A.  Sure.  That's what Dr. Taylor reported to me.
9  She said, look, this is the problem with the case.  Our
10 policy is a 30-day follow-up, but he was seen four days
11 outside of that 30-day mark.  I think that's my scribble
12 is m-a-r-k there.  But she said that was not egregious.
13 In her role as a monitor overseeing the health care in
14 ADC, she opined at that time that it was not egregious.
15 And she also identified -- I don't know if you can see,
16 she says Thanksgiving holiday.  That's around the time
17 when a lot of people take vacation and holiday.  So that
18 was her opinion she shared with me.
19     Q.  Is it your testimony that ███████  was seen
20 four days after the 30-day mark or that he committed
21 suicide four days after the 30-day mark?
22     A.  I would need to have his chart to better answer
23 your question.  I don't think I wrote in my report the
24 date of his suicide attempt and when he was actually
25 pronounced.  So I wouldn't be able to answer your

Page 128

1  question without having his chart.
2      Q.  Is it your opinion that failure to see him
3  within 30 days, as required by policy, was consistent
4  with the standard of care?
5          MS. LOVE:  Form and foundation.
6          THE WITNESS:  I'm sorry.  Can you say it
7  again.
8      Q.  BY MR. FATHI:  Is it your opinion that failure
9  to see ███████  within 30 days, as required by policy,
10 was consistent with the standard of care?
11         MS. LOVE:  Form and foundation.
12         THE WITNESS:  It is my opinion that it met
13 the standard of care.  It did not deviate from the
14 standard of care.
15     Q.  BY MR. FATHI:  You mentioned Thanksgiving.  Is
16 it your testimony that ███████  -- that Thanksgiving
17 fell before ███████  killed himself?
18     A.  Without having his chart and knowing the date
19 of the suicide attempt and when he was actually
20 pronounced, I wouldn't be able to answer the question
21 because I don't know from a factual perspective of when
22 he actually attempted suicide.
23     Q.  I'm sorry, Doctor, you keep referring to an
24 attempted suicide.  Why are you using that locution?
25     A.  I'm sorry.  Say that again.

Page 129

1      Q.  You keep referring to ███████  attempted
2  suicide.  Why are you calling it an attempted suicide?
3      A.  Maybe it's more -- I don't see the date.
4          Well, you asked the question, so I'm going
5  to answer it.  When somebody attempts suicide, post the
6  suicide attempt, they may still be alive.  They may still
7  be brain dead, they've lost oxygen, and so they're in a
8  comatose state, but medically they're still alive.  I
9  consider myself to be an expert in suicide and
10 particularly in corrections.  I guess I'm just trying to
11 be precise from the time of the attempted suicide, the
12 time being discovered and medical intervention, medical
13 response, and then being transferred to an off-site
14 facility and then when he was pronounced or life-saving
15 measures.  Was he kept in intensive care on life support.
16 I don't know that because I don't have that information.
17 So that's why -- I'm trying to be precise and not vague.
18     Q.  I'm going to ask you to assume that ███████████
19 committed suicide on November 27th, 2013.  Okay?
20     A.  Okay.
21     Q.  He was seen on October 23rd.  He was given a
22 30-day follow-up which did not occur, correct?
23     A.  According to the chart and according to what
24 Dr. Taylor told me, that sounds right, yes.
25     Q.  And he committed suicide four days after the

Page 130

1  30-day follow-up should have occurred, correct?
2      A.   According to the date you're telling me, if we
3  assume that that's correct, yes, that's fair.
4      Q.   Assuming that that's correct, did the failure
5  to see him within 30 days as required by policy meet the
6  standard of care?
7          MS. LOVE:  Form and foundation.
8          THE WITNESS:  Yes.  It's my opinion that --
9  I mean -- and I don't know if I can answer this or if I
10  answered your question.
11      Q.   BY MR. FATHI:  You've answered my question.
12  Thank you, Doctor.
13          We talked a little bit earlier about OC
14  spray.  In preparation for this supplemental report, did
15  you review any incident reports involving the use of OC
16  spray?
17      A.   Yes, I did.
18      Q.   About how many?
19      A.   I don't know the exact number, but they're
20  referenced in my report.  I think it's Exhibit C, I
21  believe.
22      Q.   Was it more than 20?
23      A.   I would say yes.
24      Q.   Was it more than 50?
25      A.   I don't think it was that many, but I think it

Page 131

1  was at least 20.  But, yes, I did review the incident
2  reports.
3      Q.   In preparation of this report, did you review
4  any videos of use of OC spray?
5      A.   Yes, I did.
6      Q.   How many?
7      A.   I don't recall the exact number, but they're
8  referenced in my report.
9      Q.   Was it more than 20?
10      A.   I don't believe it was that many, but I could
11  be wrong.
12      Q.   Was it more than ten?
13      A.   I think it was less than ten.  But I could
14  refer to my report to be sure.
15      Q.   And did you watch all of those videos in their
16  entirety?
17      A.   No, I did not.  And I can explain why.
18      Q.   That's not necessary, Doctor.
19      A.   Okay.
20          But I will make an attempt to review them in
21  their entirety if this case goes to trial.
22      Q.   All right.  Let's turn to page 94 of your
23  report.  Under heading No. 12 on page 94, you say that
24  you reviewed a random sample of records as explained
25  above.  Do you see that, Doctor?

Page 132

1      A.   Yes.
2      Q.   Are those the records that we discussed earlier
3  in this deposition?
4      A.   Yes.
5      Q.   In any of those records, did you see anything
6  that fell below the standard of care?
7          MS. LOVE:  Form and foundation.
8          THE WITNESS:  You refer to the term
9  "standard of care" a lot, and I guess -- maybe it's a
10  little late to be asking this, but I'm not sure if you're
11  referring to a correctional standard of care or a
12  community standard of care or both.
13      Q.   BY MR. FATHI:  I'm asking in any of those
14  records, did you see anything that fell below either of
15  those standards of care.
16          MS. LOVE:  Form.
17          THE WITNESS:  My opinion would be no.
18      Q.   BY MR. FATHI:  Also on page 94, you refer to
19  reviewing the records for nine of the named plaintiffs.
20  Do you see that, Doctor?
21      A.   Yes.
22      Q.   In your review of those records, did you see
23  anything that fell below the standard of care?
24          MS. LOVE:  Form and foundation.
25          THE WITNESS:  And you're referring to both

Page 133

1  correctional and/or free world?
2      Q.   BY MR. FATHI:  I'm saying anything that fell
3  below either standard of care.
4          MS. LOVE:  Form.
5          THE WITNESS:  My opinion would be no.  It's
6  my opinion that all of the care provided to the named
7  plaintiffs met or exceeded the standard of care in
8  corrections or the free world.
9      Q.   BY MR. FATHI:  And the next paragraph, the last
10  paragraph on begins on page 94, you reviewed records for
11  nine prisoners identified in Dr. Stewart's report.  Do
12  you see that?
13      A.   Yes.
14      Q.   And then further on in that paragraph, you
15  refer to reviewing seven additional records of prisoners
16  mentioned in Dr. Stewart's report.  Do you see that?
17      A.   Yes.
18      Q.   In your review of those records, did you see
19  anything that fell below the standard of care?
20          MS. LOVE:  Form and foundation.
21          THE WITNESS:  No, I did not.
22      Q.   BY MR. FATHI:  So as I understand your
23  testimony, of all the records you reviewed in preparation
24  of this report, you did not find a single instance of
25  treatment that you believe fell below the standard of

Page 134

1  care; is that right?
2      MS. LOVE:  Form and foundation.
3      THE WITNESS:  Within a correctional setting,
4  attempting to provide health care -- constitutional level
5  of health care is a challenge.  And it's my opinion based
6  on review of the record that ADC and their contracted
7  vendor, Corizon, has offered appropriate health care
8  services and mental health care services to both named
9  plaintiffs and the other offenders or inmates that I've
10  reviewed.
11     Q.   BY MR. FATHI:  Excuse me, Doctor, that was not
12  my question.
13     MR. FATHI:  Will you read the question back,
14  please.
15     (The requested portion of the record was
16  read by the reporter.)
17     MS. LOVE:  Form and foundation.
18     THE WITNESS:  That's fair, I agree.
19     Q.   BY MR. FATHI:  We have discussed Exhibit 704,
20  which is some notes you took in -- as part of preparing
21  this report, correct?
22     A.   Well, no, they were notes I took to myself.
23  During the tour, you mean?
24     Q.   I'm asking, Exhibit B consists of notes that
25  you took in the course of preparing this report, correct?

Page 135

1      Let me ask a different question.  Since
2  April 1st of this year, have you taken any notes in
3  conjunction with your work on this case that are not part
4  of Exhibit 704?
5      A.   No.  These are the only notes I've taken.
6      Q.   Since April 1st of this year, have you taken
7  any notes in conjunction with your work on this case that
8  you have destroyed?
9      A.   No.  And I want to clarify because the sticky
10  note issue that you brought up in the last --
11     Q.   Doctor, there's no question pending.
12  You've answered my question.
13     A.   So, no, I have not discarded or thrown away
14  sticky notes or similar thing.  No.
15     Q.   All right.  On page 98.  Let me know when
16  you're there, please.
17     A.   Yes.
18     Q.   In the second full paragraph, second line, you
19  write, quote:  All common areas and cells have air
20  conditioning or swamp coolers.
21     Do you see that?
22     A.   Yes.
23     Q.   Which cells in ADC have air conditioning?
24     A.   Say that again, I'm sorry, the question.
25     Q.   Which cells in ADC have air conditioning?

Page 136

1      A.   I'm not sure if -- it's more of a semantic
2  issue.  Maybe it's all buildings that have cells would be
3  the way to say it better.
4      Q.   I'm asking about what you said in your report.
5      A.   Okay.
6      Q.   And so my question is which cells in ADC have
7  air conditioning?
8      A.   Okay.  To the best of my knowledge, based on my
9  tours of these unit, discussion with several different
10  correctional leadership, wardens, deputy wardens,
11  operations people, it's my understanding that all of the
12  common areas and buildings that contain housing cell
13  units have air conditioning or swamp coolers.
14     Q.   Okay.  Doctor, that was not my question.  Will
15  you please listen to the question and answer the
16  question.
17     A.   I'll try.
18     Q.   My question was which cells in ADC have air
19  conditioning?
20     MS. LOVE:  Form.
21     THE WITNESS:  I'm not sure I know what you
22  mean.  I'm from Texas, so we have window units and we
23  have different kinds of air conditioning.  Are you saying
24  central air conditioning or window units?
25     Q.   BY MR. FATHI:  Which cells in ADC have any form

Page 137

1  of air conditioning?
2      MS. LOVE:  Form.
3      THE WITNESS:  It's my understanding per my
4  discussion that all of the cells have some sort of air
5  conditioning or swamp cooling.
6      Q.   BY MR. FATHI:  Doctor, my question is about air
7  conditioning.  I am not asking about swamp cooling.  My
8  question, again, is which cells in ADC have any form of
9  air conditioning?
10     MS. LOVE:  Form.
11     THE WITNESS:  And I don't know the answer to
12  that.  I would have to refer to -- I'd have to verify
13  that.  I don't know the answer to that.
14     Q.   BY MR. FATHI:  Do any cells in ADC have air
15  conditioning?
16     MS. LOVE:  Form.
17     THE WITNESS:  See, this is where I'm
18  confused.  I'm not -- I'm not very -- I'm not a handy
19  person.  I don't know anything about fixing things.  But
20  during the tours, it seemed that several of the units
21  that I was on, it seemed that there was central air
22  conditioning.  And the cells are contiguous with those --
23  you know, with the main area.  So the short answer is I
24  can't answer your question.  I would need to know more --
25  I probably need to have some blueprint or schematics that

Page 138

1   has the ductwork and the operational A/C units and where
2   the vents go.  Without that, I can't answer your
3   question.
4          MR. FATHI:  Okay.  Let's take a short break.
5          (A recess was taken from 1:51 p.m. to
6   1:56 p.m.)
7      Q.   BY MR. FATHI:  Doctor, I want to ask you about
8   which housing unit you went to during your recent tours
9   in June of this year.  And by housing units, I'm asking
10  where the cells are actually located.  So at Florence,
11  did you go to CB 1?
12     A.   I would need to refer to my handwritten notes.
13         MR. FATHI:  Let's go off the record.
14         (A recess was taken from 1:57 p.m. to
15  1:58 p.m.)
16     Q.   BY MR. FATHI:  Doctor, at Florence, did you go
17  to CB 1?
18     A.   I didn't write specifically which unit I went
19  to.  I wrote down like SMU I and different pods, like
20  alpha, dog, and that sort of thing.  But I didn't
21  specifically right down every single unit that I went to.
22  So --
23         MS. LOVE:  You're talking Florence, right?
24         MR. FATHI:  Yes.
25         MS. LOVE:  Not at SMU I.

Page 139

1      Q.   BY MR. FATHI:  At Florence did you go to CB 1?
2      A.   I believe so, but I would -- there was a
3   document that I was provided during the first deposition
4   that was a record locator code that helped me -- I mean,
5   this is going back to June of this year.  So I believe
6   that I toured the -- all of the housing units, in
7   particular the housing units that were maximum custody.
8      Q.   How much time did you spend in CB 1?
9      A.   I don't recall.
10     Q.   Did you go to the cell blocks in CB 2?
11     A.   I believe so.
12     Q.   How much time did you spend at CB 2?
13     A.   I don't recall.
14     Q.   Did you go to the cell blocks in CB 3?
15     A.   I believe so.
16     Q.   How much time did you spend in CB 3?
17     A.   I don't recall.
18     Q.   Did you go to the cell blocks in CB 4?
19     A.   I believe so.
20     Q.   How much time did you spend in CB 4?
21     A.   I don't recall the specific time.
22     Q.   Did you go to the cell blocks in CB 5?
23     A.   I believe so.  Anywhere that had any kind of
24  maximum custody housing, I did go to those units.
25     Q.   How much time did you spend in CB 5?

Page 140

1      A.   I don't recall.
2      Q.   Did you go to CB 7?
3      A.   I don't recall that.
4      Q.   Did you go to Kasson Unit?
5      A.   Yes.  I distinctly remember going to the Kasson
6   Unit.
7      Q.   Did you go to Wing 1 of the Kasson Unit?
8      A.   I recall going to both of the wings.  And I've
9   included that in the map that has the schematics of the
10  units that's in my report.
11     Q.   There are actually three wings at Kasson Unit.
12  Is it your testimony that you went to all three?
13     A.   Yes.
14     Q.   Would you look at -- how much time did you
15  spend at Kasson Unit?
16     A.   I don't recall.
17     Q.   Does 20 minutes sound about right?
18     A.   Well, I don't know -- when you say 20 minutes,
19  does that count from the time of entering the facility?
20  And I'm not sure what's so funny.  Did I say something
21  funny or was it --
22         MR. FATHI:  Would you read the question
23  back, please.
24         (The requested portion of the record was
25  read by the reporter.)

Page 141

1          THE WITNESS:  Mr. Fathi was laughing, and
2   I'm not sure whether I said something that was funny or
3   not.  You know, the process of getting into a facility,
4   you have to be allowed to be buzzed in or entered.  And
5   then typically you also have to go through the security
6   and clearance.  So I can't answer -- are you saying from
7   the minute that I began observing the facility or from
8   the second that I cleared the security or -- maybe I'm
9   being picky here, but I don't know the specific amount of
10  time that I spent.
11     Q.   BY MR. FATHI:  Would you look at Exhibit 704,
12  please.  Turn to page 448619 toward the end.  Are you
13  there?
14     A.   448619.
15     Q.   About a third of the way down the page, it
16  appears that you've written:  Kasson 5 p.m.  Correct?
17     A.   Yes.
18     Q.   And then on the following page, toward the
19  bottom of the page, you've written:  left Kasson
20  5:20 p.m.  Correct?
21     A.   That's fair, yes.
22     Q.   So you spent approximately 20 minutes in Kasson
23  Unit, correct?
24     A.   That sounds right.  That sounds fair.
25     Q.   At SMU, did you go to 1 wing?

Page 142

1    A.   I believe so, yes.
2    Q.   And how much time did you spend there?
3    A.   I don't recall.
4    Q.   Did you go to 2 wing?
5    A.   I believe so.
6    Q.   How much time did you spend there?
7    A.   I don't recall.
8    Q.   Did you go to 3 wing in SMU?
9    A.   I believe so.  Any unit that had max custody, I
10   made it a point to go to those units.
11   Q.   How much time did you spend in 3 wing?
12   A.   I don't know.
13   Q.   Did you go to 4 wing in SMU?
14   A.   I believe so.
15   Q.   How much time did you spend there?
16   A.   I don't recall.
17   Q.   At Browning Unit, did you go to A pod or area?
18   A.   Sorry, which unit, please?
19   Q.   Browning Unit.  Did you go to A area?
20   A.   I believe so.
21   Q.   How much time did you spend there?
22   A.   I don't recall.
23   Q.   Did you go to B in Browning?
24   A.   I believe so.
25   Q.   And how much time did you spend there?

Page 143

1    A.   I don't recall.
2    Q.   Did you go to C area in Browning?
3    A.   I'm pretty sure I went to all the units that
4    had max custody.  I didn't write down by minute what unit
5    I went into.  And I've explained this in my report.
6    Q.   Can you just answer the question, Doctor?
7    A.   I think you're making a big deal out of how
8    much time -- you're talking about a prison where people
9    get stabbed and --
10   Q.   Doctor, just answer the question.
11   A.   Okay.
12   Q.   Did you go to C area in Browning?
13   A.   I believe so.
14   Q.   And how much time did you spend there?
15   A.   I don't recall.
16   Q.   Did you go to D area in Browning?
17   A.   I believe so.
18   Q.   How much time did you spend there?
19   A.   I don't recall.
20   Q.   Did you go to E area in Browning?
21   A.   I think there's just four.  I think it's A, B,
22   C, and D.  So I don't recall.
23   Q.   You don't recall if you went to E area in
24   Browning?
25   A.   Correct.

Page 144

1    Q.   Did you go to F area in Browning?
2    A.   I would need to refer to the schematics that I
3    have.  I have maps where -- it helps me refresh my
4    recollection of all the physical units and the layout.
5    So I would need to be able to have that, the facility
6    maps, Exhibit 26 in my report Exhibit C, to be able to
7    answer your questions.
8    Q.   So your answer is you don't know?
9    A.   I don't recall.
10   Q.   Did you go to G area in Browning?
11        MS. LOVE:  Form.
12        THE WITNESS:  Same answer.  I would need the
13   facility maps to refresh my recollection.
14   Q.   BY MR. FATHI:  Did you go to H area in
15   Browning?
16        MS. LOVE:  Form.
17        THE WITNESS:  Same answer.
18   Q.   BY MR. FATHI:  Did you go to I area in
19   Browning?
20        MS. LOVE:  Form.
21        THE WITNESS:  Same answer.
22   Q.   BY MR. FATHI:  Did you go to J area in
23   Browning?
24   A.   Same answer.  I would need the facility maps to
25   help me refresh my recollection of where I toured in the

Page 145

1    different units.
2    Q.   Did you go to K area in Browning?
3    A.   Same answer.
4    Q.   At Perryville, did you go to the Lumley Special
5    Management Area?
6    A.   Yes, I did.
7    Q.   Did you go to A area there?
8    A.   I would need the map to refresh my recollection
9    of how the different areas are designated, but I did go
10   to all the different areas, the condemned row, the
11   suicide watch.  I went to everything there in the Special
12   Management Unit.
13   Q.   Do you mean the Special Management Area in
14   Lumley Unit?
15   A.   I believe -- I can't recall if it's SMA or SMU.
16   Q.   How much time did you spend in the Special
17   Management Area?
18   A.   I don't recall.  I do recall I spent a half day
19   at Perryville, but I don't recall specifically how much
20   at each particular location.
21   Q.   Okay.  Back to your report.  Would you look at
22   page 72, please.  Now, on pages 72 through 77, you set
23   forth a number of what appear to be partial references to
24   books and articles.  So, for example, on page 72, you
25   have in parentheses Metzner 2002.  Do you see that?

Page 146

1    A.   Yes.

2    Q.   And what are these references in parentheses?

3    A.   Well, they're referencing articles written,

4 like Dr. Jeff Metzner and the article from 2002.

5    Q.   And why did you not provide citations to these

6 articles?

7         MS. LOVE:   Form.

8         THE WITNESS:   I don't know the answer to

9 that.  I think -- as you can see, it's a pretty long

10 report, and I was under pretty tight deadline and the

11 legal team too.  So in hindsight, yeah, it would have

12 been good to put the citations.  It would have been

13 helpful.

14        MR. FATHI:   Let's mark this.

15        (Exhibit 705 was marked.)

16   Q.   BY MR. FATHI:  Doctor, 705 is a September 25th,

17 2014, letter from your counsel setting forth full

18 citations for the articles cited in your report.  Are

19 these the correct citations for the articles you refer to

20 in this report?

21   A.   Well, just for clarification, it's not my

22 counsel.  I mean, I'm consulting to them.  As I

23 understand, they're the Arizona Department of

24 Corrections' counsel.

25        So the answer to your question is yes, these

Page 147

1 are the full references as best I understand.

2    Q.   Have you read in its entirety each of the works

3 cited on pages 72 to 77 of your report?

4    A.   No, I have not.

5    Q.   Would you turn to page 79, please.  Under

6 Essential Services, there are three bullet points.  Do

7 you see that, Doctor?

8    A.   Yes.

9    Q.   What is the source of this text of these three

10 bullet points?

11   A.   I'm having difficulty recalling if it's the

12 American Psychiatric Association Task Force Report on

13 Psychiatric Services in Jails and Prisons, the 2000

14 edition, or if I'm referencing them from a manuscript --

15 not a manuscript, sorry, the current revised document

16 that we're currently working on right now.

17   Q.   In either case, why did you not provide a

18 citation?

19   A.   Well, I guess I could have provided a citation.

20 I apologize for that.  I think -- so I would say the

21 citation should be the American Psychiatric Association

22 Psychiatric Services in Jails and Prisons 2000 -- sorry,

23 2002 edition.  And current 2015 edition is in final

24 editor review right now.

25   Q.   That wasn't my question.  My question was why

Page 148

1 did you not provide a citation?

2    A.   It was an oversight on my part.  I was trying

3 to provide a report in a timely manner with a tight

4 deadline, and I also have a full-time job on top of this.

5 So obviously it was a mistake or error on my part.

6    Q.   Would you turn to page 81, please.  In the

7 first full paragraph, you write -- well, I will

8 paraphrase.  That CR or condemned row inmates now have an

9 opportunity to work as an AM or PM porter for two-hour

10 blocks.  Do you see that?

11   A.   Yes.

12   Q.   How many death row prisoners have jobs as

13 porters?

14   A.   I don't know the answer to that.  And I don't

15 know male or female.

16   Q.   For those death row prisoners who do have jobs

17 as porters, how many hours a week are they out of their

18 cells doing those jobs?

19   A.   I don't know the answer to that.

20   Q.   Would you turn to page 83, please.

21   A.   Sure.

22   Q.   Toward the job of the page, you describe how

23 outdoor exercise is cancelled when the outdoor

24 temperature rises above a certain level.  Do you see

25 that?

Page 149

1    A.   Yes.

2    Q.   When outdoor exercise is cancelled because of

3 heat, is that time made up so that the prisoners receive

4 the full amount of time for exercise scheduled?

5    A.   I don't know the answer to that.  That's a

6 custody question.  It's my understanding that they try to

7 make the outside time -- where they try to arrange it

8 like early in the morning or late in the afternoon so --

9    Q.   Doctor, that's not my question.  You've

10 answered my question.

11   A.   Yeah, I don't know the answer to your question.

12   Q.   Would you turn to page 84, please.  In the

13 final paragraph on page 84, you mention what you call

14 vocational opportunities, including kitchen, special

15 projects, paint crew, gardening, and horticulture

16 programs.  Do you see that?

17   A.   Yes.

18   Q.   And I assume this is -- you're referring to

19 Central Unit?

20   A.   Well, this is a program that Warden Fizer is

21 describing about the different opportunities they have.

22 But it's my understanding that they have a similar thing

23 at other units too, not just for males.  They also have a

24 lot of these opportunities for the females.

25   Q.   But what Warden Fizer is describing here on

Page 150

1  page 85, that pertains to Central Unit, correct?
2      A.   Warden Fizer was describing the work and
3  vocational opportunities at Central, and that's what I've
4  listed here.  But it's not unique to Central.  These
5  opportunities are also available at other ADC facilities.
6      Q.   Are all prisoners in Central Unit eligible to
7  participate in these programs that are described on page
8  84?
9      A.   It's my understanding that it depends on their
10 custody status and their level.  And so based on that,
11 that would determine who's eligible for what and how
12 long.
13     Q.   How many prisoners had Central Unit currently
14 participate in paint crew?
15     A.   I don't know, but I do have the work list, and
16 it does have the number of hours and the names of the
17 inmates.  But I don't know how many are actually doing
18 paint crew as we sit here today.
19     Q.   And of those who do paint crew in Central Unit,
20 how many hours a week do they do that?
21     A.   Again, I would have to refer to the document
22 that have work schedules that have inmates listed week by
23 week.
24     Q.   Would you turn to page 85, please.
25     A.   Sure.

Page 151

1      Q.   In the last paragraph on page 85, you're
2  talking about Kasson Unit, and you say, quote:  inmates
3  had access to contact visits.  End quote.
4          Do you see that?
5      A.   Yes.
6      Q.   Do all prisoners in Kasson Unit have the
7  opportunity to have contact visits?
8      A.   I don't know the answer to that.  I would
9  assume it has to do with their dangerousness level and
10 their current functioning.  You don't want to have
11 somebody who's acutely psychotic, delusional have contact
12 visits with somebody.  I'm aware of cases --
13     Q.   Doctor, that's not my question.
14          Okay.  On page 87, the first full paragraph,
15 about the second half of that paragraph, you describe a
16 female mental health professional speaking with a
17 prisoner.  Do you see that discussion?
18     A.   Yes.
19     Q.   Was this in the Special Management Area?
20     A.   Yes.
21     Q.   And you write that, quote:  The clinical
22 interaction was highly professional and correctional
23 staff was nearby but did not have any effect on the
24 clinical interview.  End of quote.
25          Do you see that?

Page 152

1      A.   That's correct.
2      Q.   Did you listen to what was being said between
3  the mental health staff person and the prisoner?
4      A.   Yes, I did.
5      Q.   Did you obtain the prisoner's consent before
6  doing so?
7      A.   No, I did not.  But if I -- if I could clarify,
8  though.  I mean, I wasn't sitting there watching the
9  entire interaction.  I was observing the entire facility,
10 and I noticed that she was going cellside and talking to
11 people.  And I may have heard like every second or third
12 sentence because she was making an effort to communicate
13 directly with the inmate in the cell without speaking in
14 a loud way to where other people could hear what she was
15 saying.
16     Q.   Well, if you weren't able to hear the
17 interaction, how are you able to say that the clinical
18 interaction was highly professional?
19     A.   Because I would observe as she would walk up to
20 a cell, introduce herself, introduce what she was doing
21 and why she was there and gain consent from the inmate of
22 do you want to speak to me.  I want to talk to you to see
23 if you're safe.  That kind of thing.  That's very common
24 and appropriate.  So that's what I'm basing that on.  But
25 I didn't sit there and listen to exactly the whole

Page 153

1  dialogue and what the inmate responded to her questions
2  because, like you said, that would have been a privacy
3  issue.
4      Q.   Then how are you able to say that correctional
5  staff did not have any clinical effect on the interview?
6          MS. LOVE:  Form.
7          THE WITNESS:  Because the correctional staff
8  were not in any way involved.  They were a good 10 feet
9  away, and they were preoccupied with -- you know, there
10 were -- what am I trying to say, there were workers,
11 other inmate workers, that were sweeping or cleaning, and
12 they were supervising the facility and were certainly not
13 sitting there eavesdropping on what the conversation of
14 what the clinical content was.  They were there for
15 custody and control is what they were doing.
16     Q.   BY MR. FATHI:  And what you wrote in your
17 report is -- you say, quote:  correctional staff was
18 nearby but did not have any effect on the clinical
19 interview.
20          Do you see that language, Doctor?
21     A.   Yes.
22     Q.   And my question is if you weren't listening to
23 the interview, how do you know that?
24     A.   What I would say is it's my professional
25 opinion that from my observation and my training and

Page 154

1  background experience, my observation was correctional
2  staff was nearby, but they did not appear to have any
3  effect on the clinical interview.
4      Q.   Well, the patient could have said, I don't feel
5  comfortable speaking with that officer nearby, correct?
6      A.   Sure, they could have said that.
7      Q.   And you wouldn't have heard it?
8      A.   Well, no.  I don't know why you're smiling.
9  But the thing is, we're talking about acutely suicidal
10 females that are in suicide smocks.  And the goal is to
11 identify are they a current suicide risk here and now as
12 we speak.  Once they're safe and able to be taken off
13 suicide watch, if they told the mental health staff, I
14 don't feel comfortable talking because there's a
15 correctional officer, the mental health staff member
16 could have taken them to a private evaluation site, and
17 they have those.  So right there, the clinical acuity is
18 to assess their suicide risk and to get them off or to
19 keep them on a suicide watch.  It's their immediate
20 safety.  So there is a mechanism for more privacy, if
21 needed, once you're not acutely suicidal.
22     Q.   The question is, Doctor, the patient could have
23 said to the therapist, I don't feel comfortable speaking
24 because of the corrections officer, and you wouldn't have
25 heard it, correct?

Page 155

1          MS. LOVE:  Form.
2          THE WITNESS:  Anything's possible, yes.
3      Q.   BY MR. FATHI:  Would you go to page 90, please.
4  On the last -- in the last paragraph on page 90, you
5  refer to witnessing a class in Building 29.  Do you see
6  that?
7      A.   Yes.
8      Q.   Was this class just for prisons in the Special
9  Management Area?
10     A.   I don't know who comprised that class.  All I
11 know, it was female inmates.
12     Q.   Were any of the students in there from the
13 Special Management Unit?
14     A.   I don't know.
15     Q.   How many students were in there?
16     A.   I believe it was three.  Three students.
17     Q.   Would you turn to page 92, please.  In the
18 second to last paragraph on page 92, you refer to
19 boarding a unit tram that was driven by a female
20 prisoner.  Do you see that?
21     A.   Yes.
22     Q.   Was this female prisoner housed in the Special
23 Management Area?
24     A.   I don't know.  I didn't ask her.
25     Q.   Page 99.  At the top of page 99, you say that

Page 156

1  prisoners who are experiencing serious psychotic mental
2  illnesses can be admitted directly to Phoenix Baker Ward.
3  Do you see that language?
4      A.   Yes.
5      Q.   Is it your testimony that all ADC prisoners
6  with serious psychotic mental illness are eligible for
7  admission to Phoenix Baker Ward?
8          MS. LOVE:  Form and foundation.
9          THE WITNESS:  It's my understanding that the
10 females go to a different ward.  I can't recall the name
11 of that ward.  But I think one is for males and one is
12 for the females.  But, yes, I believe all of the inmates
13 that are evaluated by a clinical professional that were
14 identified to have serious psychotic symptoms, that they
15 can be admitted to the Baker Ward.
16     Q.   BY MR. FATHI:  Including the females?
17     A.   It's my understanding that there's a special
18 female ward there in Phoenix.
19     Q.   Is that part of Baker Ward?
20     A.   I may be confused on this because I think
21 there's a Flamenco Ward and a Baker Ward.  And I do
22 recall touring this previously in my first report of
23 December of 2013.  But I do recall that there's an
24 inpatient female unit also.
25     Q.   Page 100, please.  On page 100, you refer to

Page 157

1  the possibility of transferring a prisoner to the Arizona
2  State Hospital if clinically required.  Do you see that?
3      A.   Sorry, where is that?
4      Q.   It says in the carryover paragraph at the top
5  of page 100.
6      A.   Oh, yeah, thank you.  Yes.
7      Q.   Is it your testimony that all ADC prisoners are
8  eligible for transfer to the Arizona State Hospital if
9  clinically required?
10         MS. LOVE:  Form and foundation.
11         THE WITNESS:  Well, I'm not sure how you
12 define "eligible."  If I were the medical director at
13 Arizona State Hospital, I sure as heck wouldn't want to
14 be taking some death row offender or some really violent,
15 aggressive, assaultive patient.  I think it's how you
16 determine eligibility.  I think if somebody is acutely
17 psychotic and they can't be managed or treated within ADC
18 by Corizon, and Corizon and ADC feel that they maximized
19 and exhausted all their treatment, I think they
20 potentially could refer somebody to Arizona State
21 Hospital.
22     Q.   BY MR. FATHI:  Is it your testimony that all
23 ADC prisoners are eligible for transfer to Arizona State
24 Hospital if clinically required?
25         MS. LOVE:  Form and foundation.

Page 158

1        THE WITNESS:  Again, I don't know what the
2   eligibility requirements are from the Arizona State
3   Hospital, if they'll take an Arizona state prisoner or
4   not, if they have a compact or a memorandum of
5   understanding or if there's state law about that.
6        Q.  BY MR. FATHI:  How often does an ADC prisoner
7   get transferred to the Arizona State Hospital?
8        A.  I don't know the answer to that.
9        Q.  Has it ever happened?
10       MS. LOVE:  Form and foundation.
11       THE WITNESS:  I don't know.
12       MR. FATHI:  Let's take a short break.
13       (A recess was taken from 2:26 p.m. to
14   2:27 p.m.)
15       (Exhibit 706 was marked.)
16       Q.  BY MR. FATHI:  Doctor, showing you what's been
17   marked as Exhibit 706.  Could you identify this document,
18   please.
19       A.  Sure.  706 looks like a list of named plaintiff
20   institutional records, medical records, other inmate
21   institutional documents, other inmate medical records,
22   inmate medical records reviewed during tours, death
23   records, Corizon monthly reports.
24       Q.  I'm sorry.  Let me ask a different question.
25   My understanding is this exhibit collectively is a list

Page 159

1   of the documents you reviewed in connection with
2   preparing your second supplemental report; is that
3   correct?
4        A.  That's fair, yes.
5        Q.  And is it your testimony that you have reviewed
6   each and every document listed in this exhibit in its
7   entirety?
8        A.  I wouldn't say in its entirety.  Some of these
9   medical records are lengthy.  But I did review the mental
10   health portions or records of all these documents, yes.
11       Q.  So it is your testimony that you have reviewed
12   each and every document listed in this exhibit?
13       A.  Yes.
14       Q.  And where you have listed videotapes, is it
15   your testimony that you have reviewed each and every one
16   of those videotapes in its entirety?
17       A.  That's what I said earlier, that I have not
18   reviewed all of the videos in their entirety.  I have
19   looked at portions of the videos.
20       Q.  But you have looked at portions of each of
21   them?
22       A.  Yes.
23       MR. FATHI:  Okay.  Doctor, I need to reserve
24   the possibility of calling you back, but for now, we're
25   finished.  Thank you.

Page 160

1        MS. LOVE:  We'll read and sign.  And we, of
2   course, object to being called back subject to any Court
3   orders to do so.
4        (The deposition concluded at 2:29 p.m.)

Page 161

1                    SIGNATURE PAGE
2        I, JOSEPH V. PENN, MD, CCHP, FAPA, a deponent
    exercising my right to read and sign my deposition taken
3   on September 30, 2014, place my signature hereon and make
    the following changes on this _____ day of
4   _____, 2014.
5        (IF THERE ARE NO CHANGES, WRITE "NONE.")
6

    _____
7            JOSEPH V. PENN, MD, CCHP, FAPA
8   PAGE  LINE   READS        CHANGE TO       REASON
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25  ____  ____  _____

Page 162

1  STATE OF ARIZONA  )
                     )
2  COUNTY OF MARICOPA )

3

4        I, CAROLYN T. SULLIVAN, a Certified
5  Reporter, Certificate No. 50528, in the State of Arizona,
6  do hereby certify that the foregoing witness was duly
7  sworn to tell the whole truth; that the foregoing pages
8  constitute a full, true, and accurate transcript of all
9  proceedings had in the foregoing matter, all done to the
10 best of my skill and ability.  Pursuant to request,
11 notification was provided that the deposition is
12 available for review and signature.

13

14       I FURTHER CERTIFY that I am not related to
15 nor employed by any of the parties hereto, and have no
16 interest in the outcome.

17

18       WITNESS my hand this 14th day of October,
19 2014.

20

21

            Carolyn T. Sullivan, RPR
22          Arizona Certified
            Reporter No. 50528

23

24

25