```
┌──────────────────────────────────────┐
│  ☐ FILED      ☒ LODGED               │
│                                        │
│         Feb 17 2016                    │
│                                        │
│     CLERK U.S. DISTRICT COURT          │
│      DISTRICT OF ARIZONA               │
└──────────────────────────────────────┘
```

LARRY JOE PRINCE
ADOC# 058251
ASPC Eyman Browning
P.O. Box 3400
Florence, Arizona 85132

In Propria Persona

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

VICTOR PARSONS, et al.,          )    No. CV 12-00601-PHX-DJH
                                 )
        Plaintiff,               )
                                 )
vs.                              )    **REQUEST   TO   ENFORCE**
                                 )    **STIPULATION (DOC.1185)**
CHARLES L. RYAN,  et al.,        )
                                 )
        Defendants.              )
                                 )
_____)

Plaintiff to the class action party, Larry Joe Prince,
hereby respectfully asks this Honorable Court to enforce the
stipulation (Doc. 1185) in this cause of action by the powers
and jurisdiction retained by this Court, pursuant to Orders of
2.18.2015 and 2.24.2015.

On 10.14.2014 the stipulation in this cause of action was
filed (Doc.1185). At p.5, line 18, the parties stipulated that
the "Defendant's shall comply with the maximum custody
performance measures set forth in Exhibit D." The Defendant's
implemented Director's Instruction 326 ("DI 326") for the
curative measures in this cause of action. DI 326, 1.1, states
that "Inmates shall be assigned to maximum custody pursuant to
Department Order 801 ("DO 801"), Inmate Classification."

DO 801 requires that the DO 801-TM-OPS Objective Classification: Custody & Internal Risk Technical Manual shall be adhered to at all times. This is to be an objective process.

Plaintiff is a party to this action. On 2.18.2015 and 2.24.2015 this Court Ordered effectuation of the stipulation and that it retained power and jurisdiction to enforce stipulation.

On 8.22.2015 Plaintiff was transferred into his current maximum custody placement at ASPC Eyman Browning Unit. Plaintiff and all others similarly situated (minimum of 300 prisoners), are housed in maximum custody in violation of the stipulation.

Rather than reiterate the entire argument provided to the ACLU on 12.10.2015, Plaintiff attaches the 4 page letter, 4 pages of classification actions and 15 pages of accompanying documentation, hereto that sets forth the entire DO 801 due process violations and thus the violations to the stipulation in this cause of action, along with the classification documents that resulted in a convoluted nonsensical response by ADC Central Office (which openly admits form 801-6 is falsified).

All maximum custody placement hearings subsequent to STG validation proceedings are arbitrary and capricious. The classification officers (CO III's and CO IV's) have absolutely no discretion. There is no determination of "active involvement in violent or disruptive behavior," as required by DO 801. To insinuate that the language in DO 801 for "active involvement in violent or disruptive behavior" applies to the STG (group/gang), rather than the prisoner being classified, is absurd (see 11.18.2015 Max Appeal Response). The STG is not before the

classification officer. The prisoner (Plaintiff) is to be provided some type of due process by notice and to be heard, but it is not allowed. Here, instead, the Defendant's hacked the language from DO 801 and falsified a form 801-6 that denies the Plaintiff's ability to refute "active involvement in violent or disruptive behavior," right after he was already denied due process at a STG validation hearing that was the direct result of some convoluted self-serving opinionated "criteria" developed by the Defendant's that (after 32 years of imprisonment) failed to state the Plaintiff had actually committed any charge applicable to the STG validation process (and was validated nonetheless--contrary to the case that was settled in Prince v. Stewart, 2:00-cv-01084-SRB-JRI). Parsons provides more protection here.

The Plaintiff was denied due process at his STG proceeding (which he will no doubt have to litigate separately because it is not with the parameters of Parsons--approximately 80 STG validated prisoners will submit their timely 42 USC 1983 Civil Right Claims within the next two weeks), and then denied due process at his DO 801 classification hearing where his classification officer openly admitted she had no discretion to make a determination based on current behavior with overall record (which DO 801 requires) over max custody placement (as directed by Central Office Defendant). This is a direct violation of the stipulation in this cause of action.

Plaintiff respectfully asks this Honorable Court to enforce its jurisdiction and Order the parties to reach a curative solution in accordance with the due process protections in DO

3

801 and the spirit of the stipulation in this cause of action (which this Court may also see is the curative solution in the matter of _Ashker_ as discussed in the attached letter to Mr. Fathi of 12.10.2015).

Respectfully submitted this 17th day of February, 2016.

Larry Joe Prince
In Propria Persona

This document has been electronically filed to the Court and all parties by ADC staff on the same date submitted above.

Larry Joe Prince

LARRY JOE PRINCE
ADOC #058251
ASPC Eyman Browning Unit
P.O.Box 3400
Florence, Arizona 85132

December 10, 2015

ACLU NATIONAL PRISON PROJECT
Attn: David Fathi, Attorney at Law
915 15th Street, NW, 7th Floor
Washington, DC 20005

Re:  Notice of ADC's non-compliance with <u>Parsons v. Ryan</u>.

Dear Mr. Fathi:

     I hope this missive finds you and yours well and enjoying the holidays. Upon my review of <u>Parsons v. Ryan</u> I discovered ADC is being non-compliant with the DI 326/DO 801 Maximum Security Classification Due Process guidelines and violating our rights afforded by the due process clause of the fourteenth amendment. I wrote to Daniel Pachoda on 11.19.2015 and 11.30.2015. I spoke with ACLU attorneys on 12.08.2015. Prison Law Office referred me to you by letter dated 12.08.2015. I'm here today to try and help you help us (DO 806 Validated Security Threat Group-"STG"-prisoners illegally classified indefinitely to Maximum Custody).

     <u>Parsons v. Ryan</u> stipulates that DI 326 shall be adhered to when classifying prisoners into Maximum Security Custody. The Maximum Security Custody here being Browning Unit (aka SMU II or any label consistent with draconian gulags).

     DI 326, 1.1, states "Inmates shall be assigned to maximum custody pursuant to Department Order 801 ("DO 801"), inmate classification." DO 801 has an overseeing Classification Manual.

     The "Implementation" authority of DO 801 (page 21) states "The Division Director for Offender Operations shall maintain the 801-TM-OPS, Inmate 'Classification Technical Manual' that provides specific direction and criteria for all custody classification actions and related functions" and "Include specific direction for completing and distributing forms associated with the classification system **including forms** developed to address processes outlined in the manual."

     DO 801 and DO 801-TM-OPS Classification Manual affords us due process protection(s). Prior to hearing (but systematically having already been placed in Max Custody), we are served Form 801-6 (Notice of Hearing and Inmate Rights Proposed Maximum Custody Placement), and advised "The COIII or COIV must determine "behavior, together with overall record, constitutes a threat to the safety and security of the institution."

After DO 806 STG validation, Form 801-6 requires "detailed factual account of the incident(s) that supports the proposed placement" for the COIII or COIV to make their determination(s). On Form 801-6 said staff arbitrarily check prepared box #5; "The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group." Form 801-6 also provides "the above listed inmate was VALIDATED as a member of the STG..." No "behavior or proven conduct" is alleged against validated prisoners on Form 801-6. No actual STG membership in a validated STG is alleged (because, contrary to just rationale, DO 806 does not require an Arizona prisoner actually be a STG--gang--member to be validated a STG member of a validated STG).

The problem here is that the entire above Maximum Security Custody process is a sham and farce. The Form 801-6, Box #5 "Behavior Category," is not authorized by DO 801 or the DO 801 Classification Manual. Indeed, The DO 801-TM-OPS Classification Manual at 801.11, 1.1.8 specifically requires that "The inmate functions as a leader, enforcer, recruiter or member of a security threat group, **which is actively involved in violent or disruptive behavior**" for "Maximum Security Due Process" protection at the classification hearing. Until recently, the Classification Manual was deemed "unavailable or restricted." Only DO 801 (Inmate Classification) was available.

DO 801 (Inmate Classification Department Order Manual) and DO 801-TM-OPS (Inmate Classification Objective Classification: Custody & Internal Risk Technical Manual) are two distinctively different documents that provide different sets of protection.

When I was researching this matter I also came across the Stipulated Agreement in <u>Ashker, et al., v. Governor of the State of California, et al.,</u> (C 09-05796 CW, U.S. Dist. Ct., Northern Dist. of Cali, Oakland Div.). <u>Ashker</u> is a STG member and Super Max classification case out of California. In that case the key mechanism put into place to cure the indefinite Super Max confinement was a review for "disruptive behavior." In our Arizona Super Max situation the mechanism to review for "active involvement/conduct in violent or disruptive behavior" was always in place, we were just duped by Notice/Form 801-6 because it omitted the specific language required at 801.11, 1.1.8.

Any prisoner in Arizona may be validated as an STG member under DO 806. DO 806 is applied vindictively and arbitrarily. ADC officials validate on "criteria" they created, that does not require any violent or disruptive behavior (equating to analogy of indicting the ham sandwich). DO 806 specifically requires the STG validation process be "objective" although once ADC staff decide a prisoner should be marked a STG suspect the process then becomes "subjective" with sure determination to validate that prisoner as a STG member (branding the prisoner as a gang member for life) by scouring any source of evidence that may be convoluted into DO 806 criteria evidence. Upon STG validation s/he is indefinitely placed in Maximum Security Custody.

Prisoners are denied access to evidence used against them, denied witnesses by the inability to investigate the alleged criteria evidence upon being confined in isolated detention with service of notice, may not be accused of active violent or disruptive behavior/proven conduct or any STG activity, validated by a committee that is prejudiced by the mere nefarious unfounded alleged supposition of officers (who fail to actually make a written concise point that can be responded to)- that are allowed to remain in deliberation room with committee offering comments undisclosed to prisoner-(prisoner is absent). The subsequent classification process is salt in the wound.

Identifying a prisoner by validation and subsequently classifying him into a Super Max prison is two different proceedings. What is illegally done here is that ADC officials undermined due process protection by omitting language from 801.11, 1.1.8, in the nefarious creation of Form 801-6; resulting in arbitrary classification into Maximum Security Custody based on the validation itself, rather than the classification officer(s) determination(s) for the required behavior predicates of DO-TM-OPS 801.11 (threatening security).

By Parsons v. Ryan I'm not asking you to look at the DO 806 validation system. Parsons v. Ryan oversees DI 326/DO 801. The above DO 806 abuses and descriptions for STG validation merely allows you to see how we reach this point (sham & farce @ best).

Here, however, the subsequent Maximum Security Custody classification does fall within the parameters of Parsons v. Ryan and the due process protections DI 326 and DO 801-TM-OPS purports to provide is being violated. I'm also not suggesting that Ashker carries legal weight here. I'm merely pointing out that Ashker was cured through the stipulation of reviewing for "disruptive behavior." A mechanism we already have in place.

If the ADC were pushed to comply with Parsons v. Ryan through DI 326 and DO 801 compliance then the DO 801 Classification Manual already in effect has a proper mechanism for review of "active involvement in violent or disruptive behavior and/or conduct" to keep STG validated prisoners out of Maximum Security Custody and to release STG validated prisoners from Maximum Security Custody.

The current "step-down" process to release from Maximum Security Custody through DO 806 conflicts with the DO 801 review mechanism. Making prisoners take polygraph examinations to release through the DO 806 "step-down" process (when the prisoner was not accused of "violent or disruptive behavior," or, "already proven conduct," constituting a threat to the safety and security of the institution--or even accused of actually being a gang/STG member by ADC staff own admission), undermines the Maximum Security Custody due process protection's within the predicate behavior language in DO 801.

3

Keeping DO 806 STG validated prisoners (who may not actually be a gang/STG member), confined in Maximum Security Custody until they debrief (inform, rat, conjure false statements against other prisoners, etc.), die, step-down, or at long shot be returned their liberty, when they were denied the due process protections afforded in the review mechanisms of DO 801 Classification Manual, is a manifest injustice and should shock the conscience of parties to this action and the Court.

By ignoring the behavior and/or conduct review mechanism afforded by due process protection in DO 801 Classification Manual then the classification officers have absolutely no discretion to avoid placing the prisoner in Maximum Security Custody and have absolutely no authority to review for behavior and/or conduct to release the prisoner from Maximum Security Custody. ADC staff enforcing DO 806 (whom all other staff fear retribution from) arbitrarily usurps DO 801 Classification.

We have a liberty interest in not being placed in this supermax facility with more severe conditions relative to other Arizona facilities created by state regulations. See similar case of Wilkinson v. Austin, 545 U.S. 209 (2005). More over, in Wilkinson there were "multiple levels of review" that protected the STG validated prisoners rights from being placed in the supermax and protected their rights to be released upon review.

Jumping over that process to forcing DO 806 "polygraph examinations" to get into a "step-down" process that nearly 80% of the STG validated prisoners will never get into, or would take up to 10 years to reach, is an absurd arbitrary process that violates the constitutional civil rights of every STG validated prisoner in Maximum Security Custody, based on the above facts and legal precedence. It's difficult to get ones mind around the fact that any other non-STG validated prisoner could get into a situation in the GP of the ADC, stab another prisoner or staff, serve his Maximum Security Custody time period under DO 801 and return to the GP thereafter without the deprivations imposed (including, but not limited to, debriefing, polygraphs, long term indeterminable waiting lists for step-down program, indefinite confinement for 20+ years, sensory deprivation, etc), upon STG validated prisoners who also wish to be released from Max Custody (who possibly were never accused of any behavior or conduct requirements in DO 801 for Max Custody).

Enforcement of Parsons v. Ryan (and avoiding costly further class action separate litigation), will cure the above problems. I will surely soon be attacking my own unjust vindictive STG validation (which I've done before in Prince v. Stewart, et al., 2:00-cv-01084-SRB-JRI), but that issue is my alone to deal with.

I (we) respectfully ask that you seek to enforce the above corrective action afforded by Parsons v. Ryan. Thank you.

Sincerely,

Larry Joe Prince
Attachments: ltr 11.19.15 & 11.30.15//

**4**



**ARIZONA DEPARTMENT OF CORRECTIONS**

## Notice of Hearing and Inmate Rights (Proposed Maximum Custody Placement)

| INMATE NAME *(Last, first M.I.) (Please print)* | ADC NUMBER | INSTITUTION/UNIT | HEARING DATE *(mm/dd/yyyy)* |
|---|---|---|---|
| PRINCE, LARRY J. | 058251 | ASPC-WINSLOW CDU | 7/22/15 |

**Purpose of Hearing:** You are being referred for a Classification Review and Hearing to determine whether you should be placed at maximum custody institution. The issue being considered is whether your already proven conduct, in conjunction with an assessment of your overall record, constitutes a threat to the safety and security of the institution.

The CO III or COIV will determine whether that behavior, together with your overall record, constitutes a threat to the safety and security of the institution. In addressing this issue, the staff member will determine whether your proven behavior falls within any of the categories below:

**Behavior Categories:** Indicate *(with Check ✓)* which of the following behavioral criteria apply to the inmate's proven behavior.

☐ 1. The inmate has demonstrated physical or sexually assaultive behavioral categories resulting in either serious physical injury or death to any person, or in an attempt to sexually assault any person, or to cause serious physical injury or death to any person, or if the inmate has conspired in the planning any of the mentioned. Such demonstrated assaultive behavior may or may not involve the use of a weapon.

☐ 2. The nature of the criminal offense(s) committed prior to incarceration constitutes a current threat to the security and orderly operation of the institution and to the safety of others; for example, assaults against law enforcement, participation in gang activity or actions indicating an escape risk.

☐ 3. The inmate was an active participant in, organized, or incited a disturbance or riot that resulted in the taking of a hostage, loss of life, property damage, or physical harm to others.

☐ 4. The inmate has conspired or attempted to convey, introduce or possess contraband, which poses a threat or danger to the security of the institution. Such items of contraband may include, but are not limited to weapons, drugs, ammunition, communication devices, or escape material.

☒ 5. The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group.

☐ 6. The inmate escaped, attempted escape or committed acts to facilitate an escape from custody.

☐ 7. The inmate, through repetitive and/or seriously disruptive behavior, has demonstrated a chronic inability to adjust to a lower custody unit, as evidenced by repeated guilty findings by the Disciplinary Hearing Officer (DHO).

**Rationale for placement:** *(Instructions: provide a detailed factual account of the incident(s) that supports the proposed placement. In addition, if the incident(s) that triggered the proposed placement is a rule violation found by the DHO, attach a copy of the DHO report(s).)*

On 07/16/2015, the above listed inmate was VALIDATED as a member of the STG Aryan Brotherhood. The location of the hearing was ASPC- F/ KASSON

Distribution: White – Master Record File
Canary – Inmate
Pink – Institutional File

Page 1 of 2

801-5(e)
7/10/14

**Notice of Hearing and Inmate Rights (Proposed Maximum Placement) - Continued**

---

**Inmate Rights:** An inmate has a right to be present at the hearing and respond to evidence presented. The staff member may waive, in writing, the inmate's appearance, if it is determined that a waiver is in the best interest of the secure and orderly operation of the institution.

The inmate shall be afforded an opportunity to provide an oral or a written statement during the hearing. A summary of the inmate's oral statement or of the statement by a witness requested by the inmate shall be recorded. A copy of the written statement(s) shall be attached to the Hearing Findings. The staff member shall insure that such summary statements are based on the inmate's intended meaning. The inmate shall be asked to read the statement and certify its accuracy when signing all form.

The staff member shall exercise authority over witnesses and the testimony of witnesses at all hearings. Witnesses requested by inmates shall be authorized at the hearing based on the conclusion by the staff member prior to the hearing that the testimony to be provided will be relevant to material facts to be considered at the hearing. If such relevancy cannot be clearly established, the witness shall not be authorized. No witnesses shall be permitted at the hearing when the sole basis for the hearing is a finding of "guilty" by the Disciplinary Hearing Officer (DHO). The staff member shall evaluate the relevance of the information the witness expects to present and approve or deny the witness for the hearing.

If confidential information is to be used in the hearing, the inmate shall be advised of such and this fact shall be stated in a manner that avoids the compromise of the confidential source of that information. If such information is to be used, a Confidential Informant Reliability Assessment Questionnaire (CIRAQ) shall be completed.

An inmate may waive appearance at the hearing, by signing the waiver provided on the referral notice, if the following circumstances exist.

☐ Both the staff member and the inmate agree to waive the inmate's appearance.

☐ The inmate must be served written notice of the scheduled hearing and the inmate shall sign the written waiver provided on this form.

_____  _____  ☐ I waive the right to the 48 hour notice of hearing.
*(Inmate Initials)*  /  *(Date)*

| INMATE SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|
| | |

| STAFF NAME *(Last, First M.I.) (please print)* | TITLE |
|---|---|
| COIII C. SPEARS | COIII |

| STAFF SIGNATURE | DATE *(mm/dd/yyyy)* |
|---|---|
| | 7/20/15 |

Distribution:   White – Master Record File
Canary – Inmate
Pink – Institutional File

801-6(e)
7/10/14

Page 2 of 2

cin-max-1-of-2-07

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Notice of Appeal – Maximum Custody or Close
Management Status Placement**

RECEIVED
OCT 9 2015

| INMATE NAME *(Last, first M.I.) (Please print)* | ADC NUMBER | INSTITUTION/UNIT | HEARING DATE *(mm/dd/yyyy)* |
|---|---|---|---|
| Prince, Larry J. | 058251 | ASPC Eyman Browning | 7.29.2015 |

I am appealing:

☒  Placement at Maximum Custody Unit.  The hearing was held on   07  /  29  / 2015  .

☐  Continued placement at Maximum Custody Unit.  The hearing was held on   ___/___/___  .

☐  Initial Placement in Close Management status.  The hearing was held on   ___/___/___  .

☐  Continued placement in Close Management status.  The hearing was held   ___/___/___  .

I understand that I have fifteen (15) workdays from the date of placement notice from which to file my appeal.

**Basis for appeal:** *(Be specific with the facts and detail the rationale on why you feel the approved placement should be reversed.)*

On 10.2.2015 I was notified* I have been classified Max Custody based on the Notice/Recommendation that relied on a DO 806 STG validation as evidence (alluding to #5 on Form 801-6(e) served me 7.20.2015; "The inmate functions as a leader, enforcer, recruiter, or member of a validated Security Threat Group"). DO 801 states all classification actions shall be in compliance with DO 801-TM-OPS (Technical Classification Manual). The following is cited from the manual; Maximum Security Due Process: DO 801.12, 1.1, states that STG validated prisoners shall be classified to Max Custody in accordance with classification procedures for Max Custody placement. DO 801.11, 1.1.8, states "The inmate functions as a member of a STG 'which is actively involved in violent or disruptive behavior.'" Here, I was classified pursuant to a checked box on Form 801-6(e), not the due process protections of DO 801. The Form used to classify me omitted the language "...**which is actively involved in violent or disruptive behavior.**" No allegation was made against me that I am "actively involved in violent or disruptive behavior" (by the 7.16.2015 STGVC or here). Hence, since DO 806 and DO 801 both require that I be classified in accordance with DO 801 and DO 801 provides due process protections for Max Custody placement, I respectfully assert that my right to due process was violated when I was classified without being accused of active involvement in violent or disruptive behavior. I further assert the denial of my protected due process rights within DO 806 by the STGVC and subsequently the STGAC corrupts any rights that could be protected in these proceedings. I ask the approval for my placement in Max Custody be reversed. Thank you. (*of 8.04.2015 CO approval).

| INMATE SIGNATURE  *Larry Joe Prince* | DATE *(mm/dd/yyyy)* 10.2.2015 |
|---|---|
| RECEIVING OFFICER NAME *(Last, first M.I.) (Please print)*  TITLE  *CO III*  Taylor, C. | BADGE NUMBER 1655. |
| SIGNATURE  *COIII C. Taylor #1655.* | DATE *(mm/dd/yyyy)* 10/2/15 |

Distribution:   White – Master Record File
Canary – Inmate
Pink – Institutional File

801-8(e)
6/23/14

**ARIZONA DEPARTMENT OF CORRECTIONS**

**OFFENDER SERVICES BUREAU**

**Inmate Classification Max Appeal Response**

| Name: | PRINCE, LARRY | ADC#: | 058251 |
|---|---|---|---|
| Complex: | EYMAN | Unit: | A52 ASPC-E BROWNING STG |
| From: | Stacey Crabtree, OSB Administrator | Date: | 11/18/2015 |
| Log Number: | CM-MAX-15-0207 | | |

This is the response to your Inmate Classification Max Appeal, log numbered as above, dated 10/02/2015;

You were approved for Maximum custody on 8/04/15, based on your scoring under the current classification system. Your score is based on your STG validation. You were validated on 7/16/15 as a member of the security threat group Aryan Brotherhood.

You are correct that departmental policy DO 801.11, 1.1.8 which deals with the criteria governing placement in maximum security states "The inmate functions as a leader, enforcer, recruiter or member of a security threat group, which is actively involved in violent or disruptive behavior." The security threat group that you have been validated as a member of has been identified by the Arizona Department of Corrections as actively involved in violent or disruptive behavior. There is no policy requirement to demonstrate violent or disruptive behavior on your part to meet the criteria, just the validation of you as a member of this security threat group. Box 5 on forms 801-6 and 801-7 sufficiently lists the behavior that meets criteria for maximum security as "The inmate functions as a leader, enforcer, recruiter or member of a validated Security Threat Group."

Once an inmate has been validated as a member of a Security Threat Group in accordance with department policy, the inmate is classified to maximum custody in accordance with current classification procedures.

The current classification criteria are available for review at the inmate library. Speak with your assigned CO III if you would like assistance with obtaining access to this information. Your Correction Officer III should also be able to assist you with an explanation of your scores, once you have reviewed the current Classification Manual.

I find that you are correctly classified to maximum custody, for the reasons noted above. Your classification will be periodically reviewed as per policy to assess your custody status.

Your placement in maximum custody is upheld. Your appeal is denied.

| Staff Signature | Date: |
|---|---|
| *Stacey Crabtree* | 11/18/2015 |

*12*

LARRY JOE PRINCE
ADOC# 058251
ASPC Eyman Browning Unit
P.O.Box 3400
Florence, Arizona 85132

November 19, 2015

ACLU FOUNDATION OF ARIZONA
Daniel Pochoda
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013

Re:  Violations of Stipulations in <u>Parsons</u> (Doc.1185).

Dear Dan:

    I hope this missive finds you well. It has been quite some time since we last conversed.  Beyond the litigation that I'm preparing against the ADOC for wrongfully validating me again, I'd like to bring the following matters to your attention.

    **First,** in June, 2015, I was housed at ASPC Winslow Kaibab. I was removed from GP, served a lame STG validation notification and placed in a CDU cell. The cell had no running water. I was given an Igloo container that had a foul smell with a brown ring in it for drinking and washing water (which was obviously cold).

    I was left in such conditions for over two weeks. During that time I was dealing with my spine injury condition. Staff came to take me to medical. They had just returned with an inmate from medical who had been severely beaten on the yard and had blood on him. Staff then came to my cell. While cuffing me staff pinched my left hand with the hand cuff. It broke the skin. It turned into a rare type of staph infection that got out of control. I was treated like shit. I collapsed. Several days into the event graveyard staff (who had previously walked me medical at 1:30AM and asked the FHA that I be taken to a hospital -- only to be denied) demanded that day shift take me to medical. Upon arriving the Provider stated "we have to get him to a hospital." I was in such pain I was hallucinating. My left hand was <u>huge</u>. Staff took 2-3 hours to get a van to take me to a hospital after the Provider asked that I be taken.

    I was taken to the Little Colorado Medical Center (LCMC) right down the road from ASPC Winslow. There I was immediately diagnosed with a 103 degree fever (where Winslow medical had stated I had no fever). I was severely dehydrated.

    I was rushed to a Flagstaff hospital. Doctor Lex immediately told me "Larry we need to stop this fever or I may have to amputate your hand." I was going in and out of consciousness. I heard him tell a nurse "these idiots nearly killed this man, another 15 minutes and he would have expired."
My mother was contacted and told the same thing.



I woke up in the recovery room with the staph infection sucked out of my hand. I had a hole larger than a silver dollar. Six days in the hospital. SSU pushed Dr. Lex to release me for my return to ASPC Winslow. Dr. Lex wrote specific recommendations for medication, treatment, recovery, etc., and he told me "Larry, you will experience severe pain and possible permanent injury upon healing." I was returned to ASPC Winslow and placed in CDU medical observation per the Provider. I was doped to the gills prior being released from the hospital.

Dr. Lex's recommendations were ignored. I later discovered that I was removed from the medical observation cell and taken to a disciplinary hearing the next morning. I was so high I did not even recall the event. The day thereafter SSU (while digitally recording the entire event--like the idiots they are), removed me from the medical observation cell, took me to medical to have the bandage removed so they could inspect it for contraband, had the Provider dope me up some more, put me in a van, drove me to Browning Unit to try to validate me as A.B. (again), denied me pain medication when the meds started wearing off, took me before the STG validation committee and I fell out of the chair. I was not validated that day. I was driven back to ASPC Winslow CDU.

Winslow Post-Orders require hand cuffs be cleaned before transferring hand cuffs from inmate to inmate (especially for medical purposes)--which did not happen here. DO 804 requires authorization by medical staff to remove me from a medical observation cell. That never happened. Parsons at ¶8 and Exhibit B, Measure 44, requires the Provider to act upon the hospitals recommendations within 24 hours. Dr. Lex recommended oxycodone (verbally telling ADC staff at the hospital that I was going to be in extreme pain when the meds wore off), other treatment, etc. I was given T3's. Morphine was ordered by the Provider. It came up missing. It was never dispensed to me in CDU. The FHA lied to my mother and told her that they gave me morphine for the pain (while I was in CDU **begging** staff to get medical to help me for the level 10+ pain, to no avail). I wrote an emergency grievance on the matter. It was ignored. The answers given are gold plated future exhibits--SERIOUSLY.

The top of my left hand is numb. I can no longer type with my left hand. I drop objects without realizing it. It is very painful at times.

I realize I have omitted exact dates, times,etc. If the matter interests you I can do that for you. I know you know from this outline the plethora of rights violated. I've been retaliated upon for most of 2015, I'm now validated again (contrary to the prior agreement in Prince v. Stewart), and pacing myself so as not to stress myself out too much in here.

**Second,** Parsons at ¶¶18, 22 and 24, state that the incentives in DI 326 shall be maintained. This is not happening.



Upon arrival at Browning property staff purposely deny prisoners their personal property for up to 3 weeks while leaving them in pods separate from other prisoners. This is an old tactic. It's intended to break the will of the prisoner and force them into debriefing. When the prisoner refuses to debrief his property is then rough-shodded and property staff find unjust reasons to deem certain otherwise allowable items as contraband.  Idiots.

Additionally, Keefe refuses to acknowledge that the Step Program Incentives in the DI 326 Program Matrix dictate the spendable amounts and hold that it's the Phase Level of the prisoners which dictate the spendable amounts (when the Step Program Incentives Matrix is clearly contrary to Keefe's assertions). Browning Staff refuse to take issue with Keefe.

I also bring to your attention that Keefe has set basically raping prices for their products. The prices currently in effect were set when gas was nearly $6.00 a gallon. Notices were issued state wide to all prisoners that the prices were raised by the ADC and Keefe because of the rapidly rising gas costs. When gas prices were lowered significantly the ADC refused to take issue with Keefe for us prisoners. This undermines the available incentives in DI 326 because many cannot afford the unjust high costs set in the Keefe Max Custody Menu for Food Items and Notices for 2015.  Corrective action needs to be taken.

**Third**, <u>Parsons</u> at ¶18 and ¶22, as well as Exhibit D , stipulate that DI 326 shall be maintained. DI 326 states that "Inmates **shall** be assigned to maximum custody pursuant to Department Order 801, Inmate Classification."  DO 801 states that all classification actions shall be in compliance with DO 801-TM-OPS (Technical Classification Manual).

ADC created Form 801-6(e) as an attachment to DO 801. Once validated we are served this Max Custody Notice. Therein at ¶5 it states "The inmate functions as a leader, enforcer, recruiter, **or** member of a validated Security Threat Group." This Form is not in compliance with DO 801-TM-OPS because the Tech Manual actually states "The inmate functions as a member of a STG 'which is actively involved in violent or disruptive behavior.'"  Do you see here they omitted the most crucial relevant fact when conjuring up the Form 801-6(e)?  I, along with numerous others, was never accused of being "**actively involved in violent or disruptive behavior**" when classified into Max Custody. Max Custody requires 801 due process protections.

Thus, DI 326 is not being maintained because DO 801 is being violated.  Noting here that the predicate behavior requirement in DO 801-TM-OPS is the issues which arose in <u>Wilkinson v. Austin</u>, 545 U.S. 209 (2005), where validated gang members were identified but released to the GP after numerous reviewers determined that evidence of active violent or disruptive behavior was not presented against the prisoner(s). The Step Down Program in DO 806 does not cure this problem (which is their lame answer to everything gone awry here).



**Fourth,** Parsons at Exhibit D, Measure #4, states "All maximum custody prisoners receive meals with the same caloric **and** nutritional content as meals served to other ADC prisoners." I came from ASPC Winslow and we received complete hot meals on trays for breakfast, the same for lunch and then a bag at dinner. Here, I receive a bag at breakfast (similar to the dinner bag at Winslow) and then a dinner tray with less food than either hot meals at Winslow identified above. It's **impossible** that the food here is compliant with the stipulation in Parsons (we do not eat as all other ADC prisoners).

Even if the ADC could get some quack to conjure up calorie content, there's no way nutrition content could be matched. It simply defies logic to believe the two meals here are the same as the three meals served to all other ADC prisoners.

As you could be assured I've documented all issues above. The validation packet used to validate me was lamer than the one used in 1997 (which was expunged by Prince v. Stewart). I'm not accused of committing any STG acts or possessing any STG evidence. I'm not asking you to step up on my validation issue, but the classification issues is a strong matter here. I realize they run neck and neck to a certain degree, but I do not believe it would be proper of me to ask you to intervene on issues outside the scope of Parsons. It would be good to confer with you. Maybe give me notice of what you'd like to see and I could have it ready for you.(?) Please advise at your convenience.

I wish you and yours all the best. Thank you for your time.

Sincerely,

Larry Joe
sve.ljp//
...
...

PS: While I note above the issues pertaining to myself as I only have standing to represent my liberty interests which have been violated here, I can assure you that there are numerous prisoners here documenting (at my constant encouragement) the violations of their rights (mostly medical and classification), and I could compile a list of names for you if so desired. Again, thank you.
...
...

**4**

16

LARRY JOE PRINCE
ADOC# 058251
ASPC Eyman Browning Unit
P.O.Box 3400
Florence, Arizona 85132

November 30, 2015

ACLU FOUNDATION OF ARIZONA
Daniel Pochoda
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013

Re:  Violations of Stipulations in <u>Parsons</u> (Doc.1185).
     (Follow up to letter dated November 19, 2015)

Dear Dan:

     On a follow up to my letter dated November 19, 2015, please
take notice of the following issue I discovered this week.

     At page 3 of my letter (at **Third** issue), I explained to you
that <u>Parsons</u> was being violated because DI 326 & DO 801-TM-OPS
was not being adhered to when classifying prisoners into
Browning Unit by failing to establish STG Validated prisoners
were "actively involved in violent or disruptive behavior."

     On August 31, 2015, in <u>Todd Ashker, et al., v. Governor of
the State of California, et al.</u>, C 09-05796 CW, in the United
States District Court for the Northern District of California
(Oakland Division), a Settlement Agreement was reached to begin
removing STG Validated prisoners from the SHU program of the
California Department of Corrections and Rehabilitation (CDCR).
As part of that Settlement Agreement the CDCR must institute a
mechanism to review files of STG Validated prisoners in the SHU
for "disruptive behavior." A mechanism that previously was not
part of CDCR STG Validation process because the STG Validation
automatically classified the validated prisoner into the SHU.

     The obvious that jumps out at me is that the ADOC has had
that mechanism to review for "active involvement in violent or
disruptive behavior" after STG Validation all the while--the
ADOC simply chose to dupe the STG Validated prisoners instead.
Simply put, DO 806 arbitrarily dictates that a STG Validated
prisoner shall be housed in Browning Unit upon validation.
However, upon STG Validation, the prisoner is referred to the
Classification Committee in accordance with DO 801 and DO 801-
TM-OPS (clearly stating due process shall be adhered to). So
rather than follow its own ADOC directives to review for the
active violent or disruptive behavior, the ADOC duped the
prisoners and omitted that protective mechanism language from
the Form 801-6(e).KeyRyest! Please initiate corrective action.

Sincerely,
Larry Joe Prince

*17*

LARRY JOE PRINCE
ADOC #058251
ASPC Eyman Browning Unit
P.O.Box 3400
Florence, Arizona 85132

January 05, 2016

ACLU NATIONAL PRISON PROJECT
Attn: David Fathi, Attorney at Law
915 15th Street, NW, 7th Floor
Washington, DC 2005

Re:  Follow up to e-mail to you dated Friday, December 18, 2015,
     with my letter dated December 10, 2015; Re: Notice of ADC's
     non-compliance with Parsons v. Ryan (with attachments).

Dear Mr. Fathi:

     I wrote a 4 page letter to you dated December 10, 2015 (w/
4 pages of ADC classification documents, 4 page letter to ACLU
of Arizona dated November 19, 2015, and, 1 page letter to ACLU
of Arizona dated November 30, 2015), had it copied and e-mailed
from Alicia Bello to you on December 18, 2015.

     Upon receiving back my documents I realized I made a brief
blunder. Please take notice that pages 2 and 3 are not properly
numbered. Oops.  Page 2 should be 3 and 3 should be 2.  Only
took me three days of frustration to snap why I didn't feel my
letter was making the strongest point to you.KeyRyest! ;)

     I (we) respectfully ask for your assistance. The ongoing
wrongful validations as Security Threat Group (gang) members and
long term indefinite super max isolation confinement must
cease. This is nothing but McCarthyism.  When ADC staff want
answers they can't get elsewhere then they label men and women
as STG gang members under Department Order 806 to induce
"debriefing" methods. ADC then uses Department Order 806 to
usurp our rights allegedly afforded under Department Order 801
to secure long term indefinite super max to further induce the
"debriefing" methods. The ADC has repeatedly wrongfully labeled
me a member of the Aryan Brotherhood for vindictive reasons. I'd
rather die in this shit hole of a prison before I would falsify
evidence/testimony against any man or woman (regardless of his
color, race, beliefs or religion) in order to be released. The
Directors Instruction 326 under Parsons v. Ryan (which does not
comply with Directors Order 801) is nothing but a sugar coating
on inhumane treatment. Please assist us.

     Thank you for your time.

Sincerely,

Larry Joe Prince
sve.ljp.all.



PRISON LAW OFFICE
General Delivery, San Quentin CA. 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Warren George
Penny Godbold
Corene Kendrick
Kelly Knapp
Alison Hardy
Millard Murphy
Lynn Wu

**LEGAL MAIL - CONFIDENTIAL**

December 07, 2015

Mr. Larry J. Prince, #058251
ASPC Eyman, Browning Unit
P.O. Box 3400
Florence, AZ 85132

Dear Mr. Prince:

Thank you for writing us for an update about *Parsons v. Ryan*, the federal lawsuit against the Arizona Department of Corrections' (ADC) medical, mental health, and dental care system. The suit also challenges inhumane conditions in the Special Management Units. This case is a "class action" and covers all prisoners in the ten ADC prisons. The lawsuit sought only changes to the policies and practices of ADC, and did not seek money damages.

The case was filed in March 2012 by the Prison Law Office, the ACLU and other lawyers. On February 18, 2015, Magistrate Judge David K. Duncan, the federal judge overseeing this case, signed an order approving the settlement of the case. Judge Duncan ordered ADC to put in each prison's library a copy of the transcript of the hearing, his written order, and the settlement agreement. If this is not available to you, please write us and we will send you a free copy of the document you request.

Currently, the case is in the monitoring phase. This means the lawyers are investigating to see if ADC is complying with the terms of the settlement agreement. The agreement requires ADC to fix its health care system and meet more than 100 health care outcome measures, including medical care for prisoners with chronic conditions; mental health care; and dental care. ADC also must overhaul the rules for isolation units. These improvements will take place over the next few years. We tour institutions, review documents including prisoners' health care files, and interview prisoners. We use information we get from letters to help us focus on system-wide or prison-wide problems. To monitor ADC more effectively, we have divided monitoring duties with our co-counsel. <u>If you are housed at Lewis, Perryville, Tucson, Winslow, or Yuma prisons, the Prison Law Office monitors your prison. If you are housed at Douglas, Eyman, Florence, Phoenix, or Safford prisons, the ACLU monitors your prison.</u> You can write them via confidential Legal Mail at: ACLU National Prison Project; Attn: David Fathi, Attorney at Law; 915 15th Street, NW, 7th Floor; Washington DC 20005.

When the judge certified the case as a class action, he appointed us to represent all prisoners <u>only</u> with regard to the case. We may be able to notify ADC's attorneys if we learn of prisoners with proof of serious and urgent untreated health care needs that could lead to death or permanent injury. If you have an urgent health care need, send us copies (not originals) of any HNRs, grievances, or other documents that you think would be of use to us. We will review and return the documents. Other than notifying ADC, <u>we cannot assist with your individual health care concern</u>. Thank you for your interest in the case, and we wish you the best.

Sincerely,
Prison Law Office

# REPORT AND RECOMMENDATIONS CONCERNING THE USE OF RESTRICTIVE HOUSING

Download the Final Report (PDF) | Guiding Principles (PDF) | Appendix (PDF) | Executive Summary (PDF)

## Executive Summary

Definitions | "Guiding Principles" for All Correctional Systems | Policy Recommendations for the U.S. Department of Justice | At a Glance: Restrictive Housing at the Federal Bureau of Prisons

In a July 14, 2015, speech at the NAACP National Convention, President Barack Obama announced that he had asked Attorney General Loretta Lynch to conduct a review of "the overuse of solitary confinement across American prisons." The President directed that the purpose of the review be not simply to understand how, when, and why correctional facilities isolate certain prisoners from the general inmate population, but also to develop strategies for reducing the use of this practice throughout our nation's criminal justice system. Over the past several months, a team of senior officials at the U.S. Department of Justice met regularly to study the issue of solitary confinement—or "restrictive housing," to use the more general corrections term—and formulate policy solutions. This Report is the culmination of the Department's review.

The Justice Department embraced this opportunity to think deeply about the use of restrictive housing in America. The issue strikes at some of the most challenging questions facing correctional officials and criminologists: How should prisons and other correctional facilities manage their most violent and disruptive inmates? How can they best protect their most vulnerable and victimized ones? And what is the safest and most humane way to do so? These questions are of particular importance to the Justice Department. Not only does the Department oversee the Federal Bureau of Prisons, the nation's largest prison system, but it also provides funding and technical assistance to other correctional systems, through the National Institute of Corrections (NIC) and the Office of Justice Programs (OJP), and enforces the constitutional and statutory rights of state and local inmates through the Department's Civil Rights Division.

After extensive study, we have concluded that there are occasions when correctional officials have no choice but to segregate inmates from the general population, typically when it is the only way to ensure the safety of inmates, staff, and the public. But as a matter of policy, **we believe strongly this practice should be used rarely, applied fairly, and subjected to reasonable constraints**. This Report includes a series of "Guiding Principles" that we believe should guide plans for limiting the use of restrictive housing across the American criminal justice system, as well as specific policy changes that the Federal Bureau of Prisons (the Bureau) and other Department components could undertake to implement these principles.

The stakes are high. Life in restrictive housing has been well-documented by inmates, advocates, and correctional officials. In some systems, the conditions can be severe; the social isolation, extreme. At its worst, and when applied without regard to basic standards of decency, restrictive housing can cause serious, long-lasting harm. It is the responsibility of all governments to ensure that this practice is used only as necessary— and **never as a default solution**. But just as we must consider the impact on inmates, so too must we consider the impact on correctional staff. These public servants work hard, often for long hours and under difficult conditions, and we must protect them from unreasonable danger. For years, the Bureau has been asked to do more and more, putting strain on its officers and other staff. Correctional officers need effective tools to manage the most challenging inmates and protect the most vulnerable.

We do not believe that the humane treatment of inmates and the safety of correctional staff are mutually exclusive; indeed, neither is possible without the other. In recent years, numerous correctional systems have

succeeded in safely lowering the number of inmates in restrictive housing, including the Federal Bureau of Prisons, which has reduced its total restrictive housing population by nearly 25% since January 2012.  Under the leadership of its outgoing Director, Charles E. Samuels, Jr., the Bureau has also developed a range of progressive alternatives to restrictive housing—and has done so while supporting and enhancing staff safety. This Report includes a number of proposals that would help continue the downward trends in the Bureau's restrictive housing population, while also ensuring that those placed in segregation receive the support and rehabilitative services they need.

### DEFINITIONS

Not all segregation is truly "solitary," and many prison systems, including the Bureau, often house two segregated inmates together in the same cell, a practice known as "double-celling."  For the purposes of this report, we define "restrictive housing" as any type of detention that involves: (1) removal from the general inmate population, whether voluntary or involuntary; (2) placement in a locked room or cell, whether alone or with another inmate; and (3) inability to leave the room or cell for the vast majority of the day, typically 22 hours or more.  Even this definition, however, leaves substantial room for variation.  Restrictive housing takes many forms, and an inmate's experience in segregation can vary considerably depending on certain external factors, such as the length of stay, conditions of confinement, and degree of social isolation, as well as factors specific to each inmate, such as age and psychological resiliency.  As this report makes clear, it is not enough to say that an inmate is in "restrictive housing" (or "solitary confinement," for that matter); it is just as important to know the details of the placement.  **[DOJ Report, pp. 3-6]**

### "GUIDING PRINCIPLES" FOR ALL CORRECTIONAL SYSTEMS

The Report includes more than 50 "Guiding Principles," which are intended as best practices for correctional facilities across the American criminal justice system.[1]  These aspirational principles are designed to serve as a roadmap for correctional systems seeking direction on future reforms, and address a range of topics, including the use of disciplinary segregation, protective custody, and long-term preventative segregation; the conditions of confinement in restrictive housing; and the treatment of certain categories of inmates, including juveniles (under 18), young adults (18 to 24), inmates with medical needs, pregnant women, LGBTI inmates, and inmates with serious mental illness.  **[pp. 94-103]**

The Report's "Guiding Principles" include:

- Inmates should be housed in the **least restrictive setting necessary** to ensure their own safety, as well as the safety of staff, other inmates, and the public.

- Correctional systems should always be able to **clearly articulate the specific reason(s)** for an inmate's placement and retention in restrictive housing.The reason(s) should be supported by objective evidence.Inmates should remain in restrictive housing for no longer than necessary to address the specific reason(s) for placement.

- Restrictive housing should always serve a **specific penological purpose**.

- An inmate's initial and ongoing placement in restrictive housing should be regularly reviewed by a **multi-disciplinary staff committee**, which should include not only the leadership of the institution where the inmate is housed, but also medical and mental health professionals.

- For every inmate in restrictive housing, correctional staff should develop **a clear plan for returning the inmate to less restrictive conditions** as promptly as possible.This plan should be shared with the inmate, unless doing so would jeopardize the safety of the inmate, staff, other inmates, or the public.

- All correctional staff should be **regularly trained** on restrictive housing policies. Correctional systems

*21*

should ensure that compliance with restrictive housing policies is reflected in employee-evaluation systems.

- Correctional systems should establish standing committees, consisting of high-level correctional officials, to **regularly evaluate existing restrictive housing policies** and develop safe and effective alternatives to restrictive housing.

- Absent a compelling reason, prison inmates **should not be released directly from restrictive housing to the community**.

- Correctional systems should seek ways to **increase the minimum amount of time that inmates in restrictive housing spend outside their cells** and to offer enhanced in-cell opportunities.Out-of-cell time should include opportunities for recreation, education, clinically appropriate treatment therapies, skill-building, and social interaction with staff and other inmates.

### POLICY RECOMMENDATIONS FOR THE U.S. DEPARTMENT OF JUSTICE

Federal Bureau of Prisons | United States Marshals Service | Civil Rights Division | United States Attorney's Offices | National Institute of Corrections | Bureau of Justice Assistance | National Institute of Justice

The Report also includes a series of policy recommendations to ensure that the Department of Justice lives out the principles described above.[2]  As the Report makes clear, the Department can and should use the full range of its powers to safely reduce the use of restrictive housing in the United States.  The Department is prepared not only to direct the Federal Bureau of Prisons to change its own policies and practices, but also to use the many tools at the Department's disposal to encourage other correctional systems to do the same.

Some of these policy proposals will be implemented in the near future; others will require additional resources and, in the case of the Bureau, may be subject to collective bargaining.  As noted in the Report, the current budget environment complicates efforts to undertake widespread changes, especially at the Bureau.  After three decades during which the inmate population grew at a far faster rate than the number of correctional officers and other staff, the Bureau is stretched thin, which presents particular challenges when addressing the high-needs, high-risk inmate population that often resides in restrictive housing.

Most these topics are discussed at multiple locations in the Report.  Citations to information about current practices are marked as **(b)**; citations to policy proposals are marked as **(p)**.

### FEDERAL BUREAU OF PRISONS

Since January 2012, the Bureau has reduced the total number of inmates in restrictive housing by nearly a quarter.  The Department believes that the Bureau can build on existing programs and further reduce its restrictive housing population through a multi-prong strategy, as described below.  The Department estimates that the policy recommendations outlined in this Report, if fully adopted, will result in additional substantial reductions in the Bureau's restrictive housing population.  Although it is impossible to quantify the exact size of the future reductions, the Department notes that other state and local correctional systems implementing reforms, including those jurisdictions discussed in the Report, have reported reductions in their restrictive housing populations in recent years by nearly 50 percent or more, depending on the metrics used.  **[pp. 72-78, 104-05]**

The Report recommends that the Bureau:

- End the practice of placing juveniles in restrictive housing, pursuant to the standards proposed in the Sentencing Reform and Corrections Act of 2015. **[pp. 61-62 (b); 114 (p)]**

- Expand the Bureau's ability to divert inmates with serious mental illness to mental health treatment

programs, by increasing the capacity of existing secure mental health units and requesting funding for substantial expansion in future years.**[pp. 46-57 (b); 112-14 (p)]**

- Expand the Bureau's ability to divert "protective custody" inmates to less restrictive forms of housing, by building "Reintegration Housing Units" (RHU) at multiple Bureau locations.**[pp. 23-25 (b); 110-11 (p)]**

- Significantly limit the use of restrictive housing as a form of punishment. Recommended changes include: across-the-board reductions of maximum penalties for disciplinary segregation (as noted in the chart below); an outright ban on the use of restrictive housing for low-level offenses; and limitations on the use of pre-adjudication "investigative" segregation, including a new requirement that routine investigations be completed within 7 days and all other investigations be completed within 30 days, absent compelling circumstances.**[pp. 18-23 (b); 107-110 (p)]**

| Offense Type | Current Maximum Penalties | | Proposed Maximum Penalties | |
|---|---|---|---|---|
| | First Offense | Subsequent Offenses | First Offense | Subsequent Offenses |
| 100-Level (Greatest) | 365 days | 545 days | 60 days | 90 days |
| 200-Level (High) | 180 days | 365 days | 30 days | 60 days |
| 300-Level (Moderate) | 90 days | 180 days | **none** | 15 days |
| 400-Level (Low) | **none** | 30 days | **none** | **none** |

- Establish policies to discourage the placement of inmates in restrictive housing during the final 180 days of their prison terms, and to provide targeted re-entry programming for inmates who require restrictive housing during that time.**[pp. 106-07 (p)]**

- Cut in half the length of the four-phase "Special Management Unit" (SMU) program, thereby reducing the total time for inmates to complete the program from approximately 18 to 24 months, to approximately 9 to 12 months, with additional incentives for high-performing inmates.**[pp. 34-37 (b); 111-12 (p)]**

- Direct wardens to develop institution-specific plans for expanding out-of-cell time for inmates in restrictive housing, based on staffing and resource capacity.**[pp. 28-30 (b); 115-16 (p)]**

- Enhance transparency by publishing system-wide restrictive housing statistics on a monthly basis on the Bureau's public website, and finalize upgrades in data collection software to improve tracking of restrictive housing inmates.**[pp. 31-33 (b); 116-17 (p)]**

- Codify in Bureau policy documents the presumption that inmates should be housed in the least restrictive setting necessary to ensure safety, and that inmates in restrictive housing should be returned to general population as soon as it is safe to do so.**[pp. 105-06 (p)]**

## U.S. MARSHALS SERVICE

23

The U.S. Marshals Service (USMS) is responsible for the housing and transportation of federal pre-trial detainees. USMS houses detainees in several types of facilities, including private detention facilities and state, county, and local jails. Although detainees remain in USMS custody on average for less than 100 days, USMS

nonetheless has several tools to limit the use of restrictive housing during that time.  The Report recommends that USMS:

- Revise the detention standards that USMS applies to private contract facilities, to incorporate the restrictive housing policies discussed in this Report.**[pp. 70-71 (b); 117-18 (p)]**

- Require that the state, county, and local jails that house USMS detainees provide DOJ with certain data on restrictive housing placements.**[pp. 70-71 (b); 117-18 (p)]**

### CIVIL RIGHTS DIVISION

The Civil Rights Division is responsible for enforcing a number of civil rights laws pertaining to individuals confined in restrictive housing.  The Report recommends that the Division:

- Continue to ensure lawful and safe restrictive housing practices in state and local correctional facilities, including the treatment of juveniles and persons with mental illness, through investigations and litigation under CRIPA, the ADA, and Section 504 of the Rehabilitation Act.**[pp. 83-87 (b)]**

### U.S. ATTORNEY'S OFFICES

The Department's 94 U.S. Attorney's Offices (USAOs) are responsible for enforcing federal criminal law in their Districts, including through the prosecution of criminal activity that occurs on federal property.  The Report recommends that USAOs:

- Continue to support the Bureau's efforts to ensure that inmates who engage in serious criminal activity while incarcerated—especially those who assault or kill correctional staff—face criminal prosecution when appropriate.**[p. 110 (p)]**

### NATIONAL INSTITUTE OF CORRECTIONS

The National Institute of Corrections (NIC) provides training, technical assistance, and information services to federal, state, and local correctional agencies.  The Report recommends that NIC:

- Incorporate this Report's Guiding Principles into existing multi-day training on restrictive housing policies for state leaders.**[pp. 79-81 (b); 118 (p)]**

- Provide technical assistance and other support to state and local correctional agencies seeking to safely reduce their restrictive housing populations. **[pp. 79-81 (b); 118 (p)]**

### BUREAU OF JUSTICE ASSISTANCE

Housed within the Department's Office of Justice Programs (OJP), the Bureau of Justice Assistance (BJA) provides direct grants and technical assistance to both correctional systems and non-profit organizations that support BJA's mission.  The Report recommends that BJA:

- Expand BJA's ongoing partnership with Vera Institute of Justice's "Safe Alternatives to Segregation" Initiative, which provides support to state and local correctional systems undertaking restrictive housing reforms.**[pp. 81-82 (b); 118-19 (p)]**

### NATIONAL INSTITUTE OF JUSTICE

Also housed within OJP, the National Institute of Justice (NIJ) serves as the Department's research, development, and evaluation agency.  The Report recommends that NIJ:

- Solicit innovative research proposals to assess restrictive housing policies, with up to $8 million



available for grants.[pp. 82 (b); 119-20 (p)]

### AT A GLANCE:  RESTRICTIVE HOUSING AT THE FEDERAL BUREAU OF PRISONS

The Bureau oversees 135 institutions, 122 of which are managed by the Bureau, and 13 of which are run by private contractors.[3]  Most Bureau inmates placed in segregation are housed in "Special Housing Units" (SHU), which serve as general purpose, on-site segregation units at 111 Bureau facilities.  [pp. 17-33]  The Bureau also operates several "Special Management Units" (SMU), which offer a four-phase program for inmates who present heightened security concerns due to their history of violent prison misconduct and/or gang activity.  [pp. 34-37]  Finally, the Bureau operates the United States Penitentiary (USP) Administrative Maximum (ADX), in Florence, Colorado, which houses approximately 400 inmates (or 0.25% of all Bureau inmates) who require the tightest controls and supervision because of the nature of their offense or their behavior while in prison.  [pp. 38-45]

| OVERVIEW OF BUREAU'S RESTRICTIVE HOUSING<br>(Adapted from Bureau's SENTRY Data) | | | | |
|---|---|---|---|---|
| Type of Housing | 01/28/12 | 12/05/15 | Change (01/28/12 to 12/05/15) | |
| | | | Total | % Decline |
| All Bureau inmates[4] | 175,733 | 161,517 | 13,848 ↓ | 8.09% ↓ |
| **Total in Restrictive Housing** | **13,196** | **9,914** | **3,282 ↓** | **24.87% ↓** |
| Special Housing Units (SHU) | 11,106 | 8,251 | 2,855 ↓ | 25.71% ↓ |
| Special Management Unit (SMU) | 1,647 | 1,260 | 387 ↓ | 23.50% ↓ |
| Administrative Maximum (ADX) | 443 | 403 | 40 ↓ | 9.03% ↓ |

Prior to January 2013, the Bureau had only limited ability to track inmates housed in SHU.  Among other things, the Bureau's electronic system could not distinguish between inmates in "disciplinary segregation" (DS) or "administrative detention" (AD) status, nor could it identify the specific reasons an inmate was placed in SHU. Starting in early 2013, however, the Bureau implemented a new, automated tracking system, known as the "SHU Application," which now operates at all Bureau-operated facilities.  In its current form, the SHU Application can provide Bureau staff with information about the number of inmates placed in DS status, as well as several "subcategories" of AD status (e.g., "protective custody," "pending transfer," or "pending investigation").

There are, however, limitations to the data collected by the SHU Application.  At present, the SHU Application can only provide a "snapshot" of all inmates in SHU at a particular moment; it cannot track information about individual inmates.  The chart below includes two such "snapshots": one from May 2013, the first month when the SHU Application could track the total number of inmates housed in the SHU for longer than 90, 180, and 364 days; and one from November 23, 2015.  Among other things, the chart reveals a decline in the Bureau's total SHU population over the two-and-a-half year period (14.5%), even when compared to the reduction in the Bureau's overall inmate population (7.9%).  The most substantial reductions have been in long-term SHU

placements: the number of inmates housed in SHU more than 180 days have declined nearly 60 percent during this period, and the number housed more than 364 days have declined by more than 50 percent. **[pp. 31-33]**

| SHU PLACEMENT OVER TIME (BUREAU-RUN FACILITIES) | | | | |
|---|---|---|---|---|
| (Adapted from SHU Application "Dashboard") | | | | |
| Type of Placement | 05/27/13 | 11/23/15 | Change (05/27/13 to 11/23/15) | |
| | | | Total | % Change |
| All Bureau inmates | 176,176 | 162,339 | 13,991↓ | 7.93%↓ |
| **Total in Security Housing Units (SHU)** | **10,086** | **8,625** | **1,461 ↓** | **14.48% ↓** |
| In SHU more than 90 days | 1,655 | 1,071 | 584 ↓ | 35.29% ↓ |
| In SHU more than 180 days | 778 | 338 | 440 ↓ | 56.56% ↓ |
| In SHU more than 364 days | 155 | 77 | 78 ↓ | 50.32% ↓ |
| Disciplinary Segregation (DS) Status | 2,041 | 1,417 | 624 ↓ | 30.57% ↓ |
| Administrative Detention (AD) Status | 8,045 | 7,208 | 837 ↓ | 10.40% ↓ |
| AD: Pending Investigation (BOP Violation) | 3,308 | 3,422 | 114 ↑ | 3.45% ↑ |
| AD: Pending Hearing (BOP Violation) | 937 | 782 | 155 ↓ | 16.54% ↓ |
| AD: Pending Investigation (Criminal Trial) | 110 | 115 | 5 ↑ | 4.54% ↑ |
| AD: Protective Custody (Inmate Requested) | 1,600 | 848 | 752 ↓ | 47.00% ↓ |
| AD: Protective Custody (Involuntary) | 254 | 73 | 181 ↓ | 71.26% ↓ |
| AD: Protective Custody (Any over 30 Days) | 1,358 | 436 | 922 ↓ | 67.89% ↓ |
| AD: Pending Transfer/Holdover | 676 | 1,180 | 504 ↑ | 74.56% ↑ |
| AD: Terminating DS, Ordered to AD | 465 | 231 | 234 ↓ | 50.32% ↓ |
| AD: Pending Classification | 573 | 342 | 231 ↓ | 40.31% ↓ |
| Separatee Assignment | 6,760 | 5,838 | 922 ↓ | 13.64%↓ |

The Bureau is currently developing the capacity to better track inmates as they progress through restrictive

housing.  In late 2016, the Bureau expects to release an upgraded version of the SHU Application, which will allow the Bureau to collect far more information about individual inmates and identify trends across institutions.

[1] These Guiding Principles do not have the force of law and do not create or confer any rights, privileges, or benefits to past, current, or future inmates or detainees within any American correctional or detention system, including the Federal Bureau of Prisons.  The Guiding Principles were developed for correctional systems that detain or incarcerate inmates in connection with criminal proceedings in civilian courts.  Other correctional or detention systems may wish to review these Guiding Principles to determine which are applicable to their unique circumstances and to make appropriate changes accordingly.  Both implementation and application of these Guiding Principles involve the exercise of judgment of relevant Department officials.  Nothing in these Guiding Principles should be construed to limit the authority of the Department, the Attorney General, or any other government official. [See Final Report for additional information.]

[2] These recommendations are subject to the same caveats and limitations that apply to the Guiding Principles.  *See supra* note 1.  Recommendations will be implemented only as consistent with applicable law and subject to the availability of appropriations.

[3] The Bureau's 13 private contract facilities have instituted restrictive housing policies similar to the ones in use at Bureau-run facilities.  The contract facilities' policies incorporate the standards of the American Correctional Association, as well as Bureau directives.  As noted in the Report, as of November 2015, these private contract facilities had a combined average daily population of 23,083 inmates, of which 924 (approximately 4.0%) were housed in SHU.  **[pp. 17, 32-33]**

[4] "All Bureau inmates" refers to inmates housed in the 122 institutions managed by the Bureau, and not the 13 facilities managed by private contractors.

*Updated January 28, 2016*