

☒ FILED ☐ LODGED

**Mar 17 2016**

CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA

LARRY JOE PRINCE
ADOC #058251
ASPC Eyman Browning
P.O. Box 3400
Florence, Arizona 85132

In Propria Persona

### UNITED STATES DISTRICT COURT

### DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Antonio Parsons, et al., | ) No. CV-12-0601-PHX-DKD |
| Plaintiffs, | ) |
| v. | ) **REQUEST FOR LEAVE TO REPLY** |
| Charles L. Ryan, et al., | ) **TO RESPONSE TO MOTION TO** |
| Defendants. | ) **INTERVENE (Doc. 1515)** |

Plaintiff class member, Larry Joe Prince, in propria persona, respectfully asks for leave to reply to class counsel's Response (Docs. 1515 & 1516) filed 3.1.2016, as set forth below.

In this Court's Order of 2.14.2016 (Doc. 1512), there is no provisions for a Reply by Prince to class counsel's Response. Prince asks for leave to Reply as follows.

**First,** Prince is unaware of why so many pleadings were filed with the Court. Prince has no control of this situation as he is bound by the e-filing directives between the Clerk of the Court and the ADOC officials at Browning Unit. Prince handed over the originals of his pleadings (Motion to Intervene and Request to Enforce Stipulation), and it does appear numerous filings have been made. Prince is unaware why so many filings.

**Second,** class counsel's misplacing of e-mails or mail is

not really the issue now. However, class counsel should be careful of the avowals it makes before the Court. Prince sent a letter dated January 5, 2016 (it was post-marked January 6, 2016), as a follow up to the December 10, 2015, letter. Class counsel responded February 11, 2016 (which Prince received after he gave his pleadings to ADOC officials), and it was non-responsive to Prince's letters. (Ex. 1). Prince wrote class counsel again on February 16, 2016. (Ex. 2).

On February 19, 2016, class counsel responded claiming, now, they had written to Prince on January 20, 2016, and attached a copy of that letter. (Ex. 3, 3A). This is why Prince puts little faith in class counsel's current pleading before the Court. If the Court compares Ex. 1 with Ex. 3A it will see class counsel took the exact same letter of February 11, 2016, and merely changed the dates to make it appear that it communicated with Prince on January 20, 2016, when it in fact did not communicate with Prince on January 20, 2016. Prince never received any such letter dated January 20, 2016, and he advised class counsel of this fact on February 28, 2016. (Ex. 4).

**Third**, class counsel contends it reached a settlement with the Defendants on the conditions of confinement in the gulag of super max prisons in the United States without first ascertaining if the prisoners were first lawfully placed in the gulag. Prince is unaware of what exactly the Defendant's are paying the 6 million or so dollars for, because the class counsel walks through Browning Unit and balks at helping class plaintiffs with any provision of <u>Parsons v. Ryan</u>, DI 326 or DO

2

801. Prince was educuated to believe light bulbs emit light and truly do not suck the dark from a room. He asks the Court to believe the same and enforce a curative solution here.

The maximum step program of DI 326 has process attachments, (Ex.5,5A,5B; Attachment B Security Threat Group Flowchart Ex. 6; Attachment F Browning Unit Step Program Matrix Ex. 7). In order for DI 326 to be complied with into the Step 1 program matrix the flowchart first requires "Inmate approved for max per DO 801 process." By class counsel's own admission, Prince cannot reach Step 1 of DI 326 unless he gets through the DO 801 process first. Then while the prisoner remains in the DI 326 programming, he supposedly receives review of his max custody classification status every 180 days, in accordance with due process. But here, Prince, and class members, do not receive due process before he reaches max custody **or** during the review process while under DI 326 or DO 801 monitoring. Prince is arbitrarily retained in max custody.

There is no provision in <u>Parsons v. Ryan</u>, DI 326 or DO 801 for dissection of the programming as it applies to Prince or those similarly situated. Class counsel apparently does not comprehend how DI 326 or DO 801 is written or should be applied (also see Ex.8, 8A). The language is clear, the application is not enforced as required by DI 326 and DO 801.

Class counsel enjoined DI 326 process issues to this action when it agreed to enforce DI 326 as written. Prince respectfully asks the Court to enforce this cause of action (through DI 326 and DO 801), and that class counsel be Ordered to represent the

3

class members further interests in doing so, in the interest of justice and judicial economy.

Respectfully submitted March 08, 2016.

*[signature]*
Larry Joe Prince
In Propria Persona

E-filed in accordance with instructions of District Court on September 17, 2015, by and through ADOC staff, same date above.

*[signature]*
Larry Joe Prince
In Propria Persona

4

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

ACLU
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

## CONFIDENTIAL ATTORNEY-CLIENT CORRESPONDENCE

February 11, 2016

Larry Joe Prince #058251
ASPC- Eyman/ Browning Unit
PO Box 3400
Florence, AZ 85132

Re:   **Parsons v. Ryan**

Dear Mr. Prince,

We received your letter from January 6th, 2016. Unfortunately we cannot assist in movement into a different housing unit. However, we are working to ensure that conditions in isolation units like Browning improve as a result of our recent litigation. This letter is to update you on the status of *Parsons v. Ryan*, the federal lawsuit regarding problems with the Arizona Department of Corrections' (ADC) medical, mental health, and dental care. The suit also challenges inhumane conditions in the isolation units. This case is as a "class action" which means it covers all prisoners in the ten ADC prisons. The case was filed in March 2012 by the ACLU, the Prison Law Office, the Arizona Center for Disability Law, and two law firms, Perkins Coie and Jones Day.

On October 14, 2014, the parties told the court that they had reached a settlement of the case. The judge approved the settlement during a February 18, 2015 Fairness Hearing and issued a written order confirming his decision on February 25, 2015. Under the settlement, ADC must fix its health care system and meet more than 100 performance measures, including health care for prisoners with chronic medical conditions; specialty care; care for mentally ill prisoners; and dental care. The settlement also requires ADC to overhaul the rules for prisoners with serious mental illnesses in isolation. Instead of spending all but six hours a week in their cells, such prisoners will now have a minimum of 19 hours a week outside the cell, and this time must include mental health treatment and other programming. ADC must also restrict guards' use of pepper

1

spray on these prisoners, using it only as a last resort when necessary to prevent serious injury or escape. If family or friends with internet access would like to access the settlement agreement, they can find it at http://prisonlaw.com/wp-content/uploads/2015/12/14.10.14-Doc-1185-Stipulation-Settlement-Agreement-and-Exhibits.pdf.

Class action status means these changes will apply to all prisoners in ADC custody. If you are a prisoner in ADC custody, you do not have to do anything else to be part of the class. **We did not seek money damages, and prisoners will not receive any money as a result of the settlement.** The lawsuit sought only injunctive relief, which means changes to the policies and practices of ADC. When the judge certified the case as a class action, he appointed us to represent all prisoners only with regard to the case. We may be able to notify ADC's attorneys if we learn of prisoners with proof of serious and urgent untreated health care needs that could lead to death or permanent injury. If you have an urgent health care need, send us copies (not originals) of any HNRs, grievances, or other documents that you think would be of use to us. We will review and return the documents. Other than notifying ADC, we cannot assist with your individual health care concern.

The settlement calls for ongoing monitoring by the prisoners' lawyers to make sure the state complies with its terms. We will tour institutions, review documents including prisoners' health care files, and interview prisoners. We will use information we get from letters like yours to help us focus on system-wide or prison-wide problems. We will also use information from surveys, such as the one enclosed here. It would help us greatly if you would fill out this survey and send it back to us in the enclosed self-addressed stamped envelope. Thank you in advance for your time.

The information you provide helps us learn what is happening in ADC's prisons so that we can hold ADC accountable and ensure that the terms of the settlement agreement are met. Thank you for your interest in the case, and we wish you the best.

Sincerely,

[signatures]

1A

Amy Fettig
Senior Staff Counsel

LARRY JOE PRINCE
ADOC #058251
ASPC Eyman Browning
P.O. Box 3400
Florence, Arizona 85132

February 16, 2016

AMY FETTIG, SENIOR STAFF COUNSEL
ACLU National Prison Project
915 15th Street, NW, 7th Floor
Washington, DC 20005-2112

Re:   Letter dated February 11, 2016; *Parsons v. Ryan*

Dear Ms. Fettig:

This is to acknowledge and respond to your letter dated 2.11.2016. You noted that you were responding to my letter dated 1.6.2016. There appears to be some confusion and I (on behalf of the *Parsons* class in Browning Unit) clarify as follows so that you do not claim to be unaware of the matter.

First, my letter dated 1.6.2016 was basically a notice of errata for my letter dated 12.10.2015 (along with the attachments thereto), which was e-mailed by an acquaintance to dfathi@npp-aclu.org on 12.18.2015. I have a copy of that e-mail (Re: Notice of ADC's non compliance with Parsons v. Ryan.pdf). You may wish to review the totality of those communiques.

Second, your form letter you sent is insulting. When I wrote the letter of 12.10.2015 (along with all the attachments), no less than 240 prisoners read it before it was sent to Mr. Fathi. Now everyone is aware of the lame response you sent me and ongoing sugar coating isn't going to fly.

Third, you clearly miss the point. Parsons v. Ryan stipulates that DI 326 and DO 801 shall provide due process protections on max custody placement. Rather than wrap your mind around how DO 801 is violated to keep this shit hole full, you ask us if the sugar coated conditions meet with positive votes. The problem with you people is that you bite on this STG validation bullshit too much. You do not wish to be seen as assisting alleged gang members being returned to the general population (violations of due process be damned). Today we're done with sugar coating games.

Fourth, I'm moving to intervene under Rule 24, F.R.C.P., and advise the Court of the non-compliance I've repeated to the ACLU until I'm blue in the face. Many of us have had it with being falsely labeled gang members by DO 806 so the Defendant's can keep these beds full to receive government funding (upon subsequently violating DO 801 and Parsons v. Ryan). If the Court does not allow me to intervene then we'll file (at the minimum) eighty 42 U.S.C. §1983 Civil Rights Complaints in two weeks and seek class action certification. This is nothing but McCarthyism (being falsely labeled anti-american domestic terrorist and cannot leave unless debriefing or polygraphed out), and the ACLU allows it to continue. Shame on you.

Sincerely,
Larry Joe Prince

2

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT

**ACLU**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

**CONFIDENTIAL ATTORNEY-CLIENT CORRESPONDENCE**

February 19, 2016

Larry Joe Prince #058251
ASPC- Eyman/ Browning Unit
PO Box 3400
Florence, AZ 85132

Re: *Parsons v. Ryan*

Dear Mr. Prince,

We received notice yesterday of your "Motion to Intervene To Enfoce Stipulation" and "Request to Enforce Stupulation," filed with the court February 17th, 2016 as documents 1504 and 1505 in *Parsons v. Ryan*, Case No. 2:12-cv-00601. As an attachment to these filings you included a letter to our office dated December 10th, 2015, to which you state you did not receive a response. Our office did not receive this letter. We did receive a letter from you dated January 5th, 2016, which we responded to on January 20th, 2016. I am enclosing that response here.

In general, we try to respond to all client mail within 30 days of receipt, if not sooner. If you send us a letter and do not receive a response within four or five weeks, please let us know. We have not experienced systemic difficulties with client legal mail during the course of the *Parsons* case, but some problems have occasionally occurred.

Sincerely,

Amy Fettig
Senior Staff Counsel

3

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



## CONFIDENTIAL ATTORNEY-CLIENT CORRESPONDENCE

January 20, 2016

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

Larry Joe Prince #058251
ASPC- Eyman/ Browning Unit
PO Box 3400
Florence, AZ 85132

Re: **Parsons v. Ryan**

Dear Mr. Prince,

We received your letter from January 6th, 2016. Unfortunately we cannot assist in movement into a different housing unit. However, we are working to ensure that conditions in isolation units like Browning improve as a result of our recent litigation. This letter is to update you on the status of *Parsons v. Ryan*, the federal lawsuit regarding problems with the Arizona Department of Corrections' (ADC) medical, mental health, and dental care. The suit also challenges inhumane conditions in the isolation units. This case is as a "class action" which means it covers all prisoners in the ten ADC prisons. The case was filed in March 2012 by the ACLU, the Prison Law Office, the Arizona Center for Disability Law, and two law firms, Perkins Coie and Jones Day.

On October 14, 2014, the parties told the court that they had reached a settlement of the case. The judge approved the settlement during a February 18, 2015 Fairness Hearing and issued a written order confirming his decision on February 25, 2015. Under the settlement, ADC must fix its health care system and meet more than 100 performance measures, including health care for prisoners with chronic medical conditions; specialty care; care for mentally ill prisoners; and dental care. The settlement also requires ADC to overhaul the rules for prisoners with serious mental illnesses in isolation. Instead of spending all but six hours a week in their cells, such prisoners will now have a minimum of 19 hours a week outside the cell, and this time must include mental health treatment and other programming. ADC must also restrict guards' use of pepper

3A

Amy Fettig
Senior Staff Counsel

LARRY JOE PRINCE
ADOC #058251
ASPC Eyman Browning
P.O. Box 3400
Florence, Arizona 85132

February 28, 2016

MS. AMY FETTIG
Senior Staff Counsel
ACLU National Prison Project
915 15th Street, NW
7th Floor
Washington, DC 20005-2112

Re:   Your letter dated February 19, 2016

Dear Ms. Fettig:

On February 26, 2016, I received your letter of February 19, 2016. Please take notice of the following matters for clarification.

**First**, as to my letter dated December 10, 2015, attached to my Request to Enforce Stipulation in *Parsons v. Ryan* (filed February 17, 2016), you will also see attached to that motion a copy of an e-mail. The letter of December 10, 2015, was attached to that e-mail. All other parties acknowledged receipt of the e-mail and the attachments (which included the letter of December 10, 2015). You may wish to review your e-mails.

**Second**, you acknowledge that you received my letter dated January 6th, 2016. That letter was but a notice of errata, per se, for my letter of December 10, 2015. That should have, at the least, caused your office to inquire as to the letter of December 10, 2015. Instead, on February 11, 2016, you sent me some non-responsive form letter that basically kicked me (us) to the curb without representation. I replied to your February 11, 2016, letter on February 16, 2016. The issues remain unresolved.

**Third**, you state that you responded to me on January 20, 2016, and provided a copy of that letter with your February 19, 2016, letter. That's erroneous. You responded to me on February 11, 2016, not January 20, 2016. Until your letter of February 19, 2016, I had not received a letter dated January 20, 2016. I now have the same exact letter from you with two different dates (February 11, 2016 and January 20, 2016).

In conclusion, you have our concerns before you. We need assistance. If you wish not to assist then say that, but we respectfully ask that you do not hinder us from proceeding with our non-frivolous request to enforce the max custody placement stipulation in *Parsons v. Ryan et al*. I will do any work necessary to help you help us. Thank you for your time.

Sincerely,

Larry Joe
ave, ljp
PS: Now in receipt of Courts February 24, 2016 *Parsons* Order (Doc. 1512-1).

4

ARIZONA DEPARTMENT OF CORRECTIONS
DIRECTOR'S OFFICE

MEMORANDUM

TO:      DISTRIBUTION

FROM:    CHARLES L. RYAN, DIRECTOR

DATE:    March 27, 2014

SUBJECT: Director's Instruction # __326__, Maximum Custody Population Management

This Director's Instruction is effective immediately and will remain in effect until incorporated into the appropriate Department Order. This Director's Instruction shall be reviewed for modifications after 90 days.

**PURPOSE:**

This Director's Instruction is being implemented to facilitate a process that requires inmates in maximum custody to work through a program utilizing a step system providing the opportunity to participate in jobs, programs and other out of cell activities. Based on behavior and programming, inmates may progress from controlled based housing to open privilege base housing where movement outside a cell is without restraint equipment.

This modifies the concept of programming maximum custody inmates involved in commission of one the Forbidden Three Acts (see definition) and the Guiding Principles (see definition) developed by the Association of State Correctional Administrators (ASCA).

**PROCEDURE:**

1.0  **INTAKE AND ASSESSMENT**

    1.1  Inmates shall be assigned to maximum custody pursuant to Department Order 801, Inmate Classification.

        1.1.1  This does not apply to inmates assigned to the Restrictive Status Housing Program (RSHP). Inmates placed in the RSHP shall remain in the program until successful completion.

            1.1.1.1  If necessary, a classification override shall be used in the RSHP until completion.

            1.1.1.2  If an inmate is removed from the RSHP due to disruptive behavior (or for any other reason) they must return to the RSHP to complete, once the issue is resolved.

    1.2  Upon arrival to maximum custody, inmates shall initially be assigned to the intake and assessment area at the Arizona State Prison Complex (ASPC) – Eyman, Browning Unit, except population groups that require specialty housing (see definition). The Assessment Team consisting of a Correctional Officer III (CO III), security supervisor and Associate Deputy Warden or designee shall within five work days:

1



GUIDING PRINCIPLES –

1. Provide a process, a separate review for decisions to place an inmate in maximum custody;

2. Provide periodic classification reviews of inmates in maximum custody every 180 days or less;

3. Provide in-person mental health assessments, by trained personnel within 72 hours of an inmate being placed in maximum custody and periodic mental health assessments thereafter including an appropriate mental health treatment plan;

4. Provide structured and progressive levels that include increased privileges as an incentive for positive behavior and/or program participation;

5. Determine an inmate's length of stay in maximum custody on the nature and level of threat to the safe and orderly operation of general population as well as program participation, rule compliance and the recommendation of the person(s) assigned to conduct the classification review as opposed to strictly held time periods;

6. Provide appropriate access to medical and Mental Health staff and services;

7. Provide access to visiting opportunities;

8. Provide appropriate exercise opportunities;

9. Provide the ability to maintain proper hygiene;

10. Provide program opportunities appropriate to support transition back to a general population setting or to the community;

11. Collect sufficient data to assess the effectiveness of implementation of these guiding principles;

12. Conduct an objective review of all inmates in maximum custody by persons independent of the placement authority to determine the inmates' need for continued placement in maximum custody;

13. Require all staff assigned to work in maximum custody units receive appropriate training in managing inmates on maximum custody status.

GROUP RECREATION AREA – Outdoor recreation enclosure with basketball court and table.

INTERACTIVE RECREATION AREA – Outdoor recreation enclosure that is in close proximity to other holding enclosures and allows for controlled social interaction between inmates.

OPEN PRIVILEGE BASED HOUSING – Least restrictive housing area in the maximum custody units housing areas. They are the Step III inmates at Central Unit, Rynning Rast and Lumley Units.

PROGRAM TEAM – Team consisting of Offender Operations and may include Support Services personnel and Mental Health professionals (i.e., Unit Psychologist, Psych-Associate, and Psych-Technician). Operations staff members include Unit Administrator(s), Captain(s), Correctional Officer IV(s), Correctional Sergeant(s), Correctional Officer(s) III, and Correctional Officer(s) II assigned to unit/housing area. Support Services staff members include teachers, chaplains and treatment counselors. These staff review inmates monthly to decide step movement, housing and program completion. Any decision concerning the inmate's mental health well-being is chaired by the senior clinical staff member present within their scope of their authority.



RESTRICTIVE STATUS HOUSING PROGRAM –Program designated to address Forbidden Three offenses and give inmates an opportunity to modify behavior in a positive way so they can return to the general population.

RESTRICTED STATUS HOUSING PROGRAM (RSHP) INDEPENDENT REVIEW COMMITTEE – Committee of at least three staff (Deputy Warden, chief of security and classification COIV) which do not work in the unit where the RSHP is located. This committee meets monthly and reviews all inmate placements into RSHP. They also review, need for continued assignment of inmates in the program for more than 180 days.

RESTRICTIVE STATUS HOUSING PROGRAM (RSHP) REVIEW COMMITTEE – Committee in Restrictive Status Housing Program that conducts face to face reviews with inmates being placed into program. They discuss reason for placement and program to follow to return to general population. It is made up of security and program staff but may have Support Services and Contract Mental Health members.

SPECIALTY HOUSING – Areas where inmates are housed that cannot be assigned to general population, i.e., sex offenders, protective custody, condemned row, etc.

**ATTACHMENTS:**

A – General Population and Specialty Housing Flowchart
B – Security Threat Group Housing Flowchart
C – Condemned Row Flowchart
D – Mental Health Housing Flowchart
E – Restrictive Housing Flowchart
F – Browning Unit Step Program Matrix
G – Central Unit Mental Health Step Program Matrix
H – Central Unit General Population Step Program Matrix
I – SMU I Step Program Matrix
J – Lumley Unit Step Program Matrix
K – Restrictive Housing Step Program Matrix
L – Baker / George / King Step Program Matrix
M – Browning Unit Mandatory Programs
N – Central Unit / Lumley / SMU I Mandatory Programs
O – Restrictive Housing Mandatory Programs

{Original Signature on File}

10



## Security Threat Group Housing

Inmate approved for max per DO 801 process
↓
Inmate transferred to Max unit
↓
Is inmate STG status? — No → Place in appropriate Max housing

Yes ↓

MH Review conducted within 72 hours ←

↓

MH Review
Does inmate have a significant mental health issues requiring intensive intervention? — No → Is inmate Debriefer? — Yes → Did inmate pass polygraph?

Yes ↓

Inmate receives appropriate MH treatment

Is inmate Debriefer? No ↓
Does inmate choose Step Down pgm?

Did inmate pass polygraph? ↓
Eligible for close custody
▲

No ↓   Yes →   Inmate participates and successfully completes

Inmate remains STG validated

↓
Step 1
Minimum 30 days

↓
Step 2
Minimum 30 days

↓
Step 3
Minimum 30 days

Inmate remains in Max custody while in validated status

Attachment B

## Browning Unit (GP/STG/Condemned Row) Step Program Matrix

| *Step I | Step I Incentive | Step II | Step II Incentive | Step III | Step III Incentive |
|---|---|---|---|---|---|
| **Intake** <ul><li>Orientation and sign Memo of Expectations for max custody step plan</li></ul> **Expectations in Step I:** <ul><li>Follow Rules and Regulations including DO704</li><li>Participate in prescribed programs/classes/ individual groups as per program plan</li><li>Medication compliance</li><li>Participate in the Re-Entry Program for all those within 18 months of release</li><li>Spend a minimum of 30 days in Step I</li></ul> | <ul><li>Store – $60 a week / $80 at Christmas</li><li>Phone – One 15 minute call per month</li><li>Visitation – One non-contact visit block per week</li><li>Recreational Activities – 3 two hour periods each week in the standard enclosure</li><li>Library Services</li><li>TV and personal property – per DO909</li><li>Securepak - once per quarter within security limitations on certain items</li></ul> | **Movement to Step II:** <ul><li>Minimum of 30 days in Step I</li><li>Display behavior that is cooperative and respectful</li><li>No discipline in previous 30 days</li><li>Be recommended by Unit Program Team</li></ul> **Expectations in Step II:** <ul><li>Follow Rules and Regulations including DO704</li><li>Participate in prescribed programs/classes/ individual groups as per program plan</li><li>Demonstrate positive social interaction skills</li></ul> | <ul><li>Store $80 a week / $120 at Christmas</li><li>Phone – Two 15 minute call per month</li><li>Visitation – Two non-contact visit blocks per week</li><li>Recreational Activities – 3 two hour recreation periods each week, one of which can be in the 10 x 10 interactive enclosure</li><li>Library Services</li><li>TV and personal property – per DO909</li><li>Securepak - once every other month within security limitations on certain items</li><li>Fundraisers - Participate in fundraisers</li><li>Hobby Craft – Origami and pencil drawing</li></ul> **Reduction to Step I:** <ul><li>Found guilty of an A or B violation</li><li>Two or more misdemeanor violations within 90 days while in Step II</li><li>Refusal to program; consistently demonstrate poor socialization skills and/or non-cooperative behavior</li><li>All decisions will be made by Unit Program Team on a case by case basis</li></ul> | **Movement to Step III:** <ul><li>Minimum of 30 days in Step II</li><li>Display behavior that is cooperative and respectful</li><li>Must complete or actively participating in all programs as per program plan</li><li>Be Recommended by Unit Program Team</li></ul> **Expectations in Step III:** <ul><li>Follow Rules and Regulations including DO704</li><li>Participate in prescribed programs/classes/ individual groups as per program plan</li><li>Maintain "meets expectation" on all work evaluations</li><li>Consistently demonstrate positive social interaction skills</li><li>Demonstrate good work ethic</li></ul> **Incentives for Step III:** <ul><li>Store - $100 a week / $160 at Christmas</li><li>Phone - three 15 minute calls per week</li><li>Visitation – Three per week</li></ul> | <ul><li>Recreational Activities - Four outdoor recreation periods a week. All can be in the 10 x 10 interactive enclosures</li><li>In pod recreation</li><li>Library Services</li><li>TV and personal property - per DO909</li><li>Securepak - once every month within security limitations on certain items</li><li>Fundraisers - Participate in fundraisers</li><li>Hobby Craft - Drawing, origami</li><li>WIPP - jobs as pod porter</li></ul> **Reduction to Step II:** <ul><li>Found guilty of misdemeanor disciplinary violation</li><li>Repeated demonstration of poor behavior</li><li>All decisions will be made by Unit Program Team on a case by case basis</li></ul> **Reduction to Step I:** <ul><li>Found guilty of an A or B violation</li><li>Refusal to program; consistently demonstrate poor socialization skills and/or non-cooperative behavior</li><li>All decisions will be made by Unit Program Team on a case by case basis</li></ul> |

\* All GP remain at Step I

Attachment F

7

recommendation on the Maximum Custody Placement Recommendation/Approval Form shall indicate that the inmate is being recommended to return to a lower custody detailing the reasons for his/her reduction.

1.4.2 The DI61 shall be completed as a TYPE 07. The procedures and time frames for reclassification shall be followed. Removal from maximum custody does not require due process. The Maximum Custody Placement Recommendation/Approval Form shall be the only necessary form for removal of maximum custody.

1.4.3 Central Office is the final approving authority for removal from maximum custody. If Central Office denies the recommendation for removal, the unit will be contacted to initiate the due process.

1.4.4 Inmates assigned to maximum custody shall receive review after 180 days from the date of the maximum custody approval, to determine if maximum custody placement is still required. If it is determined the inmate no longer requires maximum custody placement; the inmate may be transferred to a lower security facility upon reclassification and approval by the Deputy Warden or Designee.

    1.4.4.1 The Warden or designee must approve the removal of an inmate from maximum custody, using the Maximum Custody Placement Recommendation/Approval Form 801-7. The Warden or designee shall forward the transfer recommendation to Central Office Inmate Services Classification for appropriate action. If removal from maximum custody is denied by Central Office, a rehearing will be requested to ensure due process requirements are met.

    1.4.4.2 If the inmate is denied removal from maximum custody at the 180 day review, the inmate shall be classified annually thereafter unless the placement is a result of an override. Inmates who are approved for maximum custody shall not be eligible for reduction for 180 days, unless the placement was a result of a custody override.

1.4.5 Administrative Reviews - An inmate may request an administrative review of a classification score or custody level override when there is factual evidence the information utilized in the scoring process was incorrect or information that would have altered the result was omitted. No other issues will be considered. See Department Order 801 for Administrative Review Process.

## 801.12 SECURITY THREAT GROUP

1.1 **Validated Security Threat Groups** - When an inmate has been validated as a member of a security threat group in accordance with departmental policy, the inmate shall be classified to maximum custody in accordance with classification procedures for maximum custody placement.

    1.1.1 Classification to maximum security will immediately follow the validation by the STG Validation Committee. When an inmate successfully appeals and the validation has been reversed, a new reclassification shall be conducted to determine the appropriate custody.

    1.1.2 When an inmate agrees to renounce STG membership and subsequently debriefs in a satisfactory manner, the inmate shall be placed in Protective Segregation as outlined in Department Orders 805 and 806. Once an inmate successfully passes a polygraph, he/she shall be eligible to reduce to a close custody Protective Segregation Unit, but

1.8 Inmates shall be reviewed 180 days from Maximum Custody approval and annually thereafter unless the approval for maximum custody was an override. In case of an override, the inmate shall be reviewed every 180 days. The Maximum Custody Hearing process shall be followed for these reviews.

1.9 Inmates approved for maximum custody shall not be eligible for reduction for a minimum of 180 days. After 180 days from Maximum Custody approval, the inmates shall be reviewed annually unless an event occurs that will result in a reduction in custody.

    1.9.1 If no change in custody or location is recommended, the DI61 shall be completed as a type 91, with the exception overrides.

    1.9.2 If the inmate's maximum custody placement was a result of an override, the DI61 shall be completed as a type 07 by Central Office Classification. This includes inmates who are approved for continued placement in maximum custody as an override.

    1.9.3 Changes to internal risk scores only shall be entered as a type 91 and do not require a Maximum Custody Packet, unless the change to the internal risk score results in a reduction in custody, i.e., A reduction from an internal risk score of a 5 to a 4. Internal risk score changes that result in a reduction in custody shall be entered as a type 07 on the AIMS DI61 screen and approved by Central Office Classification.

1.10 The Warden or designee must approve the removal of an inmate from maximum custody, using the Maximum Custody Placement Recommendation/Approval Form. If the inmate has a reduction in custody or an override to maximum custody is no longer needed, the recommendation on the Maximum Custody Placement Recommendation/Approval Form shall indicate that the inmate is being recommended to return to a lower custody detailing the reasons for his/her reduction. The DI61 shall be completed as a TYPE 07. The procedures and time frames for reclassification shall be followed. Removal from maximum custody does not require due process. The Maximum Custody Placement Recommendation/Approval Form shall be the only necessary form for removal of maximum custody.

1.11 Central Office is the final approving authority for removal from maximum custody. If Central Office denies the recommendation for removal, the unit will be contacted to initiate the due process.

**801.11 MAXIMUM CUSTODY APPEALS**

1.1 No person who approves an inmate placement in maximum custody shall decide, or take part in deciding, the inmate's appeal to Central Office Classification.

1.2 The inmate shall submit a written appeal to Offender Services Administrator within 15 days following the receipt of the notice of the decision from Central Office Classification Administrator or designee.

1.3 If the Offender Services Administrator or designee intends to rely on a statement not previously made known to the inmate, the substance of such information shall be disclosed to the inmate. Before using such information, the Offender Services Administrator or designee shall provide the inmate with a reasonable opportunity to respond with a written statement and/or the submission of documentary evidence.

1.4 If the Offender Services Administrator or designee wishes to withhold the identity of a witness whose statement is being used, the Administrator or designee shall inform the inmate of such reliance and disclose the substance of the information without jeopardizing the safety of person(s) or institutional security.