# Exhibit A

# Expert Report of Pablo Stewart, M.D.

*Parsons v. Ryan,* No. 2:12-cv-00601-DKD (D. Ariz.)
March 30, 2016

**INTRODUCTION AND QUALIFICATIONS**

1.      I am a physician licensed to practice in California and Hawaii, with a specialty in clinical and forensic psychiatry. A true and correct copy of my current *curriculum vitae* is attached hereto as **Exhibit 1**. My background and experience as relevant to my expert testimony in this proceeding are summarized briefly below, and set forth more fully in my November 8, 2013 report (Dkt. 1104-2).

2.      In 1973, I earned a Bachelor of Science Degree at the United States Naval Academy in Annapolis, Maryland. In 1982, I received my Doctor of Medicine from the University of California, San Francisco School of Medicine.

3.      Throughout my professional career, I have had extensive clinical, research, and academic experience in the diagnosis, treatment, and prevention of mental illnesses in correctional and other institutional contexts. I also have extensive experience managing, monitoring, and reforming correctional mental health systems.

4.      Between August 1988 and December 1989, I served as the Director of Forensic Psychiatric Services for the City and County of San Francisco. In that capacity, I had administrative and clinical oversight responsibility for the psychiatric care provided to the inmate population in San Francisco at both the county jails and in the 12-bed locked inpatient treatment unit at the San Francisco General Hospital. At the time, mental health care in San Francisco's jails was subject to a consent decree in the case *Stone v. City and County of San Francisco*, 968 F.2d 850 (9th Cir. 1992).

5.      I have also served as a psychiatric expert or consultant to various federal courts or other organizations implementing remedial decrees covering the provision of mental health care in correctional institutions. For ten years, between April 1990 and February of 2000, I served as court-appointed medical and psychiatric expert in the consent decree case *Gates v. Deukmejian*, E.D. Cal. Case No. CIV S-87-1636. Among other things, that case involved the provision of adequate psychiatric care to mentally ill inmates at the California Medical Facility (CMF) in Vacaville, California.

6.      Between October 1996 and July 1997, I served as a psychiatric expert

- 1 -

for the United States District Court for the Northern District of California in the case of *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995), an omnibus case involving psychiatric care and other issues at Pelican Bay State Prison in Crescent City, California. In my work on the *Madrid* case, I gained first-hand knowledge of the severe impact of prolonged isolation on mentally ill inmates, as well as additional concrete understanding of the need for constant monitoring of both non-mentally ill and mentally ill inmates in isolation in order to prevent any further decompensation, since isolated confinement by itself sometimes causes, contributes to and/or intensifies psychiatric instability.

7.     Between June of 2003 and December of 2004, I was hired by the State of New Mexico as an expert for the implementation phase of the psychiatric sections of the "Ayers Agreement" covering the New Mexico Corrections Department (NMCD). The Agreement was a settlement between a class of New Mexico prisoners and the NMCD concerning the provision of adequate psychiatric care for inmates in New Mexico's highest security facility. The Ayers Agreement concerned a mental health treatment program in a disciplinary detention unit similar to the Security Housing Unit (SHU) at Pelican Bay State Prison.

8.     I have also worked as an expert consultant for the United States Department of Justice (USDOJ) on inspections and remedial work in connection with youth facilities in California and Michigan. In August and September of 2003, I was retained as a medical and psychiatric expert for the USDOJ in connection with an inspection of the N.A. Chaderjian Youth Correction Facility in Stockton, California. Between March of 2003 and the summer of 2006, I worked as an expert for the USDOJ in connection with inspections to identify and remedy various problems at the Maxey Training School, a youth facility with large medical and mental health treatment programs in Whitmore Lake, Michigan. The case involved the adequacy of medical and mental health care provided at the facility.

9.     In 2007 and 2008, I prepared expert statements and testified before the

three-judge panel in the *Coleman/Plata* overcrowding litigation in California. My expert report in that case was cited twice in the United States Supreme Court decision upholding the three-judge court's imposition of an order requiring California to reduce overcrowding.

10. I have presented numerous papers before mental health professionals, prosecuting and defense attorneys, probation officers, and judges, and have published in professional and peer-reviewed journals on topics including prison mental health services, dual diagnosis, mental illness, alcohol and drug abuse, and the treatment of substance abuse. I am currently a Diplomat of, and have served as an Examiner for, the American Board of Psychiatry and Neurology.

11. Since 1986, I have held academic appointments as Clinical Instructor, Assistant Clinical Professor, Associate Clinical Professor, and Clinical Professor in the Department of Psychiatry, University of California, San Francisco, School of Medicine. I received the Henry J. Kaiser Award for Excellence in Teaching in 1987 and was selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic years 1988-1989, 1990-1991, and 1994-1995. I also coordinated a course on Prisoner Health at the University of California San Francisco School of Medicine between January 2002 and January 2004.

12. I have served as an expert witness and consultant to the plaintiffs in this case since 2012. In that capacity I have conducted on-site inspections of the Arizona State Prison Complexes at Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma. I have prepared the following expert reports:

- Expert Report of Pablo Stewart, M.D., November 8, 2013 (Dkt. 1104-2).
- Supplemental Expert Report of Pablo Stewart, M.D., December 9, 2013 (Dkt. 1104-6, Exhibit 8).
- Rebuttal Expert Report of Pablo Stewart, M.D., January 31, 2014 (Dkt. 1104-6, Exhibit 9).

- Second Supplemental Expert Report of Pablo Stewart, M.D., February 24, 2014 (Dkt. 1104-6, Exhibit 10).
- Third Supplemental Report of Pablo Stewart, M.D., August 29, 2014 (**Exhibit 2**)

13.   The opinions expressed in this report are necessarily limited by the information available to me at this time.  I reserve the right to modify or supplement these opinions as additional information becomes available.

## FAILURE TO COMPLY WITH MENTAL HEALTH PERFORMANCE MEASURES

14.   When settlement discussions began in this case in the fall of 2014, I consulted with plaintiffs' counsel in formulating the remedies they would seek regarding mental health care.  Each of the mental health Performance Measures (PM) in the Stipulation is designed to protect prisoners with serious mental health needs from unnecessary risk of harm or death, and to ensure that they receive minimally adequate mental health care.[1]

15.   I have reviewed the CGARs from February through December of 2015, as well as summary charts reflecting the CGAR results.[2]  It is readily apparent that ADC has failed to comply with a number of critically important mental health performance measures. This failure has already harmed a number of ADC prisoners, as explained below; and it creates a substantial risk of serious future harm to others.

---

[1] The Performance Measures most directly relevant to mental health care are PM 73-99 (see Stipulation, Exhibit B, Dkt. 1185-1).  Of course additional measures, such as those concerning the accuracy of medical records (PM 5-10) and the provision of prescribed medications (PM 11-22), also have a profound effect on the quality of mental health care received by patients.

[2] CGARs (the acronym stands for "Compliance: Green, Amber, Red") are documents reflecting ADC's monitoring of its compliance with the Performance Measures at each ADC prison complex.  Under the Stipulation, ADC is required to reach 75% compliance on each measure at each prison during the first year; 80% during the second year; and 85% in subsequent years.

More generally, as set forth in greater detail below, many of the deficiencies in care I identified in my previous reports persist to this day.

16. At the outset, I must note that there is reason to question the accuracy of defendants' self-reported compliance. In the September 2015 CGAR for Phoenix, the monitor noted that multiple mental health contacts were listed as being done by a psychiatrist, when in fact the staff member in question was not a psychiatrist. (ADCM 197144). This also occurred in July (ADCM 135620-21). Because the majority of the mental health Performance Measures require contact by mental health staff with specified levels of training and qualifications, this finding casts doubt on the accuracy of defendants' reported compliance.[3]

## INADEQUATE MENTAL HEALTH STAFFING

17. As I said in my November 2013 report:

> The provision of sufficient numbers of qualified mental health staff is the foundation of any minimally adequate prison mental health care system. Without a sufficient number of properly qualified mental health staff, it is impossible to provide adequate mental health treatment. In addition, shortages of other health care staff, such as nurses and medical records staff, can negatively affect the delivery of mental health services, even if those employees are not formally classified as mental health staff.

November 2013 report at 11. It appears that serious shortages in mental health staff continue, with predictable results.

18. The Arizona Department of Corrections, like any state prison system, incarcerates a large number of persons with serious mental health needs. Treatment of these persons requires sufficient numbers of adequately qualified staff. Throughout

---

[3] My discussion of noncompliance with specific Performance Measures below does not indicate that I have concluded that ADC is in compliance with other Measures not discussed.

my involvement in this case, from 2012 to the present, I have been struck by the extreme and chronic shortage of mental health staff in ADC.  For example, in the ten full days I have spent inspecting mental health care in seven ADC prisons, I do not believe I have ever seen a psychiatrist.  This is extraordinary and completely unprecedented in my professional experience.  A recurrent theme in my review is that patients are not being seen by a psychiatrist as required by their clinical condition and by the Performance Measures.

19.     I have also repeatedly noted the lack of professional preparation of many of the mental health staff that do exist in ADC prisons. For example, during my tour of Eyman in December 2015, I tried to engage a mental health staff member in a collegial discussion of the events leading up to the ██████ suicide of ██████████.  As discussed below, this is a case in which ADC itself concluded the suicide was preventable, and that ██████████ was not offered adequate mental health care in the months leading up to his death.  The staff member and I, however, were unable to have this collegial discussion due to his almost complete lack of basic understanding of psychopathology, appropriate modalities of treatment and the standard of care for patients suffering from serious mood disorders.  I was frankly appalled by this staff member's lack of proper professional preparation. My concern was heightened by the fact that this particular staff member held a supervisorial position.

20.     While it may be that there are other variables preventing the delivery of adequate mental health care in ADC, the problems I observed are consistent with a shortage of qualified mental health staff.  In addition to failure to comply with critical Performance Measures, these include failure to see the patient at appropriate intervals; patient encounters that are insufficiently thorough (for example, failure to perform a mental status exam or a suicide risk assessment);[4] and inadequate documentation in the medical record.

---

[4] I saw one "individual counseling" session noted in the file of ██████████, ██████████, that took 47 seconds to complete.

21.     Indeed, ADC records consistently show large backlogs of patients waiting for mental health care.  A 12/18/15 letter from Shane L. Evans to Lucy Rand noted that "[t]he current statewide Mental Health appointment backlog is 377" and "[t]he current statewide Psychiatric appointment backlog is 1,385."  Records from individual prison complexes tell the same story:[5]

**Tucson:**

- September 2015 CQI minutes ("we have a large psych backlog – close to 1000") (ADCM 197765)
- October 2015 CQI minutes ("psych backlog 650") (ADCM 197776)
- November 2015 CQI minutes ("Mental Health backlog MH 978 psych 283") (ADCM 197785)
- "Dr. Wolfe will provide Dr. Pastor with a backlog list of MH-3D prisoners to be scheduled for telepsychiatry within the required time frames." (PM 85) ADCM199655

**Lewis:**

- September 2015 CQI minutes ("psychiatry is very backlogged currently – with approx. 400 inmates") (ADCM225806).
- "Given the backlog of such individuals, those whose medications have been discontinued in the last 30 days will be scheduled first in order to reduce the expansion of the backlog." (PM 85) ADCM199455

**Perryville:**

- September 2015 CQI minutes ("back log noted at 43 at this time") (ADCM 225821).

**Yuma:**

- September 2015 CQI minutes ("Dr. Raza [psychiatrist] has backlog due to being sick and being pulled to work at other sites.  Needs are greater at other

---

[5] Typographical and grammatical errors are as in the original.

1    sites for his assistance") (ADCM 225851).

2    **Florence:**

3    - November 2015 CQI minutes ("there were 283 backlogs for Psychiatry")
4      (ADCM228120)

5    - "A backlog was allowed to develop and the clinicians failed to maintain a
6      tracking mechanism to assure compliance." (PM 86) ADCM199489

7

8         22.    ADC records similarly acknowledge chronic shortages of mental health

9    staff, and explicitly link these shortages with ADC's failure to comply with the mental

10   health Performance Measures.  For example:

11   **Eyman:**

12   - "We actively recruiting for our vacant 1.0 FTE Psych NP and telepsych
13     positions." ADCM 199347, 199348, 199349 (PM 83, 85, 86)

14   **Florence:**

15   - "Florence complex is currently short two [mental health] providers. … The
16     conintued need to recruit additional providers is still in place and is a huge
17     need." (PM 85) (ADCM 228309).

18   - "Provider being utilized from another complex starting 8/3/15 once to twice a
19     week until backlog complete." (PM 81) ADCM199416

20   - October 2015 CQI minutes ("psychiatry backlog has increased due to lack of
21     provider coverage") (ADCM 225864)

22   - September CQI minutes ("currently down a Psychiatrist, Psychologist and mid-
23     level") (ADCM 225786)

24   **Yuma:**

25   - "Due to staffing shortage with nursing staff Mental health Associates will be
26     coming in and doing [suicide] watches on the weekend and holidays until
27     nuring can take over that duty. … This will ciontinue  until addition RN
28     coverage can be scheduled and an mental heatlh RN is hired." (PM 94)

(ADCM199401).

**Tucson:**

- "Mental Health backlog has increased since we have had a decrease in staff." (ADCM 197785).
- "Dr. Wolfe will compile a list of inmates who are past due for medications and those who are due soon to provide to Dr. Pastor for further planning due to psychiatry provider shortages." ADCM199654. (PM 81)
- "Dr. Wolfe will compile a list of past due and due soon prisoners to send to Dr. Pastor for further planning due to severe provider shortage." ADCM199656. (PM 85)

23.     ADC's mental health staffing shortage has two aspects.  First, there appears to be a chronic inability to hire and retain staff, resulting in critical positions often being vacant.  A December 18, 2015 letter from Shane L. Evans, Senior Manager of Compliance, to Lucy Rand, Assistant Attorney General, states that the statewide fill rate for psychologists is 50%, and for psych associates it is 77% (p. 3). But even those figures significantly overstate ADC's mental health staffing, since they include contract staff, overtime, and agency or locums staff (p. 2).

24.     A review of ADC's monthly staffing reports shows that these shortages are longstanding.  The following are the contract fill rates for various mental health staff in recent months:

**Psychologists:  52%** (December 2015); **52%** (November 2015); **52%** (October 2015); **46%** (September 2015); **46%** (August 2015); 52% (July 2015); **52%** (June 2015); **52%** (May 2015); **52%** (April 2015).

**Mental Health Nurse Practitioners:  49%** (December 2015); **49%** (November 2015); **26%** (October 2015); **26%** (September 2015); **43%** (August 2015); **47%** (July 2015); **47%** (June 2015); **43%** (May 2015); **43%** (April 2015).

**Psychiatric Director:  0%** (December 2015); **0%** (November 2015); **0%** (October 2015); **0%** (September 2015); **0%** (August 2015); **0%** (July 2015); **0%** (June 2015); **0%** (May 2015); **0%** (April 2015).  It appears that this position has been continuously vacant since the Stipulation became effective in February 2015.

ADCM 274691, 273945, 197358, 197347, 197336; 199719; 199708; 199697; 199686.  ADC's current level of mental health staffing is dangerously low and is woefully inadequate to provide minimally adequate care to its prisoners.

25.     Second, even if all authorized mental health staff positions were filled, staffing would likely still be inadequate.  It is impossible to be completely certain about this, because as far as I can ascertain there has never been a time since the Stipulation went into effect when all authorized mental health staff positions were filled.  But ADC's mental health staffing levels are below those of comparable state prison systems.  To take one example, ADC has a total of 19.0 psychiatric provider positions (7.5 psychiatrists, 11.5 mental health nurse practitioners).  According to the ADC website, on March 11, 2016, ADC had 35,366 prisoners in its state prisons, yielding a prisoner to psychiatric provider ratio of **1,861 to 1.**  By contrast, the Colorado Department of Corrections has 26.375 psychiatric provider positions and 14,017 prisoners in its state prisons, yielding a ratio of **531 to 1.**[6]

---

[6] January 14, 2016 email from Adrienne Jacobson, Colorado Department of Corrections, to Rebecca Wallace; Colorado Department of Corrections, Monthly Population and Capacity Report, Feb. 29, 2016, available at https://drive.google.com/file/d/0B30yLl0I1yBRUVpNSndDeU1Bc1pwcmxGVUxsQV9NYlZ3OVIw/view.

**SPECIFIC PERFORMANCE MEASURES**

**Inadequate monitoring of prisoners taking psychotropic medication**

**Performance Measure 81**

    26.    As I wrote in my November 2013 report:

> Patients taking psychotropic medication need to be monitored by a psychiatrist. The frequency depends on the clinical situation, but in no cases should it be any less frequent than every 90 days.

11/8/13 report at 29.  Accordingly, PM 81 requires that "MH-3A prisoners[7] who are prescribed psychotropic medications shall be a seen a minimum of every 90 days by a mental health provider."[8]

    27.    ADC is persistently noncompliant with PM 81 at multiple prisons.  For example, Lewis was noncompliant every month from February through November; Tucson was noncompliant from June through December.

|  | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 88 | 69 | 77 | 77 | 64 | 79 | 83 | 84 | 69 | 79 | 89 |
| Florence | 92 | 79 | 92 | 67 | 65 | 77 | 81 | 69 | 90 | 74 | 66 |
| Lewis | 54 | 58 | 72 | 51 | 61 | 74 | 68 | 73 | 51 | 60 | 77 |
| Perryville | 98 | 100 | 100 | 96 | 91 | 92 | 85 | 87 | 94 | 92 | 91 |
| Phoenix | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 100 | 80 | 100 |
| Tucson | 85 | 88 | 90 | 77 | 74 | 63 | 69 | 64 | 61 | 68 | 69 |
| Yuma | 95 | 98 | 97 | 98 | 93 | 92 | 88 | 95 | 89 | 93 | 95 |

---

    [7] ADC classifies prisoners according to their assessed mental health needs.  Those classified MH-1 have the lowest needs; those classified MH-5 the highest.  Those classified MH-3 are divided into four subcategories:  A, B, C, and D. This classification system is described in the "Definition of Terms" section of the Stipulation (Exhibit A).

    [8] The Stipulation defines "mental health provider" as a psychiatrist or psychiatric nurse practitioner.  Stipulation, Exhibit A.  "Seen" is defined as "Interaction between a patient and a Medical Provider, Mental Health Provider or Mental Health Clinician that involves a treatment and/or exchange of information in a confidential setting.  With respect to Mental Health staff, means an encounter that takes place in a confidential setting outside the prisoner's cell, unless the prisoner refuses to exit his or her cell for the encounter." Stipulation, Exhibit A.

**Performance Measure 85**

28.     I also wrote in my November 2013 report, "[i]t is … essential that a patient who discontinues psychotropic medication be closely followed by a psychiatrist in case the patient decompensates and medications need to be restarted." 11/8/13 Report at 31.  In that report I identified patients who had not been adequately followed after discontinuing medications and had suffered harm as a result.  11/8/13 report at 31-32.

29.     To avert such harm, PM 85 requires that "MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medication." Unfortunately, no prison has achieved compliance with this measure in a single month between February and November 2015.  In December 2015, only Eyman was compliant.  Some prisons had 0% compliance in multiple months; Lewis had 0% compliance in all but two months (in those two months its compliance rate was 5% and 9%).  This chronic failure to monitor prisoners who are currently prescribed, or have recently discontinued, psychotropic medication presents a significant risk of serious harm.  It is likely that this failure results at least in part from the extraordinarily high vacancy rates among mental health nurse practitioners, who constitute the large majority of mental health providers in ADC.

|  | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 0 | 0 | 14 | 0 | 20 | 25 | 20 | 33 | 0 | 0 | 80 |
| Florence | 0 | 17 | 22 | 17 | 8 | 17 | 0 | 15 | 8 | 8 | 13 |
| Lewis | 0 | 0 | 9 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 0 |
| Perryville | 50 | 43 | 69 | 24 | 55 | 33 | 0 | 43 | 57 | 50 | 67 |
| Tucson | 0 | 0 | 35 | 12 | 13 | 0 | 14 | 13 | 6 | 13 | 0 |
| Yuma | 20 | 43 | 0 | 0 | 18 | 29 | 20 | 60 | 20 | 50 | 29 |

**Inadequate access to non-medication treatment modalities**

**Performance Measure 80**

30.     I wrote in my November 2013 report:

> An adequate correctional mental health care system must provide a full range of treatment modalities; a system that relies primarily or exclusively on medication does not provide an acceptable level of care. It is my opinion that the ADC mental health care system relies almost exclusively on medication (which it fails to provide reliably or appropriately), and does not provide an appropriate level of non-medication mental health programming.

(p. 37).[9]

31.     Performance Measure 80 requires that "MH-3A prisoners shall be seen a minimum of every 30 days by a mental health clinician."[10]  ADC has not complied with this measure, with several consecutive months of noncompliance at Eyman (7 months), Tucson (8 months), and Lewis (6 months).  This is likely related to the fact that only about 50% of ADC's psychologist positions are filled.

|  | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 73 | 57 | 47 | 23 | 27 | 43 | 60 | 92 | 88 | 98 | 98 |
| Florence | 97 | 93 | 97 | 93 | 93 | 90 | 63 | 87 | 95 | 84 | 95 |
| Lewis | 62 | 79 | 93 | 40 | 67 | 69 | 59 | 64 | 62 | 80 | 75 |
| Perryville | 100 | 91 | 100 | 100 | 92 | 90 | 92 | 91 | 89 | 88 | 74 |
| Phoenix | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 80 | 100 | 100 |
| Tucson | 81 | 87 | 93 | 70 | 53 | 64 | 66 | 69 | 68 | 66 | 64 |
| Yuma | 94 | 98 | 98 | 82 | 84 | 84 | 90 | 92 | 94 | 84 | 84 |

**Inadequate access to care**

32.     The Health Needs Request (HNR) form is the primary means by which ADC prisoners access non-routine mental health services.  In my November 2013 report, I concluded that "It is clear that untimely handling of HNRs remains a serious

---

[9] I quoted the comment of Nicole Taylor, ADC Mental Health Monitor, that "I also have concerns that the inmates are receiving medication management and not other therapeutic interventions." 11/8/13 report, p. 39.

[10] "Mental Health Clinician" is defined in the Stipulation as a psychologist or psychology associate.  Stipulation, Exhibit A.

problem" (p. 34).  I noted that "I saw many records with HNRs pleading for mental health care, which were answered only after many days, or not at all" (pp. 35-36, citing examples).

**Performance Measure 98**

33.     To ensure that prisoners are able to make their mental health needs known to mental health staff in a timely fashion, PM 98 requires that "mental health HNRs shall be responded to within the timeframes set forth in the [ADC] Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0."  The relevant provision of the MHTM provides the following timeframes for response to mental health HNRs:

> 2.0 Inmates with emergency mental health issues will be seen by nursing staff immediately upon receipt of the HNR.
>
> 3.0 Inmates with urgent medication issues (e.g., serious medication side effects or lack of receiving prescribed medications) will be seen by nursing staff within twenty-four (24) hours of HNR triage.
>
> 4.0 Inmates with urgent non-medications issues describing serious mental health symptoms will be seen by either nursing or mental health staff within twenty-four (24) hours of receipt of the HNR.
>
> 4.0 Inmates with routine non-medication issues will be forwarded to appropriate mental health staff, and will be responded to within five (5) working days with a specific plan of action.
>
> 5.0 Inmates with routine medication issues will be referred to a P/PNP, and seen within fourteen (14) days.

ADC267409.

34.     I am informed that defendants have decided to monitor only one of these five categories of HNRs:  those raising "routine non-medication issues."  This by itself presents a risk of serious harm, since absent monitoring there is no way of knowing if emergency or urgent HNRs are being responded to in a timely fashion, or indeed at

all.  But even with this critical monitoring error, defendants are still unable to consistently comply with this Measure, particularly at Eyman and Florence, each of which has had nine consecutive months of noncompliance.

| | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Douglas | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Eyman | 0 | 14 | 36 | 42 | 40 | 36 | 62 | 72 | 68 | 82 | 66 |
| Florence | 100 | 63 | 50 | 18 | 29 | 52 | 72 | 57 | 65 | 67 | 79 |
| Lewis | 2 | 21 | 4 | 71 | 81 | 70 | 79 | 28 | 49 | 89 | 78 |
| Perryville | 88 | 98 | 100 | 91 | 100 | 88 | 96 | 86 | 82 | 100 | 82 |
| Phoenix | 0 | 50 | 100 | 0 | 100 | 100 | 90 | 100 | 100 | 100 | 86 |
| Safford | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Tucson | 55 | 89 | 62 | 79 | 69 | 88 | 92 | 99 | 70 | 65 | 77 |
| Winslow | N/A | 50 | 50 | 100 | 60 | 75 | 80 | 100 | 91 | 80 | 91 |
| Yuma | 93 | 67 | 91 | 94 | 95 | 100 | 100 | 100 | 100 | 100 | 98 |

## Inadequate suicide prevention

35.     A completed suicide is the ultimate failure of a prison mental health system.  In my November 2013 report, I concluded that "there are serious deficiencies in ADC's suicide prevention policies and practices, and . . .  these systemic policies and practices pose a substantial risk of serious harm to ADC prisoners" (p. 51).[11]  See 11/8/13 report, pp. 51-58 (describing deficiencies in ADC suicide prevention and citing recent prisoner suicides that I concluded were preventable); 12/9/13 report, pp. 5-10 (describing additional prisoner suicides, including one found by the ADC reviewer to be preventable); 2/24/14 report, pp. 1-8 (describing additional suicides).

## Performance Measure 94

36.     An essential element of an adequate suicide prevention program is a functioning system for placing persons at risk of suicide on watch.  While on watch, the patient's condition must be monitored by qualified mental health staff to assess the

---

[11] I also quoted the deposition testimony of Dr. Ben Shaw, ADC Mental Health Contract Monitor, that there was "a serious gap in our ability to provide suicide prevention." 11/8/13 report at p. 51.

patient's risk level and, of particular importance, to detect any decompensation or increased lethality.

37.     For these reasons, PM 94 requires that "all prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse."  The obvious purpose of this requirement is to closely monitor the condition of the patient in order to detect changes that may indicate increased risk of self-harm.  Incredibly, when monitoring this measure, defendants often do not examine the entire period when the patient was on watch, because they look only at a single calendar month.  For example, imagine a patient who is on suicide watch from May 10 through June 2.  When auditing for the month of June, the monitor would only look to see if the patient was seen on June 1 and June 2.  Even if the patient was not seen at all while on suicide watch from May 10-31, his case would be counted as "compliant" for this measure.

38.     Needless to say, the risk of suicide does not magically appear or vanish with a change in the calendar month.  It is the intent of this Performance Measure – and it is critically important – that the patient on watch be seen every day.  ADC's failure to verify that this is occurring creates a substantial risk of injury or death.

39.     Even with this significant – and very dangerous – defect in monitoring, which artificially inflates compliance figures, ADC is not in compliance with this measure, with Eyman, Florence, Tucson, and Yuma all showing multiple consecutive months of noncompliance.  It seems likely that this noncompliance results at least in part from the shortage of psychologists discussed above.

|            | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|------------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Eyman      | 29  | 35  | 17  | 60  | 78  | 60  | 100 | 70  | 75  | 65  | 90  |
| Florence   | 56  | 64  | 100 | 80  | 80  | 90  | 30  | 0   | 40  | 100 | 60  |
| Lewis      | 90  | 90  | 90  | 100 | 70  | 90  | 100 | 100 | 90  | 100 | 100 |
| Perryville | 100 | 90  | 100 | 100 | 80  | 100 | 90  | 100 | 90  | 80  | 90  |
| Phoenix    | 100 | 100 | 100 | 70  | 100 | 91  | 100 | 100 | 100 | 100 | 100 |
| Tucson     | 100 | 60  | 100 | 50  | 100 | 50  | 50  | 70  | 60  | 80  | 60  |
| Yuma       | 38  | 45  | 0   | 60  | 100 | 90  | 73  | 90  | 70  | 90  | 100 |

40.     I have reviewed the records of three ADC prisoners who died by suicide since the Stipulation went into effect on February 18, 2015.[12]  My detailed analysis of these records is set forth at ¶¶ 50-71 below.  All three of these prisoners received mental health treatment that fell far below the standard of care in the final months of their lives.  In two of the three cases (████████ and ████████) there were failures to comply with the Stipulation's mental health Performance Measures in ways that significantly contributed to the patients' suicide.  For example, ████████ was not seen every 30 days by a mental health clinician (PM 87), and a mental health HNR he submitted, saying he was having "serious mental issues," was not triaged or responded to by staff (PM 98).  Similarly, as her condition deteriorated in the final months of her life, ████████ was not seen every 90 days by a mental health provider (PM 88). [13]

41.     My record review discloses additional serious flaws in ADC's suicide prevention program.  For example, the September 2015 CQI minutes from Florence reported three attempted suicides at that facility in a single month.  In each case, the minutes read, "what we can improve upon: nothing."  ADCM225798.  This is a startling and very disturbing statement.  Every suicide attempt is an opportunity for staff to learn about gaps in the suicide prevention program and to make improvements in that program that will save lives in the future.  This cavalier attitude toward potentially lethal self-harm behavior by mental health patients suggests a culture that does not take suicide seriously.

42.     The November 2015 CQI minutes from Perryville refer to a prisoner who "swallowed razor blades while on constant watch."  ADCM 228143.  As the term

---

[12] My review did not include ████████ and ████████, who died by suicide on ████████ and ████████, respectively, as those records have not been provided to me. https://corrections.az.gov/article/inmate-death-notification-saba; https://corrections.az.gov/article/inmate-death-notification-aguilar-0.

[13] I also found significant deficiencies in care in the third case, ████████. But because ████████ died less than 90 days after the Stipulation went into effect, the mental health Performance Measures requiring that various treatments be carried out every 90 days were not yet fully applicable in his case.

suggests, "constant watch" indicates that the patient is to be under continuous observation by staff.  That a patient on constant watch was able to obtain and swallow razor blades indicates a serious and lethal defect in watch procedures.

43.     Based on my review, I believe that ADC prisoners remain at a substantial and unnecessary risk of suicide.

**Failure to monitor use of isolated confinement on the mentally ill**

44.     In my November 2013 report I discussed the damaging effects of isolated confinement – that is, confinement in a cell for 22 or more hours per day with limited social interaction and environmental stimulation.  11/8/13 report at 58-60.  The evidence that isolated confinement can be profoundly damaging to mental health, even for prisoners with no known mental illness, continues to accumulate.[14]  The American Psychiatric Association has declared that "prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates." "Prolonged segregation" is defined as "duration of greater than 3-4 weeks."[15]  Isolated confinement is associated with a greatly increased risk of suicide; I note that all three of the suicides discussed at ¶¶ 50-71 below took place in isolated confinement.

**Performance Measure 92**

45.     To mitigate this harm, PM 92 requires that "MH-3 and above prisoners who are housed in maximum custody shall be seen by a mental health clinician for a 1:1 or group session a minimum of every 30 days."[16]  ADC has failed to achieve compliance with this Measure.  For example, Lewis failed to achieve compliance in

---

[14] See, e.g., Appelbaum KL, *American Psychiatry Should Join the Call to Abolish Solitary Confinement*, J. Am. Acad. Psychiatry Law 43:406 –15, 2015, *available at* http://www.jaapl.org/content/43/4/406.full.pdf+html.
[15] American Psychiatric Association Official Actions, *Position Statement on Segregation of Prisoners With Mental Illness,* Approved by the Board of Trustees December 2012, *available at* http://www.dhcs.ca.gov/services/MH/Documents/2013_04_AC_06c_APA_ps2012_PrizSeg.pdf.
[16] ADC prisoners housed in maximum custody are subject to isolated confinement as defined above.

any month from May through October 2015; Eyman was noncompliant in every month but one from February through August; and Florence, Tucson, and Perryville each had three consecutive months of noncompliance.   This is likely related to the chronic shortage of psychologists discussed above.

| | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 35 | 45 | 85 | 57 | 50 | 65 | 70 | 80 | 85 | 90 | 80 |
| Florence | 80 | 85 | 85 | 25 | 65 | 70 | 100 | 90 | 100 | 100 | 90 |
| Lewis | 80 | 50 | 100 | 40 | 70 | 70 | 70 | 50 | 30 | 90 | 80 |
| Perryville | 100 | 100 | 90 | 60 | 70 | 50 | 90 | 100 | 80 | 70 | 70 |
| Phoenix | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 100 | 100 | 100 | 100 |
| Tucson | 11 | 29 | N/A | 71 | 17 | 67 | 75 | 100 | 100 | 80 | 100 |

**Performance Measure 93**

46.   Similarly, PM 93 requires that "mental health staff (not to include LPNs) shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum custody."  ADC continues to fall far below the compliance threshold at some prisons, with Lewis at 30% and Perryville at 50% in November; and Tucson at 0% in December.

| | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 0 | 0 | 5 | 48 | 100 | 95 | 40 | 63 | 90 | 85 | 90 |
| Florence | 0 | 5 | 40 | 70 | 85 | 95 | 95 | 100 | 100 | 90 | 100 |
| Lewis | 0 | 0 | 0 | 100 | 10 | 100 | 90 | 100 | 100 | 30 | 100 |
| Perryville | 40 | 30 | 100 | 80 | 70 | 100 | 100 | 100 | 100 | 50 | 100 |
| Phoenix | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 100 | 100 | 100 | 100 |
| Safford | N/A | N/A | N/A | N/A | N/A | 100 | N/A | N/A | N/A | N/A | N/A |
| Tucson | 0 | 0 | N/A | 86 | 100 | 67 | 87 | 90 | 80 | 80 | 0 |

**GLOBALLY INADEQUATE AND DANGEROUS MENTAL HEALTH CARE**

47.   In addition to the CGARs, I also reviewed other documents and information to assess the current state of mental health care provided to ADC prisoners.  As already noted, I reviewed records pertaining to three prisoners who died

- 19 -

by suicide (see ¶¶ 50-71).  I also spent two days (December 7-8, 2015) at ASPC-Eyman, evaluating prisoners and reviewing their records.  The results of that review are set forth at ¶¶ 72-84, below.  Finally, I reviewed records of (but did not personally interview) additional prisoners with serious mental health needs.  See ¶¶85-112.[17]

48.     My review revealed multiple instances in which ADC's failure to comply with the Performance Measures resulted in concrete harm to a prisoner.  Even as ██████████ presented with floridly psychotic behavior, sitting naked in his cell and eating his feces, he was not seen by a provider every 90 days as required by PM 81; nor was his treatment plan updated every 90 days as required by PM 77.  ¶¶85-92.  Similarly, even though ██████████ was diagnosed with a psychotic disorder and was noted by staff to be "currently psychotic," he was not seen by a provider every 90 days as required by PM 81.  ¶73.  Additional examples are set forth in my review of individual cases below.

49.     Based on all these sources of information, it is my conclusion that mental health treatment in ADC continues to fall far below the standard of care.  Many of the deficiencies I identified in my earlier reports remain substantially unchanged.   ADC is failing to comply with the Stipulation Performance Measures in ways that present a substantial risk of serious injury or death to ADC prisoners.

**Suicide reviews**

██████████, ████ – died ██████████

50.     ██████████ hanged himself at the age of 26 on ██████████, at Eyman-Browning Unit, and died the following day.  There were multiple significant lapses in his care that contributed to his death.

51.     ██████████ was classified as MH-4 and carried a diagnosis of bipolar disorder.  Upon intake into ADC, it was noted that he endorsed suicidal ideation and had a history of suicide attempts (4/23/08).  For several years he was designated SMI,

---

[17] A complete list of the documents I reviewed is attached as **Exhibit 3**.  I may use any of these documents to summarize, support, or illustrate my opinions.

- 20 -

but this designation was removed on 10/16/14 with no explanation.

52.    ████'s bipolar disorder was treated with Lithium, apparently with good effect.  However, this medication was discontinued on 9/5/14 due to side effects of nausea and vomiting.  At this point a medical/psychiatric workup should have been performed to determine why ████ became Lithium toxic. It is very likely that the Lithium could have been reinstituted at a lower dose. This was especially important in this case given ████'s positive response to Lithium in the past. If, based on the results of the medical/psychiatric workup it was determined that ████ could no longer be safely treated with Lithium, then other medications should have been considered to treat his bipolar disorder. There is no indication that this occurred, and ████ received no further medication until his death.

53.    When he was seen on 10/6/14, there was a lack of documentation that the provider evaluated for the presence of manic and/or depressive symptoms. This is a significant omission in light of ████'s recent discontinuation of Lithium.  At subsequent contacts, there was no adequate mental status exam or suicide risk assessment documented in the medical record.  ████ had several risk factors that placed him at a chronically elevated risk of suicide, such as previous suicide attempts, panic attacks and anxiety, and a family history of suicide. While these factors are mentioned in the psychological autopsy, they are almost entirely absent from the mental health notes in the year preceding ████'s suicide, suggesting that mental health staff either was not aware of them or did not take them into account in assessing his suicide risk. The absence of these risk factors being discussed in the medical records strongly suggests that the staff significantly underestimated ████'s suicide risk.

54.    On 4/28/15, ████ submitted an HNR saying "I want to get back on my lithium as soon as possible, I'm having serious mental issues."  He was scheduled to be seen on 5/19/15, but a note on that date reads, "Pt was not brought by security to appt. for unknown reasons and will be rescheduled."  In fact, the appointment was not

rescheduled and ███████ still had not seen the psychiatrist when he hanged himself more than two months later.

55.     On 7/23/15 he was seen upon intake to Browning Unit.  The question "Do you have any current mental health complaints?" was checked "yes," but there is no indication that this answer generated any follow-up, or that his urgent request from 4/28/15 was communicated to the new facility.  A 7/24/15 note from the medical record stated "inmate was scheduled for 5/19/15 but was not seen," but again, there is no indication that this resulted in any follow-up to ensure that ██████ was seen. He was found hanging ████ days later.

56.     The psychological autopsy notes several failures to provide ████████ the mental health treatment required by policy and by the *Parsons* Stipulation:

> [I]t is noted that mental health contacts had not been made in a timely manner per policy which would have required ████ to be seen by a mental health clinician at a minimum of every 90 days.[18]
>
> *   *   *
>
> [H]is request for protective segregation was also (7/23/15) denied.  However, he did not receive the required 72-hour mental health contact following denial of his request for protective custody.
>
> *   *   *
>
> ████ arrived at Browning Intake on Thursday morning, July 23 and was required to be assessed by a mental health clinician within 72 hours.  By the time of his suicide on ████████, he had not been seen by a mental health clinician.

Psychological autopsy, pp. 11-14.  The psychology autopsy also notes (p. 5) that an HNR that ███████ sent to mental health in April of 2015 was not triaged nor responded to by staff.[19]

57.     Similarly, the Mortality Review Committee answered "yes" to the

---

[18] In fact the Stipulation required that ██████, a prisoner classified MH-4, be seen by the mental health clinician no less than every 30 days.  Performance Measure 87.

[19] As discussed above, the Stipulation requires that mental health HNRs be responded to within specified timeframes.   Performance Measure 98.

question "Could the patient's death have been prevented or delayed by more timely intervention?" and "no" to the question "Was sufficient care offered/provided regarding Mental Health Issues?"  It answered "yes" to the question "How likely is it that the patient's death was caused by or affected in a negative manner by health care personnel?"  It endorsed "delay in access to care" as a contributing cause of ███ ███'s death, and "preventative measures not taken" and "treatment not timely" under the heading "general critique."

58.     It is my opinion that the multiple failures described above directly contributed to ███████'s suicide.  I agree with the Mortality Review Committee that ███████ did not receive adequate mental health care and that his death very likely was preventable.

**████████████████, ██████ - died ██████████████**

59.     ███████████ was a 28-year-old man with a history of primary psychotic and mood disorders with co-occurring substance use disorder who committed suicide on ██████ by a sertraline (Zoloft) overdose while incarcerated at Eyman-SMU.  (His post-mortem sertraline level was 6696, while the normal range is 30-200.)  ███████████ carried multiple risk factors for suicide including history of psychotic disorder, mood disorder, history of prior suicide attempts, history of trauma (including childhood sexual abuse), chronic medical conditions including chronic pain, and substance abuse (heroin, alcohol, and methamphetamine). He was classified MH-3B.

60.     Review of ███████████'s medical record during the year leading up to his suicide indicates that he was in significant distress. He submitted 30 HNRs specifically for mental health providers, 14 of which were sertraline medication refill requests.  Regarding psychiatric care, there is documentation that he was seen by a provider six times in the year leading up to his suicide.  In review of the documentation, there is a standard template that is used for mental health visits. This template is an outline of what information should be obtained during an encounter;

however, providers often left items blank and omitted critical information, resulting in documentation well below the standard of care.  For example, the provider would check "YES" for mood disturbance, but no additional information was gathered. The mental status exam consistently omitted descriptions of his affect. The assessment section was often left blank, and medication changes were made with little or no documented rationale. A risk assessment was never done, despite this patient carrying multiple risk factors for suicide.

61.   Leading up to ███████████'s suicide, he was seen on 11/10/14, at which time he endorsed command auditory hallucinations of "midgets" telling him to kill himself. Although command auditory hallucinations telling the patient to kill himself indicate a significantly elevated risk of suicide, no suicide risk assessment was done at that time. The provider also inexplicably indicated the patient's thought content was "normal. " He was next seen by a provider on 1/9/15 after a month long-lapse in care during which it was documented that he did not receive his prescribed psychotropic medications. During this appointment he reported that his mood was "unstable." Again, there was no suicide risk assessment.

62.   ███████████ was scheduled to be seen on 3/23/15; there is a brief note that an AIMS (Abnormal Involuntary Movement Scale) exam was completed because he was receiving Haldol decanoate, but no other documentation was found in the chart. It does not appear that the patient was actually evaluated except for the AIMS exam. This is the last documented visit prior to his suicide on ███████.

63.   Regarding medications, it does not appear that any laboratory monitoring was done for carbamazepine, which was restarted on 1/9/15.  A number of blood tests should be obtained prior to initiating the medication and a blood level should be obtained 5 days after initiation of the medication; it appears that none of this was performed. The psychological autopsy states that ███████████ died of a carbamazepine overdose, which appears to be an error, as it contradicts other documentation in the record consistently stating the cause of death to be sertraline

1    overdose.

2          64.    Of note, in contrast to other psychotropic medications, the prisoner was

3    allowed to "keep on person" (KOP) sertraline.  Thirteen 30-day sertraline

4    prescriptions that were filled were designated "keep on person" (KOP) in addition to

5    four 30-day sertraline prescriptions that were not KOP in the year leading up to his

6    suicide. He appears to fill one 30-day sertraline prescription on 3/20/15, which was

7    not designated KOP and another 30-day sertraline prescription on 3/30/15, which was

8    designated KOP.

9          65.    The treatment received by ███████████ was consistently below the

10   standard of care.  Most critically, for prisoners with a history of suicide attempts and

11   multiple suicide risk factors like ██████████, psychotropic medications should not

12   be given KOP, to reduce the possibility of hoarding, overdose, or non-compliance. It

13   is my experience that correctional health care systems that have insufficient staff often

14   inappropriately rely on KOP medication, since doing so requires less staff resources

15   than other, safer means of medication distribution.  It is not clear why there were

16   inconsistencies in the prescribing between sertraline and other psychotropic

17   medications.  Reviewing the record, it does not appear that his medications were

18   properly monitored. This is a critical oversight that in this case facilitated the

19   prisoner's suicide.

20   ██████████, ██████ – died ████████████

21          66.    On ████████████, ████████████ hanged herself from the air vent in

22   her cell at Perryville-Lumley Special Management Area.  She was 25 years old, and

23   was classified MH-4 and SMI.  She carried multiple risk factors for self-harm/suicide

24   including history of prior self-harm (including a March 2015 incident in which she cut

25   her arm and required more than 70 stitches), history of command auditory

26   hallucinations telling her to hurt herself, diagnosis of Schizoaffective Disorder and

27   Serious Mental Illness, trauma, family history of substance use and suicide, personal

28   substance use, poor coping skills and multiple stressors including incarceration and

the recent death of a cousin.

67.     In review of her medical record from the year prior to her death and the psychological autopsy provided by the facility, she was found to have been placed on suicide watch four times. Documentation throughout this period was consistently incomplete and below the standard of care.  For example:

1) Subjective: commonly repeated entries include "NAD [no apparent distress]. No new episodes." "IM states she is eating and drinking fluids. IM states she has no medical concerns during time of visit." "Inmate appears stable." There was a consistent failure to ask about suicidal ideation/plan/intent or about command auditory hallucinations telling her to harm herself.

2) Objective: this entry was commonly "none," which is completely inappropriate.  A note on 12/13/14 appropriately documents that ███████ is wearing a safety smock, but this was not documented in other encounters.  Her last segregation visit was on ██████, the day of her suicide; objective is again "none." This is clearly below the standard of care.

3) Assessment/Plan: this is often left blank. On 7/29/15 ████████ reported medication non-compliance and was "encouraged to speak with psychiatrist;" however, in the plan there is no documentation that the psychiatrist was notified.  ████████ was taken off suicide watch on 8/6/15; "IM presents as stable. She denies SI [suicidal ideation] and HI [homicidal ideation]. IM future-oriented, IM does not appear to be a danger to herself or others." No suicide risk assessment was documented for this encounter, which is below the standard of care.

68.     Regarding visits with mental health staff, the psychological autopsy

notes that ▮▮▮▮▮ participated in groups by mental health, "but not twice weekly as required." It also noted that the level of individual counseling provided did exceed the frequency required by policy. But in reviewing the individual counseling notes, it is quickly apparent that standardized language was used over and over again for both the objective and the assessment, regardless of the content of the subjective material provided by ▮▮▮▮▮ (see notes from 8/7/15, 8/14/15, 8/19/15, 8/21/15). For example, on 8/19/15, days prior to her suicide, when ▮▮▮▮▮ reports that she is having a difficult time with the deaths of her brother and cousin, mental health staff documented "IM discussed her stability" but provided no further information. Staff did not explore suicidal ideation, thoughts of self-harm, or command auditory hallucinations. However, as in prior encounters, in the objective it states, "IM presented with logical and linear thought content and structure," which is incorrect – "logical and linear" refers to thought process; ▮▮▮▮▮'s thought content was not addressed. The assessment states "IM denied SI/HI/AVH [suicidal ideation/homicidal ideation/audio or visual hallucinations];" however, given that this was not covered in the subjective portion of the note, it is unclear if this was actually asked. There are many other examples throughout the record of plainly inadequate documentation, creating a significant possibility that mental health staff was not aware of the gravity of ▮▮▮▮▮'s condition.

69. Regarding medications, there are multiple references to issues with ▮▮▮▮▮'s medications in notes by non-psychiatric staff, but it does not appear that the psychiatrist was notified. On 12/12/14 she reported to the psychologist that since her medications were changed two weeks previously, she has been "struggling." One option on the template was "*consult psychiatrist for possible psychotropic initiation or adjustment*;" however, the psychiatrist was not consulted. On 7/31/15, suicide watch was discontinued, while ▮▮▮▮▮ reported that she was not taking her medications; again, it does not appear that the psychiatrist was alerted.

70. In the year prior to her death, ▮▮▮▮▮ was only seen by a psychiatrist

three times (11/10/14, 3/18/15, and 6/22/15).  This was not consistent with the Stipulation, which required that she be seen at least every 90 days (PM 88), and the psychological autopsy notes, "[o]n several occasions, the psychiatry contacts were held beyond the timeframes set by policy." During the first visit on 11/10/14, the documented mental status exam was not consistent with the history provided by ███, ███, and there was no plan or risk assessment documented (the risk assessment template was left blank). On 3/18/15 ███████ complained of being sedated from olanzapine, which was then discontinued. This medication targets mood instability and psychotic symptoms including hallucinations; however, there is no documentation of screening for ongoing psychotic symptoms, which had been documented in prior notes, and no alternative medication was considered. Finally on 6/22/15 ████████ was seen and found to have some irritability, mood instability, and perhaps paranoia. The mood stabilizer was increased, but the level was not checked after the medication increase. Of note, ████████'s carbamazepine level was consistently found to be below the therapeutic range, meaning that she was not receiving the benefit of the medication, and her illness was essentially going untreated.   Reviewing ██████'s death, the Perryville CQI minutes correctly noted that "there is risk associated with failure to note lab results [and] adjust medications if appropriate to address mood symptoms." (ADCM  225818).

71.    In summary, the mental health treatment provided ████████ in the last year of her life falls below the standard of care in several respects, all of which increased her risk of suicide.  The psychological autopsy notes "[i]n retrospect, a review of ████████'s self-harm events suggests there may have been a progression/acceleration in the severity of those incidents."  The chronic absence of psychiatric input into her treatment, even as she deteriorated, is consistent with ADC's longstanding shortage of psychiatric providers noted above.  Mental health staff's infrequent contacts with ████████, the poor communication between psychiatry and other mental health staff, inadequate medication management, and the consistently

inadequate evaluations and documentation increased the risk that ███████'s deteriorating condition would be missed by mental health staff.  This death could have been prevented by adequate mental health care.[20]

**Patient evaluations and chart review –ASPC Eyman, December 7-8, 2015**

72.     On December 7 and 8, 2015, accompanied by counsel for both sides, I spent two full days at ASPC-Eyman viewing housing units, evaluating patients, and reviewing records.

███████████, █████

73.     I evaluated ██████████ on 12/8/15. He is a 37 year old Native American designated SMI and MH-3A whom we found posturing in his cell. Posturing is a serious psychotic symptom. Upon exam I noted him to be responding to internal stimuli, displaying thought blocking and complaining of auditory hallucinations telling him that he and his family are going to be hurt. The last psychiatric note I found in his medical record was dated 7/13/15. It listed his diagnosis as Psychotic Disorder NOS. It went on to state "off meds for two months; currently psychotic. plan-restart Prozac 20mg am and Risperdal 3mg qhs." As a MH-3A he should be seen a minimum of every 90 days. This lack of appropriate follow up has caused ██████████ untold harm. He needs to be reevaluated immediately and have his medication regimen modified.

██████████, ██████

74.     ██████████ is an extremely impaired man who we found placed in a cell behind an additional portable barrier. On 9/7/15 the staff noted that he was very psychotic, malodorous and uncooperative. He was designated MH-3A and SMI with the diagnosis of "Dementia." He began treatment with Haldol Decanoate 100mg every four weeks. On 10/20/15 the staff documented that "patient was almost totally mute

---

[20] I am informed that more than six months after her suicide, there is still no mortality review of ██████████'s death.  This is an unconscionable delay in carrying out a critical function of a correctional mental health system.

and uncooperative for answering questions for completing this evaluation." His

diagnosis on this visit was "Psychotic Disorder due to another medical condition with

hallucinations." The "another medical condition" was not listed but based on the

9/7/15 note, I assumed it was Dementia. A 12/2/15 note stated that ████████ was

"tangential with delusions."

75.     My exam on 12/7/15 revealed that ████████ was very psychotic

(responding to internal stimuli, stating that "my bible name is Peter") and he was

extremely malodorous. His treatment has not changed in that he continues to receive

Haldol Decanoate 100mg every four weeks. His condition has not improved and

possibly deteriorated over the last several months. He requires transfer to an inpatient

level of care. The most troublesome aspect of this case is that the use of antipsychotics

is contraindicated in individuals with dementia, and can result in death. So if in fact he

is demented, then his Haldol Decanoate should be immediately discontinued.

████████, ████

76.     Of note, one of his diagnoses listed in a 10/1/15 note was "diseases of

the nervous system complicating pregnancy, unspecified trimester." I mention this

only to demonstrate how unaware the staff is of ████████'s psychiatric condition.

████████ is designated MH-3A and SMI.  On 12/2/15, the staff noted that

"patient was referred to mental health by security; patient is yelling at night,

responding to internal stimuli and 'going down hill' the last few days." The patient

complained of hearing the voices of his mother and his sister screaming at him. His

dose of Haldol Decanoate was evidently increased to 150 mg every two weeks. This

dose is exceedingly high in that the recommended dose of Haldol Decanoate for

Schizophrenia is 50mg every four weeks.

77.     My evaluation on 12/7/15 revealed a very psychotic and anxious young

man who began to cry while speaking with me. Although he denied feeling suicidal he

readily admitted to me that the voices he hears are "freaking me out." His medication

regimen needs to be reassessed and I also believe he is at risk for self-harm. He should

be placed in an inpatient psychiatric unit.

██████████, ██████

78.     This is the case of a very ill young man that we evaluated on 12/8/15. He is classified MH-3A and SMI.  At the time of my evaluation he was on a mental health watch for "decomposition (sic), urinating on himself and property." A 9/15/15 note listed his diagnosis as schizophrenia, undifferentiated. He was being treated with the antipsychotic Trilafon 24mg QHS, Cogentin 2mg QHS and Prozac 40mg QAM. He had previously been on a mental health watch on 11/6/15 for "being found unresponsive in his shower." The nurse's ICS response was to take his vital signs and return him to mental health watch. He was then placed on mental health watch again on 12/7/15 for displaying very disorganized behavior including urinary incontinence. I could find nothing in the chart documenting any medical intervention due to this episode of incontinence.

79.     My evaluation revealed a very psychotic person who could not engage in a rational conversation. This case demands acute intervention in that he has had at least two serious medical episodes (unresponsive in the shower and urinary incontinence) for which nothing has been done. For example, urinary incontinence can be the result of overmedication, bladder or kidney infection or a seizure disorder just to name a few of the possibilities. These facts coupled with his being found unresponsive in the shower demand that ██████ receive an immediate medical workup.

80.     I note that I evaluated ██████ in 2013 and discussed his situation in my November 2013 expert report:

> ██████, ████-Eyman. At the time of my evaluation he was extremely psychotic and suicidal. There was a HNR in his chart dated 5/9/13 and he had been seen by a mental health provider on 7/16/13. Also, no evidence in that chart that he had been seen by a psychiatrist during this period. This is especially bothersome given the severity of psychotic and suicidal symptoms. (p. 36)

One example [of patients who remain highly symptomatic] is ████████,
170180, whom I evaluated in Eyman-Browning Unit. When I evaluated him, he
was very confused, standing at times naked in his cell, responding to internal
stimuli, and was unable to communicate with us in any sort of rational manner.
Upon reviewing his chart, I saw that it was only the day prior to my arrival that
there were any mental health notes documenting the degree of psychosis that he
was experiencing. This raises the question whether he was so acutely psychotic
that he only began to display these symptoms in the last couple of days. In that
case, he should be sent to the hospital for closer evaluation, as this may indicate
a very serious neuropsychiatric problem. On the other hand, he had been on this
unit for some time, and it is more likely that he had been displaying significant
psychotic symptoms over an extended period of time, and no action had been
taken. (p. 65-66)

81.    It is extremely concerning that, more than two years later, ████████
is still highly symptomatic, suggesting that he is not receiving effective treatment for
his mental illness.

████████████████, ██████

82.    ████████ is classified as SMI and MH-3A.  I evaluated him on
12/8/15 and found him to be experiencing very severe auditory hallucinations as well
as other psychotic symptoms. These symptoms were causing him a tremendous
amount of distress. A review of his chart revealed that he is currently receiving an
insufficient amount of antipsychotic medication (Trilafon 16mg Qhs). In addition,
during a previous incarceration ████████ required treatment with two different
antipsychotics (Haldol and Geodon) to control his symptoms. It is unclear from the
medical record why he wasn't restarted on this previous regimen. An individual
counseling note from 11/19/15 stated "IM appears to be functioning marginally as
evidenced by responding to internal stimuli and presenting as confused." There is no
indication in the medical record that the counselor alerted the psychiatrist to the
severity of the patient's condition. Finally, a mental health note from 11/30/15 states
"IM reported he was doing good (while lying on his bunk.)" Although ████████
denied feeling suicidal during my exam it is my opinion that he is at risk of self-harm

due to the severity of his untreated psychotic symptoms. He should be moved to an area of higher observation and be reevaluated by the psychiatrist.

83.     I evaluated ████████ in 2013 and discussed him in my November 2013 expert report:

> ████████████, ██████, Florence--Medication orders were written on 6/17/13 for Haldol l5 mg twice a day and Haldol decanoate 100 mg every three weeks. This is a tremendous amount of Haldol. When I evaluated the patient on 7/15/13 he was extremely sedated, so much so he was unable to get out of his bunk to speak with me. There was no indication in the chart that the prescribing psychiatrist was aware of the degree of the patient's sedation. (p. 67)

84.     In both my 2013 and 2015 evaluations, there was no indication that the psychiatrist was aware of ████████'s condition.

**Additional record reviews**

████████████, ██████

Records reviewed: 9/15/2014 – 9/18/2015

85.     ████████ is a 34 year old man with chronic psychosis and prior suicide attempts.  He is classified MH-3A and SMI.  My review of his file reveals repeated failure to treat psychotic decompensation, including (1) failure to perform reassessment by a psychiatrist despite multiple instances of messages to the on-call psychiatrist at various points of time, (2) failure to review medication regimen at any time when patient was on mental health watch, (3) failure to re-institute involuntary psychotropic medication administration despite florid disorganization, and (4) failure to increase his level of care to an inpatient psychiatric setting for appropriate treatment.

86.     On 7/16/15, a mental health referral was made after ████████ experienced "accidental drug poisoning."  There is no indication that a psychiatrist or psychologist evaluated ████████ after he returned from an emergency visit to the hospital, despite a discharge recommendation by the hospital physician that he have a

psychiatric evaluation.  No suicide risk assessment was performed, despite his history of depression, psychosis, and prior suicide attempt.  He was placed on suicide watch on 7/16/15.  On 7/20/15, it was noted "CO reports that IM has defecated and urinated on the ground, and drank his urine while in a yoga position."  On 7/21/15, "this writer observed urine and feces on the floor."  On 7/22/15, ███████████ endorsed auditory hallucinations, but was inexplicably taken off watch.

87.     He was placed back on watch later that day "due to psychotic behaviors on yard," when it was noted "IM was aggressive, no clothes on, in underwear only, uncooperative, thought process disorganized, reported active [auditory hallucinations]."  On 7/24/15, "he had defecated by his bedside twice.  COs reported he was seen presenting with bizarre behaviors like eating his feces and urine."  On 7/25/15 it was noted "I/M sitting on the floor on a pad at cell door naked with private parts in his left hand.  I/M does not respond to questions when asked but appears as if he is trying to process the questions."  On 7/26/15 it was noted "I/M will not use his toilet, continues to urinate and defecate on the floor of the cell."  He was taken off watch on 7/27/15.

88.     ███████████ was placed back on watch on 8/1/15 "due to having an altered mental status.  CO's state that IM is playing with his stool, drinking his urine, and other IM's are threatening to hurt him on the yard.  IM slips in and out of knowing where he is but does not make sense when he is talking, and unable to assess IM at this time."  The on-call psychiatrist was notified, but there is no indication that ██████ ██████ was actually seen by a psychiatrist.  On 8/2/15 it was noted, "I/m appears paranoid about surroundings and staff. … Many bizarre statements."  On 8/3/15 it was noted "unstable, delusional thoughts expressed, poor emotion regulation, aggressive behaviors."

89.     He was taken off watch on 8/6/15, and placed back on watch on 8/7/15.  On 8/8/15 it was noted that "he was found lying next to his feces. …  Bizarre, angry and flat affect."  On 8/9/15 "officers report I/M continues to display bizarre behavior

as he urinates and defecates on the cell floor."  On 8/10/15 "IM sat naked on concrete with puddles of urine around him and his wet pants on the ground next to him."  He was taken off watch that day.

90.     Throughout this period of nearly four weeks, when ███████ was displaying floridly psychotic behavior, there is no indication that he was ever seen by a psychiatrist, evaluated for medication changes, or considered for an inpatient level of care.  This is shockingly deficient and far below any acceptable standard of care.

91.     On 8/31/15, the mental health RN wrote "not able to fully assess I/M at this time as he is actively psychotic." ███████ was again placed on watch and referred to be seen by the psychiatrist "within the next 2 weeks."  This did not occur; in fact, no subsequent psychiatric evaluation is included in the available records, which extend through 9/18/15.

92.     Other significant deficiencies in the care received by ███████ include:

- Globally substandard documentation.  Mental status exams are either not included, lacking in standard categories, or inconsistent with reports often located in the subjective section of the notes.  There is also a lack of appropriate assessments or plans.

- Lack of comprehensive treatment plan that addresses all diagnoses listed on patient's problem list.  Failure to update treatment plan appropriately (i.e. treatment plan appears to have been copied and forwarded with outdated information).

- Lack of adequate suicide risk assessment despite (1) history of prior suicide attempt, (2) "accidental overdose" requiring hospitalization during the current period of incarceration, and (3) self-report of worsening depressive symptoms.

- Multiple medication doses missed for unexplained reasons.

- He was not seen by a provider every 90 days as required by PM 81, and

- 35 -

1    did not have his treatment plan updated every 90 days as required by PM

2    77.

3    ███████████, ████

4    Records reviewed:  11/15/14 – 11/19/15

5        93.    ████████ is a 74-year-old man with a reported diagnosis of

6    Schizoaffective Disorder, incarcerated since 1998. He is classified as MH-4 and SMI.

7    He spent the entire time period covered by this file review in the mental health area of

8    Florence-Kasson Unit, where his mental health treatment was grossly inadequate in

9    numerous respects.

10        94.    Despite being housed in a designated mental health unit and carrying a

11    diagnosis of Schizoaffective Disorder, it appears that ████████ was never

12    evaluated by a psychiatrist or psychologist during the entire one-year period (while he

13    was seen once by a psychologist for a segregation visit, this encounter did not include

14    diagnostic formulation or treatment planning).  Indeed, many of ████████'s

15    mental health encounters were with staff who appear to have little or no mental health

16    training or qualifications, such as "mental health clerks" (4/1/15, 4/8/15) and

17    "administrative assistants" (3/19/15, 4/22/15).  Moreover, despite being in segregation

18    for the entire period beginning in November 2014, he did not receive any mental

19    health segregation visits until March 2015.  As a prisoner classified MH-4, ████

20    ████ was required to be seen by a mental health clinician for a one-on-one session

21    at least every 30 days (PM 87); this did not occur.

22        95.    No diagnostic formulation is included in any of the available

23    documentation; based on this absence, it is unclear how ████████ carries a

24    diagnosis of Schizoaffective Disorder.  Treatment plans do not address his history of

25    chronic psychosis; indeed, the three treatment plans included in the file are identical,

26    with no attempt to make updates or adjustments.  ████████ refused to participate

27    in more than 50 group therapy sessions during this time period, but there was no

28    documented effort to explore the reason for these refusals, and no attempt to adapt his

- 36 -

treatment plan based on his obvious aversion to groups.

96.     Mental health encounters are superficial and documentation is inadequate throughout the file.  There is no complete mental status exam during the entire time period.  The "subjective" section of the encounter notes is identical in many notes, and appears to have been simply cut and pasted.  Many notes are internally contradictory; in others, there is no discernible relationship between the patient's presentation and mental health staff's assessment or plan; in others still, critical information is simply missing.

97.     For example, in a 5/20/15 encounter, a psych associate notes "an odor and sishevld [sic] clothing" and "thoughts are blocking, content obsessive." The writer continues:

> IM discusses randomly the idea that he is 'Due out any day.  The government will be paying me for keeping me in for a Civil case not a criminal case.  They owe me SSI and disability.  I'll be killing my number my number when I get out.  I'm moving to New York.'

98.     Under "assessment," the writer notes "delusional about releasing any day."  Despite all of this, the plan is limited to "schedule 1:1 at 30 days" and "release planning process begin" [sic].  There is no attempt at written diagnostic formulation or risk assessment for danger to self or others.

99.     In a "treatment plan review" on the same date, the only problem identified is "personal hygiene;" there is no attempt to address the patient's limited coping skills or chronic psychosis, despite the fact that those conditions are documented in the treatment plan itself.  In the "patient participation" section of the form, staff checked boxes for both "contributed to plan" and "unable to participate." (Similarly, in a 9/3/15 note, staff checked the box for "medication compliant," despite the fact that ██████████ was not taking any psychotropic medication).

100.    There is no adequate risk assessment of danger to self or others, despite

1    ██████████'s history of assault.  Moreover, there is no indication that ████████

2    has received cognitive testing, which is indicated in light of his age (over 70) and

3    history of chronic psychosis.

4         101.    Finally, although ████████'s release was approaching, release

5    planning was inadequate, with no attempt to assess whether this prisoner, currently

6    housed in mental health segregation with a diagnosis of chronic psychosis, would be

7    able to care for himself adequately in the community.

8         102.    In sum, the treatment ████████ received would be grossly

9    inadequate for any patient with his profile.  But the fact that he received such

10   inadequate treatment while housed in what is allegedly a dedicated mental health unit

11   is indicative of just how inadequate the overall mental health care is in the Arizona

12   Department of Corrections.

13   ████████, ██████

14   Records reviewed:  10/15/2014 – 10/27/2015

15        103.    ████████ is a 65-year-old man with a reported diagnosis of

16   schizoaffective disorder and prostate cancer, incarcerated since 2001, who was housed

17   in Florence-Kasson Mental Health Unit and who developed new irritability,

18   impulsivity, and behavioral activation in late 2015.  He is classified as MH-4 and SMI.

19   Given the patient's age and his poor health, his behavioral changes should have

20   triggered a thorough medical work-up, including for dementia and delirium, but there

21   is no indication that this occurred.  ████████'s mental health treatment was below

22   the standard of care in multiple respects.

23        104.    No diagnostic formulation in any of the available records.  Accordingly,

24   I am somewhat unclear about ████████'s underlying psychiatric diagnosis.  The

25   initial sentencing document indicates that he "suffers from a chronic mental illness."

26   However, in his medical records, his psychiatric nurse practitioner writes that the

27   patient has "no history of MH treatment in the community."  No psychotic symptoms

28   are described until October 2015, at which point the patient is described as "paranoid

about everybody in prison." (One of the mental health segregation visit notes also describes the patient as "very loud and psychotic" in July 2015, with no further description of symptoms).  None of the medical notes attempt to reconcile past symptoms and current presentation in order to explain why the patient meets criteria for schizoaffective disorder.  Needless to say, an accurate diagnosis is essential to effective treatment, and an inaccurate diagnosis places the patient at risk of deterioration and further harm.

105.   <u>Documentation is globally inadequate</u>.  Most notes have no mental status exam, or the MSE is limited to checkboxes that often contradict the subjective and assessment sections.  Moreover, many notes appear to have been cut and pasted, without adequate description of the patient's mental status or wellbeing on that day. For instance, approximately half of the segregation visit notes have subjective sections that are identical, using the same text that I have seen used in another prisoner's file; many of the other notes use brief stock phrases and limited details (e.g. "The I/M was doing fine on welfare check").  Diagnostic assessments are virtually non-existent.  At a minimum, such documentation falls far below the standard of care.  More seriously, this minimal documentation suggests that the mental health contacts were *pro forma* and superficial, and failed to elicit information that is critical to diagnosis and treatment.

106.   In addition, the level of training of mental health staff is unclear.  For instance, many notes are written by "psychological examiners" and by "mental health clerks."  It is unclear what, if any, mental health training these persons have; I note that they are not included in the definition of "mental health clinician" or "mental health provider" in the Stipulation.

107.   <u>Failure to work up the patient's change in mental status</u>, including failure to coordinate care among different mental health and medical treatment team members.  The patient's change in behavior raises the possibility of a neurodegenerative process.  Starting in July 2015, mental health segregation visit

notes indicate new anger and hostility on the part of the patient (e.g. described as "loud and verbally abusive with profanities" on 8/26/15).  Although the patient was seen by a psychiatric nurse practitioner on 6/18/2015 "due to the report of more agitation," the NP limited her assessment to saying that the patient "may be depressed with mood symptoms" (despite his explicit denial of depression) and that he refused antidepressant medication at the time. This NP observed that the patient seemed increasingly frail ("Looks like lost weight, very thin and with unsteady gait.  Weight checked – 101 lbs.  Physical health is deteriorating."), but no medical work-up was ordered.

108.    █████████ was on mental health watch from 10/7/15 to 10/21/15, but it does not appear that he was seen by a licensed clinician or nurse on 10/17 or 10/18/15, as required by PM 94.

109.    This same NP saw the patient on 10/16/15, at which point she wrote, "Based on his current behaviors, onset and age inmate may be having some medical issues like dementia or related is considered." Rather than performing baseline cognitive screening or ordering a work-up for medical complications, however, the NP initiated a PMRB (involuntary medication process) "as long acting meds can be helpful for psychotic agitation/ mood stabilization."  This represents a notable gap between the diagnostic assessment and the treatment plan.  Significantly, the patient underwent no cognitive testing despite his age, his poor health with recent malignancy, and his reported chronic psychosis.  It is very disturbing that ████ ████'s marked physical and psychiatric deterioration over a period of many weeks did not result in any further testing or work-up.

110.    <u>Mismatch between treatment plan and diagnosis</u>.  The patient underwent two treatment plan reviews during this period (11/20/2014 and 8/22/2015; these were not done at the 90-day intervals required by PM 77).  In both, the patient's diagnosis is listed as schizoaffective disorder, but the target problem is listed as "mood disturbances."  Moreover, the treatment goal is "Reduce/manage depressive

1   symptoms."  This represents a complete disconnect between the stated diagnosis and

2   the treatment plan, which no member of the mental health staff appears to have

3   noticed.

4   111.   Finally, there were episodes that should have resulted in further medical

5   evaluation, but did not.  On 6/14/15, ███████ was found unresponsive in his cell;

6   he was seen by a nurse, but there was no further medical work-up, or any further

7   attempt to discover the cause of this episode.  On 10/15/15, ███████ was subject to

8   a use of force by staff.  Immediately afterwards, he was seen by a nurse for a "small

9   Laceration on right forehead" and was noted to be "somnolent."  (The following day

10  he was again noted to have "a wound on his right forehead and discoloration over left

11  lower eye area").  The nurse cleaned the wound and stabilized the bleeding, but no

12  other intervention was offered.  Standard of care for somnolence following a head

13  injury would mandate an immediate head CT scan, but this was not done.

14  112.   In summary, the mental health care received by this frail elderly man

15  was globally inadequate by any standard, but particularly in light of the fact that he is

16  housed in what is allegedly a specialized mental health unit.

17

18  **CONCLUSION**

19  113.   ADC remains out of compliance with a number of critically important

20  mental health Performance Measures, resulting in a substantial risk of serious harm or

21  death to ADC prisoners with mental health needs.  Many of the systemic deficiencies

22  in ADC mental health care identified in my previous reports continue to exist and

23  result in ongoing harm to patients.

24  114.   The ongoing failure to comply with these Performance Measures, and to

25  provide minimally adequate mental health care, is due in significant part to the lack of

26  a sufficient number of qualified mental health staff.  ADC should be required to

27  immediately develop a plan to increase psychiatrist, psychologist, and other mental

28  health staff to levels that allow each prison complex to reach a passing CGAR score

(80% compliance) on each of the Performance Measures I have discussed. In addition, to ascertain the number and type of mental health staff that will be sufficient to provide minimally adequate care, ADC should be required to undertake a workload staffing study without further delay, and to create and implement a staffing plan based on the results of that study.

**COMPENSATION**

115.   I am being compensated for my work in this case at a rate of $300 per hour, with a daily cap of $2500.

1   Dated this 30TH day of MARCH , 2016, at San Francisco, California.

2

3

4   _____

5   PABLO STEWART, M.D.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

43

CURRICULUM VITAE

**PABLO STEWART, M.D.**
**824 Ashbury Street**
**San Francisco, California 94117**
**(415) 264-0237; fax (415) 753-5479; e-mail: pab4emi@aol.com**
**(Updated February 2016)**

| | |
|---|---|
| EDUCATION: | University of California School of Medicine, San Francisco, California, M.D., 1982 |
| | United States Naval Academy, Annapolis, MD, B.S. 1973, Major: Chemistry |
| LICENSURE: | California Medical License #GO50899<br>Hawai'i Medical License #MD-11784<br>Federal Drug Enforcement Administration #BS0546981<br>Diplomate in Psychiatry, American Board of<br>Psychiatry and Neurology, Certificate #32564 |

ACADEMIC APPOINTMENTS:

| | |
|---|---|
| September 2006-Present | Academic Appointment: Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| July 1995 -August 2006 | Academic Appointment:  Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1989 -June 1995 | Academic Appointment:  Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1986 -July 1989 | Academic Appointment:  Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

EMPLOYMENT:

| | |
|---|---|
| December 1996-Present | Psychiatric Consultant<br>Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues; extensive experience in all phases of capital litigation and correctional psychiatry. |

**EXHIBIT 1**

| | |
|---|---|
| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities</u><br><u>Project</u>.   Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court   Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center,</u><br><u>Department of Veterans Affairs Medical Center, San Francisco.</u><br>Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San</u><br><u>Francisco.</u>   Overall clinical/administrative responsibility for the IPCC, a community based case management program.  Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | <u>Chief, Substance Abuse Inpatient Unit, (SAIU), Department</u><br><u>of Veterans Affairs Medical Center, San Francisco.</u><br>Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | <u>Psychiatrist, Substance Abuse Inpatient Unit, Veterans</u><br><u>Affairs Medical Center, San Francisco.</u>  Clinical responsibility for patients admitted to SAIU.   Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | <u>Director, Forensic Psychiatric Services, City and County of</u><br><u>San Francisco.</u>   Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.   Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | <u>Senior Attending Psychiatrist, Forensic Unit, University of</u><br><u>California, San Francisco General Hospital.</u>   Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward.  Liaison with Jail Psychiatric Services, City and County of San Francisco.   Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |

| | |
|---|---|
| July 1985<br>June 1986 | <u>Chief Resident, Department of Psychiatry, University of California San Francisco General Hospital.</u>  Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second-year medical students. |
| July 1984 -<br>March 1987 | <u>Physician Specialist, Westside Crisis Center, San Francisco, CA.</u>  Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital.  Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | <u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u>  Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | <u>Physician Specialist, Mission Mental Health Crisis Center, San Francisco, CA.</u>  Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | <u>Psychiatric Resident, University of California, San Francisco.</u>  Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | <u>Infantry Officer - United States Marine Corps.</u>  Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Commander of a Vietnamese Refugee Camp.  Received an Honorable Discharge.  Highest rank attained was Captain. |

HONORS AND AWARDS:

| | |
|---|---|
| June 2015 | Recognized by the Psychiatry Residents Association of the University of California, San Francisco, School of Medicine, Department of Psychiatry for "Excellence in Teaching" for the academic year 2014-2015. |
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award For Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident.  The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship.  One of sixteen nationwide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry.   Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada, in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

<u>MEMBERSHIPS:</u>

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

<u>PUBLIC SERVICE:</u>

| | |
|---|---|
| June 1992 | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 -<br>January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000-<br>April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001-<br>2010 | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002-<br>June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003-<br>April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003-<br>January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |

| | |
|---|---|
| February 2004-<br>June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004-<br>January 2006 | Member of Human Services Commission, City and County of<br>San Francisco. |
| February 2006-<br>January 2007;<br>April 2013-<br>January 2015 | Vice President, Human Services Commission, City and County of<br>San Francisco. |
| February 2007-<br>March 2013;<br>February 2015-<br>present | President, Human Services Commission, City and County of<br>San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of<br>Medicine Post Baccalaureate Reapplicant Program. |
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On<br>Medicine. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of<br>Nursing, Department of Family Health Care Nursing.  Lecture to<br>the Advanced Practice Nurse Practitioner Students on Alcohol,<br>Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco,<br>School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the<br>Department of Medicine.  Also, provide crisis intervention and<br>psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California<br>San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify,<br>treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions<br>Committee, University of California, San Francisco,<br>School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract<br>and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic<br>Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the<br>special health needs of Hispanics in the United States. |

| | |
|---|---|
| September 1983 - June 1989 | Admissions Committee, University of California, School of Medicine.  Duties included screening applications and interviewing candidates for medical school. |
| October 1978 - December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic.<br>Provided free instruction to the public on proper methods of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| August 2014- Present | Small Group Facilitator, Foundations of Patient Care, University of California, San Francisco, School of Medicine. |
| July 2003- Present | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| January 2002- January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health."  This is a 1-unit course, which covers the unique health needs of prisoners. |
| September 2001- June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| April 1999- April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998- June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 - November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| March 1995- December 20002 | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 - June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine.  Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse."  This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 - February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 - February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 - June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |

| | |
|---|---|
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 -<br>February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 -<br>November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 -<br>June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 -<br>June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 -<br>November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 -<br>June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 -<br>Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 -<br>December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine.  Designed, planned and taught course, Psychiatry 170.02, "Alcoholism".  This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional.  This course is offered fall quarter each academic year. |
| July 1987-<br>June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 -<br>June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 -<br>August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 -<br>August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - | Coordinator of Medical Student Education, University of |

| | |
|---|---|
| August 1990 | California, San Francisco General Hospital, Department of Psychiatry. Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |
| July 1985 – August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital. Teach and supervise medical residents in interviewing and communication skills. Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

| | |
|---|---|
| June 2015-Present | Senior Fellow, University of California Criminal Justice & Health Consortium. |
| April 2014-Present | Plaintiffs' expert in *Hernandez, et al. v. County of Monterey, et al.*, No.: CV 13 2354 PSG. This case involves the provision of unconstitutional mental health and medical services to the inmate population of Monterey County Jail. |
| January-December 2014 | Federal Bureau of Prisons: Special Housing Unit Review and Assessment. This was a year-long review of the quality of mental health services in the segregated housing units of the BOP. |
| August 2012-Present | Plaintiffs' expert in *Parsons et al. v. Ryan* et al., (District Court, Phoenix, Arizona.) This case involves the provision of unconstitutional mental health and medical services to the inmate population of the Arizona Department of Corrections. |
| October 2007 -Present | Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown,* United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM. The litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state prisoners. My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order. *See Brown v. Plata,* ___ U.S. ___, 131 S. Ct. 1910, 1933 n.6, 1935, 179 L.Ed.2d 969, 992 n.6, 994 (2011). |
| July/August 2008-Present | Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.) This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails. |

| | |
|---|---|
| February 2006-<br>December 2009 | Board of Directors, Physician Foundation at California Pacific<br>Medical Center. |
| June 2004-<br>September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-<br>June 2008 | Organizational/Psychiatric Consultant, State of Hawaii,<br>Department of Human Services. |
| June 2003-<br>December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement,"<br>New Mexico Corrections Department (NMCD).   This is a<br>settlement arrived at between plaintiffs and the NMCD regarding<br>the provision of constitutionally mandated psychiatric services for<br>inmates placed within the Department's "Supermax" unit. |
| October 2002-<br>August 2006 | Juvenile Mental Health and Medical Consultant, United<br>States Department of Justice, Civil Rights Division, Special<br>Litigation Section. |
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training<br>Alliance's Alcohol and Drug Disability Technical Assistance<br>Project.   This Project provides assistance to programs and<br>communities that will have long lasting impact and permanently<br>improve the quality of alcohol and other drug services available to<br>individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and<br>Delinquency (NCCD) in its monitoring of the State of Georgia's<br>secure juvenile detention and treatment facilities.  NCCD is acting<br>as the monitor of the agreement between the United States and<br>Georgia to improve the quality of the juvenile justice facilities,<br>critical mental health, medical and educational services, and<br>treatment programs.  NCCD ceased to be the monitoring agency<br>for this project in June 1999.  At that time, the Institute of Crime,<br>Justice and Corrections at the George Washington University<br>became the monitoring agency.  The work remained unchanged. |
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign<br>Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance<br>Abuse Treatment, Substance Abuse and Mental Health Services<br>Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer<br>Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc.<br>Review all research protocols for the clinic per Department of<br>Health and Human Services guidelines. |

| | |
|---|---|
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic.<br>Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic,<br>Drug Detoxification and Aftercare Project. Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-July 1997 | Psychiatric Expert for the U.S. District Court, Northern District of California, in the case of Madrid v. Gomez, No. C90-3094-TEH. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 –January 2000 | Psychiatric Expert for the U.S. District Court, Eastern District of California, in the case of Gates v. Deukmejian, No. C1V S-87-1636 LKK-JFM.  Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July 1981-<br>December 1981 | Medical/Psychiatric Consultant, Youth Services, Hospitality House, San Francisco, CA.  Advised youth services staff on client management.  Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 -<br>June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 -<br>Present | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| June 1991-<br>June 1994 | Board of Directors, Pacific Primary School, San Francisco, CA. |
| April 1989 -<br>July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

PRESENTATIONS:

1.  San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1.  (10/12/1990).  "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.  Grand Rounds.  Department of Psychiatry, University of California, San Francisco, School of Medicine.  (12/5/1990).  "Advances in the Field of Dual Diagnosis."

3.  Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference, Napa, California.  (3/3/1991).  "Planning a Satisfying Life in Medicine."

4.  24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California, San Mateo, California. (9/11/1991).  "The Chronically Ill Substance Abuser."

5.  Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics.  (11/26/91).  "Mentoring as an Art."

6.  Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine.  (4/25/1992).  "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.  First International Conference of Mental Health and Leisure.  University of Utah. (7/9/1992).  "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.  American Group Psychotherapy Association Annual Meeting, San Francisco, California. (2/20/1993).  "Inpatient Groups in Initial-Stage Addiction Treatment."

9.  Grand Rounds.  Department of Child Psychiatry, Stanford University School of Medicine.  (3/17/93, 9/11/96).  "Issues in Adolescent Substance Abuse."

10. University of California, Extension.  Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97).  "Dual Diagnosis."

11. American Psychiatric Association Annual Meeting.  (5/26/1993).  "Issues in the Treatment of the Dual Diagnosis Patient."

12. Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis.  (6/23/1993).  "Dual Diagnosis Treatment Issues."

13. Utah Medical Association Annual Meeting, Salt Lake City, Utah. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14. Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993).  "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

12

15.   Haight Ashbury Free Clinic's 27th Anniversary Conference.  (6/10/94).  "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16.   University of California, San Diego.  Addiction Technology Transfer Center Annual Summer Clinical Institute:  (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98).  "Treating Multiple Disorders."

17.   National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94). "Psychiatry, Homelessness, and Serious Mental Illness."

18.   Value Behavioral Health/American Psychiatry Management Seminar.  (12/1/1994). "Substance Abuse/Dual Diagnosis in the Work Setting."

19.   Grand Rounds.  Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry.  (1/24/1995).  "Models of Addiction."

20.   San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project.   (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01). "Demystifying Dual Diagnosis."

21.   First Annual Conference on the Dually Disordered.  (3/10/1995).  "Assessment of Substance Abuse."  Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22.   Delta Memorial Hospital, Antioch, California, Medical Staff Conference.  (3/28/1995). "Dealing with the Alcohol and Drug Dependent Patient."  Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23.   Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada.   (11/23/95). "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24.   The Labor and Employment Section of the State Bar of California.   (1/19/96). "Understanding Alcoholism and its Impact on the Legal Profession."   MCCE Conference, San Francisco, CA.

25.   American Group Psychotherapy Association, Annual Training Institute.  (2/13-2/14/96), National Instructor - Designate training group.

26.   American Group Psychotherapy Association, Annual Meeting.  (2/10/96).  "The Process Group at Work."

27.   Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28.   International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29.   Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client".  (11/14/96)

30.  Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery".  (11/22/96)

31.  Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32.  Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33.  DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California.  (7/31/97)

34.  The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender".  Wilsonville, Oregon. (8/1/97)

35.  The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California. (2/12/98)

36.  American Group Psychotherapy Association, Annual Training Institute, Chicago, Illinois. (2/16-2/28/1998), Intermediate Level Process Group Leader.

37.  "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience."  The Haight Ashbury Free Clinics Inc., sponsored this seminar in conjunction with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis.  San Francisco, California.  (3/6-3/8/1998)

38.  "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection."  The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39.  Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40.  Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

41.  Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42.  "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer."  The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference.  San Rafael, California.  (6/20/1998)

43.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44.     Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse."  (7/15/1998)

45.     "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii.  (9/2/98)

46.     9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco.  "Care Issues and Pain Management for Chemically Dependent Patients."   San Francisco, CA. (9/10/98)

47.     Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000."  "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA.  (9/18/98)

48.     Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder."  Napa, CA.  (9/23/98)

49.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA.  (9/30/98)

50.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA.  (10/13/98)

51.     California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA.  (10/15/98)

52.     California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel.  (10/15/98)

53.     Northwest GTA Health Corporation, Peel Memorial Hospital, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada.  (10/23/98)

54.     1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders."  Sacramento, CA.  (12/11/98)

55.     "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA.  (1/7/99)

56.     Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder."  (1/19/99)

57.     "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA.  (1/22/99 & 2/5/99)

58.   Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High Risk Offender." (2/17/99)

59.   American Group Psychotherapy Association, Annual Training Institute, Houston, Texas. (2/22-2/24/1999). Entry Level Process Group Leader.

60.   "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii. (3/5 & 3/6/99)

61.   "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA. (3/10/99)

62.   "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA. (3/11/99)

63.   "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA. (3/17/99)

64.   Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i. Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies. Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility. (4/2-4/9/99)

65.   "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA. (4/14/99)

66.   "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA. (4/21/99)

67.   California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California. (4/29/99)

68.   "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i. (4/30/99)

69.   State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital." Honolulu, Hawai'i. (4/30/99)

70.   "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i. (4/30/99)

71.   11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Concord, California. (5/6/99)

72.    The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Escondido, California. (5/7/99)

73.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California. (5/13/99)

74.    "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", third annual conference presented by the Southern California Mental Health Directors Association. Anaheim, California. (5/21/99)

75.    15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho. (5/25/99)

76.    "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California. (6/3/99)

77.    "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan. (6/14/99)

78.    "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan. (6/17/99)

79.    "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan. (6/26/99)

81.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California. (7/13/99)

82.    "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California. (7/15/99)

83.    "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84.    1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry. Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness. What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California. (8/3/99)

85.    "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui. (8/23/99)

86.    "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California. (9/13/99)

17

87.    "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California.  (9/14/99)

88.    "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California.  (9/16/99)

89.    "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California.  (9/23/99)

90.    "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona.  (9/28/99)

91.    "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i.  (10/8-10/10/99)

92.    "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California.  (10/12/99)

93.    "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California.  (10/14/99)

94.    "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California.  (10/21/99)

95.    "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California.  (1/27/00)

96.    "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California.  (3/6/00)

97.    "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California.  (3/16/00)

98.    "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California.  (3/17/00)

99.    "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California.  (4/3/00)

100.   "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California.  (4/4-4/5/00)

101.   "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California.  (5/15/00)

102.   National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California.   "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.    "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California.  (6/9/00)

104.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunder Road Adolescent Treatment Centers, Inc., Oakland, California.   (6/29 & 7/27/00)

105.    "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California.  (9/8/00)

106.     "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California.  (9/9/00)

107.    Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey.   "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.    "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.   (11/1/00, 3/13/01)

109.    "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110.    "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California. (12/5/00)

111.    "Wasn't One Problem Enough?"  Mental Health and Substance Abuse Issues.  2001 California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California. (3/2/01)

112.    "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process."  County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California.  (3/8 & 4/5/01)

113.    "Assessment of the Patient with Substance Abuse and Mental Health Issues."  San Mateo County General Hospital Grand Rounds.  San Mateo, California. (3/13/01)

114.    "Dual Diagnosis-Assessment and Treatment Issues."  Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California. (5/8/01)

115.    Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California. (5/10/01)

116.    National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice."  I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol.  New Orleans, LA. (6/1-6/2/01)

117.    Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California. (6/15/01)

118.    Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington. (11/15/01)

119. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

120. First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas." El Centro, California. (1/28/02)

121. The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California. (4/25/02)

122. Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

123. 3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

124. New Mexico Department of Corrections, "Group Psychotherapy Training." Santa Fe, New Mexico. (8/5/02)

125. Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

126. California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

127. Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128. Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129. "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130. "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California. (10/18/03)

131. "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California. (4/2/04)

132. Lecture tour of Japan (4/8-4/18/04). "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (9/9/04)

134.  "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Sacramento, California.  (4/8/05)

135.  "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University.  San Francisco, California. (8/13/05)

136.  Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse."  San Francisco, California. (10/24/05)

137.  Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse."  Woodland, California. (1/25/06), (6/23/06)

138.  "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.  Lecture tour of Japan (4/13-4/23/06).  "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness."  Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.  "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference.  Sacramento, California. (4/25/06)

141.  "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.  "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference.  Sacramento, California. (4/27/07)

143.  "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network.  Medford, Oregon.  (5/10/07)

144.  "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar.  San Francisco, California.  (8/2/07)

145.  "Capital Punishment," Human Writes 2007 Conference.  London, England.  (10/6/07)

146.  "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California.  (10/30/07)

147.  "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

148.  "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada.  (4/10/08)

149.  "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program.  Chelan, Washington.  (6/3/08)

150.  "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference.  Burlingame, California.  (6/19/08)

151.    Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152.    2010 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th, 2010)

153.    Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA.  This conference was designed to assist Federal Courts to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154.    Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court.  San Francisco, California. (1/12/2011, 1/25/12, 2/27/13 & 1/8/14)

155.    2011 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th, 2011)

156.    2012 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd, 2012)

157.    Mexican Capital Legal Assistance Program Meeting, "Issues Related to Mental Illness in Mexican Nationals." Santa Fe, New Mexico (10/12/12); Houston, Texas (4/23/13)

158.    Los Angeles County Public Defender's Capital Case Seminar, "Mental Illness and Substance Abuse." Los Angeles, California. (9/27/13)

159.    "Perspectives on Race and Ethnicity for Capital and Non-Capital Defense Lawyers," conference sponsored by the Administrative Office of the US Courts, New York, NY., September 18-20, 2015.

160.    San Francisco Collaborative Courts, Superior Court of California, County of San Francisco sponsored training, "Personality Disorders," February 19, 2016.


PUBLICATIONS:

1)     Kanas, N., Stewart, P. and Haney, K. (1988). *Content and Outcome in a Short-Term Therapy Group for Schizophrenic Outpatients*.  Hospital and Community Psychiatry, 39, 437-439.

2)     Kanas, N., Stewart, P. (1989*). Group Process in Short-Term Outpatient Therapy Groups for Schizophrenics*.  Group, Volume 13, Number 2, Summer 1989, 67-73.

3)     Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues*.  Journal of Psychoactive Drugs, Vol. 23(4), Oct.-Dec. 1991, 387-395.

4)   Banys, P., Clark, H.W., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal.* Journal of Substance Abuse Treatment, Vol. 11(1), 9-15.

5)   Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, H.W., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* The Journal of Nervous and Mental Disease, Vol. 182(10), 570-575.

6)   Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W.O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trial Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), pages 305-309, July-September 1996.

7)   Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999.

8)   Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)   Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. by Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)  Stewart, P., Inaba, D.S., and Cohen, W.E.  (2004). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11)  James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12)  Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13)  Stewart, P., Inaba, D.S., and Cohen, W.E.  (2007). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Sixth Edition*, CNS Publications, Inc., Ashland, Oregon.

14)  Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter 10 in the book, *Uppers, Downers, All Arounders, Seventh Edition,* CNS Publications, Inc., Ashland, Oregon.

15)  Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D., Hans Toch, Ph.D. (2015) Brief of *Amici Curiae* Professors and Practitioners of Psychiatry and Psychology in Support of Petitioner: *Alfredo Prieto v. Harold C. Clarke, et al., On Petition For A Writ of Certiorari To The United States Court of Appeals For The Fourth Circuit, In The Supreme Court of the United States, No. 15-31.*

**Third Supplemental Expert Report of Pablo Stewart, M.D.**

*Parsons v. Ryan,* No. 2:12-cv-00601-DJH (D. Ariz.)

August 29, 2014

**EXHIBIT 2**

## Introduction

I have been asked to review medical records and other documents covering the period from September 27, 2013 through April 1, 2014.  The documents provided to me are listed in Appendix A, attached hereto.

More specifically, I have been asked to consider whether these documents demonstrate any significant change in the delivery of mental health services in the Arizona Department of Corrections (ADC), or in conditions of confinement for prisoners with mental illness, such that I would change one or more of the opinions expressed in my previous reports.  See Expert Report of Pablo Stewart, M.D., November 8, 2013; Supplemental Expert Report of Pablo Stewart, M.D., December 9, 2013; Rebuttal Expert Report of Pablo Stewart, M.D., January 31, 2014; Second Supplemental Report of Pablo Stewart, M.D., February 24, 2014.[1]  I reserve the right to supplement or modify these opinions as additional information becomes available.

As explained more fully below, it is my opinion that the problems I identified in my previous reports persisted during the period between September 27, 2013 and April 1, 2014.  Accordingly, I stand by the opinions I have previously expressed in this case.

---

[1] These reports were attached to and incorporated by reference in my declaration submitted to the Court on June 18, 2014 as Doc. 947, Exhibits 1-4.

**Inadequate Staffing**

In my initial report I expressed the opinion that "pervasive and longstanding staffing shortages in ADC's health care system undermine the ability of clinicians to provide minimally adequate mental health care services."  11/8/13 Report at 11.  Defendants' own monitoring reports (known as MGAR reports) continue to show shortages, both of mental health staff and of other health care staff that are essential to the delivery of mental health services, such as nurses and medical records staff:

> "There are vacancies with [] ongoing recruiting efforts in the areas of medical director, psychiatry, dental, and nursing."  ADC 211268 (Lewis).

> "There are vacancies that impair the adequacy of staff," including nursing and medical records staff.  ADC 211318 (Perryville).

> "San Pedro does not have a full time medical records librarian.  It is very difficult to keep up with the filing, movement, and other activities when that position is filled only part-time."  ADC 268943 (Perryville).

> "Positions of Director of Nursing, psych techs, medical records, Facility Health Administrator are vacant resulting in non compliance."  ADC 211371 (Phoenix).  See also AGA_Review 108408 (indicating that psychiatric director position is vacant at Phoenix and may have been vacant for more than 60 days).

> "Key positions yet to be filled include:  (1) Medical Director; (1) Psychiatric RN; (1) Psychologist; (3) Nursing Supervisors. … Although, nursing and Mental Health staff levels are improving, levels do not appear adequate to meet the need at the current time."  ADC 211175 (Eyman).

> "There are vacancies that must be filled in order to meet the needs of the inmate population."  ADC 211566 (Yuma).

2

"Per site staff, no psychiatry provider was scheduled to be on the unit for the foreseeable future."  ADC 210980 (Tucson).

"The Psyche Associate was also terminated which has added to the already heavy burden on nursing."  ADC 211508 (Winslow).

"The fact that there is not a [mental health] Clinician on site every day is a staffing issue that must be addressed to be in compliance with this performance measure."  ADC 422598 (Winslow).

"There are multiple compliance issues with Mental Health at the Douglas Complex.  The Psych Associate was terminated on 1/22/14.  Deborah Kinder will try to do her best, but clearly this Complex cannot be compliant without a Mental Health Provider."  ADC 268367 (Douglas).[2]

Arthur Gross, Assistant Director of ADC's Health Services Contract Monitoring Bureau, had this to say about mental health staffing at Eyman:

Eyman's SCD for [mental health] is 12 FTEs; and 8.5 positions are listed as being filled, with only 7.26 actually working … .  This level of coverage is unacceptable.  No wonder there are problems with [mental health] issues at Eyman.  2 more Psych Associates, 1 more [mental health] RN and 2 [mental health] Techs are projected to be in the future SCD at Eyman.  So 17 are projected for [mental health] coverage down the road, which doesn't truly address the underlining [sic] REAL problem.  Corizon can't fill the 12 FTEs they currently are recruiting to fill.  Yikes?!?!?!!!!"

AGA_Review 107026.

---

[2] Although I was told that prisoners with mental health needs are not housed at the Douglas, Winslow, and Safford complexes, this is apparently not true.  ADC 268367 (Douglas) ("We should not have MH 3 Inmates at our complex.  However we frequently are getting them in from other yards").

These staffing shortages result in needed services not being provided.  ADC 211416 ("On 12/27 this auditor was there all day and Nurseline was not conducted.  Nurse stated she had no time") (Tucson); 268381 ("Nurse's Lines (NL) were not run daily Monday-Friday during January, 2014 on any of the five ASPC-Eyman yards"); 268931 ("Nurse line is required to be staffed by a Registered Nurse.  That has consistently not been the case at San Pedro for several months and from time to time on other yards") (Perryville).  In addition, it is my opinion that many of the failures of mental health treatment described below are attributable, in whole or in part, to inadequate staffing.

In addition to these staffing shortages, ADC does not reliably verify that the health care staff it does have are licensed.  At Lewis, the "Databease [sic] of all licensure staff indicates that there are 9 nursing staff, 4 [mental health] staff, 1 dental staff and 2 providers with noted licenses that are expired."  ADC 210412.  At Yuma, "some of the licenses of the medical staff were not current and up to date."  ADC 211567.

**<u>Inadequate medical records</u>**

In my initial report, I noted that "[a]t every prison I visited, the records were disorganized to the point of being chaotic, and frequently incomplete, making it very difficult or impossible to follow the patient's history and course of treatment."  11/8/13 Report at 19.  As I describe below, I found that this continues

to be true of the records I reviewed covering the period from September 27, 2013 to April 1, 2014.

In addition, the MGAR reports show continuing defects in ADC's medical records. At Lewis, "There is a significant backlog of loose filing with dates ranging from February 2013 – October 2013." ADC 210387. At Tucson, "there appears to be missing watch notes from inmate's chart as it is unclear when the inmate was placed on watch." ADC 269372. See also ADC 211291 ("significant loose filing") (Perryville); 211243 (loose filing "equal to approximately 10 inches" and "contained records exceeding 5 months") (Lewis); 268943 ("Many charts had misfiled documents") (Perryville); 269356 ("The loose/mis-filed paperwork appearing in the charts reflects a new trend that is beginning at our Complex") (Tucson). There are also deficiencies in the quality and completeness of information being recorded in the files. See ADC 268459 ("notes completed by an unlicensed Psychology Associate were not countersigned [and] many times were a photocopy. CB2, CB3, CB4, CB5 & CB7: The vast majority of notes done by the Psychology Associate were only ½ way completed notes") (Florence).

Particularly troubling are the significant deficiencies in medical records at ASPC-Phoenix, which is ADC's dedicated mental health facility. At Phoenix, "medical records in all areas require thinning and organizational evaluation." ADC 211371. See also ADC 268974 (noting "approximately 4 inches of loose filing" in medical records); ADC 269294 (noting that "Continuity of Care summary was loose and not filed; two unauthorized memos in medical record");

ADC 268583 ("medical record is highly disorganized to the point of preventing …

accurate information gathering"); 269280 (medical record "highly disorganized").

In addition, ADC Mental Health Monitor Nicole Taylor documented the

inadequate notes being written by the psychiatrists at the Phoenix complex:

> Please be advised that there are notes being written by the Psychiatrist at
> MTU that in my clinical opinion are inadequate.  Also, the notes by the
> other Psychiatrist that is providing services at Flamenco are severely
> lacking in information as there are typically only 4 lines written, and would
> be hard to defend if an issue arose.

AGA_Review 113242.  ADC's inability to maintain accurate, reliable medical

records poses a significant risk of harm to prisoners with mental illness.


**<u>Inadequate medication system</u>**

In my initial report, I described a number of significant and dangerous

deficiencies in ADC's medication system.  11/8/13 Report at 21-29.  These

deficiencies persisted throughout the period from September 27, 2013 to April 1,

2014.

In many cases, prisoners are not receiving their prescribed medication in a

timely fashion, or at all.  See ADC 211261 (71% of charts reviewed showed

"unreasonable delays in inmate receiving prescribed medications") (Lewis);

210886 (11 out of 54 MARs reviewed showed unreasonable delays in receiving

prescribed medication) (Perryville); 210804 (three prisoners did not receive

Haldol injection in a timely fashion) (Florence); 211365 (listing examples)

(Phoenix); 268776 ("Yuma has experienced a back log in renewing psyche medications"). At Perryville, ADC Monitor Barlund expressed concern that "with the [history] of weather delays and 'we're shortstaffed and can't fill your meds today' that there will be further delays in inmates receiving their meds." AGA_Review 105005. See also AGA_Review 116456 (at Eyman, "the AM meds did not go out on time, and the afternoon meds may not have been delivered at all").

Due to the shortage of nurses to hand out medications to prisoners, not only are prisoners not receiving medication, but staff have apparently resorted to smuggling medication out of the prison and taking it home with them, or hiding medication:

> AGA_Review_110553 (Tucson: "I was at Main Point of Entry checking in four staff when I came upon CRN Ashly Paradis. I went through her bag and found a gallon size ziplock bag full of Rincon watch swallow meds in small manilla [sic] envelopes addressed to each inmate[.] … Ashly advised that she was unable to pass out some of the watch swallows on Thursday night so instead of checking them back in she brought them home. … Medical staff confirmed meds were not passed out on 11/28/13").

> AGA_Review_113556 (Eyman: "As a result of the issue of the [Director of Nursing] finding a large number of HNRs and medication in envelopes hidden in Meadows; yesterday I conducted an audit for such [.] … On SMU1 I found a stash of medication in drawers in the medication room that had no [inmate] identification on them. Five had the medication name and dosage removed. […] My audit of the Browning Unit produced a box with envelop[e]s containing medication that had not been passed and had not been disposed of properly. They were in a box which I sealed and isolated after taking the attached photos." [AGA_Review_113562-63]:



In many other cases, records are so deficient that it is simply impossible to tell if prisoners are receiving their medication.   Medication Administration Records (MARs) are not completed correctly and are often missing critically important information.   See ADC 268398-99 ("In a review of 50 handwritten MARs … 1 (2%) was found to have met all the criteria") (Eyman); 268945 ("At Perryville, very few MARs contain start dates"); 269307 ("A review of MARS show incomplete documentation") (Phoenix); 210466 (3 of 54 MARs reviewed completed in accordance with standard nursing practices) (Perryville); 210990 (3 out of 92 MARs reviewed completed in accordance with standard nursing practices) (Tucson); 210706 (48 out of 50 MARs reviewed NOT completed in accordance with standard nursing practices) (Yuma); 268618 (4 of 72 MARs reviewed completed in accordance with standard nursing practices) (Phoenix); 268520 (0 of 70 MARs reviewed completed in accordance with standard nursing practices) (Lewis).

There appear to be breakdowns at every stage of the medication process:

Medications are simply allowed to expire without renewal.  ADC 268857 (Eyman); 210791 (Florence); 210909 (Phoenix); 211430 (Tucson); 268775-76 (Yuma); 268918 (Lewis).  See also ADC 211248 (noting that SMI prisoner's "psych medications expired without follow-up in 2009") (Lewis).

Prisoner refusals of medication are not properly documented.  269140 (Eyman); 269172 (Florence).

Medication errors are not reliably reported.  ADC 210325, 210748 (Eyman); 210347 (Florence); 210993 (Tucson).

The process for obtaining non-formulary drugs does not appear to be functional.  ADC 210851, 211244, 268504 (Lewis); 211153 ("the Non formulary process still seems to escape employees when asked at some locations") (Eyman); 211430 ("The Non Formulary process continues to be a challenge") (Tucson); AGA-Review 106421 ("a centralized location for the Non Formularies in some units seems to be nonexistent or not accurately maintained").

ADC's pharmacy monitor documented significant deficiencies in medication practices at multiple complexes:

"Eyman continues to struggle with policy/procedures.  On my visit (10-21-2013) it was evident that the facility is in need of intensive retraining in multiple areas concerning pharmacy."  ADC 210299.

"I continue to alert the facility on medication issues/concerns/questions." ADC 210791 (Florence).

"Florence as with many of the facilities continues to struggle with policy and procedure.  Documentation of clinic stock is inaccurate, Refrigerator/Room temperature logs continue to be incomplete, expired medication exists in refrigerators, vials opened and not dated."  ADC 211200.

"As with previous months, I am concerned with the transfer of medication with the inmate."  ADC 210910 (Phoenix).

"Overall, of the 6 sites visited at Tucson, I witnessed the same procedural problems."  ADC 210977.

"I am still concerned with refills for active medication being filled in a timely manner."  ADC 268680-81 (Tucson).

"I am concerned with the significant drop in the timely renewal of medications."  ADC 211537 (Yuma).

"I am still concerned with refills for active medi[c]ation being refilled in a timely manner."  ADC 211245 (Lewis).

I agree with ADC Pharmacy Monitor Martin Winland when he writes that "it is my sincere hope that the new Corizon leadership will not tolerate such a haphazard approach to proper documentation of medication as I have witnessed previously."  AGA_Review 110551.


**Inadequate monitoring of prisoners taking psychotropic medication**

As was the case at the time of my initial report (11/8/13 Report at 29-32), prisoners on psychotropic medications are still not being seen by a psychiatrist, or even by a psychiatric mid-level provider, at least every three months.  ADC 422637, 211544-46, 211077-79, 210670-71 (Yuma); 422422-24, 211251-52, 210836-37, 210396-98 (Lewis); 422333, 211159-61, 210754, 210305 (Eyman); 422465, 210877-78 (Perryville); 422576-77, 211439-40 (Tucson).   Many

10

prisoners have gone far longer than three months without being seen. See ADC 422423 ("This inmate is currently on a watch and has been on approximately 5 watches in the last year – inmate was not referred to psychiatry once in the last several watches/months") (Lewis). As a result, some prisoners (including those with SMI) have had their psychotropic medications simply expire with no psychiatric follow-up; others have had their medications renewed without being seen by a psychiatrist. Both are improper and dangerous practices.

**Inadequate monitoring and management of medication therapeutic levels and side effects**

In my initial report, I wrote that "ADC does not have an adequate system in place to monitor and manage medication side effects," and identified named plaintiff ███████ as one patient who was suffering side effects. 11/8/13 Report at 32. As noted below, Mr. ██████ continues to suffer side effects that are not being adequately managed, as does named plaintiff ████████.

**Inadequate access to care**

In my initial report I wrote that "ADC does not have a reliable means for prisoners to make their mental health needs known, and to have those needs met, in a timely manner by qualified staff." 11/8/13 Report at 33. This continues to be true. ADC's documents show breakdowns at every step of the access-to-care process.

11

Significant backlogs of HNRs continue to exist, and it appears that HNRs are sometimes simply forgotten.  See AGA_Review 113522 (pile of over 200 HNRs at Eyman); AGA-Review 113556 (Director of Nursing finds "a large number of HNRs and medication in envelopes hidden at Meadows") (Eyman); AGA-Review 116455 (noting HNRs at Eyman-SMU that have not been addressed by nursing; "of those 34 are marked as emergency or otherwise require rapid attention (I.e. requesting med refills, pain issues, etc)"; ADC 210481 ("I found over 50 HNRs in various areas of the medical room") (Phoenix); 211243 ("a loose stack of HNR's was located with dates ranging from 9/10/2013 – 12/14/2013") (Lewis).

Tucson alone had the following backlog in a single month:  HNRs 463; charts requiring provider review 364; nurse line backlog 360; provider line backlog 453.  ADC 211415.  In March 2014, the auditor for the Tucson complex wrote that "provider line backlogs, and Provider chart reviews are higher than they have been at Tucson Complex, since Corizon took over the Contract," and added that "it is HIGHLY recommended that a Regional request be made – to bring in reinforcements immediately, to address the entire Sick call issue, and to bring backlogs down for the providers at this Complex!"  ADC 269333.

HNRs requesting mental health services are not triaged within 24 hours of receipt.   ADC 269095 (Yuma); 268893, 268457, 210794 (Florence); ADC 268862, 268407, 211156 (Eyman); ADC 268986 (Phoenix); ADC 268509 (Lewis); ADC 211435 (Tucson); 210875 (Perryville).   Even multiple HNRs

sometimes do not result in the prisoner receiving timely care.   ADC 268962 (Phoenix) ("this is the 3rd HNR for medication issues and has not been seen by provider"); 210834 (Lewis) ("Inmate referred 10/3 (5 HNRs submitted), not seen until 10/28").

Sick call is often canceled or does not occur as scheduled.   ADC210546 (Tucson); 211337 (Phoenix); 211241 (Lewis); 268931 (Perryville); 269380 (Winslow); 211146 (Eyman).

Once patients are referred to a mental health provider, they are very rarely seen within seven days.   This finding is remarkably consistent both across institutions and over time:

**Yuma:**  ADC 269096 (3 of 34 charts in compliance), 268787-88 (1 of 29 charts in compliance), 211542 (0 of 21 charts in compliance), 211074 (2 of 23 charts in compliance).

**Tucson:**  ADC 269037-38 (2 of 26 charts in compliance), 268688-89 (5 of 30 charts in compliance), 211435-36 (3 of 22 charts in compliance), 210980 (3 of 27 charts compliant).

**Lewis:**  ADC 268924-25 (3 of 25 charts in compliance), 268509-10 (1 of 22 charts in compliance), 211248 (3 of 11 charts in compliance), 210834 (0 of 15 charts in compliance).

**Florence**:  ADC 268893-94 (1 of 12 charts in compliance), 268458 (2 of 8 charts in compliance), 211203 (0 of 10 charts in compliance), 210794-95 (2 of 12 charts in compliance).

**Eyman:**  ADC 268863 (2 of 11 charts in compliance), 268408 (2 of 12 charts in compliance), 211156-57 (2 of 17 charts in compliance), 210752 (1 of 7 charts in compliance).

**Phoenix:** ADC 268611-12 (2 of 7 charts in compliance).

**Perryville:** ADC 268953-54 (10 of 22 charts in compliance), 268555 (3 of 14 charts in compliance), 210875 (2 of 6 charts in compliance).

**Winslow**: 211493 (0 of 1 charts in compliance), 210626 (0 of 4 charts in compliance).

Many patients, including those with serious mental illness (SMI), have experienced extraordinarily long delays in seeing a psychiatrist, during which they were in extreme distress and/or at serious risk of suicide.  For example, a January 2014 note from Perryville describes a woman with SMI who "has been on Suicide/[mental health watch] approximately 7 times since 09/2013.  Inmate has not seen psychiatrist since 9/30/13.   Inmate should have been referred to psychiatry during the 09/2013-01/2014 time period but was not."  ADC 268555. At Yuma, a SMI prisoner "was referred to psychiatry on 10/29/14[sic], 1/14/14 & 1/15/14; however, inmate was not seen until 1/29/14." ADC 269096.   Another Yuma prisoner "was referred to psychiatry on 8/5/13; however inmate was not seen until 12/20/13."  ADC 268787-88.  At Lewis, an SMI prisoner "was referred to psychiatry his HNRs [sic] on 12/25/13 and 1/10/14; inmate still has not been seen [as of February 2014]."  ADC 268924-25.  At Eyman, "Inmate was referred on 11/6/13 via HNR.   In HNR, inmate reported his psych medications were ineffective and that he was 'going crazy.' … Inmate has still not been seen [as of December 2013]."  ADC 211156-57.  At Florence, a 2/28/14 note identifies a

14

prisoner who "was referred to psychiatry on 12/4/13, 12/30/13, 1/2/14 and 1/22/14 … ; however, inmate has never been seen." ADC 268893-94.

Such delays occur even at ADC's dedicated mental health facility; an SMI patient "was referred to psychiatry on 2/12/14 & 2/11/14 in a Mental Health Clinician's note and on 2/3/14 via inmate's HNR. However, inmate has never been seen by psychiatry." ADC 268986-87 (Phoenix).

It is my understanding that, rather than taking steps to ensure that patients referred to a mental health provider are seen within seven days, ADC instead changed the standard to require only that such patients be seen within fourteen days. As noted above, many patients are not seen even within this longer time period.


**Lack of mental health programming**

In my initial report, I expressed the opinion that "the ADC mental health care system relies almost exclusively on medication (which it fails to provide reliably or appropriately), and does not provide an appropriate level of non-medication mental health programming." 11/8/13 Report at 37.

After reviewing documents from September 27, 2013 through April 1, 2014, I stand by this opinion. It remains the case that prisoners classified as MH-3 and above, including those classified as SMI, are not being seen by non-psychiatrist mental health staff as required by policy. ADC 269427, 269097, 268788-89, 210669 (Yuma); 269268-69, 268954-55, 268556, 211299, 210876

(Perryville); 269230, 268511 (Lewis); 269146-47, 268863-64, 211158, 210753, 210303(Eyman); 268690-91, 211437 (Tucson); 268458-59 (Florence).

There are many examples of long and dangerous delays.  At Perryville, one prisoner "has not been seen by psychology staff since 1/27/2010;" another "has never been seen by a licensed mental health staff member."  ADC 269268-69. Other examples include ADC 268690-91 ("this SMI inmate (who is asking for help) was not seen in a timely manner") (Tucson); ADC 268511 ("the length of time this SMI inmate had to wait to be seen by psychology is clinically inappropriate") (Lewis); ADC 269427 (March 2014 note that SMI prisoner "has not been seen since 9/20/13") (Yuma).   See also AGA_Review 106272-74 (12/6/13 email exchange between Dr. Taylor and Mr. Musson, indicating that prisoner had not been seen by mental health since November 2012).    Many prisoners with mental illness, including those with SMI, have *never* been seen by psychology staff.

While I understand that ADC alleges that prisoners with mental illness are receiving individual therapy, this was not supported by the MGAR reports. "There was little to no documentation found in charts indicating that inmates are being seen for monthly individual therapy sessions."  ADC 268458-59 (Florence). Similarly in the Behavioral Health Unit at Tucson, "several charts audited indicated that inmates are not being seen for monthly individual therapy sessions." ADC 268690-91.  At Perryville, a 2/28/14 note indicated that one prisoner "has

not been seen for individual therapy per policy," and another "has not received an individual therapy session since 10/22/13." ADC 268954.

Similarly, I understand that ADC claims that prisoners with mental illness are now participating in mental health treatment groups. I did see some evidence of groups in some of the charts I reviewed (see below), but it does not appear that such groups are provided either consistently or to more than a small minority of prisoners with mental illness. This is confirmed by the July 1, 2014 deposition of Carson McWilliams, ADC's Division Director of Prison Operations. See McWilliams dep. at 28:20-25 (as of April 1, 2014, there is no programming for Seriously Mentally Ill prisoners in Florence-Central-CB4); 93:1-9 (25% of prisoners in Florence-Central-Kasson receive one hour a week of programming), 95:16-20 (prisoner could receive "zero hours a week [of programming] if you were on a waiting list"), 111:10-12 (no out of cell programs for Step I prisoners at Perryville-Lumley-SMA). Mr. McWilliams also testified that what ADC calls "group" programming may actually occur with prisoners locked in their cells; "they're still doing the group, they're just not doing it together." McWilliams dep. 148:25-150:12.

**Lack of inpatient care**

In my initial report, I wrote that "it appears that ADC lacks a reliable system to ensure that prisoners needing a higher level of mental health care are transferred in a timely fashion to appropriate facilities." 11/8/13 Report at 40.

Cited below are additional examples of patients who needed inpatient care but did not receive it (███████████, ████████████, ██████████).

**Inadequate treatment plans**

In my initial report, I wrote that "[t]he treatment plans I reviewed in ADC do not meet minimum standards," 11/8/13 Report at 44, and that "the treatment plans were often incomplete, with key information missing; out of date; or simply missing from the chart altogether." 11/8/13 Report at 45.

It appears that little has changed. According to the MGAR reports, mental health treatment plans are still not being timely reviewed and updated. ADC 269427, 268786, 211543, 210669 (Yuma); 269370 (Tucson); 269267, 268952 (Perryville); 269146, 268407, 211157 (Eyman); 269228 (Lewis). Many prisoners, including those with SMI, were found to have treatment plans that were out of date, "incomplete and unacceptable," or simply had no treatment plan at all in the chart.

**Inadequate suicide prevention**

I wrote in my initial report that "there are serious deficiencies in ADC's suicide prevention policies and practices." 11/8/13 Report at 51. This continues to be true. The MGARs from October 2013 through March 2014 show widespread noncompliance with the requirement that prisoners on watch be seen daily by medical or mental health staff. See ADC 269372 (3 of 23 charts

compliant), 210986 (1 of 7 charts compliant) (Tucson); ADC 269270-71 (5 of 16 charts compliant), 210880 (1 of 9 charts compliant) (Perryville); ADC 269230 (2 of 18 charts compliant), 210839 (0 of 10 charts compliant) (Lewis); ADC 269181 (3 of 10 charts compliant) (Florence); ADC 269148 (1 of 16 charts compliant), 210757 (1 of 9 charts compliant) (Eyman); ADC 211082 (0 of 5 charts compliant) (Yuma). See also ADC 269270-71 ("it was impossible to tell whether or not the inmate was seen per policy while on watch because the watch disposition form from when the inmate was placed on watch had no date or time written on the watch order. Also, there appeared to be no note documenting when/why/how the inmate was placed on a watch") (Perryville).

Similarly, there is widespread noncompliance with the requirement that prisoners being discontinued from mental health watch are seen by a mental health clinician within specified time frames. See ADC 422572 (2 of 23 charts compliant) (Tucson); 422330-31 (0 of 14 charts compliant) (Eyman); 422367 (1 of 9 charts compliant) (Florence); 422419 (3 of 16 charts compliant) (Lewis); 422461 (5 of 15 charts compliant) (Perryville); 422635 (4 of 8 charts compliant) (Yuma). This was true even at ADC's dedicated mental health facility. ADC 422511 (3 of 14 charts compliant) (Phoenix).

Indeed, medical records are apparently so deficient that in some cases it was impossible to determine when the prisoner was removed from watch. ADC 422573 (Tucson); 422512 (Phoenix).

Prisoners are placed on watch because they are believed to be at risk of self-harm or suicide or otherwise in a state of crisis. Many of these prisoners are seriously mentally ill. ADC's failure to ensure that such prisoners are seen by medical or mental health staff while on watch, and followed by mental health clinicians after they are removed from watch, creates a substantial risk of serious harm or death.

A November 26, 2013 email from Caroline Haack to Jeff Hood attaches a chart of "FY 13 Self Harm Inmates – OD/ingest category." AGA Review 114506-07. This chart describes numerous prisoners with Mental Health scores of 3, 4, or even 5 swallowing razor blades, glass, pieces of metal, and other foreign objects, as well as overdosing on pills. Many prisoners had multiple such incidents; one prisoner had 10. It is extremely concerning that ADC is unable to prevent these seriously mentally ill prisoners from engaging in such potentially lethal self-harm.

I reviewed records from three suicides that occurred between September 27, 2013 and April 1, 2014:

1.  ████████, ████-Mr. ████ was a 22-year-old male prisoner who hanged himself on ████. He was housed at ASPC-Eyman/SMU1 at the time of his death. Mr. ████ medical record is very sparse and does not contain a lot of mental health-related information. His intake mental health evaluation noted that he had a depressed affect and a history of depression that was responsive to medications. These medications were listed as Prozac and Zoloft. Despite his presentation and very significant psychiatric history, Mr. ████ was designated a "MH2" with no follow up with a psychiatrist scheduled. The next mental health note is for an anger management class. The medical record is difficult to follow but it appears that Mr. ████ experienced some difficulties in the anger

management classes. The psych autopsy indicated that during this same time frame he had escalating violations within the prison system. The combination of his difficulties in group and his increased prison violations should have triggered a psychiatric referral. The medical records indicated that he did not receive any psychiatric follow up at this time or at any time prior to his death.

The medical record then indicates that on 8/3/13, Mr. ███ had a very serious suicide attempt. This suicide attempt consisted of his overdosing on 405mg of Remeron and 36mg of Risperdal. Once again, Mr. ███ was denied access to a psychiatrist. What Mr. ███ received was an extremely cursory examination by a psychologist. The mental status examination performed by the psychologist omitted observations on suicidality, affect and thought process. There was not a risk assessment completed and no differential diagnosis was made. As mentioned above, there was no referral to a psychiatrist for possible medication management. Mr. ███ was placed on suicide watch but was removed after one day. His last contact with mental health occurred on 9/27/13. Although the mental status examination documented in this note is an improvement over the one completed after his suicide attempt of 8/3/13, there is still no diagnosis made or plans to refer Mr. ███ to a psychiatrist. He killed himself in his cell on ███.

There are many serious problems with the care that Mr. ███ received but none so glaring as the fact that I found no evidence that he was ever evaluated by a psychiatrist. Mr. ███ past history of medication-responsive depression and his recent, serious suicide attempt should have alerted staff that he was at a very high risk to kill himself. It is my firm opinion that his death was preventable.

In addition, review of the Administrative Investigation Report (AIR) reveals that security checks on Mr. ███ pod were not timely performed on the day of his death, but records were falsified to show that they had been performed on time. The officer who falsified the logs had previously received a write-up for fabricating records.

I have now reviewed several records in which staff falsified records in connection with a prisoner suicide. See 11/8/13 report at 52 (suicide of ███); 12/9/13 report at 8 (suicide of ███████). I have never before encountered a system in which such fraudulent and possibly criminal behavior by staff is so widespread and is apparently tolerated by department leadership.

2. ████████, ███-Mr. ███ was a 48-year-old male prisoner who hanged himself on ███. He was housed at ASPC-Eyman/Browning at the time of his death. A review of his medical record reveals that Mr. ███ had

very little contact with mental health. Most of his contacts during his 20-year commitment were medical. He suffered from a variety of serious medical conditions, including skin cancer, eczema, hypertension, history of head injury with a subsequent seizure disorder and right-sided partial hemiplegia. Over the years of his commitment, he presented with a variety of psychiatric symptoms to his medical MD's. These symptoms included being "moody and anxious," "paranoia-? Psychosis," and being "angry, loud, demanding." The medical MD's that were seeing Mr. ████ should have referred him for a psychiatric evaluation when he presented with these symptoms. I disagree with the ADC psych autopsy that Mr. ████ suicide was unpredictable and unavoidable from a mental health perspective.  As previously mentioned, his medical MD's should have initiated a referral for a psychiatric evaluation given his symptom presentation.  Also, it is a well-established medical fact that older men with multiple medical problems are at a much greater risk for self-harm than the general population. Although Mr. ████ was not elderly per se -- he was almost 49-years-old at the time of his death --  in my opinion, 49 is elderly for a prisoner and he had been on death row for approximately twenty years and had several serious medical problems that were clearly causing him significant distress and anxiety.  All of these risk factors should have been taken into consideration to help protect him from self-harm.

3. ████████, ████ -Mr. ████ was a 38-year-old male prisoner who hanged himself on ████. He was housed at ASPC-Eyman/SMU1 at the time of his death. Mr. ████ has a long and complicated mental health and medical history. He was found to be hypothyroid and was started on low dose (0.05mg daily) thyroid replacement therapy. This dose was not changed over time. I could not locate any medical follow up or repeat laboratory tests in the medical record for this condition, which can have profound effects on an individual's mental functioning.

He carried the psychiatric diagnosis of Mood Disorder, NOS. He was begun on a combination of Haldol and Amantadine. This medication regimen is problematic given Mr. ████ history of having a seizure disorder. What is even more problematic is that his medications were abruptly discontinued in January 2013 without any follow up by a psychiatrist.

The next notable event for Mr. ████ is his submitting an HNR on 3/29/13 asking for help with psychosis. Mental health staff waited until 4/4/13 to follow up with him. A progress note from 4/5/13 documents that the patient stated "people are saying things" and staff find a noose. He is placed on suicide watch but his

medications are not restarted until 4/10/13. A progress note from 4/13/13 notes that the patient cut himself and he is placed on continuous watch. Mr. ███ submitted HNR's on 5/7/13 and 5/19/13 requesting an increase of his Haldol for persistent psychotic symptoms. He was finally evaluated for these concerns on 6/17/13. At that time the psychiatrist continued Mr. ███ medications of Haldol, Amantadine and Tegretol. Mr. ███ submitted three additional HNR's (7/10/13, 7/16/13 and 7/26/13) requesting to see the psychiatrist.

He is placed on suicide watch on 8/14/13 after lighting his cell on fire, which resulted in him being evacuated to the hospital with smoke inhalation and second-degree burns. A progress note from 8/20/13 documents that the patient was experiencing trauma-related flashbacks and was noted to be psychotic. His mental health score was increased to MH-4, but incredibly, a psychiatrist did not see Mr. ███ until 9/24/13. Mr. ███ was noted to be experiencing flashbacks, poor mood and worsening medication-induced involuntary movements. He was started on Paxil 20mg QD and Cogentin 2mg BID is substituted for the amantadine.

The final psychiatric visit Mr. ███ received prior to his death occurred on 10/23/13. It appears that he was experiencing worsening psychotic symptoms as well as increased flashbacks. The psychiatrist increased the Paxil but did not address the worsening psychotic symptoms. Also, the Amantadine was reintroduced and the Cogentin was discontinued. A psychiatric follow up appointment didn't occur as scheduled. Mr. ███ was scheduled for a 30-day follow up but this did not happen. He hanged himself on ███.

Several troubling issues arise out of this review. Mr. ███ hypothyroidism was not properly addressed. He was started on low dose thyroid replacement therapy but I could not locate if this was ever followed up. His diagnosis was Mood Disorder, NOS yet he was begun on an antipsychotic medication. This means that either the diagnosis and/or the treatment was incorrect. Mr. ███ repeatedly complained of flashbacks yet PTSD was never considered as a diagnosis. Though he displayed steadily escalating symptoms over the last several months of his life, at no time was he considered for transfer to a higher level of care such as an inpatient facility. This is especially egregious given that a noose was found in his cell, he cut himself, and he set his cell on fire. He also had a history of additional suicide attempts, including at least one by hanging. Any one of these events should have alerted staff to Mr. ███ need for a higher level of psychiatric care than was available on the SMU1. It is my opinion that this suicide was completely preventable.

23

I have previously discussed the importance of psychological autopsies in cases of suicide, and ADC's failure to perform them in a timely manner, or in some cases at all.  This problem appears to persist unchanged.  A document dated March 6, 2014 shows that as of that date, psychological autopsies had not been performed on suicides that occurred in 2013, 2012, 2011, 2010, and even 2009. AGA_Review 108573-75.

**Inappropriate use of isolated confinement**

In my initial report I noted that ADC has no policy that bars the housing of prisoners with serious mental illness in isolated confinement.  11/8/13 Report at 59.  I saw nothing in the materials I reviewed from the September 27, 2013 – April 1, 2014 time period suggesting that this has changed.

The danger created by ADC's failure to exclude the SMI from isolation is aggravated by ADC's additional failure to monitor the mental health of prisoners placed in isolation.  For example, the medical records of prisoners being placed in segregation are sometimes not reviewed by mental health staff for contraindications.   ADC 210364 (Florence); 210318-19 ("Out of the 40 charts reviewed (37) were not in compliance") (Eyman).  At Eyman, "segregation rounds are not consistently done/documented three times weekly."  ADC 210320.  See also ADC 210593 (0 of 43 charts of segregated prisoners compliant with requirement for monitoring by medical or mental health staff) (Tucson); ADC

269427 (March 2014 note that SMI prisoner is "in lockdown and not seen since 1/6/14") (Yuma).

Finally, I note that of the ten suicides that occurred in ADC between the Corizon takeover in March 2013 and April 1, 2014, eight occurred in SMU I, Browning Unit, and Florence Central Unit, although these units collectively hold only a small percentage of ADC prisoners.   This is further evidence of the extremely damaging and sometimes lethal effects of isolated confinement.


**Inappropriate use of chemical agents on the mentally ill**

In my initial report, I wrote that "[t]he use of chemical agents on prisoners with mental illness can be extremely harmful and is contraindicated with these patients."  11/8/13 Report at 60.   More specifically, I noted that chemical agents were used against ███████████ on at least three occasions, adding that ██ ███████ "is an extremely mentally ill individual, and the repeated use of chemical agents poses a grave risk of harm."  11/8/13 Report at 62.   As noted below, ADC staff continue to use chemical agents against ███████████.


**Inappropriate use of psychiatry via videolink**

In addition to the problems with telepsychiatry noted in my earlier reports, it appears that ADC is unable to ensure timely care for patients who refuse treatment by telepsychiatry.  AGA_Review 104913-14 (email exchange describing

staffing and other "barriers" to seeing "the roughly 100 refusals at Rynning and Cook") (Eyman).

## Chart reviews

I have been provided a list of  charts I reviewed for my initial and supplemental reports.  I selected every fifth chart from this list for a total of eight charts.   Because this random selection turned out not to include any female prisoners, I then selected one chart of a female prisoner at random, for a total of nine charts reviewed.

1.   ████████████, █████-I evaluated Mr. ███████ and reviewed his medical record on 7/22/13. At that time he was on watch status for "erratic behavior" and was noted to be experiencing worsening psychotic symptoms. There were numerous chart entries about his not receiving his medications for over a week. A review of his recent set of medical records reveals that in the months following my evaluation, Mr. ████████ remained on watch status and was referred to ASPC Phoenix due to the severity of his mental illness.  He was waiting for transfer to Phoenix for several weeks and was eventually taken off the referral list for reasons that are not apparent from the medical record.  At no time was a psychiatrist involved in the decision to refer Mr. ███████ to ASPC Phoenix and/or to remove him from the referral list. The October 2013 MAR lists his medications as Haldol 15mg QHS, Depakote 1500mg QHS, Buspar 20mg QHS and Cogentin 2mg QHS. Mr. ████████ had his medications properly renewed on 12/16/13 but went seven days without his medications. They were restarted on 12/23/13 and there is no explanation in the medical record why this occurred. For the six-month period of 10/1/13 through 3/31/14 Mr. ████████ was only seen by a psychology associate six times and a psychologist twice. Of note, he only saw a psychiatrist once during this six-month period even though he was noted to be symptomatic and was having problems with medication compliance.

2. ████████, ████-I evaluated Mr. ████ and reviewed his medical record on 7/22/13. He was diagnosed with PTSD/Depression for which he was supposed to take Risperdal and Celexa. He reported that he had not received his medications for several months. His medical record was very disorganized and I could not determine which medications he is prescribed or if he was receiving them. A review of his recent set of medical records reveals that Dr. Jaffe renewed Mr. ████ Risperdal 1mg QHS and Celexa 20mg QHS on 5/16/13. I mention this only to point out that Dr. Jaffe documented that he prescribed these medications even though he had not assessed the patient in person. I could not find any evidence that mental health staff followed up with Mr. ████ during the six-month period 10/1/13 through 3/31/14.  This is especially bothersome given the fact that there are multiple medication refusal forms in the medical record during this time frame. Finally, on 11/25/13, almost two weeks after Mr. ████ medications expired, he was seen by a psychiatrist who discontinued his medications.  There are no subsequent mental health contacts in the medical record. This represents very poor psychiatric care. Mr. ████ medications were renewed in the absence of an in-person evaluation and then he was completely ignored by the mental health staff. There are no documented medical record entries that staff attempted to determine why Mr. ████ was refusing his medications or that they attempted to do anything about it.

3. ████████, ████-I evaluated Mr. ████ and reviewed his medical record on 7/16/13. He was diagnosed with Psychotic Disorder, NOS and was described as being "loud and argumentative." He was prescribed high dose Haldol decanoate, 150mg q4weeks. I found him to be extremely psychotic, shouting and cursing at me. He actually ran full speed into the Plexiglas door of his cell while I was standing there. At that time I felt he represented a danger to himself and required immediate transfer to an inpatient psychiatric facility. A review of the recent set of medical records reveals that since my evaluation Mr. ████ has continued to be in an extremely psychotic and manic state despite treatment with Haldol decanoate. During the period from 10/1/13 through 3/31/14 I noted at least two incidents where chemical agents were used against Mr. ████ and at least one incident where he assaulted staff. Due to his inability to cooperate with his treatment, staff appropriately applied for an involuntary medication order. In this application, staff noted that Mr. ████ presents with "tangential thought processes, verbally demanding and threatening to staff, no insight into his mental illness and need for treatment and poor judgment." This is

27

in addition to a documented assault on staff.  Of particular note is that during this six-month period, I found only three incidences where Mr. ███████ was seen by mental health staff. All three of these clinical encounters occurred at the cell front. Psychology associates performed two of these encounters and a psychiatrist performed the third. Several points are demonstrated by this case: 1) Mr. █████████ is an extremely mentally ill individual who should be treated in a psychiatric hospital setting; 2) Staff did not make a sufficient attempt to engage him in the treatment process; 3) The psychiatrist continued with the same medication approach notwithstanding the lack of any clinical improvement. Mr. █████████ has suffered needlessly and staff has been put at risk due to this exceptionally poor psychiatric care.

4.   ██████████,  ███████-I reviewed his medical record on 7/15/13. I determined that he was a mental health patient who was being evaluated via a telemed psychiatrist. I also noted that the mental health diagnosis listed in the medical record was different from that listed by the telemed psychiatrist. It was apparent from my review that the telemed psychiatrist did not have access to Mr. █████████ medical record when he evaluated him. Also, I did not find a medication order from the telemed psychiatrist in the medical record. A review of the recent set of medical records reveals that Mr. ██████ is a patient on the Kasson Unit at the Florence complex. He was seen by a psychiatrist two days after my evaluation and was prescribed Lamictal 100mg daily and Remeron 15mg QHS. I could not determine from the medical record if this visit was via telemed or was an in-person visit. A psychiatrist did not see him again until 12/18/13. At that time Dr. French saw Mr. ██████ did not list a diagnosis but renewed his medications. He was next seen by a nurse practitioner on 3/12/14 when he was diagnosed with "Mood Disorder, NOS with Personality Disorder," and his medications were adjusted. Of note, during the period from 10/1/13 through 3/31/14 Mr. ██████ had 15 documented visits with psychology associates and attended 16 groups.

5.   ██████████,  ███████-I evaluated Mr. ██████ and reviewed his medical record on 7/16/13. The medical record indicated that his diagnosis is Psychosis, NOS and that his most recent treatment plan was over a year old; it was dated 5/20/12. It appeared from the medical record that his last dose of antipsychotic medication was administered 3/4/13. Upon my examination, he presented as extremely psychotic. That is, he was mute and posturing in an almost catatonic

state. The medical records that I reviewed covered the period of 11/4/13 through 4/1/14. On 11/4/13 Mr. ███████ submitted an HNR that stated, "I need my medication. I need to see the Dr. It's an emergency. I take Risperdal, Remeron, Tegretol, Celexa. I hear voices that tell me to kill myself. I need help. I don't want to hurt myself. I sing all night and bang to stop the voices and everyone yells at me. I don't want this. Help me." A psych tech acknowledged receiving the HNR and documented that Mr. ███████ was "no DTS/O." This is an amazing statement by an unqualified individual given the nature of the HNR. The next thing that occurred is that on 11/14/13 a nurse practitioner prescribed Tegretol 400mg BID. This medication order occurred in the absence of a comprehensive mental health progress note. A mental health staff attempted to complete a mental health evaluation on 11/21/13 that Mr. ███████ refused. Starting on 12/26/13 and ending on 2/11/14, Mr. ███████ received 33 cell front visits by members of the psychology staff that documented his extremely altered mental status. A psychiatrist did not evaluate him until 2/11/14. At that time, Mr. ███████ was diagnosed with Psychosis, NOS. A PMRB meeting was held on 2/12/14 and recommended Mr. ███████ for involuntary medication. The psychiatrist then prescribed Haldol decanoate 100mg Q4weeks. Starting on 2/12/14 and ending on 3/14/14, Mr. ███████ received an additional 22 cell front visits by the psychology staff. The therapeutic efficacy of these multiple cell-front visits was not apparent from my review of the medical record. The psychiatrist saw him again on 3/26/14. At no time during this period did any member of the mental health staff consider referring Mr. ███████ to an inpatient psychiatric facility. He suffered needlessly during this period. He should have been transferred to an appropriate psychiatric treatment facility instead of languishing in the SMU. Of note, Mr. ███████ was left in a state of extremely debilitating psychosis from the time of my examination, 7/16/13, at least through 3/26/14. This represents exceedingly injurious psychiatric care.

6.   ███████████████, ████-I evaluated Mr. ███████ and reviewed his medical record on 7/22/13. I noted that he carried the diagnosis of Mood Disorder, NOS. A 7/18/13 chart note indicated "IM reports he is out of psych meds and has been for four months." There was no apparent follow up to this note. I could not locate a MAR for July 2013 or any medication orders. Mr. ███████ claimed that he has not seen a psychiatrist since his arrival at Lewis. This fact is confirmed in the medical record. A review of the recent set of medical records documents the chaotic nature of Mr. ███████ psychiatric care. As noted above, I evaluated him

at Lewis on 7/22/13. Prior to his arrival at Lewis, he was housed at Tucson. While at Tucson, Mr. ▮▮▮▮ was prescribed Risperdal 1mg QHS and Celexa 40mg QD. These medications were not continued when he was transferred to Lewis. Of note, these medications were not ordered to be discontinued; rather, their dispensing just fell through the cracks. Mr. ▮▮▮▮ was sent back to Tucson where on 9/11/13 Dr. Harrison started him on Lithium 600mg QHS. There is no psychiatric progress note associated with this order. On 11/20/13 Mr. ▮▮▮▮ submitted an HNR requesting to stop his Lithium. He was not seen for this request for over two weeks. On 12/5/13, Dr. Harrison evaluated Mr. ▮▮▮▮ and discontinued his Lithium. There was no follow up to this 12/5/13 Tucson-based evaluation as Mr. ▮▮▮▮ was transferred to Yuma. On 3/28/14, he submitted an HNR requesting "to see psych." A mental health associate saw him on 3/31/14 noting that Mr. ▮▮▮▮ wanted to restart his medications. This case points out the difficulties patients experience when they are transferred between and among institutions. His medications did not follow him from Tucson to Lewis. Also, his psychiatric follow up did not occur when he was transferred from Tucson to Yuma.

7.   ▮▮▮▮▮▮, ▮▮▮-I evaluated Mr. ▮▮▮▮ and reviewed his medical record on 7/16/13. He is diagnosed with "Undifferentiated Schizophrenia" and was prescribed Haldol decanoate 50mg Q4weeks. Upon examination he was very sedated and unable to speak with me. Of note, he was housed in a lockdown unit at the Eyman complex.  It was my opinion that the harsh and isolated conditions of the lockdown unit were exacerbating Mr. ▮▮▮▮ Schizophrenic condition. A review of the recent set of medical records reveals that Mr. ▮▮▮▮ remains seriously mentally ill and that he is languishing in this lockdown setting. On 11/28/13 Mr. ▮▮▮▮ was placed on 30-minute watch status due to his "giving away $40.00 worth of store, not eating, presents depressed. IM reported to be making statements that he wants to hang himself." He remained on this 30-minute watch until 12/10/13. At no time during this 13-day period did a psychiatrist evaluate him. There is no evidence from the medical record that the mental health staff even bothered to consult with a psychiatrist. Two separate medication orders for Haldol decanoate 50mg Q30days were written without an accompanying psychiatric progress note. One order was written on 12/4/13 and the other on 1/2/14. I cannot determine from the medical record if Mr. ▮▮▮▮ was administered any Haldol secondary to these orders. A psychiatrist finally evaluated him on 1/28/14. This was a cell-front visit. The psychiatrist did not

make a diagnosis but only ordered Haldol decanoate 50mg Q4weeks. The next mental health contact was 3/9/14 when Mr. ███████ refused his Haldol decanoate injection. The final psychiatric contact of the period occurred on 3/31/14 when Mr. ███████ refused to speak with the psychiatrist at cell-front. Basically, Mr. ███████ remained untreated from the time of my examination on 7/16/13 through 3/31/14. During this period he was noted to be suicidal, psychotic and suffering needlessly due to his conditions of confinement and the lack of proper psychiatric treatment.

8.      ███████████, █████-I evaluated Mr. ███████ and reviewed his medical record on 7/8/13.  At that time, he was experiencing problems with the timely delivery of his psychotropic medications. The MAR for May 2013 indicated that Mr. ██████ was prescribed the antidepressants Prozac and Remeron. He was not aware that he was prescribed Remeron, as he had not been receiving this medication. Mr. ██████ readily admitted to taking Prozac for over a year but he had not received this medication for over a week. Staff informed him "they ran out of it." A review of the recent set of medical records reveals that a significant portion of his medical records is dedicated to his multiple medical problems. Of note, from October 2013 through February 2014, Mr. ███████ submitted eight HNR's outlining problems with his medications for his medical problems. A psychiatrist saw him on 11/19/13 and diagnosed him with "Depression/Anxiety." I must point out that there is no such diagnosis as "Depression/Anxiety" in the DSM. At that time the psychiatrist prescribed Prozac 40mg QAM and Remeron 15mg QHS. During the time period of October 2013 through February 2014, Mr. ███████ was only seen four times by psychology associates and he attended two groups. A psychiatrist saw him again on 2/11/14 when Risperdal 1mg QHS was added to his medication regimen.

9.      ███████████, █████-I previously evaluated Ms. ███████ on 7/18/13 at  ASPC-Perryville. At that time I found her to be extremely psychotic. I noted her shouting incoherently at the walls of her cell. At the time of my evaluation, she was on a "constant watch" because she had been banging her head in her cell. A review of her medical record at that time revealed that her most current treatment plan was dated 9/19/11. I found a very brief psychiatric note written on 6/26/13, which corresponded to a medication order for Haldol decanoate 100mg Q4weeks. Ms. ███████ had also been prescribed Celexa 20mg QHS, Cogentin 2mg BID and Tegretol 400mg QHS. She was very impaired and I felt strongly that she required

an inpatient level of care. The medical records provided for my review were from 10/19/13 through 4/1/14 so I am unable to evaluate her care in the period of time immediately following my evaluation. Of note is that Ms. ███████ had a positive PPD and was placed in medical isolation for the months of September through December 2013. Throughout this period of isolation she was seen at cell-side and administered her monthly Haldol decanoate. The first mental health note is from 10/22/13 when she was seen by a LMSW. At that time her mental status exam was noted to be within normal limits. The same LMSW next saw her on 12/4/13 and recorded that Ms. ██████ was anxious but otherwise stable. There is a reference to a 12/12/13 treatment plan but I could not locate it in the medical record. A psychiatrist saw her on 12/17/13 and renewed her previous medications. Her overall care consisted of a monthly check-in with the LMSW and her monthly Haldol decanoate injection. There is a "Mental Health Group Progress Note" dated 11/5/13. There were two separate group refusal forms dated 2/25/14 and 3/25/14. These three notes are the only references to Ms. ███████ being assigned to a therapeutic group. Finally, I located a "Mental Health Treatment Plan-Outpatient" form in the medical record dated 2/28/14. This form stated her strengths/limitations were "unable to participate." It also listed her treatment goals as "attain/maintain stable mood" and "decrease/eliminate psychotic symptoms." Of note, a psychology associate prepared this treatment plan with no apparent input from psychiatry or nursing. I am unable to fully appreciate what Ms. ██████████ psychiatric condition actually is from my review of the medical records. What I was able to determine is that a psychiatrist only saw her every six months. She may have been assigned to a mental health group. Her only documented mental health contacts were with a LMSW on a monthly basis as well as seeing the psychiatric nurse on a monthly basis for her Haldol injection. A review of the MAR's demonstrated that she did have good medication compliance during this period. My overall opinion of this case is that the quality and appropriateness of her mental health care is seriously in doubt.

The mental health care received by these prisoners during this six-month period continues to fall below the standard of care.

I have also been provided a list of charts for patients who carry the SMI designation. For the first 60 charts, I selected every tenth one for a total of six charts. I then selected the last chart listed for an overall total of 7 charts.

1. ████████████, ████-Mr. ██████ is a 73-year-old male SMI patient who is housed at ASPC-Tucson, Rincon Unit. There are no mental health-related progress notes located in the medical record for the period of 9/27/13 through 3/31/14. What I did encounter in the medical record were a series of forms titled "Skin Integrity Assessment." This form is a weekly checklist of the following health-related parameters: General Physical Condition, Mental Status, Activity, Mobility, Incontinence, Nutrition and Existing (skin) Breakdown. These checklists were completed weekly on Mr. ██████ for the period of 9/27/13 through 3/31/14. Overall, Mr. ██████ general physical condition was listed as "fair-poor" and his mental status was listed as "confused." Of note, the "Admitting Diagnosis" listed on these forms was "Schizophrenia-Dementia." The only psychotropic medication that he received during this period was Buspar 30mg BID. He received this medication during the month of September 2013 and then it was not continued for the remainder of the period in question. There was no psychiatric progress note explaining anything about this medication. Mr. ██████ did not receive any documented mental health contacts during the period of 9/27/13 through 3/31/14. This is tremendously poor care of an apparently very ill elderly patient.

2. ████████████, ████-Mr. ██████ is a 29-year-old male SMI patient who is housed at ASPC-Tucson, Santa Rita Unit. A "Transfer Summary/Continuity of Care" form dated 9/24/13 listed his diagnoses as "Depression Disorder NOS, Anxiety Disorder NOS, hx Schiz, suicide attempt age 14 plus 2 other attempts." This transfer summary also listed Mr. ██████ medications as Zoloft 100mg QHS and Hydroxyzine 25mg QHS. The next document I encountered in the medical record was an Initial Mental Health Assessment. This initial mental health assessment was conducted at ASPC-Phoenix by a psychiatric technician and signed off by a psychologist. It listed the disposition as "No Mental Health services needed at this time." However, a medication order signed by Dr. Ramirez for Zoloft 100mg QHS and Hydroxyzine 25mg QHS was dated the same day, 9/25/13. Written below this order in bold

33

letters was the phrase "Bridge Orders." It is abundantly clear from the medical record that there was no coordination among the members of the mental health treatment team.  Mr. ██████ is then transferred to ASPC-Tucson where he is seen by a psychologist on 10/2/13. A psychiatrist finally evaluates him on 10/15/13. The psychiatrist wishes to change Mr. ██████ antidepressant medication from Zoloft to Paxil and notes "I/M seeks better relief of his anxiety with change to Paxil." The medication order reads, "Cont. Zoloft 100mg PO QHS until Paxil arrives, then stop Zoloft 100mg; start Paxil 40mg PO QHS." The MAR from October 2013 indicates that Paxil was eventually started on 10/18/13. Of note, the next psychiatric contact doesn't occur until 4/8/14, which is far too long for a patient starting a new medication.

3.      ██████████, ██████-Mr. ██████ is a 42-year-old male SMI patient who is housed at ASPC-Yuma. His medical records are very disorganized and difficult to follow. A psychiatrist saw him on 9/18/13 and noted that he had a dysphoric mood and pressured speech and thought process. Mr. ██████ was prescribed Lithium 1200mg QHS for 90 days at that time. On 10/18/13, Mr. ██████ submitted an HNR stating "I need to see the physc Docter (sic) ASAP… I'm starting to lose it. Thank you. And I need to know how to get to the mental hospital." He was not seen for five days. On 10/23/13 Dr. Martinez noted "no new issues other than his insistence on being sent to a MH facility." Mr. ██████ submitted another HNR on 11/21/13 basically stating the same thing -- that he needed to see a psychiatrist ASAP because he was trying to stay out of trouble and that he was losing it. He was seen by a mental health associate on 11/26/13 who attempted to address some medication issues.  Of note, a mental health associate doesn't have the clinical expertise to deal with medication issues. Mr. ██████ submitted yet another HNR on 12/2/13 reiterating his problems with his medication and stating "my nortriptilin (sic) does not work…It make me violent." He was seen on 12/3/13 by a psychiatrist who diagnosed him with Bipolar Disorder and continued his Lithium at 1200mg QHS. A Lithium level obtained at that time was within normal limits. Mr. ██████ submitted two more HNR's, both on 1/6/14, again complaining about his medications. A psychiatrist saw him on 1/10/14 noting that Mr. ██████ ran out of Lithium 6 days ago. A review of the January MAR documents that he went without Lithium from 12/31/13 through 1/13/14. Finally, the last mental health progress note was dated 1/29/14. I did not find any other mental health contacts through 3/31/14. This case is a good illustration of the difficulties that patients in the ADC experience with their

medications, leading to needless suffering and risking aggravation of their mental illness.

4.     ██████, ████-Mr. ████ is a 33-year-old male SMI patient who in May 2013 was noted to have the diagnoses of Bipolar/Depression/Anxiety and was being treated with Lithium 300mg QHS. His medical records are extremely disorganized so it was difficult to determine exactly where he has been housed. It appears that as of 9/6/13 he was housed at ASPC-Tucson.  On that date, Mr. ██ was evaluated by Dr. Winsky who discontinued the Lithium and started Mr. ██ on Risperdal 1mg QHS for 180 days. Of note, a six-month follow up is too long when starting a patient on a new medication. On 9/12/13 he was referred to the MTU at ASPC-Phoenix. The reason for the referral was stated as "Inmate expressed a desire to break his patterns and know more about his mental health condition." As laudable as these goals are, I do not understand why this relatively stable patient was referred to the MTU knowing that there are hundreds of more seriously mentally ill individuals who drastically require treatment in a specialized mental health unit.  Between 9/25/13 and 11/8/13 Mr. ████ refused his Risperdal 1mg QHS ten times without there being any documented intervention by the staff. In fact he was seen by a psychologist on 10/7/13 and was described as being "pretty stable." Also, there was no mention of Mr. ████ poor medication compliance. Equally mysterious is a psychiatrist note dated 10/25/13 in which no mention is made of Mr. ████ poor medication compliance. The next psychiatrist note is from 12/16/13 which lists Mr. ████ diagnosis as Mood Disorder, NOS. At that time the psychiatrist, Dr. Akhtar, discontinued the Risperdal 1mg QHS. From the medical records, it appears that Dr. Akhtar is a psychiatrist at ASPC-Phoenix. I could not locate a comprehensive psychiatric intake assessment on Mr. ████ I did locate a very cursory note written by a psychology associate dated 12/17/13. I was able to locate three additional psychology associate notes dated 1/15/14, 2/18/14 and 3/18/14. Mr. ████ attended nine groups from 2/19/14 through 4/1/14. There were no psychiatric contacts documented in the medical record during this same period. This case points out three issues: 1) It is not clear why Mr. ████ was referred to ASPC-Phoenix given his relatively stable condition, 2) his poor medication compliance was not noted by any mental health staff, and 3) Between 12/16/13 through 4/1/14 he was only seen by a psychiatrist once and psychology associates three times; he never received a comprehensive psychiatric assessment.

5.   ████████████, ████-Mr. ██████ is a 57-year-old male SMI patient who also suffers from multiple medical problems. He was housed at ASPC-Tucson. His Initial Mental Health Assessment from June 2013 listed his diagnoses as Substance-Induced Psychotic Disorder versus Psychosis NOS.   On July 23, 2013 Mr. ██████ was evaluated by Dr. Winsky who prescribed Paxil 10mg QAM, Risperdal 3mg BID and Cogentin 0.5 mg BID.  All of these medications were ordered for 180 days. During the period of 9/27/13 through 3/31/14, Mr. ██████ was only seen by a psychologist on 10/4/13 and 12/19/13. He was only seen by Dr. Winsky once during this period. There is no evidence in the medical record that Mr. ██████ attended any groups. So for this six-month period, Mr. ██████ who is designated as an SMI patient, only had three contacts with anyone from the mental health staff.

6.   ████████████████, ████-Mr. ██████████ is a 43-year-old male SMI patient who during the period of 9/27/13 through 3/31/14 was housed at ASPC-Phoenix. He was officially designated SMI on 9/19/13. His first documented visit with a psychiatrist occurred on 11/13/13.  At that time, Mr. ██████████ Lithium was discontinued and he began treatment with the antidepressants Remeron, Celexa and Trazodone, the antipsychotic Trilafon and the antianxiety medication Buspar. Mr. ██████ submitted an HNR on 12/14/13 complaining of worsening nightmares. He was promptly seen by Dr. Akhtar on 12/16/14 who modified his medication regimen. He was seen by a nurse practitioner on 1/10/14 who discontinued his Remeron and Celexa and began Paxil. During the time frame of 9/27/13 through 3/31/14, Mr. ██████ had seven contacts with Psychology Associates and attended four groups. Finally, he was seen by a different nurse practitioner on 2/7/14.  This case further illustrates just how little treatment patient receive at ASPC-Phoenix, which ADC describes as its specialized mental health facility.  For this six-month period, Mr. ██████ had a total of 14 contacts with mental health staff. This works out to be approximately one mental health contact every two weeks. This represents a woefully inadequate level of treatment for a mental health facility.

7.   ████████████, ████-Mr. ██████ is a 57-year-old male SMI patient with a long history of psychosis and dementia. He had previously been treated with large doses (1500mg QHS) of the antipsychotic medication, Thorazine. Mr. ██████████ SMI status was renewed on 8/27/13.  During the period of 9/27/13

through 3/31/14 he has been housed at ASPC-Tucson. Mr. ███████ received very cursory monthly visits from a psychologist for the months of October, November and December 2013. These brief monthly visits continued into 2014. These visits in 2014 were conducted by a psychology associate and documented that Mr. ███████ was not fully oriented and was disheveled and confused. He was placed on 10-minute watch status on 3/25/14 for making threatening statements. This was changed to 30-minute watch status on 3/26/14. On 3/27/14, a psychologist visited Mr. ███████ and noted that he was "rambling at times, disjointed presentation with flight of ideas." The note also included the statement "need chart." This clearly demonstrates that the psychologist saw Mr. ███████ without the benefit of the chart. Needless to say this is extremely poor practice especially given the patient's recent threatening statements. Mr. ███████ received a cell-front contact on 3/28/14 which documented his mental status as "confused, distractible, poor concentration, apathetic mood, detached affect and tangential thought structure." Remarkably, his watch status was discontinued on 3/31/14. At no time during this six-month period did a psychiatrist evaluate him. Of special concern is during this six-month period, no effort was made to treat his underlying psychiatric conditions. This is highly inadequate care.

The mental health care received by these prisoners during this six-month period falls below the standard of care.

**Inadequate mental health care of named plaintiffs**

I have been provided updated charts for the named plaintiffs in this case:

1. ███████████, ██████-As previously reported, I evaluated him on 7/16/13 and 7/19/13. I first saw him on the SMU where he was very agitated and questionably psychotic. I next saw him on the Flamenco Unit where his clinical condition remained unchanged and I encountered serious problems with his medical record. At that time, it was unclear whether he was assigned a psychiatric diagnosis and whether he was receiving any psychotropic medication. A review of his recent set of medical records reveals that mental health staff did not see him during the period 9/27/13 through his release on 12/11/13. Per his medical records, his most recent psychiatric visit occurred on 7/25/13. At that time, Dr. Cleary

diagnosed him as suffering from Mood Disorder, NOS and Antisocial Personality Disorder. Mr. ███████ prescribed medications were Neurontin 600mg BID, Inderal 10mg BID and Wellbutrin 100mg BID. I am unable to determine from the medical record if he in fact received these medications. His last contact with a psychologist occurred on 7/31/13. Of note, a nursing entry in the medical record on the evening of 7/31/13 reported that the "inmate began screaming, yelling and threatening at 1800 re: follow through of wasting syndrome diet." The nurse went on to state that Dr. Cleary would be contacted to obtain an order for a tranquilizer. There is no indication from the medical records if Dr. Cleary was contacted or if a tranquilizer was prescribed. There is also no apparent follow up to Mr. ███████ "screaming, yelling and threatening" outburst.

2.      ████████████, ██████ -As previously reported, Mr. ███████ suffers from both mental and medical illnesses. He was diagnosed with Psychotic Disorder, NOS and was prescribed Risperdal, Cogentin and Sertraline. He experienced heat-induced medication-related problems and requested that medications be discontinued. In fact his Risperdal and Cogentin were stopped on 6/27/13. No mental health follow up occurred to evaluate how he was doing without these medications. A review of the recent set of medical records reveals that Mr. ███████ submitted an HNR on 1/2/14 stating "I am experiencing severe anxiety attacks, irritation and depression." In response to this HNR he was seen by a psychology associate on 1/6/14 and 1/13/14. Mr. ███████ then submitted a very elaborate HNR on 1/29/14 explaining in great detail his mental health problems and his need for treatment. Staff apparently ignored this HNR and Mr. ███████ submitted a new HNR on 2/9/14 simply stating "Severe Depression-would like to enroll in a treatment plan." He was seen by a psychology associate on 2/10/14 who stated "I/M will be seen 1:1 approximately every two weeks with focus on anger management and depression." Mr. ███████ was next seen by a psychologist on 2/18/14 who diagnosed him with Psychotic Disorder, NOS and referred him to a psychiatrist. He was seen the next day, diagnosed with Depressive Disorder, NOS and started on Effexor 37.5mg QHS.  Of note, it took over six weeks for Mr. ███████ to be seen by a psychiatrist after he submitted his initial HNR. In addition, a review of his medical records reveals that Mr. ███████ was prescribed Remeron 15mg QHS from 10/19/13 through 3/7/14 and Zoloft 200mg QAM from 6/27/13 through 12/24/13. I did not find any mention of these medications in any of the mental health progress notes during this period. This represents extremely poor care and lack of coordination among the members of his treatment team.

3.      ████████████, █████ -As previously reported, Mr. █████ is an SMI prisoner who is diagnosed with "bipolar and PTSD." At the time of my last evaluation, I noted that Mr. █████ experienced extended periods where he was not administered his prescribed psychotropic medications. A review of the recent set of medical records reveals that his lithium expired on 11/6/13. He was next seen by a psychology associate on 2/4/14 at which time Mr. █████ was asking to be started on Wellbutrin. He was seen by a psychiatrist on 2/11/14 when he was diagnosed with Depressive Disorder and started on Remeron 15mg QHS. This dose was increased to 30mg on 2/20/14. A chart entry on 2/21/14 indicates that Mr. █████ is refusing his Remeron because "he doesn't like the way it makes him feel." A psychologist saw him on 2/26/14 and described Mr. █████ as being "depressed, anxious and mildly histrionic." Of concern is that the psychologist is apparently unaware that Mr. █████ has been refusing his medication for the previous five days. He submitted an HNR on 3/1/14 once again requesting to be started on Wellbutrin. The response to this HNR is that the patient will be seen "on psych line on 3/19/14." Mr. █████ is seen by a psychologist on 3/5/14. The psychologist is once again oblivious to the problems that Mr. █████ is having with his medication. She also noted that "IM reports increased irritability, sleeping and vegetative symptoms." She then inexplicably states, "IM appears stable." Mr. █████ then submits two HNR's on 3/13/14 and two HNR's on 3/17/14, all of which involve requests to be started on Wellbutrin. Of note, the response to all of these HNR's is to repeat that Mr. █████ will be seen on 3/19/14. He is finally seen on 3/19/14 and prescribed Wellbutrin-SR 100mg BID. For reasons that are not readily apparent from the chart, the medication is not begun until 3/25/14. This case demonstrates a complete lack of coordination among the mental health treatment team. Also, it took over six weeks for Mr. █████ to be finally prescribed the antidepressant Wellbutrin.

4.      ████████████, █████ -As previously reported Ms. ████████ has a long history of psychotic and mood symptoms for which she has been prescribed a variety of psychotropic medications. At the time of my previous evaluation, 7/18/13, she was diagnosed with Schizophrenia, paranoid type and was being prescribed five different psychotropic medications including two antipsychotics. At that time, I found her lying on her cell floor, extremely sedated and displaying prominent medication-induced side effects. A review of the recent set of medical

records reveals that she remains on a tremendous amount of antipsychotic medication. A 2/26/14 psychiatrist note documented her medications as Haldol decanoate 200mg q4weeks, Prozac 40mg BID, Prolixin 5mg BID, Geodon 80mg BID, Cogentin 3mg BID and Buspar 15mg BID. I cannot adequately express what an absurd amount of medication this represents. For example, the recommended dose of Haldol decanoate for the treatment of schizophrenia is 50mg q 4weeks. Ms. ████████ is prescribed four times that amount.  Prolixin and Geodon are both antipsychotics. This is even more medication than when I evaluated her last year. At that time she was displaying prominent medication-induced side effects. An Abnormal Involuntary Movement Scale (AIMS) was administered on 2/26/14. It purportedly documented that the patient was not displaying any involuntary movements. I seriously challenge the results of this finding. In addition, it is my firm opinion that this patient remains at serious risk for medication and heat-related problems.

5.     ████████████,  █████-As previously reported Mr. ██████ has a long history of treatment for Bipolar Disorder with Lithium, Tegretol and Celexa. At the time of my evaluation, 7/16/13, he was not receiving any medication and was extremely agitated, having recently destroyed the sprinkler heads in two cells. He was housed in a lockdown cell, reinforced with Plexiglas at the Eyman Unit. Of note, he had not been evaluated by a psychiatrist by the time of my inspection of the unit.   A review of the recent set of medical records reveals that the first psychiatric evaluation documented in the medical record occurred on 1/24/14. At that time he was prescribed Lithium 900mg QHS and Paxil 40mg QHS. Mr. █████ had a follow up psychiatric evaluation on 2/15/14 at which time he was diagnosed with Bipolar Disorder, NOS and his Paxil and Lithium were continued at their previous doses. His clinical condition was described as "less symptomatic." This is the extent of the medical records that were made available for my review. I find it amazing and very disturbing that a patient as ill as Mr. █████ was not seen by a psychiatrist for over six months after my evaluation of 7/16/13.

6.     ████████████,  █████-As previously reported, Ms. ███████ is a chronically mentally ill woman who I evaluated on 7/18/13. I noted her to be extremely psychotic despite being prescribed Haldol decanoate, Depakote, Prozac and Cogentin. She had also suffered at least two serious bouts of dehydration requiring IV therapy and she was pepper sprayed twice for allegedly not following

the orders of the guards. A review of the recent set of medical records reveals that she continues to have problems at Perryville and was placed on suicide watch on several occasions. It is apparent from the medical record that her psychotic behavior was misinterpreted as being volitional.  Although she continued to receive the above-listed psychotropic medications, her diagnosis was felt to be that of a personality disorder. Due to the persistent difficulties she was experiencing at Perryville, she was eventually transferred to Arizona State Prison Complex Phoenix. She was admitted to the mental health program at ASPC Phoenix on 1/15/14. She was diagnosed with a Mood Disorder, Psychotic Disorder, NOS and Borderline Personality Disorder.  The medical records from ASPC Phoenix are extremely disorganized so I could only find two brief notes that indicated she was seen by a psychiatrist. One note was titled "Psychiatric Admission Note." This note was incomplete and unsigned.  The other note indicated she was seen for approximately 15 minutes. This "psychiatric follow up note" was not signed and did not list diagnoses but only her medications, which were Haldol decanoate 100mg Q2weeks, Prozac 40mg QAM, Depakote 750mg QHS and Cogentin 2mg BID. It is not clear from the medical records if Ms. ████████ was ever evaluated by a psychiatrist while she was at ASPC Phoenix. In fact, even the admitting medical orders were received via FAX. All the rest of her clinical contacts were with psychologists or psychological associates. It appears from the medical records that she was discharged from ASPC Phoenix around 2/11/14. In summary, this is a very ill woman who required inpatient psychiatric care when I evaluated her on 7/18/13. She suffered needlessly at the Perryville prison until she was transferred to the "George Unit" at ASPC Phoenix on 1/15/14. It is unclear from the medical records if she was ever seen by a psychiatrist while there. Finally, it is unclear from the medical record when she actually returned to Perryville. Her medications were renewed by a nurse practitioner at ASPC Phoenix on 1/16/14 and the Depakote dose was modified on 2/6/14. These are the most recent medication orders that I was able to find in her medical record. The overall handling of her case represents very poor care of a seriously mentally ill woman.


7.   ████████████, ██████ -As previously reported I evaluated Mr. ████████ on 7/16/13. At that time I found him to be experiencing auditory hallucinations despite his being treated with Haldol decanoate. He also was suffering the medication-induced side effects of sedation and involuntary movements. A review of the recent set of medical records reveals that Mr. ████████ continued to suffer medication-induced side effects until he began to refuse his Haldol decanoate in

late September 2013. His medications were subsequently changed on 10/1/13. Even after this medication adjustment he continued to experience side effects. On 11/8/13 he was described as "anxious/hyperactive-constant movement." He continued to refuse medications and was not seen by a psychiatrist until 1/14/14 for an adjustment of his medications. Once again this medication adjustment did not resolve his difficulties and he again began to refuse medications. Mr. ███████ was seen by a psychiatrist on 3/14/14 when his medications were adjusted again. This case demonstrates inappropriately long waits to be seen by a psychiatrist as well as overall very poor medication management. This is especially problematic given that Mr. █████ was suffering from medication-induced side effects.

8.   ███████████, █████ -As previously reported I evaluated Mr. █████ on 7/22/13. At that time I noted that his last visit with a psychiatrist occurred on 1/21/13. During this six-month period, he spent a considerable amount of time on watch status for danger to self. At no time during this period was he seen by a psychiatrist. He also experienced problems with medication administration as he was told, "they were out of Risperdal." A review of the recent set of medical records reveals that the most recent Medication Administration Record (MAR) is for January 2014. This MAR documented that Mr. █████ was prescribed Tegretol 600mg QHS, Risperdal 1mg QHS, Cogentin 0.5mg QHS, Prozac 60mg QAM. There were actually two separate MAR's that listed Risperdal 1mg QHS. One listed the Risperdal as KOP and the other documented that he was administered Risperdal 1mg QHS every day of the month. During the period of 9/27/13-3/31/14 I located a psychology associate note dated 12/10/13. I also located two psychology notes dated 1/13/14 & 1/23/14. I also located a note, which documented that Mr. █████ refused to attend a Telepsychiatry visit in 2014 but the exact date is unreadable. This lack of documented psychiatric involvement is especially worrisome given the confusion over his Risperdal dosing and the fact that two of the medication orders were not accompanied by a progress note by a psychiatrist (i.e. Risperdal 1mg QHS dated 12/12/13 & Tegretol 600mg QHS dated 12/24/13.) Finally, I located an order discontinuing his Tegretol on 4/1/14.

9.   ████████████, █████ -As previously reported I evaluated Ms. █████ on 7/18/13. She suffers from a variety of medical and psychiatric conditions. I especially noted that she experienced many problems in receiving her medications on a consistent basis. A review of the recent set of medical records

reveals that her problems with medications continued. She submitted an HNR on 10/1/13 stating she was experiencing side effects from Lamictal 200mg QD. She refused her Lamictal on 10/4/13. She was seen by a nurse practitioner on 10/8/13 who decreased her dose of Lamictal to 25mg QD. The next chart entry is 1/2/14 when Ms. ███████ again began refusing her Lamictal. This refusal continued through 1/6/14. She was seen by a nurse practitioner on 1/9/14 who finally discontinued her Lamictal. It is unclear from the medical record why it took over three months to address her very straightforward issues with her medications. At no time during this period was she evaluated by a psychiatrist.

The mental health care received by the named plaintiffs over this six-month period continues to fall below the standard of care.

**Inadequate monitoring and oversight**

In my initial report I wrote that "ADC's monitoring is deficient in significant respects." 11/8/13 Report at 72. Continuing deficiencies in monitoring and oversight are exemplified by the revised MGAR reports for March 2014. In many cases, the comments by the monitor have nothing at all to do with the item ostensibly being monitored. For example, for the Safford MGAR under "Mental Health," one performance measure reads "Are inmates currently on watch being seen daily by QMHP (including RNs on weekends and holidays)?" The monitor has written "N/A There are no SMI inmates on this complex" – a complete non-sequitur. ADC 422530. For the performance measure "Are reentry/discharge plans established no later than 30 days prior release [sic] for all inmates with a MH score of MH-3 and above?" the monitor writes "If an inmate is placed on a

Mental Health Watch they are transferred to a corridor facility ASAP."  ADC 422530.  Similarly nonsensical entries appear in the revised March 2014 MGAR reports for Douglas (ADC 422303).  The fact that such obvious errors occurred, and still had not been corrected by the time I received these documents nearly five months later, casts serious doubt on the integrity and reliability of the MGAR reports.

Similarly, the "Corrective Action Plans" appended to the MGARs are sometimes meaningless.  In the revised Tucson MGAR for March 2014, the "Corrective Action Plans" for two mental health performance measures consist of a verbatim restatement of the monitor's findings of noncompliance.  Compare ADC 422578 with ADC 422571-72 and 422573-75.  Needless to say, simply restating the fact of noncompliance is not a "corrective action plan."

Nicole Taylor, ADC Mental Health Monitor, testified in her August 1, 2014 deposition that several of the requirements set forth in the ADC Mental Health Technical Manual (MHTM) are simply not monitored.  8/1/14 Taylor deposition, pp. 71-72 (requirement that mental health staff visit SMI prisoner placed in maximum custody with 24 hours of notification); pp. 72-73 (requirement that mental health staff or medical staff with mental health training visit prisoners in maximum custody three times a week); p. 106 (requirement that mental health clinician meet with minor prisoner within two business days of the minor's arrival); pp. 128-32 (requirement that patients discharged from Men's Treatment Unit (MTU) or Women's Treatment Unit (WTU) are seen by a mental health

clinician within seven days).  With respect to other requirements, she testified she is unsure whether or how they are monitored.  8/1/14 Taylor deposition, pp. 32-33 (requirement that prisoner's medical record be reviewed within 12 hours of arrival at a new prison complex); pp. 135-36 (requirement that patients in MTU and WTU receive weekly structured activities); pp. 138-141 (requirement that arriving prisoner receive mental health assessment within two days).

**<u>Conclusion</u>**

For all of these reasons, I stand by the opinions stated in my earlier reports. Based on my review of documents covering the period from September 27, 2013 through April 1, 2014, it remains my opinion that ADC's delivery of mental health services and its conditions of confinement for prisoners with mental illness fall below the standard of care and create a substantial risk of serious harm or death.

Dated this 29th day of August, 2014 at C-O E u R d 'Ale<sub>n</sub>FIdaho.

PABLO STEWART, M.D.

**Documents Sent from Plaintiffs' Counsel to Dr. Pablo Stewart**

**In Preparation for 3/30/16 Report**

<u>Sent 1/29/16 via UPS:</u>

- Medical Records for the following inmates:
    

- Institutional Files (MRFs) for the following inmates:
    

- Medical Records and Psych Autopsy for the following inmate:
    
- Medical Records, Psych Autopsy, and Mortality Review for the following inmates:
    - 
    - 
- CGARs for February – November, 2015
    - CGAR CAPs submitted in May 2015 for Douglas, Lewis, Perryville, Phoenix, Safford, and Eyman
- Notice of Substantial Noncompliance with Appendices, 10/15/2015
- Defendants' Response to Notice of Substantial Noncompliance, with Appendix, 11/24/2015
- Defendants' Monitoring Spreadsheet (CGAR Methodology), 12/18/2015
- ADC Count Sheet for 1/13/2016
- 12/18/2015 Memo from Shane Evans to Lucy Rand

<u>Sent 3/14/2016 via UPS:</u>

- *Parsons v. Ryan* Stipulation and Exhibits
- Compliance Data Analysis Chart
- Monthly Staffing Reports for Aug. – Dec. 2015

# EXHIBIT 3

- Colorado Staffing – 1/14/16 email from Adrienne Jacobson to Rebecca Wallace
- CQI Meeting Minutes:
  - Sept. – Nov. 2015 for all facilities
  - Feb. – May 2015 for Eyman and Perryville
  - June – Aug. 2015 for Florence
  - May – July 2015 for Lewis
- CGAR Reports:
  - Dec. 2015 for all facilities
  - Jul. and Sept. 2015 for Phoenix
  - Nov. 2015 for Florence
- CGAR CAPs:
  - May – Aug. 2015 for all facilities
  - CAP re Smith – Eyman

Sent 3/24/16 via email:
- Monthly staffing reports for March – July 2015 for all facilities
- April 2014 Mental Health Technical Manual
- Article: "American Psychiatry Should Join the Call to Abolish Solitary Confinement," by Kenneth Appelbaum