Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email: dpochoda@acluaz.org
          jlyall@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email: skader@azdisabilitylaw.org
          adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-DKD <br><br> **DECLARATION OF TODD R. WILCOX** |

I, Todd Wilcox, declare:

1.      I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify.

## I.     Introduction and background

2.      This report assesses Arizona's prison medical care one year after the Court approved the parties' Stipulation settling this action.  Under the Stipulation, defendants agreed to comply with 103 health care-related performance measures, to request that the Arizona Legislature approve a budget to allow ADC and its contracted health services vendor to modify the health services contract to increase health care staffing, and to implement additional policies and training programs.

3.      Through my three-day visit to Arizona State Prison Complex-Tucson on December 2-4, 2015, and my review  of patient records, including death records, I have found that ADC prisoners continue to suffer serious harm, and in some cases preventable death, because defendants  fail to provide necessary and timely health care on a system-wide basis.  Tragically, this situation should come as a surprise to no one.  The audits that Defendants have compiled every month since the Stipulation was entered document a system where patients lack reliable access to nurse triage, physicians, specialists, and/or necessary medication.  The system is obviously broken, and human suffering is the unavoidable result.

### A.     Qualifications

4.      My qualifications are fully set forth in my November 8, 2013 Report.  My updated curriculum vitae is attached as Appendix A.  The cases in which I have been deposed and/or given trial testimony in the last two years are listed in Appendix B.

### B.     Information sources

5.      I undertook an extensive investigation of current conditions to develop my opinions expressed in this report.  I reviewed the CGAR monitoring reports for the

months of February through December 2015, as well as summary charts reflecting CGAR results, well over 100 partial and full healthcare records of Arizona prisoners, and miscellaneous logs and minutes while at ASPC-Tucson.  I reviewed staffing reports, lists of prisoners awaiting specialty referrals and meetings minutes of health care staff.  I also interviewed staff and approximately two dozen prisoners at the Tucson prison complex.  The documents I reviewed are listed in Appendix C.

### C.   Methodology

6.      To prepare this report, I reviewed documents regarding the statewide health care system, prison-specific audits and patient records, as set forth more fully below.  I also conducted a prison site visit for three days in December, 2015, at ASPC-Tucson.  I chose this prison because it is one of the largest in the state and is one of only two men's prisons with an inpatient/infirmary unit, and because it was one of the five prisons I had visited in 2013, when preparing my initial report.[1]

7.      I reviewed all records for people who died in ADC custody during 2015 that were produced to me by 1/19/16.  I reviewed patient healthcare records while visiting ASPC- Tucson and also reviewed records provided to me by plaintiffs' counsel.  As was true for my previous reports, I did not review a random sample of records during my ASPC-Tucson site visit; instead, I chose to look at files of the same types of prisoners I reviewed for previous reports, including files for patients with diabetes, hypertension, HIV, kidney failure, hepatitis, infections and cancer.  I also looked through lab reports, diagnostic test logs, and Health Needs Requests on site to identify patients who had objective findings that were concerning and then I asked for their charts to be pulled for my review.  If I found areas of concern in the health care record, I frequently would

---

[1]   Given that the ADC monitoring reports were highly consistent for the large prisons, and based upon my familiarity with the system, having visited half of the state's prisons previously and the fact that the medical record system is comprehensive and inclusive of care rendered at all state prison facilities, I concluded that I could opine about the prison system as a whole based on the documents provided to me and a multi-day visit to a representative institution.

request that the patient be pulled for me to interview to confirm my findings.  I also interviewed patients I identified while on tours of the various housing units and then would review their charts afterward to gain additional information about their condition and the care plan.  As I explained in previous reports, I focus my review on those patients with conditions requiring them to use the health care system.

8.      Although my role when touring ASPC-Tucson was to gather information, I felt obligated to report cases to prison officials and their attorneys when I discovered patients who were in imminent risk of harm.  I reported such problems for twelve prisoners, many of whom are discussed in some detail in this report.

**II.    Opinions**

9.      When I reviewed Arizona's prison medical care system in 2013 and 2014, I found that it was significantly below community standards and placed patients at serious risk of harm.  Wilcox Reports, Doc. 1104-1 and 1138-1.  Based upon my recent return visit at Tucson prison complex and my review of documents, my opinion has not changed. Prisoners in ADC custody continue to suffer an unreasonable risk of harm because the health care delivery system of their contractor, Corizon Health, Inc., is woefully deficient, and ADC officials do not acknowledge the gravity and impact of these deficiencies. Many of the deficiencies are rooted in staffing shortages, particularly for primary care providers,[2] and are exacerbated by the adoption of a poorly organized and highly inefficient electronic medical record-keeping system that impedes rather than facilitates health care delivery.  What is particularly apparent is that, lacking a sufficient number of providers and medical managers, the system is incapable of self-correction, even when gross systemic problems are identified. Consequently, the auditing reports document the same failure to comply with critical performance measures, month after month; class counsel continue to raise serious systemic issues when advocating for individuals with

---

[2]  I use the term "provider" throughout this report to mean a Physician, Nurse Practitioner or Physician's Assistant who provided primary care to class members.

serious unmet medical needs; and patients suffer preventable deaths that are poorly reviewed.

10.    In the short term, the system requires an immediate infusion of physicians and mid-level providers, and nurses.   Defendants should be ordered to immediately add a sufficient number of medical professionals to enable all ten prisons to achieve  passing scores of 80% on Performance Measures # 37 and # 39 (measuring timely access to nurse triage and to primary care appointments), Measure # 46 (measuring whether provider timely reviews diagnostic reports and acts upon abnormal values) Measure # 54 (measuring timeliness of chronic care appointments) and Measure # 66 (measuring timeliness of provider care in inpatient facility).  In a system of this complexity, the only way to achieve a sustainable long-term solution is to undertake a systematic evaluation of the staffing using an established methodology.  In my experience, estimates and ratios alone and in a vacuum simply do not work in a correctional healthcare staffing analysis. What is required is to evaluate the setting in which the care is delivered (segregation vs. open yard), the actual demand load for the system (number of sick call requests, number of pills administered, number of intakes done per day), and then apply reasonable healthcare metrics to the equation of meeting the demand in each individual setting with adequate clinical resources.  For example, we know that the actual face-to-face time for a patient to be with a provider in a routine appointment should take about 15 minutes.  It doesn't matter whether they are a segregated patient or a minimum security patient, it takes 15 minutes.  What changes, however, is the impact of the security component on the entire patient care experience.  It may take an hour in a high security setting to secure and transport a patient each way and other prisoner movement is restricted during that time. So the 15 minute appointment becomes 1:15 for that setting.

11.    We have done extensive staffing modeling, both for Maricopa County and the California Department of Corrections, and these variables really have to be taken into consideration in order to figure out what minimum staffing must be to accomplish the required healthcare tasks dictated by the system demand.  Based upon my review of the

1    system, it is clear to me that the Arizona Department of Corrections healthcare staffing is

2    below what is required to meet minimum performance standards.  What is not clear is how

3    far below, and in what job descriptions, the deficiencies exist.  Even with all of my

4    experience, without doing the actual math, you cannot discern the answer.  As such,

5    completing a formal workload staffing study is a pre-requisite to develop a long-term

6    sustainable staffing plan.  The failure to complete a formal workload staffing study will

7    result in ongoing argument about adequacy of staffing and a prolonged and unnecessary

8    continuation of inadequate care as staffing is slowly ratcheted up with each successive

9    legal action and mediation.

10          12.    Until ADC addresses its staffing deficiencies head-on, prisoners will

11   continue to suffer from neglect and inadequate care, and in some cases, they will die

12   unnecessarily.  Without sufficient staff, the system will not be able to carry out basic

13   quality review to identify and remedy systemic deficiencies.

14          13.    Review of three similar cancer cases at one prison, ASPC-Tucson, vividly

15   illustrates a system in disrepair.  I discussed the case of █████████████  in my

16   Second Supplemental Report, served on defendants in September, 2014.  Doc. 1138-1 at

17   165.  He experienced unconscionable delays in screening and treatment for testicular

18   cancer, a condition which, if treated timely is almost always curable.  The 5-year survival

19   rate of testicular cancer is approximately 95%.  Siegel RL, Miller KD, Jemal A., Cancer

20   statistics, 2015. CA Cancer J. Clin. 2015; 65:5.  Declaration of Corene Kendrick, filed

21   herewith, Ex. 4,[3] PLTF-PARSONS-036248-36272.

22          14.    Mr.████████'s complaints of testicular pain in mid-June, 2013 were

23   essentially ignored, and despite a urology recommendation for a radical orchiectomy

24   (removal of the testicle) in September, 2013, the surgery was not provided until 3/24/14.

25   Ex. 60 at ADC418740, ADC418712, 418718, 418740.  I noted previously that this delay

26   has exposed Mr. ████████ to an unreasonable risk of harm.  Doc. 1138-1 at 165.  I

27   ─────────────────────

28          [3] All subsequent references to exhibits are to the exhibits to the Kendrick
     Declaration.

1    interviewed Mr. ██████ recently while at Tucson complex on 12/4/15, and reviewed his

2    current medical record. Tragically, but predictably, the cancer has spread to his lungs and

3    has been deemed inoperable and untreatable.  Sadly, Mr. ██████ who is 30 years old,

4    has now been diagnosed as terminal, and has less than a year to live.  He will die of a

5    treatable and curable disease.  In a healthy medical care system, I would expect that the

6    identification of a case with the inexcusable and dangerous health care delays identified in

7    Mr. ██████'s case would trigger a review of the case history and remedial measures to

8    ensure that the deficiencies in Mr. ██████'s case do not recur for future patients.

9        15.    Sadly, Mr. ██████'s case was not an isolated aberration.  In addition to his

10    case, I found two other cases of testicular cancer in young men who suffered

11    unconscionable delays in care. ████████████████, died of testicular cancer on

12    ██████ less than a month shy of his 43rd birthday.  Mr. ██████ sought care for an

13    enlarged testicle in June, 2014.  He underwent an orchiectomy (removal of his testicle) in

14    September, 2014, just days after my report was submitted.  He should have seen an

15    oncologist immediately after this procedure, but he did not.  Indeed, I found no

16    documentation from the hospital following the orchiectomy, and it appears he received

17    virtually no medical attention for the three months following the surgery.  He was not seen

18    by an oncologist until five months after the surgery, on 2/12/15.  On 10/20/15 he

19    underwent surgery to remove lymph nodes and the surgeons found that he had widespread

20    cancer in major blood vessels.  He ultimately died of shock resulting from a severe post-

21    operative bleed.  The ADC's Mortality Review Committee concluded, correctly, that Mr.

22    ██████'s death was preventable.  Ex. 69 at ADCM228197-199.

23        16.    Twenty-seven year old ████████████████ may be the next victim.

24    Counsel for plaintiffs found Mr. ████ by speaking to random prisoners at cell front while

25    walking through a housing unit, and brought his complaints to my attention.  I interviewed

26    him and reviewed his health records, which confirmed his allegations of inadequate care.

27    He started complaining of testicular pain in July 2015.  He was initially scheduled to have

28    an orchiectomy on 9/30/15.  However, because nobody within the Arizona Department of

Corrections or Corizon communicated appropriately, he was fed breakfast that morning and thus his surgery had to be cancelled.  It took the system an additional month to get him scheduled for his necessary care, and he had an orchiectomy on 10/30/15.

17.     Because of the urgency of his condition, the surgeon ordered a post-operative appointment two weeks later to review pathology, post-operative imaging and to refer him to an oncologist.  As of 12/4/15 when I interviewed him, he had not seen an oncologist to consider chemotherapy and radiation.  During my prison visit, I notified ADC officials and their attorneys of Mr. █████'s critical needs.  Since visiting Tucson, I reviewed more recent documents from his medical file dated through 2/10/16.  Despite the alarm that I raised to ADC staff during the tour of Mr. █████'s critical need for immediate health care, he still has not received chemotherapy or seen an oncologist, as discussed in more detail in Part II.D.3 below.  If provided proper care, Mr. █████'s condition is curable and he would be able to survive this occurrence of cancer.  Given the unconscionable delays and incompetence that appear to be standard in these three cases, I fear he will not.

## A.   Death Reviews

18.     I reviewed medical records and corresponding mortality reviews, when available, for 72 ADC prisoners who died and for whom defendants produced medical records through January, 2016.  In most cases, the records I received covered roughly the year leading up to the patient's death. From the 72, I identified 57 files that contained sufficient records to evaluate the quality of care, for patients who died of natural causes.  Of these cases, I conclude that 21 prisoners (37%) received grossly deficient care.  Tragically, in 11 cases, it is likely that the patient would have lived had he or she received timely adequate care.  Ten other cases had significant deficits in care, including delays in diagnosis and delays in obtaining definitive care.  Even where the deaths were not preventable, the deficient care resulted in patients enduring unnecessary pain and suffering and resulted in a significant shortening of lifespan.

19.     As detailed below, a substantial proportion of the problematic deaths involved health care delivery system failures, including limited access to care based on an insufficient number of qualified providers and nurses; unreliable chronic care programs; failure to provide timely access to specialty care and, when patients do see a specialist, failure to timely follow-up to implement the specialist's recommendations; and failure to effectively track and monitor lab and diagnostic test results.  While one or two of these types of deaths in a large system could be considered aberrant, the number and quality of the problematic cases in ADC in 2015 reveal a system that is fundamentally dysfunctional and dangerous.  As discussed below, this finding is entirely consistent with the state's own CGAR monitoring scores.

**B.     Essential building blocks to a correctional healthcare delivery system**

20.     As I explained in my initial report, it is well established that functional healthcare delivery systems are comprised of certain building blocks necessary to provide effective care.  Doc. 1104-1 at 223.  Two years ago, I found ample evidence that most of these elements are either missing or profoundly flawed in the Arizona system.  Little has changed in the intervening period, and the system remains grossly deficient.

**1.     Centralized organization/management structure**

21.     A functional system must be well structured, with clear lines of authority, oversight, and accountability.  The healthcare delivery system in Arizona prisons had none of these characteristics two years ago, and it remains chaotic and ineffective.

**(a)     The CGAR system**

22.     The oversight structure ADC currently uses to monitor Corizon and ensure that care is delivered in its prisons is the Compliance Green-Amber-Red (CGAR) reporting process, an offshoot of the MGAR reporting process described in my first report.  In this system, the performance measures listed in Exhibit B to the Stipulation are monitored monthly at each prison complex.  Doc. 1185-1 at 7-15.  As before, the ADC monitor measures compliance with the performance measures, and enters a numeric score

1    and a finding of green, amber, or red to indicate compliance levels.  I was advised the

2    computerized system automatically generates an emailed request for a corrective action

3    plan (CAP) to Corizon to address each individual deficient finding.  However, I was

4    provided only a handful of proposed CAPs for medical care, and the documents provided

5    were insufficient to identify which CAPs had been approved and/or implemented at each

6    prison.

7        23.    In my first report, I explained that this system (then referred to as

8    Monitoring Green-Amber Red or MGAR), was flawed for a number of reasons including

9    that the results were unreliable,  and that there was no meaningful enforcement to ensure

10   deficiencies were actually corrected in a sustainable manner.  Doc. 1104-1 at 227-229.

11       24.    In December, 2015, Defendants provided the plaintiffs with a chart

12   purporting to show their revised method they will use to evaluate each of the performance

13   measures.  I have reviewed it and determined that the chart fails to address fundamental

14   reliability problems with the data that, in some cases, result in inflated compliance scores.

15       25.    For example, Measures # 50 and # 51 evaluate whether patients are seen

16   timely for urgent and routine specialty care appointments.  Doc. 1185-1 at 11.  These

17   measures should examine whether, once a specialty appointment is ordered, it happens

18   within 30 days (urgent) or 60 days (routine).  To measure this, the monitors should select

19   orders written more than 30 or 60 days before the month targeted for review, and

20   determine how many of the appointments have been completed timely.  Instead, the

21   defendants' methodology with the CGARs I reviewed calls for selecting patients who had

22   a specialty consultation in the target month, and working backwards to see whether the

23   consultation happened timely.  Ex. 2 at PLTF-PARSONS-036234-35.  This method is

24   fundamentally flawed because it introduces a significant selection bias by starting with

25   consultations that do occur and methodologically ignores patients for whom consults were

26   ordered but have not occurred.  Based upon my review of records two years ago, and my

27   review for this report, it is clear that many specialty consults that are ordered simply never

28   occur.  Thus, in order to derive an accurate assessment of the overall timeliness of

1   specialty consults, the monitors must begin their inquiry by examining all of the

2   consultation requests.  I consider the CGAR scores for these two Performance Measures

3   to be particularly unreliable.

4          26.    Similarly, the monitors assessing data for Performance Measure # 39

5   (routine referrals to provider by nurse's line seen within 14 days), (Doc. 1185-1 at 10),

6   measure compliance in two different ways, one of which also inflates compliance scores.

7   For the month of December 2015, the Phoenix, Douglas, and Eyman monitors identified

8   the referrals that were made in the month of December, and evaluated whether they had

9   occurred at the time of the audit in late January, and as a result found multiple referrals

10  that had not yet been seen.  Ex. 14 at ADCM322756-57; Ex. 9 at ADCM322461; Ex. 10 at

11  ADCM322510. This approach captures all of the patients who were referred during a set

12  period. In contrast, the Florence and Perryville monitors identified a sample of all

13  completed provider encounters that occurred in the month of December, and looked

14  backwards to see when the nurse's line referral occurred.  Ex. 11 at ADCM322705-06 and

15  Ex. 13 at ADCM322574. As a result of using this retrospective approach, the Florence

16  and Perryville results do not capture any late referrals that simply had not yet occurred at

17  the time of the audit, tainting the results with selection bias.

18                  **(b)  CGARs Reveal Systemic Problems**

19         27.    Although CGARs are flawed measures of compliance, they do contain

20  valuable information about deficiencies, and many of my conclusions are informed by the

21  problems they describe.  As was true when I drafted my first report, I still see no evidence

22  that the monitoring process has contributed to lasting solutions for these problems.  There

23  is still no evidence that the monitors or anyone else takes appropriate action to

24  permanently correct problems, even if they find chronic noncompliance month after

25  month.  There is also no evidence of an effective Continuous Quality Assessment process

26  wherein problems are identified, process changes are implemented, and then the problems

27

28

are studied again using the same methodology to ensure that the changes have rectified the deficiencies.

## 2.   Consistently followed policies and procedures

28.   As indicated in my previous report, policies and procedures are fairly standardized across correctional healthcare systems.  As was true two years ago, the Arizona system violates its own basic healthcare policies – including those governing sick call timelines, chronic care management, healthcare records filing, and specialty consultations – on a consistent basis.  For the sake of space, I will not repeat here the evidence set forth throughout this report, particularly in Sections II.C.1-4, II.D.1 and 3, and II.E.1-3.

## 3.   Adequate staffing

29.   A system cannot deliver adequate medical care without a sufficient number of medical staff.  The number and composition of the health care staff will depend on a number of factors, including the age and acuity of the prisoner population, the nature of the prison (e.g., reception center vs. long-term housing vs. work camp), the availability of telemedicine and a host of other issues. Thus, it is impossible to specify precise minimum staffing ratios in the abstract.  What is clear is that there must be a sufficient number of staff to ensure that patients do not suffer unreasonable delay in receiving necessary medical care.  As was true two years ago when I prepared my first report, there are clearly too few medical staff to ensure that the patients receive timely care.

30.   With approximately 35,550 prisoners in the ten ADC prisons, there are just 14 staff physician positions allocated, and only 12.8 were filled as of December 2015 according to Defendants' staffing data.  Ex. 20 at ADCM274691.  The ratio of patients to physicians is approximately 1:2500, if all positions are filled.  Including the 26 mid-level providers (nurse practitioners), the system has approximately one primary care provider for every 890 patients, if all of the positions are filled.  The ratio is closer to 1 to 1000 when the vacancies are considered.

31.     Although it can be difficult to compare staffing in different correctional systems, for the same reasons that it is impossible to identify precise minimum staffing ratios, comparison to Alabama, another medium-sized state prison system where Corizon also provides care, has significantly more physicians per capita.  According to the 2012 Corizon contract, Alabama has 14.60 physicians.  Ex. 7 at PLTF-PARSONS-036312.  According to their website,[4] Alabama housed approximately 25,000 prisoners in December, 2015, which works out to a staffing ratio of roughly 1 staff physician for every 1,700 prisoners, compared to Arizona's ratio of one staff physician to more than 2,500 prisoners.   Clearly, Corizon does not apply a standard staffing analysis to the delivery of care in prisons which underscores the need to determine appropriate staffing using mathematical principles and recognized healthcare metrics.

32.     Corizon's primary care provider team in Arizona is problematic because there are too few providers overall, and because the ratio of physicians to mid-levels is too weak.  Physicians are obligated to proctor/monitor mid-levels, which means they have less time to provide treatment to patients.  Furthermore, many of the physicians at the various facilities have significant administrative duties, which means that effectively there is very limited physician time to perform actual clinical care.

33.     I observed clear evidence of inadequate staffing during my visit to the Tucson complex.  According to the facility's Continuous Quality Improvement Meeting minutes for 9/3/15, the staff were "working down" the backlog of overdue chronic care appointments to 800.  Ex. 21 at ADMC197765.  By 11/5/15, staff reported that the backlog had been reduced to 200.  *Id*. at ADCM197785.  I questioned staff about how this reduction had been accomplished, and was told the prison had run additional tele-med lines using telemed providers, had hired additional contract providers, and had conducted weekend sick call lines.  Tucson health care staff noted, however, that the additional resources had been available only for the months of September and October 2015.  Staff

---

[4] See http://www.doc.state.al.us/docs/MonthlyRpts/2015-12.pdf at 3.

1   reported to me that, as of 12/2/15, the backlog of overdue chronic care patients had spiked

2   back up to 714.

3        34.   The CGARs document backlogs for access to providers and nursing staff.  In

4   the Corrective Action Plans, health care staff have acknowledged that the failure to meet

5   some Stipulation performance measures is related to staffing vacancies.  *See, e.g.* 7/15

6   CAP, Douglas (Failure of provider to see patients timely after sick call and to review

7   specialty consult reports timely is staffing issue) (Ex. 19 at ADCM199411,

8   ADCM199413); 7/15 CAP, Eyman (Lacking RN onsite 24/7 because of nursing

9   vacancies) (Ex. 19 at ADCM199414); 5/15 CAP, Eyman (Failure to timely and accurately

10  file medical records based on need to hire clerk) (Ex. 19 at ADCM199318); 8/15 CAP,

11  Florence (Failure to renew prescriptions timely based on need to hire nurse) (Ex. 19 at

12  ADCM199496); 8/15 CAP, Lewis (To remedy untimely RN sick call, need to "work on

13  filling vacancies") (Ex. 19 at ADCM199553); 5/15 CAP, Lewis ("Actively recruiting

14  RNs" to address untimely sick call; one nurse covering three posts; and need to "continue

15  to recruit" provider level staff) (Ex. 19 at ADCM196868).

16       35.   As I explained in previous reports, staffing shortages endanger patients.

17  They do this in a variety of ways: they lead to excessive delays in access to care (Section

18  II.C.1 below), healthcare staff acting outside the scope of their licenses (Section II.D.2

19  below), the failure to carry out providers' orders (Section II.E.2, below), and the failure to

20  review and file diagnostic test results (Section II.E.3, below).

21            **4.   Adequate physical facilities**

22       36.   My observation of the physical facilities I toured at ASPC-Tucson in

23  December 2015 was that basic elements are there: equipment, exam rooms, storage

24  facilities, lab draw rooms, and medication storage rooms were generally acceptable.  The

25  patient care areas I saw were generally clean at the time of my visit.  Many patients that I

26  spoke to reported that the staff had undertaken an extensive cleaning campaign during the

27  two weeks before we arrived, suggesting that the acceptable level of hygiene that I

28  observed may not be the usual condition of the facilities.

## C.   Timely access to care

37.    As I explained in earlier reports, access to care, *i.e.,* the task of getting patients to see nurses and providers is a basic building block in the structure of a functional health care system.  Arizona failed at this fundamental task two years ago when I first evaluated the system, and it fails today.  Having interviewed ASPC-Tucson patients and reviewed an extensive number of medical records from Tucson and other facilities, I found a shocking number of delays in access to care and complete denials of care in Arizona's prisons.  These delays and denials harm some patients and place all patients at an unreasonable risk of serious harm.

### 1.   Sick Call/HNR System

38.    Pursuant to Arizona's policies, prisoners in need of medical care must file written HNR forms, which are required to be triaged within four hours of the time they are stamped as received.  Ex. 5 at ADC010827.  As I explained in my first report, ADC's policies and Performance Measure # 37 require that patients who submit sick call slips be seen the same day for urgent needs, and immediately if emergent; otherwise, they are to be seen by nurses for sick call ("nurse line") within 24 hours of the triage (or up to 72 hours if it is a weekend and clinically appropriate).  *Id.*  If higher level attention is warranted, patients must be seen by providers within fourteen days after that ("provider line"), as monitored on the CGARs as Performance Measure # 39.

39.    Two years ago, my review of healthcare records, documents, and depositions and my interviews with patients demonstrated to me that Arizona's sick call process was deficient on a system-wide basis, and that prisoners with serious conditions, including extremely fragile patients with chronic conditions, simply could not get seen by the appropriate medical personnel on a consistent basis.  Regrettably, based on my review of the CGAR results, death records and my site visit to Tucson, I have concluded that the sick call system remains profoundly deficient.

40.     Defendants' CGAR reports document an ongoing and persistent failure to provide timely sick call triage for patients who submit sick call slips.  For the eleven month period of February through December 2015, none of the six largest ADC prisons achieved an average score of 75% or higher, and at Yuma, on average, just four in ten patients were seen timely during that period.  For the month of December, two large prisons, ASPC-Eyman and ASPC-Lewis scored under 50%.   Ex. 1 at PLTF-PARSONS-36223.



41.     The failure to respond timely to patients' health care requests can have devastating consequences.  The case of ████████████████ a Yuma prisoner, is illustrative.  He was a 59-year-old male who had been diagnosed with end-stage liver disease.  The patient clearly had severe end-stage liver disease with significant complications of that disease including massive fluid retention, groin wounds, and sepsis. Despite Mr. ██████'s serious condition, the nursing staff repeatedly failed to respond to his desperate Health Needs Requests.  For example, on 3/6/15, he submitted an HNR that indicated "my legs were bleeding with open weeping wounds sticking to my prescription

1    socks. I am in severe pain. I cannot wear my socks nor get them on. I am in pain." Ex. 46

2    at ADCM039111.  The nursing response to this sick call request indicates that it is a

3    "duplicate from 3/3/15." However, there is no health needs request dated 3/3/15 in his

4    medical record. There is a triage note entered by a licensed practical nurse that urgently

5    referred him to the nurse line at an unspecified time in the future.  Ex. 46 at

6    ADCM039213.

7            42.    Mr. ███████ filed another HNR on 3/17/15 for shortness of breath and

8    painful abdomen. This was scheduled for a nurse line appointment at an unspecified time

9    that apparently did not occur.  Ex. 46 at ADCM039103.  He filed a subsequent HNR on

10   3/21/15 for worsening fluid retention and shortness of breath. Again, the HNR was

11   essentially screened out with the notation "duplicate same as 3/17, you are on nurse line."

12   Mr. ██████'s condition deteriorated and his fluid retention worsened to the point that

13   his skin split open and became infected.  By 3/31/15 Mr. ███████'s situation

14   deteriorated to the point that he was being swarmed by flies, which he reported in a HNR.

15   The next day, 4/1/15, instead of investigating why this might be the case in a patient with

16   split skin that oozes serum, the nurse instead decided that this problem did not need to be

17   seen. Ex. 46 at ADCM039197. The flies were attracted to his massively infected wounds

18   and proved to be a harbinger of his death.  He was ultimately transferred to the hospital

19   more than a week later, on 4/9/15 where he died on ████.

20           43.    The ADC Mortality Review determined there were multiple triage mistakes

21   made by Corizon nurses that impeded and delayed care for Mr. ███████  Ex. 47 at

22   ADCM044568.  I agree with their finding but I add the conclusion that this case falls well

23   below the standard of care, and that the poor care hastened his death.  ADCM044566.

24           44.    I interviewed ████████████ at ASPC-Tucson, a patient with

25   polymyositis (a chronic inflammatory disease causing muscle weakness) and interstitial

26   lung disease.  He likewise has had inexcusable delays in nursing and medical care that,

27   while not fatal yet, have caused him serious harm and certainly place him at risk for

28   deterioration and death. On 4/6/15, he submitted a sick call for shortness of breath, severe

cough, temp elevated at 99.0, but was not seen by nursing.  Six days later, he submitted an emergency HNR for heavy coughing, vomiting, sweating, and breathing.  Still, he was not seen by nursing.  Finally, on 4/20/15, Mr. ███████ presented in person to the medical clinic with a fever, rapid pulse and respirations and a low level of blood oxygen.  At that point, he had developed sepsis, and was immediately transferred to an offsite hospital, where he almost died.  Had his symptoms been addressed two weeks earlier he would almost certainly have avoided hospitalization.  Mr. ███████ is immunocompromised because of the medications he has to take to treat his polymyositis.  Staff should be on extra high alert if he develops any signs or symptoms of infection, and should evaluate him promptly.   Instead, his serious symptoms were virtually ignored for days.

45.     As was true two years ago, ADC prisoners still frequently do not see a provider within fourteen days of sick call with a nurse. This is not surprising – Corizon has not increased its medical provider staff, and there are simply not enough providers to treat the number of prisoners in the ADC facilities and the process for seeing patients has become increasingly inefficient with the introduction of the electronic health record.

46.     The lack of sufficient primary care staff drives delays in access to care, as reflected in the CGAR measures regarding timeliness of primary care routine appointments.  According to defendants' methodology chart, the monitors assess compliance with Measure # 39[5] by reviewing a sample of records for the previous month for patients who a nurse referred to the primary care line.  Ex. 2 at PLTF-PARSONS-036233.  Review of this sample will show whether the referrals made in the previous month were completed within 14 days.  It will not shed light on the length of the delays experienced by those patients who are not seen timely, or indeed whether they are seen at all.  The CGAR results for the months of February through December demonstrate widespread non-compliance with the 14 day benchmark, particularly at the five largest

_____

[5]     Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointment will be seen within 14 calendar days of the referral. Doc. 1185-1 at 10.

1    men's prisons and at Perryville, the women's prison.[6]  At three of the five largest men's

2    prisons, during eleven months from February through December, 2015, the average

3    compliance rate for Measure 39 was below 75%, with Tucson scoring 50%.  Perryville

4    scored at 48%. Ex. 1 at PLTF-PARSONS-36224.



PM # 39 - Seen by Provider Within 14 Days of Referral
(Prisons With 11 Month Average < 75%)

17          47.    The CGAR results indicate that patients often wait six weeks or more to see

18   their Primary Care Provider following a referral.   See e.g. Ex. 13 at ADCM226165-66

19   (11/20/15) (some patients at Perryville wait six weeks to see provider); Ex 16 at

20   ADCM226312-13 (11/26/15) (at Tucson's Winchester, six of ten patients referred to the

21   provider in October had not been seen at the time of the 11/26 audit; at Catalina, five of

22   ten referred in October  had not seen the provider at the time of the audit, and an

23   additional patient had been seen, but not in relation to the referral; at Santa Rita, five of

24   ten patients referred in October were not seen timely, and three had not been seen at all);

25   Ex. 11 at ADCM226035-36 (11/30/15) (at Florence, three of four East Unit patients

26   referred in October not seen as of time of audit; at Kasson, six of eight patients not seen

27

28              [6]   ASPC-Eyman, ASPC-Florence, ASPC-Lewis, ASPC-Tucson and ASPC-Yuma.

timely, and three had not been seen at all); Ex. 10 at ADCM22585-586 (11/30/15) (at Eyman, six of six Browning patients, three of six Meadows patients, and three of five Cook patients referred in October had not been seen at time of audit); Ex. 16 at ADCM322847 (1/30/16) (Tucson complex-wide compliance rate of 60%; eleven patients simply not seen by the time of the audit, and in one case, a three month delay for a patient to see a provider); Ex. 18 at ADCM322923 (1/29/16) (Yuma complex-wide compliance rate of 68%); Ex. 10 at ADCM322510 (1/31/16) (at Eyman, six of 10 Browning patients and one Cook patient referred in early December had not been seen at time of audit); Ex. 9 at ADCM322461 (1/29/16) (Douglas patient referred to provider on 12/3/15 still not seen as of time of audit);  Ex. 11 at ADCM322574-75 (1/28/16) (Florence complex-wide compliance rate of 74%; at North Unit, three of six patients referred in December not seen at time of audit; and three of five South Unit patients referred in December not seen at time of audit); Ex. 16 at ADCM322756-57 (1/29/16) (Phoenix complex-wide compliance rate of 72%; multiple prisoners referred in early to mid-December still not seen at time of audit).

48.     The CGAR results also document that some patients are scheduled and rescheduled for appointments that do not happen. See e.g. ADCM226312 (11/26/15) (Some sampled patients in each of Tucson's eight housing units were scheduled for appointments that did not happen.)

**2.   Chronic care**

49.     Chronic care clinics are a major focus of healthcare in a well-functioning correctional setting.  Regularly scheduled appointments allow providers to track the progress of patients with chronic illnesses and ensure appropriate levels of treatment.

50.     Monitors assess compliance with Measure 54[7] by generating a scheduled appointments list from their database, and selecting the first ten patients to review whether

---

[7] Chronic disease inmates will be seen by the provider as specified in the inmate's treatment plan, no less than every 180 days unless the provider documents a reason why a longer time frame can be in place.  Doc. 1185-1 at 11.

their chronic care appointments occurred within the timeframe specified by the provider. Ex. 2 at PLTF-PARSONS-036235.  As with the primary care appointments, the CGAR results reflect overwhelming failure at the five largest men's prisons and the primary women's prison to reliably schedule timely chronic care appointments.  From February through December 2015, the average compliance rate at each of those prisons was under 75%, with Tucson and Florence at barely over 50% compliance.   Ex. 1 at PLTF-PARSONS-026225.



51.   The CGAR scores do not reveal the magnitude of the delays for those patients whose chronic care appointments are not scheduled timely.  In some cases, however, the data underlying these poor scores reveals a shocking pattern of failure, where some chronic care appointments lapse for over a year. *See e.g.*, Ex. 16 at ADCM226324-325 (11/27/15) (at Tucson, on Santa Rita, one patient had two year lapse between chronic care appointments, and at least two lapsed for over a year; on Cimarron, a patient with diabetes lapsed for over a year; on Manzanita, patient with active cancer, ordered to be seen monthly, was not seen for four months); Ex. 16 at  ADCM322858-59 (1/27/16) (Tucson complex-wide compliance rate of 52%; seven out of ten files

noncompliant at both Cimarron and Santa Rita Units where multiple patients experienced gaps of 7 to 11 months between chronic care appointments; three patients with "active cancer" at Manzanita and Rincon Units who needed to see provider monthly had gaps of 2 to 6 months between chronic care appointments); Ex. 13 at ADCM322712-13 (1/29/16) (Perryville complex-wide compliance rate of 64%; at Lumley Unit, a woman with "active cancer…with plans for radiation therapy" for thyroid cancer not seen for eight months for chronic care appointment, and another Lumley patient with rheumatoid arthritis not seen for a chronic care appointment for 19 months after her diagnosis; patient at Santa Rosa Unit with blood disorders and anemia not seen for a chronic care appointment for 14 months); Ex. 9 at ADCM322466 (1/29/16) (Douglas complex-wide compliance rate of 45%); Ex. 10 at ADCM322518 (1/25/16) (at Eyman's SMU-I unit, five of ten files reviewed showed delayed chronic care appointments including prisoner seen four months late; Rynning prisoner with seizure disorder seen four months late; Browning patient with hypertension with nine month gap between chronic care appointments); Ex. 11 at ADCM322584 (1/27/16) (Four of ten files reviewed at Florence's North Unit showed delayed chronic care appointments, including 8 month gap in chronic care appointments for patient with thyroid disorder and hypertension; at Central, patients with 9 and 14 months gap between chronic care appointments; at Central Unit, patient with seizure disorder, Hepatitis C, and asthma with no chronic care appointment between early March 2015 and mid-December); Ex. 18 at ADCM322930 (1/29/16) (At Yuma's La Paz Unit, two different patients with seizure conditions seen late, and no documentation in health records to justify not complying with CGAR's 180 day requirement);  Ex. 17 at ADCM322885 (1/20/16) (patients at Winslow seen six weeks and three months later than indicated).

### 3.  Emergency care

52.    The problems identified regarding sick call access and inadequate staffing are also barriers to timely emergency care in the ADC.  The lack of sufficient staff

1  competent to respond to emergencies places the class members at an unreasonable risk of

2  harm and, in some cases, death.

3        53.     In a system where there are simply not enough providers and medical staff

4  to handle the patient load, critical errors are likely to occur.  At Perryville, for example, I

5  found two tragic cases where staff simply failed to recognize that their patients were

6  suffering life-threatening conditions requiring emergency care.  ██████████████████

7  who had a history of deep vein thrombosis (blood clots), pulmonary embolus (blockages

8  in her lungs), abscesses and osteomyelitis (bone infection).  On 9/6/15, she complained of

9  radiating pain down her leg, abdominal pain and the inability to urinate.  Although she

10  was able to void after receiving IV fluids that day, she was unable to urinate the following

11  day. The standard of care in this situation requires an immediate and full assessment to

12  determine whether the patient is in renal failure or has a different condition interfering

13  with urination.  Instead, on 9/8/15, Ms. ████████ was given Flomax, a drug that was

14  inappropriate, and Toradol, a drug that was actually contraindicated and potentially

15  dangerous.

16        54.     The next day, she complained of chest pain and the inability to move her

17  legs.  Instead of sending her offsite for emergency care, which was clearly warranted, Ms.

18  ████████ was taken to the prison's central medical clinic, where her temperature was

19  recorded as 91.9 degrees Fahrenheit, which is a critical vital sign abnormality suggestive

20  of sepsis and requiring emergency assessment.  She was eventually taken to the hospital,

21  where she died the following day of a staph infection, spinal meningitis and pneumonia.

22  Ex. 68 at ADCM228194. Had she been sent to the hospital emergently on 9/6/15, her

23  infections would have been treated sooner and she very likely would have survived.  The

24  Mortality Review Committee's report indicates that her presentation was confusing and

25  concludes that her care met community care standards. Ex. 68 at  ADCM228195-96.  For

26  the reasons explained above, I strongly disagree.

27        55.     Another woman, ████████████████ clearly should have been sent

28  offsite for emergency care when she fell from her bed early in the morning on ██████ and

1  staff found her with bloody fecal matter on her legs and body, a racing pulse and

2  alarmingly low blood pressure.  The on-call nurse practitioner ordered Ms. ███ be

3  taken to Perryville's central medical complex, where she was provided an IV, but her

4  blood pressure continued to drop.  Her blood pressure fell dramatically at the complex,

5  and she clearly required emergency care.  Instead, despite her life-threatening blood

6  pressure readings, Ms. ███ was returned to her housing unit by nursing staff after

7  receiving her IV fluids.  Ex. 26 at ADCM228173.  Shockingly, the practitioner did not

8  document an abdominal exam or any explanation for the fecal matter on her body.  In the

9  late afternoon that same day, custody staff called another ICS (ADC code for emergency

10 incident) when they noticed Ms. ███ had vomited blood.  *Id.*  Although her blood

11 pressure again was dangerously low, the staff did not call for an emergency transport for

12 almost 40 minutes.  She died shortly thereafter.  The ADC Mortality Review Committee

13 classified this death as preventable, and I agree.  Ex. 26 at ADCM228171.  The

14 emergency response and decision making were beneath the standard of care and the delay

15 in definitive care proved fatal.

16        56.    ███, a patient at ASPC-Lewis with a history of Type 2

17 diabetes, should have been sent to a hospital on ███ when he reported left sided chest

18 pain with radiation into his neck, left arm and left shoulder blade.  He also was sweating

19 heavily and short of breath.  He also had very low blood pressure and a racing pulse.  Ex.

20 57 at ADCM196768.  Seen together, these are signs of serious cardiac pain.  Rather than

21 send him to a hospital emergency room for lab tests, the nurse treating him had labs drawn

22 at the prison and waited hours for the results, a treatment decision clearly beyond the

23 nurse's scope of practice.  When they were reported as abnormal, Mr. ███ was taken to

24 the hospital in the mid-afternoon, where he died the following day.  Although his record is

25 limited, it is very likely that the delay in providing him with definitive care and nursing

26 staff's decision to delay his emergency transport hastened his death.

27        57.    The MRC report recognized the delay, and recommended an in-service

28 training on assessment, evaluation and treatment of chest pain.  Ex. 57 at ADCM196770.

-24-

1   While I agree that training in this case is certainly warranted, the care in this case is so

2   grossly substandard that it warrants an investigation to determine whether employee

3   discipline is appropriate.

4          58.      ██████████████   illustrates the tragic consequences of poor access

5   to the appropriate level of health care and the disorganization of the electronic medical

6   record system. Mr. ██████ died on ██████ of a gallbladder infection that would have been

7   easily treated had he received timely care.  Instead, the last three months of his life were

8   marred by a series of lapses and missteps, including three mishandled emergencies, that

9   resulted in the denial of medically necessary care.

10         59.      Mr. ██████ who suffered from very poorly controlled diabetes (Ex. 31 at

11   ADCM172397), developed alarming symptoms that should have prompted a thorough

12   work up.  He submitted an HNR on 4/6/15 complaining of blood in his urine.  *Id.* at

13   ADCM173275.  Lab tests dated 4/9/15 revealed multiple critically abnormal values

14   demonstrating significant  liver dysfunction, but the record contains no indication that

15   these results were ever communicated to Mr. ██████'s physician at the time they were

16   received.  The patient's labs were reviewed on 4/16/15 and the critically abnormal tests

17   were acknowledged.  *Id.* at ADCM172737.  The patient was seen by a gastroenterologist

18   on  4/30/15 but the consultant's report was not reviewed by his physician until three

19   weeks later (ADCM172430), resulting in delayed implementation of critical care

20   recommendations.[8]

21         60.      Mr. ██████ was becoming increasingly ill, resulting in custody calling three

22   ICS's in a period of ten days.  The first ICS, on 5/27/15, was based on his shortness of

23   breath.  The healthcare provider who examined him noted he was short of breath, his

24   abdomen was distended with ascites and he had 3+ edema in his legs (*Id.* at

25   ADCM172790).  The provider failed to recognize the severity of this patient's new

26

27   ────────────────────

28         [8] Performance Measure # 52 requires a medical provider to review and act upon a specialty report within seven calendar days of receiving the report.  Doc. 1185-1 at 11.

1    symptoms and merely ordered him a diuretic and a 1-month followup.  *Id.* at

2    ADCM172793.

3         61.    The second ICS was called on 6/4/15, at which point an RN documented

4    that he had full body pain, swelling and hyperactive bowel sounds.  Although the nurse

5    writes that the physician examined the patient, there are no exam notes by a physician in

6    the record.  The patient was prescribed Tylenol, which was contraindicated in light of his

7    liver failure, and was likely ineffective for his pain. *Id.* at ADCM173216.

8         62.    The following day, Mr. ████ was assessed by an LPN, who performed a

9    complete examination of the patient, despite the fact that this level of care is well out of

10   her scope of licensure.  Although she referred the patient's chart for provider review, there

11   is no evidence that the review occurred.  *Id.* at ADCM173212.

12        63.    Finally, on 6/6/15, a third ICS was called.  The RN noted that Mr. ████

13   had a critical lab value.  At this point, the Nurse Practitioner ordered him transferred to the

14   outside hospital.  It is unclear what critical lab value prompted this transfer because there

15   are no orders for labs in this date range (*id.* at ADCM172725), there are no lab reports

16   from this date range in the medical record, the LPN note does not indicate what lab value

17   was critical (*id.* at ADCM173204), and the practitioner who received the critical lab value

18   (NP Mulhern) did not put a note in the chart indicating what critical information was

19   conveyed to her.

20        64.    Overall Mr. ████ s care was disorganized, delayed, haphazard, and

21   inadequate and the sum total of his treatment does not meet the standard of care.  His

22   medical record is extremely confusing and I agree with the Mortality Review Committee

23   that his course of care was difficult to follow because of what was documented, what

24   occurred and was not documented, and what was documented in the wrong sections.  The

25   provider failed to work up the sudden and significant changes in his health status and the

26   provider's oversight of the healthcare team was delayed and inappropriate.  This patient

27   had critical labs that were never addressed, major changes in his bloodwork, multiple ICS

28   responses with ominous physical exam findings that were completely ignored, and

1    consults that gave appropriate guidance that were not reviewed or implemented in a

2    timely fashion to facilitate his workup.  While it is clear that he had a number of tests and

3    consults completed during this three month span, the care was so fragmented and scattered

4    that nobody really put together the overall picture of his healthcare issues.  By the time he

5    was finally transferred to the hospital, he was so physically sick and compromised that his

6    treatment at the hospital was ineffective and limited and he ultimately had fatal medical

7    complications as a result.  The ADC Mortality Review Committee concluded that it could

8    not determine whether this death was preventable.  Ex. 30 at ADCM173601.  Had Mr.

9    ███████ been properly worked up in April 2015, I believe he might have survived.

10        65.    I encountered ████████████████ in the inpatient unit at ASPC-

11   Tucson.  He is an insulin-dependent diabetic who has had a kidney transplant. He has also

12   had a right leg amputation, finger amputation and he was in the IPC with a diagnosis of

13   Fournier's Gangrene.  This diagnosis was given to him by the Corizon physician.  There is

14   a note on 12/1/2015 from Dr. Burciaga indicating that he had Fournier's Gangrene and he

15   was to be a direct admit to Mt. Vista Hospital with Dr. D'Silva accepting on 12/1/2015.

16   However, when we toured on 12/2/2015 he was still in his prison bed.  This is a problem

17   because Fournier's Gangrene is a surgical emergency that carries a very high morbidity

18   rate.  Usually surgery is required to save the patient's life within hours after diagnosis and

19   hyperbaric oxygen treatment is frequently necessary as well.  So it is appropriate that Dr.

20   Burciaga sent him to be a direct admit to the hospital; it is completely inappropriate for

21   this emergency case to have waited.  In my brief time at Tucson, I was not able to identify

22   the reason for this inexcusable delay.  I suspect that it is related to staffing – had Tucson

23   allocated sufficient health care staff to the inpatient unit in which Mr. ███████ is housed,

24   someone would have been tasked with ensuring his prompt transfer. The failure to timely

25   transfer him greatly increased his chances of requiring yet another amputation or of dying.

26   This is abysmal care.

27        66.    ████████████████ is another Tucson prisoner I spoke to who failed

28   to receive competent emergency care.  He slipped in the shower on 9/6/2015, and an x-ray

1   ordered confirmed a "comminuted depressed tibial plateau fracture and proximal fibula

2   fracture."  Inexplicably, he was not referred to Mountain Vista Hospital until four days

3   later on 9/10/15, but the hospital did not admit him because, due to the delay in referral,

4   his fracture had resulted in massive swelling around the knee to the point that surgery was

5   not possible.  Moreover, the on-site x-ray was not reviewed by a provider until 9/14/2015

6   which is well beyond the injury time. Even after his swelling resolved, his care was

7   delayed.  By the time he finally had surgery on 10/16/15, his leg had healed improperly

8   and had to be re-broken.  When I saw him at Tucson, he was on bedrest, but had not been

9   prescribed medically necessary anticoagulation therapy, placing him at risk of a post-

10  surgical deep venous thrombosis and possible death from pulmonary embolism.

11            **4.    Inpatient care**

12            67.    Many of the patients housed in the ADC infirmaries are seriously, and often

13  acutely, ill and require regular visits from their Medical Providers.  However, Medical

14  Provider staffing for the infirmaries is inadequate and they do not see the patients

15  frequently enough.  ADC agreed to ensure that infirmary patients are seen by a Medical

16  Provider at least every 72 hours.  Performance Measure # 66, Doc. 1185-1 at 12.   The

17  average audit results for two of the three men's prisons with infirmary units over eleven

18  months in 2015 show shockingly poor compliance for this critical measure – 32% for

19  Tucson and 19% for Florence.  Ex. 1 at PLTF-PARSONS-037225-26.

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///





68.     When fragile infirmary level patients are not seen sufficiently often, many will suffer harm, and some may die.  The case of ███████████████ for example, is one of shocking neglect.  Mr. ██████ arrived at prison on 9/14/15 with a daily heroin habit and was housed in the ASPC-Tucson infirmary to go through opiate withdrawal. Although he was seen by several nurses over the next few days, who documented that he was experiencing serious withdrawal and was at risk of dehydration due to excessive vomiting, he was apparently never referred to a medical provider, as he should have been. He was ordered medications that were far too weak for his advanced withdrawal, and the medications that were ordered were provided only intermittently.  He should have been, but was not, prescribed IV medications in light of his severe vomiting.  Staff failed to monitor his condition, failed to order appropriate labs, and failed to refer him to a higher level of care.  Consequently, Mr. ██████ died unnecessarily ██ days after his arrival at prison, at age 44.  The Mortality Review Committee correctly classified this as a preventable death.  Ex. 58 at ADCM225738-40.

69.     Some patients experience unnecessary pain and injury because they are not seen frequently enough.  ASPC-Florence prisoner ███████████████ died on ███████ of metastatic colon cancer, after experiencing inexcusable delays in diagnosis.  When he was admitted to the hospital shortly before his death, the hospital staff reported that he had a complex decubitus ulcer on his tailbone.  Ex. 51 at ADCM018596.  A complex ulcer takes time to develop, thus Mr. ███████ clearly had been suffering with this painful wound for a considerable time.  Shockingly, the ADC nursing documentation during the period leading up to his hospitalization contains not a single mention of the ulcer.

70.     Infrequent provider visits result in lapses in care.  Mr. ████████████, discussed above, received grossly inadequate care while housed in the Tucson infirmary unit while awaiting his overdue emergency transfer to the hospital.  At the time that I saw him, he was receiving vancomycin IV to treat his gangrene pending his hospital transfer.  I verified the medication by looking at the label on the IV bag.  When I reviewed his electronic medical chart immediately after seeing him, there was no order for vancomycin.  No patient, in an inpatient or outpatient setting, should be receiving medications absent a prescription, and why he received this medication without a physician's order is a mystery.  Equally important, this medication by itself is grossly inadequate for the treatment of this condition.  He should have been on two additional classes of antibiotics in addition to the vancomycin at a minimum.

### 5.     End-of-life care and waivers of treatment

71.     End of life planning and compassionate palliative care are important components of the practice of medicine, but they must be done with extreme caution in a correctional setting, with assiduous attention to detail, multiple independent reviewers, meticulous observation of informed consent requirements, and continual review of the appropriateness of the end of life plans given the condition of the patient.  This requires spending significant amount of time face-to-face with the prisoner reviewing his care with him, and providing appropriate end of life counseling and guidance.  The cases that I reviewed involving DNRs lacked any documentation showing these basic principles were

1   observed.  This is not surprising, given the very low staffing levels in the ADC.

2   Complying with these essential patient care standards is time-consuming, and with the

3   limited number of providers on staff it is predictable that these duties would be neglected.

4       72.    The case of ██████████████████ a ASPC-Lewis prisoner, is

5   illustrative. Mr. ███████ was a 60 year old with a history of hepatitis C who developed

6   pancreatic cancer.  His medical care proceeded in a manner to be expected with this

7   diagnosis.  His "do not resuscitate" order first appears in the record on 6/10/2015 and it is

8   merely listed in the assessment notes by Dr. Malachinski.  Ex 56 at ADCM087345.  While

9   I do not have an issue with the implementation of a "do not resuscitate" order in a patient

10  with his diagnosis, I do have an issue with how it was carried out. The listing of this order

11  as a one line entry in an assessment is simply inadequate. There is no evidence of any

12  discussion with the patient or any evidence of an informed choice made by the patient.

13  There is no evidence of a second opinion by a clinician not involved in this patient's care

14  to validate his choice for a do not resuscitate order.  This patient's death was inevitable

15  given his diagnosis but this does not excuse the method by which the DNR was

16  implemented and the lack of documentation.

17      73.    Furthermore, in my review of the death charts, there clearly were patients

18  who had significant compromise and predictable decline from terminal illnesses.  I was

19  surprised that in most medical records there was no mention of end of life planning and

20  recording of medical directives made while the patient is mentally competent to make

21  such decisions.

22      **D.    Exercise of professional medical judgment**

23          **1.    Medical records and access to medical histories**

24      74.    In my initial investigation, I concluded that the medical records were "a

25  gigantic mess."  Doc. 1104-1 at 260.  Since then, Corizon has implemented an electronic

26  medical record called eOMIS.  When I asked Tucson's medical director, Dr. Lucy

27

28

-31-

1    Burciaga, to describe the system, she called it "horrific."  Unfortunately, she is correct.

2    The system is an unqualified disaster.

3    75.    A reasonable electronic health record unifies medical information in an

4    organized and inter-connected manner which speeds up care and makes documentation

5    easier.  This system really does the opposite.  For example, when lab reports come back,

6    the providers get a notice in their Outlook email that is not connected to the electronic

7    health record.  They have to log into each system and manually navigate between them in

8    order just to evaluate one lab result.  This is true with medication renewals as well.  A

9    proper system should be interfaced so that internal messages are contained within the

10   system and linked to a process for easy review.  Furthermore, the medical director

11   confirmed that there is no ability to communicate within the system about clinical care.

12   They have to utilize Outlook email for this communication which actually produces a

13   separate electronic medical record that is not accessible to anyone except the

14   sender/receiver of the email.  This is highly problematic.

15   76.    This medical record system uses templates to create encounter notes.  Most

16   of the templates are auto-generated and populated with questionably meaningless data that

17   takes up a significant amount of space.  It is difficult to read these notes as they contain

18   bits and pieces of information scattered throughout instead of in one cohesive and

19   consistent location.  Another major issue is the presence of ghost encounters in the system

20   that are generated by the system for some reason but the patient was not actually seen.

21   This just confuses the documentation process and makes reading the charts very

22   burdensome.

23                    **2.    Use of nurses as primary care providers**

24   77.    Patients are denied a clinician's professional medical judgment if nurses or

25   other staff are called upon to make decisions they are not qualified to make or exceed

26   professional licensing requirements.  I reported that this was a significant problem in my

27   first report, and it continues to occur, placing patients at serious risk of harm or death.

28

78.   ███████████████   discussed in paragraph 68 above, was in crisis during his brief stay in the infirmary, leading up to his death.  He should have been under the care of a provider who was seeing him regularly while he withdrew from his daily heroin habit.  Instead, he was repeatedly seen by LPNs and RNs who assessed his condition, but failed to address it or to refer him to a provider who was qualified to treat his life-threatening condition.

79.   ███████████████   died on ██████ at age 55 at ASPC-Tucson, after his cancer of the head and neck recurred.  When he reported his symptoms returning, he was seen for sick call by an LPN on 12/29/2014, rather than an RN, who noted his history of optic nerve cancer, but failed to refer him to a provider.  Ex. 71 at ADCM118615-20.  Mr. ██████ was finally seen by a provider, and, on 5/11/15 by an oncologist who diagnosed him with recurrence of his cancer via PET scan.  He was ordered to have chemotherapy ASAP.  ADCM120514.   Although he was finally provided treatment after seeing the oncologist, his recurrent cancer was in an advanced state, and he declined rapidly.  While he may have died in any case, the delay in seeing a provider, and subsequently an oncologist, certainly shortened his life. The mortality report indicates that this care met community standards and I disagree.  Ex. 83 at ADCM196779-82. The delays in care certainly do not meet community standards, nor does assessment of possible recurrent cancer by a Licensed Practical Nurse.

### 3.   Specialty care

80.   The exercise of professional judgment sometimes requires more in-depth knowledge than primary care providers possess.  In these cases, the provider must be able to refer patients for specialty consultations.  This essential step often was not happening two years ago, when I first reviewed care, and there continue to be major barriers for specialty access.  In addition, the specialists who see the prisoners are authorized to recommend treatment, but not to order it.  Thus, it is critical that the prison health care system ensures that prison health care providers promptly review the consultant's

1   treatment recommendations and either order the treatment or document why it is not

2   appropriate.  This essential coordination is often missing in ADC patient care.

3        81.    The failure to ensure that patients see specialty consultants for medically

4   necessary diagnosis and treatment places patients at an unreasonable risk of harm.

5   Indeed, in some cases, patients will die because they did not have access to medically

6   necessary specialty care.  Sixty-five year old ███████████████ for example, was

7   referred multiple times to a cardiologist while at ASPC-Eyman, but the appointments did

8   not occur timely because of multiple operational glitches in the referral process and lack

9   of communication between the referring clinicians and the approval authority. Ex. 45 at

10  ADCM135400.  He was ultimately referred for an implantable defibrillator, but he died on

11  ██████ before that visit was arranged.  Had his diagnostic consults been approved by

12  Utilization Management and scheduled in a timely manner, he would likely still be alive.

13  The ADC Mortality Review reached the same conclusion.  *Id*.

14       82.    I spoke to a number of Tucson prisoners regarding longstanding barriers to

15  specialty care, and brought their urgent situations to the attention of ADC officials, and

16  their attorneys.  Thirty-two year old ██████████████, was a patient in the Tucson

17  infirmary when I spoke to him.  He had been placed there after he developed a decubitus

18  ulcer on his buttocks as a result of long-standing diarrhea caused by an infection in his GI

19  tract.  Although the infection had been identified more than a year earlier, I found no

20  evidence that he had ever been treated for it.  Moreover, he had been referred to general

21  surgery to repair the wound on 6/25/15, but has been told that Corizon has not been able

22  to find a surgeon with whom to schedule surgery.  In the meantime this otherwise

23  relatively healthy young man has been bedridden for months.

24       83.    ██████████████ 78 years old, has a transplanted kidney and has been

25  on his immunosuppression medications for many years.  He developed an allergy to one

26  of his medications that is causing him to have a terrible whole-body rash.  His medical

27  record shows he has submitted many HNR's about his issues and Corizon has not sent

28  him to a transplant physician for evaluation.  As a result, he stopped taking his Prograf

and Cellsept on 10/29/2015 because the rash had become so intolerable.  Instead of
sending him to a transplant physician as medically indicated, Corizon referred him for a
psychiatric consult to see if he is competent.  In conversing with this gentleman it was
obvious that he is intellectually keen and well informed about his situation.  Competency
is not the issue in this case and a referral to psychiatry to assess competency for refusing
to take medication is a shameless cover-your-behind maneuver by the prescriber that
clearly demonstrates that the provider did not speak to Mr. ███████ in any detail, and does
not know how to deal with a patient of his complexity.  Mr. ██████'s providers have
failed to understand that he urgently needs to go see a transplant physician to manage his
medications and to assess the kidney.  Without this care, he will undoubtedly reject his
kidney, which will ultimately hasten his death.

84.    ████████████ is a 47 year old ASPC-Tucson patient with sick sinus
syndrome and Wolf-Parkinson-White Syndrome, a condition that causes rapid heartbeat.
He has had a pacemaker placed and has had two cardiac ablations.  He has had such bad
complications from his disease that he filed for a restraining order against Corizon and
forced them to house him in IPC because his heart rate fluctuates, and he loses
consciousness.  He indicates that his cardiology consult to address this was submitted by
his provider in August 2015 and he has yet to be seen.  Review of his chart demonstrates
that despite his multiple issues, his chronic care appointments were just not done and he
has not been seen in a timely fashion.

85.    ████████████, is a 25 year old who developed a slipped disc in his
back.  While at ASPC-Lewis, he submitted HNRs about this but his care was delayed.
Ultimately, he became paralyzed and incontinent before he was finally sent to the hospital
for treatment.  This constitutes abysmal care.  He has a lot of residual nerve damage and
can only walk short distances because of weakness and balance issues.  When I reviewed
his medical record, it stated that he was transferred to Tucson from Lewis in order to
receive physical therapy.  None had occurred as of my December visit, and he is
understandably upset that he has not made progress towards independence.

86. Another Tucson prisoner, ███████████████ underwent an above knee amputation April 2015. No prosthesis had been provided to him, so when I met him he was stuck in a wheelchair despite the fact that he is otherwise physically vigorous and could be up walking which would be much healthier for him and enable him to keep his muscle mass in his legs. He was sent back to the prison following his amputation and was not seen by his provider for five months. Then, on 10/19/15 a consult for a prosthesis was submitted, but that appointment has not yet occurred. When we interviewed the "consult specialist" for Corizon, she verified the consult was approved, but had no explanation for the delay in scheduling the appointment.

87. Finally, Mr. ████ the young man with testicular cancer who I described at the beginning of this report, has experienced unconscionable delays in receiving treatment even after I first brought him to the attention of ADC during the tour in early December 2015. Plaintiffs' counsel randomly met him while walking through a housing unit at Tucson, speaking cellfront with prisoners, and while I was at Tucson I reviewed his medical records and spoke with him. I also raised his case in a meeting with ADC staff and their attorneys on the last day of the tour. Since visiting Tucson, I received updated medical records for him, up until 2/10/16. These records clearly demonstrate the colossal systemic issues that exist within the ADC healthcare system.

88. Mr. ████ was originally diagnosed with testicular cancer by ultrasound on 8/6/15. Ex. 67 at ADCM340110. An urgent request for a CT scan was submitted to Corizon Utilization Management by Dr. Goodman at the time, but that was not completed until 9/23/15. Ex. 67 at ADCM340368. Mr. ████ was subsequently scheduled for an orchiectomy on 10/30/15. In the discharge plans for that surgery, the surgeon (Dr. Daley) requested a two week follow-up after the surgery, along with a CT scan so the pathology could be reviewed and the tumor could be staged appropriately to determine additional care. The specialist's request for a follow-up consult and CT scan was submitted by Dr. Goodman, and she indicated the ordered timelines. Unfortunately, Corizon did not

1  complete the CT scan until 11/24/15, and the post-op follow-up with Dr. Daley was not

2  until 12/2/15, more than a month after the surgery.  *Id.* at ADCM340344.

3       89.  Critically, only one out of three pages of the specialty consult report from

4  Dr. Daley inexplicably is included in the medical file.  *Id.* at ADCM340349.  The pages

5  that are notably missing are those that detail the diagnosis and the plan.  Furthermore, I

6  can find no evidence in the medical record that a provider at the prison reviewed the

7  incomplete specialist report from Dr. Daley, to realize that the most critical components of

8  the note were missing.  As such, Mr. ███ has had no care for biopsy-proven, CT-proven,

9  surgical pathology-proven cancer.

10       90.  Since the appropriate documentation does not exist in the chart and we have

11  no idea what the plan was for Mr. ███'s care, we have to rely on the data that does exist.

12  I know that he had a pure seminoma and that he has CT-proven evidence of mediastinal

13  (chest) adenopathy that measures 2.1 cm x 2.0 cm.  *Id.* at ADCM339817.  Applying a

14  standard grading scale to this scenario, this patient has a Grade IIB tumor.  *See* Oh, W.K.,

15  Overview of the treatment of testicular germ cell tumors; Uptodate, Kantoff, PW (ed),

16  Waltham MA (accessed March 28, 2016), available at

17  http://www.uptodate.com/contents/overview-of-the-treatment-of-testicular-germ-cell-

18  tumors.  The current treatment recommendations for a Grade IIB seminoma are surgery to

19  remove tumor (already done) and chemotherapy (not done).  *Id*.  Seminomas are a highly

20  treatable and generally curable form of testicular cancer, but the appropriate treatment has

21  to be done and it has to be done in a timely fashion.  Unfortunately, nothing about Mr.

22  ███'s care has been timely, only part of the recommendation treatment has been

23  accomplished, and there is no evidence that he is on anybody's radar within ADOC

24  because the last date he had a provider encounter was 10/30/2015—the date of his

25  surgery.  Ex. 67 at ADCM339815.  He has never been seen by a provider since returning

26  to the facility.

27       91.  We encountered Mr. ███ on my tour of the Tucson facility.  I was so

28  concerned at the time after I reviewed his file on-site about his lack of care that I made a

1    request to conduct an exit conference meeting on 12/4/15 to call his situation (and the

2    critical situations of several other patients) to the attention of Corizon administrators and

3    health care staff.  I was clear with the ADC attorneys about the purpose of the meeting

4    and the seriousness of the issues.  Unfortunately, despite my clarity about the purpose of

5    the exit conference, not a single staff person from Corizon showed up to hear my concerns

6    about Mr. ███ and other prisoners, and my concerns were directed to ADC monitoring

7    staff and attorneys for Defendants.  As such, my admonitions for Mr. ███ to have

8    emergency oncology consultation and treatment went unheeded, and he never received

9    appropriate care.  I am professionally disturbed by this case because he is a young man

10   who has a very treatable and curable condition that is being totally mismanaged, and

11   Corizon and the ADOC know of his situation.  If anybody with clinical training had

12   looked at his chart and tracked his care, the deficits in care would have been obvious.

13   Unfortunately, Corizon's healthcare delivery is so broken that this patient's life is on the

14   line from systemic incompetence despite my detailed description of his problems and his

15   needed care.

16          92.    Mr. ███ also attempted to call his situation to the attention of Corizon

17   officials.  He submitted an HNR on 12/29/15 stating "I was supposed to see the oncologist

18   over a month ago for treatment.  I need to know what's going on."  *Id.* at ADCM340317.

19   This HNR was responded to on 12/29/15 by RN Rynders with "You are scheduled for f/u

20   with the provider."  This HNR never made it into the master list of Health Services

21   Requests, (*Id.* at ADCM339817), and as of February 10, 2016 he still had not seen a

22   provider.

23          93.    Mr. ███ submitted another HNR on 1/16/16 that stated "I need to speak to

24   Doctor Goodman ASAP.  I was supposed to be scheduled to seen an oncologist over two

25   months ago to start my chemotherapy treatment but I haven't heard a thing back so I need

26   to know what is going on very soon!!!"  *Id.* at ADCM340315.  This HNR was responded

27   to on 1/18/16 by RN Rynders stating that "You are scheduled to see the Provider."  This

28   HNR is not recorded in the master list of "Health Services Requests" and it appears that it

never got implemented, because there is no evidence he ever saw a provider despite the serious nature of the HNR request.  *Id.* at  ADCM339817.

94.    If we triangulate the standard treatment recommendations for his condition with the information that he conveyed in his two separate HNR's about the treatment plan he was expecting, it is completely reasonable to assume that the missing pages of Dr. Daley's consult note contain recommendations for an oncology visit and chemotherapy that have not been carried out.  Mr. █████ has notified Corizon with clear language about his dilemma on two separate occasions and despite the dire nature of the notifications, Corizon has never scheduled him for any provider follow-up.

95.    Mr. █████'s case is sadly illustrative of the systemic issues that plague the ADC health care system:

- The specialty consult system is broken.

- Continuity of care does not occur as patients return from outside care.

- The internal provider scheduling process is inadequate.

- The HNR process is broken and does not result in appropriate care.

96.    The sum total of all of this is a system that denies prisoners access to care at all levels and needlessly puts them at elevated risk for serious healthcare complications and death.  Mr. █████ needs a STAT oncology consultation and all of the treatment ordered by the oncologist.  He probably needs to be re-staged, because I am afraid that the extreme delays in his care have resulted in spread of his cancer, and he is probably in a much higher risk category than he would have been in if the care had been accomplished in a timely fashion.

### 4.    Substandard care decisions

97.    As I explained in previous reports, treatment decisions must be consistent with community standard of care.  As was true two years ago in the Arizona system, the providers continue to make treatment decisions that are clearly substandard and endanger their patients.  Because the system lacks a viable quality assurance program to root out

1    and address patterns of poor care, substandard treatment is widespread in the Arizona

2    system, and as a result, some patients suffer harm, while all are subject to an unreasonable

3    risk of harm.

4            98.    Two particularly egregious cases involve patients who both starved to death

5    in June, 2015, while housed in so-called "inpatient" prison units, ███████████ at

6    ASPC-Florence and ██████████████ at ASPC-Tucson.  Mr. █████ was a 57 year

7    old man with a history of pancytopenia (a shortage of all types of blood cells), Hepatitis

8    C, end stage liver disease, and peripheral vascular disease.  His long-term management of

9    his end-stage liver disease was poorly done but the patient became acutely ill around

10   4/23/14, having developed significant ascites (excessive accumulation of fluid in the

11   abdominal cavity).   Ex. 32 at ADMC080751.  He was sent to see a gastroenterologist for

12   management of his end-stage liver disease nine months later on 1/30/15 and several

13   recommendations were given by the specialist (*id*. at ADCM080898), but ultimately most

14   were not followed by the Corizon providers, or were very delayed.  Mr. █████ developed

15   hepatic encephalopathy and was admitted back into the hospital, with swelling so great in

16   his scrotum that he developed scrotal abscesses.  *Id*. at ADCM085845.

17          99.    Mr. ██████ ultimately experienced gastrointestinal failure that manifested

18   itself with his inability to eat and extreme weight loss, and he died on June 21, 2015.  *Id*.

19   at ADCM081372 and ADMC085831. His baseline weight on 3/28/13 was 180 pounds.

20   The last recorded weight in his chart prior to his death was 93 pounds on 4/27/15, which

21   represents almost a 50% decrease in weight.  *Id*. at ADCM081647. The healthcare staff at

22   ASPC-Florence failed to address this substantial weight loss and he ultimately died of

23   significant malnourishment that occurred while they watched and documented it.  Had the

24   staff managed his end-stage liver disease adequately the gastrointestinal failure would not

25   have occurred and he would have lived a much longer life.  I was shocked to see the ADC

26   Mortality Review Committee's conclusion that Mr. █████'s death was unpreventable and

27   that his care met community standards.  *Id*. at ADCM225754, 225756.

28

100.    Mr. ███████ was a 64-year-old who had a history of left sided hemiplegia as a result of a gunshot wound to the head.  He also had pulmonary fibrosis which was evaluated by a pulmonologist on 11/20/14.  At that point in time the pulmonologist requested that Mr. ███████ be returned to his clinic in one month in order to initiate treatment.  Ex. 36 at ADCM078963.  I found no evidence in the chart that this requested follow-up appointment occurred.  The failure to treat his pulmonary fibrosis ultimately caused him to develop gastrointestinal failure and severe malnourishment.  On 7/29/14 he called attention to his weight loss in a health needs request (*id.* at ADCM079103) wherein Mr. ██████ stated, "I have lost a lot of weight, too much, and do not know why or how because I eat all of my meals.  I am 5'6" and weigh only 104 pounds.  My weight continues to drop and I am unable to gain weight.  Please do labs to test for cancer and any other illness that can be causing this. There's something very wrong with me."  The medical staff failed to address his weight loss.

101.    Mr. ███████ was placed in the Tucson infirmary in November 2014, weighing 94 pounds.  *Id.*at ADMC079373.  On 4/15/15, he was sent out for tube placement through his abdominal wall to facilitate feeding.  The interventional radiologist felt that the placement of a feeding tube was too risky due to his untreated pulmonary fibrosis.  *Id.* at ADCM079335.  As a result, his nutritional needs were not addressed and the last recorded weight in this chart was 85 pounds on 5/24/15.  *Id.*at ADCM079429.  Mr. ███████ needlessly died of malnourishment not long after, on ███████

102.    ████████████ was another Tucson patient who presented with alarming symptoms, who saw providers sporadically, yet was not evaluated and diagnosed for cancer for many months.  In October and November 2014, he was seen for complaints of rapid weight loss, dropping from 175 to 138 pounds in a few months.  No work up was initiated.  Ex. 50 at ADCM228185.  Eight months later, on 7/14/15, he was finally diagnosed with squamous cell carcinoma of the lung.  He was referred to an oncologist at that time, and he finally saw an oncologist two months after that, on 9/14/15.  Mr. ███████

1   died on ▮▮▮▮. *Id*. at ADCM228168.  Although his death may have been inevitable, it

2   is clear that he could have lived longer had his diagnosis not been delayed.

3       103.   Similarly, ▮▮▮▮▮▮▮▮▮▮ died at age 32 after experiencing

4   repeated and inexcusable delays by Perryville medical staff in her work up for leukemia.

5   She began submitting HNRs in September 2014 complaining of lumps on her legs.  Ex. 53

6   at ADCM246406.  On 5/13/15, she submitted an HNR stating, "you ordered lab work to

7   be done in regards to the lumps on my leg.  I have not had it done yet.  And I also found 2

8   more lumps on my pelvis area." *Id*. at ADCM246399.  Although her records are

9   confusing, it appears she did not receive a diagnosis of leukemia until 7/8/15, ten months

10  after her initial complaint. *Id*. at ADCM246856; ADCM246116.  She died ▮▮▮ months

11  after her diagnosis, on ▮▮▮▮.  What is clear from her records is that her initial work up

12  was inadequate, her labs were delayed, and ultimately, her diagnosis and treatment were

13  delayed, and these serious lapses resulted in hastening her death.

14      104.   ▮▮▮▮▮▮▮, died at ASPC-Eyman on ▮▮▮▮ at age 43 of

15  cardiogenic shock (inadequate circulation of the blood), secondary to bacterial

16  endocarditis, an infection of the heart.  Although he had been seen at sick call multiple

17  times reporting very alarming symptoms, including that he was vomiting 20 times a day,

18  he never had an adequate work up.  His lab results dated 5/27/15 were highly suggestive

19  of an infection, yet they were not signed off by his provider, a physician's assistant, for

20  three weeks,[9] and even then, it does not appear that the physician's assistant understood

21  the significance of the abnormal results.  Ex. 54 at ADCM086498. The PA's plan to order

22  a variety of tests and follow up with Mr. ▮▮▮ in two weeks was wholly inadequate.

23  Given Mr. ▮▮▮'s fevers, elevated white blood cell count, anemia and history of IV drug

24  abuse, the PA should have been able to diagnose the infection, or at least have recognized

25  the need to confer with a physician for further direction.

26

27  ───────────────────

28      [9] Performance Measure # 46 requires review of diagnostic test results within five
    calendar days.

1    105.   Mr. ████'s death was preventable, had his diagnosis been timely.  The

2    mortality review committee identified the delay in care, but called it "a difficult

3    diagnosis."  Ex. 55 at ADCM120646.  Based on the data available, however, I classify this

4    as a missed diagnosis.

5    106.   The case of ████████████████ an ASPC-Lewis prisoner who has

6    also been housed at Yuma and Tucson, is likewise disturbing.  I first raised serious

7    concerns about Mr. ███████'s treatment in my November 2013 report, explaining that

8    his HIV had been mismanaged and that he was in "desperate need" of management by an

9    HIV specialist.  Doc. 1104-1 at 271-272.  Since I first met Mr. ████████ he has

10   apparently been seen by an HIV specialist a couple of times.  Unfortunately, my review of

11   his chart in early December 2015 makes it clear that his AIDS is still unmanaged.  The

12   HIV specialist had recommended follow-up appointments at three month intervals, but it

13   appeared he had not been seen since 6/16/15.  At that appointment, the specialist had

14   ordered a critical lab test for determining whether he had developed resistance to any

15   medications, but that apparently had not been done. On 10/16/15, his lab tests revealed a

16   very high viral load, indicating that his prescribed HIV medication was not working and

17   that his virus was continuing to damage his immune system.  This ongoing pattern of

18   inadequate treatment is particularly shocking given that, since my first meeting with Mr.

19   ████████ I understand that plaintiffs' counsel have submitted advocacy letters to

20   defendants on at least five occasions, notifying them of Mr. ████████'s condition.

21   107.   ████████████████ was in obvious pain when I met him at Tucson in

22   December. According to his medical record, he was referred for a GI consult on 10/12/15

23   for rectal bleeding.  At the time of my visit and interview with him, this consult had yet to

24   occur.  He was finally seen by a facility medical provider the day before my site visit,

25   because he had staged a protest and refused to leave the clinic until seen.  At that

26   appointment, Mr. ████████ was given an injection of Toradol, which is absolutely

27   contraindicated in a patient with gastrointestinal bleeding of unknown cause and could

28   have killed him by causing his stomach to perforate.

1       108.    ██████████████, would likely not have died on ███████ at age 57 had

2  she been provided competent care.  Ms. ██████ had a history of chronic obstructive

3  pulmonary disease and congestive heart failure. She was admitted to the Perryville

4  infirmary on 7/6/15, when pulmonary disease became acute. Her situation was never well-

5  controlled from that point forward, and she declined fairly rapidly. On 7/7/15, her lab

6  results showed she was in congestive heart failure.  Ex. 39 at ADCM107998-7999.  She

7  was managed unsuccessfully and incompetently for her breathing problems: she was

8  given three liters of oxygen by nasal cannula, which is a significantly low dose of oxygen

9  delivered in a highly unreliable way.  Her blood oxygen level was dangerously low, even

10  on those three liters of oxygen. As such she had significant "air hunger" and struggled to

11  breathe for a long period of time.

12       109.    The Perryville healthcare staff struggled with her for an inordinately long

13  period of time before they finally sent her out to the hospital on 7/12/2015 in full

14  respiratory distress.  On 7/12/15 Dr. Seth Stabinsky entered a late note which documents

15  care that he rendered three days earlier, on 7/9/15.  This note outlines his logic in treating

16  this patient from a retrospective standpoint.  It is interesting that this note was entered

17  shortly after Dr. Stabinsky gave the order to send this patient to the hospital.  Given the

18  circumstances and the timing it appears as if this note is a delayed justification and

19  rationalization of poor care. *Id.* at ADCM108024.  Ms.██████ died on ███████  While this

20  ultimately was not a preventable death, the delays in care and the failure to make an

21  accurate diagnosis over months of management certainly hastened her death.

22       110.    The ADC Mortality Review Committee concluded that ██████████████

23  ██████ died because of inadequate medical care, and I concur.  Ms. ██████ who was 44

24  years old when she died on ██████ had a history of gastroesophageal reflux disease

25  (GERD), as well as significant mental illness.  While at Perryville, she was treated with

26  indomethacin and ibuprofen, two nonsteroidal anti-inflammatory drugs (NSAIDS) that are

27  contraindicated for prisoners with a history of GERD, because they cause ulcers and

28  perforation of the gastrointestinal tract.  She received the highest recommended dose of

1    indomethacin and her risk of NSAID ulcer with subsequent perforation was

2    extraordinarily high.  Ex. 26 at ADCM228171-8175.

3         111.    Ms. ▮▮▮▮ complained on 6/13/15 of constipation and abdominal pain.

4    She was referred to the nursing line, and saw the nurse several times in the following

5    weeks but did not have an abdominal exam.  Three weeks later, she bled to death, due to a

6    gastric ulcer.  She should never have been prescribed the NSAIDS for any extended

7    period, and the way that she was prescribed it caused her death.

8         112.    Grossly substandard nursing care hastened the death of 51 year old ▮▮▮▮▮

9    ▮▮▮▮▮▮▮▮▮▮ at ASPC-Tucson.  Mr. ▮▮▮▮▮▮ had a history of hepatitis C as well

10   as hypertension and Type II diabetes.  He submitted HNRs on 3/16/2015 (Ex. 48 at

11   ADCM040007), 3/22/15 (ADCM 040006) and apparently on 3/25/2015 (not found in

12   chart but referenced in a nurse note at ADCM040047) for swelling and back pain.  He was

13   not seen for nurse triage for any of these HNRs.  His HNR for back pain on 3/25/15 was

14   answered by nurse Dadasiewicz with "No action needed" and "already scheduled with a

15   provider 3/27/15."

16        113.    On 3/27/15, he saw NP Daye who did not address his back pain but did

17   document shortness of breath.  *Id.* at ADCM040163.  NP Daye did not order appropriate

18   diagnostic labs or studies for the complaint she listed.  On 4/5/15 Mr. ▮▮▮▮▮ was seen

19   on nurse line by RN Patterson who documented a fever and a very low blood oxygen level

20   indicating he was seriously ill.  The RN did not notify anyone or intervene, and her

21   assessment of this critical abnormal data is inadequate.  *Id.* at ADCM040212-216.  She

22   did refer Mr. ▮▮▮▮▮ to the provider line and he was seen by NP Daye on 4/6/15 with a

23   complaint of "IM states is dizzy, headaches, cannot breathe, gets winded walking 2 ft,

24   wants to go to a Dr."  Despite this ominous presentation, there is no blood oxygen level

25   recorded on that visit, nor is a respiratory rate.  Mr. ▮▮▮▮▮ did have an increased

26   temperature and an increased heartrate, both of which suggest possible infection.  NP

27   Daye also documented decreased breath sounds in his lungs which also suggests possible

28   infection.  Despite all of this data indicating Mr. ▮▮▮▮▮ was very seriously ill, NP

1    Daye's plan was to continue with daily weights and abdominal measurements and for him

2    to submit an HNR for any further health needs. *Id*. at ADCM040152-156.  He was finally

3    admitted to the hospital later the same day and found to have a high white cell count  and

4    an extremely low oxygen level.  *Id*. at ADCM040022 and 040025.  Mr. ███████ was

5    critically ill, well beyond what anyone in the system recognized.  He ultimately died of

6    severe bilateral pneumonia and sepsis the following day, on ████

7         114.    The nursing staff, including the Nurse Practitioner, repeatedly failed Mr.

8    ███████    As early as 3/25/15 the patient complained of back pain which is a common

9    presentation for pneumonia. Unfortunately his complaint was not evaluated by a clinician,

10   which resulted in a missed opportunity to intervene in a timely fashion and avoid his

11   death. More egregiously, he presented with a fever and a very low blood oxygen level on

12   4/5/15. These objective findings should have triggered a much more intensive response to

13   determine the reason for such an abnormal finding. Unfortunately, they did not.

14        115.    The provider visit on 4/6/15 with NP Daye is well below the standard of

15   care for this problem. Mr. ███████ presented with ominous symptoms of respiratory

16   distress including dizziness, a complaint that he could not breathe, and report that he gets

17   winded within two feet of walking. These complaints at a minimum require an assessment

18   of his respiratory status including respiratory rate and a pulse oximeter reading. These

19   were not done. In addition, he was febrile and with a racing pulse, which should have led

20   to additional inquiry as well. Using the hospital data as a reference point for how sick Mr.

21   ███████ presented just hours after he was seen by NP Daye illustrates the inadequacy of

22   NP Daye's assessment and clinical decision-making.

23        116.    The ADC Mortality Review Committee recognizes that "there was some

24   delay in patient care," and recommends that "significant abnormal findings should be

25   communicated to HCP [health care provider] by nursing."  Ex. 49 at ADCM120639 –

26   640..  Given the magnitude of the errors in this case, this response is grossly inadequate.

27   ///

28   ///

-46-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**E.     Delivery of care that is ordered**

117.    The third major component of an adequate medical care system is the right to treatment.  As I explained in my first report, patients must not only be seen by appropriate clinicians and given appropriate diagnoses and treatment orders; they must actually receive the care that is ordered, including medications, diagnostic tests and specialty referrals.  As was true when I first visited the ADC prisons, the Arizona system has multiple barriers that interfere with care delivery.

**1.     Providers' orders**

118.    Orders written by providers must actually be carried out.  Throughout the Arizona system I saw a consistent pattern of ordered care – medications, labs, nursing care, follow-up appointments, and/or specialty referrals – not getting done.  This is another symptom of a badly understaffed medical care system.

119.    While at ASPC-Tucson, I spoke to a number of patients who were referred for specialty care who never received it, and had predictably poor outcomes.  For example, ▮▮▮▮▮▮▮▮▮▮▮, was bedridden in the infirmary unit with a decubitus ulcer resulting from long-standing diarrhea caused by a C. Difficile infection in his GI tract.  His ulcer was not healing because of an exposed vein in the base of the wound that kept bleeding.  I asked Mr. ▮▮▮▮▮ why he had not had the relatively common surgery for decubitus ulcers to deal with this problem definitively.  He indicated that the Corizon staff had told him they could not find a surgeon willing to treat him.  I confirmed in his medical chart that a 6/25/15 surgery referral request for wound care had not been carried out.  The surgery that he needs is routine and not that difficult.  Any competent plastic surgeon would handle his issue easily.  It is difficult to believe that no surgeon is willing to treat him unless the problem is with payment from Corizon for that care.

120.    During the Tucson visit, I also observed that the process for alerting providers to diagnostic test results and consult reports for their patients through the electronic medical record had essentially collapsed under its own weight.  Because providers daily receive dozens of emails, and because the process for signing off on

results was unduly time-consuming and inefficient, many of the providers had simply

allowed their mail boxes to fill without reviewing them.  I observed that Tucson's NP

Daye, for example, had almost 2,500 unread emails in her inbox on the day of my visit,

many of which were lab results and specialist's reports.  Dr. Burciaga had approximately

5,600 unread clinical emails in her inbox.  Reviewing medical records at the facility, I

found numerous examples of cases where patients with abnormal labs were never

followed up, and where patients who saw the consultant did not receive the recommended

treatment because the consult reports had not been reviewed by the provider.[10]

121.    Mr. █████████, discussed above, required monitoring for the

immunosuppressive medication, tacrolimus, which he takes to maintain his transplanted

kidney.  His provider ordered a STAT tacrolimus lab drawn 11/27/15—there was no result

in the chart by 12/2/15 which is an unacceptable delay for a STAT lab.  That result should

be back within hours.  On 9/3/15 a regular tacrolimus level was ordered and a result was

delivered 9/8/15.  This lab result was never reviewed by anyone.  The failure to review

these lab results, and the failure to obtain timely results for a STAT order, put the patient

at significant risk of harm.

122.    The failure to follow orders can produce tragic results, as demonstrated in

the case of █████████████ who died on ███████ at age 50 at ASPC-Florence.

Mr. ████████ had a history of renal failure, type II diabetes, cirrhosis, foot amputation, and

peripheral vascular disease. It appears that he was significantly compromised when

transferred to the Department of Corrections on 6/10/15.  He was evaluated by a physician

on 6/12/15 and sent immediately to the hospital as a direct admit for a high white blood

cell count and a draining left foot amputation wound. Mr. ███████ was stabilized at the

hospital but noted to be in acute renal failure. That was addressed at the hospital, and he

---

[10] Performance Measure 46 requires providers to review diagnostic reports, and act upon abnormal results, within five calendar days of receipt. Doc. 1185-1 at 11. PM 52 requires that providers review and act on specialty consult report within seven calendar days of receipt. *Id.*.  ASPC-Tucson's average scores for these two measures over the months of February through December 2015 are 38% and 52%, respectively.

1    was discharged back to ADC on 6/17/15, and his discharge plan included prescriptions for

2    critical medications.  Although these medications were ordered by prison staff on 6/17/15,

3    he did not receive a dose until 6/20/15.  Ex. 37 at ADCM107446, 107448.  Without these

4    medications, Mr. ████ decompensated quickly and was ultimately admitted into the

5    infirmary. On ████ the infirmary nurses called Dr. Vukcevic at 11:35 to inform him

6    that Mr. ████ was not doing well.  Instead of sending this critically ill patient back to

7    the hospital immediately, Dr. Vukcevic instructed nursing staff to apply supplemental

8    oxygen and to continue to observe him. The doctor stated he would be in within an hour to

9    assess the patient. However at 12:55 Mr. ████ was declared dead and the treating

10   physician at the time was Dr. Chris Johnson.  *Id.* at ADCM107543.  Dr. Vukcevic never

11   came to assess the patient who he blocked from going to the emergency room.

12         123.    This case raises a number of questions. First of all it appears that Mr.

13   ████ was significantly medically compromised at the time and he was transferred to

14   the Department of Corrections and I have no way of knowing where he came from or how

15   it was possible for someone to transfer a patient this sick to ADC. This case also raises

16   questions about the intake process at the ADC reception center and its capacity to identify

17   patients who are too sick to be in a prison environment.  Furthermore, this case shows a

18   failure to coordinate care when a very sick patient transfers from the hospital back to the

19   prison.  Here, he was ordered critical medication at the hospital as part of his discharge

20   plan but went three days without that medication upon transfer back to the prison,

21   ultimately causing him to destabilize and contributing to his death.  I also question the

22   delay in emergency care, and why the physician did not send this patient to the hospital

23   immediately upon hearing that he was having difficulty.  Clearly Dr. Vukcevic's

24   instructions were inadequate for this patient, and the delay in obtaining definitive care

25   proved fatal.  Given the magnitude of Mr. ████'s medical conditions his death was

26   inevitable.  However it is clear that systemic issues abound in this case and his care was

27   compromised significantly as a result.  I concur with the ADC Mortality Review finding

28   that "more timely intervention was clearly warranted."  Ex. 38 at ADCM130868.

124.    In the charts I reviewed at Tucson, and the charts of deceased prisoners from across the prisons, I saw that labs are routinely ordered but never done, medications ordered but not approved, medications ordered but not administered by the nurses, ADA accommodations ordered but not provided, consults ordered but never approved or scheduled, and follow-up appointments requested by providers but never scheduled. Recommendations from specialists regarding follow-up and additional care were frequently not done or were substantially delayed.  Tucson prisoner ████████, ████, for example, has a condition, inclusion body myositis, which results in significant weakness of his muscles. Tucson referred him to a neurologist, who recommended on 4/16/14 that he be provided a back brace, supportive shoes, elevated shower chair, handicapped bed rails with bars, a multi-vitamin per day, a wedge pillow, an electric hospital bed, and a wheelchair assessment.  NP Daye finally ordered these items for him on 11/10/15, a year and a half later.  Corizon's Utilization Management Department has denied all of the requests for these medical devices.

## 2.    Medication administration and monitoring

125.    Prescribed medications must be provided to patients in a timely, consistent manner.  The ADC monitor reports document consistent and persistent problems delivering medications to patients on time.  Performance Measure # 11 requires that new prescriptions be provided to the patient within two business days of the prescription, or the same day, if prescribed STAT.  The average scores over the months of February through December, 2015 were below 75% at six of the ten prisons, including at all five of the largest men's prisons.  The chart on the next page highlights in yellow each month in 2015 where the prison's compliance level was less than 75%.  For each month in 2015, the statewide level of compliance for all of ten institutions on Performance Measure # 11 was less than 75%.  Lewis was non-compliant every month.  Ex. 1 at PLTF-PARSONS-036222.

///

///

| | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | 11 Mth avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Douglas | 97 | 60 | 97 | 85 | 78 | 79 | 83 | 63 | 70 | 85 | 85 | 80 |
| Eyman | 30 | 32 | 34 | 48 | 50 | 64 | 30 | 46 | 48 | 30 | 76 | 44 |
| Florence | 85 | 54 | 54 | 58 | 59 | 71 | 54 | 62 | 80 | 63 | 72 | 65 |
| Lewis | 53 | 63 | 71 | 74 | 57 | 70 | 47 | 44 | 36 | 39 | 40 | 54 |
| Perryville | 80 | 76 | 78 | 84 | 88 | 92 | 66 | 74 | 66 | 76 | 59 | 76 |
| Phoenix | 76 | 86 | 96 | 98 | 90 | 92 | 89 | 100 | 90 | 100 | 96 | 92 |
| Safford | 95 | 100 | 100 | 100 | 100 | 85 | 95 | 100 | 95 | 80 | 97 | 95 |
| Tucson | 76 | 54 | 58 | 54 | 53 | 58 | 62 | 61 | 68 | 76 | 66 | 62 |
| Winslow | 85 | 75 | 65 | 50 | 50 | 80 | 75 | 95 | 70 | 80 | 87 | 74 |
| Yuma | 77 | 76 | 78 | 60 | 78 | 74 | 78 | 76 | 76 | 70 | 70 | 74 |
| Statewide | 75 | 68 | 73 | 71 | 70 | 77 | 68 | 72 | 70 | 70 | 75 | 72 |

126.    Medications must be renewed regularly and without interruption, and prisoners must be able to transfer housing locations without medication interruptions. ADC monitors' reports show that administration of prescription medication is frequently delayed or missed, and that prescriptions for chronic care medications frequently lapse despite the patients refill requests.

127.    As a preliminary matter, I have long maintained that, in a prison or jail setting, an automatic refill system for chronic care and psychotropic medications is critical, and I so advised the parties in this action.  ADC's system of requiring patients, some of whom are on psychotropic medications for disabling mental conditions, to file health needs requests to refill their prescriptions practically guarantees they will have gaps in receiving medications.  This is particularly true in a system like ADC's, as the Corizon pharmacy responsible for filling the prescriptions is not local, but in Oklahoma.

128.    Performance Measure # 14 requires that refills of chronic care and psychotropic medications requested by the patient three to seven days before the medication runs out are filled so that the patient will suffer no lapse.  Not one of the ten prisons averaged a passing score (75%) for this measure over the ten months from March

to December 2015.  (Every facility was given a score of "NA" in February 2015.)  Again, non-compliance is shown in yellow in the chart below. Ex. 1 at PLTF-PARSONS-036223.

| | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | 10 Mth. avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Douglas** | NA | 0 | 0 | 100 | 80 | 60 | 6 | 0 | 0 | 38 | 69 | **35** |
| **Eyman** | NA | 0 | 0 | 6 | 10 | 0 | 0 | 0 | 0 | 0 | 39 | **6** |
| **Florence** | NA | 0 | 0 | 20 | 2 | 14 | 5 | 0 | 12 | 17 | 23 | **9** |
| **Lewis** | NA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33 | **3** |
| **Perryville** | NA | 92 | 92 | 76 | 0 | 81 | 8 | 12 | 35 | 8 | NA | **45** |
| **Phoenix** | NA | 93 | 94 | 100 | 90 | 50 | 19 | 45 | 59 | 33 | 55 | **64** |
| **Safford** | NA | 100 | 100 | 91 | 80 | 80 | 65 | 0 | 0 | 67 | 80 | **66** |
| **Tucson** | NA | 0 | 68 | 41 | 34 | 3 | 0 | 0 | 0 | 0 | 73 | **22** |
| **Winslow** | NA | 100 | 90 | 92 | 88 | 75 | 10 | 0 | 30 | 20 | 100 | **60** |
| **Yuma** | NA | 0 | 0 | 32 | 24 | 32 | 0 | 0 | 0 | 10 | 42 | **14** |
| **Statewide** | | 39 | 44 | 56 | 41 | 39 | 11 | 6 | 14 | 19 | 57 | **32** |

129.    ASPC-Lewis registered a 0% compliance rate for nine of the ten months, and only three small prisons, Phoenix, Safford and Winslow, had an average score of over 50%.  Of the five largest prisons, not a single one achieved a passing score at any time during the measured period.  As illustrated below, none of the ten prisons achieved a passing average score during the relevant time period.  Ex. 1 at PLTF-PARSONS-036223.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

130.   ADC's record for ensuring that prescriptions for chronic care and psychotropic medications are renewed by the prescribing provider, such that there are no lapses, is also dismal.  (Performance Measure # 13.)  For the eleven month period of February to December 2015, seven of the prisons, including all of the largest facilities, had average scores well under 75% compliance, as illustrated in the chart on the next page.  Ex. 1 at PLTF-PARSONS-036222.



### 3.   Labs, imaging, and other diagnostic tests

131.   Diagnostic tests are an essential part of any medical care system.  Such tests must be performed timely, based on the provider's order, and must be reviewed and, if abnormal, acted upon promptly.  Arizona fails all too often to ensure that labs and diagnostic tests performed are promptly reviewed and acted upon, due in part to the lack of an effective system for reporting such results in the eOMIS system.

132.   Once the diagnostic reports are available, the medical provider is required to review the reports, including pathology reports, and act upon those with abnormal values within five calendar days.  (Performance Measure # 46.)  Nine out of ten of the prisons averaged scores well below passing for this measure, from February to December, 2015.  Indeed, the only prison that averaged a passing score was ASPC-Safford, a smaller prison

that ADC previously has reported does not house prisoners with high medical needs. *See, e.g.*, Ex. 11 at ADCM226253 (11/30/15) (at Florence's, North unit, just one report of 10 reviewed timely, with half not reviewed a month or more after receipt; Central unit, only half of 10 reports timely reviewed, with three not reviewed six weeks after receipt); Ex. 16 at ADCM226321 (11/27/15) (at Tucson, in Inpatient Unit, only half of ten records in audit showed timely review); Ex. 13 at ADCM226171 (11/25/15) (at Perryville, San Pedro unit, for ten pap smear tests, only one had result timely reviewed).



133.    The failure to act timely on abnormal labs and diagnostic imaging places patients and enormous risk of harm. Given ADC's widespread non-compliance on this measure, it is not surprising that I found numerous examples of patients who were suffering unnecessarily because their providers had failed to act upon their abnormal results. Among them was Mr. ███████████ (see *infra* at ¶¶ 82 and 119), who tested positive for C. Difficile toxin on 9/18/14. There was no evidence in his record that the results were ever reviewed, or that Mr. ██████ was ever treated for this condition. *See also*, Ex. 54 at ADCM086498 (high white blood cell count for Mr. ██████ 096480,

-54-

suggestive of infection performed 5/27/15, not signed off by provider until 6/16/15;

patient died eleven days later); (per my onsite chart review, STAT test for

immunosuppressant ordered 11/27/15 for Mr. ███████ 073659, not performed as of

12/2/15; regular lab ordered 9/3/15, performed 9/8/15, results never reviewed).

### E.    Protection from preventable negative outcomes

134.    Healthcare administrators know that a significant number of negative

outcomes can be prevented through carefully implemented quality assurance, patient

feedback, and screening mechanisms.  Two years ago, I saw no evidence that any of these

measures had been meaningfully implemented in the Arizona system, and I still see no

such evidence.

### 1.    Quality assurance

135.    As I explained in my initial report, people will make mistakes. This is

unavoidable.  So, in any functioning health care system, there must be a mechanism

created and used to find and correct errors to minimize patient harm.

136.    An effective quality assurance process requires structured and systemic

review of the healthcare processes throughout the whole system. This is typically done by

identifying a problem to be investigated, developing a hypothesis, performing a review of

a statistically significant number of charts by a qualified individual or group to assess the

evidence of care, calculating appropriate statistics to prove or disprove the hypothesis,

formulating proposed action plans to improve the item being reviewed if necessary,

developing policy and procedure to implement the new action plans, and then reassessing

the results of the changes in the future to determine that the identified problems have

actually been corrected.

137.    Although ADC agreed to monitor certain Quality Assurance functions as

part of the Stipulation, review of the CGARs reveals very poor compliance.  For example,

Performance Measure # 29 requires that the Director of Nursing for each ASPC facility

conduct and document annual performance reviews of nursing staff, as recommended by

National Commission on Correctional Health Care Standard P-C-02.[11]   According to ADC staffing data, as of December, 2015, the system employed over 300 Nurse Practitioners, Registered Nurses and Licensed Practical Nurses. Ex. 20 at ADCM274691.  Based on review of the monthly CGAR results from February through December, however, it appears that just 52 nurses, i.e., less than 20%, had undergone an annual clinical performance review during those eleven months, and that nurse reviews were not performed at all at three of the facilities (Florence, Winslow and Yuma).  The overwhelming majority of the CGAR entries indicate that, "no nursing clinical performance reviews were due during the reporting period." *See, e.g.*, Ex. 9 at ADCM228222, November 2015 (QI results for Douglas).  The system is virtually ignoring a powerful quality assurance tool, thereby placing patients at risk of harm or death due to incompetent care.

138.    Similarly, the Stipulation requires ADC to monitor whether each prison is conducting monthly Continuous Quality Improvement meetings, in accordance with NCCHC Standard P-A-06.  Performance Measure # 27.  This NCCHC standard defines a CQI Committee as one that "designs quality improvement monitoring activities, discusses the results, and implements corrective action."  NCCHC Standards for Health Services in Prisons 2014, at 12.  The Standard further explains that the "standard is intended to ensure that a facility uses a structured process to find areas in the health care delivery system that need strategies for improvement…. CQI minutes should provide sufficient detail to guide future decisions." *Id.* at 13.  Typically, minutes may include problems identified, the person responsible for the corrective action and a time frame for completion.

139.    The CGAR results report consistent full compliance with this performance measure.  I reviewed some the CQI minutes for the months of September through November, 2015 for eight of the prisons.  I found that the minutes, however, were often

---

[11]  NCCHC Standard P-C-02 at 41 requires "a clinical performance enhancement process [that] evaluates the appropriateness of services delivered by all direct patient care clinicians and RNs and LPNs."

1    grossly deficient.   For example, the CQI minutes for ASPC-Tucson for the months of

2    September through November frequently describe problems, yet fail to specify correction

3    action, a timeline for correction or the person responsible for effecting it.  *See e.g.*, Ex. 21

4    at ADCM197765 (9/3/15 Minutes state "Nursing orders are not being done in a timely

5    manner across the facility."  No CAP, person responsible, or timeline); Ex. 21 at

6    ADCM197776 (10/8/15 Minutes state "We recently had a problem with Tucson Fire

7    Department. They arrived at Rincon gate then turned around and refused to go back on

8    complex.  This puts the patient and Corizon at risk.  Christina will be following up with

9    TFD."  CAP is vague, and no timeline); Ex. 21 at ADC197786 (11/5/15 Minutes state

10   "Medication administration not being reflected in MAR.  Med passes not being

11   completed."  No CAP, person responsible or timeline).

12   **III.   Conclusion**

13          Medical care in Arizona prisons continues to be inadequate to meet the basic needs

14   of many of the prisoners who experience illness and injury while in custody.  Many of the

15   barriers to care that I identified in November 2013, and in my subsequent reports,

16   continue to plague the system.  ADC's own audits demonstrate month after month that

17   many of the prisons are failing to comply with critical performance measures, even at the

18   first year level of 75%.  Fewer still will meet the current 80% benchmark.  The treatment

19   delays and backlogs point to a shortage of health care staff that must be remedied to create

20   an adequate health care system.  Defendants should be required (1) to immediately

21   develop a plan to increase nurse and physician staffing to enable each prison to achieve

22   passing CGAR scores of at least 80% for access to RN triage, primary care and chronic

23   care appointments (Performance Measures # 37, # 39 and # 54),  timely inpatient

24   encounters (Performance Measure # 66) and timely provider review of diagnostic test

25   results (Performance Measure # 46) ; and (2) to develop a plan to perform a workload

26   study for all health care positions, and to create and implement a staffing plan based upon

27   the results of the study.  Additionally, they should be required to develop a plan to

28   automatically refill prescriptions for chronic care and psychiatric diagnoses.

1    I declare under penalty of perjury under the laws of the State of Arizona and the

2    United States of America that the foregoing is true and correct.

3    Executed this 5th day of April, 2016, at Salt Lake City, Utah.

6    Todd Wilcox

1

2    **ADDITIONAL COUNSEL:**                     Donald Specter (Cal. 83925)*
                                                 Alison Hardy (Cal. 135966)*
3                                                Sara Norman (Cal. 189536)*
                                                 Corene Kendrick (Cal. 226642)*
4                                                **PRISON LAW OFFICE**
                                                 1917 Fifth Street
5                                                Berkeley, California 94710
                                                 Telephone:  (510) 280-2621
6                                                Email:     dspecter@prisonlaw.com
                                                            ahardy@prisonlaw.com
7                                                           snorman@prisonlaw.com
                                                            ckendrick@prisonlaw.com
8
                                                 *Admitted *pro hac vice*
9
                                                 David C. Fathi (Wash. 24893)*
10                                               Amy Fettig (D.C. 484883)**
                                                 Jamelia Natasha Morgan (N.Y.
11                                               5351176)**
                                                 **ACLU NATIONAL PRISON
12                                               PROJECT**
                                                 915 15th Street N.W., 7th Floor
13                                               Washington, D.C. 20005
                                                 Telephone:  (202) 548-6603
14                                               Email:     dfathi@npp-aclu.org
                                                            afettig@npp-aclu.org
15                                                          jmorgan@aclu.org

16                                               *Admitted *pro hac vice*.  Not admitted
                                                  in DC; practice limited to federal
17                                                courts.
                                                 **Admitted *pro hac vice*

18                                               Daniel C. Barr (Bar No. 010149)
                                                 Amelia M. Gerlicher (Bar No. 023966)
19                                               John H. Gray (Bar No. 028107)
                                                 **PERKINS COIE LLP**
20                                               2901 N. Central Avenue, Suite 2000
                                                 Phoenix, Arizona 85012
21                                               Telephone:  (602) 351-8000
                                                 Email:     dbarr@perkinscoie.com
22                                                          agerlicher@perkinscoie.com
                                                            jhgray@perkinscoie.com
23

24

25

26

27

28

Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:     dpochoda@acluaz.org
              jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct.
R. 38(f)

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, P.C.**
P. O. Box 91398
Tucson, Arizona 85752
Telephone:  (520) 477-1475
Email:     kirstin@eidenbachlaw.com

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:     cnmitchell@jonesday.com
              aamiri@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com

*Admitted *pro hac vice*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:     jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR
DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email:     skader@azdisabilitylaw.org
              adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
**ARIZONA CENTER FOR
DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:
    rdaly-rooney@azdisabilitylaw.org
              jrico@azdisabilitylaw.org
              jross@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability
Law*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 8, 2016, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

   s/ D. Freouf