| | Health Education and Promotion | OPR:<br>Health Services Division Administrator<br><br><br>Auth: |
|---|---|---|
| Arizona Department of Corrections | | |
| Health Services Technical Manual | HSTM<br>Chapter 6<br>Section 1.0. | Supercedes:<br>Effective Date:<br>January 1, 2010 |

REFERENCES:        NCCHC STANDARD P-F-01

**PURPOSE:**   The Health Services Program will provide information and services that promote health status, prevent disease, provide early detection and treatment of disease, and teach self-care.

**PROCEDURE:**
1.0.      Inmates will be provided education and counseling for general health maintenance and self-care throughout incarceration.

2.0      Inmate newsletters, if available, will regularly contain health related information.

3.0.      Programs to improve the health status of inmates may be offered on an individual and group basis.

4.0.      Inmates with chronic diseases will be provided with information that is designed to increase their ability to monitor and manage their health status.

5.0.      Inmates will be informed at the end of the Intake Health Assessment of the recommended schedule for preventive health care exams.

ADC010897

| | Tobacco Use | OPR:<br>Health Services Division<br>Administrator |
|---|---|---|
| Arizona Department of Corrections | | Auth: ds |
| Health Services Technical Manual | HSTM<br>Chapter 6<br>Section 2.0. | Supercedes:<br>Effective Date:<br>January 1, 2010 |

**REFERENCES**:     DEPARTMENT ORDER 109
                    NCCHC STANDARD P-F-05

**PURPOSE**:    To provided guidance regarding tobacco use in health facilities.

**RESPONSIBILITY**:  Department Order 109 describes the Department policies regarding smoking.  All Health Services Division staff are responsible for monitoring and supporting the following regulations in all Department institutions and offices, including rental and contract properties.

**PROCEDURE:**
1.0.    General Complex guidance:   Smoking shall be limited to outside areas and to designated smoking rooms. Outside smoking areas shall not subject normal traffic to second-hand smoke, e.g., smoking shall be prohibited near entrances to buildings.  Designated smoking rooms shall be self-contained with independent ventilation and exhaust systems.
1.1.     All used smokeless tobacco (chewing tobacco, plug tobacco and/or snuff) shall be disposed of in a covered receptacle; i.e., an empty soda can or closed styrofoam cup.

2.0.    Inmate Tobacco Use
2.1.    Smoking cessation information shall be made available to inmates.  The institution health services staff will make information available to inmates who request assistance with cessation of use of tobacco products.
2.2.    Inmates shall not smoke inside any building, including but not limited to the housing areas, visitation areas, kitchens and warehouses within the prison.
2.3.    Smoking and the possession of tobacco and all smoking-related materials are totally prohibited by inmates assigned to: Reception centers, Minors units, all detention units, including the detention section of Cellblock 6, Special Management Unit I and II., Santa Maria Special Management Area and all Medical Units.

3.0.    All inmates will be advised of the tobacco policies by Operations Division staff during Orientation.

ADC010898

| | Exercise | OPR:<br>Administrative Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: ds |
| Health Services Technical Manual | HSTM<br>Chapter 6<br>Section 3.0. | Supercedes:<br>Effective:<br>January 1, 2010 |

**REFERENCES**:        DIRECTOR'S INSTRUCTION 120
DIRECTOR'S INSTRUCTION 125
DEPARTMENT ORDER 804
DEPARTMENT ORDER 906
NCCHC STANDARD P-F-03

**PURPOSE:**  To establish a procedure where inmates are offered exercise outside of their cell.

**RESPONSIBILITY:**  It is the responsibility of the Facility Health Administrator and Key Contact Staff, to assure that all clinical and ancillary staff complies with policies that encourage exercise.

**PROCEDURE**:
1.0.     Inmates will be offered exercise outside of their cells in an area large enough to accommodate the activity at least three times per week for a total of three hours per week.

2.0.     Exercise focusing on large muscle activities such as walking, jogging in place, basketball and isometrics is encouraged.

3.0.     Providers should consider exercise as an adjunct to any treatment plan.

4.0.     Inmates who are under disciplinary sanctions may have modified exercise capabilities as outlined in the referenced Department Orders and Director's Instructions.

ADC010899

| | Personal Hygiene | OPR:<br>Nursing Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: jac |
| Health Services Technical Manual | HSTM<br>Chapter 6<br>Section 4.0. | Supercedes:<br>HSTM 6.4.0.<br>June 15, 2008<br>Effective Date:<br>January 1, 2010 |

**REFERENCES:**     DEPARTMENT ORDER 909
DEPARTMENT ORDER 125
DEPARTMENT ORDER 804
NCCHC STANDARD P-F-04

**PURPOSE:**   ADC has established in Department Orders, specific guidelines so that inmates can take care of their personal hygiene. These guidelines are further outlined in complex documents such as the inmate handbook, facility instructions, post orders, and standard operating procedures. These documents describe bathing schedules, clothing and bedding exchange, laundry facilities, haircuts and shaving arrangements, and the availability of personal hygiene products.

**RESPONSIBILITIES:**  The Warden and Facility Health Administrator hold joint responsibility to ensure that policies and procedures are in place that allows inmates to maintain at least a minimum level of personal hygiene.

**PROCEDURES:**
1.0.     The need to escort segregation inmates for showering and the strain on resources to accomplish this are an important regulator of inmates' ability to shower.  From a health aspect, showering every day is a best practice. However, correctional authorities retain final decision-making responsibility in this activity. The availability of a sink, hot and cold running water, wash cloths, towels and soap in segregation cells does permit sponge bathing.  Inmates will be allowed to take a shower in accordance with Department Order 125.
-        Inmates in Complex Detention Units, Security level I-5, and non I-5 inmates shall be afforded three showers per week.
-        Level 4 inmates under Department Order shall be afforded at a minimum three showers per week.
-        Level 3 inmates under Department Order shall be afforded a minimum of three showers per week.

253

ADC010900

2.0.    Clothing:

2.1.    In addition to clothing issued when the inmate is received at the institution, an inmate may exchange clothing on an as needed basis as supplies are available.

2.2.    Laundered clothing is issued to inmates at least once per week if in house laundry facilities are not available for the inmate to launder their own clothes.

2.3.    Inmates shall receive a change of outer clothing three times a week, a daily change of underwear, and a weekly bed linen and towel change.

3.0.    Personal hygiene items are issued to inmates in accordance with Department Order 909. These items include soap, tooth care items, toilet paper, and woman's sanitary care items. Additionally, a wide array of personal hygiene items is available to inmates for purchase from the canteen.

4.0.    Shaving/Grooming:  The inmate barber shall be available on a specified schedule for inmate haircuts.  Individual shaving instruments shall be available to general population inmates. Electric razors may be shared on certain units provided the razor is sanitized between units.

5.0.    Medical Providers (through the Facility Health Administrator and Warden) may approve medical exceptions to laundering and shower frequencies.  Exceptions must be documented utilizing the Duty/Special Needs Order.

254

ADC010901

| | Self Catheterization and Colostomy Care | OPR: Medical Program Manager / Nursing Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: jb/tj |
| Health Services Technical Manual | HSTM Chapter 6 Section 4.1. | Supercedes: n/a June 15, 2008 Effective Date: January 1, 2010 |

**REFERENCES:** DIRECTOR'S INSTRUCTION tbd, Intermittent Self-Catheterization and Self-Colostomy Management
NCCHC STANDARD P-A-08

**PURPOSE:** To ensure all inmates who need to perform intermittent self-catheterization or maintain and manage a colostomy, have access to a semi-private area and have been provided the necessary supplies.

**DEFINITIONS:**
A **colostomy** is an opening that is made in the large intestine (colon) with surgery. After an opening is made, the colon is then brought to the surface of the abdomen to allow stools to leave the body. The opening at the surface of the abdomen is called a stoma. Stool leaves the colon through the stoma and drains into a flat, changeable, watertight bag or pouch. The pouch is attached to the skin with an adhesive (substance that seals the pouch to the skin).
**Intermittent catheterization** is the temporary placement of a catheter (tube) to remove urine from the body. This is usually done by placing the catheter through the urethra (the tube that leads from the bladder to the outside opening) to empty the bladder.

**RESPONSIBILITY:** The Correctional Registered Nurse Supervisor II shall ensure the inmate's Unit Nursing Staff have instructed the inmate in proper technique of self-catheterization or colostomy care. The Unit Nursing Staff will provide the inmate with adequate supplies to meet his/her specific needs..

**1.0. PROCEDURE:** Inmates will be afforded adequate supplies to meet their specific needs as directed in this technical manual and/or those needs as ordered by an ADC Medical Provider. Upon the inmate's assignment to a prison unit, or upon his/her return from a medical specialist consultation or service, the Nursing Staff shall review the inmate's medical record and interview the inmate, determining the type, quantity of supplies, and products in excess of the established minimums the inmate will require.

255

**2.0.    Minimum Medical Supplies:**

2.1.    Catheterization two week supply

| Item | Quantity |
|---|---|
| Urinary catheter | 2 catheters |
| Catheter lubricant | 1 packet per use (frequency quantity-dependant) |
| Liquid anti-bacterial soap | 2 bottles |
| Paper towel | 1 packet |
| Catheter storage container | 1 denture cup or laboratory bag |
| Absorbent pad | 1 pad for day usage |
| Basin, wash | 1 assigned for catheter cleaning purposes |
| Urinary receptacle | 1 assigned for urinary collection |

2.2.    Colostomy two week supply

| Item | Quantity |
|---|---|
| Pouch | 2 pouch systems, to include wafer & pouch |
| Measuring guide | 1 assigned |
| Stoma paste | 2 tubes |
| Closure clamp | 2 clamps |
| Hypoallergenic tape | 1 roll as needed |
| Skin sealant liquid | 2 bottles |
| Ostomy belt | 1 assigned (suicide precaution item) |
| Baby wipes (without moisturizer) | 2 boxes |
| Pouch cleaning solution | 2 bottles |
| Pouch deodorant | 2 bottles |
| Mild non-moisturizing soap | 2 bottles |
| Absorbent pad | 1 per day |
| Red biohazard bag | 1 per week (exchange in Health Unit) |

**3.0.    Instructional procedure for Clean Intermittent Self-Catheterization (CISC):  Also known as Self-Catheterization, CIC or Intermittent Catheterization**

3.1 Catheterization Process:

3.1.1.   Some patients may require catheterization for a short period of time or on an occasional basis. Intermittent (short-term) catheterization may be necessary for patients with neurological disorders, women who have undergone certain gynecological surgeries, and anyone who is unable to properly empty the bladder.

3.1.2.   The goal of intermittent catheterization is to prevent urinary tract infections, further bladder or kidney damage, and to completely empty the bladder. Most patients are able to learn how to perform this procedure.

3.1.3.   To perform clean intermittent self-catheterization (CISC), the patient must learn the basic location of the important locations in the urinary system.

3.1.4.   Additionally, the patient must have the physical ability to reach the urethra, and must be able to move the equipment as necessary. Patients who are unable to see the urethra may be taught how to feel for the proper location of the urethral opening.

256

ADC010903

3.1.5.   A CISC catheter may be reused for 2 weeks. It is important that the catheter is cleaned thoroughly with soap and water after each use to prevent infection from occurring.

**4.0.   Instructional procedure for Clean Intermittent Self-Catheterization (CISC) in Men (The following information is also available in Inmate Institutional Handout)**

4.1.   Assemble all equipment: catheter, lubricant, drainage receptacle.
4.2.   Wash your hands thoroughly with soap and water  and clean the penis and urethral opening.
4.3.   Lubricate the catheter.
4.4   Hold the penis on the sides, perpendicular to the body.
4.5.   Begin to gently insert and advance the catheter.
4.6.   You will meet resistance when you reach the level of the prostate. Try to relax by deep breathing, and continue to advance the catheter.
4.7.   Once the urine flow starts, continue to advance the catheter another 1 inch and hold it in place until the urine flow stops and the bladder is empty.
4.8.   Withdraw the catheter in small steps to make sure the entire bladder empties.
4.9.   Wash the catheter with soap and water. Rinse the catheter completely and dry the outside.
4.10.   Store the catheter in a clean, dry, secure location.
4.11.   Record the amount of urine obtained, as instructed by your health care provider

**5.0.   Instructional Procedure for Clean Intermittent Self-Catheterization (CISC) in Women (The following information is also available in Inmate Institutional Handout)**

5.1.   Assemble all equipment: catheter, lubricant, drainage receptacle.
5.2.   Wash your hands thoroughly with soap and water and clean the vulva and urethral opening.
5.3.   Lubricate the catheter.
5.4.   Locate the urethral opening. The opening is located below the clitoris and above the vagina.
5.5.   Spread the labia (vaginal lips) with the second and fourth finger, while using the middle finger to feel for the opening.
5.6.   Begin to gently insert the catheter into the opening, guiding it upward as if toward the belly button.
5.7.   Once the catheter has been inserted about 2 to 3 inches past the opening, urine will begin to flow.
5.8.   Once the urine flow starts, continue to advance the catheter another 1 inch and hold it in place until the urine flow stops and the bladder is empty.
5.9.   Withdraw the catheter in small steps to make sure the entire bladder empties.
5.10.   Wash the catheter with soap and water. Rinse the catheter completely and dry the outside.
5.11.   Store the catheter in a clean, dry, secure location.
5.12.   Record the amount of urine obtained, as instructed by your health care provider.
5.13.   Some women may perform CISC standing up with one foot on the toilet. This position is also recommended when there is a question about the cleanliness of the toilet, such as in public facilities.

257

ADC010904

**6.0.    Instructional procedure for Colostomy (The following information is also available in Inmate Institutional Handout)**

6.1.    Colostomy Process: A colostomy is sometimes needed for cancer, diverticular disease, Crohn's disease, and trauma or injury. A temporary colostomy may be needed to allow the colon to rest and heal for a period of time. A temporary colostomy may be in place for weeks, months, or years. The temporary colostomy will eventually be closed and bowel movements will return to normal. A permanent colostomy is usually needed when a part of the colon must be removed or cannot be used again.

6.2.    Caring for the Skin around the Stoma.   A good time to check the stoma and skin around it is when you change the pouch. The stoma is always pink or red and moist (wet) looking. Because the stoma has many small blood vessels, it may bleed when it is cleaned and wiped. Do not worry about a little bleeding unless the bleeding does not stop. As swelling goes away, the stoma size should get smaller and should be its normal size in a bout 8 weeks after surgery.

6.2.1.   The part of the colostomy pouch that sticks to the abdomen is called a skin barrier. It is important that the skin barrier opening for the stoma fit closely (not closer that 1/8th of an inch) up to the stoma. Use the stoma measuring guide that comes with the colostomy supplies to check the size of the stoma. As the stoma gets smaller, it is advisable to cut the skin barrier opening smaller. Stool can leak through the opening onto the skin if the opening is too large. The stool may then cause the skin to be red and irritated.

6.2.2.    Red skin may also mean that the skin barrier was left on too long.  It is always important to learn why the skin around the stoma is red or irritated and discuss with the doctor or nurse.

6.3.    Instructional Procedure for Changing the Colostomy Pouch.  The way in which a colostomy pouch is changed depends on the type of pouch in use and the kind and amount of stool. The dispensing of these supplies shall be documented in the inmate's medical record.

6.3.1    Assemble supplies:
- Wafer and pouch (may be one piece)
- Measuring guide
- Stoma paste
- Closure clamp
- Hypoallergenic tape
- Skin sealant liquid
- Ostomy belt (if provided)
- Baby wipes
- Pouch cleaning solution
- Pouch deodorant
- Mild non-moisturizing soap
- Absorbent pad
- Red biohazard bag

6.3.2.   Prepare wafer/pouch. (nursing assistance is required to perform)
Trace the opening on back of the wafer and cut it out.
Snap the pouch to the wafer then remove paper backing.

6.3.3.   Remove the old pouch by gently lifting up on tape while pressing on the skin underneath. Do not rip or tear pouch off as this can irritate the skin.   If pouch is adhering too well, baby wipes may be used to press on the skin behind the barrier.

258

ADC010905

6.3.4.   Clean the skin.  Cleanse the skin and stoma with baby wipes.  Soap may be used but must be rinsed well. Allow skin to dry. Check for any skin changes.

6.3.5.   Measure the stoma.  Before applying pouch, re-measure stoma with the guide. Make a note of the new size opening. If stoma is larger, take the prepared pouch and re-cut it. (Nursing assistance is required to perform this action). If stoma is smaller, apply pouch and at the next pouch change, acquire nursing assistance to adjust the size as needed.

6.3.6.   Apply Pouch.  Center opening in wafer around the stoma and apply sticky side to skin. Press down to assure all edges are sealed. Attach clip to the bottom of the pouch.

6.4    Procedure for Emptying the Colostomy Pouch

6.4.1.   Empty the pouch when one-third to one-half full.  Do not wait until the pouch is completely full because this could put pressure on the seal, causing a leak.  The pouch may also detach, causing all of the pouch contents to spill.

6.4.2.   Place toilet paper into the toilet to reduce splash back and noise.

6.4.3.   Take the end of the pouch and hold it up. Remove the clamp (if the pouch has a clamp system).

6.4.4.   Take the end of the end of the pouch and make a cuff to keep it from getting soiled. Some pouches will not require the patient to cuff the pouch.

6.4.5.   Drain the pouch by squeezing the pouch contents into the toilet.

6.4.6.   Clean the cuff end of the pouch with toilet paper or baby wipes.  The patient may also rinse the pouch, but it is not necessary. Make sure to keep the end of the pouch clean.

6.4.7.   Undo the cuff at the end of the pouch. Replace the clamp or close the end of the pouch according instructions previously given by hospital colostomy nurse.

## 7.0   Living with Colostomy (The following information is also available in Inmate Institutional Handout)

7.1.    Bathing or Showering: The patient may take a bath with or without the pouch. The patient may take a shower or bath with the pouch off. Water will not go into the stoma during a shower or bath.

7.2.    Work: The patient may go back to work when their doctor or nurse authorizes.
   - If work involves heavy physical labor, such as digging or lifting, you may need a special support to prevent hernia
   - If a job requires frequent movement, an ostomy belt over the pouch may be required to keep it in place.

7.3.    Exercise: Exercise is very important. It is best to start slowly and do more as you get stronger. Empty the pouch before playing sports.

7.4.    Diet: As directed by your medical provider.

7.5.    Disposal:  The toilet will serve as waste (fecal) disposal.  The red biohazard bag will serve as disposal for soiled apparatus and supplies.

ADC010906

|  | Facility Capabilities Supporting Special Needs and Services | OPR: Medical Program Manager & Nursing Program Manger<br><br>Auth: ta/jb |
| --- | --- | --- |
| Arizona Department of Corrections | | |
| Health Services Technical Manual | HSTM Chapter 7 Section 1.0. | Supercedes: HSTM 7.1.0 September 15, 2008 Effective Date: January 1, 2010 |

**REFERENCES:**         NCCHC STANDARD P-A-08
                        NCCHC STANDARD P-G-01
                        NCCHC STANDARD P-G-02

**PURPOSE:**  To provide information in a cooperative effort between the facilities administration and treating clinicians regarding the inmates significant health needs that must be considered in those classification decisions that exist for purposes of preserving the health and safety of that inmate, other inmates, or staff.

**RESPONSIBILITY:**  It is the responsibility of the Facility Health Administrator to work with the Warden to jointly ensure that a cooperative relationship exists between correctional staff and healthcare staff in the dissemination of vital information relative to the special needs of the inmate population.  In cases where those identified needs are of a mental health nature, and those mental health authorities function under jurisdictions which differ from those of the health care authority, that the mental health clinician share that pertinent information with the Facility Health Administrator.

**PROCEDURES:**
1.0.      Health care needs are to be considered in decisions regarding the inmate's assignment to institutions, work and programming. This consideration is to ensure that inmates with health care problems or limitations are not placed in facilities that are unable to provide health care appropriate for individual needs; and that an inmate who has restrictions is not assigned work or programming that presents a risk of further injury or physical/mental debilitation.

1.2.      Correctional and Classification staff must be advised of inmate's special needs that may affect housing, work, and program assignments; disciplinary measures; and admissions to and transfers from institutions.  Such communication must be documented and performed in such a manner that does not compromise confidentiality of health information.

260

ADC010907

1.3.     Health and custody staff will communicate about inmates who are: chronically ill; on dialysis; adolescents in adult facilities; infected with serious communicable disease; physically disabled; pregnant; frail or elderly; terminally ill; mentally ill; suicidal; or developmentally disabled.

2.0.     The Medical Program Manager will approve for publication, a desktop reference for use by Shift Supervisors to respond to Chronic Condition Emergencies.

3.0.     Information regarding an inmate's health status is found in the Adult Information Management System (AIMS) comments.  A health status determination is to be completed when the initial Health Assessment is completed, and/or a new health condition is identified which results in the need for further diagnostic procedures, specialty consults, activity limitations, facility restrictions, health care follow-up, special housing requirements, other special needs, or, work restrictions and/or an identified health condition is resolved or stabilized, or at the time a change in restrictions has been instituted.

3.1.     Food allergies are to be entered into the AIMS to allow other Corrections Divisions (i.e., food service) to access this determination.  All other allergies (drug/substance) will be tracked through Problem Summary Listing, chart marking, pharmacy databases, and red-ink chart entries.

3.2.     AIMS comments will be documented in the AIMS system in accordance with HSTM policy.

4.0.     The attached criteria will help the reader to understand facility capabilities and clarify the level of wellness that is needed to assign an inmate to ADC complexes.

ADC010908

| | Alcohol & Substance Abuse | OPR:<br>Health Services Division Administrator |
|---|---|---|
| Arizona Department of Corrections | | Auth: st |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 1.1. | Supercedes:<br>Effective Date:<br>January 1, 2010 |

REFERENCES:        DEPARTMENT ORDER 917
                   NCCHC STANDARD P-G-06
                   NCCHC STANDARD P-G-08

PURPOSE:   To provide appropriate management of inmates who are intoxicated or withdrawing from alcohol or drugs.   To provide Health Services support in drug and alcohol education and counseling efforts led by the Counseling and Treatment Services Division.

RESPONSIBILITY:   It is the responsibility of each health staff member to evaluate every new intake or parole violator for signs and symptoms of drug or alcohol use or withdrawal symptoms. Addiction treatment services personnel at the intake facilities are to ensure each arriving inmate is assessed for drug and alcohol use/abuse.

1.0      Intake and Assessment:  Health Services staff will interview each new intake and obtain drug/alcohol use/abuse history, review corroborating documentation, assign drug/alcohol treatment needs score according to established criteria, enter score on classification profile and recommend an appropriate level of intervention and treatment required.

2.0.     Staff response to indications of alcohol intoxication
2.1.     Document observations of slurred speech, unsteady gait, odor of alcohol on the breath and level of consciousness.  Then question the inmate to glean time of last drink, number and type of drinks per day, how many days he/she has been drinking. Also inquire about previous history of withdrawal symptoms.  Staff will identify any existing medical conditions that would be exacerbated by withdrawal of alcohol.
2.2.     Intoxicated inmates will be placed where staff can observe them.
2.3.     Inmates experiencing life-threatening intoxication are sent to a licensed acute care facility.

3.0.     Alcohol Withdrawal:
3.1.     Health staff are to observe the inmate for alcohol withdrawal symptoms.

262

ADC010909

- Mild to Moderate withdrawal symptoms include: tremors, agitation, irritability, anxiety, nausea, vomiting, diarrhea, profuse sweating, and inability to sleep or eat.  Usual onset is 6-8 hours after the last drink but can occur sooner.  Inmates experiencing mild to moderate signs and symptoms of withdrawal should be placed in a single cell and closely observed for increased severity of symptoms.
- Major withdrawal symptoms include:  confusion; disorientation; agitation severe enough to require restraints; hallucinations (olfactory, tactile, auditory or visual) and must be reported to medical personnel immediately. Hospitalization is required to safely manage major withdrawal symptoms.

4.0.    Drug Intoxication:
4.1.    An inmate under the influence of drugs may present with many of the same behaviors as alcohol intoxication.  Question the inmate to ascertain the amount, frequency and type of drugs being used. Obtain a medical history to identify any conditions that could be adversely affected by abrupt withdrawal of the drugs.  Note that all inmates determined to be abusing drugs should be single celled and under observation.

5.0.    Drug withdrawal:  Withdrawal syndromes that follow abrupt cession of drug use require medical attention.  Different drugs have different withdrawal phenomena that vary in their degree of risk and intensity.  A provider should be contacted immediately upon suspicion of active drug withdrawal

6.0.    The Counseling and Treatment Services (CTS) Division is the lead agency in providing for treatment of inmate's who are afflicted with substance abuse.  Physical health staff (e.g., medical, nursing, dental) fill a very important supportive role in the treatment of these inmate-patients.   Health Services staff are responsible as per this manual and other policies to complete appropriate physical clinical assessments of intoxication and withdrawal; and/or medical treatment of the physiological results of disorders associated with alcohol and other drugs; and/or prescription of psychoactive drugs as required and in consultation with Counseling and Treatment Services Division; and/or provide supportive medical counseling during clinical encounters.   This support does not supplant CTS from its leadership role but enhances the overall treatment plans developed by CTS practitioners.

7.0.    Substance abuse education is offered by CTS to all inmates to provide information about recovery; increase self awareness about abuse and addiction; provide understanding about the need for treatment; increase awareness of solutions and resources; and generate motivation for treatment.  Appropriate education classes will be offered by CTS.  Such training may include Design for Living by Hazelden, Thinking Straight, Alcohol Education, and Formal Residential Treatment.

263

ADC010910

| | Sun Exposure Protection | OPR: Medical Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: jac |
| Health Services Technical Manual | HSTM Chapter 7 Section 1.2. | Supercedes: Effective Date: January 1, 2010 |

**REFERENCES:**     NCCHC STANDARD P-B-02

**PURPOSE:**  To ensure that immuno-compromised inmates who are at risk from exposure to the sun are provided proper medical clothing.

**RESPONSIBILITY:**  It is the responsibility the unit provider to determine an inmate's need for temporary or permanent assignment of a Special Needs Order for clothing suitable for blocking the harmful rays of the sun.

**PROCEDURE:**  Once the determination has been made, based on clinical studies, that inmates who meet the following guidelines will be issued long sleeved orange t-shirts to reduce their exposure to the sun.

1.0     The following diagnoses must be well documented (vs reported) for an inmate to qualify for issuance of a long sleeved protection.
-        Documented history of Skin Cancer
-        Rufous skinned (red-headed) inmates
-        Inmates with past histories of actinic keratosis or basal cell carcinoma
-        Inmates with illnesses which can be exacerbated by exposure to sun such as discoid lupis or systemic lupus erythematosis.
-        Inmates on medications which have photosensitivity reaction to sun as a common adverse reaction, such as: sulfonylureas, some tetracyclines, phenothiazines, thiazide, chlorothiazides, diuretics, griseofulvicin, or coal tar preparations administered topically
-        Other somewhat uncommon illnesses may be considered for long sleeved shirt issuance, such as:  erythema multiforme, pemphigus erythematosis, solar urticaria, scleroderma, dermatomyositis, erythropoetic protoporphyria, porphyries including porphyria cutanea tarda, or albinism.

3.0     Shirts should only be given after a request has been submitted by HNR.

264

ADC010911

4.0     An undocumented history of photosensitivity is not a valid reason for issuance, unless alleged to be from a medication which the inmate is currently taking.

ADC010912

| | Therapeutic Diets | OPR:<br>Health Services Division<br>Administrator / Medical<br>Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: ta |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 1.3. | Supercedes:<br>HSTM 7.1.3. June 15, 2008<br>Effective Date:<br>January 1, 2010 |

**REFERENCES:**      DEPARTMENT ORDER 912
                     NCCHC STANDARD P-F-02

**PURPOSE:**  A daily diet, which incorporates the USDA's Recommendations and Dietary Guidelines, is available to all inmates. Inmates whose medical or dental condition requires nutritional adjustment will be provided with a therapeutic diet according to orders of a prescribing practitioner.

**RESPONSIBILITY:**  It is the responsibility of the professional health service providers to ensure that the nutritional needs of inmates are met.   The dietitian is responsible to provide adequate foods to meet current industry standards of provision of nutrition).  The ADC leadership retains joint responsibility to ensure that the food served will help inmates to be healthy.  The inmate receiving a medically recommended/ordered diet has a responsibility to follow the clinical treatment plan.

**PROCEDURES:**
1.0.      Medical Diets are special diets ordered for temporary or permanent health conditions that restrict the types, preparation, and/or amounts of food.  Examples include restricted calorie, low sodium, low fat, pureed, soft, liquid, and nutritionally supplemented diets.  While medical diets may impact upon or be impacted by those diets which are of a religious or security nature, such impact is not the focus of this document.
1.1.      Restricted Diets shall be evaluated by a Registered Dietitian at least annually to ensure nutritional adequacy.  The review must also take place whenever a substantial change in the menus is made.  The review may take place through a documented on-site visit or by written consultation.  Either way, written documentation of menu reviews includes the date, signature, and title of the consulting dietician/nutritionist.  The review shall be documented by a letter to the Division Administrator who will distribute copies to all FHAs for local files.

2.0.      Inmates who may require therapeutic diets may be identified either upon the initial health screening and assessment process, by exam or by changes in physical conditions.

266

ADC010913

2.1.     Restricted Diets shall be prepared as outlined in the Food Service Technical Manual and the Diet Guidelines Manual.

3.0.     An order for a therapeutic diet must be consistent with the therapeutic diets listed in the diet manual and supported in the progress notes with SOAP documentation by the prescribing practitioner including diagnosis and treatment plan.

3.1.     When inmates refuse prescribed diets, follow-up nutritional/medical counseling is provided.   Inmates who fail to adhere to medical diets are not disciplined, but counseled by health staff.

3.2.     The clinician's decision to stop medical diets is a therapeutic decision and shall be accomplished in accordance with the Food Service Technical Manual.  The manual outlines a process for providing medically ordered and required diets. The manual establishes a process for obtaining Restricted Medical Diets, Diet terms and conditions, Diet Order/Diet Card issue, and Diet Order/Card revocation.  The Food Service Technical Manual also provides requirements regarding an inmate's removal from a Restricted Diet, the Medical Diet Process, the process for ensuring that inmates who are on a Restricted Diet and who transfer continue to receive the diet at their new location.

3.3.     When an inmate agrees to and accepts a diet card, he or she has obligated themselves to follow the operational rules regarding diet management.  If they do not follow ADC's rules, as outlined in the Food Services Operations Manual, they are subject to Departmental action.  Mere refusal to follow a therapeutic diet is not subject to discipline.  However, other actions involving diet trays or diet cards, or trading foodstuffs, which may call for discipline by the Department include; Lying or presenting false or misleading information to staff, volunteers or others acting in official capacity, Disobeying a verbal or written order, including Departmental and institutional rules, policies, procedures, memoranda or other directives, Fraud, or Counterfeiting or forging any official document or currency.

3.4.     As directed in the Food Services Technical Manual, the Dietary Services Manager is authorized to require the inmate to contact Health Services to continue a therapeutic diet.  The authorization extends to an inmate's failure to follow administrative guidelines.  The only individuals authorized to cancel or discontinue a therapeutic medical/dental diet order is a provider.

4.0.     Upon receipt of a practitioner's order, the health status will be updated on AIMS to reflect the order. Special diets are verified as needed through use of the health status program.

5.0.     Food Services maintains a diet manual that contains the cyclical centralized menu and therapeutic diet menus. Therapeutic diets conform as closely as possible to the centralized menu. A registered dietitian evaluates all menus twice a year for nutritional adequacy.

5.1.     Appropriate diets are served that incorporate the principles expressed in the United States Department of Agriculture and the Department of Health and Human Services Food Guide Pyramid and meet the current Recommended Dietary Allowances for appropriate age groups. Orders for medical diets include the type of diet, the duration for which it is to be provided as mandated by existing food service guidelines, and special instructions, if any

5.2.     Food Services Managers shall ensure that workers who prepare regular and medical diets are trained in preparing the diets, including appropriate substitutions and portions.

267

5.3.    The Food Service Contractor shall provide the necessary supervision and training, ensuring that restricted diets are prepared and served in accordance with the Diet Guidelines Manual.

5.4.    A Food Service Staff member or designee shall be responsible for obtaining the inmate's signature on the diet sign-in sheet when the inmate receives a diet tray or snack.

6.0.    Special Populations:   Basic nutrition is to be given to all inmates in administrative and punitive segregation, as well as to all others.  Menus shall be reviewed and approved by the nutritionist to ensure that the nutritional needs of adolescent inmates are met

7.0.    Any diets that are not already approved in the Diet Manual and are desired to be provided for an inmate must receive the approval of the Medical Program Manager prior to forwarding the diet order to the inmate and/or to the kitchen.

7.1.    The ordering provider will forward a request (MRC format) to the Medical Program Manager.  The following items must be addressed with that request.  If not addressed the request will be returned - not processed:

    - Description of the desired diet, identification of the diagnosis that supports such a diet order.  Include the negative impact seen as a result of lack of the special diet.

    - If allergy related, description of the outcome of tests completed.

    - If no allergy tests were performed, describe why they were not performed.

    - Describe all pertinent treatments to date provided to ameliorate the apparent negative impact of the current diet.

    - Validate that a discussion was held with the inmate regarding his diagnosis and that the inmate understands the need for compliance with the requested diet.

    - Provide any specialist or consultative documents that support the recommendation.

268

| | The Pregnant Inmate | OPR:<br>Health Services/Perryville<br>FHA & Nursing Program<br>Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: lc |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 1.4. | Supercedes:<br>Effective Date:<br>January 1, 2010 |

**REFERENCES:**     DIRECTOR'S INSTRUCTION 243
                                  NCCHC STANDARD P-G-07
                                  NCCHC STANDARD P-G-10

**PURPOSE:**   To assure that pregnant inmates receive comprehensive counseling and assistance in accordance with their expressed desires regarding their pregnancy, whether they elect to keep the child and place the child with a family member or friend, turn the child over to Child Protective Services or place the child for adoption.

**RESPONSIBILITY:** It is the responsibility of the Warden to ensure that pregnant inmates are transported and restrained in accordance with Directors Instruction 243.  It is the responsibility of the Key Contact Provider and CRNS II to assure that the OB/GYN and nursing staff provide necessary counseling to pregnant inmates

**PROCEDURES:**
1.0     Intake Counseling/Education for Pregnant Inmates
1.1.     Newly committed inmates arriving from sending counties/jails, when identified as pregnant, will be provided counseling on the day of arrival by the intake nurse.  The counseling will consist of the following topics; Avoiding the use of alcoholic beverages; Smoking cessation; Restricting the use of caffeine; Avoiding risky behaviors such as tattooing, sharing dirty needles and other dangerous practices; Obtaining sufficient rest and sleep; Avoiding street drugs; Maintaining adequate nutrition; Discussion of the birthing process and signs/symptoms of labor; and other topics determined by the FHA to be in the best interests of the patients.
1.2.     The complex OB/GYN provider will ensure that pregnant parole violators returning to custody will discuss the above counseling topics at the first scheduled appointment.
1.3.     All counseling/education provided by the OB/GYN, nursing or other staff related to pregnancy will be documented in the SOAP format within the inmate medical record.

2.0     Ongoing Pregnancy Counseling
2.1     The OB/GYN provider will meet on a scheduled basis with all pregnant inmates at a frequency determined by the progression of their pregnancy and special needs.

269

2.2.     The provider will assure that the inmate is provided an opportunity to ask questions about her pregnancy and questions are answered as comprehensively as possible.  Topics that should be raised by the provider if not asked by the inmate include:
- Use of anesthesia and details related to the birthing process
- Physical/sexual activity
- Labor signs
- Nutrition counseling
- Breast/bottle feeding (dependent on release date)
- Environmental/work habits
- Tubal sterilization (following release)
- Lifestyle choices during pregnancy related to the use of tobacco and alcohol
- Discussion of choices related to placement of the child with family, Child Protective Services or adoption.

3.0.     If the inmate is taking methadone during pregnancy due to a heroin addiction, the OB/GYN should discuss ongoing use and issues, as well as prepare the inmate for the cessation of the methadone following delivery.  Close to the time of delivery, the OB/GYN should consult with other medical providers as necessary to establish a treatment plan for dealing with any serious withdrawal symptoms that may present themselves and share this plan with the inmate.

4.0.     The newborn baby cannot return to the prison complex with the mother following birth. Therefore, the FHA will coordinate with the Warden in his/her development of a system wherein pregnant inmates are advised during their pregnancy to coordinate with the Correctional Officer III/IV staff at their housing unit.  The inmate and CO III/IV must work together in arranging contacts with family, friends, and outside agencies that will be involved in placing the child after birth.   The inmate and CO III/IV must establish contact with these individuals to finalize custody arrangements.

5.0.     Abortion Counseling:  The OB/GYN may discuss the process of abortion with all pregnant inmates with clarification of the following points:
5.1.     Elective abortions are only performed if the inmate is able to pay for all costs related to the procedure.  Related costs include all doctor and allied health clinician fees;  all laboratory and diagnostic tests completed; all inpatient hospital costs, including surgery; all medication costs; all transportation costs to and from medical appointments related to the abortion procedure; all security costs including staff/labor costs; all follow-up medical/mental health costs following the completion of the procedure
5.2.     Essential abortions will be performed as deemed appropriate by Department and contracted consultants when the mother's health and safety are jeopardized by the ongoing pregnancy.

6.0.     Post-Partum Counseling:  The OB/GYN will schedule the inmate for a follow-up appointment after delivery.  In addition to evaluating medical needs related to post-pregnancy issues, the OB/GYN should be aware of any indicators of depression that would warrant a referral to mental health services for evaluation and treatment.

ADC010917

| | Tuberculosis Screening & Management | OPR: Medical Programs Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: jrm/sr/jb |
| Health Services Technical Manual | HSTM Chapter 7 Section 1.5. | Supercedes: Effective Date: January 1, 2010 |

**REFERENCE:** HEALTH SERVICES TECHNICAL MANUAL APPENDIX D

**PURPOSE:** The purpose of this policy is to provide standard guidelines for the initial screening of inmates, management of latent tuberculosis infection (LTBI), and management of active tuberculosis (TB disease) including contact investigation, if indicated, and reporting requirements.

**RESPONSIBILITY:** The Medical Program Manager and the Nurse Program Manager are responsible for ensuring that all medical providers and nursing staff respectively, comply with these guidelines. The Medical Program Manager will ensure that Appendix D is regularly updated. The Facility Health Administrator is responsible for monitoring Health Staff compliance at his/her complex.

## 1.0. INITIAL SCREENING OF INMATES FOR TB

**1.1. Symptom Screening:** Nursing staff shall provide all inmates symptom screening for pulmonary TB at intake or no later than 7 days from admission.
**Pulmonary symptoms** include: prolonged cough (longer than 3 weeks duration), chest pain and hemoptysis (bloody sputum); or at least 3 of the following systemic symptoms: fever, chills, night sweats, easy fatigability, loss of appetite, and unexplained weight loss.
**With Symptoms:** Within 24 hours, evaluate for TB disease. Perform a tuberculin skin test and chest X-ray. Proceed to step IB.
**Without Symptoms:** Within seven (7) days, check for a documented history of a positive (+) skin test. Proceed to IB.

271

ADC010918

**1.2.    TB Skin Testing**: Nursing staff shall perform skin testing on all inmates with no documented history of a (+) skin test.  The skin test result (**measured and documented in mm**) must be read between 48-72 hours.  Skin test ≥ 5mm is read as positive if inmate has any of the following conditions: HIV, recent close contact of someone with TB disease, Chest X-ray (CXR) consistent with previous TB disease, is an organ transplant recipient or is immunosuppressed.  For all other inmates, skin test ≥10mm is read as positive.

▪ **No documented history of a positive (+) skin test**: Nursing staff shall administer a tuberculin skin test and read results between 48-72 hours.
▪ **Positive (+) skin test**:  Nursing staff shall refer inmate to provider for Chest X-ray & evaluation for TB disease and therapy.
▪ **Negative (-) skin test**:  Nursing staff shall evaluate inmate's HIV status based on  ADC Medical History Form (1101-29P).
▪ **HIV positive (+)**: Nursing staff shall refer to medical provider for Chest X-ray & evaluation for TB disease and therapy.
▪ **HIV negative (-)**:  Nursing staff shall repeat skin test annually.
- **Has a documented history of a positive (+) skin test**: Nursing staff shall check for

completion of treatment.


▪ **Treatment is completed**:  Nursing staff shall perform symptom screening annually.
▪ **Treatment is not completed**: Nursing staff shall refer inmate to medical provider for chest X-ray & initiation of therapy.  Nursing staff shall also perform symptom screening annually.
▪ **Chest X-ray:** The medical provider shall order Chest X-ray on an inmate who has one of the following conditions:  positive skin test, positive symptom screen, HIV infected.
▪ **Evaluation:**  A medical provider shall perform evaluation for TB disease if this is indicated.

**1.4.    Reports:**
▪ **State Required Reports**: Nursing staff shall complete all state required reports except for the Report of Verified Case of Tuberculosis (RVCT) which shall be completed by the diagnosing agency. A copy of the RVCT shall be requested by nursing staff from the diagnosing agency and filed in the inmate's medical record.
▪ The original **ADHS Prevention Registry Form** shall be filed at the back of the inmate's medical record under the Legal Tab.   A copy shall be submitted to ADHS for each of the following situations:  positive PPD, positive symptom screen,  positive chest X-ray,  completion of INH therapy, release or death of inmate prior to completion of INH therapy.
▪ Each time a copy of the Prevention Registry Form is sent to ADHS, this shall be documented at the bottom of the original form.
▪ **Monthly Infection Control/Reportable Diseases Report** shall be submitted to Central Office Health Services TB Coordinator.

**2.0.       ACTIVE PULMONARY TB or TB DISEASE**
**2.1.    Characteristics:**
Tuberculin skin test (TST) is usually positive.
Chest radiograph is usually abnormal.

272

ADC010919

Symptoms are present: at least one pulmonary symptom (i.e. cough greater than 3 week's duration, hemoptysis or chest pain) or at least three (3) systemic symptoms (i.e. fever, night sweats, unexplained weight loss, fatigue, & decreased appetite).
Respiratory (sputum or bronchial washing) specimens may be smear or culture positive for *M. tuberculosis*.

**2.2.** **Diagnosis:**  A positive culture for *M. tuberculosis* confirms a diagnosis of TB disease. In the absence of a positive culture, TB may also be diagnosed on the basis of clinical signs & symptoms.

ADC010920

### 2.3.    Medical Management and Case Control Measures

Nursing staff shall immediately put a surgical mask on all TB cases or suspects.

A TB case or suspect shall be excluded from work and any other group activities and placed immediately in an airborne infection isolation until all the following conditions are met:

▪ At least 3 successive sputum smears collected 8 hours apart, at least one of which is taken first thing in the morning, are negative for acid-fast bacilli (AFB).

▪ Anti-tuberculosis treatment is initiated.

▪ Clinical signs and symptoms of tuberculosis are improved.

**NOTE**: In the absence of an airborne infection isolation room within a facility, a TB case or suspect shall be sent to an ADC contract hospital for airborne infection isolation & for appropriate medical treatment until no longer infectious.

2.4.    Medical provider shall ensure all TB cases or suspects are administered appropriate medical treatment that meets accepted standards of medical practice.

All TB medications shall be administered by directly observed therapy (DOT) to ensure adherence to therapy.  This precludes these inmates from assignments to outside work crews.

A TB case or suspect on TB therapy shall be monitored by a nurse or medical provider for signs and symptoms of adverse reaction.

A TB case or suspect shall receive thorough medical evaluation by a medical provider if adverse reaction or drug intolerance develops.

If a TB case or suspect is released or transferred to an outside facility before completion of TB therapy, the public health department or receiving correctional facility shall be notified by the Facility Health Administrator or designee no later than 24 hours of release or transfer to ensure appropriate placement and completion of treatment. For deportation cases, contact the Arizona Department of Health Services TB Program at 602-364-4750.

### 2.5.    Employee Precautions: Employees shall wear a particulate mask (N95) when:

▪ Entering rooms housing an inmate TB case or suspect.

▪ Performing a high hazard procedure such as cough inducing procedure on an inmate TB case or suspect.

▪ Transporting an inmate TB case or suspect.

### 2.6.    Case Reporting

The Facility Health Administrator or designee shall immediately notify the Division of Health Services Administrator and Medical Program Manager at Central Office Health Services of any TB case or suspect.  The Facility Health Administrator or designee, after consultation with the Division of Health Services Administrator and Medical Program Manager at Central Office Health Services shall report a TB case to the local or state health department TB Control Program within one (1) working day of receipt of diagnosis.  Refer to the AZ Department of Health Services TB Control Manual for appropriate reporting form.

### 2.7.    Contact Investigation

The Medical Program Manager or designee at Central Office Health Services shall provide direction to the facility in any contact investigation.

Central Office Health Services in consultation with the local or state health department will provide direction to the facility in defining who is a close contact.

274

ADC010921

Nursing staff shall identify all individuals who had prolonged contact in an enclosed environment with a TB case.

Evaluation of a contact's TB infection status shall be completed within 3 working days after being identified as a contact to a TB case.

The Facility Health Administrator or designee after consultation with the Division of Health Services Administrator and Medical Program Manager at Central Office Health Services shall release gathered information regarding contacts upon request by the local or state health department.

**3.0.    LATENT TB INFECTION (LTBI)**

**3.1.    Preventive therapy** is recommended for inmates with latent TB infection (LTBI) to reduce the risk of becoming a TB disease, which is highly infectious:

Once medical evaluation has ruled out TB disease, nursing staff shall provide, by **directly observed therapy** (DOT) <u>whenever feasible,</u> a dose of 900 mg INH 2x/week for 9 months or a total of 76 doses within 12 months to inmates that meet the following criteria:

▪ HIV infected with skin test result ≥ 5 mm induration.

▪ Recent close contact of an infectious TB and skin test result ≥ 5mm induration.

▪ Chest radiograph suggestive of previous TB disease and skin test result ≥ 5mm induration.

▪ Immunocompromised who require ≥ 15 mg Prednisone a day for at least one month with skin test result ≥ 5 mm induration.

▪ Do not meet any of the above criteria and skin test result ≥ 10mm induration.

▪ Note that DOT may not be possible for IM assigned to outside work crews.

3.2.    Medical provider shall order a baseline liver profile prior to initiation of INH therapy then monthly thereafter during the course of treatment.

3.3.    Inmates on INH with liver function tests greater than 3x normal values or with signs of hepatitis or other adverse effects of the drug shall have the medication discontinued & clinically evaluated promptly.

3.4.    Inmates who refuse or are unable to complete a recommended course of preventive therapy shall be counseled to seek prompt medical attention if signs & symptoms suggestive of TB develop.   These inmates shall also be required to document in writing (see attached sample Form 1102-10P) their refusal for treatment and this shall be included in his/her medical record.

3.5.    If an inmate on LTBI treatment is released before completion of TB therapy, the inmate shall be provided one month's supply of INH tablets with instructions to take one tablet (300mg INH) a day. The inmate shall also be provided the name(s) and address (es) of the appropriate local health department where treatment can be obtained.

3.6.    If an inmate on LTBI treatment is transferred to an outside facility before completion of TB treatment, the CRNS I/CRNS II of the sending facility shall notify the receiving correctional facility of the inmate's current TB medication and requirements for completion of therapy.

ADC010922

**4.0.     Management of Missed Dose(s)**

For interrupted treatment lasting 2 or more months, rule out TB disease before continuing LTBI treatment.  For frequent or prolonged interruptions, start LTBI treatment from the beginning.

**5.0.     Annual Screening**

Inmates shall be screened annually for tuberculosis. Follow the steps outlined in the section on initial screening.

**6.0.     Terminology Definitions can be found in Appendix G.**

ADC010923

| | Hunger Strike clinical support | OPR:<br>Medical Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: st/jb |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 1.6.1. | Supercedes: n/a<br>Effective:<br>January 1, 2010 |

**REFERENCES:**       DEPARTMENT ORDER       1101.13
                                  NCCHC STANDARD          P-E-04

**PURPOSE**: To provide guidelines for the identification and management of inmate(s) on a hunger strike.

**POLICY:** It is the policy of the Arizona Department of Corrections to medically monitor inmates on a hunger strike.

**PROCEDURES:**
1.0.    Evaluation and Documentation:
1.1.    A hunger strike exists when an inmate communicates to staff that he or she is on a hunger strike, and/or has been observed by staff to be refraining from caloric intake for a period in excess of 72 hours.    If a hunger strike is communicated or observed by security staff, the inmate is to be referred to the medical staff for evaluation in accordance with Department Order 1101. If an inmate that is housed in a contract hospital communicates their intent or the hospital staff report activity of a hunger strike, the monitoring Utilization Management staff will immediately inform the pertinent Facility Health Administrator, ADC Medical Director, and Health Services Division Administrator.   ADC Health Services staff will follow the policy of the hospital located in the local area where the inmate resides.
1.2.    The Health Services Division Administrator and Medical Director are to be notified upon verification of any Hunger Strike.
1.3.    The inmate may be placed in medically appropriate housing to monitor and measure solid and liquid caloric intake and output.
1.4.    All commissary food and private food stock are to be removed, and commissary food purchasing privileges suspended for the duration of the Hunger Strike.
1.5.    Upon referral to medical staff, the medical staff are to arrange for the following initial assessment procedures:
    -  General physical exam including height, weight, and vital signs;
    - Dipstick Urinalysis;
    - Complete blood count and chemistry profile;
    - Serum pregnancy test on female inmates;

277

ADC010924

- Psychological evaluation;

2.0.    Monitoring and Support Activity

2.1.    A "Clinical Staffing" should be convened to assist in ascertaining the alleged purpose of the hunger strike.  During this Clinical Staffing meeting, the inmate will be encouraged to cooperate with the monitoring efforts of the health staff as a method of keeping him/her informed of their current state.  A verbal report by the Facility Health Administrator is required immediately upon completion of the clinical staffing.  This is followed by a full clinical staffing written report sent to Health Services Division Administrator and Medical Director within the same working day (shift) of the FHA's notification of a hunger strike.

2.2.    Medical staff are to assess weight and vital signs at least every 24 hours while an inmate is on the Hunger Strike, and document such measurements in their medical record.

2.3.    Intake and output (I & O) are to be documented at least every 8 hours.  Uncooperative patient activity must be documented.  If an inmate is uncooperative and/or the staff have documented difficulty acquiring valid I &O measurements, the attending provider may order a urine specific gravity

2.4.    When valid medical reasons exist and are fully documented in the medical record, medical staff may consider using a urine specific gravity as an alternative to monitoring the I & O in accordance with the inmate's cooperation.

2.5.    Additional medical actions should be carried out during the course of the Hunger Strike as determined by the facility physician or other appropriate health care provider and as permitted by the inmate.

2.6.    Inmate on a Hunger Strike will be given an opportunity to partake in each scheduled meal and refusal documented in the medical record.  The inmate is to be provided with adequate supplies of drinking water.

2.7.    The Facility Health Administrator or designee is to be kept appraised on a daily basis of the inmate's general medical condition, particularly as regards to need for potential transfer to an acute care medical institution or consideration of forced feeding.

3.0.    Refusal to Accept Treatment/Support

3.1.    When, as the result of inadequate intake or abnormally low output and a medical professional determines that the inmate's life or permanent wellbeing will be threatened if treatment is not initiated immediately, the health care professional is to immediately inform the Facility Health Administrator or designee.  The health care professional and Facility Health Administrator or designee will confer to determine whether to transfer the inmate to an acute care medical institution or if forced medical treatment should be recommended.

3.2.    When, after reasonable efforts have been exhausted (or in an emergency preventing such reasonable efforts) a medical necessity for immediate treatment of a life threatening situation exists, the health care professional may inform the Facility Health Administrator that a court order compelling treatment should be sought.  Forced medical treatment requires an order from a Court.  If forced medical treatment is contemplated, the Division Administrator and Medical Director must be notified.  Note that the earlier the Medical Director and Division Administrator are notified of an impending decision to recommend court ordered treatment, the better chance there is that timely intervention can be ordered by the court.

3.3.    Prior to forced medical treatment being recommended, the staff should make reasonable efforts to convince the inmate to voluntarily accept treatment.  Medical risks faced by the inmate

278

ADC010925

if treatment is not accepted are to be explained to the inmate and documented in the medical record.

3.4.      Medical staff shall continue clinical laboratory monitoring as well as medical and psychiatric/psychological follow-up as long as necessary.

3.5.      Each complex facility will produce a post order which provides specific guidance on complex response to these situations.  Particular attention should be given to the process to follow to meet the communication requirements above and to identify the preferred housing location of inmates on hunger strikes.

4.0.      Release from Hunger Strike Status

4.1.      Only a medical provider may order that an inmate be released from Hunger Strike evaluation and treatment.  This order must be documented in writing in the medical record of the inmate.

279

ADC010926

| | Suicide or Mental Health Watch | OPR:<br>Nursing Program Manager<br><br><br><br>Auth: st |
|---|---|---|
| Arizona Department of Corrections | | |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 1.6. | Supercedes:<br>HSTM 7.1.6 June 15, 2008<br>Effective Date:<br>January 1, 2010 |

**REFERENCES**:        DEPARTMENT ORDER 1103
                                     DEPARTMENT ORDER 807
                                     NCCHC STANDARD P-G-05

**PURPOSE**:  To establish consistent guidelines for placing an inmate on a suicide or mental health watch by mental health, health care staff or the shift commander.

**RESPONSIBILITY**:  It is the responsibility of any staff member who becomes aware of an inmate who is at risk of a suicidal gesture/acute mental health issue to notify the shift commander or mental health staff so appropriate measures to protect the inmate can be initiated.

**PROCEDURES:**  The direction for response to Suicide attempts and completion of a Suicide or Mental Health Watch are described in Department Order 1103.

1.0.     Inmates are placed on Suicide Watch when: The inmate's behavior is self-destructive; or the inmate is displaying suicidal behavior; or the inmate attempts suicide and/or has a documented history of attempting suicide, and there are situational warnings indicating an impending suicide attempt; or the inmate verbally threatens to commit suicide and/or to cause self-inflicted wounds.
1.1.     Clinical staff (especially nursing and medical providers) must ensure that the initial interaction/contact with an individual who has attempted or threatened suicide is to be documented on a numbered Information Report in accordance with Department Orders 1103 and 807.  The IR must be forwarded for the FHA's review, endorsement, and forwarding to the complex Mental Health Key Contact.  The IR will be documented for statistical purposes.  This process must not hinder nor alter the need or accomplishment of rapid sharing of daily information between Health Services and Counseling and Treatment Services.

2.0.     Suicide and Mental Health watch Performance:
2.1.     These watches are performed in cells that have been approved by the ordering mental health professional.  These areas generally will not have fixtures, appliances or bars which could be used with the inmate's clothing in a self-harm attempt.

ADC010927

2.2.     The inmate will be strip searched by security.  All objects that may be used as a weapon for self-harm will be removed by security.  In most suicide watch cases the inmate will remain stripped in the cell throughout the duration of the watch as determined by the risk assessment performed by the mental health staff..

2.3.     It is a combined effort of Health Services staff, Security Staff, and Mental Health staff to visually check the inmate for his/her welfare at ten minute intervals, or as otherwise specified and record the observations on the appropriate record.

3.0.     Suicide Watch and Mental Health Watch Support.  All visits by health staff shall be documented on the continuous progress record.   The medical staff member performing this check will ensure that the inmate response verbally and/or is seen moving purposefully.  The observing staff member will note that observation in the medical record.

4.0.     Cervical spine injuries can occur during falls and when an inmate attempts suicide by hanging.  The following is required for medical personnel when evaluating inmates who have fallen, or have attempted suicide by hanging, irrespective of level of consciousness.

4.1.     Medical personnel evaluating an inmate who has experienced a fall or who has attempted suicide by hanging will authorize movement of the inmate by security personnel only after the cervical spine has been immobilized.

4.2.     Security personnel may cut an inmate down who is attempting suicide by hanging. However, the inmate will not be moved further unless authorization by medical personnel has been obtained, and the cervical spine immobilized.

281

ADC010928

|  | Americans with Disability Act (ADA) eligible inmate management | OPR:<br>Medical Program Manager / Medical Records Program Manager<br><br>Auth: dc |
|---|---|---|
| Arizona Department of Corrections | | |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 1.7. | Supercedes:<br>HSTM 7.1.7. June 15, 2008<br>Effective Date:<br>January 1, 2010 |

**REFERENCES:**           DEPARTMENT ORDER 108
                          NCCHC STANDARD P-A-08

**PURPOSE:**  To require removal of barriers to programs, services and processes for inmates with qualifying disabilities pursuant to title II of the Americans With Disabilities Act (ADA) and consistent with reasonable accommodation and security requirements.   This policy is focused only on the ADA as it relates to inmate services.

**RESPONSIBILITY:**  Each complex/institution Warden has designated a Deputy Warden or Associate Deputy Warden to serve as the ADA Institutional Liaison.  That individual is responsible for coordinating the implementation of all ADA-related issues at the complex/institution.

**DEPARTMENT PROCESSES:**
1.0.     An Assistant Deputy Warden designated at each complex/institution to be the ADA Institutional Liaison is responsible for coordinating the implementation of all ADA-related issues at the complex/institution.
1.1.     The Division Administrator for Health Services (in consultation with the Department's Medical Director) is authorized to override an inmate's request to waive transfer to an ADA-accessible facility, and to revoke a previously approved waiver.

**HEALTH SERVICES PROCEDURES:**
2.0.     Procedures at the Reception Center and the subsequent transfer of an inmate with disabilities to an ADA-accessible facility are provided in Department Order 108, paragraph 108.07.

2.1.     In general, health services staff shall complete a nursing assessment within 24 hours after the inmate arrives.  Additionally, the staff shall ensure that the inmate is scheduled to see the health care provider, for continuity of care, within 14 workdays after arrival at the new facility.

282

ADC010929

2.2.     During processing at a reception center, a medical provider identify inmates who meet the designated criteria for transfer/placement of disabled inmates, perform a functional assessment  examination on the ADC form, and offer the inmate an opportunity to sign a voluntary "ADC Waiver of Liability by an Inmate with a Disability."   The medical provider shall assign a medical and health care needs (M) score and ensure the score and related disability needs information is relayed to the Offender Services Division and to the Medical Records Librarian, in accordance with the policy on Inmate Classification.  This information will be entered into the AIMS in an acceptable format to communicate the special needs of the patient. The medical provider shall enter the disability needs information on the problem list of the medical record.  The Key Contact Medical Records Librarian will ensure that a system is in place at the facility that will ensure that the assigned M score and related disability needs information is relayed to the Offender Services Division and to the Medical Records Library, in accordance with Inmate Classification policy.

2.3.     The Facility Health Administrator or designee will immediately forward all related documentation to the Health Services Coordinator, at the Health Services Division, for review by the Medical Director to verify that the criteria is met.

2.4.     If criteria are met, the Health Services Coordinator will complete a request for Inmate Transfer for Medical Reasons.  Upon approval, the Health Services Coordinator will forward the form to Central Classification for transfer orders.

3.0.     Upon the inmate's arrival at the new facility, the Correctional Registered Nursing Supervisor (CRNS) or designee shall (because of the inmate's special needs) instruct the inmate on how to obtain health care services, and document this instruction in the medical record and ensure the inmate is scheduled to see the health care provider, for continuity of care, within 14 workdays after arrival at the new facility.

4.0.     The CRNS or designee will complete a periodic reassessment and reevaluation of inmates with temporary disabilities who are assigned to an ADA-accessible facility, and:

4.1.     On a case-by-case basis and in order to follow-up on a chronic condition, perform at least a quarterly re-assessment of the medical and disability needs of each inmate with disabilities.

4.2.     Ensure the revised disability needs information is entered on the inmate's problem list in the medical record and the information is relayed to the Medical Records Librarian.

4.3.     Immediately after receiving a revised M score and related [changed] disability needs information from the medical provider, notify the Health Services Coordinator in Central Office.

4.4.     If called for by the reassessment, the Health Services Coordinator shall complete the Transfer for Medical Reasons, and forward the form to Central Classification.

5.0.     Recommending transfer/placement of disabled inmates from one facility that is not ADA-accessible to another facility that is ADA-accessible.

5.1.     The Key Contact Physician or CRNS shall identify inmates who may meet the designated criteria for transfer/placement of disabled inmates following recommendations of subordinate staff.

5.2.     The CRNS shall ensure completion of a Functional Assessment examination (and form ) Within seven workdays after the inmate is identified or a request is received for evaluation, and

ADC010930

- Determine if the inmate has a disability that requires the inmate to be transferred to an ADA-accessible facility or if the inmate will sign a ADC Waiver of Liability by an Inmate with a Disability; and
- Immediately after completing the assessment, forward all related documentation to the Health Services Coordinator for review to ascertain if the criteria are met.

## 6.0.  AUXILIARY AIDS AND SERVICES

6.1.     As described in Department 108, as consistent with security requirements, ADC shall provide or allow auxiliary aids and services to individuals with disabilities to enable them to communicate effectively and to participate in or to receive services, programs, and activities, provided that doing so will not result in undue hardship or cause a fundamental alteration to a service, program or activity.

6.2.     If a request cannot be accommodated, the Complex ADA Coordinator shall be contacted for advice and technical assistance in making appropriate auxiliary aids available for inmates at designated ADA facilities, special services beds and complexes.

6.3.     Providers, in considering work restrictions are informed that ADA-qualified inmates shall be eligible to apply for work, provided that their participation does not pose a direct threat to the health or safety of themselves or others.

## 7.0. TRANSFER FROM NON-ACCESSIBLE TO ACCESSIBLE INSTITUTION

7.1.     Department Order 108 requires that authorized health staff identify inmates who meet the designated criteria for transfer/placement of disabled inmates.  It also allows institutional staff to request a reassessment.  The request must be routed through the Facility Health Administrator to initiate assessment.

7.2.     Within seven workdays after the inmate with disabilities is identified or the request is received, a Functional Assessment in accordance with local post orders shall be completed to determine whether the inmate meets the criteria and has a disability that requires transfer.

7.3.     The ADC Nursing Program Manager retains the responsibility to review all documentation with the Health Services Coordinator.  A recommendation will be made to the Medical Director for decision on transfer/placement of disabled inmates. If a move or change in location is found to be clinically indicated, the case will be presented to the Division Administrator for action.

ADC010931

| | Clinical Staffing of Special Problems | OPR: Medical Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: jac/mh |
| Health Services Technical Manual | HSTM Chapter 7 Section 1.8. | Supercedes: Administrative Technical Manual June 15, 2008 Effective Date: January 1, 2010 |

**REFERENCES:**          NCCHC STANDARD P-A-08
                                    NCCHC STANDARD P-G-01

**PURPOSE:**  To provide a mechanism and forum to ensure a cooperative effort between the facilities administration and treating clinicians in responding to a specific inmate's health needs especially in situations of treatment refusals.

**RESPONSIBILITY:**  It is the responsibility of the health services providers to work with the operations and security staff to jointly ensure that every possible avenue is explored to encourage cooperation by inmates in completion of their own care.  This policy is provided to enable communication to and with the inmate-patient.

**PROCEDURES:**
1.0.     **Clinical Staffing Reasoning**: Inmates who present with a complex issue(s) or series of health issues should receive care through the methodologies described in the Department Order 1100 series. However, the provider must have an ability to access other professional comments and recommendations regarding the inmate's care.
1.1.     To access this support the provider of record may request a Clinical Staffing by a written request to the FHA including the name and ADC number of the inmate, and a history of the issue to be addressed. The request should also include a recommendation from the provider regarding any perceived need for immediacy of the Staffing meeting.
1.2.     This action must not take the place of the any clinically required specialty consultation. It is intended to serve as an adjunct to the MRC and may be useful in situations such as; hunger strikes, inmates with multiple and incessant medical complaints, etc.

2.0.     **Membership**: The FHA shall convene the Staffing and include the following members:
-        The provider(s) of record will present the case.
-        The FHA will coordinate the conduct of the Staffing and documentation of the outcome.
-        The Correctional Registered Nurse Supervisor II will provide Nursing observations and recommendations.
-        The Psychologist or Psych. Associate II will provide Mental Health observations and

285

recommendations. If appropriate, a psychiatrist shall participate.
-        The Unit Deputy Warden will serve as a member of the Staffing Committee to provide Operational and Security observations and recommendations on a case by case basis.
-        The Unit Medical Records Librarian will take minutes and collect the individual Case Worksheets after completion of the meeting.
-        Others as deemed appropriate.

3.0.    **Conduct of the Staffing**:
3.1.     The Staffing will be scheduled to last approximately one hour and, unless otherwise indicated, will proceed as follows:
-        The FHA will provide general directions to the other members, paying particular attention to the need for confidentiality and the reason and authority for including a non-medical individual in a meeting which will most likely reveal clinical information.
-        The unit provider will present the case to the committee paying particular attention to his/her observations, laboratory, and other clinical findings.
-        The remainder of the members will query the provider, seeking to determine the current status of the inmate and developing a base of information.
-        The inmate will be brought into the meeting room and the FHA will describe the clinical staffing process. The attending provider will provide the issue(s) to be discussed.
-        The inmate will be asked to provide their concern(s) relative to the clinical staffing topic.
-        Upon completion of the inmate's presentation, the FHA will provide a synopsis of the problem and the inmate will be asked to leave while the clinical staffing members discuss their case. The inmate shall be called back and the consensus statement arrived at for resolution of any issues and/or improved treatment(s) will be provided to the inmate. A statement of understanding or misunderstanding (refusal) shall be included in the minutes of meeting as well as a S.O.A.P. entry.
-        The attending provider shall provider shall provide a "S.O.A.P." note entry as to the staffing and recommendations.
-        A copy of the minutes shall be forwarded to the Health Services Division Administrator.

4.0.    **Documentation:**
4.1.    The committee is to document the discussions and outcome of the meeting as follows:
        Inmate Name:
        DOC# Unit:
        Date: Case Reviewed by (names of committee members)
        I. Case Overview:
        II. Labs/X-rays/Observations/Testing:
        III. Inmate Statement
        IV. General Findings:
        V. Recommendations:

4.2.    The Unit Provider will also document the outcome of the Staffing in S. O. A. P. Format ensuring that the Plan is clearly documented as the following example:

        *01/01/1999    This documents Clinical Staffing Review on IM B. Daddy conducted on 15 Dec 98 by FHA, CRNS II, Provider of Record, Mohave*

286

ADC010933

*Deputy Warden, Psych Associate, Lead Dentist, and Lead Pharmacist.*

**S***: ... ... ... ....*

**O***: ... ... ... ....*

**A***: ... ... ... ....*

**P***:   Per discussions during the meeting:*

*1. Deputy Warden will check property records for orthotic shoes left at Alhambra.*

*2. If Orthotics cannot be located, Medical will be informed for fitting/ordering.*

*3. No treatment is indicated for headaches beyond current treatment. Recommendation considered for salicylates.*

*4. FHA will discuss problems with Dining Services Administrator re: allegations of problems receiving "low fiber diet." Store list will be evaluated to assist in evaluation of compliance with diet and/or validate complaints of minimum ability to eat foods.*

*5. GERD screen will be conducted by provider.*

*6. Abdominal pain will be reviewed and diet developed/modified as needed.*

*7. Need for/indications for "memory test" will be discussed between Mental Health Assoc and supervising Psychiatrist on 18 Dec. Unless recommended, no test is indicated.*

 *8. I/M evaluated for clinical impact (on his flat feet) of current assignment to upper bunk. If medically warranted, lower bunk will be ordered as ordered as authorized by Deputy Warden.*

*9. Temporary filling offered if tooth is found on review to be a viable as a temporary platform.*

1.7   The HSROD shall perform periodic reviews of clinical staffings to ensure compliance with Department Orders and HSTM.

ADC010934

| | Special Needs Orders | OPR:<br>Medical Program Manager &<br>Nursing Program Manger<br><br><br>Auth: jb |
|---|---|---|
| Arizona Department of Corrections | | |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 1.9. | Supercedes: September 15,<br>2008<br>Effective Date:<br>January 1, 2010 |

**REFERENCES:**        DI # 243, Restraint Procedures for Pregnant Inmates
**(RESTRICTED)**

NCCHC STANDARD P-A-08
NCCHC STANDARD P-G-01
NCCHC STANDARD P-G-02

**PURPOSE:**  To provide information in a cooperative effort between the facilities administration and treating clinicians regarding the inmates significant health needs that must be considered in daily processing and correctional management and to preserve the health and safety of that inmate.

**RESPONSIBILITY:**  It is the responsibility of the health care provider to consider the physical needs and limitations of inmates and to share that pertinent information with correctional staff.

**PROCEDURES:**
1.0.        Health care needs are to be considered in decisions regarding the inmate's management and assignment to work and programming. This consideration is to ensure an inmate who has restrictions is not assigned work or programming that presents a risk of further injury or physical/mental debilitation.
1.1.        Correctional and Classification staff must be advised of inmate's special needs that may affect housing, work, and program assignments; disciplinary measures; and admissions to and transfers from institutions.  Such communication must be documented via an approved Special Needs Order form and performed in such a manner that does not compromise confidentiality of health information.

2.0.        Health Services support of the needs of the body should not be interpreted to be understood as all issues related to the body are a health issues.  Many issues brought to the health provider are related to comfort and the patient's interpretation of potential harm.  The below examples are provided to guide Health and Operational staff in determining accountability to respond to an inmate request.

288

ADC010935

- a proper fitting shoe size is often a comfort issue.
- an uncomfortable mattresses is often a comfort issue.
- a non-smoking vs smoking cell is often a comfort issue.
- a desire by the inmate to be cuffed in front vs behind his back is a often comfort issue.
- a desire to stay in a specific location is often a personal desire.
- a desire to have a bed wedge assigned is often a comfort issue.

2.1.    While the above are general issues, there may be aggravating circumstances that may bring the issue into the Health Services responsibility (to order and/or provide). Health Services staff are prohibited from providing clinical services to increase comfort unless there is a direct, foreseeable, and documentable relationship to the patient's clinical state of health.  Such individual circumstances must be fully evaluated and documented as having negative clinical impact on this specific inmate.

3.0.    The following guidance is provided in consideration of **bed wedges** prescribed for adjunctive treatment of Gastroesophogeal Reflux Disease (GERD) and is effective upon publication of this policy:
- ADC medical practitioners will not prescribe a Bed Wedge via the Special Needs Order process or renew a Special Needs Order for a bed wedge for the treatment of GERD.  Specifically, Bed Wedges are not authorized to be ordered.
- ADC nursing personnel will not renew an expired or expiring Special Needs Order for a bed wedge that has been previously prescribed for the treatment of GERD.
- Bed wedges that, have been previously prescribed for the treatment of GERD and, are confiscated by operations personnel will not have a bed wedge SNO renewed.
- Bed wedges **may** be prescribed for documented, current, symptomatic congestive heart failure with orthopnea.
- Any other consideration of bed wedge prescription must be approved by the Division Director in accordance with the Medical Review Committee procedures.

4.0..    **Alternative methods of restraint are not to be directed by Health Services staff**. ADC medical practitioners will not longer issue a Special Needs Order (SNO) authorizing alternative methods of restraint.  Correctional Officers will restrain an inmate appropriately based on a variety of factors, including observation of the inmate which may suggest an alternative method of restraint is necessary.  Pregnant females will be cuffed in accordance with Director's Instruction #243.

5.0.    **Metal Detector use on inmates with pacemakers or ICD**'s (implantable cardioverter-defibrillator).  There are two concerns regarding the use of walk-through metal detectors on inmates with pacemakers or ICDs. The first is the possibility of "false alarms" where the pacemaker sets off the metal detector. The second is the erroneous concern that the pacemaker or ICD will be adversely affected by passing through the metal detector, causing potential harm to the inmate.

5.1.    There is no scientific evidence to support a claim of harmful interactions between this equipment and metal detectors.  Nonetheless:

289

- It is common community practice to have patients with pacemakers bypass metal detectors.
- Inmates who happen to pass through a walk-through a metal detector do not need a medical evaluation.
- Security concerns are to be of primary importance when faced with an inmate claiming to have lost his/her SNO. When an officer is in doubt, the inmate may be passed through a walk-through metal detector. If the officer wishes, he/she may visually inspect the anterior (front) chest wall, usually on the left side, above the breast and below the collar bone, for a hard, Zippo lighter sized device visible just under the skin. The officer may also contact the appropriate medical facility for confirmation of the presence of a pacemaker/ICD.

5.2.    Inmates with a properly documented existence of either a pacemaker, or an ICD (implantable cardioverter-defibrillator) who inform the correctional staff will not be required to pass through walk-through metal detectors. Alternate methods of search will be utilized by security personnel such as, but not limited to using a hand held metal detecting wands, pat searches, etc.

5.3.    Inmates with either a pacemaker or ICD will be provided with a **Special Needs Order (SNO)** stating "I/M has a pacemaker/ICD.  Hand wanding or other alternatives to walking through a metal detector should be utilized if available."  The SNO will be written by a medical provider, and should be written on intake if the pacemaker/ICD is present, or on return from the hospital after one of these devices has been implanted in the inmate. The duration of the SNO can be written "for the duration", or "indefinite."


6.0.    It is the inmate's responsibility to keep and protect his/her copy of the SNO. "Worn out" SNOs can be returned to the health unit for replacement.  Health Staff should be vigilant regarding the susceptibility of SNOs to be sold or transferred between inmates.  Therefore, requests to make copies of the SNO to replace a "lost" SNO should be minimized and carefully scrutinized.

290

ADC010937

| | Outside (Specialty) Care and Clinics | OPR: Medical Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: rp/cp/jb |
| Health Services Technical Manual | HSTM Chapter 7 Section 2.0. | Supercedes: HSTM 7.2.0. June 15, 2008 Effective Date: January 1, 2010 |

**REFERENCES**:          NCCHC STANDARD P-A-01
                         NCCHC STANDARD P-D-05
                         NCCHC STANDARD P-E-12

**PURPOSE:**   To ensure that the inmate's serious medical needs are met by providing for specialty care beyond the medical capabilities of the prison staff by providing a system of efficient management of requesting, deliberation, monitoring, and tracking proposals for specialty services via outside consultations.  This process will aid in ADC's delivery of medical services that are comparable with a community standard of care.  Consultations may be performed in-house, at an outside location, or by way of video conferencing / telemedicine.

**RESPONSIBILITY:**  It is the responsibility of the Facility Health Administrator to develop processes for smooth management of specialty clinical support.  It is the responsibility of the individual Provider staff to monitor their orders and to ensure successful coordination of local and regional access to community providers for specialty care.  It is the responsibility of the attending Physician or Mid-level provider to follow their requests for specialty care to ensure that the needs of the patient are met.  It is the responsibility of the Correctional Registered Nurse Supervisor II to monitor nursing staff compliance.

**PROCEDURES:**
1.0.    General Authorities:
1.1.    Facility Health Administrator: It is the responsibility of the FHA to ensure that all requests for medical services submitted to the Medical Review Committee (MRC) are accurate and complete.  The FHA neither approves nor denies any requests for medical services.
1.2.    Medical Review Committee:  It is the responsibility of the Medical Review Committee to ensure that the request for approval of medical services is based upon sound medical necessity.
1.3.    Key Contact Provider:   It is the responsibility of the KCP or designee to  ensure that the request for approval of medical services are brought before the Medical Review Committee and discussed for medical necessity.

291

1.3.     Clinical Coordinator (CC):  It is the responsibility of the CC to serve as the facilitator for the Medical Review Committee.  As such the CC will forward requests that have been approved by the MRC to the Central Office Medical Review Board (MRB) for final decision on any request.   The CC is also responsible for all travel arrangements and appropriate documentation preparation to accompany the inmate for any consultations.  While the CC is responsible to ensure that pertinent medical holds are entered, local policy must be developed that ensures that inmates who are scheduled for a necessary specialty visit or treatment remain in the current location, regardless of who actually makes the entry.  The CC also schedules and documents all MRC meetings.

1.3. INTERSTATE COMPACTS:  The FHA, MRL II, and Clinical Coordinator should jointly be monitoring the existence of interstate compact inmates within their complex.  In the event that a costly medical procedure becomes necessary, the sending State should be consulted ahead of the appointment.   This will be accomplished through FHA sharing information with the Health Services Medical Administration Officer and the Interstate Compact Administrator in Phoenix, Central Office.  The FHA will determine local responsibility for maintaining and updating the list produced by AIMS (see HSTM 7.8.0.)

2.0.     Medical Review Committee:

2.1.     The membership consists of the FHA and the KCP or designee, all medical providers, and the Clinical Coordinator.  In an urgent case, the minimum quorum will be the FHA and KCP or designees.  The MRC will meet at least every two weeks to discuss requests for consultation or services.  All requests for specialty or outside of ADC healthcare services must be submitted to the MRC on the Consultation Report form #70400064.

2.2.     At the time of approval by MRC and submission to the Central Office MRB, a case appropriate "medical hold" will be placed on the AIMS system in accordance with HSTM guidance and complex procedures to guarantee that the inmate is not moved to another facility prior to disposition of the request and to allow for receipt of desired services for approved requests.  --    This information and the request will be forwarded for further consideration from the Central Office Medical Review Board (MRB).

-       Requests that are approved by MRC following discussion are entered into a database by the CC.   The database is reviewed periodically (at least weekly) by the CC for review of decisions made by MRB and assurance that appropriate result feedback is received and provided to the appropriate complex health services staff.

-       The CC will follow up w/ Central Office on any outstanding Consultation Requests that remain in a "pending approval" status after 5 business days and report on those outstanding Consult Requests at the next Medical Review Committee meeting.

2.3.     The HROD shall ensure each complex MRC complies with Department Orders and Health Services Division Technical Manual guidance and shall ensure further consistency in the procurement of health related goods and services delivered to the inmate population among complexes within the region.

2.4.     The review shall be accomplished by utilization review, ratio of referrals to inmate population, prison comparisons and the review of current monthly reports, which are produced at

292

ADC010939

the facility level.  The statistics are then compiled and distributed to the Facility Health Administrator by the Health Services Division Administrator.

3.0.    Medical Review Board (MRB):  The Medical Review Board consists of the Medical Program Manager.  Also included are all clinical program managers and Health Services Coordinator.  In an urgent case, the minimum quorum will be the Medical Program Manager.
3.1.    Only the Medical Program Manager (or specified designee) may deny any request that has been approved by MRC.

4.0    Medical Records and Documentation Requirements are set to ensure that pending appointment information is transferred from the sending facility to the receiving facility.
4.1.    The Correctional Registered Nurse Supervisor II (CRNSII) will monitor nursing staff for ensuring that systems are in place and followed to inform and convey inmates to specialty appointments.   In addition, the CRNS II shall coordinate the necessary in-service training to accomplish this process in an accurate and timely manner.

5.0.    Medical Record Scheduled Appointment Form will be used for Outside Referrals.
5.1.    Form Management—on-site specialty appointments:  Inmates are to be scheduled for appointments as indicated by the specific discipline providing the required service or exam.  Upon completion of the scheduled appointment any subsequent appointment that is scheduled shall be noted in the appropriate health unit appointment book.  The scheduled appointment shall be noted on the "Scheduled Appointment" form.
              The form shall note in columnar format:
-        the date the inmate was seen;
-        the date of the scheduled appointment;
-        the appointment location;
-        the appointing discipline; and
-        the indicating reason for the specific health care appointment.
5.2.    In the event that an appointment is to be scheduled and there are compelling reasons that cannot be scheduled at the time of the initial appointment, columns as noted in the paragraph above shall be completed. The author of the initial appointment or the staff member noting the order shall document in the progress note the reason for the postponement of the next scheduled appointment.
5.3.    When the determination has been made that the appointment, as noted above, is to be made; a member from the respective discipline shall place the appointment date in the unit appointment book and on the Scheduled Appointment form.
5.4.    Upon completion of the scheduled appointment the actual date the inmate was seen shall be noted in the "Date Seen" column.
5.5.    If the initial date of the scheduled appointment is changed the unit appointment book shall reflect the rescheduled date.  In addition "Rescheduled" shall be noted in the "Date Seen" column of the Scheduled Appointment form and a new and total entry shall be completed.

6.0.    Form Management--Community Appointments:  Upon the clinical coordinator's receipt of the Medical Review Board's approval of an outside consultation, the clinical coordinator shall: Arrange for the outside appointment as directed by local post orders; and contact the

ADC010940

sending medical unit nursing staff with the specific information as outlined in this document; and the unit nursing staff are responsible for the completion of form.

7.0.    The nurse noting the orders of the medical provider is responsible to enter the proper information into the column noting the actual date the inmate was seen upon the inmate's return from the outside consultation; subsequent follow-up appointments on or off the prison complex must be documented as directed in this document.  The Scheduled Appointment form shall be maintained as the top document in section number one of the medical record.

ADC010941

| | Outside Hospitalization | OPR:<br>Medical Service Administrator |
|---|---|---|
| Arizona Department of Corrections | | Auth: jac |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 3.0. | Supercedes: June 15, 2008<br>Effective:<br>January 1, 2010 |

**REFERENCES**:     DEPARTMENT ORDER 1101
                    DEPARTMENT ORDER 711
                    NCCHC STANDARD P-D-05
                    NCCHC STANDARD P-E-13

**PURPOSE:**  To ensure that the inmate's serious medical needs are met by providing a pre-arranged plan for hospitalization beyond the confines and medical capabilities of the prison complexes utilizing the existing community resources.

**RESPONSIBILITY:**  It is the responsibility of the Health Services Division Director, Health Regional Operations Directors, and the complex Facility Health Administrators to be aware of both local and regional options available in the community to accept continued medical care of incarcerated inmates.

1.0.     Regional Hospitalization:  Health Services Division will coordinate the development and maintenance of written contracts for hospitalization of inmates beyond the confines of the prison complexes.  The contract documents will specify the agreed upon reimbursement arrangements and billing practices.  Services will consist of Level One Trauma, intensive care, and routine hospitalized care for all anticipated medical conditions.
1.1.     Responsibility of medical care will be transferred to the physicians licensed to practice medicine in the state and credentialed in good standing by the contracted hospitals. 1.2.
         Admission of the inmate to the hospital may be arranged in advance through a Direct Admission process and/or through the hospital's Emergency Department.
1.3.     The Health Services Administrator at the HSB is responsible to brief the Medical Director and Division Director on issues of "high cost," impending death, unusual medical complications, end of life treatment issues, and public or high profile cases.
1.4.     Local hospitals closer to the individual locations of each prison complex may be utilized for emergency services and routine care.

2.0     The local Facility Health Administrator will define service requirement and assure the smooth transition of care and admission for the inmates under his responsibility.

ADC010942

2.1.    Copies of contracts detailing local arrangements will be maintained by the Facility Health Administrator and the Health Services Division.

2.2.    Local Hospital Facilities include:

| | |
|---|---|
| ASPC - Phoenix | Maricopa Medical Center, Phoenix, Az. |
| ASPC - Florence | St. Mary's Hosp. Med. Cntr., Tucson, Az. |
| | CGRM, Casa Grande, Az. |
| ASPC - Eyman | St. Mary's Hospital Medical Center, Tucson, Az. |
| | CGRM, Casa Grande, Az |
| ASPC - Douglas | Southeastern Arizona Medical Center, Douglas, Az. |
| | St. Mary's Hosp. Med. Cntr., Tucson, Az. |
| ASPC – Ft. Grant | Mt. Graham Community Hosp., Safford, Az. |
| ASPC - Globe | Cobre Valley Hospital, Globe, Az. |
| ASPC - Safford | Mt. Graham Community Hosp., Safford, Az. |
| ASPC - Winslow | Little Colorado Medical Center Winslow, Az. |
| ASPC - Apache | White Mt. Community Hosp., Springerville, Az. |
| ASPC - Yuma | Yuma Regional Med. Cntr., Yuma, Az. |
| ASPC - Perryville | Maricopa Medical Center, Phoenix, Az. |
| ASPC - Lewis | Maricopa Medical Center, Phoenix, Az. |
| ASPC - Tucson | St. Mary's Hosp. Med. Cntr., Tucson, Az. |

3.0.    Inmates in non-ADC Facilities ADC will require the same commitment of hospitalization and specialty care as it does for its own facilities for all contracted facilities, both in-state and out of state for inmates under the incarcerated care of ADC.

4.0.    Hospitalization of Inmates

4.1.    Hospital admissions may occur from pre-scheduled surgeries or procedures, from emergency department follow up, and/or from immediate admission/referral from a consulting physician of the inmate who may have been seen as an outpatient visit on a particular day.

Direct Admission to the hospital may also be made in an urgent situation by the provider on the prison complex working directly with the hospital-based Specialist to admit the patient under the care of the Specialist directly to the hospital, thereby, circumventing a clinically unnecessary stop in the Emergency Department.

Emergent admissions may be made by transporting the inmate to the Emergency Department of the receiving hospital where the patient will be examined, treated, and triaged for admission to the hospital, as medically necessary.

Refer to HSTM policy Chapter 7.2.0 regarding "Outside Consultations" and the use of the routine Medical Review Committee (MRC) process for procedures on scheduling and approvals of sending inmates to hospitals for both pre-scheduled work and emergencies.

4.2.    For pre-scheduled admissions with sufficient time for one-on-one discussions, the ADC Health Services Provider shall, in language the inmate can understand, explain the hospitalization, procedure, test, treatment, etc., to include: the nature and purpose of the referral; the risks/side effects and benefits; alternative methods/options that were or can be considered. This does not lift the responsibility that the surgeon bears to acquire informed consent.

The provider who discusses the admission must document the discussion on the Consent Form signed by the inmate.   In some medically complicated cases, the unit Provider may deem it

296

appropriate for the Specialist to obtain the Consent Form and complete a Refusal of Treatment form (if necessary) following the discussion of the inmate with the Specialist.

4.3.    As a general rule, inmates will not be transported off-complex to outside hospitals without the acknowledgment and/or direction of a medical provider employed by ADC. The FHA will be contacted by either the nursing staff or the Provider of any "send outs" to the hospital or emergency facilities.  In medical emergencies, where time is of the essence, the FHA, in consultation with the nursing staff, may authorize a medically-related transport to the hospital if a continued delay in waiting for an after-hours response from the provider would likely have a negative impact on the appropriate care of the inmate.  At the time of the Send Out, nursing service will initiate and send with the inmate to the hospital, the Outside Consultation Request form; pertinent recent Progress Notes, and a list (or printout) of the inmate's current medications. The Continuity of Care form may also be completed for significant other medical issues.  The FHA, or his designee, will provide notification of any non-scheduled transports for medical care in accordance with current Communications policies. In emergency situations, the Provider (or attending nurse) will contact the receiving hospital facility to advise of the impending transfer.

5.0    Hospitalization
5.1.    Once hospitalized, the Health Services Division Utilization Review staff will monitor the inpatient care of the inmate and will determine authorization of any additional procedures that the hospital and/or Specialist may propose following admission.
5.2.    Daily reports will be required to be provided by the hospital to the Central Office and the sending FHA.
5.3.    The FHA will continue telephone contact with the inmate's designated emergency contact following the initial notification provided by the complex chaplain in accordance with Department Order 711.

6.0.    Visitation:  Hospital visits by the relatives of a hospitalized inmate will be coordinated by the sending complex FHA according to the seriousness of the medical condition and the restrictions required by Security.  In no case, will safety for the public be diluted to allow a visit. Visitation at the St. Mary's Hospital in Tucson will be coordinated with the Tucson prison complex Chief of Security.
Visitation at the Maricopa Medical Center will be coordinated through the Case Manager at MMC and the Chief of Security for the Alhambra Complex.

7.0.    Return to the Prison Complex
7.1.    Discharge planning, and the return of the inmate to the sending complex, will be coordinated by the Health Services Division Utilization Review staff.  Decisions about the need for additional medical needs, post-hospital discharge, may determine alternate placement in an Inpatient Component at Florence or Tucson, a HU8 special needs bed, and/or considerations relative to special mobility issues.
7.2.    Discharges from the hospital will be coordinated by HSDiv UR staff with the hospital and the receiving facility.
7.3.    Security will return the inmate to the health services unit of the housing yard of the inmate upon his/her return to permit nursing staff to:  Assess the inmate following transport, Determine any continuity of care issues, Identify any medications the inmate may have been sent

297

ADC010944

back with, Obtain new prescriptions from the DOC provider for any changes in medications, Evaluate need for current insulin injections of known diabetics, Identify any follow up with the Provider and/or return visits to the Specialist, and Identify any special needs for continued recovery, such as crutches, wheelchairs, dressing changes, elastic supports, and oxygen therapy.

7.4.    Appropriate discharge information and follow-up plans will be provided by the   hospital and made available to the inmate within the requirements of control of information such as return to clinic dates.

298

| | Infirmary/Sheltered Housing Management | OPR:<br>Medical Program Manager/<br>Nursing Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 4.0. | Supercedes:<br>Effective Date:<br>January 1, 2010 |

**REFERENCES**:      DEPARTMENT ORDER 1101
                     NCCHC STANDARD P-G-03

**PURPOSE:**  To facilitate timely and appropriate care to meet the serious needs of inmates assigned to inpatient components or sheltered housing units located at Florence, Tucson, or Lewis.

**RESPONSIBILITY:**  It is the responsibility of all Health Care staff to facilitate the transfer of inmates requiring more definitive or supportive care to an appropriate housing placement.

**POLICY:**
1.0.      Medical Segregation in an inpatient setting may occur due to an inmate's medical condition requiring more definitive and supportive care than an inmate can receive in general housing areas.  ADC maintains several specially designed and staffed areas to provide for this level of care.  These medical areas are referred to as Inpatient Components (IPCs) and function like a medical infirmary with overnight bed accommodations.
1.1.      Movement in and out of the IPCs is controlled and directed by medical personnel and is based upon medical conditions.  IPCs are not to be used for detention or other security purposes.
1.2.      Consideration must be given and careful coordination must be a constant activity to ensure that (sometimes opposing priorities) fit together. Medically appropriate inmates must be placed in the open and proper IPC bed locations while security and safety for staff and inmates must be maintained.

1.0      Inpatient Components
1.1      Admission Procedure:  Admissions to the IPC or Housing Unit 8 must be coordinated by the Facility Health Administrator of the unit where the IPC is located.   Admissions requiring movement from one complex to another must be submitted through the Central Office Medical Services Administrator or designee.
An Inmate Transfer for Medical Reasons Form #70400191 must be completed by the Health Services Coordinator in Central Office.  The request shall be forwarded to Central Classification. Implementation of this transfer requires the signature of the Medical Program Manager or the

299

ADC010946

Division Administrator.   Upon request for movement into an IPC or HU-8 an Inmate Transfer for Medical Reasons Form #70400191 shall be completed by the Central Office Health Service Coordinator and forwarded to Central Classification.

1.2.      Requests for transfers will be forwarded to Central Classification by the Central Office Medical Administrator.  The inmate's medical records will be forwarded to the receiving IPC by the sending facility.

1.3.      When the admission comes following a hospitalization, the sending facility will forward the medical records after thirty days or immediately upon request.

1.4.      All visits in the IPC will be provided on a No Charge basis using the appropriate exemption code in the charge column of the Health Service Appointment List;  NC-7 for HU8 ASPC-Florence; NC-8 for Inpatient at ASPC-Phoenix (Mental Health Units); and NC-9 for IPC Patient (i.e., ASPC-Florence or Tucson or Lewis).

2.0.      Level and scope of care::
**Acute care**:    any combination of frequent observation, assistance with care activities, dressing changes, IV fluids or medications, self-care instructions or pain management.
**Complete care**:  unable to perform any self-care, needs to bfe turned, may need suctioning, oxygen-dependent, bowel and bladder care, tube feedings.
**Supportive**:  able to perform own care but needs constant supervision and verbal cueing.
**Convalescent**:  can do own care but lacks stamina to function in general population.

3.0.      Clinical Responsibilities:
3.1.      In patients arriving from a hospital prior to 1630, IPC providers will review the discharge orders before the end of that IPC provider's shift if on site.  The IPC provider will, also before the end of that shift, write admitting orders that comply with ADC's formulary.  If the patient arrives after 1630, the admission orders must be obtained by the duty nurse from the UNL provider or from the unit provider on the next duty day following the inmate's discharge from the hospital.

3.2.      No more than 72 hours will elapse between medical provider visits to the IPC units.  In the absence of the assigned medical provider, another provider will be assigned the responsibility of the visits.  On weekends/holidays after normal duty hours, the medical provider designated on the urgent notification roster will be called for orders when needed.  Medical orders from the hospital for medications and treatments may be continued.  The ADC medical provider will rewrite the orders on the next normal work day.

3.3.      Inmates admitted to the IPC will have a history and physical completed within the first 72 hours by the medical provider.  The medical provider will utilize the SOAP progress note format for their visits.

3.4.      If the assigned provider will not be on duty for 72 hours or more (i.e. vacation) the provider shall ensure the inmate is followed by another provider for continuity.  In the event the provider is unexpectedly unavailable for duty, the inmate will be followed by the provider on call.

3.5.      Nursing will observe the assigned inmates/patients frequently during each shift.  SOAP notes will be done daily and nursing assessments completed weekly.  Inmates in IPCs will be visited by nursing on a daily basis.  Daily health assessments, vitals and care will be documented in the medical record.

300

ADC010947

4.0.     Non-IPC Medical Segregation, Sheltered Housing Units are utilized for inmates with health related issues that do not require the level of care in the inpatient area.  They may or may not be in the same housing area as an IPC.  Sheltered housing units are Rincon Housing Unit 8 at ASPC-Tucson and Housing Unit 8 in Central Unit at ASPC-Florence.  The inmates in this area require assistance with some of their care.  Often they require cueing for some activities and medication administration.

4.1.     Admissions must be coordinated through the Facility Health Administrator of the facility where the sheltered housing is located.  Screening must be accomplished to prevent housing of inmates who would pose a danger to the others assigned to the unit.

4.2.     Guidelines for the management of chronic conditions will be maintained.  Medical Providers will provide ongoing visits weekly for the inmates housed in the unit.  Nursing staff will make visits to the unit at least every shift and more often as needed for the health and welfare of the assigned inmates.

4.3.     A weekly documented nursing assessment shall be performed.  All assessments shall include complete vital signs and weights when medically indicated with documentation.

4.4.     Provider follow up will be weekly for inmates housed in HU-8.

4.5.     When an inmate must be transferred from one complex to another, it must be coordinated by the Central Office Medical Administrator.

5.0.     Staffing requirements

5.1.     IPC Staffing :  A Correctional Registered Nursing Supervisor I (CRNS I) will be responsible for the daily activities of the nursing staff on the unit.  Each shift will have a minimum of one Correctional Registered Nurse (CRN) assigned to each shift.  A Licensed Practical Nurse (LPN) may be assigned to augment the activities of the RN.  Nursing Assistants (NAs) will be utilized to provide assistance with activities of daily living and routine care such as monitoring vital signs.  Mid-level Providers may be used to provide care on a temporary or intermittent basis but may not be assigned as attending provider.

5.2.     Special Housing Unit Staffing:  A CRNS I shall be assigned to monitor the care provided in the unit.  LPNs may be assigned to provide the nursing care in the unit with an RN on-site for consultation when needed.  CNAs may be used to assist with personal care if needed by the inmate.  Mid-level Providers may be assigned to provide the medical care.

5.3.     In situations where a staffing decision is being made between LPNs and RNs, Registered Nurses are the preferred level of staffing for inpatient components.  LPNs shall not be the supervising care giver in an inpatient component.

6.0.     Record keeping: The provider and the nursing staff will use the SOAP format on the continuous progress record.  An IPC chart will be initiated on every new admission to the IPC.  The same chart will be used for the inmates who return from the hospital after being admitted for more treatment/testing.  The provider will complete a discharge summary when the inmate is discharged to return to his sending unit

6.1.     The IPC chart will be incorporated in the permanent record.  The physician's Order, Admitting//Discharge Summary, Nursing care Plans should be filed under the Hospital Records Tab with the Admission/Discharge summary placed on top.  The other portions of the IPC record should be filed under the appropriate tab (SOAP notes, lab, med sheets).  If the record has not been developed with a Hospital Records Tab, the information will be temporarily filed under the Consultation Tab until the Hospital Records Tab separator can be acquired.

301

ADC010948

6.2.    A separate chart does not need to be created for Medically Segregated/Special Housing Unit inmates.

ADC010949

| | Emergency Medical Transportation Services | OPR:<br><br>Medical Services Administrator/ Medical Program Administrator<br><br><br>Auth: lc |
|---|---|---|
| Arizona Department of Corrections | | |
| Health Services Technical Manual | HSTM<br><br>Chapter 7<br><br>Section 5.0. | Supercedes:<br><br>Effective Date:<br><br>January 1, 2010 |

**REFERENCES:**    NCCHC STANDARD P-E-08
                   NCCHC STANDARD P-E-10

**PURPOSE:**  To assure that a written plan is in place pertaining to the emergency transport of an inmate from a facility to a hospital, and that medical or prison personnel involved in the transport as well as receiving hospital professionals are advised of all medical needs and issues.

**RESPONSIBILITY:**  The Facility Health Administrator and the Key Contact Physician jointly bear the responsibility to create systems that support emergency medical transportation services at each respective prison.  The Key Contact Nurse Supervisor (CRNS II) is accountable for assuring that nursing staff in preparing inmates for transport; adequately inform involved medical and security personnel of pertinent data; as well as organizing and sending necessary written documents.

1.0.    Arranging for Emergency Medical Transportation Services:  For the purposes of this policy, Emergency Medical Transportation Services will be defined as either ground-transport ambulance or air ambulance.

303

1.1.    During regular business hours, the nurse and or on-site provider will evaluate medical emergencies and determine if ground ambulance or air ambulance services are necessary. If a medical emergency is considered life-threatening, 911 should be immediately contacted.

1.2.    After hours, nursing personnel shall immediately ask that 911 be called if an emergency medical condition is determined to be life-threatening.  If the medical emergency is not immediately life threatening, the nurse will contact the provider assigned on the Urgent Response List to obtain orders for off-site use of an ambulance.

2.0    The nurse coordinating off-site emergency transfers will assure that the unit shift commander is immediately informed of the emergency so that so that security escort staff can be assigned.

2.1.    Security will provide the required number of escorts for all send outs.  In general: Security will provide two escorts and a chase vehicle to accompany the ambulance services that have been requested by medical to transport an inmate to a selected hospital and/or medical facility.  Escorts will be staged by Security as quickly as possible to avoid any delay in the initiation of the offsite emergency send out.   Radio contact will be maintained between the officer riding in the ambulance and the officer in the "chase" vehicle.   On air transports, the security team will also be staged similar to that of ground transportation, ie., one officer will accompany the patient being flown out.  Death row inmates and high risk inmates may have a second set of escorts staged by Security, but without delay to the medical urgency of the transport.  The unit nurse will continually monitor and attend to the needs of the inmate in an emergency.

3.0.    Notifications:

3.1.    Any upgrading, or changing, of the medical destination by Health Services staff or by the accepting provider will be communicated to the chase vehicle officer who will advise the sending complex of the altered change in plans.  This could also involve an upgrade to a helicopter transport if the patient's condition becomes more critical.

3.2.    Any significant delay in the transportation of an emergency send out will be reported to the complex Warden for follow up and review of circumstances to determine appropriate steps that might be taken to minimize any future events of a similar nature.

3.3.    The Facility Health Administrator will be immediately contacted by the nurse if the following conditions occur related to an emergency medical transport:  Emergency medical personnel (fire or paramedics) determine that an inmate must be flown by air ambulance to a destination hospital, or the inmate expires after off-site medical transportation is initiated.

3.4.    After hours, following the departure of an inmate by emergency medical transportation, the nurse will contact the Facility Health Administrator and leave documentation for the review on the following workday by the Clinical Coordinator and Correctional Registered Nurse Supervisor (as designated by each facility).  If the nurse cannot make contact with the FHA, leave a voice or e-mail message regarding the Name and ADC number of inmate; Housing location; Medical condition requiring transport; Type of emergency transport, Destination hospital, Date and time of transport.

3.5.    Emergency Send-Out (Sentinal Event) Review:  The FHA of a complex that sends out an inmate on an emergency transport must ensure that an event review form is completed within two weeks of the event.  The form documents the completion of a review to determine whether

304

the transport was a good clinical decision or if the health staff could have handled the situation in-house.  The review will also consider and review of what could have been done prior to the emergent situation to prevent the emergency.   The review documented on the form should include, at a minimum, the observations of the Key Contact Provider and Key Contact Nurse.  The KC provider is responsible to evaluate the medical necessity of the transport as well as advise the FHA on the efficacy of the transport.  The Key Contact Nurse should consider the attending nurses' assessment skills and make recommendations regarding corrective or educational action.

The Event Review form is to be sent to the respective Health Services Regional Operations Director within two weeks of the event.  It may be sent in inter-office mail or via email attachment.  These forms are not to be sent in batches, they must be sent as the events occur.

3.6.     If an emergency transport was ordered as a result of an order received from a provider at another complex, the HRODs must be informed so they can review the case with the Medical Program Manager.

3.7.     The Facility Health Administrator must inform the HROD if an inmate is sent to the hospital and returned the same day.

4.0.     Emergency Medical Record package

4.1.     Specific portions of the medical records must be transported with an inmate when emergency transportation is utilized.  The following will be packaged:  Transfer Summary Continuity of Care (1101-8P); Request for Medical Records (1104-1); Outside Consult Request/Medical Review Board (1101-63P); Declaration of Intent to Limit Life-Support Procedures-copy, if established (1101-9P); For pregnant inmates, copies of the MMC Pregnancy Packet

4.2.     After hours, assistance may be rendered by security staff (including medical liaison) in obtaining medical records not immediately available to nursing personnel, as well as copying and other administrative duties that need to be completed prior to the arrival of emergency transport.

5.0.     Medical Equipment

5.1.     All efforts should be taken by the nurse to retain equipment that is the property of ADC.  This includes full and half-back boards, wheelchairs, stretchers and any other equipment that could be utilized by emergency transport services.  In the event such equipment is taken, the nurse will complete an Incident Report noting the agency that took the equipment, and submit to the Facility Health Administrator.

5.2.     Effective chest compressions during Cardio-Pulmonary Resuscitation (CPR) cannot be accomplished when the patient is on a bed or a gurney.   Medical personnel, performing or supervising the performance of CPR should ensure that CPR is performed on a solid surface.  A backboard is required when performing CPR on a bed, gurney, or other transport device.

ADC010952

# SENTINAL EVENT REVIEW

| Complex: | Article II.        Unit: | Date of Event: |
|---|---|---|
| Inmate Name: | ADC # | Notifications:<br>FHA     Yes [  ]  No [  ]<br>Others: |

**Event was related to:**
[  ] Illness  [  ] Injury  [   ]  Work Accident  [  ] Self-inflict   [  ] Assault  [  ] Death

**SUMMARY OF EVENT**

| Was this a Sentinel Event?<br>Yes [  ]   No [  ] | Was the event medically predictable?<br>Yes [  ]   No [  ]   N/A  [  ] | Was the event well managed?<br>Yes [  ]   No [  ] |
|---|---|---|
| Off-site Transport Required? Yes [  ]  No [  ] | Transported to: | Authorizing Medical Provider: |
| Mode of Transport:<br>[  ] ADC Vehicle<br>[  ] Ambulance<br>[  ] Air | Airevac ordered by Ambulance Crew after accepting patient?<br>Yes [  ]  No [  ] | Disposition:<br>[  ] Admitted to Hospital<br>[  ] Returned to Unit |

*CLINICAL FINDINGS at TRANSPORT*

**Objective:**

**Assessment:**

**Transport Diagnosis:**

**Was the transport appropriate?   Yes [  ]  No [  ]     Why/Why not?  (Required)**

**KCP** _____     **Date** _____

**Is additional investigation required?   Yes [  ]   No [  ]**

*FHA* _____     *Date* _____

6/05

ADC010953

| | Segregation (Lockdown status) | OPR:<br>Medical Program Manger /<br>Nursing Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: gg/eb |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 6.0. | Supercedes:<br>HSTM 7.6.0. June 15, 2008<br>Effective Date:<br>January 1, 2010 |

**REFERENCE**:        DIRECTORS INSTRUCTION 006
                    DIRECTORS INSTRUCTION 067
                    DIRECTORS INSTRUCTION 125
                    DIRECTORS INSTRUCTION 175
                    DEPARTMENT ORDER 804
                    DEPARTMENT ORDER 1103
                    NCCHC STANDARD P-E-09
                    NCCHC STANDARD P-E-10

**PURPOSE**:   To provide continuity of care for all inmates who may be transferred into a housing area that has been designated for isolation and/or segregation of inmates.  To ensure that the inmate's medical record is reviewed upon placement/transfer to the special area.  To assess an inmate's medical issues and needs relative to any complications arising from a new housing area and to assure that the inmate has continuing access to health care.

**RESPONSIBILITY**:  It is the responsibility of the Correctional Registered Nurse Supervisor to assure that inmates are not transferred to alternative housing areas where their medical needs cannot be accommodated or met.

**PROCEDURES:**
1.0.      Special housing may be referred to as Protective Segregation (PS), DI67, Detention, Central Detention Unit (CDU), Administrative Detention, Lockdown Status, Special Management Areas, Special Management Units or similar terms.  The term "Segregation" will be used to refer to all of these areas and functions.  This policy does not apply to short term holding cells used by security, nor to suicide or mental health watches, nor to hunger strikes which are addressed elsewhere.
1.1.      Detention Rounds must be conducted by Health Services staff a minimum of 3 days per week on non-consecutive days.
1.2.      In accordance with the guidance contained in HSTM Chapter 5 Section 3.1. security will support Health Services by assure appropriate portable collection boxes are available for inmates on a daily basis.  In the lockdowns areas, the collection of HNRs will be done in such a manner as to assure medical confidentiality for the inmate.

307

ADC010954

1.3.     Inmates in a "Lock-down/lockup" status, will be instructed on local health care access procedures.  Facility/complex post orders will include the following minimum elements of direction to staff
          - specifying how the HNR forms are made available to inmates
          - specifying how the forms are collected by Health Service Staff.  Health Staff will gather those HNRs that Security has collected in the lockdown units.
          - specifying that Correctional Officer (non-health services staff) are not authorized to directly handle the HNRs.

2.0.     Security will notify Health Services of placement of an inmate in Segregation within one hour after an inmate is placed in detention. (Department Order 804).
2.1.     Upon notification of an inmate's transfer a nursing staff shall perform an immediate chart review to ascertain if any medical, dental or mental health issues exist that would contraindicate the placement or require accommodation to the inmate's lockdown status, document findings including the date and time of the "lock down" in the Progress Notes of the inmate's medical record.
2.2.     When the notification includes information that the inmate is injured or appears to be ill, nursing staff shall conduct an immediate hands-on assessment (for which there is no health care fee).
2.3.     During the first visit, nursing shall complete an initial assessment to include vital signs and weight, any physical abnormalities, including bruises or abrasions
2.4.     Any suicide ideation is to be brought to the attention of the Mental Health Staff or the Provider immediately with documentation in the Mental Health Progress Notes.
2.5.     Keep On Person (KOP) medications will be allowed to continue to be in the possession of the inmate providing there is no indication of anticipated abuse.  Watch/swallow medications will be retained by nursing and administered by nursing service, as prescribed.

3.0.     Ongoing Medical Care
3.1.     Inmates will have access to sick call, based upon a schedule established by the facility throughout their segregation.
3.2.     The HNR system will be monitored by the FHA to ensure that inmates have access to care in accordance with the basic requirements:  routine, urgent, and emergent care is available to the inmates; and inmate patient (condition and records) confidentiality is respected.
3.3.     Appointment times are scheduled and held a minimum of three times per week.  Inmates who require immediate care must have access to health care seven days per week.
3.4.     Inmates with serious mental disorders who are placed in segregation will be given consideration to being seen at the beginning, middle, and end of the week to avoid the likelihood of problems during weekend hours.
3.5.     When an inmate's housing or custody status precludes physically reporting to the Health Unit, a health services staff member will visit the housing area a minimum of three times per week to observe the segregated inmates' health status and coordinate any treatment required. There will be no health care fee for these observation visits as the visit was initiated by the health services staff.
3.6.     Should an extreme shortage of staff or a disturbance, preclude nursing staff from making a required visit, security staff shall provide the escort and supervision necessary to ensure access to health care.

ADC010955

3.7.    Necessary clinical encounters do not take place cell side, but must occur in an appropriate clinical setting.  This requires coordination between the FHA and Warden.

3.8.    Nursing will assure that necessary referrals to providers are scheduled on the Provider's Line.

3.9.    Nursing will obtain monthly weights (or witness refusals) and document those in the health record.  If an eight percent loss in weight or greater occurs from baseline measurements, the inmate must be seen by a Provider within five working days of the documented weight loss.

4.0.    Documentation of Care-in-Detention rounds must occur 3 times per week

4.1.    Nursing staff will record, in SOAP format, all of the health encounters in the Progress Notes of the inmate's Medical Record.

4.2.    Detention rounds are to be documented on ADC produced rosters or count sheets obtained for each scheduled date of detention rounds.  Specific guidance must be included in a Post Order or Institution Order.  The Health Services staff member is to place their initials by each inmate's name as rounds are conducted cell by cell.  Detention rounds documentation is considered completed upon the Health Services staff member signing and dating at the bottom of the roster or count sheet(s).

4.3.    The Facility Health Administrator is responsible to ensure that these records are maintained in a complete form and are available for auditing.  The documentation may be retained in the FHA's administrative offices or in the Detention Unit's files.  The file location must be reasonably accessible to health and operations staff performing audits to ensure that inmates placed in segregation maintains their medical health while physically and socially isolated.  These files will be maintained for a minimum of three years.

4.4.    Due to the extensive documentation of activities with segregated inmates required by policy and sound medical practices, the documentation described in this section will meet the requirements and serve as the documentation of a Health Services visit required under Department Order.

5.0     Extreme isolation refers to situations in which inmates are seen by staff or other inmates fewer than three times a day, and have little or no contact with other individuals.  ADC does not have any authorized permanent housing in this category.  However, should an inmate be placed in a temporary situation with these criteria, the inmate will be monitored by medical staff on a daily basis.

6.0     Medical segregation may occur due to an inmate's medical condition requiring more definitive and supportive care than an inmate can receive in general housing areas.  These inmates may be transferred to an Inpatient Components (IPC).  IPCs are not to be used for detention or other security purposes.   Medical Segregation is not considered a security decision.  Therefore, while there is no automatic reduction in inmate property or inmate privileges, the FHA must coordinate with the Warden to ensure the best level of health care response and care is provided to aid the patient's recovery while ensuring safety.

ADC010956

| | Management of Terminal Illness | OPR: Clinical Facility Health Administrator/ Medical Program Manager/ Nursing Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: st/cp/jac |
| Health Services Technical Manual | HSTM Chapter 7 Section 7.0. | Supercedes: HSTM 7.7.0. June 15, 2008 Effective Date: January 1, 2010 |

**REFERENCES**:          ARIZONA REVISED STATUTE § 36-3231
                         DEPARTMENT ORDER 1101
                         NCCHC STANDARD P-A-08
                         NCCHC STANDARD P-D-05
                         NCCHC STANDARD P-G-01
                         NCCHC STANDARD P-G-03
                         NCCHC STANDARD P-G-12
                         NCCHC STANDARD P-I-04

**PURPOSE:** To establish guidelines that ensures consistent management practices in providing end- of-life care for inmates with terminal illnesses.

**RESPONSIBILITY:**  It is the responsibility of all Health Care staff assigned to provide care to the terminally ill to provide a supportive environment which preserves dignity and provides pain control measures to the terminally ill inmate.  Inmates are informed of their rights to access to care as well as their right to limit life support measures at intake.

**PROCEDURES:**
1.0.    <u>Limitation of Life Support Efforts/Do Not Resuscitate (DNR)</u>.  Should an inmate develop a desire to limit life support efforts and/or to enter into a DNR agreement in future emergent situations, they must document their directive to the Health Staff.  At intake orientation, as described in HSTM 5.2.0. Inmates are informed of their right to implement a declaration via Form 1101-2P.

1.1.    The inmate must express this desire by documenting the request on an Inmate Letter (Form 70501168-A) to the Facility Health Administrator.  This letter may be written by the inmate; or dictated to an ADC employee if signed by the inmate; or verbalized to an ADC employee (and one witness), who will document the request on an IM letter form. An HNR may be accepted in lieu of an inmate letter.

1.2.    The attending physician will review the declaration with the inmate and sign the declaration as one of the two required witnesses. If the inmate is not deemed oriented to three spheres, arrange for a psychiatrist evaluation.  The physician shall discuss the inmate's illness, alternative treatment plans, and expected outcomes with the patient.

310

ADC010957

- The FHA will arrange for a meeting with a physician to determine if the inmate is alert and oriented in all three spheres prior to signing the declaration.

- The FHA will schedule a face-to-face discussion with the inmate. At the meeting the FHA will explain the form and ensure that the inmate expresses understanding of the Declaration of Intent to Limit Life Support Procedures (Form 1101-9P). The FHA will sign as the second required witness after the physician or psychiatrist signs the declaration and will ensure that the declaration is place din the medical record and copies are provided for the institutional record, master record, and to the inmate.

- The provider should write on the Problem list the Date and "DNR" and the front of the chart will need to be marked "DNR" under the name label. The forms should be filed in Legal section.

1.3.    A Pre-hospital medical care directive will be completed at this time and kept in the Nursing office. The inmate will be advised that he may revoke the declaration at any time by verbally advising any member of the ADC staff.

- The provider must enter the date and identity of "DNR" on the inmate's "Problem List"
- The Health Staff must mark "DNR" on the front of the record, under the name label.
- The forms should be filed in Legal section.

1.4.    Inmates with a directive are to have an orange 3" by 5" card affixed to his/her cell door and/or bunk with his name and ADC number. Inmates not housed in a medical unit will have a large orange self-adhering dot affixed to the back of their identification card.

1.5.    An inmate may revoke a declaration at any time verbally or by submitting an inmate letter or HNR stating his/her decision. All DNR identifying papers, cards, dots, or other labeling method, shall be removed from the inmate's area. The paperwork shall be placed in the legal section of the inmate's health record and be duly annotated as "WITHDRAWN." All medically indicated procedures shall be resumed as though the DNR had never been initiated. The inmate may re-instate the DNR directive by requesting a new declaration.

1.7.    The Division Administrator shall ensure that hospitals providing services to the Department are required by the contract to provide the Department with copies of their "Do Not Resuscitate" policy and procedures at the time the contract is approved. Inmates on a "Do Not Resuscitate" status while in a community hospital shall have this right extended after hospital discharge. Inmates shall be afforded the opportunity to complete a Pre-Hospital Medical 'Care directive (Form 1101-83P:

-        Upon return from a community hospital.
-        Subsequent to admission to an In-Patient Component Unit or medical unit.
-        The directive shall be witnessed and have the inmate's picture attached.
-        Displayed in a prominent place in the unit nursing station.
-        copied and placed in the inmate's medical record.

1.8.    If an inmate is determined to be unable to make or communicate health care treatment decisions a reasonable effort will be made to contact a surrogate who has been identified by the inmate. In the absence of a surrogate who has been identified by the inmate, contact will be attempted in accordance with the guidance contained in Arizona Revised Statutes; specifically A.R.S. § 36-3231 which states in part:

A. If an adult patient is unable to make or communicate health care treatment decisions, a health care provider shall make a reasonable effort to locate and shall follow a health care directive. A health care provider shall also make a reasonable effort to consult with a surrogate. If the patient has a health care power of attorney that meets the requirements of § 36-3221, the patient's designated agent shall act as the patient's surrogate. However,

ADC010958

if the court appoints a guardian for the express purpose of making health care treatment decisions, that guardian shall act as the patient's surrogate. If neither of these situations applies, the health care provider shall make reasonable efforts to contact the following individual or individuals in the indicated order of priority, who are available and willing to serve as the surrogate, who then have the authority to make health care decisions for the patient and who shall follow the patient's wishes if they are known:

1. The patient's spouse, unless the patient and spouse are legally separated.

2. An adult child of the patient. If the patient has more than one adult child, the health care provider shall seek the consent of a majority of the adult children who are reasonably available for consultation.

3. A parent of the patient.

4. If the patient is unmarried, the patient's domestic partner if no other person has assumed any financial responsibility for the patient.

5. A brother or sister of the patient.

6. A close friend of the patient. For the purposes of this paragraph, "close friend" means an adult who has exhibited special care and concern for the patient, who is familiar with the patient's health care views and desires and who is willing and able to become involved in the patient's health care and to act in the patient's best interest.

B. If the health care provider cannot locate any of the people listed in subsection A of this section, the patient's attending physician may make health care treatment decisions for the patient after the physician consults with and obtains the recommendations of an institutional ethics committee. If this is not possible, the physician may make these decisions after consulting with a second physician who concurs with the physician's decision. For the purposes of this subsection, "institutional ethics committee" means a standing committee of a licensed health care institution appointed or elected to render advice concerning ethical issues involving medical treatment.

C. A person who makes a good faith medical decision pursuant to this section is immune from liability to the same extent and under the same conditions as prescribed in § 36-3205.

D. A surrogate who is not the patient's agent or guardian shall not make decisions to withdraw the artificial administration of food or fluid.

E. A surrogate may make decisions about mental health care treatment on behalf of a patient if the patient is found incapable. However, a surrogate who is not the patient's agent or guardian shall not make decisions to admit the patient to a level one behavioral health facility licensed by the department of health services, except as provided in subsection F of this section or § 14- 5312.01, 14-5312.02 or 36-3281.

F. If the admitting officer for a mental health care provider has reasonable cause to believe after examination that the patient is incapable as defined in § 36-3281, subsection D and is likely to suffer serious physical harm or serious illness or to inflict serious physical harm on another person without immediate hospitalization, the patient may be admitted for inpatient treatment in a level one behavioral health facility based on informed consent given by any surrogate identified in subsection A of this section. The patient shall be discharged if a petition for court ordered evaluation or for temporary guardianship requesting authority for the guardian to consent to admission to a level one behavioral health facility has not been filed within forty-eight hours of admission or on the following court day if the forty-eight hours expires on a weekend or holiday. The discharge requirement prescribed in this section does not apply if the patient has given informed consent to voluntary treatment or if a mental health care provider is prohibited from discharging the patient under federal law.

312

ADC010959

1.9.     A person who makes a good faith medical decision is immune from liability as prescribed in A.R.S. 36-3205.  A surrogate who is not the inmate's agent or guardian shall not make a decision to withdraw the artificial administration of food or fluid.

2.0.     Pain Control.  All patients diagnosed terminally ill will have a care plan. Physical measures, such as ice packs, heat, position changes and air mattresses will be used as needed to enhance the comfort of the inmate. Medications will be given as ordered by the Health Care Provider to achieve maximum comfort for the inmate. Food and fluids will be provided as tolerated by the inmate.

3.0.     General policies for hospice type services.  Terminally Ill/Hospice care will be provided for inmates who are in the last stages of a diagnosed terminal illness. Hospice care focuses on the achievements the patient is able to make in face of physical deterioration.  The Department has embarked on a process that will lead to a hospice program.  In the interim, terminally ill patients will be provided support in a manner that is consistent with the basic medical doctrines of comfort support for the dying.

4.0.     Responsibilities of certain health care providers during terminally ill care:
4.1.     Medical:  The Key Contact Physician or designee will complete a symptom or system specific examination and develop a plan of clinical care detailing treatment, pain control and resuscitation status for consideration within 48 hours of admission.  The provider will have regular contact with and make complete progress notes on all terminally ill patients. He/she will note all changes in plans of care in the progress note. Physician orders will be written as indicated.
4.2.     The Facility Health Administrator or designee will coordinate with security for special visits when appropriate, remain administratively responsible for ensuring that all aspects of supportive care are carried out.  The FHA will arrange for the utilization of a private room for the terminally ill patient when appropriate.
4.3.     Consistent with state regulations, the FHA will facilitate the early release of terminally ill inmates in a timely manner when appropriate.
4.4.     After each patient's death, the FHA will arrange for health services staff involved in the patient's care to access Employee Assistance and Support services through the CISD team.

5.0.     Inpatient Component Nurses are responsible for ensuring that the physician/provider orders are processed and carried through; completing a daily nursing assessment, take vital signs every shift and make an entry on the patient's progress note at least every shift or as ordered by the practitioner; notifying the Key Contact Physician or treating practitioner of any significant changes in the patient's condition; ensuring that treatment orders, medications, etc. are administered as prescribed and documented and that activities of daily living are met; providing at the end of each shift, a report to be given to the oncoming infirmary nurse; and reporting all patient deaths per Department Orders and this manual.

6.0.     Monitoring and Review:  Terminally ill admissions and assignments to the infirmary shall be monitored by the Key Contact Physician and Facility Health Administrator for clinical appropriateness, quality of care and pain management.

313

ADC010960

| | Furlough Status Update | OPR:<br>Regional Health Administrator |
|---|---|---|
| Arizona Department of Corrections | | Auth: jac |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 7.1. | Supercedes:<br>Effective Date:<br>January 1, 2010 |

**REFERENCES**      ARIZONA REVISED STATUTE 41-111604.11
ARIZONA REVISED STATUTE 31-233
DEPARTMENT ORDER 1002

**PURPOSE:**   To ensure that inmates are kept informed regarding their application for medical furlough.

**RESPONSIBILITY:**   It is the responsibility the Facility Health Administrator and the Medical Staff  to keep inmates informed on the status of their applications for medical furlough or release.  It is also the FHA's responsibility to respond within a reasonable timeframe.

**PROCEDURE:**
1.0.      Inmates who have submitted a request for a medical furlough in accordance with Department Order 10002 will be kept informed of the status as the FHA is informed.

2.0.      Inmates who have submitted a request for a medical furlough in accordance with Department Order 10002 and who are found by the approving authority to meet the requirements of the program will be informed by Director's staff as described in DO 10002.

3.0.      Inmates who have submitted a request for a medical furlough in accordance with Department Order 10002 and who are found by the approving authority to not meet the requirements of the program will be informed by the FHA via an inmate letter.

The following information will be provided to the inmate:
*************************************************************
I have received your letter dated (_____) requesting initiation of Medical Furlough.

I have reviewed your medical records and discussed your situation with unit providers.

The medical furlough program is a program that allows an individual to be temporarily released from the Arizona Department of Corrections in order to obtain definitive medical treatment that

314

cannot be provided by ADC.  The policy is based on Arizona law, ARS § 41-111604.11 and
ARS § 31-233, which only permit release on a temporary basis"…for the purpose of furnishing
to the inmate medical treatment not available at the prison or institution…."

Your unit providers have advised me that all planned treatment for (primary diagnosis) can be
obtained through ADC (either in house or through one of our contracted providers).  Therefore, a
medical furlough application will not be initiated or forwarded at this time.  If your clinical
situation changes to a point that ADC is unable to provide the clinically directed care through the
mechanism's described above, you may resubmit your request.
I hope that this response helps you to understand the regulations and will help you to prepare for
successful reentry into the community.
*************************************************************

315

ADC010962

|  | Inmate Mortality | OPR:<br>Medical Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: jac |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 7.2. | Supercedes:<br>HSTM 7.7.2. June 15, 2008<br>Effective Date:<br>January 1, 2010 |

**REFERENCES**:  Arizona Revised Statute 36-2401
DEPARTMENT ORDER 601
DEPARTMENT ORDER 1105
NCCHC STANDARD P-A-10

**PURPOSE:**  To establish guidance for acknowledging, documenting, and reviewing mortalities of inmates who die while in the custody of the Department.

**RESPONSIBILITY**:  The Health Services Division Administrator retains responsibility to administer death events.  It is the responsibility of all clinical staff to understand and comply with this policy in supporting the reviews of deaths to validate the quality of care and to apply lessons learned in future mortalities.

**PROCEDURES:**
1.0.    Pronouncement:
1.1.    A Registered Nurse, mid-level provider, or a physician may pronounce death.  Only a certified coroner can certify death.    A Registered Nurse should only pronounce death if resuscitation efforts cannot be performed.
1.2.    Although Criminal Investigative Unit officers are authorized to pronounce death due to their status as peace officer, they will not pronounce deaths on inmates that are within the confines of the ADC prison system.
1.3.    As soon as possible after an inmate is determined to be dead, the Coroner or Medical Examiner will be called by the facility staff.
1.4.    The facts surrounding the pronouncement will be reported to the Division Administrator by the Health Administrator or designee within 24 hours of the death.

2.0.    Mortality Review:  All incidents of inmate death, regardless of circumstances or cause, shall be referred for investigation.
2.1.    Upon the death of an inmate the procedures listed in Department Order 1105 shall be followed.  The basic requirements include Institution Review within ten days of an inmate death performed by the Initial Mortality Review Committee and a requirement that a Central Office Review be performed upon receipt of the complete file and the inmate's medical record by the

316

ADC010963

Medical Program Manager convening a Central Office Mortality Review Committee (COMRC) meeting.  If indicated, a Suicide Review Committee will be convened by Counseling and Treatment Services Administrator.

2.2.    Medical records must be received at C.O. within 30 days of the death. Medical Records staff must make pertinent copies of the medical records that the facility's provider identifies as important to use for the 2nd Mortality Review prior to sending the records.  Do not hold the records beyond the 30 days.  **Death Records must be sent via approved commercial courier to C.O.**  If there are numerous volumes, send the 2 most current volumes.  Then, the MRL may send up the rest of the volumes via interdepartmental mail.  The MRL should inform the Medical Records Program Manager via email, informing that volumes are sent via approved commercial courier and/or via interdepartmental mail.

The date of death must be written on the front cover in red ink under the inmate label and must also be written on the Inmate Chronological Movement Record.  Please mark each volume with the date of death on the front cover.


2.3.    During the Second Level mortality review, conducted upon receipt of the autopsy, all individuals who participated in the care of the deceased patient will be involved in the second level mortality review.  This includes those individuals who provided care via UNL duty in the 7 days prior to the death.

ADC010964

| | HEALTH RECORDS TRANSFER PROCESS –Deceased Inmates | OPR: Medical Records Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: cp |
| Health Services Technical Manual | HSTM Chapter 7 Section 7.3. | Supercedes: Effective Date: January 1, 2010 |

**REFERENCES:**     NCCHC STANDARD P-A-10
                    NCCHC STANDARD P-H-05

**PURPOSE:**  To provide a uniform system to prepare health records for transfer of the records of deceased inmates to Central Office at the time of the death of an inmate.

**RESPONSIBILITY:**  The Medical Records Librarian is responsible for health records review and alterations when an inmate departs the prison system due to death.

**POLICY:**  DECEASED INMATES
1.0.    When an inmate has expired:
1.1.    Medical record librarian at the unit housing the inmate at the time of his death must secure all volumes of the health records, any "loose sheet" filing, Medication Administration Records, and any diagnostic reports that have not been signed by the provider.

2.0.    The date of death shall be marked on the front of each volume.  The date shall be located (under Allergies) on the Name /ADC # Label.  The date shall be hand written in RED MARKER as below:

### EXPIRED __/__/__   Complex/Unit name

2.1    Complete columns 4,5, and 6 of the Inmate Chronological Movement Record to document the date deceased.

3.0.    If any volumes are missing, every effort shall be made to locate the missing volume. Central Office-Medical Records shall be notified to search the database to see if it is in storage. If in storage, the health record shall be ordered from storage and kept at Central Office for placement with the current records/or sent to FHA at complex.  If the record is not in storage, the MRPM will email all MRLs with an APB to search units to locate the missing volumes.

4.0.    The health record(s) should be taken to the FHA and a Mortality Review Committee meeting will be scheduled within 10 days of death.

318

ADC010965

5.0.    The health record(s) shall be sent by the MRL II via FedX, UPS, or other acceptable certified package postal system to Central Office-Medical Records on the 30th day after the date of death for review and for permanent storage with the Expired Files.

6.0.    Charts MUST NOT be sent to Central Office via the interdepartmental mail unless approved by the Medical Record Program Manager.

319

ADC010966

| | Hospice Services Support Organization | OPR:<br>Clinical Facility Health Administrator<br><br>Auth: |
|---|---|---|
| Arizona Department of Corrections | | |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 7.4. | Supercedes:<br>Effective Date:<br>January 1, 2010 |

**PURPOSE:** To provide basic responsibilities and foundational outlines to guide in the future development of a Hospice program in support of inmates with terminal illnesses.

**RESPONSIBILITY:** It is the responsibility of all Health Care staff to, when authorized, develop Hospice services in accordance with the guidelines contained in this document.

**PROCEDURES:**

1.0. <u>General guiding principles for hospice care.</u> The HSB has a goal of providing Terminally Ill/Hospice care for inmates who are in the last stages of a diagnosed terminal illness. Hospice care focuses on the achievements the patient is able to make in face of physical deterioration. It encourages the patient to come to terms with his or her physical, mental, spiritual and emotional capacity, while providing a safe, pain-controlled and comfortable environment. Those who may be asked to participate in the hospice care team include: direct care health services staff, Religious Services, Counseling and Treatment Services (CTS) personnel, and off-site consulting practitioners.

1.1. When available, hospice care will be provided upon the inmate's request.

1.2. Family involvement will be encouraged and information provided to them during the terminal stages of the illness.

1.3. Medical personnel will deliver direct physical care and medication administration.

1.4. Volunteers may be used for spiritual and emotional support.

1.5. Adequately trained and screened inmates may be used as volunteers.

1.6. All measures will be taken to preserve the inmate's dignity while in terminal/hospice care.

1.6. The hospice system will be administered through the support of a multi-disciplinary team. The team may consist of a Chaplain, a representative from Counseling and Treatment Services, the Program Counselor assigned to the patient, Health Services staff, Key Contact Physician, other health care or non-health care providers as deemed necessary by the Facility Health Administrator, and Security staff designated by the Warden.

2.0. Admission to Hospice Program

2.1. The Clinical Facility Health Administrator will, with a supporting multi-disciplinary team, develop admission criteria. The following elements are the administrative actions to be taken for admission. Patients become eligible for hospice care when they are diagnosed with a

320

terminal disease and a prognosis of one year or less to live. The treating practitioner shall inform the patient of the prognosis and treatment options, which include hospice care.  Health Services staff will make a referral to the institution Facility Health Administrator or designee for the admission to the hospice care program. The Health Services Manager or designee will request from the treating practitioner the patient's diagnosis and estimated prognosis.  If the patient's medical condition meets the admission criteria, the Facility Health Administrator or designee shall meet with the patient to inform him/her of the care that is available and to determine if the patient wishes to participate in hospice care.

2.2.    The Facility Health Administrator or designee will notify the Key Contact Physician and schedule an interdisciplinary care conference within seven days to review the patient's condition and level of care needed.

2.3.    The interdisciplinary care conference will include all members of the hospice care team which consists of, but is not limited to: the Key Contact Physician, treating Practitioner, Facility Health Administrator, Clinical Coordinator, Hospice Supervising Nurse, and security representative.

2.4.    Upon placement of the patient in the hospice care program, the FHA or designee will stamp "Hospice Care" on the progress note to indicate the admission of the patient into the hospice care program and will review the hospice treatment plan which will be placed in the front of the patient's health care record.  The Facility Health Administrator or designee will make an entry in the patient's progress note acknowledging the start of hospice care within 24 hours of the interdisciplinary team meeting.

3.0.    The infirmary location of the Hospice Program will be staffed by adequate nursing personnel. The number of patients and care requirements will be considered by the Facility Health Administrator or designee when staffing for hospice care.

3.1.    Nursing care is to be provided according to procedures outlined in written instructions. These must be developed by the Clinical Facility Health Administrator, in consultation with the Medical Program Manager and the Nursing Program Manager.   The written Instructions will be maintained in identified Health Services Hospice areas.

3.2.    Inmate orderlies/volunteers will be assigned to assist the patient as necessary with activities of daily living in accordance with HSTM policies regarding Inmate Workers.

4.0.    Responsibilities of certain health care providers during terminally ill/hospice care:

4.1.    Medical:  The Key Contact Physician or designee will complete a symptom or system specific examination and develop a plan of clinical care detailing treatment, pain control and resuscitation status for presentation at the interdisciplinary case conference within 48 hours.  The provider will have regular contact with and make complete progress notes on all hospice care patients. He/she will note all changes in plans of care in the progress note. Physician orders will be written as indicated.  The provider will attend and participate in the interdisciplinary team hospice care meetings on all hospice care patients.

4.2.    The Facility Health Administrator or designee will schedule interdisciplinary team meetings, coordinate with security special visits when appropriate for hospice care patients and their family, remain responsible for ensuring that all aspects of care are carried out and that goals of the interdisciplinary treatment plan are met.  The FHA will arrange for the utilization of a private room for the hospice patient when appropriate.

321

ADC010968

4.3.     Consistent with state regulations, the FHA will facilitate the early release of terminally ill inmates in a timely manner when appropriate.

4.4.     At the time of hospice patient's imminent death, the FHA or designee shall notify the Warden and coordinate a hospice vigil.

4.5.     After each patient's death, the FHA will arrange for health services staff involved in the patient's care to access Employee Assistance and Support services through the CISD team and arrange for the inmate orderlies to access counseling and other bereavement services as necessary.

5.0.     Hospice Nurses are to be responsible for ensuring that the physician/provider orders are processed and carried through; completing a daily nursing assessment, take vital signs every shift and make an entry on the patient's progress note at least every shift or as ordered by the practitioner; notifying the Key Contact Physician or treating practitioner of any significant changes in the patient's condition; ensuring that treatment orders, medications, etc. are administered as prescribed and documented and that activities of daily living are met; providing at the end of each shift, a report to be given to the oncoming infirmary nurse; and reporting all hospice patient deaths per Department Orders and this manual.

6.0.     Monitoring and Review:  Terminally ill/hospice admissions and assignments to the infirmary shall be monitored by the Key Contact Physician and Facility Health Administrator for clinical appropriateness, quality of care and pain management.  Hospice admissions, average daily census and average length of stay shall be tabulated and included in the Inpatient Component monthly statistical report.

7.0.     Visits from significant others to terminally ill patients in the infirmary will be coordinated through Health Services, Security, Religious Services, and Program Counseling.

8.0.     Memorial remembrance services for deceased inmates may be coordinated and conducted by Religious Services. Attendance at these memorials will be open to inmates and staff.

ADC010969

| | Medical AIMS Entries | OPR:<br>Medical Records Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: cp |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 8.0. | Supercedes:<br>HSTM 7.8.0 of June 15, 2008<br>Effective Date:<br>January 1, 2010 |

**REFERENCES:**     DEPARTMENT ORDER 901

**PURPOSE:**  To provide a system whereby authorized Health Services staff can enter pertinent medical, dental, or mental health information into the Adult Information Management System (AIMS) described in Department Order 901.  Entry is to assist Prison Operations staff in decisions for placement of inmates.

**RESPONSIBILITY:**  It is the responsibility of the Facility Health Administrator or designee to ensure that proper entries are made by Medical Records, Dental, Mental Health and Nursing staff. Medical Record staff is responsible to monitor and maintain AIMS data.

1.0     MEDICAL RESTRICTIONS
1.1 Using AIMS data entry procedures as outlined in the AIMS User Transaction Security Procedure, authorized health staff may enter information regarding the need for an offender to be housed only at specific ADC prison facilities due to special medical or mental health needs, which are usually permanent in nature. This special need is termed a Medical Restriction.

1.2     To add a Medical Restriction to the AIMS, entries are made on the DT08, type 80 screen as follows:
- Under **ACT** (stands for Action), type: A (to indicate you are adding a comment)
- Under **Type** (of comment), type: 80
- Under **SEQ** (stands for Sequence), type: 001
- If comments take more than one line to complete, you must type in the sequential numbers under SEQ for each line used (e.g. if the comments take 3 lines, you shall type in 001, 002, 003 under SEQ.)
- Under Comments, type: the date (day/month/year), "House only at: (name specific institution(s)
- Florence, Eyman, Tucson, Perryville, Phoenix)", initials of person making the entry.
- For those cases involving restrictions based on Mental Health issues, the comment must also include the Mental Health Score as determined by Mental Health professionals.

ADC010970

1.3 To indicate a Medical Restriction has been discontinued, AIMS entries are made on the DT08, type 81 screen as follows:
- Under ACT (stands for Action), type A (to indicate you are adding a comment)
- Under Type (of comment), type: 81
- Under SEQ (stands for Sequence), type: 001.
- If comments take more than one line to complete, you must type the sequential numbers under SEQ for each line used (e.g. if the comments take 3 lines, you shall type in 001, 002, 003 under SEQ)
- Under Comments, type: the date (day/month/year) "Medical Restriction removed, may be housed at any facility", initials of person making the entry.

## 2.0    MEDICAL HOLDS

2.1 Using AIMS data entry procedures as outlined in the AIMS User Transaction Security Procedure, authorized health staff shall enter information regarding the need for an offender to be retained at an ADC prison facility due to special medical or mental health needs, which are usually temporary in nature (e.g. - pending appointments for outside consultation, postoperative recovery, etc.). This delay of an offender's transfer is termed a Medical Hold. Medical Holds are for 90 days or less.

2.2 To add a Medical Hold to the AIMS, entries are made on the DT08, type 97 screen as follows:
- Under ACT (stands for Action), type: A (to indicate you are adding a comment)
- Under Type (of comment), type: 97
- Under SEQ (stands for Sequence), type: 001.
- If comments take more than one line to complete, you must type in the sequential numbers under SEQ for each line used (e.g. if the comments take 3 lines, you shall type in 001,002, 003 under SEQ)
- Under Comments, type: the date (day/month/year) "Medical Hold: Purpose: (type in reason for hold, e.g. medical/dental work in progress; pending specialty appointments; as directed by HSD Central Office)", initials of person making the entry.

2.3 To indicate a Medical Hold has been discontinued, AIMS entries are made on the DT08, type 98 screen as follows:
- Under ACT (stands for Action), type: A (indicating you are adding a comment)
- Under Type (of comment), type: 98
- Under SEQ (stands for Sequence), type: 001.
- If the comments take more than one line to complete, you must type in the sequential numbers under SEQ for each line used. (E.g. if the comments take 3 lines, you shall type in 001, 002, 003 under SEQ.)
- Under Comments, type: the date (day/month/year) "Medical Hold removed; may be transferred from current facility", initials of the person making the entry.

## 3.0    SPECIAL DIETS

3.1 Using AIMS data entry procedures as outlined in the AIMS User Transaction Security Procedure, authorized health staff shall enter information regarding the need for an offender to receive a Special Medical Diet required because of medical diagnoses &/or conditions.

324

ADC010971

3.2 To add a Special Medical Diet to the AIMS system, entries are made on the DT08, type 01 screen as follows:
- Under ACT (stands for Action), type: A (to indicate you are adding a comment)
- Under Type (of comment), type: 01
- Under SEQ (stands for Sequence), type: 001
- If comments take more than one line to complete, you must type the sequential numbers under SEQ for each line used (e.g. if the comments take 3 lines, you shall type in 001, 002, 003 under SEQ.)
- Under Comments, type: the date (day/month/year), "Actual Diet", initials of person making the entry.

3.3 To indicate a Special Medical Diet has been discontinued, AIMS entries are made on the DT08, type 01 screen as follows:
- Under ACT (stands for Action), type: A (to indicate your are adding a comment)
- Under Type (of comment), type: 01
- Under SEQ (stands for Sequence), type: 001
d.      If comments take more than one line to complete, you must type the sequential numbers under SEQ for each line used (e.g. if the comments take 3 lines, you shall type in 001, 002, 003 under SEQ.)
- Under Comments, type: the date (day/month/year), "Special Medical Diet Discontinued", and initials of person making the entry.

4.0      SPECIAL NEEDS RELATED TO MEDICAL/MENTAL HEALTH ISSUES
4.1 Using AIMS data entry procedures as outlined in the AIMS User Transaction Security Procedure, authorized health staff shall enter information regarding special considerations required because of medical &/or mental health issues (e.g. special duty status; special housing considerations; lower bunk; extra mattress/pillows/ wedges; shaving waivers; Americans with Disabilities Act (ADA) status, etc.) which may be permanent or temporary in nature. These are termed Medical Special Needs.

4.2 To add a Medical Special Need to the AIMS, entries are made on the DT08, type 04 screen as follows:
- Under ACT (stands for Action), type: A (to indicate you are adding a comment)
- Under Type (of comment), type: 04
- Under SEQ (stands for Sequence), type: 001
- If comments take more than one line to complete, you must type in the sequential numbers under SEQ for each line used (e.g. if the comments take 3 lines, you shall type in 001, 002, 003 under SEQ.)
- Under Comments, type: the date (day/month/year), "Medical Special Need: (type in the specific special need(s) required)", initials of the person making the entry.

4.3 To indicate in AIMS that a Medical Special Need has been discontinued, entries are made on the DT08, type 04 screen as follows:
- Under ACT (stands for Action), type: A (to indicate you are adding a comment)
- Under Type (of comment), type: 04

325

ADC010972

- Under SEQ (stands for Sequence), type: 001
- If comments take more than one line to complete, you must type the sequential numbers under SEQ for each line used (e.g. if the comments take 3 lines, you shall type in 001, 002, 003 under SEQ.)
- Under Comments, type: the date (day/month/year), "Actual Diet discontinued", initials of the person making the entry.

4.4.    To indicate in AIMS that a Discharge Planning is required and/or has been initiated, entries are made on the DI35 screen as follows:
- A in the far left column of DI35 1 # is for adding subcodes
- C in the far left column of DI35 2 # is for changing subcodes
- Scroll down the page to discharge planning and type in as many discharge planning codes as are applicable (e.g., C = Hepatitis C, I- Insulin, etc.)

5.0    MEDICAL AND MENTAL HEALTH SCORE  Medical and Mental Health Score
5.1 Using AIMS data entry procedures as outlined in the AIMS User Transaction Security Procedure, authorized health staff shall enter information regarding Medical and Mental Health scores, as determined by medical and mental health providers.
5.2 To add a Medical &/or Mental Health score to the AIMS, entries are made on the DT08, type 04 screen as follows:
- Under ACT (stands for Action), type: A (to indicate you are adding a comment)
- Under Type (of comment), type: 04
- Under SEQ (stands for Sequence), type: 001
- If comments take more than one line to complete, you must type the sequential numbers under SEQ for each line used (e.g. if the comments take 3 lines, you shall type in 001, 002, 003 under SEQ.)
- Under Comments, type: the date (day/month/year) "Medical Score: (numerical score) &/or Mental Health Score: (numerical score)", initials of person making the entry.
- NOTE: For Medical and/or Mental Health scores over 1, you must also determine if a Medical Restriction or Hold exists and if so, information regarding this also must be entered as described in section 1 and/or 2 of this procedure in order to implement the Medical Restriction or Hold used in the classification transfer process.

6.0.    INTERSTATE COMPACTS:  The FHA, MRL II, and Clinical Coordinator should jointly be monitoring the existence of interstate compact inmates within their complex.  In the event that a costly medical procedure becomes necessary, the sending State should be consulted ahead of the appointment.
6.1.    To determine which inmates are interstate compact:
- go to AIMS screen DI70(space)0(space)(insert locator code here, i.e., C01 for Rincon unit)
- under criteria type and "X" in the ADC #
- this will produce a list of interstate compact inmates for that unit.

ADC010973

| | Sexual Assault | OPR:<br>Medical Program Manager |
| --- | --- | --- |
| Arizona Department of Corrections | | Auth: tj/ jac |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 10.0 | Supercedes:<br>Effective Date:<br>January 1, 2010 |

**REFERENCES**:     Public Law 108-79 (Prison Rape Elimination Act of 2003)
DIRECTORS INSTRUCTION 241
NCCHC STANDARD P-G-09
NCCHC STANDARD P-I-03

**PURPOSE:**   Inmates who report or seek health care attention as a result of sexual assault during incarceration shall receive prompt attention for treatment and evidence gathering as required.  The Arizona Department of Corrections policy encourages victims of sexual assault to report the assault and the Department encourages cooperation in its investigation and prosecution. The identity and dignity of the victim will be protected to the fullest extent possible.

**RESPONSIBILITY:**  It is the responsibility of the Health Services staff to provide supportive care to the individual.

**PROCEDURE:**

1.0.    Director's Instruction 241 directs that after the investigator has completed the suspect(s) interview, the inmate suspect(s) shall be taken to the medical unit for evaluation and documentation.

2.0     In potential cases of sexual assault, the reported victim shall be escorted for medical assessment and treatment. At no time will staff leave the victim alone until evaluated by Mental Health staff.

3.0.    It is the shift commander's responsibility to ensure that the inmate victim is escorted to the Health Unit for examination, treatment and evaluation, and if determined appropriate by the medical and/or mental health provider, transported to the hospital emergency room for the collection of forensic evidence and medical treatment.

4.0.    ADC health staff shall not conduct forensic examinations.   If a forensic examination is appropriate (as determined in accordance with DI 241), the suspect shall be taken to a hospital emergency room for such an examination.

327

| | Orthotic and Prosthetic Aids | OPR:<br>Medical Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 11.0. | Supercedes:<br>HSTM 7.11.0 June 15, 2008<br>Effective Date:<br>January 1, 2010 |

**REFERENCES**:      NCCHC STANDARD P-G-11

**PURPOSE**:   Medical and Dental orthoses, prostheses, and other aids to impairment will be provided when the health of the inmate would otherwise be significantly adversely affected, as determined and ordered by the responsible practitioner or dentist and approved by the Medical Review Committee as indicated. Inmates will not be denied prostheses, orthoses, or other aids that are medically necessary because of lack of funds. This procedure specifies the method to provide these aids to inmates.

**RESPONSIBILITY**:  It is the responsibility of the Facility Health Administrator to develop and monitor systems to support provision of medically necessary orthotics and prosthetics.

**PROCEDURE**: **Orthotics and Prosthetics**
1.0.     Definitions and Standards for Aids:  Orthoses/ Prosthetic Devices/ Mechanical Aids are specialized mechanical devices used chronically to support or supplement joints or limbs, or are artificial devices to replace missing body parts.
1.1.     Appropriate but elective orthoses, prostheses, and aids to impairment are those services/devices which are not essential to prevent significant deterioration in the essential health of the patient, but nevertheless are reasonably expected to significantly improve the quality of life for the patient as it relates to a proven chronic or ongoing medical condition. These items are generally for chronic use and become the personal property of the patient. These items include, but are not limited to; dentures, dental prosthetics such as partials, flippers, etc., glasses, contact lenses, artificial eyes, artificial limbs, certain knee/ankle/foot braces, hernia support belts, hearing aids, special support hose, TENS units, non-institution issue shoes, suspenders, batteries for hearing aids and other battery operated devices, and include maintenance and/or repair of any such device.
1.2.     There are certain items that though they may be available in the community, or are used for certain conditions, are of minimal proven medical value, requests to health services to authorize special items must be weighed against the concerns of running a safe and secure institution, and appropriate institution routine. There are many items in this category that are not generally considered or approved by Health Services as rising to a level of need to create a

328

ADC010975

medical exception to institution rules, policies, and standards, some examples are; high top tennis shoes, soft pillows, heating pads, knee sleeves for sports, etc.

1.3.    Medical aids issued by Health Services as part of acute treatment for a limited medical condition such as casts, splints, ace wraps, short-term usage of canes/crutches/braces, etc., are routinely authorized and not generally charged to the inmate.

1.4.    Hardware that is an essential part of a medically necessary procedure such as, heart valves, cardiac stent at time of angioplasty, inter-occular lens implants at time of cataract surgery, etc., are routinely authorized and not generally charged to the inmate.

1.5.    Inmates may also in certain circumstances obtain prostheses that the practitioner or dentist has determined are elective, which are medically appropriate, but are not medically necessary. This procedure establishes the mechanism for inmates to obtain these prostheses, orthoses, or other aids.

1.6.    Most aids, prostheses, orthoses become the personal property of the inmate to emphasize the inmate's responsibility to care for the item(s) properly.


2.0.    **FOOTWEAR**

2.1.    The institution is responsible for the style, quality and fitting of standard issue clothing and footwear.  Inmates with medical disorders for which special, non-standard footwear is a recognized and appropriate part of the medical treatment program and for which no reasonable treatment alternative exists will be prescribed special footwear. Footwear prescribed as "medically necessary" will be provided regardless of the inmate's ability to pay.

2.2.    Patients with medical disorders, which may require special foot care, may be scheduled with a practitioner for evaluation of the medical problem.

2.3.    Inmates with a complaint about shoes and the complaint is not clinically related to an existing medical disorder, should be directed to appropriate operations staff for assistance. A complaint of shoes being uncomfortable is not, in and of itself, a medical problem.

2.4.    The practitioner doing the examination is to determine and document by history and objective examination:  whether an inmate has a formal medical disorder for which non-standard or modified footwear is a recognized and appropriate part of the medical treatment plan, and without which there is likely to be serious deterioration in, or significant risk to, the inmate's basic health, and for which no appropriate alternative exists.

2.5.    A practitioner order for specialty shoes must be supported in the progress notes including diagnosis and treatment plan according to the criteria above.

2.6.    After authorization, the order for modified or specialty shoes will be implemented by the Facility Health Administrator or designee and sent to the appropriate purchasing agent.

2.7.    Shoes authorized by the above process and deemed "medically necessary" will not be denied due to inmate indigence.

2.8.    Requests for specialty athletic shoes are not a medical issue and should not be scheduled for practitioner examination.


3.0.    The Medical Review Committee will consider the following in determining the relative need of a prostheses, orthoses, or other aid; urgency of need, time left on sentence, overall necessity, morbidity, mortality, functional disability and expected improvement, alternatives, risk/benefit, cost/benefit, and security concerns. Based on these factors a decision is then made as to the whether the exception for the elective item should be allowed for the patient.

329

ADC010976

4.0.   **GLASSES**: The lack of vision correcting eyewear does not cause deterioration in a person's general state of health. Health Services does, however, recognize that corrected vision may promote participation in education, programming, or work assignments, it may increase comfort, or otherwise contribute to quality of life, therefore, Health Services will offer support on an as needed and as requested basis.

4.1.    Unless there is a clear clinical indication to do otherwise, Health Services will offer refractive eye examinations for each inmate a maximum of once every two years. Eyeglasses are become the inmate's real property and are handled according to the procedure outlined by Department Order 909.  Medical eye examinations will not be denied due to indigence.   Willful destruction or mistreatment of glasses will be responded to in accordance with Department guidance regarding destruction of state provided or state owned property.

4.2.    Specialty optical aids, such as photogray glasses, sunglasses, or contact lenses are considered medically optional unless ordered by an ophthalmologist as part of a medical treatment plan.

4.3.    Eyeglass frames will be provided in accordance with the styles and material described by individual optician contract.  Inmates may not choose different styles of frames beyond that offered by the optician in accordance with the ADC contract.

ADC010977

| | Establishment of Health Record | OPR: Medical Records Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: cp |
| Health Services Technical Manual | HSTM Chapter 8 Section 1.0. | Supercedes: Effective: January 1, 2010 |

**REFERENCES:**      DEPARTMENT ORDER
                     NCCHC STANDARD P-H-01

**PURPOSE:**  To provide a uniform document in which a record of an inmate's health status, diagnosis(es), examination(s), evaluation(s), treatment(s) and response(s) to treatment(s) can be recorded and maintained.

**RESPONSIBILITY:**  The establishment of the Health record is the responsibility of the Medical Records staff.  The Medical Record Program Manager may change, or revise the establishment of the health record as may be required by statute, regulation, Department Order or procedural changes.

**PROCEDURES:**  Health records (current volume and previous volumes) are kept on file in a designated area of the prison health unit(s) in numerical order as defined by the individual ADC numbers.

1.0.   ESTABLISHMENT OF THE ADC HEALTH RECORD
1.1.   Origination of Health Records: Upon arrival at any of the following designated Reception Centers medical record staff shall originate the document which becomes the inmate's health record:
-  Alhambra Reception & Treatment Center (ASPC-Phoenix-ARTC): Adult male Inmates
-  Lumley Reception & Assessment (ASPC-Perryville): Female Adult or Female minor Inmates
-  Browning (ASPC-Eyman): Death Row Male Inmates
-  Rincon Minors Unit (ASPC-Tucson): Male minor Inmates adjudicated by the courts as adults.

1.2.   Organization of All ADC Health records shall be in accordance with HSTM Chapter 8.

331

ADC010978

2.0.    Inmate Identification Information:   The health record jacket shall contain the following information in the upper right hand corner of the file jacket: Inmate's full name (last name, first name) and ADC Number (which becomes the health record file number).

2.1.    Information regarding any allergies the offender may have will be annotated in red on the Front of the file jacket

2.2.    The ADC Number will be adhered to the bottom edge of the back cover of the jacket utilizing the following color system:

3.0.   ADC INMATE NUMBER TERMINAL DIGIT – COLOR CODED BANDS will be utilized to identify the medical record for organized filing.

| 1- LT BLUE | 2-RED | 3- LT GREEN | 4-GRAY | 5-GOLD |
|---|---|---|---|---|
| 6-DK GREEN | 7-BLUE | 8-ORANGE | 9- BLACK | 0-YELLOW |

4.0.    Color-coded tabs indicating any specified Chronic Conditions which the inmate has been diagnosed with:

| CHRONIC CONDITION COLOR CODES | (SPECIFIED CONDITIONS) |
|---|---|
| RED | ALLERGIES |
| YELLOW | CANCER/CARCINOMAS |
| LT. BLUE | CARDIAC CONDITIONS |
| DK. BLUE | DIABETES MELLITUS |
| GREEN | HYPERTENSION |
| BLACK W/WHITE SPOT | PPD+ |
| BLACK | TUBERCULOSIS |
| WHITE | HEPATITIS C |
| ORANGE | RESPIRATORY DISEASES |
| MAGENTA | SEIZURE DISORDERS |
| BROWN | SERIOUSLY MENTALLY ILL (As defined by Az Department of Health Services Checklist for Seriously Mentally ill) |
| PINK | HIV+ (affixed to the inside front cover of the jacket, upper left hand corner) |
| PINK W/WHITE SPOT | AIDS (affixed to the inside front cover of the jacket, upper left hand corner) |

5.0.    All forms contained in the health record must contain the following identifying information, and be filed in chronological order, with most current on top:
-   Inmate's full name, and
-   Inmate's ADC Number, and
-   Inmate's Date of Birth, and
-   Inmate's current location (Prison, Unit).

ADC010979

**Article III.**

| | Consent to Treat/ Informed Consent | OPR: Medical Records Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: cp |
| Health Services Technical Manual | HSTM Chapter 8 Section 2.0. | Supercedes: Effective Date: January 1, 2010 |

**REFERENCES**        DEPARTMENT ORDER 1101.03
                            NCCHC STANDARD P-I-05

**PURPOSE**:   To inform staff on the requirements that all examinations, treatments, and procedures are governed by regulations and compliance with informed consent requirements.

**POLICY**:
1.0.    <u>CONSENT TO TREAT/INFORMED CONSENT</u>:    The Health Care Provider performing the procedure/treatment /test shall explain the procedure/treatment/test in language and terms the inmate can understand.  The explanation shall include what is to be done and the reason for doing the procedure/test/treatment.  The benefits of the treatment must be explained as well as any risks and possible side effects. The provider is responsible to explain the existence of any alternative test, treatment or procedures.

2.0.    The provider shall document exactly what was explained to the inmate regarding the procedure/treatment/test on the Consent to Treat Form (Form #70400005 and #1104-4P).
2.1 Request the inmate to sign the completed Consent to Treat Form before two (2) witnesses that he completely understands what has been told him/her.   The two (2) witnesses shall also sign the completed form.
2.2.    Document on the Continuous Progress Record that the Consent to treat form has been signed.
2.3.    The completed form will be filed in the inmate's Health Record File.

3.0.     The informed consent requirement **will be waived if**: an emergency requires immediate medical intervention for the safety of the patient; or if emergency care involves inmates who do not have the capacity or ability to understand the information given or if a court order to treat has been obtained.

4.0.    The completed form will be filed in the inmate's Health Record File.

333

ADC010980

|  | Release of Medical Information | OPR:<br>Medical Records Program Manager |
| Arizona Department of Corrections | | Auth: cp |
| Health Services Technical Manual | HSTM<br>Chapter 8<br>Section 2.1. | Supercedes:<br>HSTM 8.2.1. June 15, 2008<br>Effective:<br>January 1, 2010 |

**REFERENCES:**          DEPARTMENT ORDER 1104
                                      NCCHC STANDARD P-H-02

**PURPOSE:** To provide for the protection and confidentiality of the medical information and health records of inmates remanded to the custody of the ADC.  To provide guidelines for the release of medical information and copies of health records of inmates remanded to the custody of the ADC and inmates who have been released.  To provide guidelines for charging reasonable fees for the production of health record copies.

**RESPONSIBILITY:** The Medical Records staff must adhere to the strict rules of release of information.  The Medical Record Program Manager (MRPM) will instruct and guide the Medical Record staff when processing requests for medical information.

**PROCEDURE:**
1.0.    <u>RELEASE OF HEALTH RECORD COPIES TO OUTSIDE PARTIES</u>:  Health records may be released upon receipt of a valid authorization from the inmate or released offender, upon receipt of an Authorization to Release Copies of medical records, a validly served and appropriate Subpoena, or upon receipt of a Court Order.   Situations not requiring any of these documents for valid release of the health record include:
-       Court Order
-       For Law Enforcement agencies; i.e. FBI, Federal Marshall, police department, sheriff's office, jails, prisons
-       Medical Examiner;
-       Public Health Department;
-       For Emergency Treatment at a hospital;
-       State Licensure board (i.e., Board of Medical Examiners or State Board of Nursing)

334

ADC010981

1.1.    When releasing information pertaining to an inmate's care, the requesting party must produce verifiable identification and that the information is to be used only for:
-    The attending physicians or physicians responsible for the inmates care.
-    Health care facilities requiring information in order to care and treat the inmate.
-    Physicians who have a legitimate or academic interest in the case.
-    Medical staff &/or peer review committees who are responsible for monitoring and evaluating care in the health care setting, to the extent necessary to carry out their duties.
-    Insurance companies or others responsible for payment of charges, to the extent they relate to the charges.
-    The Industrial Commission, employers of patients filing industrial injury claims or the legal representatives of those employers, to the extent they relate to the claim.

1.2.    The release of mental health records is addressed in ARS 36-509.   Records and information contained in records may only be disclosed to Governmental or law enforcement agencies if necessary to secure the return of a patient who is on unauthorized absence from any agency where the patient was undergoing evaluation and treatment or to report a crime on the premises or to avert a serious and imminent threat to an individual or the public.

1.3.    Release of Health records via written Authorization: Health record copies may be released upon the written authorization of the inmate/inmate.   Although ADC does have its own Authorization to Release Health records form, any authorization meeting the following requirements shall be acceptable for release of health record copies:
-    Signed by the inmate/or released offender (must be either witnessed by an ADC staff person or non family member or can be notarized by a Notary Public)
-    Specifies copies requested with dates of service
-    Gives the full name and address of the person to whom the health record copies are to be released
Note that the Authorization must be dated within 60 days of the release request.

1.4.    In cases where health records contain information related to diagnosis &/or treatment for Mental Health, HIV+/AIDS, or Alcohol/substance abuse, the authorization must specifically note the exact information to be released (e.g. Mental Health, HIV, substance abuse).

1.5.    Upon receipt of an Authorization to Release Health records (hereinafter-called Authorization), the Medical Record staff (or designee) shall verify the signature of the inmate by comparison with other examples of inmate signature contained in the health record (ex: on the Initial/Intake Assessment form or History form).
        If the inmate is required to sign the Authorization, Central Office will complete an Authorization form and fax with Medical Record Request to unit.  The MRL will have the inmate called to the Health Unit to sign the Authorization.  MRL, medical staff person, or Correctional Officer will sign the witness portion.

1.6.    Charges for copying are accessed at $.50 per page when the request comes from an Attorney, Federal/Public Defender, family member, Subpoena, Court Order, or in rare cases, when an inmate is authorized by Legal Services to obtain health records when a valid lawsuit has

335

ADC010982

been served.   COPIES ARE NOT TO BE MADE UNTIL CENTRAL OFFICE NOTIFIES MEDICAL RECORD LIBRARIAN VIA EMAIL THAT PAYMENT HAS BEEN RECEIVED.

If a charge is required, the MRL shall count the number of pages to copy and write on the MRR the number of pages.  The MRL shall fax the Medical Record Request Worksheet (MRR) including the page count and the Authorization to Central Office Medical Records.

Upon notification from Central Office (via phone or e-mail) that payment has been received, make pertinent copies of the health record as stipulated in the Authorization and record the following information on the Medical Record Request (MRR) form: Date Mailed to Central Office; Number of pages that were copied (number of pages must be the same number that were faxed to Central Office for the invoice); Documents copied by (Signature/title of person making/releasing the copies); Make a copy of the MRR and send with copies to Central Office; File all documents in Section IV under the Legal/Administrative tab.

If there is no charge for the copies, (for requests for Continuity of Care, DES, Value Options) Central Office staff shall: Close out tracking # in database; attach a copy of the Authorization to the copies; mail copies of the health record to the requestor; and file copies of all documents in Section IV of the health record under Legal/Administrative Tab (for temporary pull requests)

1.7.     Processing

MRPM or designee shall: Compute the charges; prepare a statement of charges; and mail or fax an invoice to the requestor.  Notify the complex Medical Records Librarian via email once payment has been received and to copy records and forward to Central Office.

The complex MRL shall: Copy the records and confirm that the count is the same as was quoted for the invoice and record the following information on the Medical Record Request form:
- Date Mailed to Central Office
- Number of pages sent
- Documents copied by (Signature/title of person making/releasing the copies)

The complex MRL shall then make a copy of the Medical Record Request and send with copies to Central Office and file all documents under Section IV Legal/Administrative tab.

d.     MRPM or designee shall: Confirm correct number of pages (follow-up with MRL if incorrect); Compute a statement of charges for the health record copies as appropriate; Complete information on the appropriate Tracking Log in the database.  Close out tracking # in database; Attach a copy of the Authorization to the copies; Accept payment for the copies; Complete receipt form; Close out in invoice database; Mail copies to requesting party; Send a copy of the Authorization, original copy of receipt, and health record copies to the requester; and Send the payment check attached to the copy of the Receipt to the HSD Administrative Services Officer I (Budget/Business Office)

2.0.     **SUBPOENAS AND COURT ORDERED REQUESTS FOR COPIES OF RECORDS**: Patient authorization IS NOT REQUIRED FOR COURT ORDERS.   However patient authorization IS REQUIRED FOR SUBPOENAS.  The Program Manager shall contact the requester to advise that Authorization is needed (if not provided).  No further action shall be taken until/unless Authorization is received.

336

2.1.     Health records may be released in response to a Subpoena or Court Order, which has been validly served upon the Custodian of health records. The Custodian of health records may be either the Program Manager OR Medical Record staff assigned to the various ADC facilities/complexes.

2.2.     Subpoenas or Court Order may be served in Civil Cases in person on the Custodian of health records.  Subpoenas or Court Order may be served in Criminal Cases either in person OR via United States Mail.  Out of State subpoenas will not be accepted per Legal Services Bureau.

2.3.     Acceptance of a Subpoena or Court Order:  Medical Record Staff (Custodians of health records) shall document the following information on the face of the Subpoena and then send a copy to the Discovery Unit:

-     Date and time of the of receipt of the Subpoena,
-     Manner of Services (in person or via mail),
-     Signature and title of Custodian of Medical Records,

2.4.     Exceptions:

If the Subpoena or Court Order is not served on the MRPM, staff accepting the Subpoena or Court Order shall send a copy via Fax to the MRPM, who shall advise how to proceed.  If Subpoena or Court Order is served on the MRPM, a copy of the Subpoena or Court Order shall be sent via Fax to the health record staff for action at the appropriate facility/site where the health records requested are maintained.

If neither the State of Arizona, the Department of Corrections, nor the inmate/inmate are parties to the case involved, unless an Authorization from the inmate accompanies the subpoena, the matter shall be referred to the Discovery Unit for advice as to how to proceed.  No further action shall be taken until that advice is received.

2.5.     Processing:

Complex MRL shall: Count the number of pages to copy and fax the Medical Record Request Worksheet to C.O. Medical Records.

MRPM or designee shall: Compute charges; Prepare a statement of charges for the health record copies as appropriate;  Mail or fax invoice to the requestor;  Notify Medical Record Librarian that payment has been received and to copy records and forward to Central Office; accept payment; Complete a Receipt; Send a copy of the Authorization, original copy of receipt, and health record copies to the requester; Send the payment check attached to the copy of the Receipt to the HSD Administrative Services Officer I (Budget/Business Office); Complete information on the appropriate Tracking Log in the database.

Complex MRL shall: Copy the records and confirm that the count is accurate; Number each page of copied material in the lower right-hand corner of the page, assuring the applied number shall not obscure the documentation on the page; complete a Declaration Statement that verifies authenticity of the health record.  The Declaration Statement must include:
- inmate name
- inmate ADC #
- date range for records  (i.e. January 1, 2004 – May 12, 2004)
- number of pages
- Signature and title of Medical Record staff

337

ADC010984

- Date completed

Complex MRL shall record the following information on the Medical Record Request form:
- Date Mailed to Central Office
- Number of pages sent
- Documents copied by (Signature/title of person making/releasing the copies)
- Make a copy of the Medical Records request and attach to authorization and send with medical records to C.O.

Complex MRL shall forward the health record copies, with a copy of the Subpoena or Court Order and Declaration on top to the Central Office Medical Records.
File all documents in Section IV of the health record under the Legal/Administrative tab.  Attach a copy of the Declaration Statement to the documentation.

Upon receipt of the health record copies, MRPM or designee shall:  Call the requestor for receipt options: Pick up records at Central Office or mail.   If mailing, send documents to the requester via U. S. Registered Mail, Return Receipt requested as follows:
- Package shall be arranged in the following order:
- Copy of receipt that contains charges for document copies
- Copy of Subpoena or Court Order
- Original of Declaration Statement
- Copies of numbered health record
- Package shall be placed in a sealed manila envelope, marked "Confidential", on which is recorded the title of the action/case involved, the Case Number, the name of the inmate/inmate whose health records are enclosed
          SAMPLE:
          John Q. Inmate v. American Widgets
          CIV No.99-XXX-XX (XX)
          Medical Record Copies:
          John Q. Inmate, ADC No. 999999

3.0.    Health record copies requested by Discovery Unit (ADC Legal Services):   The Discovery Unit may request copies of health records for use of the Attorney General's Office or other ADC legal counsel in representing the Department in lawsuits &/or claims.  Include CIPS profile and any outside previous records in the package.
3.1.    Upon receipt of a request for documents and valid authorization signed by the inmate/released offender from the Discovery Unit, Central Office Medical Records shall:  Relay the request via fax or e-mail to the health record staff at the facility/unit where the health record requested is maintained.
Complex MRL staff shall:
Make the appropriate copies of the health record
Number each page of the copies in the lower right-hand corner
Prepare a Declaration Statement of authenticity of the copies
Send the copies to MRPM or designee along with the copy of the Discovery Unit request or if Tucson AG office is the requesting party, mail to the Tucson Attorney General.

338

ADC010985

File copies of all documents in Section IV under the Legal/Administrative Tab.

3.2.     Once copies are received at Central Office, Central Office staff will send via interdepartmental mail to the Discovery Unit with a copy of the Discovery Unit request.

3.3.     When a MRR is received that has been initiated by the Attorney General's Risk Management Office (Tucson), the MRL will be instructed by the Medical Record Program Manager to send the records directly to the Tucson AG's office.  The MRL will notify the MRPM with the date that the record was sent and the number of pages copied.   The MRPM will notify Legal Services office that the MRR has been completed.

4.0     Tracking Logs:  Tracking Logs of all information related to requests for Release of Medical Record Copies shall be kept by health record staff both at the facility and at Central Office. This Tracking Log can be either electronic or manual but must contain the following information:
 Date of Request/Date Received at Unit
 Inmate/Inmate Number
 Inmate/Inmate Name
 Facility
 Requester
 Type of Request: Authorization, Subpoena, or Court Order
 Copies Requested
 Date Request Relayed/To Whom/How
 Date Copies Made
 Date Copies Received in Central Office
 Date Charges Relayed to Requester
 Date Payment Received
 Date Copies Mailed to Requester
 Comments

5.0.     CHARGES FOR COPIES OF HEALTH RECORDS:  ADC may charge a reasonable fee for the production of the health record copies.
5.1.     Reasonable fees are set as:
-        By Subpoena: $.10 per page and $10.00 per hour for preparation time (minimum time 1 hour) (A.R.S. 12-2295), Declaration charge: $ 1.00.
-        By Court Order: $.50 per page.
-        Record By Authorization: $.50 per page; no charge for preparation time.
-        Xray Film By Authorization: $15.00 for each "sheet".
5.2.     Authority to Assess Charges and Collect Fees: Only the Program Manager or other Central Office designee may assess charges for health record copies and collect the fees.
5.3.     A personal check or money order shall be the only forms of payment that are accepted. No cash/debit payments will be accepted.
5.4.     There is no charge for copies of the health record released for the following purposes: Continuity of care (doctor's office, hospitals, Value Options) or to other government agencies/programs (e.g. Department of Economic Security, Vocational Rehabilitation Services, Social Security, other correctional facilities, County and Federal Public and Legal Defenders, Legal Advocate) or to Discovery-ADC Legal Services/Attorney General's office

ADC010986

6.0.     Individual Staff member named in a lawsuit:

6.1.     When a Department of Corrections Health Services staff member is named in a lawsuit and served with a subpoena to answer interrogatory questions, the Medical Record Program Manager shall be informed and will provide decision whether the staff can review the medical record or if copies of the medical records need to be made.  .

6.2.     Staff are not permitted to copy any medical records without the approval of the Medical Record Program Manager and the FHA.

6.3.     Medical Records Librarians may be called upon to testify in a court of law regarding status or maintenance of medical records.  The best support for this activity is to ensure, on a daily basis, that;

-     record management is performed in accordance with policy and
-     accuracy in copying of records in response to subpoenas and
-     ensuring that each copy is legible and straight on the page and
-     accuracy in accounting for, counting, and numbering pages and
-     preparation of declarations of specified date ranges on the MRR.


7.0.     Deceased Inmate's Records release.  Records may be released to inmates' family (next of kin) with the approval of the Division Administrator.

7.1.     Authorization to Disclose Copies of Medical Records must be completed by next of kin and witnessed by a Notary.

7.2.     Family shall provide verification of relationship:

- Death Certificate

-A copy of Driver's License required prior to the release of health records.

- payment is required before copies are released.

- Invoice will be mailed/faxed to requestor.

ADC010987

|  | HIPAA Ruling | OPR:<br>Medical Records Program Manager<br><br><br><br>Auth: cp |
| Arizona Department of Corrections | | |
| Health Services Technical Manual | HSTM<br>Chapter:8<br>Section: 2.2. | Supercedes:<br>Effective:<br>January 1, 2010 |

**PURPOSE**

To educate the HSD staff regarding the impact of the Federal Health Insurance Portability and Accountability Act requirements, and the proper authorities surrounding use and release of information.

**POLICY:**

1.0    The first comprehensive set of Federal Regulations of Health Information, the Privacy Rule under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), came into effect in April 2003.

2.0.    The Arizona Department of Corrections is a <u>non-covered entity</u> and therefore not subject to many of the privacy requirements of HIPAA.  (45 CFR Parts 160 and 164).  Under the Privacy Rule, protected health information (PHI) is defined very broadly.  PHI included individually identifiable health information related to the past, present or future physical or mental health or condition, the provision of healthcare to an individual.

3.0.    HIPAA section 164.512 (k) (5) Uses and discloses for which consent, an authorization, or opportunity to agree or object is not required.  Correctional institutions and other law enforcement custodial situations.  (1) Permitted disclosures.  A covered entity may disclose to a correctional institution having lawful custody of an inmate, protected health information (PHI) about such inmate, if the correctional institution represents that such health information is necessary for the provision of care.

341

ADC010988

|  | REQUEST FOR MEDICAL RECORDS FROM OUTSIDE HEALTHCARE PROVIDER | OPR: Medical Records Program Manager |
|---|---|---|
| Arizona Department of Corrections | | |
| Health Services Technical Manual | HSTM Chapter 8 Section 2.3 | Supercedes: Effective Date: January 1, 2010 |

**REFERENCES**:      NCCHC STANDARD P-E-12

**PURPOSE:**   To obtain previous medical records from outside physicians, hospitals, jails, prisons, and other healthcare agencies to use for continuity of care purposes.  This policy also refers to HSTM 8. Section 2.2

**RESPONSIBILITY AND PROCEDURE:**

1.0.      It is the primary responsibility of the medical provider upon Intake to inquire whether the inmate was provided with medical care prior to incarceration.   Form 1104-1 REQUEST FOR MEDICAL RECORDS is to be completed by the provider.

1.1.      The Request for Medical Records form #1104-01 specifies that an authorization is not required from an offender for ADC to obtain past medical record.

1.2.      This form is then faxed or mailed to obtain previous records by the Medical Record Librarian at the inmate's unit.

1.3.      A copy of the form is then filed in the Previous Records section with the fax confirmation notification or if mailed- date mailed and signature of MRL is marked on the form.

2.0.      Once the requested medical records are received at the unit, they are forwarded with the medical record to the provider for review.

2.1.      After the provider reviews the records, he is to sign his name and use name stamp, and write the date reviewed.

2.2.      These records are then filed under Section I, Previous Records (green tab).

342

ADC010989

| | Retention of Health Records | OPR:<br>Medical Records Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: cp |
| Health Services Technical Manual | HSTM<br>Chapter 8<br>Section 3.0. | Supercedes:<br>8.3.0. dtd June 15, 2008<br>Effective:<br>January 1, 2010 |

**REFERENCES**:       NCCHC STANDARD P-H-06

**PURPOSE**:    To establish a procedure for the control and retention of health records to assure that the safety and confidentiality of the medical information and records is maintained according to Retention Schedules as filed with the Arizona Department of Library, Archives and Public Records (hereinafter called ADLAPR).  To assure that medical information and records of inmates and former inmates are available for continuity of medical care and legal/administrative purposes.  To provide a mechanism for the re-activation of the health records of released inmates in the event of their return to the ADC.

**RESPONSIBILITY**:  The Key Contact Medical Records Librarian is responsible to ensure that the records of medical care are maintained and properly protected from unauthorized release.  The Medical Records Program Manger is responsible to coordinate archiving of health records in accordance with professional librarian standards.

**PROCEDURES:**
1.0.    <u>RETENTION SCHEDULE FOR HEALTH RECORDS OF RELEASED OFFENDERS</u>
1.1.    Following an inmate's release from ADC, health records are sent directly to the ADLAPR for retention.  In accordance with the Retention Schedule on file with ADLAPR and contract vendor, health records of released offenders shall be kept a minimum of 10 years past the date of last contact with the released offender.
1.2.    According to procedures established by ADLAPR, at the end of the 10 year retention of the health records, ADLAPR staff shall destroy the health records upon written notification from Health Services.
1.3.    ADLAPR provides listings of records destroyed and the destruction date, which is kept on file in the State Records Management Center.
1.4.    The medical records of minors (released from Perryville or Tucson) are to be sent to Central Office-Medical Records for storage.  The medical records will be destroyed after the

343

ADC010990

Minor has reached 23 years of age (unless the record has been folded into a re-incarceration medical record).

1.5.     The medical records of inmates who are transferred to another state for Interstate Compact are to be sent to Central Office-Medical Records for storage until ADC is informed that the inmate is released from that state or the inmate is received back as an active inmate in Arizona.

2.0.     USE OF ADLAPR FACILITY

2.1.     Storage of Health records at the ADLAPR Health records, prior to 1/1/1996, is located in the ADLAPR storage facility for the remainder of the retention period unless otherwise noted.

2.2.     Information to be completed on the Boxed Records Data Entry Form for ADLAPR is as follows:

-     Record Series Code: (i.e., number 162425)  Note: If records are not in numerical sequence, individual health record numbers must be listed on a Detailed Box Contents Form.

-     A copy of the completed Boxed Records Data Entry Form is retained in Central Office Health Services.

-     For 1994 and 1995 releases: an index card, identifying offender information (complete name and ADC number) indicates the health record is stored at the ADLAPR storage facility and denoting the specific box number where the record is filed is prepared.

-     The box number should match the bar code label on the storage box.

-     Index cards are maintained in Health Services and are filed using the Inmate Number Filing System.

3.0.     USE OF ADLAPR STORAGE FACILITY:

3.1.     Health records processed for storage will be boxed, information stored in the MRPM database, and sent to ADLAPR for storage.   The health records shall be arranged in numeric sequence in the specific storage containers required for storage.  Health records must be placed in the storage box leaving at least 2" of space in the box.

3.2.     Storage boxes are prepared for transmittal:

-     One Data Entry Bar Code Label is prepared for each box:

-     One label is affixed to the storage box approximately 2" below the handle; contracted label is affixed below.

-     One label is attached to the "Boxed Records Data Entry Form" at the Central Office.

-     A coversheet must be provided with each box listing the name of the unit and the date sent.

-     Information to be included in the box is as follows:

-     Packing List inventory sheet of medical records contained in the box.

-     The number of volumes in the box must be counted and match the inventory sheet.  Signature of the MRL and the date must be written on the inventory sheet.

3.3.     All records processed for ADLAPR are entered into a database, with hard copies included in the box. Boxes are labeled with one bar code from state records.  Pick up of the boxed health records shall be arranged jointly between ADC Mailroom/Courier Services and ADLAPR.

4.0.     See HSTM 5. 1.2.1. for MRL responsibilities in identifying released inmates.

4.1     The Released Record Log is faxed to Central Office-Medical Records.  All records are entered into a database by Central Office staff.  The inventory sheet and the Data Entry Bar Code

344

ADC010991

label are sent to the unit via interdepartmental mail.  If any medical records are removed from the box, a line needs to be drawn thought the name, and #, and marked with the date and the unit the chart is transferred to.  Once the inventory sheet and Data Entry Bar code are received at the unit, the MRL is responsible for checking to see that all records on the Inventory sheet are in the box.  If there are any discrepancies Central office-Medical Records must be contacted to remove information from the database.

5.0.     REACTIVATION OF HEALTH RECORDS FOR INMATES RETURNED TO ADC CUSTODY:

5.1.     If an offender returns to the ADC system within the 10 year retention time period set with ADLAPR, the receiving facility shall contact the Central Office Health Services to obtain the old volumes of the offender's health record.

5.2.     Upon notification from the Medical Records Librarian at the facility health unit to the central office staff of the return to custody of a previous ADC offender, the Central Office health record staff shall forward the health record to the appropriate ADC facility where the inmate is housed.  If the inmate was released and the health record is still at that unit he was released from, the medical record librarian at the facility health unit is responsible for contacting the previous health unit to obtain the health records.

5.3.     Health record shall be securely packaged and addressed to be sent to the appropriate facility health unit/health records office.  The package must clearly identify the contents as health records and shall be marked "**CONFIDENTIAL**."

5.4.     The complex medical record librarian will notify the Central Office medical record staff of the need to request health records that are in the ADLAPR.

        -  The Central Office medical record staff shall request the return of the ADC health record to be sent directly to the prison unit.

        -  If, in accordance with the Retention Schedule, the health record has been destroyed by ADLAPR, Health Services shall notify the appropriate ADC facility via e-mail.  The E-mail notification of "Chart Destroyed" will be printed and filed under the Inmate Chronological Movement Record.

345

| | Inmate Access to Health Record Information | OPR:<br>Medical Records Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: cp |
| Health Services Technical Manual | HSTM<br>Chapter 8<br>Section 4.0. | Supercedes:<br>HSTM 8.4.0. June 15, 2008<br>Effective Date:<br>January 1, 2010 |

**REFERENCES:**      ARIZONA REVISED STATUTES 31-221
                    DEPARTMENT ORDER 1104

**PURPOSE:** To coordinate the right of an inmate to access his/her own health record information. This access includes Health Record Chart Reviews and the approval of inmates receiving copies of health records to be used for lawsuits.

**RESPONSIBILITY:** The Medical Record staff is responsible for arranging the appointment for the inmate to review his health records after receiving the request from the inmate. The Medical Record Program Manager is responsible for notifying the inmate via Inmate Letter Response if he is approved or denied copies of his medical records.

**PROCEDURES:**
1.0.    <u>Record Review</u>:   The inmate is allowed to review portions of the health record during the Inmate Medical Record review.    The inmate needs to submit an Inmate Letter to the Medical Record Librarian to request an appointment to be scheduled by Medical Records staff.   The Medical Records Librarian will schedule Inmate Health Record Reviews for the maximum allotted time of forty five minutes as set by the Division Administrator. The review of a health record is a labor intensive and time intensive activity.   Therefore inmates are authorized to review their records no more than once per quarter. If they require additional appointments to review the records the inmate must be informed by the MRL that they must submit an Inmate Letter to the FHA explaining their justification for a review before 3 months have expired since the last review. Justification must include a reasonable explanation such as conduct of multiple laboratory tests that have not been discussed with the provider, change in diagnosis of primary illness, recent admission/discharge, etc.

1.1.    In accordance with guidance provided by Legal Services and the Health Services Division Administrator, the Medical Record Librarian is to remove the following sections of the health record chart folder prior to the review
     -   Section 1: Previous records: All Mental Health records must be removed. The inmate is allowed to review his previous medical records if he specifically requests.

346

ADC010993

- Section 4: Mental Health tab: Remove Mental Health records
- Section 4: Legal/Admin tab: remove Legal/Administrative

1.2.   Refer to form #70400089 Guidelines for Inmate Medical Records Reviews.  Once completed, the form is filed in Section IV, under Legal/Administrative tab.

1.3.   Inmates who cannot read or write English may have a translator assigned in accordance with Department Order 908 and local procedure.

2.0.   For review of Mental Health records:  The inmate needs to submit an Inmate Letter to the Mental Health staff to request an appointment to be scheduled by Mental Health.   Mental Health may answer any questions that the inmate may have at that time.

3.0.   Inmates requesting copies of their medical records; including requests for use in litigation of medical issues:

3.1.   Access to Obtain Copies of the Unit Health Record - Upon receipt of a subpoena or Court Order or an Inmate Letter that identifies the specific portions of the Unit Health Record to be copied, the Medical Records Program Manager shall:
- forward the letter via fax to Legal Services.
- Legal Services will review the Attorney General's database of valid lawsuits and coordinates with the Office of the Attorney General for advice as to whether the following requirements have been met in relation to the case:
    - The court has stipulated that the inmate may act as his own attorney.
    - The request is related to a bona fide lawsuit that has been validly served on the Department or other defendant.
    - The request for discovery has been filed.
    - The Office of the Attorney General has not filed, in court, an objection to the production of the records.

3.2.   Upon notification from the Office of the Attorney General that all requirements have been met, ensure that the copies of the appropriate portions of the Unit Health Record are prepared by Health Services staff, who shall give the copies directly to the inmate after the following have been completed:
- MRPM processes the Medical record request in the database, faxes the authorization and the medical record request to the MRL with an identification of which records to copy.
    - The inmate has signed the Inmate Medical Record Waiver of Liability, Form 70400175.
    - Health Services staff who provided the copies to the inmate sign the Inmate Medical Record Waiver of Liability form as witnesses to the inmate's signature and file the form in the inmate's Unit Health Record.

3.3.   Charges for Copies - The Medical Records Program Manager shall charge the appropriate fee for the information copied from a Unit Health Record, as follows:
- An inmate who is not indigent shall be charged 50 cents for each page.
- An indigent inmate who submits a copy of the approved Application for Indigent Status
- Health and Welfare, Form 20301017, shall not be charged for copies.

3.4.   When the inmate is approved or denied copies of his medical records, the Medical Record Program Manager shall write the Inmate Letter Response informing of the outcome.

347

ADC010994

4.0.    The Request for Medical Records (Form #1104-01) specifies that an authorization is not required from an inmate for ADC to obtain past medical record from non-ADC providers.

4.1.    This form is then faxed/mailed to obtain previous records.

4.2.    The form is then filed in the Previous Records section.

4.3.    Once copies are received the MRL will forward to the provider to review and sign/date the documents.  The "outside" records are then filed in Previous Records after the provider reviews them.


5.0.    The Health and Medical Records are State Property.  Inmates caught tampering or destroying information contained in the medical record will be referred for disciplinary action and will forfeit their automatic right to future reviews of their medical records.

5.1.    If an inmate is found guilty of tampering or destroying information, any future reviews of the Medical Record must be approved by the Division Administrator.


6.0.    In accordance with ARS 31-221 and Department policy, inmates are not allowed to possess nor view the records of other inmates.  Any release to view a record that names another inmate will not be honored and must be forwarded to the Medical Records Program Manager for review and action if appropriate.

348

ADC010995

| | RELEASE OF INFORMATION to family members, attorneys, or family designees | OPR: Medical Records Program Manager |
|---|---|---|
| Arizona Department of Corrections | | |
| Health Services Technical Manual | HSTM Chapter 8 Section 4.1. | Supercedes: HSTM 8.4.1 June 15, 2008 Effective Date: January 1, 2010 |

**REFERENCES:**     NCCHC STANDARD P-H-04

**PURPOSE:**   This policy provides instructions for Medical Record professionals and Facility Health Administrators to respond to Inmate requests from Family Members/Designees/Attorneys to:  review medical records, receive copies of medical records, and/or allow a verbal exchange of medical information.

**RESPONSIBILITY:**    The Facility Health Administrator (FHA) is the single individual that is authorized to initiate action in response to requests from Family Member/Designees/Attorneys for access to inmate health information.  The FHA will appoint an individual to act on these requests in the case of absence.  The FHA shall ensure that processes are in place to allow release of information only in those cases where the proper authority has been given and/or wherein the request has been properly prepared and recorded.   The Medical Records Librarian staff shall ensure compliance with this policy.

**PROCEDURES:**
1.0.    Authorizations:
1.1.    Family members/designee or Attorney will be permitted to come to the prison complex to review the inmate's medical and mental health records upon written authorization from the inmate.
1.2.    The authorizations under this policy include only those ADC records possessed or accessible within the ADC Medical Records Library.
1.3.    The authorizations do not extend to releasing information from community-based hospitals, medical offices, physician's offices or any other site where inmate's temporary medical records may be located.
1.4.    In accordance with ARS 31-221 and Department policy, inmates are not allowed to possess nor view the records of other inmates.  Any release to view a record that names another inmate will not be honored and must be forwarded to the Medical Records Program Manager for review and action if appropriate.

ADC010996

1.5.     All requests from Central Office for copies of records must be copied or responded to within the time frame identified.

2.0.     General Guidance for On-site Reviews
2.1.     All reviews are generally authorized to be performed on-site at the prison complex where the inmate is housed (unless directed by MRPM to be performed at Central Office for a released offender).
2.2.     If family or family designee is reviewing the Mental Health records, a Mental Health practitioner will be required during the review.  If an attorney is reviewing the Mental Health Records, a Mental Health Practitioner is not required during the review.
2.3.     Notes may be taken but copies may not be made during this examination of the record.  If copies are desired following the review, the Family Member/Designee/Attorney will list the specific pages or sections that are desired as copies, sign that request, and give it to the attending Health Services staff member for later action.
2.4.     If copies are made, 20 pages or less, any required payment must be made at the conclusion of the review.
2.5.     When sending copies of medical records via interdepartmental mail, MRLs are to **date stamp** the date the records are being sent out on an attached note card and send with the Medical Records Request (MRR) and copies as proof that the records were sent out that date.


3.0.     When a Family Member/Designee contacts the FHA requesting written or verbal information about the medical record or requesting review of the medical records and /or copies of medical records, the Medical Records staff will be consulted to ensure the Authorization has been properly executed to allow that specific Family Member/Designee to receive any information or copies of records.
3.1.     All Family Member/Designee/Attorney requests for verbal medical information and/or requesting review of the medical records and /or requesting copies of medical records will be forwarded to the complex Facility Health Administrator.
-        If the inmate has been recently released and the chart(s) is still at the prison, the chart will be sent to Health Services-MRPM for the review if the family member/designee or attorney wishes, otherwise, the review will be conducted at the prison.
-        If the inmate is deceased, all records will be sent to the MRPM and the review will be conducted at Central Office Health Services.

4.0.     The FHA will direct the unit Medical Records staff to verify that an Authorization Form (ADC #1104-2P) has been properly executed and filed in the Legal/Administrative Section of the Medical Record that allows the named specific Family Member/Designee/Attorney to receive the desired/requested verbal information or copies of records.  These requests should be processed the same day as they are received in order for them to get to C.O. by the due date.
4.1.     If a properly executed Authorization is in the medical record file the FHA will be advised:
-        That the inmate is allowing information to be released
-        The date that the Release Authorization form was executed.
-        That the requesting Family Member/Designee/Attorney is or is not listed.

350

ADC010997

\-        What (if any) restrictions are listed on the information release form.
4.2.    If a properly executed Authorization is not in the medical file, the inmate will be called to the Health Unit and will be:
\-        Informed of the request for information from the Family Member/Designee/Attorney.
\-        Informed that the request is for viewing, discussing, and/or receiving copies of the inmate's record.
\-        Asked if they want to sign an Authorization form listing the interested individual.
\-        The authorization may be signed (or refused) by the inmate and witnessed by an officer or Health Services staff person.
\-        Upon the proper execution of the Authorization, the FHA will be notified.
4.3.    If the inmate refuses to execute the Authorization,
\-        Medical Records staff will write "Refused to Sign" and sign their name/title, use name stamp, and date refused on the Authorization.
\-        The refused Authorization will then be filed in the Legal/Administrative section of the inmate's medical record.
\-        The FHA will be notified.


5.0.    Administration of the Authorization
5.1.    A signed Authorization to Disclose Copies or Provide information from Medical Records (Form # 1104-2P) will expire six months after the date of signing.
5.2.    Form #1104-2P will be filed under the Legal/Administrative tab of the Medical Record.
5.3.    No more than **two** authorizations for verbal release of information may be in effect at the same time.  The individuals authorized must be informed at initial discussions that, in order to preclude multiple individuals receiving information that differs based on the timing of their discussion with the FHA, it is desirable, if at all possible, to make arrangements so that only one person acquires information during periods of acute or crisis treatment.


6.0.    In accordance with a properly executed and filed authorization, the FHA will allow Family Members/Designees to review original medical records and/or obtain copies of the medical records on site at the prison complex where the inmate is housed.
6.1.    Appointments will only be scheduled Monday through Friday, excluding holidays, from 0800 to 1300 hours.
\-        Appointments must be scheduled at least 5 working days in advance of the review date.  - There will be no charge for the time spent reviewing the record.
\-        The review of the medical record will be conducted in Visitation.
\-        A MRL or Health Services staff member (from Mental Health) will be present during the review.
6.2.    The recorded authorization allows Family Members/Designee/Attorney to review original medical records and/or obtain copies of the medical records.
\-        The only sections that may be reviewed are those sections requested and authorized by proper authority.
\-        If the inmate has many volumes, it is recommended that the review take place at 0800 to allow time to review all the records.
6.3.    A properly executed "Authorization to Disclose Copies or Provide Information from Medical Records" (Authorization) (Form # 1104-2P) or other "Approved" form may permit Family Members/Designees to obtain copies of medical records.  This will be administered in

351

ADC010998

accordance with this manual.   The Medical Records Program Manager <u>may</u> authorize release of Mental Health records upon receipt of valid authorization.

6.4.    If the Family Member/designee desires copies of medical and mental health records at the time of the review, a fee of $0.50 per page must be paid.

-       Records will be copied at the prison complex if there are 20 pages or less.

-       If over 20 pages, the records will be copied and send to Health Services for processing and mailing to the requesting party.

-       Payment must be made by check or money order **(VS CASH)** at the time of the review. Checks are to be made out to "ADC HEALTH SERVICES".

7.0.    Central Office Responsibilities:

7.1.    The Medical Record Program Manager's (MRPM) responsibilities:

-       Contact the person requesting the review to obtain the following information in order for the prison to obtain clearance to allow coming into the prison:  legal name; date of birth; social security number.

Inform the requesting party:

-       of the number of volumes that the inmate has;

-       that if 20 pages or under will be copied at the time of the review and copies shall be provided in consideration of a fee of $0.50 per page.

-       that if 21 pages or over will be copied, then the records will be copied and forwarded to Central Office for processing and mailing. A check for the amount should be given to the complex MRL at that time. Copies will not be given to them at the time of the review. The MRL will copy the pages after the review and forward to central office for processing and mailing.

-       that payment must be received prior to releasing the copies and a check or money order should be brought to the review. Cash will not be accepted.

-       that the MRL II or FHA will be contacting the requesting party once the clearance is obtained and the date/time of the review will be set up at that time. The review is to be done within 5 working days of the clearance notification. Clearance may take a while to get.

-       that only one person will be allowed to review the records.

-       that only Pen/pencil and a note pad will be allowed for the reviewer to take notes. The reviewer will need to provide these items.

-       that the reviews are conducted in the visitation area or a conference room from 0800 - 1300 only.  If the inmate has many volumes and if they don't get to review all the records they need, another chart review will need to be scheduled.

-       the name of the MRL and the Health Services Administration phone number will be provided to the family member/designee/Attorney.

-       that in the event of an emergency and/or IMS situation: it is possible that the reviewer may not be allowed to enter the complex, or may be asked to leave the prison complex, if necessary.  The chart review will then need to be rescheduled.

-       The above instructions will be faxed or mailed to the requesting party by the MRPM.

7.2.    The MRPM will fax the clearance information to the MRL II and FHA.

8.0.    Complex responsibilities:

-       Health Services will see that clearance is approved.

ADC010999

\-        If there are Mental Health records that the inmate authorizes the family member/designee to review/receive:  The Mental Health Staff must be notified to be present at the review.  For attorney reviews, Mental Health staff does not need to be present.

\-        Complex MRL will fax the Request from the Family Member/designee or Attorney with the Authorization to MRPM at 602-364-2956 and

\-        send an e-mail to Medical Records Program Manager (MRPM) informing of the request to review medical records; including the number of medical record volumes the inmate has.

\-        MRL will check in AIMS to make sure the Complex has all the old volumes.  If old volumes are not on unit, contact the previous unit(s) until all volumes are located.  (Contact the MRPM to check the storage database.)

\-        A date/time of the review will then be set up that is workable for all involved disciplines: which may include Mental Health, Dental, Providers, etc.

\-        The MRL will contact the family member/designee or attorney and set up the date/time of the review, inform them where the review will be held, and direct them to come 10 minutes ahead of time to allow for gate clearance.

\-        Once approved and the date of the review is arranged, the date/time of the review will be faxed to the Medical Record Program Manager.

9.0.      Conduct of the appointment:

9.1.      Prior to the Chart Review:

\-        Remove the legal/administrative section and put in a folder clearly marked "LEGAL/ADMINISTRATION SECTION."   Return this section to the chart after returning w/ the chart to the unit.  If Mental Health records are not authorized to be reviewed, then that section must be removed from the chart.

\-        Remove previous records and Mental Health Records prior to chart review.

\-        Bring a blank receipt form to fill out.

9.2.      During the Chart Review:

\-        MRL I or II will meet the family member/designee or attorney at Main Control point of the unit. The driver's license will need to be checked to verify that this is the person authorized to review the medical records.

\-        The person will then be escorted to the visitation area for the chart review.

\-        All volumes of the medical records will be brought to the visitation area (the # of volumes depends on the time period of the request).

\-        There will not be a time limit for the review.  Reviews will be conducted between the hours of 0800-1300 hrs.

9.3.      The authorization will be reviewed with the requesting party so they understand what records they are allowed to see.

9.4.      MRL will stay with the person reviewing the medical records at all times.

9.5.      The review will be conducted.  No copies will be made during the review.

9.6.      If copies are requested, they will be made at the conclusion of the review

\-        If the family member/designee or attorney chooses 20 pages or less, the records will be copied and given to them upon receipt of payment.  If 21 pages or more, the check and the copies will be forwarded to Central Office for processing and mailing.  A receipt will need to be given to the family member/designee or attorney. Make a copy of the receipt to attach to the check and forward to the MRPM.  Attached is the Receipt form for you to print out.

ADC011000

-    If the family member/designee or attorney chooses, the check and the copies will be forwarded to Central Office - Medical Records for processing and mailing to requesting party.
9.7.    After the review the MRL conducting the review will contact the MRPM via e-mail to inform of; the length of time for the review, the # of pages copied, and the number of pages given to the family member/designee or attorney, or if copies will be made and forwarded to the MRPM.  Forward the check to MRPM with a copy of the receipt.

10.0.   If mental health (MH) records are to be reviewed with a mental health staff person:
-    The family member/designee will review the MH records first so the MH staff is not held up for a longer period of time than necessary. He may answer any questions the family member/designee may have.
-    The Medical Records Librarian staff will, when preparing the Medical Record for review, forward the record to the Counseling and Treatment Services, Mental Health staff on the patient's assigned unit for determination whether all information or sections are releasable.
-    The Mental Health staff will be responsible for removing and safe storage of the mental health documentation that is not authorized for review by the requester.
-    The Mental Health staff will place a single sheet in the Medical record in place of the removed document/section indicating the date and time of the removal and the signature and name stamp of the individual that removed the document(s).
-    This information will be placed in a folder clearly marked "TEMPORARY MENTAL HEALTH RECORD" and placed back in the Medical Record once the review is completed.
-    The temporary folder will be maintained by the Medical Records Librarian and upon completion of the review by the requestor; the Medical Records Librarian will return the temporary record and core Medical Record to the Mental Health staff for reconstitution of the complete record.

ADC011001



**ARIZONA DEPARTMENT OF CORRECTIONS**
**HEALTH RECORDS RECEIPT**
TO BE USED FOR FAMILY MEMBERS/DESIGNEE/ATTORNEY
FOR MEDICAL RECORD COPIES

INMATE NAME: _____

ADC # _____

COMPLEX/UNIT _____

NUMBER OF PAGES: _____

TOTAL COST: $_____          ADC CHARGES $0.50 PER PAGE

MONEY ORDER ___          CHECK ___

> PLEASE MAKE CHECK PAYABLE TO
> **ADC HEALTH SERVICES**
>
> MONEY ORDERS WILL BE ACCEPTED
> <u>BUT</u>
> THEY MUST BE FOR THE EXACT AMOUNT
>
> CASH WILL NOT BE ACCEPTED
>
> ADC STAFF WILL NOT BE ABLE TO MAKE CHANGE
>
> 20 PAGES OR UNDER, COPIES WILL BE PROVIDED AT THE COMPLEX.
>
> 21 PAGES OR OVER, PAYMENT & COPIES WILL BE PROCESSED BY CENTRAL OFFICE

AMOUNT PAID: $ _____

REQUESTER/PAYER'S SIGNATURE:_____

ADC EMPLOYEE'S SIGNATURE: _____      DATE:_____

355

ADC011002

| | Discharge Planning | OPR:<br>Medical Services<br>Administrator<br><br><br>Auth: jac |
|---|---|---|
| Arizona Department of Corrections | | |
| Health Services Technical Manual | HSTM<br>Chapter 9<br>Section 5.0. | Supercedes:<br>Effective Date:<br>January 1, 2010 |

**REFERENCES:**      DEPARTMENT ORDER 1001
                DEPARTMENT ORDER 1002
                DEPARTMENT ORDER 917
                NCCHC STANDARD P-E-13

**PURPOSE:**   To provide guidance in supporting inmates who are approaching the end of their incarcerated period.

**RESPONSIBILITY:** It is the responsibility of the Health Services Division Administrator and the Facility Health Administrator to ensure that inmate-patients who are suffering from serious health needs, are provided support planning and assistance as their release becomes imminent.

**PROCEDURE:**
1.0.    Department Order 1001 provides guidance in the process of informing health services of an impending release.
1.1.    Health Services staff will review the inmate's health record and provide support services including, but not limited to;
          - arranging for sufficient discharge medications as described in HSTM Chapter 4 Section 1.1.
          - arranging for sufficient medication delivery supplies such as insulin needles/syringes.
          - coordinating transfer of medical records to a releasee's accepting provider (in order to continue care initiated during incarceration).
          - assisting the inmate in applying for AHCCCS applications
          - Informing the inmate of points of contact for acquiring State, County, or local services.
          - Informing inmates with specific diseases and undergoing lifelong treatment (e.g., dialysis, HAART, etc) will receive assistance as necessary and desired by the releasee to locate providers.

1.2.    Actions and follow-up care for inmates released while an inpatient will be coordinated by the Medical Services Administrator, Utilization Management, and the treating hospital.

356

2.0.     Mental Health staff may also provide assistance in helping releasees to gain access to Value Options or other "outside" mental health providers.

3.0.     All AIDS Drug Assistance Programs (ADAP) applications and orders will be completed through Health Services Division Central Office.
3.1.     The Health Planning Consultant/Release Planner will complete all the forwarded applications and acquire a provider's signature.
3.2.     The application will then be forwarded to the ADAP office at Arizona Department of Health Services.  The original prescriptions will then be forwarded to the ADC central pharmacy for entry into the medication tracking system.

ADC011004

| | Medical Research | OPR:<br>Medical Services<br>Administrator<br><br><br>Auth: jac |
|---|---|---|
| Arizona Department of Corrections | | |
| Health Services Technical Manual | HSTM<br>Chapter 9<br>Section 6.0. | Supercedes:<br>Effective Date:<br>January 1, 2010 |

**REFERENCES:**      DEPARTMENT ORDER 203 (research projects)
                            DEPARTMENT ORDER 1103
                            NCCHC STANDARD P-I-07

**PURPOSE:**   To provide guidance in requesting, authorizing, and performance of biomedical research involving inmate-patients.

**RESPONSIBILITY:**  It is the responsibility of the Department Director and Division Administrator to ensure that inmate privacy and health is fully protected in the conduct of any approved research.

**PROCEDURE:**
1.0.      Department Order 203 provides guidance in the process for obtaining approval to conduct research.

2.0.      Department Order 1103 provides guidance regarding the provision of care to individuals who are or may be infected with a communicable disease.
2.1.      Confidential communicable disease information may be disclosed, subject to the approval of the Director and the Director of the Department of Health Services, for the limited purposes of special investigations of the natural history and epidemiology of AIDS or for collaborative research efforts with a public health purpose. Disclosures shall require written assurances of confidentiality of all participating agencies.  Confidential communicable disease information may be disclosed to federal, state, or local public health agencies for the limited purposes of communicable disease surveillance and control.

3.0.      Inmates placed into the custody of the Arizona Department of Corrections and disclose that they have been participating in a community-based research protocol prior to admission to ADC will be interviewed by an intake physician, and be asked for contact information of the protocol administrator.

358

ADC011005

3.1.     The intake physician will contact the research study group to determine if an adverse reaction may result from the inmate's removal from the study.   If an adverse reaction may result from the inmate's removal from the study, the intake physician will immediately contact the Medical Program manager for approval and coordination to allow the inmate to continue in the research study.

3.2.     The FHA will contact the protocol administrator and receive written verification (faxed and mailed) that the removal of the inmate from the protocol will not harm the inmate.

3.3.     All pertinent information, regarding any inmate who refuses to cooperate in identifying the protocol administrator or for whom the protocol administrator does not provide an affirmative response to removal of the inmate from the research protocol, is to be forwarded to the Medical Director through the Medical Program Manager for consideration, action, and direction.

359

ADC011006

| | Access to Custody Information | OPR:<br>Medical Services Administrator & Medical Records Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: jac |
| Health Services Technical Manual | HSTM<br>Chapter 9<br>Section 7.0. | Supercedes:<br> Effective Date:<br>January 1, 2010 |

**REFERENCES:**       DEPARTMENT ORDER 201
                      DEPARTMENT ORDER 901
                      NCCHC STANDARD P-H-03

**PURPOSE:**   To provide guidelines for promptly allowing authorized access to custody information in support of providing health care.

**RESPONSIBILITY:**  All health services Division personnel are responsible to provide a constitutional level of care to all incarcerated felons regardless of the crime or history.

**PROCEDURE:**
1.0.      At times, complete and adequate care cannot be provided without background information on the patient (e.g., lifestyle, drug use history, injury history, family history).  ADC possesses a significant amount of pre-sentencing information on all incarcerated individuals.

2.0.      Department Order 901, provides the type of information that is available to health services staff.   It also describes the method of accessing and the restrictions in handling that information.

2.1.      The health services staff have access to information described in 901 as Public Information.  This category includes:
-        Name and ADC number of any inmate committed to the Department.
-        Conviction data contained in the Judgment of Sentence or minute entry.
-        Verified conviction data from AIMS.
-        The date of admission.
-        The institution where the inmate is housed, unless the file indicates that location is not to be released.
-        The date of scheduled release and/or discharge.
-        Decisions of the Arizona Board of Executive Clemency (Board).
-        The name and office telephone number of the supervising Parole Officer.

ADC011007

2.1.     The health services staff have access to information described in 901 as Confidential Information.  This category may be provided to Department staff as authorized and Health Care providers under contract to the Department.

ADC011008

| | Restraints and Medical Seclusion | OPR: Medical Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: jac |
| Health Services Technical Manual | Chapter 9 Section 8.0. | Supercedes: Effective Date: January 1, 2010 |

**REFERENCES:**     DIRECTOR'S INSTRUCTION 243
                    DEPARTMENT ORDER 804
                    DEPARTMENT ORDER 807
                    DEPARTMENT ORDER 1103
                    NCCHC STANDARD P-I-01

**PURPOSE:**   To provide clarification and guidance in the judicious use of clinically ordered restraints and clinically ordered seclusion.

**RESPONSIBILITY:**  All health care clinicians and practitioners are professionally and morally responsible to ensure that clinically ordered restraints and seclusion are used when an inmate-patient exhibits behavior that poses a danger to himself or others as a result of illness.

**PROCEDURES**:
1.0.     Director's Instruction 243 describes the procedure to use when restraining pregnant inmates.  While this document is primarily designed for guiding transportation officers in the methods to be utilized, it is instructive for health services staff.

2.0.     Department Order 804 provides ADC guidance in
2.1.     Placement of Inmates in Detention.  This element describes that inmates may be placed in segregation/detention as necessary including for reason of identifying, minimizing, and intervening in the possibility of self- destructive behaviors.

2.2.     Progressive Behavior Control.  This element provides that physical force shall be used only when persuasion, direct orders, counseling and warnings are found to be insufficient to obtain cooperation from the inmate.   Staff are directed that no unorthodox, radical or extreme control techniques that might cause positional asphyxia or bodily injury to staff or inmates is to be used.  Further, when an inmate continues unacceptable behavior, correctional staff shall isolate the inmate in seclusion.  This may be for clinical reasons as outlined in Department Order 1103 if the inmate's behavior is related to mental illness, or may be self abusive, or self destructive.

362

ADC011009

2.3.   <u>Maximum Behavior Control</u>.  This element requires annual training for all employees and staff having inmate contact who are assigned to Alhambra Behavioral Health Treatment Facility, ASPC-Eyman-Special Management Units, ASPC-Perryville-Lumley, ASPC-Tucson-Rincon Unit, ASPC-Lewis, ASPC-Florence-CB 6, as well as any Central Detention Unit equipped with maximum behavior control beds/cells, or other facilities or locations authorized by the Director to utilize maximum behavioral control.

Maximum behavior control and maximum-control with restraints shall be the last recourse for controlling an inmate's self-destructive behavior.  They may only be authorized when an inmate causes self-inflicted wounds and/or when an inmate continues to demonstrate violent self-destructive behavior and/or after all other less restrictive measures have failed.  MBC may never be used as a form of punishment.

3.0.   Department Orders 807 and 1103 provide guidance in restraint and/or seclusion of inmates who are exhibiting suicidal behaviors.  Mental Health professionals will serve as the guiding profession in these cases.

ADC011010

| | Forensic Examinations and Information | OPR:<br>Health Services Division Administrator |
|---|---|---|
| Arizona Department of Corrections | | Auth: jac |
| Health Services Technical Manual | HSTM<br>Chapter 9<br>Section 9.0. | Supercedes:<br>Effective Date:<br>January 1, 2010 |

**REFERENCES:**     Arizona Revised Statutes 13-2505
DEPARTMENT ORDER 1101
NCCHC STANDARD P-I-03

**PURPOSE:**   To provide guidance regarding collection of, or participation in collection of forensic information.

**RESPONSIBILITY:** All Facility Health Administrators are responsible to ensure that staff assigned under their management does not participate in collection of forensic information for punitive purposes.  All Program Managers are responsible for advising the Division Administrator and Facility Health Administrators on the topic of forensic collections as it pertains to their profession.

**PROCEDURE:**
1.0.    ADC health staff shall not conduct forensic examinations except when:
- Complying with State laws in collecting DNA samples for databases; or
- conducting body cavity searches or body fluid testing when done for medical purposes and under the orders of a physician; or
- conducting court ordered examinations with the consent of the inmate.

2.0.    As described in HSTM 7.10.0, if a sexual assault forensic examination is appropriate (as determined in accordance with DI 241), the suspect shall be taken by appropriate transportation means to a hospital emergency room for such an examination.

3.0.    Incidental removal of foreign bodies from inmate-patients.   This is provided as guidance to staff in collection of forensic or potential forensic evidence that has been acquired during the course of treatment.  Forensic information is physical data or items collected from an inmate that may be used against him or her in disciplinary or legal proceedings.
3.1.    The Arizona Department of Corrections generally prohibits health services staff from participating in collection of forensic information.

364

ADC011011

3.2.     There are specific exceptions to this policy that are driven when collection is authorized/requested by the inmate or required by State law or for medical purposes by physician's order.   Specifically In accordance with ARS 13-2505 the Department may request a licensed practitioner to order that x-radiation be performed on any inmate if there is reason to believe the inmate is in possession of contraband as defined in Arizona Revised Statute 13-2501.

3.3.     If in the course of medical treatment, a provider finds a need to collect or remove a foreign body (i.e., old bullet, shrapnel, pencil tip, etc.) and if the item to be removed may be considered evidence and if the collection may be postponed without causing additional harm to the patient, contact the CIU supervisor and authorize CIU's attendance at the removal.  If the CIU supervisor determines the item to be of an evidentiary nature, they will witness the removal and advice in the preservation of the item.

3.4.     If an item is removed as a result of an unplanned discovery, preserve the item and contact CIU for advice and direction.

3.5.     Such action does not fall under the prohibition set by professional organizations, statute, or medical ethics standards because it is not an action that is collected specifically for the purposes of consideration for disciplinary or legal proceedings.


4.0.     Although Health Services personnel may be called upon to participate in investigative elements, they are prohibited from participating in any punitive activity that results from an inmate's nonparticipation in a collection process.

365

ADC011012

| | Executions | OPR:<br>Medical Services<br>Administrator |
|---|---|---|
| Arizona Department of Corrections | | Auth: jac |
| Health Services Technical Manual | HSTM<br>Chapter 9<br>Section 10.0. | Supercedes:<br>Effective Date:<br>January 1, 2010 |

**REFERENCES:**     DEPARTMENT ORDER 710
DEPARTMENT ORDER 1101
NCCHC STANDARD P-I-08

**PURPOSE:**   To provide guidance to Health Services Division Staff regarding the conduct of executions in the State of Arizona.  Any real or perceived assistance in the execution of inmates would negatively impact the appropriate relationship between a provider and his/her patient. Therefore, all such real or potential involvement is prohibited.

**RESPONSIBILITY:**   It is the responsibility of the Health Services Division Administrator to ensure that Health Staff are not assigned to perform services directly related to the execution of a condemned inmate.

**PROCEDURE:**
1.0.     The Health Services Division Administrator and Clinical Director shall ensure that health care continue throughout the lifespan of the incarcerated inmate.
1.1.     Health services staff will not assist in directly causing the death of an inmate.
1.2.     Health services staff will not supervise in activity that causes the death of an inmate.
1.3.     Health services staff will not contribute to another individual's ability to cause the death of an inmate.

2.0.     Mental Health services will be provided as necessary by the Counseling and Treatment Services Division. This will not include competency determination.  Competency determinations will be provided by contracted professionals**.**

3.0.     In no event shall an execution be performed in an area designated as a health unit.

366

ADC011013