# EXHIBIT 6

## David Fathi

**To:** Jacobson - DOC, Adrienne
**Subject:** RE: More FTE infor


---------- Forwarded message ----------
From: "Jacobson - DOC, Adrienne" <adrienne.jacobson@state.co.us>
To: Rebecca Wallace <RTWallace@aclu-co.org>
Cc:
Date: Thu, 14 Jan 2016 20:18:31 +0000
Subject: Additional info - FTE
We currently have 17.375 FTE contract psychiatric providers (22 MDs, 2 PAs, and 3 APRNs) with another 1 FTE provider (MD) joining us in August, which leaves us funding for an additional 8 positions.
HB (MD) 1.0
WB (APRN) 1.0
SB (MD) 1.0
CC (MD) 0.25
MD (MD) 0.25
KF (MD) 0.5
KG (MD) 1.0
JH (MD) 1.0
RH (MD) 1.0
JK (MD) 1.0
JL (MD) 0.25
DL (MD) 1.0
RM (MD) 0.25
JM (MD) 0.25
FM (MD) 0.5
LM (APRN) 0.5
ER (APRN) 0.375
RR (MD) 0.25
JR (MD) 0.75
MR (MD) 1.0
DS (MD) 0.5
JS (MD) 0.75
JT (MD) 0.25
LT (MD) 0.5
MW (PA) 1.0
TW (PA) 1.0
JW (MD) 0.5
Adrienne L. Jacobson
Associate Director - Legal Services



**COLORADO**
Department of Corrections
Office of Finance & Administration

P 719.226.4247  |  C 719.429.4882
2862 S. Circle Drive, Colorado Springs, CO 80906
adrienne.jacobson@state.co.us  |  www.doc.state.co.us

**PLTF-PARSONS036273**

# EXHIBIT 7

Contract Review Permanent Legislative Oversight Committee
Alabama State House
Montgomery, Alabama 36130

## CONTRACT REVIEW REPORT

(Separate review report required for each contract)

Name of State Agency: ___Department of Corrections___

Name of Contractor: ___Corizon, Inc.___
___105 Westpark Dr, Suite 200___ ___Brentwood___ ___TN___ ___37027___
Contractor's Physical Street Address (No P.O. Box)    City    ST    ZIP

\*\*Is Contractor organized as an Alabama Entity in Alabama? YES ___ NO _X_
\*\*If not, has it qualified with the Secretary of State to Business in Alabama? YES _X_ NO ___

Is Act 2001-955 Disclosure form Included with this Contract? YES _X_ NO __
Does Contractor have current member of the Legislator or family member of Legislator employed? YES __ NO _X_
Was a Lobbyist/Consultant used to secure this contract OR **affiliated with this contractor?** YES__ NO _X_
If Yes, Give Name: **No lobbyist was used to secure this contract.** Corizon, Inc., who does business in 30 different
states, has 34 lobbyists associated with the company at this time, but none of these lobbyists are registered in
Alabama, and all are associated with other state contracts.
Contract Number: _C120051206___
     First contract period (10 months) : $63,453,823
     Second contract period (12 months) : $79,095,010
     Third contract period (12 months) : $82,156,415
         Contract Total: $224,705,248
% State Funds: ___100___ % Federal Funds: _____ % Other Funds: _____

Please Specify Source of Other Funds (Fees, Grants, etc.)
Date Contract Effective: ___December 1, 2012___ Date Contract Ends: ___September 30, 2015___
Type Contract NEW _X_ RENEWAL _____ AMENDMENT _____
             If Renewal, was it originally Bid? Yes____ No _____
        If AMENDMENT, Complete A through C.
        (A) Original contract total       $ _____

        (B) Amended total prior to this amendment     $ _____

        (C) Amended total after this amendment     $ _____

Was Contract Secured through Bid Process? YES____ NO _X_ Was lowest Bid accepted? N/A
Was Contract Secured through RFP Process? YES _X_ NO _____ Date RFP was awarded: _October 4, 2012_

Summary of Contract Services to be Provided: To provide health care and medical management services to state
inmates in accordance with applicable laws.

Why Contract Necessary AND why this service cannot be performed by merit employee: To discharge the State's
constitutional duty to provide medical care and treatment to State Inmates.

*I certify that the above information is correct*

_____    _____
Signature of Agency Head    Signature of Contractor

___Kim T. Thomas, Commissioner___    ___Campbell, President & COO___
Printed Name    Printed Name

Agency Contact: ___Anne A. Hill, General Counsel___ Phone: _(334) 353-3884_
     Revised: 4/11/2011

*Received Contract Review Committee OCT 2012*

## GOVERNOR'S ADDITIONAL CONTRACT QUESTIONS FORM

(1) If this contract was not competitively Bid, explain why not: This contract was secured utilizing the Request for Proposal ("RFP") process.

(2) If this contract was not competitively Bid because the contractor is a sole source provider, please explain who made the sole source determination and on what basis:____
N/A.

(3) If contract was awarded by RFP, what process was used, was it competitive, how many vendors were contacted, and how many proposals were received?   The RFP was posted on the ADOC website and fifteen vendors who had already expressed an interest in bidding on a new contract were given notice of that posting. Six vendors were present at a bidding conference, and were allowed to submit questions and tour the facilities. Thereafter, only Corizon, Inc. submitted a formal proposal in response to the RFP.

(4) If contract was awarded by RFP, was it awarded to the person or company with the lowest monetary proposal? If not, explain why not. Yes. It was the only proposal.

(5) If contract was awarded by RFP, how and by whom were the proposals evaluated? The proposal was evaluated by a committee comprised of ADOC employees in the Health Services, Accounting, and Operations Divisions, and members of the Governor's staff. The committee did a thorough review of the technical components of the proposal to ensure that all requirements of the RFP were met.

(6) If this contract was not awarded through either Bid or RFP process, explain why not:
N/A

(7) If this contract was not awarded through either Bid or RFP process, how was it awarded?
N/A

(8) Did agency attempt to hire a **State Employee?** If so who from the State Personnel Department did you talk to?   No.

(9) How many additional contracts does contractor have with the State of Alabama and which agencies are they with?   See attached Disclosure Statement.

_____
Signature of Agency/Department Head

PLTF-PARSONS-036275

# MEDICAL SERVICES AGREEMENT

THIS AGREEMENT between the Alabama Department of Corrections (hereinafter referred to as the "ADOC"), and Corizon, Inc., a Delaware corporation, (hereinafter referred to as "CORIZON"), is entered into as of the _____ day of October, 2012. Services under this Agreement shall commence on December 1, 2012, and shall continue in accordance with Section 7.1.

## WITNESSETH:

WHEREAS, the ADOC is charged by law with the responsibility of obtaining and providing reasonably necessary medical care for inmates within its custody; and

WHEREAS, the ADOC desires to provide medical care to inmates in accordance with applicable law; and

WHEREAS, the ADOC, which receives funding as approved by the State of Alabama for the Facilities, desires to enter into this Agreement with CORIZON to promote this objective; and

WHEREAS, CORIZON is in the business of providing correctional medical care services and desires to provide such services for the ADOC under the terms and conditions hereof,

NOW, THEREFORE, in consideration of the covenants and promises hereinafter made, the parties hereto agree as follows:

## ARTICLE I: MEDICAL CARE SERVICES

### 1.1   General Engagement

The ADOC hereby contracts with CORIZON to provide for the delivery of reasonably necessary medical care as set forth herein to individuals under the physical custody and control of the ADOC and housed within the Facilities, unless otherwise excluded herein, and CORIZON enters into this Agreement according to the terms and provisions hereof.

### 1.2   Scope of General Services

The services of CORIZON will encompass all duties required in the management of a system to deliver comprehensive medical care to inmates assigned to the ADOC. CORIZON will develop and implement an overall health care system for inmates assigned to the following facilities:

PLTF-PARSONS-036276

**ADOC Correctional Facilities**

Bibb Correctional Facility
565 Bibb Lane
Brent, AL 35034

Bullock Correctional Facility
P.O. Box 5107
Union Springs, AL 36089-5107

Donaldson Correctional Facility
100 Warrior Lane
Bessemer, AL 35023-7299

Draper Correctional Facility
P.O. Box 1107
Elmore, AL 36025

Easterling Correctional Facility
200 Wallace Drive
Clio, AL 36017-2615

Elmore Correctional Facility
P.O. Box 8
Elmore, AL 36025

Farquhar Cattle Ranch
1132 County Rd. 73
Greensboro, AL 36744

Fountain / JO Davis Correctional Facility
Fountain 3800
Atmore, AL 36503-3800

Frank Lee Youth Center
P.O. Box 220410
Deatsville, AL 36022

Hamilton Aged & Infirmed
223 Sasser Drive
Hamilton, AL 35570

Holman Correctional Facility
Holman 3700
Atmore, AL 36503-3700

Kilby Correctional Facility
P.O. Box 150
Mt. Meigs, AL 36057

Limestone Correctional Facility
28779 Nick Davis Rd
Harvest, AL 35749

Montgomery – Women's Facility
P.O. Box 75
Mt. Meigs, AL 36057

Red Eagle Honor Farm
1290 Red Eagle Road
Montgomery, AL 36110

St. Clair Correctional Facility
1000 St. Clair Road
Springville, AL 35146

Staton Correctional Facility
P.O. Box 56
Elmore, AL 36025

Tutwiler Prison for Women
8966 US Hwy 231 N
Wetumpka, AL 36092

Ventress Correctional Facility
P.O. Box 767
Clayton, AL 36016-0767

PLTF-PARSONS-036277

**ADOC Work Release / Community Work Centers**:

Alex City WR / CWC
P.O. Drawer 160
Alex City, AL 35010-0160

Atmore Community Work Center
9947 Hwy 21 N
Atmore, AL 36503

Birmingham WR / CWC
1216 25th Street N
Birmingham, AL 35234-3196

Camden WR / CWC
1780 Alabama Highway 221
Camden, AL 36726

Childersburg WR / CWC
P.O. Box 368
Childersburg, AL 35044-0368

Decatur WR / CWC
1401 Highway 20 West
Decatur, AL 35601

Elba WR / CWC
P.O. Box 710
Elba, AL 36323

Hamilton WR / CWC
1826 Bexar Ave. East
Hamilton, AL 35570

Loxley WR / CWC
P.O. Box 1030
Loxley, AL 36551-1030

Mobile WR / CWC
P.O. Box 13150
Eight Mile, AL 36663-0150

**Contract facilities:**

Community Education Centers
Alabama Therapeutic Education Facility
130 Industrial Parkway
Columbiana, Alabama 35051

**The above facilities hereinafter will be referred to as the "Facilities".**

CORIZON will be required to provide a medical fitness screening for all ADOC inmates who are scheduled to be housed or transferred to any other facility, prior to the transfer. Inmates transferred back to an Alabama Department of Corrections Facility will have a medical transfer screening completed within twelve (12) hours of notification by security that they have returned to an ADOC Facility. CORIZON will utilize medical screening criteria developed by the ADOC Office of Health Services and will coordinate screening with institutional mental health professionals.

    1.3    Purpose of the Project

The ADOC is responsible, through the services of CORIZON, for the provision of inmate medical care that meets constitutional standards to include comprehensive medical services and related support services to the inmates in the custody of the ADOC. The provision of services is primarily provided on-site at the designated facilities identified in Section 1.2 of the Medical Services

Agreement. The responsibility of CORIZON to deliver the medical care set forth herein to an inmate commences with the intake and physical placement of said inmate into one of the Facilities. Specialized services shall be provided through agreements between CORIZON and area providers such as hospitals, clinics, medical specialists, laboratories, and other specialized services. The objective of the Medical Services Agreement is for CORIZON to provide, manage, and operate a comprehensive health care services system at full capacity and in a cost-effective manner; deliver quality health care services; comply with ACA, NCCHC, and constitutional standards; implement a written health care plan with clear objectives; develop and implement policies and procedures; comply with all applicable state licensure requirements and standards regarding delivery of health care; maintain acceptable levels of staffing and inventory control; maintain full reporting and accountability to the ADOC; and maintain an open, collaborative relationship with the administration and staff of the ADOC and the individual facilities. It is the intent and purpose of the ADOC that all assigned inmates receive adequate medical care regardless of place of assignment or disciplinary status.

CORIZON shall provide the medical care and management services as specified in the ADOC Request for Proposal ("RFP") No. 2012-02, dated July 17, 2012, inclusive of all attachments, referenced policies and exhibits, which are adopted and incorporated by reference into the Medical Services Agreement as though fully set out herein, subject to the following clarifications or modification:

Section 5.16 third and fourth paragraphs are revised as follows:

All recommendations involving any special procedures or non-routine follow-up must be communicated verbally between the off-site consultant and Vendor's primary care physician. Vendor is responsible for the outpatient and specialty services network and subsequent negotiation of provider rates for all services not covered by the ADOC's Blue Cross and Blue Shield network.

Vendor is required to utilize the ADOC's Blue Cross and Blue Shield contracted hospital network arrangement, as administered by the State Employees Insurance Board (SEIB), for facility visits. All claims related to inpatient, emergency room services, and other outpatient facility services as described below, will be processed and reviewed by BCBS and submitted to SEIB for payment. These paid claims will be applied against the pre-paid monthly fee of $500,000 by Vendor (reference Section 5.17 of this RFP) and any excess will be invoiced to Vendor for payment.

Section 5.17(A) Off-site Services Responsibilities, Requirements, and Financial Assumptions

Add the following to the end of section b) Vendor:

CORIZON will not be responsible for any SEIB obligations to BCBS when it provides the required reimbursements under the terms of the CORIZON/ADOC agreement. With the information provided in the electronic file submitted by BCBS monthly, CORIZON will review the data to verify that BCBS is making payment to providers for services authorized by CORIZON. CORIZON requires the right and ability to audit all payments made by BCBS for services charged to CORIZON under the CORIZON/ADOC contract. In the event that BCBS renders incorrect reimbursement to providers due to ineligibility, ineligible or

PLTF-PARSONS-036279

unauthorized services, or payments in excess of contracted rates, CORIZON will not be charged for such payments. In the event such charges are paid to SEIB/BCBS or withheld from CORIZON' reimbursement, such amounts can be recovered by CORIZON as the incorrect reimbursements are identified. CORIZON will not be financially responsible to reimburse SEIB or BCBS for periodic settlements that BCBS negotiates with its providers without audited documentation that said settlements directly result from the administration of a proper reimbursement of claims associated with care for which CORIZON is financially liable.

Section 5.27 (A) Pharmacy Services add item 'w'.

For the first period of this agreement, from December 1, 2012 to September 30, 2013, CORIZON will invoice the ADOC for all psychotropic medication and all other medication prescribed by the mental health vendor. CORIZON will invoice the ADOC actual acquisition cost plus a dispensing fee per prescription of $3.94. Prescriptions for medical conditions prescribed by the mental health vendor at the Bullock and Tutwiler Correctional Facilities will not be billed back to the ADOC. Subsequent to the first term of the agreement, the dispensing fee will be subject to a three percent (3%) annual escalator every October 1st of the remaining agreement term and renewals.

Section 5.36 (A) Management Information System

Delete the last sentence of paragraph a) of this section and replace with the following:
At the termination of the Agreement any equipment or software owned by the ADOC will remain the property of the ADOC and any equipment or software owned or licensed by CORIZON will remain the property of CORIZON.

Add the following sentence to the end of this section:
CORIZON and ADOC will mutually agree to all required electronic data interfaces and reporting requirements.

Section V-(B) Mental Health Services

This Section shall be deleted in its' entirety. CORIZON will not be responsible for mental health services requested within this Section of the RFP.

Section 6.10    Personnel Issues and Specifications: Paragraph g) of this section is deleted and the following inserted in its place:

g)      Vendor is required to keep personnel files on all contracted employees. CORIZON will make the following records available to the ADOC upon request: records required by ACA and NCCHC standards to include current CPR certification and licensures, and training.

PLTF-PARSONS-036280

Section 6.10   Personnel Issues and Specifications

Paragraph e) of this section, delete the following sentence:

Vendor will utilize the standards of the Joint Commission on Accreditation of Healthcare Organizations and Accreditation Manual for Hospitals for Medical Professional Staff appointments.

Such medical care and management services shall be provided in accordance with the Performance-Based Standards for Correctional Healthcare in Adult Correctional Institutions, American Correctional Association (ACA), and the National Commission on Correctional Health Care (NCCHC), subject to the terms of this Agreement. If any requirement of the scope of work identified in this Section exceeds the standards of the ACA, NCCHC, or standards or requirements defined in the Policies and Procedures of the ADOC, the requirements of the scope of work identified in the sections of the RFP adopted by reference in this Agreement will prevail.

    1.4    <u>Exceptions to Medical Care Costs</u>

(a)    CORIZON will not be financially responsible for any costs incurred after an inmate is released from the ADOC's custody.

(b)    CORIZON shall not be responsible for the costs or furnishing of any abortions unless medically necessary.

(c)    CORIZON will not be responsible for the cost of the following medications associated with the treatment of bleeding disorders:

Antihemophilic agents Coagulation Factor VIIa;

Antihemophilic Factor VIII;

Anti-Inhibitor Coagulant Complex;
Factor IX Concentrate; and

Von- Willebrand Factor Complex.

CORIZON will be responsible for providing the medications identified in Section 1.4 (c) to the ADOC and will invoice the ADOC at CORIZON' acquisition cost plus a dispensing fee per prescription of three dollars and sixty-four cents ($3.64). Such actual acquisition cost will have considered any applicable discounts or rebates. In the event that CORIZON thereafter receives any specific rebate attributable to the particular medications previously provided by CORIZON, CORIZON will credit the ADOC for that rebate. CORIZON will credit the ADOC with its actual acquisition cost, less shipping and handling, for any return of the said medications that can be reused in accordance with state and federal laws and regulations and/or restrictions.

1.5   Inmates Outside the Facilities

Medical care services are intended only for those inmates in the actual physical custody of one of the Facilities. This includes inmates under guard in outside hospitals and whose care CORIZON is managing. Such inmates will be included in the resident daily population count. No other inmates, including, but not limited to, those in outside hospitals who are not under guard, shall be the responsibility of CORIZON, nor shall such inmates be included in the resident daily population count. Inmates on any sort of temporary release, including, but not limited to, inmates temporarily released for the purpose of attending funerals or other family emergencies, inmates on escape status, inmates on pass, parole, or supervised custody who do not sleep in one of the Facilities at night, will not be included in the daily population count and will not be the responsibility of CORIZON with respect to the payment or furnishing of medical care services.

ADOC inmates in the custody of other penal jurisdictions for any reason are likewise excluded from the population count and are not the responsibility of CORIZON for the furnishing or payment of medical care services.

1.6   Elective Medical Care

CORIZON will not be responsible for providing elective medical care to inmates. For purposes of the Agreement, "elective medical care" means medical care which, if not provided, would not, in the opinion of the treating physician, cause the inmate's health to deteriorate or cause definite harm to the inmate's well-being. Such decisions concerning medical care shall be consistent with general NCCHC standards. Any referral of inmates for elective medical care must be reviewed and approved by the ADOC prior to provision of such services.   CORIZON will assist in arranging ADOC approved elective care, but CORIZON shall have no financial responsibility for such care.

1.7   Transportation Services

To the extent any inmate requires off-site nonemergency (i.e., non-life-threatening) medical care treatment, including, but not limited to, hospitalization care and specialty services, the ADOC will, upon request by CORIZON, its agents, employees, or contractors, provide transportation as reasonably available. When medically necessary, CORIZON shall arrange and pay for all emergency (i.e., life threatening) ambulance transportation of inmates.

1.8  Scheduling of Service

Any work performed on State premises will be done during the hours designated by the ADOC (to be established with input from CORIZON to ensure appropriateness of medical care), and will, in any event, be performed so as to minimize inconvenience to the ADOC and its personnel, and minimize interference with the operation of the ADOC. CORIZON is to schedule daily services around inmate movement, including, but not limited to, work details, meal times, program services, and activities, as to provide reasonable access to regularly scheduled physician sick call and chronic care clinics. Whenever feasible with inmate facility movement, physician sick call and clinic times should be scheduled between the hours of 6:00 AM and 8:00 PM Monday through Friday. Collection and triage (review) of inmate sick call request will take place seven (7) days per week, to include holidays and

PLTF-PARSONS-036282

weekends. For those facilities without daily nursing service, the sick call request slips will be reviewed the next clinic day. 'As needed' or 'PRN' nurse sick call will be held on weekends and Holidays. A physician and/or licensed mid-level practitioner (RNP or PA) will be on-call during unscheduled hours for emergent care seven (7) days per week twenty-four (24) hours a day.

1.9    Pharmacy Services.

CORIZON will provide and be financially responsible for all medications for medical conditions under this Agreement except as noted above in Section 1.4(d) and the RFP. Since CORIZON bears the total risk associated with providing these medications for the inmate population, all discounts, credit returns and rebates negotiated and received by CORIZON will remain the property of CORIZON.

## ARTICLE II: PERSONNEL

2.1    Staffing

CORIZON must provide adequate and sufficient medical care personnel required to perform the various services in accordance with Exhibit A.  Staffing must include physicians, dentists, nurses, administrative and clerical staff, and other personnel required to comply with the provisions of the Medical Services Agreement. CORIZON shall provide the medical care and  management staffing as specified in the ADOC Request for Proposal ("RFP") No. 2012-02, dated July 17, 2012, Sections 6.3 through 6.11. These specific Sections of the RFP and referenced correspondence of October 15, 2012 and October 17, 2012 between ADOC and CORIZON included as Exhibit C, are adopted and incorporated by reference into the Medical Services Agreement as though fully set out herein, subject to the following modifications:

Section 6.5    Personnel – Staffing Paybacks for Unfilled Hours of Service

Delete paragraph three (3) and (4) on page ninety-six (96) and continued on page ninety-seven (97); insert the following in its place:

Paybacks for unfilled hours (worked) of service will apply to the following position classifications at both the regional and facility level:

         a)  Statewide Medical Director (physician)
         b)  Assistant Statewide Medical Director (physician)
         c)  HIV Specialist (physician)
         d)  Facility Medical Director (physician)
         e)  Facility Dental Director or Dentist
         f)  Nurse Practitioner or Licensed Mid-level Provider
         g)  HSA
         h)  DON

In the event that less than 85% of the required staffing hours of the designated position classifications identified are worked in a given quarter for any position

PLTF-PARSONS-036283

subject to a payback assessment at any Facility, Corizon shall credit the ADOC for such unfilled hours to the extent that such hours, per position/per classification, fall below the 85% threshold.  For example, if there are 2 FTE nurse practitioners (NPs) identified for a particular facility, then the calculation of the 85% threshold for the NP position at the facility will be based on the number of hours equal to 2 FTEs for that month and the total number of fulfilled NP hours. Hours worked will be aggregated by position category at each individual facility. Hours worked in a position category cannot be rolled up on a statewide level.  Credit shall be at a rate equal to the average hourly wage plus 20% for benefits ($hourly rate x 1.20 = payback $) for the hours.

The ADOC may waive, at its' discretion, hours not worked for Corizon staff that are participating in corporate functions, community training and/or education to include programs to obtain Continuing Education Credits (CEU). Vendor's Program Director must submit a request for training and identify who will attend the training and length of his/her absence, two (2) weeks in advance of the date of the activity or event to the Associate Commissioner of Health Services (ACHS) for approval.

Throughout the life of the contract and any extension terms, the ADOC and CORIZON will meet and review the staffing matrix outlined in Exhibit A for each Facility, on a quarterly basis. Such reviews will be conducted at the end of each three (3) month period of service. Either party may recommend changes to the official matrix for consideration. Should the requested staffing changes be cost neutral for the contract and approved by both parties, the revised Exhibit A and the associated changes will be documented in writing, signed by both parties, and implemented for the remainder of the contract.

If the proposed staffing mix changes are not cost neutral and require additional funding by the ADOC, or result in a reduction in cost to the ADOC, CORIZON will provide additional support to justify the requested changes, to include recent history of hours worked for the position in comparison to the existing required staffing matrix.

### 2.2    Contract Monitoring

To evaluate and assess that all standards are being met and that CORIZON is in full compliance with the contract, the ADOC Office of Health Services (OHS), under the Direction of the Associate Commissioner of Health Services (ACHS), will implement a contract monitoring program as part of internal Continuous Quality Improvement (CQI).
This contract monitoring program and the payment adjustments for non-performance will be governed by ADOC Request for Proposal ("RFP") No. 2012-02, dated July 17, 2012, Sections 6.1 through 6.2. These specific Sections of the RFP are adopted and incorporated by reference into the Medical Services Agreement as though fully set out herein.

### 2.3    Licensure, Certification, and Registration of Personnel

All personnel provided or made available by CORIZON to render services hereunder shall be licensed, certified, or registered, as appropriate, in their respective areas of expertise as required by applicable Alabama law.

PLTF-PARSONS-036284

2.4     ADOC's Satisfaction with Medical Care Personnel

If the ADOC becomes dissatisfied with any medical care personnel provided by CORIZON hereunder, or by any independent contractor, subcontractors, or assignee, CORIZON, in recognition of the sensitive nature of correctional services, shall, following receipt of notice from the ADOC of the grounds for such dissatisfaction and in consideration of the reasons therefore, exercise its best efforts to resolve the problem. If the problem is not resolved satisfactorily to the ADOC, CORIZON shall remove, or shall cause any independent contractor, subcontractor, or assignee to remove, the individual about whom the ADOC has expressed dissatisfaction. Should removal of an individual become necessary, CORIZON will be allowed reasonable time to find an acceptable replacement, without penalty or any prejudice to the interests of CORIZON.

2.5     Use of Inmates in the Provision of Medical Care Services

Inmates shall not be employed or otherwise engaged by either CORIZON or the ADOC in the direct rendering of any medical care services. ADOC inmates may be used in positions not involving the rendering of medical care services directly to inmates, in accordance with ACA, NCCHC standards, and ADOC-OHS Hospice program in accordance with OHS Policy and Procedure G-11.

2.6     Subcontracting and Delegation

In order to discharge its obligations hereunder, CORIZON will engage certain medical care professionals as independent contractors rather than as employees. The ADOC may request to approve such professionals, but approval will not be unreasonably withheld. Subject to the approval described above, the ADOC consents to such subcontracting or delegation. CORIZON will not exercise control over the manner or means by which these independent contractors perform their professional medical duties.  However, CORIZON shall exercise administrative, non-clinical oversight of such professionals over matters of scheduling and fulfilling ADOC policies and procedures necessary to ensure the strict fulfillment of the obligations contained in this Agreement. For each agent and subcontractor, including all medical professionals, physicians, dentists, and nurses performing duties as agents or independent contractors of CORIZON under this Agreement, CORIZON shall provide the ADOC proof, if requested, that there is in effect a professional liability or medical malpractice insurance policy, as the case may be, in an amount of at least one million dollars ($1,000,000) coverage per occurrence and three million dollars ($3,000,000) aggregate.

2.7     Discrimination

During the performance of this Agreement, the ADOC and CORIZON, its employees, agents, subcontractors, and assignees agree as follows:

> (a)     None will discriminate against any employee or applicant for employment because of race, religion, color, sex, or national origin, except where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of the contractor. Each will agree to post in conspicuous places, available to employees and applicants for employment, notices setting forth the provisions of this nondiscrimination clause.

PLTF-PARSONS-036285

(b)     In all solicitations or advertisements for employees, each will state that it is an equal opportunity employer.

(c)     Notices, advertisements, and solicitations placed in accordance with federal law, rule, or regulation shall be deemed sufficient for the purpose of meeting the requirements of this Section.

(d)     Equal Employment Opportunities - Affirmative Action/Sexual Harassment

In addition, CORIZON will comply with the regulations, procedures, and requirements of the ADOC concerning equal employment opportunities    and affirmative action; provide such information with respect to its employees and applicants for employment; and have written sexual harassment policies.   In compliance with the Equal Employment Opportunity and Nondiscrimination Practices Act, CORIZON will comply with the provisions of the Civil Rights Act of 1964, the nondiscrimination clause contained in Section 202, Executive Order 11246, as amended by Executive Order 11375, relative to Equal Employment Opportunity for all persons with regard to race, color, religion, sex, or national origin, and the implementing rules and regulations prescribed by the Secretary of Labor; and Section 504 of the Federal Rehabilitation Act of 1973 as amended (29 U.S.C. 794), requirements imposed by the Applicable H.E.W. Regulation 45 C.F.R. Part 84, and all guidelines and interpretations issued pursuant thereto.

(e)     All services under the contract will be performed in accordance with applicable Alabama and Federal law, statutes, provisions, and regulations. Also, Corizon will comply with any Federal Court Orders that pertain to the operation of Alabama prisons and institutions for which the ADOC is statutorily responsible.  Corizon's remedy for any claim under the contract is to file a claim against the ADOC with the Alabama Board of Adjustment.

(f)     As required by the Beason-Hammon Alabama Taxpayer and Citizen Protection Act and any subsequent amendment to that Act, Corizon is required to utilize the U.S. Department of Homeland Security's E-Verify system to verify employment eligibility of: all persons employed during the contract term by Corizon to perform employment duties; and all persons including subcontractors assigned by Corizon to perform work pursuant to the Agreement with the Department. (http://www.uscis.gov/everify). Corizon shall attest to such by sworn affidavit signed before a notary.

(g)     Additionally, Corizon shall include a provision in all subcontracts that requires all subcontractors to utilize the U.S. Department of Homeland Security's E-Verify system to verify employment eligibility of: all persons employed during the contract term by Corizon or subcontractor to perform work or provide

ADOC and CORIZON
Medical Services Agreement

PLTF-PARSONS-036286

services pursuant to this Agreement with the department. The Subcontractor shall attest to such by sworn affidavit signed before a notary.

### 2.8   Training

All full-time contracted medical personnel are required to complete sixteen (16) hours of orientation to the ADOC at training sites designated by the respective facilities. 'Full time' is defined as an individual who works a total of 2080 in a calendar year. Part-time and temporary staffs are required to complete eight (8) hours of orientation. In addition to basic training, all full-time contracted medical staff must complete four (4) hours of annual training, as designated by the ADOC-OHS. Training hours must be documented.

### 2.9   Compliance With Rules

All contracted staff shall comply with applicable state, federal, and local laws, regulations, court orders, administrative regulations, administrative directives, and policies and procedures of the ADOC and CORIZON, including amendments thereto. Violation of regulations, particularly those involving institutional security, may result in the personnel being denied access to the institution. In the event of personnel being denied access to the institution, CORIZON shall provide appropriate personnel to cover the position, subject to the provision of Section 2.4.

### 2.10   Rejection of Personnel

The ADOC reserves the right to reject any CORIZON personnel, whether employees or subcontractors, whether employed now or in the future. Any such rejections shall not be unreasonably exercised by the ADOC. The ADOC may conduct criminal and driver history background checks on CORIZON' employees, agents, and/or job applicants who would may directly supervise or physically perform the contract requirements at ADOC facilities. Any such employee or agent deemed unsuitable by the ADOC must be replaced within a reasonable period and subject to the provisions of Section 2.4.

In the event that the ADOC rejects any job applicant, employee, or subcontractor, the ADOC agrees to inform CORIZON, on a confidential basis of the reason for rejection. Should CORIZON believe a rejection by the ADOC is "unreasonable" CORIZON shall, in a confidential manner, notify the ADOC in writing why it believes such rejection to be unreasonable. Due to the sensitive nature of the prison environment, CORIZON agrees that in the event the ADOC is dissatisfied with any of the personnel provided under this contract, the ADOC may deny such personnel access into the correctional facility. The ADOC will give CORIZON notice of the facts and reasons for such denial. CORIZON shall remove such personnel from the programs herein and cover the position appropriately until an approved replacement is in place.

PLTF-PARSONS-036287

### 2.11   TB Testing

All contract employees must receive an annual TB test or follow-up, if appropriate. CORIZON will provide testing for TB to ADOC employees at the request of the ADOC Associate Commissioner of Health Services.

### 2.12   Solicitation and Employment

CORIZON will not employ any person or Independent Contractor employed by the ADOC at any time during the term of the Agreement to perform any work required by the terms of the contract. As a condition of the contract, CORIZON will give notice immediately to the Commissioner of the ADOC if CORIZON solicits or intends to solicit for employment any independent contractor or employee of the ADOC during the term of the Agreement.   The ADOC has no authority to contractually refuse to hire CORIZON's employees who apply to the State for employment.

### 2.13   Drug-Free Workplace

CORIZON will provide a drug-free workplace. No individual engaged in the unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance will be eligible for employment under the contract. False certification or violation of the certification may result in sanctions including, but not limited to, suspension of contract, termination of Agreement, and/or debarment of contracting opportunities with the ADOC for at least one (1) year, but not more than five (5) years.

CORIZON certifies and agrees to provide a drug free workplace and will enforce its drug-free workplace policy.

## ARTICLE III:  STANDARD

### 3.1   Obligation of CORIZON

CORIZON's services shall be provided in accordance with the healthcare standards promulgated by the ACA and NCCHC. When a variation in ADOC-OHS Policy and Procedures and said standards exists, ADOC-OHS Policies and Procedures will prevail.

## ARTICLE IV:  REPORTS AND RECORDS

### 4.1   Medical Records

CORIZON shall cause and require tobe maintained complete and accurate medical records for each inmate, housed in any of the Facilities, who receives health care services during the term of this Agreement. Each medical record will be maintained in accordance with applicable laws, NCCHC and ACA standards, and the ADOC's policies and procedures. The medical records shall be kept separate from the inmate's confinement record.  A complete legible copy of the applicable medical record shall be available at all times. A medical transfer sheet shall accompany each inmate who is transferred from any of the Facilities to another location for off-site services or transferred to another

PLTF-PARSONS-036288

institution. Medical records shall be kept confidential. Subject to applicable law regarding confidentiality of such records, CORIZON shall comply with the ADOC's policy with regard to access by inmates and any of the Facilities' staff to medical records. No information contained in the medical records shall be released by CORIZON except as provided by the ADOC's policy, by a court order, or otherwise in accordance with the applicable law. CORIZON shall, at its own cost, provide all medical records, forms, jackets, and other materials necessary to maintain the medical records. At the termination of this Agreement, all medical records shall be delivered to and remain with the ADOC. However, the ADOC shall provide CORIZON with reasonable ongoing access to all medical records, even after the termination of this Agreement, for the purposes of defending actual and threatened litigation. Inmate medical records are the property of the ADOC.

### 4.2    Regular Reports by CORIZON to the ADOC

CORIZON will maintain and provide a monthly report to the ADOC- Office of Health Services (OHS) detailing the number of medical and dental services provided including, but not limited to, the following:

       a)  Monthly reports of services as outlined in Appendix G, of RFP 2012-02 dated July 7, 2012;

       b)  Reports for administrative meetings with ADOC officials; and

       c)  Semi-annual and annual reports for the analysis of services provided.

These monthly reports shall be provided in a form and manner mutually acceptable to the parties.

CORIZON and its subcontractors will maintain books and records related to performance of the Agreement or subcontract and necessary to support amounts charged to the ADOC in accordance with applicable law, terms and conditions of the Agreement, and generally accepted accounting practices. CORIZON will maintain these books and records for a minimum of three (3) years after the completion of the contract, final payment, or completion of any Agreement audit or contract litigation, whichever is later. All books and records directly related to this Agreement will be available for review or audit by the ADOC, its representatives, and other governmental entities with monitoring authority upon reasonable notice and during normal business hours. CORIZON agrees to cooperate fully with any such review or audit. If any audit indicates overpayment to CORIZON, the ADOC will adjust future or final payments otherwise due. If no payments are due and owing to CORIZON, or if the overpayment exceeds the amount otherwise due, CORIZON will immediately refund all amounts that may be due to the ADOC. Failure to maintain the books and records required by this Section will establish a presumption in favor of the ADOC for the recovery of any funds paid by the ADOC under the Agreement for which adequate books and records are not available to support the purported disbursement.

CORIZON will provide the ADOC with a copy of all its maintenance and/or equipment contract agreements upon request.

ADOC and CORIZON
Medical Services Agreement

14

PLTF-PARSONS-036289

4.3    Inmate Information

Subject to applicable law, in order to assist CORIZON in providing the best possible medical care services to inmates, the ADOC will provide CORIZON with information, pertaining to inmates, that CORIZON and the ADOC mutually identify as reasonable and necessary for CORIZON to adequately perform its obligations hereunder.

4.4    CORIZON Records Available to the ADOC with Limitations on Disclosure

During the term of this Agreement and for a reasonable time thereafter, CORIZON shall make available to the ADOC, at the ADOC's request, all records, documents, and other papers relating to the direct delivery of medical care services to inmates hereunder. The ADOC understands that many of the systems, methods, procedures, written materials, and other controls employed by CORIZON in the performance of its obligations hereunder are proprietary in nature and will remain the property of CORIZON. Information concerning such may not, at any time, be used, distributed, copied, or otherwise utilized by the ADOC, except in connection with the delivery of medical care services hereunder, or as permitted or required by law, unless such disclosure is approved in advance, and in writing, by CORIZON.

The ADOC may release, without the consent of CORIZON, any documents or data required to be released pursuant to the State of Alabama Open Records Law, requests by the State Legislature, or any other allied state agency. However, ADOC will inform CORIZON of such request in advance of such disclosure.

4.5    ADOC Records Available to CORIZON with Limitations on Disclosure

During the term of this Agreement and for a reasonable time thereafter, the ADOC will provide CORIZON, at CORIZON's request, the ADOC's records relating to the provision of health care services to inmates as may be reasonably requested by CORIZON or as are pertinent to the investigation or defense of any claim related to CORIZON's conduct. Consistent with applicable law, the ADOC will make available to CORIZON such records as are maintained by the ADOC, hospitals, and other outside medical care providers involved in the care or treatment of inmates (to the extent the ADOC has any control over those records) as CORIZON may reasonably request. Any such information provided by the ADOC to CORIZON that the ADOC considers confidential shall be kept confidential by CORIZON and shall not, except as may be required by law, be distributed to any third party without the prior written approval of the ADOC.

4.6    Confidentiality and Use of Work Product

During the term of this Agreement, and for a reasonable time thereafter, CORIZON shall ensure:

(a)    Any Documents or information obtained by CORIZON from the ADOC in connection with the Agreement will be kept confidential and will not be provided to any third party unless the ADOC approves disclosure in writing. All work product produced under the Agreement , including, but not limited to, documents, reports, information, documentation of any sort, and ideas, whether preliminary or final, will become and

ADOC and CORIZON                                    15
Medical Services Agreement

PLTF-PARSONS-036290

remain the property of the ADOC, except that any patent, copyright, or other intellectual ideas, concepts, methodologies, processes, inventions, and tools (including computer hardware and software where applicable) that CORIZON previously developed and brings to the ADOC in furtherance of performance of the Agreement will remain the property of CORIZON.

(b)    CORIZON will do nothing to prejudice the ADOC to recover against third parties for any loss, destruction, or damage to State property, and will at its request and expense furnish to the ADOC reasonable assistance and cooperation, including assistance in the prosecution of suit and the execution of instruments of assignment in favor of the ADOC in obtaining recovery.

## ARTICLE V: SECURITY

### 5.1    General

CORIZON and the ADOC understand that adequate security services are necessary for the safety of the agents, employees, and subcontractors of CORIZON as well as for the security of inmates and ADOC's staff, consistent with the correctional setting. The ADOC will provide sufficient security to enable CORIZON to safely and adequately provide the health care services described in this Agreement. Nothing herein shall be construed to make the ADOC, its deputies, or employees a guarantor of the safety of CORIZON employees, agents, or subcontractors, including their employees.

### 5.2    Loss of Equipment and Supplies

The ADOC shall not be liable for the loss of, or damage to, equipment and supplies of CORIZON, its agents, employees, or subcontractors unless such loss or damage was caused by the negligence of the ADOC, its employees or inmates.

### 5.3    Security During Transportation Off-Site

The ADOC will provide security as necessary and appropriate in connection with the transportation of any inmate between any of the Facilities and any other location for off-site services as contemplated herein.

## ARTICLE VI:  OFFICE SPACE, EQUIPMENT, INVENTORY, AND SUPPLIES

### 6.1    General

The ADOC will provide CORIZON with office space, at Facilities  designated by the ADOC, and utilities, except for long distance telephone services (which will be by credit or billed for services from the facility), to enable CORIZON to perform its obligations and duties.  The provision of telephones, voice mail, and/or dedicated communication lines will be limited to existing services. Additional services, including any equipment or services for connection to the internet will be at the expense of CORIZON.

ADOC and CORIZON
Medical Services Agreement

16

PLTF-PARSONS-036291

CORIZON will use the supplies and maintain the equipment in place at the designated facilities at the commencement of the contract in the performance of its responsibilities under the contract and will return all such equipment, and any new and/or purchased medical equipment under the equipment escrow, in good state of repair and working order, reasonable age, wear and tear excepted, and any remaining supplies to the ADOC upon termination of the contract. Thirty (30) days prior to the termination of the contract, representatives from the ADOC, CORIZON, and any succeeding Vendor(s) designated by the ADOC will tour the designated institutions to determine the condition of said equipment.

Corizon will assign and make available to the ADOC Office of Health Services (OHS) all warranties or guarantees associated with any materials, or equipment purchased with funds from the ADOC-OHS Medical Equipment Escrow Account.

To the extent allowed, CORIZON will convey, transfer, assign, or otherwise make available to any succeeding Vendor(s) designated by the ADOC any and all service contracts and/or warranties that are in force and effect at any time during the term of the Agreement with respect to equipment used in the medical units of the designated facilities.

### 6.2    Delivery of Possession

The ADOC will continue to provide to CORIZON, beginning on the date of commencement of this Agreement, possession and control of all ADOC medical and office equipment and supplies in place at the Facilities health care units.  At the termination of this or any subsequent Agreement, CORIZON will return to the ADOC possession and control of all medical and office equipment owned by the ADOC, in working order, reasonable age, wear and tear excepted, which were in place at the Facilities health care units prior to the commencement of services under this Agreement.

### 6.3    Equipment, Maintenance, and Replenishment

CORIZON will work with the ADOC in projecting the medical equipment needs for any facilities. CORIZON's financial responsibility for such equipment will be designated and limited to an annual aggregate cap of $75,000 per Agreement year. The total cost of medical equipment purchased under this aggregate fund will be reconciled every six (6) months, or upon the request of the ADOC-OHS. The ADOC will have the option to deduct any unspent balance left of the $75,000 annual equipment cap at the end of each twelve (12) month Agreement period, or roll a positive variance forward into the next Agreement year. For the first Agreement period, the equipment limit will be prorated to $62,500.

CORIZON may be requested to sponsor appropriate organizational and educational training and activities for ADOC-OHS Administrative and Clinical staff, through the financial means of this fund. Any such sponsored training or event must meet the approval of the ADOC Associate Commissioner of Health Services and the Commissioner of the Department of Corrections. Estimated cost and financial limitations will be established prior to the approval of any such training activity. All activities and expenditures will be approved within the guidelines and policies established by the Alabama Ethics Commission.

PLTF-PARSONS-036292

The initial maintenance, repair, and/or replacement of medical and dental equipment, including maintenance service contracts, are the financial responsibility of CORIZON up to a limit of five-hundred dollars ($500.00), per service or replacement of a single item. The cost associated with any repair or replacement of a single item that exceeds the five-hundred dollar limit ($500) will be subject to the annual equipment escrow. The Associate Commissioner of Health Services will have the final review and approval of the cost of any repairs, maintenance, supplies, training, or purchase of any equipment that is subject to the annual equipment and training escrow, prior to purchase.

The ADOC will provide for daily housekeeping services, dietary services, building maintenance services, personal hygiene and linen supplies, associated with the housing of inmates in receipt of medical services within the Facilities.

### ARTICLE VII:  TERM AND TERMINATION OF AGREEMENT

7.1     Term

This Agreement shall commence at 12:01 AM on December 1, 2012.  The initial term of this Agreement shall be through 11:59 PM on September 30, 2015, and may be extended for two (2) additional one (1) year terms, if mutually agreed to in writing and signed by both parties.  The parties agree that the contract year shall be the fiscal year beginning October 1st, with the exception of the first contract term which shall begin on December 1, 2012.  Any extension beyond the initial term must be agreed to no later than six (6) months prior to the expiration of the then existing term.  The parties clearly understand that any extension must be submitted to the Legislative Contract Review Oversight Committee and must be approved by the Governor of the State of Alabama.

The length of the term of contract, including any renewals, may not exceed five (5) years.  If the commencement of performance is delayed because the ADOC does not execute the contract on the start date, the ADOC may change the start date, end date, and milestones to reflect the delayed execution.  No renewal may be effective automatically.  No renewal may be effective solely at the option of CORIZON.

7.2     Termination

This Agreement may be terminated as otherwise provided in this Agreement or as follows:

(a)     Termination by Agreement.  In the event that the parties mutually agree in writing, this Agreement may be terminated on the terms and date stipulated therein.

(b)     Termination by Cancellation.  The ADOC may cancel this Agreement if CORIZON fails to cure any default after proper notification in accordance with this Agreement.

(c)     Annual Appropriations and Funding.  This Agreement may be subject to the annual appropriation of funds by a funding authority other than the ADOC.

PLTF-PARSONS-036293

Notwithstanding any provision herein to the contrary, if funds are not appropriated for this Agreement, then the ADOC shall be entitled to immediately terminate this Agreement, without penalty or liability.  The ADOC and CORIZON agree that, in the event the Alabama State Legislature fails to provide the necessary appropriations for the performance of this Agreement, or in the event that such appropriations are exhausted prior to the expiration of the Agreement term, or in the event that the State General Fund Budget goes into proration and such proration causes insufficient funds to be available for the performance of this Agreement , CORIZON or the ADOC may, at either party's option, be relieved of performance hereunder, upon thirty (30) days written notice.

(d)     Prior to exercising the right to terminate this Agreement for default, the party alleging the default shall provide written notice to the alleged defaulting party, stating in detail the events of default and what is needed to cure the default.  A reasonable period shall be allowed the alleged defaulting party to cure.  If the alleged default is not cured within the designated period, the party alleging default may proceed to exercise its right to terminate for default by delivering final written notice clearly stating the termination date and reason(s) for termination.

(e)     <u>Termination for Convenience</u>.  Notwithstanding any other provision to the contrary herein, either party hereto may terminate this Agreement upon the giving of one hundred twenty days (120) written notice to the other party.

(f)     <u>Option to Continue</u>.  In the event this Agreement is terminated for any cause or under any paragraph herein, CORIZON, at the option and request of the ADOC, shall continue to furnish an Administrator of the system, full-time, for thirty (30) days and, during this period, said Administrator shall assist the ADOC to continue to provide healthcare services to inmates.  It shall be understood that CORIZON shall not be responsible for the care being provided in such circumstances. The ADOC shall pay CORIZON Five Hundred Dollars ($500.00) per day for such services. The provisions of this paragraph shall not apply if ADOC contracts with another provider for inmate healthcare services following termination of this Agreement.

(g)     CORIZON may terminate this Agreement immediately upon the occurrence of any of the following:

(1)     Failure of the governing body of the State to authorize or appropriate funds sufficient for the State to meet its obligations hereunder;

(2)     Disavowal or repudiation of this Agreement by any authorized agent of the State; or

(3)     Insolvency, bankruptcy, or receivership of the State.

ADOC and CORIZON
Medical Services Agreement

PLTF-PARSONS-036294

### 7.3    Responsibility for Inmate Health Care

Upon termination of this Agreement, all responsibility for providing health care services to all inmates, including inmates receiving health care services at outside locations such as hospitals, will be transferred from CORIZON to the ADOC. However, CORIZON will be responsible for all costs incurred and/or adjudicated with said medical services prior to the date of the termination of the Agreement.

### ARTICLE VIII: DEFAULT

### 8.1    Default by CORIZON

The following described events shall constitute a default by CORIZON:

(a)    CORIZON violates any of the other terms, conditions, or covenants to be performed or observed by CORIZON in this Health Services Agreement and fails to remedy the same within thirty (30) days after written notice thereof is given to CORIZON by the ADOC or, if such default cannot be reasonably cured within thirty (30) days, fails to commence to remedy the same and thereafter diligently pursue such remedy to completion as soon as practicable;

(b)    In the event that a petition in bankruptcy or for similar relief is filed by or against CORIZON and, if filed against CORIZON, the petition is not dismissed within sixty (60) days after the filing thereof, or in the event that CORIZON is adjudged bankrupt;

(c)    In the event that an assignment for the benefit of a creditor is made by CORIZON;

(d)    In the event of the appointment of a receiver of CORIZON's property, unless such receivership is dismissed within sixty (60) days after such appointment;

(e)    In the event that CORIZON fails to promptly notify ADOC of any damage to any facility of which it is aware, and if such damage is caused by CORIZON or its agents, subcontractors, or employees, CORIZON fails to remedy such damage within a reasonable time; or

(f)    CORIZON, or any assignee or successor, is dissolved or otherwise ceases to exist.

Upon the occurrence of any one or more of the events as described in this Section, the ADOC shall have the right to terminate this Agreement immediately upon giving written notice to CORIZON of such termination. Any and all rights and remedies in the event of such default shall be cumulative, in addition to, and without waiver of or in derogation of, any right or remedy given to the ADOC under any law now or hereafter in effect.

PLTF-PARSONS-036295

8.2     Default by the ADOC

The following described events shall constitute a default by the ADOC:

(a)     The ADOC shall fail to pay, within thirty (30) days after written notice and demand for payment thereof is given to the ADOC by CORIZON, any amounts that ADOC has agreed to pay pursuant to the terms of this Agreement;

(b)     The ADOC shall violate any of the terms, conditions, or covenants to be performed or observed by ADOC in this Agreement and fails to remedy the same, within (30) days after written notice thereof is given to the ADOC by CORIZON, or if such default cannot reasonably be cured within thirty (30) days, fails to commence to remedy the same and thereafter diligently pursue such remedy to completion as soon as practicable;

(c)     The ADOC fails, after twelve (12) hours written notice by CORIZON, to provide security services in accordance with Paragraph 5.1 hereof or to move CORIZON's employees to a secure section of an institution (the word "institution" as used herein includes any designated institution or other facility where healthcare services are provided by CORIZON).

Upon the occurrence of any one or more of the events described in this Section, CORIZON shall have the right to terminate this Agreement upon giving written notice to the ADOC of such termination.  Any and all rights and remedies in the event of such default shall be cumulative, in addition to, and without waiver of or in derogations of, any right or remedy given to CORIZON under any law now or hereafter in effect.

8.3     Breach and Other For Cause Terminations

The following described events may constitute grounds for a party to terminate the Agreement:

(a)     The ADOC may terminate the Agreement without penalty to the ADOC or further payment required in the event of:

(1)     Any breach of the Agreement which, if it is susceptible of being cured, is not cured within thirty (30) days of the ADOC giving notice of breach to CORIZON, including, but not limited to, failure of CORIZON to maintain covenants, representations, warranties, certifications, bonds, and insurance;

(2)     Commencement of a proceeding by or against CORIZON under the United States Bankruptcy Code or similar law, or any action by CORIZON to dissolve, merge, or liquidate; and

(3)     Intentional material misrepresentation or falsification of any information provided by CORIZON in the course of any dealing between the ADOC and CORIZON or between CORIZON and any State agency.

ADOC and CORIZON                          21
Medical Services Agreement

PLTF-PARSONS-036296

In the event either party shall give notice to the other that such other party has materially defaulted in the performance of any of its obligations hereunder and such default shall not have been cured within thirty (30) days following the giving of such notice in writing, the party giving notice shall have the right immediately to terminate this Agreement; provided, however, that the cure period shall be limited to (10) ten days if the default is a failure by the State to timely make any payments due CORIZON hereunder.

## ARTICLE IX: COMPENSATION

### 9.1    Base Compensation

The ADOC will pay to CORIZON the Agreement Term Price, payable in equal monthly installments, as indicated below:

> First Agreement Period (December 1, 2012 to September 30, 2013) $63,453,823
> Second Agreement Period (October 1, 2013 to September 30, 2014) $79,095,010
> Third Agreement Period (October 1, 2014 to September 30, 2015)  $82,156,415

A payment of one twenty fourth (1/24) of the total annual Agreement amount will be made for the final month, with the balance to be paid no later than thirty (30) days after the end of the final month, subject to a reconciliation of any adjustments, as required by the Agreement, which have not been finalized over the previous eleven (11) months of the Agreement period, and any adjustments required as a result of operations in the final month of the Agreement period.

The pricing for the second and third year of the Agreement term assume that Agreement  rate adjustments between the BCBS network and their providers, as well as the agreement between SEIB and BCBS will not exceed 3.9% in year two and 3.9% in year three. To the extent that actual negotiated rate increases exceed this level, the above listed Agreement term prices will be adjusted upward by the following computation:

> Year 2 – (Actual SEIB/BCBS % increase – 3.9%) multiplied by $15,000,000
> Year 3 – (Actual SEIB / BCBS % increase – 3.9%) multiplied by ($15,000,000 plus amount identified in Year 2 adjustment) plus the adjustment from Year 2

### 9.2    Population Adjustments

For the first Agreement term (December 1, 2012, through September 30, 2013), should the ADOC average monthly population (AMP) increase to a level greater than 25,200 within the confines of the designated facilities for which services are to be delivered, the ADOC shall add CORIZON's individual inmate monthly rate of $126.47 to the base compensation for each inmate in excess of 25, 200. Should the AMP decrease to a level less than 25,200, the ADOC shall deduct the individual inmate monthly rate from CORIZON's base compensation. The per inmate month rate shall be $133.09 for the second year of the Agreement term and $140.08 for the third year of the Agreement term.

PLTF-PARSONS-036297

Should the average monthly inmate population (AMP) fall below 24,700 for three consecutive billing cycles; Corizon reserves the right to negotiate with the ADOC Associate Commissioner of Health Services the reduction in required staffing hours, or suspend filling open positions subject to paybacks. Should the AMP of inmates return to a level of 25,200 for three consecutive billing cycles, Corizon will be required to fulfill the required minimal staffing hours as designated in Attachment A of this agreement.'

The AMP shall be determined and recorded by the ADOC. The ADOC shall provide information to CORIZON to include a daily count for each Facility under the Agreement and the computation of the AMP within seven calendar days of the end of each calendar month.

The Average Monthly Population (AMP) is defined by adding the inmate counts each day for every day in the month and dividing by the number of days in the month. The inmate count will include all inmates for which CORIZON is responsible for providing medical services under the Agreement, regardless of the physical location of the inmates.

### 9.3    Adjustments for Unfilled Positions

CORIZON will aggregate hours per facility for each position from the CORIZON Kronos timekeeping system. In the event agency or locum services have not utilized a swipe card to record their time worked electronically, such hours (as evidenced by the agency/locum invoice) will be added to the hours recorded within the electronic timekeeping system. Additional support for employee's time as evidenced by payroll information will also be considered in determining the total number of hours provided by the Agreement in meeting the 85% required threshold. Debit adjustments will not be made for any time in excess of the regular hours required by the Agreement. A contracted medical position is not considered unfilled if the contracted employee is on vacation, holiday, or attending an ADOC or CORIZON sponsored training. Credit for hours paid for those individuals on FMLA will not exceed 10 scheduled working days in any twelve month period.

CORIZON will provide a credit memo to the ADOC based upon the budgeted hourly rate plus the 20% benefit allocation (where applicable) by position multiplied by the number of hours short of the 85% threshold in the above calculation. Part time, temporary, agency, locum, PRN and overtime hours paid to individuals will be included within the total to cover the required hours for the month. CORIZON does not employ all physicians, dentists or other physician specialists, but contracts with some of these individuals for their clinical services as independent contractors. Because these individuals do not perform their clinical duties as an employee, they do not receive employee benefits. Thus, any clinical hours subject to pay-back to the ADOC in the above calculations for the certain physician, dentist and other physician specialists will not be subject to the 20% benefit allocation required of other employed positions.

Paybacks for unfilled hours of service will apply to the position classification at both the regional and facility level as described in Section 2.1.

Intentional falsification or misrepresentation of actual hours of services provided by any position required by contract to the ADOC will be considered a form of corporate fraud, punishable by applicable federal and state laws.

PLTF-PARSONS-036298

The monthly calculation of staffing requirements will compare the required number of FTE's by eligible position, multiplied by eight (8) hours per day, multiplied by the number of week days in the calendar month at eight-five percent (85%) to the total of all hours paid for an individual position classification at each assigned facility, to include CORIZON's regional and statewide management personnel assigned to their Alabama office. The sum of the hours required for a three (3) month period will be compared to the total of actual hours worked for the same time period. For any position below the eighty-five percent (85%) threshold, CORIZON will reimburse the ADOC the difference between the eight-five percent (85%) threshold and the total of all hours paid for the position. The hours will be credited at the corresponding average hourly rate outlined in Exhibit B Staffing Payback Schedule. Pursuant to all employed positions (excluding some independent contractor physicians, specialist and dentists), the rate will be increased by twenty percent (20%) to reflect the cost of benefits. CORIZON will provide the ADOC with monthly reports that itemize both the current month and the cumulative quarter-to-date results. Any credit due the ADOC will be provided upon completion of the prior quarter's actual results. Due to the timing of payroll adjustments and agency / locum service reporting, final reports for a quarter will be issued to ADOC no later than forty five (45) days after the completion of the quarter's service.

Staffing paybacks will not be administered for the initial three months of the Agreement.

### 9.4    Retrospective Adjustments for Performance Level

Quarterly adjustments will be made for deficiencies in performance, utilizing the defined liquidated damage amount or performance deficiency adjustment, for failure to maintain a required program level, which will include unfilled positions and/or unsatisfactory service (or other specified requirements) under the terms of the Medical Services Agreement. No liquidated damage or performance deficiency adjustments will be made until written notice has been given to CORIZON. The procedures for implementing performance level adjustments for unsatisfactory services will not be initiated until the ADOC determines that certain services do not meet the minimum level as specified in the Health Services Agreement. Adjustments will apply as described in Section 6.2 of the RFP, which is adopted and incorporated by reference as modified by this Agreement.

### 9.5    Other Performance Level or Compensation Terms

(a)    CORIZON will, at all times, maintain the staff required which is reviewed quarterly by the Health Services Agreement.  Should CORIZON at any time: 1) refuse or neglect to supply adequate and competent supervision or sufficiently and properly skilled/trained/licensed personnel; 2) fail to provide equipment/drugs of proper quality or quantity; 3) fail to perform services according to the specifications required in the Health Services Agreement; 4) fail in any respect to perform the service requirements with promptness and diligence; or 5) fail in the performance of any agreement contained in the Medical  Services Agreement, the ADOC will have the option, after forty-eight (48) hours written notice to CORIZON, or by posting in some conspicuous space on-the-job site, to take any one or more of the following actions:

(1)    Withhold any monies related to the deficiency then or next due to CORIZON; or

ADOC and CORIZON
Medical Services Agreement

24

(2)     Provide such materials, supplies, equipment, and labor as may be necessary to complete said work. the rendition of the Services up to the specification and standards required in the  Medical Services Agreement, pay for same and deduct the amount so paid from any money then or thereafter due CORIZON; or

(3)     Terminate the Agreement.

b) Liquidated damages, performance deficiency adjustments, material increases to staffing, or other communication regarding material components of the contract, including cancellation of the Agreement, will be communicated only by formal written notice.

c) Liquidated damages, performance deficiency adjustments, adjustments to compensation, and/or the provisions for adjustments will not limit the rights and remedies of the ADOC for any breach or default of CORIZON.

9.6     Inmates from Other Jurisdictions

Medical care rendered within any of the Facilities to inmates from other jurisdictions housed in any of the Facilities pursuant to contracts between the ADOC and such other jurisdictions will be the responsibility of CORIZON, as limited by Section 1.3 of this Agreement.

9.7     Changes in the Law, Standard of Care, or Scope of Services

The prices in Sections 9.1 and 9.2 of this Agreement reflect the scope of services as outlined herein and the current community standard of care with regard to health care services.  Should the following occur:

(a)     any applicable law, statute, rule, regulation, standard, court order or decree, or any policy, practice, or procedure of any applicable governmental unit, agency or office (including but not limited to the federal, state or local courts, legislative bodies, and agencies, including the State or its respective officers or agents)  be adopted, implemented, amended, or changed; or if

(b)     any mandated standard of care or treatment protocol changes or evolves in any material respect, or if any mandated medication or therapy is introduced to treat any illness, disease or condition; or if

(c)     any additional correctional institutions or housing units where medical care is to be provided other than those outlined as 'Facilities' in Section 1.2

(d)     any changes in the medical mission of an institution designated as a 'Center of Care' for chronic illness

PLTF-PARSONS-036300

and if any such change as described in sub-section (a), (b), (c) or (d) materially affects the cost to CORIZON of providing healthcare services or impacts the scope of services or staffing hereunder, CORIZON and the ADOC agree to meet to negotiate compensation or service requirement changes. The parties agree to meet and negotiate in good faith within thirty (30) days following the giving of notice by one party to the other party of a change (whether such change is anticipated or implemented). If the parties fail to reach agreement regarding compensation or service requirement changes within the foregoing thirty (30) day period, then either the ADOC or CORIZON may terminate this Agreement in accordance with Section 7.2 of this Agreement.

### 9.8    Payment Method and Invoicing

CORIZON and ADOC shall comply with the following regarding payment for services.

      (a)    CORIZON will submit a detailed invoice to the ADOC. By submitting an invoice, CORIZON certifies that the supplies and services have met all of the required standards set forth in the Agreement and amount billed are as allowed in the Agreement.

      (b)    Payments for proper performance of services will be commensurate with the scheduled progress of the work and will be made upon receipt of a detailed invoice for payment and proper receiving authorization from the ADOC. CORIZON will invoice ADOC for services prior to the month of services. ADOC will pay and CORIZON will receive payment by the 15th day of the month for which services are rendered.

      (c)    CORIZON will not bill for any taxes unless a statement is attached to the bill identifying the tax and showing why it is legally chargeable to the ADOC.  If determined that taxes are legally chargeable to the ADOC, the ADOC will pay the tax as required.  State and federal tax exemption information is available upon request.  The ADOC does not warrant that the interest component of any payment including installment payments to CORIZON is exempt from income tax liability.

      (d)    CORIZON will be in compliance with applicable tax requirements and will be current in payment of such taxes.

      (e)    Payments delayed by the ADOC at the beginning of the fiscal year because of the appropriation process will not be considered a breach, so long as the delay is not longer than 45 days. The State has not historically delayed payments at the beginning of the fiscal year; however, such a circumstance will not constitute a breach by the ADOC.

      (f)    The ADOC will not be liable for payment associated with supplies provided, services performed, or expenses for those supplies and services incurred prior to the beginning of the term of the contract.

PLTF-PARSONS-036301

The approved invoice amount will be paid less any designated withholdings associated with performance penalties or staffing paybacks and previous partial payments. Any such deductions not previously documented by a CORIZON credit memo shall be documented in writing by ADOC and provided to CORIZON concurrent with the payment. Final payment will be made upon determination by the ADOC that all requirements under the contract have been completed, which determination will not be unreasonably withheld.

(g)     Payments will be made to conform to State fiscal year requirements notwithstanding any contrary provision in the Contract or order. This may include prorating payments that extend beyond the end of the fiscal year for the ADOC.

## ARTICLE X:  LIABILITY AND RISK MANAGEMENT

### 10.1     <u>Insurance</u>

CORIZON shall file with the ADOC a certificate from CORIZON's insurer showing the amounts of insurance carried and the risk covered thereby. Medical Malpractice Liability insurance must be no less than $1,000,000 per occurrence and $3,000,000 in aggregate. During all terms of this Agreement, CORIZON shall carry general liability insurance coverage with $1,000,000 combined single limit for personal injury and property damage which incorporates said coverage for all of CORIZON's employees and subcontractors. This coverage is required to extend to services performed at the various facilities and institutions where services will be provided under the contract. CORIZON will also be required to provide a certificate naming the ADOC as an additional insured. CORIZON shall carry vehicle insurance meeting state law requirements. Coverage required, includes Comprehensive General Liability, Worker's Compensation, and Employee's Liability.

CORIZON will provide legal representation, at its own expense, in defending all suits against CORIZON or CORIZON's employees. CORIZON will pay all judgments and costs rendered against CORIZON or CORIZON' employees in said suits.

### 10.2     <u>Lawsuits</u>

In the event that any lawsuit (whether frivolous or otherwise) is filed against either the ADOC, its employees, its elected officials, employees, and/or agents based on or containing allegations concerning medical care of inmates or on the performance of CORIZON's employees, agents, subcontractors, or assignees, the parties agree that CORIZON, its employees, agents, subcontractors, assignees, or independent contractors, as the case may be, may be joined as parties defendant in any such lawsuit and shall be responsible for their own defense and any judgments rendered against them. Nothing herein shall prohibit any of the parties to this Agreement from joining the remaining parties hereto as defendants in lawsuits filed by third parties.

PLTF-PARSONS-036302

Both parties will share information, provide timely notification to one another in the event of a claim against either party, and present a collaborative defense against such claims. There will be no settlement of claims involving both parties without consultation.

### 10.3    Indemnification

CORIZON will indemnify and hold harmless the State of Alabama and the ADOC and their officers, agents, and employees from and against all claims, losses, or costs arising out of CORIZON's negligence, gross negligence, wantonness, deliberate indifference, or criminal negligence, or from willful disregard of proper or lawful written instructions from the Commissioner of the ADOC and Associate Commissioner of Health Services.

CORIZON also agrees to indemnify and hold harmless the State of Alabama and the ADOC and their officers and employees from and against any and all loss or damage, including court costs and attorney fees, for liability claimed against or imposed upon the ADOC because of bodily injury, death, or property damage, real or personal, including loss of use thereof, arising out of or as a consequence of the breach of any duty or obligations of CORIZON included in this agreement, negligent acts, errors or omissions, including engineering and/or professional error, fault, mistake, or negligence of CORIZON, their employees, agents, or representatives or subcontractors, their employees, agents, or representatives in connection with or incident to the performance of their contract, or arising out of Worker Compensation claims, Unemployment Compensation claims, or Unemployment Disability Compensation claims of employees of CORIZON and/or subcontractors, or claims under similar such law or obligations. CORIZON's obligation, under this Section, will not extend to any liability caused by the negligence of the ADOC or its employees. The ADOC agrees to notify CORIZON's Legal Department in writing within thirty (30) days after the State has received written notice of a claim. CORIZON's indemnification and defense obligations hereunder will not apply for expenses incurred or settlements offered or effected, prior to notice to CORIZON. CORIZON shall have the right to control the defense and/or settlement of the claim, subject to the control of the Attorney General of the State of Alabama.

### 10.4    Responsibility for Agents and Employees

CORIZON will remain fully responsible for the negligent acts and omissions of its agents, employees, and subcontractors in their performance of CORIZON's duties under the Agreement. CORIZON represents that it will utilize the services of individuals skilled in the profession for which they will be used in performing services hereunder.

## ARTICLE XI MISCELLANEOUS

### 11.1    Independent Contractor Status

CORIZON will be an Independent Contractor. CORIZON, its agents, subcontractors, and/or employees will not be considered to be an agent, distributor, or representative of the ADOC. Further, neither CORIZON nor any employees of CORIZON will be entitled to participate in any retirement or pension plan, group insurance program, or other programs designed to benefit employees of the ADOC.

PLTF-PARSONS-036303

## 11.2   Assignment

CORIZON may not assign or transfer any interests in the work subject of the Agreement without the prior written consent of the ADOC. (pursuant to Section 41-16-29, Code of Alabama (1975)). In the event the ADOC gives such consent, the terms and conditions of the Agreement will apply to and bind the party or parties to whom such work is subcontracted, assigned, or transferred as fully and completely as CORIZON is hereby bound and obligated. This includes requiring such parties to submit certificates and disclosures to the ADOC for review and approval. The ADOC will not be bound to any terms and conditions included in any vendor or subcontractor agreements or contractual documents. CORIZON will notify the ADOC prior to discharging, removing, or failing to renew the Agreeemntof subcontracted vendors, including, but not limited to, the laboratory and hospital. Any assignment or subcontract shall not relieve CORIZON of its independent obligation to provide the services and be bound by the requirements of this Agreement.

CORIZON shall ensure the ADOC is provided the names and addresses of all subcontractors utilized to provide the services outlined in this Medical Services Agreement in a timely manner.

If CORIZON is unable to secure or maintain individuals named in the Agreement to render the services set forth in this Agreement, CORIZON will not be relieved of its obligations to complete performance. However, the ADOC will have the option to terminate this Agreement upon written notice to CORIZON.
The ADOC may transfer the subject matter of the Agreement or payment responsibility to another State agency after giving written notice to CORIZON.

## 11.3   Notice

Any notice given to the ADOC under the Health Services Agreement will be submitted in a timely manner.

Unless otherwise provided herein, all notices or other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if sent by certified mail, return receipt requested, postage prepaid or by overnight commercial carrier, and addressed to the appropriate party at the following address or to any other person at any other address as may be designated in writing by the parties:

|          |       |                                   |
|----------|-------|-----------------------------------|
| (a)      | ADOC  | Kim T. Thomas                     |
|          |       | Alabama Department of Corrections |
|          |       | Commissioner's Office             |
|          |       | 301 South Ripley                  |
|          |       | Montgomery, Alabama 36104         |

With a copy to:   Anne Adams Hill, Esq.
General Counsel
301 South Ripley
Montgomery, Alabama 36104

PLTF-PARSONS-036304

(b)      CORIZON        Stuart Campbell, President and Chief Operating Officer
                        Corizon, Inc.
                        12647 Olive Blvd.
                        St. Louis, Missouri 63141

With a copy to:         Scott King, Esq.
                        Chief Legal Counsel
                        Corizon, Inc.
                        105 Westpark Drive, Suite 200.
                        Brentwood, Tennessee 37027

Both parties agree to fully cooperate with one another for the successful pursuit of their respective and mutual interests.

### 11.4    Governing Law

All services under the Agreement will be performed in accordance with applicable Alabama and Federal law, statutes, provisions, and regulations. CORIZON will also comply with any Federal Court Orders that pertain to the operation of Alabama prisons and institutions for which the ADOC is statutorily responsible. CORIZON's remedy for any claim under the Agreement is to file a claim against the ADOC with the Alabama Board of Adjustment.

### 11.5    Entire Agreement

This Agreement constitutes the complete understanding and entire agreement between the parties with respect to the terms and conditions set forth herein, and is intended as a complete and exclusive statement of the promises, representations, negotiations, discussions, and agreements that have been made in connection with the subject matter hereof and supersede all previous written or oral agreements and representations not specifically incorporated herein.   No modifications or amendments to this Agreement shall be binding upon the parties unless the same is in writing and signed by the respective parties hereto.  All prior negotiations, agreements, and understandings with respect to the subject matter of this Agreement are superseded hereby

### 11.6    Amendment

This Agreement may be amended or revised only in writing and signed by all parties.

### 11.7    Waiver of Breach

The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

ADOC and CORIZON                          30
Medical Services Agreement

PLTF-PARSONS-036305

11.8    Severability

In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement, which shall remain in full force and effect and enforceable in accordance with its terms.

11.9    Force Majeure

CORIZON shall not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including, without limitation, strikes or labor disputes, inmate disturbances, lack of the State's financial or physical resources, failure of the State to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, failure of transportation, or any similar cause beyond the reasonable control of one or both of the parties.

11.10    Trial Duty

In the event CORIZON's personnel are required to devote time with regard to litigation or threatened litigation on behalf of the ADOC and at the request of the ADOC, this shall be part of their service time pursuant to this agreement.

11.11    Performance Bond

CORIZON will be financially responsible for all monetary obligations to its employees and designated subcontractor duties under the Agreement. CORIZON represents that it will fulfill these obligations in a timely manner. As such as ADOC has knowledge that CORIZON has met these obligations during the previous Agreement term period from 2007 to 2012, the ADOC is deleting the requirement of the $5,000,000 Performance Bond specified in Section 1.10, paragraph one (1) of RFP 2012-02. The deletion of the Performance Bonding requirement is reflected in CORIZON's proposed price revisions presented in its correspondence of October 17, 2012 included as Attachment C, of this agreement.

The parties agree that ADOC may reinstate this requirement at any time during the term of the Agreement and subsequent renewals; subject to the terms and conditions outlined in Section 9.7.

11.12    Dispute Resolution

For any and all disputes arising under or relating to this Health Services Agreement, the ADOC and CORIZON shall work together in good faith to resolve the dispute.  The parties agree, in compliance with the recommendation of the Governor and the Attorney General of the State of Alabama, when considering the settlement of such disputes, to utilize appropriate forms of non-binding dispute resolution, including, but not limited to, mediation by and through the Attorney General's Office of Administrative Hearings or, where appropriate, private mediators. As a result, in the event the parties cannot resolve their dispute, either party shall have the right to request mediation ("Mediation Request") by a neutral and/or disinterested third-party (the "Mediator") who shall, at a minimum, be an attorney licensed to practice law in the State of Alabama at the time of such request. If the parties

PLTF-PARSONS-036306

cannot agree upon a mediator, then the parties will request the Alabama Bar Association to identify the names of mediators knowledgeable in contract and healthcare issues and to make a random selection of a mediator. The parties will share equally the cost of such mediation. Either party may request mediation by providing the other party with thirty days (30) notice of their desire to mediate.

The sole remedy for the settlement of any and all monetary disputes arising under the terms of this Agreement shall be limited to the filing of a claim with the Board of Adjustment for the State of Alabama.

### 11.13   Performance Reviews

The ADOC will conduct scheduled and non-scheduled performance reviews of CORIZON's performance under this Health Services Agreement. All professional service performed under the Agreement is subject to a post-performance review. CORIZON will cooperate with the ADOC in this review, which may require that CORIZON provide records of its performance and billing. CORIZON will provide any required information within thirty (30) days of the request by the ADOC. This performance review may be used by any State agency in determining whether to enter into other contractual relationships with CORIZON.

CORIZON will supply all billings, records, evidence of services performed, or other documents relating to the services under this Agreement as may be required for review and audit by the ADOC.

### 11.14   Inmate Medical Co-pay

ADOC Administrative Regulation 601 and OHS Policies and/or Procedures allows for the establishment of a medical co-pay program. ADOC shall charge inmates a co-pay for each primary visit initiated by the inmate. CORIZON will be responsible for entering the chargeable visits in accordance with ADOC guidelines. The amount of such co-pay shall be determined by the ADOC. No inmate will be denied access to health care services due to their inability to pay the inmate medical co-pay. Regularly scheduled chronic care visits will be conducted at no charge to an inmate who has been enrolled in the Chronic Care clinic by licensed medical personnel.

### 11.15   Public Information

CORIZON shall not publish any findings based upon data obtained from the operation of this Agreement without the prior written permission of the ADOC, whose written consent shall not be unreasonably withheld. The ADOC may release without consent of CORIZON any document or data subject to release pursuant to the State of Alabama Open Records Act, requests by the State Legislature, or any other allied state agency. However, ADOC will inform CORIZON of such request in advance of such disclosure. Corizon acknowledges that its' 'Redacted' copy of its' proposal in response to RFP 2012-02 dated July 17, 2012, will be utilized in responding to a public request for said document.

ADOC and CORIZON
Medical Services Agreement

32

PLTF-PARSONS-036307

### 11.16 Research

No research projects involving inmates, other than projects limited to the use of information from records compiled in the ordinary delivery of inmate activities, shall be conducted without the prior written consent from the ADOC Commissioner's Office. The conditions under which the research is conducted shall be agreed upon by CORIZON and the ADOC. Research shall be governed by written guidelines. In every case, the written informed consent of each inmate who is a subject of a research project shall be obtained prior to the inmate's participation.

### 11.17   Food Service Personnel

CORIZON, upon request, shall conduct health clearance examinations for food service inmate personnel. An approved form shall be used to designate the status of the inmate.

### 11.18   Accounts To Be Timely Paid

CORIZON shall ensure that a procedure is in place for timely payment of all of its accounts payable. Bill paying practices that reflect negatively on the ADOC shall require review by the ADOC and a withholding of a portion of the monthly payment until the situation is rectified. Failure to pay uncontested bills within sixty (60) days of receipt or to have an agreed upon payment schedule with a subcontractor, provider, or supplier shall result in a penalty.

### 11.18   Ownership of Intellectual Property

CORIZON anticipates that it will use its existing proprietary intellectual property, including but not limited to, systems and processes, policies and procedures, pathways, protocols, manuals, computer software, etc. (collectively, the "Background IP"), as well as third-party software, to assist in performing the services required under this Agreement..

CORIZON' Background IP was developed over time and not solely for the ADOC or this project. CORIZON is willing to share its background IP for purposes of its performance of this Agreement and, to that extent, CORIZON will provide the ADOC with a license to use these products and services, subject to certain terms and conditions. However, because the Background IP involves prior ownership by CORIZON and, in some cases, its suppliers, CORIZON is unable to transfer all right, title, and interest in its intellectual property to the ADOC.

Any improvements or changes that CORIZON makes to its Background IP during the performance of this Agreement are not deliverables under this Agreement, will not be deemed to be created for this project, and will not be deemed "works for hire," but rather such improvements and changes will become part of CORIZON' Background IP. CORIZON will not be deemed to have granted the ADOC any right, title, or interest in or to any of CORIZON' Background IP, whether created for or during this project, unless expressly agreed to otherwise between the ADOC and CORIZON.

PLTF-PARSONS-036308

11.20   Confidential Information

For purposes of this Agreement, CORIZON' proprietary or trade secret information ("Confidential Information") shall include, without limitation, all information, knowledge, or data containing or relating to CORIZON' financial condition, profits, losses, sales, managerial methods, customers, suppliers, research, products, services, marketing, facilities, ideas, discoveries, processes, developments, know-how, purchasing methods, sales forecasts, strategic plans, advertising, leases, ownership, stockholders, securities, and any other information, knowledge, or data however recorded concerning or relating to the business affairs of CORIZON which is not generally known by the public at large. Material produced by CORIZON shall be regarded and treated as proprietary and confidential to CORIZON by the ADOC, unless identified in writing as public information.

11.21   Other Miscellaneous Services

(a)   CORIZON will provide emergency medical treatment to injured ADOC employees, contract employees, volunteers, or visitors who are injured or become ill at the site. Follow-up care will be the responsibility of the person receiving the emergency treatment.

(b)   CORIZON will provide initial physical examination for security personnel employed by the ADOC, together with any other examinations currently required by the ADOC-OHS.

(c)   CORIZON will cooperate with the ADOC in answering surveys and questionnaires from allied agencies.

(d)   CORIZON will provide inmate antibody testing for HIV/HBV/HCV, as requested by the ADOC, following an occupational exposure between an ADOC employee and an inmate. The results of the testing will be sent to the employee's attending physician.

(e)   CORIZON will follow the ADOC treatment protocol for Hepatitis C, as provided by the ADOC or mutually agreed upon by the parties.

(f)   Should the ADOC house inmates from other states or federal agencies within Alabama facilities, CORIZON will be responsible for providing all necessary medical and dental services to these inmates. Other than in cases of emergency, CORIZON will contact the sending State or agency in writing for advance authority before incurring medical and/or dental expenses, for which the sending State is responsible. In an emergency, CORIZON will render the necessary treatment without prior authority, but in every such case CORIZON will notify the sending state immediately and furnish full information regarding the nature of the illness, the type of treatment provided, and the estimated cost thereof.

(g)   From time-to-time, the Parole Board finds it necessary to return a parolee to an ADOC facility for intensive supervision. These Pre-Revocation parolees will be provided necessary medical services as soon as they are added to a facility count while on Pre-Revocation status.

PLTF-PARSONS-036309

(h)   CORIZON is responsible for all associated charges related to medical services for both work release and community work camp inmates. However, Work Release inmates that choose to secure their health services from a community provider do so at their own cost. CORIZON is not financially responsible for the fulfillment of any medical treatment for any inmate that has not been ordered, or approved, by the authorized practitioner of CORIZON or has chosen to secure health care services from a community provider at their own cost.

(i)   The performance or cost of abortions for other than therapeutic medical reasons is not the responsibility of CORIZON.

(j)   CORIZON will provide designated physicians with a cell phone and/or pager as well as daily computer access with an internet provider, to insure current available medical assessment and treatment information; and so they may be contacted while off-site.

(k)   All contractual staff (both employees and subcontractors) will be required to comply with sign-in and sign-out procedures on an official Department of Corrections time keeping form.

11.22   Order of Preference

Should the terms of the RFP incorporated herein and the terms of this Agreement conflict, the terms of this Agreement shall control.

11.23   Commitments

It is agreed that the terms and commitments contained herein shall not be constituted as a debt of the State of Alabama in violation of Article 11, Section 213 of the Constitution of Alabama, 1901, as amended by Amendment 26. If is further agreed that if any provision of this Agreement shall contravene any statute or Constitutional provision or amendment, either now in effect or which may, during the course of this Agreement, be enacted, then that conflicting provision in the Agreement shall be deemed null and void.


This space intentionally left blank:
Signature Page Follows

PLTF-PARSONS-036310

IN WITNESS WHEREOF, the parties have executed this Agreement in their official capacities with legal authority to do so.

ADOC

By: _____

Date: __10/23/12__

CORIZON, INC.

By: _____

Date: __10/22/12__

ATTEST:

By: __Kristi Simpson__

Date: __10/23/12__

ATTEST:

By: _____

Officer of Corporation

Date: __10/22/12__

_Robert Bentley_

Robert Bentley
Governor

Date: __11/08/2012__

Reviewed by Contract
Review Committee
Contract #C12005/206

NOV 0 1 2012

Alabama Legislature
Gina Shaffer, Clerk

Reviewed by Contract
Review Committee
Contract #

NOV 0 1 2012

Alabama Legislature

Gina Shaffer, Clerk

ADOC and CORIZON,
Medical Services Agreement

36

PLTF-PARSONS-036311

# MEDICAL
## MINIMUM STAFFING REQUIREMENTS TOTALS

| POSITIONS | TOTAL |
|---|---|
| Program Director | 1.00 |
| Physician Director | 1.00 |
| Infectious Disease Specialist MD | 1.00 |
| Assistant Physician Director | 1.00 |
| Administrative Assistant | 14.00 |
| Receptionist | 1.00 |
| Data / Reporting Specialist | 1.00 |
| RN Special Needs Case Manager/Furlough | 1.00 |
| RN Regional Director of Nursing | 1.00 |
| RN Regional Coordinator – North | 1.00 |
| RN Regional Coordinator – South | 1.00 |
| Program Administrator - North | 1.00 |
| Program Administrator - South | 1.00 |
| Consulting Pharmacist | 1.00 |
| Dental Director | 0.40 |
| H.S.A. | 12.00 |
| H.S.A./RN | 1.00 |
| MD | 13.60 |
| MD (1.00 General) | 1.00 |
| CRNP | 19.40 |
| CRNP (May utilize .20 MD -substitute) | 0.40 |
| Dentist | 12.60 |
| Dental Assistant | 12.60 |
| Dental Hygienist | 3.20 |
| D.O.N. | 13.00 |
| Assistant D.O.N. | 1.00 |
| Assistant DON (Supervises & Schedules/Work Camps) | 1.40 |
| RN | 67.40 |
| RN Nurse Manager | 5.60 |
| LPN | 229.50 |
| Certified Nursing Assistant (or RMA) | 4.20 |
| Pharmacy Inventory Manager/LPN | 13.00 |
| Phlebotomist | 2.00 |
| Phlebotomist/LPN | 8.00 |
| Administrative Assistant/Medical Records Clerk | 0.80 |
| Administrative Assistant/Scheduler | 3.00 |
| Scheduler | 9.40 |
| RMA or Clerk | 2.00 |
| Medical Records Supervisor | 1.00 |
| Medical Records Clerk | 26.50 |
| Registered Medical Technologist | 1.00 |
| Ombudsman | 1.00 |
| TOTAL | 493.00 |

ADOC and Corizon
Medical Services Agreement
Appendix A

PLTF-PARSONS-036312

（略）

**Alabama DOC**                    Minimum Staffing Required

| Alabama Central Office - Medical Statewide Management | |
|---|---|
| *Central location of Vendor Regional Office to be within 50 miles of Montgomery, Alabama | **FTE's** |
| Program Director | 1.0 |
| Physician Director | 1.0 |
| Infectious Disease Specialist MD | 1.0 |
| Assistant Physician Director | 1.0 |
| Administrative Assistant | 1.0 |
| Receptionist | 1.0 |
| Data / Reporting Specialist | 1.0 |
| RN Special Needs Case Manager/Furlough | 1.0 |
| RN Regional Director of Nursing | 1.0 |
| RN Regional Coordinator - North | 1.0 |
| RN Regional Coordinator - South | 1.0 |
| Program Administrator - North | 1.0 |
| Program Administrator - South | 1.0 |
| Consulting Pharmacist | 1.0 |
| Dental Director | 0.4 |
| **Total FTE's** | **14.4** |
| **Bibb - Facility** | **FTE's** |
| H.S.A. | 1.0 |
| MD | 1.0 |
| CRNP | 0.4 |
| Dentist | 1.0 |
| Dental Assistant | 1.0 |
| Dental Hygienist | 0.2 |
| D.O.N. | 1.0 |
| RN | 4.2 |
| LPN | 12.6 |
| Pharmacy Inventory Manager/LPN | 1.0 |
| Phlebotomist/LPN | 1.0 |
| Administrative Assistant | 1.0 |
| Scheduler | 0.5 |
| Medical Records Clerk | 1.5 |
| **Total FTE's** | **27.4** |
| **ATEF - CEC Community Education Center** | **FTE's** |
| (Home Facility - Bibb) | |
| RN Nurse Manager | 1.4 |
| MD | 0.4 |
| Dentist | - |
| Dental Assistant | - |
| LPN | 6.6 |
| Administrative Assistant/Scheduler | 1.0 |
| Medical Records Clerk | 0.4 |
| **Total FTE's** | **9.8** |
| **Farquhar Cattle Ranch – Work Center** | **FTE's** |
| (Home Facility - *Bibb* ) | |
| LPN | 0.2 |
| **Total FTE's** | **0.2** |

**Alabama DOC**                    Minimum Staffing Required

| Bullock - Facility | |
|---|---|
| **H.S.A.** | **FTE's** |
| MD | 1.0 |
| CRNP | 1.0 |
| Dentist | 1.0 |
| Dental Assistant | 1.0 |
| Dental Hygienist | 1.0 |
| D.O.N. | 0.2 |
| RN | 1.0 |
| LPN | 4.2 |
| Pharmacy Inventory Manager/LPN | 12.6 |
| Phlebotomist/LPN | 1.0 |
| Administrative Assistant | 1.0 |
| Scheduler | 1.0 |
| Medical Records Clerk | 0.5 |
| | 1.5 |
| Total FTE's | **28.0** |

| Donaldson - Facility | |
|---|---|
| **H.S.A.** | **FTE's** |
| MD | 1.0 |
| CRNP | 1.0 |
| Dentist | 0.4 |
| Dental Assistant | 1.0 |
| Dental Hygienist | 1.0 |
| D.O.N. | 0.2 |
| RN | 1.0 |
| LPN | 4.2 |
| Pharmacy Inventory Manager/LPN | 12.6 |
| Phlebotomist/LPN | 1.0 |
| Administrative Assistant | 1.0 |
| Scheduler | 1.0 |
| Medical Records Clerk | 1.0 |
| | 1.5 |
| Total FTE's | **27.9** |

| Easterling - Facility | |
|---|---|
| **H.S.A.** | **FTE's** |
| MD | 1.0 |
| CRNP | 1.0 |
| Dentist | 0.4 |
| Dental Assistant | 1.0 |
| Dental Hygienist | 1.0 |
| D.O.N. | 0.2 |
| RN | 1.0 |
| LPN | 4.2 |
| Pharmacy Inventory Manager/LPN | 12.6 |
| Phlebotomist/LPN | 1.0 |
| Administrative Assistant | - |
| Scheduler | 1.0 |
| Medical Records Clerk | 0.5 |
| | 1.5 |
| Total FTE's | **26.4** |

ADOC and Corizon
Medical Services Agreement
Appendix A

**Alabama DOC**                    Minimum Staffing Required

| Fountain - Facility | FTE's |
|---|---|
| H.S.A. | 1.0 |
| MD | 1.0 |
| CRNP | 1.0 |
| Dentist | 1.2 |
| Dental Assistant | 1.2 |
| Dental Hygienist | 0.4 |
| D.O.N. | 1.0 |
| Assistant D.O.N. | 1.0 |
| RN | 4.2 |
| LPN | 14.0 |
| Pharmacy Inventory Manager/LPN | 1.0 |
| Phlebotomist/LPN | - |
| Administrative Assistant | 1.0 |
| Scheduler | 1.0 |
| Medical Records Clerk | 2.0 |
| Certified Nursing Assistant | |
| Total FTE's | 31.0 |

| Atmore -- Work Center | FTE's |
|---|---|
| (Home Facility - *Fountain*) | |
| LPN | 1.0 |
| Total FTE's | 1.0 |

| Camden - Work Release and Work Center | FTE's |
|---|---|
| (Home Facility - *Fountain*) | |
| LPN | 0.2 |
| Total FTE's | 0.2 |

| J. O. Davis -- Facility | FTE's |
|---|---|
| (Home Facility - *Fountain*) | |
| LPN | 1.4 |
| Total FTE's | 1.4 |

| Loxley - Work Release and Work Center | FTE's |
|---|---|
| (Home Facility - *Fountain*) | |
| LPN | 2.4 |
| Total FTE's | 2.4 |

| Mobile - Work Release and Work Center | FTE's |
|---|---|
| (Home Facility - *Fountain*) | |
| LPN | 0.4 |
| Total FTE's | 0.4 |

PLTF-PARSONS-036315

**Alabama DOC**                    Minimum Staffing Required

| Hamilton Aged and Infirmed - Facility | FTE's |
|---|---|
| (Dental Work & X-Ray Home Facility – *Donaldson* or *Off-Site*) | |
| H.S.A./RN | |
| D.O.N. | 1.0 |
| MD | 1.0 |
| CRNP | 1.0 |
| Dentist | - |
| Dental Assistant | - |
| Dental Hygienist | - |
| RN | - |
| LPN | 4.2 |
| Pharmacy Inventory Manager -Assigned from LPN's | 11.2 |
| Phlebotomist-Assigned from LPN's | - |
| Administrative Assistant | - |
| Administrative Assistant/Scheduler | - |
| Scheduler | 1.0 |
| Medical Records Clerk | - |
| | 1.0 |
| **Total FTE's** | **20.4** |

| Hamilton -Work Release and Work Center | FTE's |
|---|---|
| (Home Facility - *Hamilton*) | |
| LPN | |
| CRNP | 0.5 |
| Physician Provided at Hamilton A&I | - |
| | - |
| **Total FTE's** | **0.5** |

| Holman - Facility | FTE's |
|---|---|
| H.S.A. | |
| MD | 1.0 |
| CRNP | 1.0 |
| Dentist | - |
| Dental Assistant | 0.8 |
| Dental Hygienist | 0.8 |
| D.O.N. | 0.2 |
| RN | 1.0 |
| LPN | 4.2 |
| Pharmacy Inventory Manager/LPN | 12.6 |
| Phlebotomist/LPN | 1.0 |
| Administrative Assistant | 1.0 |
| Scheduler | 1.0 |
| Medical Records Clerk | 0.5 |
| | 1.0 |
| **Total FTE's** | **26.1** |

**Alabama DOC**          Minimum Staffing Required

| Kilby - Facility | FTE's |
|---|---|
| H.S.A. | 1.0 |
| MD | 1.5 |
| CRNP | 2.0 |
| Dentist | 1.0 |
| Dental Assistant | 1.0 |
| Dental Hygienist | 0.2 |
| D.O.N. | 1.0 |
| Assistant DON (Supervises & Schedules/Work Camps) | 1.4 |
| RN | 5.2 |
| LPN | 18.2 |
| Certified Nursing Assistant (or RMA) | 4.2 |
| Pharmacy Inventory Manager/LPN | 1.0 |
| Registered Medical Technologist | 1.0 |
| Phlebotomist | 2.0 |
| Administrative Assistant | 2.0 |
| Scheduler | 1.0 |
| Medical Records Supervisor | 1.0 |
| Medical Records Clerk | 4.0 |
| **Total FTE's** | **48.7** |
| **Float - Unit Location to be determined** | **FTE's** |
| LPN | - |
| RN | - |
| **Total FTE's** | **-** |
| **Alex City- Work Release and Work Center** | **FTE's** |
| (Home Facility – *Kilby*) | |
| LPN | 0.4 |
| **Total FTE's** | **0.4** |
| **Elba -Work Release and Work Center** | **FTE's** |
| (Home Facility – *Kilby* 1st – *Easterling* 2nd) | |
| LPN | 0.2 |
| **Total FTE's** | **0.2** |
| **Montgomery Women's Center and Work Release** | **FTE's** |
| RN Nurse Manager | 1.4 |
| MD | 0.2 |
| CRNP | 0.4 |
| Dentist | - |
| Dental Assistant | - |
| LPN | 5.4 |
| RMA | - |
| Administrative Assistant/Scheduler | 1.0 |
| Medical Records Clerk | 0.5 |
| **Total FTE's** | **8.9** |
| **Red Eagle – Facility** | **FTE's** |
| (Home Facility - *Kilby*) | |
| LPN | 1.0 |
| **Total FTE's** | **1.0** |

PLTF-PARSONS-036317

**Alabama DOC**    Minimum Staffing Required

| Limestone - Facility | FTE's |
|---|---|
| H.S.A. | 1.0 |
| Special Unit Manager | - |
| MD (1.00 General) | 1.0 |
| CRNP | 2.5 |
| Dentist | 1.4 |
| Dental Assistant | 1.4 |
| Dental Hygienist | 0.4 |
| D.O.N. | 1.0 |
| RN | 5.2 |
| LPN | 20.4 |
| Social Worker(Special Unit) | - |
| Pharmacy Inventory Manager/LPN | 1.0 |
| Phlebotomist/LPN | 1.0 |
| Administrative Assistant | 1.0 |
| Scheduler | 1.0 |
| Medical Records Clerk | 2.0 |
| Total FTE's | 40.3 |

| Decatur - Work Release and Work Camp | FTE's |
|---|---|
| (Home Facility - *Limestone*) | |
| RN Nurse Manager | 1.4 |
| CRNP | 0.5 |
| RN | 1.4 |
| LPN | 4.2 |
| Administrative Assistant/Medical Records Clerk | 0.4 |
| Total FTE's | 7.9 |

| St. Clair - Facility | FTE's |
|---|---|
| H.S.A. | 1.0 |
| MD | 1.0 |
| CRNP | 2.0 |
| Dentist | 1.0 |
| Dental Assistant | 1.0 |
| Dental Hygienist | 0.2 |
| D.O.N. | 1.0 |
| RN | 7.4 |
| LPN | 14.0 |
| Pharmacy Inventory Manager/LPN | 1.0 |
| Phlebotomist/LPN | 1.0 |
| Administrative Assistant | 1.0 |
| Scheduler | 1.0 |
| Medical Records Clerk | 2.0 |
| Total FTE's | 34.6 |

| Childersburg - Work Release and Work Center | FTE's |
|---|---|
| (Home Facility - *St. Clair*) | |
| RN Nurse Manager | 1.4 |
| CRNP | 0.4 |
| LPN | 4.2 |
| Administrative Assistant/Medical Records Clerk | 0.4 |
| Total FTE's | 6.4 |

ADOC and Corizon
Medical Services Agreement
Appendix A

PLTF-PARSONS-036318

**Alabama DOC**   Minimum Staffing Required

| Staton - Facility<br>(Draper - Facility, Elmore- Facility, Frank Lee - Facility) | FTE's |
|---|---|
| H.S.A. | 1.0 |
| MD | 1.0 |
| CRNP | 3.0 |
| Dentist | 1.2 |
| Dental Assistant | 1.2 |
| Dental Hygienist | 0.4 |
| D.O.N. | 1.0 |
| RN | 6.2 |
| RN Infectious Disease and Chronic Care -Staton - Draper -Elmore-Frank Lee | - |
| LPN | 19.2 |
| Pharmacy Inventory Manager/LPN | 2.0 |
| Phlebotomist/LPN | 1.0 |
| Administrative Assistant | 1.0 |
| Scheduler | 1.0 |
| Medical Records Clerk | 3.0 |
| **Total FTE's** | **42.2** |

| Frank Lee – Facility<br>(Home Facility - *Staton* ) | FTE's |
|---|---|
| LPN | 1.0 |
| **Total FTE's** | **1.0** |

| Tutwiler - Facility<br>(& Tutwiler Annex) | FTE's |
|---|---|
| H.S.A. | 1.0 |
| MD | 1.5 |
| CRNP | 2.0 |
| Dentist | 1.0 |
| Dental Assistant | 1.0 |
| Dental Hygienist | 0.4 |
| D.O.N. | 1.0 |
| RN | 7.0 |
| LPN | 20.2 |
| Pharmacy Inventory Manager/LPN | 1.0 |
| Phlebotomist/LPN | 1.0 |
| Administrative Assistant | 1.0 |
| Scheduler | 1.0 |
| Medical Records Clerk | 3.0 |
| Ombudsman | 1.0 |
| **Total FTE's** | **43.1** |

| Birmingham - Work Release and Work Center<br>(Home Facility; **Tutwiler** - Admissions, etc.,<br>*Donaldson* - after hours nurse encounters, *St. Clair* - Dental ) | FTE's |
|---|---|
| CRNP (May utilize .20 MD -substitute) | 0.4 |
| RN | 1.4 |
| LPN | 4.2 |
| **Total FTE's** | **6.0** |

ADOC and Corizon
Medical Services Agreement
Appendix A

PLTF-PARSONS-036319

**Alabama DOC**     Minimum Staffing Required

| Ventress - Facility | FTE's |
|---|---|
| H.S.A. | 1.0 |
| MD | 1.0 |
| CRNP | 0.4 |
| Dentist | 1.0 |
| Dental Assistant | 1.0 |
| Dental Hygienist | 0.2 |
| D.O.N. | 1.0 |
| RN | 4.2 |
| LPN | 14.0 |
| Pharmacy Inventory Manager/LPN | 1.0 |
| Phlebotomist - LPN Assignment | - |
| Administrative Assistant | 1.0 |
| Scheduler | 0.4 |
| Medical Records Clerk | 1.6 |
| Total FTE's | 27.8 |

| Traveling Inmate Work Center Teams | FTE's |
|---|---|
| **Team A – Southeast - Home Base Kilby** | |
| *Alex City, Elba, Frank Lee, Red Eagle* | |
| CRNP | 1.0 |
| LPN | 1.0 |
| RMA *or Clerk* | 1.0 |
| Total FTE's | 3.0 |
| **Team B – Southwest - Home Base Fountain** | |
| *Atmore Work Center, Camden, J. O. Davis, Loxley, Mobile - Holman assignment as needed* | |
| CRNP | 2.0 |
| LPN | 1.0 |
| RMA *or Clerk* | 1.0 |
| Total FTE's | 4.0 |
| **Total FTE's** | **493.0** |

# MEDICAL
## MINIMUM PROGRAM STAFFING
### AND AVERAGE SALARIES

| POSITIONS | Payback Schedule Base Hourly Pay Rate |
|---|---|
| Program Director | 86.25 |
| Physician Director | 119.00 |
| Infectious Disease Specialist MD | 130.50 |
| Assistant Physician Director | 116.10 |
| Administrative Assistant | 13.85 |
| Receptionist | 13.85 |
| Data / Reporting Specialist | 17.85 |
| RN Special Needs Case Manager/Furlough | 43.50 |
| RN Regional Director of Nursing | 50.00 |
| RN Regional Coordinator - North | 43.50 |
| RN Regional Coordinator - South | 43.50 |
| Program Administrator - North | 62.70 |
| Program Administrator - South | 62.70 |
| Consulting Pharmacist | 59.70 |
| Dental Director | 70.00 |
| H.S.A. | 37.70 |
| MD | 91.60 |
| CRNP | 48.90 |
| CRNP (May utilize .20 MD -substitute) | 48.90 |
| Dentist | 76.20 |
| Dental Assistant | 15.50 |
| Dental Hygienist | 27.70 |
| D.O.N. | 34.10 |
| Assistant D.O.N. | 31.95 |
| Assistant DON (Supervises & Schedules/Work Camps) | 31.95 |
| RN | 30.35 |
| RN Nurse Manager | 32.50 |
| LPN | 21.05 |
| Certified Nursing Assistant (or RMA) | 13.85 |
| Pharmacy Inventory Manager/LPN | 22.40 |
| Phlebotomist | 12.80 |
| Phlebotomist/LPN | 21.05 |
| Administrative Assistant/Medical Records Clerk | 13.85 |
| Administrative Assistant/Scheduler | 13.85 |
| Scheduler | 13.85 |
| RMA or Clerk | 13.85 |
| Medical Records Supervisor | 19.15 |
| Medical Records Clerk | 12.25 |
| Registered Medical Technologist | 26.65 |
| Ombudsman | 21.55 |

## MEDICAL
## MINIMUM PROGRAM STAFFING
## AND AVERAGE SALARIES

ALABAMA DIFFERENTIALS - STATEWIDE

|  | RN | LPN | C.N.A |
|---|---|---|---|
| Evening | 1.50 | 1.50 | 0.75 |
| Night | 2.00 | 2.00 | 1.00 |
| WE Day | 1.00 | 1.00 | 1.00 |
| WE Evening | 2.50 | 2.50 | 1.75 |
| WE Night | 3.00 | 3.00 | 2.00 |

Fringe benefits will be calculated at 20% of total personnel cost and are not included in the listed salary ranges. For payback purposes, the average salary will be multiplied times 1.20 to determine the hourly payback rate for each respective position.

ADOC and Corizon
Medical Services Agreement
Appendix B

PLTF-PARSONS-036322



# State of Alabama
# Department of Corrections

Alabama Criminal Justice Center
301 South Ripley Street
P. O. Box 301501
Montgomery, AL 36130-1501
(334) 353-3883



**ROBERT BENTLEY**
**GOVERNOR**

**KIM T. THOMAS**
**COMMISSIONER**

October 15, 2012

James Marvin Courtney
Sr. Vice President
Corizon, Inc.
12647 Olive Blvd.
St. Louis, MO 63141

**RE:   RFP NO. 2012-02, Comprehensive Inmate Health Care Services**

Dear Mr. Courtney:

Congratulations on the letter of intent issued to Corizon for the award of the Alabama Department of Corrections (ADOC), inmate medical services contract. In accordance with Section 1.13 of the RFP, the ADOC would like for Corizon to consider the following modifications to its' proposed inmate medical services contract:

1) Removal of the required five million dollar ($5,000,000) annual Performance Bond

2) The required 85% of hours worked will allow for hours to be aggregated by position category. However, hours worked will be aggregated by position category at each individual facility. Hours worked in a position category <u>cannot</u> be rolled up on a statewide level. Paybacks for medical staff associated with hours not worked will apply <u>only to the following position categories</u>.

   a) Statewide Medical Director (physician)
   b) Assistant Statewide Medical Director (physician)
   c) HIV Specialist (physician)
   d) Facility Medical Director (physician)
   e) Facility Dental Director or Dentist
   f) Nurse Practitioner or Licensed Mid-level Provider
   g) HSA
   h) DON

---

PLTF-PARSONS-036323

3) The following language will be included in the final contract:

    a) 'Should the average daily inmate population (ADP) fall below 24,700 for three consecutive billing cycles; Corizon reserves the right to negotiated with the ADOC Associate Commissioner of Health Services the reduction in required staffing hours, or suspend filling open positions subject to paybacks. Should the ADP of inmates return to a level of 25,200 for three consecutive billing cycles, Corizon will be required to fulfill the required minimal staffing hours as designated in Attachment B of this agreement.'

The ADOC is requesting that Corizon consider the associated cost of these modifications and submit in writing a reduction in its' proposed thirty-four (34) month proposed ADOC medical services program pricing. The modifications to Corizon's pricing should be submitted to my office via email no later than October 17, by 5:00 PM Central Standard Time.

Thank you for your time and consideration. On the behalf of the Alabama Department of Corrections we look forward to the continuation of our partnership in service with Corizon.

Respectfully,

Ruth A. Naglich
Associate Commissioner
Office of Health Services

cc:    Anne Adams Hill, ADOC Commissioner
       Sekeena Holt, ADOC Finance and Benefit Manager

PLTF-PARSONS-036324

Exhibit C



October 17, 2012

Ms. Ruth Naglich
Associate Commissioner
Office of Health Services
Alabama Department of Corrections
301 South Ripley Street
Montgomery, AL 36130-1501

RE: RFP NO. 2012-02, Comprehensive Inmate Health Care Services

Dear Ruth:

Corizon is excited to be the chosen partner for the Alabama Department of Corrections (ADOC) in the upcoming inmate medical services contract. We have received your request for proposed modifications to the contract services and would like to offer the following in response.

1) The ADOC requested an elimination of the annual performance bond. This creates an annual savings of $31,000 for the ADOC.

2) The ADOC has offered modification of staffing payback language to cover a threshold change from 87% to 85% of hours worked and elimination of certain regional positions, Registered Nurses and Dental Hygienists. We appreciate this additional flexibility and do understand that we will not be aggregating positions across facilities to a statewide total. As you know, our payback situation has resulted in limited staffing credits to ADOC as we continue to manage labor to meet your service needs. As we priced our initial RFP response, we took into consideration prior staffing levels. With the proposed modifications, we can offer ADOC an additional credit of $50,000 in our annual cost.

3) The ADOC proposes language which allows Corizon and ADOC to negotiate revised staffing levels or suspend hiring for open positions when the population falls to certain levels. We appreciate this flexibility and would propose that such an agreement would be negotiated to the financial benefit of both ADOC and Corizon at the time that occurred. Given that the current ADP exceeds this lower level, we are not able to offer a fixed cost savings to ADOC at this time.

We have enclosed a revised pricing schedule for medical services only reflecting the above changes, prorated for the first ten month period and carried forward into the remaining two year contract term, along with the optional two yearly extension periods.

We hope this response meets your needs and that of the ADOC. Should you have any questions or concerns, please do not hesitate to call me at your convenience. On behalf of the entire Corizon organization, we look forward to finalizing the contract terms and moving forward into another long term partnership with the ADOC team.

Respectfully,

J.M. Courtney
Senior Vice President

PLTF-PARSONS-036325

OCT 19 2012

# APENDIX A-1-A
## PRICE SHEET
### Medical Services

| | |
|---|---|
| Company Name | Corizon, Inc. |
| Mailing Address | 105 Westpark Drive, Suite 200 |
| City, State, Zip | Brentwood, TN 37027 |

PRICES ARE SUBMITTED AS INDICATED BELOW:

| CONTRACT YEAR | Total Cost | Annual Cost Per Inmate | Monthly Cost Per Inmate above AMP of 25,200 | Monthly Cost Per Inmate below AMP of 25,200 |
|---|---|---|---|---|
| December 1, 2012 - September 30, 2013 | $ 63,453,823 | $ 3,021.61 | $ 126.47 | $ 126.47 |
| October 1, 2013 - September 30, 2014 | $ 79,095,010 | $ 3,138.69 | $ 133.09 | $ 133.09 |
| October 1, 2014 - September 30, 2015 | $ 82,156,415 | $ 3,260.18 | $ 140.08 | $ 140.08 |
| Total Cost for 2 years and 10 months — Contract Term | $ 224,705,248 | | | |
| CONTRACT YEAR (OPTIONAL) | | | | |
| October 1, 2015 - September 30, 2016 | $ 85,856,189 | $ 3,406.99 | 146.38 | $ 146.38 |
| October 1, 2016 - September 30, 2017 | $ 89,722,498 | $ 3,560.42 | 152.97 | $ 152.97 |
| Total Cost for 2 additional option years | $ 175,578,687 | | | |

PLTF-PARSONS-036326

AFFIDAVIT FOR BUSINESS ENTITY/EMPLOYER /CONTRACTOR
(To be completed as a condition for the award of any contract, grant, or incentive by the State of
Alabama, any political subdivision thereof, or any state-funded entity to a business entity or employer
that employs one or more employees)

State of **Missouri**

County of **St. Louis**

Before me, a notary public, personally appeared **Stuart Campbell** (print name) who, being duly sworn,
says as follows:

As a condition for the award of any contract, grant, or incentive by the State of Alabama, any political
subdivision thereof, or any state-funded entity to a business entity or employer that employs one or
more employees, I hereby attest that in my capacity as **President & Chief Operating Officer** (state
position) for **Corizon, Inc.** (state business entity/employer/contractor name)  that said business
entity/employer/contractor shall not knowingly employ, hire for employment, or continue to employ an
unauthorized alien.

I further attest that said business entity/employer/contractor is enrolled in the E-Verify program.
(ATTACH DOCUMENTATION ESTABLISHING THAT BUSINESS ENTITY/EMPLOYER/CONTRACTOR IS
ENROLLED IN THE E-VERIFY PROGRAM)

_____ Signature of Affiant

Sworn to and subscribed before me this 18th day of July, 2012.

I certify that the affiant is known (or made known) to me to be the identical party he or she claims to be.

_____ Signature and Seal of Notary Public

MARY M. MAWHINNEY
My Commission Expires
March 1, 2015
St. Louis County
Commission #11431758



PLTF-PARSONS-036328

# E-Verify



**Company ID Number:** _____

## THE E-VERIFY PROGRAM FOR EMPLOYMENT VERIFICATION
### MEMORANDUM OF UNDERSTANDING

### ARTICLE I

### PURPOSE AND AUTHORITY

This Memorandum of Understanding (MOU) sets forth the points of agreement between the Department of Homeland Security (DHS) and _____
_____ (Employer) regarding the Employer's participation in the Employment Eligibility Verification Program (E-Verify). This MOU explains certain features of the E-Verify program and enumerates specific responsibilities of DHS, the Social Security Administration (SSA), and the Employer. E-Verify is a program that electronically confirms an employee's eligibility to work in the United States after completion of the Employment Eligibility Verification Form (Form I-9). For covered government contractors, E-Verify is used to verify the employment eligibility of all newly hired employees and all existing employees assigned to Federal contracts or to verify the entire workforce if the contractor so chooses.

Authority for the E-Verify program is found in Title IV, Subtitle A, of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009, as amended (8 U.S.C. § 1324a note). Authority for use of the E-Verify program by Federal contractors and subcontractors covered by the terms of Subpart 22.18, "Employment Eligibility Verification", of the Federal Acquisition Regulation (FAR) (hereinafter referred to in this MOU as a "Federal contractor with the FAR E-Verify clause") to verify the employment eligibility of certain employees working on Federal contracts is also found in Subpart 22.18 and in Executive Order 12989, as amended.

### ARTICLE II

### FUNCTIONS TO BE PERFORMED

#### A. RESPONSIBILITIES OF SSA

1. SSA agrees to provide the Employer with available information that allows the Employer to confirm the accuracy of Social Security Numbers provided by all employees verified under this MOU and the employment authorization of U.S. citizens.

2. SSA agrees to provide to the Employer appropriate assistance with operational problems that may arise during the Employer's participation in the E-Verify program. SSA agrees to provide the Employer with names, titles, addresses, and telephone numbers of SSA representatives to be contacted during the E-Verify process.

3. SSA agrees to safeguard the information provided by the Employer through the E-Verify program procedures, and to limit access to such information, as is appropriate by law, to individuals responsible for the verification of Social Security Numbers and for evaluation of the E-Verify program or such other persons or entities who may be authorized by SSA as governed by the Privacy Act (5 U.S.C. § 552a), the Social Security Act (42 U.S.C. 1306(a)), and SSA regulations (20 CFR Part 401).

PLTF-PARSONS-036329

 

Company ID Number: _____

4. SSA agrees to provide a means of automated verification that is designed (in conjunction with DHS's automated system if necessary) to provide confirmation or tentative nonconfirmation of U.S. citizens' employment eligibility within 3 Federal Government work days of the initial inquiry.

5. SSA agrees to provide a means of secondary verification (including updating SSA records as may be necessary) for employees who contest SSA tentative nonconfirmations that is designed to provide final confirmation or nonconfirmation of U.S. citizens' employment eligibility and accuracy of SSA records for both citizens and non-citizens within 10 Federal Government work days of the date of referral to SSA, unless SSA determines that more than 10 days may be necessary. In such cases, SSA will provide additional verification instructions.

## B. RESPONSIBILITIES OF DHS

1. After SSA verifies the accuracy of SSA records for employees through E-Verify, DHS agrees to provide the Employer access to selected data from DHS's database to enable the Employer to conduct, to the extent authorized by this MOU:

  • Automated verification checks on employees by electronic means, and
  • Photo verification checks (when available) on employees.

2. DHS agrees to provide to the Employer appropriate assistance with operational problems that may arise during the Employer's participation in the E-Verify program. DHS agrees to provide the Employer names, titles, addresses, and telephone numbers of DHS representatives to be contacted during the E-Verify process.

3. DHS agrees to make available to the Employer at the E-Verify Web site and on the E-Verify Web browser, instructional materials on E-Verify policies, procedures and requirements for both SSA and DHS, including restrictions on the use of E-Verify. DHS agrees to provide training materials on E-Verify.

4. DHS agrees to provide to the Employer a notice, which indicates the Employer's participation in the E-Verify program. DHS also agrees to provide to the Employer anti-discrimination notices issued by the Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC), Civil Rights Division, U.S. Department of Justice.

5. DHS agrees to issue the Employer a user identification number and password that permits the Employer to verify information provided by employees with DHS's database.

6. DHS agrees to safeguard the information provided to DHS by the Employer, and to limit access to such information to individuals responsible for the verification of employees' employment eligibility and for evaluation of the E-Verify program, or to such other persons or entities as may be authorized by applicable law. Information will be used only to verify the accuracy of Social Security Numbers and employment eligibility, to enforce the Immigration and Nationality Act (INA) and Federal criminal laws, and to administer Federal contracting requirements.

PLTF-PARSONS-036330

# E-Verify 

**Company ID Number:** _____

7. DHS agrees to provide a means of automated verification that is designed (in conjunction with SSA verification procedures) to provide confirmation or tentative nonconfirmation of employees' employment eligibility within 3 Federal Government work days of the initial inquiry.

8. DHS agrees to provide a means of secondary verification (including updating DHS records as may be necessary) for employees who contest DHS tentative nonconfirmations and photo non-match tentative nonconfirmations that is designed to provide final confirmation or nonconfirmation of the employees' employment eligibility within 10 Federal Government work days of the date of referral to DHS, unless DHS determines that more than 10 days may be necessary. In such cases, DHS will provide additional verification instructions.

## C. RESPONSIBILITIES OF THE EMPLOYER

1. The Employer agrees to display the notices supplied by DHS in a prominent place that is clearly visible to prospective employees and all employees who are to be verified through the system.

2. The Employer agrees to provide to the SSA and DHS the names, titles, addresses, and telephone numbers of the Employer representatives to be contacted regarding E-Verify.

3. The Employer agrees to become familiar with and comply with the most recent version of the E-Verify User Manual.

4. The Employer agrees that any Employer Representative who will perform employment verification queries will complete the E-Verify Tutorial before that individual initiates any queries.

    A. The Employer agrees that all Employer representatives will take the refresher tutorials initiated by the E-Verify program as a condition of continued use of E-Verify.

    B. Failure to complete a refresher tutorial will prevent the Employer from continued use of the program.

5. The Employer agrees to comply with current Form I-9 procedures, with two exceptions:

    • If an employee presents a "List B" identity document, the Employer agrees to only accept "List B" documents that contain a photo. (List B documents identified in 8 C.F.R. § 274a.2(b)(1)(B)) can be presented during the Form I-9 process to establish identity.) If an employee objects to the photo requirement for religious reasons, the Employer should contact E-Verify at 888-464-4218.

    • If an employee presents a DHS Form I-551 (Permanent Resident Card) or Form I-766 (Employment Authorization Document) to complete the Form I-9, the Employer agrees to make a photocopy of the document and to retain the photocopy with the employee's Form I-9. The photocopy must be of sufficient quality to allow for verification of the photo and written information. The employer will use the photocopy to verify the photo and to assist DHS with its review of

PLTF-PARSONS-036331

 

**E-Verify**

Company ID Number: _____

photo non-matches that are contested by employees. Note that employees retain the right to present any List A, or List B and List C, documentation to complete the Form I-9. DHS may in the future designate other documents that activate the photo screening tool.

6. The Employer understands that participation in E-Verify does not exempt the Employer from the responsibility to complete, retain, and make available for inspection Forms I-9 that relate to its employees, or from other requirements of applicable regulations or laws, including the obligation to comply with the antidiscrimination requirements of section 274B of the INA with respect to Form I-9 procedures, except for the following modified requirements applicable by reason of the Employer's participation in E-Verify: (1) identity documents must have photos, as described in paragraph 5 above; (2) a rebuttable presumption is established that the Employer has not violated section 274A(a)(1)(A) of the Immigration and Nationality Act (INA) with respect to the hiring of any individual if it obtains confirmation of the identity and employment eligibility of the individual in good faith compliance with the terms and conditions of E-Verify; (3) the Employer must notify DHS if it continues to employ any employee after receiving a final nonconfirmation, and is subject to a civil money penalty between $550 and $1,100 for each failure to notify DHS of continued employment following a final nonconfirmation; (4) the Employer is subject to a rebuttable presumption that it has knowingly employed an unauthorized alien in violation of section 274A(a)(1)(A) if the Employer continues to employ an employee after receiving a final nonconfirmation; and (5) no person or entity participating in E-Verify is civilly or criminally liable under any law for any action taken in good faith based on information provided through the confirmation system. DHS reserves the right to conduct Form I-9 and E-Verify system compliance inspections during the course of E-Verify, as well as to conduct any other enforcement activity authorized by law.

7. The Employer agrees to initiate E-Verify verification procedures for new employees within 3 Employer business days after each employee has been hired (but after the Form I-9 has been completed), and to complete as many (but only as many) steps of the E-Verify process as are necessary according to the E-Verify User Manual, or in the case of Federal contractors with the FAR E-Verify clause, the E-Verify User Manual for Federal Contractors. The Employer is prohibited from initiating verification procedures before the employee has been hired and the Form I-9 completed. If the automated system to be queried is temporarily unavailable, the 3-day time period is extended until it is again operational in order to accommodate the Employer's attempting, in good faith, to make inquiries during the period of unavailability. Employers may initiate verification by notating the Form I-9 in circumstances where the employee has applied for a Social Security Number (SSN) from the SSA and is waiting to receive the SSN, provided that the Employer performs an E-Verify employment verification query using the employee's SSN as soon as the SSN becomes available.

8. The Employer agrees not to use E-Verify procedures for pre-employment screening of job applicants, in support of any unlawful employment practice, or for any other use not authorized by this MOU. Employers must use E-Verify for all new employees, unless an Employer is a Federal contractor that qualifies for the exceptions described in Article II.D.1.c. Except as provided in Article II.D, the Employer will not verify selectively and will not verify employees hired before the effective date of this MOU. The Employer understands that if the Employer uses the E-Verify system for any purpose other than as

PLTF-PARSONS-036332



# E-Verify

Company ID Number: _____

authorized by this MOU, the Employer may be subject to appropriate legal action and termination of its access to SSA and DHS information pursuant to this MOU.

9. The Employer agrees to follow appropriate procedures (see Article III. below) regarding tentative nonconfirmations, including notifying employees in private of the finding and providing them written notice of the findings, providing written referral instructions to employees, allowing employees to contest the finding, and not taking adverse action against employees if they choose to contest the finding. Further, when employees contest a tentative nonconfirmation based upon a photo non-match, the Employer is required to take affirmative steps (see Article III.B. below) to contact DHS with information necessary to resolve the challenge.

10. The Employer agrees not to take any adverse action against an employee based upon the employee's perceived employment eligibility status while SSA or DHS is processing the verification request unless the Employer obtains knowledge (as defined in 8 C.F.R. § 274a.1(l)) that the employee is not work authorized. The Employer understands that an initial inability of the SSA or DHS automated verification system to verify work authorization, a tentative nonconfirmation, a case in continuance (indicating the need for additional time for the government to resolve a case), or the finding of a photo non-match, does not establish, and should not be interpreted as evidence, that the employee is not work authorized. In any of the cases listed above, the employee must be provided a full and fair opportunity to contest the finding, and if he or she does so, the employee may not be terminated or suffer any adverse employment consequences based upon the employee's perceived employment eligibility status (including denying, reducing, or extending work hours, delaying or preventing training, requiring an employee to work in poorer conditions, refusing to assign the employee to a Federal contract or other assignment, or otherwise subjecting an employee to any assumption that he or she is unauthorized to work) until and unless secondary verification by SSA or DHS has been completed and a final nonconfirmation has been issued. If the employee does not choose to contest a tentative nonconfirmation or a photo non-match or if a secondary verification is completed and a final nonconfirmation is issued, then the Employer can find the employee is not work authorized and terminate the employee's employment. Employers or employees with questions about a final nonconfirmation may call E-Verify at 1-888-464-4218 or OSC at 1-800-255-8155 or 1-800-237-2515 (TDD).

11. The Employer agrees to comply with Title VII of the Civil Rights Act of 1964 and section 274B of the INA, as applicable, by not discriminating unlawfully against any individual in hiring, firing, or recruitment or referral practices because of his or her national origin or, in the case of a protected individual as defined in section 274B(a)(3) of the INA, because of his or her citizenship status. The Employer understands that such illegal practices can include selective verification or use of E-Verify except as provided in part D below, or discharging or refusing to hire employees because they appear or sound "foreign" or have received tentative nonconfirmations. The Employer further understands that any violation of the unfair immigration-related employment practices provisions in section 274B of the INA could subject the Employer to civil penalties, back pay awards, and other sanctions, and violations of Title VII could subject the Employer to back pay awards, compensatory and punitive damages. Violations of either section 274B of the INA or Title VII may also lead to the termination of its participation in E-Verify. If the Employer has any questions relating to the anti-discrimination provision, it should contact OSC at 1-800-255-8155 or 1-800-237-2515 (TDD).

PLTF-PARSONS-036333





Company ID Number: _____

12. The Employer agrees to record the case verification number on the employee's Form I-9 or to print the screen containing the case verification number and attach it to the employee's Form I-9.

13. The Employer agrees that it will use the information it receives from SSA or DHS pursuant to E-Verify and this MOU only to confirm the employment eligibility of employees as authorized by this MOU. The Employer agrees that it will safeguard this information, and means of access to it (such as PINS and passwords) to ensure that it is not used for any other purpose and as necessary to protect its confidentiality, including ensuring that it is not disseminated to any person other than employees of the Employer who are authorized to perform the Employer's responsibilities under this MOU, except for such dissemination as may be authorized in advance by SSA or DHS for legitimate purposes.

14. The Employer acknowledges that the information which it receives from SSA is governed by the Privacy Act (5 U.S.C. § 552a(i)(1) and (3)) and the Social Security Act (42 U.S.C. 1306(a)), and that any person who obtains this information under false pretenses or uses it for any purpose other than as provided for in this MOU may be subject to criminal penalties.

15. The Employer agrees to cooperate with DHS and SSA in their compliance monitoring and evaluation of E-Verify, including by permitting DHS and SSA, upon reasonable notice, to review Forms I-9 and other employment records and to interview it and its employees regarding the Employer's use of E-Verify, and to respond in a timely and accurate manner to DHS requests for information relating to their participation in E-Verify.

## D. RESPONSIBILITIES OF FEDERAL CONTRACTORS WITH THE FAR E-VERIFY CLAUSE

1. The Employer understands that if it is a subject to the employment verification terms in Subpart 22.18 of the FAR, it must verify the employment eligibility of any existing employee assigned to the contract and all new hires, as discussed in the Supplemental Guide for Federal Contractors. Once an employee has been verified through E-Verify by the Employer, the Employer may not reverify the employee through E-Verify.

a. Federal contractors with the FAR E-Verify clause agree to become familiar with and comply with the most recent versions of the E-Verify User Manual for Federal Contractors and the E-Verify Supplemental Guide for Federal Contractors.

b. Federal contractors with the FAR E-Verify clause agree to complete a tutorial for Federal contractors with the FAR E-Verify clause.

c. Federal contractors with the FAR E-Verify clause not enrolled at the time of contract award: An Employer that is not enrolled in E-Verify at the time of a contract award must enroll as a Federal contractor with the FAR E-Verify clause in E-Verify within 30 calendar days of contract award and, within 90 days of enrollment, begin to use E-Verify to initiate verification of employment eligibility of new hires of the Employer who are working in the United States, whether or not assigned to the contract. Once the Employer begins verifying new hires, such verification of new hires must be initiated

PLTF-PARSONS-036334

 **E-Verify** 

Company ID Number: _____

within 3 business days after the date of hire. Once enrolled in E-Verify as a Federal contractor with the FAR E-Verify clause, the Employer must initiate verification of employees assigned to the contract within 90 calendar days from the time of enrollment in the system and after the date and selecting which employees will be verified in E-Verify or within 30 days of an employee's assignment to the contract, whichever date is later.

d. Employers that are already enrolled in E-Verify at the time of a contract award but are not enrolled in the system as a Federal contractor with the FAR E-Verify clause: Employers enrolled in E-Verify for 90 days or more at the time of a contract award must use E-Verify to initiate verification of employment eligibility for new hires of the Employer who are working in the United States, whether or not assigned to the contract, within 3 business days after the date of hire. Employers enrolled in E-Verify as other than a Federal contractor with the FAR E-Verify clause, must update E-Verify to indicate that they are a Federal contractor with the FAR E-Verify clause within 30 days after assignment to the contract. If the Employer is enrolled in E-Verify for 90 calendar days or less at the time of contract award, the Employer must, within 90 days of enrollment, begin to use E-Verify to initiate verification of new hires of the contractor who are working in the United States, whether or not assigned to the contract. Such verification of new hires must be initiated within 3 business days after the date of hire. An Employer enrolled as a Federal contractor with the FAR E-Verify clause in E-Verify must initiate verification of each employee assigned to the contract within 90 calendar days after date of contract award or within 30 days after assignment to the contract, whichever is later.

e. Institutions of higher education, State, local and tribal governments and sureties: Federal contractors with the FAR E-Verify clause that are institutions of higher education (as defined at 20 U.S.C. 1001(a)), State or local governments, governments of Federally recognized Indian tribes, or sureties performing under a takeover agreement entered into with a Federal agency pursuant to a performance bond may choose to only verify new and existing employees assigned to the Federal contract. Such Federal contractors with the FAR E-Verify clause may, however, elect to verify all new hires, and/or all existing employees hired after November 6, 1986. The provisions of Article II.D, paragraphs 1.a and 1.b of this MOU providing timeframes for initiating employment verification of employees assigned to a contract apply to such institutions of higher education, State, local and tribal governments, and sureties.

f. Verification of all employees: Upon enrollment, Employers who are Federal contractors with the FAR E-Verify clause may elect to verify employment eligibility of all existing employees working in the United States who were hired after November 6, 1986, instead of verifying only new employees and those existing employees assigned to a covered Federal contract. After enrollment, Employers must elect to do so only in the manner designated by DHS and initiate E-Verify verification of all existing employees within 180 days after the election.

g. Form I-9 procedures for existing employees of Federal contractors with the FAR E-Verify clause: Federal contractors with the FAR E-Verify clause may choose to complete new Forms I-9 for all existing employees other than those that are completely exempt from this process. Federal contractors with the FAR E-Verify clause may also update previously completed Forms I-9 to initiate E-Verify verification of existing employees who are not completely exempt as long as that Form I-9 is complete (including the SSN), complies with Article II.C.5, the employee's work authorization has

PLTF-PARSONS-036335



**E-Verify**

Company ID Number: _____

not expired, and the Employer has reviewed the information reflected in the Form I-9 either in person or in communications with the employee to ensure that the employee's stated basis in section 1 of the Form I-9 for work authorization has not changed (including, but not limited to, a lawful permanent resident alien having become a naturalized U.S. citizen). If the Employer is unable to determine that the Form I-9 complies with Article II.C.5, if the employee's basis for work authorization as attested in section 1 has expired or changed, or if the Form I-9 contains no SSN or is otherwise incomplete, the Employer shall complete a new I-9 consistent with Article II.C.5, or update the previous I-9 to provide the necessary information. If section 1 of the Form I-9 is otherwise valid and up-to-date and the form otherwise complies with Article II.C.5, but reflects documentation (such as a U.S. passport or Form I-551) that expired subsequent to completion of the Form I-9, the Employer shall not require the production of additional documentation, or use the photo screening tool described in Article II.C.5, subject to any additional or superseding instructions that may be provided on this subject in the Supplemental Guide for Federal Contractors. Nothing in this section shall be construed to require a second verification using E-Verify of any assigned employee who has previously been verified as a newly hired employee under this MOU, or to authorize verification of any existing employee by any Employer that is not a Federal contractor with the FAR E-Verify clause.

2. The Employer understands that if it is a Federal contractor with the FAR E-Verify clause, its compliance with this MOU is a performance requirement under the terms of the Federal contract or subcontract, and the Employer consents to the release of information relating to compliance with its verification responsibilities under this MOU to contracting officers or other officials authorized to review the Employer's compliance with Federal contracting requirements.

## ARTICLE III

## REFERRAL OF INDIVIDUALS TO SSA AND DHS

### A. REFERRAL TO SSA

1. If the Employer receives a tentative nonconfirmation issued by SSA, the Employer must print the notice as directed by the E-Verify system and provide it to the employee so that the employee may determine whether he or she will contest the tentative nonconfirmation. The Employer must review the tentative nonconfirmation with the employee in private.

2. The Employer will refer employees to SSA field offices only as directed by the automated system based on a tentative nonconfirmation, and only after the Employer records the case verification number, reviews the input to detect any transaction errors, and determines that the employee contests the tentative nonconfirmation. The Employer will transmit the Social Security Number to SSA for verification again if this review indicates a need to do so. The Employer will determine whether the employee contests the tentative nonconfirmation as soon as possible after the Employer receives it.

3. If the employee contests an SSA tentative nonconfirmation, the Employer will provide the employee with a system-generated referral letter and instruct the employee to visit an SSA office within 8 Federal Government work days. SSA will electronically transmit the result of the referral to the Employer within 10 Federal Government work days of the

PLTF-PARSONS-036336

# E-Verify



Company ID Number: _____

referral unless it determines that more than 10 days is necessary. The Employer agrees to check the E-Verify system regularly for case updates.

4. The Employer agrees not to ask the employee to obtain a printout from the Social Security Number database (the Numident) or other written verification of the Social Security Number from the SSA.

## B. REFERRAL TO DHS

1. If the Employer receives a tentative nonconfirmation issued by DHS, the Employer must print the tentative nonconfirmation notice as directed by the E-Verify system and provide it to the employee so that the employee may determine whether he or she will contest the tentative nonconfirmation. The Employer must review the tentative nonconfirmation with the employee in private.

2. If the Employer finds a photo non-match for an employee who provides a document for which the automated system has transmitted a photo, the employer must print the photo non-match tentative nonconfirmation notice as directed by the automated system and provide it to the employee so that the employee may determine whether he or she will contest the finding. The Employer must review the tentative nonconfirmation with the employee in private.

3. The Employer agrees to refer individuals to DHS only when the employee chooses to contest a tentative nonconfirmation received from DHS automated verification process or when the Employer issues a tentative nonconfirmation based upon a photo non-match. The Employer will determine whether the employee contests the tentative nonconfirmation as soon as possible after the Employer receives it.

4. If the employee contests a tentative nonconfirmation issued by DHS, the Employer will provide the employee with a referral letter and instruct the employee to contact DHS through its toll-free hotline (as found on the referral letter) within 8 Federal Government work days.

5. If the employee contests a tentative nonconfirmation based upon a photo non-match, the Employer will provide the employee with a referral letter to DHS. DHS will electronically transmit the result of the referral to the Employer within 10 Federal Government work days of the referral unless it determines that more than 10 days is necessary. The Employer agrees to check the E-Verify system regularly for case updates.

6. The Employer agrees that if an employee contests a tentative nonconfirmation based upon a photo non-match, the Employer will send a copy of the employee's Form I-551 or Form I-766 to DHS for review by:
   - Scanning and uploading the document, or
   - Sending a photocopy of the document by an express mail account (paid for at employer expense).

7. If the Employer determines that there is a photo non-match when comparing the photocopied List B document described in Article II.C.5 with the image generated in E-Verify, the Employer must forward the employee's documentation to DHS using one of the means described in the preceding paragraph, and allow DHS to resolve the case.

PLTF-PARSONS-036337

# E-Verify



**Company ID Number:** _____

## ARTICLE IV

### SERVICE PROVISIONS

SSA and DHS will not charge the Employer for verification services performed under this MOU. The Employer is responsible for providing equipment needed to make inquiries. To access E-Verify, an Employer will need a personal computer with Internet access.

## ARTICLE V

### PARTIES

A. This MOU is effective upon the signature of all parties, and shall continue in effect for as long as the SSA and DHS conduct the E-Verify program unless modified in writing by the mutual consent of all parties, or terminated by any party upon 30 days prior written notice to the others. Any and all system enhancements to the E-Verify program by DHS or SSA, including but not limited to the E-Verify checking against additional data sources and instituting new verification procedures, will be covered under this MOU and will not cause the need for a supplemental MOU that outlines these changes. DHS agrees to train employers on all changes made to E-Verify through the use of mandatory refresher tutorials and updates to the E-Verify User Manual, the E-Verify User Manual for Federal Contractors or the E-Verify Supplemental Guide for Federal Contractors. Even without changes to E-Verify, DHS reserves the right to require employers to take mandatory refresher tutorials. An Employer that is a Federal contractor with the FAR E-Verify clause may terminate this MOU when the Federal contract that requires its participation in E-Verify is terminated or completed. In such a circumstance, the Federal contractor with the FAR E-Verify clause must provide written notice to DHS. If an Employer that is a Federal contractor with the FAR E-Verify clause fails to provide such notice, that Employer will remain a participant in the E-Verify program, will remain bound by the terms of this MOU that apply to participants that are not Federal contractors with the FAR E-Verify clause, and will be required to use the E-Verify procedures to verify the employment eligibility of all newly hired employees.

B. Notwithstanding Article V, part A of this MOU, DHS may terminate this MOU if deemed necessary because of the requirements of law or policy, or upon a determination by SSA or DHS that there has been a breach of system integrity or security by the Employer, or a failure on the part of the Employer to comply with established procedures or legal requirements. The Employer understands that if it is a Federal contractor with the FAR E-Verify clause, termination of this MOU by any party for any reason may negatively affect its performance of its contractual responsibilities.

C. Some or all SSA and DHS responsibilities under this MOU may be performed by contractor(s), and SSA and DHS may adjust verification responsibilities between each other as they may determine necessary. By separate agreement with DHS, SSA has agreed to perform its responsibilities as described in this MOU.

D. Nothing in this MOU is intended, or should be construed, to create any right or benefit, substantive or procedural, enforceable at law by any third party against the United States, its agencies, officers, or employees, or against the Employer, its agents, officers, or employees.

PLTF-PARSONS-036338

# E-Verify 

**Company ID Number:** _____

E. Each party shall be solely responsible for defending any claim or action against it arising out of or related to E-Verify or this MOU, whether civil or criminal, and for any liability wherefrom, including (but not limited to) any dispute between the Employer and any other person or entity regarding the applicability of Section 403(d) of IIRIRA to any action taken or allegedly taken by the Employer.

F. The Employer understands that the fact of its participation in E-Verify is not confidential information and may be disclosed as authorized or required by law and DHS or SSA policy, including but not limited to, Congressional oversight, E-Verify publicity and media inquiries, determinations of compliance with Federal contractual requirements, and responses to inquiries under the Freedom of Information Act (FOIA).

G. The foregoing constitutes the full agreement on this subject between DHS and the Employer.

H. The individuals whose signatures appear below represent that they are authorized to enter into this MOU on behalf of the Employer and DHS respectively.

**To be accepted as a participant in E-Verify, you should only sign the Employer's Section of the signature page. If you have any questions, contact E-Verify at 888-464-4218.**

| Employer | |
|---|---|
| Name (Please Type or Print) | Title |
| Signature | Date |

| Department of Homeland Security – Verification Division | |
|---|---|
| Name (Please Type or Print) | Title |
| Signature | Date |

PLTF-PARSONS-036339

# E-Verify 

**Company ID Number:** _____

| Information Required for the E-Verify Program | |
|---|---|
| **Information relating to your Company:** | |
| Company Name: | |
| Company Facility Address: | |
| Company Alternate Address: | |
| County or Parish: | |
| Employer Identification Number: | |
| North American Industry Classification Systems Code: | |
| Administrator: | |
| Number of Employees: | |
| Number of Sites Verified for: | |

**Are you verifying for more than 1 site? If yes, please provide the number of sites verified for in each State:**

| State | Number of sites | Site(s) |
|---|---|---|
| | | |
| | | |
| | | |

PLTF-PARSONS-036340

 

Company ID Number: _____

Information relating to the Program Administrator(s) for your Company on policy questions or operational problems:

| | |
|---|---|
| Name: | |
| Telephone Number: | |
| Fax Number: | |
| E-mail Address: | |

Information relating to the Program Administrator(s) for your Company on policy questions or operational problems:

| | |
|---|---|
| Name: | |
| Telephone Number: | |
| Fax Number: | |
| E-mail Address: | |

PLTF-PARSONS-036341



Home      Government Records      Business Entities      Search      Details

## Business Entity Details

| Corizon Health, Inc. | |
|---|---|
| Entity ID Number | 918 - 616 |
| Entity Type | Foreign Corporation |
| Principal Address | 105 WESTPARK DR STE 300 BRENTWOOD, TN 37027 |
| Principal Mailing Address | 105 WESTPARK DR STE 300 BRENTWOOD, TN 37027 |
| Status | Exists |
| Place of Formation | Delaware |
| Formation Date | 12-8-1978 |
| Qualify Date | 12-27-2000 |
| Registered Agent Name | C T CORPORATION SYSTEM |
| Registered Office Street Address | 2 NORTH JACKSON ST., SUITE 605 MONTGOMERY, AL 36104 |
| Registered Office Mailing Address | 2 NORTH JACKSON ST., SUITE 605 MONTGOMERY, AL 36104 |
| Nature of Business | |
| Capital Authorized | |
| Capital Paid In | |
| Annual Reports | |
| Annual Report information is filed and maintained by the Alabama Department of Revenue. If you have questions about any of these filings, please contact Revenue's Business Privilege Tax Division at 334-242-1170 or www.ador.alabama.gov. The Secretary of State's Office cannot answer questions about or make changes to these reports. | |
| Report Year | 1999  2000  2001  2002  2003  2004  2005  2006  2007 2008  2009  2010  2011 |
| Transactions | |
| Transaction Date | 3-8-2010 |
| Registered Agent Changed From | THE CORPORATION COMPANY 2000 INTERSTATE PARK DR STE 204 MONTGOMERY, AL 36109 |
| Transaction Date | 7-1-2011 |
| Legal Name Changed From | Prison Health Services, Inc. |
| Scanned Documents | |
| Document Date / Type / Pages | 12-27-2000    Articles of Formation    2 pgs. |
| Document Date / Type / Pages | 3-8-2010    Registered Agent Change    1 pg. |
| Document Date / Type / Pages | 7-1-2011    Articles of Amendment    5 pgs. |

      

PLTF-PARSONS-036342



# State of Alabama
# Disclosure Statement
(Required by Act 2001-955)

| ENTITY COMPLETING FORM | Corizon, Inc. | |
|---|---|---|
| ADDRESS | 105 Westpark Dr., Suite 200 | |
| CITY, STATE, ZIP | Brentwood, TN 37027 | TELEPHONE NUMBER (615) 373-3100 |

| STATE AGENCY/DEPARTMENT THAT WILL RECEIVE GOODS, SERVICES, OR IS RESPONSIBLE FOR GRANT AWARD | |
|---|---|
| Alabama Department of Corrections | |
| ADDRESS | |
| 301 South Ripley St., P.O. Box 30150 | |
| CITY, STATE, ZIP | TELEPHONE NUMBER |
| Montgomery, AL 36130-1501 | |

This form is provided with:

☑ Contract   ☐ Proposal   ☐ Request for Proposal   ☐ Invitation to Bid   ☐ Grant Proposal

Have you or any of your partners, divisions, or any related business units previously performed work or provided goods to any State Agency/Department in the current or last fiscal year?

☐ Yes   ☑ No

If yes, identify below the State Agency/Department that received the goods or services, the type(s) of goods or services previously provided, and the amount received for the provision of such goods or services.

| STATE AGENCY/DEPARTMENT | TYPE OF GOODS/SERVICES | AMOUNT RECEIVED |
|---|---|---|
| | | |
| | | |
| | | |

Have you or any of your partners, divisions, or any related business units previously applied and received any grants from any State Agency/Department in the current or last fiscal year?

☐ Yes   ☑ No

If yes, identify the State Agency/Department that awarded the grant, the date such grant was awarded, and the amount of the grant.

| STATE AGENCY/DEPARTMENT | DATE GRANT AWARDED | AMOUNT OF GRANT |
|---|---|---|
| | | |
| | | |
| | | |

1. List below the name(s) and address(es) of all public officials/public employees with whom you, members of your immediate family, or any of your employees have a family relationship and who may directly personally benefit financially from the proposed transaction. Identify the State Department/Agency for which the public officials/public employees work. (Attach additional sheets if necessary.)

| NAME OF PUBLIC OFFICIAL/EMPLOYEE | ADDRESS | STATE DEPARTMENT/AGENCY |
|---|---|---|
| None | | |
| | | |
| | | |

*OVER*

PLTF-PARSONS-036343

**2.** List below the name(s) and address(es) of all family members of public officials/public employees with whom you, members of your immediate family, or any of your employees have a family relationship and who may directly personally benefit financially from the proposed transaction. Identify the public officials/public employees and State Department/Agency for which the public officials/public employees work. (Attach additional sheets if necessary.)

| NAME OF FAMILY MEMBER | ADDRESS | NAME OF PUBLIC OFFICIAL/ PUBLIC EMPLOYEE | STATE DEPARTMENT/ AGENCY WHERE EMPLOYED |
|---|---|---|---|
| None | | | |
| | | | |
| | | | |

If you identified individuals in items one and/or two above, describe in detail below the direct financial benefit to be gained by the public officials, public employees, and/or their family members as the result of the contract, proposal, request for proposal, invitation to bid, or grant proposal. (Attach additional sheets if necessary.)

Describe in detail below any indirect financial benefits to be gained by any public official, public employee, and/or family members of the public official or public employee as the result of the contract, proposal, request for proposal, invitation to bid, or grant proposal. (Attach additional sheets if necessary.)

List below the name(s) and address(es) of all paid consultants and/or lobbyists utilized to obtain the contract, proposal, request for proposal, invitation to bid, or grant proposal:

| NAME OF PAID CONSULTANT/LOBBYIST | ADDRESS |
|---|---|
| None | |
| | |
| | |

*By signing below, I certify under oath and penalty of perjury that all statements on or attached to this form are true and correct to the best of my knowledge. I further understand that a civil penalty of ten percent (10%) of the amount of the transaction, not to exceed $10,000.00, is applied for knowingly providing incorrect or misleading information.*

Signature _____ Date 10/17/12

MARY M. MAWHINNEY
My Commission Expires
March 1, 2015
St. Louis County
Commission #11431752

Notary's Signature _____ Date 10/17/12   Date Notary Expires 3-1-2015

*Act 2001-955 requires the disclosure statement to be completed and filed with all proposals, bids, contracts, or grant proposals to the State of Alabama in excess of $5,000.*

**PLTF-PARSONS-036344**



Home        Government Records        Business Entities        Search        Details

## Business Entity Details

| Corizon, Inc. | |
|---|---|
| Entity ID Number | 902 - 134 |
| Entity Type | Foreign Corporation |
| Principal Address | 105 WESTPARK DRIVE STE 200 BRENTWOOD, TN 37027 |
| Principal Mailing Address | 105 WESTPARK DRIVE STE 200 BRENTWOOD, TN 37027 |
| Status | Exists |
| Place of Formation | Missouri |
| Formation Date | 11-8-1982 |
| Qualify Date | 7-14-1994 |
| Registered Agent Name | C T CORPORATION SYSTEM |
| Registered Office Street Address | 2 NORTH JACKSON ST., SUITE 605 MONTGOMERY, AL 36104 |
| Registered Office Mailing Address | 2 NORTH JACKSON ST., SUITE 605 MONTGOMERY, AL 36104 |
| Nature of Business | PROVIDE HEALTH SERVICS TO CORRECTIONAL INSTITUTIONS |
| Capital Authorized | |
| Capital Paid In | |

### Annual Reports

Annual Report information is filed and maintained by the Alabama Department of Revenue. If you have questions about any of these filings, please contact Revenue's Business Privilege Tax Division at 334-242-1170 or www.ador.alabama.gov. The Secretary of State's Office cannot answer questions about or make changes to these reports.

| Report Year | 1994  1995  1996  1997  1998  1999  2000  2001  2002 2003  2004  2005  2006  2007  2008  2009  2010  2011 |
|---|---|

### Transactions

| Transaction Date | 10-26-1994 |
|---|---|
| Legal Name Changed From | ARA Health Services Inc. |
| Transaction Date | 1-18-2005 |
| Registered Agent Changed From | THE CORPORATION COMPANY 2000 INTERSTATE PARK DRIVE STE 204 MONTGOMERY, AL 36109 |
| Transaction Date | 3-20-2008 |
| Registered Agent Changed From | NATIONAL REGISTERED AGENTS INC 150 SOUTH PERRY ST MONTGOMERY, AL 36104 |
| Transaction Date | 3-8-2010 |
| Registered Agent Changed From | THE CORPORATION COMPANY 2000 INTERSTATE PARK DR STE 204 MONTGOMERY, AL 36109 |
| Transaction Date | 7-20-2011 |
| Legal Name Changed From | Correctional Medical Services, Inc. |
| Transaction Date | 7-20-2011 |
| Principal Office Changed From | 999 EXECUTIVE PARKWAY ST LOUIS, MO 63141 |

### Scanned Documents

| Document Date / Type / Pages | 7-14-1994    Articles of Formation    3 pgs. |
|---|---|
| Document Date / Type / Pages | 10-26-1994    Legal Name Change    1 pg. |
| Document Date / Type / Pages | 1-18-2005    Registered Agent Change    1 pg. |
| Document Date / Type / Pages | 3-20-2008    Registered Agent Change    1 pg. |

PLTF-PARSONS-036345

Business Entity Details

| Document Date / Type / Pages | 3-8-2010 | Registered Agent Change | 1 pg. |
|---|---|---|---|
| Document Date / Type / Pages | 7-20-2011 | Articles of Amendment | 7 pgs |

**Browse Results**   **New Search**

Alabama Directory | Media | Online Services | Alabama.gov
Statements/Policies | Alerts | Survey/Comments | Feeds | Contact Us

7/18/2012

PLTF-PARSONS-036346

# EXHIBIT 8

Case 2:12-cv-00601-ROS   Document 1560-5   Filed 05/02/16   Page 78 of 234



# Arizona Department of Corrections

# Appendix G of the Health Services Technical Manual

# Revised April 18, 2014

ADC267378

ADC Mental Health Technical Manual - Revised 4/18/14          2
Appendix G of the Health Service Technical Manual

## Chapter 1 - Administrative

Ch. 1 Sec 1.0:    Administration of Mental Health Services…………………………………………3
Ch. 1 Sec 2.0:    Monthly Reporting of Mental Health Statistics…………………………………………7
Ch. 1 Sec 3.0:    Psychiatric and Mental Health Peer Review……………………………………………8
Ch. 1 Sec 4.0:    Medical Records Review for Inmate Arriving on Unit……………………………………11
Ch. 1 Sec 5.0:    Weekly Mental Health Teleconference………………………………………………13
Ch. 1 Sec 6.0:    Movement of Mental Health Inmates…………………………………………………15
Ch. 1 Sec 7.0:    Mental Health Urgent Responder Protocols…………………………………………17
Ch. 1 Sec 8.0:    Supervision of Unlicensed Mental Health Staff……………………………………19

## Chapter 2 – Service Delivery

Ch. 2 Sec 1.0:    Initial Mental Health Assessment………………………………………………………21
Ch. 2 Sec 2.0:    Levels of Mental Health Services Delivery……………………………………………23
Ch. 2 Sec 3.0:    Determination and Management of Seriously Mentally Ill Inmates…………………………29
Ch. 2 Sec 4.0:    Mental Health Contacts for Inmates After Reception………………………………………31
Ch. 2 Sec 5.0:    Triage for Health Needs Requests…………………………………………………………32
Ch. 2 Sec 6.0:    Mental Health Service Delivery for Minors……………………………………………33
Ch. 2 Sec 7.0:    Mental Health Watch Protocols…………………………………………………………35
Ch. 2 Sec 8.0:    Double-Bunking Inmates on Watch………………………………………………………37
Ch. 2 Sec 9.0:    Mental Health Follow-up After Discharge from Watch………………………………………39
Ch. 2 Sec 10.0:   Mental Health Follow-up in Peripartum……………………………………………………40
Ch. 2 Sec 11.0:   Additional Delivery of Services……………………………………………………………41

## Chapter 3 – Programs

Ch. 3 Sec 1.0:    Men's Treatment Unit (MTU) / Women's Treatment Unit (WTU)………………………43
Ch. 3 Sec 2.0:    Maximum Custody Specialize Mental Health Programs …………………………………48
Ch. 3 Sec 3.0:    Behavioral Management Unit (BMU)……………………………………………………50
Ch. 3 Sec 4.0:    The Rincon Mental Health Program ……………………………………………………52

## Chapter 4 – Reporting and Forms

Ch. 4 Sec 1.0:    Mental Health  Limits of Confidentiality (Consents)……………………………………54
Ch. 4 Sec 2.0:    Mental Health Treatment Plans…………………………………………………………56
Ch. 4 Sec 3.0:    Interstate Compact Consent for Mental Health Evaluation…………………………………58
Ch. 4 Sec 4.0:    Mental Health Evaluation Prior to Hepatitis C Treatment……………………………………59
Ch. 4 Sec 5.0:    Psychological Autopsy………………………………………………………………………60

## Chapter 5 – Psychiatry

Ch. 5 Sec 1.0:    Psychiatric Prescription Duration………………………………………………………62
Ch. 5 Sec 2.0:    Registered Nurse Interim Follow-up……………………………………………………63
Ch. 5 Sec 3.0:    Continuation of Psychiatric Medications for Reception Inmates…………………………65
Ch. 5 Sec 4.0:    Managing Medication Distribution During Watch and Post-Watch……………………………67
Ch. 5 Sec 5.0:    Protocols for Referral of Inmates for Psychiatric Services…………………………………68
Ch. 5 Sec 6.0:    Voluntary, Involuntary, and Emergency Use of  Psychiatric Medications………………69
Ch. 5 Sec 7.0:    Protocols for Psychiatric Services at Non-Corridor Complexes………………………………76
Ch. 5 Sec 8.0:    Inmate Follow-up After Discontinuation of Psychiatric Medication… …………………78
Ch. 5 Sec 9.0:    Antipsychotic Medication Protocol…………………………………………………………79
Ch. 5 Sec 10.0:   Management of Photosensitivity Reactions to Medications……………………………80
Ch. 5 Sec 11.0:   Management of Heat Intolerance Reactions to Medications……………………………81
                  Signature Page………………………………………………………………………82

ADC Mental Health Technical Manual - Revised 4/18/14          3
Appendix G of the Health Service Technical Manual

| | Administration of Mental Health Services | OPR:<br>Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>   Chapter 1<br>   Section  1.0 | Supersedes:<br>   MHTM 1/1/14<br>Effective Date:<br>   4/18/14 |

**Purpose**:  Arizona Department of Corrections, mental health services shall be administrated through the Vendor contracted to provide health services.  These services will be monitored by the Health Services Monitoring Bureau.  The day-to-day operation of mental health services is assigned to the local Facility Health Administrator, who operates within ADC Department Orders and under the provisions of the Mental Health Technical Manual (MHTM).

**Responsibility**:  The responsibility for the management of mental health service provision within the Department is jointly shared by the relevant mental health personnel identified in this policy. The Vendor will be required to designate individuals to perform the following roles:

1.0     Definitions of Roles

1.1     Mental Health Program Director (MHPD) – The person designated to plan and direct mental health services provided to all inmates of the Arizona Department of Corrections.

1.2     Director of Psychiatry - The person designated to provide clinical supervision to staff Psychiatrists and Psychiatric Nurse Practitioners (P/PNP), or any other provider prescribing psychotropic medications. This individual develops policy related to the delivery of psychiatric services and psychotropic medication use.

1.3     Director of Nursing (DON) – The person designated to plan and direct nursing services provided to all inmates of the Arizona Department of Corrections.

1.4     Facility Health Administrator (FHA) – That person designated to provide day-to-day direction to all health services at an ADC complex/facility.

1.5     Clinical Director – The person designated to coordinates the day-to-day operation of the licensed mental health facility (to include all units located at ASPC-Phoenix) and reports to the MHPD.

ADC267380

ADC Mental Health Technical Manual - Revised 4/18/14          4
Appendix G of the Health Service Technical Manual

1.6     Lead Psychologist – The person designated to coordinates the day-to-day operation of all mental health services and provides clinical services at the ADC complex(es) under his/her responsibility and reports to the FHA and MHPD.

1.7     Psychiatric Nurse Coordinator – The person(s) designated to provide supervision of psychiatric nursing services at ASPC-Phoenix.

1.8     Facility Director of Nursing – The person designated to the supervision of nursing services, including psychiatric nursing services, at all other complexes.

1.9     Qualified Mental Health staff - Psychologists, P/PNP, Psychology Associates, Psychology Assistants, Mental Health Therapists, Registered Nurses, Recreational Therapists, Occupational Therapists, and Psychiatric Technicians.

1.10    Alhambra Behavioral Treatment Facility (ABHTF) – including Baker Ward, and Flamenco (King, John, Ida, George, Quiet).

2.0     Local Administration of mental health services

2.1     There shall be, at each ADC complex/facility, a Mental Health Treatment Team (MHTT).  This team shall assume full responsibility for the implementation of mental health programming and services to address the mental health needs of inmates. The purpose of this team shall be to provide overall direction of mental health services at that complex/facility. Members of that team may include:

        2.1.1   The Lead Psychologist or designee,
        2.1.2   The Director of Psychiatry, or designee,
        2.1.3   The Psychiatric Nurse Coordinator (ABHTF),
        2.1.4   Other staff members may be asked to serve on the MHTT as determined by the Lead Psychologist.

2.2     The responsibilities of the Lead Psychologist, or designee, will include at a minimum:

        2.2.1   Establishing and monitoring compliance with facility mental health procedures that assure a cohesive team approach to the provision of mental health services on every yard.
        2.2.2   Ensure that there exists a procedure for a monthly (minimum) meeting of all mental health staff assigned to provide services on each yard.
        2.2.3   Ensure that mental health services and status decisions such as SMI status, mental health scores, and treatment planning are done in accordance with current policy.
        2.2.4   Development of programs and services and establishment of facility protocols for the delivery of required services to address the identified needs in keeping with Department and divisional direction.

2.2.5   Review of situations involving the delivery of mental health services to specific inmates that have not been satisfactorily resolved at a lower level and/or require a higher level of care than is locally available.

2.2.6   Responding to recommendations, directives, and requests from the Contract Vendor Administration as they relate to mental health services and issues.

2.2.7   Attend the weekly statewide teleconference.

2.3   Roles of MHTT Members:

2.3.1   Director of Psychiatry (or designee)

2.3.1.1 Serves as an expert resource to all health staff regarding psychiatric issues.

2.3.1.2 Participates in the clinical MHTT meetings.

2.3.1.3 Other duties and responsibilities as assigned by the team, the Health Services Monitoring Bureau, ADC policies, and/or Contract Vendor Administration.

2.3.2   Lead Psychologist, or designee

2.3.2.1 Serves as an expert resource to all health staff regarding psychological issues.

2.3.2.2 Coordination of the day-to-day complex/facility mental health services, to include, but not be limited to:

2.3.2.2.1   Assuring compliance with directives, goals, and procedures as established by the team or the Health Services Monitoring Bureau, ADC policies, and/or the Vendor Administrator.

2.3.3   Psychiatric Nurse Coordinator (ABHTF)

2.3.3.1 Serves as an expert resource to all health staff regarding psychiatric nursing issues.

2.3.3.2 Assures that psychiatric nursing personnel are responsive to the directives and requests of a P/PNP. This should include, but not be limited to:

2.3.3.2.1   Scheduling and maintenance of P/PNP's line.

ADC Mental Health Technical Manual - Revised 4/18/14                6
   Appendix G of the Health Service Technical Manual

      2.3.3.2.2   Acknowledging medication, laboratory, and other
                    P/PNP orders and following through as appropriate.
      2.3.3.2.3   Provides direct clinical services.

ADC267383

ADC Mental Health Technical Manual - Revised 4/18/14                    7
Appendix G of the Health Service Technical Manual

| CORRECTIONS ADC Arizona Department of Corrections | Monthly Reporting of Mental Health Statistics | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Mental Health Technical Manual | MHTM     Chapter 1     Section  2.0 | Supersedes:    Procedural Instruction    AD0005, MHTM 8/15/11 Effective Date:    1/1/14 |

**Purpose**:  To describe how mental health statistics will be collected and reported on a monthly basis.

**Responsibility**:  The Lead Psychologist (or designated staff at non-corridor complexes) at each ADC complex is responsible for completing, compiling, and forwarding the monthly mental health statistics.

1.0     At the end of each month, every mental health staff member will compile information requested by ADC and submit this to the Lead Psychologist.  The Lead Psychologist (or designee) will compile Complex wide information and submit this to the Vendor FHA (or designee).

2.0     These statistics will be forwarded to the Health Services Contract Monitoring Bureau by the 8th day of the following month.

ADC Mental Health Technical Manual - Revised 4/18/14          8
Appendix G of the Health Service Technical Manual

| CORRECTIONS ADC Arizona Department of Corrections | Psychiatric and Mental Health Peer Review | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Mental Health Technical Manual | MHTM<br>Chapter 1<br>Section 3.0 | Supersedes:<br>    Procedural Instruction AD0002, MHTM 1/1/14<br>Effective Date:<br>    4/18/14 |

**Purpose**:   To provide a standardized peer review procedure for the assurance of the quality of care and content of records for each mental health staff person to include Psychiatrists and psychiatric Nurse Practitioners.

**Responsibility**:   It is the responsibility of each Lead Psychologist (or designee) to ensure that all mental health staff members receive a peer review annually.

1.0     Psychology Peer Reviews

1.1     Each supervisor shall, on an annual basis, conduct a thorough review of the mental health section of five (5) inmate medical records for each mental health staff member they supervise and complete the Peer Review Checklist.

1.2     The mental health section will be reviewed completely, to include the:

1.2.1   Quality of service delivery

1.2.2   Thoroughness of assessment

1.2.3   Follow-up

1.2.4   Referrals made for mental health services/programs (when needed)

1.2.5   Treatment planning

1.2.6   Adherence to documentation timeframes

1.2.7   Quality of documentation (legibility, format, inclusiveness, appropriateness of notes, etc.) shall be noted and discussed with supervisee

1.3     Additionally the record as a whole shall be reviewed for elements such as: SMI designation (brown tag in a paper medical record), completeness of problem list, MH score, SMI checklist, informed consents, etc.

1.4     The supervisor will provide each staff member a copy of the Peer Review Checklist for each review completed.

1.5     The staff member will have thirty (30) days to correct any deficiencies and return the form.

1.6     When corrections are completed, the form is to be signed and returned to the supervisor.

2.0   Psychiatry Peer Reviews

2.1     Each supervising Psychiatrist shall, on an annual basis, conduct a thorough review of five (5) inmate medical records for each P/PNP member they supervise and complete the Peer Review Checklist.

2.2     The mental health section will be reviewed completely, to include the:

2.2.1   Medical and mental health SOAPE notes
2.2.2   Medication sheets/orders
2.2.3   Lab work/reports
2.2.4   X-rays
2.2.5   Consultations
2.2.6   HNRs for the  six (6) month period prior to the review

2.3     The review should focus on the preceding ninety (90) to one-hundred and eighty (180) days if possible.

2.4     The records being reviewed will include at least three (3) chosen at random, from the provider's caseload, and may include up to two (2) chosen at the supervisor's discretion.

2.5     The records of the supervisor shall be reviewed according to the following:

2.5.1   The Complex FHA will randomly select two (2) records for psychiatric review and forwarded to the Director of Psychiatry, or designee, for review. The material to be reviewed will include:

2.5.1.1 All SOAPE notes
2.5.1.2 Mental health records
2.5.1.3 Lab work
2.5.1.4 X-ray

ADC Mental Health Technical Manual - Revised 4/18/14          10
    Appendix G of the Health Service Technical Manual

    2.5.1.5 Consultations
    2.5.1.6 HNRs for the six (6) month period prior to the review

2.6    For each medical record reviewed, information gathered shall be recorded on the appropriate Psychiatric Peer Review Form.

    2.6.1   Reviewing Psychiatrists are to retain all copies of reviews.

2.7    A formal peer review or case review may be requested relative to inmate health care by the ADC Monitoring Bureau or the Vendor Administration.

2.8    In those complexes which do not have a supervising Psychiatrist, peer reviews will be completed by the Director of Psychiatry.

ADC267387

ADC Mental Health Technical Manual - Revised 4/18/14        11
Appendix G of the Health Service Technical Manual

|  | Medical Records Review for Inmate Arriving on Unit | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>    Chapter 1<br>    Section  4.0 | Supersedes:<br>    Procedural Instruction, TR0003, MHTM 1/1/14<br>Effective Date:<br>    4/18/14 |

**Reference**:  NCCHC MH-E-03

**Purpose**:   This procedure is intended to ensure that each inmate's medical record shall be reviewed by qualified health care professionals upon arrival at a new complex.  This information will be used to alert mental health staff about significant issues for each new inmate on-unit.

**Responsibility**: Assigned mental health/medical personnel completing the medical record reviews are responsible for ensuring the continuity of mental health services and making referrals for further health services when indicated.

1.0     Procedure

    1.1     The review of medical records shall:

        1.1.1    Be completed by assigned medical/mental health staff on unit.

        1.1.2    Be documented in the inmate's medical record by the reviewing staff.

        1.1.3    Include any additional documentation regarding referrals to specialized health care services relating to mental health programming, and

        1.1.4    Will be completed within twelve (12) hours of an inmate's arrival at a new complex.

    1.2     The record review shall consist of the following:

        1.2.1    Problem List – if the below information is not on the Problem list, the reviewer will add the information

            1.2.1.1 Current mental health score and need level

            1.2.1.2 SMI status

ADC Mental Health Technical Manual - Revised 4/18/14    12
    Appendix G of the Health Service Technical Manual

    1.2.1.3 Suicide history (if any)

    1.2.1.4 Diagnosis

1.2.2   Initial (intake) mental health assessment

1.2.3   Mental health section

1.3    In the event that the review was done by medical staff, the information resulting from the record review will be made available to the mental health staff on the inmate's receiving unit within one (1) working day.   The mental health staff will review all record reviews each day they are on site.

ADC267389

ADC Mental Health Technical Manual - Revised 4/18/14          13
Appendix G of the Health Service Technical Manual

| | Weekly Mental Health Teleconference | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>    Chapter 1<br>    Section  5.0 | Supersedes:<br>    MHTM 8/15/11<br>Effective Date:<br>    1/1/14 |

**Purpose**:  To provide for on-going, effective, and timely communication between mental health staff at the Alhambra Behavioral Health Treatment Facility (ABHTF) and all other complexes/facilities regarding inmates who may require intensive mental health treatment.

**Responsibility**: The Clinical Director, or designee, is responsible for moderating the content and direction of the weekly mental health teleconference.

1.0     It is the policy of the Arizona Department of Corrections that a regularly scheduled weekly teleconference will be held with the ABHTF mental health staff and other complex/facility mental health staff as outlined below. The purpose of the teleconference is to discuss:

    1.1     The mental health treatment needs of inmates being referred to or from ABHTF.

    1.2     In a consultative manner, the provision of mental health care services and/or mental health care programming options with regards to difficult cases.

2.0     The Clinical Director of ABHTF, or designee, will conduct and chair the weekly telephone conference.

    2.1     To participate in the teleconference, mental health staff will dial a phone number designated for the teleconference.

        2.1.1   If an alternate number is needed, the Clinical Director of ABHTF, or designee, will provide this number to the appropriate mental health personnel no less than twenty-four (24) hours prior to the teleconference.

    2.2     The Lead Psychologists at ASPC-Perryville, ASPC-Phoenix, ASPC-Tucson, ASPC-Eyman, ASPC-Lewis, ASPC-Florence, and other facilities as needed (including the non-corridor complexes and private prisons), will assure participation by at least one licensed clinical Psychologist (or designee) from their facility.

ADC Mental Health Technical Manual - Revised 4/18/14                    14
Appendix G of the Health Service Technical Manual

2.3    When admission to ABHTF is being considered, or when a review of an inmate
       treatment is indicated, the Teleconference Presentation Form will be completed
       by staff in advance of the meeting and forwarded to the Clinical Director a
       minimum of twenty-four (24) hours before the scheduled teleconference.

2.4    A record of the topics discussed during the teleconference will be kept by the
       Clinical Director and will be forwarded to the Lead Psychologist at their
       respective units.  Inmates awaiting a transfer to Baker Ward will have a status
       update included in the weekly meeting notes provided to each of the Lead
       Psychologists.

2.5    In the event that a teleconference has to be cancelled or re-scheduled, the Clinical
       Director of ABHTF will notify the Lead Psychologists.

ADC267391

ADC Mental Health Technical Manual - Revised 4/18/14      15
Appendix G of the Health Service Technical Manual

| | Movement of Mental Health Inmates | OPR:<br>Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>  Chapter 1<br>  Section  6.0 | Supersedes:<br>  MHTM 1/1/14<br>Effective Date:<br>  4/18/14 |

**Purpose**:  To facilitate the timely transfer of inmates, in a manner consistent with their mental health needs.

**Responsibility**:  This is a shared responsibility, with the sending and receiving complexes, Primary Clinicians, and Lead Psychologists accountable for sharing information with relevant staff members.

1.0     The Lead Psychologist, or designee, shall:

  1.1     Call or E-mail the Central Office Movement Corrections Officers IVs, or their designees, to confirm the receiving unit has a bed available on the desired unit.

2.0     Transfer to specialized mental health programs

  2.1     Movement into and out of specialized mental health programs (e.g., ABHTF, MTU/ WTU, BMU) shall be requested by the Lead Psychologist, or designee, at that specialized mental health program.

  2.2     These requests for movement to and from specialized mental health programs shall also be copied to relevant Offender Operations staff (e.g., Deputy Warden for Operations, Deputy Warden, Major, and Captain) and to the FHAs at the sending and receiving complexes.

3.0     Transfers from Non-Corridor Complexes

  3.1     Movement of inmates from non-corridor to corridor complexes (e.g., for placement on precautionary watch or because of a change in mental health score) shall be requested by the Lead Psychologist, or designee, responsible for the non-corridor complex.

  3.2     Call or E-mail the Central Office Movement Corrections Officers IVs, or their designees, to confirm the receiving unit has a bed available on the desired unit.

ADC267392

ADC Mental Health Technical Manual - Revised 4/18/14     16
Appendix G of the Health Service Technical Manual

3.3     These requests for movement from non-corridor to corridor complexes shall also
be copied to relevant Offender Operations staff (e.g., Deputy Warden for
Operations, Deputy Warden, Major, and Captain) and to the FHAs at the non-
corridor and corridor complexes.

| | Mental Health Urgent Responder Protocols | OPR:<br>Assistant Director Health Services<br>Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>    Chapter 1<br>    Section  7.0 | Supersedes:<br>    Procedural Instruction<br>AD0007, MHTM 1/1/14<br>Effective Date:<br>    4/18/14 |

**Purpose**:   To provide guidance and procedure regarding the operation of after hours, nights, and holiday Mental Health Urgent Response.

**Responsibility**:   All Mental Health Urgent Responders are responsible for the duties outlined in the below policy.

1.0     Scheduling

    1.1     Each eligible mental health staff member will receive training from their supervisor in urgent response procedures.  This will be documented in their personnel file.

    1.2     Upon completion of the orientation to the Urgent Response procedures, each trained staff person will be scheduled on the Urgent Response on a regular basis.

    1.3     Assigned duty for the primary Urgent Responder runs from 1700 each Tuesday until 1659 the following Tuesday.   If an Urgent Responder is unable to complete their assigned week they are required to:

        1.3.1     Contact other Urgent Response providers to arrange coverage for their absence (swapping of assigned shifts requires the prior approval of the MHPD).

        1.3.2     Contact the MHPD, or designee, in emergency/short notice situations where arranging alternate coverage is unrealistic.

2.0     Mental Health Urgent Response Procedure

    2.1     When an Urgent Responder is contacted from any complex, the Urgent Responder shall respond within ten (10) minutes. The call shall be placed by an on-duty nurse who is familiar with the current inmate crisis. In the event that a nurse is

ADC Mental Health Technical Manual - Revised 4/18/14          18
Appendix G of the Health Service Technical Manual

unavailable to make the call, security staff will place the inmate on a temporary
constant watch until a nurse can be located.

2.2     The Urgent Responder shall obtain all available relevant information regarding
        the corresponding situation.

2.3     If a placement on a watch is indicated, the Urgent Responder shall place the
        inmate on either a Continuous Suicide Watch or 10" Suicide Watch. The use of
        the 30" Mental Health Watch shall not be used in an urgent response situation.
        Refer to Chapter 2, Section 6.0.

2.4     If a placement on a watch is indicated, the on-duty nurse must complete the
        Mental Health Disposition (Form #1103-44) with the instructions provided by the
        Urgent Responder.

2.5     The Urgent Responder shall contact the Psychiatric Urgent Responder when
        psychotropic medication intervention is required (with the exception of ABHTF,
        who can contact the Psychiatric Urgent Responder directly).

2.6     On-duty nursing staff shall document the crisis, the reason for the watch, and the
        name of the Urgent Responder that was contacted along with their
        recommendations.

ADC267395

| | Supervision of Unlicensed Mental Health Staff | OPR:<br>Assistant Director Health Services<br>Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>    Chapter 1<br>    Section 8.0 | Supersedes:<br>    Procedural Instruction AD0009,<br>MHTM 1/1/14<br>Effective Date:<br>    4/18/14 |

**Purpose**:   To provide direction and procedure regarding mental health program staff not licensed to practice independently. Outlined in this policy are elements pertaining to the clinical supervision of such individuals by licensed mental health staff to ensure minimum mental health care requirements are met.

**Responsibility**: It is the responsibility of the Lead Psychologist to ensure that all Psychologists who supervise unlicensed mental health staff personnel abide by the clinical supervision requirements outlined in the below policy.

1.0    Definitions

1.1    Psychologist means an individual independently licensed within the state of Arizona who can use the title Psychologist as defined in A.R.S. 32-3601 and A.A.C. Title 4, Chapter 26.

1.2    Psychology Associate or Psychology Assistant means an individual who has obtained a master's level or doctoral level degree in a mental health field, and provides mental health services to offenders confined to ADC.

1.3    Unlicensed master's level and doctoral level staff members must be in the process of obtaining a license in their field, and obtain a license within 18 months of their start date.

1.4    Unlicensed master's level or doctoral level staff members are required to participate in clinical supervision under the direction of a Psychologist or designee.

1.4.1    All clinicians who do not have an active Arizona license will obtain a countersignature by a licensed Psychologist on every clinical contact (group and individual notes, treatment plans, etc.).

ADC267396

ADC Mental Health Technical Manual - Revised 4/18/14          20
Appendix G of the Health Service Technical Manual

1.5    Licensed master's level staff members, not required by statute or licensure board, may also be afforded supervision.

1.6    Other mental health staff shall be provided with supervision as indicated (e.g., Psychiatric Technicians, Recreational or Occupational therapists, etc.).

1.7    Supervision means face-to-face, videoconferencing or telephonic direction or oversight provided by a qualified individual to evaluate, guide and direct all behavioral health services, to include psycho-educational programming, to assist an unlicensed or licensed provider in increasing their necessary knowledge, skills, techniques and abilities needed to provide behavioral health services ethically, safely and competently.

2.0    Clinical supervision duration and type for each unlicensed staff member will be conducted in accordance with their respective boards or regulatory agencies:

2.1    Supervision may be conducted in either a group or individual format.

3.0    Clinical Supervision shall be documented and records kept by the supervisor.

|  Arizona Department of Corrections | Initial Mental Health Assessment | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Mental Health Technical Manual | MHTM Chapter 2 Section 1.0 | Supersedes: MHTM 1/1/14 Effective Date: 4/18/14 |

**Reference:** NCCHC MH-E-02

**Purpose:** This procedure is to ensure that all inmates, upon their arrival in the Arizona Department of Corrections, have a mental health assessment completed. This assessment will be used to assist in decisions regarding classification, placement and need level for further mental health services and/or programming.

**Responsibility**: Mental health staff assigned to the Alhambra and Perryville reception centers specifically, as well as mental health staff at all complexes where inmates are received directly from the community or county, federal and other facilities are responsible to assess and determine individual mental health needs.

1.0    Procedure

1.1    Within two (2) days of an inmate's arrival at the Arizona Department of Corrections, a qualified mental health staff will evaluate the inmate and complete the 14-Day Assessment (Form #1103-27).

1.1.1    If an Initial Mental Health Assessment is not completed by licensed mental health staff, then the completed assessment will be reviewed by licensed mental health staff within one (1) business day.

1.2    The completed assessment will be located in the inmate's Medical Record (under the Problem List in a paper record).

1.3    The qualified mental health staff will update DI 85 in AIMS accordingly. If the form needs to be reviewed by a licensed mental health staff, then the DI 85 screen will only be updated after the review has occurred.

1.4    If an inmate does not receive the assessment at the Reception Center, the receiving facility will complete the assessment within these two (2) days.

ADC Mental Health Technical Manual - Revised 4/18/14          22
Appendix G of the Health Service Technical Manual

1.5     If the inmate is not able to engage in the initial assessment (e.g., intoxicated, floridly psychotic, etc.), basic information will be gathered to determine the need for a mental health watch and will be documented in the mental health record.

        1.5.1    The initial assessment will be completed when the inmate is able to meaningfully engage in the assessment process.

ADC267399

ADC Mental Health Technical Manual - Revised 4/18/14          23
Appendix G of the Health Service Technical Manual

| CORRECTIONS ADC — Arizona Department of Corrections | Levels of Mental Health Services Delivery | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Mental Health Technical Manual | MHTM Chapter 2 Section  2.0 | Supersedes:     Procedural Instruction TR0001, MHTM 1/1/14 Effective Date:     4/18/14 |

**Purpose**:   To provide a standardized system of inmate mental health need identification that is consistent with both established standards of mental health care and the mental health needs of incarcerated individuals.

**Responsibility**: It is the responsibility of the inmate's assigned mental health provider(s) on-unit to ensure that inmates with identified mental health needs are provided services in accordance with the minimum level of service delivery outlined below.

1.0     Mental Health Service Delivery

   1.1     **MENTAL HEALTH** 1

      1.1.1     Inmates who have no history of mental health issue or treatment. These inmates will not be regularly monitored by mental health staff, but may request mental health services in accordance with the HNR protocols.

      1.1.2     The inmate's mental health score may be increased when clinically indicated based upon the treating clinician's assessment of the quality of the inmate's current functioning.

      1.1.3     Inmates designated as MH-1 are able to eligible for all movement and occupations.

   1.2     **MENTAL HEALTH 2**

      1.2.1     Inmates who do not currently have mental health needs and are not currently in treatment but have had treatment in the past. These inmates will not be regularly monitored by mental health staff, but may request mental health services in accordance with the HNR protocols.

1.2.2   The inmate's mental health score may be increased when clinically indicated based upon the treating clinician's assessment of the quality of the inmate's current functioning.

1.2.3   Inmates classified as MH-2 must have demonstrated behavioral and psychological stability for at least six (6) months.

1.2.4   Inmates with suicide attempt histories shall be evaluated on a case-by-case basis as well. Inmates with verified serious suicide attempts shall be classified as MH-2 or greater.

1.2.5   Inmates designated as MH-2 are able to eligible for all movement and occupations.

## 1.3   MENTAL HEALTH 3

1.3.1   Inmates with Mental Health needs, who require current outpatient treatment.

1.3.2   Inmates meeting this criterion will be divided into four (4) categories. These categories will be notated in the record used for AIMS classification, and may change during each interaction with the inmate as their condition warrants:

    1.3.2.1   **Category A:** Inmates in acute distress who may require substantial intervention in order to remain stable (Example: A floridly psychotic or delusional inmate with current or frequent suicidal ideation, or currently under a PMRB.) All inmates classified as SMI in ADC and/or the community will remain a Category A (or MH-4 and MH-5 if in specialized mental health program). Category A Inmates shall be seen at a minimum every thirty (30) days in either a clinical group or individual session.  All inmates on medications will be seen at a minimum by a P/PNP every ninety (90) days, unless under a PMRB (then a minimum of every thirty (30) days).

    1.3.2.2   **Category B:** Inmates who may need regular intervention but are generally stable and participate with psychiatric and psychological interventions. (Example: An inmate with a major depressive or other affective disorder who benefits from routine contact with both psychiatry and psychology staff.) Category B Inmates shall be seen at a minimum every one hundred and eighty (180) days by a P/PNP and also every ninety (90) days by a mental health clinician in a group or individual session.

ADC267401

    1.3.2.3 **Category C:** Inmates who need infrequent intervention and have adequate coping skills to manage their mental illness effectively and independently. (Example: An inmate with a general mood or anxiety disorder who has learned to manage their symptoms effectively through the use of medication and infrequent contact with mental health staff.) Category C Inmates shall be seen at a minimum every one hundred and eighty (180) days by P/PNP. Category C Inmates shall by seen by a mental health clinician by HNR or upon referral.  If an inmate is determined to be in this category, the mental health clinician must include a detailed note indicating the justification for the C Category.  No inmate currently placed in detention or Maximum Custody shall be classified as 3C.

    1.3.2.4 **Category D:**  Inmates who have been recently taken off of psychotropic medications require follow up to ensure stability over time.  Inmates shall be seen at a minimum every ninety (90) days by a mental health clinician (or every thirty (30) days if in detention or Maximum Custody), for at least a six (6) month period.  At which time, if the inmate demonstrates sufficient stability, the MH score may be changed to an MH-2.

1.3.3   Individual sessions by mental health clinicians will not be conducted at the inmate's cell front, and will be conducted in a private, confidential setting.

1.3.4   A new treatment plan is developed for all categories upon their arrival at their receiving facility.  If a treatment plan already exists, then it will be updated upon their arrival.

    1.3.4.1 This treatment plan will be updated at a minimum of every twelve (12) months, or as the inmate's condition warrants.  Refer to 1.6 of this section regarding treatment plan updates for SMI inmates.

1.3.5   A Mental Health Treatment Staffing will occur as clinically indicated, and will be documented on a staffing note (Form #1103-69).

1.3.6   Any inmate who engages in self-harm gestures/attempts will be made a MH-3 until stability is demonstrated to be reduced to a MH-2.

    1.3.6.1 If an inmate requires being placed on watch, but there was no actual self-harm event, then the clinician shall write a detailed note indicating the reasons the MH score was not increased to MH-3.

1.3.7   If housed in segregated housing, all mental health inmates will receive mental health contacts a minimum of once every thirty (30) days, or more

often as clinically indicated by mental health clinicians. This includes those segregated from general population and who receive services and activities apart from other inmates (administrative/ disciplinary segregation or maximum custody unit).

## 1.4    MENTAL HEALTH 4

1.4.1    Inmates who are admitted to a specialized mental health program outside of inpatient treatment areas (MTU/WTU, BMU, Rincon Mental Health Program, SMA, Florence and Eyman Maximum Custody programs).

1.4.1.1 A new treatment plan is developed for all inmates.

1.4.1.1.1    This treatment plan will be updated minimally every ninety (90) days, or more often as clinically indicated.

1.4.1.2 A Mental Health Treatment Staffing as clinically indicated, and documented on a staffing note (Form #1103-69).

1.4.1.3 Inmates are to participate in structured program activities on a weekly basis. The mental health clinician will provide services consistent with description of the program the inmate is participating in.

1.4.1.4 Upon discharge, these inmates require placement in a corridor facility. Inmate's score is to remain an MH-4 until he/she is transferred to the receiving unit. The receiving unit's clinician will change the mental health score to reflect his/her current placement and level of functioning.

1.4.1.5 Inmates participating in a structured mental health program will be seen by a P/PNP a minimum of every ninety (90) days.

## 1.5    MENTAL HEALTH 5

1.5.1    Inmates with mental health needs who are admitted to an inpatient psychiatric treatment program (Baker Ward and FMHC).

1.5.1.1 An initial treatment plan is written upon admissions, and a new inpatient treatment plan is developed within thirty (30) days of admissions.

1.5.1.1.1    This treatment plan will be updated minimally every ninety (90) days, or more often as clinically indicated.

1.5.1.2 A Mental Health Treatment Staffing as clinically indicated, and documented on a staffing note (Form #1103-69).

1.5.1.3 The mental health clinician will conduct weekly 1:1 contacts, or more often as clinically indicated.

1.5.1.4 Upon discharge, these inmates require placement in a corridor facility.  Inmate's score is to remain an MH-5 until he/she is transferred to the receiving unit.  The receiving unit's clinician will change the mental health score to reflect his/her current placement and level of functioning.

1.5.1.5 Inmates admitted to an inpatient psychiatric treatment program will be seen by a P/PNP a minimum of every thirty (30) days.

## 1.6    SERIOUSLY MENTALLY ILL (SMI)

1.6.1   All inmates designated SMI (as defined in MHTM Chapter 2, Section 2.0) will:

1.6.1.1 Be designated a MH-3A, MH-4, or MH-5 based on their current program placement.

1.6.1.2 All inmates who have been confirmed as SMI in the community will also be maintained as SMI in ADC.

1.6.1.3 Have a treatment plan in the medical record.

1.6.1.3.1   Treatment plans for SMI inmates shall be reviewed/ updated every ninety (90) days.

1.6.1.4 All SMI inmates will be seen by a P/PNP a minimum of every ninety (90) days, unless under a PMRB order, then they will be seen a minimum of every thirty (30) days.

1.6.2   Health Planning Coordinators, or designee, shall refer all SMI inmates to community mental health agencies for evaluation prior to release to ensure continuity of mental health care services for SMI.

1.6.3   SMI Inmates in Segregation

1.6.3.1 Mental health staff will visit SMI inmates placed in a maximum custody cell (including detention) within twenty-four (24) hours of notification by the shift commander.  If this occurs on a weekend or holiday, then this duty will be performed by a nurse, in consultation with mental health staff.

ADC Mental Health Technical Manual - Revised 4/18/14    28
Appendix G of the Health Service Technical Manual

1.6.3.2 Mental health staff or medical staff with specialized mental health training shall visit SMI inmates in detention/maximum custody three (3) times a week.

Attachment 2-2.0A

| MH score | Treatment Plan | MH score and Sub-code changes | Face-to-Face meetings |
|---|---|---|---|
| 1 | Not Applicable | Changed: As clinically indicated | By HNR |
| 2 | Not Applicable | Changed: As clinically indicated | By HNR |
| 3 (See categories below) | Developed: Upon Diagnosis<br><br>Reviewed: A minimum every 12 months or every 90 days for SMI | Updated: As clinically indicated | MH staff:  See below<br><br>Psychiatry staff:  See below |
| **Categories can change at each interaction with the inmate as their condition warrants.** | | | |
| Category A | Inmates in acute distress who may require substantial intervention in order to remain stable (Example: A floridly psychotic or delusional inmate with current or frequent suicidal ideation, or currently under a PMRB.) All inmates classified as SMI in ADC and/or the Community will remain a Category A. | | MH clinician or Psychiatry: minimum 30 Days Psychiatry:   minimum 30 or 90 days |
| Category B | Inmates who may need regular intervention but are generally stable and participate with psychiatric and psychological interventions. (Example: An inmate with a major depressive or other affective disorder who benefits from routine contact with both psychiatry and psychology staff.) | | MH clinician: minimum 90 days Psychiatry: minimum 180 days |
| Category C | Inmates who need infrequent intervention and have adequate coping skills to manage their mental illness effectively and independently. (Example: An inmate with a general mood or anxiety disorder who has learned to manage their symptoms effectively through the use of medication and infrequent contact with mental health staff.) | | Psychiatry: minimum 180days<br><br>MH clinician:  PRN or by referral |
| Category D | Inmates who have been recently taken off of psychotropic medications and require follow up to ensure stability over time. | | MH clinician: minimum 90 days, for a minimum of 6 months |
| 4 | Developed: Upon placement in program<br><br>Reviewed: Minimum every 90 days | Upon placement in the program | MH clinician: minimum 30 days<br><br>Psychiatry: minimum 90 days<br><br>Structured Activities: Weekly |
| 5 | Developed:  Upon Admission<br><br>Reviewed: Minimum every 90 days | Upon admission to inpatient facility | MH clinician: Weekly<br><br>Psychiatry: minimum 30 days |

†All MH-3, 4 or 5 inmates, if transferred to segregated housing (see definition above), will be seen by a mental health clinician a minimum of once every (30) days, or more often as clinically indicated thereafter.

ADC267405

| | Determination and Management of Seriously Mentally Ill (SMI) Inmates | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| **Arizona Department of Corrections** | | |
| Mental Health Technical Manual | MHTM<br>    Chapter 2<br>    Section  3.0 | Supersedes:<br>    Procedural Instruction TR0002, MHTM 1/1/14<br>Effective Date:<br>    4/18/14 |

**Reference**:   MHTM Chapter 2, Section 2.0
             DO 1101.05

**Purpose**: To provide a standardized system of identifying inmates who do or do not possess SMI needs while incarcerated in ADC.

**Responsibility**: It is the responsibility of each licensed mental health professional to administer the SMI Determination Form (#1103-13) when clinically indicated in accordance with this policy.

1.0     Definition

        1.1     SMI inmates are those who:

                1.1.1   According to a licensed mental health professional possess:

                        1.1.1.1 A qualifying mental health diagnosis as indicated on the SMI Determination Form.
                        1.1.1.2 A severe functional impairment directly relating to their mental illness.

2.0     SMI Status Conditions

        2.1     An inmate will be denied the SMI in ADC designation if he/she fails to satisfy all the criteria identified in Section 1.1 through 1.1.1.3, but shall receive an additional SMI screening as clinically indicated.

        2.2     All inmates previously determined to be SMI in the community shall also be designated as SMI in ADC.  This will not be based on self-report, but will need to be verified with the community provider.

ADC267406

ADC Mental Health Technical Manual - Revised 4/18/14                    30
Appendix G of the Health Service Technical Manual

2.3     Minimum mental health service delivery levels for SMI inmates will be
        determined by the inmate's mental health score and category in accordance with
        MHTM Chapter 2, Section 2.0.  They will be designated as a MH-3A, MH-4 or
        MH-5.

3.0     SMI Identification

3.1     The inmate's medical record shall be flagged (brown tag in a paper record) by
        mental health staff to identify the inmate as SMI.

3.2     The SMI designation shall be indicated on the Problem List in the inmate medical
        record.

3.3     Designations of both SMI in ADC (SMI) and SMI in the community (SMI/C)
        shall be recorded on the DI 85 screen of AIMS.

3.4     SMI inmates shall be exempt from medical and mental health charges.

ADC267407

ADC Mental Health Technical Manual - Revised 4/18/14                    31
Appendix G of the Health Service Technical Manual

| | Mental Health Contacts for Inmates After Reception | OPR:<br>Assistant Director Health Services<br>Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>    Chapter 2<br>    Section  4.0 | Supersedes:<br>    New<br>Effective Date:<br>    4/18/14 |

**Reference:**  NCCHC MH-E-02

**Purpose:**  To provide standardization of timeframes for the initial clinical contact after an inmate is received by the Arizona Department of Corrections.

**Responsibility:**  It is a shared responsibility between the mental health team at Alhambra and the mental health team at the receiving facilities.

1.0 Procedure

    1.1 After the initial assessment is completed at Reception (Form #1103-27), all MH-3 inmates will be tracked by the mental health team at Alhambra/Perryville.

    1.2 These inmates will be routinely monitored for movement out to a Complex, and the staff working at Reception will notify the receiving facilities.

        1.2.1   It is also the responsibility of the receiving facilities to monitor daily all inmates who are arriving and leaving from their Complex.

    1.3 Those inmates who quickly move to another facility will be seen by the receiving facility's mental health clinician within fourteen (14) days of arrival to the Department.

        1.3.1   This contact will be completed in a private setting by a Psychologist or Psychology Associate.

    1.4 Those inmates who remain at Reception longer than seven (7) days will be seen by a mental health clinician from Alhambra/Perryville.

        1.4.1   This contact will be completed in a private setting by a Psychologist or Psychology Associate.

ADC Mental Health Technical Manual - Revised 4/18/14          32
Appendix G of the Health Service Technical Manual

| | Triage for Health Needs Requests | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>   Chapter 2<br>   Section  5.0 | Supersedes:<br>   Procedural Instruction TR0005, MHTM 1/1/14<br>Effective Date:<br>   4/18/14 |

**Reference**: DO 1101

**Purpose**:   To provide direction regarding the assessment and immediacy of mental health issues submitted via Health Needs Requests (HNRs).  This also includes requests made at reception areas.

**Responsibility**:   Medical staff triaging HNRs are responsible for making necessary referrals to mental health staff when appropriate. It is the responsibility of the mental health staff receiving requests for services to respond within the guidelines outlined in Department Order 1101.

2.0 Inmates with emergency mental health issues will be seen by nursing staff immediately upon receipt of the HNR.

3.0 Inmates with urgent medication issues (e.g., serious medication side effects or lack of receiving prescribed medications) will be seen by nursing staff within twenty-four (24) hours of HNR triage.

4.0 Inmates with urgent non-medications issues describing serious mental health symptoms will be seen by either nursing or mental health staff within twenty-four (24) hours of receipt of the HNR.

4.0     Inmates with routine non-medication issues will be forwarded to appropriate mental health staff, and will be responded to within five (5) working days with a specific plan of action.

5.0     Inmates with routine medication issues will be referred to a P/PNP, and seen within fourteen (14) days.

ADC267409

ADC Mental Health Technical Manual - Revised 4/18/14          33
Appendix G of the Health Service Technical Manual

| CORRECTIONS ADC Arizona Department of Corrections | Mental Health Service Delivery for Minors | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Mental Health Technical Manual | MHTM Chapter 2 Section 6.0 | Supersedes: MHTM 1/1/14 Effective Date: 4/18/14 |

**Purpose**: To outline protocols for the management and mental health services provision to minor inmates (younger than 18 years of age) charged to the custody of ADC.

**Responsibility**: Mental health staff assigned to a Minor Reception area are responsible for the mental health care needs of such inmates in accordance with the procedures identified in this section.

1.0    Procedure

1.1    Within two (2) business days of a minor inmate's arrival at a reception facility, the assigned mental health clinician shall meet with the minor inmate.

1.2    Mental health staff shall conduct a clinical interview and an intellectual assessment to determine if mental health or substance abuse problems are present and may require intervention.

1.2.1    The clinical interview shall include a Mental Status Exam.

1.2.2    The findings from the clinical interview and assessment shall be documented immediately in the mental health section of the minor inmate's medical record.

1.2.3    When appropriate, the mental health clinician shall promptly refer minor inmates to the P/PNP for assessment.

1.3    In the event that a psychological evaluation of a minor inmate has been conducted and is available for immediate review, additional psychological testing shall be waived unless deemed necessary by the mental health clinician.  This evaluation must have been completed within the past six (6) months.

1.3.1    A note documenting this previous evaluation and briefly describing its findings shall be made in the mental health section of the medical record.

1.4     The Minor's Unit Psychologist shall determine if additional testing is needed in the following areas:

   1.4.1   Psychopathology

   1.4.2   Personality functioning

   1.4.3   Neuropsychological functioning

   1.4.4   Intellectual functioning

1.5     The results of psychological testing shall be documented in the mental health section of the medical record.

   1.5.1   Psychological assessment reports shall include, at a minimum, identifying data, reason for referral, mental health history, current findings, and recommendations.

   1.5.2   Reports of psychological testing may be documented either in a SOAPE format or in the form of a psychological assessment report.

   1.5.3   Reports of any psychological testing shall be signed or counter-signed by a licensed Psychologist.

1.6     In the event that a minor inmate is non-English speaking, an accommodation will be made to conduct the interview and psychological testing in the minor's native language, to the extent feasible.

1.7     Minor inmates with a Mental Health Score of 3 will be seen every thirty (30) days by a mental health clinician, regardless of their current Category.

1.8     Minor inmates on psychiatric medications will be seen a minimum of every ninety (90) days by a P/PNP.

ADC267411

ADC Mental Health Technical Manual - Revised 4/18/14          35
Appendix G of the Health Service Technical Manual

| | Mental Health Watch Protocol | OPR:<br>Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>Chapter 2<br>Section 7.0 | Supersedes:<br>    MHTM 1/1/14<br>Effective Date:<br>    4/18/14 |

**Reference**:  DO 1103. 07
              DO 807

**Purpose**:  To provide direction regarding assigning and movement between the appropriate level of mental health watch to inmates displaying suicidal ideation, suicidal gestures, and/or bizarre behavior.

**Responsibility**:   It is the responsibility of all health staff to assign the appropriate level of mental health watch to inmates in crisis.

1.0    Continuous Watch:

    1.1    Mental health staff shall order a Continuous Watch when an inmate has demonstrated signs or symptoms of significant mental disorder and is acting in a manner indicating imminent suicide risk or risk to others due to a mental illness.

        1.1.1    This watch is for inmates whose mental status has deteriorated and are considered actively suicidal.  Any gesture or attempt to self-harm will necessitate a continuous watch for a minimum of twenty-four (24) hours.

2.0    10 Minute Watch:

    2.1    Mental health staff shall order a Ten (10) Minute Watch when an inmate has demonstrated signs or symptoms of significant mental disorder and is acting in a manner indicating high suicide risk and/or risk to others due to a mental illness.

        2.1.1    Any verbal or written communication indicating suicidal ideation by the inmate shall, at a minimum, necessitate a Ten (10) Minute Watch.

ADC Mental Health Technical Manual - Revised 4/18/14                    36
Appendix G of the Health Service Technical Manual

3.0     30 Minute Watch:

    3.1     Mental health staff shall order a Thirty (30) Minute Watch when an inmate has demonstrated acute signs or symptoms of significant mental health disorder, but is not acting in a manner indicating significant suicide risk.

    3.2     Thirty (30) Minute Watch shall not be used on urgent response protocols.

4.0     Only licensed mental health staff will reduce the level of observation and/or discontinue a watch.  Any health care staff can increase the level of observation based on safety concerns.

5.0     At a minimum, inmates will remain on each level of watch for a minimum of twenty-four (24) hours, and will be reduced from a higher to a lower level of observation in the following  manner:  continuous watch, 10" watch, 30" watch, then discontinue watch.

6.0     If at any time an inmate's behavior deteriorates or suicidal ideation or gestures increases, the level of watch shall be increased according to the policy outlined above.

7.0     Refer to Arizona Department of Corrections DO 807 regarding procedural instructions for inmates requiring clinically ordered restraints.

ADC267413

| | Double-Bunking Inmates on Watch | OPR:<br>Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>  Chapter 2<br>  Section  8.0 | Supersedes:<br>  MHTM 1/1/14<br>Effective Date:<br>  4/18/14 |

**Reference**: DO 807

**Purpose:**   To provide guidelines regarding the safety review, appropriateness, and mutual decision making process between security and mental health/health services staff regarding double-bunking inmates while on ten-minute and thirty-minute watches.  There will be no double-bunking of inmates on a continuous watch.

**Responsibility**:   It is the responsibility of the security shift commander and the on-duty mental health or health services staff member to assign double-bunked watches according to the criteria outlined below.

1.0     Inmates on ten and thirty-minute watches can be double-bunked according to the following criteria:

1.1     Inmates on watch may only be double-bunked after a review of pertinent inmate data by security staff and a review of the mental health record by a mental health clinician.

1.2     Security and mental health staff assigned to the unit shall consult one another regarding a decision to double-bunk inmates on watch.

1.2.1   If consensus between security and mental health/health services staff can not be reached, the inmate will be housed according to the policy and procedures outlined in DO 807.

1.3     Inmates will only be double-bunked if each inmate is within one custody level of each other.  Inmates must also be on the same level of watch (i.e., a 10" watch with another 10" watch).

1.4     The decision to double-bunk inmates, and any conditions or changes shall be documented in each inmate's medical record by the responding mental health clinician at the time of the event.

ADC Mental Health Technical Manual - Revised 4/18/14          38
Appendix G of the Health Service Technical Manual

1.5    In the event the issue of double bunking two inmates on watch arises during non-
       business hours, under no circumstances shall the On-Call Urgent Responder be
       contacted to address this situation.  An On-Call Urgent Responder is not
       authorized to order the double-bunking of inmates on any level of watch.
       Therefore, this decision must be completed during normal business hours.

ADC267415

| CORRECTIONS ADC Arizona Department of Corrections | Mental Health Follow-up After Discharge from Watch | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Mental Health Technical Manual | MHTM Chapter 2 Section 9.0 | Supersedes: MHTM 1/1/14 Effective Date: 4/18/14 |

**Reference**: DO 807

**Purpose**:  To provide direction regarding mental health service delivery and post watch follow-up for inmates being discharged from any level of mental health watch (i.e., continuous, ten-minute, or thirty-minute).

**Responsibility**:   It is the responsibility of the mental health staff discontinuing any watch, to notify appropriate security staff and the mental health team at the Complex.  It is the responsibility of the Lead Psychologist to notify the mental health staff on a weekly basis of the dates of watch discharges and the inmates' current locations.  A copy of these notifications will be kept by the Lead Psychologist for two (2) years.

1.0     Post watch follow-up for inmates being discharged from any level of mental health watch will be conducted between twenty-four (24) hours and seventy-two (72) hours after watch discontinuation.  An additional watch follow-up appointment will occur between seven (7) and ten (10) days after watch discontinuation, and a final follow-up appointment will occur between twenty-one (21) and twenty-four (24) days after watch discontinuation.

2.0     The mental health staff clinician performing the first follow-up check will verify the appropriateness of the Mental Health Score, and make any necessary changes in AIMS.

ADC Mental Health Technical Manual - Revised 4/18/14          40
Appendix G of the Health Service Technical Manual

| | Mental Health Follow-up in Peripartum | OPR:<br>Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>    Chapter 2<br>    Section  10.0 | Supersedes:<br>    MHTM 1/1/14<br>Effective Date:<br>    4/18/14 |

**Reference**: N/A

**Purpose**:  To provide direction regarding mental health service delivery for female inmates during peripartum (before and after delivery).

**Responsibility**:   It is the responsibility of the medical staff assigned to each unit to communicate with mental health staff regarding an inmate in a peripartum stage.

1.0 The mental health staff assigned to the unit will follow-up with each female inmate within five (5) days of their return from the hospital after delivering a baby or a miscarriage.

   1.1 If it is determined that the inmate is suffering from depression, then the clinician shall schedule routine contact with the inmate until the depression is resolved.  This may include changing the MH score to a 3.

2.0    Medical may also refer a pregnant inmate if prepartum depression is suspected.

ADC267417

| CORRECTIONS ADC **Arizona Department of Corrections** | Additional Delivery of Services | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Mental Health Technical Manual | MHTM Chapter 2 Section 11.0 | Supersedes: MHTM 1/1/14 Effective Date: 4/18/14 |

**Reference**: DO 1101.13
              DO 125.05
              DO 805
              DO 807.06
              DI 326

**Purpose**:   To provide reference to policy and procedures relating to additional delivery of services by mental health staff.

**Responsibility**:   It is the responsibility of the mental health staff to familiarize themselves with the policies related to the interdisciplinary services discussed in this section.

1.0     Hunger Strike

        1.1     DO 1101.13 – A Psychiatrist or Psychologist shall administer a mental health assessment as to the inmate's capacity to made decisions about his/her health care.  There will also be an interdisciplinary clinical staffing panel determine any potential issues and attempt to resolve them.

2.0     PREA

        2.1     DO 125.05 – Any inmate who is a victim will be offered mental health services. Upon notification of an alleged sexual assault, mental health staff shall evaluate the inmate and determine if a watch is necessary.  If it is after business hours, the Mental Health Urgent Responder will be contacted.

3.0     Protective Custody

        3.1     DO 805 – Once an inmate is formally placed in the Protective Custody review process, mental health staff shall be immediately notified by security staff. Mental health staff shall evaluate/interview every inmate (regardless of MH score) within twenty-four (24) hours, but no later than seventy-two (72) hours, to determine risk of self-harm.  These inmates will be seen by mental health staff every thirty (30) days during this process.  When an inmate is denied Protective

ADC267418

Custody or approved for alternate placement, mental health staff will be immediately notified and evaluate the inmate within twenty-four (24) hours, but no later than to seventy-two (72) hours.

4.0     Maximum Behavioral Control Restraints

4.1     DO 807.06 – The use of restraints will only be authorized in a progressive fashion by a Psychologist or Psychiatrist.  The restraint is not to exceed twelve (12) hours. If restraint past twelve (12) hours is required, the Psychologist shall staff with the MHPD.  If four-point restraints are being used, then a face-to-face evaluation of the inmate must occur.  If restraints continue to be needed beyond a twenty-four (24) hour interval, then a transfer to a licensed mental health facility must be arranged.

4.1.1   If methods of restraint have been inadequate to prevent serious acts of self-harm, the MHPD shall consult with a Psychiatrist regarding emergency psychotropic medication.

5.0     Maximum Custody and Restrictive Status Housing Program

5.1     All inmates new to a maximum custody complex (Florence, Eyman, Perryville, Lewis) will be evaluated by a mental health clinician within seventy-two (72) hours of their arrival.  All inmates placed in the Restrictive Status Housing Program will be evaluated by a mental health clinician within seventy-two (72) hours of placement (even if they originated from a maximum custody unit).

5.2     Any inmates displaying significant mental health issues that will substantially affect their ability to maintain stability in their current location will be immediately reported to security, and the inmate may be placed on a watch if necessary.

ADC267419

ADC Mental Health Technical Manual - Revised 4/18/14                43
Appendix G of the Health Service Technical Manual

| | Men's Treatment Unit (MTU) / Women's Treatment Unit (WTU) | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| **CORRECTIONS** **ADC** Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM Chapter 3 Section 1.0 | Supersedes: MHTM 1/1/14 Effective Date: 4/18/14 |

**Purpose**:  The current Vendor as contracted by the Department operates the Men's Treatment Unit to provide mental health programming and housing to male inmates who demonstrate a mental disorder and who meet specific admission criteria. Mental health programming at the facility shall include, but not be limited to, individual and group therapies.

**Responsibility**:  The MTU / WTU Program Coordinator, in conjunction with the Clinical Director on complex, jointly carry the overall responsibility for the provision of mental health programming in accordance with the below outlined protocol.

1.0     Identified Program Contacts

    1.1     The Facility Health Administrator shall have overall responsibility for MTU / WTU.

    1.2     The Clinical Director of ABHTF, Lead Psychologist at Perryville, or through a designee shall:

        1.2.1   Ensure that referrals for MTU / WTU admission are limited to those inmates who have:

            1.2.1.1 A Mental Disorder as defined by current version of the Diagnostic and Statistical Manual of Mental Disorders

    1.3     The MTU / WTU Program Coordinator position will be filled by a Licensed Psychologist, or other licensed mental health clinician designated by the Clinical Director of ABHTF / Lead Psychologist at Perryville. This individual shall:

        1.3.1   Coordinate all activities related to the admission and discharge processes.

        1.3.2   Review all referrals to the MTU / WTU.

ADC267420

ADC Mental Health Technical Manual - Revised 4/18/14          44
Appendix G of the Health Service Technical Manual

    1.3.3   Notify Security of approved applicants.

2.0   MTU / WTU Admission Criteria

   2.1   The inmate exhibits emotional or behavioral functioning which would benefit from an increased level of services.

   2.2   The inmate has a Mental Health Score of 3 or higher.

   2.3   MTU / WTU placement and treatment is voluntary.

   2.4   Inmates considered for admission must have a Public Risk Score of 3 or lower and must have an Institutional Risk Score of 4 or lower.

     2.4.1   If an inmate's P/I scores are higher than 3/4, but the inmate is otherwise appropriate for MTU / WTU admission, an Administrative Reclassification will need to be completed by security/operations staff at the referring complex.

3.0   Denial of Admission to MTU / WTU

   3.1   Inmate Admission to the MTU / WTU program may be denied if the inmate:

     3.1.1   Has presented with violent or assaultive behavior during the previous year, as evidenced by a disciplinary action.

     3.1.2   Has attempted/completed an escape from a secure perimeter facility less than three (3) years ago, or multiple such escapes/attempted escapes within the past ten (10) years.

     3.1.3   Has a current or past history of active membership in a security threat group (STG).

     3.1.4   Has received a minor disciplinary ticket in the last six (6) months, or a major disciplinary ticket in the last twelve (12) months.

4.0   MTU / WTU Admission Processes

   4.1   Pre-Screening Process:

     4.1.1   The mental health clinician at the referring facility will verify that the information contained in the Department's AIMS system is up-to-date.

   4.2   Pre-screening Referral Packet

ADC267421

4.2.1   The mental health clinician at the referring facility will submit the Pre-screening Referral Packet to the MTU / WTU Program Coordinator. The Pre-Screening Referral Packet must include all four (4) of the following components:

4.2.1.1 MTU / WTU General Referral Data (Form #1103-9) completed by MH staff from the referring complex.

4.2.1.2 MTU / WTU Contract signed by the inmate.

4.2.1.3 Inmate Psychosocial History.

4.2.1.4 Copies of mental health progress notes for a three (3) month period

4.2.2   Pre-Screening Mental Health and Security Reviews

4.2.2.1 The MTU / WTU Program Coordinator will review the packet, confer with other members of the MTU / WTU mental health staff as needed, and decide whether the referred inmate will be accepted into the MTU / WTU program.

4.2.3   Pre-Screening Decision Notification

4.2.3.1 Within ten (10) working days of receipt of the Packet, the MTU / WTU Program Coordinator will notify the referring mental health clinician of the decision.

4.2.3.2 If the inmate is accepted, the MTU / WTU Mental Health Program Coordinator will notify the Classification Manager to determine if the inmate meets the security screening requirements.

4.2.3.3 When the Classification Manager has determined that the inmate meets the security criteria, the Classification Manager will arrange for inmate movement from the referring complex to MTU / WTU.

5.0   MTU / WTU Discharge Criteria

5.1   Discharge of an inmate from the MTU / WTU may be initiated when an inmate meets any one of the following criteria:

5.1.1   The inmate reached maximum treatment benefit, and/or has completed all program elements.

5.1.2   The inmate fails to participate actively and in a positive fashion in programming.

    5.1.3   The inmate has exhibited behavior that threatens the safe and secure operation of the unit, the inmate's own personal safety, or the safety of others.

        5.1.3.1 Such behaviors will be documented in accordance with DO 105 (Information Reporting).

    5.1.4   The inmate requests to end programming and transfer from MTU / WTU.

**6.0**    Discharge Processes:

    6.1    If the inmate is being released from the Department:

        6.1.1   Pre-Release planning is initiated by the Health Planning Coordinator.

    6.2    If the inmate requests a transfer, the MTU / WTU Program Coordinator, or designee, will meet with the inmate to discuss the transfer request.  If it is determined the request is appropriate, the Deputy Warden or Assistant Deputy Warden will be notified of the transfer request.

        6.2.1   The MTU / WTU Program Coordinator will coordinate continuity of care for any MTU / WTU inmate approved for transfer to another ADC facility.

        6.2.2   If the request for transfer is not appropriate, the MTU / WTU Coordinator, or designee, will meet with the inmate to attempt to resolve issues prompting the request for transfer, and will monitor the inmate's progress at least weekly for a minimum of thirty (30) days.

    6.3    When an inmate has met any of the discharge criteria:

        6.3.1   The MTU / WTU Mental Health Team shall make placement / programmatic recommendations to the Deputy Warden, the Assistant Deputy Warden or their respective designee.

        6.3.2   The MTU / WTU Program Coordinator, or a designee, will provide the receiving Lead Psychologist with a written treatment/discharge summary.

        6.3.3   The Lead Psychologist will document the review, discussion and decision regarding the transfer to the new complex.

        6.3.4   An inmate's MH Score shall remain an MH-4 until the record has been reviewed by the receiving unit's mental health staff.  The mental health clinician at the receiving unit will meet with the arriving inmate within seven (7) days of transfer, and the mental health score will be updated in the medical record and AIMS at this time.

ADC Mental Health Technical Manual - Revised 4/18/14          47
Appendix G of the Health Service Technical Manual

7.0     Therapeutic Interventions

    7.1     All inmates admitted to MTU/WTU shall receive the following services:

        7.1.1   Weekly structured activities, which can be run by security and/or qualified
                mental health staff.

        7.1.2   At a minimum of a 1:1 contact monthly conducted in a private setting by a
                licensed mental health clinician.

        7.1.3   If on psychotropic medications, they will also been seen a minimum of
                every ninety (90) days by a P/PNP.

ADC267424

ADC Mental Health Technical Manual - Revised 4/18/14          48
Appendix G of the Health Service Technical Manual

| CORRECTIONS ADC Arizona Department of Corrections | Maximum Custody Mental Health Specialized Programs | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Mental Health Technical Manual | MHTM Chapter 3 Section 2.0 | Supersedes: MHTM 1/1/14 Effective Date: 4/18/14 |

**Purpose**:   To provide direction regarding the intake, admission, treatment and discharge processes for Specialized Mental Health Programs located in Maximum Custody units.

**Responsibilities**:   The Lead Psychologist, or designee, is responsible for the provision of mental health programming in accordance with the below outlined protocol.

1.0     Placement Criteria

    1.1     To be assigned to a Specialized Program an inmate must:

        1.1.1   Have a mental health diagnosis as defined in the current version of the Diagnostic and Statistical Manual of Mental Disorders.

        1.1.2   Be motivated to participate in a structured mental health program.

    1.2     Referral Process

        1.2.1   The clinicians assigned to the Maximum Custody units refer inmates interested in programming to designated Program Coordinators.

        1.2.2   Mental health staff shall provide security staff a list of inmates to be cleared for placement in the Specialized Program.

2.0     Therapeutic Interventions

    2.1     Interventions provided are developed by the Program Coordinator and in conjunction with security staff (e.g., stage level incentives, individual and group psychotherapy, education).

    2.2     All inmates assigned to these programs will have their MH score changed to a 4 upon arrival to the program.

ADC Mental Health Technical Manual - Revised 4/18/14          49
Appendix G of the Health Service Technical Manual

2.3    All inmates will receive weekly structured activities, which can be run by security and/or qualified mental health staff.

2.4    All inmates will receive a minimum of monthly 1:1 sessions in a private setting by a licensed mental health clinician.

2.5    All inmates on psychotropic medications will be seen by a P/PNP a minimum of every ninety (90) days.  Inmates under a PMRB order will be seen a minimum of every thirty (30) days.

3.0    Program Discharge

3.1    If the Program Coordinator determines that an inmate is no longer appropriate for placement in the specialized program, mental health staff working in maximum custody units will discuss appropriate placement of the inmate.

4.0    Perryville (SMA)

4.1    All inmates with a MH-3 designation will be changed to a MH-4 and will be provided the following services:

4.1.1    Weekly structured activities that can be run by security and/or qualified mental health staff.

4.1.2    A minimum of monthly 1:1 sessions in a private setting by a licensed mental health clinician.

4.1.3    If they are on psychotropic medications, then they will also been seen by a P/PNP a minimum of every ninety (90) days.  Inmates under a PMRB order will be seen a minimum of every thirty (30) days.

ADC267426

ADC Mental Health Technical Manual - Revised 4/18/14          50
Appendix G of the Health Service Technical Manual

| CORRECTIONS ADC Arizona Department of Corrections | Behavioral Management Unit (BMU) | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Mental Health Technical Manual | MHTM<br>Chapter 3<br>Section  3.0 | Supersedes:<br>MHTM 1/1/14<br>Effective Date:<br>4/18/14 |

**Purpose:**  To provide direction regarding the intake, admission, treatment and discharge processes for the Behavioral Management Unit (BMU) located at ASPC-Eyman.

**Responsibility:**  The Lead Psychologist at ASPC-Eyman, as exercised through the BMU Program Coordinator, or designee, shall facilitate the processes outlined in this policy.

1.0     Admission Criteria

    1.1     To be admitted to the BMU program an inmate must:

        1.1.1   Have a persistent personality disorder as defined in the current version of the Diagnostic and Statistical Manual of Mental Disorders.

            1.1.1.1 If an additional diagnosis is present, it must be well controlled.

        1.1.2   Have a history of problematic adjustment to incarceration as evidenced by a persistent and ongoing inability to self-regulate assaultive, destructive and/or self-injurious behaviors.

    1.2     Referral Process

        1.2.1   The BMU Program Coordinator will review all referrals for acceptance into the program.

2.0     Behavior Planning

    2.1     Upon admission to the BMU, a face-to-face interview will be conducted. An individualized behavior plan will be developed that addresses:

        2.1.1   The inmate's mental health issues

        2.1.2   Establishes realistic goals specific to the management of the inmate's behavior.

ADC267427

ADC Mental Health Technical Manual - Revised 4/18/14          51
Appendix G of the Health Service Technical Manual

2.2   Each behavioral plan will be reviewed at a minimum of every ninety (90) days and reflect progress made towards the identified goals.

3.0   Behavioral Interventions

3.1   Each inmate assigned to BMU will be provided a minimum every thirty (30) days a 1:1 session in a private setting with a mental health clinician, which addresses the inmate's identified behavioral health problems. Additional individual and group sessions will be identified in their treatment plan as appropriate.

3.1.1   Recommendation for the inmate to move to another phase of treatment within BMU is made on a continual basis and discussed with assigned security staff.

4.0   Action Response for Regressive Behaviors

4.2   Clinically indicated behavioral interventions will be implemented to encourage an inmate's continued motivation and improvement regarding behavioral health symptomotology.

4.3   During each regressive event the mental health clinician will discuss with the inmate the need to improve their behavior according to their identified goals.

4.3.1   During this meeting the inmate will be provided with a description of conditions and time frames of expected behaviors and shall be documented in the inmate's medical record.

5.0   All inmates participating in this program will have their MH score changed to a MH-4.

6.0   Program Discharge

6.1   Upon completion of the BMU program the inmate will receive a certification of completion and be officially discharged from the Program.

6.2   If the BMU Program Coordinator determines that an inmate is no longer appropriate for placement in BMU, that inmate shall be presented on the statewide teleconference for notification and discussion of appropriate treatment and placement.

6.2.1   Documentation of this presentation shall be placed in the inmate's record, and shall include recommendations from the teleconference.

| | Rincon Mental Health Program | OPR:<br>Assistant Director Health Services<br>Contract Monitoring Bureau |
|---|---|---|
| **CORRECTIONS**<br>**ADC**<br>Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>    Chapter 3<br>    Section 4.0 | Supersedes:<br>    MHTM 1/1/14<br>Effective Date:<br>    4/18/14 |

**Purpose:**  To provide direction regarding the placement, treatment and discharge processes for the Rincon Mental Health Program (formerly BHU) at ASPC-Tucson.

**Responsibility:**  The Lead Psychologist at ASPC-Tucson, as exercised through the Rincon Mental Health Program Coordinator, or designee, shall facilitate the processes outlined in this policy.

1.0    Placement Criteria

    1.1    To be considered for placement, an inmate must:

        1.1.1    Have a mental health diagnosis as defined in the current version of the Diagnostic and Statistical Manual of Mental Disorders.

        1.1.2    Motivated to participate in a structured mental health program.

        1.1.3    Have a history of problematic adjustment to incarceration as evidenced by a persistent and ongoing inability to self-regulate assaultive, destructive and/or self-injurious behaviors.

    1.2    Referral Process

        1.2.1    The Lead Psychologist at other facilities will present on the weekly statewide teleconference, any inmate appropriate for placement in the Rincon Mental Health Program.

        1.2.2    The Rincon Mental Health Program Coordinator shall provide security staff with a list of inmates to be cleared for placement in the program.

2.0    Each inmate assigned to the Rincon Mental Health Program will be provided a minimum every thirty (30) days a 1:1 session in a private setting with a mental health clinician.

ADC Mental Health Technical Manual - Revised 4/18/14          53
Appendix G of the Health Service Technical Manual

2.1     These inmates may receive additional individual and group sessions as their treatment plan indicates.

3.0     Program Discharge

3.1     If the Rincon Mental Health Program Coordinator determines that an inmate is no longer appropriate for placement, that inmate shall be presented on the statewide teleconference for notification and discussion of appropriate treatment and placement.

4.0     Mental health score will be changed to a MH-4 for all inmates participating in this program.

ADC267430

ADC Mental Health Technical Manual - Revised 4/18/14          54
Appendix G of the Health Service Technical Manual

| Arizona Department of Corrections | Mental Health  Limits of Confidentiality (Consents) | OPR:<br>Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Mental Health Technical Manual | MHTM<br>      Chapter 4<br>      Section  1.0 | Supersedes:<br>      MHTM 1/1/14<br>Effective Date:<br>      4/18/14 |

**Purpose**:   To ensure that every inmate who participates in mental health treatment understands the limits of confidentiality, the alternatives, advantages, disadvantages, and potential risks and benefits to the treatment for which he/she is providing consent.

**Responsibility**: The mental health staff assigned to reception will ensure that the Mental Health Consent (Form #1103-18) is read and signed by the inmate.  The assigned mental health clinician is responsible for explaining the limits of confidentiality and the effect(s) it may have on patient mental health care for all inmates on his/her caseload.

1.0     Procedure

   1.1     All inmates will be provided the opportunity to read and sign the Mental Health Consent Form when they arrive to Reception prior to the Initial Mental Health Assessment (Form #1103-27).

      1.1.1     Should the inmate be unwilling or unable to sign the Mental Health Consent Form, then the Lead Psychologist (or designee) shall meet with the inmate to discuss any concerns and/or issues related to consent.

   1.2     All inmates participating in ongoing mental health treatment (classified as an MH-3 or above), will be advised by the clinician assigned to that unit of the following:

      1.2.1     Limits of confidentiality within the Arizona Department of Corrections, specific to:

         1.2.1.1 Threats of harm to self or others.

         1.2.1.2 Threats to the safe secure and orderly function of the institution (e.g., escape, disturbances, drug trafficking).

ADC267431

ADC Mental Health Technical Manual - Revised 4/18/14          55
Appendix G of the Health Service Technical Manual

1.2.1.3 Information related to abuse, neglect or molestation of a minor, vulnerable or developmentally disabled adult, or elder adult.

1.2.1.4 Legal proceedings that requires that records be opened/released pursuant to state statute or a court order.

1.2.1.5 Discussion of a supervisory or treatment planning nature among inmate health services staff.

1.2.1.6 Information related to an unsolved capital offense (e.g. unsolved murder)

1.2.2 Alternatives to proposed treatment.

1.2.3 Advantages and benefits of proposed treatment.

1.2.4 Disadvantages and risks of proposed treatment.

1.3 If the proposed treatment is medication, the P/PNP will have the inmate sign the appropriate Psychiatric Medication Informed Consent Form.

1.4 The treatment provider and witnesses (as required) will sign the form at the time of the inmate's consent.

2.0 If an inmate refuses to sign a Mental Health Consent Form, the content of the form must be read and explained to the inmate (with another staff member as a witness) to ensure that the inmate's questions have been answered.

2.1 On the inmate signature line, write "refused to sign."

2.2 Place provider's signature on the mental health staff signature line.  Include position, date and printed name or name stamp.

2.3 Below this have the witness place signature, position, date and printed name or name stamp.

2.4 After verbal presentation of the Consent Form, and signatures completed, proceed to see the inmate unless he/she is refusing to be seen.

ADC267432

| | Mental Health Treatment Plans | OPR:<br>Assistant Director Health Services<br>Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>   Chapter 4<br>   Section  2.0 | Supersedes:<br>   MHTM 1/1/14<br>Effective Date:<br>   4/18/14 |

**Reference**: MHTM Chapter 2, Section 2.0
              NCCHC Standard MH-G-03

**Purpose**:   To ensure that each inmate with a clinically indicated need (as defined in Section 1.1 of this policy) has a written Mental Health Treatment Plan (Form #1103-16 or #1103-4) based on an assessment of their clinical needs.

**Responsibility**:   The Lead Psychologist at each complex has oversight responsibility in ensuring that inmates who meet the aforementioned criteria have a complete, current treatment plan in the inmate's medical record.

1.0     Procedure

    1.1     Inmates with a Mental Health score of 3 or above shall have a current treatment plan.

    1.2     A treatment plan will be developed upon a diagnosis being given and added into their medical record.

        1.2.1     All active mental health treatment plans will be "floated" on top of the MH section of the inmate's paper medical record, under the mental health divider with the most recent treatment plan on top.  Cancelled treatment plans will be filed in chronological order in the MH section.

        1.2.2     The MH clinician who is responsible for the inmate's mental health care shall complete and update the treatment plan, as described in Chapter 2, Section 2.0 of this manual.

            1.2.2.1 The mental health provider and/or treatment team on the inmate's unit will review, sign, stamp and date the bottom of the plan.

            1.2.2.2 The inmate may attend and participate in the plan if feasible.

ADC267433

ADC Mental Health Technical Manual - Revised 4/18/14    57
Appendix G of the Health Service Technical Manual

1.3   When an inmate's score is lowered to a MH-2, the mental health clinician will line out and sign, stamp, and date the treatment plan with the word "Cancelled".

2.0   Inpatient Treatment Plans

2.1   Upon admissions to the inpatient treatment facilities (Baker Ward or Flamenco), the Psychiatrist will write an Interim Treatment Plan.  Within thirty (30) days of admissions, the Interim Treatment Plan will be replaced with an Inpatient Treatment Plan that will be developed by the Treatment Team.

2.2   The Treatment Plan will be located in the Admission section in the paper medical record.

2.3   In the event that an inmate is not admitted to the inpatient program, the mental health staff assigned to that area will ensure that the Outpatient Treatment Plan is updated with the inmate's current level of functioning and any services that will be provided.

ADC267434

| | Interstate Compact Consent for Mental Health Evaluation | OPR:<br>Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>Chapter 4<br>Section 3.0 | Supersedes:<br>    MHTM 1/1/14<br>Effective Date:<br>    4/18/14 |

**Purpose**:  To provide direction for the use of the Consent for Release of Medical Information for Facilitation of Interstate Corrections Compact Transfer (Form #1101-40).

**Responsibility**:  It is the responsibility of the Psychologist completing the interstate compact request to comply with all points noted in the below policy. In addition, the Lead Psychologist (or designee) shall ensure that all requests for psychological evaluation relating to Interstate Compacts are completed.

1.0 Upon request from the Interstate Compact Coordinator, the Psychologist assigned to the inmate's current yard will complete the required psychological evaluation as specified under the proposed interstate compact agreement.

2.0 Prior to the completion of any evaluation and/or testing the Psychologist will instruct to the inmate to read and sign the Consent for Release of Medical Information for Facilitation of Interstate Corrections Compact Transfer (Form #1101-40).

3.0 Once completed the Psychologist shall:

   3.1   Send the originals of both the Consent Form as well as the final psychological evaluation to the Interstate Compact Coordinator though the internal mail system.

   3.2   Ensure copies of all submitted materials related to the Interstate Compact have been filed in the inmate's medical record under the legal section.

   3.3   Forward copies of all submitted materials related to the Interstate Compact to Central Office records to be filed in the inmate's institutional master file.

ADC267435

ADC Mental Health Technical Manual - Revised 4/18/14                    59
Appendix G of the Health Service Technical Manual

| | Mental Health Evaluation Prior to Hepatitis C Treatment | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>     Chapter 4<br>     Section 4.0 | Supersedes:<br>     New<br>Effective Date:<br>     4/18/14 |

**Purpose**:   To provide direction for the completion of a mental health evaluation of inmates who have been determined to medically qualify for Hepatitis C treatment.

**Responsibility**:   It is the responsibility of the Psychologist or P/PNP completing the mental health evaluation to comply with all points noted in the below policy. In addition, the Lead Psychologist (or designee) shall ensure that all requests for an evaluation relating to Hepatitis C treatment are completed.

1.0 If the inmate is on medications, then the evaluation will be completed by a P/PNP.  If the inmate is not on medications, then the evaluation will be completed by a Psychologist.

2.0 Upon the request from a medical provider (documented on a Consult Request Form), the Psychologist or P/PNP assigned to the inmate's current yard will complete the required evaluation and document this in SOAPE format and on the Mental Health Assessment for Hepatitis C Treatment Candidates (Form #1103-64).

3.0 Prior to the completion of any evaluation the Psychologist or P/PNP will ensure that there is a Mental Health Consent (Form # 1103-18) in the medical record, or in the absence of such, instruct to the inmate to read and sign the Form.

4.0 Once completed the Psychologist or P/PNP shall:

  4.1 Place all original documents in the mental health section of the medical record.

  4.2 Send a copy of the completed Mental Health Assessment for Hepatitis C Treatment Candidates Form to the provider who originally requested the evaluation.

ADC267436

ADC Mental Health Technical Manual - Revised 4/18/14          60
Appendix G of the Health Service Technical Manual

| Arizona Department of Corrections | Psychological Autopsy | OPR:<br>Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Mental Health Technical Manual | MHTM<br>Chapter 4<br>Section 5.0 | Supersedes:<br>MHTM 8/15/11<br>Effective Date:<br>1/1/14 |

**Reference:** Department Order 1103
Department Order 1105
NCCHC MH-A-10

**Purpose:**  A psychological autopsy will be completed on all deaths of inmates with a MH score of 3 or above, and all inmates who complete suicide regardless of MH score.  A psychological autopsy is the retrospective review of an inmate's life with an emphasis on factors which may have contributed to the inmate causing his/her own death.

**Responsibility:**   It is the responsibility of the MHPD to have a psychological autopsy completed on each inmate suicide.  It is the responsibility of the Lead Psychologist to complete a psychological autopsy report within thirty (30) days for each death of an inmate with a MH score of 3 or above, and for all suicides involving inmates assigned to their Complex.

1.0  Purpose

   1.1  To assist medical personnel in determining the inmate's mode of death in cases where the cause of death is equivocal.

   1.2  To provide a clear understanding of the inmate's state of mind prior to death.

   1.3  To provide a written account of collateral information provided by inmate and staff first responders, fellow inmates who were friends with the deceased, and family members.

   1.4  To provide insights regarding how best to address the clinical needs of future suicidal inmates.

   1.5  To identify deficiencies in institutional policies and procedures.

2.0  Procedure

   2.1  Psychological Autopsy Committee (PAC) - Upon notification of an inmate suicide,
        the Lead Psychologist has fourteen (14) days to convene the committee.

        2.1.1   The PAC shall:

                2.1.1.1 Consist of the FHA, Unit Deputy Warden, MHPD, Director of
                        Psychiatry, and any additional staff that the Lead Psychologist
                        deems pertinent.

                2.1.1.2 Review the inmate's medical/mental health record, including
                        autopsy and toxicology reports if available.

                2.1.1.3 Review any relevant source of data (e.g., Information Reports,
                        investigation reports, and Department documents, etc.) relevant to
                        the incident.

                2.1.1.4 Make recommendations concerning policy or procedural changes,
                        as necessary, to the Lead Psychologist for consideration and
                        inclusion in the psychological autopsy.

   2.2  The Lead Psychologist shall compose the information listed in 1.1.1.1 through
        1.1.1.4 of this section into the psychological autopsy.

   2.3  The Report must be stamped with **"DO NOT COPY – QUALITY ASSURANCE
        REVIEW"** and is not subject to being reviewed for the purpose of lawsuits against
        the Department of Corrections.

   2.4  The Lead Psychologist will submit the psychological autopsy to the MHPD within
        thirty (30) days of the inmate's suicide.

   2.5  The MHPD shall:

        2.5.1   Review the psychological autopsy report with the Contract Medical
                Director, or their respective designees.

        2.5.2   Recommend any administrative or corrective action, if required.

ADC267438

ADC Mental Health Technical Manual - Revised 4/18/14          62
Appendix G of the Health Service Technical Manual

| | Psychiatric Prescription Duration | OPR:<br>Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>    Chapter 5<br>    Section  1.0 | Supersedes:<br>    MHTM 1/1/14<br>Effective Date:<br>    4/18/14 |

**Purpose**:   To outline the processes and timelines under which a prescription for psychiatric medications can be authorized.

**Responsibility**:   The  P/PNP is responsible for acting in compliance with the prescription writing processes outlined in this section.

1.0     Prescriptions for medication by a P/PNP may be written for duration of up to six (6) months.

2.0     For inmates on multiple medications, when the provider changes the dosage of one medicine the new expiration date should match the expiration date of the other previously written medications.  The other medications which are not being changed do not need to be rewritten until necessary.

3.0     Prescriptions for release medication by a P/PNP may be written for a period of time not to exceed thirty (30) days.

ADC267439

| | Registered Nurse Interim Follow-up | OPR:<br>Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>    Chapter 5<br>    Section 2.0 | Supersedes:<br>    MHTM 1/1/14<br>Effective Date:<br>    4/18/14 |

**Purpose**: To outline the procedures under which a P/PNP may order a Registered Nurse (RN) to review the inmate's medical condition.

**Responsibility**: The RN is responsible to conduct the ordered assessment in accordance with the protocols outlined in this section.

1.0     The P/PNP may order a formal follow-up of inmates by the RN.

2.0     The RN will assess the inmate within the time frame designated in the order written by the P/PNP.  The RN may also see inmates without a P/PNP order as clinically indicated. These assessments shall include a review of:

    2.1     Current symptoms

    2.2     Response to medications

    2.3     Presence or absence of side effects

    2.4     Safety issues (danger to self or others, ability to function in current environment)

3.0     If an adjustment in medication may be indicated, either by poor response to treatment or by the presence of adverse effects, the RN will staff the inmate's case with the treating P/PNP.

4.0     If the treating P/PNP is not available and the matter is urgent, the RN will staff the inmate's case with another available P/PNP or the Urgent Response P/PNP.

5.0     The RN will document the inmate contact and any staffing with the P/PNP in the mental health progress notes of the inmate medical record.

ADC267440

ADC Mental Health Technical Manual - Revised 4/18/14                    64
Appendix G of the Health Service Technical Manual

6.0   If the inmate is stable and requires no change in medications, the inmate will follow-up
       with the P/PNP as previously ordered.  The RN may provide additional interim follow-up
       with the inmate prior to the inmate's next contact with the P/PNP.

7.0   If clinically indicated, the RN may also schedule the inmate to see the P/PNP earlier than
       previously ordered.  This is not to exceed fourteen (14) days from the date of referral.

8.0   The RN will document their assessment of the inmate on the Psychiatric Nursing Follow-
       up Note (Form #1103-50) or similar form.

ADC267441

ADC Mental Health Technical Manual - Revised 4/18/14                65
Appendix G of the Health Service Technical Manual

| CORRECTIONS ADC Arizona Department of Corrections | Continuation of Psychiatric Medications for Reception Inmates | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Mental Health Technical Manual | MHTM Chapter 5 Section 3.0 | Supersedes: , MHTM 1/1/14 Effective Date: 4/18/14 |

**Purpose**: To provide direction regarding the processes under which an inmate's psychiatric medication may be continued upon arrival at ADC.

**Responsibility**:   It is the responsibility of the P/PNP to continue psychiatric medications for inmates new to ADC custody in accordance with the protocols of this section.

1.0     For Alhambra Reception Treatment Center and Perryville Reception, inmates who arrive with active prescriptions for psychiatric medications:

    1.1     Medications can be continued on inmates who are not seen, provided that the RN has verified that the inmate is currently taking the medications through one of the following:

        1.1.1     Receipt of a continuity of care form from the referring facility, or

        1.1.2     Documentation from a pharmacy, or

        1.1.3     Current, properly labeled prescription bottles,

        1.1.4     Verification with outside medical records.

    1.2     All medications, including those which are non-formulary (excluding controlled substances), can be continued for up to forty-two (42) days without a non-formulary request.

    1.3     The RN shall attach a copy of the means of verification to the prescription sent to the Vendor's pharmacy.

ADC267442

ADC Mental Health Technical Manual - Revised 4/18/14                66
Appendix G of the Health Service Technical Manual

2.0   All reception inmates who are seen by a P/PNP:

    2.1   Non-formulary medications can be continued on inmates who are seen, without a non-formulary request, provided that the RN has verified that the inmate is currently taking the medications through one of the following:

        2.1.1   Receipt of a continuity of care form from the referring facility, or

        2.1.2   Documentation from a pharmacy, or

        2.1.3   Current, properly labeled prescription bottles, or

        2.1.4   Verification with outside medical records.

    2.2   The medications can be continued at the same or reduced dosage for up to ninety (90) days. Reducing the dose will not require a non-formulary request. Prescription duration in excess of ninety (90) days will require a non-formulary request form be completed.

    2.3   The prescribing provider shall order no more than the maximum dosage recommended by the FDA for any medication regardless of the amount the inmate was formerly receiving.

    2.4   Starting a new non-formulary medication will require a non-formulary request form be completed.

    2.5   Starting, stopping or continuing formulary medications on inmates will not affect the provisions of items 1.0 through 2.5 of this section.

    2.6   The RN shall attach a copy of the means of verification to the prescription sent to the Vendor's pharmacy.

ADC267443

ADC Mental Health Technical Manual - Revised 4/18/14          67
Appendix G of the Health Service Technical Manual

| | Managing Medication Distribution During Watch and Post Watch | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM Chapter 5 Section 4.0 | Supersedes: MHTM 1/1/14 Effective Date: 4/18/14 |

**Purpose**:   To provide direction regarding the management of psychiatric and medical medications with regards to inmate's who have been discontinued from watch status.

**Responsibility**:   The P/PNP, or other provider as indicated, will order the psychiatric and medical medications for an inmate removed from watch to be dispensed in accordance with the protocols of this section.

1.0     Inmates who are put on mental health watch shall have all their medications dispensed as Directly Observed Therapy (DOT).

2.0     The RN will change all medications to DOT status upon the initiation of the watch.

3.0     The Physician or Mid-Level Provider shall write a new prescription changing all the inmate's psychotropic and medical medications to DOT status and document the change on a progress note in the medical/mental health section.

4.0     After being taken off of watch, inmates will continue to receive their medications DOT for a minimum of twelve (12) months if a suicidal gesture or attempt was involved.  If there is no suicidal gesture or attempt, then the medications must stay DOT for a minimum of thirty (30) days.  After the minimum time period has elapsed, the P/PNP may discuss with the inmate whether returning the prescription to Keep on Person (KOP) is appropriate.  If the provider determines that KOP medications are clinically indicated, the provider can write a new prescription changing any appropriate medications back to KOP.  The P/PNP will also notify the medical provider (or nursing supervisor) that medical medications can be returned to KOP.

5.0     If the inmate is placed on watch subsequent to an intentional overdose of prescription or OTC medications, then the inmate will remain on DOT status indefinitely.

ADC Mental Health Technical Manual - Revised 4/18/14          68
Appendix G of the Health Service Technical Manual

| | Protocols for Referral of Inmates for Psychiatric Services | OPR:<br>Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>   Chapter 5<br>   Section 5.0 | Supersedes:<br>MHTM 1/1/14<br>Effective Date:<br>   4/18/14 |

**Purpose**:  To provide a standardized protocol regarding referrals to P/PNPs for medication treatment of mental health conditions.

**Responsibility**:   It is the responsibility of the P/PNP to operate in accordance with the protocol outlined in this section.

1.0      Upon receipt of a referral from any health services staff, the inmate shall be seen by a P/PNP within fourteen (14) days.

ADC267445

ADC Mental Health Technical Manual - Revised 4/18/14          69
Appendix G of the Health Service Technical Manual

| CORRECTIONS / ADC / Arizona Department of Corrections | Procedures for Voluntary, Involuntary, and Emergency Use of Psychiatric Medications | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Mental Health Technical Manual | MHTM<br>   Chapter 5<br>   Section 6.0 | Supersedes:<br>   MHTM 1/1/14<br>Effective Date:<br>   4/18/14 |

**Purpose**: To provide guidance to aP/PNP (or other providers when necessary) in situations where voluntary, involuntary, and emergency dispensing of psychiatric medications to incarcerated individuals is clinically indicated as a means of treating a mental disorder or reducing an inmate's risk of serious self injury and/or the potential for injury to others as the result of a mental disorder.

**Responsibility**:   The P/PNP is responsible for assessing, and if necessary, ordering the use of psychiatric medication in accordance with the protocols of this section.

1.0 Voluntary Use of Psychiatric Medications

    1.1 When voluntarily administering psychotropic medication, the P/PNP shall:

        1.1.1   Complete the Informed Consent for Psychotropic Medication (Form #1103-12).

            1.1.1.1 In the event the inmate refuses to sign the form, the attending staff shall write "refused to sign" on the inmate signature line.

            1.1.1.2 If an approved medication consent form specific for the proposed medication is available, it should be utilized in place of Form #1103-12.

        1.1.2   Document, on the Mental Health Progress Note the reason for prescribing psychotropic medication, and the dosage and duration of the medication.

            1.1.2.1 Prepare a prescription to dispense psychotropic medication.

            1.1.2.2 Ensure, in conjunction with pharmacy and nursing staff, that the inmate receives the psychotropic medication within a medically appropriate time frame.

ADC267446

1.2 When administering voluntarily received psychotropic medication, the health care professionals responsible for administering the psychotropic medication and documenting compliance with the P/PNP's prescription for psychotropic medication shall:

1.2.1   Only dispense psychotropic medication that has been ordered in a current prescription by a P/PNP and is labeled.

1.2.2   Copy each medication order onto the MAR.

1.2.3   Complete a laboratory requisition, if indicated.

1.2.4   Bracket, after transcribing the orders, all orders in RED and write "noted," followed by the date, time, the health care professional's legal name and professional title.

1.2.5   Document, on the MAR, all psychotropic medication administered.

1.2.6   Inform the P/PNP of any adverse reactions to the psychotropic medication, and document the information on a Mental Health Progress Note and on the MAR.

1.2.7   Keep all psychotropic medication in containers bearing the Pharmacist's original label and store it in a securely locked medicine cabinet where the institution's prescription medications are stored and dispensed.

1.2.8   Administer psychotropic medication to inmates by one of the following methods, as determined by reviewing the prescription:

1.2.8.1 By DOT

1.2.8.1.1   Any health care professional may place an inmate on DOT if he or she suspects that the inmate may not take the medication as prescribed.

1.2.8.1.2   DOT can only be discontinued with written orders from the P/PNP.

1.2.8.2 By KOP

1.2.8.3 By intra-muscular injection

2.0 Involuntary Emergency Use of Psychiatric Medications

2.1 A P/PNP (or another attending Physician/Nurse Practitioner/Physician Assistant if a P/PNP is unavailable) may order emergency psychotropic medication for and administer it involuntarily to an inmate with a mental disorder if, after evaluating the severity of the inmate's symptoms and the likely effects of the particular drug to be used, the P/PNP determines that:

2.1.1   An emergency exists in which the inmate's conduct presents a likelihood of imminent serious bodily harm to self or others.

2.1.2   Alternative methods of confinement or restraint are inadequate.

2.1.3   Forced medication is required, as a last resort, to address the emergency.

2.2 Medications administered involuntarily will be documented in the same way as medication administered voluntarily.  The injections will be clearly documented on the MAR, including location of injection.

3.0 Involuntary Non-Emergency Use of Psychiatric Medications

3.1 In the absence of an emergency an inmate may be medicated involuntarily with psychotropic medication, for a maximum of  one hundred eighty (180) days, if the following conditions have been met:

3.1.1   The inmate suffers from a diagnosed mental disorder.

3.1.2   The treating P/PNP has determined that, due to a mental disorder, the inmate is either severely impaired or the inmate's conduct presents a likelihood of serious harm to self, others or property.

3.1.2.1 "Severely impaired" is defined as significant deterioration in cognitive functioning, reality testing, or volitional control over actions.

3.1.2.2 "Serious harm to self, others or property" is defined as action or lack of action resulting in bodily harm or risk to health, safety or damage to inmate or ADC property.

3.1.3   The P/PNP has concluded that there is a substantial likelihood that psychotropic medication will ameliorate the inmate's condition and has prescribed medication in the medical interest of the inmate as an integral part of the treatment plan.

3.1.4   The inmate has been offered and has refused the opportunity to voluntarily participate in the treatment plan, including the medication component.

3.1.5     A Psychotropic Medication Review Board (PMRB) has reviewed the matter according to the procedure below in 3.2 through 3.8.2 and determined that:

       3.1.5.1 The inmate suffers from a mental disorder.

       3.1.5.2 The inmate is severely impaired or his/her conduct presents a likelihood of serious harm to self, others or property.

       3.1.5.3 The proposed medication is in the inmate's medical interest.

3.2 A mental health staff member must give the inmate at least twenty-four (24) hours written notice (excluding weekends and holidays) of the P/PNP's intent to convene an involuntary medication hearing before a PMRB, during which time the inmate may not be involuntarily medicated (unless in an emergency situation) as defined in section 2.0 though 2.1.3 of this policy.

       3.2.1     The notification is to be on the Notification of Intent to Request Approval for Involuntary Medication (Form #1103-15P) and shall include the treating P/PNP's tentative diagnosis of the inmate, the factual basis for the diagnosis, and a statement as to why the P/PNP believes medication is necessary and in the inmate's medical interest.

       3.2.2     This Form (#1103-15P) shall be distributed as follows:

          3.2.2.1 White copy:  Legal/Administrative section, inmate medical record

          3.2.2.2 Canary copy:  Lead Psychologist

          3.2.2.3 Pink copy:  Inmate

3.3 The Lead Psychologist (or designee) shall schedule a meeting of the PMRB, to be held no earlier than twenty-four (24) hours and no later than seventy-two (72) hours (excluding weekends and holidays) after the inmate's receipt of the Notification of Intent to Request Approval for Involuntary Medication Form.

       3.3.1     The PMRB shall be comprised of one non-treating Psychiatrist, one non-treating Psychologist, and one Deputy Warden or Associate Deputy Warden (or designee).

       3.3.2     The Psychiatrist chairs the PMRB hearing.

3.4 Notification of the PMRB hearing must include the date and time of the hearing and shall:

3.4.1   Be provided to the inmate using the Psychotropic Medication Review Board Notification of Hearing and Inmate's Rights (Form #1103-1P).

3.4.2   Be communicated to the inmate's Correctional Officer III (COIII), the treating P/PNP, and the PMRB members of the hearing by the Lead Psychologist (or designee).

3.4.3   This Form (#1103-1P) shall be distributed as follows:

   3.4.3.1 White copy: Legal/Administrative section, inmate medical record

   3.4.3.2 Green copy:  Treating P/PNP

   3.4.3.3 Canary copy:  Deputy Warden or Associate Deputy Warden (or designee)

   3.4.3.4 Pink copy:  Inmate's COIII

   3.4.3.5 Goldenrod copy:  Inmate

3.5 The inmate has the right to attend or refuse to attend the hearing:

   3.5.1   If after encouragement the inmate refuses to attend the hearing it will be documented on the Finding of the Psychotropic Medication Review Board (Form #1103-2P).

   3.5.2   At the discretion of the PMRB panel, present evidence and cross-examine witnesses.

3.6 If the committee determines, by a majority vote, that the inmate suffers from a mental disorder and is severely impaired or poses a likelihood of serious harm to self, others, or property, the inmate may be medicated against his/her will, provided the Board's Psychiatrist is in the majority.

   3.6.1   The inmate will be informed of the Board results within eight (8) hours via receipt of the Finding of the Psychotropic Medication Review Board (Form #1103-2P).

3.7 The inmate may appeal the Board's decision to the Assistant Director Health Services Contract Monitoring Bureau, or designee, by notification via an inmate letter, within twenty-four (24) hours (excluding weekends and holidays) of receipt of the PMRB's decision.

ADC267450

3.7.1   The inmate letter will be electronically sent to the Assistant Director Health Services Contract Monitoring Bureau, along with copies of relevant P/PNP documentation and the Findings of Psychotropic Medication Review Board Form.

3.7.2   The Assistant Director Health Services Contract Monitoring Bureau, or designee, shall decide the outcome of the appeal and notify the inmate through the Lead Psychologist, or designee, of the decision, via electronic transmission, within twenty-four (24) hours of receipt (excluding weekends and holidays).

3.7.3   Within four (4) hours of receipt of the Health Services Contract Monitoring Bureau decision the Lead Psychologist or designee shall provide copies of the decision to the inmate, the inmate's COIII, the treating P/PNP, and the PMRB chair.

3.7.4   During the appeal period, in the absence of an emergency as defined in this Section, the inmate shall not be involuntarily medicated.

3.7.5   In the event that the appeal is upheld, the inmate shall not be involuntarily medicated unless in the presence of an emergency as defined in this Section or by a Court order.

3.8  The treating P/PNP may request a new involuntary medication hearing no sooner than fourteen (14) working days after the appeal is upheld.

3.8.1   If the PMRB approves the involuntary administration of psychotropic medication of an inmate, and there is no upheld appeal, the inmate's current treatment team shall review the inmate's case within ninety (90) days and approve or disapprove, by use of the criteria cited in this Order, the continuance of involuntary medication for an additional ninety (90) days.

3.8.1.1 The treatment team's decision is final and not subject to appeal.

3.8.2   At any time that the inmate becomes compliant with his medication(s) and agrees to voluntarily take them, the treating P/PNP shall so note in the inmate's medical record, though the PMRB order shall remain in effect unless rescinded by the PMRB or it expires.

3.8.3   At the end of the one hundred and eighty (180) day involuntary medication period, the PMRB order for involuntary medication shall expire.

ADC Mental Health Technical Manual - Revised 4/18/14            75
Appendix G of the Health Service Technical Manual

3.8.4   The treating P/PNP may, pursuant to the criteria above, again seek authorization to involuntarily medicate the inmate with psychotropic medication.

3.9 Nothing in this order shall relieve the treating P/PNP from responsibility for adhering to Department's written instructions.

3.10    Psychiatrists may also prescribe psychotropic medication and administer it involuntarily to inmates who are involuntarily-committed patients at the ABHTF if **one** of the following apply:

3.10.1  The conditions in 1103.08, 1.4 through 1.4.3 exist.

3.10.2  In a non-emergency, a review and consent is obtained from a committee composed of staff Physicians, Psychiatrists, and Psychologists.

ADC267452

| | Protocols for Psychiatric Services at Non-Corridor Complexes | OPR:<br>Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>Chapter 5<br>Section 7.0 | Supersedes:<br>MHTM 1/1/14<br>Effective Date:<br>4/18/14 |

**Purpose**:   To provide guidance regarding the processes for provision of psychiatric services to inmates housed at non-corridor complexes.

**Responsibility**:   The mental health provider at a non-corridor facility, or other health services provider as necessary, is responsible for initiating/coordinating the psychiatric services/referral/ transfer of the mentally disordered inmate to an appropriate corridor facility in accordance with the protocols of this section.

1.0     Each non-corridor facility will have a corridor facility with which they are affiliated for purposes of psychiatric coverage.

2.0     Procedure

2.1     An inmate identified by mental health staff as needing a psychiatric evaluation or psychiatric care shall be scheduled for the next P/PNP's appointment line.

2.2     A Registered Nurse or mental health clinician will advise the assigned P/PNP, and arrange a conference call to triage and discuss the inmate's status and reason for referral.

2.3     Inmates identified as needing to be seen by the P/PNP will be transported to the appropriate facility by security staff from the sending unit. Telemedicine appointments may be scheduled where appropriate, following Telemedicine Technical Manual procedures.

2.4     Each corridor facility providing psychiatric services to a non-corridor facility will establish, in conjunction with the Facility Warden and Deputy Warden, a regularly scheduled day and time for these services.

2.5     The inmate's medical record shall accompany the inmate to the corridor facility appointment.

2.6     Inmates placed on medication will be returned to the sending facility. The next
        work day, a designated mental health clinician will initiate appropriate paperwork
        to the Count Movement Division in Central Office to expedite the inmate's
        transfer to a corridor complex.

2.7     The affiliated corridor complex will provide emergency support services to the
        designated non- corridor complex.

2.8     Inmates requiring evaluations at ABHTF will be triaged by phone with the
        designated corridor complex's Lead Psychologist first. If the Lead Psychologist
        agrees that an inpatient evaluation is needed, he/she will contact the ABHTF
        Clinical Director to arrange for the admission.

2.9     Inmates arriving at a non-corridor facility on psychotropic medication will be
        triaged with the designated P/PNP via telephone conference call within two (2)
        working days of inmate's arrival and a decision made regarding need for transfer.

2.10    Affiliations for outlying facilities will be designated by the Vendor's
        Administration in consultation with the MHPD, or designee.

ADC267454

ADC Mental Health Technical Manual - Revised 4/18/14          78
Appendix G of the Health Service Technical Manual

| | Inmate Follow-up After Discontinuation Of Psychiatric Medication | OPR:<br>Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| **CORRECTIONS**<br>**ADC**<br>Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>    Chapter 5<br>    Section 8.0 | Supersedes:<br>    MHTM 1/1/14<br>Effective Date:<br>    4/18/14 |

**Purpose**:   To provide direction regarding the protocols and personnel involved in the timely initiation and assessment of inmates who are refusing psychiatric medications or whose psychiatric medications have been discontinued.

**Responsibility**:   It is the responsibility of the P/PNPs on complex to indicate in the inmate's medical record the need for an assessment following the complete discontinuation of psychiatric medication, due to either planned discontinuance or inmate refusal.

1.0     Following the planned discontinuation of psychiatric medication an inmate will receive a follow-up assessment to determine whether further need for medication services exists.

    1.1     Follow-up assessment will be provided:

        1.1.1     By a RN, Psychology Associate, Psychologist, or as indicated by the P/PNP.

        1.1.2     This contact is to occur no later than ninety (90) days after medications are discontinued.

2.0     It is the responsibility of the P/PNP to notify the mental health clinician assigned to that unit, that an inmate is no longer prescribed psychotropic medications.

3.0     Upon the discovery of any unplanned discontinuation of psychiatric medication, the inmate shall be seen by a P/PNP within fourteen (14) days.

    3.1     The inmate will be immediately evaluated by a mental health clinician or an RN to determine if the inmate needs to be placed on watch until psychotropic medications can be resumed.

ADC267455

| | Antipsychotic Medication Protocol | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM Chapter 5 Section 9.0 | Supersedes: MHTM 1/1/14 Effective Date: 4/18/14 |

**Purpose:** To provide direction regarding the use of antipsychotic medications by authorized medical personnel.

**Responsibility:** It is the responsibility of all authorized medical personnel to act in accordance with this policy.

1.0    All inmates who are prescribed antipsychotic medications shall have adequate assessment and monitoring done to ensure that treatment is necessary and effective, in the inmate's best interest, and the possibility of toxic side effects is minimized.

2.0    Antipsychotic medications shall be prescribed by a P/PNP who takes all customary actions to establish that treatment is necessary including taking an adequate psychiatric history and performing an adequate mental status examination, pre-treatment evaluation of involuntary movements (Abnormal Involuntary Movement Scale (AIMS).

   2.1    AIMS evaluation will be completed at a minimum of every six (6) months while the inmate remains on antipsychotic medications.

3.0    Psychological testing in consultation with psychology and review of prior ADC and non-ADC medical records and institutional records will occur when necessary to establish the inmate's mental health diagnoses with reasonable certainty.

ADC Mental Health Technical Manual - Revised 4/18/14          80
Appendix G of the Health Service Technical Manual

| | Management of Photosensitivity Reactions to Medications | OPR:<br>Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Arizona Department of Corrections | | |
| Mental Health Technical Manual | MHTM<br>    Chapter 5<br>    Section 10.0 | Supersedes:<br>    MHTM 1/1/14<br>Effective Date:<br>    4/18/14 |

**Purpose:** To provide direction regarding the management of photosensitivity reactions resulting from an inmate's use of psychiatric medication.

**Responsibility:** It is the responsibility of the P/PNP, and/or RN to assess any photosensitivity reactions and duly act in accordance with the protocols outlined in this section.

1.0     All cases of inmate reported photosensitivity shall be verified by direct clinical examination by the medical staff.  In all cases there shall be documentation of an unequivocal diagnosis of significant sunburn (to include erythema at a minimum), in the medical record or mental health progress notes.

2.0     If the P/PNP determines that the inmate's psychotropic medication is contributing to their photosensitivity, the P/PNP shall meet with the inmate and discuss treatment alternatives including medications having less marked photosensitizing effects.

3.0     For cases in which the P/PNP and inmate agree that switching psychotropic medications is not desirable, the inmate will be counseled as to proper use of sunscreen.  The P/PNP will order sunscreen minimum SPF 30.

4.0     Inmates will not be issued special duty status, special clothing or hats.

ADC267457

ADC Mental Health Technical Manual - Revised 4/18/14          81
Appendix G of the Health Service Technical Manual

| Arizona Department of Corrections | Management of Heat Intolerance Reactions to Medications | OPR: Assistant Director Health Services Contract Monitoring Bureau |
|---|---|---|
| Mental Health Technical Manual | MHTM Chapter 5 Section 11.0 | Supersedes: MHTM 1/1/14 Effective Date: 4/18/14 |

**Purpose**: To provide direction regarding the management of heat intolerance reactions resulting from an inmate's use of psychiatric medication.

**Responsibility**: It is the responsibility of the P/PNP and/or RN to assess any heat intolerance reactions and duly act in accordance with the protocols outlined in this section.

1.0   All cases of inmate reported Heat Intolerance shall be verified by direct clinical examination by the medical staff.

2.0   In all cases medical staff will document the direct clinical examination and the unequivocal diagnosis of hyperthermia (body temperature above 99.5 degrees) or orthostatic hypotension (drop of 20mm Hg or greater on rising), in the medical record.

3.0   If the inmate is currently prescribed medication by the P/PNP, medical staff will refer the inmate for evaluation by the P/PNP.

3.1   This contact is to occur within fourteen (14) days of the referral.

4.0   If the P/PNP determines that the inmate's psychotropic medication is contributing to their heat intolerance, the P/PNP shall meet with the inmate and discuss treatment alternatives including medications having less marked effects on heat tolerance.

5.0   For cases in which the P/PNP and inmate agree that switching psychotropic medications is not in the inmate's best interest, the P/PNP shall consult with the medical provider regarding a duty status, including issuing special clothing, to minimize heat exposure.

ADC267458

# Arizona Department of Corrections

# Mental Health Services Technical Manual

# Revised April 18, 2014

_Nicole Taylor_, Ph.D., J.D.      4/18/14

Nicole Taylor, Mental Health Monitor      Date

     4/18/14

Richard Pratt, Interim Assistant Director      Date

# EXHIBIT 9

# FILED UNDER SEAL

# EXHIBIT 10

# FILED UNDER SEAL

# EXHIBIT 11

# FILED UNDER SEAL

# EXHIBIT 12

# FILED UNDER SEAL

# EXHIBIT 13

# FILED UNDER SEAL

# EXHIBIT 14

# FILED UNDER SEAL

# EXHIBIT 15

# FILED UNDER SEAL

# EXHIBIT 16

# FILED UNDER SEAL

# EXHIBIT 17

# FILED UNDER SEAL

# EXHIBIT 18

# FILED UNDER SEAL

# EXHIBIT 19

# FILED UNDER SEAL

# EXHIBIT 20

# FILED UNDER SEAL

# EXHIBIT 21

# FILED UNDER SEAL

# EXHIBIT 22


# FILED UNDER SEAL

# EXHIBIT 23

# FILED UNDER SEAL

# EXHIBIT 24

# FILED UNDER SEAL

# EXHIBIT 25

# FILED UNDER SEAL

# EXHIBIT 26

# FILED UNDER SEAL

# EXHIBIT 27

# FILED UNDER SEAL

# EXHIBIT 28

# FILED UNDER SEAL

# EXHIBIT 29

# FILED UNDER SEAL

# EXHIBIT 30

# FILED UNDER SEAL

# EXHIBIT 31

# FILED UNDER SEAL

# EXHIBIT 32

# FILED UNDER SEAL

# EXHIBIT 33

# FILED UNDER SEAL

# EXHIBIT 34

# FILED UNDER SEAL

# EXHIBIT 35

# FILED UNDER SEAL

# EXHIBIT 36

# FILED UNDER SEAL

# EXHIBIT 37

# FILED UNDER SEAL

# EXHIBIT 38

# FILED UNDER SEAL

# EXHIBIT 39

# FILED UNDER SEAL

# EXHIBIT 40

# FILED UNDER SEAL

# EXHIBIT 41

# FILED UNDER SEAL

# EXHIBIT 42

# FILED UNDER SEAL

# EXHIBIT 43

# FILED UNDER SEAL

# EXHIBIT 44

# FILED UNDER SEAL

# EXHIBIT 45

# FILED UNDER SEAL

# EXHIBIT 46

# FILED UNDER SEAL

# EXHIBIT 47

# FILED UNDER SEAL

# EXHIBIT 48

# FILED UNDER SEAL

# EXHIBIT 49

# FILED UNDER SEAL

# EXHIBIT 50

# FILED UNDER SEAL

# EXHIBIT 51

# FILED UNDER SEAL

# EXHIBIT 52

# FILED UNDER SEAL

# EXHIBIT 53

# FILED UNDER SEAL

# EXHIBIT 54

# FILED UNDER SEAL

# EXHIBIT 55

# FILED UNDER SEAL

# EXHIBIT 56

# FILED UNDER SEAL

# EXHIBIT 57

# FILED UNDER SEAL

# EXHIBIT 58

# FILED UNDER SEAL

# EXHIBIT 59

# FILED UNDER SEAL

# EXHIBIT 60

# FILED UNDER SEAL

# EXHIBIT 61

# FILED UNDER SEAL

# EXHIBIT 62

# FILED UNDER SEAL

# EXHIBIT 63

# FILED UNDER SEAL

# EXHIBIT 64

# FILED UNDER SEAL

# EXHIBIT 65

# FILED UNDER SEAL

# EXHIBIT 66

# FILED UNDER SEAL

# EXHIBIT 67

# FILED UNDER SEAL

# EXHIBIT 68

# FILED UNDER SEAL

# EXHIBIT 69

# FILED UNDER SEAL

# EXHIBIT 70

# FILED UNDER SEAL

# EXHIBIT 71

# FILED UNDER SEAL

# EXHIBIT 72

# FILED UNDER SEAL

# EXHIBIT 73

# FILED UNDER SEAL

# EXHIBIT 74

# FILED UNDER SEAL

# EXHIBIT 75

# FILED UNDER SEAL

# EXHIBIT 76

# FILED UNDER SEAL

# EXHIBIT 77

# FILED UNDER SEAL

# EXHIBIT 78

# FILED UNDER SEAL

# EXHIBIT 79

# FILED UNDER SEAL

# EXHIBIT 80

# FILED UNDER SEAL

# EXHIBIT 81

# FILED UNDER SEAL

# EXHIBIT 82

# FILED UNDER SEAL

# EXHIBIT 83

# FILED UNDER SEAL