**Index of Exhibits to Declaration of
Kirstin E. Eidenbach**


Exhibit 1:      July 14, 2015 letter to Lucy Rand regarding non-compliance with the Stipulation **[FILED UNDER SEAL]**

Exhibit 2:      August 28, 2015 letter to Michael Gottfried and Lucy Rand regarding non-compliance with the Stipulation **[FILED UNDER SEAL]**

Exhibit 3:      October 15, 2015 letter to Lucy Rand regarding non-compliance with the Stipulation **[FILED UNDER SEAL]**

Exhibit 4:      December 11, 2015 letter to Daniel Struck regarding non-compliance with the Stipulation **[FILED UNDER SEAL]**

Exhibit 5:      December 18, 2015 letter to Daniel Struck regarding non-compliance with the Stipulation **[FILED UNDER SEAL]**

Exhibit 6:      February 8, 2016 letter to Daniel Struck regarding non-compliance with the Stipulation **[FILED UNDER SEAL]**

# EXHIBIT 1

# FILED UNDER SEAL

# Eidenbach Law, P.C.

**Kirstin T. Eidenbach, Attorney-at-law (AZ Bar No. 027341)**

P.O. Box 91398 • **Tucson, AZ** 85752 • **Phone:** 520-477-1475
E-Mail:  kirstin@eidenbachlaw.com

July 14, 2015

Lucy Rand
Assistant Attorney General
**Arizona Attorney General's Office**
1275 West Washington
Phoenix, Arizona 85007

Dear Lucy:

We are writing in regards to the June 1–4, 2015 monitoring tours to Perryville and Eyman State Prison Complexes.  Thank you again for your help and diligence in planning and executing these tours.  The correctional staff and Corizon medical staff were incredibly accommodating, and we are all very appreciative of the time they spent with us.

These tours were conducted to monitor each complex's compliance with the *Parsons* Stipulation and this letter focuses on several areas of ADC's serious non-compliance with the Stipulation, based on our document review, interviews with class members and institution staff, review of class members' medical and institutional files, and inspections.  This letter, however, is not meant to be exhaustive, and does not individually address every performance measure in the Stipulation.  Our decision not to discuss a particular measure in this report does not indicate an agreement on our part that the measure is being properly monitored or is in compliance.  In addition, although we have organized this letter into four main sections (Medical, Mental Health, Dental, and Maximum Custody), issues discussed in one section are often relevant to other sections as well.  For example, problems with medication administration obviously affect medical, mental health, and dental care.

During our brief visits to the two prisons, we observed that the health care delivery system continues to be plagued by systemic deficiencies, including inadequate staffing, scheduling backlogs, and specialty delays.  Staffing deficiencies were particularly acute at Eyman where, in one unit, a single provider struggles unsuccessfully to keep up with the 1000 patients she serves, while in another unit, there had been no nurse and thus no nurse's triage line for months.  As detailed below, we spoke with numerous prisoners who reported that they waited months for cancer treatment, never received critical, potentially life-saving medications, and were denied emergency care, including for a ruptured appendix.  Additionally, we saw that patients with serious mental illnesses are not receiving the out of cell programming required by the Stipulation.  In short, prisoners

1

continue to suffer because they are denied access to required health care and necessary programming, i.e., the same conditions that that prompted this suit.

We also observed that the auditing system defendants have implemented to evaluate progress towards remedying these unconstitutional conditions is critically deficient. Specifically, the system fails because the audits are inaccurate, are not standardized and lack essential Corrective Action Plans. We were advised at both Perryman and Eyman that the ADC monitors do not have a manual or written instructions detailing how to collect and analyze the audit data. When we had previously asked you for the written instructions, training manual, or other materials used to educate the monitors on how to measure compliance with the Stipulation's performance measures, you advised us that no such written materials exist. (*See* April 14, 2015 letter from Kirstin Eidenbach to Lucy Rand, etc.) Unless the monitors perform their audits using a uniform methodology at each prison, the CGAR audit results will not be reliable.

Furthermore, the methodology that was used by the Perryville and Eyman monitors was often flawed, or incomplete. We highlight these areas throughout the body of this letter. In addition to these concerns, we learned from many of the medical staff and prisoners we interviewed that there are problems on the yards that critically undermine the accuracy of the CGAR results. ADC must develop a written, standardized methodology for evaluating each performance measure and for developing CAPS, and train its monitors to rigorously follow it. We believe that it would be more efficient if Plaintiffs' counsel worked collaboratively with ADC to develop the standardized methodology to be used by the monitors. **Please report on any steps taken to standardize monitoring of compliance under the *Parsons* Stipulation and provide a copy of any written material developed.**[1]

As you know, we did not have medical, dental, or mental health experts along with us on these tours. As such all of our observations were made with an eye toward objective compliance with the Stipulation's performance measures. Please note, throughout this letter, we identify concerns voiced to us by prisoners during interviews with them. We have not always ourselves reviewed their medical or institutional files, but we thought it prudent to share with you the information we gathered about the lapses they report in the provision of their healthcare so that they may be investigated and addressed as appropriate.[2]

The conditions at Perryville and Eyman are causing class members serious harm, and defendants' efforts to measure progress in remedying these conditions are deeply flawed. Accordingly, plaintiffs' counsel request a meeting with defendants in the next month to discuss further corrective action both for the conditions and the audit process.

---

[1]   A list of requests, noted throughout the report in bold and underline, is attached as Appendix B.

[2]   We have presented class members' reports of their individual cases as they were related to us. In a handful of cases, we were also able to access the patients' medical records and, when applicable, have identified those cases where the medical records corroborated the patients' reports.

## TABLE OF CONTENTS

Medical ........................................................................................................................... 4

I.    Monitoring Methodology and Analysis of CGAR Results ................................... 4

II.   Staffing ........................................................................................................... 6

III.  Physical Facilities ............................................................................................ 6

IV.  Medication Administration ............................................................................. 7

    a.   Pill Pass ...................................................................................................... 7

    b.   Inconsistent and Delayed Administration .................................................. 7

    c.   Improper Administration or Discontinuation .............................................. 7

V.   Access to Care ................................................................................................ 8

    a.   General Issues ........................................................................................... 8

        i.   Phantom Appointments ...................................................................... 8

        ii.  Non U.S. Citizens Being Denied Care ................................................ 9

    b.   Routine Care .............................................................................................. 9

    c.   Chronic Care ............................................................................................ 10

    d.   Specialty Care .......................................................................................... 11

    e.   Emergency Care ....................................................................................... 14

VI.  Access to Medical Appliances ...................................................................... 16

Dental ........................................................................................................................ 17

Mental Health ........................................................................................................... 19

Max Custody .............................................................................................................. 25

## Medical

I.     **Monitoring Methodology and Analysis of CGAR Results**

Our review of the March 2015 CGAR prior to the tour, and the April and May CGAR reports subsequently, results reveals significant flaws with the monitoring process.  Until these flaws are addressed, the CGAR process will not produce useful auditing results.

### General concerns

It is clear that without standards for sample selection and a uniform, general methodology, the audit results reflected in the March CGARs do not accurately reflect ADC's level of compliance with the Stipulation.

In some cases, the monitors are failing to evaluate all elements of a given performance measure, where evaluating a single measure requires checking several different data points.  For example, Medical Records #1 requires the monitor to check that medical records are (1) scanned, (2) accurate, and (3) chronologically maintained.  However, the comments in the March CGARs suggest the Eyman monitor is checking only the dates that documents were scanned.  During our record review, this was confirmed when both our reviewers found documents scanned into the wrong patient's medical records.  Therefore, while the scanning component of this measure may be at 82% compliance, this is not the score for the overall performance measure, because the monitor failed to address the remaining two components.

There are some measures about which the monitors seem to be either confused or receiving incorrect information.  For example, Specialty Care # 1 and 2 measure whether Utilization Management is sending denial decisions for specialty care to the requesting provider within 14 days and placing the denial in the patient record, and whether the patient is apprised of the denial.  For the months of March and May, the CGARs do not identify a single Utilization Management denial of specialty care at *any* of the ten prisons, suggesting either that the UM process is dysfunctional or that the monitors do not know how to find this information.

Additionally, for the measures involving timeliness of referrals, (for example, Access to Care # 4 and Specialty Care # 3-4), the monitors' starting point for identifying a sample to review was to go to the lists of completed provider or specialty appointments, and then work backwards to the date the referral was made.  By using this limited group of completed appointments as the starting point, the monitors do not capture the many other appointments that are pending or never occurred (as evidenced by the Pending Specialty Appointments report, for example.).  Similarly, compliance with Stipulation Agreement #1 (interpretation), required by Paragraph 14 of the Stipulation, is not accurate.  The monitors' method of measuring compliance was to review the log of all appointments in which the language line was actually utilized, unsurprisingly, finding 2 out of 2 encounters, and 100% compliance.  This in no way would capture the clinical encounters of deaf or non-English speaking prisoners where interpretation services were not used.  A more accurate approach to monitoring this measure would be to select 10 prisoners who had health care appointments in the past month, who are deaf and

rely upon a sign language interpreter, or who do not speak English, and review the notes from their clinical encounters to see if there is any documentation of the use of interpreters or explanation by health care staff as to how effective communication was achieved.

In some cases, including Medical Records # 9 and 11 at Eyman, and Mental Health # 1 at Perryville, the monitors state that the measure is inapplicable and leave the score blank, yet classify the audit result as "green," suggesting compliance for that measure. While defendants' color classification of audit results is not covered in or relevant to compliance with the Stipulation, the implication that certain measures have been complied with when they have not only creates unnecessary confusion.

Finally, one of our biggest concerns is Corizon's failure to provide a corrective action plan (CAP) for every performance measure that falls below compliance levels. (The most recent CGARs for Perryville and Eyman contain no CAPS for any performance measures.) The absence of CAPs raises several concerns. First, unless there is a CAP, we have no way of knowing whether a lack of compliance is being addressed at all, much less how it is being addressed. But the absence of CAPs also raises concerns about a uniform resolution of a problem. Without written guidance, it seems probable that different medical staff and administrative staff will resolve problems idiosyncratically, rather than in a consistent and uniform manner. Finally, the absence of a CAP leaves the record incomplete and complicates future efforts to monitor improvement. **We ask that CAPs be included for every CGAR measure given less than 75% compliance.**

In addition to these global concerns, we have also compiled a list of some facility specific inaccuracies that raise concerns about the accuracy of the CGAR data.

**Eyman (March CGARs)**

- *Chronic Care*: Measures 6-8 (offering annual flu vaccine, immunizations and colorectal screening) were rated as 100% compliant by Monitor Franklin, based upon finding that information was posted in the Health Unit areas "for inmates to read." It was posted in English only. Presumably prisoners who do not need medical attention do not see the notices, and for those who cannot read English, the notices are irrelevant. Each qualifying patient should be offered the preventive care and the prisons need to develop a method to track this. For example, all prisoners who become due for colorectal screenings could be provided individual notice of the screening. If they accept, they are provided the screening materials. If they refuse, that would be documented in their medical record and discussed at their next medical appointment.

- *Quality Improvement*: Measure 3 indicated that the monitor is only measuring the number of peer reviews completed during that monitoring period (2 out of 2 for 100%), rather than reviewing all of the providers to determine if they have had peer reviews in the last year. Also, the peer review forms produced prior to the tours did not include recommended actions, which is required by the measure. Similarly, Measure 4 indicated that the monitor is only measuring the number of nursing peer

reviews completed during that monitoring period, instead of reviewing the peer review history for nurses in the last year.

## Perryville

*Infirmary*: Measure 8 (functioning call buttons or documenting 30-minute welfare checks):  rated as 100% by Monitor Briddle, but then she states that there are no call lights, and staff remain accessible and perform frequent rounds, but does not address documentation of or intervals of these rounds.

- *Chronic Care*: See discussion for Eyman Measures 6-8, above.

- *Medical Records*:  The findings on separate performance measures seem to contradict the findings in other measures.  For example, Measure 7 notes that there is poor compliance in recording refusals while Measure 9 states a high level of compliance with the requirement that prisoners be counseled after refusals.  It seems self-evident that if refusals are not being accurately recorded, the number of people being counseled following their refusal cannot be accurate either.

- *Infirmary Care*:  Measure 8 was rated at 100% compliance despite the fact that the comments state that Perryville is waiting on a call light system.  This clearly is not 100% compliance.

## II.     Staffing

While we understand that ADC and Corizon are working to address staffing shortages, we are concerned that these continued shortages place prisoners at risk of serious harm.  For example, at SMU-I, a single provider cares for approximately 1000 patients, working four ten hour shifts per week.  Similarly, a single nurse at Cook Unit reportedly had to handle five ICSs on her own.  We were told by management, line staff, and prisoners that Meadows Unit had not had a nurse for nurse's line for months, and that a person had only recently been hired, and was still undergoing training.   This shortage makes the proper administration of medical care nearly impossible.  While we are hopeful that ADC and Corizon will continue to fill staffing positions, we have grave concerns about the profound staffing shortages that continue to exist across Eyman and Perryville.  **Please report on any steps taken to increase ADC and Corizon staff levels.**

## III.    Physical Facilities

During our tours, we were told consistently that the emergency response or "man-down" bags were kept in the pill rooms, which are locked but to which all medical staff should have access.  Several prisoners reported that during emergencies, the staff on duty did not have keys to the pill room and therefore were unable to access the emergency response bag.  These bags contain the drugs and equipment necessary to appropriately respond to life-threatening emergencies.  Without access to them, the medical and correctional personnel on duty cannot administer the care necessary to address the emergent situation, and in some cases to save the life of a prisoner.



We ask that this issue be immediately addressed.  **Please report on what steps are taken to ensure that staff have access to the emergency response bags at all times.**

**IV.    Medication Administration**

    **a.  Pill Pass**

During the tours, we had the opportunity to observe pill pass at both medium and maximum custody units.  At the medium custody units we observed, the pill pass was done using a computerized system.  It appeared to be consistent and accurate, with the person dispensing the medication scanning each medication and each patient's identity card into the computer system to indicate it had been given and that watch-swallow had been completed.  The pill pass observed at Lumley Unit, Perryville, however, was dangerous.  Rather than use the computerized system, the nurses pre-pour medications into worn, reused manila envelopes and dispense them at cell front.   We observed that the nurse does not take the Medication Administration Record with him or her for pill pass, but instead tracks whether or not a prisoner got her medications based on whether there are empty envelopes at the end of pill pass.  The nurse we observed tracks which prisoners were not in their cells or who refused their medications during pill pass based solely on her memory.   She sometimes distributes medications to all of Buildings 28 and 30.   The sheer number of prisoners involved in such rounds raises concerns about mistakes, particularly where the only mechanism used to track refusals is the nurse's memory.  This is not a safe way to dispense medications.

    **b.  Inconsistent and Delayed Administration**

We received widespread reports from prisoners that they were experiencing delays and lapses in receiving their prescription medications.  Delays in providing prescribed medications places prisoners at risk of serious, possibly permanent, harm.  For example, Mr. ██████████ reports that he was prescribed antibiotics for a staph infection on May 28, 2015.  He states that he did not receive these antibiotics until June 1, 2015.  While this was a delay of only a couple of days, in cases of infections, such a delay can be catastrophic.  Ms. ██████████ states that she suffers from a seizure disorder.  She reports that her seizure medication gets interrupted intermittently.

    **c.  Improper Administration or Discontinuation**

Prisoners also reported regularly that they had either received the wrong medication, the wrong dose, or that their medications had been abruptly and/or inappropriately discontinued.



### Eyman

- Mr. ▮▮▮▮▮▮ reportedly had his Coumadin discontinued in February 2015, after which he developed an embolism for which he had to go to the hospital.  In addition, when the yard was locked down, he stated he did not receive Coumadin for the duration of the lockdown.  Two months ago, when the prison ran out of Coumadin, Mr. ▮▮▮ reports that he was given blood pressure medication in place of his Coumadin at the pill pass window.

### Perryville

- Ms. ▮▮▮▮▮▮ reports that she did not previously suffer from mental health issues but was nevertheless put on Celexa and Zyprexa.  After taking these medications long enough to become accustomed to their effects, Ms. ▮▮▮ states that she was abruptly discontinued from both medications and is now experiencing depression without them.

- Ms. ▮▮▮▮▮ reports she was taken off her non-formulary Plavix approximately one year ago.  It appears that on May 27, 2015, Ms. ▮▮▮ had to have an emergency cardiac procedure to clean her stent, which was blocked 60-70%, and to place a new stent to unblock her lower artery, which was blocked 100%.  The cardiac surgeon reportedly indicated that it was imperative that she be placed back on Plavix to prevent future blockages.  Ms. ▮▮▮ states that she has not seen a provider since her return.  She reports that she received her first dose of Plavix on June 1, 2015.

- Ms. ▮▮▮▮▮▮ reports that she suffers from epilepsy.  She states that she suffered a seizure on April 18, 2015 that left her with partial loss of feeling/movement on her right side, and was taken to an outside specialist who determined that she had toxic levels of phenobarbital in her system.

## V.    Access to Care

### a.   General Issues

Based on the scores and information contained in the March CGARs, much of which was confirmed by our tours of Perryville and Eyman, we are concerned that prisoners remain unable to access timely care.  Their inability to access care places them at serious risk of harm and exposes them to permanent and potentially life-threatening consequences.  Examples of delays in care abound, but the following examples illustrate our global concerns.

#### i.   Phantom Appointments

Prisoners across nearly all yards we toured reported a phenomenon they called "phantom appointments," where a prisoner is scheduled for nurse's line or provider's line, signs a confirmation of the appointment the night before the appointment or outside medical, and then is *never* seen.  Some prisoners report that they are

taken to medical, where they wait for an appointment that never occurs, and others are never taken to medical at all.  These reports raise grave concerns about the accuracy and credibility of the CGARs and the documents that underlie them.  We also heard from prisoners who said that they had been sent off-site for specialty care appointments, but were not seen by the specialist, and then were driven back to the institution.

### ii.  Non U.S. Citizens Being Denied Care

We received numerous reports at Eyman complex that non-United States citizens were being denied care based solely on their nationality.  For example, a prisoner at SMU-I reported that he was told by a nurse that he wouldn't be able to see a specialist because he doesn't have immigration papers.  Multiple other prisoners reported being told by nursing staff that they were not allowed to receive medication, medical appliances, or in-person care because they're not U.S. citizens.  Plaintiffs' counsel has received similar reports in letters from immigrants housed at other prison complexes.  These allegations are problematic, and point to the fact that **health care staff must be trained that ADC is required to provide constitutionally adequate care to every prisoner in its custody, regardless of nationality, and that if such an unwritten Corizon/ADC directive exists, such an informal policy must end.**

Furthermore, none of the immigrant prisoners with whom we spoke were aware of the language line interpreter service, any process to request interpretation services, or had had a medical, dental, or mental health appointment where the language line service was used.  Rather, they reported that to the extent they had any encounters with health care staff, they had relied upon hand gestures, limited English, or other prisoners or officers to interpret.  Again, this illustrates that the CGAR results on Stipulation Agreement #1 are suspect.  (*See* pages 4-5 above.)

### b.  Routine Care

Perryville scored poorly on performance measure 4 (routine referral within 14 days), and Lumley scored extremely poorly, with only ten percent compliance.  When Lumley's provider Dr. Reres was asked about the delays in access to general and routine care, he acknowledged there are delays and attributes them to the different levels of custody housed at Lumley, which cannot be mixed while in the clinic.  The nurse who schedules provider appointments indicated that she is always able to schedule appointments within ten days, but she could not explain how this is tracked nor could she generate a list of overdue appointments.  Neither of these responses gives us confidence that prisoners have access to routine care within the timeframes mandated by the Stipulation.

Eyman appears to suffer from similar delays.  FNP McKamey indicated that she believed that her patients were seen within the two-week compliance period and that she did not think there was a backlog; was unable to articulate or demonstrate how she came to this conclusion.  Nurse Supervisor Baker indicated that HNRs are reviewed daily and that SMU patients are seen within a day or two.  However, both the prisoners we

interviewed at SMU and the records we reviewed dispute this conclusion, and indicate instead that there are significant delays in access to care.

       **c.   Chronic Care**

The following prisoners reported experiencing critical delays in accessing chronic care that has placed them at risk of serious or life-threatening harm:

**<u>Eyman</u>**



- Mr. ▇▇▇▇▇▇▇ reports that he suffers from epilepsy. He states that on May 30, 2015, he had a really bad seizure, as reported to him by other prisoners. His last chronic care appointment was reportedly in March 2015, when he told the provider that the medication combination wasn't stopping his seizures. At the time, he reports he was on Primadone and was still having lots of seizures. Mr. ▇▇▇ stated that the provider added Kepra, but the seizures have not stopped. He also reports that the provider ordered lab tests to determine if the medication was at therapeutic levels. As of the tour, Mr. ▇▇▇ told us that he hasn't yet been told the results, and that the provider who saw him on June 1, 2015, following a severe seizure episode, did not have the results either.

- Mr. ▇▇▇▇▇▇▇ reports that he suffers from polycystic kidney disease, with 40% functioning of his kidneys. Since his admission to ADC in September 2014, he said he has not received a kidney diet. He states he was seen by a provider on Cook Yard, who reportedly told him that because he has two kidneys left, he does not need a renal diet.

- Mr. ▇▇▇▇▇▇▇ indicated that he has diabetes and a history of colon cancer. He reports he has not had a chronic care appointment since March 2014 and has had no lab work for 19 months.

- Mr. ▇▇▇▇▇▇▇ told us that he took Metformin for his Type II diabetes until he came into ADC custody in November 2014, when it was discontinued. Mr. ▇▇▇▇ indicated that he had submitted HNRs asking that the Metformin be re-started, to no avail. Since the medication was discontinued, Mr. ▇▇▇▇ reports that he has suffered from weakness, dizziness, and passing out, and that on March 6, 2015, he passed out while coming back from rec. When he fell, he apparently hit his face on a concrete slab and had to be taken to the hospital for stitches. Since then, he reports he has passed out four times.

- Mr. ▇▇▇▇▇▇▇ reports that he got a blister on his foot in November 2014. He states that he was given cream to put on it by the nurses. By February, Mr. ▇▇▇▇ reports that he had developed a full-blown MRSA infection and had to be hospitalized for a week to receive intravenous antibiotics. According to Mr. ▇▇▇▇, the podiatrist at the hospital informed him that he almost lost his foot to the infection.

- Mr.  reportedly submitted an HNR on May 10, 2015 because he was feeling dizzy. He said he was seen by a provider on May 21, 2015, and that the provider ordered weekly BP checks, which have not been done. He reports that he has not been seen again since.

## Perryville

- Ms.  reportedly had hand surgery prior to coming into custody to remove a MRSA infection. Since her incarceration, she reports she has not received any physical therapy, despite filing multiple HNRs. Her scar continually gets sunburned and cracks open, which was evident during our interview. Ms. ▇ reports that medical continues to deny her bandages to cover the scar while working as a groundkeeper. She said that she still has not seen a provider and fears that the scar will again become infected with MRSA.

- Ms.  reports ongoing problems getting her supplies to ensure her prosthetic leg remains functional. She reports she requires both an inner and an outer gel liner to ensure that her prosthesis sleeve fits properly. Because there is a hole in the inner liner, she says her prosthesis does not form a seal. Ms. ▇ explained that she suffers from a kneecap injury that causes her inner gel liners to wear out in 1-2 months, rather than the typical 9 months. Ms. ▇ says she saw an orthopedist in December who recommended a specific type of physical therapy that would rehabilitate her knee so that her gel liners would last longer, but the PT has reportedly been denied. As of the interview, Ms. ▇ knee was visibly bruised. She says she was advised by PA Rodriguez to give up on walking and use a wheelchair.

- Ms.  states she is a diabetic. In March 2015, she said she developed an infection in her toe. She was reportedly placed on antibiotics. For the first two days, Ms. ▇ stated that the nurses changed her bandage every day. After that, she said she was required to change the bandage herself and had to submit an HNR for bandage materials. The infection reportedly did not clear up, and she was placed on antibiotics again. Ms. ▇ said the nurses were instructed to check her toe every 24 hours, but these checks never happened. She reports that her toe turned black, and in late May 2015, Ms. ▇ had to have her toe amputated.

    d. **Specialty Care**

The following are prisoners who reported having experienced critical delays in accessing specialty care that has placed them at risk of serious or life-threatening harm:

## Eyman

- Mr. ▇ showed monitors what looked like an untreated broken tibia, and he reported his leg was broken prior to incarceration. What appeared to be a massive hematoma was clearly visible on

his lower leg below where the tibia was protruding under the skin. He came into custody in January 2015 and reports that he still has not seen an orthopedist. We reviewed his medical file and could find no evidence that he had been seen by an orthopedist since coming into custody. This prisoner was brought to Defendants' attention in an advocacy letter sent June 9, 2015, and during the time of the interview with Mr. ███████, Plaintiffs' counsel asked Ms. Orcutt to observe Mr. ███████ damaged leg.

- Mr. ████████████ ear infections reportedly went untreated for nearly a year and when he finally saw the ENT specialist, he was total his hearing loss was permanent. During the year his infections went untreated, he said he submitted numerous HNRs and was seen on the nurse's line, only to have the results of the cultures on his ears lost. Mr. ████████ reports he experienced bilaterally ruptured ear drums, both of which require surgical repair. On May 5, 2015, Mr. ███████ said he received surgery to repair his left eardrum. He reports he will require an additional follow-up appointment for his inner-ear. Even in the face of permanent disfigurement, Corizon has reportedly declined to provide Mr. ███████ with the ear drops prescribed by the ENT, substituting instead a generic version of a different medication.

- Mr. ██████████ reports that he suffers from polycystic kidney disease. Prior to incarceration, Mr. ███████ said he had seen Dr. Bala for this condition. When Mr. ████████ transferred to Rynning Yard, he states he was seen in January 2014 by Nurse Practitioner ████████, who referred him to Dr. Bala. Mr. ████████ reports he did not see Dr. Bala, however, until March 2015, following calls to Corizon from both Mr. ███████ s mother and Dr. Bala himself.



- Mr. ████████████ said he was told on the morning of our tour that the five inch mass on his thigh was a sarcoma. He reports that this mass has been present for at least four months. He said he filed two HNRs requesting to have it evaluated. He reportedly received no response in writing and was not seen until his CO-III, alarmed by the mass, personally intervened. He was placed on the pending specialty care list for an urgent surgery consult on April 13, 2015. Yet, the mass was reportedly not biopsied until the middle of May. Mr. ██████ said he was told at a follow-up meeting the morning of his interview that the mass is cancerous and that he needed to see an oncologist immediately. On June 9, 2015, we sent an advocacy letter to Defendants' litigation counsel on Mr. ███████ behalf.

- Mr. ████████████ ) had two visible melanomas on his face that Plaintiffs' counsel observed, about which he said he submitted HNRs as early as 2012-13. He reported, and his medical records confirmed, that during emergency quadruple bypass surgery, the surgeons found cancerous lymph nodes in Mr. ██████ chest. He also reported (and clinical notes by the provider confirmed) that his lymph nodes in his neck had been swollen for months, as large as eggs. Upon his return to ADC from the heart surgery, despite the surgeons' recommendation that he see oncology, Corizon reportedly denied the provider's request for a specialty ENT consultation for the swollen lymph nodes in his neck.



Mr. ▮▮▮ said he saw a dermatologist on June 1, 2015 and was told that that his facial lesions are almost certainly cancerous, though he did not yet have the pathology tests at the time of our interview. Plaintiffs' counsel sent an advocacy letter regarding Mr. ▮▮▮ condition to defense counsel on June 12, 2015.

- Mr. ▮▮▮▮▮▮ reports that he had his gall bladder and one kidney removed because of a cancerous mass in April 2015. Because he needed close observation after the surgery, rather than being housed in an infirmary setting, he reports that he was placed in a mental health watch cell at SMU-I. He stated that the isolation cell was infested with roaches and coated with pepper spray residue. He spent eight days in this cell. Since April, he reports he has lost 31 pounds. He said he has not received a renal diet and has not had any follow-up post-op.

- Mr. ▮▮▮▮▮ said that he was referred to the "eye line" on December 18, 2014. On December 30, 2014, a scheduler reportedly noted that he would be scheduled to see an ophthalmologist. As of June 3, 2015, Mr. ▮▮▮ said he has not seen an ophthalmologist.

- Mr. ▮▮▮▮▮ said he submitted an HNR on May 25, 2015 stating that he had been waiting seven months to see an ophthalmologist. In response, the nurse reportedly wrote "we will reschedule you." As of June 3, 2015, Mr. ▮▮▮ reports he has not seen an ophthalmologist.

- Mr. ▮▮▮▮▮ stated that he had ankle surgery about a year ago. He believes he needs to see the orthopedist to have some hardware removed from his foot. He said he submitted a grievance on March 31, 2015 regarding his surgery and received a response from Charles Ryan that he would receive an ankle brace. As of June 3, 2015, Mr. ▮▮▮ reports he has neither received an ankle brace nor seen an orthopedist.

- Mr. ▮▮▮▮▮ reported that in January 2015 the skin graft over a previous gunshot wound broke down. While he saw the provider on the same day, and despite that provider's assurance that his referral would be rushed, he reports he was not seen by a specialist for over a month. He also reports that it then took six months for him to receive all the necessary tests to address the condition.

## Perryville

- Ms. ▮▮▮▮▮ reports that she had her non-formulary Plavix discontinued by Dr. Stabinsky about a year ago. PA Rodriguez reportedly referred her to a specialist for a stress test because she was having chest pains. Ms. ▮▮▮ reports that the specialist found that the stent placed in 2010 was blocked 60-70% and that her lower artery was blocked.

- Ms. ▮▮▮▮▮▮ states that she has a hard lump on the side of her neck. In late April/early May of 2015, Ms. ▮▮▮ reports that she was sent to see an ENT. He reportedly ordered a CT scan of the

lump.  As of the date of our tour, Ms. ████████ said the CT has not yet been done, nor has the mass been biopsied.

- Ms. ████████████ reports she had an abnormal pap smear in January 2014 and was told that she would be seen for a follow-up.  She says she was not seen by a provider for almost a year, despite several requests to be seen for severe bleeding and cramping.  She said she submitted many HNRs during that year, and was seen by an RN four times.  In December 2014, she says she was seen by a NP, who did not perform a physical exam and prescribed birth control pills for the bleeding.  On January 15, 2015, she says she finally saw an OB/Gyn and was diagnosed with a tumor.  She reports she saw an oncologist on February 9, 2015 and was diagnosed with Stage 2-3 cancer.  She states she underwent a radical hysterectomy on March 3, 2015 but was told by the surgeon that the cancer had spread and that he was not able to get it all.  As of June 2, 2015, she reports that she had not returned to the surgeon for a follow-up visit.  She says she was told that she would be getting a chemo port placed on June 1, 2015, but when she went offsite, she was instead given an MRI.  She is unsure why she needed the MRI.

- Ms. ████████ reports she has lumps in her breasts, for which she received a mammogram in September 2014, and she was told she should have another mammogram in six months.  She says did not receive her next mammogram until May 2015 and now has lumps in both her breasts and her groin.

  e.  **Emergency Care**

The following prisoners reported experiencing critical delays in accessing emergency care that has placed them at risk of serious or life-threatening harm:

**Eyman**

- Mr. ████████████ reports that, in April 2015, he experienced uncontrollable bleeding following a dental procedure.  He said he filled a big bottle with blood and was vomiting the blood in his stomach.  A sergeant reportedly alerted the nurse on duty, who did not respond for 45 minutes.  Mr. ████████ said the nurse did call an ICS, with a provider's approval.  In the hospital, Mr. ████████ said he required an injection of lidocaine and IV antibotics.  He reports has never seen an oral surgeon about this incident.

- Mr. ████████████, whose experience with difficulties in accessing chronic care is described above, reportedly also suffers from epilepsy.  He and other prisoners housed in his dorm reported that on May 30, 2015, he had a really bad seizure and it took medical staff approximately 20 minutes to arrive on the scene, because the only LPN at the institution was at another Eyman unit.  The LPN reportedly took his vitals but did not send him out to the hospital.  Mr. ████ says he was seen by a provider on June 1, 2015, who performed an EKG.

- Mr. ████████ complained of abdominal pain in early 2014 and was reportedly only seen by medical staff after correctional staff insisted. When he was finally seen, he said he was sent to the emergency room for appendicitis. En route to the hospital, he reports his appendix ruptured and he had to remain hospitalized for seven days. Upon his return from the hospital, he says he was not seen by medical staff for two days.

- Mr. ████████ said he experienced severe abdominal pain beginning in mid-2014. He reports that medical staff repeatedly diagnosed him with acid reflux and gave him antacids. He said he found the only way to relieve the pain was to vomit. His pain got worse, and he began to experience nausea, for which he was reportedly given an injection. In March, he said he began to vomit feces and bile. He was reportedly sent to the hospital where he had emergency GI surgery. Since his return, he reports that medical has not seen him for a follow-up appointment.

**Perryville**

- Ms. ████████ reportedly began suffering from severe abdominal pain one evening in April 2015. By 6:00 a.m. the next morning, she said she was in so much pain that she could not get out of bed. When the officers radioed medical, they were reportedly told not to bring her to the clinic until the afternoon. At 3:00 p.m., medical finally radioed to tell the officers to bring her over. She says she sat in the medical clinic at San Pedro Unit for approximately one hour before being transferred to the IPC. She reports she was at the IPC from 4:45 p.m. to 9:00 p.m., where she was told she was too old to have appendicitis. At 10:00 p.m., the pain had become so excruciating that she was reportedly transferred to Tempe St. Luke's, where she says she was promptly diagnosed with appendicitis and underwent emergency surgery to remove her appendix.

- Ms. ████████ reports significant delays in receiving treatment for breast cancer. Despite these delays, the surgeon was able to obtain clean margins in her surgery on April 20, 2015. The oncologist has ordered radiation, but Ms. ████ reports she still has yet to receive any such treatment. Since the surgery, Ms. ████ says she has experienced severe rectal bleeding, atrial fibrillation, and chest pain. She said she was taken to the hospital on May 5, 2015, where she was diagnosed with diverticulitis, salmonella poisoning, and ulcerative colitis. More than 16 inches of colon reportedly had to be removed. On May 28, 2015, Ms. ████ said she returned to the hospital because of difficulty with urination and abdominal pains. She reports she was then diagnosed with acute renal failure. She says she has not received a renal diet.

- Ms. ████████ reportedly had a grand mal seizure on April 18, 2015. She says she was taken to the clinic, where an LPN cleared her after two hours and sent her back to the yard. While in medical, she has been told she was placed on a gurney on the ground, where she continued to seize for two hours. Because it was the weekend, there was apparently no provider on duty. Reportedly, the pill call nurse



and LPN didn't know what to do and they were unable to reach the on-call provider. Ms. ███ indicated that Sgt. Mitchell finally called 911, and she was taken to an outside hospital. As a result of this series of seizures, Ms. ███ reports she has experienced partial loss of movement on her right side.

- Ms. ████████ indicated that she had varicose veins burst in late 2014. Medical reportedly denied her treatment. A sergeant reportedly called the paramedics. She indicated she was taken to the emergency room where a band was placed to stop the bleeding.

## VI.    Access to Medical Appliances

During our tours, we observed prisoners with disabilities using broken wheelchairs. When we spoke to these prisoners, they all indicated that they had reported the breakage to ADC and Corizon but had not received replacement equipment nor had any efforts (prior to our tours) been made to repair the broken wheelchairs. Mr. ████████ said he has submitted five HNRs asking to have a broken wheel fixed on his wheelchair. He has been waiting over a year and no repairs have been made. Mr. ██████ said he has been forced to use a broken wheelchair, out of which he has fallen twice. He has submitted two HNRs, the first four months ago. No repairs have been made to his wheelchair. Ms. ██████ reported she has been forced to use a wheelchair with only rims, making it nearly impossible for her to navigate around the yard. **These broken chairs place prisoners at risk of serious injury, and we request that they be repaired or replaced immediately.**

Furthermore, prisoners with vision and mobility impairments have reported not being able to receive devices.

## Eyman, Cook Unit

- Mr. ███████ : Mr. ████ is blind and reports that he has been denied a tapping cane or ADA worked to help him navigate around the yard.

- Mr. ████████ : Mr. ██████ is a 94 year old prisoner who states that he needs a four-wheel walker and ADA accommodations, neither of which have been provided to him.

- Mr. ██████ : Mr. ███ wheelchair needs repairs, which as of the date of the tour had not been done.

- Mr. ██████ : Mr. ████ wheelchair needs repairs, which as of the date of the tour had not been done.

- Mr. ███████ : Mr. █████ wheelchair needs repairs, which as of the date of the tour had not been done.

16

- Mr. ███████████ :  One of Mr. █████ legs is longer than the other, and he needs to be evaluated for a leg brace or cane.

- Mr. ███████████ :  Mr. ██████ is an 87 year old, Spanish-only speaker, who can only get around the housing unit or yard by leaning on or holding the arm of another prisoner.  He needs to be evaluated for a four-wheeled walker with a seat or a wheelchair.  He currently has no assistive device.

- Mr. ██████████ :  Mr. █████ wheelchair needs repairs, which as of the date of the tour had not been done.

- Mr. ████████████ :  Mr. ████████ is a Spanish-only prisoner whose wheelchair needs repairs.  As of the date of the tour had not been done.

- Mr. █████████ :  Mr. ██████ reportedly has a spine injury and needs wheelchair or walker.

### Eyman, Meadows Unit

- Mr. ███████████ :  Mr. ███████ wheelchair needs repairs, which as of the date of the tour had not been done.

- Mr. ██████████ :  Mr. ██████ wheelchair needs repairs, which as of the date of the tour had not been done.

- Mr. ███████████ :  Mr. ███████ said that he used to have custom leg braces that allowed him to walk.  He reports that these braces were confiscated and that without them, or a different assistive device, he cannot walk.

- Mr. ████████ :  Mr. ████ reports that he had triple bypass surgery in 2012 and that he suffers from COPD.  He states that he cannot walk without a four-wheeled walker.

### Dental

We received widespread reports that access to dental care is delayed, many times significantly.  Dr. Gray, the dental director, acknowledged the backlog, but reported that he is optimistic that all backlogs will be cleared within a month.  We are hopeful that this will be the case, however, our interviews with prisoners revealed widespread delays in the provision of dental care.

### Eyman

The dental scheduler at Eyman, Ms. Taylor, when asked whether patients are being seen within 90 days in SMU-I, replied, "that's not going to happen."  She said that Dr. Smallwood does track the backlog, and periodically does "blitzes" to try to catch up.  However, she said security is always first, and it is not possible to

stay caught up with the demand in the SMU-I.  **Please report on what steps are being taken to reduce the dental back log at Eyman and ensure that class members are being seen within appropriate timeframes.**

- Mr. ▮▮▮▮▮▮▮▮ reports he has been suffering from dental pain for two months and has only been offered extractions.

- Mr. ▮▮▮▮▮▮ says he broke his front tooth (which appeared to be half a tooth) two years ago. Since then, he reports he has seen a dentist four times.  However, he says no one fixes his tooth, they just make an appointment for him to return in 90-180 days.

- Mr. ▮▮▮▮▮▮ says he submitted an HNR complaining about pain in his wisdom teeth about six months ago, and then submitted another about six weeks ago.  He says that he has not been seen in the dental clinic in response to either HNR.

- Mr. ▮▮▮▮▮▮▮ put in his HNR requesting a filling about seven weeks ago.  At the end of May, he said he was told it would be over two months before he would see a dentist.  He reports that he is not currently experiencing pain.

- Mr. ▮▮▮▮▮▮▮ said he submitted HNRs for dental on March 6, 2015 and April 23, 2015.  In the first, he said he complained of pain that made it hard for him to chew food.  In response to each HNR, he reports he was told that he was on a list, but according to his medical record, he had not been seen in the dental clinic since his first HNR.

- Mr. ▮▮▮▮▮▮ reports that he agreed to have eight teeth pulled in order to get dentures, but that he has since been told that since the eight teeth pulled are not next to each other, he is not eligible for dentures.

**Perryville**

We spoke with two dental assistants and Dr. Gray at Perryville.  The dental assistants reported that they were unaware that numerous HNRs were identified as missing by the Perryville monitor in the March CGAR (Dental, Measures 3 and 4) suggesting a failure to implement a CAP for this serious barrier to timely access to dental care. The dental assistants also reported no difficulty in timely triaging HNRs within the timeframes set forth in the Stipulation. Prisoner reports, however, indicate that there are still significant delays in meeting the timeframes set forth in the Stipulation.  **Please report on what steps are being taken to reduce the dental back log at Perryvilee and ensure that class members are being seen within appropriate timeframes, particularly given that compliance went from 24% in March to 18% in May.**

- Ms. ▮▮▮▮▮▮▮ said she filed multiple HNRs over the past three months regarding a painful cavity. She reports she was told to be patient.  She said she finally saw the dentist the week last week of May, and he pulled the tooth, telling her they didn't do fillings.

- Ms. ███████████ reports she had all of her teeth pulled by dental staff so she could get dentures. Now she says she is being told that she has to wait six months to be fitted for dentures, and that given her 2016 parole date that there isn't enough time to make her dentures. She said if she knew they were going to not provide her the promised dentures, she wouldn't have agreed to have her teeth pulled. In March, she reports the dentist left half of a tooth exposed and not completely pulled, which then got infected. She said she is supposedly getting a mechanical diet, but she said it is identical to the regular diet but she gets an instant carnation protein shake twice a day.

### Mental Health

We were pleased to see some progress in some areas of mental health care in comparison to MGARs produced during litigation. However, in many areas, it is simply impossible to determine Defendants' level of compliance with the mental health Performance Measures because the monitors are not accurately monitoring compliance with these Measures. A number of examples are set forth below.

<u>General issues</u>

We had the opportunity to interview Dennis Dye, who monitors the mental health Measures at Perryville, and Jessica Raak, who does so at Eyman. Both Mr. Dye and Ms. Raak stated that, for Measures requiring that a given action be performed every X days, they monitor by looking at the record and determining whether that action had been performed within the previous X days.[3] There are two problems with this method.

First, the monitors do not provide the date on which they made this determination; without this information, it is impossible to check the accuracy of their findings. The second and more fundamental flaw is that this method does not actually measure compliance with the CGAR requirements.

Take, for example, Measure #8, which requires that MH-3A prisoners be "seen a minimum of every 30 days by a mental health clinician." If the monitor reviews the file and finds that this has not been done within the previous 30 days, that file is noncompliant. However, the converse is not true – a finding that it has been done within the previous 30 days does not demonstrate compliance. It could be that the prisoner has been seen by a mental health clinician only once in the past 6 months or once in the past year, in which case the requirement that he be seen "a minimum of every 30 days" is not met. Indeed, in a number of records that Mr. Dye recorded as compliant with Measure #8, the prisoner was not in fact seen a minimum of every 30 days. See, e.g., ██████ (███) (seen 12/8/14 and 3/23/15); ███████ (███████) (seen 2/27/15 and 3/31/15); ██████ (███) (seen 2/12/15 and 3/25/15); ██████ (███████) (seen 1/18/15 and 3/24/15) (ADCM037105).

---

[3] This includes Measures # 1, 5, 8, 9, 10, 11, 12, 14, 15, 16, 17,18, and 20.

At our June 4 meeting, Ms. Raak stated that henceforth Measure #8 will be monitored by looking at the previous calendar month, rather than the 30 days immediately preceding the monitor's review. But this method suffers from the same flaw: finding that an action was performed once within a 30-day period is not the same as finding that it is performed every 30 days. Rather, monitoring of measures requiring that an action be performed every X days requires looking at the time elapsed *between* the dates on which that action was performed, which the monitors are not currently doing.

Measure #25 requires that specified items from a prisoner's health care record be "provided" to a mental health provider treating that prisoner by telepsychiatry, in advance of the telepsychiatry session. Both Mr. Dye and Ms. Raak stated that if the items in question were in the prisoner's health record in eOMIS, they found that record to be compliant. But the fact that the items are in the electronic medical record does not mean that they are "provided" to the mental health provider. **Please ensure that future monitoring of this item ascertains whether these items are actually "provided" to the mental health provider as required by the Measure.**

Stipulation Agreement Measure #2 requires, in part, that "all reasonably available steps be[] taken for prisoners who are taking psychotropic medications and suffer a heat intolerance reaction, to prevent heat injury or illness." For both Perryville and Eyman, the monitor (Dr. Taylor) coded the item green and wrote "There were no inmates being treated for heat intolerance reactions in the prior reporting period." ADCM036980, 037148. But that fact, if true, does not establish compliance with the Measure, and indeed may show noncompliance. The question to be answered is whether prisoners taking psychotropic medications who "suffer a heat intolerance reaction" receive interventions to prevent heat injury or illness. **Please explain how this Measure is monitored, including how the universe of prisoners who "suffer a heat intolerance reaction" is identified.**

A number of Measures as set forth in the CGARs do not accurately reflect the requirements of the Stipulation. For example, Measure 11 should read "…or major depression seen *by a mental health provider* a minimum of every 90 days." See ADCM 037106. Measure #23 should read "… between 7 *and* 10 days *after discontinuation."* See ADCM 037109. Measures #26 and 27 are also set forth incorrectly in the CGARs, as they both refer to "the current Mental Health Technical Manual." See ADCM 037110. In fact, the relevant performance measures in the Stipulation refer to the "Mental Health Technical Manual (MHTM) (rev. 4/18/14)." See Stipulation, Exhibit B, Measures #98 and 99. Thus, regardless of any future revisions to the MHTM, the requirements of the 4/18/14 version govern for purposes of assessing Defendants' compliance with these Measures.

Stipulation Agreement Measure #3 (psychological autopsies) similarly fails to accurately reflect the requirements of the Stipulation. The final two sentences of paragraph 16 of the Stipulation provide:

> Psychological autopsies and mortality reviews shall identify and refer deficiencies to appropriate managers and supervisors including the CQI committee. If deficiencies are identified, corrective action will be taken.

By contrast, Stipulation Agreement Measure #3 garbles the first sentence, and omits the second entirely:

> Are psychological autopsies and mortality reviews identified and any deficiencies referred to appropriate managers and supervisors including the CQI committee?

ADCM036980. Please correct these Measures so that they accurately and completely reflect the requirements of the Stipulation.

Finally, an additional concern is the presence of obvious errors in the CGARs. See, e.g., Perryville March 2015, Measure #11 (ADCM037106) (purporting to indicate that prisoners were seen on 12/17/15, 12/11/15, 12/26/15, and 11/20/15); Perryville, Measure #25 (ADCM037109) (one ADC number listed as compliant, 289214, actually belongs to a male prisoner); see also Perryville, Measure #2, discussed below. Such errors not only make it impossible to determine whether the record in question is actually compliant with the Measure; they also cast serious doubt on the reliability of the CGARs as a whole.

**Perryville**

On Measure #2 ("Are all female prisoners being seen by a licensed mental health clinician within five working days of return from a hospital post-partum?"), Mr. Dye indicated that he reviewed three records, and all three were compliant (ADCM037100). However, one of the records identified by Mr. Dye, ███████, is actually that of a male prisoner (███). Presumably the record actually reviewed was ████████). Upon her return from the hospital postpartum, Ms. ████ was seen on 3/30/15 by ███████████, who is not a licensed mental health clinician. Accordingly this record, and the Measure as a whole, should have been coded as noncompliant.

Measure #7 asks, "[i]f a prisoner's mental health treatment plan includes psychotropic medication, is the mental health provider indicating in each progress note that he or she has reviewed the treatment plan?" Mr. Dye stated that he looks only at the most recent progress note in the file; this does not measure whether the provider is indicating "in *each* progress note that he or she has reviewed the treatment plan."

Measure #11 requires that "MH-3B prisoners who are prescribed psychotropic medications [be] seen a minimum of every 180 days by a mental health provider," and that "MH-3B prisoners who are prescribed psychotropic medications for psychotic disorders, bipolar disorder, or major depression [be] seen a minimum of every 90 days." Mr. Dye coded █████ (████) and █████ (████) as compliant with this measure. ADCM037106. However, both of these prisoners carry diagnoses of major depression; accordingly, they should have been seen at least every 90 days, but were not.

Measure #14 asks, "[a]re MH-3D prisoners seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication?" Mr. Dye stated that he does not monitor whether these prisoners are seen for a minimum of six months. This is a requirement of the Measure and must be monitored.

Measure #23 requires, in part, that "inmates that are removed from a suicide or mental health watch [are] removed by a licensed mental health staff." Mr. Dye stated that he does not monitor whether the prisoner was removed from suicide watch by a licensed mental health staff. This is a requirement of the Measure and must be monitored.

Measure #26 asks "Are mental health HNRs being responded to within the timeframes within the current Mental Health Technical Manual?"[4] The 4/18/14 MHTM provides different response timeframes, depending on the nature of the mental health issue set forth in the HNR, ranging from "immediately upon receipt of the HNR" to "within fourteen (14) days." See ADC 267409. Mr. Dye stated that he only includes non-emergency HNRs in his audit. This is inconsistent with the Stipulation and impermissibly excludes the most important category of HNRs from review. Rather, a random sample of mental health HNRs must be reviewed, and a determination of compliance must be made for each, taking into account the mental health issue set forth in the HNR.

As noted above, Measure #8 requires that MH-3A prisoners be "seen a minimum of every 30 days by a mental health clinician." "Seen" is defined in Appendix A to the Stipulation as follows:

> Interaction between a patient and a Medical Provider, Mental Health Provider or Mental Health Clinician that involves a treatment and/or exchange of information in a confidential setting. With respect to Mental Health staff, means an encounter that takes place in a confidential setting outside the prisoner's cell, unless the prisoner refuses to exit his or her cell for the encounter.

Many of the encounters, particularly those by Psych Associate Hassan, are too brief to allow any meaningful "treatment and/or exchange of information in a confidential setting." See, e.g., ▇▇▇ (▇▇▇), 3/25/15 (2½ minutes); ▇▇▇ (▇▇▇), 3/20/15 (2½ minutes); ▇▇▇ (▇▇▇), 3/19/15 (less than 2½ minutes); ▇▇▇ (▇▇▇r), 3/5/15 (less than 1½ minutes); ▇▇▇ (▇▇▇), 2/25/15 (less than 2½ minutes), 5/19/15 (less than 1½ minutes).

Similarly, Measure #11 requires that MH-3B prisoners who are prescribed psychotropic medications be "seen" by a mental health provider either every 90 days or every 180 days. Here too, some encounters are too brief to allow any meaningful "treatment and/or exchange of information in a confidential setting." See, e.g., ▇▇▇ (▇▇▇) (10/27/14) (less than 4 minutes) (NP Keck); ▇▇▇ (▇▇▇) (12/5/14) (2 ½ minutes) (Dr. Riyaz).

---

[4] As noted above, this is an incorrect statement of the Stipulation's requirement.

**Eyman**

In the March 2015 CGAR, there are no results for SMU-I or Browning Units for Measures # 8, 9, 10, 11, 12, 13, or 14 (see ADCM036924-26), and Ms. Raak confirmed that she did not monitor these Measures at those units. Monitoring of these Measures is required at all units, and findings of compliance made without auditing all units are invalid.

In the March 2015 CGAR, Ms. Raak indicated that Measures #3 and #4 "do[] not apply to this complex." ADCM036922. As discussed at our June 4 meeting, this is incorrect, as male prisoners sentenced to death go through intake at Eyman. Accordingly, these Measures must be audited at Eyman.

On Measure #23, Ms. Raak stated that she did check whether the prisoner was taken off watch by a licensed mental health staff, as required by this Measure; however, her findings are not indicated on the March 2015 CGAR. ADCM036928. Again, this is a requirement of the Stipulation; it must be monitored and the results must be included in the CGAR report.

Also on Measure #23, Ms. Raak said that if only one of the three required follow-up dates had elapsed at the time she reviewed a record, and that one follow-up had occurred, the record would be coded as compliant. This method fails to measure compliance with the Measure, which requires that prisoners taken off watch be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between 7 and 10 days after discontinuation, *and* between 21 and 24 days after discontinuation. Accordingly, monitoring must be based on a sample of 20 records in which all three required follow-up dates have elapsed.

Dr. Tenrreiro stated that telepsych is used on SMU-I and Browning Units. On Measure #25, the March 2015 CGAR indicates results only for SMU-I, and Ms. Raak was unable to explain why there were no results for Browning. ADCM036928. In the future, this Measure should include results from Browning, or a statement that there were no telepsych appointments at Browning during the monitoring period.

On Measure #7 ("If a prisoner's mental health treatment plan includes psychotropic medication, is the mental health provider indicating in each progress note that he or she has reviewed the treatment plan?"), the following records were coded as compliant: ██████ (████); ██████ (████); ██████ (████); (████); ██████ (████). ADCM036924. However, in *all* of these records, Dr. Rastogi wrote "there is no treatment plan in his chart for my review." **Please explain how to reconcile these conflicting statements.**

The March 2015 Eyman CGAR contains no Corrective Action Plans (CAPs). See ADCM036930-31. These are required by the Stipulation and must be provided.

We were concerned to learn from Dr. Tenrreiro of the numerous vacancies among mental health staff at Eyman: one psych RN, one psych NP, three psychologists, three psych associates, and two behavioral health

23

technicians. It is difficult to imagine Eyman coming into compliance with the mental health Measures with this level of understaffing.

**Individual Prisoners**

      The condition and treatment of the following individual prisoners raise serious concerns:



      ██████████████, **Perryville-Lumley-SMA.** Ms. ██████ is classified as MH-4 and Seriously Mentally Ill (SMI). She also reports that she is developmentally disabled, and upon interview her intellectual functioning appears to be quite limited. She reports auditory hallucinations, saying that she hears nine different voices.

      Most disturbingly, Ms. ██████ was pepper-sprayed on two separate occasions on a single day, March 25, 2015. Although at least one of these uses of force occurred while she was on a constant mental health watch, there is no indication of intervention by mental health or other health care staff.

      It appears that the symptoms of Ms. ██████ mental illness are not being effectively treated, and as a result she is being subjected to repeated uses of force that risk further aggravating her condition. *See* letter sent to Dan Struck, June 11, 2015.

      ██████████████, **Perryville-Lumley-SMA.** Ms. ██████ is classified as MH-4 and SMI. When interviewed on June 1, 2015, she was floridly psychotic. It is apparent that whatever treatment Ms. ██████ is receiving is not successfully controlling the symptoms of her mental illness.

      ██████████████, **Eyman-SMU I.** Mr. ██████ is classified as MH-3 and Seriously Mentally Ill (SMI). When we interviewed him at his cell in SMU I on June 3, 2015, he was completely delusional and screaming loudly. Indeed, he was so agitated that Mr. Bojanowski asked us to terminate the interview. As a result we were not able to ascertain what mental health treatment, if any, Mr. ██████ is receiving, or whether he is receiving the programming and out-of-cell time required by the Stipulation. It is apparent that Mr. ██████ mental illness is not being effectively treated, as he remains highly symptomatic. *See* letter sent to Dan Struck, June 11, 2015.

      ██████████████, **Eyman-SMU I.** Mr. ██████ is classified as MH-4. On March 4, 2015, he stuck a spork and a pencil into an open wound in his stomach. On March 15, he again engaged in self-harm and was sent to an outside hospital with uncontrolled bleeding. On that occasion, and again on March 22, he was repeatedly pepper-sprayed by custody staff; on neither occasion is there any indication of intervention by health or mental health staff. It appears that Mr. ██████ self-harm is not being adequately treated, and his self-harm attempts are potentially lethal.

## Maximum Custody

### General Issues

In general, there is a problem with consistency in the documentation required for compliance with the maximum custody measures.  In particular, the different facilities reviewed some differing documentation to measure DI 326 compliance.  At Eyman, for instance, the facility put together a binder with documents containing review of phone records, visit logs, property logs, work hours, and commissary accounts – all implicated in the DI 326 privilege scheme.  None of these records were produced by Perryville when we requested to review the documentation for their Maximum Custody CGAR review for the month of March.  As a result, it is impossible to evaluate Perryville's compliance with some of the DI 326 measures.

At Eyman, each unit also explained its record draw methodology for the maximum custody CGARS and produced count sheets to demonstrate the validity of its reported method.  Perryville produced no such documents.

During our inspections, Director McWilliams mentioned that efforts were being made to standardize maximum custody CGAR review and methodology across facilities.  We strongly urge that this be done as quickly as possible and **we request any documentation provided to staff and monitors that provides guidance on determining compliance with the Maximum Custody Performance Measures.**

We have also discovered a strange inconsistency between the original and updated March CGAR report for the maximum custody performance measures.  At each facility inspected, we asked for the underlying March CGAR documentation and were provided individual records for prisoners consistent with the original March CGARS for the week of March 7–13, 2015.  However, when we later compared the ADC numbers between the original March CGAR (Perryville, ADCM016070-016119; Eyman, ADCM015902-015963) and revised March CGAR (Perryville, ADCM037099-037149; Eyman, ADCM036921-036981), we discovered that the revised performance measures had substituted almost entirely different names in the records reviewed for the maximum custody measures.  A comparison of the records reviewed for each report is in Appendix A. These new records were not produced at any of the facilities as part of the March CGARS.  As a result we cannot determine actual compliance with these reports.

**Please explain who conducted these reviews and why new records were used for the revised March CGARs in determining compliance with the maximum custody performance measures.  We also request these CGAR compliance records for the individuals whose documents were not produced for our review at the facilities** despite the fact that they were apparently used as the basis for the revised reports:





**PERRYVILLE:**



*(Male - note that we request the records actually used for compliance measurement, but this is the number recorded in the CGAR)*

In each facility, there is also differing practice amongst staff on the proper procedure to document prisoner refusals of exercise and out-of-cell time. Policy requires that refusals be signed by the prisoner or, if the prisoner refuses, two correctional officers. Yet, the actual practice varied hour by hour in each of the units' records that we reviewed. Some officers appeared not to bother even asking for a prisoner's signature and just signed themselves or did not bother signing; others noted refusals but only one officer signed; while others complied with the actual policy. Given the critical importance of ensuring that out-of-cell time under DI 326 is offered in practice, rather than just on paper, we urge tighter supervision of officers and their documentation be part of unit practice – but also monthly CGAR review.

This lack of CGAR review may be at the heart of the inconsistencies we found across the units and in the computation of compliance (discussed for each measure and facility below). Counsel informed us that although Nicole Taylor is handling the maximum custody CGAR reporting, she is only inputting the data

provided to her by the units.  She does not review the underlying documentation to ensure that the performance measures are being accurately reported.  If she had done so, she likely would have noted the inconsistency in reporting across units and some of the confusion in what to count and how to count it that has led to the current inaccurate compliance measures for DI 326 and "SMI" programming and out-of-cell time (Performance Measures #1-3; #5-6; #8).

Compliance with Performance Measure #4 related to the provision of meals with the same caloric and nutritional content as meals served to other ADC prisoners is a measure we discussed with counsel and Director McWilliams during the tours.  Counsel produced a document entitled, "Arizona Department of Corrections Menus nutrition Content" (ADCM038216) and dated April 2015.  It is our understanding that this document reflects the nutritional and caloric content of the revolving six week menu for all prisoners in ADC custody, including those in maximum custody.  However, since this is merely a verbal assurance **we ask that documents showing that prisoners in maximum custody are receiving "meals equivalent in caloric and nutritional content to the meals received by other ADC prisoners," as required by the Stipulation, be provided**. Counsel informed us at the tour that some menu items for general population and maximum custody may differ due to security issues.  We ask that these differences be identified.  We were also informed that the menus have been reviewed and certified by a nutritionist and that this certification could be produced.  **We request that this certification be produced.**

The requirements for compliance with Performance Measure #9 related to use of force also appears to have created confusion in the units.  The Maximum Custody Outcome Measure #9 requires that:

> All use of force incidents involving prisoners who are designated SMI *or* housed in Florence-CB-1 or CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU (BMU); Perryville-Lumley SMA; or Phoenix (Baker, Flamenco, or MTU) conform to the policies for use of force set forth in ¶ 27 (a)-(e) of the Stipulation.

Stipulation, Exhibit D, Doc. 1185-1 (October 14, 2014) (emphasis added).  This means that all maximum custody prisoners designated SMI *and* all prisoners housed in the enumerated units— regardless of SMI status—are subject to Performance Measure #9, and any use of force incidents involving these individuals must be included in the monthly CGAR review for Performance Measure #9.  During our tours we did confirm that this is the understanding held by Director McWilliams.  However, based on the documentation provided for the March CGAR review, it appears that the units believe that *only* SMI prisoners are included in this measure.  For example, the CGAR reports themselves indicate "SMI Use of Force Reports" as part of the evidence relied upon, and at Eyman the CGAR documentation package actually listed Use of Force Reports for SMI prisoners in the table of contents. For March 2015 and all CGAR reports promulgated thereafter, **we ask that the monitor and unit staff ensure that the use of force incidents reported include the full population required to be measured for compliance under the Stipulation.**

We are also concerned that many use of force incidents are not video recorded. In some cases this was due to foreseeable and avoidable camera problems. *See, e.g.*, SMU, ████████, 2/28/15 (camera battery died and all other cameras were occupied). In other cases there is no explanation for the failure to record the incident. The video recordings are an important source of information for monitoring Defendants' compliance with Measure #9; accordingly, use of force incidents must be recorded unless it is impossible to do so; and if that is the case, the impossibility should be well documented.

For Use of Force compliance we are also concerned that the Stipulation Criteria set forth in ¶ 27 (a)-(e) are not set forth anywhere in the documentation and are often not addressed at all in the various reports generated as part of the incident. For example, in none of the controlled use of force incidents was there mention of the "cool down period" required under ¶ 27 (b) or mention of why it was not offered. ████████ ████████████, was pepper-sprayed in two separate incidents at Perryville-Lumley-SMA on March 25, 2015; from the documents provided to us it is not apparent that *any* of the requirements of ¶ 27 were complied with. Because the documentation evaluating Performance Measure #9 does not even address specific consideration of the Stipulation requirements, it is impossible to determine compliance. As a first step, we believe that the inclusion of the required Stipulation criteria in use of force documents regularly used by staff and training around these issues would allow for more accurate monitoring of this measure.

**Perryville**

At Perryville-Lumley SMA many of the women prisoners expressed the feeling that things have improved at the unit in recent months. Out-of-cell time appears to be offered fairly consistently based on our review of the Out-of-Cell Tracking Reports produced on-site. A few things should be noted, however.

One of the records produced was for a woman who was transferred from SMA mid-week (████ ████████). As a result, her data was not useable for the review but no alternate record was chosen. This is likely to occur periodically and provision for drawing another record needs to be made.

There does appear to be a misunderstanding of the requirements of Performance Measure #3 which requires that all out-of-cell time specified in Outcome Measures 1, 2, 8 that is limited or cancelled is properly documented and justified in accordance with the terms of the Stipulation as set forth in ¶26. In the original March CGAR for Perryville that tracks the records we were given for review on site the monitor reported that no such cancellations took place. Yet when we reviewed the records we found three clearly indicated cancellations of recreation during the week in question – all on the same day. Clearly some clarification on the actual requirements of Performance Measure #3 need to take place before staff can accurately review this measure.

30



**March CGAR Performance Measure #3**

| ADC# | Name | Cancelled-or-Limited? | Compliance? | Week of 3/7 |
|---|---|---|---|---|
| █████ | ██████████ | None | Y | None |
| █████ | ██████████ | None | Y | Rec cancelled 3/10 |
| █████ | █████████ | None | Y | None |
| █████ | █████████ | None | Y | Rec cancelled 3/10 |
| █████ | █████████ | None | Y | None |
| █████ | ██████████ | None | Y | Rec cancelled 3/10 |
| █████ | █████████ | None | Y | None |
| █████ | █████████ | None | Y | None |
| █████ | █████████ | None | Y | None |
| █████ | ████████ | None | Y | None |

Also, as mentioned above, unlike Eyman, Perryville did not appear to include the full range of DI 326 records necessary to actually determine compliance with the policy in its CGAR packet. As a result, it would be impossible to measure compliance with Performance Measure #6:

> Are all maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30), who are eligible for participation in DI 326 offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy?

Provision of the required out-of-cell time and programming for prisoners with serious mental illness ("SMI") under Performance Measure #8 is where the unit falls most short of compliance. Again we used the documents provided on the tour and compared them with the findings in the March CGAR pertinent to those individual's records. The table below shows the compliance recorded in the CGAR (in white) with our findings from the records provided at Perryville (in grey). The divergent results are striking. In no case did the actual paper record reflect compliance with Measure #8 although the Monitor gave the facility a 100% compliance rating. Curiously, staff also recorded "searches" and a trip to medical under the SMI provisions requirement of

1 hour additional out-of-cell time in the daily tracking sheets.  Given that the Stipulation requires that SMI prisoners receive "one hour of additional out-of-cell programming" (Stipulation, ¶ 25), searches and escorts to medical are not activities compliant with this requirement of the Stipulation.  We suggest that additional staff training on the SMI provision is necessary to ensure accurate record keeping for this Performance Measure.

**March CGAR Performance Measure #8**

| ADC# | Name | 10 HRs Unstruct. | 1 HR MH | 1 HR Psycho-ed | 1 HR Add'l | Compliance? |
|---|---|---|---|---|---|---|
| ██ | ████ | Y | Y | Y | Y | Y |
| WEEK OF 3/7: | | 4 hrs 20 min; 2 other occasions refused | None | 2 hrs? [illegible] | 45 min | |
| ██ | ████ | Y | Y | Y | Y | Y |
| WEEK OF 3/7: | | 9 hrs | Offered/refused | None | 45 min [searches] | |
| ██ | ████ | Y | Y | Y | Y | Y |
| WEEK OF 3/7: | | 9 hrs | 1 hr | Refused | 45 min [searches] | |
| ██ | ████ | Y | Y | Y | Y | Y |
| WEEK OF 3/7: | | 9 hrs [includes dental clinic] | 2 hrs? [illegible] | None | 45 min [searches] | |
| ██ | ████ | Y | Y | Y | Y | Y |
| WEEK OF 3/7: | | 8 hrs 50 min | None | 2 hrs 10 min | 45 min [searches] | |



| ADC# | Name | 10 HRs Unstruct. | 1 HR MH | 1 HR Psycho-ed | 1 HR Add'l | Compliance? |
|---|---|---|---|---|---|---|
| ███ | ████████ | Y | Y | Y | Y | Y |
| WEEK OF 3/7: | | 9 hrs | None | Offered/refused | 45 min [searches] | |
| ███ | ████ | Y | Y | Y | Y | Y |
| WEEK OF 3/7: | | 7 hrs 35 min | None | Refused | 45 min [searches] | |
| ███ | ████ | Y | Y | Y | Y | Y |
| WEEK OF 3/7: | | Unclear [illegible] | None | Refused | 45 min [searches] | |
| ███ | █████ | Y | Y | Y | Y | Y |
| WEEK OF 3/7: | | 6 hrs 45 min [includes 15 min at nurse's line] | 2.5 hrs | Refused | 2 hrs 24 min [includes 45 min searches, 24 min going to medical] | |
| ███ | ████ | Y | Y | N | Y | N |
| WEEK OF 3/7: | | 9 hrs | None | Refused | 2 hrs 45 min [includes 45 min searches 2 hrs "step 3 activity" | |



## Eyman SMU-I and Browning

At Eyman many prisoners expressed the view that custody staff are doing their best to comply with the Stipulation's requirements for out-of-cell time, but are prevented from doing so by insufficient staff. In SMU-I we heard consistent praise for COIII Condry and COIII Mosley, who were described as doing their best to implement the program despite insufficient staff.

At SMU-I we also heard from numerous prisoners in different housing areas that they are sometimes left locked in the shower for two hours or more, with nothing to do and not even a place to sit. As a result, some prisoners are refusing showers. We were also told that if a prisoner refuses his shower to avoid this ordeal, he loses his step level. There is clearly no justification for this practice.

We heard from several prisoners at Eyman that program workbooks and other materials are available only in English; thus, prisoners who cannot read and write English are unable to advance through the program. Given the number of Spanish-speaking prisoners in ADC, it should be possible, at a minimum, to make these materials available in Spanish.

In SMU-I we were surprised to learn from DW Van Winkle that there are no longer handballs, or indeed any equipment at all, in the recreation enclosures at the end of each pod. Prior to the settlement, Defendants represented to the Court that handballs were typically available in both the SMU-I and Browning recreation enclosures on the living pods. While not required by the Stipulation, bringing back handballs is a low-cost measure that would make these areas less stark and encourage prisoners to exercise.

In terms of the Performance Measures, the reporting at Eyman reflects a lack of guidance on how to actually count out-of-cell time for compliance measuring, as well as numbers that simply don't add up. For example, below are two charts which reflect both how Performance Measure #1 out-of-cell time was computed in the March CGAR and the actual out-of-cell time we counted on the tracking forms given to us at both SMU-I and Browning. The case of ████████████████████ at SMU-I, is illustrative. Mr. ████████ is a Step III but during the days 3/7 – 3/13/15 the documentation shows that he actually had no out-of-cell time because he refused recreation four times and had no other out-of-cell programming offered. Counting these refusals as potential out-of-cell time, he would have had a maximum of 8 hours possible out-of-cell time. This amount does not meet the minimum threshold for Step III of 9.5 hours. But on the CGAR his out-of-cell time is listed as 12 hours – even though this time is not reflected in ADC's actual documentation.

The case of ████████████████, a Step 1 prisoner at SMU-I, is also illustrative. The CGAR says that Mr. ████████ received 11 hours of out-of-cell time. However, the documentation shows that he had 2 hours of recreation on March 8 and refused recreation on March 9 and 12. No other out-of-cell time was offered. Counting the refusals as four hours of potential out-of-cell time, the documentation only shows a possible out-of-cell time of 6 hours which doesn't meet the required 7.5 hours out-of-cell for Step 1. Again,

based on the documentation, there is no possibility that Mr. ███████ had or was offered 11 hours of out-of-cell time.

**Performance Measure #1:  SMU I**

| ADC# | Name | StepI StepII StepIII | Compliance? | Week of 3/7 – 3/13 |
|---|---|---|---|---|
| ██ | ███████ (step 2/3) | 14 Hr 1 Min | Y | 5 hrs 1 min (rec refused 3x) |
| ██ | ███████ (step 3) | 12 Hr | Y | 0 hrs (rec refused 4x) |
| ██ | ███████ (step 2) | 11 Hr 10 Min | Y | 2 hrs 10 min (rec refused 3x) |
| ██ | ███████ (step 3) | 14 Hr 36 Min | Y | 3 hrs 36 min (rec refused 4x; program refused; MH group refused) |
| ██ | ███████ (step 1) | 11 Hr | Y | 2 hrs (rec refused 2x) |
| ██ | ███████ (step 3) | 51 Hr 1 Min | Y | 70.77 hrs (rec refused 2x) |
| ██ | ███████ (step 2) | 10 Hr 31 Min | Y | 2.43 hrs (refused rec 1x) |
| ██ | ███████ (step 3) | 19 Hr 16 Min | Y | 8 hrs 8 min (refused rec 3x) |
| ██ | ███████ (step 2) | 13 Hr | Y | 0 hrs (refused rec 3x, program 1x) |
| ██ | ███████ (step 3) | 24 Hr 46 Min | Y | 10 hrs 51 min (refused rec 4x) |

Similarly, at Browning, it is often unclear what is being counted and where the numbers used in the CGARS are actually documented.  In the case of ████████████, ████████████, and ████████████████ the records reflect that they each had zero hours out-of-cell and that they each refused recreation three times during the week of March 7.  Assuming that each recreation session is two hours in length per policy, that amounts to a potential 6 hours out-of-cell for that week.  But the CGAR indicates that they each received 7.5 hours out-of-cell.  We question where this extra 1.5 hours is being added and how. Similarly, with ████████████████, a Step 3 prisoner, there is confusion between the amount of time out-of-cell recorded in the CGAR, 28.14 hours, and the amount of time we saw documented in the tracking form, 11 hours and 10 minutes (some of the handwriting was difficult to discern in this record but any differential in time would be a

matter of minutes and not hours).  As a Step 3, Mr. ▮▮▮ makes the required 9.5 hours out-of-cell time but it is unclear where the numbers reflected in the CGAR are actually documented.

**Performance Measure #1:  Browning**

| ADC# | Name | StepI StepII StepIII | Compliance? | Week of 3/7 – 3/13 |
|---|---|---|---|---|
| ▮ | ▮ (step 1) | 7.5 | Y | 0 hrs (ref rec 3x) |
| ▮ | ▮ (step 1) | 7.5 | Y | 0 hrs (ref rec 3x) |
| ▮ | ▮ (step 1) | 7.56 | Y | 4 hrs 25 min (ref rec 1x) |
| ▮ | ▮ (step 1) | 7.6 | Y | 5 hrs 10 min (ref rec 1x) |
| ▮ | ▮ (step 1) | 7.5 | Y | 0 hrs (ref rec 3x) |
| ▮ | ▮ | 11.51 | Y | Wrong Number in Report |
| ▮ | ▮ (step 3) | 9.54 | Y | 5 hrs 54 min (ref rec 2x) |
| ▮ | ▮ (step 3) | 10.58 | Y | 5 hrs 58 min (ref rec 2x) |
| ▮ | ▮ (step 3) | 28.14 | Y | 11 hrs 10 min (ref rec 4x) |
| ▮ | ▮ (step 1) | 10 | Y | 0 hrs (ref rec 4x) |

The same problems with unclear calculation in the CGARS were reflected in Performance Measure #5 which requires that maximum custody prisoners be offered a minimum of 6 hours out-of-cell exercise a week. The tables below reflect the amounts listed in the CGARS with the time and refusals we found in the documentation provided during out tours.  In some cases the refusals of recreation and actual recreation would be compliant for purposes of Performance Measure #5, for example, ▮▮▮ had zero hours of exercise listed in the tracking sheet, but is recorded as refusing recreation four times which could be counted as a total of eight potential hours of exercise.  In the CGAR, however, he is listed as having 12 hours of exercise that week.

**Performance Measure #5:  SMU I**

| ADC# | Name | Hours-of-Recreation | Compliance? | Week of 3/7 – 3/13 |
|------|------|---------------------|-------------|--------------------|
| █████ | ████████████ | 12 Hr 1Min | Y | 3 hrs 1 min (refused rec 3x) |
| ████ | ████████████ | 12Hr | Y | 0 hrs (refused rec 4x) |
| ████ | ██████████ | 9 Hr | Y | 0 hrs (refused rec 3x) |
| ████ | ██████████ | 12 Hr 36 Min | Y | 3 hrs 36 min (refused rec 3x) |
| ████ | █████████████ | 11 Hr | Y | 2 hrs (refused rec 2x) |
| ████ | ██████████ | 12 Hr 6Min | Y | 6 hrs 6 min (refused rec 2x) |
| ████ | ████████████ | 9 Hr | Y | 55 min (refused to stay; refused rec 2x) |
| ████ | ██████████ | 12 H 9 Min | Y | 3 hrs 9 min (refused rec 3x) |
| ████ | █████████ | 12 Hr | Y | 0 hrs (refused rec 3x) |
| ████ | █████████████ | 12 Hr | Y | 0 hrs (refused rec 4x) |

**Performance Measure #5:  Browning**

| ADC# | Name | Hours-of-Recreation | Compliance? | Week of 3/7 – 3/13 |
|------|------|---------------------|-------------|--------------------|
| █████ | ████████ | 7.5 | Y | 0 hrs (refused rec 3x) |
| █████ | █████████ | 7.5 | Y | 0 hrs (refused rec 3x) |
| █████ | ███████ | 7.56 | Y | 4 hrs 25 min (refused rec 1x) |
| █████ | ███████████ | 7.6 | Y | 5 hrs 10 min (refused rec 1x) |
| █████ | █████████ | 7.5 | Y | 0 hrs (refused rec 3x) |
| █████ | ██████████ | 10.27 | Y | Incorrect Number in CGAR |

| ADC# | Name | Hours-of-Recreation | Compliance? | Week of 3/7 – 3/13 |
|------|------|------|------|------|
| ■■■■ | ■■■■■■■ | 9.54 | Y | 4 hrs 54 min (refused rec 2x) |
| ■■■■ | ■■■■■■■ | 10.58 | Y | 3 hrs 3 min + [illegible] (refused rec 2x) |
| ■■■■ | ■■■■■■■ | 10 | Y | 0 hrs (refused rec 4x) |
| ■■■■ | ■■■■■■■ | 10 | Y | 0 hrs ( refused rec 4x) |

Provision of the required out-of-cell group Programming under Performance Measure #2 was compliant at SMU-I as reflected in the CGAR, but compliance at Browning proved problematic.  The chart below shows our findings based on the documentation in the blue column.  We found that three prisoners who are eligible for DI 326 programming, ■■■, ■■■, and ■■■, were not offered any such programming during that week according to the records provided.  Yet the CGAR indicates compliance.  At Browning we also were told by numerous prisoners that the programming for Step II and III runs in cycles so that programming is available when a prisoner is taking a course, but once the course is finished, you have to wait for several weeks or even months before you are able to participate in another program.  Prisoners explained to us that there simply aren't enough teachers or courses for all the Step II and III prisoners eligible to participate in the programming.

We understand that ADC's compliance with DI 326 is a work in progress and that resources will likely need to be added in order to fully implement the programs under the new policy, however, **we would like to discuss the plans and timeframe for fully meeting the out-of-cell programming required by the Stipulation.**[5]

**Performance Measure #2 - Browning**

| ADC# | Name | StepI StepII StepIII | Compliance? | Week of 3/7 – 3/13 |
|------|------|------|------|------|
| ■■■■ | ■■■■■■■ | N/A | Step 1 | No - N/A |
| ■■■■ | ■■■■■■■ | N/A | Step 1 | No - NA |
| ■■■■ | ■■■■■■■ | N/A | Step 1 | No - N/A |

---

[5] We note that we continue to await an answer regarding when ADC will make the budget request to the legislature to fully fund the DI 326 program, as required by Stipulation, ¶ 17.

| ADC# | Name | StepI StepII StepIII | Compliance? | Week of 3/7 – 3/13 |
|---|---|---|---|---|
| ██████ | ████████████ | N/A | Step 1 | No - N/A |
| ██████ | ████████████ | N/A | Step 1 | No - N/A |
| ██████ | ████████████ | Yes | Y | 1 hr 24 min |
| ██████ | ████████████ | Yes | Y | No |
| ██████ | ████████████ | Yes | Y | No |
| ██████ | ████████████ | Yes | Y | No |
| ██████ | ████████████ | N/A | Step 1 | No – N/A |

Eyman is clearly working on compliance with Performance Measure #8 for its population of individuals with serious mental illness (SMI) in maximum custody.  At SMU-I the required unstructured time, mental health programming, and psycho-educational groups are documented in the daily tracking sheets.  One area in need of tightening up is the additional hour of out-of-cell programming also mandated.  This appears to be a misunderstanding of how DI 326 interacts with the separate SMI provision of the Stipulation.  In 7 of the 10 records reviewed, the monitor failed to account for the fact that the prisoners in question were at Step II or III in the DI 326 program but that hour of programming is not counted for purposes of the SMI provision.  In contrast, Browning Unit did not appear to have this double-counting problem.  The one area of tightening needed in that documentation is the failure to record the actual duration of time for the "1 Additional Hour" in two of the records (██████████████ and ████████████████).  In the records of ████████████████ we also found less than 10 yours of unstructured out-of-cell time compared to the CGAR finding of 10.73 hours.  The charts below compare the CGAR findings for Performance Measure #8 with the time recorded in the actual documentation we reviewed on site (in the blue rows entitled "Week of 3/7").

We would also note that during our interviews of prisoners at SMU-I, ████████████████, told us that although he was SMI in the community, he is not considered SMI by ADC.  We were not able to view his medical record but **request that this case be reviewed for possible omission** as "[a]ll prisoners determined to be SMI in the community shall also be designated as SMI by ADC."  Stipulation at 7:26-27.



**Performance Measure # 8: SMU I**

| ADC# | Name | 10 HR Unstructured | 1 HR MH | 1 HR Psycho-ed | 1 HR Add'l | Compliance? |
|---|---|---|---|---|---|---|
| ▮ | ▮ | Yes/10Hr | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | 10 hrs [all ref] | 1 hr [ref] | 1 hr [ref] | None* | |
| ▮ | ▮ | Yes/ 11.5Hr | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | 11.5 hrs [4 ref] | 1 hr | 1 hr | 1 hr | |
| ▮ | ▮ | Yes/ 10Hr | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | 10 hrs [all ref] | 1 hr | 1 hr | None* | |
| ▮ | ▮ | Yes/ 10Hr | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | 10 hrs [2 ref] | 1 hr [ref] | 1 hr | None* | |
| ▮ | ▮ | Yes/ 10Hr | Yes | Yes | No | N |
| WEEK OF 3/7: | | 10 hrs [all ref] | 1 hr [ref] | 1 hr [ref] | None* | |
| ▮ | ▮ | Yes/ 12.5Hr | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | 12.5 hr | 1 hr | 1 hr | 1 hr | |
| ▮ | ▮ | Yes/ 10Hr | Yes | Yes | No | N |
| WEEK OF 3/7: | | 10 hr [all ref] | 1 hr [ref] | 1 hr [ref] | None* | |
| ▮ | ▮ | Yes/ 10.13 Hr | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | 10.13 hr | 50 min [NOTE: "declined to use whole hour of therapy"] | 1 hr | 1.5 hr | |
| ▮ | ▮ | Yes/ 10.27 Hr | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | 10.1 hr | 1 hr 19 min | 1 hr 11 min | None** | |
| ▮ | ▮ | Yes/ | Yes | Yes | Yes | Y |

| ADC# | Name | 10 HR Unstructured | 1 HR MH | 1 HR Psycho-ed | 1 HR Add'l | Compliance? |
|---|---|---|---|---|---|---|
| | ■■■■■ | 10.13 Hr | | | | |
| WEEK OF 3/7: | | 10.2 hr | 1 hr | 1 hr | None** | |

*  Because he is level 2, his one hour of programming/groups counts as DI326, not as one additional hour of SMI programming.

**  Because he is level 3, one hour of "socializing programming" counts as DI 326, not as additional SMI programming.

**Performance Measure # 8:  BROWNING**

| ADC# | Name | 10 HR Unstructured | 1 HR MH | 1 HR Psycho-ed | 1 HR Add'l | Compliance? |
|---|---|---|---|---|---|---|
| ■■■ | ■■■■■ | Yes/ 10.73 | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | <10 hrs | 2 hrs | 1 hr 9 min | 1 hr | |
| ■■■ | ■■■■■ | Yes/ 13.21 | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | >10 hrs | 1hr? [illegible] | 1 hr 8 min | 1 hr | |
| ■■■ | ■■■■■ | Yes/ 15.22 | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | >10 hrs | 1 hr 5 min | 2 hrs 37 min | 1 hr 5 min | |
| ■■■ | ■■■■■ | Yes/ 14.43 | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | >10 hrs | Duration not specified (R) | 1 hr 22 min | Duration not specified (R) | |
| ■■■ | ■■■■■ | Yes/ 13.34 | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | >10 hrs | 1 hr | 1 hr 20 min | Duration not specified (R) | |
| ■■■ | ■■■■■ | Yes/ 12.51 | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | >10 hrs | None | 1 hr 11 min | 2 hr 28 | |

| ADC# | Name | 10 HR Unstructured | 1 HR MH | 1 HR Psycho-ed | 1 HR Add'l min | Compliance? |
|---|---|---|---|---|---|---|
| | | Yes /15.37 | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | >10 hrs | 1 hr 30 min | 1 hr 5 min | 1 hr 8 min | |
| | | Yes/ 13.25 | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | >10 hrs | 1 hr 30 min | 1 hr 13 min | 1 hr 5 min | |
| | | Yes/ 14.15 | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | >10 hrs | None | 2 hr 13 min | 2 hr 15 min | |
| | | Yes/ 12.28 | Yes | Yes | Yes | Y |
| WEEK OF 3/7: | | >10 hrs | 1 hr 23 min | 1 hr 12 min | 1 hr 4 min | |

Please let me know if you have any questions.  We look forward to talking with you about our findings soon.

Sincerely,

Kirstin T. Eidenbach

APPENDIX A

| | Perryville MAX CUSTODY MEASURES | | |
|---|---|---|---|
| | **Performance Measure (description)** | **Inmate Records for ADCM016070-016119** | | **Inmate Records For ADCM037099-037149** | |
| 1 | Are all maximum custody prisoners at Eyman- Browning, Eyman- SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326 offered a minimum of 7.5 hours out-of-cell time per week? Are those at Step II offered a minimum of 8.5 hours out-of-cell time per week, and those at Step III offered a minimum of 9.5 hours out-of-cell time per week? | ███ ███████ | | ███ ██████████ | |
| 2 | Are all maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326 offered at least one hour of out-of-cell group programming a week at Step II and Step III? | ███ ████████ | | ███ ██████████ | |
| 3 | Is all out-of-cell time specified in Outcome Measures 1, 2, 8 that is limited or cancelled is properly | ███ ████████ | | ███ ████████ | |

| | | | |
|---|---|---|---|
| | documented and justified in accordance with the terms of the Stipulation as set forth in ¶26 of the Stipulation?<br><br>[26. If out of cell time offered pursuant to ¶¶ 24 or 25 above is limited or<br>cancelled for legitimate operational or safety and security reasons such as an unexpected staffing shortage, inclement weather or facility emergency lockdown, Defendants shall make every reasonable effort to ensure that amount of out of cell time shall be made up for those prisoners who missed out of cell time. The out of cell time provided pursuant to paragraph 24 above, may be limited or canceled for an individual prisoner if the Warden, or his/her designee if the Warden is not available, certifies in writing that allowing that prisoner such out of cell time would pose a significant security risk. Such certification shall expire after thirty (30) days unless renewed in writing by the Warden or his/her designee.] | ██ ████████<br>██ ██████<br>██ █████<br>██ ██████<br>██ ███████<br>██ █████<br>██ ████ | ██ █████████<br>██ █████████ ██<br>██ ██████████<br>██ ███████<br>██ ██████████<br>██ ██████<br>██ ████████ |
| 4 | Are all maximum custody prisoners receiving meals with the same caloric and nutritional content as meals served to other ADC prisoners? | N/A | N/A |
| 5 | Are all maximum custody prisoners at Eyman-Browning, | ██ ██████<br>██ ██████ | ██ ██████<br>██ ███████ |

| | | | |
|---|---|---|---|
| | Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) offered a minimum of 6 hours of out-of-cell exercise time a week? | ████ ████ | ████ ████ |
| 6 | Are all maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30), who are eligible for participation in DI 326 offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy? | ████ ████ | ████ ████ |
| 7 | Are there any prisoners with a mental health classification of MH-3 or higher housed in Florence Central-CB 5 or CB-7 without a cell front that has been substantially modified to increase visibility? | N/A | N/A |
| 8 | In addition to the general privileges and incentives afforded to prisoners under DI 326, are all SMI prisoners in maximum custody, receiving: -10 hours of unstructured out-of-cell time per week? -1 hour of additional out-of-cell mental health programming per week? - 1 hour of additional out-of-cell psycho-educational programming per | ████ ████ | ████ ████ |

| | | | |
|---|---|---|---|
| | week? -1 hour of additional out-of-cell programming per week? * | | ▮▮▮▮ ▮▮▮▮▮ |
| 9 | Do all use of force incidents involving maximum custody prisoners classified as SMI, and in the following housing areas: Florence-CB-1 and CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; and Phoenix (Baker, Flamenco, and MTU), conform to the policies for use of force set forth in ¶ 27 (a)-(e) of the Stipulation? * | N/A | N/A |

| EYMAN MAX CUSTODY MEASURES | | |
|---|---|---|
| | **Performance Measure (description)** | **Inmate Records for ADCM015902-015963** | **Inmate Records for ADCM036191-036981** |
| 1 | Are all maximum custody prisoners at Eyman- Browning, Eyman- SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326 offered a minimum of 7.5 hours out-of-cell time per week? Are those at Step II offered a minimum of 8.5 hours out-of-cell time per week, and those at Step III offered a minimum of 9.5 hours out-of-cell time per week? | | |
| 2 | Are all maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) who are eligible for participation in DI 326 offered at least one hour of out-of-cell group programming a week at Step II and Step III? | | |





| 3 | Is all out-of-cell time specified in Outcome Measures 1, 2, 8 that is limited or cancelled is properly documented and justified in accordance with the terms of the Stipulation as set forth in ¶26 of the Stipulation?<br><br>[26. If out of cell time offered pursuant to ¶¶ 24 or 25 above is limited or<br>cancelled for legitimate operational or safety and security reasons such as an unexpected staffing shortage, inclement weather or facility emergency lockdown, Defendants shall make every reasonable effort to ensure that amount of out of cell time shall be made up for those prisoners who missed out of cell time. The out of cell time provided pursuant to paragraph 24 above, may be limited or canceled for an individual prisoner if the Warden, or his/her designee if the Warden is not available, certifies in writing that allowing that prisoner such out of cell time | | |

| | | | |
|---|---|---|---|
| | would pose a significant security risk. Such certification shall expire after thirty (30) days unless renewed in writing by the Warden or his/her designee.] | | |
| 4 | Are all maximum custody prisoners receiving meals with the same caloric and nutritional content as meals served to other ADC prisoners? | N/A | N/A |
| 5 | Are all maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30) offered a minimum of 6 hours of out-of-cell exercise time a week? | ███ | ███ |
| 6 | Are all maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30), who are eligible for participation in DI 326 offered | ███ | ███ |



| | | | |
|---|---|---|---|
| | out-of-cell time, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy? | | |
| 7 | Are there any prisoners with a mental health classification of MH-3 or higher housed in Florence Central-CB 5 or CB-7 without a cell front that has been substantially modified to increase visibility? | N/A | N/A |
| 8 | In addition to the general privileges and incentives afforded to prisoners under DI 326,are all SMI prisoners in maximum custody, receiving: -10 hours of unstructured out-of-cell time per week? -1 hour of additional out-of-cell mental health programming per week? - 1 hour of additional out-of-cell psycho-educational programming per week? -1 hour of additional out-of-cell programming per week? * | | |

| | | | |
|---|---|---|---|
| | | ▮▮▮ ▮▮▮▮▮ | ▮▮▮ ▮▮▮▮▮ |
| 9 | Do all use of force incidents involving maximum custody prisoners classified as SMI, and in the following housing areas: Florence-CB-1 and CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; and Phoenix (Baker, Flamenco, and MTU), conform to the policies for use of force set forth in ¶ 27 (a)-(e) of the Stipulation? * | N/A | N/A |

APPENDIX B

*Information Requests*

1. Please report on any steps taken to standardize monitoring of compliance under the *Parsons* Stipulation and provide a copy of any written material developed.
2. We ask that CAPs be included for every CGAR measure given less than 75% compliance.
3. Did Perryville change its practices to start identifying urgent and emergent referrals?   Why was this data suddenly available?
4. Please report on any steps taken to increase ADC and Corizon staff levels.
5. Please report on what steps are taken to ensure that staff have access to the emergency response bags at all times.
6. These broken chairs place prisoners at risk of serious injury, and we request that they be repaired or replaced immediately.
7. Please report on what steps are being taken to reduce the dental backlog at Eyman and ensure that class members are being seen within appropriate timeframes. (pg. 17)
8. Please report on what steps are being taken to reduce the dental backlog at Perryville and ensure that class members are being seen within appropriate timeframes, particularly given that compliance went from 24% in March to 18% in May. (pg. 18)
9. Please ensure that future monitoring of this item ascertains whether these items are actually "provided" to the mental health provider as required by the Measure.
10. Please explain how this Measure is monitored, including how the universe of prisoners who "suffer a heat intolerance reaction" is identified. (pg. 19)
11. Please explain how to reconcile these conflicting statements. (pg. 21).
12. We request any documentation provided to staff and monitors that provides guidance on determining compliance with the Maximum Custody Performance Measures.
13. Please explain who conducted these reviews and why new records were used for the revised March CGARs in determining compliance with the maximum custody performance measures.  We also request these CGAR compliance records for the individuals who were not produced for our review at the facilities.
14. We ask that documents showing that prisoners in maximum custody are receiving "meals equivalent in caloric and nutritional content to the meals received by other ADC prisoners," as required by the Stipulation, be provided.
15. We request that this certification be produced. (pg 26).
16. We ask that the monitor and unit staff ensure that the use of force incidents reported include the full population required to be measured for compliance under the Stipulation.
17. We would like to discuss the plans and timeframe for fully meeting the out-of-cell programming required by the Stipulation.
18. We request that this case be reviewed for possible omission. (pg 35).

# EXHIBIT 2

# FILED UNDER SEAL

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



August 28, 2015

**BY ELECTRONIC MAIL ONLY**

Michael Gottfried
Lucy Rand
**OFFICE OF THE ARIZONA ATTORNEY GENERAL**
1275 West Washington Street
Phoenix, AZ 85007-2926
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH  FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

Re:  ***Parsons v. Ryan***
     **Notice of Substantial Non-Compliance**

Dear Counsel:

Pursuant to ¶ 30 of the Stipulation, plaintiffs hereby serve a Notice of Substantial Non-Compliance with respect to defendants' refusal to comply with Performance Measures 80-86 at Eyman-SMU I and Eyman-Browning Unit. *See* August 20, 2015 letter from Lucy Rand, at 47 ("These performance measures do not apply to SMU I and Browning").[1]

Defendants' position is completely without merit. Each of the Performance Measures in question plainly applies to each unit ("yard") at each ADC complex. *See, e.g.*, Performance Measure 80 ("An AIMS report will be run for *all* MH-3A prisoners in *each* Complex. 10 records (if available) will be reviewed *per yard* for compliance") (emphasis added). The limitation defendants seek to impose simply finds no support in the plain language of the Stipulation or the Performance Measures. "A general principle of contract law is that when parties bind themselves by a lawful contract, the terms of which are clear and unambiguous, a court must give effect to the contract as written." *Grosvenor Holdings, L.C. v. Figueroa*, 222 Ariz. 588, 593, 218 P.3d 1045 (Ct. App. 2009).

---

[1] It appears that defendants are also refusing to comply with these performance measures at other units. *See, e.g.,* ADCM 120799 (no monitoring of Performance Measures 80 and 81 at Florence-Central and Florence-Kasson units). To the extent that this is the case, this Notice of Substantial Non-Compliance applies to those refusals as well.

1

The arguments set forth in Ms. Rand's August 20 letter are meritless and cannot overcome the plain language of the Performance Measures. There is obviously no "conflict" between Performance Measures 80-86 and Performance Measure 92, since it is entirely possible to comply with all of these measures. And the argument that "[t]he monitoring of [Performance Measures] 80-86 regarding mental health are [sic] covered by [Performance Measure] 92" is both counterfactual and contrary to basic contract law. *See Scholten v. Blackhawk Partners*, 184 Ariz. 326, 329, 909 P.2d 393 (Ct. App. 1995), *as supplemented on reconsideration* (Oct. 3, 1995) ("a contract should be construed to give effect to all its provisions and to prevent any of the provisions from being rendered meaningless"). Finally, if it is indeed true that "inmates in maximum custody only are seen by psychology or a 'mental health clinician,'" that is a violation of the Stipulation; it is not an argument that Performance Measures 80-86 do not apply.

Defendants' groundless position is particularly disturbing because Performance Measures 80-86 all apply specifically to prisoners classified as MH-3, whom defendants themselves have determined to have serious mental health needs. Defendants' refusal to comply with these performance measures with respect to these vulnerable prisoners, who are subjected to the additional stresses of isolated confinement in SMU I and Browning Unit, is extraordinarily dangerous, particularly in light of the number of suicides that have occurred in these units.

In the event of future litigation, defendants' failure to comply with the plain terms of the Stipulation and Performance Measures will be powerful evidence of deliberate indifference. *See Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 560-61 (1st Cir. 1988). Defendants' willful noncompliance will also almost certainly be an issue in habeas and other proceedings brought by death-sentenced prisoners housed in Browning Unit.

We hope that defendants will promptly comply with the plain language of the Stipulation and Performance Measures. We look forward to your response as required by ¶ 30 of the Stipulation.

Very truly yours,

David C. Fathi

cc:     All counsel

AMERICAN CIVIL LIBERTIES UNION FOUNDATION