# EXHIBIT 3

# FILED UNDER SEAL



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

October 15, 2015

Ms. Lucy Rand, Assistant Attorney General
Office of the Arizona Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
Lucy.Rand@azag.gov

RE:  *Parsons v. Ryan*, CV-12-0601-DMD
Notice of Substantial Non-Compliance

Dear Ms. Rand,

Pursuant to Paragraph 30 of the parties' Stipulation, we write to notify you of Defendants' substantial non-compliance with the terms of the Stipulation.  Also pursuant to Paragraph 30, we request that Defendants meet with us telephonically or in person no later than November 16 to attempt to resolve this dispute.  Rather than spending the next 30 days disputing individual cases or drafting blanket denials and objections to our letter (*see, e.g.* 8/20/15 Rand letter, *generally*), we believe that a more productive use of time would be to use this Notice as a starting point to talk with us in a collaborative manner to address the continued systemic and serious problems with the delivery of health care to ADC prisoners.[1]

We look forward to the opportunity to work productively with ADC to find a way to resolve these problems.  However, if that does not promptly occur, we will request formal mediation with the court and prepare a motion to enforce the Stipulation pursuant to Paragraph 31.  We do not wish to return to court, but we will not hesitate to do so if Defendants will not cooperate or negotiate in good faith.  Our goal from the start of litigation, which we hope Defendants share, is that prisoners are provided humane and constitutional health care so that they do not needlessly suffer unnecessary death or injury.

One year after the Stipulation was signed and almost seven months after its effective date, the health care provided by ADC and its contractors has not improved and is plagued by systemic deficiencies.  This noncompliance is shown in ADC and Corizon documents produced by Defendants; interviews with prisoners, custody staff, and health care staff; our review of prisoners' medical files; and our observations during tours.  Since February 17, 2015, we have notified Defendants of many of these deficiencies through our written tour reports, 78 advocacy letters, and verbally during tours.

---

[1] We have identified numerous practices at ADC prisons that show substantial noncompliance with the requirements related to prisoners housed in isolation units; a Notice regarding these problems will be sent to you separately.

However, there is no system in place for us to learn if the individual deficiencies we identified have been addressed, and to date, Defendants have provided no meaningful response.  Rand 4/3/15 letter at 6; Rand 8/20/15 letter at 4-6.  When we notify you, pursuant to our ethical obligations, of class members we believe are in immediate need of medical, dental, or mental health care, Defendants do not provide any response other than a cut-and-pasted form email sent by litigation counsel acknowledging receipt of our letter, and sometimes provide no response at all.[2]

With regard to the systemic deficiencies we have identified, Defendants refuse to produce any Corrective Action Plans (CAPs) on the grounds that CAPs are not "ready" when printing out the CGAR reports for a given month; and have not retrospectively produced the CAPs even when they subsequently become "ready" for production.  Rand 8/20/15 letter at 6.  For example, according to CQI meeting minutes, Lewis "has 30 performance measure corrective action plans for the month of May." ADCM121079.  Defendants have not produced any of those CAPs.

Defendants' substantial noncompliance falls into two broad categories.  First, Defendants' monitoring methodology is fatally deficient in multiple respects and does not yield valid results. Second, even taking Defendants' monitoring results at face value, Defendants are seriously and chronically out of compliance with a large number of Stipulation requirements.

## I.    Defendants' Monitoring Methodology Calls Into Question Many Findings of Compliance

A problem permeating the entire reform effort is that ADC's monitoring process is profoundly flawed, inadequate to capture the contractors' degree of compliance or non-compliance, and must be completely overhauled.  The audits are inaccurate, not standardized, and monitors do not have written instructions or methodology to follow to ensure consistent assessments across the institutions.  We have raised this concern before, (see 7/14/15 Eidenbach letter, at 2, 4-6), and requested that Defendants work with us to develop written guidelines and protocols for the monitors.  Our offer to work cooperatively on such an effort was rebuffed, and we were told that since we agreed to these performance measures in the Stipulation, Defendants could monitor in any way they pleased and plaintiffs could not object – a nonsensical position.  See 8/20/15 Rand letter at 1-2, 6-7.  You informed us that the only methodology needed was the list of source documents in Exhibits C and E to the Stipulation, and vaguely referred to the ongoing development of guidelines.  Id.  Such guidelines, if they exist, have not been produced to us.

### A.  Failure to Monitor Certain Outcome Measures

In violation of the plain language of the Stipulation, Defendants have unilaterally decided not to monitor certain Measures at certain complexes and units.  This refusal is clear noncompliance. Examples include:

---

[2] Defendants also have taken the indefensible position that the only prisoners whose health treatment is relevant to the case are the ten whose files are reviewed each month by ADC monitors. See 8/20 Rand letter at 5.

- Failure to monitor <u>Mental Health # 8-14</u> at a number of units, including but not limited to Eyman-SMU I, Eyman-Browning, Florence-Central, Florence-Kasson, Lewis-Rast Max, Tucson-Minors, and all of ASPC-Phoenix.[3]  (June 2015 CGARs)
- Failure to monitor <u>Mental Health # 4, 20, and 21</u> at ASPC-Phoenix.  (*Id.*)
- Failure to monitor <u>Mental Health # 22</u> at ASPC-Safford. (*Id.*)
- Failure to monitor <u>any Mental Health measures</u> at Lewis-Sunrise, Florence-Globe, or Phoenix-Inmate Worker units.  (*Id.*)
- Failure to monitor <u>any Mental Health measures</u> (with the exception of Mental Health # 26) at Phoenix-Alhambra. (*Id.*)
- Failure to monitor <u>Chronic Care # 6-8</u> measures at any prison, and <u>Female Care # 4</u> measures at prisons housing women.  (Rand 8/20 letter at 9)

Defendants furthermore have taken the position, and falsely state, that with regard to requirements codified in the body of the Stipulation, "[t]he parties specifically discussed that these measures would be hard or impossible to track and, therefore, the parties intentionally omitted these items from the Performance Measures to be measured and tracked using the CGAR."  (Rand 8/20 letter at 9).  This is false:  Plaintiffs made no such agreement during the negotiations, and Defendants cannot unilaterally decide that they do not need to document or monitor compliance with the requirements of the Stipulation.  For example, Defendants take the position that <u>Paragraph 14</u> of the stipulation, which requires language interpretation[4] at all health care encounters, "does not require the use of language interpreters to be measured or reported,"  a position that would eviscerate the entire purpose of having such a requirement in the Stipulation.  (*Id.* at 8).  As detailed below in Section D, Defendants are in substantial noncompliance with the requirements of Paragraph 14.

Defendants have similarly unilaterally decided to disregard the requirements of <u>Paragraph 15</u>.  It states that "[i]f a prisoner who is taking psychotropic medications suffers a heat intolerance reaction, all reasonably available steps will be taken to prevent heat injury or illness.  If all other steps have failed to abate the heat intolerance reaction, the prisoner will be transferred to a housing area where the cell temperature does not exceed 85 degrees Fahrenheit."  We continue to receive many complaints about extreme heat in the housing units.  We observed many prisoners sweating profusely, and many report sleeping on the floor in a desperate attempt to escape the heat.  Protecting prisoners from heat injury is a matter not of luxury or comfort, but of life and death.  *See Ball v. LeBlanc*, 792 F.3d 584

---

[3] By a letter dated Oct. 13, 2015, Defendants stated that they would begin to evaluate these performance measures at ASPC-Eyman Browning and SMU-I units and ASPC Florence, Central and Kasson Units, beginning with the September CGARs.  (10/13/15 Rand Letter).

[4] Defendants appear not to be aware that American Sign Language is a language completely distinct from English.  Defendants' position that ASL does not count as a language to which this Stipulation provision is applicable, and that deaf persons who communicate using ASL would not be entitled to the same interpretation as prisoners who speak only Spanish or Chinese or any other spoken language, is meritless.  (8/20 Rand letter at 8.)  *See* USHHS, NIH National Institute of Deafness and Other Communication Disorders, at http://www.nidcd.nih.gov/health/hearing/pages/asl.aspx ("ASL is a language completely separate and distinct from English.  It contains all the fundamental features of language—it has its own rules for pronunciation, word order, and complex grammar.")

(5th Cir. 2015); *Graves v. Arpaio*, 623 F.3d 1043 (9th Cir. 2010); Holt, *Heat in US Prisons and Jails*: *Corrections and the Challenge of Climate Change* (Columbia Law School, Sabin Center for Climate Change Law, August 2015), *available at* https://web.law.columbia.edu/sites/default/files/microsites/climate-change/holt_-_heat_in_us_prisons_and_jails.pdf.

Although we have asked Defendants to describe the steps that are taken to identify prisoners who suffer a heat intolerance reaction, (*see* 7/14/15 Eidenbach letter, at 20), we have not received a response. In fact, it is apparent that no such steps are being taken. The Lewis FHA told us that at that complex, with more than six thousand prisoners, there were *no* prisoners on heat precautions. The CGARs for Lewis and other prisons similarly noted that there have been no heat intolerance incidents.

The file of Lewis prisoner ▆▆▆▆▆ was reviewed by the monitor and found to be compliant with Mental Health Measure # 8. ADCM120856. However, his file also reveals that he is SMI, and is prescribed buspirone, perphenazine, phenytoin, and levetiracetam. On 6/9/15 Ms. Qualls notes that the patient is saying that the cell is hot and is causing him to become ill because of his medications; he reported suffering two seizures, dizziness and headaches. These facts are flatly inconsistent with Defendants' implausible assertion that *no* Lewis prisoners suffered a heat intolerance reaction in May, June, or July of 2015.[5] ADCM 121223-121246. Defendants are not in compliance with the requirements of Paragraph 15. *See* Appendix A, pages 3-4,7 for more examples of prisoners who are suffering a heat intolerance reaction due to their psychotropic medications.

Defendants apparently take a similar position regarding Paragraph 16 of the Stipulation, refusing to monitor or report their compliance with that provision, which requires:

> Psychological autopsies shall be provided to the monitoring bureau within thirty (30) days of the prisoner's death and shall be finalized within fourteen (14) days of receipt. When a toxicology report is required, the psychological autopsy shall be provided to the monitoring bureau within thirty (30) days of receipt of the medical examiner's report. Psychological autopsies and mortality reviews shall identify and refer deficiencies to appropriate managers and supervisors including the CQI committee. If deficiencies are identified, corrective action will be taken.

Finally, we were told on our tours of Eyman, Florence, and Lewis that those facilities receive as direct intakes about 10 to 15 parole violators a month, and the parole violators do not first go

---

[5] We also spoke with multiple prisoners on psychotropic medications who reported stifling heat in their housing units affecting them. Many of these interviews were conducted cell-front, and Plaintiffs' counsel personally experienced heat well in excess of 85 degrees in the housing units. For example, we brought to Defendants' attention a SMI prisoner we encountered on 9/1/15 while touring Florence-North Unit – Yard 3 ("Tent City") who multiple other prisoners had advised us was floridly psychotic, frequently experienced audio and visual hallucinations, and often smeared feces on himself and the inside of the tent. *See* 9/16/15 Kendrick letter, attached hereto as Appendix C. Counsel observed that the tent he was housed in, Tent # 28, was stifling hot at mid-morning, and he was lying in his bed, crying, moaning, and stating that the heat was bothering him. *Id*.

through the Phoenix-Alhambra reception center. If this is the accurate, then all of the measures related to intake (Stipulation Measures # 33-34; Intake # 1-2, Mental Health #3-4) must be audited at prisons that directly admit parole violators. When we negotiated the performance measures, we were told that the only institutions that had intake were Phoenix (males), Perryville (females) and Tucson (juvenile males). Having immediate health screenings for parole violators is important, given that some of the behaviors that may have led to violation could include the abuse of drugs and alcohol, and these people will be going through detox. Mental health screenings are similarly critical, given that a mental health crisis may have precipitated the violation, and some violators will be taking psychotropic medications that must be continued.

### B. Failure to Accurately Monitor What the Measures Require

In many cases, Defendants are simply not monitoring what the measures require. The most fundamental flaw involves Defendants' monitoring of the more than 30 measures requiring that a given action be performed every X days, or within Y days of a referral or request. For these types of measures, the Defendants' starting point is only the universe of all files in which the required action was completed.[6]

In monitoring these measures, Defendants typically remove from their sample all files in which the required action was not performed in the month being monitored. Cherry-picking only those files in which the required action was performed in the last month obviously excludes at the outset a large number of noncompliant files. By using this limited group of completed actions as the starting point, the monitors do not capture the requests, referrals, or appointments that are pending or never occurred. For example, the Florence CQI 6/18/15 meeting minutes discuss how the clinical coordinator reported that she "has 70 inmates that need appointments. She has completed 60 just in the last 3 days…the approval rate is approximately 20 a day. She has 8 on backlog … She has 12 follow-ups that have been resubmitted." ADCM121016. None of these 70 prisoners would have been included in a June audit of timeliness of specialty referrals, because they are not yet completed.

Second, Defendants sometimes count as "compliant" files in which the required action has not actually been performed. An example given by Ms. Raak during our September 11, 2015 telephone call will illustrate. Mental Health # 14 requires "MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication." Ms. Raak stated that if she were auditing for the month of June, and the prisoner had been seen on May 1, she would count that file as compliant, because 90 days had not yet elapsed since May 1.[7]

---

[6] These include **Access to Care** Measures # 2, 4, 5, 6, 9; **Chronic Care** Measure # 2; **Dental** Measures # 3, 4; **Female Care** Measure # 1; **Medical Diet** Measure # 1; **Medical Records-CO** Measure # 1; **Medical Records** Measures # 10, 11; **Mental Health** Measures # 1, 5, 8, 9, 10, 11, 12, 14, 15, 16, 17, 18, and 20; **Quality Improvement** Measure # 1; **Specialty Care** Measures # 1, 2, 3, 4, 5, 7, 8.

[7] Defendants also fail to provide the date the file was reviewed by the monitor, making it impossible for Plaintiffs to check the accuracy of their findings. We previously brought this problem to your attention, (*see* 7/14/15 Eidenbach letter at 19), but it has not been corrected.

Taken together, these practices dramatically (and falsely) inflate Defendants' compliance figures.  As long as these practices persist, Defendants' findings of compliance are meaningless.  We offer below specific examples of how these practices result in overinflated and inaccurate compliance percentages.

For example, for the Lewis June 2015 CGAR for Specialty Care # 3 (urgent specialty consultations and diagnostic services will be scheduled and completed within 30 days), the Lewis monitor "reviewed 17 charts of inmates who had urgent consults done during the audit period."[8]  ADCM120868.  She then looked in those prisoners' files backwards in time to measure timeliness compared to the date of the urgent request, and found 16 of the charts, or 94%, compliant.[9]  However, by limiting herself to the universe of completed specialty requests, she does not capture the urgent specialty requests that were pending or scheduled, but not yet occurred as of June 30 (the day the CGAR shows she did her analysis).  With regard to the June CGAR finding, the "To Be Scheduled and Scheduled" Specialty Care Appointments chart (ADCM120999-121012) lists four urgent referral requests that were made by providers prior to May 31 (thus 30 days before the June 30 date she did her review) that as of mid-August, when the report was printed, were still listed as "Scheduled" appointments.[10]  Lewis also appears to have been noncompliant at the time of our tour:  there were 19 urgent referrals made prior to 7/18/15 (30 days before date of list) that are pending or scheduled.  (ADCM121005-12).  This included one prisoner for whom the provider requested an urgent hematology/oncology consult on March 5, 2015.  See Appendix A, pages 12-13 for complete details.[11]

The monitor used a similar methodology for Specialty Care # 4 (routine consultations scheduled and completed within 30 days) in the Lewis June CGARs, finding compliant 64 of 70, or 91% of the routine specialty appointments completed in June.  However, this finding is called into question by the "To Be Scheduled and Scheduled" Specialty Care Appointments chart that we were provided prior to the tour.  The report also shows an apparent lack of certain specialists, as consults approved as far back as February are listed as not yet scheduled.  Specifically, there are ten (10) requested and approved referrals to rheumatology that are still listed as "Pending" and not "Scheduled," and seven (7) of them were requested so long ago that they are noncompliant at the time the report was created.  There are 15 requested and approved referrals to infectious disease that are still listed as pending, and eight (8) of them were requested so long ago that they show noncompliance at the time the report was created.[12]  However, since these specialty consults have not yet been

---

[8] The CQI minutes list 21 urgent specialty consults occurring in June.  ADCM121101-03.

[9] We were unable to spot-check the accuracy of her conclusions, as she does not list in the CGAR which files were reviewed, and we were not provided her worksheets, despite our pre-tour request for all worksheets used by the monitors.

[10] In a meeting with the clinical coordinator, she stated that as each specialist appointment occurs and the specialist reports are received, she removes its designation as Scheduled.

[11] This Appendix, and all other documents served with this Notice of Substantial Noncompliance, are fully incorporated herein by reference.

[12] This apparent inability to have Lewis prisoners seen in a timely manner by infectious disease specialists is extremely problematic, given the following statistics from the CQI meeting minutes

(continued next page…)

completed, they would not appear in the pool of files that the monitor uses as the starting point for the audit.  See Appendix A, pages 12-13 for more information.

Additional defective monitoring practices include:

Infirmary Care # 8 (IPC patients have properly working call bells or nurses do 30 minute welfare checks).  The June 2015 Florence CGAR stated that 54 of 54 call bells at the infirmary were found to be compliant.  ADCM120786.  When we spoke with Ms. Franklin and asked if she tested all 54 bells, she admitted that she only picked four or five randomly to test, and extrapolated from that spot check that all 54 were functioning and therefore there was 100% compliance.  The performance measure says nothing about sampling and extrapolating, and this is problematic given the Florence May CQI meeting minutes included a corrective action plan for this same measure, stating that call bells were going to be installed on May 26.  ADCM121044.  The May CGAR found that 43 of 46 infirmary beds had functioning call bells, and the April CGAR found that there were no functioning call bells in any of the infirmary units, and that nurses were not doing 30 minute welfare checks. ADCM056673.

Mental Health # 14 requires that "MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication."  Defendants fail to monitor whether the required contacts occur for a minimum of six months.

Mental Health # 20 requires that "MH-3 and above prisoners who are housed in maximum custody shall be seen by a mental health clinician for a 1:1 or group session a minimum of every 30 days."  Similarly, Mental Health # 21 requires that "Mental health staff (not to include LPNs) shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum custody." Although these two Measures plainly apply to "MH-3 and above prisoners," Defendants exclude MH-4 and MH-5 prisoners from the sample for compliance monitoring purposes.[13]

Mental Health # 22 requires that "All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse." Defendants fail to monitor compliance with this Measure if the prisoner's watch spans more than a single month.  For example, if the prisoner was placed on watch on May 15 and removed on June 2,

---

(continued from previous page…)
showing prisoners with infectious diseases not receiving treatment:

- June meeting, statistics for May 2015:  26 out of 30 HIV positive prisoners receiving treatment, 4 out of 1,990 HCV positive prisoners receiving treatment.  ADCM121072.
- July meeting, statistics for June 2015:  30 out of 34 HIV positive prisoners receiving treatment; 4 out of 1,858 HCV positive prisoners receiving treatment. ADCM121092.  (It is unclear how the number of HCV positive prisoners dropped by 132 in one month.)
- August meeting, statistics for July 2015:  31 out of 35 HIV positive prisoners receiving treatment; 0 out of 1,836 HCV positive prisoners receiving treatment, 7 new HCV diagnoses.  ADCM121113.

[13] Even with this narrowed universe to sample, Defendants' own CGARs show noncompliance with Mental Health # 20 month after month.  See pages 30-31, infra.

defendants will monitor compliance with this measure only on June 1 and 2, and will record the file as "compliant" even if the prisoner was not seen at all May 15-31.

Mental Health # 23 requires that "Only licensed mental health staff may remove a prisoner from a suicide or mental health watch.  Any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation."  There are multiple defects in Defendants' monitoring of this measure.  First, Defendants fail to verify and document that the patient was removed from watch by licensed mental health staff, as the measure requires.  Second, Defendants record as "compliant" cases in which the three required post-watch encounters have not taken place.  Third, Defendants record as "compliant" cases in which the patient was transferred to another facility after being taken off watch, without regard to whether the three required post-watch encounters have occurred.

Mental Health # 26 requires that "Mental Health HNRs shall be responded to within the timeframes set forth in the Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0."  That section of the MHTM sets forth five categories of mental health HNRs, with response times ranging from "immediately" to 14 days.  Defendants exclude "emergency," "urgent," and other HNRs from their monitoring samples, and monitor only whether those requiring psychology contacts are seen within 5 days.  This is plainly inconsistent with the requirements of the Measure.[14]

## C.  Misinterpretation of the Plain Language of the Performance Measures

There were several measures in which the plain language of the performance measures is being misinterpreted in such a way that the measure is either rendered moot, or by virtue of how the measure

---

[14] Even with this narrowed universe to sample, Defendants' own CGARs show noncompliance with Mental Health # 26 month after month.  *See* page 32, *infra*.  In addition, some of the statistics reported by Corizon that we would hope to use to cross-check CGAR conclusions are self-evidently wrong.  For example, relevant to the performance measures of Mental Health # 26, the Lewis CQI minutes show the following at ADCM121104 and 121124:

**July stats/August meeting**
MH HNRs received – 283
MH appts as result from HNR – 190
Average wait time in days – 0

**June stats/July meeting**
MH HNRs received – 321
MH appts as result from HNR – 179
Average wait time in days – 0

An average wait time of zero (0) days in a sample of 369 appointments is literally impossible.

Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 9

is being interpreted by Defendants, results in automatic 100% compliance findings.  While the parties drafted an exhibit to the Stipulation that included definitions for some of the words used in the Stipulation and the outcome measures, Plaintiffs did not think it was necessary to define every word in every measure.  However, we need to discuss how the monitors are interpreting some of the measures, and come to a common understanding of what words mean.

We found that monitors are not properly interpreting the language of Specialty Care # 1 and 2 measures, which relate to whether Utilization Management ("UM") is sending denial decisions for specialty care to the requesting provider within 14 days and placing a record of the denial in the patient record, and whether the patient is apprised of the denial.  For the months of March through July 2015, the CGARs do not identify a single UM denial of specialty care at *any* of the ten prisons, which initially suggested to us that either that the UM process is not documenting this information, or that the monitors do not know how to find this information.  *See* Eidenbach letter at 4.  One of the monitors, Ms. Franklin, told us at Florence that she has never seen a denial of a specialty consult at any facility during any month, and there is no form or list of denials because there are no denials.  We were also given a similar response during the Perryville tour in early June from the monitor there.

However, after speaking at length with monitoring and Corizon staff at Lewis about this issue and these performance measures, we now have determined that this all is a matter of semantics.  When Corizon UM denies a provider's request for a specialty referral, they call it an "alternate treatment plan" instead of a "denial."  Apparently Corizon staff and monitors claim that since the specific word "denial" is not used to describe this action by UM, this means that there are no denials of specialty care referrals, and thus there is nothing to measure.  This willful misinterpretation of the word "denial" does not demonstrate good faith.  Simply put, Defendants cannot nullify this requirement by using a different word.  It doesn't matter what name Corizon uses for UM's decision:  the so-called "alternate treatment plan" is a decision by UM ***to not approve the provider's requested consult***, and such a decision clearly meets the dictionary definition of a denial.[15]  Thus, rather than simplistically conclude that there are no "denials" to measure or review, the monitors should review the files of prisoners who were given "alternate treatment plans" to see if there is compliance with these performance measures. We found many examples of ATPs documented in medical files and other reports.

In fact, information contained within the Lewis CQI notes document that in June there were 261 specialty consults requested, and 234 approved, and in May there were 276 specialty consults requested, and 249 were approved.  ADCM121101, ADCM121079-80.  In terms of possible methodology for monitoring the performance measure, the monitor could get the list of the month's requests that were not approved to get the names and numbers of prisoners, and then look in those prisoners' medical record to see if the chart shows compliance with the requirements of the two outcome measures.  The clinical coordinator at Lewis said that one of her tasks is to compile all of the ATP responses, so she (and other institutions' clinical coordinators) presumably would be able to

---

[15] See http://www.merriam-webster.com/dictionary/denial, last reviewed 10/7/15 ("denial (noun)  *de-ni-al*:  […] the act of not allowing someone to have something […] SYNONYMS: […] rejection, […] ANTONYMS: […] approval, grant […]")

compile a list of all names and numbers for prisoners with ATPs for the prior month and provide it to the monitor for auditing purposes.

Dental #1 requires that prisoners awaiting routine dental care are not removed from the list if they receive urgent care in the meantime. The statewide dental monitor, Dr. Karen Chu, indicated that it is "impossible" to find files that meet the criteria for this measure. With regard to Dental # 2 (dental assistants take inmate histories, vital signs, and radiographs (as ordered) by the dentist), Dr. Chu reported in the June CGARs for both Florence and Lewis (and other prisons) that "no records found to meet these criteria." *See, e.g.*, ADCM120833. We asked her to explain this statement, and she told us that she originally had interpreted this measure to require her to check whether inmate histories, vital signs, and x-rays had been done. However, she explained, after she used this method for CGARs prior to June, [16] Kathy Campbell and Richard Pratt told her that her sample should include only those patients for whom the Dentist wrote an order to the dental assistant in the dental chart to perform one of those tasks, and her job is to verify whether the dental assistant complied with the written order. Dr. Chu is herself a dentist, and reported that this is not how dentists practice; they would not write such an instruction in the chart. Such an instruction would be made verbally, similar to the way that a medical provider would not write out an order to a nurse directing the nurse to take a patient's vital signs prior to an appointment. Therefore, every month there would be no dental charts that included a written order by the dentist. She stated that the way she was instructed to interpret the performance measure made no sense, and renders the performance measure moot.

Another example is Chronic Care # 1, which requires that chronic disease treatment plans be developed and documented within 30 days of the identification of a chronic disease. The monitor reviewed only 24 files for this measure for the June 2014 Florence CGAR, and the only files that she reviewed were those of new intakes to Florence. We asked Ms. Franklin to explain why she only reviewed new intakes' files, and she said she did not know why she was doing it this way, but that another monitor, Erin Barlund, had instructed her to only look at newly-arrived prisoners' files. This is clearly inconsistent with the plain language of the measure.[17]

---

[16] The April 2015 CGARs showed 70% compliance at Florence and 61% compliance at Lewis. ADM056716, 056777. Also related to dental treatment, the Lewis July CQI meeting minutes state that during the NCCHC inspection process, a problem was identified "that dental had no efficient way to track no shows." ADCM121106.

[17] Moreover, the need to look at all prisoners newly identified as having chronic diseases, and not just intakes, is illustrated by the fact that Florence has a difficult time identifying and tracking which prisoners have chronic diseases. According to the June CQI meeting minutes, "The CQI and dump report are timely and one inaccuracy was found. This is in regards to eomis not being able to identify AIDs patients. We believe we have 11 patients that need clarification, whether HIV or AIDs." ADCM121015.

In the 8/13/15 CQI meeting, statistical reports attached to the minutes show 0 prisoners with HIV and 0 with AIDS at every yard, indicating that the system still was not identifying prisoners with HIV or AIDS. ADCM121059-60. It also shows 22 prisoners with HIV, but this only shows data from North Unit – there is no data from other units. ADCM121058. Similarly, other reports attached to the notes have all zeros for many chronic diseases, both in terms of how many prisoners have the disease,

(continued next page…)

Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 11

The fact that almost every prison is listing 100% compliance month after month for <u>Emergency Response # 1</u> (first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency) raises the question of how monitors audit this measure.[18]  We asked the Lewis monitor how he measured compliance with it, as the measure received 100% compliance in the CGARs.[19]  He explained that he interpreted this measure to have two parts: (1)  is a person trained in BLS  responding within three minutes to an emergency, and (2) is that person adequately providing care.

With regard to the question of whether a person trained in BLS responds within three minutes, since a correctional officer is mandated to be trained in BLS, and a correctional officer is in fact, the

---

(continued from previous page…)
and how many are receiving treatment.  ADCM121059-65.  According to the 8/13/15 meeting notes, there are 279 prisoners with Hep C at the institution, and 0 are receiving treatment.  This number of 279 is not accurate because it only shows the numbers for Globe and North Units. ADCM121058.  In order to have an adequate system of chronic care, as an initial matter, the medical staff must be able to track the number of prisoners with such a serious disease.

[18] Upon review of Exhibit A to the Stipulation, it appears the parties inadvertently did not include definitions for any of the terms used in this performance measure. Given the monitors' confusion, we recommend that the parties discuss adding such definitions, and suggest using as a starting point the California Correctional Health Care Services' definitions for their Emergency Response System Policy (Vol. 4, Ch. 12, Part 1), available at http://www.cphcs.ca.gov/docs/imspp/IMSPP-v04-ch04.12.1.pdf at page 2 (attached herein as Appendix D).  For example, some of the relevant definitions  in the policy include:

**Basic Life Support**:  Emergency care performed to sustain life that includes CPR, automated external defibrillation, control of bleeding, treatment of shock, and stabilization of injuries and wounds.

**First Aid**:  Emergency care administered to an injured or sick patient-inmate before Health Care Staff is available.

**First Responder**:  The first staff member certified in BLS on the scene of a medical emergency.

**First Responder Response Time**:  The time interval starting at the placement of the first call for an emergency medical response and ending with the arrival of treating personnel trained in CPR at the scene of the incident.

**Medical Emergency**:  A medical emergency as determined by medical staff includes any medical, mental health, or dental condition for which evaluation and treatment are necessary to prevent death, severe or permanent disability, or to alleviate disabling pain. A medical emergency exists when there is a sudden marked change in a patient-inmate's condition so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to the patient-inmate or others.

[19] The monitor who audited this measure at Florence, Jen Fontaine, was on medical leave and unavailable during our tour.

person who first declares that there is an emergency, there cannot possibly be anything but 100% compliance with the 3-minute requirement.  With regard to the qualitative analysis for the second part of his assessment (whether care was adequately provided), Mr. Allred said he looks at the morning reports[20] that list the previous day's activities and emergencies to see if the correctional officer either (a) called the medical clinic for help, or (b) actually rendered aid to the individual having an emergency.  Either one equates, for his purposes, to adequate care.  Therefore, if a custody officer calls for help within three minutes of learning of a medical emergency, there is compliance.  However, the sole act of picking up a phone to make a call to health care staff is not "adequately provid[ing] care" as required by the plain language of the measure.[21]

Finally, the ability of custody officers to provide adequate care is called into serious question by the CQI ▇▇▇▇ meeting minutes, which discusses the death of ▇▇▇▇▇▇▇▇▇▇ from a heart attack.  The minutes noted that "Dr. Malachinski stated moving forward we do not stop CPR until EMS arrives regardless of custody stating to stop. Per Dr. Malachinski custody instructed those performing CPR to stop effort x 3 and each time efforts were stopped and restarted after an extended amount of minutes."  ADCM121093.[22]

---

[20] It is unclear if these "morning reports" are the same as the Serious Incident Reports that are listed as the source for the review.  Stipulation, Exh. C, at Measure # 24.  Angel Nieblas, the DON, reported that nurses record their responses in eOMIS on an ICS encounter screen but that there is no way to record when an ICS was initiated in eOMIS – this is recorded on Serious Incident Reports.

[21] Again, it is instructive to look at how another prison system assesses if a first responder provided adequate aid.  The CCHCS Emergency Response System Procedures, available at http://www.cphcs.ca.gov/docs/imspp/IMSPP-v04-ch04.12.2.pdf (attached as Appendix D), describe the role of first responders and/or custody officers:
"A FR shall evaluate the situation and initiate appropriate First Aid and/or BLS measures, including establishing airway, breathing, circulation, controlling bleeding, and administering CPR.  The FR shall also:
a.     Briefly evaluate the patient-inmate and situation, then immediately notify health care staff of a possible medical emergency, and summon the appropriate level of assistance.
b.     Inform the health care staff of the general nature of the emergency including the general status of the patient-inmate. This may include whether the patient-inmate is conscious, breathing, bleeding, or other observable patient-inmate conditions and complaints.
c.     Immediately initiate CPR if appropriate.
d.     Initiate community EMS activation if necessary. If CPR is not initiated due to the condition of the patient-inmate, the reason(s) must be clearly documented.
[…] In medical emergencies, the primary objective is to preserve life. All peace officers who respond to a medical emergency shall provide immediate life support until medical staff arrives to continue life support measures."
[22] Despite the fact that CPR was stopped three separate times, the mortality review states
"What could have been prevented: No
What can we improve upon: N/a"
It also calls for no corrective action.  Compare with Medical Records-CO # 2 (Stipulation # 31) ("Mortality reviews will identify and refer deficiencies to appropriate managers and supervisors,

(continued next page…)

### D. Questionable Source Data Used or Source Data Contradicted by Other Documentation

Even putting aside the numerous serious methodological defects described above in Sections A-C, we identified multiple performance measures where the underlying numbers are highly suspect, or are contradicted outright by other documentation.  Our spot-checking of the medical records reviewed by monitors also reveals that Defendants' findings of compliance are frequently erroneous.

For example, in the June CGARs for Florence prison, Access to Care # 5, (urgent referrals to provider seen within 24 hours) the monitor found 100% compliance for the nine urgent referrals for the month in an institution of more than 4,000 prisoners.  ADCM120769.  Jen Fontaine, the monitor who compiled this performance measure, was out on medical leave and unavailable to interview regarding the source of the data.  Given the size of the institution, having only nine documented medical emergencies in a month is extremely low and raises a concern that either nursing staff are not properly recording data, and/or the nurses are designating very few patients as urgent.  Illustrative of the possibility that data is not properly recorded on all yards, at the Globe Unit, which only has a few hundred prisoners who all must have low medical scores and no chronic conditions, they reported 3 urgent referrals, one-third of those documented for the entire Florence institution.  By way of comparison, according to the Lewis June CGAR, there were 54 urgent provider referrals that month.  ADCM120825.  Additionally, that same month of June, there were 46 urgent dental referrals at Florence in comparison to only nine urgent medical referrals.  ADCM120780.

We asked the Florence Director of Nursing Nicole Lane whether nursing staff have been trained on or provided nursing guidelines on what situations constitute an "urgent" referral.  She said nurses learned what an urgent referral would be when they originally studied to be nurses.  Such a circular response does not clarify if nurses know how to designate an urgent referral in eOmis.  Finally, when we toured Perryville in early June, the monitor there said that it was impossible to measure this performance measure when we asked why a CGAR report listed "N/A".  ADCM037131.

At Lewis, we discovered that the monitor did not actually review cases of urgent referrals made by nursing in the previous month, and it is unclear how he is picking medical files to review.  We did a spot-check audit of the charts he reviewed for the June CGAR finding on Access to Care # 5.  The 18 files we checked were the ones he reviewed for Rast (7), Stiner (10) and Eagle Point/Sunrise (1).  ADCM122153, 122155.[23]  In the June CGARs Rast is listed as 10/10 compliant (100%), Stiner is

---

(continued from previous page…)
including CQI committee, and corrective action will be taken.")  The Lewis June CGAR found 50% compliance for this measure, because the committee failed to discuss one prisoner's death, but not apparently due to the shockingly deficient care received by Mr. Davis.  ADCM120850.  See Appendix A, page 11 for additional discussion of mortality reviews.

[23] Eagle Point and Sunrise are two separate units.  https://corrections.az.gov/location/98/lewis.  Accordingly, they may not be combined for monitoring purposes, as the monitor apparently did here; a separate sample must be drawn from each unit.

listed as 9/10 compliant (90%), and Eagle Point as 1/1 (100%) compliant.[24]  ADCM120825.  We found that in fact, *none* of the records reviewed at these two yards were relevant to the urgent referral performance measure:  the monitor counted five dentist appointments as urgent provider encounters, and numerous return from specialty care follow-up and regularly scheduled chronic care appointments as urgent provider referrals.[25]  Given this gross mistake in interpreting what an "urgent referral" means, it calls into question (1) the accuracy of the monitor's review of the other prisoners' medical files that we didn't have a chance to review, and (2) what, if any, training he received on auditing the measure.  It is unclear how he identifies records applicable to the measure, which again illustrates the need for a more robust methodology and clear and consistent instruction to all monitors across the institutions.  *See* Appendix A, pages 14-15 for details of our review.

Similar to our finding at Florence on Access to Care # 5 that the monitor relied upon a very small universe of applicable cases, the Florence June CGARs on Access to Care # 6, (emergent referrals to provider seen immediately) found 100% compliance with only two emergency referrals complex-wide for the month.  ADCM120770.  Again, this seems very low, especially when the small Globe unit was the source of one of these two referrals.  More significantly, this number may be contradicted by other documents.  According to the June 2015 Emergency Transport report, there were 12 prisoners transported off-site due to emergencies.  ADCM12155.  The CQI minutes indicate that there were 16 emergency transports in June.  ADCM121036.  While it is possible that prisoners may be transported off-site without first being seen by a provider, if there truly were only 2 out of 12 (or 2 out of 16) emergencies seen by a provider, then such a scenario raises the questions of (1) are there a sufficient number of providers, and (2) if not providers, then who is making the decision to send the patient off-site emergently?  The discrepancy among these three documents calls into question the monitor's methodology.  Finally, similar to Access to Care # 5, it also calls into question whether the nurses have any training on how to make a record of these emergent referrals in eOmis.

At Lewis we also did a spot check of some of the files reviewed for Access to Care # 6 for the June CGARs.  We reviewed the four files listed in the worksheet by the monitor for Stiner Unit (ADCM122154), and discovered that one of the four prisoners' file reviewed was not relevant to the performance measure.  In that case, the referral actually was marked as urgent, and not emergent, and should not have been considered under Access to Care # 6, but rather under # 5.

As described above, the Florence monitor identified a number of urgent or emergent referrals that seemed extremely low given the size of the prison.  Similarly, when measuring the June CGAR for Quality Improvement # 1 (responses to HC grievances), the monitor stated that only nine grievances were filed institution-wide and they were 100% compliant.  ADCM120810.  Given the size of Florence, that is absurdly low.  The CQI meeting minutes said there were 8 grievances filed in the month of June (3 from South and 5 from East), which is a discrepancy, but more importantly, the CQI

---

[24] The monitor found 49 of 54 (91%) urgent referrals compliant prison-wide.  ADCM120825.

[25] We found similar widespread mistakes where the Lewis monitor's worksheets did not reflect the content of prisoners' medical charts for Access to Care # 4 (routine provider referrals within 14 days) and Access to Care # 7 (follow up sick call within timeframe specified by provider).  *See infra* pages 24-27.

Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 15

minutes indicate that the grievances from Central/Kasson, North, and Globe are either not being tracked, or are not making it to medical staff.  ADCM121035.[26]  The CQI minutes state that "We currently have a total for the year of 93 grievances and last year that this time we had 223."  *Id.* During the tour, we spoke to multiple class members on the four yards who reported never receiving responses to their grievances regarding health care, leading them to believe that they were either not being collected or processed.

Similarly, the Lewis June CGAR for Quality Improvement # 1 stated that only 20 grievances were filed the month of June at the entire institution – and supposedly no grievances were filed at the Bachman, Buckley, and Eagle Point units; and only one grievance each at Barchey and Morey Units. ADCM120867.  The failure to have any grievances, or only one per yard, would tend to indicate that they are not being tracked or collected properly.  Furthermore, the data kept by Corizon contradicts the monitor's findings:  the CQI minutes state that in June, 52 grievances were filed institution wide, and the discrepancy between the two reports is summarized below.  ADCM121089-90

| Unit | # Grievances Filed June 2015 (according to CGAR) | # Grievances Filed June 2015 (according to CQI minutes) |
|---|---|---|
| **Bachman** | 0 | 5 |
| **Barchey** | 1 | 2 |
| **Buckley** | 0 | 13 |
| **Eagle Point / Sunrise** | 0 | 0 |
| **Morey** | 1 | 3 |
| **Rast** | 14 | 22 |
| **Stiner** | 4 | 4 |
| **Total** | **20** | **52** |

There are similar discrepancies between the Lewis July CGAR (ADCM135586) and CQI data (ADCM121110-11).

| Unit | # Grievances Filed July 2015 (according to CGAR) | # Grievances Filed July 2015 (according to CQI minutes) |
|---|---|---|
| **Bachman** | 1 | 4 |
| **Barchey** | 0 | 2 |
| **Buckley** | 17 | 28 |
| **Eagle Point / Sunrise** | 1 | 1 |
| **Morey** | 0 | 0 |

---

[26] Again in July, there was no record of grievances documented for these three yards in the CQI minutes, ADCM121056, and according to Corizon data, 10 grievances were filed from the South (7) and East (3) Units.  The July CGAR, on the other hand, indicated that 13 grievances were filed – six at South, six at East, and one at Central.  ADCM135531.

| Unit | # Grievances Filed July 2015 (according to CGAR) | # Grievances Filed July 2015 (according to CQI minutes) |
|---|---|---|
| Rast | 21 | 24 |
| Stiner | 1 | 1 |
| **Total** | **41** | **64** |

Another example of the questionably small number of documents reviewed can be seen in the April 2015 Tucson CGAR Access to Care # 1 (HNR screened by RN or LPN), where the monitor reviewed only eight (8) HNRs for the entire institution for the entire month, and found 100% compliance.  ADCM037242.  A sample size of eight was also used for the months of May and July.  ADCM072066, 137506.  (Those months also are listed as having 100% compliance).  This does not comport with the Stipulation requirement that a sample of ten  be taken from each unit of a prison complex, and that the only time there are fewer than 10 reviewed is when there are less than 10 examples for the month.  Given the size of Tucson, and the number of prisoners with serious medical and mental health needs, it is overwhelmingly likely that more than eight HNRs were filed institution-wide.[27]  Again, the use of a sample size that on its face is absurdly small calls into question the accuracy of the finding.

At Florence, we spot-checked the monitor's findings for Mental Health # 8 (MH-3A prisoners seen at least every 30 days by a mental health clinician).  The June MGAR found 28 out of 30 files compliant, for a rate of 93% compliance.  ADCM120799.  However, we reviewed the ten files from East Unit and found that four of them were in fact not in compliance, lowering compliance to at least 80% (24 out of 30).  This calls into question the accuracy of the review of the other 20 prisoners' files that we were unable to review.  In May, the monitor again found 28 out of 30 files compliant for a 93% compliance rate.  ADCM071832.  Again, we spot-checked some of the files that had been reviewed, and found at least two that were in fact noncompliant.  *See* Appendix A, page 1.

The spot check of Lewis June CGARs for Mental Health # 8 found at least two prisoners who are listed as having clinical contacts, when in fact the encounters had been cancelled.  ADCM120856.  This lowers the monitor's finding of compliance from 47/70 (67%) compliance to at least 45/70 (64%).  *See* Appendix A, page 2.[28]

At Lewis, we spot-checked the June CGARs for Mental Health # 9 (MH-3A prisoners on psychotropic medications will be seen at least every 90 days by a mental health provider).  The monitor found 33 out of 54, or 61% of records compliant.  ADM120856-57.  However, five of the 33 files listed as compliant (not all 33 files were reviewed) actually had not had mental health provider encounters at 90 day intervals, and a sixth file listed as compliant belonged to a prisoner who

---

[27] Tucson has eight units, and it is conceivable that the 8 of 8 refers to each unit.  However, the methodology set out in the Stipulation, and used at other facilities, requires 10 records per unit, not one per unit.

[28] Appendix A, pages 3-10 includes a summary of Lewis and Florence prisoners whose files we randomly reviewed and whose mental health treatment does not comport with various Stipulation requirements.

apparently discharged from ADC custody in 1989.  Therefore, the compliance rate is lowered to at least 28 out of 54, or 52% compliance.  *See* Appendix A, page 2 for more details.

Mental Health # 11 requires, in part, that "MH-3B prisoners who are prescribed psychotropic medications for psychotic disorders, bipolar disorder, or major depression [hereinafter "a qualifying diagnosis"] shall be seen by a mental health provider a minimum of every 90 days."  At Florence, the monitor found compliance in 27 out of 37 cases, or 73%. However, in at least three cases, the monitor concluded the prisoners did not have an applicable qualifying diagnosis, even though the prisoners had documented diagnoses of schizoaffective disorder, psychosis, and depressive psychosis.  In addition, the monitor lists a prisoner as compliant when there is no provider note on or near the date he was allegedly seen, and another prisoner listed as compliant when he is housed at Lewis, not Florence, and his record indicates he has "no history of MH services."[29]  Finally, there were several entries in the Florence CGAR listed as compliant where the documented date of the encounter was in the future, or otherwise obviously incorrect.  *See, e.g.*, ADCM120796 (entry dated 7/31/15 reporting prisoners were seen on 8/11/15, 8/7/15, and 4/1/47); ADCM120801 (prisoner reportedly seen on 6/1/34). *See* Appendix A, page 1.  Such obvious errors cast serious doubt on the accuracy and reliability of the monitors' work.

The spot check of the Lewis June CGAR for Mental Health # 11 also showed that the medical records did not support or reflect the monitor's conclusion.  The monitor had found 51 of 64, or 80%, of applicable files compliant.  ADCM120857-58.  In fact, four of the spot-checked records were not compliant with the measure, lowering the compliance level to at most 47 of 64, or 73% compliant, and calling into question the accuracy for the medical charts we did not have time to review.  One of the files was noncompliant because several appointments listed in the CGAR for the prisoner had not actually occurred, because they were cancelled for security reasons, or because the mental health staff did not have access to the prisoner's record.[30]  *See* Appendix A, page 2 for more details.

A final example in which review of the underlying source documents shows something different than the monitor's finding is Quality Improvement # 2 (facility conducting monthly CQI meetings in accord with NCCHC standards).[31]  For this measure, the monitor found 100% compliance for June at Florence, even though a review of the CQI meeting minutes show that the mental health portion is completely blank, and there are no minutes regarding dental care (indeed, the mental health

---

[29] This prisoner is also listed as compliant under Mental Health # 10 (MH-3B prisoners seen a minimum of every 90 days by a mental health clinician).  ADCM120800.

[30] Cancellation of mental health appointments due to security staff shortages and for other non-clinical reasons appears to be a common occurrence.  It also appears that the patient's records are frequently unavailable to mental health staff.  *See* Appendix A, pages 2-3 for more examples.

[31] NCCHC Standard P-A-06 defines a quality improvement committee as consisting of "health staff from various disciplines (e.g. medicine, nursing, mental health, dentistry, health records, pharmacy, laboratory)."  The Discussion Notes state:  "CQI minutes should provide sufficient details to guide future decisions.  For example, the minutes could state the problems identified, the solutions that were agreed upon, the person responsible for carrying out the corrective action, and the time frame for taking the corrective action."

portion is entirely blank for May, June, and July, a fact that Nicole Newman, the lead psych associate, was unable to explain). ADCM120810 [CGAR]; ADCM121017 [CQI notes]. Additionally, the columns that identify "Individual Responsible for Follow Up" and "Estimated Completion Date" are not completed and left blank in all three months of the CQI meeting notes we were provided for Florence. ADCM121013-19; 121035-39; 121047-54. This failure to discuss (or document a discussion occurred) regarding dental and mental health care, or to identify individuals responsible for follow up and completion date, shows that the CQI meetings are in fact not being conducted in accord with NCCHC standards, and the 100% compliance finding is incorrect, and should instead be 0%.[32]

### E.  Failure to Review the Substance of Individual Medical Records

There are measures for which it is necessary to open up the encounter notes for individual prisoners in order to assess whether the performance measure is met, but the monitors are not doing so. For example, in Part D we referred to encounters that the monitor counted as occurring, but upon opening the encounter and reading the actual notes, one could see that the encounter was cancelled. We also identified multiple prisoners' records where a provider appointment ostensibly occurred, but there are no notes of any type in the SOAPE notes, and the only information at most that is documented is the prisoner's vital signs that were taken by a nurse. *See e.g.* ████████████████ ███████████  at Appendix A, pages 24-25, 27. We previously raised our concern about "phantom appointments" at Perryville and Eyman, (Eidenbach letter at 8-9), and it appears that such a practice occurs at Florence and Lewis as well.

Significantly, compliance with Stipulation Agreement #1 (interpretation in all health care encounters), required by Paragraph 14 of the Stipulation, is not accurate without reviewing individual entries in the prisoner's medical record. The monitors' method of measuring compliance, as explained to us by the monitors during interviews and in your letter of August 20, is to review the log of all appointments in which the language line was actually utilized and therefore unsurprisingly finding 100% compliance every month. This in no way would capture the clinical encounters where interpretation services were not used. A more accurate approach would be to select 10 prisoners who cannot communicate fluently in English and had health care appointments in the past month, and review the notes from their clinical encounters to see if there is any documentation of the use of interpreters, thus showing that effective communication was achieved.[33]  We did exactly that while at

---

[32]  In the Florence July CGARs, the monitor does assess 0% compliance for this performance measure because "there is no documentation of what is being monitored/studied. What is the problem and what process study is taking place or being updated? There are no thresholds listed. What are the QI monitoring activities?" ADCM135531.

[33]  Defendants misinterpret the term of art "effective communication" in the context of a health care encounter to mean that Plaintiffs are somehow insisting that the health care staff rate the quality of the interpretation. Rand 8/20 letter at 9. We are not making such a demand; having the staff write in SOAPE notes that an interpreter was used in and of itself shows effective communication occurred, because a qualified interpreter conveyed information. In fact, at least one provider at Florence does document in her SOAPE notes when she uses an interpreter, and these include encounters that were not listed on the language log. *See* Appendix A, pages 16-19 for more details.

Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 19

Florence, and in our spot-check of the monitors' finding of 100% compliance at the institution, found that the 100% figure month after month cannot be in any way accurate.  While this review was for only one prison, we believe that using this methodology at other institutions would likewise show the 100% compliance rate is incorrect.

Our methodology for this review was to use the list of names of nine Florence prisoners on the March and April phone interpretation logs in order to identify prisoners who would be covered by this performance measure, and review their medical records to see if there were other health care encounters documented in the medical record that occurred after 2/18/15 and that weren't on the phone log.  We found a widespread failure to provide interpretation in medical, dental, and mental health encounters.  Only one of the nine prisoners whose files we reviewed had interpretation at all of his health care encounters, which if compliance were to be measured by prisoner, would result in a woeful compliance rate of 11%.  If one were to add up all of the reviewed health care encounters for the nine prisoners, and calculate compliance that way, our spot-check found that the institution would still be terribly out of compliance; for the nine prisoners, 48 of their 70 health care encounters had no interpreter.  This is a compliance rate of 31%.[34]  *See* Appendix A, pages 16-19 for detailed notes of each prisoner's medical record.

---

[34] Our review of six other prisoners' records during the tours showed they did not have language interpretation at health care encounters.  *See* Appendix A, page 20; *see also* Fathi letter, 8/6/15 (language interpretation not provided to ▮▮▮▮▮▮▮▮▮▮▮▮▮).
The number of encounters without interpretation would be higher if we relied solely upon what is documented in the medical records.  On North yard, there is a RN (Julia Madrid) who prisoners said speaks Spanish, so while there isn't documentation in the SOAPE notes that she spoke to them in Spanish, those encounters are not counted against Defendants.  Likewise, we were told by prisoners on the South Unit that LPN Garcia speaks Spanish, so any encounter with her is not counted against Defendants.

## II.  Defendants' Own CGARs Show Widespread Deficiencies and Non-Compliance

Putting aside all the deficiencies in defendants' monitoring methodology, even taken at face value the CGARs themselves show that month after month Defendants are out of compliance with many stipulation performance measures.[35]  We analyzed the CGARs we have received to date, and found that substantial noncompliance is persistent and widespread.  In the following pages, we identify the most critical elements to have a functional correctional health care delivery system.  These include:  timely access to competent health care services ("health care" = medical [including infirmary care], dental, and mental health care); a functional pharmacy and medication administration system; timely and competent management of chronic disease patients; and the use of specialty care, which includes incorporating the specialist's recommendations into the ongoing treatment plan.  For the measures relevant to these essential elements of a functional health care system, there is substantial noncompliance, with no identifiable trend towards improvement..

| | |
|---|---|
| *Access to Medical Care*<br>Access to Care # 1 (HNR triage)<br>Access to Care # 2 (24 hr NL)<br>Access to Care # 4 (14 day PL)<br>Access to Care # 7 (follow-up sick call timely)<br>Infirmary Care # 4 (72 hr provider rounds) | *Pharmacy/Medication Administration*<br>Pharmacy # 1 (newly prescribed formulary meds w/in 2 bus days or same day if STAT)<br>Pharmacy # 2 (CC and psych med renewals)<br>Pharmacy # 3 (CC and psych med refills)<br>Access to Care # 10 (all meds transferred b/n prisons w/o interruption) |
| *Access to Dental Care*<br>Staffing # 3 (statewide dental staffing)<br>Dental # 3 (routine dental 90 days)<br>Dental # 4 (urgent dental 72 hrs) | *Chronic Disease Management*<br>Chronic Care # 2 (CC seen as specified, at least every180 days)<br>Chronic Care # 3 (Disease mgmt. guidelines implemented) |
| *Access to Mental Health Care*<br>Mental Health # 13 (MH-3D seen w/in 30 days of discontinuing meds)<br>Mental Health # 20 (MH-3 & above seen every 30 days)<br>Mental Health # 21 (MH-3 &above in max custody seen weekly)<br>Mental Health # 26 (MH HNR triage) | *Specialty Care*<br>Access to Care # 9 (hosp. discharge instructions reviewed/acted upon w/in 24 hrs)<br>Specialty Care # 5 (specialty consult reports reviewed/acted upon w/in 7 days)<br>Specialty Care # 7(act on abnormal values in diag. reports w/in 5 days) |

---

[35] For the first twelve months after the effective date of the Stipulation (2/17/15), Defendants must meet or exceed a 75% threshold for every performance measure.  *See* Stipulation ¶ 10(a)(i).  Defendants believe the February CGARs are not relevant for measuring compliance.  8/20/15 Rand letter at 6.  We disagree.  In any event, the five month averages (March – July 2015) were close to the six month averages (Feb. – July 2015). We can provide six month charts if Defendants desire.

In addition to the measures listed above, there are many others documented on the CGARs where Defendants show noncompliance or no sustained compliance.  The fact that they are not analyzed below does not mean that we believe Defendants are in compliance with these measures, nor do we waive our right to raise them in a future Notice of Substantial Noncompliance.  Finally, we encountered numerous prisoners at Florence and Lewis during our tour whose treatment illustrates the widespread noncompliance with performance measures.  A summary of the findings are at Appendix A, pages 21-28.

### A.  Access to Health Care

At the outset, we note that numerous prisoners we spoke with at ASPC-Lewis reported that they did not have access to blank HNR forms in triplicate held in the officers' office ("bubble") on their housing units.  Prisoners at Rast, Barchey, Buckley, and Morey Units consistently described the process to get a blank HNR form was to first write an inmate letter/kite to their CO-III.  Generally within two to three days, the CO-III would deliver a blank form to the prisoner's cell.  The prisoner then fills out the HNR form and in the case of max and close custody units, gives the HNR to a custody officer to forward to Health Care.  This practice causes delays in prisoners' ability to bring their health care concerns to the attention of health care staff, which is especially problematic with urgent or emergent medical, dental, or mental health needs, or to request refill and renewal of chronic care and psychotropic medications.

#### *Access to Medical Care*

**Stipulation Measure # 36 (Access to Care # 1)** (HNRs screened by LPN/RN within 24 hours of receipt).  Defendants are substantially noncompliant for this performance measure.  Two prisons in particular, Lewis and Eyman, are significantly noncompliant with a five-month average rate of compliance of 28% at Lewis and 68% at Eyman.  The CQI August meeting notes at Lewis confirm this, and state that HNRs are not being picked up and stamped as received by health care staff in a timely manner, and that there is no data on HNR timeliness from Morey and Rast Units.  ADCM121116-20.  *See* Appendix A, page 30 for more details.



Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 22

It also appears that Florence has a problem properly processing HNRs.  A Director-level response signed by Richard Pratt on 6/22/15 to a grievance (███████████) filed by a South Unit prisoner (██████) grants the grievance, stating that "the 16 Health Needs Requests (HNRs) you submitted dated from 3/8/15 to 6/7/15 were reviewed and 10 of them were found to be deficient."  *See* Appendix B.

**Stipulation Measure # 37 (Access to Care # 2)** (Sick call inmates will be seen by an RN within 24 hours after an HNR is received).  Defendants are substantially noncompliant for this performance measure. ADC's statewide average compliance level every month was below 75%, and the five month average statewide compliance level was 64%.  Six prisons averaged less than 75% compliance over the five months.[36]  Four of the largest prisons (Eyman, Florence, Lewis, and Yuma) have been out of compliance every single month since monitoring began.  *See* Appendix A, page 30 for a detailed summary of each prison's performance for each month.





---

[36] Eyman (44%), Florence (53%), Lewis (34%), Tucson (67%), Winslow (73%), and Yuma (35%).

When we spot-checked the June 2015 CGAR for Lewis Complex, Stiner Unit, using the monitor's worksheets, (ADCM122153), we found that the compliance level recorded on the CGAR was overstated. The monitor found compliant 25/61 (41%) of files reviewed institution-wide, and that 2/10, or 20%, were compliant at Stiner Unit. ADCM120824.   However, a review of the records for prisoners ▮▮▮▮▮ and ▮▮▮▮▮ showed that a LVN, not a RN, conducted this face-to-face triage. Therefore, Stiner unit's compliance rate should have been 0 of 10 (0%) and assuming all other records were accurate, at most the complex-wide compliance level should have been 23 of 61 (38%).   Furthermore, the CQI minutes for Lewis prison quantified the extent of the problem of delays in prisoners being seen on nursing line.  In May, the average wait time for nurses' line was 12 days; in June, 18 days; in July, 17 days.  ADCM121073, 121092, 121114-15.  This performance measure requires a wait time of no more than 1 day.



CQI minutes documented that each month at Lewis, less than half of the HNRs submitted resulted in a nurse's line appointment.  ADCM121073, 121092, 121114-15.  While many may be requesting prescription refills since Defendants do not have an automated refill system (*see* pages 33-34, *infra*), this raises the possibility that many of the HNRs seeking medical care are not being scheduled for sick call.



Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 24

While touring Florence-Central, we asked DON Nicole Lane if she had any insight into the prison's score of 47% in the June CGARs for <u>Access to Care # 2</u> (sick call inmates seen within 24 hours by a RN). ADCM120768.  She said that nurse lines are run seven days a week and on days when there are no custody issues, 15 to 20 patients are seen each day.  She stated the Central yard goes down frequently for security reasons, and when it does, patients are not escorted to the building.  We asked Deputy Warden Morris about disruptions to medical escorts.  Mr. Morris stated the medical escort positions are fully staffed five days/week, and are not diverted, so escorts should not be disrupted.  He reported the medical escort position is filled by regular shift staff on Saturdays and Sundays.  He said this would be reflected in "incident sheets."  At our request, he collected all of the "incident sheets" from Central Unit for the month of August for our review.  We received the documents, called "Information Reports" on Friday, 9/4/15, after leaving Florence and could not follow-up with questions for custody or medical staff about the information in the reports.  We received reports for nine days. ADCM122196-213.  It is unclear if no medical escorts occurred the other 22 days of the month, but Mr. Morris had said we would be given every report for the month.  The documents contradicted the DON's assertions, and show that the sampled finding of 47% compliance underestimated the extent of the problems. The documents show that even on the nine days where there was activity at the clinic, there were very few nursing, provider, mental health or dental lines run.  *See* Appendix A, page 29 for a detailed analysis.  Our file reviews also found many cases where prisoners were not seen on sick line in response to HNRs.  *See* Appendix A, pages 21-28.

**Stipulation Measure # 39 (Access to Care # 4)** (Routine provider referrals will be addressed by a provider within 14 calendar days).  Defendants are substantially noncompliant for this performance measure.  ADC's statewide average compliance level was below 75% three out of five months.  Four prisons have been out of compliance every month since monitoring began, and five have a five-month average compliance rate of less than 75%.[37]  *See* Appendix A, page 31 for a detailed summary of each prison's performance for each month.



_____

[37] Eyman (56%), Florence (60%), Lewis (60%), Perryville (56%), Tucson (53%).

Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 25

At Lewis, we spot-checked the June CGAR Access to Care # 4 measure for Bachman, Stiner and Eagle Point/Sunrise units, and found that the monitor overestimated compliance.  The monitor found 4 of 10 (40%) at Stiner, and 5 of 10 (50%) at Eagle Point to be compliant.  ADCM120824-25.  At Bachman, the monitor found 5 out of 10 compliant on his worksheet, ADCM122145, but on the CGAR, Bachman is listed as 1 of 3 compliant.  ADCM120824.  The total number files listed by institution as compliant on the CGAR adds up to 27 of 53 (51%), not 33 out of 60 listed in the summary.  ADCM120824-25.  The total number of files listed as compliant on the monitor's worksheets is 43 out of 75 (57%). ADCM122143-58.

With the five Bachman files that were marked as compliant in the worksheets, we found that there were no referrals (and in some cases, no encounters) on the dates listed for four of the five patients.  The nine files at Stiner and Eagle Point that were marked as compliant in his worksheets were either not compliant or not applicable to this measure (three not compliant, six not relevant).  We found that in fact, assuming that all of the other records were accurate and relevant, the calculation should have been at most that 30 out of 65 files (or 46%) in June were compliant. *See* Appendix A, pages 31-32 for more details.

The CQI meeting minutes for Lewis prison quantified the extent of the problem of delays in prisoners being seen by the provider.  In May, the average wait time for provider's line was 67 days; in June, 33 days; in July, 78 days.  ADCM121073, 121092, 121114-15.  The meeting notes explain the May number as being "[d]ue to provider staffing…"  When we toured the Rast Unit clinic on September 2, we met Dr. Abraham, the Corizon Associate Regional Medical Director, who was preparing to see patients on a provider line.  He reported that he had been running provider lines at Lewis from June 1- July 14 and mid-August to present because of provider vacancies.  He said he was focused on chronic care patients and getting the institution caught up on their backlog of provider referrals.  Dr. Malachinski told us there are two doctors on staff (him and another person), and five Nurse Practitioners, with the other MD and two of the NPs only recently hired.  There is still a 0.5 FTE provider position vacant.  Dr. Malachinski reported that in addition to his administrator role as Medical Director, he manages the Hub medical unit, and he is the only provider assigned to Buckley and the infirmary (L-11).



**Stipulation Measure # 41 (Access to Care # 7)** (follow-up sick call encounter will occur within timeframe specified by the medical/MH provider).  Defendants are substantially noncompliant for

this performance measure.  For every month but one, the statewide compliance rate was less than 75%.[38]
Three facilities were below 75% for five months (Eyman, Perryville, Tucson).  Eyman and Florence had
five-month average rates of compliance less than 50%.

While at Lewis we reviewed all ten Stiner Unit files marked as compliant for this measure, 6 of the
ten Rast files found compliant, and 4 of the ten Bachman files found compliant.  We found that none of
them were relevant to the performance measure.  *See* Appendix A, pages 33-34.  This again calls into
question the accuracy and relevance of the other 50 medical records the monitor ostensibly reviewed for
this performance measure, which we did not review and for which he found 100% compliance institution-
wide.  ADCM120825.



///
///
///
///
///
///
///
///
///
///
///
///
///

---

[38] March (72%); April (69%); May (49%); June (72%); July (77%)

**Stipulation Measure # 66 (Infirmary Care # 4)** (In an IPC, provider encounters will occur at least every 72 hours).  Defendants are substantially noncompliant for this measure.  Every month the statewide compliance is less than 60%.  Three of the four prisons with infirmaries have 5 month average compliance rates below 75%.  Florence and Tucson, the two prisons with the largest infirmaries, are woefully out of compliance, with a five-month compliance rate of 30% at Tucson and **a shocking 0% compliance rate at Florence**. *See* Appendix A, page 34 for a detailed summary of each prison's performance for each month.





Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 28

### *Access to Dental Care*

Defendants have consistently been noncompliant on measures related to dental care.

**Stipulation Measure # 3 (Staffing # 3)** (Dental staffing will be maintained at current contract level).  Defendants have been noncompliant four out of five months on this statewide performance measure.[39]

**Stipulation Measure # 102 (Dental # 3)** (Routine dental wait times no more than 90 days from date HNR was received).  Defendants are substantially noncompliant for this performance measure.  ADC's statewide average compliance level was below 75% two out of the five months.[40]  Three prisons have average compliance levels for the first five months of monitoring that are below 60%.[41]  Additionally, Safford prison reported a "N/A" for the month of May, and the monitor reviewed only two records, (ADCM072030) which raises the question as to whether there were only two routine dental appointments the entire month at a prison with 1,770 prisoners.[42]  *See* Appendix A, page 35 for a detailed summary of each prison's performance for each month.



**Stipulation Measure # 103 (Dental # 4)** (Urgent dental care provided within 72 hours).  Defendants are substantially noncompliant, and Defendants' performance on this measure is quite erratic.  ADC's statewide average compliance level was below 75% two out of the five months.[43]  Two prisons

---

[39] March (71%); April (72%); May (70%); June (75%); July (74%). The five-month average is 72%. *See* ADCM036997, 56674, 71841, 120818, 135515.

[40] March (70%); April (63%).

[41] Douglas (58%), Lewis (51%), Perryville (41%).

[42] Dr. Chu's CGAR entry was dated 6/15/15.  ADCM072030.  Safford's population on that day was 1,770.  *See* https://corrections.az.gov/sites/default/files/DAILY_COUNT/June2015/june_15th_2015.pdf.

[43] March (74%); April (72%).

were below compliance for three months, and three prisons were out of compliance for two months. *See* Appendix A, 35 for a detailed summary of each prison's performance for each month.



### *Access to Mental Health Care*

As detailed in Plaintiffs' Notice of Non-Compliance dated August 28, 2015, Defendants are not in compliance due to their erroneous position that many mental health measures "do not apply" at certain complexes and units. *See* Section I.A. at page 3; 8/28/15 Fathi letter.  This noncompliance with the plain language of the performance measures necessarily invalidates any finding of compliance on these performance measures.  In any event, to the extent that Defendants are still monitoring and tracking these performance measures, the data shows sustained noncompliance statewide.

**Stipulation Measure # 85 (Mental Health # 13)** (MH-3D prisoners seen by provider within 30 days of discontinuing psychotropic medications). Defendants are substantially noncompliant for this performance measure.  Five of the six prisons for which Defendants reported data had a five-month average compliance rate of less than 20%.[44]  Similarly, for every month but one, average statewide compliance was less than 20%.[45]  The statewide five-month average level of compliance was 17%.  *See* Appendix A, page 36 for a detailed summary of each prison's performance for each month.

///
///
///

---

[44] Eyman (12%), Florence (16%), Lewis (2%), Tucson (12%), Yuma (18%).  The sixth prison, Perryville, had a five-month average compliance rate of 45%.

[45] March (15%), April (25%), May (9%), June (19%), July (17%)

Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 30





**Stipulation Measure # 92** (Mental Health # 20) (MH-3 and above prisoner in max custody seen by clinician for 1:1 or group session at least every 30 days).  Defendants are substantially noncompliant for this performance measure, and wildly erratic from month to month.  Of the five prisons for which Defendants have data, all had an average five month level below 75%.[46]  Statewide, Defendants were in

---

[46] Eyman (60%), Florence (66%), Lewis (66%), Perryville (74%), Tucson (46%).

compliance only one of five months, April.[47]  After April, compliance plummeted at multiple institutions. This may be due to the severe and chronic understaffing of mental health positions.  At Florence, Ms. Newman informed us that the Mental Health Director position has been vacant for approximately six months; one psychiatrist and one psych NP position are also vacant.  At Lewis, we were told that the Mental Health Director, two psych associate, and one psychologist position were all vacant, the latter for approximately ten months.  *See* Appendix A, page 36 for a detailed summary of each prison's performance for each month.



While at Florence, we spot-checked some of the records reviewed for the finding in the June CGAR that 13 out of 20 (65%) files were in compliance.  ADCM120802.  In fact, while below the 75% threshold, this finding overestimated compliance.  At least two of the 13 prisoners listed as compliant had no individual or group sessions on or near the date listed in the CGAR.  We did not review all 13 of the allegedly compliant files, but this mistake lowers the rate of compliance for June to be no better than 55%, and lowers Florence's five-month average to 64%.

**Stipulation Measure # 93** (Mental Health # 21) (MH-3 and above in max custody seen by mental health staff at least weekly in rounds).  Defendants are substantially noncompliant for this performance measure.  Again, Defendants' compliance with this performance measure is erratic, as monthly statewide compliance at some priosns has ranged from 7% to 93%.  Four of the five prisons for which Defendants have data have a five-month average performance level that is noncompliant.  *See* Appendix A, page 37 for a detailed summary of each prison's performance for each month.

///
///

---

[47] March (62%), April (90%), May (51%), June (54%), July (64%).

Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 32



**Stipulation Measure # 98 (Mental Health # 26)** (Mental health HNRs responded to within the timeframes of the Mental Health Technical Manual).  Defendants are substantially noncompliant for this performance measure, and again this is a measure for which there has been no sustained compliance.  Four institutions have five month average compliance levels below 75%; three of them are below 50%.[48] Furthermore, as discussed above at pages 8-9, Defendants are not monitoring this measure using the various timeframe requirements in the MHTM.  *See* Appendix A, page 37 for a detailed summary of each prison's performance for each month.



_____
[48] Eyman (34%), Florence (42%), Lewis (49%), Winslow (67%).

### B. Pharmacy/Medication Administration

The importance of a functional medication administration system in correctional facilities was explained by Dr. Todd Wilcox:  "Prescribed medications must be provided to patients in a timely, consistent manner.  Medications must be renewed regularly and without interruption, and prisoners must be able to transfer housing locations without medication interruptions.  The system must ensure appropriate monitoring of efficacy and side effects."  Wilcox 11/8/13 Expert Report [Dkt. 1104-1] at 69.

Defendants have multiple problematic pharmacy practices that interfere with their ability to comply with performance measures.  First, the institutions struggle with safely maintaining medications.  *See, e.g.*, Lewis July 2015 CQI meeting minutes at ADCM121113-14 (Bachman Unit narcotics cabinet is not locked, so they use a locked file cabinet; Barchey Unit clinic has no air conditioning, they are using a swamp cooler with household extension cord, which puts the temperature of medications at risk; Morey Unit clinic has no hot water in nursing office and no biohazard container in provider office); Lewis June 2015 CQI minutes at ADCM121074 (16 insulin bottles opened and not dated;[49] medication improperly stored (medication requiring a temperature range of 68-77 degrees stored in refrigerator); records of shift counts and narcotic counts are missing or incorrect; incomplete temperature logs; loose tablets in the drawers of medication carts).

Second, the distribution of medication via pill lines or cell-front is extremely erratic, which is problematic when medications need to be taken on a set time frame, i.e. every 12 hours or every 8 hours.[50] We reviewed Medication Administration Records that showed the delivery of the evening medication to Rast close custody could occur any time between 2 pm and midnight from one day to the next.  *See, e.g.* ADCM091349-53.  The administration of insulin at many yards is not timed to occur at the same time as meals, or the morning and evening shots are only 9 or 10 hours apart, forcing prisoners to go 14 hours through the evening and overnight with no insulin.  *See also* Lewis July 2015 CQI meeting minutes at ADCM121116 (prison is struggling with medication watch/swallow being done timely and completely, and "discussion will address the CO's responsibility as it relates to watch/swallow.").  It is unclear if the cause of the erratic distribution is rooted in an inadequate number of LPN positions allocated for medication distribution.  It may also be caused by the sheer number of medications that have to be distributed: multiple prisoners reported that many medications that have no narcotic, abuse, or other value, and that had always been keep-on-person, have in the past six to 12 months been made watch-swallow.  This includes medications such as Coumadin, high blood pressure, dementia and HIV medications.  As a result, the waits at pill windows can be inordinately long, which disproportionately affects prisoners with heat sensitivity or mobility impairments, and prisoners have to leave the line and do not receive their medications.  At Florence, several prisoners on East Yard told us that the pill line is shut down one hour after it begins, and the prisoners still waiting for their medications are sent away.  If they stay because they want their medications, they have to accept a ticket for being late to pill call, in exchange for getting their medication.  We asked the Director of Nursing about this and she denied knowing of any such practice.

---

[49] This failure to properly label and maintain insulin containers is especially disturbing in light of Lewis's history of two separate incidents where medical staff improperly administered insulin, exposing more than a hundred diabetic prisoners to the risk of infectious diseases.

[50] During our tours of Florence and Lewis, the Florence-East unit was the only one where staff reported running a pill line three times a day.

Third, prisoners on multiple yards at Florence and Lewis also reported that if they are being sent off-site for specialty care, they will not be provided their morning medications prior to leaving the institution.  This forces prisoners into an untenable double bind, especially when the medications are critical life-sustaining prescriptions for conditions such as cancer, diabetes, and HIV:  either they forego their medication and put themselves at risk of harm, so that they can see the specialist, or they decline the specialist appointment so that they can have their medication, and deprive themselves of the right to receive needed specialty treatment, and are labeled as "refusing" the specialty care.

Finally, as detailed below in the discussion of the Pharmacy # 3 performance measure (chronic disease and psychiatric medication refills without interruption), Defendants are out of compliance with this measure, in part because Corizon's system for refilling medication is convoluted and antiquated.  During the negotiations of the Stipulation, we sought to include a requirement that the refill (not the renewal) of long-term chronic care and psychotropic medications be done via an auto-refill system similar to that used in many other correctional settings, and that is ubiquitous in community pharmacies.  Defendants rejected that proposal, without explanation.  During our tours at four different prisons, we spoke to nurses at various yard clinics who reported that anywhere between a third to a half of all HNRs received and triaged are prisoners requesting refills of medication, and that dealing with these HNRs and processing refills occupies a great deal of nurses' time.  Numerous prisoners reported, and their medical records show, that every month they experience gaps in receiving a refill of their medication, whether it be KOP or watch-swallow medications.  We reiterate our position that an automated refill system should be put in place.  It would likely help Defendants come into compliance with that measure, not to mention reduce the workload of nursing staff and ensure that prisoners with chronic medical conditions or mental illness are not put at risk of harm due to gaps in the provision of their medication.

**Stipulation Measure # 11 (Pharmacy # 1)** (newly prescribed formulary medications will be provided within 2 business days, or the same day if prescribed STAT).  Defendants are substantially noncompliant for this performance measure.  For every month but July, the statewide average was below 75%.  Four prisons were noncompliant every month.[51]  Two additional prisons had a five month average compliance rate below 75%.[52]  *See* Appendix A, page 38 for a detailed summary of each prison's performance for each month.  *See also* Florence July 2015 CQI meeting minutes at ADCM121035 (pharmacy representative at the meeting stated that she had concerns with PRN ("as needed") medications, "[w]hen an RX is written PRN and is the initial RX she is not receiving the full supply.  Example: RX written for TID [three times a day] and only receiving 30 pills instead of the 45 pills.").

///
///
///
///
///
///

---

[51] Eyman (46%), Florence (59%), Lewis (67%), Tucson (56%)
[52] Winslow (64%), Yuma (73%)

Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 35



**Stipulation Measure # 13 (Pharmacy # 2)** (Chronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication). Defendants are substantially noncompliant for this performance measure. The delays in renewals is not surprising, given the noncompliance identified for timely provider and psychiatrist appointments (See pages ___ above). As shown below, seven out of the 10 prisons had an average rate of compliance over the five months that was less than 75%.[53] *See* Appendix A, page 38 for a detailed summary of each prison's performance for each month.



---

[53] Douglas (73%); Eyman (58%); Florence (63%); Lewis (65%); Perryville (71%); Tucson (71%); Yuma (56%)

**Stipulation Measure # 14 (Pharmacy # 3)** (Refills requested between 3 and 7 business days prior to running out will be refilled so there is no interruption or lapse).  Defendants are substantially noncompliant for this measure.  Defendants' performance across the state has been abysmal every month. Four out of five of the months, the statewide average compliance rate was less than 50%, with the fifth month at 56%.[54]  Seven out of 10 prisons are noncompliant.[55]  There are three prisons that have an average compliance rate over the past five months that is in the single digits.[56]

Lewis prison has never had a single month above zero percent (0%), in part apparently due to the institution's inability to maintain accurate pharmacy records.  *See, e.g.* ADCM120864 (Lewis June CGAR); *see also* ADC056688 (Florence May CGAR).  The Florence pharmacy representative reported to the CQI team at the July 2015 CQI meeting that she "has been very diligent in cleaning up 'Past Due Refills' she has gone from 52 pages last month to 7 pages."  ADCM121035.  Nonetheless, any improvement is marginal, as Florence's June compliance rate was 2%, and in July it was 14%.  *See* Appendix A, page 39 for a detailed summary of each prison's performance for each month.



///
///
///
///
///
///

---

[54] March (39%); April (44%); May (56%); June (41%); July (39%).
[55] Douglas (48%); Eyman (3%), Florence (7%); Lewis (0%); Perryville (68%); Tucson (29%); Yuma (18%).
[56] Eyman (3%), Florence (7%); Lewis (0%)

Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 37





**Stipulation Measure # 35 (Access to Care # 10)** (All medications will be transferred with inmate and provided at receiving prison without interruption).  Defendants are substantially noncompliant for this performance measure.  Defendants' performance was abysmal.  Nine of the 10 prisons were below the compliance level for the five months;[57] and five prisons averaged less than 40% for the five months (three prisons had a five-month average of less than 30%).[58]  Two prisons (Lewis and Winslow) had multiple

---

[57] This measure is not applicable to Perryville except when women are moved to or from Phoenix for inpatient mental health care.

[58] Eyman (39%); Florence (28%); Lewis (4%); Tucson (40%); Winslow (18%).

Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 38

months with a compliance level of zero.  For four months, the statewide average compliance was less than 50%.  *See* Appendix A, page 39 for a detailed summary of each prison's performance for each month.





Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 39

### C.  Chronic Disease Management

Dr. Wilcox explained the importance of a functional chronic disease management system in his expert report.  "Chronic care clinics are a major focus of healthcare in any correctional setting.  Preventive care is essential with chronic care patients; it is impossible to provide community standard of care without regularly scheduled appointments that allow providers to track the progress of these patients and ensure appropriate treatment modification are made."  *See* Wilcox 11/8/13 report at 32.

**Stipulation Measure # 54** (Chronic Care # 2) (chronic disease inmates seen by provider as specified, no less than every 180 days).  Defendants are substantially noncompliant for this performance measure.  Seven of the ten prisons' average compliance level for the five months was less than 75%, and four prisons averaged below 60% and did not have a single month where it reached the compliance level.[59]  Each month, the statewide average compliance level was at 70% or lower.  *See* Appendix A, page 40 for a detailed summary of each prison's performance for each month.

Additionally, the Mortality Review for a Lewis prisoner who died ███████████████ notes that he had co-existing conditions of uncontrolled diabetes, hyperlipidemia, and HCV.  ADC Medical Program Administrator Dr. Rowe wrote in his 7/28/15 review that "Chronic care for patients with diabetes should be more timely and frequent especially when not controlled."  ADCM120633-36.



/// 
/// 
/// 
/// 
///

---

[59] Eyman (54%); Florence (46%); Lewis (50%); Perryville (70%); Phoenix (67%); Tucson (56%); Yuma (74%).

Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 40



**Stipulation Measure # 55** (Chronic Care # 3) (Disease management guidelines implemented for chronic diseases). Defendants are substantially noncompliant for this measure. Four prisons (Eyman, Florence, Lewis, Winslow) had multiple months of noncompliance, with Florence in particular never getting above 50% compliance in a single month. (Florence reported no data in March). See Appendix A, page 40 for a detailed summary of each prison's performance for each month.



///
///
///

Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 41

### D.  Specialty Care

Dr. Wilcox explained the importance of a functional system to refer patients to specialists when the person's needs are outside the primary care provider's expertise.  "The exercise of professional judgment sometimes requires more in-depth knowledge than primary care providers possess. In these cases, the provider must be able to refer patients for specialty consultations." Wilcox report at 55.  And when the prisoner has finally been able to see the specialist,[60] the provider must review the results of any tests performed by the specialist, and implement the specialist's recommendations in a timely manner.

**Stipulation Measure # 52 (Specialty Care # 5)** (specialty consultation reports reviewed and acted upon by provider within 7 days of receipt of the report).  Defendants are substantially noncompliant for this performance measure.  Six prisons have a five-month average performance rate below 75%; four are below 60%.[61]  For four out of the five months, statewide compliance was below 75%.[62]  *See* Appendix A, page 41 for a detailed summary of each prison's performance for each month.



///
///
///
///
///
///

---

[60] See pages 9-10 above regarding the inaccuracy of performance measures dealing with the denial of a provider's request for specialty care. (Specialty Care # 1 and # 2).
[61] Douglas (42%); Eyman (69%); Florence (52%); Perryville (69%); Tucson (51%); Yuma (59%).
[62] March (67%); April (78%); May (71%); June (72%); July (56%).



Stipulation Measure #44 (Access to Care # 9) (Hospital discharge instructions are reviewed and acted upon by provider within 24 hours). Defendants are substantially noncompliant for this performance measure. Four prisons have a five-month average performance rate below the compliance level.[63] *See* Appendix A, page 41 for a detailed summary of each prison's performance for each month.



Stipulation Measure # 46 (Specialty Care # 7) (provider will review and act on abnormal values in diagnostic or pathology reports within 5 days of receipt). Defendants are substantially noncompliant for this measure. Eight of the 10 prisons have five-month average performance levels that are less than 75%,

---

[63] Douglas (47%); Lewis (71%); Tucson (61%); Yuma (54%)

Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 43

six of them are below 60% and three are less than 50%.[64]  For every month but one, the statewide average was below 60%.[65]  *See* Appendix A, page 42 for a detailed summary.



The monthly performance of the three prisons with a five-month average compliance level of less than 50% is shown below:



---

[64] Douglas (58%); Eyman (54%); Florence (16%); Lewis (43%); Perryville (65%); Phoenix (53%); Tucson (41%); Yuma (62%).

[65] March (56%); April (57%); May (54%); June (62%); July (52%).  The five month average statewide level of compliance was 56%.

Ms. Lucy Rand
RE: Notice of Substantial Non-Compliance
October 15, 2015
Page 44

The monthly performance of the five prisons with a five-month average compliance level between 50 and 75% is shown below:



Thank you for your attention to this matter.  We look forward to the opportunity to work productively with ADC to find a way to resolve these problems.  We ask that you advise us of your availability the week of November 9, 2015 to discuss this Notice.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney


cc:     Counsel of Record
        Mr. Brad Keogh, ADC General Counsel

# Appendix A

### Review of Florence and Lewis May and June CGARs – Mental Health Measures

<u>Florence</u>
<u>Measure 8</u>
     This Measure requires that "MH-3A prisoners shall be seen a minimum of every 30 days by a mental health clinician."  The following records were listed in the CGAR as compliant, but the prisoner was not in fact seen every 30 days:
June 2015 [ADCM120799]:
1. █████ (seen 5/21/15 and 6/21/15);
2. █████ (seen 4/20/15 and 6/1/15);
3. █████ (seen 5/21/15 and 6/21/15);
4. █████ (seen 2/18/15 and 5/12/15).

May 2015 [ADCM071832]:
1. █████ (seen 3/4/15 and 5/7/15);
2. █████ (seen 2/18/15 and 5/28/15).

<u>Measure 11</u>
     This Measure requires, in part, that "MH-3B prisoners who are prescribed psychotropic medications for psychotic disorders, bipolar disorder, or major depression [hereinafter "a qualifying diagnosis"] shall be seen by a mental health provider a minimum of every 90 days." In the following cases, the monitor erroneously concluded that the prisoner does not have a qualifying diagnosis.

June 2015 [ADCM120800]:
1. █████ (prisoner's diagnoses include psychotic disorder and depressive psychosis);
2. █████ (schizoaffective disorder NOS);
3. █████ (psychotic disorder NOS).

     The monitor lists prisoner █████ as compliant, stating he was seen on 5/29/15, but there is no provider note on or near that date.  Finally, the monitor lists prisoner █████6 as compliant; this appears to be an error, as this prisoner is housed at Lewis and his record indicates that he has "no history of MH services." This prisoner is also listed as compliant under <u>Mental Health Measure 10</u>.

<u>Measure 20</u>
     This Measure requires that "MH-3 and above prisoners who are housed in maximum custody shall be seen by a mental health clinician for a 1:1 or group session a minimum of every 30 days."  In the June 2015 CGAR (ADCM120802), prisoner █████ is listed as compliant, allegedly receiving a 1:1 or group session on June 11, 2015.  His record, however, lists no individual or group session on that date.  Similarly, prisoner █████ is listed as compliant, allegedly receiving a 1:1 or group session on "6/1/34."  Assuming this is meant to be 6/1/15, no record of a 1:1 or group session was found on that date.

## Lewis

Measure 8

    Prisoner ███████ is listed as compliant, purportedly receiving a clinician contact on 6/23/15. However, his file indicates that he was actually not seen that date due to a security staff shortage. He was not seen until 7/2/15, more than 30 days after the previous contact on 5/26/15. Accordingly, this file should have been listed as noncompliant.

    Prisoner ███████ is also listed as compliant, allegedly receiving a clinician contact on 6/24/15. However, there is no note in his file corresponding to that date. He did receive a 1:1 on 6/1/15, but his previous appointment on 5/21/15 was canceled due to a lockdown, and there is no other contact within 30 days of 6/1/15. This file is noncompliant.

Measure 9

    This Measure requires that "MH-3A prisoners who are prescribed psychotropic medications shall be seen a minimum of every 90 days by a mental health provider." The following files were listed as compliant with this Measure; in fact, they are not: June 2015 [ADCM120856-57]:
1. ████ (seen 5/21/15 and 1/21/15);
2. ████ (seen 4/23/15; no other provider contact in 2015);
3. ████ (seen 4/15/15; no other provider contact in 2015);
4. ████ (seen 4/8/15; no other provider contact in 2015);
5. ████ (seen 5/13/15; no other provider contact in 2015).

    In addition, prisoner ████ is listed as compliant, purportedly receiving a provider contact on 5/27/15. But this prisoner's record lists no encounters, and he was apparently discharged from ADC in 1989. This appears to be an error.

Measure 11

    The following files listed as compliant in the June CGAR are not:
1. ████ (qualifying diagnosis; telepsychiatry contact 5/27/15; no other provider contact in 2015);
2. ████ (qualifying diagnosis; seen 6/11/15; no other provider contact in file).

    In the case of prisoner ████ three other provider appointments in May and June of 2015 were canceled (6/10/15, cell searches; 5/27/15, told patient refused but couldn't confirm; 5/11/15, unable to meet with patient due to time constraints/record unavailable).[1]

---

[1] Cancellation of mental health appointments due to security staff shortages and for other non-clinical reasons appears to be a common occurrence. *See* Prisoner ████ 6/25/15 ("Attempted to meet w/pt for scheduled appt. Pt. not brought to appt. by security"), listed as compliant for Mental Health # 5 (timely update of mental health treatment plan), ADCM120853;

### Prisoner File Review – Mental Health Treatment Not in Accord With Stipulation

The following are additional examples of prisoners whose mental health care was noncompliant with the Stipulation and/or deficient in other significant respects.

Mr. ██████████ is classified as MH3-A and SMI.  As of 9/4/15, he had not been seen by the provider since 6/4/15 (MH Measure 9).  His treatment plan was not updated between 2/16/15 and 8/11/15; the latter encounter lasted 51 seconds (MH Measures 5, 6).  A 9/9/15 advocacy letter from David Fathi to Daniel Struck, attached hereto and to which we have received no response, sets forth additional serious deficiencies in the mental health care provided to this prisoner.

Mr. ████████ is diagnosed with major depressive disorder and classified as MH3-B.  He was on suicide watch from 6/26/15 to 7/2/15 after he cut his arm.  He was not seen by mental health staff for four days after being put on watch, and was only seen twice, 6/30 and 7/1. (MH Measure 22).  There also is no documentation of any encounters with mental health staff between 3/19/15 and 5/20/15, even though he was housed at the MDU. (MH Measure 20). Despite the placement on suicide watch, and the fact that he is on psychotropic medication for depression, Mr. ████████ last psychiatrist appointment was 3/19/15, when his Paxil was increased because he reported worsening symptoms of depression.  (MH Measure 11).  A 9/21/15 advocacy letter from Corene Kendrick to Daniel Struck, attached hereto and to which we have received no response, sets forth additional serious deficiencies in the mental health care provided to this prisoner.

Mr. ████████ is classified as MH3-A and SMI.  He was seen by the clinician on 4/7/15, 5/21/15, 6/18/15, and 8/13/15 (MH Measure 8).  He was seen by the provider on 4/8/15; as of 9/4/15, he had not been seen again (MH Measure 9).  On 4/8/15, Dr. Rawa noted, "took for [sic] a couple months not getting the Celexa after transfer from Barchey to Rast."  As of 9/4/15 his treatment plan had not been updated since 1/27/15 (MH Measure 5).  He reported to us in an interview that the he suffers from dizziness and exhaustion in the heat, and does not go outside because

─────────────────────────────

Prisoner ██████ 7/14/15 ("Pt. scheduled for appt.  Unable to meet with pt due to staff/security shortage per Lt. Whiting"); Prisoner ██████ 7/14/15 ("Pt scheduled for appt.  Unable to meet with pt due to staff/security shortage per Lt. Whiting").  (The last two prisoners were on the master list of all MH-3 and above prisoners provided prior to the tour).

It also appears that the patient's records are frequently unavailable to mental health staff. *See, e.g.,* Prisoner ██████ 8/19/15 ("med hist, chart, eomis, and scale unavailable.  No previous documentation available"); Prisoner ██████ 6/3/15 ("Eomis unavailable" "Pt presents for HNR, currently unavailable"); Prisoner ██████ 8/11/15 ("chart, eomis, and scale unavailable"); Prisoner ██████ 8/11/15 ("Met w/pt at SDU, eomis and scale unavailable"); Prisoner ██████ 7/21/15 ("Met w/pt at SDU, eomis and scale unavailable"); Prisoner ██████ 3/4/15 ("no chart").

prisoners are sent outside for three hours and are not allowed to come in sooner.  His post at Rast MDU (2-A) does not have a list of prisoners on heat medications who should be allowed to return to the unit sooner.  He said that officers regularly test the heat in his cell and it is often over 90 degrees.

████████████████ is classified as MH3-A and SMI.  She was not seen by the provider between 2/25/15 and 6/3/15, and as of 9/4/15 had not been seen since 6/3/15 (MH Measure 9).  On that date, the SOAPE notes' sections for O and A are empty, which calls into question whether she was seen that day.  Her treatment plan was not updated between 11/7/14 and 7/30/15 (MH Measure 5). She reported that she is on Zoloft and she suffers from exhaustion and dizziness from the heat in her cell.

████████████ is classified as SMI and MH3-A.  He has not received a clinician contact every 30 days as required (seen 6/4/15 and 7/6/15) (MH Measure 8).  In addition, a 4/8/15 note by Moonjelly states "Lithium level ordered in Jan. 2015, not done yet."

████████████ is classified as SMI and MH3-A.  He has not received a clinician contact every 30 days as required (seen 7/27/15 and 8/27/15) (MH Measure 8).

████████████ is classified as SMI and MH 4.  He is not receiving the monthly 1:1 sessions with a clinician required by MH Measure 15 (seen on 6/29/15 and 8/22/15).

████████████' diagnoses include depressive psychosis.  He was classified MH3-C, and has not been seen by the provider since 1/21/15 (MH Measure 12).  On 7/14/15 the mental health clerk changed his diagnosis to MH3-D, but he was not seen by the provider within 30 days of discontinuing medication (MH Measure 13).

On 5/20/15, Mr. ██████ submitted an HNR that said the following:

> I was taken off my medication and since then I have been experiencing some personal issues.  I have requested to speak to the psych associate well over two months now and I still haven't seen him.  I would like to speak to the psych associate as soon as possible.

On 5/27/15, a response to Mr. ██████ HNR stated "you will be scheduled for the next available appointment."  As of 9/3/15, no appointment had occurred.

───────────────

[2] ████████ is a transgendered female who identifies as a woman, and prefers the use of female pronouns and her chosen name.

███████████ is classified as SMI and MH3-A.  He was last seen by the provider on 4/30/15 (MH Measure 9).

███████████ is classified as SMI and MH3-A.  He was seen by a clinician on 5/21/15 and 8/12/15 (MH Measure 8).

███████████ is classified as SMI and MH3-A.  His diagnoses include psychotic disorder NOS.

On 8/20/15, Dr. Shaw wrote the following note:

> Patient seen at cell as he appeared somewhat agitated and behaviorally unstable.  His speech was coherent, but seemed rambling and unfocused.  Had smeared butter on the lexan windows in the cell door, and staff reported that he had tied a sheet around his neck like a cape and that he had been running and jumping around his cell.

Dr. Shaw further noted, "Appeared at times to be responding to internal stimuli."

On 8/28/15, RN Bojaj wrote the following note:

> IM's mood was congruent with his affect: fearful/paranoid; disorganized.  IM presented delusional as usual; and paranoid.

Despite these repeated staff observations of Mr. ███████ decompensated state, as of 9/3/15 there had been no follow-up by a psychiatrist.

███████████ is classified as SMI and MH3-A.  His diagnoses include schizoaffective disorder.  Mr. ███ was last seen by the provider on 5/20/15 (MH Measure 9).

███████████ is classified as SMI and MH3-A.  His diagnoses include major depressive disorder, recurrent, severe with psychotic features.  Mr. ██████ was last seen by the provider on 5/20/15 (MH Measure 9).

███████████ is classified as SMI and MH3-A.  His diagnoses include bipolar disorder.  He was not seen by the provider between 3/5/15 and 6/17/15 (MH Measure 9).  His treatment plan was not updated between 4/8/15 and 7/8/15 (MH Measure 5).  In addition, the 4/8/15 review states that

he was "seen in recreation and socialization group," rather than in a "face to face clinical encounter" as required by MH Measure 6.

████ ████████
The CQI minutes (ADCM121116) state that Mr. ████ "attempted suicide 7/22/15." However, the only mental health note in his file for 7/22/15, by an unlicensed staff person, states that Mr. ████ reported that he was attacked and almost raped; there is no mention of a suicide attempt and no placement on suicide watch – indeed, Mr. ████ is assessed as "stable."

The next mental health note is 7/24/15, stating that Mr. ████ is on continuous suicide watch and "tried to hang himself." Either there is an error in the date of Mr. ████ attempted suicide in the CQI minutes, or there was a two-day delay before this suicide attempt came to the attention of mental health staff.

Mr. ████ is classified as SMI and MH3-A. His diagnoses include schizoaffective disorder. His 6/2/15 treatment plan update provides no indication that it was done after a face-to-face clinical encounter (MH Measure 6).

In addition, the CQI minutes state that Mr. ████ "attempted suicide 7/9/15" (ADCM 121116). But the only mental health note in his file on that date is by psych tech Phillips, stating "IM housed in watch pod; not seen by PT." As with Mr. ████ either there is an error in the date of Mr. ████ suicide attempt in the CQI minutes, or it was not promptly brought to the attention of mental health staff.

████████ is classified as SMI and MH3-A. He was not seen by the provider between 3/4/15 (when Dr. Rawa noted "no chart") and 8/6/15 (MH Measure 9). His 7/3/15 treatment plan review by Dr. Shaw indicates "see clinical note dated 7/3/15," but there is no note by Dr. Shaw on that date, and no indication that Dr. Shaw completed the treatment plan review after a face-to-face clinical encounter with Mr. ████ (MH Measure 6).

████████ is classified as SMI and MH3-A. His diagnoses include schizoaffective disorder. He was not seen by the provider between 3/20/15 and 8/19/15 (MH Measure 9). In addition, on 3/20/15, Dr. Rawa noted "doing alright but not getting rx post transfer from Bachman to Barchey." On 8/19/15, Ms. Nadeau noted "Med hist, chart, eomis, and scale unavailable. No previous documentation available." In addition, Mr. ████ treatment plan was not updated between 4/21/15 and 8/6/15 (MH Measure 5).

///
///
///

 is classified as SMI and MH3-A.  His diagnoses include psychotic disorder NOS. Mr. ███ was not seen by the provider between 3/18/15 and 7/24/15 (MH Measure 9).  His treatment plan was not updated between 2/23/15 and 6/10/15 (MH Measure 5).

██████████ is classified as MH3-B; his diagnoses include psychotic disorder NOS.  He was not seen by the clinician between 4/3/15 and 7/16/15 (MH Measure 10).  As of 9/4/15 he had not been seen by the provider since 5/27/15 (MH Measure 11).

██████████ has been diagnosed as bipolar and determined to be SMI.  He takes medications to control his symptoms, but he does not remember what the medications are.  He has run out of his pysch medications and reports that it took psych two months to reorder them.  (Pharmacy # 2, MH # 1, 7).  These medications make him susceptible to heat and he will skip pill pass on hot days because he has to wait for too long in the heat.  (¶ 15).

██████████ is classified as MH3-A and SMI.  He was not seen by the clinician between 4/21/15 and 5/22/15, or between 7/16/15 and 8/25/15 (MH Measure 8).

██████████ is classified as MH3-A and SMI.  His treatment plan was not updated between 12/30/14 and 7/30/15 (MH Measure 5).

██████████ is classified as MH3-B; his diagnoses include paranoid schizophrenia, and he is prescribed Haldol.  As of 9/4/15 he had not seen the provider since 5/20/15 (MH Measure 11).

██████████ is classified as MH3-A and SMI.  His treatment plan was not updated between 12/16/14 and 7/30/15 (MH Measure 5).

██████████ is classified as MH3-A and SMI.  He was not seen by the clinician between 7/23/15 and 8/26/16 (MH Measure 8).  His treatment plan was not updated between 3/25/15 and 6/25/15 (MH Measure 5).

██████████ is classified as MH3-A and SMI.  He was seen by the clinician on 4/2/15, 5/7/15, and 6/25/15 (MH Measure 8).  Although he is prescribed medication, as of 9/4/15 he had not been seen by provider since 5/20/15 (MH Measure 9).  His treatment plan was not updated between 3/13/15 and 6/25/15 (MH Measure 5).

██████████████ is classified as MH3-A and SMI.  He was not seen by the clinician between 3/11/15 and 5/7/15, or between 6/4/15 and 7/29/15 (MH Measure 8).

██████████████ is classified as MH3-A and SMI.  His treatment plan was not updated between 2/13/15 and 6/10/15 (MH Measure 5).  He was seen by the clinician on 2/13/15, 4/22/15, 6/9/15, 7/7/15, and 8/26/15 (MH Measure 8).

██████████████ is classified as MH3-A and SMI.  His treatment plan was not updated between 2/2/15 and 6/25/15 (MH Measure 5).  He was not seen by the clinician between 4/14/15 and 6/25/15 (MH Measure 8).

██████████████ is classified as MH3-A and SMI.  He was not seen by the clinician between 4/2/15 and 5/7/15, or between 6/4/15 and 7/29/15 (MH Measure 8).

██████████████ is classified as MH3-A and SMI.  He was seen by the clinician on 1/16/15, 4/2/15, 5/7/15, and 7/29/15 (MH Measure 8).  He was not seen by the provider between 2/19/15 and 6/3/15, and as of 9/4/15 had not been seen since 6/3/15 (MH Measure 9).  His treatment plan was not updated between 4/2/15 and 7/29/15 (MH Measure 5).

██████████████ is classified as MH3-A and SMI.  He was not seen by the clinician between 6/16/15 and 7/30/15 (MH Measure 8).  His treatment plan was not updated between 4/22/15 and 7/30/15 (MH Measure 5).  As of 9/4/15 he had not seen the provider since 5/8/15 (MH Measure 9).  On 5/8/15, the provider noted, "there is no treatment plan in his chart for my review" (MH Measure 7).

██████████████ is classified as MH3-A and SMI.  He was seen by the clinician on 4/2/15, 5/7/15, 6/4/15, and 7/29/15 (MH Measure 8).  He was not seen by the provider between 5/13/15 and 8/26/15 (MH Measure 9).  His treatment plan was not updated between 4/2/15 and 7/29/15 (MH Measure 5).

██████████████ is classified as MH3-A and SMI.  He was seen by the clinician on 3/6/15, 4/7/15, and 6/18/15 (MH Measure 8).  He was not seen by the provider between 12/17/14 and 5/27/15 (MH Measure 9).

███████████ is classified as MH3-A and SMI.  He was not seen by the provider between 4/15/15 and 8/19/15 (MH Measure 9).  His treatment plan was not updated between 11/7/14 and 7/30/15 (MH Measure 5).

███████████ is classified as MH3-A and SMI.  He was not seen by the clinician between 4/7/15 and 7/2/15 (MH Measure 8).  His treatment plan was not updated between 11/7/14 and 7/30/15 (MH Measure 5).

███████████ is classified as MH3-A and SMI.  He was not seen by the clinician between 5/5/15 and 6/24/15, and as of 9/4/15 had not been seen since 6/24/15 (MH Measure 8).  When he was seen by the provider on 8/6/15, she noted that "after meeting w/pt was informed that medication has not been delivered for injection due today."  While the record purports to show that his treatment plan was updated on 6/24/15 and 8/20/15, these encounters lasted 28 seconds and 56 seconds, respectively.  Such brief and perfunctory encounters do not satisfy the requirement that the treatment plan be updated after a "face-to-face clinical encounter between the prisoner and the mental health provider or mental health clinician" (MH Measure 6).

███████████ is classified as MH3-A and SMI.  He was not seen by the clinician between 7/15/15 and 9/1/15 (MH Measure 8).  In addition, the 9/1/15 encounter lasted approximately 90 seconds.  As we have previously pointed out (see 7/14/15 Eidenbach letter at 22), such brief encounters do not satisfy the definition of "seen" set forth in Appendix A to the Stipulation.

███████████ is classified as MH3-A and SMI.  He was seen by the clinician on 3/27/15, 7/27/15, and 9/2/15; in addition, the 9/2/15 encounter lasted less than two minutes (MH Measure 8).  The only treatment plan in his record is dated 9/2/15 (MH Measure 5).

███████████ is classified as SMI and MH3-A.  He was seen by the clinician on 5/13/15, 6/25/15, and 8/12/15 (MH Measure 8).  He was not seen by the provider between 3/26/15 and 7/21/15 (on 7/14/15, the provider noted, "Pt. scheduled for appt.  Unable to meet with pt. due to staff/security shortage per Lt. Whiting") (MH Measure 9).

███████████ is classified as MH-3A and SMI.  He was not seen by the clinician between 4/2/15 and 7/17/15 (MH Measure 8).  As of 9/4/15, he had not been seen by the provider since 5/8/15 (MH Measure 9), and his treatment plan had not been updated since 4/2/15 (MH Measure 5).

██████████████████ is classified as MH3-A and SMI.  He was seen by the clinician on 3/30/15, 5/8/15, 6/30/15, 7/10/15, and 8/12/15 (MH Measure 8).  He was not seen by the provider between 3/6/15 and 8/11/15 (MH Measure 9).  As of 9/4/15, his treatment plan had not been updated since 5/8/15 (MH Measure 5).

██████████████ is classified as MH3-A and SMI.  He was not seen by the provider between 3/17/15 and 7/21/15 (MH Measure 9).  As of 9/4/15, his treatment plan had not been updated since 5/8/15 (MH Measure 5).

██████████████ is classified as MH3-A and SMI.  On 4/9/15, the provider noted, "been w/o meds for a month.  Unsure why not receiving."  The provider reordered his medications, but as of 9/4/15 he had not been seen again by the provider since 4/9/15 (MH Measure 9).  As of the same date, his treatment plan had not been updated since 5/19/15 (MH Measure 5).

██████████████████

On 9/2/15, we saw Mr. █████ on watch in Rast Max.  Although he was on a 10-minute watch, the checks were not consistently being done every 10 minutes (for example, there were no checks between 6:43 and 7:00 a.m.).  In addition, although we reviewed his watch log at 11:00 a.m., it purported to show that a check had been done at 11:05 a.m., casting serious doubt on the veracity of the logs.

*Parsons v. Ryan*
Notice of Substantial
Non-Compliance
October 1, 2015
Appendix A, Page 11

## <u>Mortality Reviews Identifying Deficiencies in Care – Florence and Lewis</u>

<u>Florence</u>

█████████████████ died on ███████ from complications of metastatic colon cancer.  Co-existing conditions were the cancer had metastasized to his liver and lungs, he had severe malnutrition and deconditioning, anemia, malignant pleural effusion and respiratory failure, and coccygeal decubitus ulcer.  Dr. Johnson (Florence Medical Director) concluded that his death could have been prevented or delayed by more timely intervention, noting that Mr. ███████ "repeatedly and consistently complained of bowel issues for 2 months.  He was not seen by GI until 2 months after his initial complaints."  Deficiencies identified were (1) failure to recognize symptoms or signs; (2) failure to follow clinical guidelines; (3) diagnosis inaccurate; (4) diagnosis and treatment not timely, and (5) inappropriate treatment.  ADCM0328221-24.

According to the mortality review, Mr. ███████ reported he had been experiencing bowel problems for two months, but it took another two months to be seen by a provider.  The provider put him on antibiotics and steroids because they thought he had Crohn's Disease or ulcerative colitis.  Three months later, he "was discovered to have poorly differentiated colon adenocarcinoma with multiple metastatic lesions in his liver, lungs, and bones."  Dr. Johnson notes there was also a one month delay between a referral for a colonoscopy and the actual colonoscopy.  According to Dr. Johnson, Mr. ███████ received a chemo port within 3 days of the cancer diagnosis, and then oncology and surgery were consulted and he began chemotherapy (no dates given).  Mr. ███████ developed a pleural effusion in his lung, was hospitalized and declined all future care.  "He was made DNR/DNI and was transferred to Promise facility" for hospice care and he died three days later.

<u>Lewis</u>

█████████████████ died on ███████ of heroin toxicity.  The Mortality Report notes that he had co-existing conditions of diabetes, hyperlipidemia, and HCV, and ADC Medical Program Administrator Dr. Rowe wrote in his 7/28/15 review that "Chronic care for patients with diabetes should be more timely and frequent especially when not controlled."  ADCM120633-36.

*Parsons v. Ryan*
Notice of Substantial
Non-Compliance
October 1, 2015
Appendix A, Page 12

<u>**Lewis – Analysis of "To Be Scheduled and Scheduled Specialty Care Appointments"**</u>
**ADCM120999-121010**

**Urgent Specialty Referrals Requested Prior to May 30, 2015 and Still Listed as "Scheduled" as of August 18, 2015 (All Entries Not in Compliance With Specialty #3)**

3/3/15 – ████████████████, Health– urgent hematology/oncology consultation requested, status listed is "Scheduled"

4/7/15 – ████████████, Barchey– urgent pulmonology consultation requested, status listed is "Scheduled"

4/20/15 – ████████████   Morey– urgent abdominal ultrasound requested, status listed is "Scheduled"

5/21/15 - ███████████, Rast– urgent oral surgery consult requested, status listed is "Scheduled"

**Referrals for Rheumatology Still Listed as "Pending" and not "Scheduled" as of August 18, 2015 (Highlighted Entries Not in Compliance With Specialty # 4)**

2/25/15 – ████████████ Barchey

3/6/15 – ███████████, Buckley

4/9/15 – ███████████, Buckley

5/26/15 – ████████████ Stiner

5/29/15 – ███████████ Rast

6/3/15 – ██████████, Stiner

6/5/15 – ███████████ Morey

6/25/15 – ███████████ Stiner

7/12/15 – ████████████ Health Unit

8/13/15 – ████████████ Rast Max[3]

---

[3] Plaintiffs' counsel interviewed Mr. ██████ and reviewed his medical record and notified Defendants of his urgent medical and mental health needs in a 9/21/15 advocacy letter, attached hereto, to which we have received no response.

**Referrals for Infectious Disease Still Listed as "Pending" and not "Scheduled" as of August 18, 2015 (Highlighted Entries Not in Compliance With Specialty # 4)**



No request date listed – █████████████ Barchey

3/17/15 – ████████, Bachman

4/27/15 – █████████ Barchey

5/6/15 – █████████ Stiner

5/28/15 – █████████ Stiner

6/3/15 – ████████, Eagle Point

6/16/15 – █████████ Buckley[4]

6/17/15 – ████████ Stiner

7/2/15 – ███████, Barchey

7/10/15 – █████████ Bachman

7/12/15 – ███████ Bachman

8/10/15 – █████████, Barchey

8/12/15 – █████████ Stiner (see also 6/17/15 request)

8/13/15 – █████████, Rast Max
█████████ Stiner

---

[4] Counsel for Plaintiffs have notified ADC multiple times (two expert reports, six advocacy letters) about delays in infectious disease consults and delivery of HIV medication for Mr. █████.

**Spot-Check of June 2015 Lewis CGAR Access to Care # 5**

Are urgent provider referrals being seen by the Medical Provider within 24 hours of the referral?

CGAR finding:  (ADCM120825)
Worksheets: (Rast – ADCM122143, Stiner - ADCM122153, Eagle Point - ADCM122155)

**Rast Unit**
Seven of seven files found compliant, but for six of them there were no referrals or encounters in eOmis that corresponded with the dates for referrals and medical provider encounters stated on the monitor's worksheet. For the seventh, the prisoner saw a nurse on the day listed for an emergency response, but there is no provider encounter.

- ███████ the auditor found compliance based on a 6/22 referral and a 6/22 Medical Provider encounter.  The eOmis records shows that on 6/22 a Registered Nurse saw the patient as a result of an ICS (emergency) response, but made no referral to a provider (the nurse got a verbal order).
- ███████ the auditor found compliance based on a 6/6 referral and 6/6 Medical Provider encounter.  No records of any such referral or encounter found in eOmis.
- ███████ the auditor found compliance based on a 6/24 referral and 6/24 encounter.  No records of any such referral or encounter found in eOmis.
- ███████ the auditor found compliance based on a 6/24 referral and 6/24 encounter.  No records of any such referral or encounter found in eOmis.
- ███████ the auditor found compliance based on a 6/24 referral and 6/24 encounter.  No records of any such referral or encounter found in eOmis.
- ███████ the auditor found compliance based on a 6/10 referral and 6/10 encounter.  No records of any such referral or encounter found in eOmis.
- ███████ the auditor found compliance based on a 6/10 referral and 6/10 encounter.  No records of any such referral or encounter found in eOmis.

**Stiner Unit**
Nine of ten files found compliant, but none of the ten were relevant to the performance measure:

- ██████ – no provider appointments documented in eOmis for June (listed as noncompliant on CGAR).
- ██████ – 6/4 provider appointment was follow up from rheumatology appointment, no nursing referral documented, not relevant to performance measure
- ██████ – 6/4 provider appointment was follow up from telemed, no nursing referral documented, not relevant to performance measure
- ██████ – 6/4 provider appointment was follow up from telemed, no nursing referral documented, not relevant to performance measure
- ██████ – 6/5 provider appointment was chronic care appointment, no nursing referral documented, not relevant to performance measure

- ███████ – no 6/10 provider appointment as listed in monitor's notes; there was a 6/11 provider's line appointment but no nursing referral documented, not relevant to performance measure
- ███████ – no 6/30 provider appointment as listed in the monitor's notes, prisoner had a dental appointment
- ███████ – no 6/30 provider appointment as listed in the monitor's notes, prisoner had a dental appointment
- ███████ - no 6/30 provider appointment as listed in the monitor's notes, prisoner had a dental appointment
- ███████ - no 6/30 provider appointment as listed in the monitor's notes, prisoner had a dental appointment

## Eagle Point/Sunrise Unit

One file marked as compliant, but is not relevant to this measure

- ███████ – 6/25 no provider appointment as listed in the monitor's notes, prisoner had a dental appointment

### Spot-Check of June 2015 Lewis CGAR Access to Care # 6 (Emergency Referrals)

Prisoner #███████ not relevant to performance measure as the nurse had marked the referral as urgent, not emergent.

## Language Interpretation:  Prisoner File Review Notes

████████████████████ **(no interpreter at 3 out of 6 encounters)**

*He is listed on the interpreter phone logs as having a 31 minute encounter on 3/26/15 at 18:49, but there are no health care encounters included in eOmis for that date other than "system generated conversion."*

1. 4/9/15 – NP McGarry provider line.  No interpreter documented, encounter not on phone log.
2. 4/22/15 – routine dental appt. with Dr. Weekly in response to 2/11/15 HNR.  No interpreter documented, encounter not on phone log.
3. 5/22/15 – nurse intake after arriving 5/18/15 at North Unit. No interpreter documented, encounter not on phone log.
4. 7/17/15 – nurse intake exam with <u>RN Madrid</u>.
5. 8/18/15 – NL with <u>RN Madrid</u>.
6. 8/19/15 – telemedicine appt w/ provider re: injury – provider Christina Boryczka, she documents in record that the nurse (Madrid?) provided interpretation.

████████████████ **(no interpreter at 2 out of 4 encounters)**

*He is listed on the phone logs as having encounters with interpreter on 3/5, 3/10, 3/20, and 4/24/15.  However, there are no health care encounters listed in eOmis as occurring on 3/5, 3/10, or 3/20.  On 3/5/15 a lab test was ordered, 3/10 and 3/20 are listed as "system-generated pharmacy order"*

1. 4/2/15 – provider Johnson requested an off-site specialty referral for a testicular ultrasound.  There are no notes of any kind showing an encounter occurred with Johnson on that date, so it's unclear whether an interpreter was used.  No interpreter documented, encounter not on phone log.
2. 4/14/15 – return from off-site hospital, seen by RN Palmer.  No interpreter documented, encounter not on phone log.
3. 4/24/15 – follow up re: ultrasound with provider.  Used phone interpreter, documented in phone logs.
4. 5/28/15 – apparently in the interim moved to North Unit.  Seen on NL by <u>RN Madrid</u>.

████████████████ **(no interpreter at 4 out of 8 encounters)**

1. 2/22/15 – dental follow up to tooth extraction.  No interpreter documented, encounter not on phone log.
2. 2/23/15 – dental follow up to tooth extraction.  No interpreter documented, encounter not on phone log.
3. 2/26/15 – CC appointment w/ NP McGarry.  Used phone interpreter (don't have the phone log for February, but she made a note of that in her SOAPE notes) to discuss his HGB-A1C levels being too high, not a candidate for surgery.
4. 3/11/15 – NL with <u>RN Madrid</u> re hernia pain.
5. 3/30/15 – Provider appt w/ NP McGarry.  Used phone interpreter, on phone log.
6. 4/8/15 – saw nurse re SNO.  No interpreter documented, encounter not on phone log.

7. 4/19/15 – NL re SNO request.  No interpreter documented, encounter not on phone log.
8. 4/21/15 – NL w/ <u>RN Madrid</u> re: knee pain.

**▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (no interpreter at 4 out of 5 encounters).**
*He is listed on the phone logs as having an encounters with interpreter on 3/5.  However, there are no health care encounters including in eOmis as occurring that date, only "conversion"*

1. 4/13/15 – return from offsite, seen by RN Palmer.  No interpreter documented, encounter not on phone log.
2. 4/22/15 –dental appt w/ Dr. Weekly.  No interpreter documented, encounter not on phone log.
3. 4/24/15 – follow up with NP Maranzano re: ultrasound result.  No interpreter documented, encounter not on phone log.
4. 5/1/15 – saw RN Palmer re: lab results.  No interpreter documented, encounter not on phone log.
5. 7/8/15 – dental appt w/ Dr. Weekly.  No interpreter documented, encounter not on phone log.

**▉▉▉▉▉▉▉▉▉▉▉▉ (no interpreter at 3 out of 6 encounters)**
1. 3/5/15 – saw NP McGarry with use of phone interpreter – documented in medical record and on language log.
2. 3/13/15 – NL, saw RN Tiernan, no interpreter documented, encounter not on phone log
3. 3/16/15 – NL w/ Nurse Backous, no interpreter documented, encounter not on phone log
4. 5/8/15 – NL sick call with <u>RN Madrid</u>.
5. 5/12/15 – NL – saw <u>RN Madrid</u> re:  injury.
6. 5/28/15 – provider appt w/ NP McGarry, no interpreter documented, encounter not on phone log.  NOTE: unclear if he was actually seen, because there are no vitals, no documentation or SOAPE notes of an encounter/exam with him.

**▉▉▉▉▉▉▉▉▉▉ (two encounters, both with interpreter)**
CC patient: diabetic
1. 3/4/15 – CC appt w/ NP McGarry with use of phone interpreter – documented in medical record and in phone log.
2. 5/19/15 – CC appt w/ NP McGarry who documented that she used <u>RN Madrid</u> as the interpreter.

**▉▉▉▉▉▉▉▉▉▉ (no interpreter at 8 out of 8 encounters).**
*He is listed in interpreter phone logs as having interpreter at encounters on 3/6/15 and 3/26/15, but there are no appointments or other health care encounters in eOmis for those dates.*
1. 6/5/15 – NL seen by RN Palmer re: head contusions.  No interpreter documented, encounter not on phone log.

2. 6/15/15 – saw NP Armenta.  She states in the SOAPE notes that Mr. ▌▌▌▌ is Spanish speaking, but it's unclear if she speaks Spanish. No interpreter documented, encounter not on phone log.
3. 6/22/15 – isolation mental health check by RN Delgado.  Unknown if RN Delgado speaks Spanish.  No interpreter documented, encounter not on phone log.
4. 6/29/15 –isolation MH check by RN Delgado.  No interpreter documented, encounter not on phone log.
5. 7/8/15 –isolation MH check by clerk Anthony Lynn.  No interpreter documented, encounter not on phone log.
6. 7/17/15 – isolation MH check by Behrend.  No interpreter documented, encounter not on phone log.
7. 7/20/15 – isolation MH check by CNA Amber Wilson. No interpreter documented, encounter not on phone log.
8. 8/3/15 – isolation MH check by CNA Wilson.  No interpreter documented, encounter not on phone log.

▌▌▌▌▌▌▌▌▌▌ **(no interpreter at 19 out of 23 encounters).**
1. 3/12/15 – saw NP McGarry with use of phone interpreter – documented in medical record and on language log.
2. 3/30/15 – saw NP McGarry, no interpreter documented, encounter not on phone log
3. 4/2/15 – saw NP McGarry with use of phone interpreter – documented in medical record and on language log.
4. 4/12/15 – NL call w/ Nurse Brinton. No interpreter documented, encounter not on phone log.
5. 4/15/15 – dental appt w/ Dr. Weekly. No interpreter documented, encounter not on phone log.
6. 4/28/15 – saw NP McGarry. No interpreter documented, encounter not on phone log.
7. 5/7/15 – NL w/ <u>RN Madrid</u>.
8. 5/11/15 – NP McGarry. No interpreter documented, encounter not on phone log.
9. 6/10/15 – dental appt. No interpreter documented, encounter not on phone log.
10. 7/13/15 – dental appt. No interpreter documented, encounter not on phone log.
11. 7/24/15 – NL sick call. No interpreter documented, encounter not on phone log.
12. 7/26/15 – ICS response vomiting for three days.  Seen by mental health RN Bainbridge. No interpreter documented, encounter not on phone log.
13. 7/27/15 – sick call. No interpreter documented, encounter not on phone log.
14. 7/28/15 – isolation MH check by Behrand.  No interpreter documented, encounter not on phone log.
15. 7/29/15 – isolation MH check by Behrand. No interpreter documented, encounter not on phone log.
16. 7/29/15 – NL sick call.  No interpreter documented, encounter not on phone log.
17. 7/30/15 – seen by NP Maranzano.  No interpreter documented, encounter not on phone log.

Case 2:12-cv-00601-ROS   Document 1561-2   Filed 05/02/16   Page 65 of 177

*Parsons v. Ryan*
Notice of Substantial
Non-Compliance
October 1, 2015
Appendix A, Page 19

18. 8/3/15 – isolation MH check by Behrand. No interpreter documented, encounter not on phone log.
19. 8/4/15 - – isolation MH check by Behrand. No interpreter documented, encounter not on phone log.
20. 8/6/15 - – isolation MH check by Behrand. No interpreter documented, encounter not on phone log.
21. 8/9/15 – NL sick call w/ Nurse Baller.  No interpreter documented, encounter not on phone log.
22. 8/13/15 – dental appt. w/ Weekly.  No interpreter documented, encounter not on phone log.
23. 8/13/15 – was transferred back to North Unit.  Saw <u>RN Madrid</u>, who took his vitals.

██████████████████████ **(no interpreter for 4 out of 7 encounters)**

1. 3/11/15 –intake dental exam by Dr. Weekly.  No interpreter documented, encounter not on phone log.
2. 3/24/15 – provider encounter with use of phone interpreter.  Documented in medical record and on language line.
3. 5/18/15 – nursing intake exam with <u>LPN Garcia</u>.
4. 5/24/15 – ICS by RN Brinton re: low blood sugar.  No interpreter documented, encounter not on phone log.
5. 6/25/15 –dental appt. No interpreter documented, encounter not on phone log.
6. 8/14/15 – saw Dr. Sharp for CC appointment. No interpreter documented, encounter not on phone log.
7. 8/22/15 – NL sick call w/ <u>RN Madrid</u> in response to HNR filed 8/20.

*************************************************

Our review of prisoners' records at Lewis and Florence revealed additional instances in which language interpretation required by paragraph 14 of the Stipulation was not provided:

█████████████████ is listed on the June language log (ADC121250) as having Spanish interpretation for three minutes at 7:45 am on April 1.  (It is unclear why the April encounter is listed on the June logs.)  We reviewed his file and he had two encounters with health care staff (6/17/15 provider, 6/20/15 nursing), with no indication that an interpreter was used.  Neither of these encounters are listed on the June 2015 language log.

█████████████████ is a Mexican national and does not speak English fluently.  See 6/18/15 note by Moonjelly ("Inmate is Spanish speaking with few broken words of English").  However, he was seen by Pedretti on 6/29/15, with no indication that an interpreter was provided.  Neither of these encounters appear on the June 2015 language log.  (ADCM121250)

████████████████ is a Mexican national and does not speak English fluently.  He has not been provided the required interpretation for health care encounters.  See notes dated 8/22/15 ("I/M has language barrier which affected assessment"); 8/25/15 ("IM seen on 30" MHW. Interpretation provided by CO to facilitate accurate assessment"); 9/4/15 ("I/M was tearful. Mostly Spanish speaker").

We interviewed Mr. ████ and confirmed that he does not speak English.  He has not had interpretation for medical, dental, or mental health encounters.

- 8/14/15 – saw nurse McConkey on NL.  No documentation of Spanish interpreter.
- 7/29/15 – dental refusal.  No documentation of Spanish interpreter.
- 7/23/15 – CC appt with Dr. Malacheski.  No documentation of Spanish interpreter.
- 7/10/15 – refused MH individual counseling with Angela Scott at Stiner CDU.  No documentation of Spanish interpreter.
- 6/15/15 – MH individual counseling with Angela Scott at Stiner CDU.  Says that his speech was WNL and logical thought process, but no other information in the SOAPE notes.  No documentation of Spanish interpreter.
- 6/1/15 – nurse Barrow MH cell check: "no complaints" - No documentation of Spanish interpreter.
- 5/29/15 - nurse Barrow MH cell check: "no complaints" - No documentation of Spanish interpreter.
- 5/27/15 - nurse Barrow MH cell check: "no complaints" - No documentation of Spanish interpreter.
- 5/22/15 - nurse Barrow MH cell check: "no complaints" - No documentation of Spanish interpreter.
- 5/20/15 – nurse Charmaine Rhodes MH cell check: "no complaints" - No documentation of Spanish interpreter.

We interviewed Mr. ████████████ and ascertained that he does not speak English, a fact that is confirmed by his record.  See 9/22/14 entry by Newman ("due to the language barrier (and without a translator) this visit did not last very long"); 10/23/14 note by Roun ("due to language barrier, and no translator, the interview was short").  However, Mr. ███████ was seen by Dr. Riaz on 5/5/15 and 8/11/15, with no mention of an interpreter.  The May 5 encounter does not appear on the May 2015 language log.  (ADCM121249)

An 8/24/15 note by Boryczka reads as follows:
"57 yo male (primarily Spanish speaking) here for f/u LTBI …. It was attempted to see the patient without an interpreter.  Pt did not understand the questions and what I was saying without an interpreter present."

## Prisoners Whose Documented Medical Care Does Not Comply
## With Stipulation Requirements

### Advocacy Letters

We have previously notified you of prisoners whose medical records we reviewed at Lewis and Florence who are in need of immediate medical attention.  The letters, attached hereto as Appendix C, detail their problems at length and the relevant stipulation requirements:

███████████████  Florence Central, 9/17/15 letter
- Delays in referral to urology and in chemotherapy for treatment of testicular cancer
- Specialty Care # 1, 3, 5; Chronic Care # 1

███████████████  Lewis Buckley, 9/25/15 letter
- Delays  in being seen by nurse or provider despite numerous HNRs re: broken clavicle
- Access to Care # 1, 2, 6; Specialty Care # 5

███████████████, Lewis Rast MDU, 9/21/15 letter
- Inadequate treatment of psoriatic arthritis, osteomyelitis, anemia, large open wounds, unexplained weight loss of almost 90 pounds
- Chronic Care # 2, 4; Specialty Care # 1, 4, Access to Care # 7, Medical Diets # 1; Pharmacy # 2

███████████████, Florence South, 3/9/15 and 9/16/15 letters
- Delays in being seen by oncology for prostate cancer recurrence; inadequate post-surgery wound management; multiple delays or cancellation of provider's urgent requests for specialty care
- Chronic Care # 1, 3; Specialty Care # 1, 2, 3, 4, 6

███████████████  Florence Central, 9/17/15 letter
- Delay in referral to oculoplastic surgeon for broken bones in his face
- Specialty Care # 4

███████████████, Florence Central, 9/23/15 letter
- Inadequate management of diabetes and post-amputation medical care
- Access to Care # 9, Specialty Care # 3, 4, Chronic Care # 1

███████████████, Lewis Rast, 9/22/15
- Failure to monitor chronic condition of cancer, delay in access to nurse or provider lines, delay/cancellation of specialty referral for alarming symptoms
- Chronic Care # 1, 2; Specialty Care # 1, 3, 4; Access to Care # 2, 4, 5

*Parsons v. Ryan*
Notice of Substantial
Non-Compliance
October 1, 2015
Appendix A, Page 22

████████████████   Florence Central, 9/17/15 letter
- Delay in treatment of throat cancer; delay in referral for PT scan and diagnostic tests
- Chronic Care # 1, Specialty Care # 1, 2, 5, 7

████████████████      Lewis Buckley, 9/23/15 letter
- Delay in treatment of prostate cancer that has now metastasized; failure to provide wasting diet; no response to HNRs
- Access to Care # 1, 2, 4; Specialty Care # 1, 3; Medical Diets # 1

████████████████      Lewis Rast MDU, 9/23/15 letter
- Delay in emergency specialty care, failure to follow discharging hospital recommendations
- Access to Care # 6, 8, 9

████████████████      Florence East, 9/17/15 letter
- Failure to provide monthly blood test to monitor lymphocyte levels or refer to oncology for possible relapse of leukemia.
- Chronic Care # 2, Specialty Care # 5, 6, 7

████████████████, Florence East, 9/18/15 letter
- Failure to provide diagnostic procedures and specialty treatment for ulcerative colitis
- Specialty Care # 3

████████████████, Florence South, 9/17/15 letter
- Failure to provide post-stroke medication, physical therapy, occupational therapy; failure to provide medical devices; no response to HNRs; failure to provide interpretation at health care encounters
- Stipulation ¶ 14; Access to Care # 1, 2; Specialty Care # 3, 5

████████████████      Florence South, 9/18/15 letter
- Failure to be seen by nurse or provider despite numerous HNRs re: broken hand.
- Access to Care # 1, 2, 6; Specialty Care # 4, 6

████████████████, Lewis Buckley, 10/12/15 letter
- Failure to install dialysis port per nephrologist instruction, delay in urgent consults
- Specialty Care # 1, 4, 5; Chronic Care # 1

████████████████      Florence North, 9/17/15 letter
- Delay in treatment of Stage 3 colorectal cancer; delay in diagnostic procedure and specialty referrals for metastasized cancer; failure to provide all chemotherapy / medication
- Specialty Care # 3, 4, 5; Chronic Care # 1; Pharmacy # 2

██████████████   Florence North, 9/18/15
- Failure to provide specialist's recommended treatment and medication for Buerger's disease
- Specialty Care # 3, 5; Pharmacy # 3, 7

        \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Additionally, we identified the following prisoners at Lewis and Florence with medical or dental care not in compliance with the Stipulation performance measures:

██████████████   Lewis Rast MDU
He has Hepatitis C.  He saw NP Taylor for chronic care appointment on 8/13/15, previous CC appointment was 12/22/14.  (Chronic Care # 2)

██████████████ has diabetes and seizure condition.  He turned in a HNR in August, complaining of symptoms he says is related to diabetes.  The Plan of Action, written on HNR, "seen 8/17/15 PL."  (Access to Care # 1, 2).  But he was not seen on the provider line; on that date he only had a urine sample collected.  (Chronic Care # 2). He has not seen the results of that test.  Two months ago, he had a blood draw, but hasn't gotten results of test.  (Specialty # 8).

██████████████ has cancer of his sinuses.  It appears there were delays in evaluating and diagnosing his condition, based on his interview and his med record.  Until two months ago he had been housed on East Yard, where he complained for many months that he was experiencing bilateral pain and blockage in his ears, as well as nose bleeds.  In his record, we found many HNRs re ear pain, including on 7/14/14, 8/21/14 and 10/30/14.  He was told he had allergies and given decongestants. (Access to Care # 1, 2, 4).  He was finally sent to an ENT on 2/20/15, who identified a mass in his sinuses.  The ENT recommended a CT scan with contrast, which was not done until 5/7/15, and was done without contrast. (Specialty Care # 1, 3, 7)  He underwent surgery in an attempt to remove the mass on about 7/13/15 and was finally diagnosed with cancer on 7/23/15.  He just started receiving chemo, once a week.  Mr. ██████ is supposed to receive Morphine 4x/day.  He reported that, on his first chemo day, he was awakened at 4 am and placed in a cage, where he waited 3 hours before he was taken to the cancer center in Phoenix. His drip chemo treatment took about five hours, and he returned to the prison around 4 pm.  He was not provided his Morphine that morning, and was in considerable pain.

██████████████ was diagnosed with cancer while in county jail.  In October 2014, ADC sent his for a biopsy.  He reports he was scheduled to see oncology, but he says he was tricked into signing a refusal.  He was told his appointment was with pysch, which he doesn't need to see, so he refused.  His mass is currently causing headaches, numbness in his left arm, and pain in his back.



had all of his top teeth pulled 6-7 months ago.  After the extractions, he was informed that he was not eligible for dentures or a partial.  (Dental # 3).  Mr. ██████ has been diagnosed with a mass in his lung.  ADC radiographed his chest approximately 6 months ago.  He has not been informed of the results and has not been seen for a follow-up appointment.  (Specialty Care # 8).  He saw the provider approximately 2 months ago for back and radiating pain.  He was referred to a pain management specialist by NP Ende.  When a new nurse practitioner took over, she cancelled the appointment without an exam.  (Specialty Care # 1, 2). NP Ende never discussed Mr. ██████ radiographs or lung mass.

██████ has had a growth on his testicle for more than a year, and has not had a requested ultrasound.  (Specialty # 1, 4).

██████
He had a back injury more than nine months ago that was so severe that he now has to rely upon a wheelchair.  On 3/18/15 the Yuma provider requested lumbar spine MRI.  The request was denied on 3/24/15 with alternate treatment plan of trying physical therapy first.  There is no documentation that this denial was conveyed to Mr. ██████ (Specialty # 2).  There is no documentation of implementation of the alternate treatment plan either through a PT referral or actually seeing the PT.  (Specialty # 2).  On 6/25/15 the Lewis provider requested MRI of back injury.  Listed as scheduled for 8/7/15, but no notes from the appointment or updated to show what happened at the appointment.  (Specialty # 5).  Mr. ██████ reported that the MRI did not occur in August, because he was too tall for the machine.  There was no record of a request for a referral to a facility with a larger MRI machine.

██████
He has long QT syndrome, dysrhythmia, HCV, and a pacemaker.  He has not had an echocardiogram since 5/20/14.  He has two chronic care appointments listed as occurring on 6/8/15 and 7/20/15, but in both cases there are no SOAPE notes or any documentation of an encounter actually occurring other than the notation of vital signs taken by the nurse.  (Chronic Care # 2)

██████
He has lost 50 pounds in past year for unknown reasons, he has HCV and kidney problems.  His medical record shows that he supposedly had three chronic appointments (1/29/15, 4/21/15, 7/27/15) with provider, in each one the only thing documented is his vital signs were taken; there are no SOAPE notes or any other individualized information showing an encounter occurred with the provider.  (Chronic Care # 2)  Medical records confirm a 50 lb weight loss – listed as 5'6" and 111 pounds.  Has filed six HNRs, the responses to all of them say he will be seen. 8/18/15 – reaction to medication; 8/17/15 – blood in urine; 7/9/15 - requesting CC appt; 6/13/15

– requesting CC appt; 4/28/15 – status of blood and stool tests.  (Chronic Care # 1, 2; Access to Care # 1, 2; Specialty Care # 8).

Mr. ██████ is being treated for brain cancer.  He also has a seizure condition, for which he takes Keppra.  The night before our visit, several inmates in the Florence infirmary said, and Mr. ████ confirmed, that he had had a seizure.  According to the prisoners, there was no nurse in the building when he started seizing, and the c/o called an ICS.  There is supposed to be an RN stationed in the HU-8 at night. (Staffing  # 1, 4; Infirmary Care # 5).  Mr. ██████ latest blood draw testing of Keppra levels was dated 3/19/15.  (Chronic Care # 1, 2).

██████ has a history of brain cancer, and has experienced delays in receiving specialty treatment for a possible recurrence.  According to his medical records, he saw specialists on 5/28/15 and 6/9/15, with a diagnosis of astrocytoma.  He reports that he was not told the results of these tests (Specialty Care # 7, 8; Chronic Care # 4).  He did not see the provider until 8/27/15, who ordered a follow up appointment in three months, but it is unclear if any requests were made for treatment of the astrocytoma.  (Chronic Care # 1, 3).

██████ receives dialysis onsite at Central.  His fistula clogged, and he received a temporary port several weeks ago.  He needs to have a permanent port placed.  Per his record, his 8/11/15 referral to the vascular surgeon was forwarded to UM on 8/16, and as of 9/1/15, was still pending approval.  (Specialty Care # 1)

██████ He is listed as 5' 8" and 140 lbs on the Inmate Datasearch page, but he clearly weighs less than that now.  He was standing in his underwear, and appeared very thin.  He said that he had submitted two HNR's requesting a "wasting diet." He said that he eats all his food, and does not know why he is losing weight.  His medical record contained one HNR dated 8/17/15, on which Mr. ██████ wrote "want wasting diet."  The nurse wrote in response, "you do not meet requirements."  There was no documented nurse encounter.  (Access to Care # 1, 2; Medical Diets # 1).  His weight has not been taken since 3/19/15, when he weighed 137 lbs.  (Access to Care # 3).

██████ has been diagnosed with multiple myeloma, stage II.  His initial diagnosis was made in June 2011.  His medical record indicates that "treatment [was] switched to velcade in 2013 and was lost to follow-up."  (Specialty Care # 1, 5).  Dr. Sharp submitted a plan to "accelerate onco referral" on June 16, 2015, noting that he'd "finally received the full oncology report from 2/4/2015."  Mr. ██████ was not seen until August 21, 2015.  (Specialty Care # 3).

████████ takes medication to control his blood pressure.  He went without these medications for 3 months.  (Pharmacy # 2).  He submitted multiple HNRs asking for refills.  (Access to Care # 1, 2).  Then, without telling him or scheduling an appointment with a nurse or provider, they changed his medication.  (Chronic Care # 1, 2).

████████ has numerous medical conditions, including kidney disease, HCV, HBV, and hypertension.  He also has a prosthetic eye, and glaucoma in his remaining eye.  He has had problems getting his numerous medications renewed.  For example, his prescription for Lisinopril was prescribed on 8/6/15.  He did not receive it until 8/15.  (Pharmacy # 1).  He requires a lubricant (lubrifresh) for his prosthetic eye.  Under his prescription, it was dispensed to him on 6/15/15, with 6 refills.  As of 7/28/15, he had run out.  (Pharmacy # 2).  His medical record shows that he submitted HNRs for refills on 7/23, 8/7 and 8/13.  (Access to Care # 1).  As of 9/1, he had not received any refills.  He says that he was referred to the orthopedist more than a year ago for DJD.  He says that he has asked his PCP repeatedly about when he will be seen, and has been told that he is scheduled for an appointment.  However, in his medical record, a referral to the orthopedist dated 6/4/15 had been denied, with an "alternative treatment plan" to monitor his knees annually.  Mr. ████ saw his PCP on 7/2/15, but the PCP did not advise him of this denial.  (Specialty Care # 1, 2).  He reports that he is supposed to see an ophthalmologist at least once a year to monitor his cataract in his remaining eye.  He says the last time he went was 18 months ago.  His record contains a referral to the ophthalmologist for cataracts on 3/31/15.  It was referred to the UM on 4/1/15, and is apparently still pending approval.  (Specialty Care # 4).

████████ has diabetes.  He takes insulin and metformin to control his diabetes.  He also takes medication to control his blood pressure.  He has been out of his metformin and blood pressure medication for a month now.  (Pharmacy # 2).  Two weeks ago, he was seen by the provider and told his medications were on order.  He had submitted one HNR and was planning to submit another.  (Access to Care # 1, 2).

████████ has lupus, he saw a rheumatologist via tele-med in mid-July but the specialist had limited knowledge of lupus.  His treatment plan has not changed.  (Chronic # 1)  He discovered lumps on his penis in early July, and has submitted three HNRs about this but has not been seen.  (Access to Care # 1, 2, 4).

████████ is housed in HU-8 due to recurrence of rectal cancer.  He had been housed in HU-8 for 16 months during his original treatment for rectal cancer and returned to East unit in or around May 2015 when the cancer was determined to be in remission.  Mr. ████ states that shortly after his return to East unit, his symptoms rapidly deteriorated, including experiencing intense fatigue and pain.  After three months of submitting HNRs reporting the symptoms he was

sent out for emergency surgery to remove a cancerous mass from his rectum and returned to housing in HU-8.  (Access to Care # 1, 4; Specialty Care # 1, 3).  He is currently receiving chemotherapy, has a wound vac, and is pending an MRI for determination of if the cancer has spread from his rectum.  He states that during the last change of his wound vac, which happens every three days, it appeared that a mass had started to regrow in the wound.

███████████ has psoriatic arthritis and HCV.  There is no treatment plan for his HCV.  (Chronic Care # 1).  A rheumatology consult was requested on 6/5/15, and as of 9/3/15, the request was still listed as pending.  (Specialty Care # 1, 4).

███████████ reports that he has a tumor in his lung that has displaced his heart.  Despite putting in multiple HNRs, he wasn't seen until he waited for NP Ende to walk past and begged for care.  (Access to Care # 1, 2, 4).  That evening he was called to medical to have radiographs and was informed he had cancer.  He didn't start his chemotherapy for 4 weeks after his oncology appointment.  (Specialty # 5, Chronic Care # 1).  During his chemotherapy, his lungs filled with fluid, which then became infected.  He was sent to the hospital, where he nearly died from the infection.  Since his return, he continues to hack white phlegm but had restarted his chemotherapy.

███████████ He has chronic HCV and weight loss (40+ lbs in 6 months - now 125 lbs, 5'10").  States he always feels sick, fatigued, with stomach pain.  He has submitted multiple HNRs describing his symptoms, but is not seen by nurses or doctors.  He also has filed countless HNRs re: drops in blood sugar level, to no avail.  (Access to Care # 1, 2, 4; Chronic Care # 2).
- 8/10/15 – requesting glutose gel to manage blood sugar. Response says to buy candy from the canteen.
- 7/15/15 – requesting follow up re: thyroid – response says on provider line.
- 6/15/15 – requesting glutose. Response says to buy peanut butter at the store.
- 5/18/15 – requesting glutose.  Not stamped with a receipt day, no response.
- 4/10/15 – requesting glutose

███████████ has a seizure disorder but according to his medical records is not receiving his Dilantin.  He claims that he was told on 7/23/15 at his intake exam that he is too close to release to be given medication. (Chronic Care # 3; Pharmacy # 2; Medical Records # 11).  He was scheduled for a chronic care appointment on 8/3/15, but the appointment did not appear to have actually happened.  (Access to Care # 4; Chronic Care # 2).

███████████ He reported that he was diagnosed with terminal cancer on 7/23/15 after long delays in diagnosis despite a recent history of kidney cancer.  He stated that his treatment plan for the kidney cancer

(that was in remission) included CAT scans with contrast every six months.  His record did not show these scans occurred with the necessary frequency.  (Chronic Care # 1) Through review of his records, it appears that while at Eyman, Mr. ████ had a CT scan without contrast in August 2014 that found at least two nodules in his lungs and recommended follow-up testing for "more sensitive evaluation and further characterization."  However, it was unclear from the EMR that the results had ever been reviewed by a provider.  (Specialty Care # 5).  It does not appear that Mr. ████ received any additional testing until 6/8/15 when he had another chest CT without contrast that found additional nodules in his lungs.

████████████████

He has had sharp abdominal pains since the beginning of the summer.  He filed HNRs, would get response saying he was on the list to be seen.  (Access to Care # 1, 2).  When he saw the nurses, they thought it was indigestion, and there were delays in seeing the provider.  (Access to Care # 5).  He saw the provider on 8/4/15 and the provider said it was most likely his liver.  His blood was tested, but he had not been told the results yet.  (Specialty Care # 8).  The blood panel found him positive for Hep B and Hep C, but there is no documentation of a treatment plan or a chronic care appointment being scheduled.  (Chronic Care # 1, 2, 3, 4).

████████████  had all of his top teeth extracted in 2013 by ADC.  Since then, he has only been seen by dental once and has never been fitted for dentures.  (Dental # 3).

████████████

He has asthma and COPD.  He was not seen for 18 months for a chronic care visit – seen on 6/11/15, w/ prior encounter on 10/1/13.  (Chronic Care # 2).

████████████  has cirrhosis, and has undergone numerous banding procedures.  He says that in the last three weeks, they have been without electricity about half the time.  The temperature in his cell gets quite hot.  He says that his lactulose, which according to manufacturer specifications must be kept at room temp between 68 and 77 degrees, frequently goes bad in his room.  His latest bottle had gone bad about four days earlier.  He had regularly requested more from the pill call nurses who pass his cell daily, but he had not received it.

**Analysis of Florence-Central August Information Reports (ADCM122196 - 122213)**

8/5/15 - The report shows that telemed, psych, and x-ray lines are completed and that dental was not. The report includes an attached list of prisoners and the reasons for their appointments. It appears that only two non-emergent nursing encounters occurred on that day.

8/6/15 - The report shows that multiple telemed and psych appointments did not occur because medical did not notify custody of all of the scheduled appointments until too late in the day, and custody staff had been redirected to other tasks and could not transport the prisoners to the clinic.

8/12/15 - The report shows that only three provider encounters and one nursing encounter occurred on that day.

8/13/15 - The report shows that not all prisoners were seen due to late notification of custody staff by medical of the needed transports.

8/14/15 – No report is included, just a list of prisoners, indicating that only a nursing line was held on that day, and that nine prisoners were seen.

8/17/15 – The report states that policy/practice is for Corizon to give custody staff 24 hours' notice of appointments. However, this did not happen. Instead, Nurse Scott delivered a one page telemed appointment list at 7:05 am indicating that the line was supposed to have started at 7 am. The report states that prisoners arrived to the medical clinic around 8 am and Nurse Scott was notified multiple times by custody staff that prisoners were there waiting. The report also indicates that the telemed line was started and stopped multiple times that morning and at 11 am was put on hold during the telemed provider's lunch break. The custody staff reported to Nurse Scott that prisoners could not be held in the cages for more than two hours at a time and they were already beyond that timeframe. According to the report, Nurse Scott then asked custody if the prisoners could be let out of the holding cages for a few minutes and then returned to the cages to continue waiting to be seen. The report states that some of the prisoners originally called up for appointments were returned to their housing units because of the extended waiting period. At 1 pm, Nurse Scott provided a second page of the telemed appointments list. Custody attempted to identify these additional prisoners. It is unclear, from the report, if they were seen on that day.

8/20/15 – The report shows that nursing, dental, and psych lines were run without issue. However, it does not appear that a provider's line occurred on that day.

8/23/15 – The report shows that only a dressing changes line was held on that day.

8/26/15 – The report states that x-ray, dental, nursing, and provider lines were held and completed. However, only five nursing encounters and two provider encounters were scheduled.

**Access to Care # 1 – HNR Screened by LPN/RN Within 24 Hours of Receipt**

|  |  | March | April | May | June | July |  | 5 Month Average |
|---|---|---|---|---|---|---|---|---|
| Douglas |  | 100 | 93 | 95 | 97 | 100 |  | **97** |
| Eyman |  | 74 | 54 | 54 | 80 | 80 |  | **68** |
| Florence |  | 87 | 95 | 83 | 87 | 85 |  | **87** |
| Lewis |  | 29 | 20 | 40 | 27 | 24 |  | **28** |
| Perryville |  | 96 | 98 | 100 | 100 | 98 |  | **98** |
| Phoenix |  | 85 | 88 | 84 | 97 | 100 |  | **91** |
| Safford |  | 100 | 95 | 95 | 100 | 100 |  | **98** |
| Tucson |  | 100 | 100 | 100 | 100 | 100 |  | **100** |
| Winslow |  | 100 | 100 | 100 | 100 | 95 |  | **99** |
| Yuma |  | 100 | 72 | 98 | 98 | 90 |  | **92** |
|  |  |  |  |  |  |  |  |  |
| **Monthly Statewide Average** |  | **87** | **82** | **85** | **89** | **87** |  | **86** |

**Access to Care # 2 – Seen by RN Within 24 Hours of HNR**

|  |  | March | April | May | June | July |  | 5 Month Average |
|---|---|---|---|---|---|---|---|---|
| Douglas |  | 85 | 100 | 75 | 70 | 90 |  | **84** |
| Eyman |  | 22 | 32 | 46 | 62 | 58 |  | **44** |
| Florence |  | 55 | 63 | 48 | 47 | 50 |  | **53** |
| Lewis |  | 29 | 30 | 24 | 42 | 46 |  | **34** |
| Perryville |  | 66 | 82 | 82 | 86 | 64 |  | **76** |
| Phoenix |  | 83 | 87 | 54 | 82 | 95 |  | **80** |
| Safford |  | 100 | 100 | 95 | 90 | 100 |  | **97** |
| Tucson |  | 45 | 78 | 78 | 75 | 61 |  | **67** |
| Winslow |  | 45 | 80 | 85 | 85 | 70 |  | **73** |
| Yuma |  | 40 | 24 | 28 | 54 | 28 |  | **35** |
|  |  |  |  |  |  |  |  |  |
| **Monthly Statewide Average** |  | **57** | **68** | **61** | **69** | **66** |  | **64** |

## Access to Care # 4 – Routine Provider Referral Within 14 Days

|  |  | March | April | May | June | July |  | 5 Month Average |
|---|---|---|---|---|---|---|---|---|
| Douglas |  | 95 | 90 | 89 | 94 | 83 |  | **90** |
| Eyman |  | 52 | 56 | 62 | 42 | 66 |  | **56** |
| Florence |  | 63 | 61 | 60 | 43 | 73 |  | **60** |
| Lewis |  | 16 | 88 | 86 | 55 | 57 |  | **60** |
| Perryville |  | 50 | 66 | 58 | 66 | 40 |  | **56** |
| Phoenix |  | 98 | 100 | 89 | 64 | 90 |  | **88** |
| Safford |  | 100 | 100 | 100 | 100 | 100 |  | **100** |
| Tucson |  | 57 | 59 | 57 | 47 | 47 |  | **53** |
| Winslow |  | 65 | 70 | 90 | 100 | 95 |  | **84** |
| Yuma |  | 74 | 70 | 72 | 78 | 86 |  | **76** |
|  |  |  |  |  |  |  |  |  |
| **Monthly Statewide Average** |  | **67** | **76** | **76** | **69** | **74** |  | **72** |

## June 2014 Lewis CGAR Spot-Check (Monitor found 33/60 = 55% compliance) [5]

CGAR: 120824-25
Worksheet: ADCM122145, 122153; 122155

We looked in the prisoners' health care records used the date the nursing encounter occurred and then looked for a specific referral to a provider, either through a check box/ button/or in written notes, and found the following.

### Stiner

The monitor found 4 out of 10 compliant.  ADCM122153. We reviewed the four records that the monitor had listed as compliant, and found that all four were actually noncompliant, and three of the four were not relevant to the measure and shouldn't have been counted in the first place.

- ▉▉▉▉ – 6/4 NL referral to a provider, and then a 6/5 chronic care encounter regarding an unrelated issue – no subsequent provider appointments in response to 6/4/15 referral.
- ▉▉▉▉ – 5/30 NL – was not referred to a provider and shouldn't have been considered under this measure
- ▉▉▉▉ – 6/4 NL – was not referred to a provider and shouldn't have been considered under this measure

---

[5] The total number files listed by institution as compliant on the CGAR adds up to 27 of 53 (51%), not 33 out of 60.  ADCM120824-25.  The total number of files listed as compliant on the monitor's worksheets is 43 out of 75 (57%). ADCM122143-58.

- ███████ – 6/4 NL - was not referred to a provider and shouldn't have been considered under this measure

**Eagle Point/ Sunrise**

The monitor found five out of 10 compliant.  We reviewed the five records that the monitor had listed as compliant, and found that all were not relevant to the measure and shouldn't have been counted in the first place.

- ███████ – 6/5 provider appointment, there was no referral from nurse and thus shouldn't have been considered under this measure
- ███████ – 6/18 f/u re lab results, there was no referral from nurse and shouldn't have been considered under this measure
- ███████ – 6/18 f/u from 5/8 surgical consult, there was no referral from nurse and thus shouldn't have been considered under this measure
- ███████ – he had no provider appointments in the month of June
- ███████ – he had a 6/18 chronic care appointment, no 6/25 provider appointment as the monitor indicates on worksheet.

**Bachman**

The monitor found five out of 10 compliant on his worksheet.  ADCM122145.  However, on the CGAR, Bachman is listed as having 1 of 3 compliant.  ADCM120824.  We reviewed the five that were marked as compliant, and found that there were no referrals or encounters on the dates listed.

- ███████ – no referral to provider documented on listed date of 6/1 and shouldn't have been considered under this measure
- ███████ – no referral to provider documented on listed date of 6/1 and shouldn't have been considered under this measure
- ███████ – no referral to provider documented on listed date of 6/4 and shouldn't have been considered under this measure
- ███████ – no encounter or referral documented on listed date of 6/9 and therefore shouldn't have been considered.

The highest possible compliance rate for Lewis for June, assuming every file we did not review was (a) relevant, and (b) accurately recorded would be 30 out of 65 files (or 46%).

*Parsons v. Ryan*
Notice of Substantial
Non-Compliance
October 1, 2015
Appendix A, Page 33

**Access to Care # 7 (Follow-up Sick Call Within Ordered Timeframes)**

|  |  | March | April | May | June | July |  | 5 Month Average |
|---|---|---|---|---|---|---|---|---|
| Douglas |  | 85 | 83 | 0 | 100 | 96 |  | **73** |
| Eyman |  | 50 | 39 | 28 | 45 | 44 |  | **41** |
| Florence |  | 63 | 20 | 25 | 29 | 100 |  | **47** |
| Lewis |  | 84 | 100 | 100 | 100 | 73 |  | **91** |
| Perryville |  | 54 | 56 | 58 | 58 | 44 |  | **54** |
| Phoenix |  | 100 | 100 | 0 | 93 | 71 |  | **73** |
| Safford |  | 100 | 100 | 50 | 100 | 100 |  | **90** |
| Tucson |  | 47 | 34 | 46 | 67 | 60 |  | **51** |
| Winslow |  | 58 | 82 | 100 | 95 | 95 |  | **86** |
| Yuma |  | 76 | 76 | 79 | 29 | 86 |  | **69** |
|  |  |  |  |  |  |  |  |  |
| **Monthly Statewide Average** |  | **72** | **69** | **49** | **72** | 77 |  | **68** |

**Spot-Check of June 2015 Lewis CGAR Access to Care # 7**

CGAR finding:  ADCM120825
Worksheets: ADCM122144, 122146, 122154

**Bachman**
Ten files were marked as compliant, we spot-checked the first four files listed in the worksheet. None of the four are relevant to the outcome measure.
- ▉ – 6/30 CC – no initiating sick call order
- ▉ – 6/30 CC – no initiating sick call order
- ▉ – 6/30 CC – no initiating sick call order
- ▉ – 6/30 provider f/up re: results of CT scan

**Rast**
Ten files were marked as compliant, we spot-checked first six files listed in the worksheet. None of the six are relevant to this outcome measure.
- ▉ – 6/30 CC – no initiating sick call order
- ▉ – 6/30 CC – no initiating sick call order
- ▉ – 6/30 CC – no initiating sick call order
- ▉ – 6/30 follow up on nursing referral – was not ordered by a provider
- ▉ 6/30 follow up on nursing referral – was not ordered by a provider
- ▉ – 6/30 follow up on nursing referral – was not ordered by a provider

**Stiner**
Ten files were marked as compliant, none are relevant to this outcome measure
- ███ – follow up on nursing referral – was not ordered by a provider
- ███ – 5/26 intake evaluation, enrolled in chronic care, first CC appointment scheduled but no timeframe for f/u indicated
- ███ – 6/25 provider ordered patient to continue in CC for HCV, no f/u date ordered – CC appointment 6/29
- ███ – 12/1/14 CC – f/u 6/29/15
- ███ – 6/29/15 CC – no initiating order
- ███ – 6/29/15 CC – no initiating order
- ███ – 6/29/15 CC – no initiating order
- ███ – 6/29/15 CC – no initiating order
- ███ – 6/29/15 CC – 4/29/15 CC
- ███ – 6/29/15 CC – no initiating order

### Infirmary Care # 4 – IPC Provider Encounters Every 72 Hours

|  |  | March | April | May | June | July |  | 5 Month Average |
|---|---|---|---|---|---|---|---|---|
| Florence |  | 0 | 0 | 0 | 0 | 0 |  | 0 |
| Lewis |  | 80 | 100 | 100 | 20 | 70 |  | 74 |
| Perryville |  | 100 | 90 | 78 | 100 | 100 |  | 94 |
| Tucson |  | 44 | 40 | 20 | 27 | 20 |  | 30 |
|  |  |  |  |  |  |  |  |  |
| **Monthly Statewide Average** |  | **56** | **58** | **50** | **37** | **48** |  | **49** |

*Parsons v. Ryan*
Notice of Substantial
Non-Compliance
October 1, 2015
Appendix A, Page 35

**Dental # 3 – Routine Dental Within 90 Days**

| | March | April | May | June | July | | 5 Month Average |
|---|---|---|---|---|---|---|---|
| Douglas | 25 | 2 | 100 | 100 | 62 | | **58** |
| Eyman | 76 | 78 | 80 | 100 | 92 | | **85** |
| Florence | 95 | 83 | 88 | 96 | 100 | | **92** |
| Lewis | 39 | 26 | 36 | 93 | 60 | | **51** |
| Perryville | 24 | 18 | 41 | 67 | 54 | | **41** |
| Phoenix | 97 | 100 | 100 | 98 | 100 | | **99** |
| Safford | 100 | 100 | N/A | 100 | 100 | | **100** |
| Tucson | 79 | 67 | 96 | 100 | 94 | | **87** |
| Winslow | 100 | 100 | 100 | 95 | 100 | | **99** |
| Yuma | 66 | 56 | 100 | 94 | 97 | | **83** |
| | | | | | | | |
| **Monthly Statewide Average** | **70** | **63** | **82** | **94** | **86** | | **79** |

**Dental # 4 – Urgent Dental Within 72 Hours**

| | March | April | May | June | July | | 5 Month Average |
|---|---|---|---|---|---|---|---|
| Douglas | 78 | 76 | 100 | 100 | 100 | | **91** |
| Eyman | 81 | 82 | 77 | 96 | 98 | | **87** |
| Florence | 84 | 77 | 92 | 100 | 100 | | **91** |
| Lewis | 37 | 40 | 52 | 85 | 75 | | **58** |
| Perryville | 74 | 86 | 74 | 97 | 100 | | **86** |
| Phoenix | 98 | 40 | 98 | 98 | 40 | | **75** |
| Safford | 75 | 75 | N/A | 92 | 100 | | **86** |
| Tucson | 60 | 68 | 73 | 98 | 100 | | **80** |
| Winslow | 80 | 92 | 60 | 78 | 69 | | **76** |
| Yuma | 76 | 86 | 97 | 95 | 100 | | **91** |
| | | | | | | | |
| **Monthly Statewide Average** | **74** | **72** | **80** | **94** | **88** | | **82** |

**Staffing # 3 – Statewide Dental Staffing at Contract Levels**

| | March | April | May | June | July | | 5 Month Average |
|---|---|---|---|---|---|---|---|
| Statewide | 71 | 72 | 70 | 75 | 74 | | **72** |

**Mental Health # 13 – MH-3D Prisoners Seen Within 30 Days of Discontinuing Meds**

|  | | March | April | May | June | July | | 5 Month Average |
|---|---|---|---|---|---|---|---|---|
| Douglas | | N/A | N/A | N/A | N/A | N/A | | |
| Eyman | | 0 | 14 | 0 | 20 | 25 | | 12 |
| Florence | | 17 | 22 | 17 | 8 | 17 | | 16 |
| Lewis | | 0 | 9 | 0 | 0 | 0 | | 2 |
| Perryville | | 43 | 69 | 24 | 55 | 33 | | 45 |
| Phoenix | | N/A | N/A | N/A | N/A | N/A | | |
| Safford | | N/A | N/A | N/A | N/A | N/A | | |
| Tucson | | 0 | 35 | 12 | 13 | 0 | | 12 |
| Winslow | | 0 | N/A | N/A | N/A | N/A | | |
| Yuma | | 43 | 0 | 0 | 18 | 29 | | 18 |
| | | | | | | | | |
| **Monthly Statewide Average** | | **15** | **25** | **9** | **19** | **17** | | **17** |

**Mental Health # 20 – MH-3 & Above Prisoners in Max Custody
Seen 1:1 or Group Every 30 Days**

|  | | March | April | May | June | July | | 5 Month Average |
|---|---|---|---|---|---|---|---|---|
| Douglas | | N/A | N/A | N/A | N/A | N/A | | |
| Eyman | | 45 | 85 | 57 | 50 | 65 | | 60 |
| Florence | | 85 | 85 | 25 | 65 | 70 | | 66 |
| Lewis | | 50 | 100 | 40 | 70 | 70 | | 66 |
| Perryville | | 100 | 90 | 60 | 70 | 50 | | 74 |
| Phoenix | | N/A | N/A | N/A | N/A | N/A | | |
| Safford | | N/A | N/A | N/A | N/A | N/A | | |
| Tucson | | 29 | N/A | 71 | 17 | 67 | | 46 |
| Winslow | | N/A | N/A | N/A | N/A | N/A | | |
| Yuma | | N/A | N/A | N/A | N/A | N/A | | |
| | | | | | | | | |
| **Monthly Statewide Average** | | **62** | **90** | **51** | **54** | **64** | | **64** |

### Mental Health # 21 – MH-3 & Above Prisoners in Max Custody
### Seen by MH Staff on Weekly Rounds

|  |  | March | April | May | June | July |  | 5 Month Average |
|---|---|---|---|---|---|---|---|---|
| Douglas |  | N/A | N/A | N/A | N/A | N/A |  |  |
| Eyman |  | 0 | 5 | 48 | 100 | 95 |  | **50** |
| Florence |  | 5 | 40 | 70 | 85 | 95 |  | **59** |
| Lewis |  | 0 | 0 | 100 | 10 | 100 |  | **42** |
| Perryville |  | 30 | 100 | 80 | 70 | 100 |  | **76** |
| Phoenix |  | N/A | N/A | N/A | N/A | N/A |  |  |
| Safford |  | N/A | N/A | N/A | N/A | 100 |  |  |
| Tucson |  | 0 | N/A | 86 | 100 | 67 |  | **63** |
| Winslow |  | N/A | N/A | N/A | N/A | N/A |  |  |
| Yuma |  | N/A | N/A | N/A | N/A | N/A |  |  |
|  |  |  |  |  |  |  |  |  |
| **Monthly Statewide Average** |  | **7** | **36** | **77** | **73** | **93** |  | **57** |

### Mental Health # 26 (Mental HNRs responded to within MHTM timeframes)

|  |  | March | April | May | June | July |  | 5 Month Average |
|---|---|---|---|---|---|---|---|---|
| Douglas |  | 100 | 100 | 100 | 100 | 100 |  | **100** |
| Eyman |  | 14 | 36 | 42 | 40 | 36 |  | **34** |
| Florence |  | 63 | 50 | 18 | 29 | 52 |  | **42** |
| Lewis |  | 21 | 4 | 71 | 81 | 70 |  | **49** |
| Perryville |  | 98 | 100 | 91 | 100 | 88 |  | **95** |
| Phoenix |  | 50 | 100 | 0 | 100 | 100 |  | **70** |
| Safford |  | 100 | 100 | 100 | 100 | 100 |  | **100** |
| Tucson |  | 89 | 62 | 79 | 69 | 88 |  | **77** |
| Winslow |  | 50 | 50 | 100 | 60 | 75 |  | **67** |
| Yuma |  | 67 | 91 | 94 | 95 | 100 |  | **89** |
| **Monthly Statewide Average** |  | **65** | **69** | **69** | **77** | **81** |  | **72** |

### Pharmacy # 1 – Timely Provision of New Formulary Prescriptions

|  | | March | April | May | June | July | | 5 Month Average |
|---|---|---|---|---|---|---|---|---|
| Douglas | | 60 | 97 | 85 | 78 | 79 | | **80** |
| Eyman | | 32 | 34 | 48 | 50 | 64 | | **46** |
| Florence | | 54 | 54 | 58 | 59 | 71 | | **59** |
| Lewis | | 63 | 71 | 74 | 57 | 70 | | **67** |
| Perryville | | 76 | 78 | 84 | 88 | 92 | | **84** |
| Phoenix | | 86 | 96 | 98 | 90 | 92 | | **92** |
| Safford | | 100 | 100 | 100 | 100 | 85 | | **97** |
| Tucson | | 54 | 58 | 54 | 53 | 58 | | **56** |
| Winslow | | 75 | 65 | 50 | 50 | 80 | | **64** |
| Yuma | | 76 | 78 | 60 | 78 | 74 | | **73** |
|  | | | | | | | | |
| **Monthly Statewide Average** | | **68** | **73** | **71** | **70** | **77** | | **72** |

### Pharmacy # 2 – Medication Renewal Without Interruptions

|  | | March | April | May | June | July | | 5 Month Average |
|---|---|---|---|---|---|---|---|---|
| Douglas | | 78 | 100 | 78 | 58 | 52 | | **73** |
| Eyman | | 72 | 54 | 44 | 52 | 70 | | **58** |
| Florence | | 58 | 66 | 60 | 64 | 67 | | **63** |
| Lewis | | 60 | 65 | 61 | 73 | 64 | | **65** |
| Perryville | | 77 | 77 | 67 | 69 | 64 | | **71** |
| Phoenix | | 84 | 93 | 87 | 92 | 100 | | **91** |
| Safford | | 100 | 93 | 80 | 100 | 100 | | **95** |
| Tucson | | 77 | 76 | 76 | 76 | 53 | | **71** |
| Winslow | | 65 | 90 | 95 | 96 | 100 | | **89** |
| Yuma | | 62 | 40 | 50 | 70 | 60 | | **56** |
|  | | | | | | | | |
| **Monthly Statewide Average** | | **73** | **75** | **70** | **75** | **73** | | **73** |

*Parsons v. Ryan*
Notice of Substantial
Non-Compliance
October 1, 2015
Appendix A, Page 39

## Pharmacy # 3  - Medication Refill Without Interruption

|  | March | April | May | June | July |  | 5 Month Average |
|---|---|---|---|---|---|---|---|
| Douglas | 0 | 0 | 100 | 80 | 60 |  | 48 |
| Eyman | 0 | 0 | 6 | 10 | 0 |  | 3 |
| Florence | 0 | 0 | 20 | 2 | 14 |  | 7 |
| Lewis | 0 | 0 | 0 | 0 | 0 |  | 0 |
| Perryville | 92 | 92 | 76 | 0 | 81 |  | 68 |
| Phoenix | 93 | 94 | 100 | 90 | 50 |  | 85 |
| Safford | 100 | 100 | 91 | 80 | 80 |  | 90 |
| Tucson | 0 | 68 | 41 | 34 | 3 |  | 29 |
| Winslow | 100 | 90 | 92 | 88 | 75 |  | 89 |
| Yuma | 0 | 0 | 32 | 24 | 32 |  | 18 |
|  |  |  |  |  |  |  |  |
| **Monthly Statewide Average** | **39** | **44** | **56** | **41** | **39** |  | **44** |

## Access to Care # 10 – Medications Transferred Between Prisons Without Interruption

|  | March | April | May | June | July |  | 5 Month Average |
|---|---|---|---|---|---|---|---|
| Douglas |  | 33 | 100 | 45 | 60 |  | 60 |
| Eyman |  | 16 | 47 | 38 | 56 |  | 39 |
| Florence | 18 | 22 | 16 | 41 | 42 |  | 28 |
| Lewis |  | 17 | 0 | 0 | 0 |  | 4 |
| Perryville |  | 100 | 100 | 100 | 100 |  | 100 |
| Phoenix | 100 | 80 | 0 |  | 100 |  | 70 |
| Safford | 70 | 50 | 78 | 65 | 30 |  | 59 |
| Tucson | 100 | 76 | 6 | 8 | 10 |  | 40 |
| Winslow | 45 | 8 | 36 | 0 | 0 |  | 18 |
| Yuma | 100 | 16 | 61 | 69 | 59 |  | 61 |
|  |  |  |  |  |  |  |  |
| **Monthly Statewide Average** |  | **72** | **42** | **44** | **41** | **46** | **49** |

**Chronic Care # 2 – Chronic patients seen as specified, at least every 180 days**

|  |  | March | April | May | June | July |  | 5 Month Average |
|---|---|---|---|---|---|---|---|---|
| Douglas |  | 91 | 91 | 93 | 100 | 59 |  | **87** |
| Eyman |  | 48 | 42 | 54 | 68 | 60 |  | **54** |
| Florence |  | 58 | 42 | 38 | 44 | 47 |  | **46** |
| Lewis |  | 70 | 66 | 45 | 31 | 37 |  | **50** |
| Perryville |  | 89 | 80 | 50 | 65 | 66 |  | **70** |
| Phoenix |  | 91 | 100 | 48 | 33 | 64 |  | **67** |
| Safford |  | 100 | 86 | 88 | 70 | 70 |  | **83** |
| Tucson |  | 73 | 43 | 67 | 52 | 46 |  | **56** |
| Winslow |  | 40 | 65 | 100 | 100 | 95 |  | **80** |
| Yuma |  | 37 | 86 | 82 | 74 | 90 |  | **74** |
|  |  |  |  |  |  |  |  |  |
| **Monthly Statewide Average** |  | **70** | **70** | **67** | **64** | **63** |  | **67** |

**Chronic Care # 3 – Chronic disease management guidelines implemented**

|  |  | March | April | May | June | July |  | 5 Month Average |
|---|---|---|---|---|---|---|---|---|
| Douglas |  | 100 | 94 | 100 | 86 | 100 |  | **96** |
| Eyman |  | 68 | 34 | 41 | 56 | 50 |  | **50** |
| Florence |  | N/A | 44 | 49 | 40 | 45 |  | **45** |
| Lewis |  | 100 | 100 | 43 | 41 | 60 |  | **69** |
| Perryville |  | 100 | 100 | 60 | 77 | 76 |  | **83** |
| Phoenix |  | 100 | 100 | 86 | 83 | 68 |  | **87** |
| Safford |  | 100 | 100 | 100 | 85 | 75 |  | **92** |
| Tucson |  | 100 | 75 | 82 | 78 | 55 |  | **78** |
| Winslow |  | 50 | 65 | 100 | 100 | 100 |  | **83** |
| Yuma |  | 100 | 100 | 92 | 66 | 96 |  | **91** |
|  |  |  |  |  |  |  |  |  |
| **Monthly Statewide Average** |  | **91** | **81** | **75** | **71** | **73** |  | **78** |

*Parsons v. Ryan*
Notice of Substantial
Non-Compliance
October 1, 2015
Appendix A, Page 41

### Access to Care # 9 – Hospital discharge instructions reviewed /acted upon by provider within 24 hours

| | | March | April | May | June | July | | 5 Month Average |
|---|---|---|---|---|---|---|---|---|
| Douglas | | NA | 100 | 0 | 40 | NA | | 47 |
| Eyman | | 67 | 71 | 90 | 80 | 100 | | 82 |
| Florence | | 96 | 90 | 83 | 100 | 88 | | 91 |
| Lewis | | 53 | 73 | 81 | 74 | 74 | | 71 |
| Perryville | | 100 | 81 | 100 | 100 | 100 | | 96 |
| Phoenix | | 100 | 100 | NA | NA | 100 | | 100 |
| Safford | | NA | NA | NA | 100 | 100 | | 100 |
| Tucson | | 50 | 64 | 63 | 57 | 73 | | 61 |
| Winslow | | 100 | 88 | 100 | 83 | 100 | | 94 |
| Yuma | | 50 | 83 | 0 | 60 | 75 | | 54 |
| | | | | | | | | |
| **Monthly Statewide Average** | | **77** | **83** | **65** | **77** | **90** | | **78** |

### Specialty Care # 5 – Specialty consultation reports reviewed /acted upon by provider within 7 days

| | | March | April | May | June | July | | 5 Month Average |
|---|---|---|---|---|---|---|---|---|
| Douglas | | 18 | 50 | 42 | 90 | 10 | | 42 |
| Eyman | | 61 | 84 | 86 | 54 | 60 | | 69 |
| Florence | | 57 | 61 | 57 | 54 | 30 | | 52 |
| Lewis | | 65 | 79 | 89 | 81 | 60 | | 75 |
| Perryville | | 66 | 80 | 68 | 77 | 52 | | 69 |
| Phoenix | | 100 | 100 | 100 | 100 | 40 | | 88 |
| Safford | | 100 | 94 | 95 | 94 | 100 | | 97 |
| Tucson | | 30 | 54 | 37 | 47 | 89 | | 51 |
| Winslow | | 91 | 100 | 86 | 78 | 86 | | 88 |
| Yuma | | 86 | 78 | 55 | 44 | 33 | | 59 |
| | | | | | | | | |
| **Monthly Statewide Average** | | **67** | **78** | **71** | **72** | **56** | | **69** |

### Specialty Care # 7 – Abnormal diagnostic/pathology reports reviewed / acted upon by provider within 5 days

| | | March | April | May | June | July | | 5 Month Average |
|---|---|---|---|---|---|---|---|---|
| Douglas | | 74 | 55 | 42 | 85 | 35 | | **58** |
| Eyman | | 56 | 48 | 48 | 52 | 64 | | **54** |
| Florence | | 32 | 9 | 20 | 12 | 7 | | **16** |
| Lewis | | 34 | 49 | 39 | 46 | 49 | | **43** |
| Perryville | | 56 | 64 | 60 | 76 | 67 | | **65** |
| Phoenix | | 58 | 85 | 38 | 38 | 45 | | **53** |
| Safford | | 95 | 90 | 95 | 100 | 70 | | **90** |
| Tucson | | 28 | 34 | 49 | 53 | 39 | | **41** |
| Winslow | | 55 | 85 | 85 | 95 | 85 | | **81** |
| Yuma | | 76 | 46 | 66 | 64 | 58 | | **62** |
| | | | | | | | | |
| **Monthly Statewide Average** | | **56** | **57** | **54** | **62** | **52** | | **56** |

# Appendix B



# 𝔄𝔯𝔦𝔷𝔬𝔫𝔞 𝔇𝔢𝔭𝔞𝔯𝔱𝔪𝔢𝔫𝔱 𝔬𝔣 𝔆𝔬𝔯𝔯𝔢𝔠𝔱𝔦𝔬𝔫𝔰

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-3133
www.azcorrections.gov



DOUGLAS A. DUCEY
GOVERNOR

CHARLES L. RYAN
DIRECTOR

## MEDICAL GRIEVANCE APPEAL:  TO THE DIRECTOR

Inmate Name: ███████████████████████████

Institution: ASPC-FLORENCE/SOUTH          Date Received: <u>May 4, 2015</u>

I have reviewed your Grievance Appeal in which you state that Ms. Pereira's response "failed to answer the Grievance completely". Specifically, you state that "access to care dealing with HNRs be dealt within 24 hours, timed, dated, stamped with the name, and signed so we can read it".

Your Grievance Appeal has been investigated including a review of your medical records. Based on our findings, your appeal is <u>granted</u>. The reasons for this decision are:

1.  During our investigation, the 16 Health Needs Requests (HNRs) you submitted dated from 3/8/15 to 6/7/15 were reviewed and 10 of them were found to be deficient.  ASPC-Florence's Facility Health Administrator (Dr. C. Pereira) has been directed to investigate and address these deficiencies expeditiously and ensure they do not happen again.

2.  Please submit a Health Needs Request (HNR) if you have additional medical concerns or needs which you wish to discuss with a medical provider.

This response concludes the medical grievance process per Department Order 802.06 Medical Appeals to the Director.

By _____          6/22/15
Charles L. Ryan, Director                              Date

cc:    Facility Health Administrator, ASPC-Florence
       Cindy Black, Corizon Vice President of Operations
       Shelley Wilson-Howard, Corizon Director of Operations
       C.O. Inmate File

# Appendix C



**LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT**

September 9, 2015

**VIA EMAIL ONLY**

Daniel P. Struck
Struck, Wieneke & Love
3100 West Ray Road, Suite 300
Chandler, AZ 85226-2473
dstruck@swlfirm.com

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH  FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
*DIRECTOR*
*ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS*

    **Re:**   ***Parsons v. Ryan***
          **Prisoner in need of immediate mental health care**
          ███████████████████████████████████████████

Dear Mr. Struck:

We write to notify you of an ADC prisoner in need of immediate mental health care.

███████████████ is classified as MH3A and Seriously Mentally Ill; his diagnoses include psychotic disorder NOS.  On August 10, 2015, he was taken off watch by Ms. Qualls.  On August 17, a mental health staff person wrote "On approach IM was laying naked on the cement next to feces and a puddle of urine … Unable to assess due to IM's current mental status."

According to his medical record, Mr. ███████ was not seen again by mental health until a full week later.  On August 24, mental health staff noted that he was again "laying on the floor naked."  Once again, there was no follow-up until a week later; on August 31, mental health staff wrote "not able to fully assess I/M at this time as he is actively psychotic."  On September 3, mental health staff noted "the inmate was standing in a puddle of his own urine" and "the inmate appears to be psychologically unstable."

It is extremely disturbing that, over a period of more than two weeks, Mr. ████████ – a prisoner who had recently been removed from watch – was repeatedly observed by mental health staff to be in this extremely decompensated state, and yet no action was taken.  We request that Mr.███████ be urgently evaluated by a psychiatrist for possible placement in an inpatient

1

mental health facility.   We look forward to your response, and to ADC's and Corizon's prompt attention to Mr. ████████ mental health needs.

Very truly yours,

David C. Fathi

cc:      All counsel

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION



*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

VIA EMAIL ONLY

September 16, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

       RE: *Parsons v. Ryan*, 2:12-CV-00601
       ADC Prisoner in Need of Immediate Medical Care
       ███████████████ – Florence South

Dear Mr. Struck,

      Our office previously contacted you on March 9, 2015 regarding Mr. ███████ urgent need for referral to oncology regarding a possible recurrence of his cancer and problems receiving post-surgery wound care.  After reviewing Mr. ████████ medical records and speaking with him on September 1 during our tour, we want to notify you that Mr. ████████ still has not had a biopsy or lab test done regarding the possible recurrence of cancer first identified in August 2013, and that his left hip replacement surgery that was supposed to occur in June has not occurred due to apparent miscommunication among Corizon staff.  Because of the failure to perform the hip surgery, he is confined to a wheelchair and encounters difficulties in performing activities of daily living.

      Mr. █████████ medical records for the period of March 2014-March 2015 show that the Florence provider Dr. Sharp has made multiple urgent requests for urology, orthopedic, and oncology consults but these requests repeatedly are delayed in the Corizon Utilization Management approval process, or the referrals get approved but then inexplicably are not scheduled or are cancelled.[1]  Dr. Sharp's most recent request for a referral to oncology/ hematology was submitted to Utilization Management on January 9, with the stated purpose

---

[1] See, e.g. 3/12/15 Sharp encounter at ADCM003680-81; 1/9/15 Sharp encounter at ADCM003683-84, 003916; 10/17/14 and 11/5/14 urgent requests cancelled on 12/10/14, ADCM003710-12; 8/12/14 request for orthopedist scheduled for 11/24/14 does not actually occur, ADCM003721-22.  In addition to Dr. Sharp, Dr. Straton requested a urology consult on 4/28/14, but Mr. ██████████ did not see the urologist until 2/4/15.

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts



being that Mr. ████████ needed biopsies and tests done of the multiple hepatic cysts and masses found on Mr. ████████ kidneys in a 12/29/14 CT scan (which itself was greatly delayed).[2]  This specialty referral was approved, but the appointment with the oncologist was scheduled to occur in July – six months after Dr. Sharp's request was made.  (ADCM003683-84, 3916).

Performance Measure # 51 of the *Parsons v. Ryan* Stipulation (Specialty Care # 4 on the CGARs) requires that routine specialty consults be scheduled and completed within 60 days of the provider's request.  Performance Measure # 50 of the Stipulation (Specialty Care # 3) requires that all urgent specialty consults occur within 30 days of the provider's request.  Performance Measure # 48 of the Stipulation (Specialty Care # 1) requires that all denials of specialty referrals must be sent to the requesting provider within 14 days of the request, and Measure # 49 (Specialty Care # 2) requires that the patient be told of the denial and his or her next scheduled appointment, no more than 30 days after the denial.

Mr. ████████ reports that he finally did see an oncologist in July, but it was a brief encounter of only a few minutes, and he did not have any of the biopsies or tests that Dr. Sharp had wanted to be done by the oncologist.

Also, as a result of the intensive radiation from his previous bout of cancer in 2010, Mr. ████████ hips are so degraded that they are ball and joint and have dysplasia.  As a result, he cannot walk and is confined to the wheelchair.  Since at least 2013, specialists have recommended replacement of both hips.  Additionally, Dr. Sharp wrote on 8/22/14 in an orthopedics consult request that Mr. ████████ has "major urology problems, kidney blockage, but urology won't treat [him] until his hips are fixed." (M003721-22)

Mr. ████████ reports that he finally had his right hip replacement surgery done in April 2015, with the surgeon stating that the left hip replacement surgery should be done eight weeks later (in June).  This did not occur.  He reports that in early August, without any notice, he was called out by custody staff and transported to the specialist to have his surgery.  Unfortunately, the surgery could not be done because Mr. ████████ is on Coumadin, and Corizon staff had not coordinated with one another to stop his Coumadin at least a week prior to the surgery.  He reported that rather than simply rescheduling this surgery, the provider now has had to start over in the specialty referral process.  At the time of our interview, Mr. ████████ reported that the

---

[2] These delays are especially egregious in light of the fact that a PET scan done in August 2013 – two years prior to the scheduled oncology appointment – indicated a right neck and oropharynx uptake suspicious for malignancy, and a questionable osseous metastatis that should be confirmed with a bone scan.  *See* the 8/21/14 grievance response (log #A02-095-014) signed by Director Ryan and attached to our March 9 letter.

RE:                    Mr. Daniel Struck
████████████
                       September 16, 2015
                             Page 3

provider has submitted a request for the surgery to Corizon headquarters, which he believed was still pending review, approval, and scheduling.

      We request that Mr. ████████ right hip replacement surgery be approved and rescheduled promptly, and that Corizon health care staff coordinate with one another so that his Coumadin is discontinued the medically-indicated time period prior to the surgery. We also request he have all necessary biopsies and lab tests regarding the suspicious cysts that Dr. Sharp requested in January. We ask that all recommendations and prescriptions made by specialists be reviewed and implemented by health care staff in a timely manner pursuant to the requirements of the *Parsons* settlement.

                            Sincerely yours,

                            */s/ Corene Kendrick*

                            Corene Kendrick, Staff Attorney

cc:      Counsel of Record
        Mr. ████████

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu



PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

VIA EMAIL ONLY

September 16, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

> RE: *Parsons v. Ryan*, 2:12-CV-00601
> ADC Prisoner in Need of Immediate Mental Health Care
> ███████████   Florence North-Unit 3 ("Tent City")

Dear Mr. Struck,

I write regarding a prisoner in need of immediate mental health care, and transfer to a housing unit more appropriate for his psychotropic medications, so that he does not suffer injury due to the heat in his current living unit.

Mr. ███████ is seriously mentally ill, and housed in Tent 28 in Florence-North.  On September 1, 2015, I attempted to interview him at his bed.  He told me he did not feel well because of the heat and his medication.  I saw him lying on his bed, rolling around, speaking to himself, crying and moaning.  The tent was already stifling hot, even though it was the morning.  Mr. ███████ was observed by counsel for Defendants, Corizon, and ADC staff, including the deputy warden who spoke with him.

Other prisoners housed in the tent reported to us that Mr. ███████ suffers from active mental health symptoms, is not receiving proper mental health treatment, and is inappropriately housed in the tent.  They described his florid psychosis, how he is often up and awake at night due to his audio and visual hallucinations, and that he tries to sleep during the day because the heat is too much for his medication.  They also reported that he frequently defecates and urinates on himself or in his bed, and has on occasion smeared his feces inside the tent.

Paragraph 15 of the Stipulation (Settlement Agreement Measure # 2 in the CGARs) requires that "[i]f a prisoner who is taking psychotropic medication suffers a heat intolerance reaction, all reasonably available steps will be taken to prevent heat injury or illness.  If all other

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

steps have failed to abate the heat intolerance reaction, the prisoner will be transferred to a housing area where the cell temperature does not exceed 85 degrees Fahrenheit."

    We request that Mr. ███████ be moved immediately out of the tent and in a housing unit appropriate to his custody level where the temperature does not exceed 85 degrees.  We request that Mr. ███████ be evaluated urgently by a psychiatrist for possible hospitalization in an in-patient mental health unit until his symptoms are under control, and that he receive all prescribed medications and recommended therapy services without interruption.

    We appreciate your prompt response, and ADC/Corizon's attention to this matter.

        Sincerely yours,

        */s/ Corene Kendrick*

        Corene Kendrick, Staff Attorney

cc:    Counsel of Record
      Mr. ████████



*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

BY EMAIL ONLY

September 17, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

> RE:   *Parsons v. Ryan*, 2:12-CV-00601
>       ADC Prisoner in Need of Immediate Medical Care
>       ████████████████ Florence - Central

Dear Mr. Struck:

We write to notify you of a class member who may be in need of immediate medical care.

Mr. ██████ reports that he was diagnosed with testicular cancer in March 2015 and had surgery (an orchiectomy) in June or July 2015.  Through review of his health care records, it appears that he had a specialty referral dated 7/2/15, labeled "ASAP", that was referred to Utilization Management (UM) on 7/7/15 and was pending as of 9/1/15.  There was another referral to Urology dated 8/5/15 that was referred to UM on 8/6/15.  It did not appear that either had occurred.  In addition, Mr. ██████ reported that he had seen an oncologist in August 2015 who recommended chemotherapy; however, as of 9/1/15, Mr. ██████ indicated that had not been seen regarding this recommendation.

We request that Mr. ██████ pending specialty referrals be reviewed by UM urgently based on the apparent delay in processing of these specialty referral requests. We also request that any alternative treatment plans that are recommended be implemented in a timely manner.  Finally, we request that Mr. ██████ be seen urgently by his provider regarding the oncologist's recommendation for chemotherapy. Thank you for your attention to this matter.

Sincerely yours,

*/s/ Alison Hardy*

Alison Hardy
Staff Attorney

Cc:   Mr. ████████

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts



*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

# PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

BY EMAIL ONLY

September 17, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

RE:   *Parsons v. Ryan*, 2:12-CV-00601
      ADC Prisoner in Need of Immediate Medical Care
      ██████████████ Florence - Central

Dear Mr. Struck:

We write to notify you of a class member who may be in need of immediate medical care.

Mr. █████ reports that his orbital bone and nose were broken during an assault while housed at Yuma Complex. As a result, he indicates that he had a plate implanted in his face, and requires additional surgery to add plates. According to his health care records, he was referred for an oculoplastics surgery consult on 7/6/15, and the referral hadbeen pending Utilization Management (UM) review since 7/7/15, as of 9/1/15.

We request that Mr. █████ pending specialty referral be reviewed by UM urgently based on the apparent delay in processing of this specialty referral request. We also request that any alternative treatment plans that are recommended be implemented in a timely manner. Thank you for your attention to this matter.

Sincerely yours,

*/s/ Alison Hardy*

Alison Hardy
Staff Attorney

Cc:   Mr. █████

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts



*Director:*
Donald Specter

## PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

BY EMAIL ONLY

September 17, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

     RE:   *Parsons v. Ryan*, 2:12-CV-00601
           ADC Prisoner in Need of Immediate Medical Care
           ██████████████████ Florence - Central

Dear Mr. Struck:

     We write to notify you of a class member who may be in need of immediate medical care.

     Mr. ████████ was diagnosed with throat cancer in or around November 2014, for which he reports he had emergency surgery about six months ago. He states that he has undergone chemotherapy and radiation treatment and is currently waiting to have a PET scan to determine whether the cancer has been eradicated.

     According to his health care records, he was referred for the PET scan on 7/1/15, and the referral had been pending at Utilization Management (UM) review since 7/13/15, as of 9/1/15. The records indicate that Mr. ████████ was seen at the Cancer Center on 7/8/15, and the recommendation was to have him return to the ENT in 1 – 2 months for an edoscopy, and to return to the Cancer Center in two months. That recommendation was referred to UM on 7/13/15 and was also apparently still pending on 9/1/15.

     We request that Mr. ████████ pending specialty referrals be reviewed by UM urgently based on the apparent delay in processing of these specialty referral requests. We also request that any alternative treatment plans that are recommended be implemented in a timely manner. Thank you for your attention to this matter.

                 Sincerely yours,

                 */s/ Alison Hardy*

                 Alison Hardy
                 Staff Attorney

Cc:    Mr. ██████

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts



*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

# PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

VIA EMAIL ONLY

September 17, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

> RE: *Parsons v. Ryan*, 2:12-CV-00601
> ADC Prisoner in Need of Immediate Medical Care
> ██████████████  Florence-East

Dear Mr. Struck,

I write regarding a prisoner in need of immediate medical care. Mr. ███ has COPD, hypertension, and a history of prostate cancer and chronic T-cell leukemia. He has received no follow up care after prostate cancer treatment, and is concerned his leukemia has become symptomatic.

In recent months, Mr. ███ has experienced and reported to medical staff, alarming symptoms including large visible hematomas, edema, and rash on his arms and body, an 18 pound weight loss, nausea, cold sweats, and exhaustion. Understandably, Mr. ███ is concerned that these are symptoms of that the disease has progressed to symptomatic leukemia. Mr. ███ also reports that after a delay in diagnosis and treatment, approximately 18 months ago he was diagnosed with prostate cancer and had radiation treatment. The oncologist recommended a follow-up consult four months after the radiation ended, but Mr. ███ reports this consult has not occurred, nor is his PSA level regularly tested and monitored.

According to Mr. ███ medical file, he was seen on 6/12/15 by the provider for couging up blood and his weight loss, nausea, and cold sweats. The provider concluded he had bronchitis, and started him on Cipro on 6/16/15. The provider also ordered labwork be done, and the results provided on 6/25/15 showed that his lymphocyte levels were well above normal range. When Mr. ███ T-cell leukemia was asymptomatic, he needed monthly blood tests to monitor his lymphocyte levels, but there was no evidence in his medical record that he had monthly blood tests. Additionally, we could find no evidence in Mr. ███ record that he has been provided any

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

RE:  Mr. Daniel Struck
     ████████████████
     September 17, 2015
     Page 2

follow up care or testing to determine if the raised lymphocyte level was a temporary result of the lung infection, or a marker (along with his other symptoms) that his leukemia has progressed and become symptomatic.

We request that Mr. ████ be urgently referred to an oncologist to evaluate whether his T-cell leukemia has progressed, and for follow-up on his prostate cancer treatment. We ask that all treatment plans and medication recommended by the specialist be provided in a timely manner without interruption, and that Mr. ████ be provided education on his treatment plan.

We appreciate your prompt response, and ADC/Corizon's attention to this matter.

Sincerely yours,

/s/ *Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:  Counsel of Record
     Mr. ████



*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

VIA EMAIL ONLY

September 17, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

RE: *Parsons v. Ryan*, 2:12-CV-00601
ADC Prisoner in Need of Immediate Medical Care
███████████████████

Dear Mr. Struck,

I write regarding a prisoner in need of immediate medical care and accommodations for his mobility impairments.

Mr. ███████████ suffered a massive stroke on July 7, and was taken by helicopter to the hospital for emergency care. He is still experiencing the effects of the stroke, including a severe inability to speak or remember words, partial paralysis, and great difficulty walking and standing. He reports that he spent eight days in the hospital after the stroke, and was told by the hospital specialists that he would need medication to reduce the likelihood of another stroke, and intensive physical and occupational therapy.

Mr. ███████████ reports that as of September 1, he has received no physical or occupational therapy, and as far as he knows, he is not receiving medication to prevent a stroke. He also has problems walking but has not been provided a cane, walker, or wheelchair to assist him. He has problems standing for long periods of time, and recently fainted from the heat while standing in the pill line and injured his wrist and arm, which now are in a splint.

Mr. ██████████ states that he has filed HNRs asking about physical therapy, but has not received any responses. He does not speak English and has to rely upon others to write his HNRs in English, or write them himself in Spanish.

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

Mr. Daniel Struck
RE: ███████████████
September 17, 2015
Page 2

We request that Mr. ████████████ be referred and seen promptly by a rehabilitative specialist who can evaluate him and develop a treatment plan involving all necessary treatment such as occupational, physical, and speech therapy.  We ask that he be evaluated for and provided all necessary mobility devices such as a cane or walker, and all necessary preventative medication.  Finally, we ask that Mr. ████████████ be educated about his diagnosis and the treatment plan either by health care staff who are fluent in Spanish, or with the assistance of a qualified interpreter, as required by Paragraph 14 of the *Parsons v. Ryan* Stipulation.

We appreciate your prompt response, and ADC/Corizon's attention to this matter.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:     Counsel of Record
        Mr. ████████████ (trans.)



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

September 17, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

RE: *Parsons v. Ryan*, 2:12-CV-00601
ADC Prisoner in Need of Immediate Medical Care
████████████████ Florence-North

Dear Mr. Struck,

I write regarding a prisoner in need of immediate medical care who is experiencing lapses in all prescribed chemotherapy treatment. Mr. ████ began treatment for Stage 3 colorectal cancer on 6/26/15, after more than nine months of reporting alarming symptoms. He reports that he was told by a radiologist who performed a CT scan several months ago that the cancer had metastacized to his liver and anus, but he has not been told of the extent of the spread of the cancer. He also is experiencing symptoms consistent with prostate cancer, but the referral request is pending with Corizon headquarters. Mr. ████ also reported during his September 1 meeting with me that in previous days he had not received all of his prescribed chemotherapy medication; after I reviewed his medical file's MARs and confirmed the accuracy of his statement, I notified Lucy Rand from the Attorney General's Office to ensure that Corizon provided Mr. ████ with all needed chemotherapy medication immediately, and without interruption or gaps in the future.

Starting in early October 2014, Mr. ████ reported via HNRs that he was experiencing frequent diarrhea with blood in his stool, as well as nausea and problems keeping a food down. He also informed health care staff that he has a family history of cancer. He reports that he was seen on nurse's line, and told by the nurses that he had hemorrhoids. He was not referred for a colonoscopy, nor was a colonoscopy performed on him. Finally, on 3/25/15 while waiting at the clinic to see the provider, he passed so many blood clots in his stool that he was rushed to the outside hospital.

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

Mr. ██████ reports that at the hospital, he underwent an emergency colonoscopy and the specialists discovered a cancerous mass the size of a grapefruit. He had emergency surgery, where the mass, his entire colon, and part of his intestine were removed. He also received a nonreversible stoma and colostomy. Mr. ██████ was discharged from the hospital on April 1, and he reports that he was told by the hospital specialists that he needed to begin chemotherapy and radiation as soon as he healed from the surgery. According to the June CGAR report (ADCM120812) and his medical record, on May 21 the provider submitted an urgent oncology consult to Corizon headquarters, but he was not seen by an oncologist until June 25,[1] and the chemotherapy treatment did not begin until three weeks later, almost three months after the specialist had recommended he start chemo.

Mr. ██████ reports that he had a PT scan in that period after seeing the oncologist and before beginning chemo, and the radiologist told him that it appeared that the cancer had spread to his liver and anus. However, he has not been educated as to the extent of the spread of his cancer, including whether it has spread to his bones or other organs. He also states he has not been informed if the chemotherapy he currently is undergoing will remove all other cancer in his body, or if he needs additional surgeries. During the summer, Mr. ██████ has reported symptoms including difficulty and pain while urinating, and tenderness and pain in his urethra. The provider made an urgent referral for a urology consult in August to evaluate if the cancer had spread to his prostate, but as of September 1 he had not seen a urologist.

Finally, he is now in a treatment cycle of receiving chemotherapy pills twice a day for 14 days, followed by one week off and liquid chemotherapy infusion, and then starting the pills again. He told me during our September 1 interview that for the past few days the pill line had not had all of the pills. I reviewed his MARs in his medical file, and confirmed that there was at least one medication he had not received since August 24, and another that was not provided the morning of the interview. I notified Ms. Rand of this gap in his cancer treatment, and asked that he be provided the medication immediately, and without interruption. Mr. ██████ also reported side effects including nausea and vomitting as a result of the chemo.

We request that Mr. ██████ be provided all necessary chemotherapy medication and infusions without interruption, and be provided all treatment and accommodations to manage the side effects of the chemo. We request that he have a meaningful consultation with the oncologist and/or his provider where he can be educated on the extent of his cancer, and the specialist's treatment plan. We request that he be seen promptly by the urologist to evaluate whether his cancer has spread to his prostate, and be provided all appropriated and medically necessary treatment subsequent to the diagnosis.

---

[1] Performance Measure # 50 of the Stipulation (CGAR Specialty Care # 3) requires that all urgent specialty consults occur within 30 days of the provider's request.

RE: Mr. Daniel Struck
██████████████

September 17, 2015
Page 3

We appreciate your prompt response, and ADC/Corizon's attention to this matter.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:   Counsel of Record
      Mr. ███████



*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

# PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

VIA EMAIL ONLY

September 18, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

RE: *Parsons v. Ryan*, 2:12-CV-00601
ADC Prisoner in Need of Immediate Medical Care
███████████████    Florence-East

Dear Mr. Struck,

I write regarding a prisoner in need of immediate medical care.

Mr. ████ has battled ulcerative colitis and other gastrointestinal symptoms for more than ten years. He reports that several years ago he saw a GI specialist who told him he needs surgery to remove the problematic and infected sections of his colon. The specialist has renewed this recommendation several times. Mr. ████ stated that East yard's provider, NP Armenta, also has submitted referral requests for the surgery, but that Wexford, and now Corizon, will not approve the surgery because it is not "medically necessary." However, Mr. ████ disease greatly affects his ability to complete activities of daily living, including the simple act of leaving his living unit, because of symptoms such as frequent and violent diarrhea.

Mr. ████ reports, and his medical record confirmed, that on 6/12/15, he was sent out for a colonoscopy to evaluate the extent of his disease. However, there appears to have been a miscommunication between specialty scheduling staff and yard health care staff, because he was not provided the required enemas the night before the exam. When he arrived at the specialist's office, the colonoscopy could not be done because Mr. ████ had not undergone the appropriate pre-procedure preparation.

Mr. ████ reported that rather than simply rescheduling this colonoscopy, the provider has had to start over in the specialty referral process. His medical records show that on 8/20/15, an

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

RE: <span>████████</span> Mr. Daniel Struck

September 18, 2015

Page 2

urgent GI consult request was submitted by the provider, but it was listed as pending approval by Utilization Management as of 9/1/15.

We request that Mr. ████████ pending urgent specialty referral for a colonoscopy be approved and rescheduled pursuant to Performance Measure # 50 of the *Parsons* stipulation, and that Corizon health care staff coordinate with one another so that he is provided all pre-procedure medications and treatment, including the required enemas.  We ask that UM review the specialists' and provider's past recommendations for surgery and approve it in a timely manner. We ask that all recommendations and made by the specialist be reviewed and implemented by health care staff in a timely manner pursuant to the requirements of the *Parsons* stipulation.  We appreciate your prompt response, and ADC/Corizon's attention to this matter.

Sincerely yours,

/s/ *Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:     Counsel of Record
         Mr. ████



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

September 18, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

RE: *Parsons v. Ryan*, 2:12-CV-00601
ADC Prisoner in Need of Immediate Medical Care
███████████████   Florence-South

Dear Mr. Struck,

I write regarding a prisoner in need of immediate medical care for a likely-broken hand. Mr. ████████ has suffered two strokes in the past year, his most recent one was in June. As a result, he has difficulty walking. He reports he fell on the yard while at Central Unit in late July, and he thinks he broke his left hand. It is visibly swollen to almost twice the size of his right hand, and he has difficulty moving his fingers or trying to make a fist. He states that he has filed HNRs about his hand, and was told in response that he is on the provider line, but that he has not yet had an X-ray. He reports that he saw a physical therapist on August 30 for rehabilitation of his ability to walk, and the PT told him that his hand appeared to be broken.

We request that Mr. ████████ be evaluated urgently by the provider, and undergo an X-ray of his hand or any other necessary diagnostic exams pursuant to Performance Measure # 45 of the *Parsons* stipulation. We ask that he be provided all necessary specialty appointments to repair his hand in a timely manner pursuant to the requirements of the *Parsons* stipulation. We appreciate your prompt response, and ADC/Corizon's attention to this matter.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:   Mr. ████████

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts



*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

VIA EMAIL ONLY

September 18, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

    RE: *Parsons v. Ryan*, 2:12-CV-00601
    ADC Prisoner in Need of Immediate Medical Care
    ██████████████   Florence-North

Dear Mr. Struck,

   I write regarding a prisoner in need of immediate medical care.

   Mr. ████ is 71 years old and has thromboangiitis obliterans, also called Buerger's disease, a disorder in which arteries and veins become inflamed, swell and are blocked with blood clots that ultimately destroy skin tissue and may lead to infection or gangrene.  Prior to his incarceration in May 2013, Mr. ████ was seen by a vascular specialist, Dr. Nitin Patel, at Prescott Valley Cardiac Care (928-759-7009).  Dr. Patel notified the Yavapai County judge as well as ADC in writing that Mr. ████ critically needed in his leg arteries because they were 75% blocked, and that he needed blood thinners to lessen the risk of thrombosis and clots.  Mr. ████ showed me the letter Dr. Patel sent to ADC, which he states he has shown to several Corizon providers.  Mr. ████ also reports his sentencing judge ordered ADC to provide the treatment when he was sentenced to prison.  However, Mr. ████ reports he has not been given the stents, nor provided Coumadin or another blood thinner.  He experiences pain in his legs, and is concerned that the failure to receive blood thinners has increased his risk of stroke or heart attack.

   We request that Mr. ████ be promptly referred to a specialist for any necessary diagnostic exams and the procedure to place the stents that Dr. Patel recommended in 2013.  We request that he be provided all medically necessary medication without interruption pursuant to the requirements of the *Parsons* stipulation.  We appreciate your prompt response, and ADC/Corizon's attention to this matter.

      Sincerely yours,

      */s/ Corene Kendrick*

      Corene Kendrick, Staff Attorney

cc:  Mr. ████

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts



*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

VIA EMAIL ONLY

September 21, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

    RE: *Parsons v. Ryan*, 2:12-CV-00601
    ADC Prisoner in Need of Immediate Medical and Mental Health Care
    ███████████, Lewis-Rast MDU

Dear Mr. Struck,

   I write regarding a prisoner in need of immediate medical and mental health care.

   Mr. ██████ has psoriatic arthritis, osteomyelitis in his spine and leg, hypertension, GERD, and since 2013 has had a large open wound on his right leg below his knee.  When Amy Fettig and I interviewed him on 9/2/15, he showed us the wound on his knee as well as other wounds on his shin.  The wounds were red, inflamed and smelled.  As a result of the wounds on his leg and the osteomyelitis in his spine, he has to use a wheelchair.  He has not seen an infectious disease or wound care specialist for more than a year, and an orthopedics consult requested in July 2014 for a bone biopsy and treatment of his osteomyelitis did not occur, and was cancelled for unknown reasons in March 2015.  Despite the excruciating pain caused by the large open wounds, his severe psoriasis, and the osteomyelitis, he is receiving no pain medications, after they were vindictively and abruptly cut off in May 2015 without any examination, after he had an outburst during a medical encounter.  Mr. ██████ also suffers from anemia that is so severe that he has had to get emergency blood transfusions.  He also reports that he has lost close to 90 pounds in the last two years, and Corizon providers have not identified the cause of the extreme weight loss.  He reports that he is not receiving his wasting diet.  Mr. ██████ also reported that he suffers from PTSD, ADHD, and depression, but is not receiving any regular mental health counseling or therapy, and that his psychiatric medication is not consistently delivered to him.

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts



Mr. Daniel Struck
RE: Mr. ████████
September 21, 2015
Page 2

We requested Mr. ████████ medical records in August, and they confirmed his allegations.  Many of the documents cited here are attached to this letter.

Despite Mr. ████████ complex health needs, his last chronic care appointment was on 1/9/15, when he was housed at Eyman SMU-I.[1]  (ADCM091679-82).  NP McKamey documented at this appointment that the largest wound was approximately 7 cm by 3 cm by 3 mm deep.  Five months earlier, Dr. Burciaga at ASPC-Tucson had requested an orthopedics consult on 7/31/14 for a bone biopsy of this area of his leg, but he never saw an orthopedist, and the consult was cancelled on 3/11/15 by Lewis NP Taylor for re-evaluation of the need for the referral.[2] (ADCM092763).  There is no documentation in his medical record that such a re-evaluation or referral has occurred since March.

Mr. ████████ has been provided a variety of topical creams to treat his open sores, but the treatment appears to not be working, as he has had the open wound since 2013.[3]  Despite the wound's failure to heal for more than two years, Mr. ████████ last saw a wound clinic specialist on 7/14/14, (M092765, 091221-22), and his last infectious disease encounter was 5/5/14, where MRSA was identified in his wound. (M092766, 92441-44).  He has had a standing order for daily wound dressing changes by nurses for more than a year, (M091449), but there is no documentation of any wound care or dressing changes being done between 8/15/14 at Tucson, and 11/11/14 at SMU-I.  (M092361, 92369).  His medical record shows that at Lewis, the nurse is coming at best every three or four days to the MDU to change the dressing, and there was a two week period from June 26 to July 7 where there is no documented wound care.  (ADCM091451). The records we were given were through 7/28/15, but July 7 is the last documented day he got a dressing change.[4]  (Id.)

As of 6/24/15, Mr. ████████ weighed 138 pounds and he is 6 feet tall.  (ADCM091816-17).  Mr. ████████ special needs order for a wasting diet expired on 8/17/15, (ADCM091450) and he reports that it has not been renewed and he is not getting additional food.[5]

---

[1] The *Parsons v. Ryan* Stipulation Performance Measure (hereinafter "PM") # 54 (Chronic Care # 2 on CGARs) requires that chronic disease patients be seen a minimum of every 180 days for chronic care appointments.

[2] PM # 51 (Specialty Care # 4 on CGARS) requires that routine specialty consults be scheduled and completed within 60 days of the provider's request.

[3] PM # 55 (Chronic Care # 3 on CGARS) requires that disease management guidelines be implemented for chronic diseases.  There is no evidence in the medical record that there is a treatment plan for Mr. ████████ chronic psoriatic arthritis.

[4] PM # 42 (Access to Care # 7 on CGARS) requires that follow-up sick call encounters will occur on the time frame specified by the medical provider.

[5] PM # 71 (Medical Diets # 1 on CGARS) requires that inmates with diagnosed and documented diseases or conditions that necessitate a special diet will be provided that diet.



Mr. █████████ medical record also documents that the site medical director, Dr. Malachinski, ordered his pain medications be decreased after an April 1 incident where he was disruptive and cursed at health care staff.  According to the notes made by NP Taylor, Mr. █████████ was called up to the clinic to discuss his lab tests and extremely low hemoglobin level (his level was 4, the normal range is 18 to 464).  NP Taylor wanted to send him to the hospital for an emergency blood transfusion.  He became upset about the idea of going to Tempe St. Lukes because he said he had a pending lawsuit against staff there, and was concerned he would be mistreated.  According to NP Taylor's notes, he became extremely agitated and cursed at her and other nursing staff about the fact that he was only getting his pain medication once a day, when it was prescribed to be given to him twice a day.  He was returned to his cell by security staff, and NP Taylor wrote that the "SMD [was] notified of encounter and directed to decrease pain medication."  (ADCM091643-46).

Mr. █████████ statements to NP Taylor that he was receiving less than his prescribed medication were correct – at the time, he was prescribed 10 mg. of morphine to be given twice a day. (ADCM091368-69, 91372, 91384-85).  But according to his MARS, during much of March he was only getting the morphine in the mornings, plus there was an almost month-long gap where there was no documentation of receiving any morphine between 2/17/15 and 3/12/15.[6] (M091385).  The prescription for 10 mg. twice a day continued to be valid from 4/1/15 to 4/22/15, although there were days in the weeks after the medical director ordered the decrease in pain medication, that he received no pain medication at all. (4/2-4/4, 4/10-4/12, 4/14-4/15 and 4/21). (ADCM091368-69, 91372, 91384-85).  Then, on 4/23/15, without seeing Mr. █████████ or documenting any basis for the decision, Dr. Malachinski discontinued the active prescription for 10 mg. twice a day, (M091384), and slashed it to 5 mg. once a day for two weeks. (M091364, 91366).  May 6, 2015 was the last day Mr. █████████ was given morphine. (M091366).  A week later, on 5/13/15, Dr. Malachinski prescribed him 600 mg ibuprofen to be taken twice a day for three days for pain.  Mr. █████████ was given the ibuprofen only once, on 5/15/15, and that is the last documented day he received any pain medication.  (ADCM091362).  Mr. █████████ reported to Ms. Fettig and me that the pain from his open wounds and the osteomyelitis is so severe that he resorts to pulling his toenails out to distract himself from the pain.  Mr. █████████ was squirming in visible pain during the interview, sitting in the wheelchair without a cushion.

Mr. █████████ has a mental health diagnosis of depression, is classified as MH-3, and is prescribed 50 mg. of Paxil every evening.  His MARS show that the evening medication is not provided consistently – from one day to the next, he receives it as early as 2 pm or as late as midnight.  (ADCM091349-53).  He was put on suicide watch on 6/26/15 because of a cut on his arm that staff thought was self-inflicted, but Mr. █████████ denied any suicidal ideation, and

---

[6] PM # 13 (Pharmacy # 2 on CGARS) requires chronic care and psychotropic medication renewals be completed such that there is no interruption or lapse in medication.

insisted that the cut happened when he fell off his wheelchair while transferring to his toilet.[7] (ADCM092576-81).  He was on suicide watch until 7/2/15.  (ADCM092557-62).  He was not seen by mental health staff for four days after being put on watch, and was only seen twice, 6/30 and 7/1.[8]  (ADCM092513).  There also is no documentation of any encounters with mental health staff between 3/19/15 and 5/20/15, even though he was housed at the MDU.[9]  Additionally, on two occasions in May, Mr. ███████ reported to the nurse changing his wound dressing that he was experiencing auditory hallucinations, but there was no referral to mental health staff.  (ADCM092047-51, 92019-22).  Despite the placement on suicide watch, and the fact that he is on psychotropic medication for depression, Mr. ████████ last psychiatrist appointment was 3/19/15, when his Paxil was increased because he reported worsening symptoms of depression.[10]  (ADCM092610-18).

We request that Mr. ████████ be evaluated promptly by a provider regarding his osteomyelitis, and be evaluated and referred for an orthopedist for the bone biopsy that Dr. Burciaga had requested in July 2014.  We ask that the provider evaluate the unhealed wounds that he has had for more than two years, and make appropriate referrals for infectious disease and/or a wound specialist, to follow up on the specialty consults he had in May and July 2014.  We ask that he be evaluated and provided pain medication that ameliorates the excruciating pain he is experiencing from the large open wounds, his severe psoriasis, and the osteomyelitis.  We ask that the provider request all medically appropriate tests to identify the cause of his severe anemia and extreme weigh loss.  We request that all specialty referrals be reviewed and completed without delay, and that the specialists' recommendations be reviewed and implemented.  We ask that Mr. ████████ be educated about his diseases and the treatment plans.  We ask that his SNO for the wasting diet be reinstated, and that he be provided the nutritional supplements and additional food he needs.  We ask that he be provided all medically necessary chronic care and psychiatric medication without interruption pursuant to the requirements of the *Parsons* stipulation.

---

[7] This same day Mr. ████████ was sent to West Valley Hospital for an emergency blood transfusion because his iron levels were below the lower panic level.  (ADC091897-91902).

[8] PM # 94 (Mental Health # 22 on CGARS) requires all prisoners on suicide or mental health watch be seen daily by a licensed mental health clinician, and by a registered nurse on weekends and holidays.

[9] PM # 92 (Mental Health # 20 on CGARS) requires MH-3 and above prisoners housed in maximum custody units be seen by a mental health clinician for a 1:1 or group session a minimum of every 30 days.  PM # 93 (Mental Health # 21 on CGARS) requires mental health staff (not to include LPNs) make weekly rounds on all MH-3 and above prisoners housed in maximum custody units.

[10] PM # 83 (Mental Health # 11 on CGARS) states that MH-3B prisoners prescribed psychotropic medications for depression shall be seen by a mental health provider a minimum of every 90 days.

Mr. Daniel Struck
RE: Mr. ██████████
September 21, 2015
Page 5

We appreciate your prompt response, and ADC/Corizon's attention to this matter.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:  Mr. ████████ (w/o enclosures)



*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

VIA EMAIL ONLY

September 22, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

   RE: *Parsons v. Ryan*, 2:12-CV-00601
   ADC Prisoner in Need of Immediate Medical Care
   ███████████████

Dear Mr. Struck,

  I write regarding a prisoner in need of immediate medical care. Mr. ██████ has a history of cancer, has not received the medically necessary follow up and monitoring, and now has a large mass in his abdomen and troubling gastrointestinal symptoms.

  In 2007, while in the community, he was treated for bladder cancer. He is supposed to see a urologist and have a MRI every six months to monitor if the cancer has recurred. He reports, and his medical record appears to confirm, that he has not had a MRI since 12/7/11 when he was hospitalized. He also has not seen a urologist in over a year: an appointment on 10/28/14 was cancelled because he had not had the necessary pre-appointment prep work done; and a new referral requested on 12/12/14 was cancelled on 1/8/15 without explanation.

  He also reports that at least since May 2015, he has had a big lump the size of a grapefruit below his ribs on the top right side of his abdomen. He has filed numerous HNRs because around the same time he started being severely constipated. Mr. ██████ reports being constipated for weeks on end, and unable to eat much food because he vomits it up due to being so backed up. He thinks the lump might be a bowel obstruction because of his symptoms, but he said medical staff told him that given the location, it could also be his liver that is enlarged. Regardless of what it is, he reported that as of 9/3/15, no biopsy or imaging of the mass had been done, and he had not seen a gastrointestinal specialist.

  According to Mr. ██████ medical record, he was seen on nurse's line on 7/5/15, stating that he had not had a bowel movement since 6/13/15. He reports that he was given GoLytely,

*Board of Directors*
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

Mr. Daniel Struck
RE: Mr. ███████
September 22, 2015
Page 2

which normally is given to people prior to a colonoscopy.  He was referred to the provider on 7/7/15, but there are no SOAPE notes or documentation of any kind that he was actually seen that day.  He saw the provider on 8/12/15, reporting that he had not had a bowel movement for 19 days, and the provider documented Mr. █████ history of cancer and the fact that he hadn't had a MRI since December 2011.  Mr. █████ record also shows that a referral to a gastrointestinal specialist from 10/28/14 was cancelled without explanation.

We request that Mr. █████ be urgently referred for a biopsy and imaging of the large abdominal mass, and that the diagnostic results be reviewed promptly by his provider.  We ask that once the mass has been diagnosed, that he promptly be referred to all necessary specialists to address the problem.  We also request that he be referred urgently to the urologist and for a MRI, as medically indicated follow up treatment from his bladder cancer.  We request that he be provided all medically necessary treatment and medication without interruption pursuant to the requirements of the *Parsons* stipulation.  Thank you for your attention to this matter.

Sincerely yours,

/s/ *Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:   Mr. █████



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

BY EMAIL ONLY

September 23, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

RE:   *Parsons v. Ryan*, 2:12-CV-00601
      ADC Prisoner in Need of Immediate Medical Care
      ███████████████████   Florence - Central

Dear Mr. Struck:

Our office has been contacted regarding a class member who may be in need of immediate medical and dental care.

Mr. ████████ reports a history of diabetes and amputations of his lower extremeties. Mr. ████████ indicates that earlier this year he developed a major infection in his left big toe after he was issued improperly fitting orthopedic shoes. As a result of this infection, Mr. ████████ reports that he had his left foot and lower leg amputated in early July. Upon his return to the Florence infirmary, his wound became infected and he was subsequently diagnosed with gangrene. He returned to the hospital and had another amputation, removing an additional portion of his lower left leg. Shortly following the second amputation, Mr. ████████ continued to have the infection. Approximately a month after his first surgery, he returned to the hospital for the third time and underwent an above-the-knee amputation on his left leg. Mr. ████████ states he has had inadequate pain management following the above-the-knee amputation, including only being given medication (Tylenol) that he is allergic to.

Following the above-the-knee amputation, Mr. ████████ states that he has not returned to the surgeon for follow-up, removal of the staples, or removal of valve / shunt that was placed in the wound. In addition, Mr. ████████ reports that the orthopedic surgeon recommended he start intensive physical therapy to relearn how to walk on crutches and eventually a prosthesis, and that his provider at Florence submitted specialty referral requests but as of 9/10/15, he had not seen a physical therapist. (Mr. ████████ does not know if the

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

Mr. Daniel Struck
Mr. ███████████
September 23, 2015
Page 2

speciality referrals have been approved by Corizon headquarters).  As a result, Mr. ███████ is wheelchair bound and experiences severely limited mobility and extreme difficulty completing basic activities of daily living, including simply transferring from his wheelchair to his toilet.

We request that Mr. ███████ be referred urgently and seen by the orthopedic surgeon for all follow-up treatment.  We also request that the referrals for physical therapy be reviewed by UM, if not already done so, and scheduled urgently based on Mr. ███████ severe mobility challenges.  We request that he receive all necessary medical appliances, prosthetic, or mobility devices recommended by the physical therapist or the surgeon.  We ask that he be given all necessary medication, including antibiotics sufficient to ensure he does not have another infection, and pain medication for which he doesn't have an allergy.  Finally, we request that all specialists' recommendations are implemented in a timely manner pursuant to the requirements of the *Parsons v. Ryan* Stipulation.  Thank you for your attention to this matter.

Sincerely yours,

/s/ *Corene Kendrick*

Corene Kendrick
Staff Attorney

cc:   Mr. ███████

2



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Warren George
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

BY EMAIL ONLY

September 23, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

  RE: Parsons v. Ryan, 2:12-CV-00601
     ADC Prisoner in Need of Immediate Medical Care
     ██████████████ Lewis-Buckley

Dear Mr. Struck:

  I write regarding an ADC prisoner in immediate need of medical care.  Mr. ██████ only recently started treatment for prostate cancer that was diagnosed almost a year ago, and it appears that the cancer may have metastasized during the delays in treatment.

  Mr. ██████ was diagnosed with prostate cancer in October 2014 while he was housed at the Red Rock facility.  He reports that he was transferred to Lewis in early 2015 in part to receive medical treatment.  He reports that he began filing multiple HNRs regarding difficulty urinating and asking when he would receive cancer treatment.  He reports that he was told he would be seen on nurse's line and scheduled to see the provider.

  According to his medical record, on 3/2/15 Dr. Malachinski made an urgent consult request for urology, noting that Mr. ██████ was diagnosed with prostate cancer on October 14, 2014, but "no f/u yet."  Despite the notation that Mr. ██████ had not been treated for cancer for five months, this referral request was denied two days later by Dr. Arnold at Utilization Management (UM).  Dr. Arnold's denial suggested an alternate treatment plan of only PSA tests and prostate exam every six months, and if Mr. ██████ situation were "more complicated please explain and resubmit."  The next day, March 5, Mr. ██████ PSA level was tested and found to be 17.2 ng/ML.

  On 3/12/15, Dr. Malachinski made an urgent referral request for oncology and provided more information to UM about the urology request, writing "PT never had follow up after

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

biopsy and diagnosis. This is first f/u." This urology request was subsequently cancelled without explanation.[1]  Mr. ███████ was not seen by the oncologist until 6/16/15.

On 3/19/15 Dr. Malachinski made a second urgent request for urology and a request for a bone scan.  This urology request was authorized, but was then was listed as cancelled on May 22.[2]  It is unclear from his medical record if Mr. ███████ has ever seen the urologist; he reports that to his knowledge, he has not seen one.  The bone scan was completed on May 13, and according to Mr. ███████ medical record, at that time his PSA level had increased to 18.6 ng/ML.

On May 18, the provider requested an urgent radiology consult.  Mr. ███████ was not seen by the radiologist until almost three months later, on August 13, 2015.[3]

On June 16, Mr. ███████ was finally seen by the oncologist Dr. Rakkar at Palo Verde Cancer Center, in response to the March 12 urgent request.[4]  Dr. Rakkar recommended surgery, radiation, and six months of chemotherapy (two months hormonal treatment to start, then two months hormonal + intensity modulated radiation therapy, and then two months hormonal).  Dr. Rakkar prescribed 50 mg. of Casodex (an androgen receptor inhibitor) and a six month chemotherapy injection.  Dr. Rakkar's June 16 report also requested that Mr. ███████ return to Palo Verde within two months, which as of 9/3/15 had not happened.

At the August 13 radiology appointment at Arizona Tech Radiology, the radiologist found suspicious masses on Mr. ███████ lungs, a suspicious 13 mm. mass on his adrenal gland, numerous abnormal lymph nodes in his abdomen (the largest 19 x 14 mm), and he had an enlarged spleen.  The radiologist recommended further PT scans to determine the extent of these suspicious masses, but his medical records do not show that a referral for the PT scans had been made, or the PT scan done, as of 9/3/15.

Mr. ███████ received chemo and radiation on August 25, and there is an entry for a chronic care appointment on August 31 with Dr. Malanchinski, but there are no SOAPE notes or other evidence he was actually examined and seen by the provider, the only documented observations from that day are his vitals that were taken by the nurse.

---

[1] The *Parsons v. Ryan* Stipulation's Performance Measure (hereinafter "PM")  # 48 (Specialty Care # 1 on CGARs) requires that documentation, including the reasons for the denial of the request for specialty care, be documented in the patient's medical record.

[2] *Id.*

[3] PM # 50 (Specialty Care # 3 on CGARs) requires that urgent specialty consultations be scheduled and completed within 30 days of the provider's request.

[4] *Id.*

Mr. Daniel Struck

Re: █████████████████

Sept. 23, 2015

Page 2

Mr. ████████ reports that in the past year he lost 30 pounds, and he is having the side effect of vomiting from the chemo.  He has asked to be on a wasting diet, but it either has not been prescribed, or was prescribed and is not being provided [5]

We request that Mr. ████████ urgently be provided the PT scans recommended by the radiologist to determine if the suspicious masses on his lungs, adrenal gland, and lymph nodes are cancerous.  We request that he be provided all biopsies and other diagnostic tests in a timely manner.  We ask that he be seen by the oncologist for the requested follow-up and to determine if the current prostate cancer treatment plan needs to be adjusted if the cancer has spread.  We ask that he be provided all necessary medication, including anti-nausea medication, and a wasting diet.  We request that all specialty referrals be reviewed and completed without delay, and that the specialists' recommendations be reviewed and implemented promptly.  We ask that Mr. ████████ be educated about his diseases and the treatment plans.  We ask that he be provided all medically necessary specialty care without interruption pursuant to the requirements of the *Parsons* stipulation.  Thank you for your attention to this matter.

Sincerely,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:    Counsel of Record
       Mr. ████████

---

[5] PM # 71 (Medical Diets # 1 on CGARS) requires that inmates with diagnosed and documented diseases or conditions that necessitate a special diet will be provided that diet.



PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Warren George
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

BY EMAIL ONLY

September 23, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

  RE: Parsons v. Ryan, 2:12-CV-00601
     ADC Prisoner in Need of Immediate Medical/Dental Care
     ██████████████ Lewis – Rast MDU

Dear Mr. Struck:

  Our office has been contacted regarding an ADC prisoner in immediate need of medical and/or dental care for a serious health condition.  This prisoner also alleges that he has been improperly housed out of level in the Rast MDU isolation unit for eight weeks not due to any conduct on his part, but because of a lack of infirmary bed space at the Lewis prison.

  On July 8, Mr. ██████ while housed on the Rast close yard, was elbowed in the face during a basketball game.  According to his medical records, he was seen that day by the dentist Dr. Pond, who diagnosed a mandible fracture and made an emergency request for offsite transport for emergency oral surgery.  However, Mr. ██████ was not taken to an oral surgeon until July 14.  In the intervening six days, he reports that he was placed in a mental health suicide watch cell at the MDU (3-A-6) pending the surgery.  He reports that during that time, he was treated as if he was suicidal, was denied hygiene items and other privileges he had while on the close yard, and subjected to repeated searches.

  After his surgery to wire his jaw shut, the oral surgeon wrote in the notes that "it is critical the patient receive amoxicillin 500 mg TID [three times a day] x 14 d" but Mr. ██████ reports that he was not provided the antibiotics, and on 7/17 he was sent out on an emergency transport for an infection of the surgery site.  Upon his return from the 7/17 hospital trip, Corizon staff had to go to a CVS to get his antibiotics.  Mr. ██████ reports that he was again put in mental health watch cells between 7/14 and 7/17, and for several days after his 7/17 return. He was then moved to MDU 4-C, where he remains.  He states that he was told that he has to be housed in the Rast MDU despite being custody level 4/3, because there are no available beds in the L-11 infirmary for him to recover until his jaw is unwired.  Mr. ██████ reports he has lost

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

weight, because he is consuming only two cartons of milk and mashed potatoes per day, along with chicken broth and jello powder.

      We request that Mr. ██████ immediately be moved out of the isolation unit into an infirmary or other setting appropriate for his custody level and health care needs, and that he be evaluated by mental health staff in light of his extended time in isolation.  We request that he be provided all necessary medication and be seen by the timetable requested by the oral surgeon for future treatment.  We request that all specialist recommendations are reviewed, approved, and implemented in a timely manner by Mr. ████████ dentist.  Thank you for your attention to this matter.

                Sincerely,

                */s/ Corene Kendrick*

                Corene Kendrick

cc:      Counsel of Record
        Mr. ██████



# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

BY EMAIL ONLY

September 25, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

      RE:    Parsons v. Ryan, 2:12-CV-00601
            ADC Prisoner in Need of Immediate Medical Care
            ███████ ███████, Lewis-Buckley

Dear Mr. Struck:

      I write regarding an ADC prisoner in immediate need of medical care.  Mr. █████ broke his clavicle bone on his right shoulder on August 7, 2014, when he fell off of his top bunk and hit a locker.  It took 11 months before Mr. █████ was seen by an orthopedist, and the orthopedist's treatment recommendations have not been implemented.

      According to Mr. █████ he had his collarbone and shoulder X-rayed approximately three days after his injury, and the X-ray showed that the clavicle was broken.  He was told that he would see the provider within three days, but he reports that did not occur.  We also could not find records in his medical file showing such an encounter occurred.  Mr. █████ filed HNRs (enclosed) on September 3, 16, 20, and 22, 2014 asking to be treated for the broken shoulder, and reporting that he had filed HNRs in August as well.  He either received no response, or a response stating "You will be scheduled."[1]  The time to receive and respond to these various HNRs ranged from eight to almost 20 days.[2]  He filed a HNR on 10/14/14, and he reports he was finally seen and told that he would be referred to an orthopedic surgeon.  He also filed HNRs on 1/27/15 and 2/4/15 and received no response.

---

    [1] *Parsons v. Ryan* Stipulation Performance Measure ("PM") # 37 (Access to Care # 2 on CGARS) requires that prisoners be seen by a RN within 24 hours after a HNR is received.  PM # 39 (Access to Care # 4) requires that routine provider referrals will be seen within 14 days of the referral.

    [2] PM # 36 (Access to Care # 1) requires a LPN or RN screen HNRs within 24 hours of receipt.

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

Mr. Daniel Struck

Re: Mr. ████████

Sept. 25, 2015

Page 2

Mr. ████████ filed the enclosed informal complaint on October 15, 2014 his shoulder not being treated.  In a January 12, 2015 response, his CO-III told him that there still was no response from Medical on the issue and "please feel free to go [to] the next level."  Mr. ████████ filed a grievance on 2/4/15, which apparently was forwarded to Corizon by the ADC grievance coordinator.  The Corizon grievance coordinator rejected the grievance because it had not been assigned a case number, a task that apparently is done by the ADC grievance coordinator.

He reports that in March, his CO-III was so disturbed by the ongoing visible injury, that the CO-III called medical on 3/16/15 and asked that he be seen, and was told Mr. ████████ was scheduled (see grievance response).  I observed Mr. ████████ on September 2, 2015 and noted that his right collarbone visibly sticks up higher than his left, and he demonstrated for me that he has an extremely limited of range of rotation of his right arm, including moving it in a forward flexion, in moving his arm in an abduction, or internal and external rotations.  He is right handed and he reports that the inability to move his arm is affecting his ability to perform activities of daily living, including writing, dressing, and eating.

His record shows that orthopedics consult was finally requested on 5/21/15, and he was seen on 7/6/15 (11 months after the accident) by Dr. Aschenbrener at Banner Hospital.  The orthopedist diagnosed a scapula fracture that had healed broken and crooked, and adhesive capsulitis (more commonly known as "frozen shoulder").  The orthopedic report (which was received by Corizon on 7/7 but not reviewed until 7/21/15)[3] recommended physical therapy and regular cortisteroid injections, but neither had been requested as of the 9/2/15 review of file, and Mr. ████████ reports he has not been told of a request for these specialty services.

We request that Mr. ████████ be referred and seen promptly and regularly by a physical therapist to develop and implement a treatment plan that will help him in regaining strength and range of motion in his right arm and shoulder, and in treating his frozen shoulder.  We request that he be provided regular cortisteroid injections and all other necessary medications and treatments for his frozen shoulder.  We ask that Mr. ████████ be educated of his treatment plan.  Thank you for your attention to this matter.

Sincerely,

/s/ Corene Kendrick

Corene Kendrick, Staff Attorney

cc:   Mr. ████████

---

[3] PM # 52 (Specialty Care # 5) requires that specialty reports be reviewed and acted on by a provider within 7 calendar days of receiving the report.



PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

BY EMAIL ONLY

October 12, 2015

Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226-2473
BY EMAIL: dstruck@swlfirm.com

> RE:   Parsons v. Ryan, 2:12-CV-00601
>        ADC Prisoner in Need of Immediate Medical Care
>        ██████████████          Lewis-Buckley

Dear Mr. Struck:

I write regarding an ADC prisoner in immediate need of medical care.

Mr. ███████ has stage IV kidney failure and he has waited for two months to have a port installed so that he can begin dialysis. Mr. ███████ also has insulin-dependent diabetes, which further compromises his kidneys.

Mr. ███████ was sent to the hospital twice in August due to kidney failure, fluid retention, and fatigue. On or around August 21, Mr. ███████ finally saw an outside nephrologist, Dr. Masute, who said that his kidney failure was acute and it was critical that he immediately begin dialysis. According to his medical record, Mr. ███████ saw the Lewis Medical Director Dr. Malachinski on September 1 for a follow up on the specialist appointment. On that date, Dr. Malachinski submitted urgent requests to Corizon Utilization Management for vascular surgery and a Doppler procedure so that he can have the port installed.

Mr. ███████ reports that as of last week, he still has not seen the surgeon to have the port installed, and thus he obviously has not started dialysis yet.[1] He reports worsening symptoms and complications.

---

[1] *Parsons v. Ryan* Stipulation Performance Measure # 50 (Specialty Care # 3) requires urgent specialty consultations and diagnostic services be scheduled and completed within 30 days of the provider's request for the consultation.

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

Mr. Daniel Struck

Re: Mr. ████████

Oct. 12, 2015
Page 2

We ask that Mr. ████████ be seen immediately by the vascular surgeon and have the dialysis port installed.  We ask that he receive all dialysis with the frequency and duration recommended by the nephrologist.  We request that he be provided all necessary medications and accommodations to assist him with the side effects of dialysis. Thank you for your attention to this matter.

Sincerely,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:   Mr. ████████
      Counsel of Record

# Appendix D



| **VOLUME 4: MEDICAL SERVICES** | Effective Date: 8/08 |
|---|---|
| **CHAPTER 12:  EMERGENCY MEDICAL RESPONSE** | Revision Date(s): 7/2/12 |
| **4.12.1: EMERGENCY MEDICAL RESPONSE SYSTEM POLICY** | Attachments: Yes ☐ No ☒ |

## I.  POLICY

California Correctional Health Care Servic    es (CCHCS), the California Departm    ent of Corrections and Rehabilitation (CDCR), and the Division of Correctional Health Care Services (DCHCS) shall ensure that m edically necessary em ergency medical response, treatm ent, and transportation is availab le, and prov ided twenty -four (24) hours per da y to p atient-inmates, employees, contract staff, volunteers, and visitors.

A.  It is the responsibility of CCHCS to plan, implement, and evaluate the Emergency Medical Response System (EMRS).  The organized pa    ttern of readiness and response services within CDCR is set f    orth in this polic    y.  The DCHCS will collabo    rate in the implementation of this policy by participating in drills and events.

B.  Basic Life Support (B LS) and Advanced Card iac Life Su pport (ACLS) treatm ent will be provided consistent with the A    merican  Heart Association (AH    A) guidelines for Cardiopulmonary Resuscitation (CP R) and Em ergency Card iovascular Care accord ing to each individual's training, certification, and authorized scope of practice.

C.  BLS and ACLS shall be documented on            the CDCR Form 7462, Cardiopulmonary Resuscitation Record.

D.  Trained CCHCS and CDCR staff   or contr actors  will pe rform the f unctions of First Aid, BLS, and ACLS.

E.  The standard guidelines for responding to emergencies are:

1.  The response tim e for BLS capable personnel (F irst Responders) shal l not exceed four (4) minutes (the First Responder Response Time).

2.  The response tim e for health care staff sha ll not exceed eigh t (8) m inutes (Health Care Staff Response Time).

## II.  PURPOSE

The purpose of this policy is to standardize:

A.  The structu re and organization of the CDCR   EMRS facilities, equipm ent, and pers onnel training.

B.  Procedures for emergency medical response.

C.  Mechanisms for docum    entation, data m    anagement,   medical oversight, and quality improvement activities.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

## III. DEFINITIONS

**Advanced Cardiac Life Support:** Em ergency care consisting of BLS procedures and definitive therapy inc luding the use of invasive proc edures, m edications, and m anual defibrillation.

**Allied Hea lth Care Staff** : Resp iratory The rapists, Ph ysical Ther apists, Occ upational Therapists, Radiology Technician s, Laboratory Technologists/Te chnicians and Phlebotom ists, and registered dieticians.

**Basic Life Support:** Emergency care performed to sustai n life that inc ludes CPR, autom ated external defibrillation, control of bleeding, treatment of shock, and stabilization of injuries and wounds.

**First Aid** : Em ergency care adm inistered to an inju red o r sick patien t-inmate before Health Care Staff is available.

**First Responder:** The f irst staf f m ember certif ied in BLS on the scene of a m edical emergency.

**First Responder Response Time:** The tim e interval starting at the p lacement of the first call for an emergency medical response and ending with the arrival of treati ng personnel trained in CPR at the scene of the incident.

**Health Care First Res ponder (HCFR):** The first health care s taff member certified in BLS to arrive at the scene of a medical emergency.

**Health Care Staff** : Physicians, Dentists, R egistered Nurses (RNs), Physician Assistants, Nurse Practitioners, Licensed Vocational Nurses, Certified Nursing Ass istants, Psychiatrists, Psychologists, Licensed Clinical Social W orkers (LCSWs), Licensed Psy chiatric Technicians, Registered Dental Assistants and Registered Dental Hygienists.

**Health Care Staff Response Time:** The time interval starting at the placement of the first call for an e mergency medical response and ending at the tim e a physician, m id-level provider, or RN has contact with the patient-inm ate, or communicates via radio or telephone with the HCFR.

**Medical Emergency** : A m edical em ergency as determ ined by m edical staff includes an y medical, mental health, or dental condition for which evaluation and treatment are necessary to prevent death, severe or perm anent disability , or to alleviate disa bling pain. A m edical emergency exists when there is a sudden m arked change in a patient-inmate's condition so that action is immediately necessary for the pres ervation of life or the prev ention of serious bodily harm to the patient-inmate or others.

**Triage and Treatment Area Registered Nurs e:** A RN assigned to work in the T riage and Treatment Area (TTA).

## IV. RESPONSIBILITIES

The Chief Executive Officer (CEO) and the Ward en at each institu tion are resp onsible for implementation of this policy.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

## V.  GENERAL REQUIREMENTS

### A.  System Organization and Management

1. Patient-inmates may request medical attention for urgent/emergent health care needs from any CDCR employee.  The employee shall, in all instances, notify health care staff.

2. Direct contact with the patient-inmate by an RN or physician, either in person or by telephone, shall be provided for all patient-inmates requesting urgent/emergent medical attention or who are referred by staff.  The RN or physician on duty shall choose one of the following options for evaluating the patient-inmate:

   a. Arrange to have the patient-inmate brought to the clinic.

   b. Arrange to have the patient-inmate brought to the TTA.

   c. Evaluate the patient-inmate in his/her housing unit or current location.

   d. Talk directly to the patient-inmate via telephone, complete a telephone triage, and give direction to the patient-inmate for subsequent care.

3. At least one RN shall be available on-site at each institution twenty-four (24) hours a day, seven (7) days a week for emergency health care. During those hours in which a physician is not on-site, the highest priority for the RN shall be emergency care. A Provider On-Call (POC) or Medical Officer of the Day (MOD) shall be available twenty-four (24) hours a day, seven (7) days a week to provide consultation and on-site care as necessary.

4. TTAs, General Acute Care Hospitals, standby licensed emergency departments, and all clinical areas shall be properly staffed and equipped.

5. Local Operating Procedures approved by the designated management team shall be in place for communications, response, evaluation, treatment, and transportation of patient-inmates, staff, and visitors.

6. Community Emergency Medical Services responders have ready entry and ready exit into and out of the institution through the vehicle sally port and throughout the facility in order to access the patient-inmate.

7. CCHCS shall maintain a system to manage and track physician and mid-level staff ACLS certification requirements.

### B.  Facilities and Equipment

1. Emergency equipment and supplies, emergency medical bags, oxygen and Automated External Defibrillators shall be maintained according to manufacturer's specifications and readily accessible to Health Care Staff in the TTA, all clinic areas, emergency medical response vehicles, and all other areas deemed appropriate by the CEO and the Warden in the institution.

2. The location of the equipment shall be clearly identified by signage.

3. The equipment will be maintained, appropriately secured, and inventoried each shift.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

### C.  Personnel:  Staffing and Training

1. The CEO is responsible for assuring a system  is in place to m anage and track clinical staff BLS certification requirements.

2. All correctional peace officers (c ustody) shall,  within  the previou s two years, h ave successfully com pleted a course in CPR    that is consistent with AHA guidelines. Custody staff shall m aintain a system to m anage and track correctional peace officers CPR requirements.

3. For Allied Health Car e Staff who have dir ect patient-inmate contact, BLS certification is recommended but not required.

4. All health c are staf f with the excep tion of dental staf f and LCSW s shall, with in the previous two years, h ave successfully completed a health care prov ider-level course in BLS that is consistent with the AHA guidelines. Psychologists who belong to the organized m edical staf f at their in stitutions and who have adm itting privileges must also complete this course.

5. Certification Requirements:

   a. Dentists, dental hygienists,    and dental assistants m ust provide proof of BLS certification which m eets the requ irements  of their respec tive  licensing Board or Committee.

   b. Psychologists who do not have adm itting privileges and LCSWs are not required to maintain BLS certification, although certification is recommended.

   c. All prim ary care physicians and m id-level providers are requi red to obtain and maintain ACLS certif ication and subm it proof  of certif ication/recertification to institutional management and the headquarters credentialing unit.

   d. Physicians and m id-level pr oviders who are currently cer tified in  ACLS are no t required to have BLS certification.

   e. Contract sp ecialty cons ultants who m ay perform  procedur es requiring procedural sedation at CDCR institutions sha ll, within the  last two years, have su ccessfully completed a course in BLS that is cons istent with the AHA guidelines.  Proof of certification/recertification m ust be rece ived by  the institu tional CEO and the headquarters credentialing unit prior to the    contract specialist's start date and/or prior to the expiration of the contract specialist's BLS certification.

6. ACLS certif ication and m aintenance of certif ication is des irable f or the  Supervisin g Registered Nurse in charge of the TTA, and TTA RNs.

7. Nursing staff, based on their level of licen sure and training, sha ll provide em ergency care only under patient-inmate specific indiv idual orders based on c linical indications. The orders may be given verbally or telephonically when the provider is not present.

8. Nursing staff, based on their level of li    censure and training, shall provide ACLS emergency care requiring cardiac rhythm  interpretation only under orders of a provider who is at the scene and directly assessing the patient-inmate.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

**D.** Institutions will conduct emergency medical response training drills and will provide access to skills training on an ongoing basis (refer to Inmate Medical Services Policies and Procedures, Volume 4, Chapter 12, Policy 4.12. 3 Emergency Medical Response Training Drill and Nursing Skills Lab policy).

## VI. REFERENCES

- California Code of Regulations, Title 15 § 3351 (a) and § 3354 (f)(1)
- California Code of Regulations, Title 16, §1016
- California Department of Corrections and Rehabilitation, Mental Health Services Delivery System Program Guide, 2009 Revision, Chapter 10, Suicide Prevention and Response
- California Department of Corrections and Rehabilitation, Emergency Alarm Response Plan
- Inmate Medical Services Policies and Procedures, Volume 4, Medical Services, Chapter 12, Policy 4.12.3, Emergency Medical Response Training Drill and Nursing Skills Lab Policy
- American Heart Association, Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiovascular Care
- 2005 Policy Memorandum entitled "Policy Regarding Peace Officer's Responsibility for Use of Cardio Pulmonary Resuscitation – Overall Directives"

## CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES

| | |
|---|---|
| **VOLUME 4: MEDICAL SERVICES** | Effective Date:  8/08 |
| **CHAPTER 12: EMERGENCY MEDICAL RESPONSE** | Revision Date(s): 7/2/12 |
| **4.12.2: EMERGENCY MEDICAL RESPONSE SYSTEM PROCEDURE** | Attachments: Yes ☐ No ☒ |

## I.  PROCEDURE OVERVIEW

Implementation of this  procedu re will en sure that m edically n ecessary m edical response, treatment, and transportation is available a  nd provided tw enty-four (24) hours per day to patient-inmates, employees, contract staff, volunteers, and visitors.

## II.  DEFINITIONS

**Definitive Care:**  The completion of appropriate care in a setting such as a hospital emergency department under the care of physician(s).

**First Responder (FR):**  The first staff m ember certified  in Basic Life Support (B LS) on the scene of a medical emergency.

**First Responder Response Time:**  The time interval starting at the placement of the first call for an emergency medical response and ending with  the arrival of treati ng personnel trained in cardiopulmonary resuscitation (CPR) at the scene of the incident.

**Health Care First Responder (HCFR):** The first health care staff member certified in BLS to arrive at the scene of a medical emergency.

**Health Care Staff Response Time:**  The time interval starting at the placement of the first call for an e mergency medical response and ending at  the tim e a physician, m id-level provider, or Registered Nurse (RN) has con  tact with the patien  t-inmate, or communicates via radio or telephone with the HCFR.

**Urgent Condition:**  Any medical condition that would not re sult in further disability or dea th if not trea ted immediately, but requires professional atten tion and has the pot ential to develo p such a threat if treatment is not provided within 24 hours.

**Urgent Health Care Request:**  An urgent health care request for imm ediate medical attention is based on the patient-inmate's or non-health care staff's belief that a medical condition, signs, or sym ptoms require imm ediate attention by st aff trained in  the eval uation and treatm ent of medical problems.

## III. GENERAL INSTRUCTIONS

- All staff has the authority to initiate a 9-1-1 call for Emergency Medical Services (EMS).

- Any individual who encounters a m  edical em ergency is responsible for summoning assistance by the m ost expeditious m eans av ailable, e.g., personal alarm  device, two-way radio, whistle, shouting, or telephone.

- Any patient-inm ate m ay request m edical attenti on for an urgent or emergent health care need from  any California Departm  ent of  Corrections and Rehabilitation (CDCR) or

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

California Correctional Health Servic es em ployee. The em ployee shall in all instances notify health care staff without unreasonable delay.

- To efficiently activate a community EMS respons e and notify appropriate facility staff of a medical emergency, Local Operating Procedures (LOP) shall identify a single point of contact for reporting m edical emergencies and estab lish the m echanism to contac t appropriate parties.

- Activation of the institu tional Em ergency Medical Response System and the community EMS system shall occur as neces sary to ensu re the m ost appropriate level of emergency medical care is available in the shortest time interval.

- Preservation of a crime scene shall not preclude or interfere with the delivery of emergency medical care. Preservation of life shall tak e precedence ov er the pres ervation of a crim e scene.

- Custody requirem ents shall not unreasonably delay m edical care during a m edical emergency unless the safety of staff, patie nt-inmates, or the ge neral public would be compromised.

- If a patient-inmate is unable to be resuscitated, the decision to terminate CPR shall be made by a physician or a mid-level provider, community EMS personnel, or by a RN if CPR wa s initiated for a patient-inm ate who exhibits cl ear signs of death as described in Section IV.B.4(a) below. Pronouncem ent of death s hall only be determ ined and m ade by a physician or a mid-level provider per LOP.

## IV. PROCEDURE

### A. Urgent Response, Treatment, and Transportation

1. Upon notification or discovery of an urgent h ealth care need, the staf f m ember shall call the designated clinical area.

2. The requesting staff mem ber shall provide a brief description of the nature of the request to the clinical staff.

3. Direct contact with the patient-inmate by licensed clinical staff shall occur in person or by phone, and be provided for all patient-inmates requesting urgent medical attention.

4. A RN, phys ician, or m id-level provider shall evaluate the patient-i nmate's request by one of the following options:

   a. Arrange to have the patient-inmate brought to the clinic.

   b. Arrange to have the patient-inm ate brought to the Triage and Treatm ent Area (TTA).

   c. Evaluate the patient-inmate in his/her housing unit or current location.

   d. Talk directly to the patient-inm ate via telephone, and th oroughly docum ent the encounter on a CDCR Form 7230, Interdisciplinary Progress Notes.

5. The licensed clin ical staff m embers shall document the evaluation in the Unit Hea lth Record (UHR) using an appropriate form. Documentation of the encounter must clearly state the disposition and the rationale for the disposition decision.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

6. The RN, physician, or mid-level provider may direct other licensed staff to obtain vital signs and other clinical data and report the information to them.

7. All urgent encounters resolved in the yard or yard clinic after hours shall be documented on CDCR Form 7230, Interdisciplinary Progress Notes, and discussed by the Primary Care Team the following business day.

8. All dispositions for urgent conditions shall be made at the RN level of licensure or higher.

**B. Emergency Medical Response**

1. A FR shall evaluate the situation and initiate appropriate First Aid and/or BLS measures, including establishing airway, breathing, circulation, controlling bleeding, and administering CPR. The FR shall also:

   a. Briefly evaluate the patient-inmate and situation, then immediately notify health care staff of a possible medical emergency, and summon the appropriate level of assistance.

   b. Inform the health care staff of the general nature of the emergency including the general status of the patient-inmate. This may include whether the patient-inmate is conscious, breathing, bleeding, or other observable patient-inmate conditions and complaints.

   c. Immediately initiate CPR if appropriate.

   d. Initiate community EMS activation if necessary.

   If CPR is not initiated due to the condition of the patient-inmate, the reason(s) must be clearly documented.

2. Custody Protocol

   a. In medical emergencies, the primary objective is to preserve life. All peace officers who respond to a medical emergency shall provide immediate life support until medical staff arrives to continue life support measures. All peace officers must carry a personal CPR mouth shield at all times.

   b. The peace officer must evaluate and ensure it is reasonably safe to perform life support by effecting the following actions:

      1) Sound an alarm (a personal alarm or, if one is not issued, an alarm based on the LOP must be used) to summon necessary personnel and/or additional custody personnel.

      2) Determine and respond appropriately to any risk of exposure to blood borne pathogens by adhering to standard precautions.

      3) Determine, isolate, contain, and control the emergency and significant security threats to self or others including any circumstances causing harm to the involved patient-inmate.

      4) Initiate life saving measures consistent with training.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

    c.  The responding peace officer will document on CDCR Form 837, Crime/Incident Report, the decisions made regarding immediate life support and actions taken or not taken (Section IV.B.4.(a) below), including cases where life support is not initiated consistent with training and/or situations which pose a significant threat to the officer or others.

3.  RN/Licensed Vocational Nurse (LVN)/Licensed Psychiatric Technician (PT) shall:

    a.  Respond as quickly as conditions permit to the scene of the medical emergency with an emergency medical response bag and Automated External Defibrillator (AED), and initiate and/or assist with CPR if indicated.

    b.  Make an initial assessment of the situation and determine whether a medical emergency is present.

    c.  Notify the TTA with relevant clinical information within eight (8) minutes of the initial call for an emergency medical response if an RN is not already at the patient-inmate location.

In all cases, a RN or higher level of licensure shall be responsible for determining the disposition of the patient-inmate and communicating this information to the HCFR either in person or via radio/telephone.

The HCFR shall initiate community EMS activation if needed and not already completed by the FR.

4.  The HCFR shall begin appropriate medical treatment and assume responsibility for directing any medical care already in progress.

    a.  The HCFR shall determine if CPR is appropriate and continue CPR in the absence of:

      1)  Rigor mortis

      2)  Dependent lividity

      3)  Tissue decomposition

      4)  Decapitation

      5)  Incineration

If one or more of the above signs is present, then the HCFR will determine the patient-inmate to be deceased. The official pronouncement of death is the responsibility of the physician or mid-level provider per LOP.

    b.  CDCR Form 7462, Cardiopulmonary Resuscitation Record:

      1)  The CDCR Form 7462, Cardiopulmonary Resuscitation Record, shall be maintained on the emergency/crash cart for immediate access, and be completed by a RN or designee during a respiratory and/or cardiac arrest event.

      2)  All drugs administered during the respiratory and/or cardiac arrest event shall be read back and documented by the recorder, in the spaces provided on CDCR Form 7462, Cardiopulmonary Resuscitation Record, at the time of administration.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

3) All othe r re suscitative m easures shall b e read back and docum ented in the spaces provided on CDCR For m 7462, Card iopulmonary Resuscitation Record as they occur.

4) Names of the team members involved in the code shall be docum ented in the space provided. Sections of CDCR Form 7462, Cardiopulm onary Resuscitation Record that are not ap plicable to a sp ecific p atient-inmate shall be m arked "*N/A*."

5) All team members involved in the code , e.g., Physician, RN, LVN, must sign CDCR For m 7462, Cardiopulm onary Resuscitation Record, next to their name under the "Team Member" column.

c. Once started, CPR shall continue until:

1) Resuscitative efforts are transferred to a rescuer of equal or higher level of training.

2) The patient-inm ate is determ ined by a physician or m id-level provider to be deceased.

3) Effective spontaneous circulation and ventilation have been restored.

4) Emergency responders are unable to conti nue because of exhaustion or safety and security of the rescuer or others is jeopardized.

5) A written, v alid Do Not Resuscitate (DNR) order is p resented. If there is any suspicion that a patient-inm ate's cardiopulmonary arrest is not part of a natural or expected death, e.g., the patient-inmate's condition is a result of an attempted suicide, resuscitation efforts shall be continued regardless of the ex istence of a DNR, Physician's Orders for Life Sustaining Treatment, or Advance Directive to the contrary, and resuscitative effo rts shall be commenced and continued until other indications to cease are present.

6) RN determines that obvious signs of death are present (Section IV.B.4(a) above) and may direct that CPR be discontinued.

**C. Definitive Care and Patient-Inmate Transportation**

1. Based on the patient-inm ate's clinical condition and emergency situation, the RN and the Primary Care Provider shall be responsible for:

a. The continu ations of medical treatm ent until community EMS responders arrive and assume care and transport the patient-inmate.

b. Directing the transpor tation of the patien t-inmate to the nea rest site equ ipped and staffed for definitive care.

c. Continuing treatm ent on locat ion and directing EMS personnel to the scene, if clinically appropriate.

2. Transportation Requirements

a. Patient-inmates shall only assist with transportation if they are part of the fire crew.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

    b.  CDCR Form 7252, Request for A uthorization of Te mporary Removal for Medical Treatment, will be initiated by health care staff and given to the designated custody representative, e.g., Associate Warden of Health Care, Watch Commander, for final completion and approval. After the form is completed it is forwarded to the custody transportation team.

    c.  The tr ansport of a pa tient-inmate via code th ree (3) ambulance shall no t b e unnecessarily delayed in order to co mplete the CDCR Form 7252, Request for Authorization of Te mporary Rem oval for Medical Treatm ent, or to obtain other approvals from custody staff.

    d.  EMS personnel will transport the patient-inmate to a community emergency facility according to local EMS agency policies and procedures.

3.  Notification

    a.  During regular business hours (Monday thr ough Friday) the TTA RN shall notify the Chief Medica l Ex ecutive (C ME) or designee and TTA Supervising RN or designee of the m edical emergency transport and the circumstances of the transport as soon as possible. The Chief of Mental Health shall be notif ied of all suicides, suicide attempts, and possible overdoses that require medical emergency transport.

    b.  During non-business hours on evenings, ni ghts, weekends, and holidays the TTA RN shall notify the institution Medical Officer of the Day (MOD) or Physician -On-Call (POC) as soon as possible to infor m him or her of the patient-inmate status and transport decision. The MOD or POC shall notify the CME or designee by the next business day.

    c.  For patien t-inmates tra nsferred to a comm unity em ergency f acility, the TTA provider or RN shall contact the receivin g facility and provide a report, including available clinical information.

## D. Documentation

1.  General Requirements

    a.  The RN wil l complete a CDCR For m 7219, Medical Report of Injury or Unusual Occurrence, for all work-related injuries or per custody requirements.

    b.  The HCFR shall docum ent his/her findings and interventions on the CDCR For m 7463, First Medical Responder – Data Collection Tool and sign this form.

    c.  In the event of a patient-inm ate death and if CPR is not initiated by non-health care staff, then non-health care staff w ill docum ent the reason(s ) on CDCR 837-A-1, Crime/Incident Report Supplement.

    d.  The use of an AED will be docum ented by a he alth care staff member. If the AED has download capability, the electronic info rmation r ecord shall be d ownloaded, printed, and added to the patient-inmates' UHR.

    e.  Notice of discharge of an AED shall be reported to the local county EMS utilizing the forms provided by that entity.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

    f.   Documentation of any additional care a nd treatm ent provided by other clinical responders at the scene shall be completed on a CDCR Form 7230, Interdisciplinary Progress Notes.

    g.   The emergency medical response docum entation shall be signed, dated, and tim ed. All documentation shall be deliver ed to the TTA RN imm ediately at th e time the patient-inmate arrives in the TTA or as s oon as possible if the patient-inm ate was transferred directly to a community emergency department.

    h.   The TTA RN shall contact th e psychiatrist on duty rega rding patient-inmates who present with self-inflicted injuries.

2.   **TTA Documentation Requirements**

    a.   A TTA Log shall be maintained in the TTA at each institution.

    b.   Care and treatm ent shall be docum ented on the CDCR Form 7464, Triage and Treatment Services Flow Sheet.

    c.   BLS and Advanced Cardiac Life Suppor t (A CLS) shall be docum ented on the CDCR Form 7462, Cardiopulmonary Resuscitation Record.

    d.   Care delivered accordin g to RN protocol s shall be docum ented on the appropria te RN protocol forms.

    e.   On arrival at th e TTA, the RN shall rem ain with the patient-inm ate and continue monitoring the patient-inmate's status until any r esuscitative efforts are terminated, or until em ergency medical service pers onnel assume patient-inmate care.  During this time, the RN shall record the following:

        1)   Patient-inmate identif ication data ( CDCR number, or, if unavailable, other identifying data).

        2)   Description of initial events and patie nt-inmate presen tation (patient-inm ate location, position, and witness description of events).

        3)   Times various treatments and procedures are rendered.

        4)   Name and title of the RN , nam e and title of the person to whom the patient-inmate is transferred, the date and time of the transfer, and the RN's signature.

    f.   TTA staff s hall attach all relevant docu mentation to the CDCR For m 7464, Triage and Treatment Services Flow Sheet, for inclusion in the patient-inmate's UHR.

3.   **Transport Documentation Requirements**

    a.   Copies of the CDCR Form 7464, Triage and Treatm ent Services F low Sheet, CDCR For m 7462, Cardiopulm onary Resuscit ation Record, if applicable, and all attachments shall be provided to the emergency medical service transport staff if the patient-inmate is sent out of the institution.

    b.   CDCR Form 7252, Request for A uthorization of Te mporary Removal for Medical Treatment.

    c.   Sally por t of ficers are to m aintain a sta ndardized log of all em ergency vehicle traffic entrances and exits, including times.

# EXHIBIT 4


# FILED UNDER SEAL



PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

BY EMAIL ONLY


December 11, 2015


Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, AZ  85226-2473

      Re:  *Parsons v. Ryan*, 2:12-CV-00601
      ADC Prisoners in Need of Immediate Care

Dear Mr. Struck:

    We write following the parties' visit to ASPC-Tucson on December 2-4, 2015 to notify you of patients who may be in need of immediate health care.  First, during the course of our visit, Dr. Todd Wilcox identified a number of prisoners whom he considered at significant risk of imminent harm, permanent injury, or death unless they received prompt medical attention.  In most cases, Dr. Wilcox had the opportunity to both interview the patients and review their medical charts.  Dr. Wilcox provided the list below verbally to Kathy Campbell at the end of the visit, and we agreed to provide a written list as well (Section I).

    We have included an additional list in Section II of prisoners who likely also require health care for serious medical and/or mental health conditions, as identified by plaintiffs' counsel and/or Dr. Wilcox during the visit.  These patients were identified through interviews and/or chart reviews.  Section III lists patients we met who require access to physical therapy but have not received it.


## I.   <u>Patients Identified by Dr. Wilcox As Requiring Urgent Attention to Avoid Imminent Harm</u>

████████████████

- Dx: Polymyositis
- Age: 48
- Issue: ██████████ is receiving treatment for his polymyositis with interstitial lung disease, which renders him severely immune-compromised.  As a result, he is extremely susceptible to infection and, in the last year, nearly died on two occasions when he contracted pneumonia in April and again in August.  In both cases, medical staff was slow to recognize the severity of his symptoms.  Given his compromised immune system, he requires a treatment plan to

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

Mr. Daniel Struck
December 11, 2015
Page 2

manage his disease, and to ensure a rapid and appropriate response when he does contract an infection.



- Dx:  Inclusion Body Myositis
- Age: 45
- Issue: ████████ has been diagnosed with COPD, but his significant shortness of breath may be due instead to his Inclusion Body Myositis.  He needs to be worked up by a pulmonologist to determine whether he is receiving appropriate treatment for his lung weakness, and possibly to receive a CPAP.  Additionally, he is suffering progressive muscle weakness in his legs and is now able to walk only short distances.  Without physical therapy, he will lose the ability to walk all together.  He should be evaluated for physical therapy in the very near future.

  Finally, ████████ saw a neurologist on 4/16/14, who recommended he be provided, among other things, an elevated shower chair, a wedge pillow, medical shoes, a hospital bed and a wheelchair assessment.  He received none of these.  He is struggling to complete his ADL's. He should receive these accommodations, as recommended.

- Dx: Colovesicular Fistula, Short Bowel Syndrome
- Age: 43
- Issue: ████████ has a severe and painful fistula between his intestine and bladder requiring surgical repair.  As a result of the fistula, he experiences chronic infections because of the mixing of urine and fecal matter in his bladder and urethra.  He has been cleared for surgery by the cardiologist.  He needs to be referred to a colo-rectal surgeon and undergo the repair operation as soon as possible.

- Dx:  Astrocytoma
- Age: 31
- Issue: ████████ had surgery to remove a stage 2 astrocytoma (a type of brain cancer) approximately five years ago, prior to incarceration.  His neuro-oncologist opined that his cell type was prone to recurrence and to return as a malignant glioblastoma (aggressive stage 4 astrocytoma) and ordered follow up evaluations, including brain MRIs with contrast, every three to six months.  ████████ has not had an MRI since August, 2014, prior to his admission to ADC.  He reports that he had developed symptoms, including blurred vision, headaches and balance issues that are the same as those he suffered prior to his first brain surgery.  He has filed HNRs describing his symptoms and medical history to no avail.  He requires an MRI and a neurosurgery consult immediately.

- Dx:  Foot injury, sepsis
- Age:  65

Mr. Daniel Struck
December 11, 2015
Page 3

- Issue: ███████ suffered a foot injury which developed into sepsis in June, 2015. Since then, he has apparently been bedridden in the IPC in Rincon (HU9). His muscles have atrophied and contracted, and he has virtually no muscle mass remaining in his legs. He will require immediate and aggressive physical therapy if there is any chance for him to recover his ability to walk.

███████████

- Dx: Post-renal transplant, Blind
- Age: 78
- Issue: ███████, who underwent a kidney transplant in 2009, recently stopped taking his anti-rejection medications. At the time of his transplant, he reports that he was told that, over time, he might develop an allergy to his anti-rejection medications Prograf and Cellcept,. Starting about a year ago, he developed a severe rash over his whole body. He believes the rash has been caused by these medications so, after many months of unsuccessfully seeking treatment/diagnosis for the rash, he stopped taking the medications on 10/29/15. He says the rash has abated since then, though it is still visible. Without his anti-rejection medications, ███████ is at extreme risk of losing his kidney, and he requires a consult with a transplant specialist as soon as possible.

███████████

- Dx: Probable Crohn's Disease and Frank Rectal Bleeding
- Age: 31
- Issue: ███████ began having rectal bleeding in October, 2014. Initially, he was treated for hemorrhoids. He submitted several fecal samples, which were positive for blood. He has also been suffering difficulty urinating. He has been experiencing severe pain and, during the week of our visit, had sought care multiple times at the ambulatory clinic. He had received two Toradol injections, which are contraindicated for his condition and must not be continued. He requires consults with a gastroenterologist and a urologist as soon as possible.

███████████

- Dx: Elevated PSA's with hip pain
- Age: 65
- Issue: ███████ has had multiple elevated PSA's and reports sharp pain in his hip. Dr. Hurowitz, a telemed physician, ordered a prostate biopsy, a routine urology consult and an urgent MRI of the hip on 9/1/15. None had been done as of 12/4/15. He requires an immediate work-up for prostate cancer, including the biopsy.

███████████

- Dx: Testicular Cancer
- Age: 27
- Issue: ███████ treatment for cancer has been significantly delayed. He noticed testicular swelling in in July 2015. He saw a urologist in September, who suspected cancer and

Mr. Daniel Struck
December 11, 2015
Page 4

scheduled a surgery soon after. However, his surgery was delayed because he was not advised to refrain from eating the day of the surgery and, ultimately, he had surgery on 10/30/15. Although he has urgent referrals for a CT scan and a urology follow up, neither had been done as of 12/4/15. ████████ surgeon emphasized he needed a post-op appointment in two weeks from 10/30/15, with the CT scan results.  As of 12/4/15, he had not had the follow-up appointment.  It should be scheduled immediately.

████████ has apparently not been referred to an oncologist.  He requires an oncology appointment immediately to determine his need for chemo and/or radiation.  Testicular cancer is highly treatable, so long as treatment is provided timely.  If treatment is delayed, however, it is deadly.  (See ████████ at p. 8, below).

████████████

• Dx: Arm injury
• Age: 43
• Issue: ████████ recently injured his arm, and believes it is fractured.  Although his arm has apparently been wrapped, his chart contained no note regarding the injury and no x-ray report as of 12/4/15.  ████████ should undergo x-rays immediately.

████████████

• Dx: Metastatic Prostate CA
• Age: 66
• Issue: ████████ was initially urgently referred to an oncologist on 3/25/15.  He apparently saw the oncologist on 4/1/15, and the oncologist recommended diagnostic tests, but there is no consult report in the file.  On 9/29/15, he returned to the oncologist who noted that the tests had not been done.  He ordered more diagnostic tests, including an MRI.  These tests had not been done by 10/15/15 when he again returned to the oncologist.  He had a bone scan on 10/16/15, but the results were not satisfactory, and the scan must be redone.  The MRI was not ordered until 11/25/15.  It appears that, as of 12/4/15, the scan had not been redone. ████ ████ must have another bone scan, an MRI, and a follow up oncology appointment immediately. He may also require chemo and/or radiation.

## II.   <u>Patients Identified by Dr. Wilcox and/or Counsel Who Likely Require Attention</u>

████████████████

• Dx:  Epilepsy
• Age: 34
• Issue: ████████████ reports that since his arrival to ADC in early October, he has not received the correct combination of anti-seizure medications, and medications are not always delivered to him.  As a result, he is suffering 2-3 seizures per day, resulting in physical injury and memory loss.  He has filed multiple HNRs requesting to see a neurologist (his pre-incarceration neurologist was Dr. Connie Schusse at St. Joseph's in Phoenix).  When he was at Lewis prison, a request for neurology consult requested by Lewis NP Ende on 11/9 was

Mr. Daniel Struck
December 11, 2015
Page 5

submitted, but he was subsequently transferred to Tucson, and the consult has not been scheduled. ████████ suffered a seizure on 12/1/15, and NP Daniel Ross noted that ████████ had "missed several doses of lacomaside in the past three weeks, history of refractive seizures. Also not given Zovisamide few doses missed." NP Ross did not document any treatment plan or request for neurology consult; the only treatment plan was that staff "ensure no more missed doses."

- ████████ approved neurology consult must be scheduled immediately.

████████

- Issue: Possible kidney mass
- Age: 26
- Issue: ████████ reports that prior to coming to prison, he had an endoscopy for kidney stones. During that scope, the doctor thought ████████ might have a mass on his kidneys. ████████ reported this during intake into ADC and to medical staff in Yuma, who told him he would be scheduled for a CT scan. On October 13, 2015, NP Roberts noted that ████████ had a possible "kidney growth in 2014, never follow-up." [sic], so she put in a request for an outside radiology consult. This consult has yet to occur. ████████ needs to have his radiology consult scheduled immediately.

████████

- Dx: Congestive Heart Failure; hx of MI
- Age: 55
- Issue: ████████ arrived at Tucson from Yuma in October. While at Yuma, NP Ling submitted a request for specialty services on 9/24/15 for him to see a cardiologist for congestive heart failure, which was approved on 10/3. Another cardiology consult was submitted on 10/1, and approved on 11/10. These approvals were sent to the Yuma clinical coordinator for scheduling. ████████ was transferred from Yuma to Tucson Whetstone on 10/23. His record was reviewed by a Tucson LPN on 10/26, who did not note the approved specialty referral, or notify the Tucson clinical coordinator that the referral had been approved. There is no documentation that ████████ was seen by a provider for a physical exam after his transfer. He was seen on 11/19/15 by a psych associate because he was on mental health watch, and the psych associate noted that ████████ had not received his mental health or chronic care medications.[1]
- ████████ approved cardiology consult must be scheduled immediately.

---

[1] According to his medical record, ████████ was last seen by a psychiatrist on 10/1/15 at Yuma.

Mr. Daniel Struck
December 11, 2015
Page 6



- Age: 51
- Dx: HIV
- Issue: ▮▮▮▮▮▮ reports that an infectious disease consult was requested on 8/18/15 but he still hasn't been seen.  He has been suffering from pain in his abdomen and is experiencing bloating and fluid retention.  His HIV/AIDS meds were made DOT, which requires him to stand in pill line for hours, and as a result of being late to work because of the long pill line, he lost his job.  He needs his ID consult and to have his medications made KOP.

- Dx:  Decubitis ulcer, non-healing
- Age: 31
- Issue: ▮▮▮▮▮▮ developed a decubitis ulcer last year.  He was been treated with a wound vac, which apparently exposed a vein.  He requires a flap surgery to repair this injury, and reports that he has been told that several surgeons have declined to take his case.  In the meantime, he has been bedbound for many months.  He requires a surgical consult so that he can undergo this relatively straightforward surgery.

- Dx: Unknown
- Age: 17
- Issue:  He was seen by the psychiatrist on 8/17/15, and reported "feeling down" and difficulty sleeping.  The psychiatrist ordered follow-up with the psychiatrist in 90 days.  This did not occur, and ▮▮▮▮▮▮ still had not seen the psychiatrist when we reviewed his record on 12/2/15.  Please ensure that ▮▮▮▮▮▮ is promptly seen by the psychiatrist, as ordered by the psychiatrist on 8/17/15.

- Dx:  coccidioidomycosis (Valley Fever)
- Age: 61
- Issue: ▮▮▮▮▮▮ contracted cocci in the early '90s while incarcerated by ADC, for which he is prescribed fluconazole.  He reports that one of the side effects of the medication is that immediately upon taking it, especially on an empty stomach, he experiences severe stomach cramps and diarrhea.  These side effects were manageable when the medication was KOP, as he could control how and when he took it.  This summer the medication was inexplicably changed to watch-swallow, requiring him to stand in the pill line and take it on an empty stomach, far from bathroom facilities.  He has stopped taking the fluconazole because of these side effects, putting him at risk of a recurrence of the disease.  On two separate occasions the infectious disease specialist, Dr. Po, has recommended that the fluconazole be provided KOP as there is no reason for it to be watch swallow.  On 7/16/15, Dr. Po wrote that AZ DOC decided to make fluconazole DOT even though every other Pharmcorr state has the medication as KOP, and recommended ▮▮▮▮▮▮ get the medication KOP.  On 10/21/15, Dr. Po wrote



Mr. Daniel Struck
December 11, 2015
Page 7

- that it was unclear to him why an antifungal medication was DOT, and reiterated his recommendation that the medication be provided KOP.
- ▇▇▇▇▇ needs to have his fluconazole provided to him as KOP, so that he can manage the side effects.

▇▇▇▇▇▇▇▇

- Dx: HIV+
- Age: 35
- Issue: ▇▇▇▇▇ was last seen at the Infectious Disease Clinic in February, 2014. He was referred back to the clinic on 8/17/15, but has not yet had his appointment. He reported a two week lapse in his medications when he was sent to ad seg in October. He needs to have his ID consult scheduled expeditiously.

▇▇▇▇▇▇▇

- Dx: Arterial disease
- Age: 60
- Issue: ▇▇▇▇▇▇▇, a former smoker with arterial disease, noticed his foot was turning black last December. He was referred to a surgeon, whom he saw about a month later. The surgeon removed his leg, below the knee, on an emergent basis. Two days later, the surgeon determined he had to remove the knee as well. ▇▇▇▇▇▇ was told that he would be fitted for a prosthetic many months ago, but he has heard nothing further. He requires a referral to an orthotist.

▇▇▇▇▇▇▇

- Dx: Unaddressed abdominal mass
- Age: 37
- Issue: On April 5, 2015, Dawn Jones, LPN noted that ▇▇▇▇▇ needed a provider to examine a "lump in LLQ of abd." However, Ms. Jones did not schedule a provider appointment, and ▇▇▇▇▇ has not seen a provider regarding his abdominal mass. On September 24, 2015, ▇▇▇▇▇ was seen on a telemed appointment for chronic care. His abdominal mass was not addressed during this appointment. ▇▇▇▇▇ needs to see a provider immediately for an examination of his abdominal mass.

▇▇▇▇▇▇

- Dx: Enlarged Prostate
- Age: 44
- Issue: On June 3, 2015, ▇▇▇▇▇ was diagnosed with an enlarged prostate. He was started on tamsulosin, from which he experienced negative side effects. He was seen by Dr. Armenta on August 15, 2015 and she ordered a provider follow-up appointment in one month. ▇▇▇▇▇ has not been seen since August. ▇▇▇▇▇ needs to be scheduled for a provider follow-up appointment immediately.

Mr. Daniel Struck
December 11, 2015
Page 8

- Dx:  Hodgkins Lymphoma
- Age:  37
- Issue:  ▮▮▮▮▮ was diagnosed before coming to prison with Hodgkins Lymphoma.  He underwent chemotherapy and radiation and was in remission.  He is, however, supposed to have annual PET scans to ensure he remains in remission.  He was due for a PET scan in May 2015.  Since his admission to the Department of Corrections, he has yet to see a provider and has not yet had his PET scan.  This scan needs to be immediately scheduled.

- Dx: Terminal Cancer
- Age: 30
- Issue:  ▮▮▮▮▮ experienced extreme delays in detection and treatment of his testicular cancer that are set forth in Dr. Wilcox's fourth expert report, lodged in this action.  Since then, his cancer has spread to his internal organs and is now inoperable and untreatable.  He has been given less than a year to live.  He indicates that Dr. Goodman recently advised him she would sign off on compassionate release paperwork.  ▮▮▮▮▮ should be promptly processed for compassionate release.

- Dx:  Schizoaffective disorder, classified MH4 and SMI.
- Age:  41
- Issue:  On 11/24/15 the provider wrote:  "IM is floridly psychotic at present and in need of medication for safety and stabilization.  MH watch is certainly presently indicated."  The provider further noted: "Prognosis guarded.  F/U with psychiatry in 7 days, sooner PRN."  Despite the provider's order and ▮▮▮▮▮' gravely decompensated state, ▮▮▮▮▮ was not seen by psychiatry within 7 days, and indeed had not been seen by the time we reviewed his record on 12/4/15.  In addition, his watch check was impermissibly done by an RN on 11/26/15, and he had no watch checks at all on 11/28/15 or 11/29/15 (PM 94).  Please ensure that ▮▮▮▮▮ is immediately seen by psychiatry, as the provider ordered on 11/24/15.

- Dx:  Unknown
- Age:  17
- Issue:  ▮▮▮▮▮ is a native of Mexico and is not fluent in English.  Nevertheless, we saw multiple medical and mental health contacts in his file that contained no indication that interpretation had been provided as required by ¶ 14 of the Stipulation.  In particular, multiple mental health group notes indicate that ▮▮▮▮▮ was "attentive & gave input," despite the fact that these groups are presumably conducted in English.  Many of these notes contained the following identical comment:

Mr. Daniel Struck
December 11, 2015
Page 9

"The following comments were programmatically copied from the Incidental Comments section of this MH Group Counseling encounter on June 24 2015 10:03 am, and appended into the Objective Comments section by eOmis."

Please ensure that ███████████████ is henceforth provided language interpretation for all healthcare encounters as required by ¶ 14 of the Stipulation.

███████████████

- Dx: Severe Sleep Apnea, Type 2 Diabetes, Hypertension, Asthma
- Age: 43
- Issue: ███████ states he is waking up choking every night and requires a Bi-PAP.  He was referred for a sleep study on 5/15/15, and says that he was too ill to go to his consult, scheduled about three months ago.  (I found no documentation of any treatment refusals in his medical record.)  He submitted an HNR on 10/20/15 regarding his sleep issues.  NP Daye wrote on 10/22 that a sleep study referral had been submitted, but there was no referral other than that written 5/15/15 in his file, and ███████ is not included on the list of pending consult referrals provided by defendants on 12/2/15.  ███████ requires a sleep study, as recommended more than six months ago.

███████████████

- Dx:  Seizures
- Age:  57
- Issue: ███████ had a seizure while in his cell approximately one week ago.  He reports a previous history of seizures when he is given too much insulin for his diabetes.  He reports it took medical four hours to send a nurse in response to his seizure.  He has not yet seen a provider.  If he hasn't already been seen by a provider, ███████ needs to be scheduled immediately with a provider.

███████████████

- Dx: Squamous Cell CA, on both arms
- Age: 79
- Issue: ███████ had a 10/27/15 pathology report showing invasive well-differentiated squamous cell CA on both arms.  Although NP Daye reviewed the report on 10/29/15, and subsequently saw ███████ on 11/17 and 11/19, she has not discussed the results with him, and there is no treatment plan in the record.  ███████ requires a treatment plan for his cancer.

███████████████

- Dx: Heart Disease
- Age: 51
- Issue: ███████ suffered heart attacks in 2013 and 2014.  He reports he was placed on Plavix, but that he stopped receiving it in July, 2015, and that his multiple HNRs on the issue

Mr. Daniel Struck
December 11, 2015
Page 10

have been ignored.  He also states that he saw the cardiologist three months ago and was told he would return to the cardiologist two weeks later.  That appointment has not happened, and ██████ does not appear on the list of patients with pending specialty referrals produced to plaintiffs on 12/2/15. ██████ case must be reviewed to ensure that he receives his prescriptions and cardio follow-up.

██████

- Dx: Extreme Headaches
- Age:  35
- Approximately one year ago, ██████ reports he began experiencing severe headaches, when he had never had headaches before.  These headaches were often accompanied by chest pains. ██████ submitted an HNR and was twice put on the provider line, but his medical record contains no record of an appointment with a provider.  On July 29, 2014, he was scheduled for a sick call appointment with the nurse.  The entry for this appointment is blank in his record.  On November 11, 2014, Jennifer Slusser opened an entry for a sick call appointment under the musculoskeletal category but entered no subjective or objective notes.  On March 25, 2015, ██████ was again called to medical for a sick call appointment.  In this entry, Ms. Slusser noted that he was experiencing pain in his clavicle and indicated that he would be scheduled with the provider. ██████ has not yet seen the provider.  He needs to be immediately scheduled with the provider to address his ongoing headaches and chest pains.

██████

- Dx: Wasting, Hypertension
- Age: 62
- Issue: ██████ is 5'9" and reports his normal weight as 135-150.  Recently, he has had rapid unexplained weight loss, and now weighs 118.   He reports he was prescribed a "wasting" diet, but says that he receives it only intermittently.  It does not appear that his weight loss has been evaluated. ██████ must see a provider to work up his weight loss, and must be provided his wasting diet on a consistent basis.

██████

- Dx: Pressure Ulcer, Paraplegia, Neurogenic Bladder
- Age:41
- Issue: ██████ apparently suffers from pressure ulcers.  He is currently housed in the Manzanita Special Needs Unit.  We attempted to interview him about his condition, but it was not clear whether he could hear or understand us, and he did not appear to be able to talk.  We did not find anything in his record that would explain his apparent aphasia.  He should be worked up to have a comprehensive treatment plan to address his ulcers, bladder, apparent aphasia, as well as any other relevant ailments.

Mr. Daniel Struck
December 11, 2015
Page 11

## III.   Patients Identified by Dr. Wilcox Requiring Physical Therapy

███████████████

- Dx:  post-CVA
- Age: 45
- Issue:  ████████  suffered three strokes a year ago, and currently uses a wheelchair.  He received speech and physical therapy for about six months while in Rincon IPC.  Since transferring to Manzanita in July, he reports receiving no PT, although he has submitted several HNRs requesting it.  He saw a provider on 9/10/15 who wrote that ██████████ gait was "slow but steady" and noted to check the status of ████████ PT.  There are no further references to PT until two months later, on 11/17/15.  According to the record, it appears ████ ████████ referral is still pending UM approval.

███████████████

- Dx: Post-laminectomy Syndrome, Morbid obesity, Neuropathy
- Age: 25
- Issue:  ████████  suffered a slipped disc/pinched nerve, for which he had surgery.  He was discharged from the Lewis Health Unit to Tucson-Manzanita on 7/31/15, with a medical plan that indicated " needs PT and weight reduction." ████████  currently weighs about 320 lbs., uses a wheelchair and can walk only a short distance.  He says that he has sharp pains in his feet, and has skin breakdowns from sitting in his chair without a cushion.  ████████  should be evaluated by a physical therapist so that he can stop relying on the wheelchair, and should see a dietician for a dietary plan.

███████████████

- Dx: Post-CVA
- Age:  59
- Issue:  ████████████  suffered a stroke about a year ago.  He saw a physical therapist on 3/13/15 who noted he had left hemiparesis from his CVA and stated he should be seen on a weekly basis for ADL's, gait training and neuromuscular education.  When the PT was not scheduled, ████████████  submitted at least two HNRs, on 4/25/15 and 11/6/15 requesting the therapy, but it has not been scheduled.

Thank you for your attention to this matter.  We look forward to your response and ADC/Corizon's prompt attention to these patients' health care needs.

Sincerely yours,

/s/  Alison Hardy

Alison Hardy
Staff Attorney

Cc:  Counsel of Record

# EXHIBIT 5


# FILED UNDER SEAL



*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

BY EMAIL ONLY

December 18, 2015

Mr. Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, AZ  85226-2473

Re:  *Parsons v. Ryan*, 2:12-CV-00601
ADC Prisoners in Need of Immediate Medical, Dental, and/or Mental Health Care

Dear Counsel:

We write following the parties' visit to ASPC-Eyman on December 7-8, 2015 to notify you of patients who may be in need of immediate health care, as identified by plaintiffs' counsel and/or Dr. Stewart during the visit.  These patients were identified through interviews and/or chart reviews, and are in addition to the individuals who we brought to your attention during the tour and/or in individual letters sent in the past ten days.

**████████████████████, Meadows**
- Dx: dental issues
- Issue:  His gum line is fully exposed to the roots and bone on the lower jaw.  He was referred to the dentist on 8/10/15 but hasn't been seen yet.  His molars have fallen out.  He reports filing numerous dental HNRs and being told he's on the waiting list.  He also has metal in his upper jaw from repair after an attack, and the plates are painful and need evaluation.  He needs to be seen by a dentist immediately for evaluation and referral to an oral surgeon for repair of his gum line.

**███████████████, Meadows**
- Dx: Cerebral palsy, epilepsy, history of heart attacks
- Age: 58
- Issue: ████████ takes Dilantin and Phenobarbital for his seizures as well as nitroglycerin for his heart. However, his dosages were recently cut in half for all three of those medications. With a reduced dose of nitroglycerin, ████████ reports increased angina.

With regard to his seizure medication, ████████ reports that the Dilantin and Phenobarbital dosages were cut because his levels tested too high. However, he says this is because he never receives the medications at the proper time (with a twelve hour window between pills), meaning that his levels are sometimes too high and sometimes too low. On 12/1/15, the Dilantin was cut to 300 mg once per day and the Phenobarbital was cut to 120 mg once per day (both were previously provided twice per day). Since that time, ████████ reports that he is having more seizures,

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

Mr. Dan Struck et al
Re: Eyman Prisoners In Need of
Immediate Health Care
December 18, 2015
Page 2

often in his sleep. ████████ needs to be immediately seen by a provider to have his medication re-established and provided at the correct times.

**████████████████, Cook**
- Dx: Heart murmur, hx of heart attacks, tremors, diverticulitis, schizophrenia
- Age: 58
- Issue: ████████ has to use a wheelchair because of his heart condition, including a history of heart attacks. He also has tremors that according to his psychiatrist may be Parkinson's Disease, but ████████ believes are a side effect of the Lithium he takes for his mental health diagnosis. ████████ reports that he has lost close to 60 pounds in recent months.████████ was improperly prescribed high blood pressure medicine (altenol), which was causing dizziness and hypotension.

  His medical record shows that on 8/23/15, the provider submitted a request for gastrointestinal specialty appointment and colonoscopy due to the diverticulitis and weight loss. The request is still listed as submitted to Utilization Management, with no action taken. He was seen on 11/18/15 by a cardiologist regarding chest pains and dizziness. The cardiologist recommended the altenol be discontinued, and that he also be referred to a neurologist for evaluation of the tremors and the dizziness. NP McKaney reviewed the cardiology report on 11/20/15, discontinued the blood pressure medication, but did not submit a request for a neurology evaluation. ████████ needs to be scheduled for a colonoscopy and GI evaluation of his weight loss, and scheduled with a neurologist regarding his tremors and dizziness.

**████████████████████, SMU I**
- Age: 27
- Issue: On 12/8/15, Dr. Stewart evaluated ████████ and observed that he was experiencing severe auditory hallucinations and other psychotic symptoms that were causing him extreme distress. Furthermore, ████████ is receiving a 16 mg dose of Trilafon Qhs, an insignificant amount of antipsychotic medication.

  A review of his medical record revealed that during a previous incarceration he was prescribed two antipsychotic medications (Haldol and Geodon) to control his symptoms and it is unclear from ████████ medical record why he is not receiving these medications today. Dr. Stewart believes that ████████ is at risk of self-harm due to the severity of his untreated psychotic symptoms, and recommends that he be promptly placed into an area that will allow for increased observation and that he be reevaluated by a psychiatrist.

  Finally, we note that concerns about ████████ mental health condition and treatment were raised before. In his November 2013 Expert Report, Dr. Stewart referenced an incident where chemical agents were deployed against ████████ while he was on mental health watch for refusing to submit to a strip search. Dr. Stewart observed that ████████ was a seriously ill man and that the use of chemical agents in response to a psychotic break, or mental health crisis, would likely inflict serious and long-term psychiatric harm.

Case 2:12-cv-00601-ROS   Document 1561-2   Filed 05/02/16   Page 159 of 177

Mr. Dan Struck et al
Re: Eyman Prisoners In Need of
Immediate Health Care
December 18, 2015
Page 3

**██████████████   Eyman SMU-I**

- Dx:  kidney disease
- Age: 44
- ████████████ receives dialysis.  He reported that raw sewage was backing up into his cell.  He then suffered an e.coli infection in his dialysis port.  On May 4, 2015, ████████ was seen on nurses' line for flu-like symptoms.  His port was checked and showed no signs of infection.  On May 7, 2015 at approximately 12 midnight, ████████ was seen again on the nurses' line for the same symptoms.  At this appointment, Christine Salas, LPN noted some redness around the port.  No vitals were taken.  ████████ was seen again at 5:30 a.m., when Ms. Salas noted no redness at the port site.  At this time, ████████ temperature was 101.6.  ████████ was not seen by a nurse until 2:29 p.m. on May 7, 2015, at which time he was suffered from severe chills and had a temperature of 100.5.  ████████ received intravenous medications and was admitted to the hospital.  By the time of his return from the hospital, the plumbing problem in ████████ cell remained unaddressed, putting him at immediate risk of contracting another infection.  Either ████████ needs to be moved to a cell with properly functioning plumbing or the plumbing problem causing sewage to back up into his cell needs to be immediately addressed.

**████████████, Cook**

- Dx:  uses w/c, cancer, no teeth
- Age: 55
- Issue: ████████ reports that in the past year he has lost 85 pounds (210 to 135), as a result of the recurrence of cancer.  He is visibly gaunt and reports that as a result of the extreme weight loss, his dentures do not fit.  He is supposed to receive a chemo infusion every three weeks at Palo Verde Cancer Center. He received his first infusion on 11/6/15, but the health care record confirms that his subsequent infusion on 11/30 was cancelled and not rescheduled.  As of the time of the 12/7/15 interview with Counsel, he reported that he had not received his scheduled chemo infusion.  If ████████ still has not had his second infusion, he must have it immediately, and the subsequent appointments should be scheduled with the frequency listed in the oncologist's cancer treatment plan.

**████████████, Browning**

- Dx: "Diseases of the nervous system complicating pregnancy, unspecified trimester" listed in his health care chart
- Age: 33
- Issue: Dr. Stewart evaluated ████████ on 12/7/2015.  During the exam, ████████ appeared very psychotic and anxious.  He broke into tears while speaking with Dr. Stewart, and complained of auditory hallucinations that were "freaking [him] out."  ████████ statements are consistent with prior behaviors observed the week before.  On 12/2/15, the staff noted that ████████ was "referred to mental health by security" and that he was "yelling at night, responding to internal stimuli and 'going downhill' in the last few days."  At the time, ████████ complained that he was hearing voices of his mother and sister screaming at him.  Although ████████ denied being suicidal, Dr. Stewart determined that he poses a serious risk of self-harm.

Mr. Dan Struck et al
Re: Eyman Prisoners In Need of
Immediate Health Care
December 18, 2015
Page 4

Furthermore, Dr. Stewart's review of ███████████ medical record raised two additional concerns.  First, ██████████ recorded diagnosis ("Diseases of the nervous system complicating pregnancy, unspecified trimester") demonstrates a lack of awareness of his specific psychiatric condition.  Second, ████████████ recommended dose of 150mg of Haldol Decanoate every two weeks is exceedingly high (for example, the recommended dose for schizophrenia is 50 mg every four weeks).  ██████████ should be placed in an inpatient psychiatric unit and his medication regime should be promptly reassessed.

**██████████████████, Cook Unit**
- Dx:  History of cancer (prostate, colon); spinal cord injury (uses wheelchair)
- Age: 63
- Issue: ██████████ prostate cancer may be returning, as his prostate-specific antigen (PSA) levels are rising, when he should not have a PSA level exceeding 0.1 after his past treatment.  After a man has been treated for prostate cancer, the standard of follow-up care is to measure his PSA every three months to detect for signs of possible recurrence of the cancer.  ██████████ reports that he has not had it tested in more than three months, and as far as he knows, no referral has been made to a cancer specialist for additional diagnostic or imaging tests to rule out the return of cancerous prostate tissue.

**████████████████, Cook Unit**
- Dx:  Marfucci's Syndrome
- Age:  51
- Issue: ██████████ has Marfucci's Syndrome, a congenital genetic bone and skin disorder that results in numerous encondromas (noncancerous cartilage and calcium growths) that develop on the bones, especially on limbs, skeletal deformation, and the development of hemangiomas, or warty vascular skin lesions, on the skin.  He has dozens of these lesions on his right arm and hand, and on his leg and foot.  There are so many on his hand, for example, that he cannot use his fingers to grasp and has problems performing activities of daily living.  People with Marfucci's Syndrome must be closely monitored by specialists because they are at a high risk of developing chondrosarcomas, a type of bone cancer.  The hemangiomas can be injected with a drug that shrinks and hardens the area (sclerosing agent); however, often surgical removal is also needed.  Enchondromas can be surgically removed if necessary. A specialist in hand surgery is needed to correct the skeletal abnormalities of the hand that cause loss of function or recurrent fracture.

A review of ██████████ medical records reflects that no specialty requests are pending.  ██████████ has a Medical score of 4.  The health chart does not include a diagnosis of Marfucci Syndrome and refers only to his hemangiomas.  There are no scheduled consults or outstanding specialty requests.  ██████████ has not been offered any surgery or other treatment for the condition, except Naproxen for the pain and inflammation.  He states he cannot take Naproxen because he has a low platelet count.

Mr. Dan Struck et al
Re: Eyman Prisoners In Need of
Immediate Health Care
December 18, 2015
Page 5

**████████████████, Cook**
- Dx: Prostate cancer, spread to bones
- Age: 52
- Issue: ████████ first filed an HNR on 7/21/14 regarding his swollen prostate. He was not seen for a month, during which his symptoms subsided and he was told to submit an HNR again if they came back. When his symptoms returned in October 2014, ████████ again started filing HNRs reporting that he could not sleep due to pain, and was repeatedly told that he was scheduled to see a doctor, but never did. ████████ was not seen until February 2015, when he was hospitalized because he could barely walk and almost fell out. At that time, he was told he had a swollen prostate with likely cancerous nodes. When his PSA was finally tested at the end of February, it was 954. On 3/4/15, ████████ seen by a urologist who said that he likely had metastasized prostate cancer and ordered a biopsy, bone density scan, colonoscopy, and CT scan. Those tests were done slowly over the next three months, with ████████ finally starting treatment in June 2015. His PSA fell to 10 by 8/24/15. However, on 12/3/15, ████████ saw the urologist, who noted that he had malignant neoplasm of the prostate with a PSA of 139, and recommended Casodex 50 mg daily, Contine, Hepron, Trelstar, and Zometa 4 mp IV monthly. Given his rising PSA, we request that ████████ be scheduled for a follow up appointment with the oncologist to discuss his treatment plan.

**████████████████, Cook**
- Dx: blindness
- Age: 57
- Issue: ████████ needs uninterrupted refills of his prescription Timolol eye drops that are used to regulate the pressure in his eyes. He has previously had to go two weeks without the drops while waiting on a refill, causing him intense pain from the built-up pressure in his eyes.

**████████████████ SMU-I**
- Dx: gastrointestinal problems
- Age: 19
- ████████ reports that he has been spitting up blood since late August 2015, as well as experiencing nausea and muscle pain. He has submitted approximately 15 HNRs. He was seen on nurses line and diagnosed with constipation. Lab tests were ordered approximately 3 weeks ago, but have yet to be drawn. His symptoms persist. ████████ needs to be immediately evaluated for his symptoms, have the proper lab work timely drawn and have an appropriate treatment plan implemented.

**████████████████, Cook**
- Age: 88
- Dx: diabetes, hypertension, coronary artery disease
- Issue: ████████ has lost his acute eyesight, and can no longer read. He reports that he saw an ophthalmologist approximately 6-7 months ago who told him they wouldn't/couldn't do anything for his case, but he did not know if this was a medical analysis or Corizon not permitting that level of care. He was not told of his exact eye condition, including whether it is a result of his diabetes.

He is a monolingual Spanish speaker and many of his medical encounters are conducted without an interpreter.  He will be released in 7 months, but he is concerned he will lose the remaining vision he has before he is released.  He has a chronic care appointment scheduled for 2/22/16 for his diabetes, hypertension, and heart disease, but nothing further scheduled with optometry or ophthalmology.

███████████ has difficulty walking, and relies upon other prisoners to assist him because he does not have a cane or walker to help him ambulate.  He needs to be evaluated for and provided with all appropriate mobility devices to reduce his risk of falls and injury.

**████████████, Cook**
- Dx: COPD
- Age: 26
- Issue: ██████ has COPD and used a nebulizer several times per day before entering ADC. He reports impaired breathing and says he frequently wakes up coughing in the night. However, ████ is currently only receiving a steroid inhaler and an Albuterol inhaler, which he uses regularly without success. On 10/1/15, ████████ provider noted that he uses up the albuterol inhaler in one month and steroid inhaler in one to two weeks with no effect, but only ordered Ciclesonide, Albuterol, and Naproxen. ████████ reports that he usually finishes the inhalers before the prescription renewal, which means that he goes for four to seven days without any treatment for his COPD.

It appears that ████████ had a chest x-ray on 9/21/15, but the results were not in his file as of 12/8/15.  He filed HNRs on 9/15/15 and 11/23/15 requesting emergency breathing treatment due to trouble breathing; the 9/16/15 response just said "UR" and 11/24/15 response said that he already had inhalers, ignoring the fact that they clearly were not working.  ████████ needs to be seen by a specialist to develop a treatment plan for his COPD, including the possible need for a nebulizer.

**████████████, Meadows Unit**
- Dx: insulin-dependent diabetic, osteomyelitis, above the knee leg amputation of left leg, left eye not functional, duplex vision in right eye, uses w/c.
- Age:  58
- Issue: ████████ had his most recent leg amputation in September 2015 due to gangrenous necropsis due to an incorrectly-fitted orthopedic shoe.  In July he had his foot amputated, but due to delays in receiving appropriate medication to fight the infection, more of his leg had to be amputated.  He reports that the gangrenous infection spread to his brain, resulting in memory loss, aphasia, and a recurrence of PTSD and agoraphobia.  He cannot open his left eye, and he has to hold his right eye open with his hand in order to see, but he has double vision.  He has not been seen by orthotics to be fitted for a prosthetic leg, and there is no documentation of a referral to specialists regarding the ongoing injury to his brain and eye.

████████████ needs to be seen by an orthotics specialist for a properly-fitting prosthetic leg, so

that he can walk and not be confined to a wheelchair.  His ongoing problems with his eyes and memory loss raise the concern of whether the infection in his brain is really cleared or not.  The determination that it is cleared must be proven via serial CT or MRI scans.  The most urgent concern is for him to see an infectious disease doctor unless he has been totally cleared by one in the hospital.  Beyond that, a neurologist would be necessary and he would probably need some cognitive testing and brain rehabilitation similar to what a stroke patient should receive.  For the vision problems, that would best be referred to an ophthoneurologist since they have to work out whether the defect is in the eye or in the central nervous system.  He probably needs to see a psychiatrist regarding the psychiatric issues but that should be done as a team approach with the neurologist, not just scheduled to see the prison psychiatrist.

███████████████, Browning Unit
- Dx: paranoid schizophrenia, bipolar disorder, multiple personality disorder
- Age:  43
- Issue: ███████████ received letter from ADC in October 2015 notifying him they were no longer considering his status to be SMI. ██████████ was SMI and receiving mental health treatment in the community, and has been on psychiatric medication since he was a teenager. According to his medical records, the 10/20/2015 SMI determination stated that ████████ did not have a mental health contact or in-person evaluation when this change was made.  Notes state he is "stable on his pysch meds, is able to care for himself, get his needs met, and is functioning quite well" which led to the decision that ████████ doesn't meet the SMI criteria for functional impairment. No explanation of why he was being removed from SMI status and programming was ever provided to ████████, and he reports feeling worse and increasingly depressed of late and that the SMI programming for prisoners in isolation units was helping him.

████████████████, Cook
- Dx:  glaucoma, hearing impaired
- Age:  80
- Issue: ██████████████ hearing aid is broken and cannot hear much speech, including instructions from custody staff.  His inability to hear custody officers puts him at risk of injury or discipline for failing to obey orders.  There are interruptions in the refill of his Latanoprost eye drops that treat the high pressure in his eyes, and the delays cause him to go days or weeks without the drop, subjecting him to a great deal of eye pain and risk of developing blindness.

████████████████, Cook
- Dx: Axonal neuropathy, stage 3 (idiopathic peripheral neuropathy); degenerative disc disease/ bulging discs, uses wheelchair
- Age:  60
- Issue: ██████████ needs to see a neurologist, needs different pain management medication, and needs diabetic shoes to prevent injury or infection of his feet due to the neuropathy.  ████████████ was seeing a neurologist every 6-8 weeks for treatment/management of his neuropathy before entering prison in April, 2015.  He was undergoing testing with his neurologist to determine the cause of his neuropathy.  He has not been able to see a neurologist at all since he was incarcerated,

Mr. Dan Struck et al
Re: Eyman Prisoners In Need of
Immediate Health Care
December 18, 2015
Page 8

despite multiple HNRs (6/23/15, 7/16/15, 9/15/15).  ██████ also requested and was denied special shoes to protect his feet, which he frequently runs over with his wheelchair wheels and causes harm to his feet because they are numb.  He was denied diabetic shoes on the basis that he's not diabetic, but the underlying reason why diabetic patients receive such shoes is because diabetics develop neuropathy, the condition which ██████ has.  He is only prescribed Tylenol-3 for the severe neuropathic pain; prior to incarceration he was taking Norco.  He has filed multiple HNRs about the need for better pain management, and has not received a response.



**██████████████, Cook**
- Dx: urethral stricture
- Age:  39
- Issue:  ██████ needs urethral reconstruction surgery.  He has a history of urethral stricture, and had two urethral surgeries on the street prior to incarceration.  He reported in a 6/22/15 HNR that he was having problems with his catheter.  The 9/7/15 response said he was referred to the provider line.  On 9/15/15, the provider requested a urology consult.  In early October, ██████ had to be rushed to the hospital due to excessive bleeding while trying to catheterize himself.  The hospital performed a cystoscopy, and he was discharged on 10/4/15 with request for follow-up urology consults including for evaluation of a possible urethrectomy.  On 10/19/15 NP McKamey submitted a request for specialty services for this surgery, as of 12/8/15, this request was still listed as submitted to Utilization Management for review.  ██████ reports extreme amounts of pain and problems with urination, as the scar tissue in his urethra is building up again.  He must be evaluated by a urologist for the urethrectomy and reconstruction surgery.

**██████████████, Cook**
- Dx: Hodgkin's Lymphoma on neck, cyst on neck (possibly from chemo)
- Age: 37
- Issue:  ██████ had his last chemo treatment on 8/5/15, but recent tests have shown a shrinking but still enlarged lymph node on his chest. The oncologist recommended a PET scan to determine if ██████ needs radiation. The patient records show that the PET scan was recommended on 11/16/15 to occur in December, but it does not appear that the scan was scheduled. We request that ██████ be immediately scheduled for a PET scan and a follow up appointment with his oncologist to discuss his treatment plan.

**██████████████████, Cook**
- Dx: cataracts, hypertension, depression
- Age: 73
- Issue:  ██████ was told in 2010 that he needed cataract surgery.  He has not received the surgery in the past five years, despite reporting that his eyesight has become so bad that he can't see well enough to read or write.  His vision impairment impacts his ability to perform activities of daily living and to get around his dorm and yard.  He submitted a HNR to see an eye doctor in May, and was told the wait was five months.  As of 12/7/15, he had not been seen by an optometrist or an ophthalmologist.

**███████████████, Cook**
- Dx: Stomach problems for several years including left side abdominal pain (level 6), pressure, lower sternum pain, frequent diarrhea, and bloating
- Age: 30
- Issue:  began filing HNRs about his stomach pain in 2012 and finally had an offsite consultation on 11/5/15. During the consult, he was told he needs biopsies and a colonoscopy. However, no testing has been done since. We request that an urgent referral for the ordered testing be submitted. We also request that ███████████ be scheduled for a follow up appointment to discuss the test results and his treatment plan.

**███████████████, Cook**
- Dx:  gastrointestinal bleeding disorder, low hemoglobin
- Age: 65
- Issue: ███████████ states that he went to the hospital in November 2015 because he was defecating and vomiting blood.  Despite complaining about his symptoms he was not taken to the hospital until he was so weak he could not get out of bed.  He reports that the hospital doctors had to infuse him with three bags of blood and two bags of iron, and his hemoglobin count was 6.  The physician in the hospital stated that he needed a surgical procedure to cauterize a section in his gastrointestinal track.  Eight years ago ███████████ had the same symptoms and they were resolved with a similar treatment.  Before the hospital could perform the procedure, Corizon would not authorize the procedure and had him discharged from the hospital.  Despite receiving the blood and iron, he states that he is feeling increasingly weak.  A review of his medical records indicates that there has been no follow up from the hospitalization.

**███████████████, Browning**
- Dx: Dementia, SMI
- Age: 51
- Dr. Stewart evaluated ███████ on 12/7/15.  During the exam, ███████ was observed to be very psychotic, responding to internal stimuli, stating that his "Bible name is Peter," and extremely malodorous.  Prior notes from staff recount similar observations.  A note by staff on 9/7/15 states that ███████ was observed to be very psychotic, malodorous and uncooperative.  At that time, ███████ was designated SMI and began a prescribed treatment of 100mg of Haldol Decanoate every four weeks.  On 10/20/15, staff noted that he was "almost totally mute and uncooperative for answering questions for completing this evaluation."  He was then diagnosed as having a "psychotic disorder due to another medical condition with hallucinations."  Although the other "medical condition" was not stated in the record, Dr. Stewart assumes that the other medical condition is dementia based on the earlier note from 9/7/15.  Finally, a staff member's note from 12/2/15 states that ███████ was "tangential with delusions."

███████████ should be promptly transferred to an inpatient care facility.  Based on his in-person exam and review of ███████ medical and mental health records, Dr. Stewart has determined that his condition has not improved and that it is possible that his condition has worsened over the last several months.  Furthermore, if indeed ███████ has been diagnosed with dementia, his

Mr. Dan Struck et al
Re: Eyman Prisoners In Need of
Immediate Health Care
December 18, 2015
Page 10

Haldol treatments should be immediately discontinued as antipsychotic medications are contraindicated in individuals with dementia.

**██████████████████, Cook**

- Dx: cataracts
- Age: 86
- Issue: ██████████ had cataract surgery nine months ago, and the ophthalmologist ordered follow up 3 months after the surgery, but he has not had this follow up appointment. ██████████ has put in several HNRs requesting to see an eye doctor (11/7/15, 11/14/15), the latest of which has a "no action needed" note on it in medical record. ██████████ vision is very blurry and he can't read at all, and the glasses he has been prescribed don't help. Due to his vision impairment, he has problems performing all activities of daily living and safely navigating his yard and dorm.

**██████████████████, SMU I**

- Dx: Schizophrenia, undifferentiated
- Age: 31
- Issue: Dr. Stewart evaluated ██████████████ on 12/8/15 and found him to be very psychotic and unable to engage in a rational conversation. At that time, ██████████ was on mental health watch for "decomposition [sic], urinating on himself and property." On two recent occasions ██████████ had serious medical episodes, but there is no documentation in the record that he received any medical intervention to address these episodes. On 11/6/15, ██████████████ was placed on mental health watch for "being found unresponsive in his shower." A nurse responded by taking his vital signs before again returning him to mental health watch. ██████████████ was returned to mental health watch on 12/7/15 for displaying very disorganized behavior and urinary incontinence.

  ██████████████ requires acute intervention. Dr. Stewart recommends an immediate medical workup in light of the two serious medical episodes observed in recent weeks to which there has been no documented response. Furthermore, it should be noted that Dr. Stewart raised concerns about ██████ ██████████ mental health condition and his access to psychiatric treatment in his November 2013 Expert Report. At that time, Dr. Stewart expressed concern that ██████████████ was not receiving the appropriate level of psychiatric treatment after he was observed to be extremely psychotic and suicidal (standing naked in his cell, responding to internal stimuli, and unable to engage in rational communication).

**██████████████████, SMU I**

- Dx: History of brain tumors and cervical foraminal stenosis resulting in an inability to use his left hand and arm
- Age: 44
- Issue: ██████████ had a large (>5 cm) non-cancerous tumor removed from his brain in 2014. The Casa Grande neurologist recommended follow-up every six months to ensure that there would not be recurrence of the tumors. He saw the neurologist during the summer who found a foraminal narrowing of the C5-6 and C6-7, likely causing the problems with his hands and arm. The

Mr. Dan Struck et al
Re: Eyman Prisoners In Need of
Immediate Health Care
December 18, 2015
Page 11

Corizon provider requested a referral to a neurosurgeon, but instead  was mistakenly sent to the neurologist again. The neurologist, Dr. Ahmandieh, saw him on 9/4/15, and again noted the foraminal stenosis, and noted a 6 mm cyst on the thyroid. The neurologist reiterated the past recommendation of a referral to a neurosurgeon for a MRI of ███████ spine with contrast to evaluate possible surgical removal of the cyst and repair of the stenosis. The neurologist also recommended referral to a rheumatologist to rule out an immune system involvement causing the damage.

On 11/6/15 the provider Dr. Graham made a note that ███████ was incorrectly sent to a neurologist, and stating that he (Dr. Graham) had sent an email to Dr. Raddatz at Corizon to explain the situation and that ███████ needed to see a neurosugeon. However, there is no evidence in ███████ electronic record that a second neurosurgery consult was requested, nor is there evidence of a rheumatology consult request. ███████ is left handed and reports great difficulty in performing activities of daily living.

**███████, Meadows**
- Dx: left and right stents, history of two heart attacks; amputated leg with no prosthesis
- Age: 52
- Issue: In November 2014, ███████ experienced heart palpitations and went to hospital where he got a stress test with abnormal results. He was told he needed a Holter Monitor, but did not get it until October 2015. He reports that he has not had any follow up since and has not seen the cardiologist since his hospitalization. We request that ███████ be immediately scheduled to see the cardiologist to assess the results of his Holter Monitor and discuss a treatment plan.

  ███████ also lost his leg to sepsis in October 2014, after he was repeatedly ignored when he alerted staff about an infected ulcer on his foot, which developed because he has diabetes but was not given special shoes. He has now been waiting for a prosthetic leg since March 2015 (he was told the amputation needed six months to heal). In September 2015, ███████ went to the orthotic specialist/ prosthetist for a fitting and was told they just needed to add carbon fiber, but has not been seen since and has not received his prosthetic. ███████ reports that he has asked multiple medical staff and, two weeks ago, was told that his last appointment got passed over inexplicably. ███████ is very concerned about receiving his prosthetic as he was told that his hip would continue to degenerate the longer that he is in a wheelchair. We ask that ███████ be immediately scheduled to see the prosthetist/orthotics specialist to receive his prosthetic.

**███████, SMU I**
- Dx: Psychotic Disorder NOS, SMI
- Age: 37
- Issue: Dr. Stewart evaluated ███████ on 12/8/15. He is designated SMI and Dr. Stewart found posturing in his cell. Posturing is a serious psychotic symptom. Upon exam Dr. Stewart noted him to be responding to internal stimuli, displaying thought blocking and complaining of auditory hallucinations telling him that he and his family are going to be hurt. The last psychiatric note Dr. Stewart found in his medical record was dated 7/13/15. It listed his diagnosis as

Mr. Dan Struck et al
Re: Eyman Prisoners In Need of
Immediate Health Care
December 18, 2015
Page 12

Psychotic Disorder NOS.  It went on to state "off meds for two months; currently psychotic. plan-restart prozac 20mg am and risperdal 3mg qhs."  As a MH-3A ███████████ should be seen by the provider a minimum of every 90 days.  This lack of appropriate follow-up has caused ███ ████████ untold harm.  He needs to be reevaluated immediately and have his medication regimen modified.

Thank you for your attention to these matters. We look forward to your response and ADC and Corizon's prompt attention to these patients' health care needs.

Sincerely yours,

/s/ Corene Kendrick

Corene Kendrick, Staff Attorney

cc:     Counsel of Record

# EXHIBIT 6


# FILED UNDER SEAL



*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

## PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

BY EMAIL ONLY

February 8, 2016

Mr. Daniel Struck
Struck Wieneke & Love, P.L.C.
3100 West Ray Road, Suite 300
Chandler, AZ  85226-2473

   Re:  *Parsons v. Ryan*, 2:12-CV-00601
   ADC Prisoners in Need of Immediate Medical, Dental, and/or Mental Health Care

Dear Counsel:

  We write following the parties' visit to ASPC-Yuma on February 4-5, 2016 to notify you of patients who may be in need of immediate health care, as identified through interviews and/or chart reviews.  In addition to the individuals listed below, we met with seven prisoners who are HIV positive and have been waiting for months to see an infectious disease specialist, as required by Performance Measures (PM) 50 and 51.  When we spoke with the scheduler, she reported that there has been a great difficulty in scheduling Infectious Disease appointments, and for reasons unknown to her, the Yuma facility was not provided ID consults via telemedicine, unlike other ASPC institutions.

  1. ██████████████████████
  2. ████████████████████████████
  3. ██████████████████████
  4. ██████████████████████
  5. ████████████████████████
  6. █████████████████████
  7. ██████████████████████

**██████████████████, La Paz Unit**

  Mr. █████ has been diagnosed with multiple large masses in and around his right knee, and he has not been seen by a general surgeon for a biopsy of the masses.  These multiple masses are affecting his ability to walk and perform activities of daily living.  On October 6, 2015, he had a MRI of his right knee which identified at least 12 masses in the area around the joint, the largest ones measured 3.9 x 2.8 x 3.9 cm, 1.0 x 2.5 x 2.5 cm, and 1.0 x 2.2 x 3.0 cm.  He saw an orthopedist on January 5, 2016, who recommended an urgent consult in "the next 2 weeks surgical consult with Dr. Todd Rungan to exclude malignancy."  Dr. Barcklay submitted a request

Mr. Dan Struck et al
Re: Yuma Prisoners in Need of
Immediate Mental Health or Medical Care
February 8, 2016
Page 2

for specialty care on January 12 to Corizon's headquarters to see a surgeon for a biopsy to rule out cancer, but as of February 4, Mr. ██████ had not had the biopsy.  Mr. ██████ needs to have a biopsy urgently, and all recommended subsequent treatment provided in a timely manner.

██████████████        **Dakota Close**

Mr. ██████ is a prisoner classified MH-3A and SMI, whom we saw on watch at Dakota Close Unit on February 4, 2016.  He has been on watch continuously since December 9, 2015.  On December 25, January 1, 2016 and January 18, 2016 he was not seen by a licensed mental health clinician or by a registered nurse, as required by PM 94.

Mr. ██████ was last seen by the psychiatrist on January 4, 2016.  The note from this encounter is extremely skeletal and makes no mention of the fact that Mr. ██████ had, by that time, been on watch continuously for nearly a month.  There has been no further involvement by the psychiatrist since January 4.  On February 1, a psych associate noted that "Patient continues to be on a wait list to be moved to Baker Ward."  On February 3, Psych Associate Bucio wrote:

> His mental health status has not improved and he continues to state he wants to kill himself with a plan.  Patient mental health condition appears to be worsening due to being on watch for a long period of time.

Mr. ██████ is suffering needless harm due to his prolonged confinement in the harsh and deprived conditions of the watch cell, even as staff acknowledge that he needs to be transferred to Baker Unit.  Mr. ██████ needs to be transferred to an inpatient hospital on an urgent basis.

███████████████████**, La Paz Unit**

Mr. ██████ has a congenital heart condition known as Wolf Parkinson White syndrome, which is a condition in which a person has irregular and rapid heartbeats.  Mr. ██████ needs to be seen at least twice a year by cardiologist for monitoring, as his condition could worsen to a point where he will need a pacemaker and/or valve replacement surgery.  Mr. ██████ reports filing HNRs requesting to see a cardiologist, reminding the prison medical staff of his need to see a specialist.  He also reports experiencing a racing heart beat on multiple occasions.

According to his medical records, he saw a cardiologist on January 8, 2015 and June 10, 2015, but no specialist report is scanned to his file from either appointment.  At the June 10, 2015 appointment, the cardiologist requested that he return within six months.  La Paz provider Dr. Jordan requested a routine cardiology consult on November 25, 2015, but as of February 4, 2016, Mr. ██████ had not seen a cardiologist, as required by PM 51.  Mr. ██████ needs to be seen by the cardiologist regarding his WPW syndrome.

Mr. Dan Struck et al
Re: Yuma Prisoners in Need of
Immediate Mental Health or Medical Care
February 8, 2016
Page 3



██████████████████**, Cheyenne Unit**

Mr. ████████ reports that he suffered a grand mal seizure on 12/30/15, and another on 1/24/16, and that he did not previously have a history of seizures.  His medical record indicates that the patient saw an RN after the first seizure, who wrote that the provider should review his case the following day.  This did not happen.   The nurse also advised the patient to "return if symptoms worsen."  An ICS was called for the second seizure, and it appears he was taken to the medical clinic, where an NP was contacted.  It does not appear that a provider actually saw or evaluated Mr. ████████ at that time.  He was seen two days later by Dr. Barcklay, who started him on Dilantin, 300 mg.  Mr. ████████ has not had a scan to determine whether his seizures were caused by a brain bleed, nor has he had a metabolic work up or a referral to a neurologist.  This patient must be properly worked up in order to determine the reason for his new onset seizures and to develop an adequate treatment plan.

In addition, Mr. ████████ has been suffering from a painful boil on his neck since mid-December. Although he has been provided multiple prescriptions for antibiotics, the sore has not healed, and as of the date of our interview, was actively and visibly bleeding.  He may need to be worked up for drug resistant staph infection.

███████████████  **Cibola Unit**

Mr. █████ is classified as MH-3B and carries a diagnosis of schizophrenia.  He is prescribed fluphenazine, sertraline, benztropine, and carbamazepine.  He has not seen the mental health provider since October 28, 2015, in violation of PM 83, and did not see the mental health clinician between June 5 and December 10, 2015, in violation of PM 82.

On December10, 2015 the psych associate wrote "inmate stated that he is having panic attacks.  Trying deep breathing – not helping a whole lot.  Reported voices are telling him that they are going to kill him."  Under "plan" the psych associate wrote "none," and Mr. ██████ has received no further mental health treatment in the intervening two months.  When we saw him on February 4, 2016, he continued to complain of hallucinations and was in considerable distress.  Mr. █████ needs to be seen as soon as possible by a mental health professional qualified to address his continuing symptoms.

███████████████  **La Paz Unit**

Mr. ██████ has a pacemaker/defibrillator installed due to his diagnosis of A-fib.  He is supposed to see a cardiologist regularly to have the pacemaker calibrated, but he has experienced delays in seeing the cardiologist.  He last saw a cardiologist on October 2, 2015, who ordered that he return within three months for follow up and evaluation of the pacemaker, which did not occur. He reports that his pacemaker feels as if it is misfiring or not working from time to time. He also reports that one of the times he was scheduled to go see the cardiologist in Phoenix, he was physically unable to climb into the small cage in the back of a van where he would have to be in

Mr. Dan Struck et al
Re: Yuma Prisoners in Need of
Immediate Mental Health or Medical Care
February 8, 2016
Page 4

five-point restraints while seated in a hunched over position.  He also is not receiving any blood thinners, although he was taking blood thinners prior to his incarceration in April 2015.  Mr. ███████ medical record shows that Dr. Jordan requested a cardiology consult on December 22, 2015, but he had not yet been sent out to have his pacemaker calibrated.

Additionally, on January 21, while trimming trees with a work crew in San Lewis, a mesquite tree's thorn pierced the length of his left index finger.  His finger was badly injured, with a deep cut and puncture wound, and his finger swelled to twice its size with pus and fluid.  He filed a HNR about the emergency and was seen by mental health staffer Hedglin on nurse's line on January 22, who documented she provided no treatment other than giving him a small bowl to fill with hot water to soak his finger.  Mr. ███████ reports that he requested antibiotics, a tetanus shot, and bandages for his finger and the nurse refused to provide him any of the requested treatment. At the time of our interview on February 4, the wound was visible, his finger was swollen, and he reported he still had not been provided a band-aid or antibiotic cream to keep the wound clean.

Mr. ███████ needs to be seen by a cardiologist to have his pacemaker calibrated, and evaluated for blood thinners.  He needs to be transported in an accessible vehicle.  He also needs to have his finger treated before any infection spreads to his hand or arm.

███████ Mr. ███████ has a history of non-Hodgkins lymphoma.  However, he reports that he continually suffers from extreme rectal bleeding and he is coughing up frank blood.  Mr. ███████ had a colonoscopy in April 2015; however, the only documentation that could be located in his medical record regarding this test is a page stating only: "Normal colonoscopy.  Repeat 10 years." He saw a gastroenterologist in December 2014, where he had an EDG performed.  This test came back negative.  On January 15, 2016, Mr. ███████ was seen for his bleeding conditions, but the record of that exam lists no treatment plan.  On January 25, 2016, the provider requested consults for a CT of Mr. ███████ pelvis, abdomen, and chest/thorax.  The provider's notes indicate that these requests were sent to UM.  However, there is no indication they actually were sent and they were not listed as pending as of February 5, 2016.

Mr. ███████ rectal bleeding and coughing up blood need to be assessed immediately and the consults requested by the provider need to be sent to UM for review.  A treatment plan, that may include at CT of Mr. ███████ pelvis, abdomen, and chest/thorax, should be put in place immediately to avoid any further delay in Mr. ███████ treatment.  In addition, Mr. ███████ has been diagnosed with an enlarged prostate.  No workup has been done to assess the status of his prostate or what treatment might be necessary.  A treatment plan to assess and treat Mr. ███████ enlarged prostate should be completed immediately.

Mr. Dan Struck et al
Re: Yuma Prisoners in Need of
Immediate Mental Health or Medical Care
February 8, 2016
Page 5

**███████████████, Dakota Unit**

Mr. █████ was diagnosed with renal cancer on October 2014 prior to his incarceration, but requests by the prison doctors for imaging and diagnosing tests that were recommended by a specialist have been denied by Corizon's Utilization Management team.  Furthermore, on February 4, Mr. █████ suffered abdominal pain and blood in his urine so severe that custody staff called an ICS, only for nursing staff to return him to his housing unit, and direct him to drink more water.

Mr. █████ arrived at ADC on July 2, 2015.  He reported to Corizon staff at intake, and in a July 25, 2015 HNR, that he had been diagnosed with kidney cancer and needed treatment.  He was seen on July 31 by Dr. Barckley, who requested his outside medical records and told him to increase his water intake.  He saw NP Ling on August 17, 2015, regarding having blood in his urine for two weeks.  On October 13, 2015, a CT scan of his abdomen identified a 56 x 46 mm heterogeneously enhancing mass on his right kidney.

After reviewing the CT results on October 23, 2015, NP Ling submitted to Corizon Utilization Management a request for a nephrology consult, a MRI of Mr. █████ kidneys, a liver ultrasound, and a urology consult.  On October 29, 2015 Corizon's UM department denied and cancelled all specialty requests but the urology request.  The Corizon State Medical Director wrote that a MRI of the kidneys was not needed because Mr. █████ "just had completed CT, will not need another imaging for 6 months," that a liver ultrasound was "not needed at this time, he will be due for it in 6 months," and that "nephrology is not needed, just urology."

Mr. █████ saw Dr. Steinway, an urologist at Banner Hospital, on 12/7/15, who stated that the renal mass needed further evaluation and ordered cystology and a CT urogram to image the mass.  Dr. Steinway also recommended an immediate a nephrology consult to discuss nephrectomy versus nephroureterectomy.  On January 26, 2016, he only had the cystology, and the urologist stated in his report that CT imaging of the mass was needed, as well as a referral to a nephrologist.  On February 4, 2016, Mr. █████ had an ICS due to severe abdominal pain and blood in his urine, and was seen by nursing staff in response to an ICS. The nurses told him to drink more water and sent him back to his living unit.  He later saw the provider who wrote that the request to see a nephrologist was pending review by UM.

As of February 5, 2016, Mr. █████ still had not seen a nephrologist to develop a treatment plan of the mass on his kidney, nor has he had a MRI to assess the extent of the mass.  Mr. █████ needs to see a nephrologist, and if appropriate, an oncologist, to develop a treatment plan.

**███████████████, Dakota Close Unit**

On February 3, 2016 Mr. █████ made a serious suicide attempt by cutting his neck and wrist; a note on that date states that he was "found on floor of restroom with pools of blood noted

Mr. Dan Struck et al
Re: Yuma Prisoners in Need of
Immediate Mental Health or Medical Care
February 8, 2016
Page 6

by inmate who was actively bleeding."  He was taken to Yuma Regional Medical Center.  Upon his return to the prison on February 4, he was placed on continuous suicide watch.  At 6:56 a.m., RN Hedglin noted "Risk for self-harm [related to] expressed paranoia, [auditory hallucinations and visual hallucinations] and expressed self-loathing."  She added "inmate to [follow up with] psychiatry ASAP."

At 1:25 p.m. on February 4, Psych Associate Bucio noted that Mr. ████ was crying, and wrote "patient appears to be in active distress and he has an unstable mental health status.  It appears that his symptoms of depression are worsening."  On the item "Is lethality an active issue?" Mr. Bucio checked "yes."

At 8:30 a.m. on February 5, a psych associate noted Mr. ████ "serious suicide attempt" and observed that he "spoke unintelligibly."  At 12:40 p.m., Dr. Bishop wrote:

> He needs to be transferred to another facility where arrangements can be made for forced medication.  Based on his history I feel he is too great a risk to attempt to treat here.

Mr. ████ is at grave risk of suicide and must be transferred to an inpatient unit immediately.[1]

Mr. ████ reports that he suffers from irritable bowel syndrome.  In November 2015, Mr. ████ was seen by a gastroenterologist who performed a colonoscopy.  According to Mr. ████ medical record, that colonoscopy revealed a blockage of his intestine beyond which the scope was unable to pass.  According to Mr. ████ medical record, no further action has been taken regarding this obstruction.  A treatment plan to assess Mr. ████ GI obstruction and provide appropriate treatment needs to be completed immediately.

**Cheyenne Detention Unit**

Mr. ████ came to Yuma on January 22, and has filed multiple HNRs since then reporting partial paralysis and numbness of the left side of his face and his left arm, and severe headaches. To date, Mr. ████ has only been provided with Excedrin.  Mr. ████ had surgery in April 2015 prior to incarceration for a fracture of his orbital bones, bone fragments in his face, and a fracture and lacerations to his left arm, resulting from a motor vehicle accident.  As a result of the partial

---

[1] It is significant that on December 29, 2015, Mr. ████ was seen by Dr. Raza, who noted that he was suffering from anxiety, and had been on suicide watch in August 2015 for suicidal ideation and self-harming behavior.  Dr. Raza ordered that Mr. ████ return in one month, but this did not occur, and Mr. ████ attempted suicide 36 days after seeing Dr. Raza.  It is probable that if Mr. ████ had been seen as ordered, this serious suicide attempt could have been avoided.

Mr. Dan Struck et al
Re: Yuma Prisoners in Need of
Immediate Mental Health or Medical Care
February 8, 2016
Page 7

paralysis and numbness, Mr. ███ mouth is drooping open, and he has difficulty eating because he cannot close his mouth and bites his tongue.  He also has limited use of his left arm.  Mr. ███ also has drop foot on his right foot, but his ankle brace was taken from him when he was incarcerated.  He has difficulty walking without the brace, and also is assigned a top bunk.

Mr. ███ needs to see a neurologist to assess the cause(s) of his partial paralysis and numbness of his arm and face, and of his headaches.  Mr. ███ must be provided the medical device for his ankle to allow him to walk, and evaluated for a Special Needs Order for a low bunk.

**███, La Paz Unit**
Mr. ███ reports that he has had blood in his urine for more than a week.  He filed a HNR on 1/28/16 with an urgent request to be seen, and the response stated that he would be placed on nurse's line.  As of February 4, he still had not been seen, contrary to PM 37.  He reported to us on February 4 that he was still passing blood in his urine.  Mr. ███ does not speak English, and he needs to be seen urgently by the provider with a non-custodial interpreter to evaluate possible causes of the blood in his urine and to refer him out for all necessary diagnostic tests or referrals.

**███ Cibola Unit**
Mr. ███ has multiple open wounds on his legs from a 1989 car accident.  These wounds are ulcerated, red, and oozing fluid.  He saw NP Livingson on 2/2/16, who documented the existence of these chronic ulcers to both legs, "open cracks" in his skin, and "serious sanguineous drainage."  However, NP Livingson did not document any sort of treatment plan, or any request for a referral to a wound care specialist.  Mr. ███ was prescribed miconazole topical ointment, an anti-fungal cream.  Mr. ███ needs to see a wound care specialist, and he may need to be worked up for drug resistant staph infection.

**███ La Paz Unit**
Mr. ███ has Klinefelter syndrome (also known as XXY syndrome), a chromosomal condition that affects men and requires regular testosterone injections and close management by an endocrinologist.  Mr. ███ is receiving neither treatment.  Mr. ███ submitted HNRs on 10/21/15 and 11/22/15 alerting health care staff to his condition, and his need for the shots and the specialty referral.  The October HNR was triaged three days later, contrary to PM 36, and the response stated that he had been referred to the provider.  This follow up did not occur.  The November HNR was triaged four days after it was submitted and the 11/26 response stated that he would be seen on nurse's line.  Mr. ███ finally saw Dr. Jordan on 12/22/15, not in response to the HNR, but for a chronic care appointment about his hypertension and high cholesterol.  Dr. Jordan ordered lab tests, which showed that Mr. ███ testosterone levels were at "below lower panic levels" of 2.5 ng/DL (normal range

Mr. Dan Struck et al
Re: Yuma Prisoners in Need of
Immediate Mental Health or Medical Care
February 8, 2016
Page 8

for men is 132 to 813 ng/DL).  Dr. Jordan reviewed the lab results on January 28, but made no request for a consult with an endocrinologist or for a non-formulary prescription of testosterone shots.

Thank you for your attention to these prisoners' urgent health care needs.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney