FILED LODGED
May 27 2016
CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA

Michael J. Cohn #288721
ASPC Lewis / STINER 5A16L
P.O. Box 3100
Buckeye, AZ 85326

United States District Court, Arizona

| | |
|---|---|
| Parsons, et al, Petitioners v. Charles L. Ryan, et al, Respondents | No. 2:12 CV-601-PHX-DLR-DKD |
| | MOTION FOR Criminal Investigation |
| | (Hon. Roslyn Silver, Chief Judge) |
| Michael J. Cohn, Pro Se | |

Pursuant to the 8th Amendment of the U.S. Constitution, and ARS§ 13-305 + 306 (Criminal ENTERPRISE), petitioner respectfully requests F.B.I. / U.S. Dept. of Justice investigation of the Arizona Dept. of Corrections and Corizon Health. Corizon Health is the contracted medical care vendor.

ARS§ 13-305 holds that a Breach of duty (such as failure to provide adequate medical care) and reckless tolerance of that breach is a felony. Directors and highly placed managerial agents are implicated.

Reports in the Public domain allege the torture and homicide of inmates that occur regularly in the Arizona Dept. of Corrections, frequently from neglect. (Az. Republic, 9/11/14, 3 + 4/2016); Death Yards, American Friends Service Committee, Prison Legal News 3/2014, 7 + 10, 2015, 2/2016. The Parsons v. Ryan, 2012 class action further documents such occurrences.

The stipulation in Parsons v. Ryan, reportedly has been futile in terms of improving inmate care. Petitioner has waited over 6 months for a biopsy of a possible ABCess / malignancy as advised via MRI of 10/2015. 2/4/16 / The internal remedies are exhausted and

are futile. Responses from Director obfuscate the essential point. adequate care is being deprived. Community Standards apply, not the Az. Dept. of Corrections or Corizon Health standards.

For the foregoing reasons, the court should refer this matter to the F.B.I. / U.S. Dept. of JUSTICE for criminal investigation.

Respectfully submitted, Date: 5/20/16

[signature]

Original to: on: 5/27/16
Clerk of the US. Dist Ct.
401 W. Washington SPC-1
Phoenix, AZ 85003

Copy to: on: 5/27/16
ATTORNEY General
1275 W. Washington
Phoenix, AZ 85007

To: ON: 5/28/16
Prison Law Office, ATTORNEYS For Plaintiffs
General Delivery
San Quentin, CA 94964

Exhibit 1

Complaint for Criminal ENTERPRISE
TO STATE POLICE (C.I.U.

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Inmate Letter**

*Requests are limited to one page and one issue. NO ATTACHMENTS PERMITTED. Please print all information.*

| Inmate Name (Last, First M.I.) | ADC Number | Institution/Unit | Date |
|---|---|---|---|
| Cohn, Michael J. | 288721 | ASPC-LEWIS-STINER | 5/18/16 |

| To: | Location |
|---|---|
| Criminal Investigations Unit C.I.U. | complex |

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

Complaint: criminal ENTERPRISE. ARS§13-305+306, Breach of duty to provide adequate medical care,/ Parsons v. Ryan, 2012, AZ. Republic, E.J. Montini, 9/11/14, 3/2016, 4/2016, Grievances exhausted and pending. Note: Reckless Tolerance of inadequate medical care by Charles L. Ryan, Director, ADC., Richard Pratt, interim Health Director, ADC, other highly placed managerial agents in ADC and Corizon Health, Cindy Black, V.P. Operations, Corizon, Ronaldo Maldonado, Div. West Region, Corizon Health,

Per D.O. 608.02.1.2 this matter is reported due to the torture/homicides of inmates as reported in Parsons v. Ryan 2012 and the Public Domain (See Death Yards by American Friends Service Committee, Prison Legal News 3/2014., 7+10/2015, 2/2016,

Personal: 1) Deprivation of NOTICE/Treatment/prevention of S-1 vertebral fracture/ Failure to provide preventive treatments/care for future injury. Note: Torture is defined as inflicting severe mental/physical pain. 2) Deprivation of biopsy for possible malignancy, unreasonable delay of service! I request to be interviewed.

CC: ACLU, et al.

U.S. Dist. Court

| Inmate Signature | Date |
|---|---|
| [signature] | 5/18/16 |

Have You Discussed This With Institution Staff? ☑ Yes ☐ No

If yes, give the staff member's name: L. Ende NP, Preciado, LPN, D.W. Weiss, R. Pratt.

Distribution: Original - Master Record File
Copy - Inmate

4 of 45

916-1
5/14/12

Exhibit 2

Plaintiff's MOTION TO ENFORCE STIPULATION

(CRIMINAL ENTERPRISE: ARS §13-305 & 306
Breach of duty to Provide adequate medical care / Reckless Tolerance of that Breach)
TORTURE / homicide of INMATES

Documentation of torture/homicide/criminal enterprise; M.J. Ch 5/25/16

Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
jlyall@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

No. CV-12-00601-PHX-DKD

**PLAINTIFFS' MOTION TO ENFORCE THE STIPULATION**

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ........ 1

PROCEDURAL HISTORY ........ 4

STATEMENT OF FACTS ........ 5

I. DEFENDANTS' AUDITS DOCUMENT A BROKEN SYSTEM ........ 5

A. Access to Medical Care ........ 5

1. Sick call ........ 5

2. Chronic Care ........ 8

3. Inpatient Care ........ 10

4. Medication Administration ........ 11

5. Diagnostic Tests ........ 13

B. Access to Mental Health Care ........ 14

1. Inadequate access to care ........ 14

2. Inadequate monitoring of psychotropic medications ........ 15

3. Inadequate Access to Non-Medication Treatment Modalities ........ 16

4. Inadequate suicide prevention ........ 17

5. Failure to monitor use of isolated confinement on the mentally ill ........ 19

C. Failure to Implement Quality Assurance Mechanisms ........ 20

II. DEFENDANTS' BROKEN HEALTH CARE SYSTEM HARMS PATIENTS AND PLACES ALL PRISONERS AT SUBSTANTIAL RISK OF HARM ........ 22

A. Systemic Failures Result in Treatment Delays and Denials Causing Suffering and Death ........ 22

B. The root cause of Defendants' non-compliance is extreme and chronic staff shortages ........ 27

1. Unfilled Vacancies and Inadequate FTE positions ........ 28

2. Appointment Backlogs ........ 29

3. Health care staff acting outside scope of practice ........ 30

# TABLE OF CONTENTS
(continued)

Page

ARGUMENT ........ 30

I. THIS COURT HAS THE AUTHORITY TO ORDER ADDITIONAL RELIEF, INCLUDING THAT DEFENDANTS REMEDY THEIR STAFFING SHORTAGES ........ 30

RELIEF REQUESTED ........ 31

CONCLUSION ........ 32

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) .......... 30, 31

*Brown v. Plata*, 563 U.S. 493, 131 S. Ct. 1910 (2011) .......... 31, 32

*Parsons v. Ryan*, 289 F.R.D. 513 (D. Ariz. 2013), *aff'd,* 754 F.3d 657 (9th Cir. 2014), *reh'g en banc denied,* 784 F.3d 571 (9th Cir. 2015) .......... 4

Plaintiffs, by and through their undersigned counsel, hereby move this Court to exercise its inherent powers and those outlined in the Stipulation (Doc. 1185 ¶¶ 35-36) to enforce the terms of the Stipulation and order Defendants to take immediate and substantial action to remedy gross and dangerous deficiencies within their health care system that continue to prevent the provision of adequate health care and place class members at grave danger of serious harm or death.

## INTRODUCTION

The Stipulation requires ADC to comply with a set of 103 health care performance measures. [Doc. 1185 ¶ 8] These performance measures were designed to determine whether ADC was providing essential health care services to the plaintiff class. To fulfill the terms of the Stipulation, ADC must meet or exceed a 75% compliance score on each measure at each prison complex for the first year, 80% for the second year, and 85% thereafter. [*Id.* at 20]

After a full year of auditing compliance with these performance measures, evidence from ADC's own audits reveals a dismal failure to meet the terms of the Stipulation. Review of Defendants' own compliance data for many of the key performance measures related to patient care show that defendants have consistently delivered failing scores. Defendants' health care audits, though skewed in defendants' favor due to methodology errors for some performance measures, amply document defendants' failure to implement critical systemic changes to the medical and mental health care delivery systems.

Month after month, particularly at the larger institutions which house 80% of the prisoners,[1] the audits reveal that patients are exposed to a substantial risk of serious harm because Defendants fail to provide timely medical and mental health appointments, fail to provide timely medications, fail to deliver ordered care and fail to adequately monitor

[1] According to the ADC website, the daily prisoner count on April 4, 2016 was 35,569 prisoners. The four smallest prisons (Douglas, Phoenix, Safford, and Winslow) had 6,669 prisoners housed in them, or 18% of the total.

mentally ill patients, including those on suicide watch. For critical performance measures, defendants have consistently failed to reach the 75% compliance benchmark for the Stipulation's first year and, without dramatic changes, have no hope of attaining the 80% benchmark currently required for compliance in year two.

As a direct result of these well-documented systemic deficiencies, patients needlessly suffer serious injury, illness and, in some cases, death. Two examples illustrate the all too frequent result of ADC's grossly inadequate health care system.

[redacted] hanged himself at Eyman-Browning Unit on [redacted]. He was 26 years old. He was diagnosed with bipolar disorder and was treated with Lithium, until the medication was discontinued due to side effects. Mental health staff did not consider any other medication to treat his illness, and did not perform an adequate suicide risk assessment, despite his history of suicide attempts and several other suicide risk factors. On April 28, 2015, he submitted a Health Needs Request (HNR) saying "I want to get back on my lithium as soon as possible, I'm having serious mental issues." He was scheduled to be seen by mental health staff, but the appointment never happened. After his suicide, the ADC psychological autopsy noted that he had not been seen by mental health staff as required by policy. The ADC Mortality Review Committee concluded that he did not receive adequate mental health care; that his death was preventable; and that a "delay in access to care" was a contributing cause of his death. In the months prior to Mr. [redacted] suicide, Defendants failed to comply with Performance Measures 87 (a prisoner with Mr. [redacted] classification must be seen by a mental health clinician no less than every 30 days) and 98 (mental health HNRs must be responded to within specific timeframes). [Declaration of Pablo Stewart, M.D., Exhibit A [Expert Report of Pablo Stewart, M.D.] ("Stewart Rep.") ¶¶ 50-58, filed concurrently herewith]

[redacted], a Yuma prisoner, died on [redacted] at age 59, after low-level nursing staff repeatedly ignored his desperate pleas for help, and did not seek the assistance of a medical doctor, even after open weeping lesions on Mr. [redacted] body were swarmed by flies. [Declaration of Todd R. Wilcox ("Wilcox Decl.") ¶¶ 41-43, filed

concurrently herewith] Mr. [redacted] had end-stage liver disease with complications including massive fluid retention, groin wounds, and sepsis. On March 6, 2015, he submitted an HNR stating "my legs were bleeding with open weeping wounds sticking to my prescription socks. I am in severe pain. I cannot wear my socks nor get them on. I am in pain." The nursing response to this sick call request indicates that it is a "duplicate from 3/3/15." However, there was no request dated 3/3/15 in his medical record. Mr. [redacted] filed another HNR on March 17, 2015 for shortness of breath and painful abdomen. He was told he would see a nurse at an unspecified time, which apparently did not occur. Four days later, he filed an HNR for worsening fluid retention and shortness of breath. Again, he was told "duplicate same as 3/17, you are on nurse line." Mr. [redacted] condition deteriorated and his fluid retention worsened to the point that his skin split open and became infected. By March 31, 2015, Mr. [redacted] situation deteriorated to the point that he was being swarmed by flies, which he reported to nursing staff in a HNR. Instead of investigating why a patient with split skin oozing pus and serum had a swarm of flies on the injury, the nurse the next day instead decided that Mr. [redacted] did not need to be seen. More than a week later, on April 9, 2015, he finally was sent to the hospital, where he died [redacted]. The ADC Mortality Review determined there were multiple triage mistakes made by nurses that impeded and delayed care for Mr. [redacted].

Plaintiffs' experts, Drs. Wilcox and Stewart, agree that compliance with the performance measures required by the Stipulation is not possible with the existing staff. [Stewart Rep. ¶¶ 17-25, 114; Wilcox Decl. ¶¶ 9-12, 29-35, 140] There are too many vacancies for existing positions, and there are too few allocated positions. Thus, as the two examples above show, and ADC's own audits described below confirm, critical lapses of care occur too often, with harmful or fatal results.

Plaintiffs seek an order requiring Defendants to develop and implement a plan to increase staffing to levels that will assure compliance with the Stipulation's performance measures and thereby reduce the risk of serious harm to the plaintiff class.

The Stipulation contemplates that the Court will have broad authority to remedy non-compliance, permitting this Court "to enforce this Stipulation through all remedies provided by law," except that the Court cannot order Defendants to build a new prison or "hire a specific number or type of staff unless Defendants propose to do so as part of a plan to remedy a failure to comply with any provision of this Stipulation." [Doc. 1185 ¶ 36] "In the event the Court finds that Defendants have not complied with the Stipulation, it shall in the first instance require Defendants to submit a plan approved by the Court to remedy the deficiencies identified by the Court." [*Id.*]

Below, Plaintiffs first show ADC's dismal record in complying with the performance measures. Second, Plaintiffs describe the serious harm and suffering that Defendants' conduct has caused. Third, Plaintiffs summarize the evidence demonstrating that ADC's failures to employ adequate staff are the root cause of their non-compliance. Finally, Plaintiffs argue that the Court has the authority, and indeed the obligation, to issue relief under these dire circumstances.

## PROCEDURAL HISTORY

In October 2014 the parties reached a settlement agreement, the "Stipulation," in the constitutional class action[2] filed by fourteen Arizona Department of Corrections ("ADC") prisoners and the Arizona Center for Disability Law ("Plaintiffs"). This Court found the Stipulation to be "fair, adequate, and reasonable," and it went into effect on February 17, 2015. [Doc. 1458 at 1] Under the Stipulation, Defendants agreed to comply with 103 healthcare measures[3] throughout ADC prison facilities and to allow Plaintiffs' counsel to monitor their implementation of these measures. [Doc. 1185 ¶¶ 8, 29]

---

[2] Class certification was granted, and the plaintiff class consists of approximately 36,000 prisoners at ADC's ten state prisons. *See Parsons v. Ryan,* 289 F.R.D. 513 (D. Ariz. 2013), *aff'd,* 754 F.3d 657 (9th Cir. 2014), *reh'g en banc denied,* 784 F.3d 571 (9th Cir. 2015); *see also* n. 1, supra.

[3] ADC contracts the provision of medical, mental health, and dental services to Corizon Health Service, Inc. ("Corizon"). Corizon is not a defendant in this matter because the duty to provide constitutionally adequate health care and constitutionally suitable conditions of confinement is a duty ADC cannot delegate. ADC is the responsible party regardless of who it hires to provide care. [*See* Doc. 175 at 9-10]

Plaintiffs have communicated regularly with Defendants about the gross deficiencies they have identified,[4] but after multiple unsuccessful attempts to work cooperatively with Defendants, the parties requested mediation with Magistrate Judge Buttrick, as required by the Stipulation. [Doc. 1185 ¶ 31] The mediation was held on March 1, 2016 and was unsuccessful in resolving this issue.

## STATEMENT OF FACTS

Review of Defendants' own compliance data for many of the critical performance measures related to patient care show that Defendants have consistently delivered failing scores.[5]

## I. DEFENDANTS' AUDITS DOCUMENT A BROKEN SYSTEM[6]

### A. Access to Medical Care

#### 1. Sick call

Patients in a prison facility must have an effective method for making their medical needs known to the medical staff. ADC prisoners seeking a medical appointment must submit a written health needs request form ("HNR"). Because these forms provide such a crucial link between medical staff and prisoners, Defendants' response time in triaging HNRs and then providing access to appropriate care is an essential monitoring parameter. Under the Stipulation and the CGAR audit, patients who submit sick call slips must be seen the same day for urgent needs; otherwise, they must be seen by nurses for sick call

[4] Plaintiffs' Notices of Substantial Noncompliance are attached as Exhibits 1 through 6 to the Declaration of Kirstin Eidenbach, filed concurrently herewith.

[5] Under the terms of the Stipulation, the standards for demonstrating compliance with the performance measures shift over time, so that during the first year after the effective date of the Stipulation, compliance with a specific measure is reached when Defendants score 75% on that measure at each prison complex for that period of time. In the year following, Defendants must score 80%, and thereafter, 85%, in order to be compliant. [Doc. 1185 ¶ 20] Defendants monitor and measure their rate of compliance with audit instruments known as the "CGARs," which stands for "Compliance-Green-Amber-Red."

[6] By discussing certain performance measures in this motion, Plaintiffs do not concede that Defendants are in compliance with other performance measures not explicitly discussed.

("nurse line") within 24 hours of the triage.[7] Based upon the nurse's assessment, the patient may or may not be referred and scheduled to see a primary care provider. Failure to adhere to these timelines places patients at serious risk of substantial harm.

Dr. Wilcox, who reviewed the CGAR audit results in addition to medical records, concluded that Defendants' "sick call system remains profoundly deficient." [Wilcox Decl. ¶ 39] According to the CGAR reports, for the eleven month period of February through December 2015, *none* of the six largest ADC prisons achieved an average score of 75% or higher, and at Yuma, on average, just four in ten patients were seen timely during that period. As illustrated in the chart below,[8] for the month of December, two large prisons, Eyman and Lewis, scored under 50%. [Wilcox Decl. ¶ 16]

If the nurse determines the patient requires the attention of a primary care provider on a routine basis, the patient must be scheduled and seen by the provider within 14 days

---

[7] Performance Measure 37: *Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need).*

[8] Given the various colors used in the charts and graphs within this motion, and in the Wilcox and Stewart Declarations, these documents are best viewed on paper if printed with a color printer, or on the screen in an electronic format.

of the nurse appointment.[9] Defendants' scores on this performance measure are likewise dismal. The CGAR results for the months of February through December demonstrate widespread non-compliance with the 14-day benchmark, particularly at the five largest men's prisons and at Perryville, the women's prison.[10] At three of the five largest men's prisons, during the eleven months from February through December 2015, the average compliance rate for Measure 39 was below 75%, with Tucson scoring 50%. Perryville scored at 48%. [Wilcox Decl. ¶ 46]

Percent Compliance

PM # 39 - Seen by Provider Within 14 Days of Referral
(Prisons With 11 Month Average < 75%)
100
90
80
70
60
50
40
30
20
10
0
Feb.
March
April
May
June
July
Aug.
Sept.
Oct.
Nov.
Dec.
Month in 2015
Eyman - 59%
Florence - 60%
Perryville - 48%
Tucson - 50%

The data underlying the CGAR reports document that patients who should be seen within two weeks may wait six weeks or more to see the provider. For example:

- In November, some patients at Perryville were waiting six weeks to see a provider;
- At Tucson's Winchester Unit, six of ten patients referred to the provider in October were not seen by the time of the November 26, 2015 audit; at Catalina

[9] Performance Measure 39: *Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointment will be seen within fourteen calendar days of the referral.*

[10] ASPC-Eyman, ASPC-Florence, ASPC-Lewis, ASPC-Tucson and ASPC-Yuma.

Unit, five of ten patients referred in October were not seen by the time of the audit, and an additional patient had been seen but not in relation to the referral; at Santa Rita Unit, five of ten patients referred in October were not seen timely, and three were not seen at all;

- At Florence, three of four East Unit patients referred in October were not seen as of the time of November 30, 2015 audit; at Kasson Unit, six of eight patients were not seen timely, and three were not seen at all;
- At Eyman, six of six Browning Unit patients, three of six Meadows Unit patients, and three of five Cook Unit patients referred in October had not been seen at time of audit on November 30, 2015;
- Tucson complex-wide compliance rate of 60% in December 2015; eleven patients not seen by the time of the January 30, 2016 audit, including one three month delay;
- Yuma complex-wide compliance rate of 68% in December;
- At Eyman, six of six Browning patients, three of six Meadows patients, and three of five Cook patients referred in October not seen at time of January 30, 2016 audit;
- Douglas patient referred to provider on December 3, 2015 not seen as of time of January 29, 2016 audit;
- Florence complex-wide compliance rate of 74% in December 2015; at North Unit, three of six patients referred in December not been seen at time of audit on January 28, 2016; and three of five South Unit patients referred in December not seen at time of audit;
- Phoenix complex-wide compliance rate of 72% for December 2015; multiple prisoners referred to the provider in early to mid-December still had not been seen at time of audit on January 29, 2016.

[Wilcox Decl. ¶ 47]

**2. Chronic Care**

Patients suffering from chronic illness require regular and coordinated health care. "Regularly scheduled appointments allow providers to track the progress of patients with chronic illnesses and ensure appropriate levels of treatment." [Wilcox Decl. ¶ 49] Failure to monitor chronic illness risks the condition or disease getting out of control, ultimately harming the patient.

Performance Measure 54[11] requires Defendants to see chronic care patients at medically appropriate intervals. The CGAR reports show widespread and continued noncompliance with this measure. From February through December 2015, five of the largest men's facilities and Perryville Complex all averaged below 75% compliance, with Tucson and Florence barely over 50% compliance. [Wilcox Decl. ¶ 50]

What these percentages do not reveal is that some of the delays in chronic care appointments lasted over a year, with one lasting two years. Patients with active cancer diagnoses have had gaps of 2 to 6 months between chronic care appointments. [Wilcox Decl. ¶ 51] The CGAR reports described numerous problems, including, but not limited to:

- At Tucson's Santa Rita Unit, one patient had a two year lapse between chronic care appointments, and at least two lapsed for over a year; on Cimarron Unit, patient with diabetes lapsed for over a year; on Manzanita Unit, patient with active cancer, ordered to be seen monthly, not seen for four months;
- Perryville complex-wide compliance rate of 64% for December 2015; at Lumley Unit, a woman with "active cancer . . . with plans for radiation therapy" for thyroid cancer not seen for eight months, and another Lumley patient with rheumatoid arthritis not seen for a chronic care appointment for 19 months after her diagnosis; patient at Santa Rosa Unit with blood disorders and anemia not seen for 14 months;
- Douglas complex-wide compliance rate of 45% for December 2015;
- Four of ten files reviewed at Florence North Unit showed delayed appointments, including 8-month gap in appointments for patient with thyroid disorder and hypertension; at Central, patients with 9 and 14 month gaps between appointments; another patient with seizure disorder, Hepatitis C, and asthma with no chronic care appointment between early March and mid-December 2015;
- At Yuma's La Paz Unit, two patients with seizure conditions seen late;
- Patients at Winslow complex seen six weeks and three months later than medically needed and previously ordered by the provider.

[Wilcox Decl. ¶ 51]

[11] Performance Measure 54: *Chronic disease inmates will be seen by the provider as specified in the inmate's treatment plan, no less than every 180 days unless the provider documents a reason why a longer timeframe can be in place.*

These are profound lapses in treatment that imminently endanger the lives of some of the system's most vulnerable patients.

### 3. Inpatient Care

Many of ADC's sickest patients are housed in the prison infirmaries, where the ADC medical providers are required to see them every 72 hours.[12] The average audit results for two of the three men's prisons with infirmary units over eleven months in 2015 show shockingly poor compliance for this critical measure—32% for Tucson and 19% for Florence. [Wilcox Decl. ¶ 67]

///

///

///

///

///

///

---

12 Performance Measure 66: *In an IPC, a Medical Provider encounters will occur at a minimum every 72 hours.*

19 of 45



### 4. Medication Administration

For a prison health care system to achieve a successful system of medication administration it must be able to (1) provide prescribed medications to prisoners in a "timely, consistent manner"; (2) ensure prescribed medications are "renewed regularly and without interruption"; and (3) ensure that prisoners transferred between complexes experience no gaps in medication administration. [Wilcox Decl. ¶¶ 126-127] Defendants' medication system fails to meet any of these thresholds and "practically guarantees that patients will have gaps in receiving their medications." [*Id.* ¶ 127]

The audits show Defendants routinely fail to provide patients with new prescriptions timely, in compliance with Performance Measure 11.[13] The average scores over the months of February through December, 2015 were below 75% at six of the ten prisons, including at all five of the largest men's prisons. The following chart highlights in yellow each month in 2015 where the prison's compliance level was less than 75%. For each month in 2015, the statewide level of compliance for all of ten institutions on

[13] Performance Measure 11: *Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT.*

20 of 45

Performance Measure 11 was less than 75%. Lewis was non-compliant every month. [*Id.* ¶ 125]

| | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | 11 Mth avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Douglas** | 97 | 60 | 97 | 85 | 78 | 79 | 83 | 63 | 70 | 85 | 85 | **80** |
| **Eyman** | 30 | 32 | 34 | 48 | 50 | 64 | 30 | 46 | 48 | 30 | 76 | **44** |
| **Florence** | 85 | 54 | 54 | 58 | 59 | 71 | 54 | 62 | 80 | 63 | 72 | **65** |
| **Lewis** | 53 | 63 | 71 | 74 | 57 | 70 | 47 | 44 | 36 | 39 | 40 | **54** |
| **Perryville** | 80 | 76 | 78 | 84 | 88 | 92 | 66 | 74 | 66 | 76 | 59 | **76** |
| **Phoenix** | 76 | 86 | 96 | 98 | 90 | 92 | 89 | 100 | 90 | 100 | 96 | **92** |
| **Safford** | 95 | 100 | 100 | 100 | 100 | 85 | 95 | 100 | 95 | 80 | 97 | **95** |
| **Tucson** | 76 | 54 | 58 | 54 | 53 | 58 | 62 | 61 | 68 | 76 | 66 | **62** |
| **Winslow** | 85 | 75 | 65 | 50 | 50 | 80 | 75 | 95 | 70 | 80 | 87 | **74** |
| **Yuma** | 77 | 76 | 78 | 60 | 78 | 74 | 78 | 76 | 76 | 70 | 70 | **74** |
| **Statewide** | **75** | **68** | **73** | **71** | **70** | **77** | **68** | **72** | **70** | **70** | **75** | **72** |

Patients must have their chronic care and psychotropic medications refilled regularly and without interruption.[14] The audits document widespread failure to comply with this requirement. Not one of the ten prisons averaged a passing score (75%) for this measure over the ten months from March to December 2015. (Every facility was given a score of "NA" in February 2015.) ASPC-Lewis registered a 0% compliance rate for nine of the ten months, and only three small prisons, Phoenix, Safford, and Winslow, had an average score of over 50%. Of the five largest prisons, not a single one achieved a passing score at any time during the measured period. Again, non-compliance is shown in yellow in the chart on the next page. [Wilcox Decl. ¶ 128]

///

///

[14] Performance Measure 14: *Any refill for a chronic care or psychotropic medication that is requested by a prisoner between three and seven business days prior to the prescription running out will be completed in a manner such that there is no interruption or lapse in medication.*

21 of 45

| | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec | 10 Mth. avg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Douglas** | NA | 0 | 0 | 100 | 80 | 60 | 6 | 0 | 0 | 38 | 69.23 | **35** |
| **Eyman** | NA | 0 | 0 | 6 | 10 | 0 | 0 | 0 | 0 | 0 | 39 | **6** |
| **Florence** | NA | 0 | 0 | 20 | 2 | 14 | 5 | 0 | 12 | 17 | 23 | **9** |
| **Lewis** | NA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33 | **3** |
| **Perryville** | NA | 92 | 92 | 76 | 0 | 81 | 8 | 12 | 35 | 8 | NA | **45** |
| **Phoenix** | NA | 93 | 94 | 100 | 90 | 50 | 19 | 45 | 59 | 33 | 55 | **64** |
| **Safford** | NA | 100 | 100 | 91 | 80 | 80 | 65 | 0 | 0 | 67 | 80 | **66** |
| **Tucson** | NA | 0 | 68 | 41 | 34 | 3 | 0 | 0 | 0 | 0 | 73 | **22** |
| **Winslow** | NA | 100 | 90 | 92 | 88 | 75 | 10 | 0 | 30 | 20 | 100 | **60** |
| **Yuma** | NA | 0 | 0 | 32 | 24 | 32 | 0 | 0 | 0 | 10 | 42 | **14** |
| **Statewide** | | **39** | **44** | **56** | **41** | **39** | **11** | **6** | **14** | **19** | **57** | **32** |

When patients' chronic care and psychotropic medications run out, the prescriptions must be promptly renewed, as indicated.[15] For the eleven month period of February to December 2015, seven of the prisons, including all of the largest facilities, had average scores well under 75% compliance. [Wilcox Decl. ¶ 130]

**5. Diagnostic Tests**

Diagnostic tests are an essential part of any medical care system. Such tests must be performed timely, based on the provider's order, and the results must be reviewed and, if abnormal, acted upon promptly.[16] Defendants routinely fail to comply with this requirement across the state. Nine out of ten of the prisons averaged scores well below passing for this measure, from February to December, 2015. Indeed, the only prison that averaged a passing score was ASPC-Safford, a smaller prison that ADC previously has reported does not house prisoners with significant medical needs. [Wilcox Decl. ¶ 132]

[15] <u>Performance Measure 13</u>: *Chronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication.*

[16] <u>Performance Measure 46</u>: *A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison.*

"The failure to act timely on abnormal labs and diagnostic imaging places patients at enormous risk of harm." [*Id.* ¶ 133]

### B. Access to Mental Health Care

#### 1. Inadequate access to care

The Health Needs Request form (HNR) is the primary means by which ADC prisoners access non-routine mental health services. To ensure that prisoners are able to have their mental health needs addressed in a timely fashion, defendants must monitor responses to HNRs, based upon the category of need. The Mental Health Technical Manual sets forth 5 specific timeframes for different categories of HNRs (e.g. Emergency, Urgent Medication, etc.).[17]

Defendants have unilaterally decided to monitor only one of these five categories: those raising "routine non-medication issues." This presents a risk of serious harm, since without monitoring, there is no way to know if emergency or urgent HNRs are being responded to in a timely fashion, or indeed at all. But even with this critical monitoring defect, Defendants are still noncompliant with this measure, with Eyman and Florence each showing nine consecutive months of noncompliance, and Lewis, Phoenix, Tucson,

---

[17] Performance Measure 98: *Mental Health HNRs shall be responded to within the timeframes set forth in the [ADC] Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0.* The relevant provision of the MHTM provides for the following response times for mental health HNRs:

> 2.0 Inmates with emergency mental health issues will be seen by nursing staff immediately upon receipt of the HNR.
>
> 3.0 Inmates with urgent medication issues (e.g., serious medication side effects or lack of receiving prescribed medications) will be seen by nursing staff within twenty-four (24) hours of HNR triage.
>
> 4.0 Inmates with urgent non-medications issues describing serious mental health symptoms will be seen by either nursing or mental health staff within twenty-four (24) hours of receipt of the HNR.
>
> 4.0 Inmates with routine non-medication issues will be forwarded to appropriate mental health staff, and will be responded to within five (5) working days with a specific plan of action.
>
> 5.0 Inmates with routine medication issues will be referred to a P/PNP, and seen within fourteen (14) days.

23 of 45

| | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 88 | 69 | 77 | 77 | 64 | 79 | 83 | 84 | 69 | 79 | 89 |
| Florence | 92 | 79 | 92 | 67 | 65 | 77 | 81 | 69 | 90 | 74 | 66 |
| Lewis | 54 | 58 | 72 | 51 | 61 | 74 | 68 | 73 | 51 | 60 | 77 |
| Perryville | 98 | 100 | 100 | 96 | 91 | 92 | 85 | 87 | 94 | 92 | 91 |
| Phoenix | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 100 | 80 | 100 |
| Tucson | 85 | 88 | 90 | 77 | 74 | 63 | 69 | 64 | 61 | 68 | 69 |
| Yuma | 95 | 98 | 97 | 98 | 93 | 92 | 88 | 95 | 89 | 93 | 95 |

Patients who are not adequately followed after discontinuing their psychotropic medications may suffer harm. Accordingly, patients whose medication is discontinued must see a mental health provider within 30 days.[20] Defendants failed to achieve compliance with this measure at *any* prison from February through November, and complied at only a single prison in December 2015. [Stewart Rep. ¶ 29]

| | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 0 | 0 | 14 | 0 | 20 | 25 | 20 | 33 | 0 | 0 | 80 |
| Florence | 0 | 17 | 22 | 17 | 8 | 17 | 0 | 15 | 8 | 8 | 13 |
| Lewis | 0 | 0 | 9 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 0 |
| Perryville | 50 | 43 | 69 | 24 | 55 | 33 | 0 | 43 | 57 | 50 | 67 |
| Tucson | 0 | 0 | 35 | 12 | 13 | 0 | 14 | 13 | 6 | 13 | 0 |
| Yuma | 20 | 43 | 0 | 0 | 18 | 29 | 20 | 60 | 20 | 50 | 29 |

Based on Defendants' noncompliance with these two Performance Measures, Dr. Stewart concludes:

> This chronic failure to monitor prisoners who are currently prescribed, or have recently discontinued, psychotropic medication presents a significant risk of serious harm. It is likely that this failure results at least in part from the extraordinarily high vacancy rates among mental health nurse practitioners, who constitute the large majority of mental health providers in ADC.

[Stewart Rep. ¶ 29]

### 3. Inadequate Access to Non-Medication Treatment Modalities

Dr. Stewart explains that "[a]n adequate correctional mental health care system must provide a full range of treatment modalities; a system that relies primarily or

[20] Performance Measure 85: *MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications.*

25 of 45

and Winslow each showing two or more consecutive months of noncompliance. [Stewart Rep. ¶¶ 32-34]

| | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Douglas | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Eyman | 0 | 14 | 36 | 42 | 40 | 36 | 62 | 72 | 68 | 82 | 66 |
| Florence | 100 | 63 | 50 | 18 | 29 | 52 | 72 | 57 | 65 | 67 | 79 |
| Lewis | 2 | 21 | 4 | 71 | 81 | 70 | 79 | 28 | 49 | 89 | 78 |
| Perryville | 88 | 98 | 100 | 91 | 100 | 88 | 96 | 86 | 82 | 100 | 82 |
| Phoenix | 0 | 50 | 100 | 0 | 100 | 100 | 90 | 100 | 100 | 100 | 86 |
| Safford | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Tucson | 55 | 89 | 62 | 79 | 69 | 88 | 92 | 99 | 70 | 65 | 77 |
| Winslow | N/A | 50 | 50 | 100 | 60 | 75 | 80 | 100 | 91 | 80 | 91 |
| Yuma | 93 | 67 | 91 | 94 | 95 | 100 | 100 | 100 | 100 | 100 | 98 |

**2. Inadequate monitoring of psychotropic medications**

Patients taking psychotropic medication, or who have recently discontinued such medication, must be monitored by a psychiatrist. Performance Measure 81 requires that "MH-3A prisoners who are prescribed psychotropic medications shall be seen a minimum of every 90 days by a mental health provider."[18] Dr. Stewart, Plaintiffs' psychiatric expert, found that "ADC is persistently noncompliant with PM 81 at multiple prisons." Both Lewis and Tucson, two of Defendants' largest complexes, reported many consecutive months of non-compliance with this measure. [Stewart Rep. ¶ 27][19]

///

///

///

///

[18] ADC classifies prisoners according to their assessed mental health needs. Those classified MH-1 have the lowest needs; those classified MH-5 the highest. Those classified MH-3 are divided into four subcategories: A, B, C, and D. The Stipulation defines "mental health provider" as a psychiatrist or psychiatric nurse practitioner. [Doc. 1185-1 at 4; Stewart Rep. ¶ 26 nn.7, 8]

[19] [REDACTED], who hanged herself at the age of 25 on [REDACTED], was not seen by the psychiatrist with the required frequency in the final months of her life. [Stewart Rep. ¶¶ 70-71] Other prisoners have also been harmed by Defendants' failure to comply with this requirement. [*Id.* ¶¶ 48, 73, 92]

exclusively on medication does not provide an acceptable level of care." [Stewart Rep. ¶ 30] Accordingly, the Stipulation requires that mental health patients be seen regularly by a mental health clinician.[21] Defendants have persistently failed to comply with this performance measure, with Lewis noncompliant for six consecutive months; Eyman for seven consecutive months; and Tucson for eight consecutive months. In Dr. Stewart's opinion, this noncompliance "is likely related to the fact that only about 50% of ADC's psychologist positions are filled." [*Id.* ¶ 31]

| | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 73 | 57 | 47 | 23 | 27 | 43 | 60 | 92 | 88 | 98 | 98 |
| Florence | 97 | 93 | 97 | 93 | 93 | 90 | 63 | 87 | 95 | 84 | 95 |
| Lewis | 62 | 79 | 93 | 40 | 67 | 69 | 59 | 64 | 62 | 80 | 75 |
| Perryville | 100 | 91 | 100 | 100 | 92 | 90 | 92 | 91 | 89 | 88 | 74 |
| Phoenix | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 80 | 100 | 100 |
| Tucson | 81 | 87 | 93 | 70 | 53 | 64 | 66 | 69 | 68 | 66 | 64 |
| Yuma | 94 | 98 | 98 | 82 | 84 | 84 | 90 | 92 | 94 | 84 | 84 |

**4. Inadequate suicide prevention**

ADC has persistently failed to implement an adequate suicide prevention program, a failure that places patients at serious risk of injury or death. [Stewart Rep. ¶ 35 (citing preventable suicides)] In an attempt to reduce this risk, the Stipulation requires close monitoring of persons placed on watch because they are believed to be at risk of self-harm or suicide.[22]

Shockingly, when monitoring this measure, Defendants often fail to examine the entire period the patient was on watch. But even with this significant and very dangerous defect in monitoring, which artificially inflates compliance rates, Defendants have failed

[21] Performance Measure 80: *MH-3A prisoners shall be seen a minimum of every 30 days by a mental health clinician.* "Mental Health Clinician" is defined in the Stipulation as a psychologist or psychology associate. [Doc. 1185-1 at 4; Stewart Rep. ¶ 31, n.10]

[22] Performance Measure 94: *All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse.*

26 of 45

to achieve compliance with this measure, with Eyman, Florence, Tucson, and Yuma all showing multiple consecutive months of noncompliance. Dr. Stewart attributes this noncompliance at least in part to ADC's chronic shortage of psychologists. [Stewart Rep. ¶¶ 36-39]

| | Feb | Mar | Apr | May | June | July | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 29 | 35 | 17 | 60 | 78 | 60 | 100 | 70 | 75 | 65 | 90 |
| Florence | 56 | 64 | 100 | 80 | 80 | 90 | 30 | 0 | 40 | 100 | 60 |
| Lewis | 90 | 90 | 90 | 100 | 70 | 90 | 100 | 100 | 90 | 100 | 100 |
| Perryville | 100 | 90 | 100 | 100 | 80 | 100 | 90 | 100 | 90 | 80 | 90 |
| Phoenix | 100 | 100 | 100 | 70 | 100 | 91 | 100 | 100 | 100 | 100 | 100 |
| Tucson | 100 | 60 | 100 | 50 | 100 | 50 | 50 | 70 | 60 | 80 | 60 |
| Yuma | 38 | 45 | 0 | 60 | 100 | 90 | 73 | 90 | 70 | 90 | 100 |

Dr. Stewart reviewed three suicides that occurred in ADC since February 2015 and concluded that "[a]ll three of these prisoners received mental health treatment that fell far below the standard of care."[23] In the cases of █████ and █████ there were failures to comply with mental health Performance Measures in ways that significantly contributed to the patient's suicide. For example, Mr. █████ was not seen every 30 days by a mental health clinician (PM 87), and an HNR he submitted, saying he was having "serious mental issues," was not triaged or responded to by staff (PM 98). Similarly, Ms. █████ was not seen every 90 days by a mental health provider in the final months of her life (PM 88). [Stewart Rep. ¶ 40] Dr. Stewart states that "[t]he chronic absence of psychiatric input into her treatment, even as she deteriorated, is consistent with ADC's longstanding shortage of psychiatric providers." [*Id.* ¶ 71] He concludes that "ADC prisoners remain at a substantial and unnecessary risk of suicide." [*Id.* ¶ 43][24]

---

[23] Dr. Stewart has not yet reviewed the suicides that occurred on February 15 and March 9, 2016: https://corrections.az.gov/article/inmate-death-notification-saba; https://corrections.az.gov/article/inmate-death-notification-aguilar-0.

[24] Dr. Stewart found other serious defects in Defendants' suicide prevention program. ADC documents show that a prisoner at Perryville "swallowed razor blades while on constant watch." The fact that a prisoner on constant watch was able to obtain and swallow razor blades "indicates a serious and lethal defect in watch procedures." [Stewart Rep. ¶ 42]

**5. Failure to monitor use of isolated confinement on the mentally ill**

The American Psychiatric Association has declared that "prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates," with "prolonged" defined as "greater than 3-4 weeks." [Stewart Rep. ¶ 44] Isolated confinement is associated with a greatly increased risk of suicide; indeed, all three of the suicides Dr. Stewart evaluated took place in isolated confinement. [*Id.*] Given this significant risk of harm, the Stipulation mandates close monitoring of mentally ill prisoners housed in isolated confinement. Unfortunately, Defendants have failed to comply with these requirements.

Mentally ill prisoners in maximum custody must be seen by a mental health clinician for clinical encounters regularly.[25] Defendants have reported widespread noncompliance with this performance measure, with Lewis noncompliant May through October 2015; Eyman noncompliant in every month but one from February through August; and Florence, Tucson, and Perryville each showing three consecutive months of noncompliance. Dr. Stewart opines that Defendants' noncompliance "is likely related to the chronic shortage of psychologists." [Stewart Rep. ¶ 45]

| | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 35 | 45 | 85 | 57 | 50 | 65 | 70 | 80 | 85 | 90 | 80 |
| Florence | 80 | 85 | 85 | 25 | 65 | 70 | 100 | 90 | 100 | 100 | 90 |
| Lewis | 80 | 50 | 100 | 40 | 70 | 70 | 70 | 50 | 30 | 90 | 80 |
| Perryville | 100 | 100 | 90 | 60 | 70 | 50 | 90 | 100 | 80 | 70 | 70 |
| Phoenix | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 100 | 100 | 100 | 100 |
| Tucson | 11 | 29 | N/A | 71 | 17 | 67 | 75 | 100 | 100 | 80 | 100 |

Mental health staff must also perform weekly rounds on mentally ill prisoners in maximum custody housing.[26] Defendants' compliance with PM 93 is shockingly low,

---

[25] Performance Measure 92: *MH-3 and above prisoners who are housed in maximum custody shall be seen by a mental health clinician for a 1:1 or group session a minimum of every 30 days.*

[26] Performance Measure 93: *Mental health staff (not to include LPNs) shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum custody.*

with Lewis at 30% and Perryville at 50% in November and Tucson at 0% in December. [Stewart Rep. ¶ 46]

| | Feb | Mar | Apr | May | June | July | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 0 | 0 | 5 | 48 | 100 | 95 | 40 | 63 | 90 | 85 | 90 |
| Florence | 0 | 5 | 40 | 70 | 85 | 95 | 95 | 100 | 100 | 90 | 100 |
| Lewis | 0 | 0 | 0 | 100 | 10 | 100 | 90 | 100 | 100 | 30 | 100 |
| Perryville | 40 | 30 | 100 | 80 | 70 | 100 | 100 | 100 | 100 | 50 | 100 |
| Phoenix | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 100 | 100 | 100 | 100 |
| Tucson | 0 | 0 | N/A | 86 | 100 | 67 | 87 | 90 | 80 | 80 | 0 |

### C. Failure to Implement Quality Assurance Mechanisms

Defendants' failure to engage in meaningful review and quality assurance ("QA") assessments prevents errors from being corrected and places prisoners at serious risk of substantial harm.

A quality assurance (QA) program must require "structured and systemic review of health care processes throughout the whole system" in order to function effectively. [Wilcox Decl. ¶ 136] Dr. Wilcox explains that

> [t]his is typically done by identifying a problem to be investigated, developing a hypothesis, performing a review of a statistically significant number of charts by a qualified individual or group to assess the evidence of care, calculating appropriate statistics to prove or disprove the hypothesis, formulating proposed action plans to improve the item being reviewed if necessary, developing policy and procedure to implement new action plans, and then reassessing the results of the changes in the future to determine that the identified problems have actually been corrected.

[*Id.*]

Several performance measures attempt to measure Defendants' ability to monitor the quality of the health care they provide. In general, Defendants report poor compliance with the QA performance measures. For example, Defendants are required to conduct annual performance reviews for nurses.[27] As of December only 52 nurses out of 300 had

[27] Performance Measure 29: *Each ASPC facility Director of Nursing or designee will conduct and document annual clinical performance reviews of nursing staff as recommended by the NCCHC standard P-C-02.*

undergone review during the previous 11 months. [Wilcox Decl. ¶ 137]   At three facilities, no nursing reviews were performed at all. [*Id.*]   Of particular concern is the repeated CGAR entry stating month after month that "no nursing clinic performance reviews were due during the reporting period." [*Id.*]   Failure to comply with this QA measure leaves the medical competence of nursing staff unassessed.   Plaintiffs' experts found multiple circumstances where nursing staff failed to recognize critical symptoms, in some cases leading to the patient's death. [*See, e.g.*, Wilcox Decl. ¶¶ 41-44, 56-57, 61-62, 68-69, 77-79, 92-94, 104-105, 111-116; Stewart Rep. ¶¶ 78, 111]   Defendants' abysmal compliance with Performance Measure 29 ensures that these lapses will go unaddressed and uncorrected.   A nursing staff whose competence is not monitored places plaintiffs at serious risk of substantial harm. [Wilcox Decl. ¶ 137]

Defendants are also required to conduct monthly continuous quality improvement (CQI) meetings, compliant with the National Commission on Correctional Health Care standards.[28]   While it appears Defendants do hold CQI meetings at each facility, a comparison of the minutes from these meetings with the requirements set forth by the NCCHC reveals gross noncompliance.   Defendants routinely fail to (1) specify sufficiently detailed corrective action plans, (2) identify a person responsible for effecting the change and subsequent reassessment, and (3) set forth a specific timeline for correction. [Wilcox Decl. ¶ 138]   Without the appropriate mechanisms in place to identify and rectify errors and failures within their health care system, Defendants virtually ensure that their system will remain chaotic and broken.   Even where deficiencies are known to particular people or groups of people, there is no effective mechanism for addressing those issues.

---

[28] Performance Measure 27:   *Each ASPC facility will conduct monthly CQI meetings, in accordance with NCCHC Standard P-A-06.*   This NCCHC standard defines a CQI committee a one that "designs quality improvement monitoring activities, discusses the results, and implements corrective action." [Wilcox Decl. ¶ 138]

## II. DEFENDANTS' BROKEN HEALTH CARE SYSTEM HARMS PATIENTS AND PLACES ALL PRISONERS AT SUBSTANTIAL RISK OF HARM

### A. Systemic Failures Result in Treatment Delays and Denials Causing Suffering and Death

Defendants' own audits establish that their health care delivery systems fail to provide reliable access to care. This failure has directly harmed many class members and has placed every prisoner at serious risk of substantial harm. Often denying and/or delaying access to medically necessary care has immediate, catastrophic, and permanent results that can result in preventable, irreversible injury or death. [*See* Wilcox Decl. ¶¶ 13-17, 41-44, 51, 53-66, 68-70, 78-79, 81-94, 98-116, 119, 121-124, 133; Stewart Rep. ¶¶ 50-71, 73-84, 85-112] While much of this case rests on metrics and audits, behind those numbers are human beings who have suffered immeasurable harm and pain, and many of whom have died, as a result of Defendants' abject failures.

Perhaps most illustrative of ADC's systemic failures and dangerous care is the case of ████████, who mercifully was released from ASPC-Tucson in March 2016, and is no longer dependent on Defendants for medical care. Mr. ███ was diagnosed with testicular cancer in August 2015. [Wilcox Decl. ¶ 88] At every juncture, Defendants failed to provide Mr. ███ with timely and appropriate care. His CT scan, ordered on an urgent basis, was performed weeks late on 9/23/15. [*Id.*] Mr. ███ underwent surgery in late October 2015, and that is where his care essentially ended. [*Id.*] The follow-up CT scan was not performed until November 24, 2015 and the consult notes attached to the CT were missing the pages that discussed the diagnosis and plan.[29] [*Id.* ¶¶ 88-89] As such, Mr. ███ received no care for biopsy-proven, CT-proven, surgical pathology-proven cancer. [*Id.* ¶ 89]

Mr. ███ is a young man with a highly treatable form of testicular cancer, but the appropriate treatment has to be done and it has to be done in a timely fashion. Unfortunately, nothing about Mr. ███ care has been timely, only part of the

---

[29] ASPC-Tucson's average score for Performance Measure 46, measuring timely review of diagnostic reports, including pathology reports, was 38% in 2015.

recommended treatment has been accomplished, and there is no evidence that he was ever on anybody's radar within ADC because the last date he had a provider encounter was 10/30/2015—the date of his surgery. [*Id.* ¶ 90] He was never seen by a provider after returning to the facility prior to his release. [*Id.*]

Mr. [redacted] case is particularly troubling, for two reasons. First, Dr. Wilcox identified him to defendants in a face-to-face meeting in December 2015 as a patient in need of immediate attention for a potentially life-threatening illness, yet according to the medical record, he received virtually no attention in the ensuing three months. [*Id.* ¶ 91] Second, Mr. [redacted] case is alarmingly similar to two other cases Dr. Wilcox reviewed at ASPC-Tucson, both involving young men with testicular cancer who experienced inexcusable delays in care. [*Id.* ¶¶ 13-15] [redacted], died at age 42, on [redacted]. After he underwent an orchiectomy (removal of his testicle), he should have immediately been placed under the care of an oncologist. In fact, he did not see an oncologist for five months, and when he did, he had widespread disease. [*Id.* ¶ 15] The ADC Mortality Review Committee concluded Mr. [redacted] death was preventable, and Dr. Wilcox agreed. [*Id.*] Similarly, thirty year old [redacted], experienced extreme delays in care for his testicular cancer, resulting in metastasis. Although he is still alive, he has been diagnosed as terminal, with less than a year to live. [*Id.* ¶ 14]

The suffering experienced prior to death by [redacted], a Yuma prisoner described above at pages 2-3, illustrates the suffering inflicted when patients cannot access basic nursing care.[30] Despite Mr. [redacted] serious conditions of end-stage liver disease with fluid retention, groin wounds, and sepsis, the nursing staff repeatedly failed to respond to his desperate Health Needs Requests in March and April 2015, including at one point when he reported that his skin split open due to swelling, was infected, and swarmed with flies. [Wilcox Decl. ¶¶ 41-42] Shockingly, the nurse

---

[30] ASPC-Yuma's average score for Performance Measure 37, measuring timely access to nurse triage, was 41% for 2015.

declined to see him. [*Id.* ¶ 42] More than a week after reporting the swarm of flies, he was finally transferred to the hospital, where he died [redacted]. Dr. Wilcox agreed with the Mortality Review Committee's conclusion that multiple triage mistakes by nursing staff impeded and delayed Mr. [redacted] care, and concluded that the abysmal care hastened his death. [*Id.* ¶ 43]

Patients in Defendants' infirmary units are particularly vulnerable and likely to suffer harm if not promptly seen. [redacted], died four days after arriving at ASPC-Tucson, without ever seeing a medical provider. [Wilcox Decl. ¶ 68] Mr. [redacted] had a daily heroin habit and was placed in the infirmary to go through opiate withdrawal. Although seen by several nurses, who documented that he was experiencing serious withdrawal and was at risk of dehydration due to excessive vomiting, he was apparently never seen a medical provider,[31] and was not prescribed IV medications for vomiting. [*Id.* ¶¶ 68, 78] Staff failed to monitor his condition, failed to order appropriate labs, and failed to refer him to a higher level of care. Consequently, Mr. [redacted] died unnecessarily on [redacted], four days after his arrival at prison, at age 44. The Mortality Review Committee report correctly classified this as a preventable death. [*Id.* ¶ 68]

A lack of timely access to providers results in delayed or denied care, and places patients at substantial risk of harm. [redacted], died of leukemia at the age of 32 after Defendants failed to provide timely diagnostic care for almost a year.[32] [*Id.* ¶ 103] She died four months after her diagnosis, and while Ms. [redacted] may ultimately have succumbed to her illness, Dr. Wilcox determined without reservation that she experienced "repeated and inexcusable delays" in receiving a diagnosis and treatment for her leukemia, and that "these serious lapses resulted in hastening her death." [*Id.*]

[redacted], likewise suffered delays in care when she complained of radiating pain in her leg, abdominal pain, and the inability to urinate. Four days later,

---

[31] ASPC-Tucson's average score for Performance Measure 66, measuring timely provider encounters for infirmary patients, was 32% for 2015.

[32] ASPC-Perryville's average score for Performance Measure 39, measuring timely access to medical providers, was 48% for 2015.

33 of 45

when her symptoms worsened and she could no longer use her legs, medical staff decided not to send her to a hospital but rather to the prison's medical clinic. While at the clinic, Ms. [redacted] temperature registered at 91.9 degrees, a classic symptom of sepsis requiring emergency assessment. While she was eventually taken to the hospital, she died the next day from a staph infection, spinal meningitis, and pneumonia. Had her condition been properly triaged, she likely would have survived. [Wilcox Decl. ¶¶ 53-54]

[redacted], experienced treatment delays at ASPC-Eyman in part because his very abnormal lab results dated May 27, 2015, were apparently not reviewed by his provider for weeks.[33] [Wilcox Decl. ¶ 104] Mr. [redacted] ultimately died [redacted] [redacted], at the age of 43, with an infection of his heart. Had he been timely diagnosed, Dr. Wilcox opines he would not have died. [*Id.* ¶ 105]

Significant barriers remain in the provision of specialty care for patients in Defendants' care. Essential coordination between Defendants' medical staff and outside specialists continues to fall well below the standard of care, with critical diagnostic results left ignored and unprocessed for extended periods of time. The following examples are demonstrative of this lack of coordination and ultimately lack of adequate specialty care:

- [redacted]., was referred to a cardiologist for an implantable defibrillator, but that appointment did not occur timely. He died before the visit was arranged. [Wilcox Decl. ¶ 81]

- [redacted], developed a decubitus ulcer as a result of long-standing diarrhea while at ASPC-Tucson. Although his record indicated Defendants knew of the infection for over a year, there is no record that he received any treatment for it.[34] On June 25, 2015, he was referred to a surgical specialist for repair. By December 2015, that referral had not been scheduled. Mr. [redacted] reports that he was told Corizon could not find a surgeon to do the repair. In the meantime, "this otherwise relatively healthy young man has been bedridden for months." [*Id.* ¶¶ 82, 133]

- [redacted], underwent a leg amputation. Following his surgery, he did not see a provider for five months. On October 19, 2015, a consult for a prosthesis was ordered. At the time of Plaintiffs' December tours, this consult had yet to be scheduled. When asked about this delay, Defendants' "consult

---

[33] ASPC-Eyman's average score for PM 47, requiring provider review of abnormal labs within five days, was 64% for 2015.

[34] ASPC-Tucson's average score for PM 46, measuring the timeliness of physician review for diagnostic reports, was 38% for 2015.

specialist" confirmed that the consult had been approved but was unable to explain why there was a delay in scheduling it. [*Id.* ¶ 86]

- [redacted], an ASPC-Lewis prisoner, suffers from HIV/AIDS. His HIV specialist has recommended that he have a specialty consult every 3 months. At the time of Plaintiffs' December tours, Mr. [redacted] had last been seen in June 2015. Moreover, he had not been seen by a specialist in spite of diagnostic results in October 2015 that revealed a very high viral load and indicated that his treatment was not working.[35] [*Id.* ¶ 106]

Defendants' dysfunctional mental health care system similarly results in gratuitous suffering, aggravation of mental illness, and risk of injury or death:

- Dr. Stewart found [redacted], who is designated MH-3A and SMI (Seriously Mentally Ill), posturing (a serious psychotic symptom), responding to internal stimuli, displaying thought blocking, and complaining of auditory hallucinations telling him that he and his family are going to be hurt. Although he was required to be seen by provider at least every 90 days (PM 81), at the time of Dr. Stewart's evaluation he had not been seen for nearly five months. Dr. Stewart opines that "[t]his lack of appropriate follow up has caused Mr. [redacted] untold harm." [Stewart Rep. ¶ 73]

- [redacted] is designated MH-3A and SMI, with a diagnosis of dementia. Dr. Stewart found him to be very psychotic (responding to internal stimuli, stating "my bible name is Peter") and extremely malodorous. Dr. Stewart concluded that his condition had not improved and had possibly deteriorated over the past several months, and that he requires transfer to an inpatient level of care. In addition, he was being treated with antipsychotic medication, which is contraindicated in patients with dementia and can cause death. [Stewart Rep. ¶¶ 74-75]

- [redacted] is a 34 year old man with chronic psychosis and prior suicide attempts, classified as MH-3A and SMI. Over a period of several weeks in July and August 2015, his mental health deteriorated dramatically. Staff noted that he was naked, urinating and defecating on the floor, and eating his feces, and characterized him as "psychotic," "unstable," and "delusional." He was repeatedly placed on and removed from suicide watch. [Stewart Rep. ¶¶ 85-92] Throughout this entire period, when Mr. [redacted] was displaying floridly psychotic behavior, there is no indication that he was ever seen by a psychiatrist, evaluated for medication changes, or considered for inpatient care. Dr. Stewart concludes that "[t]his is shockingly deficient and far below any acceptable standard of care." [*Id.* ¶ 90] Mr. [redacted] was finally referred to the see the psychiatrist "within the next 2 weeks," but this did not occur. [*Id.* ¶ 91] Mr. [redacted] was not seen by a mental health provider every 90 days as required by PM 81; nor was his treatment plan updated every 90 days as required by PM 77. [*Id.* ¶ 92]

---

35 ASPC-Lewis's average score for PM 46, measuring the timeliness of physician review for diagnostic reports, was 63% for 2015.

35 of 45

- [redacted] is a 74 year old man with a reported diagnosis of Schizoaffective Disorder, who is designated MH-4 and SMI. Although he is housed in a dedicated mental health unit, he was never evaluated by a psychiatrist or psychologist during the entire one-year period covered by Dr. Stewart's record review. Nor was he seen by a mental health clinician for a one-on-one session at least every 30 days, as required by PM 87. His medical records do not contain any diagnostic formulation. Treatment plans do not address his history of chronic psychosis; indeed, the three treatment plans included in his record are identical, with no attempt to make updates or adjustments. [Stewart Rep. ¶¶ 93-102] Dr. Stewart concludes that "the treatment Mr. [redacted] received would be grossly inadequate for any patient with his profile," but the fact that he received such treatment while housed in a dedicated mental health unit "is indicative of just how inadequate the overall mental health care is in the Arizona Department of Corrections." [*Id.* ¶ 102][36]

The cases discussed above are, unfortunately, merely the tip of the iceberg. Plaintiffs' experts, during their brief site visits, and while reviewing a limited universe of medical records, have identified numerous patients who have been denied care, or had their care grossly delayed. No doubt, if they were permitted wider access to the facilities and records, they would find many more.

### B. The root cause of Defendants' non-compliance is extreme and chronic staff shortages.

Defendants' health care system has been plagued by "extreme and chronic" health care staff shortages, with staffing levels that are "dangerously low and . . . woefully inadequate to provide minimally adequate care." [Stewart Rep. ¶¶ 18, 24] Such shortages undercut a system's ability to function and directly endanger patients by "lead[ing] to excessive delays in access to care [], [forcing] healthcare staff [to act] outside the scope of their licenses [], [causing] failure[s] to carry out providers' orders [], and [causing] the failure to review and file diagnostic test results." [Wilcox Decl. ¶ 35]

///

///

///

[36] [*See also* Stewart Rep. ¶ 76 (male prisoner diagnosed with "diseases of the nervous system complicating pregnancy, unspecified trimester"); *id.* ¶¶ 50-71 (discussing suicides of [redacted])]

### 1. Unfilled Vacancies and Inadequate FTE positions

Defendants' failure to employ a sufficient number of health care staff places class members at a significant risk of serious harm and directly interferes with the ability of prisoners to obtain any health care, let alone constitutionally sufficient health care. ADC's health care staff have such high caseloads that they cannot possibly render adequate healthcare even to those patients they do see. These failures have led to extreme suffering, permanent injury, and avoidable death.

Defendants' staffing shortage is a result of their unwillingness or inability to fill vacant positions and, more importantly, their decision to maintain woefully inadequate staffing ratios. Without adequate numbers of doctors, nurses, psychiatrists, and psychologists, as well as scheduling and other support staff, it is physically impossible for prisoners to receive timely or competent health care treatment and specialty referrals. By way of comparison, the staffing ratio of physicians to prisoner patients in Alabama, a state with a prison population similar to Arizona and where the medical care is provided by Corizon, is 1:1,741. Arizona's current ratio is 1:2,539. [Wilcox Decl. ¶ 31] Similarly, the ratio of psychiatric providers to prisoners is 1:531 in Colorado and 1:1,861 in Arizona. [Stewart Rep. ¶ 25] The ratios of mid-level providers and RNs show similar disparities. Difficulty filling positions and expense do not excuse Defendants from their duty to provide constitutionally adequate health care.

Defendants' own documents repeatedly acknowledge health care staffing shortages. Month after month, at multiple facilities, Defendants admit that their mental health staffing levels are inadequate. [*See, e.g.*, Declaration of Corene Kendrick ("Kendrick Decl."), filed currently herewith, Ex. 11 at ADCM 228309 ("The conintued [sic] need to recruit additional providers is still in place and is a huge need") (Florence); *id.*, Ex. 19 at ADCM 199401 ("staffing shortage with nursing staff") (Yuma); *id.*, Ex. 19 at ADCM 199656 ("severe provider shortage") (Tucson); Stewart Rep. ¶ 22] And Defendants' staffing reports show that these shortages are longstanding and chronic. From April through December 2015, the statewide contract fill rate ranged between 46%

and 52% for psychologists, and between 26% and 49% for mental health nurse practitioners. [Stewart Rep. ¶ 24]

Similarly, Defendants' own documents show that its contractor Corizon admits that the failure to meet some performance measures of the Stipulation regarding medical care is directly tied to staffing vacancies. For example:

- Health care staff at Douglas complex conceded that the provider's failure to see patients timely after sick call or to review specialty consult reports according to the requirements is a staffing issue;
- Eyman prison complex lacked a RN onsite 24/7 because of nursing vacancies, and the failure to timely and accurately file medical records was due to the prison's need to hire a medical records clerk;
- Florence complex's failure to renew prescriptions timely was based on the prison's need to hire another nurse;
- To remedy untimely RN sick call, Lewis prison needed to "work on filling vacancies," and was "[a]ctively recruiting RNs" to address untimely sick call as one nurse was covering three posts; and also needed to "continue to recruit" provider level staff.

[Wilcox Decl. ¶¶ 33-34]

**2. Appointment Backlogs**

Without the proper levels of medical and mental health staff, Defendants accumulate significant backlogs that delay vital care to class members. Such delays violate numerous provisions of the Stipulation and are also symptomatic of a system in disarray. On December 18, 2015, Corizon informed Defendants' counsel that "[t]he current statewide Mental Health appointment backlog is 377," and "[t]he current statewide Psychiatric appointment backlog is 1,385." [Kendrick Decl., Ex. 3 at PLTF-PARSONS-036247; Stewart Rep. ¶ 21] [*See also* Stewart Rep. ¶¶ 21-22; Kendrick Decl., Ex. 21 at ADCM 197765 ("we have a very large psych backlog – close to 1000") (Tucson); Kendrick Decl., Ex. 24 at ADCM 225806 ("psychiatry is very backlogged currently – with approx. 400 inmates") (Lewis); Kendrick Decl., Ex. 22 at ADCM 228120 ("there were 283 backlogs for Psychiatry") and at ADCM 225864 ("psychiatry backlog has increased due to lack of provider coverage") (Florence).

38 of 45

### 3. Health care staff acting outside scope of practice

Defendants' widespread staffing shortages also create situations in which "patients are denied a clinician's professional medical judgment if nurses or other staff are called upon to make decisions that standard of care—and sometimes professional licensing requirements—reserve for primary care providers." [Wilcox Decl. ¶ 77] Dr. Wilcox discusses numerous examples in his report, where LPNs and RNs failed to refer patients to providers with the medical expertise to treat the patients' life-threatening conditions. [*Id.* ¶¶ 41-44, 56-57, 61-62, 68-69, 77-79, 92-94, 104-105, 111-116] Their failure to refer and reliance instead on their own skills ultimately resulted in pain, suffering, permanent injury, and in some cases, hastened their deaths. Dr. Stewart similarly found mental health care ostensibly being provided by "administrative assistants" and "mental health clerks" whose clinical training, if any, is not apparent. [Stewart Rep. ¶¶ 94, 106]

## ARGUMENT

## I. THIS COURT HAS THE AUTHORITY TO ORDER ADDITIONAL RELIEF, INCLUDING THAT DEFENDANTS REMEDY THEIR STAFFING SHORTAGES

As noted above, the Court has the authority to issue any relief "provided by law." [Doc. 1185 ¶ 36] The Stipulation also provides that when the Court finds non-compliance it must first order Defendants to submit a plan to be approved by the Court to remedy the deficiencies. [*Id.*] Although the Court cannot specifically order Defendants to hire a specific type or number of staff, the Stipulation contains nothing prohibiting the Court from ordering the Defendants to develop a plan to increase staffing. Indeed, the Stipulation plainly contemplates that possibility. [*Id.* ("the Court shall not have the authority to order Defendants to construct a new prison or to hire a specific number or type of staff *unless Defendants propose to do so as part of a plan* to remedy a failure to comply with any provision of this Stipulation.") (emphasis added)]

When ordering a party to develop a remedial plan to come into compliance with a settlement or past court orders, "the court is entitled to give some guidance . . . and set some deadlines for compliance." *Armstrong v. Davis*, 275 F.3d 849, 873 (9th Cir. 2001).

With the inclusion of instructions as to what elements need to be in a remedial plan "the . . . district judge [does] not attempt to 'micro manage' the [party's] activities, but rather to set clear objectives for it to attempt to attain, and, in most circumstances, general methods whereby it would attain them." *Id.* The U.S. Supreme Court has also held that a court's inherent power to order a noncompliant party to develop remedial plans to achieve compliance includes the court's ability to direct the party to include certain tasks and deadlines in the plan, because the court "retains the authority, and the responsibility, to make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion." *Brown v. Plata*, 563 U.S. 493, 131 S. Ct. 1910, 1946 (2011).

**RELIEF REQUESTED**

Plaintiffs request that the Court order Defendants to submit a plan within 45 days detailing how they plan to achieve compliance with the Stipulation. Such a plan shall incorporate the following elements and contain factual justifications for each of its provisions:

1. The steps Defendants will take to increase medical and mental health staff within ADC to levels reasonably designed to allow Defendants to achieve sustained 80% compliance all ten institutions in 2016, and achieve sustained 85% compliance at all ten institutions in subsequent years with all Performance Measures detailed in this Motion.

2. The steps Defendants will take to reduce the vacancy rate to no more than 10% for physicians, nurse practitioners, physician's assistants, registered nurses, licensed practical nurses, psychiatrists, mental health nurse practitioners, psychologists, mental health nurses and psychological associates. These steps must be in addition to those currently being employed by ADC and Corizon.

3. A description of the steps Defendants will take to contract with medical specialists so that prisoners approved for specialty appointments are seen by the specialist within time frames set forth in Performance Measure Nos. 50 and 51.

40 of 45

4. The name and qualifications of an independent consultant, mutually-agreed upon by the parties, with appropriate expertise to make recommendations for staffing levels necessary to meet the Performance Measures detailed in this Motion. The Defendants will be obligated to follow the consultant's recommendations unless they can show another remedy would be equally effective in reducing the staffing shortages.

Upon receipt of Defendants' plan and any objections, the Court shall determine whether to approve the plan in full or with any necessary modifications.

## CONCLUSION

When state officials fail to discharge their constitutional duty to provide prisoners with minimally adequate medical and mental health care, the result is "[n]eedless suffering and death." *Plata*, 131 S. Ct. at 1923. More than one year after this Court approved the Stipulation in this case, it is abundantly clear that Defendants have not kept their side of the bargain, and many of the 36,000 members of the plaintiff class have paid a heavy price. The Court should order Defendants to develop a plan to comply with their obligations without further delay.

Date: April 11, 2016

**PRISON LAW OFFICE**

By: *s/ Donald Specter*

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email: dspecter@prisonlaw.com
ahardy@prisonlaw.com
snorman@prisonlaw.com
ckendrick@prisonlaw.com

*Admitted *pro hac vice*

41 of 45

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Jamelia Natasha Morgan (N.Y. 5351176)**
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@npp-aclu.org
          afettig@npp-aclu.org
          jmorgan@aclu.org

*Admitted *pro hac vice*.  Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
          agerlicher@perkinscoie.com
          jhgray@perkinscoie.com

Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    dpochoda@acluaz.org
          jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, P.C.**
P. O. Box 91398
Tucson, Arizona 85752
Telephone:  (520) 477-1475
Email:    kirstin@eidenbachlaw.com

42 of 45

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email: cnmitchell@jonesday.com
aamiri@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email: jlwilkes@jonesday.com

*Admitted *pro hac vice*

Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email: jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By: *s/ Sarah Kader*
Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
**ARIZONA CENTER FOR DISABILITY LAW**
100 N. Stone Avenue, Suite 305
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email:
rdalyrooney@azdisabilitylaw.org
jrico@azdisabilitylaw.org
jross@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

44 of 45

**CERTIFICATE OF SERVICE**

I hereby certify that on April 11, 2016, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

s/ D. Freouf

45 of 45