UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Victor Parsons, et al., on      )
behalf of themselves and all    )
others similarly situated;      ) No.  CV 12-00601-PHX-NVW
and Arizona Center for          )
Disability Law,                 )
                                )      Phoenix, Arizona
                Plaintiffs,     )      June 24, 2016
vs.                             )         9:01 a.m.
                                )
Charles Ryan, Director,         )
Arizona Department of           )
Corrections; and Richard        )
Pratt, Interim Division         )
Director, Division of Health    )
Services, Arizona Department    )
of Corrections, in their        )
official capacities,            )
                                )
                Defendants.     )
_____ )

BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

(*Status Conference*)

Transcriptionist:
Laurie A. Adams
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC-43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

For the Plaintiffs:

        ACLU - Washington DC
        By:  **David Cyrus Fathi, Esq.**
        By:  915 15th Street NW
        7th Floor
        Washington, DC 20005

        ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
        By:  **Maya S. Abela, Esq.**
        177 N. Church Avenue
        Suite 800
        Tucson, AZ 85701

        EIDENBACH LAW PC
        By:  **Kirstin T. Eidenbach, Esq.**
        P.O. Box 91398
        Tucson, AZ 85752

        PRISON LAW OFFICE
        By:  **Donald Specter, Esq.**
        By:  **Alison Hardy, Esq.**
        By:  **Corene D. Kendrick, Esq.**
        1917 5th Street
        Berkeley, CA 94710

For the Defendants:

        STRUCK WIENEKE & LOVE, P.L.C.
        By: **Daniel P. Struck, Esq.**
        By: **Ashlee B. Fletcher, Esq.**
        3100 W. Ray Road
        Suite 300
        Chandler, AZ 85226

```
 1              P R O C E E D I N G S
 2         THE MAGISTRATE CLERK:  Civil Case Number 12-601,
 3    Parsons, et al., versus Ryan, et al., on for status conference.
 4         THE COURT:  Would counsel please state their
 5    appearances for the record.
 6         MR. FATHI:  Good morning, Your Honor.  This is David
 7    Fathi from the ACLU Prison Project for the plaintiffs.
 8         THE COURT:  Thank you.  Good morning.
 9         MS. ABELA:  Good morning.  Maya Abela for Arizona
10    Center for Disability Law.
11         THE COURT:  Thank you.  Good morning.
12         MR. SPECTER:  Good morning.  This is Donald Specter,
13    Corene Kendrick, and Alison Hardy for the plaintiffs from the
14    Prison Law Office.
15         THE COURT:  Good morning.
16         MS. EIDENBACH:  This is Kirstin Eidenbach, from
17    Eidenbach Law, for the plaintiffs.
18         THE COURT:  Thank you.
19         MR. STRUCK:  Dan Struck and Ashlee Fletcher from
20    Struck Wieneke and Love and Mike Gottfried from the Attorney
21    General's Office.
22         THE COURT:  Thank you very much.  Good morning.
23         Did we cover everybody?  Okay.  Well thank you all for
24    coming in.  I will start with asking your leave for a standing
25    apology for my voice and the coughing that is likely to ensue.
```

1   I had a cold a couple of weeks ago, and after 57 years my voice

2   has decided it's no longer comfortable residing in my body so

3   it's apparently left.  I'm hoping it will come back at some

4   point but not today.

5          All right.  I have to start off by saying that I, too,

6   am skeptical about the proposed remediation plan, mostly for

7   three reasons, although there are individualized reasons that I

8   will touch upon.  But the three overarching reasons are that

9   the proposed mediation -- remediation lacks a sense of

10  persuadability on its own standing.  The disappointment, I

11  guess I should express, it starts with the very first

12  identified performance measure failure, and that's 11, in which

13  the defendants' proposal to deal with the failure to provide

14  newly prescribed provider order formula medication starts off

15  with telling me about two facilities where they are meeting the

16  benchmark but obviously leaves me in the dark.  Obviously, I'm

17  in the dark, but plaintiffs presumably and defendants certainly

18  are not in the dark about the others that are not in

19  compliance.

20         And so that kind of representation, to say hey, we've

21  got two out of eight, doesn't carry very far for me.  And then

22  I turn to the very next page under accountability manifest log,

23  and the reasons that are cited as being possible explanations

24  for this failure to provide for timely delivery of newly

25  prescribed medications are, one, refilled too soon, no refills

1    remaining, no -- or medication unavailable.  Well, starting

2    with the last, this is the formulary.  How is it that the

3    medication is unavailable?  No refills and refill too soon,

4    this performance measure is for newly prescribed medications.

5         So in order to have confidence that the defendants'

6    proposal to remediate the problems will have a chance of

7    working, I have to have some reason to believe that you

8    understand what the problem is.  And when I read this, it makes

9    me think that you don't understand what the problem is, and

10   that, therefore, why should I think that you have your hands on

11   it grasped firm enough to be able to move forward in a

12   constructive way?

13        And so each page of the proposed mediation includes

14   generalized statements of really even ranging from the absurd,

15   that is, we have required them to sign a document saying they

16   will now comply.  Well, this is not news to the defendants

17   about the failure to comply.  We started this -- well, you have

18   all started the process in November.  And you know a couple of

19   things:  One, you know you are dramatically out of compliance

20   and at some point the rubber is going to hit the road and I'm

21   going to be saying, what are we going to do about this?  And

22   here we are in June, and what you are saying is well, we are

23   going to have people sign a statement.

24        Or, and I have to also say, that this is, you know,

25   the time we have addressed this, we have moved to the

1    progressively stricter requirements.  And what you all propose

2    has us now in a world of 85 percent.  And again, it leaves me

3    with little confidence to believe that what you are proposing

4    is knowledgeable enough about the problem, specific enough, and

5    has enough focus on it in the defendant's side of the house to

6    make sure that it has a reasonable shot of accomplishing what

7    we want to do.

8          You know, I guess I'd turn to another example with

9    respect to the defendants' own suggestion that additional

10   staffing is necessary, and you seek to accomplish dealing with

11   that by either increasing the metronome on the workers, and

12   again, I can't make an intelligence judgment about that.  When

13   you say we are going to require that the medical providers must

14   provide that they must see 15 patients a day and dedicate one

15   hour to administrative tasks, I can't tell whether that's going

16   to be a remediation measure that's going to address the deficit

17   that we have, because I don't know what the previous

18   requirement was.  And I also don't know whether it's an I Love

19   Lucy kind of thing where you move the conveyer belt for the

20   candies faster and there's no way anybody can do it.

21         And then the hiring that you say, I mean, I can't

22   tell, that there's an absence of specificity in the remediation

23   plan, whether or not this hiring has already taken place.

24   There's a fair reason for me to be suspicious, because the

25   defendants also tell me that they have got a chronic problem

```
 1    with turnover and with the inability to fill positions because
 2    of pay scales or whatever.
 3            And so you leave me, you know, a table that
 4    summarizes, kind of, the accents of specificity throughout the
 5    document where there are, you know, I guess the right way to
 6    describe it is just conclusory statements about almost
 7    aspirational goals.  We're not to aspirational goals.  We're to
 8    a plan to fix something that's broken.
 9            So this leads me to be very skeptical about whether or
10    not it can work.  On the other hand, I can't know for sure that
11    it won't work.  And, in fact, it seems to me that my first
12    reaction, honestly, was just to reject it out of hand as being
13    wholly insufficient.  But then I thought that maybe is not
14    fair.  Maybe, you know, I'm not giving you a chance because
15    this is your proposal, offered in good faith, and presuming
16    that you wouldn't do something that you thought was doomed from
17    the beginning that may be consistent with due process even that
18    I ought to give you chance.  The plaintiffs, in fact, seem to
19    say the same thing.  They seem to say, this isn't going to
20    work.  We are skeptical.  But they say, Judge, impose it, with
21    the one reservation.
22            And so I moved to that position, but I guess I wanted
23    to make it very clear that if it doesn't work that we're not
24    going to be -- we're going to be sitting in this room for a
25    long time together, and I'm going to be asking specific
```

questions.  I'm going to want to know more than I know now.

And again, I really apologize about my voice.  There's absolutely nothing I can do about it.  I mean, I'm seeing doctors.  I have done steroid inhalers, anti-whatevers.  It just happens, I guess.  It's a conjunction of allergies coming on top of having had irritated vocal cords.

And so on the one hand, you know, we could go through, I mean, the questions I wrote out in reviewing this involved this sort of strict scrutiny of me trying to understand and sort of inside your head about how you thought this could work. And I concluded that I wasn't going to do that, that I was going to give you a chance to do it.

But I have got concerns not only associated with what I mentioned about time already, and that is you tell me that I have got a lag.  So I think the soonest I really can know whether these are going to work or not is late August, September.  And, you know, we're on the verge then of 85 percent.

And so maybe that's what I need to say about that. Maybe you get the message now that that's what my position is, that entering the order that is proposed to authorize proceeding with this remediation plan but with hopefully a very clear heads up that I was initially prepared to say no, because it just was wholly unpersuasive to me.

Now, I will go ahead and turn to the reservation of

1    what the plaintiffs classify or just to drive as a

2    reclassification, honestly, it looked like that to me, too.  So

3    they propose two solutions.  They say, either reject it and say

4    come up with something else, or allow us to dig into it.  You

5    know, I'm inclined to go either way.  And the only way to get

6    off to allow us to go and dig into it is for you to say, we'll

7    keep the present classification in the tech manual.  We will

8    keep the people that we previously classified, and we will use

9    that as the number of people by which we evaluate whether this

10   performance measure is used or not.

11          But Mr. Struck, go ahead and address that.

12          MR. STRUCK:  Sure.  And first of all, I'd like to say,

13   Your Honor, we certainly hear you loud and clear.  These plans

14   were put together by the Corizon folks in conjunction with work

15   with some of the ADC people.  I asked Corizon to be here today

16   to hear what your comments were with respect to that, so they

17   have heard it.  And we certainly understand your position with

18   respect to the remedial plan on these performance measures.

19          With respect to Performance Measure 85, the problem

20   with Performance Measure 85 is that there were a lot of folks

21   in there that should not be classified as MH-3 -- MH-3D, excuse

22   me.  MH-3D are individuals who are just coming off psychotropic

23   medication.  There were actually a couple thousand of people

24   who -- and usually these are people coming in through intake

25   who, when asked have you ever received mental health treatment,

they say, well, maybe five years ago, six years ago.  If that
was the case, they were being classified as someone who was
just coming off psychotropic medication.  So the problem was
that they were over-classified.  They actually should have been
classified as MH-2s, but the clinicians were being overly
cautious in classifying them as MH-3D, which is why the
Department determined it might make sense to come up with
another classification which would allow for the clinicians to
make sure that the folks who received mental health treatment
years ago didn't need to be followed up and, in other words,
make it more proactive as opposed to reactive, which is the
MH-2s, which unless there's a problem or they put in a request
for treatment, you aren't going to know there's a problem
because they aren't proactively followed up on.

          So the only difference between the MH-3D and the MH-3E
is that the MH-3Ds are seen by a psychiatric provider 30 days
after they are off the psychotropic medication.  That's the
only difference.

          THE COURT:  I appreciate that.

          MR. STRUCK:  So it -- I think the practical result of
saying don't -- I mean, and that's the thing about corrections.
It's a -- it's not set in stone.  I mean, things are changed
all the time as a result of the situations that corrections
officials and medical professionals are confronted with.  And
this is a situation where you have got some folks where, you

1    know, the clinicians would like to follow up on them, but they

2    just don't need to be followed up on to the extent that

3    somebody who has just come off psychotropic medication needs to

4    be followed.

5         THE COURT:  But the plaintiffs -- I will let Mr. Fathi

6    speak here, because I read what he wrote and he was very plain

7    about it, and that is that the performance measure recognizes

8    what seems to be common sense.  And that is something that's

9    not lost to me, you know.  I don't want to take evidence on

10   this, but I will tell you all the time I have defendants

11   appearing in front of me who have the circumstance of going

12   off, either by refusing to take it, or because the U.S.

13   marshals have transported them in a way that there was a lag in

14   having the medication accompanying them.

15        So -- and there are times where decisions are made by

16   CCA, we don't need to disburse, not all the time.  But very

17   frequently what I will see is a decompensation, somebody whose

18   been to the Federal Medical Center, been treated, been restored

19   to competency, heads out to CCA where they have a different

20   view and they discontinue the medication.  And I see in front

21   of me all the time people who are back in the situation they

22   were before they went.

23        And so it's not news to me that there would be a

24   performance measure that would say that we want to make sure

25   that we're capturing the people who have been discontinued from

1    this medication.

2         MR. STRUCK:  And those are going to be continued, Your

3    Honor.  Those are going to be the MH-3Ds.  People that are

4    coming off medication will continue to be MH-3Ds.  We're

5    talking about people that should have -- don't really fall into

6    that category but they were being placed in that category.

7         THE COURT:  But they were on psychotropic medication.

8         MR. STRUCK:  Years ago, and they are coming into the

9    system.  This is usually through intake.  They are asked, have

10   you ever been treated for mental health problems?  Oh, yeah,

11   five years ago I was on medication.  Those aren't people who

12   are just coming off psychotropic medication.  These are people

13   that were treated years ago, but the clinician feels more

14   comfortable following them than putting them as an MH-2, which

15   makes them a more reactive treatment.

16        So the idea was to create the MH-3E which would

17   capture those people -- and we're not talking about the people

18   that have discontinued medication, refused to take medication,

19   or just coming off medication.  They would continue to be

20   classified as MH-3D.  These are people that years ago received

21   treatment, but they are just coming into the system.  So the

22   clinician would likely be a little more proactive, but they

23   don't need to be seen in 30 days by a psychiatrist because they

24   haven't been seen by any mental health provider for years.

25        THE COURT:  Well, Mr. Fathi, if we're just talking

about that group of people that would be removed from the
classification previously, the MH-3, if we're just talking
about those people, let me say it again, those people who are
not coming off of just having been -- had their psychotropic
medication terminated but instead, as Mr. Struck says, people
who previously had it years ago, who were swept into this
category and then resulted in the performance failure, if we
are just talking about this group of people, do you still have
an objection?

          MR. FATHI:  Well, our initial objection, Your Honor,
is that that explanation is totally not credible.  They were
out of compliance with this performance measure at every single
prison for 10 consecutive months.  And during that time their
own documents repeatedly attributed noncompliance to staffing
shortages.  There was absolutely no mention of any alleged
misclassification of prisoners as 3D who shouldn't be 3D.

          It's only when court ordered them to develop the
remedial plan that suddenly we hear that the solution isn't to
address the staffing shortage but instead to reclassify
prisoners so they are no longer protected by this performance
structure.  And Mr. Struck talks about reclassifying people who
are now 3Ds to MH-2s.  MH-2s are not protected under the
stipulation.

          So this would deprive hundreds, perhaps thousands, of
prisoners of protections that were bargained for under the

1   stipulation.

2          THE COURT:  But what about my -- sorry to interrupt.

3   What about my particular question?  What if there is a group of

4   people who -- I mean, you were saying you don't believe it, you

5   don't buy it.  But what if there is a group of people that some

6   number, let's say 500, who were previously treated, let's, for

7   the sake of argument, say their psychotropic drugs concluded a

8   year ago but they were inadvertently included within this

9   group.  If that were true, wouldn't that be a possible

10  explanation for a component of the failure of the performance

11  measure?

12         MR. FATHI:  Well, Your Honor, I think the factual

13  representations made by Mr. Struck, which we're hearing for the

14  very first time today, show why we need discovery into what

15  actually happened here.  To answer the Court's question, if it

16  really is true that all these different providers and all these

17  different institutions were making the same mistake and

18  classifying people as 3Ds who clearly are not MH-3Ds, then no,

19  we would not object in appropriate cases to those people being

20  to reclassified.

21         But this is why we need discovery.  This is why we

22  need a list of everyone, all the 3Ds who have been reclassified

23  and to what.  And we need access to their files to see if those

24  reclassifications were really appropriate under the

25  stipulation.  The stipulation defines each of the

1    classifications, and that's a very important part of the

2    stipulation that this is what an MH-3D is.  This is what an

3    MH-4 is.  And defendants can't just modify those definitions at

4    will.  They are set forth in the stipulation.

5          So if the Court is at all inclined to credit this

6    explanation then we would ask for discovery so that we can

7    verify that that's actually what happened and that the people

8    who are being reclassified really fall into the category that

9    Mr. Struck described.

10         THE COURT:  Mr. Struck, anything you want to add?

11         I'm sorry.  Who is speaking on the telephone?

12         MR. FATHI:  This is still David Fathi.

13         THE COURT:  I'm sorry.  I didn't mean to cut you off.

14   Go ahead.

15         MR. FATHI:  We believe that the Court should reject

16   the plan with respect to Performance Measure 85, should direct

17   implementation of the plan with respect to the other measures

18   but also provide the information that the Court has requested

19   and the information the Court has correctly pointed out is

20   missing.

21         THE COURT:  All right.  Mr. Struck.

22         MR. STRUCK:  Yeah.  Just a couple things.  First of

23   all, this isn't the first time Mr. Fathi has heard this.  Dr.

24   Nicole Taylor, who is in the courtroom today, told him eight

25   months ago about this problem and has actually told him three

1    times.  So to suggest that this is the first time he's ever

2    heard that there's a problem is not correct.  This isn't

3    something that, you know, we just came up with.  This has been

4    a problem with the interpretation by the providers.

5         THE COURT:  Mr. Fathi, Mr. Struck has just said that

6    what I took you to say was that you had -- that this is a

7    post-hoc explanation from the defendants and that you never had

8    an idea until I ordered them to come up with a remediation plan

9    that this was a problem.  Let me ask you to specifically

10   respond to Mr. Struck's point about whether or not you did have

11   an awareness that the State had concerns about whether an

12   over-classification of people was resulting in categorizing

13   more people into this performance measure than made sense?

14        MR. FATHI:  Your Honor, the only discussion I recall

15   that remotely resembled what Mr. Struck has described was a

16   telephone call about a different performance measure.  It was

17   Performance Measure 86.  And when we pointed out that the

18   defendants were not correctly monitoring that performance

19   measure, defendants' counsel said words to the effect of, well,

20   if you don't like it we'll just reclassify them all as MH

21   (indiscernible).  There was no allegation that anyone was

22   actually improperly classified under the definitions that are

23   set forth in the stipulation.

24        THE COURT:  Okay.  I can't be an omnipresent person

25   with respect to all the interactions back and forth, but I

1    have, you know, some awareness of how you all dealt with one

2    another.  And I saw the best of times and the worst of times,

3    really, in the settlement discussions.  But I guess as we move

4    forward in this part of the case, if you -- you know, and I

5    don't mean to pick on one side or the other here, but it's just

6    the example that comes to mind.  And I don't want to get into a

7    he said she said right now, but I would like to figure out how

8    I can make sure that communication happens on a more authentic

9    level.  And all lawyers, we all know that we're frustrated with

10   the fact that we communicate in a way that by its very nature

11   seems obstructionist.  And it's not always intentionally

12   obstructionist but it just seems that that's the habit we

13   develop.  And it merits the word obstructionist because it gets

14   in the way of what the merits are.

15          And so I read, for example, in the letter, Mr. Fathi,

16   that you attached as one of the exhibits to your objection on

17   this performance measure, that the State is telling you that

18   they are trying to respond to your discovery request.  They

19   told you about a difficulty with it and then they say that

20   there was no response.  Again, I don't know.  And you could

21   probably say maybe there was and they were not telling the

22   truth about that.  But in any event --

23          MR. FATHI:  I'm sorry, Your Honor.  Could I have a

24   page number?  I'm not immediately finding that.

25          THE COURT:  Oh.  Of course.  Surely.  This is the

1    March 22, 2016 letter in Docket 1611-1.  It's Page 9 of 13.

2    And just for example, "On February 1st, defendants, again,

3    notified plaintiffs of this error and advised the defendants

4    would be unable to timely produce medical records.  Plaintiffs

5    did not respond."

6         And so I don't know -- I mean, one of the things that

7    I have done in the past is I have asked, you know, counsel, to

8    try to be more responsive and to try to think of a way that at

9    least nobody could ever have a straight face and write that,

10   because you responded to everything.  At least there was a give

11   and take.  You can say no, but you could at least respond.  And

12   again, I don't want to ask you to say, oh, no, yes we did.  We

13   responded and all of that.  Because I'm sure I can find things

14   on both sides and I'm not crediting that that's necessarily

15   true because I can't know.

16        But down the road, the alternatives could be is that I

17   could ask you to cc me on everything.  And that has had a

18   ameliorative effect in all of those cases.  Judge Bilbey, in

19   the infamous Lincoln Savings case, he became so frustrated with

20   the inability of the people to get to really the matter at hand

21   that he started attending the depositions.  And he required

22   they always have a name card with his name at the table so

23   there would be room for him at the table, and that was enough.

24        But in any event, because I know that you all work

25   well together, I have seen it, I would urge you to try to do

1    that.  And so with respect to this performance measure, going

2    back to I Love Lucy, to Ricky saying to Lucy, you have got some

3    'splaining to do.  So what, maybe, Mr. Struck, you can do is

4    get on the phone afterwards with Mr. Fathi and say, here's how

5    it is that you believe you should believe us, that this is not

6    a post-hoc rationalization, that you should understand that we

7    think that there are all of these class plaintiffs who were

8    seen for mental health issues.  They were prescribed

9    psychotropic medicine, but then they got better and they didn't

10   need the medicine anymore.  We decided that two years ago.  And

11   these people were captured this in this classification and we

12   can show you the medical records.  You can look and see.

13        So if you will do that explaining, what I will do is I

14   will require you, at the end of the day, to respond to the

15   discovery that the plaintiffs have asked for here.  But I would

16   urge you to try to see if you can address it in this other mode

17   first, because it will be more efficient.

18        And, you know, the more that I look, I'm not trying to

19   denigrate anybody.  But I just, you know, we've become

20   routinized in the practice of law to sort of pathways that

21   sometimes do lead us into the less -- the kind of stuff that

22   you wouldn't want to tell your kindergarten teacher that you

23   did.  And we just do that out of habit.  I think to the extent

24   that I can, by having a greater focus of illumination on these

25   issues, limit that, I'm going to do it.  And so this is an

1    opportunity for good lawyers on both sides to figure out that

2    there's a safe harbor for doing the right thing and that I will

3    listen.  You know, sometimes you figure it's not worth doing

4    the right thing because the judge always sees a pox on both

5    your houses and splits the baby or whatever and doesn't really

6    reward the people or punish the right ones.  But I'm making a

7    commitment here to you that I will do that and that I will, you

8    know, I may not always get it right in your opinion but not

9    because of inattention to detail.  I can assure you of that.

10        Okay.  Is there anything anybody else wanted to say

11   with respect to where we're going to go on the remediation

12   plan, and that is, entering an order approving it with respect

13   to all of the non-contested issues and then requiring the meet

14   and confer on the performance measure with respect to the 30

15   days after cessation of treatment group and then allowing the

16   discovery if the meet-and-confer doesn't resolve that issue?

17   Is there anyone else who wanted to say anything about that yet?

18        MR. SPECTER:  Yes, Your Honor.  This is Don Specter.

19        THE COURT:  Yes, sir.

20        MR. SPECTER:  You know, it just occurs to me that

21   there might be a way to alleviate your skepticism and our

22   skepticism about this and while also approving their plan,

23   which is something that Mr. Fathi said briefly at the end of

24   his remarks, which is to approve the plan but also to, in a

25   sense, order them to fill in the gaps that you have identified

1   so that there is some -- we have some more, both the Court and

2   the parties, have more information about the plan.  We want you

3   to order them to implement the plan so whatever beneficial

4   effects the remedial plan has can be started right away.  And

5   on the other hand, if you order them to fill in the gaps with

6   the information, it will allow us to have a better sense of

7   whether the plan -- we should be skeptical or whether there is

8   a better chance that the plan is going to work.  And if there

9   are still gaps after they have provided further information, we

10  will be in a better position to identify them and bring them to

11  the attention of the Court and to deal with them so that more

12  time doesn't go by before our clients don't get the services

13  that they so desperately need.

14          THE COURT:  Is there anything else anybody -- anyone

15  else wanted to speak?

16          Okay.  Mr. Specter, my response to you on that is if I

17  adopt your hybrid approach, I do so where I don't have the

18  benefit of you having done that in the first instance in your

19  response.  You didn't identify for me the kinds of things that

20  would be those gaps that I went through and have identified.  I

21  would say to the plaintiffs that that was not particularly

22  helpful, an approach that you chose, because it seemed rather

23  obvious to me and I was somewhat surprised that it didn't seem

24  obvious to you as well.

25          Doing it now is taking away from what I said earlier,

1    and that is, giving people an opportunity to be trusted in the

2    first instance, meaning in specific terms that the lawyer who

3    signed the proposed remediation plan did so with the

4    expectation that it would work, though if it becomes available,

5    if it becomes apparent in this short-term, meaning -- and you

6    have got data that I don't have about what's going on, and this

7    whole -- much of this talks about coming in line in May and

8    June of this year.  But some of it may already be in line, and

9    you may already have a heads up about whether it's failing

10   still.

11         If it's failing still, the right thing to do here is

12   to do what Mr. Specter says, and that is figure out in house

13   why it's failing, get a grasp on the problem, understand it,

14   and come up with a solution that works.  The -- if I require,

15   as Mr. Specter suggests now, across the board filling in the

16   gaps, what I will do is I will perhaps divert attention for

17   what I think needs to be done here, and that is find something

18   that works.  I am not going to, today, second-guess you, Mr.

19   Struck.  But I am going to second-guess you down the road.  And

20   I am going to expect the plaintiffs to be second-guessing you,

21   too.  And it means specific questions about how is it that you

22   could have thought that in June or July of 2016 that this would

23   work when you were getting this kind of information.  And we

24   will be intelligent people, just like you are, looking at it

25   and saying if you presented something to us that no reasonable

1    person could think would work, and I have to say you are kind

2    of close to that now.  You are kind of close, but you are not

3    there.  I'm giving you the benefit of the doubt.  But down the

4    road, you will not be in that situation.

5          So I'm not going to adopt Mr. Specter's suggestion,

6    but I am going to be hopeful that if between now and when we

7    next meet, and before we finish this morning we will figure out

8    when that's going to be.  But if it becomes apparent to the

9    defendants that it's not working, then rather than saying,

10   well, we've got to tell the judge in September or the end of

11   August why this isn't working, today we need to figure out what

12   we can start right now so that we're telling the judge what we

13   did in July to try to fix this rather than saying, oh, it's not

14   working and here's our plan at the end of August and this is

15   what we decided to do.  No.  You are going to be in a much

16   better position and you are going to avoid the difficulty of

17   having me doing something that I reluctantly am required to do,

18   and that is to make decisions about things that in the best

19   circumstances are made by the defendants in this case.  So

20   that's what I will do with respect to that point.

21         Turning to the status of the electronic discovery, of

22   the -- I mean, my basic frustration here is that it's taking

23   already so long, that's a basic underlying frustration.  But

24   the second point that I have to address with the plaintiffs is

25   what their current position is in response to the last filing a

1    couple of days ago from the State regarding their mentioning of

2    what your preference is regarding payment for achieving this

3    service.

4            So is that, Mr. Specter, is that your camp, or who

5    should I turn to on that?

6            MS. HARDY:  Judge Duncan, this is Alison Hardy at the

7    Prison Law Office.

8            THE COURT:  Thank You.

9            MS. HARDY:  I'm the one who is going to be handling

10   this issue.

11           I believe that at some point during talking with the

12   defendants about the myriad of issues that were involved in

13   creating a read-only access for our office, it was discussed

14   that there was a possibility that plaintiffs would consider

15   sharing the cost of whatever programming changes needed to be

16   made.  We have discussed it and reflected on that.  And it is

17   our position at this point that a read-only function is really

18   a pretty basic function of any database like this, and we

19   believe that that is a cost of business that the defendants

20   really ought to be shouldering in the first instance.

21           THE COURT:  But is it really fair to say that when

22   they have chosen not to do that as a cost of their business?

23   It's not as if we're taking advantage of something they have

24   done on their own.  It's something that we're imposing upon

25   them.

1          MS. HARDY:  But the equities here are that the

2     defendants are spending a great deal of time each month

3     reviewing records and Bates stamping them and producing them to

4     us.  And so we believe that if you look at the overall picture

5     this actually will reduce the time that they are required to

6     interact with us over the records.  And so their complaints

7     about cost for this particular aspect of the programming are

8     going to be offset over the long term.

9          In addition, the plaintiffs are bound by a very

10    restrictive yearly monitoring cap, and so given the two

11    parties, we believe that this is an expense that the State

12    ought to bear.

13         THE COURT:  Anything else you wanted to say about

14    that?  You know, I didn't mean for my question to cut you off.

15    If you were headed to something more, please go ahead.  But if

16    you are done, I will turn to Mr. Struck and ask what he had to

17    say with respect to your position that this is a money-saving

18    plan for them.

19         MS. HARDY:  Okay.  I don't have anything further.

20         THE COURT:  Okay.  Thank you.

21         MR. STRUCK:  First of all, I did want to point out

22    that when this, what we're told by the software designer,

23    Marquee, is that this was never designed to be a read-only

24    system.  And that's the difficulty here.  That wasn't

25    contemplated at the time.  But now we're trying to reprogram

1    it.

2           I'm not convinced that this is going to ultimately end

3    up being a savings overall.  My concern, and I think I

4    addressed this the last time we were here, is that the more

5    access that plaintiffs' counsel have to the records, the more

6    amount of time we're going to be spending arguing about

7    clinicians' decisions on treatment.  It's going to be -- it's

8    going to astronomically increase the amount of attorney time

9    and time that the ADC folks have to spend and the Corizon

10   people, I think, responding to questions about care.

11          That's what I'm predicting.  Maybe I'm wrong.

12          THE COURT:  And that's not so compelling to me,

13   because the stipulation contemplates a movement toward

14   electronic records which the State has now in place.  And so it

15   contemplated the access for the plaintiffs to get to that.  I

16   have told everybody that the plaintiffs' representatives are

17   entitled to have the same access that the deputy attorney

18   general has, and that is an ability to look at a computer

19   terminal and see all these medical records.  I am, as I said

20   before, unwilling to authorize off-site read-write access.  If

21   the State chooses to do that itself that's something you can

22   choose to do, but I'm not going to order off-site access for

23   others.

24          MR. STRUCK:  Okay.

25          THE COURT:  So I'm left with a situation where it

1    would seem to make sense to me for efficiency's sake overall

2    to allow for the read-only access to be available remotely for

3    the plaintiffs.  However, unfortunately, I don't know the other

4    side of the equation.  You have told me what it would cost to

5    get read-only access into the software to make it happen.  But

6    what I don't know is to balance the equities here how much it

7    is costing in the resources of the State of Arizona to

8    photocopy these documents or how much it would cost the

9    resources of the State of Arizona to have somebody sitting in

10   the room watching the plaintiffs' representatives when they

11   were sitting in front of a terminal with read-write access.

12          MR. STRUCK:  And I can't give you the answer to that

13   question right now.  That's a task that's been undertaken by

14   primarily the Attorney General's Office, so I don't know.

15          I did want to make it clear to everybody that, number

16   one, there's a chance that the software engineers aren't going

17   to be able to make it work.  That's a possibility.  We don't

18   know, because they haven't done it yet.  I find IT people to be

19   somewhat like dentists.  Every he goes to a dentist he

20   complains about the last dentist, the work that they did.

21          But the other issue is it's my understanding the

22   read-only access would be not to the entire system of records

23   but it would be to records that the plaintiff wants to see, in

24   other words, they can identify by inmate number a silo of

25   records and those -- someone would be able to provide them with

1    read-only access.  And, you know, the other issue would be, you

2    know, if there's a way we could work out having somebody come,

3    like Ms. Eidenbach, come to Lucy Rand's office at the Attorney

4    General's Office and look at records.  I mean, right now, they

5    have access every time they do a site visit or tour.  They do

6    have access and they can look at any record that they want to

7    see.  So they do have access during those periods of time.  But

8    if they wanted additional access that was, you know, that

9    wouldn't cost anything other than having somebody there and

10   providing them with the access while they are there, that could

11   be done now.  That's something that we could accomplish now

12   without any work on the software.

13          So I guess it's a matter of what the plaintiff's

14   choice is, but we think that -- I mean, they did make the offer

15   and I think it's a legitimate one, I mean, to help bear some of

16   the costs.  We're not saying they should have to pay it all but

17   I think it's reasonable we should maybe split the cost if

18   that's what they want.

19          THE COURT:  Plaintiffs' thoughts?

20          MS. HARDY:  Your Honor, I have a number of thoughts

21   that I'd like to put out there.  First, I would like to say

22   that in California, we actually have had access to the

23   Department of Corrections records here in our office for over a

24   year.  And I would say that the number of times that we contact

25   California about concerns about prisoners' healthcare has

```
1    dropped substantially, because when we receive a letter from a
2    prisoner that says I have cancer and I'm dying, we have very
3    few options other than to ask for the medical record or to do
4    an advocacy because they have raised serious issues and we have
5    no access to the Arizona record.
6              If we were to have access to the record, according to
7    the defendants, we have raised frivolous advocacy letters.
8    That would obviate that experience for them because we would be
9    able to verify what it is that the patient is receiving or not
10   receiving.  So I think that it is going to be a useful tool in
11   the same way that it is a very useful tool in California.
12             As far as --
13             THE COURT:  Can you explain how it works in
14   California?  Did they create a silo, a separate silo where you
15   designate what documents you want to see?  Do you have open
16   access to the medical records in their electronic system?  And
17   third, is it read-only?
18             MS. HARDY:  Your Honor, it is absolutely only
19   read-only, and anybody who works on this case in the office,
20   there are four of us, we all have our own personal identifying
21   logins and passwords.  So the receiver who runs the system here
22   knows who has been in and can track what we have done remotely.
23   But we have absolute wide open access to everything on a
24   read-only basis.
25             THE COURT:  Okay.  Was there anything else you wanted
```

1    to say?

2              MS. HARDY:  Yes.  I would just like to emphasize that

3    that has dramatically reduced the number of advocacy letters

4    that we write in California.  And it has increased the

5    effectiveness of that advocacy, because when we write we're

6    able to cut to the chase and get to the real issue rather than

7    having to fish to find out and basically play a game of

8    Battleship to find out whether or not we got the right

9    authorization or not.

10             THE COURT:  That makes sense.

11             What about the idea of splitting the cost?

12             MR. SPECTER:  Alison turned it over to me, Your Honor.

13             THE COURT:  You have the pockets?

14             MS. HARDY:  He writes the checks.

15             MR. SPECTER:  I sign the checks.

16             There is a certain equity to that, Your Honor.  On

17   the other hand, there's also an equity to requiring the

18   defendants to pay the cost.  I mean, first of all, as Alison

19   said, we're under a fee cap, as you know, which is less than

20   generous, I should say.  And we exceed all the time.

21             The second point is that this is part of their -- as

22   you mentioned during your remarks, the stipulation contemplates

23   them providing more records once their system became

24   electronic.  And so that seems to me to suggest that they

25   understood that they were going to bear the burden of making,

1    you know, of doing whatever is necessary to make that happen.

2            So, you know, that's our position, I guess.

3            THE COURT:  Okay.  Well, it occurs to me as an

4    uneducated, but really -- if this kind of experience is

5    reflective of other life experiences, it would seem to make

6    sense that it's in everybody's interest for us to try to

7    emulate the people that have gone down this road before, and

8    that's the California model.  California doesn't have the

9    answer for everything in Arizona, obviously, but nevertheless,

10   there have been some pathways to success that have been

11   identified there.  And so having that kind of full access of a

12   read-only capability does seem to make sense here.

13           I have got problems with financial unknowns and

14   incentivizing.  If I -- we use economics all the time to

15   incentivize behavior, and I'd really like to incentivize

16   behavior because in our capitalistic society that's really what

17   works best.

18           So the idea that both sides have some skin in the game

19   of trying to get to what makes sense, but then I remove an

20   argument from the defendants of saying, you know, this is

21   just -- we don't really want this work because we're going to

22   have to pay for it all ourselves.  I think I remove an

23   argument, this is really rough justice, but I will say you will

24   split the cost.  You won't have to know what it is in the dark

25   because I will set another status hearing.  I think we should

1    be in a much better position, based upon the timeline that you

2    identified, Mr. Struck, in 30 days to know where we're standing

3    on this.

4            So we'll set another status hearing on just this issue

5    in 30 days to see where we stand trying to work toward what I

6    think is a very wise model, and that is California just seems

7    to make sense.  And so I will ask the clerk of the court to

8    come up with a date.

9            And as I mentioned earlier, the remaining thing on my

10   agenda here is to pick a date of when we should really be

11   expecting to have a formal court proceeding about where we

12   stand where we will have the advantage of additional

13   information, months of information, about compliance with the

14   identified performance measures and some experience about

15   whether or not the proposed remediation is on track or not.

16           I would be happier to have it what I think is at the

17   soonest that it can be, and that is maybe the third week of

18   August.  But I want to hear from both sides with respect to

19   their thoughts on timing.  But also, before we conclude,

20   obviously I will give both sides an opportunity to say anything

21   else they want to say about issues that are pending.

22           But on this timing issue of addressing the remediation

23   plan, plaintiffs first, what are your thoughts on that

24   timetable?

25           MR. SPECTER:  I'm trying to gather my thoughts, Your

1    Honor.

2         THE COURT:  Do you all -- if you don't have an

3    objection to the rough time frame, I don't know if Mr. Struck

4    does or not, then I can ask you to meet and confer and provide

5    a date to the Court after you have checked your prospective

6    calendars.  I'm always willing to do that.

7         Mr. Struck, is there an objection to the general time

8    frame?

9         MR. STRUCK:  Just to my understanding of how the

10   monitoring works, for example, if we're talking about the month

11   of July, that information with respect to how the performance

12   occurred in July wouldn't be available to anybody to see until

13   the first week in September.  So there's a little bit more than

14   a 30-day lag between the month, the performance month that

15   we're talking about and when we would be able to get to see the

16   results and see how it's going.

17        So. . .

18        THE COURT:  So that means the second week of

19   September?

20        MR. STRUCK:  Yes.

21        THE COURT:  All right.  Mr. Specter, what about the

22   second week of September as a general time frame?

23        MR. SPECTER:  Your Honor, that time frame works for

24   the CGAR results, but it doesn't give us an update on the

25   status of the issue.  We don't have to wait that long to get a

1   status report on the steps that they have proposed to undertake

2   in their remedial plan.  That, I think, you know, we don't --

3   there's not a month and a half lag time between, you know,

4   the -- a month lag time in order to produce the CGAR results.

5          THE COURT:  Mr. Struck, what about that?

6          MR. STRUCK:  I guess the concern I have is, I mean, I

7   could talk to my folks and find out if there's some other way,

8   but, I mean, you know, it's my understanding -- I mean, guess

9   they would know, you know, when they were doing the monitoring

10  in August as to what's going on in July before they put --

11         THE COURT:  I would think so.

12         MR. STRUCK:  So we could probably, you know, do some

13  sort of report in August.

14         THE COURT:  All right.

15         MR. STRUCK:  As to how these remedial measures are

16  working.

17         THE COURT:  Right.  So perhaps the best way to proceed

18  is ask you to focus on the third week of August and meet and

19  confer not only with your respective sides but also together

20  and propose a time for us to come together in court.

21         You can do that hopefully this week.  And if there are

22  issues that have arisen between now and the date that we're

23  about to pick for the electronic stored information, we can

24  also address it at that interim point.  Let me give you that

25  proposed date.

1          THE MAGISTRATE CLERK:  We can do July 29th at 9:30.

2          THE COURT:  How would July 29th at 9:30 a.m. work?

3     That's for the medical records, electronic medical records.

4          MS. HARDY:  Your Honor, would it be at all possible to

5     do it on July 28th?  I actually have --

6          THE COURT:  Of course.  We're picking a date that

7     works for people's calendars.

8          MS. HARDY:  July 28th would be wonderful.

9          THE COURT:  Does that work for the State?  No?

10         MR. STRUCK:  Well, I won't be able to be here.

11         THE COURT:  Well, it doesn't work for us for some

12    reason either.  We have a settlement conference.

13         Is there another date other than the 28th that works

14    for you?

15         MR. SPECTER:  We can cover the 29th, Your Honor.  If

16    that's fine, we can cover it.

17         THE COURT:  Would that work for the State, the 29th?

18         MR. STRUCK:  We can make it work.

19         THE COURT:  What time?

20         THE MAGISTRATE CLERK:  9:30.

21         THE COURT:  I don't mean to make people bend over

22    backwards here when we can pick other dates.

23         MR. STRUCK:  My preference, Your Honor, would be the

24    first week in August, if that would be possible.

25         THE COURT:  How does that look for the plaintiffs?

```
 1              MR. SPECTER:  It's the same.  Alison will be on
 2    vacation, but can have somebody else cover it, Your Honor.
 3              THE COURT:  What date would you like, Mr. Struck?
 4              MR. STRUCK:  Any day is fine with me.
 5              THE MAGISTRATE CLERK:  We can do any day that week.
 6    Beginning of the week?
 7              THE COURT:  Fine.  Monday then.
 8              THE MAGISTRATE CLERK:  Monday the 1st of August.
 9              THE COURT:  Monday the 1st at 9:30.
10              MR. STRUCK:  That's fine.
11              THE COURT:  For the electronic medical records.  And
12    then you will meet and confer in the next week, by a week from
13    today let us know what date you would like to do, and
14    hopefully, again, when you are sort of coalescing on a date
15    call my JA and make sure it's a date that works for us and we
16    can give you a quick heads up about that.
17              MR. STRUCK:  Okay.
18              THE COURT:  Is there anything else that we need to
19    address this morning?
20              MR. FATHI:  I'm sorry, Your Honor.  I just wanted to
21    clarify that date is to be in the second week of September.  Is
22    that correct?
23              THE COURT:  Yes.
24              MR. FATHI:  Thank you.
25              THE COURT:  No.  No.  No.  Third week of August.  That
```

1    is what we agreed, wasn't it?

2         MR. FATHI:  I thought we were just discussing another

3    date in September.

4         THE COURT:  Well, we've got a bunch of witnesses in

5    this room.  My recollection is we originally talked about

6    September 2nd, the second week of September.  Then Mr. Specter

7    said no, actually, we don't have to wait until that time.  And

8    then I put it back to Mr. Struck, who said that he could -- it

9    seemed to him -- well, he didn't probably say it as

10   aggressively as this, but it certainly seemed to me we could be

11   in a position to have relevant information by the third week of

12   August and that sooner time period was more favorable to me.

13   And that's why we focused on it.

14        That's my recollection.  Anybody think I'm missing the

15   boat here.

16        MR. STRUCK:  No.  That's correct.

17        THE COURT:  So it's the third week of August.  Thank

18   you all very much.  Have a good rest of the day.

19        Who is speaking?

20        MR. SPECTER:  My question is whether you would like

21   some sort of status conference report before the meeting, or

22   the hearing, I guess.

23        THE COURT:  Obviously in my dream world you all had

24   been in a position where you would have resolved the disputes

25   and I keep counting on that dream world materializing.  But you

1    probably think that President Reagan and that somebody said in

2    one of these, you all say trust and verify.  So it does make

3    sense to do that.  But because of the late time frame of it, it

4    may be -- here's what we'll do.

5          This is -- this hearing that I'm proposing for the

6    third week of August is going to be an opportunity for the

7    State to give a report on how things are going.  If the State

8    wants to give that report in writing, in advance, it can.  But

9    otherwise, they will have to lay it out in a concrete way,

10   orally or using demonstrative exhibits in the Court for the

11   hearing.

12         The reason we're not going to back up on the timetable

13   is because I already have the sense that I'm pressuring the

14   State in a way that it may not be able to put it into a written

15   form.  And then if I put it into a written form then I fairly

16   have to give the plaintiffs an opportunity to respond to it in

17   a written form.

18         It's not ideal.  But I do think I need to set

19   something that will be meaningful on the one hand, but also as

20   soon as possible.  If I set it to the second week of September,

21   then we could build in that time where we would have a written

22   report from the State and an opportunity for the plaintiffs to

23   respond.  There's some part of me that thinks that that's

24   probably the right way to do it, that if you put stuff in black

25   and white that it's something we can all focus on in a more

```
1    constructive way.
2           So as I just talked about this, my thought process is
3    evolving and thinking that maybe it does make sense to follow
4    your suggestion, Mr. Specter, to have the written form but then
5    to allow the time for it to happen.
6           And so that we would move for Mr. Fathi's prescient
7    idea of the second week of September.  What do you all think
8    about that?
9           MR. SPECTER:  Well, Your Honor, I think that without
10   advance notice of what the State is going to say at the
11   hearing, our ability to --
12          THE COURT:  You are right.  You are right.  So what
13   we'll do is we'll give you a slightly larger assignment in your
14   meet-and-confer:  Come up with a date in September and also
15   come up with a proposed state report and the date for the
16   plaintiffs to respond.
17          MR. STRUCK:  Thank you, Your Honor.
18          THE COURT:  Thank you all very much.  This is the kind
19   of constructive commentary from all of you that I think is
20   really helpful.  We are more likely to get to the right result
21   here, I think, if we all discuss it and collaboratively come up
22   with a right way to proceed.  Thank you all very much.
23          MR. SPECTER:  Thank you, Your Honor.
24          MS. HARDY:  Thank you, Your Honor.
25          (Proceeding concluded at 10:04 a.m.)
```

```
1
2
3
4
5
6                         C E R T I F I C A T E
7
8          I, LAURIE A. ADAMS, court-approved transcriber,
9  certify that the foregoing is a correct transcript from the
10 official sound recording of the proceedings in the
11 above-entitled matter.
12
13         DATED at Phoenix, Arizona, this 28th day of June,
14 2016.
15
16
17                              s/Laurie A. Adams
18                              _____
                                Laurie A. Adams
19
20
21
22
23
24
25
```