Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email: dpochoda@acluaz.org
       jlyall@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email: skader@azdisabilitylaw.org
       adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-DKD <br><br> **MOTION TO ENFORCE THE STIPULATION** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

GOVERNING LEGAL PRINCIPLES ............................................................... 3

I.     DISPUTES THAT AFFECT MORE THAN ONE STIPULATION
PROVISION OR PERFORMANCE MEASURE ....................................... 4

       A.     Requirements and Performance Measures Codified Within the
Body of the Stipulation Must Be Monitored By Defendants ............. 4

           1.     Paragraph 12 of the Stipulation (Preventative Care) ............. 6

           2.     Paragraph 14 of the Stipulation (Language
Interpretation) ........................................................................ 7

           3.     Paragraph 15 (Heat Intolerance to Psychotropic
Medications) ........................................................................... 8

       B.     A Requirement That An Act Occur "Every X Days" Means
What It Says ..................................................................................... 9

       C.     The Stipulation Defines "Seen" With Regard to Health Care
Encounters, and Non-Confidential Encounters Do Not Meet
the Stipulation's Definition ........................................................... 10

       D.     Performance Measures For Intake Health Screening Must Be
Evaluated at All Prisons, As Male Parolees Can Be Revoked
Directly to Any Prison .................................................................... 12

       E.     "Thirty Days" and "One Calendar Month" Are Not
Interchangeable .............................................................................. 13

II.    DISPUTES WITH REGARD TO MONITORING SPECIFIC
PERFORMANCE MEASURES ................................................................ 14

       A.     PM 85 ("MH-3D prisoners shall be seen by a mental health
provider within 30 days of discontinuing medication") .................. 15

       B.     PM 86 ("MH-3D prisoners shall be seen a minimum of every
90 days by a mental health clinician for a minimum of six
months after discontinuing medication") ........................................ 15

       C.     PM 94 ("All prisoners on a suicide or mental health watch
shall be seen daily by a licensed mental health clinician or, on
weekends or holidays, by a registered nurse") ................................ 16

# TABLE OF CONTENTS
## (continued)

Page

D.      PM 95 ("Any prisoner discontinued from a suicide or mental
        health watch shall be seen … between 24 and 72 hours after
        discontinuation, between seven and ten days after
        discontinuation, and between 21 and 24 days after
        discontinuation of the watch") ........................................................... 16

E.      PM 98 (timely response to mental health HNRs) ........................... 17

CONCLUSION ................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bank One Corp. v. Indus. Comm'n of Ariz.,*
    244 P.3d 571 (Ariz. Ct. App. 2010).................................................................. 3

*Estes Co. v. Aztec Const., Inc.,*
    677 P.2d 939 (Ariz. Ct. App. 1983).................................................................. 3

*Gesina v. Gen. Elec. Co.,*
    780 P.2d 1380 (Ariz. Ct. App. 1988)................................................................ 7

*Graves v. Arpaio,*
    623 F.3d 1043 (9th Cir. 2010) ......................................................................... 8

*Liberty Ins. Underwriters, Inc. v. Weitz Co.,*
    158 P.3d 209 (Ariz. Ct. App. 2007).................................................................. 3

*Litmon v. Harris,*
    768 F.3d 1237 (9th Cir. 2014) ......................................................................... 9

*McCutchin v. SCA Servs. of Ariz., Inc.,*
    709 P.2d 591 (Ariz. Ct. App. 1985).................................................................. 3

*Rental Dev. Corp. of Am. v. Rubenstein Constr. Co.,*
    393 P.2d 144 (Ariz. 1964)................................................................................. 3

*Scotti v. City of Phoenix,*
    No. CV-09-1264-PHX-MHM, 2010 WL 994649 (D. Ariz. Mar. 17,
    2010), *aff'd,* 609 F. App'x 386 (9th Cir. 2015).............................................. 14

*Villanueva v. Phelps Dodge Corp., Morenci Branch,*
    311 P.2d 843 (Ariz. 1957)............................................................................... 14

*White v. Mitchell,*
    759 P.2d 1327 (Ariz. Ct. App. 1988)................................................................ 9

**OTHER AUTHORITIES**

Macmillan Dictionary
    (http://www.macmillandictionary.com/us/dictionary/american/every).......... 9

Restatement (Second) of Contracts § 72 cmt. a ................................................. 6

Restatement (Second) of Contracts § 205 cmt. d ............................................... 6

Webster's Third New International Dictionary Unabridged (1981) .................... 9

Plaintiffs, by and through their undersigned counsel, hereby move this Court to exercise its inherent powers and those outlined in the Stipulation [Doc. 1185 ¶¶ 35-36] to enforce the terms of the Stipulation and to order Defendants to accurately measure compliance with the requirements of the Stipulation related to the delivery of health care to class members.

## INTRODUCTION

The Stipulation creates a monitoring program in which both Plaintiffs and Defendants participate. The negotiations leading to the final agreement were premised on the idea that Defendants needed to make improvements, and focused on the scope and nature of those improvements. Ultimately, Defendants agreed to improve their provision of health care[1] and the conditions in their isolation cells in accordance with the language of the Stipulation, and the performance measures set forth in the Stipulation's exhibits. [*See* Docs. 1185, 1185-1] The Stipulation includes definitions of key terms, [Doc. 1185-1 at 3-6], and protocols for assessing compliance with each performance measure. [*Id.* at 17-36] Under the Stipulation, Defendants must appoint monitors to assess Corizon's compliance with the performance measures using randomly selected health care charts, and Defendants must provide these audit reports to Plaintiffs on a monthly basis. The reports are known as CGARs (an abbreviation for Compliance Green Amber Red). Plaintiffs review the reports and have the right to access the underlying documents and any other documents reasonably necessary to analyze Defendants' CGAR data. [Doc. 1185 ¶ 29] Defendants were required to achieve 75% or higher compliance on all performance measures for the first twelve months after the Stipulation's entry; and currently, during the second twelve months since the Stipulation's entry, Defendants must achieve an 80% rate of compliance. [*Id.* ¶ 10]

As noted in Plaintiffs' Motion to Enforce the Stipulation filed on April 11, 2016 [Doc. 1535], there are many performance measures for which Defendants' own audits

---

[1] Defendants currently employ Corizon Health Services, Inc. ("Corizon") to deliver medical, mental health, and dental care to prisoners in their custody.

show consistent and dismal failing compliance scores. Additionally, for almost a year, Plaintiffs have repeatedly notified Defendants that they are noncompliant with the terms of the Stipulation itself, because much of the methodology used to measure compliance is flawed, haphazard, inconsistent, and inaccurate, and as a result, Defendants' CGAR audits overstate the degree of compliance with the Stipulation. [*See* Doc. 1561-1 at 6-8[2] (July 14, 2015); *id*. at 58-59 (Aug. 28, 2015); Doc. 1561-2 at 3-20 (Oct. 15, 2015); *and* Exhibit 1 to the Declaration of Corene Kendrick ("Kendrick Decl.") filed herewith, (Jan. 4, 2016); *see also* April 2016 Declaration of Todd Wilcox (Doc. 1539) ¶¶ 22-26; April 2016 Declaration of Pablo Stewart, M.D. (Doc. 1538-1) ¶¶ 33-34, 37-38] Defendants provided responses to these Notices, repeatedly defending their monitoring methodology and denying the existence of any problems. [Kendrick Decl. Ex. 2 at 8-9 (Aug. 20, 2015 in response to 7/14/15 Notice); Ex. 3 (Oct. 13, 2015 in response to 8/28/15 Notice); Ex. 4 at 8-10 and 14-48 (Nov. 24, 2015 in response to 10/15/15 Notice)]

Plaintiffs' monitoring efforts since the February 17, 2015 entry of the Stipulation show that Defendants (1) fail to measure certain performance measures and Stipulation requirements; (2) misinterpret the plain language of the Stipulation and performance measures; (3) fail to measure accurately what is required by the Stipulation; (4) use questionable source data or source data contradicted by Defendants' own records; and (5) fail to review the substance of prisoners' medical records, where such a review is necessary to confirm compliance.

Pursuant to the Stipulation's dispute resolution requirements, the parties had a lengthy mediation session on March 1, 2016 with Magistrate Judge Buttrick regarding monitoring methodology. After the mediation, the parties engaged in good faith in a series of weekly telephonic meet-and-confers to review Defendants' draft monitoring guide intended to provide uniform, written instructions to ADC's monitors on how to

---

[2] All citations to Dockets 1561-1 and 1561-2 in this brief refer to the Electronic Case Filing system's assigned page numbers, and not the page numbers of the various documents contained therein as exhibits.

evaluate compliance with health care performance measures.  [*See* Kendrick Decl. Exs. 7-14]   While the parties made progress in these meetings and narrowed the scope of disputes, there remain issues surrounding Defendants' monitoring methodology where the parties are at an impasse, and Plaintiffs now seek the Court's involvement to resolve the disputes.   The areas of impasse fall into two broad categories: disputes where the resolution would affect multiple performance measures, and more narrow disputes with regard to a specific individual performance measure or Stipulation requirement.

**GOVERNING LEGAL PRINCIPLES**

It is a bedrock principle of contract law that the unambiguous language of a contract will be enforced as written.  *See Bank One Corp. v. Indus. Comm'n of Ariz.*, 244 P.3d 571, 574 (Ariz. Ct. App. 2010) ("[W]hen parties bind themselves by a lawful contract, the terms of which are clear and unambiguous, we must give effect to the contract as written."); *Liberty Ins. Underwriters, Inc. v. Weitz Co.*, 158 P.3d 209, 212 (Ariz. Ct. App. 2007) ("If the contractual language is clear, we will afford it its plain and ordinary meaning and apply it as written."); *Estes Co. v. Aztec Const., Inc.*, 677 P.2d 939, 941 (Ariz. Ct. App. 1983) ("[A] general principle of contract law is that where parties bind themselves by a lawful contract and the terms of the contract are clear and unambiguous, a court must give effect to the contract as written").

An equally fundamental principle is that when a contract is integrated—particularly where, as here, it includes an express integration clause (*see* Doc. 1185 ¶ 39)—a party will not be heard to assert the existence of an unwritten agreement or understanding that would give the contract language a meaning other than what it plainly says.  "Where two parties have made a written agreement to which they have both assented as the complete and accurate integration of that contract, evidence of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." *Rental Dev. Corp. of Am. v. Rubenstein Constr. Co.*, 393 P.2d 144, 146 (Ariz. 1964); *see also McCutchin v. SCA Servs. of Ariz., Inc.*, 709 P.2d 591, 592 (Ariz. Ct. App. 1985) ("Once the parties reach a complete and final understanding that integrates all aspects of

their agreement, the parol evidence rule prohibits judicial consideration of extrinsic evidence that adds to, subtracts from, varies or contradicts the integrated agreement.").

## I.   DISPUTES THAT AFFECT MORE THAN ONE STIPULATION PROVISION OR PERFORMANCE MEASURE

There are five areas of dispute whose resolution will affect multiple requirements of the Stipulation, and Plaintiffs' ability to monitor Defendants' compliance pursuant to Paragraphs 9, 10, and 29 of the Stipulation.  These include:  (a) whether Defendants must monitor compliance with requirements contained within the body of the Stipulation itself; (b) whether performance measures that call for an act to occur "every X days" are satisfied if the act has occurred once in the previous X days; (c) whether group meetings and cell-front checks count as a patient being "seen," given the Stipulation's definition of that term; (d) whether performance measures related to intake screening and examinations must be monitored at all prisons, given that male parolees may be revoked and taken directly to any of the nine men's prisons statewide; and (e) whether Defendants can unilaterally substitute the phrase "one calendar month" for "30 days" wherever the latter term appears in the Stipulation.

### A.   Requirements and Performance Measures Codified Within the Body of the Stipulation Must Be Monitored By Defendants

Defendants take the position that the requirements related to the provision of health care contained within the text of the Stipulation itself do not need to be monitored. [Kendrick Decl. Ex. 2 at 9; Ex. 4 at 9, 17-21, 45-46; Ex. 5 at 2; Ex. 14 at 4]  As detailed below, Defendants initially monitored some of these requirements in the first months after the Stipulation was entered, but then inexplicably stopped doing so.

The Stipulation requirements at issue are the following paragraphs:

12.   Defendants or their contracted vendor(s) will ensure that:
   a.   All prisoners will be offered an annual influenza vaccination.
   b.   All prisoners with chronic diseases will be offered the required immunizations as established by the Centers for Disease Control.
   c.   All prisoners ages 50 to 75 will be offered annual colorectal cancer screening.

d.   All female prisoners age 50 and older will be offered a baseline mammogram screening at age 50, then every 24 months thereafter unless more frequent screening is clinically indicated.

[. . .]

14.   For prisoners who are not fluent in English, language interpretation for healthcare encounters shall be provided by a qualified health care practitioner who is proficient in the prisoner's language, or by a language line interpretation service.

15.   If a prisoner who is taking psychotropic medication suffers a heat intolerance reaction, all reasonably available steps will be taken to prevent heat injury or illness. If all other steps have failed to abate the heat intolerance reaction, the prisoner will be transferred to a housing area where the cell temperature does not exceed 85 degrees Fahrenheit.

[Doc. 1185 ¶¶ 12, 14-15]

The only explanations offered to date by Defendants for their refusal to monitor and document compliance with these requirements are that they find some difficult to measure, that they think "these requirements generally cannot be quantified as a percentage or a threshold to measure," [Kendrick Decl. Ex. 4 at 18], and that "items not expressly required to be monitored by one of the 112 performance measures are not required to be monitored."  [*Id.* Ex. 6 at 2; *see also id*. Ex. 2 at 9]  However, the Stipulation by its terms gives Plaintiffs' counsel "reasonable access to the institutions, staff, contractors, prisoners and documents necessary to properly evaluate whether Defendants are complying with the performance measures ***and other provisions of this Stipulation***."  [Doc. 1185 ¶ 29 (emphasis added)]  These Stipulation provisions are key features of a functioning health care system, as detailed below, and Plaintiffs' counsel must be able to evaluate Defendants' compliance with them.

The Stipulation envisions Defendants as the primary monitors of their own compliance, [*see, e.g.*, Doc. 1185 ¶¶ 9-10, 19-20], with Plaintiffs confirming or challenging Defendants' reports of compliance.  [*See, e.g.*, *id*. ¶¶ 29, 32-33]  Someone needs to confirm that Defendants are actually performing the agreed-upon and promised requirements of the contract, as basic tenets of contract law require that in order to show

-5-

1    performance with the terms of a contract, a party must compare or evaluate the actions

2    promised in the contract terms against the performance rendered.  [*See, e.g.*, Restatement

3    (Second) of Contracts § 72 cmt. a (the exchange of performance for promise is an

4    enforceable bargain); § 205 cmt. d (good faith performance requires each party to a

5    contract to not willfully render imperfect performance)]  Only Defendants have the access

6    to staff, prisoners, and records necessary to verify compliance with the Stipulation.  If

7    they have chosen to abdicate their primary role in monitoring compliance, then Plaintiffs'

8    counsel must take the wheel and do the monitoring themselves, with complete access to

9    staff, prisoners' medical records, and other documents so that counsel can do the monthly

10   random selection and review of files built into Defendants' monitoring system.[3]  Or, on

11   the other hand, Defendants can resume monitoring compliance with these requirements,

12   and include them in the monthly CGAR reports.

### 1.    Paragraph 12 of the Stipulation (Preventative Care)

14   Defendants were at one time monitoring compliance with the subsections of

15   Paragraph 12, and had designated them as Chronic Care CGAR measures 6-8,

16   corresponding to subsections (a)-(c), and Female Care CGAR measure 4, corresponding

17   to subsection (d).  [*See* Doc. 1560-5, Ex. 13 at ADCM037139-40 (March 2015 Perryville

18   CGAR)]  Defendants stopped monitoring these measures on the grounds that "[b]ecause

19   these measures were not required to be measured and reported in the CGAR reports, they

20   will be removed." [Kendrick Decl. Ex. 2 at 9]

21   Plaintiffs notified Defendants in October 2015 that they were noncompliant with

22   the Stipulation as a result of their unilateral decision to stop monitoring the requirements

23   of Paragraph 12 (designated in the Notice and CGARs as Chronic Care #6-8 & Female

24   Care # 4).  [Doc. 1561-2 at 4]  In response, Defendants asserted that these measures "are

25   not easily reported or measured."  [Kendrick Decl. Ex. 4 at 17]  However, there are ways

26   to measure the provision of preventative medical care, for example, by documenting in an

27   _____

28   [3] The scope of Plaintiffs' access to electronic medical records is separately before the court.  [*See* Doc. 1619 at 1]

1    individual's medical records that he or she was personally sent a notification.  Plaintiffs

2    proposed such a methodology during the meet-and-confer with regard to PM 61 (females

3    offered pap smear every 36 months after intake), [*id*. Ex. 8 at 4-5], which Defendants

4    ultimately adopted in their most recent version of the monitoring guide.  [*Id.* Ex. 17 at 88]

5    Defendants could similarly measure compliance with these Stipulation requirements.

6                    **2.       Paragraph 14 of the Stipulation (Language Interpretation)**

7              Defendants initially measured compliance with Paragraph 14 of the Stipulation as

8    CGAR measure "Stipulation Agreement # 1."  [*See* Doc. 1560-5, Ex. 13 at ADCM037148

9    (March 2015 Perryville CGAR report)]  Plaintiffs first notified Defendants in July 2015

10   that Defendants were using a flawed methodology to measure compliance with the

11   language interpretation requirement.[4]  [Doc. 1561-1 at 6-7]  Rather than address Plaintiffs'

12   concerns, Defendants instead unilaterally decided to stop monitoring compliance with

13   Paragraph 14.  [Kendrick Decl. Ex. 2 at 9]  Defendants first took the nonsensical position

14   that the requirement that language interpretation occur at health care encounters "does not

15   require the use of language interpreters to be measured or reported."  [*Id*. at 8]

16   Defendants' construction of the Stipulation's language would have rendered this

17   requirement a nullity.  *See Gesina v. Gen. Elec. Co.*, 780 P.2d 1380, 1386 (Ariz. Ct. App.

18   1988) ("A contract must be construed so that every part is given effect").  Defendants later

19   retreated from that position, and then asserted that they monitor "compliance with this

20

21              [4] To the extent that Defendants ever explained how they monitored compliance
22   with Paragraph 14, their methodology was profoundly flawed as they used as source
     documents not the medical records of non-English speaking prisoners, but rather logs that
     recorded completed uses of the telephonic language line.  [Doc. 1561-1 at 6-7; Doc. 1561-
23   2 at 19-20; Kendrick Decl. Ex. 2 at 22]
24              Unsurprisingly, the monitors found 100% compliance, as the log excludes all of the
     times the language line is *not* used, and this circular method of auditing compliance
25   automatically (and falsely) results in a compliance rate of 100%.  [Doc. 1561-1 at 6-7]
     When Plaintiffs' counsel did a spot-check of medical records of nine non-English
26   speaking individuals listed in the ASPC-Florence language logs, they found a multitude of
     health care encounters with no record of interpretation: depending upon which way the
27   nine prisoners' health care records are analyzed, the rate of compliance was either 11%
     (only one of the nine prisoners had interpretation at all of his encounters) or 31% (adding
28   up all health care encounters of the nine prisoners and calculating what percentage of the
     encounters had interpretation).  [Doc. 1561-2 at 19-20, 62-66]

1   requirement, although it cannot be recorded as a percentage on the CGAR report."

2   [Kendrick Decl. Ex. 4 at 18]  Yet Plaintiffs' October 15, 2015 Notice of Noncompliance

3   explained how this interpretation requirement could be measured and quantified

4   accurately, by randomly selecting medical records of non-English speaking prisoners who

5   had health care appointments and reviewing the notes to see if there was any

6   documentation of the use of interpreters.  [Doc. 1561-2 at 19-20, 62-66]  Furthermore, if

7   any such monitoring by ADC occurs, Defendants have provided no evidence of it.[5]

8                    **3.    Paragraph 15 (Heat Intolerance to Psychotropic Medications)**

9        High temperatures pose a serious risk to the health and safety of prisoners taking

10   psychotropic medications.  *See Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010)

11   ("The district court found that air temperatures above 85° F greatly increase the risk of

12   heat-related illnesses for individuals who take psychotropic medications. . . .").  In the

13   first few months after the Stipulation's entry, Defendants measured compliance with

14   Paragraph 15, designating it as Stipulation Agreement Measure # 2 in the CGARs.

15   [Doc. 1561-1 at 22]  But Defendants since unilaterally decided to disregard the

16   Stipulation's requirement that if a prisoner on psychotropic medication suffers a heat

17   intolerance reaction, Defendants must take all reasonably available steps to prevent heat

18   injury, including, if necessary, transferring the prisoner to a housing area where cell

19   temperatures do not exceed 85 degrees Fahrenheit.  [Doc. 1561-2 at 4-5; Doc. 1561-1 at

20   22; Kendrick Decl. Ex. 6 at 2][6]

---

21

22        [5] Defendants also baldly assert that "some inmates are dishonest about the
     languages they speak" [Kendrick Decl. Ex. 6 at 2] and "many of the inmates are able to

23   communicate effectively in English when they choose to do so." [*Id*. Ex. 4 at 46]  *But see
     id.* Ex. 20 (written statement from Corizon mental health staff that "Department of

24   Corrections staff has been resistant to provide translation services for [prisoner]," and
     "[h]is mental health has been compromised due to his inability to get necessary care
     translated into his native language").

25        As Plaintiffs' psychiatric expert Dr. Pablo Stewart has explained, "a mental health
     provider must make very subtle assessments, such as whether a patient is paranoid or

26   attending to internal stimuli, and whether his or her thoughts are tangential.  This requires
     an interpreter who is not only fluent in both languages, but is also specifically trained in

27   interpretation, including specialized psychiatric vocabulary." [Doc. 1104-2 at 51]
         [6] To the extent that Defendants monitored compliance with Paragraph 15, their

28   methodology was flawed, as they repeatedly indicated that no prisoners were ever treated

1

2

**B.    A Requirement That An Act Occur "Every X Days" Means What It Says**

3    Performance Measures 73, 77, 80, 81, 82, 83, 84, 85, 86, 87, 88, 90, and 92, all of

4    which relate to mental health care, each require that a specified clinical event or encounter

5    occur a minimum of "every 30 days," "every 60 days," "every 90 days," or "every 180

6    days." This language self-evidently requires that the event or encounter in question occur

7    repeatedly at the specified intervals. *See* Webster's Third New International Dictionary

8    Unabridged (1981) (defining "every" as "being each in a succession of intervals (~ few

9    days)"); Macmillan Dictionary (http://www.macmillandictionary.com/us/dictionary/

10   american/every (last visited July 5, 2016)) ("every" is "used for showing how often

11   something happens or how far apart things are, especially when there is a regular time or

12   distance between them").

13   Accordingly, assessing Defendants' compliance with these measures requires

14   measuring the time elapsed *between* multiple occurrences of the event in question.

15   Ignoring the plain language of the Performance Measures, Defendants take the position

16   that a requirement that an encounter occur "every 90 days" is satisfied if the encounter has

17   occurred once within 90 days of the auditor's review.   This position is frivolous; a

18   requirement that something occur "every 90 days" cannot, by definition, be satisfied by

19   showing that it occurred once. *See White v. Mitchell*, 759 P.2d 1327, 1330 (Ariz. Ct. App.

20   1988) (in assessing compliance with regulation requiring vehicle inspection "every 90

21   days," court examines time elapsed between inspections); *cf. Litmon v. Harris*, 768 F.3d

22   1237, 1241 (9th Cir. 2014) (considering the burden imposed by a requirement to register

23   with the police "every 90 days").

24

25

26   for heat intolerance.  [Doc. 1561-1 at 22; Doc. 1561-2 at 5]  However, that is not what is
     to be evaluated; the question is whether prisoners suffering a heat intolerance reaction
27   receive interventions to prevent heat injury.  [Doc. 1561-1 at 22]  Furthermore, during
     monitoring tours Plaintiffs identified multiple individuals taking psychotropic medications
28   who clearly were suffering ill effects from the heat.  [Doc. 1561-2 at 5, 97-98]

Plaintiffs repeatedly notified Defendants that they are in substantial noncompliance with the Stipulation, as this method ignores the plain language of these performance measures.  [Doc. 1561-1 at 21-22; Doc. 1561-2 at 6-7; Kendrick Decl. Ex. 1 at 1; Ex. 11 at 3, 4-5; Ex. 12 at 2]  Defendants' position with regard to this language as applied to mental health performance measures is all the more inexplicable given they agreed to measure other medical performance measures with similar language by examining the time elapsed between occurrences of the required event.  [*See, e.g.* Kendrick Decl. Ex. 17 (4/11/16 Version of Draft Monitor Guide) at 79-80 (methodology to evaluate compliance with PM 54 [chronic disease inmates seen by provider as specified by treatment plan, no less than *every* 180 days] will look back at the previous encounter); Ex. 10 at 5 (monitors will look at timeframe from provider's order for next chronic care appointment)]

This erroneous methodology results in records that are not actually compliant with the Performance Measures being counted as compliant, falsely inflating Defendants' compliance scores.[7]  It also poses a risk of serious harm.  [*See* Declaration of Pablo Stewart, M.D. ("Stewart Decl."), filed herewith, ¶¶ 5-6, 8-9 (explaining that patients with mental illness must be seen repeatedly and periodically); *id.* ¶ 10 (Defendants' assertion that it is sufficient that the patient be treated or evaluated only on a single occasion "does not meet any standard of care with which I am familiar and is completely indefensible")]

**C.    The Stipulation Defines "Seen" With Regard to Health Care Encounters, and Non-Confidential Encounters Do Not Meet the Stipulation's Definition**

The Stipulation defines "seen" or "seen by" as follows:

> Interaction between a patient and a Medical Provider, Mental Health Provider or Mental Health Clinician that involves a treatment and/or exchange of information in a confidential setting.  With respect to Mental Health staff, means an encounter that takes place *in a confidential setting outside the prisoner's cell, unless the prisoner refuses to exit his or her cell for the encounter.*

[Doc. 1185-1 at 5 (emphasis added)]

_____

[7]  [*See, e.g.,* Kendrick Decl. Ex. 5 at 4-5 (Defendants claim that records in which the patient was seen only a single time are compliant with requirement to be seen "every 90 days" because "he was seen within 90 days of June 2015, the audit month")]

Despite this plain language, Defendants' proposed Monitoring Guide considers a prisoner as having been "seen" if the encounter takes place in a non-confidential setting such as group counseling, and/or the prisoner is not given the opportunity to exit his or her cell—for example, a cell-side segregation visit. [Kendrick Decl. Ex. 12 at 3-4; *id*. Ex. 17 at 105-107, 109-111, 115-125 (instructing monitor to count "segregation visit," "group counseling," or "suicide watch" as compliant with requirement that patient be "seen" by mental health clinician)]   Such an interpretation of "seen" implicates mental health Performance Measures 73, 74, 76, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 94, and 95.[8]   Plaintiffs notified Defendants that counting these types of encounters as compliant was inconsistent with the plain language of the definition of "seen" [Kendrick Decl. Ex. 11 at 5], but after meeting and conferring regarding the issue, Defendants stated that these types of encounters were counted as compliant in past monitoring reports, and Defendants would continue to consider them compliant. [*Id*. Ex. 12 at 3-4]

Defendants' erroneous methodology results in prisoners' medical records that are not actually compliant with the Performance Measures being counted as compliant, falsely inflating Defendants' compliance scores.   It also results in a mental health system that falls below the standard of care.  [*See* Stewart Decl. ¶ 11 (explaining that "it is critically important that prisoners' interactions with mental health staff take place in a setting that provides confidentiality both from other prisoners and from staff"); ¶ 14 ("prisoners in a group setting can be expected to withhold information that may be crucial to the effective diagnosis and treatment of their mental illness"); ¶ 16 ("cell-side conversations are of little to no value as a clinical encounter")]

---

[8] Performance Measure 92 explicitly provides that prisoners may be seen in a group session; accordingly, Plaintiffs do not object to Defendants counting mental health groups for the purposes of this Measure.

1

2

**D.     Performance Measures For Intake Health Screening Must Be Evaluated at All Prisons, As Male Parolees Can Be Revoked Directly to Any Prison**

3        There are four performance measures (PM 33, 34, 75, 76) that relate to the medical

4    and mental health screenings that prisoners must receive at intake when they arrive into

5    ADC custody.  [Doc. 1185-1 at 22, 30-31]  When the parties negotiated the Stipulation,

6    Defendants represented that the only institutions that conduct intake for prisoners were

7    Phoenix-Alhambra (adult males), Tucson-Minors (juvenile males), and Perryville (all

8    females), and thus the "protocol" section of the Stipulation exhibits noted that the intake

9    measures would be monitored at those institutions.  [*Id*.]  However, Plaintiffs' counsel

10   later learned from institution staff during tours at other men's prisons that each month

11   they receive as direct intakes approximately 10 to 15 parole violators who have had their

12   parole revoked.  [Doc. 1561-2 at 5-6]  In the October 15, 2015 Notice of Noncompliance,

13   Plaintiffs notified Defendants that all prisons that directly admit parole violators must also

14   be monitored for compliance with these requirements, because parole violators often are

15   admitted while detoxing from drugs or alcohol.  [*Id*.]  In response, Defendants agreed to

16   monitor incoming Death Row prisoners who are admitted directly to Eyman-Browning

17   Unit, but their position was that the word "intakes" only refers to "new" prisoners, and not

18   parole violators.  [Kendrick Decl. Ex. 4 at 21-22]  This ignores that Performance Measure

19   33 refers to "*all* inmates" receiving a health screening, and measures 75 and 76 refer to a

20   "prisoner's arrival into ADC" and "his or her arrival into ADC."  [Doc. 1185-1 at 10, 13]

21       Defendants also asserted that Plaintiffs "have not identified any actual issues or

22   concerns with care provided to parole violators…"  [Kendrick Decl. Ex. 4 at 22]  In fact,

23   Plaintiffs have notified Defendants of a parole violator who died at the Tucson prison days

24   after arrival from the community, and who was not seen by a provider, despite exhibiting

25   alarming symptoms of heroin withdrawal.  [*Id*. Ex. 7 at 3]  The April 2016 expert report of

26   Dr. Todd Wilcox, filed in support of Plaintiffs' previous enforcement motion, described

27   the prisoner's treatment as follows:

28

-12-

The case of [redacted], for example, is one of shocking neglect.  Mr. [redacted] arrived at prison on 9/14/15 with a daily heroin habit and was housed in the ASPC-Tucson infirmary to go through opiate withdrawal. Although he was seen by several nurses over the next few days, who documented that he was experiencing serious withdrawal and was at risk of dehydration due to excessive vomiting, he was apparently never referred to a medical provider, as he should have been.  He was ordered medications that were far too weak for his advanced withdrawal, and the medications that were ordered were provided only intermittently.  He should have been, but was not, prescribed IV medications in light of his severe vomiting.  Staff failed to monitor his condition, failed to order appropriate labs, and failed to refer him to a higher level of care.  Consequently, Mr. [redacted] died unnecessarily days after his arrival at prison, at age 44.  The Mortality Review Committee correctly classified this as a preventable death.

[Doc. 1539 ¶ 68]

Similarly, a prisoner hanged himself at ASPC-Tucson in March 2016.  He had recently been returned to ADC custody as a parole violator, and his medical record shows that he received no intake screening, and indeed no attention of any kind from health care staff, prior to his suicide.  The failure to conduct any kind of intake screening on a prisoner returning to custody falls far below the standard of care.  [Stewart Decl. ¶¶ 22-23]

Despite these tragic examples, Defendants again took the position that the other men's prisons will not be monitored with regard to the health care provided to parole violators at intake, and the parties declared an impasse with regard to the issue.  [Kendrick Decl. Ex. 8 at 1]  Defendants' failure to monitor all institutions masks any noncompliance that may be occurring at the non-enumerated institutions, and failure to provide these screenings has led to demonstrably deadly results.

**E.      "Thirty Days" and "One Calendar Month" Are Not Interchangeable**

Defendants count a record as compliant if an act required to be performed "every 30 days" or "within 30 days" is performed within one calendar month; if an act required to be performed "every 90 days" or "within 90 days" is performed within three calendar months; and if an act required to be performed "every 180 days" or "within 180 days" is

-13-

performed within six calendar months.  [*See* Kendrick Decl. Ex. 4 at 10; Ex. 17 at 8]  This misinterpretation affects 18 performance measures.[9]

Plaintiffs notified Defendants that their methodology is flatly inconsistent with the plain language of the measures.  [Doc. 1561-2 at 47, 50; Kendrick Decl. Ex. 9 at 2; Ex. 10 at 3; *see also* Ex. 4 at 10 (Defendants reiterate their intention to count calendar months rather than days)]  "Six calendar months" and "180 days" are not synonymous.  *See Scotti v. City of Phoenix*, No. CV-09-1264-PHX-MHM, 2010 WL 994649, at *3-4, n.1 (D. Ariz. Mar. 17, 2010) (under statute requiring notice of claim to be filed "within one hundred eighty days after the cause of action accrues," notice was not timely when filed within six calendar months, but 182 days after accrual), *aff'd,* 609 F. App'x 386 (9th Cir. 2015); *Villanueva v. Phelps Dodge Corp., Morenci Branch*, 311 P.2d 843, 844 (Ariz. 1957) (when decision of Arizona Industrial Commission was rendered on March 5, petition for certiorari filed on April 5 did not comply with statute requiring petition to be filed "within thirty days").  Defendants' erroneous methodology results in records that are not actually compliant with the Performance Measures being counted as compliant, falsely inflating Defendants' compliance scores.[10]

## II.   DISPUTES WITH REGARD TO MONITORING SPECIFIC PERFORMANCE MEASURES

There also are discrete disputes regarding the methodology to be used when Defendants monitor compliance with a specific performance measure.  The parties are at impasse on these disputes, and Plaintiffs seek the Court's resolution.

---

[9]  Specifically, this implicates Performance Measures 49, 50, 51, 53, 54, 73, 77, 80, 81, 82, 83, 84, 85, 86, 87, 88, 90, 92.

[10]  [*See* Kendrick Decl. Ex. 5, at 1 (counting as "compliant" two records in which the patient was not seen every 30 days as required, because "[t]his inmate was seen within one calendar month"); 9-10 (same); 11 (counting as "compliant" a record in which the patient's treatment plan was not updated every 90 days as required, apparently because it was updated within three calendar months); and 14-15 (same)]

1

2

### A.    PM 85 ("MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medication").

3

The Stipulation defines MH-3D patients as those "who have been recently taken

4

off of psychotropic medications and require follow up to ensure stability over time."

5

[Doc. 1185-1 at 5]  The Stipulation's protocol for monitoring this measure provides that

6

"10 records (if available) will be reviewed per yard for compliance." [*Id*. at 32]  Thus, for

7

example, at ASPC-Perryville, ten records of MH-3D prisoners must be reviewed from

8

each of the prison's seven units ("yards").

9

Defendants disregard this requirement.  Although in March 2016 Defendants drew

10

a sample of 68 MH-3D records at Perryville, they reviewed only seven of them for

11

compliance with this Performance Measure, yielding a meaningless compliance score of

12

100%.[11] [Kendrick Decl. Ex. 18 at ADCM463534-35; *see also id*. Ex. 14 at 13 (noting

13

that Defendants' methodology falsely inflates compliance scores)]

14

### B.    PM 86 ("MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication")

15

16

The plain language of this measure requires that Defendants ascertain the date on

17

which the prisoner discontinued psychotropic medications, and determine whether he or

18

she was seen by a mental health clinician within 90 days of that date, and every 90 days

19

thereafter for a minimum of six months.  Defendants ignore this plain language, and

20

instead count a record as compliant as long as the patient has been seen once in the past

21

ninety days, without regard to when he or she discontinued medications.[12] [Kendrick

22

Decl. Ex. 17 at 115, Ex. 11 at 4-5; Ex. 12 at 3]  Dr. Stewart concludes that Defendants'

23

"chronic failure to monitor prisoners who are currently prescribed, or have recently

24

discontinued, psychotropic medication presents a significant risk of serious harm." [Doc.

25

1538-1 ¶ 29]

26

27

[11] The Perryville facility is used as an illustration only; this erroneous methodology appears to be in use at all ADC facilities.

28

[12] *See supra* pages 9-10 regarding the dispute over the meaning of "every X days."

**C.     PM 94 ("All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse")**

Defendants are noncompliant with this performance measure by arbitrarily limiting their monitoring to a single calendar month.  [Doc. 1561-2 at 8-9; Kendrick Decl. Ex. 11 at 5; Ex. 12 at 4; Ex. 17 at 123].  As Dr. Stewart explained:

> The obvious purpose of this [performance measure] is to closely monitor the condition of the patient in order to detect changes that may indicate increased risk of self-harm.  Incredibly, when monitoring this measure, defendants often do not examine the entire period when the patient was on watch, because they look only at a single calendar month.  For example, imagine a patient who is on suicide watch from May 10 through June 2.  When auditing for the month of June, the monitor would only look to see if the patient was seen on June 1 and June 2.  Even if the patient was not seen at all while on suicide watch from May 10-31, his case would be counted as "compliant" for this measure.
>
> Needless to say, the risk of suicide does not magically appear or vanish with a change in the calendar month.  It is the intent of this Performance Measure – and it is critically important – that the patient on watch be seen every day.  ADC's failure to verify that this is occurring creates a substantial risk of injury or death.

[Doc. 1538-1 ¶¶ 37-38]

**D.     PM 95 ("Any prisoner discontinued from a suicide or mental health watch shall be seen … between 24 and 72 hours after discontinuation, between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation of the watch")**

This measure requires that a prisoner who has been removed from suicide or mental health watch have three post-watch contacts, at specified intervals, with mental health staff.  Obviously, only cases in which all three contacts have occurred may be counted as complaint.  However, Defendants count medical records as compliant with this measure even when only one or two of the three required post-watch contacts have occurred, thus falsely inflating their compliance scores.  [Kendrick Decl. Ex. 11 at 5-6; Ex. 12 at 4; Ex. 17 at 124]  For example, in April 2016 at ASPC-Eyman, of the 18 files counted as "compliant" with this measure, 16 had only one or two of the required three contacts documented.  [*Id*. Ex. 19 at ADCM 496391]  According to Dr. Stewart, "ADC's failure to ensure that patients who have been removed from suicide watch are seen as

1   required by this Performance Measure poses a substantial risk of self-harm or suicide."

2   [Stewart Decl. ¶ 21]

3           **E.      PM 98 (timely response to mental health HNRs)**

4           To ensure that prisoners are able to make their mental health needs known to

5   mental health staff in a timely fashion, PM 98 requires that "mental health HNRs [Health

6   Need Request forms] shall be responded to within the timeframes set forth in the [ADC]

7   Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0."   The

8   relevant provision of the MHTM provides the following timeframes for response to

9   mental health HNRs:

10          2.0 Inmates with emergency mental health issues will be seen by
            nursing staff immediately upon receipt of the HNR.
11

12          3.0 Inmates with urgent medication issues (e.g., serious medication
            side effects or lack of receiving prescribed medications) will be seen by
13          nursing staff within twenty-four (24) hours of HNR triage.

14          4.0 Inmates with urgent non-medications issues describing serious
            mental health symptoms will be seen by either nursing or mental health staff
15          within twenty-four (24) hours of receipt of the HNR.

16          4.0 Inmates with routine non-medication issues will be forwarded to
            appropriate mental health staff, and will be responded to within five (5)
17          working days with a specific plan of action.

18          5.0 Inmates with routine medication issues will be referred to a
            P/PNP, and seen within fourteen (14) days.

19   [Doc. 1560-5 at 109]  Defendants have unilaterally decided to monitor only one of these

20   five categories:   those raising "routine non-medication issues."   [*See* Kendrick Decl.

21   Ex. 11 at 6-7; Ex. 12 at 5; Ex. 17 at 128]  This is inconsistent with the plain language of

22   the Stipulation.  According to Dr. Stewart, it also "presents a risk of serious harm, since

23   absent monitoring there is no way of knowing if emergency or urgent HNRs are being

24   responded to in a timely fashion, or indeed at all."  [Doc. 1538-1 ¶ 34]

25                                    **CONCLUSION**

26          Plaintiffs are entitled to the benefit of their bargain.  Defendants may not

27   unilaterally alter or ignore the plain language of an agreement to which they freely bound

28   themselves.  The Court should order Defendants to comply with the Stipulation as written.

1    Dated:  July 12, 2016                          **PRISON LAW OFFICE**

2
                                                    By:  _s/ Corene Kendrick_
3                                                       Donald Specter (Cal. 83925)*
                                                        Alison Hardy (Cal. 135966)*
4                                                       Sara Norman (Cal. 189536)*
                                                        Corene Kendrick (Cal. 226642)*
5                                                       1917 Fifth Street
                                                        Berkeley, California 94710
6                                                       Telephone:  (510) 280-2621
                                                        Email:     dspecter@prisonlaw.com
7                                                                  ahardy@prisonlaw.com
                                                                   snorman@prisonlaw.com
8                                                                  ckendrick@prisonlaw.com

9                                                   *Admitted _pro hac vice_

10                                                  David C. Fathi (Wash. 24893)*
                                                    Amy Fettig (D.C. 484883)**
11                                                  Jamelia Natasha Morgan (N.Y.
                                                    5351176)**
12                                                  **ACLU NATIONAL PRISON
                                                    PROJECT**
13                                                  915 15th Street N.W., 7th Floor
                                                    Washington, D.C. 20005
14                                                  Telephone:  (202) 548-6603
                                                    Email:     dfathi@npp-aclu.org
15                                                             afettig@npp-aclu.org
                                                               jmorgan@aclu.org
16
                                                    *Admitted _pro hac vice_.  Not admitted
17                                                   in DC; practice limited to federal
                                                     courts.
18                                                  **Admitted _pro hac vice_

19                                                  Kirstin T. Eidenbach (Bar No. 027341)
                                                    **EIDENBACH LAW, P.C.**
20                                                  P. O. Box 91398
                                                    Tucson, Arizona 85752
21                                                  Telephone:  (520) 477-1475
                                                    Email:     kirstin@eidenbachlaw.com

22

23

24

25

26

27

28

Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    dpochoda@acluaz.org
              jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
              agerlicher@perkinscoie.com
              jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com
              aamiri@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com

*Admitted *pro hac vice*

Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:    jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;*
*Stephen Swartz; Sonia Rodriguez; Christina*
*Verduzco; Jackie Thomas; Jeremy Smith;*
*Robert Gamez; Maryanne Chisholm;*
*Desiree Licci; Joseph Hefner; Joshua*
*Polson; and Charlotte Wells, on behalf of*
*themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By:   *s/ Maya Abela*
Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email:    skader@azdisabilitylaw.org
              adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:
    rdalyrooney@azdisabilitylaw.org
        jrico@azdisabilitylaw.org
        jross@azdisabilitylaw.org
        mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability*
*Law*

-20-

1

## **CERTIFICATE OF SERVICE**

2    I hereby certify that on July 12, 2016, I electronically transmitted the above

3 document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4 Notice of Electronic Filing to the following CM/ECF registrants:

5

6                          Michael E. Gottfried
                           Katherine E. Watanabe
7                             Lucy M. Rand
                      Assistant Arizona Attorneys General
8                       Michael.Gottfried@azag.gov
                       Katherine.Watanabe@azag.gov
9                          Lucy.Rand@azag.gov

10                          Daniel P. Struck
                          Kathleen L. Wieneke
11                             Rachel Love
                         Timothy J. Bojanowski
12                          Nicholas D. Acedo
                           Ashlee B. Fletcher
13                           Anne M. Orcutt
                             Jacob B. Lee
14                  STRUCK WIENEKE, & LOVE, P.L.C.
                         dstruck@swlfirm.com
15                        kwieneke@swlfirm.com
                           rlove@swlfirm.com
16                      tbojanowski@swlfirm.com
                          nacedo@swlfirm.com
17                        afletcher@swlfirm.com
                          aorcutt@swlfirm.com
18                          jlee@swlfirm.com

19                       *Attorneys for Defendants*

20                              s/ D. Freouf

21

22

23

24    131890295.1

25

26

27

28