Exhibits to Declaration of Corene Kendrick
in Support of Motion to Enforce Stipulation

| Ex. | Description | Type of Record |
|---|---|---|
| Ex. 1 | January 4, 2016 Notice of Noncompliance from David Fathi to Daniel Struck | Public |
| Ex. 2 | August 20, 2015 letter from Lucy Rand to Kirstin Eidenbach in response to Plaintiffs' July 14, 2015 Notice of Noncompliance | *Under seal* |
| Ex. 3 | Oct. 13, 2015 letter from Lucy Rand to David Fathi in response to Plaintiffs' August 28, 2015 Notice of Noncompliance | Public |
| Ex. 4 | Nov. 24, 2015 letter from Lucy Rand to Kirstin Eidenbach in response to Plaintiffs' October 15, 2015 Notice of Noncompliance | *Under seal* |
| Ex. 5 | Nov. 24, 2015 Defendants' Response to Attachments to 10/15/15 Letter Re: Compliance | *Under seal* |
| Ex. 6 | Dec. 1, 2015 letter from Lucy Rand to Corene Kendrick memorializing meet-and-confer | Public |
| Ex. 7 | Mar. 17, 2016 letter from Corene Kendrick to Lucy Rand Re: Proposed Topics for 3/22/16 Call on Revised Monitoring Guide | *Redacted* |
| Ex. 8 | Mar. 23, 2016 letter from Corene Kendrick to Lucy Rand Re: Agreed-Upon Changes to Performance Measures from 3/22/16 Call | Public |
| Ex. 9 | Mar. 24, 2016 letter from Corene Kendrick to Lucy Rand Re: Proposed Topics for 3/29/16 Call on Revised Monitoring Guide | Public |
| Ex. 10 | Mar. 30, 2016 letter from Corene Kendrick to Lucy Rand Re: Agreements from 3/29/16 Call on Revised Monitoring Guide | Public |
| Ex. 11 | April 1, 2016 letter from Corene Kendrick to Lucy Rand Re: Proposed Agenda for April 5 Call on Mental Health Performance Measures | Public |
| Ex. 12 | April 6, 2016 letter from Corene Kendrick to Lucy Rand Re: Agreements from 4/5/16 Call on Revised Monitoring Guide | Public |

| Ex. | Description | Type of Record |
|---|---|---|
| Ex. 13 | April 7, 2016 letter from Corene Kendrick to Lucy Rand Re: Proposed Agenda for April 12 Call on Compliance Performance Measures | Public |
| Ex. 14 | April 15, 2016 letter from Corene Kendrick to Lucy Rand Re: Agreements Reached on 4/12/16 Negotiation Call; Outstanding Issues/ Questions With Remaining Performance Measures | Public |
| Ex. 15 | June 6, 2016 10:53 am email from Lucy Rand to Counsel Retracting Letter | Public |
| Ex. 16 | June 6, 2016 4:00 pm email from Corene Kendrick to Lucy Rand RE: Letter – PARSONS v. RYAN | Public |
| Ex. 17 | April 11, 2016 ADC Draft Monitoring Guide | Public |
| Ex. 18 | ADCM463534-35 (selected pages from ASPC-Perryville March 2016 CGAR) | ***Under Seal*** |
| Ex. 19 | ADCM496391 (page from ASPC-Eyman April 2016 CGAR) | ***Under Seal*** |
| Ex. 20 | Advocacy Letters dated August 6, 2015 and June 28, 2016 from David Fathi, Counsel for Plaintiffs, to Dan Struck, Counsel for Defendants, regarding prisoner in need of mental health care. | ***Under Seal*** |

# EXHIBIT 1

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



BY EMAIL ONLY

January 4, 2016

Daniel P. Struck
Struck Wieneke & Love PLC
3100 West Ray Road, Suite 300
Chandler, AZ  85226

   **Re: Parsons v. Ryan**

Dear Dan:

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

Thank you for the spreadsheet sent by Lucy Rand on December 18 (hereinafter "the Spreadsheet"), describing Defendants' monitoring methodology.  We remain hopeful that we will be able to resolve the issues set forth in Plaintiffs' October 15, 2015 Notice of Substantial Noncompliance and Defendants' November 24, 2015 response.

In preparation for our discussions, we wish to note our disagreement with a recurrent element of Defendants' monitoring methodology set forth in the Spreadsheet.  A number of performance measures require that a given act be performed "a minimum of every X days."  The Spreadsheet shows that Defendants consider these measures to be satisfied if the required act has been performed once within the previous X days.  See, e.g., Spreadsheet, HC PM 81 (requiring that prisoner be seen "a minimum of every 90 days;" methodology is to "look to see if the inmate was seen 90 days or less before the last day of the reporting month").

This method does not measure compliance with what the performance measures require.  To determine whether something has occurred "a minimum of every 90 days," it is necessary to measure the time elapsed *between* multiple occurrences.  Finding that something has occurred once in the last 90 days does not establish compliance; is entirely possible that the event has occurred only once in the past six months or once in the past year (indeed, Plaintiffs have cited many such examples), in which case it has not occurred "a minimum of every 90 days."

We have previously raised this issue with Defendants.  See, e.g., 7/14/15 Eidenbach letter at 19-20; 10/15/15 Notice of Substantial Noncompliance at 5.  Nevertheless, to ensure that this issue is discussed at the upcoming mediation, please consider this letter to be a Notice of Substantial Noncompliance pursuant to ¶ 30 of the Stipulation.

Please note that this letter does not constitute an exhaustive list of the issues we wish to discuss with Defendants and the mediator.

Very truly yours,

David C. Fathi

Cc:    All counsel

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

# EXHIBIT 2

# FILED UNDER SEAL

# EXHIBIT 3



**OFFICE OF THE ARIZONA ATTORNEY GENERAL**

**MARK BRNOVICH**
**ATTORNEY GENERAL**

**STATE GOVERNMENT DIVISION**
**LIABILITY MANAGEMENT SECTION**

**LUCY M. RAND**
**ASSISTANT ATTORNEY GENERAL**
**DIRECT LINE: (602) 542-7683**
**EMAIL: LUCY.RAND@AZAG.GOV**

October 13, 2015

**VIA E-MAIL:**

David C. Fathi
American Civil Liberties Union-National Prison Project
915 15th Street, NW
Washington, DC 20005-2112
dfathi@aclu.org

Re:     **Plaintiffs' August 28, 2015, Letter Regarding Compliance Under the Stipulation**
        *PARSONS, et al. v. RYAN, et al., USDC CV12-00601-DKD*

Dear David:

This letter responds to Plaintiffs' August 28, 2015, letter/notice regarding the Defendants' compliance with health care performance measures ("HC PM") numbers 80-86 under the parties' Stipulation (Dkt. 1185).

Plaintiffs claim that Defendants do not comply with the HC PMs ##80-86 regarding mental health because these performance measures are not monitored at maximum custody units Browning and Special Management Unit ("SMU") I at Arizona State Prison Complex (ASPC)-Eyman, and Central and Kasson at ASPC-Florence.

As you know, the parties have discussed these performance measures at length on multiple occasions. Although Defendants do not agree with Plaintiffs' position, Defendants nevertheless will begin monitoring HC PMs ##80-86 for ASPC-Eyman-Browning and SMU I and ASPC-Florence-Central and Kasson beginning with the September 2015 CGAR period, which, as you know, is monitored during the month of October.

Should you have any concerns, please do not hesitate to contact me.

Sincerely,

s/ Lucy M. Rand
Lucy M. Rand,
Assistant Attorney General

cc:     Brad Keogh
        Richard Pratt

#4713984

# EXHIBIT 4

# FILED UNDER SEAL

# EXHIBIT 5

# FILED UNDER SEAL

# EXHIBIT 6



**OFFICE OF THE ARIZONA ATTORNEY GENERAL**

**MARK BRNOVICH**
**ATTORNEY GENERAL**

**STATE GOVERNMENT DIVISION**
**LIABILITY MANAGEMENT SECTION**

**LUCY M. RAND**
**ASSISTANT ATTORNEY GENERAL**
**DIRECT LINE: (602) 542-7683**
**EMAIL: LUCY.RAND@AZAG.GOV**

December 1, 2015

**BY ELECTRONIC MAIL ONLY**

Corene Kendrick
Staff Attorney
PRISON LAW OFFICE
General Delivery
San Quentin, CA  94964
ckendrick@prisonlaw.com

Re:   **Plaintiffs' October 15, 2015, Letter re: Compliance Under the Stipulation**
*PARSONS, et al. v. RYAN, et al., USDC CV12-00601-DKD*

Counsel:

We write to memorialize today's meet and confer.  As an initial matter, to ensure uniformity in future correspondence and discussions, the parties agreed to use the numbering in the Stipulation when referencing performance measures, i.e., HC PM ##1-103, MC PM ##1-9.

Plaintiffs requested that Defendants develop written instructions and guidelines to assist the monitors in monitoring each performance measure.  Defendants have been working diligently on this guide and agreed to provide it to Plaintiffs by December 18, 2015.   The manual will include guidelines for both healthcare and maximum custody measures.

Plaintiffs expressed that inadequate staffing was the catalyst for Defendants' alleged noncompliance with the Stipulation.  Plaintiffs requested that Defendants come up with a plan to increase staffing in accordance with the current staffing plan outlined in the Stipulation.  Defendants agreed to provide more detail as to how Corizon is working to decrease staffing vacancies.  Defendants agreed to provide Plaintiffs with this information by December 18, 2015.

Next, Plaintiffs complained of the timeframe in which Defendants are responding to (1) Plaintiffs' allegations of substantial noncompliance and (2) when Defendants produce documents requested prior to prison tours after Plaintiffs request them.  Specifically, Plaintiffs take issue that not all requested documents have been provided to them prior to the upcoming tours. Defendants explained that each time Plaintiffs send a request for documentation prior to the tours, the number

Corene Kendrick
*PARSONS, et al. v. RYAN, et al.*, USDC CV12-00601-DKD
December 1, 2015
Page 2

of documents requested dramatically increases.[1]  In fact, Plaintiffs' last document request included a request for documents that resulted in approximately 16,000 pages of documents. The parties agreed to communicate more frequently and effectively regarding document requests so as to ensure efficient production that does not overly burden Defendants.

Next, the parties discussed specific sections of Defendants' November 24, 2015 Response.

## Page 30 ¶ 29

It is Defendants' position that there is a difference between a "denial" of specialty services (providing nothing) and providing an Alternative Treatment Plan ("ATP"), especially where services can be provided by an in-house provider.  Defendants explained that a denial may often still result in care and does not necessarily mean an inmate was denied care.  Plaintiffs disagree. The parties are at an impasse on this issue.

## Page 46 ¶ 57

It is Plaintiffs' position that because items such as the language line and heat intolerance reaction are referenced in the Stipulation they need to be monitored.  Defendants' disagree and take the position that items not expressly required to be monitored by one of the 112 performance measures are not required to be monitored.  Defendants advised Plaintiffs that many of the items referenced in the Stipulation would be difficult to monitor, which is why they were not included in the performance measures.  For example, with respect to language line, some inmates are dishonest about the language they speak, some providers speak multiple languages, and some providers may rely on other providers to interpret for them.  All of these items make it difficult, if not impossible, to track.  Defendants advised Plaintiffs they are not required to monitor items not contained in the performance measures.  Plaintiffs advised Defendants that they can track whether these items are occurring by requesting documentation and touring the facilities.

## Page 51 ¶ 65

Plaintiffs complained that many of the descriptions of steps taken to increase compliance were vague.  Defendants agreed to produce the CAPS from May–August.

---

[1]  Plaintiffs' May 5, 2015, letter contained 12 requests for documents and Defendants produced approximately 870 pages before the tours; Plaintiffs' August 6, 2015, letter contained 21 requests for documents and Defendants produced approximately 1,309 pages before the tours; and, Plaintiffs' November 11, 2015, letter contained 27 requests for documents and Defendants have produced approximately 2,817 pages (not including the 16,000 pages of documents Plaintiffs' did not intend to request).

Corene Kendrick
*PARSONS, et al. v. RYAN, et al.*, USDC CV12-00601-DKD
December 1, 2015
Page 3

**Page 55**

Plaintiffs requested more detail with respect to staffing.  Defendants advised Plaintiffs they have received copies of the staffing rollup which has this information for all ten facilities.

**Page 27–28 ¶ 23**

It is Defendants' position that Plaintiffs are taking the six-month requirement out of context in HC PM #86.  MH-3D inmates must be seen by a mental health clinician every 90 days for a minimum of six months after discontinuing mediation before they are reduced to MH-2.  Plaintiffs disagree.  The parties are at an impasse on this issue.

**Page 29-30 ¶ 27**

Defendants are only monitoring HC PM #98 (MH 26) for the timeliness of routine HNRS because all other HNRs are being monitored by other performance measures.  Plaintiffs want all HNRs to be monitored by this performance measure.  Defendants explained that this would require duplicative work as Defendants are already monitoring all other HNRS.  Plaintiffs insist that all HNRs be monitored under this measure regardless if they are being measured under another performance measure.  The parties are at an impasse on this issue.

Finally, Plaintiffs requested the parties exchange possible dates for a mediation in front of Judge John Buttrick.  Defendants requested that Plaintiffs first provide a list of issues they want to bring before the judge.  Although Plaintiffs agreed to provide this list to Defendants by the end of the week, Plaintiffs now agree to provide Defendants this list after receiving the documentation Defendants are providing on December 18, 2015.

Sincerely,

s/ Lucy M. Rand
Lucy M. Rand,
Assistant Attorney General

LMR

cc:   Brad Keogh
      Dawn Northup
      Michael Gottfried
      Timothy Bojanowski

#4791252

# EXHIBIT 7

# (REDACTED)



*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

**VIA EMAIL ONLY**

March 17, 2016

Ms. Lucy Rand, Assistant Attorney General
Office of the Arizona Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
Lucy.Rand@azag.gov

      RE:   *Parsons v. Ryan*, CV-12-0601-DMD
              Proposed Topics for 3/22/16 Call on Revised Monitoring Guide

Dear Ms. Rand,

      The parties agreed at the March 1 mediation to begin weekly calls on March 22 to discuss Defendants' revised Monitoring Guide and proposed methodology for measuring compliance with the Stipulation's Performance Measures. Defendants provided that Guide on Tuesday night. Plaintiffs' counsel had agreed to provide up to five performance measures that we want to discuss on each call, three business days prior to the call, so that Defendants could ensure that the individuals with the relevant knowledge for that performance measure, with final decision-making authority, were on the call.

      Listed below are the performance measures we would like to discuss on the March 22 call on the so-called "Compliance" performance measures. In the hopes of ensuring a more productive call, I have explained why we want to discuss a particular measure, or what information or answers we would like by the time of the call. Obviously, in the course of the conversation, we may identify additional concerns with a particular measure's methodology so we may not be limited just to what is written below. By specifying our questions and concerns in advance, we hope to promote transparency and demonstrate good faith. We hope that in a similar spirt of good faith, Defendants are prepared to provide on the call the information requested below.

      There are actually seven performance measures listed, but as you will see, in several cases two measures go together, where they share common issues or concerns. However, if this is too many, please advise us and we can take two of them off until the next time we talk about "Compliance" performance measures.

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

1)      **PM 33** (prisoners will receive a health screening by a LPN or RN within one day of arrival at an intake facility) and **PM 34** (prisoners will receive a physical examination by a medical provider by the end of the second full day of an intake inmate's arrival at the intake facility).

When the parties negotiated the performance measures, we were informed that the reception center institutions were Phoenix-Alhambra for adult males, Tucson-Rincon Minors for juvenile males, and Perryville for all females.  Therefore, the "Protocol" section of the chart at Exhibit D of the Stipulation (but not the language of the Performance Measure itself) states that the records from these three facilities would be reviewed.  In our Oct. 15, 2015 Notice of Non-Compliance, we stated that we had learned during our tours at Eyman, Lewis, and Florence that each of those facilities receive parole violators as direct intakes, roughly 10 to 15 per month, and those individuals do not go through Phoenix-Alhambra.  (10/15/15 Notice at 4-5).  In response to our request that the methodology be modified to monitor compliance additionally at any prison that directly receives parole violators, Defendants told us that "parole violators are not new inmates" and therefore ADC does not count them as intakes.  (Rand 11/24/15 letter at 21).

The Performance Measure states that "*all* inmates" will receive a health screening by a nurse at intake.  Whether ADC considers parole violators as "new inmates" or not is irrelevant.  Moreover, Corizon does not distinguish between parole violators and new admissions for intake purposes. (Rand letter at 21-22).  Because the Performance Measure requires a health screening for all arriving inmates, ADC is obligated to monitor whether that it is occuring at every prison where inmates arrive from a non-ADC facility.  We reiterate our position that this methodology must be revised to recognize that parole violators are directly admitted to prisons other than Phoenix-Alhambra, Perryville and Tucson-Minors.

In addition, because the "Source of Records/Review" and the "Methodology" require review of the "arrival log/list" for both PM 33 and 34, such a list needs to be maintained at all institutions (if not already in place); otherwise, the source and methodology need to be updated to reflect another method to select an appropriate sample.  Similarly, we want to know how the arrival log/list is maintained.  If the list/log is maintained by health care staff, it cannot be a list of only the intake screenings that occur, which would inherently skew the monitoring by failing to include new arrivals who did not receive a screening; it must be a list of all the people who arrived at the institution from a non-ADC facility during that monitoring period, separate from the list of intake screenings completed for the monitoring period.

The methodology in PM 33 should also make explicit the requirements that the nursing screening form is completed fully (which would require the monitor to enter and review the

screening note) and is completed by an LPN or RN.  The methodology in PM 33 should also be updated to include the direction that is included in the methodology for PM 34, as applicable ("Review the encounters tab" versus "Health Services Encounters>History>Physical examination").  The final bullet in the methodology for PM 34 should change the word "doctor" to "provider."  Finally, the methodology for PM 34 needs to include the requirement that the provider record the prisoner's history in addition to the physical exam.

As we noted, "[h]aving immediate health screenings for parole violators is important, given that some of the behaviors that may have led to violation could include the abuse of drugs and alcohol, and these people will be going through detox."  (10/15/15 Notice at 5).[1] This concern is not abstract or theoretical, as shown by a recent tragic and preventable death of a prisoner who died within four days of coming in to ASPC-Tucson on a parole violation, and was not examined by a provider despite alarming symptoms.  (████████████████, died █████████).  Our expert Dr. Todd Wilcox reviewed the medical records and agreed with ADC's mortality review committee that this death was preventable.  Mr. Wilcox's conclusion is:

> *This is a case of shocking neglect.  Mr. █████ arrived at prison on █████ with a daily heroin habit and was housed in the ASPC-Tucson infirmary to go through opiate withdrawal.  Although he was seen by several nurses over the next few days, who documented that he was experiencing serious withdrawal and was at risk of dehydration due to excessive vomiting, he was apparently never referred to a medical provider, as he should have been.  He was ordered medications that were far too weak for his advanced withdrawal, and the medications that were ordered were provided only intermittently.  He should have been, but was not, prescribed IV medications in light of his severe vomiting.  Staff failed to monitor his condition, failed to order appropriate labs, and failed to refer him to a higher level of care.  Consequently, Mr. █████ died unnecessarily ███ days after his arrival at prison, at age 44.  The mortality review committee report correctly classified this as a preventable death.*

///
///
///

_____

[1] We also noted that "Mental health screenings are similarly critical, given that a mental health crisis may have precipitated the violation, and some violators will be taking psychotropic medications that must be continued." (Notice at 5).  The relevant mental health performance measures for new arrivals are PM 75 and 76.

2)      **PM 39** (routine referrals seen by medical provider within 14 days of the referral)

We are pleased that Defendants plan to work off of the Nurse Line Appointment List to get a sample, rather than using the list of completed provider appointments and working backwards.  However, we want to confirm how the Nurse Line Appointment List is generated and maintained.  We also want to confirm whether the monitor would continue to randomly select names until she or he had ten cases where it was clear from the nursing encounter at sick call that the nurse had made a routine referral to the provider.  We believe the answer is yes, the monitor would do that, in which case that should be made specific in the first bullet point under "methodology."  In addition, if the Nurse Line Appointment List is already in Excel, the random sample selection outlined on page 10 of the Monitor Guide is feasible.  However, if the Nurse Line Appointment List is not in Excel, inputting potentially hundreds of data points into Excel and randomizing the data selection is not a sustainable monitoring method.  Instead, alternative means of randomization, such as random.org, could be utilized to more efficiently randomly select files to review.

We also want to discuss whether the monitor might need to look at the Nurse Line Appointment List for the month previous to the audited month, in order to capture cases where the 14 day period spans two calendar months.

In addition, the "Source of Records/Review" needs to include the Nurse Line Appointment Lists and HNRs.  The "Methodology" refers to both a Nurse Line Appointment List and  Nurse Line Log.  It is unclear if these are two different titles for the same log, or if they represent two separate logs.  If only one log is used, the references to said log should be standardized.  Similarly, the methodology should be more explicit about how the monitor should find the Nursing Encounter form or the HNR in eOMIS, or how the Nurse Line Log is used to determine the referral date.

Finally, the second bullet in the methodology should instruct the monitor to "review the providers' encouters and notes in eOMIS that are completed fully for the audited month for documentation of a provider encounter within 14 days of the referral."  It is important to ensure the note is completed fully as some notes are entered into eOMIS for appointments that do not appear to have occurred.  The monitor should also be limited to measuring compliance from provider encouters that occurred within 14 days, not providers review of records that do not result in encounters; thereofre, the monitor must review the provider notes in response to the referral to determine that an appointment occurred rather than a review.

///
///

3) **PM 40** (urgent provider referrals seen within 24 hours) and **PM 41** (emergent provider referrals seen immediately).

     The proposed methodology for both of these measures is confusing, and in some respects it appears to collapse the two measures and looks at the same information twice. The terms "urgent" and "emergent" are not defined in the Stipulation, and it would be helpful if they were defined so that we know we are talking about the same thing. At the very least, we need some guidance as to what Corizon tells its nurses is an urgent referral versus an emergent referral. We tried to get this information from the Florence DON, but she told us that nurses were trained on what is urgent versus emergent when they originally studied to become nurses. (10/15/15 Notice at 13).

     Similarly, we need further information about how an urgent versus emergent concern is recorded in eOMIS. Corizon's eOMIS system appears to allow a nurse to check a box in the NET noting that a referral is urgent or emergent. However, it is unclear if the check boxes in the NET are the primary method to determine whether a referral is urgent or emergent. If there is an alternative method to ensure the patient is seen on an urgent or emergent basis, the methodology must include clear instructions explaining how to determine if the referral was urgent or emergent. We request that Defendants provide the defintions, NETs, or guidelines, if any, that Corizon provides to nurses explaining when and how to designate a case as urgent versus emergent. If no such definitions exist, please let us know so we can discuss the appropriate definiton of each term.

     We also would like to discuss the methodology for selecting the random sample of files to review each monitoring period. This sample should be limited to those records where an urgent or emergent referral was made. If it is possible to use eOMIS to create a report of all cases in a month where the "urgent" or "emergent" box was checked, that would generate a list much more quickly than having to go through the Nurse Line Appointment List and keep looking for nursing encounters where the referral was marked as urgent/emergent.

     Similarly, the methodology should more explicitly direct the monitor on how to determine compliance for this performance measure. The methodology appears to provide instructions, although confusing and inadequate in detail (is a check box in the NET the only way to determine the referral was made?), about how to determine the nursing referral was made, but fails to provide instruction about how to adequately determine whether the provider encounter occurred. The methodology indicates that "the nursing notes may include a hyperlink to the schedule or a Provider note." This is inappropriate; the monitor should not review whether an appointment was scheduled, and instead, needs to ensure that a provider actually saw the patient. The methodology should also indicate whether a Provider Note is required to determine if the patient was seen within timeframes or if there is another way to

determine compliance with this performance measure.  Again, the monitor may need to review the actual notes to determine that an appontment occurred rather than a provider review.

Finally, there is a reference to an Emergency Response (ER) log, can you please explain what this is, and provide us with an exemplar from a recent month at a prison so we can see what sort of information is contained within it?  From the methodology, it is unclear how the monitor uses this log to determine compliance under these performance measures.

4)   **PM 60** (Females ages 21 to 65 offered a Pap smear at intake) and **PM 61** (Females ages 21 to 65 offered a Pap smear every 36 months after intake unless more frequent screening is clinically indicated).

Upon reviewing these two performance measures side-by-side, they are written very similarly, but PM 60 refers to intake, whereas PM 61 involves after a woman has been incarcerated for a few years.  One of our concerns is with the source of records/review and methodology for PM 61.  Unlike PM 60, which involves reviewing the health care records of women who have come in to the prison, PM 61 does not look at health care records.  Rather, it defines compliance as to whether or not posters are up in the health units telling women they can get a Pap smear.  As noted on Exhibit D of the Stipulation, the parties had envisioned that the source of records would be medical records, and that 10 records would be selected from each yard each month.  There is no explanation as to why this agreed-upon protocol was abandoned for simply checking if posters are up in the health unit.  This measure's methodology must include a review of medical files.

In terms of identifying which files to review, we propose that the monitor consult a historic list of women who were admitted more than 36 months earlier, to identify which women are still in custody as of the current date, and randomly select up to ten of those women to review their medical charts similar to what is described for PM 60.

In addition, please refer to the comments above about the arrival log/list.  The methodology should also more explicitly reiterate the requirement that the monitor review the medical record to determine if the Provider offered a pap smear during the initial intake physical exam (the exam that is to occur within 2 days, per PM 34), not any provider exam during the monitoring period.  The methodology should also make more explicit instructions for how to "confirm that a pap smear was offered."  For example, does the Provider have to write in the subjective notes that a pap smear was offered or is there a box in the Provider Note that can be checked?

Ms. Lucy Rand
ADC Monitor Guide
Proposed Agenda for 3/22/16 Call
March 17, 2016
Page 7

We look forward to speaking with you on the 22nd.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:     Counsel of Record

# EXHIBIT 8



*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

**VIA EMAIL ONLY**

March 23, 2016

Ms. Lucy Rand, Assistant Attorney General
Office of the Arizona Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
Lucy.Rand@azag.gov

   RE: *Parsons v. Ryan*, CV-12-0601-DMD
     Agreed-Upon Changes to Performance Measures from 3/22/16 Call

Dear Lucy,

  Below is a summary of the March 22 call to discuss certain "Compliance" performance measures. This summary is based upon notes taken by me, Alison Hardy, and David Fathi during the call. Please let me know if any of this does not comport with your notes.

1) **PM 33** (prisoners will receive a health screening by a LPN or RN within one day of arrival at an intake facility) and **PM 34** (prisoners will receive a physical examination by a medical provider by the end of the second full day of an intake inmate's arrival at the intake facility).

  Plaintiffs believe that the methodology for these performance measures related to prisoners arriving to ASPC should take into account the fact that adult male parole violators can be admitted directly to any men's prison. My March 17 letter and our Notice of Non-Compliance spell out the reasons for taking this position, and I will not repeat them here. Litigation Counsel for Defendants took the position that ADC will only evaluate the performance measures at the facilities listed in the Stipulation's exhibit: Phoenix-Alhambra, Tucson-Minors, and Perryville.[1] The parties reached an impasse on the issue of which institutions should be monitored.

---

  [1] Your 11/24/15 response to the Notice of Noncompliance says "Defendants agree to monitor incoming death row inmates who bypass traditional intake facilities." Rand ltr at 21. The methodology also lists "Eyman-Death Row." (3/15/16 Draft Manual, at 46-47). Please confirm that monitors will indeed evaluate Eyman for condemned persons entering the prison.

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

We discussed that defendants are transitioning from using handwritten "arrival logs" to Excel spreadsheets.Ms. Campbell stated that transition to the Excel spreadsheets, will make it easier to sort and randomize the list of patients.

With regard to PM 33, Defendants agreed
- to update the methodology section of PM 33 to mirror the language of PM 34, and make explicit that the monitor must open and review the screening note.
- To make explicit in the methodology section the requirements that the nursing screening form is completed fully (which would require the monitor to enter and review the screening note), and is completed by an LPN or RN.

With regard to PM 34, Defendants agreed
- to change the word "doctor" on the fourth bullet point to read "medical provider," to match the language of the Performance Measure, and
- to add to the fourth bullet point the language from the Performance Measure that the provider also should record the prisoner's history in addition to conducting the physical exam.

Attached to this letter is a track-changes version of PM 33 and PM 34, based on the notes we took during the call.

2) **PM 39** (routine referrals seen by medical provider within 14 days of the referral)

Ms. Campbell explained that Corizon is working on developing a Nurse Line Log that is an Excel spreadsheet and will list, among other things, the patient's name, date of HNR, date received, date of nurse's line appointment, and whether the patient was referred to the provider, with designation as routine, urgent, or emergent.  Currently they use a "Nurse Line Appointment List" which is handwritten.  Health care staff are being trained on how to use the new Log, with planned roll out on April 1.  Once the Excel spreadsheet is implemented, monitors will be able to sort the list to show only those who were referred on to the provider, and use Excel's randomizing feature to select files for the audit.

We discussed the broader issue of how the monitors are randomizing the selection of lists. Ms. Campbell noted that Excel won't work for performance measures or audit lists based upon AIMS, and as a result monitors pick every "Nth" name on a list, or just use the first or second half of the alphabet.  We suggested that Defendants look into the free random number generators available on the web, including for example random.org.

We also discussed whether the monitor might need to look at the Nurse Line Log for the month previous to the audited month, in order to capture cases where the 14 day period spans two calendar months.

With regard to PM 39, Defendants agreed
- that the methodology on this PM needs to be changed or modified to permit review of patients referred to provider line in the second half of a month, and will supply us with proposed language/instructions.
- to make the name of the source document listed in "Source of Records" and "Methodology" consistent, most likely to be referred to as the Nurse Line Log.
- to delete the words "a provider review" from the second bullet point under "Methodology" as the PM requires that there be an actual encounter, not just a "review," and to instruct the monitor that he or she must open up and review the provider notes to confirm that an actual appointment occurred.

Attached to this letter is a track-changes version of PM 39, based on the notes we took during the call.

3) **PM 40** (urgent provider referrals seen within 24 hours) and **PM 41** (emergent provider referrals seen immediately).

As a threshold matter, Plaintiffs noted that the proposed methodology for both of these measures is confusing, and in some respects it appear to collapse the two measures and look at the same information twice.  The terms "urgent" and "emergent" are not defined in the Stipulation, and we asked what sort of definition is used or instruction is given to nursing staff to decide whether a person is in need of an emergent or urgent referral.  Nobody on the call knew what, if any, instruction or definition Corizon used.  We sent you the definitions used by the California Correctional Health Care Services.  Defendants stated that they would run these definitions/instructions by Corizon clinical staff and see if they were comparable. The CCHCS definitions are:

**Medical Emergency**: A medical emergency as determined by medical staff includes any medical, mental health, or dental condition for which evaluation and treatment are necessary to prevent death, severe or permanent disability, or to alleviate disabling pain.  A medical emergency exists when there is a sudden marked change in a patient-inmate's condition so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to the patient-inmate or others.

**Urgent Condition**: Any medical condition that would not result in further disability or death if not treated immediately, but requires professional attention and has the potential to develop such a threat if treatment is not provided within 24 hours.

Based upon Ms. Campbell's description of the Nurse Line Log in our discussion of PM 39, the monitors will be able to use the Excel spreadsheet to sort and identify the universe of urgent and emergent referrals to review.  Ms. Campbell stated that once the Log is implemented, the various ER and ICS logs will not be needed as source documents.

With regard to PM 40 and PM 41, Defendants agreed
- to review Plaintiffs' proposed definitions of "urgent" and "emergent" referral.
- to make the name of the source document listed in "Source of Records" and "Methodology" consistent, most likely to be referred to as the Nurse Line Log.
- to remove from the "Source of Records" section the documents that will not be used once the Nurse Line Log is implemented.
- to revise the language/instructions on the fourth bullet to clarify that the monitor needs to determine if the provider encounter actually occurred, and not whether it was simply scheduled.
- to delete the references in the fourth bullet point to the ICS/appointment lists, as these source documents will no longer be used.
- to make the language/instructions in PM 40 and 41 consistent with one another.

Attached to this letter is a track-changes version of PM 40 and PM 41, based on the notes we took during the call.

4)   **PM 60** (Females ages 21 to 65 offered a Pap smear at intake) and **PM 61** (Females ages 21 to 65 offered a Pap smear every 36 months after intake unless more frequent screening is clinically indicated).

We noted our concerns with the source of records/review and methodology for PM 61. Unlike PM 60, which involves reviewing the health care records of women entering the prison, PM 61 does not look at health care records.  Rather, it defines compliance as to whether or not posters are up in the health units telling women they can get a Pap smear.  As noted on Exhibit D of the Stipulation, Defendants agreed that the source of records should be medical records, and that 10 records would be selected from each (Perryville) yard each month.

You stated that ADC is not following the plain language of the stipulation because you cannot monitor whether the patients saw the information.  We explained that health care staff should be documenting in the medical files that patients, during the three year period, have

received notice that they qualified for a Pap exam and that they either accepted or refused the service.  This documentation could be done by written notice and written refusal, if applicable, or Corizon could have a practice of scheduling preventative women's care appointments at least every three years to discuss with patients.

With regard to PM 61, Defendants agreed to review the methodology and document sources for this measure, and determine how they can comply with the requirements spelled out in the Stipulation exhibit.

We thought that we made progress in yesterday's call, and hope that next week's call will be productive and collaborative.  As I said yesterday, I will provide you on Thursday (3/24/16) the list of medical performance measures we want to discuss on March 29.  Please let me know if you have any questions, or if any of the above does not comport with your understanding.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:    Counsel of Record

**M O N I T O R   G U I D E**

**Health Care Performance Measure No. 33**
**Stipulation Category: Intake Facility (01)**

**CGAR Category: Intake C 01**

| |
|---|
| **Performance Measure:**<br><br>All inmates will receive a health screening by an LPN or RN within one day of arrival at the intake facility. |
| **CGAR Question:**<br><br>Has the inmate received a health screening by an LPN or RN within one (1) day of arrival at the intake facility? |
| **Source of Records/Review:**<br><br>Medical records from inmates received during the audited month; Arrival log/list; and Monthly Appointment list. |
| **Methodology:**<br><br>• The intake facilities to be audited for this measure are Phoenix, Perryville, Tucson-Minors, and Eyman-Death Row.<br><br>• Review the Arrival Log from the audited month for each intake facility and randomly select ten charts.<br><br>• If there are 10 or fewer intakes for the audited month from an intake facility, review all intake charts for that facility.<br><br>• Review ~~the encounters tab in~~ eOMIS under Health Services Encounters>History>Physical examination, to confirm whether a documented health screening was performed by an LPN or RN, ~~for a nursing screening~~ within one day of the inmate's arrival. |

---

**2**

**MONITOR GUIDE**

Health Care Performance Measure No. 34
Stipulation Category: Intake Facility (02)

**CGAR Category: Intake C 02**

| | |
|---|---|
| **Performance Measure:** | |
| A physical examination including a history will be completed by a Medical Provider (not a dentist) by the end of the second full day of an intake inmate's arrival at the intake facility. | |

| |
|---|
| **CGAR Question:** |
| Has a physical examination including history been completed by a Medical Provider (not a dentist) by the end of the second full day of an inmate's intake arrival at the intake facility? |

| |
|---|
| **Source of Records/Review:** |
| Medical records from inmates received during the audited month. Arrival log/list. |

| |
|---|
| **Methodology:** |
| • The intake facilities to be audited for this measure are Phoenix, Perryville, Tucson-Minors, and Eyman-Death Row. |
| • Review the Arrival Log from the audited month for each intake facility and randomly select ten inmate/names/numbers |
| • If there are 10 or fewer intakes for the audited month for an intake facility, review all intake charts for that facility. |
| • Review eOMIS, under Health Services Encounters>History>Physical examination, for a documented physical examination including a history, was done by a ~~doctor~~ medical provider (not a dentist) within two days of the inmate's arrival at the intake facility. |

Revised: _____

**M O N I T O R   G U I D E**

**Health Care Performance Measure No. 39**
**Stipulation Category: Access to care (04)**

**CGAR Category: Access to Care C 04**

| | |
|---|---|
| **Performance Measure:** | |
| Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointment will be seen within fourteen calendar days of the referral. | |
| **CGAR Question:** | |
| Are routine provider referrals being addressed by a medical provider and referrals requiring a scheduled provider appointment being seen within fourteen (14) calendar days of the referral? | |

**Source of Records/Review:**

Nurse ~~line Line log~~Log, Provider appointment lists, and eOMIS/Medical Record from the audited month.

> **Comment [A1]:** Will this source be necessary once the Nurse Line Log is implemented?

**Methodology:**

- Review the Nurse Line ~~Appointment Lists~~Log from the audited month and randomly select ten inmate names/numbers where there was a routine provider referral. If there are 10 or fewer charts from a facility that are applicable for this question, review all applicable charts.

> **Comment [A2]:** Defendants to add instructions re: using some portion of previous month's referrals to capture referrals made in the second half of the month prior to the audited month.

- Review the provider encounters and notes in eOMIS for the audited month for documentation of a ~~provider review or~~ provider encounter within 14 days of the referral.

- Provider referral notes may be found in eOMIS in Health Services Encounters.  Referrals may also be noted on HNRs found in scanned documents on eOMIS.

- Referrals may also be found in the Nurse Line log and noted as a Provider Referral Routine or Provider Referral Urgent.

> **Comment [A3]:** These two bullet points may be superfluous once the Nurse Line Log is in effect, see comment above.

**4**

Revised: _____

**M O N I T O R   G U I D E**

Health Care Performance Measure No. 40
Stipulation Category: Access to Care (05)

**CGAR Category: Access to Care C 05**

| **Performance Measure:** |
| --- |
| Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral. |

| **CGAR Question:** |
| --- |
| Are urgent provider referrals being seen by a Medical Provider within 24 hours of the referral? |

| **Source of Records/Review:** |
| --- |
| Emergency Response (ER) log; Incident Reports (IRs) from Incident Command System (ICS); Nurse ~~line  Line log~~Log, Appointment lists, and eOMIS/Medical Record from audited month. |

**Comment [A4]:** Ms. Campbell indicated that these will not be needed once the Nurse Line Log is fully implemented.

**Comment [A5]:** Will this source be necessary once the Nurse Line Log is implemented?

**Methodology:**

- Review the Nurse Line ~~Appointment Lists~~Log from the audited month and randomly select ten inmate names/numbers where there was an urgent provider referral.

- If there are 10 or fewer charts from a facility that are applicable for this question, review all applicable charts.

- Review the ER log and identify any contacts with a Medical Provider.

**Comment [A6]:** Again, this may be superfluous

- Then review ~~nursing~~ provider encounters and notes in eOMIS, under Health Services Encounters, to determine whether the inmate was seen by a Medical Provider within 24 hours of the referral. ~~Nursing encounters may be found in a variety of electronic entries, including, but not limited to: nursing treatment or nursing encounter.  The nursing notes may include a hyperlink to the schedule or a Provider note.  Referrals may also be noted in the Nurse Line log and noted as a Provider Referral Urgent, in IR in ICS, or Appointment lists.~~

**Formatted:** Indent: Left:  0.32"

Revised: _____

**M O N I T O R   G U I D E**

**Health Care Performance Measure No. 41**
**Stipulation Category: Access to Care (06)**

**CGAR Category: Access to Care C 06**

---

**Performance Measure:**

Emergent provider referrals are seen immediately by a Medical Provider.

---

**CGAR Question:**

Are emergent referrals being seen immediately by a Medical Provider?

---

**Source of Records/Review:**

ER log, IRs from ICS; Nurse line log, Appointment lists, and eOMIS/Medical Record from audited month.

---

**Methodology:**

- Review the Nurse Line Log ~~Appointment Lists~~ from the audited month and randomly select ten inmate names/numbers where there was emergent referral to a provider.

- If there are 10 or fewer charts from a facility that are applicable for this question, review all applicable charts.

- Review the ER log and identify any contacts with a Medical Provider.

- Then review ~~nursing~~ provider encounters and notes in eOMIS, under Health Services Encounters, to determine whether the ~~emergent provider referral is~~ inmate was seen immediately by a Medical Provider. ~~Nursing encounters may be found in a variety of electronic entries, including but not limited to, a nursing encounter. The nursing notes may include a hyperlink to the schedule or a Provider note. Referrals may also be noted in the Nurse Line log and noted as a Provider Referral Urgent, in IR in ICS, or Appointment lists.~~

---

**Comment [A7]:** Will this source be necessary once the Nurse Line Log is implemented?

**Comment [A8]:** Will this source be necessary once the Nurse Line Log is implemented?

**Comment [A9]:** See PM 40

---

**6**

Revised: _____

**M O N I T O R   G U I D E**

**Health Care Performance Measure No. 60**
**Stipulation Category: Preventative Services (02)**

**CGAR Category: Intake C 03**

| |
|---|
| **Performance Measure:** |
| All female inmates ages 21 to 65 will be offered a Pap smear at the inmate's initial intake physical examination, and every 36 months thereafter unless more frequent screening is clinically recommended. |
| **CGAR Question:** |
| Are all female inmates ages 21 to 65 offered a pap smear at the inmate's initial intake physical examination, and every 36 months thereafter unless more frequent screening is clinically recommended? |
| **Source of Records/Review:** |
| eOMIS/Medical Record: Medical records from inmates received at intake during the audited month; Arrival Log. documentation of postings on yards and inmate TV. |
| **Methodology:** |
| • This measure is specific to Perryville. <br><br> • For intakes, select ten random inmates on the arrival log/list for the audited month and review the provider encounters in eOMIS for the audited month to confirm that a pap smear was offered. <br><br> • For non-intakes, verify that postings offering pap smears are available in the health units, on the yards, and on inmate TV, where available. |

**7**

**M O N I T O R   G U I D E**

**Health Care Performance Measure No. 61**
**Stipulation Category: Preventative Services (03)**

**CGAR Category: Female Care – Prenatal Preventative C 01**

| Performance Measure: |
| --- |
| All female inmates ages 21 to 65 will be offered a Pap smear every 36 months after initial intake, unless more frequent screening is clinically recommended. |
| **CGAR Question:** |
| Are all female inmates ages 21 to 65 being offered a pap smear every 36 months after initial intake, unless more frequent screening is clinically recommended? |
| **Source of Records/Review:** |
| Notices offering Pap smears will be posted in health units and on yards, as well as information placed on inmate TV where available. |
| **Methodology:** |
| • Verify that there are postings in health units, on yards, and on inmate TV, where available, offering pap smears. <br><br> [Should reflect the agreed-upon protocol in Exhibit D of the Stipulation] |

**Comment [A10]:** Should match Exhibit D of the Stipulation::  Medical records

**8**

Revised: _____

# EXHIBIT 9



*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

**VIA EMAIL ONLY**

March 24, 2016

Ms. Lucy Rand, Assistant Attorney General
Office of the Arizona Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
Lucy.Rand@azag.gov

> RE:   *Parsons v. Ryan*, CV-12-0601-DMD
> Proposed Topics for 3/29/16 Call on Revised Monitoring Guide

Dear Ms. Rand,

This letter lists the performance measures we want to discuss on the March 29 call on the medical performance measures. Prior to discussing these measures, we want to start the call closing out all matters from the March 22 call for which Defendants stated that the issue needed to be reviewed, and that you would get back to us. Please provide us with written updates prior to Tuesday morning's call, or oral updates during the call, on the following unresolved issues:

- How does Corizon define an urgent versus emergency referral, and is this information written in training materials?
  - If Corizon does not have written guidelines, do health care and monitoring staff find the definitions we provided that were developed by and used by the California Department of Corrections & Rehabilitation's health care services agency to be acceptable guidelines for health care and monitoring staff?

- Exhibit D of the Stipulation clearly spells out the protocol and source documents to be used for PM 61 (Pap smears are offered to females at most every 36 months), yet Defendants unilaterally chose to ignore this agreement and measure compliance solely by whether posters were up in clinics advising women that they could request a Pap smear every 36 months.

- For PM 39 (routine referrals seen within 14 days by provider), has the Monitoring Bureau figured out a way to review the patients referred to provider line in the second half of the month? You had mentioned using a list of all referrals from nursing line

from the 15th of the month before the audited month to the 15th of the audited month, to determine if these referrals were completed in the audited month.  This approach makes sense to us.

- Have you reviewed free random number generators similar to that on random.org to see if their use could save the health care staff or monitors the large amounts of time that may be expended in manually entering data points into Excel?

As we did last week, for each measure I explain why we want to discuss a particular measure, and the initial concerns or questions we have regarding the measure.  In the course of the conversation, we may identify additional concerns with a particular measure's methodology so we may not be limited just to what is written below.  We have done this so that you can identify the correct and most knowledgeable persons to be on the call.

This week we have multiple questions about eOMIS and its ability to generate reports and track information; person(s) from Corizon who are extremely familiar with eOMIS would be helpful.  There are a total of eight performance measures listed below, but similar to last week, they are grouped together, because they share common issues or concerns.

Additionally, six of the eight performance measures implicate the broader issue that despite the language of the Stipulation describing the number of days that a particular action has to occur, Defendants have taken the position that these can be interpreted as months, rather than days.  (Monitor Guide, pp. 7-8).  We want to confirm that the parties are at an impasse on this issue.

1)   **PM 48** (documentation of Utilization Management denials of a provider's request for specialty care, and the reason(s) for the denial, shall be sent to requesting provider within 14 calendar days and placed in prisoner's medical record) and **PM 49** (patients for whom a provider's request for specialty care is denied are told of the denial by a provider in an appointment no later than 30 days after the denial, and provider documents in the medical record the provider's follow up to the denial).

We are happy to see that Defendants actually plan to have monitoring protocols for these two measures.  We interpret this to indicate that ADC has moved away from the position previously taken that there was nothing to measure for these two measures since Corizon refers to the denials of requests for specialty care with the phrase "alternate treatment plans" and don't use the word "denial".

Moving on, we have questions about the Source of Records for both PM 48 and 49.

- What is the "consult log" and the "Inmate Consult Request" and how would they be used? There is no reference to them in the methodology.  Do these reports only reflect scheduled consults, or does it include all requests for specialty care, including those requests which have not yet been reviewed
- PM 48 and 49 refer to the "ORC denied report" as a source for all denied requests. Why is the ORC report used instead of running reports in eOMIS? Our understanding is that the ORC report was something that ADC maintained electronically in the past prior to privatization, when the entire health care records system was paper-based.
- How exactly is information transmitted from eOMIS to the ORC report?  If someone is manually entering the ORC report information into an Excel spreadsheet in order to randomize it, that would be a lot of unnecessary work compared to generating a report via eOMIS and picking a random sample of ten files.
- Does eOMIS have the capability to generate a report all provider requests for specialty care/diagnostic services, so that the pool of possible files to review would include the requests that Utilization Management has not yet reviewed, and not just the requests for which an Alternate Treatment Plan/denial was the result? If the request has been made but there has been no decision by Utilization Management for more than 14 days, then those files should be marked as noncompliant.

We also identified a concern similar to one we raised on our call on the 22nd, as to whether the monitor will need to look at previous months' reports so that the pool of potential patient files to review is not limited to requests made in the first half of the month?  And which month would be considered the "audited month" – the month the request was made by the provider, or the month that Utilization Management denied the request?  That should be made clear in the guidelines.

In the methodology section of PM 48:

- For the last bullet point, language needs to be added to mirror the language of the actual performance measure so the monitor not only measures compliance with the timeframe, but also reviews the response entered by the Utilization Management team to determine if there are substantive reason(s) for the denial documented with the response of "Alternate Treatment Plan."
- Additionally, the bullet point should specify that the timeframe for compliance is 14 calendar days from the provider's request.

In the methodology section of PM 49:

- With regard to the first bullet point, would the monitor use the same files that were reviewed for PM 48? It seems that would make more sense than re-running the lists.

- The second bullet point refers to the "Provider-Follow Up Care" section of eOMIS. Shouldn't the correct section of eOMIS be the "Provider Encounters" section of eOMIS? This bullet point also should note that if there is no record of a provider encounter occurring at all in the 30 days subsequent to the denial, then this should count as noncompliance.

- The second bullet point also needs to have language added to it to mirror the language of the performance measure. The methodology refers to "communication of the denial" which could be interpreted as not in an encounter. We suggest that the bullet point be amended to read "…to determine if the provider documented that he or she told the patient of the denial at the patient's next scheduled appointment, or at most no more than 30 days after the denial. The provider must document in the medical record what follow-up action will be taken in light of the denial."

2) **PM 50** (urgent specialty consults and diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider) and **PM 51** (routine specialty consults will be scheduled and completed within 60 calendar days of the consultation being requested by the provider).

Under "Source of Records" for both performance measures:

- What is the "consult log" and "Inmate Consult Request"? (see questions above for PM 48/49).

With regard to methodology on both performance measures:

- How will the monitor ensure that the universe of relevant files includes requests for urgent or routine specialty care that have not yet been reviewed/approved/denied by Utilization Management?

- The third bullet on both measures refers to subsequent specialty consults that include a series of visits. What, if anything, will the monitor document if the record reflects that there have been delays between the subsequent visits, outside the timeframes recommended by the specialist, or dictated by PMs 50 and 51? Our understanding is that each subsequent visit with a specialist has to be requested by the prison provider – please clarify whether this is true, or if a series of specialty

appointments (e.g., chemotherapy) are approved all in one, such that the provider does not have to re-submit a request every few weeks.

With regard to methodology on PM 51, on what basis are diabetic optometry exams excluded from this performance measure? (See bullet # 4)

3) **PM 53** (treatment plans developed and documented in medical file by a provider within 30 days of identification that patient has a chronic disease) and **PM 54** (Chronic disease inmates seen by provider as specified in treatment plan, no less than every 180 days unless provider documents reason why a longer time frame can be in place).

With regard to the "Source of Records" section of both PM 53 and PM 54:
- What is the "New Diagnoses Report" listed in this section?
- What does "secondary sources will be considered as needed" refer to?

With regard to the "Source of Records" section of PM 54:
- What is the purpose of including the "Refusal to Submit to Treatment" documents?

With regard to the "Methodology" sections of both PM 53 and 54:
- Please explain what bullet point # 2 means. It reads: "Non-stipulation agreement chronic care conditions and previously recognized chronic conditions that are updates to coding will be excluded from review for this measure." What are these excluded chronic conditions, and where are they listed? On what basis were they excluded from the methodology?

With regard to the "Methodology" section of PM 53:
- On the fourth bullet point, what does "presence of a measurable timeframe" mean? The phrase "measurable timeframe" is also used in the sixth bullet point.
- We agree that each facility must maintain a list of special needs patients, but why is it the fifth bullet point under Methodology, and how is "special needs" defined? How should such a list of special needs patients be created and maintained?

With regard to the "Methodology" section of PM 54:
- On the first bullet point, is the "chronic care report" the same thing as the "chronic care logs" listed under "Source of Records"? What is listed in the chronic care report? Is it based only upon the prisoners seen in chronic care encounters in the audited month? We believe that working off of this universe of patients exclude all

of those who have not yet been seen but chronic care appointments were due in that month.  How could eOMIS capture those patients?

- Please explain the fifth bullet point, and the reason why "Inmates with a new chronic condition that have not been seen for other chronic conditions will be considered compliant if seen within 30 days, or as ordered

4) **PM 45** (On-site diagnostic services will be provided the same day if ordered STAT or urgent, or within 14 calendar days if routine), and **PM 46** (medical provider will review the diagnostic report and act upon those with abnormal values within 5 calendar days of receipt of the report at the prison).

Both measures state that "The state is divided into two regions, with Region I consisting of PHX, Lewis, Florence, Eyman, and Winslow, and Region II consisting of Safford, Douglas, Tucson, PV and Yuma.  Region I audits STAT and routine X-rays during even months and STAT and routine labs during the odd months.  Region II audits STAT and routine labs during the even months and STAT and routine x-rays during the odd months."

- Please explain why ADC is only monitoring half of the compliance measure at a given prison in a given month.

With regard to PM 45, under Methodology:

- Bullet point # 4 refers to diagnostic services that are drawn but with no results available within 10 days shall be considered noncompliant.  Ten days from what precipitating event?
- What should a monitor do if a provider orders multiple on-site diagnostic services at the same time, and only some of them are within the required time frames?  We believe that this file should be marked as non-compliant.

With regard to PM 46:

- This performance measure is not simply a test of whether timeframes are met.  How would a monitor make the qualitative assessment as to whether a provider "acts upon" reports with abnormal values?  Does the provider need to document a revised treatment plan? Request the recommended further specialty treatment?

///
///
///

Ms. Lucy Rand
ADC Monitor Guide
Proposed Agenda for 3/22/16 Call
March 24, 2016
Page 7


We look forward to speaking with you on the 29th. If you have any questions before the call, please contact me or Megan Lynch at the Prison Law Office.


Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney


cc:      Counsel of Record

# EXHIBIT 10



PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

March 30, 2016

Ms. Lucy Rand, Assistant Attorney General
Office of the Arizona Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
Lucy.Rand@azag.gov

RE:    *Parsons v. Ryan*, CV-12-0601-DMD
          Agreements from 3/29/16 Call on Revised Monitoring Guide

Dear Ms. Rand,

Below is a summary of the parties' March 29, 2016 conference call regarding the monitoring guide. We finalized discussion of performance measures covered on the March 22 call, and also spoke about certain medical measures that we proposed for the agenda in a March 24 letter. This summary is based upon notes taken by me, Megan Lynch, and David Fathi during the call. Please let me know if any of this does not comport with your notes.

**Remaining Performance Measures Originally Discussed on 3/22/16 Call**

1)    **PM 33** (prisoners will receive a health screening by a LPN or RN within one day of arrival at an intake facility).

I clarified that my statement in the March 23 confirming letter that Defendants needed "[t]o make explicit in the methodology section the requirements that the nursing screening form is completed fully (which would require the monitor to enter and review the screening note), and is completed by an LPN or RN" that the words "completed fully" refers to the idea that the monitor must actually open the notes from the encounter to ensure that it actually occurred, and not simply rely upon an entry in a list of encounters. The language that was in track-changes on the performance measure that I sent you with the March 24 letter reflects that intention.

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

2)     **PM 39** (routine referrals seen by medical provider within 14 days of the referral)

We appear to have made progress and reached agreement on the fact that the monitors need to look at the Nurse Line Log for a portion of the month previous to the audited month, in order to capture the universe of all routine referrals that were due to be seen in the audited month.  The solution that ADC developed is that the monitors will look back at the referrals made from the 15th of the previous month through the 15th of the current month.  We noted that there are other performance measures for which this 15th-through-15th methodology would have to be used for other performance measures that have 14 day timelines, namely PM 45 (on-site diagnostic services), and PM 48 (utilization management denials), both of which were discussed later on the call.

Defendants also stated that the "Nurse Line Log" excel spreadsheet that Kathy Campbell stated would be used starting April 1, 2016, is most likely going to be May 1.

3)  **PM 40** (urgent provider referrals seen within 24 hours) and **PM 41** (emergent provider referrals seen immediately).

As Alison Hardy and I stated on the March 22 call, and as noted in our March 23 confirming letter and March 24 proposed agenda letter, we asked what sort of definition is used or instruction is given to nursing staff to decide whether a person is in need of an emergent or urgent referral.  We suggested the definitions used by the California Correctional Health Care Services.  On the 3/29/16 call yesterday, you stated that those definitons "won't work for us," but could not explain a clinical reason why this is the case.  We reiterate our concern that the circular definition used by ADC and Corizon will introduce confusion into evaluating whether the referrals were urgent or emergent.

4)     **PM 61** (Females ages 21 to 65 offered a Pap smear every 36 months after intake unless more frequent screening is clinically indicated).

On the 3/29/16 call, the parties reached an impasse as to the methodology used for monitoring this performance measure.  Defendants currently evaluate compliance, and propose to continue to monitor compliance, by simply seeing if there is a poster up in the clinic that tells women they can ask for a Pap smear every three years.  This completely ignores the plain language of the Stipulation describing the methodology to be used, "[a]t each yard, 10 records per month are randomly selected to review the frequency with which subsequent Pap smears will have been conducted. Chart review will determine compliance."  See Doc. 1185-1 at 28.

Ms. Lucy Rand
ADC Monitor Guide
RE: 3/29/16 Call – Confirming Letter
March 30, 2016
Page 3

You also indicated that Defendants are working on another method to determine compliance under this performance measure but it is unclear what that method is or when it may be implemented.

Additionally, you asserted for the first time your position that Defendants will not be noncompliant on this measure until three years after the entry of the Stipulation. We also reached an impasse on your interpretation of the Stipulation.

## Performance Measures Discussed on 3/29/16 Call

We confirmed that the parties are still at an impasse about the broad issue that despite the language of the Stipulation describing the number of days that a particular action has to occur, Defendants have taken the position that these can be interpreted as months, rather than days. (Monitor Guide, pp. 7-8).

1) **PM 48** (documentation of Utilization Management denials of a provider's request for specialty care, and the reason(s) for the denial, shall be sent to requesting provider within 14 calendar days and placed in prisoner's medical record) and **PM 49** (patients for whom a provider's request for specialty care is denied are told of the denial by a provider in an appointment no later than 30 days after the denial, and provider documents in the medical record the provider's follow up to the denial).

Defendants confirmed that they will start monitoring these two performance measures, by evaluating the denials that Corizon refers to as "alternate treatment plans." Ms. Barlund stated that the "Inmate Consultation Log" referenced in the guide is an Excel spreadsheet that the clinical coordinator will maintain. We have been told in the past that the practice for the clinical coordinators is that each day they run a report in eOMIS that pulls up all of the requests for specialty referrals that providers in their prison submitted since the previous day, and then he or she initiates the Corizon Utilization Management process, submitting the request to headquarters. When they run these daily reports, the clinical coordinators will input the prisoner's information into the Excel spreadsheet/log, and then that log will be what is used by the monitor to get the universe of all requests for specialty care that had been made. You clarified that this log will ultimately be the only source needed for the monitors, and that the ORC Denied Report is listed in the guide currently because the new log has not yet been completely rolled out. This log is also referred to in PM 50 and PM 51.

We noted that PM 48 is a performance measure where the methodology will require going into the last 15 days of the month previous to the audited month (see pp. 1-2 above), in order to capture the universe of all requests for which a decision by Utilization Management

(either denial/ATP or approval) were due in the audited month.  In response to my request for clarification in the fourth bullet point on page 3 of my 3/24/16 Proposed Agenda letter, Mr. Bojanowski and you confirmed that if the request was made but there was no decision by Utilization Management for more than 14 days, then those files will be marked as noncompliant by the monitors.

Attached to this letter is a track-changes version of PM 48, based on the notes we took during the call.

With regard to PM 49, as we noted in our 3/24 Proposed Agenda letter, in the methodology section, the second bullet point in the methodology section refers to the "Provider-Follow Up Care" section of eOMIS, and we asked if the correct section of eOMIS should be the "Provider Encounters" section of eOMIS. You clarified that this is a subsection of the Provider Encounter tab.

While we were preparing this letter, we had a question about the "appropriate review period" for PM 49 – it seems that the appropriate time period would be the month prior to the audited month, so that the monitor could look at a universe of files where the deadline for the 30 day follow up occurs in the audited month.   How will this review period be defined?

We agreed that the bullet point also needs to have language added to it to mirror the language of the performance measure.  Finally, the methodology section needs to make clear that if there is no record of a provider encounter occurring at all in the 30 days subsequent to the denial, then this is noncompliant.

Attached to this letter is a track-changes version of PM 49, based on the notes we took during the call.

2)     **PM 50** (urgent specialty consults and diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider) and **PM 51** (routine specialty consults will be scheduled and completed within 60 calendar days of the consultation being requested by the provider).

These performance measures will ultimately use the Inmate Consult Log used for PM 48 and 49.

You clarified that the third bullet point on both performance measures referring to excluding from review the subsequent specialty consults that include a series of visits, is in the methodology section because when there are a series of visits that are needed (for example,

semi-monthly chemotherapy), that Corizon's policy is that the series of visits are approved with the first request and the providers do not have to submit an urgent request every time the patient needs to return for subsequent appointments, i.e. the next chemo session.  If this is indeed Corizon's practice with specialty referrals that require a series of visits, then we would find the bullet acceptable.  However, we need confirmation that this is Corizon's policy. <u>Please provide us with written confirmation or the section of Corizon's policies and procedures to confirm that a series of specialty visits are approved all at once up front, and that providers do not have to re-submit requests to Utilization Management each time a patient needs a follow up specialty encounter</u>.

You explained that with regard to methodology on PM 51, diabetic optometry exams are excluded from this performance measure because those encounters are separately evaluated in PM 55.

3) **PM 53** (treatment plans developed and documented in medical file by a provider within 30 days of identification that patient has a chronic disease) and **PM 54** (Chronic disease inmates seen by provider as specified in treatment plan, no less than every 180 days unless provider documents reason why a longer time frame can be in place).

You said that there had been changes to this performance measure from the draft of the guide that was sent to us, and you would send the revised language to us.  Once we review that version, we may need to discuss these performance measures again.

Defendants explained that the "New Diagnoses Report" referenced in the Source of Records section of these performance measures is a report that can be run in eOMIS, and that someone in the Corizon regional headquarters will create it each month.  It lists all new chronic care diagnoses made in the month, broken down by prison complex and unit.

You also explained that second bullet point of both methodologies refers to "non-stipulation agreement chronic care conditions … will be excluded" refers to the fact that Corizon may characterize certain diseases and conditions as "chronic care" but they are not listed under "chronic diseases" in the Definitions section of the Stipulation. Doc. 1185-1 at 3.

Defendants clarified that the reference to a "measurable timeframe" in PM 53 in the fourth and sixth bullet points refers to the specific timeframe that the provider indicates is needed for regular follow-up and monitoring of the condition.  If the provider fails to specify the timeframe, then the file is noncompliant.

With regard to PM 54, Defendants were not certain as to what information will be in the "chronic care log" once they are created.  Plaintiffs expressed our concern that if it is a log only of completed appointments in a given month, then it will exclude the universe of prisoners who should have had their appointment but were not scheduled or seen.  So that the sample is not restricted solely to the people who were seen that month for a chronic care appointment, we suggest that the source document simply be the chronic care report that lists every prisoner housed on the unit who has one or more chronic conditions.  Besides not limiting the universe of files to review, using this report would save the time needed to manually input hundreds of data points into a new Excel spreadsheet.  These chronic care reports listing the names were provided to Plaintiffs on several occasions during litigation, so they exist.

You stated that would be considered, and <u>we will need to review the revised versions of the performance measures</u>.

Defendants also agreed that the files for review under PM 54 should not be limited solely to the "newly identified" chronic conditions, as it currently says in the first bullet point, and language suggestive of a requirement to evaluate only newly identified chronic conditions will be removed through the methodology for this measure.

4)  **PM 45** (On-site diagnostic services will be provided the same day if ordered STAT or urgent, or within 14 calendar days if routine), and **PM 46** (medical provider will review the diagnostic report and act upon those with abnormal values within 5 calendar days of receipt of the report at the prison).

We noted in our March 24 Proposed Agenda letter that both of these measures state that "The state is divided into two regions, with Region I consisting of PHX, Lewis, Florence, Eyman, and Winslow, and Region II consisting of Safford, Douglas, Tucson, PV and Yuma. Region I audits STAT and routine X-rays during even months and STAT and routine labs during the odd months.  Region II audits STAT and routine labs during the even months and STAT and routine x-rays during the odd months."  We asked for an explanation as to why ADC is only monitoring half of the performance measure at a given prison in a given month.

You indicated that these two performance measures have been substantially rewritten since we saw the first version of them, and we will likely need to discuss them more on a subsequent call once we have a chance to review the revisions.

Ms. Lucy Rand
ADC Monitor Guide
RE: 3/29/16 Call – Confirming Letter
March 30, 2016
Page 7

We noted our concern that the Source of Records section lists numerous different reports and documents, and you indicated that Corizon currently didn't have a way of streamlining all of this information into one report or at least fewer reports, and this was something that ADC monitors were currently looking in to with Corizon staff.

Overall, we felt that the parties again made progress in resolving some of the issues, and narrowing the number of areas where disputes remain. Please let me know if you have any questions, or if any of the above does not comport with your notes.

We will send our our proposed agenda for the April 5 call and the list of mental health performance measures in a separate letter.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:    Counsel of Record

**D E S I G N   C U S T O M I Z A T I O N**

**Health Care Performance Measure No. 48**
**Stipulation Category: Specialty Care (01)**

**CGAR Category: Specialty Care C (C) 01**

---

**Performance Measure:**

Documentation, including the reason(s) for the denial, of Utilization Management denials of requests for specialty services will be sent to the requesting Provider in writing within fourteen calendar days, and placed in the patient's medical record.

---

**CGAR Question:**

Are denials from Utilization Management (including reason(s) for the denial) for specialty care sent to the requesting provider in writing within fourteen calendar days, and placed in the patient's medical record?

---

**Source of Records/Review:**

ORC denied report, consult log, Inmate Consult Request; eOMIS/Medical Records

> **Comment [A1]:** Will be removed once consult log is in use.

---

**Methodology:**

- Obtain the ~~ORC denied~~consult report for the appropriate review period from the 15th of the month prior to the audited month, through the 15th of the month being audited, and randomize using Excel.

- Select the first ~~10~~ten inmates per health unit with a denied specialty consultation ("alternate treatment plan") or no response from Utilization Management.

- If a sample of ~~10~~ten inmates is not available, 100% examination shall occur.

- Review eOMIS in Health Services Encounter, under inmate consult request, to determine ~~timeframe compliance~~if the denial was documented within fourteen calendar days of the request (if there is no decision within fourteen days, mark as noncompliant), and if the denial includes the reason why the request was denied.

**M O N I T O R   G U I D E**

**Health Care Performance Measure No. 49**
**Stipulation Category: Specialty Care (02)**

**CGAR Category: Specialty Care ~~C~~ (C) 02**

| |
|---|
| **Performance Measure:** |
| Patients for whom a provider's request for specialty services is denied are told of the denial by a Medical Provider at the patient's next scheduled appointment, no more than 30 days after the denial, and the Provider documents in the patient's medical record the Provider's follow-up to the denial. |

| |
|---|
| **CGAR Question:** |
| Are patients for whom a provider's request for specialty services is denied told of the denial by a Medical Provider at the patient's next scheduled appointment, within ~~thirty~~ 30 days of the denial? |

| |
|---|
| **Source of Records/Review:** |
| ORC denied report; consult log; Provider- Follow Up Care lines; eOMIS/Medical Records. |

**Comment [A2]:** Will be removed once consult log is operational

| |
|---|
| **Methodology:** |
| • Obtain the ~~ORC denied~~ consult report for the appropriate review period and randomize using Excel. |
| • Select the first ~~10~~ten inmates per health unit with a denied utilization management request ("alternate treatment plan"). If a sample of ~~10~~ten inmates is not available, 100% examination shall occur. |
| |
| • Review the Provider- Follow-Up Care in eOMIS to determine if the ~~communication~~ provider documented that the provider told the patient of the denial at the patient's next scheduled appointment which should be at most thirty days after the denial. If there is no indication of any provider encounter occurring in the thirty days after the denial, the file is noncompliant. The provider must also document any other follow-up to the denial. ~~of the denial occurred within 30~~~~thirty~~ days. |

**Comment [A3]:** Would you need to make the source of the review period be the month before the audited month, in order to capture the denials that were due and needed to be conveyed to the prisoner in the audited month?

**Comment [A4]:** Making these two sentences a separate bullet point to be consistent with PM 48.

**Comment [A5]:** Need to clarify if this is in the Provider Encounters tab of eOMIS.

**2**

# EXHIBIT 11



PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

**VIA EMAIL ONLY**

April 1, 2016

Ms. Lucy Rand, Assistant Attorney General
Office of the Arizona Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
Lucy.Rand@azag.gov

   RE: *Parsons v. Ryan*, CV-12-0601-DMD
     Proposed Agenda for April 5 Call on Mental Health Performance Measures

Dear Ms. Rand,

  This letter lists the performance measures we want to discuss on the April 5 call negotiating the mental health performance measures. Prior to discussing these measures, we want to start the call closing out all matters from the March 29 call for which we requested more information, or where Defendants stated that the issue needed to be reviewed, and that you would get back to us. You also said that you would be providing us revised versions of some of the performance measures we discussed on the 29th, please provide them to us no later than Monday, preferably mid-day, so we have time to review those before Tuesday morning's call.

**<ins>Outstanding Issues From 3/29/16 Call (Or Raised in 3/30/16 Confirmation Letter)</ins>**

1) **PM 49** (patients for whom a provider's request for specialty care is denied are told of the denial by a provider in an appointment no later than 30 days after the denial, and provider documents in the medical record the provider's follow up to the denial).

  In our confirmation letter, we asked what is the "appropriate review period" for PM 49 – it seems that the appropriate time period would be the month prior to the audited month, so that the monitor could look at a universe of files where the deadline for the 30 day follow up occurs in the audited month. <ins>How will this review period be defined?</ins>

2)  **PM 50** (urgent specialty consults and diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider)

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

and **PM 51** (routine specialty consults will be scheduled and completed within 60 calendar days of the consultation being requested by the provider).

In the 3/29/16 call, you clarified that the third bullet point on both performance measures referring to excluding from review the subsequent specialty consults that include a series of visits, is in the methodology section because when there are a series of visits that are needed (for example, semi-monthly chemotherapy), that Corizon's policy is that the series of visits are approved with the first request and the providers do not have to submit an urgent request every time the patient needs to return for subsequent appointments, i.e. the next chemo session.  As we stated on the call and in our confirming letter, if this is indeed Corizon's practice with specialty referrals that require a series of visits, then we would find the bullet acceptable.

However, we requested confirmation that this is Corizon's policy.  <u>Please provide us with written confirmation or the section of Corizon's policies and procedures that state this is their Utilization Management practice, to confirm that a series of specialty visits are approved all at once up front, and that providers do not have to re-submit requests to Utilization Management each time a patient needs a follow up specialty encounter</u>.

3)  **PM 53** (treatment plans developed and documented in medical file by a provider within 30 days of identification that patient has a chronic disease) and **PM 54** (Chronic disease inmates seen by provider as specified in treatment plan, no less than every 180 days unless provider documents reason why a longer time frame can be in place).

You said that there had been changes to this performance measure from the draft of the guide that was sent to us, and you would send the revised language to us.

With regard to PM 54, Defendants were not certain as to what information will be in the "chronic care log" once they are created.  Plaintiffs expressed our concern that if it is a log only of completed appointments in a given month, then it will exclude the universe of prisoners who should have had their appointment but were not scheduled or seen.  So that the sample is not restricted solely to the people who were seen that month for a chronic care appointment, we suggest that the source document simply be the chronic care report that lists every prisoner housed on the unit who has one or more chronic conditions.  Besides not limiting the universe of files to review, using this report would save the time needed to manually input hundreds of data points into a new Excel spreadsheet.  These chronic care reports listing the names were provided to Plaintiffs on several occasions during litigation, so they exist.

## Mental Health Performance Measures to Discuss on April 5

An overarching problem with the methodology for these and other mental health performance measures is that when a measure requires an action be done "every X days," the methodology only looks to see if the person was seen once within the last X days.  This is not what "every X days" means, and the methodology needs to be clear that the monitor should be looking at the interval between events.  Also, to make all of these measures consistent with the guides for the medical performance measures, the Source of Records sections should have eOMIS/medical records listed as one of the sources, and not just the initial document used to identify class members.

1) **PM 82** (MH-3B prisoners shall be seen a minimum of every 90 days by a mental health clinician) and **PM 83** (MH-3B prisoners who are prescribed psychotropic medications shall be seen a minimum of every 180 days by a mental health provider.  MH-3B prisoners who are prescribed psychotropic medications for psychotic disorders, bipolar disorder, or major depression shall be seen by a mental health provider a minimum of every 90 days.)

What is the "DA14 Batch Report" used as the source of records for both performance measures?  The source of documents for these measures appears to start with a universe of all completed provider contacts in the audited month.  This excludes review of people who have not yet had another provider contact but are due for one.  With many of the compliance and medical performance measures we already discussed, you have figured out how to generate a list of files to review that would capture these individuals.  Rather than use the completed provider encounter list, these performance measures should work off of a list of all prisoners in the unit who are MH-3B, and the monitor should be instructed how to randomly select ten individuals from that list.

Both of these performance measures suffer from the same problem that if a prisoner was seen in the past 90 days, then the file is marked as compliant.  This is not what the measure is trying to look at.  If there were no encounter in the month being audited, but for example, an encounter 60 days ago, then monitor needs to go further back in time in the file to see if the encounter prior to that one was within 90 days.  Additionally, with regard to the "Methodology" sections:

- PM 82 does not instruct the monitor as to the definition of a mental health clinician (psychologist or psychology associate), and PM 83 does not define a mental health provider (psychiatrist or psychiatry nurse provider).  Doc. 1185-1 at 4.  The

methodology section needs to define the term, and instruct the monitor to look at the encounter note to see what position the staff person has.

- PM 83 requires that MH-3B prisoners who are prescribed psychotropic medications for "psychotic disorders, bipolar disorder, or major depression" be seen by a mental health provider at least every 90 days.  In the course of monitoring the case, there has never been a clear list of precisely which psychiatric diagnoses fall into that category and qualify them to be seen every 90 days.  As a result, different monitors used different diagnoses for the 90 day compliance analysis.  The methodology section of PM 83 should list the diagnoses for which the 90 day timeframe is applicable.

- On PM 83, why do the second and fourth bullet points state that the monitor needs to "look back to the prior psychiatry contact for a diagnosis"?  Wouldn't the diagnosis/problem list be visible both in the Problem List section of eOMIS and in the SOAPE notes from the mental health encounter?

- Also on PM 83, please explain what this statement in the second bullet point means: "If the preceding contact was less than 90 days before, then put 'n/a' [in] the special diagnosis column and the contact is in compliance."

- On the second bullet point of PM 82 and the third bullet point of PM 83, there is a list of different pieces of information to look for, but no instructions as to where to find the information in eOMIS.

- Please explain what this statement in the third bullet point of PM 83 means: "If the preceding contact is more than 90 days (or 180 days if applicable), then it is coded as non-compliant as 'tf'."  (Similar language is in the third bullet point of PM 82, and in PM 86 [see below]).


2) **PM 86** (MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication)

   With regard to the source of documents for this measure, we have the same comment as we did with PM 82 and 83.  Rather than use the completed provider encounter list, these performance measures should work off of a list of all prisoners in the unit who are MH-3D and had their medication discontinued more than six months ago, and the monitor should be instructed how to randomly select ten individuals from that list.

   The methodology similarly suffers from the same problem identified above, that if a prisoner was seen once in the past 90 days, then the file is marked as compliant.  This is not what the measure is examining. The analysis should begin with the date the medication was

Case 2:12-cv-00601-ROS   Document 1626-1   Filed 07/12/16   Page 59 of 94

Ms. Lucy Rand
ADC Monitor Guide
Proposed Agenda for 4/5/16 Call
April 1, 2016
Page 5

discontinued and determine if an encounter occurred within 90 days from that date, and that a second encounter occurred within 90 days of the initial encounter.

The second bullet point lists "segregation visit," "group note" or "suicide watch" as types of contacts that can show compliance. These three types of contacts should not be counted; the Stipulation clearly defines the terms "seen" and "seen by" as:

> an interaction between a patient and a Medical Provider, Mental Health Provider or Mental Health clinician that involves a treatment and/or exchange of information in a confidential setting. With respect to Mental Health staff, means an encounter that takes place in a confidential setting outside the prisoner's cell, unless the prisoner refuses to exit his or her cell for the encounter.

Doc. 1185-1 at 5. Finally, the methodology does not instruct the monitor as to the definition of a mental health clinician (psychologist or psychology associate), Doc. 1185-1 at 4, and it needs to define the term, and instruct the monitor to look at the encounter note to see what position the staff person has.

3) **PM 94** (All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse).

The methodology needs to include the option of looking at the month prior to the audited month, in cases where the prisoner was on watch for a period of time that cuts across more than one month. For example, if the audited month is June, and the prisoner was on watch May 15-June 2, the monitor should look at whether he was seen as required from May 15 to 30, and not just June 1 and 2.

The first bullet point of the methodology section does not reflect that the protocol in the Stipulation requires a weekly log of prisoners currently on watch. The second and third bullet points refer to "licensed clinicians," but do not specify that under the terms of the Stipulation, a mental health clinician is limited to a psychologist or psychology associate.

4) **PM 95** (Only licensed mental health staff may remove a prisoner from a suicide or mental health watch. Any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between seven and ten

days after discontinuation, and between 21 and 24 days after discontinuation of the watch.)

Similar to PM 94, the methodology does not look outside the calendar month in which the prisoner was taken off of suicide watch.  For example, if the audited month is March and a prisoner is taken off of suicide watch on March 25, and only the first of the three contacts were done in the month of March, the case is counted as compliant even if the following two encounters did not occur.  The methodology needs to be changed, similar to some of the medical measures we discussed previously, to use as the starting point the universe of prisoners who were taken off of suicide watch during the month prior to the audited month.  That way, you will capture all of the people who have been off watch for more than 24 days, in order to evaluate the performance measure completely.  These prisoners would therefore have had all three of the encounters completed by the end of the audited month.  For example, if you want to audit the month of April, you should use as a starting point the list of all people removed from suicide watch in the last three weeks of March and the first week of April, because those prisoners' third and final required encounter will be due in April.

The second bullet point under methodology does not reflect the actual language of the performance measure.  It needs to be changed to reflect the Stipulation's requirement.  The monitor needs to determine:  (1) the date the patient was taken off of watch, (2) if the person who took the patient off of watch was licensed, (3) whether a provider, clinician, or psych RN saw the patient between 24 and 72 hours after discontinuation; (4) whether a provider, clinician, or psych RN saw the patient between seven and ten days after discontinuation; and (5) whether a provider, clinician, or psych RN saw the patient between 21 and 24 days after discontinuation of the watch.  If any of those five steps are not completed, or if the staff person who saw the prisoner for the post-discontinuation encounters was not a provider, clinician, or psych RN, then the file is marked as noncompliant.

5) **PM 98** (Mental health HNRs shall be responded to within the timeframes set forth in the Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0.)

The relevant provision of the MHTM provides the following timeframes for response to mental health HNRs (ADC267409):

Inmates with <u>emergency mental health issues</u> will be seen by nursing staff immediately upon receipt of the HNR.

Inmates with <u>urgent medication issues</u> (e.g., serious medication side effects or lack of receiving prescribed medications) will be seen by nursing staff within twenty-four (24) hours of HNR triage.

Inmates with <u>urgent non-medications issues</u> describing serious mental health symptoms will be seen by either nursing or mental health staff within twenty-four (24) hours of receipt of the HNR.

Inmates with <u>routine non-medication issues</u> will be forwarded to appropriate mental health staff, and will be responded to within five (5) working days with a specific plan of action.

Inmates with <u>routine medication issues</u> will be referred to a P/PNP, and seen within fourteen (14) days.

Defendants have decided unilaterally to ignore the MHTM requirements and to monitor only one of these five categories of HNRs: those raising "routine mental health HNRs," which appears to refer to what the MHTM refers to as "routine non-medication issues." This is contrary to the requirement of the performance measure. Defendants must monitor all five types of HNRs, for compliance with the timeframes specified in the MHTM.

Finally, what is the "HNR log" that is the Source of Records?

We look forward to speaking with you on April 5th. If you have any questions before the call, please contact me or David Fathi.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:    Counsel of Record

# EXHIBIT 12



PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

April 6, 2016

Ms. Lucy Rand, Assistant Attorney General
Office of the Arizona Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
Lucy.Rand@azag.gov

RE:  *Parsons v. Ryan*, CV-12-0601-DMD
Agreements from 4/5/16 Call on Revised Monitoring Guide

Dear Ms. Rand,

Below is a summary of the parties' April 5, 2016 conference call regarding the monitoring guide and mental health performance measures. We finalized discussion of performance measures covered on the March 29 call, and also spoke about certain mental health measures that we proposed for the agenda in an April 1 letter. This summary is based upon notes taken by me, Megan Lynch, and David Fathi during the call. Please let me know if any of this does not comport with your notes.

**Outstanding issues from March 29 call:**

1.  **PM 49** (patients for whom a provider's request for specialty services is denied are told of the denial by a Medical Provider at the patient's next scheduled appointment, no more than 30 days after the denial, and the Provider documents in the patient's medical record the Provider's follow up to the denial):

    We reported that the newest version of the Monitor Guide still did not specify the review period for the monitors. You indicated that this has been fixed and will be in subsequent versions of the Monitor Guide.

2.  **PM 50** (urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider) and **51** (Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider):

It appears that some of the methodology that we agreed needed to be included for these two measures regarding specialty consults that are a series of appointments accidentally was inserted in the revisions to PM 53. You will review this and make edits as necessary.

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

3.  **PM 53** (Treatment plans will be developed and documented in the medical record by a provider within 30 calendar days of identification that the inmate has a chronic disease):

Defs confirmed that they will use the chronic care list, a list of all patients with chronic conditions, to select the random sample for review.

**New Items for Discussion on April 5, 2016 Call**

**Overarching issues**:

It is our position that Performance Measures requiring that a contact or other act occur "every X days" require you to monitor the interval between two or more occurrences of the required act. You stated your position that if the required act has occurred a single time within the X days prior to the audit, that the file is compliant with the requirement that the act occur "every X days." We have reached impasse on this issue.

You agreed to add the definitions of "mental health provider" and "mental health clinician" to the Definitions section of the Monitor Guide.

**Specific Mental Health Measures**:

1.  **PM 82** (MH-3B prisoners shall be seen a minimum of every 90 days by a mental health clinician) and **83** (MH-3B prisoners who are prescribed psychotropic medications shall be seen a minimum of every 180 days by a mental health provider. MH-3B prisoners who are prescribed psychotropic medications for psychotic disorders, bipolar disorder, or major depression shall be seen by a mental health provider a minimum of every 90 days):

You stated that the "DA14 Batch report" is an AIMS report that generates a list of all prisoners designated with mental health classifications. This list is automatically generated at the end of each month and is brought to the monitors. A staff person manually sorts all of the different classifications and inputs the information into Excel, where the macro function randomly selects the records to be reviewed during each audit period. You agreed to make the methodology and source records section more clear about what kind of report is being run and the contents of the report.

You agreed to send us a list of all disorders classified as "psychotic disorders" for purposes of PM 83. We requested that this be spelled out somewhere in the Monitor Guide, but Defendants did not agree. We are at an impasse on whether this list needs to be included in the Monitor Guide.

Dr. Taylor stated that the methodology requirement that the monitor review multiple provider notes in eOMIS in order to determine the patient's diagnosis, is in the methodology because Corizon does not currently ensure that the "Problem List" is accurately maintained by psychiatry staff, and that many mental health staff do not enter the diagnoses into the Problem List. The monitor is also required to

review SOAPE notes, as many mental health providers record diagnoses in those sections rather than in the problem list.  We expressed our concern about this failure to accurately maintain the Problem List in eOMIS and our view that additional training and instruction is necessary to address this problem.

Dr. Taylor clarified that "tf" means "timeframe."  The mental health monitors use this code to indicate when a record that was reviewed had an appointment completed during the monitoring month, but the appointment was out of compliance with the controlling timeframe. These encounters are marked as noncompliant, but the "tf" signifies for Corizon staff that they do not need to take any additional action with that patient.  If a record reviewed has not had an appointment that was due according to the performance measures, this file is recorded with the date of the previous appointment and the phrase "not compliant."

2.  **PM 86** (MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication):

ADC currently monitors whether an MH-3D patient has been seen within the 90 days preceding the monitor's record review; you do not consider whether the patient has had medications discontinued, nor do you monitor whether he or she was seen every 90 days for six months after discontinuing medications.  Our position is that the plain language of this performance measure requires that you monitor whether MH-3D patients who have discontinued medication are seen a minimum of every 90 days by a mental health clinician for a minimum of six months.  The Stipulation defines MH-3D patients as those "who have been recently taken off of psychotropic medications and require follow up to ensure stability over time" (Doc. 1185-1 at 5), and it is our position that you cannot modify that definition to defeat the intent of this performance measure.  It is also our position that it would be improper to reclassify MH-3D prisoners as MH-2 in order to avoid the requirements of this performance measure, as you threatened to do during our April 5 call.  We are at impasse on this issue.

You stated your position that a mental health segregation visit satisfies the requirement that the patient be "seen" only if the clinician specifically records in the segregation visit note that the prisoner refused to come out of the cell for the encounter.  You agreed to add this language and requirement to the Monitor Guide methodology.

You stated your position mental health groups and cellfront suicide watch checks satisfy the requirements of this measure that the prisoner be "seen" by a clinician.  We disagree in light of the Stipulation's definition of "seen:"

[A]n interaction between a patient and a Medical Provider, Mental Health Provider or Mental Health clinician that involves a treatment and/or exchange of information *in a confidential setting*. With respect to Mental Health staff, means *an encounter that takes place in a confidential setting outside the prisoner's cell, unless the prisoner refuses to exit his or her cell for the encounter*.

Doc. 1185-1 at 5 (emphasis added).

Ms. Lucy Rand
RE: Agreements from 4/5/16 Call
on Revised Monitoring Guide
April 6, 2016
Page 4

We reached impasse on this issue.  This disagreement also applies to any other measure on which you take the position that groups and cellfront checks satisfy the requirement that the patient be "seen."

3.  **PM 94** (All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse):

You stated that a list is created of all instances in which patients were put on watch in a given month.  This is not a list of the individuals who were put on watch, but rather a list of all of the instances of watch during the audit month. You then randomly select 10 or 20 instances of watch to monitor each month.  Thus, if a patient were placed on watch three times in a given month, you would not audit whether he was seen as required by this Performance Measure on each day of those three watch episodes, unless all three of those episodes happened to be included in the sample.  Our position is that, once a prisoner is identified as being on watch in a given month, all his watch episodes in that month must be monitored.  We reached impasse on this issue.

You also stated your position that you will only monitor the days a patient was on watch during the audit month, even if his time on watch extended into another calendar month.  Thus, if a patient was on watch from May 15 through June 2, when monitoring for June you would only determine whether he was seen on June 1 and 2, and if he was, you would count the file as "compliant" even if he had not been seen at all May 15-31.  Our position is that this method is both inconsistent with the language of the performance measure. We reached impasse on this issue.

4.  **PM 95** (Only licensed mental health staff may remove a prisoner from a suicide or mental health watch.  Any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation of the watch.):

It is your current practice to count as compliant some files in which only one or two of the three required post-watch contacts have occurred.  It is our position that the language of the Performance Measure makes clear that only files in which all three of the required contacts have occurred can be counted as compliant.

To accomplish these, we propose that you monitor post-watch contacts for persons removed from watch in the month prior to the month in which the monitoring is being performed.  For example, if you are monitoring in April, you would draw the sample from those persons removed from watch in March.  Thus, it would be possible to ascertain with certainty whether the three post-watch contacts occurred. Please let us know if you agree to this proposal.

You agreed to include in the methodology the requirement that only a mental health provider, mental health clinician, or psychiatric RN can conduct the three required post-watch contacts.

5. **PM 98** (Mental health HNRs shall be responded to within the timeframes set forth in the Mental Health Technical Manual [MHTM] [rev. 4/18/14], Chapter 2, Section 5.0.):

It is your position that you are required to monitor only one of the five categories of mental health HNRs set forth in the specified section of the MHTM.  You stated your belief that the other categories are "covered by" PM 37 and 39, although you acknowledged that in any given month the samples drawn under those measures may not include any mental health HNRs.  It is our position that the plain language of PM 98 requires you to monitor all five categories of mental health HNRs.  We reached impasse on this issue.

We are pleased that we have been able to reach agreement on some of the issues.  Please let me know if you have any questions, or if any of the above does not comport with your notes.  We will send our our proposed agenda for the April 12 call and the list of "Compliance" performance measures in a separate letter.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:    Counsel of Record

# EXHIBIT 13



*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

# PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

VIA EMAIL ONLY

April 7, 2016

Ms. Lucy Rand, Assistant Attorney General
Office of the Arizona Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
Lucy.Rand@azag.gov

> RE:   *Parsons v. Ryan*, CV-12-0601-DMD
>        Proposed Agenda for April 12 Call on Compliance Performance Measures

Dear Ms. Rand,

This letter lists the performance measures we want to discuss on the April 12 call negotiating the "compliance" performance measures.

1) **PM 102** (routine dental care wait times no more than 90 days from the date the HNR was received) and **PM 103** (urgent [dental] care weight times no more than 72 hours from the date the HNR was received).

The starting point for the source of files to review is only the list of all completed dental appointments in the audited month, which results in the monitor not looking at the universe of prisoners who have not been seen or were never seen.  This issue came up in multiple medical performance measures related to specialty care, chronic care, and referrals to provider line, *i.e.* PM 39, 40, 41, 48, 50, 51, and Defendants agreed in previous calls and newer versions of the guide, that for those measures the methodology needed to be changed such that the starting point is going back prior to the audited month to look for all referrals, or requests for specialty care.  For example, on PM 39 (routine provider referrals seen within 14 calendar days), Defendants agreed that the monitor should not work off of the provider's line list for the audited month, but rather look back to identify all referrals made to the provider that were due to be seen in the audited month, such that the referrals that were not seen at all are in the pool from which the sample is pulled.

Therefore, in order to have consistency with the methodology used for the medical performance measures, we request that the methodology for the two dental measures be modified.

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

- For PM 102, review the HNR logs from 90 to 120 days prior to the audited month to identify all routine dental HNRs submitted at that time, such that those are the dental HNRs that were due to be seen on a routine dental appointment in the audit month.
- For PM 103, review the HNR logs for the time period of three days prior to the audited month to three days before the end of the audited month, thus ending up with all dental HNRs that needed to be seen on an urgent basis in the audited month.

2) **PM 36** (LPN or RN screens HNRs within 24 hours of receipt and **PM 37** (sick call inmates seen within 24 hours after receipt of HNR [or immediately if identified with an emergent need, or on the same day if having an urgent need])

These performance measures list both the HNR logs and the nurse line appointment list as sources from which the monitor should randomly select medical files to review. Again, for consistency with other measures' methodology, and in order to not limit the review solely to the completed nurse line encounters, the HNR logs should be the source for information. We were told in past calls that the HNR logs lists all HNRs as they come in to the clinic and are triaged, and therefore the pool would include prisoners who were just never seen on nurse's line in the audited month.

3) **PM 42** (follow-up sick call encounter will occur within the time frame specified by the Medical or Mental Health Provider)

This performance measure is the mirror to PM 39, which measured whether the nurse's referral to the provider was seen timely; PM 42 evaluates whether, to the extent the patient needs follow-up nursing care subsequent to a provider encounter, that the provider's referral back to the nurse is completed. For example, a prisoner sees the doctor for a cut on his arm, the doctor treats it, and the doctor orders that the prisoner come back to sick call line in 72 hours to have a nurse check how the injury is healing.

The proposed methodology uses the nurse line appointment lists/ logs as the starting point. It is unclear how the monitor would be able to identify by looking at the nurse line log which prisoners were being seen on nurse's line pursuant to a provider follow-up order, versus the more common scenario of prisoners being seen in response to a HNR.

- How would the monitor figure out which prisoners were seen for follow-up? If the monitor has to go into numerous prisoners' health care records to figure that out, it would be an incredible time burden.

- When providers want a patient to be seen on the nurse's line for follow up, is there in eOMIS a certain box they check, or a form that they fill out?  If yes, would it be possible to generate in eOMIS a report that pulls all of the medical records where that box was checked?
- Similar to PM 39, would the monitor have to use the referrals from the previous month in order to capture all of the patients whose follow-up encounter was due in the audited month?

4) **PM 43** (inmates returning from inpatient hospital stay or ER transport will be returned to the medical unit and be assessed by a RN or LPN on duty there) and **PM 44** (inmates returning from an inpatient hospital with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours)

With regard to PM 43, we only need some clarification:
- Can you please explain the second bullet point which reads "Review the ER log and identify any contacts with a medical provider."?
- Can you please explain the sentence in the third bullet point which reads "Nursing encounters may be found in a variety of electronic entries, including but not limited to, a nursing encounter."?  Why would a nurse's encounter ever not be documented in the Nursing Encounters section of the file?

With regard to PM 44, the measure has two parts:  the provider must (1) review the discharge recommendations, and (2) act upon the recommendations.  The proposed methodology only evaluates whether the hospital recommendations were reviewed or read back to the provider, and does not evaluate whether the provider acted upon the recommendations.  Therefore, the protocol should also instruct the monitor to also look for a provider order (either telephonic or in-person) entered into the health record subsequent to the review of the report.  The provider order must mirror the discharge recommendations, or have documentation explaining why the provider is not ordering or providing any part of the hospital's recommended follow-up treatment.  If there is no documentation of a provider order, or the order shows that the provider did not act upon all recommendations and did not document the reason for variation from the hospital's recommendations, then the file should be marked as noncompliant.

///
///
///

5) **PM 12** (Medical record will contain documentation of refusals or "no shows")

We just have a couple of questions:

- What are the "no show / refusal logs"? Is this something that currently exists or will it be created for purposes of measuring
- The second bullet point refers to when a chart "is not appropriate for this question" – what does this mean?  If the monitor is working off a list of names of refusals and no shows on the appointment lists, why would a chart then not be appropriate?
- The fourth bullet point needs to be more explicit as to what it means "to determine compliance with this question" – does that mean look in the medical record to find a refusal form signed by the prisoner? If yes, then it would be clearer to just say that.


6) **PM 59** (inmates will be screened for TB on an annual basis)

The protocol calls for looking at multiple reports and lists to come up with a random selection of 10 prisoners.  It also seems to limit itself to intakes and new arrivals, when the performance measure is not limited to that subgroup of people.  PM 62 is the measure that requires TB tests be done for all prisoners at intake, so the protocol for 59 as written is duplicative of PM 62.  Furthermore, ADC policy requires that all prisoners are provided an annual TB skin test.  *See* Health Services Technical Manual, Appendix D, Sect. 2.0.  Rather than this complicated protocol of piecing together the list of ten files, the protocol should be simplified (and in the process, cover all prisoners and not just intakes) to the following:

- Obtain a list of all prisoners housed on the unit on any given day of the audit month.
- Divide the number of prisoners by 10, and select every Nth prisoner.
- Look in the prisoners' medical record to see if they had a TB skin test in the past year.

We look forward to speaking with you on April 12th.  If you have any questions before the call, please contact me or Megan Lynch.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney


cc:     Counsel of Record

# EXHIBIT 14



PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

April 15, 2016

Ms. Lucy Rand, Assistant Attorney General
Office of the Arizona Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
Lucy.Rand@azag.gov

   RE: *Parsons v. Ryan*, CV-12-0601-DMD
      Agreements Reached on 4/12/16 Negotiation Call
      Outstanding Issues/Questions With Remaining Performance Measures

Dear Ms. Rand,

   I write to memorialize our discussion on the April 12 call. Additionally, we agreed that I would send you an omnibus letter covering any questions we have regarding the remaining health care performance measures and the monitoring guide. You said you would gather the information and respond in writing, and if needed, by phone. We request the written response by April 25, 2016. Please let me know if any of our comments or questions are unclear. Additionally, Amy Fettig will be responding to you separately with regard to the maximum custody performance measures.

**I.**  **Issues from the April 12 Call:**

   You stated that you would provide us the list of diagnoses that fall under "psychotic disorders" that was discussed on the April 5 call. You also stated that you would provide a response to our proposed methodology for PM 95, which we discussed on April 5, and that was again presented on page 4 of my April 6, 2016 letter. You provided us with a document listing all the types of health care encounters, which explained the language in some of the measures referring to finding encounters in multiple locations. Thank you for the explanation.

 1) **PM 102** (routine dental care wait times no more than 90 days from the date the HNR was received) and **PM 103** (urgent [dental] care weight times no more than 72 hours from the date the HNR was received).

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

We were concerned about the audit working off of the dental appointment list, rather than looking back at HNRs that had been filed and were due for a dental appointment in the audited month.  You explained that the monitor would be using Smallwood Dental Services' data system, which digitizes every single dental HNR, and so it is possible to see if the appointments have been made and completed for all dental HNRs.  I asked if you could provide screen shots or some sort of illustration of how they maintain the HNRs and dental logs, so that we could confirm that they address the need to pull from the universe of all dental appointments that are due, rather than work off of completed appointments.  You stated that you would provide us <u>screen shots or some sort of illustration of how the SDS medical records system is set up</u>.

2) **PM 36** (LPN or RN screens HNRs within 24 hours of receipt and **PM 37** (sick call inmates seen within 24 hours after receipt of HNR [or immediately if identified with an emergent need, or on the same day if having an urgent need])

We asked that for consistency with other measures' methodology, and in order to not limit the review solely to the completed nurse line encounters, that the HNR logs should be the source for information.  Kathy Campbell indicated that the nursing line logs shows cancelled and rescheduled appointments and that both sources are currently being used.  She said that she is working with Corizon to create a report using eOMIS that would show all HNRs submitted.

3) **PM 42** (follow-up sick call encounter will occur within the time frame specified by the Medical or Mental Health Provider)

You stated that you would get back to us on this measure, because it was being rewritten, and Ms. Campbell is working with Corizon to create a report that would show all referrals made by the provider.  We look forward to seeing a revised version of the measure.

4) **PM 43** (inmates returning from inpatient hospital stay or ER transport will be returned to the medical unit and be assessed by a RN or LPN on duty there) and **PM 44** (inmates returning from an inpatient hospital with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours)

Ms. Campbell explained that she is working with Corizon so they can build a spreadsheet that combines the hospital log listing patients sent out for inpatient care, with the ER log that shows all emergency room dispatches.  With regard to PM 44, we discussed the fact that the measure has two parts:  the provider must (1) review the discharge recommendations, and (2) act upon the recommendations.  The proposed methodology only

explicitly refers to the hospital recommendations were reviewed or read back to the provider, and does not evaluate whether the provider acted upon the recommendations.  We proposed that the protocol should also instruct the monitor to also look for a provider order (either telephonic or in-person) entered into the health record subsequent to the review of the report.  If the provider is not ordering or providing any part of the hospital's recommended follow-up treatment, we believe the reason why should be recorded.  Defendants' position was that if a provider chose to not follow the instructions and do nothing, that the reason why does not have to be documented.  However, we are concerned that this position means that the monitor cannot distinguish between situations when the provider dropped the ball and forgot to order anything, versus the cases where the provider made a conscious choice to do nothing. We also noted that it is basic medical practice for a provider to document when he or she chooses to do nothing, so that should be part of the methodology.  It appears that we are at an <u>impasse on whether the monitor needs to look for documentation that the provider acted upon the recommendations, even if the "act" was a choice to do nothing.</u>[1]

5) **PM 12** (Medical record will contain documentation of refusals or "no shows")

Ms. Campbell explained that the "no show / refusal logs" are something that are under development and will hopefully be in use in a few weeks.  The second bullet point referring to charts that are "not appropriate for this question" is a reference to the "Unavailable Inmates" section of the guide on page 10.  Prisoners who are not seen due to lockdowns or ICSs are inapplicable.  You agreed to make the fourth bullet point more explicit and clarify that the monitor should look for a signed refusal form in the health care record, or a note by health care staff explaining the reason the prisoner was not seen.

6) **PM 59** (inmates will be screened for TB on an annual basis)

You confirmed that this would be clarified so that it does not imply that the only prisoners to be evaluated are intakes and new arrivals, as the TB tests for intakes is covered by PM 62.  We had suggested that since ADC policy requires all prisoners be given an annual TB skin test, that the monitors work off of the housing report for the unit and randomly select ten names and see if they had a TB test in the past year.  Ms. Campbell said that Corizon was trying to develop a report showing all prisoners who were due for a TB test in a given month, but said that you would consider just working off of the housing roster.  You said that the language of this PM would be rewritten; we look forward to seeing the revised version.

---

[1] The proposed methodology for PM 52 (Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report) similarly does not include any evaluation as to whether the provider "acted on" a specialty report, and solely measures the timeframe component of the measure.

**II.      Questions/Comments on Measures Not Discussed to Date**

As an initial matter, we note that the Monitoring Guide does not include any instructions as to how the monitors should audit compliance with the requirements of the Stipulation at Paragraphs 12, 14-17.  After the Stipulation went into effect, Defendants initially audited some of these requirements, but stopped doing so, taking the position they do not have to be monitored monthly.  (Rand 11/24/15 letter at 16-21).  We discussed this during the December 2015 call, and determined that the parties were at an impasse on this issue.

Below are our substantive comments and questions on the methodology instructions for the performance measures.  These comments relate to the April 11, 2016 version of the Monitoring Guide.  We assume the guide will be reviewed for consistency across the measures in terms of language used, and so we do not point out those sorts of problems, or typos.

1)  **PM 5** (Medical Records will be accurate, chronologically maintained, and scanned or filed in the patient's chart within two business days, with all documents filed in their designated location).

We request clarification regarding the methodology section, which may need to be written more clearly:
- The second bullet point refers to charts not being appropriate for the question, what does this refer to?  Does this mean a chart that has no scanned documents from the audited month?  (This language also appears in Performance Measures **6 through 9**, does "not appropriate for this question" in those measures refer to the same thing as in PM 5?).
- The fourth bullet point instructs the monitor to "review the scanned documents in eOMIS" – does this mean that the monitor is reviewing *all* documents scanned to the record during the audited month, or only specific types of documents? (This language also appears in PM 7, same question).

2)  **PM 8** (Nursing protocols/NETS will be utilized by nurses for sick call)

More specificity in the fourth bullet point would be helpful.
- It instructs the monitor to review the nursing encounters "to determine compliance with this question."  What is the monitor looking for? NETS forms that are filled out completely?
- Is the monitor reviewing all nursing encounters in the audited month?

3) **PM 9** (SOAPE format will be utilized in the medical record for encounters).

   Again, more specificity in the fourth bullet point would be helpful.
   - It also refers to reviewing the encounters to determine compliance.  Is the monitor confirming that each part of the S-O-A-P-E is completed?
   - Does the monitor reviewing all health care encounters in the selected charts for the audited month?

4) **PM 10** (Each patient's medical record will include an up-to-date Master Problem list)

   The second bullet point refers to whether or not charts are appropriate for the performance measure, but aren't all prisoners supposed to have a problem list in their file?  This bullet point may be extraneous.

   The Methodology section needs more detail:
   - How exactly will the monitor confirm that the Master Problem list is up-to-date?
   - The fourth bullet point instructs the monitor to review the provider contacts.  How far back in time does the monitor need to go?
   - What exactly is he or she looking for in those contacts?

5) **PM 11** (Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT)

   Why are you excluding the medications listed in the third bullet point?

6) **PM 13** (Chronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication)

   Why are you only reviewing prescriptions from the 1st through the 15th of the audited month?  There also is no instruction on what the monitor is supposed to do, once he/she has a list of random prescriptions from the medication expiration report.
   - Does the monitor check the prisoner's MARS to ensure there was no interruption or lapses?

- If the monitor sees that the prisoner is on multiple medications, and that a renewal of any other medication besides the one pulled from the list is problematic, would that chart be marked as noncompliant?  In other words, is the monitor only looking at the specific prescription that was selected from the list, or once inside the chart, looks at all prescriptions the prisoner is on?

7) **PM 14** (Any refill for a chronic care or psychotropic medication that is requested by a prisoner between three and seven business days prior to the prescription running out will be completed in a manner such that there is no interruption or lapse in medication.)

What is the "exclusion criteria" referred to in the third bullet point?  Why are you excluding the medications in the seventh bullet point? (See PM 11 above)

8) **PM 15** (Inmates who refuse prescribed medication (or no show) will be counseled by a QHCP after three consecutive refusals)

- Why are you randomly selecting charts based upon whether the prisoner's ADC number ends in an odd or even number?
- The definition of a Qualified Health Care Provider does not match what is in the Stipulation (and what is listed in Appendix A of the guide).

9) **PM 16** (Perpetual inventory medication logs will be maintained on each yard.)

The methodology needs to clarify how the monitor will find these problems listed under "Review."  This measure's instructions should be harmonized to read like the other measures. The methodology section also needs to clarify how compliance is scored.  For example, if there are 100 entries and 20 of them are problematic, would that be scored as 80% compliant? Or does the monitor count the unit as noncompliant for the month if there are discrepancies or inaccuracies in the entire unit log?

///
///
///
///

Case 2:12-cv-00601-ROS   Document 1626-1   Filed 07/12/16   Page 80 of 94

Ms. Lucy Rand
ADC Monitor Guide
Additional Performance Measures
April 15, 2016
Page 7

10) **PM 17** (The Medication Administration Record (MAR) will reflect dose, frequency, start date and nurse's signature)

We have several questions about the proposed methodology:

- Why are so many source documents listed? Why would the monitor not just review ten randomly selected prisoners' MARS?
- It is unclear whether a chart would be marked as noncompliant if a monitor finds that the MAR shows gaps or failure to provide the prisoner with all medication during the audited month.  Please clarify whether it would be marked as noncompliant.
- Will the monitor review the documentation and administration of *all* medications for the selected patients for the month?

11) **PM 18** (Daily delivery manifests will be kept in binders located in medication rooms on each yard/complex and will be reviewed and initialed daily by an LPN or RN)

The second bullet point should say "…to obtain a total of ten" and not "…to obtain a total of five."

12) **PM 20** (Medical AIMs entries are accurately completed within 3 business days from the entry in the medical record)

Why are so many types of documents listed in the "Source of Records" section, but not all of them are referenced in the Methodology section?

13) **PM 21** (Inmates who are paroled or released from ASPCs will receive a 30-day supply of all medications currently prescribed by the ADC contracted vendor)

The methodology should make clear that if a prisoner receives some but not all of his or her prescribed medications, that the chart should be marked as noncompliant.

14) **PM 22** (Non-formulary requests are reviewed and approved, disapproved, or designated for an alternate treatment plan (ATP) within two business days of the prescriber's order)

Why does the methodology call for reviewing the first ten medications on the NFDR report, rather than randomly selecting the ones to review?

15) **PM 23** (Automated External Defibrillators (AEDs) will be maintained and readily accessible to Health Care Staff) and **PM 24** (Emergency medical response bags are checked daily, inventoried monthly, and contain all required essential items)

It is unclear from the methodology sections of these two measures whether the monitor physically inspects the AED and response bag herself/himself.  The instruction in PM 24 that the emergency response bag must have a new tag number implies that the monitor should be looking at the bag, but it's not clear.  This should be made clear in both performance measures; we think that it is a good idea for the ADC monitor to actually inspect the machine and response bag to confirm that they are functioning and fully stocked.

16) **PM 25** (A first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency)

On the third bullet point, there is a reference to "the time the SIR was initiated" – is this the same thing as the initiation of an ICS?

Plaintiffs noted in our October 15, 2015 Notice of Noncompliance that the performance measure as ADC was monitoring it, did not include any sort of review of the part of the requirement that the responder "adequately provides care."  (10/15/15 Notice at 11-12).  Plaintiffs' position is that there should be some sort of review of documentation to confirm that CPR was started, or the AED was used.  Defendants' position, as articulated in your response and in our December meet and confer, is that the subjective component of the performance measure did not need to be evaluated because "[w]hen an officer comes across a medical emergency that requires basic life support measures, the same officer will initiate an ICS over the radio and provide CPR. Main control of the yard will notify medical and medical will respond. If security staff act according to ADC policies and their training, then they are providing adequate care." (Rand 11/24/15 letter at 35-36).

Please confirm that the parties are at an impasse as to how to evaluate the "adequately provides care" component of the performance measure.

///
///
///

Case 2:12-cv-00601-ROS   Document 1626-1   Filed 07/12/16   Page 82 of 94

Ms. Lucy Rand
ADC Monitor Guide
Additional Performance Measures
April 15, 2016
Page 9

17) **PM 28** (Every medical provider will undergo peer reviews annually with reviews and recommended actions documented.)

We have questions about the Corizon report referenced in this measure. (The measure should refer to "contracted vendor" and not "Corizon" in the methodology section.)
- Is the review scheduled to occur one year from the date the provider began to work for Corizon?
- Does this report include agency/locum tenens and PRN providers, or only Corizon employees?


18) **PM 29** (Each ASPC facility Director of Nursing or designee will conduct and document annual clinical performance reviews of nursing staff as recommended by NCCHC standard P-C-02)

We have the following questions about the source document:
- What is the "clinical performance review spreadsheet"? Who maintains it? What information is tracked in it?
- Is the review scheduled to occur one year from the date that the nurse began to work for Corizon?
- Does this report include agency/locum tenens and PRN nurses, or only Corizon employees?


19) **PM 35** (All inmate medications (KOP and DOT) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption.)

The third bullet point under Methodology should make clear what "without interruption" means – this means that the prisoner gets the medication with the same frequency as prescribed, and doesn't mean the next day.  Therefore, if a prisoner is on a medication that is prescribed for two or three doses a day, if the prisoner only gets one dose in a day, that is not compliant.  The bullet point should also be clarified to indicate that if a patient receives some of his or her medications (i.e. s/he's prescribed three and s/he only gets two), that is also noncompliant.


///
///

Case 2:12-cv-00601-ROS   Document 1626-1   Filed 07/12/16   Page 83 of 94

Ms. Lucy Rand
ADC Monitor Guide
Additional Performance Measures
April 15, 2016
Page 10

20) **PM 47** (A Medical Provider will communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request.)

 The first bullet point under Methodology should be clarified to indicate that the monitor obtains the relevant sample from the HNR log.  Why are the first ten prisoners listed being used, versus a random selection of all prisoners who requested test results?

21) **PM 55** (Disease management guidelines will be implemented for chronic diseases.)

 The second bullet point under Methodology is incomplete.  The fourth through tenth bullet points are confusing, and we may need to discuss what the monitors are actually looking for with this performance measure.

- Does Corizon have written standard disease management guidelines for each chronic disease?  We presume that they do, as most other prison systems have these guidelines.[2]
- Where can ADC/Corizon's guideline be found? These guidelines should be referenced or provided to the monitors so they can compare the medical chart to the guidelines.
- It is unclear what the monitors would be looking for, especially with regard to the audited month.  For example, a typical diabetes treatment guideline[3] calls for in addition to chronic care appointments every 90 to 180 days, annual lab tests, tests of A1C levels every 180 days if at goal, annual foot exam and eye exams, and a variety of immunizations.  Would the monitor be going back in the medical chart to see if all of these elements are being done with the required frequency?

22) **PM 57** (A Medical Provider will order prenatal vitamins and diet for a pregnant inmate at the inmate's initial intake physical examination.)

 The Stipulation requires that "all" pregnant prisoners coming through intake have their files reviewed by the monitor.  The Methodology adds a limitation ("up to ten") that does not appear in the Stipulation.  The Methodology needs to be changed to reflect the language of the Stipulation.[4]

---

[2] *See, e.g.*, http://www.cphcs.ca.gov/careguides.aspx.

[3] http://www.cphcs.ca.gov/docs/careguides/Diabetes%20Care%20Guide.pdf at p. 5.

[4] A similar limit appears with **PM 74** (All female prisoners shall be seen by a licensed mental health clinician within five working days of return from a hospital post-partum).  The Stipulation refers to "all post-partum women from the previous 30 days" while the protocol says "up to ten post-partum women during the audit month."  The Methodology section of PM 74 also needs to be changed to reflect the language of the Stipulation.

Case 2:12-cv-00601-ROS   Document 1626-1   Filed 07/12/16   Page 84 of 94

Ms. Lucy Rand
ADC Monitor Guide
Additional Performance Measures
April 15, 2016
Page 11

23) **PM 63** (In an IPC, an initial health assessment will be completed by a Registered Nurse on the date of admission), **PM 64** (In an IPC, a Medical Provider evaluation and plan will occur within the next business day after admission), **PM 65** (In an IPC, a written history and physical examination will be completed by a medical provider within 72 hours of admission), **PM 68** (In an IPC, Inmate health records will include admission orders and documentation of care and treatment given), **PM 69** (In an IPC, nursing care plans will be reviewed weekly documented with a date and signature)

The Methodology for these Infirmary performance measures says that the first ten patients admitted to the IPC in the audited month will have their files reviewed. The Stipulation requires that the sample be randomly selected, and is not limited to patients admitted in the earlier part of the month. The Methodology section of these five performance measures needs to be changed to reflect the language of the Stipulation.

24) **PM 76** (If the initial mental health assessment of a prisoner during initial intake is not performed by licensed mental health staff, the prisoner shall be seen by a mental health clinician within fourteen days of his or her arrival into ADC.)

The measure requires that certain prisoners be "seen" by a mental health clinician "within fourteen days of his or her arrival into ADC."  In the Manual, the final bullet under "Methodology" instructs the monitor to "determine whether the inmate had an additional contact by a mental health clinician within fourteen days of the inmate's arrival."  Please confirm that only contacts meeting the Stipulation's definition of "seen" are counted as satisfying this measure, and that group and cell-front contacts are not counted.

25) **PM 77** (Mental health treatment plans shall be updated a minimum of every 90 days for MH-3A, MH-4, and MH-5 prisoners, and a minimum of every 12 months for all other MH-3 prisoners)

The Stipulation requires that "An AIMS report will be run for all MH-3 and above prisoners at each Complex.  10 records will be reviewed per yard[.]"  The Manual, however, states the source of records as "Review all inmates who were identified for HC PM ## 73, 80, 82, 84, 86, 87, 89 and 92." Please explain why you are using this record selection method rather than that specified in the Stipulation.  The Methodology section of this performance measure needs to be changed to reflect the language of the Stipulation.

26) **PM 78** (All mental health treatment plan updates shall be done after a face-to-face clinical encounter between the prisoner and the mental health provider or mental health clinician)

   The Methodology should specify that the face-to-face clinical encounter must be with a mental health clinician or mental health provider.  In addition, it is our position that segregation visits, suicide watch checks, and other cell-front contacts do not constitute a "face-to-face clinical encounter" as required by the Stipulation.  Please clarify whether Defendants count these contacts as compliant for purposes of this measure.

27) **PM 80** (MH-3A prisoners shall be seen a minimum of every 30 days by a mental health clinician)

   The final bullet in the Methodology instructs the monitor to "determine whether the inmate was out to court, out to hospital, or otherwise out of the facility."  Please explain how this information is factored into the determination of compliance/noncompliance.  This question also applies to **PM 89**.

28) **PM 82** (MH-3B prisoners shall be seen a minimum of every 90 days by a mental health clinician)

   In the third bullet of the Methodology, "If the preceding contact was more than ninety days" should read "occurred more than ninety days before" or "occurred more than ninety days previously."

29) **PM 83** (MH-3B prisoners who are prescribed psychotropic medications shall be seen a minimum of every 180 days by a mental health provider.  MH-3B prisoners who are prescribed psychotropic medications for psychotic disorders, bipolar disorder, or major depression shall be seen by a mental health provider a minimum of every 90 days.)

   The final bullet under "Methodology" does not tell the monitor what to do once he or she has ascertained the diagnosis; this information and instructions should be added.

///
///
///

30) **PM 85** (MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications)

While the language of the Methodology is not entirely clear, it appears that only prisoners who were seen by a provider in the audit month are included in the sample; please clarify whether this is the case. (Such a methodology would misleadingly inflate the compliance rate by failing to count as noncompliant (for example) a prisoner who had discontinued medications 90 days ago and was seen by a provider 45 days thereafter).

31) **PM 87** (MH-4 prisoners shall be seen by a mental health clinician for a 1:1 session a minimum of every 30 days)

The Stipulation states that "An AIMS report will be run for all complexes that have MH-4 prisoners. 10 records (if available) will be reviewed per yard for compliance." By contrast, the Methodology states that "ten records (if available) will be selected for review at each yard containing a residential program." Because MH-4 prisoners are sometimes housed in units that do not contain a residential program, please confirm that defendants will adhere to the Methodology required by the Stipulation. The Methodology section of this performance measure needs to be changed to reflect the language of the Stipulation.

32) **PM 91** (MH-5 prisoners who are actively psychotic or actively suicidal shall be seen by a mental health clinician or mental health provider daily)

The Stipulation requires that "The Records reviewed for Performance Measure #89 will also be reviewed for compliance with this performance measure." By contrast, the Manual states that a sample of ten records will be drawn from the continuous watch log, which (1) results in a smaller sample, and (2) excludes prisoners who may be actively psychotic or actively suicidal but not on watch. Please confirm that Defendants will use the sampling methodology required by the Stipulation. The Methodology section of this performance measure needs to be changed to reflect the language of the Stipulation.

33) **PM 93** (Mental health staff (not to include LPNs) shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum custody)

The Methodology should explicitly state that the contact may not be made by an LPN, and that failure to make the required number of rounds results in a finding of noncompliance for that record.

34) **PM 95** (Only licensed mental health staff may remove a prisoner from a suicide or mental health watch.  Any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation of the watch.)

The Methodology should explicitly state that the follow-up contacts must be made by a mental health provider, mental health clinician, or psychiatric registered nurse.

35) **PM 96** (A reentry/discharge plan shall be established no later than 30 days prior to release from ADC for all prisoners who are MH-3 or above)

The Methodology should explicitly state that if there is no release plan, or if the release plan is dated less than 30 days before the prisoner's release date, the record is noncompliant.

36) **PM 97** (A mental health provider treating a prisoner via telepsychiatry shall be provided, in advance of the telepsychiatry session, the prisoner's intake assessment, most recent mental health treatment plan, laboratory reports (if applicable), physician orders, problem list, and progress notes from the prisoner's two most recent contacts with a mental health provider.)

Please clarify whether telepsychiatry providers have access to eOMIS.  Please further clarify how the monitor ascertains the existence of required documents that are not in eOMIS – does he or she review the paper file?  If so, the Methodology should state that explicitly.  Finally, the second bullet in the Methodology should specify that the required documents must have been in eOMIS or scanned in prior to the telepsychiatry session being reviewed.

37) **PM 98** (Mental health HNRs shall be responded to within the timeframes set forth in the Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0.)

The CGAR question is inaccurate, since it refers to "the current Mental Health Technical Manual," while the Stipulation requires reference to "the Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0."

38) **PM 99** (Peer reviews shall be conducted as set forth in the MHTM (rev. 4/18/14), Chapter 1, Section 3.0.)

The CGAR question is inaccurate, as it refers to "the current MHTM," while the Stipulation requires reference to "the MHTM (rev. 4/18/14), Chapter 1, Section 3.0." Furthermore, Chapter 1, Section 3.0 requires annual peer reviews of "all mental health staff" and is not limited to only psychiatrists, psych NPs, and psychologists.

If you have any questions or need clarification on any of our comments, please email or call me.  We look forward to your response.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:     Counsel of Record

# EXHIBIT 15

## Corene Kendrick

| | |
|---|---|
| **From:** | Rand, Lucy |
| **Sent:** | Monday, June 06, 2016 10:53 AM |
| **To:** | 'Corene Kendrick'; 'Kirstin Eidenbach'; 'Fathi, David (dfathi@aclu.org)'; 'Amy Fettig'; 'Alison Hardy'; PRATT, RICHARD; BARLUND, ERIN; HEADSTREAM, VANESSA; Kathy Campbell; Munoz, Lupe; 'Bojanowski, Timothy (tbojanowski@swlfirm.com)' |
| **Cc:** | KEOGH, BRAD; Gottfried, Michael; 'Percevecz, Elaine (EPercevecz@swlfirm.com)' |
| **Subject:** | RE: Letter - PARSONS v. RYAN |
| **Attachments:** | 2016-06-05 RETRACTED - PHX-#5063131-v1-PARSONS_(12-0152)__LETTER_RSP_TO_PLS__2016-04-15 _MONITOR_GUIDE_ADD_L_PERF_MEASURES.pdf |

The attached letter has been retracted as I inadvertently inserted incorrected information.

Thank you.



**Lucy M. Rand, Assistant Attorney General**
ARIZONA ATTORNEY GENERAL'S OFFICE
**Direct: 602-542-7683**
Secretary: 602-542-641
Lucy.Rand@azag.gov

NOTICE:  This e-mail, including attachment(s), is the property of the Office of the Arizona Attorney General and contains information that may be PRIVILEGED, CONFIDENTIAL, or otherwise exempt from disclosure by law.  It is intended only for the recipients to whom it is addressed.  If you receive this communication in error, immediately notify the sender at the e-mail address shown above or call (602) 542-7683, and delete the original message.  Thank you.

**From:** Rand, Lucy
**Sent:** Monday, June 06, 2016 8:10 AM
**To:** 'Corene Kendrick'; 'Kirstin Eidenbach'; 'Fathi, David (dfathi@aclu.org)'; 'Amy Fettig'; 'Alison Hardy'; PRATT, RICHARD; BARLUND, ERIN; HEADSTREAM, VANESSA; Kathy Campbell; Munoz, Lupe; 'Bojanowski, Timothy (tbojanowski@swlfirm.com)'
**Cc:** KEOGH, BRAD; Gottfried, Michael; 'Percevecz, Elaine (EPercevecz@swlfirm.com)'
**Subject:** Letter - PARSONS v. RYAN


Lucy M. Rand, Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
Department of Corrections Unit
Liability Management Section
1275 West Washington Street
Phoenix, AZ 85007-2926

**(602) 542-7683 Direct**
(602) 542-7641 Secretary
(602) 542-7670 FAX
Lucy.Rand@azag.gov

The information contained in this e-mail message is privileged and confidential, intended only for the use of the specific individuals and/or entities to which it is addressed.  If you are not one of the intended recipients, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you received this

communication in error, please immediately notify the sender by return e-mail or call (602) 542-7683.  Thank you.

# EXHIBIT 16

## Corene Kendrick

| | |
|---|---|
| **From:** | Corene Kendrick |
| **Sent:** | Monday, June 06, 2016 4:00 PM |
| **To:** | 'Rand, Lucy'; 'Kirstin Eidenbach'; 'Fathi, David'; 'Amy Fettig'; Alison Hardy; 'PRATT, RICHARD'; 'BARLUND, ERIN'; 'HEADSTREAM, VANESSA'; 'Kathy Campbell'; 'Munoz, Lupe'; 'Bojanowski, Timothy' |
| **Cc:** | 'KEOGH, BRAD'; 'Gottfried, Michael'; 'Percevecz, Elaine'; Megan Lynch; Don Specter; 'mabela@azdisabilitylaw.org'; 'Rose Daly-Rooney' |
| **Subject:** | RE: Letter - PARSONS v. RYAN |

Lucy,

We sent you a letter on April 15 with all the remaining methodological issues asking for either a substantive response or an acknowledgement that we are at impasse.  We were supposed to discuss these issues this morning and you promised to provide a written response before the call.  You provided us a response minutes before the time set for the call, but later today retracted that document.  So to date, you have not responded to that letter or produced the revised version of the Monitoring Guide, and just now refused to even reschedule the call.  We view this as defaulting on the process we agreed to with Judge Buttrick on March 1, that was supposed to last only a couple months.  Therefore, we are going to be preparing our motion on these issues so that they can be resolved.  Of course, if before the filing or the hearing we are able to resolve any other these issues with you, we will withdraw them from consideration by the Court.

Thank you,

Corene

Corene Kendrick, Staff Attorney
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, CA 94710
510.280.2621
ckendrick@prisonlaw.com

---

**From:** Rand, Lucy [mailto:Lucy.Rand@azag.gov]
**Sent:** Monday, June 06, 2016 2:21 PM
**To:** 'Corene Kendrick'; Kirstin Eidenbach; Fathi, David; Amy Fettig; Alison Hardy; PRATT, RICHARD; BARLUND, ERIN; HEADSTREAM, VANESSA; Kathy Campbell; Munoz, Lupe; Bojanowski, Timothy
**Cc:** KEOGH, BRAD; Gottfried, Michael; Percevecz, Elaine; Megan Lynch
**Subject:** RE: Letter - PARSONS v. RYAN

Corene,

We cannot meet on Thursday.  As you know, we are under court-ordered deadlines to produce videos and action plans.  Further your co-counsel requested (demanded) that Defendants produce all max custody documents to date by next week.  Consequently, we will be busy producing documents.  You and your co-counsel should prioritize your requests together.

Thank you.



**Lucy M. Rand, Assistant Attorney General**
ARIZONA ATTORNEY GENERAL'S OFFICE
**Direct: 602-542-7683**
Secretary: 602-542-641
Lucy.Rand@azag.gov

NOTICE: This e-mail, including attachment(s), is the property of the Office of the Arizona Attorney General and contains information that may be PRIVILEGED, CONFIDENTIAL, or otherwise exempt from disclosure by law. It is intended only for the recipients to whom it is addressed. If you receive this communication in error, immediately notify the sender at the e-mail address shown above or call (602) 542-7683, and delete the original message. Thank you.

**From:** Corene Kendrick [mailto:ckendrick@prisonlaw.com]
**Sent:** Monday, June 06, 2016 8:39 AM
**To:** Rand, Lucy; Kirstin Eidenbach; Fathi, David; Amy Fettig; Alison Hardy; PRATT, RICHARD; BARLUND, ERIN; HEADSTREAM, VANESSA; Kathy Campbell; Munoz, Lupe; Bojanowski, Timothy
**Cc:** KEOGH, BRAD; Gottfried, Michael; Percevecz, Elaine; Megan Lynch
**Subject:** RE: Letter - PARSONS v. RYAN

Lucy, as I emailed you previously we are not going to have time to review this before the call at 9 am. Can you please advise if you can speak Thursday morning, and if you are going to provide an updated version of the monitoring guide.

Thank you

**From:** Rand, Lucy [mailto:Lucy.Rand@azag.gov]
**Sent:** Monday, June 06, 2016 8:10 AM
**To:** 'Corene Kendrick'; 'Kirstin Eidenbach'; 'Fathi, David (dfathi@aclu.org)'; 'Amy Fettig'; 'Alison Hardy'; PRATT, RICHARD; BARLUND, ERIN; HEADSTREAM, VANESSA; Kathy Campbell; Munoz, Lupe; 'Bojanowski, Timothy (tbojanowski@swlfirm.com)'
**Cc:** KEOGH, BRAD; Gottfried, Michael; 'Percevecz, Elaine (EPercevecz@swlfirm.com)'
**Subject:** Letter - PARSONS v. RYAN

Lucy M. Rand, Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
Department of Corrections Unit
Liability Management Section
1275 West Washington Street
Phoenix, AZ 85007-2926

**(602) 542-7683 Direct**
(602) 542-7641 Secretary
(602) 542-7670 FAX
Lucy.Rand@azag.gov

The information contained in this e-mail message is privileged and confidential, intended only for the use of the specific individuals and/or entities to which it is addressed. If you are not one of the intended recipients, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you received this communication in error, please immediately notify the sender by return e-mail or call (602) 542-7683. Thank you.