1  Daniel Pochoda (Bar No. 021979)
   James Duff Lyall (Bar No. 330045)*
2  **ACLU FOUNDATION OF ARIZONA**
   3707 North 7th Street, Suite 235
3  Phoenix, Arizona 85013
   Telephone:  (602) 650-1854
4  Email: dpochoda@acluaz.org
          jlyall@acluaz.org
5  *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

6  *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia
   Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith,*
7  *Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner,*
   *Joshua Polson, and Charlotte Wells, on behalf of themselves and all*
8  *others similarly situated*

   **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**
9
   Sarah Kader (Bar No. 027147)
10 Asim Dietrich (Bar No. 027927)
   **ARIZONA CENTER FOR DISABILITY LAW**
11 5025 East Washington Street, Suite 202
   Phoenix, Arizona 85034
12 Telephone:  (602) 274-6287
   Email: skader@azdisabilitylaw.org
13        adietrich@azdisabilitylaw.org

14 *Attorneys for Plaintiff Arizona Center for Disability Law*

   **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**
15
16              UNITED STATES DISTRICT COURT
17                  DISTRICT OF ARIZONA

18 | Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-DKD |
   | | **DECLARATION OF PABLO STEWART, M.D.** |

                          Plaintiffs,
22            v.
23 Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

                          Defendants.
27
28

**I, PABLO STEWART, M.D., DECLARE:**

1.   I am a physician licensed to practice in California and Hawaii, board certified in psychiatry, with a specialty in clinical and forensic psychiatry.  My background and experience as relevant to my expert testimony in this proceeding is summarized in my March 30, 2016 report.  (Doc. 1538-1, at 1-4).

2.   I have served as an expert witness and consultant to the plaintiffs in this case since 2012.  In that capacity I have conducted on-site inspections of the Arizona State Prison Complexes at Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma.  I have prepared the following expert reports:

- Expert Report of Pablo Stewart, M.D., November 8, 2013 (Doc. 1104-2);
- Supplemental Expert Report of Pablo Stewart, M.D., December 9, 2013 (Doc. 1104-6, Exhibit 8);
- Rebuttal Expert Report of Pablo Stewart, M.D., January 31, 2014 (Doc. 1104-6, Exhibit 9);
- Second Supplemental Expert Report of Pablo Stewart, M.D., February 24, 2014 (Doc. 1104-6, Exhibit 10);
- Third Supplemental Expert Report of Pablo Stewart, M.D., August 29, 2014 (Doc. 1538-1, Exhibit 2); and
- Expert Report of Pablo Stewart, M.D., March 30, 2016 (Doc. 1538-1).

3.   When settlement discussions began in this case in the fall of 2014, I consulted with plaintiffs' counsel in formulating the remedies they would seek regarding mental health care.  Each of the mental health Performance Measures in the Stipulation is designed to protect prisoners with serious mental health needs from unnecessary risk of harm or death, and to ensure that they receive minimally adequate mental health care.

4.   Unfortunately, it appears that ADC is misinterpreting and misapplying a number of Performance Measures in a way that poses a significant risk of serious injury or death to prisoners with serious mental health needs.

**Requirement that a prisoner be seen, or other care be provided, every "X" days**

5.   Mental illnesses, like physical illnesses, are dynamic conditions that change over time.  Acute conditions may appear and worsen, and even chronic conditions, like Schizophrenia, wax and wane over the course of the illness.  For this reason, it is essential that patients with mental illness receive periodic assessments of their clinical condition and treatment modifications, if required by their clinical presentation, from qualified mental health professionals.

6.   The frequency with which the patient needs to be seen varies according to the patient's condition, and that frequency itself may need to be adjusted depending on the course of the illness.  The Stipulation recognizes this principle by requiring that patients be seen by different levels of mental health staff and at different frequencies depending upon their illness.  What is uniform, however, is the requirement that the patient be seen repeatedly and periodically.

7.   It is my understanding that ADC takes the position that the Stipulation's requirement that (for example) "MH-3B prisoners shall be seen a minimum of every 90 days by a mental health clinician" (Performance Measure 82) is satisfied if the patient has been seen by a clinician on a single occasion.  This is an extraordinary and very dangerous assertion.

8.   It is essential that the patient be seen periodically so that the course of his or her illness and the ongoing efficacy of any treatment can be properly evaluated.  This is particularly vital for patients who are prescribed psychotropic medications.  It is critically important that these patients are seen on a regular basis so that the effectiveness of the medication can be assessed and any toxicity or side effects promptly detected and addressed.

9.   It is also necessary that non-medication treatment modalities, such as psychotherapy with a mental health clinician, be performed on a periodic and consistent basis.  These types of non-medication treatment modalities are only beneficial for the patient if administered on a regular basis.  Finally, the treatment plan must be periodically

reviewed and updated to take account of changes in the patient's condition and response to treatment.

10. In summary, I am not aware of any mental health professional taking the position that it is sufficient that a patient with an ongoing mental illness be evaluated or treated only on a single occasion. Such a position does not meet any standard of care with which I am familiar and is completely indefensible.

**Definition of "Seen"**

11. Confidentiality is essential to accurate mental health diagnosis and effective treatment. The patient must feel free to disclose to mental health staff thoughts, experiences, and other information that may be the source of great embarrassment or shame. Confidentiality is particularly important in the prison context, where disclosure of certain kinds of information can place the prisoner at risk of harassment or victimization by others. Thus, it is critically important that prisoners' interactions with mental health staff take place in a setting that provides confidentiality both from other prisoners and from staff.[1]

12. For these reasons, the Stipulation defines "seen" or "seen by" as follows:

> Interaction between a patient and a Medical Provider, Mental Health Provider or Mental Health Clinician that involves a treatment and/or exchange of information in a confidential setting. With respect to Mental Health staff, means an encounter that takes place *in a confidential setting outside the prisoner's cell, unless the prisoner refuses to exit his or her cell for the encounter.*

Stipulation, Appendix A (emphasis added) [Doc. 1185-1 at 5].

---

[1] As I said in my November 8, 2013 report:

> The presence of custody staff may also cause the patient to self-censor or alter his or her communications with the provider, depriving the provider of critically important information. For example, if a patient is bothered by intrusive thoughts of harming or killing corrections officers, he is unlikely to disclose that to his mental health provider in the presence of a corrections officer.

Doc. 1104-2 at 50-51.

13. It is my understanding that ADC counts a prisoner as being "seen" when he participates in a mental health group with other prisoners present. It is also my understanding that ADC counts a prisoner as being "seen" if a mental health staff member interacts with him while the prisoner is in his cell, and the staff person is outside ("cell-side" encounters). Neither of these encounters is confidential, and both are of little or no value as a clinical encounter.

14. Mental health treatment groups are a valuable component of a mental health treatment program. They are not, however, a substitute for confidential encounters with mental health staff. A group meeting is obviously not a confidential setting. Even if prisoners in the group are admonished to treat the group's discussions as confidential, such an admonition is unenforceable and is highly unlikely to be followed by all prisoners at all times. Accordingly, prisoners in a group setting can be expected to withhold information that may be crucial to the effective diagnosis and treatment of their mental illness.

15. In addition, the purpose of group meetings and the purpose of individual clinical encounters is fundamentally different. The primary purpose of a treatment group is to provide a particular type of treatment for the patient. An example of a treatment group is a psycho-educational group. In this type of group the clinician would provide the patients with general information about various aspects of mental illness so as to help the patients more effectively deal with their own mental disorders. This is in sharp contrast to the purpose of an individual clinical encounter. The purpose of this type of patient interaction is for the clinician to perform a clinical assessment of the patient, evaluate the efficacy of the current treatment plan and modify this plan if necessary. Treatment groups and individual clinical encounters are not a substitute for one another.

16. Cell-side conversations are of little to no value as a clinical encounter. Of note, they are also potentially dangerous as patients often withhold important clinical information about psychiatric symptoms and impending self-harm. During my inspections of seven ADC facilities, I found it extremely difficult to communicate with

-5-

prisoners while standing in front of their cells.  Due to background noise and the barrier of a solid cell door, it was difficult for me to hear the prisoner, and to make myself heard.  I often had to shout my questions to the patients, which were then easily overheard by custody staff, which further inhibited the patients from being open and honest with me.  Sometimes the only way to communicate verbally was to talk through the tiny space at the side of the cell door, meaning that it was impossible to talk with the prisoner while simultaneously maintaining eye contact through the window in the cell door.  Observation of facial expressions and body language is an important part of any clinical encounter, but I found it very difficult to do while speaking to prisoners at cell-side.  In addition, in some units I was required by ADC staff to wear a plastic visor covering my entire face, which made effective communication impossible.

17.   In no sense can a cell-side encounter be considered a confidential setting.  During my inspection tours, many of the prisoners with whom I spoke had cellmates who were just a few feet away while I was attempting to communicate with the prisoner.  In addition, ADC custody staff were often close enough to hear what I was saying.  Finally, it seems likely that prisoners in adjacent cells were sometimes able to overhear, especially given that both the prisoner and I often had to raise our voices to make ourselves heard.

18.   For all of these reasons, it is my opinion that a correctional mental health system that permits required mental health contacts to be routinely carried out through group meetings or cell-side encounters falls below the standard of care.

**Follow-up after removal from suicide watch**

19.   Patients who have recently been removed from suicide watch are at significant risk of self-harm or suicide.  They must be closely and periodically monitored by qualified mental health staff for signs of decompensation or increased lethality, so that any necessary interventions can be promptly undertaken.

20.   For this reason, the Stipulation's Performance Measure 95 requires in part that "any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24

1    and 72 hours after discontinuation, between seven and ten days after discontinuation, and

2    between 21 and 24 days after discontinuation of the watch."

3        21.  It is my understanding that ADC counts a record as compliant with this

4    Performance Measure even if only one or two of the three required post-watch contacts

5    have occurred.  This is a highly dangerous practice, creating a very real possibility that a

6    patient's decompensation will go undetected and unaddressed.  ADC's failure to ensure

7    that patients who have been removed from suicide watch are seen as required by this

8    Performance Measure poses a substantial risk of self-harm or suicide.

9

**Suicide of Armando Aguilar**

10        22.  I have reviewed the medical record of Armando Aguilar, ADC #77204, who

11   committed suicide at the Tucson facility on March 9, 2016; that record is attached hereto

12   as **Exhibit 1**.  I have also reviewed the ADC notice of Mr. Aguilar's death, attached

13   hereto as **Exhibit 2**, which states that Mr. Aguilar "recently returned to ADC custody for

14   a parole violation."

15        23.  The medical record provided by ADC covers the period from March 5 through

16   March 9, 2016, which I assume is the period Mr. Aguilar was in ADC custody after

17   violating parole.  Mr. Aguilar's record shows that he received no intake screening, and

18   indeed no attention of any kind from health care staff, before he hanged himself on March

19   9, 2016.  The failure to conduct any kind of intake screening on a prisoner returning to

20   custody falls far below the standard of care.

21        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is

22   true and correct.

23        Executed this 8TH day of July, 2016, at HONOLULU, Hawaii.

24

25

26                                                        PABLO STEWART, M.D.

27

28

| | |
|---|---|
| 1 | **ADDITIONAL COUNSEL:** |

**ADDITIONAL COUNSEL:**

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
              ahardy@prisonlaw.com
              snorman@prisonlaw.com
              ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Jamelia Morgan (N.Y. 5351176)**
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@npp-aclu.org
              afettig@npp-aclu.org
              jmorgan@aclu.org

*Admitted *pro hac vice*.  Not admitted
 in DC; practice limited to federal
 courts.
**Admitted *pro hac vice*

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, P.C.**
P. O. Box 91398
Tucson, Arizona 85752
Telephone:  (520) 477-1475
Email:    kirstin@eidenbachlaw.com

Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    dpochoda@acluaz.org
              jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct.
R. 38(f)

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
          agerlicher@perkinscoie.com
          jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com
          aamiri@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com

*Admitted *pro hac vice*

Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:    jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR
DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email:     skader@azdisabilitylaw.org
              adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR
DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:
    rdalyrooney@azdisabilitylaw.org
              jrico@azdisabilitylaw.org
              jross@azdisabilitylaw.org
              mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability
Law*

1

## **CERTIFICATE OF SERVICE**

2       I hereby certify that on July 12, 2016, I electronically transmitted the above

3  document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4  Notice of Electronic Filing to the following CM/ECF registrants:

5

6                            Michael E. Gottfried
                             Lucy M. Rand
7                     Assistant Arizona Attorneys General
                       Michael.Gottfried@azag.gov
8                          Lucy.Rand@azag.gov

9                            Daniel P. Struck
                           Kathleen L. Wieneke
10                            Rachel Love
                          Timothy J. Bojanowski
11                          Nicholas D. Acedo
                           Ashlee B. Fletcher
12                           Anne M. Orcutt
                             Jacob B. Lee
13                 STRUCK WIENEKE, & LOVE, P.L.C.
                          dstruck@swlfirm.com
14                        kwieneke@swlfirm.com
                           rlove@swlfirm.com
15                       tbojanowski@swlfirm.com
                          nacedo@swlfirm.com
16                        afletcher@swlfirm.com
                          aorcutt@swlfirm.com
17                          jlee@swlfirm.com

18                        *Attorneys for Defendants*

19
                                   s/ D. Freouf
20                      _____

21

22

23

24

25

26

27

28