1  Arizona Attorney General Mark Brnovich
   Office of the Attorney General
2  Michael E. Gottfried, Bar No. 010623
   Lucy M. Rand, Bar No. 026919
3  Assistant Attorneys General
   1275 W. Washington Street
4  Phoenix, Arizona 85007-2926
   Telephone: (602) 542-4951
5  Fax: (602) 542-7670
   Michael.Gottfried@azag.gov
6  Lucy.Rand@azag.gov

7  Daniel P. Struck, Bar No. 012377
   Kathleen L. Wieneke, Bar No. 011139
8  Rachel Love, Bar No. 019881
   Timothy J. Bojanowski, Bar No. 022126
9  Nicholas D. Acedo, Bar No. 021644
   Ashlee B. Fletcher, Bar No. 028874
10 Anne M. Orcutt, Bar No. 029387
   Jacob B. Lee, Bar No. 030371
11 STRUCK WIENEKE & LOVE, P.L.C.
   3100 West Ray Road, Suite 300
12 Chandler, Arizona  85226
   Telephone:  (480) 420-1600
13 Fax:  (480) 420-1696
   dstruck@swlfirm.com
14 kwieneke@swlfirm.com
   rlove@swlfirm.com
15 tbojanowski@swlfirm.com
   nacedo@swlfirm.com
16 afletcher@swlfirm.com
   aorcutt@swlfirm.com
17 jlee@swlfirm.com

18 *Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br>　　　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>　　　　　　　　　　　　Defendants. | NO. 2:12-cv-00601-DKD <br><br><br><br> **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO ENFORCE** |

## I. INTRODUCTION

Since the mediation on March 1, 2016, the parties have made an extraordinary effort to revise the monitoring guide. These efforts consisted of editing and re-working language and engaging in roundtable discussions with Plaintiffs' counsel, Defendants, Defense Counsel, Corizon, and ADC representatives.[1] The parties participated in countless telephone conferences, usually for hours at a time, in good faith, to create a guide that allows the monitors to accurately and easily report data required by the performance measures. And Defendants made countless changes to the guide, at Plaintiffs' request. Importantly, these efforts were undertaken voluntarily. Nothing in the Stipulation requires Defendants to create a monitoring guide, as monitoring guidelines are built into the Stipulation. *See* Dkt. 1185-1 at 17 – 36.

In the midst of Defendants' review of forty-seven[2] health care performance measures ("HC PM") being reviewed at the request of Plaintiffs, Plaintiffs filed the instant motion demanding Defendants monitor more than what the Stipulation requires. *See* Dkt. 1625. As evident from their Motion, and as discussed in detail below, these demands are not supported by the Stipulation and are insignificant to the only relevant inquiry - whether Defendants are in substantial compliance with the Stipulation.[3] Plaintiffs' Motion is contradictory. At times, Plaintiffs ask the Court to enforce the "plain language" of the Stipulation. *See* Dkt. 1625 at 5 - 7, 13 - 5, 18, 19, 21. And at others, Plaintiffs ask the Court to broaden the language of the Stipulation and expand what Defendants are required to monitor. They cannot have it both ways.

---

[1] The monitoring guide attached to Plaintiffs' motion is a draft which has since been, and is still in the process of, being revised. As such, it is not an accurate reflection of the parties' agreements to date.

[2] The parties reviewed thirty performance measures covered in Plaintiffs' correspondence between March 17, 2016 and April 15, 2016.

[3] Plaintiffs cite to numerous pages of correspondence that discuss a variety of performance measure issues. Defendants only address the specific monitoring issues highlighted in Plaintiffs' Motion.

1

Realistically, despite both parties' efforts to carefully craft the health care performance measures, practical implementation for some measures has been difficult, if not impossible. For example, while all measures are monitored on a monthly basis, some were written to measure data in 90 and 180 day increments – a unit of measuring not conducive to a thirty-day report. Defendants have gone above and beyond to assist Plaintiffs in drafting a monitoring guide, but Plaintiffs are unwilling to alter their positions on the items cited in their Motion. Shockingly, in their Motion, Plaintiffs request to take over the monitoring of the Stipulation. *See* Dkt. 1625 at 10. This demand is unsupported and prohibited by the Stipulation. For the reasons outlined below, Plaintiffs' Motion should be denied.

## II.  ITEMS DEFENDANTS ENSURE OCCUR, BUT ARE NOT REQUIRED TO MONITOR[4]

The Stipulation requires Defendants to "comply with the health care performance measures set forth in Exhibit B." *See* Dkt. 1185 at ¶ 8. "Compliance with the ***performance measures*** set forth in Exhibit B shall be ***measured and reported*** monthly at each of ADC's ten (10) complexes as follows." *Id*. at ¶ 9 (emphasis added). Plaintiffs now demand that Defendants measure and report on additional items beyond the health care performance measures outlined in Exhibit B. Specifically, the items outlined in Paragraphs 12, 14, and 15. But the items contained in Paragraphs 12, 14, and 15 are not performance measures – and only performance measures are required to be measured and reported. *Id*. at ¶¶ 9, 10.

Plaintiffs drafted the Stipulation. Had Plaintiffs believed these items should have been monitored and measured in the monthly CGAR, Plaintiffs could have included them as health care performance measures. Their omission as health care performance measures evidences these issues were not discussed as health care performance measures,

---

[4] Throughout their Motion, Plaintiffs inappropriately rely on Dr. Stewart's opinions as to what the Stipulation's "purpose" is. The Court should not consider his opinions. Dr. Stewart was not part of the Stipulation negotiations and does not monitor compliance with it.

2

or were discussed and disposed of, during the settlement negotiations.[5] Instead, Defendants agreed only to *ensure* that the items occur. Ensure means to make (something) sure, certain, or safe. *See* http://www.merriam-webster.com/dictionary/ensure. It does not mean to monitor or record. The Stipulation requires Defendants to do a variety of things not subject to monthly monitoring through the CGAR report (e.g, use of certain software programs, implementation of training programs, time limits on when to provide psych autopsies, budget approval). *See* Dkt. 1185 at ¶¶ 11, 13, 16, 17. Interestingly, Plaintiffs do not claim these items need to be monitored.

To support their argument, Plaintiffs rely on the following excerpt from the Stipulation:

> Plaintiffs' counsel and their experts shall have reasonable access to the institutions, staff, contractors, prisoners and documents necessary to properly evaluate whether Defendants are complying with the performance measures and other provisions of this Stipulation.

*See* Dkt. 1185 at ¶ 29.

Their reliance on this paragraph is misplaced. While this permits Plaintiffs to access documentation, facilities, and people to evaluate whether Defendants are complying with the Stipulation, it does not require Defendants to monitor items not listed as performance measures. Plaintiffs argue how and why these items should be measured, but do not and cannot cite to any section of the Stipulation that requires Defendants to monitor these items despite their assertion that monitoring of these items is required pursuant to the "plain language of the Stipulation".[6]

---

[5] This decision, in part, was because the parties agreed these items are difficult or impossible to track and/or monitor. *See* 1626-01 at 6. Regardless, the Stipulation does not require that these measures be monitored.

[6] While true that the monitors monitored (in error) these items at one point, they were not required to. Plaintiffs cite no authority for their position that Defendants are now required to monitor the items because they did so previously.

3

Finally, Plaintiffs argue these items should be monitored so Plaintiffs can "confirm that Defendants are actually performing the agreed-upon and promised requirements." *See* Dkt. 1625 at 9.  But the Stipulation already allows Plaintiffs to confirm this because it gives Plaintiffs' counsel "reasonable access to the institutions, staff, contractors, prisoners, and documents . . ." *See* Dkt. 1185 at ¶ 29.  It is not necessary to include these items in the CGAR report for Plaintiffs to confirm they occur.  In fact, Defendants routinely produce documents to Plaintiffs regarding these items.[7]

## III.   MONITORING METHODS THAT AFFECT NUMEROUS MEASURES

### A.   Requirement that an Act Occur "Every X Days"

Despite Plaintiffs statements to the contrary, Defendants monitor the time elapsed between dates.  The following methodology is used when monitoring a measure that requires an event to occur every 30, 90, or 180 days:  If the most recent event occurred during the monitoring month, look back one (30 days), three (90 days), or six (180 days) months to confirm the two dates are not farther apart than the measure allows.  If the most recent event did not occur in the monitoring month, look back to the last time the event occurred and confirm the event is no further away from the last day of the monitoring month than the timeline outlined in the measure.  *See* Exhibit 1 (Declaration of Dr. Taylor) at ¶ 3.

Plaintiffs, however, demand Defendants look at the time elapsed between the dates on which the action was performed.  *See* Dkt. 1625 at 13.  Under Plaintiffs' interpretation, if an event is required to occur every 180 days pursuant to a specific health care performance measure, the monitor must look in 180-day intervals to determine if the event occurred at 180-day intervals from the date ordered to occur.  For example, under Plaintiffs' interpretation, if an inmate is required to be seen every 180 days for a chronic care appointment, the monitor must go back, at 180-day intervals, to the date the inmate

---

[7] See ADCM037352-037361, 12130-121131, 121223-121250, 197480-197495, 197985-197990, 199730-199747, 274550, 274589-274608, 274734-274735.

was diagnosed with the chronic care issue. If this diagnosis was a year ago, the monitor must analyze a years' worth of data. This is nonsensical.

And a prior year's worth of data is not relevant to whether Defendants are in compliance with the current reporting month. "Compliance with performance measures . . . . shall be *measured and reported monthly* . . ." (emphasis added). *See* Dkt. 1185 at 6. The CGAR was designed to capture monthly compliance with the performance measures, not whether one inmate's record complied with the measure for the last six months or a year, etc.

Problematically, as discussed above, some health care performance measures require a determination of whether an inmate was seen within 90 or 180 days. Obviously, this determination cannot be made by looking at a thirty-day period. For these measures, the monitors determine whether the inmate was seen in the 90 or 180 days prior to the last day of the reporting month or last appointment. While this determination requires the monitor to look to other months, Defendants understand it is the only way to monitor compliance with these measures.

### B. "Seen" As Defined In the Stipulation

As Plaintiffs correctly point out, the Stipulation defines "seen" as follows:

> Interaction between a patient and a Medical Provider, Mental Health Provider or Mental Health Clinician that involves a treatment and/or exchange of information in a confidential setting. With respect to Mental Health staff, means an encounter that takes place in a confidential setting outside the prisoner's cell, *unless the prisoner refuses to exit his or her cell for the encounter.*

Dkt. 1185-1 at 5 (emphasis added).

Plaintiffs allege Defendants inappropriately mark files compliant as being "seen" when inmates are seen in segregation visits, group counseling, and on suicide watch.[8] *See* Dkt. 1625 at 15. Defendants' methodology is proper.

---

[8] Plaintiffs cited to a number of locations in the record; however, the following citations do not state what Plaintiffs purport them to state:

Ex. 17 at 106 / Dkt. 1626-2 at 110 (HC PM #79: no requirement that an inmate be "seen", but instead requires a review of an inmate's mental health treatment plan);

5

First, group programming meets the definition of "seen" because it is confidential. *See* Exhibit 1 (Declaration of Dr. Taylor) at ¶ 4. Similar to programming in the community for mental health and other fields, such as NA or AA, groups at ADC are closed and only open to specific members. *Id.* at ¶ 5. Assignment to a group occurs only after a clinician enrolls the inmate into a group. *Id.* At the first group meeting, confidentiality is discussed and members are advised they must abide by the confidentiality rule. *Id.* at ¶ 6. Inmates who break the confidentiality rule are removed from the group. *Id.* If an inmate does not want to be seen in a group setting, the inmate may opt to be seen individually, outside the group.[9] *Id.* at ¶ 7.

Second, cell front contacts, also known as "segregation visits," do not count as "seen" unless the inmate refuses to exit his/her cell for the encounter. *Id.* at ¶ 11. This methodology is consistent with the Stipulation's definition of "seen." *Id.* It follows that if an inmate is seen cell front, the performance measure will not be marked compliant unless it is specifically noted that the inmate refused to come out of the cell. *Id.* The only time a performance measure would be marked as compliant with being "seen" cell front, and the inmate did not refuse to exit his/her cell for the encounter, is when inmates are on hard lock down. *Id.* at ¶ 12. During hard lock downs, no inmates may leave their cells. *Id.*

---

Ex. 17 at 110-111 / Dkt. 1626-2 at 115-116 (HC PM #83: proposed methodology does not include segregation visits, group counseling, or suicide watch, but instead states that entries may be found under "MH – Initial Psychiatric Evaluation," "MH – Nurse Practitioner – Schedule," "MH – Nurse Practitioner – Unscheduled," "MH Psychiatrist – Scheduled," "MH – Psychiatrist - Unscheduled");

Ex. 17 at 117 / Dkt. 1626-2 at 121 (HC PM #88: proposed methodology does not include segregation visits, group counseling, or suicide watch, but instead states that entries may be found under "scheduled psychiatry, unscheduled psychiatry, initial psychiatric evaluation");

Ex. 17 at 119 / Dkt. 1626-2 at 123 (HC PM #90: proposed methodology does not include segregation visits, group counseling, or suicide watch, but instead states that entries may be found under "scheduled psychiatry, unscheduled psychiatry, initial psychiatric evaluation"); and,

Ex. 17 at 122 / Dkt. 1626-2 at 126 (HC PM #93: no requirement to be "seen," but instead requires "weekly rounds" and "one contact").

[9] Although not required by the Stipulation, when clinically indicated, such as assessing stability coming off of watch (HC PM #95), the monitors restrict compliance to only those contacts that are done individually. *See* Exhibit 1 at ¶ 10.

6

This has to be documented, and the monitor must confirm it occurred. *Id.* These situations are extremely rare. *Id.*

Additionally, inmates are considered "seen" during a cell front/segregation visit if they are on suicide watch. *Id.* at ¶ 13. Requiring inmates on suicide watch to exit their cells poses significant security risks and results in decompensation of the inmate. *Id.* at ¶ 14. For example, to see an inmate on suicide watch outside of his/her cell, the inmate must be cuffed and walked in a suicide smock with no undergarments through the prison past other inmates to an office. *Id.* Once in the office, the inmate has access to a variety of items he/she can use to harm him/herself such as paperclips, staples, and pens. *Id.* Although the suicide cell is swept to ensure there are no items available to the inmate that can be used for self-harm, staff offices are not subject to such strict safety measures. *Id.* As such, seeing inmates on suicide watch is most appropriately and safely done at the cell front. *Id.* at ¶ 15.

Finally, Plaintiffs' position is contradictory because they agreed that groups count as being seen for other performance measures. *See* Exhibit 1 at ¶ 9. And in other performance measures, the parties specifically indicated that an inmate be seen one-on-one. *Id.* ¶ 8. If Plaintiffs wanted "seen" to always mean one on one, they could have specified this for all measures. They did not. Plaintiffs also agreed that for HC PM #94, which requires "[a]ll prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse," that encounters that occur at the cell front for inmates on suicide watch are compliant. *Id.* at ¶ 16. Because Plaintiffs do not object to this methodology for another performance measure that utilizes the definition of seen, they cannot take issue with it here.

### C. The Stipulation Does Not Require Defendants To Monitor Parole Violators as Intakes

"Intake" is a formal process designed to facilitate and identify security and health needs (and appropriate placement) of thousands of inmates sentenced to ADC each year. *See* Dkt. 1626-1 at 9, pages 21-22. True intake processes are in place at ADC's reception

1  centers in Phoenix (males), Perryville (females), and Tucson (Male minors) only. *Id.*
2  And the protocol for measuring intake health care performance measures specifically
3  states that records shall only be pulled from reception facilities – that is, Phoenix,
4  Perryville, and Tucson.[10] *See* Dkt. 1185-1 at 22, 28, 30 – 31. Given Plaintiffs' repeated
5  request that the Court require Defendants to comply with the plain language of the
6  Stipulation, Plaintiffs should have no objection to the way intake measures are being
7  monitored. But again, they want more.

8  Now Plaintiffs want Defendants to monitor parole violators under intake
9  categories. Parole violators are not new inmates. *See* Dkt. 1626-1 at 9, pages 21-22.
10 They do not go through initial inmate orientation, may not be processed at an ADC intake
11 facility, and are not separately identified as "intake." *Id.* This is because these inmates
12 already went through the initial inmate orientation and screening when they were first
13 processed into the ADC system. *Id.* If Plaintiffs wanted Defendants to monitor parole
14 violators, they could have created a separate category; they did not.[11] Nevertheless,
15 simply because something is not monitored does not mean it does not occur. Parole
16 violators receive a mental health screening and a nursing and physician physical. *Id.* All
17 pending medications are also addressed. *Id.* To the extent Plaintiffs want information on
18 parole violators, the Stipulation allows them to request this information. *See* Dkt. 1185 at
19 ¶ 29.

20 Finally, Plaintiffs' claims that Defendants misled them during settlement
21 negotiations is without merit. *See* Dkt. 1625 at 16. Indeed, the monthly Inmate Intakes

---

[10] Importantly, although not required by the Stipulation and in an effort to be reasonable, Defendants agreed to monitor incoming Death Row prisoners admitted directly to Eyman-Browning Unit, because these inmates are true intakes, unlike parole violators. *See* Dkt. 1625 at 16.

[11] In their Motion, Plaintiffs cite to a March 2016 suicide of a parole violator to support their position that parole violators should be subject to the "intake" health care performance measures. *See* Dkt. 1625 at 17. This particular inmate, after violating parole, came back to ADC on the afternoon of March 7, 2016. *See* Exhibit 1 at ¶ 18. Had this inmate been subject to the intake measures, as Plaintiffs request, he would not have been required to be seen until the end of the day on March 9, 2016. *Id.* He killed himself at 5:30 a.m. on March 9, before the time expired to see him pursuant to HC PM #75. *Id.*

Reports, produced to Plaintiffs during discovery, show where inmates are processed. *See* Dkt. 1626-1 at 9, pages 21-22. Additionally, Department Order ("DO") #1004, which governs return of release violators, is unmistakably clear that parole violators may be returned to the nearest facility. This DO was produced to Plaintiffs and available on the ADC public website. *See* DO 1004, §§ 1.3.1. and 1.3.2.8.2, available at http://corrections.az.gov/sites/default/files/policies/1000/1004u.pdf. Plaintiffs were aware of this information, but disregarded it.

### D. Thirty Days v. One Month

Plaintiffs correctly state that Defendants count a record as compliant if an act required to be performed "every 30 days" or "within 30 days" is performed within one calendar month; if an act required to be performed "every 90 days" or "within 90 days" is performed within three calendar months; and if an act required to be performed "every 180 days or "within 180 days" is performed within six calendar months. *See* Dkt. 1625 at 17 – 18. This is because monitoring staff does not have access to "docketing" software that calculates "n" days for them. Moreover, the longer the time period, the more likely the months contain a different number of days and the more likely mistakes would be made when trying to calculate time periods. Consequently, medical staff uses calendar months to schedule subsequent events. This is also the same method State of Arizona agencies use to calculate dates.

Plaintiffs fail to explain how this results in substantial non-compliance under the Stipulation. The intent of the Stipulation is to provide health care to inmates. A difference of 1 day for 30-day follow-up events, 2 days for 60-day (2 months) or 90-day (3 months) follow-up events, and 4 days for 180-day (6 months) follow-up events is not substantial noncompliance. Using calendar months to calculate dates only affects 21[12] of 103 health care performance measures. For 11[13] of the 21 health care performance

---

[12] Health care performance measures affected are the following: 21, 49-51, 53-54, 73, 77, 80-88, 90, 92, 96, 102.

[13] HC PM ##21, 49, 50, 53, 73, 80, 85, 87, 90, 92, and 96.

9

measures, which monitor 30-day follow-up events, calculating dates using calendar months results in a maximum difference of 1 day over, and between 1 and 2 days under (or early). For 8[14] of the 21 health care performance measures, which monitor 60-day (2 months) or 90-day (3 months) follow-up events, calculating dates using calendar months results in a maximum difference of 2 days over, and 1 day under (or early). For 3[15] of the 21 health care performance measures, which monitor 180-day (6 months) follow-up events, calculating dates using calendar months results in a maximum difference of 4 days over. Due to medical staff's inability to access software to calculate dates either in the medical office or out in the field, health care performance measures that require an event to occur within "n" number of days will be considered compliant by monitors if the event occurs within the appropriate number of calendar month(s) and by the same calendar date as the original event. Defendants' position is reasonable and substantially complies with the Stipulation.

## IV. MONITORING OF SPECIFIC PERFORMANCE MEASURES

### A. Health Care Performance Measure #85

The Stipulation requires monitors to pull records for HC PM #85 and then use the same pool of records to measure compliance with HC PM #86. *See* Exhibit 1 at ¶ 19. But this contradicts the methodology used for HC PM ##80/81 and 82/83. *Id.* For these measures, the mental health contact is assessed for the first measure and then, from that same pool, the psychiatry contact is assessed. *Id.* at ¶ 19. As was discovered, and discussed between the parties after the implementation of the Stipulation, the pool should be generated under HC PM #86 (mental health contacts) and then be used to monitor HC PM #85 (psychiatry contacts. *Id.* at ¶ 20. This is because the source document agreed to by the parties (AIMS report) only allows the monitor to pull mental health contacts (HC

---

[14] HC PM ##77, 81-83, 86, 88, 102.

[15] HC PM #54 (chronic disease inmates will be seen by a provider no less than every 180 days); HC PM #83 (MH-3B inmates prescribed psychotropic medications will be seen a minimum of 180 days by a mental health provider); and HC PM #84 (MH-3C inmates will be seen a minimum of 180 days by a mental health provider).

10

PM #86). After the mental health contacts are pulled, the files can then be reviewed to determine whether those inmates were recently discontinued from medications (psychiatry contact) and can be monitored under HC PM #85. *Id.* at ¶ 21. This is consistent with the methodology used for HC PM ##80/81 and 82/83.

Further, as the parties and the Court are now aware, based on discussions at the June 24, 2016 status conference, and subsequent meet-and-confer and exchange of correspondence, many MH-3D inmates were improperly classified because clinicians were hesitant to classify intakes as MH-2 if they reported being on psychotropic medications at some point. *See* Dkt. 1619 (generally). As such, HC PM #85 (which requires the monitor to determine whether MH-3D inmates were seen by a mental health provider within 30 days of discontinuing medication) could not accurately be monitored, as the majority of MH-3D inmates had not recently been taken off medication. Now that the MH-3E category has been created to capture inmates who, at one point, were on medication but who have not been recently removed from medication, this measure can accurately be reported. *See* Exhibit 1 at ¶ 22.

Finally, while Plaintiffs take issue with the fact only seven records were pulled to monitor the measure at Perryville in March 2016, the measure specifically states ten will be pulled only *if available*. *See* Dkt. 1185-1 at 5. In March of 2016, only seven records met this performance measure's requirements and thus only seven were monitored.

### B.     Health Care Performance Measure #86

This performance measure states, "MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication." *See* Dkt. 1185-1 at 14. To monitor this measure, it is unnecessary (nor is it required) that Defendants review data from the date the inmate was taken off medication. As discussed above, this would require Defendants to review up to six months' stale data and data that was subject to reporting in prior months. For example, if an inmate's record is pulled for review in June 2016 and he was taken off medications in December of 2015, under Plaintiffs' proposed methodology, the monitor

1 would be required to review six months' worth of data to determine whether he was seen
2 every ninety days for six months. This six months' worth of data is not relevant to
3 whether Defendants are in compliance in June 2016. Monitoring as Plaintiffs desire
4 would not accurately reflect the rate of compliance for this measure for the reporting
5 month. Instead, it would reflect compliance in prior months. Defendants' method of
6 marking a file compliant for the reporting month, if the inmate was seen once within the
7 last ninety days, is appropriate.

### C.    Health Care Performance Measure #94

Confusingly, Plaintiffs state, "Defendants are noncompliant with this performance measure by arbitrarily limiting their monitoring to a single calendar month." *See* Dkt. 1625 at 20. As discussed above, pursuant to the Stipulation, compliance is measured and reported monthly. *See* Dkt. 1185 at 6.

Plaintiffs again demand that Defendants monitor more than what the Stipulation requires. This measure monitors whether inmates on watch are seen daily. Because the Stipulation requires that measures be monitored on a monthly basis, Defendants are only required to determine whether the inmate was seen on days in the reporting month. Plaintiffs' assertion that Defendants are required to look to days outside the reporting month is not supported by the Stipulation. Under Plaintiffs' interpretation, monitors would be required to monitor three months of data if an inmate had been on suicide watch for three months. This makes little sense given that the inmate's file was subject to random sampling in prior months and could have been reported in prior months. Therefore, if the inmate was not seen in January 2016, and the file was marked noncompliant in January 2016, he would still be marked noncompliant if his file came up for review again in February 2016, even if he was appropriately seen every day in February. This runs afoul of the Stipulation's purpose.

Plaintiffs' attempt to make it appear that Defendants are not monitoring days outside the reporting month is incorrect. Defendants monitor those days – during their applicable reporting month.

### D. Health Care Performance Measure #95

Plaintiffs again complain that Defendants look only to the reporting month when reporting this measure. This is true as Defendants are only required to monitor data within the reporting month. *See* Dkt. 1185 at 6. For this measure, Plaintiffs want Defendants to pull their sample size from previous months' data. Plaintiffs provide the following example:

> . . .if you want to audit the month of April, you should use as a starting point the list of all people removed from suicide watch in the last three weeks of March and the first week of April. . .

*See* Dkt. 1626-1 at 60. March data has no relevance to whether Defendants are compliant in April, and the Stipulation states otherwise. Dr. Stewart's opinion that Defendants are not "ensur[ing] that patients who have been removed from suicide watch are seen as required by this Performance Measure. . ." is wrong. *See* Dkt. 1625 at 16 – 17. Defendants do ensure this – by monitoring this measure each month and reporting the data in the CGAR. To see whether Defendants were compliant with the measure in a previous month, Plaintiffs need only look to that month's CGAR.

### E. Health Care Performance Measure #98

Plaintiffs' contention that Defendants have "unilaterally decided to monitor only one of these five categories" is wrong. *See* Dkt. 1625 at 21. To the contrary, Defendants monitor each of the five categories contained within this health care performance measure – some are just monitored under other health care performance measures. Plaintiffs have taken the unreasonable position that Defendants should monitor these four categories both here and under the other health care performance measures they already are monitored under.

Two of the five categories (HNRS with routine non-medication issues and HNRs with routine medication issues) are monitored under this category.[16] *See* Exhibit 1 at ¶ 23. The remaining three categories relate to emergent or urgent HNRs. *Id.* at ¶ 24. All urgent

---
[16] Plaintiffs are aware of this as they participated in the discussions regarding this measure. *See* Ex. 1 at ¶ 23.

13

and emergent HNRs (regardless whether they are medical, mental health, or dental related) are placed on the sick call log and seen on sick call line by medical RNs.[17] *Id.* at ¶ 24. All of those HNRs are monitored under HC PM #37. *Id.* Measuring this same information under both HC PM #37 and HC PM #98 is unnecessary and will lead to inflated or deflated results. *Id.* at ¶ 25.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Enforce the Stipulation should be denied.

DATED this 29th day of July 2016.

STRUCK WIENEKE & LOVE, P.L.C.


By /s/Daniel P. Struck
   Daniel P. Struck
   Kathleen L. Wieneke
   Rachel Love
   Timothy J. Bojanowski
   Nicholas D. Acedo
   Ashlee B. Fletcher
   Anne M. Orcutt
   Jacob B. Lee
   STRUCK WIENEKE & LOVE, P.L.C.
   3100 West Ray Road, Suite 300
   Chandler, Arizona 85226

   Arizona Attorney General Mark Brnovich
   OFFICE OF THE ATTORNEY GENERAL
   Michael E. Gottfried
   Lucy M. Rand
   Assistant Attorneys General
   1275 W. Washington Street
   Phoenix, Arizona 85007-2926

   *Attorneys for Defendants*

---

[17] HC PM #37 states: "Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need)." *See* Dkt. 1185-1 at 10.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Alison Hardy: | ahardy@prisonlaw.com |
| Amelia M. Gerlicher: | agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com |
| Amir Q. Amiri: | aamiri@jonesday.com; ttualaulelei@jonesday.com |
| Amy B. Fettig: | afettig@npp-aclu.org |
| Asim Varma: | avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| Caroline N. Mitchell: | cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com |
| Corene T. Kendrick: | ckendrick@prisonlaw.com; edegraff@prisonlaw.com |
| Daniel Clayton Barr: | DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com |
| Daniel Joseph Pochoda: | dpochoda@acluaz.org; danpoc@cox.net; gtorres@acluaz.org |
| David Cyrus Fathi: | dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org |
| Donald Specter: | dspecter@prisonlaw.com |
| Jennifer K. Messina: | jkmessina@jonesday.com |
| Jessica Pari Jansepar Ross: | jross@azdisabilitylaw.org |
| John Howard Gray: | jhgray@perkinscoie.com; slawson@perkinscoie.com |
| John Laurens Wilkes: | jlwilkes@jonesday.com, dkkerr@jonesday.com |
| Jose de Jesus Rico: | jrico@azdisabilitylaw.org |
| Kirstin T. Eidenbach: | kirstin@eidenbachlaw.com |
| Maya Abela | mabela@azdisabilitylaw.org |
| Rose Daly-Rooney: | rdalyrooney@azdisabilitylaw.org |
| Sara Norman: | snorman@prisonlaw.com |
| Sarah Eve Kader: | skader@azdisabilitylaw.org;mlauritzen@azdisabilitylaw.org; rstarling@azdisabilitylaw.org |

15

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/     Daniel P. Struck