**EXHIBIT 1**

**EXHIBIT 1**

1    Arizona Attorney General Mark Brnovich
     Office of the Attorney General
2    Michael E. Gottfried, Bar No. 010623
     Lucy M. Rand, Bar No. 026919
3    Assistant Attorneys General
     1275 W. Washington Street
4    Phoenix, Arizona 85007-2926
     Telephone: (602) 542-4951
5    Fax: (602) 542-7670
     Michael.Gottfried@azag.gov
6    Lucy.Rand@azag.gov

7    Daniel P. Struck, Bar No. 012377
     Kathleen L. Wieneke, Bar No. 011139
8    Rachel Love, Bar No. 019881
     Timothy J. Bojanowski, Bar No. 022126
9    Nicholas D. Acedo, Bar No. 021644
     Ashlee B. Fletcher, Bar No. 028874
10   Anne M. Orcutt, Bar No. 029387
     Jacob B. Lee, Bar No. 030371
11   STRUCK WIENEKE & LOVE, P.L.C.
     3100 West Ray Road, Suite 300
12   Chandler, Arizona  85226
     Telephone:  (480) 420-1600
13   Fax:  (480) 420-1696
     dstruck@swlfirm.com
14   kwieneke@swlfirm.com
     rlove@swlfirm.com
15   tbojanowski@swlfirm.com
     nacedo@swlfirm.com
16   afletcher@swlfirm.com
     aorcutt@swlfirm.com
17   jlee@swlfirm.com

18   *Attorneys for Defendants*

19                UNITED STATES DISTRICT COURT
                     DISTRICT OF ARIZONA
20

21   Victor Parsons, *et al.*, on behalf of themselves    NO. 2:12-cv-00601-DKD
     and all others similarly situated; and Arizona
22   Center for Disability Law,
                                        Plaintiffs,
23             v.                                          **DECLARATION OF NICOLE
                                                           TAYLOR, Ph.D., J.D., CCHP-MH**
24   Charles Ryan, Director, Arizona Department
     of Corrections; and Richard Pratt, Interim
25   Division Director, Division of Health Services,
     Arizona Department of Corrections, in their
26   official capacities,
                                        Defendants.
27

28

1            I, **NICOLE TAYLOR**, make the following Declaration:

2            1.      I am over the age of 18 years and have personal knowledge of and am

3 competent to testify to the matters set forth in this Declaration.

4            2.      I submit this declaration in support of Defendants' Response to Plaintiffs'

5 Motion to Enforce the Stipulation (Dkt. 1625).

6            Events That Must Occur every "nth" Day

7            3.      We measure the time elapsed between multiple dates. The following

8 methodology is used when monitoring a measure that requires an event occur every 30,

9 90, or 180 days: If the most recent event occurred during the monitoring month, look

10 back the following one (30 days), three (90 days), or six (180 days) months to confirm the

11 two dates are not farther apart than the measure allows. If the most recent event did not

12 occur in the monitoring month, look back to the last time the event occurred and confirm

13 the event is no further away from the last day of the monitoring month than the timeframe

14 outlined in the measure.

15            Definition of "Seen"

16            4.      Group programming meets the definition of "seen" because it is

17 confidential.

18            5.      Similar to programming in the community for mental health and other fields

19 like NA or AA, groups at ADC are closed and only open to specific members.

20 Assignment to a group occurs only after a clinician enrols the inmate into a group.

21            6.      At the first group meeting, confidentiality is discussed and members are

22 advised they must abide by the confidentiality rule. Inmates who break the confidentiality

23 rule are removed from the group.

24            7.      If an inmate does not want to be seen in a group setting, the inmate may opt

25 to be seen individually, outside the group.

26            8.      Importantly, for certain performance measures, the parties specified the

27 inmate must be seen one on one. For example, performance measure 87, states inmates

28

must be seen one and one and would not fall under the definition of seen as used in the other measures.

9.     Additionally, in other measures, the parties agreed that inmates seen in a group count as being "seen" such as the maximum custody contacts by mental health clinicians (PM 92).

10.    Although not required by the Stipulation, when clinically indicated, such as assessing potential instability after coming off watch (PM 95), we restrict compliance to only those contacts that are done individually.

11.    Cell front or "segregation visits" do not count as being "seen" unless the inmate refuses to exit his cell for the encounter.  This methodology is consistent with the Stipulation's definition of "seen."   It follows that if an inmate is seen cell front/segregation visit, the file will not be marked compliant unless it is specifically noted that the inmate refused to come out of the cell.

12.    The only time a file would be marked as compliant with being "seen" in cell front/segregation visit, and the inmate did not refuse to come out, is when inmates are on hard lock down.  During hard lock downs, no inmates may leave their cells.  This has to be noted in the documentation and the monitors confirm that it occurred.  These situations are extremely rare.

13.    Inmates are also considered "seen" cell front/segregation visit if they are on suicide watch.

14.    Pulling inmates on suicide watch out of their cells poses significant security risks and may result in decompensation of the inmate.  For example, to see inmates on suicide watch outside their cell, the inmate must be cuffed up and walked to an office. This requires an inmate to walk past other inmates while in a suicide smock.  Once in the office, the inmate is exposed to a variety of items he/she can use to harm him/herself such as paperclips, staples, pens, etc.  The suicide cells are routinely searched and cleaned to ensure there are no items available to the inmate which can be used for self-harm. Offices are not subject to these strict safety measures.

2

15.     As such, seeing inmates on suicide watch is most appropriately and safely done in a cell front/segregation visit.  If an inmate is need of a contact outside of the suicide watch pod, then this would be done on a case by case basis.

16.     Under Performance Measure 94, inmates on suicide watch are considered "seen" when seen in a cell front/segregation visit.   Plaintiffs take no issue with this methodology being used for this measure.

Parole Violators

17.     On page 17 of their Motion, Plaintiffs cite to a suicide of a parole violator that occurred at Tucson in March 2016.

18.     This particular inmate, after violating parole, came back to ADC on the afternoon of March 7, 2016.  Had this inmate been subject to the intake measures, as Plaintiffs request, he would not have been required to be seen until the end of day on March 9, 2016.  He killed himself at 5:30 a.m. on March 9, before the time expired to see him pursuant to Performance Measure 75. *See* Dkt. 1185-1 at 31.

Performance Measure 85

19.     The Stipulation requires monitors to pull records for PM85 and then use the same pool of records to measure compliance with PM86.   This contradicts the methodology used for measures 80/81 and 82/83. For these measures, the mental health contact is assessed for the first measure and then, from that same pool, the psychiatry contact is assessed.

20.     As was discovered, and discussed between the parties after the implementation of the Stipulation, the pool should be generated under PM86 (mental health contacts) and then be used to monitor PM85 (psychiatry contacts).

21.     This is because the source document agreed to by the parties (AIMS Reports) only allows the monitor to pull mental health contacts (PM 86). After the mental health contacts are pulled, the files can then be reviewed to determine whether those inmates were recently discontinued from medications (psychiatry contact) and can be monitored under PM 85.

3

22.     As previously discussed between the parties and with the Court, the addition of the MH-3E classification will likely increase the sample size to reflect who should be included.

### Performance Measure 98

23.     Although these timeframes were being monitored under PM 39, after discussions with Plaintiffs' counsel, I agreed to monitor HNRs regarding routine medication issues under this measure as they are contained in the same mental health HNR log as the routine non-medication issues.

24.     The remaining three categories relate to emergent or urgent HNRs and are monitored under PM 37.  All urgent and emergent HNRs (regardless whether they are medical, mental health, or dental related) are placed on the sick call log and seen on sick call line by medical RNs.  All of these HNRs are monitored under performance measure PM 37.

25.     Measuring this same information under both PM 37 and PM 98 is unnecessary and will lead to inflated or deflated results.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of July, 2016.

_Nicole Taylor_

NICOLE TAYLOR, Ph.D., J.D., CCHP-MH