Kathleen E. Brody (Bar No. 026331)
Daniel Pochoda (Bar No. 021979)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org
         dpochoda@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen
Swartz, Sonia Rodriguez, Christina Verduzco,
Jackie Thomas, Jeremy Smith, Robert Gamez,
Maryanne Chisholm, Desiree Licci, Joseph
Hefner, Joshua Polson, and Charlotte Wells, on
behalf of themselves and all others similarly
situated*

**[ADDITIONAL COUNSEL LISTED ON
SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
         adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability
Law*

**[ADDITIONAL COUNSEL LISTED ON
SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-DKD |
| Plaintiffs, | **REPLY IN SUPPORT OF MOTION TO ENFORCE THE STIPULATION** |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

LEGAL132349283.1

## INTRODUCTION

Defendants are at war with the plain language of the agreement they voluntarily signed almost two years ago.  Their brief, entirely devoid of case law or any other authority, urges the Court to conclude that "30 days" doesn't really mean 30 days; that "every 90 days" means "once"; and that other provisions of the Stipulation should be either twisted beyond recognition or disregarded entirely.[1]  Defendants' arguments are meritless, and Plaintiffs' motion should be granted.[2]

Three fundamental misunderstandings pervade Defendants' brief.  The first is that because they find compliance with the Stipulation inconvenient, compliance is excused.  [*See, e.g.*, Defs.' Br. at 9:14-15 (staff find it difficult to count 30 days)]  It is not.  Impossibility is a defense to contract performance, but it is available only when performance would be "extremely costly or onerous."  *Taylor-Edwards Warehouse & Transfer Co. v. Burlington N. Inc.*, 715 F.2d 1330, 1336 (9th Cir. 1983).  More important, only an unanticipated change in circumstances will support a defense of impossibility.  *See Ocean Air Tradeways, Inc. v. Arkay Realty Corp.*, 480 F.2d 1112, 1117 (9th Cir. 1973) ("The party advancing the [impossibility] defense must prove that the events which he claims frustrated his performance were not reasonably foreseeable at the time of contracting").

---

[1]  *Cf.* Lewis Carroll, *Through the Looking Glass* 123 (1897) ("'When *I* use a word,' Humpty Dumpty said in rather a scornful tone, 'it means just what I choose it to mean— neither more nor less.'").

[2]  Defendants' insinuation that Plaintiffs' motion is somehow premature is not consistent with the facts.  It was Defendants, not Plaintiffs, who broke off negotiations about monitoring methodology and have failed to respond to Plaintiffs' correspondence on that issue for approximately four months.  [*See* Declaration of Corene Kendrick in Support of Plaintiffs' Reply in Support of Motion to Enforce the Stipulation, filed herewith, ¶¶ 2-10]  And Defendants rejected Plaintiffs' offer, shortly before filing this motion, to resume discussions in an effort to resolve the issues now before the Court.  [*See* Declaration of David C. Fathi in Support of Reply in Support of Motion to Enforce the Stipulation ("Fathi Decl."), filed herewith, ¶ 11 & Ex. 7]

1    There are no changed circumstances here.  Defendants knowingly entered into an

2    agreement setting forth certain requirements, and now refuse to abide by them.  This is a

3    manifestation of bad faith that the Court should not tolerate.

4    Defendants' second misconception is that the Stipulation requires the monitor to

5    look at data from only a single calendar month.  [*See, e.g.*, Defs.' Br. at 13:3-4

6    ("Defendants are only required to monitor data within the reporting month")]  This is a

7    limitation entirely of Defendants' own invention, without any support in the Stipulation.

8    Defendants correctly point out that the Stipulation requires that compliance be "measured

9    and reported monthly" (Doc. 1185 at 6), but this does not assist them.  "Monthly" means

10   "once a month."[3]  It defines the frequency with which monitoring occurs; it says nothing

11   about which data are examined by the monitor each month, and Defendants point to no

12   language in the Stipulation that imposes such a limitation.  Defendants' position is

13   particularly indefensible in light of the fact that several Performance Measures require that

14   an act be performed "every 90 days" or "every 180 days" which, as Defendants concede,

15   cannot be determined by looking only at data from a single month.  [Defs.' Br. at 5:9-11]

16   Finally, Defendants state that "Plaintiffs drafted the Stipulation."  [Defs.' Br.

17   at 2:22]  This is false.  Indeed, most of the mental health Performance Measures were

18   taken virtually verbatim from Defendants' Mental Health Technical Manual (MHTM).

19   [*See* Fathi Decl. ¶¶ 2-3 & Ex. 1 (table comparing Performance Measures and MHTM

20   provisions)]   Accordingly, any ambiguity in these Performance Measures must be

21   construed against Defendants.  *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514

22   U.S. 52, 62 (1995) (recognizing "the common-law rule of contract interpretation that a

23   court should construe ambiguous language against the interest of the party that drafted

24   it").

25

26

27
_____

28
[3] *Monthly,* Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/monthly.

## I.     A REQUIREMENT THAT AN ACT OCCUR "EVERY X DAYS" MEANS WHAT IT SAYS.

Disregarding the abundant authority that the unambiguous language of a contract will be enforced as written (see Pls.' Br. at 3), Defendants stubbornly insist that a requirement that a patient be seen "every 90 days" is satisfied if the patient has been seen once.

A concrete example illustrates the absurdity of Defendants' position.  Imagine that the May monitoring sample of medical records for PM 82 ("MH-3B prisoners shall be seen a minimum of every 90 days by a mental health clinician") includes two prisoners, one of whom was last seen on May 1, the other on April 30.  For the prisoner seen on May 1, Defendants will verify that the prisoner was seen on another occasion no more than 90 days previously—that is, was seen "every 90 days."  For the prisoner last seen on April 30, however, Defendants count the record as compliant as long as the April 30 date is no more than 90 days from the date of the monitor's review.  In other words, the first patient must be seen twice for the record to be compliant; the second patient will be deemed to have been seen "every 90 days" even if he was seen only once.  Defendants provide no justification for this bizarre result except to opine that compliance with the plain language of the Stipulation would be "nonsensical" (Defs.' Br. at 5:2).  Defendants should be ordered to comply with the Stipulation as written.

## II.    THE STIPULATION'S DEFINITION OF "SEEN" MEANS WHAT IT SAYS.

The Stipulation defines "seen," for purposes of mental health staff, as "an encounter that takes place in a confidential setting outside the prisoner's cell, unless the prisoner refuses to exit his or her cell for the encounter."[4]  Defendants claim that mental health groups are "a confidential setting."  They are not.  Regardless of whether groups

---

[4] Although the instant motion involves this definition only as it applies to the mental health Performance Measures (Pls.' Br. at 11:7-9), the definition applies to medical and dental care as well.

1   may be considered confidential in the community, they cannot be so considered in a

2   correctional setting, where information about prisoners' mental illnesses and treatment

3   can be used as a weapon in conflicts among prisoners, and mentally ill prisoners can be

4   targeted for assault or other victimization.   [See Declaration of Pablo Stewart, M.D.

5   ("Stewart Decl."), filed herewith, ¶¶ 3-4; see also Doc. 1627 ¶¶ 11-15][5]

6        Defendants admit that prisoners on suicide watch are seen while locked in their

7   cells, and they do not dispute that this is inconsistent with the Stipulation's definition of

8   "seen."  They do not attempt to establish an impossibility defense, but simply assert, with

9   no evidentiary support, that seeing these patients in a confidential setting "poses

10  significant security risks and results in decompensation of the inmate."  [Defs.' Br. at 7][6]

11  These assertions are groundless.  A confidential encounter with a clinician does not lead

12  to decompensation.  [Stewart Decl. ¶ 6]  And ADC mental health clinicians' offices

13  contain locked enclosures where the patient can be confined, allowing for a confidential

14  interaction while keeping the patient in a safe and secure environment.  [Id. ¶ 7][7]

15

16  _____

17      [5] The fact that Performance Measure 92 explicitly provides that prisoners may be
    seen in a group session means that for other Performance Measures that do not include

18  that explicit language, groups do not qualify.  See Serv. Steel Warehouse Co., L.P. v.
    McDonnel Grp., LLC, Civ. Action No. 14-1416, 2016 WL 128152, at *5 (E.D. La.

19  Jan. 11, 2016) ("When a party varies its language in a contract, courts interpreting the
    contract presume that the use of different terms signifies a different meaning"); cf. S.E.C.

20  v. McCarthy, 322 F.3d 650, 656 (9th Cir. 2003) ("the use of different words or terms
    within a statute demonstrates that Congress intended to convey a different meaning for

21  those words").

22      [6] Dr. Taylor's declaration sets forth no expert qualifications; accordingly, the
    purported expert opinions in ¶¶ 4, 14-15, and 25 must be disregarded.  See McNally v.

23  Univ. of Hawaii, 780 F. Supp. 2d 1037, 1050 (D. Haw. 2011) (striking expert's
    declaration when "no information has been provided to the court about her

24  qualifications").  Moreover, Dr. Taylor is an employee of Defendants, a status that "may
    bear heavily on witness credibility, bias, and the weight of the evidence."  Den Norske

25  Bank AS v. First Nat'l Bank of Boston, 75 F.3d 49, 58 (1st Cir. 1996).

26      [7] Defendants inexplicably allege that "Plaintiffs also agreed that for HC PM #94,
    … that [sic] encounters that occur at the cell front for inmates on suicide watch are

27  compliant."  [Defs.' Br. at 7:18-21]  This is false.  [See Pls.' Br. at 11:7-9 (identifying
    PM 94 as one of the measures for which Plaintiffs challenge Defendants' refusal to

28  comply with the Stipulation's definition of "seen"); see also Fathi Decl. ¶ 10]

1
2

### III.   "NINETY DAYS" AND "THREE CALENDAR MONTHS" ARE NOT INTERCHANGEABLE.

3      Defendants do not challenge the case law holding that "180 days" and "six

4  calendar months" have different meanings.  [*See* Pls.' Br. at 14]  But they doggedly insist

5  that they should be excused from complying with this requirement of the Stipulation

6  because compliance would be inconvenient.  [*See* Defs.' Br. at 9:14-15]  This argument

7  must be rejected for several reasons.

8      First, Defendants' claims of difficulty are simple *ipse dixit* by counsel, completely

9  unsupported by declarations or any other evidentiary material.  *See Barcamerica Int'l*

10 *USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2002) ("arguments

11 and statements of counsel are not evidence") (citation and internal quotation marks

12 omitted).  Second, even taking these unsupported assertions as true, Defendants fall far

13 short of establishing an impossibility defense to compliance, entirely failing to

14 demonstrate either extreme hardship or changed circumstances.[8]

15     Third, the Stipulation expresses time periods in days in some provisions, and in

16 calendar months in others.  *Compare* PM 61 ("every 36 months") *with* PM 84 ("every 180

17 days").  The use of these different terms is presumed to be deliberate and to convey

18 different meanings.  *See* n.5, *supra*.  Finally, Defendants' own Mental Health Technical

19 Manual (MHTM), from which many of these performance measures are taken virtually

20 verbatim, expresses requirements in terms of 30, 90, and 180 days.  [*See* Fathi Decl. ¶ 3 &

21 Ex. 1]  Defendants cannot be heard to argue that they are unable to comply with

22 requirements they themselves drafted.[9]

23 _____

24     [8] In fact, there are numerous free websites that will instantly and accurately
   calculate a date 30, 90, or 180 days in the future or in the past.  [*See* Fathi Decl. ¶ 4]

25     [9] Defendants claim that they are in substantial compliance with these provisions of
26 the Stipulation, but substantial compliance must be assessed *with regard to the*
   *requirements of the agreement*; it is not a license for one party to unilaterally rewrite those
27 requirements.  *See Rouser v. White,* ____ F.3d ____, 2016 WL 3361543, at *4 (9th Cir.
   June 17, 2016) ("Like terms in a contract, distinct provisions of consent decrees are
28 independent obligations, each of which must be satisfied before there can be a finding of

## IV.    DEFENDANTS MUST MONITOR REQUIREMENTS IN THE BODY OF THE STIPULATION.

Defendants' argument consists of a series of contradictions.  They claim that they "ensure that the items [sic] occur," but refuse to "monitor" them—the difference between these terms is not explained.  [Defs.' Br. at 3:1-4]  They claim that these requirements are "difficult or impossible" to monitor, but concede that they *were* monitored, until that monitoring was halted without explanation.  [Defs.' Br. at 3 nn.5, 6]

Unless Defendants monitor the requirements set forth in the body of the Stipulation, those requirements will be nullified.  For example, to confirm Defendants' compliance with ¶ 14 (language interpretation), Plaintiffs would need (1) a roster of all ADC prisoners who are not fluent in English, (2) a list of all such prisoners who had healthcare encounters each month, (3) a means of generating a random sample of those prisoners, (4) access to the medical records of all prisoners in the sample, and (5) documentation of the use of the language line or other interpretation service.  For ¶ 15 (heat intolerance), Plaintiffs would need (1) a roster of all ADC prisoners taking psychotropic medications, (2) a list of all such prisoners who suffered a heat intolerance reaction each month, and (3) for each such prisoner, documentation of all steps taken to prevent heat injury or illness including, for those prisoners transferred to a housing area where the temperature does not exceed 85 degrees Fahrenheit, documentation of the transfer and of periodic temperature readings.[10]

---

substantial compliance").   Defendants' bald assertion of substantial compliance is impossible to assess because they provide no data on the frequency with which they have complied with the Stipulation's requirements that various acts be performed at 30, 90, and 180 day intervals.

[10]   Protection of prisoners from heat injury and provision of interpreters for medical encounters are both required by the Eighth Amendment.  *See Graves v. Arpaio*, 623 F.3d 1043, 1049-50 (9th Cir. 2010) (affirming injunction that all prisoners taking psychotropic medications be housed in temperatures not exceeding 85 degrees Fahrenheit); *Anderson v. County of Kern*, 45 F.3d 1310, 1316-17 (9th Cir. 1995) (affirming injunction that Spanish-speaking prisoners be provided non-prisoner interpreters for medical encounters), *amended*, 75 F.3d 448 (9th Cir. 1995).

1    In short, without affirmative steps by Defendants, there is no way for Plaintiffs or

2    the Court to know whether Defendants are complying with these obligations, essentially

3    reading them out of the Stipulation.  Because "a contract should be construed to give

4    effect to all of its provisions and to prevent any of the provisions from being rendered

5    meaningless," *Scholten v. Blackhawk Partners*, 909 P.2d 393, 396 (Ariz. Ct. App. 1995),

6    the Court should not countenance such a result.

7    **V.    PM 33, 34, 75, AND 76 APPLY TO PAROLE VIOLATORS.**

8    Here again, the plain language of the Performance Measures is Defendants' worst

9    enemy.  PM 33 refers to "*all* inmates," and PM 75 and 76 refer to the prisoner's "arrival

10   into ADC."  There is no exclusion for parole violators.  Defendants urge a narrow and

11   technical construction of the word "intake" to exclude parole violators, but "[c]ontracts

12   are to be construed to give words their ordinary, common sense meaning."  *A Tumbling-T*

13   *Ranches v. Flood Control Dist. of Maricopa Cty.*, 204 P.3d 1051, 1058 (Ariz. Ct. App.

14   2008).  The ordinary, common sense meaning of "intake" is "the act of taking in or

15   receiving from outside."  [Fathi Decl. ¶ 5 & Ex. 4]  Thus, PMs 33, 34, 75, and 76 must

16   apply to all prisoners "receiv[ed] from outside" ADC, whether as first-time arrivals or

17   parole violators.[11]

18

19

20

21

22

_____

23   [11] Plaintiffs' brief cited the deaths of two parole violators who did not receive the
     protection of these Performance Measures. [Pls.' Br. at 12-13] Defendants say nothing at
24   all about one death, and imply that the other is irrelevant because the prisoner hanged
     himself a few hours before the time limit for his intake mental health assessment would
25   have expired. [Defs.' Br. at 8 n.11]  Of course it is entirely possible that he would have
     been seen, and his life saved, but for Defendants' refusal to apply the intake measures to
26   parole violators.  Defendants' statement that "parole violators receive a mental health
     screening and a nursing and physician physical," (Defs.' Br. at 8:15-16), is not true of this
27   prisoner, who received no attention of any kind from health care staff before his suicide.
28   [Doc. 1627 ¶ 23 & Ex. 1]

## VI.  INDIVIDUAL PERFORMANCE MEASURES

### A.  PM 85 ("MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medication").

Defendants do not dispute that (1) the monitoring protocol for this Performance Measure requires that ten MH-3D records be reviewed each month at each prison unit ("yard"); and (2) pursuant to this requirement, Defendants drew a sample of 68 MH-3D records at Perryville in March 2016.  [*See* Pls.' Br. at 15]  Defendants' decision to review only seven of the 68 records for this Performance Measure is improper, as are similar methods at other prison complexes.[12]

### B.  PM 86 ("MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication").

Defendants do not even attempt to claim that their monitoring methodology (determining whether the prisoner was seen once within the last 90 days) bears any relationship to the requirements of this Performance Measure.  This measure is taken directly from Defendants' MHTM.  [Fathi Decl. ¶ 2 & Ex. 1]  It is simple bad faith for Defendants to agree to this Performance Measure and then refuse to monitor it as written.

### C.  PM 94 ("All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse").

Defendants concede that they limit their monitoring of this Performance Measure to a single calendar month, even if a prisoner's time on suicide watch spans more than one calendar month.  [*See* Defs.' Br. at 12:18-20 (acknowledging that a prisoner may be on

---

[12]  Defendants' statement that "[i]n March of 2016, only seven records met this performance measure's requirements" (Defs.' Br. at 11:18-19) is false.  The only "requirement" for a record to be included in this sample is that it belong to a prisoner classified as MH-3D, and Defendants drew 68 such records at Perryville in March 2016. [Pls.' Br. at 15]  Similarly, in April 2016 Defendants drew 66 MH-3D records at Perryville and reviewed only nine for PM 85; in May they drew 62 and reviewed only ten. [*See* Fathi Decl. ¶ 6 & Ex. 5]  In all three months, Defendants' improper reduction of the sample size resulted in findings of 100% compliance.  [*Id.*]

suicide watch for three months)]  As explained above, such an arbitrary and dangerous limitation on monitoring finds no support in the language of the Stipulation.[13]

**D.      PM 95 ("Any prisoner discontinued from a suicide or mental health watch shall be seen … between 24 and 72 hours after discontinuation, between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation").**

Defendants admit that they count a record as compliant *even if only one of the three required contacts has occurred.*  [*See* Pls.' Br. at 16-17; Defs.' Br. at 13:2-4]  This simply cannot be reconciled with the language of the Performance Measure.  Dr. Stewart's declaration explaining the significant risk of patient injury or death posed by Defendants' failure to adhere to the plain language of the Stipulation, on this and other Performance Measures, is entirely unrebutted.  [*See* Doc. 1627][14]

**E.      PM 98 (Timely response to mental health HNRs).**

This Performance Measure requires Defendants to monitor the timeliness of responses to five categories of mental health HNRs.  [Pls.' Br. at 17:7-18]  Defendants admit that they have unilaterally decided not to monitor three of these five categories—those involving emergency mental health issues, urgent medication issues, and urgent non-medication issues.  [*Id.*; Defs.' Br. at 13:24-25][15]

---

[13]  Defendants misleadingly imply that a prisoner whose time on suicide watch spans more than one calendar month will, in fact, be monitored for the entirety of that time because his record will be reviewed in each of those months.  [Defs.' Br. at 12:26-28]  In fact, this is highly unlikely.  PM 94 requires that only ten records be drawn per prison complex (20 at ASPC-Eyman), and a new random sample is drawn every month.  Doc. 1185-1 at 34.  Thus at ASPC-Lewis, with a population of 5,887, the probability that the same record will be drawn in two consecutive months is vanishingly small.  [*See* ADC Daily Count Sheet, August 9, 2016, https://corrections.az.gov/sites/default/files/DAILY_COUNT/Aug2016/08092016_count_sheet.pdf]

[14]  As with PM 94, Defendants misleadingly imply that the same prisoner's record is reviewed in successive months.  [*See* Defs.' Br. at 13:10-15; n.13, *supra.*]

[15]  Defendants previously informed Plaintiffs that they monitored only one of the five categories (Fathi Decl. ¶ 9); they now claim that they monitor two.  This difference is immaterial, as Defendants are required to monitor all five categories, as they agreed to do.

1    Defendants' claim that these remaining categories are "monitored under HC PM

2  #37" (Defs.' Br. at 14:3) is highly misleading.  To monitor compliance with PM 37, a

3  sample is drawn from the universe of *all* HNRs, whether medical, mental health, or dental.

4  [Defs.' Br. at 13:26-14:3]   Mental health HNRs are typically a small percentage of the

5  total.  [*See* Fathi Decl. ¶ 7 & Ex. 6 (at ASPC-Winslow in October 2015, 545 medical

6  HNRs were submitted, 229 dental, and 11 mental health)]   Thus, as Dr. Taylor has

7  admitted, in a given month the sample drawn for PM 37 at a given prison may include *no*

8  mental health HNRs.  [Fathi Decl. ¶ 9]  By contrast, the sample drawn for PM 98 consists

9  *only* of mental health HNRs, so it is guaranteed that ten mental health HNRs (if that many

10  exist) will be reviewed at each prison unit each month.

11    Plaintiffs bargained for a separate Performance Measure focused exclusively on

12  mental health HNRs, and it is not for Defendants unilaterally to decide that such

13  protection is "unnecessary."  The Court should order Defendants to comply with PM 98 as

14  written.[16]

15                                **CONCLUSION**

16    Plaintiffs' Motion to Enforce the Stipulation should be granted in its entirety.

---

[16]  Defendants' proposal to nullify the bulk of PM 98 runs afoul of the rule that "[a] contract must be construed so that every part is given effect."  *Chandler Med. Bldg. Partners v. Chandler Dental Grp.*, 855 P.2d 787, 791 (Ariz. Ct. App. 1993).   And Defendants' claim that complying with PM 98 "will lead to inflated or deflated results" (Defs.' Br. at 14:4-5) is meritless.  [*See* Stewart Decl. ¶ 8 ("It is a fundamental principle of sampling methodology that taking a larger sample, or taking multiple samples, yields a result that more accurately reflects the population being sampled.")]

1    Dated:  August 12, 2016              **ACLU NATIONAL PRISON PROJECT**

2

3                                        By:   s/ David C. Fathi
                                              David C. Fathi (Wash. 24893)*
                                              Amy Fettig (D.C. 484883)**
4                                             Jamelia Natasha Morgan (N.Y.
                                              5351176)**
5                                             915 15th Street N.W., 7th Floor
                                              Washington, D.C. 20005
6                                             Telephone:  (202) 548-6603
                                              Email:    dfathi@npp-aclu.org
7                                                        afettig@npp-aclu.org
                                                         jmorgan@aclu.org
8
                                              *Admitted pro hac vice.  Not admitted
9                                              in DC; practice limited to federal
                                               courts.
10                                            **Admitted pro hac vice

11                                            Daniel C. Barr (Bar No. 010149)
                                              Amelia M. Gerlicher (Bar No. 023966)
12                                            John H. Gray (Bar No. 028107)
                                              **PERKINS COIE LLP**
13                                            2901 N. Central Avenue, Suite 2000
                                              Phoenix, Arizona 85012
14                                            Telephone:  (602) 351-8000
                                              Email:    dbarr@perkinscoie.com
15                                                       agerlicher@perkinscoie.com
                                                         jhgray@perkinscoie.com
16
                                              Kathleen E. Brody (Bar No. 026331)
17                                            Daniel Pochoda (Bar No. 021979)
                                              **ACLU FOUNDATION OF**
18                                            **ARIZONA**
                                              3707 North 7th Street, Suite 235
19                                            Phoenix, Arizona 85013
                                              Telephone:  (602) 650-1854
20                                            Email:    kbrody@acluaz.org
                                                        dpochoda@acluaz.org
21

22

23

24

25

26

27

28

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          ckendrick@prisonlaw.com

*Admitted *pro hac vice*

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com
          aamiri@jonesday.com

*Admitted *pro hac vice*

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, P.C.**
P. O. Box 91398
Tucson, Arizona 85752
Telephone:  (520) 477-1475
Email:    kirstin@eidenbachlaw.com

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com

*Admitted *pro hac vice*

Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:    jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;*
*Stephen Swartz; Sonia Rodriguez; Christina*
*Verduzco; Jackie Thomas; Jeremy Smith;*
*Robert Gamez; Maryanne Chisholm;*
*Desiree Licci; Joseph Hefner; Joshua*
*Polson; and Charlotte Wells, on behalf of*
*themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY
LAW**

By:    s/ Maya Abela
        Sarah Kader (Bar No. 027147)
        Asim Dietrich (Bar No. 027927)
        5025 East Washington Street, Suite 202
        Phoenix, Arizona 85034
        Telephone: (602) 274-6287
        Email:    skader@azdisabilitylaw.org
                    adietrich@azdisabilitylaw.org

        Rose A. Daly-Rooney (Bar No. 015690)
        J.J. Rico (Bar No. 021292)
        Jessica Jansepar Ross (Bar No. 030553)
        Maya Abela (Bar No. 027232)
        **ARIZONA CENTER FOR
        DISABILITY LAW**
        177 North Church Avenue, Suite 800
        Tucson, Arizona 85701
        Telephone: (520) 327-9547
        Email:
            rdalyrooney@azdisabilitylaw.org
                jrico@azdisabilitylaw.org
                jross@azdisabilitylaw.org
                mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability*
*Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2016, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

s/ D. Freouf