Kathleen E. Brody (Bar No. 026331)
Daniel Pochoda (Bar No. 021979)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org
dpochoda@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

No. CV 12-00601-PHX-DKD

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATUS REPORT REGARDING PROGRESS OF REMEDIATION PLAN (DOC. 1665)**

Plaintiffs, by and through their undersigned counsel, submit the following response to Defendants' Status Report Regarding Progress of Remediation Plan (Doc. 1665) ("Defs.' Br.").

## INTRODUCTION

Just as the Court feared, Defendants' Remediation Plan (Doc. 1609-01) (the "Remediation Plan") has amounted to nothing more than "conclusory statements about aspirational goals." [Amended Transcript of June 24, 2016 Status Conference ("Trans.") at 7:6-7] From the outset of the June 24, 2016 hearing, the Court maintained that Defendants' Remediation Plan "lack[ed] a sense of persuadability on its own standing." [*Id*. at 4:9-10] This reaction was based largely on the Court's observation that the Remediation Plan was not "knowledgeable enough about the problem, specific enough" and lacked "enough focus" to ensure even a "reasonable shot [at] accomplishing what" it purported to do. [*Id*. at 6:4-7] The Remediation Plan was plagued by vague assertions "ranging from the absurd" that lacked any specific support or evidentiary basis. [Trans. at 5:14]

Unfortunately, Defendants' Status Report (Doc. 1665), and the state of Defendants' remediation, suffers from the same inadequacies. Defendants have presented the Court and Plaintiffs with another document full of aspirational statements and promises, vague descriptions of magic-bullet solutions, meaningless buzzwords ("SWOT analysis," "statewide re-boot training"), and revised staffing duties that only increase the burden on overworked health care staff. The specificity, thoughtfulness, and evidentiary support that the Court made clear in June that it expected are nowhere to be found. Defendants present no evidence of a unified plan, no details of the new programs they allege are already in place or nearly in place (such as job descriptions for newly created administrative positions; evidence showing what the centralized HNR system is and how it works; or written policies and procedures in place to guide staff through implementing and using the new system), and no details of how Defendants are holding staff accountable for the new

policies or how they plan to track compliance, if at all, outside the CGAR rubric.[1] [*See* Declaration of Todd R. Wilcox, M.D. ("Wilcox Decl."), filed concurrently herewith, ¶¶ 6-11]

Defendants seize on isolated months of compliance here and there as indicating that they have turned the corner and definitively repaired their broken health care system. But "[a] good or lucky day is not a state of compliance. Nor is the dubious state in which a past … problem is not recurring at the moment but the cause of that problem has not been completely and clearly eradicated." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 69 (1987) (Scalia, J., concurring in part and concurring in the judgment). Review of the CGAR reports over the last year shows that an institution's one or two months of compliance on a given Performance Measure is often followed by a sustained period of noncompliance. [*See generally* Declaration of Corene Kendrick ("Kendrick Decl.", filed concurrently herewith, Ex. 1; Doc. 1535 at 10-24][2]

The Court warned in June that unless Defendants provided enough data in their Status Report to convince the Court that they truly "understand what the problem is," the Court would take action. [Trans. at 5:8] Defendants have failed to comply, instead presenting the Court and Plaintiffs with a status report that looks much like the insufficient Remediation Plan they presented in June 2016. Plaintiffs request that the Court now take further action to enforce compliance, as outlined below.

---

[1] Astonishingly, *none* of the factual assertions in Defendants' submission are supported by documents, declarations, or any other evidentiary material. Defendants ask the Court to rely entirely upon the unsworn assertions of counsel, but "arguments and statements of counsel are not evidence[.]" *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2002) (citation and internal quotation marks omitted).

[2] When citing a document previously filed in this case, page references refer to the page numbers assigned by the ECF system, except for Defendants' Brief, which is cited by Defendants' pagination. Unless otherwise specified, all citations in this document to exhibits are to the exhibits to the Kendrick Declaration filed concurrently herewith.

## I. DEFENDANTS HAVE FAILED TO ADDRESS THEIR SERIOUS AND PERSISTENT STAFFING SHORTAGES

Plaintiffs' Motion to Enforce the Stipulation, filed April 11, 2016, showed that Defendants' own documents acknowledge chronic and severe shortages of health care staff. [*See* Doc. 1535 at 31-33] Defendants' documents from more recent months continue to show staffing shortages, with hundreds of patients not receiving needed care due to large and persistent backlogs. [*See, e.g.*, Ex. 3 at ADCM496804, ADCM497078, ADCM497121, ADCM497211, Florence CQI minutes, January, February, April, and May 2016 (noting a chronic care backlog never less than 202 and as high as 313); Ex. 4, Lewis CQI minutes, April 13, 2016 (noting mental health backlog of 96, psychiatry backlog of 380, and a chronic care backlog of 252) (Ex. 4 at ADCM497148); May 11, 2016 (noting mental health staff shortages—"lack of staffing has led to vacancies on many of the yards") (Ex. 4 at ADCM497240-41); Tucson CQI minutes, January 14, 2016 (noting a chronic care backlog of 473) (Ex. 7 at ADCM496855); February 4, 2016 (noting a chronic care backlog of 378, a provider line backlog of 798, a mental health backlog of 396 and psychiatry backlog of 598) (Ex. 7 at ADCM496903); March 3, 2016 (noting a chronic care backlog of 250, a provider line backlog of 584, a mental health backlog of 478 and a psychiatry backlog of 450; "large backlog due to illnesses and loss of staff") (Ex. 7 at ADCM496979); April 14, 2016 (noting a chronic care backlog of 225, a provider line backlog of 197, a SMI (seriously mentally ill) backlog of 396, mental health backlog of 488, and psychiatry backlog of 585; "these could be considered access to care issues") (Ex. 7 at ADCM539492); May 19, 2016 (noting a chronic care backlog of 203 and a provider line backlog of 294) (Ex. 7 at ADCM497266)]

But with few exceptions, Defendants' Remediation Plan does not include the hiring of additional patient care staff.[3] Rather, Defendants propose to "cover shifts with

---

[3] Some of the hires described by Defendants are administrators or other non-patient care staff. [*See* Defs.' Br. at 2 ("nursing recruiter"); *id*. at 4 ("Inventory Control" position)] And it is unclear whether these hires represent additional staff positions, or merely new incumbents in existing positions, resulting in no net increase in staffing.

supervisor staff" (Defs.' Br. at 8); "utilize[] RNs and medical providers from other facilities or the corporate offices who work at the facility on a temporary basis" (*id*. at 9); and "utilize locum tenens providers, available regional providers, tele-med providers, and providers assigned to other complexes" (*id*. at 11, 14). "[S]taff that are devoting all of their time putting out fires, as appears to be the case in Arizona, cannot simultaneously build a functional and sustainable health care delivery system." [Wilcox Decl. ¶ 10] Temporarily shifting health care staff from one understaffed prison to another is self-evidently not a viable strategy for achieving and maintaining compliance at ADC's ten prison complexes. [Wilcox Decl. ¶¶ 7-11]

## II. DEFENDANTS' PLAN FOR REMEDIATION OF INDIVIDUAL HEALTHCARE PERFORMANCE MEASURES IS REPETITIVE, VAGUE AND UNPERSUASIVE[4]

Defendants provide a Status Report on most of the healthcare performance measures addressed in the Remediation Plan: HCPM 11, 13, 14, 37, 39, 46, 54, 66, 92, 93, and 98.[5] Defendants' Status Report is extremely repetitive and vague, citing the same broad-stroke solutions for many of the measures and demonstrating the same lack of knowledgeable focus the Court found wanting in the Remediation Plan itself. [Trans. at 6:2-7; *see* Wilcox Decl. ¶ 6] Nowhere are any of these solutions supported by actual evidence or data. The compliance data Defendants do cite is cherry-picked in much the same way it was in the Remediation Plan, once again striking a tone of "hey, we've got two out of eight." [Trans. at 4:20-21] Defendants repeatedly claim that those institutions whose compliance scores have gotten worse will miraculously improve with only the

[4] Because much of Defendants' Status Report consists of cut and pasted, repeated paragraphs, Plaintiffs will sometimes address categories of performance measures rather than individual measures. Additionally, because Defendants' Status Report lacks specificity, Plaintiffs focus on high-level deficiencies. However, Plaintiffs' decision not to address every single one of Defendants' proposals line by line does not indicate their agreement with or approval of such proposals.

[5] Defendants do not address PM 85; Plaintiffs address it below. Similarly, although Defendants assert that "in-person meetings [to address noncompliance] are being held at each facility found by the Court to be non-compliant" (Defs.' Br. at 1), there is no mention of such a meeting at ASPC-Phoenix, which the Court found noncompliant with PM 46 and 54. [*See* Doc. 1583 at 2]

passage of time. For example, Defendants state that they will investigate Lewis' drop in compliance with Performance Measure 13, but that they "expect compliance to return to above 80% again," despite a four month trend of failing compliance scores and no definitive remedial plan. [Defs.' Br. at 5] This bald assertion, supported by nothing more than Defendants' unfounded optimism, is demonstrative of Defendants' profound lack of understanding regarding the root cause of their compliance failures. As they have in the past, Defendants have stubbornly declined to study the causes of their noncompliance, choosing instead to apply band-aids that, to the extent they have any impact on compliance, only affect it for short spurts of time. Also conspicuously missing is any of the "raw data"[6] from July 2016 that Defendants maintain demonstrates dramatic and sustainable compliance improvements.[7]

**A. Pharmacy Performance Measures (HCPM 11, 13, and 14)**

Defendants' state of compliance with the Pharmacy Performance Measures at the institutions for which the Court found them noncompliant can be summarized as follows:

**__Performance Measure 11__** (Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT.): Eyman, Florence, Lewis, Tucson, Winslow, and Yuma.

| | Jan | Feb | Mar | April | May | June |
|---|---|---|---|---|---|---|
| Eyman | 58 | 66 | 62 | 66 | 60 | 68 |
| Florence | 78 | 77 | 80 | 70 | 72 | 78 |
| Lewis | 42 | 38 | 30 | 36 | 48 | 60 |
| Tucson | 78 | 78 | 66 | 73 | 81 | 77 |

[6] By data, Plaintiffs mean actual numbers and measurements, as opposed to unsupported assertions by counsel.

[7] Defendants repeatedly cite "preliminary results for July 2016" which, they assure the Court, show compliance. [Defs.' Br. at 15-18] These mysterious documents have not been provided to the Court or to Plaintiffs, and in any event they have no status under the Stipulation, which provides that compliance is to be determined based on the monthly CGAR reports. [*See* Doc. 1185 at ¶¶ 9-10 (referring to "MGAR reports;" the name was later changed to CGAR reports)] The most recent CGARs that have been produced are those for June 2016. [Kendrick Decl. ¶ 3]

| | Jan | Feb | Mar | April | May | June |
|---|---|---|---|---|---|---|
| Winslow | 87 | 90 | 30 | 90 | 93 | 93 |
| Yuma | 68 | 78 | 83 | 72 | 83 | 80 |

[Ex. 1 at 1][8]

**Performance Measure 13** (Chronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication): Douglas, Eyman, Florence, Lewis, Perryville, Tucson, and Yuma.

| | Jan | Feb | Mar | April | May | June |
|---|---|---|---|---|---|---|
| Douglas | 88 | 84 | 97 | 97 | 95 | 64 |
| Eyman | 79 | 76 | 82 | 65 | 72 | 83 |
| Florence | 56 | 70 | 58 | 69 | 55 | 70 |
| Lewis | 80 | 80 | 76 | 67 | 73 | 56 |
| Perryville | 43 | 52 | 50 | 72 | 63 | 65 |
| Tucson | 66 | 75 | 89 | 71 | 89 | 86 |
| Yuma | 98 | 98 | 84 | 84 | 92 | 92 |

[Ex. 1 at 1]

**Performance Measure 14** (Any refill for a chronic care or psychotropic medication that is requested by a prisoner between three and seven business days prior to the prescription running out will be completed in a manner such that there is no interruption or lapse in medication.): Douglas, Eyman, Florence, Lewis, Perryville, Tucson, and Yuma.

| | Jan | Feb | Mar | April | May | June |
|---|---|---|---|---|---|---|
| Douglas | 80 | 85 | 90 | 93 | 100 | 100 |
| Eyman | 48 | 11 | 31 | 14 | 97 | 83 |
| Florence | 66 | 31 | 58 | 45 | 96 | 92 |
| Lewis | 19 | 7 | 8 | 9 | 95 | 84 |
| Perryville | 62 | 78 | 60 | 82 | 100 | 98 |
| Tucson | 67 | 63 | 65 | 55 | 86 | 84 |
| Yuma | 38 | 50 | 56 | 46 | 100 | 95 |

[Ex. 1 at 1-2]

8 In this and other charts in this document, noncompliant months are shaded in yellow. Accordingly, this document is best read on-screen, or printed on a color printer.

Non-compliance with the Pharmacy Performance Measures continues to be widespread. [*See*, *e.g.*, Ex. 9 at ADCM542261, Eyman CAPs, June 2016, PM 11; Ex. 10 at ADCM542276, Florence CAPs, June 2016, PM 14; and Ex. 14 at ACDM542499, Yuma CAPs, June 2016, PM 14; *see also* Ex. 8 at ADCM496915, Yuma CQI Minutes, February 11, 2016 (stating that nursing staff does not "have enough nursing to pass medications and do nurse line; there are currently 9 nursing vacancies")] These lapses "result in the advancement of disease process." [Ex. 9 at ADCM542261, Eyman CAPs, June 2016, PM 11] Defendants attribute these lapses largely to a lack of medical staff. [*See*, *e.g.*, Ex. 11 at ADCM542284-285, Lewis CAPs, June 2016 (noting that non-compliance with PM 13 is "provider driven and largely related to decline in provider support staffing."); Ex. 13 at ADCM542454, Tucson CAPs, June 2016, PM 13 (noting "lack of medical and MH providers to address medication renewals."); and Ex. 12 at ADCM542398, Perryville CAPs, June 2016, PM 14 (noting that "the nurse has to speak to the provider to have them renew the medication. This all takes time and during that time the inmate may have run out of medication.")]

Defendants' status report on compliance with the Pharmacy Performance Measures is rife with unsupported and vague solutions, which Defendants fail to describe with any specificity. Defendants' "solution" consists largely of generating even more paperwork than they already do and then relying on high-level staff to review these new checklists to confirm that medical and correctional staff are complying with new protocols, but these checklists are not included in Defendants' status report. For example, "supervisors now review the updated clinic stock lists to ensure each facility is fully stocked" in order to improve compliance with Performance Measure 11. [Defs.' Br. at 4] This statement is the extent of detail Defendants give regarding this solution. They do not provide a written protocol for how and when the stock lists should be reviewed. Moreover, whatever this new protocol consists of, it seems to have done little to achieve required compliance thresholds. While Florence has indeed improved its scores, it is still *not* compliant. [*See*

*id*. (noting that Florence has seen improved compliance)] More importantly, Defendants quickly gloss over all the other institutions, whose compliance remains failing. [*Id*.]

Defendants again take refuge in vagueness when describing the new "collaborative" interface between the electronic medical records and their pharmacy software and the tickler system for medication renewal. [Defs.' Br. at 6-8] Instead of supporting these solutions with data, a comprehensive description of *how* the plans work, or a declaration from an IT or pharmacy staff member, Defendants offer only the sunny prediction that these new programs will improve compliance. [*Id*. at 7]

Similarly, Defendants report that their new pharmacy vendor has conducted a SWOT[9] analysis to identify areas in need of improvement. [Defs.' Br. at 2, 6, 7] However, Defendants do not include this analysis with their Status Report, leaving its findings, its solutions, and its format a complete mystery to the Court and Plaintiffs.

More concerning to Plaintiffs, however, is the trend throughout Defendants' plan to improve the Pharmacy Performance measures by simply heaping additional tasks onto medical staff without increasing the number of staff on the ground. As Dr. Wilcox noted, Defendants' plan does little more than charge existing medical staff with putting out compliance fires; it does nothing to build a sustainable and functional healthcare system. For example, in response to Performance Measure 11, Defendants now require nurses to fill out incident reports when medication is not distributed. [Defs.' Br. at 4] While this solution might have a positive impact in a well-functioning system, Defendants' system is so broken that sparse nursing staff already struggle to complete basic medical tasks.

The few staffing additions or newly-filled vacancies remain vague and devoid of any substantive details that would demonstrate the existence of a unified plan, such as job descriptions. For example, Defendants report that they have added "three tele-psychiatry systems and an additional telemedicine cart to the maximum custody unit at Rast Unit."

[9] Strength, Weakness, Opportunity, and Threat Analysis.

[Defs.' Br. at 6] However, Defendants fail to provide any data on how often, if at all, these telemedicine systems are used.[10]

Ultimately, Defendants fail to provide enough specifics about the broad solutions they list and about how these solutions are being implemented and impacting compliance for Plaintiffs or the Court to conduct any meaningful assessment.

**B. Medical Care Performance Measures (HCPM 37, 39, 46, 54, 66)**

Defendants' recent rate of compliance with the Medical Care Performance Measures at the institutions for which the Court found them noncompliant are summarized as follows:

**Performance Measure 37** (Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need).): Eyman, Florence, Lewis, Tucson, Winslow, and Yuma.

| | Jan | Feb | Mar | April | May | June |
|---|---|---|---|---|---|---|
| Eyman | 60 | 52 | 48 | 22 | 36 | 28 |
| Florence | 48 | 55 | 63 | 62 | 68 | 61 |
| Lewis | 38 | 42 | 28 | 42 | 32 | 24 |
| Tucson | 59 | 75 | 74 | 64 | 80 | 61 |
| Winslow | 93 | 87 | 80 | 80 | 90 | 80 |
| Yuma | 66 | 54 | 52 | 40 | 42 | 20 |

[Ex. 1 at 2]

**Performance Measure 39** (Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointment will be seen within fourteen calendar days of the referral): Eyman, Florence, Lewis, Perryville, and Tucson.

[10] It also appears that "telemedicine" is not effective in delivering actual patient care. [*See* Ex. 7, Tucson CQI minutes, Feb. 4, 2016, at ADCM496903 ("We have a high occurrence of refusals for tele-med, various reasons, most don't want to be seen on camera for their condition"); March 3, 2016, at ADCM496979 ("We had 15 tele-med refusals at Rincon")]

| | Jan | Feb | Mar | April | May | June |
|---|---|---|---|---|---|---|
| Eyman | 65 | 69 | 49 | 33 | 79 | 60 |
| Florence | 77 | 78 | 64 | 54 | 63 | 66 |
| Lewis | 100 | 75 | 97 | 100 | 95 | 71 |
| Perryville | 54 | 54 | 52 | 44 | 48 | 66 |
| Tucson | 59 | 50 | 80 | 69 | 78 | 58 |

[*Id.* at 2-3]

**Performance Measure 46** (A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison.): Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma.

| | Jan | Feb | Mar | April | May | June |
|---|---|---|---|---|---|---|
| Douglas | 67 | 100 | 90 | 84 | 88 | 67 |
| Eyman | 74 | 74 | 42 | 72 | 86 | 78 |
| Florence | 32 | 44 | 42 | 37 | 35 | 47 |
| Lewis | 84 | 79 | 72 | 72 | 88 | 76 |
| Perryville | 46 | 58 | 28 | 32 | 38 | 40 |
| Phoenix | 61 | 78 | 80 | 82 | 82 | 82 |
| Tucson | 55 | 52 | 60 | 62 | 36 | 51 |
| Yuma | 65 | 52 | 84 | 82 | 76 | 82 |

[*Id.*at 3]

**Performance Measure 54** (Chronic disease inmates will be seen by the provider as specified in the inmate's treatment plan, no less than every 180 days unless the provider documents a reason why a longer time frame can be in place.): Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma.

| | Jan | Feb | Mar | April | May | June |
|---|---|---|---|---|---|---|
| Eyman | 82 | 82 | 96 | 94 | 74 | 82 |
| Florence | 70 | 67 | 45 | 87 | 88 | 92 |
| Lewis | 96 | 92 | 89 | 92 | 83 | 78 |
| Perryville | 68 | 76 | 72 | 88 | 86 | 94 |
| Phoenix | 96 | 87 | 90 | 97 | 98 | 100 |

| | Jan | Feb | Mar | April | May | June |
|---|---|---|---|---|---|---|
| Tucson | 53 | 63 | 66 | 81 | 81 | 80 |
| Yuma | 80 | 72 | 44 | 96 | 96 | 90 |

[*Id.*]

**Performance Measure 66** (In an IPC, a Medical Provider encounters will occur at a minimum every 72 hours.): Florence, Lewis, and Tucson.

| | Jan | Feb | Mar | April | May | June |
|---|---|---|---|---|---|---|
| Florence | 90 | 90 | 90 | 80 | 50 | 70 |
| Lewis | 100 | 80 | 80 | 70 | 30 | 30 |
| Tucson | 80 | 80 | 70 | 80 | 30 | 40 |

[*Id.* at 4]

Defendants' noncompliance with the Medical Performance Measures is as widespread and catastrophic as with the Pharmacy Performance Measures. Staffing shortages continue to plague Defendants' dysfunctional system, requiring "all yards and staff … to compensate for the shortage of providers." [Ex. 10 at ADCM589040, Florence CAPs, July 2016, PM 39] And the shortages extend to all medical personnel. In June 2016, Lewis had so few nurses that LPNs were directed to see patients and subsequently have their examinations reviewed by an RN in order to maintain compliance with Performance Measure 37. [Ex. 11 at ADCM542296-ADCM542297, Lewis CAPs, June 2016, PM 37; *see also* Ex. 11 at ADCM542279, Lewis CAPs, June 2016, PM 46 (noting that noncompliance was "highly related to staffing need."); *see also* Ex. 11 at ADCM542307, Lewis CAPs, June 2016, PM 47] In the absence of adequate staff, medical care is not being provided within the timeframes set forth in the Stipulation, resulting in a possible "negative impact on patient care." [Ex. 9 at ADCM542266, Eyman CAPs, June 2016, PM 46; *see also* Ex. 11 at ADCM542288, Lewis CAPs, June 2016, PM 54 (noting that patients with "chronic disease are not being consistently seen by the provider as specified"); Ex. 12 at ADCM542365, Perryville CAPs, June 2016, PM 39 (noting that "The volume of inmates who are scheduled for the provider line is high" so "[n]ot all inmates are being seen within timeframe"); Ex. 13 at ADCM542460-461,

Tucson CAPs, June 2016, PM 39 (noting that "[r]outine provider referrals are not happening within timeframe"); Ex. 12 at ADCM542393, Perryville CAPs, June 2016, PM 46 (noting that "[t]he providers are not reviewing the labs within timeframe"); Ex. 13 at ADCM542477, Tucson CAPs, June 2016, PM 46 (noting that there is a "lack of onsite providers" contributing to noncompliance); Ex. 13 at ADCM542479, Tucson CAPs, June 2016, PM 47 (stating that "medical providers are not communicating [lab] results within timeframe")]

Similar to Defendants' report on the Pharmacy Performance Measures, Defendants' discussion regarding the implementation of their Remedial Plan for the

Medical Care Performance Measures consists largely of nebulous, broad-stroke solutions with no evidentiary support, or short-term "blitzes" that may temporarily inflate compliance at a single institution (often at the expense of the performance at other institutions) but offer no long-term solutions.

Defendants' Status Report indicates that they have implemented measures to "help get it into compliance" at complexes not meeting compliance thresholds. [Defs.' Br. at 8] Defendants' own wording betrays the fatal deficiency in their plan. Their focus is not on how to achieve and *maintain* compliance, or build a sustainable system of healthcare. It is on achieving compliance at an institution just long enough to satisfy the Court. Certainly no sustainable, well-functioning healthcare system can be built on, or needs, "blitzes." [*Id.* at 10] "Blitzes" are exactly the type of band-aid measure that Defendants rely on to falsely inflate compliance for short periods of time. For example, ASPC-Perryville, which was *not* one of the institutions found noncompliant by the Court for Performance Measure 37 in the April order, has now been below the compliance requirements every month in 2016, showing that Defendants' whack-a-mole approach of moving limited numbers of health care staff around to different institutions for a "blitz" is not a sustainable, long term plan for compliance.[11]

[11] Perryville's 2016 scores for PM 37 are: January (70%); February (72%); March (70%), April (48%), May (52%), June (56%). [Ex. 1 at 2] Similarly, Yuma prison, which

Just as they did with the Pharmacy Performance Measures, Defendants pile on their current health care employees a host of additional responsibilities (e.g., medical staff now coordinate with security to arrange escorts (Defs.' Br. at 8; and medical staff must now see 15 patients each day and dedicate an hour to administrative tasks. [*Id.* at 10, 11, 13] [*See, e.g.*, Ex. 6 at ADCM497105, Phoenix CQI Minutes, February 10, 2016 (noting that "Dr. Epstein replied that it is difficult to meet the productivity requirements on seeing 15 inmates a day while also reviewing all labs, especially since the complex has recently lost Provider positions that will not be filled.")]

New review and accountability measures lack specificity as well. The medical director is now reviewing diagnostic reports at each complex, but Defendants give no indication that they have created a systematic method for identifying those reports the medical director needs to review or to indicate that such reviews are timely completed. [Defs.' Br. at 12] Similarly, Defendants indicate that the Regional Medical Director conducts monthly training, as necessary. [*Id.*] They do go so far as to list the date of the last training, but they do not indicate the subject of the training or provide any of the training materials. They also fail to indicate who actually attended the training. These are exactly the kind of details that lend credibility to a remediation plan and that are lacking throughout the Status Report.

**C. Mental Health Performance Measures (HCPM 85, 92, 93, and 98)**

**Performance Measure 85** (MH-3D prisons shall be seen by a mental health provider within 30 days of discontinuing medications): Eyman, Florence, Lewis, Perryville, Tucson, and Yuma.

Although Defendants do not discuss this Performance Measure in their status report, all six institutions for which the Court found noncompliance remain chronically noncompliant with the exception of Perryville.

---

was not one of the institutions found noncompliant for Performance Measure 39, was out of compliance five out of six months in 2016: January (74%); February (64%); March (66%); April (67%); May (84%); June (51%). [*Id.* at 3]

| | Jan | Feb | Mar | April | May | June |
|---|---|---|---|---|---|---|
| Eyman | 75 | 17 | 22 | 75 | 80 | 75 |
| Florence | 17 | 22 | 57 | 33 | 57 | 75 |
| Lewis | 0 | 18 | 0 | 14 | 29 | 58 |
| Perryville | 75 | 88 | 100 | 100 | 100 | 100 |
| Tucson | 0 | 33 | 6 | 28 | 38 | 23 |
| Yuma | 50 | 80 | 100 | 67 | 50 | 50 |

[Ex. 1 at 4][12]

Defendants' documents show that their noncompliance with this Performance Measure is caused by inadequate staffing. [Ex. 11 at ADCM540997, Lewis CAPs, April 2016, PM 85 ("Several inmates have been seen but were late due to the past [sic] not having providers cover this")] They further acknowledge that noncompliance with this measure poses a risk to patient health and safety. [Ex. 14 at ADCM538996, Yuma CAPs, October 2015, PM 85 ("Patients not having a follow up after having the medications stopped after 30 days may have a relapse and need medications re-started")] A prisoner who committed at Eyman on February 16, 2016 had not been seen as required by PM 85 after discontinuing medication a few months before his death. [*See* Ex. 15 at ADCM497295]

**<u>Performance Measure 92</u>** (MH-3 and above prisoners who are housed in maximum custody shall be seen by a mental health clinician for a 1:1 or group session a minimum of every 30 days): Eyman, Florence, Lewis, Perryville, and Tucson.

| | Jan | Feb | Mar | April | May | June |
|---|---|---|---|---|---|---|
| Eyman | 85 | 95 | 100 | 85 | 70 | 78 |
| Florence | 95 | 100 | 95 | 85 | 95 | 95 |
| Lewis | 70 | 70 | 50 | 30 | 30 | 52 |
| Perryville | 90 | 70 | 50 | 70 | 100 | 100 |
| Tucson | 100 | 60 | 50 | 50 | 100 | 100 |

[Ex. 1 at 4]

[12] As explained in Plaintiffs' Motion to Enforce the Stipulation (*see* Doc. 1625 at 19; Doc. 1654 at 9), Defendants' purported 100% compliance at Perryville is based on their decision to review only a small fraction of the number of records required by the Stipulation.

Defendants' statement that "Lewis has trended up" (Def. Br. at 16) is hardly encouraging when the trend in question is from 30% to 52% compliance, and the facility has been noncompliant for 12 of the last 14 months. [*See* Doc. 1535 at 23] Moreover, although the CGARs show Perryville at 100% compliance in May and June 2016, the June 2016 Perryville CAPs state that "not all inmates were seen within timeframe," which calls into question Defendants' recent and sudden finding of perfection at the institution. [Ex. 12 at ADCM542380]

On this measure too, Defendants' documents acknowledge that lack of staff is a cause of noncompliance. [Ex. 11 at ADCM541268-69, Lewis CAPs, May 2016, PM 92 ("Unfortunately, lack of staff has caused this unit to have only one provider, when two full-time is necessary")] But Defendants' Remedial Plan includes no increase in staffing; it consists instead of piling more duties on the Mental Health Lead and Facility Health Administrator (FHA).[13]

**Performance Measure 93** (Mental health staff (not to include LPNs) shall make weekly rounds of all MH-3 and above prisoners who are housed in maximum custody): Eyman, Florence, Lewis, Tucson.

| | Jan | Feb | Mar | April | May | June |
|---|---|---|---|---|---|---|
| Eyman | 63 | 37 | 45 | 90 | 100 | 95 |
| Florence | 90 | 100 | 90 | 100 | 89 | 100 |
| Lewis | 100 | 90 | 100 | 90 | 100 | 89 |
| Tucson | 67 | 100 | 100 | 100 | 100 | 100 |

[Ex. 1 at 4-5]

Defendants' documents acknowledge that noncompliance with this Performance Measure poses a risk to patient health and safety. [*See* Ex. 9 at ADCM540513, Eyman CAPs, March 2016, PM 93 ("If weekly rounds of MH-3 prisoners and above are not being completed in a timely manner, there could be mental health concerns for the prisoners")]

---

13 [*See* Wilcox Decl. ¶ 8 ("heaping more duties and arbitrary productivity quotas on existing staff is virtually guaranteed to create additional systemic issues, as staff are forced to delay performance of previously assigned tasks in order to put out fires")]

Although the CGARs show Eyman to be compliant in April, May, and June 2016, the June 2016 Eyman CAPs for this Performance Measure tell a different story: "The rounds were not being completed per protocol … The Behavioral Health Technicians were placed on administration [sic] leave for not completing their rounds per policy and ethical standards." [*Id.* at ADCM542267]

**Performance Measure 98** (Mental health HNRs shall be responded to within the timeframes set forth in the Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0): Eyman, Florence, Lewis, and Winslow.

| | Jan | Feb | Mar | April | May | June |
|---|---|---|---|---|---|---|
| Eyman | 85 | 93 | 73 | 48 | 62 | 70 |
| Florence | 80 | 94 | 92 | 72 | 74 | 84 |
| Lewis | 64 | 67 | 79 | 83 | 79 | 82 |
| Winslow | 64 | 81 | 63 | 56 | 50 | 50 |

[Ex. 1 at 5]

Defendants' documents acknowledge that noncompliance with these Performance Measures poses a risk to patient health. [*See* Ex. 9 at ADCM540093, Eyman CAPs, February 2016, PM 98 ("Quality care can be negatively impacted without prompt response")] They also acknowledge that noncompliance with this measure results from inadequate staffing. [*See* Ex. 11 at ADCM541263, Lewis CAPs, May 2016, PM 98 ("There were two yards not covered by a psych associate and no one was answering the HNR's")] Despite this acknowledgment, Defendants' remedial plan for this Performance Measure includes no provisions for increased mental health staffing, but again proposes to add more duties to existing staff.

Moreover, the foreseeable consequences of Defendants' decision to rob Peter to pay Paul, shifting health care staff from one understaffed facility to another, can be seen in the recent deterioration in this Performance Measure at Perryville and Tucson, the subject of a Notice of Substantial Noncompliance served on Defendants on July 29, 2016 (Ex. 2):

| | Jan | Feb | Mar | April | May | June |
|---|---|---|---|---|---|---|
| Perryville | 79 | 95 | 77 | 76 | 74 | 59 |
| Tucson | 76 | 85 | 45 | 61 | 62 | 74 |

[Ex. 1 at 5]

Finally, more than ten months after Plaintiffs formally gave notice of substantial noncompliance with this Performance Measure at ASPC-Winslow (*see* Doc. 1537-2 at 33), Defendants suddenly assert *for the first time* that the noncompliant CGAR scores are actually erroneous, and that "[c]orrected CGARs will be provided as soon as they are available," (Defs.' Br. at 19), presumably showing compliance. Defendants should not be permitted to retroactively rewrite CGAR scores based on the vague and unsupported assertions of counsel that the institution was really in compliance but the information was somehow recorded incorrectly. The Court should require a declaration based on personal knowledge explaining in detail the alleged "misunderstanding about the auditing procedures" and how that "misunderstanding" affected the CGAR scores, as well as production of the underlying documents to Plaintiffs' counsel.

**III. REMEDY REQUESTED**

Defendants were given the chance to provide the Court and Plaintiffs with sufficient details about their Remediation Plan and its implementation to assuage the fears, expressed by both the Court and Plaintiffs at the June 24, 2016 hearing, that the plan was vague and wholly inadequate. Defendants chose not to heed the Court's warnings. The Status Report is just as short on details as was the Remediation Plan and the data just as cherry-picked. Moreover, the "raw data" from July 2016 Defendants rely on to show improved compliance has neither been provided to Plaintiffs nor attached as support to the Status Report. Defendants ask that the Court and Plaintiffs just accept their assurance that compliance levels are moving in the right direction or have been achieved. But the time for giving the Defendants the benefit of the doubt has long passed. Neither the Court nor the Plaintiffs can meaningfully assess the validity and sufficiency of Defendants' plan based on the Status Report.

A year and a half after the Stipulation took effect, Defendants have failed to gain and define an understanding of the root causes of their non-compliance, and their Remediation Plan has failed to set forth or implement any meaningful steps to remedy their sustained and substantial noncompliance. The first step in building a sustainable and functional healthcare system that will conform to the requirements of the Stipulation is to identify deficiencies, assess resources, and create a true and accurate map of where the system needs to be. Defendants have been unable to achieve this on their own. The time has come for an independent expert to undertake this assessment and produce a report that will form the foundation for future orders by the Court on specific steps Defendants must take to bring their fundamentally broken system into compliance. [Wilcox Decl. ¶ 5] Accordingly, Plaintiffs request that the Court either appoint an independent expert to conduct a needs assessment to determine what Defendants must do to achieve and maintain compliance with the Stipulation or, in the alternative, order Defendants to hire an independent expert, subject to Plaintiffs' approval, to conduct the needs assessment.

The Court has ample authority to enter such an order. The Stipulation expressly provides that the Court "shall retain the power to enforce this Stipulation through all remedies provided by law [with two exceptions not relevant here]" when Defendants' remedial plan fails to remedy deficiencies in compliance. [Doc. 1185 at 13, ¶ 36] Under Fed. R. Evid. 706 the Court has the authority to appoint an expert *sua sponte* or upon motion by a party. *See United States v. State of Mich.*, 680 F. Supp. 928, 956-57 (W.D. Mich. 1987) (appointing Rule 706 expert in post-settlement prison conditions case "to study and report upon efforts of the State of Michigan to comply" with the settlement, when the court was "unable to make a comfortable and accurate assessment of the State's progress"). Attached hereto as Exhibits A, B, and C are three additional orders appointing independent experts in post-settlement prison and jail conditions cases.[14]

---

[14] "When outside technical expertise can be helpful to a district court, the court may appoint a technical advisor." *Fed. Trade Com'n v. Enforma Nat. Products, Inc.*, 362 F.3d 1204, 1213 (9th Cir. 2004), *citing Ass'n of Mexican-American Educators v. California*, 231 F.3d 572, 590 (9th Cir. 2000). Court appointments pursuant to Rule 706

## CONCLUSION

Defendants will not be able to achieve and maintain compliance until they understand the root causes of their continuing noncompliance. "This requires a data-driven needs assessment, which will enable the Department to make rational, evidence-based decisions to change existing processes and programs. Unfortunately, there are no short-cuts to this process." [Wilcox Decl. ¶ 11] Accordingly, the Court should grant the relief requested.

Dated: September 2, 2016

**ACLU NATIONAL PRISON PROJECT**

By: s/ David C. Fathi
David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Jamelia Natasha Morgan (N.Y. 5351176)**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email: dfathi@npp-aclu.org
afettig@npp-aclu.org
jmorgan@aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email: dbarr@perkinscoie.com
agerlicher@perkinscoie.com
jhgray@perkinscoie.com

---

have been determined to be appropriate in varied circumstances. *See, e.g., Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1071 (9th Cir. 1999) (upholding the propriety of appointing an independent expert to "assist the court in evaluating contradictory evidence about an elusive disease of unknown cause"); *San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 603 (9th Cir. 2014) (finding appointment of several experts appropriate to interpret scientific aspects of a biological opinion).

Daniel Pochoda (Bar No. 021979)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email: dspecter@prisonlaw.com
ahardy@prisonlaw.com
snorman@prisonlaw.com
ckendrick@prisonlaw.com

*Admitted *pro hac vice*

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, P.C.**
P. O. Box 91398
Tucson, Arizona 85752
Telephone: (520) 477-1475
Email: kirstin@eidenbachlaw.com

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email: cnmitchell@jonesday.com
aamiri@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email: jlwilkes@jonesday.com

*Admitted *pro hac vice*

Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email: jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By: s/ Maya Abela

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email:
rdalyrooney@azdisabilitylaw.org
jrico@azdisabilitylaw.org
jross@azdisabilitylaw.org
mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2016, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

s/ D. Freouf