# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Antonio Parsons, et al., | No. CV-12-0601-PHX-DKD |
| Plaintiffs, | |
| v. | **ORDER** |
| Charles L. Ryan, et al., | |
| Defendants. | |

The parties have exhausted their dispute resolution procedure and so Plaintiffs have moved the Court to interpret several terms in the Stipulation. (Doc. 1625) The motion is fully briefed and neither party requested oral argument. However, some of the interpretive disputes require the Court to understand how care is provided to class members. Therefore, a bifurcated approach is warranted. In order to provide clarity and allow the monitoring to proceed, this Order addresses most of the disputed terms. The remaining issues require further factual development as described below.

**Ensuring Compliance with Paragraphs 12, 14, 15.** Paragraphs 12, 14, and 15 require Defendants to "ensure" that prisoners are afforded access to certain immunizations and screenings, that non-English speaking prisoners have an interpreter during healthcare encounters, and that prisoners who suffer a heat intolerance reaction from psychotropic medication are housed accordingly. The parties disagree about how to review that Defendants are compliant with these three paragraphs' requirements.

These three requirements are not categorized as Performance Measures in the Stipulation. Accordingly, these requirements do not need to be monitored according to the same metric as Performance Measures. However, Defendants must still ensure compliance with these requirements and Plaintiffs are entitled to timely data demonstrating Defendants' compliance. (Doc. 1185 at ¶ 29) Including this information in the CGAR appears to be the simplest way to demonstrate that Defendants are compliant with these three paragraphs of the Stipulation. However, because these requirements are not Performance Measures, Defendants may provide another method of demonstrating compliance.[1] Thus, the Court agrees with Plaintiffs that Defendants must demonstrate compliance with these requirements and it will require Defendants to report to the Court within thirty days how it proposes to do so.

**Intake for Revoked Male Parolees.** The Stipulation contains four Performance Measures – 33, 34, 75, and 76 – that detail the intake process that must occur when "inmates" arrive at the Department of Corrections ("Intake PMs"). The parties disagree about whether the Intake PMs apply to inmates who arrive into custody because their parole was revoked.

The Stipulation does not define "prisoner," "inmate," or "parolee." However, it is clear that the Performance Measures begin to apply when ADOC takes custody of a person and that the Performance Measures do not apply when an inmate is released on parole. Put another way, a parolee is not in the custody of the Department of Corrections and, therefore, is not subject to the Stipulation's Performance Measures. The Stipulation does not distinguish between the different ways in which a person becomes subject to ADOC custody and the Court cannot see, nor have Defendants described, any meaningful difference between someone subject to ADOC custody because his parole was revoked and someone subject to ADOC custody because he was recently convicted.[2]

---

[1] The Court notes that Plaintiffs will shortly have read-only access to class members' healthcare records. It is possible that this access will allow Plaintiffs' counsel themselves to review compliance with some of these requirements.

[2] Defendants argue that the Performance Measures only apply to "new" inmates.

- 2 -

Accordingly, the Court concludes that the Intake PMs apply to all inmates, including those whose parole was revoked.

In a related argument, the parties disagree about which facilities are subject to the Stipulation's reporting requirements for the Intake PMs.  According to Plaintiffs, Defendants had represented that only specific facilities conducted intake and so the Stipulation's Protocol was limited to only those facilities. (Doc. 1185-1 at 22)  Plaintiffs argue that they are entitled to compliance reports on all of the additional facilities where former parolees might be returned to ADOC custody.  However, the plain language of the Stipulation is limited to those facilities and the Stipulation "is an integrated agreement [which] may not be altered or modified, except by a writing signed by all representatives of all parties at the time of modification."  (Doc. 1185 at ¶ 40)  A change to the plain language in the Stipulation's Protocol is a modification that requires Defendants' consent[3].

**Days and Months.**  Plaintiffs argue that 30 days (or 60, 90, or 180) is not the same thing as one month (or two, three, or six). (Doc. 1625 at 13)  Plaintiffs cite to two examples where Defendants considered records compliant because something occurred within one month or within three months but not within 30 or 90 days. *Id*. at n. 10.

Defendants respond that this does not raise a question of substantial non-compliance because, at most, this results in a one or two day difference.  (Doc. 1644 at 11)  Moreover, defense counsel avows that this occurs because "monitoring staff does not have access to 'docketing' software that calculates 'n' days for them." (Doc. 1644 at 10)

The Court agrees that the difference between 30 days and one month appears to be insignificant.  More importantly, Plaintiffs have not demonstrated any harm that occurred to a class member because of this difference.  Accordingly, the Court will interpret 30

---

(Doc. 1644 at 9:9)  Taken to a logical extreme, the argument could mean that the Performance Measures do not apply to recidivist prisoners.

[3] The Court notes that it would view with disfavor any attempt to circumvent the Stipulation's reporting requirements by moving intake procedures to different prisons.

days to mean one month, 60 days to mean two months, 90 days to mean three months, and 180 days to mean six months.

**Actions Occurring Every X Days.**  Many of the Stipulation's Performance Measures contain an act that must occur "every X days."  The parties cannot agree how to interpret this recurring term.

In keeping with the plain language of the Stipulation, the Court concludes that an action that must occur every X days means that, in essence, a clock starts on the day an action occurs and that clock runs for X days.  Before the end of that clock X days later, the action must occur again.  To illustrate:  Performance Measure 80 requires that a MH-3A prisoner "shall be seen a minimum of every 30 days by a mental health clinician."  If a MH-3A prisoner is seen by a mental health clinician on March 15, then this prisoner's next visit with a mental health clinician must occur by April 15.[4]  A visit that occurs later in April would be considered non-compliant.

**"Seen" for Mental Health Care Encounters.**  The parties disagree about what kind of interaction qualifies as a prisoner having "seen" a mental health care provider.  The definition of "seen" specifically states that encounters with mental health staff must "take[] place in a confidential setting outside the prisoner's cell, unless the prisoner refuses to exit his or her cell for the encounter." (Doc. 1185-1 at 5)

Group Counseling.  Plaintiffs argue that group counseling is not confidential and note that it is explicitly allowed in Performance Measure 92 but not mentioned, and therefore not permitted, in any of the other mental health Performance Measures.  (Doc. 1625 at 15)  Defendants argue that group counseling is available only to those prisoners who can maintain the confidentiality of the meeting and, therefore, should count as confidential for purposes of the Stipulation.  (Doc. 1644 at 7)

---

[4] This example is in keeping with the Court's interpretation of days and months, *supra*.

- 4 -

The Stipulation's Protocols specifically permit group counseling to count toward compliance for Performance Measure 92. (Doc. 1185-1 at 33)  By extension, then, group counseling does not count toward compliance in any of the other Performance Measures.

<u>Segregation Visit and Suicide Watch</u>.  Defendants allege that "hard lockdown" is "extremely rare" and that a "cell front/segregation visit" is considered a mental health visit while an inmate is on suicide watch. (Doc. 1644 at 6, 7)  For both issues, the Court does not have sufficient information to understand the Defendants' practice and whether it is compliant with the Stipulation.  Accordingly, within 14 days of the date of this Order, Defendants shall provide the Court with an additional explanation of what "hard lockdown" means, how frequently it occurs, and what a "cell front/segregation visit" entails.

**Performance Measure 85.**  The parties disagree about how to implement the Protocol for PM 85:  "An AIMS report will be run for all MH-3D prisoners at each Complex.  10 records (if available) will be reviewed per yard for compliance." (Doc. 1185-1 at 32)

The parties do not dispute that the Stipulation requires the review of ten records--if they are available--each month from each yard to ascertain the level of compliance with PM 85.  Nor is there any dispute that in March 2016 at Perryville, only 7 of the 68 records drawn for a sample were reviewed for compliance and yielded a compliance score of 100%.  It follows that if ten records were reviewed that the compliance rate could be as low as 70%.

Defendants insinuate that the reclassification of inmates from MH-3D to MH-3E had an impact on the number of records available to review.  This may well be but Defendants fail to provide any evidence to support this assertion.  If Defendants intend to rely on the unavailability of records to decrease their review requirement, they must establish that such records are not available.  Simply saying so does not make it so.

The plain language of the Stipulation requires the review of ten records--if they are available--each month from each yard to ascertain the level of compliance with PM

85. If Defendants want to modify this requirement to involve fewer records, then they must do so with "a writing signed by all representatives of all parties at the time of modification." (Doc. 1185 at ¶ 40)

**Performance Measure 86.** The parties disagree about how to monitor compliance with PM 86's requirement that "MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication." (Doc. 1185-1 at 14, 32) Defendants argue that "it is unnecessary (nor is it required) that Defendants review data from the date the inmate was taken off medication. (Doc. 1644 at 12:23-25) The Court disagrees. By its terms, PM 86 takes six months to be completed. As a result, and depending on how long a prisoner has been off medication, a compliance review requires reviewing up to six months of medical records.

Because the long-term nature of PM 86 makes reporting compliance more complicated, a detailed example seems warranted. A hypothetical prisoner, Inmate PM86, has medication discontinued on January 10. This means that, at a minimum, a mental health clinician must see Inmate PM86 by April 10 and again by July 10. If, for example, Inmate PM86 was seen by a mental health clinician on March 15 and by June 15, then a review of Inmate PM86's records in February, March, and May would demonstrate compliance with this Performance Measure without a mental health visit.

In a related scenario, imagine Inmate PM86 was seen by a mental health clinician on February 10 and then again on May 25. Under this scenario, Inmate PM86's records demonstrate compliance without a mental health visit in March, April, and June. But May would be considered non-compliant because the follow-up visit occurred more than 90 days/3 months after the February 10 visit.

**Performance Measure 94.** The parties disagree how to measure compliance with the requirement that "All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse." (Doc. 1185-1 at 14, 34) The disagreement centers on whether the reporting covers either

the entire period that a prisoner is on a suicide or mental health watch (which may cover more than one month) or whether the report is for a calendar month. (Doc. 1625 at 20; Doc. 1644 at 13)

The Court agrees that the plain language of the Stipulation requires monthly reporting. In other words, all of the prisoners covered by PM 94 for a given calendar month would be subject to that month's report. The following month, some of the same prisoners might still be covered by PM 94 and, therefore, might appear on the following month's report. In other words, a prisoner who is on a suicide or mental health watch that spans more than one month would appear on more than one monthly report. For the Defendants to demonstrate compliance, this prisoner would still have to be seen daily but this information would be captured under two different monthly reports.

**Performance Measure 95.** Similar to PM 86 and PM 94, compliance with PM 95 requires several weeks and may span more than one calendar month. Specifically, PM 95 requires that "Any prisoner discontinued from a suicide or mental health watch shall be seen . . . between 24 and 72 hours after discontinuation, between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation of the watch." (Doc. 1185-1 at 34)

Consistent with PM 86 and PM 94, Defendants demonstrate compliance in a specific month by showing compliance with the portion of PM 95 that occurred in that month. For example, hypothetical Inmate PM95 is discontinued from watch on April 25. Inmate PM95 must be seen again between April 26 and April 28. If this occurs, Defendants are compliant for April's report. Inmate PM95 must also be seen between May 2 and May 5 and again between May 16 and May 19. If both of these visits occur during the correct timeframe, then Defendants are compliant for May's report.

Plaintiffs argue that it is possible, perhaps even likely, that Inmate PM95's records would be randomly selected for only one of the months that PM95 applied. But, again, this is a fact of the parties' agreement in the Stipulation which specifies a random sampling each month.

**Performance Measure 98.**  The Stipulation requires Defendants to respond to mental health HRNs according to the time frames established in a technical manual. (Doc. 1185-1 at 15)  Defendants acknowledge that, at the time they negotiated the Stipulation, they understood that some of this information was captured under PM 39. (Doc. 1644-1 at ¶ 23)  Now, Defendants state that the remaining portion of this information is captured by PM 37 and argue that reporting the same data in two different Performance Measures would "lead to inflated or deflated results." (Doc. 1644-1 at ¶ 25)

As noted above, the Stipulation is an integrated agreement. (Doc. 1185 at ¶ 40) The plain language of the Performance Measure 98 requires Defendants to respond to mental health HNRs "within the timeframes set forth in the Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0." (Doc. 1185-1 at 15)  If Defendants want to modify or alter this requirement to avoid this duplication, then they must do so with "a writing signed by all representatives of all parties at the time of modification." (Doc. 1185 at ¶ 40)

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion to Enforce the Stipulation (Doc. 1625) is, as described in detail above, granted in part and denied in part.

**IT IS FURTHER ORDERED** that, within 14 days of the date of this Order, both parties will provide the Court with a supplemental brief explaining "hard lockdown" and "cell front/segregation visits" including, but not limited to, the frequency with which each is used.

**IT IS FURTHER ORDERED** that, within 30 days of the date of this Order, Defendants shall propose a reporting procedure to demonstrate compliance with Paragraphs 12, 14, 15 of the Stipulation.

Dated this 6th day of September, 2016.

_____
David K. Duncan
United States Magistrate Judge