UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) ) ) | No.  CV 12-00601-PHX-DKD |
| | ) | Phoenix, Arizona |
| Plaintiffs, | ) | September 8, 2016 |
| vs. | ) | 9:02 a.m. |
| | ) | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

(*Status Conference*)

Transcriptionist:
Laurie A. Adams
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC-43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

For the Plaintiffs:

       ACLU - Washington DC
       By:  **David Cyrus Fathi, Esq.**
       By:  **Amy B. Fettig, Esq.**
       915 15th Street NW
       7th Floor
       Washington, DC 20005
       (Present Telephonically)

       ACLU - Phoenix, AZ
       By:  **Kathleen E. Brody, Esq.**
       P.O. Box 17148
       Phoenix, AZ 85011

       EIDENBACH LAW PC
       By:  **Kirstin T. Eidenbach, Esq.**
       P.O. Box 91398
       Tucson, AZ 85752

       PRISON LAW OFFICE
       By:  **Alison Hardy, Esq.**
       1917 5th Street
       Berkeley, CA 94710
       (Present Telephonically)

For the Defendants:

       STRUCK WIENEKE & LOVE, P.L.C.
       By: **Daniel P. Struck, Esq.**
       3100 W. Ray Road
       Suite 300
       Chandler, AZ 85226

       OFFICE OF THE ATTORNEY GENERAL
       By: **Michael E. Gottfried, Esq.**
       1275 W. Washington Street
       Phoenix, AZ 85007

Also Present telephonically:

       Beth Schwartzapfel
       The Marshall Project

```
 1                    P R O C E E D I N G S

 2            THE MAGISTRATE CLERK:  Civil Case Number 12-601,

 3    Parsons, et al., versus Ryan, et al., on for a status hearing.

 4            THE COURT:  Would counsel in the courtroom first

 5    please state their appearances for the record.

 6            MS. EIDENBACH:  Kirstin Eidenbach and Kathleen Brody

 7    for the prisoner plaintiffs.

 8            THE COURT:  Thank you.

 9            MR. STRUCK:  Dan Struck and Mike Gottfried for the

10    defendants.

11            THE COURT:  Good morning.  And whom do we have on the

12    phone?

13            MR. FATHI:  Good morning, Your Honor.  David Fathi

14    from the National Prison Project for the plaintiff class.

15            THE COURT:  Thank you.

16            MS. HARDY:  And Alison Hardy from the Prison Law

17    Office for the plaintiff class.

18            MS. FETTIG:  Amy Fettig from the ACLU National Prison

19    Project for the plaintiff class.

20            THE COURT:  Thank you.  Is that everyone on the phone?

21            MS. SCHWARTZAPFEL:  Beth Schwartzapfel here.  I'm a

22    reporter with the Marshall Project.

23            THE COURT:  I've been informed that you wanted to

24    appear telephonically because you were, I think, in Boston, my

25    staff was told.  And I must say the initial reaction to that
```

1    was one that was, in the first instance, well, initially,

2    negative just because we typically don't allow pipelines

3    into -- in or out of the courtroom.

4            But there's some tension with that, because Congress

5    has told us that we ought to make our courtrooms more

6    accessible.  We, as you know, have a battle with Congress over

7    the video portion of it.  But with respect to the audio, we

8    really don't have a battle.  Congress has told us, and the

9    judicial conference is moving toward, a point where we will

10   have the recordings available on our dockets.  And so they will

11   be readily accessible, the recording.  So it doesn't seem to me

12   to be much of a departure to go from accepting the recordings

13   and to allowing those of interest to have real time access to

14   what's going on in court with the caveat that I don't know that

15   Congress has given us the means to make it available to people

16   who would just ask for it.  But if somebody is able to do so

17   without any expense to the Court, as is happening here, because

18   the Court's not paying for this line, the parties have agreed

19   to do it, it doesn't seem to me to be an issue.  And that's why

20   I said it was okay.

21           MS. SCHWARTZAPFEL:  Thank you, sir.  I appreciate it.

22           THE COURT:  Sure.  And having heard what you just

23   said, I have to tell you just in an abundance of caution, you

24   don't get to talk any more.

25           MS. SCHWARTZAPFEL:  Duly noted.

1          THE COURT:  Thank you very much.

2          Here's what my initial reaction is, partly reflected

3   or already supported by what I have sent to you this morning.

4   And I realize that many of you may not have seen it yet because

5   I received bounce backs.  I see that Mr. Gottfried is shaking

6   his head no, he hasn't seen it.  But what I did is I sent an

7   Excel spreadsheet.  And what the Excel spreadsheet does -- and

8   it was an e-mail that I sent to -- that I did myself, which

9   means that I may not have done it well.  But I sent it to

10  the -- all of the recipients of a previous e-mail that the

11  parties had submitted to the Court.

12         And what I did in that e-mail was I showed you what I

13  was looking at, which was, just give me a second please, it was

14  an e-mail that had the title, "I thought you should have the

15  benefit of what I'm looking at."  And I sent it this morning, I

16  realize, too close in time for you all to have a chance to look

17  at it perhaps.  And many of the -- several of the people that I

18  addressed it to I did receive a bounce back saying that they

19  were out of the office.

20         But the written part of it says that the attached

21  spreadsheet shows that since February of 2015, Performance

22  Measures 14, 54, and 93 appear increasingly compliant.  The

23  other performance measures may have one or two prisons that are

24  trending in the right direction, but otherwise, the compliance

25  failure is substantial at best and abject at worst.

1          And this spreadsheet you will be able to take a look

2     at presents for me what is the reality that we are still in a

3     place where there is substantial or abject noncompliance.  But

4     on the other hand, what I did not state in the e-mail is

5     another reality, and that's reflected in what the defendants

6     have presented to me.  And that it is, since June of this year,

7     that there has been an order in place requiring that this --

8     that the remediation plan be put in place.  And although I did

9     express great skepticism, which seems to be mostly borne out, I

10    also have to concede that I am dealing with dated information.

11    And that's very troubling to me, because at some point I need

12    to act.  And I don't really want to be digging around in things

13    that are fixed.  I want to be digging around in things that are

14    still broken.

15         So in the first instance what I wanted to address this

16    morning is increase my understanding of what it is that is the

17    processing steps in producing the information that results in

18    the percentages that are reported that become, pursuant to my

19    original decision on how we were going to proceed on this, the

20    driver of addressing the problem, and that is the compliance

21    rate.

22         That time lag is something that, it seems to me, we

23    can address so that we are getting closer to real time

24    reporting and that it increases the chances that when I do go

25    about trying to address the -- or to fulfill my responsibility,

1    and that is, having -- if we see a determination that there has

2    been a failure of the defendants' plan to remediate the problem

3    then it's my responsibility to figure out what to do.

4              So for today, for me, the two agenda items are:  One,

5    to learn more about what it is that results in this process so

6    that I can see whether there's anything that I can do

7    consistent with my responsibilities in the stipulation to make

8    sure it's more timely.  The stipulation does provide for

9    certain timetables, but it also doesn't seem to bar me from

10   taking steps to get more accurate information.  It would seem

11   that it would be in everybody's interest for me to do that

12   because obviously, the plaintiffs only want me to remediate

13   extant problems.  The defendants similarly feel that view and

14   also are the ones who bear responsibility if I send people on

15   what is a justifiable action based upon what I knew four months

16   ago but perhaps not justifiable based upon what's happening

17   now.  So I want to understand that.

18             And then the second thing that I want to do is to let

19   you know that I am -- I'm blunted somewhat with respect to what

20   I can do to address the situation here by what is, perhaps, the

21   most efficient and economical means.  And that appears that if

22   it's repeated in the monthly meetings, the staffing issues,

23   just -- I mean, it's all over the place.  But you have taken

24   that tool away from me.  The stipulation bars me from ordering

25   the hiring of additional personnel.

1          And so that tool is taken out of the toolbox, which

2     means that I have to be creative about other tools.  But also,

3     I think there's nobody who would disagree that in a perfect

4     world that is the best tool.  But I don't have it.

5          And so the second best tools are likely to be less

6     efficient and more expensive for the defendants.  I mean, one

7     of the things that I look at when I see that a failure to --

8     and I mean, it's unclear to me in what the defendants have

9     written whether or not the failures to comply with the

10    performance measures associated with providing prescription

11    drugs are due to staffing issues of corrections personnel as

12    opposed to health care procurement activities, in other words,

13    do they not have enough people to get people to the sick call

14    to get their medicines?  So you would think that the remedy

15    there would be to have more people to make sure they are

16    brought in.  On the other hand, I can't tell for sure, because

17    the defendants also suggest to me that there are formulary

18    issues where the things aren't in the formulary.  If that

19    happens there are places called Walgreen's and CVS in Florence

20    that I can order you to go get those things and bring them

21    over.  That would cost a lot more and would not be as

22    efficient.  But that's a toolbox in my tool -- that's a tool

23    that remains in my toolbox, just as I looked on the internet

24    and there are urgent cares in Florence.  Not the best tool for

25    this, because there are security issues and expense issues.

1    But if somebody is not being seen under the terms of the

2    stipulation, that's in my toolbox.

3            So I wanted to, as the second issue, let you know that

4    my thinking process is -- I mean, this is not an impossibility

5    situation of solving this problem.  It's not as if there's some

6    abject failure in the -- or some impossibility defense or act

7    of God issue with respect to some kind of escape from an

8    insurance contract regarding the requirements to comply with

9    the stipulation.

10           These things can be solved, but you all should

11   understand, defendants should understand, that having taken

12   away what may be the most efficient tool and the best tool,

13   that I'm looking for the other ones, and they may have extra

14   externalities associated with the use of those tools that are

15   not great.  I mentioned a couple of the problems; the expense,

16   security issues, those sorts of things.  But I have got a

17   stipulation that I have to enforce, and the stipulation is

18   doable.  And it's up to the defendants to be participating with

19   the full knowledge that they should understand that having

20   agreed to a stipulation that takes away what may be the most

21   economical and efficient tool overall, I will turn to other

22   ones that may, at the end of the day, be very troublesome for

23   the defendants.  But they are the only ones you have left me

24   with.

25           So I will be thinking about, brainstorming is the word

1  that comes to mind, about everything that is on the table about

2  what I can do to accomplish the stipulation, achieve the

3  stipulation's requirements with the tools that you have allowed

4  me to have.

5         So that's what's on my agenda.  I think it's

6  appropriate at the first instance to give both sides an

7  opportunity to say anything you would like to say at the start.

8  Then I'd like to proceed to the issue about helping me

9  understand what the timeline is to see if there's anything we

10  can do to try to get to more real time reporting about matters.

11  If we can refine that, then I will set a schedule on when I

12  will next hear a report.  But at that time, I would be inclined

13  to also be engaging in my brainstorming process that will

14  result in an order to address matters that continue not to be

15  in compliance.

16         So what we'll do is I will give you each a chance to

17  say whatever you would like to say at the get-go.  We'll move

18  to my first issue and then depending upon what we learn there

19  move to the second issue.

20         Ms. Eidenbach.

21         MS. EIDENBACH:  I think Ms. Hardy from the Prison Law

22  Office is going to speak to you this morning.

23         THE COURT:  Please go ahead.

24         MS. HARDY:  Good morning, Your Honor.  I actually

25  don't have an enormous amount to say other than, of course, we

1    agree with you that the reality is that there is currently

2    both -- there's evidence before the Court of substantial and

3    abject noncompliance.  And I would point out that although the

4    defendants represented that they have additional information

5    about compliance that they say is better, they have made no

6    efforts to provide either the Court or the parties with that

7    information.

8            So what we -- all that we have in front of the Court

9    right now shows it's a very, very serious problem and we would

10   like to work with the defendants and with the Court to come up

11   with a process that will allow us to address the very, very

12   serious problems that are causing serious pain and suffering to

13   the plaintiff class.

14           THE COURT:  Okay.  Mr. Struck.

15           MR. STRUCK:  Yes, Your Honor.  I did want to point

16   out -- and I haven't -- I think I got the e-mail as I was

17   driving in, so I haven't had a chance to look at your

18   spreadsheet.  But I believe that all that information is, as

19   you pointed out, older stale information that all preexisted

20   the remediation plan.

21           THE COURT:  The last entry is June 16th.

22           MR. STRUCK:  Correct.  And I think that the

23   remediation plan we wouldn't start seeing an effect until the

24   July numbers which is, I'm going to go into explaining how the

25   monitoring bureau does their work and how that works.  I

1    actually have Mr. Pratt and Dr. Taylor here who can explain it

2    to you in further detail.

3           THE COURT:  I'm open to having the expert speak about

4    it if -- but that's up to you.

5           MR. STRUCK:  But I think it's important to note that

6    this abject failure that the Court has pointed out is all

7    pre-remediation plan, and we believe we should have an

8    opportunity to try and make this work.  I understand the Court

9    had doubts with respect to some of the plans that the

10   defendants and Corizon put together to try and resolve these

11   things, but I think that due process requires that we at least

12   get an opportunity to see if it works.  And, you know, we don't

13   even have the final numbers for the month of July yet.  We'll

14   probably get them next week.

15          So it's really difficult to say that, you know, the

16   remediation plan hasn't worked, it's a failure.  Let's move

17   forward with something else.  I think that the defendant should

18   have an opportunity to at least have, you know, see what the

19   trend is, perhaps a three-month trend, with respect to the

20   remediation plan to see if it's working.  I mean, we, defense

21   counsel, and the monitoring bureau, went out with Corizon to

22   these facilities where some of these issues were arising and

23   actually did training on it in July and August, so, you know,

24   to try and make sure that everyone understood how -- you know,

25   the importance of documentation.  Because we believe a lot of

1    this problem is with documentation and what needs to be done in

2    order to, you know, pass these performance measures.

3            So these things have all been done just in the last 30

4    to 45 days.  So it's unfair, I believe, for the defendants to

5    have to sit here and talk about, okay, well, what are we going

6    to do next when we haven't really given this an opportunity to

7    work yet.

8            As I said, the numbers for July will be finalized, I

9    have been told, next week.  There is a process involved with

10   respect to how these numbers are gathered, put together,

11   presented to Corizon.  Corizon has an opportunity to challenge

12   or question or appeal what some of the preliminary numbers are,

13   and that generally results in a change to the final number.

14           Mr. Pratt and Dr. Taylor would be happy to explain to

15   you exactly how the monitoring works, what the monitoring

16   bureau does, how they monitor these various performance

17   measures and would probably do a far better job than I in

18   explaining to you how it works.  But there is a lag time, and

19   I'm not sure they would have a better knowledge as to whether

20   or not the time frame can be shortened, which it seems that you

21   would like to see that.  I don't know if that's possible.  But

22   they would have a better -- it would be -- they would be better

23   able to explain to you if you would like to hear from them.

24           THE COURT:  Well, what you just told me is that you

25   have a two and-a-half month lag that you deal with when you get

1     the information because you have said that July final numbers

2     are not done.

3           MR. STRUCK:  Which is a month and a half, because we

4     have -- okay.  July goes from July 1st to July 31st.  We have

5     had the month of August go by.  We will have the July numbers

6     finalized by mid-September.  And so that's about a month

7     and-a-half lag.  Sometimes it's five weeks, I understand, but

8     in this -- because there's a holiday and with vacations, things

9     like that, there's a little bit more of a time lag.  So it's

10    generally --

11          THE COURT:  Well, I understand that.  I just was

12    looking at if there was a situation on the ground on the first

13    of July.  I don't know what that situation is on the 1st of

14    July until the middle of September.  So that's two and-a-half

15    months from then.  But you are saying the whole month as a

16    total takes a month and a half to be spit out by the process?

17    I understand what you are saying, I'm just telling you that

18    that additional 30 days for the 1st of July, to me, maybe

19    that's one of the solutions.  Maybe we break up the months and

20    we have two-week reporting periods so that we can at least

21    carve out so people aren't just sitting around, that they are

22    addressing it.

23          But again, if it is, as you say, that once the month

24    is closed, it's a month and a half for you to get that

25    information, what's the next step?  How soon do plaintiffs get

1    it?

2          MR. STRUCK:  Plaintiffs will get it when we get it.

3          THE COURT:  Same.  So next week you expect that the

4    plaintiffs will have the July information?

5          MR. STRUCK:  We'll provide them with those numbers,

6    yes, when we get them.

7          THE COURT:  Okay.  Now, because we do have the people

8    who are the assemblers of this information, let me ask that

9    question and you can decide who should maybe be the right

10   person to answer.

11         Is there anything we can do to accelerate the process?

12   You said that Corizon had an opportunity to respond.  What are

13   the timetables that are built in?  Are there things that can be

14   done to accelerate that, obviously, because it just is a month

15   and a half seems like a long time.

16         MR. STRUCK:  And I know there's a -- I think it's a

17   10-day period which Corizon gets to respond to the preliminary

18   numbers.  Now, this is the -- you know, I don't know that Mr.

19   Pratt or Dr. Taylor will have ideas at this point because this

20   is kind of the first we're hearing about, you know, your desire

21   to maybe shorten up the time frame.  It might be that we could

22   go put our thinking caps on and see.  But they will be better

23   able to explain that to you than I can.

24         THE COURT:  Okay.

25         MR. STRUCK:  If you would like to ask Mr. Pratt

1    questions about how the monitoring bureau works.

2         THE COURT:  Surely.  Would you mind coming forward to

3    the microphone?

4         MS. HARDY:  Your Honor, this is Alison Hardy.

5         THE COURT:  Yes, ma'am.

6         MS. HARDY:  I'm wondering, is Mr. Pratt going to be

7    offering testimony and will he be sworn in so that he can

8    testify under oath?  We have received nothing from the

9    defendants that constitutes evidence that qualifies as evidence

10   about their compliance and their monitoring process thus far in

11   response to this motion, so I think it would be helpful if they

12   could be properly sworn and testify under oath.

13        THE COURT:  Well, I will deny that request of yours

14   without prejudice to re-raising it if it turns out that it

15   looks to me or to you that it would be necessary.  But I'm

16   really just interested in some basic fact-finding here, and so

17   we'll go forward.

18        Mr. Pratt, you have heard what the issue is about my

19   frustration, I think everybody's frustration, and that is, I'm

20   looking at a book published last year expected to make

21   decisions in real time now.  Is there anything we can do to

22   accelerate this reporting process?

23        MR. PRATT:  Good morning, Your Honor.

24        No, I don't know that there's anything that we can do.

25   I would certainly be open to exploring any possibilities that

1  may be brought up.  But in order for us to provide consistent

2  results, we want to look at a full calendar month of results

3  and that's what we monitor, is each calendar month, you know,

4  in its entirety.

5          THE COURT:  How does this information come to you as

6  the reporting team?

7          MR. PRATT:  I have got monitors that are out at each

8  facility, and they have got their -- all the performance

9  measures that are applicable to each facility.  So there's 112

10 of those, and they will go out during the month and do a review

11 of each one of those performance measures at that facility that

12 happened over that time span of that one month.

13         THE COURT:  So when do they do that?  If we take, for

14 example, July, are they on site doing that during July, or do

15 they do that after the close of July?

16         MR. PRATT:  They will do that after the close of July

17 for the July information.

18         THE COURT:  And how soon after the end of July do they

19 do that?

20         MR. PRATT:  That's done -- it started during -- the

21 month of July is audited during August, and the monitors will

22 break up the 112 performance measures and go back and review

23 all the information that happened during the entire calendar

24 month of July for that performance measure.  They will compile

25 their information and then the finals on that are submitted by

1    the end of August.

2         THE COURT:  So the monitors have 30 days from the

3    close of the reporting month to report their information?

4         MR. PRATT:  Yes, sir.  And it takes -- I will tell you

5    that it takes them the month to go through the volumes of

6    information they have to go through to come up with these

7    findings.

8         THE COURT:  And then they report that information to

9    whom?  To you?  What's the next step?

10        MR. PRATT:  I'm sorry.  That information comes to me,

11   and it also goes to Corizon.  Corizon has, at that point, 10

12   business days to rebut any of those findings, or if they are

13   unclear on them or if they want to dispute some of those

14   findings, we go back during the next 10 business days and allow

15   that to happen.  So it's typically by the 10th at the -- well,

16   it would be the 12th to the 15th typically before the final

17   results come out.

18        THE COURT:  So in that 10-day period, Corizon and you

19   are interacting about the reporting, but what you are saying to

20   me is that it is always, it seems, the case that you come to a

21   final number no later than 15 days after the next month of the

22   reporting period?

23        MR. PRATT:  Correct.

24        THE COURT:  Well, not the next month after, the month

25   following the monitor's assemblage of the data?

```
1          MR. PRATT:  Yes.

2          THE COURT:  And then once that final number -- then it

3   goes, according to what Mr. Struck said, to him and then

4   immediately to the plaintiffs as well.  Is that what would

5   happen?

6          MR. PRATT:  Yes, sir.

7          THE COURT:  It sounds to me that the only reasonable

8   possibility is to -- well, I must say, having listened to what

9   you have explained to me, it does seem applying just common

10  understanding of how long things seem to take in any

11  institution or any bureaucracy or any monitoring process that

12  it does seem that there's unlikely any opportunity to wiggle

13  about faster.

14         The plaintiffs have been watching this process as

15  well, and so I will give them a chance to ask you any questions

16  they might want to ask that maybe might highlight something I'm

17  not thinking about.

18         MS. HARDY:  Thank you, Your Honor.

19         Mr. Pratt, as you know, plaintiffs have been dealing

20  with the defense attorneys about the monitoring process and in

21  anticipation of the monitoring enforcement motion which we

22  filed in July and which we got an order on yesterday findings

23  that there were monitoring problems on those narrower subsets

24  of performance measures.  I'd like to remind you that we agreed

25  that there would be changes to your monitoring process, and
```

1  that there will be a monitoring guide update.  And we haven't

2  received the monitoring guide update.  Could you tell me where

3  you are in the process with the new revised monitoring guide

4  that reflects the changes that Ms. Rand and Corene Kendrick

5  agreed to?

6       MR. PRATT:  I think that monitoring data is probably

7  about 90 percent complete at this point, but I will tell you

8  that that monitoring guide is a -- it's a living document.

9  That changes as we find better reports and better things that

10  we can do to make it more efficient monitoring and more correct

11  as far as the numbers go, if we can update the reports that

12  we're receiving.  If we get improved information from Corizon

13  and through the data reporting process, that information will

14  change that monitoring guide.  And we're continuously looking

15  at new avenues to obtain information specific to those

16  performance measures.

17       MS. HARDY:  Right.  And defendants agreed to make

18  certain changes --

19       MR. PRATT:  Uh-huh.

20       MS. HARDY:  -- to the monitoring guides and that all

21  took place in March, April, and May.  And because of those

22  changes we did not include some performance measures in the

23  enforcement motion, because we were assured that those changes

24  would be made and yet we have not yet seen the monitoring

25  guide.

1          So would you be able to give us a copy of the

2  monitoring guide that you are currently using?

3          MR. PRATT:  I will.

4          MS. HARDY:  By next week?

5          MR. PRATT:  I'm not sure exactly on the timing of

6  that.  Lucy Rand has the current version of the monitoring

7  guide.  We have been feeding our information to her through the

8  AG's office.

9          MS. HARDY:  So Ms. Rand could give us a copy of what's

10  being used currently.  And then my second part of the question

11  is an order came out yesterday that found that there were

12  problems with how the monitoring was being done for specific

13  performance measures.  And when do you anticipate that those

14  corrections would be made to the monitoring guide so that we

15  can see the accurate data being produced?

16          THE COURT:  It may be that Mr. Struck is in a better

17  position to answer that argument, because I don't know whether

18  the order has been distributed to the clients or not.

19          But let me just say this:  Ms. Rand is out of town

20  until, I think she said, was it the middle of September she

21  said?

22          MR. STRUCK:  Yes.

23          THE COURT:  So if we set a deadline of the 23rd of

24  September for the defendants to provide the current monitoring

25  guide that is -- that includes the current policies under that

1    guide to the plaintiffs by the 23rd of September, and then I'd

2    ask that Mr. Struck and the appropriate person on the

3    plaintiffs' side to discuss the Court's order this week

4    regarding the monitoring issues.  If there are any issues

5    associated with that and you can't resolve them in the

6    meet-and-confer, we'll take that up at the next scheduled

7    monthly discovery hearing.

8            MR. STRUCK:  And I did want to alert the Court that --

9    and I'm not prepared to discuss them in detail right now, but

10   there were several issues of clarification that we may be

11   seeking.

12           THE COURT:  Okay.

13           MR. STRUCK:  In a motion to clarify and perhaps a

14   motion to reconsider one of them with the Court.  So we intend

15   to get on that quickly.

16           THE COURT:  We'll do this then.  In advance of our

17   next -- when is the -- just a moment.

18           In advance of our next scheduled monthly telephonic

19   conference, the day before, provide a notice to everybody about

20   the issues that you haven't been able to resolve, if any, and

21   the ones that you think you need clarification on.

22           MR. STRUCK:  Okay.

23           THE COURT:  And I will see if I can address it at that

24   hearing.

25           MR. STRUCK:  All right.

1            THE COURT:  Okay.  So Ms. Rand -- not Ms. Rand.  Any

2    more questions for Mr. Pratt?

3            MS. HARDY:  Well, one thing that is very critical to

4    plaintiffs' ability to continue to review the performance

5    measures is our access to the health record.  And we are

6    ordered to have access to it by September the 18th.  We have

7    not heard from defendants since that was determined and we

8    haven't -- and we anticipate there will likely be some need to

9    have our IT people talk with their IT people.  So I'm wondering

10   if Mr. Struck or Mr. Pratt could update us on where we are with

11   that access.

12           THE COURT:  Well, it's the same question I asked

13   before, so what are -- are there any issues with that?

14           MR. STRUCK:  As far as I know, there are not.  I need

15   to get an updated status from Corizon, because Corizon is

16   working with their vendor to put this into play.  So I will get

17   with them.  I know the assistant general counsel is not in the

18   office but the general counsel is, so I can get with them and

19   find out, have them tell me what the status is and let the

20   plaintiffs know.

21           THE COURT:  Right.  I just really didn't want a

22   situation of having the date that I was told it would be on

23   line being delayed because there were some access codes that

24   weren't accessible or there was some training that hadn't taken

25   place when plaintiffs said they were willing to step up to the

1    plate with their IT people and do anything in advance so on the

2    date we're supposed to go live we can go live.  We don't have

3    to say this is actually the date we're supposed to go live.  I

4    don't want to do that.

5         All right.  Well, the frustrating reality is that it

6    looks like I'm stuck with two and-a-half months from the first

7    of the month or month and a half from the end of a month before

8    I can get data.  And so that means that next week I will know

9    what happened in July, and that means that a month from then I

10   will know what happened in August.  And I think it makes sense

11   for me to revisit this after two more months.

12        And so I will require the defendants to report again

13   to the Court on the performance measures at issue apart from

14   the four additional ones, but the 12 that are at issue here,

15   are to report again at the same time that they are reporting

16   that information to the plaintiffs.  And I am expecting that

17   that will mean that next week I will get a report about what

18   happened in July, and then in the middle of October, I will get

19   a report on what happened in August.  And then what I will do,

20   based upon what I see next week, I may set a further hearing if

21   I see something that is -- I mean, obviously there have been

22   some backslides where progress has been made.  Plaintiffs think

23   that it's because of robbing Peter to pay Paul.  Even before I

24   read those words in their brief I was wondering that myself.

25   So it's not an unreasonable thing to think about and to be wary

1  and to be watching for.  And so I will look at that next week

2  and to see what the reporting reveals.

3          Let me ask the clerk when is our next --

4          (Discussion off the record.)

5          THE COURT:  Well then we don't have a monthly meeting

6  scheduled in September.  We don't have one.  We do have one --

7  we set one in October, but it's got a conflict that we have to

8  deal with.  But we don't have one set for September.  And so

9  I'm wondering if perhaps it makes sense for us to set one at

10  the end of this month that will be either -- perhaps I think we

11  talked about Wednesdays at 9 a.m.  And I don't remember from

12  the last conversation whether there were conflicts why we

13  couldn't do the 21st or 28th.

14          MR. STRUCK:  I'm in trial, Your Honor, in Pinal County

15  for the last two weeks of September.

16          THE COURT:  All right.

17          Then in October, just a second.  What about the 5th of

18  October?

19          MR. FATHI:  This is David Fathi.  That is fine with

20  me, Your Honor.

21          MS. HARDY:  That's fine for me as well.  Alison Hardy.

22          MS. FETTIG:  Me as well.  Amy Fettig.

23          THE COURT:  It appears the 5th of October at 9 a.m. --

24  I know -- I can change that.  I have something I will bump.  So

25  9 a.m. on the 5th of October we'll have what will be the

1    monthly discovery issue conference.  In advance of that, Mr.

2    Struck will let us know what issues -- you can do it in advance

3    as soon as you want, but no later than in advance of that let

4    us know what the issues are that you think need to be addressed

5    that require monitoring.  And we'll take up other issues and I

6    will be in a position then to have seen what the reporting is

7    for July.  We will replace the meeting we previously scheduled

8    for the 12th of October, so we'll vacate the one that's set for

9    the 12th of October at 9 a.m.  And we'll return to our normal

10   schedule in November with the 9th of November at 9 a.m.

11         Those are the places where I, having discussed these

12   issues, this leaves me where I feel that I have a plan in place

13   to do the best that I can in the circumstances that I have.

14   The plaintiffs have suggested that I take a course of action

15   that looks to a third person to oversee the circumstance, but

16   at present I'm going to deny that request because I think that

17   that's my job and I haven't demonstrated that I can't do it.

18   And so if it turns out that I can't or that I need further

19   assistance, that's something we can revisit.  I see that other

20   courts have done it.

21         But for now I don't think that that's necessitated by

22   the information that I have.  Information, as I said, that is

23   limited by the timeliness of the reporting.  I mean, the tea

24   leaves are very worrisome, and they become pretty strong

25   predictors on their own.  But it could be there's been a

1    sea-change, and as Mr. Struck points out, I have to see that.

2    I think that's where we have to head next as we have discussed.

3         So having now worked through my agenda items, I then

4    told you that I would give you each a chance to raise anything

5    else that you wanted to raise today.  I think there's one thing

6    that I haven't heard back from you, and that is the timetable

7    on addressing the four new performance measures that have been

8    pursued through the mediation process and are now ripe for

9    consideration in this Court.  I don't know, and I don't

10   remember whether the original plan for this included a briefing

11   schedule that had a reply for the defendants.  But I know the

12   time is not -- we have -- reply for the plaintiffs.  We had the

13   response from the defendants just on the 6th.  And so I don't

14   know whether the plaintiffs intend to reply and/or whether oral

15   argument would be necessary.  But it would seem to me that it

16   would be possible to put this on the agenda also for the

17   meeting that we scheduled for October 5th.

18        But again, I had asked you all to perhaps come up with

19   timelines to address all these issues.  I haven't seen that yet

20   so I'm trying to readdress this issue.  So that's one of the

21   things that I'm thinking about that maybe you could address now

22   as I give you a chance to say whatever else you want to talk

23   about.

24        On the plaintiffs' side?

25        MR. FATHI:  Your Honor, this is David Fathi.  On the

1    motion regarding the four additional performance measures, we

2    would like to file a reply.  I believe that under the Court's

3    rules it would be due next Friday, which would certainly allow

4    the Court to consider it on the October date.  We don't believe

5    that oral argument is necessary.  The numbers speak for

6    themselves.  But if the Court would find it helpful we're happy

7    to have argument.

8            THE COURT:  Okay.  Anything else plaintiffs want to

9    address this morning?

10           MR. FATHI:  Yes, Your Honor.  David Fathi again.  One

11   additional point.  We don't object to proceeding as the Court

12   has outlined, but one issue I would just like to highlight, in

13   the Court's order earlier this week it found that defendants'

14   monitoring methodology with regard to a number of performance

15   measures was not compliant with the requirements of the

16   stipulation.  And in light of the fact that the Court is going

17   to be looking carefully at the next few months of CGAR data,

18   we're concerned about undue delay in defendants modifying their

19   methodology so that it is compliant with the Court's order.

20           THE COURT:  Well, I guess if I had a sooner time to be

21   able to get together with you all, I would do that but it seems

22   that I don't because of the absence of critical counsel.  And

23   so I think we're going to have to just address those issues on

24   the 5th.

25           But I have asked you also to meet and confer about it

1    and see if you can -- I tried to give you as much of an insight

2    into what my thinking was.  So even if you feel there are some

3    ambiguities, you might perhaps have enough of an insight into

4    where I'm headed.

5           But failing that, failing the success of your

6    meet-and-confer to address those issues, we'll take it up on

7    the 5th.

8           MR. FATHI:  Thank you, Your Honor.

9           THE COURT:  All right.  Mr. Struck, anything for the

10   defendants' side?

11          MR. STRUCK:  The only thing that I think the

12   defendants would like some guidance from the Court on is the --

13   there's no definition in the stipulation of substantial

14   noncompliance.  And as a result, we're getting letters from the

15   plaintiffs if there's one facility that's out of compliance,

16   say they score a 79 one month then we're getting a letter on

17   that.

18          We don't believe that's substantial noncompliance.  We

19   think that they are, in order to be substantially noncompliant,

20   there needs to be more of a, I guess, a track record of

21   noncompliance as opposed to just one random month they are out

22   of compliance.

23          So as a result, we're ending up having to respond to a

24   lot of these letters with these one-month issues that have been

25   raised by the plaintiffs.  So I don't know if that's something

1    that you have given any thought to or you would like some

2    briefing on, but we think that it's important that there will

3    be some sort of understanding from the parties and the Court

4    with respect to how you view the definition of substantial

5    noncompliance.

6        THE COURT:  Well, I think I addressed this in my order

7    on the 20th of May at Docket 1583 in which I set forth what it

8    was that I understood substantial compliance to mean.  And that

9    is, if you are meeting the threshold that's required by the

10   stipulation for the particular complex in a particular

11   reporting period, what are these letters you say you have to

12   respond to?

13       MR. STRUCK:  Well, the plaintiffs' part of the

14   requirement is they send us a notice of noncompliance, and that

15   starts kind of the process.  Then we go to the mediation and we

16   end up ultimately coming to you.  So we're getting letters from

17   them with respect to performance measures that we say are in

18   substantial noncompliance where there's just one month out of,

19   in a particular facility, that is not compliant.  And I

20   understand.  I read the Court's order.  I remember what you

21   said, but I don't -- it wasn't really clear to me whether you

22   really believe that if one, for example --

23       THE COURT:  Yeah.  I really do believe.

24       MR. STRUCK:  -- if Winslow is out of compliance for

25   one month and in compliance for 11 months that's substantially

1  noncompliant.

2          THE COURT:  Well, they are, for that month, they are

3  substantially noncompliant for that one month.  Obviously with

4  respect to your arguments, you can see that I pay attention to,

5  you saw -- well, you will see from the e-mail that I noted

6  trends and I denote those.  But I do think that as a threshold

7  interpretation of the stipulation that if you fall below the

8  percentage requirement that's required in the stipulation at 80

9  percent now and 85 percent in several months in a given month

10  at a given institution on a given performance measure, then

11  plaintiffs are well within their rights to say you missed it

12  here.

13          MR. STRUCK:  Okay.

14          MR. FATHI:  Your Honor, this is David Fathi.  Just as

15  a matter of factual accuracy, we never asserted substantial

16  noncompliance when a facility has been out of compliance for

17  one month and in compliance for 11.  And if Mr. Struck has an

18  example of that, I would certainly invite him to submit it to

19  the Court.

20          THE COURT:  Maybe he's being hyperbolic.

21          Okay.  Anything else?  No?

22          MS. HARDY:  No, Your Honor.

23          THE COURT:  Thank you all very much.  We'll see you

24  soon.

25          (Proceeding concluded at 9:49 a.m.)

1

2

3

4

5

6

7

8

9              C E R T I F I C A T E

10

11         I, LAURIE A. ADAMS, court-approved transcriber,

12    certify that the foregoing is a correct transcript from the

13    official sound recording of the proceedings in the

14    above-entitled matter.

15

16         DATED at Phoenix, Arizona, this 20th day of September,

17    2016.

18

19

20                              s/Laurie A. Adams

21                              _____
                                Laurie A. Adams

22

23

24

25