CV-12-00601-PHX-DKD, August 19, 2016

1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3          _____

4

**Victor Antonio Parsons, et al.,**    )

5                              )

                    Plaintiffs,    )   CV-12-00601-PHX-DKD

6                              )

            vs.            )   Phoenix, Arizona

7                              )

                              )   August 19, 2016

8   **Charles L. Ryan, et al.,**        )   3:01 p.m.

                              )

9                    Defendants.    )

_____)

10

11

12

**BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

13

          **TRANSCRIPT OF PROCEEDINGS**

14

          **TELEPHONIC DISCOVERY DISPUTE**

15

16

17

18

19

20

21   Transcriptionist:

    **Elaine Cropper**

22   Sandra Day O'Connor U.S. Courthouse

    401 West Washington Street, SPC 35

23   Phoenix, Arizona  85003-2150

    602.322.7245/(fax) 602.322.7253

24

    Proceedings Recorded by Electronic Sound Recording

25   Transcript Produced by Transcriptionist

          United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

1                          **APPEARANCES**

2

For the Plaintiffs:
3              **DAVID C. FATHI, ESQ.** (Present telephonically)
               **AMY B. FETTIG, ESQ.** (Present telephonically)
4              ACLU - Washington, D.C.
               915 15th St. NW, 7th Fl.
5              Washington, DC  20005
               202.548.6609/(fax) 202.393.4931
6
               **CORENE T. KENDRICK, ESQ.** (Present telephonically)
7              **DONALD SPECTER, ESQ.** (Present telephonically)
               Prison Law Office
8              1917 5th St.
               Berkeley, CA  94710
9              510.280.2621/(fax) 510.280.2704

10             **MAYA STOCK ABELA, ESQ.** (Present telephonically)
               Arizona Center for Disability Law - Tucson, AZ
11             177 N. Church Ave., Ste. 800
               Tucson, AZ  85701
12             520.327.9547/(fax) 520.884.0992

13   For the Defendants:
               **DANIEL P. STRUCK, ESQ.** (Present telephonically)
14             **ASHLEE B. FLETCHER, ESQ.** (Present telephonically)
               **TIMOTHY J. BOJANOWKSI, ESQ.** (Present telephonically)
15             Struck, Weineke & Love, P.L.C.
               3100 W. Ray Rd., Ste. 300
16             Chandler, AZ  85226
               480.420.1600/(fax) 480.420.1695
17
               **LUCY M. RAND, ESQ.** (Present telephonically)
18             Office of the Attorney General
               15 South 15th Avenue
19             Phoenix, AZ  85007
               602.542.7683/(fax) 602.542.7670
20

21

22

23

24

25

                     United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

1          **P R O C E E D I N G S**

2          (Court was called to order by the courtroom deputy.)

3          (Proceedings begin at 3:01 p.m.)

4          (All parties participate telephonically.)

5               THE COURT:  Thank you.  Please call the case.

6               COURTROOM DEPUTY:  Civil case number 12-601, *Parsons*,

7     *et al. v. Ryan, et al.*, on for telephonic discovery dispute

8     hearing.

9               THE COURT:  Would counsel please state your

10    appearances for the record?

11              MR. FATHI:  Good afternoon, Your Honor.  This is

12    David Fathi from the National Prison Project for the plaintiff

13    class.

14              THE COURT:  Good afternoon.

15              MS. FETTIG:  Good afternoon, Your Honor.  This is Amy

16    Fettig from the ACLU National Prison Project, also for the

17    plaintiff class.

18              THE COURT:  Thank you.  Good afternoon.

19              MR. SPECTER:  Good afternoon.  This is Don Specter

20    and Corene Kendrick from the Prison Law Office.

21              THE COURT:  Thank you.  Good afternoon.

22              MS. ABELA:  Good afternoon, Your Honor.  Maya Abela

23    for the Arizona Center for Disability Law.

24              THE COURT:  Thank you.  Good afternoon.

25              MS. RAND:  Good afternoon, Your Honor.  It's Lucy

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

1   Rand from the Arizona Attorney General's office for the

2   defendants.

3            THE COURT:  Thank you.

4            MR. STRUCK:  Dan Struck, Tim Bojanowski, and Ashlee

5   Fletcher for defendants as well.

6            THE COURT:  Thank you.  Good afternoon.

7            Is that everybody?

8            MR. STRUCK:  I believe so.

9            THE COURT:  Oh, believe so.  I didn't know whether we

10  had somebody whose name sounded sort of like "believe so" but

11  thank you very much.

12           I will follow the agenda that plaintiffs suggested

13  and start out by addressing the matters set forth in the chart

14  that starts out with the March 2015 date, a chart that I have

15  in front of me that includes the additional contribution to the

16  chart that the defendants submitted over the wire just a bit

17  ago.  But the March 15 starts out by addressing Eyman-SMU in

18  which plaintiffs contend that the visitation logs were not

19  produced and defendants can maintain that they were.  I've read

20  some of the back and forth about that, from the plaintiffs'

21  perspective, exactly what you still are missing with respect to

22  the visitation logs for Eyman and SMU.

23           MS. FETTIG:  Thank you, Your Honor.  This is Amy

24  Fettig From the ACLU.  Appreciate your time on this matter and

25  we only brought it to your attention, as we do now, because we

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

1    believe that we are being seriously obstructed from being able

2    to evaluate, in a timely manner, defendants' compliance with

3    the max custody CGARs.

4          In the chart we provided that separates out

5    Eyman-SMU, Browning, Perryville, Lewis, and Florence, we've

6    listed the documents that we do not have at this time.  I

7    understand that Ms. Rand has just produced a number of

8    documents a few moments ago.  We have not yet had a chance to

9    compare the new production with the chart that we produced to

10   the Court.  We will most certainly do that but all of the

11   documents that are reflected, starting with the visitation logs

12   at Eyman, are -- it is our position that they have not been

13   produced to us.

14         THE COURT:  Let me cut here to a question that is

15   important because I may have misunderstood.  I thought that the

16   defendants were saying with respect to the visitation logs,

17   that they believed that those had been previously produced

18   before today.  What you're saying, Ms. Fettig, is that you

19   believe that they were just produced today?

20         MS. FETTIG:  We have not yet had an opportunity to

21   take a look at what Ms. Rand produced just a few minutes ago.

22         THE COURT:  So let me ask --

23         MS. FETTIG:  So they may well be in there.

24         THE COURT:  Let me ask Ms. Rand.  She can probably

25   answer that question the best.

United States District Court

 1          MS. RAND:  Your Honor, this chart includes both a

 2    combination of documents that were produced prior to today as

 3    well as just a few more documents that we had that were

 4    produced today.

 5          So as far as the visitation logs, they were produced

 6    last month so they were not produced today.

 7          THE COURT:  Plaintiffs continue to maintain, then,

 8    that they have not received visitation logs and so you say,

 9    Ms. Rand, that you did produce the visitation logs.  How are we

10    going to figure out whether you did or didn't?  How do we get

11    to a common agreement at least with respect -- since I can't

12    see them right now and I can't tell whether they have been

13    produced?  Some of them are -- I mean, some of this I can see

14    why a disagreement exists and some of them I can't see how a

15    disagreement exists.

16          How is it, Ms. Fettig -- how can we get our hands on

17    this when we're appearing telephonically?  How can I address

18    whether or not each of these items has been produced or not and

19    resolve the dispute when I have one person saying, "Yes, we

20    did," and another person saying, "No, they didn't?"

21          MS. FETTIG:  Your Honor, what we want, and what we

22    have always requested, is that the full max custody notebooks

23    that support the CGAR findings for the max custody performance

24    measures, and we're only talking about eight of these

25    performance measures, that they could be produced in a timely

7

CV-12-00601-PHX-DKD, August 19, 2016

1    manner.  We have gone through our records.  Some documents have

2    been produced.  What we provided to the Court is the chart of

3    records that we believe are still missing up to May 2016.

4            What we're asking the Court to do today is to order

5    that the defendants produce the back-documents and the miss is

6    documents or inform to us that they cannot be found and that

7    going forward, both parties be able to establish a reasonable

8    time frame for the max custody notebooks to be produced after

9    the CGAR reports come out.  Right now when the CGAR reports

10   come out on a monthly basis, we are waiting months and months

11   and months for the back-up documents to be provided to us.  In

12   some cases they have not been provided.  In the case of Eyman,

13   we haven't gotten anything from 2016 forward, January 2016.

14           So what we're really looking for is a reliable and

15   reasonable time period in which to get these documents so we

16   can actually evaluate the compliance findings that the

17   defendants are making on a monthly basis.

18           But what I will say is that these documents should be

19   in a notebook that is produced on a monthly basis and given to

20   the warden in each maximum custody community.  They are the

21   same basic documents at every facility.  They are gathered on a

22   monthly basis and these are the only documents that we can use

23   to actually evaluate those findings.  This should be among the

24   simplest and straightforward documents to produce on a monthly

25   basis in this lawsuit and yet so many months are missing or

CV-12-00601-PHX-DKD, August 19, 2016

 1  parts of them are missing or not produced at all.  So --

 2          THE COURT:  Go ahead.

 3          MS. FETTIG:  I'll just reiterate that what we want is

 4  a guarantee that the documents that are missing on this date

 5  forward will be produced in a timely manner and that those

 6  parties come up with a reasonable time frame for producing

 7  these documents going forward.

 8          THE COURT:  Without suggesting that what you just

 9  said, Ms. Fettig, is not constructive, because it is separately

10  constructive, it doesn't really address what I have here and

11  that is two different beasts.  I have a beast with red feathers

12  and a beast with green horns.  I have two different beasts.

13  The first beast is the one where there is a disagreement

14  between the parties on whether or not there has been a

15  production.  The second beast is one where there isn't a line

16  drawn through the item by the defendants.  It's one where you

17  say there's missing all documentation, and the defendants have

18  a view that probably is -- or have an argument to make about

19  what they should or shouldn't have to do.

20          But the question that I was asking was, how am I

21  going to be able to figure out whether there's been the

22  requisite production when there's a dispute about it?  And the

23  dispute is highlighted by this first one, the visitation logs.

24  It's very plain.  It is one where you say, "We didn't receive

25  them," and they say, "We gave them to you last month."

United States District Court

 1          And so I have to deal with that.  And then I also

 2     have to deal with the more general issue about these others

 3     where there are contentions that there's been no production.

 4     It's not a question about whether it was exactly right or not.

 5          And then beyond those two beasts, I've got, sort of,

 6     you plopping a third one in front of me, and that is, "Hey, we

 7     just want a timetable.  We just want a schedule."  Well, that

 8     third statement, I don't know whether I'm taking what you're

 9     saying to mean that we don't need to focus on the first two

10     beasts right now, we just have to look at the problem that you

11     just articulated which sounded a little bit different to me.

12     You said there are these booklets that are produced for each of

13     the facilities to the wardens and they contain the supporting

14     material and we just want to make sure we get them on a timely

15     basis.

16          MS. FETTIG:  I apologize for confusing the tissue

17     here, Your Honor.  What we are concerned about is production of

18     the documents, production on a timely manner.  I would suggest

19     that based on the production log that defendants have just

20     produced and the new documents that they produced here today,

21     both parties can consult, compare our lists.  If we can come to

22     an agreement, I would love to submit that to you.

23          But at the same time, what we need is a guarantee

24     that we won't be back in front of you three months from now

25     with the same problem.  That is plaintiffs' concern.  We want

United States District Court

1    to solve this issue of timely production of documents in

2    addition to resolving the dispute between what defendants say

3    they have produced and what we say we have received.

4              THE COURT:  All right.  Well, I can guarantee you it

5    won't be three months because you all -- because we've got this

6    idea that we're going to talk at least every month, no issues

7    should be percolate longer than 30 days.  They should be

8    brought to my attention.  If you all have got an issue, bring

9    it to my attention in a more timely basis.  I saw all of the

10   letters going on and, admittedly, we didn't have a procedure in

11   place for dealing with this.

12             But we I think now have a procedure in place where

13   you're going to have my regular engagement and, as you can see,

14   I'm willing to go item by item and to figure it out.  The

15   problem I have I have is that when I've got this dispute, the

16   way I would normally address it is to say -- getting as

17   concrete as I can.

18             So the first step in getting concrete is to look to

19   see what the issue is.  The second step in getting concrete is

20   to look what was produced.  And I can look at those things,

21   those three things; and if I can see them, I can understand and

22   make a decision about whether or not there's a need for further

23   supplementation or a need for further production or whether

24   it's been satisfied.

25             Now, what you have just suggest, and I don't know

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

 1    whether the number of additional items produced today mean that

 2    it doesn't make sense for us to go through this list, because

 3    there are a number of lines that are drawn through here, maybe

 4    about half of the items on the table, maybe a little bit more.

 5    But one of the things we could do is have you have this chance

 6    to get it resolved or to determine if it is resolved and if

 7    that isn't, I'm wondering if people are -- the next time we're

 8    planning to be in Court or the next hearing we have I think is

 9    on the eighth and I don't know whether people were planning to

10    be in Court in person but if you were, you could bring me these

11    things that I could look at and we could sit down and look at

12    them and I could be able to see whether or not there has been

13    the production that is required.

14            So I raise that as a possibility also.  What do you

15    think about that, counsel?

16            MS. FETTIG:  Your Honor, I think that makes a great

17    deal of sense.  One thing I would suggest is that where

18    defendants have conceded that the production is missing, we

19    move forward with an idea today of when those documents will be

20    produced and that at our next meeting, we can deal with the

21    dispute as to whether some of them have been produced.  But

22    it's very clear that defendants do concede that some of the

23    documents that are listed are indeed missing.

24            THE COURT:  Well, I'm not sure about that but we can

25    certainly find out for sure by asking Ms. Rand whether or not

CV-12-00601-PHX-DKD, August 19, 2016

 1    the absence of a line does demonstrate a concession that they

 2    haven't been produced yet or whether they are reserving an

 3    argument that they haven't produced them because they didn't

 4    have to produce them.

 5          MS. RAND:  Your Honor, as far as -- let me just start

 6    with the first issue as to whether or not some documents were

 7    produced.  We have a confirmation that plaintiff's staff

 8    downloaded the documents on August one and we don't, obviously,

 9    have one for today's which are very few in number compared to

10    the ones that were downloaded I think the other day in August.

11    But we are conceding that the documents that are listed here

12    that do not have a line through it, we believe those documents,

13    as far as we can tell be, are still outstanding.

14          Now, again, as far as the reasoning going behind it

15    is that we feel that the amount of production that plaintiffs

16    have been asking for is just so voluminous and they want that

17    done now.  They want all of it done now.  Different portions of

18    the request come from different parts of plaintiff -- you know,

19    they have one I guess person that focuses on mental health, one

20    person that focuses on max custody, and one focuses on the --

21    the others focus on health care.  So we get these requests

22    demanding that we produce these things and we're trying to.

23          The other reason is that over time, these requests

24    have morphed and also the process for the collection and what

25    documents are actually retained for the max custody

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

1    documentation have morphed over time as well.

2         A case and point is that in a letter recently sent by

3    plaintiffs, they contend that we have not produced any

4    documents, and these documents that they contend we didn't

5    produce are not even on this list.

6         And so they say that we are outstanding for, you

7    know, over a year but then we don't even have notice -- the

8    first time we have ever had notice that we didn't produce this

9    document that they believe we should have produced, and we

10   don't agree we should produce, was on July 7, I believe.

11        So I think that there's a lot of time that plaintiffs

12   say that we are not producing documents and I don't believe

13   that's true based on when they advise us, how they advise us,

14   et cetera, because, like I said, the procedure has morphed

15   over time and documents that they didn't say we had to produce

16   earlier, now they insist that we produce.

17        Nevertheless, going forward we are trying to produce

18   all of the documents that we are now establishing as, quote

19   unquote, standard notebook documents and then the other issue

20   is that we have hired two additional staff members, actually

21   three in the last two months, to help with the production and

22   the administration of this case.

23        So I think that it's not going to -- I'm not saying

24   that it's okay that plaintiffs inundate us with these requests

25   and they insist that we produce documents upon documents but I

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

1    am saying that I think document production, as it pertains to

2    these notebooks, will be more timely and we will be catching up

3    and we will be able to get these to the plaintiffs in a sooner

4    manner notwithstanding that documents change or they don't

5    notify us that they are not produced and, obviously, we can't

6    get those done as well.

7            THE COURT:  Well, I would suggest that I don't think

8    there will be the danger of morphing because by getting

9    concrete in this process, my hope is that my involvement will

10   mean that everybody will understand that part of the way that I

11   have to proceed is I have had to know definitively what the

12   request is so there will be a lock-in to a certain extent about

13   what requests we are talking about and there will be a timeline

14   associated with that request.

15           So I believe the morphing danger will dissolve.

16           I also have to say that a number of these requests

17   seem very basic to me and as I read through what plaintiffs

18   have asked for, many of these things seem positive, seem that

19   they should be, as a matter of course, produced and the fact

20   that it has taken so much time seems troubling to me.

21           So having heard -- is it two or three new hires?

22           MS. RAND:  We have two paralegals and one legal

23   secretary that is starting on Monday.

24           THE COURT:  I see.  They are starting on Monday in

25   your office?

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

1      MS. RAND:  The legal secretary started on -- is

2   starting this coming Monday in my office.  I had one paralegal

3   that started this week in my office and the previous -- the

4   other first paralegal started two months ago.

5      THE COURT:  I see.

6      And these people have been now given duties that you

7   believe will change the previous course of activity with

8   respect to what looks to be an unnecessarily protracted

9   process.  That's your belief, is it?

10      MS. RAND:  That's correct.

11      THE COURT:  All right.  Well, that's good news.

12      Well, then, I would suggest that the right thing to

13   do is to take a look -- for plaintiffs to take a look at the

14   documents that were produced today, take a look at the table

15   and the comments by way of the lines that the defendants have

16   made and go through them one by one because you all are able to

17   do what I will end up doing on that, is that you have enough

18   familiarity with them right now to know whether or not they

19   have been produced and you can have an informed discussion

20   about it.  But you should understand that if you can't come to

21   a resolution, you're going to have to present to me -- each

22   side is going to have to carry the day on their respective

23   argument as to why they have been requested and why they

24   haven't been produced or if they have been produced, why I

25   think they have and so I will look forward to our next time in

United States District Court

16

CV-12-00601-PHX-DKD, August 19, 2016

 1   court together to reserve time to go into that.

 2           Let me ask the clerk, what time of day is the hearing

 3   set for?

 4           COURTROOM DEPUTY:  It is set Thursday, September 8,

 5   it's 9 a.m.

 6           THE COURT:  Okay.  All right.

 7           And do I have anything yet that day thereafter?

 8           COURTROOM DEPUTY:  No.

 9           THE COURT:  All right.  I'm going to keep the rest of

10   the day clear.  We'll go until the end of the day.

11           MS. RAND:  Your Honor, this is Lucy Rand speaking.  I

12   am on annual leave until after the 17th of September so I am

13   unavailable on the eighth and I'm the one that takes care of

14   the production.  Would you want to have someone else discuss,

15   represent or would you like to reschedule and have me attend

16   the hearing on a different day?

17           THE COURT:  Well, it's not fair, you're right, for me

18   to -- because you haven't addressed the issues that are set for

19   the eighth previously.  That's really not been what -- so it

20   was unfair for me to assume that you would be present for that.

21           Having now heard that you won't be present on the

22   date that it seemed like we were all together again, that is a

23   problem because we really need you.  And so I suggest that what

24   we need to do, then, is pick -- you say you are on leave

25   until -- when do you go on leave?

                    United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

1           MS. RAND:  On the first.

2           THE COURT:  The first.  So you're out from the first

3      to the 17th of September?

4           MS. RAND:  That's correct.

5           THE COURT:  All right.  Boy.

6           Hold on just a second if you will.  I want to confer

7      with my clerk.

8           I just hate to have so much time pass.  I wonder if

9      we should do a separate hearing with respect to the documents

10     and perhaps we could do it before you leave to take -- hold on,

11     everybody.  Let me take a look at the calendar.

12          Thank you for your patience.  What I am wondering

13     about -- and let me pull up my calendar.  Just a moment.

14          The counsel on both sides who are responsible for --

15     primarily responsible for the document issues, is there any

16     possibility that they could be available a week from today in

17     the afternoon, in the later afternoon, so that we would have a

18     chance to talk about the documents that remain at issue and

19     make sure that we don't lose this time between now and the 19th

20     of September, which I really don't want to lose?

21          MS. FETTIG:  Your Honor, this is Amy Fettig.  August

22     26, I think that is the date that you're talking about, that

23     does work for us.

24          MS. RAND:  It works for defendants as well.

25          THE COURT:  Okay.  All right.  I'm on criminal duty

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

```
 1   that day.  But typically, criminal duty will conclude and let
 2   me just see if there's anything that has been set in the
 3   late -- at 4 o'clock, let's say.  What we'll do is we'll set it
 4   for 4 o'clock and we'll do it in court and everybody bring what
 5   you have to show me so that I can make a decision and you'll
 6   also have worked through the production today and make sure
 7   that you have a concrete view of what you have and what you
 8   don't have or what you think the other side should have.
 9            So 4 o'clock, a week from today, to address that.
10   Does that work?
11            MS. FETTIG:  Yes, Your Honor.
12            MS. RAND:  Yes, Your Honor.
13            THE COURT:  Okay.  All right.
14            I believe that that resolves the agenda item -- not
15   resolves but at least deals with agenda item one in plaintiffs'
16   letter.
17            Agenda item two is the issue with respect to
18   documents associated with people who may or may not have been
19   discharged, associated with or some kind of action attendant to
20   false reporting of a-- alleged false reporting.
21            I've got some issues with this request from
22   plaintiff.  The reason that I have the issues is, it's hard for
23   me to think that I should be devoting much of my energy to
24   getting people to work on -- and this I mean in particular the
25   defendants, to work on production of this issue that you have
```

CV-12-00601-PHX-DKD, August 19, 2016

1   mentioned in agenda item two because of two reasons.  One, I
2   think the most important thing for the compliance with the
3   stipulation is to make sure that the reporting on the broad
4   base occurs.  And we've got real problems, enough problems,
5   with that.  And I really want to keep the ball -- focus on that
6   ball rather than diverting attention to this other issue.

7           It admittedly may well be very important but it may
8   also not be particularly important in the context of this case
9   for another reason, because it's hard for me to think that
10  there has been a contamination of the reporting given the fact
11  that the reporting that we have received generally demonstrates
12  presentence investigative report significant failure of the
13  defendants to comply with the stipulation in a number of
14  instances.  And so it would seem unlikely that there has been
15  the rampant false report because the reporting is not looking
16  very good.  And so that makes me think that I should keep the
17  focus on getting the reporting through, because that identifies
18  the problems that we have to address in terms of getting
19  remediation -- well, in the first instance, getting mediation,
20  then remediation for these deficiencies rather than focusing on
21  what may be the subject of a different matter, whether it's a
22  state investigation or whether it's a personal injury case or
23  some other kind of case.  It seems to me that that may be
24  relevant in those contexts but it's really not job one in this
25  case.

 1            So that is my preliminary view on that and I would

 2    suggest to you that we defer -- that we not address this issue

 3    because I don't think it's particularly helpful to the

 4    plaintiffs' missions in this case.  I understand you have a

 5    disagreement.  But I really am hesitant to think that we should

 6    devote the resources of a trying-to-comply defendant that has

 7    not been complying to the plaintiffs' satisfaction for a good

 8    time now, we should not divert those resources to this other

 9    matter.  But I'll give you each a chance to respond to what

10    I've just said.

11            Who is on the plaintiffs' side going to speak to

12    that?

13            MS. FETTIG:  Your Honor, this is Amy Fettig.  And the

14    reason why we believe that these documents are so urgent is an

15    issue that you have actually addressed here.  And that is the

16    compliance.  But we're focused on the max custody performance

17    measure compliance and those Perryville-Lumley and

18    Florence-Kasson has been reporting nearly 100 percent

19    compliance for the max custody measures.  It's almost

20    suspiciously high and that's why we're especially concerned

21    that these incidences where 21 people were found to have lied

22    and falsified documents, 13 so severely that they were fired,

23    in the cases of serious suicides for our clients.

24            THE COURT:  But doesn't the fact that there has

25    been -- that there has been this corrective action, doesn't

1    that further suggest that I don't need to divert resources in

2    this case to examining that further without any other kind of

3    evidence that it's contaminated what you have?  You have what

4    you think is circumstantial evidence but, again, there will

5    come a point -- we'll hope to be at 100 point compliance.  I

6    imagine the defendants entered into -- I am hopeful that they

7    would to at some point not ever to have to even be fearful of

8    the kinds of things that can happen as you suggest have

9    happened here because of failure to comply.

10         But I do think that the number of people that you say

11   that have been discharged or reprimanded or what has taken

12   place would suggest to me that, again, it's not worth the

13   additional resource allocation where we have so much work to do

14   that is focused on whether or not there's compliance with the

15   stipulation performance measures.

16         MS. FETTIG:  Your Honor, our concern here is the

17   employees who work hard, and we are glad that at least 13

18   were -- at least there are still some remaining.  But we are

19   concerned that those employees were the same employees who may

20   have been making the compliance findings for the last year in

21   Perryville-Lumley and Florence-Kasson and that has serious

22   implications for defendants' complaints under the -- for the

23   isolation measures.

24         So what I would ask for, at just a minimum, is a list

25   of the employees involved and the role that they play in

CV-12-00601-PHX-DKD, August 19, 2016

 1   documentation and findings of compliance with the max custody

 2   performance measures.  If it turns out that those 13 and 21

 3   employees had absolutely no role in the maximum custody

 4   findings, then, as you suggest, we need to concentrate our

 5   energy on some of the very, very -- other serious things in

 6   this matter.

 7          But at a minimum, we would request those documents so

 8   that we can assure and do the diligent job that we need to do,

 9   that the compliance findings that have been published by

10   defendants are actually not suspect and have not been subject

11   to some of the falsifications that other aspects of

12   administration of those units have so clearly.

13          THE COURT:  Well, Ms. Rand, what I would then ask you

14   to do is in the next week, make an inquiry to see whether or

15   not these employees that were apparently involved in some kind

16   of sanctionable or conduct that rendered them to sanctions, see

17   if they were involved in any of the reporting that was

18   presented as part of the compliance enforcements for the

19   stipulation and just be ready next week to report about whether

20   or not they were involved.  And then if they were, then we can

21   at that point talk about whether my initial inclination is

22   wrong.

23          Are you willing to do that, Ms. Rand?

24          MS. RAND:  Yes, I am willing to do that.  However, I

25   just wanted to state that the people that actually do the

1    monitoring, the majority of them are deputy wardens and ADWs

2    and they are all still employed.  And so it just seems to me

3    like it's a waste of time and it seems to me like it's more of

4    a fishing expedition on plaintiffs' part trying to get these

5    people's names.

6         I think --

7         THE COURT:  Well, the question is whether or not

8    there's reason to think that the reporting that is required by

9    the stipulation has been tainted by conduct that has been so

10   egregious that you've sacked these people, and that I think is

11   essentially what plaintiffs' concern is and that's not an

12   unreasonable concern.

13        If you hear that the people who have been taking in

14   your data have been called into question that they were

15   reporting things improperly, it would seem to me you would want

16   to know whether that taint has spread.  Does that not make

17   sense to you, Ms. Rand?

18        MS. RAND:  No.  It does.  I just was going to say

19   that I didn't think that we actually had to provide a list of

20   the people's names.

21        THE COURT:  No.  I want you to explore in -- in the

22   first instances, I want you to explore whether or not any of

23   these people who were -- suffered an adverse employment action

24   were involved in the reporting of the material that was

25   provided to plaintiffs where they think that there's some

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

```
 1    reason to be concerned about whether or not it was accurate.

 2              MS. RAND:  Okay.

 3              THE COURT:  All right, sir.

 4              MS. RAND:  I can do that.

 5              MS. FETTIG:  Your Honor, I would just like to make

 6    the point that our concern here is not necessarily the warden

 7    himself or the deputy warden.  What we're concerned about is

 8    the individual can do all of the daily tracking, the out of

 9    cell time that make up the max custody --

10              THE COURT:  Well, Ms. Rand is going to look into that

11    to see if the people that actually did that are the people that

12    are identified as not providing complete and correct

13    information.  So she's going to take a look at that.  So it's

14    not simply saying, "Oh, the warden signed off on this," is not

15    enough.  Ms. Rand is going to make a further inquiry to see

16    whether or not the material that was provided to the warden to

17    give to him or her the information, whether that was at any

18    timed possibly by involvement of people that are subject to

19    question.

20              MS. FETTIG:  Thank you, Your Honor.  That is a

21    clarification.

22              THE COURT:  All right.  The third topic is the

23    mediator.  I have received word that you all would be in

24    agreement to have Judge Bade serve as the mediator.  Let me

25    just confirm that that's correct.
```

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

1          MS. FETTIG:  That is correct, Your Honor.

2          MR. FATHI:  Yes, Your Honor.

3          MS. RAND:  Correct.

4          THE COURT:  Okay.  And I have asked Judge Bade if she

5    would be willing to take that assignment and she has agreed.

6          And so I understand that you have just, 10 days ago,

7    conducted the last mediation with Judge Buttrick and I gather

8    that there is now another -- are you poised for another

9    mediation I think.  Is that also correct?  So that it is likely

10   sooner rather than later that Judge Bade would need to be

11   engaged; is that correct?

12         MS. FETTIG:  That is correct.

13         THE COURT:  Okay.  All right.

14         I think that each side should confer on how best to

15   present the case to her in a cooperative way to get her to be

16   as informed as she can be to start and then contact her --

17   maybe contact her JA and try to schedule an appointment, either

18   telephonically or in person, whichever she prefers, so that you

19   can establish best procedures on how she would like to move

20   forward in conducting her mediation.  She may have a different

21   view than what I've just suggested.  But I would say that in

22   the first instance, again, it would be helpful if you all could

23   come to a common understanding of the framework that you might

24   be able to present to her because not necessarily would she say

25   that she would want to do what you've done with Judge Buttrick.

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

```
 1    I don't know how you've handled it with Judge Buttrick.  But to
 2    the extent that the parties think that they have come to a
 3    framework that works well in the process and if you think that
 4    that is worth replicating, then that is something that you
 5    could talk among yourselves and say, "Well, let us inform Judge
 6    Bade of how we have done things so that she can decide whether
 7    or not that works for her or not."
 8             So I will enter an order referring the case to Judge
 9    Bade as the mediator pursuant to the parties' stipulation and
10    the Court's belief that it is helpful in this case to have the
11    parties' agreement.  I'm thankful that you were able to reach
12    that agreement and so I appreciate that.
13             Anything else anybody wanted to say about that?
14             Okay.  All right.  There are a number of other issues
15    that -- timing issues with respect to the completed mediation
16    that I haven't heard from you all about, how we best should
17    proceed with respect to the issues that have been mediated that
18    have not been addressed, not, of course, referring to what's on
19    the docket for next month.  But how best to proceed with
20    respect to those.
21             Had you all given any thought?  Have you had any
22    conversations, the two sides, together about the timetable for
23    that?
24             MR. FATHI:  This is David Fathi, Your Honor.  I'm
25    afraid I'm not quite sure what you're referring to.
```

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

```
 1           THE COURT:  Let me do a better job of trying to

 2   explain it.  My understanding is that 10 days or so ago you all

 3   conducted a mediation with Judge Buttrick.  I didn't see a

 4   minute entry respecting the result of that, so I don't know

 5   whether there are issues that are now poised for another set

 6   of -- we've gone through the first round of -- or the first

 7   motion by plaintiffs to enforce the stipulation.  We're going

 8   to have a consideration of the remediation status on the eighth

 9   and then I gather we need to be marching with respect to the

10   plaintiffs' second motion and that is what I was asking about.

11           MR. STRUCK:  Your Honor, that's correct.  This is Dan

12   Struck.  We haven't conferred with -- both sides have not yet

13   conferred about how best to proceed with that next step, you

14   are correct.  It's something that we can accomplish and report

15   back to the Court.

16           THE COURT:  All right.  Okay.  So --

17           MR. FATHI:  But just to be clear, Your Honor -- this

18   is David Fathi -- the mediation with Judge Buttrick on August 9

19   was unsuccessful in resolving the issues and, therefore, on

20   August 17 plaintiffs filed a motion to enforce the stipulation.

21   So I just wanted to make sure that the Court was aware of that

22   outcome of the mediation.

23           THE COURT:  Okay.  All right.  Well, that's what I --

24   that's certainly one thing I needed to know.

25           And then the next thing I needed to know is how we
```

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

1   get it on the calendar to address it.

2          And Mr. Struck has said you all are going to talk

3   about that and figure it out.  Is that what you just said, Mr.

4   Struck, or did I misunderstand that?

5          MR. STRUCK:  Yes.  We can confer with respect to

6   the -- obviously, there will be a briefing schedule based upon

7   the filing that the plaintiffs submitted on August 17 and then

8   we can discuss with them some available dates and get with your

9   folks and find out when you might be available.

10          THE COURT:  Okay.  Here's what it would be -- I mean,

11   some regularity because I realize there are so many people

12   involved and so many schedules.  As part of this, maybe it

13   makes sense for you to take a look at what is on the to do list

14   presently with respect to the motions to enforce and take a

15   broad view of it and to try to come up with a timetable that

16   puts in play the Court's or puts in place how the Court should

17   address the pending motions going forward beyond the first

18   motion to enforce.  That maybe would make sense that we

19   wouldn't leave anything out and also make sure that we took

20   advantage of everybody's time in the best way.

21          MR. FATHI:  Your Honor, this is David Fathi.  I just

22   want to, for the sake of completeness, make clear that on July

23   12, the plaintiffs filed an enforcement motion that has to-do

24   with the methodology by which the defendants monitor compliance

25   with the stipulation.  That motion is now fully briefed and

CV-12-00601-PHX-DKD, August 19, 2016

1    there is some urgency about resolution of that motion because

2    of course the methodology affects the ongoing monitoring that

3    the defendants are doing.

4          So our position is that that motion is fully briefed

5    and should be decided expeditiously.

6          THE COURT:  Okay.  And did anybody request oral

7    argument on that motion?

8          MR. FATHI:  No, Your Honor.

9          THE COURT:  Okay.  All right.  Then I'll take a look

10   at it and get a ruling out on it.

11         MR. FATHI:  Thank you, Your Honor.

12         THE COURT:  Okay.

13         So we have already in place briefing associated

14   preparatory to the September 8 additional hearing.  But, again,

15   beyond that, beyond the September 8 date, other matters, other

16   than the interpretation motion that Mr. Fathi just referenced,

17   which I will address, you all should take a look to see what is

18   ahead of us and to see what kind of plan that you think makes

19   sense that covers all of these things in a most efficient way

20   for the counsel who are involved.

21         Then next Friday at 4 we'll convene again on these

22   discovery issues.  And I guess one thing I would like to

23   inquire about, there still is the pending issue about whether

24   or not the videos have been fully produced.  Where do we stand

25   on that from the plaintiffs' view?

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

1          MS. RAND:  Your Honor, we produced those as ordered

2     by the Court.

3          THE COURT:  Okay.  So that issue has now been

4     satisfactorily addressed and is now moot?

5          MS. RAND:  Yes, Your Honor.

6          MS. FETTIG:  That is correct up until April.  We have

7     not received any updates since that time, so we are glad to

8     have received the videos but hope that it will not become be a

9     continuing issue of non-production when we finally get the max

10    custody CGAR background documents for May.

11         THE COURT:  Ms. Rand, what's the timetable in turning

12    over these going-forward videos?  Where do you contemplate?

13         MS. RAND:  We are trying to get the videos from the

14    complexes.  We're having a training with them at the end of

15    this month and we were trying to highlight to them that they

16    need to send them immediately when they send the other

17    documentation.  At this time they have not been sending them

18    and we have been, you know, working with them to get them to

19    send them but it's not been an automatic thing.  I think maybe

20    there was some misunderstanding on the parts of the complexes

21    that they thought it was a one-time production.  So we have

22    been trying to work with them; and, like I said, we're going to

23    meet with all of them at the end of this month to clarify that

24    the videos are a monthly production, not a one-time production.

25         THE COURT:  Okay.  Good.

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

1          MS. RAND:  And once we do, we'll start -- we should

2    start getting them in immediately and start producing them the

3    same as well.

4          THE COURT:  Good.  All right.  Hopefully, it won't be

5    an issue, then, in the future.

6          Is there anything else we need to address this

7    afternoon?

8          MR. SPECTER:  Your Honor, this is Don Specter.  I

9    just want to address the issue of the access to medical records

10   electronically.  You recall that we have been at that issue for

11   several months and we just received an e-mail from Mr. Struck a

12   few minutes before this conference suggesting that read-only

13   records are available.  So maybe Mr. Struck can explain the

14   delay.

15         THE COURT:  I didn't understand what you said,

16   Mr. Specter.  You said Mr. Struck said they were not or they

17   were available, the read-only?

18         MR. SPECTER:  Mr. Struck now says that they are

19   available after telling you and us for many months that

20   read-only access couldn't be provided, so maybe he could

21   explain why and also why those representations are made and

22   also when they were -- are going to get such access.

23         THE COURT:  Well, here let me just interpose for a

24   moment.  Perhaps if I'm understanding what you said correctly,

25   is that the read-only access is what I have been pushing for

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

1    and that is something close to the California model.  And if

2    indeed that's what Mr. Struck has come up with, he embarked on

3    a different plan.  I continued to encourage him to try to adopt

4    his plan.  If he has now adopted the plan that I was pushing, I

5    am not going to beat him up for that, nor would I suggest that

6    plaintiffs would want to look this gift horse in the mouth.

7    But that said, it is worth asking the question if it is

8    available, when does it go online?  When can plaintiffs take

9    advantage of it?  That's a good question.

10          MR. STRUCK:  Your Honor, this is Dan Struck.  I just

11   found out from Corizon that, in fact, with their conversations

12   with their technical people that they have been able to figure

13   out a way to provide read-only access to all of the records for

14   the plaintiffs.  I've asked for a time frame and the best they

15   have told me is two months but that's -- that is with the

16   caveat that they were still working on the silo idea, which

17   they don't need to do.  They can scrap that.

18          So I have been told by the Corizon in-house counsel

19   that they believe it will be less than two months, but I've

20   asked for a more concrete -- and I hoped to have that before

21   the hearing but haven't gotten a more concrete response other

22   than "within two months" but I imagine since they are now

23   scrapping the other project, it will be earlier than that.

24          THE COURT:  Well, two months does sound --

25          MR. STRUCK:  I'm sorry.  I will continue to push

United States District Court

1    Corizon for a specific deadline and let the plaintiffs know as

2    soon as I do.

3            THE COURT:  Two months does sound too long to me.

4    That doesn't seem consistent with my gentler approach of what I

5    just uttered; so if it is two months, that's too long.  Find

6    out and be able to let me know a week from today what it is

7    when they say this will be online, understanding that if it's

8    not online, I think it's fair to do what I said is the

9    alternative and that is to say that the plaintiffs can show up

10   at your office and sit next to you and get access and you can

11   make sure that they don't type any keys that write on these

12   documents.  But seems that we're now to the point that unless

13   you can offer the promise of expeditiously getting to these

14   read-only access remotely for the plaintiffs, they need to have

15   access to these documents much sooner than that.  So let me

16   know next Friday where we stand.

17           MR. STRUCK:  I will.  And I will also let Corizon

18   know of your position that two months is too long.

19           THE COURT:  Okay.

20           MR. STRUCK:  So maybe that will light a little bit

21   more of a fire.

22           THE COURT:  All right.

23           Anything else this afternoon?

24           MR. SPECTER:  Just, Your Honor -- this is Don Specter

25   again.  I'm not sure if we communicated to you.  We talked last

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

 1    time about having a monthly status conference with you.

 2              THE COURT:  Yes.

 3              MR. SPECTER:  We did meet and confer about that and

 4    we chose the second Wednesday of every month at 10 o'clock just

 5    somewhat arbitrarily.  I don't -- I'm not sure we're going to

 6    need that in September because, you know, we have this hearing

 7    next week and then on the eighth but does that time frame

 8    generally work for you or is there another time and day that is

 9    better?

10              THE COURT:  Well, the Wednesday at 10 a.m. when I'm

11    on criminal duty happens to interfere with the time for

12    arraignments but we'll put it on five.  There are five of us in

13    Phoenix and I'm on criminal duty -- one of five weeks.

14              And so what we'll do is we'll put it on the calendar

15    for 10 a.m. on Wednesday.  If there is an arraignment calendar

16    that interferes, we'll let you know in advance and maybe move

17    it to a different time, maybe just an hour off, maybe 9 a.m.

18    local time here.  We sometimes have matters scheduled then but

19    I think we would be able to put you all in that position even

20    on the criminal duty days.

21              So we'll go ahead and put that on the calendar.

22    Thank you for meeting and conferring about that.

23              MR. SPECTER:  You're welcome.

24              THE COURT:  Anything else?

25              All right.  Well --

                    United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

1           MR. FATHI:  Your Honor, just to follow up on that, so

2    the first such session would be on Wednesday, September 14; is

3    that correct?

4           THE COURT:  Well, I thought Mr. Specter thought he

5    didn't think we needed September but you would like to have one

6    on the calendar just in case?

7           MR. FATHI:  Loathe as I am to disagree with

8    Mr. Specter, I think it might be prudent to put it on the

9    calendar and then if we don't need it, of course we'll advise

10   the Court.

11          THE COURT:  All right.  I've told you that I'm

12   willing and happy to do that.  We'll put it on the calendar.

13   Is the 14th a second Wednesday?

14          MR. FATHI:  Yes, Your Honor.

15          THE COURT:  All right.  So it's on the calendar going

16   forward then.

17          MR. FATHI:  Thank you, Your Honor.

18          THE COURT:  That's not a religious holiday, is it?

19          COURTROOM DEPUTY:  October 12 is.

20          THE COURT:  October 12 is?

21          COURTROOM DEPUTY:  September 14 you will be in

22   Flagstaff.

23          THE COURT:  I'm sorry?

24          COURTROOM DEPUTY:  You'll be in Flagstaff.

25          THE COURT:  Oh, goodness.  I'm just thinking how we

                    United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

 1    can deal with a conflict that has been identified in September

 2    on the 14th.  Let's set the 14th for 9 a.m.  Is that all right,

 3    everybody?  Every out time we'll do at 10.

 4              Actually, is there any reason that -- I guess the 10

 5    a.m. is -- pretty shortly we go back to be a standard time so

 6    you don't have -- I don't know if you've thought about that

 7    with the east coast time.  But I wonder if it makes more sense,

 8    if it's all right with you all, if we scheduled it for 9 a.m.

 9    local time in Arizona instead of 10 a.m.

10              MR. FATHI:  Certainly.

11              MS. RAND:  Certainly.  That's fine with defendant.

12              THE COURT:  All right.  So we'll set this standard

13    discovery hearing for the second Wednesday at 9 a.m.  October

14    you say is Yom Kippur, is that what you are telling me?

15              COURTROOM DEPUTY:  That's correct.

16              THE COURT:  We can't do it that day in October.

17              So we can -- you all send e-mails back and forth to

18    see what an alternative date that you can do instead of

19    October, the second Wednesday, and let us know when you would

20    like that to be and we'll try and put that in place.  But

21    otherwise, absent holidays of a nature that we can't schedule,

22    we'll plan to do the second Wednesday at 9 a.m.

23              MR. FATHI:  Thank you, Your Honor.

24              THE COURT:  All right.  Thank you all very much.

25              MS. RAND:  Thank you.

                    United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

1            MR. STRUCK:  Thank you, Your Honor.

2        (Proceedings concluded at 3:55 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court

CV-12-00601-PHX-DKD, August 19, 2016

C E R T I F I C A T E

I, ELAINE M. CROPPER, court-approved transcriber, certify that the foregoing is a correct transcript, to the best of my skill and ability, from the official electronic sound recording of the proceedings in the above-entitled matter.

DATED at Phoenix, Arizona, this 17th day of October, 2016.


s/Elaine M. Cropper

_____

Elaine M. Cropper


United States District Court