Kathleen E. Brody (Bar No. 026331)
Daniel Pochoda (Bar No. 021979)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org
        dpochoda@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
        adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-DKD <br><br> **PLAINTIFFS' STATEMENT REGARDING UNRESOLVED ISSUES RELATED TO DEFENDANTS' PROPOSED MONITORING GUIDE AND METHODOLOGY TO MEASURE COMPLIANCE WITH THE STIPULATION** |

# TABLE OF CONTENTS

**Page**

BACKGROUND ........................................................................................................ 2

I.   DEFENDANTS' UNILATERAL CHANGES TO CALCULATING
     COMPLIANCE WITH THE STIPULATION ............................................. 4

     A.   Performance Measure 16 ................................................................. 7

     B.   Performance Measure 27 ................................................................. 7

     C.   Performance Measure 35 ................................................................. 8

     D.   Performance Measures 66, 67, and 69 ........................................... 9

     E.   Performance Measures 89, 91, 93, 94, 95 ..................................... 10

     F.   Isolation Performance Measures 6 and 8 ...................................... 12

II.  DEFENDANTS CONTINUE TO IGNORE THE PLAIN
     LANGUAGE OF THE STIPULATION AND THE COURT'S
     ORDERS INTERPRETING MENTAL HEALTH MEASURES ............. 13

     A.   Defendants' failure to acknowledge that cellfront encounters
          do not satisfy the requirement that a patient be "seen." ............... 13

     B.   Performance Measure 78 ............................................................... 14

     C.   Performance Measure 85 ............................................................... 15

     D.   Performance Measure 86 ............................................................... 15

     E.   Performance Measure 91 ............................................................... 16

     F.   Performance Measure 98 ............................................................... 17

III. DEFENDANTS' PROPOSED PLAN FOR MEASURING
     COMPLIANCE WITH PARAGRAPHS 12, 14, AND 15 OF THE
     STIPULATION (DOC. 1703) ..................................................................... 18

IV.  DEFENDANTS' METHODOLOGY FOR MEASURING
     COMPLIANCE WITH PMS 60 AND 61 CONTRADICTS THE
     PLAIN LANGUAGE OF THE STIPULATION ....................................... 19

V.   DEFENDANTS' PROPOSED METHODOLOGY FOR PM 44
     COUNTS INACTION AS "ACTION" ...................................................... 20

VI.  DEFENDANTS HAVE FAILED TO PROVIDE UPDATED
     PROTOCOLS FOR DENTAL PMS TO ADDRESS ONGOING
     "NOT APPLICABLE" FINDINGS ........................................................... 21

1
2

**TABLE OF CONTENTS**
**(continued)**

Page

3
4

VII.   DEFENDANTS REFUSE TO AGREE TO A FAIR AND
ACCURATE MONITORING PROCESS THAT COMPLIES WITH
THE PLAIN LANGUAGE OF THE STIPULATION AND
ISOLATION PERFORMANCE MEASURES ......................................... 22

5
6

A.   Isolation Performance Measure 1 ...................................... 22

B.   Isolation Performance Measure 2 ...................................... 25

7
8

C.   Isolation Performance Measure 5 ...................................... 26

D.   Isolation Performance Measure 6 ...................................... 26

9
10

E.   Isolation Performance Measure 8 ...................................... 27

F.   Isolation Performance Measure 9 ...................................... 28

11
12

CONCLUSION ............................................................................................ 34

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    At the October 5, 2016 status hearing, the Court directed the parties to continue to

2    negotiate regarding Defendants' proposed Monitoring Guide and methodology to measure

3    compliance with the Stipulation and its Performance Measures ("PMs"), in order to

4    narrow the disputed issues and areas of impasse for the Court's resolution.  The parties

5    engaged in a series of good-faith negotiations, and stipulated to extend the deadline until

6    November 15, 2016, to report back to the Court regarding disputes in monitoring

7    compliance.

8    As set forth in greater detail below, Plaintiffs seek the Court's assistance in

9    resolving the following issues:

- The global issue of Defendants' continuing practice of unilaterally
changing the monitoring methodology for multiple performance
measures, without notifying Plaintiffs of these changes;[1]

- Defendants' failure to abide by the Stipulation's plain language and the
Court's orders regarding multiple mental health PMs;[2]

- The inadequacy of Defendants' proposed plan [Doc. 1703] to report
compliance with Paragraphs 12, 14, and 15 of the Stipulation;

- Defendants' proposed methodology for measuring compliance with
PMs 60 and 61 of the Stipulation;[3]

- Defendants' proposed methodology for measuring compliance with
PM 44 of the Stipulation;

- Defendants' failure to modify the methodology for measuring
compliance with two dental performance measures (PMs 100 and 101),
even though the current methodology has rendered the measures moot;

---

[1] To date, the measures affected by these recent unilateral changes are health care
PMs 16, 27, 35, 66, 67, 69, 89, 91, 93, 94, and 95; and isolation subclass PMs 6 and 8.
See Part I, infra.  If Defendants continue to unilaterally change their methodology for
other PMs, Plaintiffs reserve the right to seek the Court's intervention.

[2] The measures affected are PMs 78, 85, 86, 91, and 98.

[3] These two PMs were not previously brought to the Court's attention in Plaintiffs'
Motion to Enforce the Stipulation [Doc. 1625] because Defendants had incorporated
Plaintiffs' proposed language for the PMs in their April 11, 2016 version of their
Monitoring Guide.  [Id. at 11; Doc. 1626-2 at 91-92]  However, in the version of the
Monitoring Guide produced by Defendants on October 5, 2016, Defendants had removed
the agreed-upon language and reverted to a previously proposed methodology that
Plaintiffs had found objectionable.  [See Declaration of Corene Kendrick in Support of
Plaintiffs' Statement Regarding Unresolved Issues Related to Defendants' Monitoring
Guide and Methodology to Measure Compliance With the Stipulation ("Kendrick Decl.")
Ex. 6]

- Defendants' refusal to agree to a fair and accurate monitoring process for the Isolation Subclass Performance Measures ##1-2, 5-6, 8-9; and,

- Defendants' sudden reinterpretation of the Stipulation's use of force provisions in paragraph 27 (a)-(e) and the accompanying Isolation Sub-Class Measure #9 to exclude coverage of most seriously mentally ill prisoners and non-seriously mentally ill prisoners in certain housing units.

## BACKGROUND

The Stipulation requires that Defendants follow an agreed-upon monitoring protocol for each performance measure.  [Doc. 1185 at ¶ 9(b)]  In response to Plaintiffs' October 15, 2015 Notice of Noncompliance about the methodology the ADC monitors were using [Doc. 1561-2 at 2-177],[4] Defendants agreed in a meet-and-confer on December 1, 2015 to draft a manual with uniform instructions to all ADC monitors on how to interpret and implement the protocols set forth in the Stipulation, and to provide a copy of this manual to Plaintiffs by December 18, 2015.  [Doc. 1626-1 at 12-14]  The December 2015 manual was filed with the court on April 11, 2016.  [Doc. 1536, Ex. 2]

Pursuant to the Stipulation's dispute resolution requirements, the parties had a mediation session on March 1, 2016 with Magistrate Judge Buttrick regarding monitoring methodology and the deficiencies Plaintiffs had identified in the December draft monitoring guide.  After the mediation, at Judge Buttrick's direction, the parties engaged in a lengthy series of weekly telephonic negotiations in March and April to review Defendants' draft monitoring guide.  As the parties negotiated, they agreed upon the methodology to be used for multiple health care performance measures, and the parties narrowed the areas of dispute and impasse to a handful of discrete issues.  Relying on these agreements, Plaintiffs sought the Court's assistance in July in resolving only what Plaintiffs believed were the remaining disputes and areas of impasse.  [Doc. 1625 at 6-8]

Additionally, at Defendants' request, Plaintiffs provided Defendants on April 15, 2016 a summary of all remaining health care performance measures for which Plaintiffs

---

[4]  All citations to the Electronic Case Files are to the page numbers assigned by the ECF filing system, and not the page numbers of the various documents contained therein.

1    needed clarifying information before determining whether Plaintiffs agreed with the

2    methodology and instructions.  [*See* Doc. 1626 ¶¶ 15; *id*., Ex. 14 (Doc. 1626-1 at 74-88)]

3    Defendants did not respond to this letter until October 13 and 14, 2016, after the Court

4    ordered the parties to engage in further negotiations.  [Kendrick Decl., Exs. 3-5]

5         This Court issued its Order regarding Plaintiffs' motion to enforce regarding

6    methodology on September 6, 2016.  [Doc. 1673]  The Court required Defendants to

7    change their monitoring methodology in a manner that impacted 21 different health care

8    performance measures.  [*Id*.]  The parties held a series of telephonic negotiations on

9    October 14, 19, and 28 and November 8 and 10, 2016.  Defendants have produced four

10   different versions of their health care Monitoring Guide to Plaintiffs since October 5,[5] and

11   repeatedly have made unilateral changes in methodology to performance measures that

12   Plaintiffs had thought were no longer in dispute.  Compounding the difficulty, Defendants

13   did not proactively notify Plaintiffs of these changes, and until the November 5 mental

14   health measure version and the November 11, 2016 version of the Monitoring Guide,

15   Defendants would not provide Plaintiffs updated versions of their guide in "track

16   changes" mode, so Plaintiffs would discover these changes only after laboriously

17   comparing the versions of the Monitoring Guides to one another. [Kendrick Decl. ¶ 18]

18        Defendants have taken the position that the Monitoring Guide is a "living

19   document" and thus they can continuously change it at will.  [*See* 10/5/16 Transcript at

20   14:4-7 and 22:13-23]  Plaintiffs' position is that the parties need to have an agreed-upon

21   or Court-ordered consistent approach to monitoring the Stipulation's Performance

22   Measures (which are unchanging) so that performance and compliance can be accurately

23   compared from month to month.  If Defendants are permitted to continue to make

24   _____

25   [5] Defendants produced revised Monitoring Guides on Oct. 21, Nov. 5 (mental
     health performance measures only), Nov. 6 (non-mental health performance measures),
26   and Nov. 11, 2016.  These various versions are attached as Exhibits 12-16 of the Kendrick
     Declaration.  Defendants produced revised methodologies for the isolation subclass
27   performance measures on November 10, 2016 and this is attached as Exhibit 1 of the
     Declaration of Amy Fettig in Support of Plaintiffs' Statement Regarding Unresolved
     Issues Related to Defendants' Monitoring Guide and Methodology to Measure
28   Compliance With the Stipulation ("Fettig Decl.") filed herewith.

unilateral changes to their monitoring methodology, the parties will never reach any sort of finality on how to evaluate compliance or whether Defendants are actually in compliance, and the parties will be trapped in a Sisyphean ordeal of never-ending disputes, negotiations, and briefing to the Court.

To the extent Defendants might need flexibility to modify their Monitoring Guide, they should provide formal written notice to Plaintiffs of proposed changes, and give Plaintiffs a reasonable time to respond to the proposed changes. Accordingly, Plaintiffs seek an order directing Defendants to no longer unilaterally change their methodology for performance measures without first giving Plaintiffs at least 60 days' notice of the proposed change of methodology, with a period of time for Plaintiffs to comment on the proposed changes, and an opportunity for the Court to resolve any disputes regarding the proposed changes before those changes go into effect. A proposed order is being lodged herewith.

## I.    DEFENDANTS' UNILATERAL CHANGES TO CALCULATING COMPLIANCE WITH THE STIPULATION

Nearly two years into the life of the Stipulation, Defendants have suddenly, and unilaterally, decided to change their monitoring methodology in ways that will substantially and artificially inflate their compliance scores for multiple performance measures. With the versions of the guide provided on November 5 and 6, 2016, [Kendrick Decl., Exs. 14, 15], Defendants changed the methodology for calculating compliance with health care PMs 16, 27, 35, 66, 67, 69, 89, 91, 93, 94, and 95. With the version of the guide provided on November 10, 2016, Defendants changed the methodology for calculating compliance with isolation PMs 6 and 8. [Fettig Decl. ¶ 2, Ex. 1] The Court should not permit this transparent end-run around the requirements of the Stipulation.

The vast majority of the Stipulation's Performance Measures require a certain number of prisoner records ("records" or "files")—usually ten from each unit ("yard") of an institution—to be randomly sampled each month for each PM. [*See generally*

1   Doc. 1185-1 at 17-36, 41-47]   Each prisoner's file is counted as either compliant or

2   noncompliant with the PM in question, and the percentage of compliant files is then

3   calculated and reported in the CGARs.   This is how compliance has been monitored,

4   without objection by either side, since the Stipulation took effect in February 2015.

5       A troubling pattern has emerged in the months since Court intervention regarding

6   noncompliance with the Stipulation.   Shortly after being found noncompliant by the Court

7   on multiple performance measures, Defendants have found a monitoring method more to

8   their liking.[6]   For some measures, rather than assess whether each patient's file is

9   compliant, Defendants have decided to determine, in gross, whether the entire prison

10  complex is compliant, using a method that will significantly overestimate their actual

11  compliance.   For other measures, Defendants have adopted an approach of parsing the

12  performance measure into multiple component parts and awarding themselves partial

13  credit for noncompliant health care files.

14      "A court's 'primary objective' is 'to enforce the contract as intended by the

15  parties.'"   *Warfield v. Advnt Biotechnologies, LLC*, No. CIV-06-0904-PHX-DGC, 2006

16  WL 3257718, at *2 (D. Ariz. Nov. 9, 2006) (*quoting Taylor v. State Farm Mut.

17  Automobile Ins. Co*., 854 P.2d 1134, 1140 (Ariz. 1993)).   The subsequent conduct of the

18  parties during the performance of a contract can provide evidence of the intent of the

19  parties.   *See, e.g.*, *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co*., 682 P.2d

20  388, 398 (Ariz. 1984); *see also Kimble v. Marvel Enterprises, Inc*., 692 F. Supp. 2d 1156,

21  1170 (D. Ariz. 2010), *aff'd*, 727 F.3d 856 (9th Cir. 2013), *aff'd sub nom. Kimble v.

22  Marvel Entm't, LLC*, 135 S. Ct. 2401 (2015) ("The parties' course of performance under

23  the contract is considered to be the 'most persuasive evidence of the agreed intention of

24  _____

25  [6] Of the PMs for which Defendants have made these unilateral changes to calculating compliance, on May 20, 2016, the Court found Defendants noncompliant with PM 66 at Florence, Lewis, and Tucson prisons; and with PM 93 at Eyman, Florence,

26  Lewis, and Tucson.   [Doc. 1583]   On October 7, 2016, the Court found Defendants noncompliant with PM 94 at Eyman, Florence, and Tucson.   [Doc. 1709]   On July 29,

27  2016, Plaintiffs served Defendants with a notice alleging substantial noncompliance with PM 35 at Eyman, Florence, Lewis, Phoenix, Tucson, and Yuma; with PM 94 at Perryville

28  and Winslow; and with PM 95 at Lewis, Tucson, and Winslow.   [Kendrick Decl., Ex. 2]

the parties.'") (*quoting Federal Ins. Co. v. Americas Ins. Co*., 691 N.Y.S.2d 508 (N.Y. App. Div. 1999)); *Evers v. Safety-Kleen Sys., Inc*., No. CV 10-02556-PHX-NVW, 2012 WL 2871113, at *2 (D. Ariz. July 12, 2012) (*citing Johnson v. Cavan*, 733 P.2d 649, 651-52 (Ariz. Ct. App. 1986) ("Course of performance, in particular, can inform the meaning of the contract.")).

"Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." *Abrams v. Horizon Corp.*, 669 P.2d 51, 57 (Ariz. 1983) (*citing* RESTATEMENT (SECOND) OF CONTRACTS § 202(4) (1979)). Indeed, "[t]he conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions." *Employers Reinsurance Co. v. Superior Court*, 161 Cal. App. 4th 906, 921, 74 Cal. Rptr. 3d 733, 745 (2008) (*quoting Kennecott Corp. v. Union Oil Co*., 196 Cal. App. 3d 1179, 1189, 242 Cal. Rptr. 403 (Cal. Ct. App. 1987)).

Here, the parties are nearly two years into monitoring and enforcement of the Stipulation. The actions of the parties during that time serve as the most reliable evidence of the intent of the parties as to the monitoring methodologies to be used. For months, the parties calculated compliance based on review of individual prisoner records, as mandated by the Stipulation. Then, after being found noncompliant with the terms of the Stipulation, Defendants unilaterally adopted new methods for calculating compliance.

That Defendants made these changes without consulting Plaintiffs, and did so only after they were found to be out of compliance with the Stipulation demonstrates that use of these methodologies do not represent the intent of the parties. *See Employers Reinsurance Co*., *supra,* 161 Cal. App. 4th at 921 (conduct of parties after contract execution and before controversy deemed most reliable evidence of parties' intentions).

Defendants' changes to the parties' agreed upon methodology for calculating compliance is a departure from the course of performance intended by the parties under the Stipulation, and their changes constitute a breach of the terms of the Stipulation.

### A.    Performance Measure 16

PM 16 relates to pharmacy and the provision of medication, and states that "Perpetual inventory medication logs will be maintained on each yard."  [Doc. 1185-1 at 19]  Until their November 6, 2016 version of their Monitoring Guide, Defendants' methodology for measuring compliance was to randomly select ten medication logs from a given unit, and review each log to see if it contained the following six pieces of information:  (1) medication name and dosage; (2) chronological date order of entries; (3) inmate name and ADC number; (4) additions/deletions to the pharmacy inventory; (5) the name of and licensure information for the health care staff person making the entry; and (6) documentation of log/physical inventory discrepancies.  If any of this information was missing, the log would be marked as noncompliant.  [*See* Kendrick Decl., Ex. 13 at 29 (10/21/16 version); *see also* Doc. 1626-2 at 36 (4/11/16 version)]  Defendants unilaterally decided in their November 6, 2016 version of the Guide that they will now calculate compliance by giving partial credit to medication logs that might contain some but not all of the six pieces of information, and aggregating the partial rates of compliance for each file, unit, and institution.  [*See* Kendrick Decl., Ex. 15 at 29-30]

### B.    Performance Measure 27

PM 27 relates to Quality Improvement, and requires that "Each ASPC facility will conduct *monthly* CQI meetings, in accordance with NCCHC Standard P-A-06." [Doc. 1185-1 at 21 (emphasis added)][7]  In their November 6, 2016 version of the Monitoring Guide, Defendants unilaterally changed the Methodology to add bullet points

---

[7]  NCCHC Standard P-A-06 requires that corrections departments establish a quality improvement committee with representatives from all major program areas.  "The committee meets as required but no less than quarterly" and initiates and documents a process or outcome quality improvement study of all health care problems that are identified in monitoring.  [*See* Kendrick Decl., Ex. 1]

1   noting that since the NCCHC standard only requires quarterly "updates for process and
2   outcome studies[,] and interdisciplinary team members," the facility would be compliant
3   if these actions were only "shown at least quarterly." [Kendrick Decl., Ex. 15 at 41] The
4   parties met and conferred about this changed methodology on November 8. [*See id.*,
5   Ex. 11 at 3] Defendants asserted that since NCCHC's standards require CQI meetings
6   only be done quarterly, it is not necessary that these components of a meeting be done
7   monthly, and that so long as one meeting per quarter contained these components, the
8   institution would be marked compliant. [*Id.*] Plaintiffs' position is that the parties
9   bargained in the Stipulation that the performance measure would require more than what
10  the NCCHC standard requires—namely, **monthly** CQI meetings—meetings which, by
11  definition, contain all required components of a CQI meeting. Prior to this change,
12  Defendants' methodology was "Review the monthly CQI Meeting minutes for the
13  monitored month and compare them to NCCHC Standard P-A-06." [Kendrick Decl.,
14  Ex. 13 at 40 (10/21/16 version)]

15      **C.      Performance Measure 35**

16      PM 35 is designed to evaluate whether a class member's medications are
17  transferred with him or her when transferring from one institution to another, and requires
18  "[a]ll inmate medications (KOP and DOT) will be transferred with and provided to the
19  inmate or otherwise provided at the receiving prison without interruption." [Doc. 1185-1
20  at 23] The parties had reached an agreed-upon methodology to mark patient files as
21  noncompliant if the prisoner did not receive his/her medication with the prescribed
22  frequency, as memorialized in the October 21 version of the Guide, [Kendrick Decl.,
23  Ex. 13 at 48], but then in the November 6 version of their guide, Defendants unilaterally
24  changed the agreed-upon methodology to add new language stating that the
25  documentation would only be reviewed to see if the prisoner got the prescribed
26  medication on the date of arrival to the institution. [*Id.*, Ex. 15 at 60] Plaintiffs' position
27  is that the PM and Stipulation make no reference to only evaluating the date of arrival to
28  the institution, and that if a prisoner is on a medication whose frequency is not daily, for

1  example every other day or weekly, and if she/he does not receive the required dose the

2  next time the medication is due, then the patient record should be marked as

3  noncompliant.  [*Id.*, Ex. 11 at 4]

4      **D.    Performance Measures 66, 67, and 69**

5      These three performance measures relate to the delivery of health care in

6  infirmaries, referred to as an "IPC" in the Stipulation.  [Doc. 1185-1 at 4]  PM 66 requires

7  that "[i]n an IPC, a Medical Provider encounters will occur at a minimum every 72

8  hours;" PM 67 requires that "[i]n an IPC, Registered nurses will conduct and document an

9  assessment at least once every shift.  Graveyard shift assessments can be welfare checks;"

10  and PM 69 requires "[i]n an IPC, nursing care plans will be reviewed weekly documented

11  with a date and signature."  [*Id.* at 29][8]

12      Until their November 6 version of the Monitoring Guide, Defendants' approach to

13  measuring compliance with these measures was to select ten files of patients who had

14  been in the infirmary, and review their health care charts to see if the provider and nursing

15  encounters occurred with the required frequency; if any of the encounters did not occur at

16  the required frequency, the patient's chart was marked as noncompliant.  [*See* Kendrick

17  Decl., Ex. 12 at 87-89, 91-92 (10/21/16 version)]  In their November 6, 2016 version of

18  the Guide, Defendants unilaterally changed their methodology for calculating compliance

19  to give themselves partial credit if some encounters occurred with the required frequency,

20  even if others did not.  Using PM 66 as an illustration, Defendants' November 11 version

21  of the guide now instruct monitors to

22      identify the number of provider encounters that occurred at least every 72
        hours and the number of provider encounters should have occurred at least
23      every 72 hours.  Divide the number of provider encounters that occurred by
        the number that should have occurred to determine the percentage of
24      compliance.  If the percentage of compliance meets or exceeds that month's
        threshold requirement, identify that IPC as compliant.
25

26

27      [8] On May 20, 2016, the Court found Defendants noncompliant with PM 66 at
        Florence, Lewis, and Tucson prisons.  Doc. 1583.  Defendants' noncompliance with this
28  PM continues through the most recent August 2016 CGAR reports.  *See* Doc. 1739 at 12.

1   [Kendrick Decl., Ex. 15 at 89]

2          The reasoning behind this Performance Measure is that it is important that a patient

3   be seen with regular **frequency** so that a provider can track the patient's improvement

4   and/or decline in health.  [*See* Doc. 1539 ¶¶ 67-70 (4/11/16 Declaration of Todd Wilcox,

5   M.D.) (detailing three infirmary patients who were not seen with the required frequency,

6   leading to the preventable deaths of two of them)]   The absurdity of Defendants' new

7   methodology is illustrated as follows:  suppose a prisoner was housed in the infirmary for

8   15 days.  The patient should be seen at a minimum frequency of Day 1, Day 4, Day 7,

9   Day 10, and Day 13, so that the provider can assess whether the patient is improving, is

10   responding to medication and treatment, and/or needs to be sent out to a community

11   hospital for specialty care.  Under the prior methodology, if the patient had not been seen

12   with that frequency by the provider, the chart would be marked as noncompliant.  With

13   Defendants' new approach, which focuses on the raw number of encounters versus the

14   frequency of the encounters, a provider could theoretically see a patient five separate

15   times on Day 1, and not see the patient again for the next two weeks, and that chart would

16   be marked as 100% compliant, because 5/5 = 100%.

17          Defendants have adopted similar "partial credit" approaches to PMs 67 and 69,

18   which likewise must be rejected, because the significant factor in these measures is the

19   frequency with which the patient is seen, not the raw number of encounters.  [Kendrick

20   Decl., Ex. 15 at 91-92, 94-95]

21          **E.     Performance Measures 89, 91, 93, 94, 95**

22          These five performance measures relate to the delivery of mental health care.[9]  For

23   example, PM 94 requires that "all prisoners on a suicide or mental health watch shall be

24   _____

25          [9]  PM 89 requires "MH-5 prisoners shall be seen by a mental health clinician for a
1:1 session a minimum of every seven days;" PM 91 requires "MH-5 prisoners who are

26   actively psychotic or actively suicidal shall be seen by a mental health clinician or mental
health provider daily;" PM 93 requires that "[m]ental health staff (not to include LPNs)

27   shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum
custody;" PM 94 requires "[a]ll prisoners on a suicide or mental health watch shall be

28   seen daily by a licensed mental health clinician or, on weekends or holidays, by a
registered nurse;" and PM 95 requires "Only licensed mental health staff may remove a

1    seen daily by a licensed mental health clinician or, on weekends or holidays, by a

2    registered nurse."   For the entire life of the Stipulation, Defendants have counted a

3    patient's file as compliant if the patient on watch was seen each day as required, and

4    noncompliant if one or more days was missed.   [*See* Kendrick Decl., Ex. 13 at 121

5    (10/21/16 version)]  Now, the November 5, 2016 draft of Defendants' Guide provides the

6    following instructions for monitoring PM 94:  "Record the total number of contacts that

7    are in compliance and then record the total number of contacts that should have occurred.

8    *The number of contacts in compliance will be totaled for the [prison] complex, and*

9    *divided into the total number of contacts that should have occurred for the complex.*"  [*Id.*,

10   Ex. 14 at 25-26 (11/5/16 version, emphasis added)]   Because the new monitoring

11   instructions provided for PM 89, 91, 93, and 95 are substantially identical (*see id.* at 19,

12   21-22, 24-26), Plaintiffs use PM 94 as illustrative.

13       For example, imagine that at a given prison complex, ten prisoners are on suicide

14   watch in a given month, each for five days.  Five of the prisoners are seen every day they

15   are on watch, as PM 94 requires; the other five are each seen only three of the five days

16   they are on watch, in violation of PM 94's requirements.  Under the method used for the

17   past 20 months, Defendants' compliance score is 5/10, or a failing 50%.   Under

18   Defendants' newly-invented method, however, their compliance score jumps to 40/50, or

19   a passing 80%.  Defendants' motivation for this sudden and unilateral change is blindingly

20   obvious:   to inflate their compliance scores without having to actually improve their

21   performance.[10]

22   _____

23   prisoner from a suicide or mental health watch.  Any prisoner discontinued from a suicide
     or mental health watch shall be seen by a mental health provider, mental health clinician,

24   or psychiatric registered nurse between 24 and 72 hours after discontinuation, between
     seven and ten days after discontinuation, and between 21 and 24 days after

25   discontinuation of the watch."  *See supra* note 3 for a summary of which of these PMs the
     Defendants have been found noncompliant, and/or have been served a notice of

26   noncompliance.
         [10]  Indeed, Defendants themselves provide an example in which their unilateral

27   change in monitoring methodology would boost their reported compliance rate from 0%
     to 97%.  [Doc. 1743 at 5:12-18]

28       This is not the first time Defendants have played fast and loose with the
     requirements of PM 94.  [*See* Doc. 1739 at 16-17 (documenting Defendants' practice of

**F.      Isolation Performance Measures 6 and 8**

Similar to the health care measures, Defendants have also invented an entirely new methodology for measuring the PMs applicable to the isolation subclass, specifically measures 6 and 8.   Measure 6 requires that prisoners housed in certain conditions or in enumerated units receive out-of-cell time, incentives, programs and property consistent with their step level under DI 326.  [Doc. 1185-1 at 43]  Measure 8 requires that seriously mentally ill (SMI) prisoners housed in these conditions or in enumerated units receive the general privileges and incentives set forth in DI 326 as well as additional unstructured out-of-cell time and clinical program and other out-of-cell programming.  [*Id.* at 44-45]

Since the Stipulation was approved, these measures, like almost all of the measures related to the subclass, have been measured based on ten separate, randomly selected prisoner records.  [Doc. 1185-1 at 43-45]  Each record has been found either compliant or non-compliant based on the full requirements of each measure.   Now, however, Defendants wish to parse measures 6 and 8 such that they can achieve partial compliance for each individual requirement of the whole measure.  For example, for measure 6, they propose the following:

> To determine compliance percentage for this MC PM for a particular inmate reviewed, record the total number of the five categories monitored (property, telephone, visitation, spending amount, recreation locate) that are in compliance for the particular inmate (e.g., 3/5, 4/5, 5/5, etc.).  Next, total the number of categories monitored that are in compliance for all ten (10) inmates reviewed, and divide by the total number of categories monitored for all ten (10) inmates, in order to determine the total percentage of compliance rate for this MC PM. (e.g., 45 (total categories compliant)/50 (total categories monitored) = 90% compliance reported for this MC PM; 42/50 = 84% compliance reported for this MC PM, etc.).

[*See* Fettig Decl., Ex. 1 at 17]

Defendants have proposed a similar new monitoring methodology for measure 8 by dividing up the various requirements of that measure.  [*Id.* at 21]  These new methodologies do not reflect the intent of the parties in agreeing to the Stipulation, as

impermissibly counting cellfront contacts as satisfying PM 94's requirement that patients on suicide watch be "seen")]

1   clearly evidenced by the performance of monitoring over the last year and a half.  The

2   limited number of records reviewed and the limited number of subclass measures set forth

3   in the Stipulation—there are only 9—are predicated on each file being deemed either

4   compliant or non-compliant with a single measure.  Otherwise, not only would more files

5   be necessary to truly get a systemic measure of compliance, but measures with component

6   parts would have been divided into multiple, separate measures for compliance.  The

7   parties did not agree to such monitoring; the parties have not practiced such monitoring; it

8   should not be allowed now.

9

10  **II.    DEFENDANTS CONTINUE TO IGNORE THE PLAIN LANGUAGE OF
           THE STIPULATION AND THE COURT'S ORDERS INTERPRETING
11          MENTAL HEALTH MEASURES.**

12      **A.    Defendants' failure to acknowledge that cellfront encounters do not
                satisfy the requirement that a patient be "seen."**

13  The Stipulation defines "seen" as follows:

14  Interaction between a patient and a Medical Provider, Mental Health
    Provider or Mental Health Clinician that involves a treatment and/or
15  exchange of information in a confidential setting. *With respect to Mental
    Health staff, means an encounter that takes place in a confidential setting
16  outside the prisoner's cell, unless the prisoner refuses to exit his or her cell
    for the encounter.*

17

18  [Doc. 1185-1 at 5 (emphasis added)]  Consistent with this language, the Court has ruled

19  that cellfront encounters do not satisfy the requirement that a patient be "seen," except in

20  two situations:  (1) if the patient refuses to exit his or her cell for the encounter, or (2) if

21  the prison is on "lockdown."  [*See* Doc. 1745 at 1]

22      Nevertheless, despite Plaintiffs' repeated requests, Defendants stubbornly refuse to

23  add this simple guidance to the Monitor Guide.  The need for additional guidance is

24  patent, as ADC Monitors continue to wrongly count cellfront encounters as satisfying the

25  requirement that the patient be "seen," falsely inflating Defendants' compliance scores.

26  [*See* Doc. 1739 at 16-17]  The Court should order Defendants to include a statement to

27  this effect in a prominent location in the Monitor Guide.

28

1

### B.     Performance Measure 78

2      It is a bedrock principle of contract law that the unambiguous language of a

3 contract will be enforced as written.  *See Bank One Corp. v. Indus. Comm'n of Ariz.*, 244

4 P.3d 571, 574 (Ariz. Ct. App. 2010) ("[W]hen parties bind themselves by a lawful

5 contract, the terms of which are clear and unambiguous, we must give effect to the

6 contract as written."); *Liberty Ins. Underwriters, Inc. v. Weitz Co.*, 158 P.3d 209, 212

7 (Ariz. Ct. App. 2007) ("If the contractual language is clear, we will afford it its plain and

8 ordinary meaning and apply it as written.").

9      PM 77 requires that "Mental health treatment plans shall be updated a minimum of

10 every 90 days for MH-3A, MH-4, and MH-5 prisoners, and a minimum of every 12

11 months for all other MH-3 prisoners."  [Doc. 1185-1 at 31]  Plaintiffs and Defendants

12 have reached agreement on the universe of records to be reviewed each month to monitor

13 compliance with PM 77.  [*See* Kendrick Decl., Exs. 9 and 11]

14      PM 78 requires that "All mental health treatment plan updates shall be done after a

15 face-to-face clinical encounter between the prisoner and the mental health provider or

16 mental health clinician."  [Doc. 1185-1 at 31]  The protocol for PM 78, which sets forth

17 the agreed monitoring methodology, requires that "*[e]ach record* that is reviewed for

18 treatment plan compliance will also be reviewed for a face-to-face SOAPE note dated the

19 same date."  [*Id*. (emphasis added)][11]

20      Defendants refuse to comply with this plain language; of the records reviewed for

21 PM 77, only a small portion are reviewed for PM 78 every month.  [*See* Fettig Decl.,

22 Ex. 6 (Florence August 2016 CGAR, showing 203 records reviewed for PM 77 and only

23 35 for PM 78)]  Defendants may not unilaterally rewrite the terms of the Stipulation; *each*

24 record reviewed for PM 77 must also be reviewed for compliance with PM 78.

25

26

27

28      [11]  A SOAPE [Subjective-Objective-Assessment-Plan-Education] note is a note
written in the medical record by health care staff to document a patient encounter.

1          **C.     Performance Measure 85**

2          This PM requires that "MH-3D prisoners shall be seen by a mental health provider

3   within 30 days of discontinuing medications."  [Doc. 1185-1 at 32]  In its September 6,

4   2016 order, the Court found Defendants were not reviewing the required number of

5   records for this PM.  [Doc. 1673 at 5-6]  In response to this ruling, the parties agreed on

6   the following language to be incorporated into the methodology for this PM to increase

7   the number of records reviewed:  "the monitor uses a MH-3D log that shows all inmates

8   whose medications have been discontinued, and a sample of 10 inmates per yard who

9   were due a contact [with a mental health provider] in the monitored month is selected."

10  [Kendrick Decl., Ex. 9 at 2-3; Ex. 11 at 6]  Based upon this agreement, Plaintiffs believed

11  the issue was resolved.

12         Unfortunately, within several days of the negotiation, Defendants reneged on this

13  agreement, and their November 11 Guide contains very different language: "Ten (10)

14  records (if available) with medication discontinuation follow up contacts due *or completed* in

15  the monitored month will be selected for review at each yard."  [*See* Kendrick Decl., Ex. 16

16  at 115 (emphasis added)]  Obviously Defendants may not deliberately draw a sample of

17  records with contacts completed in the monitored month; that is precisely the outcome that is

18  to be measured.  This kind of circular methodology will, not surprisingly, grossly inflate

19  Defendants' compliance figures.   The Court should order Defendants to adhere to the

20  language to which they agreed.[12]

21         **D.     Performance Measure 86**

22         PM 86 requires that "MH-3D prisoners shall be seen a minimum of every 90 days

23  by a mental health clinician for a minimum of six months after discontinuing medication."

24  [Doc. 1185-1 at 32]  Defendants' monitoring methodology for this Performance Measure

25  remains noncompliant with the Court's November 10 order (Doc. 1754 at 1-2), in that

26  (1) it begins with the date the patient was classified as MH-3D, rather than the date the

27  ────────────────────

28         [12]  Defendants use a similarly circular methodology for monitoring dental care.  *See* Section VI *infra*.

1  patient discontinued medications, and (2) it entirely fails to measure the interval between

2  the latter date and the patient's first contact with a mental health clinician.  [*See* Kendrick

3  Decl., Ex. 16 at 116-17 (11/11/16 version)]

4      **E.**    **Performance Measure 91**

5      PM 91 provides that "MH-5 prisoners who are actively psychotic or actively

6  suicidal shall be seen by a mental health clinician or mental health provider daily."

7  [Doc. 1185-1 at 33][13]  The protocol requires that a sample of 10 MH-5 records be drawn

8  at each yard at ASPC-Phoenix to evaluate compliance.  [*Id.*]

9      Defendants have taken it upon themselves to graft onto this Performance Measure

10  a restriction entirely of their own creation.  Rather than review all prisoners in the sample

11  who were "actively psychotic or actively suicidal," as required by PM 91, Defendants

12  review only those who were "determined to be actively psychotic or suicidal *on a*

13  *continuous watch*."  [Kendrick Decl., Ex. 16 at 122 (11/11/16 version, emphasis added)]

14  Indeed, if a prisoner was actively psychotic or actively suicidal but was not placed on

15  continuous watch by staff, his or her record is simply excluded from the sample and not

16  counted.  [*Id.*][14]

17      Defendants' newly-invented restriction finds no support in the plain language of

18  the Performance Measure and is accordingly invalid.  Moreover, by restricting the scope

19  of PM 91 to only those patients who are on watch, it renders PM 91 duplicative of PM 94,

20  which requires that "All prisoners on a suicide or mental health watch shall be seen daily

21  by a licensed mental health clinician or, on weekends or holidays, by a registered nurse."

22  A contract must not be interpreted so as to render one of its provisions superfluous or

23  meaningless.  *See Scholten v. Blackhawk Partners*, 909 P.2d 393, 396 (Ariz. Ct. App.

24  1995) ("[A] contract should be construed to give effect to all of its provisions and to

25

26      [13]  MH-5 represents the highest level of mental health need, requiring an inpatient level of care.  All MH-5 prisoners, both male and female, are housed at ASPC-Phoenix.

27      [14]  A continuous watch is a form of mental health or suicide watch in which a

28  corrections officer sits directly in front of the patient's cell and monitors him or her continuously.

1    prevent any of the provisions from being rendered meaningless"); *Chandler Med. Bldg.*

2    *Partners v. Chandler Dental Grp.*, 855 P.2d 787, 791 (Ariz. Ct. App. 1993) ("A contract

3    must be construed so that every part is given effect[.]").

4      Patients classified as MH-5 who are actively psychotic or actively suicidal are at

5    grave risk of harm.  Plaintiffs negotiated this Performance Measure to protect this

6    extraordinarily vulnerable population, and it is not for Defendants to unilaterally abrogate

7    that protection.  Defendants should be ordered to comply with the Performance Measure

8    as written.[15]

9      **F.** **Performance Measure 98**

10     This PM requires that "Mental health HNRs shall be responded to within the

11   timeframes set forth in the Mental Health Technical Manual (MHTM) (rev. 4/18/14),

12   Chapter 2, Section 5.0."  [Doc. 1185-1 at 35]  The specified provisions of the MHTM

13   require that emergency HNRs be responded to "immediately upon receipt," and urgent

14   HNRs within 24 hours of receipt or triage of the HNR.  [*See* Doc. 1655-1 at 19]

15     While Defendants record the date of receipt and triage of the HNR, they stubbornly

16   refuse to record the time.  [Kendrick Decl., Ex. 16 at 133 (11/11/16 version)]  Obviously,

17   without knowing the time the HNR was received or triaged, it is impossible to determine

18   if it was responded to immediately or within 24 hours, as required by this PM.

19   Defendants should be ordered to record this critical information.[16]

20

21

22

23

24     [15]  Defendants claim that it is impossible to identify prisoners who were actively
     psychotic or actively suicidal, but that contention is meritless; these conditions are clearly
25   noted in the patient's medical records.  [*See* Fettig Decl., Ex. 7 (11/9/16 note for patient,
     noting that "Inmate continues to be fluidly [sic] psychotic")]  The monitor can simply
26   review the sampled records for the audit month, searching for these notations.  Because
     MH-5 prisoners are housed only at the Phoenix prison complex, the burden of complying
27   with this PM is truly minimal.
       [16]  The Court has already entered one order regarding Defendants' failure to
28   comply with the requirements of PM 98.  [Doc. 1673 at 8]

1

2

### III.   DEFENDANTS' PROPOSED PLAN FOR MEASURING COMPLIANCE WITH PARAGRAPHS 12, 14, AND 15 OF THE STIPULATION (DOC. 1703)

3       Defendants' proposed procedure to report compliance with Paragraphs 12 and 15

4  of the Stipulation is inadequate.  [Doc. 1703]  Furthermore, Defendants offer no dates as

5  to when they will start monitoring the requirements of Paragraphs 12, 14, and/or 15.  [*Id.*

6  at 4]  Twenty months into the life of the Stipulation, it is not sufficient for Defendants to

7  say that they will comply at some date in the indeterminate future.

8       Paragraph 12 of the Stipulation requires:

9       Defendants or their contracted vendor(s) will ensure that:
          a.  All prisoners will be offered an annual influenza vaccination.
10         b.  All prisoners with chronic diseases will be offered the required
              immunizations as established by the Centers for Disease
11            Control.
          c.  All prisoners ages 50 to 75 will be offered annual colorectal
12            cancer screening.
          d.  All female prisoners age 50 and older will be offered a
13            baseline mammogram screening at age 50, then every 24
              months thereafter unless more frequent screening is clinically
14            indicated.

15  [Doc. 1185 ¶ 12]

16       Defendants' proposal for monitoring compliance with Paragraph 12 is wholly

17  inadequate, and is in contradiction to what the parties discussed in March and April for

18  performance measures 60-61, which similarly deal with preventive medical care and what

19  it means to "offer" certain preventive procedures.  *See* Part IV below; Doc. 1625 at 9-10.

20  Defendants take the position that putting up posters in clinics and housing units is

21  adequate for purposes of "offering" preventive health care services.  [Doc. 1703 at 2]

22  Plaintiffs' position is that this Stipulation requirement should include reviewing a sample

23  of qualifying prisoners' health care charts to see if individual communiques were sent to

24  the person informing him or her that she/he qualifies for the preventive care, and if the

25  prisoner requested the care, whether he or she received it.

26       Plaintiffs are satisfied with Defendants' proposal to monitor Paragraph 14 of the

27  Stipulation as currently described in their Plan [Doc. 1703 at 2-3] but Defendants offer no

28

information as to when this "hard stop" regarding information about language interpretation will be added to their electronic medical record system.

Defendants' proposal for Paragraph 15 is deficient to the extent that it purports to limit the application of that Paragraph to patients "who reported heat intolerance." [Doc. 1703 at 3]  Paragraph 15 applies whenever "a prisoner who is taking psychotropic medication *suffers a heat intolerance reaction*."  [Doc. 1185 at ¶ 15 (emphasis added)] The interaction between heat and psychotropic medications can result in impaired cognitive functioning, so that many patients do not realize they are suffering from heat-related illness.  [*See* Doc. 1104-2 at 47-48 (declaration of Pablo Stewart, M.D.)]  Others may know they are feeling ill but not be aware the cause.  [*Id.*]  For these reasons, it is not sufficient (and not consistent with the language of the Stipulation) to limit the scope of this requirement to patients who affirmatively report a heat intolerance reaction.

## IV.   DEFENDANTS' METHODOLOGY FOR MEASURING COMPLIANCE WITH PMS 60 AND 61 CONTRADICTS THE PLAIN LANGUAGE OF THE STIPULATION

The parties went back and forth at length in March and April of this year about the methodology surrounding these two preventive health care measures (PM 60—all female inmates ages 21-65 will be offered Pap smear at initial intake; PM 61—all female inmates ages 21-65 will be offered a Pap smear 36 months after intake and every 36 months thereafter unless more frequent screening is clinically indicated).  Defendants' proposed methodology they circulated in the Spring did not comply with the plain language of Exhibit D of the Stipulation (Doc. 1185-1 at 28), and Plaintiffs believe that solely putting up posters in clinic space is inadequate.  [*See* Doc. 1626-1 at 21, 27-28, 37, 46-47]

After extensive negotiations in the Spring, Defendants' April 11, 2016 version of the Monitoring Guide incorporated the language from Exhibit D of the Stipulation, and included Plaintiffs' suggestion that qualifying prisoners be sent individual communiques notifying them of their entitlement to the screening procedure, and that the monitoring methodology consist of identifying qualifying prisoners and reviewing their medical

records.  [*See* Doc. 1626-2 at 91-92]  As a result of this change in the April 11 version of the Guide, and in reliance on this agreement, Plaintiffs thought the matter had been resolved.

On October 5, 2016, Defendants reneged on this agreement, producing a new version of the Monitoring Guide which removed the agreed-upon language and reverted to their previous position that putting a poster on the wall is "offering" female prisoners these screening procedures.  [Kendrick Decl., Ex. 12 at 81-82]  In addition to being yet another example of Defendants' bad faith and bait-and-switch tactics, this methodology again contradicts the plain language of the Stipulation, which requires that Defendants select ten health care records per month per yard for review for PM 61, and ten records of all new intakes for PM 60.  [Doc. 1185-1 at 28]

## V.     DEFENDANTS' PROPOSED METHODOLOGY FOR PM 44 COUNTS INACTION AS "ACTION"

PM 44 requires that "[i]nmates returning from an inpatient hospital stay or [emergency room] transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours."  [Doc. 1185-1 at 24]  This PM has two parts to it:  the medical provider must (1) review the discharge recommendations, and (2) take action based upon the recommendations.  The Stipulation's protocol reflected that the parties had viewed this as a two part step that involves action: it states that "[p]hysician acknowledgement/action will be reviewed for timeliness."  [Doc. 1185-1 at 24]

However, Defendants' methodology only evaluates the first part of PM 44—if the hospital recommendations were reviewed or read back to the provider by a nurse—and does not evaluate if the provider acted upon the recommendations.  [*See* Kendrick Decl., Ex. 16 at 59 (11/11/16 version) ("It is not necessary for the Provider to enter an order/encounter into eOMIS for this measure to be compliant.")]

Plaintiffs' position has been and continues to be that there needs to be documentation of what action, if any, was taken by the provider upon reviewing the

1  discharge recommendations, and that it is basic medical practice for a provider to

2  document when he or she chooses to do nothing in response to the recommendations.

3  [Doc. 1626-1 at 71, 75-76]  Defendants' position is that if the provider takes no action,

4  that does not need to be documented or monitored.  [*Id*.]

## VI.   DEFENDANTS HAVE FAILED TO PROVIDE UPDATED PROTOCOLS FOR DENTAL PMS TO ADDRESS ONGOING "NOT APPLICABLE" FINDINGS

7  Plaintiffs repeatedly have requested that Defendants discuss the methodology used

8  for two dental performance measures, but Defendants failed to have their dental

9  monitor/expert participate in the negotiations or respond in writing.  [Kendrick Decl.,

10  Ex. 7 at 6-7 and Ex. 11 at 8]  PM 100 requires that "[p]risoners on the routine dental care

11  list will not be removed from the list if they are seen for urgent care or pain appointments

12  that do not resolve their routine care issues or needs" and PM 101 requires that "[d]ental

13  assistants will take inmate histories and vital signs and dental radiographs (as ordered) by

14  the Dentist." [Doc. 1185-1 at 35-36]

15  Plaintiffs noted that the October 5, 2016 version of the Monitoring Guide had

16  circular instructions for measuring compliance with PM 100.  [Kendrick Decl.., Ex. 7 at 6]

17  It stated that the monitor will use the <u>routine</u> care list to choose ten randomly selected

18  prisoners, and then confirm whether the prisoners are on the <u>routine</u> care list.  [*Id*., Ex. 12

19  at 125-26]  Plaintiffs' position is that the starting point needed to be the <u>urgent</u> care list

20  that documents all of the prisoners seen in a month on an urgent basis, randomly select ten

21  of those persons' files, and only then review the routine dental care list to determine if the

22  people are still listed as pending an appointment.  Otherwise, the measure is rendered

23  moot because there will be 100% compliance if the routine list is used to select 10 files to

24  then turn around and look at the routine list to see if the prisoner is on it.

25  With regard to PM 101, Plaintiffs have told Defendants for more than a year that

26  month after month in the CGARs, the monitor states for this PM that there are no records

27  that meet the criteria.  [*See* Kendrick Decl., Ex. 7 at 7; Doc. 1561-2 at 11 (10/15/15 Notice

28  of Noncompliance)]  During one of Plaintiffs' monitoring tours, Dr. Chu reported that she

1   was instructed by Defendant Pratt and others to only check files that have written dentist

2   orders, but the practice by the dentists is that they never write orders to assistants to do

3   these tasks, and thus the instructions she was given in monitoring rendered the PM moot.

4   [Doc. 1561-2 at 11]  Defendants have not adjusted their methodology for this performance

5   measure to meaningfully measure compliance, for example by reviewing medical records

6   to check whether inmate histories, vital signs, and X-rays had been done by the dental

7   assistant.  [Kendrick Decl., Ex. 7 at 7]

8

9   **VII.   DEFENDANTS REFUSE TO AGREE TO A FAIR AND ACCURATE MONITORING PROCESS THAT COMPLIES WITH THE PLAIN LANGUAGE OF THE STIPULATION AND ISOLATION PERFORMANCE MEASURES.**

10

11          The parties have reached agreement on the methodology for isolation PMs 3 and

12   4.[17]  The parties have also agreed that PM 7 no longer requires monitoring due to changes

13   in the physical plant of ASPC-Florence.[18]   For the remaining measures, substantial

14   differences remain regarding how Defendants measure compliance with the requirements

15   of the Stipulation.

16          **A.     Isolation Performance Measure 1**

17          Isolation PM 1 requires the following:

18          All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max who are eligible for participation in DI 326 are offered a minimum of 7.5 hours out-of-cell time per week.   Those at Step II are offered a minimum of 8.5 hours out-of-cell time per week, and those at Step III are offered a minimum of 9.5 hours out-of-cell time per week.

19

20

21

22   [Doc. 1185-1 at 41]  The parties have reached a great deal of agreement on this measure

23   but two major issues in the Methodology section remain.

24   _____

25          [17]  Isolation PM 3 requires "All out-of-cell time specified in Outcome Measures 1, 2 and 8 that is limited or cancelled is properly documented and justified in accordance with the terms of the Stipulation as set forth in ¶ 26 of the Stipulation." and PM 4 requires: "All maximum custody prisoners receive meals with the same caloric and nutritional content as meals served to other ADC prisoners."  [Doc. 1185-1 at 42]

26

27          [18]  PM 7 requires: "No prisoners with a mental health classification of MH3 or higher are housed in Florence Central-CB5 or CB-7 unless the cell fronts are substantially modified to increase visibility."  [Doc. 1185-1 at 43-44]

28

First, Plaintiffs object to the requirement in paragraph a of Defendants' proposed methodology that requires notice of the selected week to be monitored for the prior month to be given on the first day of the following month because it precludes monitoring of the last week of each month for much of the year because many full weeks do not end on the last calendar day of the month.  [*See* Fettig Decl., Ex. 1 (Current Draft of Max Custody Performance Measures Monitoring Guide (##1-9)) at 4, ¶ a]  This completely contradicts and undermines the Stipulation's requirement that the week to be monitored be randomly chosen.  [Doc. 1185-1 at 41]  It also creates the unintended consequence that staff may realize that compliance in the last week of a month will almost never be monitored, so they have no incentive to comply with the requirements of the Stipulation during that time.  This, again, undermines the Stipulation's plain language and purpose in requiring that weeks to be monitored are randomly chosen.

Second, Plaintiffs object to Defendants' removal of the performance measure's requirement to document refusals of exercise/programming with a prisoner's signature or the signature of two officers if the prisoner refuses to sign.  [*See* Fettig Decl.. Ex. 1 at 5, ¶ b]  This objection carries throughout many of the Isolation Performance Measures.  The parties have discussed the matter and Plaintiffs understand that Defendants are concerned about operational constraints.

However, Plaintiffs are concerned about the pervasive pattern of refusals across exercise, programming and other out-of-cell time that are required by the Stipulation. Plaintiffs raised these concerns in a July 7, 2016 Notice of Noncompliance.  In the Notice Plaintiffs alerted Defendants to the alarmingly high refusal rates, which translate into prisoners spending days, weeks and months in their cell and raise serious questions about both the legitimacy of the refusals and the underlying cause of such pervasive refusals.

Plaintiffs have now reviewed the missing maximum custody documentation produced by Defendants in the last two months and found that those pervasive and inexplicably high rates of refusal continue.  [*See* Fettig Decl. ¶ 3, Ex. 2, FRE 1006 Refusal Rate Charts for Exercise & Programming]  In the six month period from January to June

2016, the percentage of refusals for exercise at Eyman-Browning, for instance ranged between 71% of all periods refused in January to 58% of all periods refused in June.  [*Id*.]  For Florence-Kasson, 73% of all recreation periods were refused in January and 65% were refused in June.  [*Id*.]  Similarly, Lewis has a 74% refusal rate in January and a 45% refusal rate in June.  [*Id*.]  For individuals with serious mental illness, the refusal rates are worse.  At Lewis, the refusal rate was 90% in January and 83% in June.  [*Id*.]  For Florence Kasson the refusal rate in January was 83% and in June it was 77%.  At Perryville in June the refusals were at 82% and in June they were at 62%.  [*Id*.]

Refusal rates for programming were also astronomical across units and time for most of the facilities except Florence Central.  In February 2016 Eyman-SMU had a 65% programming refusal rate; Florence Kasson had a 59% refusal rate and Perryville had a 46% refusal rate.  [*Id*.]  In April 2016, those same units had a 61%, 60% and 34% programming refusal rate, respectively.  [*Id*.]

For the seriously mentally ill, refusal rates are also alarmingly high.  In February 2016 Eyman-SMU had a 73% SMI programming refusal rate; Florence Kasson had a 66% refusal rate and Perryville had a 48% refusal rate.  [*Id*.]  In April 2016, those same units had a 70%, 64% and 36% SMI programming refusal rate.  [*Id*.]

Plaintiffs are concerned that the lack of proper documentation and procedure for these pervasive refusals allows an end-run around the Stipulation.  The underlying documents supporting the CGAR findings for the maximum custody measures demonstrate that in each facility, there is differing practice among staff on the proper procedure to document prisoner refusals of exercise and other out-of-cell time.  Some follow the proper refusal procedure outlined in ADC policy, which requires a signed refusal by the prisoner or the signature of two officers if the prisoner refuses to sign.  *See* DO 809, Earned Incentive Program (January 11, 2011), available at https://corrections.az.gov/sites/default/files/policies/800/0809u.pdf.  Many more do not— or do so episodically.

1    During the parties' November 10, 2016 telephone conference, Defendants stated

2    that the goal was to comply with the above outlined refusal procedure, but that custody

3    staffing issues sometimes precluded such procedures.  Plaintiffs recognize that staffing

4    issues remain an issue in ADC, but are concerned about the need for safeguards to ensure

5    the accuracy of the monitoring documents.  Plaintiffs suggested an alternative proposal to

6    maintain the requirement that prisoners sign all refusals of out-of-cell time and

7    programming, but that if the prisoner refuses to sign then two officers sign, or if two

8    officers are not available, then one officer may sign, with the additional requirement that

9    if only one officer signs s/he must write the reason for the refusal and describe attempts to

10   encourage the prisoner to participate in exercise, programming, etc. in the comments

11   section on the back of the Out-of-Cell Tracking Sheet used to monitor this measure for the

12   Stipulation.

13   Plaintiffs further object to the removal of the requirement that officers record the

14   amount of time refused contemporaneously.  [*See* Fettig Decl., Ex. 1 at 5, ¶ b]  Time

15   entries added at a later date, when out-of-cell time was being tallied during the auditing

16   process—potentially by staff who were not even involved in the out-of-cell time but just

17   making assumptions based on written schedules—do not provide reliable,

18   contemporaneous documentation of refusal times.  As a result, it is impossible to assess

19   compliance with the Isolation Sub-Class Performance Measure accurately, particularly

20   where the pattern of refusals is so pervasive across the entire system raising serious

21   questions as to the authenticity of those refusals.

22   **B.     Isolation Performance Measure 2**

23   This PM requires:

24   All maximum custody inmates at Eyman-Browning, Eyman-SMU I,
     Florence Central, Florence-Kasson, Perryville-Lumley Special Management
25   Area (Yard 30), and Lewis-Rast Max who are eligible for participation in DI
     326 are offered at least one hour of out-of-cell group programming a week
26   at Step II and Step III.

27   [Doc. 1185-1 at 41-42]  The parties have reached some agreement on this measure.  The

28   remaining issue is in paragraph b of the Methodology Section, where Plaintiffs object to

the removal of the requirement to document refusals of exercise/programming with a prisoner's signature or the signature of two officers if the prisoner refuses to sign. Plaintiffs further object to the removal of the requirement that officers record the time refused contemporaneously.  [*See* Fettig Decl., Ex. 1 at 7-8, ¶ b]  These objections are the same as outlined in the discussion of Performance Measure #1 above.   Plaintiffs' alternative offer outlined in Measure #1 is the same regarding this measure.

### C.     Isolation Performance Measure 5

This performance measure requires:

> All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max are offered a minimum of 6 hours of out-of-cell exercise time a week.

[Doc. 1185-1 at 42]  The parties have also reached some agreement on this measure.  The remaining issues are in paragraph c of the Methodology Section.  [*See* Fettig Decl., Ex. 1 at 13-14, ¶ c]  As in Performance Measures 1 and 2, the objections relate to Defendants' removal of the requirement to document refusals of exercise/programming with a prisoner's signature or the signature of two officers if the prisoner refuses to sign, as well as the removal of the requirement that officers record the time refused contemporaneously.   Plaintiffs' alternative offer outlined in Measure #1 is the same regarding this measure.

### D.     Isolation Performance Measure 6

This performance measure requires:

> All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max who are eligible for participation in DI 326 are offered ***out-of-cell time***, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy.

[Doc. 1185-1 at 43 (emphasis added)]  Here again, the parties have reached agreement on much of the methodology, but serious issues remain.  In paragraph b of the Methodology Section, Plaintiffs object to Defendants' removal of monitoring under this measure which requires that each prisoner record reviewed is offered appropriate out-of-cell time under

DI 326.  Plaintiffs make this objection because the plain language of PM 6 specifically requires an evaluation of "out-of-cell time" in addition to other requirements under DI 326.  [*See* Fettig Decl., Ex. 1 at 15-16, ¶ b]

In paragraph g, Plaintiffs object to the removal of the requirement to offer particular types of exercise according to step level as part of the compliance finding for this measure.  [*Id*. at 16, ¶ g]  Different venues for exercise set forth in DI 326, such as the 10 ft. x 10 ft. enclosure, the basketball enclosure, and larger area at Eyman-SMU I, are incentives in the Step Program established by the policy.  Because increasing prisoners' access to human contact through exercise is a key part of DI 326, the Out-of-Cell Tracking Form developed to help monitor the Stipulation includes a specific column to record the type of exercise being offered.  This incentive is clearly a part of the compliance finding for PM 6 and must be included in the monitoring methodology.

In paragraph h, Defendants have added some new requirements and cut others in the most recent draft proffered.  Plaintiffs objected to these changes and proffered an alternative to Defendants to cut paragraph h as a separate methodological point if the methodology in paragraph b and paragraph g are restored as Plaintiffs suggest.  [*Id*. at 16-17, ¶ g]  Plaintiffs are awaiting their response.

Finally, as discussed above in Section I.F., Plaintiffs object to Defendants' unilateral change of the monitoring methodology established under the Stipulation, awarding themselves "partial credit" rather than counting each prisoner file as either compliant or non-compliant.  [*Id*. at 16, ¶ i]

**E.     Isolation Performance Measure 8**

This PM requires the following for prisoners with serious mental illness (SMI):

***In addition to the general privileges and incentives afforded to prisoners under DI 326***, all SMI prisoners in maximum custody receive:

- 10 hours of unstructured out-of-cell time per week
- hour of additional out-of-cell mental health programming per week
- 1 hour of additional out-of-cell psycho-educational programming per week
- 1 hour of additional out-of-cell programming per week

1   [Doc. 1185-1 at 44-45 (emphasis added)]  For this measure, the parties have reached some

2   agreement, but significant issues remain.  As in previous performance measures, Plaintiffs

3   again object to the removal of the requirement to document refusals of

4   exercise/programming with a prisoner's signature or the signature of two officers if the

5   prisoner refuses to sign.  Plaintiffs further object to the removal of the requirement that

6   officers record the time refused contemporaneously.  [*See* Fettig Decl., Ex. 1 at 20, ¶ c]

7   These objections are the same as outlined in Performance Measure #1 above.  Plaintiffs'

8   alternative offer outlined in Measure #1 is the same regarding this measure.

9          In paragraph e, it is Plaintiffs' position that language must be added to clarify that a

10  finding of non-compliance with the requirements of DI 326 for an SMI prisoner record

11  leads to a finding of non-compliance.  [*Id.* at 21, ¶ e]  The clear language of PM 8 is

12  premised on the fact that SMI prisoners in maximum custody receive out-of-cell time "in

13  addition to the general privileges and incentives afforded to prisoners under DI 326."

14  Therefore, whether or not a particular record complies with DI 326 is part of the

15  compliance finding for this measure.

16         Similarly, Plaintiffs object to Defendants' removal of language which requires a

17  finding of non-compliance if the enumerated additional SMI out-of-cell time and

18  programming in PM 8 is not met.  [*Id.* at 21, ¶ f]  Removing this requirement eviscerates

19  the meaning of the measure itself.

20         As discussed above in Section I.F., Plaintiffs object to the unilateral change in

21  calculating the monitoring methodology established by the Stipulation.  [*Id.* at 21, ¶ f]

22  **F.     Isolation Performance Measure 9**

23  PM 9 remains in great contention.  It requires:

24     All use of force incidents involving prisoners who are designated SMI ***or***
       housed in Florence-CB-1 or CB-4; Florence-Kasson (Wings 1 and 2);
25     Eyman-SMU (BMU); Perryville-Lumley SMA; or Phoenix (Baker,
       Flamenco, or MTU) conform to the policies for use of force set forth in ¶ 27
26     (a)-(e) of the Stipulation.

27  [Doc. 1185-1 at 45 (emphasis added)]  Similarly, paragraph 27 of the Stipulation requires:

28

> Defendants shall maintain the following restrictions on the use of pepper spray and other chemical agents on any maximum custody prisoner classified as SMI, **and** in the following housing areas: Florence-CB-1 and CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; and Phoenix (Baker, Flamenco, and MTU).

[Doc. 1185 at ¶ 27 (emphasis added)]

Despite the clarity of this language, Defendants recently announced an entirely new and unexpected interpretation of ¶ 27 (a)-(e) and the protocol for Performance Measure #9 that flies in the face of the plain meaning of the requirements for monitoring these provisions of the Stipulation.  During an October 28, 2016 conference call, Defendants informed Plaintiffs' counsel of their unilateral and new contention that Paragraph 27 of the Stipulation **_only_** applies to maximum custody prisoners classified as SMI who are housed in one of the enumerated facilities.  [*See* Fettig Decl. ¶ 4, Ex. 3]

This interpretation of the Stipulation and PM 9 is incorrect.  It is clear from the plain language of the text that they cover **_all_** maximum custody prisoners classified as SMI, as well as all maximum custody prisoners housed in the enumerated ADC facilities.

First, the plain language of the Stipulation states that "restrictions on the use of pepper spray and other chemical agents" apply to "any maximum custody prisoner classified as SMI "**_and_** in the following housing areas: Florence-CB-1 and CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; and Phoenix (Baker, Flamenco, and MTU)."  [Doc. 1185 at ¶ 27(emphasis added)]  "The interpretation of a settlement agreement is governed by principles of state contract law." *Botefur v. City of Eagle Point*, 7 F.3d 152, 156 (9th Cir. 1993) (*quoting Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1990)).  The starting point for interpreting a contract is the plain meaning of the contractual language, and courts may rely on dictionary definitions to construe words contained in a contract.  *See, e.g.*, *Poland v. Martin*, 761 F.2d 546, 548 (9th Cir. 1985).

The word "and" is "used to join words or groups of words" and means "added to" or "plus."  *See* Merriam-Webster, http://www.merriam-webster.com/dictionary/and (last visited Oct. 31, 2016).  Defendants' interpretation would not join, or add to, the two

1    clauses quoted above.  Instead, the Defendants' interpretation would render superfluous

2    the word "and" contained in Paragraph 27.  Such an interpretation is disfavored in light of

3    the well-known principle of contract law that calls for courts to construe contract terms in

4    such a way so as not to render a portion of the contract superfluous.  *See, e.g.*, *United*

5    *States v. Spear*, 753 F.3d 964, 967-68 (9th Cir. 2014) (declining to adopt government's

6    construction of the terms of a plea agreement where doing so would render portions of the

7    plea agreement superfluous).

8         Defendants' tortured reading of the requirements of the Stipulation's use of force

9    requirements also makes no practical sense and does not reflect the reason underlying the

10   Stipulation requirement.   Both parties are well aware that maximum custody SMI

11   prisoners are housed throughout Defendants' facilities.  At the time of settlement, the

12   enumerated facilities held many of the most troubled prisoners in maximum custody,

13   some of whom are SMI.  However, many of these prisoners, such as those in the SMU-I

14   BMU (Behavioral Management Unit), often have diagnoses such as personality disorders.

15   These prisoners are not designated SMI but nonetheless have serious mental health needs

16   that require additional supports.  That is why the Stipulation covers all SMI prisoners in

17   maximum security units **in addition to** those particularly troubled prisoners housed in the

18   enumerated facilities.  [Fettig Decl. ¶ 5]

19        Defendants' new interpretation of Paragraph 27 of the Stipulation also flies in the

20   face of the consistent practice of monitoring and reporting for the past twenty months.

21   *See generally, supra* Part I.  Use of force incidents reported in the CGAR reports and

22   documents produced to support compliance findings have consistently included maximum

23   security prisoners who are SMI and who are housed outside the enumerated units, as well

24   as non-SMI prisoners housed in the enumerated units.  Indeed, CGAR reporting and

25   documents produced to support those findings included use of force incidents across the

26   maximum custody units not expressly enumerated in the provision, including SMI

27   prisoners and non-SMI prisoners.  [*See* Fettig Decl., Exs. 4 and 5]

28

1       Defendants never proffered this alternative reading of PM 9 until a phone call on

2  October 28, 2016, even though Plaintiffs have repeatedly requested missing use of force

3  documents as part of the maximum custody documents.  [Fettig Decl. ¶ 4]  Defendants

4  had agreed to produce all maximum custody CGAR documents, including use of force

5  documents, by October 14, 2016 after months of correspondence and several hearings

6  before the Court, but never indicated their alternate reading of PM 9 until now.  [*Id.*]

7       Because the parties do not agree on the definition of the measure itself, or the

8  CGAR questions the monitor needs to evaluate, there is enormous disagreement over this

9  measure overall.  In addition, the parties disagree on the records to be reviewed for PM 9.

10  [*See* Fettig Decl., Ex. 1 at 23]  It is Plaintiffs' position that one of the records to be

11  reviewed must be a full list of all the use of force incidents during a monitoring period.

12  This list should include the MH score/SMI status of each prisoner involved; the specific

13  housing unit; and whether or not chemical agents were used.  This list is necessary to

14  ascertain if the monitor is looking at the full range of events that need to be evaluated for

15  the month.  Defendants added "Use of Force Memo" to the Source of Records section of

16  the PM, but the current memos produced to support CGAR findings do not contain all of

17  this information.   [*Id.*]   Plaintiffs also object to the conditional language Defendants

18  inserted for review of use of force videos by the monitor.  Plaintiffs' position is that if a

19  video of an incident is available (whether hand-held or stationary), it must be viewed by

20  the monitor.  [*Id.*]

21       Plaintiffs also object to Defendants' exclusion of review of medical records of

22  prisoners if they were treated by medical staff as a result of the use of force.  [*Id.*]  This

23  will not be necessary in every case, but in some cases the monitor may need to review

24  such records to make an accurate finding.  Similarly, Plaintiffs object to Defendants'

25  exclusion of notes/records of any staff or prisoner interviews that might be necessary to

26  make a compliance finding.  [*Id.*]

27       In terms of the Methodology section, there are several areas of agreement but still

28  key issues that remain unresolved.  In paragraph a, the parties' dispute on the meaning and

coverage of PM 9 leads to disagreement on the language in this paragraph.  [*Id.* at 23-24]  Plaintiffs object to Defendants' deletion of the requirement that "Staff and prisoners will also be questioned if necessary to make a final compliance finding."  [*Id.* at 23]  Plaintiffs believe that monitors should be able to engage in this level of fact-finding if it is necessary to make an accurate compliance finding.

In paragraph e, Plaintiffs object to Defendants' removal of the following language: "If the monitor believes that the cool down period was insufficient under the circumstances, there is a finding of non-compliance."  [*Id.*]  The monitor needs to be able to exercise independent judgment regarding use of force incidents and should not be bound by the fact that an officer simply checked a box if s/he believes that the underlying actions actually do not reflect compliance.   In paragraph e, Plaintiffs also object to Defendants' ***addition*** of the following language in italics:

> If there is no cool down period documented *or otherwise recorded in other documentation or on video (hand held and/or security camera footage[)] reviewed by the monitor*, then the incident must be found non-compliant.

[*Id.* at 24 (emphasis added)]   The language "or otherwise recorded in other documentation" is vague and confusing in light of the previous reference to "If there is no cool down period documented."   Also, where video is available it should be used as additional evidence to make a compliance finding—not the sole source of a finding—as the use of force videos produced are often incomplete, without sound, and difficult to track, making it impossible to verify a clinical intervention and who is conducting it without further documentation.

In paragraph f, Plaintiffs object to Defendants' ***deletion*** of the following language in italics:

> This cool down period may include similar attempts by custody staff *but such interventions by custody staff are not a replacement for the required clinical intervention*.

[*Id.* at 25 (emphasis added)]  The deleted language had made it clear to the monitor that the Stipulation and Performance Measure require that in such circumstances a cool down period by custody staff alone is not sufficient for a finding of compliance.  Plaintiffs also

object to the same language related to "other documentation or on video" as referenced in paragraph e for the same reasons as enumerated above.  [*Id.*]

Paragraph g outlines methodology for monitoring the requirement in the Stipulation that during a clinical intervention, the mental health clinician or qualified health care provider (QHCP) (other than a LPN) must determine whether the prisoner has the ability to understand orders; whether the prisoner has the ability to understand orders but has difficulty complying due to mental health issues; and whether s/he believes the prisoner's mental health issues are such that the controlled use of force could lead to a substantial risk of decompensation.  [*Id.*]  Plaintiffs object to Defendants' deletion of the requirement in paragraph g that the record be found non-compliant if no such determination is documented in the use of force documents (video alone would be insufficient due to reasons noted above) because this is an explicit requirement from paragraph 27 (c)-(d) of the Stipulation.  The monitor must know that failure to make such a determination requires a finding of non-compliance.

Plaintiffs also object to Defendants' deletion of the monitoring requirements in paragraph i.  [*Id.* at 25-26]  This paragraph tracks the requirements of Paragraph 27 of the Stipulation:

> If it is determined an inmate has the ability to understand orders but has difficulty complying due to mental health issues, or when a mental health clinician believes the inmate's mental health issues are such that the controlled use of force could lead to a substantial risk of decompensation, a mental health clinician shall propose reasonable strategies to employ in an effort to gain compliance, if the incident occurs on a weekday between 8:00 am and 4:00 pm.  At all other times a QHCP (other than a LPN) shall propose such reasonable strategies.

[Doc. 1185 at ¶ 27(d)]  Specifically, Plaintiffs object to the deletion of the requirement in paragraph i of this Measure that if the reasonable strategies required under this provision are not proposed and documented in the use of force documents (video alone would be insufficient for the reasons outlined above), then there is a finding of noncompliance.

**CONCLUSION**

Defendants cannot be allowed to continue to run amok, making repeated unilateral changes to their monitoring methodology without consulting or even notifying Plaintiffs. The parties will never reach any sort of finality on how to evaluate compliance, or whether Defendants are actually in compliance with the Stipulation. Plaintiffs respectfully request that the Court issue an order directing Defendants to comply with the plain language of the Stipulation and their course of dealing in the 20 months in monitoring the performance measures detailed in Part I. Furthermore, Plaintiffs seek an order directing Defendants to no longer unilaterally change their methodology for performance measures without first giving Plaintiffs at least 60 days' notice of the proposed change of methodology, with a period of time for Plaintiffs to comment on the proposed changes, and an opportunity for the Court to resolve any disputes regarding the proposed changes before they go into effect. A proposed order is lodged herewith.

Plaintiffs also respectfully request that the Court resolve the disputes outlined in Parts II to VII, above, and issue all necessary orders regarding the same.

Dated: November 15, 2016                    **PRISON LAW OFFICE**


                                            By:   *s/ Corene Kendrick*
                                                Donald Specter (Cal. 83925)*
                                                Alison Hardy (Cal. 135966)*
                                                Sara Norman (Cal. 189536)*
                                                Corene Kendrick (Cal. 226642)*
                                                Rita Lomio (Cal. 254501)*
                                                1917 Fifth Street
                                                Berkeley, California 94710
                                                Telephone: (510) 280-2621
                                                Email:   dspecter@prisonlaw.com
                                                        ahardy@prisonlaw.com
                                                        snorman@prisonlaw.com
                                                        ckendrick@prisonlaw.com
                                                        rlomio@prisonlaw.com

                                                *Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Jamelia Morgan (N.Y. 5351176)**
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:     dfathi@npp-aclu.org
               afettig@npp-aclu.org
               jmorgan@aclu.org

*Admitted *pro hac vice*.  Not admitted
 in DC; practice limited to federal
 courts.
**Admitted *pro hac vice*

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, PLLC**
P. O. Box 91398
Tucson, Arizona 85752
Telephone:  (520) 477-1475
Email:     kirstin@eidenbachlaw.com

Kathleen E. Brody (Bar No. 026331)
Daniel Pochoda (Bar No. 021979)
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:     kbrody@acluaz.org
               dpochoda@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:     dbarr@perkinscoie.com
               agerlicher@perkinscoie.com
               jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com
             aamiri@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com

*Admitted *pro hac vice*

Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:    jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

1

2

**ARIZONA CENTER FOR DISABILITY LAW**

3    By: ___s/ Maya Abela_____

4         Sarah Kader (Bar No. 027147)
         Asim Dietrich (Bar No. 027927)

5         5025 East Washington Street, Suite 202
         Phoenix, Arizona 85034

6         Telephone:  (602) 274-6287
         Email:    skader@azdisabilitylaw.org

7                    adietrich@azdisabilitylaw.org

8         Rose A. Daly-Rooney (Bar No. 015690)
         J.J. Rico (Bar No. 021292)

9         Jessica Jansepar Ross (Bar No. 030553)
         Maya Abela (Bar No. 027232)

10        **ARIZONA CENTER FOR DISABILITY LAW**

11        177 North Church Avenue, Suite 800
         Tucson, Arizona 85701

12        Telephone:  (520) 327-9547
         Email:

13            rdalyrooney@azdisabilitylaw.org
                 jrico@azdisabilitylaw.org

14                 jross@azdisabilitylaw.org
                 mabela@azdisabilitylaw.org

15    *Attorneys for Arizona Center for Disability Law*

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that on November 15, 2016, I electronically transmitted the above

3  document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4  Notice of Electronic Filing to the following CM/ECF registrants:

5

6                                   Michael E. Gottfried
                                     Lucy M. Rand
7                          Assistant Arizona Attorneys General
                                Michael.Gottfried@azag.gov
8                                  Lucy.Rand@azag.gov

9                                    Daniel P. Struck
                                  Kathleen L. Wieneke
10                                    Rachel Love
                                 Timothy J. Bojanowski
11                                 Nicholas D. Acedo
                                   Ashlee B. Fletcher
12                                   Anne M. Orcutt
                                     Jacob B. Lee
13                                   Mark A. Bracken
                           STRUCK WIENEKE, & LOVE, P.L.C.
14                                 dstruck@swlfirm.com
                                   kwieneke@swlfirm.com
15                                  rlove@swlfirm.com
                               tbojanowski@swlfirm.com
16                                  nacedo@swlfirm.com
                                  afletcher@swlfirm.com
17                                  aorcutt@swlfirm.com
                                    jlee@swlfirm.com
18                                 mbracken@swlfirm.com

19                              *Attorneys for Defendants*

20                                              s/ D. Freouf

21

22

23

24

25

26

27

28