# EXHIBIT 1





**Style Definition:** TOC 1: Do not check spelling or grammar, Tab stops: 5.49",

**Style Definition:** TOC 2: Do not check spelling or grammar

**Style Definition:** TOC Base: Do not check spelling or grammar

**Style Definition:** List Paragraph: Font: (Default) Calibri, 11 pt

**Style Definition:** Revision: Font: (Default) Calibri



ARIZONA DEPARTMENT OF CORRECTIONS

Health Services Contract Monitoring Bureau

# Monitor

# Guide





**Formatted:** Right

# Duties & Responsibilities

**Formatted:** Right

**ARIZONA DEPARTMENT OF CORRECTIONS**
**HEALTH SERVICES CONTRACT MONITORING BUREAU**

# Monitor Guide

October 5, 2016
Arizona Department of Corrections
1831 W. Jefferson
Phoenix, AZ 85007
Phone 602.255.2468

**Formatted:** Right

Max Custody Performance Measure No. 01
Stipulation Category: Max Custody (01)

**CGAR Category: Max Custody**

**Performance Measure:**

All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max who are eligible for participation in DI 326 are offered a minimum of 7.5 hours out-of-cell time per week.   Those at Step II are offered a minimum of 8.5 hours out-of-cell time per week, and those at Step III are offered a minimum of 9.5 hours out-of-cell time per week.

**CGAR Question:**

Are all maximum custody prisoners at Eyman–Browning, Eyman–SMU I, Florence–Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max who are eligible for participation in DI 326 offered a minimum of 7.5 hours out-of-cell time per week? Are those at Step II offered a minimum of 8.5 hours out-of-cell time per week, and those at Step III offered a minimum of 9.5 hours out-of-cell time per week?

**Source of Records/Review:**

Random number generator printout; Maximum Custody Excel Spreadsheet form/printout ("Overview"); unit count sheets; memo(s) documenting substitution of one randomly selected inmate for another inmate; Max Custody and/or (SMI) Mental Health Monthly (Program) Activity Schedule(s); Maximum Custody Daily Out of Cell Time Tracking Forms for ten (10) randomly selected inmates (ADC Form #801-19); Warden's Certification(s) attesting that a particular inmate was excluded from participation in DI 326 programming and/or activities for applicable randomly selected inmate(s) (if applicable); Incident Report (IR) documenting cancellation of activity not made up on the same day (if applicable); AIMS data (if applicable).

**Methodology:**

a. The ADC Division Director of Offender Operations, or designee, randomly selects the week to be used using a random number generator, such as random.org or other randomizing methodology, and distributes notice of the selected week to be monitored for the prior month on the first day of the following month (or the next State of Arizona business day thereafter if the first day of the month is not a business day) (e.g., the week to be monitored for January will be announced on the first day of February (or the next

4

Formatted: No widow/orphan control

Formatted: No widow/orphan control

Comment [A1]: Plaintiffs object to this requirement as it precludes monitoring of the last week of each month for many months and therefore undermines the Stipulation's requirement that the week to be monitored be randomly chosen.

Formatted: Right

business day thereafter if the first of February is not a State of Arizona business day).

The count sheets for the unit are used to determine the pool of eligible inmates.  The total number of inmates eligible for DI 326 is then divided by ten, and every nth inmate is reviewed.  If a randomly selected inmate was not present in the unit for the full seven (7) days of the monitoring week, that inmate's records are not reviewed and the inmate either directly above or below the randomly selected inmate who was on the unit for the full seven (7) days is used.  The Maximum Custody Daily Out of Cell Time Tracking Form for the specified monitoring week is reviewed for each of the ten randomly selected inmates.

b.   At each designated location, Maximum Custody Daily Out of Cell Time Tracking Forms are reviewed for the one randomly selected week for each monitored month, for the ten (10) randomly selected inmates.  Step levels for each inmate are noted and compliance with MC PM #1 for each inmate is determined.  If refusals of out of cell time are recorded on the Maximum Custody Daily Out of Cell Time Tracking Form, the refusal, indicating the amount of out of cell time offered and refused, must be signed by the inmate in the Comments Section of the Form, or if the inmate refuses to sign, two (2) staff members must sign.  Failure to document a refusal properly will lead to a finding of non-compliance for that record.  Beginning and ending times for all out of cell time must be noted on the Maximum Custody Daily Out of Cell Time Tracking Form unless an inmate refuses that time offered.  In the case of a refusal, the refusal, should be recorded on the front of the Tracking Form. the beginning time offered should be recorded on the front of the Tracking Form as well as the refusal.  The Maximum Custody Daily Out of Cell Tracking Form and the Maximum Custody Activity Schedule and/or SMI Mental Health Monthly (Program) Activity Schedule (where applicable) are reviewed to determine the amount of out of cell time refused.

b.       and the total time the inmate would have received out-of-cell is recorded in the Comments Section of the Tracking Form next to the signed refusal.  Failure to document these times will lead to a finding of non-compliance for that record.

c.  The reviewer notes the step level for each inmate in order to determine the minimum amount of out of cell time the inmate should have been afforded during the monitoring week.  This minimum amount of time is compared against the actual amount of time recorded on each inmate's Maximum Custody Daily Out of Cell Time Tracking Form. If the required amount of time for the inmate's step level is not met, there is a finding of non-compliance for that record.

d.  If an inmate selected for this measure is designated Seriously Mentally Ill, SMI time required under MC PM #8 should not be double-counted towards compliance with this

**Formatted:** No bullets or numbering

**Comment [A2]:** Plaintiffs object to the failure to document refusals of exercise/programming without a prisoner signature or the signatures of two officers if the prisoner refuses to sign.  Plaintiffs further object to the failure to contemporaneously record the refused time.

**Formatted:** Right

5

P E R F O R M A N C E   M E A S U R E S

measure. However, where a SMI inmate receives hour(s) of unstructured out-of-cell time per week in excess of ten (10) hours separately required by MC PM #8, time that exceeds the MC PM #8 ten (10) hour requirement for unstructured out-of-cell time may be counted towards the minimum out-of-cell time required under this MC PM #1.

**Formatted:** No widow/orphan control

**Formatted:** Right

P E R F O R M A N C E   M E A S U R E S

Max Custody Performance Measure No. 02
Stipulation Category: Max Custody (02)

**CGAR Category: Max Custody**

Formatted: No widow/orphan control

**Performance Measure:**

All maximum custody inmates at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max who are eligible for participation in DI 326 are offered at least one hour of out-of-cell group programming a week at Step II and Step III.

**CGAR Question:**

Are all maximum custody inmates at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max who are eligible for participation in DI 326 offered at least one hour of out-of-cell group programming a week at Step II and Step III?

**Source of Records/Review:**

Max Custody and/or (SMI) Mental Health Monthly (Program) Activity Schedule(s); Maximum Custody Daily Out of Cell Time Tracking Form; Max Custody and/or (SMI) Mental Health Monthly Programming Attendance/Sign-In Sheets (containing inmate signature or the relevant AIMS data demonstrating a prisoner's attendance).

**Methodology:**

a.  The records of the inmates selected for MC PM #1 are also reviewed for this performance measure.  The same week is also reviewed.

b.  At each designated location, Maximum Custody Daily Out of Cell Time Tracking Forms are reviewed for the one randomly selected week for each monitored month for the ten (10) randomly selected inmates.  The Maximum Custody Daily Out of Cell Time Tracking Forms are reviewed to determine if the Step II and Step III inmates were afforded one hour of group programming during the monitoring week.  Beginning and ending times for the group programming should be noted on the Tracking Form unless the inmate refuses that time. In the case of a refusal, the refusal, should be recorded on the front of the Tracking Form.If a refusal of group programming is recorded on the Maximum Custody Daily Out of Cell Time Tracking Form, the beginning time offered should be recorded on the front of the Tracking Form.  The Maximum Custody Daily Out of Cell Tracking Form and the Maximum Custody Activity Schedule and/or SMI Mental Health Monthly (Program) Activity Schedule (where applicable) are reviewed to

Formatted: Right

determine the amount of out of cell time refused. and the total time the inmate would have received in programming is recorded in the Comments Section of the Form next to the signed refusal. The refusal must be signed by the inmate in the Comments Section of the Form, or if the inmate refuses to sign, two (2) staff members must sign. Failure to document a refusal properly will lead to a finding of non-compliance for that record.

> **Comment [A3]:** Plaintiffs object to the failure to document refusals of exercise/programming without a prisoner signature or the signatures of two officers if the prisoner refuses to sign. Plaintiffs further object to the failure to contemporaneously record the refused time.

c. At each designated location, Max Custody and/or (SMI) Mental Health Monthly Programming Attendance/Sign-In Sheets for Step II and III are compared against the group programming recorded in the Maximum Custody Daily Out of Cell Time Tracking Forms of the ten (10) randomly selected inmates to confirm that the inmates attended the programs indicated. Reviewers must confirm that each selected inmate attended the group program by review of Max Custody and/or (SMI) Mental Health Monthly (Program) Activity Schedule(s); Maximum Custody Daily Out of Cell Time Tracking Form; Max Custody and/or (SMI) Mental Health Monthly Programming Attendance/Sign-In Sheets; and/or AIMS data. Failure to confirm actual attendance leads to a finding of non-compliance for that record. A determination of actual attendance may be achieved by comparison of (1) either Max Custody/Mental Health Monthly (Program) Activity Schedule(s) and/or Maximum Custody Daily Out of Cell Time Tracking Form, and (2) either Max Custody and/or (SMI) Mental Health Monthly Programming Attendance/Sign-In Sheets and/or AIMS data or other available documentation.

> **Formatted:** Right

| PERFORMANCE MEASURES

Max Custody Performance Measure No. 03
Stipulation Category: Max Custody (03)

**CGAR Category: Max Custody**

---

**Performance Measure:**

All out-of-cell time specified in Outcome Measures 1, 2, 8 that is limited or cancelled is properly documented and justified in accordance with the terms of the Stipulation as set forth in ¶ 26 of the Stipulation.

---

**CGAR Question:**

Is all out-of-cell time specified in Outcome Measures 1, 2, 8 that is limited or cancelled properly documented and justified in accordance with the terms of the Stipulation as set forth in ¶ 26 of the Stipulation, which requires the following:

- If such out of cell time is cancelled for legitimate operational or safety and security reasons, such as an unexpected staffing shortage, inclement weather or facility emergency lockdown, then reasonable efforts are made to make up such out of cell time at another date/time.

- If an individual's out of cell time is canceled or limited, then a Warden or his/her designee if the Warden is not available, certifies in writing that allowing that prisoner such out of cell time would pose a significant security risk.  Such certification shall expire after thirty (30) days unless renewed in writing by the Warden or his/her designee.

---

**Source of Records/Review:**

Maximum Custody Daily Out of Cell Time Tracking Forms for the ten (10) inmates randomly selected for the month, for the monitoring week; any IRs, or if no IR then other documentation generated during the monitoring week pertaining to the cancellation or limitation of out-of-cell time is reviewed; documentation of out of cell time made up is also reviewed.

Warden Certification of individual security risk necessitating limitation or cancellation where applicable to randomly selected prisoner.

---

**Methodology:**

a.  The records of the inmates selected for MC PM #1 are also reviewed for this performance measure.  The same week is also reviewed.

b.  The records of the inmates selected for MC PM #8 are also reviewed for this

---

9

Formatted: Right

performance measure.  The same week is also reviewed.

c.   Any cancelled activities required by MC PM #1, #2 and #8 must be  documented in an Information Report (IR).  If out-of-cell programming or activities are cancelled but made up on the same day, an Information (IR) is not required if the time is equivalent.

d.   If there are any cancellations/limitations of out-of-cell time, it is first determined whether it was for legitimate operational or safety and security reasons, such as, but not limited to, an unexpected staffing shortage, inclement weather, or facility emergency lockdown.  The reason for any cancellation/limitation of out-of-cell time is documented in an Information Report (IR).  A reason other than for legitimate operational or safety and security reasons for cancellation requires a finding of non-compliance.  However, where there is a cancellation or limitation for any reason, and the time is made up, this shall result in a finding of compliance.  These findings are documented in the monthly Monitoring Overview for this Performance Measure.

e.   Next it is determined if reasonable steps were taken to make up the out-of-cell time and/or activity.  If no steps were taken to make up the required out-of-cell time and/or activity, the reason is documented.  If the reviewer concludes that reasonable steps could have been taken, this is the basis for a finding of non-compliance.  Insufficient time remaining at the end of a week to make up the out-of-cell time and/or activity is a basis for a finding of compliance (not for a finding of non-compliance).  These findings are documented in the monthly Monitoring Overview for this Performance Measure.

f.   If an individual inmate's required out of cell time under DI 326 is cancelled or limited and is not made up, the complex Warden, or designee, will write a Warden's Certification documenting that allowing such an inmate out-of-cell time would pose a significant security risk.  The lack of such a certification will lead to a finding of non-compliance.  The time frame for a Warden's Certification is reviewed to determine whether it is current.  Any Warden's Certification with a date further out than one calendar month is "expired" and leads to a finding of noncompliance.  The Warden's Certification and the findings of compliance/non-compliance for this measure are documented in the monthly Monitoring Overview for this Performance Measure.

**Formatted:** Right

**P E R F O R M A N C E   M E A S U R E S**

**Formatted:** Right

**PERFORMANCE MEASURES**

Max Custody Performance Measure No. 04
Stipulation Category: Max Custody (04)

**CGAR Category: Max Custody**

| **Performance Measure:** |
| --- |
| All maximum custody prisoners receive meals with the same caloric and nutritional content as meals served to other ADC prisoners. |

| **CGAR Question:** |
| --- |
| Are all maximum custody prisoners receiving meals with the same caloric and nutritional content as meals served to other ADC prisoners? |

| **Source of Records/Review:** |
| --- |
| Max Custody Weekly Cycle Menu (Level 5); Food Vendor Monthly Statement of Nutritional Adequacy |

| **Methodology:** |
| --- |
| a.  At each designated location, the Max Custody Weekly Cycle Menu (Level 5) are selected for each monitored month.<br><br>b.  The Food Vendor Monthly Statement of Nutritional Adequacy is reviewed to determine whether it certifies that maximum custody inmates are receiving meals with the same caloric and nutritional content as those in lower custody areas on a monthly basis (2700 calories for Adult Male Menus and 2200 calories for Adult Female Menus) and includes the average daily caloric level for the month.  If the Weekly Cycle Menu (Level 5) is not certified as having the same caloric and nutritional content as those in lower custody, there is a finding of non-compliance.  The memo produced by the contracted Food Vendor is uploaded into the CGAR. |

Formatted: Right

PERFORMANCE MEASURES

Max Custody Performance Measure No. 05
Stipulation Category: Max Custody (05)

**CGAR Category: Max Custody**

| |
|---|
| **Performance Measure:**<br><br>All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max are offered a minimum of 6 hours of out-of-cell exercise time a week. |
| **CGAR Question:**<br><br>Are all maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max offered a minimum of 6 hours of out-of-cell exercise time a week? |
| **Source of Records/Review:**<br><br>Max Custody and/or (SMI) Mental Health Monthly (Program) Activity Schedule(s); Maximum Custody Daily Out of Cell Time Tracking Forms. |
| **Methodology:**<br><br>a.  The records of the inmates selected for MC PM #1 are also reviewed for this performance measure.  The same week is also reviewed.<br><br>b.  At each designated location, the Maximum Custody Daily Out of Cell Time Tracking Forms are reviewed for compliance with this measure.  Each record is reviewed to determine whether each inmate was provided or offered a minimum of six hours of out-of-cell exercise/recreation during the monitoring week.  If an inmate is afforded less than 6 hours of recreation time per week this will result in a finding of non-compliance.<br><br>c.  ~~If a refusal of recreation is recorded on the Maximum Custody Daily Out of Cell Time Tracking Form,~~ Beginning and ending times for all out-of-cell recreation time must be noted on the Maximum Custody Daily Out of Cell Time Tracking Form unless an inmate refuses that time offered.  In the case of a refusal, the refusal, should be recorded on the front of the Tracking Form. ~~In the case of a refusal, the beginning time offered and the refusal  should be recorded on the front of the Tracking Form.~~  The Maximum Custody Daily Out of Cell Tracking Form and the Max Custody Activity Schedule and/or SMI Mental Health Monthly (Program) Activity Schedule (where applicable) are reviewed to |

Formatted Table

Formatted: Right

13

**PERFORMANCE MEASURES**

determine the amount of out of cell time refused. ~~the refusal must be signed by the inmate in the Comments Section of the Form, or if the inmate refuses to sign two (2) staff members must sign.~~ ~~The location of the recreation time offered and refused is recorded on the Maximum Custody Daily Out of Cell Time Tracking Form.~~ If a refusal is not properly documented, the refused time will not count towards the 6 hours of out-of-cell time required for compliance under this performance measure.~~Failure to properly document a refusal may lead to a finding of non-compliance for that record.~~ Beginning and ending times for each period of accepted out-of-cell recreation are noted on the Maximum Custody Daily Out of Cell Time Tracking Form unless the inmate refuses that time.  In the case of a refusal, the beginning time offered should be recorded on the front of the Tracking Forms and the total time the inmate would have received out-of-cell time is recorded in the Comments Section of the Tracking Form next to the signed refusal.  If the time out-of-cell (either taken or refused) is not properly documented, that time will not count towards the 6 hours of out-of-cell time required for compliance under this performance measure.  Failure to document these times may lead to a finding of non-compliance for that inmate.

> **Formatted:** Font: Garamond, 12 pt

> **Comment [A4]:** Plaintiffs object to the failure to document refusals of exercise/programming without a prisoner signature or the signatures of two officers if the prisoner refuses to sign.  Plaintiffs further object to the failure to contemporaneously record the refused time.

> **Formatted:** Font: Garamond, 12 pt

14

> **Formatted:** Right

Max Custody Performance Measure No. 06
Stipulation Category: Max Custody (06)

**CGAR Category: Max Custody**

**Performance Measure:**

All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max who are eligible for participation in DI 326 are offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy.

**CGAR Question:**

Are all maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max who are eligible for participation in DI 326 offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy?

**Source of Records/Review:**

Max Custody and/or (SMI) Mental Health Monthly (Program) Activity Schedule(s); Maximum Custody Daily Out of Cell Time Tracking Form; Max Custody and/or (SMI) Mental Health Monthly Programming Attendance/Sign-In Sheets (containing prisoner signature _or the relevant AIMS data demonstrating a prisoner's attendance_); current maximum custody property inventory forms (which may include ADC Form #909-4, _Inmate Property Inventory_, Form #909-5, _Inmate Property Received_, and Form #909-1, _Inmate Property Inventory Supplement_) and/or equivalent information; inmate phone system printout and/or equivalent information; inmate visitation printouts (DV01 and DV05 screens) and/or equivalent information; banking printouts (BK03 balance and transaction screens) and/or equivalent information; AIMs data.

**Methodology:**

a.  The records of the inmates selected for MC PM #1 are also reviewed for this performance measure.  The same week is also reviewed.  If an inmate changes Step Levels under DI326 for the week monitored, the Step Level change is noted.  A change in Step Level during the week reviewed is not a basis for a non-compliance finding if eligible incentives reasonably appear to be offered after the Step Level change, in accordance with the greater or lesser incentives available at Step Level changed to.

b.  ~~Maximum Custody Daily Out of Cell Time Tracking Forms are reviewed for each inmate to~~

ensure access to the out-of-cell time required under DI 326.  If the required out of cell time was not offered to the inmate there is a finding of noncompliance for that inmate for this measure. [Defendants' objection: this is duplicative of MC PMs 1, 2, 5 and therefore need not be counted again nor be a basis of futherfurther compliance or non-compliance as including would scewskew the numbers up or down depending on compliance or non-compliance].

<div style="border:1px solid orange">

**Comment [A5]:** Plaintiffs object to removing this compliance measure from MC PM #6 as whether or not a prisoner is "offered out-of-cell time" is explicitly part of the measure itself.

</div>

c.  Current Property Inventory Forms, or equivalent information, for the ten (10) randomly selected inmates are reviewed to identify access to allowable property consistent with the inmate's Step Level under DI 326 for each monitored month.  If an inmate does not have access to property consistent with his/her Step Level due to the actions of ADC, then there is a finding of non-compliance for that inmate for this measure.

d.  Prisoner telephone records, or equivalent information, are reviewed for the ten (10) randomly selected inmates to identify access to telephone privileges consistent with the inmate's Step Level.  If an inmate does not have access to visitation and/or telephone privileges consistent with his/her Step Level, then there is a finding of non-compliance for that inmate for this measure.

e.  Prisoner visitation records, or equivalent information, are reviewed for the ten (10) randomly selected inmates to identify access to visitation privileges consistent with the inmate's Step Level.  If an inmate does not have access to visitation and/or telephone privileges consistent with his/her Step Level, then there is a finding of non-compliance for that inmate for this measure.

f.  Inmate bank account records, or equivalent information, are reviewed for the ten (10) randomly selected inmates to identify whether each inmate has access to the weekly maximum spending amount consistent with the inmate's Incentive Phase (Step Level) amount.  If an inmate does not have access to the weekly maximum spending amount consistent with his/her Incentive Phase (Step Level) due to the actions of ADC, then there is a finding of non-compliance for that inmate for this measure.

g.  The reviewer should note the Step Level for each inmate record reviewed and determine whether the type/location of recreation recorded in the Maximum Custody Daily Out of Cell Time Tracking Forms offered is consistent with the requirements of DI 326.  For example, a Step III inmate at Eyman-SMU I should be offered six hours per week to include one-time per month in a 10 x 10 enclosure (which holds up to four inmates), one time per month in 20 x 40 basketball enclosure (which holds up to eight inmates), and one-time per month recreation/par course field.  The reviewer looks at the week monitored, but if necessary to make an accurate compliance determination, the reviewer mustmay look at additional data for the month for the particular inmate to determine that each inmate is offered the appropriate type/location of recreation under DI 326.  Failure to document the type/location offer the appropriate type of recreation under DI 326 will lead to a finding of non-compliance.   [add]

h.  The location of the recreation offered or refused is recorded in the Maximum Custody Daily Out of Cell Time Tracking Form.  Beginning and ending times for all out-of-cell recreation time must be noted on the Maximum Custody Daily Out of Cell Time Tracking Form unless an inmate refuses that time offered.  In the case of a refusal, the refusal should be recorded

<div style="border:1px solid orange">

**Comment [A6]:** Plaintiffs' object to removing the requirement to offer particular types of exercise according to step level as part of the compliance finding.  Exercise incentives are central to DI 326 and this measure.  This measure originally read: "Failure to offer the appropriate type of recreation under DI 326 will lead to a finding of noncompliance."

**Formatted:** Font: Garamond, 12 pt

**Formatted:** Right

</div>

16

**PERFORMANCE MEASURES**

on the front of the Tracking Form. The Maximum Custody Daily Out of Cell Tracking Form and the Max Custody Activity Schedule and/or SMI Mental Health Monthly (Program) Activity Schedule (where applicable) are reviewed to determine the amount of out of cell time refused.

1. To determine compliance percentage for this MC PM for a particular inmate reviewed, record the total number of the five categories monitored (property, telephone, visitation, spending amount, recreation location) that are in compliance for the particular inmate (e.g., 3/5, 4/5, 5/5, etc.). Next, total the number of categories monitored that are in compliance for all ten (10) inmates reviewed, and divide by the total number of categories monitored for all ten (10) inmates, in order to determine the total percentage of compliance rate for this MC PM. (e.g., 45(total categories compliant)/50 (total categories monitored) = 90% compliance reported for this MC PM; 42/50 = 84% compliance reported for this MC PM, etc.).

> **Comment [A7]:** Plaintiffs object to the failure to document refusals of exercise/programming without a prisoner signature or the signatures of two officers if the prisoner refuses to sign.  Plaintiffs further object to the failure to contemporaneously record the refused time.
>
> However, we suggest cutting point H if Defendants agree to include evaluation of out-of-cell time as required by the measure and set forth in point b and point g..

> **Comment [A8]:** Plaintiffs object to this new addition/changing the monitoring methodology for this measure.  The Stipulation is based on the compliance of ten prisoners' files; each file is either compliant or non-compliant.

> **Formatted:** Right

17

Max Custody Performance Measure No. 07
Stipulation Category: Max Custody (07)

**CGAR Category: Max Custody**

| |
|---|
| **Performance Measure:** |
| No prisoners with a mental health classification of MH3 or higher are housed in Florence Central-CB-5 or CB-7 unless the cell fronts are substantially modified to increase visibility. |
| **CGAR Question:** |
| Are there any prisoners with a mental health classification of MH3 or higher housed in Florence Central-CB-5 or CB-7 without a cell front that has been substantially modified to increase visibility? |
| **Source of Records/Review:** |
| Housing Assignment Log for maximum custody prisoners with mental health classification of MH-3 or higher:  The Housing Assignment Log for maximum custody prisoners with mental health classification of MH-3 or higher is reviewed for one randomly selected day of each monitored month. |
| **Methodology:** |
| a.  Pursuant to Defendants providing a declaration from Division Director Carson McWilliams attesting to the alteration of all of the CB5 and CB7 cells, Plaintiffs have agreed that Defendants no longer must monitor this MC PM.  (Letter from Fettig to Gottfried/Rand dated Oct. 4, 2016.)  Defendants have agreed to notify Plaintiffs if the cell fronts in these locations are substantially modified in the future during the life of the Stipulation (Dkt. 1185).  (*Id.*) |

Formatted: No widow/orphan control
Formatted Table
Formatted: No widow/orphan control
Formatted: No widow/orphan control
Formatted: No widow/orphan control
Formatted: Right

Max Custody Performance Measure No. 08
Stipulation Category: Max Custody (08)

**CGAR Category: Max Custody**

**Performance Measure:**

In addition to the general privileges and incentives afforded to prisoners under DI 326, all SMI prisoners in maximum custody receive:

- 10 hours of unstructured out-of-cell time per week
- 1 hour of additional out-of-cell mental health programming per week
- 1 hour of additional out-of-cell psycho-educational programming per week
- 1 hour of additional out-of-cell programming per week

**CGAR Question:**

In addition to the general privileges and incentives afforded to prisoners under DI 326, are all SMI prisoners in maximum custody, receiving:

- 10 hours of unstructured out-of-cell time per week
- 1 hour of additional out-of-cell mental health programming per week
- 1 hour of additional out-of-cell psycho-educational programming per week
- 1 hour of additional out-of-cell programming per week

**Source of Records/Review:**

Maximum Custody and/or (SMI) Mental Health Monthly (Program) Activity Schedule(s); Maximum Custody Daily Out of Cell Time Tracking Form; Max Custody and/or (SMI) Mental Health Monthly Programming Attendance/Sign-In Sheets (containing inmate signature or the relevant AIMS data demonstrating a prisoner's attendance); Warden's Certification(s) attesting that a particular inmate was excluded from participation in DI 326 programming and/or activities for applicable randomly selected inmate(s) (if applicable); Incident Report (IR) documenting cancellation of activity not made up on the same day (if applicable). AIMS data (if applicable); EOMIS data (if applicable).

**Methodology:**

a. The same week selected for MC PM #1 is reviewed for this performance measure.

b. At each maximum custody unit where SMI inmates are housed, the count sheets for the unit are used to determine the pool of ten (10) randomly selected records reviewed for this

19

measure.  The total number of inmates classified as SMI is then divided by ten, and every *nth* inmate is reviewed.  If a randomly selected inmate was not present in the unit for the full seven (7) days of the monitoring week, that inmate's records are not reviewed and the next SMI inmate either directly above or below the randomly selected SMI inmate is selected.  If no SMI inmate is listed either directly above or below the randomly selected SMI inmate, then the next SMI inmate listed in the roster who was housed in the unit for the full seven (7) days is used.  The Maximum Custody Daily Out of Cell Time Tracking Form for the specified monitoring week is reviewed for each of the ten (10) SMI inmates.

c.   The Maximum Custody Daily Out of Cell Time Tracking Forms are reviewed in order to determine compliance with MC PM ##1-2, 5-6, and 8 for each SMI inmate selected.  ~~If refusals of out-of-cell time are recorded on the Maximum Custody Daily Out of Cell Time~~ Beginning and ending times for all out of cell time must be noted on the Maximum Custody Daily Out of Cell Time Tracking Form unless an inmate refuses that time offere~~d~~.  In the case of a refusal, the refusal should be recorded on the front of the Tracking Form.  ~~In the case of a refusal, the beginning time offered should be recorded on the front of the Tracking Form as well as the refusal.~~  ~~T~~The Maximum Custody Daily Out of Cell Tracking Form and the Maximum Custody Activity Schedule and/or SMI Mental Health Monthly (Program) Activity Schedule (where applicable) are reviewed to determine the amount of out of cell time refused.

~~c.   Tracking Form, the refusal must be signed by the inmate in the Comments Section of the Maximum Custody Daily Out of Cell Time Tracking Form, or if the inmate refuses to sign, signed by two (2) staff members.  Failure to properly document a refusal may lead to a finding of non-compliance.  Beginning and ending times for each period of out-of-cell recreation must be noted on the Maximum Custody Daily Out of Cell Time Tracking Form, unless an inmate refuses that time.  In the case of a refusal, the beginning time offered should be recorded on the front of the Tracking Form and the total time the inmate would have received out-of-cell is recorded in the Comments Section of the Tracking Form next to the signed refusal.  If the time out-of-cell is not properly documented, that time will not count towards compliance with the out-of-cell time required under this performance measure. Failure to document these times may lead to a finding of non-compliance for that record. Revise this re 2/3 aint bad.  Compliance~~

d.   Max Custody and SMI~~/~~-~~/~~Mental Health Monthly Programming Attendance/Sign-In Sheets are reviewed for the selected SMI inmates to confirm that the inmates attended all of the programs (e.g., mental health; psychological-education; out-of-cell programming; DI 326) reflected on the Maximum Custody Daily Out of Cell Time Tracking Forms.   Any discrepancies are noted.  Reviewers must confirm that each selected inmate attended the group program by comparison of Max Custody and/or (SMI) Mental Health Monthly (Program) Activity Schedule(s); Maximum Custody Daily Out of Cell Time Tracking Form; Max Custody and/or (SMI) Mental Health Monthly Programming Attendance/Sign-In Sheets; AIMS data; and/or EOMIS data. Failure to confirm attendance leads to a finding of non-compliance for that record.   A determination of attendance may be achieved by comparison of (1) either Max Custody/Mental Health Monthly (Program) Activity Schedule(s) and/~~or~~  Maximum Custody Daily Out of Cell Time Tracking Form, and (2)

Formatted: Font: Garamond, 12 pt

Formatted: Font: Garamond, 12 pt

Comment [A9]: Plaintiffs object to the failure to document refusals of exercise/programming without a prisoner signature or the signatures of two officers if the prisoner refuses to sign.  Plaintiffs further object to the failure to contemporaneously record the refused time.

Formatted: Font: Garamond, 12 pt, Highlight

Formatted: Right

**20**

either Max Custody and/or (SMI) Mental Health Monthly Programming Attendance/Sign-In Sheets, AIMS data; and/or EOMIS data or other available documentation. If any discrepancies regarding a determination of actual attendance cannot be reconciled that program/activity will not count towards the out-of-cell time required for compliance under this performance measure.

e.   For each of the selected SMI inmates, the Step Level is recorded, and it is determined if the basic requirements of DI 326 are met (MC PM ##1-2, 5-6). A failure to comply with any of these requirements results in a finding of non-compliance for the record.

- Determine whether each selected inmate has received the appropriate out-of-cell time, exercise, property, incentives, and programming according to his/her Step Level under DI 326 (MC PM ##1-2, 5-6).

- Determine whether Step II and III SMI inmates are receiving their one hour of group programming under DI 326 in addition to all of the SMI requirements enumerated below.

f.   For each of the selected SMI inmates determine whether the following requirements categories have been met. A failure to comply with any of these requirements results in a finding of non-compliance for the record.   A failure to comply with any of these requirements results in a finding of non-compliance the particular categoryfor this measure:

g.

- 10 hours of unstructured out-of-cell time during the monitoring week.

- 1 hour of mental health group programming during the monitoring week.

- 1 hour of psychological educational programming during the monitoring week.

- 1 hour of additional out-of-cell programming during the monitoring week.

To determine compliance percentage for this MC PM, for a particular inmate reviewed, record the total number of the four categories monitored that are in compliance for the particular inmate (e.g., 3/4, 4/4, etc.). Next, total the number of categories monitored that are in compliance for all ten (10) inmates reviewed, and divide by the total number of categories monitored for all ten (10) inmates in order to determine the total percentage of compliance rate for this MC PM. (e.g., 33 (total categories compliant)/40 (total categories monitored) = 82.5% compliance reported for this MC PM; 36/40 = 90% compliance reported for this MC PM, etc.).

Comment [A10]: Plaintiffs object to not requiring a non-compliance finding if these requirements of the measure are not met.

Comment [A11]: Plaintiffs object to not requiring a non-compliance finding if these requirements of the measure are not met.

Comment [A12]: Plaintiffs object to this new addition/changing the monitoring methodology for this measure. The Stipulation is based on the compliance of ten prisoners' files; each file is either compliant or non-compliant.

21

PERFORMANCE MEASURES

Max Custody Performance Measure No. 09
Stipulation Category: Max Custody (09)

**CGAR Category: Max Custody**

---

**Performance Measure:**

All use of force incidents involving use of pepper spray and other chemical agents on any maximum custody prisoners classified as SMI, and involving maximum custody prisoners classified as SMI or in the following housing areas: Florence-CB1 and CB4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; Phoenix (Baker, Flamenco, and MTU); and Lewis-Rast Max (4C1 and 4C2), conform to the policies for use of force set forth in ¶ 27 (a)-(e) of the Stipulation.

**CGAR Question:**

Do all use of force incidents involving use of pepper spray and other chemical agents on any where pepper spray or other chemical agents are used that involving maximum custody prisoners classified as SMI, and involving maximum custody prisoners classified as SMI or and all use of force incidents prisoners housed occurring in the following housing areas: Florence-CB1 and CB4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; Phoenix (Baker, Flamenco, and MTU); and Lewis-Rast Max (4C1 and 4C2), conform to the policies for use of force set forth in ¶ 27 (a)-(e) of the Stipulation.? Those requirements include:

    a.  Chemical agents shall be used only in case of imminent threat. An imminent threat is any situation or circumstance that jeopardizes the safety of persons or compromises the security of the institution, requiring immediate action to stop the threat. Some examples include, but are not limited to: an attempt to escape, on-going physical harm or active physical resistance. A decision to use chemical agents shall be based on more than passive resistance to placement in restraints or refusal to follow orders. If the inmate has not responded to staff for an extended period of time, and it appears that the inmate does not present an imminent physical threat, additional consideration and evaluation should occur before the use of chemical agents is authorized.

    b.  All controlled uses of force shall be preceded by a cool down period to allow the inmate an opportunity to comply with custody staff orders. The cool down period shall include clinical intervention (attempts to verbally counsel and persuade the inmate to voluntarily exit the area) by a mental health clinician, if the incident occurs on a weekday between 8:00 a.m. and 4:00 p.m. At all other times, a qualified health care professional (QHCP) (other than a LPN) shall provide such clinical intervention. This cool down period may include similar attempts by custody staff.

---

22

**Comment [A13]:** The parties are now in dispute as to the meaning of this performance measure.

It is Plaintiffs' counsels' position that the Stipulation covers **_all_** maximum custody prisoners classified as SMI, as well as those maximum custody prisoners housed in the ADC housing units enumerated in the Stipulation, para 27.

**Comment [A14]:** The parties are now in dispute as to the meaning of this performance measure.

**Formatted:** Right

c.  If it is determined the inmate does not have the ability to understand orders, chemical agents shall not be used without authorization from the Warden, or if the Warden is unavailable, the administrative duty officer.

d. If it is determined an inmate has the ability to understand orders but has difficulty complying due to mental health issues, or when a mental health clinician believes the inmate's mental health issues are such that the controlled use of force could lead to a substantial risk of decompensation, a mental health clinician shall propose reasonable strategies to employ in an effort to gain compliance, if the incident occurs on a weekday between 8:00 a.m. and 4:00 p.m. At all other times, a QHCP (other than a LPN) shall propose such reasonable strategies.

e. The cool down period may also include use of other available resources/options such as dialogue via religious leaders, correctional counselors, correctional officers and other custody and non-custody staff that have established rapport with the inmate.

**Source of Records/Review:**

SIR Packet; Use of Force Review Packet; Use of Force Memo, and incident video, including both hand-held and/or security camera footage (if relied upon by the monitorreviewer to determine compliance findingsapplicable).; medical records (in cases in which the inmate was examined or treated by health care staff following the use of force); and any interview notes/records of staff or prisoners interviewed in order to make compliance findings.

List of all use of force incidents in a given month indicating whether chemical agents were involved, the mental health classification of the prisoner(s) involved and location of housing unit.
Review the above listed records for maximum custody prisoners classified as SMI or at the following housing areas: Florence-CB1 and CB4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; Phoenix (Baker, Flamenco, and MTU); and Lewis-Rast Max (4C1 and 4C2).

**Methodology:**

a. The monitor shall review the available source records listed above for use of force incidents involving the use of pepper spray and other chemical agents on any maximum custody prisoners classified as SMI, and classifiedand classified as SMI isSMI in the following housing areas: Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; Phoenix (Baker, Flamenco, and MTU); and Lewis-

<div align="center">23</div>

**Comment [A15]:** Will this include the full list of Use of Force incidents in a given period including MH score/SMI status; housing location; whether or not chem agents used?  Plaintiffs reiterate the concern in Comment A18 below.

**Comment [A16]:** Plaintiffs object to this qualification; video whether hand-held and/or stationary should always be reviewed where it is available as a matter of  practice.

**Comment [A17]:** The parties were unable to agree on source of records during the 10/28 call.
It is Plaintiffs' position that medical records and any interview notes/records of staff or prisoners questioned in order to make compliance findings should be interviewed.

**Comment [A18]:** We suggest adding such a document or other list so that the monitor can determine which use of force incidents fall under the Stipulation.  Right now, it is unclear how this is done.

**Formatted:** Justified, Indent: Left:  0.07", Right:  0.04", Space Before:  0 pt
**Formatted:** Font: (Default) Garamond, 12 pt
**Formatted:** Font: (Default) Garamond, 12 pt

**Formatted:** Right

Rast Max (4C1 and 4C2 for the reporting period. ~~records for maximum custody prisoners classified as SMI or at the following housing areas: Florence-CB1 and CB4; Florence-Kasson (Wings 1 and 2); Eyman SMU I (BMU); Perryville-Lumley SMA; Phoenix (Baker, Flamenco, and MTU); and Lewis-Rast Max (4C1 and 4C2).~~ Staff and prisoners will also be questioned if necessary to make a final compliance finding.

b. ~~[Defendants' objection: redundant of the above]~~

~~e.~~b. If pepper spray and/or other chemical agents were used during the use of force incident, the monitor shall determine whether there was an imminent threat justifying the use of the pepper spray and/or other chemical agent. If the monitor determines that the pepper spray and/or other chemical agents were used without justification, there is a finding of non-compliance. These findings and the reasons for them must be documented in the CGAR.

~~d.~~c. If there was no imminent threat and pepper spray and/or other chemical agents were deployed without engaging in a cool down period and additional consideration and evaluation by staff, there is a finding of non-compliance for the use of force incident. These findings and the reasons for them must be documented in the CGAR.

~~e.~~d. The monitor shall determine whether or not the incident is a controlled use of force involving the use of pepper spray and/or other chemical agents or could have been a controlled use of force. If the monitor determines that the incident should have been a controlled use of force but was erroneously treated as an imminent threat, there is a finding of non-compliance. These findings and the reasons for them must be documented in the CGAR.

~~f.~~e. If the incident is a controlled use of force involving the use of pepper spray and/or other chemical agents it must be preceded by a cool down period to allow the inmate an opportunity to comply with custody staff orders. The length of the cool down period can vary depending upon the circumstances, but should be allowed to continue until all reasonable interventions have been attempted, or an imminent threat exists. ~~If the monitor believes that the cool down period was insufficient under the circumstances, there is a finding of non-compliance.~~ If there is no cool down period documented or otherwise recorded in other documentation or on video (hand held and/or security camera footage reviewed by the monitor), then the incident must be found non-compliant. These findings and the reasons for them must be documented in the CGAR.

g.f. A cool down period during a controlled use of force involving the use of pepper spray and/or other chemical agents must include clinical intervention (attempts to verbally counsel and persuade the inmate to cease the behavior that has led to consideration of use of force.  This clinical intervention must be conducted by: (1) a mental health clinician, if the incident occurs on a weekday between 8:00 am and 4:00 pm; or (2) a QHCP (other than a LPN) at all other times.  This cool down period may include similar attempts by custody ~~staff—but such interventions by custody staff are not a replacement for the required clinical intervention.~~ If no clinical intervention is documented during the cool down period or otherwise recorded in other documentation or on video (hand held and/or security camera footage reviewed by the monitor), there is a finding of non-compliance for the incident.  These findings and the reasons for them must be documented in the CGAR.

h.g. During the clinical intervention, the mental health clinician or QHCP (other than a LPN) must determine whether the inmate has the ability to understand orders; whether the inmate has the ability to understand orders but has difficulty complying due to mental health issues; and whether s/he believes the inmate's mental health issues are such that the controlled use of force could lead to a substantial risk of decompensation. ~~If no determination is documented or otherwise recorded in other documentation or on video (hand held and/or security camera footage reviewed by the monitor), there is a finding of non-compliance for the incident.   Failure to document these determinations in the SIR packet shall lead to a finding of non-compliance. These findings and the reasons for them must be documented in the CGAR.~~

i.h. If pepper spray and/or other chemical agents were used where a mental health clinician or QHCP (other than an LPN)  determined the inmate does not have the ability to understand orders, the monitor must determine that a Warden, or if the Warden was unavailable, the administrative duty officer, authorized the use of pepper spray and/or other chemical agents.  If no such authorization was obtained, there is a finding of non-compliance for the incident.  These findings and the reasons for them must be documented in the CGAR.

j.i. If the mental health clinician or QHCP (other than a LPN) determined that an inmate had the ability to understand orders but had difficulty complying due to mental health issues, or where the mental health clinician or QHCP believed the inmate's mental health issues are such that the controlled use of force involving the use of pepper spray and/or other chemical agents could lead to a substantial risk of decompensation, the mental health clinician or QHCP must propose  reasonable strategies to employ in an effort to gain compliance.  Such strategies might include, but are not limited to:  verbal persuasion, positive behavior modifications, and/or other de-escalation/intervention

25

Comment [A23]: Plaintiffs object to the deletion of this language because it needs to be clear to the monitor that in such circumstances cool downs by custody staff alone are not sufficient to meet compliance.

Comment [A24]: Plaintiffs object to this addition because "otherwise recorded in other documentation" is duplicative and vague and video often has no sound and it is impossible to verify whether a clinical intervention is occurring and who is conducting it without documentation.

Comment [A25]:  Unclear where is the best place to ensure this happens in ADC use of force packets. ADC forms may have to be altered to accommodate this requirement of the Stipulation.

Comment [A26]: Plaintiffs object to the deletion of the requirement that the record be found non-compliant if no determination is documented in the use of force documents (video alone would be insufficient due to reasons noted above) because this is a direct requirement from para 27 (c)-(d) of the Stipulation.

Formatted: Right

techniques, or engaging additional clinicians, religious leaders, correctional counselors, correctional officers and other custody and non-custody staff that have an established rapport with the inmate. ~~If no proposals of reasonable strategies are documented or otherwise recorded in other documentation or on video (hand held and/or security camera footage reviewed by the monitor), there is a finding of non-compliance for the incident. If there is no record of such strategies being proposed in such circumstances, there is a finding of non-compliance. These findings and the reasons for them must be documented in the CGAR.~~

**Comment [A27]:** Plaintiffs object to the deletion of the requirement that the record be found non-compliant if no such reasonable proposals are documented in the use of force documents (video alone would be insufficient due to reasons noted above) because this is a direct requirement from para 27 (d) of the Stipulation.

**Formatted:** Font: Bold, Condensed by 0.15 pt

**Formatted:** Right

26

# EXHIBIT 2

| | | | | | RATES OF REFUSAL OF RECREATION TIME | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| MC Notebook Month | Facility | Total Rec Periods Offered | Total Refusals | Percentage of Refusals | Non-SMI Rec Periods Offered | Non-SMI Refusals | Percentage of Non-SMI Refusals | SMI Rec Periods offered | SMI Refusals | Percentate of SMI Refusals |
| 2016-01 | Eyman-Browning | 66 | 47 | 71% | 36 | 21 | 58% | 30 | 26 | 87% |
| 2016-01 | Eyman-SMU | 75 | 58 | 77% | 40 | 30 | 75% | 35 | 28 | 80% |
| 2016-01 | Florence-Central | 27 | 5 | 19% | 27 | 5 | 19% | N/A | N/A | N/A |
| 2016-01 | Florence-Kasson | 60 | 44 | 73% | 30 | 19 | 63% | 30 | 25 | 83% |
| 2016-01 | Lewis | 61 | 45 | 74% | 30 | 17 | 57% | 31 | 28 | 90% |
| 2016-01 | Perryville | 115 | 73 | 63% | 60 | 28 | 47% | 55 | 45 | 82% |
| 2016-02 | Eyman-Browning | 66 | 43 | 65% | 36 | 21 | 58% | 30 | 22 | 73% |
| 2016-02 | Eyman-SMU | 75 | 48 | 64% | 35 | 22 | 63% | 40 | 26 | 65% |
| 2016-02 | Florence-Central | 30 | 2 | 7% | 30 | 2 | 7% | N/A | N/A | N/A |
| 2016-02 | Florence-Kasson | 60 | 45 | 75% | 30 | 19 | 63% | 30 | 26 | 87% |
| 2016-02 | Lewis | 48 | 39 | 81% | 27 | 21 | 78% | 21 | 18 | 86% |
| 2016-02 | Perryville | 114 | 68 | 60% | 57 | 30 | 53% | 57 | 38 | 67% |
| 2013-03 | Eyman-Browning | 67 | 45 | 67% | 36 | 22 | 61% | 31 | 23 | 74% |
| 2016-03 | Eyman-SMU | 75 | 54 | 72% | 39 | 28 | 72% | 36 | 26 | 72% |
| 2016-03 | Florence-Central | 30 | 4 | 13% | 30 | 4 | 13% | N/A | N/A | N/A |
| 2016-03 | Florence-Kasson | 58 | 44 | 76% | 30 | 22 | 73% | 28 | 22 | 79% |
| 2016-03 | Lewis | 56 | 43 | 77% | 30 | 20 | 67% | 26 | 23 | 88% |
| 2016-03 | Perryville | 134 | 76 | 57% | 71 | 36 | 51% | 63 | 40 | 63% |
| 2016-04 | Eyman-Browning | 67 | 29 | 43% | 36 | 14 | 39% | 31 | 15 | 48% |
| 2016-04 | Eyman-SMU | 65 | 40 | 62% | 34 | 22 | 65% | 31 | 18 | 58% |
| 2016-04 | Florence-Central | 30 | 0 | 0% | 30 | 0 | 0% | N/A | N/A | N/A |
| 2016-04 | Florence-Kasson | 64 | 31 | 48% | 32 | 12 | 38% | 32 | 19 | 59% |
| 2016-04 | Lewis | 59 | 35 | 59% | 29 | 12 | 41% | 30 | 25 | 83% |
| 2016-04 | Perryville | 125 | 66 | 53% | 60 | 33 | 55% | 65 | 33 | 51% |
| 2016-05 | Eyman-Browning | 56 | 34 | 61% | 26 | 11 | 42% | 30 | 23 | 77% |
| 2016-05 | Eyman-SMU | 75 | 47 | 63% | 38 | 22 | 58% | 37 | 25 | 68% |
| 2016-05 | Florence-Central | 30 | 1 | 3% | 30 | 1 | 3% | N/A | N/A | N/A |
| 2016-05 | Florence-Kasson | 60 | 43 | 72% | 30 | 16 | 53% | 30 | 27 | 90% |
| 2016-05 | Perryville | 118 | 53 | 45% | 59 | 23 | 39% | 59 | 30 | 51% |
| 2016-05 | Lewis | 60 | 39 | 65% | 30 | 13 | 43% | 30 | 26 | 87% |
| 2016-06 | Eyman-Browning | 64 | 37 | 58% | 36 | 21 | 58% | 28 | 16 | 57% |
| 2016-06 | Eyman-SMU | 77 | 53 | 69% | 40 | 24 | 60% | 37 | 29 | 78% |
| 2016-06 | Florence-Central | 30 | 3 | 10% | 30 | 3 | 10% | N/A | N/A | N/A |
| 2016-06 | Florence-Kasson | 60 | 39 | 65% | 30 | 16 | 53% | 30 | 23 | 77% |
| 2016-06 | Perryville | 120 | 70 | 58% | 60 | 33 | 55% | 60 | 37 | 62% |
| 2016-06 | Lewis | 60 | 27 | 45% | 30 | 7 | 23% | 30 | 25 | 83% |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | RATES OF REFUSAL OF PROGRAMS | | | | |
| MC Notebook Month | Facility | Total Programs Offered | Total Refusals | Percentage of Refusals | Non-SMI Programs Offered | Non-SMI Refusals | Percentage of Non-SMI Refusals | SMI Programs Offered | SMI Refusals | Percentate of SMI Refusals |
| 2016-01 | Eyman-Browning | 100 | 50 | 50% | 10 | 3 | 30% | 90 | 47 | 52% |
| 2016-01 | Eyman-SMU | 142 | 88 | 62% | 17 | 4 | 24% | 125 | 84 | 67% |
| 2016-01 | Florence-Central | 17 | 4 | 24% | 17 | 4 | 24% | N/A | N/A | N/A |
| 2016-01 | Florence-Kasson | 118 | 70 | 59% | 43 | 20 | 47% | 75 | 50 | 67% |
| 2016-01 | Lewis | 90 | 53 | 59% | 5 | 0 | 0% | 85 | 53 | 62% |
| 2016-01 | Perryville | 76 | 16 | 21% | 6 | 1 | 17% | 70 | 15 | 21% |
| 2016-02 | Eyman-Browning | 96 | 30 | 31% | 7 | 3 | 43% | 89 | 27 | 30% |
| 2016-02 | Eyman-SMU | 112 | 71 | 63% | 24 | 7 | 29% | 88 | 64 | 73% |
| 2016-02 | Florence-Central | 11 | 2 | 18% | 11 | 2 | 18% | N/A | N/A | N/A |
| 2016-02 | Florence-Kasson | 122 | 72 | 59% | 46 | 22 | 48% | 76 | 50 | 66% |
| 2016-02 | Lewis | 76 | 56 | 74% | 5 | 1 | 20% | 71 | 55 | 77% |
| 2016-02 | Perryville | 89 | 41 | 46% | 3 | 0 | 0% | 86 | 41 | 48% |
| 2013-03 | Eyman-Browning | 105 | 25 | 24% | 15 | 7 | 47% | 90 | 18 | 20% |
| 2016-03 | Eyman-SMU | 117 | 79 | 68% | 25 | 10 | 40% | 92 | 69 | 75% |
| 2016-03 | Florence-Central | 11 | 1 | 9% | 11 | 1 | 9% | N/A | N/A | N/A |
| 2016-03 | Florence-Kasson | 100 | 61 | 61% | 37 | 24 | 65% | 63 | 37 | 59% |
| 2016-03 | Lewis | 59 | 36 | 61% | 5 | 1 | 20% | 54 | 35 | 65% |
| 2016-03 | Perryville | 72 | 40 | 56% | 4 | 0 | 0% | 68 | 40 | 59% |
| 2016-04 | Eyman-Browning | 108 | 35 | 32% | 8 | 4 | 50% | 100 | 31 | 31% |
| 2016-04 | Eyman-SMU | 120 | 73 | 61% | 26 | 7 | 27% | 94 | 66 | 70% |
| 2016-04 | Florence-Central | 8 | 1 | 13% | 8 | 1 | 13% | N/A | N/A | N/A |
| 2016-04 | Florence-Kasson | 122 | 73 | 60% | 47 | 25 | 53% | 75 | 48 | 64% |
| 2016-04 | Lewis | 86 | 42 | 49% | 9 | 1 | 11% | 77 | 41 | 53% |
| 2016-04 | Perryville | 79 | 27 | 34% | 5 | 0 | 0% | 74 | 27 | 36% |
| 2016-05 | Eyman-Browning | 106 | 38 | 36% | 16 | 5 | 31% | 90 | 33 | 37% |
| 2016-05 | Eyman-SMU | 120 | 68 | 57% | 27 | 6 | 22% | 93 | 62 | 67% |
| 2016-05 | Florence-Central | 10 | 2 | 20% | 10 | 2 | 20% | N/A | N/A | N/A |
| 2016-05 | Florence-Kasson | 114 | 70 | 61% | 40 | 23 | 58% | 74 | 47 | 64% |
| 2016-05 | Perryville | 89 | 35 | 39% | 14 | 5 | 36% | 75 | 30 | 40% |
| 2016-05 | Lewis | 98 | 48 | 49% | 8 | 0 | 0% | 90 | 48 | 53% |
| 2016-06 | Eyman-Browning | 96 | 53 | 55% | 6 | 3 | 50% | 90 | 50 | 56% |
| 2016-06 | Eyman-SMU | 121 | 69 | 57% | 29 | 12 | 41% | 92 | 57 | 62% |
| 2016-06 | Florence-Central | 11 | 1 | 9% | 11 | 1 | 9% | N/A | N/A | N/A |
| 2016-06 | Florence-Kasson | 120 | 59 | 49% | 46 | 19 | 41% | 74 | 40 | 54% |
| 2016-06 | Perryville | 86 | 25 | 29% | 11 | 3 | 27% | 75 | 22 | 29% |
| 2016-06 | Lewis | 102 | 27 | 26% | 6 | 0 | 0% | 96 | 27 | 28% |

# EXHIBIT 3

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



### Via Email Only

November 3, 2016

Ms. Lucy Rand                                    Rachel Love
Office of Arizona Attorney General               Struck, Wieneke & Love, PLC
1275 W. Washington                               3100 West Ray Road
Phoenix AZ 85007                                 Chandler, AZ 85226
Lucy.Rand@azag.gov                               rlove@swlfirm.com

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

**RE: Maximum Custody Performance Measures, Monitoring Methodology, October 28, 2016 Call,** *Parsons v. Ryan*, **Civ-12-00601-DKD**

Dear Counsel:

This letter serves as a follow-up to the conference call between Plaintiffs' counsel and Defendants held on Friday, October 28, 2016, during which the Maximum Custody Performance Measures (MC PM) were discussed. The parties discussed proposed substantive edits to MC PM Number 9 at length. Because ADC staff had not reviewed the edits to MC PM #9 produced by Plaintiffs, the parties agreed to continue discussions regarding methodology after that review.

Plaintiffs also indicated that they would provide a line edit of Defendants' October 21, 2016 version of MC PM ##1-8 in order to expedite the process. That line edit is attached, along with a slightly updated version of MC PM #9 based on our October 28 call. These have been combined into one Word document for convenience.

In addition to specific edits on the MC PM Monitoring Guide, Plaintiffs' counsel also writes to express our views and raise objections with respect to statements Defendants made regarding the definition, scope, and related methodology that govern monitoring for Maximum Custody Performance Measure No. 9.

### 1. *Definition Scope of Stipulation ¶ 27(a)-(e)*

Paragraph 27 of the Stipulation provides as follows: "Defendants shall maintain the following restrictions on the use of pepper spray and other chemical agents on any maximum custody prisoner classified as SMI, and in

the following housing areas: Florence-CB-1 and CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; and Phoenix (Baker, Flamenco, and MTU)."

On the October 28th conference call, Defendants informed Plaintiffs' counsel of their contention that Paragraph 27 of the Stipulation **_only_** applies to maximum custody prisoners classified as SMI who are housed in one of the enumerated facilities.

Plaintiffs' counsel disagree with this interpretation of the Stipulation and Maximum Custody Performance Measure No. 9.  It is Plaintiffs' counsels' position that the Stipulation covers **_all_** maximum custody prisoners classified as SMI, as well as those maximum custody prisoners housed in the enumerated ADC facilities.

Plaintiffs' counsel's interpretation both adheres to the plain language of the Stipulation text and remains true to the express intentions of the Plaintiffs during settlement negotiations.  First, the plain language of the Stipulation states that "restrictions on the use of pepper spray and other chemical agents" apply to "any maximum custody prisoner classified as SMI" "**_and_**" in the following housing areas: Florence-CB-1 and CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; and Phoenix (Baker, Flamenco, and MTU)."  Stipulation ¶ 27(emphasis added).  In interpreting a settlement agreement, courts "rely on basic principles of state contract law." *Harps v. Cty. of Los Angeles*, 8 F. App'x 771, 772 (9th Cir. 2001) (quoting *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989)).  The starting point for interpreting a contract is the plain meaning of the contractual language, and courts may rely on dictionary definitions to construe words contained in a contract.  *See, e.g.*, *Universal Bank v. Northland Ins. Co.*, 8 F. App'x 784, 785–86 (9th Cir. 2001).

The word "and" is "used to join words or groups of words" and means "added to" or "plus."  *See And*, Merriam-Webster (last visited Oct. 31, 2016), http://www.merriam-webster.com/dictionary/and.  Defendants' interpretation would not join, or add to, the two clauses quoted above.  Instead, the Defendants' interpretation would render superfluous the word "and" contained in Paragraph 27.  Such an interpretation is disfavored in light of the well-known principle of contract law that calls for courts to construe contract terms in such a way so as not to render a portion of the contract superfluous.  *See, e.g.*, *United States v. Spear*, 753 F.3d 964, 967–68 (9th Cir. 2014) (declining to adopt government's construction of the terms of a plea agreement where doing so would render portions of the plea agreement superfluous).

Defendants' tortured reading of the requirements of the Stipulation's use of force requirements also makes no practical sense and does not reflect the intentions of the parties during settlement. Both parties are well aware that maximum custody SMI prisoners are housed throughout Defendants' facilities. At the time of settlement, the enumerated facilities held many of the most troubled prisoners in maximum custody, some of whom are SMI. However, many of these prisoners, such as those in the SMU-I BMU, often have diagnoses such as personality disorders. These prisoners are not designated SMI but nonetheless have serious mental health needs that require additional supports. That is why the Stipulation covers all SMI prisoners in maximum security units and those particularly troubled prisoners in the enumerated facilities.

Defendants' new interpretation of Paragraph 27 of the Stipulation also flies in the face of the CGAR monitoring and reporting for the past year and a half. Use of force incidents reported in the CGAR reports and documents produced to support compliance findings have consistently included maximum security prisoners who are SMI and are housed outside the enumerated units, as well as non-SMI prisoners housed in the enumerated units. Indeed, the CGAR reporting and the documents produced gave Plaintiffs no indication that Defendants were operating on an inaccurate understanding of the requirements of MC PM #9. Based on the CGAR reports, it is clear that Defendants' monitors share Plaintiffs' clear interpretation of the Stipulation.

## II. Production of Use of Force Videos

Defendants's Counsel, Ms. Rand, indicated on the October 28th conference call that the videos produced to Plaintiffs' counsel were not—or were not necessarily—relied on by the monitors responsible for determining compliance with Maximum Custody Performance Measure No. 9. In particular, Ms. Rand disputed that any stationary/security camera footage would have been viewed by the monitor. At the same time, Carson McWilliams, Division Director for Offender Operations indicated that such footage would be viewed by the monitor if it existed.[1] These statements by Defendants—made almost two years into monitoring in this case and after producing video footage under the Court's order—are deeply concerning.

The primary purpose of producing records, documentation, and use of force videos is to allow Plaintiffs' counsel the opportunity to review these materials to determine whether the monitor made the appropriate compliance determinations. Producing videos that were never reviewed by the monitors

---

[1] According to Director McWilliams, the level of security camera coverage varies across facilities.

for compliance determinations undermines Plaintiffs' ability to accurately assess the CGAR findings.  We therefore request that Defendants audit the videos produced to the Plaintiffs and provide a signed declaration as to which videos were actually used in to make previously reported CGAR compliance findings. We also request that in the future Defendants produce any use of force videos (hand-held and/or stationary/security) actually relied upon by monitors in making CGAR compliance findings.

      We look forward to working cooperatively with Defendants to address these issues and concerns.

      Sincerely,

Amy Fettig
Deputy Director, ACLU National
Prison Project

cc:    All counsel

# EXHIBIT 4

# FILED UNDER SEAL

# EXHIBIT 5

# FILED UNDER SEAL

# EXHIBIT 6

# FILED UNDER SEAL

# EXHIBIT 7

# FILED UNDER SEAL