UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Victor Antonio Parson, et al, ) | | |
| ) | | |
| Plaintiffs, ) | 2:12-cv-00601-DKD | |
| ) | | |
| vs. ) | Phoenix, Arizona | |
| ) | November 9, 2016 | |
| Charles L. Ryan, et al, ) | 9:05 a.m. | |
| ) | | |
| Defendants. ) | AMENDED PER JUDGE | |
| _____) | DESIGNATION | |

BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

STATUS HEARING

Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CRR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

2

1                          A P P E A R A N C E S

2      For the Plaintiffs:

3              Eidenbach Law, PLLC
               By: KIRSTIN T. EIDENBACH, ESQ.
4              PO Box 91398
               Tucson, AZ  85752
5
               ACLU
6              By:  KATHLEEN ERIN BRODY, ESQ.
               PO Box 17148
7              Phoenix, AZ  85011

8              Prison Law Office
               By: DONALD SPECTER, ESQ.  (via telephone) and
9                  CORENE t. KENDRICK, ESQ.  (via telephone)
               1917 5th Street
10             Berkeley, CA 94710

11             ACLU – Washington DC
               By: DAVID CYRUS FATHI, ESQ. (via telephone)
12             915 15th Street NW, 7th Floor
               Washington, DC  20005
13
               Arizona Center for Disability Law
14             By: MAYA ABELA, ESQ. (via telephone)
               177 N. Church Avenue, Suite 800
15             Tucson, AZ 85701

16

17     For the Defendants:

18             Struck Wieneke & Love, PLC
               By: TIMOTHY JAMES BOJANOWSKI, ESQ.  and
19                 MARK ALLEN BRACKEN, ESQ.
               3100 W. Ray Road, Suite 300
20             Chandler, AZ  85226

21
               Office of the Attorney General – Phoenix
22             By: LUCY MARIE RAND, ESQ.
               1275 W. Washington Street
23             Phoenix, AZ  85007

24

25

                    UNITED STATES DISTRICT COURT

INDEX

SUMMARY OF COURT PROCEEDINGS                              PAGE:

Court resumes                                              4

Court recess                                              36


INDEX OF WITNESSES

WITNESSES FOR THE        Direct     Cross    Redirect
PLAINTIFF:


* * * * * NO WITNESSES CALLED * * * * *


INDEX OF EXHIBITS

EXHIBIT NO.:        DESCRIPTION:                    RECEIVED:


* * * * * NO EXHIBITS MARKED * * * * *


UNITED STATES DISTRICT COURT

4

1                    P R O C E E D I N G S

2            (Proceedings resume at 9:05 a.m.)

3            THE COURT:  Thank you.

4            Please be seated.

5            COURTROOM DEPUTY:  Civil case number 12-601, Parsons

6    et al. versus Ryan et al., on for status hearing.

7            THE COURT:  Would counsel please announce?

8            MS. EIDENBACH:  Kirstin Eidenbach and Kathleen Brody

9    for plaintiffs.

10           THE COURT:  Thank you.

11           MR. BOJANOWSKI:  Thank you, Your Honor.

12           Tim Bojanowski on behalf of -- from Struck Wieneke &

13   Love on behalf of defendants, and Lucy Rand with the Attorney

14   General's Office, also on behalf of defendants.

15           THE COURT:  Am I the only person who had a great deal

16   of difficulty understanding what you said at the beginning?

17   There's something wrong with the microphone jacks.  Try it

18   again.

19           MR. BOJANOWSKI:  Try it again.  How about if I sit?

20           THE COURT:  Try that, okay.

21           MR. BOJANOWSKI:  Tim Bojanowski and Mark Bracken,

22   Struck Wieneke & Love, on behalf of the defendants; and also

23   Lucy Rand with the Attorney General's Office on behalf of

24   defendants.

25           THE COURT:  All right.  Thank you very much.

                    UNITED STATES DISTRICT COURT

1                    And whom do we have on the phone?

2                    MR. FATHI:  Good morning, Your Honor.

3                    David Fathi of the National Prison Project for the

4          plaintiff class.

5                    THE COURT:  Thank you.

6                    MR. SPECTER:  Donald Specter from the Prison Law

7          Office for the plaintiffs, as well.

8                    THE COURT:  Thank you.

9                    MS. KENDRICK:  Corene Kendrick from the Prison Law

10         Office.

11                   THE COURT:  Thank you.

12                   MS. ABELA:  Maya Abela with the Arizona Center for

13         Disability Law.

14                   THE COURT:  Thank you.

15                   And is that it?

16                   Okay.  I'll start with the previously identified

17         performance measures and the -- I think the need for the Court

18         to take the next step.

19                   I will announce a threshold observation that is not, I

20         think, going to be foreign to your ears because you've heard it

21         before, but I have to say it again because it apparently is --

22         is not getting through.

23                   Because of my participation in the negotiations for --

24         that resulted in the agreement to the stipulation, I do believe

25         that I have a clear understanding of the limitation that is set

1   forth in the stipulation with respect to what I can do, and I

2   do not think that I can, as plaintiffs again invite me to, act

3   to address what I think is the legitimate cause of the failure

4   of performance measures, and that is staffing issues.  I don't

5   think I can provide the remedy the plaintiffs continue to ask

6   for under the terms of the -- of the stipulation.  And I've

7   told you all that before, and I -- I see the arguments, I read

8   the arguments that plaintiffs articulate, but it is not

9   consistent with what my impression was of the parties'

10  understanding at the time that the stipulation was negotiated.

11          So I'm going to remain of the position that I cannot

12  provide for what seems to be the obvious measure for

13  remediation that would address this specific problem, and that

14  is staffing issues.  It's -- staffing issues are -- are

15  manifest in the minutes of the supervising meetings, and it

16  also just is plainly a matter of common sense; that if people

17  are not being seen as required by the performance measure, if

18  they're not receiving the -- the treatment or the actions that

19  they're required because they're -- in a certain amount of

20  time, it's simply because there aren't enough people to do it.

21  And whether it's the medical providers or whether it's people

22  in the prison who can't shuttle the inmates to the appropriate

23  place, as defendants have argued, again, that's all staffing,

24  seems to be manifestly what is the cause.  But I cannot address

25  that.

UNITED STATES DISTRICT COURT

1          The second point is one that focuses on what

2     defendants have done again, and they seem -- you seem to again

3     return to this previously addressed argument that -- that fails

4     to focus on what I've said the focus needs to be, and that is

5     on the individual performance measures of the individual

6     facilities and not this broadbrush, omnibus package of, overall

7     we're doing better.  That's not what it's about.  And so I --

8     again, I am specifically tied in the stipulation to address the

9     success or failure of meeting the performance measures, not

10    whether if you combine the system together the percentage is

11    okay.  That's not what it says.  It says I'm supposed to focus

12    on each of the facilities and each of the performance measures,

13    and so as -- as strongly resistant to that idea as I have

14    articulated to you all before.

15          So I made the original findings that there was

16    substantial noncompliance on the performance measures that were

17    identified and identified specifically with respect to the

18    facilities.

19          I need to drop a footnote here and say that plaintiffs

20    have in some of their tables included facilities that were not

21    part of my original finding on their -- in their papers and in

22    their tables.  I'll continue to focus on the ones that are

23    following the track that I have to follow, and that is starting

24    out with the specific performance measures and the specific

25    facilities.  And if it turns out that -- that along the road

1    that others fail off, you just can't add them into the list

2    midway through the process.  You have to start, with those

3    failed facilities, with the remediation process that's

4    identified in the -- in the stipulation.

5         And so closing out that -- that footnote, after the

6    mediation process, we then turn to the -- to the State to

7    provide for its remediation plan.  And as you all know, I was

8    very doubtful that it would produce the compliance with the

9    stipulation.  But I reluctantly acquiesced in not only

10   defendants' original proposal, but also the request for

11   additional time.  And I -- I granted the additional time, as I

12   think you probably remember, out of my sense of what I

13   described as fairness, and also I think I described it as a

14   sense of respect for defendants' presumed good faith, and I --

15   that they were actually proposing something that they thought

16   would work.

17        And so I allowed additional time to pass, a quarter to

18   pass.  And we were told that the implementation of the

19   defendants' remediation plan would be realized by the August

20   data, and the August data confirms the failure of many of

21   defendant's remedial measures.

22        And so accordingly, pursuit to the authority conferred

23   to me in the stipulation to effectuate compliance, I am

24   required to proceed with remedial measures.

25        And let me say that I have -- "hit's" too weak a

UNITED STATES DISTRICT COURT

1    word -- I think I foreshadowed where I was going to be on this.

2    I've told -- told the State that in the absence of having what

3    I thought to be the most effective tool in my toolbox, I would

4    turn to one that I didn't think was going to be as efficient or

5    as economic as the one that you took away from me, but it's the

6    only one that I have been able to conclude that could work, and

7    that is turning to providers who are -- who exist in -- in

8    the -- in the communities that surround the prison facilities,

9    to provide services on an emergent basis.

10            And so, for example, with performance measure 37 that

11   requires that inmates be seen within 24 hours of an HNR, and

12   the facilities of Eyman with 54 and Lewis at 35, and Tucson at

13   51, and Yuma at 34.  So we're clearly seeing a failure of

14   substantial compliance so far off of the 80 percent benchmark.

15   And so 37 provides for people to be seen within 24 hours.  If

16   the -- if the -- with the submission of the HNR.  If the clock

17   strikes 24 hours and they have not been seen by an RN, then

18   they must be taken to some place where there is an RN, whether

19   it's the hospital, whether it's an urgent care, when it's a

20   house call that's arranged by some provider, but they either

21   must be taken or the provider must be taken to them so that at

22   hour 25 everybody who wasn't seen in those first 24 hours will

23   be seen by an RN.

24            And I see this same remedy throughout all of the

25   performance measures that I must address.

                    UNITED STATES DISTRICT COURT

1          Performance measure 39, routine provider referral seen

2     within 14 days -- Yuma at 42, Eyman at 46, Florence at 41,

3     Lewis at 75, Perryville at 51, Tucson at 69 -- if they are not

4     seen within 14 days, on the 15th day, they must be taken to an

5     urgent care or to a hospital or to someplace where there can be

6     this service provided.  And that is what the performance

7     measure requires, that the -- that how it is effected will be

8     somewhat still within the State's hands.  But nevertheless, I

9     think I will -- contemplating entering a written order with

10    respect to all the performance measures where all of the

11    facilities are below substantial compliance, and where the time

12    that you have asked for has passed to see that it would work,

13    and it has not worked, to do exactly this.

14          And so I will turn to the respective parties now to

15    allow them to respond to what is, I think, a clear enough

16    indication of what I plan to do.

17          Plaintiffs?

18          MR. FATHI:  Your Honor, it may be more appropriate to

19    start with defendants at this point, since your motion mostly

20    affects them.

21          THE COURT:  Well, that's fine with me.

22          MR. BOJANOWSKI:  Your Honor, from our view, it's

23    actually -- we believe your order is one that is essentially an

24    increase in staffing because as a result of bringing a provider

25    in or taking somebody out to a provider, that is essentially

UNITED STATES DISTRICT COURT

1    what you're doing is --

2              THE COURT:  No, I -- I don't buy that for a second.  I

3    understand what increased staffing means.  That means hiring

4    somebody.  I was there for the negotiations.  It doesn't mean

5    taking somebody to the hospital.  They're not your employees.

6    That's not staffing.  That's taking somebody who is required to

7    be seen by a medical provider to a medical provider.  And

8    that's wholly different than having somebody on the payroll,

9    having somebody who is an FTE.  And so I cut you off rather

10   abruptly because you're not going to get anywhere with me on

11   that argument.

12             MR. BOJANOWSKI:  That's fine, Your Honor.

13             I think in fairness we probably ought to be given an

14   opportunity to see what the actual order is, and then be able

15   to evaluate that.

16             THE COURT:  That's fine.  And what I just wanted to do

17   was give you a chance to say --

18             MR. BOJANOWSKI:  Right.

19             THE COURT:  -- whatever might be constructive to be

20   said when we're all here together.  But I think -- I'm hopeful

21   that the -- that the order will be as plain as what I've just

22   said.  And what I mean by that is, I think what I said is

23   plain.

24             And so if you have an initial reactions to it -- I

25   heard the first reaction, and that was constructive because

1    that is something you would have spent time writing and I would

2    have read it and given you the response, and it would have

3    taken a lot longer.  So I've given you that response on that

4    and that's helpful, and that's one of the reasons why -- that

5    is the reason that I invited both sides to say what they wanted

6    to say in response to what I had to say.

7              MR. BOJANOWSKI:  And we certainly appreciate the Court

8    bringing light to its position with regard to this issue.

9              We also need to look at operational considerations

10   with regard to the movement of -- of inmates.  I mean, the

11   scope of -- of medical care at these facilities, quite frankly,

12   is fairly immense.  I mean, the month of August alone, there

13   were in excess of 88,000 medical contacts.  So in addition to

14   that, there were some 51,000-plus prescriptions and such

15   issued.

16             So when we talk about the scale of what it is that the

17   Court is seeking to order here, I think that we should be given

18   the opportunity, at least by supplemental briefing or evidence,

19   bring to light to the Court the ramifications of what its

20   proposed order is.  And we'd like to be given that opportunity

21   because obviously we have not, at this setting anyway, had the

22   opportunity to appropriately evaluate exactly what the Court is

23   going to say and then translate that into an operational impact

24   upon the facilities because each movement, obviously, within a

25   facility has ramifications with regard to security and the --

1    and the provision of other staff and such to maintain,

2    obviously, the protection of the community when we move people

3    out and stuff.

4              THE COURT:  Yeah, I can't remember whether you were

5    here or not, but I have addressed that before with Mr. Struck,

6    and I've said that there are obviously significant issues

7    associated with exactly what you describe with respect to the

8    fact that it's an inmate population.  And that's why this tool

9    is -- is not as -- is not as preferred as some other tools.

10   But the other tools you've taken out of my toolbox, and I can't

11   do it.  And so this -- this alternative, whether there's huge

12   numbers or not, you are going to have to be in a position of

13   meeting the stipulations' performance measures, and it means

14   that if it is suddenly that Walgreens decides they need to open

15   up another shop in Florence because suddenly there's this huge

16   increase in business, this -- Walgreens will do that.  The

17   market will respond.  And you will take those people to

18   Walgreens to get their prescriptions filled, if you're not able

19   to do it in-house.  And so you've got a choice.  You can do it

20   this cumbersome, more expensive way, or you can do it some

21   other way.  But so far, the other way hasn't worked.  And I

22   have to make it work.  And I am presented with no other

23   alternative that would seem to work, and I have therefore done

24   what I have to do and think about, well, I live in this -- this

25   country where we have the ability of the market to respond to

1   demand.  And I believe that it will be able to do that.  Where

2   there is market, there will be a provider.  And so I'm creating

3   that market because I have to because these people have to be

4   seen.

5          And so I appreciate what you say, but I have made it

6   clear to you I can't do anything about that.  That's your

7   problem, and you're going to have to deal with it because you

8   fundamentally have an obligation to provide these services to

9   these inmates.  You failed to do it.  And in light of that

10  failure, I'm required to come up with an alternative.  And that

11  is the alternative that appears to be the only one that can

12  work in the environment of the limitations that contracting

13  parties have imposed upon me.

14         And so I have given the defendants a chance to say

15  anything.  Is there anything the plaintiffs would like to say?

16         MR. BOJANOWSKI:  Your Honor, I have one more point --

17         THE COURT:  Sure.

18         MR. BOJANOWSKI:  -- that I would like to make.  And

19  that is, assuming compliance is obtained with regard to these

20  specific measures that this order is being placed upon, what is

21  the Court's position at that point?  Is the Court then going

22  to -- is this order going to automatically fall off, or is

23  there a time frame or a framework with regard to the existence

24  of this order?  I mean, if --

25         THE COURT:  The stipulation -- I mean, the stipulation

UNITED STATES DISTRICT COURT

1   addresses that.  It provides for when you get past the

2   benchmarks for a sufficient period of time, you can fall off.

3   The problem is, if I relieve you from the remedial measure that

4   I've imposed, it would be understandable to expect you to have

5   an immediate drop-off again back to what the previous basis

6   was.  And so that's why you don't get an instantaneous relief

7   from it.  If we embark upon this measure and it turns out that

8   the differential diagnosis hasn't been provided within five

9   days, and in the previous month, because of my remedial measure

10  of saying they had to be taken to some other provider in the

11  market to provide that service and you got the compliance above

12  the benchmark in that previous month, that doesn't mean that

13  you get -- you get relieved of it from the next month because I

14  don't have any basis to believe that it wasn't the simple fact

15  that my order required you to address the failure.  And so that

16  is what my answer is to that question.

17          MR. BOJANOWSKI:  All right.

18          Well, another -- another point that I'd like to

19  perhaps get the Court's opinion on is that much of the activity

20  in the field occurs, say, for instance today, things happened.

21  That is not evaluated by the ADC monitoring bureau until almost

22  30 days later, or maybe in excess of 30 days later.  So there's

23  obviously that lag time that arises with regard to actually

24  making sure that what the Court is implementing is actually in

25  place:  Traction, training, et cetera, et cetera, et cetera.

                    UNITED STATES DISTRICT COURT

1    So --

2            THE COURT:  Well, I guess mine is simple enough.  I'll

3    know.  I'll know whether it works or not.  I mean, actually, it

4    will work because if you're not seen by an RN within 24 hours

5    in hour 25, all those who were not seen in the first 24 hours

6    have to go to some other provider, urgent care, the emergency

7    room, someplace else.  They have to be seen by an RN.  So all

8    of those people will have to be seen by an RN.  And so there

9    doesn't matter whether there's a lag time in reporting.

10           The reporting mechanism, the monitoring process, is

11   designed for a different purpose.  It's to allow us to see

12   whether the defendants are in compliance with the stipulation

13   or not.  And it provides for this reporting mechanism with a

14   sampling.  Sometimes the sampling is at 100 percent, sometimes

15   the sampling is just a representative sample.  But the sampling

16   identifies where the performance measure is not being met.

17   Once that is demonstrated, as we have here, then it implicates

18   the additional mechanism that is not tied to that because it is

19   an identification process; it is an alert process, a warning

20   system, if you will.  The actual performance is what then I

21   focus on, and that is, were -- in performance measure 37, were

22   people seen within 24 hours?  If you come and you find that

23   somebody has a date stamp of this hour and 24 hours has passed,

24   then those people have to go.  And so all of those people will

25   be seen.  So it's not that I need to have anything monitoring

                    UNITED STATES DISTRICT COURT

1    it, other than the -- we will make sure that everybody who has

2    not been seen within 24 hours did actually get to be seen.

3            So the 80 percent benchmark, the monitoring program,

4    is designed to alert to me -- alert me when I need to ask the

5    State to come up with a remediation plan.  I then move to the

6    next step if it fails.  Then I do my remediation plan, and my

7    remediation plan is to accomplish what the stipulation

8    requires.

9            So I think that answers your question what my view is

10   on that.

11           MR. BOJANOWSKI:  Right.  I'm just trying to evaluate

12   the compliance threshold of 80 percent.  In other words, if

13   every inmate has to be transported out that's not seen within

14   24 hours, then that means there has to be 100 percent

15   compliance.

16           THE COURT:  That's right.

17           MR. BOJANOWSKI:  Is that what the Court is ordering --

18           THE COURT:  That's right.

19           MR. BOJANOWSKI:   -- is 100 percent compliance?

20           THE COURT:  That's right.  The 80 percent is to tell

21   me whether or not you're in substantial compliance.  If you're

22   above 80 percent, then you're in substantial compliance and we

23   do not get involved.  You don't get involved, I don't get

24   involved.  You don't have to propose a plan to me, I don't have

25   to consider it.  And if it fails, I don't have to come up with

1    one.   That's what that that mechanism is for.

2          When it alerts me that there's a drop-off below the

3    benchmark, then I take a step, and my step is not tested by

4    whether or not it's at 80 percent anymore.   It's designed to

5    effectuate what the performance measure -- well, actually, what

6    the stipulation calls for.   The stipulation at no place with

7    respect to the provisional services limits it to 80 percent.

8    The individual performance measures in many cases say all the

9    inmates will be seen.   But where they don't say it, it's

10   obvious from the context that that's what's supposed to happen.

11         The 80 percent measure was designed to give the

12   defendants an opportunity in graduated mechanism to work toward

13   what was the goal of full compliance.   And the 80 percent

14   criteria was respecting of the idea that -- or 75 percent was

15   respecting the idea that we would move toward that with

16   increasing compliance measures towards 100 percent.   But it was

17   also to allow some -- some generosity, I guess, to the -- to

18   the fact that it was a sampling process, and that we wouldn't

19   know, and that there would be egregious cases, there would not

20   be -- there would be some that were not to be determinators --

21   determinations of things of some -- you needed to have some

22   measure to gauge performance to alert the parties and the Court

23   when it needed to take action.   That's what it is.   It's an

24   alert mechanism.   The alert mechanism has served its role and

25   is no longer applicable to the action that the Court takes with

1    respect to accomplishing its measures.

2           So again, I think I've just said the same thing what

3    I've previously said, but I hope it's clear to you what my view

4    is with respect to what happens.  To use the example, at 25

5    hours, you just can't say to the people who are still in the

6    room who haven't yet been seen, we're going to take eight out

7    of 10 of you, and the other two, you can just go off.  No.

8    Everybody has to be seen at that point.

9           MR. BOJANOWSKI:  Thank you, Your Honor.

10          THE COURT:  Anybody from the plaintiffs' side want to

11   say anything?

12          MR. SPECTER:  Yes, Your Honor, this is Donald Specter.

13          We appreciate the Court's carefully thought-out

14   remedy, and we appreciate it because it will, if effectuated,

15   get our clients to essential medical services in the manner

16   required by both the Constitution and the stipulations.

17          And we just want to note that the defendants'

18   objections that were stated here today, they always have the

19   opportunity to mitigate those objections by coming up with this

20   staffing plan that -- and the Court under the stipulation has

21   the authority to order that, as well.  So --

22          THE COURT:  That's certainly true because if that --

23   for instance, to use 37, with the passing of the 24th hour, if

24   at that moment the defendants decide to bring a group of RNs

25   from wherever they would choose to bring them and have them

UNITED STATES DISTRICT COURT

1    seen, or if they decide at that moment that they're going to

2    incentivize with a higher rate of pay or something to make

3    people want to stay and do the -- work longer and work overtime

4    to do it, that is something that the State could do.  And as

5    long as at hour 25 there's nobody still waiting in the room to

6    be seen by an RN, and if -- because they've all been seen by

7    the RN, wherever that RN is from, that's certainly within the

8    defendants' control.

9         And again, I don't think that it's a mystery to you

10   all that -- this is not the ideal.  The ideal is a tool that's

11   been taken out of my toolbox.  And so I don't choose it with

12   the hope that it's the one you turn to.  I choose it with the

13   hope that you turn to one that makes more sense, that you have

14   the power to effectuate.

15        Go ahead.  I'm sorry, Mr. Specter.

16        MR. SPECTER:  Well, I think you took the words right

17   out of my mouth.  The stipulation permits the defendants to

18   come up with a staffing plan and it permits you to order them

19   to comply with that plan.  And if they find that your proposed

20   solution is less efficient than proposing a staffing plan that

21   will solve the serious problems, then under the stipulations'

22   procedures, they're entitled to do that.  And so any objections

23   they have to your order, we believe, are of their own making.

24        Thank you.

25        THE COURT:  All right.

UNITED STATES DISTRICT COURT

1          Turning next to the remediation plan for performance

2     measures 47, 80, and 94, it was unclear to me when the

3     defendants' plan was activated with respect to 47, 80, and 94.

4          Can you enlighten me about that?  Has it been in

5     operation for a period of time already?

6          MR. BOJANOWSKI:  May I have a moment, Your Honor?

7          THE COURT:  Of course.

8          MR. BOJANOWSKI:  I just want to clarify.  I think some

9     of the measures may have been implemented on different dates.

10          THE COURT:  Okay.  Surely.  Surely.

11                    (Pause in proceedings.)

12          MR. BOJANOWSKI:  Okay, Your Honor.  I think I've got

13     some responses to your question.

14          Measure number 80 in Lewis and Tucson; Lewis it was

15     implemented in June; Tucson, July.

16          Measure 94, facility at Eyman was April; Florence was

17     April; Tucson was May.

18          Number 47.  Okay.  For all of those facilities listed

19     in number 47, it was during the months of July and August that

20     it was implemented.  I'm not quite sure as to each particular

21     facility, but it was during those two months that measure 47,

22     the plan was put into place.

23          And I think that addresses the Court's question.

24          THE COURT:  So 47, you say July and August?

25          MR. BOJANOWSKI:  Yeah.  During the months of July and

                    UNITED STATES DISTRICT COURT

22

1    August, it was rolled out in all of those facilities.  So

2    that's one, two, three -- all 10 facilities.  And I have -- and

3    I have to be a little bit vague on that because it may have

4    been implemented, you know, on different days and different

5    facilities, and then there's obviously a ramp-up process that

6    occurs with regard to retraining staff and making sure that

7    they're implementing the changes.

8                        (Pause in proceedings.)

9              THE COURT:  Can you state again the start dates for

10   94?

11             MR. BOJANOWSKI:  94, it was --

12             THE COURT:  So you're saying Tucson was 94 --

13             MR. BOJANOWSKI:  94 is Eyman, Florence, and Tucson.

14   And it was April --

15             THE COURT:  In Tucson in April?

16             MR. BOJANOWSKI:  No, no, no.  No, Your Honor.  Eyman

17   was April.

18             THE COURT:  Okay.

19             MR. BOJANOWSKI:  Florence was April.  Tucson was May.

20             And so if you look at -- if you look at compliance

21   numbers with regard to those measures, you -- you see that it's

22   ticked up quite a bit.

23             THE COURT:  So how much time do you think we need to

24   wait before we know whether it worked or not?

25             MR. BOJANOWSKI:  Well, based on our numbers here,

                       UNITED STATES DISTRICT COURT

1    measure 80 --

2              THE COURT:  80 is -- is -- yes.  That's not -- I mean,

3    we're close with 80.  I agree.

4              MR. BOJANOWSKI:  80 -- 80 -- we're showing that Lewis,

5    an 84 percent; and at Tucson, we're showing 100 percent.

6              Now, we -- in July, we're showing for Lewis an

7    87 percent -- excuse me.  Did I -- oh, Tucson.  I'm sorry.  I

8    misspoke, Your Honor.

9              Tucson was at 75 percent in August, and it jumped up

10   to 91 percent in -- or 75 percent in July, 91 percent in August

11   under measure 80.  So the -- the scores have trended upward on

12   all the mental health measures.

13             Under 94, current numbers show Eyman at 95 percent,

14   Florence at 80, Lewis at 80, we have Perryville at 70, Phoenix

15   at 80, Tucson at 100, and Yuma at 100.

16             So out of -- out of the 10 facilities, we have one

17   that -- that was below the mark, so to speak, but I understand

18   that that was --

19             THE COURT:  Based on an earlier, different method of

20   calculation also.

21             MR. BOJANOWSKI:  No -- yeah, that was a personnel

22   change that occurred that was a problem at that facility.

23             THE COURT:  So how much time do you think would be

24   necessary to know whether or not this works or not, on these

25   three performance measures?

                    UNITED STATES DISTRICT COURT

1          MR. BOJANOWSKI:  Your Honor, I'd like 60 days.

2          THE COURT:  Okay.

3          Let me hear from the plaintiffs so I'm not --

4          MR. FATHI:  Good morning, Your Honor.

5          This is David Fathi.

6          As we said in our filing documents 1739, the

7     defendants' claims of compliance on measures 80 and 94 for the

8     month of August are simply false.  They are based on the fact

9     that in -- in many cases, the defendants were impermissibly

10    counting cell-front contacts as satisfying the requirement that

11    the patient be seen, in violation of the Court's order.  So,

12    for example, on measure 94 at Tucson for August, the defendants

13    claim 100 percent compliance but, in fact -- and we have

14    attached the medical records to our filing -- so you can see

15    that in seven out of the 10 cases they count as compliance,

16    they were actually impermissibly counting a cell-front contact

17    as satisfying the requirement that the person on suicide watch

18    be seen.  So those numbers are simply incorrect, and they are

19    not in compliance.

20          THE COURT:  Okay.  So what I'm going to do is I'm

21    going to give the defendants the 60 days that they've asked for

22    so that they can have the benefit of not only the Court's

23    clearer definition of what it means to have someone to be seen,

24    to exclude the previously identified method -- or previously

25    method -- counted method of the cell-front -- cell-front

                    UNITED STATES DISTRICT COURT

1   visits; and also to be consistent with what I had done

2   previously to take advantage of where the State's method can

3   work and really only employ the ultimate action of the Court

4   where it's truly necessary.

5          And so we'll know if we -- if we grant 60 days from

6   today -- here we are in the second week of November, and so we

7   would be in the second week of January -- I keep hoping for an

8   increased reporting rate -- but we will have the data we have

9   at that time that we meet again in January.  And we will see

10  where we stand with respect to these three performance

11  measures.  Each of them includes the obvious suggestion of a

12  similarity of approach that I would take with respect to

13  addressing a failed defendant's remediation plan, and that is

14  having these people seen by a provider that can be obtained in

15  the market.  So that's how we will proceed with those three.

16         Turning next to one of the issues that I think is

17  housecleaning -- I just don't know what the parties' respective

18  positions are presently -- the defendants requested redactions

19  from the October status conference transcript with regard to

20  the DOC employees mentioned by Ms. Rand.  And we didn't ever

21  note whether there was a plaintiffs' objection to the redaction

22  from the transcript of those.

23         Do the plaintiffs have an objection to that?

24         MR. FATHI:  Your Honor, this is David Fathi.

25         I believe that all of the references are to Richard

1   Pratt, who was a named defendant in this action and whose

2   status as such is obviously a matter of public record.  If that

3   is correct, we do not exactly object, but we certainly see no

4   need for -- for redaction of his name from the transcript.

5           THE COURT:  Ms. Rand, is Mr. Fathi right about that,

6   that that's the only individual that's at issue?

7           MS. RAND:  No, Your Honor.  I inadvertently mentioned

8   individuals that were disciplined regarding certain

9   investigations, and so we would like those names redacted,

10  especially since some of the individuals are current employees.

11          THE COURT:  Mr. Fathi, any objection to the redaction

12  of those employee names?

13          MR. FATHI:  None, Your Honor.

14          THE COURT:  Okay.  It will be ordered then that the

15  transcript will be redacted to omit those employee names.

16          Ms. Rand, if you would confer with the court reporter

17  and provide a written identification of where by line and page

18  number those names appear, provide a copy of that to the

19  plaintiffs, and you may also include the named defendant

20  because there's not an objection from the plaintiffs to do

21  that.

22          The written -- rather, the recording of the hearing

23  will be sealed because it's not possible to easily redact it,

24  but the transcript is easier to redact.  In the existence of a

25  transcript, it's not necessary to rely upon the recording.

UNITED STATES DISTRICT COURT

1          MS. RAND:  Your Honor?

2          THE COURT:  Yes.

3          MS. RAND:  May I also ask for the redaction of

4   Dr. Taylor's name from the transcript, as well?  She's an ADC

5   employee, but she was not mentioned regarding the

6   disciplinaries, but she was mentioned in conjunction with

7   Mr. Pratt's name.

8          THE COURT:  I don't remember the context of where her

9   name came up.  I -- so I'm uncomfortable ruling on that.  But

10  perhaps it is something that's not an issue from the

11  plaintiffs' perspective.  I don't know.

12          Do the plaintiffs have a view on this?

13          MR. FATHI:  Your Honor, this matter is -- is a matter

14  of great public interest, and these are State employees

15  carrying out their official functions.  We -- with the

16  exception of those who were disciplined being identified as

17  such, we see no reason why the names of Mr. Pratt and

18  Dr. Taylor, who plays a central role in the implementation of

19  this settlement, should be redacted.  And we believe there is a

20  public interest, as I think the Court acknowledged at the

21  fairness hearing, in this proceeding.

22          I -- we do not formally object, but we would ask the

23  Court to consider the countervailing considerations of

24  transparency as against the defendants' request for -- for

25  redaction.

1          THE COURT:  All right.  Well, thank you for those

2     views, both of you.

3          As I say, I don't recall the context, so I would ask

4     Ms. Rand to email me with the page and cite, copy the

5     plaintiffs on that email with the page and cite, and I'll take

6     a look at it and rule with respect to her.

7          I think that the plaintiffs' agenda items have been

8     resolved by the subsequent publishing of an order that we

9     inadvertently failed to publish -- "publish" is the wrong

10     word -- to docket.  We had thought that in this world of

11     electronic filing we had done what we needed to do, but we

12     didn't.  And so I think that most of the, if not all of the

13     plaintiffs' agenda for this morning on the email that you had

14     sent, has been addressed, but I'll turn to you all to see if

15     there are issues that remain.

16          MR. FATHI:  Yes, Your Honor.  This is David Fathi.

17          There is, I believe, only one outstanding issue, and

18     that is the defendants' noncompliance with the Court's order

19     docket 1673, regarding how -- how to measure performance

20     measures that require that something be done every 30 days,

21     every 90 days, and so on.  And also the methodology for

22     monitoring performance measure 86 which requires that MH-3D

23     prisoners who have discontinued medications be seen

24     periodically at specified intervals by a mental health

25     clinician.  The parties have both submitted additional briefing

1      on that.  I believe it's docket 1717 through 1720.

2              We don't see the need for any further argument on

3      that, Your Honor, but that matter remains pending.

4              THE COURT:  Okay.  And I did -- I did have that on my

5      agenda, but I didn't see it on -- I did not know that it was,

6      from your view, something that you hadn't been able to resolve

7      otherwise.

8              So with respect to the mental health patient --

9      inmates, I will issue a written order on that.  And with

10     respect to the number of days, I guess I don't know how I can

11     make it any plainer, but I'll try.  So I'll take a look at it

12     again, what you said, and see if -- if there's anything I can

13     do to add to that.

14             MR. FATHI:  Thank you, Your Honor.

15             THE COURT:  Yes.

16             MR. FATHI:  I beg your pardon.

17             THE COURT:  Go ahead.

18             MR. FATHI:  I believe the essential dispute on the

19     every 90 days' question is whether compliance with those

20     measures can be shown by demonstrating that the required act

21     took place a single time.  It's plaintiffs' position that to

22     satisfy a requirement that something be done every 90 days, you

23     have to look at two occurrences of that event and measure the

24     interval between them.  It's defendants' position that the

25     requirement that something can be done -- that something be

UNITED STATES DISTRICT COURT

1     done every 90 days can be satisfied by showing that it has been

2     done one single time.

3          Again, this is discussed in the parties' submissions,

4     but I think that is the crux of the dispute.

5          THE COURT:  All right.

6          Is there anything defendants wanted to add to the

7     record on this?

8          MR. BOJANOWSKI:  Well, Your Honor, I think you put out

9     some rather plain examples of how this is to be done, and that

10    is exactly the way we've been doing it and -- and continue to

11    do it.  It's -- it's a situation where we've got an auditing

12    month that we look at and -- and we -- we determine, you know,

13    has -- has the event occurred, does it need to occur within the

14    auditing month, and has it occurred.  So, you know, that --

15    that's essentially what's going on here is that the defendants

16    have been throughout following the Court's examples that you

17    had issued in your previous order.  So I -- I don't know how

18    more clear this can be, frankly.  But that's our position, is

19    we agree with the Court's order, we're following it, and it

20    seems to be working with regard to our monitoring team.

21         THE COURT:  Okay.  Well, you've refreshed my

22    recollection.  It's not simply a case of me being obtuse.  I

23    think it's a case of me wanting to make sure that I was

24    focusing on what I knew was an issue and not diverting time to

25    what I thought might have been resolved.  But now that it's

UNITED STATES DISTRICT COURT

1    plain to me that it's not resolved, I will resolve it today.

2    And so I'll issue a written order on that today.

3           From the defendants, we have two things:  The

4    suggestion for the tours for the judges and the clerks.  The

5    judges and the clerks of the courthouse have previously been

6    given this opportunity to have increased familiarity with how

7    the Department of Corrections manages its responsibilities, and

8    we have toured -- this judge in particular -- and the law

9    clerks that assist me have, as well.  So thank you for the

10   invitation, but it's -- it's not necessary.

11          Plaintiffs are apparently submitting notices of

12   noncompliance and other requests once a month, or not doing it

13   on a timely -- on a time of once a month; rather you seem to be

14   getting randomly too many -- how big an issue is this?  Is it

15   really -- to me, I guess I think increased communication is

16   usually a good thing.  Is this such a big problem?

17          MR. BOJANOWSKI:  It is, simply because we receive

18   numerous requests for documents, health needs, letters, notices

19   of noncompliance.  You know, I don't have a problem in talking

20   with the plaintiffs' counsel.  In fact, we had a phone

21   conference yesterday, me and Corene Kendrick, where we had some

22   agreements on what unfortunately the Court has declined to do

23   in taking tours.  But I don't have a problem communicating with

24   plaintiffs' counsel, and I encourage that to happen.  But what

25   ends up happening is we get multiple letters or emails that are

UNITED STATES DISTRICT COURT

1    sent out.  Sometimes people are not copied on those, and -- and

2    we've got three different groups of plaintiffs' attorneys

3    sending these things.  And then in the letter itself it says,

4    well, you need to comply or you need to answer by this date;

5    and if you don't answer by this date, we're going to the Court.

6           Well, when we get a whole bunch of those going on,

7    then it's a nightmare to, frankly, schedule it, get to the

8    people we need to get to to get an answer.  Many of these

9    things require meetings with the clients or having multiple

10   meetings with clients, multiple issues trying to gather

11   documents from 10 different facilities involving 15,000

12   inmates.  And all we ask is that, look, if you want to do a

13   notice of noncompliance or you need some kind of documents or

14   whatever, just put it into a letter, a comprehensive letter

15   that we can then look at and address in an orderly fashion

16   because as it is, we end up at the 11th hour finding out, well,

17   wait a minute, somebody didn't answer this particular letter.

18   And then everybody is scrambling to try and get answers.  And,

19   you know, when you're dealing with an entity as large as the

20   ADC, I mean, sometimes when I say, hey, can you get me this

21   piece of paper, you know, that's easy coming from my lips.  But

22   when it gets translated down to that facility level where some

23   nurse has got to grab it, it -- it can take a lot of time.  And

24   when I'm on a time pressure, then I'm pulling people out of

25   their normal, everyday jobs to do things that they wouldn't

1    normally have to do.

2           And so all I'm saying is, look, we're more than happy

3    to communicate with the plaintiffs.  But if we can get it to a

4    point where we can effectively manage their requests in an

5    orderly fashion, then I think they'll find that the responses

6    that they get are more timely, and that the documents that

7    they're requesting can actually be obtained.  And so that's --

8    that's essentially the heart of what's going on is -- is if we

9    can -- if we can get this stuff into one letter or two, or

10   whatever, so we don't have six different or seven different

11   letters floating around and demands and such that everybody is

12   running around, it just creates a lot of -- creates a lot of

13   logistical problems, both in our office and obviously with the

14   client.  So that was the basis of the request.

15          THE COURT:  All right.  Well, from my observation,

16   part of what you say is true in that it has occurred on both

17   sides where there have been drop-offs, meaning one side has

18   sent off an inquiry that hasn't been responded to, and it

19   appears that that has been the case, and it can be because

20   there are multiple players on both sides of the case.  And so

21   it may make sense to have some kind of coordination that makes

22   sure that we address this problem that we have seen of the

23   drop-offs, and also to make sure that everybody knows what is

24   expected from their side of the case, not just from individual

25   components or participants, counsel, or units of each

1   respective side having a point person or coordinating contact

2   on respective sides.  I don't know what is the best method in

3   light of how you all have been discussing in working these

4   things out to the frustration of defendants, maybe also partly

5   to the plaintiffs.  I haven't heard from them yet.

6           But I wonder if it is possible for you all to come up

7   with a mechanism that would address the concern that I have

8   seen, and that is the drop-offs of failures to respond where

9   the others -- where the side that was expecting a response is

10  telling me -- and both sides have said this:  We sent off this

11  inquiry or we heard from them, and then we responded and we

12  never heard back from them.  And so it seems that that -- that

13  link needs to be closed.  And perhaps you all can come up with

14  a mechanism that can do this.

15          But in the first instance, I need to give the

16  plaintiffs a chance to say anything you would like to say on

17  this point.

18          MS. KENDRICK:  Your Honor, this is Corene Kendrick

19  from the Prison Law Office, and we are opposed to the

20  defendants' proposal that we only send them a letter once a

21  month.  Their failure to adequately staff this case, even

22  though the largest law firm in the state of Arizona, the

23  Attorney General's Office, is representing them, does not have

24  to result in us not being able to adequately advocate for our

25  claim.

UNITED STATES DISTRICT COURT

1          This case has a lot of moving parts.  There are 113

2     performance measures in total.  So as a result, we have to

3     break it down into pieces.  And so, you know, I'm -- I'm sorry

4     that they feel they can't keep up with things, but

5     unfortunately, I think again this is an area where perhaps they

6     need to work on being more efficient in increasing their

7     staffing so that we can move things along in this case.

8          THE COURT:  Well, let me ask you this question.  Have

9     you developed a pattern of practice whereby certain issues are

10    addressed to certain lawyers in the State's defense team,

11    whether in-house or out-house; have you had a practice where

12    there are these different letters, or do they go to everybody,

13    a copy to everybody?  What's the method?

14         MS. KENDRICK:  Sure.  Well, I can tell you from our

15    side, my office, the Prison Law Office, has definitely taken

16    the lead on dealing with performance measures and issues with

17    the latest medical, dental, and pharmaceutical care.  The

18    National Prison Project has focused on the mental health

19    performance measures and those related to the isolation

20    subclass.

21         We have been asked by defendants to make sure to copy

22    all of them on our correspondence, so we normally address

23    things either to Ms. Rand, who is the lead attorney from the

24    Attorney General's Office, or Mr. Struck, who is the lead

25    attorney from their outside counsel.  They never really told

1    us, you know, issues related to the isolation subclass should

2    go to this particular attorney or that attorney.  We'd be happy

3    if they prefer to designate people like that the same way we

4    have, and perhaps that would make things more efficient too.

5              THE COURT:  Well, it seems like you all -- the

6    components in your office that you just identified, and the

7    different lawyers, in-house and out-house at the defendants, it

8    seems as though you could come up with a mechanism that

9    addressed some of these concerns.  And I think it's -- it is --

10   it's worth spending some time on.  It's worth getting on the

11   phone together and seeing if you can come up with a method that

12   will accomplish a greater sense of cohesiveness with respect to

13   what -- I mean, it's fair.  I mean, it's fair for each side

14   to -- in this case, although there's an amalgam of interest and

15   counsel are associated together -- it's fair for each side to

16   think that it understands what is expected of it; and that in

17   getting to that understanding, it also seems to me reasonable

18   to rely upon the idea that -- that there is some coordination.

19   And so I -- I do think it's probably true that there is a bit

20   of an absence of coordination here, and I -- I would encourage

21   you to talk about this and see if you can come up with a

22   mechanism that could increase the coordination.  Take a look at

23   how you've been doing things, and think about how you would

24   view it if -- if you were presented with these kinds of things

25   and how you would fix it.  And if -- if you can't get it

                    UNITED STATES DISTRICT COURT

1     resolved, I'll take it up again and see if I can offer some

2     suggestions.  It may well be that -- that something similar to

3     what we do here with a -- with a regularized meeting among the

4     key players with checklists.

5          In fact, the order that -- one of the orders that will

6     issue today will include some number of items that have been on

7     my checklist that the parties haven't mentioned in a while, and

8     rather than take up time now to ask you whether or not these

9     should be dropped off the list, I'm going to list them for you

10    and invite you to let me know whether we need to revisit them

11    in December.  And so maybe that same kind of thing, a checklist

12    that each side keeps and shares immediately with the other side

13    about what they are expecting that's circulated to everybody

14    would be helpful, so I make that suggestion.

15         So now that you've heard that I'm going to address

16    some of the items that have been pending from previous

17    discussions, I need to ask an additional question, and that is,

18    I've relied upon you all to let me know when it is that the

19    mediation before the mediator -- and Judge Bade just concluded

20    one -- and I've relied upon you in the past to let me know when

21    that process has been exhausted.  And so I -- I need to tell

22    you that I am continuing to -- the minutes I can see, but the

23    minutes don't clearly tell me whether I am in a position now to

24    take the next step.  So I need to make sure that you all are

25    doing that, communicating to me when you think matters have

1    completed the mediation process and then are ripe for advancing

2    on my agenda.

3         And so that's what I have to raise with you all this

4    morning.

5         Is there anything else you all wanted to raise now?

6    Plaintiffs?

7         MR. FATHI:  Nothing, Your Honor.

8         THE COURT:  All right.  From the defendants' side?

9         MR. BOJANOWSKI:  Nothing further, Your Honor.

10         THE COURT:  So our next scheduled meeting, I believe,

11   is December 14th.

12         COURTROOM DEPUTY:  Yes.

13         THE COURT:  Does that continue to work for everyone?

14   Okay.

15         MS. KENDRICK:  Your Honor, this is Corene Kendrick

16   from the Prison Law Office.  If it's not asking too much on

17   behalf of the folks that are on the West Coast and no longer in

18   the same time zone as Arizona, would it be possible to do it at

19   10:00 a.m. Arizona time?

20         THE COURT:  Any objection from defendants?

21         MR. BOJANOWSKI:  No objection, Your honor.

22         THE COURT:  No, we'll do that.  I wish we would

23   have -- I don't know.  I don't know why we continue to do the

24   Daylight Savings Time thing.  It's handier to have us on the

25   same time as California, though.  I guess for these few short

UNITED STATES DISTRICT COURT

1   months if you're traveling to the East Coast, it is nicer to

2   only have two hours rather than three.  It does have some

3   advantages.

4           Okay.  We'll then be together again at 10:00 a.m. next

5   month then.

6           Thank you, all.

7           MR. BOJANOWSKI:  Thank you.

8           MS. KENDRICK:  Thank you.

9           MR. FATHI:  Thank you, Your Honor.

10          (Proceedings in recess at 10:10 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

40

1          **C E R T I F I C A T E**

2

3          I, CHARLOTTE A. POWERS, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 14th day of November,

13   2016.

14

15                              s/Charlotte A. Powers

16                              Charlotte A. Powers, RMR, FCRR

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT