Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
Jacob B. Lee, Bar No. 030371
Mark A. Bracken, Bar No. 026532
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com
mbracken@swlfirm.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-DKD<br><br><br>**DEFENDANTS' MOTION FOR RELIEF FROM FINAL ORDER ENFORCING STIPULATION (DKT. 1754)**<br><br>**[Request for Expedited Hearing and Ruling]** |

Pursuant to Fed.R.Civ.P. 60(b)(1), -(4), -(6),[1] Defendants move the Court for relief from its November 10, 2016 Order enforcing the Stipulation; specifically:

> [E]ffective thirty days from this Order, when Defendants are not able to comply with the requirements of the Stipulation's Performance Measures using their current procedures, Defendants shall use all available community health care services including, but not limited to, commercial pharmacies, community-based practitioners, urgent care facilities, and hospitals to provide the health care services required in the Stipulation's Performance Measures for the facilities listed in the First Remediation Plan for which the August data demonstrated compliance below the 80% benchmark.

(Dkt. 1754 at 5.)  As the Court explained during the November 9, 2016 Status Hearing, and by example in its Order, this directive effectively requires "100 percent compliance" with the identified performance measures.  Defendants respectfully submit that the 100% compliance requirement exceeds the Court's authority because it re-writes the terms of the Stipulation and imposes upon Defendants an obligation that the parties did *not* bargain for:  100% compliance.

The Order also imposes an impossible burden on Defendants, and one that potentially exposes hundreds of inmates, staff, outside healthcare providers, and the public to serious risk of harm.  Transporting dozens—if not hundreds—of inmates outside the prison to community emergency rooms, urgent care centers, and doctors' offices on an hourly/daily basis is incredibly dangerous.  Any theoretical benefit is far outweighed by the potentially catastrophic risks.  At a minimum, the Court should temporarily suspend its Order and hold an evidentiary hearing so that it can fully understand the grave ramifications that could follow.

---

[1] Rule 60(b) authorizes relief from a "final … order."  Defendants believe Rule 60(b) is the appropriate vehicle to challenge the Court's order enforcing the settlement agreement.  *See Juanes v. Lyzwinski*, 8:10-CV-459 ATB, 2013 WL 3713419, at *3 (N.D.N.Y. July 12, 2013) (acknowledging that Rule 60(b) is appropriate motion to challenge order enforcing settlement agreement); *see also Gastile v. Virga*, 15-16294, 2016 WL 6520090, at *1 (9th Cir. Nov. 3, 2016) (order granting motion to enforce settlement agreement is a "final decision" for purposes of jurisdiction under 28 U.S.C. § 1291).  Nonetheless, this Motion is timely even if the Court believes Rule 59 is the appropriate vehicle.  *See* Fed.R.Civ.P. 59(e) (authorizing a motion to alter or amend a "judgment" within 28 days after the entry of the judgment); *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 466 (9th Cir. 1989) (a "judgment" includes "appealable interlocutory orders").

# MEMORANDUM OF POINTS AND AUTHORITIES

"The purpose of Rule 60(b)(6) is to 'vest power in courts adequate to enable them to vacate judgment whenever such action is appropriate to accomplish justice.'" *Rhoads v. Washington Mut. Bank, F.A.*, CV-10-00197-PHX-NVW, 2011 WL 3438869, at *2 (D. Ariz. Aug. 5, 2011) (quoting *Klapprott v. United States*, 335 U.S. 601, 614-15 (1949)). A court may grant relief from a final order based on "mistake, inadvertence, surprise, or excusable neglect"; if it is "void"; or for "any other reason that justifies relief." *See* Rule 60(b)(1), -(4), -(6). Although the Court suggested it would give Defendants the chance to review, evaluate, and comment on its proposed order enforcing the settlement agreement before finalizing it (Exhibit 1, 11/9/16 Transcript, at 11-12), the Court denied Defendants' formal request to do so. (Dkt. 1762.) Therefore, Defendants never had a substantive opportunity to present evidence and argument opposing the proposed order. This Motion seeks that very relief offered earlier by the Court and respectfully requests the opportunity to present the critical evidence the Court did not have before it issued its Order.

**I.    THE COURT EXCEEDED ITS AUTHORITY.**

At the November 9, 2016 Status Conference, the Court provided an outline of its Order, and made clear that it intended to impose a 100% compliance rate on Defendants with respect to the affected performance measures.

> **MR. BOJANOWSKI**: [I]f every inmate has to be transported out that's not seen within 24 hours, then that means there has to be 100 percent compliance.
>
> **THE COURT**: That's right.
>
> **MR. BOJANOWSKI**: Is that what the Court is ordering --
>
> **THE COURT**: That's right.
>
> **MR. BOJANOWSKI**: -- is 100 percent compliance?
>
> **THE COURT**: That's right. …

(Ex. 1 at 17; see also Ex. 1 at 9: "at hour 25 everybody who wasn't seen in those first 24 hours will be seen by an RN"; id. at 16: "if you're not seen by an RN within 24 hours in hour 25, all those who were not seen in the first 24 hours have to go to some other

2

provider, urgent care, the emergency room, someplace else. They have to be seen by an RN. So all of those people will have to be seen by an RN.")  When Defendants' counsel reminded the Court that the Stipulation required only 80% compliance with every performance measure, the Court sharply disagreed:

> **THE COURT**: [T]he stipulation at no place with respect to the provisional services limits it to 80 percent. The individual performance measures in many cases say all the inmates will be seen. But where they don't say it, it's obvious from the context that that's what's supposed to happen.

(Ex. 1 at 18.)  The Court went on to explain that, in its view, the 80% benchmark served only two purposes: (1) it is an "alert mechanism" that, when triggered (i.e., compliance falls below 80%), allows Plaintiffs to begin the resolution process; and (2) it gives "the defendants an opportunity in graduated mechanism to" terminate the Stipulation.  (Id. at 15-19.)  Because Defendants' compliance fell below that benchmark with respect to a few performance measures, the Court stated it "served its role and is no longer applicable to the action that the Court takes with respect to accomplishing its measures." (Id. at 18-19.)  In its formal Order, the Court confirmed what it said at the hearing (100% compliance):

> Defendants shall use all available community health care services including, but not limited to, commercial pharmacies, community-based practitioners, urgent care facilities, and hospitals (collectively, "Outside Providers") to provide the health care services required in the Stipulation's Performance Measures. This shall happen immediately following the expiration of the time-frame detailed in each PM. <u>For example, if a PM requires Defendants to provide an inmate with a specific type of care within 24 hours (or 14 days), then Defendants shall have this inmate seen by an appropriate Outside Provider in hour 25 (or day 15)</u>.

(Dkt. 1754 at 4, emphasis added.)

With all due respect, Defendants believe the Court's interpretation of the Stipulation is mistaken, and, in the absence of critical evidence, inadvertent as well.  The Stipulation requires Defendants to "comply with the health care performance measures set forth in Exhibit B."  (Dkt. 1185 at 3, ¶ 8.)  It then expressly defines what compliance means:

3

      **a.**    [C]ompliance with a particular performance measure identified in Exhibit B at a particular complex shall be defined as follows:

                                                \*       \*       \*

      **ii.**    For the second twelve months after the effective date of this Stipulation, meeting or exceeding an eighty percent (80%) threshold for the particular performance measure that applies to a specific complex, determined under the procedures set forth in Paragraph 9[.]

(Dkt. 1185 at 4, ¶ 10.a.ii.) Thus, under the plain language of the Stipulation, Defendants need only maintain an 80% compliance rate to satisfy its obligations under the Stipulation.[2] The Court is also mistaken in its belief that the 80% benchmark serves only as a resolution alarm and a route to termination. The Stipulation states that the 80% benchmark "determine[s] … whether ADC has complied with particular performance measures at particular complexes[.]" (Dkt. 1185 at 3, ¶ 10.)

      The Court's Order requires Defendants to have *every* inmate seen within an hour or day of the expiration of the performance measure's deadline. So, if 100 inmates submit HNRs at 8:00 am on Day 1, and 80 of those inmates are seen before 8:00 am the following day (Day 2), Defendants are in full compliance with the Stipulation. If the additional 20 inmates are all seen on Day 2, but between 10:00 am and 3:00 pm, Defendants are still in full compliance with the Stipulation because 80% of the inmates were seen within 24 hours and therefore they fully complied with the 24-hour HNR performance measure (PM 37). But, Defendants will have violated the Court's Order because they did not see those 20 tardy inmates between 9:00 am and 10:00 am on Day 2 (in the 25th hour), exposing them to a contempt order and sanctions.

      The result is this: the Court has re-written the Stipulation's requirement that Defendants comply with the 24-hour HNR performance measure (PM 37) 80% of the time, with its own provision: Defendants must comply with a 25-hour HNR performance measure 100% of the time—i.e., every inmate must be seen by an RN within 25 hours,

---

[2] After 2 years, the compliance rate goes up to 85%. (Dkt. 1185 at 4, ¶ 10.a.iii.)

100% of the time. In other words, the Court has effectively changed the agreed-upon performance measure's time-frame and compliance rate. Each of the involved performance measures are similarly overridden. Furthermore, because the Court's Order gives Defendants only an additional 60 minutes (or 24 hours for some performance measures) to secure 100% compliance, it is effectively requiring 100% compliance within the 24-hour/1-day time-frame required by the performance measures. Defendants have no way of knowing in real time if Corizon medical staff is at 80% compliance (or more or less) at any given hour or on any given day facility-wide. Performance is measured on a monthly basis and reported approximately a month later. By the time Defendants/Corizon become aware of the compliance level, they obviously cannot go back in time and increase performance to 100% in the 25th hour or 15th day. That leaves Defendants just one choice: ensure that *every* inmate is seen within 24 hours/14 days (100% compliance), because if they don't, then they will be in violation of the Court's Order (even if 80% of the inmates were timely seen in compliance with the Stipulation).

      The Court only has the "power to enforce this Stipulation through all remedies *provided by law*." (Dkt. 1185 at 13, ¶ 36, emphasis added). The law does not authorize a court to eliminate, re-write, or add provisions to a contract entered into between parties. *See Olliver/Pilcher Ins., Inc. v. Daniels*, 715 P.2d 1218, 1221 (Ariz. 1986) ("[T]he court cannot create a new agreement for the parties to uphold the contract."); *Isaak v. Massachusetts Indem. Life Ins. Co.*, 623 P.2d 11, 14 (Ariz. 1981) ("It is not within the power of this court to revise, modify, alter, extend, or remake a contract to include terms not agreed upon by the parties.") (Internal quotation marks omitted); *Goodman v. Newzona Inv. Co.*, 421 P.2d 318, 320 (Ariz. 1966) (court's "duty is confined to the construction or interpretation of the one which the parties have made for themselves"). Consequently, the law does not empower the Court to re-write the Stipulation as it did. For that reason, the Court should rescind its Order.

## II. THE COURT'S ORDER CREATES AN INCREDIBLE RISK OF HARM.

The Court recognized that its Order was "not ideal," "cumbersome, more expensive," and less "efficient" than other possible remedies. (Dkt. 1752 at 2; Ex. 1 at 9, 13-14, 20.) But it is much more than that: the Order, if Defendants are forced to comply with it, poses a grave danger to hundreds of inmates, staff, outside healthcare providers, and the public. (Exhibit 2, Dec. of Carson McWilliams, ¶¶ 16, 31-32.) A 100% compliance rate is simply not possible.[3] (Exhibit 3, Dec. of Richard Pratt, ¶¶ 11, 17.) For example, in August 2016, inmates submitted a total of 23,805 HNRs, which could include everything from requesting a toe-nail clipping to a headache to nausea or chest pain. (Id., ¶¶ 12-15.) Four facilities did not reach the 80% benchmark for the performance measure requiring that an inmate be seen by an RN within 24 hours of triaging an HNR. (Dkt. 1728 at 3.) Requiring Defendants to transport those inmates who were not seen within 24 hours to an off-site emergency room or urgent care center within the 25th hour (or within the following day for other performance measures) will require dozens of inmates—of all custody levels, including maximum custody and protective custody—to be escorted by dozens of security staff into the public each hour (and hundreds of inmates and their respective security staff each day).[4] (Ex. 2, ¶¶ 17-18, 21.)

Flooding these public healthcare centers with dozens of inmates, waiting for hours, can present a significant safety risk to the civilian men, women, and children awaiting care, hospital staff, security staff, and the inmates.[5] (Id., ¶¶ 21, 26.) The Court's Order

---

[3] That impossibility is why Defendants could not and did not agree to it.

[4] This is in addition to the emergency medical transports and specialty appointment transports that already occur on a daily basis. In August 2016, there were 196 total emergency medical transports outside the prison complexes, 1,358 specialty appointment transports outside the prison complexes, and 111 inmates were admitted to the hospital for extended inpatient care. (Ex. 3, ¶ 19.)

[5] Most ADC facilities are located in small, remote, communities with sparse, outside medical resources. (Ex. 2, ¶ 25.) For example, the emergency room at the Florence Hospital is about the size of a living room. (Id., ¶ 26.) Though the Florence Hospital routinely sees inmates under emergency circumstances, it does not have the capacity, ability, or staff to see more than a few inmates at a time. (Id., ¶ 27.) The next closest hospital to the Eyman and Florence facilities is in Casa Grande or Apache Junction – both at least an hour away – adding to the impossibility of staffing, and the commensurate

also presents an unprecedented threat to security that ADC has never faced before: it gives inmates never-before-available knowledge of when they will be sent out for medical appointments. (Id., ¶ 29.) ADC has historically concealed from inmates the specific date and time they are scheduled for a medical appointment in order to prevent them from communicating this operational information to others on the outside, which is a critical penological practice designed to prevent escapes and other criminal activity. (Id.) The Court's Order eviscerates this crucial security measure and can expose an untold number of people to serious risk of harm. (Id.)

The number of outside transports anticipated on an hourly and daily basis are also logistically impossible. (Ex. 2, ¶ 22.) ADC simply does not have enough vehicles to accommodate the potential volume of inmate transports. (Id.) Separate vehicles are needed to transport each custody level, which can include general population, minimum custody, medium custody, maximum custody, close custody, protective custody, and sex offenders. (Id.) Mixing classifications could place both inmates and staff, along with the public, at risk of serious harm. (Id.) ADC policy also requires two officers to escort each inmate sent off-site. (Id., ¶ 23.) ADC simply does not have enough *security* staff to assist with these daily, high-volume transports. (Id.) For example, if just 10 inmates were sent out a day, it would require *at least* 20 officers to be with those inmates at all times (officers are required to stay with each inmate sent off-site until they are secured back at the facility). (Id.) Transporting hundreds of inmates on a daily basis is unmanageable and far beyond ADC's institutional capacity. (Id.)

The substantial numbers of security staff required to transport so many inmates off-site will also mean that there will be substantially less security staff left behind at the facility, which can present a clear and present danger to the inmates, staff, and the public, and jeopardize the safe, secure, and orderly operation of the entire prison system. (Ex. 2, ¶ 24.) In addition, substantially less security staff at the prison means far fewer staff

---

dangers inherent in such transports, which sometimes involve vehicle accidents and breakdowns. (Id., ¶ 28.)

7

1  remain behind to assist with critical inmate programming, therapy, and other out-of-cell
2  activities, which are all required under the Stipulation. (Id.) On high-volume transport
3  days (which could conceivably be every day), the facility would be forced to go on
4  lockdown because of the lack of security staff, which brings inmate programming,
5  therapy, and out-of-cell activity to a screeching halt for hours, and even days. (Id.) The
6  Court's Order also gives inmates the extraordinary opportunity to deliberately overwhelm
7  the system by flooding their facilities with otherwise routine or unnecessary HNRs,
8  knowing that medical staff would not be able to see each of them within a 24-hour period,
9  just to trigger the requirement that the facility send them off-site, giving them either an
10 opportunity for escape, criminal activity, or just a change of scenery. (Id., ¶ 30.)

"Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A). Prospective relief cannot be ordered unless the Court finds it is "narrowly drawn" and "extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id*. The Court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id*. The Court's Order runs far afield from these Congressional directives. Although it allows Defendants to attempt to summon healthcare providers to the facility to provide treatment (and hire more staff) to help remedy the situation, those alternatives will not eliminate the need to transport inmates off-site in order to satisfy the Court's 100% compliance rate.

The threat to public safety is real, not exaggerated, and before the Court takes this step, it should at least conduct an evidentiary hearing so that it can thoughtfully reflect upon the evidence that it lacked when issuing its Order, and thereby fully understand not only the dangerous ramifications, but that hiring more staff and/or ordering the transport of inmates to outside healthcare providers will not necessarily improve performance in a significant way. *See Bell v. Wolfish*, 441 U.S. 520, 548 (1979) (courts should defer to

expert judgment of corrections officials regarding practices needed "to preserve internal order and discipline and to maintain institutional security"). Up to this point, the Court has only assumed that more staff will result in better compliance. Now, it makes the same incorrect assumption about off-site transports. Given the stakes, the Court should allow Defendants to present further evidence and/or another remediation plan. (See Dkt. 1185 at 15, ¶ 36: "In determining the subsequent remedies the Court shall consider whether to require Defendants to submit a revised plan.") In the meantime, it should suspend its Order.

### III.   CONCLUSION

For these reasons, Defendants request that the Court rescind its November 10, 2016 Order to the extent it requires them to be in 100% compliance with the affected performance measures within an hour or day of the expired time frame. Alternatively, Defendants request the Court to rescind its Order because it poses a very real safety risk for the public, staff, and inmates. At a minimum, the Court should temporarily suspend its Order and conduct an evidentiary hearing to allow Defendants to present critical evidence and argument as to its inherent impossibility and security and safety risks, which it did not have before issuing its Order.

/ / /

/ / /

/ / /

DATED this 23rd day of November 2016.

STRUCK WIENEKE & LOVE, P.L.C.


By /s/ Daniel P. Struck
  Daniel P. Struck
  Kathleen L. Wieneke
  Rachel Love
  Timothy J. Bojanowski
  Nicholas D. Acedo
  Ashlee B. Fletcher
  Anne M. Orcutt
  Jacob B. Lee
  Mark A. Bracken
  STRUCK WIENEKE & LOVE, P.L.C.
  3100 West Ray Road, Suite 300
  Chandler, Arizona 85226

  Arizona Attorney General Mark Brnovich
  Office of the Attorney General
  Michael E. Gottfried
  Lucy M. Rand
  Assistant Attorneys General
  1275 W. Washington Street
  Phoenix, Arizona 85007-2926

*Attorneys for Defendants*

3274319.1

# CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Alison Hardy: | ahardy@prisonlaw.com |
| Amelia M. Gerlicher: | agerlicher@perkinscoie.com; docketPHX@perkinscoie.com, kleach@perkinscoie.com |
| Amir Q. Amiri: | aamiri@jonesday.com; ttualaulelei@jonesday.com |
| Amy B. Fettig: | afettig@npp-aclu.org |
| Asim Varma: | avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| Caroline N. Mitchell: | cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com |
| Corene T. Kendrick: | ckendrick@prisonlaw.com; edegraff@prisonlaw.com |
| Daniel Clayton Barr: | DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com |
| Daniel Joseph Pochoda: | dpochoda@acluaz.org; danpoc@cox.net; gtorres@acluaz.org |
| David Cyrus Fathi: | dfathi@npp-aclu.org; astamm@aclu.org; hkrase@npp-aclu.org |
| Donald Specter: | dspecter@prisonlaw.com |
| Jennifer K. Messina: | jkmessina@jonesday.com |
| Jessica Pari Jansepar Ross: | jross@azdisabilitylaw.org |
| John Howard Gray: | jhgray@perkinscoie.com; slawson@perkinscoie.com |
| John Laurens Wilkes: | jlwilkes@jonesday.com, dkkerr@jonesday.com |
| Jose de Jesus Rico: | jrico@azdisabilitylaw.org |
| Kathleen E. Brody | kbrody@acluaz.org |
| Kirstin T. Eidenbach: | kirstin@eidenbachlaw.com |
| Maya Abela | mabela@azdisabilitylaw.org |
| Rose Daly-Rooney: | rdalyrooney@azdisabilitylaw.org |
| Sara Norman: | snorman@prisonlaw.com |
| Sarah Eve Kader: | skader@azdisabilitylaw.org; mlauritzen@azdisabilitylaw.org; rstarling@azdisabilitylaw.org |

Rita K. Lomio: rlomio@prisonlaw.com

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/ Daniel P. Struck