EXHIBIT 1

EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Victor Antonio Parson, et al,  )
                               )
            Plaintiffs,        )      2:12-cv-00601-DKD
                               )
      vs.                      )      Phoenix, Arizona
                               )      November 9, 2016
Charles L. Ryan, et al,        )         9:05 a.m.
                               )
            Defendants.        )
_____)


BEFORE:   THE HONORABLE DAVID K. DUNCAN, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

STATUS HEARING


Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CRR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

2

1                       A P P E A R A N C E S

2     For the Plaintiffs:

3               Eidenbach Law, PLLC
                By: KIRSTIN T. EIDENBACH, ESQ.
4               PO Box 91398
                Tucson, AZ  85752

5
                ACLU
6               By:  KATHLEEN ERIN BRODY, ESQ.
                PO Box 17148
7               Phoenix, AZ  85011

8               Prison Law Office
                By: DONALD SPECTER, ESQ.  (via telephone) and
9                   CORENE t. KENDRICK, ESQ.  (via telephone)
                1917 5th Street
10              Berkeley, CA 94710

11              ACLU – Washington DC
                By: DAVID CYRUS FATHI, ESQ. (via telephone)
12              915 15th Street NW, 7th Floor
                Washington, DC  20005

13
                Arizona Center for Disability Law
14              By: MAYA ABELA, ESQ. (via telephone)
                177 N. Church Avenue, Suite 800
15              Tucson, AZ 85701

16

17    For the Defendants:

18              Struck Wieneke & Love, PLC
                By: TIMOTHY JAMES BOJANOWSKI, ESQ.  And
19                  MARK ALLEN BRACKEN, ESQ.
                3100 W. Ray Road, Suite 300
20              Chandler, AZ  85226

21
                Office of the Attorney General – Phoenix
22              By: LUCY MARIE RAND, ESQ.
                1275 W. Washington Street
23              Phoenix, AZ  85007

24

25

                    UNITED STATES DISTRICT COURT

3

1                          INDEX

2    SUMMARY OF COURT PROCEEDINGS              PAGE:

3    Court resumes                               4

4    Court recess                               36

5

6

7                     INDEX OF WITNESSES

8    WITNESSES FOR THE      Direct    Cross   Redirect
     PLAINTIFF:

9

10

11         * * * * * NO WITNESSES CALLED * * * * *

12

13

14

15

16                   INDEX OF EXHIBITS

17   EXHIBIT NO.:        DESCRIPTION:          RECEIVED:

18

19

20        * * * * * NO EXHIBITS MARKED * * * * *

21

22

23

24

25

                  UNITED STATES DISTRICT COURT

4

P R O C E E D I N G S

(Proceedings resume at 9:05 a.m.)

1       THE COURT:  Thank you.

     Please be seated.

     COURTROOM DEPUTY:  Civil case number 12-601, Parsons et al. versus Ryan et al., on for status hearing.

     THE COURT:  Would counsel please announce?

     MS. EIDENBACH:  Kirstin Eidenbach and Kathleen Brody for plaintiffs.

     THE COURT:  Thank you.

     MR. BOJANOWSKI:  Thank you, Your Honor.

     Tim Bojanowski on behalf of -- from Struck Wieneke & Love on behalf of defendants, and Lucy Rand with the Attorney General's Office, also on behalf of defendants.

     THE COURT:  Am I the only person who had a great deal of difficulty understanding what you said at the beginning? There's something wrong with the microphone jacks.  Try it again.

     MR. BOJANOWSKI:  Try it again.  How about if I sit?

     THE COURT:  Try that, okay.

     MR. BOJANOWSKI:  Tim Bojanowski and Mark Bracken, Struck Wieneke & Love, on behalf of the defendants; and also Lucy Rand with the Attorney General's Office on behalf of defendants.

     THE COURT:  All right.  Thank you very much.

UNITED STATES DISTRICT COURT

5

1          And whom do we have on the phone?

2          MR. FATHI:  Good morning, Your Honor.

3          David Fathi of the National Prison Project for the

4     plaintiff class.

5          THE COURT:  Thank you.

6          MR. SPECTER:  Donald Specter from the Prison Law

7     Office for the plaintiffs, as well.

8          THE COURT:  Thank you.

9          MS. KENDRICK:  Corene Kendrick from the Prison Law

10    Office.

11         THE COURT:  Thank you.

12         MS. ABELA:  Maya Abela with the Arizona Center for

13    Disability Law.

14         THE COURT:  Thank you.

15         And is that it?

16         Okay.  I'll start with the previously identified

17    performance measures and the -- I think the need for the Court

18    to take the next step.

19         I will announce a threshold observation that is not, I

20    think, going to be foreign to your ears because you've heard it

21    before, but I have to say it again because it apparently is --

22    is not getting through.

23         Because of my participation in the negotiations for --

24    that resulted in the agreement to the stipulation, I do believe

25    that I have a clear understanding of the limitation that is set

UNITED STATES DISTRICT COURT

6

1    forth in the stipulation with respect to what I can do, and I

2    do not think that I can, as plaintiffs again invite me to, act

3    to address what I think is the legitimate cause of the failure

4    of performance measures, and that is staffing issues.  I don't

5    think I can provide the remedy the plaintiffs continue to ask

6    for under the terms of the -- of the stipulation.  And I've

7    told you all that before, and I -- I see the arguments, I read

8    the arguments that plaintiffs articulate, but it is not

9    consistent with what my impression was of the parties'

10   understanding at the time that the stipulation was negotiated.

11           So I'm going to remain of the position that I cannot

12   provide for what seems to be the obvious measure for

13   remediation that would address this specific problem, and that

14   is staffing issues.  It's -- staffing issues are -- are

15   manifest in the minutes of the supervising meetings, and it

16   also just is plainly a matter of common sense; that if people

17   are not being seen as required by the performance measure, if

18   they're not receiving the -- the treatment or the actions that

19   they're required because they're -- in a certain amount of

20   time, it's simply because there aren't enough people to do it.

21   And whether it's the medical providers or whether it's people

22   in the prison who can't shuttle the inmates to the appropriate

23   place, as defendants have argued, again, that's all staffing,

24   seems to be manifestly what is the cause.  But I cannot address

25   that.

UNITED STATES DISTRICT COURT

7

1          The second point is one that focuses on what

2    defendants have done again, and they seem -- you seem to again

3    return to this previously addressed argument that -- that fails

4    to focus on what I've said the focus needs to be, and that is

5    on the individual performance measures of the individual

6    facilities and not this broadbrush, omnibus package of, overall

7    we're doing better.  That's not what it's about.  And so I --

8    again, I am specifically tied in the stipulation to address the

9    success or failure of meeting the performance measures, not

10   whether if you combine the system together the percentage is

11   okay.  That's not what it says.  It says I'm supposed to focus

12   on each of the facilities and each of the performance measures,

13   and so as -- as strongly resistant to that idea as I have

14   articulated to you all before.

15          So I made the original findings that there was

16   substantial noncompliance on the performance measures that were

17   identified and identified specifically with respect to the

18   facilities.

19          I need to drop a footnote here and say that plaintiffs

20   have in some of their tables included facilities that were not

21   part of my original finding on their -- in their papers and in

22   their tables.  I'll continue to focus on the ones that are

23   following the track that I have to follow, and that is starting

24   out with the specific performance measures and the specific

25   facilities.  And if it turns out that -- that along the road

UNITED STATES DISTRICT COURT

8

1    that others fail off, you just can't add them into the list

2    midway through the process.   You have to start, with those

3    failed facilities, with the remediation process that's

4    identified in the -- in the stipulation.

5         And so closing out that -- that footnote, after the

6    mediation process, we then turn to the -- to the State to

7    provide for its remediation plan.   And as you all know, I was

8    very doubtful that it would produce the compliance with the

9    stipulation.   But I reluctantly acquiesced in not only

10   defendants' original proposal, but also the request for

11   additional time.   And I -- I granted the additional time, as I

12   think you probably remember, out of my sense of what I

13   described as fairness, and also I think I described it as a

14   sense of respect for defendants' presumed good faith, and I --

15   that they were actually proposing something that they thought

16   would work.

17        And so I allowed additional time to pass, a quarter to

18   pass.   And we were told that the implementation of the

19   defendants' remediation plan would be realized by the August

20   data, and the August data confirms the failure of many of

21   defendant's remedial measures.

22        And so accordingly, pursuit to the authority conferred

23   to me in the stipulation to effectuate compliance, I am

24   required to proceed with remedial measures.

25        And let me say that I have -- "hit's" too weak a

UNITED STATES DISTRICT COURT

9

1    word -- I think I foreshadowed where I was going to be on this.

2    I've told -- told the State that in the absence of having what

3    I thought to be the most effective tool in my toolbox, I would

4    turn to one that I didn't think was going to be as efficient or

5    as economic as the one that you took away from me, but it's the

6    only one that I have been able to conclude that could work, and

7    that is turning to providers who are -- who exist in -- in

8    the -- in the communities that surround the prison facilities,

9    to provide services on an emergent basis.

10            And so, for example, with performance measure 37 that

11   requires that inmates be seen within 24 hours of an HNR, and

12   the facilities of Eyman with 54 and Lewis at 35, and Tucson at

13   51, and Yuma at 34.  So we're clearly seeing a failure of

14   substantial compliance so far off of the 80 percent benchmark.

15   And so 37 provides for people to be seen within 24 hours.  If

16   the -- if the -- with the submission of the HNR.  If the clock

17   strikes 24 hours and they have not been seen by an RN, then

18   they must be taken to some place where there is an RN, whether

19   it's the hospital, whether it's an urgent care, when it's a

20   house call that's arranged by some provider, but they either

21   must be taken or the provider must be taken to them so that at

22   hour 25 everybody who wasn't seen in those first 24 hours will

23   be seen by an RN.

24            And I see this same remedy throughout all of the

25   performance measures that I must address.

UNITED STATES DISTRICT COURT

1       Performance measure 39, routine provider referral seen

2  within 14 days -- Yuma at 42, Eyman at 46, Florence at 41,

3  Lewis at 75, Perryville at 51, Tucson at 69 -- if they are not

4  seen within 14 days, on the 15th day, they must be taken to an

5  urgent care or to a hospital or to someplace where there can be

6  this service provided.  And that is what the performance

7  measure requires, that the -- that how it is effected will be

8  somewhat still within the State's hands.  But nevertheless, I

9  think I will -- contemplating entering a written order with

10  respect to all the performance measures where all of the

11  facilities are below substantial compliance, and where the time

12  that you have asked for has passed to see that it would work,

13  and it has not worked, to do exactly this.

14       And so I will turn to the respective parties now to

15  allow them to respond to what is, I think, a clear enough

16  indication of what I plan to do.

17       Plaintiffs?

18       MR. FATHI:  Your Honor, it may be more appropriate to

19  start with defendants at this point, since your motion mostly

20  affects them.

21       THE COURT:  Well, that's fine with me.

22       MR. BOJANOWSKI:  Your Honor, from our view, it's

23  actually -- we believe your order is one that is essentially an

24  increase in staffing because as a result of bringing a provider

25  in or taking somebody out to a provider, that is essentially

1  what you're doing is --

2      THE COURT:  No, I -- I don't buy that for a second.  I

3  understand what increased staffing means.  That means hiring

4  somebody.  I was there for the negotiations.  It doesn't mean

5  taking somebody to the hospital.  They're not your employees.

6  That's not staffing.  That's taking somebody who is required to

7  be seen by a medical provider to a medical provider.  And

8  that's wholly different than having somebody on the payroll,

9  having somebody who is an FTE.  And so I cut you off rather

10 abruptly because you're not going to get anywhere with me on

11 that argument.

12     MR. BOJANOWSKI:  That's fine, Your Honor.

13     I think in fairness we probably ought to be given an

14 opportunity to see what the actual order is, and then be able

15 to evaluate that.

16     THE COURT:  That's fine.  And what I just wanted to do

17 was give you a chance to say --

18     MR. BOJANOWSKI:  Right.

19     THE COURT:   -- whatever might be constructive to be

20 said when we're all here together.  But I think -- I'm hopeful

21 that the -- that the order will be as plain as what I've just

22 said.  And what I mean by that is, I think what I said is

23 plain.

24     And so if you have an initial reactions to it -- I

25 heard the first reaction, and that was constructive because

12

1    that is something you would have spent time writing and I would

2    have read it and given you the response, and it would have

3    taken a lot longer.  So I've given you that response on that

4    and that's helpful, and that's one of the reasons why -- that

5    is the reason that I invited both sides to say what they wanted

6    to say in response to what I had to say.

7             MR. BOJANOWSKI:  And we certainly appreciate the Court

8    bringing light to its position with regard to this issue.

9             We also need to look at operational considerations

10   with regard to the movement of -- of inmates.  I mean, the

11   scope of -- of medical care at these facilities, quite frankly,

12   is fairly immense.  I mean, the month of August alone, there

13   were in excess of 88,000 medical contacts.  So in addition to

14   that, there were some 51,000-plus prescriptions and such

15   issued.

16            So when we talk about the scale of what it is that the

17   Court is seeking to order here, I think that we should be given

18   the opportunity, at least by supplemental briefing or evidence,

19   bring to light to the Court the ramifications of what its

20   proposed order is.  And we'd like to be given that opportunity

21   because obviously we have not, at this setting anyway, had the

22   opportunity to appropriately evaluate exactly what the Court is

23   going to say and then translate that into an operational impact

24   upon the facilities because each movement, obviously, within a

25   facility has ramifications with regard to security and the --

UNITED STATES DISTRICT COURT

13

1    and the provision of other staff and such to maintain,

2    obviously, the protection of the community when we move people

3    out and stuff.

4             THE COURT:  Yeah, I can't remember whether you were

5    here or not, but I have addressed that before with Mr. Struck,

6    and I've said that there are obviously significant issues

7    associated with exactly what you describe with respect to the

8    fact that it's an inmate population.  And that's why this tool

9    is -- is not as -- is not as preferred as some other tools.

10   But the other tools you've taken out of my toolbox, and I can't

11   do it.  And so this -- this alternative, whether there's huge

12   numbers or not, you are going to have to be in a position of

13   meeting the stipulations' performance measures, and it means

14   that if it is suddenly that Walgreens decides they need to open

15   up another shop in Florence because suddenly there's this huge

16   increase in business, this -- Walgreens will do that.  The

17   market will respond.  And you will take those people to

18   Walgreens to get their prescriptions filled, if you're not able

19   to do it in-house.  And so you've got a choice.  You can do it

20   this cumbersome, more expensive way, or you can do it some

21   other way.  But so far, the other way hasn't worked.  And I

22   have to make it work.  And I am presented with no other

23   alternative that would seem to work, and I have therefore done

24   what I have to do and think about, well, I live in this -- this

25   country where we have the ability of the market to respond to

                    UNITED STATES DISTRICT COURT

1    demand.  And I believe that it will be able to do that.  Where

2    there is market, there will be a provider.  And so I'm creating

3    that market because I have to because these people have to be

4    seen.

5            And so I appreciate what you say, but I have made it

6    clear to you I can't do anything about that.  That's your

7    problem, and you're going to have to deal with it because you

8    fundamentally have an obligation to provide these services to

9    these inmates.  You failed to do it.  And in light of that

10   failure, I'm required to come up with an alternative.  And that

11   is the alternative that appears to be the only one that can

12   work in the environment of the limitations that contracting

13   parties have imposed upon me.

14           And so I have given the defendants a chance to say

15   anything.  Is there anything the plaintiffs would like to say?

16           MR. BOJANOWSKI:  Your Honor, I have one more point --

17           THE COURT:  Sure.

18           MR. BOJANOWSKI:   -- that I would like to make.  And

19   that is, assuming compliance is obtained with regard to these

20   specific measures that this order is being placed upon, what is

21   the Court's position at that point?  Is the Court then going

22   to -- is this order going to automatically fall off, or is

23   there a time frame or a framework with regard to the existence

24   of this order?  I mean, if --

25           THE COURT:  The stipulation -- I mean, the stipulation

UNITED STATES DISTRICT COURT

1    addresses that.  It provides for when you get past the

2    benchmarks for a sufficient period of time, you can fall off.

3    The problem is, if I relieve you from the remedial measure that

4    I've imposed, it would be understandable to expect you to have

5    an immediate drop-off again back to what the previous basis

6    was.  And so that's why you don't get an instantaneous relief

7    from it.  If we embark upon this measure and it turns out that

8    the differential diagnosis hasn't been provided within five

9    days, and in the previous month, because of my remedial measure

10   of saying they had to be taken to some other provider in the

11   market to provide that service and you got the compliance above

12   the benchmark in that previous month, that doesn't mean that

13   you get -- you get relieved of it from the next month because I

14   don't have any basis to believe that it wasn't the simple fact

15   that my order required you to address the failure.  And so that

16   is what my answer is to that question.

17          MR. BOJANOWSKI:  All right.

18          Well, another -- another point that I'd like to

19   perhaps get the Court's opinion on is that much of the activity

20   in the field occurs, say, for instance today, things happened.

21   That is not evaluated by the ADC monitoring bureau until almost

22   30 days later, or maybe in excess of 30 days later.  So there's

23   obviously that lag time that arises with regard to actually

24   making sure that what the Court is implementing is actually in

25   place:  Traction, training, et cetera, et cetera, et cetera.

UNITED STATES DISTRICT COURT

16

1    So --

2         THE COURT:  Well, I guess mine is simple enough.  I'll

3    know.  I'll know whether it works or not.  I mean, actually, it

4    will work because if you're not seen by an RN within 24 hours

5    in hour 25, all those who were not seen in the first 24 hours

6    have to go to some other provider, urgent care, the emergency

7    room, someplace else.  They have to be seen by an RN.  So all

8    of those people will have to be seen by an RN.  And so there

9    doesn't matter whether there's a lag time in reporting.

10        The reporting mechanism, the monitoring process, is

11   designed for a different purpose.  It's to allow us to see

12   whether the defendants are in compliance with the stipulation

13   or not.  And it provides for this reporting mechanism with a

14   sampling.  Sometimes the sampling is at 100 percent, sometimes

15   the sampling is just a representative sample.  But the sampling

16   identifies where the performance measure is not being met.

17   Once that is demonstrated, as we have here, then it implicates

18   the additional mechanism that is not tied to that because it is

19   an identification process; it is an alert process, a warning

20   system, if you will.  The actual performance is what then I

21   focus on, and that is, were -- in performance measure 37, were

22   people seen within 24 hours?  If you come and you find that

23   somebody has a date stamp of this hour and 24 hours has passed,

24   then those people have to go.  And so all of those people will

25   be seen.  So it's not that I need to have anything monitoring

UNITED STATES DISTRICT COURT

1    it, other than the -- we will make sure that everybody who has

2    not been seen within 24 hours did actually get to be seen.

3         So the 80 percent benchmark, the monitoring program,

4    is designed to alert to me -- alert me when I need to ask the

5    State to come up with a remediation plan.  I then move to the

6    next step if it fails.  Then I do my remediation plan, and my

7    remediation plan is to accomplish what the stipulation

8    requires.

9         So I think that answers your question what my view is

10   on that.

11        MR. BOJANOWSKI:  Right.  I'm just trying to evaluate

12   the compliance threshold of 80 percent.  In other words, if

13   every inmate has to be transported out that's not seen within

14   24 hours, then that means there has to be 100 percent

15   compliance.

16        THE COURT:  That's right.

17        MR. BOJANOWSKI:  Is that what the Court is ordering --

18        THE COURT:  That's right.

19        MR. BOJANOWSKI:  -- is 100 percent compliance?

20        THE COURT:  That's right.  The 80 percent is to tell

21   me whether or not you're in substantial compliance.  If you're

22   above 80 percent, then you're in substantial compliance and we

23   do not get involved.  You don't get involved, I don't get

24   involved.  You don't have to propose a plan to me, I don't have

25   to consider it.  And if it fails, I don't have to come up with

18

1    one.   That's what that that mechanism is for.

2          When it alerts me that there's a drop-off below the

3    benchmark, then I take a step, and my step is not tested by

4    whether or not it's at 80 percent anymore.   It's designed to

5    effectuate what the performance measure -- well, actually, what

6    the stipulation calls for.   The stipulation at no place with

7    respect to the provisional services limits it to 80 percent.

8    The individual performance measures in many cases say all the

9    inmates will be seen.   But where they don't say it, it's

10   obvious from the context that that's what's supposed to happen.

11         The 80 percent measure was designed to give the

12   defendants an opportunity in graduated mechanism to work toward

13   what was the goal of full compliance.   And the 80 percent

14   criteria was respecting of the idea that -- or 75 percent was

15   respecting the idea that we would move toward that with

16   increasing compliance measures towards 100 percent.   But it was

17   also to allow some -- some generosity, I guess, to the -- to

18   the fact that it was a sampling process, and that we wouldn't

19   know, and that there would be egregious cases, there would not

20   be -- there would be some that were not to be determinators --

21   determinations of things of some -- you needed to have some

22   measure to gauge performance to alert the parties and the Court

23   when it needed to take action.   That's what it is.   It's an

24   alert mechanism.   The alert mechanism has served its role and

25   is no longer applicable to the action that the Court takes with

UNITED STATES DISTRICT COURT

1    respect to accomplishing its measures.

2            So again, I think I've just said the same thing what

3    I've previously said, but I hope it's clear to you what my view

4    is with respect to what happens.  To use the example, at 25

5    hours, you just can't say to the people who are still in the

6    room who haven't yet been seen, we're going to take eight out

7    of 10 of you, and the other two, you can just go off.  No.

8    Everybody has to be seen at that point.

9            MR. BOJANOWSKI:  Thank you, Your Honor.

10           THE COURT:  Anybody from the plaintiffs' side want to

11   say anything?

12           MR. SPECTER:  Yes, Your Honor, this is Donald Specter.

13           We appreciate the Court's carefully thought-out

14   remedy, and we appreciate it because it will, if effectuated,

15   get our clients to essential medical services in the manner

16   required by both the Constitution and the stipulations.

17           And we just want to note that the defendants'

18   objections that were stated here today, they always have the

19   opportunity to mitigate those objections by coming up with this

20   staffing plan that -- and the Court under the stipulation has

21   the authority to order that, as well.  So --

22           THE COURT:  That's certainly true because if that --

23   for instance, to use 37, with the passing of the 24th hour, if

24   at that moment the defendants decide to bring a group of RNs

25   from wherever they would choose to bring them and have them

1    seen, or if they decide at that moment that they're going to

2    incentivize with a higher rate of pay or something to make

3    people want to stay and do the -- work longer and work overtime

4    to do it, that is something that the State could do.  And as

5    long as at hour 25 there's nobody still waiting in the room to

6    be seen by an RN, and if -- because they've all been seen by

7    the RN, wherever that RN is from, that's certainly within the

8    defendants' control.

9             And again, I don't think that it's a mystery to you

10   all that -- this is not the ideal.  The ideal is a tool that's

11   been taken out of my toolbox.  And so I don't choose it with

12   the hope that it's the one you turn to.  I choose it with the

13   hope that you turn to one that makes more sense, that you have

14   the power to effectuate.

15            Go ahead.  I'm sorry, Mr. Specter.

16            MR. SPECTER:  Well, I think you took the words right

17   out of my mouth.  The stipulation permits the defendants to

18   come up with a staffing plan and it permits you to order them

19   to comply with that plan.  And if they find that your proposed

20   solution is less efficient than proposing a staffing plan that

21   will solve the serious problems, then under the stipulations'

22   procedures, they're entitled to do that.  And so any objections

23   they have to your order, we believe, are of their own making.

24            Thank you.

25            THE COURT:  All right.

UNITED STATES DISTRICT COURT

40

## C E R T I F I C A T E

I, CHARLOTTE A. POWERS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 14th day of November, 2016.


                                    s/Charlotte A. Powers
                                 Charlotte A. Powers, RMR, FCRR


UNITED STATES DISTRICT COURT

**EXHIBIT 2**

**EXHIBIT 2**

1   Arizona Attorney General Mark Brnovich
    OFFICE OF THE ATTORNEY GENERAL
2   Michael E. Gottfried, Bar No. 010623
    Lucy M. Rand, Bar No. 026919
3   Assistant Attorneys General
    1275 W. Washington Street
4   Phoenix, Arizona 85007-2926
    Telephone: (602) 542-4951
5   Fax: (602) 542-7670
    Michael.Gottfried@azag.gov
6   Lucy.Rand@azag.gov

7   Daniel P. Struck, Bar No. 012377
    Kathleen L. Wieneke, Bar No. 011139
8   Rachel Love, Bar No. 019881
    Timothy J. Bojanowski, Bar No. 022126
9   Nicholas D. Acedo, Bar No. 021644
    Ashlee B. Fletcher, Bar No. 028874
10  Anne M. Orcutt, Bar No. 029387
    Jacob B. Lee, Bar No. 030371
11  Mark A. Bracken, Bar No. 026532
    STRUCK WIENEKE & LOVE, P.L.C.
12  3100 West Ray Road, Suite 300
    Chandler, Arizona  85226
13  Telephone:  (480) 420-1600
    Fax:  (480) 420-1696
14  dstruck@swlfirm.com
    kwieneke@swlfirm.com
15  rlove@swlfirm.com
    tbojanowski@swlfirm.com
16  nacedo@swlfirm.com
    afletcher@swlfirm.com
17  aorcutt@swlfirm.com
    jlee@swlfirm.com
18  mbracken@swlfirm.com
    *Attorneys for Defendants*

19

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | NO. 2:12-cv-00601-DKD <br><br><br> **DECLARATION OF CARSON McWILLIAMS** |

1    I, **CARSON McWILLIAMS**, make the following Declaration:

2    1.    I am over the age of 18 years and have personal knowledge of and am
3    competent to testify to the matters set forth in this Declaration.

4    2.    I have been employed by the State of Arizona Department of Corrections
5    ("ADC") since 1978.  I currently serve as ADC's Division Director, Offender Operations.

6    3.    I am intimately familiar with the *Parsons* litigation, the resulting Stipulation,
7    and monitoring.

8    4.    During my 38-year career with ADC, I have been assigned to five of ten ADC
9    prison complexes and held the following positions: Correctional Officer, Correctional
10   Program Officer I, Correctional Program Officer II, Classification Specialist, Correctional
11   Program Supervisor, Associate Deputy Warden (Arizona State Prison-Florence West),
12   Deputy Warden (Arizona State Prison Complex-Florence, East Unit & Arizona State Prison
13   Complex-Eyman, SMU II), Warden (Arizona State Prison Complex-Florence), Southern
14   Region Operations Director, Interim Deputy Director, Northern Region Operations
15   Director, Interim Division Director of Prison Operations, and Division Director, Offender
16   Operations.

17   5.    I hold a Bachelor's Degree in Criminology from Indiana State University
18   (1977).

19   6.    Throughout my employment with ADC, I have regularly attended annual
20   training and seminars to keep current in the field of corrections. I also regularly attend
21   seminars and training provided by the American Correctional Association and the National
22   Institute of Corrections.

23   7.    I am a member of the American Correctional Association.  The American
24   Correctional Association ("ACA") is the largest and oldest correctional association in the
25   world and provides training and conferences in corrections management as well as
26   corrections standards and certification.

27   8.    The National Institute of Corrections ("NIC") is an agency within the Federal
28   Bureau of Prisons that provides training policy/program development assistance to Federal,

2

1    state, and local corrections agencies.  The NIC also provides guidance regarding corrections

2    policies, practices, and operations nationwide.

3           9.     As ADC's Division Director of Offender Operations, I oversee the daily

4    operations of all ADC prison complexes, this includes staffing, staff accountability, and all

5    security operations.

6           10.    I also monitor the six private correctional facilities with which ADC contracts

7    to incarcerate ADC inmates.

8           11.    Previously, as ADC's Northern Region Operations Director, I oversaw the

9    daily operations of five ADC prison complexes which include ADC's Eyman Complex,

10   Florence Complex, Lewis Complex, Winslow Complex and Phoenix Complex.  I oversaw

11   staffing, staff accountability, and all security operations.

12          12.    As ADC's previous Northern Region Operations Director, with the exception

13   of the Winslow Complex, the four other complexes I oversaw operated maximum custody

14   units.

15          13.    In my position as Northern Region Operations Director, I directly supervised

16   the five wardens assigned to each of the five prison complexes noted above.

17          14.    Currently as Division Director of Offender Operations, I supervise the ten

18   wardens assigned to each of ADC's ten prison complexes.

19          15.    I have reviewed the Court's November 10, 2016 Order that requires ADC to

20   use all "available community health care services including, but not limited to, commercial

21   pharmacies, community-based practitioners, urgent care facilities, and hospitals"

22   "immediately following the expiration of the time-frame detailed in each [performance

23   measure]" in the Stipulation.  (Dkt. 1754 at 4.)

24          16.    The ramifications of this Order are grave and can expose hundreds of inmates,

25   staff, outside healthcare providers, and the public to serious, and even fatal, consequences.

26          17.    The Order potentially requires dozens of inmates to be escorted by dozens of

27   security staff into the public each hour if Corizon is unable to meet the Court's new 100%

28   compliance mandate.  Under the terms of the Order, for example, if an inmate has not been

3

1    seen by a registered nurse within 24 hours of submitting a health needs request ("HNR"),

2    then ADC is required to transport that inmate to an emergency room or urgent care center

3    in the 25th hour if an outside medical provider is unable, in that 25th hour, to come to the

4    prison and treat the inmate there.

5        18.    The sheer volume of HNRs submitted each day translates to hundreds of

6    inmates and their respective security staff being sent into the public each day, in addition to

7    those already scheduled to be sent out for specialty appointments or under emergency

8    circumstances.

9        19.    For example, the SMU I Unit at ASPC-Eyman in Florence, Arizona, houses

10   1,200 inmates.  On average, the inmates in that Unit alone submit 500 HNRs every two

11   weeks, which translates to an average of nearly 36 HNRs every day of the week.

12       20.    The security risk is significantly heightened by the various other performance

13   measures that have time-sensitive deadlines, including provider appointments within 14

14   days of referral, chronic disease appointments every 180 days, medical encounters for IPC

15   inmates every 72 hours, mental health appointments within 30 days of continuing

16   medication, and mental health appointments for maximum custody inmates every 30 days.

17       21.    The security risk is further significantly heightened when the inmate being

18   transported is a medium or maximum custody inmate, or a protective custody inmate.

19       22.    Transporting this many inmates on an hourly and daily basis is logistically

20   impossible.  ADC simply does not have enough vehicles to accommodate the potential

21   volume of inmate transports. Separate vehicles are needed to transport each custody level,

22   which can include general population, minimum custody, medium custody, maximum

23   custody, close custody, protective custody, and sex offenders. Mixing classifications could

24   place both inmates and staff, along with the public, at risk of serious harm.

25       23.    ADC policy also requires two officers to escort each inmate sent off-site.

26   ADC simply does not have enough *security* staff to assist with these daily, high-volume

27   transports.  For example, if just 10 inmates were sent out a day, it would require *at least* 20

28   officers to be with those inmates at all times (officers are required to stay with each inmate

1    sent off-site until they are secured back at the facility).  Transporting hundreds of inmates

2    on a daily basis is unmanageable and far beyond ADC's institutional capacity.

3          24.    The substantial numbers of security staff required to transport so many

4    inmates off-site means that there is substantially less security staff left behind at the prison,

5    which can present a clear and present danger to the inmates, staff, and the public and

6    jeopardize the safe, secure, and orderly operation of the entire prison system.  In addition,

7    substantially less security staff at the prison means far fewer staff remain behind to assist

8    with critical inmate programming, therapy, and other out-of-cell activities, which are all

9    required under the Stipulation.  On high-volume transport days (which could conceivably

10   be every day), the facility would be forced to go on lockdown because of the lack of security

11   staff, which brings inmate programming, therapy, and out-of-cell activity to a screeching

12   halt for hours, and even days.

13         25.    Most ADC facilities are located in small, remote, communities with sparse,

14   outside medical resources.

15         26.    For example, the Florence and Eyman facilities are located in Florence,

16   Arizona.  The emergency room at the Florence Hospital is about the size of a living room.

17   Flooding that room with dozens of inmates, waiting for hours, can present a significant

18   security risk to the civilian men, women, and children awaiting care, hospital staff, security

19   staff, and the inmates.  Urgent care centers are even smaller and can present an even graver

20   danger to everyone involved.

21         27.    Though the Florence Hospital routinely sees inmates under emergency

22   circumstances, it does not have the capacity, ability, or staff to see more than a few inmates

23   at a time.

24         28.    The next closest hospital to the Eyman and Florence facilities is in Casa

25   Grande or Apache Junction – both at least an hour away – adding to the impossibility of

26   staffing, and the commensurate dangers inherent in such transports, which sometimes

27   involve vehicle accidents and breakdowns.

28

29.     In addition, the Court's Order presents an unprecedented threat to security that ADC has never faced before:  it gives inmates never-before-available knowledge of when they will be sent out for medical appointments.  ADC has historically concealed from inmates the specific date and time they are scheduled for a medical appointment in order to prevent them from communicating this operational information to others on the outside, which is a critical penological practice designed to prevent escapes and other criminal activity.  The Court's Order eviscerates this crucial security measure and can expose an untold number of people to serious risk of harm

30.     The Court's Order also gives inmates the extraordinary opportunity to deliberately overwhelm the system by flooding their facilities with otherwise routine or unnecessary HNRs, knowing that medical staff would not be able to see each of them within a 24-hour period, just to trigger the requirement that the facility send them off-site, giving them either an opportunity for escape, criminal activity, or just a change of scenery.

31.     This risk is real.  It is not hypothetical or exaggerated.  For just one very real example, ADC currently incarcerates an inmate, Inmate Allgier, who killed an officer during a medical transport.  Specifically, while undergoing a C.T. scan, the inmate took the officer's weapon, killed him, and then escaped from the medical facility.  He then stole a car and engaged in a shootout with local police.

32.     I am deeply concerned about the very serious risk to public safety presented by the Court's Order.

///

///

///

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23 day of November, 2016.

CARSON McWILLIAMS

**EXHIBIT 3**

**EXHIBIT 3**

Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 22126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
Jacob B. Lee, Bar No. 030371
Mark A. Bracken, Bar No. 026532
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com
mbracken@swlfirm.com

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | NO. 2:12-cv-00601-NVW |
| Plaintiffs, | **DECLARATION OF RICHARD PRATT** |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

1        I, **RICHARD PRATT**, make the following Declaration:

2        1.      I am over the age of 18 years and have personal knowledge of and am

3    competent to testify to the matters set forth in this Declaration.

4        2.      I have been working with the Arizona Department of Corrections ("ADC")

5    since July 2000, not including from October 2009 to July 2011 when I was employed

6    elsewhere.

7        3.      In February 2012, I was appointed Interim Assistant Director of ADC's

8    Health Services Contract Monitoring Bureau following Dr. Michael Adu-Tutu's

9    retirement.

10       4.      When Arthur Gross was hired to be the Assistant Director in October 2012,

11   my position changed to Program Evaluation Administrator.

12       5.      I was placed under a temporary special assignment as the Interim Assistant

13   Director on March 1, 2014, when Mr. Gross retired.

14       6.      I was named Assistant Director on August 2, 2014.

15       7.      As Assistant Director, I am responsible for providing managerial oversight

16   and direction to the Health services Contract Monitoring Bureau to monitor the contracted

17   vendor's compliance with all aspects of the health services contract.  I am also responsible

18   for reviewing and responding to internal and external inquiries pertaining to compliance

19   issues, contract specifications, reports, inspections, staffing levels and legal mandates of

20   inmate healthcare, mental health care, and dental care services.

21       8.      I am familiar with ADC's policies and practices pertaining to healthcare,

22   including medical care, dental care, and mental health care, the privatization of ADC

23   healthcare, ADC's contract with Corizon, Corizon's responsibilities under that contract,

24   and the Health Services Contract Monitoring Bureau's monitoring of Corizon's care to

25   ADC inmates.

26       9.      I am also familiar with the *Parsons* litigation, the resulting Stipulation, and

27   the monitoring and reporting of the performance measures in the Stipulation.

28

2

10.     I have reviewed the Court's November 10, 2016 Order that requires ADC to use all "available community health care services including, but not limited to, commercial pharmacies, community-based practitioners, urgent care facilities, and hospitals," "immediately following the expiration of the time-frame detailed in each [performance measure]" in the Stipulation.  (Dkt. 1754 at 4.)

11.     I am concerned that ADC and Corizon, the vendor providing healthcare to ADC inmates, will be unable to comply with the Court's Order because of its scope and the potential risks to the health and safety of inmates, staff, and the public.

12.     As of August 1, 2016, there were 35,403 inmates incarcerated in the ten Arizona State Prison Complexes.   The total number of inmates at each complex on August 1, 2016 was:

         a.   Douglas – 2,280

         b.   Eyman – 5,283

         c.   Florence – 4,036

         d.   Lewis – 5,896

         e.   Perryville – 4,026

         f.   Phoenix – 555

         g.   Safford – 1,621

         h.   Tucson – 5,105

         i.   Winslow – 1,710

         j.   Yuma – 4,891

13.     In August 2016, inmates submitted 17,657 total Medical Health Needs Requests ("HNRs") at all Arizona State Prison Complexes.  The total number of Medical HNRs at each facility in August 2016 was:

         a.   Douglas – 885

         b.   Eyman – 3,800

         c.   Florence – 2,706

         d.   Lewis – 2,133

3

        e.  Perryville – 2,682

        f.  Phoenix – 218

        g.  Safford – 257

        h.  Tucson – 1,828

        i.   Winslow – 598

        j.   Yuma – 2,550

14.     In addition to these Medical HNRs, inmates submitted 1,721 Mental Health HNRs and 4,427 Dental HNRs in August 2016.  Thus, inmates submitted a total of 23,805 HNRs in August 2016.

15.     Requests for healthcare submitted on an HNR may include everything from a request for things such as an extra pillow or lower bunk, to other concerns such as a rash, indigestion (special diet), headache, toe-nail clipping, or a shaving waiver. There is no limit to the potential requests, which can also include more urgent and time sensitive matters such as stomach or chest pain, nausea, fatigue, sprains and strains, medication renewals or side effects.

16.     Not every HNR requires an inmate to be seen by a Registered Nurse or a Medical Provider.  Nevertheless, all HNRs must be triaged by a Registered Nurse to determine whether the need is emergent, urgent, or routine and whether the inmate needs to be seen by a nurse or a provider. The Court's Order, however, makes no distinction on the content of the HNR or professional medical opinion in addressing the HNR, but only the fact that an HNR was submitted. There is also the availability of any inmate to be seen emergently 24 hours a day, 7 days a week, 365 days a year, without the requirement of an HNR.

17.     Because of the number of HNRs received each day at each facility, it will be impossible for ADC and Corizon to comply with the Court's order requiring ADC to transport off-site for treatment every inmate who was not seen within 24 hours of triaging an HNR, or as stated in the Order to have additional medical staff be brought in to see the inmate in the next hour.  Because every HNR is not triaged at the same hour and minute

4

of the day, each and every HNR would need to be reviewed for the time and date stamp when the HNR was received and triaged in order to determine if "compliance" was reached, by comparing the date and time stamp on the HNR with the date and time of the encounter. At a minimum, the 24-hour deadline is not a realistic expectation for 100% of the inmate population. A "next day" interpretation of the 24-hour rule would be more realistic and manageable for the purposes of monitoring and tracking HNRs and resulting encounters.

18. The necessary steps to appropriately schedule an inmate encounter after all HNRs are collected and triaged requires interaction between health care staff and security staff in order to maintain inmate accountability and the running of a safe, secure prison. With advance notice, security staff is able to post appointments for the inmates in their custody to allow appropriate planning by the inmates, in the event they may have visitation, legal communications, or work obligations that may possibly be interrupted. Many inmates have work or education obligations and responsibilities that they are expected to fulfil.

19. In August 2016, there were 196 total emergency medical transports outside the prison complexes, 1,358 specialty appointment transports outside the prison complexes, and 111 inmates were admitted to the hospital for extended inpatient care.

20. In August 2016, there were 14,515 inmates (41% of inmate population) on prescription medications with 68,908 total prescriptions. The total number of inmates on prescription medications and total number of prescriptions at each facility that month was:

    a. Douglas – 509 inmates (22% of the inmate population) on prescription medications with 1,209 total prescriptions;

    b. Eyman – 5,346 inmates (47% of the inmate population) on prescription medications with 13,350 prescriptions;

    c. Florence – 1,691 inmates (42% of the inmate population) on prescription medications with 8,312 prescriptions;

5

d.  Lewis – 2,581 inmates (44% of the inmate population) on prescription medications with 11,483 prescriptions;

e.  Perryville – 2,191 inmates (55% of the inmate population) on prescription medications with 11,141 prescriptions;

f.  Phoenix – 649 inmates (100% of the inmate population) on prescription medications with 2,717 prescriptions;

g.  Safford – 378 inmates (22% of the inmate population) on prescription medications with 1,001 prescriptions;

h.  Tucson – 2,128 inmates (42% of the inmate population) on prescription medications with 11,363 prescriptions;

i.  Winslow – 478 inmates (28% of the inmate population) on prescription medications with 1,396 prescriptions; and

j.  Yuma – 1,661 inmates (34% of the inmate population) on prescription medications with 6,936 prescriptions.

21.  Corizon has contracts with offsite pharmacies where emergency medications may be obtained in the event that such prescription medications may not already be stored at the facility. To send an inmate offsite to obtain a medication simply and needlessly puts the public at risk.  Medications may be obtained by Corizon staff and brought to the facility when emergently required to treat an inmate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November _23_ , 2016.

_____
RICHARD PRATT

6