Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
Jacob B. Lee, Bar No. 030371
Mark A. Bracken, Bar No. 026532
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com
mbracken@swlfirm.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | NO. 2:12-cv-00601-DKD |
| Plaintiffs, | |
| v. | **DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT REGARDING MONITOR GUIDE** |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

## I.      BACKGROUND

The Arizona Department of Corrections (ADC) created the Health Services Contract Monitoring Bureau (HSCMB) to monitor the healthcare and treatment provided to inmates when the State privatized health services in July 2012.  Under the terms of the Stipulation in this case, the Monitoring Bureau also now measures and reports compliance with the Health Care Performance Measures (HCPM) in the Stipulation using the "GAR" (Green, Amber, Red) system.  This system is a user-friendly, web-based application that reliably measures compliance with certain performance measures.  This system reports performance results and shares corrective action plans.  From July 2012 through February 2015, ADC used Medical Green, Amber, Red (MGAR) to codify the contractor's compliance with performance measures based on National Commission on Correctional Health Care (NCCHC) standards.  This system evolved into the Compliance Green, Amber, Red (CGAR) monitoring tool that is used today to measure and report compliance with the Stipulation.  The first CGAR report was issued in March 2015.

As Plaintiffs' counsel began to question some of the CGAR results and monitoring methodology, Defendants volunteered to prepare a Monitor Guide.  The Monitor Guide was never intended to provide comprehensive step-by-step procedures for measuring and reporting compliance with the Stipulation.  The Monitor Guide is just as the name suggests – a guide to assist the monitors.  The purpose of the guide is to inform the monitors of their duties and responsibilities and to help ensure consistency and uniformity in monitoring compliance with the performance measures.  The guide may also be used to help train new monitors and remind current monitors of their duties and responsibilities.

Although the Monitor Guide includes the performance measures, protocols, and source of records or review that the parties agreed upon in the Stipulation, it also includes more specific monitoring methodologies for the benefit of the monitors.  These more specific methodologies have been and will continue to be subject to continuous review and revision as facilities have transitioned to electronic health records (EHR), and new reporting capabilities are identified.  For example, as the software used to store and

1

organize patient health information (i.e., eOMIS) is updated and revised, the information available for the monitors to review also changes. Moreover, as medical or operational practices and procedures change, so will the monitoring practices and procedures. Accordingly, Defendants will continuously review and revise the methodology to produce the highest quality report possible.

## II.    UPDATES TO MONITOR GUIDE

Under the express terms of the Stipulation, Defendants are responsible for measuring and reporting compliance with the performance measures. (Dkt. 1185 at ¶¶ 9-10.) The ADC Health Services Contract Monitoring Bureau is responsible for measuring and reporting compliance with each performance measure using monthly CGAR report. Plaintiffs' counsel and their experts have the opportunity to review any documents that form the basis of these reports and may interview the monitors who prepare the reports. (See Dkt. 1185 at ¶ 32.)

The Stipulation establishes a general protocol for determining compliance with each of the performance measures. (See Dkt. 1185-1 at 17-36, 41-45.) These protocols were negotiated and agreed upon by the parties. Based on these general protocols, more specific methodologies have been developed to assist the monitors in measuring and reporting compliance with the performance measures. These specific methodologies are outlined in the ADC Health Services Contract Monitoring Bureau, Monitor Guide. Defendants volunteered to create a formal Monitor Guide, although the Stipulation did not require them to do so. Defendants have worked with Plaintiffs' counsel to ensure the methodologies are consistent with the performance measures and protocols in the Stipulation and accurately reflect how monitors are measuring and reporting compliance. Defendants agree with Plaintiffs that there needs to be a consistent approach to monitoring compliance with the performance measures. To that end, the parties have made great strides in reaching a mutually agreeable Monitor Guide. Although Plaintiffs' characterize Defendants' proposed changes as "unilateral" (Dkt. 1755 at 2), Defendants have openly informed Plaintiffs of all changes and attempted to resolve any concerns. Several issues,

1    however, remain.

2          Despite Defendants' extensive efforts to outline the monitoring methodology in the

3    Monitor Guide, it is impossible and unwieldly to include every possible means and

4    process to monitor compliance.  As monitors learn their duties and responsibilities, they

5    will inevitably find more efficient or effective ways to review and monitor compliance.  In

6    addition, the monitors may discover that some methodologies become unworkable as

7    procedures change.  As a result, the specific methodology is subject to continuous review

8    and revision in order to provide consistent and accurate results on a statewide basis.

9          Plaintiffs request a Court order requiring Defendants to give Plaintiffs 60 days'

10   notice of any proposed changes to monitoring methodology, an opportunity to object and

11   propose further changes, and an opportunity for the Court to resolve any disputes.  (Dkt.

12   1755 at 7.)  This request is unnecessary, impractical, and contrary to the Stipulation.  The

13   Stipulation already provides a procedure for addressing any issues with compliance.  (See

14   Dkt. 1185 at ¶ 30.)  Defendants have and will continue to provide Plaintiffs with any

15   updates or changes to the monitoring methodology.  If Plaintiffs' counsel believes the

16   monitoring methodology is not compliant with the Stipulation, they may informally

17   contact Defendants.  If they are not satisfied with Defendants' response, they may send

18   Defendants a written Notice of Substantial Non-Compliance and follow the dispute

19   resolution process that is already established in the Stipulation.  It is unnecessary to create

20   a new or different process.  Plaintiffs' proposed procedure for revising the monitoring

21   methodology would also unnecessarily delay the monthly monitoring and CGAR reports.

22   Plaintiffs' proposed micro-management would delay monitoring, as monitors must delay

23   reporting until they can confirm Plaintiffs' concurrence.  The monitors would be unable to

24   quickly and efficiently perform their jobs if they must first obtain the approval of

25   Plaintiffs' counsel before correcting or changing the monitoring methodology based on

26   unforeseen circumstances.

27         Plaintiffs' counsel have the opportunity to review any changes to the methodology

28   and discuss those changes with the monitors, if necessary.  (See Dkt. 1185 at ¶ 32.)  In

1    other words, any proposed changes to the monitoring methodology are not secret and are

2    not being hidden from Plaintiffs' counsel.  Any dispute regarding these changes may be

3    addressed through the dispute resolution process provided in the Stipulation.  (See Dkt.

4    1185 at ¶¶ 30-31.)  Plaintiffs' proposed new process for addressing revisions to the

5    Monitor Guide is unnecessary, impractical, and contrary to the terms of the Stipulation.

6    **III.    CHANGE IN CALCULATING COMPLIANCE**

7              As explained in Defendants' November 7, 2016 Supplemental Status Report,

8    Defendants recently discovered that some of the CGAR findings did not accurately reflect

9    compliance with the performance measures.  (Dkt. 1743 at 5.)  Because some performance

10   measures were being measured on whether they passed or failed, rather than on the

11   percentage of compliance, it was impossible to measure any improvement or decline in

12   compliance.  Defendants discovered that there are performance measures where facilities

13   made positive improvements with compliance following implementation of corrective

14   action plans, but the CGAR findings remained the same.   To address this issue,

15   Defendants began measuring and reporting compliance based on the percentage of

16   compliance, rather than as pass/fail.

17             By way of example, PM 94 requires "[a]ll prisoners on suicide or mental health

18   watch shall be seen daily by a licensed mental health clinician or, on weekends or

19   holidays, by a registered nurse."  (Dkt. 1185-1 at 34.)  Under the old method, if an inmate

20   was on a mental health watch for 10 days and he was seen once, the record would be

21   marked noncompliant.  Similarly, if the inmate was on watch for 10 days and he was seen

22   nine times, the record would again be marked noncompliant.  Under the new method, if an

23   inmate was on a mental health watch for 10 days and he was seen once, the record would

24   be marked 10% compliant.  Similarly, if the inmate was seen nine times, the record would

25   be marked 90% compliant.  This change allows Defendants to more accurately measure

26   and report compliance.

27             This change is consistent with the terms of the Stipulation, which require

28   Defendants to meet or exceed "an eighty percent (80%) threshold for the particular

4

performance measure… ."  (See Dkt. 1185 at ¶¶ 10(a) and 20(a).)  The purpose of this change was not to surreptitiously inflate Defendants' compliance findings, as this method could both increase or decrease compliance findings, but to more accurately report the current status of compliance.  The change in calculating compliance allows Defendants to identify the specific problems and the severity of the problems so that Corizon can prioritize and focus their resources on improving compliance.  The methodology is like a college course that is graded as pass/fail compared to a course that is graded on a 100 point scale.  The teacher and the student can more accurately measure their performance and progression or regression when graded on a 100 point scale than when graded strictly pass/fail.  A grade of pass/fail does not help the student or professor to identify areas that need improvement or evaluate their performance.  Defendants revised their compliance calculation for this same reason, not to inflate their scores.

     **A.**      **HCPM 16** (*Perpetual inventory medication logs will be maintained on each yard*):

Plaintiffs take issue with Defendants' new method of determining compliance with HCPM 16.  (Dkt. 1755 at 10.)  Defendants have changed the method for calculating compliance with this measure to more accurately reflect actual compliance levels.  Previously, if any item was missing from a perpetual inventory log, the entire log was considered noncompliant.   Under the new approach, compliance is measured as a percentage of the six required items present on the log.  (Dkt. 1760-1 at 36.)  Each required item is worth a point, for a total of six points. Compliance is calculated by dividing the number of required items present on the log by six.  This revised approach will enable Defendants to pinpoint yards with more significant compliance issues (as evidenced by lower scores out of six), identify and implement additional staff training and/or other improvement strategies if needed, and monitor progress towards greater compliance with this measure.

/ / /

/ / /

5

**B.** **HCPM 27** (*Each ASPC facility will conduct monthly CQI meetings, in accordance with NCCHC Standard P-A-06*):

Plaintiffs complain that Defendants added additional bullets to the methodology for HCPM 27. (Dkt. 1755 at 10.) Defendants have added additional detail to the monitoring guide with respect to this measure to explain how the monitor determines compliance. (Dkt. 1760-1 at 47.) The Stipulation requires monthly meetings in accordance with NCCHC P-A-06, which in turn only requires quarterly meetings. If the complex holds monthly CQI meetings, and at least one meeting complies with the specific requirements for quarterly meetings set forth in the NCCHC standard, the monitor marks the complex as compliant for this measure. This approach is consistent with the plain language of the Stipulation and its reference to NCCHC Standard P-A-06. Defendants disagree with Plaintiffs' assertion that the parties bargained for monthly CQI meetings including all the quarterly components of the NCCHC standard.

**C.** **HCPM 35** (*All inmate medications (KOP and DOT) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption*):

Plaintiffs take issue with Defendants addition of a sentence to the methodology for HCPM 35. (Dkt. 1755 at 11.) Defendants monitor this measure by determining whether an inmate received all required doses of his or her prescribed medications on the date of the inmate's transfer to another ASPC facility, either from the medications physically transferred with the inmate or through the use of clinic stock. (Dkt. 1760-1 at 55.) Defendants disagree with Plaintiffs that the monitor must review beyond the date of the inmate's transfer, as nothing in the plain language of this measure requires review beyond the inmate's date of transfer. Rather, the language of the measure requires only that the medications be provided *without interruption*, which implies provision on the inmate's specific date of transfer.

/ / /

/ / /

/ / /

6

D.    **HCPM 66** (*In an IPC, a Medical Provider encounter will occur at a minimum every 72 hours*); **HCPM 67** (*In an IPC, Registered nurses will conduct and document an assessment at least once every shift. Graveyard shift assessments can be welfare checks*); and **HCPM 69** (*In an IPC, nursing care plans will be reviewed weekly documented with a date and signature*):

Defendants have changed the method for calculating compliance with these measures to more accurately reflect actual compliance levels.  (Dkt. 1760-1 at 94-97.) Previously, if any assessment was missed, the entire chart was considered noncompliant and received a zero.  Under the new approach, compliance for each chart is calculated by dividing the total number of assessments conducted and documented for the monitored month divided by the total number of assessments that were required to be conducted and documented for the monitored month.  As an example, consider an inmate who was in an IPC for the entire monitored month and was accordingly required to have 60 assessments for HCPM 67.  Under the previous approach, if the inmate missed a single assessment (and therefore had 59 out of 60 assessments) during the monitored month, the chart was marked as noncompliant and received a zero.  Under the revised approach, that same chart would receive a score of 98% and be marked as compliant.  The prior approach did not allow Defendants to differentiate between inmates who received no assessments, only a few assessments, or nearly all assessments.  The revised approach allows Defendants to more accurately determine compliance levels at each IPC and to monitor progress towards substantial compliance with this measure.

Plaintiffs use HCPM 66 as an example, which requires that inmates in an IPC be seen every 72 hours.  For an inmate who is in the IPC for 15 days, this translates into a requirement that the inmate be seen on Day 1, Day 4, Day 7, Day 10, and Day 13. Plaintiffs claim that under the new monitoring methodology for HCPM 66, a provider could see a patient five times on Day 1, not see the patient again for the next two weeks, and the chart would still be marked as 100% compliant.  (Dkt. 1755 at 12.)  Plaintiffs are mistaken.  As stated in the November 11, 2016 Monitor Guide, the monitors "identify the number of provider encounters that occurred at least every 72 hours and the number of

7

provider encounters that should have occurred at least every 72 hours." (Dkt. 1760-01 at 94.)  If the inmate was not seen at the required frequency of every 72 hours, the day(s) missed would not be counted towards compliance.  For Plaintiffs' hypothetical example of an inmate who was seen five times on Day 1 and not seen at all for the next two weeks, only one of the visits on Day 1 would be counted, and the score would be 20% (or 1 out 5).  The same result would occur for HCPMs 67 and 69, which also require that actions take place at a specified frequency.

     **E.**     **HCPM 89** (*MH-5 prisoners shall be seen by a mental health clinician for 1:1 session a minimum of every seven days*); **HCPM 91** (*MH-5 prisoners who are actively psychotic or actively suicidal shall be seen by a mental health clinician or mental health provider daily*); **HCPM 93** (*Mental health staff (not to include LPNs) shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum custody*); **HCPM 94** (*All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse*); and **HCPM 95** (*Only licensed mental health staff may remove a prisoner from a suicide or mental health watch. Any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, and between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation of the watch*)

Plaintiffs object to changes made to Defendants' monitoring methodology for HCPMs 89, 91, 93, 94, and 95 with respect to determining compliance as a percentage of the requirements met.  (Dkt. 1755 at 13-14.)  Under the prior method for determining and reporting compliance, a chart was marked as noncompliant if an inmate missed any required contacts, regardless of how few or many contacts were missed.  Taking HCPM 94 as an example, if an inmate was on suicide or mental health watch for the entire monitored month, the inmate should have been seen 30 times by a mental health provider or registered nurse.  An inmate who was seen 29 times during the monitored month would have received the same score (0%) as an inmate who was not seen at all during the monitored month.  Under the new methodology, Defendants are able to more accurately track compliance with each of these five performance measure and to determine whether Corizon is substantially compliant.  (Dkt. 1760-01 at 126, 128, 131-35.) This approach will enable Defendants to pinpoint yards with more significant compliance issues (as

8

evidenced by lower scores), identify and implement additional staff training and/or other improvement strategies if needed, and monitor progress towards greater compliance with these measures.

### F.   MCPMs 6 and 8

Plaintiffs similarly object to changes made to Defendants' monitoring methodology for MCPMs 6 and 8 with respect to determining compliance as a percentage of the requirements met. (Dkt. 1755 at 15-16.)  As with the other measures in which Defendants have implemented the new counting rule, this will result in more accurate monitoring of actual compliance levels for MCPMs 6 and 8.

Plaintiffs assert that Defendants have decided to change their maximum custody compliance calculation methodology for PMs 6 and 8 "in ways that will substantially and artificially inflate their compliance scores."  (Dkt. 1755 at 7.)  While Defendants have *proposed* a change in the calculation methodology on a categorical basis for these two category based PMs, the proposed changes are not unilateral and may be revised, pending agreement by the parties or Court Order approving the same.

Defendants propose that compliance with MCPMs 6 and 8, which govern the incentives offered to maximum custody inmates under DI 326 and additional out-of-cell time and programming offered to maximum custody SMI inmates, be calculated on a categorical basis where both PMs require compliance with a multitude of differing requirements.   This category-based calculation method does not artificially inflate compliance.   Rather, it specifies, defines, and delineates compliance as related to the numerous categories that each MCPM monitors.

This is fair.  Specifically, MCPM 6 measures five categories in one PM: property, telephone, visitation, spending amount, and recreation location.  PM 8 does the same and goes beyond for SMI inmates, adding four additional compliance categories for unstructured out-of-cell time, mental health group programming, psychological education programming, and additional out-of-cell programming.   Using the revised calculation method for MCPM 6, the monitor records the total number of the five categories that are

9

in compliance (property, telephone, visitation, spending amount, and recreation location) for each inmate, adds the total number of categories in compliance for all ten inmates, and divides this by the total number of categories possible for the ten inmates.  If 45 out of the 50 possible categories were in compliance, the unit would receive a score of 90%.  If 42 out of the 50 possible categories were in compliance, the unit would receive a score of 80%.  Similarly, for MCPM 8, the monitor records the total number of the four categories that are in compliance (property, telephone, visitation, spending amount, and recreation location) for each inmate, adds the total number of categories in compliance for all ten inmates, and divides this by the total number of categories possible for the ten inmates.  If 33 out of the 40 possible categories were in compliance, the unit would receive a score of 82.5%.  If 36 out of the 40 possible categories were in compliance, the unit would receive a score of 90%.

As illustrated, Defendants' revised compliance calculation method tracks actual compliance by category. The purpose of compliance monitoring is to identify and improve where improvements are needed.  This method allows the parties to specifically track where there may be compliance issues, and to address them with specificity.  With Defendants' revised methodology, the parties can pinpoint whether there are any issues with the provision of specific categories of services and the severity of any such issues.  Previously, a failure to offer a single category of service would receive the same score as a failure to offer four or even five of the required categories of service.  Now, Defendants will be able to prioritize resources to any categories with more significant compliance issues.

If it were the parties' intent to separately provide different categories of services within a Performance Measure, grouped by general subject matter (DI 326 per Step or incentives/programs in addition to DI 326 for SMI inmates), then it is not outside the bounds of common sense that each category be calculated for compliance, and then a percentage of compliance determined for the individual inmates.  This measures true compliance for each individual category, determined on a per complex basis.

IV. **MONITORING METHODOLOGY FOR MENTAL HEALTH PERFORMANCE MEASURES**

   A. **Cellfront Encounters**

Plaintiffs insist that Defendants must include a statement "in a prominent location in the Monitor Guide" that cellfront encounters do not satisfy the requirement that a patient be "seen," unless (1) the inmate refuses to exit his or her cell for the encounter, or (2) the facility is on lockdown. (Dkt. 1755 at 16.) Defendants have included this language in each of the specific performance measures to which it applies – HCPMs 76, 80, 82, 86, 87, 89, 91, 92, 94, and 95. (See Dkt. 1756-1 at 641, 647, 650, 656, 658, 660, 662, 664, 666, 668.) Accordingly, Defendants believe that they have included the language in the most "prominent location" in the Monitor Guide with respect to each of the applicable performance measures. Defendants disagree that it is necessary to place this language elsewhere in the Monitor Guide.

   B. **HCPM 78** (*All mental health treatment plan updates shall be done after a face-to-face clinical encounter between the prisoner and the mental health provider or mental health clinician*):

Plaintiffs insist that Defendants' monitoring methodology for this measure is deficient because the monitors do not review all records reviewed for HCPM 77 for HCPM 78. (Dkt. 1755 at 17.) Defendants monitor HCPM 78 by reviewing all charts selected for HCPM 77 (*Mental health treatment plans shall be updated a minimum of every 90 days for MH-3A, MH-4, and MH-5 prisoners, and a minimum of every 12 months for all other MH-3 prisoners*) that had a treatment plan updated in the monitored month. (Dkt. 1760-01 at 111.) The monitor then checks whether the treatment plan was updated during the monitored month, and if so, whether the update was made following a face-to-face clinical encounter with a mental health provider or clinician. If the update was not made following a face-to-face clinical encounter with a mental health provider or clinician, the chart is marked as non-compliant for the monitored month. The monitor does not review charts that did not have a treatment plan updated during the monitored month. This is because (1) charts that did not have a treatment plan updated would not be

relevant to this performance measure, and (2) monitoring treatment plans that were updated prior to the monitored month would not reflect compliance with this measure for the correct month.  Defendants believe that this approach is consistent with the Court's characterization of the monitoring period as a snapshot of current compliance levels during a given month.

C.   **HCPM 85** (*MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications*):

Plaintiffs take issue with Defendants' addition of the language "or completed" in the methodology for selecting the sample for this performance measure, which now states: "Ten (10) records (if available) with medication discontinuation follow up contacts due *or completed* in the monitored month will be selected for review at each yard." (Emphasis added.)  (Dkt. 1755 at 18.)  Plaintiffs assert that Defendants are drawing a sample of charts for HCPM 85 that had contacts completed during the monitored month to "grossly inflate" compliance results. (Id.)      Plaintiffs' characterization of the monitoring methodology for this performance measure is incorrect.  As explained in Defendants' November 14, 2016 email to David Fathi, attached as Exhibit A, the addition of the phrase "or completed" in the methodology for this performance measure is to capture  (1) contacts that were due in a prior month, but not completed until the monitored month, and (2) contacts that were not yet due in the monitored month but were completed early (e.g., an inmate whose medications were discontinued on 9/1 and therefore due for a contact on 10/1, but the contact was completed on 9/30).  The first scenario would result in a finding of non-compliance for the monitored month, while the second scenario would be found compliant. The intent is to capture all contacts that occurred in the monitored month and then look backward to determine whether the contacts occurred within 30 days of the discontinuation of the medication.  Without the added language to the methodology for this performance measure, the first scenario would be missed, and the second scenario would be inaccurately reported as compliant the month after the contact occurred, rather than the month in which the contact occurred.  Contrary to Plaintiffs' contention that this

12

approach will result in inflated compliance figures, it may actually result in reduced compliance figures because it will capture overdue follow-up contacts that might otherwise have escaped monitoring and that will be marked as noncompliant in the monitored month.

Defendants asked Plaintiffs if they had proposed language that would permit the monitor to capture both of these scenarios during the monitored month, but Plaintiffs declined to respond or to propose any alternative language.  Because Plaintiffs have failed to offer any alternative language, and the deletion of the phrase "or completed" would result in both a lost opportunity to monitor overdue follow-up contacts and inaccurate reporting of early follow-up contacts, Defendants believe that the additional language should remain in the methodology for this performance measure.

   **D.**   **HCPM 86** (*MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication*):

Plaintiffs note that Defendants' monitoring methodology is noncompliant with the Court's November 10 Order with respect to PM 86 because it begins with the date the inmate was classified as MH-3D, rather than the date the inmate's medication was discontinued.  (Dkt. 1755 at 18-19.)  The latest version of the Monitor Guide was sent to Plaintiffs less than a day after the Court issued its Order with respect to PM 86, and Defendants had not had an opportunity to evaluate the effect of the Order or to revise the methodology for this performance measure prior to sending the Monitor Guide to Plaintiffs for their review.  Additionally, the focus of the changes in the November 11, 2016 Monitor Guide was on the measures that were the subject of the parties' latest round of meet and confers.  The methodology for PM 86 will be revised in accordance with the Court's November 10 Order.

/ / /

/ / /

/ / /

/ / /

E.   **HCPM 91** (*MH-5 prisoners who are actively psychotic or actively suicidal shall be seen by a mental health clinician or mental health provider daily*):

Plaintiffs assert that for HCPM 91, "Defendants review only those who were 'determined to be actively psychotic or actively suicidal *on a continuous watch.*'" (Dkt. 1755 at 19.)  Defendants explained to Plaintiffs that their characterization of Defendants' monitoring methodology is incorrect for this performance measure.  Defendants monitor a sample of *all* inmates who were on a continuous watch during the monitored month, not only inmates who were determined to be actively psychotic or actively suicidal while on a continuous watch.  Clinicians do not generally use the terms "actively psychotic" or "actively suicidal" in their chart entries, as they are not clinically recognized terms.  Indeed, even the one example Plaintiffs cite in their Statement of a note in which they claim these conditions are "clearly noted in the patient's medical records" does not use either of these two phrases.  Rather, the note Plaintiffs cite states, "Inmate continues to be *fluidly* psychotic."  (Emphasis added.)  Whether "fluidly psychotic" has the same clinical meaning as "actively psychotic" requires a subjective determination that would be inappropriate for a monitor who has not treated the inmate to make.

Plaintiffs additionally assert that monitoring inmates who are on continuous watch for PM 91 renders it duplicative of PM 94, which requires that "All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse."  (Dkt. 1755 at 19.)  Plaintiffs are incorrect.  PM 94 also applies to inmates who are 10-minute and 30-minute watches, in addition to inmates who are on continuous watches.  Moreover, PM 94 permits the required daily contacts for inmates on mental health and suicide watches to be performed by a registered nurse, rather than a mental health clinician or provider, on weekends and holidays, while PM 91 requires that all daily contacts be performed by a mental health clinician or provider.

Contrary to Plaintiffs' claim, Defendants' methodology for selecting the sample for this performance measure is not new.  Defendants have monitored inmates on continuous

1    watch for this performance measure since the Stipulation took effect in March 2015.

2    Defendants' rationale for this methodology is that an inmate who is "actively psychotic"

3    or "actively suicidal" should be placed on a continuous watch.  There may be inmates on

4    continuous watches who are not "actively psychotic" or "actively suicidal," but inmates

5    on this status should nonetheless be seen daily by a mental health clinician or provider,

6    and monitoring them for this performance measure permits Defendants to ensure that

7    these critical contacts by Corizon's mental health clinicians and providers are occurring.

8        Defendants have asked Plaintiffs on multiple occasions to propose an objective

9    standard for measuring compliance with this performance measure, but they have refused

10   to do so.  Reviewing every note by every clinician for every MH-5 inmate during the

11   monitored month for the phrases "actively psychotic" or "actively suicidal" as proposed

12   by Plaintiffs would not only be unduly burdensome, but would also likely result in very

13   few, if any, responsive charts.  Defendants agree that the MH-5 population is a vulnerable

14   population, and believe that the current methodology, which results in monitoring a far

15   larger sample of MH-5 inmates than Plaintiffs' proposed approach, better ensures that this

16   population receives daily contacts by a mental health clinician or provider when needed.

17       **F.**    **HCPM 98** (*Mental health HNRs shall be responded to within the*
         *timeframes set forth in the Mental Health Technical Manual (MHTM) (red.*
18       *4/18/14), Chapter 2, Section 5.0*):

19       Plaintiffs argue that Defendants should be required to record the time of receipt and

20   triage of HNRs in the CGARs for this performance measure, and that without such

21   documentation in the CGARs, it is "impossible" to determine whether an HNR was

22   responded to immediately or within 24 hours.  (Dkt. 1755 at 20.)  But nothing in the plain

23   language of the Stipulation or protocols requires that Defendants record the time of receipt

24   and triage of HNRs in the CGARs for this performance measure, and Plaintiffs now have

25   access to eOMIS and can review the HNRs, which are scanned into eOMIS, if they wish

26   to verify the compliance findings with respect to this performance measure.  Accordingly,

27   Defendants disagree that any changes need to be made to the monitoring methodology

28   currently employed by the monitors for this performance measure.

## V.      COMPLIANCE WITH PARAGRAPHS 12, 14, AND 15 OF STIPULATION

Plaintiffs assert that Defendant's proposed procedure to report compliance with Paragraphs 12 and 15 of the Stipulation is inadequate.  (Dkt. 1755 at 21.)  Plaintiffs insist that Paragraph 12 of the Stipulation requires Defendants to review "a sample of qualifying prisoners' health care charts to see if individual communiques were sent to the person informing him or her that he/she qualifies for the preventive care, and if the prisoner requested the care, whether he or she received it."  (Id.)  Defendants disagree that the plain language of the Stipulation requires that Defendants or their contracted vendor take any particular action to ensure that inmates are offered vaccinations, immunizations, colorectal screening, and mammograms.  Rather, the plain language requires only that Defendants ensure that the vaccinations, immunizations, and screenings specified in Paragraph 12 be "offered" to inmates.  Currently, Defendants post signs, posters, decals, and banners in all medical and housing units advising inmates of the availability of the services described in Paragraph 12.  Defendants' proposed plan for demonstrating compliance is for the Deputy Wardens to conduct a monthly walkthrough to verify that the appropriate signage is present for each service described in Paragraph 12 in each medical and housing unit, complete a verification sheet documenting their findings, and submit the verification sheet to the applicable monitor. (See Dkt. 1703 at 2.)  Plaintiffs' position is neither supported nor required by the plain language of the Stipulation.

Plaintiffs assert that Defendants' proposed plan as to Paragraph 15 is deficient because it limits the application to inmates "who reported heat intolerance." (Dkt. 1755 at 22.) Plaintiffs insist that monitoring with respect to this paragraph must include *all* inmates taking psychotropic medications who suffer a heat intolerance reaction, even if they do not report the reaction. (Id.)  Plaintiffs' position is untenable because Defendants have no way of knowing that an inmate experienced a heat intolerance reaction unless the inmate reports the reaction to security staff or medical personnel.

Plaintiffs concede that they are satisfied with Defendants' proposed plan to monitor Paragraph 14 of the Stipulation but that Defendants have not stated when the "hard stop"

1   described in their plan will be added to the electronic medical records system.  (Dkt. 1755
2   at 22.)   Defendants will provide this information to Plaintiffs and the Court when it
3   becomes available.

4   **VI.   MONITORING METHODOLOGY FOR MEDICAL AND DENTAL**
     **PERFORMANCE MEASURES**
5
6        A.   **HCPM 60** (*All female inmates ages 21-65 will be offered Pap smear at
            initial intake*) and **HCPM 61** (*All female inmates ages 21-65 will be offered
7            a Pap smear 36 months after intake and every 36 months thereafter unless
            more frequent screening is clinically indicated*)

8        Plaintiffs insist that compliance with HCPMs 60 and 61 requires Defendants to
9   issue individual communiques to all female inmates who are eligible for Pap smears.
10  (Dkt. 1755 at 22.)  Defendants disagree that the plain language of either the Stipulation or
11  the protocols requires that Defendants take any particular action with respect to these two
12  measures, so long as female inmates are "offered" Pap smears.  Likewise, there is no
13  definition in the Stipulation of "offered." Defendants offer Pap smears to female inmates
14  during the initial medical intake process.  Defendants also place posters in the medical
15  units and housing units at Perryville alerting female inmates of the availability of Pap
16  smears, which female inmates may then request through submission of an HNR.  Because
17  all female inmates at Perryville have access to the posters advertising the availability of
18  Pap smears, there is no need to select ten individual charts per yard for HCPM 61.
19  Instead, the monitor can determine compliance with HCPM 61 by confirming the
20  placement of the posters in the medical units.  With respect to HCPM 60, Defendants'
21  monitoring methodology requires review of ten individual charts of inmates from the
22  Arrival Log for the monitored month to determine whether they were offered a Pap smear
23  during the initial intake process.  (Dkt. 1760-01 at 87.)  Defendants believe that their
24  monitoring methodology with HCPMs 60 and 61 is consistent with the plain language of
25  the Stipulation and protocols.

26
27
28

1

2

> **B.**   **HCPM 44** (*Inmates returning from an inpatient hospital stay or transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours*)

3

4

5

Plaintiffs disagree with Defendants' methodology for monitoring compliance with HCPM 44 only as to instances in which the provider does not act upon the hospital's treatment recommendations.  (Dkt. 1755 at 23.)  Plaintiffs take the position that to be compliant with this measure, a provider must document why he or she chooses not to act on an outside hospital's discharge recommendations.  Defendants maintain that reviewing the discharge recommendations and making the clinical determination not to act on them is itself an action, and that nothing in the plain language of the Stipulation or protocols requires any documentation as to the reason(s) for choosing either to act or not to act on the discharge recommendations.   Likewise, nothing in the plain language or the Stipulation or protocols requires that any particular action be taken with respect to discharge recommendations.  Plaintiffs' demand that providers document their decision not to act upon the discharge recommendations and the reason(s) for the decision is simply not supported by the plain language of the Stipulation or the protocols.

6

7

8

9

10

11

12

13

14

15

16

> **C.**   **HCPM 100** (*Prisoners on the routine dental care list will not be removed from the list if they are seen for urgent care or pain appointments that do not resolve their routine care issues or needs*) and **HCPM 101** (*Dental assistant will take inmate histories and vital signs and dental radiographs (as ordered) by the Dentist*):

17

18

19

Plaintiffs claim that Defendants have not adjusted their methodology for these two performance measures.  (Dkt. 1755 at 24-25.)  Plaintiffs are mistaken.  In the November 11, 2016 version of the Monitor Guide attached as Exhibit 16 to the Declaration of Corene Kendrick, Defendants extensively rewrote the methodology for both HCPM 100 and HCPM 101.   (See Dkt. 1755-1 at 675-77.)   Plaintiffs evidently failed to review this version of the Monitor Guide prior to preparing their Statement to the Court.  The new methodology for HCPM 100 addresses Plaintiffs' concerns with respect to identifying inmates on the routine care list who were seen for urgent care and/or pain appointments and includes highly detailed instructions for selecting samples utilizing the available

20

21

22

23

24

25

26

27

28

18

source documents and for determining compliance.  The new methodology for HCPM 101 addresses Plaintiff's concerns by specifying that the monitor must review the inmate's chart for completion of medical histories and taking of vital signs.  The new methodology also provides that the monitor must review the chart for any orders by the dentist for dental radiographs during the monitored month, and if any order by the dentist for radiographs is present in the chart, determine whether the dental assistant took the ordered radiographs.  Defendants are confident that if Plaintiffs actually review the new methodology for HCPM 100 and 101 contained in the November 11, 2016 version of Monitor Guide that they submitted to the Court, they will find that it addresses their concerns.

## VII.   MONITORING METHODOLOGY FOR MAX CUSTODY PERFORMANCE MEASURES

### A.   Selection of Weeks to be Monitored

Plaintiffs object to Defendants selecting on the first business day of each month, the week from the prior month to be monitored.  (Doc. 1755 at 22-23.)  Plaintiffs assert that this methodology consequently eliminates the last week of each month from monitoring if the last week of the month ends early or mid-week, and permits the unintended consequence that staff may have "no incentive" to comply with the Stipulation requirements the last week of the month.  (Id. at 23.)  Defendants dispute the lack of incentive argument and note that monitoring the last week of the month (when that last week begins during the previous month and continues into the new month), eschews the intended "monthly" reporting contemplated by the CGARS.

This all said, to promote cooperation and dispel myths of intentional non-compliance, Defendants' counsel Rachel Love has this same date communicated to Plaintiffs' counsel Amy Fettig and Kirstin Eidenbach that Defendants agree to Plaintiffs' request that on the seventh day of each month (rolling forward if the seventh day is a weekend or State holiday), ADC shall randomly select the week of the prior month to be monitored (excluding from eligibility a monitoring week that includes a State holiday) and

that the last week of the month remains eligible for monitoring (excluding from eligibility a monitoring week that includes a State holiday) even if the last week of the month includes the last days of the prior month and the first days of the coming month.[1]

**B.**      **Documentation of Refusals of Out-of-Cell Time - MCPMs 1, 2, 5, 6, 8**

Plaintiffs object to Defendants' proposed methodology regarding documentation of out-of-cell time refusals.  The predicate for Plaintiffs' objection is concern over an alleged "pervasive pattern of refusals across exercise, programming and other out-of-cell time that are required by the Stipulation."  (Doc. 1755 at 23.)  Plaintiffs claim "alarmingly high refusal rates" and attach as support, a table showing "refusal rates".  (Id. at 23; Fettig Decl. Ex. 1 at 5.)  The summary chart, however, fails to identify the source of the documents which are purportedly summarized.  Plaintiffs' summary also ignores that some inmates signed for their own refusals and even provided explanations as to why – too cold, or expecting a visit.  (See Decl. of M. Giardina, Exh. B,  at ¶ 16.)  Likewise, Plaintiffs appear to have double counted out-of-cell time offers and refusals, necessarily inflating their reported refusal rates.  (Id. at ¶¶ 6-17.)  Plaintiffs also fail to submit evidence from any of their clients that challenges the legitimacy of the refusals or explains the alleged underlying retaliatory cause.  Finally, absent is any statistical proof that the maximum custody refusal rates seen in the ADC system are uncommonly high as compared to other corrections systems.  Plaintiffs' lack of actual evidence of pervasive and illegitimate inmate refusals must be compared to the fact that in corrections, it is not uncommon for maximum custody inmates to decide they do not want to leave their cells for recreation or programming.  (See Decl. C. McWilliams, Exh. C, at ¶ 46.)

Indeed, there are a variety of reasons - personal to the inmate - that may be the basis for an out-of-cell time refusal.  (Id. at ¶ 47.)  It can be as simple as personal preference not to go outside and exercise.  (Id. at ¶ 48.)  The inmate may feel under the

---

[1] Plaintiffs and Defendants agree to exchange an additional red-lined draft of the Maximum Custody Monitor Guide contemplating the additional agreements made, so that the Parties can reach final agreement prior to the hearing set for December 14, 2016.

weather or would rather read a book, or watch TV, or work on in-cell programming, rather than go outside on a particular day.  (Id. at ¶ 49.)  Weather also drives refusals.  Inmates, just like persons in the community, may not wish to go outside in the winter months when it is cold, or in the summer months, when it is hot (like January and June – the months Plaintiffs highlight in their argument).  (Id. at ¶ 50.)  An inmate may also have a particular dispute with another inmate in the unit and may not want to be outside at the same time. (Id. at ¶ 51.)  In sum, there are a variety of benign, personal preference related reasons that inmates may refuse out-of-cell time for recreation and programming every single day. (Id. at ¶ 52.)  ADC cannot force an inmate to participate in offered out-of-cell recreation or programming time.  (Id. at ¶ 53.)   And, what is out of the norm for one inmate regarding frequency of refusals of out-of-cell time may not be the norm for another – each inmate has his or her own reasons for his or her particular refusals. (Id. at ¶ 44.)

Here, Plaintiffs demand that ADC personnel document the following information to prove an inmate refused offered out-of-cell time: 1) beginning time; 2) refusal; 3) end time of refused time; 4) location of refused time (recreation); 5) officer witness signature; and, 6) second officer witness signature OR inmate signature.  Plaintiffs' demand that the Monitor Guide require either signatures from an officer and the inmate, or two signatures of officers, in order to prove a "legitimate refusal" goes beyond the bounds of the Stipulation and the Performance Measure, and imposes a largely unachievable, unnecessary, and substantial burden on operations.  (Id. at ¶¶ 22-24, 34.)

ADC already attempts to have two officers witness refusals when staffing permits. However, the ability to reach this goal should not result in non-compliance.  (Id. at ¶ 35.) Requiring witness signatures by two officers for every maximum custody inmate refusal of out-of-cell time is not always achievable.  (Id. at ¶ 36.)  First, to achieve this would require two officers to always be present to witness whether an inmate refuses offered out-of-cell time.  (Id. at ¶ 37.)  Neither ADC policy nor procedure requires two officers be present to offer out-of-cell time to maximum custody inmates, or to escort maximum security inmates out-of-cell. (Id. at ¶ 38.)  To require the same under the Monitor Guide

21

1    would require double staffing where double staffing is neither required, achievable, or

2    needed. (Id. at ¶ 39.)

3        Second, requiring an inmate signature of a refusal in the absence of two officers

4    witnessing a refusal imposes substantial and unreasonable burdens on operations as well

5    as a legitimate risk of safety to the inmate and/or personnel. (Id. at ¶ 40.)  Requiring an

6    inmate signature significantly slows down operations – requiring time to instruct the

7    inmate to sign for the refusal and the time needed for the inmate to do it – including an

8    additional discussion or disagreement that may arise from the inmate deciding whether or

9    not to comply.  (Id. at ¶ 41.)  Additionally, the requirement creates a potential security

10    risk, and the officer must now assess whether or not he or she can safely provide a

11    particular inmate with a pen – a weapon (a stabbing device creating a risk of potential

12    self-harm to the inmate or harm to personnel) - that the inmate could either refuse to give

13    back (now creating a potential cell extraction/use of force scenario) or use to harm

14    personnel when having to hand the pen back and forth. (Id. at ¶ 42.)  For these reasons,

15    obtaining either a second officer signature or the inmate signature to "prove" a refusal is

16    not achievable in every case.  (Id. at ¶ 43.)

17        Finally, contrary to Plaintiffs' position, ADC DO 809, Earned Incentive Program,

18    does not require a signed refusal by an inmate or the signatures of two officers if a

19    maximum custody inmate refuses out-of-cell time for recreation or programming on a day

20    to day basis.  (Id. at ¶ 56.)  Rather, DO 809.01 (1.5.4) governing inmate refusals or

21    removals from a program applies to the case where an inmate categorically refuses to

22    participate in the program – at all – not on an individualized day-to-day basis, where the

23    inmate sometimes attends programming and sometimes does not.  (Id. at ¶ 57.)  DO 809

24    does not require witness signatures (either officers or inmates) for inmates who refuse out-

25    of-cell time for recreation.  (Id. at ¶ 58.)

26        ADC's attempt to include a second officer signature or an inmate signature to

27    further document out-of-cell refusals is sufficient.  Lack of the same does not constitute

28    non-compliance with the Stipulation or the Performance Measure.  Plaintiffs' double

1   signature requirement is unworkable, unnecessary, and should not be ordered.  To address

2   Plaintiffs' unsubstantiated concern that there is a "pervasive" pattern of unexplained

3   inmate refusals for out-of-cell time, Defendants agree that where an officer, other

4   personnel, or supervisory staff discuss an inmate's repeated refusals to come out of cell,

5   the discussion will be documented in the "Comments" section of the back of the inmate's

6   out-of-cell tracking form.  (Id. at ¶ 44.)   This discussion process is already a part of

7   ADC's normal operations and can be documented on the inmate's out-of-cell tracking

8   form. (Id. at ¶ 45.)   Such an agreement appropriately addresses Plaintiffs' concerns

9   regarding inmates who may repeatedly refuse offered out-of-cell time.

10          **C.      MCPM 6**

11          Maximum Custody Performance Measure 6 requires provision of: 1) out-of-cell

12   time; 2) incentives; 3) programs; and 4) property, consistent with the inmate's DI 326

13   Step Level.  Plaintiffs first object to Defendants' removal of Methodology paragraph b.

14   On its face, this PM measures four categories.  Methodology paragraph b unreasonably

15   dictates that noncompliance with out-of-cell time automatically renders the entire

16   performance measure noncompliant for a selected inmate, even if the inmate receives the

17   other three categories (incentives, programs, and property) in compliance with the

18   measure.  Automatic failure on the basis of a single item does not accurately reflect

19   compliance with this measure.  As discussed above in Section III.F, Defendants' proposed

20   category calculation method is appropriate, and paragraph b should be eliminated.

21          Second, at issue is how to measure compliance with the different venues for

22   exercise set forth in DI 326 which are required on a monthly basis, rather than a weekly

23   basis, and are dictated by DI 326 Step Level.  Defendants have tendered a proposed

24   agreement to address this issue.  Defendants agree that if the monitor is unable to

25   determine whether the monthly exercise venue requirements were met for a selected

26   inmate by looking at the monitored week, the monitor will review the out-of-cell tracking

27   forms for the month to determine compliance.  Other week's tracking forms that establish

28   the inmate was provided other exercise venues in accordance with the PM and Stipulation

1   will be copied, highlighted (as to location compliance), and inserted behind the tracking

2   form retained for the individual inmate.  Plaintiffs are considering this proposal.

3       Third, with respect to methodology paragraph h, lack of an "end time" documented

4   on the out-of-cell tracking form for a refusal or inadvertent failure to document the

5   location offered for recreation should not result in a finding of noncompliance for this

6   measure, or for PMs 1, 2, 5, and 8, which are equally affected by this position.  The

7   requirement under the Stipulation and PM is that required out-of-cell time is "offered."

8   Technical inadvertent documentation errors do not substantiate a finding of non-

9   compliance.

10      Plaintiffs' insistence that Defendants document end times for a refusal for out-of-

11  cell time does not make logical sense.  If the inmate refuses to leave the cell, there is no

12  end time to document. (See Exh. C, Decl. C. McWilliams, at ¶¶ 25-26.) Moreover, there is

13  already a process in place for documenting the amount of time the inmate refused for out-

14  of-cell time when the inmate refuses the block of time offered.  (Id. at ¶ 26.)  Specifically,

15  ADC personnel are trained to document in the "Comments" section on the back side of

16  the individual inmate's out-of-cell tracking form the amount of time refused.  (Id. at ¶ 27.)

17  If inadvertent error occurs in the officer failing to document the amount of time out-of-cell

18  refused, the monitor may consult the Max Custody and/or (SMI) Mental Health Monthly

19  (Program) Activity Schedule(s) to determine the amount of out-of-cell time the inmate

20  refused.  (Id. at ¶ 28.)  Because there is more than one source document to consult to

21  determine out-of-cell time refused, an inadvertent failure of an officer to document the

22  total out-of-cell time offered on the out-of-cell tracking form is not a basis for a

23  determination of non-compliance.  (Id. at ¶ 29.)

24      Furthermore, the multiple-source reasoning explained above also applies to

25  documentation of the location for out-of-cell outdoor recreation.  (Id. at ¶ 30.)  For out-of-

26  cell outdoor recreation (whether the inmate accepts the offer or refuses), officers are

27  trained that the location of the outdoor recreation offered is documented on the front of

28  the out-of-cell tracking form.  (Id. at ¶ 31.)  In the case of a refusal, the location of the

24

offered outdoor recreation may be indicated on the front of the out-of-cell tracking form for the individual inmate, or on the back in the "Comments" section.  (Id. at ¶ 32.)  If inadvertent error occurs in failing to document the recreation location on the out-of-cell tracking form (front or back), the monitor may also consult the relevant Max Custody Activity Schedule to determine location.  If location can be determined by review of these multiple sources, the inadvertent failure to document the location on the out-of-cell tracking form is not a basis for a determination of non-compliance.  (Id. at ¶ 33.)

For all of these reasons, Plaintiffs' objections to Defendants' monitoring methodology for MCPM 6 fail.  Defendants' monitoring methodology for MCPM 6 is fair, reasonable, and comports with the requirements of the Stipulation and the PM.

### D.   MCPM 8

Maximum Custody Performance Measure 8 dictates the additional out-of-cell time and programming to be provided to SMI maximum custody inmates.  Plaintiffs object to Defendants' proposed category calculation method discussed in Section III.F and documentation requirements for out-of-cell time refusals discussed in Section VII.B.  The same arguments apply here.

Defendants' counsel have communicated to Plaintiffs' counsel that Defendants agree that this PM requires compliance with DI 326 for the selected SMI inmate's Step Level and additional out-of-cell time and programming to be provided to SMI maximum custody inmates above and beyond DI 326.  Moreover, Defendants have previously been monitoring MCPM 8 consistent with this agreement.

### E.   MCPM 9

#### 1.   Reach of Paragraph 17 of the Stipulation and MCPM 9

The reach of Paragraph 27 of the Stipulation and MCPM 9 that govern use of pepper spray or chemical agents on maximum custody SMI inmates remains in dispute. Defendants' position, as supported by the language of Paragraph 27 and MCPM 9, is that ADC must monitor for compliance those: 1) use of force incidents involving pepper spray or chemical agents for maximum custody SMI inmates; and 2) those use of force incidents

25

involving pepper spray or chemical agents for SMI inmates housed at Florence-Kasson (Wings 1 and 2); Eyman SMU-I (BMU); Perryville-Lumley SMA; Phoenix (Baker, Flamenco and MTU); and Lewis-Rast Max (4C1 and 4C2).  Not, as Plaintiffs appear to contend, <u>any</u> inmate housed at either ADC's maximum custody facilities or the facilities enumerated specifically above even if they are not SMI designated.

The plain reading of Paragraph 27 of the Stipulation (Doc. 1185 at 9) reaches only to SMI inmates – 1) in maximum custody; and, 2)  housed at the additional facilities enumerated above even if not maximum security.  A discussion of the definition of "and" or the placement of a comma does not change this.  To find otherwise is nonsensical. Paragraph 27 of the Stipulation and the CGAR question all turn on heightened concern regarding the use of chemical agents on SMI inmates who may have difficulty obeying commands because of serious mental illness and may need a cool down period and intervention period before a calculated use of force.  The applicability starts and stops with SMI designation.

Plaintiffs' argument that what has been monitored thus far by Defendants supports their cause fails.  First, Plaintiffs argue that uses of force reported in the CGAR reports and documents produced have included maximum custody SMI inmates housed outside of Florence CB-1 and CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU I (BMU); Perryville-Lumley SMA; and Phoenix (Baker, Flamenco, and MTU).  This is correct. And this is because Paragraph 27 and MCPM 9 requires monitoring of <u>SMI maximum custody inmates</u>.  There is no dispute, per Paragraph 22 of the Stipulation (Doc. 1185 at 8), that ADC's maximum custody inmates are housed at Eyman-Browning, Eyman-SMU I, Florence-Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30).  That is why SMI maximum custody inmates from these facilities were indeed monitored.  Such monitoring, which continues today, does not change the scope of Paragraph 27 to the Stipulation and is not support for Plaintiffs' overreaching attempt to rewrite the Stipulation.

/ / /

Second, Plaintiffs argue that because Defendants have monitored uses of force involving chemical agents on non-SMI inmates on occasion, this shows that Defendants intended Stipulation Paragraph 27 and MCPM 9 to reach beyond SMI maximum custody inmates or SMI inmates at the enumerated additional facilities.  This argument likewise fails.  With respect to  Exhibit 5 to Declaration of Amy Fettig upon which Plaintiffs rely (Doc. 1757-1), review of the documents identified by Plaintiffs, and comparison to the CGAR reports which list the specific reports reviewed for compliance, show that the following six incidents, while included in the Maximum Custody Notebooks, were <u>not</u> considered by the monitor in determining compliance with Maximum Custody Performance Measure 9:  SIR 15-03197 (February or March 2015 incident at Perryville-Lumley); SIR 15-05693 (April 27, 2015 incident at Florence-Central Unit); SIR 15-10577 (July 31, 2015 incident at Perryville-Lumley); SIR 15-11599 (August 19, 2015 incident at Perryville-Lumley); SIR 16-01974 (February 7, 2016 incident at Florence-CB Kasson); and SIR 16-08252 (June 6, 2016 incident at Perryville-Lumley.) (Decl. of M. Giardina, Exh. B, at ¶¶ 18-19.)  Where these reports were not used for compliance determinations, it makes no difference whether the uses of force involved SMI maximum custody inmates or SMI inmates at the additional enumerated facilities.  They were not monitored, they were just included in the book.

Third, the ten incidents identified by Plaintiffs involving non-SMI which were monitored all occurred only at Perryville-Lumley.  Eight of those ten reports occurred in months where there was 100% reported compliance at ASPC-Perryville with MCPM 9.  Two of those reports occurred in the March 2016 monitoring period, where only ten of thirteen use of force incidents were found to be in compliance with that Performance Measure, and it is impossible from the CGAR notes to determine how the 77% compliance rate in March 2016 at Perryville would change if these reports were removed. (Id. at ¶20.)  That Plaintiffs identified ten instances of non-SMI uses of force monitored over the course of almost two years shows only inadvertent human error, inadvertent over inclusion, and only highlights the exact reason for the Monitor Guide – to ensure that

1    there is consistency and accuracy in reporting as required by the Stipulation and PM – not

2    reporting on issues that need not be reported. Tellingly, Plaintiffs have not identified any

3    instance where a use of force incident involving chemical agents against a <u>non-SMI</u>

4    <u>inmate</u> at ASPC-Phoenix, ASPC-Eyman, or ASPC-Lewis was reported or monitored.  (Id.

5    at ¶¶ 18, 21.)  Thus, Plaintiffs' assertion that Defendants are categorically monitoring non-

6    SMI inmates in contradiction with Defendants' position on the reach of the Stipulation

7    and PM fails.

8         In sum, both the plain language and the intent of the parties in drafting Paragraph

9    27 of the Stipulation and MCPM 9 was to monitor the use of pepper spray and chemical

10   agents on SMI maximum custody inmates and SMI inmates housed at the additional

11   enumerated facilities.  Not all maximum security inmates whether or not they are

12   designated SMI and not all inmates at the additional enumerated facilities whether or not

13   they are SMI.  Plaintiffs do not get to rewrite the Stipulation two years into monitoring.

14              2.    **Source Documents**

15        Plaintiffs challenge the documents to be reviewed to determine compliance for

16   MCPM 9.  First, Plaintiffs contend that the monitor must review a full list of all the use of

17   force incidents that occurred at a facility during a monitoring period to include the mental

18   health score or SMI status of the inmate, the housing unit for the inmate, and whether or

19   not chemical agents were used.  Plaintiffs' demand overreaches was is reasonable and

20   necessary to determine compliance.   Requiring ADC to generate unnecessary lists

21   imposes an unnecessary burden on operations where: 1) there is no requirement in the

22   Stipulation to compile such a list; and 2) the monitoring of relevant uses of force on SMI

23   maximum custody inmates is easily discernable where the inmate's ADC number will be

24   coded with the letter "M" following the ADC number to indicate the inmate is designated

25   SMI.  (Decl. of C. McWilliams, Exh. C, at  ¶¶ 59-60.)  Where ADC already reviews the

26   pool of use of force packets generated facility-wide for a monitoring month, determines

27   which are subject to monitoring, and those packets are included for monitoring, there is no

28   need to generate another list. ADC existing procedure is sufficient to denote that a use of

28

1    force packet pertains to a SMI inmate.

2          Second, Plaintiffs object to "conditional language" used by Defendants regarding

3    review of video footage of a use of force and insist the monitor review all available video

4    footage of the incident.   Plaintiffs misunderstand the points on video.   There is no

5    requirement that the monitor search out surveillance video to determine compliance.  If

6    there is existing video compiled as part of the Use of Force Packet, the monitor will

7    review it.  The monitor is not required to perform an investigation that exceeds the already

8    compiled documents and video already compiled in generating the use of force packet.

9          Third, Plaintiffs insist that the monitor review medical records if the inmate was

10   treated by medical staff as a result of the use of force.  This makes no sense.  Stipulation

11   Paragraph 27 and MCPM 9 require that for applicable controlled uses of force involving

12   chemical agents and SMI inmates (maximum custody or at the additional enumerated

13   facilities), there be: 1) a cool down period; 2) clinical intervention by a mental health

14   clinician/qualified health care practitioner; 3) determination by a mental health

15   clinician/qualified health care practitioner of whether the inmate understands orders/use of

16   chemical agents could lead to substantial decompensation; 4) authorization for use of

17   chemical agents by the warden/administrative duty officer where it has been determined

18   by a mental health clinician/qualified health care practitioner that the inmate does not

19   understand orders; and 5) proposal/employment of reasonable strategies to gain

20   compliance where a mental health clinician/ qualified health care practitioner determined

21   the inmate has difficulty complying due to mental health issues or that a controlled use of

22   force involving the use of chemical agents could lead to a substantial risk of

23   decompensation.  Injury review is not part of the analysis as to whether the lead up to the

24   use of force was compliant with the Stipulation.  Moreover, injury review cannot be

25   accomplished by the monitors, who are security personnel.  ADC Operations staff do not

26   have the medical expertise to make medical conclusions or assumptions. (Id. at ¶67.)

27   And, ADC security personnel do not have HIPAA access to inmate medical records

28   because they are not medical professionals.  Therefore, for Plaintiffs to demand the same

would require ADC security personnel to violate HIPAA, which ADC cannot and will not do. (Id. at ¶64.)

Fourth, Plaintiffs want the monitor to conduct interviews of staff and inmates if necessary to make compliance findings (methodology paragraph a).   Neither the Stipulation nor the PM require an independent investigation of a use of force that has already been reviewed at the facility level prior to monitor review.   The monitor reviews to make sure that certain required steps such as a cool down period, intervention, determination of ability to understand commands, etc. occurred by review of a detailed packet and video, where available.   Independent investigation by way of staff and inmate interviews is not necessary or required.

Fifth, for methodology paragraph e, Defendants object to requiring the monitor to independently and subjectively make an additional finding as to whether the cool down period was "sufficient."   The requirement is that the cool down period occurs.   There is no requirement for additional independent review.    Nor were there any parameters contemplated by the parties in drafting the Stipulation that would provide guideposts to the monitor to make such a determination. It is also inappropriate and likely impossible for a monitor to make a subjective determination on the sufficiency of an event that he/she did not witness.  What Plaintiffs request is another investigation of the use of force.  This goes far afield of the Stipulation and is not required to determine compliance.

Plaintiffs' further objection to Defendants' language that allows the monitor to determine whether a cool down period occurred based upon review of documentation or video makes no sense.  The point is whether the cool down period occurred.  Whether this is confirmed through documents or video makes no difference.  If the cool down period occurred, then there is compliance.  If the use of force packet contains video (whether surveillance or hand held video), then Defendants agree that the monitor will review the available video in making a compliance determination.  Defendants are not required, however, to go back and hunt for additional video if it was not compiled and reviewed in the first place in preparing the use of force packet.

30

1         Sixth, Defendants agree to include the language: "but such interventions by

2    custody staff are not a replacement for the required clinical intervention" in methodology

3    paragraph f.  Defendants also agree that methodology paragraph g contain language that

4    specifies that a clinical intervention and a determination as to whether the inmate

5    understand orders, whether the inmate has the ability to understand orders but has

6    difficulty complying due to mental health issues, and whether the mental health issues are

7    such that the controlled use of force could lead to a substantial risk of decompensation

8    must occur for there to be a finding of compliance.  This finding, however, is not subject

9    to a compliance determination only if the information is found in a SIR packet.  The SIR

10   packet, use of force packet, and video are all available sources to document that these

11   required actions occurred.  If any source documents/information reveal compliance, then

12   there is compliance.

13        Seventh, Defendants agree that methodology paragraph i should track the related

14   Stipulation provisions regarding proposal of reasonable strategies and documentation of

15   the same.  If reasonable strategies are not proposed in an effort to gain compliance where

16   a mental health clinician or QHCP believed the inmate's mental health issues are such that

17   use of pepper spray or chemical agents in a controlled use of force could lead to a

18   substantial risk of decompensation, then a finding of noncompliance for that use of force

19   is warranted.   Defendants' counsel this same date communicated their position to

20   Plaintiffs' counsel, and the parties agree to work to a mutually agreeable resolution prior

21   to the December 14, 2016 hearing.

22   **VIII.  <u>CONCLUSION</u>**

23        Defendants voluntarily created the Monitor Guide as an internal document to

24   standardize procedures for the monitors at each complex and to provide them with

25   additional guidance in performing their day-to-day monitoring tasks.  While Defendants

26   have extensively engaged, and will continue to engage, in an interactive process with

27   Plaintiffs to refine the language of the Monitor Guide, there is nothing in the Stipulation

28   requiring the creation of a Monitor Guide, and nothing conferring on Plaintiffs the ability

to dictate the precise contents of it.  Plaintiffs' request that the Court issue an Order requiring Defendants to give Plaintiffs 60 days' notice of any proposed changes to monitoring methodology, an opportunity to object and propose further changes, and an opportunity for the Court to resolve any disputes would hinder the monitors' ability to make adjustments based on changing operational requirements, new or modified source documents, and other unforeseen circumstances. Additionally, Plaintiffs' requested relief is contrary to the language of the Stipulation and was never bargained for between the parties.  Defendants welcome the Court's resolution of the issues raised above, but disagree that any additional procedures beyond those already agreed upon by the parties and memorialized in the Stipulation are necessary to govern any further disputes with respect to the Monitor Guide.

DATED this 29th day of November 2016.

STRUCK WIENEKE & LOVE, P.L.C.


By /s/Daniel P. Struck
   Daniel P. Struck
   Kathleen L. Wieneke
   Rachel Love
   Timothy J. Bojanowski
   Nicholas D. Acedo
   Ashlee B. Fletcher
   Anne M. Orcutt
   Jacob B. Lee
   Mark A. Bracken
   STRUCK WIENEKE & LOVE, P.L.C.
   3100 West Ray Road, Suite 300
   Chandler, Arizona  85226

   Arizona Attorney General Mark Brnovich
   Office of the Attorney General
   Michael E. Gottfried
   Lucy M. Rand
   Assistant Attorneys General
   1275 W. Washington Street
   Phoenix, Arizona 85007-2926

   *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 29, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alison Hardy:    ahardy@prisonlaw.com

Amelia M. Gerlicher:    agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com

Amir Q. Amiri:    aamiri@jonesday.com; ttualaulelei@jonesday.com

Amy B. Fettig:    afettig@npp-aclu.org

Asim Varma:    avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

Caroline N. Mitchell:    cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com

Corene T. Kendrick:    ckendrick@prisonlaw.com; edegraff@prisonlaw.com

Daniel Clayton Barr:    DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

Daniel Joseph Pochoda:    dpochoda@acluaz.org; danpoc@cox.net; gtorres@acluaz.org

David Cyrus Fathi:    dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

Donald Specter:    dspecter@prisonlaw.com

Jennifer K. Messina:    jkmessina@jonesday.com

Jessica Pari Jansepar Ross:    jross@azdisabilitylaw.org

John Howard Gray:    jhgray@perkinscoie.com; slawson@perkinscoie.com

John Laurens Wilkes:    jlwilkes@jonesday.com, dkkerr@jonesday.com

Jose de Jesus Rico:    jrico@azdisabilitylaw.org

Kathleen E. Brody    kbrody@acluaz.org

Kirstin T. Eidenbach:    kirstin@eidenbachlaw.com

Maya Abela    mabela@azdisabilitylaw.org

Rose Daly-Rooney:    rdalyrooney@azdisabilitylaw.org

Sara Norman:    snorman@prisonlaw.com

Sarah Eve Kader:    skader@azdisabilitylaw.org;mlauritzen@azdisabilitylaw.org; rstarling@azdisabilitylaw.org

1    Rita K. Lomio:          rlomio@prisonlaw.com

2

3        I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

4

5        N/A

6                                          /s/Daniel P. Struck

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28