1  Kathleen E. Brody (Bar No. 026331)
   Daniel Pochoda (Bar No. 021979)
2  **ACLU FOUNDATION OF ARIZONA**
   3707 North 7th Street, Suite 235
3  Phoenix, Arizona 85013
   Telephone: (602) 650-1854
4  Email: kbrody@acluaz.org
          dpochoda@acluaz.org
5
   *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia*
6  *Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith,*
   *Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner,*
7  *Joshua Polson, and Charlotte Wells, on behalf of themselves and all*
   *others similarly situated*
8  **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

9  Sarah Kader (Bar No. 027147)
   Asim Dietrich (Bar No. 027927)
10 **ARIZONA CENTER FOR DISABILITY LAW**
   5025 East Washington Street, Suite 202
11 Phoenix, Arizona 85034
   Telephone: (602) 274-6287
12 Email: skader@azdisabilitylaw.org
          adietrich@azdisabilitylaw.org
13
   *Attorneys for Plaintiff Arizona Center for Disability Law*
14 **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

15           UNITED STATES DISTRICT COURT

16              DISTRICT OF ARIZONA

17 | Victor Parsons; Shawn Jensen; Stephen Swartz; | No. CV 12-00601-PHX-DKD |
   | Dustin Brislan; Sonia Rodriguez; Christina | |
18 | Verduzco; Jackie Thomas; Jeremy Smith; Robert | |
   | Gamez; Maryanne Chisholm; Desiree Licci; Joseph | **PLAINTIFFS' RESPONSE IN** |
19 | Hefner; Joshua Polson; and Charlotte Wells, on | **OPPOSITION TO** |
   | behalf of themselves and all others similarly | **DEFENDANTS' MOTION** |
20 | situated; and Arizona Center for Disability Law, | **FOR RELIEF FROM FINAL** |
   | | **ORDER ENFORCING** |
21 |                         Plaintiffs, | **STIPULATION (DKT. 1754)** |
   | | |
22 |               v. | **AND** |
   | | |
23 | Charles Ryan, Director, Arizona Department of | **PLAINTIFFS' MOTION TO** |
   | Corrections; and Richard Pratt, Interim Division | **MODIFY THE ORDER** |
24 | Director, Division of Health Services, Arizona | **UNDER FEDERAL RULE OF** |
   | Department of Corrections, in their official | **CIVIL PROCEDURE 60(a)** |
25 | capacities, | |
   |                         Defendants. | |

26

27

28

1

## TABLE OF CONTENTS

2

<u>**Page**</u>

3
BACKGROUND .................................................................................................... 2

4
ARGUMENT ......................................................................................................... 4

5
I.      THERE IS NO BASIS FOR RESCINDING THE COURT'S
        ORDER. ................................................................................................... 4

6

7
        A.      The Court Properly Required Defendants to Fully Comply
                with the Stipulation. ................................................................... 5

8
                1.      The Court Did Not Alter the Stipulation's Negotiated
                        Time Frames. ..................................................................... 5

9

10
                2.      The Court Did Not Alter the Stipulation's Negotiated
                        Compliance Rate. .............................................................. 6

11
        B.      Defendants Have Not Established that Logistical Challenges
                Require Relief from the Court's Order. ...................................... 9

12

13
                1.      Defendants Grossly Misrepresent the Scope of the
                        Court's Order and Their Obligation to Respond to an
                        HNR. ................................................................................ 10

14

15
                2.      Defendants Must Allocate Resources to Comply with
                        the Stipulation. ................................................................ 11

16
                3.      Defendants Had Adequate Notice and Opportunity to
                        Be Heard. ......................................................................... 12

17

18
II.     THE COURT SHOULD MODIFY ITS ORDER UNDER FEDERAL
        RULE OF CIVIL PROCEDURE 60(A) TO EXPRESSLY NOTE
        THAT IT COMPLIES WITH THE PLRA. ............................................. 14

19
CONCLUSION .................................................................................................... 16

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## CASES

Armstrong v. Brown,
768 F.3d 975 (9th Cir. 2014) ................................................................. 13, 14

Coleman v. Brown,
428 F. App'x 743 (9th Cir. 2011) ................................................... 14

Dietz v. Bouldin,
794 F.3d 1093 (9th Cir. 2015) ........................................................ 4

Farmer v. Brennan,
511 U.S. 825 (1994) ....................................................................... 8

Garamendi v. Henin,
683 F.3d 1069 (9th Cir. 2012) .......................................... 14, 15, 16

Goodman v. Newzona Inv. Co.,
421 P.2d 318 (Ariz. 1966) .............................................................. 5

Halderman v. Pennhurst State Sch. & Hosp.,
901 F.2d 311 (3d Cir. 1990) ........................................................... 8

Health Care for All, Inc. v. Romney,
No. Civ. 00-10833, 2005 WL 1660677 (D. Mass. July 14, 2005) ................................. 9

Isaak v. Mass. Indem. Life Ins. Co.,
623 P.2d 11 (Ariz. 1981) ................................................................ 5

Jones v. Ryan,
733 F.3d 825 (9th Cir. 2013) .......................................................... 4

Jones-El v. Berge,
374 F.3d 541 (7th Cir. 2004) ........................................................ 14

Joseph A. by Wolfe v. New Mexico Dep't of Human Svcs.,
69 F.3d 1081 (10th Cir. 1995) ........................................................ 7

Juanes v. Lyzwinski,
No. 8:10-cv-459, 2013 WL 3713419 (N.D.N.Y. July 12, 2013) ................................. 4

Lal v. California,
610 F.3d 518 (9th Cir. 2010) .......................................................... 4

# TABLE OF AUTHORITIES
### (continued)

Page

### CASES

*Matson v. Bradbury*,
  10 P.2d 376 (Ariz. 1932).................................................................................. 7

*Ocean Air Tradeways, Inc. v. Arkay Realty Corp.*,
  480 F.2d 1112 (9th Cir. 1973) ........................................................................ 9

*Olliver/Pilcher Ins., Inc. v. Daniels*,
  715 P.2d 1218 (Ariz. 1986)............................................................................. 5

*Rienhardt v. Ryan*,
  669 F. Supp. 2d 1038 (D. Ariz. 2009) ............................................................ 5

*Rouser v. White*,
  825 F.3d 1076 (9th Cir. 2016) ........................................................................ 7

*Washington v. Ryan*,
  833 F.3d 1087 (9th Cir. 2016) ........................................................................ 4

*Withrow v. Concannon*,
  942 F.2d 1385 (9th Cir. 1991) ........................................................................ 9

### STATUTES

18 U.S.C. § 3626(a)(1)(A).................................................................... 2, 15, 16

### OTHER AUTHORITIES

Federal Rule of Civil Procedure 59(e).................................................................. 5

Federal Rule of Civil Procedure 60(a)............................................................... 14

Federal Rule of Civil Procedure 60(b) .................................................. 3, 4, 6, 13

Defendants, in their Motion for Relief from Final Order Enforcing Stipulation, contend that the Court "recognized" that its November 10, 2016 order "was 'not ideal,' 'cumbersome, more expensive,' and less 'efficient' than other possible remedies." [Doc. 1779 at 7 (quoting Transcript of Nov. 9, 2016 Status Conference ("11/9/16 Tr.") at 9:5, 13:20, 20:10)][1]   But the Court made clear that its order was the only way for Defendants to achieve compliance *unless they increased staffing*—something Defendants have been unwilling to do.  Astonishingly, Defendants contend that, "[u]p to this point, the Court has only assumed that more staff will result in better compliance."  [Doc. 1779 at 10 (stating that the Court's assumption is "incorrect")]   But the Court arrived at that conclusion after reviewing data, expert reports, the parties' briefing, and the Defendants' own admissions.  [*See, e.g.*, Doc. 1538-1; Doc. 1539; Doc. 1576; Doc. 1610; Doc. 1668; Doc. 1670; Doc. 1700; Doc. 1728; Doc. 1739; Doc. 1743]

Defendants therefore prove that they remain unwilling to address the causes of their noncompliance, and that Court intervention in the form of the November 10, 2016 order is necessary.  Defendants attempt to impede and delay enforcement of the Stipulation by grossly misstating the scope and impact of the Court's order, and by ignoring the well-documented harm to class members as a result of their continued noncompliance.  Although Defendants dismiss the importance of the Court's order as providing at most a "theoretical benefit" (Doc. 1779 at 2), the stakes are real.  [*See, e.g.*, Doc. 1539 at 24 ¶ 56 (Expert Declaration of Todd Wilcox:  concluding that hours-long delay in sending patient off-site after he complained of chest pains "hastened his death")]  Thus, there is no reason for the Court to temporarily suspend its November 10 Order or to grant Defendants relief from its effect.

Plaintiffs also respectfully request that the Court use its authority under Federal Rule of Civil Procedure 60(a) to expressly document that its November 10, 2016 order complies with the Prison Litigation Reform Act; in particular, that it "is narrowly drawn,

---

[1]   All citations to docket filings refer to the page number assigned by the Electronic Case Filing system and not to the document contained therein.

1    extends no further than necessary to correct the violation of the Federal right, and is the

2    least intrusive means necessary to correct the violation of the Federal right."

3    18 U.S.C. § 3626(a)(1)(A).

4                                    **BACKGROUND**

5            On October 15, 2015, Plaintiffs issued Notices of Substantial Noncompliance to

6    Defendants on, among others, Performance Measures ("PMs") 11, 13, 14, 37, 39, 46, 54,

7    66, 85, 92, 93, and 98.  [Doc. 1562 at 2; Doc. 1562-1 at 2-3]  In May 2016, the Court

8    ordered Defendants to submit a remediation plan for those twelve performance measures

9    and certain facilities, and set a hearing for June 24, 2016.  [Doc. 1583 at 2-3]  Defendants

10   filed their remediation plan on June 13, 2016.  [Doc. 1608]  At the June 24, 2016 hearing,

11   the Court outlined its concerns with the remediation plan.  [*See* Transcript of June 24,

12   2016 Hearing ("6/24/16 Tr.") at 5:13-14 (noting that the remediation plan "includes

13   generalized statements . . . ranging from the absurd")]  Nonetheless, the Court approved

14   Defendants' remediation plan with respect to all above-listed performance measures

15   except for Performance Measure 85.  [Doc. 1619 at 1]  The Court directed the parties to

16   resolve Plaintiffs' objection to that portion of the remediation plan informally.  [*Id.*]

17          During a status hearing on November 9, 2016, the Court addressed the failure of

18   Defendants' remediation plan to rectify the Court's previous findings of substantial

19   noncompliance regarding specific performance measures and specific facilities.  [11/9/16

20   Tr. at 5:16-20:25]  After reviewing compliance data and briefing by the parties, the Court

21   observed that "staffing[] seems to be manifestly what is the cause" of the continued

22   noncompliance.  [*Id*. at 6:23-24]  Although Plaintiffs contended that the Stipulation does

23   not preclude the Court from ordering Defendants to develop a staffing plan (*see*

24   Doc. 1739 at 6-7), the Court disagreed (*see* 11/9/16 Tr. at 6:4-25).

25          The Court determined that, as a result, there is only one remedy "that I have been

26   able to conclude that could work"—using providers in the community "to provide services

27   on an emergent basis."  [11/9/16 Tr. at 9:6-9; *see also id.* at 14:11-13 (stating that the

28   remedy "appears to be the only one that can work in the environment of the limitations

1    that contracting parties have imposed upon me")]  The Court held Defendants need only

2    use that option if they are unable to comply with the terms of the Stipulation on their own.

3    That is, the Court "hope[d]" that Defendants could find "some other way," but reiterated

4    that Defendants "fundamentally have an obligation to provide these services to these

5    inmates."  [*Id.* at 13:20-21; 14:8-9; 20:13]  If, for example, a person was "not seen within

6    14 days" as required by PM 39,[2] then "on the 15th day, they must be taken to an urgent

7    care or to a hospital or to someplace where there can be this service provided."  [*Id.* at

8    10:3-6]

9         On November 10, 2016, the Court issued an order memorializing its ruling "for the

10   facilities listed in the First Remediation Plan for which the August data demonstrated

11   compliance below the 80% benchmark."  [Doc. 1754 at 5]  On November 16, 2016, the

12   Court denied Defendants' Motion for Briefing Regarding the Court's Proposed Order,

13   noting that "Defendants have had ample opportunity to present, apply, and retool their

14   own remedial plans" and that, in light of the failure of those plans, "the Court must,

15   pursuant to the Stipulation, impose its own remediation plan to assure that the Class

16   Plaintiffs receive the Stipulation's promised care."  [Doc. 1762 at 1, 2]

17        On November 23, 2016, Defendants filed a Motion for Relief from Final Order

18   Enforcing Stipulation under Federal Rule of Civil Procedure 60(b)(1), (4), and (6).

19   [Doc. 1779]  Defendants argue that (1) the Court impermissibly sought to impose a 100%

20   compliance requirement with performance measures, when they had bargained for only

21   80%; and (2) the Court's order is logistically unworkable and "creates an incredible risk

22   of harm."  [*Id.* at 7]

23   . . .

24   . . .

25   ────────────────────

26        [2] PM 39 requires:  "Routine provider referrals will be addressed by a Medical
     Provider and referrals requiring a scheduled provider appointment will be seen within
27   fourteen calendar days of the referral."  The Court has found Defendants noncompliant on
     this measure at Eyman, Florence, Lewis, Perryville, and Tucson.  [*See* Doc. 1583 at 2]
28   Defendants continue to show noncompliance with this measure at all five prisons.  [*See*
     Doc. 1739 at 10-11]

**ARGUMENT**

**I.    THERE IS NO BASIS FOR RESCINDING THE COURT'S ORDER.**

As an initial matter, it is not clear under what legal framework Defendants seek relief.  Defendants cite Federal Rule of Civil Procedure 60(b)(1), (4), and (6), but provide no specifics on how or why those subsections apply.  Those subsections cover distinct factual scenarios and have distinct tests.  For example, a Court considering an "excusable neglect" argument under Rule 60(b)(1), must consider:  "(1) the danger of prejudice to the non-moving party; (2) the length of the filing delay and its potential impact on the proceedings; (3) the reason for the filing delay; and (4) whether the moving party acted in good faith."[3]  *Washington v. Ryan*, 833 F.3d 1087, 1098 (9th Cir. 2016) (citing *Pioneer Invest. Svcs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)).  By contrast, "'Rule 60(b)(4) applies only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard.'"  *Dietz v. Bouldin*, 794 F.3d 1093, 1096 (9th Cir. 2015) (quoting *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010)).  And "[a] movant seeking relief under Rule 60(b)(6) must show extraordinary circumstances justifying the reopening of a final judgment."[4]  *Jones v. Ryan*, 733 F.3d 825, 833 (9th Cir. 2013) (internal quotation marks and citations omitted); *see also Lal v. California*, 610 F.3d 518, 524 (9th Cir. 2010) ("We use Rule 60(b)(6) sparingly as an equitable remedy to prevent manifest injustice." (internal quotation marks and citation

---

[3]  Rule 60(b)(1) provides that "a court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . mistake, inadvertence, surprise, or excusable neglect."

[4]  In a footnote, Defendants cite *Juanes v. Lyzwinski*, No. 8:10-cv-459, 2013 WL 3713419, *5 (N.D.N.Y. July 12, 2013), for the proposition that "Rule 60(b) is appropriate motion to challenge order enforcing settlement agreement."   [Doc. 1779 at 2 n.1]  Defendants fail to mention that *Juanes* concluded that "defendants may not rely on the catchall provision in Rule 60(b)(6) because enforcement of the settlement agreement will not work an extreme and undue hardship on defendants."  *Id.* at *6 n.6; *see also id.* at *5 ("Defendants will not be unfairly prejudiced by enforcement of the settlement agreement which they voluntarily negotiated with plaintiffs in order to avoid an imminent trial and the threat of greater liabilities.").

1    omitted)).[5]  Regardless of what framework the Court applies, for the reasons discussed

2    below, the Defendants' arguments have no merit.

3
4    **A.   The Court Properly Required Defendants to Fully Comply with the Stipulation.**

5    Defendants first contend that the Court's order "has effectively changed the

6    agreed-upon . . . time-frame and compliance rate" for the Stipulation's performances

7    measures.  [Doc. 1779 at 5]  For the reasons discussed below, neither argument has merit.[6]

8
9    **1.   The Court Did Not Alter the Stipulation's Negotiated Time Frames.**

10   Defendants contend that the Court impermissibly modified the Stipulation by

11   giving them "an additional 60 minutes (or 24 hours for some performance measures) to

12   secure 100% compliance."  [Doc. 1779 at 5]  Defendants therefore seem to argue that the

13   Court's order should have been *more* restrictive.  In particular, Defendants take issue with

14   the fact that the Court gave them "an additional 60 minutes (or 24 hours . . .)" to provide

15   medical services to the class members.  [*Id.*]  That can hardly be grounds for relief under

16   _____

17       [5]  Reconsideration under Rule 59(e), which Defendants reference in passing in a
     footnote (*see* Doc. 1779 at 2 n.1), "is appropriate only if (1) the court is presented with
18   newly discovered evidence, (2) there is an intervening change in controlling law, or
     (3) the court committed clear error."  *Rienhardt v. Ryan*, 669 F. Supp. 2d 1038, 1072 (D.
19   Ariz. 2009).  None of these grounds apply here.  Defendants have presented no newly
     discovered evidence and have identified no change in the controlling law.  And, for the
20   reasons discussed below, the Court did not commit clear error.

21       [6]  The cases cited by Defendants for the proposition that the Court may not modify
     the Stipulation are inapposite here.  [Doc 1779 at 5]  *Olliver/Pilcher Ins., Inc. v. Daniels*,
22   715 P.2d 1218, 1220 (Ariz. 1986), involved a statewide restrictive covenant that
     "unreasonably restrict[ed] the right of the employee to work in his chosen occupation."
23   The Court considered and rejected the suggestion "that only that part of the agreement
     which is unreasonable should be voided" on the ground that "[n]othing in this
24   employment contract indicates it would be severable" and "[g]enerally, courts do not
     rewrite contracts for parties."  *Id.* at 1220-21.  In *Isaak v. Mass. Indem. Life Ins. Co.*, 623
25   P.2d 11, 14-15 (Ariz. 1981), the Court declined to allow the estate of a deceased driver to
     "collect the proceeds of the personal accident insurance policy" because the "rental
26   agreement fail[ed] to identify [him] as the customer or authorized driver," and "that part
     of the agreement which incorporates the contract for personal accident insurance fails to
27   include him."  Finally, in *Goodman v. Newzona Inv. Co.*, 421 P.2d 318, 320 (Ariz. 1966),
     the Court simply held that a purchaser who had not made all payments due was not
28   entitled to property because the deed required full performance of its obligations as "a
     condition precedent to its right to have a conveyance of the lots held hereunder."

Rule 60(b).  The Court chose a less intrusive remedy; it allowed Defendants every minute and hour agreed to in the Stipulation to provide necessary services in any manner they wanted.  Put differently, the Court's November 10, 2016 order does nothing to limit *how* Defendants comply with the Stipulation within the agreed-upon time frames.[7]  It is only *after* Defendants failed (for whatever reason) to comply with the performance measures, that they are required to use community services to provide agreed-upon services to class members.  [*See* Doc. 1754 at 4 (noting that the Court's remedial measures "only apply when Defendants are not able to comply with the Stipulation's Performance Measures")]

### 2.   The Court Did Not Alter the Stipulation's Negotiated Compliance Rate.

Defendants contend that the Court also exceeded its authority by "impos[ing] upon Defendants an obligation that the parties did *not* bargain for:   100% compliance." [Doc. 1779 at 1]  In doing so, Defendants conflate Paragraph 8 of the Stipulation, which outlines their obligations to class members, with Paragraph 10, which outlines when Defendants' duty to measure and report on a particular performance measure is terminated.

Paragraph 8 of the Stipulation provides that "Defendants *shall comply* with the health care performance measures set forth in Exhibit B."  [Doc. 1185 at 3 ¶ 8 (emphasis added)]  The performance measures in Exhibit B, as the Court recognized (*see* 11/9/16 Tr. at 18:8-10), are written in simple, declarative sentences, and provide no language authorizing anything less than full compliance.[8]

---

[7]  For example, Defendants could modify their contract with Corizon to require higher levels of health care staffing; bring in temporary health care staff ("locum tenens") through a staffing agency or on an individual basis, or conduct health care encounters via telemedicine or telepsychiatry in appropriate cases.

[8]  *See* PM 1 ("Each ASPC *will maintain*, at a minimum, one RN onsite 24/7, 7 days/week."); PM 13 ("Chronic care and psychotropic medication renewals *will be completed* in a manner such that there is no interruption or lapse in medication."); PM 14 ("Any refill for a chronic care or psychotropic medication that is requested by a prisoner between three and seven business days prior to the prescription running out *will be completed* in a manner such that there is no interruption or lapse in medication."); PM 37 ("Sick call inmates *will be seen* by an RN within 24 hours after an HNR is received (or

1    Defendants attempt to rewrite the plain language of Paragraph 8 by selectively

2 quoting from Paragraph 10.  In particular, Defendants state that the Stipulation "expressly

3 defines what compliance means" and quote from Paragraph 10 (*see* Doc. 1779 at 3-4), but

4 fail to mention—by omitting the bolded introduction to the quoted provision—that the

5 definition in fact is of "**substantial**" compliance.  [Doc. 1185 at 3 ¶ 10(a) (emphasis in

6 original)]

7    Substantial compliance, of course, is a contract doctrine "to assist the court in

8 determining whether conduct should, in reality, be considered the equivalent of

9 compliance under the contract."  *Joseph A. by Wolfe v. New Mexico Dep't of Human*

10 *Svcs.*, 69 F.3d 1081, 1086 (10th Cir. 1995) (citing John D. Calamari & Joseph M. Perillo,

11 *The Law of Contracts* § 11-15, at 454 (3d ed. 1987)); *see also Rouser v. White*, 825 F.3d

12 1076, 1081 (9th Cir. 2016) ("[C]ourts don't release parties from a consent decree unless

13 they have substantially complied with every one of its provisions." (internal emphasis

14 omitted)); *Matson v. Bradbury*, 10 P.2d 376, 378 (Ariz. 1932) ("Substantial performance

15 of contracts of service is sufficient.  Complete, absolute performance is not required.").

16 "[T]he touchstone of the substantial compliance inquiry is whether Defendants frustrated

17 the purposes of the consent decree – *i.e.* its essential requirements."  *Joseph A.*, 69 F.3d at

18 1086.  By defining substantial compliance, the parties gave concrete meaning to the term,

19

20 immediately if identified with an emergent need, or on the same day if identified as
having an urgent need."); PM 39 ("Routine provider referrals *will be addressed* by a
21 Medical Provider and referrals requiring a scheduled provider appointment[] *will be seen*
within fourteen calendar days of the referral."); PM 47 ("A Medical Provider *will*
22 *communicate* the results of the diagnostic study to the inmate upon request and within
seven calendar days of the date of the request."); PM 54 ("Chronic disease inmates *will be*
23 *seen* by the provider as specified in the inmate's treatment plan, no less than every 180
days unless the provider documents a reason why a longer time frame can be in place.");
24 PM 66 ("In an IPC, Medical Provider encounters *will occur* at a minimum every 72
hours."); PM 85 ("MH-3d prisoners *shall be seen* by a mental health provider within 30
25 days of discontinuing medications."); PM 92 ("MH-3 and above prisoners who are housed
in maximum custody *shall be seen* by a mental health clinician for a 1:1 or group session
26 a minimum of every 30 days."); PM 93 ("Mental health staff (not to include LPNs) *shall*
*make* weekly rounds on all MH-3 and above prisoners who are housed in maximum
27 custody."); PM 98 ("Mental health HNRs *shall be responded to* within the timeframes set
forth in the Mental Health Technical Manual . . . ."). [Doc. 1185-1 at 8, 10-12, 14-15
28 (emphasis added throughout)]

1    signaled that they are not expecting perfection, and outlined a "graduated mechanism to

2    work toward what was the goal of full compliance." [11/9/16 Tr. at 18:12-13]

3         Thus, Paragraph 10, through its definition of "substantial compliance," describes

4    when the Stipulation may be terminated with respect to a particular performance measure.

5    [Doc. 1185 at 3 ¶ 10(b)(i)-(ii) (providing that Defendants' "duty to measure and report on

6    a particular performance measure . . . terminates" when Defendants are in substantial

7    compliance with that measure)]   It also serves a gatekeeping function for informal

8    resolution, mediation, and litigation related to enforcement of the Stipulation.  [*See id.* at

9    12 ¶ 30 ("In the event that counsel for Plaintiffs alleges that Defendants have failed to

10   substantially comply in some significant respect with this Stipulation, Plaintiffs' counsel

11   shall provide Defendants with a written statement describing the alleged non-

12   compliance . . ."); *id.* at 12 ¶ 31 (outlining informal resolution, mediation, and litigation

13   processes); 11/9/16 Tr. at 17:20-25, 18:11-19:1 (discussing substantial compliance and

14   describing it as "an alert mechanism"]

15        But the term in no way diminishes the Defendants' obligations to class members

16   under Paragraph 8.  To hold otherwise would essentially allow Defendants "to treat a

17   few . . . class members in any fashion they wanted so long as they comply with the

18   [Stipulation] with regard to a substantial number of other . . . class members." *Halderman*

19   *v. Pennhurst State Sch. & Hosp.*, 901 F.2d 311, 324 (3d Cir. 1990) ("It is safe to say that

20   this inequitable and disconcerting principle is not what the parties contemplated when

21   they agreed to the [Final Settlement Agreement], it is not within the specific language of

22   the agreement, and it certainly is not part of the spirit with which the parties resolved this

23   troublesome litigation.").  Defendants' apparent claim that they need only attempt to

24   achieve the current 80% definition of "substantial compliance"—in other words, that they

25   may knowingly provide inadequate care 20% of the time—is the very definition of

26   deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (holding that

27   an official is deliberately indifferent when she or he "knows of and disregards an

28   excessive risk to inmate health or safety").

1   Defendants' conclusory assertion that complete performance is an "impossibility"

2   (Doc. 1779 at 7 n.3), similarly cannot justify their failure to even attempt to provide

3   necessary services.  *Cf. Withrow v. Concannon*, 942 F.2d 1385, 1388 (9th Cir. 1991)

4   ("Impossibility of perfect compliance, then, may be a defense to contempt, but it does not

5   preclude an injunction requiring compliance with the regulations when a pattern of non-

6   compliance has been shown to have existed."); *Health Care for All, Inc. v. Romney*,

7   No. Civ. 00-10833, 2005 WL 1660677, at *8 (D. Mass. July 14, 2005) ("While absolutely

8   perfect compliance by defendants in the instant case may not be feasible, this fact does not

9   excuse them from striving to comply as much as possible.").  Moreover, "[t]he party

10  advancing the [impossibility] defense must prove that the events which he claims

11  frustrated his performance were not reasonably foreseeable at the time of contracting,"

12  *Ocean Air Tradeways, Inc. v. Arkay Realty Corp*., 480 F.2d 1112, 1117 (9th Cir. 1973)—a

13  showing Defendants entirely fail to make.

14

15  **B.    Defendants Have Not Established that Logistical Challenges Require Relief from the Court's Order.**

16  The Court's November 10, 2016 order covers only nine (out of 103) performance

17  measures.[9]  Defendants' motion seeks relief from *all nine* performance measures by

18  discussing *one* purported logistical challenge to implementing the Court's order (off-site

19  transportation) with respect to *one* performance measure (PM 37).  As an initial matter,

20  not all nine performance measures arguably could require transportation outside of the

21  institution; PMs 11 and 13, for example, cover provision of medication and medical

22  renewals.  [Doc. 1185-1 at 8; *see also* 9/8/16 Transcript at 8:19-21 ("there are places

23  called Walgreen's and CVS in Florence that I can order you to go get those things and

24  bring them over.")]  In any event, as explained below, Defendants inflate the numbers,

25

26  [9]  *See* PM 11 (Eyman, Florence, and Lewis); PM 13 (Florence, Lewis, and Perryville); PM 37 (Eyman, Lewis, Perryville, Tucson, and Yuma); PM 39 (Eyman,

27  Florence, Lewis, Perryville, Tucson); PM 46 (Douglas, Florence, Perryville, Tucson, and Yuma); PM 54 (Tucson); PM 66 (Tucson); PM 85 (Florence, Lewis, and Tucson); and

28  PM 92 (Perryville).  [Doc. 1754 at 5; Doc. 1739]

1    misrepresent PM 37's requirements, and fail to appreciate that their obligations under the

2    Stipulation necessitate the appropriate allocation of resources.   There is no need for

3    further delay—be it through an evidentiary hearing or another remediation plan—in

4    providing agreed upon medical care to class members.   Defendants have been on notice of

5    their noncompliance for more than a year, and they have been on notice of the Court's

6    expectation that they proactively address such noncompliance for half of a year.

7
8                    **1.    Defendants Grossly Misrepresent the Scope of the Court's Order
               and Their Obligation to Respond to an HNR.**

9            Defendants first contend that, "in August 2016, inmates submitted a total of 23,805

10   HNRs, which could include everything from requesting a toe-nail clipping to a headache

11   to nausea or chest pain." [Doc. 1779 at 7]  But that number reflects the total number of

12   HNRs at *every* Arizona State Prison Complex, and includes HNRs on *any concern*,

13   including requesting "an extra pillow." [Doc. 1779-1 at 34 ¶ 13, 35 ¶¶ 14, 15] The

14   Court's order, however, applies to only five complexes—Eyman, Lewis, Perryville,

15   Tucson, and Yuma. [Doc. 1754 at 5 (limiting application to "the facilities listed in the

16   First Remediation Plan for which the August data demonstrated compliance below the

17   80% benchmark"); Doc. 1739 at 10 (discussing August data for PM 37)]

18           Next, Defendants maintain that each HNR—including those requesting toenail

19   clipping—must result in the patient being seen by an RN or else the patient must be sent

20   to an emergency room or urgent care center. [*See* Doc. 1779 at 5-7; Doc. 1779-1 at 2-6

21   ¶ 17] That is simply untrue. PM 36, which is not subject to the Court's November 10,

22   2016 order, requires an LPN or RN to "screen HNRs within 24 hours of receipt."

23   [Doc. 1185-1 at 23]  It is only the subset of people who the LPN or RN designate for the

24   nursing sick call line that must be seen within 24 hours, pursuant to PM 37. [*Id.*]  Many

25   HNRs do not raise issues that medical nurses would address.   For example, HNRs

26   regarding dental needs would be referred to that department; those class members would

27   not be placed on the medical nursing line (and thus the requirements of PM 37 would not

28   be triggered).  In addition, Defendants require patients to file an HNR when they need a

1   routine medication refill, rather than automating that process as many other prison

2   systems do to ensure no gaps in coverage.  [Doc. 1779-1 at 35 ¶ 15]  Those HNRs also do

3   not result in a class member being placed on the sick call nursing line to be evaluated.

4           Notably, Defendants do not provide specific data or information in their motion on

5   how many people actually are placed on the sick call line after a nurse triages the HNR at

6   these five prisons.  Defendants also do not quantify how many class members could not be

7   seen through existing staffing, by bringing in outside nurses, and/or through the use of

8   telemedicine.  Thus, Defendants have failed to give the Court any evidentiary basis for

9   concluding that its November 10, 2016 order should be rescinded.  Defendants also have

10  not proposed any concrete measures that balance the need to provide necessary medical

11  care to class members with any need to mitigate risk of escape or criminal activity.[10]

12  Plaintiffs would, of course, be willing to discuss any such proposal.

13          Defendants next contend that they "have no way of knowing in real time if Corizon

14  medical staff is at 80% compliance (or more or less) at any given hour on any given day

15  facility-wide.  Performance is measured on a monthly basis and reported approximately a

16  month later."  [Doc. 1779 at 6]  But this argument is irrelevant.  As explained above,

17  Defendants are not permitted to treat 80% of the patients on the sick call line and then

18  stop; they are obligated to provide the treatment required by the Stipulation to *all* patients

19  who need it.

20

21          **2.      Defendants Must Allocate Resources to Comply with the Stipulation.**

22          Defendants contend that compliance with the Court's November 10, 2016 order

23  will be "logistically impossible" because of the need for additional security staff escorts

24  _____

25          [10] Defendants assert prisoners will plot all sorts of nefarious activities, or plan sight-seeing trips through scenic Arizona, because they will know the precise moment that they will be taken off-site for medical care.  [Doc. 1779 at 9]  This argument is a red herring and makes no sense, because to have this knowledge, the prisoner would have to know (1) when his HNR would be triaged; (2) that upon triage of his HNR, he would be added to the nurse's sick call line, (3) that ADC will be unable to see him on-site or via telemedicine, and so he will be sent out, *and* (4) once the time limit has passed, when he would actually be sent out.

1    and vehicles. [Doc. 1779 at 8-9] Defendants state they will be forced to choose between

2    allocating security staff to address medical concerns or to provide "critical inmate

3    programming, therapy, and other out-of-cell activities, which are all required under the

4    Stipulation." [*Id.* at 9 (contending that programs and activities will "screech [to a] halt")]

5    Again, however, Defendants fail to understand the scope of the Court's order and their

6    bargained-for obligations under the Stipulation.

7        Defendants may not shift security staff from one area (ensuring compliance with

8    requirements regarding programming and out-of-cell time) to another (ensuring

9    compliance with requirements regarding medical care). This is analogous to Defendants'

10   whack-a-mole approach of shifting existing health care staff from institution to institution.

11   [*See, e.g.*, Doc. 1668 at 17; Doc. 1739 at 10 n.3] Defendants must come up with a

12   sustainable way to comply with *all* components of the Stipulation and to provide

13   constitutional care to those in their custody. Thus, Defendants cannot avoid complying

14   with the Stipulation by claiming that they have too few security staff and too few

15   vehicles—if that is the only obstacle to compliance, then the solution is simple: they must

16   hire more custody staff and procure more vehicles. [*See* Doc. 1185 ¶¶ 7, 17 ("This

17   provision shall not be construed as an agreement by Plaintiffs that this budgetary request

18   is sufficient to comply with the terms of this Stipulation.")]

19       Notably, Defendants concede that the Court's order "allows Defendants to attempt

20   to summon healthcare providers to the facility to provide treatment (and hire more staff)

21   to remedy the situation." [Doc. 1779 at 9] And the Court noted this as well. [*See* 11/9/16

22   Tr. at 9:19-21] But, without citation to any evidence, Defendants offer only the

23   conclusory assertion that "those alternatives will not eliminate the need to transport

24   inmates off-site." [Doc. 1779 at 9] Such an unsupported assertion, of course, cannot

25   invalidate a Court order.

26       **3.    Defendants Had Adequate Notice and Opportunity to Be Heard.**

27       Defendants contend that they "never had a substantive opportunity to present

28   evidence and argument opposing" the Court's November 10, 2016 order. [Doc. 1779 at 3]

Defendants therefore request—with no citation to authority—that the Court "temporarily suspend its Order" pending an evidentiary hearing.  [*See id.* at 2, 10]  But the Court, at the November 9, 2016 hearing [*see* 11/9/16 Tr. at 7:1-19:9], provided Defendants with "oral notice, which made [Defendants] aware of the changes contemplated," and "permitted [Defendants] to respond orally at the hearing."  *Armstrong v. Brown*, 768 F.3d 975, 980 (9th Cir. 2014).  Although the Court did not permit Defendants "to submit a further written response," *id.*, this was for good reason:  "Defendants have had ample opportunity to present, apply, and retool their own remedial plans."  [Doc. 1762 at 1]

Indeed, over five months ago, the Court repeatedly admonished Defendants that they must be proactive in identifying and responding to deficiencies in compliance.[11] Defendants' alternative argument—that they should be allowed time to present "another remediation plan" (Doc. 1779 at 10)—therefore also fails:  They have been on notice that they should proactively work toward solutions, and have chosen not to do so.

Moreover, any unfairness has been addressed by the Court setting an effective date of its order at thirty days (*see* Doc. 1754 at 5), and its consideration of the instant motion under Federal Rule of Civil Procedure 60(b), with supporting declarations, *see Armstrong*,

---

[11]  [*See, e.g.*, 6/24/16 Tr. at 5:17-21 ("We started this—well, you have all started the process in November.  And you know a couple of things:  One, you know you are dramatically out of compliance and at some point the rubber is going to hit the road and I'm going to be saying, what are we going to do about this?"); *id.* at 6:3-7 (expressing "little confidence to believe that what [Defendants] are proposing is knowledgeable enough about the problem, specific enough, and has enough focus on it in the defendant's side of the house to make sure that it has a reasonable shot of accomplishing what we want to do"); *id.* at 23:8-15 ("But if it becomes apparent to the defendants that it's not working, then rather than saying, well, we've got to tell the judge in September or the end of August why this isn't working, today we need to figure out what we can start right now so that we're telling the judge what we did in July to try to fix this rather than saying, oh, it's not working and here's our plan at the end of August and this is what we decided to do."); *see also* 9/8/16 Tr. at 8:22-9:2 ("[T]hat's a tool that remains in my toolbox, just as I looked on the internet and there are urgent cares in Florence. Not the best tool for this, because there are security issues and expense issues.  But if somebody is not being seen under the terms of the stipulation, that's in my toolbox."); 11/9/16 Tr. at 8:9-16 ("I reluctantly acquiesced in not only defendants' original proposal, but also the request for additional time.  [] I granted the additional time, as I think you probably remember, out of my sense of what I described as fairness, and also I think I described it as a sense of respect for defendants' presumed good faith, and I—that they were actually proposing something that they thought would work.")]

1   768 F.3d at 980 (holding that "[a]ny unfairness . . . was cured when the Court . . . gave the

2   State an opportunity to respond in writing to the proposed changes").  Defendants give no

3   reason why an evidentiary hearing—as opposed to written declarations—is necessary.

4       Given the Court's real concerns "about Defendants' grasp of the problem at hand,

5   the failure, abject in some cases, of its first remediation plan to deliver compliance, and

6   the health and safety danger posed by continued failures to meet the Performance

7   Measures" (Doc. 1754 at 4), there simply is no reason to allow further delay here.  This is

8   particularly true because, as noted above, Defendants can avoid transferring prisoners off-

9   site (the only safety concern raised in their briefing) by complying with the agreed upon

10  terms of the Stipulation in any other way, including by hiring more staff, bringing outside

11  providers into the facility, and utilizing telemedicine.

12      For all these reasons, Defendants fail to justify the need for any relief, temporary or

13  otherwise, from the Court's Order of November 10, 2016.

14  **II.    THE COURT SHOULD MODIFY ITS ORDER UNDER FEDERAL RULE
         OF CIVIL PROCEDURE 60(A) TO EXPRESSLY NOTE THAT IT**
15       **COMPLIES WITH THE PLRA.**

16      Finally, it is not clear whether or how a district court in the Ninth Circuit must

17  make Prison Litigation Reform Act ("PLRA") findings before entering remedial orders in

18  post-judgment proceedings.  *See Coleman v. Brown*, 428 F. App'x 743, 744 (9th Cir.

19  2011) (declining "to decide whether the [PLRA] applies to the two orders at issue because

20  its requirements are satisfied in any event"); *Armstrong*, *supra*, 768 F.3d at 983-84

21  (concluding that a modified injunction complied with the PLRA); *see also Jones-El v.*

22  *Berge*, 374 F.3d 541, 545 (7th Cir. 2004) ("The enforcement of a valid consent decree is

23  not the kind of 'prospective relief' considered by § 3626(a).").  In an abundance of

24  caution, Plaintiffs request that the Court use its authority under Federal Rule of Civil

25  Procedure 60(a) to modify its order to include reference to the PLRA's requirements.  *See*

26  Fed. R. Civ. P. 60(a) ("The court may correct a clerical mistake or a mistake arising from

27  oversight or omission whenever one is found in a judgment, order, or other part of the

28  record."); *Garamendi v. Henin*, 683 F.3d 1069, 1079, 1081 (9th Cir. 2012) (observing that

1    Rule 60(a) permits "explanations and clarifications of the district court's original intent"

2    and correction of "a failure to memorialize part of its decision" (internal quotation marks

3    omitted)).

4         The Court's November 10, 2016 order satisfies the PLRA.  The remedial measure

5    ordered by the Court "is narrowly drawn, extends no further than necessary to correct the

6    violation of the Federal right, and is the least intrusive means necessary to correct the

7    violation of the Federal right."[12]  *See* 18 U.S.C. § 3626(a)(1)(A).  As noted above, the

8    Court's order does not impose any limits or requirements on how Defendants comply with

9    the terms of the Stipulation.  It is only after Defendants have failed to comply with the

10   performance measures that they are required to use community services to provide agreed-

11   upon services to class members.  [*See* Doc. 1754 at 4 (noting that the Court's remedial

12   measures "only apply when Defendants are not able to comply with the Stipulation's

13   Performance Measures")]

14        And the record in this case certainly supports the Court's order.  The Court did not

15   come upon this remedy lightly or quickly.  The Court has spent a significant amount of

16   time reviewing compliance data and briefing by the parties.  [*See, e.g.*, Doc. 1700;

17   Doc. 1728; Doc. 1739; Doc. 1743][13]  The Court also has reviewed expert opinions

18   documenting Defendants' noncompliance.  [*See* Doc. 1538-1 at 7 ¶ 15 ("[M]any of the

19   deficiencies in care I identified in my previous reports persist to this day."); Doc. 1539 at

20   2 ¶ 3 ("I have found that ADC prisoners continue to suffer serious harm, and in some

21   cases preventable death, because defendants fail to provide necessary and timely health

22   care on a system-wide basis."); Doc. 1576 (citing to expert declarations); Doc. 1670

23   (discussing deficiencies in Defendants' proposed Remediation Plan)]   Indeed, even

24   Defendants, in staffing reports and quality improvement meeting minutes, repeatedly

25   ───────────────

26        [12] Plaintiffs continue to believe that the Court has the authority to—and should—
     order a staffing plan.  [*See* Doc. 1739 at 6-7; Doc. 1790 at 5-9]

27        [13] Some data is provided directly to the Court and not filed on the docket.
     Plaintiffs' October status report and summary of discovery disputes were not filed on the
28   docket, but instead was emailed directly to the Court and opposing counsel.

concede that staffing shortages are hindering necessary services for class members. [*See, e.g.*, Doc. 1610 at 3-4 (citing Defendants' documents); Doc. 1668 at 4 (citing CQI meeting minutes); Doc. 1739 at 3-5 (citing Defendants' September 2016 Staffing Report and CQI meeting minutes)]   Finally, the Court repeatedly gave Defendants notice, opportunity, and time to develop and implement a plan to remedy identified deficiencies. [*See, e.g.*, Doc. 1582; Doc. 1583; Doc. 1619; Doc. 1678; Doc. 1708; Doc. 1709; 9/8/16 Tr. at 9:3-10:15; 11/9/16 Tr. at 8:5-24]

Although the Court's November 10, 2016 order is thus well-supported by the record, in an abundance of caution, Plaintiffs ask that the Court specifically note in its remedial order that it "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *See* 18 U.S.C. § 3626(a)(1)(A). The requested modification is appropriate under Rule 60(a) because it would not alter the substantive terms of the order; instead, it simply would include language that "reflect[s] the contemporaneous intent of the district court as evidenced by the record." *Garamendi*, 683 F.3d at 1080 (internal quotation marks and citation omitted).

## CONCLUSION

Plaintiffs respectfully request that the Court (1) deny Defendants' Motion for Relief from Final Order Enforcing Stipulation, and (2) modify its November 10, 2016 order under Federal Rule of Civil Procedure 60(a) to expressly note that the order complies with the PLRA.

1    Dated:  December 7, 2016          **PRISON LAW OFFICE**

2

3                                     By: ___s/ Donald Specter___
                                          Donald Specter (Cal. 83925)*
                                          Alison Hardy (Cal. 135966)*
4                                         Sara Norman (Cal. 189536)*
                                          Corene Kendrick (Cal. 226642)*
5                                         Rita Lomio (Cal. 254501)*
                                          1917 Fifth Street
6                                         Berkeley, California 94710
                                          Telephone:  (510) 280-2621
7                                         Email:    dspecter@prisonlaw.com
                                                    ahardy@prisonlaw.com
8                                                   snorman@prisonlaw.com
                                                    ckendrick@prisonlaw.com
9                                                   rlomio@prisonlaw.com

10                                        *Admitted *pro hac vice*

11                                        David C. Fathi (Wash. 24893)*
                                          Amy Fettig (D.C. 484883)**
12                                        Jamelia Morgan (N.Y. 5351176)**
                                          **ACLU NATIONAL PRISON
                                          PROJECT**
13                                        915 15th Street N.W., 7th Floor
14                                        Washington, D.C. 20005
                                          Telephone:  (202) 548-6603
15                                        Email:    dfathi@npp-aclu.org
                                                    afettig@npp-aclu.org
16                                                  jmorgan@aclu.org

17                                        *Admitted *pro hac vice*.  Not admitted
                                           in DC; practice limited to federal
18                                         courts.
                                          **Admitted *pro hac vice*
19
                                          Kirstin T. Eidenbach (Bar No. 027341)
20                                        **EIDENBACH LAW, PLLC**
                                          P. O. Box 91398
21                                        Tucson, Arizona 85752
                                          Telephone:  (520) 477-1475
22                                        Email:    kirstin@eidenbachlaw.com

23                                        Kathleen E. Brody (Bar No. 026331)
                                          Daniel Pochoda (Bar No. 021979)
24                                        **ACLU FOUNDATION OF
                                          ARIZONA**
25                                        3707 North 7th Street, Suite 235
                                          Phoenix, Arizona 85013
26                                        Telephone:  (602) 650-1854
                                          Email:    kbrody@acluaz.org
27                                                  dpochoda@acluaz.org

28

LEGAL133799981.1                          -17-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:     dbarr@perkinscoie.com
              agerlicher@perkinscoie.com
              jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:     cnmitchell@jonesday.com
              aamiri@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com

*Admitted *pro hac vice*

Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:     jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARIZONA CENTER FOR DISABILITY LAW**

By:   *s/ Maya Abela*

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email:     skader@azdisabilitylaw.org
              adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:
    rdalyrooney@azdisabilitylaw.org
              jrico@azdisabilitylaw.org
              jross@azdisabilitylaw.org
              mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that on December 7, 2016, I electronically transmitted the above

3  document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4  Notice of Electronic Filing to the following CM/ECF registrants:

5

6                          Michael E. Gottfried
                           Lucy M. Rand
7               Assistant Arizona Attorneys General
                      Michael.Gottfried@azag.gov
8                        Lucy.Rand@azag.gov

9                          Daniel P. Struck
                          Kathleen L. Wieneke
10                           Rachel Love
                         Timothy J. Bojanowski
11                         Nicholas D. Acedo
                           Ashlee B. Fletcher
12                          Anne M. Orcutt
                            Jacob B. Lee
13                         Mark A. Bracken
                   STRUCK WIENEKE, & LOVE, P.L.C.
14                      dstruck@swlfirm.com
                        kwieneke@swlfirm.com
15                        rlove@swlfirm.com
                       tbojanowski@swlfirm.com
16                       nacedo@swlfirm.com
                        afletcher@swlfirm.com
17                       aorcutt@swlfirm.com
                          jlee@swlfirm.com
18                      mbracken@swlfirm.com

19                       *Attorneys for Defendants*

20                                    *s/ D. Freouf*

21

22

23

24

25

26

27

28