UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Victor Antonio Parsons, et al.,)
                               )
             Plaintiff,        )        2:12-cv-00601-DKD
                               )
       vs.                     )        Phoenix, Arizona
                               )        December 14, 2016
Charles L. Ryan, et al.,       )           9:05 a.m.
                               )
             Defendant.        )
_____)


    BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE


            REPORTER'S TRANSCRIPT OF PROCEEDINGS

                    STATUS HEARING


Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CRR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

2

A P P E A R A N C E S

For the Plaintiffs:

            ACLU – Washington, DC
            By: AMY B. FETTIG, ESQ. (via telephone)
            and DAVID CYRUS FATHI, ESQ.  (via telephone)
            915 15th Street NW, 7th Floor
            Washington, DC  20005


            Prison Law Office
            By: CORENE T. KENDRICK, ESQ.  (via telephone)
            1917 5th Street
            Berkeley, CA  94710


            Eidenbach Law, PLLC
            By: KIRSTIN T. EIDENBACH, ESQ.
            PO Box 91398
            Tucson, AZ  85752


            ACLU – Phoenix, AZ
            By: KATHLEEN E. BRODY, ESQ.
            PO Box 17148
            Phoenix, AZ  85011


            Arizona Center for Disability Law
            By: MAYA STOCK ABELA, ESQ.  (via telephone)
            177 N Church Avenue, Suite 800
            Tucson, AZ  85701


            Corizon Health
            By: JENNIFER FINGER, ESQ.  (via telephone)
            103 Powell Court
            Brentwood, TN  37027

UNITED STATES DISTRICT COURT

1                    A P P E A R A N C E S (continued)

2

    For the Defendants:

3

                    Struck Wieneke & Love, PLC
4                   By: ANNE MARIE ORCUTT, ESQ.
                    and DANIEL PATRICK STRUCK, ESQ.
5                   and RACHEL LOVE, ESQ.
                    and TIMOTHY JAMES BOJANOWSKI, ESQ.
6                   and ASHLEE B. FLETCHER, ESQ.
                    3100 W. Ray Road, Suite 300
7                   Chandler, AZ  85226

8


9                   Office of the Attorney General - Phoenix
                    By: MICHAEL EVAN GOTTFRIED, ESQ.
10                  1275 W. Washington Street
                    Phoenix, AZ  85007
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

4

INDEX

SUMMARY OF COURT PROCEEDINGS                                PAGE:

Court Resumes                                                5

Court takes Recess                                           65

Court in Recess                                             125

INDEX OF WITNESSES

WITNESSES FOR THE        Direct    Cross    Redirect
DEFENDANTS:

Nicole Taylor              19        23        25

INDEX OF EXHIBITS

EXHIBIT NO.:        DESCRIPTION:                      RECEIVED:


        * * * * * NO EXHIBITS MARKED * * * *  *


UNITED STATES DISTRICT COURT

5

1                    P R O C E E D I N G S

2              (Proceedings resume at 9:05 a.m.)

3         THE COURT:  Thank you.

4         Please be seated.

5         COURTROOM DEPUTY:  Civil case number 12-601, Parsons,

6    et al. versus Ryan, et al., on for status hearing.

7         THE COURT:  Would counsel please state their

8    appearances for the record.

9         MS. EIDENBACH:  Good morning, Your Honor.

10        Kirstin Eidenbach and Kathleen Brody for plaintiffs.

11        THE COURT:  Thank you.

12        MR. STRUCK:  Dan Struck, Anne Orcut, Rachel Love, Tim

13   Bojanowski, Mike Gottfried for defendants.

14        THE COURT:  Thank you very much.

15        And whom do we have on the phone?

16        MR. FATHI:  Good morning, Your Honor.

17        This is David Fathi from the ACLU National Prison

18   Project for the plaintiff class.

19        MS. FETTIG:  And good morning, Your Honor.

20        This is Amy Fettig from the ACLU Prison Project for

21   the plaintiff class, as well.

22        MS. KENDRICK:  This is Corene Kendrick from the Prison

23   Law Office for the plaintiff class.

24        THE COURT:  Thank you.

25        MS. FINGER:  Jennifer Finger from Corizon Health, also

                UNITED STATES DISTRICT COURT

1    on the phone this morning.

2             THE COURT:  All right.  Thank you.

3             MS. ABELA:  Maya Abela for the Arizona Center for

4    Disability Law.

5             THE COURT:  All right.  Thank you, everybody.

6                     (Pause in proceedings.)

7             THE COURT:  We're going to go forward then.

8             Thank you very much for submitting, in response to my

9    request, the proposals for agenda issues to be addressed.  I

10   have taken those and tried to create an omnibus agenda of,

11   presently, about five pages in front of me.

12            I've collated the monitoring guide issues by number of

13   performance measures that they seem to relate to and would

14   address them in that order.  So that can give you a heads-up

15   about what the roadmap looks like with respect to the

16   monitoring guide.

17            And then the -- the other issues, some would come --

18   my agenda, after the monitoring guide, and the issue that I

19   would address first is the data collection reporting issue.

20            But before get I started on my agenda, I wanted to

21   check in with counsel to see whether or not there was an

22   anticipation of testimony or evidentiary presentation so that I

23   could accommodate any schedules that needed to be accommodated.

24   So I'll make that inquiry first.

25            MR. FATHI:  Good morning, Your Honor.

                    UNITED STATES DISTRICT COURT

1          This is David Fathi.

2          The Court had inquired about expert testimony on

3   the -- the difference between being psychotic and actively

4   psychotic, and the difference between being suicidal and

5   actively suicidal.  We are certainly happy to provide expert

6   testimony, if the Court would find that useful.  Unfortunately,

7   we were not able to arrange that for today.  So we're certainly

8   happy to work with chambers to schedule a time and date for

9   that, if the Court would find that helpful.

10          THE COURT:  Okay.

11          And Mr. Struck, anything from your side on that topic?

12          MR. STRUCK:  Well, Your Honor, I think it could

13   probably be handled through declarations.  I do have Dr. Taylor

14   here, and she would be available to testify if -- if you're

15   interested.  But, you know, we can do this and coordinate it

16   with the plaintiffs so you get everything at the same time.

17          THE COURT:  Okay.  All right.  Thank you.

18          Well, then let me turn to what is the first issue that

19   I wanted to address, and that is the data collection and

20   reporting.

21          I think I've made it clear in a couple of instances

22   how important this is to the Court, because it is ultimately

23   the data that's reported and that is collected that I rely upon

24   in trying to enforce the -- the stipulation.  And when issues

25   arise with respect to that collection, whether they are

UNITED STATES DISTRICT COURT

8

1    suggestions of -- of -- in the prison unit conduct related to

2    acquiring information that might chill that production of

3    information, you saw what my reaction was to that.

4            And then I have to tell you that my reaction is -- is

5    similar to what is evident to me in a drilldown on the

6    presentation of data that's been submitted by the lawyers here

7    to me.  And what I'm referring to is, with respect to

8    performance measure 50 -- I'm sorry -- with performance measure

9    66, which is raised first in the defendants' document at 1743,

10   in which there is a -- a table at the bottom of page 12 in

11   which there are recitations of performance level percentages,

12   and four of 24 of them are accurate; if you go to document

13   1800, which is the base data source at 1136, four of 24 are

14   accurate.

15           Now, that's defendants representing something that's

16   not right with respect to data that would compel the Court to

17   act or not act.

18           But I have to say also that if you turn to the

19   plaintiffs' submission, document 1795, where they recapitulate

20   at page 3 -- or attempt to recapitulate what is represented by

21   the defendants' table in 66, you come up with errors there, as

22   well.

23           And then I have to say that these errors aren't just

24   minor in some regards.  If you take a look at the reported data

25   from what the defendants present and from what is the actual

UNITED STATES DISTRICT COURT

1   compliance, then you find that there are instances where it is

2   below the triggering point for the Court to determine whether

3   it needs to take further action or not.  So that's significant.

4          And similarly, there's an error of this gravity with

5   performance measure 98, again a table presented by the

6   defendants in document 1743 at page 15, where, for example, the

7   Winslow report for performance measure 98 in January is

8   indicated at 100 percent; document 1800 at 3845 shows that the

9   actual percentage is 64.29 percent; February's reported at

10  100 percent, it's actually 81.25; March is reported at 87, it's

11  actually 63.16; April is reported at 100 percent, it's actually

12  55.56; May is reported at 100 percent, and it's actually

13  50 percent.

14          In addition, there is another red flag, and that is

15  with respect to the compliance reporting that the plaintiffs

16  complain about in their document 1795 at page 2 where they

17  observe that there is an unexplained change in the -- the CGAR

18  that had shown that for the entry of the 30th of August, 2016,

19  at 10:30 a.m. by Erin Barlund, that there is in a subsequent

20  production a new entry with the same date and time, but no --

21  and with different data -- with different information.

22          And so the audit trail is missing.  You can't tell why

23  it is happening.  And plaintiffs understandably raise a concern

24  that this unexplained change causes one to question the

25  veracity of these reports.  And so if there's -- if there is a

1    change, there has to be an audit trail.  There has to be an

2    explanation as to why it happened.

3          And so I -- I start off with this because this is the

4    fundamental platform that I have to rely on.  And when I see

5    that a lawyer has signed a filing with the Court that contains

6    these kinds of errors, something needs to change because I rely

7    upon it.  And -- and so this is, as I started by saying, of

8    extreme concern to me.

9          Now, proceeding to the -- to the monitoring guide

10    issues, I would turn first to what seems to be something that

11    is, on the one hand, resolved, but not on the other hand, and

12    that is plaintiffs don't like the language with respect to what

13    determines whether there's a cell front, whether someone is

14    seen cell front or not.  They don't think it's exactly

15    consistent with my order.  I could have written it better, but

16    it's not my job to write that.  It's my job to determine

17    whether it accomplishes this task.  Although not Shakespearean

18    in word choice, I think that what defendants have proposed is

19    sufficient.  But what's not sufficient is how, as plaintiffs

20    point out -- point out is not incorporated in every performance

21    measure that addresses the cell front scene.  So that being

22    consistent -- that inconsistency is inappropriate.

23          So the language that has been proposed by defendants I

24    find acceptable, but it's got to be applied across -- across

25    the board.

1           And so that -- those are the -- the things that I

2      wanted to address that I'm certain of where I want to end up,

3      but the rest of them I'm pretty certain.

4           I've come to preliminary rulings about these

5      performance measure numbered issues in the monitoring guide

6      dispute between the two sides, but what I'm going to do from

7      now on is I'm going to -- and the rest of this list -- I'm

8      going to tell you what my preliminary view is, and then I'll

9      give you each a chance to talk about it.  I thought that the

10     one I just addressed I've heard enough about and I understand

11     it, so I don't need to hear any more.  But with these others,

12     I'll tell you what my preliminary view is.

13          Turning to performance measure 16 -- where I'll

14     shorthand this argument because it arises again with respect to

15     other performance measures -- 66, 67, 69 -- and that is where

16     defendants seem to think they can obtain partial credit, and

17     plaintiffs say, no, it is whether someone in -- in an

18     individual performance measure file demonstrates that that's

19     been satisfied or not.  My view is that giving defendants

20     partial credit gives you a -- it's wrong to say two bites of

21     the apple -- but it's almost like a Get Out of Jail Free card.

22     And so you either comply with it in a particular record or not.

23     And you can't amalgamate and say that the times we missed it

24     are forgiven by the fact that we've -- overall we've done

25     better.

UNITED STATES DISTRICT COURT

1          So I'll turn to plaintiffs, whomever is going to

2     speak, in their turn to speak on that first.

3          MR. FATHI:  Thank you, Your Honor.

4          This is David Fathi.

5          And the issue the Court raises is really a global one,

6     and it applies, as we said in our agenda, to performance

7     measures 16, 27, 35, 66, 67, 69, 89, 91, 93, 94, 95.  And the

8     global issue is this:  Whether the defendants can unilaterally

9     change the methodology to -- to give themselves, as the Court

10    said, partial credit, and in some cases to calculate a single

11    compliance score for the entire institution, regardless of the

12    care received or not received by an individual patient.

13         For the entire life of the stipulation, Your Honor --

14    oh, I should add that this -- this issue is also presented by

15    isolation measures number 6 and 8.

16         For the entire life of this stipulation, these

17    performance measures have been monitored using a binary

18    methodology whereby each file is determined to be either

19    compliant or noncompliant with the performance measure in

20    question for the month in question.  And neither party has ever

21    questioned or challenged this methodology, or suggested that

22    it's inconsistent with the stipulation.

23         Now, without consulting plaintiffs, the defendants

24    have gone to an entirely new methodology where they want to

25    give themselves partial credit for an individual file and, as I

UNITED STATES DISTRICT COURT

1    said, on some measures they want to simply in some way assess

2    compliance globally for the entire prison complex.

3         Now, as we showed in our brief, document 1755 at pages

4    8 to 9, the unbroken and consistent and unvarying course of

5    performance during the entire life of the stipulation is the

6    best evidence of the parties' intent.  And that intent was that

7    the binary methodology that has always been used be used.  And

8    the defendants have entirely failed to respond to this argument

9    or to the authority that we've cited.

10        So our position, Your Honor, is that they may not make

11   this unilateral change in monitoring methodology in a fairly

12   transparent attempt to inflate their compliance scores, and

13   they must adhere to the previous binary methodology whereby

14   each individual file is determined either compliant or

15   non-complaint.

16        THE COURT:  Thank you.

17        Mr. Struck, who on your side?

18        MR. STRUCK:  Yes, Your Honor.

19        First of all, I again want to point out that the

20   monitoring guide -- the monitoring guidelines were put together

21   by defendants.  Actually, they started doing this prior to the

22   stipulation when they were monitoring the -- the compliance of

23   the healthcare provider before the stipulation was ever

24   entered.  This isn't something that was bargained for by the

25   parties.  There was -- there's nothing in the stipulation with

1    respect to how this monitoring took place.

2         The methodology that is suggested or the change by the

3    defendants makes more sense because what you're actually

4    looking at is what's actually happening in the field.  For

5    example, if you have a performance measure that requires an

6    inmate patient to be seen every day of the month and they're

7    seen 29 days, but there's one day missed or one -- one day that

8    they're not seen, according to the plaintiffs that's a complete

9    fail.  And that doesn't make any sense because the whole

10   purpose of this here is what -- you know, whether or not

11   they're substantially complying with these performance

12   measures.  And to have an absolute pass/fail in a situation

13   like that just doesn't make any sense because they are -- we

14   are substantially complying when we're seeing these patients 29

15   days out of 30, and it shouldn't be an absolute failure just

16   because they miss it one day.  And so that's why the change was

17   made, because it didn't make any sense to do it the other way

18   before.

19        THE COURT:  Well, I'm going to anticipate Mr. Fathi's

20   argument, and that is the example you cite is actually not a

21   relevant example in that there are -- what really is more

22   important is to focus on whether or not there are compliances

23   that bear a close resemblance to the real world where there is

24   substantial danger and potential for harm.

25        But I'll hear from Mr. Fathi directly on that.

                    UNITED STATES DISTRICT COURT

1          MR. FATHI:  Yes, Your Honor.

2          The 29 out of 30 days, it's a made-up example.  The

3     defendants have conspicuously failed to present any evidence

4     that such a thing has ever happened in the real world in this

5     case.  Substantial compliance is already built into the fact

6     that the defendants only have to meet 80 percent at this phase

7     of the litigation to be judged substantially compliant.  So to

8     say that they -- they also want to get partial credit for

9     individual patient files is really double-counting in an

10    impermissible way.

11         Mr. Struck said over and over again that the

12    methodology that has been used for the past 20 months developed

13    by the defendants doesn't make any sense.  We would submit the

14    fact that it has been used by the defendants for the last 20

15    months without objection by either party suggests it is

16    eminently sensible; and, in fact, under the case law we cited,

17    it is -- it is all but conclusive evidence that that was the

18    intent of -- of the parties.

19         THE COURT:  Well, before turning to Mr. Struck, I will

20    say my view is that you don't get to make a unilateral change

21    without having it presented to the Court and having me have the

22    chance to do what paragraph 9B provides for me to do, and that

23    is to determine what protocol should be employed.  And so I --

24    the idea that this is something that is solely within the

25    defendants' purview as to how they want to affect the

UNITED STATES DISTRICT COURT

1    monitoring.

2         Again, I've got many variables at play here.  The most

3    important thing to do in any kind of scientific examination is

4    to define the variables and, to the extent you can, limit

5    variables that don't need change because I've got enough

6    variables that are changing, and I need to focus on those

7    because they're ones that are likely going to be more

8    informative to me.  And so I don't like the idea of change in

9    protocol that is -- that is unilateral, and I don't like the

10   change in protocol that is -- in some instances is a diversion

11   or a departure from previous conduct because it interferes with

12   my belief that I need to reduce variables.

13        But then having said that, Mr. Struck, why isn't

14   Mr. Fathi's point not a good point here?  You say it makes no

15   sense, and he says you've been doing this for most of the term

16   of the stipulation.

17        MR. STRUCK:  Well, I could have Dr. Taylor explain it.

18   She is the individual who came up with the idea that it makes

19   more sense to show what's going on in the field with respect to

20   compliance with these performance measures.

21        THE COURT:  Well, we know that if -- using your

22   made-up example if somebody doesn't have a visit every day, we

23   would assume, as necessary to apply this hypothetical, that

24   there was a reason that an every-day visit was agreed to, and

25   that it became a performance measure, and that we know and we

1    need to know whether it's complied with or not.  And so my view

2    is, no partial credit, and that you either are in compliance or

3    not, based upon the review of the individual record, and that

4    you don't get to apply some kind of we-mostly-got-there on an

5    individual application of a definitive performance measure.

6              Performance --

7              MR. FATHI:  Your Honor, could I --

8              THE COURT:  Yes.

9              MR. FATHI:  I beg your pardon, Your Honor.  Could I

10   just clarify that the --

11             THE COURT:  Yes.

12             MR. FATHI:  -- Court's order also means that the

13   defendants must continue to assess compliance with regard to

14   each prisoner file and can't come up with some sort of

15   aggregate performance measure for an entire institution as they

16   have proposed on some of these?

17             THE COURT:  That would be consistent with -- with my

18   view because the performance measures do not -- if they go

19   to -- to a requirement, they can be fairly read to address an

20   individual inmate's care, then we have to know whether or not

21   that performance measure is being met with respect to that

22   individual.  But if I've misunderstood something you said, you

23   get to tell me, Mr. Fathi, that now, and then I'll turn to

24   Mr. Struck to tell me his view.

25             MR. FATHI:  I -- I don't think you've understood, Your

1    Honor.  I just want to make clear that the Court's order is

2    that the defendants must continue to assess compliance in a

3    binary manner for each patient file.

4              THE COURT:  And that would be my view.

5              Go ahead, Mr. Struck.

6              MR. STRUCK:  Your Honor, I would like to have

7    Dr. Taylor explain the purpose behind the change.

8              THE COURT:  All right.

9              Dr. Taylor, we're --

10             MR. STRUCK:  Would you like to hear from her?

11             THE COURT:  -- always happy to have you here.

12             MR. FATHI:  Your Honor, if Dr. Taylor is going to be

13   testifying, could we have her sworn, please.

14             THE COURT:  Of course.

15             Dr. Taylor, would you please come forward to the well

16   of the Court where the clerk of the Court will administer the

17   oath.

18             (NICOLE TAYLOR, Defendants' witness, is sworn.)

19             THE COURT:  Thank you.

20             If you'd please have a seat on the witness stand.

21             Mr. Struck?

22             MR. STRUCK:  Thank you.

23   ///

24   ///

25   ///

                     UNITED STATES DISTRICT COURT

NICOLE TAYLOR – DIRECT EXAMINATION                    19

                          DIRECT EXAMINATION.

1

2    BY MR. STRUCK:

3    Q.  Would you state your name, please.

4    A.  Nicole Taylor.

5    Q.  And what is your occupation?

6    A.  I am a psychologist and an attorney, and I'm the mental

7    health director for the Arizona Department of Corrections.

8    Q.  And how long have you been so employed?

9    A.  I've been in this position for a little over three years,

10   but with the Department for almost 12.

11   Q.  Can you give us some of your education background, please.

12   A.  Yes.  I have a bachelor's degree in psychology, I have a

13   master's degree in psychology, I have a Ph.D. in clinical

14   psychology; and I have a JD, not in any specific area.

15   Q.  And how long have you been working in this field?

16   A.  Almost 12 years as a psychologist.

17   Q.  Okay.  And has it been primarily in the prison setting?

18   A.  Yes, almost exclusively.

19   Q.  Okay.  And what is your current position right now?

20   A.  I am currently the mental health director, slash, monitor

21   for the Arizona Department of Corrections.

22   Q.  And what do you do as the mental health director/monitor?

23   A.  I insure compliance with the contracts that we have with

24   the multiple vendors.

25   Q.  Okay.  And how do you do that?

                    UNITED STATES DISTRICT COURT

NICOLE TAYLOR – DIRECT EXAMINATION                    20

1    A.  I monitor a specific set of criteria to determine whether

2    they've met the requirements or not.

3    Q.  Okay.  And what does that entail?

4    A.  That entails monitoring a specific set of charts to

5    determine whether each criteria is met for each of those

6    charts.

7    Q.  Okay.  Now, you've heard the Court's view on the

8    defendants' change with respect to the monitoring.  Can you

9    explain with respect to the mental health monitoring what --

10   what the thought process was behind that change?

11   A.  Yes.  As we started to recognize that the numbers we were

12   giving you for compliance may have not changed percentage-wise,

13   and what it appeared to be is that things weren't getting

14   better.  What we started to recognize was it was because where

15   an inmate might not have been seen half the time, that would

16   have equaled a certain percentage, but now if they miss one

17   contact, you get the same percentage.  And so we weren't able

18   to clearly show you the positive changes that have occurred

19   over the last 20 months.  And the example that Mr. Struck gave

20   is actually not made up.  We have a couple of performance

21   measures, specifically the IPC rounding, that has to occur

22   twice a day.  Twenty months ago might have been that they

23   missed 30 of them, but we actually have recently where they

24   missed one.  So 59 out of 60 will give you a zero, just as much

25   as 30 out of 60 would give you a zero.

UNITED STATES DISTRICT COURT

1    So what we started to notice is that we aren't able to

2    show you the progression that's happening in the field when we

3    do an all or nothing.  And so we looked at the performance

4    measures that had multiple contacts, and what we need to know

5    is, are they getting -- are they reaching that goal more

6    consistently.  And what we're seeing is that they are, but we

7    can't show you that if we do an all or nothing.

8    And so in front of the Court was a whole lot of, look,

9    they haven't changed, they haven't done anything better.  But

10   the reality is in a lot of these performance measures they

11   have.  It's just the binary we've been using didn't display

12   that on those numbers in the performance measures.

13   Q.  Does it also help with respect to making sure that -- or

14   figuring out where problem areas are?

15   A.  Right.

16       MR. FATHI:  Objection, leading.

17       THE COURT:  Overruled.

18       THE WITNESS:  So oftentimes when you end up coming

19   across a misstep, they didn't do it, some of the monitors were

20   just sort of stopping the audit because at that point they

21   failed, as opposed to reviewing the entire month, one -- one

22   failure would stop the audit process.  You're done.  You didn't

23   do it.  But moving forward, having us look at every single one

24   of them to determine, are there pockets of areas where they are

25   hitting it/missing it, is it on the weekends, is it during the

1    week, is it a specific staff member.  It allows for that more

2    detailed information that I think is super -- is very

3    necessary, on top of showing you the changes that have happened

4    over the past 20 months because the care has significantly

5    increased.  And on some of those performance measures, the

6    percentage may not, but the amount of times that they've had a

7    misstep have drastically decreased.  And that doesn't show up

8    when you do sort of an all or nothing method.

9    Q.  Do you have an opinion, Dr. Taylor, as to whether or not

10   this method more accurately depicts the care that's being

11   rendered in the field as opposed to the binary method that the

12   plaintiffs want to propose?

13   A.  I do believe that it's much more accurate because, again,

14   unlike performance measure 94 -- 93, I think it is -- which is

15   the watch one, an inmate can be on watch the entire month.  And

16   if one staff member didn't write in their note that they

17   offered the inmate to come out and he refused, that's -- that

18   would be a zero.  And although we know the inmate was seen, we

19   don't count those contacts; and therefore, telling you that the

20   percentage at that site ends up being a zero for that one

21   instance, that one staff member on that weekend forgot to write

22   that.  I don't think that that accurately reflects the fact

23   that there were 90 contacts throughout the month or 120

24   contacts throughout the month where they did document correctly

25   exactly what they were doing.

1          MR. STRUCK:  Thank you, Dr. Taylor.

2          THE COURT:  Mr. Fathi?

3                          CROSS-EXAMINATION

4    BY MR. FATHI:

5    Q.  Good morning, Dr. Taylor.

6    A.  Good morning.

7    Q.  Your responsibility is for monitoring of the mental health

8    performance measures; is that correct?

9    A.  That is correct.

10   Q.  And those measures are numbers 73 through 99; is that

11   correct?

12   A.  Correct.

13   Q.  And you have no responsibility for monitoring the medical

14   performance measures; right?

15   A.  I don't personally monitor those, but part of the team on

16   the bureau, we work collaboratively.

17   Q.  You have no responsibility for monitoring the medical

18   performance measures; correct?

19   A.  I believe I just answered that.  I don't personally monitor

20   them, but I am part of the team.  And so if I'm auditing a

21   chart and I see something in there, that information is relayed

22   to the monitor who does monitor that, so...

23   Q.  You have no responsibility for monitoring performance

24   measure 16; correct?

25   A.  I do not.

1   Q.  And you have no responsibility for monitoring performance

2   measure 27?

3   A.  I do not personally pull charts specific to those, but I

4   may provide information related to those.

5        Does that answer your question?

6   Q.  And you have no -- and you have no responsibility for

7   monitoring performance measure 35?

8   A.  Same answer as I just gave.

9   Q.  And you have no responsibility for monitoring performance

10  measure 66, which is the IPC measure that you discussed;

11  correct?

12  A.  I have reviewed the data within these performance measures

13  that you're talking about.  I don't personally pull the

14  requisite number of charts and then report that in to the CGAR.

15  But I have participated in the discussions related to the

16  monitoring.  And that is part of what we do, Mr. Fathi.

17  Q.  And you have no responsibility for monitoring performance

18  measure 67; correct?

19  A.  Same answer as I've just given you, sir.

20  Q.  What is performance measure 67?

21  A.  It's the -- you know, I don't even have them -- all the

22  ones memorized, honestly.  I don't memorize them by numbers,

23  unfortunately.  So...

24  Q.  And you have no responsibility for monitoring performance

25  measure 69; correct?

UNITED STATES DISTRICT COURT

NICOLE TAYLOR - REDIRECT EXAMINATION          25

1    A.   Same answer as before.

2    Q.   And what is performance measure 69?

3    A.   I don't have them memorized by numbers.  I apologize.

4    Q.   Okay.

5         MR. FATHI:  Nothing further, Your Honor.

6         THE COURT:  Any redirect?

7         MR. STRUCK:  Yes.

8                   REDIRECT EXAMINATION

9    BY MR. STRUCK:

10   Q.   Dr. Taylor, when the decision was made by the monitoring

11   bureau to utilize this new methodology, was this a

12   collaborative process?

13   A.   Yes.  It was a variety of us met in a room and sat down and

14   said, why are we not able to show the judge the increase that

15   we're seeing when we do our monitoring?  And through that

16   discussion we determined that there were certain performance

17   measures that we weren't able to clearly show exactly what was

18   happening out in the field, and the percentages were

19   misleading.  And so we discussed which performance measures

20   would that relate to and how would we go about consistently

21   across medical, mental health, dental, max custody, making sure

22   we were using the same methodology.

23   Q.   And did that discussion also include the medical

24   performance measures Mr. Fathi just asked you about?

25   A.   Yes, it did.

UNITED STATES DISTRICT COURT

1          MR. STRUCK:  Thank you.

2          THE COURT:  Thank you, Dr. Taylor.

3          The Court will stand by its ruling, and that is that

4   the binary will be the method that we will employ.  If there

5   are arguments to be made with respect to what remediation

6   measures need to be taken.  If it results in a departure from

7   the bench line that is applicable at the time, then defendants

8   can make that argument and the Court will, of course, consider

9   that at the time because we are interested in husbanding the

10  resources that we have in an appropriate way.  But

11  nevertheless, I think that the reporting method using the

12  binary does give us the important information that we need

13  about whether or not the agreed upon performance measure is

14  being satisfied or not.

15          Turning now to performance measure 27, there seems to

16  be an issue associated with what appears to be arguably an

17  inconsistency between the NCCH standard and what the

18  stipulation requires.

19          To me, the resolution that I would come to on this is

20  that the stipulation requires monthly meetings, but the

21  substance is informed by the NCCH standards.

22          So, anyone from plaintiffs want to address that?

23          MS. KENDRICK:  Yes, Your Honor.

24          This is Corene Kendrick from the Prison Law Office.

25          Our position is that while the substance is informed

UNITED STATES DISTRICT COURT

1    by the NCCHC standard, the parties at the time of entering into

2    the agreement bargained for more than what NCCHC requires, and

3    that is that monthly meetings occur and that each meeting

4    comply with the requirement.  Defendants are now taking the

5    position that so long as one out of the three monthly meetings

6    in any given quarter comply with the requirement, then they're

7    going to be marked as 100 percent compliant.  And we believe

8    that that's a departure from how the parties have been -- had

9    agreed upon monitoring it and the requirement that they do it

10   monthly, which is simply the parties bargained for more than

11   what the underlying standard requires.

12              THE COURT:  All right.

13              Mr. Struck?

14              MR. STRUCK:  Yes, Your Honor.  And I just want to be

15   clear, they do do monthly CQI meetings.  And when this

16   stipulation was -- when the negotiations took place, everyone

17   understood that it was the medical/technical manual that was --

18   that was the document that we were putting together into

19   this --

20              THE COURT:  So why is the word "monthly" there?

21              MR. STRUCK:  Well, because there are CQI meetings

22   monthly.  But with respect to the medical/technical manual, it

23   very specifically said with respect to this specific type of

24   meeting, that the NCCHC standards applies.  So although the

25   meetings are --

UNITED STATES DISTRICT COURT

1          THE COURT:  Go ahead.  You can pause and get your --

2    confer with your client.

3                    (Pause in proceedings.)

4          MR. STRUCK:  With respect to the monthly meetings,

5    Your Honor, they are taking place.  The CQI meetings are taking

6    place.  But it's the reporting requirements that the NCCHC

7    standard requires.  It's only required quarterly.  So while the

8    meetings are taking place, the reporting requirements that --

9    there are certain reports that are generated that are only

10   generated on a quarterly basis, pursuant to the NCCHC

11   standards, which is pursuant to the medical/technical manual.

12         THE COURT:  Any rebuttal from the plaintiffs on that

13   point?

14         MS. KENDRICK:  Your Honor, first of all, there is no

15   reference to the medical/technical manual in the stipulation

16   with regard to the performance measures.  So what it says or

17   doesn't say is not relevant.  What matters is what's in the

18   stipulation.  And what defendants have previously stated to us

19   as their position is that a given month doesn't have to include

20   that documentation.  It would be more compliant so long as one

21   other month within that quarter contained that documentation.

22   And again, our position is that by putting the word "monthly"

23   in the performance measure, we were bargaining for more than

24   what the NCCHC standard required, and they have to perform the

25   requirement every month, not every quarter.

                    UNITED STATES DISTRICT COURT

1          THE COURT:  Well, Mr. Struck is saying that they are

2     doing it every month, they're just not reporting it every

3     month.

4          MS. KENDRICK:  Right, but those -- but the stipulation

5     requires monthly reporting, the performance measure requires

6     monthly reporting in the protocol, and the documentation has to

7     occur monthly.  He's saying, yeah, we have the meetings every

8     month, but we just don't do the documentation except quarterly.

9          THE COURT:  Mr. Struck, did you want to say anything

10    else?

11         MR. STRUCK:  Yeah, Your Honor.  I don't believe that

12    the stipulation actually says that it requires monthly.

13         THE COURT:  I'm actually trying to get there myself.

14    It would be in Exhibit --

15         MR. FATHI:  Document 1185-1, Your Honor.

16         THE COURT:  Thank you very much.

17         MS. KENDRICK:  And it's at page 21 of the electronic

18    case filing numbering.

19         THE COURT:  All right.  It will take me just a moment

20    to get there.

21         Thank you.

22              (Pause in proceedings.)

23         THE COURT:  I can't.  It's taking forever.  Can

24    someone just read to me what the performance measure says?

25         MR. STRUCK:  (Reading)  Each ASPC facility will

                    UNITED STATES DISTRICT COURT

1    conduct monthly CQI meetings in accordance with NCCHC standard

2    P-A-06.

3          THE COURT:  All right.  I'll take another look at

4    this.  I'll take this one under advisement.

5          Performance measure 35, an issue with respect to how

6    to determine with -- compliance with medications at transfer.

7    My preliminary review would be you need to look at the first

8    distribution of the meds at the new location as the signpost.

9          Plaintiffs?

10         MS. KENDRICK:  Yes, Your Honor.  That is our position,

11   that the first distribution needs to be looked at because not

12   all medication is provided daily.

13         THE COURT:  Mr. Struck?

14         MR. STRUCK:  Your Honor, our position is as we set

15   forth in our papers, that we need to look when the -- when the

16   inmate arrives, based upon the language of the stipulation.

17         THE COURT:  That doesn't make any sense with respect

18   to ongoing medication, in my view.

19         Okay.  All right.  So we'll adopt the view that I just

20   articulated.

21         Performance measure 44.  My preliminary view here is

22   that you can revise a plan and document that, but you can't

23   ignore it and still think that you're compliant.

24         Plaintiffs?

25         MS. KENDRICK:  Yes, Your Honor.  Just a second,

UNITED STATES DISTRICT COURT

1   please.

2   THE COURT:  No, take your time.  I didn't give you a

3   roadmap in advance, so it's a little bit of a surprise to both

4   sides when I pick a number.

5   MS. KENDRICK:  Yeah.  You're going in numerical order,

6   I think, instead of by the document, so that... (pause).

7   Oh.  So this is an issue –– this is the performance

8   measure that requires a provider review and act upon a

9   hospital's treatment recommendations or the discharge

10  recommendations after a prisoner comes back from the ER or

11  inpatient hospital.  And our position is that this performance

12  measure, by the fact that it says "reviewed and acted upon,"

13  has two parts that need to be evaluated.  Part one, did the

14  provider even review the recommendations; and part two, did she

15  take action upon reviewing the recommendation?  And the

16  defendants can only look at whether the provider reviewed the

17  report or if the nurse reviewed the report.  And our position

18  is that it needs to be acted upon.  There needs to be some sort

19  of documentation of what the provider did.  And our position is

20  that basic medical practice.  If the Court would like more

21  briefing on that, we're happy to provide that via our expert.

22  THE COURT:  I wouldn't think an expert would be

23  necessary for that.  It just seems a matter of common sense.

24  But in any event, go ahead, Mr. Struck.

25  MS. KENDRICK:  I agree, Your Honor.

UNITED STATES DISTRICT COURT

1          MR. STRUCK:  Your Honor, the act of rejecting --

2     the -- the providers in the facility do not have to take the

3     recommendation of the outside providers.  The law is clear in

4     that sense.

5          THE COURT:  Right.  But --

6          MR. STRUCK:  But simply by --

7          THE COURT:  -- makes perfect sense for me that I can't

8     tell whether you've ignored it or whether you've changed it, if

9     there's nothing said about it.  And the allegation repeatedly,

10    not only in this case but in many cases that this Court has,

11    again, suggests that my common sense is not informed by some

12    kind of something that is offensive to the rules of what one

13    can take judicial review of, and that is I can't tell whether

14    it's simply ignoring it or dropping between the cracks if

15    there's no mention of it.  And those two things that -- that I

16    just articulated, ignoring and falling between the cracks --

17         MR. STRUCK:  But -- but the mention of it, Your Honor,

18    is that they reviewed it --

19         THE COURT:  Well --

20         MR. STRUCK:  -- and if they don't follow it, they

21    reject it, then --

22         THE COURT:  How do you know if they don't take -- if

23    they don't put something in the chart saying, we see that

24    Dr. So-and-so has recommended surgery, but we don't believe

25    that that's appropriate for the following reasons?  Why

                    UNITED STATES DISTRICT COURT

1    wouldn't that makes perfect sense and also be common sense --

2          MR. STRUCK:  The --

3          THE COURT:  -- as opposed to just nothing in the

4    record.  So you have -- the Department thought it was worthy to

5    have an outside physician see someone, that physician makes a

6    recommendation, and it's just crickets thereafter.  You can't

7    tell whether it's fallen between the cracks or somebody has

8    decided something else.  That doesn't make any sense to me.

9          MR. STRUCK:  Or they just rejected it and didn't --

10         THE COURT:  Just -- all right.  That -- as you can

11    see, you don't have me on that one at all.  So you -- if you're

12    going to do something different than what the outside provider

13    said, then you have to docket it and say why.  Just saying

14    "rejected," to me, is insufficient as well.

15         I don't know whether that's really at issue for me

16    presently, but I will tell you that my preliminary view is that

17    if it is not ripe for a decision right now, is that you have to

18    say why because, again, you thought it was worthy to have

19    someone outside, an expert, because you couldn't provide that

20    skill in-house presumably, which is the bulk of these cases, I

21    think, that exist in this circumstance -- you just can't allow

22    it to go unanswered without some kind of evidence in the record

23    as to why your preliminary view that you needed an outside

24    report is going -- is going to result in a rejection of that

25    person you turn to.

1          MR. STRUCK:  Your Honor, may I just state one thing?

2          THE COURT:  Yes.

3          MR. STRUCK:  It doesn't say in this particular

4     performance measure -- it says "acted upon."  And if they

5     simply put in the record that they reviewed it and rejected it

6     because they don't agree with it, that should be sufficient.

7     They shouldn't -- there's nothing in this performance measure

8     that requires them to say why they rejected it or didn't accept

9     the recommendation.

10          THE COURT:  Well, it says "and acted upon."

11          MR. STRUCK:  Right.

12          THE COURT:  It actually -- you could read it also to

13     say you don't have a choice at that point.  It says "acted

14     upon."  It's a recommendation, acted upon.  So I think you're

15     on thin ice there, so we'll go with what I said.

16          Turning to 60 and 61.  Again, the language of the

17     stipulation performance measures seem to inform me on how to

18     proceed here, and that is that the time element, the temporal

19     element present at initial intake; and at 61, at -- that every

20     36 months would suggest that plaintiff -- defendants' method of

21     just having flyers available is insufficient.  First of all, I

22     don't know whether the flyers are seen, and I can't count upon

23     that fact.  And the stipulation says that somebody has to be

24     offered it.  And it seems to me that the temporal element and

25     the fact that you can't count upon the fact that somebody would

1    be viewing a flyer or a poster would deem this unsatisfied

2    unless it was offered to the inmate personally.

3          So, plaintiffs?

4          MS. KENDRICK:  Yes, Your Honor.  This is Corene

5    Kendrick.

6          We agree that the temporal factor is part of it.

7          We would just also add that the proposal that they

8    have of counting posters as being satisfactory goes in

9    contradiction to the plain language of the stipulation at

10   docket 1185-1, page 28.  For both of those performance

11   measures, the parties had agreed that at Perryville, each yard,

12   10 medical records per month would be reviewed to look at the

13   frequency at which they've been conducted.

14         So we believe, first of all, that you are correct,

15   that the temporal element is part of it, but also that the

16   language of the stipulation requires that they do this by

17   looking at medical records.

18         THE COURT:  That does seem to support my preliminary

19   view.

20         Mr. Struck?

21         MR. STRUCK:  Yes, Your Honor.

22         I first want to point out that it is offered to them

23   upon intake.

24         With respect to the Court's view that putting notices

25   throughout the facility isn't sufficient, I mean, that -- we

                  UNITED STATES DISTRICT COURT

1   believe that it is sufficient.  We -- it -- it --

2        THE COURT:  It may be sufficient.  I don't know.  But

3   I don't have to think about that because it's not what the

4   stipulation calls for.

5        MR. STRUCK:  The -- with respect to what Ms. Kendrick

6   said regarding looking at 10 records, this only requires that

7   it be offered.  It doesn't require that they actually partake

8   in this particular -- I guess it's a Pap smear.  It doesn't --

9        THE COURT:  I imagine that's true.

10        MR. STRUCK:  And so it doesn't make any sense to look

11   at the record.  I mean, if -- what makes sense is if we -- I

12   mean, if the Court is going to require that there be some sort

13   of notification to all inmates, then we would have to notify

14   them, say, on an annual basis all at once; and then, you know,

15   we would be able to show that we did notify them, as opposed to

16   looking at a record because who knows how many of the inmates

17   are going to decide whether or not they want to have the Pap

18   smear.  The whole point is to offer it.

19        THE COURT:  The medical record will indicate with all

20   of these patients who offered it.  If they decline it, I

21   suspect that there's no medical provider who wouldn't note

22   that.

23        MR. STRUCK:  Well, if they don't show up for it, Your

24   Honor, it's a -- it would be an open clinic.

25        THE COURT:  Well, again, I would say that if you offer

UNITED STATES DISTRICT COURT

1    it, you'd docket that it's been offered.  And then if you -- if

2    there's an issue down the road, it sure seems to me to make

3    sense that you are at least in a better position of having

4    docketed that you offered it -- "docket" is probably the wrong

5    word.  It's charted it, I suppose.

6         But in any event, I'll stick with what I said about

7    that.

8         MR. STRUCK:  I just want to make sure I understand

9    what you're saying here.

10        THE COURT:  Yeah.

11        MR. STRUCK:  Are you saying that the defendants -- the

12   healthcare provider has to go through every single chart and

13   say that -- because that's not the way that -- they would send

14   out a common -- you know, like an email or a message to every

15   single inmate at the facility.  That's how they would do it.

16   And the inmate -- then we could confirm that that was sent to

17   every inmate.  But it would be quite a task to go through every

18   single record and say, yes, this -- it was -- it was offered to

19   this person, yes, it was offered to this person, yes, it was

20   offered to this person, if we can show that it was offered to

21   everybody because it's voluntary.

22        MS. KENDRICK:  Your Honor, may I say something?

23        THE COURT:  Of course.

24        MS. KENDRICK:  So when we -- this is -- this is a

25   performance measure that the parties discussed practically ad

UNITED STATES DISTRICT COURT

1    nauseam.  But one thing that we had discussed and was initially

2    adopted was the idea that, since all prisoners are offered a

3    Pap smear at intake, is that there be a tickler system where

4    every 36 months after intake, something comes up in the system

5    that's triggered, sending a written communique to the prisoner

6    saying, hey, this month it's 36 months since you last had a Pap

7    smear, would you like to come in and have one.  So it wouldn't

8    require going through every single medical record every month

9    or anything like that.  And so we discussed doing such a

10   system.  At one point, one of the versions of the monitoring

11   guide adopted that, and then subsequent ones went back to the

12   previous method of just checking to see if a poster was on the

13   wall in the clinic.

14           THE COURT:  What if the defendants took care to make

15   sure that 36 months after initial intake each inmate was

16   offered a Pap smear by way of a communication to them,

17   indicating that they could come in to the open clinic and have

18   the Pap smear?

19           MS. KENDRICK:  Was that addressed to defendants or

20   plaintiffs?

21           THE COURT:  To you.

22           MS. KENDRICK:  Yes, that's what we had proposed and

23   agreed upon.

24           THE COURT:  That sounds like what you were saying,

25   Mr. Struck, or no?

UNITED STATES DISTRICT COURT

1          MR. STRUCK:  Yes, it was.  But what I understood the

2    Court to say is it would have to be something that's noted in

3    each individual medical record, which I don't think that's

4    required under the stipulation, and I don't think that it's --

5    it really makes sense to do that if we can show that that

6    communication went out to every single inmate and was offered

7    to every single inmate.

8          THE COURT:  At 36 months from their initial intake?

9          MR. STRUCK:  Well, they could do it --

10         THE COURT:  Unless you have a tickler system.

11         MR. STRUCK:  -- they can -- the can do it annually.

12         THE COURT:  No, they can't.  They have to do it 36

13   months after intake.  They have to be able to show that.

14         MR. STRUCK:  Okay.

15         THE COURT:  That's what it says.

16         MR. STRUCK:  So if they do it in 24 months, then

17   that's not compliant; is that what you're saying?

18         THE COURT:  Well, it says 36 months, and I don't know

19   whether -- all I know is it says 36 months, and I'm not --

20         MS. KENDRICK:  Well --

21         THE COURT:  Go ahead.

22         MS. KENDRICK:  It says -- the performance measure

23   says:  36 months after initial intake, comma, unless more

24   frequent screening is clinically recommended.  So, sure, if it

25   happened at 24 months because gynecologists had said we want

                    UNITED STATES DISTRICT COURT

1    this person to come in every two years instead of every three

2    years, then that would be compliant.  We just don't think that

3    it's the burden that Mr. Struck is making it out to be.

4            THE COURT:  Again, I'm not a professional, but as I

5    read the language, it says unless more frequent screening is

6    clinically recommended, that could either be interpreted to the

7    individual inmate's care and a decision about whether or not

8    there was a particular necessity identified in that patient, or

9    whether there's a broad -- in the alternative, a broader-based

10   clinical recommendation that comes out of some national

11   organization that has concluded that 36 months is no longer the

12   appropriate time, that maybe it's less.  So I can't really tell

13   which it is that applies there.  But if I go to what is

14   specifically required by the stipulation, it says that it must

15   be no less than 36 months after the intake that it must be

16   offered, and I can't tell whether there's been compliance with

17   the measure unless there's something in the record that

18   indicates that that notice has been provided.  Somehow the

19   defendants will have to chart that fact and that they have

20   provided that notice to the individual inmate something

21   different than a flyer that's broadly distributed or a poster,

22   I gather.

23           The -- the stipulation, I think, to have any real

24   meaning is something that has to be able to be tested, and I

25   can't see any other way to test it, unless there's been an

                    UNITED STATES DISTRICT COURT

1    individual reflection in -- with respect to each -- each

2    patient.

3            And I -- I guess I also think that -- that this is an

4    important element of care that has been agreed to in the

5    stipulation that it happen in 36 months, and since the people

6    who drafted the stipulation and agreed to it thought that it

7    was important enough to specify that.  It seems that if it's

8    important enough to do, it's important enough to record.

9            Am I affording plaintiffs more relief than they are

10   seeking here?  Again, understanding everybody is interested in

11   not requiring unnecessary action.

12           MS. KENDRICK:  No, Your Honor.  That's -- that's what

13   we've been asking them to do is to look at 10 medical records

14   for each unit for each month at Perryville and see if it's been

15   offered 36 months after intake.

16           THE COURT:  All right.  That's what we'll do with

17   respect to this one then.

18           66, 67, 69, I think, are addressed by the prior

19   discussion on partial credit.

20           Anybody disagree with that conclusion?

21           MS. KENDRICK:  No, Your Honor.

22           THE COURT:  All right.

23           MR. STRUCK:  No, Your Honor.

24           THE COURT:  All right.

25           Turning to 78, which necessarily involves a

1    consideration of 77.  The problem arises if 77 doesn't require

2    action to be taken in a particular month, then what do you do

3    about the application of 78?  And it seems to me that if there

4    is nothing to -- that is required that be done on a particular

5    month, then this compliant measure is just not applicable in

6    that month.  And so NA would be the appropriate entry.

7            What do plaintiffs have to say about that?

8            MR. FATHI:  Well, respectfully, Your Honor, that there

9    is no -- there aren't records that are drawn under measure 77

10   for which nothing is required under 77.  For each record drawn

11   under performance measure 77 -- and, again, the parties have

12   reached agreement on what record should be drawn -- performance

13   measure 77 requires that the monitor ascertain that the

14   treatment plan was updated within -- within the time period --

15   the appropriate time period, depending on the patient's mental

16   health classification.

17           So all we're asking is that, consistent with the --

18   the plain language of performance measure 78 which provides

19   that -- requires that each record that is reviewed for

20   treatment plan compliance will also be reviewed for performance

21   measure 78, that all of the records reviewed for number 77 also

22   be reviewed for number 78.

23           THE COURT:  Give me a second.

24           MR. FATHI:  And if -- if I may add, Your Honor, we

25   pointed out in our brief the disparity between the numbers -- I

                    UNITED STATES DISTRICT COURT

1    will find the page in a moment -- but that at a typical

2    facility, well over 100 records are reviewed under number 77

3    and only a small fraction of that reviewed under performance

4    measure 78.  And again, that is simply not consistent with the

5    language of measure 78 which requires each record that is

6    reviewed for treatment plan compliance to be reviewed for

7    number 78.

8                 THE COURT:  Okay.

9                 Mr. Struck?

10                MR. STRUCK:  Your Honor, we agree with the Court's

11   interpretation, that if -- if the treatment plan wasn't updated

12   that month, then it's not applicable.

13                MR. FATHI:  But again, Your Honor --

14                MR. STRUCK:  The charts are reviewed.  They're

15   reviewed.  But if the -- if it didn't occur during that month,

16   then it's not applicable.

17                MR. FATHI:  Well, again, Your Honor, the defendants

18   are reading into the performance measure a restriction that

19   simply doesn't exist there.  I mean, they concede that these

20   charts are reviewed under performance measure 77.  And so, for

21   example -- this is at document 1755 at 17 -- for Florence in

22   August 2016, 203 records were reviewed for performance measure

23   77, and only 35 for performance measure 78.  And again, that's

24   not consistent with the requirement of that each record

25   reviewed for a number 77 also be reviewed for number 78.

                    UNITED STATES DISTRICT COURT

1          THE COURT:  Any last word, Mr. Struck?

2          MR. STRUCK:  Your Honor, just -- I believe what we're

3    proposing is consistent with your prior ruling regarding the

4    snapshot.

5          THE COURT:  All right.  I'll take -- I'll take a

6    closer -- another look at this in light of what you just said

7    and the citation that you made, Mr. Fathi, and make sure I

8    consider that and I'll take that one under advisement.

9          Performance measure number 85 seems to suggest another

10   change in the way things had been done, and I -- I don't

11   understand the basis for that change.

12         What do plaintiffs have to say about that?

13         MR. FATHI:  Well, you know, the Court had ruled in its

14   September 6 order, which is docket 1673, that the defendants

15   weren't reviewing the required number of charts for -- for this

16   performance measure.  And so in response to the Court's ruling,

17   the parties agreed on language to be incorporated into the

18   methodology that would increase the number of records reviewed.

19   And that language was, quote, the monitor uses an MH3D log that

20   shows all inmates whose medications have been discontinued, and

21   a sample of 10 inmates per yard who were due a contact in the

22   monitored month is selected.  So far, so good.  The parties had

23   agreed on this language.  Plaintiffs believed the issue was

24   resolved.

25         Unfortunately in a matter of days, the defendants

UNITED STATES DISTRICT COURT

1    reneged on this agreement and their monitoring guide now

2    contains very different language requiring the review of 10

3    records with medication discontinuation contacts due or

4    completed in the monitored month.

5           And the problem here, Your Honor, is what's being

6    measured is, is was this patient seen by a provider within 30

7    days of discontinuing psychotropic medication?  So if you draw

8    a sample that -- that is -- consist of prisoners who have been

9    seen, you're inflating the compliance rate.

10          The appropriate course of action is the language that

11   the parties had agreed on:  You draw a sample of patients who

12   were due a contact in this month.  And that was the language

13   that the parties had agreed on, and the Court should order the

14   defendants to honor their agreement and use this language.

15          THE COURT:  That makes sense to me, Mr. Struck.

16   Why -- why doesn't it make sense?

17          MR. STRUCK:  Well, because the language is meant to

18   capture the -- the contacts that occurred in the prior month

19   and the ones that are completed in the following month because

20   it's not -- you know, we're not looking at just a 30 -- a

21   30-day period of time.  So by including that language, it

22   allows for it to be more accurate to show if -- if something

23   happened in the prior month, then you look at the prior month.

24   And then you can also look at the -- at the following month, if

25   it hasn't been completed yet.

UNITED STATES DISTRICT COURT

1          THE COURT:  No.  We'll not include the completed

2     provision.

3          Why is there an issue with 86, Mr. Struck?

4          MR. STRUCK:  There isn't an issue with 86.

5          THE COURT:  All right.

6          Mr. Fathi, is there an issue with 86?

7          MR. FATHI:  Well, the issue, Your Honor, is that the

8     defendants did acknowledge that their current monitoring

9     methodology for this measure is inconsistent with the Court's

10    orders.  They said they would revise the methodology to be

11    consistent with the Court's order, but more than a month after

12    the Court's order they have not done so.  So the issue is they

13    need to promulgate a new monitoring methodology that is

14    consistent with the Court's order.

15         THE COURT:  So --

16         MR. STRUCK:  It has been revised.

17         THE COURT:  So you've addressed this?

18         MR. STRUCK:  Yes.

19         THE COURT:  Okay.  All right.

20         MR. FATHI:  It has not been provided to plaintiffs,

21    Your Honor.

22         THE COURT:  Can you do that, Mr. Struck?

23         MR. STRUCK:  Yes.

24         THE COURT:  Thank you.

25         All right.  The next number of series 89, 91, 93, 94,

UNITED STATES DISTRICT COURT

1   95 are, again, the partial credit issue, which we've already --

2   we've already addressed.

3        And then to 98.

4        MR. FATHI:  I beg your pardon, Your Honor.  There is a

5   separate issue with the performance measure 91.

6        THE COURT:  Thank you.  Tell me what that is.

7        MR. FATHI:  All right.  If I may take a minute to

8   find -- here we go.

9        So performance measure -- let me -- let me back up a

10  moment.

11        Prisoners classified MH5, mental health 5, that is the

12  highest need classification of prisoners on the mental health

13  scale, and all MH5 prisoners are housed at the Phoenix

14  facility.  So the threshold matter, we are talking only about

15  one facility out of the 10 that are at issue in this case.  And

16  what measure 91 provides is that MH5 prisoners who are actively

17  psychotic or actively suicidal shall be seen by a mental health

18  clinician or mental health provider daily.

19        Now, unfortunately, what the defendants have done is

20  to just make up language that's -- they're -- they're measuring

21  something completely different.  They're measuring -- they're

22  reviewing the files of prisoners who are placed on watch,

23  but -- on a continuous watch.  But that is obviously something

24  completely different.  Being actively suicidal or actively

25  psychotic is not the same as being on a continuous watch.

UNITED STATES DISTRICT COURT

1          Now, the defendants say that someone who is actively

2     psychotic or actively suicidal should be placed on a continuous

3     watch.  But as we pointed out in our paper, the fact that ADC

4     has had at least eight suicides so far this year makes it very

5     clear that not everyone who is actively suicidal is placed on a

6     continuous watch.

7          So the defendants need to monitor what the performance

8     measure requires.  And if, as they suggest, their current

9     monitor isn't qualified to look at the record and determine if

10    someone is actively suicidal or actively psychotic, then they

11    need to have this measure monitored by someone who is

12    qualified.

13         But again, as the Court has repeatedly told the

14    defendants, the plain language of the measure governs.  They

15    need to monitor what the measure requires.

16         THE COURT:  Mr. Fathi, are there two issues here?

17    It's one, the competency of the monitor; or in the alternative,

18    could it be resolved by medical entry that used these terms so

19    that that would be a signal of the fact that a medical provider

20    would have to be conducting this visit every day?

21         MR. FATHI:  That could also -- that could also work,

22    Your Honor, if the medical staff or mental health staff was

23    instructed to note in the record whenever a patient was

24    actively psychotic or actively suicidal, then the monitor's

25    task would be much more a -- a ministerial one of just seeing

UNITED STATES DISTRICT COURT

1    if those notations appeared in the record.

2           And again, I emphasized in response to the defendants'

3    claim of burden, we are talking about 10 records at a single

4    facility every month.

5           THE COURT:  And Mr. Struck, maybe this is something

6    Dr. Taylor could comment on, but that's, as you see from my

7    question, what my kind of layperson's reaction was to this;

8    that it seems like the problem could be addressed -- or your

9    objection could be addressed, Mr. Struck, by taking out the

10   decision making about whether the clinical profile depicted in

11   the medical records would draw someone to the conclusion that

12   would implicate the application of this performance measure

13   because of the existence of actively psychotic or actively

14   suicidal.  And -- and if those terms were used, then that would

15   be the trigger and you wouldn't have to rely upon somebody

16   else's, perhaps, uninformed conclusion about what was

17   necessary.  But go ahead.

18          MR. STRUCK:  Well, those -- particularly the actively

19   suicidal term, also actively psychotic -- isn't necessarily a

20   term that's used by mental health clinicians.  And I think the

21   Court asked for -- that's perhaps the expert testimony I recall

22   that you asked about, in addition to what is continuous watch.

23   And we can provide that through either Dr. Taylor, who can

24   testify now, or we can provide it to a declaration because I

25   understand the plaintiffs, you know, want to have their expert

UNITED STATES DISTRICT COURT

1    have their say.

2         However, I can say that the continuous watch are

3    the -- are the folks that are the concern -- actively suicidal,

4    I mean, just the plain language of that is, someone has got

5    something round their neck and they're trying to kill

6    themselves.  But that's not the people that are on continuous

7    watch.  The people that are on continuous watch are the people

8    that unstable psychotics and the people who -- the concern is

9    we can't have them on a 15 or 30-minute watch because they will

10   hurt themselves.  We have to watch them all the time.

11        This -- the putting them on the -- by reviewing the

12   continuous watch records, that captures the people that are

13   described in this particular performance measure.  Dr. Taylor

14   can certainly explain it far better than I, but when -- I do

15   know -- I do recall that when this particular performance

16   measure was negotiated into the stipulation, Mr. Fathi told

17   Dr. Taylor that he would let her decide how the -- what

18   objective criteria would be used to determine, you know, what

19   particular records were reviewed.  And Dr. Taylor came up with

20   the continuous watch as the objective standard in which to

21   review to determine whether or not the providers are seeing

22   inmates who are actively psychotic or seriously, you know --

23   serious concerns with respect to suicide so much so that they

24   have to be watched continuously.

25        Mr. Fathi's comment about the numbers of suicides is a

UNITED STATES DISTRICT COURT

1    red herring because that -- you know, these aren't

2    necessarily -- the people who have committed suicide aren't

3    necessarily the ones who are actively suicidal that are in --

4    that are MH5s that are -- that need to be on continuous watch.

5            THE COURT:  Well, the continuous watch is not provided

6    by mental healthcare provider or -- hold on just a second --

7    or -- I'm sorry.  It says mental -- quote -- mental health

8    clinician or mental health provider.

9            Is that true, Mr. Struck?

10           MR. STRUCK:  I'm sorry.  I'm sorry.  What was the

11   question?

12           THE COURT:  The continuous watch, who are the

13   watchers?

14           MR. STRUCK:  The continuous watch is generally a CO

15   watching to make sure they're not harming themselves.

16           THE COURT:  Right.  So how --

17           MR. STRUCK:  But these people are seen.

18           THE COURT:  How is it -- well, but it says seen by a,

19   quote, mental health clinician or mental health provider.  The

20   CO probably would like to know that he or she --

21           MR. STRUCK:  They are seen, Your Honor.

22           THE COURT:  Oh, they are.

23           MR. STRUCK:  They are.  But the continuous watch

24   just -- that means that someone is sitting there, physically

25   watching to make sure that they're not harming themselves at

1     the time.  And -- but they are still seen by a mental health

2     provider.  But the mental health provider isn't the one that's

3     sitting there watching them, you know, all day long to make

4     sure they don't harm themselves.

5           THE COURT:  Well, then I'm misunderstanding something

6     here.

7           Mr. Fathi, do you want to jump in and tell me what I'm

8     getting wrong?  Because what I've just thought I've elucidated

9     from Mr. Struck is that he says that they are being seen on a

10    daily basis by a mental health clinician or mental health

11    provider, that the -- that the watch is provided by the

12    correction officer, and that's just something that they do in

13    addition.  What -- what am I missing?

14          MR. FATHI:  Your Honor, the question here is what is

15    the universe of records that the defendants monitor for this

16    performance measure.  The performance measure applies to MH5

17    prisoners who are actively psychotic or actively suicidal.  So

18    that's what they have to measure.

19          The defendants have taken it on themselves to decide

20    that they're going to monitor an entirely different population,

21    which is MH5 prisoners who are on continuous watch.  That's

22    just not the same as those who are actively -- actively

23    psychotic or actively suicidal.

24          Now, the defendants say that actively suicidal is not

25    a -- a term that doesn't make sense or a term that's not used.

1    This is a term that the defendants agreed to in the

2    negotiations.  It's -- it's far too late in the day for them to

3    turn around and say, yes, we agreed to that, but it's not a

4    meaningful term, ha-ha-ha.

5          I would also point out that the term "actively

6    suicidal" is used in defendants' own mental health technical

7    manual at page ABC267412.  We'd be happy to provide that --

8    that to the Court.

9          The bottom line, Your Honor, is that the defendants

10   have to monitor what the performance measure requires.  They

11   have chosen to monitor something unilaterally and over

12   plaintiffs' objections something completely different, and

13   that's not permissible.

14         MR. STRUCK:  The folks that are actively suicidal are

15   on continuous watch.  They're looking at -- they're pulling

16   from the continuous watch records.  The people who are unstable

17   psychotics are on continuous watch.  So that -- that is the

18   universe of records that are being pulled.

19         Mr. Fathi wants them to look at every single record of

20   every single -- of every single inmate at the -- at the Phoenix

21   facility in order to find somebody who was presuming that

22   the -- the clinician uses this term, "actively suicidal" or

23   "actively psychotic."  It makes more sense to look at these

24   folks on the continuous watch, because they are actively

25   psychotic and/or actively suicidal, or in serious danger of

1    wanting to harm themselves.

2              THE COURT:  How 100 percent is that correlation?  Are

3    there any people who are put on continuous watch who are not

4    suicidal or so suchly described as psychotic?

5              MR. STRUCK:  No.

6              MR. FATHI:  Yes, there are, Your Honor.  And more

7    importantly, the eight suicides so far this year show that not

8    everyone who is acutely suicidal is placed on a continuous

9    watch.

10             Again, it -- it's very simple.  The defendants need to

11   monitor what the performance measure requires.

12             I would also point out that we are talking about a

13   tiny universe of people.  I believe the number of MH5

14   prisoners -- the total number of MH5 prisoners in the Arizona

15   Department of Corrections, all of whom are housed at a single

16   facility, is in the 60s or 70s.  So any -- any claim of burden

17   on this performance measure is completely not credible.

18             MS. KENDRICK:  Your Honor, this is Corene Kendrick.

19   May I just say one more thing --

20             THE COURT:  Yes.

21             MS. KENDRICK:  -- on this?

22             THE COURT:  Yes.

23             MS. KENDRICK:  Yeah.  So in terms of Mr. Struck

24   overstating the burden and saying that we want them to go

25   through medical records is -- you go back to the stipulation

1    itself.  It says that it's running a report from -- like 10

2    random files of people classified as MH5 and to look into their

3    records to see if there are notations if they're actively

4    psychotic.  So we're not -- we're not asking them to go through

5    every single record, every single MH5 person housed at the

6    Phoenix complex.

7            And also, if you look at footnote 15 in document 1755,

8    our filing, there is a citation to a prisoner who was

9    actively -- horribly psychotic, and showing that is not a

10   perfect circle overlap of everyone is actively psychotic or

11   suicidal is on continuous watch.

12           MR. FATHI:  Not on.

13           MS. KENDRICK:  Is not on continuous watch.

14           MR. STRUCK:  Your Honor, let me try to understand what

15   plaintiffs are suggesting.

16           If we pull -- because there's about 80 inmates at the

17   Phoenix facility.  So if we just pull 10 records and none of

18   them happen to indicate that they're actively psychotic or

19   actively suicidal, then the -- the inquiry ends there.  Is

20   that --

21           MS. KENDRICK:  No, no.  It's the same way -- it's the

22   same way that defendants say they monitor is that if they

23   find -- they pull a record and it's not applicable, then they

24   pull another record so they have a sample of 10.

25           MR. STRUCK:  Well, then that --

1          MR. FATHI:  Exactly.  The universe -- again, the

2    universe, under the plain language of the performance measure,

3    the universe that has to be measured is MH5 prisoners who are

4    actively psychotic or actively suicidal.  So --

5          THE COURT:  That's what the stipulation says.  You do

6    have to look at people who are in that category to determine

7    whether or not there's compliance with this performance

8    measure.  I agree with that.

9          The question is whether or not the defendants'

10   denomination of someone deserving to have a constant watch

11   should be sufficient to identify the records that they have to

12   pull.  That's the issue.

13         MR. FATHI:  Correct, Your Honor.

14         THE COURT:  And I -- and I asked the question of

15   Mr. Struck whether or not there were cases that would give us

16   misleading results.  For instance, is somebody on continuous

17   watch because you want to see if they expel contraband, or

18   something like that?  Is there -- if continuous watch is only

19   used for someone that the department has the highest level of

20   concern about -- and I can't imagine a higher level of concern

21   than having somebody simply being watched all the time.  So

22   that would seem to me, as a matter of common sense, to be a --

23   embracive of everything that would be required by the actively

24   suicidal or actively psychotic.

25         And the footnote 15 is a case where there was a

                    UNITED STATES DISTRICT COURT

1    mistake, apparently, or represented as such.  And I guess, on

2    the one hand, it seems to me that this would be the kind of

3    mistake that would be very rare because it would seem that --

4    that the state would not employ a great amount of resources to

5    have someone on continuous watch unless they thought there was

6    a need to do so.  And so that it would seem like it would

7    likely be a good substitute for the way to identify which

8    records you would have to pull, as opposed to looking at all of

9    the records.

10            I guess -- is part of your logic here, Mr. Fathi, that

11   you think by having them look at all of the records, that they

12   will identify mistakes, people that should be on continuous

13   watch who aren't because they're actively psychotic, or -- but

14   again, that's not what the stipulation requires.  It doesn't --

15   that doesn't have an imposition of a continuous watch

16   requirement.

17            MR. FATHI:  Correct.  Correct, Your Honor.  The whole

18   continuous watch piece of this is -- has been invented out of

19   whole cloth by the defendants.  And the problem with that

20   category is that it is both overinclusive and underinclusive.

21   The category of people who are on continuous watch includes

22   some who are not actively suicidal or actively psychotic.

23            THE COURT:  Why else -- in your view -- I'm sorry to

24   interrupt -- but why else in your view are they being

25   continuously watched if they're not actively psychotic -- or if

1    they're not psychotic to this extreme degree or actively

2    suicidal, why else would they do it?

3         MR. FATHI:  They may be there for observation, they

4    may be there because they are believed to be a danger to

5    themselves or others.  I haven't looked at the defendants'

6    mental health technical manual recently to see what the

7    criteria are for continuous watch.  But I'm confident that it

8    is not limited to those who are activity psychotic or -- or

9    actively suicidal.

10        But the bigger problem, Your Honor, the overinclusion

11   is not such a big problem.  The bigger problem is the

12   underinclusion, the fact that we know that there are people who

13   are actively suicidal who are not on continuous watch.  None of

14   the eight people who have committed suicide in the Arizona

15   Department of Corrections so far this year were on a continuous

16   watch.  Therefore, we know that continuous watch does not

17   capture everyone who is actively suicidal.

18        THE COURT:  Mr. Struck, I'll give you the last word.

19   But I'll tell you, what Mr. Fathi just said, his last couple of

20   sentences seem persuasive to me.

21        MR. STRUCK:  Well, let me tell you why it's not

22   persuasive.  The fact that they were able to commit suicide

23   doesn't mean there was any indication prior to that that they

24   were actively suicidal.  And so for Mr. Fathi to simply say,

25   oh, well, there were eight suicides that took place, so there

UNITED STATES DISTRICT COURT

1  must be -- they must be missing, you know, some of these folks,

2  that's not accurate, Your Honor.  I mean, the reason why --

3          THE COURT:  But it could be.  We don't know.  We

4  don't -- we actually don't know.

5          MR. STRUCK:  The plaintiffs haven't --

6          THE COURT:  What we do know is that we've got some

7  intermediary step that's not enumerated in the stipulation, and

8  that is allowing the continuous watch determination to

9  supersede the requirement of the stipulation, that there be a

10  determination that there's an active psychosis or an active

11  suicidal situation present.

12          MR. STRUCK:  Your Honor, the plaintiffs haven't

13  presented any evidence that any of the folks at Phoenix that

14  are -- that are in that facility that were -- that committed

15  suicide were actively suicidal, or should have been determined

16  to be actively suicidal and should have been placed on

17  continuous watch and they weren't.  He's just throwing out, oh,

18  well, there were eight suicides in the ADC system.  We're

19  talking about one facility and one level of -- one type of

20  inmate who had -- who are -- have specific mental health needs.

21  We're not talking about all the facilities.  We're just talking

22  about Phoenix.  And they -- they can't simply say, oh, well,

23  there were eight suicides, without pointing to one of these

24  folks who was at Phoenix who the records indicated they were

25  actively suicidal, but they weren't placed on continuous watch.

1    They -- they can't do it.  They haven't done it.

2         MR. FATHI:  Your Honor, we are the ones asking for

3    compliance with the plain language of the performance measure.

4    I don't think the evidentiary burden is on us.

5         MR. STRUCK:  Your Honor, none of those suicides were

6    at Phoenix.

7         MR. FATHI:  Your Honor, Mr. Struck represented that

8    the policy, not limited to the Phoenix facility, is that

9    someone who is actively suicidal is placed on a continuous

10   watch.  If Mr. Struck wants to clarify that that policy is

11   unique to the Phoenix facility and doesn't apply throughout the

12   ADC system, then, of course, we'll take that into account.  But

13   the fact that there were eight suicides, none of whom were on

14   continuous watch at the time, shows that not every one who is

15   actively suicidal is placed on a continuous watch.

16        THE COURT:  Well, we really don't know because what we

17   all -- what we do know is that the MH5 people didn't -- who

18   committed suicide -- I'm sorry, we all know that there are no

19   MH5 people who were among the list of eight people because they

20   would have been in a different facility.  So we know that at

21   least with respect to trying to extrapolate from that, it's

22   unnecessary.

23        On the other hand, as I -- as I've indicated to you,

24   it seems to me to be a pretty compelling argument that the

25   people who are on continuous watch are a good measure of

1    determining whether or not those who have appropriate files to

2    pull to see whether or not they've been seen every day.  The

3    plaintiffs are concerned that it's underinclusive, there would

4    be someone for whom the determination could be made they were

5    actively psychotic or actively suicidal who were not deemed to

6    be worthy of having continuous watch.

7         I've been told that these terms do not have any

8    well-understood meaning in the profession by defendants, and

9    that the plaintiffs have suggested the necessity of expert

10   testimony about what it means.

11        The -- to the extent -- to the extent -- I mean,

12   frankly, we've spent so much time talking about this, and

13   because it is probably worth -- worth the discussion, I think

14   what we will do is we will invite the parties to submit

15   affidavits or expert testimony, if they wish, as to not only

16   the meaning of these terms, but the -- the plaintiffs would

17   then have the -- now you will have the burden to tell me why it

18   is that there is a risk to the overall purpose of the

19   stipulation by allowing the defendants to use as the

20   identification measure people who are on continuous watch as

21   being the definition of actively psychotic or actively

22   suicidal, and so the affidavits or the testimony would inform

23   me about whether there is such a meaning to those terms that

24   they don't need to be substituted, or the -- the briefing that

25   would accompany would also inform me about the risk of using

UNITED STATES DISTRICT COURT

1    the continuous watch measure.

2         And so I'll ask you all to do that sometime before the

3    next time that we get in court together.

4         MR. FATHI:  Okay.  That's fine, Your Honor.

5         I would just like to ask the defendants for a

6    clarification on the record.  Their monitor guide states that,

7    for this measure, they will monitor patients who were, quote,

8    determined to be actively psychotic or suicidal on a continuous

9    watch, end of quote.

10        In their brief, document 1816, they made a different

11   statement, saying that they will monitor a sample of all

12   inmates who were on a continuous watch during the monitored

13   month.  So the clarification I would appreciate from defendants

14   is, which is it?

15        THE COURT:  I think we've heard this morning what

16   their position is.  But it's going to -- if they are going to

17   go back to something closer to what was their first view, I'd

18   ask you let Mr. Fathi know that so that -- but it sounds like

19   from what we've been talking about here in court, that they're

20   not at that first position.  They're very clearly on the

21   position that the continuous monitoring would be the definition

22   of these two terms and the stipulation on what records had to

23   be pulled.

24        And -- but if I am wrong about that, Mr. Struck, let

25   Mr. Fathi know.

1          MR. STRUCK:  Okay.

2          MR. FATHI:  Could we have an answer now, Your Honor?

3          THE COURT:  Are you in position to give an answer now,

4    Mr. Struck?

5          MR. STRUCK:  Yeah, we're -- yeah.  Dr. Taylor just

6    said that they'll review -- and I think she's already -- we've

7    already offered it to Mr. Fathi, who rejected it -- that they

8    will review all of the MH5s at Phoenix that are on continuous

9    watch, not just a sample.  They will review every single one.

10         THE COURT:  Well, again, I imagine that the problem

11   there is, what if it's underinclusive?  That's what Mr. Fathi's

12   issue is.

13         Is that right, Mr. Fathi?

14         MR. FATHI:  Well, it is both underinclusive and

15   overinclusive.  But the underinclusive is the greater danger,

16   that someone who is actively psychotic or actively suicidal

17   will not be captured by using continuous watch as a proxy.

18         THE COURT:  Okay.  All right.

19         Performance measures 100 and 101.  What's the

20   plaintiffs' --

21         MR. FATHI:  I beg -- I beg your pardon, Your Honor,

22   but there is performance measure 98.

23         THE COURT:  Oh, 98.  All right.

24         MR. FATHI:  Yes.

25         Now, this is the performance --

                    UNITED STATES DISTRICT COURT

64

1      THE COURT:  You're right.

2      MR. FATHI:  Thank you, Your Honor.

3      May I proceed?

4      THE COURT:  Yes.

5      MR. FATHI:  This is the performance measure that the

6  Court may recall from its earlier ruling on methodology.  This

7  is the one that sets time limits for HNRs, health needs

8  request --

9      THE COURT:  And overlooking it was simply because I

10  thought we'd been there, done that, that you not only have to

11  act within the time frames, you have to document the time

12  frames.

13      But why is that wrong, Mr. Struck?

14      MR. STRUCK:  Your Honor, the -- with respect to this

15  particular performance measure, the -- these are -- they're

16  scanning the eOmis, and the plaintiffs can verify the findings

17  by -- they have access to the eOmis.  They can verify the

18  findings to determine whether or not the performance measure is

19  being accurately recorded by the monitors.

20      MR. FATHI:  Your Honor, the concern, particularly in

21  light of the history of this performance measure, is as

22  follows:  For months, the defendants simply refused to comply

23  with the time frames set forth in this performance measure,

24  that emergency HNRs be responded to immediately upon receipt,

25  and urgent HNRs within 24 hours.

UNITED STATES DISTRICT COURT

1        In its September 6th order, document 1673, the Court

2   ordered the defendants to comply with those provisions.

3        Obviously it is essential to know whether they have

4   complied with those provisions to know the time in which the

5   HNR was received or triaged.  And we see no burden whatsoever

6   in requiring the defendants, as the Court suggested, to simply

7   document that information.  Particularly in light of the

8   defendants' history of intransigence on this measure, we

9   think -- we think it should be required.

10       THE COURT:  I think -- I think so too.

11       MR. STRUCK:  Your Honor, I think that the problem

12  occurs when there's a -- there's a contact, there's -- the

13  inmate is seen by a provider, but then the provider doesn't

14  actually record until after they're done with their round.

15  They record it later.  And so it -- it ends up being

16  inaccurate.

17       THE COURT:  All right.  I've just been handed a note

18  that I've been inconsiderate, and so I need to take a break for

19  court staff.  And so I'm going to do that.

20       And so we'll take a 10-minute break, and we'll pick up

21  right where we left off.

22       Thank you all very much.

23            (Proceedings in recess at 10:37 a.m.)

24             (Proceedings resume at 10:50 a.m.)

25       THE COURT:  Thank you very much.

UNITED STATES DISTRICT COURT

1          Please be seated.

2          Thank you for letting me cut you off, Mr. Struck.

3          You may continue.

4          MR. STRUCK:  I'll try to remember what we were

5   discussing, Your Honor.

6          THE COURT:  Fair enough.

7          We were talking about the fact that the person who is

8   doing the chart entry is someone who is doing it after the

9   fact, and that you, I thought, were saying that that made it

10  difficult the accurate start/end time to be entered.

11         MR. STRUCK:  When the -- typically what happens is,

12  you know, the providers are seeing their patients, and they

13  get -- they get very busy, there might be an emergency, and

14  they do their charting at the end of the day.  And one of the

15  problems with the eOmis software is that when the charting is

16  done, it puts that time in automatically as when the patient

17  was seen, even though they might have been seen hours before.

18  So as a result, there are situations where there is going to be

19  a lot -- there could potentially be and there would be

20  noncompliance, even though they were compliant because they

21  were seen earlier, they were seen within the time frame

22  required.

23         THE COURT:  Yeah, but the problem is that really

24  leaves me unable to ascertain whether or not there's compliance

25  or not.  So I guess I don't understand why it is that the

                   UNITED STATES DISTRICT COURT

1        person who is taking information and putting it into the

2        software program can't also include within that entry the

3        actual time.  Don't rely upon the software to do it with its

4        date stamp, but rely upon what's actually a human person is

5        putting in.

6              MR. STRUCK:  They -- it is -- it is capable -- the

7        system is capable of them doing that; the problem is, they're

8        not doing it because they're busy and it's just not happening.

9        So as a result, there's a lot of noncompliant scores when, in

10       fact, there was compliance.  They were -- so that's -- that's

11       the -- that's the problem.

12             THE COURT:  Well, but the problem then also swamps me

13       being able to tell where there hasn't been compliance, and

14       it -- because I don't have accurate time reporting.

15             MR. STRUCK:  Well, the --

16             THE COURT:  I just think the stipulation where it

17       requires actions to be done by a certain time, it's critical

18       that the records that are being evaluated to determine whether

19       or not there's compliance do inform us of the information that

20       we have to have to make that determination.

21             All right.

22             MR. FATHI:  Your Honor, this is David Fathi.  May I

23       say one additional thing about performance measure 91?

24             THE COURT:  Of course.  Of course.

25             MR. FATHI:  I simply want to -- to note that during

UNITED STATES DISTRICT COURT

1    our discussion on performance measure 91, Mr. Struck purported

2    to testify about certain discussions that occurred during the

3    negotiation of this performance measure.  And I simply want to

4    make clear we do not agree with his version of the facts.

5              THE COURT:  All right.  Okay.

6              Now, turning to 101.01, it looks to me like I have to

7    hear from whether or not the plaintiffs think the November

8    11th, '16, guide on these two performance measures is

9    acceptable or not.

10             MS. KENDRICK:  Your Honor, this is the Corene Kendrick

11   at the Prison Office.

12             We've reviewed their proposed changes to 101, the

13   dental measures, and they do look sufficient.  So long as they

14   haven't changed them yet again, we are comfortable with what is

15   docketed at 1756-1, pages 76 to 677.

16             THE COURT:  All right.

17             MS. KENDRICK:  75 to 77.  Sorry.

18             THE COURT:  Okay.  Thank you.

19             Well, I have probably a dozen cookies in my chambers.

20   If I had enough to offer them to everybody in the courtroom, I

21   would bring them out to celebrate an agreement.  And the people

22   who appear telephonically lose the chance, I suppose.  I guess,

23   though, if people shared cookies, there might be enough.  So

24   maybe somebody might bring the cookies in and you'll get a

25   reward for agreeing.

                    UNITED STATES DISTRICT COURT

1    All right.  Paragraph 12 is where I am next, where the

2    issue is whether or not fliers are acceptable for influenza

3    shots.

4    Why can't we use fliers for influenza shots?

5    MS. KENDRICK:  Your Honor, we -- we believe that

6    paragraph 12 is analogous to the discussion we had earlier

7    about performance measures 60 and 61 in terms of what needs to

8    be done to show that preventative care has been offered to the

9    class members.

10    THE COURT:  Okay.

11    Mr. Struck?

12    MR. STRUCK:  Your Honor, we believe it's not

13    analogous.  I mean, this is more analogous to what you see in

14    the community.  You don't get -- people typically don't get a

15    note from their doctor saying, come get your flu shot.  You see

16    it posted at the grocery store, at Walgreens, or at -- you

17    know, at healthcare providers.  This -- simply by providing

18    the -- the posters and the information, that is -- that is

19    allowing the inmates to see that, yes, I can get a flue shot,

20    and that's what's required.  And as long as we can show that

21    there is adequate and ample, you know, notices posted with

22    respect to this, then -- then we are in compliance with this

23    performance measure.

24    THE COURT:  Yeah, it seems that way to me.  The Pap

25    smear is different than the influenza shots.  And so if

UNITED STATES DISTRICT COURT

1    people -- I mean, I don't know that there's an analogy outside

2    of in-custody that's particularly apt ever, because the worlds

3    are so different.  But nevertheless, the out-of-custody world

4    seems to get by with flyers on influenza shots.  But I don't

5    know any medical provider who is looking after her patient who

6    thinks that a flyer is sufficient for a Pap smear.

7              And 14, it seems like you just --

8              MS. KENDRICK:  Your Honor, excuse me.

9              THE COURT:  Go ahead.

10             MS. KENDRICK:  Sorry to interrupt, Your Honor.

11             THE COURT:  Yeah.

12             MS. KENDRICK:  First of all, on paragraph 12A, I was

13   actually going to tell you to break out the cookies because we

14   do actually agree that that's fine for influenza vaccination.

15             However, there are four subparts to paragraph 12.  And

16   in terms of the requirement about individuals ages 50 to 75

17   with colorectal cancer screening and women over the age of 50

18   being offered mammograms, we do believe that paragraph 12,

19   subsection C and D, are analogous to the performance measures

20   about offering Pap smears.

21             THE COURT:  I didn't know -- and forgive me for not

22   having appreciated this -- but I didn't know that those others

23   were still at issue.

24             Mr. Struck, are you not -- are you hoping to rely on

25   flyers, as well, for the colorectal exams for 50 to

UNITED STATES DISTRICT COURT

1    75-year-olds?

2           MR. STRUCK:  That is what the defendants currently do.

3    They post signs, posters, decals and banners in the medical and

4    housing units.

5           THE COURT:  Okay.  Well, with respect to my prior

6    ruling, 12C doesn't have one of the components that was

7    motivating me earlier, and that is what seems to be a

8    particular time period, the 36 months.  This says "annually."

9    Every 12 months, I suppose, you could describe that as.

10          All right.  Honestly, I really didn't -- I thought we

11   were just talking about the influenza vaccines.  So give me

12   just a moment.

13          What do you do with respect to 12B, Mr. Struck?  Are

14   you using flyers there too?

15          MR. STRUCK:  Yeah.  They're automatically scheduled,

16   Your Honor.  They're on a -- there's a tickler system with

17   respect to inmates who have -- have chronic illness.  So

18   that -- no, we're not relying on flyers for that.

19          THE COURT:  And when that tickler comes up, then the

20   people are called in?

21          MR. STRUCK:  Yes, they're called in when it's time for

22   them to come in for whatever medical treatment that they need.

23          THE COURT:  And your idea that 12C and D don't require

24   that kind of tickler regimen is why?

25          MR. STRUCK:  Well, because the -- the folks with

                    UNITED STATES DISTRICT COURT

1    chronic diseases, they have the disease.  I mean, this is just

2    a screening for if an individual between the ages of 50 and 75

3    want to have a colorectal cancer screening, they can see the

4    poster, I mean, that's -- and go in, if they want to get it.

5    They will be offered it.  And that's -- that's sufficient to

6    offer.  That's the standard of care.  They shouldn't have to

7    send a notice to each individual inmate between those ages to

8    let them know that they can -- they can have one if they want,

9    because they can -- they can see it in their housing unit, they

10   can see it in the -- in the medical unit.

11            THE COURT:  Have the plaintiffs seen these posters in

12   the prison facilities?

13            MR. STRUCK:  Yes, Your Honor.

14            THE COURT:  I'm just asking them now --

15            MR. STRUCK:  Oh.

16            THE COURT:  -- if I may.

17            MS. KENDRICK:  We've seen the posters about the Pap

18   smears and the influenza, but I personally do not remember

19   seeing them -- perhaps other plaintiffs' counsel do -- for the

20   subpart B through D.

21            THE COURT:  Okay.  At your next prison visit, take a

22   look, see what you see, and let me know whether you think those

23   are inadequate after you've seen them.  All right?

24            MS. KENDRICK:  Yes, Your Honor.

25            THE COURT:  Thank you.

1          Thank you for bringing it up that I've missed those.

2          Paragraph 14 seems to require that I just tell you

3     what the date certain is for implementation.  And so if that's

4     what's necessary, I know how to do that.  And so I could say 30

5     days.  Would that work?

6          Any objection?

7          I don't hear any.

8          MS. KENDRICK:  No objection, Your Honor.

9          MR. STRUCK:  That's something that's done by Corizon's

10    software.  I don't know what the status on that is, on the hard

11    stop.

12         I'm looking -- checking with the Corizon people.

13         THE COURT:  I understand.

14         MR. STRUCK:  Your Honor, I would like an opportunity

15    for them to be able to check with the software provider to

16    determine how long it's going to take them to do that, rather

17    than say yeah, it could be done in 30 days.  It may very well

18    could be done in 30 days, but they need to check with Marquis

19    to find out how long it's going to take them to do it.

20         THE COURT:  All right.  Would you provide a notice to

21    the Court, then, within 14 days about --

22         MR. STRUCK:  Yes.

23         THE COURT:  -- about whether or not the 30 days is

24    acceptable?

25         MR. STRUCK:  We will.

                    UNITED STATES DISTRICT COURT

1          THE COURT:  Paragraph 15 seems to be shifting the

2     burden to the inmate to have to use magic words to invoke the

3     protection of paragraph 15.  That doesn't seem to me to be

4     appropriate.  It seems that the stipulation says that if -- if

5     a prisoner is taking a psychotropic medication, suffers a heat

6     intolerance reaction, that seems to me something that is going

7     to be within the ken of the medical providers, and that if

8     somebody presents with a heat intolerance reaction, then the

9     paragraph is invoked and it isn't simply tested on whether or

10    not someone says, I am having a heat intolerance reaction.

11          On the plaintiffs' side?

12          MR. FATHI:  No.  We completely agree, Your Honor.

13    Once again, the defendants are reading into the stipulation a

14    limitation that simply doesn't exist.  We agree with the

15    Court's analysis.

16          THE COURT:  Mr. Struck?

17          MR. STRUCK:  Your Honor, in order to know whether

18    they're having a problem, they need to report some sort of

19    symptom.

20          THE COURT:  Well, yeah.  They would report a symptom.

21          MR. STRUCK:  Right.

22          THE COURT:  But what I read you to say is that they

23    essentially have to use these magic words.

24          MR. STRUCK:  No.  No, they have to report a symptom

25    that's consistent with heat intolerance as a result of being on

                    UNITED STATES DISTRICT COURT

1    psychotropic medication and excessive heat.  They don't -- it

2    doesn't have to be those magic words.

3             THE COURT:  Well, maybe the plaintiffs found a meaning

4    that I also found.

5             But if -- if it's informed by what Mr. Struck said, is

6    that stuff from the plaintiffs' view?

7             MR. FATHI:  Well, it's certainly an improvement, Your

8    Honor.  But, again, we were basing interpretation as -- as was

9    the Court on the plain language of defendants' filing, which is

10   that they would limit this requirement -- they would limit

11   compliance with this requirement to patients, quote, who

12   reported heat intolerance.  And again, that is not -- that's

13   not what the -- what the performance measure requires.

14            And as our expert psychiatrist, Dr. Stuart, explained,

15   many patients don't realize they're suffering from heat

16   intolerance reaction, and others may know that they're feeling

17   ill but not be aware of the cause.  So we think that shifting

18   the burden, as the Court said, to the -- to the patient, it is

19   inappropriate.  As the Court said, the defendants have trained

20   medical staff who should be able to recognize the signs and

21   symptoms of a heat intolerance reaction, and the burden should

22   not be placed on -- on the patient for whom the heat

23   intolerance reaction itself may interfere with their ability

24   to -- to recognize and articulate what's occurring to them.

25            THE COURT:  Okay.

                    UNITED STATES DISTRICT COURT

1          MR. STRUCK:  I guess -- I don't know.  Maybe we're

2     talking about the same thing.  But if they are complaining

3     about symptoms that are consistent with heat intolerance, then,

4     yeah.  But the plaintiffs seem to suggest that we need to go

5     around, and every time it's a certain temperature, we need to

6     go see and -- some medical provider needs to go talk to every

7     inmate who's on psychotropic medication, and that's not the

8     case.  It's not putting the burden on the individual inmate

9     patients to say, oh, I have a heat -- I'm having a heat

10    intolerance issue.  But they need to say if they're having an

11    issue, some sort of medical issue.  Otherwise, how are we going

12    to know?

13         THE COURT:  If an inmate presents to the medical staff

14    with symptoms that are consistent with a heat intolerance

15    reaction, then it seems to me that this paragraph is invoked.

16         MR. STRUCK:  Right.

17         THE COURT:  So that seems clear enough to me.

18    Okay.

19         MR. FATHI:  Your Honor, I beg your pardon.  There

20    is -- we have a similar issue here as we did with paragraph 14,

21    which is that in their filing docket 1703, dated October 6th,

22    the defendants said they are currently working with Corizon and

23    Marquis to develop software that would permit compliance with

24    paragraph 15.  But they did not provide a date, and we have not

25    received any updates.

UNITED STATES DISTRICT COURT

1          So we would ask the defendants and the Court follow

2     the same procedure, that defendants investigate and report to

3     the Court within 14 days.

4               THE COURT:  Can you do that, Mr. Struck?

5               MR. STRUCK:  Yeah.  We'll report, Your Honor.

6               THE COURT:  All right.  Thank you very much.

7          What is still in dispute with respect to what's set

8     forth at document 1782, page 21, note 1, the isolation

9     performance measures?  What's still going on there.

10              MS. FETTIG:  Your Honor, this is Amy Fettig.

11         I wish I -- I wish I could report more to you.

12         We did respond to defendants because they offered some

13    compromises in their brief, and on December 2nd we sent them a

14    revised monitoring guide, red line, putting forth what we

15    understood to be their compromises, and offering some

16    alternative language based on some of the issues they raised in

17    their brief.  Defendants represented that they would get back

18    to us on Monday or Tuesday of this week, but we didn't hear

19    from them.  So we cannot definitively say what has been decided

20    and what has not been decided.

21              MS. LOVE:  Your Honor, we -- we have been working on

22    this with the ADC folks to determine whether or not we could

23    agree to additional proposals by the plaintiffs.  We are not

24    able to agree to their additional proposed language.

25         Additional proposed language they provided pertained

1    to -- and if I miss, Amy, I'm sure, will jump in -- pertain to

2    how to document refusals of out-of-cell time; we're at a

3    standstill on additional things such as whether or not with

4    respect to performance measure 9 on use of force, the scope of

5    that; whether or not defendants object to any -- any suggestion

6    by plaintiffs that the monitor has to make an independent

7    judgment as to whether a -- an intervention or cooldown period

8    was sufficient, as the stipulation requires that it occurred,

9    and the use of force packet investigate those issues; and then

10   also with respect to plaintiffs' suggestion that with respect

11   to performance measure 9 on the use of force, that the monitor

12   also has to either interview additional staff and inmates, or

13   do a review of medical records where none of those items are

14   contemplated by the performance measure negotiated by the

15   parties, the stipulation, or just the four corners of the

16   performance measure related to use of force where that does not

17   at all pertain to medical.

18          So we've reached a good amount of agreement, but we're

19   not quite there yet.  But I think those are the big outstanding

20   issues, which I'm happy to address each one as to defendants'

21   remaining position.  But they were set forth in our papers at

22   1782.

23          THE COURT:  Well, here's what I wonder about, because

24   performance measure 9 is such a large pool of issues implicated

25   by the response from the defendants that plaintiffs didn't know

1       about, I wonder if it makes sense, so that we can get to

2       something other than just the performance manual issues today,

3       maybe makes sense for us to put that off to the -- to the next

4       hearing so that you can have a chance to continue the

5       discussions to see exactly what is teed up for me to have to

6       decide.

7              I'll tell you, among the issues that you just

8       mentioned, with regard to the certification, I guess I'm not so

9       persuaded that there needs to be a signature by more than one

10      guard.  It seems to me that one is sufficient.  But also I've

11      given you the heads-up about what I think about start and end

12      times.  I think those are critical.  I need to know what the

13      exact times are with respect to obligations under the stip --

14      under the stipulation.  And I've also given you a heads-up, I

15      think, about some issues that touch upon these with respect

16      to -- no, I think that's what I needed to cover on that.

17             So I would suggest that maybe it makes sense to put

18      that off until our next session.

19             MS. LOVE:  Well, Your Honor, with respect to refusals

20      and start and end times, I would like to address the Court

21      today, if you would like to hear more information.  I believe

22      that we have reached an impasse on those --

23             THE COURT:  Okay.

24             MS. LOVE:   -- issues, so it's probably ripe for you

25      to hear --

1          THE COURT:  All right.  All right.  Go ahead.

2          MS. LOVE:  -- about that.

3          With respect to refusals for out-of-cell time, we

4     start with the original -- or what the baseline analysis that

5     document -- the type of documentation to show refusals is not

6     part of the stipulation or the agreed upon performance measure.

7     The stipulation drives that out-of-cell time is offered.

8          Now, in the course of doing the monitoring, we've --

9     we've implemented these out-of-cell time sheets, and the

10    out-of-cell time sheets denote the time the inmate is offered.

11    It's 9:38.  You were offered to go to rec.

12         THE COURT:  Uh-huh.

13         MS. LOVE:  The out-of-cell tracking sheet also denotes

14    the location where the inmate is to go.  And if the inmate

15    refuses, then an R is indicated on the form.  The form is then

16    turned over to the backside and then noted "refusal of rec" and

17    the time, the amount of rec that the inmate would have gone out

18    for.  Let's say, for example, two hours.

19         Now, to require that there be a documented end time is

20    really requiring documentation that, you know, if they were

21    offered at 2:38, whether or not the inmate came in exactly, you

22    know, two hours later is probably not going to happen.  It

23    could be a few minutes later because of the -- the escort time.

24    To require officers to then go back and figure out, okay,

25    someone who has refused their out-of-cell time, they would have

UNITED STATES DISTRICT COURT

1    come back in at this time, it's really inaccurate reporting

2    because it wouldn't truly reflect, you know, an actual start

3    and end time.

4           How we take care of that is, on the back of the

5    out-of-cell tracking form, it's documented the inmate refused,

6    for instance, two hours of rec, and there is a space to

7    indicate two hours of rec.

8           Now, there's going to be human error at times where an

9    officer may not denote two hours.  But there's a double-check.

10   The monitors are then able to go back to the activity schedules

11   for that particular unit and look to see in the activity

12   schedule, can they see if an inmate in this particular housing

13   unit at 9:38 was offered rec, is it showing on the block that

14   would be a two-hour rec time for that particular inmate.  So

15   there is another source.

16          Now, if there's no ability by looking at an activity

17   schedule and it's not denoted how much time they refused, well,

18   then we do have a problem with compliance because we can't

19   determine that.

20          So providing for a beginning time and then it being

21   able to source, okay, they were going to go out for two hours

22   for rec per the activity schedule, we believe is sufficient to

23   show how much time the inmate would have gone out for had they

24   chosen that opportunity.

25          THE COURT:  All right.

1          MS. FETTIG:  Your Honor, may I respond to that?

2          THE COURT:  Of course.

3          MS. FETTIG:  So -- so actually what Ms. Love is

4    describing is very similar to the alternative we proffered to

5    them because in the brief, the defendants stated that they put

6    the time of refused recreation programming in the comment

7    section.  We haven't seen that as a general practice across any

8    of the units.  But if that is a practice that they expect of

9    their staff, we -- we agree to that, to note the amount of time

10   and then to cross-check it with the unit schedules as a routine

11   part of practice.  And we haven't seen that, but we do agree

12   that that could be included.  And then if it can't -- if time

13   cannot be confirmed, then it would not count towards

14   compliance.

15          So that issue, it actually sounds like we are closer

16   than we were before.  But it has not officially been agreed to

17   in the language.

18          THE COURT:  Okay.  All right.  Good.

19          I'll have to go to the post office, send the cookies.

20          MS. LOVE:  Next as to -- I think in the max custody

21   realm, Your Honor, there might a lot of cookies involved.

22          THE COURT:  Okay.

23          MS. LOVE:  So I'm just thinking kind of ahead.

24          So as far as the refusals are concerned, as we have

25   explained through our argument, as well as declarations, that

1    to document a refusal is quite onerous and a substantial burden

2    on operations.  The goal —— and ADC agrees that the goal is to

3    provide either a second signature from the officer or the

4    inmate's signature.  Obviously the officer who is documenting

5    the refusal, you've got one officer's signature.  The

6    substantial burden and challenges comes into play in two

7    respects.  One, as a matter of running a unit or a pod, if

8    there's no requirement that a max custody inmate has two

9    officers to escort out to rec, then most often there's one

10   officer who's taking the person out.  So to have a second

11   signature is going to require two things:  A) You're pulling an

12   officer from other duties to just come and witness the inmate

13   doesn't want to go out; or if you require a double signature,

14   it's not going to be somebody who actually witnessed the

15   refusal.  So then what's the point if that person didn't

16   actually witness?

17          Number 2 with respect to inmate —— the inmate's

18   signature, this is a significant safety and security issue

19   because the officer then has to make an assessment, an officer

20   who may not work with that particular inmate every day, to know

21   whether, is this going to cause a legitimate risk of safety to

22   now hand a pen, which is a weapon, to a max custody inmate to

23   sign.  The inmate may not give the pen back, and now we're in a

24   situation of noncompliance and possibly a cell extraction to

25   get that pen back because it can be used as a weapon.

1      In addition, it impedes the operations and the

2  efficient ability of the officers to turn people out to rec if

3  you have to have that signature there.

4      The proposal that we have made to plaintiffs' counsel

5  is this.  In the normal course of operations, if supervisory

6  staff sees that an inmate is now acting out of the norm as far

7  as out-of-cell time, whether it's programming, whether it's

8  recreation, that's a red flag to supervisory staff.  Why is

9  this inmate not coming out?  Is this inmate -- is this inmate

10  ill, needs to go to medical; is the inmate have -- there's a

11  change of behavior.  It could be the inmate is having a problem

12  with another inmate and now has some safety or concerns or

13  threat concerns.

14      So when that occurs, supervisory staff -- and it's not

15  after -- like, it's not a four-day thing or a three-day thing

16  because it's all dependent on what is that inmate's normal

17  behavior.  Not every inmate wants to go out every single time

18  they're offered out-of-cell time.  So when a supervisor sees

19  that occurring, they go and have a conversation with the inmate

20  at the cell front, to say is something going on, do you not

21  feel well, do you have a safety concern, or does the inmate

22  just not want to go out because it's winter time and they

23  prefer to go out when it's warmer.

24      What we've offered is when that conversation occurs,

25  the back of the out-of-cell tracking form, the supervisor will

1    note day of the conversation, had a conversation with the

2    inmate about not going out to rec or refusals, inmate stated

3    the following.  Encour -- you know.  And then if there's any

4    talk or encouraging of the inmate to, you know, to go out, that

5    is going to be documented on the back side.

6         So we believe that that's a reasonable way to take

7    care of plaintiffs' concerns, while not supported by evidence,

8    but their concerns that there's some sort of prevalent issue of

9    inmates just not going out to rec.  And then I guess the --

10   maybe, and they haven't said this to me so I don't want to

11   speak for them -- but it seems to me that then it's intimated

12   that no one cares that they're not going out to rec.  This is

13   the normal course of operations, and this can be easily handled

14   by, you know, something on the back of the form.

15              THE COURT:  All right.  Why is --

16              MS. FETTIG:  Your Honor --

17              THE COURT:  -- that not reasonable?

18              MS. FETTIG:  Your Honor, we think part of it is

19   reasonable.  And what we've offered to the defendants as a

20   compromise, given the staffing issues is, yes, if the prisoner

21   can sign the refusal and will sign the refusal, that's great;

22   and two officers, better in terms of a refusal, having two

23   officers because then you guarantee that it's not just a staff

24   member who doesn't really want to offer anything or any kind

25   of, shall we say, malfeasance; that it has been offered and it

UNITED STATES DISTRICT COURT

1    has been refused and there's some kind of guarantee.  But in

2    the event that two officers are not available, and we recognize

3    that there are circumstances where that might be the case, what

4    we have said is, have one officer sign and then in the comment

5    section on the back, explain why the prisoner refused and what

6    measures were taken to either try to persuade the individual to

7    go out or if that just wasn't possible.  So a short piece of

8    documentation guaranteeing that it's not just that the prisoner

9    actually wasn't offering anything and that the refusal is

10   indeed real.  You know.  We appreciate that the defendants have

11   offered that when an officer thinks there might be a problem,

12   that maybe they'll record it.  But that is far too

13   discretionary.  It does not really actually tell us the course

14   of the business in the unit.  If they want to do that too,

15   that's fine.  But we want to have some kind of base level,

16   contemporaneous recording that what is required to be offered

17   under the stipulation actually is offered.  And of course, we

18   are -- are concerned by the widespread refusal of recreation

19   programming, out-of-cell time that we've seen across the board.

20   We recognize sometimes that those refusals might be genuine,

21   but the only way for us to actually guarantee that is to have a

22   form of more secure documentation.

23            THE COURT:  Well, it seems to me that what Ms. Love

24   said with respect to what the supervisor would put on the back

25   of the form would address that very concern.  It would see --

1      in fact, it seemed to me that you're all saying the same thing

2      because the only thing I could discern that was different was

3      that the supervisor wasn't contemporaneously doing it, but the

4      supervisor under Ms. Love's plan is coming back and verifying

5      that the prisoner understood that he or she had the opportunity

6      to be out and then is also noting any concern about why it is

7      that the prisoner opted not to do it.  So I guess --

8                  MS. FETTIG:  Your Honor --

9                  THE COURT:  -- where am I missing?

10                 MS. FETTIG:  Well, it's not quite the same because

11     under our scheme it's mandatory that either the prisoner sign,

12     two officers sign, or one officer signs and explains why the

13     prisoner refused and what measures were taken.

14                 Under Ms. Loves's scheme, it's entirely discretionary

15     whether or not that happens.

16                 THE COURT:  No, I don't think so.  I think she said

17     that you would have at least two officers' signatures.  One

18     would be the -- the officer who presented at the cell front and

19     learned that the inmate didn't want to leave, and then you'd

20     have on the back of the form another corrections official --

21     officer indicating what his or her interaction was with the

22     inmate.  That's what I understood what Ms. Love said.  So that

23     gives you the two officers that you asked for, at the very

24     least.

25                 MS. LOVE:  Your Honor, I guess I should clarify

                        UNITED STATES DISTRICT COURT

1       that -- I was probably not clear.  When a supervisor comes by,

2       it's not on a daily basis.  It's not going to be a daily, oh,

3       we're going to go check and see every single inmate who refused

4       out-of-cell time and have a conversation.  There is a

5       discretionary component to this because it's based upon the

6       behavior that these supervisors are familiar with a particular

7       inmate, and you may have inmates that it's not abnormal for

8       them not to go out to rec most of the time.  But when there's a

9       change, that's when the supervisor gets involved to say why is

10      there a change, let's have a talk.

11           What plaintiff is requesting is contemporaneous

12      documentation of an officer having a conversation with an

13      inmate that goes far and beyond the stipulation of which is

14      that the time was offered.  It goes far and beyond the

15      performance measure that was negotiated by the parties because

16      essentially what plaintiffs are requesting now is that an

17      officer on the floor who has a plethora, thousands of duties to

18      do all day long, now has to sit cell front and have a

19      negotiation with the inmate, or persuasion talk, and offer

20      alternatives to try to convince an inmate to come out of cell

21      when it's the inmate's right to not go out to rec if they don't

22      want to.  It just has to be offered.

23           But the mechanism that we're suggesting, which is just

24      adding a documentation level of when it becomes a pattern to a

25      particular inmate of not coming out of the cell, then it's

UNITED STATES DISTRICT COURT

1   documented on the back.  What plaintiffs' request goes far and

2   beyond the stipulation and the negotiated performance measure.

3           THE COURT:  Any last word from the plaintiff?

4           MS. FETTIG:  Yes, Your Honor.

5           What we are requesting is multiple forms of

6   documentation.  If the prisoner just signs the refusal, that is

7   fine.  If you have two officers signing the refusal, that's

8   fine.  And this just gives an option to accommodate defendants'

9   staffing concern to have one officer sign, but then tell us a

10  little bit more so that we can have some kind of guarantee that

11  this extensive pattern of refusal is actually genuine.

12          THE COURT:  All right.  Here is what I -- what I think

13  is the way to proceed here.

14          We'll require that there be the contemporaneous

15  signature, and we will follow the protocol that Ms. Love has

16  articulated.  If there's a departure from the pattern that

17  suggests an issue, that that would also have to be supported on

18  the back page.  I'm not going to follow the plaintiffs'

19  suggestion of incorporating the requirement of two

20  contemporaneous officers because I think the records available

21  to plaintiffs will be -- will be able to provide you with

22  additional information that you can provide to the Court if you

23  think that there is some kind of wholesale -- not even

24  wholesale -- if you think there is some kind of advocation of

25  the responsibility under the stipulation to offer this time

1    outside of the cell that's associated with something other than

2    just what is docketed, and that is that the inmate refused the

3    time out.

4           I think in the first instance, in most instances, the

5    signature of the -- of the corrections officer who hears that

6    from the inmate is sufficient, augmented by the cases under

7    Ms. Love's protocol where it's supported by the supervisor's

8    after-the-fact notation of visiting with the inmate.  But if

9    you think there is some kind of problem with this compliance,

10   follow up when you -- when you have the opportunity to gain

11   access to contact with these inmates, ask them about it, and

12   report that to me if you think that there's some other issue

13   that's going on.

14          MS. FETTIG:  Thank you.  Thank you, Your Honor.

15          The one issue I would just emphasize here is that

16   we're concerned about the definition of what constitutes a

17   pattern.  We're already seeing 50, 60, 70, sometimes 80 percent

18   refusal rate.  So where do we go from the status quo here?

19          THE COURT:  Well, have you talked to your clients

20   about this?  What are they saying?

21          MS. FETTIG:  We -- we are hearing from our clients

22   that -- that oftentimes they are not actually being offered

23   recreation, or it comes at 4:00 a.m. and if you're not at the

24   door of your cell then you're marked with a refusal.  So we are

25   concerned.  We have alerted the defendants to our problem --

UNITED STATES DISTRICT COURT

1    our concerns about the pattern of refusal across time and space

2    here.  And that's why we feel, you know, going forward with a

3    new monitoring guide, there is a little more guidance hopefully

4    to the officers, that we can deal with some of these problems.

5           THE COURT:  When does the day start at the prison,

6    Mr. Struck?  This 4:00 a.m. thing, has that ever happened?

7           MR. STRUCK:  This Carson McWilliams, he says that

8    4:00 a.m. is -- 6:00 a.m. is usually when the day starts.

9           THE COURT:  All right.  So somebody could be asked at

10   6:00 a.m. if they want to have their rec time at that time.

11          MR. STRUCK:  Yes.

12          THE COURT:  Okay.  All right.

13          MS. LOVE:  Additionally, Your Honor, the rec periods

14   rotate.  So it's not going to be, like, one particular inmate,

15   Joe Smith, is always going to be only offered rec at 6:00, such

16   that he's not a morning person and he doesn't want to go out.

17          I would like to note for the record that defendants

18   have not been provided any specific information from any

19   inmates that plaintiffs have allegedly interviewed and said

20   they've been refused out-of-cell time such that we can look

21   back and address that issue.  So we've not been provided that

22   specific information.

23          With respect to -- and we put it in our papers at

24   document 1782 -- the broad-based allegation that they're seeing

25   these 80 percent refusal rates are based upon a summary table

UNITED STATES DISTRICT COURT

1   with no source documents.  When our paralegal, Mike Giardina --

2   and his declaration is attached -- did his own analysis,

3   trying -- not knowing what the source documents were, we found

4   some, perhaps, duplication.

5          We also found instances, and they're cited

6   specifically in our pleading, that even on the very out-of-cell

7   tracking form that was cited by plaintiffs, it was already

8   documented that the inmate said he didn't want to go out

9   because of -- and gave an example, like, for instance, it was

10  too cold.  Not sure looking back that that was the exact one,

11  but there was a reason given.

12         Moreover, the high alleged statistics that plaintiffs

13  monitor, A, there's no evidence that whatever rates of refusals

14  they're coming up with is anything inconsistent as compared to

15  other corrections systems across the nation.  But most

16  importantly, the months that they rely upon with respect to

17  their broad-based allegations of refusals are two months of

18  January and June.  Statistically looking at that, and just

19  based upon the years and decades in corrections as supported by

20  the declaration of Carson McWilliams, those are the months that

21  they generally see inmates not going out because January is

22  cold and June it's getting really hot.  So, you know,

23  referencing those particular months, we do not believe, is

24  sufficient evidence of a pervasive issue of refusals.

25         THE COURT:  Okay.  So I --

UNITED STATES DISTRICT COURT

1          MS. FETTIG:  Your Honor --

2          THE COURT:  Go ahead.

3          MS. FETTIG:  -- that's not accurate.  We actually gave

4   a snapshot of January through June.  That's a six-month

5   snapshot.  We did provide a 1006 FRE declaration as to how

6   those exhibits were created with the tracking sheet and the

7   mass custody notebook.  And moreover, I know Mr. Giardina's

8   declaration pointed to Florence Central where we double-counted

9   time, and that was merely because defendants, although they're

10  supposed to select 20 records, they only selected 15 for each

11  of those months.  They double-counted the SMI as non-SMI as

12  well.  So we simply counted what they counted, and it turned

13  out it was quite a bit different.

14         THE COURT:  Well, here is, I guess, what my gut

15  reaction is to this, and that is if there is a problem such as

16  the one that you identified, that people were being offered

17  time outside of their cell when it's nighttime, we can follow

18  up on that, as we just did here in court.  And if there is such

19  a high percentage that is associated with something that is not

20  just a simple election of an inmate not to participate in the

21  availability of rec time, I think it would see other indicators

22  of that, and you can bring that to the Court's attention,

23  rather than requiring this mechanism of -- which I think is --

24  is likely not to be as helpful to the Court as what I'm asking

25  you to do; and that is, the stipulation contemplates that the

                    UNITED STATES DISTRICT COURT

1    plaintiffs get the opportunity and the funding for continued

2    observation on the street level, and you need to do that so

3    that we can make appropriate action -- take appropriate action

4    that's well-informed.  And I just think that we'll be more

5    well-informed by what's happening that we need to be concerned

6    about, based upon your reporting that you do on the street

7    level, as opposed to just imposing this requirement of having

8    certain combinations of signatures.  So that will be my ruling

9    on that point.

10          MS. FETTIG:  Thank you, Your Honor.  Now that we have

11   most of the documents, we can certainly do that.

12          THE COURT:  Okay.  Good.

13          What I see next on my list is the issue about whether

14   or not the last seven days of a month remain eligible for --

15   for sampling.  The issue is whether or not if the -- if there's

16   not a complete week at the end of the month, whether you

17   straddle months.

18          I know it seems to me the right thing to do is simply

19   say that for these samples that are taken, that the last seven

20   days of a month remain eligible.  And so that means that you

21   don't simply say that a month has to go from a Sunday to a

22   Saturday, or however way it is done to get seven days, that

23   those seven days all have to be within a given month or else

24   those end dates will not be calculated -- never be captured in

25   the random sampling; whereas if you adopt a measure that says

UNITED STATES DISTRICT COURT

1    those last seven days of every month remain eligible, whether

2    they match up with your Sunday to Monday kind of overlay is a

3    better way.

4            MS. LOVE:  Your Honor, we've reached an agreement on

5    that particular issue, that the last month -- the last week of

6    a month, you know, if the first two days are Thursday and

7    Friday, et cetera, of the next month, that that will be

8    eligible.

9            THE COURT:  Okay.

10           MS. LOVE:  We -- plaintiffs' counsel -- I think we may

11   need to tweak the language a little bit to just address the

12   caveat that we've all agreed on before, that if there is a

13   state holiday somewhere in the middle, then that -- we wouldn't

14   be eligible.  But we've reached agreement on that.

15           THE COURT:  Okay.  All right.

16           MS. FETTIG:  Yes, Your Honor.  We've proffered some

17   language to defendants.  We haven't heard back from them on

18   that language.  But our understanding is that we're all on the

19   same page regarding that.

20           THE COURT:  Okay.  All right.

21           MS. LOVE:  We do still have some disagreements, Your

22   Honor, on just very detailed aspects of performance measure

23   number 9 with respect to source documents or what a monitor

24   has -- must look at that we can address.

25           THE COURT:  And these are issues that you know -- that

1   you remain at an impasse because it's not plaintiffs' hearing

2   the first time today that you're rejecting what they last

3   proposed.

4           MS. LOVE:  Correct.

5           THE COURT:  Okay.  Go ahead.

6           MS. LOVE:  Yes.

7           And this specifically addresses, you know, the red

8   line versions that Ms. Fettig and I have been exchanging.

9           The first issue is that plaintiffs request a ruling

10  requiring that for each maximum custody or the complex

11  monitored with respect to performance number 9, that there

12  be -- that there be generated a list that goes through every

13  single use of force at that facility during the monitoring

14  period; that then further sets forth the inmate involved, the

15  mental health score of the inmate involved; whether the inmate

16  is SMI, the housing unit for the inmate, and whether or not

17  chemical agents were used.

18          The defendants' position thus far exceeds the

19  stipulation and the agreed upon performance measure, and the

20  information that plaintiffs are requesting in that list that I

21  gave is already being provided.  In the maximum custody

22  notebooks that are provided as part of the max custody

23  monitoring, tab 8 contains the uses of force involving SMI

24  inmates.  The very first document of the tab 8 is a memorandum

25  that each warden generates and sends to Carson McWilliams, the

1    division director for offender operations.  Within that

2    memorandum, there is a listing of each inmate who is

3    contemplated by the monitoring.  Inmate is SMI, chemical agents

4    were used.  It includes a breakdown of the categories that are

5    required under the stipulation, whether, for instance, was --

6    what kind of methods were applied, what kind of use of force,

7    it was chemical agents, and then a synopsis, usually about a

8    paragraph long, of what occurred.  So there is already a list

9    being provided that denotes the monitored -- the use of force

10   instances to be monitored.

11         So it's our position that it far exceeds the

12   stipulation scope, the performance measures scope, and goes

13   into basically a whole litany of other discovery because now

14   defendants are required to document every single use of force

15   that may have occurred in the facility, even though it's not

16   subject to monitoring.  So we believe how the use -- the max

17   custody notebooks are currently set up gives them the

18   information that they need.

19         In addition, information like the health score or the

20   mental health score status of the inmate, that is already also

21   contained in the use of force packet for each inmate.  That is

22   denoted on the SAR, the significant incident report, as well as

23   location.  So the information is already provided.

24         Now, I know that we have talked with plaintiffs'

25   counsel about, in the count sheets, which are also provided in

UNITED STATES DISTRICT COURT

1    the max custody -- the max custody notebooks, because it shows

2    everybody susceptible to monitoring with our counting of 10,

3    like which random records are selected, there is an M that goes

4    after the inmate's ADC number, which denotes that they are an

5    SMI inmate.

6         In the past, not necessarily on the warden's

7    memorandum is there the M attached to that ADC number.  But

8    those that are compiling and doing these memos, which are the

9    wardens of the facility, they know in reviewing every use of

10   force that comes out of their facility which inmates are SMI or

11   not.  That is something that, going forward, we're going to

12   work on to make sure that the documentation in the memorandum

13   does denote the M.  So there is an ability by plaintiffs'

14   counsel to cross-reference.  But the overarching issue is that

15   there is already a synopsis provided that denotes which use of

16   force are subject to monitoring.  So that -- that's the first

17   issue on that.

18        THE COURT:  Should we hear the response to the first

19   issue --

20        MS. LOVE:  Yeah.

21        THE COURT:  -- or do we let you go to your second one?

22        MS. LOVE:  It's probably easier to talk one-by-one.

23        THE COURT:  Okay.

24        MS. FETTIG:  I agree.  I agree.  So, our position is

25   that the memo, similar to what is provided, should be something

UNITED STATES DISTRICT COURT

1    that is outlined in the monitoring guide that a monitor needs

2    to look at; in this case, the complex warden.  It's not

3    enumerated there now, although it is the partial practice

4    already.  So I believe it should actually be part of the source

5    of documents.  What was provided now though is not as excessive

6    as we think it needs to be because we question, how does the

7    monitor know that he or she is actually looking at all the use

8    of force incidents he or she needs to look at.  And that goes

9    back to our -- our definition of -- of what use of force is

10   covered, and that includes chemical agents, includes everybody

11   who is SMI, and those individuals in the enumerated units.  So

12   we want a source document that the monitor can take a look at

13   to know that he or she is actually looking at the universe of

14   what needs to be monitored under the stipulation.  And it is

15   certainly true that some use of force incidents are not

16   included under the rubric of the stipulation, but how would the

17   monitor know and how would we know that we're actually looking

18   at the correct universe, and the correct universe of incidents

19   actually being monitored and presented in the CGAR.

20          So that's our concern there.

21          THE COURT:  What are the documents that you think are

22   missing under what Ms. Love has described?

23          MS. FETTIG:  Well, number one, under the current draft

24   of the monitoring guide, that memo that -- that omnibus memo is

25   not required to be reviewed as part of the source of documents.

1    So we want just to be in the monitoring -- or part of the

2    routine monitoring.

3            THE COURT:  Well, what if what Ms. Love just described

4    becomes a part of the monitoring manual.

5            MS. FETTIG:  As it should.  As if should.  That

6    they -- our understanding is that they disputed that it should

7    become part of the monitoring manual.  But right now what

8    they're saying is they don't want to provide the whole universe

9    of incidents.  And what we're saying is how does the monitor

10   know that he or she is actually reviewing the full month

11   incidents that fall under the terms of the stipulation.  Right

12   now, we can't tell.

13           MS. LOVE:  And Your Honor, it's because the monitor is

14   the warden, and the warden is reviewing every single use of

15   force that happens in his or her facility.  So as they review

16   and say, here is an SMI inmate and chemical agents were used,

17   bam, different pile, and it goes on to this -- so it goes in

18   the notebook -- different pile because it's going in the

19   notebook, and it's the warden, him or herself, who is

20   generating the memorandum to Mr. McWilliams.  So the monitor is

21   already doing that.

22           And we do agree, if it's just a matter of saying that

23   this memo has to be a part of the source documents, that's what

24   we've been doing and we're fine with that.  It's just that

25   there's no requirement by the stipulation that there now be

1       created this different memo that does a synopsis of every

2       single use of force incident that's not subject to monitoring.

3                THE COURT:  And it just seems to me that the mechanism

4       that the defendants have just described is going to provide you

5       the information that you need to be able to address what was

6       the previous absence of information.  It seems like you've been

7       able to coalesce around what's really necessary, and it seems

8       like Ms. Love's ticked off all of the areas that you are saying

9       were wanting, and that you do have access to all of these data

10      points.

11               MS. FETTIG:  Well, what we don't have access to is to

12      know whether or not all of the use of force incidents that

13      would fall under the stipulation are actually being monitored.

14               THE COURT:  Can you give me an example of one you

15      think would fall outside so I can understand?

16               MS. FETTIG:  We, certainly.  If chemical agents aren't

17      used, then it would be part of the stipulation.

18               But, for example, if, you know, there is an SMI

19      prisoner and I'm a SMU1, chemical agents were used that somehow

20      did got get into the C-Gar, we would never know it unless we

21      had the overarching document that shows all the use of forces

22      in a month.

23               That's a concern here.  Maybe it's in the warden's

24      head what has been all the use of forces in a month, but how

25      would we ever know?  So that's the baseline.

1          THE COURT:  I thought that Ms. Love, to use her words,

2     said that they went into a pile that then became part of the

3     source data for what was provided.

4          MS. LOVE:  The warden is reviewing every single use of

5     force, and then calling out what is SMI.  I believe what

6     plaintiffs' counsel is saying is we want some sort of list or

7     synopsis of every single use of force so then we can check and

8     make sure that everything that should be in the SMI performance

9     measure 9 pile is there.

10          But, Your Honor, that far exceeds the duties under the

11     stipulation, creating monumental activities that are not

12     required under the stipulation.  At some level, there has to be

13     some trust.  And just these "we don't trust them" isn't enough.

14     If they have a client who has advised them that, I was subject

15     to use of force, I'm SMI and subject to chemical agents, and

16     they double-check back and it wasn't there, well, then that's a

17     different issue.  But just a monumental "we don't trust them

18     because we don't trust them" isn't sufficient to require ADC to

19     put in -- put into play processes that are not contemplated by

20     the stipulation, and really allows a fishing expedition of

21     broad-based discovery on a whole host of issues involving ADC

22     uses of force system-wide as to max custody inmates not

23     contemplated by the stipulation.

24          MS. FETTIG:  And our position trust and verify.  And

25     certainly this is contemplated by the stipulation because we've

UNITED STATES DISTRICT COURT

1    called out certain use of forces that requires special

2    attention under the stipulation, primarily because we're

3    dealing with seriously mentally ill people or those enumerated

4    who have some issues, and we can't -- we simply can't verify

5    that the defendants are doing what they say they're doing

6    unless we know the full universe that's out there so that we

7    can verify that all of the use of force incidents that happen

8    during a month that should be covered by the stipulation are

9    actually being monitored.

10         MS. LOVE:  But the problem is the snowball effect of

11   where does this -- this nonspecific distrust stop.  If we then

12   provide a list of all of the use of force incidents that occur

13   at a particular facility, and also don't include what's

14   monitored, and they don't trust us because they don't think

15   that inmate John Smith was documented properly as a non-SMI,

16   now they're going to ask us to turn over use of force incidents

17   to double-check and double-check and double-check.

18         THE COURT:  Well, given that the monitor in this

19   circumstance is the warden of the facility, I think that it is

20   appropriate to rely upon the mechanism that the defendants have

21   identified.  It does seem to me that, again, if there were

22   deliberate or recklessly disregarding -- a reckless

23   disregarding of the obligations of the stipulation that the

24   wardens were committing, that that would come to light and that

25   we can, in the first instance, rely upon the reporting

UNITED STATES DISTRICT COURT

1    mechanism that identifies what the monitors have seen so that

2    the plaintiffs can, when taking a look at that, be aware of

3    whether they think that it's likely to be an accurate report or

4    not, without enlarging the scope of the actual incidents that

5    have to be reported.

6              All right.  Your second issue, Ms. Love?

7              MR. STRUCK:  I think we're on 3.

8              THE COURT:  Oh.

9              MS. LOVE:  The third issue now.

10             The third issue is that plaintiffs' insistence that

11   the monitor review medical records, if the inmate was treated

12   by medical staff as a result of the use of force.  Stipulation

13   paragraph 27 and performance measure 9 does not require in any

14   way any assessment of injury.  The components of the

15   stipulation paragraph 27 and performance measure 9 are that

16   when there is a use of force involving chemical agents and it's

17   not because of imminent threat, that there be a cooldown

18   period, clinical intervention by mental health, clinician or

19   qualified mental -- or health care practitioner, determination

20   by the practitioner of whether the inmate understands orders or

21   whether the use of force -- or chemical agents could lead to

22   substantial decompensation based upon SMI status, authorization

23   for use of chemical agents by the warden or the ADO where it's

24   been determined that the inmate does not understand orders,

25   proposal and employment of reasonable strategies to try to get

1    the inmate to comply.

2            So everything driven by the stipulation is what leads

3    up to this calculated use of force.  Whether or not the inmate

4    becomes injured, physically injured or physically has to go be

5    evaluated is not part of the analysis.

6            Add on to that, the monitor is the warden or the

7    warden's designee.  Now, a warden, yes, technically they do

8    have -- and this is an issue brought up by plaintiffs'

9    counsel -- technically they do have access to an inmate's

10   medical records -- but to evaluate what?  It's not to evaluate

11   anything required by the stipulation.  Moreover, the warden

12   doesn't have the medical expertise to make any decisions about

13   medical condition.

14           In addition to that, in the use of force packets at

15   both the SAR, the significant incident review, as well as

16   the -- the report, there's boxes that indicate whether the

17   inmate went to -- went to see healthcare, whether they refused,

18   whether they had to be transported out of the hospital.  So

19   that information is there.  But that's not something that the

20   monitor has to look at.  So a requirement that now there's some

21   sort of medical inquiry is not anything contemplated by the

22   stipulation.

23           THE COURT:  All right.

24           Plaintiffs?

25           MS. FETTIG:  Your Honor -- yes, Your Honor.  The

1   reason why we think the monitor should be able at his or her

2   discretion to look at medical records is, number one, sometimes

3   medical records tell a different story.  And this would only be

4   in circumstances where the monitor thinks there's something a

5   little off.  We want the monitor -- you know, high-level ADC

6   official -- to have discretion to go behind the documentation

7   and not do a rubber stamp, attempt to do an actual monitoring

8   of what he or she is seeing in the documentation in the video.

9       Our primary concern here though is that the term of

10  the stipulation, the cooldown period, the clinical

11  interventions and alternative strategies that are required

12  under the stipulation, they're not being documented in the use

13  of force packets that we're seeing in the place where a medical

14  professional to sign, but we don't know if that person is the

15  clinician that's required under the stipulation, we don't know

16  what the cooldown period is, we don't know what the alternative

17  strategy that were proposed might be.  So we need some form of

18  documentation.  That might show up in a video or it might not.

19  But right now it's not being adequately monitored.  We want

20  some discretion for the monitor to actually make sure that this

21  stuff is happening, and it's happening accurately under the

22  terms of the stipulation.

23      MS. LOVE:  Your Honor, the warden -- I mean, the

24  warden does have the discretion, if they want to go look at it.

25  But to say there's no documentation of whether things like a

1    cooldown period occurred is -- or a clinical intervention

2    occurred, is inaccurate.  Right there in the memorandum from

3    the warden to Mr. McWilliams, there's boxes to be checked for

4    that.

5         Additionally, in the reports that are part of the use

6    of force packet, including the use of force checklist, the use

7    of force report, and the significant incident report, they all

8    contain narratives that go through what occurred.

9         Now, if the monitor, you know, I guess can't determine

10   that, they have the discretion to do so.  But there shouldn't

11   be a requirement that they do some sort of medical record

12   inquiry.

13        THE COURT:  Well, then --

14        MS. FETTIG:  What we're saying --

15        THE COURT:  Go ahead.

16        MS. FETTIG:  Oh.  I'm sorry, Your Honor.

17        I am just clarifying what Ms. Love has said here.

18   We're saying there should be discretion to -- if the monitor

19   doesn't see things properly documented in the narrative.  Right

20   now, the use of force packet, the documents have not been

21   altered since before the stipulation, so they don't actually

22   have spaces to make sure that the provisions under the

23   stipulation are automatically actually recorded.  So that -- it

24   is a problem.

25        THE COURT:  So what you're say -- I'm sorry to

                    UNITED STATES DISTRICT COURT

1    interrupt -- but what you're saying is if there's something in

2    the incident report that suggests that it would make sense to

3    take a look at the medical record, you want the monitor to be

4    told you have the discretion to look at the medical record.  Is

5    that all you're asking here?

6              MS. FETTIG:  That is all we are asking for.  We're not

7    saying it should be mandatory.

8              THE COURT:  Well, I think defendants agree to that.

9              MS. LOVE:  We agree.

10             THE COURT:  All right.

11             I've got problem, everybody, and that is it's noon,

12   and I have worked people pretty hard without a break here.  And

13   then I've a further problem and that there's a plane taking me

14   to Atlanta at 2:55 for a court program.  And so consequently, I

15   didn't think that we'd be as bad off as we are, but we're

16   pretty bad off in terms of not covering everything that I'd

17   really hoped that we would be able to cover.

18             And so I don't know what the best way is to proceed,

19   other than to say the following:  We have already scheduled a

20   meeting in January, and we may have to put off some number of

21   things to that, and then also try to take care to see if I can

22   make sure that I can give you the time to take a lunch break

23   and to return, if we do have more to do, because I really hate

24   bringing everybody out of -- out of their lives with the

25   expectancy that they'll get some resolution of some issues and

1       not delivering on that.

2               The other thing is that I don't know whether there are

3       issues that if I address them in the few remaining minutes that

4       I have here would be really efficient for the disputes that are

5       between the parties.  And so if there's something that they

6       think I should address at this instance, I'll turn to that

7       straightaway.

8               From plaintiffs?

9               MS. FETTIG:  Your Honor, the one issue that is

10      certainly pending and could use recognition is the actual

11      definition of who is covered by the use of force provision.  We

12      pointed this out in our brief.  We think the plain language is

13      extremely clear, and that is that it's all SMI max custody

14      people, and those individuals who are housed in the enumerated

15      units.  That is the only definition that makes sense.

16              I know defendants' most recent version of the

17      definition is that it's all SMI prisoners and SMI -- only SMI

18      prisoners in the enumerated units, which doesn't make sense

19      because the first definition necessarily would subsume the

20      second.  So that a ruling on that issue, either here or in the

21      near future, would be certainly helpful because it raises

22      concerns for us that not all facilities and all lines have

23      necessarily monitored what they're supposed to be monitoring,

24      or now going forward they are not actually monitoring the

25      accurate group of people under provision number 9.

                        UNITED STATES DISTRICT COURT

1          THE COURT:  Okay.  And how does the -- I guess I ask

2    defendants -- how is it that you can overlook the word "and"?

3    Doesn't that support plaintiffs' interpretation?

4          MS. LOVE:  No, because the relevant paragraph and then

5    the performance measure speaks to SMI inmates in the max

6    custody facilities and the other enumerated facilities that are

7    SMI.  That's the defendants' interpretation, that this is all

8    driven by inmates who are SMI.  Otherwise, the list of detailed

9    responses as to the use of chemical agents on an inmate, the

10   whole driving force of that is the use of chemical agents on

11   SMI inmates who, because of their mental state, may not be able

12   to appreciate orders in a controlled use of force instance, may

13   need a little bit more time to change their behavior.  So it's

14   the defendants' position that the intent from the start was

15   that this is SMI-driven.  So it was SMI inmates at the max

16   custody facilities, plus SMI inmates at these other enumerated

17   locations, which at the time of the stipulation there were SMI

18   inmates clustered at these particular additional enumerated

19   facilities -- or locations.

20         MS. FETTIG:  Your Honor, in our brief we address this

21   issue.  Of course we're concerned about the SMI.  But those

22   particular housing units were enumerated because they have --

23   they have -- they often have people -- troubled people who

24   aren't necessarily SMI, like those who are self-mutilators and

25   cutters, oftentimes have Axis II diagnosis, that are not

1       subsumed under the designation of SMI, but nonetheless have

2       similar mental health concerns.  So that's why the facilities

3       were enumerated.  Indeed, they are max custody, but our concern

4       was to capture a larger group of troubled inmates, and that's

5       why the performance measure is written the way it is.

6               MS. LOVE:  Your Honor, you know, the entire -- from

7       the inception of this lawsuit, including the complaint, was

8       driven by -- and the complaint allegation was that there was a

9       constitutional conduct with respect to the use of chemical

10      agents on SMI inmates.  So that has been the intent from

11      defendants' side throughout, as well as what we see as the

12      negotiation intent of the parties from the start.

13              To carve out use of chemical agents on others that may

14      have mental health concerns, how do you even define that?  You

15      don't -- you can't define that.  And if that were the case,

16      then why wouldn't that pertain to the entire system of 45,300

17      inmates in the ADC system?

18              THE COURT:  Because they weren't enumerated in

19      paragraph 27.  Only Florence CB1 and CB4 and Florence Kasson

20      Wings and Wings 1 and 2, and IMSMU 1, BMU, and Perryville

21      Lumley SMA, and Phoenix, Baker, Flamingo.  And to you, I mean,

22      when you told me what this said, Ms. Love, you added also at

23      the end SMI, and it doesn't say that.  It says:  Classified as

24      SMI and in the following housing areas.

25              MS. LOVE:  And that is because those enumerated

                    UNITED STATES DISTRICT COURT

1    additional facilities are where the SMI inmates at the time

2    that the stipulation was negotiated were all clustered.  And so

3    that is why then it was easy to monitor those SMI inmates who

4    may be subject to use of chemical agents because they were

5    clustered in those enumerated areas at the time.

6          THE COURT:  And are any of these enumerated places

7    places where there are no SMI -- everybody is gone now;

8    everybody is centralized?

9          MS. FETTIG:  Your Honor, the plain -- our position is

10   that the plain language governs here.  These units, yes, have a

11   lot of SMI generally in them, but they were not completely SMI.

12   They were the vulnerable, especially mentally ill, but not

13   necessarily risk that particular term of art designated in

14   their diagnosis.  The concern always is vulnerable prisoners

15   who are occupants more subject to the use of chemical agents

16   and use of force who actually need more clinical intervention.

17         The reason why the performance measure is written as

18   it is is because we were concerned for all SMI max custody, and

19   they are throughout those units, but we also knew that the

20   deeply troubled prisoners at the time of the stipulation

21   negotiation tended to be enumerated units.  And that's why we

22   didn't write performance measure "all SMI prisoners."  We knew

23   that there was an extra class of people that needed coverage,

24   and that's why that provision is written the way it is with an

25   "and."

                    UNITED STATES DISTRICT COURT

1          MS. LOVE:  But if there was -- if the intent was to be

2    deeply troubled, then "deeply troubled" would have been

3    defined.  I mean, there's no scientific, you know, definition

4    of who was deeply troubled.

5          THE COURT:  No, but your --

6          MS. FETTIG:  And I --

7          THE COURT:  Hold it just a second.

8          Your argument, Ms. Love, that the -- that those

9    enumerated units are restricted only to SMI inmates is undercut

10   somewhat by the fact that you told me that the thing from the

11   get-go was focused on SMI inmates.  And so if that was the

12   case, then you wouldn't need to have this enumeration, you

13   would just need to have a reference to SMI.

14         And so I'm going to read it as it says, and that is

15   that it says SMI and in the following housing areas.  So we'll

16   stick with the straight-up language.

17         MS. LOVE:  So any inmate at those --

18         THE COURT:  Yes.

19         MS. LOVE:   -- additional enumerated facilities who --

20   whether or not they have a mental health issue or not --

21         THE COURT:  Right.  Defendants shall --

22         MS. LOVE:   -- and chemical --

23         THE COURT:   -- make the following restrictions on the

24   use of pepper spray and other chemical agents, unless you can

25   tell me that there's been a wholesale change in what that --

1    for instance, let's say there's a unit called the Duncan unit,

2    and the Duncan unit at the time of the stipulation contained

3    SMI inmates and people who were, as plaintiff describes,

4    seriously troubled, and it was apparent to everybody at the

5    time that the Department of Corrections had made the election

6    to house those people together, but then subsequently the

7    Duncan unit became the place for people who were not so

8    classified.  If there's been a wholesale departure from what

9    has, I think, been described as the intent of the parties at

10   the time, one that's supported by the plain language, that

11   changed circumstance would have to be reflected.  But

12   otherwise, if they are people who are housed in those units and

13   pepper spray has been used on them and there's just not been a

14   wholesale change in it, I think we have to follow the

15   stipulation language.

16         MS. LOVE:  Well, Your Honor, if Mr. McWilliams, who is

17   here in the courtroom, may address specifically, he would tell

18   you that some of these enumerated facilities, because of just

19   the normal operations and needs for housing, some of them have

20   changed.

21         THE COURT:  Okay.  Here's what I'd ask you to do.

22   After the hearing, set up a time so that Mr. McWilliams can

23   explain that to the plaintiffs.

24         MS. LOVE:  Okay.

25         THE COURT:  And plaintiffs have heard what my

UNITED STATES DISTRICT COURT

1    predilection is, and that is if there's been a wholesale

2    change, if it's a completely different prisoner population that

3    doesn't include the kind of people that the plaintiffs say they

4    were concerned about at the time they drafted the stipulation

5    that seems to be reflected in -- because there's plenty of ways

6    to say it's SMI people who are located here.  It doesn't say

7    that.  It says "SMI and."

8           So you've heard -- plaintiffs have heard what my view

9    is.  So that if you hear that the department has no longer any

10   of the kind of people that you were concerned about, then you

11   probably know it's not a good argument to say we should

12   continue to require the defendants to meet paragraph 27 on

13   those facilities.

14          MR. STRUCK:  Will do.

15          MS. FETTIG:  Well, Your Honor --

16          THE COURT:  Yeah.

17          MS. FETTIG:  -- it's one thing we would ask is that if

18   defendants are going to argue that these units have been

19   substantially changed in mission and composition, we would like

20   to know where those prisoners actually are now, if they have

21   actually been changed in their housing units in terms of the

22   missions, like the BMU and those types of units.  We don't want

23   there to be a situation where in order to get out from under

24   the terms of this stipulation, we see, you know, prisoners

25   simply being put into different units that then fall out from

UNITED STATES DISTRICT COURT

1    under our -- our review and the monitoring of the court.  So we

2    would ask that that be addressed, as well.

3             THE COURT:  All right.  Well, there's a tension here

4    between what is obviously the Court's concern of a party trying

5    to effect an end run around the stipulation requirements by

6    shifting -- shifting prisoner populations.  I'm sensitive to

7    that and wouldn't want to see it happen.  On the other hand,

8    I'm not going to assume it is necessarily the case.  But I

9    think a fair compromise here is that you can ask the question

10   and an answer should be given:  Did you relocate the people who

11   were not SMI en masse to -- or not en masse, but in some way

12   that would capture what is your concern, and that is people who

13   were not SMI but were purposefully, in your view, housed at one

14   over these enumerated facilities, if they've been shifted to

15   other facilities in a way that suggests that there's

16   different -- a different matter -- manner of detention, or any

17   other indicia that would suggest to you that this would be an

18   end run, then you can ask those questions and I'll -- and I'll

19   consider it.

20            But whether or not I'm going to apply 27 to other

21   facilities, I'll put that off until after we see what that

22   question an answer session produces.

23            MS. FETTIG:  Thank you, Your Honor.  We will do that.

24            THE COURT:  All right.  Anything else from the

25   plaintiffs on an emergent basis?

1          MS. KENDRICK:  Yes, Your Honor.

2          This is Corrin Kendrick.  There are two issues that we

3     think are probably critical for you to answer either today or

4     shortly thereafter in writing.  The first one is about the

5     access to electronic medical records and provision of paper

6     medical records, and the second one is the defendants'

7     compliance with your November 10th order.  So those are --

8     those are the two others that we have.

9          THE COURT:  Okay.  Mr. Struck, on the first one, why

10    are we still talking about this?  I thought this was all going

11    to be resolved.

12         MR. STRUCK:  They have access, Your Honor, and they

13    want more.

14         THE COURT:  What do they want more?

15         MR. STRUCK:  They want their experts to have access

16    now.  Instead of -- you know, this all started out with the

17    lawyer coming to Ms. Rand's office, looking over her shoulder

18    at the computer.  Now they have seven log-ins, ACDL, the

19    National Prison Project and the Prison Law Office all have

20    log-ins as well as Ms. Eidenbach.  And now they want additional

21    log-ins for the ACDL, which they have -- they have two.  They

22    want more.  And now they want their experts to have unfettered

23    access to the records.  You know, our position on this is they

24    can -- they can monitor whether or not there's compliance with

25    the stipulation without having their experts having access.

                    UNITED STATES DISTRICT COURT

1    And if they want their experts to look at something, they can

2    print the records and send it to them.

3            THE COURT:  What is the hardship to the state?

4            MR. STRUCK:  The hardship is it's going to result in

5    an increase in the cost of litigation.  I can guarantee it.

6    We're going to have experts that are going to be perusing

7    through records, looking for problems, raising them with the

8    Court, and that has nothing to do with the stipulation.

9            THE COURT:  So that can happen now because the expert

10   can go and sit next to the lawyer and --

11           MR. STRUCK:  Well --

12           THE COURT:   -- what you think is there's a barrier to

13   that happening because it's just too hard.

14           MR. STRUCK:  No, I don't think it's a barrier, but I

15   do think it prevents unfettered access, which was never what

16   was contemplated by the stipulation or by the Court.

17           THE COURT:  Well, no, I disagree.  I think the

18   plaintiffs are entitled to have their experts review the

19   medical records.  And, again, the whole idea here was to take

20   advantage of the change in technology that would make things

21   more efficient.  It's not efficient to have a lawyer mining

22   through this information.  It's efficient to have the medical

23   experts mining through it because that's likely to produce

24   meritorious claims and fewer errors from the lawyers who don't

25   know what they're doing.  And if your idea, is it just going to

1   gin up an uncalculated amount of -- or a fearful amount of

2   cases, boy, every one of those cases that you're fearful of is

3   going to have to be subjected to the scrutiny of what you've

4   already seen of me paying attention so this.  So until I see

5   that happening, I'm not going to worry about that specter.

6           So provide the necessary log-ins to the experts that

7   the plaintiffs want.

8           All right.  Go ahead.

9           MS. ABELA:  Your Honor, this is Maya Abela with the

10  Arizona Center for Disability Law.

11          I would also request we be entitled to log-ins for our

12  attorneys.  We are still lacking log-ins for attorneys that are

13  entered -- entered appearances on this case and participate in

14  monitoring tours and monitoring --

15          THE COURT:  Again, what's the hardship?  Why don't we

16  want to have --

17          MR. STRUCK:  Your Honor --

18          THE COURT:   -- fresh minds looking at this as opposed

19  to saying we're only going to let two minds look at it.  What's

20  the problem?

21          MR. STRUCK:  Well, there's a couple issues.  First of

22  all, the ACDL hasn't really done much in this case at all.  We

23  provided them with two log-ins.  We negotiated the two log-ins.

24  They wanted four.  They agreed to two.  Now they just came back

25  and said they want more.

UNITED STATES DISTRICT COURT

120

1          THE COURT:  No, they say they want four.

2          MR. STRUCK:  Right.

3          THE COURT:  What's the hardship?  I don't understand.

4          MR. STRUCK:  Because the more people that we -- the

5     more log-ins we provide, the more this litigation in -- the

6     cost of this litigation increases.  That's the problem.  And

7     it's not that, oh, we're worried they're going to find

8     problems.  It's just the more lawyers that are involved, the

9     more experts that are involved, the more the costs of

10    litigating this case, defending it, and plaintiffs making

11    claims down the road --

12         THE COURT:  Well, I have a much different view of

13    that.

14         MR. STRUCK:  -- an increase --

15         THE COURT:  I have confidence in lawyers, that having

16    good lawyers taking a look at matters in a deliberate fashion

17    is likely to produce better results in the litigation process.

18    And I have no reason to think that that general predilection

19    shouldn't apply here.  There's, again, no counter to it in

20    terms of hardship, other than simply allowing plaintiffs to

21    divide the responsibilities of reviewing these medical records

22    among their team of lawyers.  And I think that that's

23    reasonable.  So --

24         MS. KENDRICK:  Your Honor, this is Corene Kendrick.

25    If I can speak for the plaintiffs for a second.

UNITED STATES DISTRICT COURT

1          THE COURT:  Yes.

2          MS. KENDRICK:  We had also requested that they provide

3      some sort of log-in for -- one more log-in for the paralegal at

4      our office and the ACLU.  And the reason why is because

5      defendants have taken the position that the only person who can

6      use the log-in is that lawyer.  And so right now, for example,

7      my office has two log-ins, and that's for me and Allison Hardy.

8      And for example, on Monday and Tuesday, both Allison and I were

9      out of the office.  So nobody in our office who worked on the

10     Arizona case could look at medical records of people who had

11     written us describing urgent medical concerns.  And so for that

12     reason, we had requested one additional lawyer log-in for Rita

13     O'Neill, who is now an attorney of record on the case, and for

14     a paralegal.  And defendants refused when we talked about it

15     last week.

16          THE COURT:  Well, the lawyer refusal is overruled.

17     Why, Mr. Struck, no to the paralegal?

18          MR. STRUCK:  The refusal was to a generalized -- they

19     wanted a general log-in without it being attributed to any

20     particular person, and that was the refusal.

21          THE COURT:  Oh, okay.  All right.  So if they give the

22     name of this additional lawyer and the paralegal, you'll give

23     that person -- those persons log-in credentials.

24          MR. STRUCK:  Yes, Your Honor.

25          THE COURT:  Okay.  Thank you.

                    UNITED STATES DISTRICT COURT

1          MS. KENDRICK:  Oh, okay.

2          THE COURT:  Go ahead.

3          MS. KENDRICK:  I was just going --

4          THE COURT:  Go ahead.

5          MS. KENDRICK:  -- I was just going to figure out, the

6    reason we asked for a generic one on the paralegal, they

7    generally leave within a year or two because they go off to law

8    school or do whatever.  So we just want to have assurances from

9    defendants that as that happens, we can get a new log-in for

10   the new paralegal.

11         THE COURT:  Well, I think Mr. Struck has heard what my

12   view is on that, so I think that if somebody does leave the

13   office, it's not as if you've -- like it's -- the fact that I

14   can't get Ohio State football tickets anymore because my father

15   has died.  No, that's a different circumstance.

16         MS. KENDRICK:  All right.  Thank you.

17         THE COURT:  Emergent issues from the defendants' side.

18         MR. STRUCK:  Just -- Your Honor, just some timing

19   issues.  There are a couple Rule 60 motions that are pending.

20         THE COURT:  Right.

21         MR. STRUCK:  The parties filed a stipulation with

22   respect to defendants filing a response to the plaintiffs'

23   motion on January 4th.

24         THE COURT:  Yes, and I saw that last night, and that

25   will be granted.

1          MR. STRUCK:  Okay.  And the parties just agreed --

2     they haven't filed anything -- but just agreed to allow the

3     defendants to file their reply tomorrow as opposed to today.

4     We would like the extra day.

5          THE COURT:  So ordered.

6          MR. STRUCK:  And also -- and I think I know how you're

7     going to rule on this -- but we are requesting a -- we filed a

8     Notice of Appeal with respect to that order.  We're requesting

9     a stay on the order while the appeal is pending.

10          THE COURT:  The general stay is denied.

11          MR. STRUCK:  Okay.  Thank you.

12          THE COURT:  All right.

13          The last thing that I wanted to say is what I started

14     out with, and that is I do need to follow up on the reporting

15     of information that turned out not to be accurate.  And I need

16     to also encourage the counsel involved to maintain the kind of

17     integrity in-house.  And one of the ways to do that is to make

18     sure you're following up on why it happened.  So I would ask

19     with respect to both defendants and plaintiffs, the errors that

20     I've identified -- and if plaintiffs are unsure about what the

21     error is because I wasn't as explicit with it -- but there's an

22     effort in the plaintiffs' filing to recapitulate what the

23     defendants had set forth in their table, and the plaintiffs'

24     recapitulation is not accurate.  But the over -- the

25     overwhelming inaccuracy is on the defendants' side.

                    UNITED STATES DISTRICT COURT

1          But I would ask within this 14 days that both side

2     provide -- both sides provide an individual, separate notice to

3     the Court as to their investigation of how this -- these errors

4     occurred and how they've taken steps to make sure that those

5     kind of errors won't reoccur.

6          MR. STRUCK:   That's fine. Your Honor, I was remiss in

7     not mentioning it.   We were going to report to the Court --

8     there are three reasons why that occurred.   So we'll report to

9     you.

10          THE COURT:   All right.   Thank you very much.

11          I appreciate everybody and your time today, and I'm

12     sorry we're not able to get everything done.   But we'll get to

13     this next month.   I won't be easily available, but -- in the

14     interim period because there's some travel that is involved in

15     the holiday period, but what I mean to say by that is, I will

16     be accessible, but there will be certain periods of days, three

17     or four days, when I will -- did you want me to read

18     something? --

19          COURTROOM DEPUTY:   No.

20          THE COURT:   -- where I won't be.   So if there is a

21     delay from the Court on something that does come up with

22     respect to how you would like to present issues, understand

23     that that may be the reason.   Feel free to communicate with my

24     chambers to get a heads-up about what the timing issues are

25     that involve my accessibility so you can be informed about when

UNITED STATES DISTRICT COURT

1    you can expect an answer.  But my intention is to but for a

2    couple segments of days when this international travel has me

3    in a place where I can't have an electronic device, that I will

4    be inaccessible during those times.

5              Thank you.

6              MR. STRUCK:  Thank you.

7              MR. FATHI:  Thank you, Your Honor.

8                  (Proceedings in recess at 12:20 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

126

1                          C E R T I F I C A T E

2

3           I, CHARLOTTE A. POWERS, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of

6   Arizona.

7           I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion of

9   the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 28th day of December,

13  2016.

14

15                              s/Charlotte A. Powers
                            Charlotte A. Powers, RMR, FCRR
16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT