**EXHIBIT 3**

**EXHIBIT 3**

1  Arizona Attorney General Mark Brnovich
   Office of the Attorney General
2  Michael E. Gottfried, Bar No. 010623
   Lucy M. Rand, Bar No. 026919
3  Assistant Attorneys General
   1275 W. Washington Street
4  Phoenix, Arizona 85007-2926
   Telephone: (602) 542-4951
5  Fax: (602) 542-7670
   Michael.Gottfried@azag.gov
6  Lucy.Rand@azag.gov

7  Daniel P. Struck, Bar No. 012377
   Kathleen L. Wieneke, Bar No. 011139
8  Rachel Love, Bar No. 019881
   Timothy J. Bojanowski, Bar No. 22126
9  Nicholas D. Acedo, Bar No. 021644
   Ashlee B. Fletcher, Bar No. 028874
10 Anne M. Orcutt, Bar No. 029387
   Jacob B. Lee, Bar No. 030371
11 STRUCK WIENEKE & LOVE, P.L.C.
   3100 West Ray Road, Suite 300
12 Chandler, Arizona  85226
   Telephone:  (480) 420-1600
13 Fax:  (480) 420-1696
   dstruck@swlfirm.com
14 kwieneke@swlfirm.com
   rlove@swlfirm.com
15 tbojanowski@swlfirm.com
   nacedo@swlfirm.com
16 afletcher@swlfirm.com
   aorcutt@swlfirm.com
17 jlee@swlfirm.com

18 *Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-NVW<br><br>**DECLARATION OF RICHARD PRATT** |

I, **RICHARD PRATT**, make the following Declaration:

1. I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration.

2. I have been working with the Arizona Department of Corrections ("ADC") since July 2000, not including from October 2009 to July 2011, when I was employed elsewhere.

3. In February 2012, I was appointed Interim Assistant Director of ADC's Health Services Bureau following Dr. Michael Adu-Tutu's retirement. When Health Services was privatized in July 2012, my title was adjusted to be the Interim Assistant Director of ADC's Health Services Contract Monitoring Bureau.

4. When Arthur Gross was hired to be the Assistant Director in October 2012, my position changed to Program Evaluation Administrator.

5. I was placed under a temporary special assignment as the Interim Assistant Director of ADC's Health Services Contract Monitoring Bureau on March 1, 2014, when Mr. Gross retired.

6. I was named Assistant Director of ADC's Health Services Contract Monitoring Bureau on August 2, 2014.

7. As Assistant Director of ADC's Health Services Contract Monitoring Bureau, I am responsible for providing managerial oversight and direction to the Health services Contract Monitoring Bureau to monitor the contracted vendor's compliance with all aspects of the health services contract. I am also responsible for reviewing and responding to internal and external inquiries pertaining to compliance issues, contract specifications, reports, inspections, staffing levels and legal mandates of inmate healthcare, mental health care, and dental care services.

8. I am familiar with ADC's policies and practices pertaining to healthcare, including medical care, dental care, and mental health care, the privatization of ADC healthcare, ADC's contract with Corizon, Corizon's responsibilities under that contract,

1    and the Health Services Contract Monitoring Bureau's monitoring of Corizon's care to
2    ADC inmates.

3        9.    I am personally aware of the *Parsons et al. v. Ryan et.al*. litigation, the
4    resulting Stipulation signed by the parties on October 9, 2014, and filed on October 14,
5    2014, and the monitoring and reporting of the performance measures in the Stipulation.

6    **The Stipulation**

7        10.    As a named Defendant in the litigation and ADC's Assistant Director of
8    Health Services Contract Monitoring Bureau, I personally participated in the negotiation
9    of the Stipulation and therefore I am intimately aware of, and understand the intent of, the
10   terms of the negotiated Stipulation as agreed to by the parties.

11       11.    In agreeing to the terms of the Stipulation on behalf of ADC, I understood
12   and appreciated the important impact each agreed-upon term of the Stipulation would
13   have on ADC's daily operations regarding not only the delivery of healthcare, but also the
14   impact on budget, staffing and overall daily operations for the ten ADC prison complexes
15   located throughout the state.

16       12.    In agreeing to the terms of the Stipulation on behalf of ADC, I also
17   understood the nature and scope of the agreed upon system-wide monitoring of ADC's
18   delivery of healthcare.

19       13.    As a named Defendant in the litigation and ADC's Assistant Director of
20   Health Services Contract Monitoring Bureau, I did not agree to, nor would I have ever
21   agreed to, an agreement that had the intent or force of a judicial consent decree. Nor did I
22   or ADC desire or expect the Stipulation to be enforceable as a consent decree subject to
23   subsequent judicial modifications. To memorialize that intent, ADC refused to title the
24   agreement a "Consent Decree" and instead titled it a "Stipulation." ADC also insisted on
25   including the following provision in the Stipulation itself: "The parties agree that this
26   Stipulation shall not be construed as a consent decree."

27       14.    Moreover, as a named Defendant in the litigation and ADC's Assistant
28   Director of Health Services Contract Monitoring Bureau, I did not agree to, nor would I


have ever agreed to, a Stipulation that provided the Court with the authority, directly or indirectly, to order any increased staffing, be it specific or generalized. To memorialize that intent, ADC insisted on including the following provision in the Stipulation (emphasized):

> [I]n the event the Court subsequently determines that the Defendants' plan did not remedy the deficiencies, the Court shall retain the power to enforce this Stipulation through all remedies provided by law, <u>except that the Court shall not have the authority to order Defendants to construct a new prison or to hire a specific number or type of staff</u> unless Defendants propose to do so as part of a plan to remedy a failure to comply with any provision of the Stipulation.

15. In agreeing to the terms of the Stipulation on behalf of ADC, I did not intend, expect, or agree for the Court to have the authority to unilaterally modify the Stipulation in any way for any reason. To memorialize that intent, ADC insisted on including the following provision in the Stipulation: "This is an integrated agreement and may not be altered or modified, except by a writing signed by all representatives of all parties at the time of modification."

**CGAR Performance**

16. As part of my regular duties, I review and analyze Corizon's monthly performance on the Compliance Green Amber Red (CGAR) reporting tool as it relates to the provision of medical care, dental care, mental health care, and prescription medications to ADC inmates.

17. The CGAR is used to evaluate and report Defendants' monthly performance on the performance measures required under the Stipulation.

18. I supervise a team of monitors who select random samples of inmates and review their records for compliance with the Stipulation utilizing the protocols set forth in Exhibit C to the Stipulation and in the ADC Monitor Guide. The results of their review are reported in the CGAR.

19. The CGAR reports are a snap-shot of Corizon's performance for the monitored month and are used to determine compliance under the Stipulation.

20. The results of the monitoring are reported to Corizon staff, and Corizon has an opportunity to appeal any findings of non-compliance.

21. My team requests corrective action plans (CAPs) from Corizon for any non-compliant performance measures.

22. I am aware that in its May 20, 2016 Order, the Court found Defendants to be substantially non-compliant on 12 performance measures, PMs 11, 13, 14, 37, 39, 46, 54, 66, 85, 92, 93, and 98, at certain facilities.

23. I am also aware that in its October 7, 2016 Order, the Court found Defendants to be substantially non-compliant on three additional measures, PMs 47, 80, and 94, at certain facilities.

24. The recent performance on nearly all of the PMs identified in the Court's May 20, 2016 and October 7, 2016 Orders is markedly improved.

25. Defendants were in compliance at <u>all</u> complexes for PMs 14, 66, and 93 in September and October 2016.

26. Defendants' recent compliance rates for PM 14 are as follows:

|  | August 2016 | September 2016 | October 2016 |
|---|---|---|---|
| Douglas | 86 | 100 | 100 |
| Eyman | 92 | 84 | 81 |
| Florence | 97 | 92 | 95 |
| Lewis | 92 | 94 | 90 |
| Perryville | 94 | 100 | 98 |
| Tucson | 100 | 91 | 92 |
| Yuma | 88 | 100 | 93 |

5

27. Defendants' recent compliance rates for PM 66 are as follows:

|  | August 2016 | September 2016 | October 2016 |
|---|---|---|---|
| Florence | 100 | 100 | 96 |
| Lewis | 90 | 90 | 90 |
| Tucson | 20 | 100 | 94 |

28. Defendants' recent compliance rates for PM 93 are as follows:

|  | August 2016 | September 2016 | October 2016 |
|---|---|---|---|
| Eyman | 100 | 95 | 99 |
| Florence | 100 | 95 | 97 |
| Lewis | 100 | 100 | 100 |
| Tucson | 100 | N/A | N/A |

29. Defendants were in compliance at nearly all complexes for PMs 54, 85, 92, and 98 in August, September, and October 2016.

30. Defendants' recent compliance rates for PM 54 are as follows:

|  | August 2016 | September 2016 | October 2016 |
|---|---|---|---|
| Eyman | 86 | 78 | 82 |
| Florence | 97 | 98 | 92 |
| Lewis | 84 | 99 | 93 |
| Perryville | 92 | 92 | 98 |
| Phoenix | 98 | 97 | 93 |
| Tucson | 76 | 90 | 87 |
| Yuma | 98 | 94 | 98 |

6

31. Defendants' recent compliance rates for PM 85 are as follows:

|  | August 2016 | September 2016 | October 2016 |
| --- | --- | --- | --- |
| Eyman | 86 | 100 | 100 |
| Florence | 47 | 57 | 92 |
| Lewis | 36 | 81 | 59 |
| Perryville | 85 | 87 | 89 |
| Tucson | 63 | 93 | 91 |
| Yuma | 93 | 96 | 92 |

32. Defendants' recent compliance rates for PM 92 are as follows:

|  | August 2016 | September 2016 | October 2016 |
| --- | --- | --- | --- |
| Eyman | 94 | 95 | 86 |
| Florence | 95 | 90 | 90 |
| Lewis | 96 | 90 | 74 |
| Perryville | 72 | 86 | 100 |
| Tucson | 100 | N/A | N/A |

33. Defendants' recent compliance rates for PM 98 are as follows:

|  | August 2016 | September 2016 | October 2016 |
| --- | --- | --- | --- |
| Eyman | 80 | 68 | 52 |
| Florence | 80 | 82 | 82 |
| Lewis | 87 | 87 | 91 |
| Winslow | 100 | 83 | 50 |

34. Defendants were in compliance at most complexes for PM 11 for the September 2016 and October 2016 CGARs.

35. Defendants' recent compliance rates for PM 11 are as follows:

|  | August 2016 | September 2016 | October 2016 |
|---|---|---|---|
| Eyman | 66 | 80 | 78 |
| Florence | 77 | 78 | 88 |
| Lewis | 73 | 71 | 56 |
| Tucson | 80 | 80 | 88 |
| Winslow | 87 | 97 | 93 |
| Yuma | 87 | 95 | 92 |

36. Of the 12 PMs at issue in the Court's May 20, 2016 Order, Defendants remain in non-compliance for only four PMs (13, 37, 39, and 46) at a few complexes.

37. For PM 13, Defendants were non-compliant at six out of 10 facilities in September 2016 and four out of 10 facilities in October 2016.

38. Defendants' recent compliance rates for PM 13 are as follows:

|  | August 2016 | September 2016 | October 2016 |
|---|---|---|---|
| Douglas | 93 | 79 | 82 |
| Eyman | 86 | 60 | 90 |
| Florence | 77 | 65 | 59 |
| Lewis | 69 | 67 | 77 |
| Perryville | 63 | 54 | 53 |
| Tucson | 90 | 75 | 86 |
| Yuma | 90 | 92 | 91 |

39. For PM 37, Defendants were non-compliant at four out of 10 facilities in September 2016 and five out of 10 facilities in October 2016.

8

40. Defendants' recent compliance rates for PM 37 are as follows:

|  | August 2016 | September 2016 | October 2016 |
|---|---|---|---|
| Eyman | 54 | 50 | 48 |
| Florence | 80 | 83 | 88 |
| Lewis | 35 | 6 | 29 |
| Tucson | 51 | 86 | 79 |
| Winslow | 93 | 90 | 97 |
| Yuma | 34 | 56 | 42 |

41. For PM 39, Defendants were non-compliant at five out of 10 facilities in September 2016 and four out of 10 facilities in October 2016.

42. Defendants' recent compliance rates for PM 39 are as follows:

|  | August 2016 | September 2016 | October 2016 |
|---|---|---|---|
| Eyman | 46 | 54 | 58 |
| Florence | 41 | 48 | 70 |
| Lewis | 75 | 76 | 98 |
| Perryville | 51 | 71 | 82 |
| Tucson | 69 | 81 | 76 |

43. For PM 46, Defendants were non-compliant at six out of 10 facilities in September 2016 and seven out of 10 facilities in October 2016.

9

44. Defendants' recent compliance rates for PM 46 are as follows:

|  | August 2016 | September 2016 | October 2016 |
| --- | --- | --- | --- |
| Douglas | 78 | 69 | 65 |
| Eyman | 82 | 60 | 34 |
| Florence | 43 | 55 | 30 |
| Lewis | 84 | 76 | 90 |
| Perryville | 60 | 52 | 28 |
| Phoenix | 81 | 93 | 65 |
| Tucson | 50 | 50 | 66 |
| Yuma | 78 | 84 | 76 |

45. Of the three PMs (47, 80, and 94) found to be non-compliant in the Court's November 7, 2016 Order, Defendants are now in compliance with two of them (PMs 80 and 94) at all complexes affected by the Order.

46. Defendants' recent compliance for PM 80 is as follows:

|  | August 2016 | September 2016 | October 2016 |
| --- | --- | --- | --- |
| Lewis | 84 | 91 | 95 |
| Tucson | 91 | 95 | 97 |

47. Defendants' recent compliance for PM 94 is as follows:

|  | August 2016 | September 2016 | October 2016 |
| --- | --- | --- | --- |
| Eyman | 95 | 90 | 87 |
| Florence | 80 | 100 | 91 |
| Tucson | 100 | 100 | 86 |

10

48. Of the three PMs found to be non-compliant in the Court's November 7, 2016 Order, Defendants continue to have compliance issues with only PM 47.

49. Defendants' recent compliance for PM 47 is as follows:

|  | August 2016 | September 2016 | October 2016 |
|---|---|---|---|
| Douglas | 89 | 80 | 44 |
| Eyman | 38 | 47 | 55 |
| Florence | 49 | 68 | 64 |
| Lewis | 56 | 64 | 71 |
| Perryville | 61 | 47 | 64 |
| Phoenix | 100 | 100 | 75 |
| Safford | 100 | N/A | 100 |
| Tucson | 6 | 41 | 41 |
| Winslow | 50 | 100 | 100 |
| Yuma | 66 | 80 | 79 |

50. These statistics are based on my review of the CGARs for August, September, and October 2016.

51. The 15 PMs affected by the Court's May 20, 2016 and October 7, 2016 Orders, which represent 83 total findings of non-compliance, are only a small percentage of the total performance measures required to be reported under the Stipulation.

52. There are 112 PMs under the Stipulation, most of which are applicable at all 10 ADC complexes. The total universe of reported measures each month is 846.

53. The Court has previously found Defendants to be non-compliant on 83 out of 846 possible measures, or 10% of the total possible measures required to be reported under the Stipulation.

54. The Court has not found Defendants to be in substantial non-compliance with the remaining 90% of the total possible measures required to be reported under the Stipulation.

55. The Court's 83 findings of non-compliance were based on data from June 2016 or earlier.

56. More recent compliance reporting shows that of the 83 findings of non-compliance, 50 were in compliance in August 2016, 54 were in compliance in September 2016, and 53 were in compliance in October 2016.

57. This leaves only 33 findings of non-compliance out of 846 total reported measures for August 2016, 29 findings of non-compliance out of 846 total reported measures for September 2016, and 30 findings of non-compliance out of 846 total reported measures for October 2016.

58. Overall, Defendants were compliant with 689 out of the 846 total reported measures, or 81%, for August 2016. Defendants were compliant with 734 out of the 846 total reported measures, or 87%, for September 2016. Defendants were compliant with 723 out of the 846 total reported measures, or 85%, for October 2016. These statistics are based on my review of the CGARs for August, September, and October 2016.

**Implementation of the Open Clinic Concept**

59. Compliance rates for PM 37 have historically been low in large part because the process of receiving paper HNRs, scheduling inmates to be seen by a nurse, providing the schedules to security staff in sufficient time to provide passes to the inmates to come to medical, and subsequently seeing the inmates was difficult, if not impossible, to complete within 24 hours as required by PM 37.

60. Corizon and ADC worked collaboratively to develop and implement the open clinic concept, which is essentially an open sick call.

61. To facilitate the open clinic concept, nurses line hours were increased, and nurses line now runs from 7:00 am to 7:00 pm Monday through Sunday.

62. The open clinic concept went live at ADC on December 5, 2016.

63. Under the open clinic concept, minimum, medium, and close custody inmates have the option to complete an HNR and take it with them when reporting in person to the nurses line, rather than dropping the HNR in a box for later collection.

64. Inmates are permitted to make multiple requests on a single HNR, thus significantly reducing the volume of HNRs received per inmate.

65. The process also greatly reduces duplicate submission of HNRs, because inmates had previously submitted multiple HNRs seeking treatment for the same condition.

66. Upon presentation of the HNR by the inmate, the medical staff triages and categorizes the HNR immediately. If deemed necessary, the inmate is seen by a nurse while he/she is in the medical unit.

67. If it is not deemed necessary for the inmate to be seen immediately by a nurse, but the inmate needs to be seen at a later date, he/she will be referred to a provider (i.e., mental health, medical, or dental) and seen within 14 days as required by PM 39.

68. Not all HNRs require than at an inmate be seen by nursing or a provider. For example, an inmate may submit an HNR requesting a prescription refill, which can be handled without the need for a nursing or provider appointment.

69. This streamlined process replaced the previous process, whereby a medical staff member would receive, compile, categorize, and otherwise triage all HNRs each day and subsequently schedule inmates to be seen by a nurse or other healthcare providers.

70. This process change not only reduces the volume of HNRs received, but also increases the efficiency of clinic staff, who can devote more time to seeing inmates.

71. Maximum custody inmates continue to submit their HNRs using the collection boxes, but the overall volume of HNR processing is greatly decreased under the new process.

72. During the initial weeks of implementation, the new process has proven successful, and there are no backlogs or waiting lists of inmates in any custody level who have not been seen within 24 hours of submission of an HNR.

73. It is anticipated that compliance scores for PM 37 will improve dramatically in the December 2016 CGAR and will remain in compliance in future months as a result of the new process.

74. I declare under penalty of perjury that the foregoing is true and correct. Executed on January 4, 2017.

RICHARD PRATT

14