Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
Jacob B. Lee, Bar No. 030371
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br>                              Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br>                              Defendants. | NO. 2:12-cv-00601-DKD <br><br><br> **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR CONTEMPT (DKT. 1819)** <br><br> **[Evidentiary Hearing Requested]** |

**INTRODUCTION**

Plaintiffs' Motion for Contempt is based on a very serious accusation: a Deputy Warden "intentionally" and in "bad faith" "obstructed Plaintiffs' counsel from performing their Court-ordered monitoring responsibilities" during the November tour at the Arizona State Prison Complex in Tucson ("ASPC-Tucson") by "threaten[ing] disciplinary sanctions against all class members who had just been interviewed and those who were about to be approached for an interview by their own lawyers." (Dkt. 1819 at 5:5-28, 7:5-7, 7:26, 8:10.) This is patently false. The facts—gathered during Defendants' careful, subsequent investigation—categorically prove the Deputy Warden did not threaten, intimidate, or retaliate against any inmate. Defendants shared those facts with Plaintiffs' counsel and asked that they withdraw their Motion, but they did not respond. The Court should deny their Motion, and order reimbursement of Defendants' fees and costs incurred in responding to their vexatious claim.

Evidence aside, Plaintiffs' Motion is legally improper because a defendant can only be held in contempt of a "specific and definite" court order. The Stipulation is not a court order, nor did it or any other order provide adequate notice that the alleged conduct would be a violation. Even assuming it is, Plaintiffs fail to produce clear and convincing evidence of a violation; Defendants' substantial complied with the Stipulation; and the sanctions requested should not be imposed.

**I.  FACTUAL AND PROCEDURAL HISTORY**

**A.  The Tours**

On November 1, 2016, Plaintiffs' counsel arrived at ASPC-Tucson for their scheduled two-day tour to discuss logistics for the day. (Exhibit 1, Declaration of Mark Bracken, ¶¶ 3-5.) Neither ADC nor Defendants' counsel know in advance what portion of the facility Plaintiffs' counsel intend to tour, or which inmates they want to talk to until that time. (Id., ¶¶ 5-6.) They ultimately split into three groups, one of which toured the In-Patient Care Center ("IPC") and Housing Units 7 and 8 in the Rincon Unit. (Id., ¶ 7.) Plaintiffs' attorneys Alison Hardy and Chris Carlsen and Defendants' attorney Mark

1

Bracken were in that group. (Id., ¶ 8.) During this portion of the tour, Ms. Hardy interviewed various Corizon medical staff and inmates. (Id., ¶ 9.) At no time did Ms. Hardy or Mr. Carlsen raise an allegation of staff intimidation or retaliation, despite opportunities to do so. (Id., ¶¶ 10, 12.) Nor did Mr. Bracken observe any conduct suggesting the inmates were uncomfortable speaking to their attorneys or felt threatened by ADC staff. (Id., ¶ 11.)

The following day, on November 2, 2016, Plaintiffs and Defendants' counsel met to discuss several issues before resuming the tour. (Ex. 1, ¶ 13.) Plaintiffs' counsel did not raise any allegation of staff intimidation or retaliation occurring the day before. (Id.) Plaintiffs' attorneys Kirstin Eidenbach and Jessica Jansepar-Ross continued their tour of Rincon Unit; they were accompanied by Ashley Zuerlein with the Arizona Attorney General's Office, and three ADC staff—Southern Region Operations Director ("SROD") Tara Diaz, Deputy Warden of Operations ("DWOP") Vivian Baltierra, and Rincon Unit Deputy Warden ("DW") Jason Monson.[1] (Exhibit 2, Declaration of DW Monson, ¶ 11; Exhibit 3, Declaration of Ashley Zuerlein, ¶ 2.) The Rincon Unit is a close custody unit. (Ex. 2, ¶ 12.) Close custody inmates present an increased risk to the public and staff as compared to medium or low custody inmates, requiring ADC staff to be present when attorneys or any other civilian group tours Rincon Unit. (Id., ¶¶ 12-13.) Even if the group is touring a close custody unit, like Rincon, with all inmates in their cells at the time of the tour, it is necessary for staff to be readily accessible in case of an emergency. (Exhibit 4, Declaration of Sgt. Krages, ¶ 14.)

After Plaintiffs' counsel spoke with inmates on the recreation field, the group went into Housing Unit 3. (Ex. 2, ¶ 19.) Housing Unit 3 is comprised of three runs – Able, Baker, and Charlie. (Id., ¶ 20.) The walkway adjacent to the row of cells in each run is 76 feet, 4 inches long, and 7 feet wide. (Id.) The group first toured Abel Run. (Id., ¶ 21.) Before entering Abel Run, ADC security personnel announced that women were entering

---

[1] SROD Diaz and DWOP Baltierra were in civilian clothes and not in uniform. (Ex. 2, ¶ 11.)

the Run. (Ex. 3, ¶ 4.) ADC staff then walked the run informing inmates that women were on the run and instructing them to put on shirts and pants. (Id., ¶ 7.) ADC staff did not threaten inmates with discipline for not being dressed. (Id.) Staff were merely asking the inmates to get dressed because there were female visitors on the Run, which is standard protocol. (Id.) Plaintiffs' attorneys Ms. Eidenbach and Ms. Jansepar-Ross then began conducting their cell-front interviews. (Id., ¶ 9.)

As ADC staff and Ms. Zuerlein waited, SROD Diaz noticed that the inmate in cell 3A02 had defaced his ID and she advised DW Monson he needed a new one. (Ex. 2, ¶ 21.) DW Monson took a photograph of the ID with his cell phone and sent it in an email at 10:52 a.m. to the Rincon accountability officer to order a new one.[2] (Ex. 2, ¶ 21; Ex. 3, ¶ 17.) It is a common and effective practice for deputy wardens and other supervisory staff to take photographs of issues while walking runs, as it better identifies the specific issue, allows quicker follow-up and response times, and helps educate staff. (Ex. 2, ¶¶ 5-8.) DW Monson then walked Abel Run to ensure the inmates were properly dressed and that there were no safety or security issues for the touring attorneys. (Id., ¶ 22.) As he did this, when he observed a housing unit violation,[3] he took a photograph with his cell phone so that he could address the issue with the supervisor and officers assigned to that post. (Id.) The photographs were not taken to discipline or intimidate the inmates, or in retaliation for inmates speaking with Plaintiffs' attorneys. (Id., ¶¶ 26, 28.) They were taken to educate staff and hold them accountable: to show the supervisor either that the assigned staff had not completed their DO 704 inspection, or that the assigned officer does not know what to look for. (Id.) As Deputy Warden, DW Monson is responsible for training supervisors and other staff in Rincon Unit. (Id., ¶ 3.) Inmate compliance with DO 704 was a major problem in Housing Unit 3 for at least the preceding four months; it had been a constant struggle for staff. (Ex. 4, ¶ 11.)

---

[2] Issuance of a new ID card does not result in inmate discipline. (Ex. 3, ¶ 18.)

[3] Department Order ("DO") 704 addresses housing unit regulations, inmate identification card requirements, and inmate dress and clothing requirements, among other things. (Ex. 2, ¶ 4.)

3

1    At 10:57 am, DW Monson emailed the shift commanders about the DO 704
2 compliance issues he had seen, and directed them to take necessary corrective action with
3 the responsible staff, if necessary, for failing to perform their duties. (Ex. 2, ¶¶ 28-27.)
4 DW Monson also instructed Sergeant ("Sgt.") Krages to meet him in Housing Unit 3 to
5 discuss the compliance issues. (Ex. 2, ¶ 32; Ex. 4, ¶ 5.) Meanwhile, the tour group had
6 made its way to Charlie Run. (Ex. 2, ¶ 29; Ex. 3, ¶ 13.) Again, before entering the Run,
7 ADC security personnel announced women were entering the Run, and instructed the
8 inmates to put on shirts and pants. (Ex. 3, ¶ 14.) No inmates were threatened or
9 disciplined for not being dressed. (Id.)

10    When Sgt. Krages arrived, DW Monson ordered him to do a walk-through of
11 Housing Unit 3 with the floor officer, COII Robles, to review the compliance issues. (Ex.
12 4, ¶¶ 6-7.) Sgt. Krages retrieved COII Robles, who had been doing an ID check in Baker
13 Run, and returned to Charlie Run to discuss the matter further with DW Monson. (Ex. 4,
14 ¶¶ 8-9; Exhibit 5, Declaration of COII Robles, ¶¶ 5-6.) The purpose of this conversation
15 was to reinforce to Sgt. Krages and COII Robles the expectation that they perform their
16 daily duties and hold other staff accountable for not doing their jobs. (Ex. 2, ¶¶ 9-10, 40.)
17 COII Robles advised that he had inspected Able and Charlie Runs earlier in the day, at
18 approximately 7:30 am, and addressed some of the issues with the inmates. (Ex. 5, ¶ 7.)
19 He also told DW Monson that he had warned the inmates at that time that if the issues
20 were not resolved they could receive a disciplinary violation. (Id.) During this
21 conversation, their voices were not elevated; they were speaking in a normal
22 conversational tone, and all of the cell doors on the Run were closed. (Ex. 2, ¶ 35; Ex. 3,
23 ¶ 20.) Sgt. Krages and COII Robles then walked Abel and Charlie Runs to determine
24 whether the compliance issues had been resolved. (Ex. 4, ¶ 10; Ex. 5, ¶ 8.) Shortly
25 thereafter, at approximately 11:45 am, Plaintiffs' counsel asked to break for lunch. (Ex. 2,
26 ¶ 37; Ex. 3, ¶ 23.)

27    After lunch, Plaintiffs' counsel told Defendants' counsel that they were suspending
28 the remainder of the tour due to allegations of intimidation and retaliation by staff. (Ex. 1,

¶ 15.) Specifically, Ms. Eidenbach stated that she overheard DW Monson order staff to "ticket them all," and that, as a result, the inmates would no longer speak with her. (Id.) Ms. Eidenbach also stated that two inmates had allegedly told Ms. Hardy during her interviews the day before (November 1) that a correctional officer told them to answer the questions correctly or he would make their lives "a living hell." (Id., ¶ 16.) Defendants' counsel asked Plaintiffs' counsel if they had any further information regarding the alleged intimidation on November 1, but they did not want to identify the inmates and would only say they were in Rincon Unit, Building 7 or 8. (Id.) When asked, Plaintiffs' counsel did not know when the alleged events occurred, where specifically these events occurred, or which officer made the alleged threats. (Id.) Plaintiffs' counsel rejected Defendants' suggestion to resolve the issue and continue the tours (in other Units), and insisted on calling the Court. (Id., ¶ 17.)

### B. The November 2, 2016 Hearing

Defendants' counsel arranged for a conference call with the Court. Those present—and huddled around a phone on speaker—included Defendants' attorney Mark Bracken and Ms. Zuerlein, and Plaintiffs' attorneys Kirstin Eidenbach and Alison Hardy. (Ex. 1, ¶ 18.) Ms. Eidenbach told the Court that Deputy Monson "took pictures of the cells" while they interviewed inmates on Abel Run, and "announced near the end of our visit that everyone on the run would be ticketed." (Exhibit 6, Transcript of 11/2/16 Hearing, at 4.) She further told the Court that, during her interviews on Charlie Run, Deputy Monson again "announced that everyone on the run would be ticketed, and he again took pictures of all the runs." (Id.) Ms. Eidenbach also told the Court that two inmates had told Ms. Hardy the day before "that they'd better say the right thing during the tour or their lives would be made hell." (Id.)

For Defendants, Mr. Bracken told the Court that Deputy Monson did not make those statements or any statements intended to retaliate against the inmates, and that his conversation with Sgt. Krages and COII Robles pertained to the DO 704 compliance issues. (Ex. 6 at 6-8.) The Court stated that it would "not tolerate any kind of retaliation

5

1  for conversations or meetings or speaking with plaintiffs' counsel" and that a "broad
2  brush ticketing to everybody on the line who is showing up for an interview" was not
3  permissible. (Id. at 12-13, 17.) It ordered the parties to work together and give notice to
4  the inmates that there will be no retaliation. (Id. at 12, 14-15.) The Court "put off for
5  another time when I have the opportunity to allow both sides to present their respective
6  views on whether or not the conduct here warrants a fee shift such that … there should be
7  an extra allocation of funds for the visits that were planned and conducted. (Id. at 16.)

### C.  Plaintiffs' Demand Letter

On November 8, 2016, Plaintiffs' counsel sent a letter to Defendants' counsel asking for a stipulation that would require ADC to: (1) distribute a letter to ASPC-Tucson inmates that included an apology to the inmates, an acknowledgement of wrongdoing, an assurance that there will be no retaliation for communicating with Plaintiffs' counsel, and a rescission of all disciplinary violations that were issued during the tour; (2) order staff not to threaten or retaliate against any inmate for communicating with Plaintiffs' counsel; (3) train staff regarding inmates' rights to communicate with legal counsel; and (4) afford them two make-up tour days at ASPC-Tucson. (Exhibit 8, Letter dated 11/8/16.)

### D.  ADC's Investigation and Defendants' Response

ADC conducted a thorough investigation, which revealed the facts above. DW Monson was taking photographs (approximately eight) of DO 704 violations, not for the purpose of disciplining inmates (or in retaliation for speaking with Plaintiffs' attorneys) but to educate and ensure that corrective action was taken against staff for failing to perform their duties, if necessary. (Ex. 2, ¶ 25 & Ex. G, ¶ 26, ¶ 27 & Ex. H, ¶ 28, ¶ 40, ¶ 46.) This intent is corroborated by copies of the emails he sent in real time to staff (with the photographs attached). (Ex. 2, ¶ 25 & Ex. G, ¶ 27 & Ex. H.) In those photographs, the inmate's face, name, and cell number are *not* visible.[4] (Id., ¶ 25 & Ex. G)  DW

---

[4] That DW Monson was simply carrying out his duties as Deputy Warden of the Rincon Unit is further supported by photographs he took during the tour of: an exercise

6

Monson has also avowed that he never ordered staff to "ticket," warn, or discipline any inmate for any reason during the tour. (Id., ¶¶ 34, 41.) Sgt. Krages and COII Robles have likewise avowed that DW Monson never directed them to issue disciplinary reports to any inmates in Housing Unit 3, or anywhere else. (Ex. 4, ¶ 12; Ex. 5, ¶ 10.) Ms. Zuerlein has avowed that she did not hear DW Monson or anyone else on the tour say "ticket everyone." (Ex. 3, ¶¶ 26, 31.) The investigation also revealed that no inmates in Housing Units 7 or 8, or Rincon IPC received disciplinary violations on November 1, and no inmates in Housing Unit 3 received disciplinary violations on November 2 (for anything). (Ex. 2, ¶¶ 42, 44; Ex. 5, ¶ 9.) And as of December 30, 2016, no inmate has filed a grievance alleging retaliation or intimidation during the November tours. (Ex. 2, ¶ 48.)

In accordance with the Court's November 2, 2016 directive, ADC issued two notices. The first Notice was issued to all staff at ASPC-Tucson and ordered that they "cannot threaten, intimidate, or retaliate against inmates for speaking with their attorneys." (Exhibit. 7, Declaration of Warden Ramos, ¶¶ 5, 7-9 & Ex. 1 thereto.) It also reminded staff that ADC has "zero tolerance for retaliation against inmates" and ordered them to report any instances of retaliation they become aware of. (Id.) The second Notice was issued to all inmates at ASPC-Tucson Rincon Unit, and informed that "staff have been instructed to help accommodate [Plaintiffs'] attorneys' requests to speak to inmates and that they cannot threaten, intimidate, or retaliate against inmates for speaking with their attorneys." (Id., ¶¶ 6, 10-11 & Ex. 2 thereto.) Defendants refused Plaintiffs' additional requests. (Exhibit 9, Letter dated 12/19/16.)

---

station on the recreation yard that needed reupholstering; a cell door that needed fixing; and a sign that needed repairing. (Ex. 2, ¶ 15 & Ex. B, ¶ 23 & Ex. E, ¶ 31f & Ex. N.) DW Monson was also approached by many inmates with requests. (Ex. 2, ¶¶ 29-30.) For example, one inmate advised that he needed a notary. (Ex. 2, ¶ 18 & Ex. C.) DW Monson emailed staff his request for follow up. (Id.) Another inmate asked if he had received his inmate letter. (Id., ¶ 24 & Ex. F.) Because he did not, DW Monson took a photograph of the inmate's copy and emailed it to himself so he could review it. (Id.) Other inmates raised issues pertaining to their phone, heater, diet, disciplinary credit, and clothes, and DW Monson emailed staff each time to get the issues resolved. (Id., ¶ 31a-e & Ex. I-M.)

7

### E. Plaintiffs' Motion for Contempt

Meanwhile, on December 14, 2016, Plaintiffs filed their Motion for Contempt, accusing Deputy Monson of intentionally threatening inmates with disciplinary violations in retaliation for speaking with Plaintiffs' attorneys during the November tours. (Dkt. 1819.) That Motion is supported only by Ms. Eidenbach's statements during the November 2 hearing, and her sworn declaration. (Id.) They request the Court to: (1) find Defendants in contempt; (2) "rescind all disciplinary actions taken against prisoners on Plaintiffs' November 1-2, 2016 tour of the Tucson prison complex"; (3) "allow Plaintiffs to reschedule a two-day tour of the facility"; and (4) "award Plaintiffs' attorneys' fees and costs for the cancelled trip and for this Motion."[5]  (Dkt. 1819 at 12:10-19.)

## II. THE COURT CANNOT AND SHOULD NOT HOLD DEFENDANTS IN CONTEMPT FOR VIOLATING A PROVISION IN THE STIPULATION.

### A. The Stipulation is Not a Court Order.

A party can only be held in civil contempt if it violates a court order. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). Plaintiffs contend that Defendants violated a provision in the Stipulation, which the Court "ordered the parties to comply with." (Dkt. 1819 at 6 at 19-23.) The Stipulation, however, is not a court order; it is a negotiated settlement agreement voluntarily entered into by the parties. (Dkt. 1185.) Defendants expressly incorporate herein the arguments in their Response to Plaintiffs' Motion to Modify Stipulation, Section II.A, on this point. (See Dkt. 1842.) Plaintiffs only argument is a citation to the Court's Order approving the Stipulation pursuant to Fed.R.Civ.P. 23(e), and acknowledging its enforcement (per the terms of the Stipulation). (Dkt. 1819 at 6:20, citing Dkt. 1458 at 4 and Attachment 1.) But neither one transforms the provisions of the Stipulation into a court order (or court-ordered provisions), capable of contempt. Plaintiffs offer no substantive argument on this point and have therefore waived further explanation in their Reply.

---

[5] Plaintiffs request other relief but do not provide any substantive argument to entitlement. That other relief is therefore waived.

8

### B.     Paragraph 29 of the Stipulation Is Not "Specific and Definite."

A finding of contempt can only be made if the order allegedly violated was "specific and definite." *In re Dual-Deck*, 10 F.3d at 695; *see also Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989) ("[T]o support a contempt motion, the order alleged to have been disobeyed must be sufficiently specific."); *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982) ("Where the language of a consent judgment is too vague, it cannot be enforced; to do so would be an invalid exercise of judicial authority.").

Plaintiffs contend that Deputy Monson's alleged conduct violated Paragraph 29 of the Stipulation, which states:

> Plaintiffs' counsel and their experts shall have reasonable access to the institutions, staff, contractors, prisoners and documents necessary to properly evaluate whether Defendants are complying with the performance measures and other provisions of this Stipulation. The parties shall cooperate so that plaintiffs' counsel has reasonable access to information reasonably necessary to perform their responsibilities required by this Stipulation without unduly burdening defendants.

(Dkt. 1185, ¶ 29.)  Even if the Stipulation could be construed as a court order capable of contempt, this provision did not give Defendants adequate notice that Deputy Monson's alleged conduct (particularly as accurately stated above) would be a violation of that provision.  An agreement to provide "reasonable access" to the facilities and inmates is not "sufficiently specific" to support Plaintiffs' contempt Motion. What constitutes "reasonable access" is ambiguous, and can mean many different things.  It is not specific or definite. *See Gates v. Shinn*, 98 F.3d 463, 472 (9th Cir. 1996) ("The consent decree cannot support a contempt finding for failure to provide an 'appropriate level' of psychiatric screening and care, because that provision does not command any conduct with specificity."); *Balla*, 869 F.2d at 465 (requirements of "systematic" program for screening and evaluation, participation of a "sufficient" number of healthcare professionals, and implementing a "basic" program for treating suicidal prisoners" are terms that are "too general to be enforced through a contempt motion"); *Eichenlaub v.*

*Baca*, CV 06-6979-GHK (CTX), 2007 WL 1223897, at *1 (C.D. Cal. Mar. 30, 2007) (finding the word "substantively" to be "at least ambiguous").

### C. Plaintiffs Have Not Established a Violation of Paragraph 29 By Clear and Convincing Evidence.

Plaintiffs also have the burden to "demonstrate that [Defendants] violated the court's order by 'clear and convincing evidence,' not merely a preponderance of the evidence." *In re Dual-Deck*, 10 F.3d at 695 (quoting *Vertex,* 689 F.2d at 889). Plaintiffs' evidence is scant. It is based entirely on what Ms. Eidenbach believes she heard while she was interviewing inmates "through the cracks of the [cell] doors."[6] (Dkt. 1820 & ¶ 4.) They do not, however, corroborate her claim that DW Monson ordered staff to "ticket" all inmates on the Run with any evidence. They do not provide a declaration from Ms. Jansepar-Ross, who was also in the Run with Ms. Eidenbach, or from Ms. Hardy, whom they allege claims inmates told her they were threatened by staff the previous day. In fact, Ms. Eidenbach's sworn declaration is completely silent as to the alleged event on November 1.[7] (Dkt. 1820.) Their suggestion that inmates in their closed cells (which required Ms. Eidenbach to speak through the cracks) must have overheard the same thing because they expressed fears of retaliation and refused to speak with her is not supported by any inmate declaration, only conjecture.

In contrast, Defendants have presented the sworn declarations of DW Monson, Sgt. Krages, and COII Robles, all of whom avow that DW Monson did not give a blanket order to "ticket" or otherwise discipline the inmates in Rincon Unit, and the sworn declaration of Ms. Zuerlein, who avows she did not hear any such order either. These *four* sworn declarations are supported by documented emails and photographs (and the four declarations themselves), all of which establish that DW Monson was *not*

---

[6] Plaintiffs refer to Ms. Eidenbach's statements during the November 2 hearing as "direct evidence" and testimony, but she was not under oath when she made them.

[7] The November 1 allegations also lack any detail (when, where, who). It is further undermined by the fact that Plaintiffs' attorneys did not report this allegation until the next day, despite every opportunity to do so.

10

threatening, intimidating, or retaliating against inmates for any reason; rather, he was discussing and documenting DO 704 compliance issues to take up *with staff* (for educational and accountability purposes). If DW Monson intended to retaliate against inmates for speaking with Plaintiffs' attorneys—and there is no evidence of this—then there would have been no reason for Sgt. Krages and COII Robles to walk Baker Run to address the same compliance issues. (Ex. 4, ¶ 9.) Plaintiffs' attorneys did not tour that Run. Plaintiffs' evidence falls woefully short of clear and convincing.

Plaintiffs claim "Defendants did not dispute that the actions described [by Kirstin Eidenbach during the November 2, 2016 call with the Court] took place." (Dkt. 1819 at 3:27-28.) Plaintiffs support that statement with a comment made by Defendants' attorney Mark Bracken during the call, where he stated, "we're not disputing what she said she heard or what she said occurred." (Ex. 6 at 7:15-16.) But they take that comment out of context. Mr. Bracken, who was not with DW Monson's tour group on November 2, intended to convey that he "could not dispute what Ms. Eidenbach claimed she heard or what she claimed occurred, because [he] was not present in the unit at that time and no investigation had been done." (Ex. 1, ¶ 19.) In other words, he was "not in a position to argue that she mis-heard (or did not hear) what she claimed she heard." (Id.) He could "only assume, for purposes of the call, that she heard what she heard, and argue there was no evidence that the comments were made in retaliation for inmates speaking with Plaintiffs' counsel (because there was none; there was only speculation)." (Id.) Mr. Bracken's subsequent comments make clear that he certainly was disputing Ms. Eidenbach's factual allegations (that any threat was made by staff). (Ex, 1, ¶ 19; Ex. 6 at 7:17 ["We dispute the conduct."]; 7:19 ["But what actually occurred is a very different story."]; 17:1 ["we dispute what happened"].) Therefore, his statements do not help them, and they are still far short of clear and convincing evidence.

11

### D. Defendants' Substantial Compliance and Good Faith Interpretation of Paragraph 29 of the Stipulation Precludes a Contempt Finding.

In addition to these legal and factual obstacles, a finding of contempt is not appropriate because Defendants have substantially complied with a reasonable interpretation of Paragraph 29. *See In re Dual-Deck*, 10 F.3d at 695 ("[A] person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the court's order. Substantial compliance with the court order is a defense to civil contempt, and is not vitiated by a few technical violations where every reasonable effort has been made to comply.") (Internal citations and quotation marks omitted); *General Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1378-79 (9th Cir. 1986) ("[T]echnical or inadvertent violations of the order will not support a finding of civil contempt."). Prior to the November APSC-Tucson tours, Plaintiffs' attorneys conducted 18 other tours. This is the first time they have alleged retaliation like this in violation of Paragraph 29. Defendants have gone out of their way to provide them more than "reasonable access" to the facilities and inmates. Thus, there has been at least substantial compliance with that provision. Moreover, the alleged infraction—taking photographs of, and discussing with staff, compliance issues for educational and accountability purposes, albeit during the tour—is not an unreasonable interpretation of the Stipulation. There was no "blanket statement that all prisoners would be disciplined," as Plaintiffs contend. (Dkt. 1819 at 7:22-23.) It does not warrant a finding of contempt.

### E. The Court Should Not Order Plaintiffs' Requested Sanctions

Sanctions cannot be imposed without a finding of contempt. Plaintiffs argue the Court can alternatively order the "same relief" by invoking its authority to enforce under Paragraph 36 of the Stipulation: "[t]he Court shall retain the power to enforce this Stipulation through all remedies provided by law." But the Court can only invoke that power if it first "finds that Defendants have not complied with the Stipulation." (Dkt. 1185, ¶ 36.) The evidence shows there was *no* breach of the Stipulation, much less clear and convincing evidence that there was. Without an actual breach, there is nothing to

enforce (or sanction). Although the Court previously stated that a "broad brush ticketing to everybody on the line who is showing up for an interview" is not permissible (Ex. 6 at 12-13, 17), it made that comment on the assumption that that's what actually occurred. But the actual evidence (presented with this Response) establishes that simply did not happen. With no breach, Paragraph 36 is unavailable.

Plaintiffs accuse Defendants of demonstrating a "pattern of obfuscating serious problems," "foot dragging" with respect to unrelated remediation plans, and "repeated factual misrepresentations to Plaintiffs' counsel and the Court," and argue that the Court can consider these allegations when deciding whether to impose sanctions. (Dkt. 1819 at 8:26, 9:4-19, 9:19-21.) Defendants obviously disagree with Plaintiffs' rhetoric,[8] but for purposes of their Motion, they have nothing to do with Plaintiffs' retaliation claims.[9] Furthermore, civil contempt sanctions cannot be punitive in nature, which is precisely what Plaintiffs are urging. *See Bell v. Hongisto*, 501 F.2d 346, 353 (9th Cir. 1974) (finding contempt was essentially "criminal" in nature because "the purpose of the contempt sanction in this case was punitive rather than compensatory or coercive"). Sanctions must be limited to Plaintiffs' "actual loss for injuries which result from the noncompliance." *In re Dual-Deck*, 10 F.3d at 696 (citation and internal quotation marks omitted); *see also In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1366-67 (9th Cir. 1987) ("[A] sanction for civil contempt is characterized by the court's desire to ...

---

[8] The alleged "factual misrepresentations" were unintentional typographical/transcription errors as explained to the Court in Defendants' December 28, 2016 Status Update. (Dkt. 1838.)

[9] *Whittaker* is distinguishable because the defendant there, Execuair, committed numerous violations of highly specific and detailed provisions of an injunction entered against it. *See Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 513-14 (9th Cir. 1992). Moreover, Execuair's conduct in violation of the injunction was of the same nature as its conduct that resulted in a judgment in Whittaker's favor in an earlier action for unfair competition against Execuair and that was alleged in a second lawsuit filed by Whittaker against Execuair that resulted in a settlement. *Id.* at 512-13. It was this repeated pattern of similar conduct that the district court characterized as "flagrant contempt." *Id.* at 516. By contrast, here Plaintiffs have not shown through clear and convincing evidence that Defendants have violated any specific, detailed provisions of the Stipulation, much less that they have a pattern of doing so.

compensate the contemnor's adversary for the injuries which result from the noncompliance. However, an award to an opposing party is limited by that party's actual loss.") (Internal citation and quotation marks omitted).  Plaintiffs' unrelated grievances cannot support a finding of contempt or imposition of civil sanctions.

Plaintiffs' individual sanction arguments also fail.  They ask that any disciplinary action be rescinded, but no such action was taken.[10]  They request two "compensatory" tour days to replace the November 1-2 tour.  But they provide no competent evidence supporting their November 1 retaliation allegation, or any evidence that inmates refused to speak with them on that day.  They only claim that some (not all) inmates on Charlie Run (not Abel Run) refused to speak with them on November 2, and even that claim is not supported by corroborating evidence.  Defendants' attorneys urged Plaintiffs' attorneys to continue the tour in the afternoon—and specifically Units other than Rincon—but they refused. Thus, any lost time was self-inflicted. *See In re Dual-Deck*, 10 F.3d at 696 ("Defendants' only claimed injuries were self-inflicted, by their own spare-no-expense punitive expedition, not by Go–Video's use of discovery from the first lawsuit in the second."). Defendants have even offered to allow Plaintiffs' attorneys to come back and finish the ½ day at APSC-Tucson (Ex. 9), but they have not even responded to that offer.

For this same reason, Plaintiffs' blanket request for fees and expenses should be denied.  DW Monson's conduct did not obstruct or derail Plaintiffs' tour, much less the entire tour.  Plaintiffs' attorneys had every opportunity to continue and they refused.  Fees are also not appropriate as reimbursement for preparing their Motion.  As discussed herein, the Motion meritless.  Plaintiffs refused to withdraw it after being told what really had happened, forcing Defendants to file this response.  The Court should award *Defendants' their* attorneys' fees for having to prepare it. *See* 28 U.S.C. § 1927 (fees may be awarded if party "multiplies the proceedings in any case unreasonably and

---

[10] Plaintiffs' request includes a rescission of disciplinary warnings, but warnings have no disciplinary consequences and are not documented in an inmate's file. (Ex. 2, ¶ 34.)

14

vexatiously"); *Roadway v. Piper*, 447 U.S. 752, 765 (1980) (federal courts have the inherent power to assess attorneys' fees in response to abusive litigation practices).

## CONCLUSION

For these reasons, Plaintiffs' Motion for Contempt should be denied, and the Court should award Defendants' their attorneys' fees and costs incurred in preparing this Response. If the Court is inclined to find Defendants in Contempt, it should order an evidentiary hearing and give Defendants an opportunity to be heard. *See Mission Capital Works, Inc. v. SC Restaurants, Inc.*, C-07-1807 JLR, 2008 WL 3850523, at *6 (W.D. Wash. Aug. 18, 2008) (citing *International Union, UMWA v. Bagwell,* 512 U.S. 821, 831-34 (1994)) ("The procedure for civil contempt is to set an order to show cause hearing and to provide the contemnor an opportunity to respond and/or comply with the order.")

DATED this 4th day of January 2017.

STRUCK WIENEKE & LOVE, P.L.C.

By /s/Nicholas D. Acedo
    Daniel P. Struck
    Kathleen L. Wieneke
    Rachel Love
    Timothy J. Bojanowski
    Nicholas D. Acedo
    Ashlee B. Fletcher
    Anne M. Orcutt
    Jacob B. Lee
    STRUCK WIENEKE & LOVE, P.L.C.
    3100 West Ray Road, Suite 300
    Chandler, Arizona 85226

    Arizona Attorney General Mark Brnovich
    Office of the Attorney General
    Michael E. Gottfried
    Lucy M. Rand
    Assistant Attorneys General
    1275 W. Washington Street
    Phoenix, Arizona 85007-2926

    *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 4, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Alison Hardy: | ahardy@prisonlaw.com |
| Amelia M. Gerlicher: | agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com |
| Amir Q. Amiri: | aamiri@jonesday.com; ttualaulelei@jonesday.com |
| Amy B. Fettig: | afettig@npp-aclu.org |
| Asim Varma: | avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| Caroline N. Mitchell: | cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com |
| Corene T. Kendrick: | ckendrick@prisonlaw.com; edegraff@prisonlaw.com |
| Daniel Clayton Barr: | DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com |
| Daniel Joseph Pochoda: | dpochoda@acluaz.org; danpoc@cox.net; gtorres@acluaz.org |
| David Cyrus Fathi: | dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org |
| Donald Specter: | dspecter@prisonlaw.com |
| Jennifer K. Messina: | jkmessina@jonesday.com |
| Jessica Pari Jansepar Ross: | jross@azdisabilitylaw.org |
| John Howard Gray: | jhgray@perkinscoie.com; slawson@perkinscoie.com |
| John Laurens Wilkes: | jlwilkes@jonesday.com, dkkerr@jonesday.com |
| Jose de Jesus Rico: | jrico@azdisabilitylaw.org |
| Kathleen E. Brody | kbrody@acluaz.org |
| Kirstin T. Eidenbach: | kirstin@eidenbachlaw.com |
| Maya Abela | mabela@azdisabilitylaw.org |
| Rose Daly-Rooney: | rdalyrooney@azdisabilitylaw.org |
| Sara Norman: | snorman@prisonlaw.com |
| Sarah Eve Kader: | skader@azdisabilitylaw.org;mlauritzen@azdisabilitylaw.org; rstarling@azdisabilitylaw.org |

Rita K. Lomio: rlomio@prisonlaw.com

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/Nicholas D. Acedo

17