**EXHIBIT 2**

**EXHIBIT 2**

1   Arizona Attorney General Mark Brnovich
    OFFICE OF THE ATTORNEY GENERAL
2   Michael E. Gottfried, Bar No. 010623
    Lucy M. Rand, Bar No. 026919
3   Assistant Attorneys General
    1275 W. Washington Street
4   Phoenix, Arizona 85007-2926
    Telephone: (602) 542-4951
5   Fax: (602) 542-7670
    Michael.Gottfried@azag.gov
6   Lucy.Rand@azag.gov

7   Daniel P. Struck, Bar No. 012377
    Kathleen L. Wieneke, Bar No. 011139
8   Rachel Love, Bar No. 019881
    Timothy J. Bojanowski, Bar No. 022126
9   Nicholas D. Acedo, Bar No. 021644
    Ashlee B. Fletcher, Bar No. 028874
10  Anne M. Orcutt, Bar No. 029387
    Jacob B. Lee, Bar No. 030371
11  STRUCK WIENEKE & LOVE, P.L.C.
    3100 West Ray Road, Suite 300
12  Chandler, Arizona  85226
    Telephone:  (480) 420-1600
13  Fax:  (480) 420-1696
    dstruck@swlfirm.com
14  kwieneke@swlfirm.com
    rlove@swlfirm.com
15  tbojanowski@swlfirm.com
    nacedo@swlfirm.com
16  afletcher@swlfirm.com
    aorcutt@swlfirm.com
17  jlee@swlfirm.com

18  *Attorneys for Defendants*

19              UNITED STATES DISTRICT COURT

20                   DISTRICT OF ARIZONA

21  Victor Parsons, *et al.*, on behalf of themselves      NO. 2:12-cv-00601-DKD
    and all others similarly situated; and Arizona
22  Center for Disability Law,

                                        Plaintiffs,

23              v.                                          **DECLARATION OF
                                                            DEPUTY WARDEN
24  Charles Ryan, Director, Arizona Department              JASON MONSON**
    of Corrections; and Richard Pratt, Interim
25  Division Director, Division of Health Services,
    Arizona Department of Corrections, in their
26  official capacities,

                                        Defendants.

27

28

I, **JASON MONSON**, make the following Declaration:

1.     I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration.

**Deputy Warden at ASPC-Tucson, Rincon Unit**

2.     I have been employed by the State of Arizona Department of Corrections ("ADC") since January 1995.  I began working as a Correctional Officer and was ultimately promoted to Deputy Warden ("DW") of Rincon Unit in April 2016.  Prior to becoming Deputy Warden at Rincon, I was Assistant Deputy Warden at Rincon from February 2015 to April 2016.

3.     My duties as a Deputy Warden include, but are not limited to, managing security and custody in my unit, staff and inmate discipline in my unit, inmate programs, and inmate classification.  I am also responsible for training supervisors and other staff.  I regularly interact and communicate with staff, inmates, inmates' families, and the public.

**Inmate Regulations**

4.     One of my duties as a DW is to ensure that all staff and inmates are aware of ADC policies and procedures and comply with Director's Instructions ("DI") and Department Orders ("DO"), including Inmate Regulations in DO 704.  DO 704 addresses housing unit regulations, inmate identification card requirements, and inmate dress and clothing requirements, among other things.  A copy of DO-704 is attached as **Exhibit A**.

5.     One way that I and other supervisors document and follow-up with 704 violations and other issues at our complex is by taking photographs of the issue and forwarding it to the appropriate supervisors or staff members to address the issue.  We also take photographs to help educate staff regarding what to look for when performing 704 inspections and observing inmates.

6.     It is a common practice for Assistant Deputy Wardens, Deputy Wardens, Deputy Wardens of Operations, Wardens, and the Southern Region Operations Director to photograph issues with their phones so that they and other staff can follow-up and address the issues.  I have sent and received photographs regarding various issues since I became

1    an Assistant Deputy Warden in February 2015.

2       7.    I have sent or received multiple emails with photographs of 704 violations

3 or other issues requiring attention or follow-up. I have also taken numerous photographs

4 of various issues that require follow-up while performing my regular duties.

5       8.    I have found it is very effective to take photographs of the issues because it

6 is allows for quicker follow-up and response times. The photographs also help identify

7 the specific issue and the location of the issue.

8       9.    We train our staff to give inmates specific instructions regarding policy

9 violations and if they do not comply with the instructions to correct the violation and

10 prepare an Incident Report (IR) or issue discipline to hold the inmates accountable and

11 give them consequences.

12      10.    I have explained to our supervisors that they are not doing their jobs if they

13 observe 704 violations and do not hold staff accountable. If staff are not held accountable

14 then they will not hold inmates accountable.

15    **November 2, 2016 Prison Tours**

16      11.    The tour of Rincon Unit with Plaintiffs' counsel on Wednesday, November

17 2, 2016, began at approximately 09:10 hours. I accompanied two Plaintiffs' attorneys,

18 Kirsten and Jessica, one ADC attorney, Ashley Zuerlein, Southern Region Operations

19 Director ("SROD") Tara Diaz, Deputy Warden of Operations ("DWOP") Baltierra, and a

20 Sergeant who drove the group to and from Rincon. DWOP Baltierra and SROD Diaz were

21 in civilian clothes and not in uniform during the tours.

22      12.    The Rincon Unit is a close custody unit. Close custody inmates represent an

23 increased risk to the public and staff as compared to medium or low custody.

24      13.    For these same reasons, ADC staff must be present when attorneys or any

25 other civilian group tours prison units.

26      14.    Plaintiffs' counsel first requested to speak to inmate Leighton (189928).

27 Inmate Leighton is assigned to Housing Unit (HU) 5. On our way to HU 5, I observed

28 inmate Leighton on the recreation field.  At approximately 09:17 a.m. hours the tour

1    entered the recreation field. One Plaintiffs' attorney spoke to inmate Leighton and the

2    other interviewed random inmates on the recreation field.

3         15.    While on the recreation field I noticed the sit up exercise station had not

4    been reupholstered as I had previously requested. I took a photograph and sent an e-mail

5    at 10:05 a.m. to the appropriate staff member to ensure the exercise station was repaired.

6    A copy of the email is attached as **Exhibit B.**

7         16.    While I was on the recreation field interacting with inmates and staff, I also

8    kept a visual of Plaintiffs' counsel for their safety.

9         17.    One of the Plaintiffs' attorneys asked me if we could back away while they

10   spoke to the inmates, and I immediately complied with her request.

11        18.    At 10:29 a.m., while on the recreation field, I spoke to inmate Bitter

12   (271100) who advised me that he needed a notary.  While speaking to the inmate, I sent

13   an email advising staff he needs a notary and directing them to advise the inmate how to

14   request a notary.  A copy of the email is attached as **Exhibit C.**

15        19.    At approximately 10:50 a.m., the tour exited the recreation field and we

16   made our way to HU 3 per the request of Plaintiffs' counsel.

17        20.    HU 3 is comprised of three runs – Able, Baker, and Charlie.  Each run is 76

18   feet, four inches long and 7 feet wide.

19        21.    The first area the tour entered was Able run. Upon entry, my supervisor,

20   SROD Diaz, advised me the inmate in cell 3A02 (Aguilar - 053825) had defaced his ID

21   and required a new one.  I took a photograph of the ID and sent it in an e-mail at 10:52

22   a.m. to the Rincon accountability officer to order a new one.  A copy of the email and

23   photograph is attached as **Exhibit D.**

24        22.    I then walked Able run to ensure the inmates were properly dressed and that

25   there were no safety or security issues for the touring attorneys.  When I observed a DO

26   704 housing unit compliance violation from the cell door window, I took a photograph

27   with my cell phone, so I could address the issue with the supervisor assigned to that area

28   and the officers working the post.

4

23.     While walking Able run, I observed the cell door for 3A-09 was open. I asked the inmate why the door was open, and he stated his door could not be closed electronically and the officer had to open his door with the key and just opened the door to let his cellmate out. I took a photograph of the door and emailed it to the Rincon Captain at 10:54. A copy of the email and photograph is attached as **Exhibit E.**

24.     While walking Able run, inmate Bunker (232167) asked me if I had received his inmate letter. I advised him I had not. He then showed me his copy of the Inmate letter he sent. I took a photograph of his copy and sent it to my email at 10:56, so I could follow-up with his issue. A copy of the email and photograph is attached as **Exhibit F.**

25.     While in HU 3, I observed several 704 cell compliance violations. I took approximately eight photographs of the violations with my cell phone to show to the shift commanders.   The photographs of the compliance violations reflected inmates with homemade TV antennas, items extending beyond the edges of the bulletin board, inmates not fully dressed, items attached to the cell wall, inmates under covers with their bed not made past 07:30 hours, clothes lines hanging, and windows covered. The inmate's face, name, or cell number are not visible in any of the photographs I took of 704 cell compliance issues. Copies of the photographs are attached as **Exhibit G.**

26.     The photographs were not taken to issue any inmate disciplinary. They were taken to show the supervisor that either the assigned staff had not completed his 704 inspection four hours into shift, or that the assigned officer does not know what to look for.   The photographs were also not taken in retaliation for inmates speaking with Plaintiffs' counsel or to intimidate inmates to prevent them from speaking to Plaintiffs' counsel.

27.     At 10:57 hours, I sent an email to the shift commanders, including Sergeant Krages, advising them to come to HU 3 and address the 704 compliance issues with the staff. I also directed Sgt. Krages to make a note in the COs personnel file, if necessary. I did not send the photographs in an email, because I wanted to show the supervisors the

1   photographs when they arrived.   A copy of the email is attached as **Exhibit H.**

2        28.    My intent in taking the photographs and sending the email, regarding the

3   704 violations, to the shift commanders was not to discipline the inmates, but to follow up

4   with the Correctional Officer and take corrective action with the staff, if necessary, for

5   failing to perform their duty.

6        29.    The tour only went to the Able and Charlie runs in HU 3.  While on the tour,

7   several inmates wanted to speak to me.  This is common when supervisory staff is on a

8   run.  I spoke to each inmate that requested to speak to me. If I could answer their

9   questions or address their issues, I addressed their concerns.

10        30.    If I was unable to address their concerns, I would send a follow-up e-mail to

11   myself or the staff member(s) who could resolve the issue.

12        31.    I sent the following emails during the tour:

13             a.   At approximately 10:59, I spoke with inmate Enos (214338) at HU

14                  3A12, who informed me that he was having issues with the phone, and I

15                  sent a follow-up email to staff to check on whether the phones were on

16                  because he was having phone issues.  A copy of the email is attached as

17                  **Exhibit I.**

18             b.   At approximately 11:03, I spoke with inmate Mata (125265) at HU 3A5,

19                  who told me he ordered an electric water heater or stinger that is used by

20                  inmates to heat coffee, and he has paperwork that needs to go in his file,

21                  and I sent a follow-up email to the property officer to follow-up.  A copy

22                  of the email is attached as **Exhibit J.**

23             c.   At approximately 11:07, I spoke with inmate Garcia (180582) at HU

24                  3A15, who told me he was having some issues with his diet, and I sent a

25                  follow-up email to the Correctional Officer ("CO") IVs, directing them

26                  to investigate the diet issues.  A copy of the email is attached as **Exhibit**

27                  **K.**

28             d.   At approximately 11:10, I spoke with inmate Hugenot (286671) at HU

3A15, who said he had submitted paperwork to get some of his disciplinary time back and emailed myself a reminder to check whether I had received his paperwork.  A copy of the email is attached as **Exhibit L.**

e.   At approximately 11:14, I spoke with inmate Arob (220188) at HU 3A7, who said he was missing some clothes, and I sent an email to the support sergeant directing him to provide the inmate with 3 long sleeve shirts, 4 boxers, 4 socks, 3 pants, and 2 sheets if we have them and document that these items are provided to him.  A copy of the email is attached as **Exhibit M.**

f.   At approximately 11:23, while standing near the shower in HU 3C, I noticed the PREA hotline near the phone had been painted over in part, so I sent a follow-up email to staff to ensure the phone number was visible.  A copy of the email is attached as **Exhibit N.**

32.    In response to my 10:57 email, Sergeant Krages came to HU 3 at approximately 11:25, while we were on Charlie run. He advised COII Robles that I had taken photographs of the compliance violations.

33.    I spoke with Sergeant Krages and the Correctional Officer on post, COII Robles, at approximately 11:25, while standing near the showers and telephone near the entrance of Charlie run.  COII Robles asked to see the photographs, because he wanted to know if the violations I observed were the same ones he addressed earlier in his shift. COII Robles stated, if he had advised those inmates to correct those issues previously, he was going to issue them a disciplinary.  I did not order any COII to issue any disciplinary tickets to the inmates in HU 3.

34.    I did not order any correctional officer to give "warnings" to inmates.  If any warning was given, those warnings are simply a verbal instruction and have no disciplinary consequence. Warnings are not documented in the inmate's file.

35.    All of the cell doors were closed when I was speaking with COII Robles and

1   Sergeant Krages.  We were also standing near the entrance to the run so that the only
2   inmate who could have possibly overheard us speaking would have been the inmates in
3   the first cell, and only if they were actively trying to listen to our conversation with their
4   ears to the door.

5         36.   Plaintiffs' counsel never informed me that they thought we were too close to
6   them while they were conducting interviews.  In fact, one of Plaintiffs' attorneys, Jessica,
7   informed me that one of the inmates wanted to talk to me about an issue, and I spoke to
8   the inmate at her request.  If Plaintiffs' counsel would have advised me that they thought
9   we were too close during their interviews in HU 3, my staff and I would have complied
10  with their request to provide them more space, just like we had done on the recreation
11  yard.

12        37.   After Plaintiffs' counsel were finished interviewing inmates in Charlie run,
13  they left the Rincon Unit, at approximately 11:45.

14        38.   Plaintiffs' counsel was very cordial and thanked us for our assistance during
15  the tours and did not notify us of any issues or concerns from the inmates before they left
16  Rincon Unit.

17        39.   The following day, on Thursday, November 3, 2016 at 04:20 hours, I
18  emailed the disciplinary coordinator asking if any 704 violations for HU 3 had been
19  written yesterday.  He e-mailed back at 08:54 hours, stating none had been written.  A
20  copy of the email is attached as **Exhibit O.**

21        40.   On November 2, 2016, when I was counseling the Sergeant and the CO II
22  on post, I was reinforcing the same practices and principles of accountability that I expect
23  and enforce on a daily basis.  If I do not hold supervisors accountable, then they will not
24  hold officers accountable, and in turn, the officers will not hold inmates accountable.

25        41.   I never directed staff to discipline inmates for the 704 violations I observed.
26  I did not say "ticket them all" or "ticket everyone."  I do not even use the term "ticket"
27  when referring to discipline.  I never gave any order to issue a disciplinary to any inmate
28  on Able or Charlie run, much less in retaliation for speaking with Plaintiffs' counsel.

8

1    42.    No inmates in HU 3 were disciplined on November 2, 2016.

2    43.    In fact, from November 3 – November 13, 2016, only seven disciplinary

3    violations were written for inmates assigned to HU 3.

4            a.  On November 3, 2016, a disciplinary was given to an inmate for failure

5                to report to mandatory education.

6            b.  On November 6, 2016, a disciplinary was given to an inmate for failure

7                to report to mandatory education.

8            c.  On November 6, 2016, two disciplinary violations were given to inmates

9                for being in an unauthorized area

10           d.  On November 12, 2016, a disciplinary was given to an inmate for

11               smoking in his cell.

12           e.  On November 13, 2016, a disciplinary was given to an inmate for

13               refusing to go to a medical appointment.

14           f.  On November 13, 2016, a disciplinary was given to an inmate for

15               refusing to go to his cell.

16   44. No inmates in HU 7, 8, or IPC in Rincon Unit received disciplinary violations

17           on November 1, 2016.

18   45.    I have never retaliated against an inmate for any reason and certainly

19   wouldn't do so because they were speaking to their attorneys about their medical care, as I

20   am not a medical provider and do not provide medical care.

21   46.    My intent in speaking to various inmates during the tours was to perform

22   my duties and answer inmate questions or address their issues, if possible.

23   47.    In my experience working in prison, it is common for inmates to make

24   unwarranted claims of retaliation when they are disciplined or other false allegations when

25   they do not get what they want.  Nevertheless, if an inmate claims an officer or other staff

26   member has intimidated or retaliated against them, those claims are taken very seriously

27   and promptly investigated and remedied, if necessary.

28   48.    ADC has an inmate grievance procedure, where inmates can report any

9

1   issues with staff members, including any threats, intimidation, or retaliation.   As of
2   December 30, 2016, no inmate filed a grievance alleging retaliation or intimidation during
3   the November tours.

4      **ASPC-Tucson**

5      49.    ASPC-Tucson is a large prison complex that houses approximately 5,039
6   inmates.    There are seven separate units at Tucson, including Catalina, Cimarron,
7   Manzanita, Rincon, Santa Rita, Whetstone, and Winchester.   Rincon includes the Rincon
8   Housing Units, the Minors Unit, and the In-Patient Care ("IPC") Center.   There are
9   approximately 643 inmates at Rincon Unit, including approximately 78 inmates in Rincon
10  Minors.

11     50.    These units are spread out over approximately 640 acres.   Generally, staff
12  and visitors must drive from one unit to the next because of the distance between each
13  unit.  There is generally little or no interaction between inmates and staff at these various
14  units, with the exception of supervisory staff.

15

16     I declare under penalty of perjury that the foregoing is true and correct.
17     Executed this 4TH day of January, 2017.

18

19

20     JASON MONSON

21

22

23

24

25

26

27

28

**EXHIBIT A**

**EXHIBIT A**



| ARIZONA DEPARTMENT OF CORRECTIONS | CHAPTER: 700 OPERATIONAL SECURITY | OPR: OPS |
|---|---|---|
| DEPARTMENT ORDER MANUAL | DEPARTMENT ORDER: 704 INMATE REGULATIONS | SUPERSEDES: DO 704 (3/1/10) DI 294 (10/21/10) |
| | | EFFECTIVE DATE: JULY 6, 2013 |
| | | REPLACEMENT PAGE REVISION DATE: SEPTEMBER 19, 2015 |

# TABLE OF CONTENTS

**PURPOSE**

**RESPONSIBILITY**

**PROCEDURES** PAGE

**704.01** INMATE HAIR STYLES AND HEAD GEAR............................................................1

**704.02** FACIAL HAIR............................................................................................2

**704.03** INMATE IDENTIFICATION CARDS..............................................................2

**704.04** REPLACEMENT OF INMATE IDENTIFICATION CARDS...................................3

**704.05** INMATE DRESS AND CLOTHING REQUIREMENTS.........................................5

**704.06** HOUSING UNIT REGULATIONS....................................................................5

**704.07** HOUSING UNIT INSPECTIONS....................................................................10

**704.08** INMATE HOUSING ASSIGNMENTS.............................................................10

**704.09** REFUSAL TO HOUSE PROCEDURE.............................................................15

**704.10** TEMPORARY HOLDING ENCLOSURES.........................................................16

**704.11** INMATE EXERCISE ENCLOSURES..............................................................19

**704.12** INMATE DELEGATION / CONTROL.............................................................19

**704.13** DISCRIMINATORY ACTS...........................................................................19

**704.14** SPECIFIC RESPONSIBILITIES....................................................................20

**704.15** INTERPRETERS.......................................................................................20

**704.16** ORIENTATION.........................................................................................20

IMPLEMENTATION.......................................................................................21

DEFINITIONS.............................................................................................21

AUTHORITY...............................................................................................22

ATTACHMENT

CHAPTER: 700 – OPERATIONAL SECURITY
DEPARTMENT ORDER: 704 – INMATE REGUATIONS

# PURPOSE

This Department Order provides consistent and uniform directions in reference to inmate regulations within the institution.

# RESPONSIBILITY

Wardens and Deputy Wardens shall ensure all inmates comply with this Department Order.

# PROCEDURES

**704.01        INMATE HAIR STYLES AND HEAD GEAR**

1.1     Hair shall not cover the eyes or ears, and shall be kept clean at all times.

1.2     Radical bizarre, carved, double-parted or other types of exotic hairstyles shall be prohibited.

1.3     Hair long enough to touch the top of the shoulders shall be worn tied back in a ponytail or bun seven days a week. Inmates may untie ponytails:

   1.3.1    While in their assigned housing unit.

   1.3.2    When going to or from the restroom or shower areas.

1.4     Inmates may wear their hair braided.

   1.4.1    For the inspection of inmates' hair for contraband during searches, staff shall direct inmates to remove braids or other concealing hair styles.

   1.4.2    If inmates are unable or unwilling to comply with a directive to remove braids or otherwise loosen their hair:

      1.4.2.1    Staff shall, wearing latex gloves, physically search inmates' hair.

      1.4.2.2    Inmates may receive disciplinary action in accordance with Department Order #803, <u>Inmate Disciplinary Procedure</u>.

1.5     Wigs, toupees and other artificial hair pieces shall be prohibited, except for female inmates with medical conditions causing baldness.

1.6     Hair dyes or other chemical agents which may be used to change hair color shall be prohibited.

1.7     <u>Head Gear</u>

   1.7.1    State issued ball caps shall be worn with the bill facing forwards at all times.

      1.7.1.1    Bills shall not be flipped up and caps shall not be altered in any manner.

1.7.2    Inmates shall be permitted to wear head gear as follows in accordance with Department Order #904, <u>Inmate Religious Activities/Marriage Requests</u>:

      1.7.2.1    Native Americans may wear Native American Headbands.

      1.7.2.2    Inmates may wear religious head gear authorized by the Pastoral Activities Administrator.

## 704.02    FACIAL HAIR

1.1    Mustaches shall be kept neatly trimmed and shall not extend below the upper lip or beyond the corners of the mouth on either side.

1.2    Sideburns shall not extend below the center of the ear opening and shall be no wider at the bottom than at the top.

1.3    Full beards up to one inch in length are allowed, and shall be kept clean, trimmed and well-groomed at all times. Partial beards such as Fu Manchu, Vandyke or goatee styles shall not be authorized.

      1.3.1    All inmates coming through any intake process at designated Department Reception Centers shall be required to shave any facial hair to facilitate a clean picture for the Mug Photo Interface Subsystem. This will occur regardless of previous intake processes that may have been completed by the inmate.

1.4    **SECTION DELETED**

      1.4.1    **SECTION DELETED**

      1.4.2    **SECTION DELETED**

1.5    **SECTION DELETED**

## 704.03    INMATE IDENTIFICATION CARDS

1.1    The Inmate Identification Card shall:

      1.1.1    Be yellow and white in color and shall be issued immediately after completing the initial intake/diagnostic process, in accordance with Department Order #901, <u>Inmate Records Information and Court Action</u>.

      1.1.2    Contain a color photograph of the inmate and the inmate's name, ADC number, height, weight, date of birth, eye and hair color.

            1.1.2.1    All inmates housed in Department institutions shall have their inmate photographs taken using the Mug Photo Interface Subsystem (MPI).

            1.1.2.2    All inmates housed in Contract Beds facilities shall have their photographs taken using digital cameras.

| | |
|---|---|
| 1.1.2.2.1 | Inmate photographs shall be electronically sent to the closest Department institution for inclusion in the MPI. |

1.2 Inmates shall keep their Inmate Identification Card on their person at all times including recreation, except during a work or recreational activity, where the supervising staff member holds the Inmate Identification Card.

1.3 When outside of their housing area, inmates shall have their Inmate Identification Card attached and prominently displayed toward the front on the upper chest area.

   1.3.1 When no shirt is worn, the Inmate Identification Card shall be attached to the waistband of the lower garment, over the left hip.

   1.3.2 Inmate Identification Cards shall not be worn attached to the zipper or groin area of a lower garment.

   1.3.3 Inmates shall immediately surrender their Inmate Identification Card for inspection and identification upon staff request.

1.4 Department Transportation staff shall retain possession of an inmate's Inmate Identification Card when an inmate is transported to or from a Department institution and shall surrender it to the receiving officer upon arrival.

1.5 Inmates shall present their Inmate Identification Cards to the appropriate staff member to access mail, property, recreation, visitation, library, inmate store, medical appointments, receipt of medications, security control points and other services as deemed appropriate.

1.6 Upon release from the institution, the inmate shall surrender the Inmate Identification Card to the Complex Offender Information Unit (OIU) for placement into the Institutional File.

## 704.04    REPLACEMENT OF INMATE IDENTIFICATION CARDS

1.1 Each institution shall assign the responsibility of issuing replacement Inmate Identification Cards.

   1.1.1 Staff shall submit an Information Report, Form 105-2, when requesting the replacement of an inmate's Inmate Identification Card, indicating who is requesting the replacement and the reason for the replacement.

1.2 Replacement Inmate Identification Cards for inmates housed at Department institutions shall include photographs taken using the MPI.

1.3 For Contract Beds facility inmates, digital camera photographs shall be sent to the closest Department institution for replacement Inmate Identification Card processing, along with a copy of the completed Inmate Request for Withdrawal, Form 905-1.

1.4 The Department shall replace Inmate Identification Cards at no cost to inmates when they are damaged through normal wear and tear.

1.5     Every inmate shall have a new photograph taken every five years of incarceration at no cost to the inmate. The old Inmate Identification Card shall be surrendered upon replacement.

1.6     Inmates losing or damaging their Inmate Identification Card or clip, or changing their appearance (i.e., growing or shaving facial hair, cutting hair, shaving of head, or new tattoos), shall immediately notify a staff member.

    1.6.1     The assigned staff member shall:

        1.6.1.1     When feasible, take inmates to be fingerprinted using the FAST ID device to positively identify them prior to issuing a new Inmate Identification Card.

        1.6.1.2     Immediately re-photograph inmates when there are noticeable changes to their appearance (i.e., growing or shaving facial hair, cutting hair, shaving of head, or new tattoos).

        1.6.1.3     Complete an Inmate Request for Withdrawal form when Inmate Identification Cards are replaced due to loss, damage or change of appearance.

        1.6.1.4     Provide replacement Inmate Identification Cards to inmates. Old Inmate Identification Cards shall be surrendered upon replacement.

    1.6.2     Inmates shall:

        1.6.2.1     **SECTION DELETED**

        1.6.2.2     Pay the cost of $5.00 for the replacement Inmate Identification Card, unless the card is replaced due to normal wear and tear. This cost includes distribution of updated photographs.

        1.6.2.3     Purchase a replacement Inmate Identification Card clip at the inmate store, or staff shall provide the inmate with a clip and ensure the inmate signs the Inmate Request for Withdrawal form.

1.7     If the inmate is indigent, a new Inmate Identification Card and/or clip shall be provided. The inmate's account shall be charged for the cost of the replacement Inmate Identification Card and/or clip in accordance with Department Order #905, Inmate Banking/Money System.

1.8     All monies received from the replacement of Inmate Identification Cards shall be collected and deposited in accordance with Department Order #905, Inmate Banking/Money System.

**704.05**      **INMATE DRESS AND CLOTHING REQUIREMENTS**   - Inmates shall present a neat, well-groomed appearance.

1.1      Fingernails shall be kept trimmed and shall not exceed 1/4 inch past the end of the fingers.

1.2      Clothing shall be worn as designed. Dying, marking or otherwise altering clothing or wearing it in a "fad" style is forbidden.

   1.2.1      Pants shall not be worn in a "sagging" manner where the waistband is low on the hips, or in a "high-water" style.

   1.2.2      Rolling the collar of a shirt to change its appearance is prohibited.

   1.2.3      Clothing too large or small shall not be worn.

1.3      Inmates shall be dressed in gym shorts/pants/sweat pants and a shirt, or an appropriately fastened jumpsuit at all times when out of the cell or cubicle.

   1.3.1      All shirts shall be neatly tucked in at all times when out of the housing unit with the exception of sweatshirts and pullover outerwear shirts.

   1.3.2      Sweatpants and gym shorts shall only be worn for recreational activities when worn outside of the housing area.

   1.3.3      When in the run or cell, inmates shall not be in any state of undress, unless preparing for bed or immediately upon return from the shower.

   1.3.4      Male inmates may remove their shirts while participating in authorized recreational activities on the unit-designated athletic area.

   1.3.5      Female inmates shall wear pajamas and a robe when in the living areas, such as in dayrooms or open dorm areas, and to and from the shower and restroom areas.

1.4      Inmates violating clothing requirements shall be subject to disciplinary action in accordance with Department Order #803, Inmate Disciplinary Procedure.

**704.06**      **HOUSING UNIT REGULATIONS** - Inmates shall adhere to the following housing unit regulations.

1.1      General Regulations - The following shall be prohibited:

   1.1.1      Blocking of any fire door, cell wall and/or aisle.

   1.1.2      Placing any item on any cell wall or covering cell windows.

   1.1.3      Tampering with any security device, air vent, fire alarm system or light.

   1.1.4      Clotheslines of any type.

      1.1.4.1      Except for towels and wash cloths, items shall not be hung over beds.

1.1.5    Homemade weights or exercise equipment of any kind.

1.1.6    Attaching of any item to the wall, outside or inside of the locker, shelf, drawer, ceiling, door and/or bed, electrical outlets or electrical conduit. Approved items may be attached on approved bulletin boards.

1.1.7    Any form of defacing; writing, drawing, painting on any part of the living area.

1.1.8    Floor coverings of any kind.

1.1.9    Smoking inside all buildings and living areas, and within 20 feet of building entrances or window openings.

1.1.10   Excessive noise, yelling and loud talking.

1.2    Electronic Equipment - Violations of the following shall result in the equipment being confiscated, pending the resolution of the disciplinary process, in accordance with Department Order #803, Inmate Disciplinary Procedure.

1.2.1    Audio devices shall only be operated while headphones or earbuds are positioned over the ears and plugged into the equipment.

1.2.2    Headphone volume shall not be loud enough as to be overheard by others.

1.2.3    All electronic equipment, with the exception of a clock, shall be turned off when inmates leave their cell or their run.

1.2.4    Inmates with reading lights shall not direct the light or shine it on other inmates, and/or other inmates' living areas.

1.2.5    Additional pieces of equipment shall be neatly stored on the locker or shelf.

1.3    Laundering

1.3.1    Laundering of any items in the cell or any areas within the run shall be prohibited.

1.3.2    Towels and wash cloths shall be hung over the foot or the head of the bed in units where bed rails are available. When bed rails are unavailable, towels and wash cloths shall be hung on hooks or neatly folded and stored in the designated areas.

1.3.3    Soiled laundry items shall be kept in fish net laundry bags and stored under the bed or in an area designed by the unit Deputy Warden.

1.4    Cell and Unit Regulations

1.4.1    Cell and cubicle floors shall be swept and neatly maintained on a daily basis.

1.4.2    Inmates shall remain in their assigned cell, bed or cubicle for count unless supervised by a staff member and placed on an authorized out count. Inmates shall not be in the shower or toilet area for count, unless assigned to a single cell.

1.4.3    All food and beverage items shall be stored in their original containers and neatly stored in the locker, on shelves or in the inmate's cooler. Empty containers are prohibited.

        1.4.3.1    Food items found in containers other than their original container, and/or empty containers shall be designed as contraband and confiscated.

        1.4.3.2    Store purchased coolers shall be stored under the inmate's bed or desk.

1.4.4    Security night lights shall remain on at all times. Where applicable:

        1.4.4.1    Run and/or dormitory lights shall be turned on no later than 0630 hours daily. These lights will remain on only when there is not sufficient ambient light during daytime hours to ensure the safety and security of the area. At times of sufficient ambient light, they will be reduced to half lighting

        1.4.4.2    Run and/or dormitory lights shall be turned off at 2200 hours on week nights and 2400 hours on the weekend and holiday nights.

1.4.5    Beds and bedding regulations

        1.4.5.1    Inmates shall be authorized one pillow, one mattress, one blanket for summer and two blankets for winter.

                1.4.5.1.1    Inmates may receive additional items with written authorization from health or administrative staff.

                1.4.5.1.2    Inmates being housed in tents shall be allowed three blankets from October 1st through April 30th.

                1.4.5.1.3    All mattresses shall be turned into the Sanitation Officer upon any bed location move. The Sanitation Officer shall evaluate the condition of each mattress and determine if it needs to be repaired and sanitized prior to redistribution or disposed of if severely damaged or soiled beyond repair and sanitization. A replacement mattress shall be assigned if a mattress was disposed of.

                1.4.5.1.4    The Sanitation Officer shall determine if the cause of a damaged mattress is normal wear and tear or the damage appears to be intentional.  Intentional damage shall be addressed in accordance with Department Order #803, <u>Inmate Disciplinary Procedure</u>.

        1.4.5.2    All inmates' beds shall be made no later than 0730 hours each day.

CHAPTER:  700 – OPERATIONAL SECURITY
DEPARTMENT ORDER: 704 – INMATE REGUATIONS

|  | 1.4.5.2.1 | Sheets and blankets shall be tightly tucked in under the mattress. |
|--|--|--|

1.4.5.2.1 Sheets and blankets shall be tightly tucked in under the mattress.

1.4.5.2.2 Blankets not in use shall be neatly folded at the foot of the bed. Comforters and personal bed spreads shall be neatly folded at the foot of the bed, in locations where these items are permitted.

1.4.5.2.3 When working, inmate night workers shall be exempt from the 0730 hours time frame. When not working, their beds shall be in compliance with this Department Order. A written "night worker" designation shall be posted at each inmate night worker's housing area. Staff shall designate and identify night workers.

1.4.5.3 Inmates may lie on top of their made up beds during the day when not at work or participating in program assignments, unless health staff specifically indicate inmates must rest under the sheets and blankets.

1.4.6 Each unit shall supply plastic trash containers for inmate use in all inmate living areas.  All trash containers shall be emptied daily.

1.4.7 Socialization between inmates is permitted on their own runs or in their own rooms.

1.5 Storage Areas - Including desks, shelving, partitions, lockers, dividers and bulletin boards.

1.5.1 Nude and/or sexually explicit photographs, drawings, pictures, magazines shall be prohibited in accordance with Department Order #914, Inmate Mail.

1.5.2 Pictures cut out of magazines and the magazines from which the pictures were removed from shall be confiscated as contraband.

1.5.3 Two major appliances may be neatly placed on the locker, shelf or cubicle dividers and shall not obstruct staff views of the living areas.

1.5.4 Inmate clothing shall be neatly folded and stored in either the inmate's locker or shelf when not being worn.

1.5.5 When not in use, all personal property shall be neatly stored in either the locker or on the shelf.

1.5.6 While in use, an inmate may have items such as stereos, hobby craft material, papers, etc., as needed within the cell or cubicle.  When not in use, these items shall be stored as authorized.

1.5.7 Locker doors shall be closed and secured when the inmate is outside of the housing unit or cell.

1.5.8 All lockers, shelves, partitions, bunk rails, desks, window sills and appliances shall be clean and dust free.

1.5.9       No dust or decorative covers of any type shall be authorized.

1.5.10      Inmates assigned to Minimum, Medium and Close Custody Units may have individual bulletin boards located in their personal housing areas.

    1.5.10.1       Bulletin boards shall be at a minimum 18" by 18" and maximum of 24" by 24" in size.

    1.5.10.2       No items shall extend beyond the edges of the bulletin boards.

    1.5.10.3       Bulletin boards shall be attached to the locker door.

1.5.11      Inmates shall not move beds, lockers, shelves, partitions, bunks, bulletin boards and desks unless directed to do so by a staff member.

1.5.12      The only cardboard items permitted in inmate living areas shall be the "banker" style storage boxes sold in the Inmate Store as outlined in Department Order #902, Inmate Legal Access to the Courts, and Department Order #909, Inmate Property.

    1.5.12.1       A maximum of four storage boxes purchased only through the Inmate Store shall be authorized. Limit one storage box for personal and/or religious property and up to three storage boxes for legal material and official Department correspondence. Boxes shall be kept in good condition at all times.

    1.5.12.2       The dimensions of each storage box shall not exceed 17-1/2" in length x 10-1/4" in height x 11-1/2 in width. The weight of each box shall not exceed 20 pounds.

    1.5.12.3       Inmate storage boxes shall be kept under the inmate's bed. Inmates living in top bunks shall store their storage boxes under the bottom bunk.

    1.5.12.4       Inmates without storage space available under their beds shall place their additional storage boxes in a neat and orderly manner within their living assigned area as designated by the unit.

1.6     Storage of legal materials by the Department shall be in accordance with Department Order #902, Inmate Legal Access to the Courts.

1.7     Appliance usage

    1.7.1       Any appliance altered in any way shall be designated as contraband and confiscated.

    1.7.2       No homemade antennas, remote controls, or other such items shall be authorized.

    1.7.3       Appliance cords shall be maintained neatly and untangled. No alterations, to include taping, shall be permitted.

1.7.4     No appliance or decorative covers of any kind shall be permitted.

1.7.5     Stickers on appliances or in living areas shall not be permitted.

## 704.07    HOUSING UNIT INSPECTIONS

1.1    All inmates living areas shall be inspected daily by line staff. Line staff may use a Housing Unit Regulation Violation Notice, Form 704-3, to document violations.

1.2    Inspections shall be documented in the Correctional Service Log, Form 105-6.

1.3    The Chief of Security or designee shall:

1.3.1    Conduct weekly inspections of all inmate living areas. These inspections shall be documented, by exception, in the Chief of Security's Monthly Report in accordance with Department Order #703, Security/Facility Inspections.

1.3.2    Provide a written weekly report to the unit Deputy Warden detailing the areas of non-compliance and corrective action taken.

1.3.2.1    Inmates not in compliance with the housing unit regulations may be subject to disciplinary action, as outlined in Department Order #803, Inmate Disciplinary Procedure.

## 704.08    INMATE HOUSING ASSIGNMENTS

1.1    Wardens, Deputy Wardens, and Contract Bed Monitors shall ensure inmate housing assignments yield the highest degree of safety possible when housing inmates in cells or dormitories.

1.2    Housing Assignment Principles - The assigned custody level (Minimum, Medium, Close and Maximum) and the assigned Internal Risk Level (1-5) shall be the primary criteria for all rated, temporary and special use housing to include detention units, Medical and Mental Health Units, Minor Units, transitory and holding areas for any duration.

1.3    In general, Minimum and Medium Custody inmates shall be housed in congregate settings such as dormitories and tents, but may also be housed in cells designed for double bunking.

1.4    Interstate Compact inmates shall be manually reviewed for placement in double cell environments in accordance with the criteria outlined in this Department Order.

1.5    Double Cell Environments

1.5.1    Inmates housed in the following housing areas shall be exempt from 1.5.2 through 1.5.15.4 of this section:

1.5.1.1    Dormitories, tents and other similar housing areas.

1.5.1.2    Intake/reception areas, Medical or Mental Health Units, hospitals, and transitory housing.

1.5.1.3    ASPC-Perryville – Minors Unit

1.5.2    Housing Assignment Reviews

    1.5.2.1    The Accountability and Movement Officer shall document housing assignment recommendations based on the criteria outlined in this section on the appropriate AIMS screen during normal business hours.

    1.5.2.2    The unit Correctional Officer IV and/or the unit Chief of Security shall review the AIMS scheduler for housing recommendations and include their recommendation prior to submitting them to the unit Deputy Warden for final approval on the appropriate AIMS screen.

        1.5.2.2.1    The unit Deputy Warden shall review the AIMS scheduler for housing recommendations and then approve or deny housing assignments and document decisions on the appropriate AIMS screen. The unit Deputy Warden shall be the final approval authority for all housing assignments.

    1.5.2.3    The Shift Commander shall make the housing assignments after normal business hours, on weekends and on holidays, which shall be reviewed by the unit Deputy Warden the next business day.

1.5.3    Custody Criteria for Double Cell Environments

    1.5.3.1    Minimum Custody Inmates

        1.5.3.1.1    Minimum Custody inmates shall not be housed with Close or Maximum Custody inmates at any time.

        1.5.3.1.2    Minimum Custody inmates may be housed with Medium Custody inmates in the same double cell when there are no other beds available; their internal risk scores are approximately the same; and they are otherwise similarly situated. Additional cell placement requirements and considerations are specified in this section below.

    1.5.3.2    Medium Custody Inmates

        1.5.3.2.1    Medium Custody inmates shall not be housed with maximum custody inmates at any time.

        1.5.3.2.2    Medium Custody inmates may be housed with Minimum or Close Custody inmates in the same double cell when there are no other beds available; their internal risk scores are approximately the same; and they are otherwise similarly situated. Additional cell placement requirements and considerations are specified in this section below.

1.5.3.3    <u>Close</u> Custody Inmates

        1.5.3.3.1    Close Custody inmates shall not be housed with Maximum Custody inmates.

        1.5.3.3.2    Close Custody inmates may be housed with Medium Custody inmates in the same double cell when there are no other beds available; their internal risk scores are approximately the same; and they are otherwise similarly situated. Additional cell placement requirements and considerations are specified in this section below.

1.5.4    <u>Internal Risk (IR) Score Criteria</u> - The following Internal Risk Score criteria shall be used for double cell housing inmates not in the same custody level:

    1.5.4.1    Interstate IR-1 and IR-2 may be housed together.

    1.5.4.2    IR-2 and IR-3 may be housed together.

    1.5.4.3    IR-3 and IR-4 may be housed together.

    1.5.4.4    IR-5 shall be housed in accordance with Maximum Custody inmates.

1.5.5    <u>Maximum</u> Custody inmates and/or inmates with an IR-5 may be housed together provided each inmate is placed using the criteria outlined in this Department Order.

    1.5.5.1    Maximum Custody inmates with elevated mental health needs, who are housed in a mental health program, may be double bunked if identified, screened and approved by the Warden, Deputy Warden or designee from the receiving unit and the Mental Health Supervising Psychologist or designee. Mental Health Program placement may include Mental Health Watches as appropriate, the Mental Health Step Down, Behavioral Health Unit and Mental Health Programs.

1.5.6    <u>ASPC- Florence - Central Unit and ASPC-Phoenix - Flamenco Unit, King Ward Phase Program Placement</u>

    1.5.6.1    For Phase Program placement consideration, Maximum Custody inmates shall meet the following criteria:

        1.5.6.1.1    No assaults with a weapon against staff or inmates resulting in serious physical injury.

        1.5.6.1.2    No physical assaults against staff or inmates within the past two years resulting in serious physical injury.

        1.5.6.1.3    No sex offender or Protective Custody status.

1.5.6.1.4    No Security Threat Group (STG) validation.

1.5.6.1.5    No Do Not House With (DNHW) within the Cell Block 2 Phase Program or the ASPC-Phoenix-Flamenco Unit, regardless of the Ward.

1.5.6.2    Maximum Custody general population inmates meeting the 1.5.6.1.1 through 1.5.6.1.5 criteria above may be considered for Phase Program placement, regardless of classification scores.

1.5.6.3    ASPC-Florence-Central Unit and ASPC–Phoenix Administration may exclude an inmate based on intelligence information or security concerns.

1.5.7    STG/Debriefed inmates (D) shall only be double-bunked with other STG/Debriefed inmates after successfully passing a polygraph. The inmates do not need to be affiliated with the same STG. See Department Order #806, Security Threat Groups (STGs).

1.5.8    STG-validated inmates shall not be double-bunked with other validated inmates. This includes inmates pending appeal (A), pending debrief (P) and those enrolled in the step-down program (M).

1.5.9    Inmates who have completed the STG step-down program (C) may be housed together if they are members of the same STG.

1.5.10    Protective Custody inmates shall only be housed with other Protective Custody inmates.

1.5.10.1    Inmates identified as sex offenders shall not be housed with general population inmates. Sex offender inmates are identified as follows:

1.5.10.1.1    Inmates with a sex offender status of "A".

1.5.10.1.2    Inmates with a sex offender status of "B" through "N" who have elected to house on a sex offender unit.

1.5.10.2    Female inmates shall be exempt from 1.5.10.1 through 1.5.10.2 of this section.

1.5.10.3    Inmates identified as sex offenders and approved for Protective Custody may be housed with other Protective Custody inmates.

1.5.11    Additional Double Cell Environment Placement Requirements

1.5.11.1    Neither inmate placed together in a double cell environment shall have:

1.5.11.1.1    A DNHW with each other.

1.5.11.1.2    A sentence to condemned row or an active court appeal pending the death sentence.

1.5.11.1.3    A new First Degree Murder commitment prior to the first 180-day review. This includes Preparatory Offenses of Attempt, Solicitation, Conspiracy and Facilitation. For a list of violent offenses according to statute, refer to Attachment A of this Department Order.

1.5.11.2    Inmates with current convictions for violent offenses shall <u>not</u> be housed with inmates with current convictions for non-violent offenses. This includes Preparatory Offenses of Attempt, Solicitation, Conspiracy and Facilitation.

1.5.11.3    Inmates with non-violent current convictions shall be within the below time frames in order to be housed together:

1.5.11.3.1    0 – 15 years remaining to serve.

1.5.11.3.2    16 – 25 years remaining to serve.

1.5.11.3.3    25 or more years to serve.

1.5.11.3.4    Inmates within five years of each other's years remaining to serve earliest release date may be housed together even in different "remaining to serve" groups (non-violent), as specified above.

1.5.11.4    Inmates with violent current convictions shall be within the following time frames in order to be housed together:

1.5.11.4.1    0 – 10 years remaining to serve.

1.5.11.4.2    11 – 15 years remaining to serve.

1.5.11.4.3    16 or more years remaining to serve.

1.5.11.4.4    Inmates within three years of each other's remaining to serve earliest release date may be housed together even if they are in different "remaining to serve" groups (violent), as specified above.

1.5.12    <u>Additional Considerations For Double Cell Environment Placement</u> - The following may also be considered in an inmate's placement in a double cell environment with another inmate:

1.5.12.1    Prison disciplinary history within the last two years, including violent and non-violent charges.

1.5.12.2    History of institutional violence and/or predatory behavior within the last two years.

     1.5.12.3    STG or related information.

     1.5.12.4    Physical and mental conditions or limitations and Americans with Disabilities Act (ADA) considerations.

     1.5.12.5    Detention Placement/Reason (i.e., Investigation 2A, disciplinary, Protective Custody status, Maximum Custody, Return to Custody (RTC), Detainer, medical and mental health concerns.)

1.5.13    The Deputy Warden may deem inmates inappropriate for double cell environments based on their history of being assaulted and other exigent circumstances.

1.5.14    Changes in custody level shall not automatically require a housing change. For example, when two Close Custody inmates are being housed together and one of the inmate's custody levels is reduced or increased, the inmates may continue to be housed together.

1.5.15    Exceptions - The unit Deputy Warden may authorize exceptions to the double cell placement criteria of this Department Order by documenting the reason on each inmate's appropriate AIMS screen. Exceptions include, but are not limited to:

     1.5.15.1    Inmates housed in higher custody units as a facility override.

     1.5.15.2    Inmates housed in detention pending Maximum Custody.

     1.5.15.3    Inmates housed in detention pending Protective Custody Review, in accordance with Department Order #805, Protective Custody.

     1.5.15.4    Maximum and Close Custody inmates housed in detention.

## 704.09    REFUSAL TO HOUSE PROCEDURES

1.1    Inmates refusing to house shall be isolated and interviewed by the Shift Commander prior to the end of the shift.

    1.1.1    The Shift Commander shall:

     1.1.1.1    Interview the inmate to determine their reason for refusing to house.

     1.1.1.2    Explain the possible consequences for refusing to house as outlined in this section.

1.2    If the inmate continues to refuse to house, the inmate shall be placed in detention:

    1.2.1    For refusals to house based on an inmate's sex offense history, child abuse or dangerous crimes against children conviction, the informal resolution process for sex offender housing shall be followed in accordance with Department Order #801, Inmate Classification and the Classification Technical Manual.

1.2.2    For refusals to house based on drug debts, an inmate shall be placed under investigation and issued a major disciplinary violation for Possession of Drugs and Narcotics (37-B) in accordance with Department Order #803, <u>Inmate Disciplinary Procedure</u>.

1.2.3    For refusals to house due to an inmate's not agreeing with the Protective Custody Unit placement designated by the Central Office Classification Unit, consequences for the inmate's refusal to house shall be in accordance with 1.3 through 1.5.3 of this section.

   1.2.3.1    An inmate cannot request placement at an alternative Protective Custody Unit.

1.2.4    Sound correctional judgment shall be used to determine if an inmate has legitimate issues <u>not previously addressed</u> and a new Protective Custody Review process is required.

1.3    Inmates placed in detention shall lose all property, visitation and phone calls privileges, except for hygiene, legal and religious materials.

1.4    Inmates shall be issued a major disciplinary violation for Aggravated Refusal of an Assignment (O1B) in accordance with Department Order #803, <u>Inmate Disciplinary Procedure</u>.

   1.4.1    Inmates shall be directed to move to their assigned housing location on a daily basis. A major disciplinary violation (O1B) shall be issued each day they refuse to house.

      1.4.1.1    A minimum of five earned release credits may be forfeited and inmates may be placed in a Non-earning Release Credit Class III status for a minimum of 30 days if found guilty. Non-earning Release Credit III status time shall run consecutively for each violation.

1.5    Each time custody level increases due to discipline, inmates shall be advised of their new approved housing location.

   1.5.1    If inmates refuse the new housing assignment, the process shall continue.

   1.5.2    Once inmates score out as Maximum Custody, an override to a Close Custody Unit shall be considered prior to moving inmates to Maximum Custody.

   1.5.3    At no time shall an override to Maximum Custody be requested.  An inmate's custody level must increase through the disciplinary process before Maximum Custody may be considered.

## 704.10    TEMPORARY HOLDING ENCLOSURES

1.1    Temporary outdoor holding enclosures shall:

   1.1.1    Only be occupied by inmates of the same custody level following the processes outlined in this Department Order.

1.1.2    Be used as a control measure to confine and restrict inmate movement on a temporary/short term basis and for no more than one hour.

        1.1.2.1    Any extension beyond one hour shall require Deputy Warden or On-call Duty Officer (Associate Deputy Warden and above) approval.

1.1.3    Be in direct view of staff.

1.1.4    Be inside (Mental Health Observation) or outside (Recreation, Central Intake Processing, Medical Waiting Area, Ingress/Egress or Movement) a building.

1.2    Routine usage of an outdoor holding enclosure shall include:

1.2.1    Awaiting a scheduled medical appointment.

1.2.2    Turn out for assigned work, education or treatment program.

1.3    Placement of inmates in outdoor holding enclosures shall not be for disciplinary reasons.

1.4    Inmates shall not be placed in outdoor enclosures pending transfer to Mental Health Watch, detention assignment or awaiting transfer to another unit/institution.

1.4.1    Inmates may be held at <u>inside enclosures with environmental temperature controls</u>; however, placement may not exceed the two hour limit without the Warden's approval.

1.5    The unit Deputy Warden or in his absence the On-call Duty Officer (Associate Deputy Warden and above) shall approve the placement of an inmate in a holding enclosure, outside of routine usage.

1.5.1    The unit Deputy Warden or in his absence the On-call Duty Officer shall consider the following prior to approving the use of the temporary holding enclosure:

        1.5.1.1    The availability of staff to provide the prescribed watch.

        1.5.1.2    The medical condition of the inmate.

        1.5.1.3    Any mental health status to include mental health score.

        1.5.1.4    Any medication prescribed to the inmate, particular attention to any psychotropic medications.

1.5.2    The Shift Commander shall ensure an Observation Record, Form 1101-16, is initiated and staff document observation in accordance with Department Order #807, <u>Inmate Suicide Prevention, Precautionary Watches, and Maximum Behavioral Control Restraints</u>, and the time between observations shall not exceed 30 minutes.

        1.5.2.1    Each time a staff member completes the observation of the inmate and logs the results they shall notify the unit Control room to log their observation.

1.5.3      The Observation Record form shall be on a clip board strategically placed at the holding enclosure available to any command staff for review.

1.5.4      A supervisor shall review the Observation Record form, and observe the inmate every half hour, verifying health and safety of the inmate.

    1.5.4.1      At shift change, the on-coming Shift Commander shall review all holding enclosures to review for occupancy, observe any inmate in the enclosures, check to verify the time the inmate has been in the enclosure and sign the Observation Record form.

1.5.5      Exigent circumstances shall apply for any placement in an outdoor enclosure without the Deputy Warden approval.

    1.5.5.1      These circumstances would include the immediate need to separate combatants or requests for Protective Custody review.

    1.5.5.2      Within 30 minutes of placing an inmate in the outdoor holding enclosure for exigent reasons, the unit Deputy Warden or On-call Duty Officer shall review and approve.

        1.5.5.2.1      An inmate may not be assigned to an outdoor holding enclosure for more than one hour and the Shift Commander shall initiate 1.5.2 through 1.5.4.1 of this section.

1.5.6      Extension of the one hour limit shall require authorization by the Deputy Warden or after hours, the On-call Duty Officer.

    1.5.6.1      Extension of time shall be logged on the Observation Record form to include time of extension approval, which staff approved extension and purpose of the extension.

    1.5.6.2      Extensions may be approved for up to <u>one hour only (maximum two hours)</u>.

1.5.7      Water shall be continuously available to inmates in the enclosure.

1.6      Inmates requiring use of bathroom facilities shall be accommodated.

1.7      Benches shall be available for the inmate to sit.

1.8      Outdoor holding enclosures shall:

1.8.1      Be covered to provide shade.

1.8.2      Provide a cooling or mister system.

1.8.3      Provide a continuous water source.

**704.11**      **INMATE EXERCISE ENCLOSURES (MAXIMUM CUSTODY/DETENTION/MENTAL HEALTH UNITS)**

1.1      Inmates, with exception of those listed in 1.7 of this section, shall be afforded six hours of outdoor exercise weekly. Exercise periods shall be afforded to the inmate in two hour blocks, three times weekly.

1.2      Movement of Maximum Custody inmates to and from exercise enclosures shall be logged in the Unit Control Room's Correctional Service Log form.

   1.2.1      Correctional Series staff shall make a visual check (health and welfare) on the inmates in the enclosures a minimum of every 30 minutes and ensure the check is logged in the Correctional Service Log form.

1.3      When a detention inmate goes to an exercise period, the movement shall be recorded on the Individual Inmate Detention Record, Form 804-3.

1.4      Water shall be available during the exercise period

1.5      Outdoor exercise enclosures shall be covered to provide shade.

1.6      Outdoor exercise enclosures shall have either a mister system or evaporative cooler system for temperatures exceeding 100 degrees.

1.7      Mental health inmates housed in a designated Mental Health Unit/cell block shall be afforded the same number of hours for exercise weekly as general population inmates. Exercise periods for these inmates shall be one hour in duration only, six days per week.

   1.7.1      Access to exercise areas shall be defined by mental health staff in three phases which increase the inmate's ability to access greater space and freedom of movement for exercise purposes.

**704.12**      **INMATE DELEGATION/CONTROL** – Wardens and Deputy Wardens shall:

1.1      Ensure inmates are not placed in a position of formal control or authority over other inmates.

1.2      Ensure staff report violations of this nature using an Information Report, Form 105-2, as outlined in Department Order #105, Information Reporting.

1.3      Designate a staff member to receive Information Reports concerning violations of this type.

**704.13**      **DISCRIMINATORY ACTS**

1.1      Employees shall report any known or alleged acts of discrimination against inmates by:

   1.1.1      Completing an Information Report form.

   1.1.2      Submitting the report to their first-line or any other appropriate supervisor.

1.2      Supervisors shall investigate reports of discrimination and take appropriate action to prevent and/or correct discriminatory acts against inmates.

**704.14**      **SPECIFIC RESPONSIBILITIES** - Wardens and  Deputy Wardens shall

1.1      Make reasonable modifications in job and program requirements, and/or minor site changes (e.g., wheelchair ramps, lowering shelves) to facilitate participation by disabled inmates, in accordance with Department Order #108, <u>Americans with Disabilities Act Compliance</u>.

1.2      Ensure inmate work assignments are based on the inmate's experience and skill level in accordance with the inmate's individual corrections plan, the applicable facility Priority Ranking Report(s), and applicable vacancies in work and/or program areas.

1.3      Afford inmates the right to practice their religion in accordance with Department Order #904, <u>Inmate Religious Activities/Marriage Requests</u>, and Department Order #909, <u>Inmate Property</u>.

1.4      Afford inmates the opportunity to participate in available education, training and other programs provided they meet criteria established in Department Order #910, <u>Inmate Education and Resource Center Services</u>.

**704.15**      **INTERPRETERS** - Wardens and  Deputy Wardens shall:

1.1      Provide interpreters for inmates in need of such services, which may include interpreters for language, literacy, the deaf, and the blind.

1.2      Recruit and provide interpreters in the following order:

      1.2.1      A staff member within the same prison or facility.

      1.2.2      A staff member in another institution, facility or Bureau within the Department.

      1.2.3      A volunteer interpreter from a community service agency.

1.3      Maintain, by language, a list of staff and volunteers available as interpreters for their institutions and units.

1.4      Ensure interpreters are provided for inmates for Due Process proceedings, when necessary.

**704.16**      **ORIENTATION**

1.1      Applicable rules, regulations and Department Orders shall be read aloud during initial orientation for those inmates with a language or literacy problem or are visually impaired.

1.2      Orientation staff shall ensure inmates understand orientation materials read aloud.

1.3      Hearing impaired inmates shall receive a translation of orientation materials in sign language.

1.4      Orientations shall be documented on the appropriate AIMS screen.

# IMPLEMENTATION

Within 90 days of the effective date of this Department Order, the Division Director for Offender Operations shall ensure:

- Offender Operations shall update affected Post Orders as necessary. Once distributed, Wardens and Deputy Wardens shall ensure the updated Post Orders are in place at the appropriate locations and maintained.

- Community Corrections staff address equal opportunity and access to services for offenders under Community Supervision in the Technical Manual authorized in Department Order #1003, Community Supervision.

# DEFINITIONS

**CUSTODY LEVEL** - Refers to the public risk classification of inmates.  Custody levels are Maximum, Close, Medium, and Minimum.

**DISCRIMINATION** - The denial of equal access and/or equal opportunities to certain groups or individuals.

**INTERNAL RISK** - Refers to the risk classification of inmates within the institutional setting.  Internal Risk levels are 1 (minimum) through 5 (maximum).

**INTERPRETER FOR THE BLIND** - A person who translates verbal or written communication into Braille.

**INTERPRETER FOR THE DEAF** - A person who translates verbal or written communication into sign language.

**INTERPRETER FOR LITERACY** - A person who translates verbal or written communication into simpler terms.

**INTERPRETER OF LANGUAGE** - A person who translates verbal or written communication from one language to another language.

**REFUSAL TO HOUSE** - When inmates refuse to move to the housing location approved and assigned by Central Office Classification.


{Original Signature on File}

_____

Charles L. Ryan
Director


**ATTACHMENT**
Attachment A – Violent Offenses

**FORMS LIST**
704-1 **(DELETED)**
704-3 – Housing Unit Regulation Violation Notice

CHAPTER:  700 – OPERATIONAL SECURITY
DEPARTMENT ORDER: 704 – INMATE REGUATIONS

# AUTHORITY
28 CFR, Part 36; 29 CFR, Parts 1602, 1627 and 1630, The Americans With Disabilities Act (ADA)

**DO 704**
**ATTACHMENT A**

## VIOLENT OFFENSES

| Count | ARS Code | Description | Type |
|---|---|---|---|
| 1 | 130109 | BURGLARY FIRST DEGREE | Violent |
| 2 | 130118 | SEXUALLY MOTIVATED OFFENSE | Violent |
| 3 | 130201 | ABDUCTION | Violent |
| 4 | 130231 | ARSON FIRST DEGREE | Violent |
| 5 | 130241 | ASSAULT | Violent |
| 6 | 130242 | ASSAULT | Violent |
| 7 | 130243 | SIMPLE ASSAULT | Violent |
| 8 | 130244 | SIMPLE ASSAULT & BATTERY | Violent |
| 9 | 130245 | AGGRAV ASSAULT & BATTERY | Violent |
| 10 | 130248 | ASSAULT W MURDER INTENT | Violent |
| 11 | 130249 | ASSAULT W DEADLY WEAPON | Violent |
| 12 | 130250 | ASSAULT BY PRISONER | Violent |
| 13 | 130251 | ASSAULT W CAUSTIC CHEMICAL | Violent |
| 14 | 130252 | ASSAULT W CERTAIN INTENT | Violent |
| 15 | 130253 | ASSAULT W FELONY INTENT | Violent |
| 16 | 130359 | SEND THREATENING LETTER | Violent |
| 17 | 130385 | DUELING | Violent |
| 18 | 130392 | ESCAPE FIRST DEGREE | Violent |
| 19 | 130401 | EXTORTION | Violent |
| 20 | 130402 | THEFT BY EXTORTION | Violent |
| 21 | 130403 | THEFT BY EXTORTION | Violent |
| 22 | 130404 | THEFT BY EXTORTION | Violent |
| 23 | 130452 | MURDER | Violent |
| 24 | 130453 | MURDER | Violent |
| 25 | 130455 | MANSLAUGHTER | Violent |
| 26 | 130456 | MANSLAUGHTER | Violent |
| 27 | 130457 | MANSLAUGHTER | Violent |
| 28 | 130459 | TRAIN OPERATOR CAUSE DEATH | Violent |
| 29 | 130471 | INCEST | Violent |
| 30 | 130481 | RESIST SUPRESSION | Violent |
| 31 | 130491 | KIDNAPPING | Violent |
| 32 | 130492 | KIDNAP | Violent |
| 33 | 130511 | FAILURE PARNT PROVIDE CHLD | Violent |
| 34 | 130532 | PROD OR SELL OBSCENE ITEM | Violent |
| 35 | 130534 | COERCE ACCEPT OBSCENE PUBL | Violent |
| 36 | 130536 | GIVE MINOR OBSCENE ITEMS | Violent |
| 37 | 130538 | SEXUAL FILM-PHOTO OF MINOR | Violent |
| 38 | 130541 | RESISTING PUBLIC OFFICER | Violent |
| 39 | 130587 | TAKE CHILD FOR PROSTITUT | Violent |
| 40 | 130611 | RAPE | Violent |
| 41 | 130614 | RAPE | Violent |
| 42 | 130615 | CARNAL KNOWLDGE PUPL TEACH | Violent |
| 43 | 130631 | RIOT | Violent |
| 44 | 130641 | ROBBERY | Violent |
| 45 | 130643 | ROBBERY | Violent |
| 46 | 130644 | TRAIN ROBBERY | Violent |
| 47 | 130653 | CHILD MOLESTATION | Violent |
| 48 | 130703 | DEATH OR LIFE | Violent |

**DO 704**
**ATTACHMENT A**

| Count | ARS Code | Description | Type |
|---|---|---|---|
| 49 | 130704 | METHOD OF INFLICT DEATH | Violent |
| 50 | 130705 | DANG. CRIMES AG. CHILDREN | Violent |
| 51 | 130706 | VIOLENT/AGGRVTD OFFENDER | Violent |
| 52 | 130707 | SEDITION | Violent |
| 53 | 130710 | MURDER SECOND DEGREE | Violent |
| 54 | 130711 | TRESPASS FORCE OR VIOLENCE | Violent |
| 55 | 130713 | 3RD VIOLENT/AGGRAVATED OFF | Violent |
| 56 | 130751 | DEATH OR LIFE | Violent |
| 57 | 130757 | METHOD OF INFLICT DEATH | Violent |
| 58 | 130841 | TAKE CHILD FROM PARENT | Violent |
| 59 | 130845 | SUBSTITUTE INFANT | Violent |
| 60 | 130861 | POISON W INTENT TO KILL | Violent |
| 61 | 130862 | POISON FOOD OR DRINK | Violent |
| 62 | 130863 | CRUELTY TO ANIMALS | Violent |
| 63 | 130881 | DERAIL OR WRECK TRAIN | Violent |
| 64 | 130882 | TAMPER W RAIL ROAD SWITCH | Violent |
| 65 | 130886 | UNLWFL KNOWLDG OF MESSAGE | Violent |
| 66 | 130895 | USE OF PHONE TO TERRIFY | Violent |
| 67 | 130911 | CONCEALED WEAPON | Violent |
| 68 | 130915 | POSS DEADLY WPN INTN ASSLT | Violent |
| 69 | 130916 | EXHIBITING A WEAPON NOT IN | Violent |
| 70 | 130918 | SALE OF FIREARM TO MINOR | Violent |
| 71 | 130919 | POSSESSION OF PISTOL | Violent |
| 72 | 130922 | EXPLODE W INTENT TO INJURE | Violent |
| 73 | 130923 | POSSESS EXPLOSIVE TO INJUR | Violent |
| 74 | 130932 | INCENDIARY DEVICE-USING | Violent |
| 75 | 130961 | FALSE IMPRISONMENT | Violent |
| 76 | 131102 | NEGLIGENT HOMICIDE | Violent |
| 77 | 131103 | MANSLAUGHTER | Violent |
| 78 | 131104 | MURDER 2ND DEGREE | Violent |
| 79 | 131105 | MURDER 1ST DEGREE | Violent |
| 80 | 131201 | ENDANGERMENT | Violent |
| 81 | 131202 | THREAT-INTIMIDATE | Violent |
| 82 | 131203 | ASSAULT | Violent |
| 83 | 131204 | AGGRAVATED ASSAULT | Violent |
| 84 | 131205 | UNLAW ADMIN LIQUOR/DRUG | Violent |
| 85 | 131206 | DANG/DEADLY ASLT BY PRSNR | Violent |
| 86 | 131207 | ASLT-INCT/PRTICIPATE-RIOT | Violent |
| 87 | 131208 | ASSAULT-VICIOUS ANIMAL | Violent |
| 88 | 131209 | DRIVE BY SHOOTING | Violent |
| 89 | 131211 | DSCHG FIREARM AT A STRCTRE | Violent |
| 90 | 131212 | PRSNR ASSLT W/BODY FLUIDS | Violent |
| 91 | 131223 | PEACE BOND | Violent |
| 92 | 131302 | CUSTODIAL INTERFERENCE | Violent |
| 93 | 131303 | UNLAWFUL IMPRISONMENT | Violent |
| 94 | 131304 | KIDNAPPING | Violent |
| 95 | 131306 | UNLAWFUL OBTAIN LABOR/SVCS | Violent |
| 96 | 131307 | SEX TRAFFICKING | Violent |
| 97 | 131308 | TRAFFICKING OF PERSONS | Violent |

**DO 704**
**ATTACHMENT A**

| Count | ARS Code | Description | Type |
|-------|----------|-------------|------|
| 98 | 131402 | INDECENT EXPOSURE | Violent |
| 99 | 131403 | PUBLIC SEXUAL INDECENCY | Violent |
| 100 | 131404 | SEXUAL ABUSE | Violent |
| 101 | 131405 | SEXUAL CONDUCT W MINOR | Violent |
| 102 | 131406 | SEXUAL ASSAULT | Violent |
| 103 | 131409 | OPEN/NOTORIOS COHAB/ADLTRY | Violent |
| 104 | 131410 | MOLESTATION OF CHILD | Violent |
| 105 | 131411 | CRIME AGAINST NATURE | Violent |
| 106 | 131412 | LEWD AND LASCIVIOUS ACTS | Violent |
| 107 | 131417 | CONTIN SEXUAL ABUSE CHILD | Violent |
| 108 | 131418 | SEX MISCONDUCT HLTH PROF | Violent |
| 109 | 131419 | UNLWFL SX CNDCT CORR/PRIS | Violent |
| 110 | 131423 | VIOLENT SEXUAL ASSAULT | Violent |
| 111 | 131424 | VOYEURISM | Violent |
| 112 | 131508 | BURGLARY 1ST DEGREE | Violent |
| 113 | 131704 | ARSON OF OCCUPD STRUCTURE | Violent |
| 114 | 131705 | ARSON OF OCCUPD JAIL/PRSN | Violent |
| 115 | 131804 | THEFT BY EXTORTION | Violent |
| 116 | 131902 | ROBBERY | Violent |
| 117 | 131903 | AGGRAVATED ROBBERY | Violent |
| 118 | 131904 | ARMED ROBBERY | Violent |
| 119 | 132308 | ASSIST CRIM SYND/LEAD GANG | Violent |
| 120 | 132321 | PART CRIMINAL STREET GANG | Violent |
| 121 | 132504 | ESCAPE FIRST DEGREE | Violent |
| 122 | 132903 | RIOT | Violent |
| 123 | 132904 | DISORDERLY CONDUCT | Violent |
| 124 | 132912 | UNLAW READ PHN/TELEG MSG | Violent |
| 125 | 132923 | STALKING | Violent |
| 126 | 133101 | WEAPONS & EXPLOSIVES (DEF) | Violent |
| 127 | 133102 | MISCNDCT INVOLVING WEAPONS | Violent |
| 128 | 133104 | DEPOSITING EXPLOSIVES | Violent |
| 129 | 133107 | DSCHRG FIREARM IN CITY LMT | Violent |
| 130 | 133109 | FIREARM TO MINOR | Violent |
| 131 | 133111 | MINOR WITH FIREARM | Violent |
| 132 | 133113 | FIREARM POSS-ADJUD DELIQNT | Violent |
| 133 | 133116 | WEAR BDY ARMR DURING FELNY | Violent |
| 134 | 133206 | TAKE CHILD FOR PROSTIT | Violent |
| 135 | 133211 | CHILD PROSTITUTION | Violent |
| 136 | 133212 | CHILD PROSTITUTION | Violent |
| 137 | 133502 | OBSCENE MATERIAL VIOLATION | Violent |
| 138 | 133504 | COERCE ACCEPT OBSC MTRL | Violent |
| 139 | 133505 | OBSCENE PRINTS AND ARTICLE | Violent |
| 140 | 133506 | FURNISH OBSC MTRL TO MINOR | Violent |
| 141 | 133507 | PUBLIC DISPLAY OBSCEN MTRL | Violent |
| 142 | 133508 | OBSCENE FILM/PHOTO MINORS | Violent |
| 143 | 133509 | OBSC MTRL FAILUR TO RPT | Violent |
| 144 | 133512 | OBSC PHONN COMM TO MINORSS | Violent |
| 145 | 133552 | COMM SEX EXPLOIT OF MINOR | Violent |
| 146 | 133553 | SEX EXPLOIT OF MINOR | Violent |

**DO 704**
**ATTACHMENT A**

| Count | ARS Code | Description | Type |
|---|---|---|---|
| 147 | 133554 | LURE MINOR FOR SEX EXPLOIT | Violent |
| 148 | 133556 | ADMIT MINOR TO SEX DISPLAY | Violent |
| 149 | 133558 | ADMIT MINORS TO PUBLIC SEX | Violent |
| 150 | 133601 | DOMESTIC VIOLENCE | Violent |
| 151 | 133608 | INCEST | Violent |
| 152 | 133623 | CHILD/ADULT ABUSE | Violent |
| 153 | 133704 | ADD HRMFUL SUBST FOOD/DRNK | Violent |
| 154 | 133821 | FAIL TO REG AS SEX OFFNDR | Violent |
| 155 | 133822 | ADD/NAME CHG SEX OFFENDER | Violent |
| 156 | 133824 | SEX OFFENDER REG VIOL | Violent |
| 157 | 240246 | UNLWFL KILL LIVESTOCK | Violent |
| 158 | 280602 | HIT AND RUN WITH INJURIES | Violent |
| 159 | 280611 | HIT AND RUN WITH INJURIES | Violent |
| 160 | 310130 | DESTRUCTION OF PUBLIC JAIL | Violent |
| 161 | 310232 | PRISNR POSS DEADLY WEAPON | Violent |
| 162 | 321966 | DRUGS ADULTERATED | Violent |
| 163 | 1360404 | VIOLENT CRIMES | Violent |
| 164 | 13060401 | DANG. CRIMES AG. CHILDREN | Violent |
| 165 | 13070901 | SPECIAL SENTENCING ASSUALT | Violent |
| 166 | 13090103 | VIOLENT CRIMES | Violent |
| 167 | 13140601 | SEXUAL ASSAULT OF SPOUSE | Violent |
| 168 | 13230801 | TERRORISM | Violent |
| 169 | 13291001 | DOG FIGHTING | Violent |
| 170 | 13292101 | AGGRAVATED HARRASSMENT | Violent |
| 171 | 13360102 | AGGRAV. DOMESTIC VIOLENCE | Violent |
| 172 | 130604U | AGG ASSAULT PEACE OFFICER | Violent |
| 173 | 130643A | ROBBERY | Violent |
| 174 | 130643B | ARMED ROBBERY | Violent |
| 175 | 130704N | DANGEROUS | Violent |
| 176 | 131001O | POSS KEYS TO COMMIT THFT | Violent |
| 177 | 13-3109 | FIREARM TO MINOR | Violent |

**EXHIBIT B**

**EXHIBIT B**

**MONSON,** ████

| | |
|---|---|
| **From:** | MONSON, ████ |
| **Sent:** | Wednesday, November 02, 2016 10:05 AM |
| **To:** | EVANS, ████ ; BERRANG, ████ |
| **Cc:** | FLANAGAN, ████ |
| **Subject:** | Re upholster |
| **Attachments:** | 20161102_100217.jpg |

I have asked that this get done
It has not. I am assigning it to you 2. Find a way to complete this.



**EXHIBIT C**

**EXHIBIT C**

**MONSON,** ███

| | |
|---|---|
| **From:** | MONSON, ███ |
| **Sent:** | Wednesday, November 02, 2016 10:43 AM |
| **To:** | ABELOWITZ, ███ |
| **Subject:** | RE: Bitter 271100 |

Advise him of the issue, so he knows why it hasn't been done

███ Monson
ASPC Tucson


On Wed, Nov 2, 2016 at 10:32 AM -0700, "ABELOWITZ, ███ " ███ wrote:

He only has $0.18

I will forward it the Liberian for approval
Thank you

COIII ██ Abelowitz ███
Disciplinary Coordinator
███

Rincon Unit COIII

███

The information contained in this e-mail message and any attachment is privileged and confidential, intended only for the use of specific individuals and/or entities to which it is addressed.  If you are not one of the intended recipients, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you received this communication in error, please immediately notify the sender by return e-mail.

**From:** MONSON, ███
**Sent:** Wednesday, November 02, 2016 10:29 AM
**To:** EVANS, ██ ABELOWITZ, ███
**Subject:** Bitter 271100


He needs a notary.

███ Monson
ASPC Tucson

**MONSON,** ██████

| | |
|---|---|
| **From:** | MONSON, ██████ |
| **Sent:** | Wednesday, November 02, 2016 11:04 AM |
| **To:** | EVANS, ██████ ABELOWITZ, ██████ |
| **Subject:** | RE: Bitter 271100 |

He needs to be advised of the problem, not ignored because he is not meeting a piece of criteria.

██████ Monson
ASPC Tucson

On Wed, Nov 2, 2016 at 10:55 AM -0700, "EVANS, ██████████████" wrote:

He needs to go through Legal Access, he has no funds.

**From:** MONSON, ██████
**Sent:** Wednesday, November 02, 2016 10:29 AM
**To:** EVANS, ██████ ABELOWITZ, ██████
**Subject:** Bitter 271100

He needs a notary.

██████ Monson
ASPC Tucson

**EXHIBIT D**

**EXHIBIT D**

**MONSON,** ▮▮▮

| | |
|---|---|
| **From:** | MONSON, ▮▮ |
| **Sent:** | Wednesday, November 02, 2016 10:52 AM |
| **To:** | SODARI, ▮▮ |
| **Cc:** | FLANAGAN, ▮▮ LITTLETON, ▮▮ |
| **Subject:** | This inmate needs a new id |
| **Attachments:** | 20161102_105021.jpg |

1



# ADC INMATE
## 053825

### AGUILAR, ERNEST

**EXHIBIT E**

**EXHIBIT E**

**MONSON,** ▮▮▮▮

| | |
|---|---|
| **From:** | MONSON, ▮▮▮ |
| **Sent:** | Wednesday, November 02, 2016 10:54 AM |
| **To:** | LITTLETON, ▮▮ |
| **Cc:** | FLANAGAN, ▮▮▮ |
| **Subject:** | This door is kept open because |
| **Attachments:** | 20161102_105238.jpg |

It is broken and has to be keyed. Is this acceptable?



**EXHIBIT F**

**EXHIBIT F**

**MONSON,** █████████

| | |
|---|---|
| **From:** | MONSON, █████ |
| **Sent:** | Wednesday, November 02, 2016 10:56 AM |
| **To:** | MONSON, █████ |
| **Subject:** | Check on this |
| **Attachments:** | 20161102_105512.jpg |

ARIZONA DEPARTMENT OF CORRECTIONS

Inmate Letter

Inmate Name (Last, First M.I.)

BUNKER, SEAN

ADC Number
232167

Requests are limited to one page and one issue. NO
ATTACHMENTS PERMITTED. Please print all information

Institution/Unit
TUCSON/RINCON

Date
10/

To:
D.W. MONSON

Location
ADMIN

State briefly but completely the problem on which you desire assistance. Provide as many details as possible.

COULD YOU PLEASE PROVIDE ME WITH
DOCUMENTATION ☒ CONFIRMING THAT ON APRIL
2016 I COMPLETED SERVICE OF A U.S. DISTRICT
COURT SUBPOENA BY HAD HAND DELIVERING IT TO
YOU, THIS SUBPOENA WAS ISSUED TO THE CUSTODI
OF RECORDS FOR A.D.O.C REQUESTING THE
PRODUCTION OF DOCUMENTS IN CV15-00318-TUC
AND WAS DATED MARCH 29, 2016. COULD YOU
ALSO PROVIDE THE COURSE OF ACTION YOU TOOK
ON RECIEPT OF SAID SUBPOENA, THANK YOU FOR
YOUR TIME AND I WOULD APPRECIATE YOUR
PROMPT ATTENTION TO THIS MATTER.

**EXHIBIT G**

**EXHIBIT G**

















**EXHIBIT H**

**EXHIBIT H**

**MONSON,** ▉

| | |
|---|---|
| **From:** | MONSON, ▉ |
| **Sent:** | Wednesday, November 02, 2016 10:57 AM |
| **To:** | MURPHY, ▉ KRAGES, ▉ MAY, ▉ |
| **Subject:** | Hu 3a, come down and |

Get the hu in 704 compliance, then make a map entry on the staf.

▉ Monson
ASPC Tucson

**EXHIBIT I**

**EXHIBIT I**

**MONSON,** ▮▮▮▮▮▮

| | |
|---|---|
| **From:** | MONSON, ▮▮▮▮ |
| **Sent:** | Wednesday, November 02, 2016 10:59 AM |
| **To:** | MONSON, ▮▮▮▮; ABELOWITZ, ▮▮▮▮ MOSS, ▮▮▮▮; MURDOCK, ▮▮▮▮ EVANS, KARI |
| **Subject:** | Enos 214338 |

Phones are they on. He is having issues

▮▮▮▮ Monson
ASPC Tucson

**EXHIBIT J**

**EXHIBIT J**

**MONSON,** ██████

| | |
|---|---|
| **From:** | MONSON, ██████ |
| **Sent:** | Wednesday, November 02, 2016 11:03 AM |
| **To:** | FLANAGAN, ██████ LINDSEY, ██████; IRBY, ██████ |
| **Subject:** | MATA 125265 |

This inmate says he ordered a stinger and he has paperwork that needs to go in his file. Advise me what action is taken.

██████ Monson
ASPC Tucson

**EXHIBIT K**

**EXHIBIT K**

**MONSON,** ███

| | |
|---|---|
| **From:** | MONSON, ███ |
| **Sent:** | Wednesday, November 02, 2016 11:07 AM |
| **To:** | EVANS, ███  BERRANG, ███ |
| **Subject:** | Garcia 180582 |

Call this inmate on and find out what his diet issue is.

███ Monson
ASPC Tucson

**EXHIBIT L**

**EXHIBIT L**

**MONSON,** █████████

| | |
|---|---|
| **From:** | MONSON, ████████ |
| **Sent:** | Wednesday, November 02, 2016 11:10 AM |
| **To:** | MONSON, ████████ |
| **Subject:** | Huguenot 286671 |

Check on signing his time back.

████████ Monson
ASPC Tucson

**EXHIBIT M**

**EXHIBIT M**

**MONSON,** ███

| | |
|---|---|
| **From:** | MONSON, ███ |
| **Sent:** | Wednesday, November 02, 2016 11:14 AM |
| **To:** | FLANAGAN, ███ |
| **Subject:** | Around 220188 |

3 long sleeve shirts, 4 boxers, 4 socks, 3 pants. 2 sheets. Do we have these. If so hie it to him and take a photo of him receiving them.

███ Monson
ASPC Tucson

**EXHIBIT N**

**EXHIBIT N**

**MONSON,** ███████

| | |
|---|---|
| **From:** | MONSON, ████ |
| **Sent:** | Wednesday, November 02, 2016 11:23 AM |
| **To:** | FLANAGAN, █████; LINDSEY, █████ IRBY, ██████ |
| **Subject:** | 3a preaching hot line |

Is painted over in sections.
████ Monson
ASPC Tucson

**EXHIBIT O**

**EXHIBIT O**

**MONSON,** ▮▮▮▮

| | |
|---|---|
| **From:** | ABELOWITZ, ▮▮▮▮ |
| **Sent:** | Thursday, November 03, 2016 8:54 AM |
| **To:** | MONSON, ▮▮▮ |
| **Subject:** | RE: I need to know--Sorry NO TICKETS |
| | |
| **Expires:** | Friday, October 05, 2018 12:00 AM |

Thank you

COIII ▮ Abelowitz ▮▮
Disciplinary Coordinator
▮▮▮▮▮▮▮▮▮▮

Rincon Unit COIII
▮▮▮▮▮▮▮

The information contained in this e-mail message and any attachment is privileged and confidential, intended only for the use of specific individuals and/or entities to which it is addressed.  If you are not one of the intended recipients, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you received this communication in error, please immediately notify the sender by return e-mail.

**From:** MONSON, ▮▮▮
**Sent:** Thursday, November 03, 2016 4:20 AM
**To:** ABELOWITZ, ▮▮▮▮
**Subject:** I need to know

Are there any 704 discipline from hu3 written yesterday. If so leave them on my desk.

▮▮▮▮ Monson
ASPC Tucson