**EXHIBIT 3**

**EXHIBIT 3**

1  Arizona Attorney General Mark Brnovich
   OFFICE OF THE ATTORNEY GENERAL
2  Michael E. Gottfried, Bar No. 010623
   Lucy M. Rand, Bar No. 026919
3  Assistant Attorneys General
   1275 W. Washington Street
4  Phoenix, Arizona 85007-2926
   Telephone: (602) 542-4951
5  Fax: (602) 542-7670
   Michael.Gottfried@azag.gov
6  Lucy.Rand@azag.gov

7  Daniel P. Struck, Bar No. 012377
   Kathleen L. Wieneke, Bar No. 011139
8  Rachel Love, Bar No. 019881
   Timothy J. Bojanowski, Bar No. 022126
9  Nicholas D. Acedo, Bar No. 021644
   Ashlee B. Fletcher, Bar No. 028874
10 Anne M. Orcutt, Bar No. 029387
   Jacob B. Lee, Bar No. 030371
11 STRUCK WIENEKE & LOVE, P.L.C.
   3100 West Ray Road, Suite 300
12 Chandler, Arizona  85226
   Telephone:  (480) 420-1600
13 Fax:  (480) 420-1696
   dstruck@swlfirm.com
14 kwieneke@swlfirm.com
   rlove@swlfirm.com
15 tbojanowski@swlfirm.com
   nacedo@swlfirm.com
16 afletcher@swlfirm.com
   aorcutt@swlfirm.com
17 jlee@swlfirm.com
   mbracken@swlfirm.com
18 *Attorneys for Defendants*

19              **UNITED STATES DISTRICT COURT**
20                    **DISTRICT OF ARIZONA**

21 Victor Parsons, *et al.*, on behalf of themselves     NO. 2:12-cv-00601-DKD
   and all others similarly situated; and Arizona
22 Center for Disability Law,
                             Plaintiffs,
23              v.                                        **DECLARATION OF**
                                                         **ASHLEY ZUERLEIN**
24 Charles Ryan, Director, Arizona Department
   of Corrections; and Richard Pratt, Interim
25 Division Director, Division of Health Services,
   Arizona Department of Corrections, in their
26 official capacities,
                             Defendants.
27

28

I, **ASHLEY ZUERLEIN**, make the following Declaration:

1.     I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration.

2.     On November 2, 2016, I toured the Tucson prison facility with Attorney Kirstin Eidenbach, Attorney Jessica Jansepar-Ross, Tara Diaz (an Arizona Department of Corrections ("ADC") employee), Vivian Baltierra (a Tucson ADC employee), Deputy Warden Jason Monson, and a SSU Sergeant.

3.     During the tour, Ms. Eidenbach asked to talk to inmates in Rincon Unit, Housing Unit 3.

4.     Before entering the run, ADC security personnel announced that women were entering the run.

5.     As we entered Housing Unit 3, Able run, I noticed that the last cell door on the right hand side of the run was open and an inmate was out of his cell in the hallway. The hallway of Housing Unit 3, Able run is much narrower that the runs on other yards.

6.     I asked ADC security personnel if we could be on the run. I was told it was fine.

7.     ADC staff walked the run informing inmates that women were on the run and instructing them to put shirts and pants on. I did not observe or hear any ADC staff threaten inmates with discipline for not being dressed. Staff was merely asking inmates to get dressed because there were female visitors on the run. Based on my experience with ADC, ADC staff do the same thing whenever a woman enters a male Housing Unit.

8.     Ms. Diaz walked to the end of the run and asked the inmate why his cell door was open and where his cell mate was. I did not hear the inmate's response.

9.     In the meantime, Plaintiffs' attorneys, Ms. Eidenbach and Ms. Jansepar-Ross, began to go cell-to-cell speaking to inmates.

10.    After speaking with the inmate at the end of the run, Ms. Diaz walked back down to the beginning of the run where the rest of the ADC employees and I were

2

gathered near the entrance of Able run.

11.     Several minutes later, a second inmate housed in the cell walked down the run and entered the open cell at the end run on the right hand side.

12.     While on Able run, ADC security personnel walked down the run as a result of the cell door being open.

13.     After Plaintiffs' attorneys finished speaking to inmates on Able run, we moved to Charlie run.

14.     Again, before entering Rincon, Housing Unit 3, Charlie run, ADC security personnel announced women were entering the run. As before, ADC security personnel walked the run informing inmates that women had entered the run and instructing them to put on shirts and pants. I did not observe or hear any ADC staff threaten inmates on Charlie run with discipline for not being dressed.  Staff were merely asking inmates to get dressed because there were female visitors on the run.

15.     All of the cell doors on Charlie run were closed with all inmates inside their assigned housing.

16.     I stood near the entrance of Charlie run.

17.     While in Housing Unit 3, I heard ADC staff address several policy issues. Staff noted that some of the inmates had worn or defaced ID cards which needed to be replaced.  I observed DW Monson taking a photograph with his cell phone of an inmate ID card that needed to be replaced because it was scratched out or defaced.

18.     I was informed by ADC staff that the issuance of a new ID card does not result in inmate discipline.

19.     I overheard an ADC employee tell an inmate to take something off their door which was obscuring the cell front.

20.     I also overheard DW Monson as he spoke to two correctional officers regarding issues he saw on the Housing Unit.  The officers looked at DW Monson's cell phone and one of the officers stated that he had noted violations earlier at 7:30, had

3

previously warned the inmates, and he would follow-up on the violations. Their voices were not elevated as they were all speaking in a normal conversational tone. All of the cell doors on Charlie run were closed while they were speaking, so there were no inmates nearby who could have overheard the conversation. When this discussion occurred, I was standing near the entrance of Charlie run and DW Monson and the officers were standing slightly further down the run. Ms. Eidenbach and Ms. Jansepar-Ross were on the other side of DW Monson and the correctional officers. To the best of my recollection, they were speaking to inmates at the opposite end of the run.

21.     While we were touring Rincon Able and Charlie runs several inmates initiated conversations with security personnel. For example, toward the end of the tour on Charlie run, one inmate spoke to DW Monson about obtaining another pair of pants. I observed DW Monson make a notation on his phone regarding the inmate's concerns.

22.     Late in the tour, Ms. Jansepar-Ross asked that ADC staff and I move further down the run to give her more privacy. We immediately moved to the end and partially outside of Charlie run. Ms. Diaz also explained to her that she could speak to the inmates through the side of the doors rather than trying to yell through the door window.

23.     A few minutes later, Plaintiffs' counsel completed their interviews. We exited Charlie run and an ADC staff member asked where we were headed next. Plaintiffs' counsel indicated that it was a good time to break for lunch.

24.     Although Plaintiffs' counsel interviewed inmates on Able and Charlie runs in Housing Unit 3, they did not request to speak with anyone on the Baker run.

25.     At that time, Plaintiffs' counsel did not inform me, or anyone else in our group, of alleged intimidation or harassment. Plaintiffs' counsel did not raise any concerns regarding ADC staff interfering with their interviews or concerns about being able to talk to their client.

26.     I was in Housing Unit 3 with DW Monson throughout the tour and I do not recall overhearing DW Monson or anyone else on the tour say "ticket everyone."

4

27.    Plaintiffs' counsel did not otherwise indicate that they believed ADC staff was "hovering" or negatively impacting their ability to speak to their clients.  The ADC staff that were near Plaintiffs' counsel while they were speaking to inmates were either performing their regular duties or observing Plaintiffs' counsel for their safety and security.

28.    If Plaintiffs' counsel would have informed me during the tours that they believed the correctional officers or I were too close during their interviews, I would have immediately moved and directed ADC staff to do the same.

29.    Upon return to the Tucson administrative training building for lunch, David Fathi, Plaintiffs' counsel, requested to interview Dr. Sanchez, Lead Psychologist for Tucson, Rincon Unit. Following the interview, both parties broke for lunch.

30.    After lunch, Plaintiffs' counsel informed Defendants' counsel, Mark Bracken, that they had an urgent matter to discuss.  Shortly thereafter, Ms. Eidenbach informed Defendants' counsel and me that they were cancelling the remainder of the Tucson tour and wanted to contact the Court immediately. Ms. Eidenbach alleged, for the first time, that she heard ADC personnel threaten to issue "tickets" to all inmates on Able and Charlie run and believed that ADC personnel were intimidating and retaliating against inmates.  Ms. Eidenbach also requested to call the Court.

31.    During the conference call with the Court, I attempted to speak up and tell the Court what I had observed and heard on the tours, but Plaintiffs' counsel incorrectly claimed that I had walked away and was not near DW Monson during the tour of Housing Unit 3.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of December, 2016.

ASHLEY ZUERLEIN

5