**EXHIBIT 6**

**EXHIBIT 6**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Victor Antonio Parsons, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | CV-12-0601-PHX-DKD |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | November 2, 2016 |
| Charles L. Ryan, et al., | ) | 1:47 p.m. |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE


TRANSCRIPT OF PROCEEDINGS

TELEPHONIC STATUS HEARING


Transcriptionist:
Linda Schroeder
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

1                    <u>A P P E A R A N C E S</u>

2    For the Plaintiffs:

3              Eidenbach Law
               By: KIRSTIN T. EIDENBACH, ESQ.
4              P.O. Box 91398
               Tucson, AZ  85752
5
               Prison Law Office
6              By: ALISON HARDY, ESQ.
               1917 5th Street
7              Berkeley, CA  94710

8    For the Defendants:

9              Struck Wieneke & Love
               By: MARK ALLEN BRACKEN, ESQ.
10                 JACOB BRADY LEE, ESQ.
               3100 West Ray Road, Suite 300
11             Chandler, AZ  85226

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED  STATES  DISTRICT  COURT**

1          THE COURT:  This is Parsons v. Ryan.  I was contacted

2    about five minutes ago by counsel on a joint telephone call

3    with respect to the ongoing site visit of a prison facility in

4    Tucson.  I informed the counsel that we were not on the record,

5    and they indicated or at least one counsel indicated to me that

6    it was acceptable that it not be on the record.  I don't recall

7    whether I had the views of both counsel about whether it was

8    acceptable for it to not be on the record.

9          But when I heard the nature of the issue, it is my

10   judgment that it should be on the record, and so that's why I

11   asked counsel to hold, and we would transfer the call into the

12   courtroom.  And so we are now on the record, and I'd ask those

13   on the telephone to please announce.

14         MS. EIDENBACH:  This is Kirstin Eidenbach and Alison

15   Hardy for plaintiffs.

16         MR. BRACKEN:  And this is Mark Bracken and Jacob Lee

17   on behalf of the defendants.

18         THE COURT:  Thank you very much.  Ms. Eidenbach, would

19   you please begin from the beginning again.

20         MS. EIDENBACH:  Yes, Your Honor.  We are in the middle

21   of conducting a site visit at the Tucson complex.  This morning

22   myself and an attorney from the Arizona Center for Disability

23   Law, Jessica Ross, were touring a close custody unit at Rincon

24   Unit, Housing Unit Three, runs Abel and Charlie.  And during

25   our visit, the cell doors were locked, and there were no

1    prisoners outside their cells.  So the security risk to myself

2    and Ms. Ross was pretty much nonexistent.

3           Nevertheless, during the course of our visit, the

4    deputy warden was on the run in very close proximity to

5    attorney-client communications, and he took pictures of the

6    cells on the run and announced near the end of our visit that

7    everyone on the run would be ticketed.  That was -- We began in

8    Abel run.

9           We then moved to Charlie run.  And at the beginning of

10   that visit, the deputy warden -- I believe it's Deputy Warden

11   Larson -- announced that everyone on the run would be ticketed,

12   and he again took pictures of all of the runs.

13          At that point many of our clients refused to talk to

14   us, and a couple of them indicated to us that they were afraid

15   to talk to us for fear of further retaliation in addition to

16   the tickets that had been announced, which they felt were

17   retaliatory at the time.

18          When I reported this to my team over the lunch hour, I

19   discovered that Ms. Hardy had, on Rincon unit yesterday, been

20   told by two of our clients that they'd better say the right

21   thing during the tour or their lives would be made hell.

22          So it is our concern at this point that our clients

23   have been intimidated and threatened in advance of our tour,

24   and that has inhibited and disrupted our ability to effectively

25   communicate with them about the quality and nature of the

1    medical, mental health, and dental care that they're receiving,

2    as well as the conditions of their confinement.

3            So we want to bring this to Your Honor because it is a

4    serious concern.  We feel that our clients are in danger.  And

5    as a result of that, we've decided to suspend the remainder of

6    the tour at Tucson today because we do not have an assurance

7    that our clients are not in danger on the other yards that we

8    planned to visit.

9            In addition to that, plaintiffs have developed a short

10   request for relief.  We have discussed this with defendants,

11   and on at least one of them we think that we can get a

12   stipulated order because I think we've come to an agreement on

13   one.

14           On the other three, however, we've not.  So the

15   request for relief that the parties have agreed to is a memo

16   will issue from the warden's office instructing staff that

17   there should be absolutely no intimidation or retaliation in

18   advance of or following the tours that are part of the

19   Parsons v. Ryan litigation and that if intimidation or

20   retaliation is discovered, there will be consequences.

21           The remaining three items of relief that plaintiffs

22   request, we'd ask that the Court require defendants to quash

23   the tickets that were issued during our tour so that our

24   clients understand that talking to their attorneys in the

25   Parsons v. Ryan case is not going to result in or be tied to in

1    any way tickets for minor disciplinary infractions.

2            We're asking the Court to put on the record that this

3    tour does not count towards our tour days because our

4    ability -- it's just today -- our ability to -- or I guess

5    yesterday and today, the two Tucson days, not count toward our

6    tour days, because our ability to meaningfully communicate with

7    our clients has been completely undermined.  And we feel that,

8    one, we've not been able to gather the data that we need to

9    gather in order to report back to the Court and to assess

10   defendants' compliance but also as a sanction so that

11   defendants understand that this kind of behavior is egregious

12   and will not be tolerated.

13           And the final relief that we're requesting is the

14   defendants pay for the cost of this tour because we're going to

15   have to redo it.

16           THE COURT:  All right.  Who wants to respond on behalf

17   of the state?

18           MR. BRACKEN:  Yes, sir.  This is Mark Bracken on

19   behalf of the State.  It's the defendants' position that the

20   allegations, although serious, and we recognize them, and, as

21   noted, we're willing to take action to make sure that

22   plaintiffs' counsel and their clients feel comfortable during

23   these tours, the allegations are based purely upon speculation

24   and not upon any actual evidence of any actual retaliation

25   having occurred.

```
 1              THE COURT:  I just --

 2              MR. BRACKEN:  And regarding --

 3              THE COURT:  Excuse me, Mr. Bracken.  I just had the

 4   avowal of counsel that she heard the deputy warden say that

 5   everybody would be ticketed who was in the line to be

 6   interviewed.  So that's --

 7              MR. BRACKEN:  Your Honor --

 8              THE COURT:  -- that's not speculation.  That's direct

 9   testimony, direct evidence.

10              MR. BRACKEN:  Okay.

11              THE COURT:  Do you have a different take on it?  How

12   can you -- How are you making this position that it's

13   speculation?  Help me understand that.

14              MR. BRACKEN:  Well, the allegations of retaliation, I

15   understand their position and what they heard, and we're not

16   disputing what she said she heard or what she said occurred.

17   We dispute the conduct.  Her perception of events, obviously

18   she has testified as to that.

19              But what actually occurred is a very different story.

20   And we have the warden here, who would be happy to discuss the

21   operations and be able to explain to the Court regarding what

22   actually occurred.

23              The typical operation is there's certain guidelines

24   and restrictions that each inmate needs to ensure within their

25   housing unit that's monitored every single day.  And the
```

1    corrections officers and the deputy wardens will tour these

2    facilities.  If they are out of compliance, they will be issued

3    a warning, and if there's a second instance where they are

4    still out of compliance, then a ticket will be issued.

5           It's my understanding, in discussing this with my

6    client, that he did not announce that everyone on the run would

7    be ticketed, but all of those who were out of compliance at

8    7:30 and continued to be out of compliance later in the day

9    would be ticketed for failing to follow those guidelines.

10           THE COURT:  And what was the allegation of being out

11   of compliance?

12           MR. BRACKEN:  You know, Your Honor, I'd be happy to

13   let the warden --

14           THE COURT:  No.  Do you have any idea what it is,

15   counsel?

16           MR. BRACKEN:  I do not know --

17           MS. EIDENBACH:  I do, Your Honor.

18           MR. BRACKEN:  -- specifically, no.

19           MS. EIDENBACH:  Your Honor, I overheard the deputy

20   warden discussing some of the infractions that he was ticketing

21   people for.

22           THE COURT:  And what did you overhear?

23           MS. EIDENBACH:  He said one of them did not have their

24   shirt on.  Another, Ms. Ross overheard him saying the person

25   didn't get their shirt on fast enough.  Another had their

1   window covered.  Another there were things out of place in the

2   cell.  Those are the types of infractions that we're talking

3   about.

4          THE COURT:  And so what Mr. Bracken is saying is that

5   these were other infractions that the deputy warden noticed

6   that didn't have anything to do with the fact that you were

7   interviewing these people.  Why do you think it had something

8   to do with the fact that you were interviewing these people?

9          MS. EIDENBACH:  Your Honor, it's an issue of optics,

10  because we're on a run interviewing people about the

11  Parsons v. Ryan case, and for some reason corrections staff

12  felt the need to be on the run during our interviews, which,

13  you know, invades attorney-client privilege for one.  But, two,

14  it directly ties our interviews of these folks to a ticket.

15          And this is the first time that it's happened in front

16  of us and we've had anything more than our client's word.  But

17  we have reports that tickets are issued, cells are searched and

18  shaken down immediately following our interviews of the people

19  that we interview.  We just have never had any evidence to

20  bring to the Court.

21          All that aside, Your Honor, what this -- the impact of

22  this -- So the deputy warden's intentions aside, the impact

23  that this decision of his had on our clients was to chill our

24  conversations, and they stopped talking to us.  And that

25  effectively makes our tours pointless.  We can't get

1    information about how individuals' medical care is being

2    provided on the ground if people will not talk to us because

3    they fear retaliation.

4         In addition, yesterday the folks who talked to

5    Ms. Hardy indicated that they were specifically told that

6    unless they towed the party line and told us the right thing,

7    that they would -- their lives would be made hell.  That's why

8    we're calling the Court, because we have two instances on the

9    same yard where folks are telling us that they feel intimidated

10   to talk to us.  And then two of our plaintiffs' attorneys

11   witnessed, while we're interviewing folks, the deputy warden

12   saying that everyone is going to be issued a ticket.  And he --

13   he gave examples, but his words at the head of both runs were

14   everyone is going to get ticketed.  "Ticket everyone" is what

15   he said exactly.

16        MR. BRACKEN:  And my understanding, Your Honor -- And

17   I have Ashley Zuerlein from the Attorney General's Office.  I

18   was not on the tour.  There were three separate groups.  Tucson

19   is a large facility.  And so we're all in different either

20   buildings or housing units.  So I was not there, and I could

21   not, you know, address specifically what was said or what was

22   not said other than what was reported to me.

23        Ashley is here, can report to you exactly what she

24   heard and her understanding.  And the warden is here, and he

25   can explain to you exactly what the operations are.  If the

1   Court would like to hear from them, Ashley can speak to you

2   now.

3               THE COURT:  No.  The next question I have is for

4   Ms. Eidenbach.  You said that you thought that the

5   attorney-client privilege was violated because there was the

6   possibility for people to overhear what was being said by the

7   people you were interviewing.  How do you -- How do you -- What

8   is your basis for believing that there was the possibility to

9   overhear?

10              MS. EIDENBACH:  In the close custody runs, we

11  interviewed people through closed doors.  So, you know, we

12  certainly understand that when we're out on a yard with

13  prisoners who are basically free and we're wandering among

14  them, that corrections staff stays relatively close, so most of

15  the time they're very respectful, and they give us plenty of

16  room so that we can maintain confidentiality.

17              But on the close custody runs, there was no security

18  reason for the corrections staff to be down on the run.  The

19  doors were closed and locked.

20              THE COURT:  So what you're saying is that they were

21  close enough to you, the conversation that you were having

22  through the door, that you believe that they could overhear

23  what was being said both by you and also by the person you were

24  interviewing?  Is that what you're saying?

25              MS. EIDENBACH:  Yes, Your Honor, absolutely.  They

1    were right next to me.

2            THE COURT:  All right.  That's --

3            MS. EIDENBACH:  And I did, near the end of the tour, I

4    did ask Ms. Diaz, who is the Regional Operations Director, if

5    she could move the corrections staff down, and she did.  But

6    this was on the second run, and, you know, we do have concerns

7    about that.

8            Our much bigger concern, though, Your Honor, is that

9    our clients are being intimidated.  And obviously because the

10   tour is still in progress, we don't have any evidence of

11   retaliation because they didn't know who was going to talk to

12   us in advance of our tours.

13           So what we're hearing is that before we got here, they

14   were intimidated, and then past reports indicate that

15   retaliation does occur.

16           THE COURT:  All right.  Well, with respect to the

17   stipulation that you apparently have reached, I will order that

18   that stipulation be entered, and I will order that each person

19   who is interviewed by you be provided a copy of this letter

20   which informs them that there will be no retaliation.  And you

21   can add to the stipulation and present it for my approval that

22   the Court will not tolerate any kind of retaliation for

23   conversations or meetings or speaking with plaintiffs' counsel

24   in this case.

25           With respect to the ticketing, I'm concerned about

1    that because the close proximity in time does suggest that it

2    sounds like retaliation.  That's what we frequently see in

3    cases, link in time with respect to actions and adverse actions

4    that are taken.

5            The notion that people who are appearing on the day of

6    an interview that is for important purposes, it is the only way

7    that the stipulation can be measured with respect to whether or

8    not we are seeing verifiable compliance.  And so it's of

9    critical importance.

10           And so if I have to intervene in a way that assures

11   that there is no specter of retaliation for any kind of

12   participation in this process of information gathering, I will

13   do it, including being present myself to make sure that I can

14   make the personal representation to anyone talking to you that

15   there will be no -- there will be no retaliation.

16           Now, the idea that everyone on the line would be

17   ticketed because of other infractions raises the legitimate

18   question that there may be other observances.  However --

19   observances of things that are violative of prison regulations.

20   However, the close proximity in time to the interviews that

21   plaintiffs are conducting obstructs my fact-finding mission

22   here.  And, simply stated, another way to enforce the prison

23   regulations has to be found that doesn't allow for this broad

24   brush ticketing in the temporal proximity of these interviews

25   in a way that can chill the environment.  It's just too

1    important for the Court's purposes here.

2         And so I instruct you to continue to work to come up

3    with a mechanism on behalf of the State that allows for the

4    distribution of this letter but also understands very clearly

5    that I will not abide any kind of chill in the air that

6    obstructs the disclosure of information in an attorney-client

7    context that is necessary for the enforcement of the

8    stipulation here.

9         And so I don't know whether there were other

10   infractions that were valid, but the close proximity in time to

11   these interviews being conducted by plaintiffs does have a

12   serious negative potential effect to chill the freedom of

13   people to discuss what they want to discuss.  And so I've got

14   to make sure that that chill is out of the air.  And if it

15   means that you can't decide that somebody's going to be -- that

16   everybody on the line is going to be ticketed because every

17   single one of them happens to have an infraction, then that may

18   be what we have to have, that there will be a pass on those

19   infractions so that it isn't applied in that kind of broad

20   brush measure.  Again, I'm counting upon the good faith of

21   everyone in this process to operate in a way that can

22   effectuate the stipulation.

23        And when I hear the suggestions of what have been

24   described to me in this telephone call, it questions my belief

25   about whether or not there is good faith in practice.  And,

1    again, I can't decide the very issue here about these

2    individual infractions.  I can't decide ultimately the

3    good faith or not, even with an evidentiary hearing.  I can't

4    go back in time.  I can't be overhearing every conversation.

5         But what I can do is I can observe that the

6    application of these infractions across everybody who's

7    participating in these interviews can reasonably be seen to

8    chill the environment for full disclosure.  And so I cannot

9    allow that to continue.

10        Now, with respect to the second items of relief, I

11   think that we need to have this letter prepared so that it can

12   be provided to the inmates who are being interviewed so that

13   they understand that there is no possibility for an

14   unsanctioned reprimand or retaliation for their participation.

15        The language that you suggested would seem to

16   accomplish that goal.  I want it very clearly communicated to

17   all of the inmates who talk with their counsel in this case

18   that they should feel free to say whatever they want to say and

19   that they should not fear retaliation.

20        I also want to make it clear that there cannot be

21   anybody within earshot unless there's a very grave security

22   issue posed.  If somebody is locked in their cell, I cannot see

23   how anyone needs to be within earshot of what is -- this

24   discussion is.  And I'm glad to hear that when you raised it

25   with the prison personnel, that they did back away.  But they

1    need to not be within earshot unless there's a security need

2    for it.  And when somebody is locked in, I don't see that

3    security need.

4            Then turning to the additional issues of additional

5    days for the time lost, I don't know whether it fully -- the

6    time loss means you're entitled to full -- two full days.  But

7    I would be inclined to think that based upon what I've heard

8    and the fact that we do need time to get that letter printed

9    and distributed and made available to people and the -- what

10   you've heard about people who are reporting to you that they

11   believe that they -- that they will suffer consequences if they

12   do not freely discuss with you the matters that you are asking

13   about warrants some relief along that measure.

14           And finally I will put off to another time when I have

15   the opportunity to allow both sides to present their respective

16   views on whether or not the conduct here warrants a fee shift

17   such that the -- there should be an extra allocation of funds

18   for the visits that were planned and conducted in part today.

19           So I --

20           MR. BRACKEN:  Your Honor --

21           THE COURT:  Go ahead.

22           MR. BRACKEN:  Your Honor, this is Mr. Bracken.  If I

23   may have a chance to respond, all the things that you

24   suggested, we've offered to do that.  As soon as this was

25   reported to us, it's an allegation that we take seriously.

1    Although we dispute what happened, we take it very seriously,

2    and we feel that it's important for not only plaintiffs and

3    plaintiffs' counsel to understand that there is no retaliation

4    here.  So we agreed to send the letter that needs to be done.

5            As far as the tickets being issued, as of this point,

6    we don't know whether any tickets were ever actually issued,

7    and we did talk, and we would be willing to, I think as the

8    Court suggests, rather than giving them an actual ticket that

9    would be in their file, to have a warning, because the behavior

10   and the conduct, this needs to be addressed.  It cannot be gone

11   unsaid, because these are issues that the security staff are

12   doing their job.

13           Now, the timing of it obviously is unfortunate, and it

14   leads to us being here.  But they still need to do their jobs,

15   and that's strictly what they were doing at that time.

16           THE COURT:  Well, let me make it clear to you that the

17   presumption is against you with respect to me allowing this

18   kind of broad brush ticketing to everybody on the line who is

19   showing up for an interview.  That has such a potential

20   chilling effect that you are going to have me on the line

21   watching this, if that's where you're going to go with this,

22   because I'm not going to allow that to continue.  And the fact

23   that I've heard that it happened this morning is enough for me

24   to believe that it's serious enough to stop it.  And so I don't

25   know whether you feel that the warnings are somehow less

1   offensive to me.  They're not.  This broad brush assessment of

2   a sanction to somebody who is participating in an interview, if

3   you want to make sure that people have their shirts on and

4   they're not obstructing their cells, do that on some day other

5   than when the interview's scheduled.

6           MR. BRACKEN:  And, Your Honor, what I was trying to

7   explain -- and I have the warden here who can explain it better

8   than I -- this is conduct that occurs every single day, whether

9   or not there's a tour going on.  And it's also my

10  understanding -- and I have those who were there to witness

11  it -- that it was not a broad stroke ticket issue to everybody

12  but tickets issued to those who were found non-compliant

13  earlier in the day.

14          MS. EIDENBACH:  Your Honor, Ms. Zuerlein and Ms. Diaz

15  have both indicated, when we discussed earlier, that they had

16  stepped out when both of these instances occurred, and so they

17  actually I don't think can present testimony to the contrary.

18          MR. BRACKEN:  Your Honor, I think it's important for

19  you to hear the other side of the story and hear from the

20  warden as well as from Ms. Zuerlein, who was there.

21          MS. EIDENBACH:  Not at the time of the infraction.

22  She said that herself.

23          UNIDENTIFIED SPEAKER:  I don't (indiscernible) I

24  stepped out.  I did not.  Diaz did.  I may not have heard what

25  you heard.  I acknowledge that.

1      MS. EIDENBACH:  You were at the other end of the --

2      UNIDENTIFIED SPEAKER:  Yeah, I was at the other end of

3  the run, is what I'm saying.  I was in the run but not standing

4  right next to Kirstin.  I want to give some (indiscernible)

5  obviously.  The part that I did hear was the deputy warden had

6  seen ID cards, which they need to have their ID cards to be

7  identified.  My understanding is he was looking at some ID

8  cards that were scratched out or deformed, whatnot, and that he

9  was trying to get that addressed.

10      I believe the comment I did hear was that he was

11  asking one of his employees if they had checked that earlier in

12  the morning and the day before.  So it was previous conduct and

13  seeing if they had seen current conduct as well.

14      MS. EIDENBACH:  And, Your Honor, we have an additional

15  attorney who was doing interviews who heard the same comment to

16  me that he made a broad stroke statement "Ticket them all."

17      THE COURT:  Have there --

18      MS. EIDENBACH:  I mean, we were both present when he

19  said that, so --

20      THE COURT:  And on --

21      UNIDENTIFIED SPEAKER:  I think --

22      THE COURT:  -- the previous tours have there been

23  pictures taken during the tours?

24      MS. EIDENBACH:  Never.

25      THE COURT:  All right.  Well, this kind of activity,

1    the pictures, the sanctioning of everybody, and the comments

2    that the lawyers have represented to me, I just am not going to

3    devote more time to it here on the phone.  What I am going to

4    say is I think I've made it very clear to you that my idea of

5    how this will work is the way that it's apparently worked in

6    the past and the way it's going to work in the future, and that

7    is there's going to be nothing that makes people think that

8    participating in this process of discussing their current

9    status of issues relevant to this stipulation with their

10   counsel will subject them to any kind of treatment that would

11   cause them to think that they should chill what they're saying.

12          Pictures, sanctioning people for things that you say

13   happen every day, again, pick some other day to do it.  Don't

14   do it on the day that the tour is scheduled.  Don't do it in

15   any way that links it temporarily -- temporally to a way that

16   would make people reasonably think that they're being subject

17   to the possibility of a retaliation for participating.

18          I want everyone to feel fully and freely enabled to do

19   it.  I'm not going to invest more time into getting into the

20   he-saids or she-saids of this, but I'm making it very clear on

21   what I've heard that if this kind of thing is going on, it's

22   not going to be accepted.  And so I say if this thing is --

23   kind of thing is going on, it's not going to be accepted.  To

24   make sure that it doesn't go forward, we're going to have this

25   letter.  We're going to have the communication.  And I think

1    I've made it very clear to everybody that you don't take

2    pictures in a way that happens only on the day of the tour.

3    You don't sanction people, everybody on the line on the day of

4    the tour, because it's reasonable for people to think that

5    that's associated with retaliation.

6         So if you need me to sign off on the stipulation,

7    submit it to me.  Otherwise, I think on the record here I've

8    made my rulings clear.  And I've got to get to other matters.

9    Thank you, all.

10         MR. BRACKEN:  Thank you, Your Honor.

11         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

12         MS. EIDENBACH:  Thank you, Your Honor.

13    (Proceedings recessed at 2:13 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

22

1                    C E R T I F I C A T E

2

3          I, LINDA SCHROEDER, court-approved transcriber,

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8          DATED at Phoenix, Arizona, this 17th day of November,

9    2016.

10

11                                    s/Linda Schroeder

12                                    Linda Schroeder

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT