**EXHIBIT 9**

**EXHIBIT 9**



STRUCK WIENEKE & LOVE

3100 West Ray Road, Suite 300, Chandler, Arizona 85226 | 480.420.1600 | swlfirm.com

December 19, 2016

Daniel P. Struck
Partner

Kathleen L. Wieneke
Partner

Rachel Love
Partner

Timothy J. Bojanowski
Partner

Christina Retts
Partner

Nicholas D. Acedo
Partner

Amy L. Nguyen
Partner

Tara B. Zoellner
Associate

Ashlee B. Fletcher
Associate

Anne M. Orcutt
Associate

Kevin L. Nguyen
Associate

Jacob B. Lee
Associate

Mark A. Bracken
Associate

Erica L. Gadberry
Associate

***VIA EMAIL ONLY***
Donald Specter
Prison Law Office
General Delivery
San Quentin, CA  94964
dspecter@prisonlaw.com

   **Re: Parsons v. Ryan (2:12-cv-00601-DKD)**

Dear Don:

  We are in receipt of your November 8, 2016 letter in which you claim Arizona Department of Corrections (ADC) staff prevented inmates from speaking to Plaintiffs' counsel during the November 2, 2016 prison tour at ASPC-Tucson. The ADC takes Plaintiffs' claims seriously and has investigated Plaintiffs' counsels' allegations to determine whether there is any merit to these claims. Based on ADC's investigation, and Plaintiffs' counsel's inability to provide any further detail or information regarding these claims, we have determined that Plaintiffs' claims are unfounded. In addition, based upon this investigation, it is clear that the Motion for Contempt is without merit, and we demand that Plaintiffs withdraw it immediately.

  As the following factual summary shows, Plaintiffs' claims are either without merit or lack any detail from which Defendants may attempt to corroborate or controvert Plaintiffs' claims.

  **Tucson Prison Tour – November 1, 2016**

  Alison Hardy reported that two inmates claimed on November 1st that a correctional officer told them their lives would become a "living hell" if they said anything "bad" to Plaintiffs' counsel. Ms. Hardy reported these statements the day after they were reported to her and then refused to identify the inmates who made these claims or the housing unit or pod where they are located. Ms. Hardy also did not find out the identity of the officer, when the comments were made, or where the incident(s) occurred.

Donald Specter
December 19, 2016
Page 2

When these statements were reported for the first time on November 2nd, Ms. Hardy was unable to provide any details regarding these incidents, and your letter does not provide any further information from which Defendants may investigate these allegations. In addition, although Ms. Hardy had numerous opportunities to report these incidents, she did not report them until the following afternoon. Ms. Hardy stated that these comments were reported at the end of the day on November 1st while she was interviewing inmates in Housing Unit 7 or 8, but she refused to be more specific. On November 1st, Ms. Hardy complained that she was given a premature five minute warning, but she did not find it important to report that two inmates' alleged that ADC staff said their lives would become a "living hell" if they reported anything "bad" to Plaintiffs' counsel. Mr. Bracken did not observe any conduct from which a reasonable person could conclude that inmates were being intimidated, as Ms. Hardy and Mr. Carlsen were able to interview and talk with all available inmates.

Although multiple attorneys interviewed numerous inmates in Housing Units 7 or 8, there are no other similar reports of intimidation or retaliation. Plaintiffs have only identified two vague allegations based on unreliable hearsay that is not corroborated by any other evidence of retaliation and that was not reported until the following day. Therefore, without any further information or evidence, Defendants conclude these allegations lack merit.

**Tucson Prison Tour – November 2, 2016**

Kirstin Eidenbach alleged that, while interviewing inmates in Rincon Housing Unit (HU) 3A and 3C, Deputy Warden (DW) Monson ordered correctional officers to "ticket them all." Attorney Ashley Zuerlein, who was on the tours with Ms. Eidenbach, was standing near DW Monson and the two officers he was speaking to, and she will testify that DW Monson never said "ticket them all." In addition, DW Monson vehemently denies that he ever directed the officers to "ticket them all" and will testify that he does not use the term "ticket" when referring to discipline. CO Robles and Sgt. Krages, who were speaking to DW Monson when this statement was allegedly made, will also refute Ms. Eidenbach's allegations. Plaintiffs' retaliation claim is, therefore, based on Ms. Eidenbach's recollection of a conversation that she partially overheard while interviewing inmates in HU 3C and that all individuals who were involved in the conversation will deny occurred.

There is no evidence that DW Monson had a retaliatory animus. DW Monson is not directly responsible for providing medical care for inmates and has no motive for discouraging inmates from talking to Plaintiffs' counsel regarding their healthcare. DW Monson's actions throughout the tour show he was helping inmates with a variety of issues, not retaliating against them. DW Monson sent multiple emails and took numerous photographs during the tour that all show he was assisting inmates or documenting issues to follow up with his supervisors.

Donald Specter
December 19, 2016
Page 3

DW Monson and other supervisors will also testify that they regularly photograph and/or send emails addressing issues observed while touring facilities. The photographs identify the issues and allow supervisors to show staff what they need to look for and what they missed while inspecting inmates and the premises.

DW Monson sent the following emails related to inmates or the facilities during the November 2nd tour at Rincon:

**At 10:05**, DW Monson sent an email to staff to repair some exercise equipment on the recreation yard.

**At 10:29**, DW Monson spoke to inmate Bitter (271100) and sent an email to staff advising them that he needed a notary.

**At 10:52**, DW Monson observed that inmate Aguilar's (053825) ID badge had been defaced and sent an email advising staff that he needed a new badge.

**At 10:54**, after speaking to the inmates, DW Monson sent an email advising staff to repair the cell door that was open at Housing Unit 3A-09.

**At 10:56**, DW Monson spoke to inmate Bunker (232167) regarding an inmate letter he claimed he sent to DW Monson, and DW Monson sent an email to himself to follow-up regarding the inmate letter.

**At 10:57**, DW Monson sent an email to the supervisors in Housing Unit 3 regarding multiple 704 compliance issues that he observed and asked them to follow up and take corrective action with the staff, if necessary.

**At 10:59**, DW Monson spoke with inmate Enos (214338) at HU 3A-12, who informed him that he was having issues with the phone, and DW Monson sent a follow-up email to staff to check on whether the phones were on because he was having phone issues.

**At 11:03**, DW Monson spoke with inmate Mata (125265) at HU 3A-5, who told him he ordered an electric water heater or stinger (a device used by inmates to heat coffee) and he has paperwork that needs to go in his file, and DW Monson sent a follow-up email to the property officer to follow-up;

**At 11:07**, DW Monson spoke with inmate Garcia (180582) at HU 3A-15, who told him he was having some issues with his diet, and

Donald Specter
December 19, 2016
Page 4

DW Monson sent a follow-up email to the CO IVs, directing them to investigate the inmate's diet issues.

**At 11:10**, DW Monson spoke with inmate Hugenot (286671) at HU 3A-15, who said he had submitted paperwork to get some of his disciplinary time back, and DW Monson emailed himself a reminder to check whether he had received the paperwork.

**At 11:14**, DW Monson spoke with inmate Arob (220188) at HU 3A-7, who said he was missing some clothes, and DW Monson sent an email to the support sergeant directing him to provide the inmate with 3 long sleeve shirts, 4 boxers, 4 socks, 3 pants, and 2 sheets.

**At 11:23**, while standing near the shower in HU 3C, DW Monson noticed the PREA hotline near the phone had been painted over in part, so he sent a follow-up email to staff to ensure the phone number was visible.

These emails show that DW Monson was performing his duties during the tour and was taking actions to help inmates, not to retaliate against them. If he was trying to retaliate against inmates for speaking to Plaintiffs' counsel, he would not have taken his time to listen to the inmates concerns, answer their questions, and follow up with staff regarding the inmates' issues.

In summary, Ms. Eidenbach's claims are without merit because **(1)** multiple witnesses controvert what she claims she overheard DW Monson say in a conversation with staff; **(2)** DW Monson's actions throughout the tour show he had no retaliatory animus; **(3)** no inmates in Housing Unit 3A or 3C were ever disciplined during the tour; **(4)** there is no evidence that any inmates overheard DW Monson's alleged conversation, as all of the cell doors in HU 3C were closed; and **(5)** Plaintiffs have not identified any inmates who were allegedly threatened or disciplined.

Although Plaintiffs' counsel were offered an opportunity to continue their Tucson tour and could have interviewed inmates to obtain evidence that would support their retaliation claims, Plaintiffs' counsel unilaterally decided to cancel the second half of the second day of their tour.

**Eyman Prison Tour – November 3, 2016**

Ms. Eidenbach alleged that while interviewing inmates at ASPC-Eyman, Meadows Unit, an inmate claimed he was intimidated by a correctional officer. Rose Daly-Rooney further alleged that one inmate told her he was intimidated by medical staff. Ms. Eidenbach, however, was unable to provide any further details regarding the alleged intimidation. She could not identify the inmates who were

Donald Specter
December 19, 2016
Page 5

allegedly intimidated, the staff members who were allegedly involved, when the alleged incidents occurred, or where the incidents occurred. When Ms. Eidenbach was pressed for more details, she said "It wasn't a major topic of discussion," although the day before she had contacted the Court and claimed Defendants were intimidating and retaliating against inmates.

### Eyman Prison Tour – November 4, 2016

Corene Kendrick reported that inmate Guttridge (303796) complained that Sgt. Washburn had previously assaulted and knocked his clothes off the hanger while he was showering earlier that morning, and he was concerned he would be disciplined for talking to Plaintiffs' counsel because he had previously been disciplined after meeting with his criminal defense attorney in July 2016. Defendants investigated inmate Guttridge's claims and determined they lack merit. First, Mr. Guttridge was never issued any discipline for talking to Plaintiffs' counsel, nor was he ever threatened with discipline for speaking with Plaintiffs' counsel. Sgt. Washburn did not know and had no way of knowing inmate Guttridge would be speaking with Plaintiffs' counsel on Friday, November 4th.

Second, Plaintiffs' claim that inmate Guttridge was disciplined for talking to his criminal defense attorney is false. Mr. Guttridge has been disciplined three times during his incarceration for: (1) assaulting (i.e. throwing a clear liquid at) another inmate on July 10, 2016; (2) assaulting (i.e. spitting on) a correctional officer while escorting him to a paralegal appointment on August 8, 2016; and (3) refusing to submit to restraints on August 9, 2016.

Third, Sgt. Washburn did not assault inmate Guttridge and never touched his clothes while he was showering. Inmate Guttridge has made multiple false claims and has threatened to kill Sgt. Washburn and other staff.

Ms. Kendrick also reported that inmate Ohman (189498) complained that an unidentified escorting officer told him he "better be careful what you say to them." A Captain who has a good rapport with inmate Ohman followed up with him to identify the correctional officer who made this statement. When asked, inmate Ohman responded: "Your staff did not tell me that, it was the inmate that was at the end that told me. He told me 'Hey Big Mike, you need to watch what you say, don't say anything to these lawyers, or it will not be good for you." Inmate Ohman was never intimidated or threatened by correctional staff.

### Plaintiffs' Retaliation Claims

In order to establish an inmate retaliation claim, Plaintiffs must show: "(1) [a]n assertion that a state actor took some adverse action against an inmate, (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not

Donald Specter
December 19, 2016
Page 6

reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2004). The prisoner plaintiff "bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). When evaluating this claim, the court "should 'afford appropriate deference and flexibility' to prison officials." *Id.* at 807 (quoting *Sandin v. Conner*, 515 U.S. 472, 482 (1995)).

Here, Plaintiffs have not shown (1) Defendants took an adverse action against any inmates, (2) Defendants were motivated by a retaliatory animus, (3) the adverse action chilled the inmates' right to speak to their attorneys, or (4) Defendants' alleged actions do not reasonably advance a legitimate penological goal, such as preserving institutional order or discipline.

First, although Plaintiffs' counsel have speculated that inmates would be disciplined for speaking to them, Plaintiffs have not identified any inmates who were disciplined for speaking to their attorneys or disciplined soon after speaking to their attorneys. Without any evidence that any adverse action was ever taken against an inmate, Plaintiffs' allegations fail as a matter of law.

Second, Plaintiffs have not alleged or shown the Deputy Warden or any other Correctional Officers were motivated by a retaliatory animus. Plaintiffs must show a retaliatory motive for an adverse action. *Hartman v. Moore*, 547 U.S. 250, 259 (2006) (explaining plaintiff "must show a causal connection between a defendant's retaliatory animus and subsequent injury in any sort of retaliation action"). Plaintiffs' counsel have not explained why they believe correctional staff would retaliate against inmates for speaking to Plaintiffs' counsel regarding their health care. The correctional staff are not directly involved in providing medical, dental, or mental health care to inmates, and the Health Care Performance Measures do not apply to correctional staff.

Third, Plaintiffs have not presented evidence that any conduct has chilled the inmates' ability to speak to their attorneys. Plaintiffs have not identified any inmates who would not speak to them out of fear of retaliation. Defendants' counsel observed Plaintiffs' counsel during the tours, and Plaintiffs' counsel were able to speak with all inmates who were available to meet with them.

Finally, DW Monson's actions advanced "legitimate penological goals, including preserving institutional order and discipline." *See Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003) (quoting *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994)). As his email correspondence shows, DW Monson was trying to help inmates, correct various housing violations with staff, not intimidate against inmates.

Donald Specter
December 19, 2016
Page 7

**Conclusion**

Plaintiffs' claims are without merit.  Plaintiffs have not provided any evidence to support their claims.  Inmates regularly make false staff complaints to retaliate against staff, manipulate staff, and obtain what they want, such as a transfer to a more favorable cell or housing unit.  Therefore, Defendants cannot accept Plaintiffs' counsels' vague reports of intimidation and retaliation.

Defendants remain committed to ensuring inmates are not intimidated or retaliated against for speaking to their counsel.  If you receive any reports of alleged intimidation please immediately report:  (1) the name and ID number of the inmate alleging intimidation; (2) the name and position of the ADC staff member who allegedly intimidated the inmate; (3) a description of the words or conduct; and (4) the date, time, and location of the alleged words or conduct.  Plaintiffs' failure to promptly report any alleged intimidation or retaliation will impair Defendants' ability to investigate and take remedial action.

Defendants will not agree to the new relief requested in your November 8, 2016 letter, as it is inconsistent with the relief previously requested from the Court and unnecessary as there is no reliable evidence of intimidation or retaliation. Defendants agreed on November 2 that they would issue a memo to staff regarding zero tolerance for intimidation and retaliation and that no discipline would be issued to inmates at Rincon Housing Unit 3 during the tour.  Your November 8 letter requests relief that goes beyond what Plaintiffs' counsel had previously requested and what Defendants had previously agreed to.  Defendants will not agree to these new requests.

As you are aware, Defendants have already sent a notice to Tucson staff and the Tucson inmates at Rincon who were interviewed reiterating that ADC has zero tolerance for any intimidation or retaliation against inmates.

Defendants will agree to allow Plaintiffs' counsel to continue their tour in Tucson, but they will not agree to compensate Plaintiffs' counsel for their time and expense of the canceled Tucson tour.  Ms. Hardy stated on November 2 that Plaintiffs' counsel have already exhausted their budget for prison tours.  Plaintiffs' request for reimbursement of costs is an attempt to obtain additional money for more tours.  Plaintiffs' counsel unilaterally decided to cancel the second half of the second day of the tour.  Plaintiffs' counsel could have continued their tour in other units or even continued their tour in the units where they alleged there was intimidation and retaliation to obtain evidence to support their claims.  Despite Defendants' counsel's suggestion that they complete the tours, Plaintiffs' counsel chose to discontinue them.

Donald Specter
December 19, 2016
Page 8

      Finally, Defendants demand that Plaintiffs immediately withdraw the Motion for Contempt filed on December 14, 2016.  This issue is reminiscent of the legal mail issue that Judge Wake awarded Defendants sanctions as a result of Plaintiffs' refusal to withdraw.  If you do not withdraw by close of business on Wednesday, December 21, 2016, Defendants will seek fees for having to respond to the Motion.

      Please feel free to contact me if you would like any additional information or clarification.

      Sincerely,

      Daniel P. Struck

DPS/eap