UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Victor Antonio Parsons, et al,)
                              )
            Plaintiffs,       )        2:12-cv-00601-DKD
                              )
       vs.                    )        Phoenix, Arizona
                              )        January 11, 2017
Charles L. Ryan, et al,       )          10:07 a.m.
                              )
            Defendants.       )
_____)


BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

STATUS HEARING


Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CRR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

2

1                        A P P E A R A N C E S

2

3     For the Plaintiffs:

4                 Eidenbach Law, PLLC
                  By: KIRSTIN T. EIDENBACH, ESQ.
5                 PO Box 91398
                  Tucson, AZ  85752
6
                  ACLU
7                 By:  KATHLEEN ERIN BRODY, ESQ.
                  PO Box 17148
8                 Phoenix, AZ  85011

9                 Prison Law Office
                  By: DONALD SPECTER, ESQ.  (via telephone) and
10                     CORENE T. KENDRICK, ESQ.  And
                       RITA LOMIO, ESQ.  (via telephone)
11                1917 5th Street
                  Berkeley, CA 94710
12
                  ACLU - Washington DC
13                By: DAVID CYRUS FATHI, ESQ. (via telephone) and
                       AMY FETTIG, ESQ.  (via telephone)
14                915 15th Street NW, 7th Floor
                  Washington, DC  20005
15
                  Arizona Center for Disability Law
16                By: MAYA ABELA, ESQ. (via telephone) and
                       JESSICA PARI JANSEPAR ROSS (via telephone)
17                177 N. Church Avenue, Suite 800
                  Tucson, AZ 85701
18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

1                    A P P E A R A N C E S  (continued)

2

3    For the Defendants:

4              Struck Wieneke & Love, PLC
               By: TIMOTHY JAMES BOJANOWSKI, ESQ.  And
5                  ASHLEE B. FLETCHER, ESQ. and
                   DANIEL PATRICK STRUCK, ESQ. and
6                  RACHEL LOVE, ESQ.
               3100 W. Ray Road, Suite 300
7              Chandler, AZ  85226

8
               Office of the Attorney General – Phoenix
9              By: LUCY MARIE RAND, ESQ. (via telephone) and
                   MICHAEL GOTTFRIED, ESQ.
10             1275 W. Washington Street
               Phoenix, AZ  85007
11

12   ALSO PRESENT:

13             JENNIFER FINGER, Corizon (via telephone)

14             BETH SCHWARTZAPFEL – Marshall Project (via telephone)

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

4

1                           P R O C E E D I N G S

2                  (Proceedings resume at 10:07 a.m.)

3            THE COURT:  Thank you very much.

4            Please be seated.

5            I apologize.  It's seven minutes after 10:00, and

6    we've -- obviously I don't ever like to leave anybody waiting,

7    and I want to express my apologies.

8            Part of the reason for the delay was that there was a

9    lot to get through, and I've been inaccessible for a good bit

10   of the last 17 days.  I've been out of the country and in a

11   part of the world where the administrative office of the U.S.

12   Courts says that we shouldn't access our court files.  And so

13   for that reason, I -- the plane brought me back from Heathrow

14   to Phoenix last night at 9:30.

15           And so I've been working through much of that time and

16   have gotten enough of a grip, I think, on things that we will

17   advance the ball today, and that will be -- that will be

18   helpful.

19           But there will be certain areas -- certain things that

20   I have cabined off because I wasn't able to fully get into them

21   in the time preparatory to today's hearing.  So when -- when

22   those arise, again, I apologize for not being in the full

23   position that I would like to be, like to have been in, and you

24   all deserve.

25           I have a couple of initial things I want to say about

                     UNITED STATES DISTRICT COURT

5

1     framework --

2              MR. FATHI:  Your Honor, I'm very -- excuse me, Your

3     Honor.  I'm very sorry to interrupt.

4              THE COURT:  Yeah.

5              MR. FATHI:  This is David Fathi.

6              COURTROOM DEPUTY:  Judge --

7              MR. FATHI:  For those of us on the phone -- or at

8     least I am not able to hear.

9              THE COURT:  Oh.

10             COURTROOM DEPUTY:  Judge, it's my fault.  I'm sorry.

11             THE COURT:  Thank you, Mr. Fathi.  I haven't even

12    given the folks -- I'm just in prefatory comments now.  We

13    haven't really even called the case yet.  I just was giving

14    people a heads-up at the start.  But now having heard that

15    you've --

16             COURTROOM DEPUTY:  He's not on yet.  Just a moment.

17             THE COURT:  Okay.

18                     (Pause in proceedings.)

19             COURTROOM DEPUTY:  Can you all hear us now?

20                     (Pause in proceedings.)

21             COURTROOM DEPUTY:  Can you all hear us now?

22             UNIDENTIFIED WOMAN:  Yes.

23             COURTROOM DEPUTY:  Sorry, Judge.  That was my fault.

24             THE COURT:  That's all right.  We had a little bit of

25    a technical complication here.

                    UNITED STATES DISTRICT COURT

1          So what I was saying, Mr. Fathi -- and I thank you for

2    raising the point that you couldn't hear -- is that I have been

3    out of the country for the last 17 days, and I haven't been,

4    part of that time, able to access what you all have been

5    presenting.  And so since I arrived back to Phoenix last night

6    until now, I have done the best I can to catch up.  But there

7    will be certain areas where I haven't been able to be as

8    prepared as I'd like to be, and I'll let you know about those

9    areas and I'll address them in a written -- in a written order.

10          But there are certain things that I did want to say

11    about the framework of how I see things as we are here today.

12    And then I'll, of course, give you all a chance to say whatever

13    you wanted to say.

14          But I did start off by apologizing for being tardy in

15    starting this morning, and I just wanted to add to that initial

16    statement my apology for not being 100 percent prepared.

17          As I think maybe you've come to understand and rely

18    upon, I read every word that you submit.  And in this situation

19    I haven't read every word.  And I just wanted you all to -- to

20    know that and know that the circumstances of this travel meant

21    that I just couldn't do it.

22          But having said that, we will now call the case.

23          COURTROOM DEPUTY:  Civil case number 12-601, Parsons

24    et al. versus Ryan et al., on for status hearing.

25          THE COURT:  Would counsel please state their

UNITED STATES DISTRICT COURT

1  appearances for the record, starting with those in the

2  courtroom.

3          MS. KENDRICK:  Corene Kendrick, Kirstin Eidenbach, and

4  Kathleen Brody for prisoner plaintiffs.

5          THE COURT:  Thank you.

6          MR. STRUCK:  Dan Struck, Tim Bojanowski, and Rachel

7  Love for defendants.

8          THE COURT:  Thank you.

9          And who is on the phone, please.

10         MR. FATHI:  Good morning, Your Honor.

11         David Fathi of the ACLU National Prison Project, for

12  the plaintiffs.

13         MS. FETTIG:  Good morning, Your Honor.

14         This is Amy Fettig of the ACLU National Prison

15  Project, for the plaintiff.

16         MR. SPECTER:  This is Donald Specter and Rita Lomio

17  for the plaintiff.

18         MS. ABELA:  This is Maya Abela and Jessica Jansepar

19  Ross for the Arizona Center for Disability Law.

20         THE COURT:  Could you restate that, please.

21         MS. ABELA:  Yes.  Maya Abela and Jessica Jansepar Ross

22  for the Arizona Center for Disability Law.

23         THE COURT:  Thank you.

24         MS. RAND:  This --

25         MS. SCHWARTZAPFEL:  Your Honor, this is also -- oh,

                    UNITED STATES DISTRICT COURT

1    excuse me.

2            MS. RAND:  Oh, go ahead.

3            MS. SCHWARTZAPFEL:  Beth Schwartzapfel, a reporter

4    from The Marshall Project, is also listening in.

5            MS. RAND:  This is Lucy Rand of the Attorney General's

6    Office, for defendants.

7            MS. FINGER:  Jennifer Finger from Corizon Health,

8    listening in as well.

9            THE COURT:  Thank you.  Good morning.

10           All right.  So here's -- as I think it's fair to say

11   that -- that the case presents challenges on trying to make

12   sure that we're all on the same page with respect to how we

13   analyze compliance with the stipulation, the data that is

14   necessary for that analysis, and the resulting assemblage of

15   the information that can be used to deliver what the parties

16   agreed upon in the stipulation.

17           As I view it, one of the foundational levels that

18   needs to always be firm and established is the monitoring

19   manual.  And I am earnestly trying to give you the guidance

20   that you need when you can't agree on what something means

21   under the power that you gave me in the stipulation to further

22   define things when definitions are necessary.

23           And I think getting to this foundation requires me to

24   make these individual rulings, but also requires that we have,

25   at the end of -- at the end of the day or at the end of every

                    UNITED STATES DISTRICT COURT

1    given day, a common understanding about what the monitoring

2    manual is.  And so we will have a defined monitoring manual and

3    a process for revising the monitoring manual because defendants

4    have made the reasonable point that there are circumstances

5    that change and that the monitoring manual does need to be, in

6    their words, I think, a living document, and that that document

7    needs to be able to reflect that -- that life.

8         But it can't be just one-sided.  It needs to be

9    through a process, otherwise it just becomes whatever the

10   defendants wish at a given moment, and that it's too fluid,

11   really.

12        And so what we'll do is we'll set a process for us to

13   come to an understanding about what the current version is on a

14   given day, and that given day is subject to your -- me checking

15   with your calendars, but I'm going to propose that that given

16   day would be the 26th of January after a hearing in this

17   courtroom at which anyone can appear telephonically who wishes

18   to, rather than appear in person.  But my notion is that on

19   this day, the 26th, or an alternative if there are conflict

20   issues that mean we have to shift to a different day -- we will

21   come up with a -- a common understanding of what the

22   performance monitoring manual is.

23        After that, it can continue to live and to be a living

24   document, but only through a process that reflects a proposed

25   change, comment from the other side, and me making a decision.

UNITED STATES DISTRICT COURT

1    And I will decide what the current monitoring manual is, based

2    upon any of those proposed revisions.

3           Getting to that point of the 26th, I think there are

4    at least two issues that remain unresolved that I can give you

5    my decision on.

6           The first issue is, I think, with respect to what the

7    effect is of continuous monitoring for the actively suicidal

8    and actively psychotic.  And I have decided that I am going to

9    accept the defendants' position, that the record showing

10   continuous watch that is required by the defendants' own policy

11   for actively suicidal and -- actively suicidal can be used to

12   show compliance with this performance measure, subject to

13   plaintiffs being able to demonstrate that that is a failure

14   going forward because it is underinclusive with respect to

15   capturing everybody who should be monitored who is actively

16   suicidal and, therefore, a reason to think that acceptance of

17   the defendants' position would not be appropriate.

18          The second point that I -- has been greatly discussed

19   and briefed is the, what it exactly means with respect to when

20   the defendants contend that compliance has been achieved in a

21   group setting.  And I have looked at this and thought a lot

22   about it, and I'm -- I'm going to issue a written order that

23   explains the logic and rationale and the reasoning of why I

24   believe that in the context of providing medical management of

25   medication for mental illness, that that cannot take place

UNITED STATES DISTRICT COURT

1    under the stipulation in a group setting; and further, that

2    there are -- of the 14 performance measures that I think that

3    are at issue in this subcategory of what a group setting means,

4    that there are times where the stipulation guides us in terms

5    of the definitions and the exhibits, and there are times where

6    it doesn't provide that specific guidance.  But then the

7    information provided by the expert affidavits, as well as

8    common sense, suggests that you can understand that it doesn't

9    make -- it's not a legitimate position to say that the group

10   setting can satisfy the performance measure at issue.

11         As I cited already the example in particular, I do not

12   think that a group setting that is supposed to be confidential

13   where -- I mean, I don't understand -- well, it's where it's

14   supposed to be a confidential treatment process, I don't see

15   how that can happen in a group setting.  I've read the examples

16   and the arguments.  But again, we're talking about reality, and

17   it's not as if it's talking to the joint chiefs about an

18   upcoming plan and expecting that they all understand that

19   there's serious consequences if somebody divulges something.

20   Those kinds of serious consequences aren't present in this

21   context.  I just don't think that it works.

22         So that is one of the foundational layers that I hope

23   will allow us to go forward in a more constructive way.

24         The second foundational --

25         MR. FATHI:  I beg your pardon, Your -- may I ask a

1     question?

2          THE COURT:  Yes, yes.

3          MR. FATHI:  This is David Fathi.

4          On your ruling on performance measure 91, I wanted to

5     ask simply in light of the Court's introductory remarks if you

6     had had the chance to review the declaration of Pablo Stuart

7     that was filed yesterday.

8          THE COURT:  I believe I did.  Yes, I think I did just

9     this morning.

10         MR. FATHI:  Okay.

11         THE COURT:  Yeah.

12         MR. FATHI:  Okay.  Thank you, Your Honor.

13         THE COURT:  And the second foundational point is with

14    respect to knowing where we stand on what is supposed to take

15    place in this courtroom, as opposed to under the parties' own

16    working it out on a continuous basis of their disputes, and

17    then their formalized alternative dispute resolution mechanism

18    before Judge Bade.  There's a gap that continues to exist about

19    this Court, meaning me, knowing what has fully been exhausted

20    with respect to the ADR process and is ready for me to take a

21    handle of.  It's -- the minute entries from Judge Bade don't

22    link up specifically, nor do they necessarily need to.  But I

23    need to have that kind of information.

24         I can do it in, I think, one of two ways.  One, I can

25    require at the end of each of these mediations for there to be

1    a report, a joint report from the parties, on what issues they

2    believe have been resolved and what issues they believe have

3    been exhausted and are ready for presentment to me for

4    resolution.  That's one method.  Certainly going forward that

5    makes, I think, a lot of sense.

6         But there is also the issue of dealing with making

7    sure that we have all of our loose ends tied up with what has

8    gone before.  And I, again, could turn to the parties to come

9    up and tell me what they believe the current status is with

10   respect to all of the performance measures at issue.  If you

11   can file that and that is something that you think that you can

12   come together and work on that and produce to me, that's fine.

13        In the alternative, one thing that you could do also

14   is each side could pick a representative to contact my law

15   clerk who is very facile with spreadsheets and she could come

16   up with a spreadsheet that identified all the performance

17   measures and marked off where they stood in the process.

18        So I need to ask you to digest that and let me know

19   what your preference is, but I definitely need to be in a

20   position so I am completely on top of what is supposed to be in

21   front of me.

22        And then the third issue that I wanted to address is

23   the -- I don't know how to describe it generally other than to

24   say -- the mess that is reflected in both sides' reporting

25   about the access videos and electronic medical records.  Any

1    kind of careful analysis, meaning reading with care, what you

2    both are saying, and in particular what -- I mean, I'm not

3    saying that this is the issue that I addressed previously where

4    I thought you both made mistakes.  What I'm saying is that

5    plaintiffs are articulating what appears to be a mess to them,

6    and I have to say that I agree with respect to how these

7    reviews of the documents don't seem to match up.  And I don't

8    see how we can get to a determination that there's been

9    compliance when there just are these huge lacune in the

10   information that is supposed to be provided under the

11   stipulation with respect to these, the videos in particular.

12        And so I'm -- I'm of a view to think that the right

13   way to proceed is to simply say, where there are these deficits

14   in data that are simply supposed to be provided under the

15   stipulation, that those would be deemed not compliant and they

16   be counted as not compliant.  Again, the mess part of it is --

17   on the plaintiffs' side -- is I cannot, from what I've read --

18   because you haven't told me exactly which ones that you think,

19   the plaintiffs think, are the ones that link up with particular

20   performance measures, particular facilities, and particular

21   dates.  If the plaintiffs will provide for me these dates,

22   facilities, and performance measures where they believe, as I

23   think they have demonstrated, that there is the absence of the

24   required information that needed to be produced, then I would

25   deem that those would be noncompliant.  But I need to have that

UNITED STATES DISTRICT COURT

15

1    from the plaintiffs to do so.

2              MR. STRUCK:  Your Honor, may I interrupt for a second?

3              THE COURT:  Yes.

4              MR. STRUCK:  I just want to make sure I understand.

5              Are you talking about the use of force videos?

6              THE COURT:  Yes, yes.

7              MR. STRUCK:  I think that Rachel Love and Amy Fettig

8    are working on that issue.  They had -- they've had several

9    discussions about it the last few days.  So Ms. Love might be

10   able to fill you in, or Ms. Fettig might be able to fill you

11   in.

12             THE COURT:  All right.  I'll hear from both of you

13   then.

14             MS. LOVE:  Your Honor, yesterday Ms. Fettig and I had

15   a conversation regarding plaintiffs' request for use of force

16   videos.  And she and I discussed that I'm going to be taking

17   the reins, so to speak, on that issue, getting my head around

18   what so far has been produced, not produced, where we're at,

19   and then I will report to Amy and we will come up with a plan

20   on that.  And she was agreeable, just in theory of where we're

21   going forward.  But that's -- it is an issue that Amy and I

22   agreed that we will work on together.

23             THE COURT:  Okay.

24             Ms. Fettig, anything you wanted to add?

25             MS. FETTIG:  Yes, Your Honor.  Thank you.

                    UNITED STATES DISTRICT COURT

1          Ms. Love and I did have an initial discussion in which

2     we indicated that we were going to take a look at this.  Of

3     course, our concern remains that it may not be resolvable.  We

4     are willing to work with defendants to try to resolve this

5     issue.  But we agree with the Court that if it can't be clearly

6     resolved, then noncompliance must be found here.  And we -- we

7     would certainly be willing to provide the Court with dates,

8     facilities, and performance measures that we are concerned

9     about regarding the existing evidence -- or the conflict within

10    that evidence.

11         THE COURT:  All right.  So you'll move forward.

12    You'll see if the new wrangler at the reins makes a difference,

13    and report to me if plaintiffs think that it hasn't.

14         Okay.  Thank you for interrupting me.  I appreciate

15    that, Mr. Struck.

16         And then --

17         MS. RAND:  Your Honor?

18         THE COURT:  Yeah, go ahead.

19         MS. RAND:  This is Lucy Rand from the Attorney

20    General's Office.

21         I wanted to also clarify that some of these videos

22    that plaintiffs are disputing are secondary videos, such as

23    we've already produced the video but they are unhappy with the

24    video that we produced.  And so because we're not producing --

25    (interruption in telephone connection) -- that's why we didn't

                    UNITED STATES DISTRICT COURT

1   produce that video.  I don't feel that the defendant should be

2   held as noncompliant for not producing a video that plaintiffs

3   don't feel is sufficient, even though we've produced the video

4   that was available.

5          MS. FETTIG:  Your Honor, this is Amy Fettig.

6          That's actually not the issue, as we explained in our

7   briefing.  It's the confusion over the production of videos

8   that aren't mentioned and it's the confusion over videos that

9   we noticed, the handheld videos that are insufficient videos.

10  It's the contradiction within the documents that we can't make

11  sense of.

12         And we've asked the defendants to go through --

13  especially in light of Ms. Rand's comments that some of the

14  videos produced were not actually used by the monitors in

15  compliance monitoring.  What we want is an accounting of what

16  videos were used in compliance -- in compliance measures, and a

17  declaration thereof.  Essentially where we are now is the

18  morass of the video production, compared with the written

19  documents, makes it very impossible for us to actually know

20  what the monitor looked at when making his or her compliance

21  findings.

22         So this is a clarification issue.  It's not that we're

23  unhappy with the videos that were produced.  We are -- we're

24  unhappy that we're finding contradictions within the documents

25  and contradictions by statements by counsel about what was or

UNITED STATES DISTRICT COURT

18

1    was not used in the compliance finding.

2           THE COURT:  And Ms. Rand, you can have a chance to

3    respond.

4           But exactly that was my observation, as well, that

5    there just didn't seem to be a linkup; and, in fact, there

6    seemed to be obvious errors.  And so it's not a satisfaction

7    issue, it's a completeness and rigor issue, I think.

8           MR. STRUCK:  And that's what we're working on, Your

9    Honor.

10          THE COURT:  Okay.  All right.

11          And now, "working on," nice segue.  The October

12   numbers, again, don't look good.  And, you know, there are

13   prefatory excuses that are offered in your reporting of those

14   that, again, are kind of surprising to me because they're

15   mostly about, you know, we're in process, getting along the

16   way.  It seems like we're way into the process and it should

17   have been much farther along.

18          So I guess I have to continue to observe that I think

19   that the -- this is not going well, and that the -- it's likely

20   to be reporting worse based upon my rulings on what is deemed

21   compliance.  And so I don't know whether it's right for me to

22   address that presently, but I'm -- again, I raise the concern

23   that the numbers don't look good.

24          MR. FATHI:  Your Honor, this is Dave Fathi.

25          We would, as we set forth in my declaration, at some

                    UNITED STATES DISTRICT COURT

1    point today like to specifically address the numbers on

2    performance measure 94.  But we're happy to do that whenever --

3              THE COURT:  You can do so now.

4              MR. FATHI:  Okay.  Thank you, Your Honor.

5              Performance measure 94 involves the requirement that

6    patients who are on suicide watch be seen once a day.  And

7    several months ago the Court found the defendants noncompliant

8    on that measure at the Eyman, Florence, and Tucson facilities,

9    and ordered the defendants to come up with a remedial plan.

10   That was document 1709, an order filed October 7th.

11             The defendants did come up with a plan.  At the

12   November 9th status hearing, the defendants asked the Court for

13   an additional 60 days to see if their remedial plan would, in

14   fact, address the continuing noncompliance on performance

15   measure 94 at those three -- at those three facilities.

16             Now, the defendants have in their latest filings with

17   the Court, documents 1839 and 1849, showed October 2016 figures

18   that purport to be compliant.  But those figures were

19   calculated using the defendants' newly-minted partial credit

20   methodology, which the Court invalidated in its order of

21   December 14th.

22             And as we set forth in my declaration, if you -- we'd

23   actually set forth the CGARs so the Court -- we appended the

24   CGARs so the Court could see it.  If you use the correct

25   methodology, the methodology that the Court ordered and the

1      methodology that had previously been used throughout the course

2      of the stipulation, then those numbers -- the October 16

3      numbers are noncompliant on performance measure 54 -- excuse

4      me, performance measure 94.  They are 55 percent at Eyman,

5      70 percent at Florence, and 40 percent at Tucson.

6              And so in light of the continuing noncompliance, we

7      would ask the Court to extend its November 10th order, the

8      order requiring use of community resources, to performance

9      measure 94 at those three facilities.

10             THE COURT:  All right.

11             Mr. Struck, on your side?

12             MR. STRUCK:  Your Honor, we -- we have reported that

13     the numbers in the October -- for the October -- and obviously

14     those numbers were prepared prior to the Court's order on

15     December 14th.  I haven't gone through or we haven't made a

16     determination as to whether the numbers Mr. Fathi just threw

17     out with respect to Eyman, Florence, and Tucson are accurate.

18     But we would like an opportunity to do that, to find out, you

19     know, what the level of compliance is.  But, you know, this

20     idea that, you know -- and again, we've -- we've filed a

21     motion, you know, a Rule 60 motion with respect to this idea

22     that these people are to be sent out to community -- when

23     you're talking about prisoners on suicide watch or mental

24     health watch, that -- that's really not all that practical.

25     Sending them out to a hospital to see a psychiatrist, it --

UNITED STATES DISTRICT COURT

1    it's -- it creates all sorts of problems, and I think we --

2    that we've set forth in our Rule 60 motion.  But I would --

3               THE COURT:  Well, the stipulation says they have to be

4    seen daily, and the -- the Court's rejected the methodology of

5    what you said could constitute being seen daily for some of the

6    inmates at most at risk, I think.  And again, I don't like the

7    idea of sending somebody out, but they need to be seen by a

8    mental healthcare practitioner with the appropriate skills to

9    address their needs pursuant to the plain language of the

10   stipulation.  And I have no reason to doubt what Mr. Fathi said

11   is likely to be true.  I mean, his calculation -- again, I

12   don't know that it's true, but I have no reason to doubt it --

13   in fact, likely to think that it's true -- because he knows

14   what the factors are in the formula and he knows that I'm going

15   to be looking at it afterwards.  And so he's probably unlikely

16   to say on the record that it's 55 percent.  And we've got to do

17   something about that.

18               MR. STRUCK:  Well, Your Honor --

19               MR. FATHI:  May I respond --

20               MR. STRUCK:  -- it's my understanding that the

21   November numbers are compliant.  Those numbers -- are they

22   preliminary or are they final numbers?

23               (Discussion was had off the record.)

24               MR. STRUCK:  All right.  They're final.

25               THE COURT:  Using my definition?

UNITED STATES DISTRICT COURT

1          MR. STRUCK:  Using your definition --

2          THE COURT:  All right.

3          MR. STRUCK:  -- they are compliant.

4          THE COURT:  All right.  So that's --

5          MR. STRUCK:  We would like on opportunity to produce

6   that to the Court and plaintiffs before we go to the extreme

7   measure of talking about sending people out.  And practically

8   speaking, I really don't understand how that would work.  I

9   mean, where we've got --

10          THE COURT:  It works for most people in society.

11          MR. STRUCK:  Well, except --

12          THE COURT:  That's what happens.

13          MR. STRUCK:  Except, you know -- all right.  So we

14   have somebody that --

15          THE COURT:  If they go -- they have a mental crisis

16   and they are either admitted into an inpatient facility where

17   they are seen, I would suspect, every single day, which is what

18   the stipulation calls for.  That's what happens for most of the

19   people in society when they have this kind of extreme

20   situation.  They are admitted to someplace and -- where they're

21   seen.

22          Now, you don't have the people in your facility

23   apparently to see these people every single day.  I'm saying

24   the alternative is to get them admitted to someplace where they

25   can be seen every day.  That's what the stipulation calls for.

                    UNITED STATES DISTRICT COURT

1    That's what I'm ordering.  That's what I've ordered, that's

2    what you appealed, that's the stay that I've denied.  That -- I

3    would like to know whether you have asked the Ninth Circuit for

4    a stay, whether you've heard back from them, because I haven't

5    had my hands tied by them yet, and they, of course, have the

6    power to do that --

7            MR. STRUCK:  Sure.

8            THE COURT:  -- and I must, as they expect that I must,

9    act as I believe is correct until they tell me that they are

10   going to grant the stay.  That's how our system works.  They

11   expect me to go on and to do my work until they tell me that

12   they should tie my hands.

13           MR. STRUCK:  I just want to make sure I understand the

14   Court's order on this.

15           We have -- say we have 100 SMI inmates.  Ninety-nine

16   of them are seen every day; one of them is seen 29 days.  Under

17   your order, that particular inmate has to be sent out to an

18   inpatient hospital?

19           THE COURT:  Well, here is how -- I thought I explained

20   this over the past.

21           The stipulation requires a performance measure that is

22   measured by certain percentages.  Those percentages, if they're

23   not met, are the alarm bell that tell me that the system is not

24   working.  And it's not that I will say the world now changes

25   and that everything you have to do is -- means you have to take

UNITED STATES DISTRICT COURT

1    a focus of it that is designed to deliver something that the

2    stipulation doesn't require, and that's 100 percent compliance.

3         But when I see compliance below the required level, I

4    have to take an action.  And the action is, get these people

5    seen.  Now, if that results in what you're talking about, if

6    that's the necessary measure to get us to the point of meeting

7    the percentage requirement of the stipulation, then that's

8    where we are.  That's the power that I -- that I have.  And so

9    your question is really not pertinent to what I do, because

10   there are two different systems.

11        MR. STRUCK:  And I understand.  I'm just trying to

12   understand with respect to -- we obviously don't want to be in

13   contempt of the Court's order, and so --

14        THE COURT:  Well, I mean, if I order you to -- to --

15   if I determine that your remediation proposal is insufficient,

16   I then make my own.  And my own is that you need to have these

17   people seen by somebody outside who can provide this service.

18        If in the next month we see a performance measure

19   satisfaction above the percentage level, there will -- there

20   will be some number of people, perhaps, who were not captured

21   within the -- who didn't receive the service the performance

22   measure required.

23        However, if there is a failure to meet the performance

24   measure, if you continue in the next month after I've ordered

25   you to take this extra step, and you continue to be below, then

1    I would take the next step of saying, well, it looks like we're

2    going to have to have every single one of the people doing this

3    because that's apparently all that's going to be able to --

4    that's the only way we will accomplish this.

5           Again, I'm not trying to force you to do something

6    that's unworkable.  I'm trying to deal with what -- the

7    mechanism I have, understanding that it's not that every single

8    one of the people have to have this service.  You have to meet

9    the performance measure.  I see the percentage, and I see a

10   failure in the percentages, and then I take steps.  If you get

11   an order from me to do something additional and you produce a

12   further failure, then you could get in a situation where I

13   would say I'm left with no alternative but to wonder why it's

14   not happening, and so then I guess it simply means every single

15   person has to be, because apparently something short of that

16   doesn't work.

17          Does that help?

18          MR. STRUCK:  I appreciate the clarification, Your

19   Honor.

20          THE COURT:  Okay.

21          MR. FATHI:  Your Honor, may I respond?

22          THE COURT:  Yes, you may.

23          MR. FATHI:  This is David Fathi.

24          The defendants seem to think that the Court's order --

25   the Court's orders are just interesting suggestions that they

1    can disregard at will.

2         The Court ruled on December 14th that the partial

3    credit method is invalid and impermissible, and yet since that

4    ruling the defendants have not once, but twice, submitted to

5    the Court figures that were calculated using that same

6    impermissible method.  And again that's documents 1839 and

7    1849.

8         Now, I think the Court said a few hearings ago that at

9    some point the rubber has to hit the road and the Court has to

10   enforce the stipulation.  At the November 9th hearing,

11   Mr. Bojanowski said that the defendant's remedial plan for

12   performance measure 94 went into effect in April and May of

13   2016.  That's at page 22 of the transcript.  He asked for an

14   additional 60 days to see if those remedial plans would

15   eventually work.  And the Court agreed to give them 60 days and

16   said we'll look at the data again the second week of January.

17   That's the -- that's page 25 of the transcript.

18        They've had their 60 days, and their latest compliance

19   figures, as I said, show that they remain out of compliance, in

20   some cases far out of compliance on performance measure 94 at

21   all three facilities:  Eyman, Florence, and Tucson.

22        So again, we ask that the Court extend its

23   November 10th order to performance measure 94 at those three

24   facilities.

25             THE COURT:  Well, here's what we'll do.  We'll have

                    UNITED STATES DISTRICT COURT

1    Mr. Struck provide the Court and the plaintiffs by the close of

2    business tomorrow with the November performance measure

3    compliance for performance measure 94 at these facilities, and

4    we'll see whether or not they're in compliance.  And you'll

5    have an opportunity to file as quickly as you'd like to, and

6    I'll pay quick attention to it.  If it looks like we are not in

7    a situation to think that under the method that I now have put

8    in place where partial credit doesn't work, that they are in

9    compliance or not, we'll know by the end of business tomorrow

10   night.

11           Can you do that, Mr. Struck?

12           MR. STRUCK:  Yes, Your Honor.

13           THE COURT:  Okay.

14           MR. FATHI:  Thank you, Your Honor.

15           I would just ask that at some point these endless

16   extensions come to an end.  Mr. Bojanowski asked for 60 days.

17   We are now well beyond that.  And again, we believe that the

18   point must come when the Court will take further action to

19   enforce the stipulation.

20           THE COURT:  Well, I appreciate that, Mr. Fathi.  But

21   also you should appreciate the fact that I have to focus

22   resources, limited resources.  And when I hear somebody telling

23   me that they are in compliance for the current month, and that

24   I give them 24 hours to show that that's true, that that is

25   maybe a proven husbanding of resource, and I have to give it a

UNITED STATES DISTRICT COURT

28

1      shot.

2              MR. FATHI:  Understand, Your Honor.

3              THE COURT:  All right.

4              Okay.  Give me just a moment to get back on my track.

5              MS. KENDRICK:  Your Honor?

6              THE COURT:  Yes.

7              MS. KENDRICK:  Just one quick question.

8              Your order in December about the partial credit also

9      implicated performance measure 66, which is about infirmary

10     care.  And that is another measure you had found previously

11     noncompliant.  And the more recent data is showing 100 percent,

12     90 percent, 92 percent.

13             So we would like to ask that that --

14             THE COURT:  That question, that's a reasonable

15     question.

16             Mr. Struck, do you know the answer to that question?

17             MR. STRUCK:  I do not know the answer to that

18     question.

19             THE COURT:  Can you also let the plaintiffs and the

20     Court know by end of business tomorrow?

21             MR. STRUCK:  Yes.

22             MS. KENDRICK:  Thank you, Your Honor.

23             THE COURT:  Well, let me then turn to the respective

24     parties.  Try to bring to light what you feel that you need me

25     to address today, understanding that I'm going to ask

                      UNITED STATES DISTRICT COURT

1       Mr. Struck now that -- have you asked the Circuit for a stay,

2       by the way?

3               MR. STRUCK:  We have not yet, Your Honor.

4               THE COURT:  All right.  Okay.

5               And I'm going to extend -- accept the stipulation of

6       1848, the stipulation to extend plaintiffs' time to reply.

7       I've also granted 1853, the motion to seal the CGAR data; and

8       1843, Mr. Struck's declaration.

9               MR. SPECTER:  Your Honor, this is Donald Specter.

10              THE COURT:  Go ahead, sir.

11              MR. SPECTER:  I was just wondering if we could have

12      a -- if you would be inclined to grant a sort of universal

13      order to seal certain documents so we don't have to keep asking

14      you to sign these orders every time we file a declaration.

15              THE COURT:  I don't know whether that works

16      functionally with our clerk's office.  But if there is a way,

17      Mr. Struck -- Mr. Struck, if you would get on the phone

18      sometime with Mr. Specter, or a designee of either of you, with

19      the clerk of my court and present what Mr. Specter has in mind,

20      and if there's a way that that can work -- because there is

21      some -- obviously our courts are open courts, but where there

22      is a substantial showing of an overriding interest, and the

23      overriding interest is the privacy interests of the plaintiffs'

24      class in their healthcare records -- and that's been respected

25      repeatedly by the entry of the Court's order sealing.  That is

1    as limited as it can be because we're only limiting it to the

2    requested medical records, and so we're making sure that almost

3    everything we do is in public as required.  And it would seem

4    to me that the reasons that the Court has now articulated for

5    that sealing would be the sufficient explanation on the record

6    to satisfy the constitutional requirement for having written

7    findings, if there is a way that there can be a mechanism for

8    these routine filings of private medical information about the

9    plaintiffs' class to be sealed in a way that doesn't require an

10   individual order, that simply just requires additional,

11   unnecessary expense, I'm accepting of that.  But I do need you

12   to check with the clerk to see if there is a mechanism by which

13   it can work.

14          MR. STRUCK:  Certainly.

15          THE COURT:  Thank you.

16          I guess there are a couple of things that remain on my

17   list before I turn to you all and ask if there are other things

18   on your list.

19          You have again raised the issue of the tours,

20   Mr. Struck.  I don't think we need the tours.  We've -- I've

21   been there, the Court clerk staff has been there.  Anything

22   that is -- with respect to satisfying a performance measure, it

23   seems to me that that's mostly in the data and not in the

24   environment.  And so I am -- I think I understand the

25   environment, but if there's something that you think is

UNITED STATES DISTRICT COURT

1    different than that, I think it would be more efficient for you

2    to provide a video, and I'll take a look at the video rather

3    than making a trip to the facility.

4              MS. EIDENBACH:  Your Honor?

5              THE COURT:  Yes.

6              MS. EIDENBACH:  With respect to defendants providing a

7    video, if they choose to do that, plaintiffs would like to be a

8    part of that process, just to make sure that that video is

9    actually an accurate representation of what -- of the act -- of

10   the facilities.

11             THE COURT:  Well, presumably you would be able to

12   challenge the foundation of any such video --

13             MS. EIDENBACH:  Okay.

14             THE COURT:  -- so I don't know that you need to be a

15   part of it.  But if you think that it's misrepresentative in

16   some way, because I'm gathering you're intimately familiar -- I

17   mean, that's part of the mechanism here.  You all are supposed

18   to, to a certain extent, be the ones on the ground more so than

19   me because you can have contact with your clients, and that's,

20   I think, important.  And so because that contact occurs within

21   the facilities, I think you'll have the familiarity to be able

22   to point out if there are any issues.

23             MS. EIDENBACH:  That sounds perfect.

24             Thank you.

25             THE COURT:  Well, for now, as I look through my

                    UNITED STATES DISTRICT COURT

1    agenda, I think I've addressed what I wanted to raise with you

2    all.  But there maybe are things that I didn't address that you

3    expected me to, or things that you would like to raise.

4         So I'll turn first to plaintiffs for anything

5    additionally that you'd like to raise now.

6         MS. KENDRICK:  Yes, Your Honor.

7         We'd like to talk about the issue of defendants'

8    compliance with the Court's November order.

9         They have now twice presented to you something they

10   referred to as the open clinic concept.  And as you may have

11   seen in the filings with our agenda yesterday, we have tried to

12   meet with them to determine how this open clinic concept

13   addresses the deficiencies in all nine of the performance

14   measures that are subject to your November order.  And to date,

15   we have not been provided any sort of documentary evidence

16   about what steps they are taking to comply with basically the

17   eight others that don't involve the sick call line.

18        THE COURT:  Well, Mr. Struck said he wanted to make a

19   presentation to the Court about the open clinic, and I must say

20   that based on what has been presented, I also did not

21   understand actually how it was -- how it worked.

22        Is this a good time that you would like to do that,

23   Mr. Struck?

24        MR. STRUCK:  Sure.  We can.  And I will say, the

25   plaintiffs had an opportunity last week, they were at Lewis

UNITED STATES DISTRICT COURT

1    facility for two days and they actually got to see how the

2    clinic concept worked.

3         Essentially, it -- it is a -- in the past, the way an

4    inmate had been able the access medical care, this is through a

5    health needs request form, and they would fill out a form.  And

6    if they had multiple problems, sometimes they'd fill out

7    multiple forms.  And sometimes they would fill out a form

8    multiple times for the same issue.  And that was what was

9    creating a lot of the backlog with respect to actually getting

10   these folks seen.  It was the dealing with the paperwork.

11        And so in order to expedite their access to actually

12   see a medical provider, the decision was made to kind of do --

13   not necessarily do away completely with the HNR process, but in

14   minimum, medium, and closed custody units, they are all given

15   times in which they can actually just go down to the medical

16   unit with -- with an HNR in hand and actually be seen by an RN

17   to determine what the problem is, whether it's emergent,

18   urgent, or routine, when they need to see a follow-up, if they

19   need to see -- provide the follow-up with a provider.  And

20   that's actually working very well.  There's no medical backlog

21   at all with respect to the inmates being able to access care

22   like there was before.

23        When we were down at the Lewis unit, we were in, I

24   think it was, the Barchey Unit, and there was -- they see five

25   to 10 patients a day.  And they -- and it -- you know, by all

UNITED STATES DISTRICT COURT

1    accounts, it's working very well.  It just -- it's kind of

2    reducing some of the administrative paperwork and giving the

3    actual patients immediate access.  So that -- that's

4    essentially how it works.

5            Yeah.  I mean, it's -- like if you -- if you had a

6    problem and you wanted to go to Urgent Care, you could go down

7    to it.  And that's what -- that's what's being provided to

8    them.  And if it's an urgent or emergent situation, then the

9    provider can see them much more quickly, and there's not so

10   much of this administrative paperwork which seems to have been

11   a lot of the problem with respect to being able to -- these

12   folks being able to actually access medical care in a timely

13   fashion.

14           The plaintiffs have asked about some of these other

15   performance measures.  I think -- it's my -- it's my

16   recollection we reported on some of these -- on performance --

17   on how the performance measures are doing.

18           THE COURT:  So I gather the problem the plaintiffs

19   have, though, is there's no way to test whether this is

20   satisfying the performance measures.

21           Is there documentation problems?

22           MR. STRUCK:  I'm not sure what documentation

23   problems --

24           THE COURT:  No, that's not the issue.

25           MR. STRUCK:  I think that they're talking about --

                    UNITED STATES DISTRICT COURT

1      THE COURT:  No, let me ask of you --

2      MR. STRUCK:  Okay.  Go ahead.

3      THE COURT:  -- what is the issue?

4      MS. KENDRICK:  So the issue, Your Honor, is there's

5  nine performance measures covered by your order.  And what this

6  does is it addresses performance measure 37, which is that the

7  prisoner must see an RN within 24 hours of the receipt of the

8  HNR.

9      THE COURT:  Uh-huh.

10      MS. KENDRICK:  And we went and we saw that, and we

11  talked to our clients who reported, yes, we now are seeing the

12  nurse either the same day or the next day.  That's great.  The

13  problem is that it's robbing Peter to pay Paul.  So now what we

14  are seeing both in the medical records and from speaking with

15  our clients is that it just pushes the problem off.  Yes, I get

16  to see the nurse the same day.  But anything more complicated

17  than getting the Benadryl or a bandage changed, you need to see

18  somebody with a higher level of training.  An RN is not allowed

19  to change medications.  An RN cannot do diagnostic

20  examinations.  So it's just pushing the problem down.

21      And from looking at both at the CGARs and looking at

22  some of the reports we got before going to Lewis and speaking

23  with our class members, it appears that there are still very

24  long backlogs in seeing providers, there's not enough providers

25  for the number of people and for the medical needs at an

UNITED STATES DISTRICT COURT

1    institution, and there are hundreds of requests for outside

2    specialty care that are pending, either review by Corizon's

3    corporate headquarters, utilization management, or are pending

4    being scheduled.

5           So, yes, we are happy that our clients are seeing the

6    nurses now, it appears, generally within 24 hours.  We're very

7    happy about that.  We're glad they came up with a solution and

8    a way to comply with your order.

9           Our concern is that there are still eight other

10   performance measures that we have no idea; how are they

11   addressing performance measure 13 about medication renewals,

12   how are they --

13          THE COURT:  Well, what we know though --

14          MS. EIDENBACH:   -- addressing --

15          THE COURT:  What we know is that performance measure

16   is, as you say, is being robbed.  And if we see -- I mean, if

17   we see a failure to comply, a percentage of them, we'll address

18   that.  But won't we -- you said you have no idea.  We will

19   know, won't we?

20          MS. KENDRICK:  Well, the other concern that we have,

21   and that we were unable to get really a clear answer about when

22   we were there, is the nitty-gritty operation of the --

23   accepting the HNRs.  And we've been told about something that

24   they called a dashboard to track all the people that came in

25   that wanted to be seen by the nurses.  And it became unclear

1    because it turned out it was just an Excel spreadsheet where

2    the nurses would list who they saw that day.

3              So there is some concern that if people are trying to

4    submit HNRs or are submitting HNRs outside the narrow window --

5    because we also discovered at the institutions it's not

6    7:00 a.m. and 7:00 p.m., you can come any time -- that those

7    people may not be getting counted.

8              THE COURT:  Well, if there are no HNRs, Mr. Struck,

9    how are we going to evaluate whether there's satisfaction of

10   this performance measure under the monitoring guide?

11             MR. STRUCK:  Because they do walk in with an HNR.

12   They have it in hand.

13             THE COURT:  I see.

14             MR. STRUCK:  They have it in hand.

15             THE COURT:  All right.  So we have that document.

16             MR. STRUCK:  Right.  And they, of course, close -- in

17   max custody, the HNR system is still in place because they

18   don't have access to the medical unit like that.

19             But I will say that this is -- Ms. Kendrick's

20   statements regarding the things that she learned when they went

21   out to Lewis is the first that we've heard about it.  It's my

22   understanding there is no 14-day provider backlog.

23             You know, this all was implemented on December 5th,

24   which was prior to the date in which your order took effect.

25   And so we will certainly have the December -- the December

                    UNITED STATES DISTRICT COURT

1    numbers, you're right, will -- they will prove whether or not,

2    you know, this is working or not.  It's our understanding --

3    it's my understanding that it is working, that there aren't

4    these backlogs that are being suggested.

5          With respect to some of the performance measures that

6    this necessarily wouldn't cover, one of them would be

7    performance measure number 11 regarding medications.  It's my

8    understanding that that -- they were using local pharmacies

9    when the medication is not available, the Walgreens.  They

10   have -- they have contracts with Walgreens, and that would

11   affect number 11 as well as performance measure 13.

12         And with respect to some of these other performance

13   measures, we can even go back to the October numbers on, say,

14   performance measure 54 and see that every single facility is

15   passing, even in October, which was prior to when your order

16   took effect.  And so that would be indicative that the remedial

17   measure that was put in place is working.

18         The same with 66, with 80, and then 85, with the

19   exception of Lewis in October, were all in the 80 to 90 to even

20   100 percent passing.

21         So -- and that's also true for 92, 93, 94, although

22   we're have ing -- we're going to have to go back and -- or

23   we're going to have to calculate some of those differently

24   based upon the Court's December order regarding how the

25   monitoring is actually supposed to be done.

                    UNITED STATES DISTRICT COURT

1          So we think this is a very positive step forward.

2     It's reducing a lot of the admin -- because a lot of these

3     problems were caused just by paperwork issues.  And the

4     important thing is that these folks are being seen and treated.

5     And that's what we all want.  And so if we're -- you know, if

6     they're not passing these performance measures because people

7     aren't being seen due to administrative process, eliminating

8     some of these administrative process so they can be seen

9     quicker seems to be a step in the right direction and a very

10    positive thing that is being done by Corizon and ADC.

11         And I think -- I -- I went out -- I was at the Lewis

12    tour, as well, and it was -- it appeared to be working very

13    well, from what I could see, and I was with plaintiffs' counsel

14    the whole time.  Obviously I wasn't with them when they were

15    talking to their clients, but it was -- it -- by all

16    appearance, working very well.  And that's one of the reasons

17    why, you know, we had suggested that maybe -- because I know

18    that you've toured the prisons before, but maybe when you did

19    it, it wasn't, you know, specifically addressing medical-type

20    issues.  It was probably maybe more of a general tour --

21         THE COURT:  No, we spent a considerable amount of time

22    in the medical facilities, and also you've done an able job of

23    describing what you understand the open clinic is.  And so the

24    proof will be in the pudding with the numbers.

25         MR. STRUCK:  Right.

                    UNITED STATES DISTRICT COURT

1          THE COURT:  So we'll see.

2          MS. KENDRICK:  So, Your Honor, just two points.

3          First of all, with this performance measure, I don't

4     know if I articulated it clearly, but the concern about what

5     HNRs they're looking at is that they don't have the full

6     universe.  They're not going to have the ones that are turned

7     away.  They're just going to be counting who came in, who was

8     seen.  And so we do have some concerns and reservations, and I

9     think that's something -- if I can finish -- something that we

10    may need to work with together in terms of the whole

11    methodology issue down the line is, in light of the fact that

12    they have changed the structure so much, the way that this

13    performance measure is monitored may need to be modified.  So

14    that's the first thing.

15         THE COURT:  So you're saying that somebody who

16    prepares an HNR that they're bringing with them to this open

17    clinic, if the open clinic hours are closed, then there's no

18    way for that to be logged in as an unresolved HNR.  Is that

19    what you're saying?

20         MS. KENDRICK:  Correct, Your Honor.

21         THE COURT:  All right.  Is that a possibility to

22    occur, Mr. Struck, under the current --

23         MR. STRUCK:  No.  The only possibility would be if

24    there was some sort of an emergent situation, in which case

25    they would be seen.  An emergency would be called and they

UNITED STATES DISTRICT COURT

1   would be seen by a healthcare provider.  People aren't turned

2   away at these clinics.  They -- they are -- they're all aware

3   as to when they're open.  I mean, they're essentially running

4   7:00 a.m. to 7:00 p.m., but they're open at certain times for

5   units because they can't -- they won't mix housing units.  So

6   they know when they can be seen.

7          Nobody is being turned away.  I'm not sure what

8   Ms. Kendrick is talking about, but we'd certainly be happy to

9   work with them to try to alleviate any of their concerns with

10  respect to this issue.

11         MS. KENDRICK:  We just -- we spoke with several

12  clients who reported that that had happened to them because

13  whether it was on the closed unit, the nurse is in building 1

14  in the morning and then he's in building 2 in the afternoon.

15  So if you're in building 1 and you don't get to them in the

16  morning, in the afternoon you're told, well, it's building 2's

17  time.  And they may try to squeeze them in.  The nurse had said

18  they try to squeeze them in.  The prisoners reported to us that

19  they do try to squeeze them in.  But there is some concern that

20  there may be this -- this spillage of HNRs that aren't being

21  captured.

22         And so I think that's just something I want to flag

23  for you and for defendants, that we may need to work together

24  on the methodology there.

25         The second point, I just would ask that defendants

UNITED STATES DISTRICT COURT

1    provide the parties and the Court with some sort of written

2    documentation and sworn declarations explaining how they

3    believe these other performance measures are going to be in

4    compliance with your order.  We still don't quite understand

5    how, having open sick call line every morning, every day, is

6    going to address things like providers review specialty reports

7    within X numbers of days.

8            THE COURT:  It doesn't seem like it will.

9            MS. KENDRICK:  Right.

10           THE COURT:  So if that number falls off, again -- I

11   mean, right now there is an order in place, assuming, without

12   having it in my head directly, that this was one of the

13   performance measures that I addressed where there was a failure

14   to comply at the required percentage, and I ordered that that

15   be met by making sure that an outside provider was providing

16   the service, assuming this is one of those; and assuming then

17   that the next report shows yet again a failure of compliance at

18   the reportedly, then I would address it again and I would say:

19   What have you done; who have you taken to be seen?  Why are

20   these numbers not changing?  And I would have a dialogue that I

21   think nobody would expect that any explanation of the new open

22   clinic would have satisfied that because it's not -- it's not

23   the tertiary.

24           MS. KENDRICK:  Right.  Our position though, Your

25   Honor, is that your order went into effect on December 10th.

                    UNITED STATES DISTRICT COURT

1    And so while the CGAR data is significant, this -- your order

2    is kind of almost beyond the stipulation.  And so it's a

3    stand-alone order that they have to comply with, and we're

4    asking that they prove to all of us and show how they are

5    complying with your order.

6          I don't think that-- respectfully that waiting until

7    the middle of February when we finally get the December data is

8    going to be dispositive.  I don't want to be in the situation

9    then when we're told, oh, well, December only covers half of

10   the month that your order was in effect, so we need to wait

11   until January.

12         So we're just saying that we believe that you issued

13   an order, it went into effect on December 10th.  Defendants

14   have provided some limited information about what they have

15   said they're doing to comply with it, and we're requesting that

16   they provide more of it and they provide it under oath and

17   declarations.

18         THE COURT:  I understand what you're saying, but I

19   think the answer to what you have raised is also what I

20   addressed with Mr. Struck before, and that is that the

21   stipulation doesn't require me to put in place or to take care

22   to make sure that a performance percentage above the agreed

23   upon amount occurs.  Instead what I use is this as an

24   identification tool to see where there's a failure.  And so if

25   it turns out that we don't have in a subsequent month an

1    improvement, then I will say and demand what you have asked

2    for, and that is, what have you done; what did you do; who was

3    taken?  Because then the next question will be, well, we know

4    that wasn't enough, so we're going to have to double that.  And

5    that's the way that I'll approach it.

6              MS. KENDRICK:  Okay.  Thank you.

7              THE COURT:  Anything else from the plaintiffs' side?

8              All right.  Mr. Struck?

9              MR. STRUCK:  No, Your Honor.

10             MS. KENDRICK:  Um --

11             THE COURT:  Go ahead.

12             MS. KENDRICK:  -- you mean in terms of -- on this

13   topic?

14             THE COURT:  Anything.  No.  Yeah.

15             MS. KENDRICK:  Well, yeah, we do actually have a

16   couple of items to talk about.

17             THE COURT:  Sure.  Go ahead.  Yeah.

18             MS. KENDRICK:  You had referred to coming up with a

19   process to have the defendants notify.  We submitted a proposed

20   order to Your Honor.  So that is our position, or our

21   suggestion.

22             THE COURT:  On what topic again?

23             MS. KENDRICK:  On when they want to make changes to

24   the monitoring guide.

25             THE COURT:  Oh, right.  Right.  Right.

                    UNITED STATES DISTRICT COURT

1          MS. KENDRICK:  So we have provided you in writing our

2     proposal for that.

3          THE COURT:  Okay.

4          MS. KENDRICK:  And then I believe Mr. Fathi wanted to

5     talk about the access to medical records issues some more.

6          THE COURT:  All right.  Mr. Fathi?

7          MR. FATHI:  Thank you, Your Honor.

8          The Court's order that -- allowing plaintiffs' counsel

9     access to the electronic medical records has certainly, I think

10    both sides would agree, been very successful, and it has

11    dramatically reduced the amount of production that the

12    defendants need to do.  They formerly provided us one year's

13    worth of prisoners' medical records upon our request every

14    month.  We've agreed they don't have to do that anymore because

15    we have, thanks to the Court's order, direct access to the

16    electronic medical record.

17         However, with respect to prisoners who die, either by

18    suicide or by other causes, the defendants agreed to continue

19    to produce the last one year of their medical records.  And

20    those are different because these are records that we send to

21    our experts to have them analyze the care received, the cause

22    of death, whether the death could have been avoided, and so on.

23    The defendants initially agreed that they would consider

24    producing the last year of the medical record for prisoners who

25    died.  They later reneged on that commitment, and we would ask

                    UNITED STATES DISTRICT COURT

1  the order -- we would ask the Court to hold them to their

2  commitment and order that only for prisoners who die they

3  continue to produce in pdf form the last year of the medical

4  record.

5       THE COURT:  And Mr. Struck, the defendants' position?

6       MR. STRUCK:  Your Honor, I'm just taking a look at

7  what the stipulation requires because I haven't committed --

8  yeah -- I haven't committed it to memory, and I'm not -- I'm

9  not privy to --

10      THE COURT:  Mr. Fathi, can you give us the citation?

11 You say within the --

12      MR. FATHI:  Yes.  Yes, Your Honor.

13      It's all in paragraph 29 of the stipulation, which, as

14 written, allows us to receive every month copies of 10 class

15 members' health records and five subclass members' health

16 records for a total of 15 every month.  Everyone agrees those

17 no longer need to be produced.

18      However, further down in the same paragraph,

19 paragraph 29, it provides, and I quote:  Defendants shall

20 provide to plaintiffs on a monthly basis a copy of all

21 healthcare members of class members who die during their

22 confinement at any state-operated facility.

23      We're asking that defendants continue to produce as

24 required by the stipulation those records for prisoners who die

25 in ADC custody.

                    UNITED STATES DISTRICT COURT

1          MR. STRUCK:  A couple issues.  One is, I thought they

2     were being provided.

3          But the second issue is, I believe that those records

4     are available through the eOMIS system.  So maybe we just need

5     to --

6          THE COURT:  All right.  Well, if you can, point it

7     out, figure it out.  But otherwise, if you can't, produce the

8     pdfs of the inmates who have died.

9          MR. STRUCK:  Sure.

10         THE COURT:  Thank you.

11         MR. FATHI:  Thank you, Your Honor.

12         THE COURT:  And does that exhaust plaintiffs' list?

13         MS. KENDRICK:  Unfortunately, no.

14         THE COURT:  All right.  Go ahead.

15         MS. KENDRICK:  So there's one other thing.

16         Last month we were talking about paragraph 12 of the

17    stipulation and monitoring compliance, and specifically

18    subsection C and D, which involved annual colorectal cancer

19    screening for people ages 50 to 75; and every two years,

20    mammograms for women over 50.  And at the December hearing, the

21    defendants stated that they notified people with posters on the

22    wall, and you had asked me to go and look.

23         THE COURT:  Yes.

24         MS. KENDRICK:  And so I did.

25         And I -- our position is that these are not

UNITED STATES DISTRICT COURT

1    satisfactory for the same reasons that we articulated and that

2    you articulated with regard to the Pap smear performance

3    measures 60 and 61 that had the temporal requirement of every

4    three years it happens.  We believe that these two requirements

5    of the stipulation are written in a way that is --

6         THE COURT:  And the two that you're talking about now

7    are for the prostate -- which two are you talking about now?

8         MS. KENDRICK:  The paragraph -- paragraph 12,

9    subsection C, requires that all prisoners ages 50 to 75 will be

10   offered annual colorectal cancer screening; and subsection D

11   requires that all female prisoners age 50 and older will be

12   offered a baseline mammogram at age 50, then every 24 months

13   thereafter unless more frequent screening is clinically

14   indicated.

15        THE COURT:  Right.  And I have to ask you -- remind

16   me -- I clearly remember that I did ask you to take a look on

17   the walls and see.  But the one that you were focused -- we

18   were focused on then was addressing which test?

19        MS. KENDRICK:  Both of those.

20        THE COURT:  Oh, both of those two.

21        MS. KENDRICK:  Yeah.

22        THE COURT:  All right.  And you think they're

23   insufficient because?

24        MS. KENDRICK:  For the same reasons that we had

25   offered with regard to the performance measure about offering

1    Pap smears to female prisoners every three years.

2              THE COURT:  Okay.  Because it --

3              MS. KENDRICK:  It's an eight-and-a-half-by-11 sign

4    that's up on the wall of the clinic that says, file an HNR if

5    you want.  And it just lists the subsections of paragraph 12

6    and performance measure 60 and 61.  And we believe that the

7    reasoning behind this preventative -- these preventative care

8    measures are identical to that of performance measure 60 and

9    61; and therefore accordingly, the method used for monitoring

10   them should be comparable.

11             THE COURT:  Okay.  Mr. Struck.

12             MR. STRUCK:  A couple issues.  The first is with

13   respect to the mammogram, we were at the Lewis facility, which

14   is an all-male facility, so there were -- obviously there

15   weren't anything -- anything with respect to mammograms.

16             MS. KENDRICK:  True.

17             MR. STRUCK:  We would like an opportunity -- because I

18   was at the Lewis facility, specifically about the colorectal

19   cancer.  And the notice isn't just some little piece of paper

20   put up on the wall.  They actually painted, both in English and

21   Spanish -- I think it's a butterfly -- a large butterfly

22   with -- and the notice is about this big, and it's in the

23   hallway by the medical unit, it's in the housing units.  It's

24   in the -- actually in the medical unit.  It's in English and

25   Spanish.

                    UNITED STATES DISTRICT COURT

1              We would like an opportunity to present the Court with

2      what is -- and it's also shown on the closed circuit TV that

3      inmates have access to.

4              THE COURT:  Okay.

5              MR. STRUCK:  So I would like an opportunity to present

6      that to the Court.

7              THE COURT:  Yeah.  Go ahead and file that in a week.

8              MR. STRUCK:  All right.

9              THE COURT:  And then plaintiffs can file a response to

10     it, and then I'll rule.

11             MR. STRUCK:  Okay.

12             MS. KENDRICK:  Thank you.

13             THE COURT:  Thank you.

14             MR. FATHI:  Your Honor, this is David Fathi.  There is

15     one additional item, and this involves, once again the meaning

16     of the term "seen" as it's used in the performance measures.

17     As the Court knows, that subject has been the subject of

18     multiple issues -- or multiple orders from the Court.  And in

19     an interview with plaintiffs' counsel at the Tucson facility on

20     November 2nd of last year, Dr. Lynn Calcote, who is the Corizon

21     regional mental health director, told us that he had created a

22     memorandum for the ADC monitors regarding the meaning of "seen"

23     as it's used in the performance measures.  So with our monthly

24     document requests, we asked the defendants to produce

25     memorandum as well as any other written instructions that had

UNITED STATES DISTRICT COURT

1    been provided regarding the meaning of "seen."

2            The defendants responded that they would not produce

3    any such documents.  We asked them by letter to reconsider.

4    They did not respond to that letter.  Finally we received a

5    letter at 2:00 a.m. this morning, saying that the defendants

6    don't know if any such documents exist.  That is a puzzling

7    response because defendants' counsel were with us when we spoke

8    to Dr. Calcote.  We obviously do not interview ADC or Corizon

9    staff outside the presence of defense counsel.

10           So at least one responsive document obviously exists,

11   and we would ask that that document be ordered to be produced,

12   as well as all other written instructions regarding the meaning

13   of the term "seen."

14           And this is particularly important in light of what we

15   found at the Lewis facility last year -- or last week in terms

16   of how mental health visits are occurring.  I was not present,

17   but I'd ask my colleagues who were to briefly describe what was

18   found on that subject.

19           THE COURT:  All right.

20           Mr. Struck?

21           MR. STRUCK:  Yes, Your Honor.  I know that the

22   monitoring manual has been updated, and that's what the -- the

23   monitors use the manual.  I'm not aware of any memo -- if there

24   is a memo -- I mean, we can check with Dr. Calcote, who's not

25   a -- he's a Corizon employee, he's not an ADC employee.

                    UNITED STATES DISTRICT COURT

1          THE COURT:  How do you spell his name, please.

2          MR. STRUCK:  It's Lynn, L-Y-N-N, Calcote,

3     C-A-L-C-O-T-T? -- is there an E on the end?

4          There's an E on the end.  So C-O-L -- C-A-L-C-O-T-T-E.

5     He's been in this courtroom on -- on a -- oh, he is here.

6          He's in the back row.

7          THE COURT:  Sir, would you step forward to the

8     microphone, please.

9          MR. FATHI:  Your Honor, could we have Dr. Calcote

10    sworn, please.

11         THE COURT:  Surely.

12         (LYNN CALCOTE, defendants' witness, is sworn.)

13         THE COURT:  Sir, if you don't mind just standing

14    there, it's all right, you're near a microphone, it's handy.

15         You heard the plaintiffs' lawyer say that, I think, on

16    the 2nd of November that they had a conversation with you in

17    which you said that you had created a memorandum on what the

18    definition of the word "seen" meant.

19         Did you hear that?

20         THE WITNESS:  I heard that conversation.

21         THE COURT:  Is there such is a memo?

22         THE WITNESS:  My understanding of the request was in

23    regard to whether or not I'd written a memorandum letting all

24    of the mental health clinicians know that the inmates had to be

25    offered to be taken out of a watch cell and talked to in a

                    UNITED STATES DISTRICT COURT

1    confidential setting.  That was my understanding of what I was

2    affirming, that I had sent a memorandum out in regard to that

3    issue.

4            In terms of the issue of a memorandum defining what

5    being "seen" is, that's -- that was not my understanding, sir.

6            THE COURT:  So what you're telling me now is that the

7    memorandum that you wrote was limited to the subject matter

8    that you just described as to whether -- what "seen" meant; is

9    that what I'm understanding you to say?

10           THE WITNESS:  In terms --

11           THE COURT:  Well, maybe my question is not clear --

12           THE WITNESS:  No.

13           THE COURT:  -- to you.

14           I wasn't there.  Mr. Fathi was there -- or a colleague

15   of his, I guess, was there.

16           MR. FATHI:  I was there, Your Honor.

17           THE COURT:  You were.

18           Mr. Fathi, since you were there, go ahead and ask the

19   question to put a point on this so you can find out.

20           MR. FATHI:  Well, I'm happy to ask Dr. Calcote a

21   question, Your Honor, but I think that the memorandum that

22   Dr. Calcote has described is -- that is what we're asking for,

23   instruction that -- consistent with the meaning -- with the

24   meaning of the term "seen" as defined by the Court.  The

25   prisoner has to be offered the opportunity to exit the cell for

1    the mental health interaction.  So we would ask that that --

2    that that document be ordered produced, as well as any other

3    written instructions provided to ADC or Corizon staff regarding

4    the meaning of the term "seen."

5            THE COURT:  Sir, when did you write this memorandum

6    you just described?

7            THE WITNESS:  I don't know the date, but actually I

8    have provided those -- the email memorandums to the defendants'

9    attorneys.

10           MR. STRUCK:  Your Honor, I'll get with Dr. Calcote.

11   That's actually different from what Mr. Fathi had originally

12   described.  I'm not aware of what Dr. Calcote is referring to.

13   But if there's a memo that he sent to Corizon staff, we'll

14   provide it to plaintiffs.

15           THE COURT:  So these are memoranda, perhaps more than

16   one, but emails, memoranda, that address the issues of what

17   Corizon staff should attribute the word "to be seen" is in any

18   context.

19           Is that -- do we have a common understanding?

20           MR. STRUCK:  Right, in order to comply with your

21   order --

22           THE COURT:  Okay.  All right.

23           MR. STRUCK:  -- that's what it --

24           THE COURT:  Okay.

25           MS. RAND:  Your Honor?

                    UNITED STATES DISTRICT COURT

55

1        THE COURT:  Yes?

2        MS. RAND:  Your Honor?

3        THE COURT:  Yes.

4        MS. RAND:  This is Lucy Rand.  I wanted to clarify

5   what is going on here.

6        Plaintiffs submitted a request on December 15th for

7   these memos.  Eight days later, they demanded -- and we

8   submitted our objections to the request.  And then eight days

9   later they demanded to know whether we were going to produce

10  them.  We did not.  At that time, actually finished our search

11  for the documents.  So to say that we refused to provide the

12  documents is inaccurate.

13       Dr. Calcote forwarded some emails to me.  I was going

14  to get with Mr. Calcote to determine whether this is the

15  quote/unquote memo that was forwarded to staff.  It was not a

16  memo, per se.  They were emails.  And so that's why I told

17  Mr. Fathi in a letter that we were unable to advise whether

18  that document had been located, but we were going -- I was

19  going to double-check with him to make sure that this was the

20  documentation that was requested.

21       So I believe that we have -- unless Mr. Calcote is

22  saying there's an actual memo, I have emails that I received

23  from him that say to that effect of what you're -- what

24  Dr. Calcote defined.  I just needed to confirm with him that

25  they were the memo and I was not just cc'ed on the memos,

UNITED STATES DISTRICT COURT

1        versus these are the memos for production.

2                    MR. FATHI:  Your Honor, this is David Fathi.

3                    We attached the letter that I sent to Ms. Rand to my

4        declaration.  The Court can obviously see for itself what it

5        says.

6                    But to be clear, the request was, and I quote:  All

7        written direction or instructions provided to ADC or Corizon

8        staff regarding the meaning of the term "seen" in performance

9        measures 73 through 99.

10                   End of quote.

11                   The defendants objected, indicating they would produce

12       no responsive documents.  Again, that document is appended to

13       my declaration.  The Court can see for itself.

14                   We think it's important that we see any written

15       instructions that were provided to ADC or Corizon staff,

16       including, but not limited to, the document just described by

17       Dr. Calcote, particularly in light of what we found at the

18       Lewis facility last week.  And I'd like to ask my colleagues to

19       just briefly describe some of their findings.

20                   MS. KENDRICK:  So, Your Honor --

21                   THE COURT:  Sir, to be more comfortable, Doctor, you

22       can sit, if you'd like, in one of those chairs, or wherever

23       you'd like to be.  You don't have to remain standing, but thank

24       you.

25                   Go ahead.

                        UNITED STATES DISTRICT COURT

1          MS. KENDRICK:  Just very shortly, Your Honor.

2          While we were there, we did speak with multiple

3     prisoners who are on suicide watch.  And they reported to us

4     that when they were requesting to see people one on one, that

5     on occasion they had brought -- been brought out to these

6     tables that are in front of the walls of the cells to sit and,

7     you know -- perhaps not be heard, but they were visible to all

8     of the other inmates.

9          One inmate -- I don't know -- I mean, this is -- I'm

10    just reporting what he reported, I'm not standing for the

11    veracity of it because we haven't looked at his medical record

12    yet -- but he reported that on at least one occasion he was

13    taken to a shower where he spoke with mental health staff.

14         So needless to say, these -- these allegations --

15    again, I'm not pledging for the truth of them, but this is just

16    what has been reported to us -- are very concerning, and so

17    that's why we would like to investigate further by looking at

18    their medical records and also comparing it against the memo

19    and other instructions that the doctor has provided to his

20    staff.

21         THE COURT:  Well, based upon what Mr. Struck and

22    Ms. Rand has said, they will be producing all of these emails,

23    memoranda to you that contain any descriptive or advisory

24    language with respect to what it means to be "seen."

25         MS. KENDRICK:  Thank you.

                      UNITED STATES DISTRICT COURT

1      THE COURT:  And can that happen within a week?

2      MR. STRUCK:  Sure, Your Honor.

3      MS. FETTIG:  Your Honor, we typically produce any

4  request that is given to us by the 15th of the month, we

5  produce it, if we're able to, by the next 15th of the following

6  month, and that's what methodology we were going to follow

7  here.  Again, like I said --

8      THE COURT:  So it's coming up in just four days, is

9  what you're saying?

10      MS. FETTIG:  Right.

11      THE COURT:  Okay.  Good.

12      MS. FETTIG:  You know, eight days after --

13      THE COURT:  Okay.  Thank you very much.

14      Thank you, Doctor.

15      Any more from plaintiffs?

16      MS. KENDRICK:  I can't think of anything, but I'll let

17  friends on the phone chime in.

18      THE COURT:  Anybody on the phone from plaintiffs' side

19  have anything else they wish to raise?

20      MR. FATHI:  I believe that's everything, Your Honor.

21      THE COURT:  All right.

22      Mr. Struck, please.

23      MR. STRUCK:  Nothing, Your Honor.

24      THE COURT:  Well, the next time that I raised with you

25  as a possibility to address the monitoring manual was the 26th

UNITED STATES DISTRICT COURT

1    of January in the afternoon.

2          Do you all have an ability to let me know if there

3    could be somebody from each side who could be available for

4    that telephonic hearing, if you wish it to be telephonic?  I

5    will not bar anybody from appearing in person if they want, but

6    again, I just want to make it easier for people.  Any time in

7    the afternoon of the 26th works here, and I need to hear from

8    you all.

9          MS. KENDRICK:  Yes.  That will work for us.

10         THE COURT:  Plaintiffs work.

11         How about defendants?

12         MR. STRUCK:  Yes, Your Honor.

13         THE COURT:  Okay.  And so then the next time that

14   we'll gather is the 8th of February beyond that, after the

15   26th, if that's necessary, but the 8th of February at

16   10:00 a.m.  And if you would continue to be engaged about

17   letting us know about issues that arise that perhaps need a

18   quicker response, I'm not traveling anymore, so I'll be more

19   available.  And you can contact the Court's law clerk to

20   schedule any of those hearings.

21         And we'll get the written orders we promised out

22   straightaway.

23         Thank you all very much.

24         MR. STRUCK:  Thank you.

25         MR. FATHI:  Thank you, Your Honor.

                    UNITED STATES DISTRICT COURT

1          (Proceedings in recess at 11:28 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

61

1                         C E R T I F I C A T E

2

3              I, CHARLOTTE A. POWERS, do hereby certify that I am

4      duly appointed and qualified to act as Official Court Reporter

5      for the United States District Court for the District of

6      Arizona.

7              I FURTHER CERTIFY that the foregoing pages constitute

8      a full, true, and accurate transcript of all of that portion of

9      the proceedings contained herein, had in the above-entitled

10     cause on the date specified therein, and that said transcript

11     was prepared under my direction and control.

12             DATED at Phoenix, Arizona, this 17th day of January,

13     2017.

14

15                                  s/Charlotte A. Powers

16                                Charlotte A. Powers, RMR, FCRR

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT