1  Kathleen E. Brody (Bar No. 026331)
   Daniel Pochoda (Bar No. 021979)
2  **ACLU FOUNDATION OF ARIZONA**
   3707 North 7th Street, Suite 235
3  Phoenix, Arizona 85013
   Telephone: (602) 650-1854
4  Email: kbrody@acluaz.org
           dpochoda@acluaz.org
5
   *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia*
6  *Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith,*
   *Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner,*
7  *Joshua Polson, and Charlotte Wells, on behalf of themselves and all*
   *others similarly situated*

8  **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

9  Sarah Kader (Bar No. 027147)
   Asim Dietrich (Bar No. 027927)
10 **ARIZONA CENTER FOR DISABILITY LAW**
   5025 East Washington Street, Suite 202
11 Phoenix, Arizona 85034
   Telephone: (602) 274-6287
12 Email: skader@azdisabilitylaw.org
           adietrich@azdisabilitylaw.org
13
   *Attorneys for Plaintiff Arizona Center for Disability Law*

14 **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | No. CV 12-00601-PHX-DKD<br><br>**PLAINTIFFS' COMMENTS RE: REVISED MONITORING GUIDES AND OPEN CLINIC** |

LEGAL134246483.1

Pursuant to the Court's January 13, 2017 Order (Doc. 1862), Plaintiffs submit the following comments on Defendants' most recent versions of their Monitoring Guide for measuring compliance with the Stipulation's health care and isolation performance measures. Plaintiffs further submit their comments in response to Defendants' Notice (Doc. 1873) regarding the collection of HNRs to measure compliance with Performance Measure 37 in light of the "open clinic" program developed to achieve compliance with the Court's November 10, 2016 order (Doc. 1754).[1]

## I. STATUS OF THE MONITORING GUIDE FOR THE ISOLATION SUB-CLASS PERFORMANCE MEASURES

The parties made substantial progress in reaching agreement on the methodology for monitoring the maximum custody performance measures (MC PM). There are, however, a few key remaining issues that require attention from the Court. Those issues are enumerated below and in a red-line version of the Monitoring Guide Defendants provided to the Court on Thursday, January 19, 2017, attached as Exhibit 1 to the Declaration of Amy Fettig ("Fettig Decl."), filed herewith.

### A. Performance Measures ##1, 2(c), 5(d), 6(i), and 8(d).

The parties have mostly reached agreement on Performance Measure #1. One issue that remains is Defendants' addition of the following language to MC PM #1(a): "Weeks that include a State of Arizona holiday are ineligible for monitoring." Plaintiffs object to the exclusion of any week with a State of Arizona holiday from monitoring as there is no such exception in the Stipulation, and such a known exception could lead to automatic non-compliance on a week when there is a state holiday.

The remaining issues in MC PM #1 are in paragraph c. Here, Plaintiffs have proposed adding the word "contemporaneously" to indicate when a refusal must be signed to comply with the Court's Order stating: "IT IS ORDERED a contemporaneous

---

[1] To date, Defendants have not provided an update (as promised to Plaintiffs' counsel on December 28, 2016) as to how they are complying with the Court's November 10, 2016 order with regard to the other performance measures at issue in the order. [*See* Doc. 1851-1 at 6-7]

LEGAL134246483.1

signature is required." [Doc. 1831 at 3]  The word "contemporaneously" has been added to this same language in MC PM ##2(c), 5(d), 6(i), and 8(d).

Plaintiffs have also added the highlighted language below in paragraph c to clarify the meaning and requirements of the language:

> In the normal course of operations, supervisory personnel ==shall== have a discussion with an inmate regarding refused out-of-cell time ==due to a pattern of refusals or changed behavior and== shall document the date and nature of the conversation in the Comments section on the back of the Out of Cell Tracking form, including where provided, inmate comment as to the reason for refusal(s).

[Fettig Decl. Ex. 1 at 8]  This language has been added to provide clarity to what is meant by "[I]n the normal course of operations" and to effectuate Defendants' stated policy noted in the Court's Order related to supervisory documentation of refusals.  [Doc. 1831 at 3]

Plaintiffs reiterate their concern over the pervasive and inexplicably high rates of refusal found in the MC PM documentation (*see* Doc. 1757-1, Ex. 2) and will inform the Court if this method of documenting refusals for out-of-cell time is misrepresenting or not capturing class members' intention.

This same language is at issue in MC PM ##2(c), 5(d), 6(i), and 8(d).

**B.     Performance Measure ##6 & 8**

In addition to the issues identified in MC PM #6(i) and 8(d) above, there are a few remaining issues for these performance measures.  One issue relates to what is required to be monitored under MC PM # 6 which requires the following:

> All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, Perryville-Lumley Special Management Area (Yard 30), and Lewis-Rast Max who are eligible for participation in DI 326 are offered ***out-of-cell time***, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326 policy.

[Fettig Decl. Ex. 1 at 13 (emphasis added)]  Defendants have cut the inclusion of "out-of-cell time" as paragraph b of the Methodology Section for MC PM #6 as duplicative. Plaintiffs object to this exclusion because the plain language in this measure requires that

"out-of-cell time" must be monitored in addition to other requirements under DI 326 as part of the compliance findings for this measure.

Plaintiffs also object to Defendants' MC PM #6, paragraph h in the methodology section because it changes the monitoring methodology established under the Stipulation that a prisoner file is either compliant or non-compliant as opposed to a percentage of compliance. This language is non-compliant with the Court's Order that the "Monitoring Guide shall be revised so that a record is not compliant if an inmate's record is only partially compliant." [Doc. 1831 at 3] Plaintiffs object to this same language for the same reasons in MC PM #8(g) (methodology).

### C. Performance Measure #9

Performance Measure #9 remains in greatest contention. It requires that:

> All use of force incidents involving prisoners who are designated SMI *or* housed in Florence-CB-1 or CB-4; Florence-Kasson (Wings 1 and 2); Eyman-SMU (BMU); Perryville-Lumley SMA; or Phoenix (Baker, Flamenco, or MTU) conform to the policies for use of force set forth in ¶ 27 (a)-(e) of the Stipulation.

[Doc. 1185-1 at 39]

On December 14, 2016, the Court resolved the parties' dispute regarding the definition of who is covered under the use of force provisions by finding that the "plain language of the Stipulation covers SMI inmates and those who live in the enumerated areas." [Doc. 1831 at 3-4] Defendants' new version of the Monitoring Guide for MC PM #9 mostly tracks the Court's ruling, but they omitted Florence CB-1 and CB-4 despite the fact that those units are enumerated in the Stipulation. Under the Stipulation's terms, those units cannot be excluded from coverage absent a written modification signed by representatives of all parties. [*See* Doc. 1185 ¶ 40] No such written modification exists.

For the Source of Records/Review section in MC PM #9 there remain a few pending issues. First, Plaintiffs object to the conditional language Defendants added to the review of video footage (in italics): ("including hand-held and/or security camera footage *if existing and relied upon by the monitor to determine compliance findings*)."

[*See* Fettig Decl. Ex. 1 at 22]  It is Plaintiffs' positions that *all* video pertinent to a use of force incident—whether hand-held or stationary—must be viewed as a matter of required practice in order to make compliance findings.  Review of video evidence should not be discretionary for the monitor; it must be mandatory, and the requirement must be clearly articulated.  Otherwise, the morass of video production problems and monitoring uncertainties to which Plaintiffs have already alerted the Court stand little chance of resolution. [*See* Doc. 1795 at 6-8]

In the Source of Records/Review section two other issues remain.  First, it is Plaintiffs' position that the monitor must review a list of all use of force incidents during the monitoring period that enumerates whether chemical agents were involved; whether the prisoner(s) involved are SMI; and what housing units the prisoners reside in.  If the monitor does not review such a list, it will be impossible for anyone to ensure that all of the use of force incidents that should be monitored under the Stipulation are actually being monitored.

Second, Plaintiffs have added to the Source of Records the following language to comply with the Court's Order regarding discretionary review of records (Doc. 1831 at 3): "At the discretion of the monitor, medical records; interviews of staff/inmates and interview notes may also be reviewed if deemed necessary to make accurate compliance findings."  [Fettig Dec. Ex. 1 at 22]  Defendants have already added the appropriate language to Methodology Section (a), but for the sake of clarity Plaintiffs have added this language to the Source of Records section as well.

For the Methodology Section of MC PM #9, there are two remaining issues.  The first is in Paragraph e.  Here, Plaintiffs object to Defendants' removal of the following language: "If the monitor believes that the cool down period was insufficient under the circumstances, there is a finding of non-compliance."  The monitor must be able to exercise independent judgment regarding a cool down period, beyond merely verifying that a box is checked or that the phrase "cool down" appears in the paperwork.  The Stipulation requires that the cool down period allows the inmate "an opportunity to

1  comply with custody staff orders," and that it must include "clinical intervention."
2  [Doc. 1185 at 11]  It is therefore incumbent on the monitor to make judgments about the
3  nature and substance of the cool down period in order to assess compliance.

4  The second issue relates to language in paragraph e, f, and i.  Defendants added
5  language to these paragraphs which allows for documentation by video to be used to meet
6  requirements of the Stipulation, such as the cool down period (paragraph e), the
7  requirement of clinical intervention (paragraph f), and the requirement that a clinician
8  determine whether a prisoner has the ability to understand an order or might be subject to
9  decompensation if chemical agents are used, and then propose reasonable strategies to
10 gain compliance (paragraph i).  Plaintiffs do not object to the use of video evidence *per se*,
11 but do object to the lack of documentation by the monitors as to what video evidence they
12 are using in their compliance findings and what they conclude from that evidence
13 (notably, not all video has discernible audio so certain findings will always be difficult to
14 make based on video alone).  In order to provide clarity and consistency to the use of
15 video evidence, Plaintiffs have suggested language which requires that where video
16 evidence is used to make compliance findings, a written memo accompany the monitor's
17 findings that includes the names of the staff and clinicians involved; the findings based on
18 video evidence; and a description of the events that support those findings.  Plaintiffs
19 argue for this greater level of accountability related to video evidence in part due to the
20 significant problems we have encountered with use of force videos and compliance
21 documentation to date.  [*See* Doc. 1795 at 6-8]

22 **II.    STATUS OF THE HEALTH CARE PERFORMANCE MEASURES**

23 Defendants provided Plaintiffs and the Court with a revised version of their
24 Monitoring Guide on January 18, 2017 (hereinafter "Jan. 18 Guide"), updated to
25 incorporate recent Court orders on the methodology to use when measuring compliance
26 with the Stipulation's performance measures.  [*See* Fettig Decl. Exs. 2 (Monitoring Guide
27 without Redline) and 3 (Monitoring Guide with Redline)]  Attached as Exhibit 4 to the
28 Fettig Declaration is a PDF version of an Excel spreadsheet that summarizes Defendants'

updates in response to the Court's orders and Plaintiffs' comments regarding them (Ex. 4 at 1-12 ["Ordered Changes"]), and a PDF of a spreadsheet that lists additional non-court ordered changes Defendants unilaterally made to the Jan. 18 Guide, which Plaintiffs discovered when comparing the Jan. 18 Guide with previous versions of the Guide (Ex. 4 at 13 ["Other Changes"]).[2]  Plaintiffs do not repeat all of their comments contained within the spreadsheets, but below provide more detail regarding a few of them.

### A.     Defendants' Compliance With the Order Regarding "Partial Credit"

The Court held that the ". . . Stipulation does not allow for partial credit. Defendants must continue to assess compliance by reviewing each individual's patient file for full compliance with a Performance Measure." [Doc. 1831 at 1] This ruling applied to PMs 16, 66, 67, 69, 89, 91, 93, 94, and 95. [*Id*; *see also* 12/14/16 Hearing Transcript ("12/14/16/ Tr.") at 11:13-25 and 26:3-14]

Defendants' proposed update to PMs 16, 66, 67, and 69 includes language that describes an "accepted" and "official" score to be calculated for those performance measures. [*See* Fettig Decl. Ex. 3 at 35 (PM 16); 94 (PM 66); 96-97 (PM 67); and 99-100 (PM 69)] For example, for PM 66 (providers conduct rounds of the infirmary a minimum of every 72 hours), Defendants' methodology is as follows (additions are highlighted yellow):

> - To determine actual compliance, scoring will be based upon the following method:
>   o   For each monitored IPC stay, identify the number of provider encounters that occurred at least every 72 hours and the number of provider encounters that should have occurred at least every 72 hours.  Divide the number of provider encounters that occurred by the number of provider encounters that should have occurred to determine the percentage of compliance for that inmate admission.  If the percentage of compliance meets or exceeds that month's threshold requirement, identify that IPC stay as compliant.

---

[2] The Performance Measures for which Defendants made additional unilateral changes beyond those ordered by the Court are PMs 6, 35, 42, 85, and 94. [*See* Fettig Decl. Ex. 4 at 13; Parts II.C and II.D, *infra*]

- As a result of Court interpretation, the scoring method above has been determined to [sic] an unacceptable method for reporting purposes. Therefore, an additional "accepted" score will also be provided, which will be the "official" score for reporting purposes, as follows:
  - If ANY one of the required provider encounters is missing, that entire record is marked as non-compliant.

[*Id.* at 88 (emphasis in original)]

While the very last bullet point ("If ANY…") complies with the Court's order, Defendants did not remove their "partial credit" language previously invalidated by the Court.[3] They also offer no explanation why they will burden their monitors with determining two separate scores for these performance measures, a burden that Plaintiffs believe is unnecessary. Plaintiffs seek the Court's direction whether it is necessary to have two scores for these measures (the "actual" score versus the "accepted" / "official"), or whether having two scores will further confuse the issue and make it difficult to evaluate compliance.

**B.   Health Care Performance Measure 61**

This performance measure requires that "All female inmates ages 21 to 65 will be offered a Pap smear every 36 months after initial intake, unless more frequent screening is clinically recommended." [Doc. 1185-1 at 28] The Court ordered Defendants to monitor PM 61 by reviewing prisoners' individual health care charts rather than relying upon a flyer posted in clinics. [*See* Doc. 1831 at 2 ("charts must show that they were offered a Pap smear on an individualized basis no less than 36 months after initial intake unless more frequent screening is indicated"); *see also* 12/14/16 Tr. at 38:14-18; 40:13-22; 41:12-17]

Defendants propose to monitor compliance with this measure by randomly selecting ten records of prisoners at Perryville who have an arrival date of more than three years since the monitored month, and checking the chart to see if there is documentation of a memo or communique to the prisoners offering a Pap smear. Defendants' proposed

---

[3] This last bullet point, which reflects the Court's directions, was not included in the instructions for PM 16. [*See* Fettig Decl. Ex 2 at 30]

1    methodology is inadequate for two reasons.  First, it does not comply with the plain
2    language of the Stipulation, which requires that ten records *per yard*, not per institution,
3    be reviewed.  [*See* Doc. 1185-1 at 28; *see also* 12/14/16 Tr. at 41:12-17]  Second, the
4    methodology is silent as to what date should be on these communiques to the prisoners,
5    and does not appear to address the crux of the measure (and the court's concern): namely,
6    have Defendants complied with the "temporal element" and the required frequency of
7    these preventive screenings?  Plaintiffs believe that a more accurate way of measuring
8    compliance would be to review the Arrival/Intake Logs from three years prior to the
9    audited month, randomly select up to ten prisoners per yard who are still in custody, and
10   review those prisoners' medical charts to see if there is a recent communique (i.e. within
11   60 or 90 days) advising the prisoner that her three year "anniversary" is approaching and
12   she may file a HNR requesting the screening.

### C.   Health Care Performance Measure 85

Performance Measure 85 requires that "MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications."  [Doc. 1185-1 at 32] Plaintiffs and Defendants had reached agreement on the following language for the Monitor Guide for this Performance Measure:  "the monitor uses a MH-3D log that shows all inmates whose medications have been discontinued, and a sample of 10 inmates per yard who were due a contact [with a mental health provider] in the monitored month is selected."  [*See* Doc. 1755 at 18]  Defendants then reneged on this agreement, and added the words "or completed" to the agreed language.  [*Id.*]  The Court ordered Defendants to delete those two words.  [*See* Doc. 1831 at 2 ("IT IS ORDERED the Monitoring Guide will not include the recently added 'or completed' language")]

While Defendants have in fact made this deletion, they also have made additional changes to the Monitor Guide for this measure that were not authorized by the Court's order or by agreement of the parties.  These unilateral changes should be rejected; the final version of the Monitor Guide for this PM should be the November 14, 2016 version, with the words "or completed" deleted.  [*See* Doc. 1760-1 at 120-21]

1   First, Defendants have added language that assumes that the required follow-up
2   contact has already occurred ("Review the medication discontinuation date and the
3   subsequent follow-up date to ensure that the two contacts were no more than 30 days
4   apart."). [*See* Fettig Decl. Ex. 3 at 117] In some cases, 30 days will have elapsed but the
5   required contact has not occurred; these records must be counted as noncompliant.

6   Second, Defendants have deleted the following language:

> If the medications were discontinued in any month prior to the monitored month, then look to see if the required subsequent psychiatric contact has occurred. If the subsequent contact occurred in any month prior to the monitored month, then it will be coded with a 0. If the subsequent contact has not yet occurred but should have been completed by the last day of the monitored month, then it will be coded as non-compliant.

> If the subsequent contact occurred in the monitored month, then look to see if it is no more than 30 days after the discontinuation date. If the subsequent contact occurred more than 30 days after the discontinuation date, then it will be coded as non-compliant.

> If the medications were discontinued after February 2015, and the subsequent contact still has not occurred, then it is coded as noncompliant.

16  [Fettig Decl. Ex. 3 at 117-118] As a result of these deletions, it appears that Defendants
17  are now excluding from the sample all records in which a prisoner discontinued
18  medications more than two months ago, even if the prisoner has not yet received the
19  required follow-up, thus significantly inflating their compliance figures. [*See* Fettig Decl.
20  ¶ 6 and Ex. 5 at 2] This is inconsistent with the parties' previous agreement that "'due a
21  contact in the monitored month' includes those patients who should have received a
22  contact in the previous month, but have not yet received that contact." [Doc. 1756-1 at
23  83]

24  These additions and deletions were not authorized either by the Court or by
25  agreement of the parties; accordingly, the Court should not permit them. [*See* 12/14/16
26  Tr. at 15:19-23 ("THE COURT: Well, before turning to Mr. Struck, I will say my view is
27  that you don't get to make a unilateral change without having it presented to the Court and
28

1  having me have the chance to do what paragraph 9B provides for me to do, and that is to
2  determine what protocol should be employed.").

### D. Health Care Performance Measure 94

This performance measure requires that "All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse." [Doc. 1185-1 at 34]  The protocol for this PM requires that "A minimum of 10 records (if available) per Complex will be reviewed, except ASPC Eyman, where 20 records will be reviewed." [*Id*.]  From the beginning of the Stipulation in February 2015 through October 2016, Defendants' usual practice was review no more than 20 records from Eyman and no more than 10 records from other complexes. [Fettig Decl. ¶ 7]

In the November 2016 CGARs, however, Defendants suddenly and unilaterally increased the sample size, reviewing 35 records at Eyman, 25 at Tucson, 20 at Lewis, and 15 each at Florence, Perryville, Phoenix, and Yuma. [Fettig Decl. ¶ 7]  While a larger sample size is not categorically prohibited by the Stipulation, this significant change in methodology must be presented to and approved by the Court.  *See* Part II.C, *supra*.  In particular, the basis for these new and significantly larger sample sizes must be explained, as well as the sampling methodology.  For example, it would obviously be impermissible for Defendants to keep sampling additional records until their compliance rate reached the threshold, and then stop.

### III. DEFENDANTS' STATEMENTS REGARDING "OPEN CLINICS" AND HNR COLLECTION

Plaintiffs submit the following comments regarding Defendants' filings regarding the collection of Health Needs Requests ("HNRs") as part of their new "open clinic" system designed to achieve compliance with Doc. 1754 and Performance Measure 37.

1  [Docs. 1873 and 1873-1] Plaintiffs welcome the opportunity to discuss this further during
2  the parties' January 26, 2017 hearing with the Court.[4]

3  •  First, Defendants do not specify when or how frequently the HNR boxes are
4  checked.

5  •  Second, Defendant Pratt's Declaration is confusing, as it first states that
6  there are specific open clinic hours of "generally" 7:00 am to 7:00 pm (Doc. 1873-1 ¶ 15),
7  but then states that medical staff will move to the next housing unit once they finish on
8  one unit or from one complex yard to another (*id.* at ¶ 24), such that specified open clinic
9  hours might not always be accurate, making it harder for patients to plan. Defendants do
10 not specify what the actual windows of time are for each housing unit.

11 •  Third, Attachment A of Defendants Pratt's Declaration (Doc. 1873-1 at 9)
12 shows the "Dashboard" for one day at one institution. With the "automatic referrals" in
13 the Dashboard, there is no apparent tracking of when that patient was seen by a provider,
14 so it could easily mean that a patient goes outside the 24 hour time limit without being
15 seen. It is unclear what some of the abbreviations in the Dashboard refer to, for example,
16 "NA-CNA" or "CR."

17     Finally, Defendants' proposed method for monitoring compliance with PM 37
18 (Fettig Ex. 3 at 57), continues to adhere to the selection of ten files from the HNR log,
19 which is a vestige of the days immediately following privatization of health care, when
20 Defendants still operated on a paper medical record system which made it laborious, if not
21 impossible, to obtain systemwide data. Plaintiffs would like to discuss with the Court

---

[4] Defendant Pratt avows that he "fundamentally disagree[s]" with the statements of Plaintiffs' counsel that "inmates who are not seen during open clinic hours are unable to submit an HNR[,] or that HNRs submitted outside open clinic hours are not monitored or counted for performance measures 36 and 37." [Doc. 1873-1 ¶ 14] However, this misstates what counsel reported to the Court on January 11: rather than stating these two things as fact, counsel relayed (a) that she and other Plaintiffs' counsel monitors *were told* by some prisoners at Lewis that on some occasions health care staff had told them to return to the clinic the following day, or to submit a HNR in a box to be seen the following day; and (b) that counsel was concerned that these HNRs would not be monitored or measured.

whether it would make more sense, and provide more accurate information, if the monitoring looked at all of the "Dashboards" to get system-wide data for each institution.

Respectfully submitted,

Dated: January 24, 2017

**ACLU NATIONAL PRISON PROJECT**

By: s/ Amy Fettig
David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Jamelia Natasha Morgan (N.Y. 5351176)**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email: dfathi@aclu.org
 afettig@aclu.org
 jmorgan@aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email: dbarr@perkinscoie.com
 agerlicher@perkinscoie.com
 jhgray@perkinscoie.com

Kathleen E. Brody (Bar No. 026331)
Daniel Pochoda (Bar No. 021979)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org
 dpochoda@acluaz.org

|   |   |
|---|---|
| 1 | Donald Specter (Cal. 83925)* |
|   | Alison Hardy (Cal. 135966)* |
| 2 | Sara Norman (Cal. 189536)* |
|   | Corene Kendrick (Cal. 226642)* |
| 3 | Rita K. Lomio (Cal. 254501)* |

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:   dspecter@prisonlaw.com
         ahardy@prisonlaw.com
         snorman@prisonlaw.com
         ckendrick@prisonlaw.com
         rlomio@prisonlaw.com

*Admitted *pro hac vice*

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, PLLC**
P. O. Box 91398
Tucson, Arizona 85752
Telephone: (520) 477-1475
Email:   kirstin@eidenbachlaw.com

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:   cnmitchell@jonesday.com
         aamiri@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:   jlwilkes@jonesday.com

*Admitted *pro hac vice*

Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:   jkmessina@jonesday.com

*Admitted *pro hac vice*

| | |
|---|---|
| 1 | |
| 2 | *Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated* |

**ARIZONA CENTER FOR DISABILITY LAW**

By:   s/ Maya Abela
   Sarah Kader (Bar No. 027147)
   Asim Dietrich (Bar No. 027927)
   5025 East Washington Street, Suite 202
   Phoenix, Arizona 85034
   Telephone: (602) 274-6287
   Email:   skader@azdisabilitylaw.org
         adietrich@azdisabilitylaw.org

   Rose A. Daly-Rooney (Bar No. 015690)
   J.J. Rico (Bar No. 021292)
   Jessica Jansepar Ross (Bar No. 030553)
   Maya Abela (Bar No. 027232)
   **ARIZONA CENTER FOR DISABILITY LAW**
   177 North Church Avenue, Suite 800
   Tucson, Arizona 85701
   Telephone: (520) 327-9547
   Email:
      rdalyrooney@azdisabilitylaw.org
         jrico@azdisabilitylaw.org
         jross@azdisabilitylaw.org
         mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

# CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2017, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

s/ D. Freouf