Kathleen E. Brody (Bar No. 026331)
Daniel Pochoda (Bar No. 021979)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email: kbrody@acluaz.org
           dpochoda@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email: skader@azdisabilitylaw.org
           adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-DKD <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR CONTEMPT OR FURTHER REMEDIAL ORDERS [DOC. 1819]** |

LEGAL134273855.2

Defendants concede that, at the same time that two of Plaintiffs' counsel attempted to speak with their clients at cell-fronts in narrow runs at ASPC-Tucson, a deputy warden walked through the runs and took photographs of cells, prisoners, and at least one identification card; the deputy warden summoned senior custody staff to the same units to discuss and review photographs of rule violations that could (and, in one case, must) result in prisoner discipline under ADC policy, including the possibility of "time loss" penalties; and senior and line custody staff conducted additional walk-throughs of the runs to document rule violations.  [*See* Part I.A, below]

The timing of these acts was more than "unfortunate."  [Transcript of Nov. 2, 2016 Telephonic Status Hearing ("11/2/16 Tr.") at 17:13 (Defendants' counsel conceding "the timing of it obviously is unfortunate")]  As the Court already has recognized, Defendants' actions on November 2, 2016, reasonably could have a chilling effect on class members' willingness to speak with their attorneys.  [Doc. 1734 at 1 (noting that "photographing interviewees," among other things, "could reasonably be seen to chill [attorney-client] communication")][1]  And they did:  many prisoners expressed fear of retaliation, refused to speak with their attorney, and would not even turn to face her.  The undisputed facts alone support a contempt finding or enforcement order.  The motive of custody staff is not relevant to either inquiry; an evidentiary hearing therefore is not warranted.

## ARGUMENT

### I.     THE UNDISPUTED FACTS SUPPORT AN ENFORCEMENT ORDER OR CONTEMPT FINDING.

#### A.     Defendants' Own Testimony Supports the Requested Relief.

Defendants contend that there is no "clear and convincing evidence of a violation."  [Doc. 1846 at 2]  But the facts—*as set forth by Defendants*—support a contempt finding:

1.     On November 2, 2016, two of Plaintiffs' counsel visited ASPC-Tucson, Rincon Unit, Housing Unit 3, Able and Charlie runs.  [Doc. 1846-2 at 7 ¶ 29]

---

[1]     Citations to the Court's docket are to page numbers assigned by the Court's Electronic Case Filing system and not the page number of the documents therein.

2.      "HU 3 is comprised of three runs—Able, Baker, and Charlie.  Each run is 76 feet, four inches long and 7 feet wide."  [Doc. 1846-2 at 5 ¶ 20]  "The hallway of . . . Able run is much narrower tha[n] the runs on other yards."  [Doc. 1846-3 at 3 ¶ 5]

3.      Rincon "is a close custody unit"; prisoners "are locked down unless they are out for a scheduled appointment such as medical or recreation."  [Doc. 1846-4 at 4 ¶ 13][2]

4.      Plaintiffs' counsel were accompanied by at least three senior ADC custody officials and an ADC attorney.   [Doc. 1846-2 at 4 ¶ 11 (listing Southern Region Operations Director, two deputy wardens, and a sergeant as a driver); Doc. 1846 at 3]

5.      As Plaintiffs' counsel attempted to speak with clients on Able run, a deputy warden "walked" that run to "ensure the inmates were properly dressed," and took photographs of rule violations inside cells (*see* Doc. 1846-2 at 5 ¶ 22), and at least one prisoner identification card (*see id.* at 5 ¶ 21; *id.* at 48; Doc. 1846-3 at 4 ¶ 17).

6.      In Housing Unit 3, the deputy warden "took approximately eight photographs of . . . violations" under Department Order 704, Inmate Regulations, which "addresses housing unit regulations, inmate identification card requirements, and inmate dress and clothing requirements."  [Doc. 1846-2 at 3 ¶ 4; *id.* at 6 ¶ 25; *id.* at 13-39, 56-63]

7.      The deputy warden took photographs of "inmates not fully dressed." [Doc. 1846-2 at 6 ¶ 25; *id.* at 60-61]   By ADC policy, this violation must result in disciplinary action against the prisoner.   [*Id.* at 18 ("Inmates violating clothing requirements shall be subject to disciplinary action in accordance with Department Order #803, Inmate Disciplinary Procedure.")]

8.      The deputy warden took multiple photographs of "inmates under covers with their bed not made past 07:30 hours."  [Doc. 1846-2 at 6 ¶ 25; *id.* at 57-62]  By ADC policy, this violation may result in disciplinary action against the prisoner.  [*Id.* at 20 ("All inmates' beds shall be made no later than 0730 hours each day."); *id.* at 23 ("Inmates not in compliance . . . may be subject to disciplinary action . . . .")]

---

[2]      During the visit, one door on Able run apparently was not closed.  [Doc. 1846-2 at 6 ¶ 23; *id.* at 50; *see* Doc. 1846-3 at 4 ¶ 15 (stating all Charlie run doors were closed)]

9.     The deputy warden took photographs of "items extending beyond the edges of the bulletin board."  [Doc. 1846-2 at 6 ¶ 25; *id.* at 56, 63]  By ADC policy, this violation may result in disciplinary action against the prisoner.  [*Id.* at 22 ("No items shall extend beyond the edges of the bulletin boards."); *id.* at 23]

10.    The deputy warden took at least one photograph of "items attached to the cell wall."  [Doc. 1846-2 at 6 ¶ 25; *id.* at 58]  By ADC policy, this violation may result in disciplinary action against the prisoner.  [*Id.* at 18 (prohibiting "[p]lacing any item on any cell wall"); *id.* at 23]

11.    The deputy warden took photographs of "clothes lines."  [Doc. 1846-2 at 6 ¶ 25; *id.* at 61, 63]  By ADC policy, this violation may result in disciplinary action against the prisoner.  [*Id.* at 18 (prohibiting "[c]lotheslines of any type"); *id.* at 23]

12.    The deputy warden took at least one photograph of "windows covered."  [Doc. 1846-2 at 6 ¶ 25; *id.* at 62]  By ADC policy, this violation may result in disciplinary action against the prisoner.  [*Id.* at 18 (prohibiting "covering cell windows"); *id.* at 23]

13.    The deputy warden took at least one photograph of "homemade TV antennas."  [Doc. 1846-2 at 6 ¶ 25]  By ADC policy, this violation may result in disciplinary action against the prisoner.  [*Id.* at 22 ("No homemade antennas . . . shall be authorized."); *id.* at 23]

14.    According to ADC policy, the violations discussed above are Class B and C Violations, which may result, among other things, in "time loss."  [*See* Declaration of Rita Lomio, file concurrently herewith, Ex. 1, Department Order 803, Inmate Disciplinary Procedure, Attachment A at 6 (eff. date Oct. 16, 2016) ("36B:  Violation of any Published Department or Institution Rule—Including Department Orders"); *id.*, Attachment A at 7 ("05C:  Failure to Maintain Grooming Requirements"); *id.*, Attachment B (listing "TIME LOSS" penalty of "0-120 Calendar Days" for Class B Violations)]

15.    After taking the photographs, the deputy warden summoned the shift commanders to the unit to discuss compliance issues with them.  [Doc. 1846-2 at 6 ¶ 27]

16.    On the unit, the deputy warden discussed compliance issues with a sergeant

1    who had been summoned and the officer on post.  [Doc. 1846-2 at 8 ¶ 33]

2         17.    The deputy warden directed the sergeant to conduct "a walkthrough of HU 3

3    with the floor officer . . . to review the 704 issues."  [Doc. 1846-4 at 3 ¶ 7]

4         18.    The sergeant approached the floor officer while that officer "was conducting

5    formal face to identification counts" on Baker run.  [Doc. 1846-4 at 4 ¶ 8]  Then, with the

6    floor officer, the sergeant conducted a walk-through of Baker run "to see if the violations

7    were present there."  [Doc. 1846-5 at 3 ¶ 5; *see also* Doc. 1846-4 at 4 ¶ 9]

8         19.    The sergeant and floor officer then returned to Charlie run, where Plaintiffs'

9    counsel were "talking to inmates through their cell doors."  [Doc. 1846-4 at 4 ¶ 10]

10   Nevertheless, while Plaintiffs' counsel attempted to speak with their clients, the sergeant

11   and floor officer completed a "walk through Charlie run" and then "approached [the

12   deputy warden] who showed [them] the photographs of cells that were out of 704

13   compliance in Able run."  [*Id.*]  The floor officer told the deputy warden that he had

14   "warned the inmates [earlier that day] that if the issues were not resolved they could

15   receive a disciplinary violation."  [Doc. 1846-5 at 3 ¶ 7]

16        20.    The sergeant and floor officer then "re-walked the Charlie and Able runs to

17   determine whether the 704 issues had been resolved."  [Doc. 1846-5 at 3 ¶ 8; *see also*

18   Doc. 1846-4 at 4 ¶ 10 (noting purpose of "review[ing] 704 violations"); Doc. 1846 at 5]

19        As the Court has noted, these actions—which raise the "specter of retaliation"—

20   "could reasonably be seen to chill [attorney-client] communication."  [11/2/16 Tr.

21   at 13:11; Doc. 1734 at 1 (stating that "photographing interviewees" and "ticketing

22   interviewees close in time to the interviews . . . will face a presumption of improper

23   interference with the enforcement of the Stipulation")]  And they did:  many prisoners

24   expressed fear of retaliation, refused to speak with their attorney, and would not even turn

25   to face her or allow her to introduce herself.[3]  [Doc. 1820 ¶ 12 (discussing Charlie run)]

26

27   _____

     [3]        Fear of retaliation for speaking with their attorneys would not be fanciful.  *See,*

28   *e.g.*, *Dannenberg v. Valadez*, 338 F.3d 1070, 1071-72 (9th Cir. 2003) (noting jury verdict
     for prisoner on claim of retaliation for assisting another prisoner with litigation).

**B.    Defendants Manufacture Factual Disputes From Immaterial Issues.**

Defendants request an evidentiary hearing and invite the Court to make three factual determinations, but none are necessary for resolution of Plaintiffs' motion.  *First*, Defendants contend that the deputy warden acted as he did because "he was discussing and documenting DO 704 compliance issues to take up *with staff* (for educational and accountability purposes)."  [Doc. 1846 at 12 (emphasis in original); *see also id.* at 2]  Defendants' contention that their actions were meant solely to hold staff—and not prisoners—accountable for prisoners violating ADC policy plainly is not credible.  But even if the Court accepts this implausible explanation, Defendants' argument fails because a finding of bad faith is not a prerequisite to enforcement of the Stipulation.  [Doc. 1185 at 14-15 ¶¶ 35-36]  And, to support *civil* contempt, "[t]he contempt need not be willful, and there is no good faith exception to the requirement of obedience to a court order."[4]  *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (internal quotation marks and citation omitted); *see also Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985) (noting that "civil contempt may be established even though the failure to comply with the court order was unintentional").

*Second*, Defendants dispute whether staff was expressly instructed to "ticket everyone."  [*See* Doc. 1846 at 8, 11]  But, as explained above, the "specter of retaliation" stemming from Defendants' undisputed actions alone supports the requested relief.  For present purposes, we note only that Defendants attempt to dismiss an eyewitness account from Plaintiffs' counsel—made under penalty of perjury—as "scant."  [Doc. 1846 at 11]  The Court, however, already has noted that "avowal of counsel" is "not speculation," and is "direct testimony, direct evidence."  [11/2/16 Tr. at 7:4-9]  Defendants also fail to acknowledge the reluctance prisoners may have publicly contradicting senior custody staff

---

[4]    In any event, even under Defendants' version of events, the motive behind the deputy warden's actions apparently was not communicated to prisoners or to the floor officer, who reported that he had "discretion . . . to issue inmates 704 disciplinary violations" on that day.  [Doc. 1846-5 at 4 ¶ 9]

who control their day-to-day lives.[5]  Two prisoners have agreed to be identified and to provide the Court with further testimony about what occurred.  Brian Creswell reported:

> As I was talking with [Plaintiffs' counsel], I heard ASPC staff threatening that they would give tickets and take away recreation because we were out of "704 compliance."  It's my understanding that, when recreation is taken away, it is taken away from the entire building. . . .  In my experience, it's not common for ASPC staff to sweep the run or yell at that volume regarding 704 compliance issues.

[Declaration of Brian Creswell, attached hereto as Exhibit 1, ¶¶ 12-13, 16 ("Creswell Decl."); *see also* Declaration of Ronald Miller, attached hereto as Exhibit 2, ¶ 5 ("While speaking with [Plaintiffs' counsel], I observed Deputy Warden Monson taking pictures of cells on the run, as well as pictures of prisoners' identification cards.  I thought this was odd because I had never seen it occur before.")]  Mr. Creswell further reported:  "The next day, I spoke with other prisoners in my housing unit and several told me that they wouldn't talk with the attorneys because they were afraid of retaliation by ASPC staff." [Creswell Decl. ¶ 15]

*Third*, Defendants question whether the prisoners could hear what ADC staff was discussing.  [Doc. 1846 at 11]  But, even if they could not hear (which Plaintiffs dispute), the prisoners' willingness to speak to their attorneys nonetheless was chilled.  Prisoners saw a senior custody official photographing their cells and their bodies, documenting rule violations—all while their attorneys attempted to speak with them.  Additional senior and line custody staff then came and walked through the units, looking into cells and at bodies—again while Plaintiffs' counsel attempted to speak with their clients.  That raises the specter of retaliation.[6]  [*See* 11/2/16 Tr. at 20:12-17 ("Pictures, sanctioning people for

---

[5]     Defendants' assertion that "no inmate has filed a grievance alleging retaliation or intimidation during the November tours" (Doc. 1846 at 8) misses the mark for similar reasons.  *See Gomez v. Vernon*, 255 F.3d 1118 (9th Cir. 2001) (affirming injunction protecting prisoners who were the subject of retaliation for filing grievances).

[6]     The deputy warden's statement that "[t]he inmate's face, name, or cell number are not visible in any of the photographs I took of 704 cell compliance issues" (Doc. 1846-2 at 6 ¶ 25), fails for the same reason.  A prisoner would have no way of knowing that the deputy warden's photographs (and later emails) did not identify him by name or cell number.  All he would know is that a deputy warden took photographs of his cell (or himself), documenting rule violations that could (or must) result in disciplinary action.

1    things that you say happen every day, again, pick some other day to do it. Don't do it on

2    the day that the tour is scheduled. Don't do it in any way that links it . . . temporally to a

3    way that would make people reasonably think that they're being subject to the possibility

4    of a retaliation for participating.")]

5    **II.     THE COURT HAS AUTHORITY TO ORDER THE REQUESTED RELIEF.**

6          Defendants also contend that Plaintiffs have not met the other prerequisites for a

7    contempt finding. Defendants are mistaken. In any event, the Court also may order the

8    requested relief under its authority to enforce the terms of the Stipulation—independent of

9    a contempt finding. [Doc. 1185 at 14-15 ¶¶ 35-36; Doc. 1458, Att. 1; Doc. 1734 at 1

10   (documenting the Court's "strong view that unencumbered communication between Class

11   Counsel and Class Members is vital to the Court's enforcement of the Stipulation")]

12         **A.     The Court Has Authority to Enforce the Terms of the Stipulation.**

13         Defendants first repeat their common refrain that "[t]he Stipulation is not a court

14   order . . . ." [Doc. 1846 at 2] Plaintiffs already have explained why this argument fails

15   (*see* Doc. 1882 at 8): The Stipulation provides prospective relief to the Plaintiffs, was

16   approved by this Court, and was memorialized by the Court's signing of a jointly

17   submitted proposed Order. [Doc. 1458, Att. 1] The Stipulation and memorializing Order

18   expressly provide the Court with broad remedial powers to enforce the Stipulation.

19   [Doc. 1185 at 14-15 ¶¶ 35-36; Doc. 1458, Att. 1]

20         **B.     The Stipulation Clearly Prohibits Defendants' Actions.**

21         Defendants next contend that they did not have "adequate notice that the alleged

22   conduct would be a violation." [Doc. 1846 at 2] In particular, Defendants contend that

23   "[w]hat constitutes 'reasonable access' is ambiguous, and can mean many different

24   things." [*Id.* at 10 (quoting Doc. 1185 at 12 ¶ 29)] Here, however, the standard of

25   "reasonable access" is "sufficient because the tactic [used by Defendants] was so clearly

26   inappropriate." *See Gates v. Shinn*, 98 F.3d 463, 472 (9th Cir. 1996). Put differently,

27   "reasonable minds" cannot "differ as to whether" Defendants' actions obstructed

28

Plaintiffs' counsel's reasonable access to prisoners.[7]  *Id.*   The Stipulation thus is sufficiently specific to support a contempt finding.  [Doc. 1734 at 1 ("[A]ny actions which could reasonably be seen to chill [attorney-client] communication, such as photographing interviewees or ticketing interviewees close in time to the interviews, will face a presumption of improper interference with the enforcement of the Stipulation.")]

### C.   Defendants Have Not Substantially Complied with the Stipulation.

Defendants contend that they should not be subject to a contempt finding because they "have substantially complied with a reasonable interpretation of Paragraph 29." [Doc. 1846 at 13]  But Defendants' actions on three runs at ASPC-Tucson cannot be dismissed as merely "'technical violations where every reasonable effort has been made to comply.'"  [*Id.* (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d at 695)]  "[T]he touchstone of the substantial compliance inquiry is whether Defendants frustrated the purposes of the consent decree—*i.e.* its essential requirements."  *Joseph A. by Wolfe v. New Mexico Dep't of Human Svcs.*, 69 F.3d 1081, 1086 (10th Cir. 1995). They did so here.  As explained previously, Defendants' actions "could reasonably be seen to chill [attorney-client] communication" and therefore should be considered "improper interference with the enforcement of the Stipulation" as defined by the Court. [Doc. 1734 at 1]

Defendants also assert that this is the first tour where Plaintiffs' counsel has raised a retaliation concern, and "Defendants have gone out of their way to provide them more than 'reasonable access' to the facilities and inmates."  [Doc. 1846 at 13]  Even assuming this were true, it does not excuse or cure Defendants' significant interference with the

---

[7]     The cases relied on by Defendants are distinguishable on that ground.  *See Gates*, 98 F.3d at 472 (concluding that "reasonable minds can and do differ as to whether the defendant's outpatient plan provided for 'appropriate psychiatric treatment'"); *Balla v. Idaho State Bd. of Corrs.*, 869 F.2d 461, 464, 465 (9th Cir. 1989) (holding that plaintiffs could not challenge, through a contempt motion premised on a "skeletal order," a plan that the court already had found to be "adequate . . . for compliance with" that previous order); *Eichenlaub v. Baca*, No. CV 06-6979, 2007 WL 1223897, at *1 (C.D. Cal. Mar. 30, 2007) (holding that order's requirement that defendant "respond substantively" to discovery requests did not "clearly exclude objections from substantive responses").

ASPC-Tucson site visit, particularly given the limits on Plaintiffs' counsel ability to conduct site visits and the significant out-of-pocket costs Plaintiffs' counsel have incurred in litigating this case.[8]  [Doc. 1185 at 13 ¶ 32 (listing an annual cap of 20 tour days and a limit of one visit per quarter per prison); *id.* at 16 ¶ 44 (listing cap on amount of monitoring fees at $250,000 per calendar year)]  Relief therefore is necessary.

## III.   THE RELIEF REQUESTED BY PLAINTIFFS IS NECESSARY.

### A.   Two Replacement Tour Days

Defendants contend that Plaintiffs should not receive two replacement tour days because they should have "continue[d] the tour in the afternoon." [Doc. 1846 at 15]  But Defendants ignore the fact that the previous day and a half was rendered largely "pointless" (Doc. 1819 at 11 (citing 11/2/16 Tr. at 9:25)):  many prisoners expressed fear of retaliation and refused to speak with their attorneys.  [Doc. 1820 ¶ 12]  Accordingly, counsel chose to use the afternoon to protect the rights of class members by promptly addressing the issue with Defendants and subsequently bringing it to the Court's attention.[9]  [11/2/16 Tr. at 5:9-20]

### B.   Notice to Class Members

On November 2, 2016, the Court approved "the parties' agreement that results in a letter to be provided to Class Members assuring interviewees freedom from any retaliation for their participation in the interviews conducted by Class Counsel." [Doc. 1734 at 1]

---

[8]    Plaintiffs' counsel has concerns about their access to facilities and class members, and also have received other reports of retaliation.  [*See* 11/2/16 Tr. at 9:15-20]  Because those concerns are outside the scope of this Motion, we do not raise them here.

[9]    Defendants also state that, after the Court teleconference, "we . . . again gave them an opportunity to continue the Tucson tour." [Doc. 1846-1 at 6 ¶ 20]  But, absent a prior notice to prisoners and staff regarding issues related to actual or perceived retaliation, Plaintiffs' counsel was not comfortable doing so.  [*See* 11/2/16 Tr. at 16:8-9]  In any event, the teleconference ended at 2:14 PM. [Doc. 1734 at 1]  By the time counsel cleared security and made it to a housing unit, their time would be almost up, and they still had to drive to Florence, Arizona, for the next day's scheduled tour.  Defendants' statement that they "even offered," by letter dated December 19, 2016 (over a month after the site visit and only after Plaintiffs filed the instant Motion), "to allow Plaintiffs' attorneys to come back and finish the ½ day at ASPC-Tucson" also misses the mark.  [Doc. 1846 at 15]  It makes no sense for Plaintiffs' counsel to fly from both coasts—at their own expense—for a half day, and then return later for a day and a half after litigation of this Motion.

1    Defendants report that they provided a notice to prisoners at ASPC-Tucson in Rincon
2    Unit.  The notice is undated.  [Doc. 1846-7 at 8]  It is not clear when the notice was sent,
3    why it was limited to prisoners in Rincon Unit, and until when the notice will remain
4    posted.[10]  [*Id.* at 3-4, 8]  Thus, Plaintiffs continue to request that Defendants distribute "a
5    letter from the warden of the Tucson prison complex to all class members at that prison
6    apologizing for staff conduct and assuring class members that no retaliation has occurred
7    or will occur in the future for communications with Plaintiffs' counsel," and that the
8    Court's order in response to this Motion be posted in each housing unit in each ASPC
9    facility "until further order from this Court."  [Doc. 1819-1 at 2]  The letter sent to
10   prisoners who had been housed in Rincon Unit should clearly state that (1) while
11   Plaintiffs' counsel was in Rincon Unit on November 2, 2016, ADC officials took
12   photographs and walked the units; (2) that action was done to hold staff accountable and
13   not to discipline any prisoner; and (3) no prisoner was disciplined.

14       **C.    Notice to Staff**

15          It appears that the notice sent to ASPC-Tucson staff was sent only in response to
16   Plaintiffs' Motion.  [*See* Doc. 1846-7 at 4 (noting staff briefings "in January, February,
17   and March 2017")]  The general language of the notice—that staff "cannot threaten,
18   intimidate, or retaliate against inmates for speaking with their attorneys" (*id.* at 6)—may
19   not prevent the situation that occurred during the November 2 site visit.  Accordingly, it is
20   necessary to explain that, *regardless of intention*, staff should not take photographs and
21   walk the units looking for compliance issues at the same time as (or immediately before or
22   after) Plaintiffs' counsel attempts to interview their clients.  Moreover, the notice must be
23   distributed widely; staff at other ASPC facilities have not seen or heard the notice.

24

25

---

26   [10]     The Court has ordered "that each person who is interviewed by you be provided a
         copy of this letter which informs them that there will be no retaliation."  [11/2/16 Tr. at
27   12:16-20; *see also id.* at 15:10-14]  To our knowledge, Defendants have not provided a
         copy of any letter to class members during subsequent site visits, including Plaintiffs' tour
28   of ASPC-Lewis on January 4-5, 2017.

### D.   Attorneys' Fees and Costs

Defendants oppose Plaintiffs' request for attorneys' fees and costs for the "same reason" as they oppose replacement tour dates [Doc. 1846 at 15]—and for the same reasons, Defendants' argument fails.   [*See* Part III.A, above]   Defendants' one-line assertion that *they* should be awarded attorneys' fees for "having to prepare" a response to Plaintiffs' Motion is absurd.   [Doc. 1846 at 15]   Plaintiffs' Motion was invited by the Court.   [Doc. 1734 at 1 ("The Court will address by written motion practice the Class Counsel's request to reschedule and be reimbursed for travel and expenses associated with the instant tour.")]   If anything, it is Defendants who have "multiplie[d] the proceedings . . . unreasonably and vexatiously," 28 U.S.C. § 1927, by (1) obstructing Plaintiffs' counsel's access to their clients during the site visit, requiring a teleconference with the court; and (2) ignoring Plaintiffs' subsequent attempt to resolve the matter without litigation, requiring Plaintiffs to brief and file the underlying Motion (Doc. 1846-8).[11]

### E.   Disciplinary Actions

Plaintiffs also requested that all disciplinary actions—warnings as well as tickets—be rescinded.   [Doc. 1819 at 10]   It appears this request is now moot, as Defendants report that no "disciplinary . . . action was taken."   [Doc. 1846 at 15; Doc. 1846-2 at 79 (email with subject line:  "RE: I need to know—Sorry NO TICKETS")][12]

### CONCLUSION

Plaintiffs respectfully request that the Court find Defendants in contempt of Court and issue the relief outlined in their Motion for Contempt or Further Remedial Orders. [Doc. 1819 at 11]  In the alternative, Plaintiffs respectfully request that the Court issue the same relief under its authority to enforce the Stipulation.

---

[11]   Plaintiffs' request for attorneys' fees and costs is not tied to 28 U.S.C. § 1927, the statute cited by Defendants.  [*See* Doc. 1819 at 11 (citing cases and noting that attorneys' fees and costs are "a standard remedy or civil contempt"); *id.* at 6 (Doc. 1458, Att. 1)]

[12]   "Disciplinary action," as used here, appears to apply to tickets and not warnings. [Doc. 1846 at 15 n.10]   As the Court noted, warnings are as "offensive" as tickets (11/2/16 Tr. at 18:1); going forward, they should not be issued while (or immediately before or after) Plaintiffs' counsel are on the unit, except in extraordinary circumstances.

1    Dated:  January 27, 2017                    **PRISON LAW OFFICE**

2

3                                               By:   *s/ Donald Specter*
                                                Donald Specter (Cal. 83925)*
                                                Alison Hardy (Cal. 135966)*
4                                               Sara Norman (Cal. 189536)*
                                                Corene Kendrick (Cal. 226642)*
5                                               Rita Lomio (Cal. 254501)*
                                                1917 Fifth Street
6                                               Berkeley, California 94710
                                                Telephone:  (510) 280-2621
7                                               Email:    dspecter@prisonlaw.com
                                                          ahardy@prisonlaw.com
8                                                         snorman@prisonlaw.com
                                                          ckendrick@prisonlaw.com
9                                                         rlomio@prisonlaw.com

10                                              *Admitted *pro hac vice*

11                                              David C. Fathi (Wash. 24893)*
                                                Amy Fettig (D.C. 484883)**
12                                              Jamelia Morgan (N.Y. 5351176)**
                                                **ACLU NATIONAL PRISON
                                                PROJECT**
13                                              915 15th Street N.W., 7th Floor
14                                              Washington, D.C. 20005
                                                Telephone:  (202) 548-6603
15                                              Email:    dfathi@npp-aclu.org
                                                          afettig@npp-aclu.org
16                                                        jmorgan@aclu.org

17                                              *Admitted *pro hac vice*.  Not admitted
                                                 in DC; practice limited to federal
18                                                 courts.
                                                **Admitted *pro hac vice*
19

20                                              Kirstin T. Eidenbach (Bar No. 027341)
                                                **EIDENBACH LAW, PLLC**
21                                              P. O. Box 91398
                                                Tucson, Arizona 85752
22                                              Telephone:  (520) 477-1475
                                                Email:    kirstin@eidenbachlaw.com
23
                                                Kathleen E. Brody (Bar No. 026331)
24                                              Daniel Pochoda (Bar No. 021979)
                                                **ACLU FOUNDATION OF
                                                ARIZONA**
25                                              3707 North 7th Street, Suite 235
                                                Phoenix, Arizona 85013
26                                              Telephone:  (602) 650-1854
                                                Email:    kbrody@acluaz.org
27                                                        dpochoda@acluaz.org

28

| | |
|---|---|
| 1 | Daniel C. Barr (Bar No. 010149) |
| | Amelia M. Gerlicher (Bar No. 023966) |
| 2 | John H. Gray (Bar No. 028107) |
| | **PERKINS COIE LLP** |
| 3 | 2901 N. Central Avenue, Suite 2000 |

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
          agerlicher@perkinscoie.com
          jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com
          aamiri@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com

*Admitted *pro hac vice*

Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41st Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:    jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARIZONA CENTER FOR DISABILITY LAW**

By:   *s/ Maya Abela*
Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email:    skader@azdisabilitylaw.org
               adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:
   rdalyrooney@azdisabilitylaw.org
         jrico@azdisabilitylaw.org
         jross@azdisabilitylaw.org
         mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 27, 2017, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

s/ D. Freouf