1   Kathleen E. Brody (Bar No. 026331)
    Daniel Pochoda (Bar No. 021979)
2   **ACLU FOUNDATION OF ARIZONA**
    3707 North 7th Street, Suite 235
3   Phoenix, Arizona 85013
    Telephone: (602) 650-1854
4   Email: kbrody@acluaz.org
            dpochoda@acluaz.org
5
    *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia*
6   *Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith,*
    *Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner,*
7   *Joshua Polson, and Charlotte Wells, on behalf of themselves and all*
    *others similarly situated*
8   **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

9   Sarah Kader (Bar No. 027147)
    Asim Dietrich (Bar No. 027927)
10  **ARIZONA CENTER FOR DISABILITY LAW**
    5025 East Washington Street, Suite 202
11  Phoenix, Arizona 85034
    Telephone: (602) 274-6287
12  Email: skader@azdisabilitylaw.org
            adietrich@azdisabilitylaw.org
13
    *Attorneys for Plaintiff Arizona Center for Disability Law*
14  **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

15              UNITED STATES DISTRICT COURT
16                  DISTRICT OF ARIZONA
17
    Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-DKD
18  Dustin Brislan; Sonia Rodriguez; Christina
    Verduzco; Jackie Thomas; Jeremy Smith; Robert
19  Gamez; Maryanne Chisholm; Desiree Licci; Joseph      **PLAINTIFFS' REPLY IN**
    Hefner; Joshua Polson; and Charlotte Wells, on       **SUPPORT OF MOTION TO**
20  behalf of themselves and all others similarly        **ENFORCE THE**
    situated; and Arizona Center for Disability Law,     **STIPULATION [DOC. 1863]**
21              Plaintiffs,
22          v.
23  Charles Ryan, Director, Arizona Department of
    Corrections; and Richard Pratt, Interim Division
24  Director, Division of Health Services, Arizona
    Department of Corrections, in their official
25  capacities,
                Defendants.
26
27
28

LEGAL23774493.1

**INTRODUCTION**

In many cases, Defendants' own CGAR reports conclusively establish their substantial noncompliance.  In other cases, Defendants' purportedly compliant CGAR figures are made possible only by their continuing disregard, sometimes for months on end, of the Court's orders invalidating their monitoring methodology.  Plaintiffs' motion [Doc. 1863] should be granted. [1]

I.   **DEFENDANTS' OWN CGAR SCORES SHOW SUBSTANTIAL NONCOMPLIANCE WITH PERFORMANCE MEASURES 35, 37, 39, 40, 45, 50, 51, AND 52**

**A. Performance Measure 35:** *All inmate medications (KOP and DOT) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption.*

Defendants acknowledge that they continue to be substantially noncompliant with this performance measure at five institutions.  [Doc. 1900 at 3-4 (listing Eyman, Florence, Lewis, Phoenix, and Tucson with grossly deficient scores through November 2016)]  The Court should find Defendants substantially noncompliant with PM 35 at these institutions.

**B. Performance Measure 37:** *Sick call inmates will be seen by an RN within 24 hours after an HNR is received (or immediately if identified with an emergent need, or on the same day if identified as having an urgent need).*

Again, Defendants admit that their data show that they continue to be substantially noncompliant with this performance measure every reported month of 2016 at Perryville.  [Doc. 1900 at 16-17]  While Defendants promise improvement will be seen in the December data [*id.*], such assurances are speculative and do not address the serious noncompliance at the institution. Accordingly, the Court should find Defendants

---

[1]   In light of additional compliance figures received since filing this Motion, Plaintiffs withdraw the Motion with respect to PM 4, 35 (Yuma), 45 (Florence, Yuma), 51 (Florence, Lewis, and Tucson), 52 (Yuma), 55, 87, and 97, without prejudice to their right to seek a finding of noncompliance with regard to these performance measures if Defendants' performance falls below the levels required by the Stipulation.

Defendants claim that Plaintiffs agreed to withdraw their Notice of Noncompliance with respect to any Performance Measure "that had achieved compliance for four months or more." Doc. 1900 at 2:11-16 (citing Doc. 1827).  The cited document does not support this claim, and it is false.

substantially noncompliant with this measure at Perryville.[2]

**C. Performance Measure 39:** *Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointment will be seen within fourteen calendar days of the referral.*

Defendants' monitoring data show ongoing noncompliance with this measure at Yuma every month but one through November 2016. [Doc. 1900 at 4] The Court should find Defendants substantially noncompliant with PM 39 at Yuma.[3]

**D. Performance Measure 40:** *Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral.*

Defendants have been noncompliant with this performance measure for most of 2016 at Eyman, Lewis, and Tucson, and notwithstanding some improvement in November CGAR reports, remain substantially noncompliant. [Doc. 1900 at 5 (showing performance of 80% or higher only in January, September, and October at Eyman; performance of 80% or higher only in May, September, and November at Lewis; and performance of 80% or higher only in August, September, and November at Tucson)][4] The Court should find Defendants substantially noncompliant with PM 40 at Eyman, Lewis, and Tucson.

---

[2] The Court previously found Defendants substantially noncompliant with PM 37 at Eyman, Florence, Lewis, Tucson, Winslow, and Yuma. [Doc. 1583 at 2] The Court also ordered Defendants to seek all community services necessary to reach compliance with this performance measure at Eyman, Lewis, Tucson, and Yuma prisons. [Doc. 1743 at 9; Doc. 1754 at 5]

[3] The Court previously found Defendants substantially noncompliant with PM 39 at Eyman, Florence, Lewis, Perryville, and Tucson. [Doc. 1583 at 2] The Court further ordered Defendants to seek all community services necessary to reach compliance with this performance measure at those five prisons. [Doc. 1743 at 10; Doc. 1754 at 5]

[4] Defendants contend that a month in which a Performance Measure does not require Defendants to take any action (indicated by the notation "N/A," or "not applicable") should count as a compliant month. *See* Doc. 1863 at 9 n. 10; Doc. 1900 at 5 n. 2. But the Stipulation provides a clear definition of "compliance," and it does not include this situation: "Compliance with a particular performance measure … at a particular complex shall be defined as follows: … For the second twelve months after the effective date of this Stipulation, meeting or exceeding an eighty percent (80%) threshold for the particular performance measure *that applies to a specific complex*[.]" Doc. 1185 at 4, ¶ 10.a (emphasis added). A month in which a Performance Measure does not "appl[y] to a specific complex" is neither compliant nor noncompliant; it simply drops out of the analysis and is not counted.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E. Performance Measure 45:** *On-site diagnostic services will be provided the same day if ordered STAT or urgent, or within 14 calendar days if routine.*

Defendants concede they are noncompliant with this measure at Lewis. [Doc. 1900 at 17]. They argue that they are compliant at the other three institutions (Florence, Tucson, Yuma) because of compliance for more than one month. [*Id.*] Plaintiffs contend that one month at 80% (Tucson, in November) is not compliant. The Court should find Defendants substantially noncompliant with PM 45 at Lewis and Tucson.

Defendants also assert that Plaintiffs "incorrectly state" compliance numbers for this Performance Measure at Tucson in September and October 2016 [Doc. 1900 at 17 n. 13], yet present numbers for the institution for those months in a chart that are identical to Plaintiffs' presentation. *Compare* Doc. 1900 at 17:16 *with* Doc. 1863 at 15:6. Plaintiffs reported to the Court the data that had been provided to them by Defendants in the September CGAR. *See* Declaration of Corene Kendrick, Ex. 1 [ADCM701705-06 (PM 45 for Tucson for September 2016, showing 79% compliance)]. Apparently Defendants subsequently "reissued" the September CGAR for that performance measure and institution, and without explanation found themselves above the 80% requirement, with a new score of 86%. *Id.* Ex. 2 [ADCM722911-12][5]

**F. Performance Measure 50:** *Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider.*

Defendants concede they are noncompliant with this performance measure at Florence. [Doc. 1900 at 7] The Court should find Defendants substantially noncompliant with PM 50 at Florence.

**G. Performance Measure 51:** *Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider.*

Defendants euphemistically characterize their failing rates at Eyman and Yuma

---

[5] With regard to October 2016, it appears that Plaintiffs did make a transcription error. However, there is no prejudice to Defendants, as Plaintiffs inadvertently reported a higher percentage (77%) than what Defendants reported (73%), and both numbers are below the 80% compliance threshold. Kendrick Dec. Ex. 2 at ADCM750678-79.

prisons as "inconsistent scores." Doc. 1900 at 7. In reality, they constitute substantial noncompliance.  The Court should find Defendants substantially noncompliant with PM 51 at Eyman and Yuma.

**H. Performance Measure 52**:  *Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report*.

Defendants concede noncompliance with respect to Florence, Perryville, and Tucson. [Doc. 1900 at 8][6]  The Court should find Defendants substantially noncompliant with PM 52 at Florence, Perryville, and Tucson.

## II. DEFENDANTS' PURPORTEDLY COMPLIANT CGAR SCORES WERE CALCULATED USING METHODOLOGY THE COURT HAD PREVIOUSLY INVALIDATED

"[A]n order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings." *United States v. United Mine Workers of Am.,* 330 U.S. 258, 293 (1947).  Throughout the life of the Stipulation, this Court has issued several orders interpreting the Stipulation and, in many cases, directing Defendants to change their methodology for monitoring compliance with various Performance Measures.  *See, e.g.,* Doc. 1673, 1745, 1754, 1831, 1833.  Unfortunately, Defendants have frequently disregarded the Court's orders, and continued – in some cases for several months – to calculate CGAR scores using methods the Court has already found to be invalid.[7]

Defendants should not profit from their disobedience of the Court's orders. CGARs scores calculated using methods the Court had previously invalidated should be deemed to be noncompliant, and Defendants should accordingly be found substantially

---

[6] To the extent Defendants assert that they do not have to follow a similar methodological approach to this Performance Measure as the Court ordered with respect to identical language in PM 44 because there is not any explicit Court order for PM 52, [Doc. 1900 at 8] Plaintiffs request that the Court clarify that its December 14, 2016 holding regarding PM 44's language [Doc. 1831 at 2] is applicable to the identical language in PM 52.

[7] At the monthly status conferences, Plaintiffs' counsel have repeatedly pointed out that Defendants are not complying with the Court's orders regarding monitoring methodology.  *See, e.g.,* 10/5/16 Tx. 18:11-16; 12/14/16 Tx. 46:7-14.

noncompliant with the relevant Performance Measures.[8]

**A. Counting group contacts as "seen" – PM 73, 74, 80, 86, 88, 94, 95**

The Court ruled on September 6, 2016, that "[t]he Stipulation's Protocols specifically permit group counseling to count toward compliance for Performance Measure 92. By extension, then, group counseling does not count toward compliance in any of the other Performance Measures." Doc. 1673 at 5:1-3 (citation omitted). Although Defendants made an untimely oral objection that the Court construed as a motion for reconsideration, they never sought nor received a stay of the Court's September 6 order, and the mere pendency of a motion for reconsideration did not relieve them of the duty to comply with that order. *See Fairbaugh v. Life Ins. Co. of N. Am.*, 872 F. Supp. 2d 174, 181 (D. Conn. 2012) ("[The defendant's] obligation to comply is not excused by the filing of the motions for reconsideration of the order....") (internal quotation marks, citation omitted).[9] Accordingly, Defendants were obligated to comply with that order from September 6, 2016, onward.

As the Court is aware, there is a time lag in producing CGAR reports; the report for a given month is prepared at the end of the following month. [*See, e.g.,* Doc. 1740 at 5 ¶ 21 (citing ADCM659786, previously provided to the Court) (August 2016 CGAR for

---

[8] Defendants falsely claim that Plaintiffs' motion seeks to require them to re-audit CGAR scores for months prior to the Court's orders. *See* Doc. 1900 at 3:1-5. The Court will eventually have to decide whether Defendants should profit from the many months in which, over Plaintiffs' repeated objections, they reported themselves in compliance based on methodologies that ignored the plain language of the Performance Measures and were later invalidated by the Court. The Court has said the following:

> THE COURT:  … [I]t seems to me that once I've made a ruling on how a term or a practice associated with producing information that is necessary for enforcing the stipulation should be interpreted, that that should be the rule for the case. It's also the rule for the case for the retrospective, but I'm just saying what is the primary focus here is this burning fire rather than the smoldering thing that we're trying to rebuild.

10/5/16 Tx. 31:5-15. However, this question is not presented by Plaintiffs' motion, which with a single exception (*see* section II.F., *infra*), concerns Defendants' failure to comply with the Court's orders after they were issued.

[9] Defendants' motion for reconsideration was denied. [Doc. 1907]

PM 80 was prepared September 29, 2016)]  Accordingly, the August 2016 CGAR reports, and those for all subsequent months, were prepared after the September 6 order. Nevertheless, Defendants disregarded that order and continued to count group contacts as satisfying the requirement that a patient be "seen" in the August, September, October, and November 2016 CGARs. [*See, e.g., id.* (August 2016 CGARs (prepared September 29, 2016) counted group contacts as satisfying PM 80's requirement that patients be "seen")] As Defendants concede, it was not until January 18, 2017 – more than *four months* after the Court's order – that they finally amended their Monitor Guide to state that group contacts do not satisfy the requirement that a patient be "seen."  *See* Doc. 1900 at 10:11-17.  Accordingly, results for August, September, October, and November 2016 are invalid for all Performance Measures requiring that a patient be "seen" (PM 73, 74, 80, 86, 88, 94, 95), and the Court should find Defendants substantially noncompliant with these Performance Measures.

**B. Counting cell-front contacts as "seen" – PM 73, 74, 80, 86, 88, 94, 95**

The Court ruled on November 8, 2016 that "a cell-front visit is compliant with the Stipulation if an inmate refuses to leave the cell or if the prison is on lockdown.  However, a cell-front visit is not compliant with the Stipulation if an inmate is on suicide watch." Doc. 1745 at 1:18-23.  Defendants were obligated to comply with this order from November 8, 2016 forward.  But the October and November CGARs (prepared at the end of November and the end of December, respectively) did not comply with this order; as Defendants concede, it was not until January 10 – more than two months after the Court's order – that they finally revised their Monitor Guide to comply with this order.  Doc. 1900 at 10:18-20.  Accordingly, CGAR results for October and November 2016 are invalid for all Performance Measures requiring that a patient be "seen" (PM 73, 74, 80, 86, 88, 94, 95), and the Court should find Defendants substantially noncompliant with these Performance Measures.

///

///

**C. Performance Measure 44:** *Inmates returning from an inpatient hospital stay or ER transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours.*

The Court ruled on December 14, 2016 that with respect to PM 44, "the Monitoring Guide shall only permit compliance if the inmate received the prescribed treatment, or if there is a documented reason explaining why the prescribed treatment was rejected." Doc. 1831 at 2. Plaintiffs notified Defendants that they were substantially noncompliant with this measure at Douglas, Eyman, Florence, Lewis, and Tucson prisons. [Doc. 1863 at 5-6] Defendants concede that they are noncompliant at Douglas, Florence, and Lewis prisons, but argue that they are now in compliance with this measure at Eyman and Tucson because they have been at or above 80% compliance at these prisons for the last two (Tucson) or three months (Eyman). [Doc. 1900 at 5]

However, these findings of compliance are based upon a methodology that contradicted the plain language of the Stipulation, and that the Court has invalidated. [Doc. 1831 at 2; *see also* 12/14/16 Tr. at 33:4-8 ("the Department thought it was worthy to have an outside physician see someone, that physician makes a recommendation, and it's just crickets thereafter. You can't tell whether it's fallen between the cracks or somebody has decided something else. That doesn't make any sense to me.")] It was not until mid-January, 2017 that Defendants revised their Monitor Guide to comply with the Court's order. Doc. 1890-1 at 242. Accordingly, the November 2016 CGAR scores (calculated at the end of December) fail to comply with the Court's order, and Defendants should be found noncompliant with PM 44 at all five institutions.

**D. Performance Measure 86:** *MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication.*

On September 6, 2016, the Court rejected Defendants' argument that "it is unnecessary (nor is it required) that Defendants review data from the date the inmate was taken off medication." Doc. 1673 at 6:7-9. On November 10, 2016 the Court again made clear that "the start date for calculating compliance is the date that medication is

discontinued." Doc. 1754 at 2:1-2. Defendants disregarded both of these orders, continuing to count a record as compliant as long as the patient had been seen once in the previous 90 days, without regard to when she discontinued medication – a methodology that bears no relationship to the actual language of the Performance Measure. [*See* Doc. 1760-1 at 122-23 (November 14, 2016 Monitor Guide for PM 86) ("look to see if the most recent contact occurred 90 days or less from the last day of the monitored month")]  As Defendants concede, it was not until January 2017 that they finally amended their Monitor Guide to comply with the Court's order.  *See* Doc. 1900 at 13:26-27.  Accordingly, the August, September, October and November 2016 CGARs for PM 86 are invalid, and the Court should find Defendants substantially noncompliant with this Performance Measure.

**E. Performance Measure 98:**  *Mental health HNRs shall be responded to within the timeframes set forth in the Mental Health Technical Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0.*

The MHTM sets forth five categories of mental health HNRs and specifies a response time for each.  [*See* Doc. 1625 at 21:4-20]  For months Defendants monitored only one of these five categories, in violation of the plain language of this Performance Measure. [*Id.*] On September 6, 2016, the Court ordered Defendants to comply with "[t]he plain language of the Performance Measure 98." Doc. 1673 at 8:8-14.  However, it was not until November 14, 2016 - more than two months after the Court's order – that Defendants revised their Monitor Guide to comply.  See Doc. 1760-1 at 138-39. Accordingly the CGAR results for August and September 2016 for PM 98 are invalid.

Three of the five timeframes set forth in the MHTM require that the HNR be responded to either "immediately" or "within 24 hours."  *See* Doc. 1625 at 21:4-20.  In order to determine compliance with these requirements, it is obviously necessary that the times at which the HNR was received, triaged, and responded to are recorded.  After Defendants refused to record these times, the Court at the December 14, 2016 status conference ordered them to do so.  [Doc. 1831 at 2]  Although Defendants produced a revised Monitor Guide on January 18, 2017, they *still* have not revised the Guide to comply with the Court's order.  [*See* Doc. 1890-1 at 349]  The November CGAR results,

1   prepared at the end of December, did not comply with the Court's order, and are

2   accordingly invalid, and the Court should find Defendants substantially noncompliant

3   with this Performance Measure.[10]

4   **F. Defendants' newly-invented "partial credit" methodology – PM 94, 95**

5   In their November 2016 Monitor Guide, Defendants unilaterally adopted their

6   newly-invented "partial credit" methodology, which dramatically inflated their

7   compliance figures. *See, e.g.,* Doc. 1851 at 3-4, ¶¶ 8-10 (Defendants' new methodology

8   inflated October 2016 scores on PM 94 at Eyman from 55% to 87%; at Florence from

9   70% to 91%; and at Tucson from 40% to 86%). Directly relevant to the instant motion,

10  Defendants' methodology falsely inflated the October 2016 CGAR score on PM 94 at

11  Perryville from 40% to 85%. Doc. 1863 at 11:17-24. On December 14, the Court

12  invalidated this new methodology, and made clear that it was improper for Defendants to

13  adopt it unilaterally. [Doc. 1831 at 1-2][11]

14  In a stunning display of chutzpah, Defendants now argue that they should receive

15  full credit for the falsely inflated compliance figures they calculated with this

16  impermissible methodology. [*See* Doc. 1900 at 14:15-18] If Defendants' argument is

17  accepted, they will have every incentive to continue unilaterally changing their monitoring

18  methodology, because even after the Court rules against them, they will still benefit from

19  the falsely inflated scores they had calculated in the interim. The Court should reject this

20  argument; the October 2016 CGAR scores for PM 94 and 95, calculated with this

21

22  [10] Defendants insinuate that the Court's written order was unclear. Doc. 1900 at 16

23  n. 12. But the Court's oral order at the hearing left no doubt that Defendants must record the times: "THE COURT: I just think the stipulation where it requires actions to be done

24  by a certain time, it's critical that the records that are being evaluated to determine whether or not there's compliance do inform us of the information that we have to have to make

25  that determination." 12/14/16 Tx. 67:16-20. In any event, if Defendants believed the Court's order was unclear, the appropriate response would have been to seek clarification

26  – not simply ignore it.

27  [11] "THE COURT: Well, before turning to Mr. Struck, I will say my view is that you don't get to make a unilateral change without having it presented to the Court and

28  having me have the chance to do what paragraph 9B provides for me to do, and that is to determine what protocol should be employed." 12/14/16 Tx. 15:19-23.

1  impermissible methodology, are invalid, and the Court should find Defendants

2  substantially noncompliant with these Performance Measures.

3                          **CONCLUSION**

4          The Court should find Defendants to be substantially noncompliant with the

5  Performance Measures set forth in Plaintiffs' Motion, and order them to develop an

6  appropriate remedial plan.  *See* Doc. 1863 at 15:17-27.

7  Dated:  February 3, 2017                    **PRISON LAW OFFICE**

8

9                                             By:   *s/ Corene Kendrick*
                                                    Donald Specter (Cal. 83925)*
10                                                   Alison Hardy (Cal. 135966)*
                                                    Sara Norman (Cal. 189536)*
11                                                   Corene Kendrick (Cal. 226642)*
                                                    Rita Lomio (Cal. 254501)*
12                                                   1917 Fifth Street
                                                    Berkeley, California 94710
13                                                   Telephone:  (510) 280-2621
                                                    Email:    dspecter@prisonlaw.com
14                                                            ahardy@prisonlaw.com
                                                             snorman@prisonlaw.com
15                                                            ckendrick@prisonlaw.com
                                                             rlomio@prisonlaw.com
16
                                                    *Admitted *pro hac vice*
17
                                                    David C. Fathi (Wash. 24893)*
18                                                   Amy Fettig (D.C. 484883)**
                                                    Jamelia Morgan (N.Y. 5351176)**
19                                                   **ACLU NATIONAL PRISON
                                                    PROJECT**
                                                    915 15th Street N.W., 7th Floor
20                                                   Washington, D.C. 20005
                                                    Telephone:  (202) 548-6603
21                                                   Email:    dfathi@npp-aclu.org
                                                             afettig@npp-aclu.org
22                                                            jmorgan@aclu.org
23                                                   *Admitted *pro hac vice*.  Not admitted
                                                     in DC; practice limited to federal
24                                                    courts.
                                                    **Admitted *pro hac vice*
25

26

27

28

LEGAL23774493.1                       -10-

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, PLLC**
P. O. Box 91398
Tucson, Arizona 85752
Telephone: (520) 477-1475
Email:    kirstin@eidenbachlaw.com

Kathleen E. Brody (Bar No. 026331)
Daniel Pochoda (Bar No. 021979)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:    kbrody@acluaz.org
          dpochoda@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:    dbarr@perkinscoie.com
          agerlicher@perkinscoie.com
          jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:    cnmitchell@jonesday.com
          aamiri@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:    jlwilkes@jonesday.com

*Admitted *pro hac vice*

Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3498
Email:    jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY
LAW**

By:    s/ Maya Abela
    Sarah Kader (Bar No. 027147)
    Asim Dietrich (Bar No. 027927)
    5025 East Washington Street, Suite 202
    Phoenix, Arizona 85034
    Telephone: (602) 274-6287
    Email:    skader@azdisabilitylaw.org
        adietrich@azdisabilitylaw.org

    Rose A. Daly-Rooney (Bar No. 015690)
    J.J. Rico (Bar No. 021292)
    Jessica Jansepar Ross (Bar No. 030553)
    Maya Abela (Bar No. 027232)
    **ARIZONA CENTER FOR
    DISABILITY LAW**
    177 North Church Avenue, Suite 800
    Tucson, Arizona 85701
    Telephone: (520) 327-9547
    Email:
      rdalyrooney@azdisabilitylaw.org
        jrico@azdisabilitylaw.org
        jross@azdisabilitylaw.org
        mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability
Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2017, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

C. Kendrick