Kathleen E. Brody (Bar No. 026331)
Daniel Pochoda (Bar No. 021979)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org
        dpochoda@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia
Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith,
Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner,
Joshua Polson, and Charlotte Wells, on behalf of themselves and all
others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
        adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-DKD <br><br><br> **PLAINTIFFS' MOTION TO ENFORCE THE STIPULATION (MAXIMUM CUSTODY PERFORMANCE MEASURES 1-3, 5-6, AND 8)** |

LEGAL134533970.1

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................. 1

PROCEDURAL HISTORY ................................................................. 2

STATEMENT OF FACTS .................................................................. 4

    I.     PROFOUND FLAWS IN THE MONITORING PROCESS
          FATALLY UNDERMINE THE ACCURACY OF THE CGAR
          FINDINGS ............................................................................. 4

          A.     Defendants' Selection of Weeks to be Monitored is Not
                Random & is Therefore Non-Compliant for MC PM ##1-3, 5-
                6, and 8. ...................................................................... 5

          B.     Selection of Prisoners to be Reviewed Does Not Allow Full
                Review of Ten Prisoners for Each Maximum Custody
                Performance Measure .......................................................... 7

          C.     An Overwhelming Pattern of Refusals Raises Serious
                Concerns about the Legitimacy of Compliance Findings. ................. 9

          D.     Failure to Document Times Out-of-Cell & Alterations of the
                Times Recorded ................................................................ 14

          E.     Conflicting Out-of-Cell Times Documented on Tracking
                Sheets. ....................................................................... 18

          F.     Failure to Cross-Check Prisoner Participation in Programs
                with Activity Schedules and Sign-In Sheets/ Rosters & Failure
                to Produce Sign-In Sheets. .................................................. 22

    II.    ERRONEOUS COMPLIANCE FINDINGS ............................................. 25

          A.     Failure to Document or Account for Exercise Venue in
                Compliance Monitoring in Violation of the Requirements of
                MC PM #6. ................................................................... 25

          B.     Erroneous Findings for Maximum Custody Performance
                Measure 8. .................................................................... 29

ARGUMENT ................................................................................ 36

    I.     THIS COURT HAS THE AUTHORITY TO FIND THE
          DEFENDANTS NON-COMPLIANT WITH THE MAXIMUM
          CUSTODY PERFORMANCE MEASURES AND ORDER
          ADDITIONAL RELIEF ........................................................ 36

RELIEF REQUESTED ...................................................................... 37

CONCLUSION .............................................................................. 38

# <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

**CASES**

*Armstrong v. Davis,*
   275 F.3d 849 (9th Cir. 2001) ...................................................................... 36

*Brown v. Plata,*
   563 U.S. 493 (2011) ................................................................................... 37

Plaintiffs, by and through their undersigned counsel, hereby move this Court to exercise its inherent powers and those outlined in the Stipulation (Doc. 1185 ¶¶ 35-36) to enforce the terms of the Stipulation by finding Defendants substantially non-compliant with Maximum Custody Performance Measures 1-3, 5-6, and 8, and order Defendants to take immediate and substantial action to implement the terms of the Stipulation required to end the extreme conditions of solitary confinement and isolation in the subclass units, as well as the mental health and other out-of-cell group programming designed to counteract the devastating impact of isolation on prisoners with serious mental illness.

**INTRODUCTION**

This motion arises from profound flaws in the monitoring process for the Maximum Custody Performance Measures ("MC PM") in all of the covered units across more than eighteen months of monitoring.  During that time Plaintiffs repeatedly sought the underlying compliance documents from Defendants and were repeatedly denied those documents until the Court intervened.  The documents that were eventually produced have proven to be so rife with problems, inconsistencies, and remaining holes that it is still impossible to analyze some of Defendants' compliance findings fully.

After careful and extensive analysis, the picture that finally emerged from the documents produced demonstrates inconsistent and often blatantly false compliance findings and methodologies, including both the failure to select random weeks for monitoring each month and the failure to select random prisoner records for review each month—as clearly required by the terms of the Stipulation.  *See* Section I.A.-I.B., *infra*.

A profound and inexplicable pattern of refusals of out-of-cell time and group programming across all units and nearly all months raises serious questions about the factors undermining the operation of the Stipulation which prisoners report as deliberate efforts to undermine participation in out-of-cell activities.  The pervasiveness of these refusals, especially by individuals with serious mental illness (SMI) is so severe that psychiatric expert, Dr. Pablo Stewart, declares it a "clinical red flag" that signals "strong evidence that the SMI population is undertreated and subjected to inadequate mental

health care as a whole." Dr. Stewart further states that such high rates of refusal demand an "immediate response by the mental health care staff to reduce the refusal rate." *See* Section I.C., *infra*.

Systemic failures to document times in and out-of-cell as required by the forms developed for compliance tracking under the Stipulation; inconsistent, and overlapping program and out-of-cell times documented on some records but contradicted by others; incomplete and inaccurate records; and after-the-fact calculations have created a morass of compliance documentation that makes it almost impossible to discern how compliance findings were actually made across facilities and months of reporting. *See* Section I.D.-I.F., *infra*. Where Plaintiffs have been able to analyze compliance findings, substantial patterns of non-compliance emerge across measures, facilities, and months despite Defendants' repeated self-reports of nearly 100% compliance across the board for the MC PM. *See* Section II.A.-II.B., *infra*.

Below Plaintiffs set forth in detail the extensive procedural and substantive errors in Defendants' compliance findings for MC PM ##1-3, 5-6, and 8[1] and ask that the Court find non-compliance with these measures from March 2015 to September 2016 and order a remedial plan to correct that non-compliance.

## PROCEDURAL HISTORY

Following the procedures set forth in the Stipulation (Doc. 1185 ¶¶ 30-31) Plaintiffs' counsel provided a Notice of Substantial Non-Compliance to Defendants' counsel on July 7, 2016 with respect to the Maximum Custody Performance Measures ("MC PM") ##1-3, 5-8 at Perryville Lumley SMA; Eyman-Browning; Eyman-SMU I; Florence Central; Florence Kasson; and Lewis Rast Unit. [*See* Declaration of Amy Fettig ("Fettig Decl.") ¶ 2] Defendants' responded within the timeframe set by the Stipulation and thereafter the parties conducted a meet and confer in order to try to resolve the dispute in the Notice on August 30, 2016. [Fettig Decl. ¶ 3] Mediation of this matter was

---

[1] Compliance issues with MC PM #9 regarding the use of force provisions of the Stipulation is being addressed separately.

conducted on October 26, 2016.  [Doc. 1725]   As agreed during the mediation, discussions have continued around the Monitoring Guide and some issues have been resolved but the mediation was ultimately unsuccessful in addressing core compliance issues for MC PM ##1-3, 5-6, and 8.  [Fettig Decl. ¶ 4]

The backdrop of this process is Defendants' repeated and long-standing failure to produce the documents used to complete and support the findings for the monthly CGAR review of the isolation/maximum custody performance measures (Doc. 1185-1, Ex. E)— often referred to by Defendants as the "Max Custody Notebooks."   Every month beginning in October 2015 until the present Plaintiffs have requested production of all of these underlying documents.  [Fettig Decl. ¶ 5]  Defendants never objected to production of these for Eyman-Browning; Eyman-SMU; Perryville-Lumley; Florence-Central; Florence-Kasson; Lewis-Rast; or Phoenix.  They have simply failed to produce them.  [*Id.*]

Plaintiffs spent months attempting to obtain the documents.  But Defendants either failed to respond or promised to produce the missing documents by a date certain which they then failed to meet.  [Fettig Decl. ¶ 6]  As a result of Defendants' intransigence and non-responsiveness in this matter, Plaintiffs were forced to turn to the Court for assistance.  [*Id.*]  The Court dealt with these issues in two hearings on August 19 and August 26, 2016. [Doc. 1666; Doc. 1667]  At the time of these hearings, despite over ten months of requesting these documents and being told by Defendants that production was forthcoming, months and months of documents supporting Defendants' CGAR findings had never been produced.  [Fettig Decl. ¶ 7]  In the case of some facilities, such as Eyman-SMU and Eyman-Browning, Defendants had not produced one component of the Max Custody Notebooks for all of 2016.   Even more egregiously, Defendants had produced virtually none of the requisite documentation for Florence (Central & Kasson) and Phoenix since September 2015.  [Fettig Decl. ¶ 7]  Without these documents it was impossible for Plaintiffs to evaluate Defendants' compliance findings fully for the isolation performance measures.  [Fettig Decl. ¶ 8]  At the August 26, 2016 hearing the

1  Defendants agreed to produce all of the missing documents through June 2016 by
2  October 14, 2016.  [Doc. 1667]  Despite this agreement, Plaintiffs have informed the
3  Court that critical documents remain missing to this day.[2]  [Doc. 1795; Doc. 1796-1,
4  Ex. A (under seal); and Doc. 1850]

## STATEMENT OF FACTS

### I.   PROFOUND FLAWS IN THE MONITORING PROCESS FATALLY UNDERMINE THE ACCURACY OF THE CGAR FINDINGS

8       In the review of the documents produced by Defendants in support of the MC PM
9  CGAR findings, Plaintiffs found both systemic problems with the monitoring
10  methodology itself, as well as inaccurate compliance findings in all units for which
11  documentation has been provided.  Unfortunately, missing and incomplete documentation
12  made it impossible to monitor and test all of the CGAR findings for much of the life of the
13  Stipulation.  Although some documents still remain missing or unproduced, Plaintiffs
14  have identified systemic problems in the monitoring and implementation of the
15  Stipulation which invalidate findings for Eyman-Browning; Eyman-SMU; Perryville-
16  Lumley; Florence-Central; Florence-Kasson; and Lewis-Rast for all months for MC PM
17  ##1-3, 5-6, and 8 through September 2016.[3]

18       The MC PM at issue here involve out-of-cell time, incentives, program
19  participation and increased group programming.  These activities are central to the
20  provisions of both the Stipulation and the policy entitled, Director's Instruction 326,
21  Maximum Custody Population Management, March 27, 2014 ("DI 326") (ADC261959-
22  85) (Doc. 1775-3).  Under the Stipulation, which incorporates DI 326 in many of the
23  measures, the MC PM require the following:

---

26       [2]  The Court has already indicated that it will find Defendants non-compliant due to
27  the failure to produce documents supporting their compliance findings.  [*See, e.g.*,
   Transcript of Hearing, Jan. 11, 2017 at 14:12-16; 14:21-25]
       [3]  Compliance documentation for the October and November 2016 CGAR reports
28  has not yet been produced by Defendants despite repeated requests by Plaintiffs.

- MC PM #1 requires that maximum custody prisoners receiving a minimum amount of out-of-cell time per week: Step I (7.5 hours); Step II (8.5 hours); and Step III (9.5 hours);
- MC PM #2 incorporates DI 326's incentive system and requires that all Step II and III prisoners are mandated to be offered at least one hour of out-of-cell group programming a week;
- MC PM #3 requires that if out-of-cell time mandated by MC PM #1, 2, and 8 is limited or cancelled it must be properly documented and justified as required by the Stipulation;
- MC PM #5 requires that all maximum custody prisoners are offered a minimum of 6 hours of out-of-cell exercise a week;
- MC PM #6 requires that all prisoners eligible for participation in DI 326 be offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing.
- MC PM #8, requires that prisoner with serious mental illness be offered all of the privileges and incentives under DI 326 and additional out-of-cell time per week, including ten hours of unstructured time; one hour of additional mental health programming; one hour of psycho-educational programming; and one hour of additional out-of-cell programming.

[Doc. 1185-1, Ex. E]

## A. Defendants' Selection of Weeks to be Monitored is Not Random & is Therefore Non-Compliant for MC PM ##1-3, 5-6, and 8.

In order to assess compliance with the Maximum Custody Performance Measures, one randomly selected week per month at each institution is to be reviewed for six of the nine outcome measures (##1-3, 5-6, 8).  [Doc. 1185-1, Ex. E ("At each designated location, Max Custody Daily Out of Cell Time Tracking Forms are reviewed for one *randomly* selected week for each monitored month, for 10 *randomly* selected prisoners.") (emphasis added)]   In order to assess compliance, the monitor must review these

randomly selected individual prisoner tracking forms to determine compliance with out-of-cell time, exercise, programming, etc.   In order to comply with the outcome measurement system established by the Stipulation, *each* month one week must be selected for review of the Maximum Custody Performance measures at *random*, so that the week chosen cannot be known in advance.

During the monitoring months of March 2015 through June 2016, for each facility monitored, with just one exception, the week chosen for monitoring the previous month was either the first or second week[4] of the following month.[5]  Exhibit 1 to the Declaration of Jennifer Onka ("Onka Decl.") sets forth the week selected by Defendants for monitoring of the MC PM from March 2015 to July 2016.  [Onka Decl. ¶ 3, Ex. 1 (FRE 1006 Summary Exhibit – Weeks Chosen for Monitoring – March 2015 – June 2016)] This means that for 16 months, with the exception of just one facility in one month, the third or fourth week was never monitored at any time at any facility.

The weeks selected for review by Defendants are non-random because over a period of sixteen months, it is clear that all facilities knew they would be monitored during either the first or second week of the month.  In fact, the non-random nature of the monitoring appears to be the reason why defendants adopted the bizarre convention of monitoring the previous month during the first two weeks of the following month.  For example, the compliance documents produced in the September 2015 Notebook actually correspond with the August 2015 CGAR report.  [Fettig Decl. ¶ 9]  This is because the previous month is almost always monitored in the first or second week of the next month.  There is nothing random about this selection process.  And this process was used until the July 2016 CGAR reports.  [*Id.*]

---

[4] Weeks are measured starting from Saturday; therefore, depending on when the first Saturday falls in a given month, the first week of that month may start on any date between the 1st and 7th day of the month.

[5] In April 2015, all facilities selected the second week, except for Florence-Central and Florence-Kasson, which selected the third week; in December 2015, Lewis-Rast selected the second week while all other facilities chose the first week.

The probability that just one institution would do this randomly is less than one tenth of one percent; the probability that all would is virtually zero.  Given the statistical near-impossibility that the weeks were selected randomly, it is clear that there was some non-random selection process occurring with respect to the weeks selected for CGAR reporting.  Because the selection process is non-random, it does not comply with the requirements of MC PM ##1-3, 5-6, and 8.

In addition, the plain language of the Stipulation is written to prevent Defendants from being able to provide records of compliance without fully complying during the entirety of the monitored months.  By providing records from non-randomly selected weeks, Defendants can ensure that they are prepared for the monitoring, and can comply only during the selected weeks.  Plaintiffs have no way of assessing whether Defendants continued to comply during non-selected weeks.  Because the method of selecting weeks is non-random and undermines the Stipulation's methodology for ensuring compliance during an entire month rather than just the known time period when a non-random process ensures that monitoring will take place, Defendants are in non-compliance with both the monitoring protocol and the substantive provisions of the Stipulation relating to maximum custody prisoners.  As a result, the CGAR findings from March 2015 to June 2016 for MC PM ##1-3, 5-6, and 8 are irretrievably corrupted and their findings must be disregarded.[6]

## B. Selection of Prisoners to be Reviewed Does Not Allow Full Review of Ten Prisoners for Each Maximum Custody Performance Measure.

From March 2015 to August 2016 at Florence-Kasson, only fifteen total prisoners, rather than twenty, were selected for audit.[7]  At that facility, the same five prisoners in each month's audit were included in both the non-SMI group sampled *and* the SMI group

---

[6] Defendants have allegedly abandoned this non-random practice as of the July 2016 CGARs and agreed to institute a random process for the selection of weeks in the Monitoring Guide.  [Fettig Decl. ¶ 9]  The Court also recently ordered that the last seven days of the month shall be eligible for compliance sampling.  [Doc. 1831 at 3]

[7] The Maximum Custody Outcome Measure Protocol requires that the records of ten randomly selected prisoners be used for MC PM ##1-3, 5-6 and the records of ten randomly selected prisoners with serious mental illness be selected for MC PM #8.  [Doc. 1185-1, Ex. E]

sampled.  Plaintiffs have tracked these overlapping records in Exhibit 2 to the Declaration of Jennifer Onka (filed under seal).  For each month starting in March 2015 this chart lists all of the ADC prisoners selected for review.  The five highlighted records for each month are the records double-counted for both the non-SMI and SMI groups.  [*See* Onka Decl. ¶ 4, Ex. 2 (FRE 1006 Summary Exhibit – Defendants' Inmate Record Selection – March 2015 - August 2016)]

Under the clear terms of the Maximum Custody Protocol, ten randomly selected prisoners' Daily Out-of-Cell Tracking forms are supposed to be selected for measures ##1-3, 5-6, and *another* ten are to be randomly selected for MC PM #8.  [Doc. 1185-1, Ex. E]  Using an overlapping subset of only fifteen prisoners for all of these measures is clearly not random; it is also insufficient in number under the Stipulation.  The practice is also methodologically unsound, as it permits Defendants to double-count out-of-cell requirements for five prisoners each month, thereby reducing the scale of the out-of-cell monitoring.

By using five overlapping records for both reviews, Defendants have wrongfully reduced the number of prisoners whose total out-of-cell time, group programming, and exercise they are required to monitor and report.

At every other facility, with rare exceptions,[8] Defendants complied with the Stipulation by selecting ten unique non-SMI prisoners and ten unique SMI prisoners for audit, for a total of twenty prisoners reviewed each month.  [Onka Decl. ¶ 5]  The population of prisoners at Florence-Kasson is sufficiently large such that twenty prisoners can readily be selected each month for evaluation.[9]  A sample size of twenty is already a

---

[8] Plaintiffs identified sporadic instances at other facilities in which one or two prisoners were counted in both the non-SMI and SMI audits.  [*See* Onka Decl., Ex. 2 at 5 (filed under seal) (showing record selection overlap between SMI and non-SMI record draws at Eyman-SMU I for one or two records from April 2015 through August 2016)]  No facility, however, engaged in this practice to the same extent as Florence-Kasson.

[9] According to recent count sheets made publicly available by the Arizona Department of Corrections, Florence-Kasson houses approximately 64 maximum custody prisoners at any given time.  *See ADC Institutional Capacity Committed Population, January 13, 2017,* ARIZ. DEP'T OF CORR., https://corrections.az.gov/sites/default/files/DAILY_COUNT/Jan2017/01132017_count_s

modest number of prisoners to monitor, but Defendants have improperly restricted the monitoring cohort even further.  In every monitored month for which only fifteen prisoners were selected, non-compliance must be found at Florence-Kasson for MC PM ## 1-3, 5-6, and 8.

## C.  An Overwhelming Pattern of Refusals Raises Serious Concerns about the Legitimacy of Compliance Findings.

A troubling and consistent pattern of refusals of out-of-cell time and group programming exists across the system.  These alarmingly high refusal rates translate into days, weeks and months in their cell for many prisoners and raise serious questions about both the legitimacy of the refusals, the underlying cause of such pervasive refusals, and why Defendants have taken no action to solve the problem.

In fact, the pattern of refusals is so pervasive across units and time that Defendants have found themselves at least 80% and mostly 100% compliant every month in every facility since monitoring started in March 2015 merely because they have recorded prisoners refusing most out-of-cell time and group programming—rather than actually providing what is required under the Stipulation.  [*Compare* Onka Decl. ¶ 6, Ex. 3 (FRE 1006 Summary Exhibit of Defendants' Reported Compliance Percentages for MC PM ##1-3, 5-6, and 8 from February 2015 to September 2016) with Onka Decl. ¶ 8, Ex. 4 (FRE 1006 Summary Exhibit, Rates of Refusal of Out-of-Cell Time and Programming – December 2015 – September 2016)]  Together these factors raise serious question about Defendants' compliance efforts and findings for MC PM ##1-2, 5-6, and 8.

At Perryville-Lumley, Eyman-SMU I, Eyman-Browning, Florence-Kasson, and Lewis-Rast, the monitoring documentation produced by Defendants reveals that in most months half or more of the prisoners monitored refused all or almost all out-of-cell exercise time, with many others refusing some of their additional programming hours. [*See* Onka Decl., Ex. 4]  Exhibit 4 demonstrates that for out-of-cell exercise, the non-SMI

heet.pdf (last visited January 16, 2017).  This population size is more than sufficient for the required monitoring purposes.

population is allegedly refusing to leave their cells almost 50% of the time.  [*Id.* at 1-2]  For the SMI population, the exercise refusal rates are even higher with rates between 70% to 90% for most months at most facilities.  [*Id.*]  For group programming, the non-SMI population refusal rates remain a problem, but Eyman-Browning, Eyman-SMU I and Florence Kasson are especially high, posting refusal rates between 30% to 60% on a consistent basis.  [*Id.* at 3-4]  For the SMI population, the rate of refusal for group programming at most facilities for most months is 50% and several reach 70% or greater on a regular basis.  [*Id.*]  This stunning pattern of refusals often extended to a prisoner allegedly refusing all out-of-cell time offered him/her during an entire week.  [*See* Onka Decl. ¶ 11, Ex. 5 (under seal)].  In other instances, entire classes of 7-10 inmates would allegedly refuse to participate in group programming.  [*See* Onka Decl. ¶ 12, Ex. 6 (under seal)]

In a clinical setting, occasional refusals from an SMI population are expected, but aggregate rates of refusal for the population above 30% to 40% must be addressed as a clinical failure (meaning an indicator of less than adequate clinical care), as must persistent patterns of refusal in individual patients.  [*See* Declaration of Pablo Stewart, M.D. ("Stewart Decl.") ¶ 2]  According to Dr. Stewart, the rates of refusal recorded in ADC's compliance documentation "are stunning in any population, and also undermine any contention that provisions to ameliorate damaging levels of isolation for individuals with SMI are being successfully implemented by ADC."  [*Id.*]  Dr. Stewart considers these high rates of refusal a "clinical red flag" that signals "strong evidence that the SMI population is undertreated and subjected to inadequate mental health care as a whole." [Stewart Decl. ¶ 3]  According Dr. Stewart:

> The medical literature, often termed "adherence to treatment," supports the fact that sicker patients tend to have the most difficulty with treatment regimes.  For psychiatric patients, refusals of treatment tend to be correlated to higher levels of acuity.  In other words, the sicker the mental health patient, the more likely s/he is to refuse treatment.  Given my first-hand knowledge of ADC's mental health care system developed during the course of this litigation, inspection of facilities, interviews with prisoners and staff, and review of medical

1
2
3

> records and other documents, I am certain that the acuity of mental health problems in the prisoner population and the lack of adequate mental health treatment is one of the underlying factors leading to the high rates of program and out-of-cell time refusal in the isolation units.

4   [Stewart Decl. ¶ 3]

5       Further, Dr. Stewart notes that in a clinical setting in the community, such high
6   rates of refusal in an SMI population would require an "immediate response by the mental
7   health care staff to reduce the refusal rate" and would be seen as a clinical failure
8   demanding a quality assurance process to determine the factors causing the refusals and
9   plans for corrective action.   [Stewart Decl. ¶ 4]   Dr. Stewart sets forth several typical
10   factors that may be underlying the high refusal rates in a correctional setting in addition to
11   patient acuity and inadequate mental health care, including: clinical activities occurring in
12   a non-confidential setting; the time of the treatment program interfering with other
13   activities (e.g., commissary, yard time, visiting, etc.); the quality of the programming
14   being poor, including poor skill sets of the clinician; previous attendance in the same
15   group program in the recent past; the group not being pertinent to the inmate's mental
16   illness; the inmate being too disorganized to participate (often indicating a need for a
17   higher level of care); the lack of a positive relationship with the treatment provider;
18   custody staff discouraging people from coming out of their cells; fear of officers or other
19   inmates; and the failure to create a safe environment for the patient.   [Stewart Decl. ¶ 5]
20   Often, high refusal rates in a corrections setting are due to a combination of clinical and
21   custody staff factors that undermine the participation of individuals with SMI in their own
22   treatment.  [*Id.*]

23       Refusal to adhere to treatment and refusal to socialize or leave one's cell can
24   sometimes be a symptom of disease for SMI individuals who are subjected to isolation.
25   But "it is not acceptable for mentally ill inmates to regularly refuse to leave their cells to
26   participate in care and activities.   These are symptoms of uncontrolled, undertreated
27   disease that must be addressed."  [Stewart Decl. ¶ 7]   ADC clinicians, and the staff as a
28   whole, must work to address the factors undermining the care and treatment of these

patients.  [*Id.*]  "Failure to reduce refusals and establish adherence to treatment creates an unacceptable risk of harm for the SMI population in isolation; their diseases will likely get worse if they continue to go untreated and undertreated."  [*Id.*]  Defendants must take affirmative steps to prevent this harm and solve the clear problems surfaced in the stunningly high refusal rates in the SMI population.  Dr. Stewart addresses next steps:

> In my opinion ADC must take immediate action to reduce the refusal rates substantially in the SMI population in isolation. ADC should immediately undertake a quality assurance process to identify likely causes of the refusals, including both medical and custody issues.  Given the persistence of the refusals over time and the widespread nature of the refusal rates across facilities it is also my opinion that the system needs outside expert guidance on how to identify the underlying problems and what corrective actions to take to effectively reduce the rates of refusal.

[Stewart Decl. ¶ 8]

The underlying causes of refusals predicted by Dr. Stewart are borne out by the experiences of the subclass members in the isolation units.  Prisoners describe mental health classes as unengaging, difficult to follow, and poorly implemented.  [*See, e.g.*, Fettig Decl., Ex. 1 (Declaration of Robert Larry Dadisman ("Dadisman Decl."), dated February 3, 2017) ¶ 5 ("I refuse to go because it is not useful to me [sic] some of the instructors do not interact or engage with us.  They stand up and read from a book or a piece of paper.  Because of my mental health disabilities, I do not process information well in a linear fashion."); Fettig Decl., Ex. 2 (Declaration of Stephen Waggoner ("Waggoner Decl."), dated February 3, 2017) ¶ 5 ("the classes are not interactive and it is difficult to stay focused and interested"); Fettig Decl., Ex. 3 (Declaration of David Orr ("Orr Decl."), dated February 3, 2017) ¶ 1 ("We don't do anything in group.  There is no activity, structure, game, or set plan.  There is nothing to keep our minds busy.")]  Others cite the conduct of mental health and custody staff as a source of discouragement for attending group programming.  One prisoner states that he liked his group sessions but was told by the "doctor who ran the group that the judge in the *Parsons v. Ryan* case ordered the mental health class to be cancelled and replaced with individual counseling at

the demand of the ACLU."  [*See* Fettig Decl., Ex. 4 (Declaration of Eugene Doerr ("Doerr Decl."), dated February 3, 2017) ¶ 2]   Another prisoner states, "The officers act disrespectfully; sometimes they scream and yell at us, and call us 'losers' and 'retards'" while walking the prisoners to group sessions.  [Orr Decl. ¶ 3]  He further observes that mental health staff are also a problem: "The psych tech does not interact with us positively.   Our usual psych tech just sits at a table or walks around.   She is condescending and treats people, prisoners and officers alike, disrespectfully.   For example, she sometimes makes faces behind the back of a prisoner who smells bad because he cannot control his bladder."  [Orr Decl. ¶ 6]  As a result, this mentally fragile Plaintiff refuses group sessions, "[b]ecause of the way the officers and psych tech treat me, I am worried that I will act out and get into trouble to my mental health conditions." [*Id*. ¶ 7]  He also notes that the negative and demeaning treatment suffered by SMI prisoners and ADC's failure to address their complaints led to a general strike against programming by most men on his housing pod.  [*Id*. ¶ 11]

Similar problems are found with the provision of recreation for members of the subclass as well as for the SMI unstructured out-of-cell time.   The pain of being simultaneously hand-cuffed and chained during SMI unstructured time making it impossible to enjoy time out-of-cell is noted as a reason for refusal.  [Doerr Decl. ¶ 5] Others state that being chained to a table for three hours with nothing to do causes refusals. [Dadisman Decl. ¶¶ 11-14]  One prisoner recalled asking officers for something to do during "table time" and being told by an officer that "Parsons v. Ryan does not tell them how they're supposed to give me out of cell time, just that they're supposed to give me out of cell time."  [*Id*. ¶ 15]  For some, recreation is simply not offered.  [Fettig Decl., Ex. 5 (Declaration of Michael Martinez ("Martinez Decl."), dated February 3, 2017) ¶ 2; Fettig Decl., Ex. 6 (Declaration of Gonzalo Prudencio ("Prudencio Decl."), dated February 3, 2017) ¶ 2]  Lack of access to bathrooms and water also discourages prisoners from leaving their cells.  [Dadisman Decl. ¶¶ 16-17; Prudencio Decl. ¶¶ 4-5; Martinez Decl. ¶ 3; Fettig Decl., Ex. 7 (Declaration of Jonathan Wilson ("Wilson Decl."), dated

February 3, 2017) ¶ 3]  And for others, a common cause for "refusals" appears to be that when programming and recreation are offered in the morning and prisoners are not awake or immediately ready, the officers mark them as refusing the activity.  [Dadisman Decl. ¶¶ 4, 8-9; Prudencio Decl. ¶¶ 2-3]  These bogus refusals occur even though officers are supposed to give prisoners a 30 minute warning in advance of recreation—because advance warning is actually never given.  [Prudencio Decl. ¶ 3]

Given the critical importance of ensuring that out-of-cell time and group programming time required by the Stipulation is offered in practice, rather than just on paper, the overwhelming pattern of refusals reflected in Defendants' compliance documents raises serious concerns about actual compliance with the MC PM ##1-2, 5-6, and 8.  Plaintiffs further believe that the pervasive pattern of refusals illustrates a systemic malfunction in the maximum custody units similar to those outlined by Dr. Stewart.  [Stewart Decl. ¶ 5]  In any case, this massive pattern of refusals points to Defendants' responsibility to investigate the causes underlying this malfunction and undertake corrective action rather than responding with indifference and inaction.

### D.      Failure to Document Times Out-of-Cell & Alterations of the Times Recorded.

At almost all facilities, when out-of-cell time was recorded as refused, Defendants failed to document consistently the start and end time of the activity offered, and frequently failed to note the total time offered on the tracking sheets and comments pages.  [Onka Decl. ¶ 13]  This failure to properly record information impacts compliance with MC PM ##1-2, 5-6, and 8.

To the extent that some facilities' tracking sheets do show "time offered" next to refusals of out-of-cell time, the entries appear to have been added at a later date, when out-of-cell time was being tallied during the auditing process—potentially by staff who were not even involved in the out-of-cell time but were just making assumptions based on written schedules.  [Onka Decl. ¶ 14; *e.g.*, Ex. 7 (under seal)]  Often, a lack of chronological order in documentation was also present on the tracking sheets.  [Onka

Decl. ¶ 15; *e.g.*, Ex. 8 (under seal)]  Without reliable, contemporaneous documentation of refusal times, it is impossible to assess compliance with the MC PMs accurately, particularly when a prisoner has refused the majority of his or her out-of-cell time.  The pervasiveness of refusals across facilities and months, discussed in Section I.C., *supra*, only exacerbates this problem.

Across nearly all units in all months, Plaintiffs frequently could not discern from the tracking sheets whether prisoners were in fact offered out-of-cell time in compliance with the MC PMs.  [Onka Decl. ¶ 16]

**Perryville-Lumley (SMA)**.  For example, at Perryville-Lumley, the documentation reflects a repeated failure to note the amount of out-of-cell time actually offered when prisoners refused out-of-cell time.  [Onka Decl. ¶ 17]  The following are illustrative examples of this problem.  In the April 2016 Notebook/March 2016 CGAR report Plaintiffs were unable to verify compliance for nearly half of the SMI prisoner records audited.   [Onka Decl. ¶ 18, Ex. 9 (under seal)]   In the March 2016 Notebook/February 2016 CGAR, Plaintiffs could not determine compliance with the SMI unstructured out-of-cell time requirement or DI 326 out-of-cell requirements for eight of the ten SMI records audited.  [Onka Decl. ¶ 19, Ex. 10 (under seal)]  In the January 2016 Notebook/December 2015 CGAR report, Plaintiffs could not evaluate compliance with the SMI unstructured out-of-cell requirements with respect to four of the ten SMI prisoners.   [Onka Decl. ¶ 20, Ex. 11 (under seal)]   In the October 2015 Notebook/ September 2015 CGAR report, Plaintiffs were unable to verify compliance for nine of the ten SMI records audited, again because Defendants failed to document time offered. [Onka Decl. ¶ 21, Ex. 12 (under seal)]  On other tracking sheets that month, time offered for refusals has been noted faintly on the tracking sheets and appears to have been added in the course of Defendants calculating time for compliance purposes.  [Onka Decl. ¶ 22, Ex. 13 (under seal)]   Similarly, in Perryville-Lumley's July 2015 Notebook/June 2015 CGAR report, Plaintiffs were unable to determine compliance with out-of-cell requirements for three of the ten non-SMI prisoners and eight of the ten SMI prisoners

because the activity log sheets did not indicate how much total time was offered when prisoners refused.  [Onka Decl. ¶ 23, Ex. 14 (under seal)]  The same problems were found with much of Perryville-Lumley's underlying CGAR compliance documentation as illustrated above from March 2015 to September 2016 with the exception of sporadic efforts to record refused time for SMI unstructured time starting in October 2015.  [Onka Decl. ¶ 24]

**Eyman-Browning**.  At Eyman-Browning, Defendants have similarly failed to appropriately document the total out-of-cell time offered when activities are refused. [Onka Decl. ¶ 25]  For example, in the December 2015 Notebook/November 2015 CGAR report, when prisoners refused out-of-cell time, the start and end times are not listed on the tracking sheets, nor is the total time offered noted in the comments alongside prisoner or officer signatures affirming a refusal (where such signatures are present); rather, total time offered has been entered on the tracking sheets and appears to have been added after-the-fact in the course of calculating compliance with the performance measures, rather than recorded at the time of refusal because it looks to be different handwriting, in different ink (usually red), and simply inserts totals, such as 2.5, after an entry marked "R" for refusal.  [Onka Decl. ¶ 25, Ex. 15 (under seal)]  Such after-the-fact calculations, likely done by a third person without first-hand knowledge of the actual time offered, are not reliable.  Documentation of refusals was entered in the same slap-dash fashion consistently across all auditing months.  [Onka Decl. ¶ 26]  For example, in the July 2015 Notebook/June 2015 CGAR for Eyman-Browning, it is also impossible to verify compliance with most of the MC PMs for several prisoners because, when out-of-cell time was refused, the total time offered was not noted on the tracking sheet or in the comments or appears to have been entered after the fact, and often does not include start and stop times.  [Onka Decl. ¶ 26, Ex. 16 (under seal)]  This is also the case for the June 2015 Notebook/May 2015 CGAR, May 2015 Notebook/April 2015 CGAR, April 2015 Notebook/March 2015 CGAR, and with the SMI prisoners monitored for the March 2015 Notebook/February 2015 CGAR.  [Onka Decl. ¶ 27]

**Eyman-SMU I**.  Similar issues also exist at Eyman-SMU I across all monitored months.  [Onka Decl. ¶ 28]  For example, in the December 2015 Notebook supporting the November 2015 CGAR report, when prisoners refused out-of-cell time, start and end times are not documented on the tracking sheets and total time offered is not noted on the comments page; instead, total time offered is listed on the tracking sheets and appears to have been added after-the-fact in the course of calculating total time offered and evaluating compliance with the performance measures.  [Onka Decl. ¶ 28, Ex. 17 (under seal)]  Here again, such calculations are simply not a reliable measure of compliance.  Plaintiffs found the same documentation irregularities in the April 2015 and June through November 2015 notebooks.  [*See, e.g.,* Onka Decl. ¶ 29, Ex. 18 (under seal)]  In the May 2015 Notebook supporting the April 2015 CGAR report, when out-of-cell time was refused, the actual time offered is not noted on the tracking sheets or in the comments, making it impossible in many cases to evaluate compliance.  [Onka Decl. ¶ 30, Ex. 19 (under seal)]  The same is true of the March Notebook 2015/February 2015 CGAR report. [Onka Decl. ¶ 31, Ex. 20 (under seal)][10]

**Lewis-Rast**.  The Lewis notebooks show a similar pattern.  [Onka Decl. ¶ 33]  In the April 2016 Notebook/March 2016 CGAR report, for example, when out-of-cell time is refused, the start and stop times are not noted, nor is the actual time offered for each activity documented on the tracking sheets or in the comments; as a result, it is impossible in many cases to verify compliance with the performance measures requiring a certain number of total out-of-cell hours.  [Onka Decl. ¶ 33, Ex. 22 (under seal)]  The same deficiencies in the documentation of refusals persisted in the March 2016 Notebook/ February 2016 CGAR report, February 2016 Notebook/January 2016 CGAR report, and January 2016 Notebook/December 2015 CGAR report.  [Onka Decl. ¶ 34]

---

[10]  Even when officers would note in the comment section the actual time offered for refused sessions of out-of-cell time, review of the documentation demonstrated that the monitors were not reviewing these comments in the course of determining compliance.  There were several instances where the notes in the comment section directly refuted the monitor's calculations on the tracking sheet.  [Onka Decl. ¶ 32; *see, e.g.*, Ex. 21 (under seal)]

**Florence-Kasson and Florence Central**.  Only the Florence-Kasson and Florence Central notebooks consistently list start and end times on the tracking sheets when time was refused.  [Onka Decl. ¶ 35]

Defendants' failure to document time offered accurately and contemporaneously makes it impossible to verify compliance with respect to actual out-of-cell time, actual exercise time, group programming time and total SMI unstructured time (MC PM ##1-2, 5-6, and 8).[11]  As a result, Defendants' compliance findings for these months should be found invalid in all facilities except for Florence-Kasson and Florence-Central for all months March 2015 to September 2016 based on a failure to note out-of-cell and group programming start and end times when records are marked "refused".

**E.      Conflicting Out-of-Cell Times Documented on Tracking Sheets.**

Defendants' failure to document out-of-cell times when records are marked "refused" is further highlighted by the problems with conflicting out-of-cell times when such times are actually recorded in the tracking sheets.  The daily tracking sheets ostensibly show all out-of-cell time a prisoner in the subclass was offered over the course of a given week and whether the prisoner attended or refused the activity.  Because the tracking sheets provide space for staff to document start and end times for each activity offered each day, the sheets can demonstrate when a prisoner was out of his or her cell on any given day.  There is no reason that a prisoner should be recorded as being in two

---

[11]  Although Plaintiffs are able to determine refusal times for some prisoners in some months using the corresponding sign-in sheets for particular programs, and thereby verify total out-of-cell time offered, the utility of this method is limited.  It applies only to SMI unstructured out-of-cell time and group programming; and exercise refusals are not documented via sign-in sheets.  Additionally, Plaintiffs were able to verify refused out-of-cell time only for the limited months for which sign-in sheets were provided.  *See infra*, Section I.F., for further discussion of this problem.  Furthermore, for effective monitoring it is critical that refusal times be documented on the tracking sheets themselves.  In addition to the pervasive problem of start and end times not being recorded when prisoners refused out-of-cell time, disorganization and sloppiness in the Defendants' documentation also made it extremely difficult in many instances to determine compliance.  On some out-of-cell tracking sheets, the handwritten start or stop times documented on some tracking sheets were illegible, making it difficult to calculate the total amount of time a prisoner received in each category of out-of-cell time.  [Onka Decl. ¶ 36; *e.g.*, Ex. 23 (under seal)]

places—for example, at both exercise and mental health programming—on the same day at the same time. This principle stands, even when the prisoner refuses one of the overlapping activities: no prisoner should be recorded as having been offered the opportunity to be in two places at one time. Under the Stipulation this time must be offered separately; offering exercise and programming at the same time is equivalent to not offering one of these activities.

In fact, many of the institutions have recorded overlapping times for different activities. [Onka Decl. ¶ 37] Exhibit 24 (filed under seal) to the Onka Declaration, "FRE 1006 Summary Exhibit 'Examples of Overlapping Times Affecting Compliance,'" sets forth some of the problems with activities being offered at the same time and double-counted for compliance purposes. For example, at Eyman-Browning, on March 11, 2015, one prisoner was recorded as being out of his cell for unstructured out-of-cell time from 13:37 to 17:19 and at a class from 16:15 to 17:15; another was recorded as being at unstructured out-of-cell time from 09:17 to 13:13 and at a class from 12:00 to 13:05; a third was recorded as being at unstructured out-of-cell time from 13:16 to 17:32 and at a class from 16:15 to 17:23; and a fourth was recorded as being at unstructured out-of-cell time from 13:25 to 17:21 and at a class from 16:15 to 17:20. [Onka Decl., Ex. 24 at 1-2; *see also* Ex. 25 (under seal)]

Similar problems were found at Florence-Kasson. On June 8, 2015, one prisoner was recorded as being offered SMI unstructured out-of-cell time from 6:35 am to 9:05 am and mental health group psych education from 8:30 am to 9:30 am; on June 12 another prisoner was recorded at mental health group therapy from 8:46 am to 9:50 am and offered recreation from 6:25 am to 9:00 am; on June 9 another prisoner was given SMI unstructured out-of-cell time from 6:02 am to 9:05 am and mental health group psych education from 8:37 am to 9:37 am; on June 9 still another prisoner is recorded as being offered recreation from 8:08 am to 10:38 am and mental health group therapy from 8:23 am to 9:25 am. [Onka Decl., Ex. 24 at 4-5; *e.g.*, Ex. 26 (under seal)] All of these overlapping incidents were included in the time necessary for compliance, despite the fact

1    that the activities were offered at the same time and therefore one had to be refused.

2    [Onka Decl. ¶ 38]

3    In February 2016 similar problems were found with the underlying compliance

4    documentation at Florence Kasson.  One prisoner is recorded at work from 19:00 to 21:30

5    and SMI unstructured out-of-cell time from 18:00 to 20:30 on February 12, 2016; another

6    is recorded at mental health group therapy from 9:30 am to 10:30 am and SMI

7    unstructured out-of-cell time from 9:30 am to 11:30 am; and a third prisoner on that same

8    day is recorded at mental health group therapy from 9:30 am to 10:30 am and SMI

9    unstructured out-of-cell time from 9:00 am to 11:00 am.  [Onka Decl., Ex. 24 at 5 (under

10   seal)]  Again, all of these overlapping time periods were included in the time necessary for

11   compliance, despite the fact that the activities were offered at the same time and therefore

12   one had to be refused—or perhaps was not actually offered.  [Onka Decl. ¶¶ 38-39]

13   Exhibit 24 also includes several other overlapping times which impact Defendants'

14   compliance findings at Florence-Kasson for April, May and June 2016.  [Onka Decl.,

15   Ex. 24 at 6-7 (under seal)]

16   Because of incomplete documentation—especially of refusal times—Plaintiffs'

17   capacity to identify overlapping times was limited and it is likely that additional problems

18   exist.  [Onka Decl. ¶¶ 40-41]  At many of the facilities, it is impossible to determine in a

19   significant percentage of cases whether out-of-cell offerings overlapped because out-of-

20   cell times for "refusals" are not recorded.  Only the Florence institutions—Florence-

21   Kasson and Florence Central—have consistently documented on the tracking sheets the

22   start and end times for activities that prisoners refused.  As a result, it was possible to

23   cross-check activity schedules and sign-in sheets to discover that activities were actually

24   being offered at the same time.  {Onka Decl. ¶ 44]  Other institutions either note the

25   amount of time offered without providing start and end times or fail to document time

26   offered at all.  *See* Section C & D, *supra*.  This shortcoming in documenting refusals

27   fatally compromises Plaintiffs' ability to monitor implementation of and compliance with

28   the Stipulation.  At all institutions other than Florence-Kasson and Florence Central, if a

1   prisoner refused an out-of-cell activity that was scheduled at the same time as another out-
2   of-cell activity that the prisoner attended, the prisoner's daily tracking forms will
3   generally not reflect this discrepancy—only the start and end times for the activity the
4   prisoner attended would appear on the tracking sheet under most facilities' current
5   documentation practices.  [Onka Decl. ¶ 45]

6       Given the volume of refusals at almost all facilities, it is no coincidence that the
7   vast majority of overlapping times identified by Plaintiffs occurred at the Florence
8   facilities, where refusals times are appropriately documented for the most part.  Further
9   underscoring this point, nearly all instances included at least one "refused" activity.
10  [Onka Decl. ¶ 46]  Had other institutions provided start and end times for refusals, the
11  tracking sheets for those institutions likely would have recorded additional impermissible
12  overlapping times and erroneous compliance findings.

13      A prisoner who is recorded as having attended multiple out-of-cell activities at the
14  same time could not, of course, actually have been in both places simultaneously; at least
15  one of the times was recorded inaccurately.  Relatedly, where a prisoner is offered a
16  choice between two out-of-cell activities whose times overlap, the prisoner has not truly
17  been offered the opportunity to attend both activities.  Simply put, Defendants may not
18  count two or more simultaneous activities toward compliance with the requirements of
19  MC PM ##1-2, 5-6, and 8.

20      The examples provided above illustrate this problem and call into question the
21  accuracy, quality, and reliability of the data Defendants have provided via the tracking
22  sheets.  In order to determine compliance with the performance measures dictating precise
23  allotments of out-of-cell time for specific out-of-cell activities, Plaintiffs need access to
24  complete and accurate records.  Plaintiffs are otherwise left unable to fully evaluate
25  Defendants' compliance with the substantive provisions of the Stipulation.

26

27

28

### F.   Failure to Cross-Check Prisoner Participation in Programs with Activity Schedules and Sign-In Sheets/ Rosters & Failure to Produce Sign-In Sheets.

Program participation and increased group programming are cornerstones of both the Stipulation and DI 326.  Under DI 326's incentive system and MC PM #2, all Step II and III prisoners are mandated to be offered at least one hour of out-of-cell group programming a week.  [Doc. 1185-1, Ex. E]  Additionally, under the Stipulation and MC PM #8, SMI prisoners must be offered all of the privileges and incentives under DI 326 and additional out-of-cell time per week, including ten hours of unstructured time; one hour of additional mental health programming; one hour of psycho-educational programming; and one hour of additional out-of-cell programming.  [*Id.*]  The Maximum Custody Daily Out of Cell Time Tracking Sheet was developed to capture all of this information.  [Fettig Decl. ¶ 10]

In order to cross-check compliance with MC PM #2 and #8, monitors must review the Maximum Custody monthly Activity Schedules and Program Attendance/Sign-In Sheets together with the prisoner Tracking Sheets as required by the Maximum Custody Outcome Measure Protocol.  [Doc 1185-1, Ex. E]  In reviewing the maximum custody notebooks to evaluate Defendants' CGAR compliance findings with these MC PM, Plaintiffs could find no evidence that the monitors are cross-checking documentation on the daily tracking sheets with either the monthly Activity Schedules or the actual sign-in sheets/rosters for the programs the prisoners are allegedly being offered.  [Onka Decl. ¶ 47]

In fact, when Plaintiffs cross-checked the available sign-in sheets (not all have been produced) with the prisoner tracking sheets, many discrepancies were identified.  Plaintiffs found repeated instances in which a Tracking Sheet records a prisoner as having been offered participation in a class, but there is no indication in the program sign-in sheets/Program Attendances produced that the prisoner actually was offered or did participate in the program.  [Onka Decl. ¶¶ 48-50, Exs. 27-29 (under seal) (tracking sheet examples)]  Discrepancies were even found between the sign-in sheets themselves.  For

example, some sign-in sheets indicated that a prisoner attended two different programs at the same time, suggesting that either the sign-in sheet had the wrong date or time, or that the prisoner was not actually present for one of the simultaneous programs.  [Onka Decl. ¶ 51 (under seal); *see also* Ex. 30 (under seal)]

Exhibit 31 of the Onka Declaration, "FRE 1006 Summary Exhibit 'Discrepancies Noted in Eyman-Browning Maximum Custody Notebook January 2016,'" sets forth a comparison between activity times recorded on Tracking Sheets and the actual Activity Schedule for Eyman Browning for the December 2015 CGAR/January 2016 Notebook for the prisoner records selected for monitoring and the required out-of-cell/programming time.[12]  This Exhibit shows that two prisoners are recorded as having out-of-cell time from 7:30 am to 8:20 am on January 11, 2016 but the unit schedule says there are only social activities from 9:30 am to 12:30 pm that day.  Another prisoner is recorded as having unstructured out-of-cell time from 14:45 to 16:45 on January 11, but the unit schedule only records "social activities" from 12:30 pm to 15:30 that day.  Still another prisoner is listed at mental health group therapy on January 13, 2016 from 15:00 to 16:41 but the unit schedule only lists a mental health group from 7:00 am to 9:00 am that day.  Another prisoner is recorded at mental health group programming on January 13 from 11:36 am to 12:40 pm but the unit activity schedule that day says the mental health group is from 7 am to 9 am.  [*See* Onka Decl., Ex. 31 at 1-2 (under seal)]  The rest of the prisoner records sampled show similar discrepancies between unit schedules and the events recorded on the tracking sheets.  [*Id.*]

Unfortunately, similar problems are found when all sources of documentation—Tracking Sheets, Program Sign-in Sheets/Program Attendances, and Activity Schedules—are compared.  In Exhibit 32 of the Onka Declaration (filed under seal), "FRE 1006 Summary Exhibit 'Discrepancies Noted in Lewis-Rast Maximum Custody Notebook December 2015,'" a comparison was made between these three record sources for the

---

[12] The program sign-in sheets were never produced for this month.  [*See* Onka Decl. ¶ 52]

Lewis Rast, December 2015 Notebook/November 2015 CGAR. By comparing the available documentation Plaintiffs found two prisoners who allegedly refused "group programming" on December 18, 2015 with no start and end times; a Program Attendance/Sign-in Sheet shows the two prisoners refusing the program "Socialization" from 14:00 to 15:00 that day but the Activity Schedule says that "Socialization" was held from 10:30-11:30 am. [Onka Decl., Ex. 32 at 1 (under seal)] Another prisoner is listed as attending "group programming" from 10:10-11:00 am on Wednesday, December 16, 2015, but the only sign-in sheet produced that week has the prisoner at a class called "self-control" but on a different date—Monday, December 14, 2015 from 9-10:30 am; and the unit Activity Schedule says that "self-control" is offered on Mondays and Wednesdays from 9–10:00 am. [*Id.*] Still another prisoner is listed as refusing a "mental health therapy and psych education" program on December 15, 2015; no sign-in sheets were produced; and the Activity Schedule does not list mental health programming on that day so it is impossible to verify this record. [*Id.*] Similarly, another prisoner is listed as attending "group programming" on Thursday, December 17, 2015 from 10-11 am; there is a Program Attendance/Sign-in Sheet listing him at a "self-control" class from 12:30-13:30 pm that day; but the unit Activity Schedule says that "self-control" is not offered on that day. [*Id.*]

As noted above, Plaintiffs' capacity to cross-check the sign-in sheets was limited by incomplete records. Exhibit 33 of the Onka Declaration sets forth all of the months for which Defendants have failed to produce Program Attendance/Sign-in Sheets. [Onka Decl. ¶ 53, Ex. 33] At Eyman SMU, Defendants failed to produce Program Attendance/Sign-In Sheets for non-SMI prisoners in March and April 2015; for SMI and non-SMI prisoners for June 2015-October 2015 and December 2015 to February 2016; and July 2016 for SMI prisoners. [*Id*.] At Eyman Browning Defendants failed to produce program Attendance/Sign-In Sheets for non-SMI prisoners in March 2015 and failed to produce Attendance/Sign-In Sheets for both SMI and non-SMI prisoners from April 2015 through October 2015 and December 2015 through February 2016; and for SMI prisoners in

March 2016.  [*Id*.]  At Perryville Defendants failed to produce Program Attendance/Sign-In Sheets for both SMI and non-SMI prisoners in May 2015.  [*Id*.]  For Florence Central and Kasson Defendants failed to produce Program Attendance/Sign-In Sheets for SMI and non-SMI prisoners for April 2015, and January 2016 to February 2016; SMI only documentation is missing from May 2015 to August 2015 and in December 2015 and July 2016; and in April and June 2016 Kasson did not produce any sign-in sheets.[13]  [*Id*.]

This failure of documentation raises serious questions about the monitoring process as a whole.  Non-compliance for MC PM ##2, 8 must be found non-compliant for all the months at all facilities where Defendants have failed to produce sign-in sheets for program attendance.

## II.   ERRONEOUS COMPLIANCE FINDINGS

### A.   Failure to Document or Account for Exercise Venue in Compliance Monitoring in Violation of the Requirements of MC PM #6.

Out-of-cell exercise and socialization is a cornerstone of DI 326 and the Stipulation.  It is a key component of MC PM ##1, 3, 5-6.  In particular, MC PM #6 requires that:

> All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30), who are eligible for participation in DI 326 are offered out-of-cell time, **_incentives_**, programs and property consistent with their Step Level and housing assignment under the DI 236 policy.

[Doc. 1185-1, Ex. E) (emphasis added)]  As part of the DI 326 incentive system, Step Level II & III prisoners at the maximum custody facilities are allowed access to larger exercise enclosures and greater socialization during exercise periods.  [Fettig Decl. ¶ 11; *see also* Director's Instruction 326, Maximum Custody Population Management,

---

[13]  Furthermore, several of the sign-in sheets Defendants did produce were hand-written or simply a printed list of names rather than a specific sign-in sheet for a specific class or group session so there was no indication of what programming they were supposed to represent.  [*See* Onka Decl., Ex. 34 (under seal)]  Other attendance sheets were scanned in at such low resolution and high contrast that the names and ADC numbers on them were barely legible.  [*See* Onka Decl., Ex. 35 (under seal)}

March 27, 2014 ("DI 326") (ADC261959-85) (Doc. 1775-3)]   For example, a Step III prisoner at Eyman-SMU I must be offered six hours per week of out-of-cell exercise to include once per month in a 10 x 10 enclosure (up to four prisoners), one time per month in a 20 x 40 basketball enclosure (up to eight prisoners), and one-time per month recreation/par course field.  [*Id.* at ADC261978]  At Browning Unit a Step II prisoner can expect 3 two hour recreation periods each week, one of which can be in the 10 x 10 interactive enclosure, and a Step III can expect 4 outdoor recreation periods a week in the 10 x 10 enclosure.  [*Id.* at ADC261974]  At Florence Kasson Step II's are allowed one day a week in group recreation and Step III's are allowed three recreation sessions per week on the outdoor field.  [*Id.* at ADC261975]  At Florence Central a Step II prisoner is allowed one outdoor field recreation a week and a Step III is allowed field recreation during all three periods.  [*Id.* at ADC261977]   Similarly, at Perryville-Lumley, Step II prisoners are allowed one hour of exercise six days a week in groups of 12 women, and Step III prisoners are allowed the same in groups of 14 women.  [*Id.* at ADC261979]

The group exercise and larger enclosures are central to the DI 326 program and efforts to ameliorate the impacts of isolation.  Because of the importance of this element of the program, the Maximum Custody Daily Out of Cell Time Tracking sheet developed for implementation of the settlement includes a column to record the nature of the enclosure being used for each exercise period—either the "chute"[14]; 10 x 10;  20 x 40, 45 x 90; or the field.  [*See, e.g.*, Onka Decl., Exs. 21-23 (under seal) (including multiple examples of tracking sheets)]

Despite the centrality of this aspect of the exercise component of DI 326 and the Stipulation, Plaintiffs have found absolutely no evidence that Defendants are monitoring this aspect of the Performance Measures in MC PM #6.  In fact, when reviewing the underlying documentation produced, Plaintiffs found that the maximum custody units are

---

[14]  The term "chute" references the concrete enclosures attached to some of the living units in maximum custody where prisoners are taken for exercise.  [Fettig Decl. ¶ 12]

not consistently documenting the type of exercise enclosures being offered to prisoners as part of the DI 326 program when recreation time is refused.  [Onka Decl. ¶ 56]  There is also no indication in any of the documentation that Defendants reviewed records for Step II and III Eyman-SMU I prisoners to ensure that the required *monthly* incentives under DI 326, such as provision of access to the par course[15] or basketball enclosure, was provided.  [Onka Decl. ¶ 56]

In Exhibit 36, to the Onka Declaration, "FRE 1006 Summary Exhibit, "Recreation Enclosures Noted for Refusals in Maximum Custody Documentation – March 2015 – September 2016,'" Plaintiffs set forth whether Defendants have recorded recreation enclosures when prisoners refuse recreation in each facility for each month starting in March 2015 through September 2016 (comprehensive underlying documents for October 2016 onward have not yet been produced by Defendants).  For each facility, for each month, Exhibit 36 sets forth whether the recreation enclosures were noted for Step II and Step III prisoners.  If this failure to note recreation enclosures for the purposes of MC PM #6 impacted three or more of the ten prisoner records reviewed, a check was placed in the non-compliance column.  Every check in the non-compliance column means that compliance should have been 70% or below that month for MC PM #6 due to the failure to note recreation enclosures offered—and therefore failure to monitor the performance measure itself.  If failure to note recreation for Step II or III prisoners only impacted two or fewer records, then the compliance column was marked instead.  [Onka Decl. ¶¶ 57-58, Ex. 36]

**Eyman-Browning**.  At Eyman-Browning, Defendants consistently noted which enclosure was offered when prisoners took their exercise time.  [Onka Decl. ¶ 59]  However, when prisoners were marked as *refusing* their exercise time—which accounts for 50% or more of the records reviewed on a regular basis (Onka Decl., Ex. 4 (FRE 1006

---

[15]  The maximum custody "par course" referred to in DI 326 refers to a very large outdoor enclosure at some of the maximum custody facilities equipped with a series of stations that have various exercise equipment.  {Fettig Decl. ¶ 13}

Summary Exhibit, 'Rates of Refusal of Recreation' and 'Rates of Refusal of Out-of-Cell Time and Programming – December 2015 – September 2016))—Defendants routinely failed to document the type of recreation/location offered.   At Eyman Browning the March 2015 through September 2016 tracking sheets consistently demonstrate the failure to properly note exercise enclosure when a prisoner refused exercise.  [Onka Decl. ¶59; Ex. 36 at 1-5]  In our review of all tracking sheets for Eyman-Browning, the failure to note exercise enclosure changed compliance findings to 70% or below for every month from March 2015 to October 2015; December 2015; January 2016; and March 2016 through September 2016.  [*See* Onka Decl., Ex. 36 at 1-5; *see also* Ex. 37 (examples of improper Eyman-Browning tracking sheets)]

**Eyman-SMU I**.   By contrast, Eyman-SMU has consistently documented the exercise enclosure offered, whether exercise time was accepted or refused, with just a few exceptions.   [Onka Decl., Ex. 36]   The only month where recreation enclosures for refusals was not properly recorded so that compliance for MC PM #6 went to 70% or below is August 2015.  [*Id*. at 2]

**Perryville-Lumley (SMA)**.   At Perryville-Lumley, Defendants' failure to note recreation enclosures reduced compliance findings to 70% or below in September 2015 and June 2016.  [Onka Decl., Ex. 36 at 2, 5]

**Florence-Central & Florence Kasson**.   At Florence Central, except for August 2016[16] when defendants failed to produce tracking sheets, failure to note out-of-cell exercise enclosure for refusals did not reduce compliance to 70% or below.  [*See* Onka Decl., Ex. 36 at 1-5]   Likewise, the Florence-Kasson documentation consistently documented exercise enclosures, even when the exercise time was refused.  [Onka Decl., Ex. 36 at 1-5]   For the period reviewed, Florence Kasson's failure to note exercise enclosures for refusals did not reduce compliance to 70% or below, except for the month

---

[16] Plaintiffs have not received sufficient documentation to evaluate Florence-Central for August 2016.  [Onka Decl. ¶ 10]  It is Plaintiffs' position that this month should be found non-compliant as a result.

of October 2015.  [Onka Decl., Ex. 36 at 3]  For August 2016 no evaluation could be made due to Defendants' failure to produce tracking sheets for Kasson (it is Plaintiffs' position that the failure to produce underlying compliance documents should lead to a finding of non-compliance).  [*Id*. at 5]

**Lewis-Rast**.  Defendants' failure to document exercise enclosures at Lewis did not impact compliance under 70% for the months reviewed.  [Onka Decl., Ex. 36]

It is impossible to monitor whether the proper exercise and incentives required under MC PM #6 and DI 326 are being offered to prisoners without documentation of the exercise enclosures offered.  At the same time, due to the widespread patterns of exercise refusal discussed in Section I.C., *supra*, the failure to record exercise enclosure offered when prisoners refuse exercise raises questions about whether the proper exercise opportunities are being offered at all in some units, and whether the failure to offer the proper exercise opportunities in the maximum custody units is also in part creating the pervasive patterns of refusal.

Given Defendants' failure to monitor the provision of required recreation incentives as required under DI 326 and MC PM #6, the months and facilities identified above and in Exhibit 36 of the Onka Declaration with 70% compliance or less must be found non-compliant under MC PM #6.

### B.   Erroneous Findings for Maximum Custody Performance Measure 8.

Maximum Custody Performance Measure 8 requires that:

> *In addition to the general privileges and incentives afforded to prisoners under DI 326, all SMI prisoners in maximum custody receive:*
>
> - *10 hours of unstructured out-of-cell time per week*
>
> - *1 hour of additional out-of-cell mental health programming per week*
>
> - *1 hour of additional out-of-cell psycho-educational programming per week*
>
> - *1 hour of additional out-of-cell programming per week[.]*

[Doc. 1185-1 at 44-45]  Notably, the provision requires that SMI prisoners receive this out-of-cell time *in addition to* all of the "general privileges and incentives afforded to prisoners under DI 326."  [*Id.* at 44]  For prisoners who have reached Step II or III under the DI 326 program, in particular, Performance Measure #2 requires that they be offered at least one hour of out-of-cell group programming weekly.  This means that Step II or III prisoners who are SMI must have an additional hour of group programming on top of the SMI programming required by MC PM #8.

In the vast majority of months for which they have produced CGAR reports, Defendants have reported 100% compliance with this measure.  [Onka Decl., Ex. 3]  However, when reviewing underlying documentation, Plaintiffs found erroneous compliance findings in the vast majority of months for which documentation has been produced.  Defendants' actual compliance percentages with MC PM #8 for the CGARs in the months February 2015 to September 2016 which fell below 75% compliance in Plaintiffs' review are listed in Exhibit 38 to the Onka Declaration (filed under seal).  These charts demonstrate the following months where the CGARs were actually non-compliant: **Perryville-Lumley** (December 2015 60%; June 2015 20%; May 2015 10%; April 2015 0%; March 2015 10%; February 2015 20%); **Eyman-Browning** (August 2016 70%; July 2016 70%; May 2016 50%; February 2016 0%; April 2015 70%; February 2015 60%); **Eyman-SMU I** (March 2016 70%; August 2015 60%; July 2015 60%; June 2015 70%; March 2015 70%; February 2015 0%); **Florence-Kasson** (May 2016 30%; April 2016 70%; March 2016 30%; February 2016 40%; January 2016 70%; August 2015 50%; June 2015 40%; May 2015 40%; April 2015 50%; March 2015 70%; February 2015 40%); **Lewis-Rast** (July 2016 30%; March 2016 70%; February 2016 10%; January 2016 60%; December 2015 30%; November 2015 50%; October 2015 50%).  [Onka Decl., Ex. 38]

Exhibit 39 of the Onka Declaration, "FRE 1006 Summary Exhibit 'Max Custody Performance Measure 8 Compliance Review,'" sets forth facility by facility, month by month, and record by record where Plaintiffs found non-compliance with MC PM #8.

1 [Onka Decl., Ex. 39 (under seal)]  Below Plaintiffs highlight some of the non-compliance

2 findings and analysis for each facility.  All of the non-compliance findings are detailed in

3 Exhibit 39 of the Onka Declaration along with an explanation of the methodology used to

4 evaluate compliance.  [Onka Decl. ¶¶ 61-80][17]

5  **Perryville-Lumley (SMA)**.   At Perryville-Lumley, for example, Defendants

6 reported 100% compliance in the December 2015 CGAR but in the supporting January

7 2016 Notebook, Plaintiffs' review found only 60% compliance.  [Onka Decl., Ex. 38 at 1

8 (under seal)]   Four of the records produced were non-compliant: one was given

9 overlapping group programming and unstructured time leading to insufficient time; two

10 were missing the required hour of additional group programming; and one was missing all

---

12  [17] In making compliance findings, Plaintiffs analyzed prisoner out-of-cell tracking sheets and attendance sheets produced by Defendants but found the activity schedules to be an unreliable source of documentation for several reasons.  First, with regard to recreation, most facilities either do not reflect recreation time or have it in large blocks. Activity Schedules for Perryville-Lumley only reflect weekdays and do not contain recreation time.  [*See* Onka Decl. ¶ 62; Ex. 40 (under seal) (examples of activity schedules for Perryville-Lumley)]   Activity Schedules for Eyman-Browning, conversely, have outdoor recreation offered in 30 minute blocks for the entire day, every day of the week, rendering them useless in trying to determine how long a recreation period is when a prisoner refuses exercise time.  [*See* Onka Decl. ¶ 63; Ex. 41 (under seal) (examples of activity schedules for Eyman-Browning)]   Activity Schedules for Eyman-SMU show that recreation is offered in 3 hour blocks, however, a review of the out-of-cell tracking sheets show that when a prisoner refuses recreation time the monitor credits the prisoner with 2.5 hours of refused time.  It is unclear what the monitor is using to make this determination. [*See* Onka Decl. ¶ 64; Ex. 42 (under seal) (examples of activity schedules for Eyman-SMU)]   It is also difficult to ascertain what kind of programming is reflected on the activity schedule.  For instance, one entry on the activity schedule for Eyman-Browning for March 2015 indicated "Socialization Programming" was offered on Fridays from 1045 – 1145.  It is led by a CO III.  It does not indicate anywhere on the activity schedule that this is mental health programming, however, the date and time corresponds to a "Mental Health Therapy" entry on one of the SMI prisoner's out-of-cell tracking sheet produced for that month.  [*See* Onka Decl. ¶ 65; Ex. 43 (under seal) (tracking sheet and activity schedule demonstrating discrepancy)]   Across time and facilities there were many other instances in which the entries on the tracking sheets did not correspond to the activity schedule, making the schedules an unreliable source document.  [Onka Decl. ¶ 66]   In some instances, assessing compliance was also especially difficult due to disorganization and inconsistencies in Defendants' record keeping.  For example, the handwritten start and end times on tracking sheets were often illegible.  Defendants sometimes crossed out start and end times or wrote over them, making it even more difficult to discern the amount of time offered.  Defendants produced written and typed attendance sheets, some missing crucial information such as the class type and start and end times.  [Onka Decl. ¶ 80; Ex. 44 (under seal) (copies of attendance sheets: ADCM632053-55; ADCM632061-62)]

group programming and had only 4:15 hours of unstructured out-of-cell time.  [Onka Decl., Ex. 39 at 1 (under seal); Ex. 45 (under seal) (tracking sheets from the Perryville December 2015 CGAR/January 2016 Notebook)]   In Perryville-Lumley's June 2015 CGAR report, Defendants alleged 100% compliance, but when Plaintiffs reviewed the underlying documents only 20% compliance was found.  [Onka Decl., Ex. 38 at 1 (under seal)]   In eight of the records, the required group programming or psycho-educational programming was missing.  [Onka Decl., Ex. 39 at 2-3 (under seal); *see also* Ex. 46 (under seal) (tracking sheets for the Perryville June 2015 CGAR report/July 2015 Notebook)]  In the May 2015 CGAR report, Defendants also reported 100% compliance at Perryville, but Plaintiffs' review showed deficient programming in nine of the ten records.  In these records, at least one hour of required group programming for SMI or Step II and III prisoners was missing and out-of-cell unstructured time was short by thirty minutes for seven of the records.  [Onka Decl., Ex. 39 at 3-5 (under seal); *see also* Ex. 47 (under seal) (tracking sheets for the Perryville-Lumley May 2015 CGAR/June 2015 Notebook)]  Exhibit 39 of the Onka Declaration (filed under seal) sets forth the same type of inaccurate reporting in Defendants' compliance findings at Perryville-Lumley throughout the non-compliant months enumerated.  [Onka Decl., Ex. 39 at 1-8 (under seal)]

**Eyman-Browning**.  At Eyman-Browning, a pattern similar to the one at Perryville-Lumley emerged.  In both the August and July 2016 CGAR reports, Plaintiffs found that Defendants double-counted group programming, unstructured time, and exercise time that clearly overlapped on the Tracking Sheets but was nonetheless counted as separate time for compliance monitoring.  This double-counting lowered the compliance finding to 70% in both months.  [*See* Onka Decl., Ex. 39 at 9-10; *see also* Ex. 48 (under seal) (tracking sheets for Eyman Browning August and July 2016 CGAR reports)]   Overwhelming discrepancies in the records, significant overlapping times and documentation errors in the compliance records for both the May 2016 and February 2016 CGARs lead to a finding of 50% and 0% compliance respectively.  [*See* Onka Decl., Ex. 39 at 10-14]  In the April

1   2015 CGAR only 70% compliance was found.  Two of the prisoners are Step II or III and

2   yet were not afforded a second hour of group programming and one of the prisoners was

3   recorded as being at both group programming and work at the same time.  [*See* Onka

4   Decl., Ex. 39 at 14-15 (under seal); *see also* Ex. 49 (under seal) (tracking sheets for the

5   Eyman SMU I for the May 2015 Max Custody Notebook/April 2015 CGAR report)]

6       **Eyman-SMU**.    At Eyman-SMU, Plaintiffs found similar compliance and

7   monitoring problems with respect to MC PM #8.  For example, in the April 2016

8   Notebook, supporting the March 2016 CGAR findings, Defendants reported 100%

9   Compliance, but Plaintiffs found only 70% compliance.  [Onka Decl., Ex. 38 at 2 (under

10  seal)]  In that month, Defendants failed to produce one of the records relied upon despite

11  repeated requests, so that no compliance can be measured.  [*See* Onka Decl. ¶ 86; Ex. 39

12  at 16 (under seal)]  In two of the other records out-of-cell time was insufficient: one

13  record reported overlapping group programming and exercise for 1:05 hours; and the

14  other record only reported 9:30 hours of SMI unstructured out-of-cell time.  [*Id*. at Ex. 39

15  at 16 (under seal); *see also* Onka Decl., Ex. 50 (under seal) (tracking sheets produced by

16  Defendants for Eyman SMU I for the April 2016 Max Custody Notebook/March 2016

17  CGAR report]  In the September 2015 Notebook supporting the August 2015 CGAR

18  report, Plaintiffs found noncompliant records falsely reported as compliant for four of the

19  SMI prisoners, despite Defendants' finding of 100% compliance in the CGAR.  [Onka

20  Decl., Ex. 38 at 2 (under seal)]    These prisoners were all entitled to an hour of

21  programming under DI 326 due to their Step Level, as well as all of the SMI

22  programming under the Stipulation.  None of them was afforded the full programming

23  required.  [*See* Onka Decl., Ex. 39 at 17 (under seal); *see also* Ex. 51 (under seal)

24  (tracking sheets produced by Defendants for the Eyman SMU I September 2015

25  Notebook/August 2015 CGAR report)]  The same problem was found with four of the

26  allegedly compliant Step II and Step III SMI records for the August 2015 Notebook

27  supporting the July 2015 CGAR findings.  [*See* Onka Decl., Ex. 39 at 17-18 (under seal);

28  *see also* Ex. 52 (under seal) (tracking sheets produced by Defendants for the Eyman

1  SMU I August 2015 Notebook supporting the July 2015 CGAR findings)]   And in the

2  July 2015 Notebook supporting the June 2015 CGAR findings, Plaintiffs found three of

3  the allegedly compliant SMI records were missing the required additional hour of group

4  programming.  *See* Onka Decl., Ex. 39 at 18 (under seal); *see also* Ex. 53 (under seal)

5  (tracking sheets produced by Defendants for the Eyman SMU I July 2015 Notebook/June

6  2015 CGAR)]  Similarly, all three of the allegedly compliant Step II and Step III records

7  for the April 2015 Notebook supporting the March 2015 CGAR findings were actually

8  non-compliant.  [*See* Onka Decl., Ex. 39 at 19 (under seal); *see also* Ex. 54 (under seal)

9  (tracking sheets produced by Defendants for the Eyman SMU I April 2015

10  Notebook/March 2015 CGAR)]

11     **Florence-Kasson**.  Plaintiffs' review of the Florence-Kasson notebooks exposed a

12  similar pattern of noncompliance with respect to SMI programming requirements and a

13  discrepancy between Defendants' reports of compliance in the CGARs and the

14  documentation in prisoners' tracking sheets.  [*See* Onka Decl. ¶ 90]  For example, in the

15  February 2016 CGAR, Defendants reported 100% compliance but Plaintiffs' analysis

16  shows only 40% compliance.  [Onka Decl., Ex. 38 at 2 (under seal)]  Plaintiffs' review of

17  the corresponding March 2016 Notebook found that five of the SMI prisoners did not

18  receive their ten hours of SMI unstructured out-of-cell time, as required by MC PM #8;

19  and the tracking sheet of another prisoner, listed in the CGAR report as compliant with all

20  the requirements of MC PM #8, shows insufficient SMI unstructured time, no mental

21  health programming, and insufficient group programming.  [Onka Decl., Ex. 39 at 24

22  (under seal); *see also* Ex. 55 (under seal) (tracking sheets produced by Defendants for

23  Florence-Kasson for the February 2016 CGAR/March 2016 Notebook)]

24     For many other months for which Defendants provided notebooks and tracking

25  sheets for Florence-Kasson, Plaintiffs' review found that Step II and Step III prisoners

26  routinely were not afforded their full programming allotment.  In the June 2016 Notebook/

27  May 2016 CGAR and May 2016 Notebook/April 2016 CGAR compliance fell to 30% and

28  70% respectively due to a failure to offer the required group programming.  [Onka Decl.,

Ex. 39 at 21-22]  Similarly, in the July 2015 Notebook, despite Defendants' report of 100% compliance in the corresponding June 2015 CGAR, none of the Step II or Step III prisoners received both hours of group programming, as required by DI 326 and MC PM #8.  This brought compliance down to 40%.  [Onka Decl., Ex. 39 at 26-27 (under seal); *see also* Ex. 56 (under seal) (tracking sheets produced by Defendants for Florence-Kasson for the July 2015 Notebook/June 2015 CGAR)]  The same pattern of noncompliance for Step II and Step III prisoners' programming appear in the June 2015 Notebook/May 2015 CGAR report and the May 2015 Notebook/April 2015 CGAR report, again despite Defendants' allegations of 100% compliance for this performance measure in the corresponding CGARs.  [*See* Onka Decl., Ex. 39 at 27-28 (under seal); Ex. 57 (under seal) (tracking sheets produced by Defendants for Florence-Kasson May 2015 CGAR); Ex. 58 (under seal) (tracking sheets produced by Defendants for Florence-Kasson April 2015 CGAR)]

In the April 2015 Notebook/March 2015 CGAR report, Plaintiffs' review again found several instances of noncompliance, unreported by Defendants in the CGAR, in which Step II and Step III prisoners were not afforded their full group programming hours.  [Onka Decl., Ex. 39 at 28 (under seal); *see also* Ex. 59 (under seal) (tracking sheets produced by Defendants for Florence-Kasson March 2015 CGAR)]

**Lewis-Rast**.  At Lewis-Rast, Plaintiffs' review uncovered a similar pattern of noncompliance with respect to the programming requirements.  For example, in the July 2016 CGAR compliance documents, Plaintiffs' analysis found 30% compliance rather than the 90% reported by Defendants.  [Onka Decl., Ex. 38 at 3 (under seal)]  Two of the underlying records showed insufficient mental health and psycho-education programming; and five of the underlying records demonstrated insufficient DI 326 programming for Step II and III prisoners.  [Onka Decl., Ex. 39 at 30 (under seal); *see also* Ex. 60 (under seal) (tracking sheets)]  In the March 2016 Notebook/February 2016 CGAR, Defendants reported two instances of non-compliance but Plaintiffs' analysis showed only 10% compliance.  [Onka Decl., Ex. 38 at 3 (under seal)]  Plaintiffs found that none of the other

Step II and Step III prisoners received their group programming in compliance with the requirements of this performance measure; two prisoners did not get the required unstructured out-of-cell time; and one prisoner's tracking sheet was never produced. [Onka Decl., Ex. 39 at 31-32 (under seal); *see also* Ex. 61 (under seal) (tracking sheets)] Similarly, Plaintiffs' review of the January 2016 Notebook/December 2015 CGAR report found that, though Defendants reported 100% compliance, none of the seven Step II and Step III prisoners were afforded their group programming hours in accordance with DI 326 and MC PM #8.  [Onka Decl., Ex. 39 at 34 (under seal); *see also* Ex. 62 (under seal) (tracking sheets)]

## ARGUMENT

### I.   THIS COURT HAS THE AUTHORITY TO FIND THE DEFENDANTS NON-COMPLIANT WITH THE MAXIMUM CUSTODY PERFORMANCE MEASURES AND ORDER ADDITIONAL RELIEF

Given the overwhelming evidence set forth above, this Court should find that Defendants are non-compliant with Maximum Custody Performance Measures ##1-3, 5-6, and 8 from March 2015 to October 2016.  The Court has the authority to issue any relief "provided by law."  [Doc. 1185 ¶ 36]  The Stipulation also provides that when the Court finds non-compliance it must first order Defendants to submit a plan to be approved by the Court to remedy the deficiencies.  [*Id.*]

When ordering a party to develop a remedial plan to come into compliance with a settlement or past court orders, "the court is entitled to give some guidance … and set some deadlines for compliance."  *Armstrong v. Davis*, 275 F.3d 849, 873 (9th Cir. 2001). With the inclusion of instructions as to what elements need to be in a remedial plan "the … district judge [does] not attempt to 'micro manage' the [party's] activities, but rather to set clear objectives for it to attempt to attain, and, in most circumstances, general methods whereby it would attain them."  *Id*.  The U.S. Supreme Court has also held that a court's inherent power to order a non-compliant party to develop remedial plans to achieve compliance includes the court's ability to direct the party to include certain tasks and deadline in the plan, because the court "retains the authority, and the responsibility, to

make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion." *Brown v. Plata*, 563 U.S. 493, 542 (2011).

## RELIEF REQUESTED

Plaintiffs request that the Court issue an order that:

1)      Finds Defendants non-compliant with MC PM ##1-3, 5-6, and 8 from March 2015 to September 2016 at Eyman-SMU I, Eyman-Browning, Florence Central, Florence Kasson, Perryville-Lumley, and Lewis-Rast due to the overwhelming deficiencies with those findings and the documentation that allegedly supports them.

2)      Finds Defendants non-compliant with MC PM ##1-3, 5-6, and 8 from March 2015 to July 2016 at Eyman-SMU I, Eyman-Browning, Florence Central, Florence Kasson, Perryville-Lumley, and Lewis-Rast due to the failure to randomly select weeks for monitoring, as required by these Performance Measures.

3)      Finds Defendants non-compliant with MC PM ## 1-3, 5-6, and 8 for Florence-Kasson for March 2015 to August 2016 due to the failure to randomly select prisoner records for review, as required by these Performance Measures.

4)      Finds Defendants non-compliant with MC PM #6 at the following facilities in the following months: **Eyman-Browning** (from March 2015 to September 2016); **Eyman-SMU I** (August 2015); **Florence-Kasson** (October 2015; August 2016); **Florence Central** (August 2016); and **Perryville-Lumley** (September 2015 and June 2016).

5)      Finds Defendants non-compliant with MC PM #8 for following facilities in the following months: **Perryville-Lumley** (December 2015; June 2015; May 2015; April 2015; March 2015; February 2015); **Eyman-Browning** (August 2016; July 2016; May 2016; February 2016; April 2015; February 2015); **Eyman-SMU I** (March 2016; August 2015; July 2015; June 2015; March 2015; February 2015); **Florence-Kasson** (May 2016; April 2016; March 2016; February 2016; January 2016; August 2015; June 2015; May

2015; April 2015; March 2015; February 2015); **Lewis-Rast** (July 2016; March 2016; February 2016; January 2016; December 2015; November 2015; October 2015).

6)      Orders Defendants to submit a plan within 30 days detailing how they plan to address the findings of non-compliance detailed in paragraphs 1-5 above.

7)      Orders Defendants to submit a plan, including retaining an outside expert for technical assistance, within 30 days detailing how they plan to remedy the overwhelming pattern of refusals in programming and all other out-of-cell time for the SMI and non-SMI prisoners at Eyman-SMU I, Eyman-Browning, Florence Central, Florence Kasson, Perryville-Lumley, and Lewis-Rast.

8)      Orders Defendants to submit a plan within 30 days detailing how they will ensure that the monitors use the methods and procedures necessary to accurately monitor compliance with MC PM ##1-3, 5-6, and 8 of the Stipulation.

## CONCLUSION

The Court should find the Defendants non-compliant with the Stipulation for Max Custody Performance Measures ##1-3, 5-6, and 8 for the period March 2015 through September 2016 and order the Defendants to develop a plan to comply with their obligations without further delay.

Dated: February 22, 2017               **ACLU NATIONAL PRISON PROJECT**

By:  s/ Amy Fettig
      Amy Fettig (D.C. 484883)**
      David C. Fathi (Wash. 24893)*
      Jamelia Natasha Morgan (N.Y. 5351176)**
      915 15th Street N.W., 7th Floor
      Washington, D.C. 20005
      Telephone:  (202) 548-6603
      Email:     dfathi@npp-aclu.org
                 afettig@npp-aclu.org
                 jmorgan@aclu.org

      *Admitted *pro hac vice*.  Not admitted
       in DC; practice limited to federal
       courts.
      **Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
          agerlicher@perkinscoie.com
          jhgray@perkinscoie.com

Kathleen E. Brody (Bar No. 026331)
Daniel Pochoda (Bar No. 021979)
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    kbrody@acluaz.org
          dpochoda@acluaz.org

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, P.C.**
P. O. Box 91398
Tucson, Arizona 85752
Telephone:  (520) 477-1475
Email:    kirstin@eidenbachlaw.com

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          ckendrick@prisonlaw.com

*Admitted *pro hac vice*

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com
          aamiri@jonesday.com

*Admitted *pro hac vice*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com

*Admitted *pro hac vice*

Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:     jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARIZONA CENTER FOR DISABILITY LAW**


By:   s/ Maya Abela

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email:    skader@azdisabilitylaw.org
             adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:
   rdalyrooney@azdisabilitylaw.org
         jrico@azdisabilitylaw.org
         jross@azdisabilitylaw.org
         mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

1

## **CERTIFICATE OF SERVICE**

2        I hereby certify that on February 22, 2017, I electronically transmitted the above

3   document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4   Notice of Electronic Filing to the following CM/ECF registrants:

5

6                                   Michael E. Gottfried
                                 Lucy M. Rand

7                 Assistant Arizona Attorneys General
                  Michael.Gottfried@azag.gov

8                        Lucy.Rand@azag.gov

9                               Daniel P. Struck
                     Kathleen L. Wieneke

10                              Rachel Love
                    Timothy J. Bojanowski

11                        Nicholas D. Acedo
                     Ashlee B. Fletcher

12                        Anne M. Orcutt
                         Jacob B. Lee

13         STRUCK WIENEKE, & LOVE, P.L.C.
                     dstruck@swlfirm.com

14                     kwieneke@swlfirm.com
                      rlove@swlfirm.com

15                  tbojanowski@swlfirm.com
                   nacedo@swlfirm.com

16                     afletcher@swlfirm.com
                   aorcutt@swlfirm.com

17                       jlee@swlfirm.com

18                     *Attorneys for Defendants*

19

20                              s/ D. Freouf
                            —————————————————————

21

22

23

24

25

26

27

28