Kathleen E. Brody (Bar No. 026331)
Daniel Pochoda (Bar No. 021979)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email: kbrody@acluaz.org
           dpochoda@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email: skader@azdisabilitylaw.org
           adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-DKD <br><br> **DECLARATION OF JENNIFER ONKA IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE** |

LEGAL134539242.1

1  I, JENNIFER ONKA, declare:

2      1.      I am a paralegal employed by the ACLU National Prison Project.  I serve as

3  the lead paralegal in my office for the *Parsons v. Ryan* case.  As part of my regular duties

4  I track and review all compliance documents produced by Defendants in that case related

5  to the maximum custody performance measures (MC PM) set forth in the Stipulation.

6  [Docs. 1185, 1185-1, Exs. D, E]  Together with the attorneys, legal fellows, and other

7  paralegal working on this matter I have developed protocols and procedures for analyzing

8  these compliance documents vis-à-vis the requirements of the Stipulation.     These

9  protocols and procedures are discussed below.  If called as a witness, I could and would

10  testify competently to the facts stated herein, all of which are within my personal

11  knowledge.

12      2.      Attached to this declaration are a number of Federal Rule of Evidence

13  (FRE) 1006 summary exhibits created because the underlying data and documents are so

14  voluminous they cannot be conveniently examined by the court.  All of these summaries

15  are based on true and correct copies of the compliance documents produced by

16  Defendants in this matter and reflect Plaintiffs' reasonable analysis of the contents of

17  these documents.  Each FRE 1006 summary is identified as such.

18  **I.     PROFOUND FLAWS IN THE MONITORING PROCESS UNDERMINE
19           THE ACCURACY OF THE CGAR FINDINGS**

20      **A.     Defendants Selection of Weeks to be Monitored is Not Random &
                  Therefore Non-Compliant for MC PM ##1-3, 5-6, and 8.**

21      3.      I attach hereto as **Exhibit 1,** "FRE 1006 Summary Exhibit 'Weeks Chosen

22  for Monitoring – March 2015 – June 2016.'"  This chart demonstrates the week chosen for

23  monitoring at each of the maximum custody facilities during the monitoring months of

24  March 2015 through June 2016.  This chart was formulated by reviewing the prisoner out-

25  of-cell tracking sheets produced by Defendants for each facility during each month of

26  monitoring to establish the dates monitored.  For each facility monitored, with just one

27  exception, the week chosen for monitoring of the previous month was either the first or

28  second week of the following month.  Exhibit 1 was compiled by reviewing the individual

prisoner tracking sheets produced by Defendants at each facility for each of the months monitored from March 2015 through June 2016 and noting the calendar week selected for monitoring.  In Defendants' documentation, weeks are measured starting from Saturday; therefore, depending on when the first Saturday falls in a given month, the first week of that month may start on any date between the 1st and 7th day of the month.  As reflected in Exhibit 1, all facilities choose the first or second week of the following month to monitor except in April 2015 when all facilities selected the second week, except for Florence-Central and Florence-Kasson, which selected the third week; in December 2015, Lewis-Rast selected the second week while all other facilities chose the first week for monitoring.

### B.   Selection of Prisoners to be Reviewed Does Not Allow Full Review of Ten Prisoners for Each Maximum Custody Performance Measure.

4.     I attach hereto as **Exhibit 2 (under seal),** "FRE 1006 Summary Exhibit 'Defendants' Inmate Record Selection – March 2015 – August 2016.'"  Exhibit 2 sets forth the prisoner records selected for monitoring by Defendants from March 2015 to August 2016 at Florence-Kasson.  This chart shows that only fifteen total prisoners, rather than twenty, were selected for audit in each of those months.  In my review of the records produced, I noted that five prisoners in each month's audit were included in both the record draw for the seriously mentally ill (SMI) and the non-SMI group sampled.  In Exhibit 2, the five records highlighted in yellow for each month are the records that were double counted for both the non-SMI and SMI groups.  In September 2016, Defendants properly, randomly selected ten unique prisoners for the non-SMI audit and ten unique prisoners for the SMI audit for a total of twenty prisoners reviewed.

5.     At every other facility, with rare exceptions, ten unique non-SMI prisoners and ten unique SMI prisoners were selected for audit, for a total of twenty prisoners reviewed each month.  In my review of the records I identified sporadic instances at other facilities in which one or two prisoners were counted in both the non-SMI and SMI audits.  At Eyman-SMU I there was overlap between one or two records from April 2015 through

December 2015 and from January 2016 to August 2016.  These are noted in Exhibit 2. No facility, however, engaged in this practice to the same extent as Florence-Kasson.

### C. Overwhelming Pattern of Refusals Raises Serious Concerns about the Legitimacy of Compliance Findings.

6.     I attach hereto as **Exhibit 3**, "FRE 1006 Summary Exhibit, 'Defendants' Reported Compliance Percentages for MC PM ##1-3, 5-6, and 8 – February 2015 – September 2016.'"  This chart was compiled by summarizing the reported compliance percentages for each measure and for each month at each facility as reported in the CGAR reports produced by Defendants.

7.     I highlighted in yellow all instances where Defendants reported a compliance percentage below the 75% threshold.

8.     I attach hereto as **Exhibit 4**, "FRE 1006 Summary Exhibit, 'Rates of Refusal of Recreation' and 'Rates of Refusal of Out-of-Cell Time and Programming – December 2015 – September 2016.'"  These two (2) charts indicating the rates of refusal for: 1) exercise/recreation; and 2) programming (which includes mental health programming, group programming, and unstructured out-of-cell time) for each facility for the months December 2015 to September 2016.  I calculated the rates of refusal for each of the facilities by reviewing the individual tracking sheet for each prisoner for each month and: 1) adding up the total number of rec periods/programs offered; and 2) adding up the total number of rec periods/programs refused by prisoners.  I further broke-down these totals to non-SMI and SMI prisoners and then added the two together to determine an overall refusal rate.

9.     When determining the total number of refusals, I included in my calculations any instances where a prisoner refused either an entire recreation period/program, or elected to return to his or her cell early, thereby refusing part of the out-of-cell time offered.  Due to variations in the way partial refusals were denoted across the various facilities, it is possible that some partial refusals may not have been accounted for in these figures.

10.     Refusal rates for Florence-Kasson and Florence-Central for August 2016 were not included in the charts as Defendants have not produced tracking sheets for the Florence units for the August 2016 CGAR reports.

11.     When reviewing the individual prisoner tracking sheets produced by Defendants I noted that there were numerous instances when a prisoner would refuse all out-of-cell time offered to him/her for the entire week.  I attach hereto as **Exhibit 5 (under seal)** true and accurate copies of a few representative samples of these types of tracking sheets produced by Defendants:  ADCM630278-79;  ADCM630288-89;  ADCM037878-79;      ADCM037886-87;      ADCM605610-13;      ADCM321451-52;  ADCM321735-36; ADCM321743-44.

12.     In my review of the documentation produced by Defendants I also found multiple instances in which an entire class of 7-10 inmates would allegedly refuse to participate in the out-of-cell group programming.  I attach hereto as **Exhibit 6 (under seal)** true and accurate copies of a few representative samples of these types of sign-in sheets for programming produced by Defendants:   ADCM619832; ADCM619863;  ADCM628115;    ADCM628426;    ADCM628438;    ADCM663474;    ADCM605413;  ADCM464778; ADCM664401.

### D.      Failure to Document Times Out-of-Cell & Alterations of the Times Recorded.

13.     In my review of the individual out-of-cell tracking sheets produced by Defendants for each month at each facility, I noted that at almost all facilities, when out-of-cell time was recorded as refused, Defendants failed to document the start and end time of the activity offered and frequently failed to note the total time offered on the tracking sheets and comments pages.

14.     To the extent that some facilities' out-of-cell tracking sheets do show "time offered" next to refusals of out-of-cell time, the entries appear to have been added at a later date, when out-of-cell time was being tallied during the auditing process—potentially by staff who were not even involved in the out-of-cell time but just making assumptions

based on written schedules.  I attach hereto as **Exhibit 7 (under seal)** true and accurate copies of documents produced by Defendants which are representative examples of out-of-cell tracking sheets demonstrating refusal times that appear to have been entered after-the-fact during the auditing process:   ADCM388015-16;  ADCM628576-77;  ADCM628847-48;   ADCM628858-59;   ADCM628944-45;   ADCM466656-57;  ADCM466665-66; ADCM466683-84; ADCM387886-87.

15. I also noted numerous instances where the comments on the back of the out-of-cell tracking sheets were not in chronological order, making it unlikely that Defendants were taking notes in real time.  I attach hereto as **Exhibit 8 (under seal)** true and accurate copies of a few representative samples of these types of tracking sheets produced by Defendants:   ADCM466534-35; ADCM585411-12; ADCM628263-64; ADCM665188-89.

16. In my review of the MC PM compliance documents produced by Defendants across nearly all units in all months, it was frequently difficult or impossible to discern from the tracking sheets whether the audited prisoners were in fact offered out-of-cell time in compliance with the MC PMs due to a failure to document time in and out of cell.

17. At Perryville-Lumley, the documentation reflects a repeated failure to note the amount of out-of-cell time actually offered when prisoners refused out-of-cell time. The following are illustrative examples of this problem—but not a comprehensive list.

18. In the Perryville-Lumley April 2016 Notebook/March 2016 CGAR report compliance documentation, for example, nearly half of the tracking sheets audited for MC PM #8 do not accurately reflect start and stop times when a prisoner refused time out-of-cell, nor do they consistently indicate the actual time offered for each session of refused unstructured out-of-cell time.  I attach hereto as **Exhibit 9 (under seal)** true and accurate copies of documents produced by Defendants which are examples of Perryville April 2016 Notebook/March 2016 CGAR tracking sheets for SMI prisoners, ADCM465408-09;

1    ADCM465410-11;      ADCM465414-15;      ADCM465416-17;      ADCM465418-19;

2    ADCM465420-21.

3        19.    In my review of the Perryville-Lumley March 2016 Notebook/February

4    2016 CGAR compliance documentation, I could not use the tracking sheets to determine

5    the time offered for each refused session of  unstructured out-of-cell time for eight of the

6    ten SMI records audited because Defendants did not properly note the start and end time

7    for each refused activity.  I attach hereto as **Exhibit 10 (under seal)** true and accurate

8    copies of the these problematic tracking sheets produced by Defendants for the Perryville

9    Lumley March 2016 Notebook/February 2016 CGAR documentation:  ADCM465017-18;

10   ADCM465019-20;      ADCM465021-22;      ADCM465025-26;      ADCM465027-28;

11   ADCM465031-32; ADCM465033-34; ADCM465035-36.

12       20.    In my review of the Perryville-Lumley January 2016 Notebook/December

13   2015 CGAR report compliance documentation I could not use the tracking sheets to

14   determine the time offered for each refused session of unstructured out-of-cell time for

15   four of the ten SMI prisoners because Defendants did not properly note the start and end

16   time for each refused activity.  I attach hereto as **Exhibit 11 (under seal)** true and

17   accurate copies of these types of tracking sheets produced by Defendants for the

18   Perryville-Lumley   January   2016   Notebook/December   2015   CGAR   report:

19   ADCM463939-40; ADCM463945-46; ADCM463947-48; ADCM463955-56.

20       21.    In the October 2015 Notebook/September 2015 CGAR report, I could not

21   use the tracking sheets to determine compliance with the SMI time requirements or

22   DI 326 out-of-cell requirements for nine of the ten SMI records audited, again because

23   Defendants failed to either reflect start and stop times when a prisoner refused time out-

24   of-cell, or indicate the actual time offered for each session.  I attach hereto as **Exhibit 12**

25   **(under seal)** true and accurate copies of these Perryville October 2015 Notebook/

26   September 2015 CGAR tracking sheets produced by Defendants for SMI prisoners:

27   ADCM321449-50;      ADCM321451-52;      ADCM321453-54;      ADCM321455-56;

28

1   ADCM321457-58;       ADCM321459-60;       ADCM321461-62;       ADCM321465-66;

2   ADCM321467-68.

3        22.    On other tracking sheets that month, time offered for refusals was noted

4   faintly on the tracking sheets and appears to have been added in the course of Defendants

5   calculating time for compliance purposes.  I attach as **Exhibit 13 (under seal)** true and

6   accurate copies of the following Perryville October 2015 Notebook/September 2015

7   CGAR tracking sheets produced by Defendants:  ADCM321598-99; ADCM321605-06;

8   ADCM321627-28.

9        23.    Similarly, in Perryville-Lumley's July 2015 Notebook/June 2015 CGAR

10  report, I was unable to use the tracking sheets to determine compliance with out-of-cell

11  requirements for three of the ten non-SMI prisoners and eight of the ten SMI prisoners

12  because the activity log sheets did not indicate how much total time was offered when

13  prisoners refused.  I attach hereto as **Exhibit 14 (under seal)** true and accurate copies of

14  the Perryville July 2015 Notebook/June 2015 CGAR tracking sheets produced by

15  Defendants   for   the   non-SMI   prisoners:     ADCM276155-56;   ADCM276195-96;

16  ADCM276215-16; and for the SMI prisoners:  ADCM276322-23; ADCM276324-25;

17  ADCM276326-27;       ADCM276328-29;       ADCM276330-31;       ADCM276332-33;

18  ADCM276336-37; ADCM276338-39.

19       24.    I found the same type of problems enumerated above with nearly all of

20  Perryville-Lumley's underlying CGAR compliance documentation for all months from

21  March 2015 to September 2016.   Beginning in October 2015, Defendants began

22  sometimes noting in the comments section of the tracking sheet how much time was

23  offered when a prisoner refused unstructured out-of-cell time.  However, this practice was

24  not engaged in universally.  In July 2016, they also began noting the start time for the

25  refused activity.

26       25.    In my review of the out-of-cell tracking sheets produced by Defendants for

27  Eyman-Browning, I found the same failure to document the actual time offered for each

28  refused session.  For example, in the December 2015 Notebook/November 2015 CGAR

report, when prisoners refused out-of-cell time, the start and end times are not listed on the tracking sheets, nor is the total time offered noted in the comments alongside prisoner or officer signatures; rather, total time offered has been entered on the tracking sheets and looks to have been added after-the-fact in the course of calculating compliance with the performance measures, rather than recorded at the time of refusal because it appears to be different handwriting, in different ink (usually red), and simply inserts totals, such as 2.5, next to an entry marked "R" for refusal.  I attach hereto as **Exhibit 15 (under seal)** a true and accurate copy of a tracking sheet for the Eyman-Browning December 2015 Notebook/November 2015 CGAR report that reflects this problem:  ADCM276616-17; ADCM276625-26;  ADCM276633-34  (non-SMI  prisoners);  ADCM276816-17; ADCM276818-19; ADCM276822-23 (SMI prisoners).  **Exhibit 15** is an example of a pattern of documentation is present throughout the notebook.

26.    This pattern of documentation of refusals was consistent across all auditing months at Eyman-Browning.  The July 2015 Notebook/June 2015 CGAR for Eyman-Browning is an exemplar of that unit's compliance practices.  In the documentation it is impossible to verify compliance with most of the MC PMs for several prisoners because, when out-of-cell time was refused, the actual time offered for each refused session was either not noted or appears to have been entered after the fact, and often does not include start and stop times.  I attach hereto as **Exhibit 16 (under seal)** true and correct copies of Eyman-Browning July 2015 Notebook/June 2015 CGAR tracking sheets, produced by Defendants  for  the  non-SMI  prisoners:    ADCM387898-99;  ADCM387902-03; ADCM387904-05; ADCM387906-07; ADCM387908-09; and for the SMI prisoners: ADCM387999-8000; ADCM388001-02; ADCM388003-04; ADCM388005-06.

27.    The problems I identified in the July 2015 Notebook/June 2015 CGAR documentation for Eyman-Browning were also present in the June 2015 Notebook/May 2015 CGAR, May 2015 Notebook/April 2015 CGAR, April 2015 Notebook/March 2015 CGAR, and with the SMI prisoners monitored for the March 2015 Notebook/February 2015 CGAR.

28.     The same failure to document beginning and ending times for out-of-cell exercise and programming that exists in Eyman-Browning and Perryville-Lumley also typifies the documentation at Eyman-SMU I across all monitored months.  For example, in the December 2015 Notebook supporting the November 2015 CGAR report, when prisoners refused out-of-cell time, start and end times are not documented on the tracking sheets and total time offered is not noted on the comments page; instead, total time offered is listed on the tracking sheets and looks to have been added after-the-fact in the course of calculating total time offered and evaluating compliance with the performance measures. I attach hereto as **Exhibit 17 (under seal)** true and correct copies of the Eyman-SMU I December 2015 Notebook/November 2015 CGAR tracking sheet that typifies this problem in the documentation produced by Defendants:     ADCM322177-78; ADCM322189-90;     ADCM322200-01     (non-SMI     prisoners);     ADCM322401-02; ADCM322403-04; ADCM322405-06 (SMI prisoners).  This pattern of documentation is present throughout the whole notebook.

29.     My review of the April 2015 and June through November 2015 notebooks for Eyman-SMU I found the same type of documentation errors and inconsistencies.  I attach hereto as **Exhibit 18 (under seal)** a true and correct copy of Eyman-SMU I tracking sheets produced by Defendants for:     ADCM428931-32 (November 2015 Notebook/October CGAR report); ADCM198434-35 (October 2015 Notebook/September CGAR report); ADCM198213-14 (September 2015 Notebook/August CGAR report); ADCM198019-20 (August Notebook/July CGAR report); ADCM467811-12 (July 2015 Notebook/June CGAR report); ADCM320880-81 (June 2015 Notebook/May CGAR report); ADCM275521-22 (April 2015 Notebook/March CGAR report)).  In each month, this pattern of documentation is present throughout the whole notebook.

30.     In the Eyman-SMU I May 2015 Notebook supporting the April 2015 CGAR report, when out-of-cell time was refused, the actual time offered for each refused session is not noted on the tracking sheets or in the comments, making it impossible in many cases to evaluate compliance.  I attach hereto as **Exhibit 19 (under seal)** true and correct

copies of the documents produced by Defendants for Eyman-SMU I May 2015 Notebook/April 2015 CGAR tracking sheets for non-SMI prisoners, ADCM037717-18; ADCM037725-26; ADCM037742-43; ADCM037752-53; ADCM037760-61; ADCM037768-69; ADCM037775-76; ADCM037783-84; and for SMI prisoners, ADCM037876-77; ADCM037878-79; ADCM037884-85; ADCM037886-87; ADCM037888-89; ADCM037890-91; ADCM037892-93.

31. I found the same types of documentation errors in Eyman-SMU I's March Notebook 2015/February 2015 CGAR report, namely that start and stop times are not included for refusals, or the actual time offered for each refused session appears to have been entered after the fact. I attach hereto as **Exhibit 20 (under seal)** true and correct copies of the Eyman-SMU I March Notebook/February CGAR tracking sheets for tracking sheets for non-SMI prisoners, ADCM275076-77; ADCM275083-84; ADCM275093-94; ADCM275099-100; ADCM275105-06; ADCM275122-23; ADCM275128-29; ADCM275137-38; ADCM275145-46; and for SMI prisoners, ADCM387979-80; ADCM387981-82; ADCM387985-86; ADCM387987-88; ADCM387989-90; ADCM387993-94; ADCM387995-96; ADCM387997-98.

32. Even when officers would note in the comment section the actual time offered for refused sessions of out-of-cell time, it became clear during my review of the documentation that the monitors were not reviewing these comments in the course of determining compliance. There were several instances where the notes in the comment section directly refuted the monitor's calculations on the tracking sheet. I attach hereto as **Exhibit 21 (under seal)** true and accurate copies of these types of tracking sheets: ADCM198181-82; ADCM467835-36; ADCM198187-88.

33. In my review of the Lewis-Rast maximum custody notebooks produced by Defendants I found a similar pattern of improper documentation of out-of-cell time. In the April 2016 Notebook/March 2016 CGAR report, for example, when out-of-cell time is refused, the start and stop times are not noted, nor is the actual time offered for each refused session documented on the tracking sheets or in the comments; as a result, it is

impossible in many cases to verify compliance with the performance measures requiring a certain number of total out-of-cell hours.  I attach hereto as **Exhibit 22 (under seal)** true and correct copies of the documents produced by Defendants for the April 2016 Notebook/March 2016 CGAR tracking sheets for non-SMI prisoners: ADCM466259-60; ADCM466272-73;       ADCM466297-98;       ADCM466307-08;       ADCM466333-34; ADCM466345-46;  and  for  SMI  prisoners:  ADCM466489-90;  ADCM466498-99; ADCM466508-09;       ADCM466517-18;       ADCM466524-25;       ADCM466534-35; ADCM466543-44; ADCM466554-55; ADCM466564-65; ADCM466573-74.

34.    The same type of deficiencies in the documentation of refusals at Lewis-Rast persisted in the March 2016 Notebook/February 2016 CGAR report, February 2016 Notebook/January 2016 CGAR report, and January 2016 Notebook/December 2015 CGAR report.

35.    Only the Florence-Kasson and Florence Central notebooks consistently list start and end times on the tracking sheets when time was refused.

36.    In addition to the pervasive problem of start and end times not being recorded when prisoners refused out-of-cell time, disorganization and sloppiness in the Defendants' documentation also made it extremely difficult in many instances to determine compliance.  On some out-of-cell tracking sheets, the handwritten start or stop times documented on some tracking sheets were illegible, making it difficult to calculate the total amount of time a prisoner received in each category of out-of-cell time.   I attached hereto as **Exhibit 23 (under seal)** true and accurate copies of a few representative samples of these types of tracking sheets:      ADCM387888-89; ADCM466237-38.

**E.    Conflicting Out-of-Cell Times Documented on Tracking Sheets.**

37.    During my review of the tracking sheets produced by Defendants I noted several instances where Defendants reported a monitored prisoner being two places at once, or reported that he/she was offered the opportunity to be two places at once.  In

many instances these overlapping times are being double counted by Defendants for compliance purposes.

38.     I attach hereto as **Exhibit 24 (under seal),** "FRE 1006 Summary Exhibit 'Examples of Overlapping Times Affecting Compliance,'" a chart summarizing instances in the records Defendants produced in which overlapping times for out-of-cell activities affected compliance with the maximum custody performance measures.   The chart indicates which performance measure is impacted by overlapping times and analyzes how these conflicting out-of-cell times actually impacted compliance.   In compiling this exhibit I used prisoner Out-of-Cell Tracking Sheets, and where available, activity schedules and program sign-in sheets.

39.     In compiling this summary data chart, if the tracking sheet indicated that the monitored prisoner accepted one type of programming and refused another I gave the prisoner credit for the programming he/she attended but I did not give credit for the time refused when calculating compliance.   If the tracking sheet indicated that the monitored prisoner either accepted both types of programming offered to him/her or refused both of types of programming, I did not count either of these overlapping times towards compliance.   This protocol was used in analyzing compliance because Defendants cannot offer two activities simultaneously and credit both.   **Exhibit 24** demonstrates that for the majority of the instances where I noted overlapping times, I could not use sign-in sheets to corroborate which programming prisoners attended or refused, as Defendants did not produce a number of sign-in sheets.

40.     **Exhibit 24** does not reflect all of the instances of overlapping time because Defendants rarely noted the start and end times of exercise time, unstructured time, or programming when a prisoner refused the time offered to them.

41.     **Exhibit 24** is not exhaustive of all overlapping times reflected on the tracking sheets.   There were far more instances of overlapping times.   However, if the overlapping times did not ultimately affect compliance for the facility for the month in question, I did not include these examples on **Exhibit 24**.   Similarly, there may be

additional instances of overlapping times affecting compliance that were not included on this chart.  **Exhibit 24** was intended merely to be illustrative of the types of discrepancies and inconsistencies I noted during my review of Defendants' documentation.

42.     I attach hereto as **Exhibit 25 (under seal)** true and correct copies of tracking sheets produced by Defendants for Eyman-Browning which demonstrate activities offered and recorded at overlapping times: ADCM387961-62; ADCM387963-64; ADCM387971-72; ADCM387973-74.

43.     I attach hereto as **Exhibit 26 (under seal)** true and correct copies of tracking sheets produced by Defendants for Florence-Kasson which demonstrate activities offered and recorded at overlapping times:   ADCM121508-09; ADCM121510-11; ADCM121512-13; ADCM121518-19; ADCM121520-21; ADCM632038-39.

44.     Because of incomplete documentation produced by Defendants—especially of refusal times—it was impossible to identify overlapping times for most records.  At many of the facilities, it is impossible to determine for a significant percentage of the monitored prisoners whether out-of-cell offerings overlapped because the start and end times of "refused" activities are not recorded.  Only the Florence institutions—Florence-Kasson and Florence Central—have consistently documented on the tracking sheets the start and end times for activities that prisoners refused.  As a result, it was possible to cross-check activity schedules and sign-in sheets (where actually produced) to discover that activities were actually being offered at the times reflected on the tracking sheets.

45.     At all institutions other than Florence-Kasson and Florence Central, if a prisoner refused an out-of-cell activity that was scheduled at the same time as another out-of-cell activity that the prisoner attended, the prisoner's daily tracking forms will generally not reflect this discrepancy—only the start and end times for the activity the prisoner attended would appear on the tracking sheet, under most facilities' current documentation practices.

46.     Due to the volume of refusals at almost all facilities, the vast majority of instances of overlapping times affecting compliance that I identified occurred at the

Florence facilities, where refusal times are generally appropriately documented.   Nearly all the instances of overlapping times that I identified at Florence included at least one "refused" activity.   Conversely, only about half of the instances of overlapping times that I found at Eyman-Browning included at least one "refused" activity.   For the other half of incidents, the tracking sheet reflected that a prisoner attended two activities simultaneously.

**F.      Failure to Cross-Check Prisoner Participation in Programs with Activity Schedules and Sign-In Sheets/ Rosters & Failure to Produce Sign-In Sheets.**

47.      In reviewing the maximum custody notebooks to evaluate Defendants' CGAR compliance findings with MC PM #2 and #8, I found no evidence that the monitors are cross-checking documentation on the daily tracking sheets with either the monthly Activity Schedules or the actual sign-in sheets/rosters for the programs the prisoners are allegedly being offered.

48.      When I cross-checked the available sign-in sheets (not all have been produced), many discrepancies were identified.   In my review of the documentation produced by Defendants I found instances in which a prisoner is recorded on the tracking sheet to have been offered participation in a class, but there is no indication in the program sign-in sheets/rosters produced that the prisoner actually was offered or did participate in the program.   I attach hereto as **Exhibit 27 (under seal)** true and correct copies of documents produced by Defendants that illustrate this problem: the Perryville-Lumley December 2015 Notebook (tracking sheet showing prisoner's attendance of group programming class (ADCM276359-60), but prisoner's name missing from the sign-in sheet for that class (ADCM387708)); Perryville-Lumley October 2015 Notebook (tracking sheet indicating prisoner's refusal of SMI unstructured time (ADCM321453-54), but prisoner's name is missing from corresponding sign-in sheet (ADCM387659)); (tracking sheet shows prisoner's attendance at mental health programming class (ADCM321455-56); however corresponding sign-in sheet shows prisoner refused programming (ADCM387645)); tracking sheet showing that prisoner attended mental

health programming (ADCM321465-66), but there is no record of participation on the sign-in page for the class (ADCM387646); Perryville-Lumley July 2015 Notebook (tracking sheet indicating prisoner refused SMI unstructured time (ADCM276330-31), but prisoner not included on sign-in sheet (ADCM387636-37)); (tracking sheet for one prisoner showed that she attended psych education (ADCM276324-25), whereas sign-in sheet noted her as a refusal (ADCM387618); tracking sheet for another prisoner showed that she attended mental health programming (ADCM276166-67), whereas sign-in sheet stated that she had switched groups and that her programming had been re-scheduled (ADCM387621)); Perryville-Lumley April 2015 Notebook (several prisoners' tracking sheets showed their attendance of psycho-educational programming (ADCM467648-49, ADCM467652-53, ADCM467656-57), but they were not listed on corresponding sign-in sheet for the class (ADCM467688)).

49.     Similar discrepancies were noted when reviewing the documentation Defendants produced for Florence-Kasson.  I attach hereto as **Exhibit 28 (under seal)** true and correct copies of documents produced by Defendants that further illustrate this problem: the Florence-Kasson May 2016 Notebook (several prisoners' tracking sheets showed their attendance at mental health group therapy (ADCM6302036-37, ADCM632042-43, ADCM632044-45), but sign-in sheet does not reflect their attendance (ADCM632323-24)).

50.     I also noted discrepancies between the tracking sheets and sign-in sheets when reviewing the documentation Defendants produced for Eyman-Browning.  I attach hereto as **Exhibit 29 (under seal)** true and correct copies of documents produced by Defendants that further illustrate this problem: the Eyman-Browning April 2016 Notebook (tracking sheet indicating prisoner refused group programming (ADCM620111-12), but sign-in sheet reflects that prisoner signed-in for class (ADCM620006)); (several prisoners' tracking sheet show they refused unstructured out-of-cell time (ADCM620197-98, ADCM620203-04) but sign-in sheet reflects they signed-in for unstructured time (ADCM620226); (tracking sheet shows prisoner attended unstructured out-of-cell time

(ADCM620207-08) but sign-in sheet shows he refused (ADCM620219)); (tracking sheet shows prisoner attended mental health group therapy (ADCM620211-12) but on sign-in sheet he was marked as "Absent-Unexcused" (ADCM620244).

51.    Finally, I noted discrepancies between the sign-in sheets themselves.  There were several instances where sign-in sheets indicated that a prisoner attended two different programs at the same time, suggesting that either the sign-in sheet had the wrong date or time, or that the prisoner didn't actually attend said program.  I attach hereto as **Exhibit 30 (under seal)** true and correct copies of these types of sign-in sheets: ADCM630774 (reflecting prisoner signed in for group programming from 0940 – 1030 on 6/16/16); ADCM661433 (reflecting same prisoner signed in for mental health therapy from 1000 – 1100 on 6/16/16); ADCM628601 (reflecting prisoner attended group programming from 0924 – 1024 on 6/13/16); ADCM628585 (reflecting same prisoner attended unstructured out-of-cell time from 0924 – 1223 on 6/13/16); ADCM628570-71 (out-of-cell tracking sheet indicates that prisoner refused both unstructured time and group programming offered to him on 6/13/16).

52.    I attach hereto as **Exhibit 31 (under seal),** "FRE 1006 Summary Exhibit 'Discrepancies Noted in Eyman-Browning Maximum Custody Notebook January 2016,'" which demonstrates the discrepancies between the tracking sheets and activity schedule for Eyman-Browning for the month of January 2016 Notebook/December 2015 CGAR for the prisoner records selected for monitoring and the required out-of-cell/programming time.  To create this chart I compared the tracking sheets with the activity schedule and noted in red anytime there was an inconsistency between the two source documents. Defendants did not produce program attendance sign-in sheets for Eyman-Browning for the January 2016 Notebook.

53.    Similar problems are found when out-of-cell tracking sheets, program sign-in sheets, and activity schedules are compared.  I attach hereto as **Exhibit 32 (under seal),** "FRE 1006 Summary Exhibit 'Discrepancies Noted in Lewis-Rast Maximum Custody Notebook December 2015,'" a chart showing the discrepancies between these three record

sources for the Lewis-Rast unit for the December 2015 Notebook/November 2015 CGAR. By comparing the available documentation, I found numerous conflicts between the out-of-cell time allegedly offered to the prisoners whose records were monitored for that month.  This chart illustrates the importance of being able to review the required forms of documentation in order to validate any compliance findings that the tracking sheets allegedly demonstrate.  As part of my regular work duties I maintain a running log of all documents Defendants produce in support of their MC PM findings; I also maintain a list of the missing documents in each production.  I attached hereto as **Exhibit 33,** "FRE 1006 Summary Exhibit, 'Program Attendance Sign-In Sheets Not Produced,'" which is a comprehensive list of all the Program Attendance/Sign-in Sheets which Defendants have failed to produce from March 2015 to September 2016.

54.    Furthermore, several of the sign-in sheets Defendants did produce were unofficial looking and did not definitively show what programming they were for.  I attach hereto as **Exhibit 34 (under seal)** are true and accurate copies of a few representative samples of these types of sign-in sheets:  ADCM387601; ADCM632327-29.

55.    Other attendance sheets were scanned in at such low resolution and high contrast that the names and ADC numbers on them were barely legible.  I attach hereto as **Exhibit 35 (under seal)** true and accurate copies of a representative sample of this type of sign-in sheet:  ADCM632359; ADCM465375; ADCM201011.

## II.    ERRONEOUS COMPLIANCE FINDINGS

### A.    Failure to Document or Account for Exercise Venue in Compliance Monitoring in Violation of the Requirements of MC PM #6.

56.    In reviewing Defendants' compliance findings for MC PM #6 I found absolutely no evidence that Defendants are monitoring the provision of exercise/recreation incentives as required by DI 326.   My review of the underlying compliance documentation produced by Defendants found that the maximum custody units are not consistently documenting the type of exercise enclosures being offered to prisoners as part

of the DI 326 program when recreation time is refused.  I also found no indication in any of the documentation that Defendants reviewed records for Step II and III Eyman-SMU I prisoners to ensure that the required *monthly* incentives under DI 326, such as provision of access to the par course or basketball enclosure, were provided.

57.     I attach hereto as **Exhibit 36**, "FRE 1006 Summary Exhibit, 'Recreation Enclosures Noted for Refusals in Maximum Custody Documentation – March 2015 – September 2016,'" a chart indicating whether or not recreation enclosures were noted when prisoners refused recreation in each facility for each month starting in March 2015 through September 2016 (comprehensive underlying documents for October 2016 have not yet been produced by Defendants).  For each facility, for each month, **Exhibit 36** sets forth whether the recreation enclosures were noted for Step II and Step III prisoners on the individual prisoner Out-of-Cell Tracking Sheets produced by Defendants in the maximum custody compliance documentation.  If the failure to note recreation enclosures for the purposes of MC PM #6 impacted three or more of the ten prisoner records reviewed, I placed a check in the non-compliance column.  Every check in the non-compliance column means that compliance should have been 70% or below that month for MC PM #6 due to the failure to note recreation enclosures offered.  If failure to note recreation for Step II or III prisoners only impacted two or fewer records, then I marked the compliance column.

58.     There were two instances where the non-compliance column was checked, not solely because recreation enclosures were not noted when recreation time was refused, but because Step II and Step III inmates were not allowed access to larger exercise enclosures in accordance with the DI 326 incentive system.  The monitors' failure to note these instances as non-compliant provides further evidence that the Defendants are not properly monitoring the provision of exercise/recreation incentives as required by DI 326.

59.     At Eyman-Browning, Defendants consistently noted which enclosure was offered when prisoners took their exercise time.  However, when prisoners were marked as *refusing* their exercise time – Defendants routinely failed to document the type of

recreation/location offered.  I attach hereto as **Exhibit 37 (under seal)** true and accurate copies of a representative sample of the sign-in sheet from Eyman-Browning reflecting these errors: ADCM585397-400; ADCM585403-04; ADCM276666-67; ADCM276682-83; ADCM276691-92; ADCM628107-08; ADCM628128-29; ADCM628157-58.

       **B.**    **Erroneous Findings for Maximum Custody Performance Measure 8.**

       60.    In reviewing the documentation produced by Defendants, I found numerous erroneous compliance findings.  I attach hereto as **Exhibit 38** (**under seal**) "FRE 1006 Summary Exhibit 'Max Custody Performance Measure 8 Overall Compliance,'" which lists all the instances where Defendants fell below 75% compliance with PM #8 in the months February 2015 to September 2016 according to my analysis of the underlying compliance documentation produced by Defendants.

       61.    For each instance of non-compliance, i.e., the monitored facility did not meet or exceed the 75% compliance threshold, I performed a detailed analysis identifying which audited prisoners I found non-compliant and why.  I attach this detailed analysis hereto as **Exhibit 39 (under seal)** "FRE 1006 Summary Exhibit 'Max Custody Performance Measure 8 Compliance Review.'"  This exhibit is based on the underlying compliance documents produced by Defendants for each month including prisoner tracking sheets and activity sign-in sheets.

       62.    In performing my analysis of compliance, I analyzed prisoner out-of-cell tracking sheets and attendance sheets produced by Defendants.  I did not rely upon the activity schedules as I found them to be an unreliable source of documentation for several reasons.  First, with regard to recreation, most facilities either do not reflect recreation time or have it in large blocks.  Activity schedules for Perryville-Lumley for March 2015 – June 2016 only reflect weekdays and do not contain recreation time.  Beginning in July 2016, activity schedules for Perryville-Lumley reflect weekends and recreation time; however, recreation appears on the schedule in 1 hour blocks for the entire day, every day of the week.  Therefore the activity schedules cannot be used to determine how long a recreation period is when a prisoner refuses exercise time and when the guard fails to note

the time offered on the out-of-cell tracking sheet.  Attached hereto as **Exhibit 40 (under seal)** are true and accurate copies of examples of activity schedules for Perryville-Lumley:  ADCM037590-93; ADCM605032; ADCM605412; ADCM661206-08.

63.    Similarly, activity schedules for Eyman-Browning have outdoor recreation offered in 30-minute blocks for the entire day, every day of the week, rendering them useless in trying to determine how long a recreation period is when a prisoner refuses exercise time.  Attached hereto as **Exhibit 41 (under seal)** are true and accurate copies of examples of activity schedules for Eyman-Browning:  ADCM037558-61; ADCM199291-94; ADCM276608-12.

64.    Activity Schedules for Eyman-SMU I show that recreation is offered in 3 hour blocks, however, a review of the out-of-cell tracking sheets show that when a prisoner refuses recreation time the monitor credits the prisoner with 2.5 hours of refused time.  It is unclear what the monitor is using to make this determination.  Attached hereto as **Exhibit 42 (under seal)** are true and accurate copies of examples of activity schedules for Eyman-SMU:  ADCM037575-79; ADCM037580-84; ADCM199303-07.

65.    Finally, it is difficult to ascertain what kind of programming is reflected on the activity schedule.  For instance, one entry on the activity schedule for Eyman-Browning for March 2015 indicated "Socialization Programming" was offered on Fridays from 1045 – 1145.  It is led by a CO III.  It does not indicate anywhere on the activity schedule that this is mental health programming, however, the date and time corresponds to a "Mental Health Therapy" entry on one of the SMI prisoner's out-of-cell tracking sheet produced for that month.  Annexed hereto as **Exhibit 43 (under seal)** is the tracking sheet and activity schedule demonstrating this type of discrepancy:  ADCM387963-64; ADCM037558-61.

66.    Across months and facilities, there were many other times the entries on the tracking sheets did not correspond to the activity schedule, making the schedules an unreliable source document.

67.     To determine the total amount of unstructured out-of-cell time offered to a prisoner, I analyzed the start time, end time, date, and details of each unstructured session on the out-of-cell tracking sheets to calculate the total offered time.

68.     If the total offered time was less than 10 hours and Defendants produced attendance sheets for unstructured out of cell time, I gave Defendants credit for any additional time reported on attendance sheets.

69.     If Defendants were short of the 10-hour unstructured out of cell time requirement by more than 10 minutes, I regarded the instance as noncompliant.

70.     If Defendants noted that an unstructured session had been refused, but failed to note the start and end time of the program, I attempted to locate the corresponding attendance sheet to determine the amount of time refused.  For most facilities, Defendants did not produce attendance sheets for unstructured out-of-cell time, so this method was not always viable.

71.     If attendance sheets for unstructured sessions had not been produced to us and start and end times were not noted on the tracking sheet, I attempted to locate a note on the sheet indicating the duration of the session or the total time offered.

72.     If the tracking sheet indicated a refusal but failed to note start time, end time, duration of the session, or total time offered, then I deferred to the amount of time Defendants reported in the CGAR.

73.     To determine whether Defendants were compliant with the requirements to offer 1 hour each of psycho-educational and mental health programming, I tracked start time, end time, date, and details for each psycho-educational session and mental health session.  Again, if Defendants were short of the 1 hour requirement by more than 10 minutes, I regarded the instance as noncompliant.

74.     If Defendants did not note either a mental health or psycho-educational session (or both) on the tracking sheet, I would attempt to find an attendance sheet for the missing session before marking them noncompliant.  I did this by matching each

attendance sheet to each session documented on the tracking sheet to see if Defendants had indeed offered the program, but failed to document it on the tracking sheet.

75.   To determine whether Defendants were compliant with the requirement to offer 1 additional hour of out-of-cell programming to SMI prisoners, I again tracked all relevant information from the tracking sheets to accurately calculate the amount of time offered.   If the prisoner received mental health, psycho-educational, or other group programming in excess of what was required under performance measure 8 for SMI prisoners, I counted that time towards the missing hour of group programming, since both mental health and psycho-educational programming are types of group programming.

76.   In cases in which a Step 2 or 3 prisoner was not offered an additional hour of group programming under DI 326 as required by Performance Measure 8 (for a total of two (2) hours of group programming), I again counted any mental health, psycho-educational, or other group programming in excess of what was required under performance measure 8 for SMI prisoners, towards the missing additional DI 326 group programming.

77.   However, if a prisoner was missing an hour of group programming under Performance Measure 8 and received unstructured out-of-cell time in excess of the 10-hour requirement, I did not count this extra time towards group programming time.

78.   If a tracking sheet was missing from the records, I counted this instance as noncompliant as it is impossible to determine if all of the requirements of PM #8 were met without reviewing the tracking sheet.  Both the February 2016 and March 2016 notebooks for Lewis-Rast were missing a tracking sheet for one of the prisoners monitored for PM #8.  I considered both of these instances noncompliant.

79.   In all instances where the tracking sheet and attendance sheets directly refuted one another, I defaulted to the tracking sheet, however, if the attendance sheet evidenced that a prisoner attended a program not reflected on his/her tracking sheet, I counted this program towards compliance.

80.     In some instances, assessing compliance was especially difficult due to disorganization and inconsistencies in Defendants' record keeping.  For example, the handwritten start and end times on tracking sheets were often difficult to read or illegible. Defendants sometimes crossed out start and end times or wrote over them, making it even more difficult to discern the amount of time offered.  Defendants produced written and typed attendance sheets, some missing crucial information such as the class type and start and end times.  In Florence-Kasson in May 2016, for example, Defendants appear to have used Count Sheets with spaces for prisoner signatures in lieu of attendance sheets and failed to include start and stop times for the session, making it difficult to match attendance sheets with the information on the tracking sheet.  Attached hereto as **Exhibit 44 (under seal)** are true and accurate copies of these types of attendance sheets: ADCM632053-55; ADCM632061-62.

81.     Defendants reported 100% compliance in the December 2015 CGAR for Perryville-Lumley, but after reviewing the supporting January 2016 Notebook, I found only 60% compliance.  Four of the records produced were non-compliant: one was given overlapping group programming and unstructured time leading to insufficient time; two were missing one-hour of additional group programming; and one was missing all group programming and had only 4:15 hours of unstructured out-of-cell time.  Attached hereto as **Exhibit 45 (under seal)** are true and correct copies of tracking sheets produced by Defendants for the Perryville January 2016 Notebook/December 2015 CGAR: ADCM463939-40; ADCM463943-44; ADCM463949-50; ADCM463951-52.

82.     In Perryville-Lumley's June 2015 CGAR report, Defendants alleged 100% compliance, but after reviewing the underlying documents I only found 20% compliance. In eight of the records, group programming or psych-educational programming was missing.  Attached hereto as **Exhibit 46 (under seal)** are true and correct copies of tracking sheets produced by Defendants for the Perryville July 2015 Notebook/June 2015 CGAR:  ADCM276322-23;  ADCM276324-25;  ADCM276326-27;  ADCM276328-29; ADCM276330-31; ADCM587982-83; ADCM276336-37; ADCM276338-39.

83. In the May 2015 CGAR report, Defendants also reported 100% compliance at Perryville, but my review showed that nine of the ten prisoners audited did not receive either the requisite two (2) hours of mental health programming or additional hour of group programming. Additionally, out-of-cell unstructured time was short by thirty minutes for seven of the records. Attached hereto as **Exhibit 47 (under seal)** are true and correct copies of tracking sheets produced by Defendants for the Perryville-Lumley June 2015 Notebook/May 2015 CGAR: ADCM429275-76; ADCM429277-78; ADCM429279-80; ADCM429281-82; ADCM429283-84; ADCM429285-86; ADCM429287-88; ADCM429289-90; ADCM429191-92.

84. At Eyman-Browning, a pattern similar to the one at Perryville-Lumley emerged. In both the August and July 2016 CGAR reports, I found that Defendants double-counted group programming, unstructured time, and exercise time that clearly overlapped on the Tracking Sheets but was nonetheless counted as separate time for compliance monitoring. This double-counting lowered the compliance findings to 70% in both months. Attached hereto as **Exhibit 48 (under seal)** are true and correct copies of tracking sheets produced by Defendants for Eyman Browning for the August 2016 Notebook and July 2016 Notebook: ADCM662854-55; ADCM662856-57; ADCM662850-51; ADCM660230-31; ADCM660238-39; ADCM660240-41.

85. In the April 2015 CGAR for Eyman-Browning only 70% compliance was found. Two Step 2 or 3 prisoners were not afforded a second hour of group programming and one of the prisoners was recorded as being at both group programming and work at the same time. Attached hereto as **Exhibit 49 (under seal)** are true and correct copies of tracking sheets produced by Defendants for Eyman Browning May 2015 Max Custody Notebook/April 2015 CGAR tracking sheets: ADCM387878-79; ADCM387884-85; ADCM387886-87.

86. At Eyman-SMU, I found similar compliance and monitoring problems with respect to MC PM #8. For example, in the March 2016 CGAR, Defendants reported 100% compliance, however after reviewing the documentation in the April 2016

1   Notebook, supporting the March 2016 CGAR findings, I found only 70% compliance.

2   Attached hereto as **Exhibit 50 (under seal)** are true and correct copies of tracking sheets

3   produced by Defendants for Eyman SMU I for the April 2016 Max Custody

4   Notebook/March 2016 CGAR report:  ADCM629475-76; ADCM629479-80.  Defendants

5   failed to produce one of the records they relied upon despite repeated requests so that no

6   compliance can be measured for that record.

7        87.    In the September 2015 Notebook supporting the August 2015 CGAR

8   report for Eyman-SMU I, I found noncompliant records falsely reported as compliant for

9   four of the SMI prisoners, despite Defendants' finding of 100% compliance in the CGAR.

10  These prisoners were all entitled to an hour of programming under DI 326 due to their

11  Step Level, as well as all of the SMI programming under the Stipulation.  None of them

12  was afforded the full programming.  Attached hereto as **Exhibit 51 (under seal)** are true

13  and correct copies of tracking sheets produced by Defendants for the Eyman SMU I

14  September 2015 Notebook/August 2015 CGAR report:  ADCM198401-02 (missing

15  additional group programming; some minutes recorded in "other out of cell time" column,

16  but unclear from comments what was afforded prisoner); ADCM198403-04 (missing

17  additional group programming); ADCM198407-08 (missing additional group

18  programming); ADCM198419-20 (missing additional group programming; "other out of

19  cell time" listed as "other Psych Hallway").

20       88.    I noted the same pattern in the August 2015 Notebook supporting the July

21  2015 CGAR report for Eyman SMU I.  Despite Defendants' finding of 100% compliance

22  in the CGAR, I found that four of the SMI prisoners who were either Step 2 or Step 3 did

23  not receive their additional hour of programming under DI 326, as well as all of the SMI

24  programming under the Stipulation.  Attached hereto as **Exhibit 52 (under seal)** are true

25  and correct copies of tracking sheets produced by Defendants for the Eyman SMU I

26  August 2015 Notebook supporting the July 2015 CGAR findings:  ADCM198179-80;

27  ADCM198181-82; ADCM198185-86; ADCM198191-92.

28

89.     After reviewing Eyman-SMU I's July 2015 Notebook supporting the June 2015 CGAR findings, I found three of the allegedly compliant Step II and Step III, SMI records were missing the required additional hour of group programming.   Attached hereto as **Exhibit 53 (under seal)** are true and correct copies of tracking sheets produced by Defendants for the Eyman SMU I July 2015 Notebook/June 2015 CGAR: ADCM467831-32; ADCM467833-34; ADCM467841-42.   Similarly, all three of the allegedly compliant Step II and Step III records for the April 2015 Notebook supporting the March 2015 CGAR findings were actually non-compliant.   Attached hereto as **Exhibit 54 (under seal)** are true and correct copies of tracking sheets produced by Defendants for the Eyman SMU I April 2015 Notebook/March 2015 CGAR: ADCM275706-07; ADCM275714-15; ADCM275716-17.

90.     In my review of the maximum custody notebooks for Florence-Kasson, the underlying documentation exposed a similar pattern of noncompliance with respect to SMI programming requirements and a discrepancy between Defendants' reports of compliance in the CGARs and the documentation in prisoners' tracking sheets.   In the March 2016 Notebook, I found that five of the SMI prisoners did not receive their ten hours of SMI unstructured out-of-cell time, as required by MC PM #8; and the tracking sheet of another prisoner, listed in the CGAR report as compliant with all the requirements of MC PM #8, shows insufficient SMI unstructured time, no mental health programming, and insufficient group programming.   Attached hereto as **Exhibit 55 (under seal)** are true and correct copies of tracking sheets produced by Defendants for Florence-Kasson:         ADCM467274-75;         ADCM467276-77;         ADCM467278-79; ADCM467280-81; ADCM467282-83; ADCM467292-93.

91.     Similarly, in the July 2015 Notebook for Florence-Kasson, despite Defendants' report of 100% compliance in the corresponding June 2015 CGAR, none of the Step II or Step III prisoners received two hours of group programming, as required by DI 326 and MC PM #8.   Attached hereto as **Exhibit 56 (under seal)** are true and correct copies of tracking sheets produced by Defendants for Florence-Kasson:   ADCM121545-

46; ADCM121547-48; ADCM121549-50; ADCM121551-52; ADCM121553-54; ADCM121561-62. The same pattern of noncompliance for Step II and Step III prisoners' programming appears in the out-of-cell tracking sheets in the Florence-Kasson June 2015 Notebook, supporting the May 2015 CGAR. Attached hereto as **Exhibit 57 (under seal)** are true and correct copies of those tracking sheets produced by Defendants: ADCM121506-07; ADCM121508-09; ADCM121514-15; ADCM121516-17; ADCM121522-23; ADCM121524-25. The same pattern of noncompliance for Step II and Step III prisoners' programming also appears in the supporting documentation for Florence Kasson May 2015 Notebook/April 2015 CGAR report and the April 2015 Notebook/March 2015 CGAR report. Attached hereto as **Exhibit 58 (under seal)** are true and correct copies of the tracking sheets produced by Defendants for the May 2015 Notebook/April 2015 CGAR report at Florence-Kasson: ADCM121486-87; ADCM121488-89; ADCM121492-93; ADCM121494-95; ADCM121498-99. Attached hereto as **Exhibit 59 (under seal)** are true and correct copies of the tracking sheets produced by Defendants for Florence Kasson's April 2015 Notebook/March 2015 CGAR report: ADCM467790-91; ADCM467794-95; ADCM467796-97.

92.     At Lewis-Rast, my review uncovered a similar pattern of noncompliance with respect to the programming requirements. Attached hereto as **Exhibit 60 (under seal)** are true and correct copies of the tracking sheets produced by Defendants for the July 2016 CGAR compliance documents: ADCM661124-25; ADCM661127-28; ADCM661133-34; ADCM661136-37; ADCM661142-43; ADCM661148-49; ADCM661151-52. Attached hereto as **Exhibit 61 (under seal)** are true and correct copies of the tracking sheets produced by Defendants for the March 2016 Notebook/February 2016 CGAR at Lewis-Rast: ADCM466170-71; ADCM466179-80; ADCM466187-88; ADCM466194-95; ADCM466203-04; ADCM466221-22; ADCM466230-31; and ADCM466237-38 (note that the record of one prisoner was never produced). Attached hereto as **Exhibit 62 (under seal)** are true and correct copies of the tracking sheets produced by Defendants for the January 2016 Notebook/December 2015

1 CGAR report for Lewis Rast:  ADCM466797-98; ADCM466815-16; ADCM466824-25;

2 ADCM466833-34; ADCM466842-43; ADCM466861-62; ADCM466870-71.

3  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

4 is true and correct.

5  Executed the 22nd of February, 2017, in Washington, D.C.

6

7       Jennifer Onka

8 **ADDITIONAL COUNSEL:**    David C. Fathi (Wash. 24893)*

9             Amy Fettig (D.C. 484883)**

               Jamelia Natasha Morgan (N.Y.
10             5351176)**

               **ACLU NATIONAL PRISON**
11             **PROJECT**

               915 15th Street N.W., 7th Floor
12             Washington, D.C. 20005

               Telephone:  (202) 548-6603
13             Email: dfathi@npp-aclu.org

                   afettig@npp-aclu.org
14                  jmorgan@aclu.org

15             *Admitted *pro hac vice*.  Not admitted
                in DC; practice limited to federal
16              courts.

               **Admitted *pro hac vice*
17

                Daniel C. Barr (Bar No. 010149)
18              Amelia M. Gerlicher (Bar No. 023966)

                John H. Gray (Bar No. 028107)
19             **PERKINS COIE LLP**

               2901 N. Central Avenue, Suite 2000
20             Phoenix, Arizona 85012

               Telephone:  (602) 351-8000
21             Email: dbarr@perkinscoie.com

                   agerlicher@perkinscoie.com
22                  jhgray@perkinscoie.com

23              Kathleen E. Brody (Bar No. 026331)
                Daniel Pochoda (Bar No. 021979)
24             **ACLU FOUNDATION OF**
               **ARIZONA**
25             3707 North 7th Street, Suite 235

               Phoenix, Arizona 85013
26             Telephone:  (602) 650-1854

               Email: kbrody@acluaz.org
27                  dpochoda@acluaz.org

28

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, P.C.**
P. O. Box 91398
Tucson, Arizona 85752
Telephone:  (520) 477-1475
Email:    kirstin@eidenbachlaw.com

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          ckendrick@prisonlaw.com

*Admitted *pro hac vice*

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com
          aamiri@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com

*Admitted *pro hac vice*

Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:    jkmessina@jonesday.com

*Admitted *pro hac vice*

1

*Attorneys for Plaintiffs Shawn Jensen;*
*Stephen Swartz; Sonia Rodriguez; Christina*

2

*Verduzco; Jackie Thomas; Jeremy Smith;*
*Robert Gamez; Maryanne Chisholm;*

3

*Desiree Licci; Joseph Hefner; Joshua*
*Polson; and Charlotte Wells, on behalf of*

4

*themselves and all others similarly situated*

5

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)

6

**ARIZONA CENTER FOR**
**DISABILITY LAW**

7

5025 East Washington Street, Suite 202
Phoenix, Arizona 85034

8

Telephone:  (602) 274-6287
Email:    skader@azdisabilitylaw.org

9

adietrich@azdisabilitylaw.org

10

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)

11

Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)

12

**ARIZONA CENTER FOR**
**DISABILITY LAW**

13

177 North Church Avenue, Suite 800
Tucson, Arizona 85701

14

Telephone:  (520) 327-9547
Email:

15

rdalyrooney@azdisabilitylaw.org

16

jrico@azdisabilitylaw.org
jross@azdisabilitylaw.org

16

mabela@azdisabilitylaw.org

17

*Attorneys for Arizona Center for Disability*

18

*Law*

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 22, 2017, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

s/ D. Freouf