1

2

3

4

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

5   **Victor Parsons, et al., on** )
    **behalf of themselves and all** )
6   **others similarly situated;** )
    **and Arizona Center for** )
7   **Disability Law,** )
                                  )   No. **CV 12-00601-PCT-DKD**
8              Plaintiffs,    )
                                  )
9        vs.                  )   Phoenix, Arizona
                                  )   January 26, 2017
10  **Charles Ryan, Director,** )   1:32 p.m.
    **Arizona Department of** )
11  **Corrections; and Richard** )
    **Pratt, Interim Division** )
12  **Director, Division of Health** )
    **Services, Arizona Department** )
13  **of Corrections, in their** )
    **Official capacities,** )
14                                )
              Defendants.    )
15  _____ )

16

17     **BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

18          <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

19               (_**Status Hearing**_)

20

21  Official Court Reporter:
    Laurie A. Adams, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Suite 312
    401 West Washington Street, Spc 43
23  Phoenix, Arizona 85003-2151
    (602) 322-7256

24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

<u>**A P P E A R A N C E S**</u>

For the Plaintiffs:

     EIDENBACH LAW PC
     By:  **Kirstin T. Eidenbach, Esq.**
     P.O. Box 91398
     Tucson, AZ 85752

     ACLU - Washington DC - (Appearing Telephonically)
     By:  **David C. Fathi, Esq.**
     By:  **Amy Fettig, Esq.**
     915 15th Street NW
     7th Floor
     Washington, DC 20005

     ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
     (Appearing Telephonically)
     By:  **Maya S. Abela, Esq.**
     177 N. Church Avenue
     Suite 800
     Tucson, AZ 85701

     PRISON LAW OFFICE - (Appearing Telephonically)
     By:  **Donald Specter, Esq.**
     By:  **Corene D. Kendrick, Esq.**
     1917 5th Street
     Berkeley, CA 94710

For the Defendants:

     STRUCK WIENEKE & LOVE, P.L.C.
     By: **Timothy J. Bojanowski, Esq.**
     By: **Rachel Love, Esq.**
     By: **Anne M. Orcutt, Esq.**
     3100 W. Ray Road
     Suite 300
     Chandler, AZ 85226

     OFFICE OF THE ATTORNEY GENERAL - Phoenix
     By:  **Lucy M. Rand, Esq.**
     1275 W. Washington Street
     Phoenix, AZ 85007

P R O C E E D I N G S

1

2          THE MAGISTRATE CLERK:  Civil Case Number 12-601,

3   Parsons, et al., versus Ryan, et al., on for a status hearing.

4          THE COURT:  Counsel please state their appearances for

5   the record.                                              01:32PM

6          MS. EIDENBACH:  This is Kirsten Eidenbach for the

7   prisoner plaintiffs.

8          THE COURT:  Thank you.  Who is on the phone on

9   plaintiffs' side?

10         MR. FATHI:  Good afternoon, Your Honor.  This is David  01:32PM

11  Fathi from the ACLU National Prison Project for the plaintiff

12  class.

13         THE COURT:  Thank you.

14         MS. FETTIG:  This is Amy Fettig from the ACLU National

15  Prison Project for the plaintiff class.                   01:32PM

16         THE COURT:  Thank you.

17         MR. SPECTER:  And in Berkeley, California, we have Don

18  Specter and Corene Kendrick from the Prison Law Office for the

19  plaintiffs.

20         THE COURT:  All right.  Thank you.                 01:32PM

21         MS. ABELA:  This is Maya Abela for the Arizona Center

22  for Disability Law.

23         THE COURT:  Thank you.

24         That's it from the phone.  Whom do we have in the

25  courtroom?                                                01:33PM

1           MR. BOJANOWSKI:  Your Honor, on behalf of the

2   defendants, Timothy Bojanowski, Anne Orcutt, and Rachel Love.

3           THE COURT:  All right.  Thank you very much.

4           MR. BOJANOWSKI:  And Lucy Rand.

5           THE COURT:  Indeed.  Thank you.  Welcome all.     01:33PM

6           Well, my plan of setting this hearing was to establish

7   the foundation of a finalized Monitoring Guide subject to a

8   court-approved process for revision.  And that is what I intend

9   for us to emerge with at the conclusion of today's hearing.

10          The foundation of the Monitoring Guide is, I think, a   01:33PM

11   nice way to describe it because I do think we build a structure

12   upon that.  And the structure also will likely require further

13   examination and, in particular, what I mean by that is the

14   practice and procedures that are employed by the monitors in

15   effecting the Monitoring Guide.                            01:34PM

16          And I guess by way of example, I can tell you that I

17   continue to learn more about this, the practice and procedures

18   associated with the Monitoring Guide and continue also to be

19   informed about how I need to learn more.

20          And so by way of example, what is set forth in the    01:34PM

21   sealed document at 1892 at Page 3 of 3, and it's sealed because

22   it contains personal medical information from the class

23   members, in this document I have tried as best I can to really

24   understand how it is reflecting the reporting that is

25   occurring.  And I can't really figure it out.             01:35PM

1          Also, I think there is a distinction between the

2     Monitoring Guide as I imagine we will come to its finalized

3     agreement on what its provisions provide and how it is actually

4     playing out on the street.  So, for example -- on the floor, I

5     guess, is the right way to put it, at the medical units.  And I          01:35PM

6     need to understand more about that and I think the plaintiffs

7     need to understand more about it.

8          And so my contemplated thought is that once we come to

9     a conclusion about what the Monitoring Guide means, what is, a

10    definitive state of the current Monitoring Guide, we'll then          01:35PM

11    look to a second step that will be necessary for me, at least,

12    and that is to set an evidentiary hearing on the subject of how

13    it is implemented to allow for me to have some of these

14    questions addressed and also to make sure that I have a greater

15    sense of confidence about how it is that, for example, records          01:36PM

16    are pulled.

17         It's probably fair to say the plaintiffs have some

18    concern, they have articulated these concerns, that sudden

19    changes in reporting are sometimes unexplained.  And there is

20    also a suggestion when -- because perhaps only an incomplete          01:36PM

21    explanation from the defendants, I'm not trying to cast

22    aspersions where they are not due, but there is at least a

23    probable cause for asking the question, for example, where more

24    files are pulled.  That's not a problem generally, because it's

25    going to be a more accurate sample.  If you have 100 percent          01:36PM

1  that's the most accurate sample that you can have.  So if the

2  stipulation says you pull a minimum of 10 and then the

3  defendants report that they have pulled 21, that's okay as long

4  as they are counting all the 21.  But if you are going fishing

5  for only the legal fish and throwing back the illegal fish that          01:37PM

6  are under the weight limit before you come in to the dock and

7  have the park ranger see you, that's not okay.

8           So that's the kind of thing that I think a greater

9  transparency of the process entirely that would be informed by

10  a better understanding that would occur at the second phase of         01:37PM

11  making sure that we have a foundation but also a structure

12  built upon that foundation that is understandable by everyone.

13          Today what we'll do is we'll work through my agenda,

14  which I will tell you what it is and how I came to it, and then

15  I will give you an opportunity, each side, to raise issues that        01:37PM

16  were not raised in my agenda.  But what I contemplate doing,

17  because it was the most recently filed document, is using the

18  plaintiffs' comments, our Re: Revised Monitoring Guide in Open

19  Clinic, Document 1889, and using it as a road map to track

20  through.  And then I would jump to the exhibit, that                    01:38PM

21  spreadsheet exhibit that plaintiffs provide, because that also

22  raises issues with respect to the Monitoring Guide.  And then

23  there are some issues that I have that neither party has raised

24  about the Monitoring Guide.  Once I have done that, then I will

25  turn to you all and ask you to raise any issues that I haven't         01:38PM

1    raised.

2            Couple of prefatory comments, first, apologies about

3    my voice.  When we were last in court together I reported to

4    you that I just returned from Europe and I may have brought

5    back some kind of scourge there that has produced this        01:39PM

6    protracted cough that has produced this hoarseness that I

7    cannot deal with, meaning I cannot address it in a way to save

8    you from that.  So I'm sorry about that.

9            The second prefatory comment is I wish this could

10   somehow be a round table so it would be convenient for everyone  01:39PM

11   to be able to assert their points.  I realize that that's

12   probably not practically possible, but I will do my best to

13   turn to the respective parties and to give them an opportunity

14   to add anything they would like to add to the considerations

15   that they have already provided to me and what they have filed  01:39PM

16   with respect to their comments on the Monitoring Guide.

17           That said, I will, in the first instance, I think, let

18   you know what my preliminary view is and then naturally turn to

19   the side that would disagree with that.  So as it happens, my

20   preliminary view is probably 8 out of 10 times to agree with   01:39PM

21   what the plaintiffs have said, so I will be turning to the

22   defendants to tell me why it is that what they have said

23   doesn't seem to be or shouldn't be right.  So that's why I will

24   be proceeding that way, to give people a chance to talk and not

25   going the normal fashion of one after the other.  I will be    01:40PM

1    really focusing it.

2          I'm just reviewing my notes to make sure there are no

3    other prefatory comments that I wanted to make.

4          All right.  So then turning to plaintiffs' comments,

5    Document 1889, and this is the Plaintiffs' Comments Re: Revised          01:41PM

6    Monitoring Guides and Open Clinic.  And Paragraph 1 addresses

7    the status of the Monitoring Guide for the isolation sub-class

8    performance measures.  And it appears that the first issue is

9    what has been identified as I.A., and this is the consideration

10   of what to do about a week that has a state holiday in it.          01:41PM

11         It seems to me that the best way to proceed here is to

12   just make sure that the reporting period starts the day after a

13   state holiday or concludes the day before a state holiday

14   rather than excluding any week that has a state holiday in it.

15   And so I will turn to defendants as to why we can't go that          01:41PM

16   way.

17         Take your time.  That's all right.

18         (Discussion off the record between the parties and

19   attorneys.)

20         MS. LOVE:  Okay, Your Honor.  Thank you for allowing          01:46PM

21   us the time to discuss with our clients.  The impact on

22   operations that that would impose is that the monitoring week

23   runs from a Saturday to a Friday.  And it is already in

24   agreement as far as the monitoring is concerned that, for

25   instance, in the case of an emergency or something like that          01:46PM

there is efforts to be made to make up services, let's say, for
instance, mental health programming in that monitored week.  If
we have -- and here's where the initial issue comes in, is on
the holidays, the programs that are difficult to provide are
the mental health employees may be off and the educators, like
the CO-IIIs, those that are doing the educational programs,
those people are traditionally off on the holidays.  So because
our monitoring, agreed upon monitoring week runs from a
Saturday to a Friday, if we have an interspersed holiday, it's
not going to always be possible because of the strict running
of the facility to make up those programs in a week.  So then
offsetting by an additional day doesn't ease that operational
burden.

        And when we're, you know, we understand that
there's -- I think I counted up there would be like 10 holidays
during the year that this may happen, it is akin to the
community in which, you know, schools are closed or someone may
not be able to have a visit with a medical provider in a
nonemergent situation.

        So we would respectfully request that we continue on
on the current mode of monitoring, excluding those weeks
because statistically it is not a huge statistical probability
that those weeks may be the ones that are monitored.  If there
is a concern that, by the plaintiffs, that, you know, that this
is a situation where, okay, ADCC -- which is not the case --

1  but ADCC says, okay, it's a holiday week, so we're not going to

2  do anything that week, I think that's their concern.  You know,

3  that may not be the monitoring week, but in the course of their

4  tours they can still check to see in those holidays weeks if

5  it's a, oh, we just don't do anything, which is not what          01:49PM

6  occurs.

7          MS. FETTIG:  Your Honor.

8          THE COURT:  I was pausing because Ms. Love was

9  conferring, so I wanted to make sure that she had finished her

10  statement before I turn to you and ask you to give your          01:49PM

11  response.

12          MS. LOVE:  And there's also a discrepancy, as Ms. Rand

13  has just advised me, that if, for instance, if, for instance,

14  something occurs on Friday where programming, for instance,

15  cannot occur, like there's a lockdown situation or an emergency  01:49PM

16  situation, per the terms of monitoring and agreement of the

17  parties then that service does not need to be made up because

18  your monitoring week has ended because you go Saturday to

19  Friday.

20          If we're in a situation where that holiday falls          01:49PM

21  somewhere in the middle of the week, that's now, you know, an

22  additional requirement to make up programming that in

23  operations' side just may not be feasible because you are still

24  running your everyday groups in the normal course of

25  operations.                                                       01:50PM

UNITED STATES DISTRICT COURT

1        THE COURT:  Okay.  Plaintiff's response, please?

2        MS. FETTIG:  Thank you, Your Honor.  This is Amy

3   Fettig.

4        First, we actually think that the Court's solution is

5   pretty simple and straightforward.  It would not be difficult

6   to simply add an extra day, look at monitoring sheets and, you

7   know, if there are 10 state holidays, we all know what the

8   state holidays are.  They can be planned for.  It's just a

9   matter of recognizing the mental health care staff are going to

10  be off on Monday so you move your groups around.

11       Our concern is we don't want those programs to be off

12  limits.  The stipulation is based on weekly compliance.  We

13  understand that defendants will have staff off during some

14  holidays.  We think that can be planned for.  And the

15  alternative is if a week that has a state holiday is drawn and

16  there were no provisions made to actually provide the type of

17  program that is mandated under the stipulation, then that's

18  non-compliant.  We should not be shifting around schedules

19  around so we can guarantee compliance.

20       So our position is that no week should be exempted

21  automatically from monitoring under the stipulation.  The

22  protocol requires random week selection, and if we start Xing

23  out certain weeks then we undermine the important elements of

24  randomness in the compliance monitoring.

25       THE COURT:  All right.  The stipulation requires that

01:50PM
01:50PM
01:51PM
01:51PM
01:51PM

```
 1    these things be done, and if there's a holiday during the
 2    sampled week things do get bumped, but it doesn't mean that
 3    they get excused.  So consequently, I think that removing from
 4    the sampling week these 10 weeks, if it is 10 holidays, and
 5    they fall on, as you describe, on when services are to be        01:52PM
 6    provided, then we are potentially excluding 10 weeks out of 56.
 7    So it seems significant to me.  So I am going to provide for
 8    the plaintiffs' recommended approach to be employed with
 9    respect to this measure.
10         Turning next to the addition of the word                   01:52PM
11    "contemporaneously."  That seems to track exactly what we had
12    discussed previously, and so I am a little bit puzzled why it
13    is that it remains an issue.
14         MS. LOVE:  It doesn't remain an issue, Your Honor.
15    Amy Fettig and I and representatives from ADC had a              01:52PM
16    conversation just -- it wasn't yesterday but the day before,
17    and then the update was provided.  We talked through those what
18    Ms. Fettig's additions would be over the phone.  We saw them
19    yesterday when everything was filed.  That is one of the things
20    that now we have had a chance to look at it we agree with that.  01:53PM
21         THE COURT:  Does it make sense for me to ask counsel
22    now which are the ones you have removed from the agenda by
23    having agreed upon them?
24         MS. LOVE:  Sure.  It's the "contemporaneous."  We
25    agree with that.                                                01:53PM
```

```
 1              THE COURT:  Okay.

 2              MS. LOVE:  That may be the only one.

 3              THE COURT:  Okay.  My optimism is dashed.

 4              MS. LOVE:  There are certain as we go through --

 5              THE COURT:  You can raise them.

 6              MS. LOVE:  There's some partial.

 7              THE COURT:  Fair enough.

 8          The next one is at the top of Page 2, and this is the

 9      language that I think almost -- I didn't review the transcript,

10      Ms. Love, but it almost seems to track exactly what you said

11      when we last addressed this issue.  So I'm wondering why is

12      that a problem?

13              MS. LOVE:  The one where it is the shall, the word of

14      "shall."

15              THE COURT:  Right.  Shall.  And also the addition of

16      "due to the pattern of refusals and changed behavior," that

17      seems to reflect -- that paragraph as set forth at the top of

18      Page 2 seems to reflect exactly what we had come to agree upon

19      when we last addressed the subject.

20              MS. LOVE:  The phrase of "due to the pattern of

21      refusals and changed behaviors," we are okay with that.  We

22      agree to that.  It's the change of the word, the "shall" versus

23      "who."  And that was part of the discussion that we had, Your

24      Honor, at the last hearing when we explained that it is not --

25      it's not a written policy that there is a shall to have a
```

01:53PM

01:53PM

01:54PM

01:54PM

01:54PM

discussion with an inmate because that would then, as we

discussed, a pattern of different behavior for one inmate may

be different than another.  Somebody may never go out.

Somebody all of a sudden missing one rec might be different.

So per policy, there's no policy that says after X number of

refusals somebody shall have a conversation with the inmate

because it's based upon ADC staff knowing their inmate

population, knowing what's different.

What happens in the normal course of operations, and

as we said in here, is that when any multitude of staff are in

the pods, are seeing the inmates, are looking at the sheets or

there's an alert, just verbal, then a discussion in the normal

course of operations is going to occur, it's the word "shall."

Shall denotes this shall happen at some specific time of a

certain number of refusals there's a conversation.

I will give you an example of how this works.  It may

be, for example, that a sergeant doing his or her normal rounds

is looking at the sheets and notices that a particular inmate

hasn't gone out to rec even once that week.  Well, in the

normal course of just of practice will have a conversation with

the inmate, will discuss why, and then as per the terms of the

Monitoring Guide will now denote that conversation on the back.

It could also be this:  It could be the warden making

rounds who may not have a very specific knowledge of an inmate

but just have a conversation with the inmate, hey, is there

anything going on as to why you are refusing rec?  It could be
a matter of when we're doing our tours that Carson McWilliams,
sitting here in the courtroom with us, may look at a sheet,
have a conversation with an inmate and ask, hey, is there a
reason you didn't go to rec once this week or didn't go                01:56PM
multiple times or isn't going to programming.

So because this does happen in the normal course of
operations as far as practice, there's not a "shall" that
denotes exactly when these conversations will occur.  So we
believe that our language, which was the supervisory personnel          01:56PM
who have a discussion with the inmate, they are going to
document that.  And that does happen.

So that's also, you know, as far as going forward,
when plaintiffs' counsel are looking at the sheets provided
they can see whether that is, you know, is occurring.  But              01:57PM
again, we don't have like a cutoff point of when those
conversations must occur.

THE COURT:  Well, how about addressing it this way,
and that is to take the phrase "in the event of a pattern of
refusals or changed behavior" and move that to replace the             01:57PM
first line up until shall.  So it would read "in the event of a
pattern of refusals or changed behavior, supervisory personnel
shall have a discussion with an inmate regarding refused
out-of-cell time and shall document the date and nature of the
conversation in the comments section."                                 01:57PM

1          MS. LOVE:  Our concern with that, again, Your Honor,

2     is that it's -- it's very subjective as to when it occurs that

3     there is a pattern of different behavior.  So we would suggest

4     a language of when these conversations occur, because they do

5     happen all the time in the normal course of operations.  When          01:58PM

6     the conversations occur, then those conversations will be

7     documented on the back of the out-of-cell tracking form.  For

8     example, when the conversation occurs, I'm paraphrasing, but

9     when the conversation occurs supervisory personnel shall

10    document that the conversation occurred and the nature of any          01:58PM

11    comments that the inmate made.

12         THE COURT:  But I thought that the conversation that

13    we had last time about this identified the real need to make

14    sure that there was a requirement that in the event of a

15    pattern of refusals, I mean, the plaintiffs wanted more.  They         01:58PM

16    wanted you to be able to write up a memorandum every time

17    somebody didn't leave their cells.  And you wanted to have the

18    greater flexibility, as I recall, to make the call and whether

19    this was a pattern that was -- or something different than what

20    has been established and it was changed behavior.                       01:59PM

21         And so it seems to me that requiring it in those

22    circumstances where there is a pattern of refusals or changed

23    behavior, that that does seem to provide a reasonable

24    addressing of the plaintiffs' concerns without putting too much

25    of a burden on you, which is what I tried to alleviate last             01:59PM

1   time.  But I think if I leave it completely in your hands, such

2   as only if the conversation itself occurs, then there is this

3   obligation to document it.  Then it seems to remove the

4   requirement of this supervisory personnel to be actually

5   engaged in this to make sure that they are perceiving these          01:59PM

6   kinds of problems and identifying them when they happen.

7           But before I hear from you again, Ms. Love, let me

8   turn to the plaintiffs to see if they want to amplify this

9   discussion.

10          MS. FETTIG:  Thank you, Your Honor.  And we agree with       02:00PM

11  the edit that you have suggested, because our concern here is

12  that what defendants are suggesting is so discretionary that it

13  is meaningless.  We'll rarely ever see any of this type of

14  documentation if there isn't an affirmative obligation to do it

15  and to do it in certain circumstances.  If course, it would be      02:00PM

16  plaintiffs' position that defining pattern of refusals would be

17  a good idea, for example, three or more refusals in a given

18  week.  That would give very clear guidance to staff of when

19  they have to actually engage in this activity.  It is

20  problematic that this non-policy policy that is not written          02:00PM

21  down anywhere, that's just a nice practice, is giving guidance.

22  We would like to see this be far more affirmative, because in

23  our experience, without clear guidance and clear written

24  obligation this is not going to happen and it is not going to

25  lead to the kind of compliance we want to see with the              02:01PM

1    stipulation.

2            So we would agree with the Court's suggestion on the

3    edit.  We would like to see more definition of what pattern of

4    refusals and hear what defendants would proffer with the caveat

5    that we think three or more in a week should signal there may          02:01PM

6    be an issue with this particular prisoner.

7            THE COURT:  Well, there are some, though, for whom it

8    is standard, some inmates for, I gather from the last

9    conversation, for whom it is their standard practice to not

10   want to be removed.  And so that would be an extended period          02:01PM

11   that would satisfy your three or more, but that would be an

12   unnecessary reporting because it wouldn't be a changed behavior

13   that really warranted any different attention, I think.

14           MS. FETTIG:  But at the same time, it signals that

15   there may be an issue.  So if you have got a mentally ill            02:02PM

16   person, seriously mentally ill person who is refusing treatment

17   on a repeated basis, regardless of whether or not they have

18   done that for a week or six weeks, that calls for some type of

19   intervention because they are not adhering to treatment.  So we

20   would not want to see someone who was truly sick, truly            02:02PM

21   suffering and has been doing it for a long time be excluded

22   from the type of protections that this provision could afford

23   simply because they are too sick to leave their cell.

24           THE COURT:  Just a second, please.

25           Then I would propose for your consideration, Ms. Love,     02:03PM

1    the following:  In the event of an extended pattern of refusals

2    or changed behavior, supervisory personnel shall have a

3    discussion with an inmate regarding refused out-of-cell time

4    and shall document the date and nature of the conversation in

5    the comments section of the back of the out-of-the-cell          02:03PM

6    tracking form including where provided inmate comment as to

7    reason for refusal or refusals.

8              MS. LOVE:  Your Honor, does the language you just

9    proposed, does that include having a benchmark of how many --

10             THE COURT:  No.  It just says extended.              02:03PM

11             (Discussion off the record between the parties and

12    defense counsel.)

13             MS. LOVE:  Your Honor, clarifying that there is not a

14    benchmark as to how many of times of a refusal constitutes a

15    pattern for a particular inmate, because there is that          02:04PM

16    variance, I have consulted with our clients and they would

17    agree to that language.

18             THE COURT:  Okay.  Well, I would adopt that language

19    then.

20             Ms. Fettig, the court reporter has asked me to inquire  02:04PM

21    whether you are on a speaker phone or some kind of phone that

22    is catching background sound.  Because you are cutting in and

23    out and making it difficult to get a good transcription of what

24    you are saying.

25             MS. FETTIG:  Oh, dear.  Hold on a second.  Is that      02:04PM

1   better?

2           THE COURT:  Well, certainly in those words it sounds

3   good.

4           MS. FETTIG:  Can you hear me now?

5           THE COURT:  Yes, we can.  Thank you.                    02:05PM

6           So this same modification would be made in Paragraphs

7   2(c), 5(d), 6(i) and 8(d).  Is there any reason, Ms. Love, not

8   to treat those similarly, or is there any reason to treat them

9   differently?

10          MS. LOVE:  There's no reason to treat differently,      02:05PM

11  Your Honor.  We agree.

12          THE COURT:  Then Performance Measure 6, I'm puzzled by

13  why it is that the language "out-of-cell time" is problematic.

14          MS. LOVE:  Your Honor, this is -- this applies -- this

15  argument applies equally to Performance Measure 6 and to        02:05PM

16  Measure 8.

17          THE COURT:  8.  Correct.  Yes.

18          MS. LOVE:  The exclusion of the out-of-cell time, the

19  proffered language by plaintiff is if the out-of-cell time does

20  not happen then there's an automatic noncompliance with both 6  02:05PM

21  and 8.  But here, the parties agreed through the performance

22  measures negotiated through the stipulation, that Performance

23  Measures 1, 2, and 5, are already measuring out-of-cell time.

24  Performance Measure 1 is out-of-cell time based upon max

25  custody step level.  Performance Measure 2 is out-of-cell group 02:06PM

programming for an hour.  Performance Measure 5 is six hours of

rec.  So those three categories, 1, 2, and 5, already measure

out-of-cell time.  6 and 8 then put additional requirements of

monitoring per DI 326 and then special provisions for the SMI

inmates.  Specifically, Performance Measure 6 measures the

additional categories of services of property, phone time,

visitation, store, and rec location.

So having just not enough out-of-cell time making this

entire performance measure non-compliant doesn't make any

sense, because they are already being measured for out-of-cell

time in 1, 2, and 5, which is why -- which is the lead-in as to

why we suggested the category type percentage calculation.

THE COURT:  Right, which runs afoul of my previous

determination that we shouldn't be in the business of partial

credit.  It just is problematic for the reasons I have

previously addressed.

Does the plaintiff have a response to what Ms. Love

said in court?

MS. FETTIG:  Yes, Your Honor.  Looking at Performance

Measure 6, it is clear that that performance measure was

written and, in fact, does include out-of-cell time.  Now, the

fact that defendants used the same 10 prisoners means because

they are looking at some out-of-cell time in other measures

they will have monitored this.  And if a record is found

non-compliant with out-of-cell time, it's going to mean that

```
 1    Number 6 is non-compliant as well.  But that's the way the

 2    measure is written.  We haven't negotiated a change to the

 3    measure.  It's clearly enumerated in Number 6 just as it's

 4    clearly enumerated in Number 8 that the evaluation of that

 5    performance measure includes not just the enumerated time for      02:08PM

 6    SMI but also the DI 326 privileges and out-of-cell time.  This

 7    was deliberately included in the drafting, and it is meant to

 8    be measured.  There is just no way around the fact that what we

 9    put down is what we meant to be measured and now defendants

10    don't want to comply with that.                                    02:08PM

11         But if that's the case, then we have to change the

12    stipulation.  And we are not at the point where we are

13    agreeable to that.

14         THE COURT:  Any last word, Ms. Love?

15         MS. LOVE:  Yes.  It's not an issue of not complying.          02:08PM

16    It's an issue of now quadruple and five times counting

17    out-of-cell time to make a measure non-compliant when the point

18    of 6 and 8 is to measure these additional services provided on

19    top of the out-of-cell time.

20         THE COURT:  How do you know that?                             02:09PM

21         MS. LOVE:  Because of -- because when you are in our

22    Monitoring Guide, the parts that we do agree upon -- what we're

23    doing is we're measuring the categories and the source

24    documents looking at property, phone time, visitation, store,

25    and rec location.  So they are getting the out-of-cell time,      02:09PM
```

which is the baseline of provisions provided under DI 326 plus

these additional categories for Performance Measure 6, plus

Performance Measure 8 where they, in addition to out-of-cell

time, the inmates the, SMI inmates, are provided 10 hours of

unstructured, one hour of mental health programming, one hour   02:09PM

of psychoeducation, and one additional out-of-cell programming.

So both of these are measuring services in addition to that

out-of-cell time.

    THE COURT:  But what you are saying is that 6 and 8,

even though it specifically states out-of-cell time, doesn't   02:10PM

seek to have that counted in this performance measure.  And I

asked why it is that you know that, and then you listed these

other factors, some of which are also included.  So I don't see

how that's a persuasive argument.

    MS. LOVE:  Well, the point -- it's because both 6 and   02:10PM

8 are looking at these additional factors on top of the

out-of-cell time which is why, for just reasons of across the

board fairness -- and I understand, Judge, I do understand your

order as to the partial compliance.  I would just like to add

because we hadn't had an opportunity to have a verbal   02:10PM

discussion on this is that we see it as distinguishable from

your order on the medical measures where partial credit

couldn't count.  Because, for instance, Performance Measure 67,

which that would apply to the medical side, that counts welfare

checks conducted at least once a shift for IPC.  That's one   02:11PM

```
 1   service being provided.  Here we're looking at five categories
 2   of services as to property, phone time, visitation, store, rec
 3   location in addition to out-of-cell time.  So we're looking at
 4   the provision of very distinct and different types of services
 5   which there should then be a calculation as to compliance.  For     02:11PM
 6   instance, if an inmate doesn't receive one phone call but still
 7   gets store, rec, location, visitation, phone time, property
 8   otherwise and out-of-cell time, to make that a complete
 9   noncompliance just fundamentally does not seem fair when we're
10   trying to measure the provision of services to have one           02:11PM
11   category document for the entire when there are different types
12   of services versus the entire medical.
13         THE COURT:  If you were at the get-go in drafting the
14   stipulation of the performance measures, would you then say it
15   would be your position to break out all of these individual        02:12PM
16   components into separate performance measures so they would all
17   be separately evaluated?
18         MS. LOVE:  Yes.  That would have been -- yes.  But
19   separating out the, you know, even if you categorize the
20   property, phone time, visitation, store, and rec location, and     02:12PM
21   have to measure those, okay, but we shouldn't have to measure
22   for the fourth and fifth time the out-of-cell time on top of
23   that.
24         THE COURT:  Because you say that it would be easy for
25   anyone to tell whether or not the out-of-cell time had been        02:12PM
```

1   complied with?

2           MS. LOVE:  Because of 1, 2, and 5.  You are either

3   going to be compliant or not compliant with 1, 2, and 5, which

4   is out-of-cell time.  Performance Measures 6 and 8 go above and

5   beyond to different categories of services.                    02:12PM

6           THE COURT:  Ms. Fettig, your response first to this

7   specific issue about how this is already being collected in the

8   other performance measures?

9           MS. FETTIG:  Your Honor, indeed it is not.  For

10  Performance Measure 6, that's written the way it's written.     02:13PM

11  Out-of-cell time has always been included.  It is part of the

12  measure.

13          THE COURT:  Let me ask you this:  If I'm asking you in

14  Performance Measure 6 how many cats were found on the yard and

15  I'm also asking you to tell me in Performance Measure 7, were    02:13PM

16  there cats, dogs, and mice on the yard, and you say to me we

17  don't want to have to count in 7 the cats again because we have

18  already counted them in 6, why wouldn't that be a reasonable

19  thing?

20          MS. FETTIG:  Well, I would say the provision had to      02:13PM

21  have been written differently than it was.

22          THE COURT:  No.  I understand that, but --

23          MS. FETTIG:  -- you directed the count.

24          THE COURT:  I know.  And it is -- I'm exploring here a

25  possibility of trying to get a workable way to proceed wholly    02:14PM

```
 1    apart of the issue about how difficult it is indeed for me to

 2    overcome the black and white fact that the stipulation in

 3    Performance Measures 6 and 8 includes the words out-of-cell

 4    time.  And so but the defendants have raised an issue that is

 5    addressed, or that follows along with something that I have          02:14PM

 6    some interest in, and that is making sure that they are

 7    spending time on what's going to produce the best results in

 8    the case.  And if it is true that it's something that's already

 9    been reported, even though it's not permissible to exclude it

10    here, I'm trying to explore why it is that we can't see or we       02:14PM

11    can't talk about whether it makes sense to exclude it here,

12    understanding that it is captured elsewhere.  If it's not

13    captured elsewhere in your view, and you started out saying

14    that, but that's completely contrary to what Ms. Love said.  So

15    I need to understand whether you do have a disagreement about       02:15PM

16    whether it's captured elsewhere.

17         MS. FETTIG:  Well, what's captured elsewhere is

18    recreation, and that is -- and group programming, but there is

19    other out-of-cell time that is afforded to prisoners.  Our

20    concern here, too, is that, you know, quite frankly, it's hard      02:15PM

21    to -- we don't buy the defendants' argument that this is

22    onerous.

23         THE COURT:  They are not saying it's onerous.  What

24    they are doing is saying is if one fallout -- what they are

25    doing, I imagine, is trying to get this cut out of here so if       02:15PM
```

```
 1   they are non-compliant because they have had out-of-cell time
 2   reported in these other measures, it's not going to do it in
 3   this measure too where they are compliant on the other ones.
 4   That's sort of cutting to the quick about what their thought is
 5   here.  So it really doesn't give me any additional information      02:15PM
 6   to know that all of these collected together are non-compliant
 7   when it is something that is happening because of the
 8   out-of-cell time, which I will know if they are out of
 9   compliance because of the other performance measures that
10   require this.                                                        02:16PM
11           Do you follow what I'm saying, Ms. Fettig?
12           MS. FETTIG:  I do, Your Honor.  And our position would
13   be that that out-of-cell time is so critical to the
14   amelioration of the negative impacts of solitary confinement,
15   that's why it shows up so often in performance measures.             02:16PM
16           THE COURT:  Okay.  So let me drill down and ask this
17   question.  Is that concern about out-of-cell time captured
18   adequately in another performance measure where it is not
19   clouded by these others?  Because then there is also the
20   danger, too, that you are getting a noncompliance here in 6 and      02:16PM
21   8 and you don't know exactly what the reason is.  And if it is
22   that one of the most important things is general out-of-cell
23   time, then you would want to have the identification of that
24   red flag as bright and as undistracted from or unalloyed as
25   possible.  If you are getting that someplace else, why wouldn't      02:17PM
```

1    it make sense to focus on the ones here that maybe would tell

2    you something that you didn't know, namely, one of the other

3    enumerated ones where the basis for the noncompliance.

4         MS. FETTIG:  Certainly, Your Honor, in the CGAR

5    reporting it is obvious to some extent what categories are

6    found non-compliant within the requirements of MC Number 6.

7    That is not actually an issue.

8         THE COURT:  What would you think about -- let me ask

9    the same question I asked Ms. Love.  If you were at the get-go,

10   again, would you break this one out into its individual

11   components?

12        MS. FETTIG:  Well, it was drafted to be the omnibus

13   measure capturing the incentive program with DI 326, and to

14   some extent that program as a whole.  It was broken out in

15   other ways and certainly the SMI provision Number 8 is in

16   addition to the DI 326.  And that's very clear in the drafting

17   that the concern is not only that the SMI prisoners receive the

18   out-of-cell time and incentives in the DI 326 but because of

19   their special status as vulnerable prisoners they get this

20   additional out-of-cell time.

21        So the measures themselves were grouped the way they

22   were because that was found to be an organic way.  And our

23   concern here is that the defendants are really using this as a

24   back door argument.

25        THE COURT:  Slow down.  You are going a little bit too

02:17PM

02:17PM

02:18PM

02:18PM

02:18PM

UNITED STATES DISTRICT COURT

1    fast.  I'm sorry.  Slow down.

2         MS. FETTIG:  Our concern here is that by breaking

3    individual measures into their component parts, this is a back

4    door way to get away from the, you know, 20 months of

5    monitoring that we have done, which is essentially yes or no.          02:19PM

6    We are only using 10 records here.  The monitoring process was

7    designed to be yes or no because we have a very small sample

8    size and we, you know, we agree with your order in 1831 that

9    partial credit is not what we have done.  It has been past

10   practice.  It wasn't the intention.  And the goal, really, is     02:19PM

11   to dilute compliance.

12        THE COURT:  Well, I am torn.  I am torn between the

13   black letter of fact that this stipulation calls for this and

14   what are persuasive arguments that are raised with respect to

15   workability.  I have to think more broadly, though, and with      02:20PM

16   respect to potential impact, and I don't know that I have the

17   opportunity to do that.  So I'm going to do something I didn't

18   want to do, and that is on this one, I'm going to take it under

19   advisement and I will get you a ruling no later than the end of

20   this week.                                                        02:20PM

21        So again, my foundation will be established close in

22   time, but I'm going to think some more about what you both have

23   said about this and also take a look at, perhaps, the broader

24   implications of how to construe my determination that was made

25   in a health care performance measure, whether it can be          02:20PM

1    extended here in a fair way.  Okay.

2           MS. FETTIG:  Your Honor, may I just say one more

3    thing?

4           THE COURT:  Surely.

5           MS. FETTIG:  For clarification purposes, while it is          02:20PM

6    true that in the general population DI 326, 1 through 7

7    measures that there are some out-of-cell time, like Number 2

8    measures exercise, it is not true that any DI 326 measuring

9    takes place for the SMI population except for within max

10   custody Number 8.  And that is why it was drafted, so that that     02:21PM

11   measure would encompass for the SMI population, both the

12   additional protections enumerated in that measure but also the

13   protections of DI 326.

14          THE COURT:  So Ms. Love, do you want to address the

15   suggestion that your explanation as to why it would not be a        02:21PM

16   problem to excuse in Performance Measure 8 the inclusion of the

17   words -- or to exclude the words out-of-cell time, why that

18   doesn't work because it's not reported elsewhere?

19          MS. LOVE:  Your Honor, I believe it's persuasive to

20   defendants' position that Ms. Fettig said just previously prior     02:21PM

21   to this last round of statements that the purpose of DI 3 -- or

22   the purpose of Performance Measure 6 and 8 was to provide

23   services in addition to out-of-cell time.  SMI inmates, max

24   custody SMI inmates are not excluded from monitoring for

25   Performance Measures 1, 2, and 5.  If they show up on that          02:22PM

1    random count of however many down we're counting to get to our

2    random draw they are going to be included in that.  So they are

3    not excluded from measurement in 1, 2, and 5.

4        And defendants also, our position is that it is

5    extremely persuasive that because, as Ms. Fettig said, that it      02:22PM

6    was so important for plaintiffs to measure out-of-cell time,

7    that out-of-cell time was broken down into those specific

8    performance measures of 1, 2 and 5.  So there is detailed

9    monitoring of out-of-cell time not just in bulk but in these

10   different categories.  So the same arguments do apply to Number    02:22PM

11   8 that the additional four categories are out-of-cell time in

12   addition to the baseline.

13       THE COURT:  Ms. Fettig, you are both saying things

14   that can't both be true.

15       MS. FETTIG:  That's right.  And we look back at what       02:23PM

16   is actually in the stipulation.  And the language is clear:  In

17   addition to the general privileges and incentives afforded to

18   prisoners under DI 326, all SMI prisoners --

19       THE COURT:  I have to tell you to pause.  One of the

20   problems when people read -- and judges do this too -- but       02:23PM

21   lawyers do it habitually.  That is when we read we read really

22   quickly.  The court reporter hasn't thrown up her arms yet but

23   you have even outpaced my brain's ability and I don't have to

24   move my hands.  So just slow down, please.

25       MS. FETTIG:  Thank you, Your Honor.  And I apologize.      02:23PM

1     It's difficult sometimes when you are on the phone.

2            So our position is that the clear language of the

3     outcome measures define what needs to be monitored.  That has

4     been the practice for the last, you know, almost two years of

5     the stipulation.  There is no reason to change that now.                02:24PM

6     There's no negotiated change in the stipulation.

7            THE COURT:  All right.  And I'm sorry to interrupt,

8     but that's not really an answer to my question, is it?  Wasn't

9     my question directed to Ms. Love saying that, indeed, the

10    out-of-cell time sought after in 8 is reported in the other          02:24PM

11    performance measures just as she said it was in 6.  And then

12    you said no, I thought, and that's not true with respect to --

13    well, you actually said 8 doesn't include it.  And then she

14    said that, yes, 8 does include what is elsewhere reported.

15           So I'm asking you whether there is something different        02:24PM

16    about the reporting in 8 with respect to the other three

17    performance measures that she said, Ms. Love said, was reported

18    redundantly, in her view, in Performance Measure 6.

19           MS. FETTIG:  Number 8 applies to the SMI population.

20    They are -- the records are drawn from the SMI population and        02:25PM

21    while an SMI person might sometimes get into the general draw

22    that is fairly unlikely.  These folks live generally in the

23    same unit together.  And so their experience should be

24    reflected in maximum custody Number 8.

25           THE COURT:  Okay.  So what -- I understand what you          02:25PM

```
 1   are saying.  You are saying that the reason 8 is separate is
 2   because 8 was focused on a particular population that might not
 3   be fully represented and reported on in the other three
 4   performance measures.  I took what Ms. Love to say to be that
 5   they were equivalent, that indeed, eight would be redundant        02:25PM
 6   with the other three.  I'm going to check in with Ms. Love
 7   right now and see whether it is a true statement to say that 8
 8   is not redundant entirely of the other three based upon what
 9   Ms. Fettig has said.
10        MS. LOVE:  It's not redundant because all inmates at         02:26PM
11   the max custody facilities, including SMI, are subject to that
12   random draw and monitoring for 1, 2, 5 and 6.
13        THE COURT:  But Ms. Fettig is saying that the
14   population for these other three, other than 6, 1, 3, and 5, is
15   one that is not likely to capture the people addressed in 8.      02:26PM
16   Is that a fair restatement of what you said, Ms. Fettig?
17        MS. FETTIG:  That is accurate.  8 is drawn only from
18   the SMI population.  The rest is drawn from the entire
19   population.
20        THE COURT:  And you are saying that there's an absence       02:26PM
21   of consonance between those two populations significant enough
22   to cause one to want to assay the SMI population separately in
23   8.
24        MS. FETTIG:  Exactly.  The SMI population is a very
25   small subset of the thousands of people who are held in          02:27PM
```

1    isolation in ADC.  That is why 8 was specifically drafted to

2    include both the provisions of DI 326 for this unique

3    population as well as the additional protections.

4            THE COURT:  Okay.

5            MS. LOVE:  And, Your Honor, if I may add that Ms. Rand    02:27PM

6    has provided me information because she is looking at these

7    monitoring and these monitoring books and has from the start,

8    and in the random draw across the board for the max custody

9    performance measures that are measured in 1, 2, and 5, on

10   average, there's three to five SMI inmates that are showing up    02:27PM

11   on that 10-file draw.  So without evidence of actual

12   underrepresentation, I don't think that we can go just with a

13   broad allegation without statistics behind that.

14           THE COURT:  Well, I wanted to understand the point

15   that you were making as well as the contrary point or the    02:27PM

16   contrary factual assertion that Ms. Fettig was making.  And you

17   have now provided some evidence that reflects that the sampling

18   in these other three measures captures.  But I don't know

19   whether Ms. Fettig has an opportunity, or based upon what you

20   have just said orally to be able to, at this moment, evaluate    02:28PM

21   whether or not that undercuts her argument that there is an

22   insufficient sampling potential.  Certainly the fact that you

23   have reported repeated months of 3 out of 10, given the small

24   size of the population that Ms. Fettig has informed me about,

25   would make a person wonder about that.  But I don't know    02:28PM

1   whether Ms. Fettig has had an opportunity to look at the data

2   that you cite and to see whether or not it is reliable with

3   respect to the assumption that -- or the position you are

4   asking us to accept.

5          MS. FETTIG:  Your Honor, may I say a word?          02:29PM

6          THE COURT:  Yes.

7          MS. FETTIG:  We have never seen this data.  And quite

8   frankly, I would question why there would be so many SMI people

9   in the general record draw given their small proportion of the

10  overall population.  This would make me wonder how this could   02:29PM

11  possibly be random.  Certainly Max Custody Number 8, the

12  performance measure was designed specifically because this is a

13  smaller subset of the population, relatively small, although

14  too large in some ways.  Whether or not what Ms. Rand now

15  alleges is actually true across the board, we have never seen   02:29PM

16  this data.  But regardless, it does not make up for the fact

17  that max custody Number 8 was specifically designed and drafted

18  to deal with the SMI population both in relation to DI 326

19  which is the general stepdown program and the additional

20  protections for the SMI.  We would not have included the        02:29PM

21  language under DI 326 if it was not meant to be measured in

22  this measure.

23         THE COURT:  Okay.  I believe I have what I need to

24  have to consider this issue further from you all here today.

25  So I will take a look at it again and think about it and get    02:30PM

1   the ruling out, as I said.

2          I need to go off the record for a second because I

3   have to talk to the court reporter.

4          (Discussion off the record.)

5          THE COURT:  We were off the record for a moment.  You                    02:30PM

6   heard what I said off the record, and that is I asked the court

7   reporter whether you were speaking too quickly, Ms. Fettig.  I

8   am very familiar with this offense because I am guilty of it

9   frequently myself.  So that is why I am particularly sensitive

10  to it.                                                                          02:30PM

11         You are going too fast.  You really need to put a

12  rubber band on your wrist or something to remind yourself to

13  slow down just for the sake of not only the court reporter, but

14  also the ability of people to understand what you are saying

15  when you are not present.  We don't have the other clues of                     02:31PM

16  body language and things like that.  So the phone makes it a

17  little bit harder.  Maybe there are other reasons, too, with

18  respect to the sampling of digital transmission of voices.  I

19  don't know.  But please do just slow down.

20         Now, turning to C, which is on Page 3, and I                             02:31PM

21  contemplated earlier that there could be a possibility of a

22  change in assignment or location of the class members such that

23  the State could redefine where there was a demonstration of

24  that.  And that's essentially what appears to have happened

25  here, that there's been a change.  But there's been nothing in                  02:31PM

UNITED STATES DISTRICT COURT

1    the record that makes me see how the circumstances have

2    changed.

3              MS. FETTIG:  Your Honor?

4              THE COURT:  This is actually not a question for you,

5    unless you want to add.  If you have got something to say, Ms.          02:32PM

6    Fettig, you can jump in.  But that was actually a question to

7    the defendants because they are the ones who want to omit these

8    other locations.

9              MS. LOVE:  Your Honor, we are continuing to have

10   discussions about Performance Measure 9 and the scope of -- as         02:32PM

11   to whether it covers CB-1 and 4 because of the change --

12   because there are no max custody inmates in these locations.

13   We have discussed with Ms. Fettig that pursuant to the terms

14   that govern a change, that we will work on providing, versus a

15   phone call and providing ADC representatives to tell everybody        02:32PM

16   that this is the case, to provide competent evidence in the

17   form of declarations and work with Ms. Fettig as to whether

18   they agree that there has been an actual change in the

19   circumstances.  So we are continuing to work on that one.

20             THE COURT:  And would there be any problem of              02:33PM

21   including it -- including these other sites within the language

22   but with the parenthetical if any SMI inmates are housed in

23   those facilities, is there a reason that's not a solution?

24             Ms. Fettig.

25             MS. FETTIG:  Yes, Your Honor.  I would just like to        02:33PM

UNITED STATES DISTRICT COURT

explain the conversation that has taken place here.  After your

order came out in December for the parties, including Mr.

McWilliams, to talk about the various enumerated units in

maximum custody Number 9, because as plaintiffs explained, the

concern of Number 9 is for all SMI but also particularly

mentally ill people who are housed in those enumerated units

who might not necessarily have an official SMI designation but

nonetheless are mentally ill and need some special care and

custody provisions.

When I spoke with Mr. McWilliams and Ms. Love, they

indicated that the only change had been that Florence CB-1 and

CB-4 no longer housed mentally ill people because one of the

reasons is the actual physical plant of these units was found

to be not very conducive for the mentally ill, and those

individuals were instead moved to Florence-Kasson and the Eyman

SMU.  We then agreed that they would provide some more

documentation regarding this.  The issue, as we understand it,

and certainly as we would move forward on it, is not that

Florence CB-1 or CB-4 has a close custody or lower custody

group of individuals now.  You have already ruled on that issue

related to employment.  That is irrelevant.  Our concern for

maximum custody Number 9 is that Florence CB-1 or CB-4 is no

longer one of the special units that holds mentally ill people

and, instead, they have been dispersed to other parts of the

facility.  Plaintiffs are amenable to continued conversations

1   with defendants about this.  We certainly understand that under

2   the right conditions, stipulations can change organically but

3   through the process that is laid out in the stipulation under

4   Paragraph 40, and that's what we would wish to follow here.

5          THE COURT:  Well, without prejudice to you pursuing          02:35PM

6   what I have told you previously you could pursue, and that is a

7   concern that the people were being farmed out into areas that

8   would allow the purpose of this performance measure monitoring

9   to be evaded, I also think that it seems reasonable to adopt

10  what I suggested, and that is the parenthetical that says with          02:36PM

11  respect to these two that the defendants say there is nobody

12  there, why couldn't you just have the parenthetical say that if

13  there are any such inmates present, why, again, is that not a

14  workable alternative?

15         MS. FETTIG:  We would not be opposed to that.  It          02:36PM

16  would just be subject, subject to proof.

17         THE COURT:  Indeed.  I'm not cutting that off at all.

18  And I think I made it clear to everybody.  And that's not

19  something that I think that the monitors will be deciding.  It

20  will be something that the Court will be deciding so that the          02:36PM

21  lawyers will be the ones talking about it.  And if you find

22  that there is an issue where you think that there is reason to

23  believe that people have been farmed out to escape this

24  monitoring this performance measure then you can let the Court

25  know.  How is that?          02:37PM

```
 1            MS. FETTIG:  That's fine, Your Honor.  Thank you.

 2            THE COURT:  So we'll add that parenthetical.

 3            And I will leave to counsel to be exactly what the

 4      language should be, so in your conversation that's continuing

 5      about the proof that you said you have engaged in, also talk          02:37PM

 6      about what you think the best language should be for the

 7      parenthetical.

 8            Turning now to the issue at the bottom of Page 3, and

 9      that is the review of the video footage and the contention

10      about whether or not it's being discretionary for the monitor.       02:37PM

11            I think that the monitor should be in a position to be

12      reviewing all of the monitoring and that the force of video

13      incidents the monitor should be informed about what

14      information's been collected.  With respect to the concern that

15      the defendants have about memorandum, it seems to me that,           02:38PM

16      perhaps, the best way to approach this is to not require a

17      memorandum but a written checklist that would indicate whether

18      or not the monitor had identified the issues of the cool-down

19      procedure, for example, whether that had been done.  And you

20      could then, I think, avoid the added imposition but then             02:38PM

21      nevertheless provide the information that the plaintiffs seek.

22            Let me turn to Ms. Fettig on this one to see what your

23      response is to all of this.

24            MS. FETTIG:  Well, Your Honor, we agree that the

25      monitor should view all available video.  That tells the story      02:38PM
```

```
 1   and sometimes it tells a story that's not reflected in the

 2   documentation.  It's absolutely critical that the monitor be

 3   able and, indeed, obliged to look at the universe of a

 4   particular incident in order to determine its compliance or

 5   not.                                                              02:39PM

 6           In terms of the checklist you mentioned, I think that

 7   that could be -- I would want the parties to negotiate back and

 8   forth what would be contained in the checklist.  But I think

 9   that that could be an efficient way.  I know defendants are

10   concerned about adding paperwork, and certainly we're concerned  02:39PM

11   about having to review the millions of documents but a

12   checklist that covers the topics that need to be addressed so

13   that the monitor can ensure that the stipulation is followed

14   and, indeed, so that the plaintiffs can review what has been

15   done and have the knowledge we need to assess whether or not     02:39PM

16   it's accurate.  So we would be amenable to that.

17           THE COURT:  Ms. Love.

18           MS. LOVE:  Your Honor, the max custody notebooks that

19   are produced in this case, in the tab regarding Performance

20   Measure 9, there is the memo from each warden that goes to       02:40PM

21   Carson McWilliams and that is the synopsis we talked about the

22   last time that lists the monitored uses of force.  In that they

23   go through the checklist.  There's categories for a cool-down

24   period and a check box if it's applicable, if there was time to

25   do a cool-down period.  There's a box for is video footage       02:40PM
```

1    available, yes or no with an X.  Was the video reviewed?  X,

2    yes or no.  So that information is already contained and is

3    what we have been doing all along.

4          MS. FETTIG:  Your Honor, we would disagree.  We found

5    the documentation, including the memos, to not be sufficient     02:40PM

6    under the requirements of the stipulation.  They do not contain

7    key elements and they do not contain, for example, you know, we

8    know whether or not the video might not be reviewed sometimes,

9    although as the Court is aware we have had problems with the

10   video documentation being contradictory.  But we would ask for   02:40PM

11   a revised checklist that is geared towards the actual

12   stipulation requirements instead of superimposed to some extent

13   to what defendants were doing prior to the stipulation and that

14   has specific findings so that when we look at that memo we know

15   exactly how the monitor came to his or her conclusions.  Right   02:41PM

16   now that is simply not the case.  Often times the memos are not

17   actually written by the monitor or there's no indication that

18   they were written by the monitor.  So we don't know what

19   conclusions are actually based upon.  The paperwork needs to be

20   modified so that it's much more clear what's being evaluated,    02:41PM

21   what's not being evaluated, and where those conclusions were

22   drawn by the monitor.

23         THE COURT:  Have you happened to have already prepared

24   a proposed new checklist that addresses these concerns?

25         MS. FETTIG:  Not a formal one.  But we would certainly     02:41PM

1    be willing to do so.

2              THE COURT:  All right.  Do that and send it over to

3    the defendants and then have a conversation about it, and then

4    we'll address this in the next hearing that we have already

5    set.  We will take a little bit of time from that hearing to        02:42PM

6    address these follow on issues on the monitoring manual.

7              The -- just so you know, I'm trying to be as thorough

8    as I possibly can, and because of that I contemplate that we'll

9    be at this a bit more.  We've been at it now for 45 minutes

10   almost.  My thought is that at 45 minutes we'll take a               02:42PM

11   five-minute break and every 45 minutes we'll take a five-minute

12   break.  Just so you know in a couple minutes that what we're

13   going to do.

14             Oh.  I'm lying.  We started at 1:30.  So we have been

15   going for an hour and 12 minutes.  That's too long for the          02:42PM

16   court reporter and maybe for other people.  So we'll take a

17   five-minute break right now.

18             Thank you.

19             MS. FETTIG:  Thank you.

20             (Recess from 2:42 p.m. until 2:51 p.m.)                    02:51PM

21             THE COURT:  So to backtrack a little to make sure

22   we're all on the same page, what I think that I just tried to

23   communicate to you was that I generally agree with what the

24   plaintiffs have set forth on Pages 4 and 5, and that my -- and

25   so I would follow their recommendations about the inclusion of     02:51PM

```
 1    the language in the monitoring manual and ask that you meet and

 2    confer and consider plaintiffs' proposed new checklist

 3    memorandum that would address the issues that I am embracing,

 4    and that is that the monitors be able to have access to and

 5    document the reliance upon these videos and that it be          02:52PM

 6    emphasized that the monitor can review the records that are

 7    enumerated at Line 17 of Page 4 of the plaintiffs' memorandum.

 8    And I think that carries me through.  Let me just check.

 9         I think that I have covered, but let me -- all of the

10    issues that are in this section, but since we're here now, and   02:53PM

11    because there are so many things there and I have addressed it

12    not in the exact order of how it was presented when we were

13    last talking, and that may have created some confusion, let me

14    turn to counsel and see if they feel that they need further

15    clarification.                                                   02:53PM

16         Ms. Fettig.

17         MS. FETTIG:  Your Honor, there is one remaining issue

18    and that is on Page 4 starting at Line 22, going down to 28,

19    over to the next Page 5, and that is the issue that the

20    defendants remove the language that plaintiffs put forward       02:53PM

21    that, quote, "If the monitor believes that the cool-down period

22    was insufficient under the circumstances there is a finding of

23    noncompliance."  And that is based on the stipulations

24    requirements that the cool-down period have certain

25    characteristics like an opportunity to comply with custody       02:54PM
```

1   orders and include clinical interventions.  The cool down

2   required by the stipulation for these individuals in a

3   potential use of force action is one of the key linchpins to

4   prevent use of force.  So we -- it is critical for the

5   functioning of the stipulation requirement for the max custody          02:54PM

6   measure, and it is our position that the monitor needs to be

7   instructed and in a position to have discretion looking at a

8   use of force incident and finding that the cool-down period

9   provided by staff was insufficient.

10          MS. LOVE:  Your Honor, we have had a chance to further          02:54PM

11  consider plaintiffs' position, and we agree to that language.

12          THE COURT:  Okay.  Thank you very much.

13          Turning now to Roman Numeral II, the health care

14  measures, the partial credit issue arises again, and the

15  difficulty there touched upon in our last discussion is that          02:55PM

16  the purpose here is to effectuate a written agreement that the

17  parties agreed to.  And in the past, I have been strongly

18  motivated to follow your agreement to the letter as best I can

19  and in the absence of any guidance.  And so that then leads me

20  to rely upon the Monitoring Guide as it affects the          02:56PM

21  stipulation.  And I appreciate that the Monitoring Guide had an

22  existence before the stipulation was agreed to, but it appears

23  to me that, for the most part, I mean, I may have an obscured

24  view, but it appears to me mostly what's driving the Monitoring

25  Guide now is its function as part of the stipulation.          02:56PM

1          And so the first thing that draws my attention in this

2     section is the defendants' desire to identify an alternative

3     method inconsistent with the Court's rulings on how the

4     stipulations should be monitored.  And so I have this tension

5     between a document that was previously existed, previously          02:57PM

6     existed and perhaps has another purpose, maybe it is currently

7     being used by the State for monitoring Corizon's compliance

8     wholly apart from anything associated with the stipulation.

9     And it certainly is possible and permissible for the State to

10    monitor things separate from what's required in the                 02:57PM

11    stipulation.

12          But I'm troubled by the language at the bottom of Page

13    6 insofar as it sends a conflicting and potentially confusing

14    message to the monitors.  And so I think I would prefer that we

15    avoid any risk of confusion, because I rely so much on the          02:57PM

16    monitoring that this manual is going to define and that the

17    best way to, perhaps, accommodate defendant's desire here that

18    may be reflective of the fact that they have other purposes is

19    to say, if that's what you want to do, fine, but do it in a

20    separate section or do it in a separate part.  Don't address        02:58PM

21    the performance measure as you do at the bottom of Page 6.  And

22    then make my criteria the second one that they are asked to

23    ascertain, make my criteria what is sought after.  And then if

24    you want something in addition to that, do it.  But -- that's

25    fine, but do it in a separate place.                                02:58PM

```
 1            Ms. Love?  Oh.
 2            MR. BOJANOWSKI:  I will be responding to the medical
 3     and mental health measures --
 4            THE COURT:  Thank you.
 5            MR. BOJANOWSKI:  -- Your Honor.                          02:58PM
 6            May I have a moment?
 7            THE COURT:  You may.  Surely.
 8            (Discussion off the record.)
 9            MR. BOJANOWSKI:  Your Honor, you are exactly right.
10     The defendants are utilizing this information not for purposes  02:59PM
11     of reporting to the Court the pass/fail of a particular
12     measure, but we use it internally in trying to determine
13     whether remedial measures are taking effect.  We're looking for
14     trends.  We're looking for, perhaps, outliers that trigger us
15     or identify at a particular location, perhaps a physician or    02:59PM
16     nursing staff or something of that nature that is creating an
17     issue at one of the facilities or one of the units that we can
18     then target, identify, and address.
19            So it's more efficient for us to have the people with
20     the boots on the ground there reviewing the data as it's       02:59PM
21     happening and report that data to us so that we can utilize
22     that data.
23            Now, in reporting to the Court, as you have seen our
24     previous filings, we take the pass/fail numbers that you have
25     ordered us to provide and provide that in a chart form with     03:00PM
```

regard to each performance measure.  And we'll continue to do

that.  That is the compliance with your order.  So although it

requires our monitors to, perhaps, take on some extra duty, the

purpose of that is so that we can adjust the provision of

medical care to both increased compliance and identify

particular problems with the delivery of care.

03:00PM

So we find that utilizing this data helps us

internally, and we would like to continue to do that.  And the

best way for the monitor to be able to do that is to have that

information within the particular performance measure that they

03:00PM

are looking at and actually taking a measurement upon.  So to

have it in another document or something like that may be a

little bit more difficult because they are looking at the data.

THE COURT:  I'm sorry to interrupt, Mr. Bojanowski.

You don't have to put it in a separate document.  Just don't

03:01PM

put it in the same place as what is my approved method.  And so

you can have an additional method.  You can describe it as an

additional.  I would prefer that you not define it as accepted

and official, because it's unacceptable for my purposes and so

that's not a word that I favor.

03:01PM

And the reason -- I'm not taking personal affront

about this.  What I'm doing is I'm worried that it might be

communicating to the monitors that I, or that someone, is

saying it's all right to have this alternative way.  And I just

don't want there to be that confusion.  So figure out a way to

03:01PM

```
 1   put that requirement of additional monitoring of a different

 2   way of assessing that you would like to have it, put it in a

 3   different place in the Monitoring Guide.  You can say:  In

 4   addition you are also to collect the following data.  But don't

 5   make it seem as if what I'm requiring is in any way secondary      03:02PM

 6   or suspect.  And I think a fair reading of your language does

 7   import that meaning.  But lest I wade into an area in which

 8   there's some other agreement, I will turn to Ms. Fettig to see

 9   if she has any comment about this.

10            MS. KENDRICK:  Your Honor, this is Corene Kendrick       03:02PM

11   from the Prison Law Office.

12            THE COURT:  Thank you, Ms. Kendrick.

13            MS. KENDRICK:  We agree with you.  We are not saying

14   in any way that we think that you need to order them to not do

15   that.  It's just this is not the place or time for them to be    03:02PM

16   muddying the waters and including two different scores either

17   in the CGAR reports or having somewhat conflicting information

18   in the Monitoring Guide.  So we agree with your position there.

19            THE COURT:  Okay.  All right.

20            MS. KENDRICK:  Your Honor, just one other thing?         03:03PM

21            THE COURT:  Yes.

22            MS. KENDRICK:  On Performance Measure 16, it appears

23   that they may have omitted the bullet point that actually

24   complied with your instruction about --

25            THE COURT:  I didn't catch that, if that's true.        03:03PM
```

1          MR. BOJANOWSKI:  That is true, Your Honor.  It just

2     was when it was being copied and pasted into the document it

3     dropped off.  And so it just needs to be put back in there is

4     all it is.

5          THE COURT:  All right.                                    03:03PM

6          MR. BOJANOWSKI:  But I do want to mention one thing.

7          THE COURT:  Yes.

8          MR. BOJANOWSKI:  I was informed that per your prior

9     order, we were allowed to utilize this percentage method to

10    determine the viability of remedial action plans.  So maybe    03:03PM

11    what I can do is follow up with some additional proposed

12    language with regard to the utilization of this methodology and

13    maybe propose that in a document that we can then get over to

14    plaintiffs and yourself for further consideration.

15         THE COURT:  I don't know what you are referring to,       03:04PM

16    Mr. Bojanowski.  I'm a little bit concerned that what you may

17    be referring to is my description of how I would view, or what

18    I would require, with respect to satisfaction of the benchmark

19    percentages.  That's -- it sounded as though you may have been

20    touching upon that instead of making a different point.  And so 03:04PM

21    I'm not sure exactly what you mean.  Maybe you can confer

22    further.

23         MS. KENDRICK:  Your Honor, this is Corene Kendrick.

24         Could Mr. Bojanowski point us to the docket order that

25    he is referring to?                                            03:05PM

1          THE COURT:  Could you refer to the docket order that

2     you are referring to?

3          MR. BOJANOWSKI:  I cannot.

4          THE COURT:  He can't.

5          MR. BOJANOWSKI:  I was just informed by the client and     03:05PM

6     such that there's some language out there with regard to how we

7     determine whether a remedial action plan is actually taking

8     effect.

9          THE COURT:  Right.

10          MR. BOJANOWSKI:  So that --     03:05PM

11          THE COURT:  Right.  That is wholly different.  That's

12     different than what's happening here.

13          MR. BOJANOWSKI:  And that's, you know, that's what we

14     use this data for as well as other things to identify problems.

15          THE COURT:  Right.     03:05PM

16          MR. BOJANOWSKI:  So what I'm suggesting is if the

17     Court doesn't like the way this is structured, what we can do

18     is we can draft, perhaps, other clauses or such to be added to

19     the guide such that this data is still captured.  Because it's

20     important with regard to the functioning of the medical care     03:05PM

21     delivery system that we be able to utilize this raw data in

22     order to identify problems, determine if remedial action plans

23     are actually taking effect, and use that to help us in getting

24     the delivery of health care and mental health care

25     appropriately done.     03:06PM

1              THE COURT:  Well --

2              MR. BOJANOWSKI:  So if you want us to break it out

3      into a separate clause or separate part of the manual, maybe

4      that's the method by which we would suggest we do that and

5      provide that to the Court and counsel.                          03:06PM

6              THE COURT:  Ms. Fettig, it's your declaration that

7      first set this is forward.  And I know Ms. Kendrick is

8      addressing this topic, but I can't put my hands on quickly

9      because I tried to use only the .pdf document captured in my

10     iPad and it takes too much time to do it.  If I printed it out   03:07PM

11     I would probably be able to get my hands on it straight away.

12             But what I would like is the Footnote 2 on Page 6

13     suggests that this language was added.  Is this one of the

14     areas where there was, you thought, the plaintiffs thought,

15     there was a previous agreement on the language?  Do you          03:07PM

16     understand the question?

17             MS. FETTIG:  Yes.  I believe that's correct.  Let's

18     defer it to Ms. Kendrick just in case I am not remembering.

19             MS. KENDRICK:  No.  It's not one that we have reached

20     an agreement on, Your Honor, because it's one of the ones that   03:07PM

21     we have presented to you for resolution at our status hearing

22     and you subsequently issued that order stating that there would

23     be no partial credit on December 14th.  I believe it was Docket

24     1831 that you had that order on, but I did not see anything

25     about remedial percentages or anything like that.               03:08PM

1          THE COURT:  Right.

2          MS. KENDRICK:  So we had not anticipated that anything

3     had been resolved because we were waiting to see if they fixed

4     them in accord with your order.

5          MR. BOJANOWSKI:  I don't believe there's language in          03:08PM

6     an order.  I believe it was done during the course of the

7     hearing.

8          THE COURT:  Right.  And again, I still remain pretty

9     convinced that it's a different subject that we were talking

10    about.  And that is how to deem whether or not the benchmark     03:08PM

11    had been met and whether or not -- Mr. Struck raised the

12    concern that I was going to require that every encounter be

13    compliant, in other words, 100 percent compliant.  And I

14    explained to him, no, that that's not what the benchmarks

15    contemplated but that I would be paying attention to that issue  03:08PM

16    of the possibility of partial credit not being awarded if it

17    showed that the subsequent remedial measures that were either

18    employed by the defendants on their own action or imposed by

19    the Court were not successful and then that would address what

20    the next measure would be.  And so I think that's what the       03:09PM

21    context of the conversation was that you referred to.

22          But in any event, with respect to this issue, I think

23    what has to happen is we have to avoid the confusion that I

24    have discussed, and so you have to come up with language that

25    doesn't include this, the two-method approach in close           03:09PM

1    proximity to one another.

2            MR. BOJANOWSKI:  Well, we'll redraft something, Your

3    Honor, and submit it for consideration.

4            THE COURT:  All right.  Thank you.

5            MS. KENDRICK:  Your Honor, just quickly reviewing the        03:10PM

6    transcript of the December hearing, it appears that the

7    discussion of these percentages of the partial credit being

8    somehow used for remedial was actually raised by counsel for

9    defendants and Dr. Taylor, when she was testifying, that that

10   was the purpose of it.  But it doesn't look like the Court had        03:10PM

11   ordered that or the parties had agreed that that was somehow

12   going to be used to develop remedial plans.  That was what

13   defendants had proffered to the Court.

14           THE COURT:  So that's what you think the allusion is

15   to.  Thank you for providing that information.        03:10PM

16           MS. KENDRICK:  You're welcome.

17           THE COURT:  Turning to B on Page 7, Health Care

18   Performance Measure 61, I am really thinking that there is an

19   easier way to solve this problem that's compliant with the

20   stipulation, and it is adopting the following as the language        03:11PM

21   that would be employed in the performance measure.  Just give

22   me a moment.  Might be handy for you to do what I'm doing, and

23   that is to turn to the Performance Measure 61, because I'm

24   going to suggest that the language that would be employed for

25   the monitors to rely upon is that they are to, in eOMIS, check        03:11PM

1   whether there is documentation that the inmate was personally

2   advised that she may have a pap smear every 36 months, and that

3   this occurred within 90 days of the 36-month anniversary.  And

4   if you wish, if you didn't get it, I can read it again.

5          MR. BOJANOWSKI:  Your Honor, you are saying -- I want          03:12PM

6   to be clear on what you are actually saying here.  You are

7   saying that the inmate needs to be personally notified every

8   three years of the availability of the pap smear, and that

9   notification has to occur no later than --

10         THE COURT:  Or within 90 days.          03:13PM

11         MR. BOJANOWSKI:  Within 90 days of the three-year

12  anniversary date.  Correct?

13         THE COURT:  Right.

14         MR. BOJANOWSKI:  All right.  This is what we

15  contemplate doing, okay, in order to meet this.          03:13PM

16         THE COURT:  Okay.

17         MR. BOJANOWSKI:  We are going to personally notify

18  each inmate in Perryville, all of them, of this and that will

19  be our trigger date, so to speak.  Say it's, you know, February

20  1st.  We'll have that notification to each inmate at          03:13PM

21  Perryville, and then that notification will occur three years

22  from that date or within 90 days of three years of that date to

23  make sure it's accomplished prior to the next February 1st,

24  2020.

25         So that's what we're contemplating doing here to meet          03:14PM

1    this.  So what's going to end up happening is every inmate at

2    Perryville will receive that notification which will trigger

3    that.  So that should alleviate any issue with regard to this

4    particular measure.

5         THE COURT:  Based upon what you have said on the         03:14PM

6    record here today, that would address my concerns.  Because my

7    concerns were directed to the language that you had proposed,

8    which was not committed to this notification, this personal

9    notification and the cycle that you can provide for this

10   three-year cycle that starts now.  It would mean, however, that  03:14PM

11   we would -- and I imagine we'll hear from plaintiffs that there

12   will be an issue about whether or not there's been compliance

13   with the performance measure because of the people who were not

14   given this within the time period required.  But I need to hear

15   from the plaintiffs on whether they are going to hold to that   03:15PM

16   issue.

17        MS. KENDRICK:  Yes, Your Honor.  This is Corene

18   Kendrick from the prison law office.

19        What Mr. Bojanowski proposed in no way meets the

20   reason for the performance measure nor does it comply with its  03:15PM

21   requirement.  The requirement is based off of three years from

22   the date of intake, not the date that they were notified.  And

23   significantly, there needs to be a review of the medical

24   records because the performance measure says that it shall be

25   every 36 months unless more frequent screening is clinically    03:15PM

```
 1    indicated.  And that's similar language we have on other

 2    performance measures, for example, with chronic care where the

 3    default is 180 days for each chronic care appointment unless

 4    the provider says, I need to see you more frequently.  So

 5    there's no way to know if this is a person, for example, who      03:16PM

 6    has a history of cervical cancer who needs to be screened every

 7    six months versus three years.

 8          So unfortunately, while that may be the kind of quick

 9    and very convenient way to get the notice out at least once and

10    not to have think about it until 2020, the reality is that this   03:16PM

11    does nothing to address the actual medical care that's being

12    offered or delivered to our clients especially for the

13    individuals where more frequent screening is clinically

14    indicated.

15          MR. BOJANOWSKI:  Your Honor, I'm not suggesting that         03:16PM

16    we're not going to monitor this per the guide.  I mean, we're

17    still going to be pulling the records.  We're still going to

18    make sure that if it's clinically indicated or recommended that

19    that person is going to be notified of that.  All of these

20    inmates that are coming through intake are given this             03:16PM

21    notification as soon as they set foot in Perryville and they go

22    through their intake medical exam.  So we have provided that

23    already to the intake -- the ladies that are coming in through

24    intake.

25          In addition to this personal notification, we're not        03:17PM
```

1  taking down any of the posters and other items that we continue

2  to have in every housing unit, in every medical unit that

3  remind the inmates that they are eligible for this type of

4  screening.  So to the extent that an inmate needs additional

5  screening, of course that's going to be provided on a clinical          03:17PM

6  basis.  So we're still going to be measuring this.  I'm not

7  suggesting at all that we're not going to measure per the

8  guideline here.

9        So we think we're trying to address what the Court

10  wants to do with regard to personal notification, which was          03:17PM

11  something different than what we had been utilizing in the

12  past.  So in order to address that concern that the Court had

13  and the order that the Court gave, we have come up with this

14  solution to make sure that everybody is covered by the Court's

15  order.                                                                03:18PM

16        I would also make note of the fact that we agree with

17  the plaintiffs' suggestion that it's 10 records per yard and

18  not 10 records per facility.  That was left out of our

19  methodology in Measure Number 61.  We'll add that back in

20  because that's plainly incorrect.                                     03:18PM

21        THE COURT:  Okay.  With the yard correction then let

22  me re-focus on what it is that is at dispute.  I will refer you

23  to the Performance Measure 61 in the date revised January 18,

24  2017, Page 82.  The performance measure is set forth, I gather,

25  accurately, the plaintiffs agree?  The first paragraph where        03:18PM

```
 1   all female inmates ages 21 to 65 will be offered a pap smear
 2   every 36 months after initial intake unless more frequent
 3   screening is clinically recommended?
 4           MR. BOJANOWSKI:  That's taken directly from Exhibit C
 5   in the protocols.                                              03:19PM
 6           THE COURT:  Okay.  So it seems like the answer is in
 7   the affirmative there.
 8           And then jumping down to methodology, if we change
 9   "Select 10 inmates per yard whose arrival date was at least
10   three years prior to the monitored month, what is plaintiffs'  03:19PM
11   view on that?"  Are you checking or have you wandered off?  Ms.
12   Kendrick?  Ms. Fettig?
13           MS. KENDRICK:  I'm sorry, Your Honor.  I had the phone
14   on mute so you wouldn't hear the train.  Sorry about that.
15           So yes, the first bullet point with the correction    03:20PM
16   that it's 10 from each yard, that part of it is correct.
17   However, whose arrival date was at least three years prior to
18   the monitored month, we had pointed out that to the extent they
19   want to make it significant looking at a particular audited
20   month it makes sense to look at the files of people who were   03:20PM
21   coming up -- who had come in three years prior to the audited
22   month.
23           THE COURT:  I see.  So you would be agreeable to have
24   that to be amended whose arrival date was -- no.  What you just
25   said is what's set forth there, I thought.  How is that        03:21PM
```

1    different?

2           MS. KENDRICK:  Well, it's unclear if it's three years

3    prior.  I mean, you could have somebody who came in 16 years

4    ago so it doesn't necessarily mean that that person was due in

5    the audited month.  To the extent the purpose is to measure          03:21PM

6    compliance month to month and whether they are doing what they

7    are supposed to do in a given month, you would want to focus on

8    the subgroup of individuals who were due for -- due to be

9    offered such a screening.

10          THE COURT:  So would it be all right to change it to           03:21PM

11   at least three years and no more than four years prior?

12          MS. KENDRICK:  Well, in light of your suggestion that

13   there be the "within 90 days" it might be more within three

14   years or three years plus 90 days.

15          MR. BOJANOWSKI:  I don't think I understand.                   03:22PM

16          THE COURT:  Well, she's concerned that if we do not

17   change it to address the possibility that where it says at

18   least three years, captured in the pull will be people who

19   arrived on the yard, as she suggested, 16 years prior.  And so

20   we're trying to find a way to capture a set of records that        03:22PM

21   would be reflective of the three-year requirement in the

22   stipulation.

23          MR. BOJANOWSKI:  Well, if they were there 10 years

24   prior then you would -- it's supposed to be offered a pap smear

25   every 36 months after initial intake.  So if the person, you        03:22PM

1  know, in the audited month, if you are looking and seeing if in

2  the past 36 months whether they were offered a pap smear or

3  not, you would say either they were or they weren't.

4          THE COURT:  That seems like a good point.

5          MS. KENDRICK:  I'm sorry to interrupt, Your Honor.          03:23PM

6          THE COURT:  Go ahead.

7          MS. KENDRICK:  The performance measure uses the

8  magical word "every," and as I'm sure you remember we have

9  talked about that extensively about what that word means in the

10 context of mental health performance measures.  So it doesn't          03:23PM

11 say whether the person was offered a pap smear in the past

12 three years, it says they need to be offered one every three

13 months.  So in order to have a starting point and a termination

14 point, we need to look at a universe of people where they were

15 due in the audited month.  And so therefore, that's why we were          03:23PM

16 suggesting going back three years.  And your idea makes sense,

17 too, of the between three and four years.  You are going to

18 capture a universe of people who are coming due for their

19 anniversary.

20          THE COURT:  But you're interested in whether or not          03:23PM

21 there's compliance with this measure and so whether somebody

22 came in 16 years ago or three years ago, if they haven't had a

23 pap smear offered within three years, then they will be

24 non-compliant.  And so that record would be non-compliant and I

25 don't understand -- I guess the problem I'm having here is I'm          03:24PM

```
 1    still tending to agree with Mr. Bojanowski that it is not so

 2    critical as to when their arrival at Perryville was, it's

 3    actually more critical about whether or not they were offered

 4    the test within at least every 36 months.  Is that not the

 5    idea?                                                              03:24PM

 6              MS. KENDRICK:  Yes, Your Honor.  But the point of it

 7    is not just whether it has been offered but the frequency,

 8    every 36 months.

 9              THE COURT:  Right.  Every 36 months.  So --

10              MS. KENDRICK:  So that was just, you know, this is      03:24PM

11    what we have of struggled with with some of the mental health

12    performance measures is how, you know, what's the event 1 and

13    event 2.  So we're saying you need to look at a universe of

14    records where the second event used to measure the frequency is

15    to occur in or around the audited month.                          03:25PM

16              MR. BOJANOWSKI:  Well, the audited month is this

17    month.  We would go back three years and see if it was offered.

18    I mean, that's what the measure is.  If Ms. Kendrick is

19    suggesting that we then have to go back 12 years and determine

20    whether it's been offered four times in the past 12 years, even  03:25PM

21    before the existence of the stipulation.

22              MS. KENDRICK:  I did not at all say that at all.

23              THE COURT:  No.  No.  But that's how -- fairly, that's

24    what is a natural secondary thought to your concern about us

25    grabbing in people who are there who didn't arrive three years    03:25PM
```

```
1    ago but arrived 12 years.  We really don't care so much about

2    when they arrived if it was greater than three years.  We care

3    more about whether in the light of the current stipulation that

4    somebody be seen within 36 months, be told personally and that

5    it's documented every 36 months that you have the opportunity          03:26PM

6    to have a pap smear.

7              And so you have some number of files of eligible

8    women, women who haven't had hysterectomies, and you pull those

9    files and you look to see, have they had this advice given with

10   every 36 months.  And you would look to when it is currently          03:26PM

11   given but you would also look to see whether it was given 36

12   months ago.  Isn't that what has to happen under the

13   stipulation?

14             MS. KENDRICK:  Well, Your Honor, if you look at the

15   ruling that you made previously on every, the meaning of the          03:27PM

16   word "every" is that you stated that you look -- the monitor

17   should look at the last two incidents.

18             THE COURT:  I know.  But this is -- this one is a

19   little bit different because we're talking about such a greater

20   time period that goes beyond the scope of when the parties had        03:27PM

21   agreed to do this.  Isn't that a fair reason to distinguish

22   this one?

23             MS. KENDRICK:  No.  We don't think so, Your Honor.

24             THE COURT:  Okay.

25             MR. BOJANOWSKI:  Your Honor, I will just note for the       03:27PM
```

```
 1    record that this notice that I suggest is going out is going to

 2    go out to about 4,000 women.  So --

 3              THE COURT:  That's not what I'm going to allow.  You

 4    are not just going to allow a mailing to go out to these

 5    people.  You have to have a personal consult.              03:27PM

 6              MR. BOJANOWSKI:  They have got to sign.  Each inmate

 7    will have to sign, and that's going to go into their medical

 8    record so that it can then be seen that they were given that

 9    particular notification.  So the whole idea is to make sure

10    that we've got this personal notification out there, that they  03:28PM

11    signed for it, that it's documented.  And that at intake, the

12    idea is that it will be documented at intake and then in

13    addition, if they don't want the pap smear, we'll have a

14    refusal that the inmate will sign as well indicating that they

15    don't want it.                                             03:28PM

16              So I think we're adequately addressing the concern

17    which is making sure that the women have a pap smear every

18    three years.  That's the idea here.  So. . .

19              THE COURT:  And the reason that the language requires

20    that they be there at least three years is because then we know  03:28PM

21    that we can apply the relevant benchmark of 36 months.  And so

22    I think that it's okay if we capture people who are there for

23    four years or five years because we'll learn whether or not

24    they were offered the test within -- in the last 36 months.

25              So I don't think for the purposes of this requirement  03:29PM
```

that we need to do the additional lookback as we have done in

other cases, two times, perhaps, because those two times, I

think, were inclusive in the time period of the stipulation.

But this one would not be.

          MS. KENDRICK:  Your Honor?                          03:29PM

          THE COURT:  Help me out.  Please help me out.  Why is

my logic wrong here?  Obviously you have an issue with it and I

want to hear why it is.

          MS. KENDRICK:  Your Honor, I apologize.  I just want

to take a step back for a second.  And we have been talking     03:29PM

about this measure for months with the defendants.  And at one

point there had been a discussion about whether the Corizon

computer system could do exactly what the electronic medical

records do with Kaiser, which is they generate, for lack of a

better word, a tickler that goes out about 90 days before your  03:30PM

three-year anniversary, goes out to an individual by US mail or

e-mail for those of us in the free world, or a communique

through the prison that says:  Dear Prisoner X, did you know

you are coming up on the three-year anniversary?  You can

request a pap smear.                                            03:30PM

          And that, to us, seems like a much more logical and

simpler system and it would happen on a rolling basis versus

some sort of dramatic release of 4,000 communiques across an

institution and people signing it.  And so I don't know if Mr.

Bojanowski or their contractor is prepared to speak to this,    03:30PM

1    but that was something we had discussed at one point.  It

2    seemed like a much simpler system and would address our

3    concerns.

4            THE COURT:  Any response?

5            MR. BOJANOWSKI:  They are getting the notice, Your          03:31PM

6    Honor.

7            THE COURT:  What about responding -- you say you have

8    already vetted this and you say it's easier to do it this way.

9            MR. BOJANOWSKI:  Correct.  And the idea is get the

10   notice to them, have it signed off, get it scanned into the       03:31PM

11   medical records so it could be measured and proven that they

12   got the notes.

13           MS. KENDRICK:  Your Honor -- I'm sorry.  I didn't mean

14   to interrupt you, Mr. Bojanowski.

15           Your Honor, that still would not address our concern      03:31PM

16   about the fact that there are people for whom it is clinically

17   indicated that they need more frequent screening.

18           THE COURT:  They are not disagreeing with that.  They

19   agree that the performance measure will always be addressing

20   people for whom more frequent screening is recommended.          03:31PM

21           MS. KENDRICK:  But they haven't indicated how they

22   would notify those individuals or would measure for that.  And

23   so that is actually the advantage of the tickle r system where

24   the physician or nurse practitioner, when they see you, can

25   just enter in, you know, follow up in three years, and the       03:32PM

1    notice will come, or follow up in six months, whatever the case

2    may be.

3         MR. BOJANOWSKI:  Your Honor, obviously if a woman has

4    a condition that requires more screening or additional testing

5    that's going to be noted in the medical record itself.  So the      03:32PM

6    monitor, when looking at the medical record can make the

7    determination that if more frequent screening is clinically

8    recommended that it, in fact, has occurred and measured this

9    based upon the medical record.

10        But, you know, that's something that's going to be            03:32PM

11   individualized by each woman as to whether she requires that,

12   and that's something the monitor is going to continue to look

13   at and continue to measure.  We're not saying that we are not

14   going to be looking at and measuring that activity, because

15   that's what this measure provides.  So it will be looked at and    03:32PM

16   it will be reflected in the doctors' notes or nursing notes or

17   lab test results or any of a number of other documents and such

18   associated with the medical record.

19        THE COURT:  Here's how I read -- go ahead.

20        MS. KENDRICK:  Well, I'm glad that Mr. Bojanowski            03:33PM

21   recognizes the individualized needs.  But that, to us, speaks

22   back to the need for individualized notice not just this mass

23   notice every three years going out to 4,000 people.

24        THE COURT:  Here's how I read this stipulation

25   requirement.  And it is designed to make sure that this test       03:33PM

```
 1    was provided on a routine basis every 36 months to all women
 2    who should have it, but that the parenthetical added at the
 3    end, unless more frequent screening is clinically recommended,
 4    was to make clear that the health care providers were not
 5    relieved of an obligation to provide these individual tests on      03:33PM
 6    a more frequent basis.
 7            But this performance measure is not designed to
 8    ascertain whether or not the individuals who have the unique
 9    circumstance of needing to have the test more often are
10    receiving that test.  This one is designed to make sure that       03:34PM
11    the standard routine practice that is followed in much of the
12    world is also followed with respect to the patients within the
13    defendants' care.
14            And so what I'm going to do is require that the
15    performance manual say that it be, within the yard, that it be     03:34PM
16    at least three years prior to the monitored month.  And then
17    I'm going to impose the language that I have proposed, and that
18    is:  In eOMIS, check whether there is documentation that the
19    inmate was personally advised that she may have a pap smear
20    every 36 months and that this occurred within 90 days of the       03:34PM
21    36-month anniversary.
22            All right.  Then I'm going to turn now to the items
23    set forth on the spreadsheet that appear to be still at issue.
24    The first issue that is --
25            MR. BOJANOWSKI:  Your Honor?                                03:35PM
```

1           THE COURT:  Go ahead.

2           MR. BOJANOWSKI:  I'm sorry.  Before we move on, you

3    said 36 -- what was the question?  36 months of the anniversary

4    of their intake or which they got the notice?

5           THE COURT:  No 36 months of -- well, that's a good          03:35PM

6    point because it both should be within their intake if that's

7    within 36 months.  But if they have been there longer than 36

8    months, then it has to be the last time the test was offered.

9    So let's go back to that.

10          MR. BOJANOWSKI:  We would suggest --                        03:36PM

11          THE COURT:  I think my language addressed that.  It

12   said:  Check to see whether the documentation that the

13   individual was personally advised that she may have a pap smear

14   every 36 months and that this occurred within the 36-month

15   anniversary.  And the anniversary that I'm referring to is when  03:36PM

16   the person was last given that advice.

17          MR. BOJANOWSKI:  Okay.  Thank you, Your Honor.

18          THE COURT:  The first issue that I think the

19   plaintiffs raised in their spreadsheet is whether or not those

20   on parole are counted.  Is that one of the issues you have all   03:37PM

21   been able to resolve, I hope?

22          MS. KENDRICK:  No.  Your Honor, this is Ms. Kendrick.

23   It's unclear to us whether the language as written for

24   Performance Measures 33, 34, 75, and 76 reflect the Court's

25   order that parole violators need to be included.  It's not       03:37PM

1   explicit in there.

2          THE COURT:  So why can't we make it explicit then?

3          MR. BOJANOWSKI:  Well, the arrival log lists

4   randomized source record.  That includes everybody who is being

5   at intake including parole violators.  So it's already there.          03:37PM

6   It's just parole violators are included in the intake sheets.

7   I mean, you get a sheet of 50 people who are getting intakes,

8   and, you know, 15 of them are parole violators.  So they are

9   already within the source document that the monitor is pulling

10  at the reception centers that they have within the system.  So,       03:38PM

11  you know, they are already there.

12         THE COURT:  Is a shorter way to say what you say that

13  they are included?

14         MR. BOJANOWSKI:  Yes.

15         THE COURT:  And does that address your concern from          03:38PM

16  the plaintiffs' side?

17         MS. KENDRICK:  Well, the concern, Your Honor, is that

18  in past versions of the guide prior to your order it had said

19  the source prior to the arrival log.  So there hasn't been any

20  change to indicate that the monitor would know they need to          03:38PM

21  include the parole violators in that sample.

22         THE COURT:  But the document they are looking at,

23  apparently, is -- the only document that they would be looking

24  at would be one that does include parole violators.  Is that a

25  correct understanding?                                                  03:39PM

```
 1              MR. BOJANOWSKI:  That's correct, Your Honor.  And as a

 2     matter of practice throughout this stipulation, they have been

 3     included.

 4              THE COURT:  Okay.  Just a moment.

 5              I'm sorry.  I'm just juggling a number of different            03:40PM

 6     documents here, and I appreciate your patience.

 7              The reason now that I'm pausing is I think that the

 8     number I have cited as the one that I wanted to turn to next

 9     does not match what I recalled that the subject matter was.  So

10     it makes me think I have written down the wrong performance              03:41PM

11     measure, so I'm trying to backtrack where I should be.  I think

12     what I will do is I will hope it will come to my mind and I

13     will remember as I search through these others.  Maybe it will

14     be adjacent.

15              So I will turn to 98 where the issue is specifying the         03:41PM

16     start and stop times.  We have addressed that before, and I

17     guess my question would be, why is it that we don't do that

18     here as well, where we have this start and end times?

19              MR. FATHI:  Your Honor, this is David Fathi.  If I may

20     clarify something.                                                      03:42PM

21              THE COURT:  Surely.

22              MR. FATHI:  Your Honor, you have ruled specifically on

23     this issue with regard to Performance Measure 98.  This is your

24     order at Docket 1831.  The issue here is that this performance

25     measure is about the timeliness of responding to mental health         03:42PM
```

1    HNRs, health needs requests.  And three of the five categories

2    of mental health HNRs require that the patient be seen either

3    immediately or within 24 hours.  And it's impossible to

4    ascertain if those time frames were met unless the time of the

5    encounter, the time of the HNR and the time of the encounter as      03:43PM

6    well as the date are recorded.  And you ordered in Document

7    1831 that the times must be recorded, but that does not appear

8    in the current version of the monitor guide.

9         THE COURT:  And that's why I thought it maybe should.

10   And so let me hear from defendants why we don't.                     03:43PM

11        While you are working on that, my promise to the court

12   reporter, because it's just frankly harder to do a telephonic

13   hearing as well as in present, as maybe you don't all

14   appreciate, so we'll take another five-minute break now.

15        Thank you.                                                      03:44PM

16        (Recess from 3:44 p.m. until 3:51 p.m.)

17        THE COURT:  There are people in the world who can

18   juggle and throw many balls in the air and catch them and pass

19   them on.  I'm not one of those people.  I can't juggle.  And

20   maybe that's why I have been having some trouble.  I thought it      03:51PM

21   would be a good road map to use to start with the plaintiffs'

22   filing on the 24th and then to move to their spreadsheet.  But

23   that's part of the problem I have run into is that I'm moving

24   from one document to another, and there's actually two

25   spreadsheets.  And I appreciate the effort that was made in          03:52PM

1    putting this together, and maybe it would be ideally the right

2    method to use for a juggler.  But because I'm not a juggler,

3    maybe having everything in one document going in order is

4    probably easier for me.  Because as I just was checking I

5    realized I missed a couple that I had wanted to address.  And I      03:52PM

6    will get back to those that are in the plaintiffs' filing that

7    was the first page of my road map.  And then I was clearly lost

8    not being able to find the one that I wanted to get to next

9    from the spreadsheet.

10        So I would just make that suggestion that maybe in the      03:52PM

11   future it would be helpful for me if you put everything in one

12   place that you want me to consider at the same time and do so

13   in an ordered fashion so that I can take advantage of the

14   opportunity to have a road map when it is so.

15        So when we were, I think, last talking we were talking      03:53PM

16   about the start and stop and the defendants were conferring.

17   And I then said we would take a break, so now I need to ask you

18   what you conferred to.

19        MR. BOJANOWSKI:  Your Honor, I would suggest that I

20   just -- we located Doc 1831 so we could look at the language of      03:53PM

21   the Court's order.  And we would suggest to the Court that what

22   we do is we take your language from that order and draft a

23   provision in the methodology to address that and resubmit it to

24   counsel and the Court.

25        THE COURT:  Okay.  Very well.      03:53PM

1          MR. FATHI:  Your Honor, may I address that?

2          THE COURT:  You may.

3          MR. FATHI:  Thank you, Your Honor.  With all due

4    respect, the Court's order on this point was not entirely

5    clear.  The Court's order talks about a compliant record having

6    documented start and end times, and that's not exactly what

7    we're talking about here.  We're talking about the need to

8    record the time that the HNR is received and the time that it's

9    acted on so that we can tell if, in fact, it is being acted on

10   immediately or within 24 hours, as required by the performance

11   measure.

12         So I would suggest what I think is a clearer edit, and

13   that is if you look at the penultimate paragraph, the

14   penultimate bullet of the monitor manual on Performance Measure

15   Number 98, it requires that the following information be

16   recorded, and I quote:  "Date of receipt, date of triage, date

17   of response, date of required contacts," end of quote.  It

18   would be very simple to just change "date" to "date and time"

19   in each of those four places, and I think that would accomplish

20   what the stipulation requires.

21         THE COURT:  All right.  Well, do consider that when

22   you prepare your proposed modification here.  And if you can

23   agree great; if you can't, I will look at it next time.

24         MR. BOJANOWSKI:  Your Honor, we'll review Mr. Fathi's

25   suggestion, and as I said, we'll draft some language and get it

1    to the Court.

2           THE COURT:  Thank you.

3           Going back to where I was a bit of adrift earlier

4    because I couldn't find it, and that is 91, with respect to the

5    continuous watch.  It seemed to me that the commitment that we          03:56PM

6    had from, actually, from Dr. Taylor, with respect to who was

7    being seen resolved this issue.  And I guess I thought we

8    talked about that enough that it would seem to me that there

9    shouldn't be still confusion about this.  And I need to ask

10   plaintiffs why they think we're still in this situation.          03:56PM

11          MR. FATHI:  Your Honor, this is David Fathi.

12          The Court's order is absolutely clear that all

13   prisoners who are on continuous watch shall be reviewed.  That

14   is the commitment the defendants also made in open court.  The

15   difficulty is that's not what the latest version of the monitor          03:56PM

16   guide says.  It says that a sample of 10 records will be

17   reviewed.  So the monitor guide needs to be revised to be

18   compliant both with the Court's order and with the commitment

19   that the defendants made in open court that all prisoners who

20   are on continuous watch will be reviewed for Performance          03:57PM

21   Measure 91.

22          THE COURT:  Who is going to respond on defendants'

23   point?

24          MR. BOJANOWSKI:  There's no disagreement with

25   monitoring everybody who is on watch, and we'll modify the          03:57PM

1    monitor guide accordingly.

2              THE COURT:  Okay.  Good.  Thank you.

3              Turning to Number 6 in the spreadsheet, seems to me

4    that here 24 hours is reasonable in terms of what to expect

5    people to do rather than thinking somebody who finishes the          03:57PM

6    work at 11:55 has to get it done by midnight.  So I think 24

7    hours makes sense.

8              Tell me, plaintiffs, why we can't go with that.

9              MS. KENDRICK:  It doesn't match the language of the

10   stipulation, Your Honor.  But if that's your position, we will      03:58PM

11   abide by --

12             THE COURT:  It's not unreasonable to say that day

13   means 24 hours because a day is 24 hours.

14             Ms. Kendrick, was that you speaking?

15             MS. KENDRICK:  Yes.  I'm sorry.                            03:58PM

16             THE COURT:  It's all right.  The court reporter just

17   wanted to make sure.  Thank you.

18             I gather the issue with Number 35 is that there are

19   some medications that are not dosed daily, that they are dosed

20   every couple of days or some other time period.  And so there       03:58PM

21   is a concern that the required regimen, if it's not a daily one

22   but it's a recurrent one, is not captured here.  And so that's

23   why I think that the plaintiffs are concerned with this

24   additional language for medication with a daily dosing

25   interval.                                                           03:59PM

```
 1              Am I getting what your concern is here on the

 2   plaintiffs' side?

 3              MS. KENDRICK:  Yes, Your Honor.  In your order, which

 4   is at Docket 1831, you just said the first required dose.  And

 5   at the December hearing we talked about the fact that, you          03:59PM

 6   know, the way they had previously written the methodology was

 7   first dose and we had one discussion about dosing frequency.

 8   So we just felt that the language that we put in the revision

 9   did not match what your order had stated.

10              THE COURT:  Any problem with deleting this language?    03:59PM

11              MR. BOJANOWSKI:  The added language was to expand the

12   scope of the language being reviewed.  So it was clear to the

13   monitor they were to include the daily dose as well as a longer

14   interval dose.

15              MS. ORCUTT:  It's not cited by plaintiff there, Your    04:00PM

16   Honor, but if you look at the guide on Page 49 there's a second

17   sentence.

18              THE COURT:  Thank you.  Let me take a look.

19              Which bullet point are you referring me to?

20              MR. BOJANOWSKI:  The third one.                         04:00PM

21              THE COURT:  Thank you.

22              MR. BOJANOWSKI:  Is that this one you are talking

23   about?

24              MS. ORCUTT:  Last part of the bullet we added a phrase

25   that we thought made it clear that the monitor also has to look    04:00PM
```

1   beyond the daily dose to the first --

2         MR. BOJANOWSKI:  For the first required administration

3   of the medication following the transfer.  So we're picking up

4   both.  We want to make sure that we're getting the daily doses

5   as well as a dose that may be administered, say, once a week,          04:00PM

6   once a month, whatever it would be.  So it's an expansion of

7   essentially what they are supposed to look at to make it clear

8   that they have to look at everything.

9         MS. KENDRICK:  So it may just be a language thing,

10  Your Honor, because it wasn't clear that that last sentence of        04:01PM

11  that third bullet point was to be construed as additionally or

12  referring to medication that had a different dosing schedule

13  than daily.

14        THE COURT:  So would it solve your complete problem if

15  you added before the word if in addition, comma, if the               04:01PM

16  documentation shows -- rather make this addition of in addition

17  or maybe rather say it this way:  Or for example, with a daily

18  dosing interval?  Is there some kind of language so that your

19  concern that you drew from this when you first read it wouldn't

20  be confusing to the monitor?                                          04:01PM

21        MS. KENDRICK:  Well, I think one thing might say to

22  add to the last sentence to say, for purposes of medications

23  with a dosing interval different than daily look to, and then

24  the first required administration.  But just to make clear the

25  last sentence refers to medications that are not on a daily           04:02PM

1    dosing schedule.

2         MR. BOJANOWSKI:  We can perhaps modify that.  We will

3    submit it, work through that.

4         THE COURT:  Thank you.

5         MS. KENDRICK:  Okay.                              04:02PM

6         THE COURT:  In 42, there is a concern raised upon this

7    term that is new, and that is follow-up encounters log.  What

8    exactly is that?  The concern that I think plaintiffs would

9    articulate, and one that I have, too, is that if this is only a

10   log that you have done follow-ups on, how will it be helpful in  04:02PM

11   determining whether or not 42 has been satisfied because you

12   are only checking among those that you followed up with, if

13   that's what the meaning of follow-up encounters log is?

14        MR. BOJANOWSKI:  May I have a moment, Your Honor?

15        THE COURT:  Surely.                               04:03PM

16        MR. BOJANOWSKI:  This is one that as we were juggling

17   we missed.

18        THE COURT:  Fair enough.

19        MR. BOJANOWSKI:  Your Honor, my understanding is that

20   we're going to have to, again, resubmit some language here.    04:03PM

21   This follow-up encounters log apparently was something that was

22   contemplated but is not in place, and so we're going to have to

23   probably retool this language in some fashion for source

24   documents.

25        THE COURT:  All right.  So 42, the defendants will      04:04PM

1    propose a source, a new source record.

2         MR. BOJANOWSKI:  Yeah.  We're using the language you

3    see that's stricken out, the provider encounter log randomized

4    and the nursing encounter log randomized, those are the

5    documents we're currently using as source documents.  What we          04:04PM

6    will do is we'll go back and we'll check and see what the

7    status of the follow-up encounters log is and modify this

8    source document accordingly.

9         THE COURT:  Okay.  So the juggler is going to go back

10   to Performance Measure 85 as described, as the issue is          04:04PM

11   presented by the plaintiffs' memorandum of the 24th of January.

12   This is on Page 8.

13        And I have to say that the language that the

14   defendants have deleted seems to raise the specter of the

15   possibility of underreporting that the plaintiffs complain          04:05PM

16   about.

17        That said, one of the paragraphs seems, perhaps,

18   appropriate to remove.  That's the last one.  But let me see

19   whether or not you have had any additional discussion about

20   this and where things stand regarding this issue.          04:05PM

21        Maybe I should hear from plaintiffs first on this one.

22        MR. FATHI:  Your Honor, this is David Fathi.  We have

23   not had any additional discussion.

24        THE COURT:  Okay.  Fair enough.

25        So tell me, then, defendants, why this needs to be --          04:06PM

1    these three paragraphs you say that should be replaced, why you

2    have deleted this language that's set forth and why you add

3    this additional language that seems to raise the possibility,

4    just as plaintiffs say, that 30 days could have elapsed but

5    that the required contact wouldn't have occurred?                    04:06PM

6         MS. ORCUTT:  So to address the deleted three

7    paragraphs, those related to the language "or completed" that

8    court ordered to be stricken.  That was to explain to the

9    monitor what the "or completed" meant.

10        THE COURT:  Right.                                               04:06PM

11        MS. ORCUTT:  Now that that language is stricken those

12   paragraphs no longer make sense or need to be included.  So

13   that's why we deleted them.

14        THE COURT:  Okay.  Seems like it doesn't work

15   entirely.  As I read through it over and over and over again,     04:06PM

16   maybe I don't understand exactly.  But as you know, in the

17   previous orders that we have entered with respect to timing

18   considerations, there is a sense that you want to make sure

19   that you are contemplating all possibilities.  The plaintiffs

20   have raised some concerns that, again, highlight what I have     04:07PM

21   been concerned about in the past and have actually had to

22   readdress, and that is where I have not adequately provided for

23   all contingencies.

24        And so here, and you have had a further opportunity to

25   look at this on the plaintiff's side.  Do you continue to          04:07PM

UNITED STATES DISTRICT COURT

1    believe that this alternative language is likely to be

2    dangerously under or overinclusive?

3            MR. FATHI:  Yes, Your Honor.  It is a complete rewrite

4    of virtually the entire text of the performance measure.  In

5    November, the parties had reached agreement on the text of the          04:07PM

6    monitor guide for this performance measure.  Then the

7    defendants unilaterally added two words, "or completed."  The

8    Court ordered them to remove those two words, so that returned

9    us to the text that we had agreed upon.  And that should have

10   been the end of the story.          04:08PM

11           But now the defendants have made a whole series of

12   unilateral and very significant changes that stand to grossly

13   overstate their compliance.  And here's the most significant

14   one.  The agreed version said that if medications were

15   discontinued in a prior month and the 30-day follow-up still          04:08PM

16   hadn't occurred, the file would be coded as non-compliant.  The

17   defendants, as you can see, have removed that language and now

18   they simply exclude from the sample all files in which the

19   follow-up is two or three or six months overdue.

20           We're not writing on a blank slate here, Your Honor.          04:08PM

21   We're not drafting the monitor guide from scratch.  The

22   question is whether the defendants can reach an agreement with

23   the plaintiffs and then unilaterally make a number of very

24   significant changes that substantially inflate their compliance

25   scores.  And the Court has said in the past that that's not          04:09PM

permissible and it shouldn't be permitted here.  We should go

back to the version that had been agreed on before the

defendants unilaterally added the words "or completed."

THE COURT:  And the prior months would seem to be

relevant here in contrast to the period of time I was concerned

about with the pap smear because the prior months are within

the time of the stipulation.  Is that a fair statement, Mr.

Fathi?

MR. FATHI:  Yes, Your Honor.  This is a 30-day

follow-up.  This performance measure requires that MH-3D

prisoners be seen by a health provider within 30 days of

discontinuing a medication.  So what the prior agreed version

said was, okay, if you discontinued months, let's say it's now

June.  If you discontinued medication in March or February or

January, and you still hadn't been seen for your 30-day

follow-up, then we're going to count that file as

non-compliant.  And that is the language that the defendants

have deleted in this new revision.  And that obviously will

substantially inflate their compliance scores.

THE COURT:  And you are saying that the middle of the

first paragraph where it states:  If the subsequent contact

occurred in any month prior to the monitored month, then it

will be coded with a zero, which means it's not to be counted,

not applicable to this sample, that that would allow those

months that you just described where there had to be no contact

1    excluded.

2          MR. FATHI:  Yes, Your Honor.  Correct.  And that's

3    exactly what they are doing.  And we submitted Exhibit 5 to

4    show you that.  And I understand that it may be difficult to

5    read for the uninitiated but I would be happy to walk you          04:10PM

6    through it.  But what it shows is that they are systematically

7    excluding from the sample anyone who discontinued medication

8    more than two months ago.

9          MS. ORCUTT:  Your Honor, I think maybe some confusion

10   occurred with the deletion of the language "or completed."  And    04:11PM

11   I just wanted to explain maybe in a different way the reason we

12   put that language in there in the first place was that we

13   considered that language to encompass those charts that the

14   review would have been due in a prior month and was completed

15   in this month so that those would still get counted.  And it       04:11PM

16   also was to -- so when Your Honor struck the language "or

17   completed" the only language left is "due."  So the monitor is

18   only looking at contacts that would be due in that monitor

19   month so we then missed the other ones.  And the only reason we

20   had that language "or completed" was to capture those other        04:11PM

21   months.  And when the Court struck that language we went back

22   and deleted that accordingly.

23         MR. FATHI:  Your Honor, that's completely

24   non-responsive.  That doesn't explain the deletions that the

25   defendants have made.  If you look at the first of the three       04:12PM

1    paragraphs they deleted, and this appears on Page 9 of our

2    brief, the first of the three intended paragraphs.  What that

3    paragraph says is that if medications were discontinued at any

4    month prior to the monitored month, and the subsequent contact

5    has not yet occurred, but should have been completed by the          04:12PM

6    last day of the monitored month, then it will be coded as

7    non-compliant.  And that's what they have taken out.  That has

8    nothing to do with what Ms. Orcutt was talking about, which is

9    cases in which the contact was completed in the monitored

10   month.  But again, Your Honor, we don't need to get into sort       04:12PM

11   of which is better and which makes more sense, because the

12   parties had already agreed on the text of the monitor guide for

13   this performance measure, and the Court should hold defendants

14   to that agreement and not allow them to completely rewrite

15   this -- the monitor guide for this performance measure.            04:13PM

16           MR. BOJANOWSKI:  Your Honor, let's get back to what

17   we're actually looking at here.  And what that is, is was the

18   inmate seen by a health care provider within 30 days of

19   discontinuing the meds?  Now, how do you do that when you are

20   monitoring a month?  You are going to look and see whether         04:13PM

21   there is a discontinuation of medications.  You take your

22   discontinuation of medications report and you say, was that

23   inmate seen within 30 days of the discontinuation of that med

24   during the monitored month.  And either he was or he wasn't.

25   Okay.  It's that simple.                                           04:13PM

1            THE COURT:  But what if there's a lag.  What if

2    there's somebody who is not seen in the monitored month who

3    should have been seen in the previous months that were within

4    30 days after the discontinuation?  So there's a lag, that

5    person is not compliant, but it's not reported.                    04:14PM

6            MR. BOJANOWSKI:  Those inmates are captured in the

7    prior monitored month.

8            MR. FATHI:  Your Honor, that -- you have identified

9    exactly the problem.

10           THE COURT:  That's not true because we don't look at    04:14PM

11   the same records every month.

12           MR. BOJANOWSKI:  Maybe I can have Dr. Taylor explain

13   it a little more.

14           THE COURT:  Dr. Taylor, would you mind coming forward

15   to a microphone?                                                  04:14PM

16           MR. FATHI:  Your Honor, we would, once again, ask if

17   Dr. Taylor is going to testify she be sworn.

18           THE COURT:  Dr. Taylor, the oath that you previously

19   took at the last hearing continues to apply.  Do you understand

20   that?                                                             04:14PM

21           DR. TAYLOR:  Yes, I do, Your Honor.

22           Your Honor, per your order that we needed to look at

23   literally almost every single record that falls into this

24   category, every month there's consistently less than 10 per

25   unit.  So those records are looked at at each unit every month.   04:14PM

1          THE COURT:  So they all are.

2          DR. TAYLOR:  The ones that are due that month that are

3     looked at every month, there's very rarely more than 10, very

4     rarely.

5          THE COURT:  So if that's the case, Mr. Fathi, how are          04:15PM

6     we -- my assumption that had led me to be concerned about this

7     would seem not to be true if everyone who has had the

8     discontinuation of medication has had their record pulled?

9          MR. FATHI:  That's not true, Your Honor, because if

10    you look at Exhibit 5 which is MH -- Performance Measure 85 for     04:15PM

11    the Florence complex for November, you see that they pulled 43

12    records, but they -- because they excluded everyone who had

13    discontinued medication in a previous month, they only counted

14    23 for purposes of calculating their compliance and, again,

15    excluding people who had discontinued medications in earlier        04:15PM

16    months and, perhaps, still haven't had the required contact is

17    obviously going to inflate their compliance figures.

18         If the Court will give me a minute, I can certainly

19    quickly look at the latest CGARS and show the Court that many,

20    many more than 10 records are drawn for this performance            04:16PM

21    measure at every one of the large facilities.  We attached

22    Florence, which is one example where there were 43, but I can

23    certainly -- again, if the Court will give me a minute, let the

24    Court know that they are drawing many, many more than 10.  So

25    that's just simply not true.                                        04:16PM

1          THE COURT:  Well, it's important to get -- go ahead

2    and take your time to look for it.  It's important to get to

3    the base of this because, essentially, what you two are saying,

4    both things can't be true.  They are inconsistent.

5          MR. FATHI:  That's correct, Your Honor.  So at the      04:16PM

6    Eyman facility in November of 2016, they counted 25 records.

7    They drew a much larger number.  I could take the time to count

8    them up, but again, it's much larger than 25.  Florence complex

9    we have discussed.  Lewis complex, again, they considered 25

10   records, drew a much larger number, it looks like at least 50.   04:17PM

11   Again, I can count if the Court would like that.  Perryville

12   facility counted 26, drew a much larger number.  Again, it

13   appears to be at least 50.

14         DR. TAYLOR:  Mr. Fathi, can I explain something that

15   may help you with this process?                                04:17PM

16         MR. FATHI:  If I could finish, Your Honor.

17         THE COURT:  Let's go ahead and let Dr. Taylor say what

18   she wants to say about -- she may have a comment about how you

19   are interpreting the data.  May I ask, Dr. Taylor, if you could

20   move the microphone closer to your mouth.                      04:17PM

21         DR. TAYLOR:  Sure.  Sorry about that.

22         Per what you had asked for, we start with the process

23   of looking to see who was discontinued and we fill up those 10

24   slots with those individuals first.  If we don't have 10 slots

25   filled up we then fill them with people who were discontinued   04:18PM

1    in months prior so that we can answer 86, because they are,

2    unfortunately, dependent on one another the way that it was

3    written.

4          So when you see less than the 50 charts we pulled,

5    it's because we filled up the first slots with every single        04:18PM

6    record at that unit that fell into that category.  And then

7    after that point we then pull the other set that did not have

8    their meds discontinued in the month prior to the auditing

9    month.  And that's where the N/As and zeros come from.

10         And so typically on a unit there's three to five           04:18PM

11   inmates who were discontinued the month prior and, therefore,

12   need a 30-day contact.  Those are filled up first.  We're just

13   simply reporting, for purposes of the start date, that you have

14   asked us to do for mental health to then do their follow-up,

15   the additional slots into that with the N/A and zero.             04:19PM

16         MR. FATHI:  Okay.  Your Honor, I'd like to try to get

17   our eye back on the ball, if I could.

18         The problem is that under the previous version, which

19   I repeat, the defendants and the plaintiffs had agreed to, they

20   looked at records of people who had discontinued medications     04:19PM

21   several months ago, and if they still hadn't received their

22   required 30-day contact, those records are counted as

23   non-compliant.  In the new version the defendants have deleted

24   that provision, and their practice is to simply exclude from

25   the pool any record in which the person discontinued meds more    04:19PM

```
1    than two months ago.

2            And again, we provided the example from the Florence

3    complex where you can see that every record of someone who

4    discontinued medication before October 31st of 2016 has a zero

5    next to it, and that zero means that record was excluded from     04:20PM

6    the calculation of the compliance score.

7            But again, Your Honor, I think the simple answer here

8    is there was an agreement.  The defendants tried to

9    unilaterally alter that agreement.  The Court told them to take

10   out those two words.  We should go back to what was the agreed    04:20PM

11   document.

12           THE COURT:  Dr. Taylor, it seems what Mr. Fathi says

13   is right, that I'm now moving to a point where I'm changing the

14   criteria in a way that runs the risk of an underreporting.

15           DR. TAYLOR:  So, again, the N/A and zeros that he's       04:20PM

16   referring to are inmates who were discontinued months prior and

17   therefore not due in the monitored month.  When we had

18   discussed this with them on the phone, and we had put in the

19   completed language, not unilaterally, it was through a

20   discussion where I attempted to explain to Mr. Fathi how the      04:21PM

21   word "or completed" captured those ones from the past, but also

22   captured the inmates who were discontinued in the monitored

23   month and seen also in the monitored month does not inflate the

24   compliance because they would only be captured in that month.

25   They wouldn't then be captured the next month and next month.     04:21PM
```

1    But Mr. Fathi believed that that inflated it and asked for you

2    to remove that language.  That language was put there to

3    capture both types.  And so when removed, we removed the

4    additional language which doesn't make any sense.  The question

5    is each month, whether those that were discontinued 30 days        04:21PM

6    prior to that were seen.  And every month we captured the whole

7    group of individuals who fall into that category.  There is

8    often almost every unit less than 10.

9         And so going forward, if it's helpful, we can not

10   include any of the records that don't fall into that category.     04:22PM

11   We have just continued to put that information in there because

12   that is the start date of when mental health then has three

13   months so we left that data in there for that purpose and then

14   put a zero because that information is there just to tell us

15   when mental health has three months from, not whether or not a     04:22PM

16   30-day contact occurred or not because that is in prior

17   monitoring months.  If that makes more sense.

18        THE COURT:  I understand what you are saying.  It's

19   helpful to me.  And what I have heard from you, Dr. Taylor, and

20   from Mr. Fathi, is helpful for me to understand this.  I'm         04:22PM

21   going to, again, take this issue under advisement, take another

22   look at it and make sure I'm giving you the precise instruction

23   on how to proceed.

24        MR. FATHI:  Thank you, Your Honor.  May I just say one

25   more thing?                                                         04:22PM

1           THE COURT:  Surely.

2           MR. FATHI:  I don't agree with Dr. Taylor's recitation

3    of the facts about our previous discussion.  But one very

4    important point is that part of the agreement we had reached

5    with the defendants was that we clarified that the phrase, "due          04:23PM

6    a contact in the monitored month" includes those patients who

7    should have received a contact in a previous month but have not

8    yet received that contact.  And you can see that at Document

9    1756-1, Page 83.

10          So that is -- those are the people who in the November          04:23PM

11   agreed version of the monitor guide were being assessed, were

12   being included in the pull.  If they hadn't received their

13   contact yet they were counted as non-compliant.  Those were the

14   people who under defendants new and unilateral revisions of the

15   monitor guide are now being excluded from the pull.          04:23PM

16          THE COURT:  Okay.  Thank you.  94 is related to this,

17   I gather.  I raised this issue at the very start.  Sounds like

18   Dr. Taylor has partly explained, or perhaps potentially

19   explained to me, why it is these greater records are being

20   drawn, the greater number of records being drawn.  But is there          04:24PM

21   anything different about this 94 measure that is not informed

22   by what we just talked about?

23          MR. FATHI:  It is distinct, Your Honor.  And as we --

24   as the Court said at the outset, drawing a larger sample is not

25   necessarily objectionable.  The protocol requires a minimum of          04:24PM

1    10 records per complex except at Eyman where there must be 20.

2    And from the beginning of the stipulation, it has been the

3    defendants' virtually invariable practice to draw no more than

4    10 at each facility and no more than 20 at Eyman.  Now suddenly

5    in November they have dramatically increased that to 35 records    04:25PM

6    at Eyman, 25 at Tucson, 20 at Lewis, and 15 each at Florence,

7    Perryville, Phoenix, and Yuma.

8            And again, as the Court has said previously, the

9    defendants don't get to just unilaterally start doing something

10   differently than it has been done for the entire life of the    04:25PM

11   stipulation.  They have to present the change to the Court.

12   They have to explain it.

13           THE COURT:  Mr. Fathi, that's a different context.  I

14   think here you are going to have to suggest to me what is

15   perhaps something that is contrary to the purpose of this    04:25PM

16   stipulation of the drawing this greater number.  For instance,

17   if you do think that they are doing something to manipulate the

18   data that gives false reporting of what's actually happening

19   that's one thing.  But if it's just them drawing more records

20   to try to get a better sense of things themselves with the    04:25PM

21   belief that maybe they were unlucky for the first 10 and 20 may

22   give them a better view, that's okay.  They can change to do

23   that.

24           But if you think that it is they are drawing more

25   files and discarding the ones that don't count or don't help    04:26PM

1    them, that's a different thing.

2         MR. FATHI:  Well, here's the problem, Your Honor.

3    Again, it would be nice if the defendants would communicate

4    this with us rather than just unilaterally making this change

5    without any communication to the plaintiffs or the Court.          04:26PM

6         Here's the concern:  It would obviously be

7    impermissible if the defendants were to draw 10 records, look

8    at those 10 records, see that they weren't compliant and then

9    keep drawing additional records until they inched above the

10   threshold of compliance.  I'm not saying that's what they are     04:26PM

11   doing but we don't know.  We have no explanation for the sudden

12   increase in the sample size.

13        We have no objection to the increased sample size if,

14   number one, it is the same sample size at a given facility

15   every month, it doesn't fluctuate from month to month, and it     04:26PM

16   is a true random sample that you draw all 35 or 25 or whatever

17   the number at once and then evaluate them.  You don't look at

18   the first 10, see how you are doing, and then decide if you

19   want to draw some additional records.

20        THE COURT:  Well, I mean, what you say does make some        04:27PM

21   sense to me, I have to say, Mr. Fathi.  But let me see if there

22   is some explanation from the defendants that doesn't raise that

23   last concern that you raised.

24        MR. BOJANOWSKI:  Well, Your Honor, obviously what Mr.

25   Fathi suggests is not true.  That is not what is happening.       04:27PM

```
 1    Obviously, the monitors are very diligent in the way they

 2    monitor as can be seen by the amount of negative findings that

 3    are before this very court.

 4            The reasoning behind 94 having an increased number of

 5    sample size is that you look at the protocol and you are          04:28PM

 6    talking about 10 records per complex.  So you have a complex

 7    of, say, 3,000 individuals and you are pulling 10 records for

 8    the whole complex for this measure.  So the thinking was

 9    increase the sample size to get a more accurate reporting.  The

10    stipulation says it's a minimum 10 records per complex.          04:28PM

11    Increasing that helps with the accuracy in reporting.  And

12    that's the underlying basis of what's going on here.  There's

13    no nefarious activity that Mr. Fathi suggests that somehow

14    there's some cherry picking going on here.  If he's got some

15    evidence of that I would sure as heck like to see it.            04:28PM

16            THE COURT:  Okay.  Well, there will be an opportunity

17    for that as part of the greater understanding that will happen

18    when we have this subsequent evidentiary hearing on how it is

19    that the performance measures are carried out.  This 94

20    actually fits nicely within that and, perhaps, doesn't fit as    04:29PM

21    well with what we have otherwise on the agenda today, and that

22    is defining language in the Monitoring Guide.

23            MR. FATHI:  Your Honor.

24            THE COURT:  Please.

25            MR. FATHI:  Could we have defendants' commitment that,   04:29PM
```

1    number one, the number of records drawn, at least the target

2    number of records to be drawn at every facility will be the

3    same from month to month, and number two, that it will be a

4    true random sample.

5              THE COURT:  Well, I think the random sample idea, I'm          04:29PM

6    hoping, is a given.  Is that true?

7              MS. ORCUTT:  Correct.

8              THE COURT:  All right.  So I have had avowal of

9    counsel that that is true.  And then turning to the first one

10   that it doesn't change from month to month, Mr. Fathi, would it          04:29PM

11   not make sense to hear from the people who are involved in

12   doing this as to why it is that they think that they might want

13   to do that and that the evidentiary hearing could, perhaps,

14   where we would ask the defendants to provide the person who

15   would be making that decision as to explain, under oath, why it          04:30PM

16   is they do that?

17             MR. FATHI:  That's fine, Your Honor.  I was assuming

18   the defendants would be willing to make that commitment today.

19   If they're not, we could explore that at the evidentiary

20   hearing.                                                                 04:30PM

21             THE COURT:  I guess I will pose your question to

22   defendants.  We will see what they have.

23             MR. BOJANOWSKI:  Is he asking for a commitment as to

24   the number of records per facility, per unit?  We have 10

25   facilities.                                                              04:30PM

```
 1            THE COURT:  He's concerned about the variability of

 2    one month, lower the next.  Maybe that is a fair way to

 3    capitulate what he's saying.

 4            DR. TAYLOR:  So what we have done is take a quarter of

 5    people who were on watch for that month at that site because    04:30PM

 6    what we found is actually recently when, I think it was Lewis,

 7    I pulled the first 10 like we normally do and was planning to

 8    pull the next 20, they actually were 100 percent in the first

 9    10.  Continued to pull the next 20, because that's what we do,

10    and there were three other findings in the remaining 10.        04:31PM

11    Because that's important.

12            THE COURT:  Is it something you would be willing to

13    commit to today that you would follow this -- did you say 40

14    percent or a quarter?

15            DR. TAYLOR:  A quarter, 25 percent.                      04:31PM

16            THE COURT:  25, thank you, would be willing to follow

17    this 25 percent across the board and going forward?

18            DR. TAYLOR:  Yeah.

19            THE COURT:  Would that satisfy you, Mr. Fathi, on that

20    point?                                                          04:31PM

21            MR. FATHI:  Well, Your Honor, I would need to think

22    about that.  It does seem odd that 25 percent yields very round

23    numbers at each and every facility, 35, 25, 20, perhaps that's

24    a coincidence.

25            But I would like the chance to think about that.  It    04:31PM
```

| | |
|---|---|
| 1 | may be satisfactory.  But again, for every other measure it is |
| 2 | a fixed number drawn at each unit or each complex per month.  I |
| 3 | would prefer it be a fixed number for this measure, too, as it |
| 4 | has been for the entire life of the stipulation.  But if the |
| 5 | Court would allow me to think about that, then perhaps we |
| 6 | either will or will not need to address it at the evidentiary |
| 7 | hearing. |

04:32PM

THE COURT:  Just to emphasize she is offering a fixed number, it's just different than the one they used before.  You have now heard the explanation as to why they have done it and maybe you would be comfortable with that.  But I will give you the chance to think about it.

04:32PM

MR. FATHI:  Thank you, Your Honor.

THE COURT:  I have run through all of my issues except for the two that I would do at the very end, and that is to set this timetable for when you will get me your final revisions on the monitoring manual and then also selecting a date for us to consider the separate issue of how it is that the monitoring manual is implemented by the monitors.

04:32PM

And so before we get to those last two issues, it's now time for me to turn to the plaintiffs and the defendants and ask them to raise any issues that they believe I should have raised and didn't.  Plaintiffs get to go first.

04:33PM

MS. KENDRICK:  Your Honor, this is Corene Kendrick from the Prison Law Office.  Were you planning on your agenda

04:33PM

1    talking about the issue of the HNRs and the open clinic?

2         THE COURT:  No, I thought that would fit -- because we

3    don't really know everything about that right now.  I think

4    it's a plain thing from the record.  But it's also much more

5    with respect to implementation than it is with what is called                    04:33PM

6    for in the monitoring manual, don't you think?

7         MS. KENDRICK:  Okay.  Well, we also wanted to, and

8    maybe we have been going for over three hours so we may want to

9    defer this to the next hearing, but the issue we raised that --

10   about perhaps looking at the possibility with this performance                    04:34PM

11   measure for collecting institution-wide data to start moving to

12   recording that versus the 10 files randomly selected, which is

13   the best they have.

14        THE COURT:  Hold on just a second.

15        Well, isn't that also something that you can confer                          04:34PM

16   with Mr. Fathi about and decide whether or not you are

17   comfortable with what you have heard here today?

18        MS. KENDRICK:  Yes, Your Honor.  And we hope that that

19   hopefully will spark an ongoing conversation in the future with

20   the defendants.                                                                   04:34PM

21        MR. FATHI:  Your Honor, I beg your pardon.  May I say

22   just one more thing?

23        THE COURT:  Of course.

24        MR. FATHI:  As I said earlier, it would be nice and I

25   think it would be helpful if the defendants would communicate                    04:35PM

1    with us about these changes and not just make them unilaterally

2    and we come across them when we review the CGARS.  I think that

3    might avoid the necessity of bringing at least some of these

4    disputes to the Court.

5         THE COURT:  Aren't you talking about something that's          04:35PM

6    going to be resolved once we agree on what the monitoring

7    manual requires, or are you thinking that they will do things

8    that tweak in a way that is something that is not specifically

9    addressed in the monitoring manual?  Is that what your concern

10   is?                                                                 04:35PM

11        MR. FATHI:  Well, yes, Your Honor.  For example, with

12   Performance Measure 94, the substantial increase in the sample

13   size is not at all reflected in the monitor manual, or they did

14   not communicate that to us.  I'm simply suggesting, and I guess

15   the defendants can accept the suggestion or not, but it might      04:35PM

16   be helpful if these things were communicated to us.

17        THE COURT:  Just to be clear, there's really no foul

18   here because what they did in drawing more files didn't

19   actually violate the stipulation or violate a specific

20   requirement of the monitoring manual.  What you are simply         04:36PM

21   saying is if there is going to be a change in the procedure and

22   the methods you would find it helpful to be informed about that

23   in the first instance.  Is that what you are saying?

24        MR. FATHI:  Precisely, Your Honor.

25        THE COURT:  Okay.  And that's a reasonable request,           04:36PM

certainly, and one that I would endorse.  I think it is helpful

to have people talking about things, and certainly I know that

you do engage in a lot of back and forth and that sometimes

that back and forth has been difficult because of the strong

views that are held by respective sides.                    04:36PM

        But nevertheless, the challenge we all have is to

figure out how to agree what we can agree to and how to

disagree agreeably on what we can.  But it still is best to

always have happen in the context of a conversation rather than

by just unilateral action.  And if it is that it can't be      04:37PM

resolved by the discussion then people aren't so surprised when

they see that there is an action that follows on.  They have at

least been given the heads up about it.

        So I think that is telling me that the plaintiffs are

finished with their issues that they would like to present.    04:37PM

        MS. KENDRICK:  Actually, Your Honor, this is Ms.

Kendrick again.  This is just a housekeeping matter.

        THE COURT:  Yes.

        MS. KENDRICK:  There are going to be five separate

motions that will be fully briefed as of tomorrow, and we were  04:37PM

just wondering how the Court plans to handle those pending

motions.

        THE COURT:  We noted that just -- I'm saying "we" in a

meeting with -- it's not the royal we, it's the people that

monitor me to make sure that I'm staying on top of things,     04:37PM

1    people I work with in my chambers.  And we are aware of the

2    issues that will be ready to rule as of tomorrow, and we're

3    going to be paying attention to that.  If you find after you

4    think that these measures are ready to rule that we haven't

5    ruled, it's possible that we have allowed something to fall          04:38PM

6    between the cracks, then feel free to, on procedural matters,

7    inquire with the Court by a call to the law clerk or to my

8    judicial assistant and ask whether or not the Court is aware

9    that a ruling is being awaited on a particular matter.  That's

10   not an impermissible ex parte contact, and I won't do what the      04:38PM

11   judges of lore did, and that is, ask what side you are on and

12   say denied if you are the movant and contrary if it's the other

13   way.  I will appreciate that kind of information you provide to

14   me.

15              MS. KENDRICK:  Thank you, Your Honor.                     04:38PM

16              THE COURT:  All right.  Defendants' side?

17              MR. BOJANOWSKI:  Your Honor, we have no further issues

18   to bring before the Court.

19              THE COURT:  All right.  Let's try to pick a time when

20   it is that we can have another hearing that will be an              04:39PM

21   evidentiary hearing that is sufficient out in time that we'll

22   be able to get wrapped up on the monitor manual so everybody

23   knows what it says.  So I guess that probably means at least

24   about a month from now, and I also don't want to be overtaxing

25   to people by being too close in time to when our standard           04:39PM

1    meeting is.  And so we'll have to take care to be mindful of

2    when that is.  We don't want to make people be butting heads on

3    court appearances.

4          The clerk is checking to see what we have and then I

5    will offer that up and see what you all think about it.          04:39PM

6          While the clerk is consulting about that, the

7    defendants had asked previously for an opportunity to have a

8    presentation at an evidentiary hearing with respect to the

9    issue that arose at a prison tour that the plaintiffs have said

10   that they would like to seek redress that includes financial    04:40PM

11   reimbursement for the costs incurred at that tour.  And the

12   defendants have asked for an opportunity to present evidence as

13   to why it is that their conduct was not as alleged.

14         And so we would, if we're going to proceed with that,

15   I think I need to also pick a time for that hearing as well.     04:40PM

16   So when the clerk gives us the first date we'll then also try

17   to pick a second time.  And maybe -- I was about to say we

18   could maybe join it with another but that's not wise because

19   everybody doesn't necessarily have to be present for every

20   hearing if it doesn't cover an area that they are working on.    04:40PM

21         THE MAGISTRATE CLERK:  How about March 6th at 9 a.m.

22         THE COURT:  March 6th at 9 a.m. is the implementation

23   hearing date.  March 6th at 9 a.m.  How does that look for

24   plaintiffs' calendars?

25         MR. FATHI:  This is David Fathi, Your Honor.  That's      04:41PM

1    fine with me.

2         THE COURT:  Anybody else wanting to comment on that on

3    the plaintiffs' side?

4         MS. KENDRICK:  We're checking, Your Honor.

5         MR. BOJANOWSKI:  Which hearing?                    04:41PM

6         THE COURT:  On the implementation.  So I talked about

7    the foundation of the monitoring manual, but then the

8    suprastructure that's built upon that is going to be what kind

9    of implementation practices actually happen, what are the

10   monitors doing, how are they doing it, how are they reading   04:41PM

11   this.  There are concerns that have been raised about it and

12   this would be an opportunity for us to have the relevant people

13   who are on the ground in the courtroom so that they could be

14   examined about this and that everybody could have a clear

15   understanding about issues that they have been raising that   04:41PM

16   have never really been able to be addressed.

17        THE MAGISTRATE CLERK:  Judge, I'm sorry, our regular

18   status hearing is the 8th.

19        THE COURT:  That's a problem.  Why don't you see about

20   the middle of -- maybe the third week of March.  No.  February  04:42PM

21   is a short month, but what about the third week of February?

22        THE MAGISTRATE CLERK:  How about the third week of

23   February?

24        THE COURT:  Yeah.

25        THE MAGISTRATE CLERK:  We're on duty.             04:42PM

1          THE COURT:  On a Monday of that week?

2          MR. BOJANOWSKI:  I think that's a holiday, Your Honor.

3          THE COURT:  Okay.  Sorry.  How about the following

4   week.

5          THE MAGISTRATE CLERK:  We have the trial 1st and 2nd.          04:42PM

6          THE COURT:  Okay.  I wonder if we should do this.

7   Maybe it's possible that by getting the issues that are

8   engendered by a lack of clarity on the monitoring manual,

9   getting those squared away, maybe we won't have as much to do

10  on the monthly.  And so maybe we could adopt the March monthly          04:43PM

11  meeting, which is, you said, the 8th that we have already

12  cleared?

13         THE MAGISTRATE CLERK:  Yeah.  We're already set for

14  March 8th at 10.

15         THE COURT:  Okay.  Why don't we set that for the          04:43PM

16  implementation hearing date.

17         MR. BOJANOWSKI:  Just so I understand, because if I

18  need to have kind of an idea of the scope of what we're talking

19  about.

20         THE COURT:  I understand.          04:43PM

21         MR. BOJANOWSKI:  Because it's useless to have a

22  hearing without the appropriate people present.

23         THE COURT:  Right.

24         MR. BOJANOWSKI:  So I need to have an idea of what the

25  Court is envisioning as far as evidence is concerned so that I          04:43PM

1    can then go back and have the appropriate people present.

2         THE COURT:  Who is in charge of making sure that the

3    performance measure monitoring, as defined by the monitoring

4    manual, happens consistently with the monitoring manual?

5         MR. BOJANOWSKI:  Ultimately, Mr. Pratt, but there are          04:44PM

6    other individuals within the monitoring Bureau that have

7    specified areas that they maintain, like Dr. Taylor takes care

8    of the mental health portions.  We've got other individuals

9    that take care of maybe CQ-I type things and other individuals

10   that may look at, maybe, nursing.  And so it's --                    04:44PM

11        THE COURT:  It would seem that it is true that Dr.

12   Taylor and Mr. Pratt would be likely suspects.

13        MR. BOJANOWSKI:  Correct.

14        THE COURT:  But it also could be true there could be

15   others.  But I wonder if plaintiffs from their visits have          04:45PM

16   observed enough to suggest to defendants who also might be

17   appropriate as potential witnesses.

18        MR. BOJANOWSKI:  Are you talking about an actual

19   monitor who's boots on the ground at a facility?  Is that what

20   you are --                                                          04:45PM

21        THE COURT:  Well, it depends what the level of

22   supervision is and how much autonomy the monitors have.  As I

23   read the documents, it seems that the monitors have some level

24   of monitoring that would be helpful to know from a monitor

25   exactly how do you take this?  What do you take this to mean?       04:45PM

UNITED STATES DISTRICT COURT

1    It seems like that kind of transparency would maybe obviate

2    some of the issues that are raised in the briefing in front of

3    me and that is, frankly, described as a lack of trust.

4         And so if I can address that, and I think this might

5    be one of the methods to do it, it would, perhaps, be helpful    04:45PM

6    to have such a person.

7         MR. BOJANOWSKI:  All right.  We'll try and bring

8    appropriate --

9         THE COURT:  And maybe I can ask the defendants to

10   think about this and, in a timely way, if you do have           04:46PM

11   suggestions about who might be helpful as a witness, make those

12   suggestions to the defendants and see what that conversation

13   produces.  Is that all right with plaintiffs?

14        MR. FATHI:  Yes, Your Honor.

15        THE COURT:  Okay.  So we will turn the March 8th date,     04:46PM

16   and that is at what time again, please?

17        THE COURTROOM DEPUTY:  It's currently set for 10.

18        THE COURT:  All right, for 10 a.m., and we'll turn

19   that into this hearing on the implementation aspect of the

20   monitoring manual.                                              04:46PM

21        And then with respect to the evidentiary hearing,

22   we'll need to pick a date also for that.  We know that -- well,

23   here's perhaps what we should do.  We have for some period of

24   time these dates set for the monthly meetings.  It's possible

25   that we will find that we have the opportunity to address other  04:47PM

1    things at those meetings, but this particular issue isn't one

2    that needs to be addressed immediately because it's all about

3    money, and the money can be dealt with at any time, I think.

4    There may be some aspect of it with respect to whether or not

5    plaintiffs burned one of their opportunities to visit.  I don't    04:47PM

6    recall whether I already ruled on that.  I think maybe I did

7    that it wasn't a burn of a visit, but what remains at issue is

8    the money.  So we really don't have to turn to that immediately

9    so I won't set a hearing.  But I will keep it in mind.  I'm

10   thankful that I, at least, have informed you that I haven't    04:48PM

11   allowed that to drop off the agenda because it's been raised.

12           All right.  Anything else we need to address today?

13           All right.  Thank you all very much.  Appreciate your

14   time and patience with the process.  It is a big system that

15   you all run, speaking to the defendants who do this, and it's a    04:48PM

16   big system that plaintiffs are monitoring.  And so I appreciate

17   that you are working hard and devoting a lot of energy to this.

18           And I also appreciate that there are increases in the

19   familiarity with the Court's appreciation of exactly what is

20   the circumstance on the ground.  I have rejected the    04:48PM

21   defendants' opportunity to have another tour because I don't

22   think that's helpful.  I think my hours are helped by spending

23   time reading what you have submitted.  And so I appreciate that

24   you have done that.  And I think each time that we go through

25   this process I get a finer sense of the circumstances.  And I    04:49PM

UNITED STATES DISTRICT COURT

1    will do my best to continue to give you an equal measure of the

2    care that you have taken in preparing these kinds of things for

3    me.

4         But I also think it's fair to end with the concern

5    that the model that I have set up of the Monitoring Guide and    04:49PM

6    this implementation session is really designed in the spirit of

7    optimism that we can, through transparency and clear

8    understanding, one with the other, remove any doubt that

9    everybody is focused on a good faith enforcement of the

10   stipulation.  And I continue to encourage both sides to keep    04:50PM

11   that in mind; that I am interested in the letter of the

12   stipulation but I'm also not divorced from appreciating the

13   spirit of it as well.  And I think I do understand that and

14   lawyers naturally have an inclination to try to sometimes hide

15   behind the letters even though the spirit would say you          04:50PM

16   couldn't be there.  And I would encourage you to be as faithful

17   to the spirit of the agreement that you reached.

18         Thank you all very much.

19         (Proceeding concluded at 4:50 p.m.)

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5         I, LAURIE A. ADAMS, do hereby certify that I am duly

6  appointed and qualified to act as Official Court Reporter for

7  the United States District Court for the District of Arizona.

8         I FURTHER CERTIFY that the foregoing pages constitute

9  a full, true, and accurate transcript of all of that portion of

10 the proceedings contained herein, had in the above-entitled

11 cause on the date specified therein, and that said transcript

12 was prepared under my direction and control.

13         DATED at Phoenix, Arizona, this 15th day of February,

14 2017.

15

16                              s/Laurie A. Adams

17                              _____
                                Laurie A. Adams, RMR, CRR

18

19

20

21

22

23

24

25