1

2            UNITED STATES DISTRICT COURT

3            FOR THE DISTRICT OF ARIZONA

4            _____

5   Victor Parsons, et al., on    )
    behalf of themselves and all   )
6   others similarly situated;     )
    and Arizona Center for         )
7   Disability Law,                )
                                   )   No. CV 12-00601-PCT-DKD
8            Plaintiff,            )
                                   )
9        vs.                       )   Phoenix, Arizona
                                   )   February 8, 2017
10  Charles Ryan, Director,        )   10:01 a.m.
    Arizona Department of          )
11  Corrections; and Richard       )
    Pratt, Interim Division        )
12  Director, Division of Health   )
    Services, Arizona Department   )
13  of Corrections, in their       )
    Official capacities,           )
14                                 )
             Defendants.           )
15  _____   )

16

17    BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

18          REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                (*Status Hearing*)

20

21  Official Court Reporter:
    Laurie A. Adams, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Suite 312
    401 West Washington Street, Spc 43
23  Phoenix, Arizona 85003-2151
    (602) 322-7256

24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2    **For the Plaintiffs:**

3              EIDENBACH LAW PC
              By:  **Kirstin T. Eidenbach, Esq.**
4              P.O. Box 91398
              Tucson, AZ 85752
5
              ACLU FOUNDATION OF ARIZONA
6              By:  **Kathleen E. Brody, Esq.**
              3707 N. 7th Street
7              Suite 235
              Phoenix, AZ 85013
8
              ACLU - Washington DC
9              By:  **Amy Fettig, Esq.**
              915 15th Street NW
10             7th Floor
              Washington, DC 20005
11
              ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
12             By:  **Maya S. Abela, Esq.**
              177 N. Church Avenue
13             Suite 800
              Tucson, AZ 85701
14
              PRISON LAW OFFICE
15             By:  **Donald Specter, Esq.**
              By:  **Corene D. Kendrick, Esq.**
16             1917 5th Street
              Berkeley, CA 94710
17
     For the Defendants:
18
              STRUCK WIENEKE & LOVE, P.L.C.
19             By: **Timothy J. Bojanowski, Esq.**
              By: **Rachel Love, Esq.**
20             By: **Ashlee B. Fletcher, Esq.**
              By: **Anne M. Orcutt, Esq.**
21             3100 W. Ray Road
              Suite 300
22             Chandler, AZ 85226
23             OFFICE OF THE ATTORNEY GENERAL - Phoenix
              By:  **Lucy M. Rand, Esq.**
24             1275 W. Washington Street
              Phoenix, AZ 85007
25

```
 1                      P R O C E E D I N G S
 2            THE MAGISTRATE CLERK:  Case Number 12-601, Parsons, et
 3    al, versus Ryan, et al., on for status hearing.
 4            THE COURT:  Would counsel please state their
 5    appearances for the record.                                    10:02AM
 6            MS. EIDENBACH:  Kirsten Eidenbach and Kathleen Brody
 7    for the plaintiff class.
 8            THE COURT:  Good morning.
 9            MS. FETTIG:  Amy Fettig from the ACLU for the
10    plaintiff class.                                               10:02AM
11            THE COURT:  Thank you.  Good morning.
12            MR. SPECTER:  Donald Specter and Corene Kendrick for
13    the plaintiff.
14            THE COURT:  Thank you.  Good morning.
15            MS. ABELA:  Maya Abela for Arizona Center for          10:02AM
16    Disability Law.
17            THE COURT:  Thank you.  Good morning.  That's all for
18    the phone?
19            MS. SCHWARTZAPFEL:  Beth Schwartzapfel, reporter from
20    the Marshall Project.                                          10:02AM
21            THE COURT:  Thank you.  Good morning.
22            MS. FINGER:  Jennifer Finger from Corizon Health is
23    also on the phone.
24            THE COURT:  Okay.  Thank you.
25            MR. BOJANOWSKI:  Tim Bojanowski, Rachel Love, Ashley   10:03AM
```

1    Fletcher, Anne Orcutt, and Lucy Rand for the defendants.

2         THE COURT:  Thank you.  I don't see everybody that you

3    mentioned, though.

4         MR. BOJANOWSKI:  Lucy is --

5         THE COURT:  I didn't see.                                    10:03AM

6         MR. BOJANOWSKI:  She was clearing security, and so she

7    should be arriving momentarily.

8         THE COURT:  All right.  Fair enough.

9         And that's covered everybody.  Thank you.

10        Here's how we'll proceed.  I am going to address the         10:03AM

11   status of the matters, the performance measures that are

12   presently the subject of the Court's remediation plan first.

13   And then I will turn to subjects raised by the Court in its

14   e-mail to the parties and then the responses from the parties

15   and their own agenda items.  And then, of course, I will give    10:03AM

16   everybody an opportunity to raise anything that they wish to

17   raise that they thought should have been raised or want to

18   raise additionally.

19        Turning to Performance Measure 11, which is that newly

20   prescribed provider-ordered formulary medications will be        10:04AM

21   provided to the inmate within two business days after

22   prescribed or on the same day if prescribed stat, looking at

23   the spreadsheet, I think it's fair to say cautious optimism is

24   perhaps justified with respect to this performance measure.

25        So my proposal would be, or my plan, would be to let        10:04AM

1    more time run before I make any inquiry or further imposition

2    of remediation measures upon defendants.  But I will give

3    plaintiffs an opportunity to say anything they would like to

4    say about Performance Measure 11.

5         MS. KENDRICK:  Your Honor, this is Corene Kendrick          10:05AM

6    with the Prison Law Office.

7         We would just note that perhaps we can be cautiously

8    optimistic about the Eyman Prison going above 80 percent for

9    the first time in November.  The Lewis Prison continues to be

10   abysmal and, in fact, has not been above the requirement for    10:05AM

11   substantial compliance for all of 2016 and in November was at

12   67 percent.

13        THE COURT:  And I see that, and I see that October was

14   at 56, and so the improving trend that had been previously

15   developing there seems to have been cut off.  But because there  10:05AM

16   was a -- I mean, it's certainly fair to describe what was

17   happening in the middle of last year as being abject failure

18   there, we did see somewhat of a return or a trend, a positive

19   trend, and a falloff from that trend but I think that what the

20   right thing to do is to wait for accumulation of more data      10:06AM

21   before we focus on Lewis and what is happening there.

22        With respect to Performance Measure 13, which requires

23   chronic care and psychotropic medication renewals be completed

24   in such a manner that there's no interruption or lapse in

25   medication, I need to ask the defendants what is going on with  10:06AM

UNITED STATES DISTRICT COURT

1    respect to Florence.

2         MR. BOJANOWSKI:  Your Honor, I'd like to note

3    initially that the Court's Docket 1754 order was implemented

4    midway through December, so we don't have accurate data.  This

5    November data that you are looking at is actually September --    10:06AM

6    is from September prior to the Court's order.

7         We do want to note for Performance Measures 11 and 13,

8    Corizon has entered into contracts with the local Walgreen's

9    stores to provide stop gap medications and such in the event

10   that they don't have the supply in their stock at the facility,   10:07AM

11   because we do run a centralized pharmaceutical distribution

12   system at the -- or with Corizon.  So in an effort to remediate

13   these two measures, those contracts and such are entered into

14   and the facilities are utilizing those to provide the needed

15   medication.                                                       10:07AM

16        So I guess the bottom line is with regard to Florence

17   and the other facilities on these measures, as you have

18   suggested with Number 11, the same would be true with Number

19   13.  We think that perhaps more time needs to be in place to

20   see what is happening with these things.                         10:08AM

21        THE COURT:  I guess two questions:  When did these

22   Walgreen contracts become operative, and then when do you

23   expect that we would see a change in the results based upon

24   that?

25        MR. BOJANOWSKI:  May I have a moment, Your Honor?           10:08AM

1              THE COURT:  Surely.

2              MR. BOJANOWSKI:  I have to go through several levels.

3              Your Honor, the contract has been in place for some

4    period of time.  I think the problem was is they just simply

5    weren't utilizing that outside resource and, instead, were          10:09AM

6    using the centralized pharmaceutical distribution system,

7    which, you know, when you put an order in it takes time to get

8    shipped because I think they are shipped by Fed Ex.  Are they

9    shipped by Fed Ex, the meds?  Yes.  The meds are shipped by Fed

10   Ex so you put the order in, it gets shipped, and there's where      10:10AM

11   your --

12             THE COURT:  I guess the import of my question is, I

13   have data which indicates a failure to comply.  You have said

14   that there's now a measure in place that's going to address

15   that.  And I asked, well, when did this new measure become          10:10AM

16   implemented and when can we expect it to be reported in the

17   data, or reflected in the data?

18             MS. KENDRICK:  Your Honor?

19             THE COURT:  Yes.

20             MS. KENDRICK:  This is Corene Kendrick from the Prison     10:10AM

21   Law Office.  I would just like to say a few things in response

22   to what Mr. Bojanowski said.  While your order that was issued

23   came into effect on December 10th, you issued it on November

24   10th.  So defendants were on notice that they were going to

25   have to put in place outside community service providers and be     10:11AM

1    in compliance by December 10th when it was operative.

2            The second thing is that there has been no mention by

3    defendants about the proposal that we put in front of them when

4    we were trying to settle this case and that other correctional

5    healthcare systems do, and that's automatic renewal of          10:11AM

6    medication.  And they have refused to do that, and that's

7    something else that we would like to see in some sort of

8    remedial plan.

9            THE COURT:  So what you are saying is that if it turns

10   out that if we don't see any turnaround, one of the additional   10:11AM

11   tools that you would suggest the Court consider is an automatic

12   renewal so that there is not anything but a presumption for the

13   renewal of the medication that has to be put off as opposed to

14   taking affirmative steps to make it happen.  Is that what you

15   are saying these other places do?                                10:12AM

16       MS. KENDRICK:  Yes, Your Honor, because they require

17   prisoners to submit HNRs saying please refill my medication.

18   And that creates a lot of the time lag and then the centralized

19   pharmacy is in Oklahoma, and so they are scrambling to Fed Ex

20   medication to the prisons in Arizona.  So one thing that our     10:12AM

21   experts have been pointing out since before we settled the case

22   is that it creates a lot of unnecessary delays and smoother and

23   uninterrupted refills would be achieved with an automatic

24   refill system that you see in other correctional health care

25   systems and also just in the community with your local          10:12AM

1    Walgreen's if you had chronic care medication.

2         THE COURT:  Okay.  Thank you.  And let me see if Mr.

3    Bojanowski has been able to come up with an answer to the

4    question.  The question was when we should expect to see the

5    improvement reflected in the data and when the new use of the          10:12AM

6    available resource started.

7         MR. BOJANOWSKI:  Your Honor, our preliminary numbers

8    for December are trending upwards.  We're into the 70s.  From

9    what I'm being told, there apparently is also a new reporting

10   mechanism that Pharmacor and Corizon have come up with.  It's a        10:13AM

11   daily reporting mechanism that became effective in January, and

12   we're hopeful that that will alleviate some of the delay issues

13   that are currently existing.

14        So as I mentioned before, I think Performance Measures

15   11 and 13 are trending upward, and we should probably give it a        10:13AM

16   little more time to see if what, in fact, they have done is

17   going to take hold.

18        THE COURT:  Forgive me, Mr. Bojanowski.  I'm old

19   school.  I asked two questions.  Neither have been answered by

20   what you have just said.  Would you like to take another shot          10:14AM

21   at answering my questions?

22        MR. BOJANOWSKI:  Okay.

23        THE COURT:  Do you want me to restate them?

24        MR. BOJANOWSKI:  Why don't you restate the questions,

25   because maybe I got off track.                                         10:14AM

1          THE COURT:  All right.  The first question was, you

2     told me that this Walgreen's resource had been available but it

3     had not been used.  And then I asked, when did you implement

4     the use of this Walgreen facility?  And then the second

5     question was, when do you expect that the data will reflect          10:14AM

6     this new employment of this resource in terms of showing a

7     better result than what we're presently seeing?

8          MR. BOJANOWSKI:  It was being utilized much more

9     aggressively in January, so we would anticipate that the

10    January numbers -- I always get this messed up, Judge.  January          10:15AM

11    numbers will be reported in March, middle of March.  But we're

12    looking at numbers now for December that have not been yet

13    released and reported.  And I'm indicating to the Court that

14    those preliminary findings right now are trending upward.

15         THE COURT:  Okay.          10:15AM

16         MR. BOJANOWSKI:  So it may be that half a month of,

17    you know, utilizing -- hopefully getting more aggressive on

18    these is bearing some fruit.

19         MR. SPECTER:  Your Honor?

20         THE COURT:  Yes.  Go ahead, Mr. Specter.          10:15AM

21         MR. SPECTER:  Thanks.  You know, Mr. Bojanowski's

22    comments about data indicate the difficulty that we're having

23    when they put out contemporaneous data about the issues.  Our

24    clients, you know, should have been getting the relief that you

25    ordered in December, and it's now February.  And according to          10:16AM

1    Mr. Bojanowski, we're not going to know whether this system for

2    getting, you know, critical medications is, you know, working

3    properly four months later.

4         So I think we have a structural problem here with the

5    data, especially since we have these representations from the                    10:16AM

6    defendant at every hearing that the numbers are trending upward

7    and we don't have access to any of those numbers.  So that's

8    the first thing.

9         The second thing, which is a little more narrowly

10   defined, is Mr. Bojanowski never answered your first question,                    10:16AM

11   which was when the contracts are were signed with Walgreen's.

12        THE COURT:  As I understood the entire context was

13   that he said that this was an available resource that was not

14   used and then it was aggressively used starting in January of

15   this year.                                                                        10:17AM

16        MR. SPECTER:  Yes.  Right.  But he didn't say when

17   they signed the contracts with Walgreen's.

18        THE COURT:  No, he didn't.  But it seemed to me that

19   that was less important as he explained to me that the contract

20   may have been in existence but it wasn't turned to for the                        10:17AM

21   filling of prescriptions.  So it's less important to me about,

22   I guess, when the contract existed as to when they started

23   using it because it seems to fit within the rubric of the

24   remediation plan that I had ordered, and that is that you would

25   turn to outside providers if you couldn't do it in house.                         10:17AM

1          And so it seems like it fits within that, but we'll

2    have -- your point about the delay is one that I have addressed

3    previously in these in these hearings.  And as you probably

4    recall, after working through it with defendants' counsel and

5    the steps that are necessary for their monitoring and auditing          10:18AM

6    and review process, it seemed that there was just nothing I

7    could do to accelerate it.  I was frustrated by that very much

8    as you perhaps recall, but I also concluded that there was

9    nothing I could do more than what I was doing to try to

10   accelerate the process.  When there were critical decisions          10:18AM

11   that needed to be made I did ask that the preliminary data be

12   shared with the Court and with the plaintiffs.  But I think

13   going forward on this performance measure, and considering how

14   we can best proceed, it does make sense to understand the harsh

15   reality that there was nothing, or is nothing, to be done to          10:19AM

16   try to accelerate this frustrating delay, this impediment to

17   having real time information.

18          Is there anything else that plaintiffs wanted to say

19   about Performance Measure 14?  It looks to me like 14 were

20   okay.          10:19AM

21          MS. KENDRICK:  No, Your Honor.

22          MR. BOJANOWSKI:  Judge, if we're in compliance on a

23   performance measure, can we get it terminated from the Court's

24   consideration?

25          THE COURT:  Only pursuant to the stipulation.  So          10:19AM

```
 1    there's two standards that have to be satisfied.  You have to

 2    have the consecutive month satisfaction and also 18 of 24

 3    months, isn't it, as I recall?

 4              MR. BOJANOWSKI:  18 of 24, right.

 5              THE COURT:  Yeah.                                    10:19AM

 6              MR. BOJANOWSKI:  But at that point -- all right.  I

 7    understand.

 8              THE COURT:  The stipulation provides for that method.

 9              MR. BOJANOWSKI:  Okay.

10              THE COURT:  Turning to 37, I gather 37 is one in which 10:19AM

11    the defendants believe that their open clinic practice will,

12    perhaps, produce improvements in these situations that are

13    present at Eyman and at Lewis and at Yuma.  Is that correct,

14    Mr. Bojanowski?  Am I right about that?

15              MR. BOJANOWSKI:  That's correct, Your Honor.        10:20AM

16              THE COURT:  And again, when can we -- well, let me ask

17    you:  Do you have a heads up about the preliminary data?  Are

18    you seeing anything yet?

19              MR. BOJANOWSKI:  We implemented this open clinic

20    system on December 10th, I believe.  It was middle of December. 10:20AM

21    So because of your order, we had to structure a systemwide

22    change, and so that took some time to get into place, do the

23    training, whatever.  And then it finally kicked off on December

24    10th.

25              So, again, our true -- I know this is frustrating.  10:20AM
```

```
1    Our true data is going to be the full month of January.  But we
2    were showing some preliminary data in December where Mr. Pratt
3    was receiving information from the facility showing that there
4    was no backlog associated with the HNR situation.  So we
5    developed a tool, so to speak, to try and get a little bit more    10:21AM
6    contemporaneous data so we could tell whether this measure was
7    being met.  And so far, from what I'm hearing from Mr. Pratt,
8    it seems to be working well, but the numbers may not actually
9    get into your hands until we get that full month of January
10   data in.  But preliminary reporting out in the field looked    10:21AM
11   pretty good.
12             THE COURT:  And --
13             MS. KENDRICK:  Your Honor?
14             THE COURT:  Go ahead.  I was going to turn to
15   plaintiffs, because you previously had reported some concerns    10:22AM
16   having contact with your clients about whether or not this new
17   mechanism was likely to impose an invalidity in the data
18   collected.  Because what would happen if somebody hadn't been
19   able to make the open clinic then they would not be counted as
20   having not receiving the benefit that this performance measure    10:22AM
21   was designed to ascertain being delivered or not.
22             But go ahead.
23             MS. KENDRICK:  Thank you, Your Honor.  Just as a
24   preliminary matter, Mr. Bojanowski is alluding to
25   contemporaneous data that defendants have and he assures the    10:22AM
```

```
 1    Court that they are showing that they are in compliance.  And I
 2    would just want to note that they have not provided any of this
 3    contemporaneous data to us and as far as we can tell, either,
 4    to you.  And so if he goes on to say but wait until March when
 5    the January data comes out, we would ask that all the                    10:23AM
 6    contemporaneous data that is right now at their fingertips be
 7    provided to the parties so that we can take a look at it and
 8    analyze it.  Because it's very hard for us to contest that when
 9    we don't have access to the same information that he's
10    representing to the Court.                                               10:23AM
11            So as a result, what we have to rely upon is what our
12    clients have told us, and that is the case that some of them
13    have said and said at the Lewis tour and --
14            MR. BOJANOWSKI:  We can make a production, Your Honor.
15            THE COURT:  When would you be able to do that?                   10:23AM
16            MR. BOJANOWSKI:  Could I get seven days?
17            THE COURT:  Yes.
18            But let me make an inquiry as to those on the phone,
19    Ms. Kendrick, are you still there?
20            MS. KENDRICK:  Yes.  I'm still here.                             10:24AM
21            THE COURT:  And who was speaking last?
22            MS. KENDRICK:  That was me.
23            THE COURT:  All right.  So you stopped mid-word and
24    we -- I can tell you what the last word was, perhaps:  "So as a
25    result what we have to rely upon is what our clients told us,            10:24AM
```

UNITED STATES DISTRICT COURT

```
 1    and that is the case that some of them have said at the Lewis

 2    tour."  And that's where we lost you.

 3              MS. KENDRICK:  Okay.  I apologize.  I don't know what

 4    happened.  What I was going on to say is that my co-counsel

 5    Kirsten Eidenbach, who is in the courtroom with you, was just      10:25AM

 6    at Safford prison earlier this week and Eyman prison this week,

 7    so she would be able to report what our clients were saying

 8    regarding the open clinic concept at least at Eyman.  I don't

 9    think it's in effect at Safford.

10              But with regard to this issue of this contemporaneous    10:25AM

11    data, we would ask that either defendants --

12              THE COURT:  Hold on just a second.  I guess when you

13    were lost to us, maybe we were lost to you.  And that is that

14    Mr. Bojanowski said that in a week's time he will give you all

15    the data that they presently have.                                 10:25AM

16              MS. KENDRICK:  Okay.  That's great, but we would just

17    ask in the future when they are at hearings alluding to

18    contemporaneous data that we don't have access to that they

19    provide it to the Court and to us before the hearing, because

20    our hands are tied otherwise.  And it's really hard when they      10:25AM

21    are making reference to this data and we can't see it.

22              So thank you for ordering him to do that, but we would

23    just ask in the future, at future hearings, that they refrain

24    from referring to preliminary data unless they plan on

25    providing it to us beforehand.                                     10:26AM
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Mr. Bojanowski.

 2              MR. BOJANOWSKI:  An issue has been raised over here on

 3   our side about some attorney/client privileged documentation.

 4   I'm going to have to square that up with them so I can figure

 5   out what's going on as far as production of data.                10:26AM

 6              THE COURT:  How does the privilege apply to anything

 7   that is associated with the data collection?

 8              MR. BOJANOWSKI:  I'm not sure.  I haven't had an

 9   opportunity to talk to them.  It was just raised as an issue.

10   So if I can have a moment.                                        10:26AM

11              THE COURT:  Surely.  Take a moment.  Yeah.

12              MR. BOJANOWSKI:  I think we have cleared the issue up,

13   and we'll take the position that we'll gather the documents and

14   try to get those produced within seven days.

15              THE COURT:  All right.  And you will also provide that  10:28AM

16   information to the Court as well as to the plaintiffs?

17              MR. BOJANOWSKI:  Sure.

18              THE COURT:  Thank you very much.

19              MR. SPECTER:  Your Honor?

20              THE COURT:  Yes, Mr. Specter.                          10:28AM

21              MR. SPECTER:  What about Ms. Kendrick's point that in

22   the future they provide this information to us before the

23   hearing or that they refrain from talking about it?  It doesn't

24   seem fair -- or to provide the Court with accurate and reliable

25   information.                                                      10:28AM
```

1        THE COURT:  The problem is based upon my recollection

2   of the last time that you raised this issue and that I followed

3   up on it at a hearing with defense counsel was that I learned

4   that there were, depending upon what point of the month that

5   you were in for the hearing, there were different capabilities        10:28AM

6   that the defendants would have with respect to producing the

7   data faster.  I don't want to cut off the opportunity for

8   counsel to make good faith representations to me about what

9   they are seeing, but I think they should also do what Mr.

10  Bojanowski has done here, and that is if we are at a point in         10:29AM

11  the month where the data can be produced on an accelerated

12  basis, that will be helpful for everyone to have it.

13        So I have got a balancing that I need to effect.  If I

14  create a bright line rule, I think I will choke off the

15  opportunity for the defendants to offer the data when they have       10:29AM

16  it.  At the same time, I also am sensitive to the issue that

17  you raise, and that is representations of counsel on the day of

18  the hearing are troubling for two reasons:  One, it gives you

19  no ability to be prepared for it and to respond in an

20  appropriate manner; and also there's a real difficulty with          10:30AM

21  respect to relying upon counsel's representations because it is

22  no surprise to everybody in this case that it's complicated.

23  And so the possibility for someone to be thinking that they are

24  making an accurate, good faith representation to the Court as a

25  lawyer can be completely undercut by the fact that the               10:30AM

```
 1   complication, the multitude of issues, the fact that there are
 2   numerous counsel involved on both sides, can infect that
 3   representation in a way such that -- the representation that's
 4   made in the Court that it's wrong.
 5        And so there is a preference, obviously, to have
 6   information come to the Court in the standard way that it is
 7   usually tendered, and that is in advance and in writing so that
 8   people can see that the plaintiffs have been repeatedly
 9   encouraging me to make sure that it even has the further test
10   of rectitude, and that is that it be an avowal.  And we're
11   seeing more of that in the case naturally, I think.  Both sides
12   are doing that.
13        But I take this time to talk to you at length about my
14   analysis, because I don't think there's a simple answer.  I
15   think there's a danger, Mr. Specter, of employing your simple
16   remedy, and I am hesitant to do it in light of what I learned
17   at the previous hearing about the various issues associated
18   with assembling the data and at the same time not really
19   wanting to cut off the opportunity to let me have more real
20   time information.  Because if the lawyer knows that the hidden
21   data is suggesting that what we're doing is not appropriate,
22   that will come to light later on in a way that will cause a
23   lawyer to want to let me know either things are going well or
24   things are not going well.  And I want to encourage that.
25        So for now, Mr. Specter, I will decline the
```

10:30AM
10:31AM
10:31AM
10:31AM
10:32AM

1    plaintiffs' request to do what you asked me to do.

2            Turning next to Performance Measure 39, which is that

3    the routine provider referrals will be addressed by a medical

4    provider and referrals requiring a scheduled provider,

5    appointments will be seen within 14 calendar days of the                10:32AM

6    referral.  As I look at the data, we continue to have a grave

7    problem with Eyman, and the others not so grave, but certainly

8    Florence and Tucson not compliant presently.

9            So, Mr. Bojanowski, what about the status of Eyman on

10   this performance measure?                                                 10:32AM

11           MR. BOJANOWSKI:  On Number 39, Your Honor?

12           THE COURT:  Yes.

13           MR. BOJANOWSKI:  Okay.  I'm showing trending upward on

14   this one.  Corrective action has been taken.

15           THE COURT:  I don't know.  Do you really want to say          10:33AM

16   that 39 for Eyman is a trend upward to go from 54 to 58 when we

17   have a previous history of 79, 60, and 59?

18           MR. BOJANOWSKI:  It's part of the open clinic concept,

19   so the issues associated with the turnaround time, we think,

20   are being impacted by having the HNR seen within 24 hours.  So        10:33AM

21   what we're doing, it appears as though what we found out is

22   three nurses were identified as not doing the referrals to the

23   provider appropriately.  That's why we were having trouble with

24   that particular measure.  Those three nurses were retrained and

25   placed on a performance improvement plan.                                 10:34AM

```
 1              THE COURT:  This is at Eyman?

 2              MR. BOJANOWSKI:  This is at Eyman.  The reason why you

 3    have a problem --

 4              THE COURT:  When did this arise, this problem with the

 5    three nurses?  When did you identify that and when did you          10:34AM

 6    impose the training program for them?

 7              MR. BOJANOWSKI:  When was that?  It was identified

 8    this week.

 9              THE COURT:  Oh.

10              MR. BOJANOWSKI:  Because they were getting the           10:34AM

11    preliminary numbers in, and it was showing that there was still

12    difficulty meeting that measure.  So Corizon went in and

13    investigated and found that that was what the issue was, was

14    they just weren't scheduling these guys appropriately.

15              So what they are doing now is because you have a        10:35AM

16    14-day window in which to get these guys seen, they are now

17    scheduling them within seven days so that if there's a, say, an

18    ICS or a problem or somebody is sick, or you know, a provider

19    doesn't show up on a particular day there's enough lead time

20    now to get them within the 14-day window.                        10:35AM

21              So that's kind of what we're looking at.  And as I

22    indicated to the Court, my preliminary numbers at Eyman for

23    December are going up.  So you know --

24              THE COURT:  Well, but that wouldn't really be matching

25    our issue here, because you have just identified a problem that  10:35AM
```

```
 1    you have only fixed just this week.
 2              MR. BOJANOWSKI:  Correct.
 3              THE COURT:  So that doesn't seem particularly helpful.
 4              MR. BOJANOWSKI:  They may not have been doing it in
 5    the past, and that's why it was -- you see, and then when you       10:35AM
 6    identify and fix the issue then going forward you are going to
 7    have improvement.
 8              THE COURT:  So you say that -- I mean, are you in a
 9    position to say what the percentage number is for December?  We
10    have November at 58.  You say there's a trend of --               10:36AM
11              MR. BOJANOWSKI:  My preliminary number is 68.
12              THE COURT:  Okay.  All right.  Anything plaintiffs
13    want to say on this performance measure?
14              MS. KENDRICK:  Oh, yes, Your Honor.  First of all,
15    going from 58 to 68 percent, while that's an increase, is still   10:36AM
16    substantially non-compliant.  Plaintiffs' position on this is
17    that the open clinic concept is not going to do anything to
18    increase the timeliness for providers to see patients within 14
19    days and according -- and we believe that it's based on a lack
20    of staffing.  According to the monthly staffing report that       10:36AM
21    defendants provided to us for Eyman for November, which they
22    Bates stamped ADCM 750755, it shows that they have zero percent
23    filled for medical director positions.  They don't have a
24    Director of Nursing.  They don't have an RN Supervisor II.
25    They have 1.8 out of three nurse practitioner positions filled    10:37AM
```

1    and those are primary care physicians.  So those are -- I mean,

2    nurse practitioners are considered providers, excuse me.

3            Also, they only have 67 percent staffing for their RNs

4    and 70 percent staffing for their LPNs.  So we believe that

5    this open clinic concept, while it might have helped with the          10:37AM

6    HNR issue with Performance Measure 37 did nothing to address

7    the problem with Performance Measure 39, and that they do need

8    to increase their staffing level of providers and nursing staff

9    to get into compliance with this performance measure not only

10   at Eyman but also at Florence and Tucson and the other                  10:37AM

11   institutions where they have been found previously

12   non-compliant.

13           THE COURT:  Well, it certainly does make sense what

14   you say with respect to whether or not open clinic will work

15   where it is the obligation of the treater to approach and              10:38AM

16   address a need of the patient.  The open clinic seems to be

17   something that provides for the patient to initiate the

18   process.  And so I do think that that does make sense, what you

19   say.

20           But we'll wait and see whether or not this correction          10:38AM

21   that's been identified with respect to the three errant nursing

22   practices of the errant nurses has any correction on this.  And

23   we'll continue to be, obviously, sensitive to what you are

24   getting on the street, so to speak, with respect to the

25   workability of the open clinic approach.                               10:39AM

1          MS. KENDRICK:  Well, Your Honor, we would just add

2     that even if this truly was all the fault of three errant

3     nurses that Eyman has five separate facilities, and each

4     facility medical records are reviewed for a total of 50.  So it

5     seems a little unbelievable that somehow doing corrective                    10:39AM

6     training for three nurses is going to make 58 percent move into

7     80 percent.

8          And so again, we would just reiterate our position

9     that we not wait any longer because your order was issued on

10     November 10th and they have been on notice since November 10th            10:39AM

11     that they need to come into compliance.

12          THE COURT:  Well, again, your point makes sense with

13     respect to the multiple units at Eyman.  And presumably, the

14     inmates in the multiple units are seen by different staffing

15     components.  So, again, it does seem to make sense.  You seem            10:39AM

16     to be laying a foundation for a serious concern about this,

17     that the increase to 68 percent is worrisome.  But because this

18     has been announced as a recent problem and because it appears

19     that Corizon has been taking some action, they have actually,

20     as represented by counsel, they have identified a problem and            10:40AM

21     sought to redress it.  My hope is that that will be reflected

22     in the Eyman numbers generally, a greater scrutiny of

23     compliance with this performance measure.

24          MS. KENDRICK:  Well, we would just note for the

25     record, Your Honor, that you actually found them compliant on            10:40AM

1    this measure on May 20th while your community services order

2    went into effect in November.  They have been non-compliant

3    since May, and we issued a notice of non-compliance on this

4    performance measure in 2015.  So they have had plenty of time

5    to focus on this and come into compliance versus training three    10:41AM

6    people last week.

7            THE COURT:  Fair point.

8            The next performance measure implicates an issue about

9    whether it -- 46 and 47 implicate an issue about the

10   workability of my mechanism of outside providers with respect    10:41AM

11   to these two performance measures.  The difficulty is that

12   the -- well, I probably should start by making sure that

13   everybody is on the same page.

14           What I'm focused on is in 46, and in 47, it is the

15   fact that a medical provider will review the diagnostic report    10:41AM

16   and act upon reports with abnormal values within five calendar

17   days of receiving the report at the prison.  And then 47,

18   medical provider will communicate the results of the diagnostic

19   study to the inmate upon request and within seven calendar days

20   of the date of the request.                                       10:42AM

21           And what is problematic here is that my outside

22   provider method seems to interpose a medical provider that,

23   perhaps, would be someone who could satisfy the requirements of

24   46 or 47 but would not necessarily make good medical sense

25   because you would want to have the medical provider who is        10:42AM

1    providing this review and this communication and acting upon it

2    being the person's supervisor of care.  And I guess there is

3    the worry that the Court has that the -- if the defendants turn

4    to outside providers they could satisfy these performance

5    measures but in a way that would not be to the betterment of          10:42AM

6    the health of the plaintiffs' class.

7         So I wanted to, in the first instance, embracing and

8    understanding what the spreadsheet shows is a very serious

9    failure to comply with these two performance measures, a worry

10   that the method that the Court has imposed may not be workable     10:43AM

11   upon deeper thought.  And so I will turn to plaintiffs to see

12   if they have anything that they can suggest with respect to an

13   alternative method other than hiring new staff.

14        MS. KENDRICK:  Yes, Your Honor.  We are concerned

15   about this.  I mean, again, we do believe that part of it is      10:43AM

16   that there are not enough -- just not enough providers to

17   review the reports, you know.  They could also hire what they

18   call locum tenens who are temporary contracted providers to

19   come in and assist and help them with this backlog.

20        The other issue, I think, is that with the reports and    10:44AM

21   getting the reports, when our expert, Dr. Wilcox, went to

22   Tucson prison with us in December of 2015 and spoke with the

23   medical director there, she talked about the fact that every

24   time a provider report comes in, she just gets an e-mail.  And

25   she opened up her e-mail, and there was thousands of unread        10:44AM

```
 1    messages.  And so we think that this would be something where
 2    defendants would need to work with Corizon and our experts to
 3    figure out different processes and methodologies to make it a
 4    smoother process when these diagnostic reports come in how is
 5    the provider notified so that she or he knows to review it and    10:44AM
 6    then what processes are in place to send the results to the
 7    inmate.
 8              THE COURT:  Well, I would like to embrace that idea
 9    that the plaintiffs' experts and the experts on the defendants'
10    side, perhaps the people on the floor, get together and try to    10:45AM
11    identify a mechanism for addressing the failures in 46 and 47.
12    Mr. Bojanowski, can you make that happen?
13              MR. BOJANOWSKI:  May I have a moment?
14              THE COURT:  Yes.
15              MR. BOJANOWSKI:  Your Honor.                             10:45AM
16              THE COURT:  Yes.
17              MR. BOJANOWSKI:  Currently, Corizon is working on an
18    automated response system to communicate test results and such
19    to the inmates.  But frankly, if plaintiffs want to send us a
20    suggested protocol or solution, I'm certainly willing to look     10:46AM
21    at it, get it off to Corizon, see if it's something that is
22    workable within the system and try and get this measure up.  So
23    I'm open to having a communique from the plaintiffs if that's
24    what they want to do.
25              THE COURT:  How would the communication to the inmates  10:46AM
```

1  work electronically?

2        MR. BOJANOWSKI:  What we're trying to develop is a

3  method by which we can print directly from eOMIS a communique

4  that is then sent to the inmate, okay.  So it would be a piece

5  of paper, essentially, that would go directly to the inmate          10:47AM

6  with his lab results in it, if I understand it correctly.  Is

7  that the way it's works?

8        It would let the inmate know an indication of the

9  result; normal, abnormal.

10       THE COURT:  But that doesn't address 46.                       10:47AM

11       MR. BOJANOWSKI:  I'm sorry, Judge.  I was talking

12  about 47.

13       THE COURT:  All right.

14       MR. BOJANOWSKI:  As far as the communique is concerned

15  what I was suggesting for 46 is that if the plaintiffs want to      10:47AM

16  send us information, a protocol, something that they have seen

17  in other systems that is being used successfully with regard to

18  this measure, then I would get that over to Corizon and see if

19  it could be implemented or whatever to try and get this to

20  work.                                                              10:47AM

21       THE COURT:  Why wouldn't it make sense to have at

22  least a telephonic conference between the Corizon people and

23  anybody else on your side that you wanted to be involved and

24  the plaintiffs' counsel and their expert to discuss the

25  mechanism of trying to accomplish the difficult task of 46,        10:48AM

```
 1   which I say is difficult, because the numbers are so poor,

 2   obviously.  You are just not --

 3         MR. BOJANOWSKI:  Right.  We would have no problem with

 4   a telephone conference being set up.

 5         THE COURT:  Yeah.  What do plaintiffs think about that    10:48AM

 6   methodology of trying to address the problem?

 7         MS. KENDRICK:  Your Honor, we would be very happy to

 8   have a phone conference between Corizon and their experts or a

 9   series of them or in-person meeting.  We think that to the

10   extent we can really try to work collaboratively, that would be  10:48AM

11   more positive and get quicker results for our clients.  We had

12   no idea that any of this was being worked on by Corizon or by

13   the defendants.  So, again, it's hard for us to comment upon

14   what they may or may not be planning at this point.

15         But to the extent we can work collaboratively and       10:49AM

16   actually have real conversations, I'm not inclined to just

17   write a letter with what our expert, Dr. Wilcox, suggests

18   because I think it's more important to have the experts speak

19   to each other and, to the extent possible, have the attorneys

20   step back and get out of the way of the people who know how to  10:49AM

21   provide the medical care.

22         MR. BOJANOWSKI:  Corene, my office will set up a

23   telephone conference, okay.

24         THE COURT:  And you will get this accomplished within

25   21 days.  Is that okay?                                        10:49AM
```

```
 1              MR. BOJANOWSKI:  That would be fine, Judge.

 2              THE COURT:  Let me just take a moment.  I recall from

 3       the settlement discussions that the plaintiffs' counsel really

 4       were emphatic in their desire to move to a settlement context

 5       that could match what they viewed as a favorable side of their        10:49AM

 6       California experience.  And I don't know whether the favorable

 7       side has continued.  But what they reported to me was an

 8       ability to obviate a number of acute issues by sitting down and

 9       working toward a mechanism that would be the product of each

10       side bringing their respective positions and their respective        10:50AM

11       knowledge about how to solve problems.  There was not, at least

12       reported to me then, the feared outcome of working together

13       that people somehow would be forfeiting legal positions or

14       ending up in a worse situation.

15              And that workable relationship is one that I would           10:50AM

16       like to replicate here, obviously, because we have a

17       settlement.  So you both came to an agreement that defined how

18       you thought you should proceed into the future, and you also

19       each have respective interests that are, at some points,

20       completely aligned.  The provision of healthcare is a              10:51AM

21       responsibility of the State.  The plaintiffs' counsel brought

22       the lawsuit because they thought the State wasn't meeting its

23       responsibilities.  And to the point where those interests

24       aligned in the settlement, it's certainly clear that the State

25       understands that it has an obligation to address the health        10:51AM
```

```
1    care needs of its inmate population and it also had other

2    reasons of thinking why it is that it makes sense to make for

3    the best care provided just to avoid the potential downside of

4    further liability and individual cases.

5            But in any event, a lot of fear still seems to exist          10:52AM

6    between the parties here on trying to work together, and I

7    think part of that is fear that was present at the beginning.

8    Part of it is also because each side thinks there's been some

9    disingenuous actions on the other side.  And I guess if I can,

10   by my role here, do anything to further the ability of people       10:52AM

11   to, in good faith, sit down and try to solve a common problem,

12   I would want to do that.

13           And so I make this little speech again to try to

14   encourage you to do what I have just said, but also to be

15   mindful that if you think that there's something that I can do      10:52AM

16   further to facilitate that kind of climate, I think that

17   it's -- I'm inviting you to do it.

18           Okay.  Turning to 54, looks to me like we don't need

19   to say much here.  Same thing with 66.  But I will give

20   plaintiffs a chance to say anything to the contrary.                10:53AM

21           MS. KENDRICK:  Sorry.  I had it on mute, Your Honor.

22           THE COURT:  That's all right.

23           MS. KENDRICK:  So I guess what there is to say is that

24   it does look like, from their data, that they are improving.

25   We would note that Eyman is still kind of hit or miss, and it       10:53AM
```

```
 1   looks like one month they get above 80 percent and then the
 2   next month they drop down.  So again, we would just say, you
 3   know, what problems we pointed out earlier with regard to Eyman
 4   prison may be impacting this one because, again having this
 5   open clinic isn't really going to have an impact on how
 6   frequently a provider sees a chronic care patient.
 7           THE COURT:  All right.  And the reason that I'm not
 8   going to focus on Eyman at this stage is that the last four
 9   months -- well, I guess I could certainly ask the question, do
10   we have a heads up on December on Performance Measure 54?
11           MR. BOJANOWSKI:  It appears to be trending about the
12   same as it is.
13           THE COURT:  74?
14           MR. BOJANOWSKI:  Yeah, 74 -- well, it may trend
15   actually down to 72, which is problematic.
16           THE COURT:  That's not good.
17           MR. BOJANOWSKI:  So we think that -- well, I haven't
18   discussed this particular measure with Corizon yet, Judge.  But
19   I know that in the past what we've done is we have utilized
20   some staff from Florence over to Eyman to try and make sure
21   that this is taken care of.  I would anticipate that that's
22   what will occur here.
23           THE COURT:  All right.  Well, take -- the fact that we
24   have this, I mean, I was giving you a pass because I really was
25   hopeful that there was a reason to think that we would return
```

10:54AM
10:54AM
10:54AM
10:54AM
10:55AM

1    to the compliance level.  But now that we have dropped off

2    again, it is worthy of additional focus, as you say.

3              MR. BOJANOWSKI:  We're going to concentrate and look

4    and see if there's some under lying problem, because there is

5    that -- it does look like it's going to go down by two          10:55AM

6    percentage points so we're going to look at that.

7              THE COURT:  All right.  The Performance Measure 80

8    that the MH-3A prisoners shall be seen a minimum every 30 days

9    by a mental health clinician, the data is suspect because it

10   incorporates a now-impermissible definition of "seen."  So I    10:55AM

11   guess I need to ask the defendants when would we expect to see

12   numbers that would accurately report where we stand on this

13   performance measure?

14             MR. BOJANOWSKI:  The December numbers will reflect

15   that, Judge.                                                     10:56AM

16             THE COURT:  And what are we seeing now?

17             MR. BOJANOWSKI:  Pardon me?

18             THE COURT:  What does December preliminarily show?

19             MR. BOJANOWSKI:  They are all passing.  We have

20   preliminarily for Lewis, a 97; Perryville at 97; Tucson has     10:56AM

21   increased to 96.  Are those all the facilities?  So those are

22   my preliminary numbers, Your Honor.

23             THE COURT:  If that's right, that's, of course, very

24   welcome news.  Anything plaintiffs want to say about that?

25             MS. FETTIG:  Your Honor, this is Amy Fettig.  We, of  10:56AM

course, have not seen this underlying data.  That sounds like a

hopeful upswing, but we're going to reserve comment until we

have actually seen the data and been able to analyze it.

THE COURT:  Fair enough.

With respect to 85, you need to hear from me on

whether or not the -- well, let me -- this is also another

"seen" one but turns on the question of what happens as we have

addressed before if no follow-up occurred but should have.  So

my ruling on that will be if there is no follow-up, or rather

we'll add the sentence to the performance measure, quote, "If

no follow-up occurred but should have, then it is coded as

non-compliant."

And again, we'll see what the data produces when that

definition is imported into the evaluation of that performance

measure.  Is there anything anybody wanted to say about that

performance measure on the record?

All right.  92 seems to be holding and seems to be not

requiring at this moment any further comment but I will turn to

plaintiffs to see if I'm missing something there.

MS. FETTIG:  No, Your Honor.  We are, of course,

watching this measure carefully and looking forward to some

additional data from the defendants.

THE COURT:  And is the same true for 93 from your

perspective?

MS. FETTIG:  That's correct.

1          THE COURT:  94, you have asked me to decide, or you

2     presented the issue in defendants' notice regarding the agenda

3     for the hearing.  I don't have an objection, and I will give

4     plaintiffs a chance to address this, but I don't have an

5     objection to defendants selecting a number greater than the          10:58AM

6     minimum.  I just would say that if you are going to do it, you

7     can't do it -- change it every month.  If you adopt -- you

8     different numbers for different units, but if you are going to

9     adopt a number, continue to use that same number unless you

10     provide prior notice to the plaintiffs explaining that you are          10:59AM

11     going to do that and why you think it's appropriate to take a

12     different step.  That would increase everybody's faith, I

13     think, in the reporting process.  But having now heard my

14     preliminary view on 94, I will turn to plaintiffs' counsel to

15     see whether they have any objection to me adopting the          10:59AM

16     defendants' proposal as, perhaps, tweaked a bit by what I just

17     said.

18          MS. FETTIG:  Yes, Your Honor.  This is Amy Fettig

19     again.

20          With regard to PM 94 we do not have a problem with it.          10:59AM

21     The only two issues we would raise is that we are concerned

22     that the sample size not actually dip below that set forth in

23     the stipulation, which is 20 for Eyman and 10 for all the other

24     facilities.  And as you noted, if defendants are going to

25     change their methodology here, we would appreciate 30 days          11:00AM

```
 1   advance notice so this can be -- we can explore it, we can ask
 2   questions and, if necessary, we can address this issue with the
 3   Court.
 4            THE COURT:  All right.  Well, I will adopt your 30-day
 5   advance notice procedure.                                          11:00AM
 6            Okay.  98, did the defendants provide the status
 7   report this week that you said you would?  Did that happen, Mr.
 8   Bojanowski?
 9            MR. BOJANOWSKI:  Your Honor, I'm not quite sure what
10   you are referring to.                                              11:00AM
11            THE COURT:  Okay.  I'm going to your proposed agenda
12   and for 98 on Page 2.
13            MR. BOJANOWSKI:  Oh.  I see what you are saying.
14            THE COURT:  You said that you had prepared a new
15   version of the monitor guide that incorporates proposed          11:01AM
16   language.
17            MR. BOJANOWSKI:  Correct, Your Honor.  That has not
18   yet been sent to the plaintiffs.  We have drafted the language.
19   It's now being reviewed by the clients for approval.  And when
20   do you think we will have that?  We will have that to them by     11:01AM
21   end of the week.
22            THE COURT:  Let's set some deadlines, then, about how
23   we get to the final version of the performance manual.  So by
24   the end of this week you will send off your, what you believe,
25   to be the final version that incorporates all of the comments.    11:01AM
```

UNITED STATES DISTRICT COURT

1    I then need to cast the Court's imprimatur on that but

2    I also, I think, need to build into it any last opportunity for

3    the plaintiffs to respond to what's been said.  And there may

4    be one or two, or hopefully no more than that, issues that need

5    to actually be decided by the Court.                          11:01AM

6        So I will turn to plaintiffs to see what timing

7    mechanism they would like to employ toward getting to the point

8    of the final version.

9        MS. KENDRICK:  Your Honor, this is Corene Kendrick.  I

10   think that if the defendants provide us what they consider     11:02AM

11   their final version on Friday the 10th we could get comments

12   back to them within one week and hopefully have a discussion

13   the following week and be queued up for the next status

14   conference with you in March to hopefully say that we are in

15   agreement with everything, but if we're not to bring to you any 11:02AM

16   last outstanding issues.

17       THE COURT:  So you are thinking on March 8th we add

18   this to the final approval of the monitoring manual?

19       MS. KENDRICK:  Yes, Your Honor.

20       THE COURT:  And let me also, while we're talking about  11:02AM

21   the monitoring manual, address what plaintiffs raised about the

22   mechanism for amending it.  You seek to employ the mechanism

23   that involves an ADR component.  I'm not so convinced that's an

24   appropriate way to proceed, not only because we are employing

25   the services happily offered by Judge Bade, but I don't see a   11:03AM

UNITED STATES DISTRICT COURT

```
 1    purpose of asking her to get engaged in the monitoring manual

 2    when I have been, myself, thoroughly engaged in that issue.  So

 3    my proposal would be that if a party wishes to modify the

 4    monitoring manual that it file a motion with the Court to

 5    modify it.  We have a response and reply, and then I rule.  But      11:03AM

 6    I will give you both a chance to say why you think that's not

 7    the best way to proceed.

 8          Plaintiffs.

 9          MS. KENDRICK:  Your Honor, this is Corene Kendrick.

10    That's fine with us, just making sure there's time for us to        11:03AM

11    comment and that changes are not put into place until you have

12    had a chance to review and rule on them.

13          THE COURT:  I think I have made that clear previously

14    that once we decide on a final version it can't be unilaterally

15    changed.                                                             11:04AM

16          Okay.  And Mr. Bojanowski is conferring.  And when

17    he's done, we'll hear from the defendants.

18          MR. BOJANOWSKI:  May I have a moment, Your Honor?

19          THE COURT:  Surely.

20          MR. BOJANOWSKI:  Your Honor, we would suggest a               11:04AM

21    preliminary meet-and-confer prior to the filing of a motion in

22    an effort to maybe resolve the issue before formal motion

23    practice.  We have worked many, many hours on the manual with

24    the plaintiffs, and so it's not unusual for us to have a

25    conversation with them.  And I suggest that maybe we do that       11:04AM
```

```
 1    prior to actually filing a motion.
 2            THE COURT:  All right.  I'm not opposed to that, as
 3    you can imagine.  So the procedure for modifying the monitoring
 4    manual will be that if a party wishes to modify the monitoring
 5    manual, it shall meet and confer in the first instance with the     11:05AM
 6    opposing party and to present and to discuss the proposed
 7    modification.  If they are able to agree on a proposed
 8    modification they will file a joint motion with the Court
 9    requesting that the monitoring manual be modified in the way
10    that they have agreed.  If they are unable to agree, then the       11:05AM
11    side wishing to modify the manual will file a motion and we
12    will proceed as I have previously said.
13            Okay.  Thank you.  So now I have worked through the
14    performance measures and I need to --
15            MS. FETTIG:  Your Honor?                                    11:05AM
16            THE COURT:  Yes.  Go ahead.
17            MS. FETTIG:  This is Amy Fettig.  I'm sorry.  I wanted
18    to step back to Performance Measure Number 98.
19            THE COURT:  Okay.
20            MS. FETTIG:  There was some confusion created by           11:05AM
21    defendants' filing on the bottom of Page 2 at Line 27 and
22    onward.  When we read what they discussed for Performance
23    Measure 98 we're concerned they are actually talking about
24    Performance Measure 91 which deals with mental health by
25    prisoners who are actively psychotic.  We don't have a problem      11:06AM
```

1    with them monitoring all MH-5s on continuous watch under the

2    terms of Performance 98 rather than Performance Measure Number

3    91, but currently the monitoring guide does not actually say

4    that.

5              THE COURT:  Okay.  I didn't catch that the title was      11:06AM

6    perhaps not linked with the text.

7              So Mr. Bojanowski, did you follow what the issue was

8    here?

9              MR. BOJANOWSKI:  No.

10             THE COURT:  Could you restate what the issue is,        11:06AM

11   please?

12             MS. FETTIG:  Sure.  Sorry for the confusion there.

13             So when we read the discussion of Performance Number

14   98 at the bottom of Page 2 on defendants' filing, starting at

15   Line 27, it discusses MH-5 prisoners, and we were concerned      11:06AM

16   that maybe you were actually talking about Performance Measure

17   Number 91 which actually deals with MH-5 prisoners.

18             MR. BOJANOWSKI:  It is Performance Measure 91.  It's a

19   typo.

20             MS. FETTIG:  Okay.                                      11:07AM

21             MR. BOJANOWSKI:  On Line 26.  It should be PM 91, not

22   98.

23             THE COURT:  All right.  Thank you.

24             MS. FETTIG:  Thank you for that.

25             THE COURT:  Thank you.                                  11:07AM

1          All right.  With respect to the plaintiffs' motion to

2     have the Court implement remedial measures for additional

3     performance measures, this is -- I'm pausing, because -- oh.

4     It's Docket 1863 is the plaintiffs' motion that I'm addressing

5     now.  This raises an issue that is addressed partly in          11:08AM

6     defendants' response, and that is, that they seek guidance from

7     the Court on what is the procedure for when a performance

8     measure enters the process.  And it turns out to be somewhat of

9     a complicated issue, because the pendency of the ADR procedure

10    and the Court's process where it turns in the first instance to  11:08AM

11    the defendant and then if the defendants' plan fails then it

12    turns to its own plan, this is a process that takes some time.

13    And during this time, it is possible for the performance

14    measures to vary with respect to whether or not they are

15    meeting the benchmarks.                                          11:08AM

16          And so it's not an unreasonable question to ask.  It's

17    not a question that's answered by the mechanism for when

18    performance measures are removed from the stipulation.  But it

19    is a more nuanced question of when they should enter.  It's

20    complicated because of the fact that we have also in this time   11:09AM

21    lag, we are presently dealing with a need to appreciate the

22    impact of the Court's previous rulings on how the performance

23    measures are measured and also with respect to whether the

24    monitoring guide was in a final process that meant that all of

25    these other performance measures that, perhaps, are now just     11:09AM

being looked at, whether they are affected by that as well.

So these two additional variables of the timing and also exactly what the criteria is requires, I think, a need for a conversation about how best to come to a common understanding, a rule, if you will, about when performance measures enter into this three-step process and if they can be removed from the three-step process during the time that they are in it, if there is new data that suggests that it's not worth doing.

And so I thought I would, in the first instance, turn to the side of the case that initiates this process. Obviously I think there's some decisionmaking that goes on on the plaintiffs' side about when to bring performance measures into this process. And I thought I would ask you all what your analysis is and how you consider the answer to the question of when is a performance measure properly brought into the process. And I suppose, I guess, if you would be willing to offer this, notwithstanding when it is in your view of the stipulation's strict terms, when it is, as a practical matter, that you decide to do that.

MS. KENDRICK: Your Honor this is Corene Kendrick. Just as an initial matter, we do share this frustration because, for example, the motion that we filed on January 13th actually comes out of a July notice of non-compliance. And so because of the long time necessary for the meet-and-confer and

1    then to schedule a mediation with Judge Bade, there were

2    performance measures where they were doing terribly at the

3    beginning of 2016 and then there was some improvement by the

4    time we were filing.

5         So we also struggled with that and, as you might          11:12AM

6    notice from the motion and the reply, we did actually withdraw

7    our notice with regard to a number of the performance measures

8    at institutions.

9         As to what criteria we're using, honestly, Your Honor,

10   we don't have some sort of hard and fast rule that, you know, X   11:12AM

11   number of months out of Y triggers us doing a notice.  We look

12   at the trends from month to month and, you know, look

13   whether -- what the numbers are saying.  And so, you know, for

14   example, if a prison is very, very close to being compliant,

15   say, in the high 70s, we may wait a few months, before doing a   11:12AM

16   notice whereas a prison that has even just one month of single

17   digit compliance would be so shocking that we would want to get

18   that kind of in front of you as quickly as possible.

19        THE COURT:  Well, it sounds that you essentially do

20   what I have been doing in a rough handed way is I have been      11:12AM

21   working through the performance measures that are currently

22   under my auspices that I have sort of a rough sense about

23   whether or not it's worth pursuing additional concrete steps

24   immediately, waiting more time for additional data, or

25   accepting what the defendants have said that they are doing to   11:13AM

1    try to further address it.  So it seems that there is something

2    that is occurring that, perhaps, is difficult to define in a

3    precise way.

4          I also wonder if I'm better making this decision about

5    when, if I -- if I'm going to make a rule about when matters          11:13AM

6    enter into the process and when they can be removed from the

7    process of this additional remediation plan, if I'm going to

8    make a rule, I should probably understand what the

9    ramifications of that rule would be.  And that would mean that

10   I would have to understand also what the current status of          11:14AM

11   affairs is as completely as possible.

12         And so that is contingent on the application of the

13   monitoring guide and on data that is reflective of the Court's

14   rulings late last year about how the data is to be counted.

15   And so maybe what I will do is on this issue of when matters          11:14AM

16   enter and when they could, perhaps, be removed, defendants have

17   asked for that counsel, or a ruling from the Court, I think,

18   perhaps, what I will do is defer for the moment and wait to see

19   if any greater information becomes available to me to let me

20   know what the scope and potential ramifications are of such a          11:15AM

21   rule.

22         And otherwise in that interim period we'll continue to

23   proceed on an ad hoc basis, which means a couple of things that

24   I should also say about data collection generally in response

25   to what the defendants have said in their paper preparatory to          11:15AM

1    this hearing.  Do you abjure any desire to recalculate data

2    based upon the Court's new interpretations?  I'm, as you know,

3    embracive of the idea of trying to work with as much current

4    data as I can so the fact that we're not fixing things in the

5    past is not so abhorrent to me.                                    11:15AM

6         But I also want defendants to understand that they

7    can't have the benefit of those months that they haven't

8    recalculated with respect to the exit procedures.  So you can't

9    count those months as being incompliant when I know they have

10   not been proved to be so.  I don't know whether they are        11:16AM

11   compliant or not, but you all have the burden, I think, of

12   demonstrating to me that you were compliant.  And if you don't

13   recalculate a month based upon the Court's latter adopted view

14   of how that calculation should have been done, you can't use it

15   to get out.  Those months become non-countable.  So that would  11:16AM

16   be, I guess, giving you a heads up, a fair warning, about what

17   the consequence is of not reworking that data down the road.

18        I should also, I think, address what it means to have

19   an N/A, and I think that those just don't get counted.  It's

20   not for or against, it's just pulled out.                        11:16AM

21        MS. KENDRICK:  Your Honor, this is Corene Kendrick

22   from the Prison Law Office.  I just want to bring something,

23   ask the Court's guidance and maybe get some more explanation

24   from the defendants.  But in their filing for the hearing, they

25   make a reference to the fact that they are somehow going to     11:17AM

1    simplify and condense data provided in the CGARs.

2         THE COURT:  Right.

3         MS. KENDRICK:  And to the extent they are changing the

4    reporting procedure we would take the position that they can't

5    do that without first clearing it with you.  But we also want          11:17AM

6    to know what this means, because we actually haven't been

7    complaining about the large quantity of data.  If anything,

8    especially with the medical performance measures we have raised

9    the issue before that they only list the non-compliant files.

10   So we don't know the whole universe of files that are reviewed        11:17AM

11   and marked as compliant.  We just get to see the ones that are

12   non-compliant.

13        THE COURT:  You are jumping ahead to an issue that I

14   had on my agenda to address in the context of your request for

15   discovery and depositions in advance of the March 8th hearing.        11:18AM

16        I was going to say essentially what you said, and that

17   is, I didn't have a problem with the amount of the CGAR data

18   that was provided in the columns and in the reports.  I had a

19   problem understanding what it meant.  And that's why I set the

20   March 8th hearing.  I wanted to be instructed and informed so         11:18AM

21   that I could understand what it meant.

22        I don't want less information.  And I don't think

23   plaintiffs want less information either.  I think they have

24   become, plaintiffs, I gather, have expressed a greater

25   proficiency at understanding what this means, what this data          11:18AM

means, but I haven't been able to.  So there was -- it was -- I

became aware of the fact that I was limited in my ability to

fully understand and to make appropriate rulings by not

understanding what that information meant.  And I thought that

being tutored on it would be helpful for the whole process.     11:19AM

        So I wasn't trying to invite what the defendants have

come up with, and that is in an effort to reduce the amount of

information or dumb it down or simplify it, I don't really want

that either.

        MR. BOJANOWSKI:  Your Honor, I think what occurred     11:19AM

here is at the last hearing we were including extra data, and

there was a rather lengthy discussion about that extra data and

you didn't feel, at least I took it, that you didn't feel it

was appropriate to have that data in there, because somehow it

impacted on one of your rulings because we were counting the     11:19AM

number of files and having that data in there.

        So it was my understanding, frankly, that we needed to

remove perhaps extraneous data from the CGAR so that it's

reflecting, essentially, the pass, fail, the name or

identifying number of the non-complying file and then just     11:20AM

removing the extra superfluous data to make it an easier and

more comprehensible document.

        THE COURT:  I apologize if I was ambiguous or

misleading.  But here's what I recall my frustration was.

There were instances where it seemed like the data that you had     11:20AM

```
1    reported was inconsistent internally.  So that caused me to
2    question whether it was right or whether I was misunderstanding
3    it somehow.  And so I think what my recollection is, and again,
4    I could be wrong, and I'm sorry if I misled you, I didn't mean
5    to suggest that you should reduce what would be helpful for the    11:20AM
6    audit trail.  I mean, again, I want the plaintiffs and I want
7    the Court to be able to follow exactly what was happening with
8    respect to the accumulation of this data so that we can test
9    and be comfortable that it's accurate.
10           And so by reducing the amount of data, I think that        11:21AM
11   runs the risk of also reducing the trust and confidence that
12   others can have in it.  So I would not encourage that.
13           Turning generally to the topic of the March 8th
14   hearing and plaintiffs' request, I didn't envision it really as
15   an adversary proceeding so much so as an education opportunity     11:21AM
16   for questions to be asked before the Court and for the Court to
17   ask questions.  I think that there's some indication to me that
18   there is frustration and a lack of complete confidence with
19   respect to the reporting procedures.  And some of that is just
20   the specter and is not the reality.                                11:22AM
21           So I thought presiding in a hearing at which we could
22   come to an understanding of exactly what was happening and that
23   people would tell us under oath what they did we would then
24   have a greater sense of confidence about the process and not
25   have it be this kind of unknown.  And that's, at least from my     11:22AM
```

1    perspective, where it was.  And I think to a certain extent I

2    think it's fair to say that plaintiffs have that concern also.

3              And so I don't think it's necessary to have this

4    discovery and pre-hearing process that the plaintiffs envision.

5    That's, of course, without prejudice to any determination that    11:22AM

6    could be made after the hearing that there were areas that

7    required further inquiry, and that I would certainly listen to

8    somebody who asked for a need to have that.

9              But my vision for the hearing is I have identified

10   some issues I'm concerned about.  I think plaintiffs in my        11:23AM

11   meet-and-confer I have asked you to undertake with the

12   defendants are supposed to identify to the defendants issues

13   that they are concerned about and that you make sure that we

14   have the appropriate witnesses present so that we can go

15   through this process and educate everybody for the purpose of     11:23AM

16   making it as possible as it can be that people will trust the

17   process and not be so frightened of specters that may, in fact,

18   not be real.

19             I will give you each a chance to say anything you want

20   to say additionally about the March 8th hearing.  Plaintiffs?     11:23AM

21             MR. SPECTER:  Yes, Your Honor.  It's Donald Specter.

22   Having now had the benefit of the questions that you are posing

23   for the hearing, we have largely modified our position quite a

24   bit and mostly to agree with what you just said.  We don't

25   think it would be necessary to have, you know, all the            11:24AM

discovery that we mentioned in the pleadings.  But the one

thing that we would think that would make the hearing go a

little better, smoother, faster and give us a chance to prepare

for it a little bit, would be a request that the defendants

answer your questions in writing sometime before the hearing

kind of like, you know, it could be just a direct written

testimony by declaration that many courts use.

And that way, we'll at least have some sense of what

they are going to say and give us a chance to think about

questions that might help the Court and us understand the

process a little better.

THE COURT:  You may be right, and I may be wrong that

your method is a better way to proceed.  But I'm not going to

embark upon it in the first instance just because I think

having a dialogue about these things, perhaps, can be more

efficient and also of a greater use to me.  So thank you for

that suggestion but I will demur for now.

Anything that the defendants wanted to say about the

March 8th hearing?

MR. BOJANOWSKI:  Just so I'm clear as to the scope of

the hearing, Your Honor, I mean, I know that you have issued

some bullet points and such.

THE COURT:  Right.

MR. BOJANOWSKI:  That you want us to hit upon.  My --

there's like 103 measures.  Are there particular ones the Court

```
 1    wants us to have a person talk about and the methodology that's
 2    used to measure that?  In other words, you know, there are
 3    different monitors for different measures.  And so in hoping to
 4    target the appropriate person to present to the Court what you
 5    need to have, I'm wondering if you are looking at identifying        11:26AM
 6    specific measures you would like us to address or just the
 7    bullet points that you had issued in your order?
 8            THE COURT:  Well, I think that my bullet points are of
 9    general applicability.  So I think --
10            MR. BOJANOWSKI:  Okay.                                      11:26AM
11            THE COURT:  -- if there are performance measures that
12    are outliers with respect to how you acquire information, then
13    be prepared to let the Court and the plaintiffs know about
14    that.
15            What I would ask to make sure it happens is that,           11:26AM
16    frankly, I am developing a much better sense of awareness and
17    understanding of how things do operate with respect to the
18    monitoring and enforcement of the stipulation.  But among the
19    people in this room, I am still the least knowledgeable.  And
20    to the extent that the others who are more knowledgeable and        11:27AM
21    particularly the ones that have a reason to -- the defendants
22    have no reason to be concerned about what they are doing
23    because you are fully aware of it because you know about it.
24    But the transparency issue on the other side from the
25    plaintiffs is one that is always a real issue, because they         11:27AM
```

```
1    don't have -- they are not privy to all you have.

2            And so I would ask that in this time between now and

3    then, that the plaintiffs also, as I have allowed them to do,

4    foreshadow for you and present to you what issues that they

5    think they would be raising because they are going to do that      11:27AM

6    not only for their own purposes, but they also understand that

7    they are not the decider.  I am.  So they want to educate me.

8            So I think other than relying on me in the first

9    instance to do what I have already done, I think it's incumbent

10   on the plaintiffs to identify to the defendants the areas they     11:28AM

11   think would be most helpful that would address their concerns

12   so, again, we can wipe out these specters if they deserve to be

13   wiped out and that I can be appropriately educated.

14           So that's the answer I can give on that point.

15           MR. BOJANOWSKI:  I think we can --                          11:28AM

16           MS. KENDRICK:  Your Honor, do you have a time frame

17   for us to do that?

18           THE COURT:  Can you all -- do you think there's a

19   problem on figuring that out, all of you together, or do you

20   need me to -- I mean, it's not a good idea if I hear that it       11:28AM

21   didn't happen because people weren't making themselves

22   available.  So I think I can rely upon you all to make that

23   happen between now and then, I think.

24           MS. KENDRICK:  Right.  I just meant more to the extent

25   that we might have more bullet points that we would want to put    11:28AM
```

1   after yours in your minute order would you have a time frame

2   that you would like us to submit it to you as well?

3         THE COURT:  Well, the sooner that you do it for the

4   defendants the better it will be, because they will have more

5   time to prepare and to make sure that they have got the right         11:29AM

6   person on board for it.

7         Does that answer the question?

8         MS. KENDRICK:  Yes, sir.  Thank you.

9         THE COURT:  Okay.  All right.  I skipped over

10  something that I need to go back to.  And that is with respect      11:29AM

11  to the max custody performance measures and the issue about 6

12  and the issue about 8.  I am endorsing the plaintiffs'

13  interpretation.  I think that 6 is, as it is, is cumulative and

14  8 is for a separate population.

15        I understand defendants' point, but defendants' point      11:29AM

16  will not be lost because it can be persuasive argument if you

17  are down the road, for instance, at the time when you are

18  seeking to have the Court to consider whether or not a matter

19  should be removed from the stipulation if -- you know, common

20  sense arguments are not going to be lost.  But I think as it is      11:30AM

21  written presently, I need to go with what the meaning is fairly

22  taken from these statements.  So that's what we'll do on that.

23        All right.  Couple other questions that I have based

24  upon what you all have submitted.  And again, I apologize for

25  jumping around because we have touched upon some of these, but      11:30AM

```
 1    I can't put my hands on it right now.  But I have made a note
 2    with respect to Performance Measure 94 and about the issue of
 3    charts versus percentage and let me try to see -- just a
 4    second.  I think it was in plaintiffs' agenda but I'm not able
 5    to find it right now.  I don't know why that is.               11:31AM
 6         MS. FETTIG:  Your Honor, this is Amy Fettig.  I
 7    believe we already addressed the Performance Measure Number 94
 8    regarding the sample size and the 30 days advance notice of a
 9    change in sample size.
10         THE COURT:  So what I have done is my notes, what I        11:31AM
11    did, is used different terminology in two places and that's
12    what made me think that maybe I had left something unanswered
13    for you.  And apparently I didn't.
14         Okay.  Thank you.  That's helpful.  With respect to
15    this continuing issue -- actually, we have been at this now for 11:32AM
16    an hour and a half.  I need to give our court reporter a break.
17    So we'll take just a couple of minute break.  When you all are
18    back in your seats let me know.  I will come right back and we
19    will pick it up again.
20         Thank you.                                                 11:32AM
21         (Recess from 11:32 a.m. until 11:44 a.m.)
22         THE COURT:  Again, thank you.  Be seated.
23         Having had the opportunity, as perhaps you all of you
24    did as well, to collect my thoughts and to identify, I think,
25    five additional areas that I need to address from the list,    11:44AM
```

1    from my to do list, I come to return to the issue of the Docket

2    Number 1900.  And that's the plaintiffs' latest motion or

3    addition, I guess, the addition of additional performance

4    measures that are not in compliance.

5          And I'm personally vexed by the difficulty that I have    11:44AM

6    with respect to knowing full well that the data that I'm

7    relying upon is not reflective of my rulings on how the data is

8    to be collected and further frustrated by the idea that if I

9    wait for the data to tell me where we stand, the soonest I can

10   hope for that to happen based upon the understanding I have of    11:45AM

11   the timing and as supported by what we learned this morning

12   about the availability of December data is that the soonest I

13   could have the January data is the middle of April.

14         And so that frustrates me, because I have a pretty

15   strong suspicion that my interpretations that in the most -- in    11:45AM

16   most instances were imposed against the wishes of defendants

17   are not likely to produce numbers that are better for

18   defendants.  They are likely to produce numbers that are worse.

19         And so I think what I will do, what you all have told

20   me already is that with respect to the performance measures    11:45AM

21   identified in 1900, there are a number of those that the

22   defendants concede that they need to impose or suggest to the

23   Court a remediation plan.  And then there are others in which

24   the defendants argue that the data that was collected under the

25   then understanding of how the data should be collected did not    11:46AM

```
 1    produce a basis for any further remediative plan and the

 2    plaintiffs, of course, object.

 3              I will, with respect to this category, where there is

 4    the defendants' view that they are in compliance because of the

 5    data that was collected under the previously operating scheme,     11:46AM

 6    that -- and where plaintiffs say that it is invalid because it

 7    does not include tabulations of data based upon the Court's

 8    current method, what I will do is I will give the defendants a

 9    week to do the following.  And that is to --

10              MS. EIDENBACH:  Your Honor, I apologize for               11:47AM

11    interrupting you.  My co-counsel just informed me that I think

12    the phone is on mute on their end.

13              THE COURT:  Appreciate the interruption.

14              MS. KENDRICK:  No.  We can hear you.

15              MS. EIDENBACH:  Apologize.  There must have been a        11:47AM

16    little bit of delay.  I just wanted to make sure everybody was

17    on.

18              THE COURT:  I appreciate that.

19              What I will ask defendants to do is a week from today,

20    file a notice with the Court informing it of the following two     11:47AM

21    things:  First, what performance measures they believe that the

22    Court should require them to propose for remediation measures.

23    So those may be some in which you have decided to concede that

24    they were not in compliance and that it's warranted for

25    plaintiffs to ask for remediation on those measures based upon     11:47AM
```

1    an understanding on your own part that may reflect what I

2    previously said in that there's a potential downside of not

3    making an intelligent decision about whether you want to really

4    recalculate.  And if you do recalculate, you might get a

5    benefit of that.  But if you don't recalculate it will be                11:48AM

6    counted against you at the end and maybe counted against you

7    here at the beginning.  I'm undecided about that point.

8              The second thing that I would like you to articulate

9    in this notice is whether or not what you have included in your

10   response to the plaintiffs' Docket Number 1900, and that is         11:48AM

11   your response -- oh.  I'm missing -- I misstated the numbers.

12   The plaintiffs' motion is Docket 1863.  The defendants'

13   response is 1900.  I need to know whether your 1900 in which it

14   appears to include your remediation proposals for the areas

15   that you -- performance measures that you concede were failing,     11:49AM

16   whether those, indeed, are your proposed remediations for the

17   Court and for the Court to consider such that I need to give

18   the plaintiffs an opportunity to respond to those.

19             And so your notice will inform the Court and inform

20   the plaintiffs whether what you have set forth with respect to      11:49AM

21   the conceded performance measures, that those remedial measures

22   that you mentioned in the discussion in 1900 are your intended

23   remediation measures or not.  And if they are not, then file

24   what they are.

25             And then with respect to the category that I started      11:49AM

```
 1    with, and that is the ones where potentially you would not be
 2    in compliance based upon the data, decide whether in some of
 3    those cases, that you think it makes sense for you to go ahead
 4    and recalculate or to concede.  If you recalculate, you get the
 5    potential benefit if it shows that you are in compliance, and      11:50AM
 6    you can use that down the road.
 7          But that is how I think I will deal with the conundrum
 8    that I think is visited upon the circumstances of the case in
 9    light of the fact that we have changed the procedure for
10    measuring performance.                                             11:50AM
11          Having said that now I will give both plaintiffs and
12    defendants an opportunity to say anything in response you would
13    like to.
14          Nothing from plaintiffs.  Defendants?
15          MR. BOJANOWSKI:  Your Honor, if we choose to                 11:50AM
16    recalculate data, that's a rather significant undertaking and
17    would probably -- we would need more than a week to do because
18    of the potentially hundreds of files that would have to be
19    looked at again.
20          THE COURT:  All right.  Let us know in a week whether        11:51AM
21    or not that's what you would want to do.  And if you do, then
22    propose how much time you think would be necessary to do it.
23          MR. BOJANOWSKI:  Okay.  We'll do that then.  Thank
24    you, Your Honor.
25          THE COURT:  Anything plaintiffs wanted to say on that        11:51AM
```

UNITED STATES DISTRICT COURT

```
 1   point?
 2           MR. SPECTER:  Yes, Your Honor.  Given that the issues
 3   here are relatively critical in terms of getting, as you have
 4   said in one of your latest orders, they involve critical
 5   measures necessary for the health of many, many people, we're a    11:51AM
 6   little hesitant to allow -- it's not our call whether to allow
 7   it, but for these type of recalculations, if they decide to do
 8   it, to drag this process on before any remedial measures are
 9   taken given the long time it's taken to get to court.  And then
10   if they decide to recalculate, it will, as Mr. Bojanowski           11:52AM
11   alluded to, it's a massive project.
12           So we think that if they do decide to recalculate,
13   there should be some interim relief in the meantime.  I mean,
14   this has dragged on for how many months, since May.  And, you
15   know, they have had the opportunity several times to decide         11:52AM
16   whether to recalculate their procedures.  They could have done
17   that as soon as you issued your orders.
18           THE COURT:  But some of those were as recently as the
19   turn of the last month.
20           MR. SPECTER:  Yes.  You are right.  And some of them        11:53AM
21   have been many months ago.  So that would have reduced the
22   burden on them and made this process go much more smoothly if
23   they had done that in the beginning.  We don't think that
24   further remediation of, you know, these critical issues
25   necessary to the health and well-being of thousands of             11:53AM
```

```
 1    prisoners should be delayed any further because they didn't

 2    want to recalculate it after you issued your original orders.

 3    Thank you.

 4              THE COURT:  All right.  Thank you.

 5              Turning now to an issue that I addressed partly, or      11:53AM

 6    started to address right before we took the break, and that is

 7    the max custody checklist with respect to Number 9.  What is

 8    the status of that checklist?

 9              MS. FETTIG:  Your Honor, this is Amy Fettig.  We are

10    developing that checklist.  We expect to have it out to          11:54AM

11    defendants either later today or early tomorrow.  I wanted to

12    consult with our corrections expert, Eldon Vail, who is

13    familiar with the Arizona system.  That delayed the process a

14    little but has improved it.  So that will be in shortly.

15              THE COURT:  Thank you for that update.                  11:54AM

16              And then with respect to this issue that I was

17    addressing right when we took the break, that is the max

18    custody documents and the videos that has just been going on

19    for, I think, six plus months and still not resolved.  I guess,

20    I think, that what remains for the Court to do is to employ the   11:54AM

21    power that we do have, and that is to say that there's a

22    deadline, perhaps 14 days, to submit these documents and

23    videos, and if they aren't submitted then presumptively, those

24    performance measures are not in compliance.

25              But tell me why that's not a fair way to approach       11:55AM
```

```
 1    things, Mr. Bojanowski.

 2           MR. BOJANOWSKI:  Ms. Love will address the maximum

 3    custody measures, Your Honor.

 4           MS. LOVE:  Your Honor, as we reported last month, we

 5    have taken on the task of doing -- going through the 133         11:55AM

 6    reports regarding use of force videos where plaintiffs have

 7    either asked for the video or have identified what they see as

 8    inconsistencies.  We have undertaken that which has involved

 9    substantial facility resources to go back and to determine

10    whether videos exist in archive.                                 11:55AM

11           We are well through that process and in a position to

12    provide plaintiffs with details which I think would be helpful

13    for the parties because we may be able to come to agreements

14    where they have identified inconsistencies in the reports but

15    we can point them to other information that may clear up their   11:56AM

16    concerns.  We would ask for 21 days to complete that process.

17           THE COURT:  So you are saying in 21 days, you will

18    have had an opportunity to try to discuss this issue further,

19    but if you are not able to come to a resolution, then you will

20    produce everything that you were required under the stipulation  11:56AM

21    to produce 21 days from today?

22           MS. LOVE:  What we would like to do in 21 days is to

23    provide -- plaintiffs have started a spreadsheet which

24    identifies all our issues.  We would comment back as to each

25    one and our position and where videos are appropriate to         11:56AM
```

1    produce.  We could produce that and do that within 21 days, and

2    then they will have that data in their hands, the data and the

3    explanations, and then we can go from there.

4         THE COURT:  Let me not jump into negotiations that I

5    haven't been present in.  Let me first ask the plaintiffs to          11:56AM

6    respond to what you have said, Ms. Love.  Thank you.

7         MS. FETTIG:  Yes, Your Honor.  We object to prolonging

8    this long history of non-production.  We are talking about

9    documents that were supposed to be produced by October 14th.

10   We have given the Court an exhibit enumerating exactly what          11:57AM

11   hasn't been produced in addition to the max custody measures

12   that are pertinent to that lack of documentation.  We have also

13   given the Court an exhibit that sets forth the documents that

14   haven't been produced since July 2016.

15        We do not want more delays on this production.  They          11:57AM

16   either exist or they don't.  At this point, our ability to

17   monitor and analyze defendants' compliance measures to the max

18   custody performance has almost been irrevocably impacted

19   negatively because of these long series of delays.

20        In terms of these videos, we have not even heard from          11:57AM

21   defendants regarding the contradictory statements related to

22   whether or not videos were even viewed or viewed by the

23   monitors in each of the incidents that we have outlined.  This

24   raises huge concerns for us.  21 more days is yet 21 more days

25   where we don't have the opportunity to actually analyze what's          11:58AM

going on with the use of force measure Number 9.  We don't want

any more delays.  We think the Court's 14 days for the videos

is fine, but we would prefer a ruling regarding the documents

today.

THE COURT:  I'm asking you to stand by for a second.            11:58AM

I am anxious to have this issue resolved.  And what

I'm going to do is set a 14-day deadline for this issue to be

resolved and/or decided.  And so if, come the 24th of February,

which is 14 days from today, you are not able to have resolved

this issue yourselves, you all are to get on the phone and            12:00PM

place a call to me here at court.  I will go on the record.  I

will hear what the status is.  And I will rule at that time.

But I'm going to give you an additional slightly more

than 14 days.  I picked the day that I picked because it's when

I'm available and you can contact me and I will find a time            12:00PM

during that day, whether it's at the lunch hour or at the close

of business, but we will get this issue resolved one way or the

other no later than the 24th of February.

Turning next to the issue of the evidentiary hearing

with respect to the issues that arose at a prison tour with            12:01PM

respect to allegations of retaliation.  First, responding to

the defendants' concern about whether or not it's the Court's

exercise of contempt authority, in the first instance, I don't

recall how I addressed the subject matter at the

non-on-the-record interaction that I had with counsel for both            12:01PM

```
1   sides that originated with a phone call from the locus in quo.

2   And I may have used other language afterwards.  I don't recall

3   whether I used the prospect of contempt authority of the Court

4   but that's not what I am envisioning.  What I am envisioning is

5   a cost shift, if appropriate, meaning that the costs incurred    12:02PM

6   of a prison tour, if it was aborted by conduct of the

7   defendants, should be not charged against the plaintiffs and

8   also with respect to whether it would count or not as one of

9   the visits authorized by the stipulation.

10          That's my view of what I will be considering, and my      12:02PM

11  understanding was that defendants wanted an opportunity to have

12  an evidentiary hearing.  And so I addressed your contempt

13  concern.  I have done that.  Now I need to address when we

14  could possibly set this hearing.  We talked about the hopeful

15  idea that maybe one of our monthly gatherings could be the      12:02PM

16  opportunity to do that.  But I guess I'm not so bullish anymore

17  that we're going to find openings of time.

18          So I would ask the parties to meet and confer about

19  when a time would work for their schedules to do that and then

20  to get on the phone together to my judicial assistant and ask   12:03PM

21  if those proposed times, if one of them could work for the

22  Court and set that evidentiary hearing then.

23          MR. SPECTER:  Your Honor.

24          THE COURT:  Yes, Mr. Specter.

25          MR. SPECTER:  Before you move on to another subject, I   12:03PM
```

don't know if you have read all the papers and had a chance

given all the voluminous pleadings that have been filed, but in

our reply brief, we rely on uncontested facts that are set

forth in the defendants' response for most of the -- for

basically all of the facts that we're relying on.  So we're not                    12:03PM

-- given that, given those -- given the fact that we're relying

on undisputed facts, for the most part, I'm not sure that

there's really a need for an evidentiary hearing.

          THE COURT:  Well, the defendants are the ones who want

to be heard because they say that I never allowed them the                          12:04PM

opportunity to present their side of the story.

          MR. SPECTER:  Well, they filed that voluminous memo

and many declarations, so they did present their side of the

story to you.  So I'm not sure what they mean.

          THE COURT:  Well, any response to that point from                         12:04PM

defendants?

          MR. BOJANOWSKI:  I think we want the opportunity to

bring the officers in who were involved in this to explain to

the Court what was happening at the time so that the Court can

see what was, in fact, going on.  Because the claims of                             12:04PM

retaliation and such are rather significant to my client, and

they certainly want the opportunity to be heard with you, Your

Honor, so that we can clear this issue up.

          I don't think the declarations and such, and I haven't

looked at this pleading in quite some time, Your Honor, so I'm                      12:05PM

1    not really up to speed, to be frank with you.  I typically

2    don't believe that declarations tell the whole story

3    necessarily.

4          THE COURT:  I mean, they are not subject to

5    cross-examination.  And it seems to me that in this context      12:05PM

6    that could be useful.

7          So I would ask you again to meet and confer, come up

8    with a proposed date and we'll address it at that time in

9    fairness.

10          Last on my list of issues that I think that you have      12:05PM

11   asked me to comment on, and I believe it's -- well, the last

12   one that I have on my list, I don't believe I know it, it is

13   the pictures issue about the influenza vaccines.  You are

14   asking me to say whether that's all right or not.  I have

15   looked at the pictures and the paintings on the walls.  Is      12:06PM

16   there an issue that those are not generally available to the

17   plaintiffs' class?

18          MS. KENDRICK:  No, Your Honor.  The dispute was with

19   regard to the two subsections of the stipulation that would

20   relate to notifying people of timely preventive medical         12:06PM

21   procedures.

22          THE COURT:  Well, but we have addressed them

23   individually.  The pap smears we have addressed and then -- so

24   we have a different rule for the pap smears with respect to the

25   flu shots, with respect to the colonoscopies, I think.  Help me  12:06PM

1    further understand what you need from me, from the plaintiffs'

2    side on this.

3        MS. KENDRICK:  We don't need anything from you.  That

4    was defendants' filing.

5        THE COURT:  Ms. Love.  Thank you.                    12:07PM

6        MS. LOVE:  Well, how this came about, Your Honor, is

7    during the status hearing in January, Ms. Kendrick made a

8    statement that during the Lewis tours that they didn't see

9    these postings and that they also weren't at Perryville.  So at

10   that time we just offered to provide the Court with, in fact,   12:07PM

11   that they were there.  So I don't know there was actual

12   specific relief requested and since plaintiffs haven't

13   responded and objected we actually kind of considered this

14   matter closed unless there was anything further that needed to

15   be done.                                                 12:07PM

16       THE COURT:  Okay.  That's where it will be then for

17   now.

18       I have gone through my list.  Plaintiffs, your turn.

19       MS. KENDRICK:  My office does not have anything more.

20   I will see if Ms. Fettig has anything else.              12:07PM

21       MS. FETTIG:  We have nothing further, Your Honor.

22       THE COURT:  And from the defendants.

23       MR. BOJANOWSKI:  Your Honor, I'd like to have the

24   opportunity to maybe further brief this issue with regard to

25   the not applicable designation.  Just very briefly, as an   12:08PM

example, one of performance measures may be measuring something

that has to do with a minor at the women's facility.  Well, if

there are no minors at the women's facility, there's nothing

that is to be measured.  And how is it that we could ever get

that measure at the end of two years terminated if it's                     12:08PM

impossible to measure.

        I will give you another example, say, at the Douglas

facility for Measure 73, are you measuring MH-3D prisoners or,

I should say, Performance Measure 86.  Well there's, you know,

no prisoners located at that facility that meet that                        12:09PM

classification of mental health need.  So you end up with two

years of not applicables.  And if you can't count it or not

count it, how do you get out from under that?

        THE COURT:  Well, among all the hundred performance

measures, are there some number that you know of right now                  12:09PM

where the non applicable issue is live?

        MR. BOJANOWSKI:  Yes.  Yes.

        THE COURT:  Okay.  And so --

        MR. BOJANOWSKI:  It's reported every month as not

applicable.                                                                 12:09PM

        THE COURT:  And among those are there some that are

these that you would argue now are obvious non sequiturs, they

just don't apply.

        MR. BOJANOWSKI:  Right.  You are not going to have a

pap smear issue at the Lewis facility.                                      12:09PM

1          THE COURT:  Okay.  And there are some, I gather, where

2     the plaintiffs think there is an issue that is calling into

3     question the data that is being addressed.  And you want an

4     opportunity to further brief it because you don't think the

5     Court has sufficiently been apprised of the ones that are easy          12:10PM

6     yeses or easy nos?

7          MR. BOJANOWSKI:  Well, how do you -- I guess what I

8     wanted to do is to clarify how it is after 18 months if the not

9     applicable means nothing, so to speak, how do you get rid of

10    that measure?          12:10PM

11         THE COURT:  I think if that's your concern that

12    argument is always going to be alive for you.  You will be able

13    to say, this is not something that should be counted against us

14    because it made no sense to count pap smears at a male

15    population.  And so that's not going to be something the Court          12:10PM

16    says, well, I can address that.

17         MR. BOJANOWSKI:  So I guess, as you say, when we're

18    coming out on that back end of this thing then it's just going

19    to be part of the motion.  We'll have to deal with that

20    differently than the compliant/non-compliant measures.          12:10PM

21         THE COURT:  Well, I guess I have made it clear to you

22    that I'm not going to be opposed to listening to common sense

23    arguments at any point.

24         MR. BOJANOWSKI:  Right.  I just wanted --

25         THE COURT:  Is there anything plaintiffs wanted to say          12:11PM

1    in response to this?

2          MS. FETTIG:  Yes, Your Honor.  This is Amy Fettig.  I

3    just wanted to point out the defendants have already briefed

4    this issue in Document 1900.  Compliance is very clearly

5    defined in the stipulation and as the Court notes, not                    12:11PM

6    applicable pap smears at Lewis are not at issue here.

7          THE COURT:  You are right.  I will say no for right

8    now to the briefing but if it turns out there's some common

9    sense arguments I'm not going to be jumping to the side of no

10   sense.                                                                      12:11PM

11         MR. BOJANOWSKI:  We don't have anything else, Your

12   Honor.

13         THE COURT:  Thank you.  My apologies to the court

14   staff and the court reporter for keeping you past the noon

15   hour.                                                                       12:11PM

16         Thank you all very much.  Good day.

17         (Proceeding concluded at 12:11 p.m.)

18

19

20

21

22

23

24

25

1

2

3

4                    C E R T I F I C A T E

5

6          I, LAURIE A. ADAMS, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 21st day of January,

15   2017.

16

17                              s/Laurie A. Adams

18                              _____
                                Laurie A. Adams, RMR, CRR

19

20

21

22

23

24

25