```
 1                    UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF ARIZONA

 3                   _____

 4

 5   Victor Parsons, et al., on   )
     behalf of themselves and all )
 6   others similarly situated;   )
     and Arizona Center for       )
 7   Disability Law,              )
                                  )   No. CV 12-00601-PHX-DKD
 8                Plaintiffs,     )
                                  )
 9        vs.                     )   Phoenix, Arizona
                                  )   January 26, 2017
10   Charles Ryan, Director,      )   1:32 p.m.
     Arizona Department of        )
11   Corrections; and Richard     )
     Pratt, Interim Division      )
12   Director, Division of Health )
     Services, Arizona Department )
13   of Corrections, in their     )
     Official capacities,         )
14                                )
                  Defendants.     )
15   _____)

16

17     BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

18             REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                    (Status Hearing)
                         (Amended)
20

21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc 43
23   Phoenix, Arizona 85003-2151
     (602) 322-7256
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription
```

1                    **A P P E A R A N C E S**

2    For the Plaintiffs:

3            EIDENBACH LAW PC
              By:  **Kirstin T. Eidenbach, Esq.**
4            P.O. Box 91398
              Tucson, AZ 85752
5
              ACLU - Washington DC - (Appearing Telephonically)
6            By:  **David C. Fathi, Esq.**
              By:  **Amy Fettig, Esq.**
7            915 15th Street NW
              7th Floor
8            Washington, DC 20005

9            ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
              (Appearing Telephonically)
10           By:  **Maya S. Abela, Esq.**
              177 N. Church Avenue
11           Suite 800
              Tucson, AZ 85701
12
              PRISON LAW OFFICE - (Appearing Telephonically)
13           By:  **Donald Specter, Esq.**
              By:  **Corene D. Kendrick, Esq.**
14           1917 5th Street
              Berkeley, CA 94710
15
     For the Defendants:
16
              STRUCK WIENEKE & LOVE, P.L.C.
17           By: **Timothy J. Bojanowski, Esq.**
              By: **Rachel Love, Esq.**
18           By: **Anne M. Orcutt, Esq.**
              3100 W. Ray Road
19           Suite 300
              Chandler, AZ 85226
20
              OFFICE OF THE ATTORNEY GENERAL - Phoenix
21           By:  **Lucy M. Rand, Esq.**
              1275 W. Washington Street
22           Phoenix, AZ 85007

23

24

25

P R O C E E D I N G S

1          THE MAGISTRATE CLERK:  Civil Case Number 12-601,

2   Parsons, et al., versus Ryan, et al., on for a status hearing.

3          THE COURT:  Counsel please state their appearances for

4   the record.                                                      01:32PM

5          MS. EIDENBACH:  This is Kirsten Eidenbach for the

6   prisoner plaintiffs.

7          THE COURT:  Thank you.  Who is on the phone on

8   plaintiffs' side?

9          MR. FATHI:  Good afternoon, Your Honor.  This is David   01:32PM

10  Fathi from the ACLU National Prison Project for the plaintiff

11  class.

12         THE COURT:  Thank you.

13         MS. FETTIG:  This is Amy Fettig from the ACLU National

14  Prison Project for the plaintiff class.                          01:32PM

15         THE COURT:  Thank you.

16         MR. SPECTER:  And in Berkeley, California, we have Don

17  Specter and Corene Kendrick from the Prison Law Office for the

18  plaintiffs.

19         THE COURT:  All right.  Thank you.                        01:32PM

20         MS. ABELA:  This is Maya Abela for the Arizona Center

21  for Disability Law.

22         THE COURT:  Thank you.

23         That's it from the phone.  Whom do we have in the

24  courtroom?                                                       01:33PM

1          MR. BOJANOWSKI:  Your Honor, on behalf of the

2    defendants, Timothy Bojanowski, Anne Orcutt, and Rachel Love.

3          THE COURT:  All right.  Thank you very much.

4          MR. BOJANOWSKI:  And Lucy Rand.

5          THE COURT:  Indeed.  Thank you.  Welcome all.            01:33PM

6          Well, my plan of setting this hearing was to establish

7    the foundation of a finalized Monitoring Guide subject to a

8    court-approved process for revision.  And that is what I intend

9    for us to emerge with at the conclusion of today's hearing.

10          The foundation of the Monitoring Guide is, I think, a    01:33PM

11    nice way to describe it because I do think we build a structure

12    upon that.  And the structure also will likely require further

13    examination and, in particular, what I mean by that is the

14    practice and procedures that are employed by the monitors in

15    effecting the Monitoring Guide.                              01:34PM

16          And I guess by way of example, I can tell you that I

17    continue to learn more about this, the practice and procedures

18    associated with the Monitoring Guide and continue also to be

19    informed about how I need to learn more.

20          And so by way of example, what is set forth in the      01:34PM

21    sealed document at 1892 at Page 3 of 3, and it's sealed because

22    it contains personal medical information from the class

23    members, in this document I have tried as best I can to really

24    understand how it is reflecting the reporting that is

25    occurring.  And I can't really figure it out.                01:35PM

1          Also, I think there is a distinction between the

2    Monitoring Guide as I imagine we will come to its finalized

3    agreement on what its provisions provide and how it is actually

4    playing out on the street.  So, for example -- on the floor, I

5    guess, is the right way to put it, at the medical units.  And I          01:35PM

6    need to understand more about that and I think the plaintiffs

7    need to understand more about it.

8          And so my contemplated thought is that once we come to

9    a conclusion about what the Monitoring Guide means, what is, a

10   definitive state of the current Monitoring Guide, we'll then          01:35PM

11   look to a second step that will be necessary for me, at least,

12   and that is to set an evidentiary hearing on the subject of how

13   it is implemented to allow for me to have some of these

14   questions addressed and also to make sure that I have a greater

15   sense of confidence about how it is that, for example, records          01:36PM

16   are pulled.

17         It's probably fair to say the plaintiffs have some

18   concern, they have articulated these concerns, that sudden

19   changes in reporting are sometimes unexplained.  And there is

20   also a suggestion when -- because perhaps only an incomplete          01:36PM

21   explanation from the defendants, I'm not trying to cast

22   aspersions where they are not due, but there is at least a

23   probable cause for asking the question, for example, where more

24   files are pulled.  That's not a problem generally, because it's

25   going to be a more accurate sample.  If you have 100 percent          01:36PM

that's the most accurate sample that you can have.  So if the
stipulation says you pull a minimum of 10 and then the
defendants report that they have pulled 21, that's okay as long
as they are counting all the 21.  But if you are going fishing
for only the legal fish and throwing back the illegal fish that
are under the weight limit before you come in to the dock and
have the park ranger see you, that's not okay.

       So that's the kind of thing that I think a greater
transparency of the process entirely that would be informed by
a better understanding that would occur at the second phase of
making sure that we have a foundation but also a structure
built upon that foundation that is understandable by everyone.

       Today what we'll do is we'll work through my agenda,
which I will tell you what it is and how I came to it, and then
I will give you an opportunity, each side, to raise issues that
were not raised in my agenda.  But what I contemplate doing,
because it was the most recently filed document, is using the
plaintiffs' comments, our Re: Revised Monitoring Guide in Open
Clinic, Document 1889, and using it as a road map to track
through.  And then I would jump to the exhibit, that
spreadsheet exhibit that plaintiffs provide, because that also
raises issues with respect to the Monitoring Guide.  And then
there are some issues that I have that neither party has raised
about the Monitoring Guide.  Once I have done that, then I will
turn to you all and ask you to raise any issues that I haven't

1   raised.

2           Couple of prefatory comments, first, apologies about

3   my voice.  When we were last in court together I reported to

4   you that I just returned from Europe and I may have brought

5   back some kind of scourge there that has produced this                 01:39PM

6   protracted cough that has produced this hoarseness that I

7   cannot deal with, meaning I cannot address it in a way to save

8   you from that.  So I'm sorry about that.

9           The second prefatory comment is I wish this could

10  somehow be a round table so it would be convenient for everyone        01:39PM

11  to be able to assert their points.  I realize that that's

12  probably not practically possible, but I will do my best to

13  turn to the respective parties and to give them an opportunity

14  to add anything they would like to add to the considerations

15  that they have already provided to me and what they have filed         01:39PM

16  with respect to their comments on the Monitoring Guide.

17          That said, I will, in the first instance, I think, let

18  you know what my preliminary view is and then naturally turn to

19  the side that would disagree with that.  So as it happens, my

20  preliminary view is probably 8 out of 10 times to agree with          01:39PM

21  what the plaintiffs have said, so I will be turning to the

22  defendants to tell me why it is that what they have said

23  doesn't seem to be or shouldn't be right.  So that's why I will

24  be proceeding that way, to give people a chance to talk and not

25  going the normal fashion of one after the other.  I will be           01:40PM

```
 1    really focusing it.

 2           I'm just reviewing my notes to make sure there are no

 3    other prefatory comments that I wanted to make.

 4           All right.  So then turning to plaintiffs' comments,

 5    Document 1889, and this is the Plaintiffs' Comments Re: Revised    01:41PM

 6    Monitoring Guides and Open Clinic.  And Paragraph 1 addresses

 7    the status of the Monitoring Guide for the isolation sub-class

 8    performance measures.  And it appears that the first issue is

 9    what has been identified as I.A., and this is the consideration

10    of what to do about a week that has a state holiday in it.       01:41PM

11           It seems to me that the best way to proceed here is to

12    just make sure that the reporting period starts the day after a

13    state holiday or concludes the day before a state holiday

14    rather than excluding any week that has a state holiday in it.

15    And so I will turn to defendants as to why we can't go that      01:41PM

16    way.

17           Take your time.  That's all right.

18           (Discussion off the record between the parties and

19    attorneys.)

20           MS. LOVE:  Okay, Your Honor.  Thank you for allowing       01:46PM

21    us the time to discuss with our clients.  The impact on

22    operations that that would impose is that the monitoring week

23    runs from a Saturday to a Friday.  And it is already in

24    agreement as far as the monitoring is concerned that, for

25    instance, in the case of an emergency or something like that     01:46PM
```

there is efforts to be made to make up services, let's say, for

instance, mental health programming in that monitored week.  If

we have -- and here's where the initial issue comes in, is on

the holidays, the programs that are difficult to provide are

the mental health employees may be off and the educators, like

the CO-IIIs, those that are doing the educational programs,

those people are traditionally off on the holidays.  So because

our monitoring, agreed upon monitoring week runs from a

Saturday to a Friday, if we have an interspersed holiday, it's

not going to always be possible because of the strict running

of the facility to make up those programs in a week.  So then

offsetting by an additional day doesn't ease that operational

burden.

        And when we're, you know, we understand that

there's -- I think I counted up there would be like 10 holidays

during the year that this may happen, it is akin to the

community in which, you know, schools are closed or someone may

not be able to have a visit with a medical provider in a

nonemergent situation.

        So we would respectfully request that we continue on

on the current mode of monitoring, excluding those weeks

because statistically it is not a huge statistical probability

that those weeks may be the ones that are monitored.  If there

is a concern that, by the plaintiffs, that, you know, that this

is a situation where, okay, ADCC -- which is not the case --

```
 1    but ADCC says, okay, it's a holiday week, so we're not going to

 2    do anything that week, I think that's their concern.  You know,

 3    that may not be the monitoring week, but in the course of their

 4    tours they can still check to see in those holidays weeks if

 5    it's a, oh, we just don't do anything, which is not what          01:49PM

 6    occurs.

 7            MS. FETTIG:  Your Honor.

 8            THE COURT:  I was pausing because Ms. Love was

 9    conferring, so I wanted to make sure that she had finished her

10    statement before I turn to you and ask you to give your          01:49PM

11    response.

12            MS. LOVE:  And there's also a discrepancy, as Ms. Rand

13    has just advised me, that if, for instance, if, for instance,

14    something occurs on Friday where programming, for instance,

15    cannot occur, like there's a lockdown situation or an emergency   01:49PM

16    situation, per the terms of monitoring and agreement of the

17    parties then that service does not need to be made up because

18    your monitoring week has ended because you go Saturday to

19    Friday.

20            If we're in a situation where that holiday falls          01:49PM

21    somewhere in the middle of the week, that's now, you know, an

22    additional requirement to make up programming that in

23    operations' side just may not be feasible because you are still

24    running your everyday groups in the normal course of

25    operations.                                                       01:50PM
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Okay.  Plaintiff's response, please?

 2              MS. FETTIG:  Thank you, Your Honor.  This is Amy

 3   Fettig.

 4              First, we actually think that the Court's solution is

 5   pretty simple and straightforward.  It would not be difficult          01:50PM

 6   to simply add an extra day, look at monitoring sheets and, you

 7   know, if there are 10 state holidays, we all know what the

 8   state holidays are.  They can be planned for.  It's just a

 9   matter of recognizing the mental health care staff are going to

10   be off on Monday so you move your groups around.                       01:50PM

11              Our concern is we don't want those programs to be off

12   limits.  The stipulation is based on weekly compliance.  We

13   understand that defendants will have staff off during some

14   holidays.  We think that can be planned for.  And the

15   alternative is if a week that has a state holiday is drawn and         01:51PM

16   there were no provisions made to actually provide the type of

17   program that is mandated under the stipulation, then that's

18   non-compliant.  We should not be shifting around schedules

19   around so we can guarantee compliance.

20              So our position is that no week should be exempted          01:51PM

21   automatically from monitoring under the stipulation.  The

22   protocol requires random week selection, and if we start Xing

23   out certain weeks then we undermine the important elements of

24   randomness in the compliance monitoring.

25              THE COURT:  All right.  The stipulation requires that       01:51PM
```

```
 1    these things be done, and if there's a holiday during the
 2    sampled week things do get bumped, but it doesn't mean that
 3    they get excused.  So consequently, I think that removing from
 4    the sampling week these 10 weeks, if it is 10 holidays, and
 5    they fall on, as you describe, on when services are to be          01:52PM
 6    provided, then we are potentially excluding 10 weeks out of 56.
 7    So it seems significant to me.  So I am going to provide for
 8    the plaintiffs' recommended approach to be employed with
 9    respect to this measure.
10            Turning next to the addition of the word                  01:52PM
11    "contemporaneously."  That seems to track exactly what we had
12    discussed previously, and so I am a little bit puzzled why it
13    is that it remains an issue.
14            MS. LOVE:  It doesn't remain an issue, Your Honor.
15    Amy Fettig and I and representatives from ADC had a               01:52PM
16    conversation just -- it wasn't yesterday but the day before,
17    and then the update was provided.  We talked through those what
18    Ms. Fettig's additions would be over the phone.  We saw them
19    yesterday when everything was filed.  That is one of the things
20    that now we have had a chance to look at it we agree with that.   01:53PM
21            THE COURT:  Does it make sense for me to ask counsel
22    now which are the ones you have removed from the agenda by
23    having agreed upon them?
24            MS. LOVE:  Sure.  It's the "contemporaneous."  We
25    agree with that.                                                  01:53PM
```

1          THE COURT:  Okay.

2          MS. LOVE:  That may be the only one.

3          THE COURT:  Okay.  My optimism is dashed.

4          MS. LOVE:  There are certain as we go through --

5          THE COURT:  You can raise them.                    01:53PM

6          MS. LOVE:  There's some partial.

7          THE COURT:  Fair enough.

8          The next one is at the top of Page 2, and this is the

9    language that I think almost -- I didn't review the transcript,

10   Ms. Love, but it almost seems to track exactly what you said    01:53PM

11   when we last addressed this issue.  So I'm wondering why is

12   that a problem?

13         MS. LOVE:  The one where it is the shall, the word of

14   "shall."

15         THE COURT:  Right.  Shall.  And also the addition of     01:54PM

16   "due to the pattern of refusals and changed behavior," that

17   seems to reflect -- that paragraph as set forth at the top of

18   Page 2 seems to reflect exactly what we had come to agree upon

19   when we last addressed the subject.

20         MS. LOVE:  The phrase of "due to the pattern of          01:54PM

21   refusals and changed behaviors," we are okay with that.  We

22   agree to that.  It's the change of the word, the "shall" versus

23   "who."  And that was part of the discussion that we had, Your

24   Honor, at the last hearing when we explained that it is not --

25   it's not a written policy that there is a shall to have a       01:54PM

1    discussion with an inmate because that would then, as we

2    discussed, a pattern of different behavior for one inmate may

3    be different than another.  Somebody may never go out.

4    Somebody all of a sudden missing one rec might be different.

5    So per policy, there's no policy that says after X number of          01:55PM

6    refusals somebody shall have a conversation with the inmate

7    because it's based upon ADC staff knowing their inmate

8    population, knowing what's different.

9         What happens in the normal course of operations, and

10   as we said in here, is that when any multitude of staff are in       01:55PM

11   the pods, are seeing the inmates, are looking at the sheets or

12   there's an alert, just verbal, then a discussion in the normal

13   course of operations is going to occur, it's the word "shall."

14   Shall denotes this shall happen at some specific time of a

15   certain number of refusals there's a conversation.                   01:55PM

16        I will give you an example of how this works.  It may

17   be, for example, that a sergeant doing his or her normal rounds

18   is looking at the sheets and notices that a particular inmate

19   hasn't gone out to rec even once that week.  Well, in the

20   normal course of just of practice will have a conversation with      01:55PM

21   the inmate, will discuss why, and then as per the terms of the

22   Monitoring Guide will now denote that conversation on the back.

23        It could also be this:  It could be the warden making

24   rounds who may not have a very specific knowledge of an inmate

25   but just have a conversation with the inmate, hey, is there          01:56PM

anything going on as to why you are refusing rec?  It could be

a matter of when we're doing our tours that Carson McWilliams,

sitting here in the courtroom with us, may look at a sheet,

have a conversation with an inmate and ask, hey, is there a

reason you didn't go to rec once this week or didn't go                 01:56PM

multiple times or isn't going to programming.

          So because this does happen in the normal course of

operations as far as practice, there's not a "shall" that

denotes exactly when these conversations will occur.  So we

believe that our language, which was the supervisory personnel          01:56PM

who have a discussion with the inmate, they are going to

document that.  And that does happen.

          So that's also, you know, as far as going forward,

when plaintiffs' counsel are looking at the sheets provided

they can see whether that is, you know, is occurring.  But               01:57PM

again, we don't have like a cutoff point of when those

conversations must occur.

          THE COURT:  Well, how about addressing it this way,

and that is to take the phrase "in the event of a pattern of

refusals or changed behavior" and move that to replace the              01:57PM

first line up until shall.  So it would read "in the event of a

pattern of refusals or changed behavior, supervisory personnel

shall have a discussion with an inmate regarding refused

out-of-cell time and shall document the date and nature of the

conversation in the comments section."                                  01:57PM

```
 1          MS. LOVE:  Our concern with that, again, Your Honor,
 2    is that it's -- it's very subjective as to when it occurs that
 3    there is a pattern of different behavior.  So we would suggest
 4    a language of when these conversations occur, because they do
 5    happen all the time in the normal course of operations.  When
 6    the conversations occur, then those conversations will be
 7    documented on the back of the out-of-cell tracking form.  For
 8    example, when the conversation occurs, I'm paraphrasing, but
 9    when the conversation occurs supervisory personnel shall
10    document that the conversation occurred and the nature of any
11    comments that the inmate made.
12          THE COURT:  But I thought that the conversation that
13    we had last time about this identified the real need to make
14    sure that there was a requirement that in the event of a
15    pattern of refusals, I mean, the plaintiffs wanted more.  They
16    wanted you to be able to write up a memorandum every time
17    somebody didn't leave their cells.  And you wanted to have the
18    greater flexibility, as I recall, to make the call and whether
19    this was a pattern that was -- or something different than what
20    has been established and it was changed behavior.
21          And so it seems to me that requiring it in those
22    circumstances where there is a pattern of refusals or changed
23    behavior, that that does seem to provide a reasonable
24    addressing of the plaintiffs' concerns without putting too much
25    of a burden on you, which is what I tried to alleviate last
```

01:58PM
01:58PM
01:58PM
01:59PM
01:59PM

```
 1    time.  But I think if I leave it completely in your hands, such
 2    as only if the conversation itself occurs, then there is this
 3    obligation to document it.  Then it seems to remove the
 4    requirement of this supervisory personnel to be actually
 5    engaged in this to make sure that they are perceiving these
 6    kinds of problems and identifying them when they happen.
 7            But before I hear from you again, Ms. Love, let me
 8    turn to the plaintiffs to see if they want to amplify this
 9    discussion.
10            MS. FETTIG:  Thank you, Your Honor.  And we agree with
11    the edit that you have suggested, because our concern here is
12    that what defendants are suggesting is so discretionary that it
13    is meaningless.  We'll rarely ever see any of this type of
14    documentation if there isn't an affirmative obligation to do it
15    and to do it in certain circumstances.  If course, it would be
16    plaintiffs' position that defining pattern of refusals would be
17    a good idea, for example, three or more refusals in a given
18    week.  That would give very clear guidance to staff of when
19    they have to actually engage in this activity.  It is
20    problematic that this non-policy policy that is not written
21    down anywhere, that's just a nice practice, is giving guidance.
22    We would like to see this be far more affirmative, because in
23    our experience, without clear guidance and clear written
24    obligation this is not going to happen and it is not going to
25    lead to the kind of compliance we want to see with the
```

01:59PM

02:00PM

02:00PM

02:00PM

02:01PM

1    stipulation.

2              So we would agree with the Court's suggestion on the

3    edit.  We would like to see more definition of what pattern of

4    refusals and hear what defendants would proffer with the caveat

5    that we think three or more in a week should signal there may          02:01PM

6    be an issue with this particular prisoner.

7              THE COURT:  Well, there are some, though, for whom it

8    is standard, some inmates for, I gather from the last

9    conversation, for whom it is their standard practice to not

10   want to be removed.  And so that would be an extended period           02:01PM

11   that would satisfy your three or more, but that would be an

12   unnecessary reporting because it wouldn't be a changed behavior

13   that really warranted any different attention, I think.

14             MS. FETTIG:  But at the same time, it signals that

15   there may be an issue.  So if you have got a mentally ill              02:02PM

16   person, seriously mentally ill person who is refusing treatment

17   on a repeated basis, regardless of whether or not they have

18   done that for a week or six weeks, that calls for some type of

19   intervention because they are not adhering to treatment.  So we

20   would not want to see someone who was truly sick, truly              02:02PM

21   suffering and has been doing it for a long time be excluded

22   from the type of protections that this provision could afford

23   simply because they are too sick to leave their cell.

24             THE COURT:  Just a second, please.

25             Then I would propose for your consideration, Ms. Love,      02:03PM

```
1   the following:  In the event of an extended pattern of refusals
2   or changed behavior, supervisory personnel shall have a
3   discussion with an inmate regarding refused out-of-cell time
4   and shall document the date and nature of the conversation in
5   the comments section of the back of the out-of-the-cell          02:03PM
6   tracking form including where provided inmate comment as to
7   reason for refusal or refusals.
8           MS. LOVE:  Your Honor, does the language you just
9   proposed, does that include having a benchmark of how many --
10          THE COURT:  No.  It just says extended.               02:03PM
11          (Discussion off the record between the parties and
12  defense counsel.)
13          MS. LOVE:  Your Honor, clarifying that there is not a
14  benchmark as to how many of times of a refusal constitutes a
15  pattern for a particular inmate, because there is that          02:04PM
16  variance, I have consulted with our clients and they would
17  agree to that language.
18          THE COURT:  Okay.  Well, I would adopt that language
19  then.
20          Ms. Fettig, the court reporter has asked me to inquire  02:04PM
21  whether you are on a speaker phone or some kind of phone that
22  is catching background sound.  Because you are cutting in and
23  out and making it difficult to get a good transcription of what
24  you are saying.
25          MS. FETTIG:  Oh, dear.  Hold on a second.  Is that      02:04PM
```

1    better?

2         THE COURT:  Well, certainly in those words it sounds

3    good.

4         MS. FETTIG:  Can you hear me now?

5         THE COURT:  Yes, we can.  Thank you.                    02:05PM

6         So this same modification would be made in Paragraphs

7    2(c), 5(d), 6(i) and 8(d).  Is there any reason, Ms. Love, not

8    to treat those similarly, or is there any reason to treat them

9    differently?

10        MS. LOVE:  There's no reason to treat differently,      02:05PM

11   Your Honor.  We agree.

12        THE COURT:  Then Performance Measure 6, I'm puzzled by

13   why it is that the language "out-of-cell time" is problematic.

14        MS. LOVE:  Your Honor, this is -- this applies -- this

15   argument applies equally to Performance Measure 6 and to       02:05PM

16   Measure 8.

17        THE COURT:  8.  Correct.  Yes.

18        MS. LOVE:  The exclusion of the out-of-cell time, the

19   proffered language by plaintiff is if the out-of-cell time does

20   not happen then there's an automatic noncompliance with both 6  02:05PM

21   and 8.  But here, the parties agreed through the performance

22   measures negotiated through the stipulation, that Performance

23   Measures 1, 2, and 5, are already measuring out-of-cell time.

24   Performance Measure 1 is out-of-cell time based upon max

25   custody step level.  Performance Measure 2 is out-of-cell group  02:06PM

1    programming for an hour.  Performance Measure 5 is six hours of

2    rec.  So those three categories, 1, 2, and 5, already measure

3    out-of-cell time.  6 and 8 then put additional requirements of

4    monitoring per DI 326 and then special provisions for the SMI

5    inmates.  Specifically, Performance Measure 6 measures the              02:06PM

6    additional categories of services of property, phone time,

7    visitation, store, and rec location.

8           So having just not enough out-of-cell time making this

9    entire performance measure non-compliant doesn't make any

10   sense, because they are already being measured for out-of-cell          02:07PM

11   time in 1, 2, and 5, which is why -- which is the lead-in as to

12   why we suggested the category type percentage calculation.

13          THE COURT:  Right, which runs afoul of my previous

14   determination that we shouldn't be in the business of partial

15   credit.  It just is problematic for the reasons I have                  02:07PM

16   previously addressed.

17          Does the plaintiff have a response to what Ms. Love

18   said in court?

19          MS. FETTIG:  Yes, Your Honor.  Looking at Performance

20   Measure 6, it is clear that that performance measure was                02:07PM

21   written and, in fact, does include out-of-cell time.  Now, the

22   fact that defendants used the same 10 prisoners means because

23   they are looking at some out-of-cell time in other measures

24   they will have monitored this.  And if a record is found

25   non-compliant with out-of-cell time, it's going to mean that            02:08PM

```
 1    Number 6 is non-compliant as well.  But that's the way the
 2    measure is written.  We haven't negotiated a change to the
 3    measure.  It's clearly enumerated in Number 6 just as it's
 4    clearly enumerated in Number 8 that the evaluation of that
 5    performance measure includes not just the enumerated time for      02:08PM
 6    SMI but also the DI 326 privileges and out-of-cell time.  This
 7    was deliberately included in the drafting, and it is meant to
 8    be measured.  There is just no way around the fact that what we
 9    put down is what we meant to be measured and now defendants
10    don't want to comply with that.                                    02:08PM
11            But if that's the case, then we have to change the
12    stipulation.  And we are not at the point where we are
13    agreeable to that.
14            THE COURT:  Any last word, Ms. Love?
15            MS. LOVE:  Yes.  It's not an issue of not complying.        02:08PM
16    It's an issue of now quadruple and five times counting
17    out-of-cell time to make a measure non-compliant when the point
18    of 6 and 8 is to measure these additional services provided on
19    top of the out-of-cell time.
20            THE COURT:  How do you know that?                          02:09PM
21            MS. LOVE:  Because of -- because when you are in our
22    Monitoring Guide, the parts that we do agree upon -- what we're
23    doing is we're measuring the categories and the source
24    documents looking at property, phone time, visitation, store,
25    and rec location.  So they are getting the out-of-cell time,      02:09PM
```

which is the baseline of provisions provided under DI 326 plus

these additional categories for Performance Measure 6, plus

Performance Measure 8 where they, in addition to out-of-cell

time, the inmates the, SMI inmates, are provided 10 hours of

unstructured, one hour of mental health programming, one hour                    02:09PM

of psychoeducation, and one additional out-of-cell programming.

So both of these are measuring services in addition to that

out-of-cell time.

          THE COURT:  But what you are saying is that 6 and 8,

even though it specifically states out-of-cell time, doesn't         02:10PM

seek to have that counted in this performance measure.  And I

asked why it is that you know that, and then you listed these

other factors, some of which are also included.  So I don't see

how that's a persuasive argument.

          MS. LOVE:  Well, the point -- it's because both 6 and        02:10PM

8 are looking at these additional factors on top of the

out-of-cell time which is why, for just reasons of across the

board fairness -- and I understand, Judge, I do understand your

order as to the partial compliance.  I would just like to add

because we hadn't had an opportunity to have a verbal              02:10PM

discussion on this is that we see it as distinguishable from

your order on the medical measures where partial credit

couldn't count.  Because, for instance, Performance Measure 67,

which that would apply to the medical side, that counts welfare

checks conducted at least once a shift for IPC.  That's one        02:11PM

```
 1    service being provided.  Here we're looking at five categories

 2    of services as to property, phone time, visitation, store, rec

 3    location in addition to out-of-cell time.  So we're looking at

 4    the provision of very distinct and different types of services

 5    which there should then be a calculation as to compliance.  For    02:11PM

 6    instance, if an inmate doesn't receive one phone call but still

 7    gets store, rec, location, visitation, phone time, property

 8    otherwise and out-of-cell time, to make that a complete

 9    noncompliance just fundamentally does not seem fair when we're

10    trying to measure the provision of services to have one            02:11PM

11    category document for the entire when there are different types

12    of services versus the entire medical.

13         THE COURT:  If you were at the get-go in drafting the

14    stipulation of the performance measures, would you then say it

15    would be your position to break out all of these individual        02:12PM

16    components into separate performance measures so they would all

17    be separately evaluated?

18         MS. LOVE:  Yes.  That would have been -- yes.  But

19    separating out the, you know, even if you categorize the

20    property, phone time, visitation, store, and rec location, and     02:12PM

21    have to measure those, okay, but we shouldn't have to measure

22    for the fourth and fifth time the out-of-cell time on top of

23    that.

24         THE COURT:  Because you say that it would be easy for

25    anyone to tell whether or not the out-of-cell time had been        02:12PM
```

1    complied with?

2            MS. LOVE:  Because of 1, 2, and 5.  You are either

3    going to be compliant or not compliant with 1, 2, and 5, which

4    is out-of-cell time.  Performance Measures 6 and 8 go above and

5    beyond to different categories of services.                    02:12PM

6            THE COURT:  Ms. Fettig, your response first to this

7    specific issue about how this is already being collected in the

8    other performance measures?

9            MS. FETTIG:  Your Honor, indeed it is not.  For

10   Performance Measure 6, that's written the way it's written.    02:13PM

11   Out-of-cell time has always been included.  It is part of the

12   measure.

13           THE COURT:  Let me ask you this:  If I'm asking you in

14   Performance Measure 6 how many cats were found on the yard and

15   I'm also asking you to tell me in Performance Measure 7, were   02:13PM

16   there cats, dogs, and mice on the yard, and you say to me we

17   don't want to have to count in 7 the cats again because we have

18   already counted them in 6, why wouldn't that be a reasonable

19   thing?

20           MS. FETTIG:  Well, I would say the provision had to     02:13PM

21   have been written differently than it was.

22           THE COURT:  No.  I understand that, but --

23           MS. FETTIG:  -- you directed the count.

24           THE COURT:  I know.  And it is -- I'm exploring here a

25   possibility of trying to get a workable way to proceed wholly   02:14PM

```
 1    apart of the issue about how difficult it is indeed for me to

 2    overcome the black and white fact that the stipulation in

 3    Performance Measures 6 and 8 includes the words out-of-cell

 4    time.  And so but the defendants have raised an issue that is

 5    addressed, or that follows along with something that I have         02:14PM

 6    some interest in, and that is making sure that they are

 7    spending time on what's going to produce the best results in

 8    the case.  And if it is true that it's something that's already

 9    been reported, even though it's not permissible to exclude it

10    here, I'm trying to explore why it is that we can't see or we       02:14PM

11    can't talk about whether it makes sense to exclude it here,

12    understanding that it is captured elsewhere.  If it's not

13    captured elsewhere in your view, and you started out saying

14    that, but that's completely contrary to what Ms. Love said.  So

15    I need to understand whether you do have a disagreement about       02:15PM

16    whether it's captured elsewhere.

17              MS. FETTIG:  Well, what's captured elsewhere is

18    recreation, and that is -- and group programming, but there is

19    other out-of-cell time that is afforded to prisoners.  Our

20    concern here, too, is that, you know, quite frankly, it's hard      02:15PM

21    to -- we don't buy the defendants' argument that this is

22    onerous.

23              THE COURT:  They are not saying it's onerous.  What

24    they are doing is saying is if one fallout -- what they are

25    doing, I imagine, is trying to get this cut out of here so if       02:15PM
```

 1   they are non-compliant because they have had out-of-cell time

 2   reported in these other measures, it's not going to do it in

 3   this measure too where they are compliant on the other ones.

 4   That's sort of cutting to the quick about what their thought is

 5   here.  So it really doesn't give me any additional information          02:15PM

 6   to know that all of these collected together are non-compliant

 7   when it is something that is happening because of the

 8   out-of-cell time, which I will know if they are out of

 9   compliance because of the other performance measures that

10   require this.                                                          02:16PM

11          Do you follow what I'm saying, Ms. Fettig?

12          MS. FETTIG:  I do, Your Honor.  And our position would

13   be that that out-of-cell time is so critical to the

14   amelioration of the negative impacts of solitary confinement,

15   that's why it shows up so often in performance measures.              02:16PM

16          THE COURT:  Okay.  So let me drill down and ask this

17   question.  Is that concern about out-of-cell time captured

18   adequately in another performance measure where it is not

19   clouded by these others?  Because then there is also the

20   danger, too, that you are getting a noncompliance here in 6 and       02:16PM

21   8 and you don't know exactly what the reason is.  And if it is

22   that one of the most important things is general out-of-cell

23   time, then you would want to have the identification of that

24   red flag as bright and as undistracted from or unalloyed as

25   possible.  If you are getting that someplace else, why wouldn't       02:17PM

```
 1    it make sense to focus on the ones here that maybe would tell

 2    you something that you didn't know, namely, one of the other

 3    enumerated ones where the basis for the noncompliance.

 4           MS. FETTIG:  Certainly, Your Honor, in the CGAR

 5    reporting it is obvious to some extent what categories are         02:17PM

 6    found non-compliant within the requirements of MC Number 6.

 7    That is not actually an issue.

 8           THE COURT:  What would you think about -- let me ask

 9    the same question I asked Ms. Love.  If you were at the get-go,

10    again, would you break this one out into its individual           02:17PM

11    components?

12           MS. FETTIG:  Well, it was drafted to be the omnibus

13    measure capturing the incentive program with DI 326, and to

14    some extent that program as a whole.  It was broken out in

15    other ways and certainly the SMI provision Number 8 is in         02:18PM

16    addition to the DI 326.  And that's very clear in the drafting

17    that the concern is not only that the SMI prisoners receive the

18    out-of-cell time and incentives in the DI 326 but because of

19    their special status as vulnerable prisoners they get this

20    additional out-of-cell time.                                      02:18PM

21           So the measures themselves were grouped the way they

22    were because that was found to be an organic way.  And our

23    concern here is that the defendants are really using this as a

24    back door argument.

25           THE COURT:  Slow down.  You are going a little bit too     02:18PM
```

1     fast.  I'm sorry.  Slow down.

2          MS. FETTIG:  Our concern here is that by breaking

3     individual measures into their component parts, this is a back

4     door way to get away from the, you know, 20 months of

5     monitoring that we have done, which is essentially yes or no.          02:19PM

6     We are only using 10 records here.  The monitoring process was

7     designed to be yes or no because we have a very small sample

8     size and we, you know, we agree with your order in 1831 that

9     partial credit is not what we have done.  It has been past

10    practice.  It wasn't the intention.  And the goal, really, is       02:19PM

11    to dilute compliance.

12         THE COURT:  Well, I am torn.  I am torn between the

13    black letter of fact that this stipulation calls for this and

14    what are persuasive arguments that are raised with respect to

15    workability.  I have to think more broadly, though, and with        02:20PM

16    respect to potential impact, and I don't know that I have the

17    opportunity to do that.  So I'm going to do something I didn't

18    want to do, and that is on this one, I'm going to take it under

19    advisement and I will get you a ruling no later than the end of

20    this week.                                                          02:20PM

21         So again, my foundation will be established close in

22    time, but I'm going to think some more about what you both have

23    said about this and also take a look at, perhaps, the broader

24    implications of how to construe my determination that was made

25    in a health care performance measure, whether it can be            02:20PM

1    extended here in a fair way.  Okay.

2         MS. FETTIG:  Your Honor, may I just say one more

3    thing?

4         THE COURT:  Surely.

5         MS. FETTIG:  For clarification purposes, while it is        02:20PM

6    true that in the general population DI 326, 1 through 7

7    measures that there are some out-of-cell time, like Number 2

8    measures exercise, it is not true that any DI 326 measuring

9    takes place for the SMI population except for within max

10   custody Number 8.  And that is why it was drafted, so that that   02:21PM

11   measure would encompass for the SMI population, both the

12   additional protections enumerated in that measure but also the

13   protections of DI 326.

14        THE COURT:  So Ms. Love, do you want to address the

15   suggestion that your explanation as to why it would not be a       02:21PM

16   problem to excuse in Performance Measure 8 the inclusion of the

17   words -- or to exclude the words out-of-cell time, why that

18   doesn't work because it's not reported elsewhere?

19        MS. LOVE:  Your Honor, I believe it's persuasive to

20   defendants' position that Ms. Fettig said just previously prior   02:21PM

21   to this last round of statements that the purpose of DI 3 -- or

22   the purpose of Performance Measure 6 and 8 was to provide

23   services in addition to out-of-cell time.  SMI inmates, max

24   custody SMI inmates are not excluded from monitoring for

25   Performance Measures 1, 2, and 5.  If they show up on that        02:22PM

1   random count of however many down we're counting to get to our

2   random draw they are going to be included in that.  So they are

3   not excluded from measurement in 1, 2, and 5.

4          And defendants also, our position is that it is

5   extremely persuasive that because, as Ms. Fettig said, that it      02:22PM

6   was so important for plaintiffs to measure out-of-cell time,

7   that out-of-cell time was broken down into those specific

8   performance measures of 1, 2 and 5.  So there is detailed

9   monitoring of out-of-cell time not just in bulk but in these

10  different categories.  So the same arguments do apply to Number     02:22PM

11  8 that the additional four categories are out-of-cell time in

12  addition to the baseline.

13         THE COURT:  Ms. Fettig, you are both saying things

14  that can't both be true.

15         MS. FETTIG:  That's right.  And we look back at what         02:23PM

16  is actually in the stipulation.  And the language is clear:  In

17  addition to the general privileges and incentives afforded to

18  prisoners under DI 326, all SMI prisoners --

19         THE COURT:  I have to tell you to pause.  One of the

20  problems when people read -- and judges do this too -- but         02:23PM

21  lawyers do it habitually.  That is when we read we read really

22  quickly.  The court reporter hasn't thrown up her arms yet but

23  you have even outpaced my brain's ability and I don't have to

24  move my hands.  So just slow down, please.

25         MS. FETTIG:  Thank you, Your Honor.  And I apologize.        02:23PM

1    It's difficult sometimes when you are on the phone.

2         So our position is that the clear language of the

3    outcome measures define what needs to be monitored.  That has

4    been the practice for the last, you know, almost two years of

5    the stipulation.  There is no reason to change that now.          02:24PM

6    There's no negotiated change in the stipulation.

7         THE COURT:  All right.  And I'm sorry to interrupt,

8    but that's not really an answer to my question, is it?  Wasn't

9    my question directed to Ms. Love saying that, indeed, the

10   out-of-cell time sought after in 8 is reported in the other      02:24PM

11   performance measures just as she said it was in 6.  And then

12   you said no, I thought, and that's not true with respect to --

13   well, you actually said 8 doesn't include it.  And then she

14   said that, yes, 8 does include what is elsewhere reported.

15        So I'm asking you whether there is something different      02:24PM

16   about the reporting in 8 with respect to the other three

17   performance measures that she said, Ms. Love said, was reported

18   redundantly, in her view, in Performance Measure 6.

19        MS. FETTIG:  Number 8 applies to the SMI population.

20   They are -- the records are drawn from the SMI population and    02:25PM

21   while an SMI person might sometimes get into the general draw

22   that is fairly unlikely.  These folks live generally in the

23   same unit together.  And so their experience should be

24   reflected in maximum custody Number 8.

25        THE COURT:  Okay.  So what -- I understand what you         02:25PM

| | |
|---|---|
| 1 | are saying.  You are saying that the reason 8 is separate is |
| 2 | because 8 was focused on a particular population that might not |
| 3 | be fully represented and reported on in the other three |
| 4 | performance measures.  I took what Ms. Love to say to be that |
| 5 | they were equivalent, that indeed, eight would be redundant |
| 6 | with the other three.  I'm going to check in with Ms. Love |
| 7 | right now and see whether it is a true statement to say that 8 |
| 8 | is not redundant entirely of the other three based upon what |
| 9 | Ms. Fettig has said. |
| 10 | MS. LOVE:  It's not redundant because all inmates at |
| 11 | the max custody facilities, including SMI, are subject to that |
| 12 | random draw and monitoring for 1, 2, 5 and 6. |
| 13 | THE COURT:  But Ms. Fettig is saying that the |
| 14 | population for these other three, other than 6, 1, 3, and 5, is |
| 15 | one that is not likely to capture the people addressed in 8. |
| 16 | Is that a fair restatement of what you said, Ms. Fettig? |
| 17 | MS. FETTIG:  That is accurate.  8 is drawn only from |
| 18 | the SMI population.  The rest is drawn from the entire |
| 19 | population. |
| 20 | THE COURT:  And you are saying that there's an absence |
| 21 | of consonance between those two populations significant enough |
| 22 | to cause one to want to assay the SMI population separately in |
| 23 | 8. |
| 24 | MS. FETTIG:  Exactly.  The SMI population is a very |
| 25 | small subset of the thousands of people who are held in |

02:25PM

02:26PM

02:26PM

02:26PM

02:27PM

 1   isolation in ADC.  That is why 8 was specifically drafted to

 2   include both the provisions of DI 326 for this unique

 3   population as well as the additional protections.

 4          THE COURT:  Okay.

 5          MS. LOVE:  And, Your Honor, if I may add that Ms. Rand    02:27PM

 6   has provided me information because she is looking at these

 7   monitoring and these monitoring books and has from the start,

 8   and in the random draw across the board for the max custody

 9   performance measures that are measured in 1, 2, and 5, on

10   average, there's three to five SMI inmates that are showing up   02:27PM

11   on that 10-file draw.  So without evidence of actual

12   underrepresentation, I don't think that we can go just with a

13   broad allegation without statistics behind that.

14          THE COURT:  Well, I wanted to understand the point

15   that you were making as well as the contrary point or the      02:27PM

16   contrary factual assertion that Ms. Fettig was making.  And you

17   have now provided some evidence that reflects that the sampling

18   in these other three measures captures.  But I don't know

19   whether Ms. Fettig has an opportunity, or based upon what you

20   have just said orally to be able to, at this moment, evaluate   02:28PM

21   whether or not that undercuts her argument that there is an

22   insufficient sampling potential.  Certainly the fact that you

23   have reported repeated months of 3 out of 10, given the small

24   size of the population that Ms. Fettig has informed me about,

25   would make a person wonder about that.  But I don't know        02:28PM

1    whether Ms. Fettig has had an opportunity to look at the data

2    that you cite and to see whether or not it is reliable with

3    respect to the assumption that -- or the position you are

4    asking us to accept.

5              MS. FETTIG:  Your Honor, may I say a word?          02:29PM

6              THE COURT:  Yes.

7              MS. FETTIG:  We have never seen this data.  And quite

8    frankly, I would question why there would be so many SMI people

9    in the general record draw given their small proportion of the

10   overall population.  This would make me wonder how this could    02:29PM

11   possibly be random.  Certainly Max Custody Number 8, the

12   performance measure was designed specifically because this is a

13   smaller subset of the population, relatively small, although

14   too large in some ways.  Whether or not what Ms. Rand now

15   alleges is actually true across the board, we have never seen    02:29PM

16   this data.  But regardless, it does not make up for the fact

17   that max custody Number 8 was specifically designed and drafted

18   to deal with the SMI population both in relation to DI 326

19   which is the general stepdown program and the additional

20   protections for the SMI.  We would not have included the         02:29PM

21   language under DI 326 if it was not meant to be measured in

22   this measure.

23             THE COURT:  Okay.  I believe I have what I need to

24   have to consider this issue further from you all here today.

25   So I will take a look at it again and think about it and get     02:30PM

1    the ruling out, as I said.

2            I need to go off the record for a second because I

3    have to talk to the court reporter.

4            (Discussion off the record.)

5            THE COURT:  We were off the record for a moment.  You    02:30PM

6    heard what I said off the record, and that is I asked the court

7    reporter whether you were speaking too quickly, Ms. Fettig.  I

8    am very familiar with this offense because I am guilty of it

9    frequently myself.  So that is why I am particularly sensitive

10   to it.                                                         02:30PM

11           You are going too fast.  You really need to put a

12   rubber band on your wrist or something to remind yourself to

13   slow down just for the sake of not only the court reporter, but

14   also the ability of people to understand what you are saying

15   when you are not present.  We don't have the other clues of     02:31PM

16   body language and things like that.  So the phone makes it a

17   little bit harder.  Maybe there are other reasons, too, with

18   respect to the sampling of digital transmission of voices.  I

19   don't know.  But please do just slow down.

20           Now, turning to C, which is on Page 3, and I            02:31PM

21   contemplated earlier that there could be a possibility of a

22   change in assignment or location of the class members such that

23   the State could redefine where there was a demonstration of

24   that.  And that's essentially what appears to have happened

25   here, that there's been a change.  But there's been nothing in  02:31PM

```
 1    the record that makes me see how the circumstances have
 2    changed.
 3              MS. FETTIG:  Your Honor?
 4              THE COURT:  This is actually not a question for you,
 5    unless you want to add.  If you have got something to say, Ms.
 6    Fettig, you can jump in.  But that was actually a question to
 7    the defendants because they are the ones who want to omit these
 8    other locations.
 9              MS. LOVE:  Your Honor, we are continuing to have
10    discussions about Performance Measure 9 and the scope of -- as
11    to whether it covers CB-1 and 4 because of the change --
12    because there are no max custody inmates in these locations.
13    We have discussed with Ms. Fettig that pursuant to the terms
14    that govern a change, that we will work on providing, versus a
15    phone call and providing ADC representatives to tell everybody
16    that this is the case, to provide competent evidence in the
17    form of declarations and work with Ms. Fettig as to whether
18    they agree that there has been an actual change in the
19    circumstances.  So we are continuing to work on that one.
20              THE COURT:  And would there be any problem of
21    including it -- including these other sites within the language
22    but with the parenthetical if any SMI inmates are housed in
23    those facilities, is there a reason that's not a solution?
24              Ms. Fettig.
25              MS. FETTIG:  Yes, Your Honor.  I would just like to
```

02:32PM
02:32PM
02:32PM
02:33PM
02:33PM

explain the conversation that has taken place here.  After your

order came out in December for the parties, including Mr.

McWilliams, to talk about the various enumerated units in

maximum custody Number 9, because as plaintiffs explained, the

concern of Number 9 is for all SMI but also particularly          02:33PM

mentally ill people who are housed in those enumerated units

who might not necessarily have an official SMI designation but

nonetheless are mentally ill and need some special care and

custody provisions.

        When I spoke with Mr. McWilliams and Ms. Love, they     02:34PM

indicated that the only change had been that Florence CB-1 and

CB-4 no longer housed mentally ill people because one of the

reasons is the actual physical plant of these units was found

to be not very conducive for the mentally ill, and those

individuals were instead moved to Florence-Kasson and the Eyman   02:34PM

SMU.  We then agreed that they would provide some more

documentation regarding this.  The issue, as we understand it,

and certainly as we would move forward on it, is not that

Florence CB-1 or CB-4 has a close custody or lower custody

group of individuals now.  You have already ruled on that issue   02:35PM

related to employment.  That is irrelevant.  Our concern for

maximum custody Number 9 is that Florence CB-1 or CB-4 is no

longer one of the special units that holds mentally ill people

and, instead, they have been dispersed to other parts of the

facility.  Plaintiffs are amenable to continued conversations     02:35PM

1    with defendants about this.  We certainly understand that under

2    the right conditions, stipulations can change organically but

3    through the process that is laid out in the stipulation under

4    Paragraph 40, and that's what we would wish to follow here.

5              THE COURT:  Well, without prejudice to you pursuing      02:35PM

6    what I have told you previously you could pursue, and that is a

7    concern that the people were being farmed out into areas that

8    would allow the purpose of this performance measure monitoring

9    to be evaded, I also think that it seems reasonable to adopt

10   what I suggested, and that is the parenthetical that says with    02:36PM

11   respect to these two that the defendants say there is nobody

12   there, why couldn't you just have the parenthetical say that if

13   there are any such inmates present, why, again, is that not a

14   workable alternative?

15             MS. FETTIG:  We would not be opposed to that.  It        02:36PM

16   would just be subject, subject to proof.

17             THE COURT:  Indeed.  I'm not cutting that off at all.

18   And I think I made it clear to everybody.  And that's not

19   something that I think that the monitors will be deciding.  It

20   will be something that the Court will be deciding so that the     02:36PM

21   lawyers will be the ones talking about it.  And if you find

22   that there is an issue where you think that there is reason to

23   believe that people have been farmed out to escape this

24   monitoring this performance measure then you can let the Court

25   know.  How is that?                                               02:37PM

1          MS. FETTIG:  That's fine, Your Honor.  Thank you.

2          THE COURT:  So we'll add that parenthetical.

3          And I will leave to counsel to be exactly what the

4     language should be, so in your conversation that's continuing

5     about the proof that you said you have engaged in, also talk          02:37PM

6     about what you think the best language should be for the

7     parenthetical.

8          Turning now to the issue at the bottom of Page 3, and

9     that is the review of the video footage and the contention

10    about whether or not it's being discretionary for the monitor.       02:37PM

11         I think that the monitor should be in a position to be

12    reviewing all of the monitoring and that the force of video

13    incidents the monitor should be informed about what

14    information's been collected.  With respect to the concern that

15    the defendants have about memorandum, it seems to me that,           02:38PM

16    perhaps, the best way to approach this is to not require a

17    memorandum but a written checklist that would indicate whether

18    or not the monitor had identified the issues of the cool-down

19    procedure, for example, whether that had been done.  And you

20    could then, I think, avoid the added imposition but then             02:38PM

21    nevertheless provide the information that the plaintiffs seek.

22         Let me turn to Ms. Fettig on this one to see what your

23    response is to all of this.

24         MS. FETTIG:  Well, Your Honor, we agree that the

25    monitor should view all available video.  That tells the story      02:38PM

```
 1   and sometimes it tells a story that's not reflected in the

 2   documentation.  It's absolutely critical that the monitor be

 3   able and, indeed, obliged to look at the universe of a

 4   particular incident in order to determine its compliance or

 5   not.                                                           02:39PM

 6          In terms of the checklist you mentioned, I think that

 7   that could be -- I would want the parties to negotiate back and

 8   forth what would be contained in the checklist.  But I think

 9   that that could be an efficient way.  I know defendants are

10   concerned about adding paperwork, and certainly we're concerned  02:39PM

11   about having to review the millions of documents but a

12   checklist that covers the topics that need to be addressed so

13   that the monitor can ensure that the stipulation is followed

14   and, indeed, so that the plaintiffs can review what has been

15   done and have the knowledge we need to assess whether or not   02:39PM

16   it's accurate.  So we would be amenable to that.

17          THE COURT:  Ms. Love.

18          MS. LOVE:  Your Honor, the max custody notebooks that

19   are produced in this case, in the tab regarding Performance

20   Measure 9, there is the memo from each warden that goes to     02:40PM

21   Carson McWilliams and that is the synopsis we talked about the

22   last time that lists the monitored uses of force.  In that they

23   go through the checklist.  There's categories for a cool-down

24   period and a check box if it's applicable, if there was time to

25   do a cool-down period.  There's a box for is video footage     02:40PM
```

1    available, yes or no with an X.  Was the video reviewed?  X,

2    yes or no.  So that information is already contained and is

3    what we have been doing all along.

4            MS. FETTIG:  Your Honor, we would disagree.  We found

5    the documentation, including the memos, to not be sufficient          02:40PM

6    under the requirements of the stipulation.  They do not contain

7    key elements and they do not contain, for example, you know, we

8    know whether or not the video might not be reviewed sometimes,

9    although as the Court is aware we have had problems with the

10   video documentation being contradictory.  But we would ask for        02:40PM

11   a revised checklist that is geared towards the actual

12   stipulation requirements instead of superimposed to some extent

13   to what defendants were doing prior to the stipulation and that

14   has specific findings so that when we look at that memo we know

15   exactly how the monitor came to his or her conclusions.  Right        02:41PM

16   now that is simply not the case.  Often times the memos are not

17   actually written by the monitor or there's no indication that

18   they were written by the monitor.  So we don't know what

19   conclusions are actually based upon.  The paperwork needs to be

20   modified so that it's much more clear what's being evaluated,         02:41PM

21   what's not being evaluated, and where those conclusions were

22   drawn by the monitor.

23           THE COURT:  Have you happened to have already prepared

24   a proposed new checklist that addresses these concerns?

25           MS. FETTIG:  Not a formal one.  But we would certainly        02:41PM

1    be willing to do so.

2              THE COURT:  All right.  Do that and send it over to

3    the defendants and then have a conversation about it, and then

4    we'll address this in the next hearing that we have already

5    set.  We will take a little bit of time from that hearing to          02:42PM

6    address these follow on issues on the monitoring manual.

7              The -- just so you know, I'm trying to be as thorough

8    as I possibly can, and because of that I contemplate that we'll

9    be at this a bit more.  We've been at it now for 45 minutes

10   almost.  My thought is that at 45 minutes we'll take a                 02:42PM

11   five-minute break and every 45 minutes we'll take a five-minute

12   break.  Just so you know in a couple minutes that what we're

13   going to do.

14             Oh.  I'm lying.  We started at 1:30.  So we have been

15   going for an hour and 12 minutes.  That's too long for the            02:42PM

16   court reporter and maybe for other people.  So we'll take a

17   five-minute break right now.

18             Thank you.

19             MS. FETTIG:  Thank you.

20             (Recess from 2:42 p.m. until 2:51 p.m.)                      02:51PM

21             THE COURT:  So to backtrack a little to make sure

22   we're all on the same page, what I think that I just tried to

23   communicate to you was that I generally agree with what the

24   plaintiffs have set forth on Pages 4 and 5, and that my -- and

25   so I would follow their recommendations about the inclusion of        02:51PM

```
 1    the language in the monitoring manual and ask that you meet and

 2    confer and consider plaintiffs' proposed new checklist

 3    memorandum that would address the issues that I am embracing,

 4    and that is that the monitors be able to have access to and

 5    document the reliance upon these videos and that it be                  02:52PM

 6    emphasized that the monitor can review the records that are

 7    enumerated at Line 17 of Page 4 of the plaintiffs' memorandum.

 8    And I think that carries me through.  Let me just check.

 9           I think that I have covered, but let me -- all of the

10    issues that are in this section, but since we're here now, and         02:53PM

11    because there are so many things there and I have addressed it

12    not in the exact order of how it was presented when we were

13    last talking, and that may have created some confusion, let me

14    turn to counsel and see if they feel that they need further

15    clarification.                                                          02:53PM

16           Ms. Fettig.

17           MS. FETTIG:  Your Honor, there is one remaining issue

18    and that is on Page 4 starting at Line 22, going down to 28,

19    over to the next Page 5, and that is the issue that the

20    defendants remove the language that plaintiffs put forward            02:53PM

21    that, quote, "If the monitor believes that the cool-down period

22    was insufficient under the circumstances there is a finding of

23    noncompliance."  And that is based on the stipulations

24    requirements that the cool-down period have certain

25    characteristics like an opportunity to comply with custody            02:54PM
```

orders and include clinical interventions.  The cool down

required by the stipulation for these individuals in a

potential use of force action is one of the key linchpins to

prevent use of force.  So we -- it is critical for the

functioning of the stipulation requirement for the max custody

measure, and it is our position that the monitor needs to be

instructed and in a position to have discretion looking at a

use of force incident and finding that the cool-down period

provided by staff was insufficient.

MS. LOVE:  Your Honor, we have had a chance to further

consider plaintiffs' position, and we agree to that language.

THE COURT:  Okay.  Thank you very much.

Turning now to Roman Numeral II, the health care

measures, the partial credit issue arises again, and the

difficulty there touched upon in our last discussion is that

the purpose here is to effectuate a written agreement that the

parties agreed to.  And in the past, I have been strongly

motivated to follow your agreement to the letter as best I can

and in the absence of any guidance.  And so that then leads me

to rely upon the Monitoring Guide as it affects the

stipulation.  And I appreciate that the Monitoring Guide had an

existence before the stipulation was agreed to, but it appears

to me that, for the most part, I mean, I may have an obscured

view, but it appears to me mostly what's driving the Monitoring

Guide now is its function as part of the stipulation.

1          And so the first thing that draws my attention in this

2    section is the defendants' desire to identify an alternative

3    method inconsistent with the Court's rulings on how the

4    stipulations should be monitored.  And so I have this tension

5    between a document that was previously existed, previously          02:57PM

6    existed and perhaps has another purpose, maybe it is currently

7    being used by the State for monitoring Corizon's compliance

8    wholly apart from anything associated with the stipulation.

9    And it certainly is possible and permissible for the State to

10   monitor things separate from what's required in the                 02:57PM

11   stipulation.

12          But I'm troubled by the language at the bottom of Page

13   6 insofar as it sends a conflicting and potentially confusing

14   message to the monitors.  And so I think I would prefer that we

15   avoid any risk of confusion, because I rely so much on the          02:57PM

16   monitoring that this manual is going to define and that the

17   best way to, perhaps, accommodate defendant's desire here that

18   may be reflective of the fact that they have other purposes is

19   to say, if that's what you want to do, fine, but do it in a

20   separate section or do it in a separate part.  Don't address        02:58PM

21   the performance measure as you do at the bottom of Page 6.  And

22   then make my criteria the second one that they are asked to

23   ascertain, make my criteria what is sought after.  And then if

24   you want something in addition to that, do it.  But -- that's

25   fine, but do it in a separate place.                                02:58PM

1         Ms. Love?  Oh.

2         MR. BOJANOWSKI:  I will be responding to the medical

3    and mental health measures --

4         THE COURT:  Thank you.

5         MR. BOJANOWSKI:  -- Your Honor.                    02:58PM

6         May I have a moment?

7         THE COURT:  You may.  Surely.

8         (Discussion off the record.)

9         MR. BOJANOWSKI:  Your Honor, you are exactly right.

10   The defendants are utilizing this information not for purposes   02:59PM

11   of reporting to the Court the pass/fail of a particular

12   measure, but we use it internally in trying to determine

13   whether remedial measures are taking effect.  We're looking for

14   trends.  We're looking for, perhaps, outliers that trigger us

15   or identify at a particular location, perhaps a physician or   02:59PM

16   nursing staff or something of that nature that is creating an

17   issue at one of the facilities or one of the units that we can

18   then target, identify, and address.

19        So it's more efficient for us to have the people with

20   the boots on the ground there reviewing the data as it's       02:59PM

21   happening and report that data to us so that we can utilize

22   that data.

23        Now, in reporting to the Court, as you have seen our

24   previous filings, we take the pass/fail numbers that you have

25   ordered us to provide and provide that in a chart form with     03:00PM

```
 1   regard to each performance measure.  And we'll continue to do

 2   that.  That is the compliance with your order.  So although it

 3   requires our monitors to, perhaps, take on some extra duty, the

 4   purpose of that is so that we can adjust the provision of

 5   medical care to both increased compliance and identify              03:00PM

 6   particular problems with the delivery of care.

 7        So we find that utilizing this data helps us

 8   internally, and we would like to continue to do that.  And the

 9   best way for the monitor to be able to do that is to have that

10   information within the particular performance measure that they    03:00PM

11   are looking at and actually taking a measurement upon.  So to

12   have it in another document or something like that may be a

13   little bit more difficult because they are looking at the data.

14        THE COURT:  I'm sorry to interrupt, Mr. Bojanowski.

15   You don't have to put it in a separate document.  Just don't       03:01PM

16   put it in the same place as what is my approved method.  And so

17   you can have an additional method.  You can describe it as an

18   additional.  I would prefer that you not define it as accepted

19   and official, because it's unacceptable for my purposes and so

20   that's not a word that I favor.                                    03:01PM

21        And the reason -- I'm not taking personal affront

22   about this.  What I'm doing is I'm worried that it might be

23   communicating to the monitors that I, or that someone, is

24   saying it's all right to have this alternative way.  And I just

25   don't want there to be that confusion.  So figure out a way to     03:01PM
```

```
 1    put that requirement of additional monitoring of a different

 2    way of assessing that you would like to have it, put it in a

 3    different place in the Monitoring Guide.  You can say:  In

 4    addition you are also to collect the following data.  But don't

 5    make it seem as if what I'm requiring is in any way secondary          03:02PM

 6    or suspect.  And I think a fair reading of your language does

 7    import that meaning.  But lest I wade into an area in which

 8    there's some other agreement, I will turn to Ms. Fettig to see

 9    if she has any comment about this.

10           MS. KENDRICK:  Your Honor, this is Corene Kendrick           03:02PM

11    from the Prison Law Office.

12           THE COURT:  Thank you, Ms. Kendrick.

13           MS. KENDRICK:  We agree with you.  We are not saying

14    in any way that we think that you need to order them to not do

15    that.  It's just this is not the place or time for them to be      03:02PM

16    muddying the waters and including two different scores either

17    in the CGAR reports or having somewhat conflicting information

18    in the Monitoring Guide.  So we agree with your position there.

19           THE COURT:  Okay.  All right.

20           MS. KENDRICK:  Your Honor, just one other thing?            03:03PM

21           THE COURT:  Yes.

22           MS. KENDRICK:  On Performance Measure 16, it appears

23    that they may have omitted the bullet point that actually

24    complied with your instruction about --

25           THE COURT:  I didn't catch that, if that's true.           03:03PM
```

1        MR. BOJANOWSKI:  That is true, Your Honor.  It just

2   was when it was being copied and pasted into the document it

3   dropped off.  And so it just needs to be put back in there is

4   all it is.

5        THE COURT:  All right.                          03:03PM

6        MR. BOJANOWSKI:  But I do want to mention one thing.

7        THE COURT:  Yes.

8        MR. BOJANOWSKI:  I was informed that per your prior

9   order, we were allowed to utilize this percentage method to

10  determine the viability of remedial action plans.  So maybe   03:03PM

11  what I can do is follow up with some additional proposed

12  language with regard to the utilization of this methodology and

13  maybe propose that in a document that we can then get over to

14  plaintiffs and yourself for further consideration.

15       THE COURT:  I don't know what you are referring to,     03:04PM

16  Mr. Bojanowski.  I'm a little bit concerned that what you may

17  be referring to is my description of how I would view, or what

18  I would require, with respect to satisfaction of the benchmark

19  percentages.  That's -- it sounded as though you may have been

20  touching upon that instead of making a different point.  And so  03:04PM

21  I'm not sure exactly what you mean.  Maybe you can confer

22  further.

23       MS. KENDRICK:  Your Honor, this is Corene Kendrick.

24       Could Mr. Bojanowski point us to the docket order that

25  he is referring to?                                   03:05PM

1        THE COURT:  Could you refer to the docket order that

2   you are referring to?

3        MR. BOJANOWSKI:  I cannot.

4        THE COURT:  He can't.

5        MR. BOJANOWSKI:  I was just informed by the client and        03:05PM

6   such that there's some language out there with regard to how we

7   determine whether a remedial action plan is actually taking

8   effect.

9        THE COURT:  Right.

10       MR. BOJANOWSKI:  So that --        03:05PM

11       THE COURT:  Right.  That is wholly different.  That's

12   different than what's happening here.

13       MR. BOJANOWSKI:  And that's, you know, that's what we

14   use this data for as well as other things to identify problems.

15       THE COURT:  Right.        03:05PM

16       MR. BOJANOWSKI:  So what I'm suggesting is if the

17   Court doesn't like the way this is structured, what we can do

18   is we can draft, perhaps, other clauses or such to be added to

19   the guide such that this data is still captured.  Because it's

20   important with regard to the functioning of the medical care        03:05PM

21   delivery system that we be able to utilize this raw data in

22   order to identify problems, determine if remedial action plans

23   are actually taking effect, and use that to help us in getting

24   the delivery of health care and mental health care

25   appropriately done.        03:06PM

1          THE COURT:  Well --

2          MR. BOJANOWSKI:  So if you want us to break it out

3     into a separate clause or separate part of the manual, maybe

4     that's the method by which we would suggest we do that and

5     provide that to the Court and counsel.                    03:06PM

6          THE COURT:  Ms. Fettig, it's your declaration that

7     first set this is forward.  And I know Ms. Kendrick is

8     addressing this topic, but I can't put my hands on quickly

9     because I tried to use only the .pdf document captured in my

10    iPad and it takes too much time to do it.  If I printed it out  03:07PM

11    I would probably be able to get my hands on it straight away.

12         But what I would like is the Footnote 2 on Page 6

13    suggests that this language was added.  Is this one of the

14    areas where there was, you thought, the plaintiffs thought,

15    there was a previous agreement on the language?  Do you     03:07PM

16    understand the question?

17         MS. FETTIG:  Yes.  I believe that's correct.  Let's

18    defer it to Ms. Kendrick just in case I am not remembering.

19         MS. KENDRICK:  No.  It's not one that we have reached

20    an agreement on, Your Honor, because it's one of the ones that  03:07PM

21    we have presented to you for resolution at our status hearing

22    and you subsequently issued that order stating that there would

23    be no partial credit on December 14th.  I believe it was Docket

24    1831 that you had that order on, but I did not see anything

25    about remedial percentages or anything like that.          03:08PM

1          THE COURT:  Right.

2          MS. KENDRICK:  So we had not anticipated that anything

3     had been resolved because we were waiting to see if they fixed

4     them in accord with your order.

5          MR. BOJANOWSKI:  I don't believe there's language in          03:08PM

6     an order.  I believe it was done during the course of the

7     hearing.

8          THE COURT:  Right.  And again, I still remain pretty

9     convinced that it's a different subject that we were talking

10    about.  And that is how to deem whether or not the benchmark     03:08PM

11    had been met and whether or not -- Mr. Struck raised the

12    concern that I was going to require that every encounter be

13    compliant, in other words, 100 percent compliant.  And I

14    explained to him, no, that that's not what the benchmarks

15    contemplated but that I would be paying attention to that issue   03:08PM

16    of the possibility of partial credit not being awarded if it

17    showed that the subsequent remedial measures that were either

18    employed by the defendants on their own action or imposed by

19    the Court were not successful and then that would address what

20    the next measure would be.  And so I think that's what the        03:09PM

21    context of the conversation was that you referred to.

22          But in any event, with respect to this issue, I think

23    what has to happen is we have to avoid the confusion that I

24    have discussed, and so you have to come up with language that

25    doesn't include this, the two-method approach in close            03:09PM

1    proximity to one another.

2         MR. BOJANOWSKI:  Well, we'll redraft something, Your

3    Honor, and submit it for consideration.

4         THE COURT:  All right.  Thank you.

5         MS. KENDRICK:  Your Honor, just quickly reviewing the          03:10PM

6    transcript of the December hearing, it appears that the

7    discussion of these percentages of the partial credit being

8    somehow used for remedial was actually raised by counsel for

9    defendants and Dr. Taylor, when she was testifying, that that

10   was the purpose of it.  But it doesn't look like the Court had          03:10PM

11   ordered that or the parties had agreed that that was somehow

12   going to be used to develop remedial plans.  That was what

13   defendants had proffered to the Court.

14        THE COURT:  So that's what you think the allusion is

15   to.  Thank you for providing that information.          03:10PM

16        MS. KENDRICK:  You're welcome.

17        THE COURT:  Turning to B on Page 7, Health Care

18   Performance Measure 61, I am really thinking that there is an

19   easier way to solve this problem that's compliant with the

20   stipulation, and it is adopting the following as the language          03:11PM

21   that would be employed in the performance measure.  Just give

22   me a moment.  Might be handy for you to do what I'm doing, and

23   that is to turn to the Performance Measure 61, because I'm

24   going to suggest that the language that would be employed for

25   the monitors to rely upon is that they are to, in eOMIS, check          03:11PM

whether there is documentation that the inmate was personally

advised that she may have a pap smear every 36 months, and that

this occurred within 90 days of the 36-month anniversary.  And

if you wish, if you didn't get it, I can read it again.

MR. BOJANOWSKI:  Your Honor, you are saying -- I want                03:12PM

to be clear on what you are actually saying here.  You are

saying that the inmate needs to be personally notified every

three years of the availability of the pap smear, and that

notification has to occur no later than --

THE COURT:  Or within 90 days.                                       03:13PM

MR. BOJANOWSKI:  Within 90 days of the three-year

anniversary date.  Correct?

THE COURT:  Right.

MR. BOJANOWSKI:  All right.  This is what we

contemplate doing, okay, in order to meet this.                      03:13PM

THE COURT:  Okay.

MR. BOJANOWSKI:  We are going to personally notify

each inmate in Perryville, all of them, of this and that will

be our trigger date, so to speak.  Say it's, you know, February

1st.  We'll have that notification to each inmate at                  03:13PM

Perryville, and then that notification will occur three years

from that date or within 90 days of three years of that date to

make sure it's accomplished prior to the next February 1st,

2020.

So that's what we're contemplating doing here to meet                03:14PM

this.  So what's going to end up happening is every inmate at

Perryville will receive that notification which will trigger

that.  So that should alleviate any issue with regard to this

particular measure.

THE COURT:  Based upon what you have said on the                03:14PM

record here today, that would address my concerns.  Because my

concerns were directed to the language that you had proposed,

which was not committed to this notification, this personal

notification and the cycle that you can provide for this

three-year cycle that starts now.  It would mean, however, that  03:14PM

we would -- and I imagine we'll hear from plaintiffs that there

will be an issue about whether or not there's been compliance

with the performance measure because of the people who were not

given this within the time period required.  But I need to hear

from the plaintiffs on whether they are going to hold to that    03:15PM

issue.

MS. KENDRICK:  Yes, Your Honor.  This is Corene

Kendrick from the prison law office.

What Mr. Bojanowski proposed in no way meets the

reason for the performance measure nor does it comply with its   03:15PM

requirement.  The requirement is based off of three years from

the date of intake, not the date that they were notified.  And

significantly, there needs to be a review of the medical

records because the performance measure says that it shall be

every 36 months unless more frequent screening is clinically     03:15PM

1    indicated.  And that's similar language we have on other

2    performance measures, for example, with chronic care where the

3    default is 180 days for each chronic care appointment unless

4    the provider says, I need to see you more frequently.  So

5    there's no way to know if this is a person, for example, who          03:16PM

6    has a history of cervical cancer who needs to be screened every

7    six months versus three years.

8         So unfortunately, while that may be the kind of quick

9    and very convenient way to get the notice out at least once and

10   not to have think about it until 2020, the reality is that this       03:16PM

11   does nothing to address the actual medical care that's being

12   offered or delivered to our clients especially for the

13   individuals where more frequent screening is clinically

14   indicated.

15        MR. BOJANOWSKI:  Your Honor, I'm not suggesting that             03:16PM

16   we're not going to monitor this per the guide.  I mean, we're

17   still going to be pulling the records.  We're still going to

18   make sure that if it's clinically indicated or recommended that

19   that person is going to be notified of that.  All of these

20   inmates that are coming through intake are given this                  03:16PM

21   notification as soon as they set foot in Perryville and they go

22   through their intake medical exam.  So we have provided that

23   already to the intake -- the ladies that are coming in through

24   intake.

25        In addition to this personal notification, we're not            03:17PM

1    taking down any of the posters and other items that we continue

2    to have in every housing unit, in every medical unit that

3    remind the inmates that they are eligible for this type of

4    screening.  So to the extent that an inmate needs additional

5    screening, of course that's going to be provided on a clinical          03:17PM

6    basis.  So we're still going to be measuring this.  I'm not

7    suggesting at all that we're not going to measure per the

8    guideline here.

9         So we think we're trying to address what the Court

10   wants to do with regard to personal notification, which was         03:17PM

11   something different than what we had been utilizing in the

12   past.  So in order to address that concern that the Court had

13   and the order that the Court gave, we have come up with this

14   solution to make sure that everybody is covered by the Court's

15   order.                                                                   03:18PM

16        I would also make note of the fact that we agree with

17   the plaintiffs' suggestion that it's 10 records per yard and

18   not 10 records per facility.  That was left out of our

19   methodology in Measure Number 61.  We'll add that back in

20   because that's plainly incorrect.                                        03:18PM

21        THE COURT:  Okay.  With the yard correction then let

22   me re-focus on what it is that is at dispute.  I will refer you

23   to the Performance Measure 61 in the date revised January 18,

24   2017, Page 82.  The performance measure is set forth, I gather,

25   accurately, the plaintiffs agree?  The first paragraph where          03:18PM

```
1    all female inmates ages 21 to 65 will be offered a pap smear

2    every 36 months after initial intake unless more frequent

3    screening is clinically recommended?

4          MR. BOJANOWSKI:  That's taken directly from Exhibit C

5    in the protocols.                                              03:19PM

6          THE COURT:  Okay.  So it seems like the answer is in

7    the affirmative there.

8          And then jumping down to methodology, if we change

9    "Select 10 inmates per yard whose arrival date was at least

10   three years prior to the monitored month, what is plaintiffs'  03:19PM

11   view on that?"  Are you checking or have you wandered off?  Ms.

12   Kendrick?  Ms. Fettig?

13         MS. KENDRICK:  I'm sorry, Your Honor.  I had the phone

14   on mute so you wouldn't hear the train.  Sorry about that.

15         So yes, the first bullet point with the correction      03:20PM

16   that it's 10 from each yard, that part of it is correct.

17   However, whose arrival date was at least three years prior to

18   the monitored month, we had pointed out that to the extent they

19   want to make it significant looking at a particular audited

20   month it makes sense to look at the files of people who were   03:20PM

21   coming up -- who had come in three years prior to the audited

22   month.

23         THE COURT:  I see.  So you would be agreeable to have

24   that to be amended whose arrival date was -- no.  What you just

25   said is what's set forth there, I thought.  How is that        03:21PM
```

1    different?

2         MS. KENDRICK:  Well, it's unclear if it's three years

3    prior.  I mean, you could have somebody who came in 16 years

4    ago so it doesn't necessarily mean that that person was due in

5    the audited month.  To the extent the purpose is to measure          03:21PM

6    compliance month to month and whether they are doing what they

7    are supposed to do in a given month, you would want to focus on

8    the subgroup of individuals who were due for -- due to be

9    offered such a screening.

10        THE COURT:  So would it be all right to change it to          03:21PM

11   at least three years and no more than four years prior?

12        MS. KENDRICK:  Well, in light of your suggestion that

13   there be the "within 90 days" it might be more within three

14   years or three years plus 90 days.

15        MR. BOJANOWSKI:  I don't think I understand.                 03:22PM

16        THE COURT:  Well, she's concerned that if we do not

17   change it to address the possibility that where it says at

18   least three years, captured in the pull will be people who

19   arrived on the yard, as she suggested, 16 years prior.  And so

20   we're trying to find a way to capture a set of records that      03:22PM

21   would be reflective of the three-year requirement in the

22   stipulation.

23        MR. BOJANOWSKI:  Well, if they were there 10 years

24   prior then you would -- it's supposed to be offered a pap smear

25   every 36 months after initial intake.  So if the person, you     03:22PM

1    know, in the audited month, if you are looking and seeing if in

2    the past 36 months whether they were offered a pap smear or

3    not, you would say either they were or they weren't.

4              THE COURT:  That seems like a good point.

5              MS. KENDRICK:  I'm sorry to interrupt, Your Honor.      03:23PM

6              THE COURT:  Go ahead.

7              MS. KENDRICK:  The performance measure uses the

8    magical word "every," and as I'm sure you remember we have

9    talked about that extensively about what that word means in the

10   context of mental health performance measures.  So it doesn't   03:23PM

11   say whether the person was offered a pap smear in the past

12   three years, it says they need to be offered one every three

13   months.  So in order to have a starting point and a termination

14   point, we need to look at a universe of people where they were

15   due in the audited month.  And so therefore, that's why we were  03:23PM

16   suggesting going back three years.  And your idea makes sense,

17   too, of the between three and four years.  You are going to

18   capture a universe of people who are coming due for their

19   anniversary.

20             THE COURT:  But you're interested in whether or not    03:23PM

21   there's compliance with this measure and so whether somebody

22   came in 16 years ago or three years ago, if they haven't had a

23   pap smear offered within three years, then they will be

24   non-compliant.  And so that record would be non-compliant and I

25   don't understand -- I guess the problem I'm having here is I'm   03:24PM

1    still tending to agree with Mr. Bojanowski that it is not so

2    critical as to when their arrival at Perryville was, it's

3    actually more critical about whether or not they were offered

4    the test within at least every 36 months.  Is that not the

5    idea?                                                            03:24PM

6            MS. KENDRICK:  Yes, Your Honor.  But the point of it

7    is not just whether it has been offered but the frequency,

8    every 36 months.

9            THE COURT:  Right.  Every 36 months.  So --

10           MS. KENDRICK:  So that was just, you know, this is     03:24PM

11   what we have of struggled with with some of the mental health

12   performance measures is how, you know, what's the event 1 and

13   event 2.  So we're saying you need to look at a universe of

14   records where the second event used to measure the frequency is

15   to occur in or around the audited month.                        03:25PM

16           MR. BOJANOWSKI:  Well, the audited month is this

17   month.  We would go back three years and see if it was offered.

18   I mean, that's what the measure is.  If Ms. Kendrick is

19   suggesting that we then have to go back 12 years and determine

20   whether it's been offered four times in the past 12 years, even  03:25PM

21   before the existence of the stipulation.

22           MS. KENDRICK:  I did not at all say that at all.

23           THE COURT:  No.  No.  But that's how -- fairly, that's

24   what is a natural secondary thought to your concern about us

25   grabbing in people who are there who didn't arrive three years   03:25PM

1   ago but arrived 12 years.  We really don't care so much about

2   when they arrived if it was greater than three years.  We care

3   more about whether in the light of the current stipulation that

4   somebody be seen within 36 months, be told personally and that

5   it's documented every 36 months that you have the opportunity      03:26PM

6   to have a pap smear.

7          And so you have some number of files of eligible

8   women, women who haven't had hysterectomies, and you pull those

9   files and you look to see, have they had this advice given with

10  every 36 months.  And you would look to when it is currently       03:26PM

11  given but you would also look to see whether it was given 36

12  months ago.  Isn't that what has to happen under the

13  stipulation?

14         MS. KENDRICK:  Well, Your Honor, if you look at the

15  ruling that you made previously on every, the meaning of the       03:27PM

16  word "every" is that you stated that you look -- the monitor

17  should look at the last two incidents.

18         THE COURT:  I know.  But this is -- this one is a

19  little bit different because we're talking about such a greater

20  time period that goes beyond the scope of when the parties had     03:27PM

21  agreed to do this.  Isn't that a fair reason to distinguish

22  this one?

23         MS. KENDRICK:  No.  We don't think so, Your Honor.

24         THE COURT:  Okay.

25         MR. BOJANOWSKI:  Your Honor, I will just note for the        03:27PM

1    record that this notice that I suggest is going out is going to

2    go out to about 4,000 women.  So --

3                THE COURT:  That's not what I'm going to allow.  You

4    are not just going to allow a mailing to go out to these

5    people.  You have to have a personal consult.                    03:27PM

6                MR. BOJANOWSKI:  They have got to sign.  Each inmate

7    will have to sign, and that's going to go into their medical

8    record so that it can then be seen that they were given that

9    particular notification.  So the whole idea is to make sure

10   that we've got this personal notification out there, that they  03:28PM

11   signed for it, that it's documented.  And that at intake, the

12   idea is that it will be documented at intake and then in

13   addition, if they don't want the pap smear, we'll have a

14   refusal that the inmate will sign as well indicating that they

15   don't want it.                                                   03:28PM

16               So I think we're adequately addressing the concern

17   which is making sure that the women have a pap smear every

18   three years.  That's the idea here.  So. . .

19               THE COURT:  And the reason that the language requires

20   that they be there at least three years is because then we know 03:28PM

21   that we can apply the relevant benchmark of 36 months.  And so

22   I think that it's okay if we capture people who are there for

23   four years or five years because we'll learn whether or not

24   they were offered the test within -- in the last 36 months.

25               So I don't think for the purposes of this requirement 03:29PM

1    that we need to do the additional lookback as we have done in

2    other cases, two times, perhaps, because those two times, I

3    think, were inclusive in the time period of the stipulation.

4    But this one would not be.

5            MS. KENDRICK:  Your Honor?                          03:29PM

6            THE COURT:  Help me out.  Please help me out.  Why is

7    my logic wrong here?  Obviously you have an issue with it and I

8    want to hear why it is.

9            MS. KENDRICK:  Your Honor, I apologize.  I just want

10   to take a step back for a second.  And we have been talking    03:29PM

11   about this measure for months with the defendants.  And at one

12   point there had been a discussion about whether the Corizon

13   computer system could do exactly what the electronic medical

14   records do with Kaiser, which is they generate, for lack of a

15   better word, a tickler that goes out about 90 days before your  03:30PM

16   three-year anniversary, goes out to an individual by US mail or

17   e-mail for those of us in the free world, or a communique

18   through the prison that says:  Dear Prisoner X, did you know

19   you are coming up on the three-year anniversary?  You can

20   request a pap smear.                                          03:30PM

21            And that, to us, seems like a much more logical and

22   simpler system and it would happen on a rolling basis versus

23   some sort of dramatic release of 4,000 communiques across an

24   institution and people signing it.  And so I don't know if Mr.

25   Bojanowski or their contractor is prepared to speak to this,    03:30PM

```
 1    but that was something we had discussed at one point.  It

 2    seemed like a much simpler system and would address our

 3    concerns.

 4              THE COURT:  Any response?

 5              MR. BOJANOWSKI:  They are getting the notice, Your        03:31PM

 6    Honor.

 7              THE COURT:  What about responding -- you say you have

 8    already vetted this and you say it's easier to do it this way.

 9              MR. BOJANOWSKI:  Correct.  And the idea is get the

10    notice to them, have it signed off, get it scanned into the       03:31PM

11    medical records so it could be measured and proven that they

12    got the notes.

13              MS. KENDRICK:  Your Honor -- I'm sorry.  I didn't mean

14    to interrupt you, Mr. Bojanowski.

15              Your Honor, that still would not address our concern    03:31PM

16    about the fact that there are people for whom it is clinically

17    indicated that they need more frequent screening.

18              THE COURT:  They are not disagreeing with that.  They

19    agree that the performance measure will always be addressing

20    people for whom more frequent screening is recommended.          03:31PM

21              MS. KENDRICK:  But they haven't indicated how they

22    would notify those individuals or would measure for that.  And

23    so that is actually the advantage of the tickle r system where

24    the physician or nurse practitioner, when they see you, can

25    just enter in, you know, follow up in three years, and the       03:32PM
```

1    notice will come, or follow up in six months, whatever the case

2    may be.

3         MR. BOJANOWSKI:  Your Honor, obviously if a woman has

4    a condition that requires more screening or additional testing

5    that's going to be noted in the medical record itself.  So the          03:32PM

6    monitor, when looking at the medical record can make the

7    determination that if more frequent screening is clinically

8    recommended that it, in fact, has occurred and measured this

9    based upon the medical record.

10        But, you know, that's something that's going to be              03:32PM

11   individualized by each woman as to whether she requires that,

12   and that's something the monitor is going to continue to look

13   at and continue to measure.  We're not saying that we are not

14   going to be looking at and measuring that activity, because

15   that's what this measure provides.  So it will be looked at and     03:32PM

16   it will be reflected in the doctors' notes or nursing notes or

17   lab test results or any of a number of other documents and such

18   associated with the medical record.

19        THE COURT:  Here's how I read -- go ahead.

20        MS. KENDRICK:  Well, I'm glad that Mr. Bojanowski             03:33PM

21   recognizes the individualized needs.  But that, to us, speaks

22   back to the need for individualized notice not just this mass

23   notice every three years going out to 4,000 people.

24        THE COURT:  Here's how I read this stipulation

25   requirement.  And it is designed to make sure that this test          03:33PM

was provided on a routine basis every 36 months to all women

who should have it, but that the parenthetical added at the

end, unless more frequent screening is clinically recommended,

was to make clear that the health care providers were not

relieved of an obligation to provide these individual tests on

a more frequent basis.

But this performance measure is not designed to

ascertain whether or not the individuals who have the unique

circumstance of needing to have the test more often are

receiving that test.  This one is designed to make sure that

the standard routine practice that is followed in much of the

world is also followed with respect to the patients within the

defendants' care.

And so what I'm going to do is require that the

performance manual say that it be, within the yard, that it be

at least three years prior to the monitored month.  And then

I'm going to impose the language that I have proposed, and that

is:  In eOMIS, check whether there is documentation that the

inmate was personally advised that she may have a pap smear

every 36 months and that this occurred within 90 days of the

36-month anniversary.

All right.  Then I'm going to turn now to the items

set forth on the spreadsheet that appear to be still at issue.

The first issue that is --

MR. BOJANOWSKI:  Your Honor?

1        THE COURT:  Go ahead.

2        MR. BOJANOWSKI:  I'm sorry.  Before we move on, you

3   said 36 -- what was the question?  36 months of the anniversary

4   of their intake or which they got the notice?

5        THE COURT:  No 36 months of -- well, that's a good          03:35PM

6   point because it both should be within their intake if that's

7   within 36 months.  But if they have been there longer than 36

8   months, then it has to be the last time the test was offered.

9   So let's go back to that.

10        MR. BOJANOWSKI:  We would suggest --                        03:36PM

11        THE COURT:  I think my language addressed that.  It

12   said:  Check to see whether the documentation that the

13   individual was personally advised that she may have a pap smear

14   every 36 months and that this occurred within the 36-month

15   anniversary.  And the anniversary that I'm referring to is when   03:36PM

16   the person was last given that advice.

17        MR. BOJANOWSKI:  Okay.  Thank you, Your Honor.

18        THE COURT:  The first issue that I think the

19   plaintiffs raised in their spreadsheet is whether or not those

20   on parole are counted.  Is that one of the issues you have all    03:37PM

21   been able to resolve, I hope?

22        MS. KENDRICK:  No.  Your Honor, this is Ms. Kendrick.

23   It's unclear to us whether the language as written for

24   Performance Measures 33, 34, 75, and 76 reflect the Court's

25   order that parole violators need to be included.  It's not       03:37PM

1    explicit in there.

2            THE COURT:  So why can't we make it explicit then?

3            MR. BOJANOWSKI:  Well, the arrival log lists

4    randomized source record.  That includes everybody who is being

5    at intake including parole violators.  So it's already there.    03:37PM

6    It's just parole violators are included in the intake sheets.

7    I mean, you get a sheet of 50 people who are getting intakes,

8    and, you know, 15 of them are parole violators.  So they are

9    already within the source document that the monitor is pulling

10   at the reception centers that they have within the system.  So,   03:38PM

11   you know, they are already there.

12           THE COURT:  Is a shorter way to say what you say that

13   they are included?

14           MR. BOJANOWSKI:  Yes.

15           THE COURT:  And does that address your concern from      03:38PM

16   the plaintiffs' side?

17           MS. KENDRICK:  Well, the concern, Your Honor, is that

18   in past versions of the guide prior to your order it had said

19   the source prior to the arrival log.  So there hasn't been any

20   change to indicate that the monitor would know they need to     03:38PM

21   include the parole violators in that sample.

22           THE COURT:  But the document they are looking at,

23   apparently, is -- the only document that they would be looking

24   at would be one that does include parole violators.  Is that a

25   correct understanding?                                          03:39PM

```
 1              MR. BOJANOWSKI:  That's correct, Your Honor.  And as a

 2   matter of practice throughout this stipulation, they have been

 3   included.

 4              THE COURT:  Okay.  Just a moment.

 5              I'm sorry.  I'm just juggling a number of different          03:40PM

 6   documents here, and I appreciate your patience.

 7              The reason now that I'm pausing is I think that the

 8   number I have cited as the one that I wanted to turn to next

 9   does not match what I recalled that the subject matter was.  So

10   it makes me think I have written down the wrong performance             03:41PM

11   measure, so I'm trying to backtrack where I should be.  I think

12   what I will do is I will hope it will come to my mind and I

13   will remember as I search through these others.  Maybe it will

14   be adjacent.

15              So I will turn to 98 where the issue is specifying the       03:41PM

16   start and stop times.  We have addressed that before, and I

17   guess my question would be, why is it that we don't do that

18   here as well, where we have this start and end times?

19              MR. FATHI:  Your Honor, this is David Fathi.  If I may

20   clarify something.                                                      03:42PM

21              THE COURT:  Surely.

22              MR. FATHI:  Your Honor, you have ruled specifically on

23   this issue with regard to Performance Measure 98.  This is your

24   order at Docket 1831.  The issue here is that this performance

25   measure is about the timeliness of responding to mental health         03:42PM
```

```
 1    HNRs, health needs requests.  And three of the five categories
 2    of mental health HNRs require that the patient be seen either
 3    immediately or within 24 hours.  And it's impossible to
 4    ascertain if those time frames were met unless the time of the
 5    encounter, the time of the HNR and the time of the encounter as    03:43PM
 6    well as the date are recorded.  And you ordered in Document
 7    1831 that the times must be recorded, but that does not appear
 8    in the current version of the monitor guide.
 9           THE COURT:  And that's why I thought it maybe should.
10    And so let me hear from defendants why we don't.                   03:43PM
11           While you are working on that, my promise to the court
12    reporter, because it's just frankly harder to do a telephonic
13    hearing as well as in present, as maybe you don't all
14    appreciate, so we'll take another five-minute break now.
15           Thank you.                                                  03:44PM
16           (Recess from 3:44 p.m. until 3:51 p.m.)
17           THE COURT:  There are people in the world who can
18    juggle and throw many balls in the air and catch them and pass
19    them on.  I'm not one of those people.  I can't juggle.  And
20    maybe that's why I have been having some trouble.  I thought it    03:51PM
21    would be a good road map to use to start with the plaintiffs'
22    filing on the 24th and then to move to their spreadsheet.  But
23    that's part of the problem I have run into is that I'm moving
24    from one document to another, and there's actually two
25    spreadsheets.  And I appreciate the effort that was made in        03:52PM
```

1    putting this together, and maybe it would be ideally the right

2    method to use for a juggler.  But because I'm not a juggler,

3    maybe having everything in one document going in order is

4    probably easier for me.  Because as I just was checking I

5    realized I missed a couple that I had wanted to address.  And I          03:52PM

6    will get back to those that are in the plaintiffs' filing that

7    was the first page of my road map.  And then I was clearly lost

8    not being able to find the one that I wanted to get to next

9    from the spreadsheet.

10          So I would just make that suggestion that maybe in the          03:52PM

11   future it would be helpful for me if you put everything in one

12   place that you want me to consider at the same time and do so

13   in an ordered fashion so that I can take advantage of the

14   opportunity to have a road map when it is so.

15          So when we were, I think, last talking we were talking          03:53PM

16   about the start and stop and the defendants were conferring.

17   And I then said we would take a break, so now I need to ask you

18   what you conferred to.

19          MR. BOJANOWSKI:  Your Honor, I would suggest that I

20   just -- we located Doc 1831 so we could look at the language of          03:53PM

21   the Court's order.  And we would suggest to the Court that what

22   we do is we take your language from that order and draft a

23   provision in the methodology to address that and resubmit it to

24   counsel and the Court.

25          THE COURT:  Okay.  Very well.          03:53PM

```
 1            MR. FATHI:  Your Honor, may I address that?

 2            THE COURT:  You may.

 3            MR. FATHI:  Thank you, Your Honor.  With all due

 4   respect, the Court's order on this point was not entirely

 5   clear.  The Court's order talks about a compliant record having    03:54PM

 6   documented start and end times, and that's not exactly what

 7   we're talking about here.  We're talking about the need to

 8   record the time that the HNR is received and the time that it's

 9   acted on so that we can tell if, in fact, it is being acted on

10   immediately or within 24 hours, as required by the performance    03:54PM

11   measure.

12            So I would suggest what I think is a clearer edit, and

13   that is if you look at the penultimate paragraph, the

14   penultimate bullet of the monitor manual on Performance Measure

15   Number 98, it requires that the following information be          03:54PM

16   recorded, and I quote:  "Date of receipt, date of triage, date

17   of response, date of required contacts," end of quote.  It

18   would be very simple to just change "date" to "date and time"

19   in each of those four places, and I think that would accomplish

20   what the stipulation requires.                                    03:55PM

21            THE COURT:  All right.  Well, do consider that when

22   you prepare your proposed modification here.  And if you can

23   agree great; if you can't, I will look at it next time.

24            MR. BOJANOWSKI:  Your Honor, we'll review Mr. Fathi's

25   suggestion, and as I said, we'll draft some language and get it   03:55PM
```

```
 1    to the Court.
 2            THE COURT:  Thank you.
 3            Going back to where I was a bit of adrift earlier
 4    because I couldn't find it, and that is 91, with respect to the
 5    continuous watch.  It seemed to me that the commitment that we      03:56PM
 6    had from, actually, from Dr. Taylor, with respect to who was
 7    being seen resolved this issue.  And I guess I thought we
 8    talked about that enough that it would seem to me that there
 9    shouldn't be still confusion about this.  And I need to ask
10    plaintiffs why they think we're still in this situation.          03:56PM
11            MR. FATHI:  Your Honor, this is David Fathi.
12            The Court's order is absolutely clear that all
13    prisoners who are on continuous watch shall be reviewed.  That
14    is the commitment the defendants also made in open court.  The
15    difficulty is that's not what the latest version of the monitor   03:56PM
16    guide says.  It says that a sample of 10 records will be
17    reviewed.  So the monitor guide needs to be revised to be
18    compliant both with the Court's order and with the commitment
19    that the defendants made in open court that all prisoners who
20    are on continuous watch will be reviewed for Performance          03:57PM
21    Measure 91.
22            THE COURT:  Who is going to respond on defendants'
23    point?
24            MR. BOJANOWSKI:  There's no disagreement with
25    monitoring everybody who is on watch, and we'll modify the        03:57PM
```

```
 1    monitor guide accordingly.

 2              THE COURT:  Okay.  Good.  Thank you.

 3              Turning to Number 6 in the spreadsheet, seems to me

 4    that here 24 hours is reasonable in terms of what to expect

 5    people to do rather than thinking somebody who finishes the          03:57PM

 6    work at 11:55 has to get it done by midnight.  So I think 24

 7    hours makes sense.

 8              Tell me, plaintiffs, why we can't go with that.

 9              MS. KENDRICK:  It doesn't match the language of the

10    stipulation, Your Honor.  But if that's your position, we will      03:58PM

11    abide by --

12              THE COURT:  It's not unreasonable to say that day

13    means 24 hours because a day is 24 hours.

14              Ms. Kendrick, was that you speaking?

15              MS. KENDRICK:  Yes.  I'm sorry.                            03:58PM

16              THE COURT:  It's all right.  The court reporter just

17    wanted to make sure.  Thank you.

18              I gather the issue with Number 35 is that there are

19    some medications that are not dosed daily, that they are dosed

20    every couple of days or some other time period.  And so there       03:58PM

21    is a concern that the required regimen, if it's not a daily one

22    but it's a recurrent one, is not captured here.  And so that's

23    why I think that the plaintiffs are concerned with this

24    additional language for medication with a daily dosing

25    interval.                                                            03:59PM
```

1        Am I getting what your concern is here on the

2  plaintiffs' side?

3        MS. KENDRICK:  Yes, Your Honor.  In your order, which

4  is at Docket 1831, you just said the first required dose.  And

5  at the December hearing we talked about the fact that, you                    03:59PM

6  know, the way they had previously written the methodology was

7  first dose and we had one discussion about dosing frequency.

8  So we just felt that the language that we put in the revision

9  did not match what your order had stated.

10       THE COURT:  Any problem with deleting this language?                    03:59PM

11       MR. BOJANOWSKI:  The added language was to expand the

12  scope of the language being reviewed.  So it was clear to the

13  monitor they were to include the daily dose as well as a longer

14  interval dose.

15       MS. ORCUTT:  It's not cited by plaintiff there, Your                    04:00PM

16  Honor, but if you look at the guide on Page 49 there's a second

17  sentence.

18       THE COURT:  Thank you.  Let me take a look.

19       Which bullet point are you referring me to?

20       MR. BOJANOWSKI:  The third one.                                         04:00PM

21       THE COURT:  Thank you.

22       MR. BOJANOWSKI:  Is that this one you are talking

23  about?

24       MS. ORCUTT:  Last part of the bullet we added a phrase

25  that we thought made it clear that the monitor also has to look            04:00PM

1    beyond the daily dose to the first --

2          MR. BOJANOWSKI:  For the first required administration

3    of the medication following the transfer.  So we're picking up

4    both.  We want to make sure that we're getting the daily doses

5    as well as a dose that may be administered, say, once a week,      04:00PM

6    once a month, whatever it would be.  So it's an expansion of

7    essentially what they are supposed to look at to make it clear

8    that they have to look at everything.

9          MS. KENDRICK:  So it may just be a language thing,

10   Your Honor, because it wasn't clear that that last sentence of    04:01PM

11   that third bullet point was to be construed as additionally or

12   referring to medication that had a different dosing schedule

13   than daily.

14         THE COURT:  So would it solve your complete problem if

15   you added before the word if in addition, comma, if the          04:01PM

16   documentation shows -- rather make this addition of in addition

17   or maybe rather say it this way:  Or for example, with a daily

18   dosing interval?  Is there some kind of language so that your

19   concern that you drew from this when you first read it wouldn't

20   be confusing to the monitor?                                     04:01PM

21         MS. KENDRICK:  Well, I think one thing might say to

22   add to the last sentence to say, for purposes of medications

23   with a dosing interval different than daily look to, and then

24   the first required administration.  But just to make clear the

25   last sentence refers to medications that are not on a daily      04:02PM

```
1    dosing schedule.
2            MR. BOJANOWSKI:  We can perhaps modify that.  We will
3    submit it, work through that.
4            THE COURT:  Thank you.
5            MS. KENDRICK:  Okay.                                    04:02PM
6            THE COURT:  In 42, there is a concern raised upon this
7    term that is new, and that is follow-up encounters log.  What
8    exactly is that?  The concern that I think plaintiffs would
9    articulate, and one that I have, too, is that if this is only a
10   log that you have done follow-ups on, how will it be helpful in  04:02PM
11   determining whether or not 42 has been satisfied because you
12   are only checking among those that you followed up with, if
13   that's what the meaning of follow-up encounters log is?
14           MR. BOJANOWSKI:  May I have a moment, Your Honor?
15           THE COURT:  Surely.                                      04:03PM
16           MR. BOJANOWSKI:  This is one that as we were juggling
17   we missed.
18           THE COURT:  Fair enough.
19           MR. BOJANOWSKI:  Your Honor, my understanding is that
20   we're going to have to, again, resubmit some language here.      04:03PM
21   This follow-up encounters log apparently was something that was
22   contemplated but is not in place, and so we're going to have to
23   probably retool this language in some fashion for source
24   documents.
25           THE COURT:  All right.  So 42, the defendants will       04:04PM
```

1    propose a source, a new source record.

2         MR. BOJANOWSKI:  Yeah.  We're using the language you

3    see that's stricken out, the provider encounter log randomized

4    and the nursing encounter log randomized, those are the

5    documents we're currently using as source documents.  What we            04:04PM

6    will do is we'll go back and we'll check and see what the

7    status of the follow-up encounters log is and modify this

8    source document accordingly.

9         THE COURT:  Okay.  So the juggler is going to go back

10   to Performance Measure 85 as described, as the issue is                   04:04PM

11   presented by the plaintiffs' memorandum of the 24th of January.

12   This is on Page 8.

13        And I have to say that the language that the

14   defendants have deleted seems to raise the specter of the

15   possibility of underreporting that the plaintiffs complain              04:05PM

16   about.

17        That said, one of the paragraphs seems, perhaps,

18   appropriate to remove.  That's the last one.  But let me see

19   whether or not you have had any additional discussion about

20   this and where things stand regarding this issue.                       04:05PM

21        Maybe I should hear from plaintiffs first on this one.

22        MR. FATHI:  Your Honor, this is David Fathi.  We have

23   not had any additional discussion.

24        THE COURT:  Okay.  Fair enough.

25        So tell me, then, defendants, why this needs to be --             04:06PM

these three paragraphs you say that should be replaced, why you

have deleted this language that's set forth and why you add

this additional language that seems to raise the possibility,

just as plaintiffs say, that 30 days could have elapsed but

that the required contact wouldn't have occurred?                    04:06PM

      MS. ORCUTT:  So to address the deleted three

paragraphs, those related to the language "or completed" that

court ordered to be stricken.  That was to explain to the

monitor what the "or completed" meant.

      THE COURT:  Right.                                          04:06PM

      MS. ORCUTT:  Now that that language is stricken those

paragraphs no longer make sense or need to be included.  So

that's why we deleted them.

      THE COURT:  Okay.  Seems like it doesn't work

entirely.  As I read through it over and over and over again,    04:06PM

maybe I don't understand exactly.  But as you know, in the

previous orders that we have entered with respect to timing

considerations, there is a sense that you want to make sure

that you are contemplating all possibilities.  The plaintiffs

have raised some concerns that, again, highlight what I have     04:07PM

been concerned about in the past and have actually had to

readdress, and that is where I have not adequately provided for

all contingencies.

      And so here, and you have had a further opportunity to

look at this on the plaintiff's side.  Do you continue to        04:07PM

1   believe that this alternative language is likely to be

2   dangerously under or overinclusive?

3          MR. FATHI:  Yes, Your Honor.  It is a complete rewrite

4   of virtually the entire text of the performance measure.  In

5   November, the parties had reached agreement on the text of the          04:07PM

6   monitor guide for this performance measure.  Then the

7   defendants unilaterally added two words, "or completed."  The

8   Court ordered them to remove those two words, so that returned

9   us to the text that we had agreed upon.  And that should have

10  been the end of the story.                                              04:08PM

11         But now the defendants have made a whole series of

12  unilateral and very significant changes that stand to grossly

13  overstate their compliance.  And here's the most significant

14  one.  The agreed version said that if medications were

15  discontinued in a prior month and the 30-day follow-up still            04:08PM

16  hadn't occurred, the file would be coded as non-compliant.  The

17  defendants, as you can see, have removed that language and now

18  they simply exclude from the sample all files in which the

19  follow-up is two or three or six months overdue.

20         We're not writing on a blank slate here, Your Honor.             04:08PM

21  We're not drafting the monitor guide from scratch.  The

22  question is whether the defendants can reach an agreement with

23  the plaintiffs and then unilaterally make a number of very

24  significant changes that substantially inflate their compliance

25  scores.  And the Court has said in the past that that's not             04:09PM

permissible and it shouldn't be permitted here.  We should go

back to the version that had been agreed on before the

defendants unilaterally added the words "or completed."

THE COURT:  And the prior months would seem to be

relevant here in contrast to the period of time I was concerned

about with the pap smear because the prior months are within

the time of the stipulation.  Is that a fair statement, Mr.

Fathi?

MR. FATHI:  Yes, Your Honor.  This is a 30-day

follow-up.  This performance measure requires that MH-3D

prisoners be seen by a health provider within 30 days of

discontinuing a medication.  So what the prior agreed version

said was, okay, if you discontinued months, let's say it's now

June.  If you discontinued medication in March or February or

January, and you still hadn't been seen for your 30-day

follow-up, then we're going to count that file as

non-compliant.  And that is the language that the defendants

have deleted in this new revision.  And that obviously will

substantially inflate their compliance scores.

THE COURT:  And you are saying that the middle of the

first paragraph where it states:  If the subsequent contact

occurred in any month prior to the monitored month, then it

will be coded with a zero, which means it's not to be counted,

not applicable to this sample, that that would allow those

months that you just described where there had to be no contact

UNITED STATES DISTRICT COURT

1    excluded.

2           MR. FATHI:  Yes, Your Honor.  Correct.  And that's

3    exactly what they are doing.  And we submitted Exhibit 5 to

4    show you that.  And I understand that it may be difficult to

5    read for the uninitiated but I would be happy to walk you          04:10PM

6    through it.  But what it shows is that they are systematically

7    excluding from the sample anyone who discontinued medication

8    more than two months ago.

9           MS. ORCUTT:  Your Honor, I think maybe some confusion

10   occurred with the deletion of the language "or completed."  And   04:11PM

11   I just wanted to explain maybe in a different way the reason we

12   put that language in there in the first place was that we

13   considered that language to encompass those charts that the

14   review would have been due in a prior month and was completed

15   in this month so that those would still get counted.  And it      04:11PM

16   also was to -- so when Your Honor struck the language "or

17   completed" the only language left is "due."  So the monitor is

18   only looking at contacts that would be due in that monitor

19   month so we then missed the other ones.  And the only reason we

20   had that language "or completed" was to capture those other       04:11PM

21   months.  And when the Court struck that language we went back

22   and deleted that accordingly.

23          MR. FATHI:  Your Honor, that's completely

24   non-responsive.  That doesn't explain the deletions that the

25   defendants have made.  If you look at the first of the three      04:12PM

1    paragraphs they deleted, and this appears on Page 9 of our

2    brief, the first of the three intended paragraphs.  What that

3    paragraph says is that if medications were discontinued at any

4    month prior to the monitored month, and the subsequent contact

5    has not yet occurred, but should have been completed by the           04:12PM

6    last day of the monitored month, then it will be coded as

7    non-compliant.  And that's what they have taken out.  That has

8    nothing to do with what Ms. Orcutt was talking about, which is

9    cases in which the contact was completed in the monitored

10   month.  But again, Your Honor, we don't need to get into sort        04:12PM

11   of which is better and which makes more sense, because the

12   parties had already agreed on the text of the monitor guide for

13   this performance measure, and the Court should hold defendants

14   to that agreement and not allow them to completely rewrite

15   this -- the monitor guide for this performance measure.             04:13PM

16          MR. BOJANOWSKI:  Your Honor, let's get back to what

17   we're actually looking at here.  And what that is, is was the

18   inmate seen by a health care provider within 30 days of

19   discontinuing the meds?  Now, how do you do that when you are

20   monitoring a month?  You are going to look and see whether          04:13PM

21   there is a discontinuation of medications.  You take your

22   discontinuation of medications report and you say, was that

23   inmate seen within 30 days of the discontinuation of that med

24   during the monitored month.  And either he was or he wasn't.

25   Okay.  It's that simple.                                           04:13PM

1          THE COURT:  But what if there's a lag.  What if

2     there's somebody who is not seen in the monitored month who

3     should have been seen in the previous months that were within

4     30 days after the discontinuation?  So there's a lag, that

5     person is not compliant, but it's not reported.                04:14PM

6          MR. BOJANOWSKI:  Those inmates are captured in the

7     prior monitored month.

8          MR. FATHI:  Your Honor, that -- you have identified

9     exactly the problem.

10          THE COURT:  That's not true because we don't look at     04:14PM

11     the same records every month.

12          MR. BOJANOWSKI:  Maybe I can have Dr. Taylor explain

13     it a little more.

14          THE COURT:  Dr. Taylor, would you mind coming forward

15     to a microphone?                                              04:14PM

16          MR. FATHI:  Your Honor, we would, once again, ask if

17     Dr. Taylor is going to testify she be sworn.

18          THE COURT:  Dr. Taylor, the oath that you previously

19     took at the last hearing continues to apply.  Do you understand

20     that?                                                         04:14PM

21          DR. TAYLOR:  Yes, I do, Your Honor.

22          Your Honor, per your order that we needed to look at

23     literally almost every single record that falls into this

24     category, every month there's consistently less than 10 per

25     unit.  So those records are looked at at each unit every month. 04:14PM

1            THE COURT:  So they all are.

2            DR. TAYLOR:  The ones that are due that month that are

3      looked at every month, there's very rarely more than 10, very

4      rarely.

5            THE COURT:  So if that's the case, Mr. Fathi, how are          04:15PM

6      we -- my assumption that had led me to be concerned about this

7      would seem not to be true if everyone who has had the

8      discontinuation of medication has had their record pulled?

9            MR. FATHI:  That's not true, Your Honor, because if

10     you look at Exhibit 5 which is MH -- Performance Measure 85 for      04:15PM

11     the Florence complex for November, you see that they pulled 43

12     records, but they -- because they excluded everyone who had

13     discontinued medication in a previous month, they only counted

14     23 for purposes of calculating their compliance and, again,

15     excluding people who had discontinued medications in earlier        04:15PM

16     months and, perhaps, still haven't had the required contact is

17     obviously going to inflate their compliance figures.

18            If the Court will give me a minute, I can certainly

19     quickly look at the latest CGARS and show the Court that many,

20     many more than 10 records are drawn for this performance            04:16PM

21     measure at every one of the large facilities.  We attached

22     Florence, which is one example where there were 43, but I can

23     certainly -- again, if the Court will give me a minute, let the

24     Court know that they are drawing many, many more than 10.  So

25     that's just simply not true.                                        04:16PM

1          THE COURT:  Well, it's important to get -- go ahead

2     and take your time to look for it.  It's important to get to

3     the base of this because, essentially, what you two are saying,

4     both things can't be true.  They are inconsistent.

5          MR. FATHI:  That's correct, Your Honor.  So at the          04:16PM

6     Eyman facility in November of 2016, they counted 25 records.

7     They drew a much larger number.  I could take the time to count

8     them up, but again, it's much larger than 25.  Florence complex

9     we have discussed.  Lewis complex, again, they considered 25

10    records, drew a much larger number, it looks like at least 50.   04:17PM

11    Again, I can count if the Court would like that.  Perryville

12    facility counted 26, drew a much larger number.  Again, it

13    appears to be at least 50.

14          DR. TAYLOR:  Mr. Fathi, can I explain something that

15    may help you with this process?                                  04:17PM

16          MR. FATHI:  If I could finish, Your Honor.

17          THE COURT:  Let's go ahead and let Dr. Taylor say what

18    she wants to say about -- she may have a comment about how you

19    are interpreting the data.  May I ask, Dr. Taylor, if you could

20    move the microphone closer to your mouth.                        04:17PM

21          DR. TAYLOR:  Sure.  Sorry about that.

22          Per what you had asked for, we start with the process

23    of looking to see who was discontinued and we fill up those 10

24    slots with those individuals first.  If we don't have 10 slots

25    filled up we then fill them with people who were discontinued    04:18PM

1    in months prior so that we can answer 86, because they are,

2    unfortunately, dependent on one another the way that it was

3    written.

4         So when you see less than the 50 charts we pulled,

5    it's because we filled up the first slots with every single      04:18PM

6    record at that unit that fell into that category.  And then

7    after that point we then pull the other set that did not have

8    their meds discontinued in the month prior to the auditing

9    month.  And that's where the N/As and zeros come from.

10        And so typically on a unit there's three to five          04:18PM

11   inmates who were discontinued the month prior and, therefore,

12   need a 30-day contact.  Those are filled up first.  We're just

13   simply reporting, for purposes of the start date, that you have

14   asked us to do for mental health to then do their follow-up,

15   the additional slots into that with the N/A and zero.           04:19PM

16        MR. FATHI:  Okay.  Your Honor, I'd like to try to get

17   our eye back on the ball, if I could.

18        The problem is that under the previous version, which

19   I repeat, the defendants and the plaintiffs had agreed to, they

20   looked at records of people who had discontinued medications     04:19PM

21   several months ago, and if they still hadn't received their

22   required 30-day contact, those records are counted as

23   non-compliant.  In the new version the defendants have deleted

24   that provision, and their practice is to simply exclude from

25   the pool any record in which the person discontinued meds more   04:19PM

1    than two months ago.

2            And again, we provided the example from the Florence

3    complex where you can see that every record of someone who

4    discontinued medication before October 31st of 2016 has a zero

5    next to it, and that zero means that record was excluded from          04:20PM

6    the calculation of the compliance score.

7            But again, Your Honor, I think the simple answer here

8    is there was an agreement.  The defendants tried to

9    unilaterally alter that agreement.  The Court told them to take

10   out those two words.  We should go back to what was the agreed       04:20PM

11   document.

12           THE COURT:  Dr. Taylor, it seems what Mr. Fathi says

13   is right, that I'm now moving to a point where I'm changing the

14   criteria in a way that runs the risk of an underreporting.

15           DR. TAYLOR:  So, again, the N/A and zeros that he's          04:20PM

16   referring to are inmates who were discontinued months prior and

17   therefore not due in the monitored month.  When we had

18   discussed this with them on the phone, and we had put in the

19   completed language, not unilaterally, it was through a

20   discussion where I attempted to explain to Mr. Fathi how the        04:21PM

21   word "or completed" captured those ones from the past, but also

22   captured the inmates who were discontinued in the monitored

23   month and seen also in the monitored month does not inflate the

24   compliance because they would only be captured in that month.

25   They wouldn't then be captured the next month and next month.       04:21PM

1    But Mr. Fathi believed that that inflated it and asked for you

2    to remove that language.  That language was put there to

3    capture both types.  And so when removed, we removed the

4    additional language which doesn't make any sense.  The question

5    is each month, whether those that were discontinued 30 days          04:21PM

6    prior to that were seen.  And every month we captured the whole

7    group of individuals who fall into that category.  There is

8    often almost every unit less than 10.

9         And so going forward, if it's helpful, we can not

10   include any of the records that don't fall into that category.      04:22PM

11   We have just continued to put that information in there because

12   that is the start date of when mental health then has three

13   months so we left that data in there for that purpose and then

14   put a zero because that information is there just to tell us

15   when mental health has three months from, not whether or not a      04:22PM

16   30-day contact occurred or not because that is in prior

17   monitoring months.  If that makes more sense.

18        THE COURT:  I understand what you are saying.  It's

19   helpful to me.  And what I have heard from you, Dr. Taylor, and

20   from Mr. Fathi, is helpful for me to understand this.  I'm          04:22PM

21   going to, again, take this issue under advisement, take another

22   look at it and make sure I'm giving you the precise instruction

23   on how to proceed.

24        MR. FATHI:  Thank you, Your Honor.  May I just say one

25   more thing?                                                         04:22PM

1           THE COURT:  Surely.

2           MR. FATHI:  I don't agree with Dr. Taylor's recitation

3      of the facts about our previous discussion.  But one very

4      important point is that part of the agreement we had reached

5      with the defendants was that we clarified that the phrase, "due        04:23PM

6      a contact in the monitored month" includes those patients who

7      should have received a contact in a previous month but have not

8      yet received that contact.  And you can see that at Document

9      1756-1, Page 83.

10          So that is -- those are the people who in the November        04:23PM

11     agreed version of the monitor guide were being assessed, were

12     being included in the pull.  If they hadn't received their

13     contact yet they were counted as non-compliant.  Those were the

14     people who under defendants new and unilateral revisions of the

15     monitor guide are now being excluded from the pull.        04:23PM

16          THE COURT:  Okay.  Thank you.  94 is related to this,

17     I gather.  I raised this issue at the very start.  Sounds like

18     Dr. Taylor has partly explained, or perhaps potentially

19     explained to me, why it is these greater records are being

20     drawn, the greater number of records being drawn.  But is there        04:24PM

21     anything different about this 94 measure that is not informed

22     by what we just talked about?

23          MR. FATHI:  It is distinct, Your Honor.  And as we --

24     as the Court said at the outset, drawing a larger sample is not

25     necessarily objectionable.  The protocol requires a minimum of        04:24PM

1     10 records per complex except at Eyman where there must be 20.

2     And from the beginning of the stipulation, it has been the

3     defendants' virtually invariable practice to draw no more than

4     10 at each facility and no more than 20 at Eyman.  Now suddenly

5     in November they have dramatically increased that to 35 records      04:25PM

6     at Eyman, 25 at Tucson, 20 at Lewis, and 15 each at Florence,

7     Perryville, Phoenix, and Yuma.

8            And again, as the Court has said previously, the

9     defendants don't get to just unilaterally start doing something

10    differently than it has been done for the entire life of the        04:25PM

11    stipulation.  They have to present the change to the Court.

12    They have to explain it.

13           THE COURT:  Mr. Fathi, that's a different context.  I

14    think here you are going to have to suggest to me what is

15    perhaps something that is contrary to the purpose of this           04:25PM

16    stipulation of the drawing this greater number.  For instance,

17    if you do think that they are doing something to manipulate the

18    data that gives false reporting of what's actually happening

19    that's one thing.  But if it's just them drawing more records

20    to try to get a better sense of things themselves with the          04:25PM

21    belief that maybe they were unlucky for the first 10 and 20 may

22    give them a better view, that's okay.  They can change to do

23    that.

24           But if you think that it is they are drawing more

25    files and discarding the ones that don't count or don't help        04:26PM

1    them, that's a different thing.

2         MR. FATHI:  Well, here's the problem, Your Honor.

3    Again, it would be nice if the defendants would communicate

4    this with us rather than just unilaterally making this change

5    without any communication to the plaintiffs or the Court.          04:26PM

6         Here's the concern:  It would obviously be

7    impermissible if the defendants were to draw 10 records, look

8    at those 10 records, see that they weren't compliant and then

9    keep drawing additional records until they inched above the

10   threshold of compliance.  I'm not saying that's what they are    04:26PM

11   doing but we don't know.  We have no explanation for the sudden

12   increase in the sample size.

13        We have no objection to the increased sample size if,

14   number one, it is the same sample size at a given facility

15   every month, it doesn't fluctuate from month to month, and it    04:26PM

16   is a true random sample that you draw all 35 or 25 or whatever

17   the number at once and then evaluate them.  You don't look at

18   the first 10, see how you are doing, and then decide if you

19   want to draw some additional records.

20        THE COURT:  Well, I mean, what you say does make some       04:27PM

21   sense to me, I have to say, Mr. Fathi.  But let me see if there

22   is some explanation from the defendants that doesn't raise that

23   last concern that you raised.

24        MR. BOJANOWSKI:  Well, Your Honor, obviously what Mr.

25   Fathi suggests is not true.  That is not what is happening.       04:27PM

1    Obviously, the monitors are very diligent in the way they

2    monitor as can be seen by the amount of negative findings that

3    are before this very court.

4          The reasoning behind 94 having an increased number of

5    sample size is that you look at the protocol and you are          04:28PM

6    talking about 10 records per complex.  So you have a complex

7    of, say, 3,000 individuals and you are pulling 10 records for

8    the whole complex for this measure.  So the thinking was

9    increase the sample size to get a more accurate reporting.  The

10   stipulation says it's a minimum 10 records per complex.          04:28PM

11   Increasing that helps with the accuracy in reporting.  And

12   that's the underlying basis of what's going on here.  There's

13   no nefarious activity that Mr. Fathi suggests that somehow

14   there's some cherry picking going on here.  If he's got some

15   evidence of that I would sure as heck like to see it.            04:28PM

16         THE COURT:  Okay.  Well, there will be an opportunity

17   for that as part of the greater understanding that will happen

18   when we have this subsequent evidentiary hearing on how it is

19   that the performance measures are carried out.  This 94

20   actually fits nicely within that and, perhaps, doesn't fit as    04:29PM

21   well with what we have otherwise on the agenda today, and that

22   is defining language in the Monitoring Guide.

23         MR. FATHI:  Your Honor.

24         THE COURT:  Please.

25         MR. FATHI:  Could we have defendants' commitment that,     04:29PM

```
1    number one, the number of records drawn, at least the target

2    number of records to be drawn at every facility will be the

3    same from month to month, and number two, that it will be a

4    true random sample.

5         THE COURT:  Well, I think the random sample idea, I'm     04:29PM

6    hoping, is a given.  Is that true?

7         MS. ORCUTT:  Correct.

8         THE COURT:  All right.  So I have had avowal of

9    counsel that that is true.  And then turning to the first one

10   that it doesn't change from month to month, Mr. Fathi, would it   04:29PM

11   not make sense to hear from the people who are involved in

12   doing this as to why it is that they think that they might want

13   to do that and that the evidentiary hearing could, perhaps,

14   where we would ask the defendants to provide the person who

15   would be making that decision as to explain, under oath, why it   04:30PM

16   is they do that?

17        MR. FATHI:  That's fine, Your Honor.  I was assuming

18   the defendants would be willing to make that commitment today.

19   If they're not, we could explore that at the evidentiary

20   hearing.                                                          04:30PM

21        THE COURT:  I guess I will pose your question to

22   defendants.  We will see what they have.

23        MR. BOJANOWSKI:  Is he asking for a commitment as to

24   the number of records per facility, per unit?  We have 10

25   facilities.                                                       04:30PM
```

UNITED STATES DISTRICT COURT

1        THE COURT:  He's concerned about the variability of

2   one month, lower the next.  Maybe that is a fair way to

3   capitulate what he's saying.

4        DR. TAYLOR:  So what we have done is take a quarter of

5   people who were on watch for that month at that site because      04:30PM

6   what we found is actually recently when, I think it was Lewis,

7   I pulled the first 10 like we normally do and was planning to

8   pull the next 20, they actually were 100 percent in the first

9   10.  Continued to pull the next 20, because that's what we do,

10  and there were three other findings in the remaining 10.          04:31PM

11  Because that's important.

12       THE COURT:  Is it something you would be willing to

13  commit to today that you would follow this -- did you say 40

14  percent or a quarter?

15       DR. TAYLOR:  A quarter, 25 percent.                          04:31PM

16       THE COURT:  25, thank you, would be willing to follow

17  this 25 percent across the board and going forward?

18       DR. TAYLOR:  Yeah.

19       THE COURT:  Would that satisfy you, Mr. Fathi, on that

20  point?                                                            04:31PM

21       MR. FATHI:  Well, Your Honor, I would need to think

22  about that.  It does seem odd that 25 percent yields very round

23  numbers at each and every facility, 35, 25, 20, perhaps that's

24  a coincidence.

25           But I would like the chance to think about that.  It     04:31PM

1    may be satisfactory.  But again, for every other measure it is

2    a fixed number drawn at each unit or each complex per month.  I

3    would prefer it be a fixed number for this measure, too, as it

4    has been for the entire life of the stipulation.  But if the

5    Court would allow me to think about that, then perhaps we          04:32PM

6    either will or will not need to address it at the evidentiary

7    hearing.

8         THE COURT:  Just to emphasize she is offering a fixed

9    number, it's just different than the one they used before.  You

10   have now heard the explanation as to why they have done it and    04:32PM

11   maybe you would be comfortable with that.  But I will give you

12   the chance to think about it.

13        MR. FATHI:  Thank you, Your Honor.

14        THE COURT:  I have run through all of my issues except

15   for the two that I would do at the very end, and that is to set    04:32PM

16   this timetable for when you will get me your final revisions on

17   the monitoring manual and then also selecting a date for us to

18   consider the separate issue of how it is that the monitoring

19   manual is implemented by the monitors.

20        And so before we get to those last two issues, it's          04:33PM

21   now time for me to turn to the plaintiffs and the defendants

22   and ask them to raise any issues that they believe I should

23   have raised and didn't.  Plaintiffs get to go first.

24        MS. KENDRICK:  Your Honor, this is Corene Kendrick

25   from the Prison Law Office.  Were you planning on your agenda      04:33PM

1    talking about the issue of the HNRs and the open clinic?

2          THE COURT:  No, I thought that would fit -- because we

3    don't really know everything about that right now.  I think

4    it's a plain thing from the record.  But it's also much more

5    with respect to implementation than it is with what is called          04:33PM

6    for in the monitoring manual, don't you think?

7          MS. KENDRICK:  Okay.  Well, we also wanted to, and

8    maybe we have been going for over three hours so we may want to

9    defer this to the next hearing, but the issue we raised that --

10   about perhaps looking at the possibility with this performance          04:34PM

11   measure for collecting institution-wide data to start moving to

12   recording that versus the 10 files randomly selected, which is

13   the best they have.

14         THE COURT:  Hold on just a second.

15         Well, isn't that also something that you can confer          04:34PM

16   with Mr. Fathi about and decide whether or not you are

17   comfortable with what you have heard here today?

18         MS. KENDRICK:  Yes, Your Honor.  And we hope that that

19   hopefully will spark an ongoing conversation in the future with

20   the defendants.          04:34PM

21         MR. FATHI:  Your Honor, I beg your pardon.  May I say

22   just one more thing?

23         THE COURT:  Of course.

24         MR. FATHI:  As I said earlier, it would be nice and I

25   think it would be helpful if the defendants would communicate          04:35PM

```
 1    with us about these changes and not just make them unilaterally

 2    and we come across them when we review the CGARS.  I think that

 3    might avoid the necessity of bringing at least some of these

 4    disputes to the Court.

 5            THE COURT:  Aren't you talking about something that's      04:35PM

 6    going to be resolved once we agree on what the monitoring

 7    manual requires, or are you thinking that they will do things

 8    that tweak in a way that is something that is not specifically

 9    addressed in the monitoring manual?  Is that what your concern

10    is?                                                               04:35PM

11            MR. FATHI:  Well, yes, Your Honor.  For example, with

12    Performance Measure 94, the substantial increase in the sample

13    size is not at all reflected in the monitor manual, or they did

14    not communicate that to us.  I'm simply suggesting, and I guess

15    the defendants can accept the suggestion or not, but it might     04:35PM

16    be helpful if these things were communicated to us.

17            THE COURT:  Just to be clear, there's really no foul

18    here because what they did in drawing more files didn't

19    actually violate the stipulation or violate a specific

20    requirement of the monitoring manual.  What you are simply        04:36PM

21    saying is if there is going to be a change in the procedure and

22    the methods you would find it helpful to be informed about that

23    in the first instance.  Is that what you are saying?

24            MR. FATHI:  Precisely, Your Honor.

25            THE COURT:  Okay.  And that's a reasonable request,        04:36PM
```

certainly, and one that I would endorse.  I think it is helpful

to have people talking about things, and certainly I know that

you do engage in a lot of back and forth and that sometimes

that back and forth has been difficult because of the strong

views that are held by respective sides.                    04:36PM

        But nevertheless, the challenge we all have is to

figure out how to agree what we can agree to and how to

disagree agreeably on what we can.  But it still is best to

always have happen in the context of a conversation rather than

by just unilateral action.  And if it is that it can't be     04:37PM

resolved by the discussion then people aren't so surprised when

they see that there is an action that follows on.  They have at

least been given the heads up about it.

        So I think that is telling me that the plaintiffs are

finished with their issues that they would like to present.    04:37PM

        MS. KENDRICK:  Actually, Your Honor, this is Ms.

Kendrick again.  This is just a housekeeping matter.

        THE COURT:  Yes.

        MS. KENDRICK:  There are going to be five separate

motions that will be fully briefed as of tomorrow, and we were  04:37PM

just wondering how the Court plans to handle those pending

motions.

        THE COURT:  We noted that just -- I'm saying "we" in a

meeting with -- it's not the royal we, it's the people that

monitor me to make sure that I'm staying on top of things,     04:37PM

1   people I work with in my chambers.  And we are aware of the

2   issues that will be ready to rule as of tomorrow, and we're

3   going to be paying attention to that.  If you find after you

4   think that these measures are ready to rule that we haven't

5   ruled, it's possible that we have allowed something to fall          04:38PM

6   between the cracks, then feel free to, on procedural matters,

7   inquire with the Court by a call to the law clerk or to my

8   judicial assistant and ask whether or not the Court is aware

9   that a ruling is being awaited on a particular matter.  That's

10  not an impermissible ex parte contact, and I won't do what the      04:38PM

11  judges of lore did, and that is, ask what side you are on and

12  say denied if you are the movant and contrary if it's the other

13  way.  I will appreciate that kind of information you provide to

14  me.

15          MS. KENDRICK:  Thank you, Your Honor.                        04:38PM

16          THE COURT:  All right.  Defendants' side?

17          MR. BOJANOWSKI:  Your Honor, we have no further issues

18  to bring before the Court.

19          THE COURT:  All right.  Let's try to pick a time when

20  it is that we can have another hearing that will be an               04:39PM

21  evidentiary hearing that is sufficient out in time that we'll

22  be able to get wrapped up on the monitor manual so everybody

23  knows what it says.  So I guess that probably means at least

24  about a month from now, and I also don't want to be overtaxing

25  to people by being too close in time to when our standard           04:39PM

```
 1    meeting is.  And so we'll have to take care to be mindful of

 2    when that is.  We don't want to make people be butting heads on

 3    court appearances.

 4          The clerk is checking to see what we have and then I

 5    will offer that up and see what you all think about it.        04:39PM

 6          While the clerk is consulting about that, the

 7    defendants had asked previously for an opportunity to have a

 8    presentation at an evidentiary hearing with respect to the

 9    issue that arose at a prison tour that the plaintiffs have said

10    that they would like to seek redress that includes financial   04:40PM

11    reimbursement for the costs incurred at that tour.  And the

12    defendants have asked for an opportunity to present evidence as

13    to why it is that their conduct was not as alleged.

14          And so we would, if we're going to proceed with that,

15    I think I need to also pick a time for that hearing as well.    04:40PM

16    So when the clerk gives us the first date we'll then also try

17    to pick a second time.  And maybe -- I was about to say we

18    could maybe join it with another but that's not wise because

19    everybody doesn't necessarily have to be present for every

20    hearing if it doesn't cover an area that they are working on.   04:40PM

21          THE MAGISTRATE CLERK:  How about March 6th at 9 a.m.

22          THE COURT:  March 6th at 9 a.m. is the implementation

23    hearing date.  March 6th at 9 a.m.  How does that look for

24    plaintiffs' calendars?

25          MR. FATHI:  This is David Fathi, Your Honor.  That's     04:41PM
```

```
 1    fine with me.
 2            THE COURT:  Anybody else wanting to comment on that on
 3    the plaintiffs' side?
 4            MS. KENDRICK:  We're checking, Your Honor.
 5            MR. BOJANOWSKI:  Which hearing?                          04:41PM
 6            THE COURT:  On the implementation.  So I talked about
 7    the foundation of the monitoring manual, but then the
 8    suprastructure that's built upon that is going to be what kind
 9    of implementation practices actually happen, what are the
10    monitors doing, how are they doing it, how are they reading    04:41PM
11    this.  There are concerns that have been raised about it and
12    this would be an opportunity for us to have the relevant people
13    who are on the ground in the courtroom so that they could be
14    examined about this and that everybody could have a clear
15    understanding about issues that they have been raising that    04:41PM
16    have never really been able to be addressed.
17            THE MAGISTRATE CLERK:  Judge, I'm sorry, our regular
18    status hearing is the 8th.
19            THE COURT:  That's a problem.  Why don't you see about
20    the middle of -- maybe the third week of March.  No.  February  04:42PM
21    is a short month, but what about the third week of February?
22            THE MAGISTRATE CLERK:  How about the third week of
23    February?
24            THE COURT:  Yeah.
25            THE MAGISTRATE CLERK:  We're on duty.                   04:42PM
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  On a Monday of that week?

 2              MR. BOJANOWSKI:  I think that's a holiday, Your Honor.

 3              THE COURT:  Okay.  Sorry.  How about the following

 4    week.

 5              THE MAGISTRATE CLERK:  We have the trial 1st and 2nd.    04:42PM

 6              THE COURT:  Okay.  I wonder if we should do this.

 7    Maybe it's possible that by getting the issues that are

 8    engendered by a lack of clarity on the monitoring manual,

 9    getting those squared away, maybe we won't have as much to do

10    on the monthly.  And so maybe we could adopt the March monthly   04:43PM

11    meeting, which is, you said, the 8th that we have already

12    cleared?

13              THE MAGISTRATE CLERK:  Yeah.  We're already set for

14    March 8th at 10.

15              THE COURT:  Okay.  Why don't we set that for the       04:43PM

16    implementation hearing date.

17              MR. BOJANOWSKI:  Just so I understand, because if I

18    need to have kind of an idea of the scope of what we're talking

19    about.

20              THE COURT:  I understand.                              04:43PM

21              MR. BOJANOWSKI:  Because it's useless to have a

22    hearing without the appropriate people present.

23              THE COURT:  Right.

24              MR. BOJANOWSKI:  So I need to have an idea of what the

25    Court is envisioning as far as evidence is concerned so that I   04:43PM
```

1    can then go back and have the appropriate people present.

2          THE COURT:  Who is in charge of making sure that the

3    performance measure monitoring, as defined by the monitoring

4    manual, happens consistently with the monitoring manual?

5          MR. BOJANOWSKI:  Ultimately, Mr. Pratt, but there are          04:44PM

6    other individuals within the monitoring Bureau that have

7    specified areas that they maintain, like Dr. Taylor takes care

8    of the mental health portions.  We've got other individuals

9    that take care of maybe CQ-I type things and other individuals

10   that may look at, maybe, nursing.  And so it's --          04:44PM

11         THE COURT:  It would seem that it is true that Dr.

12   Taylor and Mr. Pratt would be likely suspects.

13         MR. BOJANOWSKI:  Correct.

14         THE COURT:  But it also could be true there could be

15   others.  But I wonder if plaintiffs from their visits have          04:45PM

16   observed enough to suggest to defendants who also might be

17   appropriate as potential witnesses.

18         MR. BOJANOWSKI:  Are you talking about an actual

19   monitor who's boots on the ground at a facility?  Is that what

20   you are --          04:45PM

21         THE COURT:  Well, it depends what the level of

22   supervision is and how much autonomy the monitors have.  As I

23   read the documents, it seems that the monitors have some level

24   of monitoring that would be helpful to know from a monitor

25   exactly how do you take this?  What do you take this to mean?          04:45PM

1    It seems like that kind of transparency would maybe obviate

2    some of the issues that are raised in the briefing in front of

3    me and that is, frankly, described as a lack of trust.

4          And so if I can address that, and I think this might

5    be one of the methods to do it, it would, perhaps, be helpful          04:45PM

6    to have such a person.

7          MR. BOJANOWSKI:  All right.  We'll try and bring

8    appropriate --

9          THE COURT:  And maybe I can ask the defendants to

10   think about this and, in a timely way, if you do have                   04:46PM

11   suggestions about who might be helpful as a witness, make those

12   suggestions to the defendants and see what that conversation

13   produces.  Is that all right with plaintiffs?

14         MR. FATHI:  Yes, Your Honor.

15         THE COURT:  Okay.  So we will turn the March 8th date,           04:46PM

16   and that is at what time again, please?

17         THE COURTROOM DEPUTY:  It's currently set for 10.

18         THE COURT:  All right, for 10 a.m., and we'll turn

19   that into this hearing on the implementation aspect of the

20   monitoring manual.                                                      04:46PM

21         And then with respect to the evidentiary hearing,

22   we'll need to pick a date also for that.  We know that -- well,

23   here's perhaps what we should do.  We have for some period of

24   time these dates set for the monthly meetings.  It's possible

25   that we will find that we have the opportunity to address other        04:47PM

things at those meetings, but this particular issue isn't one

that needs to be addressed immediately because it's all about

money, and the money can be dealt with at any time, I think.

There may be some aspect of it with respect to whether or not

plaintiffs burned one of their opportunities to visit.  I don't        04:47PM

recall whether I already ruled on that.  I think maybe I did

that it wasn't a burn of a visit, but what remains at issue is

the money.  So we really don't have to turn to that immediately

so I won't set a hearing.  But I will keep it in mind.  I'm

thankful that I, at least, have informed you that I haven't        04:48PM

allowed that to drop off the agenda because it's been raised.

      All right.  Anything else we need to address today?

      All right.  Thank you all very much.  Appreciate your

time and patience with the process.  It is a big system that

you all run, speaking to the defendants who do this, and it's a        04:48PM

big system that plaintiffs are monitoring.  And so I appreciate

that you are working hard and devoting a lot of energy to this.

      And I also appreciate that there are increases in the

familiarity with the Court's appreciation of exactly what is

the circumstance on the ground.  I have rejected the        04:48PM

defendants' opportunity to have another tour because I don't

think that's helpful.  I think my hours are helped by spending

time reading what you have submitted.  And so I appreciate that

you have done that.  And I think each time that we go through

this process I get a finer sense of the circumstances.  And I        04:49PM

```
 1    will do my best to continue to give you an equal measure of the
 2    care that you have taken in preparing these kinds of things for
 3    me.
 4            But I also think it's fair to end with the concern
 5    that the model that I have set up of the Monitoring Guide and      04:49PM
 6    this implementation session is really designed in the spirit of
 7    optimism that we can, through transparency and clear
 8    understanding, one with the other, remove any doubt that
 9    everybody is focused on a good faith enforcement of the
10    stipulation.  And I continue to encourage both sides to keep       04:50PM
11    that in mind; that I am interested in the letter of the
12    stipulation but I'm also not divorced from appreciating the
13    spirit of it as well.  And I think I do understand that and
14    lawyers naturally have an inclination to try to sometimes hide
15    behind the letters even though the spirit would say you            04:50PM
16    couldn't be there.  And I would encourage you to be as faithful
17    to the spirit of the agreement that you reached.
18            Thank you all very much.
19            (Proceeding concluded at 4:50 p.m.)
20
21
22
23
24
25
```

1

2

3                    C E R T I F I C A T E

4

5           I, LAURIE A. ADAMS, do hereby certify that I am duly

6    appointed and qualified to act as Official Court Reporter for

7    the United States District Court for the District of Arizona.

8           I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13           DATED at Phoenix, Arizona, this 15th day of February,

14   2017.

15

16                              s/Laurie A. Adams

17                              _____
                                Laurie A. Adams, RMR, CRR

18

19

20

21

22

23

24

25