Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
Jacob B. Lee, Bar No. 030371
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-DKD<br><br>**DEFENDANTS' AMENDED NOTICE RE: ITEMS FROM FEBRUARY 8, 2017 HEARING PURSUANT TO COURT ORDER (DKT. 1951)** |

Pursuant to the Court's February 24, 2017 Order, Defendants submit their Amended Response to the Court's Order at Dkt. 1933 at 3. (Dkt. 1951).

## I. BACKGROUND & INTRODUCTION

In response to Defendants' request for clarification on whether the Court required Defendants to re-audit, what measures are subject to re-auditing, and how far back Defendants are required to re-audit, the Court stated:

> Defendants are under no obligation to apply the Final Monitoring Guide's procedures retroactively. However, if Defendants want to persuade the Court that a given Performance Measures (sic) at a given facility is compliant with the Stipulation, then Defendants will have to show that this PM/facility was compliant under the Final Monitoring Guide's procedures. *Id*.

This is because, the Court explained, "For some Performance Measures, the final version of the Monitoring Guide will require monitors to start using different procedures." *Id.* at 1. As such, Defendants' decision to re-audit, and Defendants' ability to advise the Court whether a re-audit will alter the current scores, is contingent upon implementation of a "Final Monitoring Guide." Unfortunately, because the parties have not yet finalized the Monitoring Guide, no "final" version currently exists.[1]

As the Court can appreciate, this hampers Defendants' ability to answer the Court's pending questions regarding measures subject to Plaintiffs' Motion to Enforce (Dkt. 1863): (1) which performance measures do Defendants believe warrant remediation; and (2) what are Defendants' proposed remediation plans for failing performance measures.[2] (Dkt. 1933 at 3). Defendants cannot know which measures they will re-audit because the methodology they must employ for the re-audits, as the Court ordered, are contained in

---

[1] And Defendants are justifiably concerned that no "Final Monitoring Guide" can ever exist. Indeed, the parties and the Court have recognized that this document is a "living" document, and the Court has authorized a process in which to modify the Guide. *See* Exhibit 1 (2/8/17 Hr'g Tr. at 39:2 – 12).

[2] The Court also ordered Defendants to advise whether the corrective actions discussed in their Response to Plaintiffs' Motion to Enforce (Dkt. 1900) are Defendants' proposed remediation plans. Defendants answered that question in their February 15, 2017 Notice – no remediation plans were included in Defendants' Response to Plaintiffs' Motion to Enforce. (Dkt. 1930 at 2).

1

the "Final Monitoring Guide", which does not yet exist. While Defendants know what the Court's interpretive rulings are, the "Final Monitoring Guide" encompasses more. It will also include the hundreds of monitoring methodology agreements made by the parties, and those still being negotiated by the parties, without court intervention, over the last two years. Because the Court ordered that the "Final Monitoring Guide" be the starting point for re-audits, and it is not yet in final form, Defendants are unable to make an individualized determination as to which performance measures to re-audit. It follows that Defendants cannot propose remediation plans, as it is unknown which measures will receive non-compliant scores under the methodologies outlined in the "Final Monitoring Guide."

Further complicating matters are the unanswered questions previously raised by Defendants as to what constitutes "substantial non-compliance" and when measures should enter and exit the remediation process. Both the Court and Plaintiffs recognized the importance of answering these questions ("And so it's not an unreasonable question to ask. It's not a question that's answered by the mechanism for when performance measures are removed from the Stipulation. But it is a more nuanced question of when they should enter." (Exhibit 1 at 41:16 – 19). And the Court appreciated the difficulty in answering these questions, "[the answer to these questions] . . . is difficult to define in a precise way." (*Id*. at 44:2 – 3); "and it turns out to be somewhat of a complicated issue…" (*Id*. at 41: 8 – 9); "it is possible for the performance measures to vary with respect to whether or not they are meeting the benchmarks." (*Id*. at 41:13 – 15). Plaintiffs agree: "[Plaintiffs do share this frustration . . . so we also struggled with that. . . " (*Id*. at 42:22 – 23; 43:5).[3]

---

[3] Plaintiffs and the Court also admit they don't use a "hard and fast rule" in deciding whether to send Defendants a notice of non-compliance or in ruling that Defendants are in substantial non-compliance at a particular facility for a particular measure. (*Id*. at 43: 9 – 10; 43: 19 – 44:3). Such a subjective standard makes it difficult for Defendants to determine whether a measure is "failing", as requested by the Court. (Dkt. 1933 at 3).

2

And the Court appreciated Defendants' concern: "It's complicated because of the fact that we have also in this time lag, we are presently dealing with a need to appreciate the impact of the Court's previous rulings on how the performance measures are measured and also with respect to whether the monitoring guide was in a final process that meant that all of these other performance measures that, perhaps, are now just being looked at, whether they are affected by that as well." (*Id*. at 41:19 – 42:1). The Court deferred ruling on this issue:

> I also wonder if I'm better making this decision about when, if I -- if I'm going to make a rule about when matters enter into the process and when they can be removed from the process of this additional remediation plan, if I'm going to make a rule, I should probably understand what the ramifications of that rule would be. And that would mean that I would have to understand also what the current status of affairs is as completely as possible
>
> And so that is contingent on the application of the monitoring guide and on data that is reflective of the Court's rulings' late last year about how the data is to be counted.[4] And so maybe what I will do is on this issue of when matters enter and when they could, perhaps, be removed, defendants have asked for that counsel, or a ruling from the Court, I think, perhaps, what I will do is defer for the moment and wait to see if any greater information becomes available to me to let me know what the scope and potential ramifications are of such a rule.

(*Id.* at 44:4 – 11; 44:14 – 21)

These unanswered questions further impede Defendants' ability to answer the questions regarding re-audits and remediation plans. Defendants hope the Court will engage further discussion and clarification at the March 8, 2017 Status Hearing.

Despite these obstacles, in an attempt to comply in good faith with the Court's Order and ensure underperforming measures are remedied, Defendants reviewed each of the performance measures subject to Plaintiffs' Motion to Enforce (Dkt. 1863) and developed remediation plans for those measures Defendants reasonably believe (without having the benefit of re-audited scores) warrant a remediation plan.[5]

---

[4] Significantly, the Court's reasons for deferment are the same reasons for Defendants' inability to answer the Court's pending questions.

[5] Defendants also note that, pursuant to the Stipulation, the Court must first find

3

## II. DEFENDANTS' PROPOSED REMEDIATION PLANS

### A. Performance Measure 35:

#### 1. Florence & Lewis

Corizon recently hired a medicine management/pharmacy monitor (John Chapman) who will be responsible for this measure. He is currently touring all facilities and conducting an analysis as to how and why this measure is underperforming. He is implementing successful processes at underperforming facilitates and analyzing why other processes have been unsuccessful. He will tour Florence and Lewis next.

Additionally, for both Florence and Lewis, a licensed practical nurse ("LPN") will see each inmate who arrives at the facility to verify he has his medications ordered and that he is placed on the medication line master pass. The LPN will confirm that any medication is documented as an active order in eOMIS. The Director of Nursing ("DON") will work with both the LPN and security to ensure all incoming inmates are brought through intake.

#### 2. Tucson

The Corizon Compliance Team compiled a list of "best practices" and provided Tucson's intake nurse with training tailored to best practices for completing and documenting intakes. These best practices ensure documentation of the intake process is complete and that all inmates' medications are checked prior to completion of the process. If an inmate arrives without medications, missing medications will be ordered from the back-up pharmacy. Additionally, an Information Report ("IR") will be submitted to the intake officer for all inmates who arrive without medications.

///
///
///

---

Defendants have not complied with the Stipulation before it can require Defendants to submit a remedial plan. (Dkt. 1185 at ¶36). The Court has not yet ruled on Plaintiffs' Motion to Enforce (Dkt. 1863) and has not yet found that Defendants are in substantial non-compliance with respect to any measures raised in Plaintiffs' Motion.

4

### 3. Eyman

Eyman implemented a centralized process, which utilizes 1 – 2 intake nurses, to ensure and confirm inmate medications are transferred with and provided to the inmate at the receiving facility. Training on the process will be led by the DON and will be provided to the intake nurses tasked with this assignment.

### B. Performance Measure 37:

#### 1. Perryville:

All sites have moved to an "open sick call" process so that inmates with immediate health concerns will be seen the same day. Routine follow-up, administrative inquiries, and other non-medical issues will be scheduled when an inmate presents at "open sick call" with a Health Needs Request ("HNR"). Each unit is expected to address all HNRS at the time they are presented.

### C. Performance Measure 39:

#### 1. Yuma:

To increase compliance and provider productivity, Yuma recently added two additional telemedicine kiosks and an additional telemedicine provider. These additional resources will increase capacity for provider appointments, and will decrease the time it takes for the telemedicine provider to review X-rays and lab results.

### D. Performance Measure 40:

#### 1. Eyman

Internal reports outlining pending urgent referrals (with aging) were developed to assist clinical staff in managing urgent referrals. These reports are provided each shift to every housing unit. Nursing supervisors will ensure inmates on these reports are scheduled, and providers will confirm all inmates listed in the report were addressed.

### E. Performance Measure 44:

#### 1. Eyman

Going forward, the Facility Health Administrator ("FHA") will be exclusively responsible for reviewing and acting upon hospital treatment recommendations. The CC

1  will review both the scheduled and unscheduled offsite appointments daily. When the CC
2  receives discharge recommendations, he/she will ensure their completion and review
3  eOMIS to ensure the nurse completing the offsite return form has contacted the provider.
4  The CC will also cross check the findings with the scheduler.

5  When an inmate is sent to the emergency room, the Assistant Director of Nursing
6  ("ADON") will send an Arizona Utilization Management Emergency Room Alert to the
7  CC. This, and the emergency room logs from the previous day, will be reviewed daily by
8  the CC. Unit nurses will complete emergency logs. These revised operating procedures
9  have been distributed to the ADON on each yard. The DON will follow up with the
10 assistants to ensure understanding of the new procedures.

11 Additionally, each day, the FHA will follow up with the control center to
12 determine which inmates were sent out to a medical appointment in the last 24 hours. The
13 HAS will then obtain the paperwork regarding the off-site appointment, and take it to the
14 Medical Director ("MD") for review and signature. The FHA will sit with the provider to
15 ensure the MD's timely review and signature.

16         2.    <u>Florence</u>

17 Utilization Management ("UM") will distribute hospital discharges to all yards,
18 and is working with security to ensure all returns are seen in medical before the inmate is
19 returned to his yard. When inmates return from the hospital or emergency room, the
20 provider on duty will review their discharge recommendations. If no provider is available
21 (outside business hours), the on-duty nurse will review the discharge recommendations
22 and contact the provider on duty for verbal authorization (for meds, etc.), if needed. The
23 following day, at the beginning of shift, the provider will see the inmate. Providers that
24 give verbal/phone orders will ensure they are following up with appropriate
25 documentation as soon as practical. The nursing staff will also be educated that all offsite
26 returns, including inmates returning from the hospital, must be labeled/coded as "return
27 from offsite."

28

### 3. Lewis

All inmates returning from offsite transports are processed at the central medical hub prior to being returned to their respective housing units. Nursing supervisors will immediately notify providers of hospital returns and ensure discharge recommendations are available. When the facility provider has verbal communication with the hospital treating physician, the facility provider will document the discussion and his/her intended course of action in eOMIS, even if there are no treatment recommendations.

### F. Performance Measure 45[6]:

#### 1. Lewis

All nursing staff will receive additional education and training in mid-March. The training will focus on drawing labs and the timeframe required for completion of the labs. Additionally, each day, the lab technician will pull lab reports to determine whether additional assistance is needed to complete lab draws. If so, the lab technician will notify the Director of Operations ("DO"), FHA, and the DON that assistance is needed. In the next two weeks, the x-ray techs from Perryville and Yuma will travel to Lewis to assist with clearing x-ray backlog. Going forward, each day, the x-ray tech will run a pending x-ray report and notify the DO, FHA, and DON when ancillary assistance is necessary in order to achieve compliance. To avoid a delay in care, nursing staff will also be instructed to call the x-ray tech when STAT x-rays are ordered. If STAT x-rays are ordered on the weekend, the provider will send the inmate out for the films, and nursing will document accordingly.

### G. Performance Measure 50:

#### 1. Florence

To increase compliance, internal reporting has been created to assist staff in managing outside consults. This report contains information such as patient name and number, specialty type, provider, status, and date of order. The FHA and the CC will

---

[6] Plaintiffs withdrew their Notice of Non-Compliance with respect to this measure at Florence and Yuma. (Dkt. 1911 at 2, n. 1).

7

1 monitor this report for scheduled urgent specialty consultation orders. The CC and
2 scheduler will alert the FHA of any consult not completed within twenty days of the order.
3 The CC will work closely with community providers in improving the timeliness of
4 receiving reports and results back from those outside providers.

### H. Performance Measure 51[7]:

1. Eyman

To increase compliance, the CC at Eyman is now exclusively responsible for scheduling and completing routine specialty consults. Defendants believe this will increase compliance because, previously, both the CC and scheduler handled this task. This presented documentation errors, and coordination was difficult, because the CC and scheduler are in different areas of the facility. Now, all routine consultations are forwarded directly to the CC who will schedule the inmate the same day he is approved. Each day, the previous day's scheduled consultations are now added to a newly created and implemented spreadsheet that the CC uses to monitor the lifecycle of that consultation and ensure it is completed within the 60-day timeframe. Any consultations that have not been seen by the 53rd day will be flagged and forwarded to the FHA and DON to ensure compliance with the timeline is achieved.

### I. Performance Measure 52[8]:

1. Florence

At Florence, it was discovered that medical was not receiving inmates' reports when they returned to the facility, partly due to challenges in receiving reports back from outside providers in a timely fashion. It was reiterated to security that all inmates must be brought to medical upon return to the facility. Nursing Supervisors and/or medical records staff will review charts of inmates returning from an outside consult to ensure they

---

[7] Plaintiffs' withdrew their Notice of Non-Compliance with respect to this measure at Florence, Lewis, and Tucson. (Dkt. 1911 at 2, n. 1).

[8] Plaintiffs withdrew their Notice of Non-Compliance with respect to this measure at Yuma. (Dkt. 1911 at 2, n. 1).

are seen and that medical has the necessary information. Providers, Certified Nursing Assistants ("CNA")/Medical Assistants ("MA"), and the CC, recently received additional training on the proper way to pull a Consult Completed Results Received Report ("CCRRR"). They, and the Site Medical Director ("SMD"), will pull the report Monday through Friday. After reviewing the outside consult notes, the provider will indicate "consult completed practitioner reviewed" in the "action taken" section of the consult. As a second layer of protection, to ensure notes are being reviewed in the seven-day timeframe, the FHA and SMD will designate someone to run a weekly "consult completed report." Florence also received thorough training and PowerPoint demonstrations on how to run the reports, switch the status to "consult completed", and the timeframe required to do so. Additionally, reports are run at the UM office twice a week.

### 2. Perryville

Providers, CNA/MAs, and the CC recently received additional training on the proper way to pull a CCRRR. They, and the SMD, will pull the report Monday through Friday. After reviewing the outside consult notes, the provider will indicate "consult completed practitioner reviewed" in the "action taken" section of the consult. As a second layer of protection, to ensure notes are being reviewed in the seven-day timeframe, the FHA and SMD will designate someone to run a weekly "consult completed report." Additionally, providers will review the reports for any new Alternative Treatment Plans ("ATP") and provide those to the certified nursing assistant each day.

### 3. Tucson

Providers, CNA/MAs, and the CC recently received additional training on the proper way to pull a CCRRR. They, and the SMD, will pull the report Monday through Friday. After reviewing the outside consult notes, the provider will indicate "consult completed practitioner reviewed" in the "action taken" section of the consult. As a second layer of protection, to ensure notes are being reviewed in the seven-day timeframe, the FHA and SMD will designate someone to run a weekly "consult completed report." Tucson also received thorough training and PowerPoint demonstrations on how to run the

reports, switch the status to "consult completed", and the timeframe required to do so. Additionally, reports are run at the UM office twice a week. Providers will review the reports for any new ATPs and provide those to the CNA/MA each day.

In addition to the remedial plans detailed above, for Performance Measures 48 – 52, Defense counsel will be facilitating training at all underperforming facilities. Specifically, because of Lewis's success rates on these measures, Defense counsel will meet with various Corizon employees at Lewis to learn their best practices, and how they achieve and maintain compliance. Defense counsel will then conduct training at underperforming facilities based on the information learned from Lewis.

DATED this 17th day of March 2017.

    STRUCK WIENEKE & LOVE, P.L.C.


By /s/Daniel P. Struck
    Daniel P. Struck
    Kathleen L. Wieneke
    Rachel Love
    Timothy J. Bojanowski
    Nicholas D. Acedo
    Ashlee B. Fletcher
    Anne M. Orcutt
    Jacob B. Lee
    Mark A. Bracken
    STRUCK WIENEKE & LOVE, P.L.C.
    3100 West Ray Road, Suite 300
    Chandler, Arizona 85226

Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried
Lucy M. Rand
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926

*Attorneys for Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Alison Hardy: | ahardy@prisonlaw.com |
| Amelia M. Gerlicher: | agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com |
| Amir Q. Amiri: | aamiri@jonesday.com; ttualaulelei@jonesday.com |
| Amy B. Fettig: | afettig@npp-aclu.org |
| Asim Varma: | avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| Caroline N. Mitchell: | cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com |
| Corene T. Kendrick: | ckendrick@prisonlaw.com; edegraff@prisonlaw.com |
| Daniel Clayton Barr: | DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com |
| Daniel Joseph Pochoda: | dpochoda@acluaz.org; danpoc@cox.net; gtorres@acluaz.org |
| David Cyrus Fathi: | dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org |
| Donald Specter: | dspecter@prisonlaw.com |
| Jennifer K. Messina: | jkmessina@jonesday.com |
| Jessica Pari Jansepar Ross: | jross@azdisabilitylaw.org |
| John Howard Gray: | jhgray@perkinscoie.com; slawson@perkinscoie.com |
| John Laurens Wilkes: | jlwilkes@jonesday.com, dkkerr@jonesday.com |
| Jose de Jesus Rico: | jrico@azdisabilitylaw.org |
| Kathleen E. Brody | kbrody@acluaz.org |
| Kirstin T. Eidenbach: | kirstin@eidenbachlaw.com |
| Maya Abela | mabela@azdisabilitylaw.org |
| Rose Daly-Rooney: | rdalyrooney@azdisabilitylaw.org |
| Sara Norman: | snorman@prisonlaw.com |
| Sarah Eve Kader: | skader@azdisabilitylaw.org;mlauritzen@azdisabilitylaw.org; rstarling@azdisabilitylaw.org |

Rita K. Lomio:          rlomio@prisonlaw.com

     I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/Daniel P. Struck