1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3                   _____

4

   Victor Parsons, et al., on   )
5  behalf of themselves and all  )
   others similarly situated;    )
6  and Arizona Center for        )
   Disability Law,               )
7                                )   No. CV 12-0601-PHX-DKD
                   Plaintiff,    )
8                                )
         vs.                     )   Phoenix, Arizona
9                                )   March 8, 2017
   Charles Ryan, Director,       )   8:10 a.m.
10 Arizona Department of         )
   Corrections; and Richard      )
11 Pratt, Interim Division       )
   Director, Division of Health  )
12 Services, Arizona Department  )
   of Corrections, in their      )
13 Official capacities,          )
                                 )
14                 Defendants.   )
   _____)

15

16

17    BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

       REPORTER'S TRANSCRIPT OF PROCEEDINGS
18
           (*Evidentiary Hearing Re: Status*)
19

20

21 Official Court Reporter:
   Laurie A. Adams, RMR, CRR
22 Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc 43
23 Phoenix, Arizona 85003-2151
   (602) 322-7256
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2    **For the Plaintiffs:**

3            EIDENBACH LAW PC
             By:  **Kirstin T. Eidenbach, Esq.**
4            P.O. Box 91398
             Tucson, AZ 85752
5
             ACLU - Washington DC
6            By:  **David C. Fathi, Esq.**
             By:  **Amy Fettig, Esq.**
7            915 15th Street NW
             7th Floor
8            Washington, DC 20005

9            PRISON LAW OFFICE
             By:  **Corene D. Kendrick, Esq.**
10           1917 5th Street
             Berkeley, CA 94710
11
             ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
12           By:  **Maya S. Abela, Esq.**
             177 N. Church Avenue
13           Suite 800
             Tucson, AZ 85701
14

15   For the Defendants:

16           STRUCK WIENEKE & LOVE, P.L.C.
             By: **Timothy J. Bojanowski, Esq.**
17           By: **Rachel Love, Esq.**
             By: **Anne M. Orcutt, Esq.**
18           3100 W. Ray Road
             Suite 300
19           Chandler, AZ 85226

20

21

22

23

24

25

1                        **I N D E X**

2    **WITNESS:**              **DIRECT**    **CROSS**    **REDIRECT**    **RECROSS**

3    KATHY CAMPBELL
     By Mr. Bojanowski         11
4    By Ms. Kendrick                        31

5    MARK OWENS
     By Mr. Bojanowski         65                        84
6    By Mr. Fathi                           70                          92
     By Ms. Kendrick                        77

7

8    MARK HALDANE
     By Mr. Bojanowski         94

9

10

11

12

13

14

15                   **INDEX OF EXHIBITS**

16

17   **EXHIBIT**                           **IDENT**      **RECEIVED**

18

19                       (None.)

20

21

22

23

24

25

March 8, 2017 - Evidentiary Hearing re:  Status

1              P R O C E E D I N G S

2          THE MAGISTRATE CLERK:  Civil Case Number 12-601,

3   Parsons, et al., versus Ryan, et al., on for status hearing.

4          THE COURT:  Counsel, please announce.

5          MR. FATHI:  Good morning, Your Honor.  David Fathi of     08:10AM

6   the ACLU National Prison Project for the plaintiff class.

7          THE COURT:  Thank you.  Good morning.

8          MS. KENDRICK:  Corene Kendrick from the Prison Law

9   Office for the prisoner plaintiffs.

10          THE COURT:  Thank you.                                    08:10AM

11          MS. FETTIG:  Amy Fettig from the ACLU National Prison

12   Project for the plaintiffs.

13          THE COURT:  Thank you.

14          MS. EIDENBACH:  Kirsten Eidenbach and Maya Abela for

15   the prisoner plaintiffs and the Arizona Center for Disability   08:10AM

16   Law.

17          THE COURT:  Thank you.

18          MR. BOJANOWSKI:  Tim Bojanowski for defendants.

19          THE COURT:  Thank you.

20          MS. LOVE:  Rachel Love for defendants.                   08:10AM

21          THE COURT:  Thank you.

22          MS. ORCUTT:  Anne Orcutt for defendants.

23          THE COURT:  Thank you.

24          Thank you all very much.  Couple of preliminary things

25   I need to say.  First of all, thank you very much for agreeing  08:11AM

1    to come in early.  I know that -- I think you know the reason

2    for it.  One of our colleague's spouses died unexpectedly last

3    week and the memorial service is in Tucson at 2 p.m. which

4    means we will need to conclude by 11:30.

5           Secondly I want to thank you for doing this because I     08:11AM

6    know that for litigators it's awkward to depart sometimes from

7    the adversary environment.  That's what I contemplated today,

8    to the extent that it's possible, that we would gather together

9    in the context of the case that you settled.  And I'm not naive

10   enough to think that settlement means that everybody is          08:11AM

11   necessarily on board.  You adopt felt markers instead of your

12   swords.  The notices of appeal suggest that there's plenty

13   still to be adversarial about here.

14          But I also know that certain aspects, too, of the

15   adversarial process are not unhelpful.  The testing that         08:12AM

16   occurs, that some of it will occur today, even, in this context

17   of what I contemplated to be a learning opportunity, some of

18   the aspects of litigation of the adversarial process are

19   helpful.  They build integrity into the system.  They give

20   people a greater comfort, a greater confidence.  The truth       08:12AM

21   finding function of the adversarial process can, at the end,

22   produce a product that ensures people that the conclusions that

23   they have reached are ones that are the process of being

24   tested.  And, again, what that results in, I think, is further

25   confidence and a faith in the integrity of where we are.         08:12AM

1    Nevertheless, overall but in the main, the paradigm

2  that I hope to honor in advance is one informed more by

3  cooperation and understanding, the idea being that we maybe can

4  push aside some of the fear and distrust that comes from the

5  unknown, the fear that you don't know exactly how things are          08:13AM

6  decided or arrived at.  And so the process that I envision

7  today is one where we would understand more about exactly what

8  was happening in the defendant's side of the house, one that

9  plaintiffs, I'm hopeful by learning more about, perhaps can

10  come to an understanding that some number of areas where there       08:13AM

11  are fears can be reduced and that if there remain areas about

12  which there are vibrant fears we can focus on that and we can

13  at least move forward in a constructive way that I think

14  ultimately at the end of the day will produce something

15  consistent with the idea that you presented, and that is you         08:14AM

16  settled the case.  And so it is a contemplated settlement that

17  required you all to work together, and I'm hopeful that what we

18  do today can further that process.

19    I understand from having spoken to my law clerk and

20  the chief pro se law clerk that you all have worked together to      08:14AM

21  try to develop a way to proceed.  And it appears to me that

22  that's going to be, in the first instance, led by the

23  defendants.  But I also understood that the plaintiffs were

24  going to invoke the Rule, and so I don't know whether you have

25  already spoken to your witnesses and they are aware of that and      08:14AM

1    are not in the courtroom, or where we stand on that.

2          MR. BOJANOWSKI:  Your Honor, the witnesses are

3    currently in the courtroom.  If the plaintiffs invoke the Rule

4    we'll have them leave.

5          THE COURT:  Okay.  And am I speaking correctly, Mr.          08:15AM

6    Fathi, that is the plaintiffs' intention?

7          MR. FATHI:  Correct, Your Honor, obviously with the

8    exception of Mr. Pratt, who is a defendant.

9          THE COURT:  Very well.  So then with the Rule being

10   invoked what that means is that, again, it's part of the          08:15AM

11   integrity of the system, the confidence of the system that is

12   served by this rule.  So thank you.

13         And Mr. Fathi, is there anything else preliminarily we

14   need to address before I turn to Mr. Bojanowski?

15         MR. FATHI:  Thank you, Your Honor.  We understand that      08:15AM

16   you have limited time today, and we appreciate your

17   accommodating us with the early start time.  And we appreciate

18   the defendants bringing their witnesses and we look forward to

19   hearing from them.  But we also have questions that we would

20   like to ask these witnesses, and that is why out-of-state        08:15AM

21   counsel who normally participate by telephone are here in the

22   courtroom today.

23         So we would ask the available time be divided equally

24   between the parties so that we will hear the testimony the

25   defendants want to elicit but we will also have time to ask the   08:16AM

─── **March 8, 2017 - Evidentiary Hearing re:   Status** ───

1   questions that we need to ask.

2          THE COURT:  I'm not sure exactly what the best method

3   is for allowing for those questions but it certainly was my

4   contemplation that there would be an opportunity for those

5   questions.  I don't know whether, as we go along, that it will          08:16AM

6   be your sense that there will be times that you would like to

7   raise questions.  I think what we'll need to do is rather than

8   starting out with a firm structure that might turn out to be

9   counterproductive because it was procrustean and was not

10   necessarily required.  What we'll do is we'll go with how          08:16AM

11   things are.  If you think at a point it's appropriate to

12   interject or you think the time is running away with you, let

13   me know and we'll take that up.

14          MR. FATHI:  Thank you, Your Honor.  We certainly may

15   have cross-examination for some of their witnesses, but in          08:17AM

16   addition, for example, we have questions we would like to ask

17   Dennis Dye, who is one of the monitors.  Mr. Dye has been

18   listed as someone defendants may call but may not.

19          So understanding that we have limited time, perhaps we

20   can continue the hearing at some other time.  Perhaps we can be          08:17AM

21   allowed to take depositions of the witnesses that we don't get

22   to today.  But I just wanted to make sure the Court is aware

23   that in addition to hearing the testimony defendants elicit we

24   have our own questions that we would like to ask.

25          THE COURT:  Right.  And it occurred to me I was          08:17AM

**March 8, 2017 - Evidentiary Hearing re:  Status**

1  hopeful originally in setting this, in not setting anything

2  else for the day, we would just work through it for the whole

3  day.  And one of the sad complications is that we are limited

4  thereby and we may have to go into another time.  But certainly

5  you will get your opportunity to do what I think is necessary          08:17AM

6  here, and that is to allow you all to get the level of

7  confidence that will serve the means and the ends that I

8  discussed a moment ago.  Thank you.

9          MR. FATHI:  Thank you, Your Honor.

10          THE COURT:  Mr. Bojanowski.                                   08:18AM

11          MR. BOJANOWSKI:  Thank you, Your Honor.

12          We certainly appreciate this opportunity to provide

13  what we view as more of an educational process for the Court

14  and not an adversarial process.  We understand plaintiffs may

15  have some questions.  They did submit some written topics and        08:18AM

16  such that they were looking to get some answers to.  Frankly, I

17  intend to cover as many of those topics that the plaintiffs

18  have raised as well with each of the witnesses such that we

19  can, perhaps, expedite this.  And hopefully, through that

20  process, we'll find that there should be sufficient time in          08:18AM

21  which to complete what we've got going on here today.  So thank

22  you again for letting us have the opportunity to explain to the

23  Court exactly how this process works.

24          What I did do, though, for the Court's use is a large

25  notebook in front of you that the witness also has that we'll        08:19AM

March 8, 2017 - Evidentiary Hearing re:  Status

1   refer to to help the Court understand maybe what is being

2   looked at during the monitoring process.  So we'll try and

3   address, initially, the questions of the Court and plaintiffs

4   as quickly as we can and then get into those examples farther

5   on down the road.                                              08:19AM

6        THE COURT:  And my sense is that the notebook would be

7   a non-admitted demonstrative exhibit for the facilitation of

8   the Court and the parties' understanding?

9        MR. BOJANOWSKI:  Correct, Your Honor.  We felt that we

10  should supply something so that when we're talking about a CGAR   08:19AM

11  or a health needs request or a portion of a medical record that

12  the Court could actually see that and be able to look and say,

13  well, this is how they are calculating, for instance, number of

14  days.  They are looking at this and they are looking at that.

15  And it's 29 or 32 or whatever and then that would give the        08:20AM

16  Court a better handle and then tie that into the actual CGAR

17  results.  Because there's a lot of codes in there like Ns and

18  Ys and zeros and things like that that we would like to explain

19  to the Court, well, what does that mean?  Okay.  Because it has

20  meaning to it and it will help the Court understand then those    08:20AM

21  CGAR results that you get every month.

22        That's kind of our intention.  It's more of an

23  educational process.  We did provide plaintiffs copies of all

24  the documents as well so they can follow along and participate.

25        THE COURT:  Thank you.  You may proceed.                    08:20AM

1        MR. BOJANOWSKI:  Your Honor, we're going to call Kathy

2    Campbell as our first witness.

3        THE COURT:  Thank you.  Ms. Campbell, would you please

4    step forward to the well of the court here before the clerk who

5    will administer the oath.                                    08:21AM

6        THE COURTROOM DEPUTY:  Can you spell your first name

7    for me, please?

8        THE WITNESS:  K-A-T-H-L-E-E-N.

9        THE COURTROOM DEPUTY:  And Campbell, C-A-M-P-B-E-L-L?

10       THE WITNESS:  Correct.                                    08:21AM

11       (The witness was sworn.)

12       THE MAGISTRATE CLERK:  Thank you.  Please step onto

13   the witness stand.

14                          KATHY CAMPBELL,

15   a witness herein, having been first duly sworn by the clerk to

16   speak the truth and nothing but the truth, was examined and

17   testified as follows:

18                       DIRECT EXAMINATION

19   BY MR. BOJANOWSKI:

20   Q.  Would you please state your name for the record?         08:21AM

21   A.  Kathleen Campbell.

22   Q.  Ms. Campbell, what is your business address?

23   A.  1831 West Jefferson Street, Phoenix, Arizona.

24   Q.  What do you do for a living?

25   A.  I work for the Department of Corrections.                08:22AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Direct

1    Q.  In what capacity?

2    A.  I'm a program evaluation administrator with the Health

3    Services Division.

4    Q.  And what does that job entail?

5    A.  I currently supervise nine compliance monitors that are    08:22AM

6    located at the different state facilities.  And I have

7    assistant underneath me and I also work with the compliance

8    monitor that does the private prisons.

9    Q.  All right.  What's your educational background?

10   A.  I received my LPN in 1989; my associate degree in nursing    08:22AM

11   in '91; got my BSN and I completed my MBA in, I believe, it was

12   2005.

13   Q.  Are you currently licensed?

14   A.  Yes, I am.

15   Q.  In what way?    08:22AM

16   A.  As an RN in the state of Arizona, Illinois, and Hawaii.

17   Q.  How long have you worked for the Department of Corrections?

18   A.  A little over nine years.

19   Q.  In the same capacity?

20   A.  No.    08:23AM

21   Q.  What other capacities have you worked with the Department

22   of Corrections?

23   A.  I started off as a utilization review nurse when I first

24   became with the Department, and then I promoted up to the

25   statewide director of nursing.  And then when we privatized I    08:23AM

**March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Direct**

1   was the clinical lead nurse supervisor that oversaw the audit

2   nurses and then promoted up to this current position.

3   Q.  In your capacity, your current capacity with the

4   Department, do you have the responsibility to actually conduct

5   monitoring yourself?                                         08:23AM

6   A.  I do.

7   Q.  What areas do you monitor?

8   A.  The compliance, depending -- I do coverage when I don't --

9   if I have somebody that's either on family leave or out sick

10  and I do do a couple of the measures myself.                 08:23AM

11  Q.  Okay.  The compliance, or monitoring bureau, so to speak,

12  has how many total monitors?

13  A.  The staff is 34.  It's broken down into clinical

14  compliance, mental health, dental.  I don't know exactly how

15  many offhand.                                                08:24AM

16  Q.  All right.  So the way it works is that each of the

17  sections, the clinical, the compliance, the mental health, and

18  the dental all have separate monitors that concentrate in those

19  areas, is that right?

20  A.  Correct.                                                 08:24AM

21       MR. FATHI:  Excuse me, Your Honor.  I'm very sorry to

22  interrupt.  Perhaps it's my advancing age.  I'm having a little

23  trouble hearing if Ms. Campbell could pull the microphone

24  closer.

25       THE COURT:  The microphone can move.  Just bring it     08:24AM

14

```
 1    closer to your mouth.  It will help.

 2           THE WITNESS:  Sorry about that.

 3           MR. FATHI:  I apologize again.  I thought it was just

 4    me.

 5    BY MR. BOJANOWSKI:                                          08:24AM

 6    Q.  Okay.  We were talking about how the monitoring bureau is

 7    set up and then each category of monitors then monitors their

 8    area, so to speak, is that right?

 9    A.  Correct.

10    Q.  And so with, say, the clinical monitors, they just do the  08:25AM

11    medical clinical portion of the 103 measures, right?

12    A.  Correct.

13    Q.  And so the measures are kind of broken down in the same

14    fashion.  You have measures for medical, you have measures for

15    the contract compliance, you have measures for mental health  08:25AM

16    and then measures for dental.  Right?

17    A.  Correct.

18    Q.  All right.  And so you're personally familiar with how

19    monitoring takes place because you, in fact, do it, right?

20    A.  Yes.                                                      08:25AM

21    Q.  You do it each month?

22    A.  Correct.

23    Q.  Are there particular areas that you do each month all the

24    time?

25    A.  Yes, there is.  I do --                                   08:25AM
```

UNITED STATES DISTRICT COURT

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Direct

1    Q.  What would that be?

2    A.  Performance etch measures that I cover are the staffing

3    related ones, the Number 20, Number 59, Number 23, and Number

4    24.

5    Q.  All right.  Now, you also said that you fill in when          08:26AM

6    somebody is not available as a monitor, say somebody gets sick,

7    they go on family leave, something happens then you fill in for

8    that monitor, right?

9    A.  Correct.

10   Q.  Now, would that be on the medical side or the clinical side  08:26AM

11   or would it be contract compliance or what would it be?

12   A.  Mostly contract compliance.  And I have done dental, too.

13   Q.  Okay.  All right.  Now, in front of you is kind of a

14   notebook, all right.  And I would like you to turn to Tab A.

15   And you are going to see on top there that there's a pleading   08:26AM

16   that was filed by the plaintiffs.  If you could go to the next

17   page of that, Page 2 of 7, are you there?

18   A.  Yes.

19   Q.  All right.  Now, the Court is looking for some information

20   and some answers to questions.  And so their questions are here 08:26AM

21   at the top of this page, and then the defendants have asked

22   some other questions here that follow.  And what I'm going to

23   try and do here, so you know where I'm going, is I'm going to

24   work through these questions with you.  Okay?

25   A.  Okay.                                                        08:27AM

**March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Direct**

1    Q.  All right.  So the first question is concerning records

2    preservation.  And the Court would like to know who maintains

3    the records that exist with regard to the monitoring?

4    A.  As far as the medical records?

5    Q.  Yes.                                                        08:27AM

6    A.  I would think that would be Corizon.

7    Q.  Okay.  Corizon has eOMIS, is that right?

8    A.  Correct.

9    Q.  What about the old paper records that existed?  Where are

10   those, do you know?                                            08:27AM

11   A.  Those should be at the complexes where the inmate's

12   currently housed.

13   Q.  What about when an inmate is released from custody?  What

14   happens to the medical records at that point?

15   A.  They usually go to archives after they are released from   08:28AM

16   the facility.

17   Q.  Okay.  So medical records are going to be essentially in

18   three places:  It's either going to be in eOMIS; it's going to

19   be at the complex level if it's a paper and the inmate is still

20   incarcerated; or it's going to be in archive if the inmate is  08:28AM

21   released.  Is that correct?

22   A.  Correct.

23   Q.  And Corizon maintains all of those records, correct?

24   A.  Correct.

25   Q.  As far as maximum custody records are concerned, do you    08:28AM

**March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Direct**

1  have any information with regard to those records and who and

2  how those are maintained?

3  A.  I do not.

4  Q.  Okay.  The next question -- well, I'm going to do the

5  questions that you know the answers to or that I believe you          08:28AM

6  know the answers to.  Some of them here you are not going to

7  know the answer to.

8          There's a question under the randomization one in the

9  second bullet point, and it says, "Who decides how many records

10  to select?"  And I am assuming what the Court wants to know          08:29AM

11  there is, who makes the determination as to the number of

12  records to select to monitor a particular measure?  Who decides

13  that?

14  A.  Well, it's in the user guide.  And the stipulation

15  agreement was a minimum of 10 records per yard that we look at       08:29AM

16  unless there isn't 10, then we use all of them.

17  Q.  So each measure is going to have, at a minimum -- or each

18  measure should, if available, have 10 records, correct?

19  A.  Correct.

20  Q.  And then if I understand your testimony correctly, if you        08:29AM

21  find, say, six applicable records, you would monitor the six

22  records.  Correct?

23  A.  Correct.

24  Q.  And this is broken down by unit, correct?

25  A.  By yard or unit, yes.                                            08:30AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Direct

1    Q.  All right.  So what's a unit?

2    A.  It's a particular yard within the complex.

3    Q.  So a complex will have various yards, right?

4    A.  Correct.

5    Q.  And then the various yard may have various units within the      08:30AM

6    yard, correct?

7    A.  Correct.  Well, within the complex has the various yards

8    slash units.

9    Q.  All right.  So what you are doing is you are looking at

10   records for each unit that apply to a particular measure,            08:30AM

11   correct?

12   A.  Correct.

13   Q.  And in order to determine what -- let's say you found 50

14   applicable records.  How, then, do you, you know, how many

15   records do you look at if you find 50 applicable records within     08:30AM

16   a unit?

17   A.  We would use 10 that were applicable, a minimum of 10.

18   Q.  Okay.  Is it the first 10?

19   A.  It's randomized.

20   Q.  Right.                                                           08:30AM

21   A.  So off the randomization logs we utilize it would be the

22   first 10 that were applicable for that question.

23   Q.  What if you are on record Number 8 and you find that record

24   Number 8 doesn't apply in your first 10 and you have got 50

25   records.  What do you do then?                                       08:31AM

─── **March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Direct** ───

1   A.  We wouldn't use that one and go to the next one that's

2   appropriate to use.

3   Q.  So once you reach the 10 level you stop even if you have to

4   go down to, say, 12 or 15 on the randomized list.  Correct?

5   A.  Correct.                                                    08:31AM

6         THE COURT:  Can you drill down a little bit on the

7   randomization process?  You mentioned a randomized log, I

8   think.  Exactly how are the records randomized?

9         MR. BOJANOWSKI:  Your Honor, we have the randomization

10  witness that we're --                                           08:31AM

11        THE COURT:  Okay.  Fair enough.

12        MR. BOJANOWSKI:  -- we are going to bring in for you.

13  He does randomization statewide.

14  BY MR. BOJANOWSKI:

15  Q.  You get a randomized list, correct?                         08:31AM

16  A.  Correct.

17  Q.  So that comes from somebody else within ADC, correct?

18  A.  Yes.

19  Q.  And so when you go to monitor, you already have the

20  randomized list and that's what you are using?                  08:32AM

21  A.  Correct.  Yes.

22        MR. BOJANOWSKI:  So we'll fill that in, Judge, in our

23  next witness, actually.

24        THE COURT:  Thank you.

25        MR. BOJANOWSKI:  Yes.                                      08:32AM

—— March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Direct ——

1    BY MR. BOJANOWSKI:

2    Q.  The Court then asks what does, quote, "N/A", close quote

3    mean and quote "0" close quote mean?  Do you know, generally

4    speaking, what those terms mean?

5    A.  Yeah.  N/A is not applicable.  You said before if we had          08:32AM

6    pulled a chart and it wasn't appropriate for that measure we

7    would mark that as a not applicable and then go on to the next

8    one.  If it's zero, it means that we didn't find any charts at

9    all for that yard.

10   Q.  Okay.  So can you give us a general example of what a             08:32AM

11   non-applicable chart would be?

12   A.  If they were -- trying to think of a measure that would be

13   appropriate.  Under sick call, if they had vital signs taken

14   but it was actually a treatment versus -- or if they didn't

15   have vital signs taken but it was actually a treatment call to      08:33AM

16   where it wasn't like a wound dressing change versus an actual

17   sick call encounter, that would be non-applicable for us to use

18   on one of the performance measures relating to sick call for

19   the vital signs.

20   Q.  So does the N/A, the N/A that appears in the CGAR final          08:33AM

21   result, is that what you are talking about?

22   A.  Yes.

23   Q.  So when you go through and you are listing your charts,

24   now, in the CGAR, you list every single chart you are looking

25   at at this point.  Correct?                                          08:33AM

March 8, 2017 - Evidentiary Hearing re: Status - Campbell - Direct

1   A.  We're starting to do that, yes.

2   Q.  Okay.  Yes.  Okay.  All the charts that are pulled will

3   then be listed and then you will have, next to a chart that

4   doesn't meet the parameters of the measure, an N/A, correct?

5   A.  Correct, or maybe a yard, too.  If we don't have anything      08:34AM

6   to measure, if there was hospital sendouts for a Number 43 or

7   44, if there are no hospital sendouts for that yard, on the

8   finding you would see like Fort Grant, they didn't send anybody

9   out for the month so that would be an N/A for that yard.

10  Q.  So no files met the performance measurement requirements?      08:34AM

11  A.  Correct.

12  Q.  What about the zero?

13  A.  We don't find a lot of those.  When I do them that may be

14  under more of the clinical aspect.

15  Q.  Okay.  Do you see those arise maybe in the mental health       08:34AM

16  area?

17  A.  I don't do the mental health monitoring.

18  Q.  All right.  So you don't know.

19         One of the questions the Court wants to understand is

20  if you look at the fifth bullet point down, the Court asks,       08:34AM

21  "Does Corizon's contractual ability to challenge percentages

22  impact the data presented to the Court?  If so, how?"

23         So is there a rebuttal process that exists in the CGAR

24  monitoring process?

25  A.  Yes, there is.                                                  08:35AM

────March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Direct────

1   Q.  All right.  Can you describe for the Court generally how

2   that works, step by step.  And let's say that you got -- let's

3   just say you got December CGAR results on your desk.  Okay.  Is

4   there a preliminary result which is reached?

5   A.  Yes, there is.                                            08:35AM

6   Q.  And how do you obtain that preliminary result?

7   A.  That is entered by the monitor into the CGAR before the end

8   of each month.

9   Q.  And then what happens?

10  A.  If there's any questions of -- if we maybe transpose        08:35AM

11  numbers, that's when we go back and look at that then.

12  Q.  So is there an initial review of the CGAR results by ADC

13  staff?

14  A.  Yes, there is.

15  Q.  And that is to try and make them as accurate as possible,   08:36AM

16  correct?

17  A.  Correct.

18  Q.  So you may find, as you suggested, there may be transposed

19  numbers; there may be addition problems or math issues that

20  arise.  And those are all cleaned up, so to speak, before the   08:36AM

21  final numbers are reported, correct?

22  A.  Correct.  We -- there's actually a two-step process.  The

23  monitor who has a finding does either an out brief, verbally

24  discusses it with the site of what their finding is.  That

25  gives the site the time to go back and research what we did.    08:36AM

1    And if we did something wrong before that gets entered into the

2    CGAR, we take care of it then.  And the rebuttal is when we

3    actually put it into the CGAR and if the site missed it at the

4    site level or they elevate it to the region office we do the

5    formal rebuttal process.                                          08:37AM

6          THE COURT:  Could I interrupt and ask you to do it in

7    the context where you do it, where you are actually monitor,

8    this two-step process where you say site level.  I imagine

9    "site level" is referring to Corizon personnel that you

10   presented first in that first step.                              08:37AM

11         THE WITNESS:  Correct.

12         THE COURT:  Could you take an example of when you are

13   the monitor how that works actually?

14         THE WITNESS:  For performance measure, I believe it's

15   20, for the PPD or the AIMS, either one, if I have where I       08:37AM

16   transpose a number and there should have been a special needs

17   order, or I thought I had a special needs order that was needed

18   for that particular inmate, I would go back and do the audit.

19   When I did the audit if I transposed numbers and I gave them

20   the wrong information, they will come back to me and say, that   08:37AM

21   inmate never had a special needs order.  Where did you find

22   that information from?  And then I would go back and say, oops,

23   I transposed the numbers and I'd give them the correct

24   information.  And that would be resolved at that level.

25         THE COURT:  How do they see your initial monitoring        08:38AM

──── **March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Direct** ────

 1    evaluation?  Is it on a piece of paper?  Is it on the computer?

 2    How does it come to them?

 3            THE WITNESS:  Mine I send by e-mail.

 4            THE COURT:  So you send it to somebody at the site at

 5    Corizon.  You come to your initial monitoring conclusion.  They    08:38AM

 6    then look at it.  That's the first step?

 7            THE WITNESS:  Correct.

 8            THE COURT:  And then what happens with the second step

 9    where they could, I gather, challenge your conclusion, is that

10    what happens in the second step?                                   08:38AM

11            THE WITNESS:  Correct.  And then they would submit a

12    formal rebuttal process through their regional office or

13    compliance team back to our compliance team, myself, Mr. Pratt,

14    and Ms. Headstream.

15            THE COURT:  Thank you.  Thank you.                         08:38AM

16    BY MR. BOJANOWSKI:

17    Q.  To help educate the Court a little bit, why don't you go

18    past the colored page of the document and look at the next

19    document there.

20            MR. BOJANOWSKI:  May I approach the witness, Your          08:39AM

21    Honor?

22            THE COURT:  You may.  And feel free, everyone, to do

23    that without asking me.

24    BY MR. BOJANOWSKI:

25    Q.  Do you see what this is?  It reads as a "February 2017 CGAR    08:39AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Direct

1    Rebuttals" document.  Do you see that?

2    A.  Yes.

3    Q.  What is that?

4    A.  This is my tracking sheet I use for the formal rebuttals.

5    Q.  So this is the Part 2 of what you talked about.  And then    08:39AM

6    if you follow the next page there, you will see an actual

7    formal rebuttal.  Correct?

8    A.  Correct.  Yes.

9    Q.  And could you describe for the Court what's going on in

10   this so the Court understands this process?                     08:39AM

11   A.  This is a particular one for Performance Measure Number 1

12   to where I did the staffing for the 24/7 RN.  And the initial

13   one that Yuma had disagreed with, on this one that they did

14   have an RN on site and it just wasn't on the schedule that I

15   had had.  So they did a formal rebuttal process on that, and I  08:40AM

16   accepted this one.

17   Q.  So it was -- the monitor was wrong in its finding because

18   it didn't have the correct nursing schedule?

19   A.  Correct.

20   Q.  And then there's another one here, just as an example,      08:40AM

21   well, there's actually two more.  But essentially it works the

22   same way that, you know, they have gotten the notification,

23   they have decided why don't we just look at the second one for

24   PM 35.  Again, this was an objection that was filed by Corizon

25   to you.  And what happened?                                     08:40AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Direct

1    A.  Correct.  This particular inmate arrived without the

2    medication, or so we thought.  It turns out that he arrived but

3    there was no indication that he received the medication on the

4    dose on the 12-28.  So with this rejection we rejected it.

5    Q.  How come?                                                08:41AM

6    A.  Because they didn't have the evidence that he received the

7    medication.

8    Q.  Okay.  And then the next one, Number 39?

9    A.  It was similar to the same thing.  He was referred to --

10   this inmate was referred to the nurse line, from the nurse line   08:41AM

11   on 12-7 but didn't get seen until 12-28.  Corizon thought that

12   he was seen on 12-15, which he was, but the provider didn't

13   address the issue on that particular one.  So this one was also

14   rejected.

15   Q.  Okay.  So after this process is done and it's either       08:41AM

16   accepted or rejected, that's communicated back to Corizon,

17   correct?

18   A.  Correct.

19   Q.  And what happens?

20   A.  The finding -- they either stand or we go back and change    08:42AM

21   them in the CGAR.

22   Q.  When do they actually become final?

23   A.  We give them the 10 days after the final information is

24   inputted into the CGAR for them to have that rebuttal process.

25   Q.  Okay.  So after that 10-day period expires, in other words,   08:42AM

─── **March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Direct** ───

1   let's say there are findings made and they don't file a

2   rebuttal.  Then after 10 days, those findings become the final?

3   A.  Correct.

4   Q.  Okay.  So once the numbers become final, are they then

5   released to, say, for instance, me?                          08:42AM

6   A.  Yes.

7   Q.  Okay.  So the documentation process is this rebuttal

8   process that we went through and the informal kind of process

9   in Step 1, right?

10  A.  Correct.                                                 08:42AM

11  Q.  Is there anything that's done in the process that affects

12  the final numbers that are provided to the Court?

13  A.  No.  Not after the rebuttal period.

14  Q.  Okay.

15         THE COURT:  So there's never been any time when       08:43AM

16  someone, anyone, has identified a problem with respect to

17  something that you have concluded in your monitoring process

18  after the rebuttal has ended, so it's final, from your view,

19  there's never been a time that anybody has said you made a

20  mistake or this wasn't characterized correctly and you have   08:43AM

21  gone and changed it after that period?

22         THE WITNESS:  The only ones that I recall were the

23  Winslow, some of the mental health ones that we went back to

24  change from last year.

25         THE COURT:  Can you tell me what that circumstance     08:43AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Direct

1    was?

2             THE WITNESS:  I believe it was a fact that we were not

3    monitoring it correctly, so we had to go back and Dr. Taylor

4    did a reaudit of that information.

5             THE COURT:  All right.  Thank you.                    08:44AM

6    BY MR. BOJANOWSKI:

7    Q.  The next bullet point the Court has is what grounds can

8    Corizon use to challenge data?

9    A.  I don't know what you mean by that question.

10   Q.  Well, is that part of the rebuttal process, they can raise  08:44AM

11   any issue they have with regard to the data that -- the

12   findings?  Is that --

13   A.  Yes.  They can -- yeah.  They can bring up anything that

14   they see that we may have done wrong.

15   Q.  So it can be anything, wrong date, wrong inmate number, guy  08:44AM

16   was out court at the time that he, you know, the time frame was

17   ticking, so to speak?  I mean, all kinds of things happen that

18   can be raised?

19   A.  Correct.

20   Q.  Okay.  And you talked about the Court wants to know what     08:44AM

21   rationale would convince ADOC to change data.  And I think you

22   have used a few examples of what that is.  It's just basically

23   a demonstrated mistake that's made in either the calculation of

24   the data or the methodology used to monitor?

25   A.  Correct.                                                    08:45AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Direct

1          MS. KENDRICK:  Objection, Your Honor.  Leading.

2          THE COURT:  I think there's some helpfulness here with

3     respect to leading questions that means that we shouldn't

4     strictly follow that rule here.  Sometimes, however, you can go

5     a little bit too far, but this one is not such an example.          08:45AM

6          MR. BOJANOWSKI:  Thank you, Your Honor.  Okay.

7          THE COURT:  And I gather, Ms. Campbell, you understand

8     that there is an integrity issue associated with a concern that

9     if numbers that you conclude produce a certain result or facts

10    that produce a certain result, if those can be manipulated by    08:46AM

11    someone who has an interest that's contrary to what might be

12    the stipulation's interest, there's a possibility here of that

13    existing because Corizon obviously has an economic interest in

14    trying to do what it needs to do under the contract, but also

15    some things are not always so clear that the contractor, the     08:46AM

16    State, may have a different view and so you are at odds

17    sometimes.  But also you are in the context of litigation with

18    the performance of a stipulation, and so there can be people

19    who wonder whether or not data can be manipulated to serve some

20    and other than compliance with the stipulation and compliance    08:46AM

21    with the contract.

22          And so that's why these inquiries, these questions

23    were raised.  We wanted to know what could happen down the road

24    that could result in your original conclusion as a monitor and

25    your similarly situated monitors making a decision.  Could       08:46AM

1    there be pressures that would come in that would be contrary to

2    what would be your view, undistracted by these other issues?

3    Do you understand what I just said?

4            THE WITNESS:  Yes.  And our goal is to be able to

5    validate our findings and be as accurate as we can be on these          08:47AM

6    as we do them.

7            THE COURT:  Thank you.

8    BY MR. BOJANOWSKI:

9    Q.  Okay.  One of the questions that the plaintiffs have asked

10   in their list is how are performance measures rated if two            08:47AM

11   different monitors audit the same measure the same month and

12   come up with different scores?

13   A.  Yeah, I don't -- the only example I can think of that was

14   the Winslow mental health issues to where they weren't done at

15   the same time.  But when Dr. Taylor went back to do the               08:48AM

16   re-audit, typically we don't audit the same measures at the

17   same sites.

18   Q.  So there's not two monitors monitoring each measure at a

19   particular site.  There's just one?

20   A.  Correct.                                                          08:48AM

21   Q.  And then that one is supervised by someone such as

22   yourself?

23   A.  Correct.

24   Q.  Are there other supervisors within the monitoring bureau

25   that are -- part of their job duty is to assure the validity of      08:48AM

1  the findings that are made?

2  A.  Yes.

3  Q.  And who would that be?

4  A.  Erin Barlund and Dr. Taylor.

5  Q.  Okay.                                                          08:48AM

6        MR. BOJANOWSKI:  May I have a moment, Your Honor?  I

7  don't want to cover things that have already been covered

8  because some of the questions are the same and such.

9        THE COURT:  Of course.

10       MR. BOJANOWSKI:  Your Honor, I believe that's all I      08:49AM

11 have for this particular witness.

12       THE COURT:  All right.  Well, let's give the

13 plaintiffs an opportunity to ask their questions.  Ms.

14 Kendrick, is that you?

15       MS. KENDRICK:  As an initial matter, do you want me to   08:49AM

16 approach the bench?

17       THE COURT:  Because of the materials that you have

18 there, you may remain seated, anybody may, if you find that

19 that's more useful in this working environment.  Go ahead.

20       MS. KENDRICK:  Okay.  I think that would be more         08:49AM

21 productive to have it there.

22                      CROSS-EXAMINATION

23 BY MS. KENDRICK:

24 Q.  Ms. Campbell, I just wanted to ask you some more questions

25 about the rebuttal maybe to get -- the rebuttal process to get   08:49AM

**March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross**

 1    some more clarification.

 2           You said that when the CGAR data is done there's an

 3    initial review by ADOC staff.  Who does that review?

 4    A.  The initial review is done by the monitor that inputs that

 5    information with the Corizon leadership at the site.                08:50AM

 6    Q.  So she or he is reviewing their own work?

 7    A.  Correct.

 8    Q.  Do you review the nine institution monitors' initial data?

 9    A.  Not all of it all the time, no.

10    Q.  Does anybody else at headquarters review it, to your          08:50AM

11    knowledge?

12    A.  I'm not sure on that.

13    Q.  Okay.  And then with these rebuttals, how are they

14    physically transmitted?  Because, you know, for example,

15    looking at this one with the Yuma Performance Measure 1,          08:50AM

16    there's no to or from so it's unclear who is sending them.  How

17    are they sent back and forth and transmitted?

18    A.  That is from the regional office at Corizon.

19    Q.  Who at the regional office?

20    A.  It's -- Chris Tucker is their compliance person now in        08:50AM

21    charge there.

22    Q.  Okay.  And Chris Tucker a woman or a man?

23    A.  It's a man.

24    Q.  Man.  So he will send these to the site monitor, for

25    example, the Yuma monitor?                                        08:51AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

1   A.  No.  This rebuttal comes to our regional office.

2   Q.  Who at the regional office does it go to?

3   A.  It goes to myself, Ms. Headstream, and Mr. Pratt.

4   Q.  And then do the three of you forward it to the institution

5   monitor?

6   A.  No.  We review it there.  We will pull up what they had

7   stated that they thought was incorrect, and we either -- if we

8   don't have the answer based off what we can look at in eOMIS or

9   from the schedules or the information that we receive, for the

10  Yuma one, that's one of the measures that I do.  So I went back

11  and looked at the schedule and the schedule I had was not

12  reconciled.  So those nurses were missing off that schedule

13  that I had initially received.

14  Q.  Okay.  And these printouts are in black and white but I

15  have been produced some where some of the text is in red.  So

16  for like, for example, if you go to the next one, Performance

17  Measure 35, there's different fonts there and my memory is that

18  font is normally red.  Is that the response that you all at ADC

19  are writing back to Corizon?

20  A.  I believe so, yes.  Without having the color here, we

21  typically answer them in red.

22  Q.  And who writes the responses?  Is it you?

23  A.  It would either be myself or Ms. Headstream.

24  Q.  And I believe you said earlier that, you know, if you all

25  agree with the rebuttal, the rebuttal's quote, unquote,

08:51AM

08:51AM

08:51AM

08:52AM

08:52AM

1   accepted, that you guys go back and change the results in the

2   CGAR?

3   A.   Correct.

4   Q.   When you do that, do you poll more files so you go back to

5   a sample size of 10?                                          08:52AM

6   A.   It typically doesn't need to be.  If we throw one out it

7   does, we do go back.  But if it's not, if it's one that we

8   rejected because their rebuttal wasn't a correct rebuttal, for

9   instance, the Performance Measure 35 one, the fact that the

10  inmate didn't get the medication, it would still stand as a    08:53AM

11  finding.

12  Q.   Okay.  So are you aware of any rebuttals ever being

13  accepted but then tossing out files because they are not

14  applicable?

15  A.   I would have to go back and look at my checking sheets.  I  08:53AM

16  don't know offhand.

17  Q.   What written instructions or guidelines did you receive on

18  how to do the rebuttal process?

19  A.   We actually talked about it with Mr. Pratt, Ms. Headstream,

20  and myself.                                                   08:53AM

21  Q.   And did you develop any sort of written guidelines on how

22  you would decide whether or not to accept or reject a rebuttal?

23  A.   No.  We actually sit down and go through them together as

24  we get them in, in either rebuttals, to find out whether or not

25  they have merit to overturn it or not.                        08:54AM

1    Q.  And had the three of you agreed that the process should be

2    that if files are removed from the sample size, say, for the 10

3    files at a yard at Yuma, two of them have been removed because

4    they are not applicable, who goes and pulls two more files to

5    get it back to a sample size of 10?                                    08:54AM

6    A.  We would do that up there.

7    Q.  "We" being the three of you?

8    A.  Yes.

9    Q.  So you would complete the review for the institutional

10   monitor?                                                               08:54AM

11   A.  Depending on what the question is, yes.

12   Q.  So would you go into the CGAR system and then make an

13   additional entry in your name or Mr. Pratt's name saying, here

14   are the two additional files?

15   A.  We have not done that yet.  We are going to be doing that          08:54AM

16   as an addendum versus removing information and exchanging it

17   out.

18   Q.  So how do you do it now?

19   A.  We had been -- if there was any issues that we had to take

20   out, we -- such as the Winslow ones, we removed the information        08:54AM

21   initially and then when they did the re-audit we put the

22   information back in and the old information was removed.

23            Moving forward, we're doing an addendum to where that

24   information, the old information will still be in there, and

25   then the new information will show up as an addendum to the            08:55AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

 1   findings.

 2   Q.  So when you are taking out the old information -- I'm

 3   sorry.  Let's take a step back.

 4        On the CGAR system, my understanding is this is a

 5   computer system where all the monitors log in with their name.    08:55AM

 6   So, for example, you know, there's like Jen Fontaine at

 7   Florence, there's Erin, there's various people, monitors.  But

 8   if you or Mr. Pratt or somebody at headquarters is going back

 9   in, you log in as that institutional monitor?

10   A.  Correct.  Well, it wouldn't be the institutional.  It would    08:55AM

11   be our name that shows up on the CGAR finding then.

12   Q.  But I thought you said that you removed the information

13   that had been previously entered by the monitor.

14   A.  Yes.  When Dr. Taylor went back and did the re-audits in

15   Winslow, the information that Mr. Mitchell had done up there        08:56AM

16   for the mental health was removed and Dr. Taylor's information

17   was put in.

18   Q.  So to your knowledge, do you, the three of you or Dr.

19   Taylor ever go in and replace information with the same date

20   and time that the monitor had previously inserted the              08:56AM

21   information?

22   A.  I have only done that with the IT department with Dr.

23   Taylor's information for mental health up at Winslow where we

24   put in her information and then we put in Mr. Mitchell's

25   information back in there so that you could see his findings,      08:56AM

1    and her findings showed up after that.

2    Q.   So when the information is taken out, what happens to it?

3    Is it just erased from the system and there's no record of it?

4    A.   I don't know that part what the IT. . .

5    Q.   Who would know?                                              08:56AM

6    A.   Probably our IT department.

7    Q.   But it's set up where you can just do that?

8    A.   I don't -- I usually have to open a ticket with the IT

9    department with any changes that I make if it's after the end

10   of the month.                                                    08:57AM

11   Q.   So you said that after you have made the changes in the

12   body of the CGAR, I believe Mr. Bojanowski asked you that's

13   when it's considered quote, unquote, final and you send the

14   CGARs on to the attorneys for the State?

15   A.   Correct, 10 business days after the end of the month when   08:57AM

16   that rebuttal period ends.

17   Q.   Okay.  And if there was some question about the -- is there

18   any sort of information given to when they are final saying

19   well, you know, this one performance measure, Performance

20   Measure 35, it was subject to rebuttal and it's been rewritten?  08:57AM

21   A.   With the rebuttals there is, with rebuttal tracking.  But

22   we had not been putting it in the CGAR up until this point

23   which we are doing that moving forward.

24   Q.   Starting with which month's reviews?

25   A.   If we have any rebuttals from last month, they would in     08:58AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

1   this month.

2   Q.  So in the text of the CGAR, it would say "as the result of

3   the rebuttal process"?

4   A.  Correct, or an addendum to it as a result of, yes.

5   Q.  So how would we know that any review done prior -- and this   08:58AM

6   is the January 2017 reviews that you are talking about?

7   A.  No, March for February's.

8   Q.  February 2017 will be the first month CGARs where this

9   information is included?

10  A.  Correct.   08:58AM

11  Q.  So how would a person looking at the CGARs be able to know

12  that the information reported there is rewritten information

13  for all the months prior to February?

14  A.  The only way you would know is if there was a rebuttal

15  there to be able to look at that rebuttal and see that there   08:58AM

16  was a change.  Some of them I know we have produced and then we

17  have gone back to change.  So you guys, I believe, had some

18  copies of each one.

19  Q.  So a person would need to sit with the stack of rebuttals

20  side by side with the stack of CGARs?   08:59AM

21  A.  Well, there's not usually a stack of rebuttals but you

22  would sit with the rebuttals that were presented, yes.

23  Q.  Okay.  Do you have -- do you keep any sort of record of all

24  the rebuttals?  You said you have these logs.  How far back do

25  these rebuttal logs go?   08:59AM

1   A.  I would have to look on my computer.  I don't know offhand.

2   Q.  Have you been doing the rebuttal process since Corizon took

3   over from Wexford a couple years ago?

4   A.  Not as a formal rebuttal, no.  It was informal at that time

5   where we were doing them at the site level or talking to each          08:59AM

6   other to find out what we had missed.

7   Q.  What were you doing when it was informal?

8   A.  It was more of a verbal than it was a written.  We came up

9   with this written rebuttal form, Corizon did, to be able to

10  submit that to us.                                                      09:00AM

11  Q.  And were the monitoring staff going back and changing the

12  CGARs as a result of the informal process?

13  A.  They would still go through us for the rebuttal process.

14  Q.  So any change to a CGAR has to be approved by somebody at

15  headquarters?                                                           09:00AM

16  A.  For the changes, yes.  It -- depending on when it's put in,

17  if they are doing it at the site level, the whole goal is to be

18  able to get the accurate information in the first time around

19  with the CGAR.  That's why they meet at the site level with

20  their leadership, our monitor does with the Corizon leadership          09:00AM

21  to say these are what our findings are.  Let me know if you

22  have any questions on them or to review the information and get

23  back to me if you think I missed something.  So they do that

24  before they even put that into the CGAR.

25  Q.  When did you guys start doing the more formal rebuttal              09:00AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

1  process versus the informal one you described?

2  A.  I don't recall offhand.  I want to say it was January or

3  December.  I don't -- it may have even been further back than

4  that.  I don't know offhand.

5  Q.  Of what year?                                          09:01AM

6  A.  Of last year, of -- well, December -- it was either

7  November or December of 2016 or I don't remember offhand,

8  though, without going back to look it up.  It may have been as

9  far back as September.  I don't know offhand, though.

10 Q.  The oldest information we have been provided by defendants 09:01AM

11 is from September 2016.

12 A.  Okay.  So that was probably correct then.

13 Q.  So was any written records kept when it was the informal

14 process prior to September?

15 A.  I would have to check.  I don't know offhand.           09:01AM

16 Q.  So who would know that there had been changes made to a

17 CGAR?

18 A.  As far as the rebuttal process, you mean?

19 Q.  Yeah, that somebody went back in and changed the

20 information?                                                09:02AM

21 A.  I would have to go back through my tickets from -- that I

22 had submitted to IT depending on what it was for.  Because

23 sometimes we do the tickets if -- if the monitor at the site

24 level puts in the wrong information when they are typing up

25 their CGAR, even if they put in the wrong date or wrong inmate  09:02AM

1   number, once that's submitted they can't pull that back out.

2   We have to open a ticket with IT.  So it's not just a ticket

3   for rebuttals it could be a ticket because they screwed it up

4   and have to fix it.

5          THE COURT:  That's the first stage review possibility?   09:02AM

6          THE WITNESS:  Well, the first stage is for them to

7   catch it before they put it into the CGAR.

8          THE COURT:  But there is a dialogue with Corizon

9   before it's put into the CGAR.  So I guess I want to

10  understand, the first stage is before the CGAR input?          09:02AM

11         THE WITNESS:  Right.

12         THE COURT:  So that somehow a conclusion of a monitor

13  is presented to Corizon in the first stage where you say that

14  if a number was reversed or something they could identify that.

15         THE WITNESS:  Correct.                                  09:03AM

16         THE COURT:  Okay.  I guess -- Ms. Kendrick, do you

17  have lots of questions about this thing that I have just asked

18  about?  Because I do.

19         MS. KENDRICK:  Yeah, but feel free.  I defer to you.

20         THE COURT:  No, I guess I -- the first question I have  09:03AM

21  is I understand that you are a supervising monitor.  But also

22  you perform the role as a regular monitor, too.

23         THE WITNESS:  Correct.

24         THE COURT:  There are people who are regular monitors,

25  and these regular monitors will make a conclusion about whether 09:03AM

—— March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross ——

1    a performance measure has been met or not.  And then in the

2    first review, they go to Corizon and somehow Corizon can see

3    what that preliminary conclusion is.

4    A.  Yes.

5    Q.  Is that right?  How does that happen?  How is that          09:03AM

6    presented to the site person at the Corizon?

7    A.  Varies by site.  I have one monitor that covers two

8    complexes, so he will either pick up the phone sometimes or if

9    they are embedded on site like they are at eight of these

10   facilities, they actually will go meet with the facility health  09:04AM

11   administrator and sometimes the director of nursing and say

12   these were my findings for this measure.  They try to do more

13   than one measure at a time to give them results.

14            THE COURT:  So they will walk over with the 10 files

15   for the performance measures that they are going to address,      09:04AM

16   and they will say, here's my conclusion on file 1, or is it

17   only the ones where they think that there's non-compliance that

18   they will present to Corizon?

19            THE WITNESS:  We do, with the verbal, unless Corizon

20   asks for it, we only give them the ones there was                09:04AM

21   non-compliance in.

22            THE COURT:  So they say, here's the file where we are

23   thinking there is non-compliance.  Is that a meeting at a table

24   with a site person or how does that happen?

25            THE WITNESS:  It varies.  It could be either at the      09:04AM

—— March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross ——

1  site.  It could be done by e-mail.  It could be done by

2  telephone.  I encourage the monitors to go in and verbally have

3  that discussion with them because it's a little easier to do it

4  in real time than it is to have a delay.

5       THE COURT:  So when Corizon responds at that stage      09:05AM

6  with what is a -- it could call it a rebuttal but it's

7  apparently not a formal rebuttal because it doesn't happen in

8  the rebuttal form.  It's just a dialogue at a table, is that

9  right?

10      THE WITNESS:  Yeah.  They typically will take down the   09:05AM

11  information and they will have to research it themselves.

12      THE COURT:  I guess I'm trying to understand what the

13  distinction is between the first stage and the second stage

14  because I'm imagining that if there is something that is

15  obvious to Corizon in the first stage that they could make that  09:05AM

16  statement to your monitor and your monitor, at that first

17  stage, could do something much different than just transposing

18  an improperly transposed number.

19      Do you understand what I have just said?

20      THE WITNESS:  Well, Number 35 in here was a prime       09:05AM

21  example.  That was done at the site level.  The monitor met

22  with --

23      THE COURT:  But was that the first stage or the second

24  stage?

25  A.  This was the second stage.  First stage, I don't know what  09:06AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

1  happened with that.

2  Q.  Couldn't that issue have been raised in the first stage by

3  Corizon?

4  A.  It could have.  What may have happened, and I don't know

5  offhand, they may not have hit the time frames of that 10 days,     09:06AM

6  you know, the time period from when we put it in.  So if the

7  monitor put it in on the 28th and Corizon got the e-mail

8  notification that we got a finding, they may not have caught it

9  in the initial -- they may not have had time or there may have

10  been staff turnover.  I don't know why they wouldn't have         09:06AM

11  caught it during that first process with the site monitor and

12  then they can raise it to say oh, you know, we think you guys

13  didn't do this one correctly.  Can you guys look at this one?

14  And that's when it becomes a formal rebuttal.

15  Q.  But is it also possible that they could raise that in the     09:06AM

16  first stage and your monitor would say, okay, I think that's

17  right and then it goes away as a non-compliant file even though

18  it doesn't have this paper record associated with the formal

19  rebuttal?

20  A.  It could happen, yes.                                         09:07AM

21  Q.  And so it's up to the individual monitor, really, how big

22  an issue can be.  That's not a precise way to say it.  I would

23  take as a simple issue a transposition of a number, and that

24  that kind of mistake could be something that nobody would

25  disagree about.  But beyond that kind of simple mistake,          09:07AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

1   judgment calls, I think, are more likely to be involved, the

2   kind of judgment call that I think invokes your process where

3   you, as a supervising monitor and the other supervising

4   monitors engage in a more formal rebuttal process.  It seems to

5   me from what you have described that more formal process        09:07AM

6   subject matter could occur at the very first informal meeting

7   with a monitor and Corizon where you all would never know it

8   happened.

9           THE WITNESS:  If they -- if the monitors have

10  questions on certain findings or certain feedback from Corizon  09:08AM

11  they usually will pick up the phone and call and we'll walk it

12  through together and say are you seeing the same thing I'm

13  seeing?  Because they are saying something different.  So that

14  does happen, too, with the feedback.

15          THE COURT:  Thank you, Ms. Kendrick.                     09:08AM

16  BY MS. KENDRICK:

17  Q.  So back to the formal process, I noticed on these forms

18  that are in the binder that there are some areas that talk

19  about appellate review, appellate response, ADC appellate

20  response, and appellate reasoning.  And it appears in the       09:08AM

21  examples here that that process was not invoked.  But could you

22  describe what the rebuttal appellate review and response

23  process is?

24  A.  We have never utilized that.  So I would assume it would be

25  one that Mr. Pratt would end up overriding on us.               09:08AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

1  Q.  So there's no -- you have no idea what this actually means?

2  A.  No.  We have never utilized it at all that I recall.

3  Q.  Did you guys write this form or did Corizon?

4  A.  Corizon did.

5  Q.  Did they explain what they wanted out of this appellate          09:09AM

6  review process that they put on the form that they gave you?

7  A.  Not that I recall.

8  Q.  Okay.  Just to clarify, when Mr. Bojanowski was asking you

9  questions he was talking about yards and units at institutions.

10  I just want to confirm, a yard and a unit is referring to the     09:09AM

11  same thing?

12  A.  Correct.

13  Q.  Okay.  So like, for example, Yuma has La Paz unit but

14  sometimes it's called La Paz yard?

15  A.  Correct.                                                       09:09AM

16  Q.  Okay.

17          MS. KENDRICK:  And I'm going to come up, Your Honor,

18  to show her something.

19          THE COURT:  Thank you.

20  BY MS. KENDRICK:

21  Q.  I will stand here because it's a little closer.  What I'm

22  giving you and what I showed to the Court are those CGAR

23  rebuttal logs that there was a February one in the binder but

24  these are the ones that we were provided for September,

25  October, and November.  Do these look familiar to you?          09:10AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

1   A.  Yes.

2   Q.  Are these the logs that you keep?

3   A.  Yes, they are.

4   Q.  Do you keep them -- do you keep all of them for the entire

5   system or does Mr. Pratt have his own log?                    09:10AM

6   A.  No.  I keep them for the entire system.

7   Q.  Okay.  So this would be the entire, for example, the first

8   page would be the entire universe of all rebuttals that were

9   done in September?

10  A.  Correct.                                                  09:10AM

11  Q.  Okay.  So --

12          MS. KENDRICK:  Unfortunately, Your Honor, I don't have

13  extra copies of this.

14          THE COURT:  That's all right.

15          MS. KENDRICK:  This is Docket 1838 from the case file.  09:11AM

16  It's filed December 28th by defendants.

17          THE COURT:  Thank you.

18          MS. KENDRICK:  I'm going to show this to you.

19          MR. BOJANOWSKI:  Is this something I can see?

20          MS. KENDRICK:  Sorry.                                 09:11AM

21          THE COURT:  It's more important that Mr. Bojanowski

22  see it than I see it at this stage.  I can go back.

23          MS. KENDRICK:  Do you have that, Your Honor?

24          THE COURT:  Go ahead.

25  BY MS. KENDRICK:                                              09:11AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

1   Q.  Okay.  So can you read what it says along 7 and 8?

2   A.  To ensure the Court has full disclosure of all re-audited

3   measures to date the following chart outlines all measures for

4   which re-audits were performed.

5   Q.  Okay.  Did you help prepare that chart?                    09:12AM

6   A.  No, I did not.

7   Q.  Can you also read into the record the performance measures

8   that are listed in the left column?

9   A.  Under HC PM Number revised or reissued HC PM Number 40, HC

10  PM Number 66, HC PM Number 14, HC PM Number 9, HC PM Number 45,  09:12AM

11  and then HC PM 31 for multiple CGAR dates.  Oh.  I'm sorry.

12  And HC PM Number 94, 95 and 98.

13  Q.  Okay.

14          MS. KENDRICK:  Your Honor, we actually have a lot more

15  questions for Ms. Campbell, but in the interest of time and     09:13AM

16  because I know you have your questions for other witnesses, if

17  you would like we could, perhaps, continue any additional

18  questions from her so that you can hear from the other

19  witnesses.  I'm putting this out to for your --

20          THE COURT:  Well, we have Ms. Campbell here.  We have   09:13AM

21  the continuity of the inquiries.  Is there some reason to think

22  that it doesn't make sense to continue with her?

23          MS. KENDRICK:  I just wanted to raise that for you to

24  decide because there are so many people listed.

25          THE COURT:  I understand.                               09:14AM

——— March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross ———

1        MS. KENDRICK:  I'm doing a time check.

2        THE COURT:  Thank you.  I think I would press ahead.

3        MS. KENDRICK:  Okay.  Thank you.

4   BY MS. KENDRICK:

5   Q.  Ms. Campbell, are you involved in the CAP process,                09:14AM

6   corrective action plans?

7   A.  Yes, I am.

8   Q.  Is anybody else from ADC involved in that?

9   A.  Just with the private prisons.

10  Q.  But for -- in terms of dealing with Corizon, are you the           09:14AM

11  point person?

12  A.  Yes, I am.

13  Q.  Is anybody else from headquarters involved?

14  A.  Not as a point person, no.

15  Q.  Can you walk us through the corrective action plan process,        09:14AM

16  the procedures, how it works?

17  A.  If there is a negative finding that falls below the

18  threshold, Corizon responds with a corrective action plan.  And

19  we either approve it or we think we need more information or we

20  may reject it straight outright.  And then they will resubmit         09:15AM

21  that and then we accept it and approve it.

22  Q.  How much time do they have to submit a corrective action

23  plan?

24  A.  We don't have a time frame as far as how long with the

25  finding.  We had had issues in the past where they were --            09:15AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

1    there was a delay.  But pretty much we're getting them more on

2    time now than we had in the past.

3    Q.  What's the longest delay that you are aware of in receiving

4    a corrective action plan?

5    A.  I think with the transition from Wexford to Corizon in that    09:15AM

6    there was probably months to where there was delays.

7    Q.  How many months?

8    A.  I don't know offhand.

9    Q.  Are you aware of any corrective action plans taking six or

10   five months to be submitted?                                      09:15AM

11   A.  Yes.

12   Q.  Where are those?

13   A.  I don't -- what do you mean where?

14   Q.  So, for example, a finding that was made and given to

15   Corizon, for example, let's say, in May and not receiving a       09:16AM

16   corrective action plan until November?

17   A.  That was happening, yes, in the past.

18   Q.  How recently?

19   A.  We are pretty much caught up within the next month.

20   Typically with their corrective action plans when they get the    09:16AM

21   notice at the end of the month they are much better with

22   getting them in, usually within two or three weeks into the

23   following month.

24   Q.  Why was there such a delay?

25   A.  I don't know offhand.  I'm assuming it may be turnover or      09:16AM

1  the fact that they didn't have the staff to be able to put the

2  information back into the CGAR.

3  Q.  Who's responsible for developing the corrective action

4  plan?

5  A.  Corizon is.  I don't know what level.                    09:16AM

6  Q.  So when you receive a corrective action plan who does it

7  come from?

8  A.  The regional office.

9  Q.  So you don't know if it's the Corizon staff at the prison

10 or headquarters who writes the CAP?                           09:17AM

11 A.  I don't know offhand, no.  I mean, it may vary depending on

12 what it is.  I don't know.  That would be an answer for

13 Corizon.

14 Q.  And had you ever brought to Corizon regional headquarters'

15 attention that there were long delays in receiving CAPs?      09:17AM

16 A.  Yes, I have.

17 Q.  When did you do that?

18 A.  I don't know off the top of my head, I don't know the date.

19 Q.  Do you remember telling -- saying something to them about

20 it more than once?                                            09:17AM

21 A.  Yes.

22 Q.  And what happened?

23 A.  I actually submitted a list to them of the ones that were

24 still outstanding that had not -- had either a CAP submitted or

25 that we had required more information from them to be able to  09:17AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

1   close it out.

2   Q.  And if a particular institution is non-compliant month

3   after month for the same performance measure, do they have to

4   submit a new CAP for each non-compliance finding?

5   A.  They submit a CAP each month, yes, for those outstanding        09:18AM

6   ones.  It may not be a new CAP.  It may be an extension of that

7   CAP because whatever they were doing may have started working

8   and they wanted to extend that time frame out.

9   Q.  So, what, they just were resubmitting the one that we

10  submitted last month?                                               09:18AM

11  A.  No.  They would rewrite a whole new CAP.

12  Q.  But saying the same thing?

13  A.  It may.  Sometimes they may have changed the wording within

14  them.

15  Q.  And do you provide feedback to Corizon about the adequacy       09:18AM

16  of the CAPs?

17  A.  I don't understand what you mean by that.

18          THE COURT:  Do you push back?  If it didn't work, if

19  you were in the same situation again and they come back with

20  the same CAP, do you say that didn't work before.  Why do you      09:18AM

21  think it's going to work now, that kind of thing?

22          THE WITNESS:  I have done that, yes.

23          MS. KENDRICK:  Thank you, Your Honor.

24  BY MS. KENDRICK:

25  Q.  And what particular deficiencies did you identify in the       09:19AM

1    CAPs when you pushed back?

2    A.  It varies from CAP to CAP.

3    Q.  Could you give an example of one time where did you push

4    back?

5    A.  Trying to think of a decent one that is quick and easy that          09:19AM

6    you would understand.  If the heads put a process in place that

7    they thought was going to work at their site, and if that

8    process didn't work month after month, I had suggested maybe

9    they relook at the process of why it's not working.  If they

10   were trying to do pill call a certain way, or some of the sick        09:19AM

11   call questions, if they weren't hitting that CAP that they were

12   supposed to be doing within what they were saying they were

13   going to do, month after month, if it wasn't working then I

14   suggested that they go back and maybe look at the process to

15   see if it's an issue that maybe they are getting started late        09:20AM

16   on their sick call lines but it's not their fault.  It was

17   either there was a lockdown, so what's your backup plan, if

18   we're in lockdown what do you do then?

19   Q.  Okay.  Besides kind of those process questions, have you

20   ever gone back to Corizon and said, I think the only way you         09:20AM

21   are going to fix this is to hire more nurses, for example, or

22   you know, the problem with pill call isn't process it's because

23   you have one nurse.  Maybe you need two?

24        MR. BOJANOWSKI:  Note an objection.  That's outside

25   the scope of the stipulation.                                        09:20AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

1              THE COURT:  Overruled.  You can answer.

2              THE WITNESS:  I have not done that with them, no.

3    BY MS. KENDRICK:

4    Q.  Do you recall any corrective action plans with Corizon

5    where they said as part of their plan to come into compliance      09:21AM

6    they thought they needed to hire more health care staff?

7              MR. BOJANOWSKI:  Same objection.

8              THE COURT:  Overruled.

9              THE WITNESS:  Not that I recall offhand.

10   BY MS. KENDRICK:                                                    09:21AM

11   Q.  Do you recall ever having a discussion with people at

12   Corizon regional office about a need to hire more health care

13   staff to come into compliance with the stipulation?

14             MR. BOJANOWSKI:  Same objection.

15             THE COURT:  Overruled.                                    09:21AM

16             THE WITNESS:  I have not.

17   BY MS. KENDRICK:

18   Q.  Do you think that more health care staff would help Corizon

19   come into compliance?

20             MR. BOJANOWSKI:  Same objection.  Calls for --           09:21AM

21             THE COURT:  Overruled.

22             THE WITNESS:  I don't think it's a matter of more

23   staff.  I think it's a matter of using more staff they have

24   adequately and in a more practical matter.

25   BY MS. KENDRICK:                                                    09:21AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

1   Q.  I'm trying to recall, did you say you used to work as a

2   nurse at one of the institutions?

3   A.  No.  I was a utilization review nurse.  I did the hospital

4   discharges.

5   Q.  Okay.                                                    09:21AM

6       THE COURT:  So you have never told Corizon that when

7   they have failed to satisfy a performance measure that this

8   looks like a staffing issue?

9       THE WITNESS:  I have not.  That would probably be Mr.

10  Pratt not -- that would be above my level.                  09:22AM

11      THE COURT:  Okay.  But have you ever thought that that

12  was the case?

13      THE WITNESS:  I don't think it was always a staffing

14  issue.  I think it was the matter of what the turnover staff

15  that they have had, that the processes never got solidified in  09:22AM

16  place.

17      THE COURT:  The reason I ask this question is I have

18  been give in information that shows that there are many times

19  where there are vacant positions.  There just are no people to

20  do the jobs, and so it's been no surprise to me that there have  09:22AM

21  been failures for the performance measures to be met in those

22  circumstances where there aren't enough people to do it.  And I

23  guess as someone in the position who is monitoring the

24  performance of the contractor that -- where they haven't filled

25  positions where they have, as a nurse, I guess I would think   09:22AM

1    that you would have of an acute sensitivity to the idea that

2    you cannot get a nurse to do something beyond his daily

3    capacity to do.  And it just strikes me as odd that you have

4    never raised that point with them.

5        THE WITNESS:  Well, simple things.  Vital signs, you    09:23AM

6    know, you are failing your vital signs because staff isn't

7    taking a full set of vital signs.  That isn't related to

8    staffing at all.  That's that nurse not taking the time to take

9    the full set of vital signs.  To me that's not a staffing issue

10   it's just that for some reason they did not take a full set of  09:23AM

11   vital signs.  They may have missed the weight or may have

12   missed the height, things like that.  They get a non-compliance

13   for -- even though they did the blood measure, the pulse, the

14   temperature, they just didn't do the height or the weight.

15       THE COURT:  And I wonder if it's fair to even ask this  09:23AM

16   question.  Of the performance measures that you have

17   responsibility over, because they may not be ones that are more

18   likely to be staff related, what do you think about that?

19       THE WITNESS:  Well, I do do the staffing questions,

20   you know, do they have an RN 24/7 on site at all times in the  09:24AM

21   infirmary, questions with the nursing staff.  So they are

22   passing those.  The questions with regards to the special needs

23   order being put into our AIMS system for the officers to know

24   if they have a special need, that is, I believe, more of a

25   training issue and we're working with Corizon on that, the fact  09:24AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

```
 1    that the provider isn't putting in correctly into eOMIS so it's

 2    not feeding correctly into AIMS.  So they are doing it.  It's

 3    on the paper, piece of paper that they give to the inmate to

 4    show that they have that special needs order, it's just that

 5    they are not putting it correctly into eOMIS so it's not          09:24AM

 6    feeding correctly over to AIMS so they are failing that

 7    question.  It's not staff-related.  It's just that they are not

 8    following the processes that were put in place to be able to

 9    make sure that that training got done so that person who is

10    ever putting them in knows that they need to click every box     09:24AM

11    for it to feed over into AIMS.

12              THE COURT:  Thank you.

13    BY MS. KENDRICK:

14    Q.  Ms. Campbell, what training or instruction have you been

15    given about the Court's orders on methodology to be used in      09:25AM

16    monitoring compliance with the stipulation?

17    A.  We have gotten the updated -- I have received the updated

18    user guide.

19    Q.  Are you working on the updated user guide?

20    A.  As far as input?                                             09:25AM

21    Q.  Who is doing the updating?

22    A.  I believe our attorneys are updating that with our input.

23    Q.  Okay.  And are they providing you any other instruction as

24    to the Court's rulings, for example, providing you with copies

25    of the Court's orders?                                           09:25AM
```

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

1    A.  Yes.  We do get that.

2    Q.  Okay.  Are you aware of the Court's order about partial

3    credit for performance measures?

4    A.  Yes.

5    Q.  And do you remember when you were told about that order?        09:25AM

6    A.  I believe it was last month for the -- I believe it was the

7    infirmary questions, if I'm not mistaken.  But I'm not 100

8    percent positive on that.

9    Q.  Are you aware of other performance measures where you or

10   the monitors are using a partial credit method of calculating     09:26AM

11   compliance?

12   A.  I do now on 23 and 24.

13   Q.  So Performance Measure 23 is the one about automated

14   external defibrillators?

15   A.  Correct.                                                        09:26AM

16   Q.  And you had said earlier that 23 is one of your performance

17   measures?

18   A.  Correct.

19   Q.  And how do you calculate compliance with it?

20   A.  Well, when we were with our attorneys and you guys on the      09:26AM

21   phone, we had actually -- I thought we had agreed to doing the

22   partial credit.  So that's why I ended up doing the partial

23   credit on those.  So if an AED wasn't checked on one day,

24   instead of them getting a zero for the whole month we were

25   adding up the total number of days as a denominator and then       09:27AM

1    the total number of days they did check it as a numerator.  But

2    now we have gone back to doing if that yard missed it any day

3    for that month it's a zero.

4    Q.  For what month have you started doing that older method of

5    it's non-compliant if any days are missing?                    09:27AM

6    A.  Starting with this month's audit for last month's data.

7    Q.  So the February 2017 CGARs would reflect --

8    A.  Yes.

9    Q.  -- a method that complies with the Court?

10   A.  Yes.                                                        09:27AM

11   Q.  And were you using a similar methodology with Performance

12   Measure 24?

13   A.  Yes, I was.

14   Q.  And that's the man down bag performance measure?

15   A.  Yes.                                                        09:27AM

16   Q.  And have you changed your approach for this coming month

17   review?

18   A.  Yes.

19   Q.  Are there other performance measures that you use where you

20   have been using partial credit that you can think of?          09:27AM

21   A.  No.

22   Q.  And earlier you said that you sometimes monitor the dental

23   performance measures?

24   A.  Occasionally, yes, if Dr. Chu is going to be off.

25   Q.  And what sort of training have you received on evaluating   09:28AM

March 8, 2017 - Evidentiary Hearing re:   Status - Campbell - Cross

 1   compliance on dental issues?

 2   A.  I have gone through the measures with Dr. Chu and actually

 3   have gone through the logs she utilizes, and she walks me

 4   through the process of how she does it.

 5   Q.  Are you a monitor for pharmacy performance measures?          09:28AM

 6   A.  I am not.

 7   Q.  Who is?

 8   A.  Depending on the question, there is numerous.  Well,

 9   there's a few people that answer some of those questions; Mr.

10   Winland and Ms. Barlund.                                         09:28AM

11   Q.  Mr. Winland is Martin Winland?

12   A.  Yes.

13   Q.  And is he in headquarters?

14   A.  He's in our regional -- in our office, yes.

15   Q.  And does he -- what is his title?  Do you know?              09:28AM

16   A.  He's a pharmacist.

17   Q.  Do you oversee the hiring and training of the nine

18   institutional monitors that you said you supervise?

19   A.  Yes.

20   Q.  What sort of training do you provide them?                   09:29AM

21   A.  They spend some time with me up in the regional office and

22   we actually go through the performance measures.  I haven't

23   hired anybody new recently that wasn't with us prior to, but I

24   usually walk them through.  We sit down and we do an audit

25   together of the measures.                                        09:29AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

1   Q.  Prior to what -- you said you hadn't hired anybody prior

2   to.

3   A.  I was trying to think of the last time I hired anybody.  I

4   was with the, I think, with the formalized user guide I don't

5   think we have hired.  I don't recall hiring anybody where we          09:29AM

6   have actually formalized the user guide.

7   Q.  Have you done any trainings with the nine monitors about

8   the monitoring guide?

9   A.  Yes.  We actually do a video conference monthly, and they

10  actually get a copy of the user guide as it changes.                 09:30AM

11  Q.  And have you been doing any sort of auditing or review of

12  the nine monitors to see if their CGAR data is complying with

13  the changes to the monitoring guide?

14  A.  I do spot checks on them, yes.  I don't do every measure

15  for every complex.                                                   09:30AM

16  Q.  How do you decide the spot checking?  Do you spot check

17  everybody or just certain individuals?

18  A.  No, I will spot check everybody.  And if there is a trend

19  one way or another to where maybe they were a big change of

20  either going from non-compliance to compliance or vice versa, I      09:30AM

21  look at those.

22  Q.  And are there any vacant monitor positions at the

23  institutions right now?

24  A.  There is currently one.

25  Q.  At what institution?                                             09:31AM

March 8, 2017 - Evidentiary Hearing re:   Status - Campbell - Cross

1   A.  Lewis complex.

2   Q.  How long has it been vacant?

3   A.  I believe his last day was February, the end of -- sometime

4   in February he left.  I have somebody in backgrounds now

5   hopefully -- I'm hoping to start her Monday.                    09:31AM

6   Q.  Okay.  Great.

7          And what sort of qualifications and background is

8   required for these positions?

9   A.  I don't have the job description in front of me to be able

10  to read it verbatim.                                            09:31AM

11  Q.  I'm not expecting you to recite, but generally what are you

12  looking for with these monitors?

13  A.  I look for somebody that has some correctional background

14  and preferably somebody who has done some auditing and knows

15  corrections.  I don't limit it to -- does not necessarily have  09:31AM

16  to be a nurse.

17  Q.  So it can be somebody without any health care training?

18  A.  It could be, yes.

19  Q.  Is this individual who you are hoping to have start, does

20  she have health care background?                                09:32AM

21  A.  She does.

22  Q.  Okay.

23          MS. KENDRICK:  Can I have just a second, Your Honor?

24          THE COURT:  Of course.

25  BY MS. KENDRICK:

**March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross**

1   Q.  Do you supervise any of the monitors who do the measure --

2   evaluation of the mental health performance measures?

3   A.  No, I do not, except for the private prison.

4   Q.  You do that at the private prison?

5   A.  We have -- our compliance monitor has a background in          09:33AM

6   mental health and he does do the mental health performance

7   measures there.

8   Q.  Okay.  But for the 10 institutions covered by the

9   stipulation?

10  A.  No.                                                            09:33AM

11  Q.  You are not involved.  Okay.  Is that Dr. Taylor?

12  A.  Yes, it is.

13          MS. KENDRICK:  Sorry.  We're looking at this.

14          So, Your Honor, this is the December CGARs which I

15  believe you have a copy of them.                                   09:34AM

16          THE COURT:  I do.

17  BY MS. KENDRICK:

18  Q.  And it's Bates ADCM 835659 for December 2016 at Eyman

19  complex for Performance Measure 1.

20  A.  Okay.                                                          09:35AM

21  Q.  And for that, its staffing levels for the nurses at Eyman

22  institution for December, what is the level of compliance?

23  A.  67.74 percent for the RN being on site 24/7.

24  Q.  Okay.  And you are the person who put that information in

25  there?                                                            09:35AM

March 8, 2017 - Evidentiary Hearing re:  Status - Campbell - Cross

1    A.  Yes.

2    Q.  Are you aware of any corrective action plan that's been

3    created yet with regard to that non-compliance?

4    A.  I would have to go into the system to look.  Offhand, I

5    don't know.                                                    09:35AM

6    Q.  Do you know why Eyman did not have a nurse on staff 24/7?

7    A.  Well, this is for an RN.  They did have LPNs on site.  But

8    we don't count LPNs in on this measure.

9    Q.  Why didn't they have RNs?

10   A.  I don't know offhand.                                      09:35AM

11   Q.  Do you know what the current vacancy level is for RNs at

12   Eyman?

13   A.  I do not.

14   Q.  Do you think that they would need to hire more RNs?

15          MR. BOJANOWSKI:  Same objection.                       09:36AM

16          THE COURT:  Overruled.

17          THE WITNESS:  Based off this measure, if they are

18   below the threshold, yes.

19          MS. KENDRICK:  Okay.  Thank you.

20          Your Honor, we don't have anything else for her right  09:36AM

21   now.

22          THE COURT:  Thank you.

23          Mr. Bojanowski, any redirect?

24          MR. BOJANOWSKI:  No, Your Honor.

25          THE COURT:  Thank you, Ms. Campbell.                   09:36AM

March 8, 2017 - Evidentiary Hearing re:  Status - Owens - Direct

1          THE WITNESS:  Thank you.

2          THE COURT:  You may call your next witness.

3          While you are getting your witness we'll take a

4     five-minute break.

5          MR. BOJANOWSKI:  That's fine, Your Honor.                    09:37AM

6          (Recess from 9:37 a.m. until 9:46 a.m.)

7          THE COURT:  Thank you.  The next witness, please.

8          MR. BOJANOWSKI:  Ryan Owens.

9          THE COURT:  Thank you.  Would you please step forward

10    to the well of the courtroom before the clerk for the             09:46AM

11    administration of the oath.

12          THE MAGISTRATE CLERK:  Please raise your right hand.

13          (The witness was sworn.)

14          THE MAGISTRATE CLERK:  Thank you.  Please step right

15    onto the witness stand.                                           09:46AM

16                         RYAN OWENS,

17    called as a witness herein, having been first duly sworn, was

18    examined and testified as follows:

19                      DIRECT EXAMINATION

20    BY MR. BOJANOWSKI:                                                09:45AM

21    Q.  Would you please state your name for the record?

22    A.  Ryan Owens.

23    Q.  Mr. Owens, what is your business address?  Where do you

24    work?

25    A.  The Health Services Contract Monitoring Bureau Building.      09:47AM

───── March 8, 2017 - Evidentiary Hearing re:  Status - Owens - Direct ─────

1    1891.

2    Q.  1831 West Jefferson?

3    A.  Yes, sir.

4    Q.  Okay.  And you are employed with the Department of

5    Corrections, Arizona Department of Corrections?          09:47AM

6    A.  Yes, sir.

7    Q.  In what capacity?

8    A.  My title is legal advisor.

9    Q.  What are your job duties?

10   A.  I produce and randomize worksheets for the Health Services   09:48AM

11   Contract Monitoring Bureau's monitors.

12   Q.  Now, what's your educational background?

13   A.  I have a Bachelor's degree from Arizona State University

14   and a JD from Gonzaga University School of Law.

15   Q.  Are you currently licensed?                          09:48AM

16   A.  I am not.

17   Q.  Now, as part of your job duties, you are stationed at the

18   Health Services Monitoring Bureau, correct?

19   A.  Yes, sir.

20   Q.  And is Mr. Pratt your supervisor?                    09:48AM

21   A.  Yes.

22   Q.  How long have you been so employed?

23   A.  I have been with the Health Services Monitoring Bureau

24   since April of 2015.

25   Q.  We're here in court to try and educate the judge and    09:48AM

1   everyone else as far as how the process works.  And you are a

2   part of the monitoring process.  Do you understand that?

3   A.  Yes.

4   Q.  One of the questions that the Court had asked is how are

5   records randomized for use by the monitors?  And I take it you      09:49AM

6   are the person who is in charge of doing that, correct?

7   A.  Yes.

8   Q.  And in doing that, do you do that for all 10 facilities

9   that are monitored under the stipulation that's a part of this

10  case?                                                              09:49AM

11  A.  Yes.

12  Q.  So maybe you could just take us through, step by step, how

13  it is you go about randomizing and how that happens.  What's

14  the first document or source that you look to to begin the

15  randomization process?                                             09:50AM

16  A.  For the mental health worksheets, I start with an Excel

17  spreadsheet that has all the current inmates that are at the

18  state facilities.  And I then assign each inmate a randomized

19  number that's populated by an Excel code.  And then from there,

20  I break it down into unit and facility and mental health score.    09:50AM

21          So, for instance, if I'm doing -- I prepare each

22  facility separate.  So for Perryville I will create a

23  Perryville worksheet that's got separate spreadsheets in it,

24  Perryville, for example, Lumley 3A, Lumley 3B.  And so I will

25  take the source document that's got all of the inmates and I       09:50AM

 1    will pull out all the three As that are currently at Lumley.  I

 2    will randomize it, copy it, paste it in the spreadsheet and go

 3    forward with each other unit.

 4    Q.  So you do that for each prison facility at each unit in the

 5    state?                                                              09:51AM

 6    A.  For the ones that are monitored for that, for the mental

 7    health.

 8    Q.  Okay.  Do you also do the medical monitoring randomization?

 9    A.  The nurse line logs, HNR logs, yes, sir.

10          THE COURT:  Can you move the microphone a little             09:51AM

11    closer?  Thank you.

12          THE WITNESS:  Yes, sir.

13    BY MR. BOJANOWSKI:

14    Q.  So when you basically are starting with a full population,

15    do you then randomize the entire population and then filter out    09:51AM

16    various units?

17    A.  I filter it per unit and then I randomize it.

18    Q.  So you get the total population, you identify all inmates

19    within a unit, then you randomize all of those inmates that

20    fall within whatever criteria that you are going to be -- or       09:51AM

21    that's being utilized, correct?

22    A.  Yes.

23    Q.  And that -- so after you get that random list, you transmit

24    it to somebody, correct?

25    A.  Yes.                                                           09:52AM

```
 1   Q.  Who is that?

 2   A.  For mental health I send it to Dr. Taylor, Dennis Dye, and

 3   the other mental health staff monitor.

 4   Q.  What about for the nurse line and HNR line and those ones?

 5   A.  Kathy Campbell and Erin Barlund.                              09:52AM

 6   Q.  Do you also do pharmacy and dental and --

 7   A.  I do not do pharmacy.

 8   Q.  Okay.

 9   A.  On occasion I do dental.

10   Q.  All right.  Now, once this -- I mean, you don't physically   09:52AM

11   randomize it.  It's a computer program that randomizes the

12   inmates, correct?

13   A.  Correct.

14   Q.  Okay.  Excel?

15   A.  Excel.                                                        09:52AM

16   Q.  Excel randomization is what you are using to randomize,

17   correct?

18   A.  I assign each inmate a random number and then I click

19   randomize and I click sort and it randomizes it.

20   Q.  Okay.  And then that information is transmitted in to the     09:53AM

21   monitors.  Do you know what happens to that information after

22   that or are you basically done with it?

23   A.  I do not know what's done with it after that.

24   Q.  So your sole job is to just randomize various lists of

25   inmates under various filters and categories that somebody        09:53AM
```

March 8, 2017 - Evidentiary Hearing re:  Status - Owens - Direct

1   requests of you.  You give them the random list and you are

2   done?

3   A.  Yes.

4   Q.  All right.

5        MR. BOJANOWSKI:  Your Honor, I have nothing further.    09:53AM

6        THE COURT:  All right.  Thank you.

7        Any cross-examination?

8        MR. FATHI:  Your Honor, both Ms. Kendrick and I have

9   some questions if it's permissible.

10        THE COURT:  Of course.  Of course.    09:53AM

11                        CROSS-EXAMINATION

12   BY MR. FATHI:

13   Q.  Good morning.

14   A.  Good morning.

15   Q.  Could you tell us about your training in statistics?    09:53AM

16   A.  I'm not sure what you mean by statistics.

17   Q.  Have you had any training in statistics?

18   A.  Not that I'm aware of.

19   Q.  What's your definition of a random sample?

20   A.  My personal definition?    09:54AM

21   Q.  Sure.

22   A.  Something that's just that random that's not -- I'm not

23   sure.

24   Q.  Well, you are using the word "random" in the definition, so

25   I'm going to ask you to try not to do that and tell me what    09:54AM

```
 1    your definition of a random sample is.

 2    A.  A list of names that aren't in any particular order that

 3    have been set by -- with no predetermined location or order.

 4    Q.  So if you wrote down everyone's name on a piece of paper

 5    and threw the papers on a flight of stairs, would that be a        09:55AM

 6    random sample?

 7            MR. BOJANOWSKI:  Objection.

 8            THE COURT:  Overruled.

 9            THE WITNESS:  No.

10    BY MR. FATHI:                                                      09:55AM

11    Q.  You mentioned Mr. Dye and then the other mental health

12    monitor.  Who is the other mental health monitor?

13    A.  Her first name is Kenya.  I'm not sure what her last name

14    is.  I can't think of it off the top of my head.

15    Q.  You said you assign each inmate a random number.  Is that     09:55AM

16    correct?

17    A.  Yes, sir.

18    Q.  How do you generate those random numbers?

19    A.  I create a column next to the inmate's name and I highlight

20    all the columns that are next to the inmate name.  At the top I    09:55AM

21    put in equal sign, rand, open parenthesis, close parenthesis

22    and I hit control, enter, and a random number is generated for

23    them based on Excel.

24    Q.  So you are saying that the Excel program generates the

25    random numbers?                                                    09:56AM
```

March 8, 2017 - Evidentiary Hearing re:  Status - Owens - Cross

1   A.  Yes, sir.

2   Q.  Who decides the universe of records that you randomize?

3   A.  For what worksheets?

4   Q.  Well, you said you among other things you do randomization

5   for the mental health performance measures, correct?                09:56AM

6   A.  Yes, sir.  For the mental health worksheets, on the last

7   day of each month an AIMS report is automatically generated

8   that then I use to create the Excel spreadsheet that populates

9   the full list.  So it's a self-generated list automatically

10  generated through AIMS.                                             09:56AM

11  Q.  So is it the case that for all of the mental health

12  measures -- let me back up.

13          A random sample is a sample from a larger population.

14  Correct?

15  A.  Yes.                                                            09:57AM

16  Q.  So it matters what the larger population is, right?

17  A.  I guess so.

18  Q.  Are you familiar with Performance Measure 85?

19  A.  I am not.

20  Q.  Let me just represent to you that Performance Measure 85        09:57AM

21  involves prisoners who are classified as MH 3D.

22  A.  Okay.

23  Q.  So when you are creating a random list for Performance

24  Measure 85, do you sample all MH 3Ds at a given unit, or do you

25  sample differently?                                                 09:57AM

March 8, 2017 - Evidentiary Hearing re:  Status - Owens - Cross

1   A.  I don't specifically provide a worksheet for each

2   performance measure.  I just provide worksheets that then are

3   used for whatever performance measures that they want.  I don't

4   create random samples of lists.  I provide every inmate for

5   that particular category.  So if it's Lumley 3A it's every                09:57AM

6   single Lumley 3A inmate that may be 3A for that, 3B for Lumley,

7   3B.  I put them in random order.  I don't provide a specific

8   random sampling.  I just provide them all to them with a random

9   number in a random order.

10  Q.  Okay.  Is your answer the same with respect to all the        09:58AM

11  mental health performance measures?

12  A.  Yes.

13  Q.  So let me say this back to you and make sure I have got it

14  right.

15         For each mental health performance measure, you take       09:58AM

16  all of the MH 3As or MH 4s or MH 3Bs as the case may be, at a

17  given unit, and using the process you have described, you

18  generate a list of those prisoners that is in a random order.

19  Is that right?

20  A.  Yes.                                                          09:58AM

21  Q.  Okay.  So you don't know what's done with that list after

22  it leaves your hands, correct?

23  A.  I do not.

24  Q.  You don't know how that list is used to create the CGAR

25  reports?                                                          09:59AM

1   A.  I do not.

2   Q.  Do you know what the CGAR reports are?

3   A.  I do.

4   Q.  And I think you testified that you create that list for

5   each unit within each complex.  Is that correct?                09:59AM

6   A.  Yes.

7   Q.  And that's true for all of the mental health performance

8   measures?

9   A.  If they use those for all the mental health performance

10  measures.  I just provide them the worksheets for each facility  09:59AM

11  broken down by unit and then I don't know what they use them

12  for.

13  Q.  And do you only create lists of prisoners who have a

14  certain mental health classification?

15  A.  For the mental health I do.                                  09:59AM

16  Q.  Okay.  For mental health do you create lists of prisoners

17  who are on suicide watch?

18  A.  I do not believe so.

19  Q.  Do you create lists of prisoners who are releasing within

20  the next 30 days for mental health?                             10:00AM

21  A.  I don't create those but I do randomize those lists.

22  Q.  Who creates the lists?

23  A.  I'm not sure.

24  Q.  Do you create random lists of health needs requests that

25  have to do with mental health?                                  10:00AM

—— **March 8, 2017 - Evidentiary Hearing re:  Status - Owens - Cross** ——

1   A.  I do not create them.  I randomize them.

2   Q.  Who creates them?

3   A.  They are provided from Corizon, by Corizon.

4   Q.  So who creates them?

5   A.  I do not know.                                          10:00AM

6   Q.  Who at Corizon provides them to you?

7   A.  I believe her name is Pam -- Wilson?  I'm not sure of her

8   last name.

9   Q.  Do you create random lists of prisoners who have recently

10  come off suicide watch?                                     10:01AM

11  A.  I do not create those lists.

12  Q.  Do you randomize those?

13  A.  Believe so.

14  Q.  Who gives you the material that you randomize?

15  A.  For that particular list?                              10:01AM

16  Q.  Yes.  If you randomize prisoners who have recently come off

17  of suicide watch, what is the source of the list that you

18  randomize?

19  A.  I'm not sure who provides that particular list off the top

20  of my head.                                                10:01AM

21        THE COURT:  The idea with the randomization is to

22  assure that there's not some kind of direction to the sampling

23  process that could skew it.  The questions that are being asked

24  now raise the possibility in my mind that if you are getting

25  the list of the people to be randomized from Corizon, it is    10:01AM

———— **March 8, 2017 - Evidentiary Hearing re:  Status - Owens - Cross** ————

1   possible that they could omit from that list people that should

2   be collected in the list as a way to manipulate the sample and

3   render it not as trustworthy.

4          Is that a reasonable thought?

5          THE WITNESS:  Your Honor, I know that the mental                    10:02AM

6   health worksheets that I get, they are pulled directly from

7   AIMS and then I transfer them to Excel.

8          THE COURT:  But who pulls them from AIMS?

9          THE WITNESS:  It's automatically generated.

10         THE COURT:  But that's the mental health.  But the                  10:02AM

11  other ones that Mr. Fathi was just asking about, those are

12  lists that are not pulled automatically.  Those are lists that,

13  apparently, are furnished to you by Corizon?

14         THE WITNESS:  Yes, sir, Your Honor, I get an e-mail

15  that says this worksheet has been sent to me through a secure          10:02AM

16  e-mail.  So I go and download it.  I check to make sure all the

17  units for that facility are included.  If not then I revert

18  back and make sure it's been included, and then from there I

19  populate and break it down.  So I don't know what the

20  information --                                                         10:03AM

21         THE COURT:  So the list includes the names of the

22  inmates who are represented to you to be the ones that need to

23  be sampled?

24         THE WITNESS:  Yes, sir, Your Honor.

25         THE COURT:  And just to make sure that I do                       10:03AM

March 8, 2017 - Evidentiary Hearing re:  Status - Owens - Cross

1    understand, in some cases other than the mental health cases,

2    that list comes directly from Corizon.

3              THE WITNESS:  Yes, sir.

4              MR. FATHI:  Thank you, Your Honor.  Nothing further.

5    But as I said, Ms. Kendrick has some.                    10:03AM

6                        CROSS-EXAMINATION

7    BY MS. KENDRICK:

8    Q.  Hi.  How are you?

9    A.  Good.  How are you?

10   Q.  Good.  Thank you.  So when Mr. Bojanowski was asking you    10:03AM

11   about which types of logs you look at besides the mental health

12   ones, you mentioned HNR and nursing line logs?

13   A.  Yes, ma'am.

14   Q.  Are there other types of reports or logs that relate to the

15   medical performance measures that you randomize each month?    10:03AM

16   A.  I'm not sure what reports I get that coordinate to what

17   performance measures.

18   Q.  Okay.  Well, no, I'm not asking.  But like are you familiar

19   with something that's called the Provider Encounter Log?

20   A.  Yes, ma'am.                                          10:04AM

21   Q.  And is that one that you randomize?

22   A.  Yes, ma'am.

23   Q.  And you said that you do not do the randomization for the

24   pharmacy performance measures?

25   A.  Not to my knowledge.  I do not believe I do that.     10:04AM

March 8, 2017 - Evidentiary Hearing re:  Status - Owens - Cross

1  Q.  Do you know who does?

2  A.  I do not.

3  Q.  Okay.  And are you aware of something that's called the

4  SNO, or Special Needs Order report?

5  A.  It sounds familiar.                                    10:04AM

6  Q.  Is that one of the ones that you randomize?

7  A.  I'm not sure.  I don't believe so.

8  Q.  Okay.  How about one that's called the Release Inmate

9  Report?

10  A.  I believe I might have started that within the last couple   10:04AM

11  months, randomizing that.

12  Q.  And I'm sorry if you already said this.  How long have you

13  been in this position?

14  A.  Since July of '15, 2015.

15  Q.  Did somebody have your position before you?            10:05AM

16  A.  Not that I am aware of.

17  Q.  Okay.  Do you have any, like, specialized training on

18  Microsoft Excel and other sorts of software programs?

19  A.  No other training other than usage.

20  Q.  Okay.  Do you have other duties in your position besides   10:05AM

21  working on preparing the logs?

22  A.  I do.

23  Q.  What is it?

24  A.  I request and sort and then provide the Inmate Medical

25  Records for the deceased subclass and class members as well as   10:05AM

1  the master record files for the five subclass members that are

2  named each month.

3  Q.  So that would be for the performance measures about maximum

4  custody?

5  A.  I believe so.                                                    10:06AM

6  Q.  And are you familiar with something that's called the

7  Arrival Log?

8  A.  That sounds familiar.

9  Q.  Is that one that you normally randomize?

10 A.  I believe I have randomized it recently in the last couple   10:06AM

11 months.

12 Q.  How about the Diagnostic Service Report?

13 A.  That doesn't sound familiar.

14 Q.  How about the Denied Consult Report?

15 A.  That doesn't sound familiar.                                   10:06AM

16 Q.  How about the Urgent Consult Report?

17 A.  That definitely doesn't sound familiar.

18 Q.  Okay.  How about the Routine Consult Report?

19 A.  No.

20 Q.  How about the Chronic Care Report?                             10:06AM

21 A.  That doesn't sound familiar.

22 Q.  Okay.  How about the DI 37 AIMS report?

23 A.  I have randomized that in the last few months.

24 Q.  Why not?

25 A.  I have.                                                        10:07AM

———— March 8, 2017 - Evidentiary Hearing re:  Status - Owens - Cross ————

1   Q.  Oh, you have.  I apologize.  Do you remember when you

2   started working on that one?

3   A.  I think I randomized it for the last two or three months.

4   Q.  Are you familiar with the IPC Census Report?

5   A.  Yes.                                                          10:07AM

6   Q.  Is that one that you randomize?

7   A.  I believe so.

8   Q.  Are you familiar with a Diet Report?

9   A.  No.

10  Q.  Is that one that you have randomized?                         10:07AM

11  A.  No.

12          THE COURT:  Is that an acronym?

13          MS. KENDRICK:  Diet?

14          THE COURT:  Meaning the diet people eat.

15          MS. KENDRICK:  Correct, D-I-E-T.                          10:07AM

16  BY MS. KENDRICK:

17  Q.  How about you said you occasionally do the dental reports?

18  A.  I have run the dental reports for the last -- I did for a

19  couple months while somebody was on leave and they are back.

20  Q.  Who is that person?                                           10:08AM

21  A.  Mary Fuller.

22  Q.  I'm sorry?

23  A.  Mary Fuller.

24  Q.  And she works in the ADC as well?

25  A.  Yes, ma'am.                                                   10:08AM

1            THE COURT:  Other than Ms. Fuller is there anybody

2      else, to your knowledge, who does randomization?

3            THE WITNESS:  Not to my knowledge, Your Honor.

4            THE COURT:  What year did you graduate from college?

5            THE WITNESS:  I graduated from college in December of          10:08AM

6      2005.

7            THE COURT:  What was your major?

8            THE WITNESS:  Political science.

9            THE COURT:  Did you take a statistics class?

10           THE WITNESS:  I took, Your Honor, I took something          10:08AM

11     similar to a statistics class but it was about polling.

12           THE COURT:  It was in the Political Science

13     Department?

14           THE WITNESS:  Yes, Your Honor.

15           THE COURT:  And what did you study in that class, the          10:08AM

16     polling class?  What kinds of things did you study?  I guess

17     how math intensive was it?

18           THE WITNESS:  Not very math intensive, Your Honor.

19           THE COURT:  And then in law school, did you take any

20     statistics classes?          10:09AM

21           THE WITNESS:  No, Your Honor.

22           THE COURT:  And have you had -- what year did you

23     graduate from law school?

24           THE WITNESS:  I graduated in May of '09, Your Honor.

25           THE COURT:  Between then and now, have you taken any          10:09AM

1    professional classes in statistics?

2              THE WITNESS:  No, Your Honor.

3              THE COURT:  Have you had any training in statistics

4    other than that polling class?

5              THE WITNESS:  No, Your Honor.                    10:09AM

6              THE COURT:  Thank you.

7    BY MS. KENDRICK:

8    Q.  And I believe you had said earlier that Pam Wilson is --

9    you believed that was her last name at Corizon was the person

10   who actually gives you the raw data you use to randomize?    10:09AM

11   A.  Yes, ma'am.

12   Q.  So that's the case for everything you randomize, or is

13   there anybody else at Corizon that provides you information?

14   A.  For the most -- all the logs that I randomize and provide

15   that aren't the ones that I create for mental health, they come  10:10AM

16   from Corizon.

17   Q.  So you said on the last day of the month, they send you

18   over reports or --

19   A.  On the last day of the month, the report that I use to

20   create the mental health worksheets is automatically generated  10:10AM

21   through AIMS.  Corizon provides the other reports to me that I

22   then randomize periodically through the week, so periodically

23   through a certain time.

24   Q.  And you are familiar with the monitoring process where, for

25   example, for the month of January, 2017, the monitor would be  10:10AM

1   reviewing in the month of February and polling files and that

2   sort of thing?

3   A.  Yes.

4   Q.  So in terms of your role, where do you come in?  Is it on

5   January 31st that you would be given the raw data to randomize?    10:10AM

6   A.  So on January 31st, for the mental health worksheets, I

7   pull that and I give it to the mental health monitors who then

8   use that for February.

9   Q.  Okay.  What about for all of these medical reports like the

10  HNR logs or the nursing line logs.  What are the dates, you    10:11AM

11  know, roughly, kind of the time frames you have for randomizing

12  and getting stuff out to the monitors?

13  A.  It's normally the previous month, I believe.  So for this

14  month I just got HNR logs, nurse line logs that were for the

15  month of February because we're in March now.    10:11AM

16  Q.  Yeah.  So how much turnaround time do you have to do to --

17  you get them, you just got them.  You are going to randomize

18  them.  How quickly do you need to get them out to the monitors

19  at the institutions?

20  A.  I get them out as quickly as I can.  So I think I started    10:11AM

21  getting them on Friday, and --

22  Q.  Uh-huh.

23  A.  -- and I have them all out that I have received as of close

24  of business yesterday.

25  Q.  Who is your supervisor?    10:12AM

March 8, 2017 - Evidentiary Hearing re:  Status - Owens - Cross

1   A.  I report directly to Mr. Pratt.

2   Q.  Okay.  And did you work in any other positions at the

3   Department of Corrections prior to doing this?

4   A.  Yes.  Prior to Health Services Contract Monitoring Bureau I

5   was in legal services for two years.                      10:12AM

6   Q.  Were you an attorney in that department?

7   A.  No, ma'am.

8        THE COURT:  What did you do in legal services?

9        THE WITNESS:  Your Honor, I reviewed inmate grievances

10  and disciplinary appeals, and I handled public records requests  10:12AM

11  and subpoenas and court orders for records.

12       THE COURT:  Thank you.

13       MS. KENDRICK:  Thank you.

14       THE COURT:  Anything further from plaintiffs for Mr.

15  Owens?                                                    10:12AM

16       MR. FATHI:  No, Your Honor.  Thank you.

17       THE COURT:  Mr. Bojanowski.

18                    REDIRECT EXAMINATION

19  BY MR. BOJANOWSKI:

20  Q.  Mr. Owens, do you need any kind of statistical background  10:13AM

21  in order to randomize the lists that you are randomizing with

22  the Excel program?

23  A.  No, sir.

24  Q.  The program is automatic.  It's a function of Excel, is

25  that right?                                               10:13AM

1   A.  Yes, sir.

2   Q.  In other words, you can't change the random order at all

3   once you randomize, right?

4          MR. FATHI:  Objection, Your Honor.  We have been

5   patient with leading questions given the informal nature but I          10:13AM

6   do think counsel --

7          THE COURT:  Let me cut that off a little bit, Mr.

8   Bojanowski.  I understand the point that you are making.  And

9   the point that I'm concerned about is not whether or not the

10  randomization of pushing the right buttons on Excel works or          10:13AM

11  not.  I don't think you need to have any training to do that.

12  The concern that's raised in my mind is one that somebody who

13  doesn't have any statistical training would not see any red

14  flags that would raise a concern of the kind that I think your

15  polling class talked about and that is people can say all sorts          10:14AM

16  of things based upon polling numbers.  But if you go beyond

17  what was asked, who was it asked of, where did the information

18  come from, all those things can adversely affect the polling

19  process.

20          There are other things that can adversely affect a          10:14AM

21  sampling process.  One of the things I have highlighted is

22  where did the list of names come from?  Did you have control

23  over those names?  Could they have been the subject of

24  manipulation before you got the names?  I don't have any doubt

25  that you can run the Excel program and randomize and probably          10:14AM

1    what you get is probably okay and probably not subject to

2    attack.  It just raises other issues for me about whether or

3    not the integrity of the system from start to finish is

4    completely secure.

5          So I hope that cuts off the redirect that you were          10:14AM

6    hoping to do here, Mr. Bojanowski, but if not go ahead.

7    BY MR. BOJANOWSKI:

8    Q.  Do you have any information that would lead you to believe

9    that the lists that you receive from Corizon are not complete?

10   A.  No, sir.                                                      10:14AM

11         THE COURT:  Have you ever made any inquiry about that?

12         THE WITNESS:  As I did mention, there are, Your Honor,

13   there are times where I will get like an HNR log, for example,

14   and I check to make sure that all the individual units from

15   that complex are included.  And if there's a situation where    10:15AM

16   there isn't one, for example, maybe North unit is absent from

17   the facility, then I will reach back out to Pam and reply and

18   say can you please make sure that North unit wasn't excluded

19   for any reason.  There has been occasion where they have said

20   there weren't any, or yes, it wasn't, here it is.  But I do     10:15AM

21   that to make sure all units are included for that facility.

22         THE COURT:  But other than checking to make sure a

23   unit was not excluded you don't do any other further inquiry?

24         THE WITNESS:  Your Honor, I don't know what I could do    10:15AM

25   to. . .

March 8, 2017 - Evidentiary Hearing re:  Status - Owens - Redirect

1           THE COURT:  Thank you.

2   BY MR. BOJANOWSKI:

3   Q.  What's an AIMS report?

4   A.  Arizona Inmate Management System that -- I'm not exactly

5   sure how it works but I know that it's created and it's, like I    10:15AM

6   said, it's a list of every single inmate along with some other

7   information.

8   Q.  I'm going to direct your attention to Tab E, Number 1.  Do

9   you see that document that's in front of you?

10  A.  Yes, sir.                                                      10:16AM

11  Q.  Do you recognize that document?

12  A.  Yes, sir.

13  Q.  What is it?

14          MR. FATHI:  I'm sorry.  Could we have a more specific

15  description for counsel?                                           10:16AM

16          MR. BOJANOWSKI:  Tab E, 1.

17          THE COURT:  Tab E, 1, which appears to have the name

18  randomization then medication and location at the top.  We're

19  all at the same page?  You are not there, Mr. Fathi?

20          MR. FATHI:  Your Honor, the first page in our E, 1 is    10:16AM

21  PM 85 and 86.  Okay.

22  BY MR. BOJANOWSKI:

23  Q.  See that list of names there?

24  A.  Yes, sir.

25  Q.  What is it?                                                    10:17AM

1    A.  Looks like the 3D report.

2    Q.  3D report?

3    A.  All the inmates have 3D.

4    Q.  So this is a listing that you receive.  Is this something

5    that comes off AIMS?                                        10:17AM

6    A.  The 3Ds are not -- the 3Ds do not come from AIMS.

7    Q.  Where does this come from?

8    A.  This is sent to me by Dennis Dye.

9    Q.  Okay.

10   A.  Works in mental health.                                 10:17AM

11   Q.  Is this a listing of every single inmate in every unit

12   throughout the system that is an MH 3D?

13   A.  I can't --

14   Q.  You don't know?

15   A.  I don't know.                                           10:17AM

16   Q.  But it's one of the lists that's given to you for

17   randomization?

18   A.  For the 3D inmates, yes, sir.

19   Q.  Okay.  Now, you say you take this list and assign a number

20   to each one of the names?                                   10:18AM

21   A.  Yes, sir.

22   Q.  All right.

23        MR. BOJANOWSKI:  May I have a moment, Your Honor?

24        THE COURT:  Surely.

25   BY MR. BOJANOWSKI:                                          10:18AM

Q.  You are looking at about three color pages farther in to

this exhibit, and you see what that list is?

A.  Yes, sir.

Q.  What is that?

A.  That looks like a list of inmates that are housed at East

Unit with a random number next to them.

   THE COURT:  I'm not sure where you are.

   MR. BOJANOWSKI:  This was the first list.

   THE COURT:  Thank you.

BY MR. BOJANOWSKI:

Q.  Okay.  So the various filters are added, and then this list

is generated.  This is something that you produce, right?

A.  Yes, sir.

Q.  And then this is something that is then -- this is the list

that you then send back to whoever is going to do the

monitoring, right?

A.  Yes, sir.

Q.  And this number that's on the left-hand side, is that the

number that the computer assigns to that particular inmate?

A.  It is.

Q.  Okay.  And so this is -- this all looks like these are

inmates in the East Unit, correct?

A.  Yes.

Q.  And then there -- the number is the inmate number, correct?

A.  Yes.

10:19AM

10:20AM

10:20AM

10:20AM

March 8, 2017 - Evidentiary Hearing re:  Status - Owens - Redirect

1    Q.  The inmate name?

2    A.  Yes.

3    Q.  And then there is a med discontinue date there, correct?

4    A.  I believe so.

5    Q.  And then a 30-day follow-up completed date on the final        10:20AM

6    column.  Correct?

7    A.  Yes, sir.

8    Q.  Now, the only thing that you produce with regard to these

9    records is the left-hand column, and then this page is just

10   printed, right?                                                    10:21AM

11   A.  Yes, sir.  I provide -- I put it into an Excel spreadsheet

12   and I send it over and the monitors themselves print the

13   documents.

14   Q.  The AIMS report that you talked about, that's a report that

15   is produced or generated by ADOC, is that right?                  10:21AM

16   A.  Yes.

17   Q.  And really what it is, is it's a listing of every single

18   inmate in the system?

19   A.  Yes.

20   Q.  Regardless of where they are at, what their mental health     10:21AM

21   score is, what their medical condition is.  It's just every

22   single person in the system?

23   A.  Yes, sir.

24   Q.  And you use that source document to then move forward to

25   reduce down into the documents that look something like this,     10:21AM

1   correct?

2   A.  Yes, sir.

3   Q.  All right.  Now, the other documents that you get from

4   Corizon, are they similar to the list that you receive that we

5   first looked at?                                                    10:22AM

6   A.  No.

7   Q.  Or is it something different?

8   A.  It's a different format.

9   Q.  What is it?

10  A.  It normally has a heading.  It has different information,        10:22AM

11  different dates that's more specific to that particular -- so

12  if it's HNR logs it has different dates that's needed for that

13  monitor, I guess, to use.

14  Q.  You don't know who produces or who is responsible for

15  producing all of those Corizon lists?                               10:22AM

16  A.  I just know that I get them sent in an e-mail.

17  Q.  Pardon me?

18  A.  I just know that I get them sent in an e-mail.

19  Q.  Do you know who that e-mail is from?

20  A.  Like I mentioned, I know her first name is Pam.  I believe       10:22AM

21  her last name is Wilson.

22  Q.  So everything you get from Corizon runs through Pam, and

23  you thought it was Wilson?

24  A.  I believe it's Wilson, yes.

25          MR. BOJANOWSKI:  I don't have anything further, Your         10:23AM

March 8, 2017 - Evidentiary Hearing re:  Status - Owens - Recross

 1    Honor.

 2            THE COURT:  Thank you.  Anything further from

 3    plaintiffs for this witness?

 4            MR. FATHI:  Briefly, Your Honor.

 5                    RECROSS-EXAMINATION                          10:23AM

 6    BY MR. FATHI:

 7    Q.  I'm a little bit confused by your testimony, and I hope you

 8    can help me clear it up.

 9            I thought you said that the list you randomize of

10    prisoners who -- patients whose mental health code is 3A, 3B,   10:23AM

11    those come from AIMS.  Was that your testimony?

12    A.  Yes.

13    Q.  But then you testified that the list of 3Ds doesn't come

14    from AIMS, correct?

15    A.  Recently 3Ds got separated so they come from a different    10:23AM

16    list.

17    Q.  And are 3Ds the only mental health score that is handled

18    differently?

19    A.  As far as me creating the documents and the worksheets,

20    yes.                                                            10:24AM

21    Q.  And you testified that the list of 3Ds that you randomize

22    comes from Dennis Dye, correct?

23    A.  That's how I receive it.

24    Q.  And you don't know how Mr. Dye generates that list?

25    A.  I do not.                                                   10:24AM

March 8, 2017 - Evidentiary Hearing re:  Status - Owens - Recross

1   Q.  And so you don't know if that's a complete list of all the

2   MH 3Ds in a given unit or a given complex?

3   A.  I assume that it is, but I do not know.

4   Q.  Why are the 3Ds handled differently than any other mental

5   health category?                                                    10:24AM

6   A.  I'm not sure.

7   Q.  That's never been explained to you by anybody?

8   A.  I don't need to know.

9   Q.  That's never been explained to you by anybody?

10  A.  No.                                                             10:24AM

11  Q.  When did it start that the 3Ds were handled differently

12  from all other mental health codes?

13  A.  I believe it's been three or four months.

14  Q.  Did you receive an e-mail, anything in writing about why

15  that was being done?                                               10:24AM

16  A.  No.

17  Q.  Did you receive any verbal explanation about why that was

18  being done?

19  A.  I was just told that 3Ds were going to be monitored or

20  sent -- generated from a separate list moving forward.             10:25AM

21  Q.  And who told you that?

22  A.  I believe it was Dr. Taylor.

23  Q.  But Dr. Taylor didn't explain why that was?

24  A.  I don't know why -- no.

25  Q.  Nothing further.  Thank you.                                   10:25AM

March 8, 2017 - **Evidentiary Hearing re:** Status - Haldane - Direct

1      THE COURT:  Thank you.  And thank you, Mr. Owens.  I

2  appreciate it.

3      You may call your next witness, please.

4      Thank you.  Please step forward to the well of the

5  court so the clerk of the court can administer the oath.                10:26AM

6      THE MAGISTRATE CLERK:  May I have your name, please.

7      THE WITNESS:  Mark Thomas Haldane, H-A-L-D-A-N-E.

8      (The witness was sworn.)

9      THE MAGISTRATE CLERK:  Please step around to the

10  witness stand.                                                          10:26AM

11      THE COURT:  Sir, it may sound like you are booming

12  through the courtroom, but if you would keep your mouth close

13  to the microphone because we need it to hear.

14      THE WITNESS:  Yes, sir.

15                          MARK HALDANE,

16  a witness herein, having been first duly sworn by the clerk to

17  speak the truth and nothing but the truth, was examined and

18  testified as follows:

19                      DIRECT EXAMINATION

20  BY MR. BOJANOWSKI:

21  Q.  Would you please state your name for the record?

22  A.  Mark Thomas Haldane.

23  Q.  Mr. Haldane, what is your business address?

24  A.  2105 North Citrus Road, Goodyear, Arizona, 85395.

25  Q.  Are you employed?                                                   10:27AM

March 8, 2017 - Evidentiary Hearing re:  Status - Haldane - Direct

1   A.  Yes, I am.

2   Q.  In what capacity?

3   A.  I'm the Health Services Contract Monitor for the Arizona

4   Prison Complex at Perryville.

5   Q.  How long have you been so employed?                          10:27AM

6   A.  Since July 9th, 2012, so going on five years.

7   Q.  What are your job duties, generally speaking, in your

8   position?

9   A.  To monitor the contract compliance for contract performance

10  measures that have been outlined mostly through the stipulation  10:27AM

11  agreement.

12  Q.  Previous to being employed with ADOC as a contract

13  compliance monitor, were you -- or do you have any experience

14  in auditing or monitoring in prior positions?

15  A.  Yes.                                                          10:28AM

16  Q.  Why don't you describe for the Court your prior monitoring

17  or auditing experience.

18  A.  Prior to coming to the Department of Corrections, I worked

19  for the Department of Health Services.  I was the Bureau Chief

20  for the Office of Audit and Evaluation from -- and I worked --   10:28AM

21  trying to remember the dates there.

22  Q.  2006 to 2010?

23  A.  I worked for Health Services 2006 through 2010.  That was

24  broken up as Bureau Chief for Audit and Evaluation with the

25  Division of Behavioral Health Services.  And I also worked as a  10:28AM

1    compliance auditor for Children's Rehabilitative Services.

2    Q.  Between 1998 and 2006, where were you employed?

3    A.  At the Arizona Office of the Auditor General.

4    Q.  And what did you do there?

5    A.  I was a performance auditor and -- a Performance Auditor II    10:29AM

6    and Senior Performance Auditor during that time.

7    Q.  Prior to that, where were you employed?

8    A.  I was employed from 1991 until 1998 with the Commonwealth

9    of Massachusetts.  I worked as a state Administrative Law Judge

10   for the Commonwealth of Massachusetts.                           10:29AM

11   Q.  Could you describe for us your educational background?

12   A.  Yes.  I have a Bachelor of Arts in political science and

13   history from the University of Michigan, and I have a JD from

14   New England School of Law in Boston.

15   Q.  Are you currently licensed?                                  10:30AM

16   A.  No.

17   Q.  I'd like you to turn in the notebook that's in front of you

18   to Tab C.  Are you there?

19   A.  Yes, sir.

20   Q.  Part of what the Court wants to do today is to learn some    10:30AM

21   background and facts about how monitoring occurs.  So we're

22   going to run through one of the measures that you monitor.

23        You don't monitor all the measures at the Perryville

24   facility, do you?

25   A.  I do not.                                                    10:31AM

March 8, 2017 - **Evidentiary Hearing re:   Status - Haldane - Direct**

1   Q.  There's a certain number of measures that you monitor, and

2   then other people monitor other measures.  Is that fair to say?

3   A.  That's correct.

4   Q.  Which types of measures do you monitor?

5   A.  I monitor the contract --                                          10:31AM

6   Q.  The compliance?

7   A.  Compliance.

8   Q.  So you do not involve yourself in the clinical or medical

9   monitoring or the mental health monitoring or the dental

10  monitoring?                                                            10:31AM

11  A.  None of those, or the pharmacy monitoring.

12  Q.  Or the pharmacy.  All right.  And how many actual measures

13  do you personally have to monitor?

14  A.  I think we have 53, but some of those are done by my boss

15  each month, and so it's varied some.  But it's roughly 45 to          10:31AM

16  50, I guess.

17  Q.  And who is your immediate supervisor?

18  A.  Kathy Campbell.

19  Q.  Now, as part of the process, each month you are tasked with

20  monitoring these 50-some measures.  What's the first step you         10:32AM

21  take in the first measure you are going to look at?  And I'm

22  only speaking as a general scenario how you do it before we get

23  into the specifics, just so the Court has an idea, step by

24  step, in a general fashion, how it is you go about doing it.

25  A.  Generally, the first step is we receive randomized lists          10:32AM

1   from source documents that are e-mailed to us from our central

2   office.

3   Q.  And then what?

4   A.  We'll take those randomized lists, and depending on which

5   performance measure it is, the general rule is that we'll take        10:32AM

6   the first 10 charts from each unit that we audit and -- audit

7   those and determine whether or not that chart has information

8   that is -- that meets the criteria of the performance measure.

9   Q.  Okay.  And if it does meet the criteria, there is some

10  notation of that.  And if it does not, there's a notation of          10:33AM

11  that, correct?

12  A.  Yes.

13  Q.  And then once you are done reviewing -- well, about how

14  many charts are you looking at in a month?

15  A.  It's --                                                           10:33AM

16  Q.  Just rough estimates?

17  A.  I'm going to say probably 250.

18  Q.  Okay.  And so once you are done doing your chart review and

19  you have got your data, you collect the data and then I take it

20  you have each measure with the data listed, in other words, you       10:34AM

21  identify the charts you looked at, what the finding was per the

22  chart, and then the end result, you do the math and come up

23  with a percentage.  Is that generally the way it works?

24  A.  Well, when I actually enter the number of compliant charts

25  into the electronic CGAR and the number of charts reviewed, the       10:34AM

1    math is automatically calculated.  I don't actually have to do

2    the math.

3    Q.  The computer program does it for you?

4    A.  Yes, it does.

5    Q.  And so once that's done and you have the preliminary data,    10:34AM

6    then what happens?

7    A.  Once I have looked at the data, I then take the -- each

8    chart will have the ADC, Department of Corrections, inmate

9    number and I will put that number into the field in eOMIS to

10   call the chart up electronically.  And I will then look for the    10:35AM

11   information that applies to the specific performance measure.

12   Q.  Okay.  Are you filling in your eOMIS data as you are doing

13   it?

14   A.  I am filling it into -- yes.  I put my data into a Excel

15   spreadsheet.                                                       10:35AM

16   Q.  Okay.  So then once you have all of the data for the month,

17   you then upload that into the CGAR system?

18   A.  For each measure, I don't wait until I'm done with the

19   whole thing and then upload everything together.  But as we go

20   along through the month, as I finish a performance measure, I     10:35AM

21   will then e-mail the file and people from Corizon to let them

22   know what the information is.  And to be honest, you know, if

23   it's compliant, there's really nothing to challenge.

24         But then I will upload it into eOMIS or upload it,

25   rather, into the CGAR system.                                     10:36AM

**March 8, 2017 - Evidentiary Hearing re:  Status - Haldane - Direct**

1    Q.  There's been some testimony with regard to a rebuttal

2    process where you meet with representatives from Corizon to

3    review findings to determine whether they are accurate or not.

4    Are you familiar with that at all?

5    A.  I'm familiar with the rebuttal process, but I don't          10:36AM

6    actually meet with anyone.  It's done electronically.

7    Q.  And what, do you e-mail back and forth is what you do?

8    A.  I will, if there's a rebuttal -- and quite honestly, there

9    have been very few at Perryville.  But when there is a

10   rebuttal, I will get an e-mail and there's a standard form that  10:37AM

11   says they are challenging the accuracy of a particular finding

12   within a particular performance measure.  And so then I will

13   review it to see if I agree with the challenge or not.

14   Q.  Have you ever had an occasion where you agree with the

15   challenge?                                                       10:37AM

16   A.  Yes.

17   Q.  And what kinds of things happen that create you to change

18   what you are doing?

19   A.  Well, for instance, there has been an occasion where a

20   document was actually in the record.  I didn't see it, because  10:37AM

21   it wasn't filed in where you would normally find that

22   information.  There was -- I can remember one instance where --

23   normally I'm looking at the electronic encounter for

24   information about what went on during a visit, and -- but the

25   system was apparently down and so they used a paper encounter   10:38AM

March 8, 2017 - Evidentiary Hearing re:  Status - Haldane - Direct

1    and then scanned it into scanned documents.  So when I went to

2    where I would find the electronic encounter, I didn't see it.

3    So I missed it.  And so when they brought it to my attention,

4    then, in fact, the information was in the record.  I changed

5    that finding to be compliant.                                    10:38AM

6    Q.  Okay.

7            THE COURT:  Excuse me.  That was that particular

8    incident that you just reported about one that was part of the

9    formal rebuttal procedure where you actually received the form,

10   or was it part of what I understand also exists in a more       10:38AM

11   informal context where you send, at the initial stage, an

12   e-mail back to Corizon saying I think that you are out of

13   compliance on this issue?  Which one was that?

14           THE WITNESS:  It was the formal rebuttal process.

15           THE COURT:  And how often is it that you send off that   10:39AM

16   inquiry -- or not an inquiry, you send off a notice of

17   non-compliance, potential non-compliance in this sort of first

18   stage informal, more informal e-mail to Corizon that results in

19   a suggestion that they see a mistake that you have made?

20           THE WITNESS:  Not as often as I'm supposed to.  But I    10:39AM

21   am supposed to do it with every finding that I make, but I find

22   that especially if the performance measure is compliant,

23   that --

24           THE COURT:  That doesn't make any sense.  I

25   understand.                                                      10:39AM

March 8, 2017 - Evidentiary Hearing re:  Status - Haldane - Direct

1          What I'm given to understand, and maybe you can tell

2     me whether my understanding is correct or not, is that there's

3     really a two-step process that allows Corizon to identify

4     something that may have caused you to come to an erroneous

5     conclusion finding non-compliance.  The first step is that you      10:40AM

6     review the record, you determine yourself that there's

7     non-compliance, and then you send an e-mail to Corizon in which

8     you say there's non-compliance on this record.  Is that --

9          THE WITNESS:  Yes, sir.

10          THE COURT:  Then Corizon has an opportunity to respond      10:40AM

11     in that e-mail and to point out anything that they think is

12     relevant to a determination about whether there's compliance or

13     not.  Is that right?

14          THE WITNESS:  That is correct.

15          THE COURT:  If you reject that response in the first       10:40AM

16     stage and then move to the second stage then there's this more

17     formal process that involves the rebuttal form.  Is that

18     correct?

19          THE WITNESS:  Yes, sir.

20          THE COURT:  All right.  And in the first stage, if you      10:40AM

21     have changed a determination, gone from non-compliant to a

22     determination of compliant based upon what Corizon has told you

23     in response to your informal e-mail, other than the e-mail

24     record, is there any record of those?

25          THE WITNESS:  I don't believe there is.  It would show      10:41AM

March 8, 2017 - Evidentiary Hearing re:  Status - Haldane - Direct

1    -- no.  I don't believe that there is, other than the -- and to

2    be honest, I haven't had the occasion to have the informal

3    e-mails saying you were wrong about this.  The only challenges

4    I ever changed have been through the formal process.

5          THE COURT:  And so what that means is that when you          10:41AM

6    have contacted them, Corizon, in the informal process you have

7    never changed your decision?

8          THE WITNESS:  I have not, no.

9          THE COURT:  And in that informal process with the

10   e-mail from you to Corizon, is Ms. Campbell copied on that          10:42AM

11   e-mail, or is there anybody else involved on the state side?

12         THE WITNESS:  Yes.  On the e-mails?

13         THE COURT:  Yes.

14         THE WITNESS:  Yeah.  Now, again, have I been always as

15   diligent as I'm supposed to be?                                     10:42AM

16         THE COURT:  Take a case where you find an initial

17   determination of non-compliance and you send an e-mail to

18   Corizon informing them of your preliminary conclusion.  That

19   e-mail back to Corizon, is it copied to Ms. Campbell?

20         THE WITNESS:  It has been.  Not on every case, but          10:42AM

21   yes.  And I should be.  I should be doing it every time, but I

22   can't say that I have on every occasion.

23         THE COURT:  Thank you.

24   BY MR. BOJANOWSKI:

25   Q.  What's the purpose of the rebuttal process?                    10:43AM

March 8, 2017 - Evidentiary Hearing re:  Status - Haldane - Direct

1   A.  To ensure accuracy of the findings through our monitoring.

2   Q.  And do you self-review your data each month to make sure

3   that your findings are accurate?

4   A.  Yeah.  The process I personally go through is -- now, there

5   are a lot of findings that, if they are compliant, I may not go      10:43AM

6   back and look at them a second time.  If they are

7   non-compliant, I generally will try to check to make sure

8   because I want to avoid this whole rebuttal process.  It's

9   extra work for me.  So I want to make sure that what we're

10  uploading -- and it's also difficult once you have uploaded      10:43AM

11  something in the CGAR to change things and it involves IT.  So

12  I do check to make sure that if there's a finding that's going

13  to be -- if there's a performance measure that's going to be

14  out of compliance I want to check to make sure that those have

15  been done on all the compliant ones.  A lot of times they are      10:44AM

16  fairly routine things like did they meet -- did they use the

17  SOAPE format or did they use a nursing NET.  Those are pretty

18  simple.  And they are not something I would normally miss, so

19  it's usually the things that involve judgment.  I will go back

20  and check again.      10:44AM

21  Q.  What do you mean by "involve judgment"?

22  A.  Well, if there is a measure where you are looking at

23  whether it meets the criteria of a standard, and I don't have

24  of an example at the front my head right now, but sometimes,

25  not every record is always black and white.  And so there are      10:45AM

UNITED STATES DISTRICT COURT

March 8, 2017 - Evidentiary Hearing re:   Status - Haldane - Direct

1    some times where information may be not right there.  For

2    example, I can tell you there have been times where I will look

3    at an encounter and I will look for the HNR, and maybe I don't

4    see it, the HNR that's associated with that encounter.  Now

5    that doesn't really happen anymore because we have changed the          10:45AM

6    process.  But there are times where you say, well, how do I

7    then back into this?  How do I know where that came from?

8    Sometimes you have to use your judgment as to where you are

9    going to look, how much you are going to look for the

10   information, where you are going to find it.                            10:45AM

11   Q.  But even if you are using your judgment, the bottom line is

12   you have to find the information --

13   A.  Absolutely.

14   Q.  -- in order to give them compliance?

15   A.  Yes.                                                                10:46AM

16   Q.  Or to make a finding that it isn't there?

17   A.  We would say all the time if it's not documented it's not

18   done.

19   Q.  Right.  So that's what you are really looking for, is the

20   documentation --                                                       10:46AM

21   A.  Yes.

22   Q.  -- within eOMIS, to basically --

23   A.  Validate compliance.

24   Q.  -- validate compliance of the measure.

25   A.  Yes.                                                               10:46AM

March 8, 2017 - Evidentiary Hearing re:  Status - Haldane - Direct

1   Q.  So you are in eOMIS pretty much all day long?

2   A.  Yes.

3   Q.  Navigating through the various records to identify the

4   trigger documents or the source documents or whatever to then

5   identify the compliance for the measure?                          10:46AM

6   A.  Absolutely.

7   Q.  Now, if you go to the last page of Part C, it's right

8   before the Tab D.  Do you see that?

9   A.  Yes, sir.

10  Q.  What is that?                                                  10:47AM

11  A.  That's the -- looks like the CGAR findings for Perryville,

12  December 2016, and it looks like Performance Measures 5, 6, 7,

13  and 8.

14  Q.  Okay.  And your example here is looking at Performance

15  Measure Number 7.  Okay?                                          10:47AM

16  A.  Okay.

17  Q.  Do you see that?

18  A.  Yes, sir.

19  Q.  So in that performance measure, you are trying to determine

20  if the medical records are legible and complete with time, name  10:47AM

21  stamp, and signature present.  Right?

22  A.  Correct.

23  Q.  And so what you are doing is you are looking at a medical

24  record to make that determination as to whether all the

25  elements of that measure exist within the eOMIS record,           10:47AM

March 8, 2017 - Evidentiary Hearing re:  Status - Haldane - Direct

1   correct?

2   A.  Yes, sir.

3   Q.  And you are only looking at the month that you're

4   evaluating, correct?

5   A.  Yes.  We monitor data from the month previous to the time        10:48AM

6   that we actually monitor the performance measure.

7   Q.  Correct.  And so in other words, if you're monitoring, if

8   this is a December report, what data are you monitoring in

9   eOMIS for the December report?

10  A.  I believe that the December -- well, the CGAR finding for        10:48AM

11  December, I think, would have been done in January.

12  Q.  Correct.  And you are looking at December data?

13  A.  Yes.

14  Q.  Okay.  But it's actually -- the physical performance of it

15  is done in January?                                                 10:48AM

16  A.  That's correct.

17  Q.  All right.  So any record which is dated in November or

18  October or whatever is not going to be used in the evaluation

19  of this measure.

20  A.  That's correct.  No, we only use the audit period or the        10:49AM

21  monitoring period.

22  Q.  So as we read through here, this notifications column, do

23  you see that?

24  A.  Yes, sir.

25  Q.  All right.  And under Performance Measure Number 7, it's        10:49AM

March 8, 2017 - Evidentiary Hearing re:  Status - Haldane - Direct

1   got a date in there of 1-29-2017.  Do you see that?

2   A.  I do.

3   Q.  What is that date significant of, the date and time,

4   actually?

5   A.  That is -- shows that I entered this data and uploaded it          10:49AM

6   into the CGAR system on January 29th at 3:05 p.m.

7   Q.  Okay.  And then the next number compliance, 68, what does

8   that mean?

9   A.  There are seven -- well, the 68 is the number of records

10  that I reviewed that were compliant with the standard.                 10:50AM

11  Q.  There's a semi colon, then there's a number review of 70.

12  A.  That's the number of records that I reviewed.

13  Q.  Okay.  So if I understand correctly, you reviewed a total

14  of 70 records, and 68 of those turned out to be compliant?

15  A.  Yes, sir.                                                          10:50AM

16  Q.  And then the percent compliance is 97.14 percent, right?

17  A.  That is correct.

18  Q.  And that's something you said the computer generates,

19  right?

20  A.  Yes, sir.                                                         10:50AM

21  Q.  And then we have a comments section.  Do you see that?

22  A.  Yes, sir.

23  Q.  And it's at Lumley, 10 records were reviewed.  All 10 were

24  compliant.  So what you are doing is you are listing in this

25  part the unit that you are looking at, the number of records         10:50AM

1    and the number of those records that you reviewed which were

2    compliant?

3    A.  Yes, sir.

4    Q.  And then we get down to at San Pedro, 10 records were

5    reviewed; eight were compliant.  Correct?                        10:51AM

6    A.  Yes, sir.

7    Q.  And then we have 267752-12/23 HNR not scanned, zero -- HNR

8    not scanned.  What does that mean?

9    A.  That means when I looked at that particular record --

10   Q.  Okay.  The 267752?                                           10:51AM

11   A.  The 267752 is an inmate number.

12   Q.  Okay.

13   A.  That's the record.

14   Q.  Particular person you looked at?

15   A.  Yes.                                                         10:51AM

16   Q.  And then you have 12/23 HNR.  Is that the document you were

17   looking at?

18   A.  Yes.  The HNR for December 23rd had not -- there was an

19   encounter for the 23rd.  The source document -- let me back up

20   a second because the source document for this particular        10:51AM

21   standard is the HNR log.

22   Q.  Okay.

23   A.  So this was listed, 12/23 was listed on the HNR log.

24   Q.  Right.

25   A.  Yet when I went to eOMIS I did not see that scanned into    10:52AM

March 8, 2017 - Evidentiary Hearing re:  Status - Haldane - Direct

1  the record.

2  Q.  Okay.  Does it mean that it didn't exist or it wasn't just

3  scanned or you simply don't know?

4  A.  Well, it means I didn't see it in scanned documents in

5  eOMIS.                                                          10:52AM

6  Q.  Could it have been somewhere else?

7  A.  Yes.

8  Q.  All right.  But it wasn't in the place that you would

9  normally look so you marked it non-compliant?

10  A.  Correct.                                                   10:52AM

11  Q.  Now, what if Corizon came back and said oh, well, it was

12  misfiled.  It was over here in a different encounter area.

13  Would you then review this and say, well, it was scanned in?

14  A.  No.  Well, I would review it, and if it was scanned in at

15  the time that I conducted my review, and they could show that  10:52AM

16  it was scanned in at that time and I missed it, yes, I would

17  give them credit for that.  But if it was scanned in after I

18  did my review or if it hadn't been scanned in, I would not give

19  them credit for that.

20  Q.  Okay.  So it may be that it existed, it just was           10:53AM

21  essentially a late entry that you are not going to give them

22  credit for on the audit?

23  A.  On this particular standard.  Now, if it was scanned in

24  later than two days after the date that they received it, then

25  they are going to miss on another standard.                    10:53AM

March 8, 2017 - Evidentiary Hearing re:  Status - Haldane - Direct

1   Q.  Right.

2   A.  For this one.

3   Q.  But for this particular standard --

4   A.  Yes.

5   Q.  That's why you made the finding?                         10:53AM

6   A.  Yes, sir.

7          THE COURT:  Mr. Bojanowski, can I interrupt and ask a

8   question that related to the questions that I asked before?

9          THE WITNESS:  Yes, sir.

10         THE COURT:  On this page, if you take a look at Number   10:53AM

11  2, that's one where you found that there was not compliance and

12  so that would have been one that you would have presented to

13  Corizon at the first instance, the informal process.

14         THE WITNESS:  Number 2, Performance Measure Number 6?

15         THE COURT:  No, that's actually not right.  I looked    10:54AM

16  at the wrong number.  It is compliant.

17         But let me do this.  Let me use this as an -- let me

18  raise a hypothetical.

19         THE WITNESS:  Yes, sir.

20         THE COURT:  Let's say that Number 2 did produce a       10:54AM

21  finding of non-compliance.  I'm trying to understand the date

22  that you entered this, the 31st of January, 2017, that's a date

23  where you are already in the system such that it would have to

24  be changed with an IT person to do it, right?

25         THE WITNESS:  Yes, sir.                                 10:54AM

1      THE COURT:  So that means that sometime previously,

2  you would have developed this information and provided it

3  informally to Corizon.  With respect to this 31st of January,

4  2017 incident, if we're assuming that it was, just for the sake

5  of this hypothetical, non-compliant, at what time period would     10:54AM

6  you have informally communicated that to Corizon?

7      THE WITNESS:  In this particular -- if it's this late

8  in the month, and I have to say in January there were other

9  duties that I was doing and so it might very well be that I

10  didn't even -- wouldn't have presented this because I am doing     10:55AM

11  work on the last day of the month.  And I'm just -- I'm

12  uploading it because you can't upload it after the 31st.  It

13  shuts down and you can't get it in.  So I have to make sure all

14  of my audit findings are in, or monitoring findings are in by

15  the 31st.                                                          10:55AM

16      THE COURT:  Let's use maybe a better hypothetical

17  example.  And that is Number 4 on this page where your date of

18  entry is the 12th of January?

19      THE WITNESS:  12th, yes.

20      THE COURT:  When would you have, roughly, if that had      10:55AM

21  been non-compliant, would you have had the informal

22  correspondence with Corizon?

23      THE WITNESS:  I'm not sure what day of the week the

24  12th of January is.

25      THE COURT:  It was a Thursday.                                 10:56AM

March 8, 2017 - Evidentiary Hearing re:  Status - Haldane - Direct

1           THE WITNESS:  So probably Monday.

2           THE COURT:  So the previous Monday is when you would

3   have --

4           THE WITNESS:  Yes.

5           THE COURT:  Thank you.  I'm sorry.  Thank you.                 10:56AM

6           MR. BOJANOWSKI:  Thank you, Your Honor.

7   BY MR. BOJANOWSKI:

8   Q.  And kind of spring boarding off your questioning here, the

9   formal rebuttal process, would that occur before this first

10  date where you are entering it, or could that occur after?       10:56AM

11  A.  No.  The formal rebuttal process is, I believe, always

12  after the CGAR has been presented, has been completed.

13  Q.  And you are locked out of the system at that point?

14  A.  Yes, sir.

15  Q.  All right.  So that formal rebuttal process would then       10:56AM

16  require, like Kathy Campbell to, if a change was to be made, it

17  would have to come out of the home office?

18  A.  Yes.  All of them have to be approved.

19  Q.  Okay.

20  A.  If it's a change it would have to be approved at the         10:57AM

21  central office.

22  Q.  All right.  So when you look at this CGAR report in a

23  general sense, you don't use any special codes here like a zero

24  or an N/A, or anything like that?

25  A.  No.  When I -- you know, when I'm going through and doing     10:57AM

UNITED STATES DISTRICT COURT

1    my own work I might have some shorthand.  But when I enter the

2    information into the CGAR I try to make it plain English so

3    people can understand what I'm saying.

4    Q.  Okay.  As far as findings are concerned here, at least as

5    of December you were not including all of the files you looked          10:57AM

6    at.  You are just including the non-compliant ones in the

7    actual CGAR report?

8    A.  That's true, but that's changed.

9    Q.  Right.  And so you are going to start, I take it, reporting

10   every file you have looked at and then the numbers of                   11:02AM

11   compliant?

12   A.  I did that with the most recent CGAR findings, yes.

13   Q.  Okay.  All right.  So let's back up here to the first part

14   of Tab C.  Go back to the first page.

15          Now, what we're going to do is this backup                      11:03AM

16   documentation, I understand, is the documentation that you used

17   to make the determination of compliance on Performance Measure

18   Number 7 that we kind of went through just a few minutes ago.

19   Right?

20   A.  Yes, sir.                                                           11:03AM

21   Q.  So when you get -- well, what is this first part, this HNR

22   log that has the numbers on it on the left-hand side and then

23   names and units and et cetera?  What is that?

24   A.  That's the randomized source document that we use from

25   which I pull my samples for the performance measures that              11:03AM

March 8, 2017 - Evidentiary Hearing re:  Status - Haldane - Direct

1    require the HNR log to be used as the source document.

2    Q.  Do you know how the HNR log is actually developed?

3    A.  I do not.

4    Q.  Okay.  Do you provide any data to the person who does the

5    randomization at all to generate this randomized HNR log?          11:04AM

6    A.  I do not.

7    Q.  Okay.  Do you know who does?

8    A.  No, sir.

9    Q.  All right.  So what does -- what do you do with this HNR

10   randomized log?  Well, let me back up.                             11:04AM

11        You receive this HNR randomized log as part of your

12   job duties, right?

13   A.  I do.

14   Q.  Who do you get it from?

15   A.  Kathy Campbell.                                                11:04AM

16   Q.  And you get that every month?

17   A.  Yes, sir.

18   Q.  And you take and you use this for Performance Measure

19   Number 7.  How do you use it?

20   A.  It's sorted by unit, and so our instruction in our monitor     11:04AM

21   guide will instruct us how to review each performance measure.

22   And so in this particular case, it would be to use the first 10

23   randomized charts from each unit that meet the criteria of that

24   performance measure.

25   Q.  So if you go through the pages of this particular document,    11:05AM

1   I see Lumley as the first part, Piestewa as the second part,

2   San Carlos, San Pedro, Santa Cruz, Santa Maria, Santa Rosa.

3   Those are all --

4   A.  Yes.

5   Q.  -- units at Perryville?                                    11:06AM

6   A.  That's correct.  Yes, sir.

7   Q.  And so what you are going to do then is the -- and let's

8   just use Page 1 of 31, on Lumley, you are going to take the

9   first 10 on this list and you are going to poll each one of

10  those charts?                                                  11:06AM

11  A.  That's correct.

12  Q.  And then what you are going to do is you are going to look

13  into that chart and determine whether the measure is met,

14  right?

15  A.  Yes, sir.                                                  11:06AM

16  Q.  Now, after you see this, what's your next step taking the

17  first inmate here on the list?

18  A.  I would take -- I would start with Lumley unit, and I would

19  put 314893, which is the inmate number, into the field in eOMIS

20  that will bring up that inmate's chart.  And still if we're     11:07AM

21  talking about Performance Measure Number 7 --

22  Q.  Correct.

23  A.  -- I would then look in eOMIS.  There 's a link to scanned

24  documents and photos, and I would click on that link.  It would

25  take me to a list of all the documents that had been scanned    11:07AM

March 8, 2017 - Evidentiary Hearing re:  Status - Haldane - Direct

1    into that record.

2    Q.  Before you go any further, go to the next colored break in

3    this tab.  And that's the scanned documents photos page that

4    you were talking about?

5    A.  Yes, it is.  That's the first page, yes.                    11:08AM

6    Q.  Okay.  And so how would you determine which of these

7    scanned documents you would look at based on looking at this

8    page in eOMIS?

9    A.  Because we're talking about December data, and I would look

10   at -- there are two HNRs, Health Needs Requests, that are in    11:08AM

11   December '16; 12-7-16 and 12-13-16.  And I would look at those

12   two documents.

13   Q.  Okay.  And did you look at the 12-7-2016 -- well, what,

14   click on the Health Needs Request?

15   A.  Yeah.  There's where -- the document type column, those are 11:09AM

16   hyperlinked -- actually, the dates, I'm sorry, the date scanned

17   is hyperlinked.

18   Q.  Okay.

19   A.  So I can just click on it and it will take me to another

20   page that will tell me how many pages are scanned in.          11:09AM

21   Q.  So you clicked on the Health Needs Request for 12-7-2016?

22   A.  I did.

23   Q.  And it brought up the next page.  Is that right?

24   A.  That's correct.

25   Q.  So that's what you are looking at now is the Health Needs   11:09AM

—— March 8, 2017 - Evidentiary Hearing re:  Status - Haldane - Direct ——

1    Request, right?

2    A.  That's correct.  Yes, sir.

3    Q.  Now, our measure is to determine whether this is complete,

4    whether it's signed, legible, complete, with time name stamp

5    and signature present.  So you are looking at this document,        11:10AM

6    right?

7    A.  Yes, sir.

8    Q.  And what -- why don't you walk us through what it is --

9    what parts of this document you look at to make sure that you

10   get compliance.                                                     11:10AM

11   A.  First thing I look for is in the upper right-hand corner

12   there is a date and time stamp on it, and it says December 7,

13   2016, at 7:50, which would be 7:50 a.m.  There's initials.

14   That's what it gives, a date and time with initials.  I

15   looked -- obviously this is legible.  Scanning isn't always         11:10AM

16   legible.  So this is -- I go down to referral.  Staff signature

17   on Section 3 is Nurse Ellison, and she has, in fact, a name

18   stamp, which is a requirement.  And then the date/time stamp is

19   also there.  And then in Section 4, I look to see that there's

20   a plan of action, which there is.  They have -- schedules this      11:11AM

21   inmate on the nurse line, and again, she is signed and name

22   stamped there and has date time stamped Section 4.  And so that

23   record is compliant with the requirements of, as far as this

24   one document is concerned, with the requirements of that

25   performance measure.  If any one of those areas was not filled      11:12AM

March 8, 2017 - Evidentiary Hearing re:  Status - Haldane - Direct

```
 1   then it's non-compliant.
 2   Q.  Okay.  Do you look at other records as well for this
 3   performance measure?
 4   A.  I look at all of the HNRs within the -- within the
 5   monitoring month that we're -- the audit period we're looking    11:12AM
 6   at.
 7   Q.  In this particular case, there were two HNRs within the
 8   month.  Did you look at both of them?
 9   A.  I did.
10   Q.  And were both in compliance?                                  11:12AM
11   A.  Yes, they were.
12   Q.  What if one of them was in compliance but one of them
13   wasn't?
14   A.  Then the record is non-compliant.
15   Q.  Okay.                                                         11:12AM
16   A.  They all have to be compliant.
17   Q.  All right.  And you did this for 70 files at the Perryville
18   facility?
19   A.  Yes, sir.
20   Q.  And then you put that into your Excel spreadsheet, your       11:13AM
21   findings, and then uploaded that into the system, and that's
22   it.  That's essentially the process, right?
23   A.  Yeah.  There's a -- well, for me, because I have the data
24   electronically, cut and paste into the CGAR system and retype
25   some things.  That's basically correct.                          11:13AM
```

1   Q.  But for each of the monitory measures you are involved in,

2   it's essentially the same process for each one.  You are

3   looking at the measure itself, going into records, identifying

4   compliance or non-compliance, and then uploading into the

5   system?                                                          11:14AM

6   A.  Correct, yes.

7   Q.  And then once it's all done, you are double checking your

8   work, so to speak, to make sure that, you know, on the ones

9   that are non-compliant you are double checking to make sure

10  that, in fact, it's a finding?                                   11:14AM

11  A.  Well, I do that before it's uploaded into the CGAR.  But

12  yeah, when I'm -- as I'm going along, yes, I would be double

13  checking that.

14          MR. BOJANOWSKI:  All right.

15          (Discussion off the record.)                             11:26AM

16          THE COURT:  Back on the record.

17          We'll schedule the continuation of this hearing for

18  issues other than max custody for the 21st of March at 9 a.m.

19  unless people are comfortable with 8 a.m.  I certainly am

20  comfortable with that.  I'm suggesting if you are comfortable    11:26AM

21  with 8 a.m., I am too.

22          MR. BOJANOWSKI:  That's fine.

23          THE COURT:  So 8 a.m. then on the 21st for everything

24  except for max custody, and then who on your side is covering

25  max custody issues?                                              11:26AM

March 8, 2017 - Evidentiary Hearing re:  Status

1          MS. LOVE:  I am, Your Honor.

2          MR. BOJANOWSKI:  Ms. Love.

3          THE COURT:  So we need to avoid the conflict of 29,

4   30, and 31.  Is that correct, Ms. Love?

5          MS. LOVE:  Yes.                                          11:26AM

6          THE COURT:  So that means that we could do it,

7   perhaps, on the 27th.  That's -- well, or perhaps, let me --

8   what about the 28th?

9          MS. LOVE:  That's fine, too.

10         MS. FETTIG:  Your Honor, the 28th works for me as      11:27AM

11  well.

12         THE COURT:  So we'll do max custody and shall we start

13  at 8 or 9 a.m. on that issue?  Any suggestion from counsel?

14         MS. LOVE:  Whatever works best for the Court.

15         MS. FETTIG:  Your preference.                          11:27AM

16         THE COURT:  We'll then schedule it for 9 a.m. on the

17  28th, Tuesday, for max custody.

18         MS. LOVE:  At this point, unless something changes, at

19  least from defendants' side, we don't anticipate that max

20  custody would be a full day.                                  11:27AM

21         THE COURT:  I understand.  I understand.  But we

22  might -- I will encourage people to keep the calendar open and

23  I will keep my calendar open in case we realize that we get

24  into trouble with what we have scheduled for the week before

25  and whether we need it so we've got those two dates.          11:27AM

1          Also, there are other matters that we can take

2    advantage of that time because our next meeting together is not

3    until later in the month of April on the 19th.  So I think that

4    makes sense to do what we have done.

5          MR. FATHI:  Pardon me for interrupting, Your Honor.          11:28AM

6    As I mentioned, there were also witnesses whose presence we

7    requested today who did not come.  Obviously no harm done since

8    we wouldn't have gotten to them anyway.  But for these next two

9    hearings, we request that those witnesses either be in

10   attendance or if they are not available or defendants think     11:28AM

11   they are unnecessary, if they would consult with us in advance

12   so that we can seek the Court's guidance, if necessary.

13         THE COURT:  Surely.  Have a meet-and-confer about

14   that.  If you can't resolve it, call me on the phone.

15   Obviously, again, I'm trying to preserve the collaborative       11:28AM

16   sense here that's been demonstrated so far.  I really

17   appreciate it.  I am apologetic of the fact circumstances have

18   prevented us from making progress.  I realize people have

19   sacrificed their schedules to a grave degree.  I have a number

20   of people in the hallway who are not hearing this who have sat   11:29AM

21   on their heels, and I am very sorry about that.  But as you

22   know, circumstances beyond our control.

23         Given now it's 25 minutes past the hour, I think it

24   makes sense to conclude.

25         MS. KENDRICK:  I'm sorry.  You said our next status        11:29AM

1  conference was not going to be until April 19?  I looked at my

2  calendar and it says April 12.  So I was hoping you could

3  clarify that.

4          THE COURT:  I believe it was changed to the 19th.

5          MS. KENDRICK:  Okay.                                  11:29AM

6          THE COURT:  Is that a problem?

7          MS. KENDRICK:  It is for me, but my co-counsel can

8  handle it.

9          MR. FATHI:  It is actually a problem for me also, Your

10  Honor.  I apologize.  I have the 12th also.                  11:29AM

11          THE COURT:  It may be my mistake that we didn't enter

12  an order or -- but in any event --

13          MS. KENDRICK:  Normally it's been the second --

14          THE COURT:  I know because of a conflict in the Court

15  I thought we had rescheduled it to the 19th.  Maybe the order  11:30AM

16  did not issue on that point.

17          How about the 18th?  Does that work for people?

18          MR. FATHI:  Unfortunately that does not work for me,

19  Your Honor.  Is something the previous week possible?

20          MR. BOJANOWSKI:  I'm in a jury trial in federal court  11:30AM

21  that week, Your Honor.  I'm sure I can get other counsel to

22  cover, but I always like to be present.

23          THE COURT:  How about the 17th.  That's the day

24  following Easter.  I don't know if that's a problem.

25          MR. FATHI:  I believe that is fine with me, Your       11:31AM

March 8, 2017 - Evidentiary Hearing re: Status

1  Honor.

2          MR. BOJANOWSKI:  Looks good to me.

3          THE COURT:  Monday the 17th.  All right.  So we'll

4  change the regular monthly scheduled meeting to the 17th at 9

5  a.m.                                                              11:31AM

6          Thank you all very much.

7          MR. FATHI:  Thank you, Your Honor.

8          (Proceeding recessed at 11:26 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                            C E R T I F I C A T E

4

5              I, LAURIE A. ADAMS, do hereby certify that I am duly

6   appointed and qualified to act as Official Court Reporter for

7   the United States District Court for the District of Arizona.

8              I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control.

13             DATED at Phoenix, Arizona, this 17th day of March,

14  2017.

15

16                                 s/Laurie A. Adams
                                   _____
17                                 Laurie A. Adams, RMR, CRR

18

19

20

21

22

23

24

25