Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
Jacob B. Lee, Bar No. 030371
Kevin R. Hanger, Bar No.
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br>                          Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br>                          Defendants. | NO. 2:12-cv-00601-DKD <br><br><br> **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO ENFORCE THE STIPULATION (MAXIMUM CUSTODY PERFORMANCE MEASURES 1-3, 5-6, AND 8) (DKT. 1944)** <br><br> **(Oral Argument Requested)** |

Defendants Charles Ryan and Richard Pratt respond as follows to Plaintiffs' Motion to Enforce the Stipulation regarding Maximum Custody Performance Measures (MC PMs) 1-3, 5-6, and 8.

## I.      **INTRODUCTION**

Plaintiffs' Motion to Enforce is premature, unfounded in fact or law, and fails to establish that Defendants are in substantial noncompliance as to any of the MC PMs challenged.

Plaintiffs' Motion is premature because the vast majority of the issues they raise in their Motion were not exhausted at the October 26, 2016 mediation before Magistrate Judge Bade.  Much of that mediation focused on the transition of minor inmates from maximum to close custody, and there was little discussion of Plaintiffs' concerns with respect to monitoring methodology for the MC PMs. Instead, the parties agreed that they would work collaboratively to address these issues through the creation of the Max Custody Monitor Guide.  (*See* October 28, 2016 Minute Entry for Mediation before Magistrate Judge Bade on October 26, 2016: "The parties agreed to continue discussions regarding these issues by expanding the scope of their continuing discussions regarding the Monitoring Guide to include discussions regarding the methodologies to determine compliance with maximum custody performance measures 1, 2, 3, 5, 6, and 8.".)

The monthly CGAR reports also show that Defendants have consistently met or exceeded the compliance thresholds for the MC PMs.  As a result, ADC is on course to terminate its monitoring and reporting requirements under the Stipulation for all MC PMs during 2017.  Rather than accept and appreciate these positive results, Plaintiffs seek to throw out all positive findings, restart the monitoring period for the MC PMs, and "take the wheel and do the monitoring themselves…."  (*See* Doc. 1625 at 10.)  In doing so, Plaintiffs entirely disregard the plain language and intent of the Stipulation.  The Stipulation expressly establishes that Defendants are solely responsible for measuring and reporting compliance with the Stipulation based on the agreed upon protocols in the Stipulation.  (Doc. 1185 at ¶¶ 9-10, 19-20.)

1

If Plaintiffs had a problem with the monitoring protocol, it was the responsibility of Plaintiffs' counsel to promptly bring those issues to Defendants' attention in order to discuss and, if necessary, adjust the monitoring methodology. (*See* Doc. 1185 at ¶ 19(a).) Plaintiffs cannot wait nearly two years to alert Defendants of their complaints and then demand that all prior compliance findings be found invalid. Plaintiffs' delay in timely addressing these issues unreasonably and unfairly prejudices Defendants. *See Wade v. Ratella*, 407 F. Supp. 2d 1196, 1208 (S.D. Cal. 2005) (dismissing case for failure to prosecute pursuant to Fed.R.Civ.P. 41(b) and finding the "law presumes injury from unreasonable delay") (citing *In re Eisen*, 31 F.3d 1447, 1452 (9th Cir. 1994) and *Morris v. Morgan Stanley & Co.*, 942 F.2d 648, 651 (9th Cir. 1991)). Defendants have invested a considerable amount of time and resources to conduct monthly monitoring of the MC PMs. Plaintiffs' delay in addressing these issues has deprived Defendants an opportunity to timely investigate and address any reasonable concerns that may affect the monitoring methodology or CGAR findings.

Moreover, Plaintiffs' Motion fails to demonstrate "substantial noncompliance" pursuant to Paragraph 30 of the Stipulation because the CGAR findings consistently meet or exceed compliance thresholds. The parties agreed that the monthly CGAR findings would be used to determine substantial compliance with the MC PMs. (Doc. 1185 at ¶ 19.) Defendants are in substantial compliance if the MC PMs meet or exceed 75% compliance during the first twelve months, 80% compliance during the second twelve months, and 85% compliance thereafter. (*Id.* at ¶ 20.) ADC's duty to measure and report compliance with the MC PMs terminates, as to each specific unit, when the unit is in compliance for 18 out of 24 months and has not been out of compliance for three or more consecutive months within the past 18 months. (*Id.*) Plaintiffs have not shown a pattern of recurrent noncompliance continuing to the present. Therefore, Plaintiffs' Motion does not address "substantial noncompliance" as defined under the Stipulation. Plaintiffs' Motion is more properly construed as a dispute regarding the protocol for measuring compliance with the MC PMs which should have been addressed pursuant to Paragraph

19(a) of the Stipulation.  But which now has been addressed by agreements or rulings regarding the Max Custody Monitor Guide.

Many of Plaintiffs' concerns should have been resolved in drafting the Stipulation and its accompanying protocols or, at the very least, much earlier in the monitoring process.  If the errors or omissions Plaintiffs now identify in their Motion have been present since February 2015 and are as "profound" as Plaintiffs allege, then Plaintiffs' counsel should not have waited nearly two years to challenge the same.  Defendants have been working collaboratively with Plaintiffs to address any reasonable concerns Plaintiffs have regarding monitoring methodology through the creation of the Monitor Guide, but these changes to monitoring methodology do not invalidate the prior two years of findings for the MC PMs.

Defendants have worked diligently to address deficiencies with respect to prior production of maximum custody documentation.  Defendants have made multiple, large-scale productions addressing the missing documentation Plaintiffs cite at Dkt. 1795, 1796, and 1850.  To date, Defendants have produced 840,695 pages since the effective date of the Stipulation.  Plaintiffs incorrectly assert in their Motion that Defendants have not produced the maximum custody notebooks for the October and November 2016 CGARs; these documents were produced to Plaintiffs.  (*See, e.g.,* ADCM834699-835297; 835325-835611; 836455-839097.)

## II.   ARGUMENT

### A.   Plaintiffs have not proven substantial noncompliance for MC PM #1-3, 5-6, or 8

The Court has repeatedly stated that in determining whether Defendants are substantially noncompliant with the Stipulation, the Court must consider current compliance figures.  In their Motion to Enforce, Plaintiffs do not cite any specific compliance scores for MC PM #1-3 or 5, and Plaintiffs cite only alleged past noncompliance for certain complexes and certain months for MC PM #6 and #8 ranging from March 2015 through September 2016.  As shown in the following chart, current

compliance scores demonstrate that Defendants are not in substantial noncompliance for any of these measures at any complex.  As such, Plaintiffs' Motion should be denied at the outset.

| MC PM | Complex | November 2016 | December 2016 | January 2017 |
|---|---|---|---|---|
| 1 | Florence | 100% | 100% | 100% |
| | Eyman | 100% | 100% | 100% |
| | Perryville | 100% | N/A[1] | N/A |
| | Lewis | 100% | 100% | 100% |
| 2 | Florence | 100% | 100% | 100% |
| | Eyman | 100% | 100% | 100% |
| | Perryville | 100% | N/A | N/A |
| | Lewis | 100% | 100% | 100% |
| 3 | Florence | 100% | 100% | 100% |
| | Eyman | 100% | 100% | 100% |
| | Perryville | 100% | N/A | N/A |
| | Lewis | 100% | 100% | 100% |
| 5 | Florence | 100% | 100% | 100% |
| | Eyman | 100% | 100% | 100% |
| | Perryville | 100% | N/A | N/A |
| | Lewis | 100% | 100% | 100% |
| 6 | Florence | 100% | 100% | 100% |
| | Eyman | 100% | 100% | 100% |
| | Perryville | 100% | N/A | N/A |
| | Lewis | 100% | 100% | 100% |

---

[1]   Perryville is reporting N/A for December 2016 and January 2017 because Perryville no longer has any inmates classified as maximum custody.

4

| | | | | |
|---|---|---|---|---|
| | Florence | 80% | 100% | 100% |
| 8 | Eyman | 100% | 100% | 100% |
| | Perryville | 100% | N/A | N/A |
| | Lewis | 100% | 100% | 100% |

**B.    Selection of weeks to be monitored**

Plaintiffs contend that the selection of weeks for monitoring the maximum custody performance measures cannot have been random because for nearly all months and complexes, the first or second week of the month was selected for monitoring.  (Dkt. 1944 at 9.)  Plaintiffs fail to take into account the reality that restrictions on the eligible weeks previously agreed upon by the parties limited the number of weeks Defendants could randomly select from.   The parties had previously agreed that a full week must occur (from Saturday through Friday) within a month to be eligible for monitoring.  Likewise, Plaintiffs were aware of, but did not challenge, ADC's practice of excluding weeks containing a holiday from selection for monitoring.[2]  For most months, these agreed upon limits left only one or two weeks that were eligible to select for monitoring.

Plaintiffs speculate that the max custody units knew they would not be monitored in the third and fourth weeks of the month, and they would need only to comply with the Stipulation requirements during those weeks.  (Id. at 9.)  Plaintiffs further claim they have no way of assessing whether Defendants continue to comply during non-monitored weeks.  (Id. at 10.)  But Plaintiffs have offered absolutely no evidence to suggest that the unit staff – from security to programming – knew exactly which week may be monitored and, furthermore, deliberately failed to comply with the Stipulation requirements in the weeks

_____

[2]  *See, e.g.*, Defendants' August 8, 2016 response to Plaintiffs' July 7, 2016 Notice of Substantial Non-Compliance regarding MC PMs 1, 2, 3, 5, 6, and 8.  In addition, Defendants' Mediation Memorandum for the October 26, 2016 mediation before Judge Bade regarding the maximum custody performance measures clearly indicated that weeks containing a holiday were excluded from monitoring, but Plaintiffs did not include this issue in their Mediation Memorandum, did not raise this issue at the mediation, did not follow up on it through correspondence, and did not request a meet-and-confer on the subject.

that were not selected for monitoring.  Plaintiffs' counsel had ample opportunity to obtain declarations from their clients regarding whether they are afforded out-of-cell time, programming, and other incentives during non-monitored weeks.  In addition, Plaintiffs have had ample opportunity to review the Out of Cell Tracking Sheets and other maximum custody documentation during their monitoring tours to verify that Defendants are offering the out of cell time, programming, and incentives required by the Stipulation in all weeks.  Plaintiffs choose when they wish to tour the ADC facilities.  Plaintiffs' monitoring tours at the four complexes housing maximum custody inmates have been staggered throughout various weeks of the month, permitting them to confirm for themselves that Defendants are complying with the requirements of the Stipulation even in weeks that do not ultimately end up being selected for monitoring.[3]  Yet, with all this, Plaintiffs rely on conspiracy, distrust, and speculation to argue that Defendants fail to comply with the Stipulation except during a monitored week.  This position is nonsensical and unsupported by any evidence.

Plaintiffs have been aware of the process Defendants used for selecting the weeks to be monitored since the start of monitoring under the Stipulation, but they waited until July 2016 to raise the issue with Defendants so they could attempt to invalidate the prior 16 months of monitoring.  Had Plaintiffs brought their concerns to Defendants at the beginning of the monitoring period, the issue could have been addressed much earlier.  Plaintiffs should not be permitted to lie in wait and then seek to disregard 16 months of compliance findings. Plaintiffs' rote distrust without proof is insufficient to invalidate all monitoring that has occurred thus far.

C.    <u>Selection of inmates for review</u>

Plaintiffs allege that Defendants have "wrongfully reduced the number of prisoners whose total out-of-cell time, group programming, and exercise they are required to

---

[3]    At their request, Plaintiffs have toured Perryville on 6/1/2015, 6/2/2015, 5/23/2015, and 5/24/2015; Eyman on 6/3/2015, 12/7/2015, 12/8/2015, 11/3/2016, 11/4/2016, 2/2/2017, and 2/3/2017; Florence on 8/31/2015 and 9/1/2015; and Lewis on 9/2/2015, 9/3/2015, 5/25/2016, 5/26/2016, 1/4/2017, and 1/5/2017.

monitor and report" because they claim that Defendants monitored only 15 inmates at Florence-Kasson for MC PMs 1-3, 5-6, and 8. (Dkt. 1944 at 10-11.)  Plaintiffs' claim is misleading—Plaintiffs fail to note that Defendants reviewed ten inmates each for MC PMs 1-3, 5-6, and 8 at that facility.  Plaintiffs' issue appears to be that five of the SMI inmates who were selected for monitoring for MC PM 8 were also selected and monitored for PMs 1-3, 5, and 6.  This is because Defendants do not exclude SMIs from monitoring for MC PMs 1-3 and 5-6.

Plaintiffs assert that "[u]nder the clear terms of the Maximum Custody Protocol, ten randomly selected prisoners' Daily Out-of-Cell Tracking forms are supposed to be selected for measures ## 1-3, 5-6 and *another* ten are to be randomly selected for MC PM #8." (Dkt. 1944 at 11.)  But Plaintiffs fail to cite to any specific language in the Stipulation or the protocols that requires Defendants to select ten *different* inmates for monitoring MC PM 8.  This is because no such language exists.  The Stipulation and protocols merely require that Defendants select ten inmates for review, and there is no express prohibition on reviewing an inmate for more than one measure.  MC PM #8 measures additional incentives and programs provided to max custody inmates. Where MC PM #8 measures a distinct set of requirements only applicable to max custody SMI inmates, it does not matter whether SMI inmates are also included in the pool for measurement of MC PMs ## 1-3, 5-6.

Plaintiffs further contend that a sample size of 20 inmates per month at Florence-Kasson "is already a modest number of prisoners to monitor" (Dkt. 1944 at 11-12), but they fail to note that in a total population of only 48 inmates, a sample size of 20 inmates comprises more than 40% of the total inmate population at Florence-Kasson.[4]  The sample size of 15 inmates reported for Florence-Kasson reflects more than 30% of the total inmate population at that unit.

---

[4] As of March 7, 2017, Florence-Kasson had a population of 48 inmates.  *See* https://corrections.az.gov/sites/default/files/DAILY_COUNT/Mar2017/03072017_count_sheet.pdf.

In short, Plaintiffs provide no legitimate basis in the Stipulation or otherwise for invalidating compliance findings for Florence-Kasson on the basis of the number of inmates selected for monitoring.

### D.    Inmate refusals

Plaintiffs allege that there is an "alarmingly high" rate of refusals of out-of-cell time and group programming across the system. (Dkt. 1944 at 12.)  Plaintiffs' retained expert claims that similar rates of refusals in a "clinical setting in the community" would be seen as "a clinical failure" and would require an "immediate response." (Dkt. 1944 at 14.)  This is an apples to oranges comparison.  Plaintiffs have provided no citations to any research or statistics regarding refusal rates at comparable prison facilities with comparable populations and comparable policies regarding the amount of out-of-cell time and programming offered to maximum custody inmates.  Moreover, Plaintiffs have no actual evidence to back up the far reaching conclusions made by the expert.

The Stipulation and Director's Instruction (DI) 326 require that Defendants *offer* additional out-of-cell time, programming, recreation, and incentives to inmates in maximum custody.  But whether an inmate chooses to take advantage of the additional items afforded to him or her is entirely up to that inmate.  Nothing in the Stipulation or DI 326 provides that Defendants can or must require inmates to participate in the additional out-of-cell time, programming, and incentives offered to them.  Despite Plaintiffs' assertions to the contrary, Defendants' prior compliance findings should not be invalidated because inmates choose not to accept the out-of-cell time and programming offered to them.

There are a myriad of reasons that inmates refuse out-of-cell time and programming, only some of which are reflected in the expert's declaration.  Plaintiffs ignore an obvious explanation for the "pattern" of refusals—that the inmates simply do not want the extra out-of-cell time and programming that their counsel secured for them through the Stipulation.

/ / /

Plaintiffs also submit declarations of a few inmates with anecdotal complaints about isolated issues relating to refusals. Despite having two years to marshal their evidence for their claims regarding a "pattern" of refusals, Plaintiffs have only managed to procure declarations of a mere seven max custody inmates out of a total population of max custody inmates ranging from 3054 inmates system-wide at the start of monitoring under the Stipulation in March 2015 to 2787 inmates system-wide in February 2017,[5] and of these seven declarations, there is no pervasive or common reason given for the refusals. In addition, many of the explanations for refusals of out-of-cell time relate to the inmate's own choices or preferences. For example, Inmate ███████ states in his Declaration that he chooses not to attend morning groups, which usually start at 8:00 or 8:30, because he is asleep at that time, and he does not like going out for table time because he would rather not talk to other inmates and is not given games to play. (See ███████ Declaration at ¶¶ 4, 13-14.) Inmate ███████ states that he refused to attend mental health programming for three months because he did not want to walk outside in cold weather. (See ███████ Declaration at ¶ 4.) Inmate ███ states that he and other inmates in his pod decided to refuse programming for "one or two days" because grievances that Inmate ███ wrote on behalf of himself and other inmates in the pod regarding laundry, property, and clippers had not been resolved. (███ Declaration at ¶¶ 8-11.) These declarations reflect mere personal choice in how an inmate prefers to spend his day, not as Plaintiffs would like to have it – a pervasive pattern showing retaliation, fear, deliberate deprivation, or widespread sickness.

While a few declarations include allegations that refusals are based on staff conduct, because these declarations fail to provide any identifying information regarding the officers and mental health staff, Defendants have no way to verify the accuracy of the

---

[5] *See* https://corrections.az.gov/sites/default/files/REPORTS/Monthly_CP/bed_capacity_2015/bed_capacity_mar15.pdf; https://corrections.az.gov/sites/default/files/REPORTS/Monthly_CP/bed_capacity_2017/bed_capacity_feb17.pdf.

inmates' allegations or to make any operational changes, if warranted, as a result of their vague allegations.   For example, Inmate ▆ states that "officers act disrespectfully; sometimes they scream and yell at us, and call us 'losers' and 'retards,'" but he does not name any of the officers he alleges behaved in this way.  (See ▆ Declaration at ¶ 3.) Inmate ▆ states that he frequently refuses recreation and showers because he does not have access to the restroom during these activities when an unnamed sergeant is not available.  (See ▆ Declaration at ¶¶ 3-4.)  Anecdotal, self-serving, unverifiable declarations fail to establish that Defendants are acting with mal intent to deprive inmates of recreation opportunities.

Finally, Plaintiffs request that Court order Defendants to hire an expert to evaluate the basis for the refusals.  (Dkt. 1944 at 15.)  This is unnecessary and unwarranted.  As Defendants have previously explained to Plaintiffs and the Court, when an individual inmate evidences a pattern of refusals that is unusual for that inmate, supervisory staff or line staff who have a good rapport with the inmate will meet with the inmate, inquire into the reason(s) for the refusals, and encourage the inmate to participate in the offered out-of-cell activities and programming.  There is no need to hire someone to undertake a practice that ADC staff already engage in on a routine basis.  And as the Court has reminded Plaintiffs on multiple occasions, the Court has no authority under the Stipulation to issue orders with respect to hiring or staffing.  Plaintiffs' Motion fails.

**E.   Documentation of out-of-cell times**

Plaintiffs assert that at Perryville, Eyman, and Lewis, Defendants did not consistently document start and end times for activities that were refused by the inmate from March 2015 through September 2016.[6]  (Dkt. 1944 at 17.)  Plaintiffs further claim that at some facilities, tracking sheets do show "time offered" for refusals, but it appears to Plaintiffs that the entries were added later when the out-of-cell time was being tallied. (Dkt. 1944 at 17.)  (Id.)  Plaintiffs also contend that documentation on the tracking sheet is

---

[6]  Plaintiffs note that the Out of Cell Tracking Sheets for Florence routinely document start and end times.

1  "often" not in chronological order.  (Id.)

2  　　　There is nothing in the Stipulation or protocols requiring Defendants to note the

3  start and end times for out-of-cell time and programming that inmates refuse on the out-

4  of-cell tracking sheets.  Moreover, in guiding the parties on disagreements over

5  methodology for the Max Custody Monitor Guide, the Court has ruled that Defendants

6  <u>need not</u> document an end time for a refusal where there logically is no end time for

7  something that does not occur.  Rather, what was refused is to be documented on the back

8  of the Out of Cell Tracking Sheet along with the time offered that was refused.  Likewise,

9  there is nothing in the Stipulation or protocols that prevents Defendants from calculating

10  the amount of time offered from other source documents, such as activity schedules and

11  sign-in sheets.  In addition, there is nothing that prevents the monitors, who are the

12  Wardens of the complex they are monitoring, from utilizing their own institutional

13  knowledge as to the standard length of specific activities offered, such as recreation, when

14  calculating compliance.  For these reasons, Plaintiffs' documentation of out-of-cell time

15  challenge fails.

16  　　　**F.**　　**<u>Overlapping out-of-cell times</u>**

17  　　　Plaintiffs assert that Defendants have recorded overlapping times for different

18  activities on various tracking sheets and that Defendants may not count two or more

19  simultaneous activities towards compliance with the requirements of MC PM #1-3, 5-6,

20  and 8.  (Dkt. 1944 at 22.)  Plaintiffs offer as an example an inmate at Eyman-Browning

21  who was recorded on the tracking sheet for March 11, 2015 as having unstructured out-of-

22  cell time from 13:37 to 17:19 and attending a class from 16:15 to 17:15.

23  　　　At Eyman-Browning, inmates are escorted from their cell to a classroom where

24  they participate in SMI unstructured out-of-cell time followed by programming. An

25  officer therefore may not know precisely when SMI unstructured out-of-cell time ends

26  and the program begins – but he/she does know that the inmate left the cell, participated in

27  both activities, returning to his cell after. The example cited by Plaintiffs shows how

28  documentation under these circumstances may overlap.  But, this does not mean that there

11

is falsification of the tracking sheets trying to double dip on out of cell time and the separation of time is easily handled.   Specifically, Defendants agree that in such an example, the inmate should not be counted as having the full amount of unstructured time offered (three hours and 42 minutes), plus the amount of time spent in the class (one hour), for a total of four hours and 42 minutes.   Instead, the inmate should be counted as having been offered a total of three hours and 42 minutes (two hours and 42 minutes of unstructured out-of-cell time and one hour of class).   This situation as detailed does not result in automatic noncompliance, but rather analysis of actual time in each place to be counted toward that specific activity.   The issue is simple, easily addressed, and not a basis for an overarching finding of substantial noncompliance.

### G.   Cross-checking with activity schedules and sign-in sheets

Plaintiffs contend that the monitors must crosscheck compliance with MC PM #2 and #8 by comparing the activity schedules and sign-in sheets with the out-of-cell tracking sheets.   (Dkt. 1944 at 25.)   Plaintiffs claim they could find no evidence that monitors are crosschecking documentation on the Out of Cell Tracking Sheets with the activity schedules or sign-in sheets.   (Id.)   Plaintiffs assert that when they crosschecked the out-of-cell tracking sheets with sign-in sheets, they identified many discrepancies. (Id.)   Plaintiffs further contend that facilities must be found noncompliant for MC PM #2 and #8 where Defendants have failed to produce sign-in sheets.   (Dkt. 1944 at 28.)

The activity schedules and sign-in sheets are included in the protocols as potential source documents for determining compliance, but nothing in the Stipulation or protocols requires Defendants to crosscheck compliance by comparing the activity schedules and sign-in sheets with the out-of-cell tracking forms.   Nonetheless, Defendants have reached an agreement with Plaintiffs in the process of finalizing the Monitor Guide to require the monitors to crosscheck using three out of four potential source documents.   As with other prospective agreements between the parties, the agreement to add crosschecking does not invalidate the prior months of compliance findings at the four facilities because nothing in the plain language of the Stipulation or protocols requires it.   This is especially so with

1   respect to crosschecking activity schedules.  Schedules are monthly plans and, as with

2   many things in life, things don't always happen according to an hour-by-hour plan.

3   Activities may back up.  Cancellations and makeups may occur.  This does not mean that

4   activities do not occur.  Common sense must prevail on crosschecks for compliance

5   determinations.  One size does not fit all for every day, week, month, and complex.

6   Plaintiffs' Motion in this regard fails.

7           **H.**    **Documentation of exercise venue for MC PM #6**

8       MC PM #6 provides that maximum custody inmates at Eyman-Browning, Eyman

9   SMU-I, Florence Central, Florence-Kasson, and Lumley Special Management Area who

10   are eligible for participation in DI 326 are offered out-of-cell time, incentives, programs,

11   and property consistent with their step level and housing assignment.  As an incentive, DI

12   326 provides Step 2 and 3 inmates at certain yards access to specific recreation enclosures

13   and fields.  Plaintiffs claim they "have found absolutely no evidence that Defendants are

14   monitoring this aspect of the Performance Measures in MC PM #6."  (Dkt. 1944 at 29-

15   30.)  Yet, in the same section of their Motion, Plaintiffs point to only a few isolated

16   months at most yards where they allege that Defendants did not document the exercise

17   enclosure offered to inmates.

18       Plaintiffs contend that if *any* maximum custody inmate's tracking sheet does not

19   document the type of exercise enclosure offered, that inmate must be found noncompliant

20   for MC PM #6 without regard to the inmate's Step level or yard.  Plaintiffs' argument

21   fails because nothing in MC PM #6 or the protocols requires reporting of the exercise

22   enclosure offered, and DI 326 includes specific access to recreation enclosures only for

23   certain step levels at certain units.

24       Plaintiffs include a chart that purportedly shows for each month and yard whether

25   Defendants were compliant with MC PM #6 (based on whether the exercise enclosure

26   offered is documented on the tracking sheets).  There are, however, fatal flaws with

27   Plaintiffs' chart and their resulting analysis and conclusions.

28   / / /

First, Plaintiffs' Motion and the Declaration of Jennifer Onka contend that Defendants are noncompliant for MC PM #6 when the finding was "70% or below" for a given month at a given yard.  Plaintiffs do not specify the percentage they calculate for each month/yard in their chart.  Instead, they merely include a checkmark to indicate whether the score was "70% or below."  Plaintiffs have failed to provide the underlying documentation to permit Defendants to calculate the actual percentages for this measure, making it impossible to determine whether Plaintiffs have correctly identified that a given yard was noncompliant during a given month in the first year of the monitoring period.[7]

Second, in creating their chart, Plaintiffs looked only at the tracking sheets produced for the monitored week and failed to consult the corresponding monthly activity schedules to determine whether the exercise enclosure is noted there.  Nothing in the Stipulation or the protocols provides that the Out of Cell Tracking Sheets are the sole source document for determining which exercise enclosure was offered to the inmates selected for monitoring.  Moreover, the tracking sheets cannot be the sole source document for determining whether Defendants were compliant for a given month with respect to offering exercise enclosures consistent with DI 326 because the tracking sheets cover only the *one week* of the month that is selected for monitoring, whereas the activity schedules cover the *whole month*.  And the protocols speak only to analyzing the Out of Cell Tracking Sheets for the *week* monitored.

Third, Plaintiffs' chart breaks out their alleged findings of noncompliance for MC PM #6 by yard.  But CGAR reporting is done by complex.  For Florence and Eyman, which each contain two maximum custody yards, the compliance score for the complex is calculated by adding up the number of compliant inmates at both yards and dividing by the total number of charts reviewed for both yards.  Thus, alleged noncompliance at only one of the two Florence yards or only one of the two Eyman yards is irrelevant.

---

[7]   In choosing to file a Motion to Enforce with respect to this measure, it is Plaintiffs' burden to show that Defendants are noncompliant.  Plaintiffs should not be able to come back in their Reply and state specific percentages for this measure.  If they are permitted to do so, Defendants should be permitted to file a surreply.

Fourth, Plaintiffs' chart does not correlate with the specific recreation incentives outlined in DI 326 for specific step levels. DI 326 provides the following recreation incentives, which vary based upon an inmate's particular step level, as well as the physical plant of the inmate's designated ADC complex and unit:

- Eyman-Browning Step 2 – "3 two hour recreation periods each week, one of which can be in the 10x10 interactive enclosure." (On the tracking sheets, the 10x10 enclosure is Recreation Area "B".)

- Eyman-Browning Step 3 – "Four outdoor recreation periods a week. All can be in the 10x10 interactive enclosures." (On the tracking sheets, this would be Recreation Area "B".)

- Eyman-SMU I Step 2 – "six hours per week to include one-time per month in 10x10 enclosure (up to four inmates) [Recreation Area "B" on the tracking sheets] and one X per month in 20x40 basketball enclosure (up to four inmates) [Recreation Area "C" on the tracking sheets.]"

- Eyman-SMU I Step 3 – "Six hours per week to include one-time per month in 10x10 enclosure (up to four inmates) [Recreation Area "B" on the tracking sheets], one time per month in 20x40 basketball enclosure (up to eight inmates) [Recreation Area "C" on the tracking sheets], and one-time per month recreation/par course field [Recreation Areas "D" or "E" on the tracking sheets.]"

- Florence-Central Step 2 – "On the field one day per week." (On the tracking sheets, this would be Recreation Area "E".)

- Florence-Central Step 3 – "On the field three days per week." (On the tracking sheets, this would be Recreation Area "E".)

- Florence-Kasson Step 2 – "One day per week group recreation." (On the tracking sheets, this can be Recreation Areas "B", "C", "D", or "E".)

- Florence-Kasson Step 3 – "Recreation on the field three x per week." (On the tracking sheets, this is Recreation Area "E".)

- Perryville-Lumley Step 2 – "12 inmate groups, one hour six days a week." (On the tracking sheets, this could be in Recreation Areas "C", "D", or "E")

- Perryville-Lumley Step 3 – "14 inmate groups, one hour six days a week." (On the tracking sheets, this could be in Recreation Areas "C", "D", or "E")

DI326, (Dkt. 1775-3).

Plaintiffs appear to argue (at Dkt. 1944 at 28-32) that any time a refusal of recreation fails to indicate the size of the recreation enclosure offered, Defendants should be found non-compliant with MC PM #6, which requires offering incentives in accordance with the Step Matrix for each unit. Plaintiffs, however, are incorrect that DI

15

326 incentives universally require Step 2 and 3 prisoners to be provided "access to larger exercise enclosures and greater socialization during exercise periods." (Dkt. 1944 at 28). Rather, such claims must be viewed on a unit-by-unit basis and then aggregated to a complex level for a determination of compliance.

The incentives at Eyman-Browning are only based on the frequency of recreation periods.  The term "can" in DI 326 is permissive and allows ADC to permit one or more of those sessions to occur in a 10x10 enclosure, but does not require it.  The Step 2 incentive at Florence-Kasson is only for "group recreation" and does not specify any particular location where it may occur.  The incentives for Florence-Central and Florence-Kasson Step 3 are weekly.   The incentives at Perryville-Lumley are only for group recreation, without any specification of location. Moreover, Eyman-SMU I has a  more complicated incentive structure, where there are specific locations identified, some of which only need to be provided to an inmate at Step 2 or Step 3 once a month.  Although Lewis-Rast is not mentioned in DI 326, it has a similar physical plant to Eyman, and in practice also follows the Step Matrix for Eyman-SMU I.

When the Stipulation was negotiated, Plaintiffs were well aware of the unit specific measures for the DI 326 incentives.  Yet, they agreed to a monitoring protocol whereby monitoring compliance with MC PM #6 would be determined based upon only "one randomly selected week for each month, for 10 randomly selected prisoners." (Dkt. 1185-1 at 43).  Plaintiffs' buyer's remorse that they did not seek monitoring of the monthly incentives at Eyman-SMU would be a material change in the Stipulation to which the parties have not agreed.  It is improper for the Court to enter any enforcement decision which changes the terms of the Stipulation.

Moreover, Plaintiffs fail to carry their burden of proof in establishing that any Maximum Custody Complex was noncompliant with this measure in any specific month.  Contrary to the analysis conducted by Plaintiffs regarding MC PM #8, Plaintiffs only provided a bare, inadequate summary of where they contend that recreation enclosures for refusals were not noted.  (Dkt. 1946-1 at 56-61).  Plaintiffs do not report any specific

compliance level, but, rather, Defendants surmise that Plaintiffs contend that they reviewed the Out of Cell Tracking Sheets contained in a particular Max Custody Monitoring Notebook and determined them to be non-compliant when three or more of the sheets for a particular month fail to indicate the location where recreation was offered in conjunction with a documented refusal of recreation.[8]

There are three main reasons why this methodology is unsound. First, Plaintiffs ignore the facts that compliance with MC PM #6, as with all other performance measures, is assessed and reported monthly on a complex-by-complex basis. Thus, when a complex such as Eyman and Florence, have multiple units, the scores from both units are averaged to determine compliance. Because Plaintiffs only contend that compliance was "70% or less", without providing a specific compliance level and without providing the Court or Defendants with any documents from which a specific determination could be made, Defendants are entitled to the benefit of the doubt that the level is no less than 70%. As a result, when Plaintiffs contend that Eyman-Browning Unit was 70% in March 2015, but do not dispute the reported compliance at Eyman-SMU I of 100% in the same month, the Eyman Complex compliance level remains at 85%, which is fully compliant under the terms of the Stipulation. Such is the case at Eyman in March – July 2015; September and October 2015, December 2015 – January 2016, and March – September 2016. The same situation occurred at Florence Complex in October 2015.[9]

Second, and more significantly, Plaintiffs rest upon the misapprehension that if any recreation refusal fails to note the recreation area offered, that Defendants are not offering recreation in accordance with the DI 326 incentives. Examples show this is incorrect.

---

[8] Because Plaintiffs failed to provide any specific analysis or evidence in their Motion, it would be unduly prejudicial for the Court to consider any new analysis provided in any Reply. If Plaintiffs want to submit a detailed analysis with sufficient proof to support such a claim, they should proceed through the Stipulation's Notice, mediation, and motion process anew to permit Defendants to respond appropriately.

[9] Plaintiffs also assert that compliance at Florence should be deemed noncompliant, because they did not have the tracking sheets for August 2016. Those source documents were produced to Plaintiffs on February 23, 2017 in accordance with the Court prior order regarding production of outstanding maximum custody documents.

17

At Eyman-Browning in August 2015, there are ten tracking sheets which contain refusals of recreation where a specific recreation enclosure is not identified.  (Ex. 1).  Yet, of those, six are for Step 1 inmates, and none are for Step 2 inmates.  Of the four Step 3 inmates, all of them were offered recreation at least four times during the week.  (Ex. 1 at ADCM198626, ADCM198667, ADCM198686, and ADCM198696).  Of the three Step 3 inmates who accepted their offered recreation, two of them (#███████ and #███████) were offered and received recreation sessions twice in the 10x10 enclosures during the monitored week.  *Id.* at ADCM198667 and ADCM198696.  The third (#███████) was offered and received three recreation sessions in the 10x10 enclosures.  *Id.* at ADCM198686.  The fact that refusals do not indicate a location where an inmate chose not to go is simply not evidence that Defendants are noncompliant, particularly where, at this unit, there is no requirement that recreation be provided in any particular location.

At Eyman-SMU I in August 2015, there are four tracking sheets which contain refusals of recreation where a specific recreation enclosure is not identified.  (Ex. 2).  Yet, the sheets contained in that sample are for two Step I inmates and eight Step 3 inmates.  Those sheets show that two Step 3 inmates (#███████ and #███████) were offered and accepted a recreation session in the 10x10 recreation enclosure, although both inmates also had one more refusal where no recreation location was specified.  (*Id.* at ADCM198043 and ADCM198069).  Additionally, one Step 3 inmate (#███████) was offered and received recreation in the 20x40 basketball enclosure, and did not refuse any sessions.  (*Id.* at ADCM198079).  Three Step 3 inmates (#███████, #███████, and #███████) were offered and received recreation on the 45x90 par course during the monitored week, although the second two refused other recreation sessions.  (*Id.* at ADCM198006, ADCM198037, and ADCM198063).  And finally, two Step 3 inmates (#███████ and #███████) were only offered recreation in the chutes during the monitored week, and did not refuse any sessions.  (*Id.* at ADCM198019 and ADCM198055).  Where recreation incentives only need to be offered once a month, these records show that recreation was offered in each of the three areas to different inmates, and those

18

opportunities where accepted.  Simply because an inmate refused a different recreation opportunity is no basis for a finding of noncompliance.

At Perryville-Lumley, Plaintiffs assert that Defendants' failure to note the exercise enclosure reduced compliance findings to "70% or below" for only two months— September 2015 and June 2016.  But even if Plaintiffs are correct, two months of noncompliance out of 24 months of monitoring clearly does not constitute substantial noncompliance.  Moreover, at Perryville-Lumley in September 2015, there were three Step 1, three Step 2 and four Step 3 inmates selected during the monitored week.  (Ex. 3).  There are also a total of three refusals among those ten inmates.  (Including, one for #████, who was a Step 1 inmate.  *Id.* at ADCM321393).  Of the Step 2 inmates, the sheets show that one (#████) was offered and received five recreation sessions in the 45x90 recreation enclosure, and refused one session; one (#████) was offered and received four sessions in the 45x90 recreation enclosure, and refused two sessions; and, one (#████) was offered and received four sessions in the 45x90 recreation enclosure and two in the chutes, and did not have any refusals. (*Id.* at ADCM321362, ADCM321371, and ADCM321378).  Of the four Step 3 inmates, one (#████), received two sessions in the 45x90 recreation enclosure, received one session in the field, and refused three sessions; one (#████) received six sessions in the 45x90 recreation enclosure, and refused no sessions; one (#████) received one session in the 45x90 recreation enclosure and received five sessions in the field; and one (#████) received two sessions in the 45x90 recreation enclosure and received two sessions in the field.  (*Id.* at ADCM321327, ADCM321335, ADCM321344, and ADCM321353).  Where DI 326 only requires that recreation opportunities be provided in groups at Perryville, an analysis of the tracking sheets is conclusive proof of compliance.  A review of the tracking sheets for June 2016 at Perryville yields similar results.

No pattern can be deduced from the tracking sheets of any noncompliance with providing the unit-specific recreation incentives set forth in DI 326.  While there may be some refusals noted, the acceptance of recreation opportunities by Step 2 and 3 inmates

19

(for example, the eight times at Eyman-Browning in August 2015; the 24 times at Eyman-SMU I in August 2015, and the 46 times at Perryville in September 2015), shows that the incentives are being provided. The fact that there were a total of fourteen (14) refusals by comparison in those same months among Step 2 and 3 inmates is not evidence of substantial noncompliance.

In sum, Plaintiffs' methodology is unsound because they counted refusals without a specific recreation location for Step 1 inmates in arriving at their conclusion that the failure to note the recreation enclosure impacted compliance with MC PM #6. However, the DI 326 Step Matrices for Step 2 inmates only specify that recreation will occur in the "standard enclosure" at Eyman-Browning, Florence-Central, and Perryville-Lumley. (Florence-Kasson is silent on any Step I incentives. At Eyman-SMU, the incentive is one recreation session per month in the 10x10 enclosure with two inmates.)

Finally, Plaintiffs do not challenge the compliance findings for Florence-Central for MC PM #6, other than for August 2016, which is addressed below. At Florence-Kasson, Plaintiffs assert that failure to note the exercise enclosure reduced compliance findings to "70% or below" for only one month—October 2015. Because compliance is reported by complex, not by yard, and the two yards' scores must be aggregated to achieve an overall score, Florence complex's compliance rate for October 2015 was compliant. Plaintiffs contend that Defendants did not produce tracking sheets for August 2016 for Florence-Central and Florence-Kasson and that, as a result, both facilities should be found noncompliant for MC PM #6 for August 2016. However, Defendants produced the maximum custody notebook for Florence-Central and Florence-Kasson, which includes the tracking sheets and activity schedules, to Plaintiffs on February 23, 2017.[10]

/ / /

/ / /

---

[10]As stated above, Plaintiffs' Motion was premature. Had Plaintiffs complied with the meet and confer and mediation requirements prior to filing their Motion, this issue could have been avoided.

### I.     Compliance findings for MC PM #8

MC PM #8 provides that, in addition to the general privileges and incentives afforded to max custody inmates under DI 326, SMI (seriously mentally ill) max custody inmates must also be offered an additional:

- 10 hours of unstructured out-of-cell time per week
- 1 hour of additional out-of-cell mental health programing per week
- 1 hour of additional out-of-cell psycho-educational programming per week
- 1 hour of additional out-of-cell programming per week.

(Dkt. 1185 at 8-10 (¶21, 25); 1195-1 at 44-45 (MC PM 8)). Combining MC PM #2 and #8, DI 326 Step Level 2 and 3 inmates must be offered two hours of additional out-of-cell programming per week. (Dkt. 1185 at 8-10 (¶21, 22, 25); 1195-1 at 41, 44-45 (MC PM 2, 8)).

Plaintiffs argue Defendants are substantially non-compliant with MC PM #8 at Perryville-Lumley (SMA); Eyman-Browning; Eyman-SMU I; Florence-Kasson; and Lewis-Rast, challenging Defendants' calculation/verification of offered programming and out-of-cell time for SMI max custody inmates.   As demonstrated below, Plaintiffs' analysis and conclusions, however, are flawed, thereby defeating Plaintiffs' characterization of Defendants' compliance as "substantially noncompliant."

Defendants have offered programming and out-of-cell time in accordance with MC PM #8.   The grand scheme conspiracy theory by Plaintiffs that Defendants intentionally sidestep or avoid the complicated requirements of this measure, or intentionally misreport CGAR results, is without proof.    It is simple reality that MC PM monitoring requires daily, hourly, minute-by-minute documentation of the daily activities of all ADC max custody inmates and with this comes advertent human error in achieving perfect duplicate or even triplicate documentation.  An Out of Cell Tracking Sheet may not denote that a Step 2 SMI max custody inmate went to a second program, yet a sign in sheet confirms attendance or refusal.  An Out of Cell Tracking Sheet may not denote program attendance, but AIMS confirms enrollment. A program may not always start on time in accordance

21

with a monthly activity schedule (which is a plan), but the program takes place. An inmate may choose to leave SMI unstructured out-of-cell time to go to work. These myriad of situations do not equate to automatic noncompliance.

In short, various sources may require review to confirm MC PM #8 programs and out-of-cell time were offered. The protocols for MC PM #8, however, do not require verification by every source document to conclude compliance. Where source review reasonably reveals programs and out-of-cell time were offered, whether by existing or additional proffered source documents, compliance is reached. Where Plaintiffs sufficiently challenge and where Defendants acknowledge challenge to certain CGAR compliance rates, albeit disputing Plaintiffs' specified percentages, Defendants will revise and reissue the same. Defendants' acknowledgment of the same, as specified below, however, does not result in a finding of "substantial non-compliance" such that Court ordered remedy is warranted. Indeed, the Parties' agreements and Court rulings pertaining to the forthcoming Max Custody Monitor Guide address fully Plaintiffs' concerns regarding methodology in monitoring MC PM #8 such that no remedial measures, Court Orders, or other action is required.

**Perryville-Lumley**

Defendants acknowledge upon reanalysis that Perryville-Lumley did not reach applicable 75% compliance levels for MC PM #8 for March, April, May, June, and July 2015, or January 2016 data. Defendants dispute the specified percentage compliance findings proffered by Plaintiffs, however, and, as a result, will revise and reissue CGAR reports regarding the same.

This acknowledgment does not, however, establish a finding of substantial noncompliance such that Plaintiffs are entitled to any relief. To date, twenty-three (23) months of compliance levels have been reported on CGAR. As of the filing of Plaintiffs' Motion, Defendants produced eighteen (18) months of underlying data. [11] The

---

[11] The exception being the Max Custody Notebook for Florence-Central which was produced on the same date Plaintiffs filed their Motion.

acknowledged months span the very first five months of monitoring under Stipulation – the very start of the monitoring process, and adds on one isolated noncompliance occurrence in January 2016.  Plaintiffs make no other compliance challenges related to the twelve other months of monitoring at issue.  This means progress, without challenge to the last year of monitoring.  Plaintiffs are without proof of constant and ongoing substantial noncompliance up to the very present.  Substantial progress has been made, not substantial noncompliance.  Plaintiffs' Motion should be denied.

**Eyman-Browning and SMU I**

Plaintiffs separately challenge a myriad of CGAR results for Eyman-Browning and SMU I.  Plaintiffs ignore, however, that Eyman-Browning and SMU I CGAR results are calculated in the aggregate.  Thus, a noncompliance finding for one unit does not necessarily equate to a noncompliance finding overall.  While Defendants acknowledge that, upon reanalysis, Eyman complex did not reach applicable 75% compliance levels for March and May 2015 data, two isolated incidents of noncompliance by no means equate to "substantial noncompliance" under the Stipulation.  Plaintiffs are without sufficient challenge to the other sixteen (16) months of CGAR reports and underlying data provided by Defendants.  Moreover, when compliance across units is calculated in the aggregate, Eyman Complex achieves compliance levels for April, July, August, and September 2015, as well as March, April, June, July and August 2016.  Accordingly, Plaintiffs' compliance challenges fail to establish "substantial noncompliance" at the complex level for MC PM #8.

Plaintiffs argue in large part that the compliance findings are erroneous because the times reflected on the Out of Cell Tracking Sheet and program attendance sheets are different than the times noted on the activity schedules.  The variations in time do not equate to substantial noncompliance.  While the units run according to a schedule, variance with start times happens.  Just like variances happen out in the community, at home, and at work, schedules change.  Just because a program may not start at its scheduled time, does not mean it was not offered and did not take place.

Plaintiffs also argue that overlap in times indicating an inmate is out of cell but at two or three places at once automatically requires a noncompliance finding. This argument too, fails. The simple and commonsense explanation is that an inmate may leave his cell for one activity/program and proceed to another before returning to cell. Accordingly, overlapping times out of cell may result because the inmate never physically returns back to his cell between the two activities. Such manner of logging does not equate to noncompliance where overlaps in times can be easily discerned and mathematically accounted for.

**Eyman-Browning – March 2016 Data**

Plaintiffs assert that Eyman-Browning's compliance level for March 2016 data was 0%. Plaintiffs are incorrect. Defendants correctly reported compliance with MC PM #8 at 100%. Plaintiffs' challenges to the following inmate specific findings fail for the reasons specified and thus compliance stands.

- ██████████████████. Plaintiffs argue that the 3/7/16 MH group does not c███████████y schedule. However, attendance sheet that was completed by the mental health provider shows the inmate attended the group on 3/7/16. (Exh. 29).

- ██████████████████. Plaintiffs argue that the 3/7/16 MH group does n██████████████ity schedule. However, attendance sheet that was completed by the mental health provider shows the inmate attended the group on 3/7/16. (Exh. 30).

- ████████████████. Plaintiffs argue PsychEd on 3/10/16 and MH group on 3██████████elate to the activity schedule. However, on 3/10/16, he signed himself in to the PsychEd class on the line for inmate ████████. (Exh. 31).

- ██████████████████. Plaintiffs argue that the 3/7/16 MH group does not c███████████ity schedule. However, attendance sheet that was completed by the mental health provider shows the inmate attended the group on 3/7/16. (Exh. 32).

- ████████████████. Plaintiffs argue PsychEd on 3/10/16 and MH group on 3██████████late to the activity schedule. However, on 3/10/16, he signed himself in to the PsychEd class. On 3/7/16, the mental health provider reported he attended the MH group. (Exh. 33).

- ████████████████████ Plaintiffs argue PsychEd on 3/10/16 and MH g███████████ correlate to the activity schedule. However, on 3/10/16, he signed himself in to the PsychEd class. On 3/7/16, the mental health provider reported he attended the MH group. (Exh. 34).

- ███████████████. Plaintiffs argue PsychEd on 3/10/16 and MH group on 3/7/16 do not correlate to the activity schedule. Plaintiffs also argue that the time recorded is after the last time for a group on the activity schedule. However, on 3/10/16, he signed himself in to the PsychEd class. On 3/7/16, the mental health provider reported he attended the MH group. (Exh. 35).

- ███████████████. Plaintiffs argue PsychEd on 3/10/16 and MH group on 3/7/16 do not correlate to the activity schedule. However, on 3/10/16, he signed himself in to the PsychEd class. On 3/7/16, the mental health provider reported he attended the MH group. (Exh. 36).

- ███████████████. Plaintiffs argue PsychEd on 3/10/16 and MH group on 3/7/16 do not correlate to the activity schedule. However, on 3/10/16, he signed himself in to the PsychEd class. On 3/7/16, the mental health provider reported he refused to attend the MH group. (Exh. 37).

- ███████████████. Plaintiffs argue PsychEd on 3/10/16 and MH group on 3/7/16 do not correlate to the activity schedule. However, on 3/10/16, the facilitator placed a check mark next to his name. Although it does not indicate he refused and the inmate simply could have forgotten to sign his name, it indicates the PsychEd was offered that day. On 3/7/16, the mental health provider reported he attended the MH group. (Exh. 38).

### Eyman-Browning – June 2016 Data

Plaintiffs assert that Eyman-Browning's compliance level for June 2016 data was 50%. Plaintiffs are incorrect. Defendants' compliance with MC PM #8 is 80%, meeting the compliance threshold. [12] Plaintiffs' challenges to the following inmate specific findings fail for the reasons specified and thus compliance stands.

- ███████████████. Plaintiffs argue the Out of Cell Tracking Sheet and attendance sheet are inconsistent and that the tracking sheet shows the inmate was in two places at once on 6/13/16. The tracking sheet contains refusals recorded at the same time because the inmate refused to attend either. If the inmate had attended his program, he would have been held from 1430 to 1530 and the inmate would have been offered recreation at a different time. (Exh. 39).

- ███████████████. Plaintiffs argue the times on the Out of Cell Tracking Sheet and the attendance sheet for SMI unstructured activity on 6/15/16 are inconsistent. The attendance sheet shows the inmate refused to participate in SMI unstructured activity on that day. Either way, if he refused or was participating, the program was offered. (Exh. 40).

- ███████████████ Plaintiffs argue the times on the Out of Cell Tracking Sheet and the attendance sheet for SMI unstructured activity on 6/15/16 are inconsistent. The attendance sheet shows the inmate refused to

---

[12] Defendants CGAR reporting on this measure is 100%. Defendants will revise the CGAR accordingly.

participate in SMI unstructured activity on that day.  Either way, if he refused or was participating, the program was offered.  (Exh. 41).

**Eyman-Browning – July 2016 Data**

Plaintiffs assert that Eyman-Browning's compliance level for July 2016 data was 70%.  Plaintiffs are incorrect. Defendants' compliance with MC PM #8 is 90%, meeting the compliance threshold. [13]  Plaintiffs' challenges to the following inmate specific findings fail for the reasons specified and thus compliance stands.

- ██████████████████    Plaintiffs argue that the inmate is listed in two places at one time on 7/21/16 on the Out of Cell Tracking Sheet.  He is an STG stepdown inmate.  The time for recreation was inadvertently written in the wrong row.  Recreation for STG step down inmates is scheduled to be offered at the same time on 7/21/16 per the activity schedule.  (Exh. 42).

- ██████████████████.  Plaintiffs argue that the inmate was in two places at one time on 7/18/16 on the Out of Cell Tracking Sheet.  The sign in sheet shows the inmate attended a program from 1305 to 1456 outside of his run.  The inmate could not go to rec in the chute at the end of his run until he returned from his program.  Although the tracking sheet contains an erroneous start time for rec, removing the overlapping time still provides the inmate with both sufficient rec time at 6.5 hours and total out of cell time of more than 19.5 hours which are compliant for a Step 1 inmate.  (Exh. 43).

**Eyman-Browning – August 2016 Data**

Plaintiffs assert that Eyman-Browning's compliance level for August 2016 data was 70%.  Plaintiffs are incorrect. Defendants' compliance with MC PM #8 is 100%, meeting the compliance threshold.  Plaintiffs' challenges to the following inmate specific findings fail for the reasons specified and thus compliance stands.

- ██████████████████    Plaintiffs argue he was in three places at one time on 7/25/16 per the Out of Cell Tracking Sheet.  The back of the tracking sheet documents that the inmate was at rec and began acting out.  His participation in additional programs for that day was therefore restricted due to the inmate's disruptive behavior where permitting attendance created a legitimate safety/security risk.  The time of the restriction was logged as a refusal on the tracking sheet.  (Exh. 44).

- ██████████████████    Plaintiffs argue he was in two places at the same time on both 8/22/16 and 8/23/16 per the Out of Cell Tracking Sheet.  He refused all time out of cell on these dates.  The times do not overlap.  Attendance sheets indicate that the program on 8/22/16 was scheduled to occur from 0915 to 1015; SMI unstructured out of cell time is scheduled

---

[13] Defendants CGAR reporting on this measure is 100%.  Defendants will revise the CGAR accordingly.

from 1015 to 1215.   On 8/23/16, SMI unstructured out of cell time is scheduled from 1015 to 1215; MH programming is scheduled from 1215 to 1315.   On 8/24/16, PsychEd was attended from 0929 to 1029 and SMI unstructured out of cell time was from 1029 to 1210.  At Eyman-Browning, SMI inmates are escorted from the run to a classroom which is used for both SMI unstructured out of cell time and other programs.  At the conclusion of one program, the instructors switch classrooms.  The times recorded on the attendance sheets are not reflective of the total out of cell time because the sheets do not contemplate escort time to and from the classroom.  (Exh. 45).

- █████████████████   Plaintiffs argue he was in two places at the same time on 8/22/16.  Bulk refusal of programming was logged on the Out of Cell Tracking Sheet at the time of the refusal.  The attendance sheets show the program was scheduled from 0942 to 1028; and SMI unstructured out of cell time was scheduled from 1015 to 1215.  These programs are scheduled back to back in the same classroom.  Even subtracting the overlapping difference of 18 minutes from the two instructors' attendance sheets, this inmate is still incompliance.  (Exh. 46).

**Eyman-SMU I – April 2016 Data**

Plaintiffs assert that Eyman-SMU I's compliance level for April 2016 data was 70%.  Plaintiffs are incorrect. Defendants' compliance with MC PM #8 is 90%, meeting the compliance threshold. [14]   Plaintiffs' challenges to the following inmate specific findings fail for the reasons specified and thus compliance stands.

- ████████████ **192723.**  Plaintiffs argue he was in two places at the same time on 4/14/16.  The inmate went directly from rec to programming. If the overlapping 1:05 minutes of recreation is removed, the inmate still received 7:05 hours of recreation which exceeds the requirement to be offered to Step 1 inmates.

- ████████████████   Plaintiffs argue there is no Out of Cell Tracking Sheet for the inmate identified only by the above reference ADC number on the CGAR report and the Overview in the Max ██████████████.   The notebook contains a tracking sheet for **inmate** ████████ which was used to assess compliance.  In preparing the Overview, a "3" was typed in lieu of a "5" and this █████ was inadvertently copied into the CGAR.  Moreover, whil **mate** ████ was housed at Eyman-SMU I during this month, **inmate** ████ was never housed at any max custody unit, let alone Eyman-SMU I.  (Exh. 48).

**Florence-Kasson**

Defendants   acknowledge   upon   reanalysis,   Florence-Kasson   did   not   reach applicable 75% compliance levels for MC PM #8 for March, April, May, June, July, and September data or 80% compliance level for March and June 2016 data.  Defendants

---

[14] Defendants CGAR reporting on this measure is 100%.  Defendants will revise the CGAR accordingly.

dispute the specified percentage compliance findings proffered by Plaintiffs, however, and, as a result, will revise and reissue CGAR reports regarding the same.

As is the case for Perryville-Lumley as discussed above, this acknowledgment does not establish a finding of substantial noncompliance such that Plaintiffs are entitled to any relief.  To date, twenty-three (23) months of compliance levels have been reported on CGAR. As of the filing of Plaintiffs' Motion, Defendants produced eighteen (18) months of underlying data – seventeen (17) months for Florence.[15]  The acknowledged months span the very first five months of monitoring under Stipulation – the very start of the monitoring process, and adds on one isolated noncompliance occurrence in September 2016 and two incidents in March and June 2016.  Plaintiffs make no other compliance challenges related to the other months of monitoring at issue.  This means progress, without challenge to the last nearly a year of monitoring.  Plaintiffs are without proof of constant and ongoing substantial noncompliance up to the very present.  Substantial progress has been made, not substantial noncompliance.  Plaintiffs' Motion should be denied.

While Plaintiffs separately challenge  several other reporting months for Florence-Kasson, Plaintiffs' challenges fail as illustrated below and compliance stands.

**February 2016 Data**

Plaintiffs assert that Florence-Kasson's compliance level for February 2016 data was 70%.  Plaintiffs are incorrect. Defendants correctly reported compliance with MC PM #8 at 80%.  Plaintiffs' challenges to the following inmate specific findings fail for the reasons specified and thus compliance stands.

- ███████████████████   Plaintiffs argue that, according to the Out of Cell nmate was in two places at once on 2/12/16 (unstructured out of cell time and work) and thus was denied required SMI unstructured out of cell time.  The inmate, however, was offered SMI unstructured out of cell time. He refused, just like he refused all other same offerings that week.  He later chose to leave his cell to go to work.  The inmate's week history shows a pattern of refusals of offered out of cell time,

---

[15] The exception being the Max Custody Notebook for Florence-Central which was produced on the same date Plaintiffs filed their Motion.

which he choose to refuse.  He was offered the same in compliance with MC PM #8.  (Exh. 18).

**April 2016 Data**

Plaintiffs assert that Florence-Kasson's compliance level for April 2016 data was 30%.  Plaintiffs are incorrect. Defendants correctly reported compliance with MC PM #8 at 100%.  Plaintiffs' challenges to the following inmate specific findings fail for the reasons specified and thus compliance stands.

- ███████████████     Plaintiffs argue that, according to the Out of Cell Tracking Sheet, the inmate was in two places at once on 4/11/16 (programs and work) and thus was denied required Program time. He received an extra program 4/11/16, Peers, from 1500-1600.  Thus, he received sufficient Programs.  And, he went from Programs to work on 4/14/16 (Exh. 19).

- ██████████████████     Plaintiffs argue that, according to the Out of Cell Tracking Sheet, the inmate was in two places at once on 4/10/16 and 4/12/16. He, however, chose to go to work.  He was still offered appropriate programs and out of cell time.  (Exh. 20).

- ████████████████     Plaintiffs argue that, according to the Out of Cell Tracking Sheet, the inmate was in two places at once on 4/12/16.  However, he refused SMI unstructured out of cell time first, then refused group.  Even if you remove 1:20 from his SMI unstructured out of cell time, he still had 10 hours, 40 minutes of the same.  Had he not refused his Program, it would have been from 1940 to 2140 and thus he would have received required Program time too.  (Exh. 21).

- █████████████████.  Plaintiffs argue that, according to the Out of Cell Tracking Sheet, the inmate was in two places at once on 4/12/16.  However, he refused PsychEd on Monday, 4/11/16 from 1340-1440.  He also refused MH Group, on Thursday, 4/14/16, from 0905-1005.  Likewise, he refused Peers Program from 1145-1245 on Monday, 4/11/16.  Since he was scheduled and offered separate Program, the argued conflict is immaterial. (Exh. 22).

- ███████████████     Plaintiffs argue this Step 2 SMI inmate did not receive two programs as required by MC PM #8.  However, his Out of Cell Tracking sheet shows he attended Program on Thursday, 4/14/16.  Also, he attended and signed in to Peers Group Program on Monday, 4/11 from 1145 to 1245.  Therefore, he received the two required Programs.  (Exh. 23).

- ███████████████     Plaintiffs argue this Step 3 SMI inmate did not receive two programs as required by MC PM #8.  However, his Out of Cell Tracking Sheet shows he attended Program on Thursday, 4/14/16.  He also attended and signed in to Peers Group Program on 4/11/16 from 1145 to 1245.  Therefore, he received the two required Programs.  (Exh. 24).

- ██████████████     Plaintiffs argue this inmate did not receive required PsychEd.  However, he attended PsychEd and signed in - 4/11/16 from 1230

to 1330.  Also attended and signed-in Peers Group Program on 4/11/16.  He received required PsychEd and Programs.  (Exh. 25).

**May 2016 Data**

Plaintiffs assert that Florence-Kasson's compliance level for May 2016 data was 70%.  Plaintiffs are incorrect. Defendants correctly reported compliance with MC PM #8 at 100%.   Plaintiffs' challenges to the following inmate specific findings fail for the reasons specified and thus compliance stands.

- ████████████████  Plaintiffs argue this Step 3 SMI inmate did not receive two programs as required by MC PM #8.  However, per AIMS, he was enrolled in Socialization and Successful Living Programs.  He attended Successful Living Program from 1440-1540 on Monday, 5/9/16.  He therefore was offered participation in two Programs.  (Exh. 26).

- ████████████████  Plaintiffs argue this Step 3 SMI inmate did not receive two programs as required by MC PM #8.  However, per AIMS, he was enrolled in Socialization and Successful Living Programs.  He attended Successful Living Program from 1550-1650 on Monday, 5/9/16.  He was therefore was offered participation in two Programs. (Exh. 27).

- ████████████████  Plaintiffs argue this Step 3 SMI inmate did not receive two programs as required by MC PM #8.  However, per AIMS, he was enrolled in Socialization, and, Successful Living Programs.  He attended Successful Living Program from 1710-1810 on Monday, 5/9/16.  He was therefore offered participation in two Programs.  (Exh. 28).

**Lewis-Rast**

Defendants acknowledge upon reanalysis, Lewis-Rast did not reach applicable 75% compliance levels for MC PM #8 for November 2015 data or 80% compliance level for March or July 2016 data.  Defendants dispute the specified percentage compliance findings proffered by Plaintiffs, however, and, as a result, will revise and reissue CGAR reports regarding the same.

This acknowledgment does not, however, establish a finding of substantial noncompliance such that Plaintiffs are entitled to any relief.  Three isolated incidents of noncompliance, considering analysis of eighteen (18) months of data, by no means equates to "substantial noncompliance" under the Stipulation. While Plaintiffs challenge four other months of compliance findings for Lewis-Rast, Plaintiffs fail to prove Lewis-Rast fell below compliance during those months as illustrated below.

**December 2015 Data**

Plaintiffs assert that Lewis-Rast's compliance level for December 2015 data was 50%.  Plaintiffs are incorrect. Defendants correctly reported Lewis-Rast's compliance with MC PM #8 at 80%.  Plaintiffs' challenges to the following inmate specific findings fail for the reasons specified and thus compliance stands.

- ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  Plaintiffs argue this Step 3 SMI inmate did not r▇▇▇▇▇▇▇▇▇▇▇▇s required by MC PM #8. Per AIMS, however, he was enrolled in both Responsible Thinking and Hygiene & Self Care Programs.  As such, he was offered participation in both programs. He attended Responsible Thinking from 0900-1005 on Wednesday, 12/16/15. (Exh. 4).

- ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  Plaintiffs argue this Step 3 SMI inmate did n▇▇▇▇▇▇▇▇▇▇▇▇equired by MC PM #8. Per AIMS, however, he was enrolled in Responsible Thinking and Hygiene & Self Care Programs.  As such, he was offered participation in both programs. He refused Responsible Thinking from 0900-1005 on Wednesday, 12/16/15. (Exh. 5).

- ▇▇▇▇▇▇▇▇▇▇▇▇▇  Plaintiffs argue this Step 2 SMI inmate did not r▇▇▇▇▇▇▇▇▇▇ required by MC PM #8.  However, his Out of Cell Tracking sheet reports one program from 1000-1100 on Thursday, 12/17/15. He also attended a second Program, Self Control, from 1230-1330 on Thursday, 12/17/15.  (Exh. 6).

**January 2016 Data**

Plaintiffs assert that Lewis-Rast's compliance level for January 2016 data was 30%.  Plaintiffs are incorrect. Defendants correctly reported compliance with MC PM #8 at 100%.  Plaintiffs' challenges to the following inmate specific findings fail for the reasons specified and thus compliance stands.

- ▇▇▇▇▇▇▇▇▇▇▇▇▇  Plaintiffs argue this Step 3 SMI inmate did not r▇▇▇▇▇▇▇▇▇▇ required by MC PM #8 and that his second hour of PsychEd was counted as a Mental Health group.  However, per AIMS, he was enrolled in Hygiene & Self Care and Responsible Thinking Programs and thus was offered two programs.  He signed in to attend Family Ties program from 1030-1131 on Wednesday, 1/13, which was not recorded on the Tracking Sheet.  eOMIS confirms that Mental Health group was offered from 1430-1530, and PsychEd was offered from 1530-1630 on Tuesday, 1/12/16.  (Exh. 7).

- ▇▇▇▇▇▇▇▇▇▇▇▇▇  Plaintiffs argue this Step 3 SMI inmate did not r▇▇▇▇▇▇▇▇▇▇ required by MC PM #8.  Per AIMS, however, he was enrolled in Hygiene & Self Care and Core Skills Programs.  As such, he

31

was offered participation in both programs. Attendance shows refusal of Core Skills on Friday, 1/15/16. (Exh. 8).

- ████████████████ Plaintiffs argue this Step 2 SMI inmate did not receive two programs as required by MC PM #8. Per AIMS, however, he was enrolled in Hygiene & Self Care and Responsible Thinking Programs. As such, he was offered participation in both programs. He signed in to attend Family Ties program from 1030-1131 on Wednesday, 1/13/16 which was not recorded on the Out of Cell Tracking Sheet. (Exh. 9).

- ████████████████ Plaintiffs argue this Step 3 SMI inmate did not receive two programs as required by MC PM #8. Per AIMS, however, was enrolled in Core Skills and Hygiene & Self Care Programs. As such, he was offered participation in both programs. Attendance shows refusal of Core Skills on Friday, 1/15/16. (Exh. 10).

- ████████████████ Plaintiffs argue this Step 2 SMI inmate did not receive two programs as required by MC PM #8. Per AIMS, however, he was enrolled in Core Skills and Hygiene & Self Care Programs. As such, he was offered participation in both programs. Attendance shows refusal of Core Skills on Tuesday, 1/12/16, which does not appear on the Out of Cell Tracking Sheet. (Exh. 11).

- ████████████████ Plaintiffs argue this Step 2 SMI inmate did not receive two programs as required by MC PM #8. He attended Core Skills Program on Monday, 1/11 from 0930-1035. Out of Cell Tracking Sheet shows he attended second hour of Programming on Friday, 1/15/16 from 0930-1030. (Exh. 12).

- ████████████████ Plaintiffs argue this Step 2 SMI inmate did not receive two programs as required by MC PM #8. He attended Core Skills Program on Monday, 1/11, from 0930-1035. Out of Cell Tracking Sheet shows he attended second hour of Programming on Friday, 1/15/16 from 0930-1030. (Exh. 13).

**February 2016 Data**

Plaintiffs assert that Lewis-Rast's compliance level for February 2016 data was 60%. Plaintiffs are incorrect. Defendants correctly reported Lewis-Rast's compliance with MC PM #8 at 90%. Plaintiffs' challenges to the following inmate specific findings fail for the reasons specified and thus compliance stands.

- ████████████████ Plaintiffs argue this Step 3 inmate did not receive Mental Health group or PsychEd on 2/12/16 because it was cancelled and not made up. The Friday classes were cancelled due to staff shortage and could not be made up during monitored week, because the monitored week ends on a Friday. Thus, the cancellation without makeup was in compliance with Paragraph 26 of the Stipulation. Plaintiff is also correct that Hygiene & Self-Care constituted a second hour of Programs for this inmate. (Exh.14).

32

- ███████████████████ Plaintiffs argue this inmate did not receive Mental Health group or PsychEd on 2/12/16 because it was cancelled and not made up. The Friday classes were cancelled due to staff shortage and could not be made up during monitored week because the monitored week ends on a Friday. Thus, the cancellation without makeup was in compliance with Paragraph 26 of the Stipulation. (Exh. 15).

- ███████████████ Plaintiffs argue this Step 3 inmate did not receive Mental Health group or PsychEd on 2/12/16 because it was cancelled and not made up. The Friday classes were cancelled due to staff shortage and could not be made up during monitored week because the monitored week ends on a Friday. Thus, the cancellation without makeup was in compliance with Paragraph 26 of the Stipulation. Plaintiff is also correct that Hygiene & Self-Care constituted a second hour of Programs for this inmate. (Exh. 16).

**April 2016 Data**

Plaintiffs assert that Lewis-Rast's compliance level for April 2016 data was 70%. Plaintiffs are incorrect. Defendants correctly reported Lewis-Rast's compliance with MC PM #8 at 80%. Plaintiffs' challenges to the following inmate specific findings fail for the reasons specified and thus compliance stands.

- ████████████████ Plaintiffs argue this Step 2 SMI inmate did not receive two programs as required by MC PM #8. He refused his second program, Hygiene & Self Care, on Thursday, 4/14/16, which is held in Blue Education Room from 12:45 to 13:45, in addition to the one hour of additional programming which was written on his Out of Cell Tracking Sheet. (Exh. 17).

**J.** **Requiring development of remedial plans for issues already resolved would be futile**

In addition, Plaintiffs' request that the Court order Defendants to submit remedial plans for these measures to address the issues raised in their Motion to Enforce is moot. The issues Plaintiffs raise—selection of weeks to be monitored, documentation of the exercise venue offered on the tracking sheets, documentation of start and end times for refusals, and crosschecking—have already been addressed, either through agreement by the parties or by Court Order, and have already been incorporated into the Monitor Guide for maximum custody where appropriate.

/ / /

/ / /

33

**K.     Plaintiffs' additional requested relief is unnecessary and unwarranted**

Plaintiffs request that the Court order Defendants to retain an outside expert and submit a plan "detailing how they plan to remedy the overwhelming pattern of refusals in programming and all other out-of-cell time for the SMI and non-SMI prisoners" in the maximum custody units. (Dkt. 1944 at 41.)  Plaintiffs have not shown through comparison of refusal rates at similarly sized prison institutions with similar populations and policies regarding out-of-cell time that the refusal rate in ADC's maximum custody population is abnormally high.   Plaintiffs' expert outlines some reasons for refusals, and Plaintiffs submit declarations from a few inmates with anecdotal information regarding their reasons for refusing programming, but Plaintiffs fail to acknowledge a simple possibility for the refusals—that the inmates simply do not want the extra out-of-cell time and programming offered to them.  Plaintiffs also ignore the practice of ADC staff when they notice a pattern of refusals that is unusual for an inmate of meeting with the inmate, inquiring into the reason(s) for the refusals, and encouraging the inmate to participate in the offered out-of-cell activities and programming.  There is no need to hire someone to undertake a practice that ADC staff already engages in on a routine basis.  And, as the Court has reminded Plaintiffs on multiple occasions, the Court has no authority under the Stipulation to issue orders with respect to hiring or staffing.

Plaintiffs also request that the Court order Defendants "to submit a plan within 30 days to detail how to ensure that the monitors use the methods and procedures necessary to accurately monitor compliance with MC PM ##1-3, 5-6, and 8.  (Dkt. 1944 at 41.)  This is first not warranted for the reasons argued herein, and second unnecessary where the Max Custody Monitor Guide is near completion, addressing by agreement or ruling, all Plaintiffs' methodology concerns going forward. Retroactive application of agreements or Court interpretation is not a basis for a general finding of substantial noncompliance invalidating nearly two years of monitoring, progress, and success.

/ / /

/ / /

34

III.     **CONCLUSION**

For the foregoing reasons, Defendants request that the Court deny Plaintiffs' Motion to Enforce.

RESPECTFULLY SUBMITTED this 23rd day of March 2017.

STRUCK WIENEKE & LOVE, P.L.C.


By /s/Rachel Love
                    Daniel P. Struck
                    Kathleen L. Wieneke
                    Rachel Love
                    Timothy J. Bojanowski
                    Nicholas D. Acedo
                    Ashlee B. Fletcher
                    Anne M. Orcutt
                    Jacob B. Lee
                    Kevin R. Hanger
                    STRUCK WIENEKE & LOVE, P.L.C.
                    3100 West Ray Road, Suite 300
                    Chandler, Arizona  85226

                    Arizona Attorney General Mark Brnovich
                    Office of the Attorney General
                    Michael E. Gottfried
                    Lucy M. Rand
                    Assistant Attorneys General
                    1275 W. Washington Street
                    Phoenix, Arizona 85007-2926

                    *Attorneys for Defendants*

1

**CERTIFICATE OF SERVICE**

2

3

I hereby certify that on March 23, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

4

Alison Hardy:                   ahardy@prisonlaw.com

5

Amelia M. Gerlicher:       agerlicher@perkinscoie.com;docketPHX@perkinscoie.com,
                                          kleach@perkinscoie.com

6

7

Amir Q. Amiri:                 aamiri@jonesday.com; ttualaulelei@jonesday.com

Amy B. Fettig:                  afettig@npp-aclu.org

8

9

Asim Varma:                    avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org;
                                          phxadmin@azdisabilitylaw.org

10

Caroline N. Mitchell:       cnmitchell@jonesday.com; mlandsborough@jonesday.com;
                                          nbreen@jonesday.com

11

12

Corene T. Kendrick:        ckendrick@prisonlaw.com; edegraff@prisonlaw.com

Daniel Clayton Barr:        DBarr@perkinscoie.com; docketphx@perkinscoie.com;
                                          sneilson@perkinscoie.com

13

14

Daniel Joseph Pochoda:  dpochoda@acluaz.org; danpoc@cox.net; gtorres@acluaz.org

15

David Cyrus Fathi:          dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

16

Donald Specter:               dspecter@prisonlaw.com

17

Jennifer K. Messina:        jkmessina@jonesday.com

18

Jessica Pari Jansepar Ross:   jross@azdisabilitylaw.org

19

John Howard Gray:          jhgray@perkinscoie.com; slawson@perkinscoie.com

20

John Laurens Wilkes:      jlwilkes@jonesday.com, dkkerr@jonesday.com

21

Jose de Jesus Rico:          jrico@azdisabilitylaw.org

22

Kathleen E. Brody            kbrody@acluaz.org

23

Kirstin T. Eidenbach:       kirstin@eidenbachlaw.com

24

Maya Abela                      mabela@azdisabilitylaw.org

25

Rose Daly-Rooney:          rdalyrooney@azdisabilitylaw.org

26

Sara Norman:                   snorman@prisonlaw.com

27

Sarah Eve Kader:             skader@azdisabilitylaw.org;mlauritzen@azdisabilitylaw.org;
                                          rstarling@azdisabilitylaw.org

28

36

Rita K. Lomio:          rlomio@prisonlaw.com

     I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

     N/A

                   /s/Rachel Love

**EXHIBITS 1 – 48 TO
DEFENDANTS' RESPONSE TO
PLAINTIFFS' MOTION TO ENFORCE
THE STIPULATION (MAXIMUM
CUSTODY PERFORMANCE MEASURES
1-3, 5-6, AND 8)**

**<u>FILED UNDER SEAL</u>**