1  Kathleen E. Brody (Bar No. 026331)
   Daniel Pochoda (Bar No. 021979)
2  **ACLU FOUNDATION OF ARIZONA**
   3707 North 7th Street, Suite 235
3  Phoenix, Arizona 85013
   Telephone:  (602) 650-1854
4  Email: kbrody@acluaz.org
          dpochoda@acluaz.org
5
   *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia*
6  *Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith,*
   *Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner,*
7  *Joshua Polson, and Charlotte Wells, on behalf of themselves and all*
   *others similarly situated*
8  **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

9  Sarah Kader (Bar No. 027147)
   Asim Dietrich (Bar No. 027927)
10 **ARIZONA CENTER FOR DISABILITY LAW**
   5025 East Washington Street, Suite 202
11 Phoenix, Arizona 85034
   Telephone:  (602) 274-6287
12 Email: skader@azdisabilitylaw.org
          adietrich@azdisabilitylaw.org
13
   *Attorneys for Plaintiff Arizona Center for Disability Law*
14 **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | No. CV 12-00601-PHX-DKD<br><br><br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO ENFORCE THE STIPULATION [DOC. 1944]** |

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

ARGUMENT ......................................................................................................................... 2

    I.    Defendants Admit to a Non-Random Monitoring Methodology. ............................ 2

    II.   Defendants Fail to Address the Overwhelming Refusal Rates or Rebut Expert Testimony. ................................................................................................................ 4

    III.  Defendants Admit They Failed to Follow the MC PM Protocol. ............................ 5

    IV.  Defendants Failed to Adequately Monitor the Exercise Incentive Provisions of MC PM #6. ................................................................................................................ 6

    V.   Defendants' Attempt to Inflate Compliance Findings by Measuring Prison Complexes Rather than Units is Contrary to the Stipulation. ................................... 8

    VI.  Defendants' Unsupported Allegations and Eleventh Hour Production of New Documents Does Not Establish Compliance with MC PM #8. ................................ 9

CONCLUSION ..................................................................................................................... 11

# TABLE OF AUTHORITIES

**CASES**

*Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) (Breyer, J., dissenting) ............................ 4

*In re Cement and Concrete Antitrust Litig.*, 817 F.2d 1435, 1442-43 (9th Cir. 1987) (*vacated on other grounds*, 940 F.2d 1583 (9th Cir. 1991)) ............................................ 9

*In re Medley*, 134 U.S. 160, 168 (1890) .............................................................................. 4

*Madrid v. Maricopa Cty.*, No. CV-10-2031-PHX-GMS, 2012 WL 1964414, at *1 (D. Ariz. May 31, 2012) ....................................................................................................... 4

*Melczer v. Unum Life Ins. Co. of Am.*, 259 F.R.D. 433, 434–36 (D. Ariz. 2009) .............. 10

*Merch. Transaction Sys., Inc. v. Nelcela, Inc.*, No. CV 02-1954PHXMHM, 2009 WL 2355807, at *10-*12 (D. Ariz. July 28, 2009) ................................................................ 10

*Thompson v. Frank Luna*, No. 09–17421, 2011 WL 2631257 (9th Cir. July 6, 2011) ........ 4

**RULES**

Fed. R. Evid. 403. ............................................................................................................... 10

**INTRODUCTION**

Defendants have admitted to some of the months of non-compliance established in Plaintiffs' brief. *See* Defs.' Br. at 21-33 [Doc. 1983] (hereinafter "Defs.' Br."). In other cases, Defendants' purportedly compliant CGAR findings are still the result of months and months of erroneous findings and an irrevocably flawed monitoring methodology.

Despite the long history of Defendants' intransigence and troubling inability to produce the maximum custody monitoring documents; the multiple interventions required by this Court; and the serious handicap this created for Plaintiffs' ability to monitor the maximum custody performance measures ("MC PM") (*See* Pls.' Br. at 3-4 [Doc. 1944] (hereinafter "Pls.' Br.")), Plaintiffs strictly followed the enforcement provisions set forth in the Stipulation prior to following the instant motion. [Doc. 1185 at ¶¶ 30- 31; Pls.' Br. at 2-4]. Contrary to Defendants' argument (Defs.' Br. at 1), the fact that mediation failed to resolve all issues does not bar this motion. Moreover, Defendants' complaint that Plaintiffs' motion was filed *too early* because the parties agreed to deal with some issues through development of the Monitoring Guide during mediation is irrelevant to the problems identified in the instant motion with Defendants' compliance findings from March 2015 through September 2016. Indeed, under the clear terms of the Stipulation, once mediation is completed the parties may file a motion to enforce. [Doc. 1185 at ¶ 31]. Nothing more is required.[1]

Similarly, Defendants' complaint that Plaintiffs' motion was filed *too late* is unavailing. The Stipulation places no time limit on the filing of motions to enforce. [*Id*. at ¶¶ 30- 31]. In the instant case, Defendants' repeated and long-standing failure to produce the maximum custody monitoring documents made it impossible for Plaintiffs to assess Defendants' CGAR findings accurately and completely for much of the life of the Stipulation. [Pls.' Br. at 3-4]. Contrary to Defendants' argument, Plaintiffs' did not "lie

---

[1] The Court has noted in the past that it does not intend to be involved in the mediation process. Hrg. Tr. (Aug. 26, 2016) at 22:13-17.

-1-

in wait" to bring a motion to enforce.[2] Defs.' Br. at 6. If there has been any prejudice in this matter – it is to the Plaintiffs.

In their brief Defendants repeatedly attempt to excuse their poor monitoring methodology by arguing that either the Stipulation or the Protocol does not specifically require something. Defs.' Br. at 7-8, 11-13. As demonstrated in Sections I, III, IV, and V of this brief, Defendants' argument is based on a flawed understanding of the Stipulation and Exhibit E, the Maximum Custody Outcome Measure Protocol ("the Protocol"). Defendants' argument also misses the larger point that the monitoring documentation needs to be sufficient to show the Plaintiffs and the Court that Defendants have complied with the requirements of the Performance Measures – regardless of whether such documentation was outlined in the original Protocol. If Defendants' documents fail to show compliance, as Plaintiffs have demonstrated, then noncompliance is presumed.

Defendants also repeatedly argue that the development of the Monitoring Guide is sufficient to deal with the maximum custody compliance problems and retroactive application of agreements or Court interpretation is not a basis for noncompliance. *See, e.g.*, Defs.' Br. at 3, 12, 34. But the Court has already ruled that there is such a basis: "if Defendants want to persuade the Court that a given Performance Measure at a given facility is compliant with the Stipulation, then Defendants will have to show that this PM/facility was compliant under the Final Monitoring Guide's procedures." [Doc. 1951 at 1-2]. Plaintiffs' motion [Doc. 1944] should be granted in its entirety.

## ARGUMENT

**I.  Defendants Admit to a Non-Random Monitoring Methodology.**

Defendants do not dispute that they violated the Stipulation by failing to select the weeks to be monitored at random; rather, they blame Plaintiffs for not catching their malfeasance earlier. Defs.' Br. at 5-6. Defendants make this argument despite the fact

---

[2] The Court has previously rejected Defendants' argument that retroactive application of noncompliance encourages Plaintiffs to "lie in wait" and recognized that the Stipulation's dispute resolution process takes time. [Doc. 1951 at 2 n. 1].

-2-

1  that they agreed to the clear terms of the Stipulation requiring "random" selection [Doc.
2  1185-1, Ex. E] and despite the fact that they repeatedly failed to produce the
3  documentation demonstrating their non-random selection of weeks. Because CGAR
4  reports do not include the week selected for monitoring, the only way to ascertain the
5  week monitored is through examination of the out-of-cell tracking sheets for each prisoner
6  at each unit. These are contained in the maximum custody notebooks that Defendants
7  repeatedly failed to produce. *See* Declaration of Amy Fettig, April 6, 2017, at ¶ 2
8  (hereinafter "Fettig Decl. II").

9  Defendants also make the unsupported claim that they were forced into a non-
10 random process because Plaintiffs allegedly agreed that a full week must occur within a
11 month to be eligible for monitoring. Defs.' Br. at 5. Plaintiffs never agreed to such a
12 limiting proposition; counsel's only direct involvement with Defendants' methodology for
13 monitoring prior to the development of the Monitoring Guide was Exhibit E of the
14 Stipulation's Protocol and the out-of-cell tracking sheet. Fettig Decl. II ¶ 3.

15 Defendants also do not dispute that they failed to randomly select the prisoner
16 records to be monitored at Florence-Kasson from March 2015 to August 2016. Defs.' Br.
17 at 6-8. Instead, they claim that the Stipulation's requirement that, "[a]t each designated
18 location, Max Custody Daily Out of Cell Time Tracking Forms are reviewed…for 10
19 randomly selected prisoners," [Doc. 1185-1, Ex. E] does not mean that the records
20 selected need to be for 10 *different* prisoners. Defs.' Br. at 7. This circular argument
21 ignores the fact that if the *same* five prisoners for both the SMI and non-SMI prisoner
22 cohorts are always selected, the methodology is by definition not *random*.[3]

---

[3] A random sample is one in which each member of the population being sampled has an equal probability of being included in the sample. *See* 'Definition of Random Sampling,' THE ECONOMIC TIMES, http://economictimes.indiatimes.com/definition/random-sampling (last visited Apr. 5, 2017).

**II.    Defendants Fail to Address the Overwhelming Refusal Rates or Rebut Expert Testimony.**

In reviewing Defendants' maximum custody monitoring documents Plaintiffs identified shockingly high refusal rates for programs and out-of-cell time across units, months, and populations. Pls.' Br. at 9-10. Defendants' sole response to this extremely troubling pattern has been to argue that human beings in their custody simply prefer to remain in solitary confinement. Defs.' Br. at 8. This argument flies in the face of common sense. Over one hundred years ago, well before the emergence of overwhelming empirical research in this area, the Supreme Court recognized that solitary confinement caused "[a] considerable number of the prisoners [to] f[a]ll, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane." *In re Medley*, 134 U.S. 160, 168 (1890). More recently, Justice Breyer has observed that with the abundance of medical and psychological literature the "dehumanizing effect" of solitary confinement is firmly established. *Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) (Breyer, J., dissenting). Combatting these "dehumanizing" effects by allowing for greater social interaction through group programming and out-of-cell time is a key purpose of the Stipulation and the accompanying MC PM set forth in the Protocol. [Doc. 1185-1; Ex. E].

The pervasive rates of refusal recorded in Defendants' documentation raise serious questions about the implementation of the MC PM and the required protocols. And as the unrebutted expert testimony of Dr. Pablo Stewart explains, these tremendously high prisoner refusal rates constitute a systemic "clinical failure" in need of immediate corrective action. *See* Pls.' Br. at 10-12. Defendants' primary response to these critical findings is to complain that Plaintiffs should have provided more prisoner declarations to support Dr. Stewart's expert testimony. Defs.' Br. at 9. They tellingly do not attempt to rebut Dr. Stewart's testimony or these declarations with any evidence of their own. *Id.* at 8-10. Where expert testimony is unrebutted, it is generally credited. *See, e.g.*, *Thompson v. Frank Luna*, No. 09–17421, 2011 WL 2631257 (9th Cir. July 6, 2011); *Madrid v.*

1  *Maricopa Cty.*, No. CV-10-2031-PHX-GMS, 2012 WL 1964414, at *1 (D. Ariz. May 31,
2  2012).

3       Defendants' failure to deal clinically or operationally with the pervasive problem
4  of refusals is the reason for Plaintiffs' request that the Court order them to hire an outside
5  expert to help address this malfunction.[4]  Pls.' Br. at 38.

6  **III.  Defendants Admit They Failed to Follow the MC PM Protocol.**

7       Several of the systemic problems with Defendants' monitoring methods and
8  documentation for the MC PM are set forth in Sections D through F of Plaintiffs' brief,
9  including failure to document out-of-cell times; a pattern of conflicting out-of-cell times
10 documented in the tracking sheets; and a failure to cross-check source documents as set
11 forth in the Maximum Custody Outcome Measure Protocol.  [Pls.' Br. at 14-25 (Doc.
12 1944)].  Defendants' primary response to the missing data and contradictions in their own
13 records is to claim that the "institutional knowledge" of Wardens is sufficient for
14 monitoring purposes (Defs.' Br. at 11) and that the source documents set forth in the
15 Stipulation's Maximum Custody Outcome Measure Protocol are merely a "potential"
16 source of information (Defs.' Br. at 12).  Both assertions are incorrect.

17      While Plaintiffs do not doubt that Wardens have particular knowledge of the
18 operations of the institutions they are charged with running, as monitors they are also
19 charged with ensuring that compliance with the MC PM is adequately and appropriately
20 documented.  As monitors they are further charged with determining compliance with the
21 MC PM based on the Protocol set forth in the Stipulation – at a minimum. [Doc. 1185-1,
22 Ex. E].  That Protocol clearly sets forth the text of the outcome measure; a brief protocol
23 for evaluating that measure; and the source of records/review for evaluating each measure.
24 *Id*.  For example, for MC PM #2 which requires that all Step II and III prisoners receive at

---

[4] Defendants claim that if there is a pattern of refusals "that is unusual for [an] inmate" then supervisory staff will meet with them.  Defs.' Br. at 10.  Defendants submit no evidence in support of this claim.  Plaintiffs found absolutely no evidence of this practice in any of the maximum custody monitoring documentation.  *See* Declaration of J. Onka, April 6, 2017 at ¶ 2 (hereinafter "Onka Decl. II").

least one hour of out-of-cell group programming a week, the Protocol lists the following documents for review:  max custody month activity schedule; max custody daily out of cell time tracking form; program attendance/sign in sheets. [Doc. 1185-1, Ex. E at 41 of 47].  Contrary to Defendants' assertions, there is nothing in the Protocol to indicate that any of the elements set forth therein are discretionary; rather it sets forth the minimum requirements for monitoring the MC PM.  *Id*. at Ex. E.  The fact that Plaintiffs repeatedly documented Defendants' failure to follow the most basic requirements of the Protocol from March 2015 to September 2016 is a basis for noncompliance.

**IV.    Defendants Failed to Adequately Monitor the Exercise Incentive Provisions of MC PM #6.**

Defendants appear to misunderstand Plaintiffs' argument related to their failure to monitor exercise incentives under MC PM #6.  As Plaintiffs' brief clearly states, Exhibit 36 to the Onka Declaration, "FRE 1006 Summary Exhibit, 'Recreation Enclosures Noted for Refusals in Maximum Custody Documentation – March 2015-September 2016,'" sets forth whether Defendants have documented which recreation enclosure was offered when prisoners *refuse* recreation in each facility for each of the enumerated months.  [Pls.' Br. at 27; Doc. 1947, Ex. 36].  Plaintiffs' non-compliance findings are based *only* on Step II and III prisoners who refused exercise because they are entitled to exercise incentives under DI 326, and a failure to note exercise enclosure indicates a failure to monitor those requirements.  For example, if the records of three or more Step II or III prisoners failed to note enclosures (70%), a unit was marked non-compliant for that month because no monitoring could have been done for those prisoners, but if there were two or fewer, the month was marked compliant on Exhibit 36.  *Id*.; *see also* Onka Decl. ¶¶ 57-58 (Doc. 1947).[5]  Contrary to Defendants' assertions (Defs.' Br. at 13), no Step I prisoner records were part of the compliance calculation in Exhibit 36.  Thus, Exhibit 36 is actually a very

---

[5] In Exhibit 36 there were two instances where non-compliance was checked where Step II and III inmates were not allowed access to larger exercise enclosures but did not refuse recreation.  Onka Decl. ¶ 58.

-6-

1  conservative estimate of Defendants' non-compliance for this measure.

2  Further, the problem identified by the Plaintiffs goes beyond differentiating between the specific incentives Defendants outline from DI 326 in their brief. Defs.' Br. at 15. The real problem with Defendants' compliance findings for MC PM #6 is that there is no evidence that monitoring of the exercise incentives was actually taking place at all – thus providing the detailed information Defendants cite from DI 326 for each prisoner record is not only irrelevant, it is generally impossible because Defendants never undertook this monitoring themselves.[6] Pls.' Br. at 26-27; Onka Decl. II at ¶ 4.

9  Defendants also argue that Plaintiffs should have cross-checked the monthly activity schedule for each month to discern the exercise incentives offered. Defs. Br. at 14. Indeed, the Protocol in Exhibit E to the Stipulation specifically requires a review of the Max Custody Monthly Activity Schedule for MC PM #6. This requirement makes sense because some of the incentives under MC PM #6 require monthly review, and the tracking sheets, for instance, only record weekly activities. [Doc. 1185-1, Ex. E at 43 of 47]. But such cross-checking is impossible for the months and units in question because Defendants' activity schedules fail to indicate exercise enclosures offered; instead most schedules simply indicate a generic "outdoor recreation" being offered. *See* Onka Decl. II at ¶¶ 5-7; Exs. 1-3. Thus, neither Plaintiffs nor Defendants could make the appropriate compliance findings with the available documentation, and Defendants' findings are invalid.

21 Defendants also appear to argue that even if their documentation fails to show compliance, compliance should be presumed. Defs.' Br. at 17-20. This is absurd. Defendants point to a few limited examples in Eyman-Browning, Eyman-SMU I, and Perryville where they argue that compliance can be assumed from the documentation.

---

[6] Similarly, Defendants argue that incentives at Eyman-Browning are only discretionary so their failure to monitor those incentives under DI 326 is irrelevant for compliance monitoring. Defs.' Br. at 14. Regardless of their interpretation of DI 326, however, the Stipulation requires that all of the incentives under MC PM #6 be monitored in all of the enumerated units. [Doc. 1185-1, Ex. E at 43 of 47]. Failure to monitor means that Defendants' compliance findings are inherently flawed and invalid for this measure.

Defs.' Br. at 18-20. But each of these examples fails to address that there is no evidence that exercise incentives were being monitored in any of the compliance documents. Onka Decl. II at ¶¶ 4; 8-9.

### V. Defendants' Attempt to Inflate Compliance Findings by Measuring Prison Complexes Rather than Units is Contrary to the Stipulation.

Defendants advance the argument that even where a unit such as Eyman-Browning or Florence-Kasson is non-compliant, that non-compliance would be subsumed by the findings in the larger complex, such as combining the findings of Eyman-Browning and Eyman-SMU I to determine an overall compliance percentage rather than a unit-based compliance finding. *See* Defs.' Br. at 14, 23. But this argument flies in the face of the subclass definition and the language of the outcome measures.

From the outset, the subclass has always been defined to include prisoners housed at particular housing units (referred to by Defendants as "yards"):[7]

> The subclass is defined as 'All prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in the following housing units: Eyman-SMU I; Eyman-Browning Unit; Florence-Central Unit; Florence-Kasson Unit; or Perryville-Lumley Special Management Area.'

[Doc. 1185 at 1]. Similarly, the construction of the MC PM also incorporates reference to the particular housing units as the unit of measure, for instance, MC PM #6 requires that:

> All maximum custody prisoners at Eyman-Browning, Eyman-SMU I, Florence Central, Florence-Kasson, and Perryville-Lumley Special Management Area (Yard 30), who are eligible for participation in DI 326 are offered out-of-cell time, incentives, programs and property consistent with their Step Level and housing assignment under the DI 326.

[Doc. 1185-1, Ex. E at 43 of 47]. This requirement that monitoring shall be done by housing unit as opposed to prison complex extends to the language in the Stipulation's Protocol instructing the monitor that: "At each designated location, Max Custody Monthly Activity Schedule Calendars are selected…"; " "At each designated location,

---

[7] The terms "unit" and "yard" are synonymous. Hrg. Tr. (Mar. 8, 2017) at 46:8-12.

Max Custody Daily Out of Cell Time Tracking Forms are reviewed…"; etc. [Doc. 1185-1, Ex. E]. The "designated locations" for monitoring here are clearly the enumerated units. Watering down the compliance findings for each unit by aggregating the findings for the complex is not allowed under the clear language of the Stipulation. And the clear language or plain meaning of the text is the starting point for interpreting the Stipulation's meaning and requirements. *See, e.g.*, *In re Cement and Concrete Antitrust Litig.*, 817 F.2d 1435, 1442-43 (9th Cir. 1987) (starting with the plain language of the class definition in reviewing a lower court's interpretation of an existing class definition), *vacated on other grounds*, 940 F.2d 1583 (9th Cir. 1991).

## VI. Defendants' Unsupported Allegations and Eleventh Hour Production of New Documents Does Not Establish Compliance with MC PM #8.

In response to Plaintiffs' detailed analysis of Defendants' compliance findings for MC PM #8 set forth in Exhibit 39 of the Onka Declaration, "FRE 1006 Summary Exhibit 'Max Custody Performance Measure 8 Compliance Review,'" Defendants have admitted that some of their original compliance findings were erroneous. Defs.' Br. at 22. For other measures Defendants dispute Plaintiffs' findings. Attached as Exhibit 4 to the Decl. of J. Onka, dated April 6, 2017 (filed under seal), is an expanded version of the chart Plaintiffs originally provided to the Court in Exhibit 39. This chart contains the original findings with the addition of two columns: a column for "Defendants' Response" with Defendants' assertions from their brief (Defs.' Br. at 21-33); and a column for "Plaintiffs' Reply." Plaintiffs reassert the accuracy of their noncompliance findings for each record in dispute.

Defendants primarily attempt to counter Plaintiffs' findings by relying on the production of new documents never previously produced to Plaintiffs, and never included in the Max Custody Notebooks that contain all of the documents used by the monitors to make their maximum custody CGAR findings. A number of these documents were produced after the filing of the present motion, including Exhibits 19, 22-24, 29-38 and 47. *See* Onka Decl. II ¶ 15. Other documents were only produced on March 23, 2017

1   hours before Defendants' filing and then as documents within exhibits to that filing,
2   including Defendants' Exhibits 4-5, 7-11, 14-17, 26-28, 45-46, and 48. *See* Onka Decl. II
3   ¶¶ 11-13; Ex. 5. This eleventh hour production took place despite Plaintiffs' long and
4   torturous efforts to obtain all of the maximum custody monitoring documentation, *see,*
5   *e.g.*, Pls.' Br. at 3-4, and even though the Court had recently directed the Defendants, yet
6   again to produce missing maximum custody compliance documents and/or verify whether
7   or not such documents exist. [Doc. 1979]. These newly produced documents were also
8   not included in any of the production or declarations produced to Plaintiffs as a result of
9   this Court's February 24, 2017 Order (Doc. 1979). *See* Onka Decl. II ¶ 13. The nature,
10  timing and circumstances of the production of these documents clearly undermine any
11  probative value they might offer and subvert the truth-seeking function of the Court. At
12  the very least, the eleventh hour circumstances of their production and the fact that
13  Defendants have provided no evidence that any monitor ever reviewed these outlier
14  documents[8] in making their compliance findings undermines any relevance these
15  documents have to the compliance findings at issue. As such, they should be excluded.
16  *See Melczer v. Unum Life Ins. Co. of Am.*, 259 F.R.D. 433, 434–36 (D. Ariz. 2009)
17  (excluding untimely disclosed documents from evidence); *Merch. Transaction Sys., Inc. v.*
18  *Nelcela, Inc.*, No. CV 02-1954PHXMHM, 2009 WL 2355807, at *10-*12 (D. Ariz. July
19  28, 2009) (same); *see also* Fed. R. Evid. 403.

20  Defendants' remaining arguments for MC PM #8 compliance are also without
21  foundation. Many rely on unsupported claims and explanations for the findings that are
22  nowhere substantiated in the monitoring documents or supported by declaration. *See, e.g.*,
23  Onka Decl. II Ex. 4 at 13 (Prisoner Record for Eyman-Browning: R.J. (July 2016
24  CGAR)); at 25 (Prisoner Record Eyman-SMU: R.B. (March 2016 CGAR)); at 37
25  (Prisoner record Florence-Kasson: D.P. (March 2016 CGAR)); at 48-49 (Prisoner record

---

[8] Many of these new documents produced by Defendants in their exhibits include eOmis records, AIMS or "Inmate Program Records" which have not been part of the Max Custody Notebook documentation. Onka Decl. II ¶ 14. The latter also do not record a prisoner's specific attendance at a group program session. *Id*.

1  for Lewis-Rast: J.R. (January 2016 CGAR)).  Other arguments simply do not address the
2  myriad contradictions and insufficiencies of the monitoring documentation established by
3  Plaintiffs.  *See, e.g.*, Onka Decl. II Ex. 4 at 11-12 (Prisoner Record for Eyman-Browning:
4  H.M. (August 2016 CGAR)); at 25 (Prisoner Record for Eyman-SMU: R.B. (March 2016
5  CGAR)); at 34-35; 38-39 (Prisoner Record for Florence-Kasson: R.S. (March 2016
6  CGAR) and M.R. (January 2016 CGAR)).  In sum, Defendants argue "trust us" with
7  regard to their missing data, conflicting documentation, and flawed findings.  But the task
8  here is to "trust, but verify."[9]

## CONCLUSION

The Court should find Defendants to be substantially noncompliant with the Performance Measures set forth in Plaintiffs' Motion, and order them to take appropriate remedial measures.  *See* Doc. 1944 at 37-38.

Dated:  April 6, 2017

---

[9] "Trust, but verify" is a Russian proverb that became well known when used by President Ronald Reagan in the context of nuclear disarmament.  *See* WIKIPEDIA, "Trust, but verify," https://en.wikipedia.org/wiki/Trust,_but_verify (last visited Apr. 4, 2017).

| | |
|---|---|
| 1 | **ACLU NATIONAL PRISON PROJECT** |
| 2 | By: s/ Amy Fettig |
|   | David C. Fathi (Wash. 24893)* |
| 3 | Amy Fettig (D.C. 484883)** |
|   | Jamelia Natasha Morgan (N.Y. 5351176)** |
| 4 | 915 15th Street N.W., 7th Floor |
| 5 | Washington, D.C. 20005 |
|   | Telephone: (202) 548-6603 |
| 6 | Email:   dfathi@npp-aclu.org |
|   |              afettig@npp-aclu.org |
| 7 |              jmorgan@aclu.org |

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

**ADDITIONAL COUNSEL:**

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:   dbarr@perkinscoie.com
             agerlicher@perkinscoie.com
             jhgray@perkinscoie.com

Kathleen E. Brody (Bar No. 026331)
Daniel Pochoda (Bar No. 021979)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:   kbrody@acluaz.org
             dpochoda@acluaz.org

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, P.C.**
P. O. Box 91398
Tucson, Arizona 85752
Telephone: (520) 477-1475
Email:   kirstin@eidenbachlaw.com

| | |
|---|---|
| 1 | Donald Specter (Cal. 83925)* |
| | Alison Hardy (Cal. 135966)* |
| 2 | Sara Norman (Cal. 189536)* |
| | Corene Kendrick (Cal. 226642)* |
| 3 | **PRISON LAW OFFICE** |
| | 1917 Fifth Street |
| 4 | Berkeley, California 94710 |
| | Telephone: (510) 280-2621 |
| 5 | Email:   dspecter@prisonlaw.com |
| |             ahardy@prisonlaw.com |
| 6 |             snorman@prisonlaw.com |
| |             ckendrick@prisonlaw.com |
| 7 | |
| | *Admitted *pro hac vice* |
| 8 | |
| | Caroline Mitchell (Cal. 143124)* |
| 9 | Amir Q. Amiri (Cal. 271224)* |
| | **JONES DAY** |
| 10 | 555 California Street, 26th Floor |
| | San Francisco, California 94104 |
| 11 | Telephone: (415) 875-5712 |
| | Email:   cnmitchell@jonesday.com |
| 12 |             aamiri@jonesday.com |
| 13 | *Admitted *pro hac vice* |
| 14 | John Laurens Wilkes (Tex. 24053548)* |
| | **JONES DAY** |
| 15 | 717 Texas Street |
| | Houston, Texas 77002 |
| 16 | Telephone: (832) 239-3939 |
| | Email:   jlwilkes@jonesday.com |
| 17 | |
| | *Admitted *pro hac vice* |
| 18 | |
| | Jennifer K. Messina (N.Y. 4912440)* |
| 19 | **JONES DAY** |
| | 222 East 41 Street |
| 20 | New York, New York 10017 |
| | Telephone: (212) 326-3498 |
| 21 | Email:   jkmessina@jonesday.com |
| 22 | *Admitted *pro hac vice* |
| 23 | *Attorneys for Plaintiffs Shawn Jensen;* |
| | *Stephen Swartz; Sonia Rodriguez; Christina* |
| 24 | *Verduzco; Jackie Thomas; Jeremy Smith;* |
| | *Robert Gamez; Maryanne Chisholm;* |
| 25 | *Desiree Licci; Joseph Hefner; Joshua* |
| | *Polson; and Charlotte Wells, on behalf of* |
| 26 | *themselves and all others similarly situated* |
| 27 | |
| 28 | |

**ARIZONA CENTER FOR DISABILITY LAW**

By: *s/ Maya Abela*
Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email:   skader@azdisabilitylaw.org
         adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)

177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email:
    rdalyrooney@azdisabilitylaw.org
    jrico@azdisabilitylaw.org
    jross@azdisabilitylaw.org
    mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2017, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

          s/ Jennifer Onka