1            **UNITED STATES DISTRICT COURT**

2               **FOR THE DISTRICT OF ARIZONA**

3                   _____

4

**Victor Parsons, et al., on**    )
5  **behalf of themselves and all**  )
   **others similarly situated;**     )
6  **and Arizona Center for**         )
   **Disability Law,**                )
7                                     )    No. **CV 12-00601-PHX-DKD**
              Plaintiff,              )
8                                     )
          vs.                         )    Phoenix, Arizona
9                                     )    April 17, 2017
**Charles Ryan, Director,**           )    8:12 a.m.
10 **Arizona Department of**           )
   **Corrections; and Richard**       )
11 **Pratt, Interim Division**        )
   **Director, Division of Health**   )
12 **Services, Arizona Department**   )
   **of Corrections, in their**      )
13 **Official capacities,**           )
                                      )
14              Defendants.           )
   _____       )
15

16

17   **BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

       **REPORTER'S TRANSCRIPT OF PROCEEDINGS**
18
           **(*Status Hearing - Resumed*)**
19

20

21 Official Court Reporter:
   Laurie A. Adams, RMR, CRR
22 Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc 43
23 Phoenix, Arizona 85003-2151
   (602) 322-7256
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2  **For the Plaintiffs:**
           EIDENBACH LAW PC
3          By:  **Kirstin T. Eidenbach, Esq.**
           P.O. Box 91398
4          Tucson, AZ 85752

5          ACLU - Washington DC
           By:  **David C. Fathi, Estq.**
6          By:  **Amy Fettig, Esq. (Telephonic)**
           915 15th Street NW
7          7th Floor
           Washington, DC 20005

8
           ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
9          By:  **Maya S. Abela, Esq.**
           177 N. Church Avenue
10         Suite 800
           Tucson, AZ 85701

11
           PRISON LAW OFFICE
12         By:  **Donald Specter, Esq. (Telephonic)**
           By:  **Corene Kendrick, Esq.**
13         1917 5th Street
           Berkeley, CA 94710

14
   For the Defendants:
15         STRUCK WIENEKE & LOVE, P.L.C.
           By: **Timothy J. Bojanowski, Esq.**
16         By: **Rachel Love, Esq.**
           By: **Anne M. Orcutt, Esq.**
17         3100 W. Ray Road
           Suite 300
18         Chandler, AZ 85226

19

20

21

22

23

24

25

1                          **I N D E X**

2    **WITNESS:**              **DIRECT**     **CROSS**      **REDIRECT**    **RECROSS**

3    DENNIS DYE
     By Mr. Bojanowski          423
4    By Mr. Fathi                             437
     By Ms. Kendrick                          522
5    By Mr. Bojanowski                                        559
     By Ms. Kendrick                                                         567
6
     ERIN BARLUND
7    By Mr. Bojanowski          570
     By Ms. Kendrick                          582
8
     RICHARD PRATT
9    By Ms. Kendrick                          623

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

─ **April 17, 2017 - Status Hearing Resumed** ─

```
 1              P R O C E E D I N G S

 2          THE MAGISTRATE CLERK:  Civil Case Number 12-601

 3   Parsons, et al. versus Ryan, et al. on for status hearing.

 4          THE COURT:  Good morning.  Would counsel please

 5   announce, please.                                          08:12AM

 6          MR. FATHI:  Good morning, Your Honor.  David Fathi of

 7   the ACLU National Prison Project for the plaintiff class.

 8          THE COURT:  Thank you.  Good morning.

 9          MS. KENDRICK:  Corene Kendrick, Prison Law Office, for

10   the plaintiff class.                                       08:12AM

11          THE COURT:  Thank you.

12          MS. EIDENBACH:  Kirsten Eidenbach for the prisoner

13   plaintiff class.  And behind me is Maya Abela for the

14   plaintiffs.

15          THE COURT:  Thank you.                              08:12AM

16          MR. BOJANOWSKI:  Is there anybody on the phone, Your

17   Honor?

18          THE COURT:  Do we have anybody for plaintiffs on the

19   telephone?

20          MS. FETTIG:  Yes.  This is Amy Fettig from the ACLU   08:13AM

21   for the plaintiff class.

22          MR. SPECTER:  And Donald Specter for the plaintiff

23   class as well.

24          THE COURT:  For defendants.

25          MR. BOJANOWSKI:  Tim Bojanowski on behalf of          08:13AM
```

1    defendants, Your Honor.

2              THE COURT:  Thank you.

3              MS. LOVE:  Rachel Love on behalf of defendants, Your

4    Honor.

5              THE COURT:  Thank you.                              08:13AM

6              MS. ORCUTT:  Anne Orcutt on behalf of defendants, Your

7    Honor.

8              THE COURT:  Thank you very much.

9              Thank you all for coming in, especially for coming in

10   early so that we can make sure we have enough time after the    08:13AM

11   previous delays.

12             Have the parties talked about how they wanted to start

13   things this morning in light of having continuity from the last

14   time we were together?

15             MR. BOJANOWSKI:  Your Honor, it's my understanding      08:13AM

16   that we wanted to continue the evidentiary phase because

17   counsel has to leave early.  So we thought perhaps we would

18   finish that up and then proceed into the status.

19             THE COURT:  All right.  Let's do that then.

20             MR. BOJANOWSKI:  We'll call Dennis Dye, Your Honor.     08:14AM

21             THE COURT:  Would you please step forward to the well

22   of the courtroom, sir, for the administration of the oath.

23             THE MAGISTRATE CLERK:  Can you spell your last name

24   for me, please.

25             THE WITNESS:  D-Y-E.                                   08:14AM

 1          THE MAGISTRATE CLERK:  Please raise your right hand.

 2          (The witness was sworn.)

 3          THE MAGISTRATE CLERK:  Please step to the witness

 4   stand.

 5                      DENNIS DYE,

 6   a witness herein, having been first duly sworn by the clerk to

 7   speak the truth and nothing but the truth, was examined and

 8   testified as follows:

 9                   DIRECT EXAMINATION

10   BY MR. BOJANOWSKI:

11   Q.  Please state your name for the record and spell your last

12   name.

13   A.  My name is Dennis Dye, D-Y-E.

14   Q.  And what is your business address, Mr. Dye?

15   A.  1831 West Jefferson in Phoenix, Arizona.                    08:15AM

16   Q.  Are you employed?

17   A.  Yes, I am.

18   Q.  In what capacity?

19   A.  I'm a mental health auditor for the Department of

20   Corrections.                                                    08:15AM

21   Q.  And how long have you been so employed?

22   A.  I have been in that position a little over three years.

23   Q.  What are your job duties, generally?

24   A.  Well, basically, I get reports that are randomized and then

25   I go through them and check certain CGAR questions to make sure 08:15AM

1  they are compliant.

2  Q.  Could you describe your educational background for the

3  Court.

4  A.  I have got a master's degree in clinical social work, and I

5  have been employed in the corrections field for 18 or so years          08:15AM

6  starting with Department of Corrections and then the Maricopa

7  County Jail.

8  Q.  How long have you been with the Arizona Department of

9  Corrections?

10  A.  Total, I mean I was a field worker for most of the time,          08:16AM

11  but probably around 14 years.

12  Q.  What does a field worker do?

13  A.  I was providing on-site therapy with the inmates out in the

14  complexes.

15  Q.  So for ADC, you have actually had hands-on treatment          08:16AM

16  responsibility for inmates in the field, so to speak?

17  A.  Oh, yeah, for 14 years or so I did that.

18  Q.  At what facilities did you work?

19  A.  I worked mostly at Eyman, some at Florence.  I also worked

20  at a private prison for one year in Florence.  Mostly those          08:16AM

21  two.

22  Q.  You said you also worked at a jail facility.  What was

23  that?

24  A.  I was at Maricopa County Jail for about four years.

25  Q.  What did you do there?          08:17AM

1   A.  I was -- about half that time I was a -- I provided therapy

2   for the inmates and then the other half, I was -- I supervised

3   the Fourth Avenue Jail mental health facility.

4   Q.  And in your capacity as a supervisor at the Fourth Avenue

5   Jail, what did you do?                                          08:17AM

6   A.  I supervised -- there were about 10 master's level

7   therapists at the mental health services, so I provided

8   supervision and training to them.

9   Q.  And as far as your background in working in social work,

10  has that helped you in your analysis with regard to what you do  08:17AM

11  now?

12  A.  Oh, without a doubt.  You know, I think social workers more

13  than most helping professions, we go into it specifically to

14  help like underprivileged, the underrepresented, the underdogs

15  in society.  I think that's what social workers, do which is     08:18AM

16  why I got into this field, why I'm in this job I'm in now, to

17  help ensure that the vendor is providing services that they are

18  obligated to do.  And providing all that care on line,

19  especially at Eyman complex, they can't fool me.  I know how it

20  is to work there, so they can't like bluff me or fool me.  I     08:18AM

21  know what services are needed and what to do.

22  Q.  All right.  So when you talk about what you do now, what

23  exactly is your job title?  Is it as a monitor, ADC monitor, or

24  is it an auditor?

25  A.  Well, I think the official title is Program Evaluation       08:18AM

April 17, 2017 - Status Hearing Resumed - Dye - Direct

1    Specialist.

2    Q.  Okay.

3    A.  That's the official title.  But it comes down to I'm the

4    mental health auditor for half of the state.

5    Q.  And what half of the state do you monitor?                    08:18AM

6    A.  I monitor right now -- it's changed recently -- but Yuma,

7    Tucson, and Perryville.

8    Q.  And so those are the only three facilities that you

9    evaluate?

10   A.  Right now, yes.                                               08:19AM

11   Q.  All right.  Who are the other monitors that evaluate

12   facilities?

13   A.  Right now, there's a fairly new worker, Kenya McRae is in

14   training right now, and Dr. Taylor helps.  During this training

15   process, Dr. Taylor's been auditing also.                        08:19AM

16   Q.  All right.  So what measures do you specifically monitor,

17   the numbers?  Do you know?

18   A.  You know, tell you the truth, I don't -- I know them by

19   names.  I call them like 3As, 3Bs 3Cs, mental health watches,

20   mental health follow-ups, HNRs, telepsych.  I know them by       08:19AM

21   names like that.  I'm not always sure of the exact numbers.

22   Q.  The 3As, the 3Bs the 3Cs, that's a mental health

23   classification.  Is that a fair statement?

24   A.  Right.  The subcode A, B, C specifies how often they are to

25   be seen, basically, by the different specialties.                08:20AM

April 17, 2017 - Status Hearing Resumed - Dye - Direct

1   Q.  All right.  So if there's a monitoring measure for a 3A you

2   know that that inmate needs to be seen a certain number of

3   times, right?

4   A.  Right.

5   Q.  And the same with the 3Bs, 3Cs, 3Ds, 3Es?                    08:20AM

6   A.  Correct.  They all have a little bit of different

7   specifications.

8   Q.  So when you are looking at the monitor guide to make a

9   determination as to what to do, then that coding, so to speak,

10  helps you identify the type of inmate that you are dealing     08:20AM

11  with?

12  A.  Exactly.  Yes.

13  Q.  Okay.  And so generally, how is it that you go about, in

14  fact, monitoring on a hands-on basis?  I mean, what's the first

15  thing that happens?  And you can select any one of the 3A, 3B, 08:20AM

16  3C, whatever you want to do, just in a general sense.  How does

17  it work for you?

18  A.  In a general sense, Ryan Owens runs a randomized report of

19  all the different subcodes A, B, C, and then he gives me that

20  list after they are randomized.                                08:21AM

21  Q.  Let's stop just for a second there.  So where does Ryan

22  Owens get the list of inmates that he randomizes?

23  A.  That comes right off of the ADC AIMS screen.  It's what the

24  database of all the inmates on the system is on a thing called

25  AIMS.  And he prints them off of that, sorts it by mental       08:21AM

1    health code.

2    Q.  So in the AIMS system, you have the name of the inmate plus

3    the code, the A, B, C, D code that you just referenced?

4    A.  Correct.

5    Q.  And so for a 3A measure, does he pull all the 3As                    08:21AM

6    statewide?

7    A.  Yes, he does.

8    Q.  And then what happens?

9    A.  Then he sorts them by complex and then by yard on the

10   complex.  So, for instance, every single MH-3A on Tucson Rincon         08:22AM

11   unit would show up on that report.

12   Q.  All right.  So with the Tucson Rincon Unit, you get a list

13   of names, right?

14   A.  Right.

15   Q.  Is it already randomized when you receive it?                        08:22AM

16   A.  Yes.

17   Q.  How do you know?

18   A.  I know, one, because I know Ryan tells me but there's

19   numbers by it that I can tell has been through an Excel process

20   where they are all randomized.                                          08:22AM

21   Q.  Then what do you do with that list?

22   A.  Then I take the top 10 from each yard on a complex, plug it

23   in, and then I go through the process of checking just the CGAR

24   questions in order:  One, the treatment plan, is it current and

25   was it within times frames of the one previous to that; and was        08:22AM

**April 17, 2017 - Status Hearing Resumed - Dye - Direct**

1    it done face-to-face.  Yeah.

2    Q.  Let me slide you back just a little bit.  You are doing

3    just fine.

4    A.  I thought that was too loud.

5           THE COURT:  It's hard to know.                        08:23AM

6           THE WITNESS:  Is that right?  Oh, yeah.  There's no

7    reverb now.

8    BY MR. BOJANOWSKI:

9    Q.  Our court reporter is losing her eardrum sometimes.

10          So let's back up.  Where are you now?                 08:23AM

11   A.  Okay.  I get the list for the specific yard in the subcode

12   and I go through and just check.  The treatment plan, is it

13   current and was it within time frames of the one before that

14   one?  And then was it done face-to-face.  If appropriate, did

15   the physician, the medical the psychiatric provider review the  08:23AM

16   treatment plan.  And go on with the mental health contact, was

17   it within time frames and then now, and then the one before

18   that.  And then the same with the provider, the prescriber, was

19   it within time frames now and the one before that.

20   Q.  What are you looking at in making that determination?  I    08:23AM

21   mean, are you in a database or what are you doing?

22   A.  I'm looking at the date.  I'm opening up the electronic

23   health record called eOMIS and I'm looking at dates like when

24   was this entered.

25   Q.  Okay.  And then once you make a determination as to a       08:24AM

1  particular date on a particular file, then you either make a

2  finding or no, right?

3  A.  Yeah.

4  Q.  And how do you record that?

5  A.  I record it on the spreadsheet that we use that gets          08:24AM

6  uploaded into the CGAR, Y or an N, yes or no.

7  Q.  Okay.

8  A.  For compliant or not compliant.

9  Q.  So you have an Excel spreadsheet that you prepare as you

10  are doing your analysis?                                        08:24AM

11  A.  Right.

12  Q.  Do you identify each inmate in that spreadsheet?

13  A.  Right.

14  Q.  And their inmate number is also included?

15  A.  Yeah.  The inmate numbers and their names and then I go on   08:24AM

16  with the dates of -- all of those CGAR questions and then I

17  enter the dates and then yes or no.

18  Q.  All right.  And then once you are done with that analysis

19  for, say, the Rincon Unit at Tucson, what do you do when you

20  are done with those files?                                      08:25AM

21  A.  When I'm done with the entire complex of Tucson you mean?

22  Q.  Correct.

23  A.  I keep them until I'm ready to enter them before the end of

24  the month.  They've got to be uploaded into the CGAR system

25  which is where all the reports are generated.  I basically just  08:25AM

1    copy my spreadsheet and paste it onto the CGAR system and

2    upload it that way.

3    Q.  Do you give Corizon an opportunity to review the results

4    before they are actually uploaded into the CGAR system?

5    A.  Well, we normally out brief with them before the end of the        08:25AM

6    month.  After I have completed the audit I will set up a

7    meeting for the mental health staff and the facility health

8    administrator and the director of nursing to meet with me and

9    we'll review the findings before.  Usually that happens.

10   Q.  So as you are reviewing the findings, is part of the             08:26AM

11   process, then, to try and address whatever problems you may see

12   occurring in the field?

13   A.  Absolutely.  It's what we talk about problems and patterns

14   that I'm seeing, and then sometimes we problem solve; well,

15   what could be done to correct this?                                  08:26AM

16   Q.  Do you make recommendations as to potential solutions to

17   problems?

18   A.  Yeah.  Yeah.  I mean, like I say, I have worked in the

19   field for so long, I kind of know how it operates.  Sometimes I

20   can use that experience to make recommendations.                     08:26AM

21   Q.  Okay.  And you have done that in the past?

22   A.  Yes.

23   Q.  Have they implemented those recommendations?

24   A.  Sometimes, yeah.  Yeah.

25   Q.  Okay.  Once that meeting is done, do you then upload the         08:26AM

1  final results?

2  A.  Yes.

3  Q.  And once they are uploaded, is there a process by which

4  they are reviewed again?

5  A.  No.  They have an opportunity to rebut it.  I have never    08:26AM

6  actually got a formal rebuttal thing from them.  But they can

7  review that and sometimes they will call me and ask me a

8  question like why is this a finding, and things like that.

9  Q.  Have you ever made a change in a CGAR finding once it's put

10 in final form, so to speak?                                   08:27AM

11 A.  I mean, rarely, yes.  They will call me and say that record

12 was actually something like it wasn't in the right place.  It

13 was scanned in the paper documents and maybe I missed something

14 like that.  So once in a great while, yes.  It doesn't happen

15 very often, but yeah, if they point out something that I missed  08:27AM

16 then, yeah, I will correct it.

17 Q.  What about as far as meetings internally with the monitors?

18 Are there regular monitor meetings that are conducted within

19 the ADC?

20 A.  Well, we all work within five feet of each other,           08:27AM

21 literally, so all of three of us, we are -- we are constantly

22 in communication about everything.  We talk a lot.  Our formal

23 meetings happen once a month with all the monitors, like from

24 the Department, but within the mental health we meet so often,

25 like we don't have like formal meetings.  We're basically       08:28AM

April 17, 2017 - Status Hearing Resumed - Dye - Direct

1    always in a meeting.

2    Q.  Do you communicate regularly with representatives from

3    Corizon as far as how things are going, methodologies,

4    potential changes, things like that?

5    A.  I do that at the out briefs with each unit.  Dr. Taylor, I          08:28AM

6    think, meets more with them, but I personally meet them during

7    the out briefs and I talk with them.

8    Q.  What about at these monthly meetings that are conducted

9    with all the monitors?  Are there various issues and such that

10   are discussed at those meetings concerning monitoring                   08:28AM

11   methodology or problems or issues, anything like that?

12   A.  Yeah.  Like any office meeting people bring their concerns

13   and gripes in, yeah.

14   Q.  What about training?  How is it that you are trained to be

15   a monitor?                                                              08:29AM

16   A.  Well, most of my training just comes from field experience

17   for so many years.  But I did spend, when I first started, I

18   went with the existing monitor at that time for several weeks

19   and trained under her.  And then herself and Dr. Taylor would

20   review my work for the first month or so to make sure I was            08:29AM

21   doing it correctly.

22   Q.  As far as the methodology is concerned do you rely on the

23   monitor guide?

24   A.  Yes.

25   Q.  As a source?                                                       08:29AM

April 17, 2017 - Status Hearing Resumed - Dye - Direct

1    A.  Yeah.

2    Q.  All right.  And that describes for you the source documents

3    and what you are to look at and how you go about measuring?

4    A.  Yeah, everything we do.  And if I had a question -- I

5    pretty well got it down now, but if I do have questions I go        08:29AM

6    back to the monitor guide to look at that.

7    Q.  What about changes to the guide?  What happens as far as,

8    you know, how is it that changes to the guide are communicated

9    to monitors in the field?

10   A.  Well, I can only speak really of mental health.  I'm not        08:30AM

11   that connected to the medical side.  But changes to the mental

12   health guide, Dr. Taylor and Mr. Pratt would talk about it,

13   revise it or change it.  And I'm usually part -- if they are

14   changing a mental health part Dr. Taylor will usually talk to

15   me and say, does that make sense?  Then when it's done it comes     08:30AM

16   to me for review.

17          MR. BOJANOWSKI:  Your Honor, may I have a moment?

18          THE COURT:  You may.

19          MR. BOJANOWSKI:  Thank you.

20   BY MR. BOJANOWSKI:                                                  08:30AM

21   Q.  Mr. Dye, do you provide any documents to Mr. Owens as far

22   as gathering raw data for his use in randomization?

23   A.  Yes.  Everything but the ABCs things like suicide watch

24   logs, HNR log, Corizon sends them to me.  Their logs get sent

25   to me.  I look them over for kind of a quality assurance check.     08:32AM

April 17, 2017 - Status Hearing Resumed - Dye - Direct

```
1   I just check to make sure they are complete, are there any

2   gaps, things like that.  Once I have assured that it's a

3   complete report and looks accurate then I give it to Ryan Owens

4   then he will randomize it and then send it back to the

5   appropriate people.                                         08:32AM

6   Q.  Now, these logs you are talking about are they a

7   handwritten log or is it a --

8   A.  It's a typed Excel spreadsheet log, like I said, of the

9   HNRs and the suicide watches.

10  Q.  You said something about making sure that they are        08:32AM

11  complete.

12  A.  Right.

13  Q.  How do you know if one is complete or not?  I mean, have

14  you ever run across a time when it hasn't been?

15  A.  Well, I mean, it happens occasionally.  I will check --    08:32AM

16  because I see them so much, I can tell like okay, one yard has

17  been reporting 60 HNRs for two years and now there's only four,

18  that would tell me this is not accurate.

19       Sometimes the dates stop like halfway through the

20  month.  I say well, they quit entering them halfway through the  08:33AM

21  month so I send it back and go, you need to complete this

22  first.  Things like that.  It doesn't happen very often but it

23  has happened.

24  Q.  So why is it that you would want to make sure that you have

25  a complete log?                                              08:33AM
```

UNITED STATES DISTRICT COURT

1  A.  I want to make sure we get an accurate account, an accurate

2  randomized account that I can use to evaluate the vendor, like

3  are they doing -- I need enough of a sample size and an

4  accurate one.  I absolutely have to have an accurate log before

5  I can go forward with anything.                                08:33AM

6  Q.  So that's part of your job duty is to assure that that raw

7  data that's coming in is complete, it's accurate, and fits

8  within what you, in your experience, have seen in the field?

9  A.  Yeah.  I mean, without an accurate log, it's nothing.  So

10 yeah, that's a big part of the job to make sure they are        08:34AM

11 accurate.

12 Q.  And like you said, you have flagged in the past on occasion

13 something that has arisen and was that log then corrected or

14 completed, or what happened?

15 A.  Yes.  Yes.  I send it back to the mental health lead and    08:34AM

16 say this is incorrect, please complete it.  And they do.  They

17 look into it and get it completed.  It's usually some tech

18 along the line forgot to put stuff in.  But it gets completed

19 and sent back, yes.

20 Q.  All right.                                                  08:34AM

21        MR. BOJANOWSKI:  Your Honor, I have nothing further.

22        THE COURT:  Thank you very much.

23        Who on the plaintiffs' side?

24        MR. FATHI:  That would be me, Your Honor.

25        THE COURT:  Thank you, Mr. Fathi.                       08:34AM

1                    CROSS-EXAMINATION

2    BY MR. FATHI:

3    Q.  Good morning, Mr. Dye.

4    A.  Good morning.

5    Q.  I have just handed you a couple of documents.  One is          08:35AM

6    simply a list of the mental health performance measures.  You

7    said you tend to know them by name and this has the numbers so

8    that we can all be clear that we're --

9    A.  Perfect.

10   Q.  Talking about the same thing.                                   08:35AM

11   A.  Thank you.

12   Q.  And the second is the February 24th, 2017 edition of the

13   monitor guide.  Have you seen that document before?

14   A.  Yes.

15   Q.  And have you read the portions of that document that            08:35AM

16   pertain to the mental health performance measures?

17   A.  Yes.

18   Q.  And I think you said that when you monitor you are guided

19   by the instructions in this manual?

20   A.  Yes.                                                            08:36AM

21   Q.  Do you deviate from those instructions in any way?

22   A.  Not to my knowledge I don't, no.

23   Q.  Okay.  Mr. Dye, I have handed you now the December 2016

24   mental health CGAR reports from Yuma, Eyman, and Perryville.

25   Do you have all three of those?                                    08:37AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1    A.  Yes, I do.

2    Q.  And I know you said that you -- the institutions you

3    monitor have changed recently.  But it appears that in December

4    of 2016, with the exception of Number 99, you entered results

5    for all of the mental health performance measures at those                08:37AM

6    three institutions.  Is that right?

7    A.  I'm guessing just by this, yes.  I see -- yeah.  My name is

8    on them, so I must have, yeah.

9    Q.  Okay.  Now I'm going to go through these CGARs and just ask

10   you some questions about how you monitor.  Okay?                          08:37AM

11   A.  Okay.

12   Q.  Let's start with Number 74, which requires that all female

13   prisoners shall be seen by a licensed mental health clinician

14   within five working days of return from a hospital post-partum.

15   A.  Okay.                                                                 08:37AM

16   Q.  I think you testified that, well, first of all, what is the

17   universe of records from which the sample for Number 74 is

18   drawn?

19   A.  There's a -- ADC does a hospital admission log that's on a

20   shared drive, and I pull that for Perryville and then go                  08:38AM

21   through all of them to see if any are related to birth.

22   Q.  Okay.  So the source document is all ADC hospital transfers

23   from Perryville?

24   A.  All hospital transfers to the hospital, yes, admission to

25   the hospital.                                                            08:38AM

1    Q.  And then you are the one who selects all the ones that seem

2    birth related.  Is that correct?

3    A.  Right.  Right.

4    Q.  Okay.  If there are more than 10 records in a given month

5    that qualify, are they randomized?                              08:38AM

6    A.  Yes, if there are more than 10.

7    Q.  Who does that randomization?

8    A.  If that's -- if that has been done, I can't recall a time

9    it's been over 10, but if it had been done I would have done

10   that.                                                           08:39AM

11   Q.  And how do you do randomization?

12   A.  How do I what?

13   Q.  How would you do that randomization?

14   A.  I would use the Excel randomize function.

15   Q.  Have you used that function before?                         08:39AM

16   A.  Many times, yeah.

17   Q.  Now, if in a given month there are fewer than 10 records

18   reviewed for Performance Measure 74, does that mean that there

19   were just fewer than 10 that qualified so you reviewed all of

20   them?                                                           08:39AM

21   A.  Yes.

22   Q.  Now, does the list that you generate include only cases of

23   live birth or does it also include cases where the patient went

24   to the hospital but the fetus died?

25   A.  That would be included, yes.  Any post-partum would be      08:39AM

1   included.

2   Q.   Okay.  Mr. Dye, I'm showing you records pertaining to a

3   female prisoner at Perryville whose ADC number ends in 394.

4   And the first document in the packet is a letter from Family

5   Practice Associates Medical Group.  And it says in the first          08:40AM

6   paragraph that this patient was evaluated in our Phoenix office

7   on January 6th, 2017 for second trimester termination of

8   pregnancy complicated by intrauterine fetal demise.

9        Do you see that?

10  A.   Yes.                                                             08:40AM

11  Q.   And it further says in the third paragraph that she

12  underwent a D and E, or dilation and evacuation, on the same

13  day.  Do you see that?

14  A.   Right.  Yes.

15  Q.   And in the second document, the last page in the packet is       08:41AM

16  a note from eOMIS showing that this patient returned to the

17  Perryville facility on April 6th -- or January 6th, 2017.  Do

18  you see that?

19  A.   Yes, I do.

20  Q.   So I'd like you to look at the Perryville CGARs for --           08:41AM

21  excuse me, you don't have January.

22        All right.  Mr. Dye, I have just handed you the

23  Perryville CGARs for January of 2017, including Number 74.  And

24  it lists the six records you have reviewed for Number 74 in

25  January 17th.  Do you see that?                                       08:42AM

1   A.  Yes.

2   Q.  And it appears that this patient's record was not reviewed

3   for Number 74 in January.  Is that correct?

4   A.  Give me a second here.  I'm looking for her ADC number.  I

5   forgot it.                                                          08:42AM

6   Q.  Take your time.

7   A.  No, I do not see that.

8   Q.  Why was her record not included in the sample for Number

9   74?

10  A.  Well, without the source document I wouldn't know how.  I    08:42AM

11  mean, was it on the source document when I got it?  I don't

12  know.  I couldn't say without looking at the source document

13  why it's not on there.

14  Q.  Okay.

15  A.  I can say that would be I mean, it could be an error, but    08:43AM

16  that would be very rare.  That wouldn't happen that much.

17  Q.  But you can't explain why her record was not among those

18  reviewed in January?

19  A.  Not exactly, no.  But that wouldn't happen much.

20          THE COURT:  How do you know?                              08:43AM

21          THE WITNESS:  I guess I --

22          THE COURT:  If you don't know about this one, how do

23  you know?  What kind of quality control do you have?

24          THE WITNESS:  Well, other than the source document I

25  have never ever heard before that this person wasn't on the       08:43AM

1   list for over three years I have never heard of one person that

2   didn't get captured.  I guess that's how I would know.  But as

3   long as it's on the source document, it would be on the report.

4   So I guess one could have missed getting entered on the source

5   document.  I just have never seen any reason to believe that        08:43AM

6   would be a pattern of that happening, though.

7           THE COURT:  Again, how do you know?  You receive these

8   documents from Corizon, the party that you are supposed to be

9   monitoring for compliance, as you said, to see whether or not

10  they are providing the service of the contractor to provide.      08:44AM

11          THE WITNESS:  Right.

12          THE COURT:  If the supervised party is providing you

13  the documents and they are the ones who are being monitored and

14  are also the ones who are subject to possible ramifications for

15  failure to provide that service, then it would raise a question   08:44AM

16  about whether or not there was some problem with relying upon

17  that entity providing you the source documents.

18          Do you see what I'm saying?

19          THE WITNESS:  Yes, sir, I do.  I can only say when I

20  use the source document and then when I'm auditing other things   08:44AM

21  at Perryville, I audit a lot of records, I have never once came

22  across a woman, oh, she gave birth but was not on the log.

23  Because as I open a lots of Perryville documents, as I monitor

24  other items, I have never noticed one that gave birth that did

25  not end up on the log.  So I mean, we're as good as the logs we   08:45AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1   get.

2   BY MR. FATHI:

3   Q.  Let's move on to Performance Measure 75 which requires that

4   a mental health assessment of a prisoner during initial intake

5   shall be completed by mental health staff by the end of the          08:45AM

6   second full day after the prisoner's arrival into ADC.

7        And I'd like you to look, Mr. Dye, at the December

8   2016 Perryville CGAR for this item.  It's page ADCM 835785.

9   A.  I'm sorry.  You are talking about the monitor?

10  Q.  No.  I'm talking about the CGAR report, the Perryville CGAR  08:45AM

11  report.

12  A.  Oh.  All right.

13  Q.  Should be right there on the first page.

14  A.  Okay.

15  Q.  Do you have it?                                                08:46AM

16  A.  Yes.

17  Q.  And it looks like you reviewed a sample of 10 records for

18  Number 75, correct?

19  A.  Correct.

20  Q.  How was that sample created?                                   08:46AM

21  A.  That's by an arrival log that -- Department of Corrections

22  enters everyone that comes into Perryville, enters that on a

23  log.  It's done on the operations side.  And then I get that

24  list and randomize it to get the first 10.

25  Q.  And you randomize it, again, using the Excel program?         08:46AM

1    A.  Actually, Ryan Owens randomizes that, but yeah.

2    Q.  Okay.  And does that source document from which this list

3    is created include parole violators as well as new admissions?

4    A.  At Perryville, yes.  Yes, it does.

5    Q.  Okay.  And has that always been the case since you have          08:46AM

6    been monitoring?

7    A.  I believe so going back three years.  I mean, I can't say

8    for sure three years ago.  I mean, I believe so.  Three years

9    ago I'm not sure.

10   Q.  So you don't remember a time when that source document did      08:47AM

11   not include parole violators?

12   A.  Correct.

13   Q.  Okay.  Let's move to Number 77 which requires that a mental

14   health treatment plan shall be updated a minimum of every 90

15   days for MH-3A, MH-4 and MH-5 prisoners and a minimum of every     08:47AM

16   12 months for all other MH-3 prisoners.

17   A.  Right.

18   Q.  And on the same page from the Perryville December 2016,

19   CGAR are your findings for Number 77 for Perryville.  Do you

20   see that?                                                          08:47AM

21   A.  Yes.

22   Q.  And looks like you reviewed a sample of 240 records.  Is

23   that correct?

24   A.  If that's what the number says.

25   Q.  Well --                                                        08:48AM

UNITED STATES DISTRICT COURT

1   A.  That sounds about right.

2   Q.  I'm not asking you to count them, I just see in a column on

3   the right-hand side of the page number reviewed, and it says

4   240.

5   A.  Right.  Okay.  Yes.                                    08:48AM

6   Q.  Okay.  How is that sample of 240 records created?

7   A.  Okay.  That comes from, like I said, Ryan Owens gives a

8   spreadsheet of all the subcodes 3As, Bs, Cs on each yard.  So

9   there would be 10 -- up to 10 on each yard which would all the

10  yards on Perryville would come up to roughly that number of    08:48AM

11  240.

12  Q.  And how do you know that?

13  A.  How do I know what?

14  Q.  How do you know that that's how the sample is generated?

15  A.  I see the AIMS list that comes to me and I see the numbers  08:48AM

16  on it.  I mean, he gives me a copy right directly from AIMS.

17  Q.  But you have described a process by which cases are drawn

18  from this larger source document to generate the sample.

19  A.  Right.

20  Q.  I'm asking how you know that is, in fact, the process that  08:49AM

21  is followed?

22  A.  Well, let me think.  I get -- all I can say is I get an

23  AIMS report that is I can see on the report there's like

24  hundreds, I mean hundreds.  There's many more than 240.

25  There's a thousand or so names on it.  So that's a pretty good  08:49AM

1   conclusion that's everybody within the system is on that AIMS

2   report.  And that wouldn't be hard to check.  You can run an

3   AIMS report the same day and check, is everybody on there?

4   Well, yeah.

5   Q.  Again, you have described a process by which a sample of          08:49AM

6   240 is generated from that larger number, correct?

7   A.  Right.

8   Q.  And my question is, how do you know that that is, in fact,

9   the process that's followed?

10  A.  I guess I'm not understanding the question.  Which part of    08:50AM

11  the process?

12  Q.  Are you at all personally involved in selecting these 240

13  records that you ultimately review?

14  A.  No.

15  Q.  Okay.                                                          08:50AM

16  A.  Those are selected by Ryan Owens when I get them.

17  Q.  Okay.  Can you just go through one example of your findings

18  here and just explain what it means.  Why don't we start

19  with -- let's start with the first one.

20  A.  Okay.  Let me see.  Let's get the --                           08:50AM

21  Q.  Actually, do you have highlighting on your document?

22  A.  Yes, I do.

23  Q.  Let's start with the first highlighted one the person whose

24  number ends in 120.  Do you see that?

25  A.  Yes.                                                           08:50AM

1    Q.  All right.

2    A.  It would start 269120 is the inmate number.

3    Q.  Excuse me, Mr. Dye.  We're trying not to use complete

4    numbers just because those do identify the patient.  So if you

5    could just use the last three numbers.                        08:51AM

6    A.  Okay.

7    Q.  The ADC number.

8    A.  All right.

9    Q.  Thank you.  Please go ahead.

10   A.  120 is the inmate number.                                 08:51AM

11   Q.  Uh-huh.

12   A.  The next date of 12-9-16 is the day that they became

13   whatever subcode they are.  This is a 3A.  So that would be on

14   12-9 they were designated as a 3A.

15   Q.  Uh-huh.                                                    08:51AM

16   A.  And then the next date would be -- what is this measure

17   for?  Treatment plans.  Oh.  When was the treatment plan done,

18   on 12-9, and is that compliant.  So it was done on 21-9, and

19   that is compliant.

20   Q.  Okay.  Now, the monitor guide requires you to look at the  08:51AM

21   two most recent treatment plans and measure the interval

22   between them, correct?

23   A.  Correct.

24   Q.  Now --

25   A.  Which we now do.                                           08:52AM

1   Q.  Now, it looks like at Perryville in December out of the 240

2   records you reviewed, you found 234 compliant.  Is that right?

3   A.  Right.

4   Q.  And for each and every one of those 234 that you found

5   compliant, did you look at the last two treatment plans and          08:52AM

6   measure the interval between them?

7   A.  In December, I believe, we were looking at the ones if the

8   treatment plan was done in December was that one incompliant,

9   was that one compliant from the one before that if it was done

10  in December.  That's the way we did it then.  Now, on every          08:52AM

11  single one of them, we list both dates.

12  Q.  Okay.  Let me just -- let's focus on December for the

13  moment.

14  A.  Okay.

15  Q.  So your testimony is that for every single one of these 234      08:52AM

16  cases that you found compliant, you looked in the file, you

17  found the two most recent treatment plans and you measured the

18  interval between them, correct?

19  A.  Only the ones that were done in December I would look at

20  the one before that is the way we did it in December.               08:53AM

21  Q.  Okay.  So let's look at the next highlighted case then.

22  The number ends in 710, and the two dates are 11-23-16,

23  11-23-16.  Do you see that?

24  A.  Yes.

25  Q.  So in that case, did you look at the two most recent            08:53AM

 1   treatment plans and measure the interval between them?

 2   A.  Yes.  Oh.  No.  I'm sorry.  November, no.

 3   Q.  So let me say this back to you to see if I understand it.

 4        In December of 2016, if the most recent treatment plan

 5   was any month other than December, you did not look at the last        08:53AM

 6   two treatment plans.  Is that correct?

 7   A.  Right.  In December we audited to get a snapshot of, on

 8   this day when I'm auditing, taking a picture of, is it

 9   compliant as we're sitting here now.  We don't do that anymore

10   but that's how we did it at that time, yes.        08:54AM

11   Q.  I just want to make sure the record is clear.  So your

12   testimony is that in December of 2016, so for this record we're

13   looking at now, if the most treatment -- most recent treatment

14   plan was any month other than December, you did not look at the

15   most recent two treatment plans?        08:54AM

16   A.  That would be correct, yeah.

17   Q.  Okay.  But if the most recent treatment plan was in

18   December, then you did look at the two most recent?

19   A.  Right.

20   Q.  All right.  Let's go back to the first highlighted record,        08:54AM

21   the one ending in 120.

22        How would you decide if this record was compliant?

23   A.  I would look to see if there was one -- this is a 3A, if

24   there was one three months before that.  October, November,

25   December, October, what would it be, September.  Yeah.        08:55AM

UNITED STATES DISTRICT COURT

1   Q.  And if there was, you would mark it as compliant?

2   A.  If there was one within three months before that, yes.

3   Q.  And if there wasn't, how would you mark this file?

4   A.  As a no, not compliant.

5   Q.  You would do that even though the person just became 3A on      08:55AM

6   December 9th?

7   A.  Yeah.  That -- oh.  Let me go back to the second -- oh, no.

8   That was a change to our auditing at that time.  We started to

9   put a start date to indicate when did they become this specific

10  subcode.  We have changed this a couple times.  But if it -- if   08:55AM

11  the treatment plan was before they became that subcode we would

12  not look at that.

13  Q.  Okay.

14  A.  So if it was -- if he became a 3A on 12-9 and it wouldn't

15  matter what the treatment plan was before that because he was    08:56AM

16  not a 3A.  So that wouldn't come into play.

17  Q.  So let me ask you again, then, how did you decide whether

18  this file was compliant?

19  A.  This particular one would be compliant just by the fact

20  that it's December and he became a 3A in December and had a      08:56AM

21  treatment plan in December.  So that would make it compliant.

22  Q.  So again, for cases where the most recent treatment plan

23  was in December, you didn't look at the last two treatment

24  plans.  Correct?

25  A.  Depending on when they became a 3A.  If they had become a    08:56AM

UNITED STATES DISTRICT COURT

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1    3A in October, and the recent treatment plan was in December I

2    would have looked, yes.

3    Q.   Now, staying with this file, let's say he had become a 3A

4    on 12-9-16 and there was no treatment plan.  How would you

5    score that file?                                                    08:56AM

6    A.   If he became one at 12-9 he would have until March 9 to

7    have a treatment plan because the way the question reads is was

8    it updated within 90 days.  So he would have until March 9.

9    Q.   So if I understand your testimony, this record cannot

10   possibly be found non-compliant.  Correct?                          08:57AM

11   A.   If it -- well, if there was no treatment plan, yeah.  If he

12   was in December that would be a compliant -- that would always

13   be compliant.

14   Q.   Okay.  And even if there was no treatment plan, you would

15   not find it non-compliant, correct?                                 08:57AM

16   A.   That's correct.

17   Q.   So this record could not possibly be found non-compliant?

18   A.   Not at this month, but as we went to the other way, audited

19   the following month, I would have picked that -- if that got

20   pulled I would have picked that up on the January or February      08:57AM

21   audit when we were checking the ones after.

22   Q.   Okay.  But I'm just asking about December.

23   A.   Right.

24   Q.   And the way you audited in December, this record could not

25   possibly be found non-compliant.  Correct?                          08:58AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1   A.  That could be correct for December.

2   Q.  Okay.  Let's go back down to the next highlighted case, the

3   one ending in 710, with the dates 11-23-16 and 11-23-16.  How

4   would you determine if this record was compliant or not?

5   A.  He became a 3A at 11-23, so if there was a treatment plan          08:58AM

6   between 11-23 and 2-23 that would be compliant.

7   Q.  So as I understand you, this record, too, could not

8   possibly be found non-compliant in December 2016, correct?

9   A.  Not if it's within the first 90 days of the designation of

10  3A it could not be non-compliant.                                      08:58AM

11  Q.  So you could find this record compliant or you could find

12  it not applicable, but you could not possibly find this record

13  non-compliant in December 2016, correct?

14  A.  In the way we audited at that time, yes.  But we would have

15  picked it up on a later audit.                                         08:59AM

16  Q.  I'm sorry?

17  A.  We would have caught it on a later audit.  The way we audit

18  now, if that's pulled, it would be caught.

19  Q.  Let me ask you about that.  Is -- my understanding is that

20  every month a new sample is drawn for each performance measure,        08:59AM

21  is that correct?

22  A.  Right.

23  Q.  So the fact that a record was pulled for the sample in

24  December doesn't mean it's going to be pulled for the sample in

25  January.                                                               08:59AM

1  A.  It's totally random.  Right.

2        THE COURT:  So your previous statement that you would

3  have caught it later --

4        THE WITNESS:  I thought I said it.  I meant to say if

5  pulled, yes.                                                    08:59AM

6        THE COURT:  All right.

7        THE WITNESS:  If it was pulled, yeah.

8        THE COURT:  Thank you.

9  BY MR. FATHI:

10 Q.  So based on your testimony I gather that there were a      09:00AM

11 number of records in Performance Measure 77 at Perryville for

12 December of 2016 that you found compliant even though you

13 looked at only one treatment plan.  Is that correct?

14 A.  Right.  Again, at that time we were taking a snapshot of

15 today so it's since changed.                                   09:00AM

16 Q.  All right.  But the way you did it in December, how long

17 going back had you been doing it that way?

18 A.  Using the month of -- the auditing month went back to most

19 of the time I have been here, when I started we used an

20 auditing month.  Because that helped us a lot to tell, are     09:00AM

21 things changing in the present, because things could have

22 improved since, like some of the measures like the treatment

23 plan could be a year old on the Bs and corrected but it

24 wouldn't show.  So we thought at that time it would help us

25 give a snapshot how is it going today and are things improving 09:01AM

1    today.

2    Q.  And we have been talking about Number 77 in the context of

3    Perryville, but I just want to confirm that in December of 2016

4    you used the same methodology that we have been discussing for

5    Performance Number 77 at all institutions you monitored,                09:01AM

6    correct?

7    A.  Right.

8    Q.  And now you said you have changed the way you did number

9    77.  Correct?

10   A.  Right.                                                                09:01AM

11   Q.  And when did that change happen?

12   A.  I can't remember.  It probably would have been January.

13   Q.  And so it would show up in the January 2017 CGARs?

14   A.  Yes, I believe.

15   Q.  And describe the change to the Court.                                09:01AM

16   A.  Well, then we started entering both treatment, all dates on

17   the treatment plan, the mental health contact, the psychiatry

18   contact we would enter the dates of the last two contacts and

19   then determine whether there was the appropriate amount of time

20   between them.                                                            09:02AM

21   Q.  So is it your testimony that starting in January, a file

22   could not be found compliant unless you looked at two treatment

23   plans and found them within the proper time limit?

24   A.  I can't be certain it was January.  I'd have to see the

25   CGAR.                                                                    09:02AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1   Q.  Well, if I look at the January 2017 CGAR, should I find any

2   cases where you found it compliant based on one single

3   treatment plan?

4   A.  I'm sorry.  Could you say that again?

5   Q.  In 2016, at the December 2016, we've been talking about          09:02AM

6   some cases where you found compliance even though there was

7   only one treatment plan in the file, correct?

8   A.  Right.  Right.

9   Q.  Should I be able to find that in the January 2017 CGARs?

10  A.  I can't be certain when we started entering that was          09:03AM

11  January or February.  I can't be sure.

12  Q.  Should I be able to find that in the February 2017 CGARs?

13  A.  I'm pretty sure in February it would be listed, yes.

14  Q.  I'm sorry.  I just want to make sure the answer is clear.

15  So if I look at the February 2017 CGARs, which we do not yet          09:03AM

16  have, I should not find any cases in which you found compliance

17  even though there was only a single treatment plan in the file.

18  A.  I can say that in February, both treatment plans would have

19  been entered.  If there were more than one both of them would

20  have been entered in CGAR in February.  And if they are 3As          09:03AM

21  there could not have been more than 90 days between them or

22  they would have been found non-compliant.

23  Q.  Let me ask you a different question.  Let's go back to

24  example 120, with the two dates 12-9-16, 12-9-16.

25  A.  Okay.  Let me see.          09:04AM

1   Q.  On the first page of the Perryville December 2016, first

2   highlighted item.

3   A.  I know.  I moved these papers around.  Okay.  Which one

4   now?

5   Q.  The number ending in 120 and the two dates after it are          09:04AM

6   12-9-16.  Do you see that?

7   A.  Yes.

8   Q.  Now, you testified that that file audited in December could

9   not possibly be found non-compliant.  Correct?

10  A.  Right, If that's the way we audited at that time yes.           09:04AM

11  Q.  So when I look at February should I find files that could

12  not possibly be found non-compliant?

13  A.  If -- I'm trying to think.  Well, the same thing would hold

14  if the person became a 3A in that month, in February, if they

15  became that 3A in February, then they wouldn't be non-compliant   09:05AM

16  for this system.  The way we used to, we would have checked

17  back before that system but now we don't.

18  Q.  So you are saying that the February 2017 sample may also

19  include files that cannot possibly be found non-compliant?

20  A.  Well, yeah, if they are just designated a 3A there would be    09:05AM

21  no reason to look back before that to see if a treatment plan

22  was done.  We go by when they were made a 3A, have they been

23  compliant since then.

24  Q.  Let's move on to Number 78, which requires that all mental

25  health treatments plan updates shall be done after a             09:05AM

1   face-to-face clinical encounter between the prisoner and mental

2   health provider or mental health clinician.  I'd like you to

3   turn to Page 835788, which is the December 2016 Perryville

4   findings.  Do you see that?

5   A.  Is there page numbers on here?                                       09:06AM

6   Q.  In the lower right-hand corner.

7   A.  What's the number again?

8   Q.  835788.

9   A.  All right.

10  Q.  And my understanding is that you -- the sample for Number     09:06AM

11  78 is the same files as for Number 77, correct?

12  A.  Yes.

13  Q.  I noticed that you looked at 240 files for Number 77 and

14  243 files for Number 78.  How is that possible?

15  A.  Some of these would -- these are only -- they would only       09:06AM

16  have reviewed the face-to-face.  Let me see.  Let me read the

17  question.  Well, if a treatment plan was not due at that time

18  there was a treatment plan and it was not due, so they came in,

19  they became an MH-3 within the last three months and I reviewed

20  that record it would be -- if they don't have a treatment plan    09:07AM

21  yet that would be N/A.  So there wouldn't be -- that would not

22  count in the total.  It would be N/A if they did not yet have a

23  treatment plan within the first three months.

24  Q.  So the N/As don't count in the total number of files you

25  reviewed?                                                          09:07AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1   A.  It wouldn't count either way, no.

2   Q.  But when I see that you reviewed 240 files that does not

3   include the N/As?

4   A.  It would not show up as a number reviewed.

5   Q.  And is that your testimony for all treatment for all          09:08AM

6   performance measures, a file that is found to be N/A is not

7   counted in the number of files reviewed?

8   A.  Let me see.  I'm not sure.  Let me read that.

9   Q.  I'm not trying to hide the ball.  I just don't understand

10  how you come up with a larger number of files reviewed for       09:08AM

11  Number 78 than for Number 77 when you are supposed to review

12  the same files for both.

13  A.  Last treatment plan. . . I mean, offhand, I would have to

14  say I would have to look at it more thoroughly.  But I can say,

15  yeah, if there was not a treatment plan done at that time, if    09:09AM

16  there was not a treatment plan due it would not be counted.

17  Q.  But if there was not a treatment plan due then how could

18  you find for purposes of Number 78 that the treatment plan was

19  completed after a face-to-face clinical encounter?

20  A.  The only ones listed here would be the ones that I did       09:09AM

21  review.  I'm just looking at one, it says N/A zero.

22  Q.  Well, I don't want to take too much time on this, Mr. Dye.

23  Is it fair to say you don't know why those two numbers are

24  different?

25  A.  Well, like I said, it would be, offhand, it would be if      09:09AM

1    like I'm looking at 1, treatment plan 11, the start date

2    11-5-16, there was not a treatment plan done because they still

3    had two more months to do it.  So that would not have been

4    included.

5    Q.  But it would have been included in Number 78?                    09:10AM

6    A.  Yes.

7    Q.  Okay.  Did the sample size for Number 78 change at some

8    point?

9    A.  Did the sample size change for 78?

10   Q.  Yes.                                                             09:10AM

11   A.  When we started auditing differently, when we started

12   including all treatment plans, the last two treatment plans and

13   all of them would have counted at that time.

14   Q.  Okay.  So when did the sample size for Number 78 change?

15   A.  That, I'm not exactly sure.  Somewhere around January.  I'm     09:10AM

16   not sure when exactly we started changing that.

17   Q.  January of this year?

18   A.  I believe it was sometime around then, although I'm looking

19   at -- okay.

20   Q.  All right.  Let's move on to Number 80.  Performance            09:10AM

21   Measure 80 requires that MH-3A prisoners shall be seen a

22   minimum of every 30 days by a mental health clinician.  And I'd

23   like you to turn to the Yuma December 2016 CGAR, look at Page

24   835963, if you would.

25   A.  For 80?                                                         09:11AM

1    Q.  For Performance Measure 80, Page 835963.

2    A.  Okay.

3    Q.  Now, you reviewed 50 records for Performance Measure Number

4    80 at Yuma in 2016.  How were those records chosen?

5    A.  Well, again, I would have been provided a copy of the AIMS          09:11AM

6    randomized report and I would have selected the first 10 in

7    each unit on Yuma.

8    Q.  And you received that AIMS randomized report from Mr.

9    Owens?

10   A.  Correct.                                                           09:12AM

11   Q.  And how do you know it's randomized?

12   A.  I can see by the randomized number, I can see he put it

13   through the Excel process randomization.  That's off to the

14   left of all the numbers.

15   Q.  So the fact that there's numbers in the left-hand column          09:12AM

16   that tells you it's been randomized?

17   A.  Yeah, pretty much.

18   Q.  Is that conclusive proof that it's been randomized?

19   A.  Pretty much.

20   Q.  So you couldn't have numbers on the page unless it had been       09:12AM

21   randomized.  Is that your testimony?

22   A.  There would be no reason.  Ryan doesn't know anybody,

23   doesn't know these people.  There would be no reason whatsoever

24   he would not randomize that.

25   Q.  All right.  Staying with Yuma Performance Measure 80, can         09:12AM

1  you explain, as did you with the previous measure, what each of

2  these entries means?

3  A.  Okay.  The first number would be the inmate number.  The

4  second number would be the date of the last mental health

5  contact, and -- the first date would be the start dates that          09:13AM

6  they became a 3A, and the second date would be the date of the

7  last mental health contact.

8  Q.  Okay.

9  A.  And then Y or N.

10  Q.  So you found 49 out of 50 of these records compliant,           09:13AM

11  correct?

12  A.  Right.

13  Q.  And same question as with Number 77.  For each and every

14  one of those records you found compliant, did you look at the

15  two most recent clinician contacts and ascertain that they were     09:13AM

16  no more than 30 days apart?

17  A.  If?  Yes.  If it was -- for the ones that are 30 days, let

18  me go back.

19       Everything that is a 30-day contact I would always

20  look at the one before that, yes.                                   09:14AM

21  Q.  Okay.  So your testimony is for each and every one of these

22  49 records you found compliant, you found two contacts in the

23  file and you measured the interval between them, correct?

24  A.  All of them that were -- for all of them except the ones

25  that became 3As in December I would have checked the one before     09:14AM

1    that, yes.

2    Q.  So there were some files that you found compliant even

3    though you didn't check two contacts, correct?

4    A.  The ones that became 3As in December, yeah, there would be

5    no reason to check the one before that because they weren't 3As    09:14AM

6    at that time.

7    Q.  No reason except the fact that the monitor guide requires

8    it?

9    A.  I would have to look at that.  I'm not sure that it says

10   that.  Because we're going by the dates that they became 3As.    09:14AM

11   Because then if we went back before we would be measuring them

12   as a 3B or a 3C or whatever they were.  If they were not 3As we

13   wouldn't be measuring a 3A compliance.

14   Q.  Will you turn to Page 109 of the monitor guide, please?

15           MR. BOJANOWSKI:  Which version are you looking at?    09:15AM

16           MR. FATHI:  This is the 2-24-17.

17           MR. BOJANOWSKI:  Well, the -- all right.

18   BY MR. FATHI:

19   Q.  And you see the fourth bullet toward the bottom of the

20   page?    09:15AM

21   A.  Fourth bullet?

22   Q.  Yes.

23   A.  Yes.

24   Q.  And this page pertains to Performance Measure 80, correct?

25   A.  Yes.    09:15AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1   Q.  Would you read the first sentence of that fourth bullet?

2   A.  The last two contacts by clinician will be reviewed to

3   determine whether the contacts were no more than 30 days apart.

4   Q.  Okay.  Thank you.

5   A.  But going back to the performance measure, it's mental          09:16AM

6   health 3A, prisoner shall be seen every 30 days.  So we're

7   measuring a 3A.  If they were not a 3A at the time before, then

8   we're not measuring a 3A we're only measuring the time they

9   were not a 3A.  Was there 30 days when there they were a 3A and

10  that's what we measure.  When they were a 3B or 3C or whatever,    09:16AM

11  we would have measured that under 3C.

12  Q.  Would you look at the first highlighted case under Number

13  80, last three digits 916.

14  A.  Yes.

15  Q.  I'm sorry.  Please look at the second highlighted case,        09:16AM

16  last three digits 336.

17  A.  Okay.

18  Q.  And the two dates after it are 12-20-16 and 12-20-16.  Do

19  you see that?

20  A.  Yes.                                                            09:17AM

21  Q.  Could you tell us what those dates mean?

22  A.  That would mean they became a 3A on 12-20-16 and they had

23  their contact on 12-20-16.

24  Q.  So this record also cannot possibly be found non-compliant,

25  correct?                                                            09:17AM

_April 17, 2017 - Status Hearing Resumed - Dye - Cross_

1   A.  If it was done in December, yeah, then we are only

2   measuring also when they were 3As, correct.  It would go --

3   they would have until March.  They would have until 1-20 to be

4   seen.

5   Q.  So this record, it could be compliant or it could be N/A     09:17AM

6   but it could not possibly be non-compliant, correct?

7   A.  Yes.  That's true.

8   Q.  Okay.

9   A.  But again, we're only measuring 3As.

10  Q.  Okay.  Would you please turn to the Eyman December 2016      09:17AM

11  CGAR.  And you can find Performance Measure 80 on Page 835648.

12          Are you there?

13  A.  Yes, sir.  I'm right there.

14  Q.  Okay.  Would you please look at the case, the highlighted

15  case where the number ends in 968?                               09:18AM

16  A.  Uh-huh.

17  Q.  The dates 3-19-14 and 12-28-16, do you see that?

18  A.  Yes.

19  Q.  What do those numbers mean?

20  A.  The first number would have been the inmate number and then  09:18AM

21  when they became a 3A on 3-19-14 and then when their last

22  contact was.

23  Q.  So this person was seen by a mental health clinician on

24  12-28-16?

25  A.  Right.  And this one I would have looked back to make sure    09:19AM

1  they were seen within 30 days.  Because they were a 3A during

2  that whole time.

3  Q.  Okay.  Mr. Dye, showing you -- this is a screen shot from

4  eOMIS which is the medical record, correct?

5  A.  Right.                                                    09:19AM

6  Q.  And this is the medical record for this prisoner we have

7  been discussing whose number ends in 968, correct?

8  A.  Right.

9  Q.  And you found that he was seen by a clinician in a way that

10  complied with Measure 80 on December 28th, correct?          09:20AM

11  A.  Correct.

12  Q.  I'm having trouble finding where this patient was seen by a

13  clinician on December 28th.  Could you help me find that?

14  A.  He was seen by clinician Stephen Stein in group counseling.

15  Q.  So you count group counseling as satisfying Performance    09:20AM

16  Measure 80?

17  A.  We did at that time, yes.

18  Q.  In auditing for December of 2016, you were still counting

19  group contacts as satisfying Performance Measure 80?

20  A.  I believe so.  I can't remember the exact date that changed  09:20AM

21  but it was around that time we were still counting groups, yes.

22  Q.  Okay.  Thank you.

23  A.  Which, for the SMU population in max custody, that was kind

24  of a requirement that we offered group counseling for them.

25  Q.  But it was not a requirement that you count groups as       09:20AM

1   satisfying Performance Measure 80, was it?

2   A.   That's -- we had always included groups in that when we

3   audited at that time, yes.

4   Q.   And you were still doing that as of December of 2016?

5   A.   I can't be sure that -- one, I can't be sure when that          09:21AM

6   actually happened, and two, I can't be 100 percent sure without

7   having eOMIS here in front of me that there wasn't a contact in

8   the scanned documents at that time either that would not show

9   up on here.  But I don't know exactly when we changed to not

10  allowing -- not considering groups.                                  09:21AM

11  Q.   But just to be clear on this one record at least you

12  counted group session as satisfying the requirements of Number

13  80?

14  A.   Yes.

15  Q.   Let's move on to Performance Measure 81 which requires that      09:21AM

16  MH-3A prisoners who are prescribed psychotropic medications

17  should be seen a minimum of every 90 days by a mental health

18  provider.

19  A.   Okay.

20  Q.   How are the records selected for this performance measure?       09:22AM

21  A.   Again, Ryan Owens does a randomized list of 3Bs and sorts

22  them by complex and yard.  I get the top 10 from each yard and

23  put it on the spreadsheet.

24  Q.   I'm sorry, we're talking about Performance Measure 81,

25  which pertains to 3As.                                               09:22AM

```
 1   A.  Oh, 81.  I thought you said 82.  That would be the same

 2   thing like 3As.  He would give a list of the 3As and I would

 3   take the top 10 from each yard.

 4   Q.  Does he generate a separate random sample for Number 81, or

 5   do you use the same records that you do for 80?                    09:22AM

 6   A.  That would be the same one, yeah.

 7   Q.  Okay.  Would you please look at Yuma, Page 835964.

 8   A.  Yuma.  You said 835964?

 9   Q.  Yes.

10   A.  Okay.                                                          09:23AM

11   Q.  Are you there?

12   A.  Yep.

13   Q.  All right.  These are your December findings for

14   Performance Measure 81 at Yuma.  Can you walk us through and

15   explain what each entry means?                                     09:23AM

16   A.  Every 90 days by a mental health provider.  Okay.  So the

17   first number would be the inmate number.  The second number

18   would be the start date.  And then a third number would be date

19   of last contact by the mental health provider and then a yes or

20   a no as compliant.                                                 09:23AM

21   Q.  Okay.  Would you look at the first highlighted record

22   number ending in Number 916?

23   A.  Yes.

24   Q.  What do those two dates after the number mean?

25   A.  It means he became a 3A on 12-4-16 and he had his contact     09:24AM
```

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1    with the provider on 12-14-16.

2    Q.  And you found this record to be compliant, correct?

3    A.  Yes.

4    Q.  And this record could not possibly be found non-compliant,

5    correct?                                                    09:24AM

6    A.  Well, again, if he was only a 3A starting in December, I

7    mean, that's -- I don't know how many times to say it.  We are

8    measuring from December when he's a 3A, so yeah.

9    Q.  So this record could not possibly be found non-compliant?

10   A.  No.  He just became a 3A.  No.                          09:24AM

11   Q.  And, in fact, any record where the patient has been a 3A

12   for less than 90 days, cannot possibly be found non-compliant,

13   correct?

14   A.  Yes.  The way we now audit, that's true.

15   Q.  I'm trying to think about how to move things along, and    09:25AM

16   would it be the case, Mr. Dye, that for all of the performance

17   measures that require something to happen every so many days,

18   as of December 2016, your samples were still including records

19   that could not possibly be found to be non-compliant?

20   A.  Well, again, the way we audited then, which was a change,   09:25AM

21   we used to always look back to the one before that when it was

22   done in the auditing month.  Now, with this change, we're only

23   auditing whatever their subcode is.  So yeah, if they get

24   randomly pulled into the section and they just became a 3A then

25   of course they couldn't be found non-compliant.  That's the    09:26AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1   nature of randomization.

2           THE COURT:  Same argument could be made about what you

3   told us with respect to the inmates who were delivering babies.

4   You looked through the -- you have a randomization of all of

5   the inmates, you exclude the ones who did not go off site to         09:26AM

6   deliver a baby.  Here, what Mr. Fathi is saying, why wouldn't

7   you exclude the ones who could not possibly be found

8   non-compliant because they are within that time interval, same

9   sort of argument.  Is that essentially what you are saying?

10          MR. FATHI:  Exactly, Your Honor.                              09:26AM

11          THE COURT:  Do you get that?

12          THE WITNESS:  I get it, sir.  But if we're going to

13   pull a random file, we have -- then we would be selecting ones

14   out.  If we're going to pull a random file we're going to take

15   the first 10 that come up.  For whatever reason they come up,        09:27AM

16   we use them.

17          THE COURT:  Well, you don't use the ones who are males

18   who come up because they can't possibly be post-partum or the

19   ones who are females who were not taken off site because they

20   didn't deliver babies.  You exclude those because they cannot       09:27AM

21   possibly be useful in evaluating that performance measure.

22   These people who are that month become subject to this criteria

23   cannot possibly be useful for evaluating that performance

24   measure because they cannot possibly be found not compliant.

25          THE WITNESS:  Yeah.  That's true.  I mean, I don't           09:27AM

1    know what led to the change.  I mean, I know that before we

2    used to look at the ones previous to that and something

3    changed.  And I'm not always aware of what goes on in court.

4    But now we look from the date they became their subcode now.

5    BY MR. FATHI:                                                    09:27AM

6    Q.  Okay.  Well, again, Mr. Dye, we can go through all of them

7    but I'm trying to move things along.  So I'd like to know if it

8    is the case for every mental health performance measure that

9    requires something to happen every X days.  As of December of

10   2016, your samples were including cases that could not possibly  09:28AM

11   be found non-compliant?

12   A.  Yeah.  That's true.

13   Q.  And as I understand your testimony, even under the new

14   methodology that was adopted in January or February for all of

15   these performance measures, your samples may still include      09:28AM

16   cases that could not possibly be found non-compliant because

17   the person only recently became a 3A or 3B or whatever?

18   A.  Right.  Now, that's true.  And I understand that that was

19   the direction of the Court that we audit this way.

20   Q.  You understand it was the direction of the Court that you    09:28AM

21   include cases that could not possibly be found non-compliant?

22   A.  That we use the start dates when they became whatever

23   subcode they are now.

24   Q.  And where did that understanding come from?

25   A.  It's just hearing talk in the office.  I don't have -- I'm   09:29AM

 1   not in court a lot.  But. . .

 2   Q.  Were you provided with the Court's orders?

 3   A.  No.  Those usually don't come directly to me.

 4           MR. FATHI:  I'm sorry, Your Honor.  Just one moment if

 5   we could.                                                          09:29AM

 6           THE COURT:  Why don't we take our 10-minute break at

 7   this point, Mr. Fathi.  We'll be back in 10 minutes.  Thank

 8   you, sir.  We'll be back in 10 minutes.

 9           (Recess from 9:30 a.m. until 9:46 a.m.)

10           THE COURT:  Again, we're a little bit longer.  We have    09:46AM

11   a technical problem with associated with cleaning the

12   microphones.  Apparently, we didn't clean them too well.

13           Mr. Fathi.

14           MR. FATHI:  Thank you, Your Honor.

15   BY MR. FATHI:                                                      09:46AM

16   Q.  Mr. Dye, did you speak with anyone during the break?

17   A.  Yes.

18   Q.  Whom did you speak with?

19   A.  I talked with our lawyer, Tim.

20   Q.  Was anyone else present besides you and Tim?                  09:46AM

21   A.  Dr. Taylor was there.

22   Q.  Was anyone else present?

23   A.  Not that I remember.

24   Q.  Was Dr. Calcote there?

25   A.  Not that I remember.                                          09:46AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1    Q.  And about how long did that conversation last?

2    A.  About two minutes.

3    Q.  That's all, two minutes?

4    A.  That I was part of them, yeah.

5    Q.  Okay.                                                    09:46AM

6    A.  We were talking about my suit.

7    Q.  Mr. Dye, looks like you completed these -- or at least you

8    input these December 2016 CGAR results in January 31st of this

9    year.  Is that right?

10   A.  Yes.                                                     09:47AM

11   Q.  And at that time, were you aware of the Court's order

12   regarding accounting of groups to satisfy the requirement that

13   a patient be seen?

14   A.  I can't recall the actual date.  If I was entering groups

15   regularly on here then I wasn't aware of it.  If that's one in   09:47AM

16   the whole thing, maybe I made that mistake.  I don't know when

17   exactly that happened.

18        MR. FATHI:  Your Honor, I would note for the record

19   that the Court's order on not counting groups issued on

20   December 8, 2016.  It's Docket Number 1745.                   09:47AM

21   BY MR. FATHI:

22   Q.  Mr. Dye, I want to make sure I heard you correctly.  Going

23   back to Performance Measure 77 involving treatment plans, did

24   you say that the sample is composed of patients whose treatment

25   plans were completed in the monitored month?                  09:48AM

1    A.  The sample size would have been everyone that had -- I'm

2    trying to see.  I enter these things all the time, but I don't

3    always review them like this, in this form.  What is the sample

4    size.  Yeah.  So the sample size would have been roughly, for a

5    77, the treatment plans for the 10 on each unit.                    09:48AM

6    Q.  I'm sorry.  I'm not asking about the number.  I'm asking

7    does the sample consist of patients whose treatment plan was

8    updated in the audited month?

9    A.  No the sample size would have included all treatment plans

10   that I came across.                                                 09:49AM

11   Q.  So I assume you agree it would be a problem if the sample

12   were just limited to those who had treatment plans completed in

13   the audit month, correct?

14   A.  Well, not necessarily, because a lot of those are intakes.

15   They came in in December, they were seen in December, they were  09:49AM

16   given meds in December.  That would show more that they are

17   doing what they are supposed to be doing.  They only came in in

18   December.

19   Q.  So your testimony is it would be permissible to limit the

20   samples for Number 77 just to patients whose treatment plans       09:49AM

21   were updated in December of 2016?

22          MR. BOJANOWSKI:  We'll object, Your Honor.  His

23   opinion as to what constitutes the sample is not relevant.  I

24   mean, the sample is identified in the guide and is provided to

25   him.  He doesn't have discretion.                                   09:49AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1      THE COURT:  Would you restate the question again?

2      MR. FATHI:  Sure.  Of course, Your Honor.  And I do

3  think we have seen today what's written in the monitor guide

4  and what's actually done are not always exactly the same thing.

5      I'm asking if, in your view, it would be permissible          09:50AM

6  to have a sample for Number 77 that just included patients

7  whose treatment plans were updated in the audited month.

8      THE COURT:  The objection is overruled.

9      THE WITNESS:  If that came up at a random sample then

10  that's what it would be, yes, because like I said, a lot of      09:50AM

11  them are intakes that are showing they came in were seen

12  promptly.  I don't think that should be left out when they are

13  doing what they are supposed to be doing at 3A in need of

14  counseling and medication, were seen promptly and put on the

15  list.  I don't think excluding that would be the right thing.    09:50AM

16  BY MR. FATHI:

17  Q.  Let's move on to Performance Measure 85 which requires that

18  MH-3D prisoners shall be seen by a mental health provider

19  within 30 days of discontinuing medication.

20      Please turn to the Yuma December CGAR Page 835966.          09:51AM

21  A.  Okay.

22  Q.  So these are your results for Measure 85 at Yuma for

23  December 2016, correct?

24  A.  Correct.

25  Q.  And you reviewed 32 records for Performance Measure 85?      09:51AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1    A.  Yes.

2    Q.  Okay.  Please walk us through from the very start to the

3    very finish how those 32 records were selected.

4    A.  Okay.  Those 32 records, there's -- we get a list from

5    Corizon that's taken from the AIMS list all MH-3Ds that are in          09:51AM

6    the state.  We select from there all of them that they were due

7    for the follow-up in the month I'm auditing or they are overdue

8    in the follow-up I'm auditing.  So in December, everyone that

9    would have gone off in November we would be reviewing for

10   December except -- I could be wrong.  On that one month I think        09:52AM

11   maybe it was a little bit differently.  But generally we would

12   have included all the ones that are due or overdue on that

13   month for up to 10.  Most sites do not have 10.  So then --

14   well, that's up to 10 for that question is all we would do.

15   Q.  So you said you get the list from Corizon, correct?               09:52AM

16   A.  Right.

17   Q.  And how do you verify that that list is complete and

18   accurate?

19   A.  Well, for the first few months when we started doing this I

20   ran an AIMS report myself to compare it against the one that          09:53AM

21   was being sent to me and they were all the same.  So I knew for

22   the first few months they were running the right report.

23   Because I would run an AIMS report, they would send me one, I

24   would match them up, and there were no differences.

25   Q.  But in December of 2016, what steps did you take to verify        09:53AM

1    that the report you got from Corizon was both complete and

2    accurate?

3    A.  Exactly that.  I ran my own AIMS report and used it against

4    the once that was sent to me.

5    Q.  Your testimony is you do that every single month?          09:53AM

6    A.  No.  I did it for the first three months, I think.

7    Q.  Right.  And my last question was December of 2016?

8    A.  Yes.  In December of 2016 I ran my own AIMS report to check

9    for accuracy to make sure it was correct.

10   Q.  Did you do that in November 2016?                           09:53AM

11   A.  I can't remember exactly.  I think so, but I can't remember

12   the exact months I did that.

13   Q.  Do you do it every month at every institution?

14   A.  Did I what now?

15   Q.  Do you check the accuracy of the Corizon list in the way    09:54AM

16   described every month at every institution?

17   A.  No.  I was only checking 3Ds at that time because the 3D

18   process of auditing was changing like rapidly.  So I wanted to

19   make sure that the first three months we were doing it this new

20   way that I checked to make sure that they were doing it the     09:54AM

21   correct way.

22   Q.  So as I understand your testimony, the sample isn't a

23   random sample of all MH-3Ds, correct?

24   A.  If there's over 10 we use a randomization.  If there's more

25   than 10 that had meds due for their follow-up that month we     09:54AM

1    would randomize it.  If it was less than 10 there would be no

2    need to randomize it.

3    Q.  I'm sorry.  My question is, it's not a random sample of all

4    MH-3Ds in the unit, correct?

5    A.  For this question, Number --                                    09:55AM

6    Q.  85.

7    A.  -- 85?  Is it random?  Well, again, if it's more than 10

8    it's random.

9    Q.  I'm sorry.  I don't think I'm communicating.

10          I thought you testified that you exclude certain          09:55AM

11   MH-3Ds, people who have had their 30-day follow-up in previous

12   months.  Isn't that correct?

13   A.  That is correct, yeah.

14   Q.  So the sample is not a random sample of all MH-3Ds.  You

15   exclude certain cases because you think they are not            09:55AM

16   informative, correct?

17   A.  Right.  And my understanding is we didn't always do it that

18   way.  My understanding is that's what you and the Court wanted.

19   We had to use the ones that were due this auditing month,

20   either due or overdue this auditing month.  It's not the way we  09:55AM

21   always did it.

22   Q.  Who randomizes the list for Performance Measure 85?

23   A.  The list is randomized by a Corizon employee.

24   Q.  And how do they perform that randomization?

25   A.  It would be -- no, wait.  I'm sorry.  I'm getting -- we've   09:56AM

1   changed it several times.  The Corizon employee sends that to

2   Ryan Owens.  Ryan Owens then randomizes it.

3   Q.  What steps does Mr. Owens take to make sure the list he

4   receives from Corizon is complete and accurate?

5   A.  I do a quality check and let him know if I think there's          09:56AM

6   any mistakes or gaps as I look through it.

7   Q.  Okay.  So the list first comes to Corizon, comes from

8   Corizon to you and then goes to Mr. Owens?

9   A.  The one for 3D goes right to Mr. Owens.

10  Q.  From Corizon?                                                    09:56AM

11  A.  Yeah.

12  Q.  So my question is, what steps does Mr. Owens take to make

13  sure the list that he receives from Corizon is complete and

14  accurate?

15  A.  Well, he relies on it being accurate from Corizon.  And 3Ds      09:57AM

16  I do check.  I do check -- I do a quality check on that just

17  like I do the other logs to make sure there's no glaring

18  patterns that are being omitted.

19  Q.  If the list had 30 names on it and it should have had 32,

20  how would you know that?                                             09:57AM

21  A.  Well, the -- like I said, the first few months when I was

22  checking it against my own AIMS report I would have noticed

23  that.  But because I saw no pattern of that as we were changing

24  it, then I don't do it anymore.  I could.

25  Q.  Right.  And my question is, now that you don't do it             09:57AM

1    anymore, if the list has 30 names on it and it should have had

2    32 or 33, how would you know that?

3    A.  I guess I wouldn't, but there would be no reason to leave

4    names off of it.

5    Q.  All right.  Let's get back to Page 966, the Yuma results          09:57AM

6    for MH-3D.

7    A.  Okay.

8    Q.  So you reviewed 32 cases, correct?

9    A.  Yes.

10   Q.  And it looks like every single one of the 32 cases that you       09:58AM

11   reviewed was somebody who discontinued meds in November.  Is

12   that correct?  And feel free to take a look.

13   A.  Yes.  Yeah.  It looks like all of those were the ones that

14   had meds received in November, which is what it should have

15   been.                                                               09:58AM

16   Q.  So is that, the fact that every single one of those 32

17   cases was someone who discontinued meds in November, was that

18   coincidental or was that by design?

19   A.  No.  We wanted, again, I understood it as direction from

20   the Court.  We wanted pull the ones due in the auditing month,       09:59AM

21   as we sit here in December, who is due or overdue right now.

22   That was the direction we got.

23   Q.  But this list doesn't have anybody who is overdue, correct?

24   A.  Right.  Not that I can tell at first glance.

25   Q.  Well, assuming that everyone on this list discontinued in        09:59AM

1    November, there's nobody on this list who discontinued in, say,

2    September and still hasn't been seen, correct?

3    A.   Correct.

4    Q.   Are those cases excluded from the sample?

5    A.   No.  If they are due in the month I'm auditing, if they are          09:59AM

6    still overdue then I use them.  But they are put in the sample.

7    Q.   So why are there no such cases in this month's sample?

8    A.   One of two reasons.  One, there's none that actually apply.

9    Everyone had already been followed up is my guess.  The other

10   one is I think there was one month, I don't know if it was          10:00AM

11   December, that if they were done in November and seen in

12   November, then we wouldn't have used that one because it was

13   already compliant.  I think we did that one month.  I don't

14   know if it was on this month or not.  But if they were seen in

15   the same month that they had them discontinued for one of the          10:00AM

16   months we did not include that it would have been included in

17   the previous month.  It would have been caught either way.

18   Q.   Why would it have been caught either way?

19   A.   Because in November, if it had been pulled in November, and

20   most of them would have been because most of them have a sample          10:00AM

21   under 10, we would have seen that it was followed up in

22   November appropriately.

23   Q.   But just to be clear, your testimony is that a separate

24   random sample is drawn every month, correct?

25   A.   Right.          10:00AM

1   Q.  Okay.  Could you please walk us through what your results

2   mean for Performance Measure 85?  Just pick the first one

3   ending in 071, if you would.

4   A.  Okay.  Start date, 11-2-16, that would have been the date

5   the meds were discontinued.                                          10:01AM

6   Q.  Excuse me.  Before you go on, is that the date the meds

7   were discontinued, or is that the date the person was

8   classified as a 3D?

9   A.  They are the same thing.  As soon as they go off of meds

10  they are called a 3D.  So start date and med DC date would be       10:01AM

11  the same.

12  Q.  So your testimony is it never happens that someone is taken

13  off meds on a Monday and because, you know, the record person

14  is out sick doesn't get reclassified 3D until Tuesday.  That

15  never happens?                                                      10:01AM

16  A.  I don't know if that happens because I automatically

17  consider the date they came off meds as their start date of 3D.

18  I mean, whether it technically goes through the process in AIMS

19  I'm not sure.  But they are a 3D as soon as they come off meds.

20  Q.  So your testimony is the first date here, that's the date       10:02AM

21  they came off meds, correct?

22  A.  Correct.

23  Q.  Okay.  Please go on.

24  A.  And then the second number is whether they are compliant or

25  not.  The Y or the N, are they compliant.  They came off on         10:02AM

1    11-2-16 and was that within 30 days -- were they seen within 30

2    days.

3    Q.  So if I want to know the date of the contact that you are

4    counting as compliant, how can I tell that from this document?

5    A.  You would not from this document.                           10:02AM

6    Q.  Okay.

7    A.  But that could be very easily checked.

8    Q.  Let's move on to Measure 86, which requires that MH-3D

9    prisoners shall be seen a minimum of every 90 days by a mental

10   health clinician for a minimum of six months after             10:02AM

11   discontinuing medication.  And let's go to Eyman, Page 835651.

12           Let me know when you are there.

13   A.  Measure 86, right?

14   Q.  Correct.

15   A.  Okay.  I'm there.                                           10:03AM

16   Q.  All right.  You reviewed 43 records for Measure 86 this

17   month, correct?

18   A.  Right.

19   Q.  And you found all 43 to be compliant?

20   A.  Right.                                                      10:03AM

21   Q.  Walk us through, again, from start to finish, how those 43

22   records were selected.

23   A.  Okay.  The first ones would have been the ones used for 85

24   that everyone used for 85 we would use for 86.  If there were

25   less than 10 on some units, which is most of the units, then we  10:03AM

1  fill it in with a random pull for people that meds had

2  already been followed up or were due a follow-up the following

3  month all other ones.

4  Q.  Let me drill down into that random pull that you do to get

5  additional records if there aren't enough from Number 85.                    10:04AM

6        First of all, what is the universe from which that

7  random pull is drawn?

8  A.  That, again, comes from Ryan Owens.  He randomizes it,

9  gives us a list from that yard.  Then I select the ones for 85

10  from that randomized list first, and then if there are less     10:04AM

11  than 10 I fill it in with the next ones on the randomized list.

12  Q.  I want to be really clear here.  You start with the ones

13  that you have used for Number 85?

14  A.  Correct.

15  Q.  If there's enough then that's just what you use for Number    10:04AM

16  86?

17  A.  Correct.

18  Q.  If there aren't enough, then you draw -- or someone draws

19  some additional MH-3s for Number 86, correct?

20  A.  Right.                                                        10:05AM

21  Q.  And you said it's Ryan Owens who does that?

22  A.  Right.

23  Q.  First of all, what is the universe from which he draws

24  those additional records?

25  A.  Like I said, the entire 3D list is sent from Corizon, all     10:05AM

1    3D lists is sent and separated by complex and yard.  So like

2    again, Eyman, every 3D on SMU would be on that list.

3    Q.  And Mr. Owens draws a random sample from that list of every

4    MH-3D on the yard?

5    A.  Yes.                                                          10:05AM

6    Q.  And are any records excluded based on when the person

7    discontinued meds?

8    A.  The only ones excluded -- everyone that has meds due in

9    this month that were DC'd the previous month, those would all

10   be included up to 10.  If there's less than 10, then we just    10:06AM

11   take however many it takes to fill in the 10, three, four,

12   five.

13   Q.  I'd like to rather than -- you told us what's included?

14   A.  Right.

15   Q.  He starts with a random sample of all MH-3Ds at the unit,    10:06AM

16   right?

17   A.  Right.

18   Q.  My question is:  Are any records from that random sample

19   thrown out, not used, for Number 86?

20   A.  Not to my knowledge, no.                                     10:06AM

21   Q.  So the additional records that are drawn for Number 86 are

22   a random sample for all MH-3Ds for a given unit?

23   A.  Yeah.

24   Q.  Okay.  Okay.  Let's look at your findings from Eyman.

25   Would you look at the first highlighted entry, ADC number ends   10:07AM

1   in 428, and walk us through that.

2   A.  The meds would have been DC'd 11-17-16, and it was

3   non-applicable for this month in December, which tells me that

4   that was the one month that we included.  He would have been

5   followed up in November, later in November he would have had     10:07AM

6   his follow-up.  And in that single month we did not include

7   that one in the December.  We would have included that in the

8   one before.

9   Q.  How do you know he was seen in November?

10  A.  I would have to have eOMIS up and my spreadsheet in front    10:07AM

11  of me, but I am almost 100 percent certain that because of the

12  date I was auditing in December and he had his meds DC'd in

13  November that is almost 100 percent sure he was followed up in

14  November.  I would have to pull up.

15  Q.  Performance Measure 85 is they have to be seen by a mental   10:08AM

16  health provider within 30 days, correct?

17  A.  Yes.

18  Q.  Performance Measure 86 is they have to be seen by a mental

19  health clinician.

20  A.  I'm sorry.  I'm looking back on 85 again.                    10:08AM

21  Q.  All right.  So getting back to Mr. 428.

22  A.  Okay.  I'm sorry.  Mr. 428 had his meds DC'd on 11-17 and

23  he has not yet been followed up by mental health.

24  Q.  But you, rather than a no, you count that as an N/A because

25  it hasn't been 90 days, correct?                                 10:08AM

**April 17, 2017 - Status Hearing Resumed - Dye - Cross**

1   A.  Right.  And because we have to use that because it's in 85.

2   Q.  So this record also cannot possibly be non-compliant for

3   Number 86?

4   A.  I mean, that's true, but I don't know why we ever changed

5   that to only include the ones that are due the auditing month.        10:08AM

6   Because, yeah, that made that -- most of them would not be able

7   to find non-compliant.

8   Q.  Right.  So you start, for Number 86 you start with the

9   records you pulled for Number 85?

10  A.  Right.                                                             10:09AM

11  Q.  And in this month, at least at Eyman -- I'm sorry.  That

12  was at a different facility where every single record you

13  pulled for 85 was discontinued in November?

14  A.  That was Yuma, yes.

15  Q.  Thank you.  Someone who discontinued meds in November         10:09AM

16  cannot possibly be found non-compliant for Number 86 in

17  December, correct?

18  A.  Most of them, absolutely not.  That's -- and that's not the

19  way we preferred to do it.  I understand that also came from

20  you.  You wanted us to include all of them in 85 to 86.  The      10:09AM

21  way we pull 85 almost makes it assured that none of them will

22  be non-compliant.

23  Q.  For 86?

24  A.  86, yes.

25  Q.  Who told you that's what I wanted?                              10:10AM

1   A.  When I talked to Dr. Taylor from the direction from the

2   Court told us we had to change the way we were auditing, I

3   would say that came from the Court that we have to include all

4   of them on this month that were due, which would automatically

5   mean 86 would not be -- could not be non-compliant.          10:10AM

6   Q.  Is that your understanding of what the Court's order

7   requires?

8   A.  Yes.

9   Q.  Have you seen the Court's order?

10  A.  No.                                                       10:10AM

11  Q.  Have you asked to see the Court's order?

12  A.  Actually, I may have seen the Court order.  I don't

13  remember.  But I could have.  I mean, is that not the way we're

14  supposed to do it?

15  Q.  So it's similarly true that when you are monitoring in     10:10AM

16  December Number 86, someone who discontinued meds in October

17  can't possibly be found non-compliant?

18  A.  No.  If they were followed up, then they would not be

19  non-compliant.

20  Q.  But even if they weren't followed up they would be counted  10:11AM

21  N/A because it hasn't been 90 days, correct?

22  A.  Well, I think October, November, December, that is correct.

23  If their meds were DC'd in October then they have three months.

24  Yeah.  That would be -- that would not be non-compliant.

25  Q.  It could not be found non-compliant?                      10:11AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1    A.  Right.

2    Q.  Let's move on to Performance Measure 92 which requires that

3    MH-3 and above prisoners who are housed in maximum custody

4    shall be seen by a mental health clinician for a one-on-one or

5    group session a minimum of every 30 days.  Are you with me?          10:11AM

6    A.  Yes.

7    Q.  First of all, do you currently monitor this performance

8    measure at Perryville?

9    A.  Yes.

10   Q.  You do?                                                           10:12AM

11   A.  Yes.

12   Q.  Let's look at the Perryville December 2016 CGAR, Page

13   835797.  Let me know when you are there.

14   A.  Okay.  I'm there.

15   Q.  Does this refresh your recollection as to whether you            10:12AM

16   currently monitor this measure, Measure 92, at Perryville?

17   A.  Yes, I do.  There have not been any max custody prisoners

18   there for a while.

19   Q.  I'm sorry.  So in what sense do you monitor Measure 92 at

20   Perryville?                                                           10:13AM

21   A.  We look.  We look for max custody inmates at Perryville and

22   if there are some, we monitor it for that question, were they

23   seen every 30 days.  But if there are none we make the whole

24   Number 92 non-applicable.

25   Q.  So every month you actually do look for max custody             10:13AM

1    prisoners at Perryville?

2    A.  Yes.  If there's any max custody at Perryville they will

3    come out in the AIMS report.

4    Q.  How do you look for them?

5    A.  That's one of the reports that Ryan runs.                    10:13AM

6    Q.  So who told you that there's no maximum custody prisoners

7    at Perryville?

8    A.  The printout that Ryan ran and after they -- Perryville

9    reclassified a lot of people so they are no longer max.  So for

10   the first few months I checked myself to make sure this says    10:13AM

11   none, which didn't seem right, so I began checking myself.  And

12   I still do that, actually, to make sure we're not missing any

13   max.

14   Q.  Okay.  Same question about Tucson.  Do you currently

15   monitor Performance Measure 92 at Tucson?                        10:14AM

16   A.  Yes.

17   Q.  And is that a similar situation where you are finding no

18   max custody prisoners?

19   A.  Right.  Only max at Tucson were minors, and I understand

20   now they have quit designating minors as max.                   10:14AM

21   Q.  And what is the source of that understanding?

22   A.  That was -- well, one, there 's no -- we check for max

23   every month and none come out on the AIMS report.  Another is

24   talking to some of the securities operations people at one of

25   the out briefs, the warden and one of the security people       10:14AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1  there, and they told me that they are not going to designate

2  them max anymore in one of the out briefs that we do.

3  Q.  Did anyone tell you a similar thing at Perryville?

4  A.  Yes.  Actually the warden attends those, usually, and I

5  can't recall exactly, but yeah, probably she was there and told          10:15AM

6  me that.  And again we run the report to make -- I run the

7  report to make sure there's no max.

8  Q.  Okay.  Let's turn to Eyman, please, Page 835652.

9  A.  I'm there.

10  Q.  All right.  These are your findings for Performance Measure          10:15AM

11  92 for Perryville -- excuse me -- for Eyman for December,

12  right?

13  A.  Right.

14  Q.  And it looks like you reviewed 50 records for this measure?

15  A.  Right.                                                               10:15AM

16  Q.  How were those 50 records selected?

17  A.  The same way as all of them, the report from Ryan with max

18  custody and then the randomize it and I would have selected the

19  first 50.

20  Q.  Now, Performance Measure 92 applies to MH-3 and above                10:16AM

21  prisoners, correct?

22  A.  Right.

23  Q.  And there are MH-4 prisoners at Eyman, correct?

24  A.  Yes.

25  Q.  So what steps are taken to ensure that both MH-3 and MH-4            10:16AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1   prisoners are included in the sample for this measure?

2   A.   In the AIMS report you would put the way you would enter

3   everything above mental health 2.  So that would get the 3s, 4s

4   and there are no 5s, but if there were they would come out,

5   anything above 2 would come out for that max unit.                    10:16AM

6   Q.   How do you know that?

7   A.   Well, again, that Ryan runs that automatically from AIMS,

8   and I could at any time double check that to make sure it's

9   right.

10  Q.   I'm sorry.  I'm just asking you how you know that he takes   10:17AM

11  those steps to make sure that the 4s are included also.

12  A.   Well, I know that we instructed him to do that.

13  Q.   Okay.

14  A.   Most of the 4s, though, would be in a special program.

15  Q.   Okay.  But again, my question was simply how you know that   10:17AM

16  that's --

17  A.   Right.

18  Q.   -- what he does, and it sounds like your answer is because

19  we told him to.

20  A.   Yeah.  And during my regular audits of Number 4 I would     10:17AM

21  notice when I audit MH-4s I would notice why wasn't this person

22  on this list.  But that's never happened that I remember.

23  Q.   So is there any -- in order to be drawn for the sample for

24  Performance Measure 92, is there any requirement that the

25  person have been housed in max custody for any particular        10:17AM

─── April 17, 2017 - Status Hearing Resumed - Dye - Cross ───

1   period of time?

2   A.  No.  It's when we run that report, on that day, who was in

3   max.

4   Q.  Okay.  So even if they got there the day before, if they

5   were randomly chosen they would be the in the same --          10:17AM

6   A.  Right.  Yeah.

7   Q.  Okay.  Would you walk us through your findings, and again,

8   just pick one and let us know what these numbers mean.

9   A.  First one ends in 439, ADC number.  Then the start date

10  would be the date that they went into max.                     10:18AM

11  Q.  Excuse me.  Could the start date also be the date they

12  became an MH-3 or 4?

13  A.  No.  That start date would be when he went into max at that

14  time, yeah.

15  Q.  Well, what if someone went into max and subsequently was    10:18AM

16  made a 3 or 4?  How would that show up?

17  A.  They are already in max?

18  Q.  Yes.

19  A.  Then it would have -- I guess I'm not quite understanding.

20  That would come -- they would be on the max roster as being in  10:18AM

21  max.  So there's a part of that that shows their current mental

22  health score.  But I know it's at least a 3.  So I don't really

23  know what you are asking.

24  Q.  Okay.  So in any event, you are telling me that the first

25  number here is always the date they came into max custody?      10:19AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1    A.   Right.

2    Q.   Okay.  Please continue.

3    A.   And then the second number, the second date would be the

4    date they were last seen and whether that's compliant or not.

5    Q.   Okay.                                                        10:19AM

6    A.   So that would mean seen 12-28, he would have been seen at

7    least 11-28 before that to be compliant.

8    Q.   So for each of the 47 records that you found to be

9    compliant, did you look at the two most recent clinician

10   contacts and ensure that the interval between them was 30 days  10:19AM

11   or less?

12   A.   Yes.

13   Q.   For each and every one of those?

14   A.   Yes, I did.

15   Q.   Okay.  Let's look at the first highlighted case.  The       10:19AM

16   number ends in 237.  And the dates following that number are

17   12-22-16 and 12-22-16.  Can you tell us what those numbers

18   mean?

19   A.   That would mean that in all -- he was transferred to max

20   and very possibly was in intake and went right to max.  I       10:20AM

21   don't know.  But on 12-22 he was put in max, and he was seen on

22   12-22.

23   Q.   And your testimony is that for this case you would have

24   gone back and ensured that he would have been seen within 30

25   days prior to 12-22?                                            10:20AM

1    A.  For that one, no, because we're only checking max, was he

2    seen 30 days apart in max custody.  And he wasn't in max

3    custody in November.

4    Q.  I thought you said for each and every one of the 47 you

5    found compliant you went back and looked at the last two      10:21AM

6    contacts and ascertained they were less than 30 days apart.  Do

7    you want to change your testimony?

8    A.  Yeah.  Except for the ones that there are 30 days or less

9    that they are in max, I would not check them, no.

10   Q.  So this case, the one ending in 237, again, this record    10:21AM

11   cannot possibly be non-compliant when audited in December.

12   Correct?

13   A.  That's correct.  I think, you know, he was put in and seen

14   that very day is a good thing.  I mean, going to max is kind of

15   traumatic.  So the fact that you are seen right away would      10:21AM

16   be -- I would hate to exclude that because that would have

17   problems.

18        THE COURT:  Nobody disagrees with what you just said

19   as a professional opinion with respect to how to treat people.

20   But it's a different question as to whether it's any utility at  10:21AM

21   all with respect to gauging this performance measure, which is

22   designed to make sure people are seen within 30 days.  For

23   somebody for whom this cannot possibly be a non-compliant

24   record it does not help us analyze that situation.  You would

25   agree with that?                                               10:22AM

1          THE WITNESS:  Yes, sir.  I see what you mean, yes.

2     BY MR. FATHI:

3     Q.  Would you look next highlighted case ending in 250.

4     A.  Yes.

5     Q.  Dates are 12-22-16 and 12-23-16.  What do those dates mean?    10:22AM

6     A.  That would mean he came into max on 12-22-16 and was seen

7     the following day.

8     Q.  So this record, too, could not possibly be found

9     non-compliant, correct?

10    A.  Well, yes.  That's true.                                      10:22AM

11    Q.  In fact, no record in which the patient has been in max

12    custody for less than 30 days could possibly be found

13    non-compliant?

14    A.  Right.  But again, that's a random pull and I think it does

15    show, like Your Honor said, it does show that they are at least   10:22AM

16    seen when they come into max early on.  So therefore I think it

17    should be included, because they are doing the right thing.

18         THE COURT:  But that's not what the performance

19    measure is asking about.  That's a different question, isn't

20    it?  This Performance Measure is asking whether somebody has      10:23AM

21    been seen a minimum of every 30 days.  So it doesn't really

22    help us with respect to what was the reason for this

23    performance measure, and that is, people who were not seen

24    within at least every 30 days.

25         THE WITNESS:  Yes, sir.  But for a minimum of every 30       10:23AM

1    days shows me that, yeah, not over 30 days so he was seen in

2    under 30 days but under the minimum of 30 days.

3    BY MR. FATHI:

4    Q.  Mr. Dye, are you familiar with the Court's order on how to

5    interpret performance measures that require something happen                10:23AM

6    every X days?

7    A.  I have probably seen it, yes.  I can't spit it out, no.

8    But I have probably seen it.

9    Q.  Okay.  Let's move on to Number 93 then, which requires that

10   mental health staff, not to include LPNs, shall make weekly                  10:23AM

11   rounds on all MH-3 and above prisoners who are housed in max

12   custody.

13   A.  Uh-huh.

14   Q.  First of all, I assume that your answer regarding

15   Perryville and Tucson would be the same for 93 as your answer                10:24AM

16   for 92?

17   A.  Yes.

18   Q.  Your understanding is there are no longer any max custody

19   prisoners at those facilities?

20   A.  Right.  Right.                                                           10:24AM

21   Q.  How are the records selected that you audit for Number 93?

22   A.  93, the first 20, because there's two units that have max,

23   so we use 10 from each.  So the first 10 from each complex are

24   used.

25   Q.  Okay.                                                                    10:24AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1    A.  To make 20.

2    Q.  Would you turn to Page 126 of the monitor guide, please.

3           And this is -- Page 126 is the methodology for Number

4    93, correct?

5    A.  Yes.                                                          10:25AM

6    Q.  And in the first bullet it says, "Review the same records

7    from Performance Measure 92 for compliance with this

8    performance measure," correct?

9    A.  Correct.

10   Q.  Do you do that?                                               10:25AM

11   A.  I did it for the first 20, for the first 10 on each unit.

12   Q.  I'm sorry.  It says, "Review the same records from Number

13   92 for Number 93."  And so my question is, did you review for

14   Number 93, the same records that you did for Number 92?

15   A.  Mr. Fathi, during that time, as I remember, we had been     10:25AM

16   having trouble, or Corizon had been having trouble meeting

17   compliance with that particular measure.  So we met with them

18   and came up with this remedial plan, like okay, this is how

19   we're going to get compliance.  And we were doing just 20 at

20   that time.                                                        10:26AM

21          They agreed to put this plan into action, so we

22   thought, okay, how are we going to tell if this is working?  So

23   we got together and decided we're going to pull a higher

24   sample, because we wanted to make sure the remedial plan was

25   working.  And so we pulled a larger sample for that, for the     10:26AM

1   previous question, I guess, would be 92.

2           Now, when it comes to 93, or 94 --

3   Q.  No, 93.

4   A.  93, a couple things are at play.  One, rounds have never

5   been a problem.  They just haven't been a problem anywhere.          10:26AM

6   Q.  Excuse me.  Is it your understanding that there's never

7   been non-compliance with that performance measure?

8   A.  Very few non-compliance.  Eyman went through a couple-month

9   period where they were non-compliant.  That got fixed.

10  Generally speaking, rounds are not a problem.  But what was          10:27AM

11  going on at that time, a staff member quit and left me and Dr.

12  Taylor -- and Dr. Taylor has a lot of administrative tasks.

13  She was helping to audit, but I was doing most of the auditing.

14  And rounds take a long time to audit.  You have got to go

15  through every week.  So we decided we are just going to do the        10:27AM

16  first 10 on each unit for the rounds because of time.  We did

17  not have the time with one staff member gone.  And the fact

18  that rounds are usually compliant, anyway we had no choice.

19  We -- yeah, we didn't have the people to do the whole thing.

20          MR. FATHI:  Your Honor, I would just note for the            10:27AM

21  record that the Court has found defendants non-compliant on

22  Number 93 at multiple facilities.

23          THE WITNESS:  For a few months they were.  But we met

24  with them and that kind of got fixed.  There were maybe a

25  two-month period where they were not compliant, but we found         10:28AM

UNITED STATES DISTRICT COURT

1    out why and that was fixed.

2    BY MR. FATHI:

3    Q.  So Mr. Dye, you agree with me, I assume, that the monitor

4    guide says, "Review the same records from Number 92 for Number

5    93."  Correct?  You agree that's what it says?                    10:28AM

6    A.  Well, I mean I could argue the words.  Does it say every

7    single one of them, I don't know.  But the fact is we didn't

8    have the time to do that, so yeah, we made a decision not to do

9    all 50 because we simply couldn't have.

10   Q.  Did anyone tell you to monitor 50 for Number 92 and only 20  10:28AM

11   for Number 93?

12   A.  That was part of the discussion I had with Dr. Taylor at

13   the time, because there was only us two in the department.  So

14   we had to problem solve, how are we going to deal with one

15   staff member down and you having all your administrative        10:29AM

16   duties, how am I going have to all this time to do the

17   auditing.

18   Q.  Did anyone raise a concern that was not compliant with what

19   the monitoring guide requires?

20   A.  I don't remember that come coming up, no.  Rounds generally  10:29AM

21   speaking are not much of a problem.  So we didn't --

22   Q.  I'm not sure that opinion is universally shared.

23   A.  I mean, if you look at the audit, there were a couple

24   months they were non-compliant but other than that, statewide

25   has been pretty compliant on rounds.                            10:29AM

1    Q.   Let's look at the Eyman CGAR, Page 653.

2    A.   653.  That's what I'm on, right?

3    Q.   Eyman, December 2016.

4    A.   Yeah.

5    Q.   Page 653, looking at your results for Number 93.  Could you          10:30AM

6    walk us through an example and tell us --

7    A.   For 93?

8    Q.   Yes, please.

9    A.   Okay.  There would be the ADC number and the start date.

10   Q.   Start date meaning what?                                             10:30AM

11   A.   Oh.  The day they came into max, and then I look at the

12   first one four of four.  There were four possible weeks that

13   would count that they were in max, and of those they were seen

14   four times.  So that number would be four/four, four/five,

15   depending how many weeks they were in max.  If they came in          10:30AM

16   part way into the month it would be two or three.  So anyway,

17   this first person was in max for four of the weeks and seen

18   four times on rounds.

19   Q.   What does the plus sign mean?

20   A.   That would mean they are SMI.                                         10:31AM

21   Q.   And is that true wherever I see a plus sign in the CGARs?

22   A.   I'm trying to think what would I have meant by a plus sign

23   there.  Yeah.  I would have marked SMIs with a plus sign.

24   Q.   So that plus sign has the same meaning at least for all the

25   mental health CGARs.  If I see a plus sign it means that person      10:31AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

```
 1    is SMI?

 2    A.  Yeah.

 3    Q.  Now, you don't exclude from -- oh.  I'm sorry.

 4            So you're reviewing 50 for 92, 19 for 93.  How do you

 5    choose the 19 out of the 50 that you review for Number 93?     10:31AM

 6    A.  It would be the first 10 on each site.

 7    Q.  Well, then, how do you choose the 50 that you review for

 8    Number 92?

 9    A.  That's from the randomized -- the 50 is a randomized thing

10    that Ryan sends us, and then from that I put 50 on -- the first  10:32AM

11    50 on the spreadsheet for 92.  And then for 93 I used the first

12    10 on each unit to do 94.

13    Q.  Okay.

14    A.  Or 93.

15    Q.  So are there any cases reviewed for 93 that wouldn't also   10:32AM

16    be reviewed for 92?

17    A.  I'm sorry.  I'm not following.  Are there any for 93.

18    Q.  Is the sample for 93 a subset of the sample for Number 92,

19    or is it possible that the sample for Number 93 includes cases

20    that weren't reviewed for Number 92 that month?               10:32AM

21    A.  No.  All the ones in 93 would have been in 92.

22    Q.  Are you sure of that?

23    A.  I'm pretty sure.  I haven't audited this for a few months

24    now so I'm a little bit cloudy.  But, yeah, all of these should

25    be in the 92.                                                 10:33AM
```

1   Q.  So there's no requirement that the prisoner have been in

2   max custody for the entire month to be in the sample, correct?

3   A.  Correct.

4   Q.  In fact, you include people who have been there for just

5   one week?                                                           10:33AM

6   A.  Right.

7   Q.  And if they had rounds that one week then they are

8   compliant for the month, correct?

9   A.  Yeah.  They would be one of one.  I would think it would be

10  important if they weren't seen that week that would be           10:33AM

11  significant.  If they were in there a week and you didn't see

12  them, so yes, I would include that.  And I see some on there

13  that are like that.

14  Q.  All right.  Let's move on to Number 94.  All prisoners on a

15  suicide or mental health watch shall be seen daily by a          10:33AM

16  licensed mental health clinician or on weekdays or holidays by

17  a registered nurse.

18  A.  Uh-huh.

19  Q.  Let's stay with Eyman, same Page, 835653, you looked at 35

20  records for this measure.  Correct?                              10:34AM

21  A.  Correct.

22  Q.  How were those 35 records chosen?

23  A.  Corizon furnishes a log of all people on suicide or mental

24  health watch.  I get that and I just look it over to make sure

25  it's complete; are all the dates filled in, are there blanks,    10:34AM

1    and does it cover the entire month.  And once I see that it is

2    good on those, then I send it to Ryan.  He randomizes it then

3    and sends it back.  So then I would select the first 35.

4    Q.  Okay.  And when you said you make sure that the list that

5    you receive from Corizon is complete, I understand if          10:34AM

6    something, an entry is blank you will notice that, right?

7    A.  Right.

8    Q.  But again, if there's 35 people on the list and there were

9    actually 38 on suicide watch and they just left three off you

10   have no way of knowing that, correct?                          10:35AM

11   A.  I mean, I would not know that.  I have never had reason to

12   believe that things are left off because as I'm auditing

13   through their other measures, if I would see somebody that was

14   on watch, which I would, I would say wait, they weren't on the

15   list, I would probably catch that.  So I have never had any    10:35AM

16   reason to believe that they are leaving people off.

17   Q.  Now, the list, is it a list of individual patients or is it

18   a list of watch occurrences?  So in other words, if Prisoner

19   Smith was on suicide watch three times that month would he be

20   listed once or three times?                                    10:35AM

21   A.  He would be listed three times.

22   Q.  And then the sample that's drawn, I assume, is similarly a

23   sample of watch incidents not of individual prisoners?

24   A.  Right.

25   Q.  So the 35 is 35 watch incidents?                           10:36AM

1    A.   35 watch what?

2    Q.   Incidents.

3    A.   Yes.

4    Q.   There could be, hypothetically, only 20 different prisoners

5    here, but they had a total of 35 watch incidents, correct?        10:36AM

6    A.   That's correct.  We would want to make sure on each

7    incident were they seen appropriately, yes.

8    Q.   Now, patients' time on suicide watch spans more than one

9    month.  You only check the contacts in the month you are

10   monitoring, correct?                                              10:36AM

11   A.   Right.

12   Q.   So if a prisoner went on watch on November 15 and came off

13   on December 1st and you are monitoring for December, you would

14   only check December 1st, right?

15   A.   December 1st through the end of the month.  And he would     10:37AM

16   have been in the pool for November, too, so would have been in

17   the pool for November.  So he would have had equal chance to be

18   pulled that month, too.

19   Q.   Sure.  He would have had an equal chance.  But I think your

20   testimony is a new random sample is pulled every month?           10:37AM

21   A.   Right.  That's correct.

22   Q.   So he may have been drawn in November or may not have?

23   A.   That's right.

24   Q.   We can't rely on him having been drawn in November,

25   correct, because that might not happen?                           10:37AM

────── April 17, 2017 - Status Hearing Resumed - Dye - Cross ──────

1   A.  Correct.  That's the beauty of randomization.

2   Q.  All right.  Let's move on to Number 95 which requires only

3   licensed mental health staff may remove a prisoner from a

4   suicide or mental health watch.  Any prisoner discontinued from

5   a suicide or mental health watch shall be seen by a mental          10:38AM

6   health provider, mental health clinician, or psychiatric

7   registered nurse between 24 and 72 hours after discontinuation,

8   between 7 and 10 days, and between 21 and 24 days of

9   discontinuation of the watch.

10         My first question is:  How was the sample drawn for           10:38AM

11  Performance Measure 95?

12  A.  We take, again, the list comes and it's the same list I

13  check for accuracy, same list from the previous measure, but we

14  take a sample from up to three weeks in the prior auditing

15  month to make sure if they went off three weeks ago before         10:38AM

16  December 1st, were they seen for their three-week follow-up in

17  December.  So we include those, and everyone that was off watch

18  from three weeks before the start of the month up to the next

19  to last day of the month they came off watch.

20  Q.  And are those instructions written down anywhere?             10:39AM

21  A.  Yeah.  I'm pretty sure.  I mean, I haven't seen them but

22  they should be.

23  Q.  They are not in the monitor manual, but you are saying that

24  those instructions are written down somewhere?

25  A.  Yeah.  How is it worded?                                       10:39AM

1   Q.  So is the sample from 95 completely independent from the

2   sample for Number 94?

3   A.  Yes.

4   Q.  It's a new random sample?

5   A.  Totally new random sample, yes.                         10:39AM

6   Q.  So people, in a given month, you could be pulled for 94 but

7   not 95?

8   A.  Right.

9   Q.  Pulled for 95 but not 94?

10  A.  Right.                                                  10:39AM

11  Q.  Pulled for both or pulled for neither?

12  A.  Right.  Because some of the people for 94 are still on

13  watch so they couldn't be used for 95.

14  Q.  And is the list for 95, again, is it a list of individual

15  patients or is it a list of watch incidents like Number 94?  10:40AM

16  A.  It would be watch incidents, but it's different because if

17  someone I'm checking for like two-week follow-ups, say, and he

18  went back on watch somewhere in the interim, that would start

19  the clock over.  So it would still be used if there were watch

20  follow-ups from the watch that I'm auditing.  Does that make  10:40AM

21  sense?

22  Q.  Well, we'll get to that in a minute.  But right now my

23  question is simply, is the master list from which this is

24  drawn, is it a list of watch incidents or individuals?

25  A.  It's watch incidents.                                   10:40AM

507

1   Q.  All right.  Let's go to, oh, same page.  Number -- Eyman

2   Number 95, Page 654.  These are your December findings from

3   Eyman for Measure 95, correct?

4   A.  Correct.

5   Q.  Can you tell us what each of these incidents means, or          10:41AM

6   excuse me, each of these symbols means?

7   A.  Okay.  Well, first highlighted one ending in 301 is

8   probably the easiest to look at.  It's the inmate number, the

9   unit he was at for the follow-ups, so whatever unit he's at

10  when the follow-ups are being done.  And then the first date    10:41AM

11  would be when was the three-day contact done, when was the 7-

12  to 10-day contact done, and when was the 21 to 24 contact done

13  and is it compliant or not.

14  Q.  And there's a lot of N/As here.  What does N/A mean?

15  A.  N/A would mean either he went back on watch before the      10:42AM

16  third one was done, so he only had the first two from that

17  incident and then went back on watch, or he came off watch too

18  late in the month.  He came off watch like the third week of

19  the month.  He wouldn't have time to have the third follow-up

20  so that would be N/A.                                           10:42AM

21  Q.  So if you are auditing for December and the patient came

22  off watch in November, you don't check whether he was removed

23  by a licensed clinician, correct?

24  A.  Not in December, no.  Again, that had the chance of being

25  pulled in November, we would have checked.                      10:42AM

1    Q.  No.  I understand that everyone has a chance of being

2    pulled every month.  I'm just asking if you are auditing in

3    December, he came off watch in November, you don't check and

4    see that he was, in fact, taken off watch by a licensed

5    clinician?                                                    10:42AM

6    A.  That is correct in December.

7    Q.  And you also don't verify the follow-up checks if they did

8    not occur in the monitored month.  Correct?

9    A.  Correct.  That would fall in the month of the audit that

10   those dates fall in.                                          10:43AM

11   Q.  Let's say you are monitoring for December.  The person came

12   off watch on November 22nd.  So the 7- to 10-day check would

13   have been due sometime between November 29th and December 2nd.

14   Are you with me?

15   A.  Okay.  Yeah.                                              10:43AM

16   Q.  So you're monitoring for December.

17   A.  Uh-huh.

18   Q.  Do you verify that that check occurred?

19   A.  Yes.

20   Q.  If you looked on December 1st and December 2nd and you saw  10:43AM

21   that the check hadn't occurred, would that be an N/A or would

22   that be a non-compliant?

23   A.  I'm sorry, you are saying if it was due by those dates?

24   Q.  It's due on November -- between November 29 and December

25   2nd.  You look on December 1st and 2nd, you don't see it.  What  10:44AM

1    do you do?

2    A.  Then that would be a non-compliant for that follow-up.

3    Q.  You would count that as non-compliant?

4    A.  Right.

5    Q.  You so you wouldn't look and see if it happened on November        10:44AM

6    29th or 30th?

7    A.  I mean, I would.  You said, I thought, if there hadn't been

8    a follow-up.  Now, if there had been a follow-up in November

9    that would be an N/A because that was done in November.

10   Q.  But if you are looking on December 1st and 2nd, you don't       10:44AM

11   see it there, what do you do next?

12   A.  I look to see was it done in November.  And then if it was

13   done in November, then it's an N/A.  If it was not done in

14   November or December, that's a non-compliant.

15   Q.  Even though it could have been done in November and been       10:44AM

16   within the time frame?

17   A.  Right.  That would have fallen into the pool on the

18   November audit.

19   Q.  So if it wasn't done in any of those four days you count it

20   as non-compliant?                                                  10:45AM

21   A.  Yes.

22   Q.  Okay.  Let's go back to that first person, Number 301.

23           So he came off watch December 1, and so his last

24   contact would have been due December 22nd through 25.  Is that

25   right?                                                             10:45AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1    A.  I'm sorry.  Say the dates again.

2    Q.  Well, I'm just reading the dates.  He came off watch on

3    December 1st?

4    A.  Okay.

5    Q.  So his third contact would have been due December 22nd to        10:45AM

6    25th, right?

7    A.  Let me see.  Yes.

8    Q.  So since it was due in December why was it N/A?

9    A.  I'm trying to follow this.  I mean, I would have to have

10   eOMIS here ahead of me.  My first guess would be he went back        10:46AM

11   on watch before the 8th.

12   Q.  And why would you not count the why would you not verify

13   the third contact if he's back on watch?

14   A.  Because he could no longer have a -- it's not a follow-up

15   anymore.  He's back on watch so he's having a daily contact.       10:46AM

16   Q.  Well, it doesn't -- the language in the performance measure

17   doesn't use the term follow-up.  It requires that the person be

18   seen.  So if he's still at the institution, maybe he's on

19   watch.  Why don't you verify that he was seen between 21 and 24

20   days after coming off watch?                                        10:46AM

21   A.  Because the question is or removed from a watch.  He is now

22   on a watch and that would -- we would count the number he had

23   while he was off of watch but if he goes back on a watch that

24   would start it all over again.

25   Q.  I see.                                                          10:47AM

1    A.  And if he wasn't seen daily that would fall in the group

2    for the previous measure, was he seen daily.

3    Q.  But you just testified that the fact that someone is in the

4    pool for 95 doesn't mean he's in the pool for 94?

5    A.  Not always, correct.                                        10:47AM

6    Q.  Is it your testimony that being seen pursuant to Number 94

7    satisfies Number 95?

8    A.  I'm not following.  Say it again, please.

9    Q.  What I'm getting at here is that Number 94 can be satisfied

10   by a contact with a registered nurse.                           10:47AM

11   A.  On weekends.

12   Q.  Right.  Number 95 requires a psychiatric registered nurse.

13   So even if the person was seen pursuant to Number 94 by a

14   registered nurse that does not satisfy Number 95 which requires

15   a psychiatric registered nurse.  Would you agree with me?       10:48AM

16   A.  That's true.

17   Q.  All right.  Let's look at the next highlighted -- sorry --

18   two down, one that ends in 315.  Do you see that?

19   A.  Yep.

20   Q.  Again, he came off watch December 13th so his second        10:48AM

21   contact would have been due December 20th to 23rd.  Do you

22   agree with that?

23   A.  Yes.

24   Q.  All right.  So why is his second contact listed as an N/A?

25   A.  He was seen for his first contact 12-14.  And again, I      10:48AM

 1   don't have eOMIS, but my guess would be that he was back on

 2   watch by that time so he did not have the second and third

 3   follow-up visits because he's back on watch.

 4   Q.  So if someone is on watch, comes off, and then goes back on

 5   watch, is it your testimony that you don't check the -- any          10:48AM

 6   contacts that are due after that second watch?

 7   A.  That is correct because they would be seen daily on watch.

 8   Q.  Well, again, they may or may not be.  I'm simply asking do

 9   you check that the contacts required pursuant to Number 95 are

10   done?                                                               10:49AM

11   A.  Not for 95, No.  Once they are back on watch we don't check

12   that.

13   Q.  Okay.  Let's look at the second one ends in Number 050.  Do

14   you see that one?

15   A.  Yes.                                                            10:49AM

16   Q.  All right.  He came off watch December 14th, so his second

17   contact would have been due December 21st through 24th.  Do you

18   agree with me?

19   A.  Yes.

20   Q.  So why is his second contact N/A?                               10:49AM

21   A.  Well, again, probably the same reason.  He went on watch

22   before the second contact was due.

23   Q.  Okay.

24   A.  Which puts another incident that would be pulled for a

25   separate incident.                                                  10:50AM

513

1          I might say also he could have been transferred to

2    another prison, too.

3    Q.  I'm going to represent to you that all of these prisoners

4    we have been discussing were at Eyman for the entire month of

5    December.                                                          10:50AM

6    A.  Oh.  Okay.

7    Q.  All right.  Mr. Dye, I have shown you the record of -- or

8    screen shot from the record of the prisoner we have been

9    discussing.  And it shows, among other things, his healthcare

10   encounters between December 21st and 24th.  Was he on watch at   10:51AM

11   that time?

12   A.  Yes, he was.

13   Q.  But you are saying because he was on watch, it would be

14   verified that he was seen daily pursuant to number Measure 94,

15   correct?                                                          10:51AM

16   A.  Correct.

17   Q.  All right.  Would you look at Number 94 for Eyman, on the

18   previous page?

19   A.  Uh-huh.

20   Q.  And can you show us where this prisoner's number is listed?  10:51AM

21   A.  I don't know that it is.  That would have been a separate

22   random pool to be pulled from.

23   Q.  Okay.  Well, I will represent to you that this prisoner is

24   not listed under 94.  So that would mean that no one was

25   verifying that he was seen while on watch from December 21st     10:51AM

1   through 24th, correct?

2   A.  No.  If he had been pulled for the randomization we would

3   have been verifying that, if he would have been pulled for that

4   pool.  But I don't personally check every single person that's

5   been on watch.  I only check the ones that were pulled for that      10:52AM

6   pool, yeah.

7   Q.  My question is this prisoner, if you accept my

8   representation that he was not pulled for Number 94, then no

9   one was checking that he was, in fact, seen daily between

10  December 21st and 24th, correct?                                     10:52AM

11  A.  Well --

12          MR. BOJANOWSKI:  Your Honor, we will object.

13          THE COURT:  Overruled.  I know what you are going to

14  say.  But the point is a clear one to me.  You are giving

15  somebody a pass on 95 based upon the fact that you are assuming      10:52AM

16  that they are going to be seen under 94.  But there's no

17  verification of that.  So how can you make the determination in

18  95?

19          MR. BOJANOWSKI:  Two different pools.

20          THE COURT:  Truly two different pools, but the witness      10:52AM

21  has testified that you can make the determination on 95 based

22  upon the assumption that it's going to happen as would be

23  demonstrated in 94, but nobody is checking to see whether it

24  happened with this inmate.  So there's a determination here

25  made in 95 that's based upon, as we say, facts not in evidence.      10:53AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1        THE WITNESS:  I mean, I'm sorry.  Did I say that

2   that -- we would follow that through to make sure --

3        THE COURT:  No, you didn't say that.  But what you

4   were saying is you made a determination with this particular

5   inmate, according to the representations of Mr. Fathi, that you      10:53AM

6   made a representation with 95, and that you are comfortable

7   doing that, saying that it wouldn't necessarily -- it wouldn't

8   be important for you to determine whether or not there was

9   compliance or not with 95 because you knew that based upon 94

10  that somebody in this person's circumstances, and that is,        10:53AM

11  taken off of watch and then being seen -- no, somebody who is

12  going back on watch and then you are assuming that they are

13  being seen on the daily basis, there's no verification that

14  that happened with this particular inmate.

15        Did I state that correctly, Mr. Fathi?                      10:54AM

16        MR. FATHI:  Exactly, Your Honor.

17        THE WITNESS:  Again, that would go under another pool

18  where he's no longer getting a watch follow-up, which is what

19  this question is, after they are removed from watch he's on

20  watch.  So it's not a removed from watch visit, it's an on        10:54AM

21  watch visit.  It's a completely different pool.

22        THE COURT:  It is a completely different pool and

23  completely different question.  But you don't come to a

24  conclusion in 95 based upon information that you have verified.

25  Nevertheless, you testified that you are assuming that it's       10:54AM

 1  safe to do that.

 2         THE WITNESS:  Yes.  I mean, we could check to see if

 3  he was in the pool for the previous month, but yeah.

 4  BY MR. FATHI:

 5  Q.  Let's look at the last highlighted case under Number 95          10:54AM

 6  ending in 079.  Do you see that?

 7  A.  Yes.

 8  Q.  So he came off watch December 5th so his third contact

 9  would have been due between December 26 and December 29th.  Is

10  that correct?                                                        10:55AM

11  A.  Yes.

12  Q.  But his third contact here is listed as N/A.  Do you see

13  that?

14  A.  Yes.

15  Q.  And I will represent to you that this prisoner was at the       10:55AM

16  Eyman complex through the month of December.  So if you accept

17  that representation, why was his third watch -- post-watch

18  contact listed as N/A?

19  A.  I mean, probably the same reason.  He probably went back on

20  watch and would have then fallen into a different pool.            10:55AM

21  Q.  All right.  Mr. Dye, I'm showing you a screen shot of Mr.

22  079's record that covers the period between December 26th and

23  29th.  Do you see that?

24  A.  Yes.

25  Q.  And he wasn't on watch during that period, was he?            10:56AM

1    A.  Let's see.  When would he have been due?

2    Q.  Between the 26th and the 29th.

3    A.  It looks like he was seen the 27th.

4    Q.  That wasn't my question, Mr. Dye.  My question is he wasn't

5    on watch between December 26th and 29th, was he?                    10:57AM

6    A.  He wasn't on watch.  I don't know for sure he was in the

7    facility.  But he was not on watch, correct.

8    Q.  If you look at the right-hand column it says ASPCE all the

9    way down?

10   A.  I mean, was he out to the hospital, things like that.          10:57AM

11   Q.  All right.  You could agree with me he was not on watch

12   between December 26th and December 29th, correct?

13   A.  Yes.

14   Q.  Well, if his post-watch follow-up was due in that period

15   and he was still at Eyman and he wasn't on watch, why is that      10:58AM

16   third post-watch follow-up listed as N/A?

17   A.  Again, without all the eOMIS in front of me I wouldn't be

18   able to say why.  I would need to look at all the records.  It

19   is possible I erred on one.  I mean, I'm human.  I make a

20   mistake once in a while.  But there wouldn't be a pattern of me    10:58AM

21   missing people on watch.  I mean, there wouldn't be a pattern

22   of that if I missed one.

23   Q.  My understanding of your testimony, though, is that if a

24   patient comes off watch and then goes on watch again before the

25   three follow-up contacts have been completed, you don't verify     10:58AM

1  that the subsequent contacts occurred, isn't that correct?

2  A.  That's correct.  It goes into the other pool.

3  Q.  What do you mean it goes into the other pool?

4  A.  Well, it goes into the watch pool if he went back on watch.

5  Q.  I'm not sure what you mean.  My question is, you don't --          10:59AM

6  once he's back on watch, you don't verify that the remaining

7  post watch contacts occurred, is that correct?

8  A.  That's correct.

9         THE COURT:  This health services encounters, if he had

10  been removed to the hospital would that be indicated here on          10:59AM

11  this screen shot?

12         THE WITNESS:  Not in the mental health.  This is the

13  mental health section.  It wouldn't be on there.  It would be

14  on another screen.

15         MR. FATHI:  Actually, Your Honor, since I created this          10:59AM

16  exhibit, this is all health services encounter.  So I think the

17  Court is correct that if you had been sent out to the hospital

18  it would have been reflected on here.

19         THE COURT:  Thank you.

20         THE WITNESS:  There's no entry by anybody but mental          10:59AM

21  health on here, so. . .

22  BY MR. FATHI:

23  Q.  Excuse me, Your Honor.

24         All right.  Mr. Dye, I'm showing you now an individual

25  health services encounter for this prisoner.  And it shows that          11:00AM

UNITED STATES DISTRICT COURT

1    he was taken off watch on December 20th, correct?

2    A.  Right.

3    Q.  So his first two watch follow-ups from that watch episode

4    would have been due in December, correct?

5    A.  Right.                                                      11:01AM

6    Q.  Did you verify that those two watch follow-ups occurred?

7    A.  The first two, yes, they were done.

8    Q.  Can you show me where that is in the CGAR?

9    A.  It's in where it says 12-6 and 12-12.

10   Q.  I'm sorry.  The document I just handed you shows that this  11:01AM

11   patient came off watch a second time on December 20th.  Do you

12   see that?

13   A.  Yes.

14   Q.  So his first two follow-ups from that watch episode would

15   have been due in December, correct?                            11:01AM

16   A.  Right.  So that explains -- I mean, after the second

17   contact where I have N/A for the third, he must have been back

18   on watch.  That's reflected either on another screen, or it was

19   scanned into the paper documents that he was on watch.

20   Q.  Can we agree that this patient came off watch on December   11:01AM

21   20th?

22   A.  Yes.

23   Q.  So his first two follow-ups from that watch episode would

24   have been due in December, correct?

25   A.  Correct.                                                    11:02AM

1  Q.  And did you verify that those two required follow-ups

2  occurred?

3  A.  Well, that would have come under -- each incident would

4  have been a separate entry.  So they would have come up on a

5  random pull.  Each time he went on watch would have been a         11:02AM

6  separate entry.  So if he's not on this one that means he

7  wasn't selected for a second watch.

8  Q.  So if I understand your testimony, if a patient is drawn

9  for the sample in Number 95 and he goes on watch a second time

10 during the month, you don't look at all at the required           11:02AM

11 follow-ups or that watch incident?

12 A.  Right.  That incident goes into the pool for watch

13 follow-ups each incident that he's on watch.  So he was on

14 watch again.  That's why the third follow-up didn't happen.

15 Q.  I'm sorry.  That's not correct.  The third follow-up was     11:02AM

16 due between December 26th and 29th, and we just established

17 with the previous document he was not on watch with that

18 period?

19 A.  No.  But somewhere along the line he went back on watch

20 after the 16th because he came off on the 20th.  So he came off  11:03AM

21 watch before the third one was due.

22 Q.  So is it your testimony that if a patient goes back on

23 watch before the three watch follow-ups have been completed you

24 don't verify that the subsequent watch follow-ups took place

25 even if he's not on watch at the time those follow-ups are due?  11:03AM

UNITED STATES DISTRICT COURT

1  A.  Well, yeah, if he goes back on watch then we select if he's

2  pulled, did he have the three-day, the seven-day and the

3  three-week day for that particular watch that he was on.  So

4  when he went off on the 20th, if he pulled up we would look to

5  see if he had one by the 23rd and then a week later and three        11:03AM

6  weeks later.  But that would be a separate incident.

7  Q.  Let me give you a hypothetical.

8          Prisoner comes off watch on December 2nd -- December

9  1st, okay?

10  A.  Okay.        11:04AM

11  Q.  Goes back on watch on December 2nd.

12  A.  Okay.

13  Q.  Comes off watch again on December 3rd.  Would you verify

14  the required watch follow-ups for either of those watch

15  incidents?        11:04AM

16  A.  Okay.  On the first one, if it was pulled I would check to

17  see if he had the three day follow-up on the first one.  As it

18  happens sometimes, he's seen 24 hours later and put back on

19  watch so that counts as, yes, he was seen for his first watch

20  follow-up.  Now he's back on watch December 2nd.  That would be        11:04AM

21  a separate incident would go on whenever he came off watch did

22  he have the three follow-ups from that particular watch that

23  started December 2nd.

24  Q.  But you would not verify any of the subsequent required

25  follow-ups from the first watch, correct?        11:04AM

 1   A.  Correct, because I keep saying that's a separate pool.  He

 2   is now on watch again.

 3   Q.  So if he goes back on watch even for 24 hours that

 4   essentially wipes out the previous watch incident, correct?

 5   A.  Well, yeah, now we're following him for the last time he    11:05AM

 6   got off watch.

 7   Q.  And you don't verify that the 7- to 10-day or 21- to 24-day

 8   follow-ups occurred from the first watch, correct?

 9   A.  Right, because he's now on another watch.

10        MR. FATHI:  Your Honor, I'm terribly sorry.  I'm sorry    11:05AM

11   to be the difficult one again.  I need to go.  I believe Ms.

12   Kendrick has some questions.

13        THE COURT:  Fair enough.

14        MR. FATHI:  Thank you for accommodating me.

15        THE COURT:  Thank you.  What we'll do, because of the    11:05AM

16   early start date I will check with the court reporter to see.

17   The normal timing would have us taking a break at 11:15.  Is

18   that what you would like to do?  Or we could alternatively just

19   take a 10-minute break now.

20        Let's do that.  We'll be back in just 10 minutes.    11:05AM

21        (Recess from 11:05 a.m. until 11:19 a.m.)

22             CROSS-EXAMINATION (Resumed)

23   BY MS. KENDRICK:

24   Q.  My name is Corene Kendrick.  I'm an attorney at the Prison

25   Law Office.  I'm just going to finish up here for Mr. Fathi who    11:19AM

1   had to leave.

2           So, I wanted to move on to Performance Measure 98.

3   That's the performance measure about mental health HNRs.  And

4   continuing with the December 2015 CGAR that I think is in front

5   of you, for that performance measure it's on Page 835655.      11:19AM

6   A.  I've got it.

7   Q.  And it shows that you reviewed 70 records.  How were those

8   records chosen?

9   A.  I'm getting 50 here.  Which complex are we on?

10  Q.  Eyman.                                                      11:20AM

11  A.  Eyman 98, number reviewed 50.

12  Q.  Yes.

13  A.  I thought you said 70.

14  Q.  No, I said 50.  I apologize if I misspoke.

15          How were those 50 records chosen for this performance   11:20AM

16  measure?

17  A.  Well, similar to the suicide watch log, Corizon keeps a

18  record of all the HNRs.  Those are sent and I look them over to

19  make sure they are complete, if anything is outstanding or like

20  seems wrong, if not, or whenever it's ready, I give it to Ryan  11:20AM

21  Owens and he randomizes it and then I would pick out the first

22  up to 10 on each yard.

23  Q.  Is this a list of prisoners or is it a list of HNRs?

24  A.  This is a list of HNRs.

25  Q.  So if Mr. Smith submitted three separate HNRs he would be   11:21AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1   listed three separate times in that month?

2   A.  Yes.

3   Q.  Okay.  And this is a random sample of all the HNRs?

4   A.  Yes.

5   Q.  What is the time frame, the window that you are looking at                11:21AM

6   for the sample?

7   A.  Well, we go by the tech manual from 2014, which was an old

8   one.  I wish we could update that.  But it's different for

9   urgent, emergent, whether it's a referral for meds or whether

10  it's not.  So it would be different in each case whatever the              11:21AM

11  HNR is, the nature of the HNR.

12  Q.  Okay.  And you made a referral to the 2014 manual.  Are you

13  referring to the mental health technical manual?

14  A.  Yes.

15  Q.  And my understanding is within that manual, depending upon             11:22AM

16  the category of the mental health HNR and what their person is

17  asking, there's different time frames for responding.  Some

18  need to be responded to more quickly than others, is that

19  correct?

20  A.  Correct.                                                              11:22AM

21  Q.  Okay.  And do you sample separately for each one of those

22  subcategories?

23  A.  No.  We just take them in order, the first 10 on each unit,

24  and whatever they are urgent, emergent, routine, however they

25  come up.                                                                  11:22AM

1   Q.  And you said it was Mr. Owens that gives you that random

2   list?

3   A.  Yes.

4   Q.  And you said earlier that you know it's random because the

5   numbers on the far left side are just random numbers?          11:22AM

6   A.  Yes.  It's somewhat easier to tell with HNRs because the

7   date of the HNR, if it wasn't randomized, would be in

8   chronological order.  But when I look at the list, the dates

9   are all scrambled up.  So that tells me it's randomized also.

10  Q.  Okay.  And the list of numbers in that far left column, are  11:23AM

11  they sorted from smallest to largest?

12  A.  I don't know.

13  Q.  You have never really noticed that whether they are or not?

14  A.  I haven't looked.  I believe they are, but it's a decimal

15  point with a lot of numbers after, and I never check that.    11:23AM

16  Q.  And are you aware that the Court issued an order in

17  December 14th requiring that the times needed to be recorded

18  for this performance measure because some of the requirements

19  it was you needed to know the number of hours not just the

20  date.                                                          11:24AM

21  A.  Yes.

22  Q.  Okay.

23  A.  Which we do now.  Yeah.  We do that.

24  Q.  Okay.  And what is the date on the Eyman with the entry?

25  It says that you did this on January 31st?                     11:24AM

1   A.  Yes.

2   Q.  Okay.  And when were you told about the Court's December

3   14th order, if you can --

4   A.  I don't remember.  I don't remember when I was told that.

5   Q.  Was it after you did the December CGARs?                    11:24AM

6   A.  I don't remember.  Honestly, I don't.  I know I'm doing it

7   now but I don't remember exact the month or I started including

8   it.

9   Q.  Okay.  So would the January CGARs that you normally work on

10  January CGARs in the month of February, would those reflect the  11:24AM

11  Court's order with the times?

12  A.  I'm pretty sure by January I was doing it, yes.

13  Q.  And the February CGARs that you did, you gathered the

14  information in March, those would definitely --

15  A.  February would definitely have the times, yes.             11:25AM

16  Q.  Okay.  So do you have the monitoring guide in front of you

17  still, sir?

18  A.  Yes.

19  Q.  So for Performance Measure 98, I believe it's Page 133.

20  A.  Okay.  I got it.                                           11:25AM

21  Q.  Okay.  So the manual says to review 10 records from each

22  yard.  So do you review 10 different patients' files or do you

23  review 10 HNRs with the possibility that two or more of those

24  HNRs are from the same file?

25  A.  Yeah.  I review 10 HNRs and it could be from the same      11:26AM

1    inmate, could have more than one.

2    Q.  So what if a file in the sample that you get has more than

3    one mental health HNR besides the one that first kind of

4    triggered you to look at the file?  Would you look at all the

5    other mental health HNRs in there to see if those were also         11:26AM

6    timely responded to?

7    A.  No.  On the log they are dated, like when was the HNR

8    stamped.  So I would look and see when the HNR was stamped on

9    that date and use that one.

10   Q.  Uh-huh.  And do you remember when you began reviewing all       11:26AM

11   five categories of the HNRs as required by the performance

12   measure?

13   A.  Not exactly.  I think I was doing it by December.  I mean,

14   all five -- it's been a while.  If it came up as urgent or

15   emergent or routine, I have been doing that for quite a while.      11:27AM

16   Q.  Okay.  So maybe you will be able to answer my question.  If

17   you look at it, I believe there's some highlight to Prisoner

18   100 and then there's an R after his name or after his number.

19   A.  I don't see a highlight.

20   Q.  Okay.  About eight lines down.                                  11:27AM

21   A.  Ends in 100.  Okay.  I see it.

22   Q.  Then it has an R?

23   A.  Uh-huh.

24   Q.  What does the R mean?

25   A.  That means it's a routine.                                      11:27AM

1    Q.   Okay.

2    A.   As opposed to urgent or emergent.

3    Q.   And then it says medication.  That means the HNR was about

4    medication?

5    A.   Yes.                                                          11:27AM

6    Q.   Okay.  You have triaged, resolved, no referral needed?

7    A.   Right.

8    Q.   What does the Y mean?

9    A.   That means it's compliant.

10   Q.   Okay.  And then the next one, Mr. 663, he has a U?         11:28AM

11   A.   Right.

12   Q.   That means urgent?

13   A.   Yes.

14   Q.   Okay.  Medication triaged 12-1, not seen 12-2, N, meaning

15   non-compliant?                                                    11:28AM

16   A.   Correct.

17   Q.   Do you normally, if you looked at it and so he wasn't seen

18   within the 24 hours as required, but do you have a practice of

19   ever noting when he was actually seen?  So if I was looking at

20   this, I could know, well, he wasn't -- he didn't get his         11:28AM

21   medication within one day but he got it five days later or 20

22   days later?

23   A.   Speaking for the HNRs?

24   Q.   Yeah.

25   A.   I mean, now I put the time down on most of them, I mean, if  11:28AM

1   it's urgent, needs to be seen within 24 hours.  If they are not

2   seen within three days I don't see a lot of point putting the

3   time down because it's way out of compliance.  Now I put the

4   time down no matter what.

5   Q.  Okay.  Yeah.  So holding aside the time, I guess what I'm          11:29AM

6   asking is, you know, you are looking at this at some point in

7   January and you have made a note that it was triaged on

8   December 1st, and he was not seen December 2nd, which was the

9   date it was due.  But do you think it might be useful to others

10  reviewing it to know when somebody who had an urgent request          11:29AM

11  actually did finally get his medications, just as kind of a

12  parenthetical or something?

13  A.  Well, maybe one, it's not necessarily that he was missing

14  medication.  It would be something else.  But, yeah, I mean, it

15  could help people to know.  But as far as the question is          11:29AM

16  concerned, was he seen or not, I'm just answering the question

17  as it is.  And he wasn't seen within 24 hours so I made it

18  non-compliant.

19  Q.  When you kind of -- I just want to take a step back.  When

20  you are looking at a file and say you saw something where it          11:30AM

21  was classified as urgent and it was -- you are looking at it

22  four or five weeks later, and you see something in there based

23  on your clinical experience and your work in the profession

24  that alarms you, would you normally pick up the phone or send

25  an e-mail to somebody and say, you know what?  I was just          11:30AM

1   looking at Mr. 663's file to audit it and I saw something

2   alarming?

3   A.  Yeah.  If I see something that would require like I think

4   this person needs to be seen and hasn't been, I would call the

5   lead mental health person in that yard saying, this person put          11:30AM

6   in an HNR on this date and still hasn't been seen.  It's

7   important.  But yeah, I would do that.  It would still be

8   non-compliant but I would alert them to that.

9   Q.  I mean, holding aside compliance/non-compliance, but just

10  as a professional with a professional obligation, how                    11:30AM

11  frequently do you do that?

12  A.  It's not often.  I mean, they are usually seen at some

13  point, and close to the right time.  Sometimes they are not.

14  But they are -- I can think of maybe twice I have had to do

15  that.                                                                     11:31AM

16  Q.  And what happened?

17  A.  I checked to make sure they were seen and they were.

18  Q.  What was the situation, though?

19  A.  One, I can't remember but it probably I think had to do

20  with he had transferred to that complex and the medication did           11:31AM

21  not follow him and he had not been getting his medication.  And

22  so when I looked at the HNR and I noticed he still hadn't

23  gotten it so I would call them to make sure that he's getting

24  it.  But again, that doesn't happen very often.

25  Q.  Okay.  And so you also sometimes use a symbol of E when you           11:31AM

1    are looking at these HNRs.  Is that for emergency?

2    A.  Emergent, emergency, yeah.

3    Q.  Who decides whether an HNR is urgent, emergent, or routine?

4    A.  Well, me auditing would normally, if I consider it urgent

5    and if I have doubt, I always -- if I have doubt I will always          11:32AM

6    rule in favor of the inmate and make it emergent.  But

7    sometimes I may talk to my co-workers and say, do you think

8    this was emergent?  But usually emergents are pretty cut and

9    dried.  It's danger to their life or health.  It's pretty

10   straightforward.                                                        11:32AM

11   Q.  It's the urgent versus routine where it can be more

12   nuanced?

13   A.  A little bit, yeah, it can.

14   Q.  So you are deciding, but isn't the decision made earlier in

15   the process when the HNR is triaged, that it gets triaged and           11:32AM

16   somebody at that point decides it's urgent, emergent, or

17   routine?

18   A.  Yes.  At any time if it's triaged and they call it urgent

19   or emergent, I treat it like that.  If they say it's emergent,

20   then I will treat it like an emergent.                                  11:33AM

21   Q.  So the E, U, or R that we would see in here, that refers to

22   how the nurse characterized the HNR?

23   A.  No, it usually refers to do I think this is urgent,

24   emergent, or routine.  Usually that's how it is.  And usually

25   the nurse triaging, they don't always write that in there, but          11:33AM

1    yeah.

2            THE COURT:  I sometimes do recall having seen that

3    it's been written.

4            THE WITNESS:  I mean, it is.

5            THE COURT:  So how often is that the case that when    11:33AM

6    you are looking at a pulled file that somebody prior to you

7    looking at the file, a nurse, for example, has made the

8    designation as to whether it's urgent, emergent, or routine?

9    How often do you see that that prior decision has been made?

10   Is that most of the cases?                                    11:34AM

11           THE WITNESS:  In most of the cases they don't actually

12   write it on the HNR, routine, they put it on the log.  Most of

13   the cases the routines they don't write.  If it's either urgent

14   or emergent they will write it on there.  Most of the routine

15   they don't write it on there.  I guess it's considered the     11:34AM

16   default of routine if they don't write it.  Regardless, it's

17   what I think it is when I read it.  So sometimes they may not

18   write anything thinking it's routine, but I consider it urgent

19   so I will treat it like an urgent one.

20   BY MS. KENDRICK:                                               11:34AM

21   Q.  When you get the list of the HNRs, does it have any sort of

22   designation like saying routine, emergent, urgent, just based

23   on what the nurses wrote or didn't write?

24   A.  They do have that, but I don't pay it a lot of attention

25   because I'm going to evaluate it by what I think it is.  And I  11:35AM

─────── April 17, 2017 - Status Hearing Resumed - Dye - Cross ───────

1    may consider what they say.  Certainly if they think it's more

2    urgent than me I will treat like that.  But first thing I do is

3    make my decision based on what is the nature of the HNR.  Then

4    I will label it routine, urgent, or emergent.

5    Q.  But isn't the fact that it's the nurse who makes this                        11:35AM

6    initial designation of urgent, emergent, or routine what

7    dictates the outcome in terms of what the requirements are for

8    the timeliness of the response?  So if say, she designated it

9    as it urgent and the person needs to be seen within X number of

10   hours, then you read it and you decide, no, I think it's                         11:35AM

11   routine --

12   A.  No.  I never question it down.  If they say it's urgent or

13   emergent that's what it is to me.  I will elevate it up

14   sometimes.  When they say it's routine I will say I think

15   that's urgent or emergent, but I would never go the other way.                   11:36AM

16   If they say it's emergent or urgent, I treat it like that.

17   Q.  How frequently do you do that?

18   A.  Not that often, because usually they have it right.  But it

19   happens occasionally that they will treat it as routine but I

20   say no, this is an urgent one.                                                   11:36AM

21   Q.  Are the nurses who triage the mental health HNRs, are they

22   just the regular sick line nurses or are they specially trained

23   mental health RNs doing the triaging?

24   A.  Usually it's a medical registered nurse, you know, they all

25   have training in mental health.  But it's not a mental health                    11:36AM

1    nurse doing it usually.

2    Q.  Is that why you review and substitute your own judgment

3    sometimes?

4    A.  Not because they are not mental health, it's just an extra

5    quality assurance thing.  Because sometimes we can disagree,          11:36AM

6    but in the end, if I think it's urgent and they don't I'm going

7    to treat it as urgent.  Whether it's a psych person or

8    non-psych person that writes it, I would review it either way.

9    Q.  What if the prisoner wrote emergency on the HNR but then

10   the nurse treated it as a default routine?  Would you look at         11:37AM

11   that and say that should be an emergency because the prisoner

12   said it was an emergency?

13   A.  Well, most of the time, yes, but I will look.  Because they

14   could say emergency and then it's like -- and I have seen

15   this -- emergency, I need a journal to write out my thoughts.         11:37AM

16   So in cases like that, I have said no, it's not really

17   emergency.  Just because the inmate wrote it that way.

18   Emergency is imminent danger to life or health.  Getting a

19   journal, I don't know, I wouldn't consider that emergency.  So

20   I take that into consideration.                                       11:38AM

21   Q.  Okay.  And you said that these medical nurses have some

22   mental health training as part of being nurses but to your

23   knowledge, have they received any training or written

24   instructions on how to triage mental health HNRs given the

25   various categories in the technical manual?                          11:38AM

1    A.  I know that they have been instructed because I have seen

2    memos sent out to the director of nursing in that what -- how

3    to treat each classification with an HNR.  So they have

4    received the instructions, yes.

5    Q.  And who prepared those written instructions?                    11:38AM

6    A.  It would be probably someone on the -- someone up on the

7    Corizon end.  I can't remember exactly who wrote it.  Someone

8    on Corizon, one of the top manager, directors.

9    Q.  From mental health?

10   A.  Right.  Yes.                                                     11:39AM

11   Q.  And do you know when those written instructions went out to

12   the line medical nurses?

13   A.  Well, they may go out more than I see them.  I guess the

14   last one I saw would have been four, five, maybe even six

15   months ago.  I wouldn't see all of them that go out.  I'm not     11:39AM

16   administration.  I wouldn't see most of them.  But I know

17   within -- yeah.  Four to six months ago is the last one I saw.

18   Q.  And do you know if as new medical nurses are hired if this

19   is part of their training and orientation?

20   A.  I don't know.  It's handled by Corizon.  I don't know.          11:39AM

21   Q.  Have you ever had an emergency HNR included in the sample

22   for this performance measure?

23   A.  Yes.  Yes.

24   Q.  And the emergency HNR, the definition is it's supposed to

25   be seen immediately upon receipt of the HNR, correct?               11:40AM

UNITED STATES DISTRICT COURT

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1    A.   Right.

2    Q.   What's your definition of immediately?

3    A.   Well, I mean, it's hard to put that down like what do I

4    mean immediately.  But usually within an hour I would say.  If

5    you get an HNR that needs to be seen emergently, considering          11:40AM

6    sometimes there's like difficulty moving around prisons, but

7    loosely speaking I would say within an hour definitely.

8    Q.   How about the next day?

9    A.   Next day would not be immediately, no.  That would not be

10   compliant.                                                           11:40AM

11   Q.   I have handed you a stack of the February CQI minutes.

12   They are arranged alphabetically by prison.  I'd like you to

13   look at the Yuma one which should be the very last one in the

14   packet.

15   A.   Yuma.  Okay.                                                    11:41AM

16   Q.   Okay.  So if you could turn to Page 4.

17   A.   Okay.

18   Q.   And about six lines down it says, "MHRN" -- I assume that

19   stands for mental health registered nurse -- "Hedglen reported

20   a that there's been an increase in the refusals for mental           11:41AM

21   health.  The new HNR process requires that nursing has an

22   encounter with all patients that submit a mental health related

23   HNR.  Many patients are refusing this encounter with the nurse

24   due to only wanting to see mental health and not wanting to be

25   charged a $4 fee for the nursing appointment. "                      11:42AM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1   A.  Yes.

2   Q.  Are you familiar with this policy?

3   A.  Well, I know that somewhat recently Corizon set up the

4   system where they have sick call lines every day a couple times

5   a day so all HNRs are processed through that rather than giving          11:42AM

6   it to somebody to wait for a response.  There's sick call times

7   twice a day.  So, yeah, I'm aware of that.

8   Q.  So my understanding is they are doing the sick call more

9   than just Yuma so this is not just a new policy at Yuma.  It's

10  at all of the institutions?                                              11:42AM

11  A.  I understand it's statewide, yes.

12  Q.  Statewide.  Okay.  And what's the purpose of having medical

13  nurses see a prisoner who is raising a mental health issue and

14  charge him $4?

15  A.  Well, it's to get a triage.  Because nurses can tell, they         11:43AM

16  are supposed to be trained, is this something that needs

17  immediate attention?  Is this something that can wait or is

18  this kind of a routine request?  So we need to have some way to

19  get it triaged, you know, quickly when they write the HNR who

20  is going to triage it quickly to see when it needs to be              11:43AM

21  followed up.

22  Q.  But why does a person need to be seen face-to-face and

23  charged $4 in order for the nurse to triage an HNR and refer it

24  to mental health staff?

25  A.  As far as the $4, that is a decision that's made within           11:43AM

1   Corizon like who is going to charge, who isn't.  I know SMIs

2   are never charged.  But clinically speaking, it's important

3   that anybody who puts an HNR for somebody to screen it and see

4   how important is that.  And like I said, rather than putting it

5   in, giving it to the officer, waiting for the officer to give          11:44AM

6   it to somebody else, that caused a delay.  So having sick call

7   lines twice a day eliminated that.

8   Q.  Aren't there locked boxes in all the yards where prisoners

9   can privately put HNRs in and not have to use custody officers?

10  A.  I understand there is, yes.  But I could see where there           11:44AM

11  would be a delay with that.  You have got to pick up, take them

12  back read them, sort them, I'm thinking that could take longer

13  than an immediate like, what's the issue?  I need to know what

14  the issue is right now.

15  Q.  What was the process for triaging mental health HNRs before        11:44AM

16  this new policy went into effect?

17  A.  Well, there was always the boxes they could drop them in

18  and, I believe, I can't say if this was universal on all the

19  complexes, but nurses would go by on certain times and pick

20  them up, like on pill calls, they would pick them up and bring        11:45AM

21  them back.

22  Q.  And they would just triage them like sitting in an office

23  without the person there --

24  A.  Right.

25  Q.  -- in front of them.                                               11:45AM

1          Does this apply to all mental health HNRs?

2    A.  Yes.

3    Q.  Does this apply to refills?

4    A.  If they are writing an HNR saying I want a refill, then if

5    it's on an HNR, they should -- I mean, all HNRs have to, in          11:45AM

6    theory, come down and see on sick call.  And if they are

7    overdue that's an urgent HNR anyway.  They would have to be

8    seen within 24 hours.

9    Q.  I'd like you to go back to the monitoring guide.

10   A.  Okay.                                                            11:46AM

11   Q.  If you go to Page 11.

12   A.  Page 11.

13   Q.  Yes.  Page numbers are on the bottom.

14   A.  Okay.

15   Q.  And it says on the monitoring guide under cell front          11:46AM

16   encounters, "For all mental health measures in which an inmate

17   is required to be seen, any contact on cell front may only be

18   counted as a contact if there is a refusal or a lockdown."

19          Are you familiar with this requirement?

20   A.  Yes.                                                            11:46AM

21   Q.  And was there a time when you counted cell front for

22   performance measures?

23   A.  Only if, like it says here, there was a refusal or a

24   lockdown we would count it.  But if there wasn't a refusal or a

25   lockdown, it would be non-compliant.                               11:47AM

1    Q.  Right.  That's now.  But I said have you ever -- was there

2    ever a time that you did count them?

3    A.  Not to my knowledge.  Not since I have worked there did we

4    ever count them without a refusal.

5    Q.  Were you aware that the Court had to specific order that        11:47AM

6    the cell front encounters not be counted as being seen?

7    A.  For suicide watches, more recently there was a court order

8    for that, for the suicide watches, yes.  We did count cell

9    fronts for suicide watches until that court order.

10   Q.  I'm not as fluent with the numbers as my colleague is.  So     11:47AM

11   that would be Performance Measure 94?

12   A.  I'm not that fluid either.

13   Q.  All prisoners will be seen.

14   A.  All prisoners who are on suicide watch, yes, to be seen

15   daily.  Yes.  At one time, we did take cell front visits for       11:48AM

16   that.

17   Q.  What about for Performance Measure 93 which is the mental

18   health staff not to include LPNs will make weekly rounds on

19   MH-3 and above prisoners housed in max custody?

20   A.  Well, rounds, sort of by the definition, are done at cell      11:48AM

21   front.

22   Q.  So you did count cell fronts for that particular measure?

23   A.  For the rounds, yes.

24   Q.  And then working backwards, Performance Measure 92, "Mental

25   Health 3 and above housed in max custody will be seen for a        11:48AM

1   clinician for one-on-one or group session a minimum of every 30

2   days."  Cell fronts used to be counted for those too?

3   A.  No.  That would not be counted unless there was a refusal.

4   Q.  Why not?

5   A.  Well, because it's a -- they are required a one-to-one or          11:49AM

6   group contact.  So a cell front would not work.  It says

7   one-to-one or group.

8   Q.  I know what it says.  I'm just curious why on 92 you

9   wouldn't count a cell front but on 93 and 94 you would.

10  A.  Well, 92 is a measure that measures like contacts.  Rounds,     11:49AM

11  like I said, rounds kind of by definition are rounds that are

12  done going around to all of the cells on rounds.  If they were

13  pulled out, each one pulled out, that would not be a round.

14  Q.  So none of these others about the MH-5, the MH-3Ds being

15  seen after discontinuing of medication, it's your testimony          11:50AM

16  that cell fronts were never counted as compliant?

17  A.  Correct.  Not without a refusal.

18  Q.  Was that just for you?

19  A.  No.  That was everyone in mental health compliance.  We

20  always required a refusal if they were seen cell front.  And         11:50AM

21  now we do it for everything, suicide watches and everything

22  except rounds.  Because rounds are done by technicians.  They

23  are not done by clinical staff.  Rounds are done by

24  technicians.

25  Q.  So the rounds, are you still letting those count?                11:50AM

1  A.  Yes.  Again, because they are by technicians who, because

2  by licensing they couldn't pull out and talk to somebody

3  one-to-one because they are not licensed.

4  Q.  So you are saying unlicensed people are doing the rounds?

5  A.  Mental health staff.  So sometimes that is technicians,          11:51AM

6  like mental health techs.

7  Q.  So you have to be licensed to do one-on-ones?

8  A.  Yes.

9  Q.  Okay.  I apologize.  I'm not as familiar with the mental

10  health performance measures.                                        11:51AM

11          How do you currently ensure that none of the contacts

12  you are counting when you are looking at a file occurred at the

13  cell front?

14  A.  Well, first of all, I read the note.  It's designated on

15  each note, it says clinical or cell front so they have to pick      11:51AM

16  one of those.  So I could tell that way.  And then if they

17  document -- if they document someone, patient who was seen cell

18  front or patient seen outside of the cell, I can tell by their

19  documentation, or what they choose, the nature of the visit

20  they choose, clinic or cell front.                                  11:52AM

21  Q.  And same question for Performance Measure 95 about removing

22  people from suicide watch and then the follow-ups.  How do you

23  ensure that you are not counting cell front encounters?

24  A.  The same way.  If they are removing from a watch, we check.

25  If they are on a watch, we check to make sure they are offered      11:52AM

1    a one-to-one.  In the language of the note, did they offer a

2    one-to-one, and also check the nature of the HNR, whether they

3    were at the cell front or clinic marked.  That's for the ones

4    removed from watch.  What was the other thing you said?

5            Most of the states have gotten pretty good about          11:53AM

6    people on watch documenting that patient was offered a

7    one-to-one and the patient either accepted or not.

8    Q.  So you testified that you and mental health staff used to

9    randomize the lists.  Is that correct?

10   A.  Yes.                                                          11:53AM

11   Q.  What time period was that?

12   A.  Oh, boy.  Loosely speaking, a year ago Ryan Owens started

13   doing it.  I can't be sure the exact time, but a year.

14   Q.  So Spring of 2016?

15   A.  Approximately.                                                11:54AM

16   Q.  So for how long before he came on were you doing it?

17   A.  Since I started, I have worked three years, so the first

18   couple years I was getting the reports myself.

19   Q.  Okay.  And did you randomize the list for all the mental

20   health performance measures?                                     11:54AM

21   A.  The ones on my -- the complexes that I was auditing, yes.

22   Q.  And the other mental health monitors randomized their own?

23   A.  Yes.

24   Q.  How did you do it?

25   A.  Same way.  I would -- well, randomization has changed over   11:54AM

1    time, but the last way I did it was the Excel randomization

2    function.

3    Q.  So my understanding on how you did the Excel randomization

4    function is you have a list of names, say, prisoner names and

5    their inmate numbers and then, say, whatever the date was or                11:55AM

6    whatever you are looking for, and then you add a column and you

7    assign random numbers?

8    A.  Right.  Yeah.

9    Q.  And you do that using the randomization formula?

10   A.  Yes.                                                                     11:55AM

11   Q.  And it assigns random numbers, right?

12   A.  Yes.

13   Q.  And then what do you do next?

14   A.  After they randomize then the audit starts.  I select with

15   10 or whatever is required from each yard and I select the 10              11:55AM

16   from the randomized list to audit.

17   Q.  So you go straight from assigning the numbers to picking

18   the first 10?

19   A.  Yes.  I mean, they are sorted by complex and a unit on the

20   complex.                                                                    11:55AM

21   Q.  But they were sorted by complex before you randomized them,

22   correct?

23   A.  Yes.

24   Q.  And then you assigned the random numbers?

25   A.  Right.                                                                  11:56AM

1    Q.  So your testimony is then the next step that you do is you

2    take the first 10?

3    A.  Yes.

4    Q.  Okay.  So do you select the column of random numbers and

5    sort the table by that column, from smallest number to largest    11:56AM

6    number?

7    A.  Going through, I insert the column for randomization and

8    then I use the formula.  And then when I hit the enter, it

9    changes the order and randomizes them.  Whether it's smallest

10   to largest, largest to small, I think it's smallest to largest.  11:56AM

11   Q.  But do you -- would you affirmatively take the steps of

12   selecting the table and sorting it from smallest to largest or

13   are you just going by what the computer randomly assigns?

14   A.  I would go by what the computer randomly assigns.

15   Q.  And then do you also not -- okay.  So you do not sort them   11:57AM

16   afterwards?

17   A.  No.  They are already sorted by unit by that point.

18   Q.  And also back to the monitoring guide on Page 11, it says

19   that any -- under group contacts, "Any performance measure that

20   requires being seen cannot be done in a group setting unless     11:57AM

21   expressly stated in the performance measure?

22   A.  I'm sorry.  Page 11?

23   Q.  Yeah.  Are you familiar with that requirement?

24   A.  Yes.  And I know that on the max contacts it was entered in

25   that they needed to have groups.                                  11:58AM

1    Q.  Right.  It says "unless otherwise expressly stated"?

2    A.  Right.  Right.

3    Q.  So do you comply with this requirement in your monitoring

4    now?

5    A.  Yes.                                                            11:58AM

6    Q.  Was there a time when you were counting group encounters as

7    satisfying the requirement that the patient be seen?

8    A.  Yes.  We did it on some of the measures and never heard

9    anything about it, but yeah.

10   Q.  Did you do it for Performance Measure 73, which is about     11:58AM

11   MH-3 minors being seen by a clinician a minimum of every 30

12   days?

13   A.  I am pretty certain, and my memory is correct, that minors

14   always had to be seen one-to-one.  And they didn't as I note, I

15   have never, in my knowledge, counted a group as a minor          11:59AM

16   contact.  Because they are seen so often as minors one-to-one.

17   Q.  The minors are either at Tucson if they are boys and at

18   Perryville if they are girls, right?

19   A.  Right.

20   Q.  Have you ever reviewed Tucson or you said you are assigned    11:59AM

21   to Perryville?

22   A.  I have reviewed both, and I have never seen -- I'm pretty

23   sure I have never counted a group encounter as a contact for

24   the minors.

25   Q.  What about Performance Measure 74, the one that requires      11:59AM

1  that female inmates be seen by a clinician within five days of

2  a return from a hospital post-partum?

3  A.  Best of my knowledge, I have never counted a group for that

4  contact.

5  Q.  What about a cell front?                                    11:59AM

6  A.  No.  Not unless there is a refusal.

7  Q.  And the refusal has to be documented?

8  A.  Yes.  And that has almost never happened.  I can't even

9  recall once it has happened.

10 Q.  What about Performance Measure 76.  That's the performance   12:00PM

11 measure if the initial assessment is not done -- during intake

12 is not done by licensed mental health staff the prisoner shall

13 be seen by a clinician within 14 days?

14 A.  Right.  And again, to the very best of my knowledge I have

15 never counted a group for that contact.                        12:00PM

16 Q.  Okay.  What about a cell front?

17 A.  I mean, again, possibly, if they were offered a one-to-one

18 and refused then I would have counted it.

19 Q.  So even before the Court's order you would have looked for

20 a refusal before counting it?                                  12:00PM

21 A.  Oh, yeah.  For required one-to-one contact I would have

22 looked for some kind of a refusal, yeah.

23 Q.  Do you know if the other mental health monitors did

24 similar?

25 A.  Yeah, they did.                                             12:01PM

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1   Q.  How do you know they did it the same way too?

2   A.  Well, I mean, these are the things we talked about as a

3   team, how are we going to handle this, how are we going to

4   handle that.  We have discussed that before, like what needs a

5   refusal.                                                          12:01PM

6   Q.  Are you aware the issue of group contacts counting as being

7   seen or cell front contacts being seen was a source of great

8   confusion and repeated clarifications by this Court?

9   A.  I caught wind of that, yeah.

10  Q.  You seem to understand it quite clearly, so, you know. . .   12:01PM

11  A.  I mean, I caught clear that there was controversy.  I mean,

12  we always needed a refusal for a cell front.  If there was a

13  cell front, to my knowledge, we always needed a refusal or we

14  wouldn't have counted it.

15  Q.  And so you were doing this based upon your clinical          12:02PM

16  experience?

17  A.  Yes.  Yeah.

18  Q.  And why is it not good to do cell front encounters?

19  A.  Cell front encounters, generally, the patient may not talk

20  as openly, I guess.  That's why a one-to-one would have to be    12:02PM

21  offered.

22  Q.  Because often times they are having to shout through a

23  closed door so others can hear what's being said?

24  A.  Right.

25  Q.  I mean, from your perspective, as somebody who worked in     12:02PM

1   the prisons, did you find it difficult to try to have any sort

2   of meaningful encounter with your patients when you were

3   talking to them through a plastic door?

4   A.   I mean, I guess we're talking about the suicide watches.

5   Generally, no.  Any time the inmate wanted to talk, even if the      12:02PM

6   patient wanted to talk it would always have been pulled out.

7   If it was something that needed to be talked in private we

8   always would have pulled them out.  Even though it may not be

9   documented this patient was offered a one-to-one if they asked

10  to be pulled out it was usually done.                                12:03PM

11  Q.   Would you offer to pull them out?

12  A.   When I worked there?

13  Q.   Yes.

14  A.   It's been several years since I worked there, but I would

15  usually offer to pull them out, yeah.                                12:03PM

16  Q.   Yeah.  Or like on the max custody units where you have to

17  wear those ridiculous plastic shields covering your face, would

18  you offer to pull them out so you could speak to them?

19  A.   When I worked there, I encouraged visits outside of the

20  cell, I believe.  Like I said, it's been a number of years           12:03PM

21  since I worked on the max units.

22  Q.   Uh-huh.  Was it because of custody that you wouldn't do it

23  or wouldn't offer it?

24       MR. BOJANOWSKI:  Objection, Your Honor.

25       THE WITNESS:  I can't remember when I worked there.            12:04PM

1    Things were different.

2            THE COURT:  Are you close to a concluding point?

3            MS. KENDRICK:  Yes.  Yep.

4    BY MS. KENDRICK:

5    Q.  So I just want to kind of try to clarify a few things.  You          12:04PM

6    have been saying throughout your testimony about how Corizon

7    gets its list from AIMS and AIMS creates lists.  My

8    understanding is that AIMS is a program that belongs to the

9    Arizona Department of Corrections.  Is that correct?

10   A.  Yes.                                                                  12:04PM

11   Q.  And so the AIMS lists are maintained by ADC staff?

12   A.  The AIMS lists are for what can be taken out of the AIMS or

13   mental health scores, As, Bs, Cs, Ds, those can be taken out,

14   release dates.  Things like suicide watches HNRs would not be

15   on AIMS.                                                                  12:04PM

16   Q.  I think you said that's the original source for the mental

17   health scores that people have, like whether they are an MH-3A?

18   A.  Yeah.  That comes from ADC AIMS.

19   Q.  So who is inputting that information into AIMS?

20   A.  Right now it's Ryan Owens.                                           12:05PM

21   Q.  Ryan --

22   A.  Ryan Owens puts that in to get the reports for A, B, C, Ds.

23   Q.  So it's not when a psychiatrist sees someone and says I'm

24   going to make you MH-3B that it shows -- do clinical staff go

25   into the AIMS?                                                           12:05PM

1    A.  Oh.  I see what you mean.  I'm sorry.

2         It's connected to the electronic health record.  So

3    any time the score is changed on the electronic health record,

4    eOMIS, daily AIMS goes through and matches that.  So if there

5    was a score change it would reflect within the next day on the          12:05PM

6    AIMS.

7    Q.  So the psychiatrist puts it into eOMIS and then the nightly

8    upload, if you will, from eOMIS to AIMS inputs that new

9    information into the AIMS system.

10   A.  Right.  The mental health scores, yes.                              12:06PM

11   Q.  Does it work the other way?  Could somebody go into AIMS

12   and change the person's score and then the next day eOMIS would

13   show that the prisoner's score had changed as a result of

14   somebody making a change at AIMS?

15   A.  That I can't be sure.  The clinicians would have no reason         12:06PM

16   to open AIMS and change a score.  I don't know.

17   Q.  Who has access to AIMS?  Who uses it?

18   A.  People who work in ADC and people in Corizon.  There's a

19   process where you get approved to use AIMS.  I don't -- so

20   there are people within Corizon that use AIMS.  I don't know            12:06PM

21   what the process is or who qualifies.

22   Q.  Does it -- you said they interact and upload.  Do they

23   upload diagnoses to AIMS?

24   A.  No.  Those are entered.

25   Q.  Those do not show the names?                                        12:07PM

1    A.   Right.

2    Q.   Do custody officers have access to AIMS?

3    A.   Yes, they do.

4    Q.   Do you know if their access is limited in any way?

5    A.   They -- usually regular line officers don't have access to          12:07PM

6    the medical and mental health screens.  Tell you the truth, to

7    go back a second, I'm not sure that the diagnoses aren't

8    automatically uploaded.  I guess I don't really know.  I know

9    that the mental health scores are.

10   Q.   Okay.  So I want to, in closing, go back to some stuff that        12:07PM

11   you mentioned at the very beginning.  When you were talking

12   about how you have these debriefs and meetings with the

13   facility staff and you go over your findings, initial findings

14   for the month, you said at these meetings, based on your

15   professional clinical experience, that you have given                   12:08PM

16   recommendations to Corizon.  And so I just want to ask you

17   about that, like what were you recommending to Corizon?

18   A.   I don't know if I can recall every one.  It was just

19   information based more on when I worked I tried to tell them I

20   have been in the field for years, you know, things like you           12:08PM

21   have got to coordinate this with security.  If you are going

22   to -- this is one of them.  If you are going to do a group, you

23   have got to coordinate with security the times are set up and

24   where it's set up, you have got to run a lot of these things by

25   security first.  Things like that I would tell them based on my       12:08PM

UNITED STATES DISTRICT COURT

April 17, 2017 - Status Hearing Resumed - Dye - Cross

1    experience.

2    Q.  When is the last time you did that at a meeting that you

3    can remember recently?

4    A.  I mean, last month we talked about HNR process, what might

5    help the HNR process and who is going to enter it, you know,        12:09PM

6    things like that.

7    Q.  What institution was that at?  Do you remember?

8    A.  I think -- I'm trying to remember.  Perryville, I believe,

9    we were talking about HNR process.

10   Q.  And was this related to the issue of the nurses having to       12:09PM

11   see them on the mental health HNRs or what specifically?

12   A.  I'm trying to remember.  Let's see who we were talking

13   about.  More of -- there seemed to be a pattern of they were

14   leaving blanks on the log.  It happened a couple months where

15   the date it was triaged or date it was stamped was not on the      12:09PM

16   log and I would have to send that back and get that corrected.

17   So we just talked about things like when a person gets the log,

18   enter that immediately -- when a person gets an HNR, enter it

19   immediately on the log.  It's problem-solve things like that,

20   who enters the time, who puts it on the log, having one person     12:10PM

21   designated to do the log so it's not five or six people

22   entering.

23   BY MS. KENDRICK:

24   Q.  So what's the impact of not entering the date on the log?

25   A.  If there was a blank on the date, then really it would just    12:10PM

1   take me longer.  If I didn't see a date of the HNR I would have

2   to -- or if the date stamp wasn't on there I would have to send

3   it back to them and say I need it stamped.  We need to know

4   when this HNR came in.  So it would just be sending it back to

5   them, getting a new one.  A lot of times it's different things.   12:10PM

6   They are not entering -- the title may not be right so I will

7   say you have got to change the title to say it's mental health

8   so I don't have to spend half an hour looking for one HNR.

9   Q.  So these HNRs were coming up in your group of 10 and you

10  would say, oh, there's a problem here?                           12:11PM

11  A.  It happened before that.  As soon as I would look at the

12  log I would see if there's gaps or blanks on it.  So I would

13  send it back to get it filled in before it would even be

14  randomized.

15  Q.  So why weren't they doing this?                              12:11PM

16  A.  I don't recall exactly.  There's been changes with this new

17  sick call system.  There's been a lot of changes it's led to, I

18  think, some problems on the units.  But I don't know exactly

19  why that wasn't being done.  I don't remember.  There's been a

20  lot of adaptation to the new sick call.                          12:11PM

21  Q.  And have there been other times -- I believe you also said

22  there were recommendations that you have made in these meetings

23  to Corizon, and I think you said sometimes they take my

24  suggestions.  Can you remember times they did not take your

25  suggestions and what those suggestions were?                     12:12PM

1   A.  No.  I can't remember exactly.  It's all anecdotal based on

2   my experience working with ADC.  It's not really my official

3   capacity as an auditor.  I'm just given it based on my personal

4   experience.  I don't remember if there was something they did

5   or didn't do.                                          12:12PM

6   Q.  Have you, in your doing your auditing and finding

7   non-compliance, it seems like you are very thoughtful in

8   bringing your clinical experience and you are not just blindly

9   recording numbers.  Have you reflected and thought about what

10  some of the causes might be for ongoing non-compliance with   12:12PM

11  some compliance measures?

12          MR. BOJANOWSKI:  Note an objection, asks for opinion.

13          THE COURT:  Overruled.

14          THE WITNESS:  Well, if I see patterns of something

15  wrong, of course I think, well, what could aid this?  And     12:13PM

16  that's when we talk to Corizon, like to come up with a remedial

17  plan.  If something is consistently showing a problem, then we

18  would meet with Corizon staff to come out with a remedial plan

19  to fix it.

20  BY MS. KENDRICK:                                       12:13PM

21  Q.  Do you review the CAPs that are created for the mental

22  health performance measures that you monitor?

23  A.  No.  Those are not done by me.

24  Q.  I know Corizon does the CAPs.

25  A.  The reviews are not done by me.                    12:13PM

───── **April 17, 2017 - Status Hearing Resumed - Dye - Cross** ─────

1    Q.  Who reviews them?

2    A.  One of the other administrators.  I don't know which one

3    exactly.  Ms. Campbell or Headstream or somebody reviews the

4    CAPs.

5    Q.  Even the mental health ones?                                12:13PM

6    A.  Yes.

7    Q.  Have you ever been asked for your input on whether a CAP

8    was adequate when it's your institution and you are the one who

9    made the finding of non-compliance?

10   A.  Yeah, I get asked that.                                     12:14PM

11   Q.  Do you remember what it was about?

12   A.  Not exactly, like is training enough of an answer that

13   we're going to train.  I don't know.  I can't remember exactly.

14   I'm not asked that much.

15   Q.  Have you ever identified a root cause being not having      12:14PM

16   enough mental health staff?

17             MR. BOJANOWSKI:  Same objection.

18             THE COURT:  Overruled.

19             THE WITNESS:  No.  I have never thought that, no.

20   BY MS. KENDRICK:                                                12:14PM

21   Q.  Do you think Perryville has an adequate number of psych

22   associates?

23             MR. BOJANOWSKI:  Same objection.

24             THE COURT:  Overruled.

25             THE WITNESS:  I mean, I can't -- because that's an     12:14PM

1   internal Corizon matter, I can't say.  I would need to know how

2   are they allocating their staff, do the staff work 10 hours,

3   eight hours, how is the allocation done.  So I would need to

4   know that before I had any opinion about staffing.

5   BY MS. KENDRICK:                                          12:15PM

6   Q.  So you would need some sort of analysis or study before you

7   could form your opinion?

8           MR. BOJANOWSKI:  Same objection.

9           THE WITNESS:  Yeah.  I'm not involved in that end of

10  the staffing.  It's not my job.  I'm not aware of that.  That's  12:15PM

11  a Corizon decision.

12  BY MS. KENDRICK:

13  Q.  Do you know how many psychiatrist positions are in the

14  contract for Perryville?

15          MR. BOJANOWSKI:  Same objection.                  12:15PM

16          THE COURT:  Overruled.

17          THE WITNESS:  I can't remember exactly, no.

18  BY MS. KENDRICK:

19  Q.  Do you know if they are all filled currently?

20          MR. BOJANOWSKI:  Same objection.                  12:15PM

21          THE WITNESS:  I do not know.  I mean, I just audited

22  to see if psychiatry fulfilled their CGAR question.  But I

23  don't know that the numbers allotted are there.

24  BY MS. KENDRICK:

25  Q.  Do you have a practice of attending the monthly CQI        12:15PM

1  meetings for the institutions that you monitor?

2  A.  No, I don't.

3  Q.  You don't?

4  A.  No.

5  Q.  Have you ever?                                          12:15PM

6  A.  No.

7  Q.  Why not?

8  A.  It's never come up.  I have never thought about it until

9  right now.

10  Q.  They never invited you?                                12:16PM

11  A.  I guess they have never invited me.  I don't think they

12  invite anyone from the compliance department.

13  Q.  Over on medical they do.

14  A.  Well, maybe.

15  Q.  Maybe you should invite yourself.                      12:16PM

16  A.  Hey, maybe I will show up there.  That would change things

17  if I just showed up to a CQI meeting.

18  Q.  I think you would find it very illuminating.

19       Okay.  I'm done torturing you.

20       THE COURT:  Thank you very much.  What will happen now  12:16PM

21  is we'll take a lunch break and Mr. Bojanowski, if he chooses,

22  will have an opportunity to ask you more questions.  I will

23  have to ask you to stay by.  We'll come back into court at 1:30

24  this afternoon.  Thank you all.

25       (Recess from 12:16 p.m. until 1:33 p.m.)              12:16PM

─── April 17, 2017 - Status Hearing Resumed - Dye - Redirect ───

1          THE COURT:  Mr. Bojanowski, any redirect?

2          MR. BOJANOWSKI:  Just a very few questions, Your

3     Honor, tie things up, so to speak.

4                       REDIRECT EXAMINATION

5     BY MR. BOJANOWSKI:                                          01:33PM

6     Q.  Mr. Dye, earlier this morning we had some discussion about

7     healthcare Performance Measure Number 74.  And Mr. Fathi had

8     brought out a record of an inmate Number 394?

9          MS. KENDRICK:  Objection.

10         THE COURT:  What is the objection?                     01:34PM

11         MS. KENDRICK:  I thought we had an agreement to not

12    list the entire inmate number.

13         MR. BOJANOWSKI:  I said 394.

14         THE COURT:  You were just giving the suffix, last

15    three or first three?                                       01:34PM

16         MR. BOJANOWSKI:  Last three, just like they did this

17    morning.

18         MS. KENDRICK:  All right.  Sorry.

19         THE COURT:  Thank you for reminding that.  Looks like

20    we don't have a problem.                                    01:34PM

21    BY MR. BOJANOWSKI:

22    Q.  So we were looking at Number 74 for the Perryville complex,

23    and this has to do with female prisoners being seen by a

24    licensed mental health clinician within five working days of

25    return from a hospital post-partum.  And Mr. Fathi had shown    01:35PM

————— April 17, 2017 - Status Hearing Resumed - Dye - Redirect —————

1    you a record that looks like this?

2    A.  Yes.

3    Q.  Now, if you would go to Page 99 of the monitor guide.

4    A.  Okay.

5    Q.  Does that show you Measure Number 74?                    01:35PM

6           THE COURT:  I don't think so.

7           THE WITNESS:  No.  Page 99?  103 is Measure 74, Page

8    103.

9    BY MR. BOJANOWSKI:

10   Q.  It would help if I used same one.                       01:35PM

11          Yes.  103 is Performance Measure Number 74, right?

12   A.  Yes.

13   Q.  And in that performance measure there's a source document

14   called the in-patient hospital report.  Do you recognize that?

15   A.  Yes.                                                     01:36PM

16   Q.  And an in-patient hospital report is a report that shows

17   when a patient is actually admitted into the hospital.  Is that

18   right?

19   A.  Yes.

20   Q.  Go ahead and look at this report about inmate Number 394.  01:36PM

21   This particular inmate was not admitted into the hospital.

22   This was an outpatient procedure.

23   A.  I can't seem to find it.  But if it was it would not have

24   been on the in-patient report.  There it is.  Thank you.

25   Q.  This was done at the Family Planning Associates' office?  01:37PM

─────── April 17, 2017 - Status Hearing Resumed - Dye - Redirect ───────

1    A.  Right.

2    Q.  So this inmate would not appear on the in-patient hospital

3    report that would be the source document for Number 74, so the

4    fact of the matter is that this inmate would not fall into the

5    group that would be considered for this measure?                    01:37PM

6    A.  Correct.  She would not be on the in-patient report.

7    Q.  Right.  So there would be no way to find this particular

8    inmate, because the source document would not contain her name

9    because she was treated as an outpatient?

10   A.  Correct.                                                        01:37PM

11   Q.  Now, there was quite a bit of discussion about Performance

12   Measure Number 95, 94 and 95 -- excuse me -- 95, that talked

13   about various files where somebody was removed from watch and

14   then there were several categories of things, contacts that

15   needed to be made over a period of time.                           01:38PM

16        Do you remember that?

17   A.  Yes.

18   Q.  And as part of that analysis, it's my understanding that if

19   an inmate is on watch they then trigger 95 if they are then

20   removed from watch and there are certain time frames that then     01:38PM

21   come into play once that person is removed from watch, right?

22   A.  Yes.

23   Q.  And then once that person then goes back on watch, within

24   the time frames that are specified in 95, you basically don't

25   consider that file any longer because the person is now under a    01:39PM

——— **April 17, 2017 - Status Hearing Resumed - Dye - Redirect** ———

1   different set of time frames?

2           MS. KENDRICK:  Objection.  Leading.

3           THE COURT:  Sustained.

4   BY MR. BOJANOWSKI:

5   Q.  So does a person have a new set of time frames when they          01:39PM

6   are taken off watch and then put back on?

7   A.  Yes.  It would start from the last time they were taken off

8   watch.

9   Q.  All right.  So if a person is on watch on Monday, goes off

10  watch on Tuesday, then the time frames in 95 are triggered on         01:39PM

11  Tuesday but if they go on watch on Thursday, those time frames

12  no longer apply under 95?

13  A.  That's correct, unless there happened to be a 24-hour watch

14  in that one-day period.  But the rest of them would not apply.

15  Q.  All right.  And the reason why is because the acuity level        01:40PM

16  of that patient is much higher when they are on watch than when

17  they are off?

18  A.  Yes.  They are seen daily and offered a one-to-one every

19  day.

20  Q.  Okay.  If you would go to the Eyman complex CGAR PM Number        01:40PM

21  87.

22  A.  Got it.

23  Q.  Strike that.

24          Go to Perryville Number 77.

25  A.  Perryville 77.                                                    01:41PM

——— April 17, 2017 - Status Hearing Resumed - Dye - Redirect ———

1   Q.  We have a couple of highlighted items under 77 in

2   Perryville.  Do you see that?

3   A.  I'm not quite there yet.

4   Q.  Okay.

5   A.  Okay.  I got the first page.  I got it.                      01:42PM

6   Q.  Now, inmates Number 120, 710, which are highlighted there,

7   can you explain to me why those are compliant?

8   A.  This is for -- okay.  These are the 3As.  It's compliant

9   because this person was designated a 3A on 12-9 to possibly new

10  admission on 2-9, and had their treatment plan on 2-9.  So it   01:43PM

11  tells me it probably was an intake but it's compliant because

12  they had the intake.

13  Q.  So 12-9, the inmate is actually given -- is seen and given

14  a treatment plan on the same day that they were designated as a

15  3A?                                                             01:43PM

16  A.  Correct.

17  Q.  All right.  And then that inmate, what if they waited

18  another 30 days before they did that?  Would it be compliant

19  still?

20  A.  If they waited past 1-9 it would not be compliant.          01:44PM

21  Q.  All right.  Have you seen, over the course of time, that

22  treatment plans for inmates on the whole are becoming quicker

23  and quicker as far as Corizon seeing the inmate and getting a

24  treatment plan in place?

25  A.  Yes.  I think, you know, after years of monitoring and      01:44PM

1   hammering out solutions and out briefs, they are pretty quick

2   to do a new treatment plan, both on admission when they come

3   through intake and then --

4   Q.  So that's being reflected now in our draws as far as our

5   samples.  We're pulling more of these inmates that are          01:44PM

6   compliant because they are being seen immediately, and they are

7   being given a treatment plan immediately.  Right?

8   A.  Yes.  That happens a lot.

9   Q.  Is that the goal of this particular measure, is to get a

10  treatment plan in place as soon as possible so that treatment   01:45PM

11  can begin with the inmate as soon as possible?

12  A.  Yes.  Any treatment comes from the treatment plan.  If you

13  don't have a treatment plan you don't know really where you are

14  going.  So to get the treatment plan ASAP is very important.

15  Q.  And the same is true as far as other contacts that we       01:45PM

16  talked about during the morning where, you know, the contact or

17  designation is made in the month, the contact is made in the

18  same month.  Are you seeing that Corizon is speeding up its

19  contacts and seeing inmates a lot quicker now than in the past?

20  A.  Yes.  They weren't always real compliant with a lot of      01:45PM

21  these measures.  But yeah, they have been faster and more

22  accurate.

23  Q.  And so these measures that we are counting as compliant in

24  the same month that a designation is made, that is certainly

25  the goal that we're trying to reach, is to push that treatment  01:46PM

——— **April 17, 2017 - Status Hearing Resumed - Dye - Redirect** ———

1   so that it is timely and effective and speedy.

2   A.  Of course.  If someone changes a subcode we would expect

3   now there's a new direction to go.  They are a different

4   subcode.  There's a new direction to go.  So they should do

5   that as soon as possible.                                    01:46PM

6   Q.  When you talk about a subcode we're going from, say, a 3B

7   or whatever to a 3A, that's a different type of treatment for

8   that person?

9   A.  Yes.  That would indicate they need -- it's a higher acuity

10  now, so I would encourage them get a treatment plan, which is  01:46PM

11  your map of treatment, out as soon as possible.

12  Q.  So the fact that compliance is shown is certainly not a

13  problem in your mind, especially when it occurs in the same

14  month that the change was made in the inmate status?

15  A.  No.  That indicates they are doing their job, I mean, doing 01:47PM

16  their job well.

17  Q.  Now, there were some questions that you were asked about

18  sorting.  And I'm sorry, I was a bit confused in your answers.

19  A.  Okay.

20  Q.  You say you may get a list of inmates and then -- or you   01:47PM

21  have got maybe in the past you got a list of inmates and you

22  would have had randomized that list, is that right?

23  A.  Yes.

24  Q.  You don't randomize anymore.  You said that's done by

25  someone else?                                                 01:47PM

566

```
 1   A.  Yes.

 2   Q.  You said that you use the Excel program to randomize?

 3   A.  Correct.

 4   Q.  So you would get the list of inmates, right?

 5   A.  Yes.                                                      01:48PM

 6   Q.  Assign it a number?

 7   A.  Yes.

 8   Q.  And you would hit the sort button?

 9   A.  Right.

10   Q.  So it would have a number next to the name and then you   01:48PM

11   would sort it and then that would then spit out your random

12   list.  Is that how you did it?

13   A.  Yes.

14        MR. BOJANOWSKI:  May I have a quick moment, Your

15   Honor?                                                        01:48PM

16        THE COURT:  You may.

17        MR. BOJANOWSKI:  Your Honor, I don't have any further

18   questions.

19        THE COURT:  Thank you very much.

20        MS. KENDRICK:  Recross please?                           01:49PM

21        THE COURT:  I'm sorry?

22        MS. KENDRICK:  Recross?

23        THE COURT:  In what area?

24        MS. KENDRICK:  Just about something that came up in

25   the testimony after lunch.                                    01:49PM
```

UNITED STATES DISTRICT COURT

—— April 17, 2017 - Status Hearing Resumed - Dye - Redirect ——

1        THE COURT:  In what area, though?

2        MS. KENDRICK:  About Performance Measure 74.

3        THE COURT:  You may briefly do so.

4                    RECROSS-EXAMINATION

5   BY MS. KENDRICK:                                              01:49PM

6   Q.  I swear we're almost done.

7   A.  Okay.  That's fine.

8   Q.  So you said that Ms. 394 was not reviewed in January

9   because she was not on the hospitalization list?

10  A.  That's likely true, yes.                                  01:50PM

11  Q.  Do you use any other sources of information to get the

12  universe of files to review?

13  A.  No.  I just use the in-patient hospital report.

14  Q.  Do you still have the report that Mr. Fathi showed you

15  earlier for her?                                              01:50PM

16  A.  Yes.

17  Q.  And do you see -- well, first off, what would you do if a

18  woman gave birth at the prison or at the infirmary because she

19  didn't go off to the hospital?  Would she be included?

20  A.  If she did not go to the hospital it would not be on the  01:50PM

21  in-patient report.

22  Q.  Okay.

23  A.  Even if she gave birth, which I have seen, gave birth in

24  the prison, they still transport them both to the hospital

25  after the birth.                                              01:50PM

**April 17, 2017 - Status Hearing Resumed - Dye - Recross**

1   Q.  Okay.  Do you see on that document, I think it's on the

2   second paragraph, that Ms. 394 was 22 weeks pregnant, and that

3   no fetal heartbeat was found on December 29th?

4   A.  In the second paragraph?

5   Q.  I believe so.                                              01:51PM

6   A.  Okay.

7   Q.  And the date of this procedure was January 6th according to

8   the top of it?

9   A.  Yes.

10  Q.  Do you think that it would be appropriate for a woman who   01:51PM

11  carried a dead fetus inside of her for eight days to see mental

12  health after returning from an outpatient procedure?

13          MR. BOJANOWSKI:  Note an objection.

14          THE COURT:  Overruled.

15          THE WITNESS:  Well, I would always -- any traumatic     01:51PM

16  event would be good to talk to a mental health person.

17  BY MS. KENDRICK:

18  Q.  So that's a yes?

19  A.  Well, it's a yes.  But I think also --

20          MR. BOJANOWSKI:  Same objection.                        01:51PM

21          THE COURT:  Overruled.

22          THE WITNESS:  The question is for -- it says for

23  release from the hospital.  And my understanding is that was

24  not a hospital.  It would not show up on the in-patient

25  hospital report.                                               01:52PM

1    BY MS. KENDRICK:

2    Q.  So you believe that, yes, it is important that somebody who

3    went through that experience should be seen by mental health

4    staff?

5              MR. BOJANOWSKI:  Same objection.                      01:52PM

6              THE COURT:  Overruled.

7              THE WITNESS:  Well, like I said, any traumatic event

8    in life it would be good to talk to a mental health person,

9    yes.

10             MS. KENDRICK:  Yes.                                   01:52PM

11             Okay.  Thank you.

12             THE COURT:  Thank you.  This is actually the time

13   where we can thank you very much for your testimony.  You may

14   step down.

15             THE WITNESS:  I appreciate it.  Thank you.            01:52PM

16             THE COURT:  Thank you.

17             Mr. Bojanowski.

18             MR. BOJANOWSKI:  May I have a moment, Your Honor?

19             THE COURT:  You may.

20             MR. BOJANOWSKI:  Erin Barlund.                        01:53PM

21             THE COURT:  Good afternoon.  Please step forward to

22   the clerk of the court here.  And if you would just stand there

23   in the well of the court, she will administer the oath.

24             Thank you.

25             THE MAGISTRATE CLERK:  Please raise your right hand.  01:53PM

───── April 17, 2017 - Status Hearing Resumed - Barlund - Direct ─────

```
1              (The witness was sworn.)

2              THE MAGISTRATE CLERK:  Thank you.  Please step around

3    to the witness stand.

4                           ERIN BARLUND,

5    a witness herein, having been first duly sworn by the clerk to

6    speak the truth and nothing but the truth, was examined and

7    testified as follows:

8                         DIRECT EXAMINATION

9    BY MR. BOJANOWSKI:

10   Q.  Would you please state your name for the record and spell      01:54PM

11   your last name?

12   A.  Erin Barlund.  B-A-R-L-U-N-D.

13   Q.  What is your business address?

14   A.  1831 West Jefferson Avenue, Phoenix, Arizona 85007.

15   Q.  Are you employed?                                              01:54PM

16   A.  Yes, I am.

17   Q.  In what capacity?

18   A.  I'm employed by the Arizona Department of Corrections

19   Health Services Contract Monitoring Bureau as a health services

20   coordinator.                                                       01:54PM

21   Q.  And what are your job duties, generally?

22   A.  They vary a bit.  The position was originally designed to

23   have somebody monitoring performance measures in the field

24   approximately three days a week and performing other duties as

25   necessary two days a week.                                         01:55PM
```

April 17, 2017 - Status Hearing Resumed - Barlund - Direct

1   Q.  What kind of duties do you perform?  Actual hands-on

2   monitoring?

3   A.  Yes, I do.

4   Q.  And what measures do you monitor?

5   A.  I currently monitor clinical performance measures for          01:55PM

6   Phoenix complex, Phoenix West, and Kingman.  In addition, I

7   have a statewide performance measure, which is Number 48, and

8   I'm doing 61 for Phoenix George unit and Perryville.

9   Q.  How long have you been so employed?

10  A.  I started with the Bureau in July of 2013.                     01:55PM

11  Q.  Have you always been in the same position since July 2013?

12  A.  No.  In May of 2014, I was appointed to an interim position

13  as the health services coordinator.  Prior to that I was a

14  program evaluation specialist.

15  Q.  What did you do as a program evaluation specialist?           01:56PM

16  A.  I monitored performance measures.

17  Q.  Which ones?

18  A.  For Perryville complex, for Phoenix complex, Phoenix West,

19  on occasion Kingman, on occasion Lewis.

20  Q.  Do you remember the numbers?                                   01:56PM

21  A.  I couldn't speak specifically to all of them, but it's

22  generally the clinical performance measures.

23  Q.  All right.  And what do you mean by "clinical performance

24  measures"?

25  A.  The performance measures currently are divided amongst         01:56PM

1    disciplines, so it would look like contract compliance,

2    clinical, mental health, and pharmacy.

3    Q.  All right.  Could you describe your educational background?

4    A.  I have a master of science in nursing with a specialty

5    track of clinical systems management.  And I'm currently in a          01:56PM

6    measuring and improving business performance certificate

7    program.

8    Q.  Are you licensed?

9    A.  Yes, I am.

10   Q.  In what capacity?                                                   01:56PM

11   A.  I'm a registered nurse in the state of Arizona.

12   Q.  And how long have you been so licensed?

13   A.  I believe in the state of Arizona since 2005.  I believe my

14   first state of licensure was about 1994.

15   Q.  Where were you first licensed?                                      01:57PM

16   A.  North Carolina.

17   Q.  Did you work as an RN?

18   A.  In any capacity?

19   Q.  Yes, ma'am?

20   A.  Yes.                                                                01:57PM

21   Q.  What capacity did you work as an RN?

22   A.  I have worked in hospitals, I have worked in psych

23   facilities, I have worked as a case manager for hospice.  I

24   began working correctional healthcare in 2006.

25   Q.  In your capacity as an RN, did you provide actual hands-on          01:57PM

1    care and treatment of the inmate population?

2    A.  Historically, yes.

3    Q.  As far as your work with the Arizona Department of

4    Corrections, have you provided any hands-on care, medical care,

5    to any of the inmate population?                              01:57PM

6    A.  Not since we became a Monitoring Bureau, no.

7    Q.  Prior to that did you provide any care?

8    A.  In the past, I was employed by the Arizona Department of

9    Corrections, and I did provide care, yes.

10   Q.  Where at?                                                 01:58PM

11   A.  Perryville.

12   Q.  As an RN?

13   A.  Yes.

14   Q.  Did you hold any supervisory positions?

15   A.  At Perryville, no.                                        01:58PM

16   Q.  Anywhere else?

17   A.  Yes.

18   Q.  Where at?

19   A.  In hospitals and hospice, and then I would take interim

20   positions in correctional healthcare working as a supervisor. 01:58PM

21   Q.  What kind of experience have you had in healthcare

22   monitoring like you do now?

23   A.  Historically, I have audited.  We did a lot of self-audits

24   in the past.  As far as learning this job, it was mostly

25   on-the-job training.  We do have a monitor guide that I follow. 01:58PM

1    Q.  So in a general sense, can you tell me how you go about

2    performing an audit of a particular measure, just in a general

3    sense?

4    A.  I receive a source document.  Once I receive that I

5    generally review the methodology that is required for that          01:59PM

6    performance measure and then I begin my monitoring for the

7    performance measure.

8    Q.  Depending upon whatever the measure is that's the procedure

9    you will follow to determine either compliance or

10   non-compliance, correct?                                            01:59PM

11   A.  Correct.

12   Q.  How long have you been doing that now?

13   A.  Since July of 2013.

14   Q.  In front of you is a notebook, big notebook, and you are at

15   Tab D, D-2, which is a CGAR finding.  Do you see that?              01:59PM

16   A.  Is that the one you turned to.

17   Q.  Yes.

18   A.  Phoenix complex 2016.

19   Q.  Okay.

20        THE COURT:  Did you say B as in boy or D?                      01:59PM

21        MR. BOJANOWSKI:  D, dog, 2.

22   BY MR. BOJANOWSKI:

23   Q.  Now, this is Performance Measure Number 16, perpetual

24   inventory medication logs being maintained on each yard.  Do

25   you see that?                                                       02:00PM

—— April 17, 2017 - Status Hearing Resumed - Barlund - Direct ——

1    A.  Yes, I do.

2    Q.  And so the date at the top of the finding here is 1-30-2017

3    and it's 8:09 a.m. indicating that that's when you put it in,

4    correct?

5    A.  That's correct.                                          02:00PM

6    Q.  And then number compliance is 42, number reviewed 45.  Is

7    that the number of files you found compliant out of the 45 you

8    pulled?

9    A.  Correct.

10   Q.  How come you pulled 45 files?                            02:00PM

11   A.  There would have been 45 available.  We would have looked

12   at 10 per area in which the clinic stock is stored.  And if 10

13   are not available or fewer than 10 are available then 100

14   percent examination occurs.

15   Q.  All right.  So what if there's more than 10?             02:00PM

16   A.  We don't audit those.

17   Q.  What do you mean?

18   A.  The methodology states that we will audit the first 10.

19   Q.  So you are pulling 10 random, the first 10 random files and

20   auditing those.  Is that what you are doing?                 02:01PM

21   A.  In this particular performance measure I'm pulling the

22   first 10 perpetual inventory medication logs.

23   Q.  And that's what you are looking at?

24   A.  Correct.

25   Q.  So your source document would be contained in the guide   02:01PM

April 17, 2017 - Status Hearing Resumed - Barlund - Direct

1    under Performance Measure 16, right?

2    A.   Correct.

3    Q.   There's a guide there in front of you.

4            So as you had indicated before, you would go to Number

5    16 in the guide, and you would look and see what your source          02:02PM

6    record review would be, and that would be clinical stock

7    perpetual inventory log, right?

8    A.   Correct.

9    Q.   And that is contained in this notebook somewhere, is that

10   right?                                                                 02:02PM

11   A.   The perpetual inventory log is contained within the

12   notebook.  But we do start with a source document that would

13   lead us to that particular log.

14   Q.   Do you see it in there somewhere?

15   A.   Yes.                                                              02:03PM

16   Q.   Where is it at?

17   A.   There's a tab Number 1 and then there are -- there's orange

18   paper and then there is -- I'm sorry -- there's orange paper

19   and then there is another part of the log.  This performance

20   measure actually requires the use of two specific source              02:03PM

21   documents.  One is what we refer to as the clinic stock log and

22   the other is the patient specific narcotic log.

23   Q.   And that's what you are looking at now?

24   A.   I see one of them.  I don't believe I see the other.

25           I'm sorry.  I do see the other.  It's a few pages             02:04PM

1    back.

2    Q.  Is that the one with the blue highlighting?

3    A.  Yes.

4    Q.  What is that?

5    A.  That is the patient specific narcotic log.                    02:04PM

6    Q.  And so what's the next one behind the next piece of orange

7    paper?  It looks like a photostatic copy of a handwritten log.

8    A.  That is the perpetual inventory log that we actually

9    monitor to determine if compliance was achieved.

10   Q.  All right.  So when you look at these logs, what is it you   02:04PM

11   are trying to -- what are you looking for?  I mean, what's this

12   measure trying to attain?

13   A.  So through the process of standardization, we were able to

14   determine that a log must contain the six points listed, and we

15   are using the binary method to determine compliance.  So it's   02:05PM

16   required to have a medication name and strength, chronological

17   date order, at least one patient identifier, name or number for

18   each dose administered, date of any entry that identifies at

19   least one addition, subtraction, dose given, wasted, or

20   transferred.                                                     02:05PM

21   Q.  Go ahead.

22   A.  So in addition to that data, documentation of a nurse's

23   signature or initials and an IR if one is required.

24   Q.  So what you are doing is the methodology set forth in the

25   manual under PM Number 16 has got a list of elements in it that  02:05PM

1    you check to see if that log contains each one of those

2    elements, right?

3    A.   That is correct.

4    Q.   What happens if it is missing one of the elements?

5    A.   It is identified as non-compliant.                          02:06PM

6    Q.   So the whole thing is a fail if there's just one of the six

7    that is not contained within that log, right?

8    A.   That is correct.

9    Q.   So when you went through these logs, you reviewed 45 of

10   them.  Is that right?                                            02:06PM

11   A.   Yes.

12   Q.   And out of that 45, you determined that 42 of them had all

13   six elements of this particular measure?

14   A.   Correct.

15   Q.   And then you essentially list out in your CGAR finding      02:06PM

16   additional findings by unit.  Do you see that?

17   A.   Yes, I do.

18   Q.   And just using the first one under the Aspen unit, do you

19   see that?

20   A.   Yes.                                                        02:06PM

21   Q.   And that one indicates that 10 inventory logs demonstrates

22   eight compliant to non-compliant, but then you have prednisone,

23   10 milligrams missing nursing signature and no IR.  Augmentin

24   with incorrect math and no IR compliant, MSER.

25         What's all that mean, essentially?                        02:07PM

1   A.  So where the prednisone and Augmentin are listed, they are

2   listed along with the reasons for non-compliance and after that

3   I list the medication logs that I did find to be in compliance.

4   Q.  And so then you are just listing the types of medications

5   that you found in the logs that show compliance and            02:07PM

6   non-compliance in this finding?

7   A.  Each log is an individual medication.

8   Q.  Okay.  So it's a log of one medication?

9   A.  That is correct.

10  Q.  And that's what you are evaluating?               02:07PM

11  A.  Yes.

12  Q.  I see.  Once you are done with your finding on a monthly

13  basis, you do your review, you come up with a preliminary

14  finding, is that right?

15  A.  Yes.                                              02:08PM

16  Q.  Do you discuss that at all with anyone at Corizon?

17  A.  Yes, I do.

18  Q.  Who do you discuss it with?

19  A.  I generally send my findings to the FHA, the director of

20  nursing, the AFHA, their compliance staff.  And then if I know   02:08PM

21  of anybody that really could impact significant change in this

22  major -- or really any change I would discuss that directly

23  with them to make sure that they understand what we're

24  monitoring and most importantly, or just as importantly, the

25  why of the monitoring.                               02:08PM

1   Q.  Have you had those kinds of discussions with Corizon?

2   A.  Almost on a daily basis.

3   Q.  All right.  And is there some action that's taken that you

4   have seen as far as increasing compliance over time based upon

5   your discussions and work with Corizon?                          02:08PM

6   A.  Absolutely.  I think we meet face-to-face very frequently,

7   telephonically frequently, through e-mail.  Performance Measure

8   58 we saw that starting to decline.  I created posters, pink

9   posters, so that all the providers and the lab techs and the

10  intake nurse knew which pregnancy labs needed to be ordered,     02:09PM

11  took those out there, met with as many providers as I could

12  with the intake nurse with the lab tech.  And we have not seen

13  that go into non-compliance since.  So we're out there all the

14  time.  We spend as much time in the field working

15  collaboratively with the vendor as possible.                     02:09PM

16  Q.  So as a result of those efforts, obviously, it translates

17  into better compliance scores.  Is that right?

18  A.  That's the goal.  And it's been my experience if they

19  understand the why behind what we're doing they often times

20  have a vested interest and they become more agreeable to,        02:09PM

21  perhaps, trying to be compliant.

22  Q.  Is this more of an educational process that you are going

23  through to teach them what it is you are looking at and why you

24  are looking at it?

25  A.  Yes.  It's definitely an educational process.  I think many  02:10PM

April 17, 2017 - Status Hearing Resumed - Barlund - Direct

1   of them are not familiar with these 100 plus performance

2   measures and how they impact their daily care.

3   Q.  So the more information you can provide to them, the better

4   their compliance is as far as the changes they can make perhaps

5   structurally to assure they are checking the correct box in      02:10PM

6   eOMIS, so to speak?

7   A.  That's been my experience, yes.

8   Q.  Now, are you involved at all in the CAP process?

9   A.  I am not.

10  Q.  Do you know who is?                                           02:10PM

11  A.  I believe it's Kathy Campbell.

12  Q.  Now, as far as the methodology that you used, you kind of

13  described generally with us, is that the same methodology you

14  use for all of the performance measures that you work on?

15  A.  Each performance measure has an individualized methodology.  02:10PM

16  Q.  And so whatever is in the guide, that's what you're

17  following?

18  A.  That is correct.

19  Q.  And do you look at things outside the guide to determine

20  compliance?  If, say, there was a document misfiled would you    02:11PM

21  look elsewhere?

22  A.  If we can identify the compliance we'll absolutely look

23  elsewhere.  But generally speaking, we do try to follow the

24  methodology stated in the monitoring guide.

25  Q.  All right.                                                    02:11PM

April 17, 2017 - Status Hearing Resumed - Barlund - Direct

1      MR. BOJANOWSKI:  Nothing further, Your Honor.

2      THE COURT:  Thank you.  Cross-examination, please.

3                    CROSS-EXAMINATION

4  MS. KENDRICK:

5  Q.  Good afternoon.                                          02:11PM

6  A.  Good afternoon.

7  Q.  Before coming to testify, did you review any documents to

8  prepare for this?

9  A.  I had historically looked at those that I had submitted.

10 Q.  And which documents did you submit?                       02:12PM

11 A.  It would have been this perpetual inventory guide and the

12 source documents associated with it.

13 Q.  Okay.  Is it everything that's after Tab D was stuff you

14 submitted?

15 A.  It appears to be similar to what I submitted between --    02:12PM

16 after Tab D and then through Number 2, I believe.

17 Q.  Okay.  Did you meet with anybody to prepare for testifying

18 today?

19 A.  No.

20 Q.  Did you ever work for Wexford?                            02:12PM

21 A.  No.

22 Q.  Did you ever work for Corizon?

23 A.  Yes.

24 Q.  When?

25 A.  So I began working for Correctional Medical Services which  02:13PM

**April 17, 2017 - Status Hearing Resumed - Barlund - Cross**

1    later merged with CHS and merged with Corizon in 2006 in

2    another state.

3    Q.  And I believe you said that you spend about three days on

4    site doing the monitoring and then two days other duties as

5    needed.  What are the other duties as needed?                          02:13PM

6    A.  I supervise five nurses.  I follow-up on clinical issues

7    that are unrelated to the CGAR, and I do my best to work

8    collaboratively with Corizon staff.  And I audit private

9    prisons, so I do work with them as well.

10   Q.  You supervise five nurses where?                                   02:13PM

11   A.  Where are they located?

12   Q.  Yeah.

13   A.  We have one that is housed out of Lewis, one that is housed

14   out of Perryville, two that are housed out of Tucson, and one

15   who maintains office space at Eyman.                                   02:14PM

16   Q.  And they work for Corizon or the Department?

17   A.  They work for the Health Services Contract Monitoring

18   Bureau.

19   Q.  And what do these nurses do?

20   A.  They monitor performance measures.                                02:14PM

21   Q.  Clinical ones?

22   A.  Correct.

23   Q.  Okay.  Is there a written job description for what they do?

24   A.  Yes, there is.

25   Q.  And can you describe the training that you received when          02:14PM

1   you were hired as a monitor?

2   A.   I was taken to the field.  We went in and monitored some of

3   the performance measures.  I was given a guide book and any

4   questions I had were answered.

5   Q.   When was this?                                          02:14PM

6   A.   It would have been approximately July of 2013 and then

7   there's been ongoing training since then.

8   Q.   Who took you out?

9   A.   Vanessa Headstream.

10  Q.   Does Ms. Headstream still work for the Department?       02:15PM

11  A.   Yes, she does.

12  Q.   Is she your supervisor?

13  A.   Yes, she is.

14  Q.   And you said you are normally assigned to Phoenix for all

15  clinical performance measures?                              02:15PM

16  A.   I have been.  I have been assigned to other complexes as

17  well.

18  Q.   How long have you been assigned to Phoenix?

19  A.   Intermittently since probably August of 2013.  But I do not

20  recall the exact date.                                      02:15PM

21  Q.   Okay.  And you measure Performance Measure 14 at all the

22  institutions or just at Phoenix?

23  A.   Just at Phoenix.  And I'm sorry, at Winslow as well.

24  Q.   Are you aware that the Court found that ADC is

25  non-compliant with Performance Measure 14 at multiple        02:15PM

April 17, 2017 - Status Hearing Resumed - Barlund - Cross

1    institutions?

2    A.  Yes, I am.

3    Q.  Were you involved in creating any sort of action plan to

4    comply with the Court's order?

5    A.  I was not, no.                                              02:16PM

6    Q.  Do you know if any was created at Phoenix or Winslow or any

7    other prison?

8    A.  I have seen an action plan for Lewis, I believe, but I

9    really am not involved with that aspect of monitoring.

10   Q.  What were the remedial efforts that they were going to take  02:16PM

11   at Lewis?

12   A.  I don't recall specifically.

13   Q.  How do you keep your notes that you are making before you

14   enter information into CGARs?

15   A.  The majority of performance measures I keep on paperwork     02:16PM

16   sheets.  I have two performance measures which I enter into an

17   Excel spreadsheet.  That information, both from the paper

18   worksheet and Excel spreadsheet is then entered into a Word

19   document which is sent to the vendor.

20   Q.  What do you do with the paper worksheets?                    02:16PM

21   A.  I retain them.

22   Q.  Who told you to retain them?

23   A.  I don't recall.

24   Q.  But the Word document is sent to Central Office?  What do

25   you do with the Word document?                                  02:17PM

1  A.  The Word document, I send to the FHA, the AFHA the DON, the

2  ADON generally, the Corizon compliance monitors, Vanessa

3  Headstream, and Kathy Campbell.  There's possible on occasion I

4  have eliminated one of those people but that's generally who I

5  send them.                                                          02:17PM

6  Q.  Okay.  Do you send them just the non-compliant measures for

7  the month?

8  A.  No.  I send the compliant finding as well.

9  Q.  If Corizon came back and said some of the files you

10  reviewed for a performance measure weren't applicable and        02:17PM

11  shouldn't be counted and they were right, what would you do?

12  A.  I'm not sure I understand the question.  What would I do as

13  far as would this be a telephone conversation?  I'm not sure I

14  understand exactly what you are asking.

15  Q.  Sure.  So you said you do Performance Measure 48, I          02:17PM

16  believe, is the off site specialty?

17  A.  Yes, I do.

18  Q.  So if they came back and said one of these files you

19  reviewed isn't applicable, you know, it was a different month

20  or something like that, and so then -- because let's take a      02:18PM

21  step back.  Your goal is to pull 10 files per unit, correct?

22  A.  That is correct.

23  Q.  So let's say you had more than 10 so had you a sample size

24  of 10, you sent it to them and they came back and said, you

25  know what?  One of those is not applicable, and you agreed.      02:18PM

**April 17, 2017 - Status Hearing Resumed - Barlund - Cross**

1   What would you do?

2   A.   So I'm guessing based on what you are saying is that I

3   would mark it as N/A and then I would choose an alternate chart

4   to review in an attempt to reach the 10 that we have agreed to

5   try to reach.                                                    02:18PM

6   Q.   Okay.  And would you delete from the Word document the

7   inapplicable file?

8   A.   I'm not sure I can think of an exact circumstances where

9   this has happened.  So my initial thought is that I probably

10  would and I would identify the next chart as either compliant   02:19PM

11  or non-compliant.

12  Q.   And then once you enter something into the CGAR it's locked

13  in, is that correct?

14  A.   For me it is locked in, yes.  For others it may not be.

15  Q.   So if you put something in there and realized I transposed  02:19PM

16  a number or something like that, you would have to create a new

17  entry with a new date and time to say this entry below was

18  entered in mistake?

19  A.   Yes.

20  Q.   You cannot open an old entry and change what you had        02:19PM

21  written before?

22  A.   I do not have the ability to do that, no.

23  Q.   Who has the ability to do that?

24  A.   I don't know definitively.

25  Q.   Who do you think has the ability?                           02:19PM

April 17, 2017 - Status Hearing Resumed - Barlund - Cross

1   A.  I believe Kathy Campbell may.

2   Q.  Anyone else?

3   A.  That's the only person that I know of.

4   Q.  Mr. Pratt?

5   A.  Not that I know of.                                      02:20PM

6   Q.  And when you are entering information into the CGARs, do

7   you write down only the non-compliance files?

8   A.  I believe you just asked me that, and my answer was I write

9   down both the compliant and the non-compliant files.

10  Q.  Have you always done it that way?                        02:20PM

11  A.  Probably at least for a year if not longer.

12  Q.  Why did you start doing it that way?

13  A.  I think for transparency purposes.  But I don't recall

14  specific direction.

15  Q.  Okay.  Can you explain why it's important for you or any    02:20PM

16  other auditor to use random lists?

17  A.  Well, I think it allows us to look at things objectively

18  and hopefully accurately.  It eliminates cherry picking, or the

19  perception of cherry picking from any side.

20  Q.  And so Performance Measure 16, I believe you identified     02:21PM

21  this document that looks like a Xerox copy?

22  A.  Correct.  Yes.

23  Q.  That 's the source document?

24  A.  It's not the source document.  We start with the document

25  that were in the preceding pages, and then those documents      02:21PM

1   would lead us to this photocopied page.

2   Q.  So how do you randomize the photocopy page?

3   A.  I don't randomize the photocopy page.  I randomize the

4   source document.

5   Q.  Okay.  So I handed you a packet of documents and we'll just    02:21PM

6   walk through some of them.  So I just have some questions on

7   them.

8           The first one should be the November 2016 Phoenix

9   complex.  Is that what's in front of you?

10  A.  Yes, it is.    02:22PM

11  Q.  At the bottom of the page is PM 16?

12  A.  Correct.

13  Q.  And it shows that the score was 232 out of 234?

14  A.  Correct.

15  Q.  Did you review 234 files?    02:22PM

16  A.  So this is one where we had one month and it must have been

17  the month of November, where we did not use the binary method.

18  We reported it in aggregate.  So in this particular case I

19  reviewed 39 available logs as documented in the CGAR finding

20  and it demonstrated that 232 components were accurate, two    02:23PM

21  components were inaccurate.  And then subsequent to that it

22  discusses how many logs were available and how many were

23  compliant and how many were non-compliant using both the binary

24  method and the aggregate method.

25  Q.  When were you told to abandon the aggregate method, as you    02:23PM

UNITED STATES DISTRICT COURT

—— April 17, 2017 - Status Hearing Resumed - Barlund - Cross ——

1   called it?

2   A.  I don't recall.

3   Q.  Did you do it again in December?

4   A.  I do not believe we did.  Or I believe we separated it as

5   requested.                                                            02:23PM

6   Q.  And at Phoenix how many units are there that you are

7   looking at?

8   A.  As far as health units, there's Aspen, there's Baker,

9   there's a combination unit CF, George-Ida share -- they

10  technically have two separate nursing stations but they share     02:24PM

11  clinic stock for this performance measure, and John-King-Quiet

12  share a clinic stock for this performance measure.

13  Q.  So five units total?

14  A.  For this performance measure clinic stock is stored in five

15  separate locations.                                                  02:24PM

16  Q.  Okay.  So looking at the text, says for Ida that there were

17  only four available logs.  How big is the Ida unit?

18  A.  I would be guessing to the number of inmates, but perhaps

19  20.  There's very little clinic stock used on that unit.  And

20  many of those inmates are there long term and so the                 02:24PM

21  medications that they require are on site and available for

22  administration.

23  Q.  And that's -- is that one of the in-patient mental health

24  units?

25  A.  I don't know technically how it's classified.  I do,            02:24PM

1    however, think of it as being in-patient.  But the technical

2    classification is beyond me.

3    Q.  Fair enough.  And then if you go down two lines it says

4    George unit has no records reflecting this measure?

5    A.  That's correct.  They do not have clinic stock there.          02:25PM

6    Q.  And you normally measure George and Ida as a combination?

7    A.  I would measure them separately if there was clinic stock

8    available in both locations.  It has not been my experience

9    it's ever been in both locations.  It's generally housed at

10   Ida.                                                             02:25PM

11   Q.  Okay.  So if you could turn the page to the next document

12   in the packet.  Should be the February 2016 Phoenix complex

13   CGAR.

14   A.  Yes.

15   Q.  And there aren't the performance numbers, but the number   02:26PM

16   that has 4 next it to says, "Are perpetual inventory logs being

17   maintained."

18         And I'm curious, if you had no logs, would you count

19   that as just throw it out as part of the sample, or would you

20   count that as zero out of 10?                                   02:26PM

21   A.  First of all, this --

22   Q.  I know it's not you.

23   A.  It's not my finding, so I can't speak to what she did or

24   how she did it.  And if you could repeat the question again I

25   will try to answer it.                                          02:26PM

1    Q.  Sure.  Fair enough.

2           I'm just trying to figure out, I know it's different

3    people, but the consistency, because as I read it, it appears

4    that Ms. Chastain didn't have logs, no previous logs for date

5    range.  Then she scored zero out of 10 compliant.                    02:26PM

6    A.  Are you talking about C area?

7    Q.  Yeah, C area.

8    A.  Clearly, I'm not Ms. Chastain.  I can't speak to her

9    findings.  It appears she is saying the 10 were reviewed and

10   zero of those 10 were compliant.  So in other words, 10 out of    02:27PM

11   10 were non-compliant for that area.

12          MS. KENDRICK:  Take a break?

13          THE COURT:  You may.

14   BY MS. KENDRICK:

15   Q.  So if you go to the next page in the little packet there's    02:29PM

16   a Perryville October 2016.  Do you see that?

17   A.  I see Phoenix December 2016 and then after that, October

18   2016 Perryville.

19   Q.  Yeah.  So if you flip to the second page, it's for

20   Performance Measure 16.  It starts at the bottom and carries       02:30PM

21   over to the top.  And I will recognize that this is Ms.

22   Chastain and not you.  But I was wondering if you could explain

23   what these codes mean on the top of the page that ends in 551

24   Where it says:  Key equals 1, corrective Count 2 equals count

25   off?                                                               02:30PM

April 17, 2017 - Status Hearing Resumed - Barlund - Cross

 1              MR. BOJANOWSKI:  Where are you at, Corene?

 2              (Discussion off the record between counsel.)

 3    BY MS. KENDRICK:

 4    Q.  Is that something all the monitors do, or is that something

 5    you have never seen before?                                    02:30PM

 6    A.  I was neither present for the audit nor do I have awareness

 7    of that coding.

 8    Q.  Do you use a coding like that for your review of the

 9    performance measure?

10    A.  For this performance measure, no.                          02:30PM

11    Q.  Can you explain what these things actually mean, the

12    concept of a corrective count or a count off?

13    A.  I don't know how she coded this and I don't know what data

14    she used to code it.

15    Q.  So what do you look for in terms of whether something is    02:31PM

16    compliant?

17    A.  For Performance Measure 16?

18    Q.  Yeah.  If documentation is incomplete, would that be

19    counted as --

20    A.  Just as the methodology describes, I look for six          02:31PM

21    components, the first of which is the medication name and

22    strength; second is chronological date order; the third is at

23    least one patient identifier; data for any entry that

24    identifies at least one addition subtraction dose given,

25    wasted, or transferred; and an ending balance for each entry   02:31PM

April 17, 2017 - Status Hearing Resumed - Barlund - Cross

 1    documentation of a nurse's signature or initials in an IR.

 2    Q.  Okay.  So you don't know why she does her monitoring

 3    differently from you for this performance measure?

 4    A.  I do not.

 5         THE COURT:  So really, as you look at this CGAR            02:32PM

 6    document, even though you supervise other nurses who do this,

 7    you are really telling us you can't make out and tell us what

 8    this means?

 9         THE WITNESS:  I would really be making a guess as to

10    what she considers a corrected count.  What we did in recent    02:32PM

11    months is we tried to better standardize this performance

12    measure.  So we sat down, really got into the weeds and defined

13    what does maintained mean, and what actually is a perpetual

14    inventory.  And then we decided we need to make sure that

15    anybody doing this performance measure has an awareness of what 02:32PM

16    those requirements are.

17         So it has changed somewhat from when Ms. Chastain was

18    doing this, and I think at this point, because it is

19    standardized, anyone should be able to go to the field and

20    should be able to monitor this in a consistent and accurate     02:33PM

21    manner.

22         THE COURT:  Thank you.

23         THE WITNESS:  You're welcome.

24    BY MS. KENDRICK:

25    Q.  So I want to talk a bit about Performance Measure 14, which 02:33PM

April 17, 2017 - Status Hearing Resumed - Barlund - Cross

1   you said you also review.

2   A.   For some complexes, yes, I do.

3   Q.   Okay.  Which complexes?

4   A.   Phoenix and Winslow.

5   Q.   And do you have any training in pharmacy?                    02:33PM

6   A.   I'm not sure that since these are labeled pharmacy that

7   they are necessarily pharmacy performance measures.  We have no

8   on-site pharmacies.  Most of these performance measures are

9   related to medications and things that nurses would be familiar

10  with.                                                            02:34PM

11  Q.   Okay.  And what's the source of documents for this?

12  A.   For Performance Measure Number 14?

13  Q.   Yeah.

14  A.   It's the pharmacy log.

15  Q.   And is that a log of prescriptions or a log of HNRs or what  02:34PM

16  is it?

17  A.   It's a log of HNRs.

18  Q.   Who creates the log of pharmacy HNRs?

19  A.   Different sites handle it differently.  It is a Corizon

20  responsibility.  At some sites it's completed by the inventory    02:34PM

21  coordinators; at others it's completed by the nurses.

22  Q.   How is it done at Phoenix and Winslow?

23  A.   At Phoenix the ICs complete it; at Winslow the ICs complete

24  it.

25  Q.   What is IC?                                                  02:34PM

─────── **April 17, 2017 - Status Hearing Resumed - Barlund - Cross** ───────

1   A.  I apologize, inventory coordinator.

2   Q.  Thank you.  So after they create it, where does it go?  To

3   you?

4   A.  Eventually it gets to me, yes.

5   Q.  So does it get randomized?                                    02:35PM

6   A.  Yes.

7   Q.  By whom?

8   A.  Historically, I did it up until last month.  Beginning this

9   month, Ryan Owens will be -- is randomizing the documents.

10  Q.  Can you walk us through the steps out how you randomized     02:35PM

11  these lists that you were getting from Corizon?

12  A.  I would insert a column into the document.  I would use the

13  Excel rand function.  I would then save those numbers as a

14  value and I would sort them in ascending order and I would

15  apply a filter so that I could audit by unit.                    02:35PM

16  Q.  Is that the way you always randomized then them?

17  A.  I don't recall exactly when I switched to that method.

18  Prior to that, we would not have used Excel rand function.  If

19  I were to guess it would probably be at least approximately a

20  year and a half if not longer that we have been doing that.      02:36PM

21  Q.  How did you do it before you used Excel?

22  A.  I would have to check the methodology at that time.

23        THE COURT:  So for a year and a half you, yourself,

24  have been using the Excel randomizing feature and you have then

25  been taking the product of that program, identifying the        02:36PM

April 17, 2017 - Status Hearing Resumed - Barlund - Cross

```
 1   numbers, and then you say you are placing them in the
 2   randomized order that you just specified going from numbers in
 3   ascending order.
 4         THE WITNESS:  For approximately a year and a half,
 5   yes.                                                              02:36PM
 6   BY MS. KENDRICK:
 7   Q.  Who taught you how to do that?
 8   A.  I have taken Excel courses, and so once I really thought it
 9   through, I began using it.
10   Q.  Were you doing the special paste of the values for the       02:36PM
11   entire year and a half?
12   A.  Yes.  As long as I have been randomizing, I always pasted
13   them as a value so that the numbers remained constant since it
14   is a volatile formula.
15   Q.  Why do you have to paste the values?                         02:37PM
16   A.  It's a volatile formula.
17   Q.  It's volatile because every time you click on the Excel
18   screen new numbers are generated?
19   A.  That's my understanding, but as long as I have been pasting
20   them as a value I can't honestly say I have experience with      02:37PM
21   that.
22         THE COURT:  The understanding that you say that you
23   have about the effect of confronting the data again and not
24   reserving the original randomization, do you understand what I
25   have said so far?                                                02:37PM
```

UNITED STATES DISTRICT COURT

––––––– April 17, 2017 - Status Hearing Resumed - Barlund - Cross –––––––

 1          THE WITNESS:  Yes.  I believe I understand what you

 2     are saying, Your Honor.  If they are not saved as a value those

 3     numbers do change because of the volatility of the formula.

 4          THE COURT:  Have you ever heard anybody discuss that

 5     problem at the Department of Corrections before?                    02:37PM

 6          THE WITNESS:  It was a brief conversation, yes.

 7          THE COURT:  How long ago?

 8          THE WITNESS:  I believe it may have been three or four

 9     months ago, approximately.

10          THE COURT:  And do you remember with whom?                     02:38PM

11          THE WITNESS:  I believe we were in a meeting and I

12     mentioned the volatility of the formula and the fact that it

13     may need to be pasted as a value.  But it's really outside of

14     my purview.

15          THE COURT:  But the meeting was with whom?                     02:38PM

16          THE WITNESS:  I don't recall.

17          THE COURT:  What kind of meeting could it be that you

18     would be raising this issue?  Who could be the possible

19     suspects?  I'm not using it in a pejorative.  I just want to

20     understand the mechanism of what I think is important            02:38PM

21     information and how -- it appears that you are the first person

22     who has raised this issue at the Department of Corrections as

23     far as I can tell.  You just told me you were the one who

24     raised it?

25          THE WITNESS:  It may have been raised before me.            02:39PM

April 17, 2017 - Status Hearing Resumed - Barlund - Cross

1          THE COURT:  I'm telling you from what I have heard so

2     far you are the first person that told me.

3          THE WITNESS:  Most likely we attend a lot of meetings

4     regarding methodologies, source document procurement,

5     randomization, things like that.  We have a lot of meetings          02:39PM

6     with the plaintiffs.  So if I were to guess it would probably

7     be associated with those types of topics.  The most likely

8     attendees would be Kathy Campbell, Vanessa Headstream, perhaps

9     Mr. Pratt was there and perhaps Dr. Taylor was there.

10          THE COURT:  Okay.  But not the person at the DOC who          02:39PM

11     is the go-to person on randomization for much of the

12     performance measures of the evaluation?

13          THE WITNESS:  So if I recall correctly at that time I

14     was randomizing the documents that are used by the clinical

15     component, I do believe I discussed it with that person          02:40PM

16     briefly.

17          THE COURT:  Is that Mr. O'Neill?

18          THE WITNESS:  Owens.

19          THE COURT:  Owens.  Yes.  Right.  Okay.

20          THE WITNESS:  So I believe there was a brief          02:40PM

21     discussion.  I don't know what came of it.  I don't supervise

22     Mr. Owens and at that time I had very little interaction with

23     Mr. Owens.

24          THE COURT:  So as we have talked about it, do you

25     think this was the conversation you had where you raised it          02:40PM

April 17, 2017 - Status Hearing Resumed - Barlund - Cross

1    that you just described that you couldn't remember for sure a

2    moment ago?

3              THE WITNESS:  I believe the conversation with Mr.

4    Owens was separate from the conversation that I mentioned

5    earlier.                                                        02:40PM

6              THE COURT:  Thank you.  You may continue.

7              Can I ask a follow-up question?  Before you used the

8    randomization feature of Excel, you testified, I think, that

9    you couldn't recall what you did before.

10             THE WITNESS:  Uh-huh.                                 02:41PM

11             THE COURT:  As we have talked about it some more, do

12   you have any better recollection?  I guess it's just hard for

13   me to imagine that you can't remember how you did it before

14   because it was so important so you could avoid cherry picking.

15             THE WITNESS:  Right.                                  02:41PM

16             THE COURT:  The idea that you can't remember how you

17   did it before.

18             THE WITNESS:  You know, I would actually appreciate

19   the opportunity to review the old methodology.  It was most

20   likely something very similar to auditing either the first 10  02:41PM

21   inmates or first 10 medications.  But I might misspeak as to

22   whether we used the first 10 inmates.  So if there were

23   multiple entries for one inmate it's possible we used that

24   inmate more than once.  Or I can't quite recall if we used the

25   first 10 medications.                                          02:41PM

1      THE COURT:  That sort of sounds like it's anything but

2  random before you used the randomization feature.

3      THE WITNESS:  It was probably more haphazard

4  selection.

5      THE COURT:  Thank you.                              02:42PM

6  BY MS. KENDRICK:

7  Q.  If you go back to that packet that I gave you, I think if

8  you flip two pages there's a page for July for Florence?

9  A.  Yes.

10 Q.  At the bottom right it ends in 950?                  02:42PM

11 A.  Yes.

12 Q.  This is for Performance Measure 14.  I'm asking about the

13 one that you did for a change.

14     So you found that only three charts out of 45 reviewed

15 were compliant for a compliance rate of 6.67, correct?   02:42PM

16 A.  Yes.  That's the entry.

17 Q.  Now, if you flip to the next page, it also says July 2016

18 Florence but on the bottom right it has a page number ending in

19 686 and says "reissued."  And for Performance Measure 14, it's

20 now 20 out of 21 at 95 percent.                          02:42PM

21 A.  And so what is the question?

22 Q.  I was about to ask it.

23 A.  Oh.

24 Q.  Do you know what happened between the first entry and the

25 second entry?                                            02:43PM

1   A.  To the best of my recollection, we received an incomplete

2   source document.  We weren't able to identify the HNRs that

3   were submitted three to seven business days before the

4   medication running out.  So we did end up receiving that

5   document very late in the month, if I recall.          02:43PM

6   Q.  And what was the incomplete documentation, from whom?  Who

7   should have been sending it to you?

8   A.  Corizon.  Is that what you are -- the answer you are

9   looking for?

10  Q.  I'm looking for the answer.  So if it's a person or who   02:43PM

11  normally would send you the documents and sent you incomplete

12  information to work off of?

13  A.  I have received documents from different people probably as

14  people change positions and are no longer with the company.  I

15  don't know who would have sent it to me in July of 2016.      02:44PM

16  Q.  But was it a Corizon employee or was it a supervisor, one

17  of your supervisors?

18  A.  No.  It would not have been one of my supervisors.

19  Q.  So with the subsequent information, once you had additional

20  documents, why did it decrease from 45 reviewed to 21 files    02:44PM

21  reviewed?

22  A.  If I were to -- I don't recall specifically.  However, I do

23  believe that the document was incomplete and there may have

24  been some dates missing.  Therefore, we identified those

25  particular medication requests as non-compliant.  However, with  02:44PM

**April 17, 2017 - Status Hearing Resumed - Barlund - Cross**

1   the subsequent documentation received we were able to identify

2   that those, in fact, had not been submitted three to seven

3   business days prior to the prescription running out.

4   Q.  I'm curious why you didn't just supplement the previous

5   entry of 3 and 45 where you could combine them so you would          02:44PM

6   have 23 in compliance and 66 reviewed, if these are additional

7   new documents that you reviewed.

8   A.  So as I just stated, because we look for medications that

9   were requested three to seven business days prior to that

10  refill running out, if we were able to identify those               02:45PM

11  medications that were not submitted three to seven days prior

12  to the refill running out we would not include those as either

13  compliant nor non-compliant.

14  Q.  Non-applicable?

15  A.  Correct, if they don't meet the performance measure.  So if     02:45PM

16  they are not submitted three to seven business days before that

17  actual refill runs out, we would not audit those for

18  compliance.  We do follow the methodology.

19  Q.  And you said earlier that you can't go in and erase or

20  change an entry once it's locked in the CGAR system.  So did        02:45PM

21  you put this new information in the CGAR?

22  A.  No.  I would not have put this in.

23  Q.  Did you know that somebody had done this for this entry in

24  this month?

25  A.  I would have submitted it for revision.  I don't recall if      02:46PM

UNITED STATES DISTRICT COURT

1    I went back to check to see if it was submitted.

2    Q.  How do you submit -- to whom are you submitting a revision?

3    A.  I usually send it to Kathy Campbell and I believe I send it

4    to Vanessa Headstream as well.

5    Q.  And are they the ones that open up the CGAR entry that was        02:46PM

6    previously there for 8-30-16, 10:36 a.m. and put in the new

7    information?

8    A.  I don't know.

9    Q.  Have there been other times that somebody went in and

10   swapped out what you had previously entered?                         02:46PM

11   A.  I believe I have had other revisions.  I think there have

12   been very few of them.  If anything else has been changed

13   beyond what I requested I have no knowledge.

14   Q.  They don't notify you if they have changed something in

15   your name if you didn't request it?                                  02:47PM

16   A.  If it's never happened they would not have had occasion to

17   notify me.

18   Q.  Well, how do you know that it hasn't happened if you are

19   not being notified?

20   A.  Well, how do I know it happened?                                 02:47PM

21   Q.  So what I'm trying to say is if somebody can go in and

22   change an entry that is in your name, there's no mechanism

23   where they have to notify you, correct?

24   A.  I'm unaware of a mechanism, but I do work with a group of

25   ethical and professional people so it would be my belief, my         02:47PM

1   strongest belief they would not document under my name without

2   my awareness of it.

3           MS. KENDRICK:  I'm going to move on, Your Honor, but

4   you looked like you were about to ask a question.

5           THE COURT:  No.  Sorry.  I didn't mean to give that                02:48PM

6   impression.

7   BY MS. KENDRICK:

8   Q.  And you also, at Phoenix, monitor Performance Measure 45,

9   which is about on site diagnostic services being done the same

10  day?                                                                        02:48PM

11  A.  Yes, I do.

12  Q.  Okay.  Or 14 calendar days if they are routine?

13  A.  Correct.

14  Q.  And what is the source of documents that you use to do this

15  monitoring?                                                                 02:48PM

16  A.  We receive a diagnostic services report.  We look at the

17  universe of diagnostic services requested for the month that we

18  are reviewing.

19  Q.  Who sends you the diagnostic services report?

20  A.  It comes from Corizon.                                                  02:48PM

21  Q.  Corizon sends it to you?

22  A.  Yes.

23  Q.  Is it randomized?

24  A.  Yes.

25  Q.  How do you know that?                                                   02:49PM

——— **April 17, 2017 - Status Hearing Resumed - Barlund - Cross** ———

1    A.  I'm sorry, is the question was it -- when I receive it is

2    it randomized or is the question is it randomized after

3    receipt?

4    Q.  Either.  I just asked is it randomized.

5    A.  It's randomized prior to us monitoring the performance          02:49PM

6    measure yes.

7    Q.  So somebody at Corizon is randomizing it?

8    A.  No.

9    Q.  You just said it came directly to you from Corizon?

10   A.  Historically it came directly to me.  However, it now goes      02:49PM

11   directly to Mr. Owens.  I didn't say that the document was

12   randomized -- I didn't say the document was received

13   randomized.  It's randomized internally by us.

14   Q.  When did you stop getting them directly from Corizon?

15   A.  I didn't say that I stopped getting them directly from          02:49PM

16   Corizon.

17   Q.  Okay.  I'm very confused.

18   A.  We don't create this document.  We have no ability to

19   extract the data.  The document is received from Corizon.  The

20   document is received.  The document the randomized.  Once it's     02:50PM

21   randomized and filtered appropriately, it is then sent out to

22   the field so the performance measure number can be monitored.

23   Q.  Who is doing the randomization and filtering?

24   A.  At this time it would be Mr. Owens.

25   Q.  For how long has he been doing that?                            02:50PM

---
**April 17, 2017 - Status Hearing Resumed - Barlund - Cross**
---

1   A.  For this particular performance measure?

2   Q.  Yeah.

3   A.  I believe it was effective this month.  There were a couple

4   performance measures he did last month for clinical, but there

5   were a few and I don't recall if this was one.                    02:50PM

6   Q.  When you say "this month" do you mean April or last month?

7   A.  I mean the audit that we are currently working on during

8   the month of April.

9   Q.  So that would be March data?

10  A.  Actually for this one we are using February's data, because   02:50PM

11  it has two weeks to be done.  Some of these diagnostics take a

12  little over two weeks to be resulted and they have seven days

13  to review it.  So we are looking one month prior to what we

14  typically think of as the review period.

15  Q.  Right.  So prior to Mr. Owens recently beginning to be in     02:51PM

16  charge of randomizing and sorting the report, who did that?

17  A.  I did.

18  Q.  You did it the same way that you described earlier?

19  A.  That is correct.

20  Q.  Do you know how Corizon creates that list?                    02:51PM

21  A.  At this time, I believe it's a Pentaho extract from eOMIS.

22  Q.  What does Pentaho mean?

23  A.  I actually don't know.  I think Corizon might be better

24  able to answer that question.

25          THE COURT:  What were those -- you say pen -- I didn't   02:51PM

―――― April 17, 2017 - Status Hearing Resumed - Barlund - Cross ――――

1   understand the word.

2          THE WITNESS:  It's, I think, a data management

3   program.  It's Pentaho.  I believe it's spelled P-E-N-T-A-H-O.

4   So it allows them -- to the best of my knowledge it allows them

5   to extract data directly from the electronic medical record.      02:52PM

6          THE COURT:  So between the eOMIS medical record and

7   when you receive it from Corizon, Corizon is applying a

8   software program to do this filtering component?

9          THE WITNESS:  I don't know that they are filtering it,   02:52PM

10  I think they are capturing the universe.  What used to happen      02:52PM

11  when we would try to extract that data directly from eOMIS, we

12  would, for this particular performance measure, we would --

13         THE COURT:  Slow down, please.

14         THE WITNESS:  We would pull basically by locator code.

15  So for Lewis, for example, there might be approximately 20         02:52PM

16  locator codes.  So we would pull an urgent report and we would

17  pull -- I'm sorry -- a stat report and a routine report for

18  those approximately 20 locator codes.  And some of those pieces

19  of papers, some of those documents would be multiple pages.  So

20  we could end up with a hundred pieces of paper.  And this is       02:52PM

21  kind of as we were transferring MGAR over the CGAR.  There was

22  no way to truly approach that in a standardized methodical

23  fashion that was objective.

24         And so through the use of Pentaho, we're able to

25  receive this information in a usable format that we can            02:53PM

April 17, 2017 - Status Hearing Resumed - Barlund - Cross

1    randomize.

2          THE COURT:  And why is Pentaho necessary here as

3    compared to other performance measures?

4          THE WITNESS:  I believe many use Pentaho.  Prior to

5    Pentaho we used what we referred to as the raw data report.  So    02:53PM

6    whether it came from the raw data report or it came from

7    Pentaho it did give us information in an Excel spreadsheet that

8    we could deal with effectively rather than having those hundred

9    pieces of paper that we were trying to figure out which Pen to

10   audit.                                                             02:53PM

11         THE COURT:  So Pentaho is not just limited to the

12   performance measures you evaluate, as far as you know, you

13   think it may be used in others, too?

14         THE WITNESS:  I do believe so.

15         THE COURT:  Thank you.                                       02:54PM

16   BY MS. KENDRICK:

17   Q.  So if you could turn the page in that document, the next

18   one should say December 2016 Phoenix complex.  And it has PM 52

19   and then PM 45 underneath it.

20   A.  Yes.                                                           02:54PM

21   Q.  So I just have a couple questions about Performance Measure

22   45, to begin with.

23         The general rule is you pull 10 files per unit, you

24   see if they are applicable, you record it, and then do you move

25   on to the next unit to review or the next performance measure?    02:54PM

April 17, 2017 - Status Hearing Resumed - Barlund - Cross

1   A.  Are you asking me to choose between the next unit or the

2   next performance measure?

3   Q.  I'm just asking the general rule as set out is it's 10

4   files per unit.  Did you ever, for whatever reason, you had a

5   lot of spare time or you were interested, pull more than 10          02:55PM

6   files per unit if the first 10 you pulled were applicable?

7   A.  I don't recall having pulled more than 10.

8   Q.  Okay.  So I guess I'm just, for clarification, on this one

9   as opposed to the previous performance measure when we went

10  through the units, it looks like you reviewed, it's about           02:55PM

11  halfway down, George and Ida separately.  Are they supposed to

12  be reviewed separately or together?

13  A.  Historically I have reviewed them separately.

14  Q.  Okay.  Are you still doing that separately?

15  A.  Up until last month, yes.  I believe this month we are          02:55PM

16  auditing Flamenco as one unit.  However, I have not done this

17  performance measure so it's possible that I am not correct on

18  that.

19  Q.  So Flamenco is a unit at Phoenix, correct?

20  A.  Generally when we think of Flamenco we think of George,         02:56PM

21  Ida, John, King, Quiet.

22  Q.  So it has subunits within it?

23  A.  Correct.

24  Q.  Do you also call those units, or do you use some other term

25  of art to refer to the smaller subparts?                            02:56PM

**April 17, 2017 - Status Hearing Resumed - Barlund - Cross**

1    A.  I don't think I understand the question.

2    Q.  I'm just trying to figure this out, because I look at the

3    Phoenix reports and there's different monitors for different

4    measures.  So, for example, here, this is very thorough what

5    you did.  You went to all these different yards.  And then      02:56PM

6    others I won't see John, Quiet, King, George, Ida, I just see

7    Flamenco as kind of its own unit.  So I'm just trying to figure

8    out what's -- why there's this reason for the inconsistency.

9    A.  So I appreciate the compliment.  Thank you.  As to why

10   other people monitor differently, I don't know the answer to    02:57PM

11   that.

12   Q.  Okay.  But you said so starting this month, you are not

13   going to monitor Ida and George separately?

14   A.  I believe there was discussion of that.  I have not looked

15   at the source document and so I can't speak definitively to     02:57PM

16   that.  I do know that we are working to standardize, just as

17   you suggested, across disciplines to make sure that we do

18   monitor consistently as much as possible.

19   Q.  So what are the new instructions on -- are you just going

20   to do review of something called Flamenco, and George, Ida,     02:57PM

21   John, King, Quiet will all be subsumed under that review?

22   A.  I don't have the information in front of me.  I believe

23   there was some discussion of auditing Flamenco unit and having

24   everything under one, but I, as I said, I don't have that in

25   front of me.  I almost hate to misspeak.                        02:58PM

1   Q.  You said there was a discussion about this.  Who was the

2   discussion with?

3   A.  I believe it would be Mr. Owens, Kathy Campbell, Vanessa

4   Headstream, Dr. Taylor, and Mr. Pratt.

5   Q.  So even though you are the Phoenix monitor, you were not          02:58PM

6   part of the discussion, or you were?

7   A.  I was in attendance of the discussion.  There were many

8   components to standardization.  I don't recall the exact

9   details on this.  And as I mentioned, I have not opened the

10  source document.                                                     02:58PM

11  Q.  Did anybody say why this consolidation is being done for

12  the yards?

13  A.  I don't know that we spoke specifically about

14  consolidation.  I think we spoke more specifically about

15  standardization.  And just as you had mentioned, it's important      02:58PM

16  that when possible, we audit consistently across these yards,

17  whether we look at a yard or a health unit a determination has

18  to be made how to deal with all of these different entities

19  within a complex.

20  Q.  I'm calling it a consolidation, because I don't know what        02:59PM

21  other noun to use.  So if you guys have a word for what this

22  act is doing, please let me know and I will use it.  I'm not

23  trying to characterize it.

24  A.  Right.  I think what I'm trying to say is I don't truly

25  know the details and what was determined about every unit and        02:59PM

1    how we would be doing this so that the contract compliance

2    monitors would look at it the same way as the clinical

3    monitors.  But it is an effort to make this as good as we

4    possibly can.

5    Q.  So if this consolidation, for lack of a better word,          02:59PM

6    happens where Flamenco is just being looked at as Flamenco, for

7    this performance measure you would be moving from having a

8    maximum of 60 to a maximum of 40 files reviewed?  Is that

9    correct?

10   A.  If that, in fact, happens that would be correct.             03:00PM

11   Q.  And if you go down to the bottom of that same page and flip

12   it over is Performance Measure 46, which is medical providers

13   review the diagnostic report and act upon the reports with

14   abnormal values within five calendar days?

15   A.  Yes.                                                          03:00PM

16   Q.  Is this one that you regularly monitor at Phoenix?

17   A.  Yes, it is.

18   Q.  So what are you looking at with this measure?  What are you

19   looking for?

20   A.  If there are results available, did the provider review the  03:00PM

21   result and act -- did they review it within five calendar days

22   of the report being received at the prison.

23   Q.  Do you look at whether they acted upon it?

24   A.  Historically we have considered the acted upon portion to

25   be part of the review because this is very challenging.  And I   03:01PM

April 17, 2017 - Status Hearing Resumed - Barlund - Cross

1  understand that we have to look at this differently.  But if

2  one were to look at this and just because there's an abnormal

3  flag, there's a reference range.  It only speaks about healthy

4  people and what may be normal for them.  It doesn't necessarily

5  mean it's abnormal for any particular inmate nor does it mean                03:01PM

6  there's a disease process in existence.

7         THE COURT:  I'm going to ask if we could break now and

8  take an afternoon break.  So we'll come back into court at

9  3:15.  Thank you very much.

10        (Recess from 3:01 p.m. until 3:18 p.m.)                                03:02PM

11        THE COURT:  Thank you for the interruption.  You may

12  continue.  I interrupted you practically mid-paragraph.

13        Please continue.

14  BY MS. KENDRICK:

15  Q.  So you also monitor Performance Measures 48 and 49.  Those                03:18PM

16  are the specialty denials?

17  A.  I currently audit Performance Measure 48.  I no longer

18  complete Performance Measure 49.

19  Q.  Have you always done Performance Measure 48, or for how

20  long have you been measuring that at all institutions?                       03:18PM

21  A.  I don't recall.

22  Q.  So if you flip in the packet that's in front of you there

23  should be a page -- the next page should be September 2016

24  Florence, specialty care.  Do you see that?

25  A.  Yes.                                                                     03:18PM

——— **April 17, 2017 - Status Hearing Resumed - Barlund - Cross** ———

1    Q.   Number 48 is at the top?

2    A.   Correct.

3    Q.   What's the source of the documents for this performance

4    measure?

5    A.   Now or in September of 2016?                          03:19PM

6    Q.   Either.  Both.  Yes.  Now how do you go about doing it?

7    A.   Now we're using a report that shows consults that were

8    placed in ATP status or as you, the plaintiffs, had requested.

9    We also look at those who were in CCX status at the end of the

10   month and that remained in that for at least 14 days.  So      03:19PM

11   looking at this document, that would be correct as well for

12   September of 2016.

13   Q.   And for those who may not know what CCX stands for?

14   A.   For consults that remained in clinical coordinator

15   initiated status.                                          03:19PM

16   Q.   Okay.  That's always been the source, or was that the

17   source last year?

18   A.   Originally we used the denied consult report from ORC.

19   However, at the plaintiff's request, we did change that.  We

20   started looking at ATPs, which seems to have, in a sense,      03:20PM

21   superseded with Performance Measure actually asks.

22   Q.   Why did you stop reviewing Performance Measure 49 which is

23   about the provider telling the patient about the denial?

24   Because the two performance measures seem very intertwined.  So

25   why are you no longer doing that?                          03:20PM

April 17, 2017 - Status Hearing Resumed - Barlund - Cross

1   A.  I would agree that they are intertwined.  We are making

2   some changes as far as standardization of performance measures,

3   and so we do have to orient people to different performance

4   measures.  In addition, we have to look at efficiency and time

5   required for the different work assignments.                    03:21PM

6   Q.  But wouldn't it be more efficient for you to just take the

7   files you reviewed for 48 and go ahead and complete Number 49?

8   A.  So in a sense, that is one possible way to look at it.  In

9   the future I believe these two performance measures will be

10  intertwined, as you mentioned, and they will be going out to    03:21PM

11  the field.

12  Q.  So the same person would review both of them?

13  A.  That is correct.

14  Q.  And it would be the same universe of documents?

15  A.  That is correct.                                            03:21PM

16  Q.  Okay.  I'm asking this because below on Performance Measure

17  49, Ms. Franklin did the review, and she had a universe of 10

18  denials that she reviewed whereas you had 11.  Are you aware of

19  that discrepancy happening in other months at other

20  institutions?                                                   03:22PM

21  A.  I'm aware -- I'm not aware of this particular discrepancy

22  however I'm aware there would most likely be a discrepancy

23  because the source documents encompass different dates.

24  Q.  Which dates are for 48?

25  A.  Which dates did we use for the September 2016 CGAR?         03:22PM

1   Q.  Or just in general.  You said they are for different dates

2   so I'm trying to figure out what you meant by that.

3   A.  So Performance Measure 49 very simply requires that we look

4   at the date during which an ATP was -- a date for which the ATP

5   was written.  Performance Measure 48, based on your request and          03:22PM

6   that of your colleagues, also incorporates information from

7   that clinical coordinator initiated report.  So some of that

8   information has to be based on the date the consult was

9   written.  Otherwise we would have no way to incorporate the

10  requested information.                                                   03:23PM

11  Q.  Okay.  Did you monitor before -- you monitored before the

12  case settled, right, when it was still called MGARs?

13  A.  Yes, I did.

14  Q.  Weren't these performance measures there at the time?

15  A.  I don't recall.                                                      03:23PM

16  Q.  But are most of the CGAR performance measures taken from

17  what you guys were doing before the MGARs monitoring the

18  Corizon contract?

19  A.  I don't recall which were retained and which were not.

20  They went under different disciplines and some went away.  So           03:23PM

21  really being able to speak to which ones we currently do that

22  we used to do, it was years ago and it is very difficult to

23  remember.

24  Q.  Okay.  I'm just curious why you keep saying that plaintiffs

25  requested something.                                                    03:23PM

April 17, 2017 - Status Hearing Resumed - Barlund - Cross

1   A.  I do believe that the plaintiffs requested that we look at

2   ATPs rather than denials.  This performance measure does not

3   address ATPs, and clearly I believe the plaintiffs know the

4   difference because it was differentiated in Performance Measure

5   22.  There's information in Performance Measure 22 about            03:24PM

6   approval, disapproval, or an ATP and it wasn't referenced here.

7   However, I do believe that you guys requested it and we did

8   acquiesce.

9   Q.  And was that because the monitors were taking the position

10  they were called alternative treatment plans not called denials  03:24PM

11  so there was nothing to measure?

12  A.  No.  Historically there have been denials.

13  Q.  Okay.  So this is the January CGAR for Phoenix, the most

14  recent one we have.  And if you could turn to about five pages

15  in on the bottom right corner it ends in 154.                      03:25PM

16  A.  Yes.  I'm there.

17  Q.  And Performance Measure 97?

18  A.  Yes.

19  Q.  Why did you review Performance Measure 97?

20  A.  Because it's currently one of my assigned performance         03:25PM

21  measures.

22  Q.  Did you ever review mental health performance measures

23  before the January CGAR?

24  A.  I don't recall.

25  Q.  Who told you that this was going to be one of your assigned   03:25PM

**April 17, 2017 - Status Hearing Resumed - Barlund - Cross**

 1  performance measures?

 2  A.  This performance measure requires going into a paper chart.

 3  This performance measure was reallocated to staff that has easy

 4  access to those paper charts.  Because we are in the medical

 5  units we are looking for posters, we are looking for clinic                          03:25PM

 6  stock documentation, we are looking for manifests.  It made

 7  sense for us to complete this performance measure once we had

 8  received adequate training.

 9  Q.  And what is the source document from which you pick the

10  files that you are going to review?                                                  03:26PM

11  A.  We receive a telepsych log.

12  Q.  Who sends that to you?

13  A.  I believe that comes from Mr. Owens.

14  Q.  Okay.  So I'd like, if possible, you could walk us through,

15  who trained you on how to do this performance measure?                              03:26PM

16  A.  Dr. Taylor.

17  Q.  Did you do this performance measure for February 2017 at

18  Phoenix?  I don't have the February CGARs yet so I don't know.

19  A.  I believe I did.

20  Q.  Did you do this performance measure at any other                                03:26PM

21  institutions?

22  A.  I don't believe that I did.

23  Q.  So I'm looking at the column, and there's a lot of inmate

24  numbers and then Ys or Ns or N/As.  Do those correspond to the

25  topics at the top that say unit ADC number, date scanned, et                        03:27PM

April 17, 2017 - Status Hearing Resumed - Barlund - Cross

 1   cetera?

 2   A.  Yes.  Those N/As, those Ys correspond to the key above the

 3   input documentation.

 4   Q.  Are you working off an Excel spreadsheet and then pasting

 5   it in -- or?                                                    03:27PM

 6   A.  Yes, I am.

 7   Q.  About three lines down, or four lines down there's a

 8   prisoner whose number ends in 783.  Do you see that?

 9   A.  Yes, I do.

10   Q.  And it says 1-18-17, and then the next item says N/A.       03:28PM

11   A.  Yes.  I see that.

12   Q.  And that appears to coordinate to scanned or to intake?

13   Which column would it fall under?

14   A.  Without looking at the source document, it's difficult for

15   me to say.  It does appear that it may be the appointment date. 03:28PM

16          THE COURT:  Were you referring to inmate 783?

17          MS. KENDRICK:  Yes, Your Honor.

18          THE COURT:  And I believe you said that it states

19   1-18-17.

20          MS. KENDRICK:  Yes.                                      03:28PM

21          THE COURT:  Where does -- I see 1-18-17 following 154

22   but 1-25-17 following 783.  You are not seeing what I'm seeing?

23          MS. KENDRICK:  Unless the version I printed out in my

24   office and Mr. Fathi printed out in his office differs.

25          THE COURT:  Is this Document 842154?  Am I on the        03:29PM

—— April 17, 2017 - Status Hearing Resumed - Barlund - Cross ——

1    wrong page?

2           MS. KENDRICK:  No, you are on the correct page, sir.

3           THE COURT:  Could you approach, please?  Mr.

4    Bojanowski you don't need to approach.  I'm going to highlight

5    where I have my confusion if that's all right.  I have 783 and        03:29PM

6    1- 25-17.

7           MS. KENDRICK:  I'm looking one line up.

8           THE COURT:  I see.  Sorry.  Thank you.  Same person is

9    listed twice and I was on the wrong line.  Thank you very much.

10   BY MS. KENDRICK:                                                       03:30PM

11   Q.  So you can't remember what the N/A might refer to?

12   A.  I don't believe you asked me that question.

13   Q.  Okay.  So as Judge Duncan just identified, the same

14   prisoner is listed twice.  So with the source document, is it

15   done by prisoner or is it done by telepsychiatry session?               03:30PM

16   A.  It's documented by telepsychiatry session along with the

17   inmate's identifying information.

18   Q.  Okay.  So if Mr. Smith saw the telepsych three times it's

19   possible he would have been reviewed three separate times for

20   different dates?                                                        03:30PM

21   A.  To the best of my knowledge, yes.

22   Q.  Are you monitoring any other mental health performance

23   measures?

24   A.  No, I'm not.

25   Q.  Do you know of any plans for you to review any more mental          03:30PM

_April 17, 2017 - Status Hearing Resumed - Barlund - Cross_

1   health?

2   A.  I do not.

3   Q.  Okay.  I have nothing further.

4           THE COURT:  Any redirect, Mr. Bojanowski?

5           MR. BOJANOWSKI:  May I have a moment, Your Honor?      03:31PM

6           THE COURT:  Surely.

7           MR. BOJANOWSKI:  No questions, Your Honor.

8           THE COURT:  Thank you, Ms. Barlund, very much.

9           Is there a next witness?

10          MR. BOJANOWSKI:  Richard Pratt.                        03:31PM

11          THE COURT:  Mr. Pratt, please.

12          (The witness was sworn.)

13          THE MAGISTRATE CLERK:  Thank you.  Please have a seat.

14          MR. BOJANOWSKI:  Your Honor, this is not a witness

15  that we intended to ask any questions of and produced pursuant   03:32PM

16  to plaintiff's request.

17          THE COURT:  Okay.

18          MR. BOJANOWSKI:  So we'll allow plaintiffs to proceed.

19          THE COURT:  Fair enough.

20          MS. KENDRICK:  Can I have a minute?                    03:32PM

21          THE COURT:  You may.

22          MR. BOJANOWSKI:  I did that on purpose.

23

24                      RICHARD PRATT,

25  a witness herein, having been first duly sworn by the clerk to

1    speak the truth and nothing but the truth, was examined and

2    testified as follows:

3                          CROSS-EXAMINATION

4    BY MS. KENDRICK:

5    Q.  How are you doing, Mr. Pratt?                          03:32PM

6    A.  I'm well.  How are you?

7    Q.  All right.  Are you hanging in there?

8    A.  Absolutely.

9    Q.  Okay.  Did you review any documents to prepare for this

10   hearing?                                                   03:32PM

11   A.  Not specifically to prepare for this, no.

12   Q.  No.  Did you speak to or meet with anybody about your

13   testimony today?

14   A.  I have met with my legal staff but really not being prepped

15   for anything specific.  I don't know what the questions will   03:33PM

16   be.  It's just an open conversation as far as I know.

17   Q.  Okay.  So anybody besides your attorneys?

18   A.  My staff.

19   Q.  Your staff?

20   A.  Sure.                                                  03:33PM

21   Q.  Okay.  Did you speak with Mr. Ryan about your testimony

22   today?

23   A.  I did not.

24   Q.  And I just want to go over some background.

25            How long have you been the head of the Monitoring   03:33PM

1    Bureau?

2    A.  I have been officially in the position of the assistant

3    director for the past three years either on an interim basis or

4    on a permanent basis.

5    Q.  And what did you do before that?                        03:33PM

6    A.  I worked in different positions within the Department and

7    within the Monitoring Bureau.  I started with the Department in

8    2000.  I was a health administrator.  I worked at different

9    facilities.  And then I left the Department in 2009, came back

10   in 2011, and when I came back I was a southern regional        03:34PM

11   director for the Department.  We were still self-operated and

12   it wasn't -- health wasn't privatized yet.

13          And then I was in an interim position at the time that

14   we did privatize.  Shortly thereafter Art Gross was brought in

15   as the assistant director, and that lasted a little over a year  03:34PM

16   and then I came back as the interim assistant director again

17   for about five months until I was made the permanent assistant

18   director of the Health Services Contract Monitoring Bureau.

19   Q.  That's a lot of title changes.

20   A.  Nine.  Yes.                                              03:34PM

21   Q.  What did do you from 2009 to 2011?

22   A.  I worked for a private company.  I worked for CMS, which

23   eventually merged with a company named PHS to become Corizon.

24   Q.  Did the merger occur while you were working for CMS?

25   A.  It did.                                                  03:35PM

April 17, 2017 - Status Hearing Resumed - Pratt - Cross

1   Q.   How far into your tenure at Corizon?

2   A.   About a year and a half into my tenure with Corizon.

3   Q.   What did you do for Corizon?

4   A.   I traveled.  I was kind of a troubleshooter with them.  If

5   they were having issues in different contracts I would go check          03:35PM

6   them out, make suggestions.  I worked for their central offices

7   which at the time were in St. Louis.  And I, again, helped them

8   set up for things like NCCHC or open up new contracts or go in

9   with change in management just to make sure things were

10  operating smoothly.                                                      03:35PM

11  Q.   What kind of suggestions would you make?

12  A.   Changes to processes.

13  Q.   Like what?

14  A.   If there were issues with med pass, for instance, we would

15  go in and look at the existing process that was there and see          03:35PM

16  if there were ways to tweak it, to make it more efficient to

17  make it work better.

18  Q.   How about changes to staffing allocation?

19  A.   No, not specifically staffing allocations.  They were

20  basically set up based upon contracts.                                  03:36PM

21  Q.   So the number of staff that Corizon would have at an

22  institution just depended upon the contract with the respective

23  state or municipality?

24  A.   Correct.

25  Q.   And when you worked at CMS or Corizon did you receive any          03:36PM

1   equity shares in Corizon as part of your compensation?

2   A.  No, ma'am.

3   Q.  How about in Valitas Health Services?

4   A.  No.

5   Q.  How about in Beecken Petty O'Keefe & Company?                03:36PM

6   A.  No.

7   Q.  What's the purpose of the Monitoring Bureau?

8   A.  Make sure that the contractor vendor is doing what they

9   signed on to do.

10  Q.  Okay.  I'm going to read to you what it says on the ADC      03:36PM

11  website.  I will represent that I got this off yesterday.

12  A.  Okay.

13  Q.  It says, "The Department created a Monitoring Bureau to

14  follow the medical care and treatment of inmates after

15  privatization of health services effective July 1st, 2012.      03:37PM

16  Responsibility and accountability for inmate health care is

17  demanded now as in the past."

18          So as head of the Bureau, you are ultimately

19  responsible for demanding that Corizon complies with the Parson

20  stipulation and the terms of the contract?                      03:37PM

21  A.  No.  I'm there to make sure that they live up to the

22  contract itself that they entered into.  The stipulation is a

23  separate item.

24  Q.  Who is responsible and accountable for making sure they

25  comply with the stipulation?                                    03:37PM

April 17, 2017 - Status Hearing Resumed - Pratt - Cross

1    A.  I am.

2    Q.  How about the Court's orders?  Is that you also?

3    A.  Yes, ma'am.

4    Q.  And how many monitoring positions do you have?

5    A.  33.                                                    03:38PM

6    Q.  How many of them are vacant right now?

7    A.  I think there may be two vacant.  I'm not sure.

8    Q.  Who are the newest hires, or when were they hired?

9    A.  Pardon?

10   Q.  When were the newest hires hired?                      03:38PM

11   A.  The most recent hire that we had was in mental health and

12   that was a couple of months ago.

13   Q.  And do you do performance reviews of the people who work

14   for you?

15   A.  Yes.  I have some direct reports to me, yes.            03:38PM

16   Q.  And who are your direct reports?

17   A.  Dr. Taylor, Dr. Robertson, Dr. Chu, Kathy Campbell, Vanessa

18   Headstream and administrative staff as well.

19   Q.  Martin Winland, does he report to you?

20   A.  No, he does not.                                        03:39PM

21   Q.  Who does he report to?

22   A.  He reports, I believe, to Vanessa Headstream through Erin

23   Barlund.  I'm not exactly sure of the chain there.

24   Q.  How does Ms. Taylor provide you with updates on whether

25   she's finding compliance with the mental health performance    03:39PM

1   measures?

2   A.  Dr. Taylor?

3   Q.  Yes.

4   A.  We talk almost daily regarding findings that she's got

5   going, which is no different than Kathy Campbell or Vanessa          03:39PM

6   Headstream.

7   Q.  Have you ever spot-checked her work on the MGARs to make

8   sure she is accurately monitoring the performance measures?

9   A.  Quite honestly, I don't do the monitoring.  So for me to

10  turn around and tell her that she's doing it incorrectly would      03:40PM

11  not be appropriate.

12  Q.  So that's a no?

13  A.  That's a no.

14  Q.  And then Dr. Chu, she's the dental monitor?

15  A.  Yes, ma'am.                                                      03:40PM

16  Q.  And she's a direct report to you?

17  A.  Correct.

18  Q.  And does she provide you updates or reports on what she is

19  finding when she's monitoring?

20  A.  I get a copy of all the reports that she does when they         03:40PM

21  input their findings into the CGAR.  I get copies of those

22  reports.

23  Q.  And I don't want to assume the answer, but have you ever

24  spot checked her work on the MGARs to ensure she's accurately

25  monitoring the performance measures?                               03:40PM

April 17, 2017 - Status Hearing Resumed - Pratt - Cross

```
 1   A.  Not directly, no.

 2   Q.  Do you supervise Ryan Owens directly?

 3   A.  Yes, I do.

 4   Q.  How do you supervise him?

 5   A.  Mr. Owens came to us through our legal department.  He is      03:40PM

 6   not a direct part of the Bureau, but he was added to the Bureau

 7   for assistance.  Basically he was brought on to set up our

 8   documentation for the monthly site visits that the ACLU, that

 9   you were doing, and to back up Lucy Rand as far as

10   documentation processes.  So we have expanded his role over       03:41PM

11   time to work on things such as randomization.

12   Q.  But he reports to you and not the general counsel?

13   A.  He's still under the general counsel.  He's not on my

14   payroll per se.  He's under general counsel.  But he does work

15   in my office, and he reports to me.  If he needs time off he      03:41PM

16   comes to see me.  He works all of his schedules and everything

17   through me.

18   Q.  And have you ever reviewed the lists that he creates?

19   A.  No, I have not.

20   Q.  Why is it important to use random samples?                    03:42PM

21   A.  I have heard it stated before, and I will repeat it.  It's

22   to avoid cherry picking.

23   Q.  Who is -- you mentioned a Dr. Robertson.  Who is he?

24   A.  Dr. Robertson is my medical -- my lead medical person.  He

25   was a provider when we were self-op and now he oversees any       03:42PM
```

1  questions that come through the Monitoring Bureau as far as

2  medical care goes.

3  Q.  So what does he do?  He's not treating patients, correct?

4  A.  Correct.  No.  He is not treating patients.  But he

5  oversees, again, any direct care, any issues that are coming up          03:42PM

6  from the field where there may be a question as to the quality

7  of the care that's going on or what may need to be happening in

8  his opinion for any specific patient, he will discuss those

9  things directly with Corizon through his counterpart there,

10 it's usually Dr. Williams.          03:43PM

11         And he also sits on the Mortality Review Board and he

12 participates in the Hepatitis C Committee and the Pharmacy and

13 Therapeutics Committee as well.

14 Q.  What is the Hep C Committee?

15 A.  It's a committee that oversees, in general we have about          03:43PM

16 7500 patients that have been identified with Hepatitis C.  And

17 they are set up in a triage-type system to determine who would

18 qualify for care immediate care right now or where they would

19 fall in the process.

20 Q.  So ADC involves itself in the decision about who would get          03:43PM

21 the Hepatitis C treatment?

22 A.  No, ma'am.  We sit on the committee.  It's more of an

23 awareness scenario so we're knowledgeable about exactly what's

24 happening.

25 Q.  So he's there representing the Bureau with the utilization          03:44PM

April 17, 2017 - Status Hearing Resumed - Pratt - Cross

1  management team from Corizon?

2  A.  Yes.

3  Q.  Do you know if he's ever ordered the utilization management

4  team to approve Hepatitis C treatment that Corizon originally

5  wanted to deny?                                              03:44PM

6  A.  Dr. Robertson is not in a position to order care for

7  anyone.  He may want that care to take place but he cannot

8  order it.

9  Q.  As I'm sure you are aware, I sometimes get e-mails from my

10 office or the ACLU or other plaintiffs' counsel regarding      03:44PM

11 individuals who have come to our attention who we are concerned

12 are in serious need of medical care?

13 A.  Yes, ma'am.

14 Q.  What do you do with those e-mails when you get them?

15        MR. BOJANOWSKI:  I will note an objection.  This isn't  03:45PM

16 relevant to monitoring.

17        THE COURT:  Overruled.

18        THE WITNESS:  I will look at them.  Typically what I

19 will do, first thing I will normally do when I get those is

20 read the context of it.  Depending upon the context, I may jump 03:45PM

21 into the medical record myself to see what's going on.  But on

22 the norm, what I will do is pass that information on to Vanessa

23 Headstream and then she will investigate, plus it's given to

24 Corizon directly and she will follow up to see if there's any

25 issue involved to make sure any outstanding issues are taken   03:45PM

1    care of.

2    BY MS. KENDRICK:

3    Q.  Do you send it to Dr. Robertson since he's a doctor?

4    A.  He may be copied on those as well.

5    Q.  Who is your supervisor?                                    03:45PM

6    A.  Director Ryan.

7    Q.  Do you meet directly with Charles Ryan?

8    A.  At a minimum once a week, yes, ma'am.

9    Q.  When was the last time?

10   A.  Last Wednesday or Thursday.                                03:45PM

11   Q.  How long did you meet with him?

12   A.  I have a formal meting with him every Monday.

13   Unfortunately, today is that Monday, so I missed that meeting

14   today.  More than likely he has rescheduled.  It's called a

15   one-on-one where I sit down with him and we go through         03:46PM

16   different topics.  So it's probably scheduled for later in the

17   week.

18   Q.  And at the last one, do you remember roughly how long you

19   met with him for your one-on-one?

20   A.  It's typically half hour to an hour.                       03:46PM

21   Q.  What did you talk about last week?

22   A.  Healthcare, just in general; where are we at right now with

23   the CGAR findings.  But there's a whole host of other things

24   that we do talk about because I sit on the executive staff.  We

25   talk about recidivism in general, different directives that     03:46PM

1  we're taking as a overall department to try to reduce

2  recidivism, outside efforts that we've got going on, anything

3  legislative that's going on, where are we at with the budgetary

4  process.  So there's a number of different things that we

5  cover.                                                          03:47PM

6  Q.  And this is in the one-on-one?

7  A.  Yes, ma'am.

8  Q.  And you said a whole host of other things, so what you just

9  rattled off is the host of other things?

10  A.  That's -- yes.                                             03:47PM

11  Q.  So I want to dig down in healthcare since that's what we're

12  here about.  What else do you talk to him about besides the

13  CGAR findings?

14  A.  In general that's it unless there is something that I think

15  he needs to be aware of.  If there is an exceptionally high      03:47PM

16  profile thing, an active TB case, for instance, somewhere at a

17  facility I will fill him in on that.  But those things are

18  typically done through e-mail and we don't wait to have a

19  formal meeting to have those discussions.  It's typically an

20  e-mail notification.  So anything of vital importance doesn't    03:48PM

21  wait for a meeting.

22  Q.  So you said this is a weekly one-on-one and you talk about

23  the CGAR results.  So the CGAR results come out once a month so

24  I'm curious what do you talk about at the other three weekly

25  meetings?                                                       03:48PM

1    A.  The rest of the stuff that I had mentioned before.  It's

2    not a set agenda.  There's not a set number of talking points

3    on each one.  A meeting may last 10 minutes.  It may last an

4    hour.  Just depends on what we have got to talk about.  And

5    it's not always me bringing stuff to him.  He brings stuff to        03:48PM

6    me as well.

7    Q.  Did you tell Mr. Ryan that Judge Duncan had requested this

8    series of evidentiary hearings?

9    A.  Yes.

10   Q.  When did you tell him that?                                      03:49PM

11   A.  I don't recall.  It's probably months ago.

12   Q.  Did you tell Mr. Ryan about the testimony that was given on

13   March 8th?

14   A.  Can you be more specific?

15   Q.  So March 8th was when we started the testifying with the         03:49PM

16   witnesses.  I believe we had to leave early at noon.  I'm just

17   curious if you know, in the following weeks, if you reported

18   back to him about what people were testifying to with the

19   judge?

20   A.  No.  What I was doing in general is telling him here's           03:49PM

21   where we're at in the process.  Day one we had nine people

22   scheduled and three testified.  Day two we had six people

23   scheduled and three testified.  And I'm still waiting and I'm

24   still waiting.  Now I will be able to go back and say yes, yes,

25   sir, I testified.                                                    03:49PM

**April 17, 2017 - Status Hearing Resumed - Pratt - Cross**

1    Q.  And did you go into the substance of the testimony with

2    him?

3    A.  No.

4    Q.  Just the fact that the testifying had occurred?

5    A.  Yes.  Notes come from our legal staff to kind of overview          03:49PM

6    everything that was -- that took place in the testimony.

7    Q.  So when you told him that you would be testifying today,

8    hopefully, what was his response?

9    A.  About time.

10   Q.  Okay.  And --                                                      03:50PM

11            THE COURT:  Mr. Pratt, allow me to interject my

12   question.  You said last week when you met with the director

13   one of the things you addressed with him was, quote, where we

14   are with CGAR findings right now," close quote.  That, of

15   course, is of keen interest to me as well.  What did you tell         03:50PM

16   him.

17            THE WITNESS:  I gave him what our draft response was

18   up to this point.  We vetted it last Friday night, and the

19   results that I had as of Friday night were that 91 percent of

20   the performance measures, the 849 performance measures,              03:50PM

21   actually passed and hit the threshold.

22            THE COURT:  Which threshold, the 80 or 85 percent?

23            THE WITNESS:  80 percent.  We have 80 percent.  We go

24   to 85 starting now.

25            THE COURT:  And you said this was in last week's            03:51PM

April 17, 2017 - Status Hearing Resumed - Pratt - Cross

1    meeting?

2            THE WITNESS:  Yes.

3            THE COURT:  But you vetted it Friday night?

4            THE WITNESS:  Well, there's the 10-day rebuttal period

5    for Corizon to come back and say you might want to take a          03:51PM

6    second look at this one or that one.

7            THE COURT:  I see.  So you gave him the pre-vetted

8    numbers?

9            THE WITNESS:  Correct.

10            THE COURT:  And how about the performance measures       03:51PM

11    that the Court has identified that required mediation where

12    we -- the most recent ones I have seen show more failures than

13    successes?  Did you talk about those?

14            THE WITNESS:  We talk about those each week.  It's the

15    fact that we are still struggling with the number of            03:51PM

16    performance measures.  That's a given, and it's a frustration

17    for both of us.

18            THE COURT:  And how are you addressing that?

19            THE WITNESS:  I meet with Corizon all the time.  My

20    staff meets with Corizon all the time.  Trying to work           03:52PM

21    collaboratively, trying to come up with different ways to get

22    the job done.  If it's a process issue, if there's anything

23    that operations staff is doing that may be hindering, for

24    instance med lines we need to make sure that's being addressed.

25    The biggest thing I try to strive with with my staff is the      03:52PM

1    communication with Corizon and with operations staff.  Because

2    it takes my monitors, it takes operations staff, and it takes

3    Corizon all meeting on these things to make this work.

4              THE COURT:  We've been at this for two years.

5              THE WITNESS:  Yes, sir.                              03:52PM

6              THE COURT:  And we still have, I think, a chilling

7    amount of failures.  So the discussions that you have with the

8    director on a weekly basis addressing this haven't produced any

9    real results.  And that must be apparent to you as well.

10             THE WITNESS:  Well, I wouldn't -- judge, I wouldn't   03:53PM

11   say that they haven't produced any results.

12             THE COURT:  With respect to the performance measures

13   where we continued -- where we have identified failures and we

14   have given the State an opportunity to remediate.  And then on

15   some number I have stepped in and ordered remediation measures.  03:53PM

16   And on some of those and on the others, we continue to back

17   slide.  In fact, I think the best that can be said overall is

18   that we're treading water.  We're not making much progress.

19   And I'm -- I will tell you frankly, and I will take more time

20   than perhaps Ms. Kendrick would be happy to have me do because   03:53PM

21   you are the person in charge with respect to this, to explain

22   what my concern is.

23             My concern is that there is a relationship between the

24   provider and the State that creates a conflict of interest with

25   respect to accomplishing the goal of the stipulation.  And that   03:54PM

1   is if the State is too insistent about complying with the

2   stipulation, you lose the contractor at the price that you

3   like.

4            And so you have got an incentive to stand back from

5   doing what I have no disincentive to do, and that is to point          03:54PM

6   out what the problems are.  And that you have an incentive to

7   try to find the least obtrusive and expensive way for it to be

8   done.  That also means a counterincentive to address or to use

9   the techniques that can, perhaps, be the most efficacious and

10  perhaps even the only ones that will work but will cost more.          03:54PM

11           And so you have an incentive with the contractor that

12  you have who is giving you something that you want, and that is

13  a price to accomplish something that you have to do.  And if

14  you drive that contractor too hard then you lose the

15  opportunity to have that contractor available to you and it           03:55PM

16  becomes a possibility, I think, as a management perspective, a

17  real possibility, that you cannot obtain those services for the

18  same costs, meaning that they would have to be obtained

19  elsewhere at a higher cost.

20           So this disincentive to do what I would normally think       03:55PM

21  a contracting party would do, and that is to really hold

22  someone to the wire, to the line, to push them hard, worries me

23  that that's part of your discussion with the director.

24           Can you address this concern that I have just

25  explained?                                                            03:55PM

1         THE WITNESS:  Yes, Your Honor.  We are under a budget,

2    granted.  The legislature gives us a budget each year.  That is

3    based on the contract that we've got that we signed into.  If

4    we do anything substantially to change that contract, if there

5    is a change in scope in that contract for some reason, then we          03:56PM

6    are required to go back to the legislature to try to obtain

7    funds for whatever it is that that change may result in.

8         So we do have some constraints.  That's the reality of

9    it.  We're fighting with education.  We're fighting with other

10   departments for every tax dollar that we can get.                      03:56PM

11        I understand what you are saying.  But I will tell

12   you, sir, that we are not going soft on Corizon when it comes

13   to making demands that they do what they need to do.  That's

14   why we're there.  That's why we were created.

15        I'm not exactly sure how else I can say that.  But I          03:57PM

16   will tell you, no, sir, we do not look the other way.  We do

17   not look for the softest landing for Corizon.  We look for the

18   correct response.  Some of these things do take time.  And

19   while I know the question continues to come back about

20   inadequate staffing, which is where I think a lot of this          03:57PM

21   discussion is pointing to, I cannot say that Corizon is

22   inadequately staffed.  They have never been 100 percent staffed

23   based on the current contract.  And I would honestly like to

24   see what their performance would be if they were 100 percent

25   staffed.  Do I think it would show some improvement?  Yes, it          03:58PM

1    would.  But we also sanction Corizon for the fact that they are

2    not 100 percent staffed.  I think since the beginning of the

3    contract we have probably sanctioned them well over $3 million

4    because they don't have the right staff.

5          THE COURT:  But the problem is the persons on whose          03:58PM

6    back that failure to staff is not the state budget.  It's the

7    inmates who are not receiving the care that is not being

8    provided by the staff who aren't there because Corizon hasn't

9    filled the positions.

10         MR. BOJANOWSKI:  Note an objection.                          03:58PM

11         THE COURT:  You can't object to a judge's question.

12         THE WITNESS:  Where they may not have online staff,

13   they may not have staff that are hired directly by them, they

14   do use locums.  They do use temp staff.  That doesn't show up

15   in their actual numbers of FTEs, full time employees.             03:59PM

16         THE COURT:  But you have been here and you have

17   obviously seen the letters, many letters, that include the

18   defendant's excuses on why they haven't complied with the

19   compliance measures, the performance measures, that indicate

20   that there has been new employees; that a spot hasn't been        03:59PM

21   filled; the absent employee, over and over again that same

22   excuse has been offered.  And so it's not unreasonable to point

23   to this issue of staffing and that if you are running such a

24   lean machine that you don't have the redundancy that over and

25   over again when someone leaves it leaves you all in a lurch.      03:59PM

April 17, 2017 - Status Hearing Resumed - Pratt - Cross

1   And the lurch, again, is falling on the shoulders of the people

2   who the stipulation is designed to protect.

3          THE WITNESS:  I don't disagree with you at all.

4          THE COURT:  All right.  Thank you.

5          You may.                                              03:59PM

6   BY MS. KENDRICK:

7   Q.  And Mr. Pratt, you participated in the settlement

8   negotiations in this case, correct?

9   A.  Correct.

10  Q.  And you participated in meetings and phone calls with me    04:00PM

11  and other plaintiffs' counsel in terms of coming up with the

12  performance measures for the stipulation, correct?

13  A.  Yes.

14  Q.  And is it correct that many, if not most of these measures

15  came straight out of what you guys were doing under the MGAR    04:00PM

16  monitoring process?

17  A.  No, I don't know that most of them came out of the MGAR.

18  The MGAR itself was 43 performance measures.  And they were

19  very vague and they were very subjective.  When we created this

20  Monitoring Bureau, honestly we didn't know what we were doing   04:00PM

21  because we had never done it before.  So as far as creating

22  performance measures, again, they were subjective, and we had

23  to rely on kind of a gestalt as far as some of the monitors

24  went.  That's where we had a green score, an amber score, and a

25  red score.  There is no real such thing as green, amber, and    04:01PM

1    red anymore.  You either make the threshold or you don't.  It's

2    green and red.

3          The performance measures themselves, I think some of

4    them did come out of the MGAR.  I believe a lot of them were

5    brought from the plaintiffs out of the California case to          04:01PM

6    mirror some of those performance measures.

7    Q.  And were you involved in developing the original

8    performance measures for the MGARs?

9    A.  No.

10   Q.  Why not?                                                      04:01PM

11   A.  I was not in that position at that time.  There was a lot

12   of discussion through Dr. Adetutu, who was in charge prior to

13   that.  So I'm sure I was on the periphery as far as some of the

14   discussions went.

15   Q.  And then once the parties settled, I think you made some      04:01PM

16   reference but I want to be correct here, the contract with

17   Corizon was amended to incorporate the CGAR measures?

18   A.  Correct.

19   Q.  As a way of measuring compliance?

20   A.  That's correct.  That was our standard.  We moved to the      04:02PM

21   performance measures in the stipulation.

22   Q.  Okay.  And what are the sources of information you use to

23   assess the quality of healthcare?

24   A.  EOMIS, different reports that we get from Corizon.  The

25   paper medical record is a possibility.  We use pharmacy reports   04:02PM

April 17, 2017 - Status Hearing Resumed - Pratt - Cross

1  from the pharmacy subcontractor.  We use dental reports from

2  the dental subcontractor.

3  Q.  So I don't want to put words in your mouth, but it sounds

4  like you are evaluating based on both individual cases and more

5  systemic reports, like system-wide reports of, you know, you        04:03PM

6  were referring to?

7  A.  The original question was how do I review --

8  Q.  What are the sources of information?  And you started off

9  talking about medical files and eOMIS and then you started

10  talking about some of these reports Corizon gives you?            04:03PM

11  A.  Well -- go ahead.

12  Q.  No, so my question is:  Those reports that you are

13  referring to that Corizon gives to you, are they about just one

14  individual's care, or are they about the medical care that,

15  say, all the prisoners at the Buckley unit at Lewis got?          04:03PM

16  A.  They are generally reports from a whole perspective not

17  individualized reports.  I get more individualized information

18  from folks like you and other advocates that may bring to my

19  attention somebody that is in need of care that we want to jump

20  on right away.  But those are not part of the CGAR per se.        04:04PM

21  Q.  Do you read the monthly CGAR reports?

22  A.  Yes, I do.

23  Q.  When was the last time?

24  A.  I just read the one from Friday night, is the most recent.

25  Q.  And that's -- so that would be February?                      04:04PM

1   A.  Yes.

2   Q.  And do you do that for all institutions or specific

3   institutions?

4   A.  All institutions.

5   Q.  And do you do this for all performance measures or just          04:04PM

6   specific ones?

7   A.  All of the performance measures.

8   Q.  So tell me what you saw in the February ones.  Did you see

9   non-compliance again in areas that had been non-compliant

10  before?                                                             04:04PM

11  A.  I did.  I saw some areas of frustration where performance

12  measures have been consistently failing and still have failed.

13  But on the other hand, I saw basically, in the last couple of

14  months, I have seen a pretty good turnaround in a couple of the

15  performance measures that seem to be doing much better lately       04:05PM

16  than they have ever in the past.  And the overall performance,

17  as I said, the 91 percent is the highest it's ever been since

18  we started monitoring.  So that's telling me that some positive

19  things are happening.

20  Q.  What's the purpose of a CQI meeting?                            04:05PM

21  A.  Take a process and follow it for several months to see if

22  it's -- review the process, see if it needs to be tweaked, see

23  if there's anything to be done to make it better.

24  Q.  Do you read the monthly CQI minutes?

25  A.  Rarely.                                                         04:05PM

April 17, 2017 - Status Hearing Resumed - Pratt - Cross

1   Q.  Why?

2   A.  I just don't.

3   Q.  And when you said that there were areas in the February

4   ones where, yet again, there's non-compliance, could you

5   describe what steps you are going to take to address the          04:06PM

6   continued non-compliance?

7   A.  Straight back to Corizon, talk with them, talk with their

8   leadership.  Pounding my fist on the desk does not seem to have

9   an effect.  This is a collaboration.  We need to get it done

10  correctly.  It's about patient care.  That's what we're all       04:06PM

11  about, so I go back to them demanding.

12  Q.  What have you done to make Corizon increase salaries so

13  that the positions are actually attractive and they can hire

14  staff and fill the contracted positions?

15          MR. BOJANOWSKI:  Same objection.                           04:06PM

16          THE COURT:  Overruled.

17          THE WITNESS:  I have no power to make them raise

18  salaries.  Suggestions, yes.

19  BY MS. KENDRICK:

20  Q.  Have you suggested that in the past?                           04:07PM

21  A.  Yes, we have.

22          MR. BOJANOWSKI:  Same objection.

23          THE COURT:  Overruled.

24  BY MS. KENDRICK:

25  Q.  And what was their response when you suggested it?             04:07PM

April 17, 2017 - Status Hearing Resumed - Pratt - Cross

1          MR. BOJANOWSKI:  Same objection.

2          THE COURT:  Overruled.

3          THE WITNESS:  They review that.  They go through this.

4   They do this on a national level.  They tell us what they are

5   doing as far as trying to attract talent.                    04:07PM

6   BY MS. KENDRICK:

7   Q.  What are they doing?

8   A.  They do fairs.  They work with colleges.  They do

9   advertising.  They work with different agencies to refer to

10  staff to them.                                                04:07PM

11  Q.  How do they refer psychiatrists, recruit psychiatrists?

12  A.  I don't know specifically.

13  Q.  How do they recruit physicians?

14  A.  Again, I don't know specifically.  But again, as I say,

15  they work with colleges.  They work with different referral   04:07PM

16  agencies.  That I do know.  I don't know which agencies.

17  Q.  Have they described reaching out to any medical schools?

18  A.  Yes.  I know they do work with medical schools in

19  particular with nursing.

20  Q.  What about for provider-level clinicians?              04:08PM

21  A.  That I don't know.

22  Q.  What are they doing to recruit more psychologists?

23  A.  I don't know specifically.

24  Q.  Who would know?

25  A.  Corizon leadership.                                    04:08PM

────── April 17, 2017 - Status Hearing Resumed - Pratt - Cross ──────

1   Q.  Have you ever asked them?

2   A.  Yes.  And they will tell me here and there who they are

3   working with or who they are working for to try to retain or

4   attract some talent.  But right off the top I don't know who

5   they are.                                                          04:08PM

6   Q.  Have they ever said anything about their raising the

7   salaries?

8   A.  We have talked with them about the potential of raising

9   salaries and doing whatever it takes to attract the right

10  staff.  What I have found is it's not necessarily the fact that  04:08PM

11  they can't attract staff.  What I have found is it's the

12  retention of the staff that seems to be the biggest issue for

13  me.

14  Q.  And why are people not staying?

15  A.  I don't know.  It could be a host of things.  They may not  04:09PM

16  like the prison system once they get into it.  I don't know.

17  Q.  Have you ever asked Corizon why is there no retention?

18  A.  It's kind of a rhetorical question.  Yes, we ask them all

19  the time, basically, what are you doing?  What's the latest

20  status?  What's your vacancies?  What are you doing to attract  04:09PM

21  staff?  And where are you at in that process?

22  Q.  Do you know if Corizon does exit interviews with doctors or

23  psychiatrists or nurses as they are leaving to ask them why

24  they are leaving?

25  A.  I don't know.                                                 04:09PM

1   Q.  Is that something Corizon did when you worked for them as a

2   troubleshooter?

3   A.  Not to my knowledge, no.

4   Q.  So if you were still there working at Corizon, and you had

5   a state where there's a contract and you can't keep the staff          04:10PM

6   and there's a lot of turnover, what steps would you take to

7   find out why people don't stay?

8           MR. BOJANOWSKI:  Same objection.

9           THE COURT:  Overruled.

10          THE WITNESS:  You typically, you get an overall feel           04:10PM

11  for why they don't have staff.  But personally, I didn't have

12  an exit interview when I put in my resignation.

13  BY MS. KENDRICK:

14  Q.  Do you have an overall feel for why they are leaving here?

15          MR. BOJANOWSKI:  Same objection.                               04:10PM

16          THE COURT:  Overruled.

17          THE WITNESS:  No, I don't.  It could be, as I said, a

18  host of things.  It could be people that don't like prison.  It

19  could be people that don't like the management.  It could be

20  people that don't like being sued.  There's a number of               04:10PM

21  different issues that staff may say this is not the job for me.

22  BY MS. KENDRICK:

23  Q.  So when you worked at Corizon you had a feeling about why

24  staff were leaving, but now you don't have a feeling about why

25  staff are leaving?                                                     04:11PM

**April 17, 2017 - Status Hearing Resumed - Pratt - Cross**

 1  A.  No.  I gave you a list of reasons why they may be leaving.

 2  Q.  Have you ever talked to any providers or nurses who

 3  announced they are leaving and asked them why they are leaving?

 4  A.  No.  Not personally.

 5  Q.  Have any of your monitors, to your knowledge, ever done        04:11PM

 6  that?

 7  A.  I would imagine they have, yes.

 8  Q.  Why do you imagine they have?

 9  A.  Because they talk to the staff in the field all the time.

10  Q.  Have any of your monitors ever told you that they spoke to     04:11PM

11  staff who were leaving and the reasons why?

12          MR. BOJANOWSKI:  Same objection.

13          THE COURT:  Overruled.

14          THE WITNESS:  Nothing specific, no.

15  BY MS. KENDRICK:                                                   04:11PM

16  Q.  So you used to be the troubleshooter, so help us shoot the

17  trouble.  What measures, in your opinion, need to be taken to

18  retain staff?

19          MR. BOJANOWSKI:  Same objection.

20          THE COURT:  Overruled.                                     04:11PM

21          THE WITNESS:  I'm not sure.  I would imagine

22  increasing salaries may have some impact on some staff.  Others

23  it would not matter.  Possibly making adjustments as I know

24  going from eight-hour shifts to 12-hour shifts or working out

25  different things with different staff members might have an        04:12PM

1    effect to try to prevent burnout from the staff that are out

2    there right now.

3    Q.  Would hiring more staff help?

4           MR. BOJANOWSKI:  Same objection.

5           THE COURT:  Overruled.                                04:12PM

6           THE WITNESS:  You know, I can't say point blank that

7    hiring staff would not help.  Honestly I think hiring

8    additional staff would help.  But what I would like to see is

9    hiring the staff that they don't have that they are already

10   contracted for.                                              04:13PM

11   BY MS. KENDRICK:

12   Q.  Do you think it would be useful to do some sort of analysis

13   about the various needs at different yards to figure out maybe

14   a max custody yard has different staffing requirements than,

15   say, a low security yard or based upon the patient profile an  04:13PM

16   analysis of not only the number of positions but where they

17   should be allocated?

18          MR. BOJANOWSKI:  Same objection.

19          THE COURT:  Overruled.

20          THE WITNESS:  That wouldn't hurt.                      04:13PM

21   BY MS. KENDRICK:

22   Q.  Are you aware of such staffing studies being done in

23   corrections in general in other states?

24   A.  Well, there's a saying in corrections that when you've seen

25   one prison, you've seen one prison.  They all vary quite a bit  04:13PM

1    by population, by physical structure, by accessibility.  So to

2    try to take a study from somewhere and bring it into --

3    Q.  No, I'm not saying that you take the study that was done in

4    Idaho or Wyoming or Alabama.  I'm saying if Corizon did an

5    Arizona-specific study so they could see that at Lewis prison          04:14PM

6    the needs are very different at Buckley yard than at Rast max,

7    that sort of analysis.  So I'm not talking about importing --

8    A.  I'm sorry.  I misunderstood.  No, I think that's already

9    being done.  I think Corizon looks at their staff.  They look

10   at their staffing needs.  They look at their allocation.              04:14PM

11   Q.  How do you know they are doing that?

12   A.  I don't know.  I can't say that I have seen that study, so

13   I don't know that they are not though.

14   Q.  You have no basis actually to say they are doing that?

15   A.  I can't say they are not doing that.                             04:14PM

16   Q.  So you don't know if they are doing it?

17   A.  That's correct.

18   Q.  Have you ever asked them to do one?

19   A.  No.

20   Q.  Why not?                                                         04:14PM

21          MR. BOJANOWSKI:  Same objection.

22          THE COURT:  Overruled.

23          THE WITNESS:  My assumption is that they are doing

24   that.  That's part and parcel of what they do.

25   BY MS. KENDRICK:                                                     04:15PM

652

1   Q.  But you are assuming but you are not asking for it?

2   A.  I'm not asking for a physical study, no.

3   Q.  If you don't have the power to get Corizon to raise the

4   salaries then who does?

5   A.  Only Corizon has that power.                          04:15PM

6   Q.  Why?

7   A.  They have signed a contract to provide services.  There's

8   nothing in that contract that says that the Department has the

9   ability to go in and tell them what they will pay their staff.

10  Q.  But there's also nothing in the contract prohibiting the  04:15PM

11  Department from doing that, correct?

12  A.  That's correct.

13  Q.  Have you ever asked them to do it?

14  A.  We have discussed it with them in the past, yes.

15  Q.  Discussion but actual asking are two different things.     04:15PM

16  A.  No.  Again, if I were to ask them to do that, if you turn

17  that into a contract demand, then what that turns into is a

18  change in scope on the contract which then whatever raises they

19  would give their staff would come as an addition to the

20  contract cost which I would have to go back to the legislature  04:16PM

21  and say, I need X amount of dollars to pay for this proposed

22  raise for Corizon staff.

23  Q.  Why couldn't it come out of the line item in the contract

24  for their profit?

25       MR. BOJANOWSKI:  Same objection.                       04:16PM

UNITED STATES DISTRICT COURT

1    THE COURT:  Sustained.  I mean really, that's not a

2    helpful question.  That's a legal issue.

3    BY MS. KENDRICK:

4    Q.  Have you asked Corizon to change the hours that the

5    providers are working?                                        04:16PM

6    A.  No, I have not asked them to do that.

7    Q.  Why not?

8    A.  It's something that they can look at and they provide the

9    staffing they provide the hours.  Again, collaboration with

10   them on different ways to look at the process and the way that  04:17PM

11   they provide the services.  And if changing hours is something

12   that looks like it would work, then we're all for asking them

13   to consider it.

14   Q.  Okay.  So I'd like to move on to some of the Court's

15   orders.  And you are aware of the Court's orders that have been  04:17PM

16   issued over the past few months since September about

17   monitoring methodology?

18   A.  Yes.

19   Q.  And you usually attend.  You are here for all the hearings,

20   correct?                                                       04:17PM

21   A.  Wouldn't miss them.

22   Q.  Do you take notes while you are here?

23   A.  No, I don't.  Well, I can't say I never have.  I have

24   jotted down a few things but typically I don't take notes, no.

25   Q.  When you go back to your office do you convey what the     04:17PM

1  Court said or instructed or ordered that day with your

2  employees?

3  A.  Not that day, no.  What I will do is get an overview from

4  my legal staff.  They will advise Director Ryan and the ADC

5  legal staff what took place in court.  And I don't take the                04:18PM

6  Court orders verbatim and send them out to my monitoring staff.

7  What we will do is any changes that are resulted from the

8  orders, we will get that information out to them as a change in

9  process or something they need to do differently.

10 Q.  So that's when you are -- so you have been here listening        04:18PM

11 to the individual monitors testify.  And what I have heard from

12 several of them is that the way they are notified about changes

13 is they are provided an updated version of the monitoring guide

14 and track changes that ostensibly reflects the Court's orders.

15 Is that what's sent to them?                                               04:18PM

16 A.  That's one method, yes.

17 Q.  What else?  What's the other method?

18 A.  Talking.

19 Q.  Do you ever provide them any sort of summary of what

20 happened or forward the summary that the legal department          04:19PM

21 provided you?

22 A.  No, I have not.  I can't say that my staff underneath me

23 have not.  I don't know that.  But I have not.

24 Q.  Have you ever, in writing, explained why the judge has

25 ordered something, for example, the reasoning behind these          04:19PM

April 17, 2017 - Status Hearing Resumed - Pratt - Cross

1   changes, or are they just presented the guide and told here are

2   the changes?

3   A.  They are presented the guide, told here's the changes, but

4   we do have, at a minimum, we have a monthly meeting where I get

5   together with all of my monitoring staff either in person or by          04:19PM

6   video conference and we discuss changes, anything that needs to

7   be updated, any changes in process that need to take place,

8   making sure that everybody is on the same page.

9   Q.  So I'm sure you are very aware of the Court's order of

10  November 10, 2016 that said that the Department needed to seek           04:20PM

11  outside providers for certain performance measures?

12  A.  Yes.

13  Q.  Is there a certain shorthand you use for this order that I

14  should also use?

15  A.  The community resource order.                                        04:20PM

16  Q.  The community resource order.  Okay.

17          And is it correct that part of the community resource

18  order was the open clinic?

19  A.  That was something that we did to try to effect that, yes.

20  Q.  Did you come up with the idea of the open clinic?                    04:20PM

21  A.  No.  It was brought to my attention that they were using

22  this in Florence or Eyman as far as tracking went.  And it made

23  good sense to me to be able to track who was being seen and who

24  wasn't being seen.  And then the potential of having open sick

25  call had been raised in the past.  I'm not sure when, but it             04:21PM

April 17, 2017 - Status Hearing Resumed - Pratt - Cross

1   seemed to make very good sense in allowing inmates an

2   additional option as far as a way to be seen without going

3   through another process of submitting an HNR and having it

4   triaged and waiting for an inmate to be scheduled to be seen

5   and then having the inmate actually brought in to be seen.  If        04:21PM

6   we just knock down that barrier for the inmate where he could

7   just walk in with an HNR on the yards where it was possible to

8   do that, it seemed to make perfect sense to avoid delays in

9   care and making sure these things got addressed.  It seemed

10  like a real simple --                                                 04:21PM

11  Q.  So you are aware that this order covered more than

12  Performance Measure 37, correct?

13  A.  Yes.

14  Q.  So can you explain to me how the open clinic is helping the

15  Department achieve compliance on Performance Measure 11, which        04:22PM

16  is newly prescribed formulary medications will be provided to

17  the inmate within two business days after prescribed?

18  A.  It's not.  However --

19  Q.  Okay.  How about --

20  A.  Can I answer?                                                     04:22PM

21       THE COURT:  You may.

22  BY MS. KENDRICK:

23  Q.  Yeah, you did.

24  A.  There's already a process there that says that

25  medications -- Corizon goes outside already for those                 04:22PM

1    medications if they are not available.  So no, the community

2    resource, I mean, the open sick line really doesn't have

3    anything to do with that performance measure in specifics.

4    Q.  And it doesn't have anything to do with the other pharmacy

5    Performance Measure 13, either?                                04:22PM

6    A.  What's 13?

7    Q.  13 is about no interruptions in renewals of chronic care

8    and psychotropic medications?

9    A.  No.  Again, they are able to go outside for those and

10   they've got outside contracts with pharmacies to be able to do   04:23PM

11   that.

12   Q.  So is it your testimony that the open clinic concept was

13   designed to come into compliance solely for Performance Measure

14   37?

15   A.  I don't know if it was solely 37 but it was mainly 37, yes.   04:23PM

16   It may have some potential positive side effects if you have

17   got a provider that is in the same building as the open sick

18   call, if there's something emergent that needs to be taken care

19   of and that inmate actually walks in he's going to get that

20   addressed right away as opposed to submitting an HNR and        04:23PM

21   waiting the time frame to be seen for that.

22   Q.  So what have you specifically done to get compliance with

23   Performance Measures 11 and 13, the two pharmacy measures?

24   A.  I don't understand the question.

25   Q.  Well, what is your role?                                    04:24PM

1   A.  What is my role in making Corizon meet the performance

2   measure?

3   Q.  Yeah.

4   A.  I ask them to take care of business, to give me a

5   corrective action plan, to address this, do training, do          04:24PM

6   updates, whatever it is they need to do to bring this into

7   compliance.

8   Q.  And what action are they taking on Performance Measures 11

9   and 13?

10  A.  I would have to look at their corrective action plans.  I     04:24PM

11  don't have them memorized.

12  Q.  So do you, I guess, to take a step back, you have referred

13  multiple times that you tell them to do something.  You tell

14  them to get into compliance but you personally don't get into

15  the nitty-gritty about what they need to do.  You just say fix   04:24PM

16  it, figure it out, and wash your hands?

17  A.  No.  That is not a kind thing to say.  Absolutely I do not

18  wash my hands of an obligation that I have to take care of the

19  inmate population.  I expect Corizon to take care of business

20  but I don't direct the care.  And I don't tell Corizon to take   04:25PM

21  care of it and turn my back and walk away.

22  Q.  So what do you tell them?

23  A.  I tell them take care of business, let me know how you are

24  going to do it, and we will work with them in a collaborative

25  fashion any way we can to make that happen.                      04:25PM

1    Q.  Have you been involved with that for all of these

2    performance measures that are subject to the community

3    resources order?

4    A.  Yes.

5    Q.  But as you sit here today you can't say what the plan is          04:25PM

6    for the pharmacy Performance Measures 11 and 13?

7    A.  No.  I would have to go back and look at the corrective

8    action plans.

9    Q.  And are these the corrective action plans that are provided

10   every month to Kathy Campbell on an institution basis when they      04:26PM

11   are found non-compliant?

12   A.  No.  The ones that Kathy -- I think the ones you are

13   referring to are any performance measures that don't meet the

14   threshold during the month.  Corizon leadership meets with the

15   FHAs and DONs and they individually have corrective action          04:26PM

16   plans at their level to address how they might fix those.  I

17   think that's what you are referring to.

18   Q.  Yes, so the month-to-month ones.  The -- you have referred

19   to action plans to come into compliance with the community

20   resources order.  So these are separate super CAPs separate        04:26PM

21   from what month to month might be coming across Kathy's desk?

22   A.  These are CAPs put in place based upon the Court's order,

23   not based upon the monthly performance rating.  So there would

24   be more in depth review from Corizon's side and I think the

25   action plans would be generated more from their corporate          04:27PM

April 17, 2017 - Status Hearing Resumed - Pratt - Cross

1    office than from the facility level.

2    Q.  Did you review these action plans created in response to

3    the order?

4    A.  Yes.

5    Q.  Who reviewed it?  You?                                    04:27PM

6    A.  I have seen them, yes.

7    Q.  Did you provide comments back to Corizon on them?

8    A.  We talked with our legal staff about them, yes.  And I have

9    talked with Corizon about them and let them know if an action

10   plan came across that I felt was either nonresponsive or not as  04:27PM

11   responsive as I want it to be, or it doesn't truly address the

12   shortcoming, I will go back to Corizon and say it needs to be

13   beefed up.

14   Q.  Have you done that?

15   A.  I have.                                                   04:27PM

16   Q.  Which one?

17   A.  I don't know which one specifically.  This is in the past

18   couple months.

19   Q.  This is kind of important though, right, to come into

20   compliance with the Court's order?                           04:28PM

21   A.  It is.

22   Q.  But you can't remember which plans you felt needed

23   additional work?

24   A.  Not right off the top, no.

25   Q.  Was it because it was all of them?                       04:28PM

April 17, 2017 - Status Hearing Resumed - Pratt - Cross

1   A.   No.

2   Q.   Was it about pharmacy?

3   A.   Again, I don't know which one specifically.

4   Q.   What information do you have to show whether Corizon is

5   complying with the November 10th order?                    04:28PM

6   A.   I have to work off of my CGAR findings.

7   Q.   That's all you are using?

8   A.   That's the litmus test, yes.

9   Q.   No other information or reports or data beyond what your

10  monitors find in the CRs?                                  04:28PM

11  A.   I'm not sure what you are getting at.

12  Q.   Has Corizon provided you any sort of reports showing that

13  like for the entire Eyman facility here's the number of

14  prisoners who were seen within 14 days by a provider?

15  A.   Yes.                                                   04:29PM

16  Q.   They are providing you that sort of information?

17  A.   Yes, ma'am.

18  Q.   Does it track with the CGARs and similarly show system-wide

19  non-compliance?

20  A.   Not 100 percent, no.                                   04:29PM

21  Q.   Does it show non-compliance, their own reports?

22  A.   The majority of the reports show compliance but some of the

23  CGAR findings come back showing non-compliance.

24  Q.   Is there any other information that you rely upon to show

25  whether ADC and Corizon are complying with the order?      04:29PM

April 17, 2017 - Status Hearing Resumed - Pratt - Cross

```
 1    A.  No.  I have to rely upon my monitors to validate the

 2    information and report their findings.

 3    Q.  Are you aware of any problems that have arisen with the

 4    open sick call process?

 5    A.  I'm aware that some of the inmate population really doesn't    04:29PM

 6    like it.

 7    Q.  Where?

 8    A.  Perryville.

 9    Q.  Why?

10    A.  Because they prefer to put in a health needs request and     04:30PM

11    then wait to be called in instead of walking up with a health

12    needs request and waiting to be seen.

13    Q.  Have they had to wait up to eight hours to be seen?

14    A.  Not to my knowledge, no.

15    Q.  Have they waited up to six hours to be seen?                  04:30PM

16    A.  No.  Nothing like that, no.

17    Q.  Have you been told of wait times of four hours at

18    Perryville?

19    A.  No.

20    Q.  Has anybody told you that on some days there will be up to    04:30PM

21    60 people waiting to be seen on nurse's line at Perryville?

22    A.  How many?

23    Q.  60, 6-0?

24    A.  No, I have not heard that.

25    Q.  So why don't they like waiting at Perryville versus the       04:30PM
```

—— April 17, 2017 - Status Hearing Resumed - Pratt - Cross ——

1    other prisons?

2    A.  I didn't say it was just Perryville.  There are other

3    prisons as well.

4    Q.  What are they doing for the prisoners who work and have

5    jobs?                                                            04:31PM

6    A.  They usually make accommodations to see them either before

7    they go out to the work crew or they will hold back staff to

8    see them when they return from their job.

9    Q.  And were you aware that this had arisen as a problem at

10   multiple institution?                                            04:31PM

11           MR. BOJANOWSKI:  Same objection.

12           THE COURT:  What was the objection?  You said "same

13   objection."  I didn't understand.

14           MR. BOJANOWSKI:  She's saying that this is a problem

15   at multiple institutions, I believe, is what her question was.   04:31PM

16           THE COURT:  And so the objection is?

17           MR. BOJANOWSKI:  Well, I don't believe there's any

18   foundation that's been laid as far as, well, is there, in fact,

19   a problem with regard to this issue and what's the

20   non-compliance finding.                                          04:31PM

21           THE COURT:  So it's a foundation objection?

22           MR. BOJANOWSKI:  Yes.  Does this witness --

23           THE COURT:  Hold it just a second.  The question was,

24   "And were you aware that this had arisen as to a problem at

25   multiple institutions?"                                          04:32PM

1      The foundation objection is inappropriate and is

2   overruled.

3      I'm sorry.  Why are you pausing?

4      MS. KENDRICK:  I didn't hear.  Did you rule on the

5   objection?                                                          04:32PM

6      THE COURT:  I did.  Was I not loud enough?  I'm sorry.

7   No.  I said -- I re-read the question and the question was

8   asking whether the witness was aware.  And so the foundation

9   objection was inappropriate and it was overruled.

10      MS. KENDRICK:  Okay.                                            04:32PM

11      THE WITNESS:  So what was the question?

12      THE COURT:  I can ask the court reporter to read it

13   back.

14          (The question was read back by the court reporter.)

15      THE WITNESS:  The answer is no.                                 04:33PM

16   BY MS. KENDRICK:

17   Q.  The issue of the workers not being able to be seen?

18   A.  Correct.

19   Q.  Where was it a problem?

20   A.  I don't know that it ever was a problem.  I know that that     04:33PM

21   was an arrangement that they made for the working crew, because

22   that came up when we discussed open sick call and how they were

23   going to take care of the workers.

24   Q.  Is one of the ways that Corizon has decided to comply with

25   Performance Measure 37 and 39 to require all patients be seen      04:33PM

665

1    twice on nurse's line for the same health concern before they

2    are referred to the provider?

3    A.   No.

4    Q.   Are you aware of this Corizon policy?

5    A.   I had heard that it had happened in the past where they          04:34PM

6    would not refer a patient to a provider until they were seen

7    twice by nursing for the same issue.  When that was brought to

8    their attention, we explained to them that that was not a good

9    policy in our opinion and for them to quit doing that.

10   Q.   Why is that not a good policy?                                   04:34PM

11   A.   Well, you can't automatically say that an inmate needs to

12   be seen twice for one thing.  Depends on the severity of the

13   issue.

14   Q.   But it would have the effect that fewer people are being

15   referred to see the provider?                                        04:34PM

16   A.   It could, yes.

17   Q.   It also means that they are being charged $8 instead of $4

18   because they have to do two visits to the nurse's line?

19   A.   If they submitted two HNRs, that's correct.

20   Q.   So they have to pay $8 before they can see a provider?          04:34PM

21   A.   In those specific instances, yes, that would be correct.

22          THE COURT:  When Corizon adopts a policy like that, do

23   they clear it with you?  Is that permitted under the contract

24   to create these barriers to entry?

25          THE WITNESS:  No.  It's typically not cleared with us,        04:35PM

UNITED STATES DISTRICT COURT

1   Your Honor, before -- I know that wasn't cleared with us

2   beforehand.  Otherwise it would not have happened.

3           THE COURT:  Is it still happening?

4           THE WITNESS:  No, it's not.

5   BY MS. KENDRICK:                                          04:35PM

6   Q.  It's not still happening at Tucson?

7   A.  Not that I'm aware of, no.

8   Q.  It's not happening at Perryville?

9   A.  It's not happening anywhere that I'm aware of.

10  Q.  What is the basis for your statement that it's not     04:35PM

11  happening everywhere?

12  A.  I have not heard that it's happening anywhere.

13  Q.  Who do you hear this from?

14  A.  I would hear it from the inmate population.

15  Q.  Would they e-mail you or call you or how do they tell you?  04:35PM

16  A.  Inmate letters.

17  Q.  When was the last time you got an inmate letter telling you

18  they were told they had to see the nurse twice on sick call

19  before they could get a referral?

20  A.  Maybe a year ago.                                      04:36PM

21  Q.  Are you aware of whether Tucson currently has a backlog of

22  referrals that need to be seen by the provider?

23  A.  No.

24  Q.  You testified you don't read the CQI minutes, right?

25  A.  Rarely.                                                04:36PM

1   Q.  So the attorneys said that you are the person who knows the

2   most about these nurse line and provider line dashboards.

3   That's what they told us in the court.

4   A.  Okay.

5   Q.  Are you?                                                    04:36PM

6   A.  Probably, yes.

7   Q.  Well, let's find out.

8        THE COURT:  For planning purposes, Ms. Kendrick, how

9   much more examination do you think you have of this witness?

10        MS. KENDRICK:  Depends on how quickly he answers my        04:37PM

11   questions.  Seriously hopefully 40 minutes.

12        THE COURT:  Okay.  All right.  We're not going to be

13   able to finish that today, obviously, so we're going to have to

14   figure out a time that we can do it.

15        MS. KENDRICK:  What time would you like me to stop,        04:37PM

16   sir?

17        THE COURT:  The problem is I have got to give Mr.

18   Bojanowski an opportunity to take a hand at direct if only for

19   the reason to allow him to use the proper method for

20   challenging the judge's question and that is with his own       04:37PM

21   witness to ask questions, you remember the judge asked you

22   about this.  Why is that wrong, or something like that.  That's

23   what he needs to, in fairness, have an opportunity to do.

24        So I need to understand also whether or not the

25   parties had contemplated additional witnesses beyond Mr. Pratt, 04:38PM

1    or is he your last witness for this process?

2            MR. BOJANOWSKI:  It's my understanding he's the last

3    one.  We produced everybody the plaintiffs wanted and I think

4    we have hit everybody.  Correct?

5            MS. KENDRICK:  You produced everybody that court          04:38PM

6    ordered.  We didn't get everybody we wanted.

7            THE COURT:  Again, with respect to the people we had

8    understood to be on the agenda, Mr. Pratt is our last witness?

9            MS. KENDRICK:  Correct.

10           THE COURT:  All right.  So we've got 40 minutes that       04:38PM

11   plaintiffs believe that you need additionally, then we have

12   whatever time and I have just a couple of questions.  So I

13   think what we'll do is we'll get through -- well, here's the

14   problem.  I have also got an agenda of other items that need to

15   be addressed today, and if I don't do it today, then I lose      04:39PM

16   more time on getting things addressed in a way that I think can

17   be constructive.

18           So the next time that we're scheduled to meet is May

19   10th, I believe.  So what I'm thinking is the right thing to do

20   is to let me say what I have to say about the agenda in the      04:39PM

21   remaining time.  And I'm trying to be respectful.  This has

22   been a long day for the court staff.  We started at 8.  So I'm

23   very hesitant, in fact, will not go past the 5:00 hour today.

24           But there are things that we do need to address today,

25   and so unfortunately in your next conversation with Director     04:39PM

1    Ryan you are going to have to tell him that you are not done.

2    But that's not so offensive to me because you told me you

3    wouldn't miss it for anything, so I know you will be here the

4    next time.

5         THE WITNESS:  Absolutely.                                04:40PM

6         THE COURT:  So you unfortunately set that trap for

7    yourself.  I just snapped it on you.  But thank you.  I

8    appreciate that.

9         So what I'm going to do is ask you, Ms. Kendrick,

10   unless you just want to ask one or two more questions here, I'm   04:40PM

11   going to say we finish with Mr. Pratt now.  I then turn to the

12   subjects that I need to address and set the framework for what

13   we think will be the agenda for the 10th of May, including

14   finishing Mr. Pratt, both plaintiffs and defendant.

15        MS. KENDRICK:  I'm actually at a pretty good stopping     04:40PM

16   place with him.  Since we were about to start something new I

17   can hand it over to you.

18        THE COURT:  Mr. Pratt, you may sit down for a couple

19   of weeks.

20        All right.  I don't know my agenda is going to match     04:40PM

21   completely with yours, but I'm going to start off in a way that

22   I think will have some effect on what you think the agenda

23   items may be.  And I will also tell you what I think we need to

24   set in particular for oral argument and also to give you a

25   heads up about how I'm going to address the pending motion for   04:41PM

1    additional issues, performance measures that are deemed not

2    compliant.

3         I do need to take a moment to say, however, that I

4    have really appreciated the witnesses that have been produced

5    in this process that I envisioned as an educational process.          04:41PM

6    It has been that for me.  I think it's also been helpful for

7    the parties to be able to address some of these issues.

8         I do think, however, that it goes beyond, it has grown

9    beyond just an educational process, that that is to say, that

10   issues have been raised through questions and answers that have       04:41PM

11   not been addressed by way of the respective parties telling the

12   court this is the significance of those questions and answers.

13   Some of it has been apparent to me because it's obvious.  Some

14   of the issues on the plaintiffs' side with respect to the

15   randomization, the issue with respect to including within the         04:42PM

16   sampling records that could be described as necessarily

17   compliant from the get-go as being really of questionable

18   utility in the monitoring process.

19        And so I think it's necessary and appropriate to

20   provide for an opportunity for the parties to present to the          04:42PM

21   Court what they think the significance of the testimony will be

22   in terms of how the Court addresses the tasks that it has at

23   hand, and that is enforcing the stipulation in a reasonable and

24   appropriate manner and also in its power, the Court's power, to

25   effect remedial measures.                                             04:43PM

1          So I need to give you that opportunity to do that.

2     And even though we haven't finished with Mr. Pratt's testimony,

3     I think it does make sense to allow, to provide, to require, in

4     fact, the parties to articulate the comeuppance, if you will,

5     of what they respectfully believe the questions and answers          04:43PM

6     have done.

7          And I think that it's appropriate to do so in a manner

8     that requires you to tell me in writing and then to give the

9     opportunity for a response and a reply.  And what I also think

10    that it's appropriate for me to do is to let you know that this    04:44PM

11    education process has informed me in a way that has raised

12    serious concerns about the quality and the dependability of the

13    monitoring program that the defendants currently have in place.

14         I think that there has been sufficient testimony to

15    warrant a reasonable conclusion that even accepting, as Mr.        04:44PM

16    Pratt has said, that this has been a learning process and they

17    started out not knowing how to do it and they have been

18    building this project that there are great chasms of competence

19    with respect to, for example, the randomization that the

20    witness that was proffered with respect to who has               04:44PM

21    responsibility for randomization doesn't seem to have an

22    understanding of the basic mechanism that he uses with Excel,

23    an understanding that is not beyond the ken of competent people

24    as we have heard from the testimony today.  This is

25    particularly referring to the issue of how the randomization is   04:45PM

1    not perfected or preserved if you do not mind the fact that the

2    program regenerates the list without respect to the component

3    of the program that provides for the randomization.  The

4    testimony today was the first time that I have heard about how

5    this issue has been raised within the State but it was not          04:45PM

6    raised or didn't even seem to be within the awareness of the

7    individual who is tasked with responsibility of the state.

8            So that's just one example of how the testimony that I

9    have heard through this process has added to my concern about

10   the quality and dependability of what is a critical function       04:46PM

11   and that is the monitoring of the performance measures.

12           Added to this are the continued extensive disputes

13   between the parties over what could be called discovery

14   matters.  I contemplate that the stipulation can best be

15   enforced in a free exchange of information.  I read the letters     04:46PM

16   back and forth, and I read them as if I'm looking at discovery

17   letters where parties are vulcanized, and really, I can point

18   to both sides, predominantly on the defendant's side, but I can

19   point to both sides where there are objections that are

20   asserted that are preposterous.                                     04:46PM

21           So this is not helpful to me and it's unfortunately

22   beyond the capacity of this one judge to appropriately address

23   it.  It takes more time than I have.  I don't have full time

24   for this case.  This case deserves that kind of attention.

25   Unfortunately I cannot deliver it given the conscripts of the       04:47PM

1    duties that I have as a judge in this court.

2          Added to this is the reality that I mentioned in my

3    discussion with Mr. Pratt, and that is on many of the important

4    performance measures that have been identified we really are

5    just treading water.  We're not making progress.  And I have          04:47PM

6    done my best to crack this nut, to solve this problem.  I have

7    told you in the past that I thought I would be up to the task

8    when the suggestion had been raised to me that perhaps there

9    was another avenue I should take.  And I resisted that

10   believing that I could get to it, that I could get it done,          04:48PM

11   that I could figure it out.

12          Perhaps one of the limiting features of this process

13   that makes it difficult for me to do that is, again, alluded to

14   by Mr. Pratt's testimony in that if you know one prison you

15   know one prison.  I don't know any prisons.  I know as well as      04:48PM

16   I perhaps should need to know a prison.  And that it requires

17   much more time and energy and devotion to detail than I can in

18   my day provide.

19          It's further complicated by the fact that it's a time

20   delay.  The reporting means that always I'm chasing a shadow.       04:48PM

21   And if someone is on the scene and is seeing what is happening

22   before him or her, they know perhaps what the reality is and

23   it's not the shadow.  It's not Plato's Cave.

24          And so all of this has caused me to reconsider what I

25   previously rejected, and that is whether or not the Court          04:49PM

UNITED STATES DISTRICT COURT

1   should appoint a special master to serve in multiple capacities

2   to address these issues; one capacity to oversee the monitoring

3   program, to observe where there can be things that somebody who

4   is, perhaps, more skilled in this area who has already been

5   involved in it for considerable years and not trying to invent     04:49PM

6   a new mechanisms can bring that wisdom and that experience to

7   bear; in addition to monitoring the monitoring program; to also

8   provide guidance to the Court on what remedial measures would

9   be best considered in the context of a very complicated

10  stipulation involving many different individual prisons.          04:50PM

11          And so what I do now is I provide the notice under

12  Rule 53(b)(1) of the Rules of Civil Procedure that the Court is

13  contemplating appointing a special master to serve these

14  functions, functions to be specifically delineated after I have

15  given the parties an opportunity to be heard.                      04:50PM

16          And so what I would ask you to do is that plaintiffs,

17  14 days from today, should provide a memorandum to the Court of

18  the comeuppance of what they believe the testimony that has

19  previously been heard is and to also address the Court's

20  consideration of a Rule 53 master and what responsibilities       04:50PM

21  that master should have and how best to select such a master.

22          Then I would ask, 14 days after that, for the

23  defendants to provide their comeuppance memorandum of what they

24  believe the comeuppance of the testimony is and also address

25  the issue of whether or not a special master should be            04:51PM

1    appointed in this case and, if one is going to be appointed,

2    how that master should best be selected.  And then seven days

3    after that, the plaintiffs may have the opportunity to reply to

4    the defendant's response.

5           Then we will, when it is ripe for consideration at the     04:51PM

6    next monthly meeting, we will hear oral argument about it and I

7    will also address matters that the parties have raised because

8    I do think the rule makes sense in requiring the opportunity

9    for the parties to be heard because I think they can bring much

10   to the consideration of this issue.                              04:52PM

11          The other issue that would have to be addressed is how

12   in fairness it should be paid for.  The Court has the power to

13   allocate the cost of that.  It is likely, though without

14   prejudice to having made this decision, that it would be my

15   view that much of the responsibility for this would be falling   04:52PM

16   upon the defendants.  But I would not be unopposed to

17   considering an argument that some amount of the allocation that

18   the State presently pays for monitoring to the plaintiffs would

19   be reallocated to the monitor if it turns out that that monitor

20   is performing services that are -- that the Court had in the     04:52PM

21   stipulation previously contemplated would be provided by the

22   plaintiffs.

23          And so that's how we'll address what I think may

24   become a defining decision point in the case.  As I say, I do

25   not -- I do not tell you that I have already decided that this    04:53PM

1    is the way to go, but I certainly am not providing this notice

2    without having thought deeply and long about whether this is a

3    necessary approach to consider.  And so I am seriously

4    considering it, but I will tell you that I will listen to what

5    the respective parties have to say with respect to what their          04:53PM

6    view is.

7            Now, with respect to the time after May 10, on May 10,

8    after we complete Mr. Pratt's testimony, there are at least two

9    motions that are -- in which the parties have requested oral

10   argument.  And it would be my thought that we would set that           04:54PM

11   oral argument for May 10th after we concluded with Mr. Pratt's

12   testimony.

13           There is, however, some doubt about whether there are

14   more than just two motions that are ready to rule, that are

15   ready for oral argument.  There is the, I think, the community         04:54PM

16   provider order, using that rubric now that's been used, and

17   there is also a motion to enforce the max custody stipulation.

18   I think that those both are the two that I'm identifying, but

19   there may be a third issue that you all think is appropriate

20   for oral argument.                                                     04:55PM

21           If you do think that there is an additional issue

22   beyond the two that I have identified, please on a joint

23   conference call, a representative of the two sides contact

24   Sarah Selzer, my law clerk, and raise with that what you would

25   like to be heard at that time and we'll give you a heads up            04:55PM

1    about whether or not that seems appropriate or not.

2           With respect to the pending motion on the other issue

3    that's been fully briefed regarding other performance measures

4    at the other institutions, because the last time that I tried

5    to do this orally from the bench left you all with some          04:55PM

6    confusion and we did need to follow up with a written order, I

7    will issue a written order this week with respect to the other

8    facilities and performance measures for which there will be a

9    finding of non-compliance.

10          Then the last issue that I wanted to address is the       04:56PM

11   monitoring guide.  The version today that was presented by Mr.

12   Bojanowski, which -- or when -- yes, was the 24th of February

13   2017 edition, but my previous orders on this establish that we

14   would come to an agreement about what it would be and that it

15   would no longer bear this draft overlay.                         04:56PM

16          Where are we with respect to you all having resolved

17   the issues that I thought we last addressed and had concluded

18   so that we would be in a position to move to what is everyone's

19   understanding of what the current version of the monitoring

20   guide is subject to only future changes with the Court's        04:56PM

21   approval?

22          MR. BOJANOWSKI:  Your Honor, I believe the latest

23   draft is actually a March 4th draft -- 7th.  I'm sorry.  Couple

24   days off.  March 7th is the latest draft.  There are some

25   issues we have been working with the plaintiffs on.             04:57PM

 1          THE COURT:  So you are still working on it, so you

 2   actually are engaged in the process.  And so I can be expecting

 3   that in short order you will be able to tell me that you are

 4   done or if there's some issue you need me to address we'll get

 5   done with that because we're on task with it.                    04:57PM

 6          MS. KENDRICK:  Don't quote me on this, but my

 7   understanding is there's about three medical performance

 8   measures where we're still in discussion, and I believe there's

 9   only two mental health that are still out there.

10          MR. BOJANOWSKI:  Let me check with the expert.           04:57PM

11          MS. KENDRICK:  Five or less, Your Honor.

12          THE COURT:  Okay.

13          MS. FETTIG:  Your Honor, this is Amy Fettig.  I'm

14   actually still here.

15          For the max custody monitoring guide, we have as noted    04:58PM

16   on the agenda regarding holidays that has now been resolved.

17   So max custody measures 1 through 8 are completed.  We are

18   still finishing up the use of force provision in the max

19   custody Performance Measure 9 but I believe we are going to get

20   there shortly.                                                    04:58PM

21          THE COURT:  Okay.  Good.

22          MS. LOVE:  And from the defendants, I agree with Ms.

23   Fettig.  We are just down to max custody Performance Measure 9

24   and we both have an agreement in the general, and we are

25   trading drafts and we are very near finished on that.            04:58PM

1          THE COURT:  All right.

2          MR. BOJANOWSKI:  We just conferred, Your Honor, and we

3     believe that we're going to re-send our most recent draft over

4     to the plaintiffs for a review.  But we feel fairly confident

5     that we'll know one way or another whether we've got a final          04:59PM

6     document or we need to have the Court's intervention on an

7     issue.  But I'm thinking this is less than five.

8          MS. KENDRICK:  Five or fewer.

9          MR. BOJANOWSKI:  Potential issues.

10          THE COURT:  That's good.  Thank you very much for          04:59PM

11     working on that.

12          And let me say this.  I have got one minute left.  And

13     I have deprived you both of an opportunity to raise issues

14     about what you think I need to be addressing this afternoon.  I

15     can't let you do it because if I do, we'll be past the promise          04:59PM

16     that I made to the court reporter and the court staff.

17          So what I would ask you to do, if there are issues

18     with respect to the May 10th agenda or things that are looming

19     that you think need to be addressed urgently that haven't been

20     addressed, get on the phone together and call my court staff          04:59PM

21     and get me on the phone too.  I will address that in an

22     informal telephonic conference so that things that do need to

23     be moving forward are moving forward.

24          All right.  Thank you all very much.

25          MR. BOJANOWSKI:  Thank you.          05:00PM

1          MS. KENDRICK:  Thank you.

2          MS. FETTIG:  Thank you, Your Honor.

3          (Proceeding concluded at 5:00 p.m.)

1

2

3

4                    C E R T I F I C A T E

5

6          I, LAURIE A. ADAMS, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 25th day of April,

15   2017.

16

17                              s/Laurie A. Adams

18                              _____
                                Laurie A. Adams, RMR, CRR

19

20

21

22

23

24

25