1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3          _____

4
    **Victor Parsons, et al., on**        )
5   **behalf of themselves and all**      )
    **others similarly situated;**        )   No.  **CV 12-00601-PHX-DKD**
6   **and Arizona Center for**            )
    **Disability Law,**                   )
7                                         )        **Phoenix, Arizona**
                    Plaintiffs,           )        **March 28, 2017**
8   vs.                                   )         **9:01 a.m.**
                                          )
9   **Charles Ryan, Director,**           )
    **Arizona Department of**             )
10  **Corrections; and Richard**          )
    **Pratt, Interim Division**           )
11  **Director, Division of Health**      )
    **Services, Arizona Department**      )
12  **of Corrections, in their**          )
    **official capacities,**              )
13                                        )
                    Defendants.           )
14  _____)

15

16     **BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

17                        (*Status Conference*)

18

19

20

21  Official Court Reporter:
    Laurie A. Adams, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Suite 312
    401 West Washington Street, Spc 43
23  Phoenix, Arizona 85003-2151
    (602) 322-7256
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

```
1    APPEARANCES:

2    For the Plaintiffs:
             ACLU - Washington DC
3            By:  Amy Fettig, Esq.
             By:  915 15th Street NW
4            7th Floor
             Washington, DC 20005
5
             ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
6            By:  Maya S. Abela, Esq.
             177 N. Church Avenue
7            Suite 800
             Tucson, AZ 85701
8
             EIDENBACH LAW PC
9            By:  Kirstin Eidenbach, Esq.
             P.O. Box 91398
10           Tucson, AZ 85752

11   For the Defendants:
             STRUCK WIENEKE & LOVE, P.L.C.
12           By: Rachel Love, Esq.
             By: Anne Orcutt, Esq.
13           3100 W. Ray Road
             Suite 300
14           Chandler, AZ 85226

15

16                         I N D E X

17   WITNESS:              DIRECT    CROSS    REDIRECT   RECROSS
18   WENDY HACKNEY

19   By Ms. Love              7
     By Ms. Fettig                     64
20
     CARSON MCWILLIAMS
21   By Ms. Love            135
     By Ms. Fettig                    148
22   By Ms. Love                                 167

23

24

25
```

UNITED STATES DISTRICT COURT

──────── March 28, 2017 - Status Hearing ────────

1              P R O C E E D I N G S

2              THE MAGISTRATE CLERK:  On the record in CV 12-601,

3    Victor Antonio Parsons, et al., versus Ryan, et al., before the

4    Court for a status hearing.

5              Counsel, please state your appearances.                      09:01:53

6              MS. FETTIG:  Your Honor, Amy Fettig for the plaintiff

7    class.

8              THE COURT:  Thank you.  Good morning.

9              MS. EIDENBACH:  Kirsten Eidenbach for the prisoner

10   plaintiff class.                                                        09:02:07

11             THE COURT:  Thank you.

12             MS. ABELA:  Maya Abela for the Arizona Center for

13   Disability Law.

14             THE COURT:  Thank you.

15             MS. FETTIG:  Good morning.  Rachel Love and Anne             09:02:10

16   Orcutt for the defendants.

17             THE COURT:  Thank you.  Good morning.  Good morning.

18             So we're ready to proceed on the max custody issue.

19   Have you all talked about an order of presentation and how you

20   thought you would like to go forward?                                  09:02:24

21             MS. LOVE:  Yes, Your Honor.  I discussed with Ms.

22   Fettig this morning that defendant's plan is to have Associate

23   Deputy Warden Wendy Hackney testify this morning, take us

24   through the monitoring process.  We have provided plaintiff

25   counsel and the Court an exemplar book, a max custody book from        09:02:38

—————— March 28, 2017 - Status Hearing ——————

1    the Florence complex from 2016 as well as a separate for Eyman,

2    an exemplar on the use of force tab only because the exemplar

3    we did for Florence didn't have any uses of force that month.

4         We'll take you through the process how the monitoring

5    occurs, and then also Division Director Carson McWilliams is          09:03:02

6    also here to testify, and he can testify about some additional

7    issues that Associate Deputy Warden Wendy Hackney is unable to

8    including the months monitored and how that works.

9         So we have talked to plaintiff's counsel about this

10   process.  We think it will be helpful for both the Court and          09:03:21

11   plaintiff's counsel to see almost really in live time how

12   Associate Deputy Warden Hackney conducts the monitoring

13   meetings that the wardens engage in to come to the final

14   product of the books and the determination.

15        THE COURT:  Thank you.  Anything plaintiffs need to              09:03:39

16   say before we start?

17        MS. FETTIG:  Your Honor, just as it has in the past

18   practice in these evidentiary hearings, plaintiffs would like

19   to invoke the rule.

20        THE COURT:  And whom are you thinking of being                   09:03:47

21   inclusive in that?

22        MS. FETTIG:  I guess there are only two proposed

23   witnesses here.

24        THE COURT:  Any objection to that?

25        MS. LOVE:  Your Honor, the objection, yes, under Rule            09:03:55

——March 28, 2017 - Status Hearing——

```
 1   615(c) is Division Director Carson McWilliams is and has always

 2   been ADC's designated representative for max custody.  He is an

 3   essential witness to the defense of the case.  He has been here

 4   at every evidentiary hearing and therefore we would request on

 5   this basis that he not be excluded.                              09:04:14

 6        THE COURT:  How can I, Ms. Fettig, draw a distinction

 7   between my previous ruling where I have found that a witness

 8   should be able to attend under Subsection (c)?

 9        MS. FETTIG:  Your Honor, could you speak up?  I

10   couldn't hear.                                                   09:04:31

11        THE COURT:  This is why I think musicians wear those

12   headphones where they have speakers so they have a sense.  It's

13   difficult for me to appreciate whether I'm getting across or

14   not.  As I have shared with you when we have had witnesses on

15   the stand the feature of the courtrooms in this courthouse is   09:04:43

16   that people have the sense that they are bombasting people with

17   sound when it's really not happening.

18        Okay.  So the question I have is how is it that I can

19   find a reason to make a distinction between my previous ruling

20   not excluding a witness who seems to be in the same position as 09:05:04

21   the witness that the defendants would like to have assist them

22   in presenting their information this morning?

23        MS. FETTIG:  Well, Your Honor, you were talking

24   about --

25        THE COURT:  Dr. Taylor.                                    09:05:22
```

1    MS. FETTIG:  Dr. Taylor?

2    THE COURT:  Right.  I made -- overruled the

3 plaintiff's prior request because I found that Dr. Taylor had

4 attended every hearing and seemed to be someone the defendants

5 were turning to throughout the hearings for additional                  09:05:35

6 information.  Lawyers do that to try to make sure that they are

7 asking the right questions and being as efficient as they can

8 possibly be.  And that that, to me, is what the Subsection (c)

9 was designed to allow a court to do, to allow a witness to

10 attend.                                                                 09:05:56

11    It also seemed to me that at the time that

12 cross-examination would allow for the plaintiffs to reduce any

13 manipulation of the testimony that is sometimes the concern for

14 the invocation of the rule.

15    MS. FETTIG:  Well, I would say, Your Honor, that our         09:06:16

16 concern here is that Deputy Warden Hackney's testimony first

17 might influence the testimony of Director Carson McWilliams

18 coming afterwards.  We would like a clean slate.

19    THE COURT:  My resolution to this issue is based upon

20 what is the different nature of this hearing, and that is that         09:07:15

21 I am hoping for something that is, albeit in an adversary

22 proceeding, a little bit different by way of a learning

23 process.  And so if it appears to me that -- and again, we're

24 all pretty sophisticated about this and are probably pretty

25 good about picking up the fear that plaintiffs raise, which is        09:07:37

 1    the reason for the rule overall.  I mean, it's a human nature.

 2    I understand that.

 3            But nevertheless, in the context of this hearing I

 4    think it's more appropriate at these senior levels not to

 5    invoke the rule.  So the request is denied.                    09:07:55

 6            MS. LOVE:  Thank you, Your Honor.

 7            THE COURT:  Anything else.

 8            MS. FETTIG:  That's all, Your Honor.

 9            THE COURT:  You may proceed, Ms. Love.

10            MS. LOVE:  Thank you, Your Honor.  Defendants call    09:08:02

11    Associate Deputy Warden Wendy Hackney.

12            THE COURT:  Would you please step forward to the clerk

13    of the court to be sworn.

14            (The witness was sworn.)

15            THE MAGISTRATE CLERK:  You can have a seat at the      09:08:25

16    witness stand.  If you can please say and spell your name into

17    microphone.

18            THE WITNESS:  Wendy, W-E-N-D-Y Hackney, H-A-C-K-N-E-Y,

19    Associate Deputy Warden.

20                         WENDY HACKNEY,                            09:08:47

21    called as a witness herein, having been first duly sworn, was

22    examined and testified as follows:

23                       DIRECT EXAMINATION

24    BY MS. LOVE:

25    Q.  Associate Deputy Warden Hackney, is it okay if I refer to  09:08:52

——— **March 28, 2017 - Status Hearing - Hackney - Direct** ———

1    you as ADW Hackney or ma'am?

2    A.  Either or.

3    Q.  Can you please tell us who your employer is currently?

4    A.  The Arizona Department of Corrections.

5    Q.  How long have you worked for the Arizona Department of                09:09:03

6    Corrections?

7    A.  Just over 21 and-a-half years.

8    Q.  What is your current position?

9    A.  Northern Region Associate Deputy Warden.

10   Q.  Can you take us through the basic steps and basically                 09:09:15

11   through your career, your 21 and-a-half years with ADC, what

12   different positions have you held?  And within holding those

13   positions, what positions pertain to max custody?

14   A.  Okay.  I started in August of 1995 as a corrections officer

15   at Meadows unit in Eyman complex.  It was a medium custody at            09:09:37

16   the time GP, and then within a couple years was a sex offender

17   unit.  I was there for about four and-a-half years.

18        I promoted to sergeant to SMU-2, which is now known as

19   Browning.  It's a max custody unit.  I was at SMU-2 for almost

20   five years.  Then I promoted to lieutenant, and I moved to East         09:10:01

21   unit at Florence complex, which is a medium custody GP unit.  I

22   was at East unit for just over five years and then was

23   transferred as a lieutenant to North unit at Florence complex

24   which is a minimum custody unit, and I spent about a year there

25   prior to promoting to captain, which I then moved back to East          09:10:24

1    unit and was at East unit for about 14 months before I moved to

2    Florence complex operations as the interim major, prior to

3    promoting to major, which I was a major for three and-a-half

4    years at Florence complex and then moved to ADW in August of

5    2015 and was assigned to South unit, medium custody sex                09:10:47

6    offender unit for about eight months.

7            And then I was moved as ADW to Central unit which was

8    both close and max, and I was there for about 8 months.

9    Q.  Let me take you back to your position as a major.  Can you

10   tell us what were your duties as a major?                              09:11:07

11   A.  As the major, there's only 10 of us in the state.  There's

12   one per complex.  So it's a hard position to get.  There's a

13   lot of competition.  Overall, you are the complex chief of

14   security.  And at the time there were six units there.  There

15   was a unit in Picacho when I first became major that was         09:11:25

16   minimum custody that later shut down.  And also at the time,

17   Tempe St. Luke's secure ward was in operation and I was

18   overseeing the secure ward for the Florence complex.

19           Basically, I just made sure that overall, any security

20   issues were addressed.  I dealt with issues with the hospital         09:11:46

21   with inmates off on transports, with any visits, the family

22   visits at the hospitals.  I also dealt with at the time we did

23   end up having an escape during that time frame, I had to deal

24   with that situation.  I conducted numerous security assessments

25   and dealt with any issues that happened within Central unit to        09:12:07

─── **March 28, 2017 - Status Hearing - Hackney - Direct** ───

1   max custody unit.

2   Q.  Your two duty assignments as ADW that we have taken you

3   through, can you first explain what does that stand for, ADW?

4   A.  ADW stands for associate deputy warden.  And basically as

5   the associate deputy warden, you have a deputy warden of the          09:12:23

6   unit and you are assisting then.  You are basic overall

7   operations of the unit is what you are in charge of.

8          So you need to make sure all the things that are

9   supposed to be happening in that unit are happening.  You deal

10  with inmate issues, staffing issues, classification issues, and     09:12:39

11  any emergency situations that happen.  But you are also

12  supposed to be touring constantly and making sure that the

13  overall operation of your unit is where it's supposed to be

14  within policy.

15  Q.  As associate deputy warden at the Florence complex, did you     09:12:53

16  supervise maximum custody inmates?

17  A.  Yes, I did.  At Central unit, CB-5 and 7 and Kasson.

18  Q.  As part of your duties as associate deputy warden at

19  Florence complex, were you involved in monitoring max custody

20  inmates as part of the Parsons versus Ryan stipulation?           09:13:14

21  A.  Yes.

22  Q.  How so?

23  A.  Would check the forms, the tracking forms on the cell to

24  make sure they were being completed, would also make sure that

25  the programming, the recreation, and all of the other             09:13:28

—— **March 28, 2017 - Status Hearing - Hackney - Direct** ——

1  out-of-cell activities were being accomplished each day in

2  compliance with the unit's activity schedule.  And would also

3  address any issues that came up, and I would also -- I also

4  helped in the production of the notebook and the review of the

5  notebook.                                              09:13:44

6  Q.  When you say that you helped in the production and review

7  of the notebook, can you explain for us what you mean by that?

8  A.  In October of 2016, I put the actual notebook together

9  piece by piece for each section and did all the data entry on

10 the overview and made sure that all the pieces of the notebook  09:14:01

11 with completed correctly so that I understood the full dynamics

12 of the notebook and how it was assembled.

13 Q.  When you were ADW of the Florence complex, did you receive

14 any training or instruction in how monitoring max custody under

15 the Parsons versus Ryan stipulation was to occur?       09:14:19

16 A.  Yes, I did.  When I arrived there in April of 2016, the

17 deputy warden at the time was Stephen Morris.  He provided me

18 some training.  And then the warden at the time was Greg Fizer.

19 He also provided me some training.

20       And then I did attend some training sessions that      09:14:36

21 happened with our attorneys.  One of them would be Lucy Rand.

22 She did a training session.  And then I have also had some

23 other training with some of the other deputy wardens of max

24 custody when we come together.

25 Q.  Tell us, please, what your current duties are in your   09:14:54

—— March 28, 2017 - Status Hearing - Hackney - Direct ——

1   current position.

2   A.   Currently I conduct random, unannounced tours at each of

3   the max facilities.  I go into the facility and I go to a

4   random location in there, a pod, a different cluster, and I

5   will monitor or watch.  I'm actually watching them complete          09:15:15

6   those out-of-cell tracking forms in the field.

7   Q.   And when you say out-of-cell tracking forms, are you

8   speaking of out-of-cell tracking forms that are used in the

9   monitoring of max custody under the Parsons versus Ryan

10  stipulation?                                                         09:15:31

11  A.   Yes.  So I will watch them completing those forms.  I will

12  also watch them engaging the activities that are taking place;

13  the programming, the recreation, I've watch recreation turns,

14  program turns.  I have also watched any of the other activities

15  they are having, table time, anything that is on their activity     09:15:48

16  schedule that is happening that current day I'm looking to see

17  that it's happening.  So I'm doing a lot of observations in the

18  field.

19  Q.   How long have you held this position?

20  A.   Since December 3rd of 2016.                                     09:16:01

21  Q.   In the performance of your current duties, what complexes

22  do you monitor or do your tours and do your unannounced visits?

23  A.   I tour Browning and SMU-1 at Eyman Central at Florence and

24  Rast at Lewis complex.

25  Q.   Do you have free and unfettered access to these complexes?     09:16:27

——— March 28, 2017 - Status Hearing - Hackney - Direct ———

1   A.  Yes, I do.

2   Q.  Do you have to advise the wardens of the complexes that you

3   may be visiting on a certain date and time?

4   A.  I do not.

5   Q.  So you are able to go unannounced at any time to any of the    09:16:38

6   max custody complexes?

7   A.  Yes, I do.

8   Q.  Who do you -- do you have a chain of command that you

9   report to in the performance of your current duties as related

10  to the monitoring of the max custody portion of the Parsons v.    09:16:51

11  Ryan stipulation?

12  A.  Yes.  I report directly to the Northern Region Operation

13  Director Ernie Trujillo, and then I also report to the Division

14  Director Carson McWilliams.

15  Q.  Take us through an example, maybe is there no normal, maybe    09:17:05

16  there is a normal, but if you have a normal week, take us

17  through what that looks like in the performance of your duties

18  as related to the max custody monitoring.

19  A.  Normally, I would -- I decide what my schedule would be for

20  the week, so I kind of mix it up on where I'm going to go so I     09:17:26

21  don't end up at the same facility on the same day.  I will go

22  out to that facility, unannounced, and then I will start

23  walking around their unit.  I'm pretty familiar with all of

24  them now.

25          I will start going up to the cells, looking at the        09:17:41

1    forms.  I will talk with the inmates.  I go over to see where

2    the programs that are taking place, where the recreation is

3    taking place, talk with the staff that are there and overall

4    keep an eye on what's happening while I'm on site.

5         Before I leave that facility, or even as before I            09:17:57

6    start my day at that facility, sometimes I will do a

7    comprehensive review of all the out-of-cell tracking forms from

8    the previous week.  So each week I do see all of the tracking

9    forms for each of the facilities.

10        And then once I'm done with my tour, I will brief out       09:18:13

11   the administration that's on site and then provide a written

12   observation report to my direct supervisor.

13   Q.  In performing your tours, do you interact with the max

14   custody inmates?

15   A.  Yes.                                                          09:18:35

16   Q.  How so?

17   A.  I talk to them when I go up to their cell front.  I say

18   good morning to them, or hello.  I will ask them questions.  If

19   I look at their form and see that they have been refusing, I

20   will ask them what's going on.                                   09:18:47

21   Q.  And in the performance of those duties and interacting with

22   the inmates, if an inmate brings a complaint to your attention

23   as related to programs or services to be provided under DI-326

24   do you engage in a conversation with the inmate and do anything

25   to follow up?                                                    09:19:06

1   A.  I do.  I actually will talk to them about what the issue is

2   they are bringing to me, and I will provide a follow-up.  I

3   will do some research on it, talk with administration, and then

4   I will get back to that inmate and let him know the outcome of

5   that conversation.  And any issues with the red flags as you          09:19:19

6   say that there's something not being performed, I will come

7   back around to do an additional tour to verify without them

8   knowing that's what my plan is.

9   Q.  To your knowledge, how are the out-of-cell tracking forms

10  for max custody inmates at each of the max custody locations        09:19:34

11  maintained, or saved, if they are?

12  A.  They are all being saved, and they are all being filed by

13  week.  So they do have them filed.  Most of them have them

14  filed by the cluster, by cluster then by pod.

15  Q.  Where are those documents maintained?                            09:19:52

16  A.  They are usually maintained in the 326 supervisor's office.

17  They do have an archive for that in each of those areas.

18  Q.  You have talked to us about the max custody notebook.  Can

19  you explain for the Court and for plaintiff's counsel what you

20  mean by that?                                                        09:20:09

21  A.  There's a notebook generated each month when a monitoring

22  week is picked in which it has documents that show the 10

23  randomly selected max inmates and the 10 randomly selected SMI

24  inmates that were chosen during that week.  They have -- it

25  contains their out-of-cell tracking form.  It also contains         09:20:26

1   supporting documents to show that they have property, that they

2   are allowed to purchase items, that they make phone calls and

3   that they have visits.  It also contains use of force

4   documentation for that month and it contains the programs

5   rosters and the group rosters that are associated with them          09:20:44

6   going to their out-of-cell activities.

7   Q.  These max custody notebooks, are these notebooks something

8   that are maintained on a weekly basis or a monthly basis?  How

9   does that work?

10  A.  They are maintained on a monthly basis.                          09:21:01

11  Q.  And are you involved in any way in compiling or production

12  of those max custody notebooks as related to CGAR reporting and

13  monitoring under the stipulation?

14  A.  Yes, I am.  I let the units know when the date is picked

15  and start the process of putting the notebook together.  Once        09:21:18

16  the -- it's about a week that they get to put the notebook

17  together with all the materials, then they -- the first level,

18  we do several levels of review.  We're reviewing at the

19  sergeant/lieutenant level within about a week of the production

20  starting, and we'll sit down in a room together.  I bring all        09:21:37

21  of the units.  They bring their supervisors together and we sit

22  down and we exchange notebooks.  So nobody is reviewing their

23  own notebook.  They are reviewing somebody else's.

24  Q.  Let me stop you there.  When you say the date is picked you

25  mean the date relating to the monitoring week?                       09:21:54

—— March 28, 2017 - Status Hearing - Hackney - Direct ——

```
1    A.  Yes.

2    Q.  So the max custody notebook at this first level of review,

3    compiling and review, is documents related to the maximum

4    custody inmates who will be monitored for the specific week

5    selected under the stipulation?                                    09:22:07

6    A.  Yes.

7    Q.  Let me -- we're going to go through the levels of review,

8    so I want to back up just a bit.

9    A.  Okay.

10   Q.  Who are the monitors for max custody as related to the        09:22:15

11   complexes involved in the stipulation?

12   A.  The wardens.

13   Q.  Do you, in your capacity, determine compliance of the

14   performance measures for max custody?

15   A.  No.                                                            09:22:31

16   Q.  That is done by the wardens?

17   A.  Yes.

18   Q.  Who reports in the CGARs as to compliance levels?

19   A.  The wardens do.

20   Q.  Each warden for their own specific complex?                   09:22:42

21   A.  Yes.

22   Q.  Do you know how the wardens determine compliance?

23   A.  I have not been in their review.

24   Q.  So I want to take you back now, let's start talking about

25   the levels of review.  You told us after the week that is        09:23:01
```

1   selected for the monitoring happens there's about a week

2   interim where the notebooks are put together.  And then you go

3   through the first level of review with sergeants and

4   lieutenants?

5   A.  Yes.                                                    09:23:16

6   Q.  And are you involved in that review?

7   A.  Yes, I am.  I will run that review to make sure that they

8   start in a specific area and that every spot on that notebook

9   is checked.

10  Q.  And when you run that review, tell us what you mean by    09:23:25

11  running that review.

12  A.  Basically, when we get ready to start, they exchange their

13  notebooks and I usually tell them who is exchanging with who so

14  that they don't continue to see the same one each month.

15  Q.  So they are all in a room?                               09:23:41

16  A.  They are all in one room together.  We bring them together

17  into one room, and they exchange the notebooks and then we

18  start from the very start of the cover when we open it up to

19  make sure that the cover sheet actually has what it's supposed

20  to have in it.                                               09:23:58

21  Q.  And we'll go through how you do that review when we get to

22  the final, because there's multiple levels as I understand.

23  Correct?

24  A.  Yes.

25  Q.  So your first level of review is sergeants and lieutenants  09:24:06

**———— March 28, 2017 - Status Hearing - Hackney - Direct ————**

1    exchange books.  Would it be fair to say that they are

2    exchanging books to make sure the proper documentation is

3    contained in the books?

4    A.  Yes.  They are an additional set of eyes looking at the

5    book.                                                                09:24:20

6    Q.  Are they only looking at proper documentation to be in the

7    book, or are they calculating?  Are they determining

8    compliance?  What are they doing?

9    A.  We do the same thing that they would do putting the book

10   together.  They have to go back through and check all the          09:24:31

11   calculations to make sure that they are accurate.  They have to

12   make sure that the overview has all the correct documentation

13   that matches the rest of the documentation in the book and that

14   everything that is required to be there for each inmate and

15   required to be there as far as programs, group, rosters, and       09:24:46

16   use of force documentation is all in that book.

17   Q.  When you say that they are making calculations, what are

18   they calculating?

19   A.  They are calculating the out-of-cell time.  So they are

20   calculating the amount of rec time, any individual visits that     09:25:00

21   happen, calculating programs, groups, table time, SMI and

22   structured time, mental health -- the additional mental health

23   programming, and anything else in the other category.

24   Q.  So we have the first level of review is sergeants and

25   lieutenants.  Is there a second level of review?                   09:25:20

1  A.  There is.  A few days after that review is done and they

2  have a chance to go back and make any corrections that they

3  need to, the ADW and the deputy warden are brought together as

4  a group into one room and they go through the same process.

5  They will exchange books and will go from the very beginning of        09:25:38

6  the book all the way through to the end of the notebook.  They

7  are also required to do calculations.  They are also required

8  to cross-reference the out-of-cell tracking with the programs

9  and group rosters and verify that the use of force

10  documentation is in there and complete.        09:25:55

11  Q.  When you say that they exchange books, is it a situation

12  where, for instance, at the first level of review the sergeants

13  and the lieutenants from SMU-1 are exchanging a book with

14  another complex?

15  A.  Yes, they are.        09:26:09

16  Q.  So they are checking each other's books?

17  A.  Yes, they are.  They are checking each other's work.

18  Q.  Is there a review process beyond these first level with

19  sergeants and lieutenants and second level with associate

20  deputy wardens and deputy wardens?        09:26:24

21  A.  Yes.  I also do a review of the each of the notebooks just

22  as another look to make sure that things are what they are

23  supposed to be in that notebook and that they match up.  And

24  then the wardens will come together at a monthly meeting and

25  they will exchange notebooks and go through the same process        09:26:40

1   and check each other's notebook.

2   Q.  Is that the final level of review, so to speak, or do the

3   wardens do additional levels of review beyond their exchange

4   meeting?

5   A.  The wardens will take the notebook back and they will do          09:26:54

6   one more review in their office area.  That's the part where I

7   have not been a witness to.

8   Q.  And at that point, is it then the point where the wardens

9   are doing their final review, their compliance checks and

10  reports and putting it into the CGARs themselves?                     09:27:12

11  A.  Yes.  That's when they are doing that.

12  Q.  In your current position, do you provide training or

13  instruction to any max custody complex staff in how to perform

14  documentation or monitoring of the max custody performance

15  measures?                                                             09:27:33

16  A.  I do assist the staff in, especially any new staff, in how

17  the documentation is supposed to be completed and then how they

18  are supposed to put the notebooks together and then any

19  questions that come up with consistency between the max units.

20  Q.  Is this a formal situation where you have people come into        09:27:50

21  a classroom?  Is it out in the field?  How does that work?

22  A.  A majority of the time it's out in the field.  I will do

23  some at our meetings, our review meetings.  If there's some

24  things I want to discuss with everybody I will do it then.  But

25  a lot of it is done in the field when issues arise.                   09:28:07

— March 28, 2017 - Status Hearing - Hackney - Direct —

1   Q.  Do you receive training from persons in your chain of

2   command that instruct you in how to -- what's required of the

3   stipulation, how the performance measures are to be monitored,

4   what the Court orders are that are coming out on the max

5   custody monitoring?                                          09:28:28

6   A.  Yes.  We do some -- usually do some training with the

7   northern region operation director, the division director, and

8   then with our counsel.

9   Q.  And when you speak of counsel, who is performing the

10  training?                                                    09:28:40

11  A.  Rachel Love.

12  Q.  Me.

13  A.  You.

14  Q.  Okay.  We have before you an exemplar max custody notebook.

15  And if the Court would like to hear and plaintiff's counsel    09:29:05

16  would like to hear how these review meetings occur, ADW Hackney

17  can take us through the process as she leads the final warden

18  exchange book review and how that is accomplished.

19          THE COURT:  Okay.

20          THE WITNESS:  All right.                             09:29:24

21  BY MS. LOVE:

22  Q.  Okay.  Let's pretend you are in one of your warden

23  meetings, your monthly warden meetings, and as part of running

24  those meetings as related to the book review, I guess I should

25  ask you, is that something that you are taking charge of as to  09:29:38

1   how the review is going to occur, and are you taking them

2   through the process?  How does that work?

3   A.  Yes.  I'm in charge of it at that point.  I basically get

4   them to exchange their books, and then we start from the very

5   opening of the book and work our way through it very          09:29:55

6   meticulously.

7   Q.  Well, tell us then what is your first step?  How do you do

8   that?

9   A.  The first step is to look at the first cover sheet in

10  there.                                                        09:30:06

11  Q.  And you are looking at the binder that's in front of you?

12  A.  Yeah, looking at the binder.

13  Q.  And can you tell us what the title is of this binder so

14  that we know exactly what you are looking at?

15  A.  Looking at the ASPC Florence Central Unit November 2016 max  09:30:16

16  custody notebook.

17       MS. LOVE:  And, Your Honor, for the record we just

18  intend to use this as an exemplar.  We do not intend on

19  admitting it into evidence.  It has not been redacted.

20       THE COURT:  Understood.                                 09:30:32

21       THE WITNESS:  The first step is we make sure that the

22  cover sheet has the complex and unit name spelled correctly and

23  that it has that monitoring month, that current month and the

24  right year.  And then we make sure that they are -- which this

25  one does not, I don't see it right off the bat -- has an index,  09:30:52

1   and the index also has the same information so that the

2   information is matching.  So if it were to come apart from the

3   notebook you would know whose complex it belonged to.

4   BY MS. LOVE:

5   Q.  Let me stop you right there.  Your current duties in your          09:31:03

6   current position that started in December of 2016, correct?

7   A.  Yes.

8   Q.  And we are looking at a notebook of November, 2016?

9   A.  It's a little different.

10  Q.  So as we go through here, if there are differences that are        09:31:14

11  in place now, since you have been in your current position, if

12  you could alert the Court and myself and plaintiff's counsel as

13  to where things might differ from this previous book.

14  A.  Okay.  The first one I see is the index.  There's an index

15  to tell you what each of the tabs is.  And that's not present,        09:31:36

16  at least in the front of this book.  So normally there's two

17  documents that sit in front of Tab 1.  It's the cover sheet,

18  the index sheet, and then I tell them once we have verified

19  that we proceed to Tab 1 and look at the cover sheet in Tab 1

20  to make sure it has the complex name, unit name, month and year      09:31:52

21  correct.

22  Q.  And what do you do next?

23  A.  Once they verify that then I tell them we're at the

24  overview for Tab 1.  And in the overview, the first page of the

25  overview, we make sure that the complex name is there, that the      09:32:07

**March 28, 2017 - Status Hearing - Hackney - Direct**

1    month and date of the reporting week is actually the monitored

2    week is there, and that the year is correct.  And then from

3    there we proceed down and make sure that the first three

4    questions that are listed there that say 10, looking at -- you

5    guys are looking at the same Page -- 838392 Bates number.  The          09:32:28

6    10 max custody inmates selected from Central Unit and the date

7    of the count sheets are right.  There so they have to have a

8    date, full date, month, day, and year.

9    Q.  Let me stop you there.  Are you aware of how the 10 inmates

10   are selected for monitoring purposes?                                   09:32:47

11   A.  I am.  They take the total population of max custody and

12   they divide it by 10 and that gives them their picking order.

13   Q.  And how where is that data sourced from?  You said count

14   sheets?

15   A.  The count sheets.  They will use it at that point.  Once           09:33:02

16   they determine the picking order then there's different

17   starting points each month on the count sheets.  So they don't

18   always start with, say, Abel cluster.  One month they may do

19   Abel; the next month they may do Baker so it continues to be

20   random when they are doing their picking order.                        09:33:20

21          So I verify here they have their population total and

22   that they also show the picking of order of how they did it.

23   So in this case it's the 17th, every 17th inmate.  From there,

24   the first box I ask everybody to verify that there's ADC

25   numbers in there, that there's last names, and that there's           09:33:38

1   housing locations.  Later on we'll actually cross-reference

2   this to the sheets that are in there.

3   Q.  When the 10 inmates are selected, is that something that is

4   computer generated?  Is it a manual count to selecting, for

5   instance, here the -- every 17th inmate?  How does that work?     09:33:53

6   A.  It is a manual count on the count sheet.  It's somebody

7   sitting there with a count sheet and manually counting down the

8   count sheet to find wherever that 17th person lines up.

9   Q.  And is that methodology consistent across Lewis, Florence,

10  Eyman, Browning?                                                   09:34:14

11  A.  Yes.  Every unit is using the same way of selecting the

12  inmates.  At this point, once they verify that there are ADC

13  numbers there, I will also make sure that they verify --

14  Central is a little bit different so you can see the

15  difference.  Central has an additional 10 inmates of max on the    09:34:34

16  next page for Kasson.  And I make sure the same things are done

17  there that the top of the form is correct and that they do have

18  their picking order and there are ADC numbers, names, and

19  housing locations.  And then we move down to the SMIs and the

20  same thing, but the SMIs will have Ms next to their number and     09:34:52

21  they have their name and their housing location.

22  Q.  So let me stop you there.  So at Florence, the Florence

23  complex, 10 random inmates are being drawn for -- max custody

24  inmates are being drawn for monitoring from Central, 10 from

25  Kasson, and then 10 as to SMI?                                     09:35:11

1   A.  Yes.  There's 10 out of the CB-5 and 7 and 10 from Kasson

2   max and 10 SMI from Kasson.  So it takes -- it's a little

3   different from the other sheets.  The other sheets will mainly

4   have their max custody and SMIs on the same page where Central

5   will be an additional page.                                         09:35:30

6           So I make sure that they have looked at that

7   information, and then from here what I do is I have them check

8   these ADC numbers, max custody inmates' numbers to the rest of

9   the overview real quick to verify that each of those max

10  inmates' numbers matches in each of the boxes.  Although we're   09:35:44

11  going to go through the entire thing, I make sure that they

12  first identify any issues with ADC numbers not matching and

13  then the SMIs also then match Performance Measure 4 and 8.  And

14  then we go back to the very first performance measure and begin

15  our review.                                                        09:36:04

16  Q.  So then there is an overview summary for each of the

17  performance measures, is that correct?

18  A.  Yes, there is.

19  Q.  Now, if I could turn your attention to Bates Number 838394,

20  on Performance Measure 1 it says MC PM Number 1 at the top       09:36:21

21  left.  Do you see that?

22  A.  Yes.

23  Q.  And then in the table below, there is -- can you explain

24  what the reason is for listing a step level out-of-cell time

25  offered and compliance and how does one look at that and          09:36:37

1   understand what's happening with respect to review and

2   monitoring?

3   A.  In this particular performance measure, we're looking

4   for -- you need to have their step level to determine if they

5   are compliant with 326.  So Step 1 to make sure they have met          09:36:51

6   the minimum standard you need to be able to verify that with

7   their step level.  Without it there you would have to keep

8   looking back and forth to the forms to verify their step level.

9   But there's amount of time offered in the out-of-cell so you

10  can verify whether or not, just visually right there, did they          09:37:08

11  meet 326.  And then the compliance is a basic yes or no.

12  Q.  When you say that they meet 326, are you referring to

13  DI-326?

14  A.  Yes.

15  Q.  Which governs max custody inmates?                                   09:37:22

16  A.  Yes.  So what I do on this particular set of boxes, I make

17  sure that they verify that there's a step level because they

18  have already verified the ADC number; that there is an amount

19  of time in hours and minutes, and it's clear, and that there is

20  a compliance of yes or no and that the total box actually               09:37:40

21  totalled down there below it for the percentage.

22  Q.  And this information that's contained in the overview, is

23  that sourced from data that is also contained in the notebook?

24  A.  Yes.  It's sourced from the out-of-cell tracking forms.

25  Once they determine Performance Measure Number 1, we move to            09:38:03

1  Performance Measure Number 2.  The same thing, I verify they

2  have a step level listed in there and that they have a yes or a

3  no for Step 2 and Step 3, and the reason being is Step 1s are

4  not required to have a program and this is about the program

5  for Performance Measure Number 2.  So for a Step 1 you are          09:38:23

6  going to see a zero because there's no -- they are not required

7  to have that.  So we just put a zero in there instead of a yes

8  or no.

9  Q.  And you are referring to Bates 838395?

10 A.  Yes.  You will see the first one on there actually has a      09:38:37

11 zero, and right below it you will see a Y.

12 Q.  So the zero does not mean no compliance.  It means what?

13 A.  Basically means N/A.  It's not applicable.  So once they

14 verify that, we discuss if anybody has any nos in there so we

15 will be able to spot those when we go through the tracking        09:38:59

16 forms.  If everybody is good once we're done with that section

17 we move to Performance Measure Number 3, which will be the next

18 page there, 838396, verify if they have any cancellations or

19 limitations.  If they do there must be an IR number listed

20 there.  If there are none then they need to write no             09:39:23

21 cancellation or limitation or no cancellation for that week in

22 that box.

23        In this particular case, it's evolved since then.

24 When you see the attempt to make up box is empty here, has

25 nothing in it, but as the way we do it now they will put N/A.     09:39:40

**March 28, 2017 - Status Hearing - Hackney - Direct**

1   So if they did have a cancellation then the attempt to make up

2   will be marked in there, yes.  And then compliance, Step 1's

3   again will be a zero.  This is about programs.  So you will

4   have to use the page before to make sure you know what Step 1

5   is and Step 2s and 3s will be a yes or no.  But this thing          09:40:01

6   should not be left blank.  There should be either an IR number

7   or no cancellation.

8           So we verify both of those for both the max.  Once

9   we're done at that section then we move on to Performance

10  Measure 4.  This one is basically making sure that they have a      09:40:18

11  step level in there and that their compliance -- everybody

12  should be at yes, unless somebody didn't eat, but they should

13  be at yes.  This is about the caloric intake.

14  Q.  Do you also have an overview for Performance Measure 5?

15  A.  I do.  Performance Measure Number 5 will be about the          09:40:35

16  recreation.  So we verify that there's an amount of time in

17  that box, hours and minutes, and a compliance of yes or no.

18  And that's for everybody, all steps.  And then we discuss if

19  anybody has anything below six.

20  Q.  And what is the reason for that, discussing if anybody has      09:40:54

21  below six?

22  A.  If it's below six, that means that we're going to be

23  non-compliant for that particular week.  So there needs to be

24  some kind of documentation that will be part of the book

25  explaining that.                                                    09:41:09

1   Q.  Is there also an overview for Performance Measure 6?

2   A.  There is.  Performance Measure 6, I have them verify that

3   the step level is listed, that the out-of-cell time should be,

4   in this particular case, it's evolved since then, we actually

5   have the amount of time.  So it will be hours and minutes in          09:41:28

6   the out-of-cell time offered which should match Performance

7   Measure Number 1, which at this point in time I will have them

8   check Performance Measure 1 to Performance Measure 6 to make

9   sure that they match.

10  Q.  And here we're looking at Bates 838399?                          09:41:42

11  A.  Yes.

12  Q.  And here also, we have columns that have Ys and zeros in

13  it.  Do the zeros also mean N/A or not applicable?

14  A.  The zeros in this particular case should have been N/A for

15  the programs, not for the incentives.  But that's how it's          09:42:03

16  evolved is in this particular performance measure if Step 1, a

17  program will be N/A.  And the rest of it should be a Y or an N.

18  Q.  And is there also an overview for Performance Measure 8?

19  A.  Yes, there is.  We have the step level in there.  We verify

20  the step level and we also verify that the DI-326 met that          09:42:26

21  there is hours and minutes and that it should be a greater

22  amount of time than the next box, which is the 10 hours of

23  unstructured which also should have hours and minutes.  And

24  then each of the boxes from there on, the mental health, the

25  psych ed, the additional and the compliance should be yes or        09:42:44

32

1   no.

2   Q.  What category of inmates does Performance Measure 8 pertain

3   to?

4   A.  This is for the SMI inmates only.

5   Q.  So is it fair to say, then, that the overview contains data      09:42:54

6   that is then found in the tabs following?

7   A.  Yes.  And I actually will have them pull the Tab 1 out at

8   the overview at this time, and they will keep it off to the

9   side because it will be used to verify in the next series of

10  tabs.                                                                 09:43:15

11  Q.  What do you do next then in the review process after you

12  have gone through the overview?

13  A.  So we have the overview pulled.  What I will have them do

14  next is go to Tab 2 verify that cover sheet, which is 838401,

15  that cover sheet has the complex name, unit name, month and        09:43:32

16  year, and that the count sheets are found right behind that.

17  They will now take the overview, the first page or page and a

18  half of overview that has the inmates' names and housing

19  locations and they will go through and verify that they find

20  those inmates on these sheets.                                      09:43:53

21  Q.  And are these sheets the manual selection -- random

22  selection of inmates that you were speaking of before?

23  A.  Yes.  This will be that set of count sheets that was

24  labeled at the beginning on the overview that told you when the

25  date was of the count sheets.  The count sheets are highlighted   09:44:08

1    in yellow and in green; yellow for non-SMI and green for SMI.

2    And each of those people will go through and verify they find

3    the inmate, his name, number, and housing location match the

4    overview.

5           So once we're done with the count sheets and                    09:44:26

6    everybody's been able to verify, then we will move into -- and

7    if nobody has any -- that one also has substitution letters in

8    it.  So if anybody has substitution memos they would be for

9    each inmate that it applies to.

10   Q.  What is a substitution memo?                                        09:44:43

11   A.  Substitution memo is a memo generated by the warden to the

12   division director when an inmate in their picking order is not

13   eligible that week.  And that could be due to just arriving in

14   the unit midway through that week, going out on watch, or

15   having any other issue that pulls them away to the hospital,            09:45:00

16   something during that reporting week where they don't have a

17   full week of monitoring.

18   Q.  So it's a situation where an inmate is not in the max

19   custody housing units such that they have received a full week

20   there?                                                                  09:45:15

21   A.  Yes.

22   Q.  How does it work if an inmate who is selected on the random

23   is, for instance, an inmate who goes out to the hospital midway

24   through the week?  How is the next inmate selected?  Do you

25   know?                                                                   09:45:37

**March 28, 2017 - Status Hearing - Hackney - Direct**

1    A.  They would do the substitution memo, because obviously they

2    can't pick him.  They would just pick the next guy in order

3    below him on the count sheet.

4    Q.  How do the monitoring weeks run?  Is there a specific, you

5    know, do the monitoring weeks run Tuesday through the next          09:45:54

6    Wednesday?  How does that work?

7    A.  They run from Saturday to Friday.

8    Q.  What do you do next after reviewing the count sheets?

9    A.  Then once we're done there the substitution memos are

10   checked.  If there are any we move to Tab 3 and look at that        09:46:10

11   overview, that cover sheet, 838407, to make sure the same thing

12   that there is a complex name, unit name, month, and year listed

13   on there.  And then we look for a warden certification memo

14   which would be from the warden to the division director and it

15   will identify whether or not there were any inmates that were       09:46:32

16   not able to participate due to bad behavior during that month.

17   They would be identified in here.  There should be a signature

18   line on this memo that the warden signs.

19   Q.  And are you looking at which tab, Tab 3 or 4?

20   A.  I'm looking at Tab 3 and it's Bates 838401 -- or 408.  You       09:46:49

21   will see a memo right there from Kevin Curran to Carson

22   McWilliams.  There's no certifications that month.  That means

23   no inmates were excluded from participating.

24   Q.  When you say "excluded from participating," when you look

25   at the next -- what do you mean by that?  If you look at the         09:47:07

1    next page they are talking about nutritional adequacy?

2    A.  It doesn't affect their meals, but it affects their ability

3    to go to programs or recreation depending upon their behavior.

4    Usually it's somebody who is acting out or being violent.  Most

5    of the time they will be on a watch.                                    09:47:24

6    Q.  If you turn to Tab 4 in your book.  So this Tab 4 says

7    cancellation reports.  Is that what you are speaking of?

8    A.  No.  Cancellation would be if there is an issue with

9    something happened during the day and they weren't able to do

10   the program as it was listed on the activity schedule or some    09:47:45

11   emergency situation happened just as they started their turn

12   and they had to put the inmates back in their cells and weren't

13   able to conduct that class.  That's what cancellation report

14   section is for.

15   Q.  So Tab 4 cancellation reports pertain to a broad-based        09:47:58

16   cancellation of a program or recreation due to some sort of

17   emergency or other event?

18   A.  Yes.

19   Q.  And if there's nothing behind that tab, what does that

20   mean?                                                                    09:48:13

21   A.  That means that there were no cancellation reports for that

22   particular month, that week, so there will be nothing behind

23   it.  At this point in time that's all you will have is the

24   cover sheet.

25   Q.  If you could turn to Tab 5 for us.                                   09:48:24

March 28, 2017 - Status Hearing - Hackney - Direct

1    A.  Tab 5 is the same thing.  We check the cover sheet to make

2    sure it has the information correct on the front.  And this

3    should have -- we also check the activity schedule, which is in

4    this tab, to verify that the units, the complex name, unit

5    name, and that the month and year for that particular month are          09:48:42

6    on this activity schedule.  So you are getting an activity

7    schedule that is for that particular month.  So each page is

8    checked to verify that that information is listed.

9    Q.  What does an activity schedule show for someone who has

10   maybe never even looked at an activity schedule, what does that         09:49:00

11   show?

12   A.  We call it a 24-hour clock of our operations in our unit.

13   So this will basically break down when we do counts, when we do

14   any recreation activities, programs, when they do religious

15   services, any other store, laundry, everything that we do               09:49:15

16   basically is usually listed on this form.  It's just so that

17   everybody in the unit, the inmates also know this so that they

18   know what the activities are going to be for that particular

19   day.

20   Q.  How do the inmates know what is on the schedule?  Is it             09:49:31

21   posted somewhere?

22   A.  They post it on the inmate bulletin board.  Should be

23   available where they can see what the activities are.

24   Q.  Does each max custody unit have the same activity schedule,

25   or does it differ by unit?                                             09:49:46

**March 28, 2017 - Status Hearing - Hackney - Direct**

1    A.  It differs by unit.  The activities will not be exactly the

2    same in each unit.  It depends on their physical structure and

3    how they have their programming and recreation laid out.  But

4    they all will have recreation programming, all of that.

5    Q.  And the activity schedule is for -- is it made month to                09:50:04

6    month?  Is it made for the whole year?  A week?  How does that

7    work?

8    A.  It's made month to month, and it's updated any time that

9    there is any kind of change in the schedule.  So if any class

10   completes and they have a different class going on at that time            09:50:20

11   then the activity schedule is updated.

12   Q.  On a day-to-day basis, is this activity schedule adhered to

13   minute by minute?  Can there be fluctuations in the schedule?

14   How does that work?

15   A.  The activity schedule is a basic guideline.  It doesn't                09:50:34

16   mean some of these are going to actually happen at that minute

17   because we can't predict when something is going to happen

18   that's going to deviate from them being able to use the

19   schedule.  It's just an overall guideline of what should be

20   occurring during that day and as much as possible try to stay             09:50:50

21   on that guideline for that day.  But any ICS emergency

22   situation, anything like that can throw this schedule off.

23   Q.  When you use the acronym ICS, what does that mean?

24   A.  Incident command system what we activate any time we have

25   some kind of emergency situation where we need resources, staff           09:51:08

```
 1   resources.
 2   Q.  Are emergency situations the only thing that might delay or
 3   make the time start and stop times of a particular activity on
 4   an activity schedule, you know, not right on time for that
 5   particular day?                                                    09:51:25
 6   A.  It could be staffing issues.  There are staffing shortages
 7   that might happen.  It could be that a CO-III or whoever was
 8   teaching the class is either sick or late.  That does happen.
 9   Q.  What is the purpose of including an activity schedule in
10   this Tab 5, and how does that relate to monitoring of the max     09:51:44
11   custody performance measures?
12   A.  It's part of a cross-reference that is in here.  It's to
13   show that there are activities going on within the facility and
14   that you can use that in conjunction with the out-of-cell
15   tracking form to see that the activities that the inmate is       09:51:59
16   participating in are part of what the unit is supposed to be
17   doing during those particular days.
18   Q.  And behind the activity schedule, if you turn to Bates
19   38424, can you explain what we see next?
20   A.  What you are seeing next is part of what we now use as Tab    09:52:20
21   6.  This time we use a little different tab.  Tab 6 will be all
22   the max custody inmates.  It will be a cover sheet for each one
23   that will verify to the overview the name, number is on here.
24   And normally these are colored as well.  Normally the max
25   custody cover sheets will be yellow, and the SMI cover sheets     09:52:43
```

1    will be green so it stands out in the book.

2            You will have a cover sheet followed by the

3    out-of-cell tracking form.  And you should have a front and

4    back copy of the out-of-cell form, either two-sided or two

5    separate pages which will actually go down through and see the          09:53:01

6    manual calculations they are doing.  We will actually

7    recalculate that to make sure they are accurate.  And then you

8    have the back of the form where you can check to see where the

9    refusals are at and the amount of time for each refusal.

10           And following the activity schedule you will have a          09:53:19

11   banking screen which will show you what his current balance is

12   and what he has been -- he's had the ability to purchase

13   things, followed by the DVO-1 screen which is a visitation

14   screen, shows you if he's got visitors, followed by a DVO-5

15   screen which will show if he had visits during a time frame.          09:53:41

16   Q.  Now, let me stop you there on the visits.  If an inmate

17   does not show visits during a monitored week, is that a basis

18   for determining non-compliance for that particular inmate?

19   A.  No.  Some inmates do not get visits at all and some get

20   them only a couple times a year and then others get them every          09:53:59

21   week.  It just depends.

22           And then there should be the phone log will be behind

23   it.  It will show you if he's made phone calls.  Some guys make

24   lots of them.  You might have three or four pages.  Some don't

25   make any.          09:54:17

**March 28, 2017 - Status Hearing - Hackney - Direct**

1    Q.  Let me back you up one more time on the visitation, if

2    could go to Bates 838429 and also the previous page, 838428.

3    When I look at these I don't see any visitors names listed?

4    A.  That means he doesn't have any approved visitors at this

5    time.                                                                    09:54:34

6    Q.  Is that something that is the inmate's responsibility if

7    they want visitors to request approval?

8    A.  Yes.  They will actually fill out a visitation list, and

9    then they notify the people that they want to visit to apply.

10   And then they will go through an application process.                    09:54:48

11   Q.  So a lack of names on a visitor list does not equate to

12   non-compliance as to allowing visits.  Am I summarizing this

13   right?  Is it safe to say that the inmate just doesn't have

14   persons that visit him or her?

15   A.  Yeah.  He doesn't have anybody approved to visit, and he             09:55:07

16   doesn't show a restriction on the DVO-1 screen.  If you look at

17   the top of that form where it says NC asterisk and none

18   asterisk, that means he has no restriction for visiting.  So if

19   he had visitors he would be able to visit.  N/C stands for

20   non-contact and that's usually where we'll also list loss of            09:55:27

21   visits, suspensions, that kind of stuff in that line.  He shows

22   no restrictions, so it's up to him if he's got somebody he

23   wants to visit.

24   Q.  And you are referring to Bates 838428?

25   A.  Yes.  Right near the top of the form under housing you will          09:55:42

1   see N/C and asterisk and none and asterisk.  He has no

2   restrictions for visits.

3   Q.  You can go back to speaking about property now.

4   A.  So a property inventory will be completed to show what kind

5   of property the inmate has, to show that he does have the         09:56:02

6   ability to have appliances if he can afford to buy them.  Some

7   inmates have them, some don't.  And it also shows all the other

8   property items that he had at that particular date that the

9   inventory was conducted.  Some inmates have very little and

10  some inmates have pages and pages of property inventory.  But    09:56:19

11  that's to show as part of the incentives for the property.

12          And then it will be followed by the next inmate at

13  that point in time.  There will be each inmate we go through

14  and check the same thing, look at their out-of-cell tracking

15  form, calculate that, and then check the refusals.  And I think  09:56:41

16  on the next one you will see where the pages split, 838436 and

17  838437, you will see a front and back copy.

18  Q.  Let's use this at Bates Number 838436 and 437 as an example

19  of an out-of-cell tracking sheet.  And can you explain for us

20  as calculations are being made as to out-of-cell time, what are  09:57:10

21  you -- and from the sergeants all the way up to the wardens --

22  looking at and how are you making the calculations?

23  A.  They are looking for, in this particular case, there's

24  times written.  On the first one for Sunday you see, looks like

25  a C an then R in it, which this has evolved to be a little       09:57:30

1    different now.  We use the actual letter of the type of rec and

2    the time offered.  If this is a refusal time offered and time

3    in box we will use the R there that indicates it.  So it's a

4    little less confusing than this one.

5         But basically, they listed the amount of time and it          09:57:49

6    should be the same on the back of the form for the refusal.

7    You will see he refused rec and it was two and-a-half hours.

8    So they are going to verify those times.  So they are going to

9    look at the time of 8 to 10:30 and see, is that two and-a-half

10   hours?  Yes.  And then they are going to look at the next time    09:58:07

11   frame and verify the amount of time it has and the same with

12   the bottom time frame in that box, and they are going to add

13   them together and see that they have come up with the same

14   calculation.  And you can actually see two different

15   calculations down there, seven hours, 46 minutes twice.  So      09:58:22

16   somebody wrote on it again showing you they verified it.

17   Q.  So then is the same process -- you don't have to go through

18   every detail of each report -- is the same process is that a

19   similar process that you go through and you are looking at

20   times out for visitation, for programming, for classes, and      09:58:39

21   also to the right is the SMI additional programs and

22   incentives?

23   A.  We go through and verify each of these columns the addition

24   is correct and the overall addition of the form matches up to

25   the total.  And then that actual -- the rec time and the         09:58:58

1   overall total are matched to the overview.  The rec time will

2   be matched to Performance Measure Number 5 on the overview.

3   They will make sure that that time matches what's listed here

4   and then the overall time is matched to Performance Measure

5   Number 1 that that overall time is correct, which 1 and 6          09:59:14

6   should be the same.

7   Q.  And as the process is currently, when you are looking at

8   the max custody books, for example, going from probably

9   December forward, since you have been in this position are

10  there separate tabs for the max custody inmates, the 10           09:59:31

11  selected for monitoring, and then a separate section for SMI

12  inmates?

13  A.  Yes.  The Tab 6 in the books from December on will have the

14  max custody and Tab 7 will be strictly SMI.  So this will go

15  through and do all the max inmates.  Some of it has been         09:59:55

16  redacted.

17  Q.  So the calculation exercise is then completed for each of

18  the 10 inmates in this -- that have been selected for random

19  monitoring?

20  A.  Yes.  They do the calculation and do the matching to the     10:00:10

21  overview before they even bother to look at the supporting

22  documentation behind it.  And then each of those documents is

23  cross-referenced to make sure it belongs to that particular

24  inmate and everything he's supposed to have in that section he

25  has.                                                             10:00:27

——— March 28, 2017 - Status Hearing - Hackney - Direct ———

1   Q.  And for the book for Florence, so if we have looking at

2   Tabs 5 and 6 for the Florence complex, you have got two

3   sections of tracking forms, correct?

4   A.  Yes.

5   Q.  And that is because you are selecting 10 from Central and          10:00:41

6   10 from Kasson?

7   A.  Yes.  That's how this particular book was set up at that

8   time.  Now, those 10 from Kasson will be part of Tab 6.  So you

9   will have 20 inmates in Tab 6 with all their supporting

10  documentations and then the 10 SMIs in Tab 7.                         10:01:00

11  Q.  So Tab 7 then, here in this book, relates to SMI inmates,

12  is that correct?

13  A.  Yes.

14  Q.  And is this -- which performance measure does Tab 7 relate

15  to?                                                                   10:01:18

16  A.  Performance Measure Number 8.

17  Q.  And Performance Measure 8 measures what, to your knowledge?

18  A.  SMI.  They are out-of-cell activities and they are groups

19  and programs that they are required to have.

20  Q.  Now, in monitoring Performance Measure 8 which pertains           10:01:36

21  specifically to the SMI max custody inmates, are, in the

22  monitoring process, are you still calculating recreation

23  out-of-cell time DI-326 incentive programs as to banking and

24  visitation, et cetera?

25  A.  Yes.  We do the same thing we do with the max.  Everything        10:01:57

1    is calculated, all their rec, all their visitation programming,

2    any of the other categories and then all the categories under

3    SMI are calculated.  So when they get to this particular

4    section it takes a lot longer because there's a lot more manual

5    calculations to be done.                                         10:02:15

6    Q.  So is it safe to say for Performance Measure 8 for the SMI

7    max custody inmates you are measuring all the performance

8    measures that relate to out-of-cell time, programming, and

9    incentives plus this additional Performance Measure 8 that

10   provides for additional unstructured out-of-cell time and       10:02:30

11   programs and classes specifically related to the SMI inmates?

12   A.  Yes.

13   Q.  And for officers, boots on the ground officers who are

14   filling out these out-of-cell tracking forms, is there -- are

15   they doing it in any different way than is done for max custody  10:02:54

16   inmates who are not SMI?

17   A.  No.  They are filling out the forms the same way.  They

18   just have additional activities going on.  So in those

19   particular areas the forms will have a lot more material on

20   them.                                                            10:03:11

21   Q.  And I may have jumped ahead there and should have asked you

22   the question of, who is filling out these out-of-cell tracking

23   forms?  Is it the wardens filling them out?  How does that work

24   on a day-to-day basis?

25   A.  It's the floor officer that's assigned to that particular    10:03:23

1   area.  It may be a corrections officer, could be a CO-3.  It

2   could even be sergeants and lieutenants that are working in

3   that particular area that day.  It's whoever is working in that

4   area during that shift.

5   Q.  And are you able to see from an out-of-cell tracking form        10:03:38

6   which staff member is filling out the form as related to a

7   particular activity that may be occurring?

8   A.  Yes.  They have a name on the front but that doesn't always

9   mean that's the person who pulls them.  You will see comments

10  on the back for programming and other activities where you          10:03:54

11  might have a different name because there's staff members that

12  are escorts.  And the escort officers take these inmates to and

13  from different activities so the escort officer might be the

14  one who pulls him out of his cell and he will write the comment

15  on the back.                                                        10:04:12

16  Q.  And the comment on the back relates to what?

17  A.  It relates to telling you where he went.  So if he went to

18  a program what program did he go to.

19  Q.  If we're talking about the time period of since you took

20  your current position forward, if we looked at a notebook from,     10:04:24

21  say, January, January data of this year, would you see more

22  detail in these comments sections or less detail?

23  A.  More detail, and the legibility has evolved.

24  Q.  What kind of additional detail would you expect to see on

25  the comments back side of an out-of-cell tracking form              10:04:49

——— March 28, 2017 - Status Hearing - Hackney - Direct ———

1    currently?

2    A.  Well, in this particular book, it's pretty much hit or miss

3    on what program they went to, even with the unstructured, any

4    table time.  Now any time they pull them out they have to tell

5    you exactly what program they are going to, if it was table          10:05:08

6    time, if it was unstructured activity.  If it was a psych

7    group, what was it?  Psych ed?  Psych therapy?  And anything in

8    the other category which could be they're portering, they're

9    working in the kitchen, anything like that that we need to know

10   to explain in that column where that inmate went to.  So there       10:05:26

11   is a lot greater detail on the back.

12        There's also additional comments now on the back when

13   supervisors talk to inmates about refusals, about a pattern of

14   refusals you will see comments from supervisors having that

15   discussion with the inmate.                                          10:05:42

16   Q.  Does the additional information provided currently on the

17   back of the forms provide a greater level at this time of the

18   ability to crosscheck?

19   A.  Yes, it does.

20   Q.  And how so?                                                      10:05:52

21   A.  When you see the program name on there, it makes it easier

22   to cross-reference back to the class roster so you verify that,

23   yes, that inmate did go to, say, a class of self-control.  You

24   have got a self-control roster right there and his name is on

25   it and signed.                                                       10:06:08

—— March 28, 2017 - Status Hearing - Hackney - Direct ——

1   Q.  Currently, how are refusals documented on out-of-cell

2   tracking forms?

3   A.  Currently the refusals, if it's recreation, it's the type

4   of recreation.  So using the grid on that sheet, say he went to

5   a chute rec, A rec, you would have an A in the first column for          10:06:26

6   the recreation and then you would have the time that it was

7   offered.  So say it was 6:30 in the morning, it would say 0630

8   on it.  And then in the time in box, because he never left his

9   cell, there will be an R there.  So the R is for refusal.  And

10  the corresponding comment should be on the back for that                 10:06:48

11  particular date stating that the inmate refused rec, the staff

12  member signed.  You try to get the inmate to sign, if feasible,

13  and if there happens to be a second floor officer in that area

14  that witnessed the refusal then that second officer signs for

15  that refusal if the inmate refuses to sign.                              10:07:05

16  Q.  Should there be a notation of the amount of time that the

17  inmate refused?

18  A.  Yes.  There will be an amount of time based on the type of

19  rec.  Each type of rec has a different time frame depending on

20  the facility because of the location where the recreation takes          10:07:21

21  place.  So some may be longer, may be as long as three, three

22  and-a-half hours where some will be two and a half.

23  Q.  Does the same system apply currently for documenting

24  refusals if an inmate is refusing a program or a class?

25  A.  Yes.  Little different because there's not a column for a            10:07:40

1    letter, so it's basically the time out is when they offered it

2    and then there should be an R in the other box, time in box

3    with a corresponding comment that says what he refused and an

4    amount of time.  Same thing with a signature if feasible and a

5    second signature if the inmate refuses if that staff member is          10:08:00

6    in that area when he refuses.

7    Q.  When you say a signature by an inmate if feasible, what

8    circumstances are going to make an inmate's signature feasible

9    or not feasible to your knowledge?

10   A.  There are some inmates who will eat the paper or destroy          10:08:15

11   it.  We have had instances where the inmate will grab it from

12   the staff member, say yeah, I will sign it, grab it and rip it

13   to shreds or eat it or flush it, do something to damage the

14   form.

15   Q.  Are there inmates where there are security issues or safety          10:08:31

16   issues with providing the inmate with a writing utensil or a

17   paper to sign?

18   A.  Yes.  There are some inmates that will use that to cause

19   harm to themselves so we will not provide that to them.  And

20   there's also some where they are a danger to the staff members.          10:08:50

21   They spit or they throw.  We will not offer the form to them at

22   that point because you are taking down that barrier in order to

23   provide that paper to them.

24   Q.  What circumstances would allow the opportunity for a second

25   staff member signature to document a refusal?          10:09:08

**—— March 28, 2017 - Status Hearing - Hackney - Direct ——**

1    A.  If we had an escort or some other staff member in that

2    particular pod when this was happening, that would be the time

3    frame.  But majority of the time there's usually only one floor

4    officer.  But you might happen to have an escort or a rover or

5    somebody in that same area, even a supervisor.  I have been a          10:09:29

6    witness to them when I have been in the area and the inmate is

7    refusing, I will sign as a second.  It needs to be a staff

8    member that is there to see him do his refusal.

9    Q.  If you can flip now to Tab 8.  And what goes into the

10   review of Tab 8?                                                       10:09:50

11   A.  Tab 8 is the use of force for the month.  So what we do in

12   Tab 8 is we look for -- the first thing they are going to look

13   for is the memo.  There will be an actual memo, and in this

14   case November for Florence did not have any use of force so

15   they have a very basic memo stating they had none.  But          10:10:09

16   normally any place that has one they will have an extensive

17   memo that is from the warden to the division director that

18   explains -- breaks down each incident that happened.  There's

19   like a little checklist on the front of each of the memos and

20   then there will be a synopsis that's provided.                    10:10:28

21   Q.  For this exemplar book we're using in today's exercise,

22   there were no uses of force reports for SMI inmates for the

23   monitored month, correct?

24   A.  That is correct.

25   Q.  And are you aware of what kinds of uses of force are being     10:10:42

1    monitored with respect to Performance Measure 9 under the

2    stipulation?

3    A.  The use of force is being measured at the enumerated

4    facilities, and that's for SMI and non-SMI in those specific

5    facilities.                                                    10:11:02

6    Q.  Also in front of you we have a stapled exemplar of a Tab 8.

7    A.  It's a big Tab 8, yes.

8    Q.  If you could take a look at that and explain for us if

9    there are uses of force, chemical agent uses of force to be

10   monitored with respect to Performance Measure 9 for max custody  10:11:19

11   inmates and/or -- or SMI max custody inmates or inmates at the

12   additional enumerated areas.  Is this the kind of packet you

13   would expect to see?

14   A.  Yes.

15   Q.  And can you take us through just quickly, not the entire    10:11:35

16   packet but maybe the first section and explain for us what kind

17   of information is provided to determine compliance for

18   Performance Measure 9?

19   A.  The first thing that will be in there after the cover sheet

20   will be the memo.  And you want to make sure that -- I have     10:11:56

21   them go through and make sure each of the inmates that they are

22   identified in here, that there is a corresponding packet.  But

23   the part on the memo is they should have the basic information

24   of the incident; the SIR number; when it took place; imminent

25   harm, ongoing physical harm, little check boxes here; methods   10:12:14

—— March 28, 2017 - Status Hearing - Hackney - Direct ——

```
 1    applied; the type of; force, authorization if it had to be
 2    authorized for an SMI in particular situations.  And then video
 3    footage is another part of this I ask them to check to see is
 4    the video footage checked.  And in the hard books will be a
 5    disk but there will also be an electronic file.  But when we          10:12:37
 6    produce these books the electronic version goes with it.  So
 7    this is a guideline for me when I produce those books that I
 8    actually know that I need videos corresponding them so that
 9    everything lines up.
10    Q.  Who completes the uses of force memos?                            10:12:50
11    A.  The warden does.  The warden does this memo to the division
12    director.
13    Q.  And who is the division director?
14    A.  Carson McWilliams.  So we look at the first inmate, look at
15    the inmates that are listed in here and there's different ones.       10:13:09
16    For the Eyman report that we're looking at you have Browning
17    and SMU included.  So depending on the book they are looking at
18    it might be SMU, might be Browning.  So they've got to pay
19    attention to where they start at.
20         In this particular case the first one is a Browning             10:13:23
21    inmate.  Let me see where the SMU inmate takes place.  Right
22    below it.  There's a packet in here following it.  We want to
23    verify that the packet has a cover sheet.
24    Q.  Can you tell us what Bates label number?
25    A.  664010.                                                           10:13:40
```

——— **March 28, 2017 - Status Hearing - Hackney - Direct** ———

1   Q.  So then following the memo, would you expect there to be a

2   use of force packet that pertains to each inmate that's denoted

3   in the memo?

4   A.  Yes.  There must be a packet for each one.  So there would

5   be a cover sheet, which you see here, giving you the same     10:13:59

6   information to cross-reference from the front from the memo,

7   and each package should contain a use of force checklist, both

8   front and back page.  So 664011 and 664012, that is a

9   checklist, front and back page, use of force checklist and it

10   should be completed through the deputy warden level.  The     10:14:22

11   warden's level, when we make these packets, may or may not be

12   available.  Sometimes you will see a full completed one and

13   sometimes you don't.  It should follow that with an ICS report,

14   an incident command report.  And then there should be

15   supplements for every person that's listed on that ICS report.   10:14:41

16   There will be a supplement for each and every one of those, a

17   statement of what they did during that incident, what they

18   observed and what they did.

19         And then that should be followed by the SIR,

20   significant incident report that's generated for any use of    10:14:59

21   force.  And then in some packets you will see a memo that says

22   there was no video available.  Otherwise that's pretty much the

23   end of what those packages should contain.  So we verify that

24   each of the inmates listed on here has a packet that matches up

25   and has all that information contained in it.     10:15:20

1    Q.  And it's the warden for each complex that is monitored

2    under the max custody provisions of the stipulation that makes

3    the determination as to whether a particular use of force is

4    compliant with Performance Measure 9?

5    A.  Yes.                                                    10:15:36

6    Q.  That's not something you personally do?

7    A.  No.

8    Q.  Is there anything else then that goes into the process of

9    doing a book review and exchange other than what you have

10   explained meticulously going through this book with us today?  10:15:52

11   A.  Tab 9 would be the last one, and that would be the programs

12   rosters.  And normally what we do is I have them pull Tab 9

13   completely out and then go back to Tab 6 for the max custody

14   inmates and review their out-of-cell tracking form and verify

15   that the program that they either attended or refused is in   10:16:11

16   here, that you can cross-reference it.  Same thing happens in

17   Tab 7 with the SMIs.  In some locations the SMI unstructured

18   activities are done on rosters as well.  So there may be three

19   different source documents that have to be used in

20   cross-referencing Tab 6 and 7.                                10:16:31

21   Q.  What does one of these rosters tell you?  If you are

22   looking at -- why don't we just take the first --

23   A.  First one.

24   Q.  -- roster at Bates 838731.  If you just look at this piece

25   of paper, what is it telling you as far as a cross-reference to  10:16:47

——— **March 28, 2017 - Status Hearing - Hackney - Direct** ———

1    an out-of-cell tracking form?

2    A.  Well, it's going to show you that at the top you will have

3    a date, gives you the date when this took place.  If you look

4    to the far left-hand side you will see a location code.  The

5    location code in this particular instance is 848 which          10:17:03

6    cross-references back to us.  Each of the units has a locator

7    code.  848 stands for Kasson.

8            So below it you will have a code that will tell you

9    what the class is.  In this particular case it's Psych Ed.  And

10   you will have a listing of all the inmates that were assigned   10:17:19

11   to go to that group on that day and the time is actually across

12   on the right-hand corner.  You will see the time and who

13   performed it.  So you will have the inmates here and then you

14   will have signatures, or if they refuse you will either have

15   refused or nothing in there.  Now it's evolved to where they    10:17:36

16   have to have the word "refused" in there.  So you won't see

17   blanks.  It needs to be signature or refused.

18   Q.  If you look on the top right of the document where it says,

19   it looks like F-R-E-Q, freq, does that mean frequency?

20   A.  Yeah, frequency time and supervisor.  Frequency is when it  10:17:57

21   is occurring.

22   Q.  When you go across it says 0700 to 0800.

23   A.  That's a guideline of what they expect that class to take

24   place.  If you look, you will see some of them do take place

25   exactly on that time frame.  Others might be a little later and 10:18:13

1    sometimes they might be a little bit sooner.

2    Q.  So is there a place on this particular form we're looking

3    at that would show you what the exact time the class occurred

4    versus the 8:00 to -- or 7:00 to 8:00 time frame on the top

5    right?                                                        10:18:30

6    A.  Yes.  If you proceed down the form you will see where it

7    says actual start time, and it says 0915 and actual end time

8    1015.  So that's when the actual class took place.  You use

9    that time frame to cross-reference the out-of-cell tracking

10   form.                                                         10:18:47

11   Q.  So is this then one of the examples we talked about if you

12   are looking at an activity schedule for the month you are

13   looking at an out-of-cell tracking form to see when an inmate

14   went out for a particular activity and then you are looking

15   also at a sign-in sheet.  Are you taking all of that          10:19:02

16   information into account to determine whether an inmate

17   attended a class?

18   A.  Yes.

19   Q.  Or a program?

20   A.  Yeah.  We have all those documents that we use to         10:19:09

21   cross-reference.

22   Q.  So is it then the process that for the performance measures

23   related to inmates going out to classes whether under DI-326 or

24   the additional for the SMI inmates under Performance Measure 8

25   that you are looking to see through these sign-in sheets if an 10:19:31

1    inmate went to a class or refused?

2    A.  Yes.  We're verifying if he did end up attending or refused

3    that class.

4    Q.  In this situation where you have an out-of-cell tracking

5    form that shows that an inmate went to a class, you have an          10:19:47

6    activity schedule, if you don't have a sign-in sheet are there

7    additional documents or sources that you all can check to

8    determine whether or not an inmate had the offering of a

9    program or a class?

10   A.  Yes.  We have it documented in the our AIMS system, adult       10:20:07

11   inmate management system, which is our -- basically our inmate

12   database.  There's a program screen in there that shows the

13   inmate was registered for that class.  So you will see the time

14   frame he is basically scheduled to attend that class from a

15   certain date to a certain date of completion.  We use that also    10:20:29

16   as a cross-reference.  We can go in there and see that he was

17   scheduled for a couple of programs.  Self-control will be one

18   of them, maybe thinking for a change.

19        So you know that he is actually registered to attend

20   classes so he should have some kind of sign-in somewhere and       10:20:43

21   maybe they forgot to print it that day.  But he is actually

22   attending a class.  The groups, the mental health groups, can

23   be cross-referenced in eOMIS.

24   Q.  What is eOMIS?

25   A.  I don't know exactly what it stands for, but it's              10:20:57

1   medical -- or Corizon's inmate medical records.  It's an

2   electronic system for their medical records.

3   Q.  Are there any additional sources that you are aware of that

4   could crosscheck whether an inmate is being offered a program

5   or a class beyond what we've talked about?                    10:21:15

6   A.  Beyond those, the activity schedule and programs rosters

7   and then the computers sections, no.

8   Q.  What happens, then, at the completion of wardens exchanging

9   books with others and going through the process we just went

10  through?                                                      10:21:42

11  A.  They will take the book back and any corrections that need

12  to be completed they will complete them and then the wardens

13  will do an additional review before they make their entries

14  into CGAR.  They will review the book one more time.

15  Q.  When you say corrections that need to be made, what kinds   10:21:56

16  of corrections could come out of a review that would need to be

17  made?

18  A.  There could be a mathematical error, a simple mathematical

19  error.  It could be that the out-of-cell tracking form, it may

20  be off by a few minutes to the overview so they need to be     10:22:10

21  corrected.  Sometimes there might be a document missing maybe a

22  visitation screen is missing.  Maybe a sign-in roster is

23  missing.  They try to cross-reference it and they can't find

24  it.  It could be that something is just misspelled.  Any kind

25  of clerical errors are usually what we end up having.          10:22:29

1   Q.  Currently, on a day to day basis, boots on the ground,

2   floor officers, sergeants, lieutenants who are in those units

3   looking at these tracking sheets on a day-to-day basis, if

4   there is an error in documentation or a correction that needs

5   to be made, is there a process by which that occurs that us,      10:22:50

6   looking at a book two, three months down the line, we can see a

7   correction has been made on an out-of-cell tracking form?

8   A.  Yes.  The sergeants in red on the front, say the officer's

9   just busy and didn't write down the time the inmate went out

10  for say it was Psych Ed he didn't write it down, the inmate      10:23:09

11  went to the class and came back and the sergeant, upon

12  reviewing it, sees that, goes and cross-references it to the

13  source document, to the sign-in, he can then go on the front of

14  that form and, in red, mark the form for the type, Psych Ed

15  would be B, and then put an asterisk in the time out because he  10:23:30

16  wasn't there to know when they pulled him.

17      So he puts an asterisk there, and then on the back of

18  the page he will put a comment, he or she will put the comment

19  as to what they found with that roster, that the inmate did

20  attend a class from this time to that time and that the entry   10:23:46

21  was not made by the officer at the time.  That way you can

22  still get credit for it.  The inmate did attend it.  You can

23  show he did attend it.  It was just a simple human error that

24  the person got busy and did not write the time down that the

25  activity took place.                                             10:24:05

**March 28, 2017 - Status Hearing - Hackney - Direct**

1    Q.  So on the current enhanced detail in these out-of-cell

2    tracking forms that we see from December going forward, the

3    Court, defense counsel, and plaintiffs' counsel could look on a

4    sheet and if they see an asterisk, then that means a correction

5    has been made or additional information has been provided by a          10:24:23

6    supervisor?

7    A.  Yes.  You will see that.  Actually we started doing that in

8    February, beginning of February, end of January, so you will

9    see that February going forward.  You will see asterisks and

10   that's when the supervisor has done a review and found an                10:24:37

11   issue.  Then they have gone and pulled the source document and

12   verified it and wrote that on there.

13   Q.  And as a matter of daily duties, are sergeants or

14   lieutenants boots on the ground in those units, are they doing

15   reviews of the out-of-cell tracking forms to look at legibility         10:24:57

16   to make sure later on down the road everyone here in the

17   courtroom, the judge, myself, and plaintiffs' counsel can read,

18   for instance times, or the printing and explanations of what's

19   occurring in the comments section?

20   A.  Yes.  The form actually has evolved just recently again to          10:25:15

21   give them a little more room to print their name neatly and

22   then a badge number so you can read everything legibly.  The

23   supervisors are doing their tours addressing the staff in the

24   field when they come across issues with legibility.  Also they

25   have been counseling.  Some of the staff will write on those            10:25:34

1    forms while the cell door is moving, trying to write the time

2    down.  And that will make it really hard to read that time when

3    the cell door is moving.  So they have been working diligently

4    on the legibility and it has improved significantly from

5    December coming forward.  It is down to a couple of people          10:25:52

6    we're working with right now to work on their writing skills.

7    Q.  So if it's a situation where a supervisor goes through and

8    sees a time entry and says I can't tell if that's 11:19 or 1:19

9    in the afternoon, does a supervisor have the ability to go ask

10   the officer, can you tell me what this says and then make a        10:26:15

11   correction with an asterisk if needed so that we can all

12   understand what the original officer was trying to write down?

13   A.  Yes.  They will try to track them down and have them

14   explain what the time was and they will put a comment

15   explaining that this time is this exact thing.  Because it is      10:26:31

16   hard to decipher some 13s from 11s sometimes.

17   Q.  And when you spoke about the situation where a cell door is

18   moving, how does that affect the ability sometimes of the

19   legibility?  Is it because the sheet is literally attached

20   vertically right on that wall versus sitting down on a table?      10:26:52

21   A.  Yeah.  So a lot of sheets are attached to the cell front.

22   A lot of the staff have to write on it because there's not

23   really a good place to take it down and write anyplace.  So

24   they will write on whatever piece of cell front that they can

25   what the times are or the information is.  Some of them will       10:27:12

1    take them down and go over to the table and sit down and fill

2    them out.  Usually when they do that they are doing a big turn

3    so you will get a little better legibility that way.

4    Q.  And after the final review occurs by the wardens, the

5    wardens go back and do their own individualized personal review          10:27:29

6    and report to the CGARs as to compliance levels, are you done

7    at that juncture with your month?  Are you doing more with

8    documents?  What is your role?

9    A.  At that point in time once the CGAR is done I will be

10   reviewing to make sure that the entries are in there, make sure          10:27:49

11   everything lines up.  The units will load their book.  We have

12   a shared drive.  They will load their electronic version of the

13   notebook by tab.  I will go in and review each of those tabs to

14   make sure -- and this is where the process has evolved

15   greatly -- to make sure how they scanned them doesn't come out           10:28:07

16   in such a manner you can't read.  So the majority of them now

17   we pretty much have them doing them in color just so they don't

18   have dark versions or that the scanner caught it and cut it

19   sideways and cut the top off.

20          So I will go through and look at each one of those                 10:28:21

21   electronic files to make sure everything is the way it's

22   supposed to be very legible.  If it's not I let them know, no,

23   you need to rescan.  Before I produce anything, I make sure

24   that the book now has everything it's supposed to including the

25   videos.  So instead of having to chase videos down after the             10:28:36

```
 1   fact, the book will come with everything that it's supposed to

 2   come with now.  So there's that last set of verification to

 3   make sure the book is complete and is being sent.  Then I keep

 4   a receipt when I send it as I normally send it liquid file to

 5   the AGs office to Lucy Rand, I will keep a receipt in my          10:28:55

 6   archive to show that I sent it so in case something happened I

 7   can cross-reference that time frame.

 8            But there is an electronic book in a shared drive that

 9   we can access so I don't have to rely on the unit to send to it

10   to me through the e-mail that actually goes up on there since     10:29:11

11   they are usually pretty large.

12   Q.  And once you provide the electronic versions of the books

13   and the videos to the AG's office then you are finished?

14   A.  I'm done unless she is missing something and asks me to

15   track something down.  But I'm -- basically I'm also the         10:29:26

16   liaison for all the units for document production.  All the

17   requests are going to come to me and then I will notify the

18   units because I have access to their different complex drives

19   now so that I can go get it without necessarily having them to

20   keep chasing down paperwork.  They store that stuff             10:29:43

21   electronically.

22   Q.  So all document requests that are related to the max

23   custody monitoring, you are the liaison for either within your

24   abilities tracking documents down that may be needed or working

25   with complex personnel to find you the documents?               10:30:01
```

—————————— **March 28, 2017 - Status Hearing - Hackney - Direct** ——————————

1    A.  Yes.

2    Q.  And within all of this review process that you have talked

3    to us about, the multiple meetings that you have, interspersed

4    with all of this is when you are out in the units walking,

5    talking, and doing your reviews of documentation on a daily          10:30:17

6    basis?

7    A.  Yeah.  I do in the field and then when we get together each

8    month for our reviews it could be at a location in Florence or

9    it could be where -- we're moving it around where we'll do

10   different locations at different facilities so that they can          10:30:32

11   network as well, the supervisors get a chance and the unit

12   administrators get a chance to talk to each other.

13   Q.  No further questions.

14           THE COURT:  Thank you.  This will be a good time to

15   take a 15-minute break, so we'll stand at recess.                     10:30:45

16           When we come back you will sit there again and the

17   plaintiffs will be learning more from you, too.

18           Thank you.

19           (Recess from 10:30 a.m. until 10:51 a.m.)

20           THE COURT:  You may proceed.                                  10:51:54

21                      CROSS-EXAMINATION

22   BY MS. FETTIG:

23   Q.  Thank you, Your Honor.  And good morning, ADW Hackney.

24   A.  Good morning.

25   Q.  Thank you for coming in.  I think I express the sentiment         10:52:03

—— March 28, 2017 - Status Hearing - Hackney - Cross ——

1    of everyone here we're glad you are in your new position.  And

2    I wanted to talk a little bit about that and the work you did

3    on max custody monitoring prior to, I believe -- were you

4    promoted to associate deputy warden in -- was it December of

5    2016?  Is this a new title?                                    10:52:25

6    A.  No.  It's actually a different position.  I have been an

7    associate deputy warden since August of 2015.

8    Q.  But in December of 2016, is this a new role for you?

9    A.  Yes.  This is a different role.

10   Q.  Okay.  And do you know, did anyone hold that role prior to  10:52:40

11   you taking it on in December of 2016?

12   A.  No.

13   Q.  Do you know why this new role was created?

14   A.  I couldn't answer that.  I didn't make this decision.

15   Q.  Were you chosen for this role in particular?             10:52:58

16   A.  Yes, I was.

17   Q.  Okay.  So prior to December, you stated in your testimony

18   that you were involved or you were trained in April of 2016 on

19   max custody monitoring, am I correct on that?

20   A.  I was trained once I arrived at Central unit and I arrived  10:53:18

21   there in April.  And the training continued from April to the

22   time that I left there.

23   Q.  And was it April of 2016?

24   A.  Yes.

25   Q.  And can you tell me a little bit more about that training?  10:53:28

You mentioned that Deputy Warden Morris and Warden Fizer
trained you?

A.  Yes.  They walked me through the -- went through the
stipulation agreement and how the notebooks were being produced
and how the documentation was to be reviewed, the out-of-cell          10:53:46
tracking forms, the other supporting documentations with it,
and just basically getting me up to speed with what the
stipulation agreement versus what the operations were doing at
the time.  Because I had not been in max custody for a little
while and had not been exposed a lot to the stipulation              10:54:06
agreement prior to my arrival at Central.

Q.  Okay.  And you mentioned that Attorney Rand also gave you
some training.  Can you tell me a little bit about that?

A.  Yes.  She conducted a training with all the max units in
June of 2016 where she walked through the stipulation agreement      10:54:23
with everybody making sure everybody understood all the
requirements of all the activities that needed to take place
and then how the notebooks, the production of the notebooks
evolved at that point to an index system of the nine-tab system
of that following month.                                            10:54:42

        So she was walking everybody through the changes that
were taking place in the notebooks and any issues that came up
with updating us with the Court.

Q.  And I'm sorry, was that in April of 2016 that Ms. Rand did
this training?                                                      10:54:55

1  A.  June of 2016.

2  Q.  June of 2016.  And at that time, were you given a

3  monitoring guide as part of the training for the max custody

4  measures?

5  A.  No.  There isn't a monitoring guide at this point.          10:55:06

6  Q.  Okay.  So were you given any written materials during the

7  training?

8  A.  Just basically, how the notebook was going to be produced.

9  That's it.  Basically what you see in here is what we were

10  given.                                                          10:55:21

11  Q.  Like a table of contents of the --

12  A.  Yeah.

13  Q.  -- various tabs?

14  A.  Yeah, an index of that and a series of cover sheets and an

15  explanation was given what was supposed to be in each of those. 10:55:31

16  Q.  Who else was at that training with Ms. Rand?

17  A.  All of the max custody units were there.  I don't remember

18  exactly who all was there.  It was a pretty busy room.

19  Q.  When you say max custody units, do you mean the wardens,

20  the ADWs, the line staff, who exactly?                          10:55:49

21  A.  It was wardens, a deputy wardens, associate deputy wardens,

22  supervisors that were assigned to DI-326.  And there were some

23  captains in the room of some of the max units and there was

24  also some medical staff in the room as well.

25  Q.  Okay.  And did that happen one day, over a period of days?  10:56:09

─── **March 28, 2017 - Status Hearing - Hackney - Cross** ───

1    A.  One day.

2    Q.  One day.  Was it all day?

3    A.  It was pretty, yeah, it was a pretty long day.

4    Q.  To your knowledge, had there ever been any training on the

5    max custody performance measures prior to June 2016?        10:56:26

6    A.  I'm not aware of any, but I wasn't at Central unit that

7    long before this actually happened.

8    Q.  And what was your understanding of why the training was

9    being done in June of 2016?

10   A.  For the change to the way the books were going to be set up  10:56:41

11   for July of 2016.  The tab system was going to change from the

12   six-tab system they had at the time to a nine-tab system.

13   Q.  Okay.  You mentioned in your testimony that in October of

14   2016 you were helping with the max custody notebooks at

15   Florence.  Am I remembering that correctly?              10:57:07

16   A.  Yeah.  What I did in October was I put the book together.

17   I wanted to put it together from start to finish completely

18   without any assistance to see how long it was taking to put the

19   book together and what all it took to actually physically put

20   the notebook together so that I could have an understanding of  10:57:24

21   every little piece that it took at that point in time to do it

22   by yourself, to do it.

23   Q.  And prior to October of 2016, the work you were doing

24   gathering the materials and producing the max custody notebook,

25   what was your involvement in the max custody performance   10:57:42

—— March 28, 2017 - Status Hearing - Hackney - Cross ——

1   measure monitoring?

2   A.  I was basically, as the unit administrator, required to

3   review the out-of-cell tracking forms.  I would go through and

4   check out-of-cell tracking.  I would also review them after

5   that previous week was done and then the actual production of          10:58:02

6   the notebook, reviewing that.  I didn't determine any

7   compliance or any of that.

8   Q.  When you arrived in April of 2016 at Florence, what was the

9   monitoring process for max custody, to your knowledge?

10  A.  The only part I had was within the unit.  I have no idea        10:58:21

11  what happened outside of the unit.  But we would, as the

12  documents were being put together in the book, we would, myself

13  and the deputy warden, would be reviewing the book, the

14  completion of it, making sure that all of the documents that

15  were required in it were there, checking the overview.  And       10:58:37

16  that's pretty much the bases I had there.  The deputy warden

17  did other things beyond that that I wasn't involved in.

18  Q.  Were there any exchange of notebooks with other units at

19  that time, or did that happen later?

20  A.  That happened later.                                          10:58:57

21  Q.  Okay.  Well let's talk about your new role then.  So you

22  entered this new role in December of 2016.  Is that when the

23  random tours started?

24  A.  For me they did, yes.  That was part of the position was to

25  conduct random tours.  But tours were being conducted before by   10:59:16

1   the NROD and the division director when they would come out

2   into the field.

3   Q.  Do you know when that started?

4   A.  The tours, no.

5   Q.  So you mentioned in your testimony that you are responsible    10:59:29

6   for the unannounced visits at Eyman, Browning, SMU-1, Florence

7   Central and Lewis Rast.  Do you know who does Perryville?

8   A.  Perryville is not max custody anymore.  I did go out there

9   in late December and met with them and reviewed their notebook.

10  They were, at that point in time, had converted to close         10:59:59

11  custody.  But I will do -- I will be doing some random checks

12  of them and Phoenix complex periodically throughout the year.

13  Q.  And to your knowledge, you mentioned you were looking at

14  the Perryville notebook in late November, or December,

15  misspoke.  To your knowledge, is Perryville being monitored      11:00:17

16  under the max custody measures of the stipulation at this time?

17  A.  They are -- there is a form of monitoring happening but

18  it's not the out-of-cell tracking forms on every cell because

19  they are not max custody.

20  Q.  So they are not reporting on the CGARs?                       11:00:37

21  A.  They are reporting on CGARs but they are reporting use of

22  force.

23  Q.  Only use of force?

24  A.  That I'm aware of.

25  Q.  Okay.  Do you know when this started?                         11:00:47

1   A.   December.

2   Q.   Of 2016?

3   A.   Yes.

4   Q.   So in your unannounced visits, or let me just back up a

5   second.  You mentioned Florence Central.  Do you also do          11:01:07

6   Florence Kasson unannounced visits?

7   A.   Yes.  Central is Kasson so I do it at both of them.

8   Q.   Okay.  Just wanted to clarify.

9        When you are doing the unannounced visits, do you

10  document anything in writing about your visit?                     11:01:22

11  A.   I do a weekly report that is sent to the NROD and then to

12  Rachel Love.

13  Q.   And when you say NROD, are you talking about Director

14  Trujillo?

15  A.   Regional Director, yeah, Trujillo, Northern Region.           11:01:37

16  Q.   So a weekly memo.  And when you do your unannounced visits

17  are you looking specifically at the maximum custody performance

18  measure compliance?

19  A.   I'm not looking at the compliance I'm doing observations in

20  the field of how they are completing the forms and are the        11:01:55

21  activities that are on the activity schedule take place,

22  watching the programs making sure programs are underway,

23  recreation, table time, any of the other out-of-cell

24  activities.  But I'm not determining compliance.

25  Q.   So would you characterize your memo to the regional           11:02:12

1   director as just an update on how things are going?

2   A.  It's a -- basically it's an overview of all my observations

3   in the field.  So I give them what I have seen in the field, I

4   send that to him and to Rachel Love.

5   Q.  When was your most recent memo written?                    11:02:31

6   A.  Last Friday.

7   Q.  Last Friday.  What facility?

8   A.  Eyman.

9   Q.  Eyman.  Okay.  Can you just tell us a little bit about some

10  of the observations you made in the memo?                      11:02:48

11          MS. LOVE:  Objection, Your Honor.  The memos are

12  addressed to me as work product and attorney/client privilege

13  reports.

14          THE COURT:  Whose idea was it to prepare these memos?

15          THE WITNESS:  It's was actually both Rachel Love and    11:03:02

16  the division -- the northern region division director so that I

17  could tell them what I have seen in the field.

18          THE COURT:  When you are -- you have told us in your

19  earlier testimony that you do these unannounced visits so that

20  you can observe what's going on in the field.  Without talking  11:03:23

21  to us about what you specifically wrote to the attorney in this

22  memorandum, it would be helpful to understand what kind of

23  things that you see in the field that have been examples in the

24  past where you have made observations that have caused you to

25  want to alert people in the monitoring process about possible   11:03:42

1    changes that you would suggest or problems you would identify.

2    I mean, I'm understanding that -- tell me if I'm wrong -- my

3    understanding is the reason you do these unannounced visits is

4    that you want to see whether or not there's reason for you to

5    have confidence in the monitoring process and also beyond that          11:04:02

6    to try to correct anything that may be wrong with respect to

7    the monitoring process.  And so you have an involvement that's

8    not just one that's limited to filling in little holes on an

9    aptitude or a scholastic achievement test, little circles, you

10   are actually thinking outside of the circle and thinking what          11:04:22

11   is going on here so that I can know whether I can have

12   confidence in it.

13          One of the things that you have told us is that you

14   make observations and you report those observations.  We want

15   to understand what kinds of things.  And so if you could give          11:04:36

16   us some examples of those.

17          MS. LOVE:  Your Honor, we would object to

18   attorney/client privilege work product as to the specifics of

19   her findings as they are directed in memorandums and

20   correspondence to counsel as well for the purposes of providing        11:04:51

21   training and legal advice regarding the monitoring process.

22          THE COURT:  Well, the problem here is that it's not

23   exclusively legal advice because there's an obligation under

24   the stipulation for the Court to understand the monitoring

25   procedure.  And we have this witness who is engaged in that            11:05:05

1    process and so you can't cloak the attorney/client privilege

2    what is her job independent of anything an attorney might ask

3    her to do.

4           So the objection is overruled.  You may answer.

5           THE WITNESS:  Some of the observations like                    11:05:23

6    legibility, how are the forms looking, legibility-wise.  That's

7    some of the generalized.  And the programs, did I observe

8    programs taking place?  Did I observe recreation taking place,

9    and if there were any issues that arose during my tour.

10          A lot of it is how are the things being done in the       11:05:44

11   field.  Legibility has been a big one, that's a big one we're

12   looking at.  And then if there was anything that would be

13   inconsistent from one facility to another because the goal is

14   to have consistency amongst all the facilities, so a lot of

15   quality control, quality assurance observations.                 11:06:03

16          THE COURT:  I can interrupt for just a moment?

17          MS. FETTIG:  Of course, Your Honor.

18          THE COURT:  So one of the things you just mentioned

19   are possible inconsistencies between what you observed and what

20   is being reported as a possible outcome.  For instance, you      11:06:18

21   have said that I'm interested to see whether or not what was

22   supposed to be done was being done.

23          Is there a time when you are going through your

24   double-check of the notebooks where you link up your previous

25   observations that may not be accurately reflected in the report  11:06:39

1    in the monitoring notebook.  For example, and let me give you a

2    concrete example, you observe in one of your unannounced visits

3    something that was supposed to happen hasn't happened.  Do you

4    ever have an occasion to see where that has been reported as

5    having happened in the monitoring manual?  And then if that          11:07:01

6    inconsistency is apparent to you, what do you do?

7            MS. LOVE:  Same objection.

8            THE COURT:  Overruled.

9            THE WITNESS:  For your example, say what I'm looking

10   at the forms, maybe there hasn't been a program that's taken         11:07:15

11   place yet for that particular group of inmates, I will go find

12   out what the reasoning is, why it hasn't taken place.  Because

13   I will see it -- most of the time I will see them before

14   Fridays, sometimes on Fridays.  But I will go find and out when

15   that person is supposed to have that program and I will alert        11:07:31

16   them that, hey, have you noticed that these particular inmates

17   haven't had their program yet?  Do you guys have something

18   scheduled?  Because it didn't happen on the day it was

19   scheduled for.  And then I can find out and I do pull

20   documentation to cross-reference for programs as well.  So if I      11:07:47

21   see a program on there I can cross-reference it to see if it

22   happened.

23           THE COURT:  Does the full documentation that you just

24   mentioned also include a documentation of your observance that

25   there is a problem with this particular task because it hasn't       11:07:59

—— **March 28, 2017 - Status Hearing - Hackney - Cross** ——

1    been completed and you have alerted the people that were on the

2    path to having a problem because we're going to have to report

3    that this didn't happen?  Is there someplace that's documented?

4         MS. LOVE:  Same objection.

5         THE COURT:  Overruled.                                    11:08:14

6         THE WITNESS:  It's documented in my report but I also

7    out briefed that administrator of that unit of what my

8    observations are.

9         THE COURT:  Okay.

10        THE WITNESS:  So that gives them an opportunity to        11:08:22

11   address it.

12        THE COURT:  But with respect to the documentation that

13   makes its way into the notebook, there is no notation of that

14   process that you just described?

15        THE WITNESS:  I may not see the documents that are in     11:08:34

16   here.  Now I do see all the out-of-cell tracking forms, but I

17   don't put anything in there as far as my report doesn't go in

18   there unless there's some issue with one of these forms.  That

19   would be the only time it would be in a report.

20        THE COURT:  So if it gets resolved before the time        11:08:52

21   that the notebook has to be closed, for instance, the problem

22   that you identified has been fixed, then there is no paper

23   record of that having been a looming problem in the notebook?

24        THE WITNESS:  No.  It's just basically observations of

25   what's happening real time in the field.  So there's still time 11:09:10

1    in that week for them to make any corrections that they need

2    to, any additional programs, if I see anything that is alerting

3    me to that.

4           THE COURT:  Okay.  Thank you.

5    BY MS. FETTIG:                                                    11:09:24

6    Q.  ADW Hackney, other than the memo that you write to Regional

7    Director Trujillo that you copy to Ms. Love, do you produce any

8    written materials as a result of your unannounced visits?

9    A.  No.

10   Q.  You mentioned during the unannounced visits that you do a    11:09:41

11   debrief.  Who is that done with?

12   A.  That's done with the unit administration if they are

13   available.  There will normally be some supervisors there, some

14   lieutenant or sergeant usually around.  I will brief them but I

15   also brief their unit administrator.  If their warden is        11:10:02

16   available then I will brief their warden.  It just depends on

17   their availability at the time.  But they will be notified of

18   what my observations were.

19   Q.  And do you ever follow up on your observations after the

20   debrief session?                                                 11:10:20

21   A.  Yes.

22   Q.  In what manner?

23   A.  I do a comprehensive review each week of the tracking form

24   so I know any issues that I have observed, I can check to see

25   if they were corrected or addressed on those forms when I do     11:10:33

——— **March 28, 2017 - Status Hearing - Hackney - Cross** ———

 1    the full comprehensive review.

 2    Q.  And that's at each of the max custody units, you are

 3    reviewing the tracking forms every week?

 4    A.  Yes.

 5    Q.  And would that be all the tracking -- what tracking forms        11:10:45

 6    actually are you reviewing?  Are you spot checking or --

 7    A.  I'm checking -- I touch every one of them.  I actually look

 8    at them, front and back, every week to see how they look

 9    overall, are the refusals being done correctly and consistently

10    across the board.                                                    11:11:05

11    Q.  And if you spot problems what do you do?

12    A.  I will alert my supervision of any issues that I have and

13    then we'll make sure that the unit is aware of it as well.

14           THE COURT:  When you say "I'm touching every one of

15    them" are you touching every one of the 10 that are selected or     11:11:21

16    every one of the people?

17           THE WITNESS:  Every one of them in the max.  There are

18    stacks of them.

19           THE COURT:  Thank you.  I'm sorry.

20           THE WITNESS:  Yes.                                           11:11:29

21    BY MS. FETTIG:

22    Q.  So you alert your supervisor if you find problems with the

23    tracking sheets?

24    A.  Yes.  I notify him and I notify Ms. Love, too.

25    Q.  Okay.  And do you do that via e-mail or is this the             11:11:41

```
 1    separate memo?
 2    A.  This is part of that report.  Because everything is
 3    conducive on that report.
 4    Q.  And then when you -- let's talk a little bit -- before we
 5    do that let's talk about your interviews with the inmates        11:11:59
 6    during your unannounced visits.  Is this something you put on
 7    the memo as well?
 8    A.  No.  If there's any issues brought up by the inmates, say
 9    there are unit issues like needs clothing or needs something
10    else, I make a note of that and I talk with the unit            11:12:17
11    administrator and I follow up with them on that.  But I don't
12    normally document conversations on there unless they are
13    alerting me to a potential issue like, say, the example earlier
14    was about a program taking place.
15    Q.  Uh-huh.                                                     11:12:33
16    A.  That would be the only time I would put something on there
17    but that would be after I have researched, did it actually
18    happen or was the inmate actually not being truthful.
19    Q.  And is most of your communication with the unit, is that
20    done via e-mail or telephone or in person?                      11:12:45
21    A.  I do a lot of it in person.  A lot of it is in person.
22            THE COURT:  And are you doing that in the units that
23    have been selected for reporting?  I mean, are you focused on
24    what of the inmates for whom they have been selected for the
25    monitoring report, or do you do that without an eye to who was  11:13:08
```

UNITED STATES DISTRICT COURT

1    involved?  Is it more general or is it more specific?

2          THE WITNESS:  We don't know who the inmates are until

3    after that month is over that we are selected so I'm in general

4    picking at random a pod in a cluster or a couple pods in a

5    cluster throughout the facility to just randomly walk around.        11:13:24

6          THE COURT:  Thank you.

7    BY MS. FETTIG:

8    Q.  I just wanted to ask you a clarifying question.  You

9    mentioned that the tracking forms are saved in the 326

10   supervisor office.  What is that and who is that?                     11:13:36

11   A.  Their supervisors are assigned at each facility to conduct

12   reviews of their areas.  Some of them are assigned a wing; some

13   are assigned clusters.  Their responsibility is to go around

14   every day and check to see that the inmates are getting their

15   activities and that the forms are being completed correctly.          11:13:57

16   So at the end of the week they gather all those forms up and

17   they review them.  They have to do a review of the forms.

18          Once they are completed, they put the forms away, they

19   file them away until the monitoring week is actually picked the

20   next month and then they go and extract the forms, do their           11:14:14

21   count, and that's when they randomly pick the inmates based on

22   the count sheets.

23   Q.  You mentioned so there are supervisors.  Would this be a

24   sergeant or a lieutenant?  Who would that person be?

25   A.  There are sergeants and a lieutenant, usually a couple           11:14:31

1    sergeants and a lieutenant at each facility.

2    Q.  Do you know how long that's been the practice?

3    A.  As far as I know they have been in place since the

4    beginning.  They have had supervisors assigned to those areas.

5    Q.  And keeping track of the tracking forms?                    11:14:50

6    A.  Yes.

7    Q.  Is that contained like in a locked cabinet in their office?

8    A.  It's in a filing cabinet, yes.  They have it locked up.

9    Q.  And to your knowledge, do they save these tracking sheets

10   after the month is over?                                        11:15:04

11   A.  Yes.  They are archived.

12   Q.  So we could go back and look and say where are your April

13   2015 tracking sheets and the supervisor would have them?

14   A.  Yes.

15   Q.  Okay.  I wanted to go over this new process you have for     11:15:17

16   the levels of review that you talked about with Ms. Love.

17           Did that start with your new position in December

18   2016?

19   A.  Yes.

20   Q.  Okay.                                                        11:15:40

21   A.  Yes, it did.

22   Q.  And who developed these levels of reviews?  Was that you?

23   A.  I developed the sergeant, lieutenant, and the

24   administrator.  The wardens had started to come together at

25   monthly just prior to that.  So I added the extra levels of      11:15:53

1  review.

2  Q.  And do you know what they were doing before you came in and

3  set up this discerned process?

4  A.  I don't.  I wasn't actually there.

5  Q.  Okay.  All right.  Well, let's talk about your new levels    11:16:11

6  of review.

7        So the first level of review with sergeants -- and

8  bear with me just so I have a very clear idea of how this is

9  working.  And I guess I would first ask, has this been written

10  down?  Did you put it in policy?                                11:16:27

11  A.  No, it's not in policy.  It's just a procedure that we're

12  using.

13  Q.  Okay.  And is there a written procedure that you have come

14  up with?

15  A.  We have -- I pretty much run it.  There is, I want to say,  11:16:39

16  kind of a checklist system with it but nothing formal in

17  policy, nothing like that.

18  Q.  So a document that you have created?

19  A.  Yeah, pretty much.  A little checklist.

20  Q.  Okay.  And did anyone review your checklist before you      11:17:02

21  implemented this policy or program?

22  A.  Yes.  It was reviewed by the northern region operation

23  director and Ms. Love.

24  Q.  And can you tell me when that happened?

25  A.  Sometime in December, somewhere in December after I took    11:17:16

1    this position.

2    Q.  Oh, so right out of the gate when you started, huh?

3    A.  Yeah.

4    Q.  Okay.  So the first level of review, tell me why did you

5    think it was important for the sergeants to make -- to have        11:17:32

6    this exchange and do this review?

7    A.  The sergeants are involved in helping produce the

8    notebooks.  So for them to come together and exchange books was

9    just another set of eyes from somebody else looking at the

10   stuff that was put together to see the accuracy.  It was like      11:17:47

11   quality control.

12   Q.  And do you set a date each month where the sergeants are

13   going to, you know, everybody is meeting at Florence or

14   everybody is meeting at Eyman?  How does this work?

15   A.  I establish a date after we're notified of what the random     11:18:02

16   week was picked, so usually about five or seven days after that

17   date is selected when we know to start the book, then I set a

18   date.

19   Q.  And does everybody bring their notebooks to the meeting or

20   have you vetted them before?                                       11:18:22

21   A.  Yes.  They bring their notebooks to the meeting.

22   Q.  And at that meeting do people review someone else's

23   notebook?  Is that how it works?

24   A.  Yes.  Everybody reviews somebody else's notebook.  Nobody

25   is reviewing their own notebook.                                   11:18:37

1   Q.  And when you find problems or areas that need to be

2   corrected, how does that process work?  What happens at that

3   meeting?

4   A.  They will mark the book with a sticker, some kind of

5   Post-It note or something and explain it to that person in the     11:18:49

6   room what they found so they can go back and make the

7   correction before the next level of review.

8   Q.  And is that ever -- are the problems identified in the

9   first level of review written up anywhere, or is it basically

10  the sticky system?                                                 11:19:07

11  A.  It's just basically on the actual notebook itself, a little

12  removable sticker.

13  Q.  So is it a first draft of the notebook?

14  A.  Yes, it is.  That's the first draft.

15  Q.  Okay.  So the sergeants, maybe some problems have been         11:19:18

16  found in the Florence sergeants' notebook, he or she goes back

17  and corrects it and then what happens to the notebook?

18  A.  It's given to the unit administrator, and the unit

19  administrator will bring it to the second level review which

20  will be set.  Normally when I set the first level review a few     11:19:40

21  days after that the second level review will also take place.

22  Q.  Okay.  And this is ADWs?

23  A.  ADWs and deputy wardens both.

24  Q.  That would be assistant deputy warden?

25  A.  Associate deputy warden.                                       11:19:58

1  Q.  Associate deputy warden and the deputy warden from each

2  unit?

3  A.  From each of the max units, yes.

4  Q.  And is the process during this meeting the same as the one

5  with the sergeants?                                              11:20:12

6  A.  Exact same process.

7  Q.  And again, if there are problems found in the notebooks --

8  A.  They use the same sticker system.  It will be a little

9  sticker off to the side with a little explanation.  And they

10 will talk to the person in the room afterward.  They will go    11:20:26

11 over all of their issues.

12 Q.  Okay.  So that's sort of the second draft?

13 A.  Yes.

14 Q.  And then the third level is you look at each of the

15 notebooks, is that correct?                                      11:20:38

16 A.  Yes.  I will try to get -- I can't do it every month but

17 there are some that I do, try to do it every time before the

18 wardens do their meet and review, I try to go through their

19 notebook as well to see if I can find anything that needs to be

20 corrected.                                                       11:20:54

21 Q.  And if you do, how do you communicate that?

22 A.  The same system.  I use a sticker and I verbally tell them

23 when I give them their book back, this is what I found and I go

24 through it and I show them.

25 Q.  So you give it to the wardens.  But is it the case that not  11:21:05

1    every month are you going to be able to do all the notebooks

2    for all the max custody facilities?

3    A.  Yeah.  It just depends on any other activities that are

4    taking place or if I'm on leave.  So I may not be able to get a

5    review done before the wardens meet.  There's only like a          11:21:23

6    couple-week time frame before that happens.

7    Q.  Well, everybody is entitled to some vacation.

8    A.  Sometime.

9    Q.  Good for the mind and soul.

10          So fourth level, that's the wardens and we're talking        11:21:36

11   about complex wardens here, right?

12   A.  Yes, complex wardens and usually it's their deputy warden

13   of operations with them as well, their DWOP.

14   Q.  So each facility's got two people generally representing

15   them?                                                              11:21:58

16   A.  Yes.

17   Q.  And so they have a meeting scheduled.  And do you schedule

18   this meeting do they do that themselves?

19   A.  The Northern Region Director Ernie Trujillo, he schedules

20   that meeting.                                                      11:22:07

21   Q.  Is he present at that meeting?

22   A.  Yes, he is.

23   Q.  And are you present at that meeting?

24   A.  Yes, I am.

25   Q.  So other than you, Mr. Trujillo, and the deputy wardens and    11:22:13

—— March 28, 2017 - Status Hearing - Hackney - Cross ——

 1   the wardens, is there anybody else who attends this meeting?

 2   A.   The division director, Carson McWilliams, usually attends,

 3   the southern regional operations director Joe Profiri attends

 4   and Rachel Love attends the meeting as well.

 5          We also now have some line staff attending that          11:22:40

 6   meeting so that they can understand the process better.

 7   Q.   And when did you start inviting the line staff?

 8   A.   This last month.

 9   Q.   Okay.

10          THE COURT:  Whose idea was that?                          11:22:53

11          THE WITNESS:  Mr. Trujillo's.

12          THE COURT:  Thank you.  Seems like a good idea.

13          THE WITNESS:  It worked out very well.

14   BY MS. FETTIG:

15   Q.   Seems like a good idea, right?                             11:23:01

16          So that's quite a full house.

17   A.   Yes, it is.

18   Q.   Can you walk me through what happens at this full house

19   meeting?

20   A.   The same thing that happens at the other levels of review. 11:23:10

21   I will conduct -- have them conduct a review.  They exchange

22   their notebooks and they go through step by step, just like

23   their sergeants and lieutenants and ADWs and wardens did, go

24   through each piece of the notebook, do the calculations,

25   double-check the overview to the out-the-cell tracking forms,   11:23:30

1    check all the use of force documentation.  They will even go

2    back and cross-reference all of the programs to the out-of-cell

3    tracking forms.  So they do the exact same process.

4    Q.  How long do these meetings take?

5    A.  I depends on this last one, the line staff took a little          11:23:46

6    longer because they had to explain how this works.  It can take

7    three to four hours to do a full review.

8    Q.  For every unit?

9    A.  For every -- yeah, every level of review it can take three

10   to four hours.  But yeah, for that book, that particular book      11:24:01

11   for that unit, it could take three to four hours.

12   Q.  Let me just clarify so I make sure I'm understanding this.

13           So three to four hours like, for example, you have got

14   the Florence Central notebook.  Is that going to take three to

15   four hours or are we talking ever single notebook?                  11:24:20

16   A.  All the notebooks being done at the same time it will take

17   somewhere between three and four hours normally to do the book

18   review.  Some books may take a little less time because they

19   are smaller.  Central's book being the largest takes a little

20   longer for all the review to be completed because there's 10        11:24:37

21   additional inmates.

22   Q.  So are you using this same format where you are exchanging

23   notebooks between the different units?

24   A.  Yes.  Yes.

25   Q.  Okay.  And did that exchange happen before the meeting or       11:24:50

1   does it happen during the meeting?

2   A.  It happens in the meeting.  I have them move notebooks

3   around.  I tell them who is going to do which notebook so that

4   each month they are seeing a different notebook.

5   Q.  Okay.                                              11:25:05

6          THE COURT:  How often is this process constructive,

7   meaning, does it produce information that results in something

8   that's useful?

9          THE WITNESS:  Every time we do it it's been --

10         THE COURT:  Can you give me some examples, some of the  11:25:16

11  constructive things that come out at this fourth level of

12  review?

13         THE WITNESS:  A lot of it is consistency, making sure

14  that everything looked the same.  So in the beginning, people

15  had different fonts, different sizes, bold, all that kind of   11:25:29

16  stuff and it's just making them so they all look the same so no

17  matter what book you are looking at everybody's got the same

18  standard of work.

19         THE COURT:  Are there things beyond style that, you

20  know, that are also constructive outcomes of these meetings?   11:25:43

21         THE WITNESS:  This one with the line staff it gave

22  them a chance to understand why they need to write neatly on

23  these forms.  Because they had themselves were helping their

24  warden review somebody else's book and they had to physically

25  read those times and verify that stuff and read the entries on  11:26:04

```
 1   the back of the form.  And there were a lot of staff in the

 2   room that said, okay, now I understand.  You guys -- I didn't

 3   realize you guys were reviewing all this so deeply so now I'm

 4   able to -- I understand why I need to write neatly.  They were

 5   having some difficulty.  They were like wow, if you didn't        11:26:21

 6   write that neat I wouldn't be able to read it.  So it was a

 7   very good thing out of there, and they understood why --

 8   especially the millennials -- why what we ask them to do is

 9   important.

10           THE COURT:  Thank you.                                    11:26:34

11   BY MS. FETTIG:

12   Q.  Well, let me just say, personally say thank you about the

13   legibility issue.  That is a struggle.  And I say that as

14   someone with poor handwriting.

15           So in this meeting, are compliance findings actually      11:26:46

16   made or is that happening separately?

17   A.  That happens separately.

18   Q.  And you mentioned before, so it's the complex warden he or

19   she is at this meeting and then they go back and make their

20   findings?                                                         11:27:05

21   A.  They go back and if there are any issues with the book they

22   give it back to that unit administrator.  They make the

23   changes, corrections that need to be done.  Then it goes back

24   to the warden and the warden does another review before they do

25   any compliance finding or entry in the CGAR.                      11:27:19
```

1    Q.  So there's potentially a fourth draft from the warden to

2    the administrator?

3    A.  Yes.

4    Q.  Before the final CGAR is created?

5    A.  Before the final true product of that book, and this is        11:27:32

6    what it is.

7    Q.  And then who actually creates the CGAR?

8    A.  The warden does.  The wardens make the entries into the

9    CGAR.

10   Q.  Does anyone else have the authority to enter findings into     11:27:45

11   the max custody CGAR?

12   A.  For max custody, just the wardens.

13   Q.  In terms -- you mentioned that you had brought line staff

14   to this last meeting.  Do you know at all what training has

15   occurred for line staff in implementing the terms of the max      11:28:10

16   custody performance measures?

17   A.  I don't have any specifics, not from witnessing any of it.

18   But they do training at each of the facilities.  When staff are

19   sent to that facility they usually have some kind of overview

20   for them to look at, something with the tracking forms and        11:28:30

21   explaining how, like an example tracking form of how these

22   things are supposed to be filled out and why it's important.

23   That's part of what the supervisors, the DI-326 supervisors are

24   required to do is to train those staff in the field.  Because a

25   lot of them are coming in from other facilities.                  11:28:46

——— **March 28, 2017 - Status Hearing - Hackney - Cross** ———

1   Q.  Do you know how long the DI-326 supervisors have been

2   playing this role of training line staff?

3   A.  I don't have an idea other than when maybe it started, but

4   I didn't see it.

5   Q.  Have you seen the curriculum that they use for the line          11:29:01

6   staff?

7   A.  I haven't seen a curriculum.  I have seen the example

8   out-of-cell tracking forms that they use, and I have been

9   present to see some of their discussions with the staff in the

10  field.  But there's not a curriculum developed for it.             11:29:16

11  Q.  So they use examples primarily to teach.  Is that what you

12  are saying?

13  A.  Yes.

14  Q.  Have you ever had occasion to -- have you ever observed in

15  your visits of the max custody units the need for increased       11:29:32

16  line training staff?

17  A.  I haven't seen the need for increased training, it's just

18  making them slow down and write legibly is basically part of

19  it.  They've got to make that documentation at the time it was

20  happening.                                                         11:29:48

21  Q.  Okay.  In terms of your own training, you mentioned that

22  when you came on in April, the leadership at Florence gave you

23  some training and Ms. Rand gave you some training.  And then

24  you have subsequently gotten some training from Ms. Love, I

25  believe you mentioned.  When did that happen?                      11:30:12

March 28, 2017 - Status Hearing - Hackney - Cross

1  A.  With Ms. Love, it happened in November right before I went

2  into that position and then it continues each month.

3  Q.  And who else besides you was at the training?

4  A.  All the wardens, the NROD, the division director, and the

5  SROD.                                                                  11:30:36

6  Q.  Do you know if any of the, for example, the sergeants or

7  ADWs were also trained?

8  A.  We have done -- Ms. Love's met with the sergeants and

9  lieutenants also during the reviews and conducted some training

10 with them as well.                                                     11:30:54

11 Q.  Do you know if all the max custody sergeants have been

12 trained?

13 A.  All of them were there, yes.

14 Q.  Were you present at this training?

15 A.  I was present at that, yes.  Yeah.  The supervisors, and       11:31:03

16 even in the field, we do some in the field when we're out there

17 because Ms. Love will go out into the field with me as well.

18 Q.  Was this in November of 2016?

19 A.  No.  We just recently, I want to say, February or March,

20 March, actually, of this year, we went into the field to do        11:31:19

21 some there.  But trying to remember when that review was.  I

22 think in February.  In February we did one with the sergeants

23 and lieutenants.

24 Q.  And what materials were given out at this training?

25 A.  No materials were given out.  It was all verbal.               11:31:36

─────── March 28, 2017 - Status Hearing - Hackney - Cross ───────

1   Q.  So did you work through scenarios?  Can you walk me through

2   what the training kind of felt like or was?

3   A.  We went through training about the production of the

4   notebook is what we were doing, talking about that, and the

5   out-of-cell tracking forms on making sure what we mentioned          11:31:52

6   earlier with the asterisks with the red and how to make sure

7   when you check source documents, how to document that

8   correctly.

9   Q.  So there are new out-of-cell tracking forms, is that

10  correct?                                                             11:32:08

11  A.  Yeah, there is a version -- I can't remember the date we

12  put that out, but it's been out in the field for a little bit.

13  Sometime in February we put out a revised version that has a

14  badge number column now.

15  Q.  Okay.  And the tracking sheet that we were looking at in       11:32:19

16  the November 2016 maximum custody notebook, do you recall when

17  that came on line?

18  A.  No.  It should have a date at the bottom.  That's usually

19  what we do when we update something.

20  Q.  Okay.  Okay.  I did want to -- I wanted to ask you a            11:32:38

21  question about one of the things in the Florence max custody

22  notebook.  This is just a technical question.  In the overview

23  section for MC-PM Number 3, I'll get you the ADC number.  So

24  it's ADCM 838396.  And my question is around the two entries

25  that have zeros.  And I understand that those, based on looking     11:33:22

1   at the previous page, those are folks who are Step 1?

2   A.  Yes.

3   Q.  But I didn't understand why they would be zero for this

4   measure, because Performance Measure Number 1 which is included

5   in the measures that have to be considered in cancellation          11:33:44

6   applies to all max custody prisoners Steps 1 through 3.  So why

7   wouldn't that be monitored?

8   A.  In Performance Measure Number 3, it would be based on the

9   program.  They are not required to have programming at Step 1.

10  And that's what it's referring to is the programs.                  11:34:07

11  Q.  So here's my concern:  The actual measure says is all

12  limited or cancelled out-of-cell time in Performance Measures

13  1, 2, and 8 properly documented?  And out-of-cell time includes

14  stuff beyond programming like recreation or showers which is

15  why Performance Measure Number 1 has a mandatory 7.5 hours        11:34:30

16  out-of-cell for Step 1?

17  A.  Uh-huh.  I know this is just in reference to the program.

18  We don't usually have cancellation of rec.  The rec is usually

19  not cancelled or put in this particular section.  It's usually

20  referring to programs only.  Programs or groups.                  11:34:55

21  Q.  Okay.  So you haven't been monitoring Performance Measure 1

22  cancellation as part of Performance Measure 3?

23  A.  No, we have been measuring them all.  The only reason why

24  the zero is there is because they basically don't get a

25  program.  Step 1 is not required to get a program.  That's the    11:35:15

— March 28, 2017 - Status Hearing - Hackney - Cross —

1   only reason why the zero would be there.  But there were no

2   cancellations at all during that week anyway, so that would be

3   why the zero is there as well.  Nothing was cancelled during

4   that week.

5   Q.  Okay.  So it's your understanding that within MC-PM Number       11:35:29

6   3 which covers Performance Measure 1, 2, and 8, you haven't

7   been monitoring out-of-cell time for Performance Measure Number

8   1 in that, any cancellation?

9   A.  We have been monitoring cancellations but there wasn't any

10  in that particular month.                                            11:35:57

11  Q.  But just for programming not for out-of-cell time

12  generally?

13  A.  No.  If there was a recreation issue then there wouldn't be

14  a zero there.  It would be a Y or an N.  The only reason why

15  there's a zero is they didn't have any cancellations during         11:36:09

16  that week.  There were none.

17  Q.  But then why is there a yes?  What's the difference between

18  a zero and a yes, or Y?

19  A.  The yes is for Step 2 and 3.  That's just how we have set

20  up how we are going to mark those sheets in there was the step      11:36:27

21  1s in those particular 2 and 3 would be a zero, and then Step 2

22  and 3 -- or Step 2 and 3 would be a Y and Step 1 would be a

23  zero.

24  Q.  And both the zero and the Y would mean compliant?

25  A.  Would mean compliant, yes.  It's just identifying a Step 1.     11:36:46

─── March 28, 2017 - Status Hearing - Hackney - Cross ───

1   Q.  So if you had a Step 1, and I understand Step 1s don't do

2   programming.  It's not under DI-326 to do programming.  That's

3   not what you are measuring.  But you do measure MC-PM 1 for

4   out-of-cell time for Step 1 and 3.  So how does this capture

5   with a zero if, for example, recreation was cancelled?        11:37:13

6   A.  If recreation was cancelled in there, there would actually

7   be an IR number explaining for reference what happened with

8   recreation.

9   Q.  For the Step 1s?

10  A.  For the Step 1s, yes; for any inmate.  It's actually lined  11:37:30

11  up with each one of the inmates by number.  So you may find

12  that maybe only two of those inmates had a cancellation and not

13  all of them.  So that's why it's done individual line.

14  Q.  So are you telling me that the zero and the Y, that's just

15  basically the same thing but the zero means it's a Step 1?     11:37:49

16  A.  The zero means it's a Step 1, yes.

17  Q.  But it doesn't mean, for example, not applicable?

18  A.  No, it doesn't mean non-applicable in that one, no.  It's

19  just identifying Step 1.  There's no step column in here.  So

20  for me I know it's a Step 1 but I cross-reference it.  But if   11:38:08

21  there was a cancellation and it was out of compliance we would

22  have to mark it no.  It would be non-compliant.  But there are

23  none for that week.  Everything is being monitored.  There's no

24  skipping for Step 1.  Recreation is being monitored as well as

25  any other out-of-cell activities to make sure that they get the 11:38:27

—— **March 28, 2017 - Status Hearing - Hackney - Cross** ——

1    minimum of seven and-a-half hours.

2    Q.  Okay.  Well, thank you for clarifying that.

3         I wanted to talk a little bit about MC-PM Number 9,

4    which is the use of force measure.  Are you familiar with the

5    provisions of the stipulation for MC-PM Number 9?          11:39:02

6    A.  Yes.

7    Q.  And I know you talked with Ms. Love about who's covered by

8    MC-PM Number 9.

9    A.  Yes.

10   Q.  And is it your understanding that's everybody who is SMI in  11:39:18

11   a max custody unit and then individuals in the enumerated

12   units?

13   A.  Yes.

14   Q.  So I want you to turn to -- I need a clarification and I'm

15   going to forget which tab this is, I'm quite sure.  Tab 8.     11:39:36

16   ADCM 838278.  And that's the memo from Mr. McWilliams to K.

17   Curran?

18   A.  Other way.  Warden to Mr. McWilliams.

19   Q.  Yes.  From the warden at Florence.  And it says there

20   were -- was no use of force incidents involving SMI inmates    11:40:01

21   during the month of November.  And when I read this my first

22   question was, well, what about the individuals in Kasson and

23   CB-1 and CB-4 who are in enumerated units?  They wouldn't seem

24   to be included in this memo.

25   A.  The Kasson, that's where the SMI inmates are.  The main    11:40:21

1    yard, Central unit, there are no SMI inmates.  They are only in

2    Kasson.  I can't -- I don't know if I can really attest to why

3    it says just that on there because I didn't write the memo.

4    Q.  What about CB-1 and CB-4?  Why wouldn't they be included in

5    the memo?                                                    11:40:51

6         MS. LOVE:  Objection.  Foundation.

7         THE COURT:  Overruled.

8         THE WITNESS:  Like I said, I can't explain why they

9    wouldn't be included in here.  CB-1 and CB-4, they don't have

10   SMI inmates.  They are close custody inmates in CB-1 and CB-4.  11:41:06

11   I didn't draft this memo, the warden did.

12   BY MS. FETTIG:

13   Q.  But is it your understanding that CB-1 and CB-4 is one of

14   the enumerated units for Max Custody Performance Measure Number

15   9?                                                           11:41:23

16   A.  Yes, they are, and they are being monitored for use of

17   force, yes.

18   Q.  So if you were going over this memo in your -- as part of

19   your review sessions, what would you do with that?

20   A.  This has evolved.  If we had seen something like this in   11:41:39

21   the review sessions now it would have been sent back.  The memo

22   would have been sent back for correction and to provide

23   documentation for any of those areas.  So the memo should

24   actually state that it covers all those areas.  So if there

25   were no uses of force including CB-1 and CB-4, it should state  11:41:56

— March 28, 2017 - Status Hearing - Hackney - Cross —

1    that.

2            THE COURT:  And who would have caught it?  Would you

3    have caught it or one of the other deputy wardens who were

4    exchanging the notebooks?

5            THE WITNESS:  At this time the notebooks weren't being    11:42:09

6    exchanged, this book in particular.  This process had just

7    began after this.  So it would have been caught during those

8    reviews.  But in this particular case the warden, he didn't

9    catch it when he was doing the review.

10           THE COURT:  Would the process be one where if you were    11:42:27

11   present in the meeting that you would have caught this kind of

12   thing?  Would you be looking, in the four-hour review session,

13   would you be looking for just this kind of mistake?

14           THE WITNESS:  Yes.  We would be looking to see that if

15   there were none, did it include all of the enumerated           11:42:43

16   facilities.  That's how it's evolved to now where it

17   specifically tells you it involved no SMI inmates and there

18   were none in those enumerated facilities.

19   BY MS. FETTIG:

20   Q.  For your understanding of the prisoners that are actually    11:43:01

21   covered by MC-PM Number 9, where does that come from?

22   A.  From the stipulation agreement.

23   Q.  And in your training that you were given, for example, in

24   April, was that your understanding then at the training?

25   A.  Yeah.  I was provided a copy of the stipulation agreement    11:43:19

——— March 28, 2017 - Status Hearing - Hackney - Cross ———

1    then and we went through it.  And, yes, they were monitoring

2    them then.

3    Q.  At Florence?

4    A.  Yes.

5    Q.  Do you have knowledge of any of the other facilities?          11:43:33

6    A.  No.  Not at that point in time.  Not until I came into this

7    position.

8    Q.  And since October of 2016, what was your understanding of

9    the definition for MC-PM Number 9?

10   A.  That it involved SMI inmates and those in the enumerated       11:43:50

11   facilities.

12   Q.  And was that clarified at the training you recently went to

13   in, what, February?

14   A.  We've been discussing it each month.  That's part of our

15   process, is to discuss the stipulation agreement.                 11:44:06

16   Q.  For -- in your new level of review system, do you cover

17   MC-PM Number 9 as well as the other performance measures?

18   A.  The only part of it that I look at is Tab 8 in the book.  I

19   don't determine compliance or review any of the videos or any

20   of the paperwork other than what the packets require to be in     11:44:28

21   this book.

22   Q.  In the max custody notebook?

23   A.  In the max custody.

24   Q.  During, you know, at the first level, the second level,

25   fourth level of review, is the use of force provision actually    11:44:39

1   reviewed by everybody in addition to 1 through 8?

2   A.  We review, as part of the notebook, yes.  As part of the

3   notebook we go over use of force.

4   Q.  And does part of the review system you review the notebook

5   but do you review the videos?                                    11:44:59

6   A.  No.  We do not review the videos.

7   Q.  Do you know who does review the videos?

8   A.  The wardens do.

9   Q.  And is it only the warden who is looking at the video?

10  A.  No, the supervisors as part of the checklist process, will   11:45:10

11  look at the video.  The shift commander to the captain to the

12  unit administrator and then the warden will be the last review

13  process.  So if there's any videos available, that's part of

14  the review process you do for that checklist.

15  Q.  You mentioned the use of force packet that's part of the     11:45:32

16  max custody notebook?

17  A.  Uh-huh.

18  Q.  Do you know where in that packet -- you are familiar with

19  the stipulation provisions.  And I'm assuming you are also

20  familiar with the provisions regarding planned use of force,     11:45:47

21  controlled use of force.

22  A.  Yes.

23  Q.  Around seriously mentally ill people and the folks in the

24  enumerated provisions.

25          Where in the use of force documentation are certain      11:46:01

1    things recorded?  For example, the mental health clinical

2    intervention, where would that be in the paperwork?

3    A.  There would be -- if there was one available it would be

4    either a form filled out by that person like a supplement.

5    Q.  Uh-huh.                                                        11:46:27

6    A.  It could be in the actual incident commander's supplement

7    explaining the interactions they had and the observations that

8    they made, so that would be part of their supplement.  It could

9    also be included in the SIR, the significant incident report

10   that there was -- that mental health staff intervened.  It also  11:46:42

11   should be mentioned in the synopsis in the memo that's done for

12   the packet.  There's a monthly memo done in the synopsis.  It

13   should mention that as well.  And the only other place that it

14   could be in addition to that besides the memo, there could be

15   some kind of notes or something from that person anything that   11:47:09

16   would be included in that packet --

17   Q.  Notes from that person?

18   A.  -- or video.

19   Q.  Mental health clinician?

20   A.  Yeah, the clinician.  They could also be on video.  They      11:47:19

21   could be standing in front of the camera explaining this is

22   what they have done, this is how the inmate was acting, this is

23   what the recommendations are.

24   Q.  So you said there could be a supplementary memo, could be

25   in the SIR, the synopsis, the overview memo?                      11:47:36

1  A.  Yeah, the overview memo that the warden does, in him

2  reading that.  It also could be listed in the use of force

3  packet, the checklist in their synopsis in the back and their

4  summary could also be mentioned there that they did.

5  Q.  So it could be in all of these places.  Is there any policy          11:47:54

6  that tells you where it's supposed to be?

7  A.  It's supposed to be part of the packet.  Without having to

8  go back and look at the policy, I know that it's just included

9  in those locations.

10  Q.  Potentially?          11:48:09

11  A.  Yes.

12  Q.  Do you know if it's included in the current use of force

13  policy?

14  A.  The use of force policy says anybody that's there, there

15  needs to be some kind of documentation either through the shift          11:48:24

16  commander, incident commander, somebody documenting their

17  involvement in that situation.

18  Q.  Uh-huh.  Uh-huh.  So it should be in there if it was done?

19  A.  Yes.  There might be one other location.  That would be

20  eOMIS, the medical record.  The medical staff may have put a          11:48:42

21  notation in the medical record if they had some interaction

22  with the inmate.

23  Q.  In the case of it being in eOMIS, would a copy of that then

24  be included in the use of force packet?

25  A.  No.  We don't normally include any kind of medical records          11:48:56

———— March 28, 2017 - Status Hearing - Hackney - Cross ————

1    in that packet.

2    Q.  So the warden, when he or she is doing their overview,

3    would be looking at the packet, correct?

4    A.  The wardens have access to eOMIS.  They could actually

5    check it if they wanted to check that location.                    11:49:13

6    Q.  Uh-huh.  If they used a record in eOMIS to make a

7    determination would they write it down in the memo?

8    A.  I would believe they would.  I haven't been part of one so

9    I'm not sure.

10   Q.  Okay.  How about under the terms of the stipulation MC-PM     11:49:27

11   Number 9, one of the things that's required is for a mental

12   health clinician to determine if an inmate understands orders.

13   A.  Yes.

14   Q.  Where would that determination be documented in the use of

15   force packet?                                                      11:49:53

16   A.  In either a supplement, in the synopsis, in the incident

17   commander's supplement, in the use of force checklist, their

18   synopsis on there, or it could be captured on video.

19   Q.  Would it be anywhere else?

20   A.  Those are the only locations that I can think of that would   11:50:12

21   have that, would capture that information in it.

22   Q.  How about if under the terms of the stipulation and the new

23   use of force provisions resulting from it, if a mental health

24   clinician determines that a prisoner actually does understand

25   but can't follow orders, or does understand but if sprayed with   11:50:36

1    a chemical agent is likely to decompensate substantially, if

2    that determination is made, the stipulation requires the mental

3    health clinician to propose reasonable strategies as an

4    alternative to the use of force?

5    A.   Yes.                                                          11:51:00

6    Q.   Where would that type -- where would the reasonable

7    strategies in that determination be documented in the use of

8    force packet?

9    A.   I would say in the same locations.  Any interactions or

10   anything that would be part of that incident should be included  11:51:13

11   in there, even in the incident commander there are telling him

12   this guy doesn't -- he understands but he's not able to follow,

13   they should be able to capture that information in their report

14   or have that person do a report or put them on camera and have

15   them explain what's going on and what their strategies are.  It  11:51:30

16   should be captured in those reports and in the synopsis.

17   Q.   In the reviews you have done so far, have you seen this

18   captured anywhere?

19   A.   I don't normally review all the individual paperwork.  I

20   just go over -- make sure that the parts of the packet are       11:51:47

21   there.  I don't read through all administrative pieces of the

22   documentation.

23   Q.   I see.  So that substantive review would be done by the

24   warden, for example?

25   A.   The warden would be the final review but the unit          11:52:00

—— **March 28, 2017 - Status Hearing - Hackney - Cross** ——

1   administrator would review it before the warden.  And as the

2   unit administrator I would have reviewed that, yes, but I

3   didn't have any of those when I was there.

4   Q.  Okay.  So it's just not within your experience at this

5   point?                                                              11:52:14

6   A.  Not at this point in time, no.

7   Q.  Okay.

8          THE COURT:  But that's the kind of thing that you do

9   think is appropriate for you to be thinking about when you are

10  looking about whether or not the max custody notebook includes    11:52:25

11  the required information to allow the warden, who is making the

12  ultimate CGAR determination, you are looking to see whether or

13  not the information that would allow someone to make that

14  determination is present or not.  Is that true, that's

15  something you do?                                                   11:52:43

16         THE WITNESS:  I look to make sure that the parts of

17  the packet are there, but I don't look at the specifics of the

18  actual incident to determine any compliance or make sure that

19  actual determination of compliance is set up for the warden.

20  Those packets would already have gone to the warden by the time   11:52:56

21  we see them in the notebook.

22         THE COURT:  But sometimes you have testified that you

23  do make a determination about whether or not it looks like

24  there's going to be compliance or not.

25         THE WITNESS:  That's only on the out-of-cell tracking      11:53:08

_March 28, 2017 - Status Hearing - Hackney - Cross_

1   forms.  I don't look at the use of force incidents.  I look at

2   the out-of-cell tracking forms being done in the field.

3           THE COURT:  So there's nobody like you performing the

4   role in the use of force component?

5           THE WITNESS:  Just the wardens doing their -- as the      11:53:23

6   monitor for the complex, the wardens are the ones who make that

7   determination.

8           THE COURT:  Okay.  Thank you.

9   BY MS. FETTIG:

10  Q.  So ADW Hackney, is there anyone else besides the wardens     11:53:35

11  who oversee the use of force findings?

12  A.  I know the use of force findings are reviewed by the

13  regional operations directors, the northern region and the

14  southern region, all review those packets as well.

15  Q.  Is that done before the CGAR finding is made or after?      11:53:54

16  A.  It's not usually done before the CGAR finding.

17  Q.  It's not usually done before the CGAR finding?

18  A.  No.  It depends on when the packets come in.  Because they

19  have -- if you break the state down, they have five complexes

20  each.  They have five complexes they are in charge of.  So       11:54:12

21  that's a lot of stuff coming to them.  They may or may not get

22  it done before the CGAR is due but they will go back and review

23  after the wardens do.

24  Q.  To your knowledge, are any CGAR findings made based on

25  documentation that's not part of the max custody notebook?      11:54:36

——————— **March 28, 2017 - Status Hearing - Hackney - Cross** ———————

1    A.  Not that I'm aware.

2    Q.  You mentioned when you were testifying with Ms. Love

3    cross-referencing with AIMS or eOMIS documents.  Is this a new

4    practice, or to your knowledge did it happen before November

5    2016?                                                              11:55:13

6    A.  These were available at least for the unit administrators.

7    The AIMS screens were available, and I have used those.  When I

8    was at Central unit, I did go look to see programs on specific

9    screens to see if they were signed up for programs.

10   Q.  And if they were used in a compliance finding would they    11:55:27

11   have been in the max custody notebook?

12   A.  I don't know if they necessarily printed them out and put

13   them part of it, but you can do a screen shot and print those

14   out.  But I haven't seen them in any of the notebooks.  They

15   were just mainly a source document so you could look at it.      11:55:43

16   But we can do a screen shot on them and put them in part of the

17   notebook if need be.

18   Q.  If you used an eOMIS document to make a compliance finding,

19   would that be in the max custody notebook?

20   A.  I haven't seen any in there, but you could.  You could     11:55:58

21   actually pull, if you are talking like a mental health group?

22   Q.  For example.

23   A.  Yeah.  You could pull a printout of that and use that.  I

24   think -- I know the wardens look at eOMIS each month, but I

25   don't believe they pull any screen shots.  But I do know they   11:56:16

1  do go back as a matter of reference to see does it a match up

2  with the roster with the out-of-cell tracking and that.

3  Q.  You talked a lot about cross-referencing group programming,

4  for example, and I understand why cross-referencing might need

5  to be used in order to make a compliance finding especially          11:56:34

6  given the dynamic nature of the schedules in correctional

7  institutions.  But in terms of compliance findings, how do you

8  document when a cross-reference has been necessary?

9  A.  I do cross references as part of my normal duties.  So if I

10 see on an out-of-cell tracking form that an inmate's gone to       11:57:00

11 programming I will write down that date and time and have them

12 pull a roster for me or set of rosters and I will look at it

13 myself just so I know that activities are taking place.  If I

14 document it anywhere it would be in my report.  I think I have

15 documented it periodically in my report just saying that I have    11:57:18

16 done that, done some cross-referencing to make sure.  But it's

17 not something that has to be done each and every time.  I do it

18 at random.

19 Q.  When you say a report are you talking about the memo that

20 you write to Regional Director Trujillo?                            11:57:32

21 A.  And Ms. Love, yes.

22 Q.  And Ms. Love.

23 A.  Yes.

24 Q.  But in terms of the way the CGAR findings are made and the

25 compliance findings made for cross-referencing purposes, are       11:57:44

—— **March 28, 2017 - Status Hearing - Hackney - Cross** ——

1  all the documents that are used in cross-referencing going to

2  be in that notebook?

3  A.  All the stuff that's in here that we used to do this

4  through the notebook, yes.  But if there needed to be any

5  program screens or anything else that needed to be added, then        11:57:59

6  yes we would add that.  But at this point in time we haven't

7  had to use that.

8  Q.  Okay.  And do you know what the practice was before you

9  came on board in December?

10  A.  No.                                                               11:58:10

11  Q.  No?

12  A.  No, I do not.  I was not present for their any kind of

13  reviews other than in the unit.  That was it, mine and my

14  deputy warden.  That was it.

15  Q.  So you know what was happening in Florence, though, right?        11:58:22

16  A.  Just within the unit.  I didn't meet -- I met with the

17  warden a couple of times.  I didn't see his final review.  He

18  would meet with me.  We would go over stuff and that started in

19  September that he started meeting with me on the notebooks.

20  But that's the only time I was ever introduced it.  To before        11:58:41

21  then I wasn't part of it so everybody was taking a turn.

22  Q.  Okay.  And did you gather documents to cross-reference in

23  your role at Florence, or was this not something you did?

24  A.  I gathered the documents that are in those particular

25  notebooks, like the screens, the visitation screens, those kind       11:59:01

```
 1   of things, but not any of the other documents while I was at

 2   Central unit, no.  Everything I needed to do for

 3   cross-referencing was usually in there.

 4          THE COURT:  I'm sorry to interrupt but it's the noon

 5   hour.  Would this be a good time to take the lunch break?      11:59:18

 6          MS. FETTIG:  Yes.  And I will review whether or not we

 7   need to call ADW Hackney back up.

 8          THE COURT:  So we'll take a break until 1:15.

 9          MS. FETTIG:  Thank you, Your Honor.  And thank you ADW

10   Hackney.                                                      11:59:38

11          (Recess from 11:59 a.m. until 1:17 p.m.)

12          THE COURT:  Before we resume, let me just quickly, if

13   you don't mind, address a procedural matter and that is the

14   defendant's request to seal the response.  I noted that you

15   filed a redacted version under seal at Document 1986, and I am 13:17:57

16   puzzled a little bit.  It may have been we gave you

17   misdirection.  But my view would be that the redacted version

18   could be filed, the unredacted version can be sealed and the

19   exhibits can be sealed.  So to the extent that you need help

20   from the Court on figuring out how to effect that, that's my   13:18:17

21   intent.

22          MS. LOVE:  Yes, Your Honor.  We apologize for that.

23   That's what I --

24          THE COURT:  Was aiming for?

25          MS. LOVE:  -- to have happened.  Apparently it did      13:18:28
```

—— **March 28, 2017 - Status Hearing - Hackney - Cross** ——

1    not.  So the redacted version, we agree, is appropriate to be

2    on the public docket.  We will take care of that.

3              THE COURT:  Thank you.  You may resume.

4              MS. FETTIG:  Thank you, Your Honor.

5    BY MS. FETTIG:                                              13:18:39

6    Q.  Good afternoon, ADW Hackney.  I promise I won't keep you

7    too much longer.  You will be free soon.  I understand that

8    testifying is not exactly the most fun thing to do.  But I did

9    have a few questions.

10             And before the break, we were talking about the use of   13:19:01

11   force provision Max Custody Performance Measure Number 9.  And

12   I wondered if you knew if there had been any training for line

13   staff on how to implement the new procedures mandated by the

14   stipulation and, of course, evaluated under MC-PM Number 9?

15   A.  For the line staff?                                     13:19:26

16   Q.  Uh-huh, the folks who presumably will be implementing it on

17   the ground.

18   A.  Other than our normal training that we have, no, I'm not

19   aware of anything special.

20   Q.  And when you say "normal training" what do you mean?     13:19:38

21   A.  We have of yearly training that we do in all aspects of our

22   job, and use of force is one of them that we have yearly

23   training in.

24   Q.  So in that annual training, to your knowledge, has the

25   curriculum been updated to reflect the new requirements for use   13:19:51

UNITED STATES DISTRICT COURT

_____ March 28, 2017 - Status Hearing - Hackney - Cross _____

1   of force under the stipulation?

2   A.  Not to my knowledge.

3   Q.  Okay.  And do you know of any policy change or memo that

4   went out to line staff to inform them about the new procedures

5   they now have to follow under the stipulation?                          13:20:07

6   A.  I'm not aware of any memo or policy change.

7   Q.  Okay.  And I know that you formerly were a corrections

8   officer yourself.  You started out that way, right?

9   A.  Yes.

10  Q.  And, you know, as a CO, is it true that you followed the            13:20:20

11  policy that you knew?

12  A.  You are supposed to.

13  Q.  In doing your job?

14  A.  Yes, you are supposed to.

15  Q.  And also you follow the training you have been given.               13:20:30

16  Isn't that correct?

17  A.  Yes.

18  Q.  And so how do line staff in the max custody units now know

19  what they are supposed to do under the stipulation if the

20  training hasn't been changed and the policy hasn't been                 13:20:42

21  changed?

22  A.  It's the same day-to-day operations that we have had.  The

23  use of force, what you are talking about specifically, the

24  supervisor will be involved at that point.

25  Q.  Uh-huh.                                                             13:20:58

1   A.  So the staff members deal with, based on whatever is

2   happening in front of them, they deal with the situation.  A

3   lot of those situations are spontaneous.  They are not

4   preplanned.  Anything preplanned will have a supervisor

5   involved.                                              13:21:11

6   Q.  And would the supervisor have been trained on the new

7   provisions of the stipulation?

8   A.  The supervisors are trained, yes.

9   Q.  And in terms of imminent uses of force and how you

10  determine what or what is not imminent, there are certain   13:21:25

11  provisions under the stipulation for that.  How would staff

12  know about those provisions?

13  A.  Are you asking in context of imminent harm or imminent

14  danger?

15  Q.  Yes.  Imminent risk that means you can't do a planned use   13:21:40

16  of force.

17  A.  I think that would be a little different for each person.

18  It's the perception of what the incident is.  It's hard to

19  judge that.  You would have to be in that situation that

20  person's in to understand whether they decided it was imminent   13:21:56

21  or not.

22  Q.  And is that something that's evaluated under Max Custody

23  Performance Measure Number 9?

24  A.  That's part of the use of force checklist.  The process is

25  going through, seeing what the situation is and getting their   13:22:13

—————— March 28, 2017 - Status Hearing - Hackney - Cross ——————

1   perspective on it and reviewing the whole thing, the whole

2   incident from another view.  But you have to have that person

3   at that time, unless you are right there, you won't truly

4   understand what they saw unless it's actually captured on

5   video.                                                          13:22:29

6   Q.  Uh-huh.  Uh-huh.

7   A.  And it's very detailed in the report or you talk to them

8   about it.  But each person is going to perceive things a little

9   different than the other person.

10  Q.  And so is that part of the review for Max Custody         13:22:38

11  Performance Measure Number 9?

12  A.  That is part of the review.  They review all those reports,

13  and if they need to they talk to the staff members that were

14  involved.

15  Q.  In terms of the training that's done for the supervisors,  13:22:49

16  and when you say "supervisor" are you talking about shift

17  commander and above?  Can you clarify who that would be?

18  A.  Supervisor would be anywhere from a sergeant, lieutenant,

19  captain to associate deputy warden, deputy warden, anybody who

20  is in a supervisory rank.                                      13:23:05

21  Q.  And those individuals, do they also follow what is in

22  written policy?

23  A.  Yes.

24  Q.  And they also follow what they have been trained to do?

25  A.  Yes.                                                       13:23:16

1  Q.  And you mentioned that they would have been trained under

2  the new use of force provisions in the stipulation?

3  A.  Everybody is provided the same set of training and there

4  is -- use of force training is done every year.

5  Q.  Okay.  So the use of force -- you are actually saying they       13:23:28

6  would have been trained under the general use of force

7  provision?

8  A.  General use of force, yes.  And those in the max facilities

9  are -- they are aware of the stipulation agreement that is

10 discussed quite often.                                              13:23:42

11 Q.  So the training would be what they hear in meetings?

12 A.  It would be done, I would say, in meetings or at any kind

13 of designated meetings that we have where we bring groups

14 together.

15 Q.  To your knowledge, has there been any curriculum developed       13:23:56

16 for either line staff or supervisory staff on the differing

17 requirements for the use of force policy under the stipulation?

18 A.  Not to my knowledge.

19 Q.  Okay.  I also, I had a question about one of the new

20 provisions that I think you are implementing maybe in February      13:24:24

21 2017.  So let me know if that's correct.  You mentioned when

22 you were testifying with Ms. Love that the sergeants might do

23 something, write in red when there has to be a correction on

24 the tracking sheet.  Is that correct?

25 A.  Yes.                                                            13:24:41

1    Q.  And can you just walk me through, is there a new policy on

2    that that directs them how they are supposed to do it, how they

3    are supposed to record it, does it always have to be in red?

4    A.  Everything supervisors do, whether it's journal review or

5    anything they do in their capacity as supervisors they do it in          13:24:57

6    red ink.  so it's just using the same red ink pen to mark the

7    form with so we know it's the supervisor making the change and

8    then they have to make the comment on the back.

9    Q.  Okay.  And that -- when did that start?

10   A.  We discussed it in February and that's when it started.  It         13:25:13

11   was based on, in their review of those sheets, if they find

12   that a staff member forgot to write a time, if they are able to

13   identify a source document and find that inmate did attend that

14   program, then they go in and make a comment on the form.

15   Q.  Okay.  And in the max custody notebook that identified              13:25:33

16   source document that the supervisor looked at, is that going to

17   be in there?

18   A.  Yes, it will be.

19   Q.  Okay.  In your -- both in the unannounced visits that you

20   do and also in the new procedure that you run for oversight,           13:26:03

21   the levels of review, how do you deal with corrective actions?

22   A.  Are you talking specifically with the staff members?

23   Q.  Any.  Like do you document your corrective actions?  Do you

24   do a monthly report about your corrective actions?  Is there

25   anywhere where findings for improvement or correction are              13:26:25

1    actually documented by you?

2    A.  The only thing I do is my weekly report.  There is no

3    monthly report on it.  As far as corrective actions with the

4    staff, that's to that specific unit to address.

5    Q.  Do you follow up on that, or do you just --                    13:26:45

6    A.  I do follow up on it.  They will let me know when they have

7    taken any kind of corrective action.  They will let me know how

8    they address the issue.

9    Q.  Okay.  So in describing your work, you mentioned that after

10   the CGAR is done you review all the final max custody            13:27:04

11   notebooks.  Am I correct?

12   A.  After the CGAR is done, I review -- when they produce the

13   notebook electronically is the time I will do a review.  I

14   will, beginning this month, starting the CGAR review after the

15   entry is done just to make sure that there's no clerical errors   13:27:23

16   on the CGAR.  But then the notebook, as soon as it's provided

17   to me, within a few days of that month ending I will review

18   those notebooks before they are produced to the Attorney

19   General's Office.

20   Q.  And is that review procedural or substantive?                 13:27:38

21   A.  It's more of -- probably more procedural just making sure

22   that everything looks correct.

23   Q.  So you are not making substantive findings regarding the

24   CGAR reports for max custody?

25   A.  No.                                                           13:27:55

March 28, 2017 - Status Hearing - Hackney - Cross

1   Q.  And is it the case that you don't -- you do a lot.  You are

2   sort of now the traffic cop for the max custody measures in

3   some ways, and that is a welcome role.  But based on what you

4   have been saying, am I correct that you are not making

5   substantive findings for the CGARs you are facilitating the          13:28:12

6   CGAR process.  Is that accurate?

7   A.  I'm just facilitating the process.  No.  I'm not making any

8   kind of findings.

9   Q.  And in terms of layers of review, you have got the four

10  layers that we talked about that include substantive and           13:28:33

11  procedural findings, but it's ultimately, am I right, it's

12  ultimately only the warden who is making the finding for that

13  monthly CGAR report?

14  A.  That is correct, just the warden.

15  Q.  Okay.  And after the warden makes that report, I guess         13:28:48

16  actually enters it into the CGAR, nobody else questions that

17  finding, is that correct?

18  A.  There's a review process that has just begun.  We'll be

19  looking at them.  But the only time anything will be questioned

20  is if we find a clerical error on it and an adjustment needs to    13:29:06

21  be made to correct that.

22  Q.  Okay.  And you mentioned there's a new process.  Can you

23  tell me a little bit about that?

24  A.  The new process with the CGAR?

25  Q.  For reviewing what the warden has found.                       13:29:20

March 28, 2017 - Status Hearing - Hackney - Cross

1   A.  This position is evolving.

2   Q.  Okay.

3   A.  And I'm taking on a little bit more and little bit

4   different things.  One of them was based on the fact of some

5   things being asked for from the past, what, year or two years.      13:29:34

6   There's been some issues about the CGAR maybe not being

7   accurate because there's been some issues found.  So in having

8   to reproduce stuff just to have another layer of review on the

9   CGAR, I'm going to review it after they do their entry just to

10  make sure there's nothing glaring that's incorrect that will      13:29:52

11  cause us to have to reproduce that document.

12        So that's more of me evolving with what else do I need

13  to look at so I don't have to come back and reproduce stuff six

14  or eight months later.  Trying to get it right the first time.

15  Q.  Well, that is a great idea.                                   13:30:08

16  A.  Trying.  It's human error, though.

17  Q.  Right.  Right.  Well, everything is always evolving.

18        Going back to MC-PM Number 9, the use of force

19  provision, when you are gathering -- you are gathering the

20  materials, and -- or the sergeants are, how does the warden,     13:30:27

21  for example, who is the ultimate reviewer of the use of force

22  incidents, how does he or she know that they are looking at the

23  entire universe of use of force incidents that need to be

24  monitored under the terms of the stipulation?  I know there's

25  the memo from the warden, but how does the warden have that      13:30:52

UNITED STATES DISTRICT COURT

1    initial I know that I have covered all the use of force

2    incidents, the SMI and the folks in the enumerated units?

3    A.  I don't know if I can really attest to that, I have not

4    been a warden, other than the fact that the packets are -- have

5    to go to the warden after they have been reviewed at the level          13:31:08

6    unit by the shift commander, by the captain, by the unit

7    administrator, they go to the warden after they are complete.

8    And the warden, one way the warden will know is based on the

9    significant incident report that they get every day that tells

10   them what incidents happened.  Use of force will be identified      13:31:26

11   in there so they should be able to track that they received

12   those packets.

13   Q.  Okay.  Is there any way that you know of in the current

14   formatting of the max custody notebooks that contain the use of

15   force packets, is there any way an outside reviewer would be        13:31:42

16   able to know every single use of force incident that should be

17   covered under the stipulation is covered here?

18   A.  Just the memo, the memo that's in there.

19   Q.  The warden's memo?

20   A.  Yes.                                                            13:32:04

21   Q.  And to your knowledge, does anybody review that memo to

22   make sure that it is complete other than the warden?

23   A.  The warden does.  The unit administrators as well will know

24   what happened in their unit during that month.

25   Q.  Okay.  For the selection -- you talked a little bit with        13:32:20

1    Ms. Love about the count sheets and how the 10 random records

2    are selected.  Can you just walk me through, you get a count

3    sheet and it is -- like what day in particular is that count

4    sheet generated, and how do you know that it encompasses the

5    full sample that needs to be drawn from?                          13:32:53

6    A.   Normally, the count sheets are pulled either on the

7    Thursday or the Friday.  We keep -- the count sheets every day

8    are produced and put in a file so they can go back and get

9    them.

10   Q.   Uh-huh.                                                      13:33:08

11   A.   The count movement officer produces those every day so when

12   the reporting week, when it's selected, then they can go back

13   in and they will pull it either Thursday or Friday of that

14   week.  Most of them pull it on Friday so you have got the

15   entire week and they will make -- they will decide where they    13:33:22

16   are going to start based on where they started the previous

17   month.  So they are keeping track of it each month on where

18   they start at.  So say Browning, for instance, maybe they

19   started in John cluster last month.  This month they decide to

20   start in Easy.  So that way you get a whole different sampling.   13:33:40

21   Q.   Let me make sure I understand this right, ADW.  So are you

22   talking about the fact that like the first name in the count

23   sheet is going to vary based on which housing unit you draw

24   from first?

25   A.   The majority of it may be different, depending -- some       13:33:58

1   facilities, their SMIs, you are going to see the same names

2   over and over again because they have a very small population.

3   You only have 20 inmates, you draw 10 of those, the likelihood

4   of seeing that same inmate three or four months in a row is

5   pretty likely because they are small.                          13:34:18

6          What I'm talking about the total random selection is

7   based on where they start.

8   Q.  So if we're looking at Florence Central, then it varies by

9   month where you start the count sheet?

10  A.  Yes.                                                        13:34:31

11  Q.  So it's going to be on a different housing unit, just go

12  all the way down?

13  A.  Yes.  They may start in 5 Charlie for the main yard, start

14  5 Charlie one month, the next month they decide to start 7 Fox.

15  So it will be different.  Kasson the same way, they will start  13:34:44

16  in the different section.  Maybe they do 2 Baker high instead

17  of 2 Baker low or 2 Abel high and they start to process there.

18  Q.  Do you know how long this process has been in place?

19  A.  As far as I -- since I have been involved in it it's been

20  in place.                                                       13:35:03

21  Q.  For Kasson as well?

22  A.  Yes.

23  Q.  So for the SMI population, the count sheets you are just

24  drawing only the people who have an M on their number?

25  A.  Yes.                                                        13:35:19

——— **March 28, 2017 - Status Hearing - Hackney - Cross** ———

1   Q.  And who generates those sheets again?  I think I missed

2   that in your testimony.

3   A.  The count movement officer.  There's a count movement

4   officer for each unit and their job is to print those count

5   sheets out every day.                                          13:35:36

6   Q.  So is it the matter of course, aside from the stipulation

7   that those count sheets are generated every single day and they

8   are generated with a different unit every single day, or is

9   that something that has been implemented as a result of the

10  stipulation?                                                   13:35:53

11  A.  No, the count sheets were implemented -- that's been in

12  place for years that the count sheets are generated every day

13  and they are kept for a period of time so we can go back to

14  them on that particular date if we needed to.  But the starting

15  point has been just part of what we do with the stipulation     13:36:06

16  agreement.  I can't tell you exactly when that started.  I know

17  when I got into Central in April that was the process in place.

18  Q.  So that's what you are familiar with?

19  A.  I'm very familiar with that.

20  Q.  You talked about one of the new processes for documenting   13:36:18

21  refusals and including if a pattern of refusals is identified

22  having a supervisor go talk with an individual prisoner and

23  then recording that on the tracking sheet.  Can you tell me,

24  when did this practice start and, you know, is it part of

25  policy?  How is it generated?                                   13:36:55

1  A.  I don't know when the process actually started.  But it's

2  been in place for many months now that I'm aware of talking to

3  them.  But before then, even before it was said, that was just

4  normal, one of your normal routines when you went around and

5  toured, is if you see something going on you always stop and          13:37:14

6  talk to the inmate and see what's happening with them.

7  Q.  And when you say "you" who do you mean?  You personally?

8  A.  Anybody who is touring, anybody who -- basically

9  supervisors, that's part of your job.  That's part of your

10  training when you become a supervisor is engaging the inmates,      13:37:31

11  engaging your staff.  So if you see something that doesn't seem

12  right or you are just concerned, general welfare, hey, how are

13  you doing, that's part of what you do as a supervisor.

14  Q.  So it's an expectation but it's an unwritten expectation?

15  A.  Yeah, it's an expectation.  Yeah.  I don't think it's in       13:37:59

16  any specific policy per se to draw from, but that's in our

17  training we do, the Sergeant's Leadership Academy.  That's part

18  of the training that you do, you go out do your tours and you

19  engage in staff and the inmates.

20  Q.  And, you know, from your point of view as a supervisor and      13:38:15

21  somebody who has been around, what would be something that --

22  what kind of refusal pattern would be a flag for you?

23  A.  Somebody who hasn't come out of the cell during the week,

24  maybe they have refused all the activities for the week so you

25  go see what's going on with them.  It's not unusual.  In the 21     13:38:35

1   and-a-half years in the Department I have seen inmates refuse

2   all activities.  Some folks are just not very social and they

3   don't want to come out.  And they are happy where they are at

4   in their little comfort area there.  So it's not unusual.  It's

5   something to me, I'm not going to be, I guess you could say,                13:38:54

6   freaking out about it.  I'm going to go ask them, hey, how are

7   you doing?  You start to learn who those inmates are and you

8   learn about them.  And there's just some inmates that feel

9   happier by themselves than they do engaging in groups.

10  Q.  Do you ever have occasion to flag them for mental health              13:39:11

11  staff?

12  A.  If I see any kind of signs that there might be an issue,

13  maybe he's not responded to me very well or he seems a little

14  out of it, I will flag it for mental health, ask to have him

15  checked out.                                                              13:39:27

16  Q.  And speaking of mental health, do you know how mental

17  health care staff, the first line responders who would be

18  present in a use of force incident, we hope, how are they

19  trained on the provisions of the stipulation in MC-PM Number 9?

20  A.  I have no idea how they are trained.                                  13:39:46

21  Q.  Okay.  Do you have any idea what documentation they are

22  supposed to provide?

23  A.  Other than anything that we ask them to provide, so if we

24  ask them for a statement they will need to do a statement.

25  Q.  And who would do the asking?                                          13:40:00

1    A.  Usually it's done by the incident commander or the shift

2    commander.  And it could be an administrator or a captain,

3    whoever happens to be in the area at the time or is asking for

4    that kind of information.

5    Q.  All right.  Give me a few seconds just to make sure that I          13:40:17

6    have asked all my questions.  I will soon let you off the hook.

7              I have no further questions.  Thank you, ADW Hackney.

8              THE COURT:  Thank you, Associate Deputy Hackney.  I

9    have a few questions too, but before I ask those questions I

10   wanted to thank you for your testimony today.  I thought that          13:40:54

11   you helped me understand more of what you were doing.  You also

12   helped me understand some of how you had achieved what I think

13   is a promise for more success.  It's probably not a surprise

14   for you to hear me say it's been frustrating with the

15   documentation previously in your area and your arrival and the         13:41:15

16   care that you have taken to the documentation is evident from

17   your testimony.  And I'm hopeful that that will result in

18   largely addressing some of the concerns that I have had.

19             But I want to follow up on just a couple of questions

20   and make sure that I do understand.                                     13:41:31

21             The first question is remember when you were talking

22   about the exceptions?  I think it was Tab 4 where we first

23   encountered the exception sheet and the example that we had

24   here was there were no exceptions that took any of the inmates

25   out of being eligible for the sampling.                                 13:41:50

March 28, 2017 - Status Hearing - Hackney - By the Court

1           THE WITNESS:  Yes, certification.

2           THE COURT:  Certification.  And the one that was

3    provided in the notebook happened to not have any.  And I'm

4    wondering is that a representative sample, or do they usually

5    have such exceptions or do they not?                          13:42:02

6           THE WITNESS:  I have only seen a few where they have

7    had to do a certification letter.  Their behavior was that bad

8    that they had to do a certification saying that we cannot have

9    this person in the setting because they are a danger to staff,

10   they are a danger to other inmates.  I have only seen that     13:42:19

11   happen a couple of times.

12          THE COURT:  Okay.  And then, because of your title, I

13   guess it's true that you have command authority over the staff

14   at the facilities where you are and that that means that as

15   opposed to simply being a mere monitor, I guess maybe the      13:42:40

16   example I could use, the analogy, it's not simply that you are

17   a classroom monitor who is able to note by taking attendance

18   all of the students are here and then giving that report, that

19   if you notice some reason that is resulting in not all of the

20   students being there, let's just say that you notice that the  13:43:05

21   bus is coming late or something like that.  Not only do you

22   note that fact but you also feel that it's your ability and

23   responsibility to inquire further and to follow up and then,

24   perhaps, to say if the bus is late because you are hitting the

25   train crossing guard maybe you should think about taking a     13:43:25

UNITED STATES DISTRICT COURT

1    different route and you will never run into that train.

2          Is that fair to say?

3          THE WITNESS:  Yes.  As associate deputy warden the

4    staff will look at me probably a little different than they

5    would maybe a monitor because of the authority that comes with          13:43:37

6    that position.  But yes, I can follow up on things.

7          THE COURT:  Okay.  And it sounds as though you have

8    done that, that you have told people to do things this way

9    because you think that that will result in a better service of

10   your function in this monitoring capacity.  Is that fair.          13:43:58

11         THE WITNESS:  Yes.  And anything that I want to do or

12   anything that I think that we should be doing, I make sure that

13   that is first vetted with my supervisor, the NROD, and also Ms.

14   Love to make sure it's consistent.

15         THE COURT:  And I guess an example of that is the          13:44:14

16   legibility, that you noted an issue with legibility.  And you

17   have talked somewhat, probably not covering everything that you

18   did with respect to legibility, but I suppose that even the

19   part of having the staff members present at the Level 4 meeting

20   was helping them to understand the reason for the importance of          13:44:32

21   legibility, that being part of your idea, how can I communicate

22   this to the staff that it's important.  And so I can see how

23   you have done that throughout.

24         I'm wondering, though, as you get more involved in

25   this process month to month, do you expect that we'll continue          13:44:51

1    to see improvement based upon your analysis in the max custody

2    area of things that can make things better?  I mean, are you

3    continuing to keep eyes that are open to those issues?

4         THE WITNESS:  Yes.  As I get going in this position

5    more and more, things continue to evolve.  One of the things        13:45:15

6    that we're looking at is the line staff that came to the

7    warden's meeting.  Now the line staff will come to the other

8    levels of review as well.  We'll be implementing that this

9    month, seeing how successful it was.  So as we see something

10   that's working successfully and helping us engage people and        13:45:32

11   making them understand it better, we're going to do that.

12        The legibility, we're getting down to only a couple

13   staff members we're working with at this point.  Everybody else

14   is starting to understand the dynamics of it.  You are seeing

15   it evolve from where it was.  I have seen documents back in         13:45:47

16   2015 to forward now and you are seeing this evolution of it

17   becoming clearer and better and easier for anybody to read,

18   pick it up and read.  So I do expect to see -- we'll still

19   continue to see things evolve in this whole process, be a lot

20   tighter on reviews and everything.                                  13:46:05

21        THE COURT:  And forgive me for being a cynic, or in

22   other words, the person who thinks about the worst-case

23   scenario, but to a large extent the monitoring component of the

24   stipulation serves the role of my eyes and ears on trying to

25   enforce the stipulation.  And that's actually important that my     13:46:20

March 28, 2017 - Status Hearing - Hackney - By the Court

```
 1   eyes and ears are not obstructed and that they are forward

 2   thinking, constructively thinking.  Because I just don't want

 3   to be like the person who at the end of the day has

 4   responsibility to try to make sure that the stipulation is

 5   enforced by walking into a room and just making a bunch of        13:46:38

 6   orders.  We all know commanders like that who walk into an

 7   assignment and make a bunch of orders.  You know it's just the

 8   purpose of making orders without any constrictive purpose.  I

 9   don't want to do that.  I want to be well-informed.

10          But one of the things that I don't have a good sense       13:46:53

11   about is -- causes me to have some concern in what I describe

12   as the cynical or worst-case scenario kind of thing, and that

13   is an environment where, if it's possible that the staff people

14   don't get the idea that legibility is necessary for what they

15   are doing to have any purpose there might be the possibility of   13:47:17

16   a culture of thinking most of what we do in terms of this

17   reporting and this paperwork has no purpose and we just sort of

18   have to get it through.  It doesn't really matter what it says

19   or what it doesn't say.

20          What kind of role can you play, or do you play, with       13:47:33

21   respect to trying to imbue or create a culture that it matters?

22          THE WITNESS:  When I'm out in the field, I'm talking

23   with the staff.  I engage the staff when I'm out there and

24   explain to them and try to put it in terms of how it does

25   affect them, explaining it more instead of just, you're going     13:47:53
```

1    to do it because I told you to do it.  It's more of let me

2    explain to you why you are doing this and why your part of this

3    is done correctly and what the repercussions are if you don't.

4    And also talking to them about the understanding when you are

5    given direction as well, insubordination is not looked on very          13:48:10

6    well either so there is a corrective action for that.  But

7    basically trying to engage the staff to understanding why what

8    they are doing is important and why we need it done right.

9    Because it is important.  It needs to be done right.  We need

10   to follow that and have it done right all the time.                      13:48:31

11        THE COURT:  Thank you.  And I guess the last question

12   is you talked a lot about how you look at areas where there are

13   multiple sources of information that are telling -- that have

14   the capacity to tell you the same thing about whether or not

15   something has happened so there are ways to double-check, cross          13:48:44

16   checking, I think, is another way it's described.

17        What do you do when you come into a conflict where one

18   says X and one says Y or one says yes, it was done and the

19   other says no it wasn't done?

20        THE WITNESS:  If there's not enough to prove that it                13:49:02

21   did happen you are not going to be able to count it.  That's

22   basically the way it is or if you have them in two places at

23   one time on the sheet, and that could be an error by the staff

24   writing all the stuff down at the same time, you are going to

25   have to take that time off of one those activities and back             13:49:18

1    that time off and adjust it because you cannot be in two places

2    at one time.  So there has to be some kind of a judgment made

3    and some kind of concession made if something is not done

4    right.  So we don't want to try to just cover that up and do

5    that.  That's not how it's going to happen.  If it's          13:49:38

6    non-compliant it's non-compliant.

7         THE COURT:  In fairness I need to turn to Ms. Love now

8    to ask her to do what's called redirect examination.  She may

9    have some questions based not only upon the plaintiffs'

10   questions as well as my questions.  And I will give you as well  13:49:52

11   a chance to follow up.

12        MS. LOVE:  Your Honor, we have no further questions.

13   Thank you.

14        THE COURT:  Ms. Fettig.

15        MS. FETTIG:  Your Honor, we have no further questions    13:49:59

16   either.

17        THE COURT:  Thank you very much.

18        We can proceed.

19        MS. LOVE:  Your Honor, defendants call Carson

20   McWilliams.                                                    13:50:08

21        THE COURT:  Thank you.  Please step forward to the

22   clerk for the administration of the oath.

23        (The witness was sworn.)

24        THE MAGISTRATE CLERK:  Have a seat at the witness

25   stand.  If you can say and spell your name into the microphone.  13:50:29

—— March 28, 2017 - Status Hearing - McWilliams - Direct ——

1        THE WITNESS:  My name is Carson C-A-R-S-O-N,

2   McWilliams, M-C-W-I-L-L-I-A-M-S.

3                    CARSON MCWILLIAMS,

4   a witness herein, having been first duly sworn by the clerk to

5   speak the truth and nothing but the truth, was examined and

6   testified as follows:

7                    DIRECT EXAMINATION

8   BY MS. LOVE:

9   Q.  Sir, who is your current employer?

10  A.  Arizona Department of Corrections.                    13:50:54

11  Q.  How long have you worked for the Arizona Department of

12  Corrections?

13  A.  I'm working on my 39th year.

14  Q.  What is your current position?

15  A.  I'm the Division Director of Offender Operations.      13:51:04

16  Q.  Director, can you please describe for us what are your

17  duties as division director?

18  A.  The daily operational overseeing of how the prison system,

19  the units themselves, the complexes, run; everything from daily

20  operations with inmate activities and also staffing and staff   13:51:25

21  issues.

22  Q.  How many complexes do you oversee operations for?

23  A.  10 plus private prisons in the State of Arizona that have

24  Arizona inmates in them which is another six facilities.

25  Q.  As division director, are you aware of the stipulations   13:51:49

March 28, 2017 - Status Hearing - McWilliams - Direct

1    requirement in the Parsons versus Ryan litigation as to maximum

2    custody?

3    A.  Yes, I am.

4           THE COURT:  Ms. Love, before you proceed, maybe you

5    were going to do this already, and that's why I don't do it,                13:52:04

6    but I need -- it would be helpful for me to understand exactly

7    where Division Director McWilliams is in the chain.  Does he

8    report to the director?  How many division directors are there?

9    That sort of thing.

10   BY MS. LOVE:                                                                 13:52:19

11   Q.  Can you answer that question the Court has?  How about

12   that?

13   A.  Yes, I can.  I report directly to Mr. Ryan, the director of

14   the Department of Corrections.  There are three division

15   directors.  There is also Mr. Pratt who runs our medical          13:52:29

16   services.

17          THE COURT:  So the three division directors are Mr.

18   Pratt, you --

19          THE WITNESS:  No.  They are Mike Kearns, Karen

20   Hellman, and myself.                                                         13:52:40

21          THE COURT:  And is there anyone between these division

22   directors and the director?

23          THE WITNESS:  No.  The director -- the division

24   directors report directly to Mr. Ryan.

25          THE COURT:  Okay.  Thank you.  And the three division               13:52:52

UNITED STATES DISTRICT COURT

March 28, 2017 - Status Hearing - McWilliams - Direct

1    directors you have for Offender -- what is it -- Operations?

2              THE WITNESS:  Yes.

3              THE COURT:  And the other two are titled?

4              THE WITNESS:  One runs programs, reentry, and the

5    other is administrative services.                        13:53:06

6              THE COURT:  Thank you.

7              Thank you.

8    BY MS. LOVE:

9    Q.  As the chain of command flows down below you in the reverse

10   order, how does that work?                               13:53:15

11   A.  There are regional directors which there are three of

12   those:  One oversees private prisons; one oversees the five

13   northern complexes; and one oversees the five southern

14   complexes and then from there are wardens that oversee the

15   complexes themselves and deputy wardens, so forth down the  13:53:37

16   chain of command.

17             There's also a division in Central office where

18   there's a bureau administrator that oversees records and time

19   computation and classification who also reports directly to me.

20   Q.  Who is the regional operations director for the northern  13:53:53

21   unit or the northern region?

22   A.  It is Ernie Trujillo.

23   Q.  What about the southern?

24   A.  Joe Profiri.

25   Q.  And are the -- are Joe Profiri and Ernie Trujillo involved  13:54:08

1   in the monitoring process for the max custody requirements

2   under the stipulation?

3   A.  Yes, they are.

4   Q.  How so?

5   A.  Well, they work directly with the wardens and the deputy      13:54:20

6   wardens touring those facilities dealing with issues.  And then

7   Mr. Trujillo and Mr. Profiri also oversee the review process

8   that is done monthly which is the process that's been discussed

9   here this morning.

10  Q.  How familiar are you with the stipulation requirements as     13:54:40

11  related to maximum custody as part of your duties as division

12  director?

13  A.  I'm familiar with how it's supposed to work, and I have

14  been involved in it since the very beginnings.

15  Q.  When you say you have been involved from the beginning,        13:54:59

16  what do you mean?

17  A.  When we were doing the negotiation on the stipulation

18  itself, I was involved in those negotiations that were part of

19  the maximum custody side of it.

20  Q.  After the stipulation was entered into, whose                  13:55:13

21  responsibility was it to create a monitoring process that would

22  govern the maximum custody requirements of the stipulation?

23  A.  When we first started it, myself and Nicole Taylor were the

24  two main people that started developing that, and then we

25  involved the regional directors and the wardens as part of that   13:55:35

1    also.

2    Q.  Was there training or direction provided to personnel at

3    the max custody locations with respect to what the stipulation

4    requirements were and how they would be implemented and

5    monitored?                                                    13:55:57

6    A.  There was a variety of instructional training that occurred

7    at different levels.  It started out with the more executive

8    level with the regional directors and the wardens with going

9    over the stipulation itself and talking about issues with it.

10   Deputy wardens were included in that.  We also did some        13:56:17

11   training with line staff and supervisors in the units that was

12   more along the lines of dealing with max custody inmates,

13   mental health inmates to include, you know, there was a

14   couple-day training.  The first session we did a few of these.

15   But it involved a variety of staff from programs, CO-IIs, and  13:56:40

16   mid-level supervisors inside the units.

17          And we addressed several issues, mostly about

18   communication skills, direct supervision, crisis intervention,

19   mental health signs that we wanted to make sure people were

20   aware of that might be problematic, and just handling difficult 13:57:01

21   inmates.

22   Q.  If we flash forward to the present, to what extent are you

23   involved in the monitoring of the max custody provisions of the

24   stipulation presently?

25   A.  Well, I attend the monthly meetings that Mr. Trujillo and   13:57:19

March 28, 2017 - Status Hearing - McWilliams - Direct

1    Mr. Profiri hold that -- where the documentation is actually

2    reviewed and analyzed.  I also am involved in daily issues that

3    might arise.  I'm involved in program development and program

4    selection along with Karen Hellman.  I'm involved in purchasing

5    those materials so I make sure that we have the funds available        13:57:46

6    and we purchase the right type of curriculum for inmate groups.

7            I'm also involved with review of use of force issues,

8    and I'm involved with mental health, any type of mental health

9    concerns that we have on the operational side.  And then inmate

10   management itself with development and management of the inmate       13:58:21

11   population level including things like movement and sometimes

12   changing classifications to where we have done some adjustments

13   to close custody.

14   Q.  As part of your duties, are you familiar with DI-326 as it

15   pertains to the stipulation?                                          13:58:41

16   A.  Yes.  I'm involved -- was involved in writing it, so yes,

17   I'm familiar with it.

18   Q.  How do you receive -- or let me start over.  How do you

19   maintain current presently with ongoing orders that the Court

20   may provide or agreements that the parties may make together as      13:59:05

21   to the monitoring of the max custody requirements of the

22   stipulation?

23   A.  I am provided those updates and orders through counsel.

24   Q.  And do you also attend the hearings --

25   A.  Yes, I do.                                                        13:59:23

1  Q.  -- here?

2       Were you involved in the decision to create the

3  position that Associate Deputy Warden Wendy Hackney currently

4  is?

5  A.  Yes, I was.                                            13:59:40

6  Q.  What was the reason that her position was created?

7  A.  About six months ago Mr. Trujillo discussed with me the

8  importance of finding one person to kind of be a quality

9  control, quality assurance type person that we could put into

10  this process to help us with consistency and ensuring that    14:00:06

11  everybody had the same understanding and level of

12  understanding.  So we discussed it, found a position that we

13  could move to make this happen, and then we selected ADW

14  Hackney as that person to be involved in it.

15  Q.  Why was ADW Hackney selected for the position?          14:00:33

16  A.  Well, Mr. Trujillo and myself both have known her for many

17  years.  She's worked for us both directly.  And myself and a

18  couple of different areas, one of them being Browning, which at

19  the time was called SMU-2 when I was a deputy warden there,

20  also at Florence at Central unit and she was also the major of  14:00:54

21  the Florence complex.

22       But just our knowledge of her attention to detail, her

23  organizational skills, her respect level among staff, we just

24  felt that she would be the perfect person for an assignment

25  like this.                                                   14:01:14

1  Q.  For the maximum custody provisions of the stipulation, who

2  are the ultimate monitors who determine compliance?

3  A.  The wardens.

4  Q.  Why is it the wardens who are acting as the monitors who

5  determine ultimate compliance for their complexes?                      14:01:31

6  A.  Because they are in charge of those complexes.  For lack of

7  a better term, they are the CEO of that complex.  And their

8  responsibility is to run that complex, make decisions on a

9  daily basis.

10 Q.  Are you, yourself, involved in making compliance            14:01:48

11 determinations for reporting on the CGARs?

12 A.  I don't make the actual determinations myself, even though

13 I do look at some things and I certainly would be involved if

14 there was an issue with something.  But as the actual deciding

15 compliance for the CGARs, I don't do that, no.                  14:02:14

16 Q.  Could you please explain for the Court and for plaintiffs'

17 counsel the evolution over time during this monitoring period

18 as to the selection of the week that would be monitored for the

19 maximum custody performance measures?

20 A.  Well, when we started with the stipulation, we looked at a  14:02:33

21 calendar and, you know, it's easy to ascertain that the most of

22 the state holidays fall either at the beginning or end of a

23 month.  So we decided to look at the middle of the month, so it

24 would be like the second and third week, which would be the

25 most logical week to use and it would be one that didn't have a 14:02:55

1   holiday involved in it.  And the reason for that was because by

2   state law, we have 10 holidays that are given to state

3   employees to take off, and they we don't have key people in our

4   institutions, the ones that facilitate groups, the ones that do

5   mental health type counseling, they are not working on those          14:03:23

6   type of days.  So that's why we chose that route of going on a

7   week that wouldn't involve a holiday.

8   Q.  Has there been any change throughout the monitoring process

9   over the last almost two years as to monitoring live time for

10  the month that's right there in front of your face that you are       14:03:47

11  on versus monitoring -- gathering information or weeks

12  throughout the whole month and reporting backwards in time?

13  A.  Yes.  In -- last summer, I believe the first month that we

14  changed it was July of '16.  We went to the same process that

15  medical side of it was doing, and that was just for consistency       14:04:11

16  too.  And I think the plaintiffs had requested that.  But the

17  bottom line was we did change it at that point in time.  Before

18  that we were actually doing same month and then we went to

19  reporting the month after.  So the reporting month is the prior

20  month.                                                                 14:04:32

21  Q.  Currently, are all weeks in a month subject to monitoring

22  whether or not that week has a holiday in it?

23  A.  Yes, they are.

24  Q.  When did that change?

25  A.  That changed about two months ago, I believe.  Two months         14:04:41

1    ago.

2    Q.  And are there processes in place -- first of all, I will

3    ask this question:  Since this change has occurred, has there

4    been a week that included a holiday that was subject to

5    monitoring?                                                          14:05:00

6    A.  I don't believe so.

7    Q.  Are there any processes in place to address going forward

8    should a week subject to monitoring also include a holiday, how

9    will that work as to monitoring whether services incentives and

10   programs were provided in accordance with the stipulation?          14:05:21

11   A.  Yes.  We have given instruction that if it would fall on a

12   holiday the monitoring week, we would take one day in the

13   following week that could be used to ensure that the

14   programming needs were met.

15   Q.  In the prior situation where ADC was basically, for lack of     14:05:42

16   a better term, live month monitoring and weeks that did not

17   have holidays and subject to monitoring were involved, were

18   there any steps taken to ensure that in the weeks not

19   monitored, that the programs incentives and requirements of the

20   stipulation were, in fact, indeed still being provided to the       14:06:09

21   inmates?

22   A.  Yes.  Just daily operational observation, you know, we have

23   numerous people touring prisons, myself included.  But also the

24   regional directors are out a lot more frequent than I am, and

25   they tour.  And we also give a lot of tours of people, like we       14:06:27

March 28, 2017 - Status Hearing - McWilliams - Direct

1    tour attorney groups, we tour elected officials, we tour

2    college students.  We tour all kinds of people in prisons and

3    we always tour them in maximum custody prisons because they are

4    little more interesting for people to see things in.  And every

5    time I have toured and the regional directors have toured, to          14:06:52

6    my knowledge, we have observed activities going on.

7          And we also, when we tour, we talk to staff.  We look

8    at out-of-cell tracking forms.  We talk about issues on those

9    if we see any with the staff members directly.  We go into

10   groups and we talk to inmates about what they are getting out       14:07:10

11   of this.  In fact, we made a very interesting video about a

12   year and a half ago that was about the max custody programming.

13   And, in fact, we made it for -- we toured all of the directors,

14   not every director showed up, but I think about 35 of them

15   showed up from around the country, came out and toured our        14:07:36

16   facilities and looked at what we were doing.  And we made this

17   video and we gave them each a copy of it.

18         But in the video it interviews inmates, it talks to

19   staff, and they all talk, you know, about their experience in

20   this.  Inmates were very positive about the programming being      14:07:56

21   beneficial in reintegrating them back into society and helping

22   them control anger and address issues they had like substance

23   abuse, anger control, things along those lines.

24   Q.  I want to turn your attention now to Performance Measure 9

25   that governs the use of chemical agents and use of force on SMI     14:08:20

1    max custody inmates as well as inmates in the additional

2    enumerated locations.  Who are the ultimate monitors who are

3    charged with determining whether or not a specified use of

4    force is compliant with the stipulation?

5    A.   That would be the wardens.                                14:08:43

6    Q.   Why is it the wardens who make that final determination?

7    A.   It is the warden's responsibility to review everything that

8    comes out of their complex.  They are the subject matter

9    experts in that area.  They also are the hiring authorities in

10   case of some type of corrective action that has to be taken.    14:09:01

11   They would have to be involved in that.

12   Q.   Is there any review of use of force incidents subject to

13   monitoring that occurs prior to the wardens making their

14   determinations, or are the wardens the only ones looking at it

15   to make a compliance determination?                            14:09:20

16   A.   No.  There are several layers.  It starts with the shift

17   commanders when a use of force occurs.  It's reviewed at that

18   level.  It's reviewed by the chief of security.  It's reviewed

19   by the deputy warden of the unit.  It's reviewed by the warden

20   or deputy warden of operations.  They might review it first,    14:09:37

21   but it's reviewed at the warden's level also.  So it's reviewed

22   at a whole series of levels.

23   Q.   Is there any review of use of force incidents subject to

24   monitoring that occurs above, or I guess above the chain of

25   command of a warden with respect to compliance determinations   14:09:56

March 28, 2017 - Status Hearing - McWilliams - Direct

1    under the stipulation?

2    A.  The regional directors also review those.  They review the

3    overview memo that the wardens produce, and they -- so they

4    look at that on a monthly basis.

5    Q.  Is there a reason why ADW Hackney up to this point has not          14:10:14

6    been charged with doing an additional substantive review of the

7    use of force incidents to determine compliance under the

8    stipulation?

9    A.  When we developed this position, it wasn't designed for her

10   or whoever was in that position, not just her, it could be            14:10:32

11   anyone, for that person to be involved in that review.  Like I

12   said, it's more of a quality assurance type position that we

13   want consistency with.  The use of force review still needs to

14   be held outside of that and we kept that into the warden's

15   purview only.                                                          14:10:57

16   Q.  When it comes to the underlying data pull with respect to

17   Performance Measure Number 9, how is there assurance that

18   chemical use of force incidents subject to monitoring under the

19   stipulation are all captured and reviewed to report compliance?

20   A.  Every use of force is a significant incident report.  That        14:11:19

21   happens real time, so that is produced that day.  It comes out

22   in a morning report the next morning.  But wardens know when

23   uses of force happen inside their complexes anyway.  But it's

24   also documented in that document the next morning.  It's looked

25   at by mental health score and location.                               14:11:43

March 28, 2017 - Status Hearing - McWilliams - Cross

1          MS. LOVE:  Those are all the questions I have.

2          THE COURT:  Plaintiffs.

3                    CROSS-EXAMINATION

4  BY MS. FETTIG:

5  Q.  Good afternoon, Director McWilliams.  I just have a few          14:12:04

6  questions.

7          Director McWilliams, when you were talking with Ms.

8  Love, you mentioned that Ernie Trujillo and Joe Profiri

9  participate in this new warden's process.  And I wanted to

10  know, this monthly process, when did that start?          14:12:33

11  A.  I believe the review itself started around maybe September,

12  October of last year.

13  Q.  So that started before AWD Hackney began her job?

14  A.  Yes, it did.

15  Q.  And you mentioned that you -- that ADW Hackney's position          14:12:55

16  was sort of outside of review of the use of force provisions at

17  this moment.  Why was that decision made?

18  A.  Well, we, you know, like I said, we felt she certainly had

19  enough to do with doing the quality assurance on the other

20  measures.  But it's also the use of force itself, if there was          14:13:15

21  something that was going to be a problem, and when I mean a

22  problem, something that we would say was not appropriate, then

23  it's the duty of the warden to make that assessment and to take

24  some type of corrective action.

25  Q.  And in terms of -- I'm thinking through the analogous          14:13:32

1   process in the other parts of the lawsuit with the health care

2   provisions we have designated ADC monitors who are actually

3   monitoring Corizon which is not ADC, and there's a process for

4   Corizon to challenge those findings and for ADC to respond.

5   And in trying to think through what's the analogous outside          14:14:02

6   review of wardens for the max custody provisions?  Is there --

7   who oversees the wardens, in other words?

8   A.  Well, the wardens are overseen by the regional directors

9   and myself.

10  Q.  And is that only for the max custody for MC-PM Number 9?         14:14:20

11  A.  No.  It would be for everything that's involved in the max

12  custody review process.

13  Q.  In what sense?  How did that happen?  Can you walk me

14  through it?

15  A.  Well, I think this process that we're doing now is really a      14:14:35

16  prime example of the detail in it.  It does involve a very

17  detailed look at the documentation that's used, the whatever

18  was used for the person to make the decision, for the warden to

19  make that decision that was compliant, and the review process

20  itself.  You don't review your own documentation.  Someone else    14:15:01

21  reviews it.  And we have layers of that also.  We have now

22  expanded that out to mid-level supervisors and deputy wardens

23  and the wardens that do the reviews with the regional

24  directors.

25          But this last one that we did, I was very impressed to      14:15:19

1   see the reaction of the line staff, the COs that were there.  I

2   spoke with each one of them individually after they went

3   through the review process, and there was representation for

4   every max custody unit including our mental health area in

5   Phoenix and Perryville.  And they were all very impressed.  I        14:15:38

6   think they gained knowledge that day.  They saw a new

7   perspective on the big picture, and I think it was a good step

8   in the direction that we're going and the evolution that's

9   happening to just keep growing and tightening this down more

10  and more.                                                            14:16:01

11  Q.  I agree with -- I think evolution is a great analogy here.

12          What happened, I mean, before October of 2016 when you

13  started more oversight of the wardens, I know you have been

14  involved in this process, you testified, from the beginning.

15  What existed before?                                                 14:16:21

16  A.  Well, when we first started it was a little bit more

17  individualized complex to complex.  And, of course, our

18  complexes are different.  I'm sure you have toured enough you

19  know the difference between an Eyman complex and a Perryville

20  complex.                                                             14:16:38

21  Q.  Uh-huh.

22  A.  And Rast wasn't even open at that time.  When we first

23  started that we tasked Warden Fizer who is at Florence to kind

24  of coordinate some things, even though the book that we used

25  has the book that we would say would be the one we wanted            14:16:55

1    people to build on, was the one from SMU-1.  We thought that

2    was the book that had the best documentation and the best

3    setup.  So we kind of built it out from there.  So that's how

4    it started was doing that process.

5        And through a series of things, whether it was our own          14:17:12

6    better understanding or court, you know, direction, we have

7    evolved into what it is now.  So but we always had some type of

8    process.  It just was not near as structured, as meticulous, or

9    as, I think, consistent as it is now.

10   Q.  Going back to the beginning of monitoring, you testified          14:17:41

11   about the weeks chosen to be monitored at the beginning, saying

12   that you often times chose the second or third week because

13   there was no holiday.

14   A.  Correct.

15   Q.  Were you aware that the weeks to be monitored were supposed       14:17:58

16   to be randomly chosen?

17   A.  At first, when we were doing it live time, we had discussed

18   this and it was kind of our understanding that we could do it

19   like that as long as it, you know, because it was live that we

20   were picking a week and that we were ensuring that there was         14:18:19

21   monitoring happening monthly, you know, through the whole

22   month, wasn't just that week we worried about it.  We actually

23   looked at things the whole time.  We just chose that period of

24   time to put down as documentation.  So it wasn't, no, at that

25   time we didn't think about the random.org.                           14:18:41

1    Q.  When did that change?

2    A.  When we switched to the process that medical uses, so that

3    would have been July of 16.

4    Q.  And what is that process?

5    A.  We go to random.org and then it scrambles the weeks and          14:18:55

6    that's the week you use, whatever comes up as the week.  And

7    the only way that would be different would be if the week came

8    up that -- because now we use partial weeks also, so it could

9    be there's three days in the previous month into, you know,

10   this month that we're now doing the random.org on.  So let's       14:19:19

11   say that last month review was that last three days and the

12   first four days of this month.  Then we wouldn't use that same

13   week again.  We would pick the second number.

14   Q.  So random.org, does it generate like 1, 2, 3, 4?

15   A.  It's 1 through 5, yes.                                          14:19:44

16   Q.  Okay.  And you just each month, whatever number comes up?

17   A.  Correct.

18   Q.  You also mentioned that about two months ago, you started

19   reporting weeks that had holidays?

20   A.  Correct.                                                        14:20:03

21   Q.  Okay.  So before two months ago you were using random.org

22   but if a month came up that had a week in it would you go back

23   to random.org or choose another?

24   A.  We would use the next week.

25   Q.  Say, for example, week three came up, there's a holiday,       14:20:19

1   you picked week 4?

2   A.  If that was the next number, yes.  Because it lines the

3   numbers up in some type of order, random order.

4   Q.  I see.

5   A.  So if week three was the first one, week 2 was the second          14:20:32

6   one and week 4 was the third one we would pick week 2.

7   Q.  So two months ago you changed the process and you are now

8   including state -- a week that has a state holiday.  Is that

9   correct?

10  A.  Correct.                                                           14:20:48

11  Q.  But you are adding another day to do programming or what

12  have you, is that correct?

13  A.  Correct.

14  Q.  Can you walk me through the logistics of that?  How is the

15  extra day chosen?  How do you make sure it's not programming          14:20:59

16  that should actually be counted for that week?

17  A.  Well, that's why we leave it up to the warden to choose

18  that day, because it is a week.  So they have to figure a way

19  to fit it in during that week where they can -- so they might

20  have to adjust some stuff on their activities schedule to fit         14:21:18

21  it in.  But that way it gives them some options to do that and

22  then they will just write a statement basically saying this is

23  the day that we selected for the -- to cover the holiday.

24  Q.  Okay.  And if you were the monitor looking at the max

25  custody notebook, is there going to be a memo in there?  What's       14:21:39

1   the documentation you are thinking of?

2   A.  There will be a memo that states that.

3   Q.  Because you haven't had a week yet, right?

4   A.  No, we haven't.

5   Q.  So there will be a memo.  And how would the monitor say,         14:21:50

6   okay, you have got the warden's memo that says we chose Tuesday

7   to do the extra, I don't know, SMI programming.  How could the

8   warden or the monitor then ensure that you didn't rob Peter to

9   pay Paul, for example, didn't take away a programming week from

10  the non-monitored week in order to accomplish the state holiday     14:22:15

11  week?  How would that documentation work?

12  A.  They would have to look to make sure they would get the

13  activity schedule and make sure the things listed on that day

14  actually did occur, too.  And a lot of the things that happened

15  for the holiday, like the rec and those type of things are          14:22:33

16  still going to happen on that holiday.

17  Q.  Uh-huh.

18  A.  It would be the psych groups and maybe the CO-III group,

19  even though we are trying to work some things out with some of

20  our CO-IIIs where -- especially on the minor holidays, you          14:22:49

21  know, Christmas probably wouldn't be the day we told them to

22  work but we might tell them to work on Labor Day.

23  Q.  Okay.  So you mentioned that prior -- before you changed to

24  the random selection of weeks, before July 2016, wardens

25  regularly tour, administrators regularly tour the max custody       14:23:15

1   units as a matter of course.  You have got groups coming in.

2   You check them out and you make daily operations about how

3   things are going on the unit.  Was that documented in any way?

4   Did you write it up?  How would we know what you saw?

5   A.  It's not written up per se in saying hey, today I toured          14:23:39

6   these three places and talked to these six inmates.  It's not

7   documented like that.  There might be a mention of something

8   significant on a big tour would be mentioned.  And there are

9   monthly reports that the regional directors do to me about

10  activities inside prisons.  It would be documented in something     14:23:58

11  like that, just that that tour occurred.  Probably wouldn't

12  talk about going in talking to groups, but it would talk about

13  that tour happening.

14  Q.  Okay.  So that would be kept as an e-mail or a memo?

15  A.  No.  It's a monthly report document.                            14:24:17

16  Q.  Okay.  From each facility?

17  A.  Each facility does one, each warden does one and then each

18  regional director does one on their five complexes that include

19  the warden's monthly report.

20  Q.  Okay.  Would there be any other way of documenting the          14:24:35

21  operations of the max custody units prior to the change the

22  randomization of the week?

23  A.  Well, obviously you would have the activity schedules, you

24  would have the AIMS screens, you would have the eOMIS screens,

25  you would have group rosters, you would have out-of-cell          14:25:05

1    tracking forms.  There would be all kinds of documentation that

2    would show things happened.

3    Q.  So the out-of-cell tracking forms are all archived?

4    A.  Yes, they are.

5    Q.  From March 2015?                                          14:25:16

6    A.  From day one, yes.

7    Q.  From day one.  Okay.  For Max Custody Number 9 you

8    mentioned to Ms. Love that in terms of tracking, how does the

9    warden capture the full gamut of use of force incidents that

10   happen per month and how would she know which ones would be      14:25:48

11   monitored under the stipulation?  You mentioned that there's a

12   morning report.

13   A.  Yes.

14   Q.  Okay.  And this is any unusual incident that occurs the day

15   before?                                                        14:25:59

16   A.  Every significant incident that happened in the prior 24

17   hours is documented in that report.  If it's on a weekend then

18   it covers the weekend.  So Monday would be Saturday and Sunday

19   also.

20   Q.  Would that be the most efficient way for a warden to pull    14:26:12

21   the universe of possible monitored incidents?

22   A.  Well, it would be a very accurate way to do it.

23   Q.  Okay.

24   A.  I think the warden also knows when something happens inside

25   their complex, and I also think that they review uses of force   14:26:28

UNITED STATES DISTRICT COURT

1    to begin with.  In fact, I don't think it I know it.  But it

2    would be a very accurate document to use to double-check

3    things, yes.

4    Q.  Do you know if any of the wardens do that?

5    A.  They all do it.  I even review those every morning, and if          14:26:47

6    I have a question -- and I have looked for uses of force with

7    chemical agents on mental health inmates.  I mean, I actually

8    look for that.  And if I have a question about anything I

9    immediately pick up the phone and direct that to the warden for

10   more details about it.                                                  14:27:08

11          THE COURT:  So they are on your radar screen so that

12   in your capacity to review the use of force determinations that

13   are made by the wardens, if there was an incident where you had

14   noted this use of a chemical agent with a mentally health

15   inmate and it didn't show up on the monthly report, you would          14:27:25

16   know about that?

17          THE WITNESS:  I would certainly know of an issue on a

18   daily basis that I think might have some questions.  It doesn't

19   mean that it's not appropriate, but I might have some questions

20   about it, yes.                                                         14:27:44

21          THE COURT:  I'm just wondering -- part of the problem

22   is, forgive me for interrupting.

23          MS. FETTIG:  No.  No.  No.  Please.

24          THE COURT:  Part of the problem is that you are asking

25   the student to score the exam in one respect, and that's with         14:27:54

1   no disrespect to the any of the wardens, it's just there is

2   something called an honor system.  And we do, in some parts of

3   our society, employ the honor system and we expect people to

4   comply with it.  In large part they do.  But I always think

5   back to what Ronald Reagan said, trust but verify.                    14:28:16

6          MS. FETTIG:  That's my favorite phrase.

7          THE COURT:  I'm wondering just what the oversight is

8   for the wardens that allows there to be some sense that

9   verification is taking place.  And that's why I'm asking this

10  question.                                                             14:28:35

11         THE WITNESS:  I don't take that morning report and go

12  through and say, okay, these three chemical agent use of force

13  happened on mental health inmates and then follow up to make

14  sure that was documented.  I don't do that.  But I think we do

15  have a check and balance of looking at every single one for any       14:28:50

16  type of red flags that might pop up.  It's kind of like in the

17  military, a general doing something, you know.  I think a

18  warden is someone who has a very vested interest in what the

19  big picture is here.  And the big picture, of course, is

20  having -- turning out inmates into society who are not going to       14:29:12

21  cause more victims, to have, you know, public safety as their

22  primary goal and concern along with staff safety and inmate

23  safety.  And I think they try very hard to make sure that is

24  accomplished every day.

25         So, yes, we do have a very vested interest in our              14:29:29

1   careers of ensuring that we do things in a very fair and honest

2   way of dealing with people.  That's what we do.  And I think

3   inmates are probably the best way to tell that that is

4   inaccurate because inmates are real quick to complain or say

5   something if they don't think is right if they are being          14:29:51

6   wronged.  But we don't have a system that goes through and

7   checks every single one, I don't.  The warden is doing that to

8   make sure they are catching everything.  They are verifying it.

9   But I'm not verifying it.

10  BY MS. FETTIG:                                                    14:30:06

11  Q.  My question, Director McWilliams, is how do we know the

12  warden is verifying it if we don't have a paper trail?  That's

13  my problem here.  I can well understand that a warden would

14  open up his or her e-mail in the morning, see the morning

15  report, flag anything that's a problem but then, you know, at     14:30:24

16  the end of the month how do we know that the warden's actually

17  collected that entire universe?  And I'm not saying -- there

18  could be an unintentional omission, quite frankly, especially

19  with all the paperwork that is involved in a warden's daily

20  life.                                                             14:30:44

21          So I'm just wondering, how is the universe mapped so

22  that there is a double-check that indeed we have all the stars

23  in the universe listed?

24  A.  I don't know if we actually have a process that would

25  satisfy that for you.  I don't know of one that would actually    14:30:59

1    entail that.

2    Q.  In terms of the coverage, you were here when I was talking

3    with AWD -- ADW Hackney -- forgive me, get this right -- about

4    who is covered by Max Custody Performance Measure Number 9.

5    And we looked at the memo in the notebook that your counsel                    14:31:27

6    provided.  And actually let's just turn to it.  That might be

7    the easiest thing to do if I can remember where it is.  I

8    believe it was 8, Tab 8.  ADCM 838728 is the Bates number.

9    A.  Yes, I see it.

10   Q.  Yes.  And that's a memo to you, correct?                                   14:32:04

11   A.  Yes, it is.

12   Q.  And it's dated December 2nd, 2016 from K. Curran the warden

13   of the Florence complex.  Are you familiar with this memo?

14   Have you seen it before?

15   A.  Yes, I have.                                                               14:32:19

16   Q.  And so you know that the subject is use of force reports

17   November 1st, 2016 through November 30, 2016.  And it says

18   there, and I quote, "There was no use of force incidents

19   involving SMI inmates during the month of November."  And you

20   probably heard me talk with AWD Hackney about my concern that                 14:32:37

21   at Florence we're not only looking at seriously mentally ill

22   inmates but indeed the enumerated facilities of CB-1 and 4 and

23   Kasson Wing 1 and 2.

24        That appears to exclude those units.  Can you tell me

25   how you read this and responded to it?                                        14:32:59

1   A.  Well, as I look at this, first of all, my understanding in

2   what Central unit is, Kasson is part of Central unit.

3   Q.  Yeah.

4   A.  It didn't used to be but it has been for several years.  We

5   haven't always -- we started out with this concept of the CB-4            14:33:18

6   and CB-1 in the stipulation as being a mental health area.  It

7   was a mental health area, but the SMI area that we originally

8   had there didn't work out for us.  And the reason, for the most

9   part for that, was because -- it was twofold.  The cells in

10  that area are open barred, which means they have a space and           14:33:39

11  the inmates can reach out through the bars and they can also

12  project things out or project things in.  And we had a few

13  incidents where inmates were assaulted and some staff were

14  assaulted and some of the mental health inmates that were in

15  the SMI group especially felt they are scared.                          14:34:02

16         So we decided we're better off having them in a more

17  controlled environment.  That's why we took all the SMIs out of

18  that area and moved them into Kasson.  So there are no more

19  SMIs in CB-1 or CB-4.  There hasn't been for quite a while.

20  And that's why -- and the reason we chose Kasson was a couple          14:34:23

21  of reasons.  But the main was it was the place that had the

22  solid door concept but it also had the windows cut into it.  So

23  that accomplished the goal of having the better visibility.

24         So that's why we took that approach.  So when I see

25  this memo, I know that the SMIs they are talking about here             14:34:42

1   have to be either in Kasson or they could be in 5 and 7 now

2   because all the windows have also been adjusted in CB-5 and 7.

3   Q.  So have you not been monitoring inmates in CB-1 and 4 from

4   Max Custody Performance Measure Number 9?

5   A.  We haven't -- we might have monitored but there weren't any      14:35:06

6   there.  There weren't any SMIs there.  We weren't always

7   monitoring, because as I said we moved all those guys out.  We

8   took a conscious effort to do that because we just felt it

9   wasn't safe.  So we moved them out quite some time ago.

10  Q.  So I want to back up because we may have created some          14:35:24

11  confusion here.  In terms of who is covered by Max Custody

12  Performance Measure 9, there are the max custody SMI prisoners

13  and, as the Court has ruled, individuals regardless of their

14  SMI status in the enumerated units.  Is that your

15  understanding?                                                     14:35:47

16  A.  Yes, it is.

17  Q.  When did you start monitoring under that definition, to

18  your knowledge?

19  A.  We would have started in the very beginning and then we

20  would have went back to monitoring everybody in there.  Would      14:35:56

21  have been after a court review.  It was probably maybe several

22  months ago but I'm not exactly sure of the date of that.

23  Q.  So before the Court ruled on this issue last year, you were

24  not monitoring people in the enumerated units.  Is that

25  accurate?                                                          14:36:23

1    A.  If we would have had a use of force involving a mental

2    health inmate we would have looked at it.  But there weren't

3    any.  It wouldn't have been an issue.

4    Q.  So you mean if they were SMI you monitored them, but if

5    they just lived in the enumerated units you didn't?                    14:36:34

6    A.  Right.  And we have used chemical agents in CB-4 but it

7    wouldn't have been with a mental health inmate.  Yes.

8    Q.  So we're looking at this memo, and it's dated December 2nd,

9    2016.  It was for the November 2016 max custody CGAR report.

10   A.  Right.                                                              14:36:57

11   Q.  Had you changed your policy for this review, or does this

12   predate the change?

13   A.  This is -- I think we probably changed it right around

14   maybe the end of the year time frame, right around December.

15   Q.  Okay.  All right.  So moving forward, December 2016, is        14:37:13

16   that when we're going to see a record that shows both SMI and

17   anybody who is in the enumerated units?

18   A.  I know you will see them in this year.

19   Q.  In 2017, January of 2017.  Okay.  All right.

20          Give me a few minutes, Director McWilliams.  I just        14:37:50

21   want to make sure that I have asked you all my questions.

22          I did want to touch base, you mentioned in your

23   testimony with Ms. Love that one of your jobs is -- deals with

24   classification issues and the close custody issue in

25   particular.  You were probably here when ADW Hackney testified   14:38:18

1    about Perryville.  My understanding is she does not oversee

2    Perryville, and the reason for that is that it's close custody.

3    Is that your understanding?

4    A.  We have converted it to close custody, yes.

5    Q.  And I believe she also testified that as of December 2016          14:38:34

6    you are not monitoring Perryville except for Max Custody

7    Performance Measure 9, is that correct?

8    A.  Well, we're in the process.  That's correct in that sense.

9    We're in the process, as you probably well know, of trying to

10   develop some type of system that we can use to look at the            14:38:54

11   close custody group that's in these max custody areas that we

12   converted.  Perryville is a little more unique than it is at

13   some other places because of the fact that we spread the

14   inmates out throughout the yard.  Now it's very successful.

15   The inmates love it.  I would really hate to have to move them        14:39:19

16   back.  But if that's what we have to do, that's what we'll end

17   up doing.

18          But it just seems like I'm trying to move forward with

19   this and trying to do I think what's right for the inmate

20   population.  But it has been a very successful transition.           14:39:35

21   Q.  So right now at Perryville you are not distinguishing

22   between those who have 20 hours of work and above and those who

23   have less, is that correct?

24   A.  We have -- the inmates that were originally in the max

25   custody yard, which was yard 30, they are spread out throughout      14:39:56

1   the close custody system of that unit.  So they are all over in

2   every cell block.  So no, we're not distinguishing on work

3   hours.  We're distinguishing on the ability that you have to be

4   out of your cell, which close custody is much different than

5   max custody and the activities that you can participate in,          14:40:16

6   everything from contact visitation to, you know, just walking

7   around the yard or athletic events or education opportunities,

8   whatever that entails.

9   Q.  Okay.  And I know you also testified that you are involved

10  in program development.  It's a big job.  Do you have any          14:40:36

11  knowledge of the mental health programming development or

12  mental health programming for the SMI population, or is that

13  strictly Dr. Taylor?

14  A.  That would be Dr. Taylor.

15  Q.  Are you aware of any problem with CO-IIIs teaching the          14:40:52

16  mental health classes?  Is that something you have heard about?

17  A.  Well, obviously to teach a psycho -- an actual psych group

18  you would have to have the right degree to do that.  So there

19  would be some type of conflict with that.  There was some

20  discussion at one point in time whether they could teach a          14:41:14

21  Psycho Ed group.  But outside of that I'm not aware of anything

22  else.

23  Q.  So you are not aware this has been a problem at Perryville?

24  A.  I'm aware that it was an issue, yes.

25  Q.  And has it been resolved?          14:41:28

───── **March 28, 2017 - Status Hearing - McWilliams - Cross** ─────

1   A.  Yes, it has been.

2   Q.  Okay.  And can you tell me roughly the date that it was

3   resolved?

4   A.  I know it was definitely resolved when we changed the

5   custody status because it changed the whole complexity of that.    14:41:44

6   But the CO-IIIs have been instructed just to run the

7   programming that we're doing on that program side which is the

8   change company and some other basis groups that we do that we

9   have done for years which entails substance abuse counseling

10  and things along those lines.  So, yes, I would say it's    14:42:07

11  definitely been changed since November.

12  Q.  November 2016?

13  A.  Yeah.

14  Q.  And that's in November 2016, my recollection of the CGAR,

15  and you can tell me if it's wrong, was that you were monitoring    14:42:20

16  Perryville in November of 2016 but you stopped in December

17  2016?

18  A.  That was the last month that -- we converted it at the end

19  of November.

20  Q.  And converted it, you mean everybody went to close custody?    14:42:31

21  What do you mean?

22  A.  Yes.  Everyone went to close custody and we changed the

23  just the programming and recreational opportunities.

24  Q.  Give me just a second.  I want to double-check that I have

25  gotten everything.    14:43:04

**March 28, 2017 - Status Hearing - McWilliams - Redirect**

1          Director McWilliams, I don't have any more questions.

2     Thank you.

3     A.  You're welcome.

4          THE COURT:  Ms. Love, any redirect?

5          MS. LOVE:  A few, Your Honor.                              14:43:21

6                    REDIRECT EXAMINATION

7     BY MS. LOVE:

8     Q.  Director McWilliams, can you please explain why there was a

9     change at Perryville to change the custody level of inmates who

10    were previously max custody down to close custody?             14:43:42

11    A.  Well, it's all part of the master plan that we have to

12    revamp our max custody system, and we have been working on this

13    actually since the summer of 2009.  So it's nothing new to us.

14    But if you -- the trend in the country right now is to take

15    some populations and change those from max to close custody.    14:44:08

16    To my knowledge, several states around the country have

17    eliminated maximum custody if they ever even had it in female

18    populations.  Death row is another example of that.  Sex

19    offender groups would be a close group of those, protective

20    custody-type inmates.                                           14:44:29

21          So we're looking at -- and our goal was to reduce that

22    population.  And so far we have reduced it down by about maybe

23    about 7 or 800 in population.  And our goal is to take it down

24    probably another maybe 5 or 600 in population.  So and then

25    we'll probably have to look at things, see what else we can do.  14:44:57

1   But it's just part of this plan we have had for years to reduce

2   that population and provide a different set of services because

3   we have a real strong focus on reentry and public safety.

4   Q.  Is there anything unique about the female offender

5   population that allowed you to classify those that used to be      14:45:19

6   max custody versus the male population?

7   A.  Well, historically females, one of the things I ask people

8   when we were going to do this is tell me the last time that a

9   female has stabbed someone to death inside a prison.  And they

10  are like I can't remember that happening.  Well, I can't          14:45:40

11  either.  So I think one of the issues was looking at the

12  tendency for violence and gang activity, those type of things,

13  group behavior isn't the same as the male population.

14  Q.  Was the change of Perryville female offenders who used to

15  be max custody down to close custody, was that done in order to   14:46:05

16  avoid the stipulation requirements in the Parsons versus Ryan

17  litigation?

18  A.  Not at all.

19  Q.  When it comes to monitoring close custody inmates, are you

20  able, from the operations side, to monitor individual movement    14:46:19

21  of close custody inmates like you do max custody inmates?

22  A.  It's a lot -- it's very difficult to do because the freedom

23  of movement is open where you can have yard time and you go to

24  the chow hall and you go to visitation and you go to rec

25  activities, you know, to programming.  You go to all these        14:46:39

**— March 28, 2017 - Status Hearing - McWilliams - Redirect —**

1    different outside-of-cell activities.  So it's very hard to do.

2    It would be almost impossible.

3    Q.  In the close custody setting when there's programs

4    available or recreation, those times on the activity schedule,

5    is it like max custody when an individual is taken out on an          14:47:00

6    individual basis from their cell, escorted to the next

7    location, or is it an open call situation?

8    A.  Open call.  It could be a whole building turnout at the

9    time or half building, whatever the activity was, whatever that

10   called for.  Or a group of individuals if it was for like an         14:47:18

11   education class, it might be spread out across the yard 20

12   people out of four different buildings.

13   Q.  Are the inmates then escorted individually, restrained by

14   an officer to that location, or is it more a free come and go

15   situation?                                                            14:47:36

16   A.  It's a free come and go.  They aren't escorted.

17   Q.  Those are all the questions I have.

18           THE COURT:  All right.  Thank you very much.

19   Appreciate your time this afternoon and your time otherwise

20   when you come to this Court sometimes probably feeling that you       14:47:48

21   don't have a chance to say anything.  Today you did.  Thank you

22   so much.

23           THE WITNESS:  You're welcome.

24           MS. LOVE:  Your Honor, defendants have no further

25   witnesses.                                                            14:48:01

1    THE COURT:  All right.  What is plaintiffs' pleasure.

2    MS. FETTIG:  Your Honor, we do not have any witnesses

3  to call.  I just wanted to flag an issue for the Court that has

4  raised some concern for plaintiffs.  That is while ADW

5  Hackney's testimony was incredibly informative about what's          14:48:16

6  happening now and Division Director McWilliams also was very

7  informative, we are somewhat concerned that we have not

8  actually heard from the person who does the monitoring, and

9  that's the warden.  That does, to some extent, limit our

10  ability to know what this process actually looks like from the     14:48:34

11  prospect of the monitor.

12    THE COURT:  Well, did you raise that in the

13  meet-and-confer that you had with the defendants on who the

14  appropriate witnesses would be?

15    MS. FETTIG:  You know, I will say that we expected ADW     14:48:47

16  Hackney, although we did not know much about her, to be able to

17  testify more to that.  And that was perhaps an omission on our

18  part assuming there had been an actual -- someone who had done

19  the monitoring here.

20    THE COURT:  I must say I was a little bit surprised     14:49:05

21  too that there wasn't a warden, but I guess I had given the

22  responsibility of identifying the witnesses to the plaintiffs

23  because of what I thought would be the case, your greater

24  familiarity of what people could testify about.  And maybe you

25  were under the impression that someone with the title Associate     14:49:24

1   Deputy Warden would be somebody who could testify about the

2   process.  But it has always been a warden centric process.  I

3   don't think it's ever been delegated below the warden.  So

4   again, I'm troubled, too, by that but I'm a little bit hesitant

5   to -- well, on the one hand, I'm hesitant to deal with the                14:49:55

6   problem out of the context of today because we set this up

7   today for the purpose; on the other hand, I'm frustrated by

8   what you are frustrated about, and that is I feel I don't fully

9   understand it.

10          I guess when I say fully understand it, the antecedent     14:50:15

11  for "it" is the warden process.  I don't know what the

12  perspective is of an individual warden who is going through

13  this process and how they view it, especially because it

14  appears that it is an insular activity that ultimately the

15  reporting on the CGARs and the statement of the compliance          14:50:35

16  report is something that is solely up to the warden.

17          I suppose it's possible that we could see if we could

18  have the benefit of a warden's testimony at some future date.

19  And the only thing that's causing me to hesitate is you have

20  raised what was a specter of concern of mine.  I have admitted       14:51:13

21  that.  But you haven't really told me how you think that the

22  testimony today has left you in a position to be more concerned

23  than otherwise, than you would have been after having heard

24  today.  What in particular that you heard today that made you

25  think that this is now a bigger problem than perhaps it was          14:51:35

—— March 28, 2017 - Status Hearing ——

1    before when you maybe didn't take care to make sure we would

2    have had a warden here?

3         MS. FETTIG:  Well, we had originally asked for the

4    wardens and my assumption that ADW Hackney could play that role

5    proved to be incorrect.                                        14:51:53

6         What struck me as concerning is that while I think

7    that the new role of ADW Hackney is absolutely essential and a

8    very positive step forward, it was clear from her testimony

9    that she is more of a traffic cop.  She's the process person

10   that's in a very important role but she does not have input    14:52:12

11   into the substance.  And indeed it is really the warden who has

12   that sole input.  There appears to be very little oversight

13   after that CGAR finding is made.

14        So that actual process, for example, for MC-PM Number

15   9, the use of force provision is very solely in the hands of   14:52:34

16   the warden, and ADW Hackney was not really able to testify how

17   those decisions are made about compliance, nor now that I

18   understand what her role is more, would I expect her to.

19        THE COURT:  And if you wanted to hear warden

20   testimony, would you think that there is a particular warden   14:53:16

21   that would be the one that you would want to hear from?

22        MS. FETTIG:  Well, I do tend to think that one of the

23   critical wardens is always the Eyman complex warden because the

24   majority of the max custody population is in the units in that

25   complex.                                                       14:53:38

1          THE COURT:  All right.

2          MS. LOVE:  Your Honor, may I interject here?

3          THE COURT:  Yes.

4          MS. LOVE:  While yes, there was -- ADW Hackney was not

5   able to testify as to how the determinations are made and the          14:54:00

6   information synthesized on Performance Measure 9, ADW Hackney

7   did take us through the process for all performance measures

8   talking about the source documents, talking about how totals

9   are calculated at the bottom.  And but for Performance Measure

10  9, which is subject to a myriad of requirements for the use of          14:54:22

11  force or chemical use of force on SMI inmates and those in the

12  enumerated areas, much of tracking the performance measures for

13  1 through 8 is looking at those out-of-cell tracking forms,

14  making calculations as to total hours at the bottom and looking

15  for source documents.                                                   14:54:45

16          So to the extent that those were all discussed today,

17  there's not going to be anything more that the wardens are

18  going to testify to other than just like the book that was

19  shown in detail, here's the tracking form.  Here's how we add

20  and here's the source documents and this is what we check.             14:55:00

21          So that would be cumulative to the extent that we're

22  going to have to have five wardens sit up here and explain how

23  they calculate whether something added up to seven and-a-half

24  hours, eight hours, or whether there was a program in a column

25  where they could also verify a double-check on.                        14:55:19

—————— March 28, 2017 - Status Hearing ——————

1        In addition, to have five wardens also come in and

2   testify to Performance Measure 9 again would be cumulative and,

3   you know, what this doesn't need to be is a compliance

4   challenge and determination because that's not where we're at.

5   I think we have done a good job today of sticking to the                 14:55:44

6   education of how the processes work.  But our position would be

7   it would be unnecessary to have all five wardens come in and

8   testify as to Performance Measure 9 and how they are monitoring

9   that.  Since there has been no testimony that it differs, yes,

10  they are making the determinations and so they are the sole        14:56:03

11  decision-maker there but that has been determined without

12  dispute.

13        THE COURT:  For now I'm going to deny the request.

14  It's without prejudice to re-raise it.  If you want to present

15  what kind of inquiry you think would be serviceable in this         14:56:22

16  area in a more concrete way then I will entertain it.  But for

17  now I will deny that request.

18        Is there anything else we need to address today?

19        MS. FETTIG:  Not from the plaintiffs' perspective.

20        THE COURT:  Ms. Love?                                          14:56:38

21        MS. LOVE:  Nothing further, Your Honor.

22        THE COURT:  Thank you for this process.  I appreciate

23  it very much.  I have learned a great deal.  It's helpful for

24  me.  It may be that I will have additional questions but I know

25  how to tender those to the parties if I do.                          14:56:51

UNITED STATES DISTRICT COURT

─────March 28, 2017 - Status Hearing─────

1          And I thank you very much.

2          MS. FETTIG:  Thank you, Your Honor.

3          MS. LOVE:  Thank you.

4          (Proceeding concluded at 2:56 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                              C E R T I F I C A T E

6

7          I, LAURIE A. ADAMS, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 27th day of April,

16   2017.

17

18                              s/Laurie A. Adams

19                              _____
                                Laurie A. Adams, RMR, CRR

20

21

22

23

24

25