Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen
Swartz, Sonia Rodriguez, Christina Verduzco, Jackie
Thomas, Jeremy Smith, Robert Gamez, Maryanne
Chisholm, Desiree Licci, Joseph Hefner, Joshua
Polson, and Charlotte Wells, on behalf of themselves
and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON
SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
          adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability
Law*

**[ADDITIONAL COUNSEL LISTED ON
SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-DKD |
| | **PLAINTIFFS' STATEMENT REGARDING EVIDENTIARY HEARINGS ON MONITORING** |
| Plaintiffs, | |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

I.   DEFENDANTS' TESTIMONY REGARDING MONITORING OF THE STIPULATION AND THE COURT'S ORDERS CALLS THEIR ENTIRE MONITORING SCHEME INTO QUESTION ............... 2

    A.   Defendants' Inability To Randomize Source Documents Properly Makes Monitoring Results Unreliable ............................... 4

    B.   Additional Problems Arise From The Source Documents Used to Create Samples ............................................................. 10

        1.   Uncertainty As to What Monitors Use for Source Documents ......................................................... 11

        2.   Incomplete Information or Errors in Source Documents ...... 14

    C.   Idiosyncratic or Improper Methodology Yields Unreliable Results ................................................................. 19

        1.   Inconsistent and Improper Methodology Used by the Monitors ................................................................. 19

        2.   Defendants Include in The Samples Records That Cannot Possibly Be Found Noncompliant ........................... 27

    D.   Defendants' Rebuttal Process Allows Changes To Be Made to CGARs Prior to Production .............................................. 29

    E.   Defendants Do Not Identify Root Causes of Sustained Noncompliance, Follow the Court's Orders, or Hold Corizon Accountable ................................................................. 33

        1.   Defendants Fail To Meaningfully Investigate the Causes of Noncompliance With The Stipulation and the Court's Orders ................................................................. 35

        2.   Defendants Fail to Obey The Court's Orders ...................... 36

        3.   Defendants Fail to Demand Accountability From Corizon ................................................................. 40

II.   DEFENDANTS' PRACTICES IN MONITORING THE MAXIMUM CUSTODY PERFORMANCE MEASURES CREATE DUBIOUS COMPLIANCE RATES FOR THE ISOLATION SUBCLASS ................................................................. 44

PRAYER FOR RELIEF ................................................................. 45

1

### INTRODUCTION

2  At the April 17, 2017 hearing, the Court instructed the parties "to present to the

3 Court what they think the significance [is] of the testimony" heard at the evidentiary

4 hearings held on March 8, 21, and 28, and April 17, 2017.  [Transcript of April 17, 2017

5 Hearing ("4/17/17 Tr.") at 670:20-21]  The Court also gave notice to the parties under

6 Rule 53(b)(1) of the Federal Rules of Civil Procedure that it was contemplating

7 appointing a Special Master to evaluate Defendants' monitoring program and to provide

8 guidance to the Court on potential remedial measures.  [*Id.* at 673:24-674:15]  This brief

9 addresses the Court's questions regarding the significance of the testimony heard at the

10 evidentiary hearings; Plaintiffs are filing concurrently a separate brief regarding the

11 Special Master.

12  The recent filing by Defendants of their "Notice of Compliance with the

13 Stipulation and Termination of Monitoring Pursuant to Paragraph 10(b)" (Docs. 2040 and

14 2041) calls for the Court to consider further measures.  The Court already has found that

15 much of the methodology that Defendants have used for the past two years is faulty.  [*See,*

16 *e.g.*, Docs. 1673, 1745, 1831, 1833, 1907, 1915, 1918, 1933, and 1951]  After listening to

17 several days of testimony by the people who do the actual monitoring and their

18 supervisors, the Court found that there remain "great chasms of competence" in the

19 monitoring.  [4/17/17 Tr. at 671:18]  Despite the Court's finding, Defendants rely on the

20 CGAR scores using a methodology that the Court has rejected—and instructed them that

21 they would need to recalculate, *see* Doc. 1951 at 1-2—to announce that they unilaterally

22 stopped monitoring numerous Performance Measures before notifying the Court or

23 Plaintiffs' counsel.  [Docs. 2040, 2041]  This action shows bad faith if not contempt for

24 acting directly contrary to the Court's February 24, 2017 Order, which stated:

25
> Defendants are under no obligation to apply the Final
26
> Monitoring Guide's procedures retroactively.  However, if
> Defendants want to persuade the Court that a given
27
> Performance Measures at a given facility is compliant with the
> Stipulation, *then Defendants will have to show that this*
28
> *PM/facility was compliant under the Final Monitoring*
> *Guide's procedures*.  The Court expects that this situation

> would arise for Defendants in at least three contexts: in response to a Motion to Enforce, when moving to terminate a finding of noncompliance under a remediation plan, and *when moving to terminate the Court's oversight.*

[Doc. 1951 at 1-2 (emphasis added) (citing Doc. 1185 at ¶¶ 10, 20)]

The history of the past two years leads to the inescapable conclusion that Defendants are incapable of and unwilling to accurately and reliably monitor Corizon's compliance with the Performance Measures. There simply is no incentive for Defendants rigorously to monitor compliance of its contractor, a for-profit corporation that has shown itself to be unable or unwilling to improve the health care it provides to class members.

In light of this history and the Court's Order, Plaintiffs submit that the Court should either order Defendants to hire an independent auditing entity to monitor compliance with the Performance Measures, or appoint a Receiver for the limited purpose of monitoring compliance with the Performance Measures. No other solution will provide the Court and the parties with confidence in the compliance scores.

## I.    DEFENDANTS' TESTIMONY REGARDING MONITORING OF THE STIPULATION AND THE COURT'S ORDERS CALLS THEIR ENTIRE MONITORING SCHEME INTO QUESTION

At the outset of the evidentiary hearings, the Court stated

> And so the process that I envision today is one where we would understand more about exactly what was happening in the defendant's side of the house, one that plaintiffs, I'm hopeful by learning more about, perhaps can come to an understanding that some number of areas where there are fears can be reduced and that if there remain areas about which there are vibrant fears we can focus on that and we can at least move forward in a constructive way that I think ultimately at the end of the day will produce something consistent with the idea that you presented, and that is you settled the case.

[Transcript of March 8, 2017 Hearing ("3/8/17 Tr.") at 6:6-16]

After days of testimony, Plaintiffs' concerns about Defendants' inadequate monitoring have been magnified significantly: past concerns about potential inaccuracies were confirmed, and new monitoring problems emerged that Plaintiffs previously had not been aware of. Defendant Pratt admitted that, "When we created this Monitoring Bureau,

honestly we didn't know what we were doing because we had never done it before."

[4/17/17 Tr. at 641:19-21]  The widespread, ongoing, and profound inconsistencies and

incompetence uncovered in the testimony of Defendants' employees calls into question

whether the Court can rely upon the accuracy of the past two years of monitoring reports,

and the accuracy of Defendants' reports of compliance with many performance measures.

The Court similarly noted at the conclusion of the April 17, 2017 hearing,

> [W]hat I also think that it's appropriate for me to do is to let you know that this education process has informed me in a way that has raised serious concerns about the quality and the dependability of the monitoring program that the defendants currently have in place.  I think that there has been sufficient testimony to warrant a reasonable conclusion that even accepting, as Mr. Pratt has said, that this has been a learning process and they started out not knowing how to do it and they have been building this project, that there are great chasms of competence . . . .

[4/17/17 Tr. at 671:9-18]

Plaintiffs' concerns regarding monitoring and enforcement that arose due to the

testimony fall into five broad categories:

1. Defendants have failed to properly randomize source documents used by monitors;

2. Problems and questions raised by the source documents themselves— who is preparing them, who is inputting the information that is used in the source documents, and whether the source documents listed in the Monitoring Guide are what the monitors actually use to determine compliance;

3. Idiosyncratic auditing and reporting practices of the individual monitors which lead to inconsistent results for the same performance measure, prison-by-prison or from month-to-month, and sampling of cases or files for which it is mathematically or temporally impossible for there to be noncompliance;

4. Defendants' "rebuttal" system, created without notification to the Court or Plaintiffs, which allows headquarters staff to change monitors' date and time stamped entries and findings in the CGARs at Corizon's request, without notice to the monitors, or any indication apparent on the face of the CGARs;

5. An unwillingness by Defendants to identify the root causes of sustained noncompliance, to follow the Court's orders, and to hold Corizon accountable for noncompliance.

Plaintiffs also request that the Court order that the past two years of monitoring data is null and void for purposes of Paragraphs 10(b) and 20(b) of the Stipulation, and that the Court "reset the clock" for the requirement of terminating monitoring as to all performance measures.[1]

Plaintiffs discuss each of their concerns in turn below, with representative illustrations from witness testimony.  Given that almost 700 pages of testimony was taken regarding the monitoring of the health care performance measures, the excerpts contained here are not exhaustive; there is additional testimony that illustrates each point. Furthermore, this is not a comprehensive summary of all of Plaintiffs' concerns regarding Defendants' methodology; instead, this report to the Court is focused on the issues that emerged during the hearings.  Given the non-transparent nature of Defendants' monitoring methodology, and their history of making changes to that methodology without notifying Plaintiffs or the Court, additional problems may come to light in the future.

## A.    Defendants' Inability To Randomize Source Documents Properly Makes Monitoring Results Unreliable

The cornerstone of Defendants' auditing process should be ensuring that source documents are randomized properly.  [*See* Declaration of Corene Kendrick ("Kendrick Decl."), Ex. 1 (March 7, 2017 Monitoring Guide at 10)]  Randomization is critical to the process because for almost all of the health care performance measures, the monitors use a randomized list of patients (or encounters, or prescriptions), and select the first ten applicable files listed for each unit.[2]  [*See, e.g.*, Haldane (3/8/17 Tr. at 98:4-8); Evans

---

[1]  In the alternative, if the Court is not inclined to reset the clock on the Stipulation, Plaintiffs request that the Court order Defendants to re-audit all performance measures from March 2015 to the time at which a final Monitoring Guide is in place.  [*See* Doc. 1951 at 1-2]

[2]  The testimony confirmed that there is inconsistency with regard to the sample size of ten files per unit.  Most monitors testified that they review the first ten applicable files at a given unit for a performance measure and do not go beyond the ten and audit additional files.  [*See, e.g.*, Haldane (3/21/17 Tr. at 150:1-9, "I have neither the time nor the inclination to do that"); Cartwright (*Id*. at 278:19-279:1); Fontaine (*Id*. at 319:6-9);

(continued on next page…)

1    (3/21/17 Tr. at 236:23-24); Winland (*Id.* at 172:1-8); Cartwright (*Id.* at 278:15-279:1);

2    Fontaine (*Id.* at 332:22-25); Dye (4/17/17 Tr. at 460:3-19; 523:20-22)]  The monitors are

3    given source documents that they are told are randomized, but they have no other way of

4    knowing they are randomized.  [*See, e.g.*, Haldane (3/21/17 Tr. at 167:7-13); Fontaine

5    (3/21/17 Tr. at 313:6-14; 332:20-21)]

6         But, as the Court observed, "the witness that was proffered with respect to who has

7    responsibility for randomization doesn't seem to have an understanding of the basic

8    mechanism that he uses with Excel."  [4/17/17 Tr. at 671:19-22]  As detailed in the

9    Declaration of Dr. Craig Haney ("Haney Decl."), filed herewith, when surveying and

10   sampling a large universe of cases, random sampling is critical to ensure that the sample is

11   not skewed.  [Haney Decl. ¶¶ 5-7]  Random sampling ensures that "no one case from the

12   universe of cases has a higher probability . . . of being included in the sample," which

13   could result in intentional or inadvertent bias.  [*Id.* ¶¶ 5, 7]

14        The Court similarly observed that:

15             The idea with the randomization is to assure that there's not
               some kind of direction to the sampling process that could
16             skew it.  The questions that are being asked now raise the
               possibility in my mind that if you are getting the list of the
17             people to be randomized from Corizon, it is possible that they
               could omit from that list people that should be collected in the
18             list as a way to manipulate the sample and render it not as
               trustworthy.
19

20   [3/8/17 Tr. at 75:21-76:3]  The testimony of witnesses, including the person Defendants

21   presented as being responsible for randomizing lists and reports, casts doubt on whether

22

23

24   (…continued from previous page)

25   Barlund (4/17/17 Tr. at 575:15-18, 610:3-7)]  In contrast, the mental health monitors
     decided, without notice to Plaintiffs or the Court, to go beyond 10 files for PM 92.  [Dye
26   (*Id.* at 497:12-498:1)]  The Court has previously expressed concerns about such unilateral
     and undisclosed changes in the monitoring methodology, including with respect to the
27   selection of files to be reviewed.  [1/26/17 Tr. at 5:17-6:12]  *See* Part I.C., *infra*, regarding
     additional inconsistencies among the various monitors.

28

Defendants even know how to properly randomize information, let alone whether randomization is reliably occurring.

Ryan Owens testified that his job duties include producing and randomizing lists of prisoners for the monitors to use when selecting their samples for auditing purposes. [3/8/17 Tr. at 66:9-11; 71:15-23]  Yet he has no training in statistics or in the use of Microsoft Excel, and was unable to define a random sample.  [*Id.* at 70:15-71:3; 81:9-21; 81:25-82:5]  He testified that he assigns random numbers to the lists using a formula in Microsoft Excel, and sends the spreadsheets to the monitors.  [*Id.* at 67:12-68:3; 90:8-13]

However, the lists that Mr. Owens produces using Excel (including those used by Defendants as testimonial exemplars) do not appear to have been sorted after he randomized them, because the lists either do not have randomly generated numbers next to the prisoners' names, or the random numbers are not sorted from smallest to largest.[3] [*See, e.g.*, Evans (3/21/17 Tr. at 245:19-24); Cartwright (*Id.* at 285:21-287:13, 301:3-17); Fontaine (*Id.* at 332:20-21)]  This is because Mr. Owens apparently omits the required step of saving the random numbers as a value (versus as the randomization formula), and then sorting the entire table by the random value.

Dr. Haney explains that

> After assigning the random numbers to the universe of cases, the table of cases would then be re-sorted into numerical order by the random numbers, from smallest to largest, and the first "X" cases would be selected from that list (where "X" is the sample size desired).  Omission of any of these steps will result in a sample that is not random."

[Haney Decl. ¶ 10]

Another monitor, Erin Barlund, testified she has training in Excel, and she correctly described this step of saving the random numbers as a value, as a necessary part

---

[3]  [*See* 3/21/17 Tr. at 268:2-10 ("THE COURT:  [I]f you look at Exhibit C, . . . [t]hey are not in -- these randomized numbers are not in an order.  So you would think that if you are randomizing and assigning numbers you would respect the randomization by putting them in order.")]

of the process, because of what she characterized as the "volatility" associated with Excel's randomization feature.  [4/17/17 Tr. at 596:10-15; 597:7-14]  She monitors PM 14 at Phoenix and Winslow prisons,[4] and he testified that for approximately a year and a half, until April 2017, she was using Excel to randomize the HNR log document used to extract a list of applicable files to review for PM 14.[5]  [*Id.* at 594:25-595:4; 595:15-19, 596:10-20]

Ms. Barlund testified that at a meeting about three or four months prior to the April 2017 hearing, she raised her concerns regarding the volatility of the random numbers in Excel spreadsheets, and the fact that the person(s) randomizing the source documents needed to take the step of saving the random numbers as a value before sorting the numbers.  [*Id.* at 598:4-599:23]  She said that she believed that Ms. Campbell and Ms. Headstream would have been at the meeting, and possibly Mr. Pratt and Dr. Taylor.  [*Id.* at 599:7-9]  She also testified that she separately spoke with Mr. Owens about her concerns with how the numbers were randomized.  [*Id.* at 599:15-19]  It is troubling that the person responsible for randomizing the lists, and the Monitoring Bureau's senior management, apparently disregarded Ms. Barlund's warnings about the mistakes that could be occurring by not using Excel properly.[6]

---

[4] PM 14 states "Any refill for a chronic care or psychotropic medication that is requested by a prisoner between three and seven business days prior to the prescription running out will be completed in a manner such that there is no interruption or lapse in medication."  [Doc. 1185-1 at 8]  The Court found Defendants noncompliant with  PM 14 at Douglas, Eyman, Florence, Lewis, Perryville, Tucson, and Yuma.  [Doc. 1583 at 2]

[5] In response to the Court's questions, Ms. Barlund conceded that her monitoring of the performance measure prior to using Excel was "haphazard":

THE COURT:  That sort of sounds like it's anything but random before you used the randomization feature.
THE WITNESS:  It was probably more haphazard selection.

[4/17/17 Tr. at 601:1-4]  [*Cf.* Haney Decl. ¶ 5 ("A random sample does not mean a sample that is selected in an arbitrary, haphazard, or idiosyncratic fashion.")]

[6] Dr. Taylor conceded that Mr. Owens' failure to follow every step required in Microsoft Excel of (1) generating the random numbers with a formula; (2) saving them as
(continued on next page…)

1    Mr. Owens also does not randomize all of the source documents, and it was unclear

2   from the witnesses whether the other entities or individuals supplying the other reports

3   were randomizing them, or if the monitors knew themselves how to properly randomize a

4   report.  For example:

5       To measure PM 21,[7] the Perryville monitor, **Mr. Haldane** uses a release list
        from custody staff based on emails he receives each day in terms of which
6       prisoners are coming in, leaving, or moving, and checks against a list of
        prisoners on medication.  [3/21/17 Tr. at 138:1-18]  He will then choose the
7       first ten names from each yard.  [*Id.* at 139:1-2]  Mr. Haldane said that he
        thinks the list is randomized because he does not know "who is being
8       released when."  [*Id.* at 139:11-13][8]

9       **Mr. Winland**, the ADC pharmacist and pharmacy monitor, testified that the
        source document he uses for PM 11[9] is a patient profile report supplied by
10

11

12   _____

13   (…continued from previous page)
     values; and (3) sorting the table by the values, "is why when you are looking at it, it does
14   not appear to be in the randomization number order."  [3/21/17 Tr. at 346:12-14]  She also
     referred to a conversation similar to the one Ms. Barlund testified to: "We have discussed,
15   I believe, there is a way to save the number as an actual number so that it cannot change
     each time you sort.  And so I think that's something we're going to do going forward in
16   order to clearly show everyone that it is a random sample."  [*Id.* at 346:15-19]

17       To date, beyond Dr. Taylor's remarks at the hearing, Defendants have not notified
     Plaintiffs nor the Court if such a change has been implemented, as required by
18   Paragraph 9(b) and the Court's orders.  [*See* Doc. 1895 at 1; Jan. 11, 2017 Tr. at 9:2-25]

19       [7] PM 21 states "Inmates who are paroled or released from ASPCs will receive a
     30-day supply of all medications currently prescribed by the ADC contracted vendor."
20   [Doc. 1185-1 at 9]

21       [8] Mr. Haldane said he thought that he was knowledgeable "in a general sense"
     about how to randomize lists, and how to use Excel to create such lists.  [3/21/17 Tr. at
22   134:18-23]  However, he could not describe additional steps in the process beyond the
     first step of creating a formula to generate random numbers:  he did not know that the next
23   step would be to save the numbers as a value, he did not think that the table would need to
     be sorted after generating the column of random numbers, and he does not sort the table
24   when using Excel.  [*Id.* at 135:15-136:6 ("Well, I don't do that.")]

25       [9] PM 11 states "Newly prescribed provider-ordered formulary medications will be
     provided to the inmate within 2 business days after prescribed, or on the same day, if
26   prescribed STAT."  [Doc. 1185-1 at 8]  The Court found Defendants noncompliant with
     this measure at Eyman, Florence, Lewis, Tucson, Winslow, and Yuma prisons.
27   [Doc. 1583 at 2]  The Court's November 10, 2016 outside provider order covered PM 11
     at Eyman, Florence, and Lewis prisons.  [Doc. 1754 at 5; Doc. 1739 at 10-11]

28

PharmaCorr.[10]  [3/21/17 Tr. at 171:20-24; 203:1-9; 214:9-12]  Mr. Winland said he thinks the patient profile report comes to him already randomized based on the dates the prescriptions are written.  [*Id.* at 172:1-2; 203:10-11; 217:6-18]  He admitted that he does not know for sure that this document is randomized, but he is assuming that it is, based on its appearance.  [*Id.* at 217:19-218:4]  He also testified that the list does not have a column of random numbers in it.  [*Id.* at 203:22-24]

Mr. Winland testified that to measure PM 22,[11] he receives an "eOMIS extract" from a person at Corizon named Pam.  [*Id.* at 173:1-3]  He thinks the reports are random when she sends them to him because the dates of the prescriptions are not in order.  [*Id.* at 214:16-215:6]

**Ms. Cartwright**, the Eyman monitor, audits PMs 71 and 72, which relate to medical diets.[12]  She testified that she is provided information regarding inmates who have refused diets by the food service liaison.  [*Id.* at 306:15-23]  In response to the Court's questions, she testified that she assumes that if a prisoner is not on that list, then he received his diet.  [*Id.* at 307:2-8]  The Court observed that with this methodology, "[t]here's nothing in this performance measure anybody certifying this was done.  It is only someone refused it."  [*Id.* at 307:18-19]

---

[10]  PharmaCorr is a subsidiary of Corizon Health.  [3/21/17 Tr. at 232:17-18]  Mr. Winland testified that he has no reason to think that PharmaCorr would "cherry pick" the lists provided to him, given their historic rates of noncompliance with some pharmacy measures.  [*Id.* at 215:11-20]

> THE WITNESS:  . . . PharmaCorr has no idea of how [. . .]  my methodology for my performance measures.  It literally is a computer abstract of that audit month.
> THE COURT:  But they have a horse in the race.  They want to be found compliant.

[*Id.* at 216:12-17]

[11]  PM 22 states, "Non-formulary requests are reviewed and approved, disapproved, or designated for an alternate treatment plan (ATP) within two business days of the prescriber's order."  [Doc. 1185-1 at 9]

[12]  PM 71 states, "Inmates with diagnosed and documented diseases or conditions that necessitate a special diet will be provided the diet, if clinically indicated.  When prescribing the special diet, the provider will include the type of diet, duration for which it is to be provided, and any special instructions."  [Doc. 1185-1 at 13]  PM 72 requires "Inmates who refuse prescribed diets for more than 3 consecutive days will receive follow-up nutritional counseling by a QHCP."  [*Id.*]  A "QHCP" is a Qualified Health Care Professional, defined in the Stipulation as "Physicians, Physician Assistants, Dentists, nurses, nurse practitioners, dentists [sic], mental health professionals, and others, who by virtue of their education, credentials/license, and experience are permitted by law to evaluate and care for patients."  [*Id.* at 5]

1  **Ms. Barlund**, the Phoenix monitor testified that until the February 2017
   CGARs, in order to measure PM 45,[13] she used a document sent to the
2  monitors by Corizon called the Diagnostic Services Report. [4/17/17 Tr. at
   605:8-11, 605:14-22] She randomized the report herself for her prison. [*Id.*
3  at 607:15-17]  As of the February 2017 CGARs, Mr. Owens is now in
   charge of randomizing the Diagnostic Services Report.[14]  [*Id.* at 606:23-
4  607:14]

5
   **B.    Additional Problems Arise From The Source Documents Used to
6         Create Samples**

7      The monitors' testimony also raised concerns regarding the source documents used

8  to obtain the lists of prisoners from which the monitors draw their samples.   First,

9  Mr. Owens testified to not being familiar with, and/or randomizing, many of the reports

10 that are purportedly the source document for various performance measures pursuant to

11 Defendants' Monitoring Guide.  This raises the question of what the monitors actually

12 have been using and/or are using as their source documents for monitoring.  Second, there

13 appear to be incomplete information or errors in the source documents that are not

14 observed or resolved by ADC monitors.

15     The Court noted that

16         There are other things that can adversely affect a sampling
           process.  One of the things I have highlighted is where did the
17         list of names come from?  Did you have control over those
           names?  Could they have been the subject of manipulation
18         before you got the names?  I don't have any doubt that you
           can run the Excel program and randomize and probably what
19         you get is probably okay and probably not subject to attack.  It

20

21     [13] PM 45 states, "On-site diagnostic services will be provided the same day if
   ordered STAT or urgent, or within 14 calendar days if routine." [Doc. 1185-1 at 11] The
22 Court found Defendants noncompliant with PM 45 at Lewis and Tucson.  [Doc. 2030 at 2]

23     [14] Mr. Owens testified that the Diagnostic Services Report "doesn't sound
   familiar."  [3/8/17 Tr. at 79:12-13]  *See infra* Part I.B.1.  Ms. Barlund was the only
24 monitor who testified who audits PM 45; the other monitors who testified who are
   assigned to pharmacy measures (Mr. Winland, Douglas and Safford (Mr. Evans), Eyman
25 (Ms. Cartwright), Florence (Ms. Fontaine), and Perryville (Mr. Haldane), do not monitor
   PM 45.  [*See* Doc. 1999-1, Ex. 1 at ADCM841917 (Douglas January 2017 CGAR), Ex. 2
26 at ADCM841962 (Eyman), Ex. 3 at ADCM842015 (Florence), Ex. 5 at ADCM842134
   (Perryville), Ex. 7 at ADCM842190 (Safford)]  Thus it is unknown if the others who
27 monitor PM 45 knew how to randomize the report properly like Ms. Barlund did, when
   they were provided the reports.

28

1  |  just raises other issues for me about whether or not the integrity of the system from start to finish is completely secure.

2

3  [3/8/17 Tr. at 85:20-86:4]

4  Dr. Haney observes that "it is critically important that the random sample be drawn

5  from an appropriate source" because "[a]ny incompleteness or inaccuracy, whether

6  deliberate or inadvertent, in the source document from which the sample is drawn

7  compromises the representativeness of the sample and the extent to which generalizations

8  can be made about the population from which it is drawn." [Haney Decl. ¶ 8] Mental

9  health monitor Dennis Dye observed, "I mean, without an accurate log, it's nothing."

10  [4/17/17 Tr. at 436:9-11]

11  **1.  Uncertainty As to What Monitors Use for Source Documents**

12  Mr. Owens, whom Defendants presented as their witness to answer the questions

13  raised by the Court about randomization of source documents, (3/8/17 Tr. at 67:4-7),

14  testified that he was unfamiliar with multiple reports that the Monitoring Guide lists as the

15  source documents for numerous performance measures, or he testified that he has only

16  started randomizing these reports in the past month or two. This raises two immediate

17  questions: (1) Who, if anyone, was randomizing these source documents prior to a few

18  months ago? (2) What source documents have the monitors been using for the past two

19  years to monitor compliance, if not these reports?

20  For example, Mr. Owens testified as to the following regarding report

21  randomization:

22  • Reports for the pharmacy performance measures: "Not to my knowledge. I do not believe I do that."[15] [3/8/17 Tr. at 77:23-25]

23

24  • Reports for the dental performance measures:[16] "I did for a couple months while somebody was on leave." [*Id*. at 80:17-19]

25

26  _____

[15] There are 12 pharmacy performance measures: PMs 11-22. [Doc. 1185-1 at 8-9]

27

28  [16] There are four dental performance measures: PMs 100-103. [*Id*. at 15]

- <u>Special needs orders reports</u>:[17]  "[i]t sounds familiar" but he does not believe he randomizes it.  [*Id.* at 78:3-7]

- <u>Released inmate reports</u>:[18]  "I believe I might have started that within the last couple months, randomizing that."  [*Id.* at 78:8-11]

- <u>Arrival log reports</u>:[19]  "I believe I have randomized it recently in the last couple months."  [*Id.* at 79:6-11]

- <u>Diagnostic services reports</u>:[20]  "That doesn't sound familiar."  [*Id.* at 79:12-13]

- <u>Denied consult reports</u>:[21]  "That doesn't sound familiar."  [*Id.* at 79:14-15]

- <u>Urgent consult reports</u>:[22]  "That definitely doesn't sound familiar."  [*Id.* at 79:16-17]

---

[17]  This relates to PM 20 (Medical AIMs entries are accurately completed within 3 business days from the entry in the medical record).  [Kendrick Decl. Ex. 1 at 35]

[18]  This relates to PM 21 (Inmates who are paroled or released from ASPCs will receive a 30-day supply of all medications currently prescribed by the ADC contracted vendor).  [Kendrick Decl. Ex. 1 at 36]

[19]  This relates to PM 33 (All inmates will receive a health screening by an LPN or RN within one day of arrival at the intake facility); PM 34 (A physical examination including a history will be completed by a Medical Provider (not a dentist) by the end of the second full day of an intake inmate's arrival at the intake facility); PM 60 (All female inmates ages 21 to 65 will be offered a Pap smear at the inmate's initial intake physical examination, and every 36 months thereafter unless more frequent screening is clinically recommended); and PM 62 (All prisoners are screened for tuberculosis upon intake). [Kendrick Decl. Ex. 1 at 50, 51, 86, 88]

[20]  This relates to PM 45 (On-site diagnostic services will be provided the same day if ordered STAT or urgent, or within 14 calendar days if routine) and PM 46 (A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison).  [Kendrick Decl. Ex. 1 at 62, 64]

[21]  This relates to PM 48 (Documentation, including the reason(s) for the denial, of Utilization Management denials of requests for specialty services will be sent to the requesting Provider in writing within fourteen (14) calendar days, and placed in the patient's medical record) and PM 49 (Patients for whom a provider's request for specialty services is denied are told of the denial by a Medical Provider at the patient's next scheduled appointment, no more than thirty (30) days after the denial, and the Provider documents in the patient's medical record the Provider's follow-up to the denial). [Kendrick Decl. Ex. 1 at 68-70]

[22]  This relates to PM 50 (Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within thirty (30) calendar days of the consultation being requested by the provider) and PM 52 (Specialty consultation

(continued on next page…)

- Routine consult reports:[23] "No." [*Id*. at 79:18-19]

- Chronic care reports: "That doesn't sound familiar." [*Id*. at 79:20-21]

- DI 37 AIMS reports:[24] "I have randomized that in the last few months." [*Id*. at 79:22-23; 80:1-3]

- Diet reports:[25] He is not familiar with them, and has not randomized. [*Id*. at 80:8-11]

The only reports Mr. Owens could confirm definitively that he has been randomizing for any duration of time or regularity, were some mental health reports, the HNR log and nurse's line logs, and the provider encounter log; he "thinks" he randomizes the IPC [infirmary] Census Report. [*Id*. at 75:9-13; 77:10-13; 77:18-22; 80:4-7]

Except for Ms. Barlund and Dr. Taylor, the compliance monitors did not testify that they personally randomized lists, but rather they testified that they receive lists they are told are randomized, and they select the first ten applicable names. [*See, e.g*., Haldane (3/21/17 Tr. at 136:10-12; 137:1-5; 139:9-16); Cartwright (*Id*. at 272:24-273:16); Fontaine (*Id*. at 313:6-14; 319:6-9; 332:22-25); Winland (*Id*. at 171:16-172:8; 203:10-11; 217:6-218:4); Evans (*Id*. at 245:10-24; 246:7-8); Dye (4/17/17 Tr. at 428:15-20; *see also* 438:16-439:14 (Mr. Dye hypothesizing that if there were more than 10 records in a given month

---

(…continued from previous page)

reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report). [Kendrick Decl. Ex. 1 at 71-72, 75] The Court found Defendants noncompliant with PM 50 at Florence. [Doc. 2030 at 2]

[23] This relates to PM 51 (Routine specialty consultations will be scheduled and completed within sixty (60) calendar days of the consultation being requested by the provider) and PM 52. [Kendrick Decl. Ex. 1 at 73-75] The Court found Defendants noncompliant with PM 51 at Eyman, Florence, and Tucson, and with PM 52 at Florence, Perryville, and Tucson. [Doc. 2030 at 2]

[24] This relates to PM 59 (Inmates will be screened for TB on an annual basis). [Kendrick Decl. Ex. 1 at 85]

[25] This relates to PMs 71 and 72. *See supra* page 9 and n.12.

1    that qualified for PM 74[26] he would randomize them himself using Excel, but he could not

2    recall that ever happening).]

3          The Court noted to Mr. Dye, the mental health monitor, that "the supervised party

4    is providing you the documents and they are the ones who are being monitored and are

5    also the ones who are subject to possible ramifications for failure to provide that service,

6    then it would raise a question about whether or not there was some problem with relying

7    upon that entity providing you the source documents."   [4/17/17 Tr. at 442:12-17]   If

8    Mr. Owens has not been randomizing the documents for the monitors (putting aside the

9    significant questions about his randomization skills, *see* Part I.A. above), it raises the

10   question of what source documents or lists the monitors are using, and whether they are

11   pulling a random sample of records when they select the first ten files on these lists.

### 2.        Incomplete Information or Errors in Source Documents

13         After three days of testimony from the health care monitors, there also were more

14   questions than answers about the accuracy of the source documents, including

15   - What persons or entities are creating the source documents prior to
16     randomization?

17   - What information is contained in the source documents?

18   - Is there is any quality control to ensure that the source documents are
     complete and accurate, as they are based upon whether or not health care
19     staff correctly entered information into eOMIS, or if custody staff correctly
     entered information into ADC's various databases?

20         Mr. Owens testified that he does not create the non-mental health lists that he

21   randomizes, his work is based upon what Corizon sends him.   [3/8/17 Tr. at 74:24-75:3;

22   76:10-16; 76:25-77:3, 82:14-16]   He does not know who at Corizon creates the lists.   [*Id*.

23   at 75:4-5; 91:14-16]   Other than checking to make sure a unit was not excluded from the

---

26     PM 74 states, "All female prisoners shall be seen by a licensed mental health
clinician within five working days of return from a hospital post-partum."   [Doc. 1185-1
at 13]

source lists, Mr. Owens does not do any further inquiry into the completeness of the list. [*Id*. at 86:22-24]

With regard to the mental health source documents involving prisoners with specified mental health [MH] classifications, Mr. Owens testified that he pulls all of them except the list of MH-3D prisoners from ADC's AIMs system.   [*Id*. at 72:6-10] Mr. Owens testified that the list of MH-3D mental health prisoners comes from mental health monitor Dennis Dye, but he doesn't know if it lists every prisoner in the system who is MH-3D, doesn't know how Mr. Dye creates the list, or why the MH-3D prisoners are handled differently.   [*Id*. at 88:1-15; 92:21-25; 93:1-10]   Mr. Owens does not create the source documents for patients who are on suicide watch; those who have recently been removed from suicide watch; those who are releasing within the next 30 days; or those who have filed mental health HNRs.  The latter list comes from Corizon; Mr. Owens does not know where the others come from.  [*Id*. at 74:13-75:20]

Mr. Dye testified that he receives various source documents from Corizon, and then sends them to Mr. Owens for randomization.  [4/17/17 Tr. at 434:21-435:5] Mr. Dye acknowledged that if these lists were inaccurate or incomplete, he would not be able to tell by looking at them.   [*Id*. at 441:22-442:6; 478:12-479:4; 503:4-11]   When asked what steps Mr. Owens takes to ensure that the list from Corizon is complete and accurate, Mr. Dye replied, "Well, he relies on it being accurate from Corizon." [*Id*. at 478:12-15]

The CGAR results for multiple performance measures are implicated by the monitors' testimony as to whether the source documents, as defined in the monitoring guide, match the information in the reports that they are using.  As one example, many of the performance measures that evaluate the timeliness of referrals from nursing staff to provider staff, or from provider staff to outside specialists, are supposed to be based upon *referral* reports, rather than *encounter* reports.  This is not simply a matter of semantics. For example, PM 39 requires that referrals *from* a nurse *to* a provider that are routine,

must be seen by the provider within 14 days.[27]  [Doc. 1185-1 at 10]  Therefore, in order to properly measure this performance measure, the monitor must work off a report that captures the entire universe of all referrals made by nurses to providers, where the referral would be due in the audited month.  [*See* Kendrick Decl. Ex. 1 at 56]  If the monitor were to work in reverse, that is, to use a report listing completed provider appointments for the audited month and see when the patient was referred, it would eliminate the entire universe of patients who were referred but not seen in the audited month.  [*See also* Doc. 1539 (Declaration of Dr. Todd Wilcox) at 10-11 ¶¶ 25-26 (describing selection bias in using a source document of completed appointments)]  Defendants agreed to make the Monitoring Guide reflect the need to use referrals as the starting point for multiple medical performance measures.[28]

However, based upon some of the witnesses' testimony, it is unclear if the source documents for which Corizon compiles the raw data, are including referrals or solely completed encounters.  Representative examples include:

**Mr. Haldane**, the Perryville monitor, testified that he receives a nurse encounter report and provider line encounter report from ADC's central office that he believes is generated by Corizon.  [3/21/17 Tr. at 136:12-19; 137:3; 3/8/17 Tr. at 97:17-18]  Mr. Haldane did not know if the lists show the encounters that should have happened in the month (in other words, a report that includes all referrals), or only the encounters that were in fact completed in the month, and does not know how they are generated.  [3/21/17 Tr. at 136:20-25]  He testified he thinks that it would *not* include people with a pending or requested appointments that were not seen, and that the monitor "probably" would have to go to the HNR log in order to find the people who were referred but not seen.  [*Id*. at 137:13-15]  He admitted, however, that he does not compare the list of all HNRs submitted with the provider or nurse line encounter list.  [*Id*. at 137:21-25]  Mr. Haldane does not know how the HNR log is created.  [*Id*. at 115:2-3]

---

[27]  The Court has found Defendants noncompliant with PM 39 at Eyman, Florence, Lewis, Perryville, Tucson, and Yuma.  [Doc. 1583 at 2; Doc. 2030 at 2]  The Court's Nov. 10, 2016 outside provider order covered PM 39 at Eyman, Florence, Lewis, Perryville, and Tucson prisons.  [Doc. 1754 at 5; Doc. 1739 at 10-11]

[28]  *See* Doc. 1626-1 at 19, 25-26, 31, 46, 69-71 for an exhaustive history of the parties' communications over a year ago regarding the multiple performance measures where referrals need to be the starting point for an assessment of compliance, including PM 39.

On the other hand, **Ms. Cartwright**, the Eyman monitor, reported that when monitoring PMs 39 and 40,[29] she uses the "nurse referral log," which is a list of prisoners, their numbers, their units, and the dates they were seen by the nurse. [*Id*. at 288:22-25 (PM 40); *id*. at 294:18-295:20 (PM 39)] She does not know if this log is randomized when it is sent to her; she picks the first ten names listed in the log for the type of referral. [*Id*. at 289:6-13] Nurses have to affirmatively select emergent or urgent referral in the eOMIS system. [*Id*. at 291:4-6]

**Mr. Evans**, the Douglas and Safford monitor, testified that for PM 39, the source document is the "nurse's line" report, and then he looks for any referrals made by the nurses. [*Id*. at 257:6-10] Whether or not a referral shows up as routine, urgent, or emergent is solely dependent upon whether the nurse classifies them. [*Id*. at 257:13-258:5] With regard to PM 42,[30] Mr. Evans testified that "it is a fluid process" and he does not use a referral report but instead reviews all of the provider visits, but "it's very hard to go through 800 charts and find where a provider actually referred that inmate for a specific follow-up." [*Id*. at 258:13-259:2; 256:22-24] He works off of a list of all provider encounters and reviews the encounters to see if there was a request for follow up. [*Id*. at 258:19-23]

The witnesses' testimony also elicited other examples of how the source documents are only as accurate or as complete as the information entered into the system by health care or custody staff.[31] For example:

With regard to PMs 40 and 41,[32] **Mr. Haldane** testified that the monitors do not get a list of the referrals. [*See* 3/21/17 Tr. at 159:19-21 ("I don't get a list of here are the emergent or urgent referrals. We have to look for them.")] He then contradicted himself and said he gets a referral list that is "supposed to be" referrals to the provider, and "[u]sually" the list says if the referrals are routine, urgent, or emergent. [*Id*. at 160:4-7] However, he then conceded, "No they are not marked. [...] I can't look at a list and say here are the urgent ones, here are the emergent ones, and here are the – I have to look in each encounter to try to determine which it is." [*Id*. at 160:15-19] "[T]here are individual cases where sometimes buttons aren't pushed." [*Id*. at 160:9-10; *see also id*. at 161:12-15 ("Q. So your testimony is that one

_____

[29] PM 40 states: "Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral." [Doc. 1185-1 at 10] The Court has found Defendants noncompliant with PM 40 at Eyman and Tucson. [Doc. 2030 at 2]

[30] PM 42 requires: "A follow-up sick call encounter will occur within the time frame specified by the Medical or Mental Health Provider." [Doc. 1185-1 at 10]

[31] This concept is known in the military and computing worlds as GIGO, or "Garbage In, Garbage Out."

[32] PM 41 requires: "Emergent provider referrals are seen immediately by a Medical Provider." [Doc. 1185-1 at 10]

1    emergency referral for the entire institution for the entire month of
2    December is normal?   A. I'm saying my testimony is that that's what I
     found in December.")]

3    In the May 2016 CGAR for Eyman, **Ms. Cartwright** reported for PM 39
4    only one routine referral from nurse's line to provider on both SMU-I and
     Browning Units for the entire month.  [*Id.* at 294:18-24]  She could not
5    recall whether the source document only listed one referral, or whether she
     contacted her supervisor to ask if there was information missing from the
6    source document.  [*Id.* at 295:14-15, 298:11-15]  Ms. Cartwright could not
     say whether a log listing only one routine referral for the month for an entire
7    unit would raise a question to her about whether the source document was
     complete.  [*Id.* at 295:21-296:2]  Similarly, she did not think that three
8    urgent referrals and four emergent referrals for an entire month for a prison
     complex of 5,000 prisoners seemed low.  [*Id.* at 289:24-290:5]

9    Ms. Cartwright testified that to monitor PM 26,[33] she receives separate
10   grievance logs from Corizon and from custody staff.  She does not combine
     or reconcile the two logs or randomize them, she does not know if they are
11   randomized when given to her, but she picks the first 10 grievances listed on
     the Corizon log and continues to the custody log if there are discrepancies
12   between the two lists.  [3/21/17 Tr. at 285:4-286:19; 287:11-13]  She was
     shown the CQI minutes for the same month as the Eyman May 2016 CGAR
13   report, and it reported a different number of grievances at the institution for
     the month of May; but she did not know the source used for the CQI
14   minutes, or why there was a discrepancy from her CGAR source.  [*Id.* at
     287:14-288:5]

15   **Ms. Fontaine**, the Florence monitor (3/21/17 Tr. at 310:2), testified that the
16   health care staff who administer medication are responsible for the
     medication non-compliance log that is used in monitoring PM 15.[34]  [*Id.* at
17   331:18-19, 332:11-17]   She does not know if the list is randomized;
     regardless, she simply picks the first ten people listed.  [*Id.* at 332:20-25]
18   For the September 2016 CGAR, she did not receive any logs at all for one
     unit, but rather than giving the unit a 0/10 on the performance measure, she
19   gave them a 0/0.  [*Id.* at 331:18-19, 333:1-3, 334:1-8]  In the CGAR, she
     repeatedly referred to the "grossly incomplete" medication logs at other
20   units.  [*Id.* at 334:9-23]

21   Ms. Fontaine attended the Florence CQI meeting on December 1, 2016
     where, according to the minutes of the meeting, there was a discussion about
22   approved specialty requests not showing on the pending consult report.[35]
     [3/21/17 Tr. at 337:8-25]   She testified she could not recall any of the

23

24   ─────────────────
        [33] PM 26 states, "Responses to health care grievances will be completed within 15
25   working days of receipt (by health care staff) of the grievance."  [Doc. 1185-1 at 9]

26      [34] PM 15 states, "Inmates who refuse prescribed medication (or no show) will be
     counseled by a QHCP after three consecutive refusals."  [Doc. 1185-1 at 9]

27      [35] This report would thus relate to PMs 50 and 51, regarding the timeliness of
     routine and urgent requests for outside specialty care.  [Kendrick Decl. Ex. 1 at 71-74]
28

1    discussion as to why the pending consult report was incomplete.  [*Id.* at
2    338:1-5]   She also attended a CQI meeting on January 5, 2017, where
     according to the minutes there was a discussion about how a "CAG report"
3    regarding mental health visits did not have accurate information, but she
     again testified she could not remember the discussion about why the report
4    was incomplete.  [*Id.* at 338:6-339:3]

5    **Ms. Barlund**, the Phoenix monitor (4/17/17 Tr. at 571:5-6), testified that a
     log of HNRs is used as the source document for PM 14, and that it varies
6    from prison to prison as to who creates this log for the monitors.  [*Id.* at
     595:11-21]   "Different sites handle it differently."  [*Id.* at 595:19]   To
7    measure PM 16,[36] she uses two separate source documents: a Clinic Stock
     Log and Patient-Specific Narcotic Log.  [*Id.* at 575:25-576:1, 576:19-22]
8    However, the Monitoring Guide only lists the Clinic Stock Log as the
     source document.  [Kendrick Decl. Ex. 1 at 30]

9    ### C.    Idiosyncratic or Improper Methodology Yields Unreliable Results

10       Multiple monitors described inadequate training on how to do their jobs, consisting

11   of initially being given a guidebook to read, and the primary way they learn of the Court's

12   orders and the parties' agreements regarding the methodology to use in their monitoring is

13   when they are sent an updated Monitoring Guide.  [*See, e.g.*, Pratt (4/17/17 Tr. 654:10-

14   18); Barlund (*Id.* at 583:25-584:7); Dye (*Id.* at 471:2-3, 487:1-13); Haldane (3/21/17 Tr. at

15   143:13-144:3); Evans (*Id.* at 251:12-14)]

16   ### 1.    Inconsistent and Improper Methodology Used by the Monitors

17       The testimony from the hearings demonstrated widespread inconsistencies in how

18   the monitors audit the performance measures.  Some examples include:

19   **Ms. Cartwright**, the Eyman monitor, in the November 2016 CGAR for
     PM 40 (urgent referrals to medical provider), included three referrals to the
20   dentist, because she thought dental referrals should be included in the audit.
     [3/21/17 Tr. at 298:16-299:11]
21
     **Mr. Evans**, the Douglas and Safford monitor, testified that when he is
22   auditing performance measures relating to medical diets, he uses as his
     sample only the diets newly issued in that given month.  [3/21/17 Tr. at
23   266:21-267:7]  On the other hand, **Ms. Cartwright** described how she looks
     at a no-show log, which would not be limited to newly-issued diets but
24   include all prisoners on special diets, which reflects the instructions in the
     Monitoring Guide.  [*Id.* at 306:15-308:17; Kendrick Decl. Ex. 1 at 101-102]
25

26

27       [36]  PM 16 states, "Perpetual inventory medication logs will be maintained on each
     yard."  [Doc. 1185-1 at 9]
28

To measure PM 25 at Perryville,[37] **Mr. Haldane** uses the field briefing reports sent every day by operations to see if there are any incidents that required basic life support. [3/21/17 Tr. at 151:17-25] "[T]here isn't a list per se for this." [*Id.* at 152:6-7] He also looks at the "significant incident report[s]," or nursing notes to figure out if life support was provided, "there are a variety of ways to find that out." [*Id.* at 156:12-15]

- Mr. Haldane did not include in his review for PM 25 for December 2016 a suicide attempt described in the CQI minutes as occurring in that month. [*Id.* at 151:12-20; 152:10-153:8]
- Mr. Haldane found in the July 2016 CGAR that an emergency response was compliant, but the CQI minutes reviewing July incidents, reported the same incident as a mortality in which the "man down bag [was] not mobile enough for needs; new man down bag ordered." [*Id.* at 154:21-155:8] Mr. Haldane was not aware of the man down bag not being mobile enough, and could not answer whether if he had known that fact, it would have changed his conclusion that the response met the performance measure requirement. [*Id.* at 156:19-157:22]

**Ms. Barlund**, the Phoenix compliance monitor, confirmed that different monitors at Phoenix treat the subunits of Flamenco Unit differently. While she pulls out Flamenco's subunits of George, Ida, John, King, and Quiet, and reviews up to 10 files for some of her performance measures; other monitors just review 10 files at Flamenco. [4/17/17 Tr. at 610:11-611:11] She does not know why other monitors looking at Phoenix do it differently. [*Id.* at 611:9-11] She testified that there has been some discussion of uniformly putting those subunits under one review of Flamenco, (*id.* at 611:12-25) and confirmed that fewer files would be reviewed at the prison if the monitors didn't separately measure the subunits of Flamenco. [*Id.* at 613:6-10]

Ms. Barlund also could not explain the notations used by a different person for a different month for the same performance measure she reviews (PM 16), and she does not use a similar coding system for the measure. [*Id.* at 592:17-593:10] She did not know why another monitor would use a method different than hers for the same PM. [*Id.* at 594:2-4]

The monitors also described varying and individualized practices related to recordkeeping and the "informal rebuttal" process they engage in with the facilities prior to entering data into the CGAR system, which implicates the ability for others, such as Plaintiffs, Corizon, or the Court, to spot-check their work via an "audit trail." This also affects Defendants' ability to go back and re-audit performance measures using the final Monitoring Guide, as the Court has previously noted. [Doc. 1951] For example,

---

[37] PM 25 states, "A first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency." [Doc. 1185-1 at 9]

**Ms. Campbell**, who supervises the various monitors (3/8/17 Tr. at 12:5-6), stated it "[v]aries by site" as to how the monitors notify institution-level health care staff of their preliminary findings. [*Id.* at 41:24-42:5-12] Ms. Campbell testified that the monitors only have to present the non-compliant findings, (*id.* at 42:20-21), and that she "encourage[s] the monitors to go in and verbally have that discussion with them. . . ." [*Id.* at 43:2-3]

**Ms. Barlund** testified that she keeps most of her notes on paper, and she uses an Excel spreadsheet for two performance measures. She then enters all of her preliminary findings in a Word document and sends that to the Facility Health Administrator and headquarters. [4/17/17 Tr. at 585:13-586:5] She sends Corizon all of her preliminary findings, not just the noncompliant ones. [*Id.* at 586:6-8]

**Mr. Haldane** fills his notes into an Excel spreadsheet. [3/8/17 Tr. at 99:12-15] As of December 2016, Mr. Haldane was not listing the compliant files he reviewed in the CGARs. [*Id.* at 114:4-8; 3/21/17 Tr. at 141:10-19] If someone wanted to go back and spot check his work for a month prior to January 2017, they would have to look at the Excel spreadsheet that he uses for tracking his work. [3/21/17 Tr. at 141:23-142:8] Mr. Haldane made the personal decision to track his work in an Excel spreadsheet, but he was not instructed to do so, and he does not know if other monitors keep similar records. [*Id.* at 142:17-25] He started using an Excel spreadsheet at some point after Corizon took over the contract. [*Id.* at 143:8-12] Mr. Haldane has never been instructed to go back and recalculate a past month's finding. [*Id.* at 144:13-16] He testified that it is "possible" to go back but "given the job duties that I have" it would require "spending an enormous amount of time doing it[.]" [*Id.* at 144:17-25]

When asked by the Court how often he sends an informal notification to Corizon staff about his findings, Mr. Haldane stated, "Not as often as I'm supposed to. …I am supposed to do it with every finding that I make…." [3/8/17 Tr. at 101:20-21] In the first stage of the rebuttal, if the monitor changes a determination, including going from a finding of non-compliance to a determination of compliance based on Corizon's response to the informal notification, there is no record of the change other than an email exchange. [*Id.* at 102:20-25]

**Mr. Winland**, the statewide pharmacy monitor (3/21/17 Tr. at 170:10-20), makes a Word document where he records his notes he takes while reviewing prisoners' files. [*Id.* at 204:24-205:5] "[S]ome" of these Word documents are saved on his computer. [*Id.* at 205:11] Until he audited January 2017, his Word document listed only the non-compliant files he reviewed, not the compliant ones. [*Id.* at 211:6-21] He would only be able to recreate his past work from a year ago "[w]ith great difficulty." [*Id.* at 212:23] Mr. Winland testified that he provides an informal review of his findings to the institution prior to entering the results into the CGAR. [*Id.* at 205:13-22] He sends over all findings, not just the noncompliant ones. [*Id.* at 206:14-18]

**Dr. Taylor** testified that she could re-audit the mental health performance measures pursuant to the Court's orders and the parties' agreements "if I had a team of 50 people." [3/21/17 Tr. at 413:6]

**Ms. Fontaine** takes notes by hand on a paper worksheet as she reviews files; she scans and sends these worksheets to the central office and keeps the paper copies in her office. [3/21/17 Tr. at 319:10-19]  She sends her preliminary results to the facility staff prior to entering the results in the CGAR system, and she does this for every performance measure she reviewed. [*Id.* at 319:25-320:13]

**Mr. Evans** keeps his working review notes by hand on physical pieces of paper, a worksheet. [3/21/17 Tr. at 246:25-247:2]  He does not keep his notes in a Word document, and does not know what the other monitors do. [*Id.* at 246:20-21]  He scans his handwritten notes and emails them to headquarters, but does not save a copy of them to the computer server or anywhere else. [*Id.* at 247:3-5, 9-11]  He thinks a record of the scans would be in his sent e-mails. [*Id.* at 247:6-8]

Mr. Evans only lists the noncompliant files in the CGARs. [3/21/17 Tr. at 247:13-15]  He testified that he used to list all of the files reviewed but "I have kind of gone away from that not for any other reason than it's just our approved practice that we list the non-compliant findings." [*Id.* at 247:23-248:4]  If somebody wanted to go back and spot check his work in a month when he didn't list the compliant records, they would have to look at his worksheet that would list all 10 files reviewed for that measure. [*Id.* at 248:12-17]

With regard to the informal rebuttal process, Mr. Evans testified that he sends an email to the health care administration at the prison with the initial findings before putting them in the CGAR. [3/21/17 Tr. at 238:10-12]  He "generally" sends the Corizon staff both the compliant and noncompliant findings, for every measures that he reviews. [*Id.* at 249:4-9]  He said that Corizon "absolutely" has found mistakes in his work, but they usually involve transposing a number. [*Id.* at 238:18-24]  However, he could not remember Corizon health staff telling him that he had made a mistake in Corizon's benefit, by overstating the rate of compliance in November 2016 CGAR for PM 44, where he entered the finding as 4/7 records, or 57% compliant, while his notes in the CGAR clearly showed that it was actually 3/7 compliant, or 43%. [*Id.* at 260:11-261:16]

The Court articulated its concerns with the informal review between the individual monitors and the facility staff in an exchange with Kathy Campbell:

Q. But is it also possible that they could raise that in the first stage and your monitor would say, okay, I think that's right and then it goes away as a non-compliant file even though it doesn't have this paper record associated with the formal rebuttal?

A. It could happen, yes.

Q. And so it's up to the individual monitor, really, how big an issue can be. That's not a precise way to say it. I would take as a simple issue a transposition of a number, and that that kind of mistake could be something that nobody would disagree about.  But beyond that kind of simple mistake, judgment calls, I think, are more likely to be involved, the kind of judgment call that I think invokes your process where you, as a supervising monitor

and the other supervising monitors engage in a more formal rebuttal process. *It seems to me from what you have described that more formal process subject matter could occur at the very first informal meeting with a monitor and Corizon where you all would never know it happened.*

[3/8/17 Tr. at 44:15-45:8 (emphasis added)]

Defendants also ignore the plain language of the Stipulation's monitoring requirements and their own Monitoring Guide. For example, the Stipulation's agreed protocol for PM 93 states that "[t]he Records reviewed for Performance Measure #92 will also be reviewed for compliance with this performance measure."[38] [Doc. 1185-1 at 33] However, Defendants disregard this requirement.

Q. So Mr. Dye, you agree with me, I assume, that the monitor guide says, "Review the same records from Number 92 for Number 93." Correct? You agree that's what it says?

A. Well, I mean I could argue the words. Does it say every single one of them, I don't know. But the fact is we didn't have the time to do that, so yeah, we made a decision not to do all 50 because we simply couldn't have.

\*\*\*

Q. Did anyone raise a concern that was not compliant with what the monitoring guide requires?

A. I don't remember that coming up, no.

[4/17/17 Tr. at 499:3-9, 18-20;[39] *see also* Doc. 1999-1, ADCM 841936-37 (Eyman CGAR for January 2017) (50 records sampled for PM 92 while only 20 sampled for PM 93); ADCM 842046 (Lewis CGAR for January 2017) (50 records sampled for PM 92 while only 10 sampled for PM 93)]

Defendants have also made the unilateral decision to simply read certain Performance Measures out of existence. Performance Measures 92 and 93 apply to

---

[38] PM 92 requires, "MH-3 and above prisoners who are housed in maximum custody shall be seen by a mental health clinician for a 1:1 or group session a minimum of every 30 days," and PM 93 requires, "Mental health staff (not to include LPNs) shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum custody." [Doc. 1185-1 at 14]

[39] Mr. Dye had previously testified that he does not "deviate from those instructions [in the Monitor Guide] in any way." [4/17/17 Tr. at 437:21-22]

prisoners who are "housed in maximum custody." [Doc. 1185-1 at 14]  The Court has previously found Defendants noncompliant with PM 92 at (*inter alia*) Perryville and Tucson, and with PM 93 at (*inter alia*) Tucson.[40]   [Doc. 1583 at 2]   The Court's November 10, 2016 Outside Provider Order included PM 92 at Perryville. [Doc. 1754 at 5; Doc. 1739 at 13]  Now Defendants, without seeking either Plaintiffs' agreement or the Court's permission, have taken the position that PM 92 and 93 simply no longer apply at Perryville and Tucson.  [*See* Doc. 2041 at 59 (listing compliance scores for Perryville and Tucson on PM 92 and 93 as "N/A")]  They assert (without providing any evidence to the Court) that there are no longer any maximum custody prisoners at those facilities.  [*See* 4/17/17 Tr. at 489:8-9 ("Perryville reclassified a lot of people so they are no longer max"); *id*. at 489:19-20 ("Only max at Tucson were minors, and I understand now they have quit designating minors as max.")]

This is not a decision Defendants may make unilaterally.  When Defendants similarly asserted that there were no longer any maximum custody prisoners at Florence Central Unit, the Court ordered them to provide "competent, admissible evidence demonstrating that (1) the enumerated facilities no longer house maximum custody inmates and (2) the conditions of close custody are substantially different from maximum custody such that close custody inmates would not otherwise qualify for protection under DI-326." [Doc. 1745 at 2.]  The Court should require the same of Defendants regarding Perryville and Tucson, and should order Defendants to continue monitoring PM 92 and 93 at those prisons until the Court has ruled on the adequacy of Defendants' evidence.

Defendants have also chosen to disregard the Stipulation's requirements regarding required contacts for patients recently removed from suicide watch.  Performance Measure 95 is intended to protect the lives of some of the most vulnerable people in

---

[40] The Court also found Defendants noncompliant with PM 92 at Eyman, Florence, and Lewis, and with PM 93 at Eyman, Florence, and Lewis.  [Doc. 1583 at 2]

Arizona prisons:  those who are sufficiently at risk of suicide that they are placed on suicide watch.  It provides in relevant part:

> Any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation of the watch.

[Doc. 1185-1 at 15]

Defendants' Monitor Guide appropriately instructs the monitor to "[v]erify that each watch follow up contact was completed by a mental health provider, mental health clinician, or psychiatric registered nurse."  [Kendrick Decl. Ex. 1 at 131]  However, Defendants are not complying either with the plain language of PM 95, or with their own Monitor Guide.  If a patient goes back on watch before the three required contacts have occurred—a common occurrence with this vulnerable population—Defendants do not verify that the remaining contacts occurred:

> Q. My understanding of your testimony, though, is that if a patient comes off watch and then goes on watch again before the three follow-up contacts have been completed, you don't verify that the subsequent contacts occurred, isn't that correct?
>
> [Dye]. That's correct.

[4/17/17 Tr. at 517:23-518:2; *see also id*. at 512:4-11; 521:24-522:9; 562:9-14] Defendants' noncompliance with PM 95 creates a serious risk of injury or death to class members.[41]

--------

[41] According to Dr. Pablo Stewart, Plaintiffs' expert psychiatrist:

> Prisoners are placed on watch because they are believed to be at risk of self-harm or suicide or otherwise in a state of crisis. Many of these prisoners are seriously mentally ill.  ADC's failure to ensure that such prisoners are seen by medical or mental health staff while on watch, and followed by mental health clinicians after they are removed from watch, creates a substantial risk of serious harm or death.

[Doc. 1538-1 at 89]

Finally, Defendants fail to select the required number of prisoner medical records for PMs 94, 95, and 97.[42]   The agreed protocols for PM 94, 95, and 97 all require that a specified number of "records" be sampled each month—for example, for PM 97, "10 records (if available) from each yard."  [Doc. 1185-1 at 34-35]  The plain meaning of this phrase is that the medical records of 10 different prisoners will be selected.  [*See* Kendrick Decl. Ex. 1 at 128 (PM 94) ("The monitors will review the following number of charts (if available):")]

However, it has emerged that Defendants do not comply with this requirement. Instead, they sample a specified number of watch incidents, rather than individual patient records, for PM 94:

> Q. Now, the list, is it a list of individual patients or is it a list of watch occurrences? So in other words, if Prisoner Smith was on suicide watch three times that month would he be listed once or three times?
>
> [Dye]. He would be listed three times.
>
> Q. And then the sample that's drawn, I assume, is similarly a sample of watch incidents not of individual prisoners?
>
> A. Right.
>
> Q. So the [sample of] 35 is 35 watch incidents?
>
> A. 35 watch what?
>
> Q. Incidents.
>
> A. Yes.
>
> Q. There could be, hypothetically, only 20 different prisoners here, but they had a total of 35 watch incidents, correct?

---

[42]  PM 94 states, "All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse."  [Doc. 1185-1 at 14]  The Court has found Defendants noncompliant with PM 94 at Eyman, Florence, Perryville, and Tucson.  [Doc. 1709 at 1; Doc. 2030 at 2]  PM 97 states, "A mental health provider treating a prisoner via telepsychiatry shall be provided, in advance of the telepsychiatry session, the prisoner's intake assessment, most recent mental health treatment plan, laboratory reports (if applicable), physician orders, problem list, and progress notes from the prisoner's two most recent contacts with a mental health provider."  [Doc. 1185-1 at 15]

1      A. That's correct.

2   [4/17/17 Tr. at 503:17-504:6]

3       The same is true of PM 95 (sample is of watch incidents, not prisoner records),

4   (4/17/17 Tr. at 506:14-25), and PM 97 (sample is of telepsychiatry sessions, not individual

5   prisoner records).  [*Id.* at 618:17-21, 621:13-21]  In short, Defendants are not sampling the

6   number of individual patient records required by the plain language of the Stipulation's

7   protocol.

8
                    **2.      Defendants Include in The Samples Records That Cannot**
9                   **Possibly Be Found Noncompliant**

10      The testimony of witnesses also elicited the fact that for many measures, the

11   monitors are including in their samples records that cannot possibly be found

12   noncompliant.  Dr. Haney emphasizes "the importance of defining the universe of cases in

13   a proper way that correctly identifies the cases that actually test the hypothesis for which

14   the sample is being drawn and the universe of cases is being analyzed."  [Haney Decl.

15   ¶ 11]

16              For example, in the present instance, a sample drawn to test
                compliance with Performance Measure 86 (requiring that
17              "MH-3D prisoners shall be seen a minimum of every 90 days
                by a mental health clinician for a minimum of six months after
18              discontinuing medication") must <u>exclude</u> cases in which 90
                days have not yet elapsed since the patient discontinued
19              medications. … In each of these examples, the cases described
                must be excluded from the sample because they cannot
20              possibly be found to be noncompliant, and thus do not test the
                hypothesis in question—that is, compliance with the relevant
21              Performance Measure.

22   [*Id.*]

23      With regard to PM 85, Defendants concede that a file in which 30 days have not

24   yet elapsed since the patient discontinued medications cannot possibly be found

25   noncompliant with PM 85.[43]  [3/21/17 Tr. at 390:9-18]  Defendants similarly acknowledge

26

27      [43] PM 85 requires, "MH-3D prisoners shall be seen by a mental health provider
     within 30 days of discontinuing medications."  [Doc. 1185-1 at 14]  The Court found
28                                                    (continued on next page…)

that a file in which 90 days have not yet elapsed since the patient discontinued medications cannot possibly be found noncompliant with PM 86.[44]   [4/17/17 Tr. at 485:21-486:7; 486:15-24; 487:15-488:1]

However, Defendants continue to include in the samples for both PM 85 and PM 86 records that cannot possibly be found noncompliant.  [*See, e.g.*, Doc. 1999-1 at ADCM842102-03 (January 2017 CGAR for Perryville; sample for PM 85 includes patients who discontinued medications in January, and sample for PM 86 includes patients who discontinued medications in November, December, and January)]  As Dr. Haney explains, such cases must be excluded from the sample; including them misleadingly inflates Defendants' compliance scores.  [Haney Decl. ¶ 11]

On the medical side, when measuring PM 25, which relates to a timely and appropriate emergency response, Mr. Haldane testified that he only looks at the initial response by security staff, and "they are always going to meet the three minutes because as soon as they find out about an incident you have security staff on site who is trained in basic life support and they are providing that care immediately.  So there isn't going to be a three-minute lapse."   [3/21/17 Tr. at 153:13-14, 20-24]  He testified that he does not recall ever making a finding of other than 100% for the emergency performance measure.[45]   [*Id*. at 167:24-168:9]  However, this is because his interpretation of the three-minute response rule is always met because the start and stop time is the same, and he apparently does not evaluate the adequacy of the response, or think that an evaluation of

---

(…continued from previous page)
Defendants noncompliant with PM 85 at Eyman, Florence, Lewis, Perryville, Tucson, and Yuma.  [Doc. 1583 at 2]  The Court's Nov. 10, 2016 outside providers order included PM 85 at Florence, Lewis, and Tucson.  [Doc. 1754 at 5; Doc. 1739 at 12-13]

[44]  PM 86 requires "MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication." [Doc. 1185-1 at 14]

[45]  Indeed, Defendants' reported numbers for Perryville for PM 25 show that every finding for the past 24 months has either been 100% or N/A.  [Doc. 2041 at 45]

the adequacy would change even if the man down bag is not "mobile enough for needs." *Id.* at 155:7.  *See supra* page 20.

### D.  Defendants' Rebuttal Process Allows Changes To Be Made to CGARs Prior to Production.

In addition to the review process done by the individual monitors with site-level Corizon staff prior to entering their findings in the CGAR system, witnesses testified to a rebuttal process between Corizon and ADC headquarters staff, whereby Corizon can challenge the monitors' findings after they have been entered into the CGAR system. This happens before Defendants provide the CGAR reports to Plaintiffs and the Court. [3/8/17 Tr. at 23:2-5; 24:8-14; 32:16-33:3]  There are numerous reasons why this rebuttal process is highly problematic.

*First*, Ms. Campbell testified Defendants have been engaged in a rebuttal process since Corizon began providing health care, and historically it has been an unwritten process.  [3/8/17 Tr. at 39:2-8]

*Second*, it was not until around September 2016 that Ms. Campbell began keeping written logs of the headquarters rebuttal process, and prior to then, there is no way of knowing when or why information was changed.  [*Id.* at 37:17-38:16, 40:13-15, 47:4-10]

*Third*, Defendants did not notify the Plaintiffs about this rebuttal process until they produced the September 2016 rebuttal logs on November 23, 2016 (Kendrick Decl. ¶ 3) and it appears that the Court did not learn of a rebuttal process until the hearings.[46]

*Fourth*, there are no written guidelines, instructions, or standards for the rebuttal process.  [3/8/17 Tr. at 34:17-23]

---

[46]  The multiple CGAR performance measures that were changed just since September 2016, according to the logs maintained by Ms. Campbell, were not listed in Defendant's December 28, 2016 filing (Doc. 1838) that purported to report to the Court all performance measures that had been changed to date.  [*See* 3/8/17 Tr. at 46:21-48:12; *compare* Doc. 1838 *with* Kendrick Decl. Ex. 3 (monitoring logs shown to Ms. Campbell during testimony)]

*Fifth*, ADC only presents Corizon with the noncompliant findings for rebuttal; there is no parallel process to test the accuracy of findings of compliance. [*Id.* at 42:19-21] The creates a one-sided process that can only result in improved compliance scores.

*Sixth*, when ADC headquarters staff accept Corizon's challenges, they discard the challenged files from the sample if the basis for the challenge is that the file was not applicable, and they do not randomly select additional applicable files, thus changing not only the rate of compliance, but the number of files reviewed.[47]  [3/21/17 Tr. at 164:3-165:13; 219:12-23; 264:18-265:1; 265:22-24]

*Seventh*, and most significantly, Ms. Campbell admitted, and the documentation proffered by Plaintiffs' counsel at the hearings showed, that ADC headquarters staff have a pattern and practice of going into the CGAR computer system to alter entries made by the individual monitors in the CGAR system, to wipe clean the monitors' original findings that had been locked into the CGAR system, and replace the previous findings with new information.  [3/8/17 Tr. at 22:2-23:5; 26:15-21; 33:24-34:3, 35:12-36:10]   ADC headquarters staff make changes in the monitors' names, without notifying the individual monitor,[48] and without changing the original date and time stamp. [*Id.* at 36:18-37:1]  For example:

---

[47] [*See* Haney Decl. ¶ 12 ("Whenever it is determined that one or more of the randomly selected cases is inapplicable (that is, should not be considered as part of the universe that is being sampled), it is necessary to return to the universe of cases and randomly select another case to include in the sample (rather than to simply discard the inappropriate cases and reduce the sample size).  That is because, depending on how many discarded cases there are, the remaining sample could be unrepresentative of the properly defined universe.")]

[48] Ms. Campbell testified that she, Ms. Headstream, and Mr. Pratt are the three individuals who collectively review the rebuttals submitted by Corizon headquarters, that they do not forward to the formal rebuttal to the institution monitor who made the finding, and that either she or Ms. Headstream write the response to Corizon.  [3/8/17 Tr. at 33:1-6; 33:22-23]

Ms. Campbell testified that the only time she has logged in to the CGARs as the institutional monitor and replaced the information was with certain reaudited Winslow mental health performance measures, (3/8/17 Tr. at 36:4-25); however, given the number of individual monitors who testified subsequent to her that they cannot make these

(continued on next page…)

**Mr. Evans** testified "once the CGAR is submitted in the website, we can't make any changes in it," (3/21/17 Tr. at 238:8-10), and "once you submit it there's no way to retract it." *Id.* at 260:4-5. Mr. Evans was not aware of the rebuttal process that occurs at headquarters after the monitor enters information into the CGAR. [*Id.* at 265:2-7]

Mr. Evans was shown the rebuttal Corizon submitted challenging his finding at Douglas for PM 10 for September 2016, in which ADC accepted the rebuttal, and wrote in November that the finding would be changed from 36/40 compliant to 35/39 compliant. [*Id.* at 265:8-24] He was shown the September 2016 CGAR for Douglas for PM 10 produced to Plaintiffs, which reflected an entry made in his name, dated October 31, 2016 (before the date of the rebuttal response) that showed a final compliance of 35/39. [3/21/17 Tr. at 266:6-15] Mr. Evans was asked,

> Q. Were you asked to change the score?
>
> A. Not that I recall.
>
> Q. Do you know who might have logged in as you and changed the score in your name?
>
> A. No.

[*Id.* at 266:16-20]

**Ms. Barlund** testified that once she enters information into the CGAR system, it is locked in, and if she needs to correct or change an entry, she must create a new entry with a new date and time stamp. [4/17/17 Tr. at 587:12-22] She was shown two versions of the July 2016 Florence CGAR for PM 14. [Doc. 1797, Ex. 1] In one version of the report, she found 3 out of 45 charts or 6.67% compliant, but in the second version of the report, listing the same date and time stamp, showed 20 out of 21 charts or 95% compliant.[49] [4/17/17 Tr. at 601:8-20]

---

(…continued from previous page)

changes in the CGAR system, and were not notified of changes made in their names, the discrepancy in testimony raises the question of who is making these changes to the CGARs. Ms. Barlund testified that she thought Ms. Campbell could make these changes, but that Mr. Pratt could not. [4/17/17 Tr. at 587:25-588:5]

Ms. Campbell testified she does not know what happens to the original record of the finding by the institution monitor, when headquarters staff overwrites it. [*Id.* at 37:2-6]

[49] The Court remarked upon the discrepancy between these two reports at the December 14, 2016 status conference:

> In addition, there is another red flag, and that is with respect to the compliance reporting that the plaintiffs complain about in their document 1795 at page 2 where they observe that there is an unexplained change in the
>
> (continued on next page…)

Ms. Barlund's explanation for the discrepancy was that she had received an incomplete source document for this performance measure and that she subsequently received additional documents. [*Id.* at 602:1-5] Ms. Barlund could not "recall specifically" why, if they received *additional* documentation, the number of files reviewed *decreased* from 45 to 21. [*Id.* at 602:19-22] She did not add the new findings of 20 compliant out of 21 to the previous 3 out of 45 compliant because they were listed as N/A. [*Id.* at 603:4-13] Ms. Barlund testified that she did not enter the new information in her name. [*Id.* at 603:19-22] She also testified that she is not notified when headquarters makes changes to information she entered. [*Id.* at 604:9-24]

**Mr. Winland** was shown a rebuttal challenging a finding he made on September 29, 2016, for PM 13 at Douglas for the audited month of August 2016. [3/21/17 Tr. at 218:13-19; 219:12-14] The rebuttal response (dated October 5, 2016) stated that four of the files that Mr. Winland reviewed would be removed from the sample, with a new compliance rate of 26 out of 28. [*Id.* at 219:19-23] The August 2016 CGAR that was produced to Plaintiffs showed an entry made by Mr. Winland on 9/29/16 with the new compliance rate of 26/28. He did not recall if he made the change to the entry, but testified that in the past he could not change his entries, but had to ask Ms. Campbell to change his entries for him. [*Id.* at 220:11-24, 221:3-10; 221:24-222:1] He explained that "I know in the past when I have entered something incorrectly that I have asked Kathy and she would have that wiped. . ." [*Id.* at 221:7-9]

**Mr. Haldane** testified that if he has entered information in the CGAR and needs to update it because he made a mistake, the correction will show up in the system as a new entry with a different date and time stamp. [*Id.* at 162:2-8] "I can't erase," he stated. [*Id.* at 162:22] In response to questions from the Court, he said that he did not think that anybody had erased information he entered in the CGARs. [*Id.* at 163:1-7]

Mr. Haldane then was shown a Corizon rebuttal challenging a July 2016 finding he had made at Perryville on August 31, 2016. He confirmed that the rebuttal document (which was dated after 8/31/16) said ADC headquarters would be making changes to reflect a new compliance number. [*Id.* at 163:22-164:20] He testified he did not know who rewrote his

---

(…continued from previous page)

-- the CGAR that had shown that for the entry of the 30th of August, 2016, at 10:30 a.m. by Erin Barlund, that there is in a subsequent production a new entry with the same date and time, but . . . with different information.

And so the audit trail is missing. You can't tell why it is happening. And plaintiffs understandably raise a concern that this unexplained change causes one to question the veracity of these reports. And so if there's -- if there is a change, there has to be an audit trail. There has to be an explanation as to why it happened.

[12/14/16 Tr. at 9:14-10:2]

August 31 finding in his name to match the rebuttal response.  [*Id.* at 165:14-21]  He was not instructed to pull additional records to review to get the total number in the sample back up to a full sample of ten.  [*Id.* at 165:6-13]

Defendants' entire rebuttal process, in particular the practice of changing findings in the CGARs without any indication that changes were made (*i.e.* no audit trail), is fraught with danger and compromises any reliance on the CGARs.  Dr. Haney states that

> [I]t is critically important to carefully document all steps of the process that was followed, including the source from which the sample was drawn, the process by which randomization was accomplished, the origin and results of the random draw, and how the random numbers were assigned to the list or series of cases in the universe of cases from which the sample was created (including which specific cases were included).  This "audit trail" permits others to recreate the process and make sure that the steps that were taken were appropriate and correctly followed.

> Similarly, if the ultimate results derived from the sample (in this case, a given percentage level of compliance) are changed at any point, it is critically important that both the original values and the changed values be clearly documented, along with documentation of when and by whom the change was made and the justification for it.  Under no circumstances should results be changed without this information being clearly apparent to anyone viewing the audit document.

> The documentation should occur in real time rather than after the fact.  [. . .] [S]uch an audit trail allows others to ensure the appropriateness of the methods by subsequently reviewing the exact actions that were taken.

[Haney Dec. ¶¶ 13-15]

### E.   Defendants Do Not Identify Root Causes of Sustained Noncompliance, Follow the Court's Orders, or Hold Corizon Accountable

A theme that emerged with many of the witnesses was (1) an apparent lack of curiosity or interest in identifying the root causes of continued noncompliance with the Stipulation and the Court's orders; (2) an indifference towards implementing the Court's orders and the parties' agreements about monitoring methodology; and (3) a contract enforcement approach based upon lots of talk with Corizon administrators, but little or no apparent action.

1

2

### 1. Defendants Fail To Meaningfully Investigate the Causes of Noncompliance With The Stipulation and the Court's Orders

3      Multiple monitors expressed a lack of interest, need, or desire, to investigate the

4  cause(s) of the ongoing noncompliance that they dutifully record in their files each

5  month.[50]  With Mr. Winland, the pharmacy monitor, the Court observed,

6
7
8
9
10

> But I wonder whether as you are going through this process you also have another cap on, maybe I could describe it as a thinking cap about thinking when you see non-compliance, what can we do to try to address that non-compliance?  Do you do that as well? [. . .]  I know you have seen failures in compliance.  When you see that, I guess my question is, you don't, yourself, think what should I be raising with somebody whether it's someone at Corizon or someplace else, about how to address this failure of compliance?

11  [*Id.* at 174:2-18]

12      The Court also raised this with ADC monitor Sarah Cartwright:

13
14

THE COURT: I know you say you can't say if I were to ask you definitely. I'm just asking you, have you ever thought in your own mind, I think I know why that's happening?

15
16

THE WITNESS: I do not know for certain, honestly. I can't.  I would be able -- I would need the information.

17
18
19

THE COURT: Listen to my question.  As you have read through this, I understand you can't say for certain.  But as you have looked through these records, have you ever thought in your own mind, just the thoughts come into your head, I think I know why this is happening?  Has that ever happened?  Yes or no?

20  THE WITNESS: No. No.

21  [3/21/17 Tr. at 284:3-14]   The Court's questions came after this exchange between

22  Plaintiffs' counsel and Ms. Cartwright, probing her bureaucratic trained incapacity:

23

24

25

26

27

---

[50]  The notable exception was the Florence monitor, Ms. Fontaine, who unlike her colleagues, testified that she has made suggestions to health care staff about changes in practice and process that could streamline the delivery of health care.  [3/21/17 Tr. at 314:24-316:22]  When asked by the Court why she had a different attitude about her role than others, she said, "I'm a nurse. . . I have a duty, whether or not it's in my job description, or I'm directed to do so by my supervisor, I have a duty to do that."  [*Id.* at 317:14, 20]

28

Q. Have you ever thought about what factors might be contributing to these findings of non-compliance?

A. I don't feel I have enough data to be able to come up with any type of conclusions in regards to the changes they may be required to make to come into compliance.

Q. But I'm just asking as a person who works at the prison and interacts with the health care staff on a daily basis, and month after month you have been the one documenting this sustained non-compliance, if you, as an intelligent person looking at this information, have drawn any personal observations or conclusions about the cause of the non-compliance?
[. . .]
THE WITNESS: I get most of my data from the electronic medical record. I am not at every single unit to be able to observe exactly what the deficiency is. That would be impossible for me to do. I don't have enough data to be able to determine what the non-compliance is. I can tell you based off of my findings what was non-compliant when I looked into the electronic medical record.

Q. Right. But you have no opinion about what might have caused the non-compliance?

A. No.

[3/21/17 Tr. at 280:4-281:3]

### 2.        Defendants Fail to Obey The Court's Orders

Multiple monitors testified that they are not provided the Court's orders regarding methodology, or any sort of summary information explaining the orders or the reasoning behind them.  Instead, they are occasionally provided updated versions of the Monitoring Guide from Counsel for Defendants, with little or no explanation of the reasons for the changes.  [*See supra* page 19]  Multiple monitors also testified that they were not aware of the Court's orders finding noncompliance at the institutions they monitor, or improvement plans to come into compliance with the Court's orders, even though the finding of noncompliance is based upon their audits.  [Winland (3/21/17 Tr. at 179:12-24; 181:17-22; 182:18-24); Fontaine (*Id.* at 321:14-24); Cartwright (*Id* at 279:20-23); Evans (Id. at 245:3-6); Barlund (4/17/17 Tr. at 585:3-12)]

Defendants also apparently take the position that the Court's orders regarding methodology are advisory, and not mandatory. As detailed below, they continue to defy

the Court's orders as to the meaning of the words "seen" and "every" as they are used in the mental health performance measures.

### *Continuing to count group contacts for the requirement that a patient be "seen" (PM 73, 74, 76, 80, 81, 82, 83, 84, 85, 86, 88, 90, 91, 94, 95)*

On September 8, 2016, the Court ruled that "group counseling does not count toward compliance in any of the other Performance Measures [except Performance Measure 92]." [Doc. 1673 at 5]  However, nearly five months later, Defendants continue to count group contacts as satisfying the requirement that a patient be "seen:"

> Q. So you count group counseling as satisfying Performance Measure 80?
>
> A. We did at that time, yes.
>
> Q. In auditing for December of 2016, you were still counting group contacts as satisfying Performance Measure 80?
>
> A. I believe so.

[4/17/17 Tr. at 465:15-20][51]

### *Continuing to count cellfront contacts as satisfying the requirement that a patient be "seen" (PM 73, 74, 76, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 94, 95)*

On November 8, 2016, the Court ordered that a cellfront contact can satisfy the Stipulation's requirement that a patient be "seen" only "if an inmate refuses to leave the cell or if the prison is on lockdown." [Doc. 1745 at 1][52]  Mental health monitor Dennis Dye testified that, except for Performance Measure 94, Defendants never counted cellfront contacts as satisfying a Performance Measure's requirement that a patient be

---

[51] The December 2016 CGAR results were input on January 31, 2017.  [4/17/17 Tr. at 472:7-10]

[52] The Stipulation defines "seen" as follows: "Interaction between a patient and a Medical Provider, Mental Health Provider or Mental Health Clinician that involves a treatment and/or exchange of information in a confidential setting.  With respect to Mental Health staff, means an encounter that takes place in a confidential setting outside the prisoner's cell, unless the prisoner refuses to exit his or her cell for the encounter." [Doc. 1185-1 at 5]

1   "seen," unless the patient had been offered a private, out-of-cell interview and had refused

2   the offer, and that refusal was documented.   [4/17/17 Tr. at. 541:14-17; 546:25-547:8;

3   548:10-14]   This is not true.   Defendants' own documents show that, for example,

4   cellfront contacts were repeatedly counted as satisfying PM 80, without any evidence that

5   the patients were offered the opportunity to be seen out of cell.  [*See* Doc. 1739 at 15-16;

6   Doc. 1740 at ¶¶ 21-23 and Ex. 19]  This practice continues.  [*See* Kendrick Decl., ¶¶ 5-7,

7   Exs. 4-6 (December 2016 CGAR: multiple entries counting cellfront contacts as satisfying

8   PM 80's requirement that the patient be "seen," with no indication that an out-of-cell

9   meeting was offered)]

10

11   ### *Failure to comply with the Court's order regarding Performance Measures requiring action "every X days" (PM 73, 77, 80, 81, 82, 83, 84, 87, 88, 89, 90, 92)*

12   This Court has ruled that, for Performance Measures requiring that an action occur

13   at specified intervals,

14   > the monitor must look back two visits.  The oldest reviewed visit is the
15   > baseline and will be used to determine if the most recent visit was timely.  If
16   > the most recent visit was timely, then the intervening months are compliant.
    > If the most recent visit was untimely (measured by looking to the previous
    > visit), then the intervening months are non-compliant.

17   [Doc. 1833 at 1-2]

18   Following this order, Defendants appropriately revised their Monitor Guide to

19   incorporate its requirements.  [*See, e.g.*, Kendrick Decl. Ex. 1 at 107 (PM 77) ("Review

20   eOMIS, in the Mental Health tab, for the two most recent treatment plans.  Determine

21   whether the two treatment plans were 90 days (or 12 months if applicable) or less apart")]

22   However, it is now apparent that Defendants are disregarding both the Court's

23   order and their own Monitor Guide:

24   > Q. So let me say this back to you to see if I understand it.  In December of
25   > 2016, if the most recent treatment plan was any month other than December,
    > you did not look at the last two treatment plans.  Is that correct?

26   > A. Right.

27   [4/17/17 Tr. at 449:3-7 (PM 77)]  Instead, Defendants count a file as compliant even if

28   there is only one treatment plan in the file:

1
2

Q. In 2016, at the December 2016, we've been talking about some cases where you found compliance [with PM 77] even though there was only one treatment plan in the file, correct?

3

A. Right. Right.

4

[4/17/17 Tr. at 455:5-8]   [*See also id*. at 462:2-6 (records found compliant with PM 80

5

although two contacts were not checked); 493:15-494:13 (same regarding PM 92)]

6

In addition, under Defendants' newly-invented methodology, the sample for these

7

Performance Measures includes files that *cannot possibly be found noncompliant*, even if

8

there is *no* treatment plan in the file:

9
10

Q. So if I understand your testimony, this record cannot possibly be found non-compliant. Correct?

11

A. If it -- well, if there was no treatment plan, yeah. If he was in December that would be a compliant -- that would always be compliant.

12
13

Q. Okay. And even if there was no treatment plan, you would not find it non-compliant, correct?

14

A. That's correct.

15

[4/17/17 Tr. at 451:9-16]   [*See also id* at 463:15-464:7 (sample for PM 80 included

16

records that could not possibly be found noncompliant); 468:9-14 (same for PM 81);

17

495:3-14 (same for PM 92)]

18

Indeed, Mr. Dye testified that this faulty monitoring methodology is used with all

19

Performance Measures requiring that an action occur at regular intervals:

20
21
22

Q. Okay. Well, again, Mr. Dye, we can go through all of them but I'm trying to move things along. So I'd like to know if it is the case for every mental health performance measure that requires something to happen every X days. As of December of 2016, your samples were including cases that could not possibly be found non-compliant?

23

A. Yeah. That's true.

24
25
26

Q. And as I understand your testimony, even under the new methodology that was adopted in January or February for all of these performance measures, your samples may still include cases that could not possibly be found non-compliant because the person only recently became a 3A or 3B or whatever?

27

A. Right. Now, that's true.

28

[4/17/17 Tr. at 470:6-18]

Defendants' methodology for these Performance Measures is plainly inconsistent with the Court's order that "the monitor must look back two visits." [Doc. 1833 at 1] Moreover, including in the sample cases that cannot possibly be found noncompliant is impermissible and falsely inflates Defendants' compliance figures. [*See* Haney Decl. ¶ 11][53]

### 3. Defendants Fail to Demand Accountability From Corizon

Defendants' articulated method of demanding accountability from Corizon appears to consist of talking to Corizon officials about their noncompliance. [*See, e.g.*, 4/17/17 Tr. at 645:3-8 (Pratt: "Q. And when you said that there were areas in the February [CGARs] where, yet again, there's non-compliance, could you describe what steps you are going to take to address the continued non-compliance? A. Straight back to Corizon, talk with them, talk with their leadership."); *id*. at 647:8-10 (Pratt: "We have talked with them about the potential of raising salaries and doing whatever it takes to attract the right staff."); *id*. at 431:13-15 (Dye: "we talk about problems and patterns that I'm seeing, and then sometimes we problem solve; well, what could be done to correct this?"); *id*. at 433:5-7 (Dye: "Dr. Taylor, I think, meets more with them, but I personally meet them during the out briefs and I talk with them"); 3/21/17 Tr. at 140:3-7 (Haldane: "in my case it's usually just talking to the [Facility Health Administrator] saying, here are our results for this performance measure. It's not – I'm not asking them to review it. I'm not asking them to – it's just a piece of information that I give them in the general course of

---

[53] The Court recognized the impropriety of including cases that cannot possibly be found noncompliant:

> THE COURT: Well, you don't use the ones who are males who come up because they can't possibly be post-partum, or the ones who are females who were not taken off site because they didn't deliver babies. You exclude those because they cannot possibly be useful in evaluating that performance measure. These people who are that month becom[ing] subject to this criteria cannot possibly be useful for evaluating that performance measure, because they cannot possibly be found not compliant.

[4/17/17 Tr. at 469:17-24]

business."); *id.* at 174:20-24 (Winland: "We have used the PNT committee meeting to talk about the non-compliance of certain measures, specifically the medications. You know, I have had meetings with Corizon, both at their office and ours, discussing ways to increase this non-compliance [sic]."); *id.* at 198:11-14 (Winland: "that gap has been discussed multiple times. We have spoken to Corizon about this as what we're seeing.")]

The hands-off approach to Corizon extends to Defendant Pratt, who testified that as head of the Health Services Monitoring Bureau, "I'm there to make sure they live up to the contract itself that they entered into," and he is responsible for making sure that Corizon complies with the stipulation and the Court's orders.  [4/17/17 Tr. at 626:21-627:3]  Mr. Pratt testified that in his opinion, steps that could be taken to retain staff include increasing salaries and making adjustments to the shift hours.  [*Id.* 649:16-650:2]  Mr. Pratt testified that he has "suggested" to Corizon that they increase salaries, but they only reviewed his suggestion.  [*Id*. at 645:12-646:3]  He does not know what Corizon is doing to recruit psychiatrists, physicians, provider level clinicians, or psychologists.  [*Id.* 646:11-23]  He "asks" Corizon "all the time" why staff are leaving and the status of vacancies.  [*Id.* at 647:17-21]  Yet despite "asking," he doesn't have an "overall feel" for why staff don't stay.  [*Id.* at 648:14-21]

Despite his belief that changing the shift hours would increase retention of provider-level health care staff, he testified that he has not asked Corizon to change the hours that the providers are working because "[i]t's something they can look at and they provide the staffing they provide the hours."  [*Id*. at 653:4-9]  Additionally, a staffing analysis study "wouldn't hurt."  [*Id*. at 650:12-20]  He assumes that Corizon has done a staffing allocation or study, but he has no basis for that belief, and he has never asked that Corizon do one.  [*Id*. at 651:8-24]

Ms. Campbell, who is responsible for reviewing Corizon's Corrective Action Plans (CAPs), testified that there are no timeframes for Corizon to produce the CAPs, and that it has taken as long as five or six months to get a CAP from Corizon.  [3/8/17 Tr. at 49:5-12; 49:22-25, 50:9-11]  She thought that the reason for the delays "may be turnover or the fact

1    that they didn't have the staff to be able to put the information back into the CGAR." [*Id.*

2    at 50:24-51:2]  She also testified that she could not ever recall seeing a CAP from Corizon

3    in which the contractor included hiring more staff as part of their remedial plan (3/8/17 Tr.

4    at 54:4-9), and incredibly, she testified that she could not recall *ever* having a discussion

5    with Corizon's regional office about hiring more health care staff to come into compliance

6    with the Stipulation.  [*Id.* at 54:11-16]

7            The Court pinpointed some of the disincentives for Defendants to aggressively

8    monitor Corizon regarding the noncompliance:

9                    With respect to the performance measures where we continued
                     -- where we have identified failures and we have given the
10                   State an opportunity to remediate. And then on some number I
                     have stepped in and ordered remediation measures.  And on
11                   some of those and on the others, we continue to back slide. In
                     fact, I think the best that can be said overall is that we're
12                   treading water. We're not making much progress. And I'm -- I
                     will tell you frankly, and I will take more time than perhaps
13                   Ms. Kendrick would be happy to have me do because you are
                     the person in charge with respect to this, to explain what my
14                   concern is.

15                   My concern is that there is a relationship between the provider
                     and the State that creates a conflict of interest with respect to
16                   accomplishing the goal of the stipulation. And that is if the
                     State is too insistent about complying with the stipulation, you
17                   lose the contractor at the price that you like.

18                   And so you have got an incentive to stand back from doing
                     what I have no disincentive to do, and that is to point out what
19                   the problems are. And that you have an incentive to try to find
                     the least obtrusive and expensive way for it to be done. That
20                   also means a counterincentive to address or to use the
                     techniques that can, perhaps, be the most efficacious and
21                   perhaps even the only ones that will work but will cost more.

22                   And so you have an incentive with the contractor that you
                     have who is giving you something that you want, and that is a
23                   price to accomplish something that you have to do. And if you
                     drive that contractor too hard then you lose the opportunity to
24                   have that contractor available to you and it becomes a
                     possibility, I think, as a management perspective, a real
25                   possibility, that you cannot obtain those services for the same
                     costs, meaning that they would have to be obtained elsewhere
26                   at a higher cost.

27                   So this disincentive to do what I would normally think a
                     contracting party would do, and that is to really hold someone

28

to the wire, to the line, to push them hard, worries me that that's part of your discussion with the director.

[4/17/17 Tr. at 637:12-638:23]

The Court's concerns are not far-fetched.  As one constitutional law scholar has noted:

> Without effective and thorough monitoring through which governments can assess how well private entities respect constitutional rights, governments will struggle to hold private entities accountable. Assuredly, there are many examples where government monitoring effectively rooted out poor performance by a private contractor.  On the whole, however, there are many reasons to believe that monitoring is not a fully effective device for maintaining private accountability.

> [. . .] [M]onitoring itself is fraught with difficulties. In order to monitor effectively, a government has to know what information it is looking for and how to find it. Especially for traditional public services that have more abstract democratic goals than procurement or purchase contracts, it is difficult to develop a useful metric for evaluating private performance. Measuring whether a contractor provided the correct number of pencils is much easier than measuring, for example, how many assaults on prisoners took place at a private prison, which assaults were justified and which were not, and how those results compare against the cost of the contract and the overall quality of service.

> [. . .] Even if governments could design effective metrics, financial concerns may discourage them from engaging in thorough monitoring. One main purpose of privatization is to achieve cost savings. Effective monitoring, particularly of complex, multifaceted programs, is expensive, requiring significant amounts of data as well as a well-trained workforce to evaluate it.  Monitoring can add 15 to 20 percent to the cost of a contract, which in many cases makes it more expensive for the government to contract out a service than to perform the service itself.

> Governments also have other incentives to avoid intensive monitoring. Misconduct by a private contractor reflects badly on the government. Government actors may be hesitant to admit that they made a mistake in choosing a contracting partner, and therefore may have their own incentives to shield contractor misconduct from public view.  Decreased monitoring both reduces the chances of public exposure of contractor misconduct and also allows the government to deny knowledge of any wrongdoing if the misconduct is made public. In this sense, government agencies may be prone to a contracting form of agency capture.

1

2

3

4

5

> Furthermore, the argument that the risk of losing government contracts will keep private entities in check assumes an efficiently functioning marketplace in which governments can replace bad contractors with good ones. Many of the markets for traditional public services, however, are essentially oligopolies with few market participants. Private contractors therefore face little risk that their employees' constitutional violations will result in revoked contracts or lost business.

6    Richard Frankel, *Regulating Privatized Government Through § 1983*, 76 U. CHI. L. REV.

7    1449, 1497-1501 (2009) (footnotes omitted).

8    **II.   DEFENDANTS' PRACTICES IN MONITORING THE MAXIMUM**

9    **CUSTODY PERFORMANCE MEASURES CREATE DUBIOUS COMPLIANCE RATES FOR THE ISOLATION SUBCLASS.**

10       Similar to the health care performance measures, Defendants' monitoring of the

11   Maximum Custody Performance Measures (MC PMs) has been plagued with

12   methodological problems since the commencement of the Stipulation.    Plaintiffs

13   extensively detailed many problems with Defendants' methodology in the pending Motion

14   to Enforce the Stipulation.  [Doc. 1944]  In particular, Defendants failed to randomly

15   select weeks for monitoring, as required by the Stipulation, for the 16-month period from

16   March 2015 to July 2016.  [Doc. 1944 at 5-7]  Similarly, Defendants failed to randomly

17   select ten prisoners to monitor for MC PMs 1-3, 5-6, and 8 at Florence-Kasson for the

18   months March 2015 to August 2016.  [*Id.* at 7-9]

19       In addition to the direct problem of non-random selection, Defendants' monitoring

20   and documentation for the MC PMs during the vast majority of the life of the Stipulation

21   is characterized by inaccurate, incomplete, and shoddy documentation and oversight that

22   undermines the integrity of the vast majority of the compliance findings.  [*See* Doc. 1944

23   at 9-29]

24       During the March 28, 2017 evidentiary hearing, Defendants testified that they

25   implemented a new system of monitoring and accountability for the MC PMs in

26   December of 2016 and appointed ADW Wendy Hackney to oversee and facilitate the

27   process.  [3/28/17 Tr. at 24:5-7; 65:1-14; 81:15-21]  The new monitoring methodology is

28   so recent that ADW Hackney actually testified that the maximum custody notebook

documentation introduced at the hearing is now outdated, as it is from November 2016. [*Id.* at 24:5-21]  Plaintiffs hope that this new system of review will lead to more accurate and reliable findings for the MCPM—but it is too early to tell.

Based on testimony from the March 28, 2017 hearing it is also now clear that only Complex Wardens make final determinations of compliance for their own facilities—with no subsequent, external review.  [3/28/17 Tr. at 90:15-25; 91:1-12; 106:17-25; 107:1-25; 108:1-7; 119:12-25; 120:1-21]  During that hearing, Plaintiffs raised the fact that no Complex Wardens were available as witnesses to testify about the MC PM CGAR compliance findings, and the Court noted their troubling absence, but declined to require their testimony at that time.  [*Id.* at 170:2-11; 170:20-25; 171:1-18; 174:13-17]

Plaintiffs request that the Court grant their Motion to Enforce, and order the relief requested.  [Doc. 1944]  Additionally, due to the new and untested nature of Defendants' recently created MC PM monitoring process, and the lack of testimony from the individuals who actually make the MC PM CGAR compliance findings, Plaintiffs request that this new monitoring process for the isolation subclass's performance measures be given a minimum of six months as a test period, so that the actual findings and documentation of Defendants' new monitoring process for all the MCPM measures can be reviewed at an evidentiary hearing after the six-month testing period.  Plaintiffs also request that Complex Wardens be ordered to testify at that hearing about their monitoring processes and decisions regarding compliance findings for the MCPM at this hearing.

## PRAYER FOR RELIEF

For the reasons stated above, Plaintiffs seek the following relief.

Plaintiffs request that the Court appoint a Rule 706 expert who has knowledge and experience in random sampling methodology, and whose duties would include, *inter alia*, evaluating the reliability and accuracy of ADC's monitoring program, including the CGARs; ensuring that ADC's monitors are properly trained and supervised; and absent the agreement of the parties, evaluating any proposed changes to the Monitoring Guide.

1   Plaintiffs further request that the Court order that the past two years' of monitoring

2   data is null and void pursuant to Paragraphs 10(b) and 20(b) of the Stipulation, and that

3   the Court "reset the clock" for the requirement of terminating monitoring as to any

4   performance measures.  In the alternative, if the Court is not inclined to reset the clock on

5   the Stipulation, Plaintiffs request that the Court order Defendants to re-audit all

6   performance measures from March 2015 to the time at which a final Monitoring Guide is

7   in place.  [*See* Doc. 1951 at 1-2]

8   Plaintiffs request that the new monitoring process for the isolation subclass's

9   performance measures be given a minimum of six months as a test period, so that the

10  actual findings and documentation of Defendants' new monitoring process for all the MC

11  PM measures can be reviewed at an evidentiary hearing after the six-month testing period.

12  Plaintiffs also request that Complex Wardens be ordered to testify at such a hearing or

13  hearings.

14  Respectfully submitted,

15  Dated:  May 8, 2017                    **PRISON LAW OFFICE**

16

17  By:  *s/ Corene Kendrick*
        Donald Specter (Cal. 83925)*
18      Alison Hardy (Cal. 135966)*
        Sara Norman (Cal. 189536)*
19      Corene Kendrick (Cal. 226642)*
        Rita K. Lomio (Cal. 254501)*
20      1917 Fifth Street
        Berkeley, California 94710
21      Telephone:  (510) 280-2621
        Email:    dspecter@prisonlaw.com
22                ahardy@prisonlaw.com
                  snorman@prisonlaw.com
23                ckendrick@prisonlaw.com
                  rlomio@prisonlaw.com
24
        *Admitted *pro hac vice*
25

26

27

28

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Jamelia N. Morgan (N.Y. 5351176)**
Victoria Lopez (Ill. 6275388)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:    dfathi@aclu.org
            afettig@aclu.org
            jmorgan@aclu.org
            vlopez@aclu.org

*Admitted *pro hac vice*.  Not admitted
  in DC; practice limited to federal
  courts.
**Admitted *pro hac vice*

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, PLLC**
P. O. Box 91398
Tucson, Arizona 85752
Telephone: (520) 477-1475
Email:    kirstin@eidenbachlaw.com

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:    kbrody@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:    dbarr@perkinscoie.com
            agerlicher@perkinscoie.com
            jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:    cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;*
*Stephen Swartz; Sonia Rodriguez; Christina*
*Verduzco; Jackie Thomas; Jeremy Smith;*
*Robert Gamez; Maryanne Chisholm;*
*Desiree Licci; Joseph Hefner; Joshua*
*Polson; and Charlotte Wells, on behalf of*
*themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY
LAW**


By:  ___s/ Maya Abela_____
     Sarah Kader (Bar No. 027147)
     Asim Dietrich (Bar No. 027927)
     5025 East Washington Street, Suite 202
     Phoenix, Arizona 85034
     Telephone:  (602) 274-6287
     Email:     skader@azdisabilitylaw.org
                adietrich@azdisabilitylaw.org

     Rose A. Daly-Rooney (Bar No. 015690)
     J.J. Rico (Bar No. 021292)
     Jessica Jansepar Ross (Bar No. 030553)
     Maya Abela (Bar No. 027232)
     **ARIZONA CENTER FOR
     DISABILITY LAW**
     177 North Church Avenue, Suite 800
     Tucson, Arizona 85701
     Telephone:  (520) 327-9547
     Email:
        rdalyrooney@azdisabilitylaw.org
        jrico@azdisabilitylaw.org
        jross@azdisabilitylaw.org
        mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability
Law*

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2017, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
Kevin R. Hanger
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com
khanger@swlfirm.com

*Attorneys for Defendants*

s/ D. Freouf