Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
Jacob B. Lee, Bar No. 030371
Kevin R. Hanger, Bar No. 027346
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com
khanger@swlfirm.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | NO. 2:12-cv-00601-DKD |
| Plaintiffs, | |
| v. | **DEFENDANTS' STATEMENT REGARDING EVIDENTIARY HEARINGS ON MONITORING** |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

Defendants Charles Ryan and Richard Pratt provide the following Statement regarding the significance of the testimony at the March 8, March 21, March 28, April 17, and May10, 2017 evidentiary hearings on monitoring.[1]

## I.   **INTRODUCTION**

The Court scheduled an evidentiary hearing designed as an educational process to assist the Court and Plaintiffs in gaining a greater understanding of the monitoring process for healthcare and maximum custody performance measures under the Stipulation.   To this end, the Court provided a set of topics and questions on which he wanted to hear testimony.  The Court's questions were as follows:

• Records preservation: Who is responsible for maintaining medical records dating back to Feb. 2015?

• How are records selected to ensure randomization? Who decides how many records to select?

• What does "n/a" mean? "0"?

• What is the audit/review process? Who has the authority to change reports? Subject to what documentation process?

• Does Corizon's contractual ability to challenge percentages impact the data presented to the Court? If so, how?

• What grounds can Corizon use to challenge data? What rationale would convince ADOC to change data? What's an example of a successful challenge?

• CGAR interpretation (perhaps employing a demonstrative exemplar which would avoid the potential disclosure of individual health care information).

(Dkt. 1915 at 3.)

Despite the Court's repeated assurance that the process should be educational, rather than adversarial in nature, Plaintiffs' counsel treated the hearings like trial testimony in a contested matter, invoking the rule of exclusion, vigorously cross examining witnesses, objecting to the form of questions from defense counsel, and attempting to introduce impeachment evidence.  In addition, throughout the course of the

---

[1]   Defendants will respond separately to the Court's request for their position regarding the appointment of a special master pursuant to Federal Rule of Civil Procedure 53.

1

1   lengthy hearings, it became abundantly clear that Plaintiffs' counsel were focused not on

2   gaining insight into the monitoring process but on attempting to poke holes in Defendants'

3   reported findings of compliance for the healthcare and maximum custody performance

4   measures during the first two years of the Stipulation monitoring period and attacking the

5   credibility of the individual monitors.   Moreover, Plaintiffs also used the evidentiary

6   hearings to again advance their argument that Defendants should be required to increase

7   staffing for healthcare positions, despite repeated rulings from the Court that the plain

8   language of the Stipulation does not permit him to issue any orders with respect to staffing

9   levels.

10          Defendants prepared and presented witnesses and testimony to address the Court's

11   specific questions as set forth in the Court's January 26, 2017 Minute Entry (Dkt. 1915).

12   If Defendants had known that the evidentiary hearings would devolve into a full-scale

13   assault on the validity of the monitoring system as a whole and all compliance findings

14   made during the first two years of monitoring under the Stipulation, Defendants would

15   have approached the hearings in an entirely different fashion, calling additional witnesses

16   and presenting detailed testimony and evidence on the validity of the specific source

17   documents and the findings.

18          Nonetheless, Defendants submit that the evidentiary hearings regarding healthcare

19   monitoring showed that ADC has a dedicated team of monitors who take very seriously

20   their assigned task of evaluating Corizon's compliance with the performance measures set

21   forth in the Stipulation.   Likewise, the evidentiary hearing regarding maximum custody

22   monitoring showcased ADC's commitment to ensuring that the maximum custody

23   performance measures are met at each of the applicable units and to ensuring the

24   consistency of the documentation provided in the monthly maximum custody monitoring

25   notebooks.

26          Plaintiffs have advanced no arguments that support the drastic relief they seek of

27   declaring all compliance findings from the past two years of monitoring under the

28   Stipulation "null and void" and resetting the clock on the monitoring process.  At most,

they have pointed to a few statements in monthly continuous quality improvement meeting (CQI) minutes—which were made by Corizon employees, not ADC monitors— that are inconsistent with the CGAR reporting, Monitor Guide, and/or testimony from the ADC monitors during the evidentiary hearings. But these statements have not been adopted by, and cannot be attributed to, Defendants. Plaintiffs have also identified a few isolated instances of potential mistakes made by individual monitors, but in a monitoring program of this size and scope,[2] it is unreasonable to expect perfection. And Plaintiffs have not shown that any of these mistakes—if confirmed—would drop any findings below the required compliance thresholds set forth in the Stipulation.[3] The Court should not accept Plaintiffs' unsupported attempt to invalidate two years of monitoring employing the protocols and source documents Plaintiffs agreed to at the time of the Stipulation but are now seeking to discount.

II.     **ARGUMENT**

    A.     **Scope of the hearings**

Defendants prepared for and presented testimony of ADC witnesses based on the Court's stated purpose of the hearing and the specific questions set forth in the Court's Order (Dkt. 1915). To this end, Defendants presented testimony from Kathy Campbell regarding records preservation, records selection, the audit/review process, the rebuttal

---

[2] The ADC monitors review 849 total performance measures and facilities each month, which requires reviewing tens of thousands of individual inmate charts each and every month. Over the course of the 24 months of monitoring to date, the ADC monitors have reviewed more than 20,000 total performance measures and facilities. A few isolated errors cannot invalidate the entire system.

[3] For example, Plaintiffs attach five notes as exhibits 5 and 6 which Plaintiffs claim were inappropriately counted as compliant for performance measure 80 in December 2016 at Eyman when the inmates were seen at cell-front, and there is no indication that they were offered the opportunity to be seen in a confidential setting. However, Plaintiffs fail to note that three out of the five files were in compliance because the inmates had additional contacts beyond the groups they refused within the requisite 30-day period. As a result, the compliance finding should have been reported as 92% for the month. But even if Plaintiffs were correct that all five files should have been found noncompliant, that would have dropped the score for that measure to 86% for the month, which still exceeds the compliance threshold of 80% for the second year of monitoring under the Stipulation.

process, including the criteria for changing a compliance finding, and an example of a successful challenge. (3/8/17 Tr. at 16:2-24, 17:8-19:21, 21:21-24:14, 24:25-27:13, 28:7-25.) Defendants presented testimony from Ryan Owens regarding randomization of source documents using the Excel RAND function. (3/8/17 Tr. at 68:14-25, 69:10-19.) Defendants also presented testimony from several monitors regarding how they monitor a sample performance measure, including selection of records, review of source documents, and data included in the CGAR report. (*See, e.g.*, 3/8/17 Tr. at 114:13-120:6.) Defendants also presented testimony regarding how to interpret the CGARs as requested by the Court. (3/8/17 Tr. at 106:14-110:10.) With respect to the maximum custody performance measures, Defendants presented testimony from Associate Deputy Warden (ADW) W. Hackney regarding the multi-level process for reviewing maximum custody documentation, including out-of-cell tracking forms and other documents, to determine compliance with the Stipulation.

Defendants could not anticipate that Plaintiffs would transform the hearings from an educational process into a trial on the validity of all compliance findings made by the ADC monitors for all 112 performance measures for the first 24 months of monitoring under the Stipulation. If Defendants had known that the hearings would take such a drastic departure from their stated purpose, Defendants would have presented additional witnesses, elicited testimony far beyond that sought by the Court's questions, and introduced evidence into the record to support the monitors' findings.

### B.    Randomization of Source Documents

Plaintiffs claim that Defendants have failed to properly randomize source documents used by the ADC monitors and that, as a result, all the compliance findings from the first two years of the Stipulation should be declared "null and void." (Dkt. 2046 at 5-9.)

For a number of the healthcare performance measures, the Stipulation protocols require that Defendants randomly select a minimum of ten records per unit for each measure, but not all of the protocols require randomization. (Dkt. 1185-1 at 16-36.) In

4

addition, there is nothing in the Stipulation that prescribes the exact procedure by which Defendants must randomize and select the ten records for those measures that do require randomization.   The introduction to the healthcare Monitor Guide—which has been reviewed and approved by Plaintiffs—includes a section on random selection, which states:

> Certain Performance Measures require the Monitor to review a random selection of medical records. Whenever possible, a list of applicable source document records will be inserted into an Excel spreadsheet and assigned a random number using Excel randomizing macros will be used [sic] to generate a true random sample of records to monitor.   Performance measures will identify where the random sample will be pulled.

(Dkt. 2047-1 at 15.)

Ryan Owens testified that he randomizes certain source documents for the ADC monitors each month using the Excel RAND function.   Mr. Owens stated that he does so by inserting a column next to the inmate's name and uses the RAND function to generate random numbers in the column.   (3/8/17 Tr. at 71:19-23.)   He then clicks sort, and the program randomizes the list.   (Id. at 69:18-19.)

Plaintiffs fault Mr. Owens for not having taken any statistics or Excel classes, but as the Court acknowledged, there is no need to take either to utilize what is a very basic function in Excel.   (*Id.* at 85:8-11: "And the point that I'm concerned about is not whether or not the randomization of pushing the right buttons on Excel works or not.  I don't think you need any training to do that.".)   Indeed, a quick Google search reveals that there are numerous online tutorials on the Excel RAND function that anyone, including Mr. Owens, could use to learn the function.   And as the Court noted, "I don't have any doubt that you can run the Excel program and randomize and probably what you get is probably okay and probably not subject to attack."   (Id. at 85:24-86:2.)   Even Plaintiffs' expert, Dr. Haney, does not opine that Mr. Owens does not randomize correctly.

Plaintiffs additionally try to make much of the fact that Mr. Owens did not testify that he saves the random numbers as values on the spreadsheets before sorting them and

5

1    sending them to the monitors.  But none of the three attorneys who questioned Mr. Owens

2    or the Court actually asked him whether he does so.  Regardless, Plaintiffs' complaint is

3    much ado about nothing.  The only effect of not saving the random numbers as values is

4    that the random numbers will change each time a cell on the worksheet is changed.  The

5    other columns on the worksheet, however, will remain in the same random order as before

6    the change.  (3/21/2017 Tr. at 348:24-349:12)

7         The Court can easily test this fact by performing a simple randomization using

8    Excel.  To do so, enter a list of the numbers 1 through 10 in column A and a list of the

9    letters A through J in column B on a blank Excel worksheet.  Insert a new column to the

10   left of the column containing the list of numbers.  The new column will now be column A,

11   the list of numbers will be in column B, and the list of letters will be in column C.

12   Highlight the cells in the newly inserted column A, and in the formula pane, enter

13   =RAND().  Drag the corner of cell A1 containing the random number formula down to

14   cell A10 to copy the formula to all the cells.  This will generate the random numbers.

15   Highlight the contents of cells 1 through 10 in columns A, B, and C and click Sort

16   Smallest to Largest.  The data from Columns B and C will now be in random order.  If a

17   change is made to the worksheet, for example, by typing something in cell B13, the

18   random numbers shown in Column A will change, but the data in Columns B and C will

19   remain in the same random order as before the change.

20        Plaintiffs also claim that the source documents Defendants presented during the

21   evidentiary hearings were not properly randomized because the random numbers are not

22   sorted from smallest to largest.  (Dkt. 2048 at 8.)  They are mistaken.  The Court can also

23   test this fact through the same example as above.  After the RAND formula is copied and

24   pasted to all the cells in Column A, Click Sort Smallest to Largest.  The random numbers

25   in Column A will be re-sorted in random order, but they will not be in ascending order,

26   and the data in Columns B and C will clearly be in random order.

27        The point of using the Excel RAND function is to transform a list of items into a

28   randomized order.  Simply put, the method employed by Mr. Owens accomplishes that

6

purpose.  Before randomization occurs, the source documents used by the monitors are ordered by either inmate number or date.  Plaintiffs did not point to any source documents at the hearings in which the inmate numbers or dates were still in that order.  And, as the Court noted when sustaining an objection to Plaintiffs' questioning during the March 21, 2017 hearing, Dr. Taylor could testify that the documents are randomized based on her knowledge of the process that results in the source documents.  (3/12/17 Tr. at 380:19-381:5.)

Plaintiffs also question whether other source documents used by the ADC monitors in monitoring compliance with the healthcare performance measures are randomized in light of Mr. Owens' testimony that he does not randomize all of the source documents used by the monitors.  But Plaintiffs did not inquire of all of the monitors who testified whether and how they randomize source documents that are not provided to them already randomized, and they sought testimony from only a small proportion of the ADC monitors.  Plaintiffs also ignore testimony from Dr. Taylor that she personally randomized the source documents used by the mental health monitors prior to Mr. Owens taking over that function.  (3/21/17 Tr. at 345:20-346:1.)   Plaintiffs also criticize Erin Barlund's testimony that while she has used Excel RAND to randomize source documents for the measures she audits for approximately the past year and a half, she has not always used Excel RAND, and her approach prior to that was "probably more haphazard."  (4/17/17 Tr. at 601:1-4.)  However, neither Plaintiffs nor the Court asked Ms. Barlund what she meant by "more haphazard" and what that earlier approach entailed.  If they had, they would have learned that before the ADC monitors began using the Excel RAND function, they pulled their samples by starting from a random point on the source document and manually selecting every Kth record, which is also considered an acceptable method of statistical sampling.  (Exhibit 1: Campbell Decl. at ¶¶ 17-19.)

In short, throughout the course of the Stipulation monitoring period, Defendants have randomized the source documents used by the monitors for the performance measures requiring randomization, either manually or using the Excel RAND function.

## C.    Selection and Use of Source Documents

The protocols set forth in Exhibit C to the Stipulation provide some source documents agreed upon by the parties for use in monitoring the healthcare performance measures.  At the time the parties negotiated the Stipulation protocols, a large number of the performance measures had never been monitored at ADC, and the parties included documents they believed would likely be used by the monitors in reviewing compliance. In addition, at the time the parties drafted the protocols, ADC had not converted to the use of electronic medical records, and the source documents were based on the use of paper medical records and logs.   In light of the development of a large number of new performance measures and the transition from paper to electronic records, it is no surprise that there have been changes in the availability and use of source documents over the course of the first two years of monitoring under the Stipulation.

During the evidentiary hearings, both Plaintiffs and the Court questioned the use of logs and reports supplied by contract vendors.  While the Court and Plaintiffs' counsel may prefer otherwise, there is nothing in the Stipulation that requires that the source documents be created by ADC or prohibits the monitors from using source documents created or maintained by Corizon or other contract vendors.  Moreover, Plaintiffs' counsel agreed to the use of the source documents contained in the Stipulation protocols.

Despite the Court's concern that Corizon has an incentive to remove non-compliant charts from logs before providing them to the ADC monitors, there has been absolutely no evidence that this is occurring.  Many of the Corizon logs relied upon by the ADC monitors merely list dates of HNRs or encounters and corresponding ADC names and numbers.  To locate non-compliant charts, someone at Corizon would have to go into eOMIS and review multiple encounter screens for each individual listed to determine whether the inmate was timely referred or seen.  It takes the ADC monitors a month to go through this process of review just for the ten charts that are randomly selected for each measure.  It would be utterly unfeasible for someone to review all charts on the logs to identify those that are non-compliant prior to submission of the logs to ADC.  Moreover,

if Corizon did in fact have a practice of falsifying logs to remove non-compliant charts, one would expect far greater levels of compliance than have been reported over the past two years.

Likewise, the PharmaCorr reports used for the pharmacy performance measures merely contain the dates of prescriptions and corresponding inmate names and numbers. There is no way to tell whether the prescriptions listed on the reports were timely provided to the inmates without accessing the inmate's individual records on eOMIS and searching multiple Medication Administration Reports.  The PharmaCorr reports are sent directly from PharmaCorr to ADC, and there is no evidence that anyone at PharmaCorr has the authority to access ADC inmates' medical records to evaluate the timeliness of provision of medications and remove any non-compliant prescriptions from the reports. Moreover, the PharmaCorr reports consist of about 500 pages each month, with each row corresponding to a prescription during the audit month, which would make it extremely difficult to cherry pick compliant records.  (3/21/17 Tr. at 227:19-228:20.)

While Plaintiffs may have concerns about the accuracy of the source documents used by the monitors to determine compliance with the healthcare performance measures, they agreed to their use as set forth in the Stipulation protocols.

### D. Monitoring Methodology

As the Court is aware, Defendants voluntarily created a Monitor Guide to assist the ADC monitors in standardizing the monitoring process at the ten ADC complexes statewide and to provide a roadmap for new monitors.  Although the Monitor Guide is not mentioned in or required by the Stipulation, Defendants shared the Monitor Guide with Plaintiffs' counsel and the Court in an attempt to increase transparency regarding the monitoring process.   What began as a voluntary internal effort to standardize the monitoring process across monitors and complexes has been transformed into a formal document requiring approval from Plaintiffs and the Court as to all current content and a 30-day review and comment period as to any proposed changes.

/ / /

The Court has entered several orders over the past nine months changing the monitoring methodology employed by the ADC monitors.  Defendants have sought reconsideration or clarification of some of these orders, resulting in briefing from both parties that drew out the process of declaring a final methodology.

Plaintiffs have taken the position that Defendants must immediately employ any new methodology announced by the Court, failing to take into account the reality of the monitoring process, which is retrospective.  As a result, if the Court announces a new methodology in the middle of a month, that change will not be reflected in the monitoring until the first full month following the order and, due to the length of the monitoring cycle, will not be reported until the next month's CGAR report.  For example, if an Order directing a methodology change was issued in December 2016, the change will take effect in January 2017, and findings employing the new methodology will be reported in February 2017.

This is significant because Plaintiffs asked mental health monitor Dennis Dye a number of questions regarding the methodology he used in December 2016 in an attempt to argue that Defendants are ignoring the Court's orders with respect to monitoring methodology, particularly as related to group encounters and measures which require that an action occur "every X days."  Plaintiffs did not, however, inquire into the methodology Mr. Dye used in subsequent months, when such changes would have been reflected in the monitoring cycle.

Plaintiffs also conveniently overlooked the fact that the orders regarding monitoring methodology they inquired about with Mr. Dye were subject to additional motions practice, including a motion for reconsideration and motion for clarification, following the date of the original order. The Court first issued an order (Dkt. 1673) regarding whether group contacts satisfy the Stipulation's language regarding being "seen" in a confidential setting and concluding that group contacts may be counted towards compliance only for performance measure 92.  Defendants made an oral Motion for Reconsideration of that Order on October 5, 2016, and the Court ordered briefing from

the parties.  Plaintiffs filed their brief on November 22, 2016 (Dkt. 1772), and Defendants replied on November 29, 2016 (Dkt. 1781).  On December 1, 2016, Plaintiffs filed a Motion for Leave to File a Sur-reply (Dkt. 1791), and on December 2, 2016, Defendants filed a Reply to Plaintiffs' Motion for Leave to File a Sur-Reply (Dkt. 1794).  On February 1, 2017, the Court issued its final Order (Dkt. 1907) denying Defendants' oral Motion for Reconsideration and ruling that the Stipulation's requirement of being "seen" does not include group encounters.

With respect to the "every X days" issue, the Court issued an Order (Dkt. 1673) on September 6, 2016 concluding that "an action that must occur every X days means that, in essence, a clock starts on the day an action occurs and that clock runs for X days. Before the end of that clock X days later, the action must occur again." Unfortunately, that Order raised more questions than it answered, and the parties could not reach an agreement as to the appropriate language to include in the Monitor Guide for these measures.  On October 19, 2016, Plaintiffs and Defendants submitted separate briefs regarding their understanding of how to employ that order (Dkt. 1717; Dkt. 1719).  On November 10, 2016, the Court issued an order (Dkt. 1754) in an attempt to provide clarification to the parties.  Believing that the additional order still left questions unanswered, Defendants filed a Motion for Clarification (Dkt. 1774) on November 22, 2016.  Plaintiffs responded on December 9, 2016 (Dkt. 1809), and Defendants replied on December 16, 2016 (Dkt. 1824).  The Court issued its final order (Dkt. 1833) with respect to the "every X days" issue on December 23, 2016.

No doubt Plaintiffs' insistence in focusing on the methodology employed by Mr. Dye in December 2016 was deliberate in light of their knowledge of the parties' additional briefing on each of these issues and the inherent delay in reporting due to the retrospective nature of the monitoring process.   If Plaintiffs had inquired about the monitoring methodology employed in later months for the mental health performance measures, they would have learned that the monitors are complying with the Court's final orders that were issued after the start of the December monitoring cycle.

11

Plaintiffs are also critical that a number of the monitors testified that they are not provided the Court's orders regarding changes to monitoring methodology. (Dkt. 2046 at 37.) But Plaintiffs gloss over the testimony from Richard Pratt and most of the site monitors that the ADC Monitoring Bureau has monthly meetings at which they discuss any changes to monitoring methodology and are provided updated versions of the Monitor Guide, which reflect the Court's orders and any agreements with Plaintiffs as to methodology. (*See, e.g.*, 3/8/17 Tr. at 143:17-24, 144:7-10; 3/21/17 Tr. at 251:7-15; 4/17/17 Tr. at 654:7-18, 655:3-8.)

Plaintiffs additionally raise several issues with respect to monitoring methodology that could have been hammered out between the parties during the negotiations and resulting hearings with respect to the Monitor Guide, but which Plaintiffs have inexplicably waited to raise with the Court until now. Plaintiffs claim that Defendants have unilaterally and improperly ceased monitoring for performance measures 92 and 93 for maximum custody inmates at Perryville and Tucson. (Dkt. 2043 at 26.) But as Defendants pointed out at the April 17, 2017 hearing, there are no longer any inmates at either facility who are "housed in maximum custody." This can be verified by reviewing the daily count sheets for these facilities.[4] Indeed, Dennis Dye testified that he checks each month whether there are any inmates classified as maximum custody at either facility. Defendants have not ceased monitoring these measures at Perryville and Tucson, but they are now reported as non-applicable because, pursuant to the plain language of the Stipulation, there are no longer any inmates "housed in maximum custody" at either complex.

Plaintiffs next claim that Defendants are not complying with the Stipulation's requirements for watch follow-up contacts in performance measure 95 if an inmate has

---

[4] The count sheets are available at https://corrections.az.gov/capacity-custody-level/2017/05. The count sheet for May 22, 2017 indicates that there are no units at Perryville or Tucson that are designated as maximum custody. *See* https://corrections.az.gov/sites/default/files/DAILY_COUNT/May2017/05222017_count_sheet.pdf.

been returned to watch.  (Dkt. 2046 at 26-27.)  Performance measure 95 provides that an inmate who has been discontinued from a suicide or mental health watch must be seen between 24 and 72 hours, seven and ten days, and 21 and 24 days after the discontinuation.  These contacts are not required to be with a licensed clinician.  If, however, an inmate who has been discontinued from a suicide or mental health watch is returned to a watch, under performance measure 94 that inmate must now be seen daily by a licensed mental health clinician during the week and by a registered nurse on weekends and holidays.  Plaintiffs insist that Defendants must continue monitoring the watch follow-up contacts at the intervals set forth in performance measure 95 triggered by the discontinuation of watch even though the inmate is no longer discontinued from watch and is now required to receive daily watch contacts as set forth in performance measure 94.  Plaintiffs' insistence on observing a longer interval of contacts by non-licensed individuals when the inmate is now being seen for daily contacts by a licensed provider defies logic and is contrary to the intent of these performance measures, which provide for increased scrutiny of inmates judged to have a higher level of acuity.

Plaintiffs claim that it has "emerged" that Defendants sample a specified number of watch incidents or telepsychiatry sessions for performance measures 94, 95, and 97, rather than a specified number of inmate records.  (Dkt. 2046 at 28-29.)  Plaintiffs have known since the start of the Stipulation that the source documents agreed upon by the parties in the Stipulation protocols list individual encounters rather than inmates.  Plaintiffs have also known from their review of the monthly CGAR reports that Defendants were sampling by encounter rather than by record.  Plaintiffs could have raised this issue two years ago but chose not to.

Plaintiffs additionally complain that Defendants include records in their samples for performance measures 25, 85, and 86 that "cannot possibly be found noncompliant."  (Dkt. 2046 at 29-30.)  For performance measure 85, which requires that "MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications" (Dkt. 1185-1 at 14), Plaintiffs assert that Defendants must exclude from the

13

sample any inmate who was seen within the same month that he or she discontinued medications because the inmate's file "cannot possibly be found noncompliant" in that month.  While this may be true, there is nothing in the language of the Stipulation or the protocols that provides for exclusion of this file.  In addition, including the file in the sample accurately reflects that the inmate was seen within 30 days of being discontinued from medication, which is the entire point of the performance measure.  Excluding the file from monitoring would create a perverse incentive for Corizon to delay seeing inmates until the 30th day after discontinuation of medications, rather than seeing them as soon as possible.  Plaintiffs' approach essentially replaces the phrase "within 30 days of" with the phrase "exactly 30 days after" because if the inmate is seen within 30 days, Plaintiffs contend that the file must be excluded.  However, if the inmate is seen more than 30 days after medications are discontinued, the file will be noncompliant.

For performance measure 86, which requires that "MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medications" (Dkt. 1185-1 at 14), Plaintiffs contend that Defendants must exclude from the sample any inmates who were seen before 90 days have elapsed, because their files "cannot possibly be found noncompliant."  Again, Plaintiffs' approach rewrites the language of the Stipulation to replace the phrase "a minimum of every 90 days" with the phrase "exactly every 90 days," because if the inmate is seen within 90 days, Plaintiffs contend that the file must be excluded.  But if the inmate is seen more than 90 days after discontinuing medications, the file will be noncompliant.  Plaintiffs argue that Defendants are artificially inflating compliance, but Plaintiffs' approach guarantees that all compliant files are excluded from the sample.[5]

For performance measure 25, which requires that "[a] first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency" (Dkt. 1185-1 at 9), Defendants review whether there is documentation that

---

[5]   Plaintiffs make a similar argument with respect to treatment plans under performance measure 80 which should likewise be disregarded.

14

1  custody staff, who are all trained in basic life support, provided an emergency response.

2  While it is exceedingly unlikely that this measure will be found noncompliant because the

3  custody staff who are the first responders will immediately begin a response, it is unclear

4  how this practice includes records that "cannot possibly be found noncompliant."  In

5  addition, Plaintiffs' citation to a Corizon nurse's statement in the minutes for a CQI

6  meeting that a man down bag was not sufficiently mobile is not relevant because the

7  custody staff, not nursing, will be the first responders whose conduct is measured by the

8  monitors for this performance measure.

9      In short, the Court should not condone Plaintiffs' attempt to invalidate two years of

10  compliance findings for the healthcare performance measures because they are now

11  experiencing buyers' remorse as to the self-monitoring process and the methodology and

12  source documents they agreed to in the Stipulation protocols in order to settle this case.

13          **E.    Rebuttal Process**

14      Plaintiffs assert that the rebuttal process whereby Corizon can challenge the

15  accuracy of CGAR findings is "problematic."  (Dkt. 2046 at 31.)

16      Plaintiffs mischaracterize Ms. Campbell's testimony as to the availability of

17  information as to rebuttals that occurred prior to her creation of a rebuttal log.  Ms.

18  Campbell testified that to make a change to the CGAR after the information has been

19  submitted by the monitor, she has to submit a ticket to the IT Department regarding the

20  change.  The emails she sends to IT include a copy of the CGAR finding that needs to be

21  changed and the new information to be inputted.  Ms. Campbell also prints and maintains

22  a hard copy of each month's CGAR report, as well as any reissued CGAR reports based

23  on a successful rebuttal by Corizon.

24      Plaintiffs claim that they did not learn of the Corizon rebuttal process until

25  November 23, 2016, when Defendants produced the September 2016 rebuttal logs, but

26  this is not accurate.  Plaintiffs have been aware of the rebuttal process for much longer

27  than that, and it has been explained to both Plaintiffs and the Court that part of the delay

28  in receiving final CGAR reports following the completion of the monitoring month is that

15

there is a ten-day period during which Corizon may challenge the monitors' findings. And Plaintiffs' assertion that the Court did not learn that a rebuttal process existed until the evidentiary hearings is clearly undermined by the Court's list of questions for the hearings, which was issued on January 26, 2017. (Dkt. 1915 at 3.)

Plaintiffs also complain that there are no written guidelines, instructions, or standards for the rebuttal process. (Dkt. 2046 at 31.) But they have not explained what written guidelines or standards they believe are necessary for this process. The rebuttal process is simple. If Corizon believes that a monitor made a mistake with respect to a particular compliance finding, they inform the monitor or Ms. Campbell of the alleged mistake. If the communication takes place prior to the monitor's finalization of the result for that measure, the monitor will review the relevant chart and determine whether he or she made a mistake and, if so, the monitor will adjust the finding. If not, the finding stands. If the communication occurs after the monitor has finalized the result for that measure, Ms. Campbell or Ms. Headstream review the relevant chart and determine whether the monitor made a mistake. If so, Ms. Campbell submits a ticket to IT to change the finding. If not, the finding stands. And contrary to Plaintiffs' claim, there is a written guideline—the process identified in the applicable portion of the Monitor Guide has to be followed for a challenge to the accuracy of a compliance finding to stand.

Plaintiffs are critical that the changes are made under the name of the monitor who entered the original finding and show the entry date of the original finding, rather than the entry date of the changed finding. (Dkt. 2046 at 32.) Defendants have adjusted this practice and are now making the change in an addendum following the original finding to clearly show that the information has been changed following the original submission. This change will be reflected in the March 2017 CGAR report.

Plaintiffs additionally claim that "ADC only presents Corizon with the noncompliant findings for rebuttal; there is no parallel process to test the accuracy of findings of compliance" which "creates a one-sided process that can only result in improved compliance scores." (Dkt. 2046 at 32.) This is not true. Corizon receives the

full CGAR report each month, which contains all findings on all healthcare performance measures, and Corizon has the opportunity to challenge any finding, regardless of whether the finding is compliant or noncompliant.  And Plaintiffs provide the parallel process in that they focus only on findings of compliance and have never pointed out any measures for which Defendants have mistakenly found noncompliance.

The purpose of the rebuttal process is to ensure that the CGAR findings for the healthcare performance measures are accurate.  (3/8/17 Tr. at 103:25-104:1.)  Plaintiffs have not articulated any valid reason to discontinue this practice.

## F.    Root Cause Analysis

Plaintiffs are critical that a couple of the ADC monitors did not testify that they engage in dialogue with Corizon regarding their identification of problems with compliance and suggested solutions.  (Dkt. 2046 at 36.)  If the evidentiary hearings had been conducted as the Court originally envisioned as an informal, educational process, it is far more likely that the monitors would have been comfortable sharing their impressions with respect to potential causes of non-compliance for the measures they monitor and any suggestions they may have for improvement.  Instead of cultivating a collaborative environment in which the monitors—many of whom are unaccustomed to appearing in court—could have freely contributed their knowledge, Plaintiffs' counsel subjected them to vigorous cross examination and impeachment and questioned their competency and ethics.  It should come as no surprise, then, that many of the monitors were not comfortable expressing their ideas during the hearings.

Despite this, there were several monitors who nonetheless testified that they have discussed compliance issues and potential improvements with the Corizon site-level leadership.  (3/21/17 Tr. at 314:24-316:22, 4/17/17 Tr. at 433:2-7, 579:12-580:15.)  And Martin Winland, one of the monitors Plaintiffs are critical of, testified that he meets with Corizon to discuss ways to increase compliance scores and has identified what he believes to be the cause of compliance issues with respect to the timely delivery of medications to inmates—documentation of the provision of the medications to the inmates.  (3/21/17 Tr.

17

at 174:20-24, 191:13-192:3, 193:2-23, 194:6-14.)  But Plaintiffs discount this testimony because it does not comport with their agenda, which appears to include arguing for on-site pharmacies, rather than the use of a centralized mail-order pharmacy.

In addition, Richard Pratt testified that he regularly meets with the Corizon regional leadership to discuss non-compliant healthcare measures and how to improve Corizon's performance.  (4/17/17 Tr. at 636:19-637:3.)  Plaintiffs did not ask Kathy Campbell about her interactions with Corizon, but she has almost daily communications with Corizon at the site level regarding the medical measures and attends nearly all of the meetings with Richard Pratt and the Corizon regional leadership to develop action plans for noncompliant performance measures.  (Exhibit 1: Campbell Decl. at ¶¶ 13, 16.)  Dr. Taylor also testified that she has regular communications with the Corizon regional leadership and site-level leadership with respect to compliance and improving processes and performance for the mental health performance measures.  (3/21/17 Tr. at 341:6-9, 15-21, 342:12-343:5.)  She further testified that this function is primarily performed by the higher-level monitoring staff, rather than the site monitors.  (3/21/17 Tr. at 341:10-14.)

While Plaintiffs were adamant that certain of the ADC monitors testify at the evidentiary hearings, Plaintiffs did not seek testimony from Dr. Chu, who monitors Smallwood Dental's performance on the dental performance measures, or Vanessa Headstream, who supervises a group of site monitors and is responsible for monitoring some of the medical performance measures, both of whom regularly engage in dialogue with the relevant players regarding compliance issues and ideas for improvement. (Exhibit 1: Campbell Decl. at ¶ 15.)  Plaintiffs also did not seek testimony from most of the site level monitors, many of whom have face-to-face out-briefings with the Corizon site-level leadership to discuss their findings each month.  (*See, e.g.*, 3/8/17 Tr. at 22:22-24; 4/17/17 Tr. at 563:25-564:1.)  The ADC site monitors and Corizon site leadership also attend the monthly ADC Wardens' meetings at which time the monitors and Corizon staff brief the ADC leadership on current compliance levels, challenges they are facing in achieving compliance, and potential strategies for increasing compliance.  (4/17/17 Tr. at

18

1    489:23-490:6.)   Most of the site monitors have their offices on the complexes they

2    monitor and have daily contact with the Corizon personnel on-site.   And as Plaintiffs are

3    aware, some of the site monitors also attend Corizon's monthly CQI meetings.   (3/8/17 Tr.

4    at 145:2-14, 3/21/17 Tr. at 287:14-21, 337:8-16.)

5         Plaintiffs claim that Defendants fail to meaningfully investigate the causes of

6    noncompliance is not supported by the evidence presented at the hearings or the reality of

7    the day-to-day operation of the Monitoring Bureau.

8         **G.    Monitoring of Maximum Custody Performance Measures**

9         Plaintiffs' attempt to characterize the testimony presented by ADW Hackney and

10   Division Director of Offender Operations C. McWilliams as evidence that the monitoring

11   system for the maximum custody performance measures ("MC PMs") is "plagued with

12   methodological problems" fails.   (Dkt. 2046 at 43.)   No testimony provided by either

13   ADW Hackney or Division Director McWilliams illustrated fundamental flaws with the

14   monitoring system.   Moreover, Plaintiffs' characterization of the March 28, 2017,

15   evidentiary hearing as uncovering a "new system of monitoring and accountability" is

16   disingenuous. (Id.)  Rather, ADC's competent witness testimony simply established that

17   the monitoring system in place from the start has been built upon to include multiple

18   levels of review for quality assurance purposes before the complex Wardens report their

19   final results.  In short, there is no "new" system that replaced a prior "shoddy" system as

20   Plaintiffs try to make it out to be. Nor is the documentation prior to November 2016 "out

21   of date" as Plaintiffs' assert.   (Id.)   Instead, organization of the maximum custody

22   notebooks has been adjusted, and the out-of-cell tracking forms have been changed to fit

23   the parties' agreements contained in the Max Custody Monitor Guide, but the monitoring

24   methodology agreed to by the Plaintiffs, and long known to the Plaintiffs, stands.

25        As to monitoring and reporting on the MC PMs, the Court has never found "great

26   chasms of competence."  (Dkt. 2046 at 1.)  Details added to the monitoring system, the

27   majority of which were agreed upon by the parties as memorialized in the soon-to-go-live

28   Max Custody Monitor Guide, required very little guidance by the Court.  Nor has the

1   Court found Defendants' methodology for each of the MC PMs at each maximum custody

2   unit faulty such that the entirety of twenty-four months of monitoring should be

3   categorically discounted and set aside.  Likewise, there has been no ruling on Plaintiffs'

4   Motion to Enforce the Stipulation as to MC PMs 1-3, 5-6, and 8.  (Dkt. 1944.)  And, thus,

5   no finding of substantial non-compliance on any of the MC PMs for any maximum

6   custody unit. Add to this, Defendants' Response to Plaintiffs' Motion to Enforce (Dkt.

7   1983) shows that Plaintiffs' grandiose discounting of the parties' agreed-upon monitoring

8   methodology and the resulting CGAR reports fails.  Defendants stand on their Response

9   to Plaintiffs' Motion to Enforce in addressing Plaintiffs' attacks on methodology and

10  CGAR reporting such that further explanation would be unnecessarily duplicative here.

11  Simply put, Plaintiffs' self-serving characterization of a maximum custody monitoring

12  mission gone awry fails.

13         Next, Plaintiffs' criticism as to the absence of Complex Wardens' testimony at the

14  evidentiary hearing carries no weight.  The Court has already addressed this issue and

15  denied Plaintiffs' request to reconvene and have the Complex Wardens face challenges to

16  CGAR reporting for the last 24 months.  Indeed, Defendants' counsel advised Plaintiffs'

17  counsel which witnesses would be offered by ADC to explain the monitoring

18  methodology, and Plaintiffs did not object.  The purpose of the hearing was to educate the

19  Court as to the current monitoring methodology – not to convene an evidentiary assault on

20  compliance determinations.  That ADC's competent witnesses may not have had the

21  personal knowledge necessary to answer a challenge to a specific historical document or a

22  specific historical CGAR report was of no consequence where the evidentiary hearing was

23  never meant to be a full throttle "substantial non-compliance" hearing – especially where

24  Defendants have not yet moved for termination of the MC PMs.  Plaintiffs' renewed

25  demand that the Complex Wardens now come into Court to testify "about their

26  monitoring processes and decisions regarding compliance findings" should not be

27  reconsidered.  Plaintiffs have come forward with no new and valid reason to discount the

28  Court's prior ruling on this issue.  The current monitoring system has been explained in

20

great detail. In sum, since last fall, additional levels of quality assurance review have been added to the mix. But, this does not change the monitoring methodology at its base. A request for explanation from the Wardens about past "decisions" is really an unveiled attempt to prematurely and inappropriately conduct a compliance hearing – not an educational monitoring methodology hearing.

Finally, Plaintiffs' arbitrary request for a six-month extension of the monitoring period for the MC PMs should be denied. No "new and untested" system exists. The methodology agreed to by Plaintiffs has been employed. Now, there are additional levels of review in place. That is all. Additional levels of review not required by the Stipulation and never even demanded by Plaintiffs are not evidence of prior non-compliance with the Stipulation monitoring protocols. Moreover, the request is not based on empirical evidence of substantial non-compliance for each and every MC PM at each of the units affected by the Stipulation. Cut to its core, the request to extend monitoring is really a blatant demand for a "remedial plan" to be applied to every single MC PM at each maximum custody unit, but lacking the necessary justification to support such relief - *actual evidence* supporting *a finding* of substantial non-compliance as defined by paragraphs 19 and 20 of the Stipulation. (Dkt. 1185). No such findings have been made. No such remedial measures are required, nor can they be ordered by the Court at this stage.

## III. <u>CONCLUSION</u>

Plaintiffs impermissibly turned what was intended to be an informal, educational process regarding ADC's monitoring under the Stipulation into a full-scale attack on the first two years of compliance findings for all 112 of the healthcare and maximum custody performance measures. Because this was not the appropriate forum for raising these issues, and because Plaintiffs have not provided any valid justification supporting the extreme relief they request of invaliding all compliance findings for the first two years of monitoring under the Stipulation, the Court should deny Plaintiffs' requested relief. If the Court is inclined to make any determinations with respect to the validity of the

1    compliance findings, Defendants must be afforded a full and fair opportunity to present

2    evidence supporting them.

3           DATED this 22nd day of May 2017.

4                                          STRUCK WIENEKE & LOVE, P.L.C.

5

6                                   By /s/Daniel P. Struck
                                        Daniel P. Struck
7                                       Kathleen L. Wieneke
                                        Rachel Love
8                                       Timothy J. Bojanowski
                                        Nicholas D. Acedo
9                                       Ashlee B. Fletcher
                                        Anne M. Orcutt
10                                      Jacob B. Lee
                                        Kevin R. Hanger
11                                      STRUCK WIENEKE & LOVE, P.L.C.
                                        3100 West Ray Road, Suite 300
12                                      Chandler, Arizona  85226

13                                      Arizona Attorney General Mark Brnovich
                                        Office of the Attorney General
14                                      Michael E. Gottfried
                                        Lucy M. Rand
15                                      Assistant Attorneys General
                                        1275 W. Washington Street
16                                      Phoenix, Arizona 85007-2926

17                                      *Attorneys for Defendants*

18

19

20

21

22

23

24

25

26

27

28

22

**CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alison Hardy:          ahardy@prisonlaw.com

Amelia M. Gerlicher:   agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, kleach@perkinscoie.com

Amy B. Fettig:         afettig@npp-aclu.org

Asim Varma:            avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

Caroline N. Mitchell:  cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com

Corene T. Kendrick:    ckendrick@prisonlaw.com; edegraff@prisonlaw.com

Daniel Clayton Barr:   DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

David Cyrus Fathi:     dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

Donald Specter:        dspecter@prisonlaw.com

Jessica Pari Jansepar Ross:   jross@azdisabilitylaw.org

John Howard Gray:      jhgray@perkinscoie.com; slawson@perkinscoie.com

John Laurens Wilkes:   jlwilkes@jonesday.com, dkkerr@jonesday.com

Jose de Jesus Rico:    jrico@azdisabilitylaw.org

Kathleen E. Brody:     kbrody@acluaz.org

Kirstin T. Eidenbach:  kirstin@eidenbachlaw.com

Maya Abela            mabela@azdisabilitylaw.org

Rose Daly-Rooney:      rdalyrooney@azdisabilitylaw.org

Sara Norman:           snorman@prisonlaw.com

Sarah Eve Kader:       skader@azdisabilitylaw.org;mlauritzen@azdisabilitylaw.org; rstarling@azdisabilitylaw.org

Rita K. Lomio:         rlomio@prisonlaw.com

Victoria Lopez:        vlopez@aclu.org

1

2          I hereby certify that on this same date, I served the attached document by U.S.
Mail, postage prepaid, on the following, who is not a registered participant of the
3   CM/ECF System:

4          N/A

5                                           /s/Daniel P. Struck

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28