1          **UNITED STATES DISTRICT COURT**

2            **FOR THE DISTRICT OF ARIZONA**

3            _____

4

**Victor Parsons, et al., on**  )
5  **behalf of themselves and all**  )
   **others similarly situated;**  )
6  **and Arizona Center for**  )
   **Disability Law,**  )
7                    )  No. **CV 12-00601-PHX-DKD**
              Plaintiff,  )
8                    )
        vs.          )  Phoenix, Arizona
9                    )  March 21, 2017
**Charles Ryan, Director,**  )  8:01 a.m.
10 **Arizona Department of**  )
   **Corrections; and Richard**  )
11 **Pratt, Interim Division**  )
   **Director, Division of Health**  )
12 **Services, Arizona Department**  )
   **of Corrections, in their**  )
13 **Official capacities,**  )
                    )
14            Defendants.  )
   _____  )
15

16

17   **BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

18      **REPORTER'S TRANSCRIPT OF PROCEEDINGS-*REDACTED***

19       (***Evidentiary Hearing re: Status - Resumed***)

20

21 Official Court Reporter:
   Laurie A. Adams, RMR, CRR
22 Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc 43
23 Phoenix, Arizona 85003-2151
   (602) 322-7256
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2    **For the Plaintiffs:**

3            EIDENBACH LAW PC
             By:  **Kirstin T. Eidenbach, Esq.**
4            P.O. Box 91398
             Tucson, AZ 85752
5
             ACLU - Washington DC
6            By:  **David C. Fathi, Esq.**
             915 15th Street NW
7            7th Floor
             Washington, DC 20005
8
             ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
9            By:  **Maya S. Abela, Esq.**
             177 N. Church Avenue
10           Suite 800
             Tucson, AZ 85701
11
             PRISON LAW OFFICE
12           By:  **Corene D. Kendrick, Esq.**
             1917 5th Street
13           Berkeley, CA 94710

14   **For the Defendants:**

15           STRUCK WIENEKE & LOVE, P.L.C.
             By: **Timothy J. Bojanowski, Esq.**
16           By: **Daniel P. Struck, Esq.**
             By: **Anne M. Orcutt, Esq.**
17           3100 W. Ray Road
             Suite 300
18           Chandler, AZ 85226

19

20

21

22

23

24

25

1

## I N D E X

2

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS | COURT |
|---|---|---|---|---|---|

3

HALDANE, Mark
4    By Ms. Kendrick
     (Resumed)

|  |  | 132 |  |  |  |
|---|---|---|---|---|---|

5

WINLAND, Martin
6    By Mr. Bojanowski
     By Ms. Kendrick
7    By Mr. Bojanowski
     By The Court

| 169 |  |  |  |  |
|---|---|---|---|---|
|  | 176 |  |  |  |
|  |  | 226 |  | 173 |

8

EVANS, Troy
9    By Mr. Bojanowski
     By Ms. Kendrick

| 234 |  |
|---|---|
|  | 241 |

10

CARTWRIGHT, Sarah
11   By Mr. Bojanowski
     By Ms. Kendrick
12   By The Court

| 271 |  |  |  |  |
|---|---|---|---|---|
|  | 275 |  |  |  |
|  |  |  |  | 305 |

13

FONTAINE, Jenny
     By Mr. Bojanowski
14   By Ms. Kendrick
     By The Court

| 309 |  |  |  |  |
|---|---|---|---|---|
|  | 317 |  |  |  |
|  |  |  |  | 316 |

15

TAYLOR, Nicole
16   By Mr. Bojanowski
     By Mr. Fathi

| 340 |  |
|---|---|
|  | 367 |

17

18

## INDEX OF EXHIBITS

19

| EXHIBIT | IDENT | RECEIVED |
|---|---|---|

20             (NONE.)

21

22

23

24

25

UNITED STATES DISTRICT COURT

─────── March 21, 2017 - Status Hearing ───────

1          P R O C E E D I N G S

2          THE MAGISTRATE CLERK:  Civil Case Number 12-601,

3   Parsons, et al., versus Ryan, et al., on for status hearing.

4          THE COURT:  Counsel, please announce.

5          MR. FATHI:  Good morning, Your Honor.  David Fathi of       08:01AM

6   the ACLU National Prison Project for the plaintiff class.

7          THE COURT:  Thank you.  Good morning.

8          MS. KENDRICK:  Corene Kendrick from the Prison Law

9   Office for the plaintiff class.

10         THE COURT:  Thank you.  Good morning.                       08:02AM

11         MS. EIDENBACH:  Good morning.  Kirsten Eidenbach for

12  the prisoner plaintiff class.

13         THE COURT:  Thank you.

14         MS. ABELA:  Maya Abela for the Arizona Center For

15  Disability Law.                                                    08:02AM

16         THE COURT:  Thank you.  Good morning.

17         MR. BOJANOWSKI:  Tim Bojanowski and Anne Orcutt for

18  the defendants.

19         THE COURT:  Thank you very much.  Good morning.

20         Well, I appreciate, again, the fact that we are coming      08:02AM

21  together after the necessary need to adjourn prematurely last

22  time.  I hope that we continue to be able to operate in the

23  spirit that I had envisioned, this idea that even in an

24  adversarial setting that there can be some cooperative learning

25  that can take place.  And so that's where we're -- the paradigm    08:02AM

—March 21, 2017 - Status Hearing—

1    we're trying to model.

2          And so Mr. Bojanowski, are you prepared to pick up

3    again?

4          MR. BOJANOWSKI:  Yes, Your Honor.

5          THE COURT:  Please.                                    08:02AM

6          MR. BOJANOWSKI:  Your Honor, we had Mr. Haldane on the

7    witness stand.  We had terminated the hearing when he was

8    halfway into his testimony.  I believe it now lies with the

9    plaintiffs to examine.

10         THE COURT:  Okay.  All right.  Thank you.              08:03AM

11         Mr. Haldane, if you would kindly return to the witness

12   stand.  The oath that you took before is still in application.

13         MR. FATHI:  I beg your pardon, Your Honor.  We would

14   like to invoke the rule excluding witnesses.

15         THE COURT:  Are there other witnesses who are present  08:03AM

16   in the courtroom, Mr. Bojanowski?

17         MR. BOJANOWSKI:  We have people who have already

18   testified.  We have Mr. Pratt, who is a named party and we have

19   Dr. Taylor as a designated representative of the Department.

20   And no one else that's going to testify.  Everybody else is out 08:03AM

21   in the hallway.

22         THE COURT:  Okay.  Thank you.

23         MR. FATHI:  Excuse me, Your Honor.  If I may, under

24   Rule 615, only a party that is not a natural person may have a

25   designated person present.  There is no party in this case who 08:03AM

—March 21, 2017 - Status Hearing—

1    is not a natural person, so the only person who may be present

2    is -- are the two defendants, Mr. Ryan and Mr. Pratt.  So Dr.

3    Taylor needs to be excluded.

4         THE COURT:  Well, the difficulty with that is I also

5    appreciate from my experience in this case that Dr. Taylor is a          08:04AM

6    critical information source for the defendants and that part of

7    the reason that the rule has exceptions is that it embraces the

8    idea that lawyers will need to have counsel from their clients

9    from time to time.  And when you have the circumstance here

10   where there is someone who is at a senior level, and has, in            08:04AM

11   this case already, as evident to me by just the interactions

12   that I see between counsel and Dr. Taylor, it is evident to me

13   that this is a circumstance where the rule should not be

14   enforced.

15        So that objection is overruled.                                    08:05AM

16        MR. FATHI:  Respectfully, Your Honor, the Rule of

17   Exclusion is mandatory upon request of a party and a party who

18   is a natural person may not designate a representative.

19        THE COURT:  I don't think it is mandatory.  Why do you

20   think it is mandatory?                                                  08:05AM

21        MR. BOJANOWSKI:  Your Honor, Mr. Ryan has been sued in

22   his official capacity, which is sued against the Department.

23   So frankly, I believe we are allowed to designate Dr. Taylor as

24   a party representative.

25        MR. FATHI:  Your Honor, Rule 615 provides as follows:             08:05AM

─────────── March 21, 2017 - Status Hearing ───────────

1   "At a party's request the Court must order witnesses excluded

2   so that they cannot hear other witnesses' testimony.  The only

3   exceptions are a party who is a natural person or an officer or

4   employee of a party that is not a natural person after being

5   designated as the party's representative by its attorney."          08:05AM

6   There are no parties here who are not natural persons, Your

7   Honor.

8            THE COURT:  And under Rule 615(c) the objection is

9   overruled.

10           MR. FATHI:  Thank you very much.                           08:06AM

11           THE COURT:  Thank you.  You may continue, Mr. Fathi.

12           MR. BOJANOWSKI:  Your Honor.

13           THE COURT:  Yes.

14           MR. BOJANOWSKI:  We would like to note for the record

15   that Mr. Struck has arrived on behalf of defendants.              08:06AM

16           THE COURT:  Thank you.  Good morning, Mr. Struck.

17           MR. STRUCK:  Good morning.  Thank you.

18                        MARK HALDANE,

19   a witness herein, having been previously sworn by the clerk to

20   speak the truth and nothing but the truth, was examined and

21   testified further as follows:

22                      CROSS-EXAMINATION

23   BY MS. KENDRICK:

24   Q.  Good morning, Mr. Haldane.

25   A.  Good morning.                                                  08:06AM

**March 21, 2017 - Status Hearing - Haldane - Cross**

1   Q.  How are you?

2   A.  I'm a little under the weather.

3       THE COURT:  What's wrong, sir?

4       THE WITNESS:  Just a cold.

5       THE COURT:  The reason I ask is not to pry, but it is          08:06AM

6   just to inquire whether there's anything that we could do to

7   make you feel better.

8       THE WITNESS:  I took some aspirin and some throat

9   lozenge and I'm okay.

10      THE COURT:  All right.  Thank you.                             08:07AM

11      MS. KENDRICK:  If you need a break or anything, just

12  let us know.

13      THE WITNESS:  I have got some water.

14      MS. KENDRICK:  All right.

15  BY MS. KENDRICK:                                                   08:07AM

16  Q.  So when you testified last week, I believe you mentioned

17  you had worked as an auditor before you came to the Department

18  of Corrections?

19  A.  That is correct.

20  Q.  What were you doing before ADC?                                08:07AM

21  A.  Before ADC I worked for the Department of Health Services.

22  I was -- the immediate job before ADC was as the Bureau Chief

23  for the Office of Audit and Evaluation at the Division of

24  Behavioral Health Services.

25  Q.  So in those positions, did you ever have any special          08:07AM

—————— March 21, 2017 - Status Hearing - Haldane - Cross ——————

1   training in statistics or auditing or something like that?

2   A.  Well, I have taken many classes on auditing, statistics.  I

3   took one class in college, and I worked with a methodologist

4   when I worked at the Department of Health Services, or at the

5   Auditor General's Office, I'm sorry.  And so I didn't have any          08:08AM

6   specialized training just classes that I took as part of my

7   job.

8   Q.  And given this background in training, is it safe to assume

9   that you are familiar with the concept of why you need to use

10  random samples or random lists when doing audits?                      08:08AM

11  A.  Yes.

12  Q.  Could you explain why it's important to use random samples?

13  A.  Well, because if you -- the reason to use random samples,

14  it would go to whether -- I mean, there's several steps

15  involved, really.  It's not just simple.  The real basic answer       08:08AM

16  would be to try to make your sample representative of the

17  sample set as a whole.

18  Q.  Okay.  And are you familiar with the concept of how one

19  goes about creating random lists?

20  A.  Somewhat, yes, in a general sense.                                 08:09AM

21  Q.  Okay.  So one way to do it is to use Microsoft Excel, is

22  that correct?

23  A.  That would be one way.

24  Q.  Okay.  And if you were to do that, and say you had a list

25  of people arranged in alphabetical order by their last names          08:09AM

**March 21, 2017 - Status Hearing - Haldane - Cross**

1    and you wanted to randomize them, would the first step be that

2    you take an empty column next to the names and assign a formula

3    to generate the random numbers?

4              MR. BOJANOWSKI:  Your Honor, we'll object.  I mean,

5    this witness is not the person who does randomization for the                08:09AM

6    department.  He merely receives a randomized list already.  So

7    this line of questioning really is not relevant to what he does

8    on a day-to-day basis.

9              THE COURT:  It's too preliminary for me to be able to

10   sustain that objection, so overruled.  Go ahead.                             08:10AM

11             MS. KENDRICK:  Okay.

12             THE WITNESS:  Your question again?

13             MS. KENDRICK:  Sure.  Sorry about that.

14   BY MS. KENDRICK:

15   Q.  So you have the list of names in alphabetical order, for                 08:10AM

16   example, and you need to generate random numbers so you just --

17   there's a way in Excel to create a formula that generates the

18   random numbers.  Is that your understanding?

19   A.  That's my understanding, yes.

20   Q.  Okay.  And then the next step would be that you copy and                 08:10AM

21   paste those values into another column?

22   A.  I don't know.

23   Q.  Okay.  And then when the random numbers are generated, do

24   you have to sort them from smallest to largest to actually

25   randomize the names?                                                         08:10AM

1    A.  I don't believe so.  It randomizes automatically, I

2    believe.  The Excel program is what randomizes.  I don't think

3    you have to re-sort after it randomizes.

4    Q.  So it generates random numbers but then you don't have to

5    sort it?                                                           08:11AM

6    A.  Well, I don't do that.

7    Q.  Based on your knowledge?

8    A.  Which is apparently very limited, yes.

9    Q.  Fair enough.

10          Mr. Bojanowski referred to the lists that you were       08:11AM

11   sent.  Who sends you these randomized lists?

12   A.  I receive them from our central office downtown.

13   Q.  Okay.

14   A.  Usually in an e-mail from Kathy Campbell.

15   Q.  What are the lists that she sends you?                       08:11AM

16   A.  There are several.  There's -- I get a list of nurse line

17   encounters; a list of provider line encounters; I get the HNR

18   logs; the -- trying to think all the various -- I think there

19   are more but I don't recall offhand.

20   Q.  Okay.  And you mentioned the nurse's line and provider line  08:12AM

21   encounters.  Do those lists show all the encounters that should

22   have happened in the month or only the ones that were completed

23   in the month?

24   A.  I don't -- I get the list.  I don't know how the list is

25   generated.                                                        08:12AM

1   Q.  Do you know if it's Kathy or somebody else who is

2   generating the list?

3   A.  I believe the source document is generated by Corizon, I

4   believe.  But -- and then the randomization is done by Ryan

5   Owens, I believe, and then Kathy sends the list to us.          08:13AM

6   Q.  What does the word "encounter" mean to you?  How would you

7   define it?

8   A.  It's when an inmate is seen by a health care professional.

9   Now, there are encounters in the system where it might be a

10  non-contact encounter, and it will tell us that.  But generally  08:13AM

11  speaking, it's when a patient has been seen by a medical or

12  mental health professional.

13  Q.  Would an encounter list include people who had an impending

14  appointment or requested appointment but were not seen?

15  A.  No.  That would be on the HNR list, probably.               08:14AM

16  Q.  Okay.  And the HNR list is another one you get from Kathy?

17  A.  Yes, it is.

18  Q.  And what's on that?

19  A.  It's the list of HNRs, health need requests, that have been

20  submitted by patients to be seen.                              08:14AM

21  Q.  And when you receive these lists, do you compare the HNR

22  list that lists all HNRs that were submitted with the provider

23  line list that lists the completed encounters or the nurse line

24  lists that list the completed nurse appointments?

25  A.  No.                                                         08:14AM

**March 21, 2017 - Status Hearing - Haldane - Cross**

1   Q.  I noticed looking through some of the Perryville CGARs that

2   you do regularly monitor performance measure about people being

3   released from prison with a 30-day supply of medication?

4   A.  That's correct.

5   Q.  It's Performance Measure 21.  Where do you get the source      08:15AM

6   of the names for that performance measure?

7   A.  I get a release list, and so I take the whichever over

8   time, which number of inmates we use.  The methodology of

9   choosing the list has changed somewhat but I use the release

10  lists.                                                             08:15AM

11  Q.  Is that a list that's provided to you by custody staff or

12  by Corizon?

13  A.  I get -- I have been using the list that was provided by

14  custody that I get e-mails from work each day in terms of the

15  movement lists of who is in and who is out and then I will        08:16AM

16  check that list against who has medications.  And then if they

17  do have medications, then I will -- in which yard they are

18  coming from, I will check that.

19  Q.  And you said that the methodology had changed a lot

20  recently for this?                                                 08:16AM

21  A.  I didn't say it changed a lot.  I said it has changed over

22  time where I think -- I'm trying to remember.  I think we have

23  more recently been getting -- we've been getting more and more

24  lists that are sort of officially randomized.  And to be

25  honest, I don't recall exactly the last month.  If I don't get    08:17AM

```
 1   a list then I'm going to use the release list and take the
 2   first 10 names from each yard.  Now not every month will I have
 3   10 names from every yard because our releases come mostly from
 4   our minimum security yards.  But I will, in that case, I will
 5   use however many there are from -- if there's less than 10 I          08:17AM
 6   will use all of them.  If there's more than 10 I will use the
 7   first 10 names that have medications that they should receive
 8   when they are released.
 9   Q.  If there's more than 10 is that list randomized, or are you
10   picking like every other name or every third name?                    08:18AM
11   A.  I am -- it's randomized in the sense that I don't know, you
12   know, I take the list.  I don't know who has been -- who is
13   being released when.  And so I have been taking the first 10
14   names off the list, generally speaking, the first 10 that I
15   find from that yard and that may take -- that may cover, it's       08:18AM
16   usually several days for most yards.
17   Q.  And last week we talked a little bit about the two, kind
18   of, there was like an informal rebuttal process and then a
19   formal one.  So the first one was when you had your preliminary
20   results and you would send them to the Corizon folks and say I      08:19AM
21   want you guys to just take a look at this before I put it in
22   the system.  Correct?
23   A.  I'm sorry.  Can you --
24   Q.  I just want to confirm, what do you call that process of
25   when you have gathered your data but you haven't put it in the      08:19AM
```

1   CGAR system and you notify the facility health administrator

2   hey, you might want to take a look at this performance measure?

3   A.  Well, it's -- just in my case it's usually just talking to

4   the FHA saying, here are our results for this performance

5   measure.  It's not -- I'm not asking them to review it.  I'm          08:19AM

6   not asking them to -- it's just a piece of information that I

7   give them in the general course of business.

8   Q.  And FHA is?

9   A.  The facility health administrator for Corizon.

10  Q.  FHA.  Okay.                                                       08:20AM

11          And you said that you normally just notify them of the

12  ones where it looks like they are going to be non-compliant for

13  the month?

14  A.  Generally, I mean, in a more -- I'm more apt to do that.  I

15  will sometimes if I see them say, hey, if there's a change what     08:20AM

16  it's been in the past to what it is now I would say, hey, you

17  know, I just finished this one up.  And that one from being

18  non-compliant to compliant or being compliant to non-compliant.

19  It's usually if there's a change in what the routine has been.

20  If they have something that's been consistently in one area or      08:20AM

21  the other, I'm not as inclined to let them know that there

22  hasn't been any change.

23  Q.  Is it more in the context of, congratulations, you are

24  achieving compliance now, or is it my numbers show that you are

25  above 80 percent this month.  Do you want to take a look at it      08:21AM

1    and make sure it's true?

2    A.  It's just here's the results, you know.  I don't -- it's

3    pretty -- I don't apply any particular, you know, sense of -- I

4    don't send them congratulatory notes on doing their job.  But

5    on the other hand, I don't say, you know, you are doing                08:21AM

6    terrible either.  I just say here are the results and let them

7    deal with that.

8    Q.  The numbers speak for themselves?

9    A.  Yes.

10   Q.  And you said that last week that you only recently started        08:21AM

11   listing the files you reviewed that were compliant in the

12   CGARs.  When did you start doing that?

13   A.  I have done it for the last -- for last month's CGAR and

14   this month's CGAR I have been putting all the -- both the

15   compliant and non-compliant records in the CGAR.  Prior to that       08:22AM

16   I was putting just the non-compliant records listing them.

17   Now, in the CGAR -- actual CGAR, yeah.

18   Q.  So that would be January data and February data?

19   A.  That's correct.  Yes, ma'am.

20   Q.  Okay.  And why did you start doing that?                          08:22AM

21   A.  Because we were asked -- we were told that we needed to

22   start doing that.

23   Q.  And if somebody wanted to go back and spot check a random

24   performance measure from an earlier month, say, like October

25   2016, and you gave them 100 percent or 90 percent compliance,        08:23AM

1    would there be a record or a way for that person to see a list

2    of all the records you have reviewed?

3    A.   Yes.

4    Q.   And what is that?

5    A.   Worksheets.                                                    08:23AM

6    Q.   Okay.  Are these worksheets that you keep by hand or that

7    you keep on a computer?

8    A.   In my case, I use an Excel spreadsheet.

9    Q.   So do you just kind of carry your laptop around with you as

10   you review things and type them in, or do you take notes by      08:23AM

11   hand and transfer them to the spreadsheet?

12   A.   No.  I work mostly from my office.  Now that we -- it used

13   to be when we had paper records I was walking all over the

14   prison, but now we have electronic records.  So I can do it

15   mostly from just from my office.  And I have two screens on my    08:24AM

16   computer, so I can just enter data from one side to the other.

17   Q.   Okay.  And was this idea of keeping a spreadsheet something

18   that you came up with based on past work as an auditor?

19   A.   No.  I mean, keeping worksheets is pretty -- I will say the

20   Excel spreadsheet is something I do just because it's the way I   08:24AM

21   like to work.  It's my own personal preference.  But the

22   worksheet itself is not new.

23   Q.   So you don't know if other monitors are keeping a

24   spreadsheet the way you do on your computer?

25   A.   I do not.                                                     08:25AM

1   Q.  And do you e-mail these spreadsheets at the end of the

2   month or save them anywhere on the server or where do they go?

3   A.  I have them on my computer and I send them to the

4   administrative assistant at our central office.

5   Q.  Okay.  And have you been keeping these spreadsheets the        08:25AM

6   entire time you have been auditing Corizon?

7   A.  They haven't been in electronic format -- well, let me

8   think when -- I don't remember exactly when I started using the

9   Excel spreadsheet.  I know I did not have it when -- prior to

10  Corizon when Wexford had the contract.  But for most of the        08:26AM

11  time, since we have had the CGAR standards, absolutely, yes, I

12  have been.

13  Q.  Okay.  And have you been informed and updated of the

14  Court's orders interpreting the stipulation and how the

15  monitors should be interpreting the requirements and measuring     08:26AM

16  compliance?

17  A.  We aren't -- what we're given is updates in the monitoring

18  guide, this document.  And so I assume that many of the changes

19  that have taken place in the monitoring guide are as a result

20  of what has happened here.  But we aren't told that there's --     08:27AM

21  necessarily that this change is a result of this court order or

22  this change is a result of this court order.  We're saying

23  we're told here's the latest version of the monitoring guide.

24  There are changes in it.

25  Q.  Is there some sort of summary sheet that explains, like,       08:27AM

1    here are the seven performance measures that have been changed

2    so you don't have to read through the whole thing?

3    A.  No.

4    Q.  No.

5         THE COURT:  Who informs you about these changes in the    08:27AM

6    monitoring guide?

7         THE WITNESS:  We have monthly statewide staff

8    meetings.  They are usually video conferences.  So Mr. Pratt

9    and Kathy Campbell and Vanessa Headstream and Erin Barlund, the

10   leadership team will all tell us about what's been going on.    08:27AM

11        THE COURT:  Thank you.

12   BY MS. KENDRICK:

13   Q.  Have you been instructed to go back and recalculate any

14   performance measures based on the new methodology in the

15   changed monitoring guide?    08:28AM

16   A.  No.

17   Q.  If you were told that you had to do it, would you be able

18   to do so?

19        MR. BOJANOWSKI:  Objection.  Calls for speculation.

20        THE COURT:  Overruled.    08:28AM

21        THE WITNESS:  Would I be able to -- is it possible to

22   do it?  It is possible to do it.  Can I -- would I be able to

23   do it given the job duties that I have going forward and to --

24   would I be able to look back at it without spending an enormous

25   amount of time doing it?  No.    08:28AM

**March 21, 2017 - Status Hearing - Haldane - Cross**

```
 1   BY MS. KENDRICK:
 2   Q.  Okay.  So there's a stack of documents in front of you.
 3   One is labeled CQI minutes, and I will come over and show you
 4   which one.
 5           They are in alphabetical order.  There's Perryville       08:29AM
 6   CQI minutes for November.  Do you see that?  It might be the
 7   next one.  There's two from Perryville in that stack.
 8   A.  August --
 9   Q.  Says November 9th?
10   A.  Yes, ma'am.                                                   08:30AM
11   Q.  So if you turn to the last page of that document, it's Page
12   8.  First off, were you at this meeting?  Do you normally
13   attend these meetings?
14   A.  I normally do attend these meetings.  I don't recall
15   whether on November 9 I was there or not.                        08:30AM
16   Q.  Okay.  There's a sign-in page on the front sheet so it
17   might tell you.
18   A.  There's a sheet although there aren't signatures on the
19   sheet.
20           THE COURT:  Second to last page.                         08:30AM
21           THE WITNESS:  Oh.  Okay.
22           THE COURT:  Lower right corner, second to the last
23   page.
24           THE WITNESS:  Yes, I was there.
25   BY MS. KENDRICK:                                                 08:31AM
```

1    Q.  Okay.  We have established that.

2         Back on Page 8 there's a grid, and the large box in

3    the middle under "Discussion," the first box there's a bullet

4    point at the 4th.  And it says that, "Dr. Stabinsky asked that

5    multiple labs for the same patient not be used for the audit so    08:31AM

6    that if one patient has five different labs and those labs are

7    not reviewed within time frame, it does not count as five

8    findings.  Contract monitor will check with monitor that does

9    this measure."

10         You are the contract monitor correct?    08:31AM

11   A.  I am the contract monitor, but I am not the contract

12   monitor that does this measure.

13   Q.  Right.  So you said you were going to check with the person

14   who does.

15         What was -- do you remember what Dr. Stabinsky's issue    08:31AM

16   was specifically regarding this auditing measure?

17   A.  Well, I think that his concern was getting dinged multiple

18   times for the same -- for basically the same error that he said

19   if -- so if you have one person where the labs didn't get

20   reviewed in time that he didn't want -- he wanted to know is    08:32AM

21   there a way not to get dinged five times if they have five

22   labs.  So the answer, of course, is that now, with the

23   randomization of lists, if it comes up it comes up.  If it

24   doesn't, it doesn't.

25   Q.  Was that because -- I know you don't monitor this, but did    08:32AM

UNITED STATES DISTRICT COURT

1   he say that, for example, the monitor who was -- who was the

2   monitor that does this measure?

3   A.  Becky Biddle.

4   Q.  So Ms. Biddle, was she looking at these -- you know,

5   selecting 10 files, say one person had two labs another person          08:33AM

6   had five, she was counting up all the labs?

7   A.  I don't --

8          MR. BOJANOWSKI:  Foundation.

9          THE WITNESS:  I don't know what Becky does.

10         THE COURT:  Overruled.                                           08:33AM

11  BY MS. KENDRICK:

12  Q.  He didn't explain the context of this comment, he just he

13  said they were being dinged five times?

14  A.  I don't even believe -- I don't know that they were.  I

15  think that was his concern.  So I don't know whether in              08:33AM

16  practice this is what has happened or not.

17  Q.  I wanted to talk to you a little bit about the CAPs, the

18  Corrective Action Plans.

19  A.  Uh-huh.

20  Q.  When they are found -- when you find them non-compliant on       08:33AM

21  a performance measure, they are -- Corizon is required to

22  develop a CAP in response, correct?

23  A.  That is correct.

24  Q.  Do they develop CAPs for what are called amber findings and

25  red findings?                                                          08:34AM

1   A.  I don't -- I believe they do, but I don't see the CAPs.

2   Q.  What determines whether something in a CGAR is classified

3   as red or amber?

4   A.  If it has been -- if a performance measure has been

5   compliant and the next month it's non-compliant, it would go to          08:34AM

6   an amber finding that -- and after two months of being amber,

7   if it remains non-compliant, goes to a red finding.

8   Q.  And what is the significance of that?  Do they have to do

9   more than a CAP at that point or something else?

10  A.  No.  What's the significance?  I'm not sure.  I tend to             08:35AM

11  look at the percentages, personally.  But I don't know.

12  Q.  Right.  I'm asking actually, because I look at the

13  percentages, too, and I have noticed sometimes something that's

14  at like 70 percent is classified as red and then something that

15  is 30 percent is classified as amber.  And that was confusing.          08:35AM

16  A.  I would say it's only because it has not been non-compliant

17  for a period of time.

18  Q.  Okay.

19  A.  I think if there's any significance to it in my mind, it's

20  that we're not using -- you know, you can have, based on the            08:36AM

21  small samples we use, you can have a month where something just

22  luck of the draw, of the charts you are pulling, is

23  non-compliant but it might generally be compliant.  So I guess

24  they make it amber instead of red.  If it remains compliant

25  over time, I think red is supposed to signify it's a more              08:36AM

1    serious level of non-compliance.

2    Q.  So you said you don't see the CAPs for the findings that

3    you make?

4    A.  Yes.  I did say that.

5    Q.  So who sees them if not you?                          08:36AM

6    A.  The CAPs, I believe, go to Kathy Campbell.

7    Q.  Has Kathy Campbell ever contacted you after receiving a CAP

8    for something you had done the measure and said, Mr. Haldane, I

9    want you to take a look at what they are proposing to do?

10   A.  I don't recall if she ever has, but I would say it's not   08:37AM

11   routine.

12   Q.  So you can't say that she has done that?

13   A.  I don't recall if she has.

14   Q.  So I wanted to go back to the CGARs and the monitoring you

15   are doing.  I believe you referred to this earlier, but the    08:38AM

16   general rule is that for each unit you reviewed 10 random files

17   unless there's fewer than 10, and then you review all of them?

18   A.  Generally speaking, yes.  There are some where -- well,

19   yes, that's true.  10.

20   Q.  How many units are there at Perryville?                08:38AM

21   A.  There are seven units.

22   Q.  So generally, the maximum number of records you would

23   probably look at for a given measure would be maximum of 70?

24   A.  The number of records that I use is 70.  The number we look

25   at is often greater, far greater than 70.                 08:38AM

1   Q.   Okay.  And have you ever reviewed more than 10 files for a

2   given measure at a given unit?  So, for example, this is a

3   hypothetical, if you reviewed 10 files at the San Carlos unit,

4   found they were all relevant to what you were looking for,

5   recorded the information, would you then stop and move to the        08:39AM

6   next performance measure?

7   A.   Yes, I would.

8   Q.   You wouldn't pull another 10 or 15 files just to --

9   A.   I have neither the time nor the inclination to do that.

10  Q.   Fair enough.                                                    08:39AM

11          And we talked about the informal process where you

12  notify the facility health administrator or other people of

13  what you found before you put it in.  If they came back to you

14  and said, Mr. Haldane, you know what?  Three of those files you

15  reviewed aren't applicable to this performance measure, would       08:39AM

16  you then go back and pull three more files to get yourself back

17  up to 10 for that count?

18  A.   Not necessarily, no.  I would look to see why I chose those

19  three files and to see if they are actually correct.  I mean,

20  that's never happened.  But if, in fact, they were                  08:40AM

21  non-applicable and somehow I didn't know what I was doing, and

22  pulled three incorrect files then, yes, I would pull three more

23  to get 10.  That's not a scenario that I have encountered.

24  Q.   I mean, if they came back and said, you counted a dental

25  appointment for a provider appointment, that sort of thing,         08:40AM

151

1    possibly?

2    A.  I mean, it's possible.  Sure.  I'm sure that there's a

3    mistake in there somewhere.

4    Q.  Okay.  And if that were to happen, would you delete from

5    your spreadsheet the inapplicable files, or would you just add          08:40AM

6    more like at the end, add an 11th column, say?

7    A.  I would delete the inapplicable file and I would add the

8    next one.

9    Q.  Okay.  So there's a stack in front of you that's called

10   CGARs.  It's very pretty in color up there.  And Perryville is          08:41AM

11   in there in alphabetical order.

12          And on the bottom right the Bates number, it's the

13   page that ends in 813.

14   A.  Yes, ma'am.

15   Q.  Did you find it?                                                     08:41AM

16   A.  I did.

17   Q.  It's Performance Measure 25.

18   A.  Yes.

19   Q.  And emergency response, and you said that no records met

20   the criteria.  What's the source that you use to find possible          08:42AM

21   files to look at for this one?

22   A.  I am using -- each day I get the field briefing report from

23   operations that will tell me the significant incident reports.

24   I will look at the Perryville list, see if there's anything

25   that would require basic life support, then I will check the            08:42AM

1    records on those, see if there was anything that was -- what

2    was done was their -- how did medical respond?  Did EMTs

3    respond?  Was it a 911 situation?  What was the type of

4    incident that it was.

5    Q.  Okay.                                                      08:43AM

6    A.  And determine from there.  And we also will -- there isn't

7    a list per se for this.

8    Q.  Okay.  So you work off the incident reports that ADC --

9    A.  Yes.

10   Q.  Okay.  In that stack of the CQI meeting minutes there's one 08:43AM

11   from Perryville from January 10th, I believe it's the next one

12   after that November one you were looking at.

13   A.  Yes.

14   Q.  And I see your name, signature, about halfway down on the

15   cover.                                                         08:44AM

16   A.  Yes.

17   Q.  So if you go to the third page of the document, it ends in

18   Bates Number 984.  And the discussion column says Part H, other

19   sentinel events.  And it refers to attempted suicide, hanging

20   of a prisoner.  And she was found in her cell and was initially 08:44AM

21   unresponsive and was transported to the hospital via ambulance.

22          Do you see that?

23   A.  I do.

24   Q.  Were you aware of that suicide attempt?

25   A.  I believe so.  I don't recall exactly.  I don't recall her  08:44AM

1   name.  But I -- and I don't recall the exact date of when that

2   took place, but I'm generally aware, yes.

3   Q.  Okay.  Then the December CGAR that you have, it says you

4   entered the information on January 31st?

5   A.  Yes.                                                          08:45AM

6   Q.  So that was after you were at that CQI meeting on January

7   10th?

8   A.  Yes.  31st is after the 10th, yes.

9   Q.  Okay.  So this performance measure, it asks that they

10  respond and adequately provide care within three minutes.  When  08:45AM

11  you do review files that you think are applicable, are you

12  looking at the time frame for the response?

13  A.  What happens with this, I do look at the response but the

14  initial response is by security staff.  And security staff is

15  all trained in basic life support.  And so there's no -- there   08:46AM

16  isn't any time from -- they respond from the time they learn

17  the incident they are already on site and providing basic life

18  support.  So, you know, the three minutes is --

19  Q.  That's what you look at?

20  A.  Well, no.  I mean, they are always going to meet the three   08:46AM

21  minutes because as soon as they find out about an incident you

22  have security staff on site who is trained in basic life

23  support and they are providing that care immediately.  So there

24  isn't going to be a three-minute lapse.

25  Q.  Right.  And I believe you said you have a JD like way too    08:47AM

——— March 21, 2017 - Status Hearing - Haldane - Cross ———

1    many people in this courtroom?

2    A.  Yes, I do.

3    Q.  Would evaluating the adequacy of care be more of a clinical

4    judgment by somebody with medical training?

5    A.  The -- well, yes, but I also work -- I share an office with    08:47AM

6    an RN, and when I have questions about clinical issues, all I

7    have to do is turn my head and ask the question, which I do

8    quite often.

9    Q.  Who is that RN?

10   A.  Becky Biddle.                                                  08:48AM

11   Q.  And would this be something you would consult with her

12   about?

13   A.  On this particular case, no, because I didn't -- I don't

14   know when this incident that was discussed in the CQI meeting

15   took place.  And so the CGAR finding, there were no -- there    08:48AM

16   was no record that I entered so I wouldn't have discussed this

17   with her, no.

18   Q.  Okay.

19           THE COURT:  Thank you.

20   BY MS. KENDRICK:                                                   08:49AM

21   Q.  So I have handed you the same performance measure for July

22   of 2016, Bates Number 604054.  And in this case, there was an

23   incident that you reviewed.  And you said that it met the

24   criteria of the standard and it was compliant.

25           So I want to ask you to go back to the stack of the     08:49AM

1    CQI meeting minutes.  There's one from August.  It should be

2    right next to the November one.

3    A.  Yes.

4    Q.  If you go to Page 8 of those minutes, it's a Bates number

5    ending in 586.  And at the top of the column, it says, "First          08:50AM

6    review of mortality; opportunities for teaching and learning;

7    man down bag not mobile enough for needs; new man down bag

8    ordered."

9           Were you at this CQI meeting?

10   A.  No, I was not.  I was in Boston.                                    08:50AM

11   Q.  Are you aware of this mortality that occurred on -- in

12   July?

13   A.  I would be -- I would certainly be aware of any mortality

14   and so I would have to be refreshed as to who it was.

15   Q.  Okay.  And for this one, since there obviously was an              08:50AM

16   incident that you had decided met the qualifications to be

17   applicable, do you remember what you looked at to evaluate the

18   emergency response?  An incident report?

19   A.  I don't recall exactly offhand.  I'd have to review my

20   records to see what I looked at.                                       08:51AM

21   Q.  Did you just look at the time it took for the officers to

22   respond?

23   A.  Like I say, I'd have to review my -- the time it took,

24   probably not looking at the time it took the officers to

25   respond because, I mean, once -- the officers are the people         08:51AM

1    who call the ICS.  So as soon as the incident takes place they

2    are on -- they are already on site.  They are addressing the

3    issue until medical gets there.

4    Q.  So are you saying that the act of the officer picking up

5    the phone and calling the ICS counts as responding within three    08:52AM

6    minutes?

7    A.  No, I'm saying that the officer, in responding and

8    providing basic life support, is -- counts as being within the

9    three minutes.

10   Q.  Okay.  And how do you know that the officers provided basic    08:52AM

11   life support?  Is that in the incident report or --

12   A.  It may be in the significant incident report, and there may

13   also be something -- sometimes the nurse's note will say that

14   when they arrived officers were providing CPR or whatever.  So

15   there are a variety of ways to find that out.                      08:53AM

16   Q.  Okay.  And do you remember being made aware of the fact

17   that the man down bag was not mobile enough?

18   A.  No.

19   Q.  If you had been aware of that information, would you have

20   marked that file as compliant?                                     08:53AM

21   A.  I don't know.  I don't know what the -- I don't know what

22   the issue, whether the fact that -- or that they said at the

23   CQI meeting that the man down bag wasn't mobile enough, I don't

24   know if that actually resulted in any -- what difficulties that

25   created to their response.  I think it says here that it was       08:53AM

1   excellent teamwork and efforts to resuscitate, and so I don't

2   know that it necessarily resulted in any deficient care.

3   Q.  Would that be a clinical judgment as to whether the failure

4   to have the man down bag impacted the response?

5           MR. BOJANOWSKI:  Objection.  Calls for speculation.        08:54AM

6           THE COURT:  Overruled.

7           MR. BOJANOWSKI:  And lack of foundation for this

8   witness.

9           THE COURT:  Overruled.

10  BY MS. KENDRICK:                                                   08:54AM

11  Q.  Would this be one of the ones where you turn your head to

12  Becky who is sitting next to you and say, can you look at this?

13          MR. BOJANOWSKI:  Same objection.

14          THE COURT:  Overruled.

15          THE WITNESS:  Not necessarily, because the mobility,      08:54AM

16  the mobility of the man down bag is not a clinical judgment.

17  That's the opinion of someone at the CQI meeting that I was not

18  at, apparently.  And so I don't know -- I can't even tell you,

19  to be honest, what that means, the man down bag wasn't mobile

20  enough.  They have meds in an orange box that they carry and     08:55AM

21  then they have like a duffle bag.  And so I'm not sure what the

22  issue was.  I don't know.  I wasn't at the meeting.

23  BY MS. KENDRICK:

24  Q.  Do you have any idea what that last sentence, deputy warden

25  reported that deputy warden should be notified if Corizon        08:55AM

—— March 21, 2017 - Status Hearing - Haldane - Cross ——

1    receives reports of an inmate being bullied might mean?

2    A.  No, I wasn't at the meeting, so I don't know.

3    Q.  Okay.  How would you count a performance measure if there

4    was no information provided from the unit for that month?

5    A.  I don't understand that question.                              08:55AM

6    Q.  You got the nurse's line log, and it shows that there were

7    a grand total of zero HNRs submitted at San Carlos in January.

8    A.  That's never happened.  And since San Carlos is the largest

9    unit at Perryville, I'm sure it would never happen.  But if

10   that did happen, I would notify my superiors that there's an   08:56AM

11   obvious problem here, that we haven't received the data

12   necessary to do our audit.  So I am sure they would go back to

13   Corizon and say we need the data from San Carlos for the HNR

14   logs and, you know, get it to us within, you know, today.

15   Q.  Okay.  What if there was some data but it seemed remarkably  08:56AM

16   low to you given just how the institution operates?

17   A.  I don't -- I look to when I get -- are you asking me off

18   the lists?

19   Q.  Sure.  Well, here.  Let's be concrete, shall we?

20       If you look at the December CGAR for Perryville.           08:57AM

21   A.  Yes.

22   Q.  The Bates number ends in 817.  It's about halfway through.

23   A.  Yes, ma'am.

24   Q.  Performance Measures 40 and 41 involving urgent and

25   emergent referrals being seen by a medical provider?           08:57AM

1   A.  Yes.

2   Q.  Does the fact that there were only three urgent provider

3   referrals by nurses for the entire institution for the entire

4   month of December seem low to you?

5   A.  No.  That seems about -- because this does not -- the          08:58AM

6   question does not ask is there urgent response.  It asks if

7   there's an urgent referral, is there a nurse who says that this

8   patient needs to be seen urgently by a doctor or by a provider.

9   And quite honestly, at Perryville, we don't have very many and

10  then emergent, even fewer.  Those referrals are not, you know,   08:58AM

11  I don't see very many urgent and emergent referrals in any

12  month.

13  Q.  Where do you get the list of prisoners that qualify for

14  this measure?

15  A.  I don't -- there will be within the -- as I'm going through  08:58AM

16  the encounters, there's a spot, there's a box, or a button,

17  actually, I guess, that they can hit that will say, you know,

18  whether it's an urgent or emergent referral and it's been

19  referred to the provider.  I look for those and -- but I don't

20  get a list of here are the emergent or urgent referrals.  We     08:59AM

21  have to look for them.

22  Q.  So just as you are going about looking through medical

23  records you check and see if maybe this one was an urgent or

24  emergent?

25  A.  On every one I look at I look to see did this get referred   08:59AM

─── **March 21, 2017 - Status Hearing - Haldane - Cross** ───

1   to the -- on the nurse line encounters, I will -- and on the

2   referrals, I do get a referral list, and I will look to see was

3   it an emergent or urgent referral.

4   Q.  The referral list is referrals to providers?

5   A.  Yes.  It's supposed to be.  It is, yes.                    09:00AM

6   Q.  And so it says routine, urgent, or emergent?

7   A.  Usually.

8   Q.  Okay.  When did it last not do that?

9   A.  I don't -- there are individual cases where sometimes

10  buttons aren't pushed.  The record itself.  The list, I will go  09:00AM

11  off the list, the referral list.  And, you know, if it's not --

12  obviously if it's not urgent or emergent then it's routine.

13  Q.  So --

14  A.  So it's not that I can't determine which one it is.  It's

15  are they marked?  No, they are not marked.  It's not like I can  09:01AM

16  go before I open up the record, I can't look at a list and say

17  here are the urgent ones, here are the emergent ones, and here

18  are the -- I have to look in each encounter to try to determine

19  which it is.

20  Q.  And whether or not it is made urgent or emergent is         09:01AM

21  contingent on the nurse pushing a button that says urgent or

22  emergent?

23  A.  Or there might -- there are -- well, the other thing I will

24  look at is if there's a 911 sendout, and that I would -- I

25  don't know if that is necessarily urgent or emergent, but --    09:02AM

1   Q.  Well, don't 911 sendouts have to be authorized by somebody

2   at a provider level who is on call or on site?

3   A.  Does it have to be?  I think that that's the --

4   Q.  General rule?

5   A.  -- the general rule.  But I think that, for instance, if --     09:02AM

6   I mean, I think security can send people out 911.

7   Q.  Okay.

8   A.  And so is it always the case that a provider has authorized

9   it?  I would say no.  And depending on the situation, and --

10  but I think that's the general rule is that they would get        09:03AM

11  approval for the sendout.

12  Q.  So your testimony is that one emergency referral for the

13  entire institution for the entire month of December is normal?

14  A.  I'm saying my testimony is that that's what I found in

15  December.                                                         09:03AM

16  Q.  So on the CGAR, if you could flip back towards the front to

17  the Bates number that ends in 784, it's actually the first page

18  of the CGAR.

19  A.  Yes.

20  Q.  Performance Measure Number 60.  And there are two separate     09:04AM

21  entries in here.  There's one that you made on January 9th at

22  12:44 where you note that two of the records you had listed

23  below were compliant and so the entry below is my error, and

24  then the second one, the older one, is the 1-6-17, 2:58 p.m.,

25  do you see that?                                                  09:04AM

1    A.   Yes.

2    Q.   So when you put something in the CGAR and you subsequently

3    realize, just like this shows, that you had made a mistake, you

4    can go back in and make a note of that, correct?

5    A.   Yes.                                                              09:04AM

6    Q.   But it shows up as a new entry with a different date and

7    time stamp, correct?

8    A.   Yes.

9    Q.   Okay.

10   A.   Now, what happened here is that 8 out of 10 was still          09:05AM

11   compliant at 80 percent and 10 out of 10 obviously still a

12   green.  What I cannot do is if that had been 7 out of 10 and it

13   would have been an amber and gone to 8 out to 10 and gone to a

14   green, I cannot change the color from amber to green.

15   Q.   Okay.  But you also, on the 9th, when you realized you had     09:05AM

16   made a mistake, you couldn't go back and open up that January

17   6th entry and rewrite it, correct?

18   A.   I'm sorry.

19   Q.   On January 9th when you realized your mistake.

20   A.   Yes.                                                              09:05AM

21   Q.   You just had to create a new entry?

22   A.   Yeah, I can't erase.

23   Q.   You can't erase what you had.  Okay.  Great.

24            So there's just a couple more things.  I will bring it

25   to you.  There's a stack of documents that says rebuttals.          09:05AM

1           THE COURT:  Can you erase it if you get the IT people

2    to unlock it for you?

3           THE WITNESS:  I can't but somebody can.

4           THE COURT:  Do you know how often that happens?

5           THE WITNESS:  I do not, no.  I don't think in my                    09:06AM

6    experience, as shown here, it doesn't -- it hasn't happened in

7    my experience, but I don't know others.

8    BY MS. KENDRICK:

9    Q.  So this is a document that says rebuttal.

10   A.  Yes.                                                                   09:06AM

11   Q.  For September.  Make sure Judge and counsel are on the same

12   page.

13          Do you have it?

14          THE COURT:  No, I don't.  I was distracted.  I'm

15   sorry.                                                                     09:07AM

16          Thanks.

17   BY MS. KENDRICK:

18   Q.  And this is the rebuttal process that you testified about

19   last week where this is after the fact and it's to confirm the

20   accuracy of the data?                                                     09:07AM

21   A.  Yes, ma'am.

22   Q.  Okay.  So this cover sheet that says log, the first entry

23   is Perryville Tracker 15805 and then the next page is a

24   rebuttal to a finding that was made on August 31st.

25          So if the finding was made on August 31st, does that              09:07AM

1   mean it's actually looking at July data for the audited month?

2   A.  Yes.

3   Q.  Okay.  So it discusses the fact that some chronic call

4   appointments were counted in this performance measure.  Well,

5   first of all, did you write this rebuttal response, or is that          09:08AM

6   somebody at headquarters?

7   A.  I think I talked to Kathy about it.  I think the -- I don't

8   recall whether I actually -- the process has changed where we

9   used to send them directly.  Now they go through our central

10  office.  And so on this one, I don't particularly recall.  But          09:08AM

11  I do recall the question and I know that I talked to Kathy

12  about it.

13  Q.  Okay.  And it says on that second page that it was

14  submitted to ADC on 9-13 and the response ADC sent on 9-15.

15  And it says the rebuttal was accepted.  Yes?                            09:09AM

16  A.  Yes, it says that.  Yes.

17  Q.  And it also says we will be giving credit and make the

18  changes to reflect compliance of 56 over 64 equals 87.5

19  percent?

20  A.  Yes.  I see that.                                                   09:09AM

21  Q.  Okay.  If you could look back at that August CGAR document

22  that I gave you a little while ago, it's one sheet that had the

23  emergency care on it.  The second page?

24  A.  Yes.

25  Q.  So the second page is this same measure, Performance                09:09AM

---

**March 21, 2017 - Status Hearing - Haldane - Cross**

1    Measure 42.

2    A.  Yeah.

3    Q.  And it says that it was entered on 8-31 and that the

4    compliant level was 56 compliant out of 64 reviewed, 88

5    percent.                                                        09:09AM

6         After this rebuttal was sent did anybody tell you to

7    go pull nine new files to replace the ones that were not

8    applicable?

9    A.  Not to my recollection.

10   Q.  You don't remember?                                         09:10AM

11   A.  I don't remember pulling new files, no.  No.  I don't

12   believe I did because you are looking at September 13th, and I

13   did not go back into the August CGAR.  So I'm --

14   Q.  Because you previously testified that you can't get back

15   into them, that you have to create a new entry, correct, when  09:10AM

16   you go back into the CGARs?

17   A.  Yes.

18   Q.  So who rewrote this entry in your name?

19   A.  I don't know.  I mean, I assume it's done downtown, but --

20   and I know that we talked about making the changes, but I don't 09:10AM

21   physically do it because I can't.

22   Q.  So the original percentage that you had found, if nine

23   files were taken out would have been 56 compliant out of 73

24   reviewed.  Correct?  Because 64 plus 9 is 73?

25   A.  Well 64 plus 9 is 73.  The reason I hesitate is that as we  09:11AM

─── **March 21, 2017 - Status Hearing - Haldane - Cross** ───

 1   discussed before, usually 70 is the number I'm looking at as my

 2   N, the denominator, and so I'm not sure why I would have 73.

 3   Because if I'm looking at 10 from each unit, then it -- so but

 4   I will stipulate that 64 plus 9 is 73.

 5   Q.  Okay.  Thank you.  I have nothing further.                09:12AM

 6          THE COURT:  Any redirect?

 7          MS. KENDRICK:  Wait.

 8          Off the record?

 9          THE COURT:  Yes.

10          (Discussion off the record.)                          09:12AM

11          THE COURT:  Big black binder is now before the

12   witness.

13   BY MS. KENDRICK:

14   Q.  Almost done.  I swear.

15   A.  It's okay.                                               09:13AM

16   Q.  So the first page lists names, and I believe you are Tab --

17   A.  C.

18   Q.  C.  And then there's the list that's the HNR log Mr.

19   Bojanowski was asking you about yesterday, or last week?

20   A.  Yes, ma'am.                                              09:13AM

21   Q.  Okay.  So what is the order of the names in this list?  How

22   is it sorted?

23   A.  Looks to be sorted by -- it's sorted by unit.

24   Q.  Okay.  Is this the randomized list that you get?

25   A.  Yes.                                                     09:14AM

—————— **March 21, 2017 - Status Hearing - Haldane - Cross** ——————

1   Q.  Why is it randomized?

2   A.  Why is it randomized?

3   Q.  Yeah.

4   A.  So that, I presume --

5   Q.  Why do you say it's randomized?  How do you know it's          09:14AM

6   randomized?

7   A.  Well, we have a value on the left-hand side here that

8   appears to be how the random numbers were picked.  I don't

9   really know how -- I think they take the list from each unit

10  and randomize each individual unit.                                09:14AM

11  Q.  So you can't say how you know it's randomized other than

12  you have been told that it's a randomized list?

13  A.  Yes.  That's true.

14  Q.  And there's a column on the far left.  The hole punch kind

15  of covers it up.  But the last 3 letters are D-O-M, so I'm        09:15AM

16  going to guess the rest of it is "random."  Is that the column

17  of random numbers that appear on the lists that you are given?

18  A.  Yes.

19  Q.  But it's not in order by the random numbers?

20  A.  No, it's not.                                                  09:15AM

21  Q.  So you would take the first 10 names off this list for your

22  Lumley analysis?

23  A.  Yes.

24  Q.  And just a final question on the emergency response, is it

25  your testimony that the three-minute response rule is always      09:16AM

——— **March 21, 2017 - Status Hearing - Haldane - Cross** ———

1   met?

2           MR. BOJANOWSKI:  Foundation.

3           THE COURT:  Overruled.

4           THE WITNESS:  It's -- my experience has been that the

5   three-minute response rule has always been met.                    09:16AM

6   BY MS. KENDRICK:

7   Q.  Have you ever had a finding other than 100 percent for that

8   performance measure, to your memory?

9   A.  No.  Not to my memory.

10  Q.  Okay.  Thank you.                                              09:16AM

11          THE COURT:  Any redirect, Mr. Bojanowski?

12          MR. BOJANOWSKI:  No redirect, Your Honor.

13          THE COURT:  Thank you, Mr. Haldane.  Appreciate it.  I

14  hope that you feel better, sir.

15          THE WITNESS:  Thank you, Your Honor.                       09:16AM

16          MR. FATHI:  Your Honor, in light of your earlier

17  ruling we would ask Dr. Taylor testify next to minimize the

18  possibility that her testimony may be shaded by that of other

19  witnesses.

20          THE COURT:  Is that something that we can accommodate,     09:17AM

21  Mr. Bojanowski?

22          MR. BOJANOWSKI:  Your Honor, I have got witnesses

23  waiting in the hallway who have taken time out of their day to

24  get here who have a day-to-day thing to do.

25          THE COURT:  I'm just --                                    09:17AM

 1          MR. BOJANOWSKI:  Honestly, I want to accommodate those

 2   who are waiting.  There's not really a particular --

 3          THE COURT:  I just was asking to see whether it was a

 4   request that could be accommodated.  I'm not going to impel it.

 5          We'll take a five-minute break, please, and have your          09:17AM

 6   next witness ready, please.

 7          Thank you.

 8          (Recess from 9:17 a.m. until 9:26 a.m.)

 9          THE COURT:  Thank you.  Please be seated.  Who is the

10   next witness, please?          09:26AM

11          MR. BOJANOWSKI:  Mr. Martin Winland.

12          THE COURT:  Mr. Winland, would you please step forward

13   to the well of the courtroom before the clerk so she may

14   administer the oath.

15          (The witness was sworn.)          09:26AM

16          THE COURTROOM DEPUTY:  Thank you.  Please step around

17   to the witness stand.

18                         MARTIN WINLAND,

19   a witness herein, having been first duly sworn by the clerk to

20   speak the truth and nothing but the truth, was examined and

21   testified as follows:

22                       DIRECT EXAMINATION

23   BY MR. BOJANOWSKI:

24   Q.  Would you please state your name for the record?

25   A.  Martin Winland.          09:27AM

—— March 21, 2017 - Status Hearing - Winland - Direct ——

1    Q.  Mr. Winland, what is your business address?

2    A.  183 West Jefferson, Phoenix, Arizona, 85007.

3    Q.  Are you employed, sir?

4    A.  Yes.

5    Q.  In what capacity?                                          09:27AM

6    A.  I'm the pharmacist for the Department of Corrections Health

7    Monitoring Bureau Service.

8    Q.  How long have you been so employed?

9    A.  I believe it was June of 2013, I believe.

10   Q.  As part of your job duties as the pharmacist at the        09:27AM

11   monitoring Bureau, what is it that you do on a day-to-day

12   basis, generally?

13   A.  Well, we're all consumed by the CGAR so I audit CGAR

14   performance measures.

15   Q.  And which performance measure do you audit?                09:27AM

16   A.  Performance Measure 11 and Performance Measure Number 22.

17   Q.  Are those the only ones that you monitor?

18   A.  That's correct.

19   Q.  Do you do that statewide?

20   A.  Yes.                                                       09:28AM

21   Q.  Do you supervise other monitors?

22   A.  I do not.

23   Q.  Could you give us some of your educational background?

24   A.  Uh-huh.  I have a Bachelor of Pharmacy and also a Bachelor

25   of Science from in Ohio Northern University in Ohio.           09:28AM

——————— **March 21, 2017 - Status Hearing - Winland - Direct** ———————

1    Q.  At Ohio Northern?

2    A.  Yes.

3    Q.  When did you receive your degree?

4    A.  I believe it was 1989.  Some time ago.

5    Q.  Are you licensed?                                        09:28AM

6    A.  Yes.

7    Q.  In what states?

8    A.  I'm licensed in Arizona; my primary license is in Ohio; and

9    I'm also licensed in New Hampshire.

10   Q.  As a pharmacist?                                         09:28AM

11   A.  Correct.

12   Q.  Are you familiar with the monitoring process that takes

13   place with regard to Performance Measures Number 11 and Number

14   22?

15   A.  Yes.                                                     09:29AM

16   Q.  In a general sense, can you describe for the Court how it

17   is that you perform your monitoring?

18   A.  Taking 11 first or 22?

19   Q.  Yes.

20   A.  Performance Measure 11 is basically do the inmates receive   09:29AM

21   their medication within two days within when the prescription

22   was written; if urgent or emergent would be the day that it was

23   written.  I monitor that by a patient profile report that is

24   supplied by PharmaCorr.

25   Q.  And then is that a randomized report?                   09:29AM

**March 21, 2017 - Status Hearing - Winland - Direct**

1    A.  It's -- the report comes already randomized based on the

2    dates prescriptions are written.  So you would basically be

3    re-randomizing a randomized report.

4    Q.  So do you take the first 10 files off of that report?

5    A.  I take the first 10.  Yeah.  I take the first 10 -- I'm          09:29AM

6    sorry -- the first 10 inmates that appear on the report.

7    Q.  Is that per unit?

8    A.  Yes.

9    Q.  And what do you look for when you then move on to examine

10   whether there's compliance or non-compliance?                       09:30AM

11   A.  Well, basically I look at the date that the prescription is

12   written and then I use eOMIS or the paper file because they are

13   typically scanned in at that point to see if that inmate slash

14   patient did, in fact, receive the medication in two business

15   days or on that day based on the drug delivery status in eOMIS.     09:30AM

16   Q.  And if they did?

17   A.  Then it's compliant.

18   Q.  If not?

19   A.  Then it's non-compliant.

20   Q.  What about Performance Measure 22?                              09:30AM

21   A.  Performance Measure 22 is a non-formulary performance

22   measure.  It's also a date-range question.  The performance

23   measure basically says if a prescription is written for a

24   non-formulary, is that formulary medication responded to via

25   ATP, approved or whatever within a two-business-day period.         09:31AM

1          So I receive an eOMIS extract from Marquee and that's

2    sent to me via Corizon through -- Pam is her name.  Her last

3    name escapes me.  Then I use that report for my research.  The

4    report basically marries eOMIS's tracking on when the

5    prescription was written and through the drug status screen it     09:31AM

6    shows when the prescription was actually acted upon.

7    Q.  And what are you looking for?

8    A.  Whether that non-formulary medication was acted upon within

9    the two-day period, two-business-day period.

10   Q.  And if it is?                                                   09:31AM

11   A.  Then it's compliant.

12   Q.  If it's not?

13   A.  Then it's non-compliant.

14          MR. BOJANOWSKI:  No further questions, Your Honor.

15          THE COURT:  While the plaintiffs are preparing to ask       09:32AM

16   their questions, let me ask a couple of questions.

17                          EXAMINATION

18   BY THE COURT:

19   Q.  So you are the pharmacist for the Arizona Department of

20   Corrections?                                                       09:32AM

21   A.  That's correct, Your Honor.  Uh-huh.

22   Q.  And you have a role that you have talked about with respect

23   to monitoring.

24   A.  Correct.

25   Q.  And I understand that based upon the testimony.                09:32AM

March 21, 2017 - Status Hearing - Winland - Exam by The Court

1    A.   Uh-huh.

2    Q.   But I wonder whether as you are going through this process

3    you also have another cap on, maybe I could describe it as a

4    thinking cap about thinking when you see non-compliance, what

5    can we do to try to address that non-compliance?  Do you do          09:32AM

6    that as well?

7    A.   Because we basically audit a month in arrears the

8    non-compliance has actually taken place prior to the audit

9    period.  So Corizon would get that information based on the

10   completion of the other performance measure that is actually        09:32AM

11   enters into the CGAR.  So they would see all those -- they

12   would see all those if they were deemed non-compliant, and they

13   would see that in the CGAR itself.

14   Q.   But when you see and you -- and I know you have seen

15   failures in compliance.  When you see that, I guess my question     09:33AM

16   is, you don't, yourself, think what should I be raising with

17   somebody whether it's someone at Corizon or someplace else,

18   about how to address this failure of compliance?

19   A.   Oh.  Beyond the actual completion of the CGAR, yeah, we

20   talk about that.  We have used the PNT committee meeting to         09:33AM

21   talk about the non-compliance of certain measures, specifically

22   the medications.  You know, I have had meetings with Corizon,

23   both at their office and ours, discussing ways to increase this

24   non-compliance.  But if you look at the performance measure

25   itself, the problem with the performance measure was not           09:33AM

March 21, 2017 - Status Hearing - Winland - Exam by The Court

1    achieving compliance prior to eOMIS.  It was that everything

2    was being used basically through a paper file.  So eOMIS

3    greatly helped the process because you could actually track the

4    compliance.  So if you look at the measures themselves, with

5    the advent of eOMIS, it's been a very helpful tool for most            09:34AM

6    every performance measure that I have had anything to do with.

7    The compliance scores went up basically overnight because it

8    was never a matter of Corizon or the medical staff approving

9    those measures it was that we, at that point, or I could not

10   locate the paper files necessary to even start the audit.  So         09:34AM

11   it's a very compliant measure.

12   Q.  When you first testified, I was struck by your use of the

13   word, "We're consumed by the CGARs."  Being consumed is, in the

14   circle of life, is not usually a good thing.  It means the

15   bigger -- it's got a pejorative cast to it.  And so do you            09:35AM

16   think that this focus on the CGARs is counterproductive in some

17   way?

18   A.  I don't -- I wouldn't say that it's counterproductive.  I

19   think that there are quite a few performance measures, and we

20   are trying to, you know, do our audit to the best of our             09:35AM

21   ability based on the methodology and the changes that come down

22   the pike because we're a bureau that's constantly changing to

23   get better.  I think we have come a long way.  So I think we

24   are all passionate about our jobs and the word consuming wasn't

25   meant to be a negative connotation.  It's basically that we're        09:35AM

1    passionate and want to do a good job, want to make sure we're

2    getting the accurate figures and accurate scores.  So I think

3    consuming isn't necessarily, in my mind, a bad thing.  Maybe

4    passionate would be the word I'm looking for.

5              THE COURT:  All right.  Thank you.                    09:36AM

6              Plaintiffs.

7                         CROSS-EXAMINATION

8    MS. KENDRICK:

9    Q.  I'm not going to ask you about that right now so you don't

10   have to look at it.                                            09:36AM

11   A.  Okay.

12   Q.  I just want to ask some preliminary background questions.

13   But later on I will ask you about some of the things in there.

14   A.  Okay.

15   Q.  How long have you worked -- you said you worked for the    09:36AM

16   Department since 2013, June?

17   A.  It's going on five years.

18   Q.  Okay.  Did you work as a pharmacist for the Department?

19   A.  I did.  Prior to -- I'm sorry.

20   Q.  Prior?                                                     09:36AM

21   A.  Prior to privatization I worked as a pharmacist at

22   Perryville.

23   Q.  How long did you do that?

24   A.  Just under a year, because we privatized within that year.

25   Q.  And when they privatized, did you go to work for Wexford?  09:37AM

------------------------------------------------------------
**March 21, 2017 - Status Hearing - Winland - Cross**
------------------------------------------------------------

1    A.  Yes.

2    Q.  For how long?

3    A.  For the length of time Wexford occupied the contract, which

4    was, I believe, just under a year too.

5    Q.  And why didn't you stay and work for Corizon when Corizon          09:37AM

6    came in?

7    A.  My predecessor was retiring, so I applied for the job.  I

8    wanted to get back with the State and I applied and they

9    accepted the application and here I am.

10   Q.  Okay.  Great.                                                        09:37AM

11          And before Perryville, did you work as a pharmacist in

12   any other correctional or jail system?

13   A.  No.

14   Q.  What sort of pharmacy work did you do before Perryville?

15   A.  Basically retail.  Predominantly retail.                            09:37AM

16   Q.  Okay.  And do you have any training in statistics?

17   A.  Not formal training, no.

18   Q.  And Mr. Bojanowski asked you about Performance Measure 11

19   and Performance Measure 22.  But you also monitor Performance

20   Measure 13, correct?                                                    09:38AM

21   A.  No.  Not at this time.

22   Q.  When did you stop measuring it?

23   A.  I believe it was December.

24   Q.  And why did you stop monitoring it?

25   A.  The Department is trying, I believe, to reorganize the work         09:38AM

—— March 21, 2017 - Status Hearing - Winland - Cross ——

1   better and some of the measures have been switched around for

2   that reason.

3   Q.  Who is monitoring Performance Measure 13 now?

4   A.  Dr. Robertson.

5   Q.  Who is Dr. Robertson?                                    09:38AM

6   A.  Dr. Robertson is our chief medical officer for the Bureau.

7   Q.  Did you meet with him when he took over to kind of walk

8   through the process that you use to monitor?

9   A.  Yes.

10  Q.  And have you monitored Performance Measure 14 in the past?  09:38AM

11  This is the one about refills.

12  A.  Oh, yeah.  Sorry.  I had to think about it.  Briefly.  Yes.

13  Briefly I did.

14  Q.  Okay.  Are you aware that this Court has found

15  non-compliance for Performance Measures 11, 13, and 14 at      09:39AM

16  multiple institutions?

17  A.  11, 13, and 14?

18  Q.  Uh-huh.

19  A.  I'm not aware of 14, because I don't audit that measure.

20  For 13 when I did it knew there were non-compliance.  And I    09:39AM

21  know for 11 there's non-compliance prior to the advent of

22  eOMIS.

23  Q.  Right.  And there's still non-compliance at some of the

24  institutions?

25  A.  For Performance Measure Number 11?                        09:39AM

1   Q.  Yes.

2   A.  I guess I would have to see that because that would --

3   Q.  It's not?

4   A.  I'm sorry.  I'm thinking 22.  Yeah.  Okay.  You are

5   correct.  I'm sorry.                                    09:39AM

6   Q.  And are you aware that this Court, on November 10th, issued

7   an order to ADC that said that they need to seek outside

8   assistance if they can't come into compliance with certain

9   performance measures?

10  A.  I was not specifically involved in that conversation, to my  09:40AM

11  recollection.

12          THE COURT:  That's a different question.  Were you

13  aware of it is the question.  The question that counsel asked

14  was, "Were you aware that the Court, on November 10th, issued

15  an order to ADC that they need to seek outside assistance if   09:40AM

16  they can't come into compliance with certain performance

17  measures?"

18          THE WITNESS:  I don't recall that.

19          THE COURT:  So the answer is no, you were not aware?

20          THE WITNESS:  I don't recall.  So --                    09:40AM

21          THE COURT:  If you were aware you would probably

22  recall.  It's only a couple months ago, right?

23          THE WITNESS:  No.  I was not aware, to my

24  recollection.

25          THE COURT:  Thank you.                                  09:40AM

**March 21, 2017 - Status Hearing - Winland - Cross**

1    By MS. KENDRICK:

2    Q.  I believe sometimes they refer to it as the outside

3    resources order, something like that.  Are you aware of any

4    corrective action plans or remedial plans that Corizon and ADC

5    have put into place to comply with Performance Measures 11, 13,    09:41AM

6    or 14?

7    A.  The corrective action plans I don't take part in.  That

8    would be Kathy Campbell or Vanessa Headstream, so I would not

9    know what those corrective action plans were.

10             THE COURT:  Can I interrupt for just a second just to    09:41AM

11   make sure we're not two ships passing in the night here and

12   we're using terms that we don't have common assumptions about

13   the meaning.

14             The question that counsel asked that I re-asked you

15   was referring to seek outside assistance.  Do you have an idea    09:41AM

16   what that -- what she's referring to, outside assistance?

17             THE WITNESS:  I do not.

18             THE COURT:  All right.  Outside assistance is if you

19   cannot, in the confines of the Corizon operating scheme and to

20   provide for prescription medications for the inmates that are     09:42AM

21   compliant with the performance measure, using outside

22   assistance means that you would need to turn to providers that

23   were outside of that system that Corizon was presently using.

24   And it would be an example turning to providers that are

25   available in the private sector such as Walgreen's or CVS.        09:42AM

**March 21, 2017 - Status Hearing - Winland - Cross**

1          Does that help you understand what outside assistance

2     means?

3          THE WITNESS:  They do use Walgreen's and CVS for

4     outside assistance for medications that need be to be filled

5     urgent or emergent.                                    09:42AM

6          THE COURT:  So it's fair to say that you understand

7     that outside assistance does mean using providers such as CVS

8     or is Walgreen's.  So is that true?

9          THE WITNESS:  Correct.  Providers --

10         THE COURT:  So when you are asked about whether or not  09:43AM

11    you were aware of a court order to use outside assistance, you

12    would take that to mean the use of Walgreen's or CVS, for

13    example.  And so it's fair to say based upon what you have told

14    me you were unaware of any court order to do that?

15         THE WITNESS:  I'm aware that we use Walgreen's or CVS  09:43AM

16    for outside assistance, yes.

17         THE COURT:  That's a different question, again, you

18    are answering.  I need you to answer the question that I'm

19    asking.  And the question I'm asking is:  Were you aware that

20    the Court had ordered outside assistance which we take to mean  09:43AM

21    using CVS or Walgreen's?

22         THE WITNESS:  No.

23         THE COURT:  Thank you.

24    BY MS. KENDRICK:

25    Q.  Are you aware of any action plan or remedial efforts that  09:43AM

1  Corizon has undertaken since November to improve prisoners'

2  access to medication in a timely manner?

3  A.  Through a CAP?

4  Q.  Through having walking around, talking to people, has

5  anybody said we're overhauling the way we prescribe and fill          09:44AM

6  and refill and renew prescriptions?

7  A.  I think that they are constantly looking for ways to better

8  the refill or renewable prescriptions.  I know that they have

9  been to different sites and they have looked at chronic care

10  charts and they have basically renewed prescriptions based on        09:44AM

11  seeing those inmates.  So yeah, I think they are constantly

12  trying to do that.

13  Q.  Have you heard of something that's called the open clinic

14  concept that's being implemented at some of the prisons?  It's

15  where basically nurse's line is kind of like an urgent care          09:44AM

16  center where prisoners can just walk up?

17  A.  Okay.  Yes.  Yes.

18  Q.  Have you heard of anything similar, kind of some other new

19  campaign or concept like that to address pharmacy performance

20  measures?                                                            09:45AM

21  A.  Nothing like that, no.

22  Q.  There's been no announcements of we've got this new

23  fabulous process and we're implementing it to improve things?

24  A.  No.

25  Q.  You said you had heard of this open clinic concept on how         09:45AM

1    they change nurse's line.  Do you think this open clinic for

2    nurse's line will help prescriptions be filled within two

3    business days?

4             MR. BOJANOWSKI:  Foundation, Your Honor.

5             THE COURT:  Overruled.                               09:45AM

6             MR. BOJANOWSKI:  It's also asking for an opinion

7    that's outside the scope of this witness's background.

8             THE COURT:  Overruled.

9             THE WITNESS:  Can you restate the question?

10   BY MS. KENDRICK:                                              09:45AM

11   Q.  So the open clinic system where now they can -- the

12   prisoners can walk up with their HNRs and be seen the same day

13   by the nurse's line, do you think that will have of a positive

14   impact on the ability to get prescriptions filled within two

15   business days?                                                09:46AM

16   A.  I would hope that it would.

17   Q.  How?

18   A.  Well, the prisoners have the ability to walk up and it's an

19   open clinic, therefore, hopefully they can see more people at

20   that time.                                                    09:46AM

21   Q.  But how will that impact the time it takes from when the

22   provider writes a prescription to the time that the

23   prescription is put in the prisoner's hand?

24   A.  Well, if the inmate has an open clinic and it goes to the

25   nurse's line and they are referred to the provider then I would 09:46AM

1   assume the provider would write the prescription if necessary.

2   I don't take part in that process, so I'm not really sure that

3   I can answer the question you are asking.

4   Q.   Right.  So Performance Measure 11 is about the time it

5   takes from when the prescription is written until the time that   09:46AM

6   it is delivered to the prisoner and put in his or her hand?

7   A.   Uh-huh.

8   Q.   It has to be two business days, correct?

9   A.   Correct.

10  Q.   So how would seeing a provider sooner, which I think we all   09:46AM

11  agree is a positive thing, impact the two days after they see

12  the provider when the prescription is being filled?  Do you

13  understand my question?

14  A.   I understand your question, but I'm not sure how that

15  relates to the performance measure.  I think that for those   09:47AM

16  inmates requiring medication in two business days, if for some

17  reason that medication is not there they have the option to go

18  to an off site pharmacy or use clinic stock.  So I think

19  there's more facets to an inmate receiving that medication than

20  waiting for it to come be filled by PharmaCorr.   09:47AM

21  Q.   And do you think that open clinic system is going to

22  improve the timeliness with which providers renew and write new

23  prescriptions?

24  A.   I would hope so.

25  Q.   Because you think they are going to see a provider sooner?   09:47AM

March 21, 2017 - Status Hearing - Winland - Cross

1    A.  If -- I'd take no part of the HNR process, so I'm not

2    really sure how the nursing line, how that translates into a

3    provider.  But I'm assuming if they were to see a nurse and a

4    nurse deemed it necessary to see a provider then that person

5    would be shunted to a provider.                            09:48AM

6    Q.  Right.  I guess I'm not trying to ask you to hypothesize.

7    I don't see how the nurse's line, the timeliness with which you

8    see a nurse impacts the speed with which medication is

9    delivered.

10   A.  Right.                                                 09:48AM

11   Q.  But you said it might, so that's why I asked you how.  So

12   it sounds like you can't explain how nurse's line would do

13   that.

14   A.  I said I'm hopeful that it would, and it might, but I don't

15   know enough about the process to actually give you a definite  09:48AM

16   answer.  I guess that's my answer.

17   Q.  So you can't say that it does improve it?

18   A.  Correct.

19   Q.  When you were working at Perryville, there was a pharmacy

20   on site where you filled the prescriptions as they were      09:48AM

21   written?

22   A.  Yes.

23   Q.  Okay.  And did you have in stock, you know, the common

24   medications that you needed?

25   A.  Yes.                                                   09:49AM

1   Q.  Clinical stock?

2           And what would you do if a doctor prescribed something

3   that was kind of outside the typical realm, like if he

4   prescribed something and you were out of it, or it's just a

5   drug that's not used very frequently so you didn't have          09:49AM

6   clinical stock of it?

7   A.  We would order for the next day through the vendor that

8   they used at that point.

9   Q.  Who would you order it from?

10  A.  I believe it was either Amerisource or McKesson.            09:49AM

11  Q.  And that's like a mail order pharmacy company?

12  A.  No, it's a wholesale company.  The drug would come to us.

13  We would, in turn, run the prescription label and fill the

14  prescription based on that.

15  Q.  In your clinic stock did you stock everything that was on   09:49AM

16  the formulary?

17  A.  Non-specific clinic stock?

18  Q.  Well, just because there's a formulary of approved

19  medications.

20  A.  Correct.                                                    09:50AM

21  Q.  That they can use.  So if a drug is on the formulary does

22  that mean back then it was automatically in the clinic stock?

23  A.  I think the concern is we want to make sure we're using

24  clinic stock correctly.  Are you talking about non-patient

25  specific medication that would be housed on the units that the  09:50AM

1    pharmacists didn't fill, or are you talking about a patient

2    specific?

3    Q.  Non-patient specific.

4    A.  Okay.  The clinic stock would not be a complete

5    representation of what we housed in the pharmacy because we          09:50AM

6    were there on a daily basis.  It was used -- the clinic stock

7    would be used for urgent or emergent need based if it needed to

8    be filled post-pharmacy hours that we were open there.

9    Q.  And if it was a stat order and you guys didn't have it in

10   stock would you go to Walgreen's or Target or the nearest          09:50AM

11   retail pharmacy and fill it?

12   A.  I believe there are times when they did do that, yes.

13   Q.  And you mentioned this company that you would order the

14   drugs from if it wasn't in stock.  Would the 10 prisons

15   directly order their drugs or was there some sort of               09:51AM

16   centralized ADC pharmacy storage area that you worked through?

17   A.  No.  Each complex ordered their own medication.  Now, there

18   were some complexes that we filled for remotely, but the

19   filling complexes, we all had our own individual accounts, I

20   guess, for lack of a better word that we would order the           09:51AM

21   medication as, you know, stock depleted.

22   Q.  Did you have an annual or monthly budget for your pharmacy

23   orders?

24   A.  I'm assuming that we did, but that was taken care of by the

25   pharmacy program manager, which I was not.                         09:51AM

1   Q.  Okay.  And was the pharmacist the person who is responsible

2   for ordering durable medical equipment or medical devices like

3   prosthetics or splints or wound care kits, those sorts of

4   things?

5   A.  I don't recall me specifically ever ordering that.  That        09:52AM

6   may have come through a hospital supply.

7   Q.  Not -- maybe not you specifically but like a pharmacy tech,

8   someone that's kind of a lower level, would they be ordering

9   those things?

10  A.  They may have.  I don't -- because I didn't order the           09:52AM

11  prosthetics or the medication.

12  Q.  Okay.  So you have been here now monitoring for four years

13  almost.  Can you describe the system that Corizon uses to fill

14  the newly prescribed medications?  Do they have pharmacists

15  working in the prisons like you used to?                            09:52AM

16  A.  No.

17  Q.  Where do they fill their prescriptions?

18  A.  Off site through PharmaCorr.

19  Q.  Through PharmaCorr?

20  A.  Uh-huh.                                                         09:52AM

21  Q.  And PharmaCorr is located in Oklahoma, correct?

22  A.  Correct.

23  Q.  So after a provider orders a medication, can you walk us

24  through the process?  What happens next?  Does a nurse sign off

25  on the order and give it to somebody to send to PharmaCorr?         09:53AM

—— **March 21, 2017 - Status Hearing - Winland - Cross** ——

1   A.  I actually don't see that process.  I monitor the end

2   result.

3   Q.  Okay.  When you were working at Perryville and a doctor

4   would write a prescription, who would carry it over to you?

5       MR. BOJANOWSKI:  Your Honor, I don't know how his work    09:53AM

6   at Perryville is relevant.

7       THE COURT:  We're going to find out.  The objection is

8   overruled.  We're going to find out.  We're going to let the

9   plaintiffs' lawyer ask this witness every question that she

10  wants to ask.  If he doesn't know he has demonstrated he knows   09:53AM

11  how to say he doesn't know.  He doesn't need shepherding from

12  counsel in this education process.  So you can make your

13  objections but I'm telling you, and I think I have tried to

14  make this clear to you, I'm overruling virtually every one of

15  them.  And that's because I want to allow for more of a          09:53AM

16  discussion than an evidentiary record, and that's how we're

17  proceeding.

18      MS. KENDRICK:  Thank you.

19  BY MS. KENDRICK:

20  Q.  Who would bring the prescription to you when you were the    09:54AM

21  pharmacist?

22  A.  Typically nursing.

23  Q.  Okay.  And then you would just fill it and it would be

24  done, right?  I mean you would fill the prescription, the nurse

25  would take it, it would go away to the patient?                  09:54AM

1   A.  For Perryville specifically we would fill the medication,

2   and if it was urgent or emergent it would be taken back

3   immediately.  Typically they would come the next day pick up

4   what was filled.  We always basically filled in advance.

5   Q.  As parts of your role as the pharmacy monitor, do you ever    09:54AM

6   go out and check what the areas where they store the

7   medications and pills look like in the clinics?

8   A.  I have periodically in the past.  Not so much now.  Yeah.

9   Q.  And why were you doing that in the past?

10  A.  Because I had the time.                                       09:54AM

11  Q.  Okay.  And were you checking things like to see if they had

12  the proper clinical stock in place?

13  A.  Not necessarily checking to see if they had proper clinic

14  stock because that would be up to each site to determine what

15  their clinic stock was that they needed.  So it wasn't that       09:55AM

16  there was a list of clinic stock I went to check for because

17  each site would be different based on the inmate patient

18  population.

19  Q.  Okay.  So like a yard that has a lot of diabetics would

20  probably have a lot more insulin on hand than a yard that only    09:55AM

21  has one or two?

22  A.  Correct.

23  Q.  Okay.

24         THE COURT:  Can I ask a question?  Who is in charge of

25  the yard level with respect to these medications?                 09:55AM

1          THE WITNESS:  Theoretically, it would be nursing.

2          THE COURT:  So there's not, below you, there's not --

3    they're not pharmacists?

4          THE WITNESS:  No.  I am the only pharmacist and then

5    Corizon also has their regional pharmacist.                    09:55AM

6          THE COURT:  But the regional pharmacist is off site.

7    So at the units and in the individual yards of the units there

8    is no pharmacist person who is overseeing the maintenance of

9    these medications that are kept at each of the units?

10          THE WITNESS:  Correct.                                  09:56AM

11          THE COURT:  Thank you.

12   BY MS. KENDRICK:

13   Q.  Do you have any theories or ideas as to why are Corizon is

14   so out of compliance with Performance Measure 11?

15          MR. BOJANOWSKI:  Same objection.                        09:56AM

16          THE COURT:  Overruled.

17          THE WITNESS:  I believe that for those areas that are

18   out of compliance it's more of a documentation issue than a

19   compliance issue.

20          THE COURT:  Why do you think that?                      09:56AM

21          THE WITNESS:  By doing the performance measure I see

22   certain trends, and some of those trends, I think, more is -- I

23   can track the medication coming into the site.  As a

24   pharmacist, I can see the medication through the drug status

25   screen for the medication coming in.  You can see the distance  09:57AM

1   between when a medication is being given and when the refill is

2   actually given the next time around.  There are some sites that

3   I don't think document appropriately.  Does that make sense?

4           THE COURT:  This is, I gather, a supposition of yours.

5           THE WITNESS:  Yes.                                      09:57AM

6           THE COURT:  That could be verified apart from your

7   monitoring responsibility.  You could take a look at these

8   trends and try to dig deeper and find out whether or not a

9   medication, once prescribed, is provided to the inmate within

10  the time period required for everyone within a particular unit  09:57AM

11  and that would either affirm or disaffirm your supposition that

12  you think it's just a reporting issue.  Is that right?

13          THE WITNESS:  I think in some situations that could be

14  true.  This is something that we discussed.

15          THE COURT:  And if it is true that that could be done,  09:57AM

16  it's also true that you, though haven't done it, you haven't

17  verified whether or not this trending that you think is saying

18  something or the overall acquisition of medications at a macro

19  level, you haven't verified that that is actually demonstrating

20  that the performance measure is being complied with at the      09:58AM

21  micro level.  But it's causing you to be suspicious of the

22  reporting of non-compliance but you haven't verified that

23  that's a fact.  Is that true?

24          THE WITNESS:  Do I know 100 percent?  No.

25          THE COURT:  Okay.                                       09:58AM

───── **March 21, 2017 - Status Hearing - Winland - Cross** ─────

1    BY MS. KENDRICK:

2    Q.  Could one factor also be the distance between Oklahoma and

3    Arizona?

4    A.  No.

5    Q.  Why do you say no?                                      09:58AM

6    A.  As I said before, I see medications being written, being

7    filled, and you can track the medication in eOMIS on the drug

8    delivery screen or the drug status screen that shows when the

9    medication was written, when the medication was received, and

10   basically processed at the site.  So there doesn't seem to be a  09:59AM

11   lag in the medication being filled at PharmaCorr and being

12   deposited at the respective site.

13   Q.  So it's almost like a UPS tracking thing where you can see

14   a prescription went in this day, PharmaCorr filled it at this

15   time, put it in the Fed Ex box, the Fed Ex box arrived at the  09:59AM

16   prison?

17   A.  I can see when the prescription was written, when

18   PharmaCorr received the medication, when the medication was

19   received at the site.

20   Q.  And then so the breakdown is once it's been received,    09:59AM

21   trying to figure out when it was actually given to the

22   prisoner?

23   A.  If there were a breakdown that would be the area.

24        THE COURT:  And your analysis is completely devoid of

25   any specifics with respect to once it arrives at the site to  09:59AM

1    when it's received by the inmate.  We have no knowledge, you

2    have no knowledge, about that other than when you are pulling

3    records for the performance measures, right?

4          THE WITNESS:  Yes.

5    BY MS. KENDRICK:                                          10:00AM

6    Q.  But is that the piece that results in the finding of

7    non-compliance when there's all these steps of prescription to

8    Oklahoma, Oklahoma sends it, gets to, say, Lewis prison, and

9    then it's at Lewis prison.  But the piece that's missing when

10   you are looking at it is what time and what date it was handed  10:00AM

11   to the prisoner?

12   A.  Yes.

13   Q.  So the breakdown is in that area or that space right there?

14   A.  Yes.

15   Q.  Who delivers pills to prisoners?  Are they -- what are they  10:00AM

16   called?  Pill nurses?  LPNs?

17   A.  We have two -- of course, I am not part of the

18   administration.  That would be nursing.  I know that some sites

19   the prisoners come to the window.  KOPs, watch swallows and

20   some of the medications are taken to cell front based on their  10:00AM

21   level.

22   Q.  Right.  It depends on the security level and if the they

23   are locked down.  But who are the people either standing at the

24   pill window handing out the pills and the cups of water?

25   A.  Nursing.                                              10:01AM

March 21, 2017 - Status Hearing - Winland - Cross

```
 1    Q.  What level are they?  RNs or LPNs?

 2    A.  I don't know.  I know they are nursing.  I don't know their

 3    status whether they are an LPN or RN.

 4    Q.  What is a pharmacy tech?  It's a job title that's on -- are

 5    they people that hand out medications?                          10:01AM

 6    A.  Not to my knowledge.  A pharmacy tech -- are we talking a

 7    licensed pharmacy tech or using just a generic term pharmacy

 8    tech?

 9    Q.  Corizon staffing reports just say pharmacy tech, so I don't

10    know what that means.                                           10:01AM

11    A.  A licensed pharmacy tech holds licensure for the state they

12    are in, but they work basically under the umbrella of the

13    pharmacist license.

14    Q.  So that's more about the dispensing of the medication and

15    less about the administration?                                  10:02AM

16    A.  Right.  Even a pharmacy tech can't dispense medication.  A

17    pharmacy tech can assist the pharmacist in preparing the

18    medication, but dispensing is actually a pharmacy function.

19    Q.  Okay.  So you said you think that this breakdown is a

20    documentation failure.  Are you familiar with the idea of not   10:02AM

21    documented, not done?  If it's not written down, it didn't

22    happen?

23    A.  That's -- I guess I'm not sure what you are asking.  In

24    what respect, I guess?

25    Q.  Well, you said you think that the problem is that they are   10:02AM
```

1    not writing things down.  But it's the concept in auditing that

2    if something is not written down or documented that it

3    occurred, that it therefore did not occur.

4    A.  Yes.

5    Q.  And that's how you audit, correct?                      10:03AM

6    A.  Yes.

7    Q.  Do you think that the reason the nurses are either not

8    documenting it that they are giving the medications or not

9    giving the medications to the prisoners is because there's not

10   enough staff to distribute the medication?                 10:03AM

11          MR. BOJANOWSKI:  Same objection.

12          THE COURT:  Overruled.

13          THE WITNESS:  Staffing is not something that I would

14   audit or look at.  So I guess I wouldn't be the person to

15   answer that question.                                       10:03AM

16          THE COURT:  Well, you have identified two possible

17   causes for non-compliance.  One you think that it's not being

18   documented.

19          THE WITNESS:  Uh-huh.

20          THE COURT:  Or two, you think there is something     10:03AM

21   happening after the part you have been paying attention to, and

22   that is when the medication arrives at the facility in Arizona.

23   And then counsel referred to it as this gap period of that time

24   from when it arrives in Arizona to when it is received by the

25   inmate.                                                     10:04AM

March 21, 2017 - Status Hearing - Winland - Cross

1              So those are the two, I think --

2              THE WITNESS:  Okay.

3              THE COURT:  -- categories.  Fair?

4              THE WITNESS:  Fair.

5              THE COURT:  Okay.  Do you have any idea as to -- or do    10:04AM

6    you have any sense that inadequate staff is a reason for those

7    two problem areas?

8              THE WITNESS:  No.

9              THE COURT:  Do you have any idea as to what is the

10   reason for the failure to document and the failure to close the   10:04AM

11   gap of arrival to receipt?

12             THE WITNESS:  I would say it's probably education.

13   New employees coming in and, you know, maybe fresh to eOMIS,

14   something like that.  I think it's more education than

15   anything.                                                         10:04AM

16             THE COURT:  I guess as a pharmacist it's hard for me

17   to imagine what could be more important than communicating the

18   educational idea that once a medicine that has been prescribed

19   for an inmate is in the facility that it be received by the

20   inmate as soon as possible.  So it's hard for me to fathom how    10:05AM

21   that can't really be job one of education.  Why do you think

22   that's happened?

23             THE WITNESS:  I think that if we look at the roles of

24   the pharmacist and the nurse, the pharmacist's official duty is

25   to dispense.  That's what we have licenses for.  The duty of      10:05AM

1    the nurse is to administer that medication.  So the education

2    would not necessarily be a pharmacy function to educate because

3    once that medication is handed off it now becomes the property

4    of nursing.

5             THE COURT:  So as the head of the pharmacy for the          10:05AM

6    Arizona Department of Corrections you are pretty much washing

7    your hands of that gap period from when it arrives at that

8    facility to when it is received by the inmate?

9             THE WITNESS:  Oh, no.  We don't wash our hands at all.

10            THE COURT:  Sounds like what you just said.               10:06AM

11            THE WITNESS:  I was explaining the difference between

12   dispensing and administering from -- that gap has been

13   discussed multiple times.  We have spoken to Corizon about this

14   as what we're seeing.  And I think things are getting better if

15   you look at the performance measures that I do, the 11 and the       10:06AM

16   22, 11 seems to be getting better than what it was.  So I think

17   there are strides being made.  I think there's always a

18   learning curve, new people coming in and people leaving.  I

19   don't think any of us on either side wash our hands of

20   something that important.  And I think the CGAR scores, or the       10:06AM

21   compliance scores, have gotten somewhat better in my

22   recollection.  So we take that very serious.

23            THE COURT:  Okay.

24   BY MS. KENDRICK:

25   Q.  You told the judge that you guys have discussed this            10:06AM

1   multiple times with Corizon and this problem.  What sort of

2   solutions or plans were discussed or recommended at these

3   meetings about the ongoing non-compliance?

4   A.  Corizon, to my knowledge, has extended their compliance

5   group.  Those compliance monitors for Corizon have a closer eye          10:07AM

6   on the facilities.  I think they divided them up.  So we're in

7   communication with Corizon's compliance side to help increase

8   these scores.  So they are seeing what we're seeing, and like I

9   said, I think they are getting better.

10  Q.  Okay.  So Corizon compliance monitors are the ones who              10:07AM

11  check the work of the ADC monitors to make sure you're

12  reporting correctly?

13  A.  I think you have to look at it more holistically.  We have

14  the CGAR we do and then we're in constant communication with

15  Corizon on areas that we see that need improvement which, in            10:07AM

16  turn, help increase the compliance scores of the CGAR.  Does

17  that answer your question?

18  Q.  Not really.  But I'm sure the problem is I'm not

19  articulating it clearly enough.

20          Are there any discussions of changes in process or              10:08AM

21  changes in how medication is administered or distributed, for

22  example, maybe we need to make fewer medications watch swallow

23  so then there's not a three-hour line at the pill line window

24  every morning, or maybe we need to hire five more nurses to go

25  into the max custody units and administer the medications cell          10:08AM

1    front because we only have one for this yard.  Are those kind

2    of process things ever discussed?

3    A.  We have discussed watch swallow medications.  I have never

4    specifically discussed hiring anybody for the process because I

5    believe that's an educational issue.  I think that Corizon          10:08AM

6    needs to continue to educate their nurses.  I think that there

7    might be some disconnect on my performance measures because I

8    think that if you look at my performance measures, they were

9    all basically -- I'm not sure that some of them actually assess

10   it to care for the inmate.  They were more of a checkbooking        10:09AM

11   type thing.

12          So I think when we're -- when I'm saying that things

13   aren't being documented, I'm not saying they are getting care

14   or they are getting care.  I'm just saying that some of these

15   measures that I monitored in the past are more of what a            10:09AM

16   pharmacist would view as maintaining a log or something like

17   that.  And I think that those in the past were probably

18   difficult to pass based on the methodology of those performance

19   measures.

20          So I think that education is -- I think they               10:09AM

21   continually educate their employees, we continue to

22   communicate, and I think that's why the scores are going up.

23   Q.  I'm not trying to harass you here, but what exactly does

24   educate and communicate mean?  I mean, are you saying simply

25   you tell them, don't forget to push the button or scan the bar     10:10AM

March 21, 2017 - Status Hearing - Winland - Cross

1   code when you give them the medication?  What type of education

2   do they need?

3   A.  Those are some of them, yeah.  You know, if you are using

4   the perpetual inventory, make sure you wright it down.  If you

5   are delivering KOP medication, make sure you scan it in eOMIS   10:10AM

6   to show the KOP delivery.  So it would be education in those

7   areas.

8   Q.  And do you know when medication is distributed cell front

9   in the max custody units, do the people distributing the

10  medication have remote access to eOMIS like a handheld tablet   10:10AM

11  or a laptop where they can make an entry that I just gave pill

12  X to prisoner Y?

13  A.  I would not.  That would be a nursing function.  The actual

14  delivery of and administration would be a nursing function.

15  I'm not sure if they have remote access or not.   10:11AM

16  Q.  So if they don't have it then they are just doing paper

17  MARs, medication administration records?

18  A.  I couldn't tell you specifically what each site does, no.

19  Q.  Based on your experience of working in Perryville, how did

20  they make the record of cell front distribution at Lumley unit   10:11AM

21  in the max custody?

22  A.  I never was in Lumley unit.  I was in the pharmacy.  So it

23  was all done by nursing there, too.

24  Q.  Okay.  Would you say if the fact was that they were using

25  paper records and then they had to go back after distributing   10:11AM

*March 21, 2017 - Status Hearing - Winland - Cross*

1   the medication and pull up every single prisoner record and

2   re-enter the information, that that may be a cause of why it's

3   not being documented properly?

4   A.  I guess I can't answer that, because I'm not sure if that's

5   what they are doing or not.                                    10:12AM

6   Q.  I'm saying it as a hypothetical, if that is how they are

7   doing it in max custody units could that be a contributing

8   factor?

9   A.  I don't know.

10  Q.  Has that topic of having remote access for the pill nurses  10:12AM

11  ever come up in these meetings?

12  A.  I know discussion of remote access was -- I know that was

13  discussed at one time, uh-huh.

14  Q.  And what was the result of that discussion?

15  A.  I was not part of those discussions so I'm not sure.        10:12AM

16  Q.  How did you know it was discussed if you weren't part of

17  the discussion?

18  A.  Because they talked about it in the office.  I'm not sure

19  if they used it or not, to tell you the truth.  The discussion

20  was just a discussion, not the final decision.                 10:13AM

21  Q.  So what is the source of the documents when you monitor

22  Performance Measure 11?  You said it was a list of ordered

23  medications?

24  A.  It's a patient profile report.

25  Q.  What is in a patient profile report?                        10:13AM

——— March 21, 2017 - Status Hearing - Winland - Cross ———

1    A.  A patient profile report is a report that I get from

2    PharmaCorr and it basically has a lot of stuff that's not used;

3    the inmate name, the inmate number, the inmate location, the

4    medication, the date of the medication being written.  That's

5    primarily what I use.  And then I use eOMIS to see if that          10:13AM

6    medication was delivered to the inmate within that

7    two-business-day period.

8    Q.  And PharmaCorr sends the list directly to you?

9    A.  Yes.

10   Q.  Is that list randomized?                                        10:13AM

11   A.  It's randomized by date.  If you look at the report itself,

12   based on prescription writing practices, there's no logical

13   order to the dates when it gets to me.  So the report itself is

14   randomized by virtue of prescription writing.

15   Q.  So what order is it in?  Is it sorted by the date ordered       10:14AM

16   or the type of medication?

17   A.  It's actually not sorted by the date ordered or the

18   medication.  It is actually sorted by location and unit.  And

19   then if you look at that, there's a whole host of medications

20   and the dates of the prescription ordering is all over the map     10:14AM

21   for the audit period.

22   Q.  Does that report have a column on it that says random that

23   has random numbers going down?

24   A.  No.

25   Q.  And when you get that report, you pick the first 10 listed      10:14AM

1    for each unit?

2    A.  The first 10 inmates listed for each unit.

3    Q.  Okay.  And when you are monitoring, do you like take notes

4    kind of either by hand or on your computer before you enter the

5    final data into the CGAR?                                          10:15AM

6    A.  The note would either be --

7    Q.  Like do you use worksheets or spreadsheets or something

8    like that before going into the CGAR system and making your

9    judgment and entry for the end of the month?

10   A.  My worksheet is the report.  But basically the only note    10:15AM

11   that I would make would be the date the inmate received the

12   medication which would prove compliance or non-compliance.  So

13   you will basically see a date it was written, the calculated

14   two business days that they should have received the medication

15   and the date that they actually did or did not, if it was       10:15AM

16   compliant or not on that date.

17   Q.  Okay.  So you just have that list in front of you and you

18   have the CGAR computer system open and you are entering it

19   directly in there?

20   A.  No, I have the report in front of me, and I am using eOMIS   10:16AM

21   for the initial report for the fact finding.  And then yes, I

22   had that report in front of me.  That's how I enter it into

23   eOMIS.

24   Q.  I guess what I'm trying to figure out is whether you have a

25   scratch pad or notes or something where you write everything     10:16AM

```
 1   down before you enter it into CGAR?
 2   A.  The report would be the notes that I would take which would
 3   be the date the inmate received.  From that report, I would
 4   make a Word document from that report, and that Word document
 5   then goes into CGAR.                                          10:16AM
 6   Q.  Okay.  The Word document.  That's what I was trying to get
 7   to.  So you keep it somewhere before the final entry?
 8   A.  Uh-huh.
 9   Q.  Okay.  And what do you do with these documents?  Do save
10   them on your computer or e-mail them to your supervisor?      10:17AM
11   A.  The documents, some are saved on my computer.  I typically
12   print the document off.
13   Q.  Okay.  And when you have done kind of your first run
14   through and you have this Word document with your results,
15   before putting it in the CGAR system do you share it with     10:17AM
16   anybody at the institution, like the facility health
17   administrator or anybody else to say, hey, look, I want you to
18   see Performance Measure 11 and how you guys did -- how it looks
19   like you did this month?
20   A.  Yes.                                                      10:17AM
21   Q.  What do you -- is that like an informal review process?
22   A.  It's an informal review process, yes.
23   Q.  And so that's so they can kind of come back to you and say
24   no, actually, that medication was compliant, look here, or, you
25   know, that medication was a renewal not a new prescription?  Is  10:17AM
```

 1   that kind of the idea of doing this?

 2   A.  I guess the terminology for renew a new prescription, from

 3   the pharmacy point of view, a renewal is a new prescription.  I

 4   don't want to mix words.  I want to make sure we're comparing

 5   apples to apples here.                                              10:18AM

 6          THE COURT:  What she's asking you is, is the purpose

 7   of this informal process to allow the FHA to identify errors

 8   that you may have made that came to a conclusion of

 9   non-compliance?

10          THE WITNESS:  Yes.                                          10:18AM

11   BY MS. KENDRICK:

12   Q.  And do you do that for every institution, for every month?

13   A.  Yes.

14   Q.  Do you do it when they actually are in compliance when it's

15   above 80 percent or just when it's below?                          10:18AM

16   A.  Yes.

17   Q.  You do it for both?

18   A.  Yeah.  Uh-huh.

19   Q.  Why do you do it for both?

20   A.  Consistency.  I think that you can learn from compliance.      10:18AM

21   Q.  And when you kind of finalize everything -- well, first of

22   all, if they come back and say, you know, three of those

23   medications you listed are just not applicable, they shouldn't

24   be counted, would you go back and pull three more medications

25   to review so that you would have a complete sample of, say, 10     10:19AM

1  files from the unit?

2  A.  That's honestly never happened.  Typically, what I get back

3  is maybe a number has been transposed on the inmate ID.  Other

4  than that, I mean, I don't think that I have ever had an

5  informal rebuttal, not even a rebuttal, I guess that's the            10:19AM

6  wrong word.  Through the informal process I never see anything

7  that is actually challenged.

8  Q.  Okay.

9  A.  At least from my performance measures.

10 Q.  That's good.                                                     10:19AM

11      If they were to come back and tell you that, would you

12 just take those out of the calculation and not pull, say, three

13 more files?

14 A.  I have never had the opportunity to do that, so I guess I'm

15 not really sure.  I can't tell you I have done it either way        10:20AM

16 because my performance measures have never been challenged when

17 it comes to --

18 Q.  Well, hypothetically, if you got an e-mail when you go back

19 to the office from somebody at Lewis and they say, hey, those

20 three didn't count, what are you going to do?                       10:20AM

21 A.  For my performance measures there's no reason they wouldn't

22 count.  I guess that's where I'm hung up, because it's a

23 written prescription.  So I'm not sure why it wouldn't count.

24 And for the non-formulary I'm not sure why that wouldn't count.

25 Q.  They would say you looked at a guy who is over at Tucson,        10:20AM

UNITED STATES DISTRICT COURT

1    yet you pulled three guys where the prescription was written

2    when they were at Tucson so it's not applicable to us.

3    A.  I -- for me, I look at it as statewide.  When the

4    prescription is written I don't care where they are at.  I'm

5    looking at the prescription itself.  I guess because when the        10:21AM

6    report comes to me, like I said, it's actually broken down by

7    the facility and the units below it.

8    Q.  Right.  And the general rule is you said you select first

9    10 from each unit?

10   A.  Correct.                                                          10:21AM

11   Q.  So I guess I was confused that you said this was a

12   statewide report.

13   A.  But you said -- are you saying if they have gone to Tucson

14   since the prescription was written?

15   Q.  No.  I'm just -- let's say there was a mistake in the            10:21AM

16   report that they gave you and it listed a guy being at Lewis

17   and actually he was at Tucson when it was written.

18   A.  That's not happened.

19   Q.  What about with Performance Measure 13.

20   A.  Okay.                                                            10:22AM

21   Q.  If they came back and said, you have measured something

22   that wasn't a renewal, it was a refill, would you pull another

23   file?

24   A.  Performance Measure 13?

25   Q.  Yes.                                                             10:22AM

1  A.  I wouldn't be looking at a refill.  I'd be looking at a

2  renewal.  A refill is medication on an active prescription.  A

3  renewal would be a new prescription.  And Performance Measure

4  13 is looking at stop dates.  So I'm not --

5  Q.  So Performance Measure 13 has to do with renewals of          10:22AM

6  chronic care and psychotropic medication, and so if they came

7  back and said, well, you looked at three things and they are

8  not a chronic care medication, you know, you counted Tylenol?

9  A.  I count anything that does not have a PRN status.  It says

10  chronic care medication, it doesn't say chronic care condition   10:23AM

11  medication.  That was my instruction.

12  Q.  So Tylenol counts under this performance measure?

13  A.  Not if it's PRN and it typically is.  I have never seen

14  Tylenol not be a PRN.

15  Q.  What is a PRN?                                                10:23AM

16  A.  Pro re nata, as the occasion arises.  It would be a

17  medication that the inmate would take would be a pain

18  medication, Tylenol, for instance.

19  Q.  So basically you are unable to testify as to what you would

20  do if you had files removed from the sample in the informal      10:23AM

21  process.  Correct?

22        MR. BOJANOWSKI:  Objection, Your Honor.  That's not

23  what he says.

24        THE COURT:  Well, let's figure out what he says by

25  asking questions.  Overruled.                                    10:23AM

—— **March 21, 2017 - Status Hearing - Winland - Cross** ——

1    BY MS. KENDRICK:

2    Q.  As you sit here, you are unable to hypothesize a situation

3    where you might actually make a mistake and count a file that's

4    not applicable.  Correct?

5    A.  On the two performance measures that I'm doing.                10:24AM

6    Q.  Yes or no?

7    A.  It's not a yes or no question.  You are asking me if on

8    Performance Measure 11 or Performance Measure 13, something

9    that I have never seen happen.

10   Q.  So because it's never happened you cannot say what you       10:24AM

11   would do in a hypothetical situation.  Correct?

12            MR. BOJANOWSKI:  Your Honor, I have to object.  She's

13   cutting off the witness.

14            THE COURT:  Do try to be careful about that.  Let the

15   witness finish his response before you ask a follow-up           10:24AM

16   question.

17            THE WITNESS:  If I understand your question, you are

18   asking me that if for some reason my reporting was inaccurate

19   based on movement of an inmate?

20   Q.  For whatever reason.                                          10:25AM

21   A.  The movement of the inmates on either one of my questions

22   would not affect their performance measure because we're

23   looking at the renewal of a prescription or looking a

24   prescription being given to the inmate within two business days

25   regardless of his movement.                                      10:25AM

1    Q.  When you pill out the CAPs, do you enter all of the

2    prisoners whose files you reviewed or just the non-compliant

3    ones?

4    A.  When I fill out the CAPs?

5    Q.  The CGAR.  The CGARs, sorry.                         10:25AM

6    A.  I have recently begun entering all compliance and

7    non-compliance.

8    Q.  When did you start doing that?

9    A.  I believe it was two months ago.

10   Q.  So January data?                                     10:25AM

11   A.  Yes.  I believe so.

12   Q.  And before you only listed the non-compliant ones?

13   A.  Correct.

14   Q.  And that Word document you described, that would be the

15   record that would show the entire universe of files reviewed? 10:26AM

16   A.  The Word document would be the reconstruction of the

17   non-compliant, not the compliant, up until the last, I believe

18   the last two months I added both compliant and non-compliant.

19   Q.  So the Word document before then, you wouldn't list the

20   compliant ones in it?                                    10:26AM

21   A.  Yeah.  That's what I said.  Uh-huh.

22   Q.  So if somebody wanted to go back and check a performance

23   measure from September and they wanted to look at, say, all 10

24   files you looked at at a yard, how would they get a record of

25   all 10 you looked at?                                    10:26AM

1    A.  The patient profile report.

2    Q.  Because you have marked on that patient profile report

3    which ones you looked at?

4    A.  Yes.

5    Q.  And do you keep all of those patient profile reports from          10:26AM

6    month to month?

7    A.  Yes.

8    Q.  And have you been informed of any changes in the monitoring

9    methodology that the monitors are using as a result of court

10   orders in this case?                                                   10:27AM

11   A.  For the two that I presently do?

12   Q.  For ones you do or have done in the past?

13   A.  I know there have been changes in methodology.

14   Q.  If somebody came to you and said you are going to need to

15   recalculate Performance Measure 13 using the new methodology,         10:27AM

16   how would you do that?

17   A.  First of all, I don't know the new methodology.  I know

18   it's changed.  Their performance measures I no longer use.  I

19   would have to review the methodology to even be able to do

20   that.                                                                 10:27AM

21   Q.  You would be able to re-create the work you had done a year

22   ago?

23   A.  With great difficulty.  I would --

24   Q.  Are you involved in the CAP process for the performance

25   measures that you review?                                             10:28AM

─────── **March 21, 2017 - Status Hearing - Winland - Cross** ───────

1    A.  No.

2    Q.  So you never see the corrective action plans?

3    A.  No.

4         THE COURT:  Do you think that would be a good idea?

5    And I ask that question just because your title suggested that          10:28AM

6    would be something within your purview.

7         THE WITNESS:  I think that streamlining is probably

8    the best way to do it because we have people consistently

9    answering those.  I mean, I have been asked in the past, not

10   specifically about the CAP, but you know, I think -- no.  I        10:28AM

11   think that streamlining is probably the best way to do it.

12        THE COURT:  What do you mean by "streamlining"?

13        THE WITNESS:  Well, I think that when you get too many

14   hand in the pot, it needs to be done by individuals that are

15   consistent and show consistency throughout.  I'm sure if there     10:28AM

16   was a question that arose that required my expertise or my

17   background that I would be informed to help out.  But presently

18   I'm not involved in those CAPs.

19        THE COURT:  It just seems to me that if you are

20   talking about what chefs you want to be stirring the pot, if       10:29AM

21   you are talking about compliance with a performance measure

22   that is designed to make sure that inmates receive medication

23   in a timely way that the State's chief pharmacist would be one

24   of those chefs you would want in the room.

25        THE WITNESS:  I guess I don't make that decision.            10:29AM

214

1          THE COURT:  I just was asking whether you thought it

2     was a good idea or not.

3          THE WITNESS:  I don't know if it's good or bad.  I

4     think that we're all aware of, you know, some of the challenges

5     that we have and some of the leaps we have made in our                      10:29AM

6     compliance scores.  And I think that it seems, in my opinion, I

7     think it seems to be working okay.  But that would be a

8     decision made above me whether I was involved or not.

9          THE COURT:  You said that you receive from the

10    contractor, whether it's the pharmacy contractor -- the                     10:30AM

11    PharmaCorr.

12    A.  PharmaCorr, uh-huh.

13    Q.  Do you receive the randomized lists that you use to start

14    your analysis?

15    A.  Correct.                                                                 10:30AM

16    Q.  And it comes to you in a form that you believe has already

17    been randomized?

18    A.  Yes.  It's a date range report, and most pharmacy computers

19    have the ability to create a date ranged report.  So they

20    basically plug in the date range for the audit month and that's            10:30AM

21    what is sent to me.  If you see the report, it's obvious to me

22    that based on, you know, the dates prescriptions are written

23    that there's -- to me it is random.

24          THE COURT:  Because you would assume that if you were

25    just generating your report for the month of January it would              10:31AM

1   start on the first prescription written on January 1st and then

2   move through that day and then move to January 2nd.

3           THE WITNESS:  You would think.

4           THE COURT:  Right.  So what you received is something

5   that is all these days mashed up.                                    10:31AM

6           THE WITNESS:  Correct.

7           THE COURT:  For January.

8           And I gather the reason for the randomization is that

9   you want to get a fair sample.  Is that right?

10          THE WITNESS:  Yes.                                           10:31AM

11          THE COURT:  Okay.  And I guess, do you have as part of

12  your thought process, as you look about this, what are the

13  threats to drawing a fair sample, meaning what could endanger

14  my position to be taking a fair sample?  Do you think about

15  that as you look at it?                                              10:31AM

16          THE WITNESS:  I think that if you look at the past

17  performance for the performance measures that I have reviewed

18  that certainly if there was a threat to quote, unquote, cherry

19  pick those measures then those measures would be considerably

20  higher than they are.  So if you are asking me if I'm           10:32AM

21  concerned there may be cherry picking --

22          THE COURT:  I'm sorry for over speaking you.  But one

23  of the reasons your alarm bell isn't going off is because they

24  are failing so often.  You think if they were going to cheat

25  they would make it so that they are passing.                        10:32AM

1          THE WITNESS:  I don't want to say they are all

2     failing.

3          THE COURT:  You are seeing enough failures that make

4     you think, well, if this is an effort at cheating they are not

5     very good cheaters.  I mean, I guess what I'm saying is --          10:32AM

6          THE WITNESS:  I wouldn't want to phrase it that way,

7     but I would say yes.  I would think that if, to me, for the

8     reports that I receive, it would be much harder to cherry pick

9     than just do it correctly to begin with.  So I don't believe

10    I -- you know, I have no 100 percent evidence, but I don't          10:33AM

11    believe that those reports, based on where they come from,

12    because PharmaCorr sends me that report directly.  PharmaCorr

13    has no idea of how we -- how -- my methodology for my

14    performance measures.  It literally is a computer abstract of

15    that audit month.                                                  10:33AM

16         THE COURT:  But they have a horse in the race.  They

17    want to be found compliant.

18         THE WITNESS:  Well, I think that you are correct.  But

19    based on previous scores, because they go back to what we said

20    before, that if they truly were to cherry pick those scores       10:33AM

21    would be higher than they were.

22         THE COURT:  But I guess at bottom it's fair to say you

23    have a healthy skepticism in your mind when you look at this

24    whole process to be weary that somebody who has a horse in the

25    race might be trying to game it, and you are at least looking      10:33AM

— March 21, 2017 - Status Hearing - Winland - Cross —

1   for clues about that.  Is that fair to say?

2           THE WITNESS:  I'd say that's fair.

3           THE COURT:  I'm sorry.

4           MS. KENDRICK:  No.  Thank you.

5   BY MS. KENDRICK:                                          10:34AM

6   Q.  And you said randomized by virtue of prescription writing.

7   What does that mean?  That's not random, is it?  How is that --

8   how does writing prescriptions create a random list?

9   A.  As I explained to Judge Duncan, the report, when you

10  receive the report, as I said, it doesn't come all             10:34AM

11  prescriptions written on the 1st, all prescriptions written on

12  the 2nd.  The report comes as an extract, and the reports

13  may -- the first new prescription signed, the prescription date

14  may be 1-10, we'll use January.  The next prescription date may

15  be 1-31, then it may be 1-2, then maybe 1-5.  So my attempt to   10:34AM

16  explain that being randomized is that there's a whole -- the

17  prescriptions would never come all written on the same day in

18  that report based on the extract.

19  Q.  Right.  But so you -- this -- so you are assuming by virtue

20  of how it looks to you that this list has been randomized?       10:35AM

21          MR. BOJANOWSKI:  Objection.

22          THE COURT:  Overruled.

23          THE WITNESS:  Based on the report, yes.

24  BY MS. KENDRICK:

25  Q.  So just based on looking at it, you think it's randomized?   10:35AM

—— March 21, 2017 - Status Hearing - Winland - Cross ——

1   A.  Yes.  I think it's a randomized report.

2   Q.  But you do not know that for certain that it's a randomized

3   report?

4   A.  No.

5   Q.  Okay.  Are you familiar with the formal rebuttal process?        10:35AM

6   A.  I know we have one, but I don't take part in it.

7   Q.  Okay.  So if somebody wants to rebut a finding that you

8   have made you are not involved at all?

9   A.  No.

10  Q.  Do you know who is?                                              10:35AM

11  A.  Yes.  The rebuttal process entails Kathy Campbell, Vanessa

12  Headstream, and, I believe, Mr. Pratt.

13  Q.  There's a document in the pile there, and I will show it to

14  you.  It's October Rebuttal.

15  A.  Okay.                                                           10:36AM

16  Q.  And the fourth from the bottom on this list is Douglas

17  prison, and it's internal tracker Number 15964.

18  A.  Okay.

19  Q.  For Performance Measure 13.

20  A.  Uh-huh.                                                         10:36AM

21  Q.  And if you flip in this document, it has numbers written in

22  the bottom right corner.  You are looking for the one that ends

23  in 673.

24  A.  Okay.  I lost you already.

25  Q.  It's almost to the end of the document.                        10:36AM

1    A.  On the rebuttal itself where it says CGAR tracking or on

2    the very back page of the document?

3    Q.  On the bottom, bottom right-hand corner number that says

4    ADCM.  Look for one that ends in 673.

5    A.  Okay.  673.  639.  641.  643.  645.  647.  649.  6 -- okay.    10:37AM

6    673.

7    Q.  Number 13, chronic care renewals.  And it says the date of

8    the finding was 9-29-16.

9    A.  Uh-huh.

10   Q.  Were you still reviewing Performance Measure 13 back then?    10:37AM

11   A.  Yes.

12   Q.  Okay.  And since it's 9-29, the end of September, does that

13   mean you were actually auditing the month of August?

14   A.  Yes.  We would be the month in arrear.

15   Q.  Were you aware that Corizon did this rebuttal to your    10:38AM

16   finding?

17   A.  I think that this is one that I may have been asked about

18   by Vanessa Headstream.

19   Q.  Okay.  So they challenged four of the files that you

20   reviewed.    10:38AM

21   A.  Okay.

22   Q.  And the response says that the findings will be removed

23   changing the compliance factor to 26 out of 28.  And on the

24   next page it says that it was submitted or returned on the 5th

25   of October.    10:39AM

1    A.  Okay.

2    Q.  So on your table in front of you there's a stack of CGARs

3    that says Winland on the top of it.

4    A.  Okay.

5    Q.  And if you go towards the end, there's one for Douglas          10:39AM

6    complex in August.  The number on the bottom right corner is

7    669.

8    A.  Okay.

9    Q.  Did you find it?

10   A.  669, Douglas complex.                                           10:39AM

11   Q.  Yeah.  So on Performance Measure 13, it shows an entry of

12   26 compliant out of 28 reviewed.  Did you make that change to

13   that entry?

14   A.  It looks like it was entered by me.

15   Q.  So someone else came in and changed the entry that you had     10:40AM

16   made on the 29th to have the new numbers?

17   A.  So we're looking at Douglas complex on the 669, correct?

18   Q.  Yes.

19   A.  9-29?

20   Q.  Yes.  So it says that you entered it on September 29th and     10:40AM

21   found 26 out of 28 compliant, yet this rebuttal document from

22   Kathy Campbell dated October 5th said that it would be changed

23   to 26 out of 28.

24   A.  I don't recall if I entered that or not.

25   Q.  Okay.                                                          10:41AM

1  A.  It's under my name, so I'm assuming based on that I would

2  have.

3  Q.  When you enter things in CGARs, if you make an entry and

4  you make a mistake do you just go back in and have a new entry

5  with a new date and time, or are you able to go into an old          10:41AM

6  entry and delete what you wrote and write something new?

7  A.  I know in the past when I have entered something

8  incorrectly that I have asked Kathy and she would could have

9  that wiped so I could put the correct information in.  Is that

10  what you are asking me?                                               10:41AM

11  Q.  Yeah.  So what your practice was, if you have put something

12  in the CGAR it's kind of locked in there.  So either you are

13  going to have to make a subsequent entry that says, you know,

14  my entry on January 10th was incorrect, or can you go in and

15  wipe out what you originally wrote on January 10th and put the        10:42AM

16  correct information in?

17  A.  When I have entered something incorrectly it's before I

18  have actually put the numbers and colored the actual CGAR.  And

19  I know some of those have been taken out and I have been able

20  to put the correct information in post CGAR, post the entry.         10:42AM

21  I'm not sure how that works.

22  Q.  Who takes them out?

23  A.  Who takes what?

24  Q.  Who takes your entry out?  You said "they take them out"?

25  A.  Oh.  In the past I have asked Kathy to help me out because       10:42AM

---

**March 21, 2017 - Status Hearing - Winland - Cross**

1    I have entered something incorrectly.

2    Q.  Okay.  And so you take it out and replace it with the

3    correct information?

4    A.  Uh-huh.

5    Q.  Okay.  And do you remember about four years ago being          10:42AM

6    deposed in this case by my colleague, Warren George, older

7    gentleman?

8    A.  Yes.  I remember him.

9    Q.  And he had a lot of questions for you about things that

10   were in the CGAR?                                                  10:43AM

11   A.  Uh-huh.

12   Q.  The CGARs that were entered in your name?

13   A.  Okay.

14   Q.  And do you recall that you testified under oath that you

15   actually didn't enter that information but you were cutting and    10:43AM

16   pasting information other people gave you?

17   A.  What had happened was a transition, and that's been four

18   years ago.

19   Q.  Did you testify to that?

20          MR. BOJANOWSKI:  Can he explain his answer, Your            10:43AM

21   Honor?

22          THE COURT:  That question, did you testify to that can

23   be answered yes or no.

24          THE WITNESS:  There was some information that --

25   BY MS. KENDRICK:                                                   10:43AM

——— **March 21, 2017 - Status Hearing - Winland - Cross** ———

```
 1   Q.  Did you testify to that?  Yes or no?

 2           MR. BOJANOWSKI:  Does he have a transcript he can look

 3   at?

 4           THE WITNESS:  I don't recall.

 5           THE COURT:  If he remembers.  Do you remember whether     10:43AM

 6   you testified to that?

 7           THE WITNESS:  I don't recall.  That was four years

 8   ago.

 9           THE COURT:  Okay.  Thank you.

10   BY MS. KENDRICK:                                                  10:43AM

11   Q.  When did you start putting your own information in the

12   CGARs and stop cutting and pasting?

13   A.  July.  So that was June.  It would probably be July, August

14   for July, because there was a transition period when my

15   predecessor was there and some of the information was compiled.   10:44AM

16   She had since left the Bureau and there was some information

17   there but I don't -- I mean, I would have to see the transcript

18   because I don't -- the cut and paste would have been

19   information that was compiled.  It's not that I'm cutting and

20   pasting bogus information into anything.                          10:44AM

21   Q.  It's not that it was bogus.  It was just collected by other

22   individuals who sent it to you in e-mails and you compiled it

23   in the CGARs.  That was your practice four years ago, so I'm

24   just asking, when did that practice change?

25           MR. BOJANOWSKI:  Your Honor, I will object.  The CGARs    10:44AM
```

─── **March 21, 2017 - Status Hearing - Winland - Cross** ───

1    that existed before the stipulation have got nothing to do with

2    the CGARs that exist after the stipulation.

3           MS. KENDRICK:  Your Honor --

4           MR. BOJANOWSKI:  Which had agreed-upon measures and

5    agreed-upon protocols.  Now, you know, she's trying to elicit      10:45AM

6    testimony with regard to CGARs that no longer even exist.

7           MS. KENDRICK:  Your Honor, he testified under oath

8    that he was copying other people's information into what was

9    then called the MGARs.  And I'm trying to find out when he

10   ended that practice, if he was still engaged in that practice     10:45AM

11   when the new post-settlement CGARs began.  That's why I'm

12   asking, when did you stop doing that?

13          THE COURT:  Overruled.

14          THE WITNESS:  If you are asking when the CGAR came in

15   existence, that's my work.  In the beginning when I first          10:45AM

16   assumed the position, Paulette Boothe, my predecessor, had

17   compiled some information.  Cutting and pasting was -- I mean,

18   I copy and paste information now from a Word document.  I'm not

19   sure -- I guess I'm not sure.

20   BY MS. KENDRICK:                                                   10:45AM

21   Q.  Are you still relying upon other monitors or individuals to

22   provide you with information that is used to create the

23   calculations in the CGARs?

24   A.  The performance measures I do is my work based on the

25   documents that I receive.                                          10:46AM

1    Q.  So it's your firsthand work.  So my question is for how

2    long have you been doing it that way versus relying upon the

3    legwork of others?

4            MR. BOJANOWSKI:  Same objection.

5            THE COURT:  Overruled.                                    10:46AM

6            THE WITNESS:  From the time that I began this

7    position.  I guess are you asking me if I continue to copy and

8    paste other people's work?  Is that what you are asking?

9    BY MS. KENDRICK:

10   Q.  Other people were doing some of the work and doing some of  10:46AM

11   the analysis and you would put it in the CGAR?

12   A.  No.  It's my work.  There was one instance where we would

13   travel and she didn't -- Ms. Chesney (phonetic) would not have

14   access.  So at one point I had placed some of that in.  But it

15   was there during the actual audit period.  So if you are asking 10:47AM

16   me, my work is my work, I guess if that is what you are asking

17   me.  Is that what you are asking me?

18   Q.  For how long?  I'm trying to find out when you stopped

19   doing that because that's you what you testified was your

20   practice when you were deposed.                                  10:47AM

21           MR. BOJANOWSKI:  Your Honor, he said it happened on

22   one occasion, and it was when he first started his position.

23   He was deposed, he was in that position for about 60 days.  And

24   so there was a transition of another employee, and he has not

25   testified that it was a practice of his to rely on the other   10:47AM

—March 21, 2017 - Status Hearing - Winland - Cross—

1   people's data which he just lifted and placed into it his MGAR

2   or CGAR finding.

3           THE COURT:  Did you ever lift data, as Mr. Bojanowski

4   just described, from other people and put it into a CGAR?

5           THE WITNESS:  No.  The only time that I can recall          10:48AM

6   that even happened was as Mr. Bojanowski said, the first month

7   that I came because it was a transition period.  And that

8   information, because it was a month in arrears, was actually --

9   she was no longer in the department.

10          THE COURT:  Okay.                                          10:48AM

11          MS. KENDRICK:  Thank you.

12          THE COURT:  Let's take five minutes before -- do you

13  have any redirect?

14          MR. BOJANOWSKI:  Pardon me?

15          THE COURT:  Do you have any redirect?                      10:48AM

16          MR. BOJANOWSKI:  It's very brief.  We can do it now.

17          THE COURT:  How many minutes do you think it is?

18          MR. BOJANOWSKI:  I would say 5, 10 at most.

19          THE COURT:  You may go ahead.

20          MR. BOJANOWSKI:  Thank you, Your Honor.                    10:48AM

21                      REDIRECT EXAMINATION

22  BY MR. BOJANOWSKI:

23  Q.  Mr. Winland, is it fair to say that Corizon processes

24  approximately 51,000 medical prescriptions each month in the

25  system?                                                           10:49AM

1   A.  I would say that's fair to say.

2   Q.  Is it fair to say that they process approximately 17,000

3   additional mental health prescriptions each month within the

4   system?

5           MS. KENDRICK:  Objection.  Leading.                    10:49AM

6           THE COURT:  Sustained.

7           MR. BOJANOWSKI:  Your Honor, I'm just trying to give

8   information as to the volume.

9           THE COURT:  I know.  It would be helpful for the

10  process if you could ask questions that were not so leading.   10:49AM

11  BY MR. BOJANOWSKI:

12  Q.  Do you know how many prescriptions are processed each month

13  by Corizon?

14  A.  I do not know the exact number.  I know there are

15  thousands.                                                     10:49AM

16  Q.  Is it roughly around 60,000 a month?

17  A.  As I said, I don't know the correct number.  But that would

18  seem reasonable.

19  Q.  When you receive these sheets from PharmaCorr, it's listing

20  each prescription.  Is that my understanding?                  10:50AM

21  A.  For the performance measure?

22  Q.  Yes, sir.

23  A.  Yes.

24  Q.  11.  All right.  And how many pages is that report?

25  A.  Quite a bit.  I mean, it's probably a ream of paper.       10:50AM

UNITED STATES DISTRICT COURT

1   Q.  A ream of paper?  Several hundred pages long?

2   A.  Yes.  I think the one topped out about 500 pages.

3   Q.  All right.  And so that is a report of just the

4   prescriptions that were issued in one month, correct?

5   A.  That's a report of the -- for Performance Measure Number 11   10:50AM

6   that's a report of new prescriptions written for that month.

7   Q.  And out of that 500 pages is that a single-spaced listing

8   or a double-spaced listing?

9   A.  I would say it's probably double.

10  Q.  All right.  Now, has there ever been an occasion which you   10:51AM

11  felt that somehow out of that 500 pages of listing of

12  prescriptions that somehow there was some kind of cherry

13  picking going on to where there was a manipulation of the data?

14  Have you ever had a feeling that that has occurred based upon

15  the raw data that you get every month?   10:51AM

16  A.  No.

17  Q.  The sheer volume of prescriptions that's written, does that

18  indicate to you that it would be extremely difficult to try and

19  just select some kind of cherry picked prescriptions?

20  A.  Yes.  I -- yes.   10:51AM

21  Q.  Okay.  Now, as far as Performance Measure Number 11 is

22  concerned, in the past five months, do you know how many

23  facilities have been out of compliance?

24  A.  Very few.  Fewer compared to previous months, but I don't

25  have the totals in front of me.   10:52AM

─────── March 21, 2017 - Status Hearing - Winland - Redirect ───────

1          MR. BOJANOWSKI:  May I approach the witness, Your

2    Honor?

3          THE COURT:  You may.

4          Nobody can hear because he's just trying to read it.

5    And so go ahead and ask a question.  The print is very small.      10:52AM

6    The witness needs to go to the optometrist.

7          THE WITNESS:  It's the age thing.

8          MR. BOJANOWSKI:  We have one on staff.

9    BY MR. BOJANOWSKI:

10   Q.  Do you know how many facilities are out of compliance with      10:53AM

11   this measure, Number 11?

12   A.  I see quite a few yellows.  If that's the non-compliance

13   there's quite a few.

14   Q.  And historically, that was a bad measure?

15   A.  When I took it over, there were more out of compliance, I      10:53AM

16   believe, then than there is now.

17   Q.  And right now, is it fair to say there's only one facility

18   that's out of compliance for December?

19   A.  From what I can see.

20   Q.  That would be the Lewis facility.  And the same is true for      10:53AM

21   November?

22   A.  Correct.

23   Q.  Just the one facility out of the 10 was out of compliance?

24   A.  Yes.

25   Q.  And as far as Performance Measure Number 22 is concerned,      10:53AM

1    is it fair to say that all 10 facilities have been in

2    compliance with this measure?

3    A.   Yes.

4    Q.   And historically, all 10 facilities have complied with this

5    measure.  I see only one instance, one month out of the 18 that        10:54AM

6    I'm looking at, were chose non-compliance.  Is that your

7    understanding as well?

8    A.   That's probably correct, yes.

9    Q.   You had indicated earlier that you felt that sometimes the

10   problems with compliance on some of the measures involved some         10:54AM

11   lack of education of, perhaps, some nursing staff or other

12   staff.  Do you remember that testimony?

13   A.   Yes.

14   Q.   And when you review the records, do you find that say, for

15   instance, in Performance Measure Number 11, that the medication        10:54AM

16   is, in fact, delivered to the facility is, in fact, maybe given

17   to -- well, is it given to the inmate and then they just don't

18   mark the appropriate box?  Do you find that to happen?

19   A.   For Lewis specifically, when we're talking about trending,

20   Lewis consistently does not use a drop down box that would mark        10:55AM

21   an officer delivery.  So the medication, as I said before, we

22   can track the medication coming from PharmaCorr received by the

23   facility, and it seems to be the KOP medication that is often

24   times delivered by officer delivery that is not documented.

25   And it would be for the -- yes.                                        10:55AM

UNITED STATES DISTRICT COURT

1   Q.  Can you tell if the medication actually made it to the

2   inmate?

3   A.  I cannot.

4   Q.  Okay.  And that's why there's non-compliance?

5   A.  Correct.                                              10:56AM

6   Q.  But we know the medication's at the facility?

7   A.  Right.  It would seem inconceivable to have the medication

8   sitting there and not be given to the inmate.  Yes.

9   Q.  What would happen if the medication didn't get delivered to

10  the inmate?  Does it go back somewhere?  Is there a record of   10:56AM

11  that?

12  A.  Medication that sits for a while would be reversed back to

13  PharmaCorr.  I'm assuming if the inmate did not receive the

14  medication there's possibly an HNR could be written.  I mean,

15  so yeah, it would eventually it would probably be sent back.    10:56AM

16  Q.  As far as PharmaCorr having a horse in the race, does

17  PharmaCorr know or track when medications are ultimately

18  delivered to the inmates?

19  A.  No.  That's what I said in my previous testimony, that they

20  would not -- there would be no reason to even track that.  As a  10:56AM

21  pharmacy function they dispense the medication, put it in the

22  totes.  It's delivered to health care units.  At that point it

23  would be the responsibility of nursing.

24  Q.  And PharmaCorr is not specifically an entity that only

25  serves the state of Arizona, is it?                            10:57AM

UNITED STATES DISTRICT COURT

1    A.  Oh, no.

2    Q.  It serves many other institutions across the country, is

3    that your understanding?

4    A.  Correct.

5    Q.  So as far as you know, and it's your understanding, is          10:57AM

6    PharmaCorr is not involved in any way with the monitoring of

7    the Arizona Department of Corrections' contract with Corizon,

8    is it?

9    A.  Not that I know of.  And I'm not sure why they would even

10   be, so no.                                                          10:57AM

11         MR. BOJANOWSKI:  All right.  No further questions.

12         MS. KENDRICK:  Redirect.

13         THE COURT:  You have just a quick follow-up?

14         MS. KENDRICK:  Yes.

15                     RECROSS-EXAMINATION                               10:57AM

16   BY MS. KENDRICK:

17   Q.  Is PharmaCorr a subsidiary of Corizon?

18   A.  That's my understanding.

19   Q.  Okay.  And you said that if medication sits for a while

20   that it gets reversed back to PharmaCorr.  Have you ever           10:58AM

21   requested a reversal report?

22   A.  No, I have not.  I said it could be reversed back.  It

23   could also be given to the inmate.  There's reasons why it

24   could sit.

25   Q.  To your knowledge, does Corizon or PharmaCorr keep any sort    10:58AM

1    of report listing the medications that have been sent back?

2    A.  I would think they would have to for inventory control.

3    Q.  But you have never requested it?

4    A.  I have not.

5    Q.  Okay.  Thank you.                                    10:58AM

6         THE COURT:  Thank you, sir.  Appreciate it.

7    Appreciate your time today.

8         We'll take a five-minute break.  Thank you all.

9         (Recess from 10:58 a.m. until 11:09 a.m.)

10        THE COURT:  Please be seated.                        11:09AM

11        Mr. Bojanowski, is somebody in the bull pen?

12        MR. BOJANOWSKI:  Yes, Your Honor.  We have Troy Evans

13   who we are calling a little bit out of order since he's got to

14   head back to Safford today.  That's a long drive.  We're

15   hopeful we can get him and through.                       11:09AM

16        THE COURT:  Please step forward to the clerk of the

17   court in the well to be sworn.  Thank you.

18        (The witness was sworn.)

19        THE COURTROOM DEPUTY:  Please have a seat in the

20   witness stand.                                            11:09AM

21        THE WITNESS:  Drinking fountain doesn't work.

22        THE COURT:  Really?

23        THE WITNESS:  It's a teaser.  When you push the button

24   it goes --

25        THE COURT:  Well, thank you for telling me.  I will   11:10AM

────── **March 21, 2017 - Status Hearing - Evans - Direct** ──────

1    have somebody look into it.

2         THE WITNESS:  I let maintenance now about it when he

3    was out there.

4         THE COURT:  Oh, you did.  Thank you.

5                        TROY EVANS,

6    a witness herein, having been first duly sworn by the clerk to

7    speak the truth and nothing but the truth, was examined and

8    testified as follows:

9                     DIRECT EXAMINATION

10   BY MR. BOJANOWSKI:

11   Q.  Would you please state your name for the record?

12   A.  Troy Lawrence Evans.

13   Q.  Mr. Evans, what is your business address?

14   A.  At the Safford complex, it's 896 South Cook Road, Safford,

15   Arizona.                                                          11:10AM

16   Q.  And you are employed, sir?

17   A.  Yes, by the Arizona Department of Corrections Health

18   Services Monitoring Bureau.

19   Q.  In what capacity?

20   A.  Compliance monitor.                                           11:11AM

21   Q.  And what facilities do you monitor?

22   A.  Safford and Douglas.

23   Q.  What -- are you the contract monitor, a medical monitor, or

24   a -- I mean, what type of monitor are you?

25   A.  Contract medical monitor.  We monitor the contractor that    11:11AM

1    delivers health care for the inmates.

2    Q.  How big is Safford population-wise?

3    A.  Inmates?

4    Q.  Yes, sir.

5    A.  Currently -- we just switched one of our yards.  I believe          11:11AM

6    we're about 1700 right now, I believe, shooting from the hip.

7    And then Douglas is about 2300.  They are a little bigger.

8    Q.  Could describe for the Court your educational background?

9    A.  I am a 14-year RN, currently working on my bachelor's

10   degree in undergrad school with intent to go to grad school          11:11AM

11   hopefully next semester.

12   Q.  Are you licensed?

13   A.  Yes.

14   Q.  In what states?

15   A.  I have an Arizona compact, so Arizona -- I don't know what          11:12AM

16   all states we can practice in.  It's a compact license so it

17   follows through to many different states.  I only practice in

18   Arizona, so I'm not sure exactly.

19   Q.  Could you describe your educational background?

20   A.  Well, I went through nursing on school.  And I spent seven          11:12AM

21   years in the emergency room, and I'm currently enrolled in a

22   bachelor's program.

23   Q.  So where did you spend seven years in the emergency room?

24   What emergency room was that?

25   A.  Most of it in Safford.  I also worked in Tucson and in          11:12AM

1    Globe, Arizona.

2    Q.  All right.  All in the emergency room?

3    A.  Primarily.

4    Q.  All right.  And you say you have done that for 14 years?

5    A.  Yeah.  I think so.                                      11:13AM

6    Q.  Okay.  Now, what are your job duties for the Department as

7    the monitor for the Safford and Douglas facilities?

8    A.  As a compliance monitor I monitor medical records through

9    the utilization of the CGAR.  I also monitor medical diets as

10   well as access to care.                                     11:13AM

11   Q.  All right.  So how do you go about monitoring a particular

12   measure?  What do you do first?

13   A.  Any measure?

14   Q.  Well, there's a monitor guide, correct?

15   A.  Yes.                                                     11:13AM

16   Q.  Does the monitor guide give you the procedure to follow for

17   the measures that you are monitoring?

18   A.  Very much.

19   Q.  Does it give you the source documents you need to look at?

20   A.  Yes.                                                     11:14AM

21   Q.  And is that the procedure that you follow when you are

22   monitoring a particular measure?

23   A.  In addition to we're provided with random lists for each

24   measure so that we have random lists to pull from.

25   Q.  So in a general sense, you receive a random list of inmates  11:14AM

1    from the central office, is that right?

2    A.  Yeah.

3    Q.  Is that the list of inmates that you use for particular

4    measures that you are measuring?

5    A.  Yes.                                                        11:14AM

6    Q.  And there's different types of lists that you are provided

7    depending upon the measure that's used, correct?

8    A.  Correct.

9    Q.  And so what you do is you take the random list, you look at

10   your guide that tells you what to look for, and then you look   11:14AM

11   for that document in eOMIS and then you make a decision as to

12   whether they have complied with the measure or not.  Is that

13   right?

14   A.  Correct.

15   Q.  And that's the way you have done it for how long?           11:14AM

16   A.  The randomized lists we have been -- we have always

17   randomized, so since we started doing the CGAR it's always been

18   random.  So since I started doing the CGAR in 2013.

19   Q.  Okay.

20   A.  It's always been random.                                    11:15AM

21   Q.  All right.  So you have -- have the measures changed since

22   you started the actual measure itself?

23   A.  No.

24   Q.  Okay.  So you have been measuring the same thing since

25   2015?                                                           11:15AM

1  A.  Yeah.

2  Q.  And how do you assure that what you do is accurate?

3  A.  Related to -- I guess I don't -- how do I make I sure it's

4  accurate related to what?

5  Q.  Well, how do you know that your finding is correct?  Do you          11:15AM

6  double check it?  Do you run it by somebody?  Do you review it?

7  A.  Well, when the CGAR is compiled before I submit it -- once

8  the CGAR is submitted into -- I don't know -- like once the

9  CGAR is submitted into the website, we can't make any changes

10  in it.  So what we do is we send an e-mail to the contractor          11:16AM

11  basically saying, you know, these are the measures.  These are

12  the findings that we have.  Because obviously we could

13  transpose a number or there might be an error made, whether by

14  our own fault or not.  So it's kind of a checks and balance

15  they go through, and if they have a question.  But we can all          11:16AM

16  look at the same information in eOMIS, so usually it's just a

17  verification that there's findings or there's not findings.

18  Q.  Has there been occasions where you informally have

19  presented the findings to Corizon and they found a mistake that

20  you have made?          11:16AM

21  A.  Absolutely.

22  Q.  How often does that happen?

23  A.  Not very often.  And usually it's a transposed number.  I

24  mean, we transpose numbers keyboarding.  And one number makes a

25  big difference in an inmate number.  So usually it's just an          11:17AM

1    error on my part.

2    Q.  Okay.  And then how do you fix that?

3    A.  I just change it.  I will look it up with the -- generally

4    it's the facility health administrator who is questioning it,

5    and we'll look it up together and I'll go, you know what?  You        11:17AM

6    are absolutely right.  I transposed that number.  And we'll fix

7    it.  And once we have pretty much made any other changes we

8    think are errors or not errors it's submitted, and once it's

9    submitted we can't do anything with it.

10   Q.  Okay.  Now, the transposition of numbers that you are             11:17AM

11   talking about is generally the inmate number that's assigned by

12   the State to that particular inmate.  Is that what you are

13   talking about?

14   A.  Yeah.

15   Q.  And when you plug that number into eOMIS it pulls up that         11:17AM

16   inmate's medical record, is that right?

17   A.  Yeah.

18   Q.  Has a picture of the inmate on it?

19   A.  Correct.

20   Q.  It's got name and information, and then it's got just pages      11:18AM

21   and pages of whatever the medical records are.  Right?

22   A.  Yeah.

23   Q.  And that's what you are reviewing when you are trying to

24   determine compliance is the medical record that's contained in

25   the computer system?                                                 11:18AM

1    A.  Correct.

2    Q.  So if you plug in the wrong number you get the wrong inmate

3    so the finding is going to be incorrect?

4    A.  Right.

5    Q.  So you go back and you look at it and see what the right          11:18AM

6    number is and then you can correct that at that time.  Right?

7    A.  Correct.

8    Q.  Now, when you have that kind of transposition of numbers do

9    you select the next guy on your list, or you just fix the

10   number and then essentially re-audit that file that you made       11:18AM

11   the mistake on?

12   A.  Well, if it was an error, you know, just transposing a

13   number, then it's pretty -- there's no reason to replace that

14   number on the list.  The only reason I would replace the number

15   if it wasn't appropriate for that measure.  You know, there's      11:19AM

16   times where certain numbers are in whatever categorically --

17   however we're using the random order for that measure for the

18   month, it might be N/A for that, you know, for that particular

19   measure.  So generally, I will just skip to the next one and

20   make sure it's applicable.                                         11:19AM

21          But in the case of an error it's usually an error.  It

22   wasn't an N/A it's just a transposed number so I just fix it

23   and move on.

24   Q.  Well, but is the -- what I'm getting at is this:  Are you

25   looking at the wrong file when you transpose the number or was     11:19AM

1   it just a keyboarding error, you put the wrong number in?

2   A.  No.  Generally, it's -- usually I send them the wrong

3   number when I e-mail them because, I mean, I'm not actually

4   inputting the CGAR.  I'm sending an e-mail saying here's the

5   finding for a specific measure.                                11:20AM

6   Q.  You have nothing to do with CAP issues?

7   A.  No.

8   Q.  Or rebuttal issues?

9   A.  No.

10  Q.  That's -- central office handles all that?                11:20AM

11  A.  Yeah.

12       MR. BOJANOWSKI:  No further questions, Your Honor.

13                      CROSS-EXAMINATION

14  BY MS. KENDRICK:

15  A.  Hello.                                                    11:20AM

16  Q.  How are you doing, Mr. Evans?

17  A.  I'm great.  How are you?

18  Q.  Okay.  Thank you for coming out here.  I know it's quite a

19  drive so we really appreciate that you have come out to answer

20  some questions.  We'll try to make this go as quickly as      11:20AM

21  possible so you can get on the road home.

22       Did you review any documents to prepare for this

23  testimony?

24  A.  No, ma'am.  I actually just came back to work Tuesday.  I

25  have been off for surgery for an extended period of time.     11:21AM

1    Q.   How long were you out?

2    A.   I have been out since early January.

3    Q.   I'm not going to ask you about those documents right now.

4    I just wanted you to have them by there?

5    A.   No problem.                                                   11:21AM

6    Q.   And did you ever work for the Department as a nurse before

7    it was privatized?

8    A.   I did.

9    Q.   How long?

10   A.   I started in '09, actually.                                   11:21AM

11   Q.   Did you work for Wexford or Corizon when they took over?

12   A.   I did.  I worked for Wexford for the initial -- whatever

13   they were there, six months or seven months before they were

14   replaced.

15   Q.   And what is your training in statistics?                      11:21AM

16   A.   Statistics?

17   Q.   Do you have training in --

18   A.   Just statistics from college, I mean, other than any -- I

19   think we all take statistics in college.  But other than that I

20   don't have any specific statistical training.                     11:22AM

21   Q.   You are assigned to monitor two different prisons; Safford

22   and Douglas.  But do you just stay at Safford and check things

23   remotely on the electronic records for Douglas, or do you go

24   down there?

25   A.   No, I actually go to both.                                    11:22AM

1    Q.   And Safford has three units, correct?

2    A.   Yeah.

3    Q.   One is 60 miles away?

4    A.   Correct.

5    Q.   Okay.  But the rule normally when you are auditing is that          11:22AM

6    you pull 10 random files per unit?

7    A.   Correct.

8    Q.   So with Safford, would you pull a total of 30 for a

9    performance measure?

10   A.   Correct.                                                            11:22AM

11   Q.   And then Douglas has four units?

12   A.   Correct.

13   Q.   So it would be 40 there?

14   A.   Yes.

15   Q.   And do these prisons house people with serious mental              11:23AM

16   illness?

17   A.   My units do not.

18   Q.   Those two do not?

19   A.   No.

20   Q.   Okay.  How about people with complex medical needs?                11:23AM

21   A.   No.  Generally anything medically involved goes to a

22   court-ordered facility.

23   Q.   And are you aware that this court found the Douglas

24   facility non-compliant for four performance measures, Number

25   13, 14, 46, and 47?                                                     11:23AM

1   A.  Aware in what aspect?

2   Q.  That the judge issued an order saying that they were --

3   that Douglas was non-compliant with these measures and that

4   Corizon and the defendants needed to take action to improve

5   performance?                                                    11:23AM

6   A.  Yes.

7   Q.  Are you working with the medical staff at the Douglas

8   institution to come up with a reform plan of any sort to bring

9   it into compliance?

10  A.  We review their plans as they come up with them.           11:24AM

11  Q.  Okay.

12  A.  We don't formulate their plans with them.

13  Q.  But they do let you see what they are planning to do?

14  A.  Correct.

15  Q.  What are they planning to do at Douglas?                    11:24AM

16  A.  I'm not sure at this time.

17  Q.  Do you remember when you were shown those plans?

18  A.  I do not.

19  Q.  Are you aware that this court issued an order telling the

20  Department that they needed to take -- use outside services,    11:24AM

21  whether it's like outside providers, outside medical care, if

22  they couldn't meet the requirements of certain performance

23  measures?

24  A.  Yes.

25  Q.  And are you aware that Douglas is one of the institutions    11:24AM

1    covered by that?

2    A.  Yes.

3    Q.  And are you aware of any action plan or reform plan that's

4    underway at Douglas to comply with the Court's order on

5    Performance Measure 47?                                    11:25AM

6    A.  Not specifically, no.

7    Q.  Is there anybody else who works for the Department who

8    would know?

9    A.  I'm not sure.  I don't know.

10   Q.  You said earlier that you get random lists.  How do you   11:25AM

11   know the list is random?

12   A.  I mean, it's pretty easy.  I guess if it was specific to,

13   say, a nurse's line it's pretty easy to look at that and see if

14   somebody was seen on one day and the next person in that line

15   was seen, say, 14 days later there's no cohesion between those   11:26AM

16   two.  So, I mean, the lists are generated randomly.  I don't

17   actually know how they are generated, but I can tell you that

18   it's random, you know.

19   Q.  Are there a column of numbers, random numbers, next to the

20   people's names?  I'm not talking about their ADC prisoner   11:26AM

21   number, just random computer generated numbers?

22   A.  No.  It's their ADC number.

23   Q.  Okay, so their name and the ADC number?

24   A.  Yeah.

25   Q.  And who provides you with these random reports?   11:26AM

1    A.   Central office.

2    Q.   Who at central office?

3    A.   I don't actually know, to be honest with you.  I just give

4    them my e-mail.

5    Q.   Who is the sender?                                         11:26AM

6    A.   My boss, Kathy Campbell.

7    Q.   So Kathy sends them to you?

8    A.   Correct.

9    Q.   Okay.  So you were talking about how once you put

10   information in the CGAR software system you can't make any      11:27AM

11   changes.  So you kind of have your notes somewhere else.

12   Correct?

13   A.   Yeah.

14   Q.   Do you keep those notes on a pad of paper by hand, or do

15   you store them in your computer in a Word document or a        11:27AM

16   Microsoft Excel spreadsheet?

17   A.   Yeah.  We actually use a worksheet that just -- it's just

18   one way to align with each parameter.  And then once we input

19   them we send them into central office.  So, I mean, they are in

20   e-mails that we have sent them in.  So I don't put them in a    11:27AM

21   Word format.  Others might.  I don't know what other people do.

22   I keep mine specific to units, so I will do Douglas as Douglas

23   and Safford as Douglas and then when I input I do them

24   separately.

25   Q.   But you are doing it by hand.  You are writing it down on a 11:28AM

1    physical worksheet?

2    A.  Correct.

3    Q.  And so at the end of the month when you are done, you scan

4    them and e-mail them to headquarters?

5    A.  Correct.                                                      11:28AM

6    Q.  Do you keep a copy of the scans, or would a record be in

7    your sent folder of your e-mail?

8    A.  I would imagine in my sent e-mails.

9    Q.  Okay.  But do you save them to the computer server or

10   anywhere else?                                                    11:28AM

11   A.  I do not.

12   Q.  Now, when you are entering information into the CGAR after

13   you have done the worksheets, do you only list the

14   non-compliant files by prisoner number?

15   A.  Yeah.                                                         11:29AM

16   Q.  Okay.  Did someone tell you to do it that way?

17   A.  I believe that's the way our manual is spelled out to do

18   it.

19   Q.  Okay.  Has anybody ever told you that you should list all

20   the files, so like say you look at 10; nine are compliant, one  11:29AM

21   is non-compliant but you still need to list the numbers of the

22   prisoners for the nine compliant files?

23   A.  I actually made that my personal practice for a long time

24   that I listed both in most of my findings.  I would list the

25   nine complaint and the one non-compliant or the 10 compliant or 11:29AM

1    whatever just so it was very spelled out which I utilized for

2    my findings or whatever.  I have kind of gone away from that

3    not for any other reason than it's just our approved practice

4    that we list the non-compliant findings.

5    Q.  Do you remember when you stopped doing the longer version?          11:30AM

6    A.  Not really.  I mean, honestly, it's probably pretty

7    apparent by my CGAR.

8    Q.  So if we looked at your CGARs over time, we could see at

9    what month you stopped doing that?

10   A.  Yeah.                                                               11:30AM

11   Q.  So for those months for which you only list -- you have

12   been listing the non-compliant ones more recently.  If somebody

13   wanted to go back and check a non-compliance measure how would

14   they be able to do that, check your work?

15   A.  Look at my worksheet.                                              11:30AM

16   Q.  Because your worksheet lists all 10?

17   A.  Correct.

18   Q.  And when you -- you had mentioned that when you have done

19   the worksheet but before you enter things in you send it over

20   to the institution to eyeball just to make sure like you didn't        11:30AM

21   transpose a number or make some other sort of mistake in the

22   finding?

23   A.  Uh-huh.

24   Q.  Is that a yes?

25   A.  Yes.                                                               11:31AM

1    Q.   Okay.

2    A.   I thought you were going on with your question.  I'm sorry.

3    Q.   No problem.

4            So what do you send over?  Do you only send over the

5    findings that show potential non-compliance or do you send them    11:31AM

6    all 25 or however many measures you monitor for?

7    A.   Every -- generally every measure.

8    Q.   So also the ones that may show 95 percent compliance?

9    A.   Yes.

10   Q.   Okay.  And then generally when they get back to you if    11:31AM

11   there's any kind of corrections they might have, do they fall

12   into categories such as you switched the 8 and the 3, sort of

13   thing?  Is that one of them, transposing?

14   A.   Yeah.

15   Q.   How about where they come back and say, well, actually that    11:31AM

16   file doesn't apply.  You counted a dental appointment when it's

17   a provider question.  That's another type of response you could

18   get, right?

19   A.   Not really.  I'm pretty good about my findings.  Usually

20   before I will submit an e-mail I will double check it and make    11:32AM

21   sure it's a legitimate finding.  So usually the errors are

22   going to be transposing of my fat fingers as opposed to, you

23   know, bad data.

24   Q.   Yeah.  Or if somebody came back and said this is not

25   applicable because you were looking at the wrong date range or    11:32AM

1    something, and you look at it and you agree with them, what do

2    you do?  Do you just change the number of files reviewed for

3    that unit to be nine?

4    A.  Generally not.  The only time it would be less than 10 is

5    if there wasn't 10 available that were applicable.  So that                11:32AM

6    would be up front rather than the amended number.

7    Q.  Okay.

8    A.  Just for a quick instance, there's units on Douglas that

9    don't have 10 that might apply so there might be seven.  But it

10   wasn't seven because I pulled three out that were N/A, it was         11:33AM

11   only seven that were applicable for that.  Does that make

12   sense?

13   Q.  Yeah.  Yeah.  Because the rule is you do up to 10?

14   A.  Correct, if there's 10.  But we're talking some units that

15   are very small so they may not have 10 for that month.              11:33AM

16   Q.  Right.  So I'm talking of a situation where there's more

17   than 10, like the HNR performance measure?

18   A.  Right.

19   Q.  Did nurses respond.  You review that performance measure,

20   right?                                                                11:33AM

21   A.  Correct.

22   Q.  And so there will be, you know, say like 50 or something at

23   one of the units.  They come back and say, you know what, one

24   of the 10 you reviewed was actually for September, and you are

25   looking at October and you are like gee, you are right.  Would        11:33AM

1   you keep the number at nine, or would you go pull a 10th file?

2   A.  I can't think of an instance where that's happened.  So if

3   I added -- I mean, I would -- if I pulled one out I would

4   probably add another to the random number.  But I can't think

5   that that's happened, so I guess I can't speak to how I would          11:34AM

6   actually do it until it came up.

7   Q.  Okay.  And are you informed of court orders that have been

8   issued in this case about changes in how performance measures

9   are to be monitored and the methodology that you should be

10  using?                                                                 11:34AM

11  A.  Yes.

12  Q.  What form do these instructions and updates take?

13  A.  We have a monitor manual that tends to coincide with

14  whatever changes have come about as well as, obviously, we get

15  e-mails with relation to changes.                                      11:35AM

16  Q.  Okay.  Do you get any sort of trainings or seminars?

17  A.  I don't believe that the methodology has changed from the

18  onset to where we have had to retrain anybody on exactly how we

19  do it.  The biggest changes have been our source documents.

20  Q.  Right.  And if you were told that in light of the changes         11:35AM

21  in the source documents you need to go back and recalculate

22  performance measures, say, from like last April, would you be

23  able to do that?

24  A.  I'm not sure I understand the question.  If you are asking

25  me can I do something from -- I don't know what happened last         11:35AM

1   April, so I don't know that I could do anything with last April

2   but --

3   Q.  Well, you said like you have your worksheets that you have.

4   So, you know, could you go back and basically redo what you did

5   but with the different newer methodology using those same 10                 11:36AM

6   files?

7   A.  I mean, if the methodology that I utilized in April was

8   what we were using in April, then I would think it would be

9   applicable for that specific finding that was from April.  So I

10  don't know why I would redo it.                                              11:36AM

11  Q.  But what if you were told that you needed to go back and do

12  it the new way?

13  A.  I'm sure I could do it.

14  Q.  Would it take a lot of time?

15  A.  I mean, I just have to pull my worksheets up and start.                  11:36AM

16  Q.  Okay.  And in those times when you have sent the kind of

17  informal results to the facility before you put it in the CGAR,

18  you talked about times when they came back and said, you know,

19  this is actually compliant when you marked it as non-compliant,

20  Mr. Evans.  Have you had them come back and say, Mr. Evans, we                11:37AM

21  noticed you marked a file as compliant but actually we realized

22  that it's non-compliant?

23  A.  Not that I recall.

24  Q.  There's a stack of CGARs in front of you, and I think the

25  Douglas one is on top.                                                       11:37AM

1    A.   Uh-huh.

2    Q.   So if you go towards the end, the page number at the bottom

3    ends in 34.  It's the Access to Care section of the report.

4    A.   34?

5           MR. BOJANOWSKI:  I don't think I have that one.        11:38AM

6           THE COURT:  Maybe you can show him.

7    BY MS. KENDRICK:

8    Q.   There's page numbers printed on the bottom right of the

9    paper.

10          THE COURT:  Starts with ADC.                            11:39AM

11          THE WITNESS:  I gotcha.  I was looking for 34.

12   BY MS. KENDRICK:

13   Q.   So this is the December CGAR, and I just want to kind of

14   ask you something about your practice with these entries.

15   Because they look a little different than what we see from     11:39AM

16   other monitors.

17          It looks like you make multiple entries at different

18   times.  Can you explain how you enter the data that's in your

19   handwritten workshop into the CGAR software?

20   A.   Specific to what?                                         11:39AM

21   Q.   Well, the fact that you have multiple entries on the same

22   day but like at different times, and most of the other entries

23   we see for people, it's just one date, one time, and it has all

24   the information for the entire institution.

25   A.   I think probably the difference in the time frame is       11:40AM

1    sometimes people will make Word documents and transpose the

2    whole Word document in there, or sometimes people will just

3    enter it directly into the CGAR instead of transposing it.

4    Generally I will type it directly in there and save the CGAR

5    page as my Word document.  So does that answer your question?    11:40AM

6    Q.  So you enter the information for, let's say, Eggers and

7    then it saves it and then, you know, 14 minutes later you put

8    in an entry for another?

9    A.  What question are you looking at specifically?

10   Q.  36.  The top one.                                           11:40AM

11   A.  Okay.  So we're still on the wrong page.

12   Q.  Access to Care?

13   A.  You said -- okay.  Number 1?

14   Q.  Yeah.  Performance Measure Number 36.

15   A.  Okay.                                                        11:41AM

16   Q.  So see how you have like entries, multiple entries over

17   about an hour's period of time?

18   A.  Yeah.

19   Q.  So is it that you enter one unit and then save it and then

20   enter a second unit and save it?  I just don't understand why   11:41AM

21   each unit is with a different date and time stamp.

22   A.  Because each unit is entered individually.  So I have a set

23   of worksheets for Eggers, Papago, Mohave, and then I enter

24   Mohave and then I submit it.  Then I enter Papago and I submit

25   it.  I enter Gila and then I submit it.  And then when they are  11:41AM

1    all four entered then I gather the total and do the complex

2    total, score it, and submit it.

3    Q.  Okay.  And then at the bottom of that entry, it says 100

4    percent, comments, Papago dash.  Does that mean Papago wasn't

5    reviewed or why is it listed last?                                  11:42AM

6    A.  Are you asking why is there a dash after Papago?

7    Q.  Right.  So if you look further up, the way you have written

8    it, like where it says comments, Eggers, and then it has a

9    prisoner number and date on HNR?

10   A.  Uh-huh.                                                         11:42AM

11   Q.  Does that entry apply to Eggers Unit or does it apply to

12   Gila Unit?

13   A.  So I guess easiest thing for me to do, since I'm looking at

14   it right here, is to start with where it says review percent

15   compliance 90, comments Eggers.  So one out of the 10 of Eggers   11:43AM

16   306785, the 12/22 HNR was non-legible.  So that was specific to

17   Eggers.  And some of this is automatically entered in the CGAR

18   when you go, like when you enter it.  So that was specific to

19   Eggers, and then the next one we go down, we go Gila, 10 out of

20   10.                                                                 11:43AM

21          So at the very bottom, I'm honest with you, I don't

22   know what the Papago and the hyphen is about.  I don't have a

23   clue.

24   Q.  And if you go down, Performance Measure 39 is another one

25   that you review.  And that's referrals by the nurse to the         11:44AM

─── March 21, 2017 - Status Hearing - Evans - Cross ───

1    provider within 14 days.

2    A.  Yeah.

3    Q.  Can you explain in your own words the difference between

4    this performance measure and the one on the next page, Number

5    42?                                                          11:44AM

6    A.  It's very specific.

7    Q.  Are they the same thing?

8    A.  No.  So if you go to Performance Measure 42, if you were to

9    look at your protocols for your source documents it would be

10   the provider line, okay.  So our follow-up sick call encounter  11:45AM

11   is occurring with the time specified by the medical provider.

12   So this is specific to the provider's line.  So you would use

13   your provider's line.  And say the inmate was seen on, you

14   know, March 5th and the provider scheduled a follow-up for

15   March 8th you would look at March 8th and see if that follow-up  11:45AM

16   occurred.

17        One of the problems with Performance Measure 42 is

18   often times the providers don't spell out a specific, you know,

19   follow up May 8th, it's follow up PRN or follow up with

20   additional signs and symptoms.  So it's very difficult.  And    11:45AM

21   I'm guessing you are attributing the low number on that as why

22   that is such a low number, it's very hard to go through 800

23   charts and find where a provider actually referred that inmate

24   for a specific follow-up.

25   Q.  Okay.  So I'm going to break this down a little bit.  So on  11:46AM

1    Performance Measure 39 where you are looking at the referrals

2    by the nurse to the provider, you said that your source is the

3    provider line?

4    A.  No.  You just transposed that.

5    Q.  What is your source?                                          11:46AM

6    A.  For PM 39 our source document, I believe, currently is

7    still the nurse's line for that.

8    Q.  And so you look for all the referrals and whether the nurse

9    categorized something for follow-up?

10   A.  Yes, ma'am.                                                   11:46AM

11   Q.  Routine, urgent, or emergent?

12   A.  Correct.

13   Q.  So whether something gets reviewed in urgent or emergent

14   depends on whether the nurse is entering information correctly?

15   A.  Yes.                                                          11:46AM

16   Q.  Because you don't go analyze separately and say well,

17   actually, something else says there were five emergency

18   referrals, but if only one button has been pushed saying

19   emergency you are going to look at just the one, right?

20   A.  If it's classified as a routine referral, it's a routine     11:47AM

21   referral.  If it's an emergency referral it's a completely

22   different criteria.

23   Q.  Right.

24   A.  So if it's a routine referral, which is what we're talking

25   about in that performance measure then, yeah, they have got a    11:47AM

1    lot of time to see them so the nurse generally refers the them.

2    Q.  So in the eOMIS, the nurse has to click urgent or emergent

3    and otherwise -- if she's doing a referral, or otherwise it

4    just defaults to the routine, is that correct?

5    A.  Generally, yes.  It prints out that way.  Generally the          11:47AM

6    nurses will show in their medical file referred to provider.

7    And it will come up as a routine provider referral on the list.

8    Q.  Okay.  Was it just a coincidence that you reviewed the

9    exact same number of records for Performance Measure 39 and 42,

10   23 records?  Or did you review the same records?                     11:48AM

11   A.  It would have to be a coincidence.  I don't know how that

12   happened.

13   Q.  And you said for Performance Measure 42 you just go through

14   the provider line to look for where the provider had written

15   for follow-up?                                                       11:48AM

16   A.  Correct.

17   Q.  And is that a list that you are given or you pull the

18   individual records of all the people that were seen that month?

19   A.  That's actually a fluid process, and it's changing with

20   additional lists that the contractor's providing us.                11:48AM

21   Originally, we would review -- I mean, we would look through

22   all of the provider visits in anticipation of a scheduled

23   follow-up.  So, you know, at the bottom of the visit it would

24   say follow-up whenever.  But that's becoming more prevalent

25   with provider follow-up lists.  And it's getting better and         11:49AM

1   easier because it was hard.  It was very time consuming to try

2   and track those.  So it's evolving into an easier system.

3   Q.  You said there was a glitch.  What was the glitch?

4   A.  I didn't say anything about a glitch.

5   Q.  I'm sorry.  I guess I misheard you.                          11:49AM

6        So are you now getting a list that lists all provider

7   referrals so you don't have to manually check the medical

8   records?

9   A.  Yeah.  I haven't done a CGAR since December, so I'm not

10  sure exactly my next list, exactly what we'll get.  But I know  11:49AM

11  it's fluid.  So like I told you, I just came back to work.

12  So --

13  Q.  Okay.  So --

14  A.  I'm listening.

15  Q.  If you look at the document that's in front of you to your   11:50AM

16  left.

17  A.  Uh-huh.

18  Q.  It says Evans, W. on it?

19  A.  Uh-huh.

20  Q.  It's the November CGAR.                                      11:50AM

21  A.  Uh-huh.

22  Q.  And on Performance Measure 39, about eight lines down, you

23  note that you had made an error and that Mohave data that you

24  had previously entered in here was for Performance Measure 42?

25  A.  Uh-huh.                                                      11:50AM

March 21, 2017 - Status Hearing - Evans - Cross

1   Q.  So when things like that happen when you realize you have

2   put in the wrong data in the wrong field, you have to just put

3   in a new entry that says error or mistake made?

4   A.  Yeah.  Unfortunately, once you submit it there's no way to

5   retract it.  So the easiest way to do it is look at notation of          11:51AM

6   an error.

7   Q.  So you don't have the ability to go open the old Mohave

8   entry and delete it or rewrite it.  That's kind of further

9   down.

10  A.  No.          11:51AM

11  Q.  Okay.  If you could just turn that page and look at

12  Performance Measure 44, it's whether inmates returning from

13  hospital have their recommendations reviewed and acted upon.

14        And you reviewed it, and it says four out of seven.

15  And I have a couple questions.  First of all, did you see or          11:51AM

16  were you given the CAP for this performance measure finding?

17  A.  No.

18  Q.  Okay.  Do you have any idea why there was this problem that

19  month with that performance measure, what was going on, why

20  that provider wasn't reviewing and acting upon the          11:52AM

21  instructions?

22  A.  I don't know.

23  Q.  Just as somebody who is at that prison a lot, did you have

24  your own ideas of what the underlying cause might be?

25  A.  No.          11:52AM

1   Q.  Is that part of your job to identify the underlying causes

2   of non-compliance that you encounter and document?

3   A.  No.

4   Q.  So since this was four out of seven, or 57 percent, I'm

5   guessing that you sent this over to the people at the            11:52AM

6   institution so they could check it to make sure you didn't make

7   any mistakes?

8   A.  Correct.

9   Q.  Did they come back and tell you that actually, according to

10  your notes, it shouldn't be four out of seven but it should be   11:52AM

11  three out of seven?

12  A.  Not that I recall.

13  Q.  Okay.  So you marked -- when you did the calculation you

14  marked as compliant a file that was actually non-compliant?

15          MR. BOJANOWSKI:  Objection.                               11:53AM

16          THE WITNESS:  I might have made a mistake.

17          MR. BOJANOWSKI:  He doesn't recall.

18  BY MS. KENDRICK:

19  Q.  Do you monitor the performance measure about medications

20  being transferred in with people when they come into the        11:53AM

21  institution?

22  A.  I do.

23  Q.  How do you monitor it?

24  A.  I review the transfer log of inmate transfers to the

25  facility.  Generally, like at Douglas, it's only the two         11:53AM

1  facilities, the two yards that actually transfer inmates in

2  and I review their intake data to assure that there's something

3  that was said in there about medications if they, in fact, have

4  medications, that there's something that says the inmate had

5  his medications.  They were verified somehow, either they saw          11:54AM

6  them, or -- but it has to be written in there somewhere that

7  they saw the medications.

8  Q.  So the source is from custody staff originally, how you get

9  the list of the names of people who came in?

10  A.  Correct.  We have a movement sheet.                                11:54AM

11  Q.  Okay.  And is that movement sheet randomized, or is it just

12  listed by the day they come into the institution?

13  A.  In my particular unit, it's not randomized because very

14  frequently we won't have 10 transfers with medications for the

15  whole month.  So Safford very rarely has 10 transfers.                 11:54AM

16  Douglas, since we have two, sometimes it may be.  But to make

17  sure I can obtain 10 it generally won't be randomized because

18  it might be nine.  So if it has to be randomized then we'll

19  randomize it.  But generally I'm lucky to have 10 for both

20  units.  So I use what I get.                                           11:55AM

21  Q.  So how would you randomize it if it was more than 10 at

22  Douglas?

23  A.  I don't know that it's come up enough to know.

24  Q.  Who would you ask to help you with it?

25  A.  I would probably ask central office.  But I don't believe          11:55AM

1    that it's come up enough.  I think most months I don't have 10

2    instead of having 14.

3    Q.  There's also in the stack of CGARs, there's one for

4    Safford.

5    A.  This one?                                                      11:55AM

6    Q.  Yeah.  They are listed in alphabetical order by prison.  So

7    if you can grab the Safford one.  And then the little number

8    that's in the bottom on the right that starts with ADCM, you

9    want to look for the page that ends in 874, towards the end.

10   A.  Okay.  I have it.                                              11:56AM

11   Q.  Okay.  So Performance Measure 35, which is the transfer

12   one.

13   A.  Correct.

14   Q.  It's at the bottom of the page.  And you have an entry

15   that's about seven lines down.  It says "non-contact nurse       11:56AM

16   transfer receiving by RN," and the name of that nurse.

17         What does that mean?

18   A.  Non-contact nurse transfer.  When I reviewed the intake of

19   that inmate, rather than an intake being done by the nurse, it

20   was listed as a no contact, so I documented that it was a no     11:57AM

21   contact entry, which meant no mention had been made of the

22   inmate's omeprazole.

23   Q.  Right.  Is that because if they haven't seen the nurse you

24   can't be sure that they actually got their medications?

25   A.  Correct.  It's unsubstantiated to me the inmate had his      11:57AM

1    omeprazole.

2    Q.  Okay.  Have you heard about the formal rebuttal process

3    that happens after the CGAR has been completed?

4    A.  No.

5    Q.  Where Corizon can go to headquarters to Kathy and dispute          11:58AM

6    findings that the monitors have made?

7    A.  No, ma'am.

8    Q.  Okay.  So I'm going to show you a document.

9    A.  Am I done with these?  Okay.  My stack is getting big.

10   Starting to look like my desk.                                        11:58AM

11          MR. BOJANOWSKI:  What are you showing him, Corene?

12          MS. KENDRICK:  It's the rebuttal document for

13   November.  And it's in front of you.

14   BY MS. KENDRICK:

15   Q.  And on this chart, do you see that the second entry says          11:59AM

16   Douglas, and it has a tracker number?

17   A.  Yes, ma'am.

18   Q.  For Performance Measure 10 given to ADC on November 16th

19   and returned to Corizon on November 18th?

20   A.  Yes.  I see that.                                                  11:59AM

21   Q.  Okay.  So if you turn two pages you will get to the actual

22   rebuttal, has the tracker number on it.  Do you see it?  Next

23   page.

24   A.  Okay.

25   Q.  Performance Measure 10.                                           11:59AM

1   A.  Okay.

2   Q.  Okay.  And it says that the date of the finding was October

3   31st.  So this would be regarding an audit in September,

4   correct?

5   A.  Yeah.  I'm honest with you, like, I guess.  I don't have          12:00PM

6   anything to do with rebuttals, so I'm not sure exactly what you

7   are asking me about them.

8   Q.  Well, they are asking about a finding that was made at

9   Douglas for Performance Measure 10 that was entered into the

10  computer system on October 31st.                                       12:00PM

11  A.  Uh-huh.

12  Q.  So if you are entering something into the computer system

13  on October 31st, that would actually be for a September audit,

14  correct?

15  A.  Well, it depends.  If it's an HNR that was submitted 10-31        12:00PM

16  which is October, and the inmate was seen in November, then it

17  would be for November.  I mean, I'm not saying that this was

18  for an HNR, but --

19  Q.  Okay.

20  A.  Hold on a second.  Let me read it and I will tell you.          12:01PM

21          Yeah.  I don't know.

22  Q.  Okay.  But do you see that on the next page, at the top, it

23  says was 36/40, will make score 35 out of 39?

24  A.  Yes.  I see that.

25  Q.  Okay.  So in that packet that had your name written on it         12:01PM

1    just a little while ago.

2    A.  Yeah.

3    Q.  If you flip to the end there's a document from September at

4    Douglas.  Not that one.

5    A.  You are overwhelming me here.                          12:01PM

6    Q.  I'm sorry.  It's Bates Number 701379.

7           And for Performance Measure 10, it's entered in that

8    you put the information in on October 31st.

9    A.  So you want me on 79?

10   Q.  Yes.                                                   12:02PM

11   A.  You have me on 39.

12   Q.  I'm sorry.

13   A.  Okay.  Performance Measure 10.

14   Q.  10-31.  And it says that the score is 35 over 39.

15   A.  Yes.                                                   12:03PM

16   Q.  Were you asked to change the score?

17   A.  Not that I recall.

18   Q.  Do you know who might have logged in as you and changed the

19   score in your name?

20   A.  No.                                                    12:03PM

21   Q.  Okay.  So you said you monitor the performance measure

22   about diets?

23   A.  Correct.

24   Q.  And that's about whether prisoners are provided their

25   diets?                                                     12:03PM

_March 21, 2017 - Status Hearing - Evans - Cross_

1    A.  One of the questions is, yes.

2    Q.  And do you review all prisoners who have diets for that

3    performance measure?

4    A.  It's diets that were issued that month, specific to the

5    monitored month.                                                    12:03PM

6    Q.  You only look at new diets?

7    A.  Correct.

8    Q.  Okay.  Thank you.  That's it.

9            THE COURT:  All right.  Any redirect?

10           MR. BOJANOWSKI:  No redirect, Your Honor.                    12:04PM

11           THE COURT:  Thank you, sir.  Appreciate your time

12   today.  Have a safe drive back.

13           THE WITNESS:  Thank you.  I'm out?

14           THE COURT:  You're out.

15           THE WITNESS:  What do I do with all these papers?           12:04PM

16           THE COURT:  You leave them there.

17           THE WITNESS:  Sweet.

18           THE COURT:  We don't make you clean up after yourself.

19           THE WITNESS:  Right on.

20           THE COURT:  So we'll come back at 1:15.  Does that          12:04PM

21   make sense for everybody?

22           Thank you.

23           (Recess from 12:04 p.m. until 1:16 p.m.)

24           THE COURT:  Few preliminary things first.  Over the

25   noon hour, I looked through the defendant's notebook because I     01:17PM

1    have been a little bit feeling that I haven't understood

2    exactly the nature of the randomization that surely, if you

3    look at Exhibit C, for example, within the units, it appears

4    that there are these random numbers assigned but it's not clear

5    whether these -- this Exhibit C then is randomized because the          01:17PM

6    random numbers on the left column, which appear to be random,

7    you cannot tell -- well, I guess how to put it.  They are not

8    in -- these randomized numbers are not in an order.  So you

9    would think that if you are randomizing and assigning numbers

10   you would respect the randomization by putting them in order.          01:18PM

11   Do you understand what I'm saying, Mr. Bojanowski?

12          MR. BOJANOWSKI:  I'm afraid I don't.  I would assume a

13   random list would not be in order.

14          THE COURT:  Here.  Take a look at C in your big black

15   book.                                                                    01:18PM

16          MR. BOJANOWSKI:  Okay.

17          THE COURT:  And so what it has, it's upper left column

18   HNR log and then it's 1 of 31.  An then it has this random

19   column on the far left and then QTY, which is a separate

20   question.  I wonder what does QTY mean.  But if you are                  01:18PM

21   generating random numbers that are the product of what I have

22   come to understand is your Excel computer program that is

23   generating these random numbers to link to names, once you have

24   done that with the random numbers then you would think that the

25   random numbers would go in some kind of order because the               01:19PM

1    numbers are not linked to anything other than already a

2    randomization process.  The plaintiffs are nodding their heads

3    as if they get what I'm saying but I have apparently now said

4    the same thing twice and not successfully communicated.

5         Mr. Fathi, do you have an aid here?                      01:19PM

6         MR. FATHI:  You are exactly right, Your Honor.  The

7    whole point of assigning a random number to each file is then

8    that you then put them in numerical order using those random

9    numbers.  That's how you create a random list.  If you don't do

10   the second step you have accomplished nothing and it's not --   01:19PM

11   there's no randomization.  Merely assigning the number

12   accomplishes nothing in terms of randomization.

13        THE COURT:  And --

14        MR. BOJANOWSKI:  Your Honor, I think Dr. Taylor may be

15   better able to describe this.                                   01:20PM

16        THE COURT:  Okay.  All right.  I noticed that one of

17   the exhibits does seem to match up with Dr. Taylor's

18   performance measures.  But the thing that caused me to not wait

19   until then is because Dr. Taylor's list doesn't look like the

20   other lists.  Dr. Taylor's list is --                          01:20PM

21        MR. BOJANOWSKI:  E.

22        THE COURT:  Yeah.  Hers has the unit in the left

23   column then the -- well, as you can see, I don't need to

24   describe it to you, it looks completely different than C.  So

25   that's why I raised it now.  And maybe also at some point you   01:21PM

```
 1   can tell me what the QTY means on Exhibit C.  And actually, if

 2   you look at Exhibit D, it does look like it's been sorted in

 3   the second step.  The numbers seem to be in some kind of order.

 4           MR. BOJANOWSKI:  Did you say D?

 5           THE COURT:  D.  Yeah.  But in any event, that's one          01:21PM

 6   issue that I raise that maybe we can work through and get some

 7   maybe with Dr. Taylor.

 8           The second issue is, I have noticed -- and I'm not

 9   saying that it's been purposeful, but it's just a natural

10   reaction, perhaps, but there's been some non-verbal               01:22PM

11   communication from the people behind the bench visible to the

12   witness.  If you could advise the people on your side not to do

13   that, to remain placid if we can and not to shake heads or

14   mouth things, or we'll just ask the plaintiffs to get in the

15   line of sight.                                                     01:22PM

16           MR. BOJANOWSKI:  I'm sure we'll remain stoic.

17           THE COURT:  All right.  You may continue.

18           MR. BOJANOWSKI:  We'll call Jen Fontaine.

19           THE COURT:  Would you please step forward to the well

20   of the court --                                                    01:22PM

21           MR. BOJANOWSKI:  I'm sorry.  Wrong person.  Sarah

22   Cartwright.

23           THE COURT:  Thank you, Ms. Cartwright.  If you would

24   please step forward to the well of the courtroom so you may

25   have the oath administered.                                        01:23PM
```

—— March 21, 2017 - Status Hearing ——

1          (The witness was sworn.)

2          THE MAGISTRATE CLERK:  Thank you.  Please have a seat

3   at the witness stand.

4                    SARAH CARTWRIGHT,

5   a witness herein, having been first duly sworn by the clerk to

6   speak the truth and nothing but the truth, was examined and

7   testified as follows:

8                    DIRECT EXAMINATION

9   BY MR. BOJANOWSKI:

10  Q.  Please state your name for the record.                   01:23PM

11  A.  Sarah Cartwright.

12  Q.  Ms. Cartwright, what is your business address?

13  A.  4374 East Butte Avenue in Florence, Arizona.

14          THE COURT:  You can move the whole thing.  The

15  platform will move closer to your mouth.  Thank you.         01:24PM

16  BY MR. BOJANOWSKI:

17  Q.  Is that the address of the Eyman complex?

18  A.  Yes, it is.

19  Q.  And is that where you are a medical monitor?

20  A.  Yes.                                                     01:24PM

21  Q.  All right.  So you are employed with who?

22  A.  The State of Arizona Department of Corrections.

23  Q.  And how long have you been employed with the State of

24  Arizona?

25  A.  I started July 2014.                                     01:24PM

1    Q.  I'm sorry?

2    A.  July 2014.

3    Q.  All right.  And what are your duties as a medical monitor?

4    A.  My duties are to audit the previous month's data.  We are

5    given certain performance measures that we audit on a monthly          01:24PM

6    basis.  So that is my primary duty.

7    Q.  Could you describe for us your educational background?

8    A.  I am a registered nurse.  I'm currently working on my BSN

9    through Chamberlain.

10   Q.  And you are licensed?                                             01:25PM

11   A.  Yes.

12   Q.  In what states?

13   A.  Arizona.

14   Q.  Are you familiar with what we call the monitoring guide?

15   A.  Yes.                                                              01:25PM

16   Q.  What is it?

17   A.  Our monitoring guide is just that, our guide that we use to

18   guide us on answering these questions, performance measures.

19   Q.  So when you go to monitor do you use the guide as a

20   resource to give you the steps and source documents that you         01:25PM

21   follow to come up with a finding of compliance or

22   non-compliance?

23   A.  Yes.

24   Q.  And could you just generally describe to the Court how you

25   go about doing your job of monitoring?                               01:26PM

1   A.  Well, I have a set of performance measures as a compliance

2   monitor that I monitor or audit every single month, and each

3   performance measure has a source document that is given to us

4   that we, or I, utilize to complete my audit.  So the

5   performance measure will have a source document.  From that          01:26PM

6   source document, we, or I, look at my monitoring guide in

7   regards to our methodology that is required to answer that

8   performance measure that I'm working on.

9           So if the methodology says use the first 10 inmates or

10  charts that apply to that performance measure then that's what      01:26PM

11  I use.

12  Q.  Do you engage in the randomization of any source documents

13  at all?

14  A.  No.

15  Q.  Do you have any idea how that is done?                           01:26PM

16  A.  No.

17  Q.  Do you engage in any kind of CAP process or rebuttal

18  process?

19  A.  No.

20  Q.  Then you upload your findings into the CGAR report, is that     01:27PM

21  right?

22  A.  That's correct.

23  Q.  And once you upload it into the CGAR report are you able to

24  change it at all?

25  A.  No.                                                              01:27PM

1   Q.  Do you use any kind of special codes or abbreviations in

2   your CGAR report?

3   A.  Well, performance measure we use PM.  Is that what you are

4   referring to?  And for inmate, I will use IM.  Those are

5   examples.  I can't remember off the top of my head anything          01:27PM

6   else.

7   Q.  Well, I don't see any specific codes like a Y or an N/A or

8   a 0 or a 1 or anything like that in your measures.

9   A.  Sometimes I will use N/A.

10  Q.  Why do you use N/A?                                              01:28PM

11  A.  Not applicable.  So, for instance, there are some of my

12  performance measures that will ask questions related to intake.

13  So if Eyman complex did not receive a death row, a new death

14  row inmate for that specific audit month then I will use N/A,

15  which is not applicable.                                            01:28PM

16  Q.  So if I understand your testimony correctly you are saying

17  the only intakes that occur at Eyman are the death row inmates?

18  A.  That would apply to those specific performance measures.

19  Q.  That you measure?

20  A.  Yes, that I handle.                                             01:28PM

21  Q.  So if no one who is going to be assigned to death row

22  arrives during the audit month that you are looking at, you

23  would have no files to review and that's why you put an N/A in.

24  Right?

25  A.  Right.                                                          01:28PM

**March 21, 2017 - Status Hearing - Cartwright - Direct**

 1    Q.  All right.

 2         There are other monitors that perform monitoring at

 3    Eyman as well besides yourself?

 4    A.  As a compliance monitor, I am the only one.  There is one

 5    more auditor.  She is a clinical -- she does a clinical part of     01:29PM

 6    monitoring.

 7         MR. BOJANOWSKI:  We have nothing further, Your Honor.

 8         THE COURT:  Thank you.  Plaintiffs, please.

 9                         CROSS-EXAMINATION

10    BY MS. KENDRICK:                                                   01:29PM

11    Q.  How are you this morning, or this afternoon, I guess.

12    Sorry.

13    A.  Good.

14    Q.  Could you explain the difference between a clinical and a

15    compliance monitor?                                                01:30PM

16    A.  Well, a compliance monitor specifically answers the

17    questions that deal with compliance, and clinical will

18    answer -- or is responsible to answer more questions that deal

19    with, for instance, possibly medications and chronic care.

20    Those are some examples.                                          01:30PM

21    Q.  So would the compliance ones be more focused on kind of

22    discrete things that a lay person could determine like time

23    frames, things like that, versus making a clinical judgment?

24    A.  Well, not necessarily.

25         THE COURT:  Why are there two categories, clinical and       01:30PM

1    the one that you do?  Why -- I don't understand that.

2              THE WITNESS:  Honestly, that would be a question for

3    my superiors because as I -- when I was employed when I first

4    started, I was told there are two, and I'm not sure the reason

5    why.                                                              01:31PM

6              THE COURT:  And there's one other and this other

7    person is a clinical person?

8              THE WITNESS:  She's a clinical -- I believe her title

9    is clinical monitor.

10             THE COURT:  And what does -- do you know what she      01:31PM

11   monitors?

12             THE WITNESS:  Not specifically.

13             THE COURT:  But generally?

14             THE WITNESS:  Generally, I mean, we have a certain

15   amount of performance measures, but to tell you the truth, I     01:31PM

16   could not spit out which one she does honestly.  I would have

17   to look at them all and then tell you I do this one, I do this

18   one.  She possibly does this one.

19             THE COURT:  So she does performance measures as well?

20             THE WITNESS:  Yes.                                      01:31PM

21             THE COURT:  I see.  But we just don't know why -- I

22   will even ask you to guess as to why there's somebody who is a

23   clinical monitor as opposed to you.  I don't understand, I

24   guess.

25             THE WITNESS:  I honestly do not know.                   01:31PM

March 21, 2017 - Status Hearing - Cartwright - Cross

1           THE COURT:  You don't have a guess?

2           THE WITNESS:  I do not know why it's broken up the way

3   it is.

4   By MS. KENDRICK:

5   Q.  But you do have clinical training, right?                    01:32PM

6   A.  I'm a registered nurse.

7           THE COURT:  That's why I'm having trouble

8   understanding, because it sounds to me like -- do you know what

9   her training is?

10          THE WITNESS:  She's also a registered nurse.             01:32PM

11          THE COURT:  Right.  Right.  Okay.  Do you work in the

12  same place?

13          THE WITNESS:  We both work at Eyman complex.

14          THE COURT:  But in the same office?

15          THE WITNESS:  No.                                        01:32PM

16          THE COURT:  So you don't know what she does on an

17  average day as opposed to what you do?

18          THE WITNESS:  I do not.  I would not be able to speak

19  to what she does.

20          THE COURT:  Okay.  Thank you.                            01:32PM

21  By MS. KENDRICK:

22  Q.  Did you work for Wexford or Corizon before the Department?

23  A.  I worked for Wexford as a PRN nurse for possibly, I

24  believe, it was only about a month or so.  I had recently been

25  hired before they lost contract or whatever happened.  The      01:32PM

UNITED STATES DISTRICT COURT

1    contract was then given to Corizon.

2    Q.  Did you stay and work for Corizon?

3    A.  No.

4    Q.  You said a para nurse?  What's the word?

5    A.  PRN nurse.                                           01:32PM

6           THE COURT:  As needed.

7           MS. KENDRICK:  Thank you, Your Honor.

8           THE WITNESS:  Yes.

9    BY MS. KENDRICK:

10   Q.  So you have been assigned to Eyman the whole time you have   01:33PM

11   been a monitor?

12   A.  Yes.

13   Q.  And Eyman has five units, correct?

14   A.  Correct.

15   Q.  And so the general rule is that you select 10 applicable   01:33PM

16   files from each unit each month to look at the performance

17   measure compliance?

18   A.  Yes.

19   Q.  And if you -- have you ever reviewed 10 files, say, for

20   Meadows unit, they are all applicable, you did your score and   01:33PM

21   then decided to do -- pull more files to review them, or do you

22   just stop and go to the next performance measure?

23   A.  If I'm able to get the first 10 that applied then that's

24   what I review.

25   Q.  You stop and move on?                                01:33PM

1    A.  Yes.

2    Q.  Okay.  And when you applied for this job, was there a

3    written job description?

4    A.  Yes, there was.

5    Q.  I'm not going to ask you to recite it from memory but          01:33PM

6    roughly what were they looking for that made you think you fit

7    the bill?

8    A.  Oh, gosh.  It's been a while since I have read it.  I had

9    to have experience in corrections, some sort of experience in

10   the correctional setting.  If I recall correctly, it was --      01:34PM

11   gosh, I don't know.

12   Q.  Do you have any training in statistics or methodology?

13   A.  I have taken statistics classes.  It was a requirement for

14   my license.

15   Q.  In college?                                                   01:34PM

16   A.  Yes.

17   Q.  Are you aware that this court has found the Eyman prison

18   non-compliant on 13 different performance measures?

19   A.  Yes.

20   Q.  And have you been involved in working with the Corizon       01:34PM

21   staff at the institution in implementing and developing plans

22   to come into compliance with those 13 performance measures?

23   A.  I don't implement processes or plans.  I monitor them.

24   Q.  Have you ever been asked for your opinion about what you

25   think the underlying causes are of the non-compliance?           01:35PM

1    A.  I have explained to them how I came up with my findings.

2    Q.  So you explained your work, how you got to there?

3    A.  Yes.

4    Q.  Have you ever thought about what factors might be

5    contributing to these findings of non-compliance?                    01:35PM

6    A.  I don't feel I have enough data to be able to come up with

7    any type of conclusions in regards to the changes they may be

8    required to make to come into compliance.

9    Q.  But I'm just asking as a person who works at the prison and

10   interacts with the health care staff on a daily basis, and        01:35PM

11   month after month you have been the one documenting this

12   sustained non-compliance, if you, as an intelligent person

13   looking at this information, have drawn any personal

14   observations or conclusions about the cause of the

15   non-compliance?                                                      01:36PM

16            MR. BOJANOWSKI:  Objection.

17            THE COURT:  Overruled.

18            THE WITNESS:  I get most of my data from the

19   electronic medical record.  I am not at every single unit to be

20   able to observe exactly what the deficiency is.  That would be    01:36PM

21   impossible for me to do.  I don't have enough data to be able

22   to determine what the non-compliance is.  I can tell you based

23   off of my findings what was non-compliant when I looked into

24   the electronic medical record.

25   BY MS. KENDRICK:                                                    01:36PM

1  Q.  Right.  But you have no opinion about what might have

2  caused the non-compliance?

3  A.  No.

4       THE COURT:  I guess the sort of analogy is, you asked

5  somebody to take a look at these reports of fires that have          01:36PM

6  been happening in the city, and that's your job.  You are

7  supposed to monitor the reports of fires.  So you are looking

8  and you are seeing that, oh, my goodness, there's another fire.

9  There's another fire.  There's another fire.  It's not as if

10 you are seeing a sign that says there's another fire, you are     01:37PM

11 actually getting a report that says where and how the fire

12 happened.

13      That's sort of an analogy for you.  You are looking --

14 you have a performance measure.  You look at the medical

15 record.  You can see that there was a fire.  But you also can     01:37PM

16 see maybe why the fire happened.  And I guess the question the

17 lawyer is asking is when you look through that, do you ever

18 think to yourself, oh, I think I know why this is happening.

19 Do you ever think that?

20      THE WITNESS:  Well, when I look at my source document      01:37PM

21 and I'm given inmates that I have to look at, it's more

22 individualized.  So, for instance, I have inmates, you know,

23 with an agency number, I look that up, that specific chart.

24 When I'm in the chart I can tell you if they meet the

25 requirement for the performance measure.  But I'm not looking    01:38PM

1    at comparing every single inmate that was seen or not seen for

2    that day.

3              THE COURT:  I will give you that.  Admittedly, you

4    don't look at every one.  But you do look at ones where you are

5    seeing there's a fire and, in fact, you have been reporting        01:38PM

6    that the fire is happening more than is permissible.  So you

7    see that over and over again, month to month, there are more

8    fires than we're supposed to be having.  And you are looking at

9    the report of the fire and it never occurs to you in your head

10   as to, I think I see why that fire is happening.                   01:38PM

11             THE WITNESS:  I can't say definitely.  I don't have

12   enough data.  There's so many variables to be able to make that

13   determination, and I'm not in the -- my role is not -- I'm not

14   given enough information based off of my job description, I

15   guess.  My role in what I'm doing -- I guess what I'm trying to    01:38PM

16   say is if I was possibly maybe the health service administrator

17   or the director of nursing for Corizon I would have more data

18   to be able to determine that.  With myself being a compliance

19   monitor, when we go into the chart it is more individualized

20   for that specific chart whether that chart meets whatever          01:39PM

21   performance measure I am looking at at that time.

22             THE COURT:  I understand what you are saying.  But I

23   guess what strikes me as kind of common sense, let's take my

24   fire example again.  You are the firefighter.  You show up at

25   the fire.  And fires have causes and you are fighting the fire     01:39PM

1  and you see something that you think is the cause of the fire.

2  Here, as you review these records, do you ever think in your

3  head, I know what the cause is here.  Do you ever think that at

4  all?

5          THE WITNESS:  I think I would need a specific example.  01:39PM

6          THE COURT:  My question is have you ever thought of

7  that?  Have you read through the 10 on any given performance

8  measure and you see there's non-compliance, have you ever

9  thought in your head, I think I know why this is happening?

10          THE WITNESS:  It's sort of hard to do that based off  01:40PM

11  of what I'm looking at.  So, for instance, if I'm looking at a

12  performance measure that requires there to be a weight taken on

13  every patient, I can't specifically say if I got five out of 10

14  compliant why those five were compliant and the other ones

15  weren't.  I can't tell you why the nurse maybe didn't take a  01:40PM

16  weight.

17          THE COURT:  Right, but you surely maybe could tell

18  from the ones, maybe, you see something in the ones that you

19  have reviewed where there wasn't a weight taken, maybe you

20  would see something that would suggest why it wasn't happening.  01:40PM

21  I guess my question is pretty simple.  When you have seen this,

22  you have never thought in your own mind, oh, I think I know why

23  that's happening?

24          THE WITNESS:  I can't say definitely why it's

25  happening.  01:40PM

1          THE COURT:  That's different.

2          THE WITNESS:  I don't have enough data.

3          THE COURT:  I know you say you can't say if I were to

4    ask you definitely.  I'm just asking you, have you ever thought

5    in your own mind, I think I know why that's happening?          01:41PM

6          THE WITNESS:  I do not know for certain, honestly.  I

7    can't.  I would be able -- I would need the information.

8          THE COURT:  Listen to my question.  As you have read

9    through this, I understand you can't say for certain.  But as

10   you have looked through these records, have you ever thought in  01:41PM

11   your own mind, just the thoughts come into your head, I think I

12   know why this is happening?  Has that ever happened?  Yes or

13   no?

14         THE WITNESS:  No.  No.

15         THE COURT:  Thank you.                                     01:41PM

16         THE WITNESS:  Okay.

17   BY MS. KENDRICK:

18   Q.  And one of the performance measures you monitor is

19   regarding grievances about health care?

20   A.  I was at one time.  Not anymore as of two months ago, I      01:41PM

21   believe.

22   Q.  Why did you stop reviewing it?

23   A.  It was assigned to a different person within the

24   Department.

25   Q.  Why was it assigned to a different person?                   01:41PM

March 21, 2017 - Status Hearing - Cartwright - Cross

1   A.   There is a grievance person now who takes care of all of

2   the grievances.

3   Q.   The document I gave you just a little while ago that says

4   Cartwright written on the top, it's for May at Eyman, and

5   Performance Measure 26 is at the top.  And you list 38 out of          01:42PM

6   38 grievances were completed within 15 days.

7          How did you monitor this?  What was your source to get

8   those 38 files?

9   A.   The grievance log.

10  Q.   And who maintains the grievance log?                              01:42PM

11  A.   Corizon maintains one and the CO IIIs at each unit, they

12  maintain one also.

13  Q.   And are you given these -- were you given these logs

14  separately?

15  A.   You mean like receiving one from the one unit CO III and         01:42PM

16  then one from Corizon?  Yes, separately.  They are not all put

17  together.

18  Q.   Two separate documents.  So would you, yourself, personally

19  like combine them into one spreadsheet or one list?

20  A.   No.                                                              01:43PM

21  Q.   Okay.  And were these sent to you randomized?

22  A.   They were sent to me electronically.  I'm not sure if they

23  were randomized before.

24  Q.   So you can't say definitively that they were randomized?

25  A.   No.                                                              01:43PM

--- March 21, 2017 - Status Hearing - Cartwright - Cross ---

1   Q.  Okay.  And then once you got them how did you select your

2   10 grievances for the month for, say, Rynning unit?

3   A.  I would first look at my methodology.  If it required that

4   month that I choose the first 10, then that's what I would do.

5   It would depend on the methodology that was given to me.                01:43PM

6   Q.  Would you start with one of the lists and then go to the

7   second one if you couldn't get up to 10?

8   A.  No.  Not necessarily.  Because the lists were -- they could

9   have been the same.  So, for instance, there was one Corizon

10  grievance log.  There was one for -- from the unit, the CO III        01:44PM

11  that would maintain.  So I would compare to make sure that,

12  first of all, they all had the same grievances, make sure that

13  one wasn't missing like one listed one and the other one

14  didn't.  So that's the first thing I would do.  And then I

15  would just start off from the grievance log that was given to         01:44PM

16  me by Corizon and work from there.

17  Q.  Okay.  So when you were looking at them, you would

18  reconcile them?

19  A.  I did not reconcile them myself.  I would just compare

20  them.  I would look at it to make sure that the material or the       01:44PM

21  data was there on both.

22  Q.  So for example, say Corizon handed you a list with 13 on

23  it.

24  A.  Uh-huh.

25  Q.  And then the CO III gave you a list that had 19 grievances        01:44PM

1    on it.  Would you take the six that weren't on the Corizon one

2    and move them over the Corizon list?

3    A.  I did not move data from one list to the other.

4    Q.  So what was the purpose of looking to see if there was

5    discrepancies between the two?                                        01:45PM

6    A.  To make sure that they were all captured within that month,

7    and if not, there was some sort of breakdown, in my opinion,

8    because -- and I don't know what the breakdown would be but I

9    would just notify Corizon or the CO III that there was a

10   discrepancy.                                                          01:45PM

11   Q.  And then you would go to the Corizon list and pick the

12   first 10?

13   A.  Yes.

14   Q.  Okay.  If you look in front of you there's a pile that says

15   CQI minutes.                                                          01:45PM

16   A.  Uh-huh.

17   Q.  It's arranged alphabetically.  So there's one from Eyman

18   for June 15th.  Do you have it?

19   A.  Yes.

20   Q.  And you see that you signed it there?                             01:45PM

21   A.  Yes.

22   Q.  So if you go to the very next page that ends in 429, on

23   Number B, grievances, it says there were 39 grievances in April

24   and 49 grievances in May.

25   A.  Yes.                                                              01:46PM

March 21, 2017 - Status Hearing - Cartwright - Cross

1   Q.  Okay.  But your CGAR finding only lists that there were 38.

2   A.  Okay.

3   Q.  Do you know what source they had for the CQI minutes that

4   they had for the 11 discrepancies?

5   A.  I'm not sure.                                                      01:46PM

6   Q.  Okay.  So there's a stack of color CGARs in front of you on

7   the right, to your right.  Eyman should be the second one down.

8   A.  I don't see Eyman here unless I missed it.

9        THE COURT:  I have Eyman.  Maybe I have two Eymans.

10  Do you think?                                                         01:47PM

11  BY MS. KENDRICK:

12  Q.  Sorry about that.

13       So I'd like you, if you see at the bottom, bottom

14  right ADCM?

15  A.  Uh-huh.                                                           01:47PM

16  Q.  You are going to want to go to the page that ends in 671.

17  A.  671?

18  Q.  Yeah.  Are you on that page, PM 40 at the top?

19  A.  Yes.

20  Q.  What source do you use to come up with the files that you          01:48PM

21  review to look at the urgent provider referrals?

22  A.  The nurse referral log.

23  Q.  And can you describe that to me what it looks like?

24  A.  It's an Excel spreadsheet that has the inmate's number,

25  their name, their unit, when they were seen by the nurse.             01:48PM

March 21, 2017 - Status Hearing - Cartwright - Cross

1   There's other information towards the right.

2   Q.   And where do you get that log from?

3   A.   From my superiors.

4   Q.   From Kathy Campbell?

5   A.   Yes.                                                          01:48PM

6   Q.   And is that list randomized?

7   A.   I don't know.

8   Q.   And what do you do when you get that list?

9   A.   Are you asking what's the first step of my audit?

10  Q.   Yeah.  Yeah.  Walk us through.                               01:49PM

11  A.   Depending on what the methodology says, then that's what I

12  follow.  So if it's the first 10 inmates that are applicable to

13  my performance measure then I use those first 10 inmates.

14  Q.   Okay.  So does that list say, like, routine, urgent, or

15  emergent so you know what type of referral it was?               01:49PM

16  A.   Yes.

17  Q.   So, for example, for the urgent ones at, say, Meadows, you

18  would look theoretically for the first 10 that say urgent,

19  right?

20  A.   Yes.                                                         01:49PM

21  Q.   In this case there was only one?

22  A.   Yes.

23  Q.   The entire month.  Okay.

24       Does three urgent referrals for a complex of 5000

25  people seem a little low for you?                                 01:50PM

1    A.   No.

2    Q.   How about four emergent referrals?

3    A.   Does it seem low?  Is that what you are asking?

4    Q.   Yeah.  Does that seem low?

5    A.   No.                                                01:50PM

6    Q.   If you can turn the page to the next page there's

7    Performance Measure 44, which is inmates returning from an ER

8    transport or inmate hospital stay, must be seen.  And you

9    reviewed a total of 25 files.

10   A.   Yes.                                               01:50PM

11   Q.   So the fact that there were 25 people that were returning

12   from transport to the hospital didn't raise a question in your

13   mind that maybe three urgent referrals was low?

14   A.   No, because some of these are off site appointments that

15   are returning.  So they could have seen a specialist and not   01:50PM

16   necessarily been an urgent or emergent reason why they were

17   seen off site.

18   Q.   Do you know how a nurse classifies a referral to a doctor

19   as urgent or emergent?

20   A.   I can't speak in general.  It would just depend on the    01:51PM

21   situation, the inmate, how the inmate presents or the patient

22   presents as to what would classify urgent or emergent referral.

23   Q.   I didn't mean what medical condition.  I meant do they push

24   a button or go down on a pull down menu that says urgent or

25   emergent in the eOMIS system?                          01:51PM

1    A.  Oh, yes, they have that option in eOMIS.

2    Q.  And if they don't choose an option it defaults to routine?

3    A.  I don't know if it defaults.

4    Q.  But they do have to affirmatively choose urgent or

5    emergent, correct?                                      01:51PM

6    A.  Yes.

7    Q.  While we're on it, I wanted to ask you about Performance

8    Measure 44.  Because it requires that the provider review and

9    act upon the report from the hospital.  How would you mark a

10   file if the provider did review it but there was no          01:52PM

11   documentation that the provider took any action?  Is that a

12   compliant file?

13   A.  If there were no discharge recommendations there would be

14   no actions to take.

15   Q.  But if there were recommendations in the discharge report?  01:52PM

16   A.  Are you asking if they did not document?  I guess I'm not

17   understanding your question.

18   Q.  Are you familiar with the concept that if something is not

19   documented it's not done?

20   A.  Yes.                                                  01:52PM

21   Q.  So if they didn't document that they took any action, based

22   on reviewing the report, would you still mark it as compliant

23   because they reviewed it?

24   A.  If there were no discharge recommendations, again, there

25   would be nothing to act upon.                            01:53PM

1   Q.  But if there was something to act upon?

2   A.  So are you asking me if there was something to act upon,

3   did they document that they acted upon it?

4   Q.  Correct.

5   A.  And would it be compliant?  Is that what you are asking me?   01:53PM

6   Q.  So let's say the person comes back from having an MRI and

7   the discharge report recommendation is follow up seven days

8   with orthopedist.  And the provider reviewed this MRI report,

9   but then -- you know, there's a stamp that says she reviewed it

10  but you can't find documentation that anything was done, would   01:53PM

11  that be considered compliant because she still reviewed it?

12  A.  When an inmate comes back from the hospital, they don't

13  necessarily have to continue any recommendations.  The provider

14  at that time can make his or her own recommendations based off

15  of the assessment that that provider has made.  It doesn't     01:54PM

16  necessarily have to be the same one that the provider made off

17  site.

18  Q.  So you would mark it as compliant?

19  A.  Again, if there was no recommendations and the provider did

20  not -- if there was a recommendation and the provider did not   01:54PM

21  think or feel that that was necessary, then it would be

22  compliant.

23  Q.  How would you -- I'm sorry.  I didn't mean to interrupt

24  you.  How would you know if what the provider was thinking or

25  feeling if he or she did not write down their thoughts or       01:54PM

1   feelings about the report?

2   A.  Well, if the nurse also documented that they reviewed these

3   discharge recommendations and no new orders were received or

4   obtained, then that provider did not want anything to continue

5   or follow through.                                              01:54PM

6           THE COURT:  Let me understand.  Somebody goes to see a

7   specialist.  Specialist says in seven days, I want this person

8   seen by an orthopedist.  The person comes back to the facility

9   and the provider at the facility decides that that specialist

10  doesn't need to be seen but doesn't document in the record that 01:55PM

11  that decision has been made.  But you are assuming that that

12  decision has been made because there's nothing in the record

13  indicating that the specialist was seen.

14          THE WITNESS:  So I guess I'm a little -- the way I

15  look at it, and I'm thinking is not the same as you guys are    01:55PM

16  describing.

17          So the way I know is, as being a nurse, if an inmate

18  or a patient has a recommendation from a specialist when that

19  patient or inmate comes back to their home or primary care

20  physician, that primary care physician doesn't necessarily have 01:55PM

21  to follow all the recommendations from the specialist.  And if

22  the provider has reviewed the discharge paperwork, for

23  instance, that provider could just sign and date and time that

24  they have reviewed that.

25          THE COURT:  How do you know that the provider just      01:56PM

─────── **March 21, 2017 - Status Hearing - Cartwright - Cross** ───────

```
 1    failed to see that recommendation and didn't take the action

 2    because he or she didn't see it as opposed to making a clinical

 3    decision that it was no longer necessary?

 4            THE WITNESS:  Well, that documentation would need to

 5    be in there.                                                    01:56PM

 6            THE COURT:  So if you see a recommendation from a

 7    specialist, using this example, to see an orthopedist in seven

 8    days, and the person is not seen by a specialist and there is

 9    no notation by the provider in the record that that

10    recommendation is rejected, then you would review that record   01:56PM

11    as non-compliant?

12            THE WITNESS:  Yes.  That's correct.

13            MS. KENDRICK:  Thank you.

14    BY MS. KENDRICK:

15    Q.  If you could look at that sheet again that had your name     01:56PM

16    written on the front of it.

17    A.  This one?

18    Q.  Yeah.  So the second page of it, it's, again, from May 2016

19    and it's Performance Measure 39.  Do you see that?

20    A.  Yes.                                                         01:57PM

21    Q.  Okay.  You see this is routine provider referrals.  And do

22    you see there that both Browning and SMU-1 had one referral

23    from a nurse line to the provider for the entire month of May?

24    A.  I do see that.

25    Q.  Does that seem low to you?                                   01:57PM
```

1   A.  Hold on a second.  Let me back up.  You said Browning and

2   which was the other one?

3   Q.  SMU, the very end of that entry.

4   A.  Yes, I see that.  I'm sorry.  What was the question?

5   Q.  Roughly how many prisoners are housed in Browning and                01:57PM

6   SMU-1?

7   A.  I know the total population for all of Eyman complex is

8   roughly 5000, 5900.

9   Q.  Okay.  So does it seem realistic to you that in the 30 days

10  of the month of May, there was only one occasion on which a             01:58PM

11  nurse in Browning and a nurse in SMU referred a patient to see

12  a provider?

13  A.  I don't have the data in front of me to determine whether

14  this is realistic or not.  I'm not sure what happened that

15  month.  I can't recall what happened that month.                       01:58PM

16  Q.  What source -- you said for the referrals here you are

17  using that referral document we talked about earlier?

18  A.  Yes.

19  Q.  So if you got that log and it's listed by unit, correct?

20  A.  Yes.                                                                01:58PM

21  Q.  It's sorted by unit.  So if you looked at that and you saw,

22  wow, there's only one name for SMU-1?

23  A.  Uh-huh.

24  Q.  Would a question mark or a bell kind of go off in your head

25  of, like, it seems like this information is incomplete?                 01:58PM

1   A.  What if the nurse did not choose the correct drop down?  I

2   don't know that.

3   Q.  But you said earlier that routine is the default.

4   A.  I did not say that earlier.  I said I wasn't certain if it

5   was a default.                                                    01:59PM

6   Q.  So you're testifying that they have to affirmatively push

7   routine?

8   A.  The nurse should choose or handwrite or free white, I

9   should say, whether the inmate is being referred routine,

10  urgently, or emergent.  If nothing is written I cannot tell you   01:59PM

11  if they were referred or not.

12  Q.  Have you ever been sent a log, whether it's for this or

13  some other performance measure, a list where you looked at it

14  and it seemed like information was missing?

15  A.  Information from the log itself?                              01:59PM

16  Q.  Yeah, like zero referrals from, you know, whatever yard?

17  A.  Which one?

18  Q.  Would you think either, A, data is missing, or B, there

19  were zero referrals at this yard?

20  A.  I would have to actually see the log itself to be able to     02:00PM

21  answer that.  I can't just guess as far as what the log looks

22  like.  I need to be able to see the log to answer that

23  question.

24  Q.  But here, did the log just list one entry for Browning and

25  one for SMU-1?                                                    02:00PM

1  A.  I don't have the log in front of me to be able to answer

2  that question.

3  Q.  Have you ever called Kathy Campbell or another supervisor

4  and said, I think I'm missing information in something you sent

5  me?                                                                    02:00PM

6  A.  There was an instance where I did not receive anything for

7  that unit and it was just a time where that log just was not

8  sent to me.  So it was the whole entire unit that I didn't

9  receive a log for, so I was missing the log for that unit.

10  Q.  So you just used that one out of one.  You didn't say       02:00PM

11  there's got to be more so I'm going to give them a one out of

12  10?

13  A.  You are asking me to answer a question I don't have nothing

14  to refer to.

15  Q.  If you got a log for -- what month is it -- for February,   02:01PM

16  and it showed there were zero referrals from Browning unit to

17  the provider, would you just say N/A and not count Browning

18  unit that month?

19  A.  If I had a log for Browning unit I would count Browning

20  unit.                                                                  02:01PM

21  Q.  No, I said if you got a log for the prison and it had a log

22  from Rynning, SMU-1 and all the other units but Browning

23  there's no entries, would you say, oh, I'm only going to review

24  40 files this month instead of 50?

25  A.  No, I would call my supervisor and ask her if for some      02:01PM

1    reason she forgot to send Browning, just like I gave you the

2    example a little while ago as far as what I have done in the

3    past.

4    Q.   But once there's one listed that's enough?

5    A.   Once there's one log?                                      02:02PM

6    Q.   One entry for Browning unit for the entire month.

7    A.   No.  I have to review at a minimum 10 charts.

8    Q.   Why did you review one chart at Browning then?

9    A.   I cannot answer because I don't have the log in front of me

10   as to why.                                                      02:02PM

11   Q.   And you don't remember contacting anybody to ask if the

12   Browning or SMU information was incomplete?

13   A.   This was May of 2016.

14   Q.   Yeah.

15   A.   I cannot recall.                                           02:02PM

16   Q.   Okay.  If you turn to the next page to November, 2016,

17   Performance Measure 40, urgent provider referrals.  So these

18   are referrals from the nurse's line to the medical provider,

19   correct?  That's what the performance measure asked for?

20   A.   Yes.                                                       02:03PM

21   Q.   Do you see that in the details section you have three

22   separate referrals to dental as counting here?

23   A.   For which one?  For which unit?

24   Q.   Meadows unit, Number 2.

25   A.   Meadows unit, Number 2.                                    02:03PM

1    Q.  Meadows unit Number 3.  And further up on Cook unit there

2    was a referral to dental?

3    A.  Cook unit, yes.

4    Q.  Are there separate performance measures about dental care?

5    A.  There is.                                                          02:03PM

6    Q.  Do you normally monitor those?

7    A.  For dental, I have not in a while.

8    Q.  Why are you counting dental appointments for urgent medical

9    provider?

10   A.  At that time, I understood it as urgent referral, so I         02:04PM

11   utilized that chart.

12   Q.  You monitor the diets.  Correct?

13   A.  Correct.

14   Q.  And so that performance measure you are looking at whether

15   people prescribed special diets are receiving them?               02:04PM

16   A.  Wait, are you --

17   Q.  It's Performance Measure 71.  I guess we could just look at

18   it in a December report if you wanted to.  I'm just asking in

19   the abstract.

20   A.  Okay.                                                         02:04PM

21   Q.  You are looking to see that they got their meals, correct?

22   A.  As far as I'm looking, if I recall correctly, Performance

23   Measure Number 71, is that the one where if they miss three

24   consecutive days they were cancelled by a physician, or -- I

25   believe it's Performance Measure Number 72 where it states was   02:04PM

UNITED STATES DISTRICT COURT

1    the diet order complete, for instance, did it have a start

2    date, an end date?  So I'm not understanding what you are

3    trying to ask me.

4    Q.  Well, are you measuring whether or not the prisoner

5    actually got the diet that was prescribed for him?                    02:05PM

6    A.  I am confirming that the diet that was prescribed for him

7    was correct and entered completely.

8    Q.  So you are only looking at documentation as to whether the

9    prescribed diet is correctly entered in the computer system?

10   A.  Well, I'm looking for accuracy and making sure that it is     02:05PM

11   in AIMS also.

12   Q.  Do you review logs that come from the contractor who

13   provides food?

14   A.  For that specific question, no.

15   Q.  Right.  To make sure like all the people on diabetic diets    02:05PM

16   got a diabetic diet, that sort of thing?

17   A.  That's not what the question asks.

18   Q.  Okay.  If you flip a few more pages in that document, it's

19   the number at the bottom right is 1964.

20   A.  Are we still looking at this colored one?                     02:06PM

21   Q.  No.  I'm sorry.  So it's Bates Number ADCM 771964 from

22   November, and it's Performance Measure 12 about documentation

23   of refusals and no shows.

24        And I'm wondering if you, first of all, could tell us

25   what the source is for this performance measure that you          02:07PM

1  review?

2  A.  It's a no show log.

3  Q.  And who maintains that list?

4  A.  This list is given to me by my supervisor.

5  Q.  Okay.  And is it -- are you told when you are given it that    02:07PM

6  it's randomized and to just select the first 10 names?

7  A.  I'm told that it's randomized, and I follow the methodology

8  in regards to answering my question.

9  Q.  Okay.  And do you know how that list is created?  Is it all

10  the people who were ducketed for nurse's line or provider's      02:08PM

11  line?

12  A.  I'm not sure how it's created.

13  Q.  When it comes to you does it have a column of random

14  numbers on the left-hand side?

15  A.  Yes.                                                         02:08PM

16  Q.  Are those numbers sorted from lowest to highest?

17  A.  I don't know.

18  Q.  Do you have any idea why there are so many cancellations of

19  nurse's line appointments documented?

20  A.  I do not know.                                               02:08PM

21  Q.  You said --

22  A.  I don't know.

23  Q.  You don't --

24  A.  I do not know.

25  Q.  And when you are going through the files and looking at      02:08PM

1   them, do you have a worksheet or a spreadsheet or something

2   like that where you keep your notes?

3   A.  I have a worksheet.

4   Q.  And then at the end of the month you put everything into

5   the CGAR computer system?                                    02:09PM

6   A.  Yes.

7   Q.  And is that worksheet, is that just paper and handwritten

8   or is it a computerized thing?

9   A.  It's paper handwritten.

10  Q.  Okay.  And before you enter information into the CGAR, do   02:09PM

11  you look at your findings and contact the facility health

12  administrator or other staff at the institution to say, heads

13  up, here's my preliminary findings on the measures I have

14  looked at?

15  A.  I send it to them via e-mail.                            02:09PM

16  Q.  Okay.  And what do you send them?  Do you send them the

17  non-compliant?

18  A.  I send them every single chart.  So if it's 10 charts that

19  I audited then I send them the 10 charts.

20  Q.  But when you send them -- so you do it for every single    02:09PM

21  performance measure you have looked at that month?

22  A.  Yes.

23  Q.  Including the ones where preliminarily it looks like they

24  are compliant?

25  A.  Yes.                                                      02:10PM

1    Q.  How much time do you give them to get back to you about it?

2    A.  Well, usually 48 hours.  It depends on when I send it to

3    them throughout the month.  So if I send it to them on the 5th

4    of the month, then they have a little bit longer to review it.

5    Q.  Okay.  And if they come back to you in this informal phase    02:10PM

6    of things, and, you know, it's not a situation where maybe you

7    have transposed the numbers of an inmate and so that was the

8    correction they had but they said something like you listed

9    dental appointments for this provider measure, and that was the

10   feedback you got, would you go and pull three new files to       02:10PM

11   review to replace the ones that are inapplicable?

12   A.  Which performance measure are you referring to to determine

13   whether it's not applicable or not?

14   Q.  Well, we can use that as the example, the one about the

15   urgent referral to a medical provider and that it listed three   02:11PM

16   dental.  If they had come back to you and said, Ms. Cartwright,

17   we think these three are not applicable because they are

18   dental, would you go then pull three new files to replace them

19   to audit?

20   A.  I would have to look at the actual file to see if it's       02:11PM

21   correct what they are telling me.

22   Q.  And if they are telling the truth then it's correct and you

23   made a mistake and pulled the wrong -- or used the wrong one,

24   would you then go get some more files to look at?

25   A.  I suppose so.  I mean, I can't say for certain until I know   02:11PM

1    the actual situation.

2         THE COURT:  In this informal process, how often do

3    they respond and say that you got it wrong?

4         THE WITNESS:  Not often.

5         THE COURT:  How many times a month?                    02:11PM

6         THE WITNESS:  How many times a month do I communicate

7    with them?

8         THE COURT:  How many times a month do they come back

9    and say you have this one wrong?

10        THE WITNESS:  There's rarely ever, honestly.           02:12PM

11        THE COURT:  Okay.  Thank you.

12   BY MS. KENDRICK:

13   Q.  Okay.  I'm just going to show you the document.  It will be

14   faster.

15   A.  Okay.                                                    02:12PM

16        MR. BOJANOWSKI:  What are you showing her, Corene?

17        MS. KENDRICK:  January CQI minutes for Eyman.

18        THE WITNESS:  Okay.

19   BY MS. KENDRICK:

20   Q.  And you are listed as attending via Web X?               02:12PM

21   A.  Yes.

22   Q.  And if you go towards the end of the document -- actually,

23   no.  It's Page 4 of the document where it says "statistical

24   report."

25   A.  Yes.                                                     02:13PM

1   Q.  And I understand that you do not monitor mental health, but

2   at the bottom of the statistical report entry, it says, "Ms.

3   Masters reports the stats are pulled from eOMIS and are not 100

4   percent accurate.  She is investigating how to obtain more

5   accurate data.  Dr. Babich suggests this process should be          02:13PM

6   consistent across the state."

7           Do you remember that part of the conversation at the

8   meeting last month?

9           MR. BOJANOWSKI:  Objection, Your Honor.  This has

10  nothing to do with what monitors use as far as their analysis      02:13PM

11  of a measure.

12          THE COURT:  Overruled.

13  BY MS. KENDRICK:

14  Q.  Do you remember that part of the meeting?

15  A.  Very vaguely, honestly.                                        02:13PM

16  Q.  Okay.  Do you remember any discussion of what specifically

17  the inaccuracies were?

18  A.  No.

19          MS. KENDRICK:  I have nothing further, Your Honor.

20          THE COURT:  I have a follow-up question, please.  And      02:14PM

21  it's going back to Performance Measure 71.

22                          EXAMINATION

23  BY THE COURT:

24  Q.  When we left that topic last, you said that that wasn't

25  what the question asked.  And there are two questions in           02:14PM

1    Performance Measure 71.  I will read the entire performance

2    measure.  "Are inmates with a diagnosed and documented disease

3    or condition that necessitates a special diet being provided

4    the diet if clinically indicated?  When prescribing the special

5    diet, did the provider include the type of diet, duration for          02:14PM

6    which it is to be provided, and any special instructions?"

7            When you responded to Ms. Kendrick's question with the

8    answer that's not what the question asked, were you referring

9    to one or two or both of these questions?

10   A.  Well, she wasn't specific as to which one.  She said             02:15PM

11   medical diet.  So we do have the two.

12   Q.  I guess I'd like to follow up on the first question, that

13   is, are inmates with a diagnosed and documented disease or

14   condition that necessitates a special diet being provided the

15   diet if clinically indicated?"  How do you determine whether an      02:15PM

16   inmate is being provided that diet?

17   A.  First of all, I look to make sure there's an order in there

18   in eOMIS, and then I look to see if it is also in AIMS because

19   AIMS is what operations follows.  And I also receive

20   information from the diet liaison person, food service liaison,      02:15PM

21   I think, is the proper title for that person in regards to any

22   inmates who have refused their diet for whatever reason or no

23   showed for their diet.

24   Q.  But with respect to documenting that an inmate was provided

25   with a particularly medically required tray, you don't have any      02:16PM

March 21, 2017 - Status Hearing - Cartwright - Exam by The Court

1    audit mechanism to find out whether that's true?

2    A.  If they are not on the list as far as refusing or

3    no-showing, then they received their diet.

4    Q.  And that's the assumption you make every month?

5    A.  Well, that's the process that we have.  It's not an          02:16PM

6    assumption.

7    Q.  Well, it kind of is an assumption because you don't know

8    for sure whether or not someone has received the tray.

9    A.  The only way I can tell you for certain is if I would show

10   up at the line, you know, the food line every day and actually    02:16PM

11   observe it.  That's the only way I would be able to tell you

12   for certain.

13   Q.  Some performance measures would seem to be requiring direct

14   observation.  Some wouldn't, but many do.  Many, for instance,

15   in the health care field include notes in the medical record by   02:16PM

16   the provider saying, I did this.

17   A.  Uh-huh.

18   Q.  There's nothing in this performance measure anybody

19   certifying this was done.  It is only someone refused it.

20   A.  Yes.  If they are not on there, then they received their      02:17PM

21   diet.

22   Q.  But you see the difference how I'm talking about in the

23   medical example that I gave you, there's somebody certifying

24   that it happened.  And what you are relying on in the other is

25   someone saying inmate didn't refuse it, or inmate is not on a     02:17PM

March 21, 2017 - Status Hearing - Cartwright - Exam by The Court

1    list indicating that he or she refused it.  But other than

2    that, there is no actual observation by anybody who was engaged

3    in the process of providing this tray?

4    A.  As far as my observation, there isn't.  But there is --

5    Trinity, I believe, has a log that the inmate has to sign for    02:17PM

6    his or her tray every single month.

7    Q.  I see.

8    A.  And if that inmate did not sign for his or her tray, that's

9    when I get the information -- or I'm sorry, his tray, because

10   we don't have females -- that's the information that I get.  So  02:17PM

11   they are put -- they are given to me the inmates that no-showed

12   or refused because there was no signature on this log.  So I

13   don't -- so Trinity tracks whether they receive either the

14   medically prescribed diet or religious diet because the inmate

15   will sign.  If there's no signature, that's the information       02:18PM

16   that's given to me as far as the inmate not receiving their

17   tray or no-showing.

18            THE COURT:  All right.  Thank you.

19            MS. KENDRICK:  Thank you.

20            THE COURT:  Any redirect?                                  02:18PM

21            MR. BOJANOWSKI:  No redirect, Your Honor.

22            THE COURT:  Thank you very much.  You may step down.

23            Your next witness, please.

24            MR. BOJANOWSKI:  I will wait until they bring the

25   person in to make sure I get the right name this time.            02:19PM

March 21, 2017 - Status Hearing - Fontaine - Direct

1          Jen Fontaine.

2          THE COURT:  Ms. Fontaine, if you will step forward to

3    the well of the court to the clerk of the court so she may

4    administer the oath.

5          (The witness was sworn.)                              02:19PM

6          THE MAGISTRATE CLERK:  Please step to the witness

7    stand.

8                          JENNY FONTAINE,

9    a witness herein, having been first duly sworn by the clerk to

10   speak the truth and nothing but the truth, was examined and

11   testified as follows:

12                        DIRECT EXAMINATION

13   BY MR. BOJANOWSKI:

14   Q.  Would you please state your name for the record?

15   A.  Jenny Milke Fontaine.                                   02:20PM

16         THE COURT:  Ms. Fontaine, if you would kindly pull

17   microphone platform closer to you.  It will sound like you are

18   awfully loud but you are really not.  It just sounds that way.

19   BY MR. BOJANOWSKI:

20   Q.  Could you give us your business address?                02:20PM

21   A.  1305 East Butte Avenue, Florence, Arizona 85132.

22   Q.  Are you employed?

23   A.  Yes.

24   Q.  And where are you employed?

25   A.  Through the Arizona Department of Corrections.          02:20PM

—— March 21, 2017 - Status Hearing - Fontaine - Direct ——

1    Q.  In what capacity?

2    A.  I'm a Compliance Monitor II assigned to Florence complex.

3    Q.  And how long have you been so employed with the Department

4    in that position?

5    A.  In this position, May of 2013, I believe.                    02:20PM

6    Q.  Could you give us some of your educational background?

7    A.  Sure.  How far back do you want me to go?

8    Q.  Well, college.

9    A.  I went to college first for business and then I did an

10   associates degree in business management and marketing.  And    02:21PM

11   then in 2003, I finished my LPN and 2010, my RN.

12   Q.  Are you licensed?

13   A.  Yes.

14   Q.  As a registered nurse?

15   A.  Yes.                                                         02:21PM

16   Q.  In what states?

17   A.  Arizona and all associated with the compact.  So it's a

18   multi-state compact license.

19   Q.  All right.  Now, as part of your job duties, you monitor

20   various measures within the compliance documents and such at    02:21PM

21   the Florence facility?

22   A.  Yes.

23   Q.  You are not the clinical monitor, is that right?

24   A.  No, I am not.

25   Q.  And who is?                                                  02:21PM

1   A.   Edna Franklin.

2   Q.   Do you monitor mental health measures?

3   A.   No.

4   Q.   Dental health measures?

5   A.   No.                                                    02:22PM

6           THE COURT:  What's the difference between a clinical

7   monitor and the kind of monitor you are?

8           THE WITNESS:  They just monitor different questions.

9   Prior to my compliance monitor position I did have that same

10  position as a clinical monitor, but it's just specific measures   02:22PM

11  that each monitor reviews and reports on monthly.

12          THE COURT:  I guess if somebody wanted to understand

13  why there are two different kinds of monitors, what would you

14  say?

15          THE WITNESS:  I don't know why there are two different   02:22PM

16  kinds of monitors, honestly.  I have no idea.  That's just the

17  way the structure the Bureau has set up to have a clinical

18  monitor as well as a compliance monitor.  I think the

19  compliance monitors spend more time specific to one complex and

20  maybe don't share their time with more than one facility, so   02:22PM

21  more facilitate and assist with the vendor at the facility they

22  are assigned to.

23          THE COURT:  Thank you.

24  BY MR. BOJANOWSKI:

25  Q.   I'm going to help you out a little bit here.  Get right   02:23PM

─────── March 21, 2017 - Status Hearing - Fontaine - Direct ───────

1   into that mic.  There's a big fan over here.  We're having a

2   little bit of difficulty hearing you.

3   A.  Okay.

4   Q.  That's much better.  Thank you.

5          All right.  So why don't you turn -- I have handed you          02:23PM

6   the December 2016 Florence complex CGAR findings.  Do you see

7   that?

8   A.  Yes.

9   Q.  On the bottom of the page on the right-hand corner there

10  are a series of numbers there.  Would you go to the page that          02:23PM

11  ends in 835707?

12  A.  Yep.

13  Q.  Now, this is a series of items that you measure the

14  Performance Measures Number 5 through 10.  Do you see that?

15  A.  Yes.                                                               02:24PM

16  Q.  Now, when you go to monitor, let's say, Performance Measure

17  Number 8, which is our nursing protocols slash nets utilized by

18  nurses for sick call.  Do you see that?

19  A.  Yes.

20  Q.  Now, when you go to actually monitor that particular               02:24PM

21  measure, do you go to the monitoring guide to identify what

22  source documents you need to look at and what procedure to

23  follow in order to make your determination as to compliant or

24  non-compliant?

25  A.  I go to the monitor guide to determine the source document        02:25PM

 1   and the methodology to use to get compliant or non-compliant,

 2   yes.

 3   Q.  Do you know what the source document is for this particular

 4   measure?

 5   A.  No.  I can't -- I'd have to look at it to be specific.          02:25PM

 6   Q.  Certain measures that you are involved in require

 7   randomization of documents.  Are you aware of that?

 8   A.  Yes.

 9   Q.  Are you engaged in the actual randomization of any

10   documents that you utilize in performing the compliance           02:25PM

11   measurements that you are engaged in?

12   A.  No.

13   Q.  You receive those from the home office?

14   A.  I receive them from central office.

15   Q.  And then you rely on those random lists to select your 10      02:25PM

16   files for whatever particular unit that you would be

17   evaluating, is that right?

18   A.  Correct.

19   Q.  How many units are located at Florence?

20   A.  Six.                                                           02:26PM

21   Q.  So you would, generally speaking, be looking at 60 files

22   for each measure, correct?

23   A.  Correct.

24   Q.  And if you don't have enough files to meet the minimum 10,

25   then you look at all of the files, say if there were seven you     02:26PM

1    would look at all seven and base your analysis on those seven

2    if there were only seven available files?

3    A.  Correct.

4    Q.  Okay.  Are you engaged in any fashion in the process

5    whereby Corizon can challenge a particular finding that you                02:26PM

6    make after it's entered into the CGAR, the rebuttal process?

7    Are you involved in that at all?

8    A.  No.

9    Q.  Are you involved in the CAP process at all?

10   A.  No.                                                                    02:26PM

11   Q.  Are you involved in any process whereby you are developing

12   policies, procedures, or other methodologies to be used by

13   Corizon staff with regard to how they deliver health care

14   within the Florence system?

15   A.  Can you repeat that?                                                   02:27PM

16   Q.  Do you engage in telling Corizon how to deliver health care

17   to the patients at the Florence complex?

18   A.  No.

19   Q.  Do you engage in writing any kind of policies or procedure

20   manuals for staff at -- medical staff at the Florence complex             02:27PM

21   and tell them how to do their job as far as delivery of health

22   care?

23   A.  No.

24   Q.  Do you at all make any type of suggestions as to changes in

25   procedures or practices that Corizon utilizes in the delivery            02:28PM

UNITED STATES DISTRICT COURT

1    of health care to the inmate population at Florence?

2    A.   I can.  I have, yes.

3    Q.   And in what instance have you done that?

4    A.   If I observe them doing sick call or doing a med pass and I

5    can see where a small change could have a significant positive        02:28PM

6    impact, I share that.  I don't order them to do it necessarily

7    that way, but I do share my thoughts with them.

8    Q.   Okay.  And would that be with the line staff or with the

9    FHA, or other Corizon individuals?

10   A.   The FHA, director of nursing, not the line staff.              02:28PM

11   Q.   Okay.  Have you -- how many -- on how many occasions have

12   you actually engaged in giving them a recommendation as to

13   maybe modifying a procedure that they are following?

14   A.   A couple, maybe.  Not many.

15   Q.   Can you give us a specific example?                            02:29PM

16   A.   Example, like for med pass, they go to the building to

17   administer meds to the inmate population.  They bring their med

18   cart, their laptop, they go to deliver the medication.

19   Sometimes they had to wait for an officer.  I suggested that

20   maybe the officer report there at a specific time every day        02:29PM

21   that would streamline it; doing intake at the time they arrive

22   instead of waiting to call them up at a later time, just

23   different small process changes where they could maybe

24   streamline it and make it easier for the nursing staff to

25   complete the tasks.                                                 02:29PM

1   Q.  Did you see that that suggestion was welcomed by the

2   Corizon staff and then ultimately implemented?

3   A.  Yes.

4   Q.  As part of your monitoring duties, do you go out in into

5   the field, so to speak, and observe things like maybe rounds      02:30PM

6   occurring, or med passes, those types of things, do you do that

7   on a regular basis?

8   A.  Yes.

9   Q.  And why do you do that?

10  A.  It's part of my duties.                                       02:30PM

11  Q.  Okay.

12  A.  You know, I'm assigned that complex, and I go and see if

13  there is any, you know, just to see, like -- it's what I do.

14  Q.  Is there any particular measure which requires you to go

15  out into the field and do a direct observation of the delivery   02:30PM

16  of health care to the inmate population in order to determine

17  compliance or non-compliance?

18  A.  No.

19  Q.  So your observations and going out into the field is just

20  something extra that you do is not involved in the actual per     02:31PM

21  se monitoring of a specific measure?

22  A.  Correct.

23          MR. BOJANOWSKI:  Nothing further, Your Honor.

24                        EXAMINATION

25  BY THE COURT:                                                     02:31PM

March 21, 2017 - Status Hearing - Fontaine - Exam by The Court

1   Q.  You know, I have to interject with some questions because I

2   have listened today to a number of witnesses who have not said

3   what you just said, but what you just said makes perfect sense

4   to me.  And that is the monitor who is paying attention to

5   compliance performance measure would, seems to me, would notice    02:31PM

6   some things on a monthly basis, especially if there were

7   repeated compliance failures.  You would notice maybe some, as

8   you say, suggestions that you could make that could streamline

9   things that might be able to address it.

10          I have been puzzled that when I have asked other          02:32PM

11  witnesses they say no, it's not my job, essentially.  But it

12  sounds like you think that is part of your job.

13  A.  Yes, I do.

14  Q.  And why do you think that's part of your job?

15  A.  I'm a nurse.  I have worked for the Department for a long     02:32PM

16  time, even before they privatized.  And I guess if there's some

17  way that I can share my knowledge with them to help them be

18  more successful, that I have a duty, whether or not it's in my

19  job description or I'm directed to do so by my supervisor, I

20  have a duty to do that.                                           02:32PM

21          THE COURT:  Thank you.  You may ask your questions.

22                      CROSS-EXAMINATION

23  BY MS. KENDRICK:

24  Q.  How are you doing, Ms. Fontaine?

25  A.  I'm doing well.                                               02:33PM

UNITED STATES DISTRICT COURT

—— March 21, 2017 - Status Hearing - Fontaine - Cross ——

 1   Q.   Good.  Did you review any documents to prepare for today?

 2   A.   No.

 3   Q.   Did you meet with anyone to go over your testimony?

 4   A.   No.

 5   Q.   Okay.  You said you worked for the Department before as a          02:33PM

 6   nurse?

 7   A.   I have worked for the Department since 2004.

 8   Q.   Okay.  And were you working at Florence or a different

 9   institution?

10   A.   At Florence.                                                        02:33PM

11   Q.   And you are an RN?

12   A.   I am.

13   Q.   And since the medical care privatized, have you ever been

14   asked to go down to an institution and provide support and see

15   patients on nurse's line?                                               02:33PM

16   A.   No.

17   Q.   Have you ever been asked to monitor or review the medical

18   care being provided to any of the named plaintiffs in this

19   case?

20   A.   I do not know who the named plaintiffs are.                        02:34PM

21   Q.   Shawn Jensen?

22   A.   No.

23   Q.   And you said that you reviewed 10 files per unit.  And if

24   you were going through, and let's say you were at central unit,

25   you were looking at central unit files and you found 10              02:34PM

1    applicable files, you reviewed them, you wrote down which ones

2    were compliant and non-compliant, would you continue to pull

3    files or would you move on and say I'm going to the next

4    performance measure.  I'm now going to look at it for that?

5    A.  What do you mean?                                        02:34PM

6    Q.  Have you ever reviewed more than 10 files at a unit for a

7    particular performance measure when the first 10 were all

8    applicable and you had your finding right there?

9    A.  No.

10   Q.  Okay.  And when you are reviewing the files, do you take  02:35PM

11   notes on a worksheet or on a spreadsheet or something like

12   that?

13   A.  I use a worksheet.

14   Q.  It's a paper document done by hand?

15   A.  Yes.                                                     02:35PM

16   Q.  And how do you maintain those worksheets at the end of the

17   month?  What do you do with them?

18   A.  I scan them and send them to central office and I retain

19   the paper copy in my office.

20   Q.  So if somebody wanted to go back and see which 10 files you 02:35PM

21   reviewed for a particular measure at a particular unit, in a

22   particular month, theoretically they could do it by looking at

23   those?

24   A.  Absolutely.

25   Q.  And before you enter information into the CGARs, do you   02:35PM

March 21, 2017 - Status Hearing - Fontaine - Cross

1   provide a preliminary snapshot of your findings to the facility

2   health administrator or the DON or other people at Corizon at

3   the institution?

4   A.  Yes.  I send my findings prior.

5   Q.  Is that just called like the informal review?  What do you      02:36PM

6   call that process?

7   A.  I don't necessarily call it anything.  I don't have a

8   specific term for it.  I send in my findings related to each

9   performance measure and give them the opportunity to review

10  them.                                                               02:36PM

11  Q.  And do you do it for each non-compliant or every single one

12  that you looked at?

13  A.  Every single one that I look at.

14  Q.  And most of the time if they come back and they have

15  noticed something, is it generally like you have transposed       02:36PM

16  numbers in an inmate number or something like that?

17  A.  They very rarely notice anything, but yeah.

18  Q.  Have you ever had them come back and say you reviewed a

19  file that we don't think is applicable?

20  A.  There was one instance where they reviewed a file and I had   02:36PM

21  overlooked the provider's notation at the bottom of the

22  encounter.  And other than that, there has not been a question

23  in my findings.

24  Q.  So you just switched it to be compliant?

25  A.  Yes, because it was.                                           02:37PM

**March 21, 2017 - Status Hearing - Fontaine - Cross**

1   Q.  It wasn't that they said you were looking at dental notes

2   and throw it out.  It wasn't something like that?

3   A.  Correct.

4   Q.  Okay.  Are you aware that this Court has found Florence

5   non-compliant on 14 different performance measures?                   02:37PM

6   A.  No.  I really only focus on the compliance measures.  When

7   you say performance measures I believe you are speaking to the

8   entire CR.

9   Q.  Okay.  And are you aware of any sort of improvement plan

10  underway between the Department and Corizon to come into          02:37PM

11  compliance with the measures that the Court has found them

12  non-compliant on?

13  A.  What do you mean "improvement plan."

14  Q.  Well, a federal judge has said that they are not complying

15  with the requirements of the stipulation for 14 different         02:38PM

16  performance measures.  And so generally, when a federal judge

17  says something like that you take action to fix the problem.

18  And I just was wondering since you are there at the

19  institutions if you are aware of any plans to fix the problem

20  for those 14 performance measures?                                02:38PM

21  A.  Specific plan?  I think that every day is an opportunity

22  for improvement.  So like a specific plan, we're going to do A,

23  B, and C and that's going to guarantee compliance with the

24  performance measure, no.

25  Q.  So you are aware of no plan?                                  02:38PM

—————— March 21, 2017 - Status Hearing - Fontaine - Cross ——————

1    A.  Well, I'm aware that they are constantly, we are constantly

2    working towards compliance with these measures.

3    Q.  Did you help develop the measures?

4    A.  No.

5    Q.  What do you think of them?                                    02:39PM

6    A.  What do I think of the measures?

7           MR. BOJANOWSKI:  Objection.

8    BY MS. KENDRICK:

9    Q.  Yeah.

10   A.  I think they are a series of questions that they -- we use   02:39PM

11   them and some of them are applicable to health care that's

12   being provided and others, not really so much.

13          THE COURT:  Some of them just missed the mark in terms

14   of being a helpful measure?

15          THE WITNESS:  Correct.  I don't believe that -- and      02:39PM

16   this is my opinion -- whether or not a nurse puts a stamp on a

17   document is not an indication of adequate health care being

18   provided.  So some of the measures that we look at and monitor

19   on a monthly basis don't significantly impact the health care

20   delivery.                                                        02:39PM

21          THE COURT:  And is there a process that you could

22   envision whereby you could try to identify these problematic

23   measures and replace them with more efficacious ones?

24          THE WITNESS:  One more time the question.

25          THE COURT:  Is there a process that you could envision   02:40PM

**March 21, 2017 - Status Hearing - Fontaine - Cross**

1   how you could -- if you were trying to figure out, given what

2   you said is true, and that is some of the performance measures

3   missed the mark, they don't do a good job of giving us

4   information that we need to try to improve the quality of

5   health care.  How would you go about trying to develop          02:40PM

6   alternative performance measures?

7        THE WITNESS:  I can't say that I would develop

8   alternative performance measures.  I would eliminate those

9   performance measures that did not have an impact on health care

10  delivery so that one, both Corizon and the Bureau, could focus  02:40PM

11  on those measures that can improve health care delivery.

12       THE COURT:  But let's posit a hypothetical where you

13  remove one of the measures but it's the only measure addressing

14  a particular area of care.  So when you remove it you don't

15  have any window to that area of care.  Do you understand what I  02:41PM

16  said?

17       THE WITNESS:  Yes.  I understand what you said.  But

18  again, using my example of a stamp, I don't see where that, or

19  any window similar to that, would impact care being provided.

20  So replacing that performance measure with another such         02:41PM

21  performance measure that measures something similar to that

22  does not have an impact on whether or not the guy is getting

23  care or gal.

24       THE COURT:  Maybe I could ask a better question if you

25  told me the stamp example you are giving me.                    02:41PM

1          THE WITNESS:  There's a performance measure that says

2     do the medical records have a stamp behind the signature.

3          THE COURT:  And the stamp is the name?

4          THE WITNESS:  Yes.  The name stamp where they allow

5     them to print their name following it.                              02:42PM

6          THE COURT:  And the reason for that is so you can, I

7     gather, tell who the person was rather than just a signature

8     that you can't tell who it was?

9          THE WITNESS:  Correct.

10         THE COURT:  If you didn't have a stamp, how would you    02:42PM

11    be able to know who provided that -- signed that document?

12         THE WITNESS:  The medical records are electronic.  The

13    person that scanned it in, the computer captures that.  The

14    person that created the encounter for that day, that is the

15    person.                                                             02:42PM

16         THE COURT:  So you are saying in light of adopting the

17    electronic medical records now, this stamp is silly.  It's no

18    longer necessary.

19         THE WITNESS:  I don't see it as something that

20    determines health care delivery.                                   02:42PM

21         THE COURT:  All right.  So that helped me understand

22    why my example is not a good one that I tried to suggest to you

23    where there was a performance measure that didn't make any

24    sense.  If you took it away, what would you have in its place?

25    My example wasn't a good one because if you took away the stamp    02:43PM

1   you are saying that the electronic medical record actually

2   imports a stamp of its own so you actually know the information

3   that the stamp is providing.

4           THE WITNESS:  Correct.

5           THE COURT:  I'm positing what if there's a performance      02:43PM

6   measure that if you took it away, even though it's not perfect,

7   it would be the only window to that particular care.  How would

8   you come up with identifying an alternative performance

9   measure?

10          THE WITNESS:  I don't know.                                 02:43PM

11          THE COURT:  Okay.  Fair enough.

12  BY MS. KENDRICK:

13  Q.  Have you ever told your boss or other superiors at

14  headquarters there are performance measures you monitor that

15  you think are extraneous or irrelevant to the delivery of        02:43PM

16  quality care?

17  A.  I am sure we have had this conversation like we're having

18  right now, yeah.  But no, not really.

19  Q.  You said yeah, but not really.

20  A.  Well, it wasn't like a direct I think this question is       02:44PM

21  silly type of a thing.  It's more like a conversation around

22  lunch or something like this doesn't really have an impact on

23  whether or not a person is receiving care.

24  Q.  And did you say this to Kathy Campbell, your superior?

25  A.  I don't recall.                                               02:44PM

1   Q.  Or to anybody in a position of power who could possibly

2   have those performance measures modified or deleted?

3   A.  Possibly.  I don't know who was at the conversation.

4   Q.  Has your opinion or that of other monitors ever been

5   solicited by the people in headquarters about, you know, what          02:44PM

6   do you think of these 103 performance measures that we have you

7   running around looking at each month?

8   A.  No.

9   Q.  They have never asked for your feedback?

10  A.  Not that I can recall, no.                                          02:45PM

11  Q.  Okay.  And one of the areas were if you look at the CGARs

12  that you monitor Florence where they have been non-compliant

13  has to do with triaging HNRs within 24 hours.  And I wanted to

14  ask you if you have heard of something Florence did that was

15  called the centralized HNR process.                                    02:45PM

16  A.  What page is that on?

17  Q.  It's not on a page.  It's just a question.

18  A.  Can you repeat it?  I was looking for the page.

19  Q.  Sorry.  Have you ever heard of a change that Florence put

20  into place on how they process HNRs that was called the               02:45PM

21  centralized HNR process?

22  A.  Yes.

23  Q.  What is that?

24  A.  It's no longer in use.  But it was --

25  Q.  Could you describe it?                                             02:45PM

—— March 21, 2017 - Status Hearing - Fontaine - Cross ——

1   A.  They had one staff member, Corizon staff member, that would

2   travel to each unit and collect the HNRs every morning and

3   triage them and schedule them appropriately.

4   Q.  And when were they doing this, roughly?

5   A.  I can't remember the exact dates.                                          02:46PM

6   Q.  It was last year?

7   A.  It was the process they used before they went to the open

8   sick call process.  I don't know the dates exactly.

9   Q.  Was it hot outside when they were doing it?  Roughly, was

10  it summertime?                                                                 02:46PM

11  A.  I don't know.  It was the process they used immediately

12  preceding the open sick call process.

13  Q.  Okay.

14  A.  I don't remember when they put it -- when they started it.

15  Q.  So there's five units at Florence, and this person would go   02:46PM

16  and collect the HNRs in the evening or in the morning?

17  A.  Morning.

18  Q.  Certain time of day?

19  A.  In the morning.

20  Q.  And he or she would then bring them back to a central         02:47PM

21  location?

22  A.  Not -- no.  They triage the HNRs on the units where they

23  have them.  They call it a centralized HNR process because one

24  person did it.

25  Q.  So he or she would go to east unit, pick up the HNRs,         02:47PM

1    triage them there, and then go to north unit and repeat the

2    process?

3    A.  Correct.

4    Q.  And why did they stop it?

5    A.  Because the open sick call process was started.                    02:47PM

6    Q.  And in the time that they implemented the centralized HNR

7    process, do you remember -- and I'm not asking you precise

8    numbers -- but if generally their compliance levels were

9    trending upwards or staying the same?

10   A.  Trending upwards.                                                  02:47PM

11   Q.  Do you know whose idea it was to do that centralized

12   process?

13   A.  No.

14   Q.  What do you do on the days that person was off?

15   A.  They had more than one of them.  There was actually two and       02:48PM

16   they worked alternating schedule.  There was always one there,

17   seven days a week.

18   Q.  Can you describe for us how you understand the open clinic

19   system to work, how you see it working?

20   A.  The inmates that are on units where they are open, they go        02:48PM

21   to the health unit when they have a medical need.

22   Q.  So it's more like -- almost like going to an urgent care in

23   the community?

24   A.  Yes.

25   Q.  You have something.                                               02:48PM

1    A.   Yes.

2    Q.   And what happens if there are more people coming to be seen

3    than the nurse can see in one day?

4    A.   I don't recall that ever being an issue.

5    Q.   And so you said it was on the units that are open.  So some        02:48PM

6    units are higher level security and not doing this?

7    A.   No.

8    Q.   Which units are not doing open clinic?

9    A.   Kassen and a portion of Central.

10   Q.   So they are still doing it the old way where they drop the         02:49PM

11   HNRs in the --

12   A.   They place an HNR and they are scheduled.

13   Q.   And do you think by having them be able to go see the nurse

14   the same day that this is going to impact other areas where

15   Florence is non-compliant?                                             02:49PM

16   A.   What?

17   Q.   Do you know why the open clinic system was put into place?

18   A.   So they could ensure inmates are seen within 24 hours of

19   their request.

20   Q.   Right, on nurse's line?                                           02:50PM

21   A.   Uh-huh.

22   Q.   And that's Performance Measure 37?

23   A.   I believe so.

24   Q.   I will represent it's 37.

25   A.   Okay.                                                             02:50PM

March 21, 2017 - Status Hearing - Fontaine - Cross

1        THE COURT:  If she's wrong it's her fault, not yours.

2        THE WITNESS:  I'd have to look at a list.

3   BY MS. KENDRICK:

4   Q.  It's not a quiz.

5        So I said earlier the Court had found them                    02:50PM

6   non-compliant an 14 performance measures, so are you aware of

7   whether this system was designed to address those other areas

8   of non-compliance?

9   A.  One more time.

10  Q.  Is the open sick call system helping improve compliance in   02:50PM

11  areas besides the nurse's line where you have found them

12  non-compliant month after month?

13  A.  I don't recall finding them non-compliant month after month

14  on nurse's line.

15  Q.  I'm not talking about nurse's line.  I said the other        02:50PM

16  performance measures?

17  A.  I don't recall.  I would have to look at whether their

18  performance measures exactly are non-compliant, like trending

19  non-compliant across the board before I could answer that

20  question.                                                        02:51PM

21  Q.  Okay.  So for example in pharmacy, on prescribed

22  medications within two days, renewals and refills, those were

23  three performance measures the Court has found them

24  non-compliant.  So I'm just wondering if you think having an

25  open sick call would improve the speed with which prisoners are  02:51PM

—— **March 21, 2017 - Status Hearing - Fontaine - Cross** ——

1    provided medication.

2    A.  I don't answer the pharmacy questions at all.  I couldn't

3    speak to whether or not an open sick call would improve that or

4    not.

5    Q.  So another performance measure he found non-compliant was          02:51PM

6    whether the provider refused diagnostic reports within five

7    days of receiving them.  How would sick call improve that open

8    clinic?

9    A.  I don't know how it would improve that.  Open sick call is

10   not going to impact how fast a report gets there.                       02:51PM

11   Q.  Or how quickly the provider reviews it?

12   A.  Either way.

13   Q.  Okay.

14   A.  Open sick call allows an inmate to be seen by the nurse

15   when he needs to be seen and care to be provided.                       02:52PM

16   Q.  If you can take a look at that document I handed you that

17   has your name written at the top of it.  It's in black and

18   white.  And it's September 2016 Florence Performance Measure

19   15.  Do you see that?

20   A.  Yes.                                                                02:52PM

21   Q.  In the middle column with the text, about an inch and a

22   half down you have written in all capital letters, East no

23   medication, non-compliance log received from this unit for

24   September.

25   A.  Correct.                                                            02:52PM

March 21, 2017 - Status Hearing - Fontaine - Cross

```
 1    Q.  And when you don't get an information source, what do you
 2    do?  Who do you contact?
 3    A.  My supervisor.
 4    Q.  Okay.  And do you recall whether you contacted Kathy
 5    Campbell and asked her why you didn't get a log of medication      02:53PM
 6    refusals for East unit?
 7    A.  It's highly likely that I contacted her, but I did not -- I
 8    would not have asked her why didn't I receive this?  She's not
 9    responsible for it.  I just report to her that I didn't get it.
10    That's it.                                                         02:53PM
11    Q.  Who is responsible for it?
12    A.  The people who administer the meds.
13    Q.  So you normally get this report from Kathy?
14    A.  I get it from central office.
15    Q.  What do you look at -- what's that list called, the source    02:53PM
16    of documents you use for this performance measure?
17    A.  Medication non-compliance log.
18    Q.  And it's e-mailed to you by somebody in central office?
19    A.  It comes from -- yes, it comes from central office.
20    Q.  And do they tell you that that list is randomized?            02:53PM
21    A.  I don't know, no.
22    Q.  And holding aside not getting a log, let's say you did get
23    a log and it had 24 people on it, how would you select the 10
24    files that you would use?
25    A.  I'd do the first 10.                                          02:54PM
```

333

1    Q.   Okay.  So you never found out from Kathy why East unit

2    never turned in their logs for non-compliance?

3    A.   No.

4    Q.   So I see here that instead of having 50 files reviewed it

5    says there's 37 files reviewed?                                    02:54PM

6    A.   Yes.

7    Q.   And that was because you didn't get the 10 from East?

8    A.   Not just that.  Some -- this is a medication non-compliance

9    question.  Sometimes the unit don't have 10 inmates that were

10   non-compliant or missed three consecutive doses.                   02:55PM

11   Q.   So have you been instructed that if you don't get

12   information from a unit for a month, you just don't count it?

13   A.   What?

14   Q.   So there's five units.

15   A.   Yes.  Six with Globe.                                         02:55PM

16   Q.   So you look at 60 files?

17   A.   No.  I look at 50 for this question because Globe does not

18   administer direct observation therapy meds.

19   Q.   Okay.  So assuming there's more than 10 refusals on each

20   yard, you would look at 10 refusals times five yards for a         02:55PM

21   total of 50, correct?

22   A.   Correct.

23   Q.   So when you have not looked at them you just don't count

24   those 10 as being there?

25   A.   I can't count them if there's none there.                     02:55PM

— March 21, 2017 - Status Hearing - Fontaine - Cross —

1   Q.  Why didn't you put a zero over 10 for East unit?

2   A.  Because that would be inaccurate.  I didn't review 10.  I

3   would give it a zero out of zero.

4   Q.  But if you have a smaller number that you are reviewing and

5   you are reducing the denominator, aren't you inflating the          02:56PM

6   level of compliance?

7   A.  No.  I can't -- if there's no refusals, there's nothing to

8   review.

9   Q.  Okay.  And if you go down about 10 lines from where it's in

10  all caps and it says North unit, two out of seven, and you          02:56PM

11  wrote MAR documentation grossly incomplete for September, and

12  there are no refusals in eOMIS.  So you counted this one even

13  though there was no documentation?

14  A.  No.  I mean, I counted it but it's not compliant.

15  Q.  But you reviewed it because you were given the prisoner's        02:56PM

16  number as a person who refused?

17  A.  The nurse recorded this inmate's number on the medication

18  non-compliance log.

19  Q.  But then proceeded to record no details about it?

20  A.  Correct.                                                          02:57PM

21  Q.  I notice if you go down you use the phrase grossly

22  incomplete repeatedly?

23  A.  Correct.

24  Q.  And you were talking earlier about how you do feel that

25  it's your obligation as a medical professional and an employee       02:57PM

1    to bring things to people's attention.  Is this something where

2    you would contact the director of nursing and say, look, your

3    nurses are not documenting correctly, or would you just --

4    A.  I would bring this to their attention.

5    Q.  Did you bring this particular problem to their attention?          02:57PM

6    A.  This was a long time ago.  I'd have to --

7    Q.  October was only four months ago.

8    A.  It's highly likely that I did.

9    Q.  What kind of reception do you get from the director of

10   nursing when you bring your comments and suggestions to her?           02:58PM

11   A.  I have never had an abrasive or negative one, so good.

12   Q.  Are they aware of these problems before you bring them to

13   their attention?

14   A.  Not always.

15          THE COURT:  Ms. Kendrick, would this be a good place            02:58PM

16   to take a five-minute break?

17          MS. KENDRICK:  Sure.

18          THE COURT:  All right.  Thank you.

19          MR. FATHI:  Your Honor, if we could just do a time

20   check.  It's about 3:00, and I recognize you denied our request        02:58PM

21   to have Dr. Taylor testify this morning but we would very much

22   like to get to her today simply because I'm examining her and

23   while I recognize everyone has schedules, my ability to return

24   for a third day is somewhat limited.

25          THE COURT:  How many witnesses are in the way before            02:59PM

1    we get --

2              MR. FATHI:  We don't know what they are planning.

3              THE COURT:  You haven't talked about that?

4              MR. BOJANOWSKI:  As you are well aware, Your Honor,

5    the plaintiffs requested all these folks, and so we've got          02:59PM

6    probably two -- I would say two more in front of Dr. Taylor.

7              THE COURT:  And who are these two additional ones in

8    front of Dr. Taylor?

9              MR. BOJANOWSKI:  It would be Erin Barlund, Dennis Dye.

10             THE COURT:  Where are they located?  Where do they         02:59PM

11   work?  Florence?

12             MR. BOJANOWSKI:  Oh, no.  I'm getting the out-of-town

13   people done right away.  Erin is here.  Right?  Yeah.  Yeah.

14   Both of them live in Phoenix.

15             THE COURT:  All right.  Well, how much more time do        03:00PM

16   you need with Ms. Fontaine?

17             MS. KENDRICK:  Five, 10 minutes.

18             THE COURT:  Okay.  How much more time -- any redirect

19   from Ms. Fontaine, do you think?

20             MR. BOJANOWSKI:  At this point I don't anticipate any.     03:00PM

21             THE COURT:  What we'll do is take the five-minute

22   break, come back, have the 10 minutes maximum that you think

23   you need with Ms. Fontaine additionally.  If you need some

24   redirect, we'll do that.  Doesn't look like it's going to be

25   that much.  I would ask that we then move to Dr. Taylor to          03:00PM

—— March 21, 2017 - Status Hearing - Fontaine - Cross ——

```
 1   accommodate Mr. Fathi and do that for the balance of the day.
 2   Thank you.
 3            MR. FATHI:  Thank you.
 4            Recess from 3:00 p.m. until 3:14 p.m.)
 5            THE COURT:  Please continue.                      03:14PM
 6   BY MS. KENDRICK:
 7   Q.  Thank you, Your Honor.
 8            Ms. Fontaine, in front of the water pitcher to your
 9   right there's a stack of documents that say CQI minutes.  The
10   first two, I believe, should be for Florence.  Do you see that?  03:15PM
11   A.  Yeah.
12   Q.  I just want to ask you a couple questions about the
13   Florence ones.  So first, with the one that has the date of
14   December 1st, your name is the fourth one down.  So I take that
15   to mean you were in attendance at it?                     03:15PM
16   A.  Yes.
17   Q.  If you could turn to Page 2 of the document where it says
18   on the left-hand side topics and multi-disciplinary is
19   underlined.  Can you see that?
20   A.  Yes.                                                  03:15PM
21   Q.  To the right in the column that says discussion, there's a
22   description of some patient issues.  And then there's a
23   sentence that says scheduling, rescheduling, cancellation
24   concerns.  Not all approved requests are showing on pending
25   consult report.                                          03:16PM
```

**March 21, 2017 - Status Hearing - Fontaine - Cross**

1          Do you remember why this was happening?

2     A.  No.

3     Q.  You don't remember this discussion at the meeting in

4     December?

5     A.  I'm sorry, I don't.                                      03:16PM

6     Q.  Okay.  And if you could look at the January minutes, I

7     think it's the next document in that stack.  It's for January

8     5th.

9     A.  Yes.

10    Q.  And again, you are about the fourth or fifth signature    03:16PM

11    down, so you were there?

12    A.  Yes.

13    Q.  If you go to Page 4 and entry E, statistical report, and

14    this is a statistical report about mental health visits.  And I

15    know that you don't monitor mental health, but you were at the  03:17PM

16    meeting.  And there's a note that's about five letters from the

17    bottom that says CAG group counseling went from 941,

18    parenthesis, 650 in reported, close parenthesis, to 785 for

19    December.  Note, N-O-T-E, in all caps.  The CAG report shows

20    512.                                                          03:17PM

21          Do you know what a CAG report is?

22    A.  I do not.

23    Q.  Do you remember a discussion about the CAG report not

24    having accurate information?

25    A.  I do not recall a discussion.  She said that, that's it.  03:17PM

```
 1   Q.  You don't recall anything more being said than what's
 2   written on there?
 3   A.  No.
 4   Q.  Okay.  Thank you.  That's it.
 5           THE COURT:  Any redirect?                              03:17PM
 6           MR. BOJANOWSKI:  No redirect.
 7           THE COURT:  Thank you.  Ms. Fontaine, thank you very
 8   much.  And I should explain to you maybe something you already
 9   know, and that is there was a lawsuit that was settled, and
10   part of that settlement was an agreement between the parties    03:18PM
11   that involves the role of the Court.  And the Court doesn't
12   really want to use the word earlier "be doing silly things."
13   And part of that is help to avoid doing silly things by
14   listening to people like you who know what is going on.  So I
15   thank you for helping the parties and helping me better         03:18PM
16   understand how we can do a good and, perhaps, better job of
17   enforcing the stipulation that was the result of the parties'
18   settlement.
19           Thank you, ma'am.
20           THE WITNESS:  Thank you.                               03:18PM
21           THE COURT:  So Dr. Taylor, if you would please step
22   forward.
23           (The witness was sworn.)
24           THE WITNESS:  I apologize.  I have a bit of a cold.  I
25   may end up with a cough drop.                                  03:19PM
```

1          THE COURT:  Then I won't be worried that are you

2    handling the notebook that was last handled by the previous

3    witness who had a cold.

4          THE WITNESS:  It's perfect.

5                    NICOLE TAYLOR,

6    a witness herein, having been first duly sworn by the clerk to

7    speak the truth and nothing but the truth, was examined and

8    testified as follows:

9                    DIRECT EXAMINATION

10   BY MR. BOJANOWSKI:

11   Q.  Would you please state your name for the record?

12   A.  Nicole Taylor.

13   Q.  Ms. Taylor, what's your business address?

14   A.  1831 West Jefferson, Phoenix, Arizona, 85007.

15   Q.  Are you employed?                                          03:20PM

16   A.  Yes, I am.

17   Q.  In what capacity?

18   A.  At the Arizona Department of Corrections.  And my official

19   title is Health Services Contract Monitor II and the unofficial

20   title is Mental Health Director.                              03:20PM

21   Q.  So what is it that your job duties entail as being the

22   mental health director for ADC and working as a mental health

23   monitor?

24   A.  There's a variety of job functions which includes auditing

25   during the month, meeting with Corizon to provide them          03:20PM

1    feedback, to also working with some of our other -- am I

2    actually too loud?  Oh, not enough.

3            Providing information to different agencies within

4    Arizona relating to how we work together with the patient

5    population.                                                   03:21PM

6    Q.  As part of your job duties, do you coordinate your efforts

7    with Corizon individuals to address problems that may be

8    arising in the delivery of services to the inmate population?

9    A.  Sometimes on a daily basis, yes.

10   Q.  So we have heard testimony from a number of different      03:21PM

11   monitors in the field who said that they don't engage in that

12   kind of activity.  Is it something that is done, perhaps, at a

13   higher level within ADC?

14   A.  That is correct.

15   Q.  All right.  So when you get -- do you get information from  03:21PM

16   the field, so to speak, from the field monitors as I will call

17   them, that trigger in your mind, perhaps, a problem with regard

18   to the delivery of mental health care to an inmate population

19   at a particular unit or particular facility that you would then

20   address with Corizon representatives?                          03:22PM

21   A.  Yes, I do.

22   Q.  And what kind of things do you do when you engage Corizon

23   in trying to both identify an issue and then work toward a

24   solution to assure that there is an appropriate delivery of

25   mental health care to the inmate population?                   03:22PM

March 21, 2017 - Status Hearing - Taylor - Direct

1    A.  You know, often times a lot of the things that we're

2    addressing within mental health right now is not actually

3    related to the CGAR because the scores are really good.  And so

4    a lot of the things a kind of ancillary stuff that may come up,

5    documentation, what -- maybe they are writing in the E section      03:22PM

6    of a SOAPE note that we consistently say, hey, part of our

7    field is to write something differently, you know.  And so we

8    may work with the staff at each site related to that with Dr.

9    Calcote coming up with a plan.  But a lot of things that aren't

10   something that you would see necessarily in a CGAR but            03:23PM

11   something we still want to clinically address.

12   Q.  What about with regard to CGAR issues, when you notice that

13   there's been non-compliance with a particular measure, what is

14   it that you would do to address the non-compliance findings?

15   And I'm speaking maybe not as a single outlier but more of a       03:23PM

16   consistent problem in meeting a particular measure.  What kinds

17   of things would you do and that have been done with regard to

18   addressing that non-compliant situation?

19   A.  Typically I first contact the mental health lead that is at

20   the site.  Each site has a designated lead.  I share those         03:23PM

21   concerns that I have and then right after that I contact their

22   regional mental health director, Dr. Calcote and share with him

23   what I have seen.  And then I provide numerous suggestions that

24   I have, having worked in the field for 12 years, related to how

25   I think they could adjust things, figure out better ways,          03:24PM

1  faster ways, cheaper ways to do things that would address any

2  of the issues that we have seen.

3  Q.  And this is all part of your job duties to address these

4  kinds of issues on a day-to-day basis?

5  A.  That is correct.                                          03:24PM

6  Q.  And could you give us an example, perhaps, of a change in

7  procedure or practice or policy that has resulted in allowing a

8  finding to improve?

9  A.  I think one that we addressed recently is related to the

10 MH-3D.  And so historically they struggled with that           03:24PM

11 performance measure, mostly because they didn't have a tracking

12 system in place.  So back in June I worked with Corizon to

13 develop a tracking system in place so that they couldn't miss

14 the people anymore.  They knew exactly who they were, when they

15 needed to be seen.  And they began that tracking system.        03:25PM

16       So what we've seen over the months is that compliance

17 has drastically increased as they have been able to make sure

18 that they have everybody identified exactly as they need to and

19 as they move throughout the state that tracking system stays in

20 place as opposed to one of their facilities only tracking who   03:25PM

21 is there.  And so that system-wide tracking as been wonderful

22 in increasing their compliance on that one.

23 Q.  So the problem was essentially that an inmate may be a 3D

24 inmate, say, at Florence and then that inmate, for whatever

25 reason, was reclassified and moved to the Lewis facility.  And  03:25PM

1    they would essentially lose track of that inmate as far as

2    making sure timing-wise that they were receiving the

3    appropriate care because there was no system in place to follow

4    that inmate on the transfers.  Is that what you are saying?

5             MR. FATHI:  Objection, Your Honor.                    03:26PM

6             THE COURT:  It was a great leading question.

7             MR. BOJANOWSKI:  I love my leading questions, Your

8    Honor.  I'm trying to move it along and describe and restate

9    her testimony, so to speak.

10            THE COURT:  All right.  The objection is overruled.    03:26PM

11   It's a leading question.  But again, it doesn't seem that this

12   witness is not going to be subject to cross-examination that

13   cannot undercut any of these issues.  So go ahead.

14   BY MR. BOJANOWSKI:

15   Q.  Was that the essence of the problem was to try and just    03:26PM

16   find out where a guy is at a particular point in time so you

17   could evaluate the care that was being given to him if he were

18   transferred between facilities?

19   A.  That was definitely a huge portion of the problem.  The

20   other problem was that that category had way too many inmates   03:26PM

21   that didn't actually qualify for the category.  So half of the

22   inmates did not even meet the criteria for the category.  So

23   while that was being developed in June, that's when we also

24   developed the 3E subcategory that we have talked about a lot to

25   help them be able to hone in exactly who had to get that        03:27PM

 1   follow-up contact.  So it was both of those issues.

 2   Q.  Okay.  And just to finish you up your background, as far as

 3   your education and such, can you just briefly describe for the

 4   Court your educational background and any licensures that you

 5   hold?                                                    03:27PM

 6   A.  Sure.  I have a bachelor's degree in psychology.  I have a

 7   Ph.D. in psychology.  And I have a law degree.  I also have a

 8   CCHP certification in general correctional health and also in

 9   mental health.  And I have taken statistics courses, many of

10   them, in both of my programs that I have been through.   03:27PM

11        THE COURT:  Are you sure you want to admit that?

12   Because that's going to open you up to a bunch of questions.

13        THE WITNESS:  To the level that we would need for

14   randomization in Excel.

15        THE COURT:  Very well.                              03:28PM

16   BY MR. BOJANOWSKI:

17   Q.  So are you familiar with randomization processes and how

18   that is obtained?

19   A.  Yes.

20   Q.  Do you engage in the randomization of any of the lists that 03:28PM

21   are utilized with regard to mental health monitoring?

22   A.  Mental health used to do all have our own, and it became

23   part of a task that was bogging us down.  We don't have enough

24   time to review the number of charts.  So that is something we

25   did hand off to Mr. Owens to be able to assist us to get  03:28PM

1    through that.  But prior to that we were doing it ourselves.

2    Q.  How is it that the files are randomized with the mental

3    health group?

4    A.  The list that we have, almost all of our performance

5    measures are automatically generated out of AIMS which provides    03:28PM

6    us every inmate who meets that criteria.  We then break them

7    down into which unit they are assigned to, and then from there,

8    they are assigned a random number.

9         And to kind of help clarify the issue that was brought

10   up earlier about the randomization, in Excel, when you tell    03:29PM

11   Excel to sort by that number it quickly sorts by that number

12   and then reassigns a new randomization number which is why when

13   you are looking at it, it does not appear to be in the

14   randomization number order.

15        We have discussed, I believe, there is a way to save    03:29PM

16   the number as an actual number so that it cannot change each

17   time you sort.  And so I think that's something we're going to

18   do going forward in order to clearly show everyone that it is a

19   random sample.  But I personally have randomized those and

20   that's the process by which you do it.  That's what happens.    03:29PM

21   Q.  So the Court was looking at some documents that had the

22   numbers on the left-hand side.  It had a decimal number and

23   then it had a quantity next to it.  Do you know what those two

24   numbers represent?

25   A.  The first one is the randomization number that's assigned    03:30PM

1    by Excel.  The second one I'm not sure what QTY meant.

2    Q.  When you look at those particular lists that were looked at

3    for other measures in medical monitoring, you recognized that

4    as being an Excel randomization data, so to speak?

5    A.  That is correct.                                          03:30PM

6    Q.  All right.  And that's because of the decimal number that

7    the computer automatically gives to the list of inmates that

8    you are sorting?

9    A.  Correct.  And the lists that are provided to us are in

10   chronological order or ADC order.  So when you see them with a  03:30PM

11   randomization number in front of those there is no rhyme or

12   reason to the order that they are in, which helps us to

13   identify whether they have been randomized or not.

14   Q.  So if I understand what you are saying, from the AIMS

15   report that you get, the list that is sent over as to who is   03:31PM

16   currently within the ADC system, that list starts with the

17   oldest number and then works down, correct?

18   A.  Correct.

19   Q.  And so for -- how many inmates are in the system?

20   A.  There's 43,000 inmates, roughly.                          03:31PM

21   Q.  So the initial list that you get, that you take into Mr.

22   Owens for randomization is the 43,000 people who are currently

23   in the system as of the date that that report is run?

24   A.  That is correct.

25   Q.  And that is then randomized through the Excel program which  03:31PM

1    spits out the decimal point number on the left-hand side for

2    whatever criteria you put in to randomize?

3    A.   Correct.

4    Q.   So you could, for mental health purposes, you could take

5    the AIMS report, and you could extract from the AIMS report all          03:32PM

6    the MH-3Ds, for instance?

7    A.   Correct.

8    Q.   And then you could send that list over to Mr. Owens for

9    randomization?

10   A.   He does all those steps for us now, which we appreciate.          03:32PM

11   So he has the whole report, and he selects 3E at North unit and

12   creates a subfolder, 3E at South unit, creates a subfolder, and

13   does this for each of them, puts on the randomization process,

14   and then it's randomized.  And so they are no longer an ADC

15   number order, which is where they started.                             03:32PM

16            THE COURT:  So are you saying the number on the left

17   is the original randomization number that is taken from the

18   40,000 plus inmates that's given everybody, and then when he's

19   asked to identify the inmates that are relevant to the

20   performance measures that you are monitoring, he then asks the        03:33PM

21   computer to provide a list.  And that it is then at that stage

22   also randomizing among those applicable inmates for your

23   performance measures but just including the original number

24   that was first assigned?

25            THE WITNESS:  The original number is lost when you            03:33PM

1   re-sort.  That's why it's not in decimal order.  When you look

2   at it, the decimals are all over the place because when you

3   sort it reassigns a new random number to it.  When he gets it

4   it doesn't have a random at all.  He gets it as a file and then

5   he puts on the randomization, pulls out North unit 3E and then     03:33PM

6   says sort this, which is why they are not in ADC number order

7   anymore.  So the one that you see is not in that order anymore

8   because it's been sorted by the random number that was assigned

9   to it.

10        But as soon as you click sort the way Excel works is        03:34PM

11   it reassigns a new random number, and that's why it looks out

12   of order to you on the number when you are looking at it.

13        THE COURT:  All right.  Thank you.

14   BY MR. BOJANOWSKI:

15   Q.  Now, you also, as part of your duties, actually perform      03:34PM

16   some monitoring at various locations throughout the state?

17   A.  Yes.  And I currently re-audit the new employee that I just

18   hired.  Every one of her audits I re-audit those.

19   Q.  Is that part of the training that the new monitor goes

20   through?                                                         03:35PM

21   A.  That's how I do it, but yes.

22   Q.  All right.  So you have a new mental health monitor, I take

23   it, right?

24   A.  That is correct.

25   Q.  And part of your job duty is to allow her -- it's a lady?    03:35PM

1    A.  Correct.

2    Q.  Okay.  Allow her to do the monitoring and then you are

3    going back and re-auditing everything she's doing.  And then if

4    you find issues or problems you are pointing out and showing

5    her the appropriate either methodology or appropriate                    03:35PM

6    documentation to look at or whatever it may be to assist her in

7    developing the skills to be a standalone monitor?

8    A.  That is correct.

9            MR. FATHI:  Objection, Your Honor.  Leading.

10           MR. BOJANOWSKI:  I really will try, Your Honor.  But       03:35PM

11   again, I'm trying to --

12           THE COURT:  I understand.

13           MR. BOJANOWSKI:  -- speed things up here a bit.

14   BY MR. BOJANOWSKI:

15   Q.  All right.  So, now, are you actually monitoring any units     03:35PM

16   within the system currently?

17   A.  I currently am still re-auditing all the facilities she's

18   auditing.

19   Q.  I was wondering if you were doing, say, the Florence

20   facility or Yuma whatever on your own at this point, or are you    03:36PM

21   just supervising her?

22   A.  I just supervise her and then I do the peer review question

23   for mental health.

24   Q.  Okay.  In front of you is the big notebook, and I have got

25   you to turn to E-2, which is Performance Measure Number 94.  Do    03:36PM

1    you see that?

2    A.  Yes, I do.

3    Q.  So let's go to the back of that all the way to the back

4    right before Tab F.  And you are going to see the actual CGAR

5    report.  And I take it this is for the Yuma complex, correct?          03:37PM

6    A.  Correct.

7    Q.  And this is for November 2016?

8    A.  Correct.

9    Q.  And it appears as though you inputted this information on

10   December 30th, 2016, at 4:03 p.m.?                                      03:37PM

11   A.  That is correct.

12   Q.  You reviewed 15 files?

13   A.  Correct.

14   Q.  And 10 were found compliant?

15   A.  That is correct.                                                    03:37PM

16   Q.  And that left a compliance rate of 66.67 percent.

17   A.  Correct.

18   Q.  Then you have a comments section in there where you said,

19   "Out of the required 68 watch contacts during the audit months,

20   63 were done in compliance, 93 percent."  Do you see that?             03:37PM

21   A.  Yes, I do.

22   Q.  If you go down further you have got some additional notes

23   here which may need some interpretation.  We've got date

24   placed, weekends missed, weekdays missed, watched DC license

25   compliant ████?                                                        03:38PM

1   A.  Correct.

2   Q.  I take it that's an inmate number?

3   A.  That's correct.

4   Q.  All right.  And you have got 11-21-16, 11-24 CF.  What does

5   CF mean?                                                      03:38PM

6   A.  CF means the inmate was seen cell front without an offer of

7   a confidential setting and/or refusal.

8   Q.  All right.  Further on down in this description, you have

9   got -- and I'm just skipping down here.  You have got

10  11-3-16 -- excuse me -- 11-28-16 you have a Y and an N.  What  03:38PM

11  does the Y and N mean?

12  A.  So we have worked with the defendants and agreed to put --

13  I'm sorry, plaintiffs.

14          THE COURT:  Plaintiffs, yeah.

15          THE WITNESS:  To put the headers just before we put     03:39PM

16  our information in so that they could easily tell what each of

17  the categories were.  So that's what the ADC number, date

18  placed, weekends missed, weekdays missed, those are each of the

19  headers that we have taken the information from.  And so then

20  when you see an entry you can line those up because the CGAR,    03:39PM

21  unfortunately, is difficult to read.

22          And so the Y would corresponds with one of those

23  columns and the N would correspond with one of those columns.

24  BY MR. BOJANOWSKI:

25  Q.  Okay.                                                       03:39PM

—— **March 21, 2017 - Status Hearing - Taylor - Direct** ——

1   A.  So likely in that one the Y would mean the person was

2   licensed but the N means that they were non-compliant because

3   there was a cell front contact.

4   Q.  So let's work through the documents so we can maybe explore

5   these codes here so the Court can understand when it's going          03:39PM

6   through the CGAR finding what it is that it's actually showing.

7        All right.  So the first --

8   A.  Okay.

9   Q.  If you go to the first document, 1, it looks like a list of

10  inmates.  Is that what that is?                                       03:40PM

11       MR. FATHI:  I'm sorry.  Where are we?

12       MR. BOJANOWSKI:  Document 1.  No.  We're still under

13  94, David.  Go back to 94.  Tab 2.  Document 1.  And each one,

14  each thing is going to be like Document 2.  Okay.  All right.

15       Do you see where we are at, Your Honor?                          03:40PM

16       THE COURT:  Yes.

17  BY MR. BOJANOWSKI:

18  Q.  So we're at document Number 1 which appears to be a list of

19  inmates, is that right?

20  A.  That is correct.                                                  03:40PM

21  Q.  And what kind of list is this?  What is this list?

22  A.  This is a watch log depicting every inmate at, in this

23  case, the Yuma facility who has been placed on watch and/or

24  come in from another facility and needing a watch follow-up.

25  So they track all their inmates on their log.                        03:41PM

1   Q.  Where does this information come from?

2   A.  Each site maintains the individuals who were placed on

3   watch.  And usually, the mental health lead is the one who

4   maintains the log and then provides that to us.

5   Q.  So somebody from Corizon prepares a log and then sends that          03:41PM

6   log over to ADC for use every month?

7   A.  That is correct.

8   Q.  So each facility does the same thing.  Any facility that

9   involves a watch, for instance, Eyman or, you know, may have

10  watches there, they do the same thing.  They prepare a log and           03:41PM

11  send it over to ADC?

12  A.  That is correct.

13  Q.  So that's the source document, is that right?

14  A.  Correct.

15  Q.  So go to Document Number 2.  And what is that document?              03:42PM

16  A.  So Document 2 is all the inmates who have been pulled out

17  of that log who meet the criteria for Performance Number 94, I

18  believe it is, which is the daily suicide watches.  So any

19  inmate who was on watch for at least one day in the audit month

20  is placed into this tab.  It's on an Excel sheet.  So we create          03:42PM

21  a tab that pulls out those individuals who meet the criteria.

22  Q.  So Performance Measure 94 is measuring, it says, all

23  prisoners who are on a suicide watch or mental health watch

24  seen daily by a licensed mental health clinician or on weekends

25  or holidays by a registered nurse.                                       03:43PM

1          So that's what you are trying to measure, right?

2    A.   Correct, for the audit month.

3    Q.   So is the list -- how is Document Number 2 related to

4    Document Number 1?

5    A.   So Document Number 2 are those individuals who have been          03:43PM

6    copied from Document Number 1 who met the criteria for the

7    month of November.

8    Q.   What is the criteria?

9    A.   That they were on watch for at least one day in the month

10   of November.                                                          03:43PM

11   Q.   Okay.  So the list from Document Number 1 is you cull out

12   of that list the inmates who meet the criteria of being on

13   watch for 24 hours.  Right?  Then is that list then randomized?

14   A.   That is correct.

15   Q.   And so this Document Number 2 is after the randomization         03:43PM

16   has occurred?

17   A.   That is correct.

18   Q.   How do you know that?

19   A.   So the random numbers are first assigned, and then the

20   entire sheet, this tab, is sorted by the random number that was      03:44PM

21   assigned.  So as you can see, the order that they were in in

22   the original document is no longer the order that they are in

23   in Document Number 2 because they have been randomly sorted.

24   Q.   All right.  So now when you go to analyze this particular

25   measure, what you are going to do is are you going to go to the      03:44PM

1    first 10 on this random list?

2    A.   That is correct, now 15.

3    Q.   15?

4    A.   Based on the agreement.

5    Q.   So what do you do next after you get this random list?            03:44PM

6    A.   So we go to the first person, which is the ████, and we

7    look to see -- they may tell us when the inmate went on or off

8    watch but we go and then verify that that is, in fact, when the

9    inmate went on and went off watch.  So we go and find those two

10   contacts.                                                              03:45PM

11   Q.   How do you do that?

12   A.   So in eOMIS, we go and look for the contact that placed the

13   inmate on watch.  And we -- I have put a copy of sort of what

14   we can see, which will show you the contacts and you can see

15   that there is a mental health sick call.                              03:45PM

16   Q.   So this is Document Number 3 that you are looking at?

17   A.   Correct.

18   Q.   And Document Number 3 is something that is like a screen

19   shot out of eOMIS?

20   A.   Correct.                                                         03:45PM

21   Q.   And so this is -- what you then do is you have got your

22   first patient, who is Mr. ████████?

23   A.   Correct.

24   Q.   And you are basically pulling up his -- what is this, a

25   contact sheet?                                                        03:46PM

1  A.  So we go into the health services encounters, and I just

2  copy and paste it so that I didn't have to print his whole

3  record.  But we go and look to see during the range that they

4  say he's on watch and we go and read each of the notes to

5  determine exactly the date that he was placed on watch.          03:46PM

6        THE COURT:  And maybe we should use the last three

7  numbers of the inmate's number rather than his name or the full

8  number just to protect the record in case somebody should walk

9  into the courtroom.

10        THE WITNESS:  Appreciate that.                            03:46PM

11  BY MR. BOJANOWSKI:

12  Q.  So the first inmate is 912?

13  A.  Correct.

14  Q.  So Mr. 912 -- is the first line, 11-28-2016, is that when

15  he was placed on watch?                                         03:46PM

16  A.  That's when he came off watch.  EOMIS puts it in

17  chronological order with the most recent on top unless you

18  re-sort it in the other direction.  So 11-21 was when he was

19  placed on watch, and that's only verified by actually opening

20  up the encounter and determining that that is when he was       03:47PM

21  actually placed on watch.

22  Q.  So you look at this particular document, then you go

23  further into eOMIS to actually see an entry that matches up

24  with what this log is showing?

25  A.  That is correct.  So in Document 4 is that actual note, the  03:47PM

1    11-21.

2    Q.   Okay.  So if we go to Doc 4 then, this is another page out

3    of eOMIS that you have copied, and it's dated 11-21-2016,

4    right?

5    A.   That is correct.                                    03:47PM

6    Q.   And it says that the type is a mental health sick call

7    unscheduled.  What does that mean?

8    A.   That means that the inmate was seen unplanned, and so he

9    wasn't scheduled already through some other method.  And

10   typically it's that maybe the inmate turned in an HNR, needed    03:47PM

11   to be seen, or security asked mental health to go see the

12   inmate.  So it wasn't a planned contact.

13   Q.   Okay.  So what do you do with Document Number 4, which is

14   six pages long?

15   A.   We review the encounter note to ensure that that is the     03:48PM

16   actual placement on watch so that we have a starting point to

17   determine whether the inmate was seen each day while on a

18   suicide or a mental health watch.

19   Q.   Where in this six pages is it verified that he was placed

20   on watch?                                                 03:48PM

21   A.   So on 5 of 6, the psych associate wrote, "Patient will be

22   placed on a 10-minute suicide watch."

23   Q.   So you now have gone from the log and verified the log

24   entry showing that on this date he's placed on a 10-minute

25   suicide watch, right?                                     03:48PM

1    A.   Correct.

2    Q.   What's the next step in determining compliance?

3    A.   So the next step under the next -- I think I have Document

4    3-C written here.  But the next set is each note that we then

5    review to ensure that a licensed individual met with the inmate          03:49PM

6    in a confidential setting or offered to meet with the inmate in

7    a confidential setting, if it's a weekday, and then if it is

8    not a weekday, or it's a holiday, we then check to see if the

9    registered nurse did the same.  So you can see 11-22 is the

10   first note and the psych associate indicated that they offered          03:49PM

11   the individual the opportunity to talk in a private setting

12   outside of the cell but he refused to come out.

13            So that's the first note that we are looking for and

14   then we go to the next set which is 11-23.

15   Q.   That's 3D?                                                          03:49PM

16   A.   Correct, the next.  And I'm just trying to kind of move it

17   along, too.  So I know we're trying to get through a lot.

18   Q.   Yeah.  So what you are doing with 3 C, D, E, F, G, H, and I

19   is you are looking for these contacts.  Is that accurate?

20   A.   That is correct.                                                    03:50PM

21   Q.   All right.  So let's run through each of these health

22   services encounter notes and identify the contact that's made

23   and whether that contact is compliant or non-compliant.

24   A.   Okay.  So back on 3C on 11-22 the inmate was seen by the

25   psych associate.  That psych associate is licensed.  We get a           03:50PM

1    list from Corizon of everybody who has a license.  And the

2    individual was offered to come out of his cell to a

3    confidential setting.  He was not interested in that.  That's

4    documented.  So that would be considered compliant.

5           Under 3D the next day is 11-23, again, psych associate    03:51PM

6    Vasquez who is a licensed individual met with the inmate.  He

7    said that he saw the inmate cell front due to refusing to come

8    out of his cell for the one-to-one contact in a confidential

9    setting.

10   Q.  What if the psych associate was not licensed?              03:51PM

11   A.  Then it would not be compliant under the column licensed,

12   yes or no.

13   Q.  Okay.  So the Y/N thing that we looked at in the CGAR, that

14   translates into one of the criteria for compliance is that the

15   person needs to be seen by a licensed individual?             03:51PM

16   A.  That is correct.

17   Q.  Okay.  And so you are making that determination on each

18   health services encounter to run through the list of is he

19   licensed or not licensed, is the contact appropriate, is it

20   timely.                                                        03:51PM

21   A.  Uh-huh.  Correct.

22   Q.  So the next one is 11-23?

23   A.  11-23.  Again, that one would be compliant.  Seen by a

24   licensed psych associate.  Psych associate offered for him to

25   come out into a confidential setting which she refused,        03:52PM

1    therefore, seen cell front.

2    Q.  Next one?

3    A.  Then under 3E is 11-24, which was Thanksgiving.  That day

4    was covered by a registered nurse, and the registered nurse

5    indicated that the inmate was sleeping and does not respond to          03:52PM

6    medical's attempts to communicate verbally.

7    Q.  Is it okay to have a registered nurse do this kind of

8    review under the measure?

9    A.  Yes, it is, on weekends and holidays.

10   Q.  Okay.  So you are looking to make sure that it's either a          03:52PM

11   registered nurse on weekends and holidays or a licensed

12   individual on other days?

13   A.  That is correct.

14   Q.  So this note says inmate sleeping and does not respond to

15   medical's attempts to communicate verbally.  Is that what it          03:52PM

16   says?

17   A.  That is correct.

18   Q.  Is that compliant or not compliant?

19   A.  That is not compliant.

20   Q.  Why is that not compliant?                                        03:53PM

21   A.  Per the October 5th order by this Court, the inmate needs

22   to be offered to be seen in a confidential setting and refused

23   that offer to be seen cell front.

24   Q.  So because the nurse did not wake this person up and make

25   sure that they were woken up and communicated with him and           03:53PM

1    offered to him to come out and do a confidential one-on-one,

2    this is a non-compliant finding?

3    A.   Correct.  And she might have, because she says attempts to

4    communicate verbally, but we wouldn't count that because we

5    specifically require them to document that they offered that          03:53PM

6    confidential contact and that that was refused.

7            And so generally writing that you tried to communicate

8    verbally is not something that we have included in compliance.

9    Q.   So she actually showed up and tried to do something with

10   the inmate, but he was not cooperative, apparently, and she         03:54PM

11   didn't do anything about it by having him maybe removed from

12   the cell.  Is that the next step?  I mean, I don't know.

13   A.   Yeah.  Usually they will drop the trap, the front part of

14   the door, and have an officer say something to the inmate

15   through the door, try to get their attention that way.  Maybe      03:54PM

16   the nurse will try to talk to them.  And all of that may or may

17   not have happened.  But she didn't document the attempts, so we

18   didn't count that as a compliant contact.

19   Q.   So what's the next date?

20   A.   The next day is 11-25.  And again, in this, the               03:54PM

21   documentation by the licensed psych associate is that he was

22   seen cell front for his daily watch contact.  He was offered

23   the opportunity to talk in a private setting, and he declined

24   to come out.  So 11-25 would be considered compliant.

25   Q.   Okay.  And the next day under 3G?                             03:55PM

1    A.  And then under 11-26, again, seen by a licensed psych

2    associate.  And at this point, the patient did agree to come

3    out of the cell for the one-on-one, so that's documented in

4    there.  And he was at that point removed from watch.

5    Q.  Okay.                                                                03:55PM

6    A.  Actually, he may not --

7    Q.  Not quite yet.

8    A.  I was thinking 28th.  Sorry.

9    Q.  So the next contact with the inmate is 11-27?

10   A.  Correct.                                                             03:55PM

11   Q.  So what happened there?

12   A.  On 11-27, again, seen by a licensed psych associate.  We

13   checked to see that, and again, in this contact he was offered

14   the opportunity to talk in a private setting.  And he declined

15   to come out so he was seen cell front.                                   03:56PM

16   Q.  Okay.  Then on 11-28 which is the next one?

17   A.  And then on 11-28 seen again by a licensed psych associate,

18   and he was offered the opportunity to have a one-on-one

19   contact.  He refused that opportunity so he's seen cell front,

20   which is documented in there.  And this is the note where the           03:56PM

21   inmate was discontinued from watch, so you can see on Page 3 of

22   4 they indicated discontinued watch at 1130 hours.  And that

23   then tells us the date ranges for the start and stop time to

24   review for this performance measure.

25   Q.  So under this performance measure, you are going to look at         03:56PM

1  the eight days that he was on watch, right?

2  A.  Correct.

3  Q.  And analyze whether he was seen on each of those eight

4  days, right?

5  A.  That is correct.                                          03:57PM

6  Q.  Now, he was seen seven out of the eight days, correct?

7  A.  Correct.

8  Q.  Now, how do you score this particular inmate's file?

9  A.  We score that as non-compliant in totality.

10  Q.  Why is that?                                             03:57PM

11  A.  Based on the Court's order that partial credit doesn't

12  count, we count the entire file as non-compliant for the

13  contact by the nurse.

14  Q.  How is that reflected, then, in the CGAR result at the end

15  of this measure?  How is this particular inmate's non-compliant 03:57PM

16  file reflected in this CGAR report?

17  A.  So the portion that's highlighted, the very last thing

18  before the next inmate's number is an N.  And that N is whether

19  or not this file is compliant or not.  This file is one of the

20  five that were found non-compliant.                         03:58PM

21  Q.  So I'm looking here about halfway down where it says

22  ████.  Is that our person?

23  A.  That is correct.

24  Q.  And it says 11-21-16, 11-24 CF none.  What does that mean?

25  A.  So the 11-21 lines up with date placed on watch.  The 11-24 03:58PM

365

1    CF lines up with the weekends missed, and so that is the note

2    by the nurse that was done cell front.

3    Q.  That's where she couldn't wake him up?

4    A.  Correct.  So we signify the CF so that Corizon is aware

5    that it's not that the note is missing, we did see the note,                    03:58PM

6    but the note does not meet the criteria that it needs to be for

7    compliance.  The CF is cell front.

8    Q.  And the reason it didn't meet compliance is because the

9    nurse that did it did not offer him to come out of the cell?

10   A.  That is correct.                                                             03:59PM

11   Q.  Or if she did, she didn't document it.  One of the two?

12   A.  Correct.

13   Q.  Okay.  So then it says after a CF, it says none.  Then

14   11-28-16 it has a Y.  What does that mean?

15   A.  So just to back up, the none is that there are none weekday     03:59PM

16   ones that are a problem.  We recently switched to not splitting

17   it up to weekends and weekdays because in general now mental

18   health is doing them on the weekends and holidays.  But we were

19   trying to provide information back to Corizon about whether

20   it's a nursing function that's a problem or mental health          03:59PM

21   function.  So we used to kind of split those up.  So none was

22   that none of those were the psych associates but instead was

23   the nursing staff seen cell front.  And 11-28 is the watch DC

24   date.  The Y means that all the contacts were done by a

25   licensed clinician.  And the N means although all that              03:59PM

——— **March 21, 2017 - Status Hearing - Taylor - Direct** ———

1   information, it is a non-compliant file.

2   Q.  So then the next file that's non-compliant was 30576?

3   A.  How far down is that?

4   Q.  Next one?

5   A.  That one is compliant.                                    04:00PM

6   Q.  That's compliant.  So you are listing all of the files that

7   you reviewed here?

8   A.  That is correct.

9   Q.  How do you know that the ▮▮▮▮▮ is compliant?

10        MR. FATHI:  Excuse me, Your Honor.  Could we use        04:00PM

11  partial --

12        MR. BOJANOWSKI:  Sorry.  376.  I'm sorry.

13        THE WITNESS:  After the first date, which is the date

14  the inmate was placed on watch, the next thing says none and

15  then none, meaning there were no notes found during the time   04:00PM

16  period that that individual was on watch that did not meet the

17  criteria.

18  BY MR. BOJANOWSKI:

19  Q.  Then so he went on 10-31-16, came off 11-3-16.  All of --

20  everybody was licensed with a Y, and every file was compliant  04:01PM

21  with another Y?

22  A.  That is correct.

23  Q.  Yes and yes.  So the next one is 581, went on watch

24  10-25-16.  Again, there were no problems in any of the contacts

25  notes, came off 11-4-16, licensed individual, compliant file.  04:01PM

1    That's how you go through and read these lines, right?

2    A.   That is correct.

3    Q.   Okay.  Now is this same basic procedure done with regard to

4    the other measures that are involved in the mental health

5    review?  In other words, is it a source document looking at the          04:02PM

6    notes and records and making a determination of compliance,

7    non-compliance, based on the methodology set forth in the

8    guide?

9    A.   That's correct.

10   Q.   It's done for each measure?                                          04:02PM

11   A.   That is correct.

12          MR. BOJANOWSKI:  Nothing further, Your Honor.

13          THE COURT:  Thank you.  Mr. Fathi.

14                    CROSS-EXAMINATION

15   BY MR. FATHI:                                                             04:02PM

16   Q.   Good afternoon, Dr. Taylor.

17          Dr. Taylor, who is Dennis Dye?

18   A.   He is a mental health auditor that I supervise.

19   Q.   Did you speak with Mr. Dye at the last break?

20   A.   I did.  I said he looked very nice in his suit.                      04:02PM

21   Q.   Did you speak with him about the testimony he was going to

22   be giving in this case?

23   A.   No, I did not.

24   Q.   You did not speak with Mr. Dye about randomization?

25   A.   I told him that we are going to change our randomization             04:02PM

1   process.  But that's not about his testimony.  That's about a

2   method that we need to look at as I was just describing to the

3   judge about saving the number as a solid number so that you

4   guys can see the order, that we're going to probably need to

5   change that piece.                                          04:03PM

6   Q.  You did not talk to Mr. Dye about his testimony in any way?

7           MR. BOJANOWSKI:  Your Honor, we'll object to this.

8           THE COURT:  Overruled.

9           THE WITNESS:  That's not about his testimony.  That's

10  about a process change that we need to make.                04:03PM

11  BY MR. FATHI:

12  Q.  You did not speak with Mr. Dye about his testimony in any

13  way?

14  A.  No, I did not.

15  Q.  You did not in any way suggest to him what he should       04:03PM

16  testify to in this proceeding?

17  A.  No, I did not.

18          MR. BOJANOWSKI:  Same objection.

19          THE COURT:  Overruled.

20  BY MR. FATHI:                                               04:03PM

21  Q.  Have you e-mailed or texted with Mr. Dye since the last

22  break?

23  A.  No.  I came right up here.

24  Q.  You have not e-mailed or texted with Mr. Dye since the last

25  break?                                                      04:03PM

1  A.  I don't think so.

2  Q.  Are you sure?

3  A.  I'm not sure.  I e-mailed and text -- I e-mailed Mr.

4  Ryan -- sorry -- Mr. Owens and told him that we need to change

5  the randomization process.                                      04:04PM

6  Q.  So you may have e-mailed or texted Mr. Dye since the last

7  break.  You are just not sure?

8  A.  I'm not sure.

9  Q.  Would you turn to Tab E-1, please, Document Number 1?

10  A.  Yes.                                                        04:04PM

11  Q.  What is this document?

12  A.  This is the MH-3D log that I was referring to a little bit

13  earlier.

14  Q.  Who created this document?

15  A.  Corizon creates the document by running a report out of    04:04PM

16  AIMS to tell them who needs to be placed into the log.

17  Specifically, Amber Ornelas is the individual who maintains the

18  statewide 3D log.

19  Q.  So you know that Ms. Ornelas is the person who created this

20  document?                                                       04:04PM

21  A.  We kind of created it together, but yes, she maintains it.

22  Q.  Okay.  I'm trying to find out who created this document

23  that we're looking at.

24  A.  Oh.  I apologize.

25  Q.  You or Ms. Ornelas?                                         04:05PM

1    A.  She created this one.

2    Q.  Okay.  And what is the date of this document?  And by that

3    I mean the information in this document is correct and current

4    as of what date?

5    A.  So depending on which month the CGAR was referring to, let          04:05PM

6    me just look at the CGAR that we attached to this one.  So this

7    would be up and through October, the end of October.

8    Q.  So the information in this document is correct and current

9    as of October 31st, 2016?

10   A.  Correct.                                                             04:05PM

11   Q.  And this is a list of all patients classified as MH-3D in

12   the Arizona Department of Corrections, is that right?

13   A.  As of October 31st.

14   Q.  Of 2016?

15   A.  Correct.                                                             04:06PM

16   Q.  And you're confident that it is complete and comprehensive?

17   A.  We have done numerous checks to make sure as we

18   transitioned from the process we had that you were not happy

19   with, into sort of this process where we had a log that

20   identified exactly everybody who met the criteria.  And so we,          04:06PM

21   for many months, ran both reports to ensure that every one was

22   maintained, but she runs the same report out of AIMS that feeds

23   into this to ensure that every inmate who is designated at the

24   end of October 31st is on this list.

25   Q.  Let me repeat my question.  Are you confident that this             04:06PM

1   document is a complete and comprehensive list of every MH-3D

2   patient as of October 31st?

3   A.  I have no indication that anybody is missing on here.

4   Q.  And you are confident that it is an accurate document?

5   A.  I am confident of that, yes.                              04:06PM

6   Q.  Performance Measure 85 requires that all MH-3D prisoners

7   shall be seen by a mental health provider within 30 days of

8   discontinuing medications, is that right?

9   A.  That is correct.

10  Q.  What are the two right-hand columns in this document?  What   04:07PM

11  do they indicate?

12  A.  The pinkish colored column is the date that their

13  medications were discontinued, and the blue column is the date

14  that they were seen by the provider for follow-up.

15  Q.  After discontinuing medications?                         04:07PM

16  A.  That is correct.

17  Q.  Okay.  Would you please flip a few pages in.  We're looking

18  at the prisoners who were at Dakota unit about five pages in.

19  A.  Okay.

20  Q.  And I wanted to ask you about the last record on that page.   04:07PM

21  The last three digits of the ADC number are 383, and the

22  person's initials are ME.  Do you see that?

23  A.  The last Dakota one?  I'm sorry.

24  Q.  The last record on the page.  I'm looking at the page that

25  ends with Dakota.  Perhaps you are on the next page.           04:08PM

1   A.  Okay.

2   Q.  Okay.  And I'm asking about the last record on that page,

3   the last three digits are 383, initials ME.  Do you see that?

4   A.  Yes.

5   Q.  And this indicates that this person discontinued          04:08PM

6   medications on July 12th, 2016, and had his follow-up on May

7   3rd, 2016.  Do you see that?

8   A.  I do.

9   Q.  Okay.  Would you turn to the next page, please?

10  A.  Yes.                                                       04:08PM

11  Q.  Still a Dakota unit, maybe the seventh one from the top,

12  last three digits 032, initials AB.  Do you see that?

13  A.  Yes, I do.

14  Q.  And this indicates that this person discontinued

15  medications on September 9th, 2016, and had his follow-up on   04:09PM

16  August 18, 2016.  Do you see that?

17  A.  Yes, I do.

18  Q.  All right.  Would you turn several more pages into the

19  document.  I'm looking at a page where most of the prisoners

20  are at San Carlos.                                             04:09PM

21  A.  Starting with Rynning?

22  Q.  Yes.

23  A.  Okay.

24  Q.  And maybe a third or so down the page I'm looking at a

25  record, last three digits 106, initials DW.  Please let me know 04:09PM

—— **March 21, 2017 - Status Hearing - Taylor - Cross** ——

1    when you have found that.

2    A.  Uh huh.  Yes.  I see that.

3    Q.  And this document indicates that this patient discontinued

4    medications on June 13th, 2016, and had her follow-up on April

5    6th, 2016.  Do you see that?                              04:10PM

6    A.  Yes, I do.  And if I may.

7    Q.  May I continue?

8           And finally, back toward the beginning I'm looking at

9    a page where the second half is Cibola unit.

10   A.  Okay.                                                04:10PM

11   Q.  And about maybe two-thirds of the way down the page, last

12   three digits 627, initials RC.  Do you see that record?

13   A.  Yes, I do.

14   Q.  And this document indicates that this person discontinued

15   medications on May 16th and had his follow-up on March 2nd.   04:10PM

16   Do you see that?

17   A.  Yes, I do.

18   Q.  Would you turn to the previous page, please?

19   A.  Sure.

20   Q.  About seven or eight from the top, the first record from   04:11PM

21   the central unit, last three digits of the number are 851,

22   initials ND.  Do you see that?

23   A.  Yes, I do.

24   Q.  This person discontinued medications on January 11, 2016,

25   correct?                                                 04:11PM

March 21, 2017 - Status Hearing - Taylor - Cross

1    A.  That is correct.

2    Q.  Then it says court?

3    A.  That is correct.

4    Q.  What does court mean?

5    A.  That means the inmate is out to court.                    04:11PM

6    Q.  Is out to court when?

7    A.  During the period of time that this report is run.

8    Q.  So we can't tell from this document if this person was ever

9    seen by a provider after discontinuing medications on January

10   11th, 2016, correct?                                           04:11PM

11   A.  To be honest, Mr. Fathi, I don't use this report to tell me

12   whether or not they saw the provider.  I actually go and review

13   the record myself.

14   Q.  Could you answer my question, Doctor?

15   A.  The answer to the question is that this documentation --    04:12PM

16   this document isn't used to tell you whether they were seen or

17   not.  This is used to tell us when their medications were

18   discontinued so that we can go review those individuals.

19   Q.  Doctor, you can't tell from this document if this patient

20   was ever seen by a provider after discontinuing meds on January 04:12PM

21   11th, 2016, correct?

22   A.  That is not the purpose of the document, so I'm confused

23   why you would ask whether you would use the document for

24   something it's not made for.

25   Q.  Would you answer my question, Doctor?                       04:12PM

**March 21, 2017 - Status Hearing - Taylor - Cross**

1    A.  Sir, this document is used as a source document so that I

2    know what records to pull.  I also don't take their answer as

3    saying that they saw this inmate on 9-20 as their answer.  I go

4    and review that myself.  So none of these individuals would we

5    take their word for them saying they saw them.  We go and                04:13PM

6    review them ourselves.

7    Q.  Would you answer my question, Doctor?

8         MR. BOJANOWSKI:  Your Honor, I think she's answered

9    the question.  And quite frankly, you know, this is supposed to

10   be an educational situation not some kind of gotcha                      04:13PM

11   cross-examination that, you know, Mr. Fathi wants to lead.

12        THE COURT:  At some point Mr. Fathi probably will try

13   to ask a more useful question.  But right now the question he's

14   asking seems pretty obvious to everybody in the room, except

15   you are not saying.  And that is from this document you can't            04:13PM

16   tell when the medication -- you can't tell when the person was

17   seen with respect to this court person because it doesn't tell

18   you that.  So everybody can see what he's asking you.  He just

19   wants you to say it.  It doesn't seem like it's going to be

20   particularly efficacious but if you could answer that question          04:13PM

21   it would be helpful.

22        THE WITNESS:  No.  I cannot tell whether the inmate

23   was seen from this document.

24   BY MR. FATHI:

25   Q.  Thank you, Doctor.                                                  04:14PM

1          Would you turn to Document 2, please.  And what is

2    this document?

3    A.  This is the suicide and mental health watch log from Yuma.

4    Q.  I'm sorry.  I think you may be looking at the wrong

5    document, too.  This is the document that immediately follows          04:14PM

6    the one we've been looking at.

7    A.  I apologize.  So this is the Florence complex information

8    pulled out of the statewide log we were just looking at.

9    Q.  So does this document list all MH-3D patients at Florence

10   as of a certain date?                                                  04:15PM

11   A.  That is correct.

12   Q.  And what is the date of this document?

13   A.  This is up and through October 31st of 2016.

14   Q.  So this document lists all the MH-3Ds at Florence as of

15   October 31st, 2016?                                                    04:15PM

16   A.  That is correct.

17   Q.  Would you turn to Document 3A please, next in order.  What

18   is this document?

19   A.  This is East unit pulled out of the statewide log of all

20   inmates as of October 31st who were classified as MH-3D.              04:15PM

21   Q.  So this is all MH-3Ds at Florence east unit as of October

22   31st, 2016?

23   A.  That is correct.

24   Q.  And what are the numbers in the left-hand column?

25   A.  Those are the randomization numbers that we have been             04:15PM

1   discussing.

2   Q.  Is this a randomized list?

3   A.  Yes, it is.

4   Q.  And what makes it a randomized list?

5   A.  Randomization numbers were assigned to all the inmates that    04:16PM

6   were on East unit and then the entire document was sorted by

7   the random number and shifted them around from the

8   chronological order that they were in.

9   Q.  What is the order of the names on this list?

10  A.  Random.  The names are not in any order.    04:16PM

11  Q.  A random sample, you would agree, is a sample in which

12  every member of the larger population has an equal chance of

13  being selected into the sample.  Is that correct?

14  A.  Correct.

15  Q.  So a random sample is not the same as a haphazard sample.    04:16PM

16  Correct?

17  A.  I would say by definition, no.

18  Q.  It is not the same?

19  A.  No.

20  Q.  So you don't know -- is it your testimony that you can't    04:17PM

21  tell me what is the order of these names?

22  A.  I can tell you that they have been randomized by the number

23  that is out on the left-hand column because that is the process

24  that was done that month.

25  Q.  Except that they are not in order of those random numbers,    04:17PM

1    correct?

2    A.  Because the number reassigns itself.  As I was explaining

3    earlier when you sort, it reassigns a new number to that of

4    which we're more than happy to learn ways to fix that so that

5    you can better see what we're doing.                         04:17PM

6    Q.  Okay.  But you testified that these numbers in the

7    left-hand column are the random numbers that were assigned?

8    A.  That is correct.

9    Q.  And all I'm asking is these records are not in order, in

10   numerical order, according to those random numbers, correct?  04:17PM

11   A.  They are in order according to the numbers that were

12   assigned when sorted.  And as I have explained, it reassigns a

13   new number each time you do that.

14   Q.  Doctor, I'm asking a really simple question.  These names

15   are not in numerical order according to the numbers in the   04:18PM

16   left-hand column.  Isn't that right?

17   A.  As they are printed out, they are not.  They are in the

18   order --

19   Q.  Thank you.

20   A.  -- that they were assigned when it was sorted.           04:18PM

21   Q.  Isn't the whole point of assigning random numbers to each

22   file that you then list them in numerical order according to

23   the random numbers.  That's now you generate a random number?

24   A.  I wouldn't say that's the point of it.  The point is that

25   every chart has the same chance of any other chart being there. 04:18PM

1    So they all had numbers assigned to them.  We tell the program

2    to sort it based on that number of which it did.  And every

3    file had the chance to be at the top and pulled for review

4    which is exactly what we did.

5    Q.  So once you assign each file a random number it's not                04:18PM

6    necessary then to place them in numerical order in order to

7    generate a random order?

8    A.  It's not, because it's -- every one of them has the same

9    opportunity to be picked, regardless.  We could say reverse

10   number order.  The point is we cannot have it by the date                04:19PM

11   order, right, or by their ADC number or by some fashion of

12   which could be predicted ahead of time.  Because every file

13   needs to have the same chance to be picked as the 10 for that

14   unit, which is exactly what happens in this case.

15   Q.  So as I understand your testimony, just assigning each file          04:19PM

16   a random number is sufficient.  You don't need to then put them

17   in numerical order.  Is that what you are saying?

18   A.  You do need to put them into some form of an order so that

19   it sorts them.  But that number staying with that file isn't

20   necessary.  Because this is -- it's a random number.  It                 04:19PM

21   doesn't then dictate whether or not they were randomized

22   because they were.  We could tell it to randomize it again,

23   like I said, in reverse order, right, so that the biggest one

24   is on top.  But if it reassigns a number it doesn't mean they

25   weren't sorted randomly.  They still were sorted randomly.               04:20PM

UNITED STATES DISTRICT COURT

1   Q.  How can we tell by looking at this document they were

2   sorted randomly?

3   A.  As I have shared, it's become very clear it's hard for you

4   guys to tell we know what we're doing.  We know we have sorted

5   them.  We see you have struggled to see that because the end          04:20PM

6   product is not in a certain order.  So I think we're going to

7   work on how we can -- I believe you save the numbers as a

8   specific number so that it can't change so that then you can

9   see very clearly how they were sorted.

10  Q.  Okay.  But just to be clear, you can't tell by looking at          04:20PM

11  this document that these files have been sorted in a random

12  order, correct?

13          MR. BOJANOWSKI:  Objection.  She's asked and answered

14  this several times saying she can tell they have been sorted.

15  She assured us they have been sorted.  She's described the           04:20PM

16  methodology by which it was sorted.

17          MR. FATHI:  Well, that is different from my question

18  which is by looking at this document you can't tell.

19          THE COURT:  Correct.  Well, she can because she

20  understands, she's testified she understands the process that        04:21PM

21  results in this.  So she believes she can testify that these

22  have been by looking at this document because she knows where

23  it came from in the process.  She does believe that she would

24  agree that you can't tell that based upon the fact that you are

25  expecting that randomization would reflect that the numbers          04:21PM

1   would be in the order of the randomized numbers.  And she has

2   said that she appreciates that disconnect and they are trying

3   to address it.  But at least with respect to this witness's

4   testimony the objection is sustained because she has testified

5   that she does believe that these are randomized.                04:21PM

6           MR. FATHI:  Okay.  Thank you.

7   BY MR. FATHI:

8   Q.  Would you turn to Document 3B please.

9           MR. BOJANOWSKI:  A what was the number, David?

10          THE WITNESS:  Did you say 3B?                             04:21PM

11  BY MR. FATHI:

12  Q.  3B like Bravo, yes.  And what is this document?

13  A.  This is the same thing I just described but for North unit.

14  Q.  So this is every MH-3D patient at North unit as of October

15  31st, 2016?                                                      04:22PM

16  A.  Correct.

17  Q.  Who created this document?

18  A.  This comes from the statewide log we were previously

19  discussing.  These individuals are pulled out based on being at

20  North unit and put into a separate sheet and randomized.        04:22PM

21  Q.  So this was also created by Ms. Ornelas?

22  A.  She creates a statewide log.  We then sort it by the unit

23  and pull the unit out and put it onto a separate tab.

24  Q.  Right.  So I'm just asking who created this document Number

25  3B?                                                              04:22PM

March 21, 2017 - Status Hearing - Taylor - Cross

1   A.   That would be something we create from the source document.

2   Q.   We being you personally?

3   A.   Correct.

4   Q.   So you created this document?

5   A.   This one being at Florence very likely because I have                04:22PM

6   covered Florence for most of the time.  So yes.

7   Q.   Would you turn to Document 4-A, please.  What is this

8   document?

9   A.   This is the same log that we were looking at from East

10  unit.  The charts identified that we have worked -- you guys            04:23PM

11  have assisted us to determine the best process to include all

12  records where their medications were discontinued and were due

13  a contact in the audit month or should have had a contact in

14  the audit month.  And those are highlighted.

15  Q.   Okay.  Before we get to the highlighting, both Document 3A          04:23PM

16  and Document 4A are labeled October 2016 Florence east unit

17  MH-3D log source document.  Is that right?

18  A.   3B?

19  Q.   3A and 4A?

20  A.   I'm sorry, yes.                                                      04:23PM

21  Q.   They both have the same name?

22  A.   That is correct.

23  Q.   But they are different documents, aren't they?

24  A.   That is correct.

25  Q.   Okay.  The names appear in a different order?                       04:24PM

1   A.  That is correct.  I was creating this for an example for

2   you so --

3   Q.  And if you look -- if you pick any given prisoner name, you

4   will see that prisoner has a different number between 3A and

5   4A, correct?                                                    04:24PM

6   A.  That is correct.

7   Q.  And there's a different number of names in the two

8   documents.  3A has 44 names and 4A has 45 names?

9   A.  Oh.  That might have been an error on my fault when I was

10  creating this document to help you see how we pick the names.   04:24PM

11  Q.  Okay.  So we have two different documents, both of which

12  are labeled October 2016 Florence East unit MH-3D log source

13  document, correct?

14  A.  Correct.

15  Q.  Now, the difference, or one difference, is Number 4-A says  04:24PM

16  with applicable records highlighted.  So could you tell me what

17  that means?

18  A.  So as we have been discussing over the months that the

19  Performance Number 85 needs us to identify every record that

20  falls into that category.  And in the past we had just been, if 04:25PM

21  we were reviewing a chart, we found one, great.  And so part of

22  a what this log makes available to us is to identify those

23  individuals who meet that criteria for review, for 85.

24  Q.  I'm sorry.  So how did you select the ones that are

25  highlighted in yellow on Document 4-A?                          04:25PM

1    A.  So as I was saying a minute ago.  The individuals whose

2    medications were discontinued in the month prior, so therefore

3    they were due a contact in the audit month, or previous to that

4    and therefore still due in the audit month.

5    Q.  Okay.  So this is for October of 2016, correct?          04:25PM

6    A.  That is correct.

7    Q.  So you include people who discontinued medications in

8    September?

9    A.  Or earlier, if not seen until October.

10   Q.  But if someone discontinued medications in August and was  04:26PM

11   seen in October, you wouldn't count that person?

12   A.  We would count those, yes.  Absolutely.

13   Q.  If they discontinued medications in August and had still

14   not been seen in October, by the end of October, would you

15   include that record?                                         04:26PM

16   A.  Yes, we would.

17   Q.  All right.  So describe to me the universe of all records

18   that gets included for Performance Measure 85 for October.

19   A.  So any inmate who needed a contact in the audit month or

20   had a contact that was late in the audit month, so your example  04:26PM

21   of discontinued in August and not seen until October, included.

22   They were also included and found as a finding in November --

23   or in September.

24   Q.  If that record happened to be drawn?

25   A.  Correct.  Typically, what we were discussing at one of the  04:27PM

1    other hearings is the fact that we almost -- we rarely have

2    more than 10.  We rarely have 10.  It's usually we end up

3    reviewing every record that falls into that category.  But we

4    include every record that should have had a contact or was late

5    having their contact in the audit month.                          04:27PM

6    Q.  So we're still in October.  Let's say someone discontinued

7    meds in May and wasn't seen until October.  Would that be

8    included?

9    A.  Yes, it would.

10   Q.  And would that be compliant or non-compliant?              04:27PM

11   A.  That would be non-compliant.

12   Q.  And same situation, discontinued meds in May, still not

13   seen as of the end of October.  Would that record be included?

14   A.  Yes, it would.

15   Q.  That would be compliant or non-compliant?                  04:28PM

16   A.  Non-compliant.

17   Q.  Thank you.

18   A.  Unless the inmate was out to court the whole time.  So if

19   the inmate is out to court there isn't a way for a Corizon

20   provider to go see the inmate.  So we do verify that they were  04:28PM

21   in the facility during that time.

22   Q.  So just to be clear, for Performance Measure 85 you do not

23   draw a random sample of all MH-3Ds had at the institution,

24   correct?

25   A.  So as you can see from the next example, if there's more    04:28PM

1  than 10 we do.  If there's less than 10 we review every record

2  that falls into that category.

3  Q.  I'm saying you don't draw a random sample of all of the

4  MH-3Ds at the institution.  You limit to people who were, in

5  your term, due a contact in the audit month.  Correct?          04:28PM

6  A.  Correct.  I believe that's what you have asked for.

7  Q.  I'm just trying to clarify the record.  It's not a random

8  sample of all MH-3Ds at the facility, correct?

9  A.  It is a random sample of all individuals who meet the

10  criteria for Performance Number 85, and sometimes when there's  04:29PM

11  more than 10, we randomized those individuals and pull a random

12  sample from that when there's more than 10.

13  Q.  But it is not a random sample all the MH-3Ds of the

14  institution?

15  A.  That's what we were doing before that you were not happy    04:29PM

16  with.

17  Q.  If you would just answer my questions this would go a lot

18  faster, Doctor.

19  A.  I am trying to help you answer these questions.  I really

20  am.  I'm trying to make sure that this is very clear.  You are   04:29PM

21  asking me if I do something that you have asked me not to do.

22  So the answer would be no, you have asked me not to do that.

23  Q.  So it's not a random sample of all the inmates 3Ds at the

24  institution?

25  A.  Correct.                                                    04:29PM

1  Q.  Thank you.  Will you turn to Document 4B, please.  And what

2  is this?

3  A.  So this, again, was a document that I created for the

4  hearing so that you could see what would happen if we had more

5  than 10, whereby I have highlighted those individuals who meet          04:30PM

6  that criteria just as we were speaking about and, therefore,

7  were due or received a late contact in the audit month.  So I

8  have highlighted those to see which ones fall into that

9  category.

10 Q.  So is the only difference between Documents 4A and 4B that          04:30PM

11 they pertain to different units at Florence complex?

12 A.  Correct.

13 Q.  Okay.  Would you turn to Document 5A, please.

14 A.  Yes.

15 Q.  And what is this?                                                    04:30PM

16 A.  So this is the CGAR findings for this performance measure

17 for the month of October of 2016.

18 Q.  For Performance Measure 85 at the Florence complex,

19 correct?

20 A.  Correct.                                                            04:31PM

21 Q.  Could you just interpret, maybe read the first record and

22 explain what those symbols mean, the dates and symbols?

23 A.  Sure.  And again, we put the headers up there to try to

24 help with this because we do recognize the CGAR is very

25 difficult to read.  And so the first word that you see is         04:31PM

─── **March 21, 2017 - Status Hearing - Taylor - Cross** ───

1   North, so that you can identify which unit from the complex

2   this set comes from.  And then the next thing is the ADC number

3   ending with 144.  And then the 9-8-16 is the date that the

4   medications were discontinued.  And then the next thing is a Y,

5   which is the individual was seen within the 30-day parameter.        04:31PM

6   Q.  Okay.  So I notice here that for the this October CGAR you

7   have counted a couple of people who discontinued medications in

8   October, correct?

9   A.  Uh --

10  Q.  If you look about a little less than halfway down the         04:31PM

11  number ending in 935, looks like that person discontinued meds

12  on October 11th of 2016, correct?

13  A.  So they were not included in the sample for review.  They

14  are used for the review of Number 86, and that's why there is

15  zero after them because they do not apply to the 85 because,      04:32PM

16  again, their medications were discontinued in October.

17  Therefore they don't apply to that.

18  Q.  I'm sorry.  I think we're looking at different --

19  A.  I'm sorry.

20  Q.  -- different ADC numbers.  This is a little less than        04:32PM

21  halfway down.  The last four numbers are 6935, and the person

22  discontinued meds on October 11, 2016.  Do you see that?

23  A.  Which unit is that?

24  Q.  This is east.

25  A.  Yes.  I see that.                                            04:32PM

1    Q.  And the Y next to the date means this file is counted as

2    compliance for Performance Measure 85, correct?

3    A.  That is correct.

4    Q.  If you go down to the fourth line from the bottom, the DOC

5    number ending in the 082, that person discontinued meds on          04:33PM

6    10-10-16.  Do you see that?

7    A.  That is correct.

8    Q.  And the Y next to that date means that that file was

9    counted as compliant, correct?

10   A.  Correct.                                                         04:33PM

11   Q.  Performance Measure 85?

12   A.  Could I share with you --

13   Q.  If I could just ask another question.

14          MR. BOJANOWSKI:  Could we let the witness answer the

15   question?                                                           04:33PM

16          MR. FATHI:  She answered the question.

17          THE COURT:  Why wouldn't it be helpful to understand

18   what looks to be a big mistake?

19          THE WITNESS:  Can I share with you why it's like that?

20   So we've had multiple discussions about which ones to include       04:33PM

21   in which months.  So the way we were auditing in October is

22   those that were discontinued in October and seen in October for

23   their follow-up, they were used in the month of October.  So

24   they were a yes finding for October.  Regardless of which month

25   we put those in, they were a yes finding.  And so after we had      04:34PM

UNITED STATES DISTRICT COURT

1    a conversation in court, you requested that those be moved to

2    the November one where they would still be a yes finding.  And

3    so after that point, those files are in the November -- those

4    would, you know, those have shifted because you guys have

5    requested that.  But the yes finding is still an accurate                04:34PM

6    finding.  It's just that we had them in a different month than

7    you had requested them to be in.

8    BY MR. FATHI:

9    Q.  Okay.  But when you are monitoring Performance Measure 85

10   in October of 2016, somebody who discontinued meds in October            04:34PM

11   2016, that file cannot possibly be non-compliant, correct?

12   A.  It also cannot be non-compliant in November because they

13   were followed up in October.

14   Q.  Could you just answer the question, Doctor?  When you are

15   monitoring for the month of October, if someone discontinued            04:35PM

16   meds in the month of October, their file cannot possibly be

17   non-compliant because 30 days happened to lapse, correct?

18   A.  Yes.  But, sir, you need to understand that they also

19   wouldn't be allowed to count that in their November one.  And

20   so the compliance, no matter what month you put it in, that             04:35PM

21   person is compliant regardless of how you look at it.  So it

22   doesn't inflate scores and it doesn't deflate scores because

23   that individual is compliant no matter which month you put it

24   in.  You have requested we put it into November, which is still

25   a yes, as opposed to October but the finding is still a yes             04:35PM

1    regardless of when you put them in there.

2         THE COURT:  Right.  But by counting that file, aren't

3    we losing the opportunity to go to another file of someone who,

4    perhaps, is not compliant because it wasn't the same month that

5    they were discontinued and seen?                          04:35PM

6         THE WITNESS:  Mostly, we have so few files that that

7    would not be the case.  There is maybe five units across the

8    state where there are more than 10 that are discontinued at any

9    one month that maybe that one bumped another one.  But in

10   general, it could then mean that in the next month, they ended  04:36PM

11   up with a negative where they wouldn't have in the next month

12   because that file was removed from being placed as a positive

13   the next month.  So it would hurt them the next month.

14        So if you continually are doing that, it's hurting and

15   helping in the exact same way.  It can't inflate or deflate   04:36PM

16   because it would then not be allowed to be used the next month

17   where it would have been a yes and would have bumped maybe

18   somebody who was a no.

19        THE COURT:  Mr. Fathi, is the concern I raised the one

20   that you were aiming at?                                  04:36PM

21        MR. FATHI:  Exactly, Your Honor.  The concern is that

22   by including in the sample records that cannot possibly be

23   non-compliant, they are inflating their compliance rates.

24        THE COURT:  But then Dr. Taylor said that if you

25   exclude it, you create a rule that says will not count someone  04:37PM

1    who was discontinued in the same month that they were seen that

2    that means that they would be disqualified for being considered

3    in the next month.  Why would that be?

4         THE WITNESS:  So these two that we used in October

5    would not be used in November because they were not -- their          04:37PM

6    contact was not done in November.  This was prior to the Court

7    hearing where you said, no, include the ones that were due and

8    done.  So they didn't get the benefit of the yes in November

9    because it was used in October.  And so then maybe a no snuck

10   in there where that yes could have bumped them out.  It works        04:37PM

11   both directions.  No matter where you put it that file is

12   compliant.  And it doesn't automatically bump out other people

13   especially because most of the units that we have significantly

14   less than 10, which is why you see such a small N on this

15   performance measure.                                                 04:38PM

16         And so no matter where you put it, it's a compliant

17   file.  So it could bump an N from October or it could bump an N

18   from November.  But regardless, it has every chance as anybody

19   else to be pulled on one of those months.  As long as you

20   consistently use it in a month, it can bump an N any time           04:38PM

21   because it's always going to be compliant because they

22   discontinued and followed up in the same month.

23         THE COURT:  Okay.

24         MR. FATHI:  Your Honor, that just doesn't make any

25   sense.  You obviously can't include in the sample files that        04:38PM

1    can only be compliant.  That is going to inflate the compliance

2    level.

3            THE WITNESS:  It can't, sir.  It absolutely can't

4    because they would be included in November's and automatically

5    be compliant there.                                                04:39PM

6            MR. FATHI:  If they happen to be drawn for November

7    which is not guaranteed.

8            THE WITNESS:  Neither is it guaranteed they would be

9    drawn in October.

10           THE COURT:  If we have a rule that says in October       04:39PM

11   we're not going to draw people who are seen in the same month

12   that they are discontinued because we know it's a pointless

13   exercise because we know they will be found compliant.  So it's

14   not telling us anything because we are not able to see whether

15   or not there are other files where people have not been seen     04:39PM

16   within the 30 days.  So we'll just define a rule that says we

17   will not consider those in a given month.

18           What you are saying is that if we do that, that -- and

19   that file is drawn in the next month, they will be a yes

20   because they were compliant.                                     04:39PM

21           THE WITNESS:  Correct.

22           THE COURT:  But to me, that doesn't seem to be as

23   offensive to the rule or the performance measure that we're

24   supposed to evaluate because we're looking to see whether

25   somebody is being seen within 30 days.  But we have this close   04:40PM

March 21, 2017 - Status Hearing - Taylor - Cross

1    proximity as we have in the October example.  It seems we know

2    it is not going to be useful.  But if we exclude those people,

3    draw those people in November, and we are only looking at

4    people who -- we will exclude from people who were discontinued

5    in November and seen in November, so we'll exclude those people    04:40PM

6    but then we have a greater chance of capturing people who might

7    give us information about non-compliance.

8              THE WITNESS:  Unfortunately, it doesn't quite work

9    that way because that person would be in the November one

10   because they were discontinued in October.  So they would also    04:40PM

11   potentially bump out somebody who wasn't compliant.  And so

12   after you asked us to switch that, we switched that month to

13   where we shifted which month they are reported in.  But

14   regardless, they reported in one of the months because their

15   meds were discontinued.  So no matter where you report them       04:40PM

16   they are a yes.  It doesn't matter.

17             MR. FATHI:  Excuse me.

18             THE COURT:  Go ahead.

19             MR. FATHI:  The difference is, first of all, they

20   would only be drawn for the month of November if they happen to   04:41PM

21   be drawn as part of the random sample.  So they are not

22   guaranteed to be drawn in November.  Secondly, the difference

23   is if they are drawn in November there is a chance that the 30

24   days could have elapsed, the person isn't seen, so the file is

25   found non-compliant.  If you draw files of people who            04:41PM

1    discontinued meds in October at the end of October they are

2    always going to be compliant.

3           THE COURT:  There is no chance.  That makes sense to

4    me.

5           THE WITNESS:  But again, they are not necessarily        04:41PM

6    going to be pulled in October just as they are not necessarily

7    going to be pulled in November.  Either direction they are not

8    necessarily going to be pulled.  But regardless if they are

9    pulled in either one, they are a yes, so it doesn't inflate

10   scores.  So per your guys's request, we did move that so that    04:41PM

11   those are not included.  The problem is we often have October 1

12   they are discontinued, October 31 they are followed up.  So

13   those do happen in the same month, so we were including those.

14   Fine.  We have shifted it per your request, which is -- it's

15   fine, too, because regardless they get the yes no matter where   04:42PM

16   we put it.  It doesn't bump people necessarily because it could

17   have bumped somebody in November if you move it there.  But you

18   have got to move it somewhere.

19          THE COURT:  You have a one-day chance of the 30 days

20   running into the fact that months can go greater than 30 days    04:42PM

21   in October, whereas we have many more chance in November

22   because somebody could be discontinued on October 1st then seen

23   on November 10th.

24          THE WITNESS:  Correct.  But we -- as you can see, we

25   know when they were discontinued, right.  And so we put it in    04:42PM

1   October as a yes.  You put it in November, it's a yes.  It's a

2   yes no matter which month you put it in.  It always will be

3   because they were followed up in October, therefore it's a yes

4   no matter what month you put it in.  So they are not bumping a

5   no unless they are --                                          04:43PM

6        THE COURT:  We don't know whether that file is going

7   to be drawn in November.

8        THE WITNESS:  But we don't know whether they are going

9   to be drawn in October either.

10        MR. FATHI:  They need to be excluded from the sample    04:43PM

11   for October.

12        THE WITNESS:  Per your request we transitioned to that

13   after the conversation we had in here.  But they, again, in

14   October or November, they are a yes.  And so they have every

15   chance of bumping somebody that's a no in October or November 04:43PM

16   because they were followed up in the same month they were

17   discontinued.  No matter where you put them, they are a yes.

18   So they could bump somebody if they were pulled or not get

19   pulled at all.  But it doesn't change the fact that they were

20   followed up within time frames.                               04:43PM

21        So we had a different way of looking at it.  We had a

22   discussion.  We have transitioned it.  But if we were to look

23   at the scores, they would be the same scores.  Have you done

24   every analysis to determine if that would change the scores,

25   Mr. Fathi?  Because if I look at this, there are 22 of 24.  So 04:44PM

1    we pull those two yeses out there are 20 of 22.

2              MR. FATHI:  I don't know how to be any clearer, Your

3    Honor.

4              THE COURT:  Again, it may be it's not worth debating

5    because of what the witness just said.  At least on the current    04:44PM

6    scenarios that we have in front of us it doesn't look like it's

7    making a difference.

8    BY MR. FATHI:

9    Q.  Let's move on to the next document.  Dr. Taylor, is it your

10   testimony that currently you no longer would count when          04:44PM

11   auditing for October someone who discontinued meds in October?

12   A.  Correct.  Per your request, we have transitioned to that as

13   soon as we had that discussion.

14   Q.  So you would only count people who discontinued meds the

15   previous month or earlier?                                        04:44PM

16   A.  Correct.

17   Q.  Okay.  Would you look at Document 7A, please.

18   A.  I'm sorry, 7 --

19   Q.  7A?

20   A.  Okay.                                                         04:45PM

21   Q.  What is this?

22   A.  This is the CGAR finding for October Florence complex.

23   Q.  For which performance measure?

24   A.  For Number 86.

25   Q.  And Performance Measure 86 requires that MH-3D prisoners      04:45PM

1   shall be seen a minimum of every 90 days by a mental health

2   clinician for a minimum of six months after discontinuing

3   medication, correct?

4   A.  That is correct.

5   Q.  And could you interpret this document as you did with the            04:45PM

6   last one?

7   A.  Yes.  Again, with the headers, we have the unit and that

8   corresponds with the North.  And then we have ADC number, which

9   is the ending with 144; the MH-3D, which is the date that they

10  were followed up; and then compliant, yes or no.                        04:45PM

11  Q.  Now, if you look back at Document 5A which was the October

12  2016 Florence CGAR report for Performance Measure 85, I see

13  that you are considering the same documents, the same records

14  for 85 and 86.  Correct?

15  A.  That is correct.                                                     04:46PM

16  Q.  Now, when you are monitoring Performance Measure 86 in

17  October, it's impossible for the record of someone who

18  discontinued meds in October to be non-compliant, correct?

19  A.  I'm sorry.  I didn't track your question.

20  Q.  If you were monitoring Measure 86 for October.                      04:46PM

21  A.  86 for October.

22  Q.  And you pull the file of someone who discontinued meds in

23  October, it's impossible for that file to be non-compliant, is

24  that correct?

25  A.  That is correct.                                                     04:46PM

1   Q.  And it's also impossible for the file of someone who

2   discontinued meds in September to be non-compliant?

3   A.  That is correct.

4   Q.  And it's also impossible for the file of someone who

5   discontinued meds in August to be non-compliant?          04:47PM

6   A.  That is correct.  Unfortunately, that is how the

7   performance measures were set up when we were negotiating this,

8   and that's what they say is all records pulled for this will be

9   evaluated for this question.

10  Q.  So when you look at --                                 04:47PM

11        THE COURT:  Mr. Fathi, I need to understand some

12  things for planning purposes here.  About how many more minutes

13  do you have?

14        MR. FATHI:  I think -- well, if Dr. Taylor is

15  responsive, I think, perhaps, 15 minutes.                  04:47PM

16        THE COURT:  If we take a five-minute break now, we

17  can -- we'll come back and give you your 15 minutes.  Is that

18  all right?  Okay.

19        MR. FATHI:  Thank you, Your Honor.

20        (Recess from 4:47 p.m. until 4:54 p.m.)              04:54PM

21        THE COURT:  Please continue.

22        MR. FATHI:  Thank you, Your Honor.  Can I ask you for

23  a five-minute warning?

24        THE COURT:  I checked with the court reporter by way

25  of saying that of making an inquiry if we took a break would we  04:54PM

—— March 21, 2017 - Status Hearing - Taylor - Cross ——

1    be able to give you your 15 minutes.  So I will give you 15

2    minutes, and what you are asking for is you would like to know

3    when 10 minutes have passed.

4              MR. FATHI:  If it's not too much trouble.

5              THE COURT:  Not too much trouble at all.  Go ahead.      04:54PM

6    BY MR. FATHI:

7    Q.  Dr. Taylor, before we took the break we were talking about

8    Performance Measure 86 and how if when you are monitoring that

9    measure for the month of October, it's impossible for someone

10   who discontinued meds in August or September or October it's      04:55PM

11   impossible for their file to be non-compliant, correct?

12   A.  It is with the new methods you have asked us to employ, but

13   they used to be non-compliant with the way we were monitoring

14   previously.

15   Q.  I don't think it has to do with the monitoring methodology.   04:55PM

16   It simply has to do with arithmetic.

17             Performance Measure 86 requires that the person be

18   seen every 90 days after discontinuing meds, correct?

19   A.  That is correct.

20   Q.  So if 90 days haven't elapsed since the person discontinued   04:55PM

21   meds, that file cannot be non-compliant, correct?

22   A.  That is correct.

23   Q.  And we also talked about how if you -- Document 5A, which

24   is the CGAR for Number 85 and Document 7A which is the CGAR for

25   Document Number 86 involve the same files, correct?             04:56PM

1  A.  The files pulled for 85 are reviewed for 86.  Is that what

2  you are asking?

3  Q.  It's the same files, correct?

4  A.  That's correct.  The protocols that are in the stipulation

5  say to do that.                                                    04:56PM

6  Q.  Now I'm going to represent to you that looking at Number

7  5A, of the 41 records listed there, 30 out of the 41 patients

8  discontinued medications in August, September, or October.

9        So --

10 A.  I didn't quite track what you were saying.  I'm sorry.       04:56PM

11 Q.  What I'm saying is -- are you at Number 5A?

12 A.  5A is North's list?

13 Q.  5A is the CGAR finding for October 2016 for Florence

14 complex.

15 A.  I'm sorry.  I was on 4B.  Okay.                               04:56PM

16 Q.  So if you look at those 41 records there, 30 of them were

17 patients who discontinued medications for August, September, or

18 October of 2016?

19 A.  I would need to count them.

20 Q.  Okay.  If that's true, then at Florence for October of 2016  04:57PM

21 you have a sample in which 75 percent of the records cannot

22 possibly be non-compliant, correct?

23 A.  Now just to be clear, as you can see, only 24 were used.

24 So no, not 75 percent because as you can see there's ones with

25 zeros after them.  Those were not used in that, even though      04:57PM

1   they were discontinued in October they were not used because

2   they were not followed up until November.

3   Q.  I'm not asking about the ones that were used, Doctor.  I'm

4   asking if you assume 41 records, 30 of them were of people who

5   discontinued meds in August, September, or October, then you            04:57PM

6   have a sample of which 75 percent of the charts cannot possibly

7   be non-compliant.  Is that correct?

8   A.  Are you making numbers up?  Are you giving me a scenario?

9   Q.  No.  I'm representing to you that there are 41 different

10  files listed on Document 5A and that 30 of them were of people          04:58PM

11  who discontinued medications in August, September, or October

12  of 2016.  I'm asking you to assume that's true.

13  A.  That's fine.  I haven't counted them.  So you are

14  representing to me that that's the case.

15  Q.  I'm asking, yes, I'm asking you to assume that's true.               04:58PM

16  A.  Correct.

17  Q.  If that's true, then you have a sample for Performance

18  Measure 86 of which 75 percent of the records cannot possibly

19  be found non-compliant, correct?

20  A.  For 86?                                                             04:58PM

21  Q.  Yes.

22  A.  Under the methodology --

23  Q.  Can you answer my question, Doctor?

24  A.  So the methodology has changed.  I would have to look to

25  when it was.  We used to hold them non-compliant based upon             04:58PM

1    their last contact.  So if they were MH-3B and their last

2    contact was four months ago and then their medications were

3    discontinued and they weren't seen for those four months, we

4    found them non-compliant.  You have asked us to follow the

5    protocols in the stipulation which requires every chart that's        04:59PM

6    reviewed for 85 is then reviewed for compliance with 86.  We

7    have said that that doesn't work for us.

8            MR. FATHI:  Your Honor --

9            MR. BOJANOWSKI:  Could she finish?

10           MR. FATHI:  I would like Dr. Taylor to answer my              04:59PM

11   question.  Time is short.

12           THE COURT:  Can you maybe make the -- interrupt the

13   question by making the argument of what you see the danger to

14   be?

15           MR. FATHI:  What I see the danger to be, Your Honor,          04:59PM

16   it is the same danger we talked about with Number 85 only in a

17   much magnified form, is that 75 percent of the records in this

18   sample cannot possibly be found to be non-compliant.  And

19   therefore, their compliance figures are grossly inflated.

20           THE COURT:  And that point seems to be right.                 05:00PM

21           THE WITNESS:  And it is right.  We were not monitoring

22   that way until it was insisted upon by the plaintiffs to

23   monitor that way, because the protocols that we agreed to

24   specifically state that.  We have felt that that wasn't correct

25   to use the start date of their medications being discontinued        05:00PM

```
 1    and that if, in fact, they were prior in MH-3B and needed a
 2    contact that we would still hold them non-compliant even though
 3    the medications weren't discontinued until August, September,
 4    October.  So we were told we couldn't do that and we had to use
 5    the start date of the medications being discontinued per the        05:00PM
 6    discussion in here.
 7    BY MR. FATHI:
 8    Q.  Per the Court's order.
 9    A.  Correct.  And when you look at the protocols it says the
10    files pulled for 85 will be reviewed for 86.  I attempted to        05:00PM
11    explain in this courtroom how that doesn't work and doesn't
12    make sense, but unfortunately, I maybe didn't clearly explain
13    that.  But I continue to say that you are buying them three
14    extra months that I don't agree with.  And so although the
15    protocols I think when we sat down and we were negotiating this     05:01PM
16    made sense in our heads, when we have tried to sometimes put
17    them down into paper they don't make sense.  So unfortunately,
18    this one's been one of the ones that's been transitioned to no,
19    you will use the start date of the medications being
20    discontinued even though I personally don't feel like that's        05:01PM
21    the right thing to do.  Because it can end up buying them a
22    six-month window of being seen when they need to be seen every
23    90 days.
24            THE COURT:  And what's the solution to that?
25            MR. FATHI:  The solution, Your Honor, is they don't         05:01PM
```

1    pick only files from the last month, that they pick a random

2    sample of all MH-3Ds at the unit and then this problem will go

3    away.

4              THE WITNESS:  But that doesn't allow for you to

5    know -- so if a file is pulled for 85 from May, for instance,      05:01PM

6    and they weren't followed up in June, they were 31 days.  If in

7    October or November, I say to you, your compliance rate's 75

8    percent, but of that, it comes from all these May and June and

9    July, then any remedial measures that we may have put into

10   place we would have absolutely no idea whether they are          05:02PM

11   working.  What we know is that on Number 85 the remedial

12   measures are absolutely working and that's why everybody is now

13   compliant.

14              MR. FATHI:  No.  First of all, not everyone is

15   compliant on Number 85.  Secondly, it's an artifact of your      05:02PM

16   artificial decision to only look at files from the previous

17   month rather than a random sample of all MH-3Ds at the

18   institution.

19              So to answer your question, Your Honor, that's the

20   solution for both 85 and 86.  Just pick a random sample of all   05:02PM

21   3Ds at the unit and this problem will go away.

22              THE WITNESS:  So that would be very inconsistent with

23   the way that we're monitoring and the way we have been working

24   through this monitoring guide.  So I'm kind of confused why in

25   the 11th hour you are wanting to change the process for the 3D.  05:03PM

1    You have never brought this up before.

2           MR. FATHI:  That's not true at all.  We litigated

3    this and the judge ruled Performance Measure 86 requires up to

4    six months to evaluate compliance or non-compliance, and that

5    is why you have to look at six months of post-discontinuation          05:03PM

6    contacts.

7           THE WITNESS:  Correct.  But 85 --

8           MR. FATHI:  You have to look at six months.  You

9    can't look at people who discontinued in the last month.

10          THE COURT:  And I'm very troubled by this.  And part          05:03PM

11   of this process today was to help me to learn how to do this

12   better, and I will take a careful look at this and figure out

13   if I have given you the wrong direction on how to go on this.

14   Because what you have just said to me makes perfect sense, and

15   that is, I cannot rely upon a performance measure where it is          05:04PM

16   impossible for 75 percent of them to be failing.

17          MR. FATHI:  Thank you, Your Honor.  But just to be

18   clear, from our perspective, the difficulty is not the Court's

19   order which is faithful to the language of the stipulation.

20   The difficulty is the defendant's unilateral decision to          05:04PM

21   constrict the pool of records that they look at.

22          THE WITNESS:  Mr. Fathi, is it not true that in the

23   protocols it literally says, use the same records?  Is that not

24   the agreed upon procedure in the stipulation?

25          MR. BOJANOWSKI:  That's part of the stipulation.          05:04PM

1    That's what was agreed to and negotiated.  Now all of a sudden

2    let's throw that all out the window so we can now pull out what

3    is clearly compliant files.  To sit here and say that, oh,

4    let's eliminate the files and the things that are happening

5    with regard to how Corizon is performing and just say they are          05:04PM

6    compliant but we can't use that, okay, that doesn't count for

7    anything.  That has to be thrown out.

8         Well, wait a minute.  The whole idea is to provide the

9    health care to the inmate.  And if they are doing that then why

10   do we have to artificially beat these things out?                        05:05PM

11        THE COURT:  Because what I'm concerned about is by

12   definition, it's not by performance, it's by definition because

13   of, as Mr. Fathi said, it is arithmetic.  So it's by definition

14   they can't tell me anything useful.  It is not by application

15   of anything that anyone has constructively done.                         05:05PM

16        So go on to your next question.  I will look at this

17   and before I decide anything I will certainly give everybody a

18   chance to say anything by way of argument.

19        THE WITNESS:  Real quick, I do need to clarify one

20   additional thing.  So the files that are reviewed for 85, per            05:05PM

21   the protocol we have to review them for 86.  But because there

22   is less than 10 most of the time, the remaining files that we

23   review for 86, if they don't meet the criteria where a contact

24   needs to have occurred after the medications were discontinued,

25   we don't use that record because they would be an N/A in and of          05:06PM

1   themselves.  So we remove those files to finish off 86 so we

2   can get to 10 records.  We only reviewed the ones that are

3   automatically compliant because we're required to by the

4   protocol.  But beyond the 10 -- I'm sorry, beyond let's say

5   five, if East unit has five that fall into that, we review          05:06PM

6   those and then the remaining five cannot be people who are

7   automatically compliant.  If they haven't had a contact and/or

8   didn't need one to have one, we move to the next file in the

9   random order.  We only include those, because we have to per

10  the protocols in the first five.                                    05:06PM

11  BY MR. FATHI:

12  Q.  Protocol does say that you look at the same files for

13  Performance Measure 85 and 86.  It does not say you only look

14  at people who discontinued medications in the last month.  That

15  is the defendant's unilateral decision.  That is the problem.       05:07PM

16  The problem would be solved, as I said, if they simply took a

17  random sample of all MH-3Ds at the unit.  And now I will move

18  on, Your Honor.  Okay?

19          THE COURT:  You will move on.  You are at 11 minutes.

20          MR. FATHI:  Thank you, Your Honor.                          05:07PM

21  BY MR. FATHI:

22  Q.  Dr. Taylor, Performance Measure 94, which we have talked

23  about, is about patients on suicide watch being seen daily,

24  correct?

25  A.  That is correct.                                                05:07PM

```
 1   Q.  And you re-audited Performance Measure 94 at Winslow,

 2   correct?

 3   A.  That is correct.

 4   Q.  And that re-audit went all the way back to the beginning of

 5   stipulation in March of 2015, correct?                            05:07PM

 6   A.  That is correct.

 7   Q.  And you did the re-audit because an incorrect methodology

 8   had been used in the original audit, correct?

 9   A.  I did the re-audit because there was misinformation

10   unfortunately with the auditor related to what the rest of us     05:08PM

11   were doing, and so -- and it was a small number of files that I

12   had to review so I could get it done.  But he was not using the

13   same method that the rest of us were using.

14   Q.  So it was an incorrect methodology?

15   A.  That is correct.                                              05:08PM

16   Q.  Okay.  And Performance Measure 95 involves people being

17   seen periodically after they come off suicide watch, correct?

18   A.  Correct.

19   Q.  And you re-audited Performance Measure 95 at Winslow?

20   A.  That is correct.                                              05:08PM

21   Q.  And that re-audit went all the way back to the beginning of

22   the stipulation, correct?

23   A.  Correct.

24   Q.  That also was done because an incorrect methodology had

25   been used?                                                        05:08PM
```

UNITED STATES DISTRICT COURT

1    A.  Correct.  He did not use the same one as us.

2    Q.  And Performance Measure 98 requires or involves the

3    selection or timeliness of response to mental health health

4    needs request forms, correct?

5    A.  That is correct.                                          05:08PM

6    Q.  And you re-audited Performance Measure 98 at Winslow?

7    A.  I did.

8    Q.  And that re-audit also went all the way back to March 2015,

9    correct?

10   A.  Correct, again, very small sample.  He was not using the   05:09PM

11   same methodology that we were using and had been in the guide.

12   Q.  Okay.  Now you are familiar, I'm sure, with Judge Duncan's

13   ruling regarding cell front contacts, correct?

14   A.  That is correct.

15   Q.  When you re-audited Performance Measure 94 at Winslow you    05:09PM

16   didn't comply with the Court's order that cell front contacts

17   could not be counted except in limited circumstances, correct?

18   A.  That court order had not happened when I re-audited.

19   Q.  The re-audited CGARs were re-issued on December 28, 2016,

20   correct?                                                      05:09PM

21   A.  As you can see, that's not the date I entered.  That might

22   be the date you got them, but it was in August that I

23   re-audited.

24        MR. FATHI:  Your Honor, I just note for the record

25   Document 1838 at Page 6 indicates the re-audited CGARs were     05:09PM

1    reissued on December 28th.

2            But in any event, you did not comply with the Court's

3    order when you re-audited Performance Measure 94, correct?

4    A.  The court order did not exist when I re-audited, and I have

5    not gone back and redone those after the court order.                    05:10PM

6    Q.  As you sit here today, you still have not complied with the

7    Court's order with regard to that re-audit, correct?

8    A.  I have complied with the Court's order that from October

9    5th at no point after that has any cell front contact have been

10   counted compliant without the offer of a confidential setting           05:10PM

11   and a refusal from October 5th on.  That has been complied

12   with.

13   Q.  Just to be clear, you haven't gone back and re-audited

14   Performance Measure 94 at Winslow to comply with the Court's

15   order, correct?                                                          05:10PM

16   A.  That is correct as that court order was not in existence.

17           THE COURT:  Well, you could choose to do that if you

18   wanted to, as I mentioned before in court, but you have chosen

19   not to.

20           THE WITNESS:  Correct.                                           05:10PM

21   BY MR. FATHI:

22   Q.  You have similarly chosen not to comply with the Court's

23   order in the re-audit of Performance Measure 95?

24           THE COURT:  You can't really use it in that language

25   saying comply with the Court's order.  That has a pejorative            05:11PM

1    sense that there's been a contumacious failure to follow it

2    going forward.  What is clear here is that she has testified

3    that they have applied the order going forward.  What you are

4    establishing is that they have not gone back and re-audited

5    prior records to reflect the order's definition of how these          05:11PM

6    visits should be defined.

7    BY MR. FATHI:

8    Q.  Is that correct, Dr. Taylor?

9    A.  That is correct, although you were asking about 95 and it

10   doesn't apply to 95.                                                  05:11PM

11   Q.  Oh.  So your understanding is that cell front contacts are

12   permissible for post-watch follow-ups?

13   A.  They have never been permissible and never been counted.

14   So only watches was the only concern that was a problem and had

15   to be changed.  We have never counted contacts that were seen        05:12PM

16   cell front without a refusal for any other contact.

17   Q.  So I should not be able to find any other contacts other

18   than suicide watch where cell fronts were counted, correct?

19   A.  That is correct, unless we have made some human error that

20   is -- has been our standard from the very beginning.                  05:12PM

21   Q.  Okay.  Have you re-audited any other mental health

22   performance measures besides 94, 95 and 98 at Winslow?

23   A.  Are you requesting after they have been provided to you?

24   Q.  Yes.

25   A.  Because I re-audited my supervisee.                               05:12PM

March 21, 2017 - Status Hearing - Taylor - Cross

1   Q.  After they have been provided to the plaintiffs?

2   A.  I can't think of any.

3   Q.  As you sit here today, do you have any plans to re-audit

4   any other mental health performance measures that have already

5   been -- the CGARs have already been provided to the plaintiffs?   05:12PM

6   A.  You know, honestly, if I had a team of 50 people, that

7   would be great.  I would love to be able to do that and to show

8   the Court that there is still compliance in there.  But

9   unfortunately, it takes three of us all month long to do one

10  month.  And I can't imagine how we're going to do 22 months and   05:13PM

11  still continue auditing.

12          So I would love to be able to, and if I can find a

13  team of people and get approval from our monitors, by all

14  means.

15  Q.  As we sit here today, do you have any plans to re-audit any   05:13PM

16  other mental health performance measures other than the ones

17  you have already done at Winslow?

18  A.  If given the resources, again, I would love to, to be able

19  to show you that the things you have said have affected the

20  scores.  I can show the Court that that is not, in fact, the   05:13PM

21  case in many cases.  Other than probably the cell fronts for

22  watches, a lot of the other ones would still be compliant.  I

23  would love to be able to do that.

24  Q.  Do you have plans to do it?

25  A.  I would love to be able to speak for my supervisor that we   05:14PM

1  can get the resources, but --

2  Q.  So it sounds like you don't know?

3  A.  I'm hopeful.

4  Q.  Okay.  Thank you, Dr. Taylor.  Nothing further, Your Honor.

5       THE COURT:  Thank you, Dr. Taylor.  Thank you very                05:14PM

6  much.

7       THE WITNESS:  Do you want this book back?

8       THE COURT:  You can leave it there.  Thank you.

9       I don't know whether in light of the fact that

10  cross-examination has already taken place whether there's any         05:14PM

11  idea you would want to do any direct further examination, but

12  if you do, you can, I think, do that next week when we convene

13  at 9 a.m. on Tuesday.  And we'll be addressing the max custody

14  issues.  But if for some reason you think there's something

15  that needed to be communicated to the Court or to the                05:14PM

16  plaintiffs by way of this education project, that can still

17  happen next week.  Just Mr. Fathi won't be present but he would

18  be able to see the transcript of it and be educated that way.

19       MR. BOJANOWSKI:  Your Honor, as I indicated to you

20  before, I'm scheduled in Ohio for the final pretrial hearing         05:14PM

21  and will be flying back on the 8th.

22       THE COURT:  Luckily, the defendants are not single

23  pilots here.  You have got somebody sitting next to you.

24       THE WITNESS:  I'm out of town.

25       THE COURT:  You are out of town.  Okay.  Well, as you           05:15PM

1    sit here today, are you thinking there's further direct that

2    you would like to do?  Think about it and then if there is

3    we'll give you the chance to do it.  I just wanted to

4    accommodate Mr. Fathi's calendar, and we have done that.  And I

5    will accommodate yours as well.                          05:15PM

6         MR. BOJANOWSKI:  I'm taking a vote and the consensus

7    is no.

8         THE COURT:  Fair enough.

9         So we're set again to go on a different subject on

10   Tuesday at 9 a.m.  Is that correct?                      05:16PM

11        MR. BOJANOWSKI:  Correct.

12        MR. FATHI:  Correct, Your Honor.  And I thank you

13   again for accommodating my schedule and allowing us to have Dr.

14   Taylor.  There are some witnesses we did not get to today.  I

15   don't know how the Court wants to handle that.           05:16PM

16        THE COURT:  Who on your side would be handling those

17   witnesses?

18        MR. FATHI:  I would be handling Mr. Dye.  Ms. Kendrick

19   would be handling --

20        MS. KENDRICK:  Erin Barlund, Richard Pratt.  If       05:16PM

21   there's anybody else they were bringing out --

22        THE COURT:  Who on the defendant's side would be

23   handling those witnesses?

24        MR. BOJANOWSKI:  I would.

25        THE COURT:  So what we'll have to do then is we'll    05:16PM

1   have to pick another date to address those witnesses other than

2   next Tuesday.  So perhaps, Mr. Bojanowski and Mr. Fathi, you

3   can confer, including Ms. Kendrick within that dialogue, about

4   when you think it would be appropriate to do that and see if

5   that works with the Court's schedule.  And we'll come up with          05:17PM

6   an alternative time to do that.  I'm hoping it's not such a

7   whole day affair again because it doesn't seem like that would

8   be the case.

9           MR. BOJANOWSKI:  Your Honor, I think a half day would

10  be sufficient.                                                         05:17PM

11          MR. FATHI:  Just to be clear, next Tuesday the 28th is

12  max custody only.

13          THE COURT:  Correct.

14          MR. FATHI:  Thank you.

15          THE COURT:  Thank you all very much.  Appreciate it.          05:17PM

16          (Proceeding concluded at 5:17 p.m.)

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1

2

3

4                       C E R T I F I C A T E

5

6          I, LAURIE A. ADAMS, do hereby certify that I am duly

7     appointed and qualified to act as Official Court Reporter for

8     the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10    a full, true, and accurate transcript of all of that portion of

11    the proceedings contained herein, had in the above-entitled

12    cause on the date specified therein, and that said transcript

13    was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 11th day of April,

15    2017.

16

17                              s/Laurie A. Adams

18                              _____
                                Laurie A. Adams, RMR, CRR

19

20

21

22

23

24

25