**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| Victor Parsons, et al., on ) behalf of themselves and all ) others similarly situated; ) and Arizona Center for ) Disability Law, ) ) Plaintiff, ) ) vs. ) ) Charles Ryan, Director, ) Arizona Department of ) Corrections; and Richard ) Pratt, Interim Division ) Director, Division of Health ) Services, Arizona Department ) of Corrections, in their ) Official capacities, ) ) Defendants. ) ) | No. **CV 12-00601-PHX-DKD** Phoenix, Arizona May 10, 2017 9:01 a.m. |

**BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

(*Status Hearing-Resumed*)
(*Pages 682 through 886, inclusive.*)

Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                  A P P E A R A N C E S

 2   For the Plaintiffs:
            EIDENBACH LAW PC
 3          By:  Kirstin T. Eidenbach, Esq.
            P.O. Box 91398
 4          Tucson, AZ 85752

 5          ACLU - Washington DC
            By:  David C. Fathi, Esq. (Telephonic)
 6          By:  Amy Fettig, Esq. (Telephonic)
            915 15th Street NW
 7          7th Floor
            Washington, DC 20005
 8
            ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
 9          By:  Maya S. Abela, Esq.
            177 N. Church Avenue
10          Suite 800
            Tucson, AZ 85701
11
            PRISON LAW OFFICE
12          By:  Corene Kendrick, Esq.
            1917 5th Street
13          Berkeley, CA 94710

14   For the Defendants:
            STRUCK WIENEKE & LOVE, P.L.C.
15          By: Timothy J. Bojanowski, Esq.
            By: Rachel Love, Esq.
16          By: Anne M. Orcutt, Esq.
            3100 W. Ray Road
17          Suite 300
            Chandler, AZ 85226
18
            OFFICE OF THE ATTORNEY GENERAL - Phoenix
19          By:  Lucy M. Rand, Esq. (Telephonic)
            1275 W. Washington Street
20          Phoenix, AZ 85007

21                     I N D E X

22   WITNESS:              DIRECT   CROSS    REDIRECT  RECROSS

23   RICHARD PRATT
     By Ms. Kendrick (Resumed)          685
24

25
```

UNITED STATES DISTRICT COURT

1              P R O C E E D I N G S

2          THE COURTROOM DEPUTY:  Civil Case Number 12-601,

3    Parsons, et al. versus Ryan et al., on for a status hearing.

4          THE COURT:  Counsel, please announce.

5          MS. KENDRICK:  Corene Kendrick from the Prison Law    09:02AM

6    Office for prisoner plaintiffs.

7          MS. EIDENBACH:  Kirsten Eidenbach for the prisoner

8    plaintiff class.

9          MS. ABELA:  Maya Abela for the Arizona Center For

10   Disability Law.                                            09:02AM

11         THE COURT:  Whom do we have on the phone for

12   plaintiffs, if anyone?

13         MR. FATHI:  Good morning, Your Honor.  David Fathi and

14   Amy Fettig from the ACLU National Prison Project for the

15   plaintiff class.                                           09:02AM

16         THE COURT:  Thank you.  Good morning.

17         And defendants.

18         MR. BOJANOWSKI:  Tim Bojanowski.

19         MS. RAND:  Lucy Rand.

20         THE COURT:  Thank you.                               09:02AM

21         MS. LOVE:  Rachel Love and Anne Orcutt for the

22   defendants.

23         THE COURT:  Thank you.  Good morning.

24         And is that everyone who is on the phone?

25         MS. RAND:  Lucy Rand from the Attorney General's     09:02AM

**May 10, 2017 - Status Hearing Resumed - Pratt - Cross**

 1    office for the defendants.

 2              THE COURT:  Thank you.

 3              The first order of business, I think, is to resume

 4    with Mr. Pratt.  If you would kindly return to the witness

 5    stand.  The oath that you took before continues to apply.      09:03AM

 6              THE WITNESS:  Yes, sir.

 7              THE COURT:  You may continue.

 8                        RICHARD PRATT,

 9    a witness herein, having been previously duly sworn by the

10    clerk to speak the truth and nothing but the truth, was

11    examined and testified further as follows:

12                   CROSS EXAMINATION (Resumed)

13    BY MS. KENDRICK:

14    Q.  Good morning, Mr. Pratt.  How are you?

15    A.  I'm well.  How are you?                                    09:03AM

16    Q.  Good.  Thank you.

17              So I just want to continue with a few weeks ago.

18    First of all, I just wanted to go over, you are aware of the

19    court's orders on methodology, correct?

20    A.  Correct.                                                   09:03AM

21    Q.  And you also are aware of the parties' agreements that we

22    reached on the methodology for monitoring?

23    A.  Yes.

24    Q.  And you get copies of the updated monitoring guide as it

25    changes over time?                                             09:04AM

1    A.  I do.

2    Q.  And to your knowledge the parties are still discussing a

3    few performance measures for the monitoring guide?

4    A.  Yes.

5    Q.  And then once it's finalized, we'll take it to the Court          09:04AM

6    and have the Court finalize it too, correct?

7    A.  That's my understanding, yes.

8    Q.  And you also testified, and I believe I stated recently in

9    a declaration, that you are responsible to ensure that Corizon

10   complies with the contract and the stipulation and the Court's      09:04AM

11   orders?

12   A.  Correct.

13   Q.  And Director Ryan is relying on you to be responsible for

14   this compliance?

15   A.  He is.                                                           09:04AM

16   Q.  And you are a named defendant in this case, correct?

17   A.  Correct.

18   Q.  And you understand when a federal court orders a party to

19   do something you have to do it, correct?

20   A.  Yes.                                                             09:05AM

21   Q.  Even if you disagree you have to do it?

22   A.  Yes.

23   Q.  And it's very important to follow these Court's orders,

24   correct?

25   A.  Correct.                                                         09:05AM

**May 10, 2017 - Status Hearing Resumed - Pratt - Cross**

1  Q.  And you can't stop doing what the Court has told you to do,

2  correct?

3  A.  Correct.

4  Q.  Unless the Court subsequently says you no longer need to do

5  this?                                                          09:05AM

6  A.  Agreed.

7  Q.  Okay.  I'm going to show you a declaration that you

8  recently signed.  It's Docket 2041.

9        And the other stack of documents that I gave you a few

10  minutes ago that are orders, could you take a look at it?      09:05AM

11  There are -- I'm hoping you could find docket 1951, the numbers

12  are at the top.

13  A.  I have got it.

14  Q.  Okay.  And could you go to Line 26 and read what is

15  highlighted?                                                   09:06AM

16  A.  "If defendants want to persuade the Court that a given

17  performance measure at a given facility is compliant with the

18  stipulation, then defendants will have to show that this

19  performance measure facility was compliant under the final

20  monitoring guide procedures."                                 09:06AM

21  Q.  Have you gone back and recalculated any CGAR scores in

22  light of the Court's orders on monitoring methodology?

23  A.  Some of it have gone back and been recalculated.

24  Q.  Which ones?

25  A.  I'm not sure which ones, specifically.                    09:06AM

1   Q.  Okay.  Have you recalculated scores from the period when

2   you were given partial credit for multiple performance

3   measures?

4   A.  Yes.

5   Q.  For all of those performance measures?                    09:07AM

6   A.  I don't know if it's been done for all performance measures

7   or not.

8   Q.  Okay.  Well, why don't we go through some performance

9   measures.  I just handed you Docket 2041 which is your

10  declaration that was filed on May 4th.                        09:07AM

11          Do you recognize that document?

12  A.  I do.

13  Q.  And you signed it?

14  A.  I did.

15  Q.  Okay.  Did you prepare this?                              09:07AM

16  A.  No.  This was prepared by my legal reps.

17  Q.  Did you read it?

18  A.  Absolutely.

19  Q.  Did you read every page?

20  A.  Yes.                                                      09:07AM

21  Q.  Did you review it by comparing the Court's orders regarding

22  non-compliance against the declaration?

23  A.  I didn't specifically take this and put it side by side

24  with the Court orders.

25  Q.  So that's a no?                                           09:07AM

1    A.   That's a no.

2    Q.   Did you compare it against CGAR findings?

3    A.   I did.

4    Q.   Did you compare it against your spreadsheet?

5    A.   I did.                                                    09:08AM

6    Q.   Did you compare -- when you said yes to comparing it

7    against CGARs were you referring to the spreadsheet or the

8    actual reports?

9    A.   To the spreadsheet.

10   Q.   So you compared it against the spreadsheet but not the    09:08AM

11   monthly reports?

12   A.   Correct.

13   Q.   Okay.  If you could turn to Page 3, Paragraph 12.  It says,

14   "I have also reviewed the Court's April 24th, 2017 order which

15   states that a performance measure is not compliant, quote,     09:08AM

16   'when, one, 6 of 24 months are non compliant; and, two, three

17   consecutive months are non-compliant.'"

18        Do you see that?

19   A.   I do.

20   Q.   So would that mean that a performance measure that had a    09:08AM

21   score of zero percent in October, zero percent in November, 80

22   percent in December, zero percent in January, and zero percent

23   in February would be compliant?

24   A.   Give me those first three scores again.

25   Q.   Zero, zero, 80, zero, zero.                               09:09AM

1    A.  Depending upon what time frame it was during the first 24

2    months, if you are saying that there were four that were out of

3    compliance at that time and there were not three in a row it

4    would be considered compliant.

5    Q.  Okay.  Then if you go down that page to Paragraph 19, you          09:09AM

6    state that you created and maintain a spreadsheet of compliance

7    rates as reported in the CGARs for all health care performance

8    measures at all facilities for each month.

9           How did you create this?

10   A.  By going back and recapturing all the scores that are            09:09AM

11   reported to me on a monthly basis, entering them on a

12   spreadsheet and then just adding to it as each month's results

13   were finalized.

14   Q.  So you personally were entering this information each

15   month?                                                               09:10AM

16   A.  I was.

17   Q.  So it was something you were manually entering?

18   A.  That's correct.

19   Q.  It wasn't that the CGAR system was automatically creating a

20   report for you?                                                      09:10AM

21   A.  Correct.

22   Q.  Did you ever have other individuals enter information into

23   the spreadsheet?

24   A.  No.

25   Q.  Did you ever spot check your work?                               09:10AM

**May 10, 2017 - Status Hearing Resumed - Pratt - Cross**

1    A.   Several times.

2    Q.   When?

3    A.   Several times over the course of the two years.

4    Q.   Did you spot check the spreadsheet before the filing on May

5    4th?                                                                  09:10AM

6    A.   I did.

7    Q.   When?

8    A.   Right before it was filed.

9    Q.   Within a week?

10   A.   Yes.                                                             09:10AM

11   Q.   Okay.  If you turn to page -- to Paragraph 23, you state

12   that of the total universe of 849 reported measures and

13   facilities, 581, or 68.43 percent, have been compliant for at

14   least 18 out of the past 24 months and have not been out of

15   compliance for three or more consecutive months without --        09:10AM

16   within the past 18 months.

17        So you stopped monitoring those 581 performance

18   measures as of the March CGARs?

19   A.   No.

20   Q.   So what are you doing?                                          09:11AM

21   A.   We continue to monitor in the same fashion we always have.

22   Q.   But you are not reporting the results?

23   A.   We're still reporting the results.

24   Q.   So when we get the March CGARs, and the Court gets the

25   March CGARs around May 15th, we will still see all of the same    09:11AM

1    849 performance measures?

2    A.  Yes, you will.

3    Q.  Has any decision been made to stop monitoring any of these

4    performance measures?

5    A.  No.                                                        09:11AM

6    Q.  I guess I'm a little confused, because your declaration,

7    how it's titled, is that it's your declaration in support of

8    defendants' notice of compliance with the stipulation and

9    termination of monitoring pursuant to Paragraph 10b.  So are

10   you terminating monitoring or not?                            09:12AM

11   A.  No, ma'am.  That's a determination made by the Court.

12   Q.  Okay.  So I'd like you to turn to Page 7.  At Paragraph 56,

13   you state that for health care Performance Measure 11, which

14   requires newly prescribed provider ordered formulary

15   medications be provided within two business days after         09:13AM

16   prescribed or on the same day.

17   A.  I'm sorry.  I'm not following.  On Page 7?

18   Q.  Page 7, Paragraph 55.  Health care Performance Measure 11.

19   A.  That's not on Page --

20          THE COURT:  The reference may be to the docket number   09:13AM

21   page at the top.

22   BY MS. KENDRICK:

23   Q.  Oh, I'm sorry.  Yes.  I'm using the page numbers at the

24   top.  I apologize.

25   A.  Oh.  Okay.  And which paragraph?                           09:13AM

May 10, 2017 - Status Hearing Resumed - Pratt - Cross

1    Q.   Paragraph 55.

2    A.   Got it.

3    Q.   Okay.  So that's about health care Performance Measure 11.

4    And you list five prisons:  Douglas, Perryville, Phoenix,

5    Safford, and Winslow.  And I'd like to ask you about Winslow.          09:13AM

6    If you look at the Court's orders, the packet that I gave you

7    earlier, there's one that's Docket 1583.  It's from May 20th.

8    A.   I have got it.

9    Q.   If you look at the Page 2, the Court finds Winslow, along

10   with other prisons, non-compliant with Performance Measure 11         09:14AM

11   and ordered a remedial plan.

12   A.   I see that.

13   Q.   Okay.  So to your knowledge, have the defendants moved the

14   Court to change this order?

15   A.   Not to my knowledge.                                             09:14AM

16   Q.   So it's still in effect?

17   A.   As far as I know, yes.

18   Q.   Okay.  Then why are you notifying the Court that you are

19   going to terminate monitoring a performance measure when the

20   Court found defendants non-compliant on it?                           09:14AM

21   A.   That's not what I'm indicating.  I'm stating that based

22   upon the stipulation in my opinion, they are in compliance

23   based on the rules and the stipulation at that facility, or at

24   these facilities.

25   Q.   Okay.  So I handed you some CQI minutes from February.  If       09:15AM

UNITED STATES DISTRICT COURT

1   you want to just take a look and find the Tucson minutes.

2          THE COURT:  Can I interrupt for just a second?

3   Someone on the telephone is typing and maybe thinks that the

4   mute is on, but it's not.  Thank you.

5   BY MS. KENDRICK:                                              09:16AM

6   Q.  And if you could go on the page numbers on the bottom right

7   that's been stamped, there's a number that starts ADCM.  And if

8   you could go to the one that says 840319.

9   A.  Okay.

10  Q.  And if you go down, do you see the text that says the        09:17AM

11  multi-disciplinary team is now meeting quarterly?

12  A.  Yes.

13  Q.  When did the CQI team go to quarterly meetings at Tucson?

14  A.  I don't know.

15  Q.  Okay.  If you look at that pile of orders on your desk       09:17AM

16  there's one that's Docket 1833.  It's from December 23rd.

17  A.  Okay.

18  Q.  If you turn to Page 3 of it, could you read what's

19  highlighted?

20  A.  "The Court concludes that the stipulation requires monthly   09:17AM

21  meetings where the content is dictated by the standard."

22  Q.  Have you gone back and recalculated the CGAR score for

23  Performance Measure 27 at the 10 prisons in light of the

24  court's order on methodology?

25  A.  I don't know if they have or not.                           09:18AM

May 10, 2017 - Status Hearing Resumed - Pratt - Cross

1    Q.  And is the Tucson facility aware of the Court's order that

2    the CQI meetings need to be monthly and meet the standard

3    monthly?

4    A.  Are you saying the Monitoring Bureau or Corizon?

5    Q.  Both.  We'll start with the Monitoring Bureau.          09:18AM

6    A.  The Monitoring Bureau is aware of it and Corizon leadership

7    has been made aware of it.

8    Q.  Do you know if the Tucson monitor is aware of this?

9    A.  Yes.

10   Q.  Do you know if the Tucson health care leadership are aware   09:18AM

11   of this?

12   A.  Yes, they are.

13   Q.  Okay.

14   A.  And if I can interject, when you are talking

15   multi-disciplinary, what they are talking about is a MAC        09:18AM

16   meeting which is not a CQI meeting.

17   Q.  Isn't the multi-disciplinary MAC meeting part of the

18   standard that's in the NCHCC standards for what should be in a

19   meeting?

20   A.  A MAC meeting is something that Corizon holds on a          09:19AM

21   quarterly basis.

22   Q.  Separate from the multi-disciplinary meeting that's

23   required?

24   A.  That's my understanding, yes.

25   Q.  But isn't that language in the section of the notes that    09:19AM

1  refer to multi-disciplinary meetings?

2  A.  Well, it indicates in the discussion that MAC meetings are

3  going to be held quarterly.

4  Q.  So a MAC meeting for Corizon is a multi-disciplinary

5  meeting, correct?                                              09:19AM

6  A.  That's correct, yes.

7  Q.  So are they doing multi-disciplinary meetings monthly?

8  A.  I know they are holding their -- according to this they are

9  holding their MAC meetings on a quarterly basis.  This isn't

10 necessarily telling me when this their CQI meetings are held.   09:19AM

11 Q.  So you cannot say they are doing multi-disciplinary

12 meetings monthly?  You have no basis to know that they are?

13 A.  No.  Not unless I have got CQI minutes from each month.

14 Q.  And I think you testified last time that you don't read the

15 CQI minutes, correct?                                          09:20AM

16 A.  That's correct.

17 Q.  I'd like to move on to Performance Measure 35.  In your

18 declaration, at Page 14 at the top, Page 13 at the bottom, it's

19 Paragraph 124.  You state that three prisons, Douglas,

20 Perryville, and Safford, have been compliant.  And I just want  09:20AM

21 you to --

22 A.  That's on Page 14?

23 Q.  14 with the page numbers on the top, correct.

24 A.  Okay.  All right.

25 Q.  Sorry.  And health care Performance Measure 35.  Do you see 09:20AM

1    that?

2    A.  I do.

3    Q.  Okay.  So the Court has another order I'd like you to take

4    a look at.  It's Docket 1933.  It's dated February 8, 2017.

5    A.  Okay.                                                           09:21AM

6    Q.  And if you go to Page 3, the last paragraph says,

7    "Defendants request to further brief the 'not applicable'

8    designation.  Argument is heard.  It is ordered denying the

9    request to brief; however, the Court will not oppose common

10   sense arguments."                                                  09:21AM

11        I have given you pages from the transcript from the

12   February 8, 2017 hearing.  I was wondering if you could turn to

13   Page 45 and Line 18, if you could read that line.

14   A.  "I should also, I think, address what it means to have an

15   N/A and I think that those just don't get counted.  It's not     09:22AM

16   for or against, it's just pulled out."

17   Q.  Okay.  Thank you.  Are you counting all N/As as compliance?

18   A.  Yes.  It's an issue of counting it as either in compliance

19   or not in compliance, and we have counted them as basically not

20   out of compliance per the rules of the stipulation.               09:22AM

21   Q.  So yes, you are counting them as compliant?

22   A.  We're not counting them as non-compliant, and that's, to

23   me, where the rules take effect, is if it's been out of

24   compliance more than six months or three in the last 18 months

25   in a row.                                                          09:23AM

1  Q.  Okay.  So on your declaration, you attached your chart to

2  it at the end of the declaration.  That's the chart that you

3  maintain?

4  A.  Yes, ma'am.

5  Q.  Okay.  So if you turn to what's labeled at the top as Page          09:23AM

6  47, it will show you Performance Measure 35.

7  A.  Yes.

8  Q.  And if you look at Perryville, there are quite a few N/As.

9  And I will represent to you that I counted them and that there

10  are nine months with N/As.                                            09:24AM

11  A.  I will take your word for it.

12  Q.  Okay.  So that means 15 months with scores.  And of those

13  15 months, I counted seven months of non-compliance with 40

14  percent in August, 2015; 75 percent in October 2015; 50 percent

15  in November and December, 2015; 67 percent in February, 2016;         09:24AM

16  50 percent in July 2016; and zero percent in October 2016.

17          Do you see that too?

18  A.  I do.

19  Q.  So you have decided that this performance measure at this

20  institution is in compliance and monitoring will be terminated       09:24AM

21  when they have been non-compliant seven out of the 15 months

22  for which you have data?

23  A.  Yes.

24  Q.  Okay.  And if you could go back to the pile of the Court's

25  orders, there's one Docket 1831 that's dated February 14th.          09:25AM

1   A.  Okay.

2   Q.  And at Page 2.  Do you see a reference to Performance

3   Measure 35?

4   A.  I do.

5   Q.  Could you please read that?                              09:25AM

6   A.  "The Court hears argument on Performance Measure 35

7   regarding continuation of medications at transfer.  It is

8   ordered that the monitoring guide shall only permit a finding

9   of compliance after review of whether the first required dose

10  of medication was distributed at the inmate's new location."  09:25AM

11  Q.  Did you go back and recalculate the CGAR score for

12  Performance Measure 35 at Perryville in light of the Court's

13  order on the methodology?

14  A.  I don't know that we went backwards to re-monitor.

15  Q.  So you can't say that you did?                           09:26AM

16  A.  Correct.

17  Q.  Did you go back and recalculate the CGAR score for

18  Performance Measure 35 at Douglas in light of the Court's

19  order?

20  A.  To go back in history, not to my knowledge, no.         09:26AM

21  Q.  And how about for Safford?

22  A.  I can't say for sure, but I don't believe so.

23  Q.  Don't believe so.  Okay.

24          And that same court order, Docket 1831, on Page 2, it

25  next talks about Performance Measure 44.  Could you read what 09:26AM

1    the Court had to say about Performance Measure 44?

2    A.   "The Court hears argument on Performance Measure 44.  It is

3    ordered that the monitoring guide shall only permit compliance

4    if the inmate received the prescribed treatment or if there is

5    a documented reason explaining why the prescribed treatment was          09:27AM

6    rejected."

7    Q.   Okay.  And in your declaration on Page 16, Paragraphs 150

8    and 151, you state that Perryville, Phoenix, and Safford have

9    been compliant with Performance Measure 44.

10   A.   Correct.                                                            09:27AM

11   Q.   Did you go back and recalculate the CGAR score for

12   Performance Measure 44 at Perryville in light of the Court's

13   order on December 14?

14   A.   I don't believe there's any retro review.

15   Q.   So no?                                                             09:27AM

16   A.   Correct.

17   Q.   How about for Phoenix?

18   A.   Same answer.

19   Q.   You did not?

20   A.   Correct.                                                           09:28AM

21   Q.   And for Safford?

22   A.   Same answer.

23   Q.   No, you did not?

24   A.   Correct.

25   Q.   Okay.  So with your chart that you filed, I was hoping you          09:28AM

1    could flip a few pages for -- it's Page 50 at the top and for

2    Performance Measure 48 and 49.

3    A.   Okay.

4    Q.   And do you see for all 10 prisons for both performance

5    measures that from March 2015 through June 2016, the finding          09:28AM

6    was N/A?

7    A.   Yes.

8    Q.   And Performance Measure 48 is the one that requires

9    documentation including the reasons for a denial of all

10   utilization management denials of requests for specialty care,        09:29AM

11   correct?

12   A.   Correct.

13   Q.   And 49 is about notifying the patient that the utilization

14   management department has denied the specialty request, is that

15   correct?                                                              09:29AM

16   A.   I would have to verify it, but I will take your word for

17   it, yes.

18   Q.   It's in your declaration on Page 18.

19   A.   Unfortunately I don't have all the measures memorized by

20   number and exactly what they all are.                                 09:29AM

21   Q.   Fair enough.  It's not a quiz.  I was reading from your

22   declaration.

23   A.   Okay.

24   Q.   Okay.  So why was it that prior to July 2016 every single

25   monitor at every single institution for these months found N/A?      09:29AM

1   A.  Well, based on the performance measure, if you are talking

2   about refusals, we were considering this is where we got into

3   ATPs as not considered a refusal.

4   Q.  So that was the dispute where because Corizon called them

5   alternate treatment plans the monitor said that's not a denial?   09:30AM

6   A.  Correct.

7   Q.  So I have handed you something that's been filed with the

8   Court, Docket 1626-1, Exhibits 9 and 10.  And if you could turn

9   to Page 2 of Exhibit 9.

10  A.  Okay.                                                          09:30AM

11  Q.  Do you find it?

12  A.  I do.

13  Q.  Okay.  Can you read what's highlighted?

14  A.  "We are happy to see that defendants actually planned to

15  have monitoring protocols for these two measures.  We interpret   09:31AM

16  this to indicate that ADC has moved away from the position

17  previously taken, that there was nothing to measure from these

18  two measures since Corizon refers to denials of requests to

19  specialty care with the phrase 'alternate treatment plans' and

20  don't use the word 'denial.'"                                     09:31AM

21  Q.  Thank you.  So have you gone back and recalculated the CGAR

22  scores for any of the 10 prisons for Performance Measure 48?

23  A.  No.

24  Q.  And the same question for 49.

25  A.  Same answer.  Correct.                                        09:31AM

1   Q.  So the fact that they still say N/A is indication that you

2   didn't go back?

3   A.  Correct.

4   Q.  Okay.  In your declaration at Page 21, using the page

5   numbers at the top, there's a discussion about health care          09:32AM

6   Performance Measure 58.

7   A.  Okay.

8   Q.  And this is one that obviously only applies to female

9   prisoners because the performance measure requires that results

10  of an inmate's prenatal screening test be documented in the         09:32AM

11  medical record, correct?

12  A.  Correct.

13  Q.  So the first document that I handed you is the January 2017

14  CGAR for Performance Measure 58.

15  A.  Okay.                                                            09:33AM

16  Q.  And Becky Briddle reviewed it and reviewed 11 files.  Is

17  that correct?

18  A.  Correct.

19  Q.  And do you see on the last page that there is a woman whose

20  last three numbers of her ADC number are 594?                       09:33AM

21  A.  Yes.

22  Q.  And can you look at the next page which is a printout of

23  Ms. 594's inmate locator from the website?

24  A.  Yes.

25  Q.  What is her prison release date?                                 09:34AM

1  A.  You will have to give me a second.  I'm not familiar with

2  this at all.

3  Q.  Fourth line down.

4  A.  Yes.  February 11, 2010.

5  Q.  So she couldn't possibly have been pregnant and in custody    09:34AM

6  in January 2017, right?

7  A.  I don't know, unless she was back in prison.  I don't --

8  I'm not familiar with this information source.

9  Q.  Well, this is from the Department of Corrections website?

10  A.  Okay.    09:34AM

11  Q.  Where the information is listed for all current and former

12  inmates.

13  A.  Okay.

14  Q.  And it lists that her last commitment was from 2009 for one

15  year.  So would you agree that it appears that she is not back    09:35AM

16  in on a new charge?

17  A.  That's the way it looks, yes.

18  Q.  Okay.  And if you can also look on that January CGAR for

19  Performance Measure 61, which is about all female inmates aged

20  21 to 65 being offered a pap smear every 36 months, do you see    09:35AM

21  that?

22  A.  I do.

23  Q.  And do you see Ms. Briddle's description of how she

24  monitored this performance measure?

25  A.  I do.    09:35AM

May 10, 2017 - Status Hearing Resumed - Pratt - Cross

1    Q.  And what does she say under "comments"?

2    A.  "I rounded on Wednesday, January 25th, at Lumley, San

3    Pedro, and San Carlos.  On Thursday, January 26th I rounded on

4    Santa Cruz, Rosa, Maria, Piestewa, and Maria medical, intake,

5    and found posters up informing inmates of this in both Spanish          09:36AM

6    and English.

7    Q.  Are you aware of the Court's recent orders about

8    Performance Measure 61 and notifying women regarding pap

9    smears?

10   A.  Yes.                                                                 09:36AM

11   Q.  The other page of the documents I gave you is from the

12   February 2017 CGAR.  It's the same performance measure.

13   A.  Yes.

14   Q.  And it appears that Ms. Barlund looked in prisoners' files,

15   individual prisoners' files to do this?                                  09:36AM

16   A.  Correct.

17   Q.  Are you aware of any plans to go back and redo this

18   performance measure for the previous 23 months the same way

19   that Ms. Barlund did it in February?

20   A.  No.                                                                  09:36AM

21   Q.  And the Court's order is in front of you.  I think it's

22   Docket 1831.  He's issued a lot of orders.

23   A.  I have got it.

24   Q.  You have got it?  Do you see the bottom of Page 1?

25   A.  Yes.                                                                 09:37AM

1    Q.  Could you read what's been highlighted?

2    A.  "Argument is heard regarding Performance Measures 16, 66,

3    67, 69, 89, 91, 93, 94, and 95.  Defendants believe the

4    revisions to the Monitoring Guide are appropriate because

5    partial compliance credit is more accurate.  The Court finds          09:37AM

6    that stipulation does not allow for partial credit.  Defendants

7    must continue to assess compliance by reviewing each

8    individual's patient file for full compliance with the

9    performance measure."

10   Q.  Okay.  And have you gone back and recalculated Performance     09:38AM

11   Measure 16 in light of the Court's order?

12   A.  I don't know if we've gone back in time.  I am doubtful

13   that it has been recalculated based on the Court's order.

14   Q.  So you have no basis to say that it has been redone?

15   A.  That's correct.                                                 09:38AM

16   Q.  Okay.  And according to your declaration at Paragraph 69,

17   you state that the duty to monitor Performance Measure 16

18   terminates at Douglas, Safford, and Winslow as of the end of

19   February 2017?

20   A.  Yes.                                                            09:38AM

21   Q.  Okay.  And did you go back and recalculate Performance

22   Measure 66 using the Court's ordered methodology?

23   A.  Not to my knowledge.

24   Q.  So you have no basis to say that it was recalculated?

25   A.  That's correct.                                                 09:39AM

1  Q.  And according to your declaration at Paragraph 226, which

2  is on Page 24, you state that this performance measure

3  Perryville has been compliant?

4  A.  Yes.

5  Q.  So your position is that Lewis, Florence, and Tucson are          09:39AM

6  not compliant?

7  A.  I'm not sure.  I'm just saying that Perryville was

8  compliant.

9  Q.  Okay.  The previous paragraph you state that it applies to

10 four paragraphs, and then you state that Perryville has been        09:39AM

11 compliant?

12 A.  Right.  I'm only singling out Perryville as what I would

13 consider to be in compliance.

14 Q.  So you don't know whether Florence, Lewis, and Tucson are

15 compliant or non-compliant?                                        09:40AM

16 A.  I would have to look back at the spreadsheet to see what

17 the total findings were.

18 Q.  Okay.  And did you go back and recalculate Performance

19 Measure 66 at Perryville in light of the court's order on

20 Docket 1831?                                                       09:40AM

21 A.  No.  Not to my knowledge.

22 Q.  How about for Performance Measure 67?  The Court's order at

23 Docket 1831 also references Performance Measure 61.

24 A.  Oh, 67?

25 Q.  Yeah.                                                          09:40AM

1    A.  Yes.  I don't think that that has been gone back and

2    reevaluated.

3    Q.  Okay.  And in your declaration at Page 33, Paragraphs 301

4    to 303, you state that Performance Measure 89, which requires

5    MH-5 prisoners be seen by a clinician for a one-on-one session                09:41AM

6    a minimum of every seven days is only applicable at Phoenix

7    because that's the only institution where MH-5 inmates may by

8    housed.  And Phoenix has been compliant for 18 out of the past

9    24 months.

10           Do you see that?                                                      09:41AM

11   A.  I do.

12   Q.  And did you go back and recalculate Performance Measure 89

13   at Phoenix in light of the Court's order on partial credit?

14   A.  No.  Not that I am aware of.

15   Q.  And then in your declaration, a couple pages later, at                   09:41AM

16   Paragraph 314, and 315, you state regarding Performance Measure

17   93 that Florence, Lewis, Perryville, Phoenix, and Tucson have

18   been compliant.  Did you recalculate Performance Measure 93 at

19   any of those five institutions?

20   A.  No.  Not to my knowledge.                                               09:42AM

21   Q.  And then if you go down the page regarding Performance

22   Measure 94, which requires that all prisoners on suicide watch

23   be seen daily by a licensed mental health clinician or weekends

24   and holidays by a registered nurse, you state that Douglas,

25   Lewis, and Safford have been compliant.  Did you recalculate at             09:42AM

May 10, 2017 - Status Hearing Resumed - Pratt - Cross

1    Douglas, Lewis, or Safford for Performance Measure 94?

2    A.  Again, not to my knowledge, no.

3    Q.  What about for the other seven prisons?

4    A.  No.

5    Q.  And then Performance Measure 95, according to your          09:42AM

6    declaration, which is regarding licensed mental health staff

7    removing a prisoner from suicide watch, you state at Paragraph

8    321 that Douglas, Eyman, Florence, Perryville, Phoenix,

9    Safford, and Yuma have been compliant.  Did you recalculate

10   Performance Measure 95 in light of the Court's order?           09:43AM

11   A.  No, ma'am, not to my knowledge.

12   Q.  What about the other three prisons that aren't listed?

13   A.  Same answer.

14   Q.  Okay.  And you testified last week that you reviewed the

15   advocacy letters that my office, or the ACLU, sent you about    09:43AM

16   individual prisoners who have serious health care needs?

17   A.  Yes.

18   Q.  And I believe you said you looked in the medical records

19   often times to try to figure out what's going on?

20   A.  I will give it a cursory look and then refer it to my       09:44AM

21   staff, yes.

22   Q.  So you forward it to the appropriate staff like Dr. Taylor

23   or Dr. Robertson?

24   A.  Taylor, Robertson, Headstream, Campbell.

25   Q.  Okay.  Do you notify the treating staff at the institution? 09:44AM

1  A.  No, I do not.

2  Q.  Do you forward it to your counterparts at Corizon?

3  A.  They are already informed of this.  It's forwarded to them

4  by my legal staff, and if there's something of particular -- an

5  issue that I really think needs to be addressed right away and          09:44AM

6  it looks extremely serious, I will look at the record.  If I

7  see something I really don't like I will get in touch with

8  Corizon leadership right away and tell them get on it.

9  Q.  Okay.  I'm showing you a letter that my office sent you

10  last year after the May 2016 tour of Perryville regarding             09:45AM

11  a 17-year-old girl who was housed in isolation in the minors

12  unit.  Do you remember her?

13  A.  I remember the case, yes.

14  Q.  You were on the Perryville tour with us?

15  A.  I was.                                                            09:45AM

16  Q.  Do you remember me talking to you or Dr. Taylor about this

17  particular young woman?

18  A.  I don't, no.

19  Q.  So if you see on the bottom of Page 1, it states that she

20  had been put -- she reported she had been in an isolation cell        09:45AM

21  since March 10th after I interviewed her on May 24th, 2016.

22        MR. BOJANOWSKI:  Your Honor, we'll note an objection.

23  This is really not relevant to the monitoring process or any of

24  the performance measures, et cetera.  This is an individualized

25  case.                                                                 09:46AM

1          THE COURT:  Overruled.  We'll see where it goes.

2          MS. KENDRICK:  This is in regards to Performance

3   Measure 73, Your Honor.

4          THE COURT:  Thank you.

5   BY MS. KENDRICK:                                           09:46AM

6   Q.  At the bottom of Page 1, we stated that, "We reviewed her

7   medical file and found she is designated as SMI and diagnosed

8   with mood disorder, bipolar disorder, and narcicisstic

9   personality disorder.  She is listed as being prescribed

10  risperidone and benztropine.  There is an indication that she  09:46AM

11  has multiple prior prison hospitalizations for suicidality and

12  15 prior suicide attempts.

13          Since admission in July 15, 2015, her contacts with

14  mental health staff have been sporadic and insubstantial.  Most

15  of these encounters are watch follow-up notations.  There is no  09:47AM

16  group therapy noted and no one-to-one clinical sessions

17  documented.

18          Significantly, since she was placed in maximum custody

19  on or around March 9, 2016, she has only had three mental

20  health encounters:  3-6-16, seen per security; 4-20-16, seen    09:47AM

21  for refusing medications; and 5-6-16 placement on watch.  Based

22  on her medical records, it is apparent that she is receiving

23  far less mental health programming than adults with an SMI

24  diagnosis in the other maximum custody units under Maximum

25  Custody Performance Measure 8."                                09:47AM

1           This sounds pretty serious, huh?

2    A.  Yes.

3    Q.  Do you remember taking any action after receiving this

4    letter?

5    A.  I don't recall specifically what action was taken.  But          09:47AM

6    again, I remember the case.

7    Q.  And Performance Measure 73 requires that minors who are

8    MH-3 be seen by a clinician every 30 days, is that correct?

9    A.  Yes, I believe so.

10   Q.  Okay.  So as her medical record was reviewed it appears         09:48AM

11   that that is a violation of Performance Measure 73?

12   A.  It does.

13   Q.  So you don't remember if you forwarded this to Dr. Taylor

14   or somebody from Corizon?

15   A.  Well, again, Corizon is notified on all these.  I do know       09:48AM

16   that.  I don't know if I personally got involved in this one at

17   that time.

18   Q.  What do you do for follow-up in terms of once you send the

19   notification to the people on your staff or to Corizon?

20   A.  I will forward that in an e-mail and say, "investigate and     09:48AM

21   advise."  And they will go into the records in more detail,

22   take a look at what's going on.  They will come back and tell

23   me, I think this person needs to be seen, or we're missing some

24   information, or they are going to Corizon for more information

25   on it.                                                              09:49AM

UNITED STATES DISTRICT COURT

1    Q.  Do you keep any sort of like chart or log where you keep

2    track of these individual cases as they come through from

3    either me or concerned family members to keep track of whose

4    been -- whose issues have been raised to you?

5    A.  I do not.  I know when issues are brought to us through the    09:49AM

6    plaintiffs in letter form, I know there's a spreadsheet that

7    shows every inmate that's been brought to our attention on that

8    spreadsheet.

9    Q.  So that way you could check and see if somebody who you

10   said please look into this, whether they actually did it?    09:49AM

11   A.  Yes.  Typically -- and I don't track it that way.  I may

12   put it out there and then track it myself in my calendar for

13   follow-up if I need something back.  But very typically, I get

14   a response back from my staff telling me exactly what's going

15   on.    09:49AM

16   Q.  Okay.  And if you don't get a response you contact them and

17   say, what's going on with this case?

18   A.  Yes.

19   Q.  But you don't remember if you did it with this specific

20   case last year?    09:50AM

21   A.  I'm sorry, I don't.

22   Q.  Were you keeping that log back then, last June?

23   A.  Yes.

24        MR. BOJANOWSKI:  Your Honor, same objection.  This is

25   not part of the monitoring process.  I mean, this is well    09:50AM

1    outside the parameters of what we're here for.  I mean --

2          THE COURT:  It's helping me understand how the

3    Department of Corrections superviserial staff interacts with

4    Corizon.  That's useful for me.  So overruled.

5    BY MS. KENDRICK:                                                09:50AM

6    Q.  I'm giving you two documents.  One of them is labeled a

7    psychological autopsy.  These are done every time a prisoner

8    commits suicide, is that correct?

9    A.  That's correct.

10   Q.  And if you could turn to Page 2 under Section 3, there's a   09:51AM

11   -- it's titled Description of Suicidal Act.  And it says that

12   the time of the incident was approximately 5:52 p.m., or 1752

13   in military time.  And under detection intervention strategies

14   it says medical arrived on site at 1757.

15         So that would be five minutes for the emergency           09:51AM

16   response, correct?

17   A.  By medical staff, yes.

18   Q.  And doesn't Performance Measure 25 require medical

19   responders arrive within three minutes?

20   A.  Yes.                                                        09:51AM

21   Q.  So this emergency response would not be compliant with

22   Performance Measure 25?

23   A.  No.

24         MR. BOJANOWSKI:  Your Honor, we'll object.  That's not

25   an accurate statement of the measure.                          09:52AM

1          THE COURT:  Well, what is the accurate statement?

2          MR. BOJANOWSKI:  It's medical responders.  The COs are

3    trained in emergency medical treatment and, you know, the

4    question is was there emergency medical treatment being

5    provided by either medical staff responding and/or COs on the          09:52AM

6    scene.

7          THE COURT:  I think your objection has informed the

8    Court so the record is informed as you wished.  You may

9    continue.

10   BY MS. KENDRICK:                                                        09:52AM

11   Q.  Do you know what score Perryville prison got in July for

12   Performance Measure 25?

13   A.  I can look at my sheet.  I'm guessing you know already.

14   For Performance Measure --

15   Q.  25.                                                                 09:53AM

16   A.  25.

17          MR. BOJANOWSKI:  For what month?

18          MS. KENDRICK:  July 2016.

19          THE WITNESS:  100 percent.

20   BY MS. KENDRICK:                                                        09:53AM

21   Q.  Okay.  And if you continue in the psychological autopsy

22   under other relevant information, it states that she had told

23   mental health staff that she was being made fun of by others

24   and they were telling her to hang herself, cut herself, and

25   fight.  She said talking to her bunkee had been helpful in              09:53AM

1    helping her cope.  She told another staff member she was being

2    bullied on the yard.  She had recently been on mental health

3    watch due to engaging in minor self-harm.

4          And then a few more lines down it states it is noted

5    on the day she was placed on watch she had been combative with          09:54AM

6    staff and was taken down to the ground hitting her nose.  She

7    was removed from watch on July 15, 2016.

8          Does reading that description raise any questions

9    about the mental health care that she was supposed to be

10   receiving pursuant to the stipulation?                                    09:54AM

11         MR. BOJANOWSKI:  Same objection.

12         THE COURT:  Overruled.

13         THE WITNESS:  No that raises concern.  Of course it

14   does.

15   BY MS. KENDRICK:                                                          09:54AM

16   Q.  Do you remember reviewing the psychological autopsy for

17   this case?

18   A.  Yes.

19   Q.  If you turn to Page 6 of the psychological autopsy, at the

20   bottom of the page, it states that a review of the mental        09:54AM

21   health records indicated that documentation of contacts to be

22   in some instances sparse and in others out of time frames.  On

23   the other hand, the notes by the attending psychiatrist showed

24   very appropriate and attentive care to her.

25         Do you know if any steps were taken with Corizon to          09:55AM

1    improve the time frames used for seeing children under

2    Performance Measure 73?

3           MR. BOJANOWSKI:  Well, note an objection, Your Honor.

4    At the time of death she was no longer a minor.

5           THE WITNESS:  Any mortality review --                09:55AM

6           THE COURT:  Overruled.

7           Go ahead.

8           THE WITNESS:  I'm sorry.  Any mortality review

9    involves staff from Corizon, so they are fully aware of all the

10   findings and everything that has taken place and what the      09:55AM

11   results of that review are.

12   BY MS. KENDRICK:

13   Q.  Do you know what steps have been taken since her suicide to

14   ensure that minor girls who are MH-3 at Perryville are provided

15   sufficient mental health care?                                 09:55AM

16   A.  I don't know if there have been specific steps.  I know

17   when an error or omission is brought to their attention,

18   basically you have to go back to the process and the protocol

19   and reinforce with your staff that the rules need to be

20   followed.                                                      09:56AM

21   Q.  And at the top of Page 7, there are three recommendations

22   that were made.  Greater attention to the impact of bullying of

23   young or vulnerable individuals is warranted.  Do you know what

24   concrete steps have been taken at Perryville or other prisons

25   housing young individuals to reduce the impact of bullying?    09:56AM

1  A.  I do not know.  I would have to rely upon Dr. Calcote,

2  basically.

3  Q.  The second recommendation is that there be a review and

4  evaluation of available programming for preparing minors to

5  transfer to adult population.                              09:56AM

6          Are you aware of any review or evaluation being done?

7  A.  I'm not.  Not personally, no.

8  Q.  And the third recommendation is a closer monitoring of the

9  documentation practices of mental health clinicians and

10  training on appropriate content and timeliness.           09:57AM

11          Do you know if training was done for mental health

12  clinicians on documenting and ensuring timeliness?

13  A.  I know that training takes place all the time.

14  Q.  But my question was whether the training specifically to

15  this recommendation.                                      09:57AM

16  A.  Specific to this outcome, no, I'm not.

17  Q.  Okay.  And the other document that I handed you is the

18  Mortality Review Committee final report.  And you are a part of

19  the Mortality Review Committee, is that correct?

20  A.  Yes.                                                  09:57AM

21  Q.  And that these are reports done for every single death

22  regardless of the cause of death?

23  A.  Correct.

24  Q.  And I believe if you look at the last page of this document

25  it looks like you signed it at the bottom?               09:58AM

May 10, 2017 - Status Hearing Resumed - Pratt - Cross

1   A.  Correct.

2   Q.  You sign every committee report?

3   A.  I do.

4   Q.  And review every committee report?

5   A.  I do.                                                    09:58AM

6   Q.  And what do you do when you get a report that notes that

7   there's been some sort of deficiency in care or

8   recommendations?  What step do you take next after --

9        MR. BOJANOWSKI:  Your Honor, may we approach?  I mean,

10  I'm not sure that this document -- I mean, it's not subject to   09:58AM

11  discovery and I'm not sure if there are some statutory

12  confidentiality provisions which may be at play with regard to

13  this document.  And to have open court testimony concerning it

14  may be a problem.  And I just -- I just don't know whether this

15  can be used in evidence.  I mean, it certainly at the top says,   09:58AM

16  "Document not subject to discovery."  And it's got some revised

17  or revised statutory citations there that I'm not personally

18  familiar with.

19       So I'm hesitant to have this witness testify with

20  regard to the content of this document or have this document    09:59AM

21  come into evidence in any open court proceeding.

22       MR. FATHI:  Your Honor, this is David Fathi.  State

23  law privileges do not control in federal question litigation in

24  federal court.  So the state law privilege that Mr. Bojanowski

25  is referring to is not operative here.  And we would be happy    09:59AM

1    to provide the Court with authority, if necessary.

2            THE COURT:  No.  I'm aware of that rule.  What I'm

3    also, though, sensitive to is whether or not there's violation

4    of privacy interests that are -- that should reasonably be

5    protected.  I will ask, if you can, to ask questions and          09:59AM

6    provide answers in a way that can respect that privacy concern.

7            MS. KENDRICK:  Yes, sir.  I have made an effort to not

8    use names or precise dates.

9    BY MS. KENDRICK:

10   Q.  On the first page of that mortality review, do you see        10:00AM

11   about two-thirds of the way down, on the first page the

12   question, "Was sufficient care offered slash provided regarding

13   mental health issues?"

14   A.  Yes.

15   Q.  Which box is checked?                                          10:00AM

16   A.  No.

17   Q.  How many suicides have there been in ADC in the past week?

18   A.  I'm aware of one, possibly two.  I became aware of one last

19   weekend.

20   Q.  Possibly two?                                                  10:00AM

21   A.  Yes, in the last week.  I'm not sure of the time frame.

22   Q.  So the second one is it just that it's not ruled that it's

23   been a suicide yet.  It's apparent self-harm?

24   A.  Well, yes.

25   Q.  Okay.  Is that a typical number of deaths by apparent          10:01AM

1    self-harm in a week?

2    A.  No.

3    Q.  That's a higher number than you would normally get in a

4    week?

5    A.  Most definitely.                                          10:01AM

6    Q.  What are you doing to investigate the causes of this higher

7    than usual number of deaths by apparent self-harm?

8         MR. BOJANOWSKI:  Same objection.

9         THE COURT:  Overruled.

10        THE WITNESS:  We go through the same process              10:01AM

11   regardless of the number.  This is alarming that we have had a

12   couple recently, and for some unknown reason nationally,

13   numbers have gone up very recently in the prison system.

14   BY MS. KENDRICK:

15   Q.  And do you know what two institutions they were at?        10:01AM

16   A.  Not off the top, no.

17   Q.  Do you know if these are institutions that have all of

18   their allocated mental health staff positions filled?

19   A.  I don't know which facilities specifically, and I honestly

20   don't know exactly what the staffing is at each facility right  10:02AM

21   now.

22   Q.  Okay.  So back to your chart with all the performances.  On

23   Performance Measure 73, which is at Page 55, this is a measure

24   that only applies at Perryville in Tucson because it is

25   relevant to minors.  There are N/As for the past six months    10:02AM

UNITED STATES DISTRICT COURT

1    from September 2016 through February 2017.  And does this mean

2    that no data was provided to the monitor, or does this mean

3    that there are no minors with a mental health score of 3 at

4    Perryville?

5    A.  I'm assuming this means there are no minors with an MH       10:03AM

6    score of 3.

7    Q.  But the monitors who have testified the past three days

8    also say that they enter N/A when they are not provided any

9    information, correct?  Like if a log is empty they put N/A, not

10   applicable?                                                      10:03AM

11   A.  No.  That's not correct.

12   Q.  Oh.  What did they testify to then?

13   A.  If they are not receiving adequate information and it

14   hasn't been provided to them and there's no documentation of

15   performance, they will get a zero in instead of an N/A.          10:03AM

16   Q.  That's the policy as you understand it?

17   A.  Yes.

18   Q.  And have your monitors been informed of that policy?

19   A.  Yes.

20   Q.  Okay.  I want to go back to the Court's orders.  There's     10:03AM

21   one that's Docket 1673.  It's dated September 8, 2016.

22   A.  Okay.

23   Q.  If you go to Page 5 of that order.

24   A.  Yes.

25   Q.  You are getting ahead of me.                                 10:04AM

1           And could you read what it says about segregation

2    visit -- or sorry -- Page 5, Lines 1 through 3, could you read

3    that?

4    A.   "The stipulation's protocols specifically permit group

5    counseling to count toward compliance for Performance Measure          10:04AM

6    92.  By extension then, group counseling does not count toward

7    compliance in any of the other performance measures.

8    Q.   And you were in the courtroom on April 17, correct?

9    A.   Yes, ma'am.

10   Q.   And did you hear Mr. Dye testify that when he did the CGARs        10:04AM

11   in December he counted group contacts for measures other than

12   Performance Measure 92?

13   A.   If I was here, I heard that, yes.

14   Q.   And is that compliant with the Court's order?

15   A.   No.                                                                10:05AM

16   Q.   Have you gone back and recalculated any of the mental

17   health performance measures other than 92 in light of this

18   order on group counseling?

19   A.   Not to my knowledge, no.

20   Q.   If you flip through the orders there's another one that's         10:05AM

21   Docket 1745, filed November 8, 2016.

22   A.   Okay.

23   Q.   And on Page 1, it states cell front visits.  Can you read

24   what the Court wrote?

25   A.   "As explained to the parties at the October 5, 2016 status        10:05AM

1    conference, the cell front visit is compliant with the

2    stipulation if an inmate refuses to leave the cell or if the

3    prison is on lockdown.  However, a cell front visit is not

4    compliant with a stipulation if an inmate is on suicide watch.

5    Q.  And have you gone back and calculated any of the mental       10:06AM

6    health performance measures in light of the Court's order on

7    cell front visits?

8    A.  Not to my knowledge, no.

9    Q.  And you have never done any of the mental health

10   monitoring, correct?                                              10:06AM

11   A.  Correct.

12   Q.  Okay.  If you can flip through the orders, there's one

13   Docket 1843, dated December 23rd, 2016.

14   A.  Okay.

15   Q.  And at the bottom of Page 1, it states, "The Court           10:06AM

16   concludes that if the month under review does not require any

17   health care, the monitor must look back two visits.  The oldest

18   review visit is the baseline, and will be used to determine if

19   the most recent visit was timely.  If the most recent visit was

20   timely, then the intervening months are compliant.  If the most  10:07AM

21   recent visit was untimely, parenthesis, measured by looking to

22   the previous visit, close parenthesis, then the intervening

23   months are non-compliant."

24        That's what it says?

25   A.  Yes.                                                          10:07AM

May 10, 2017 - Status Hearing Resumed - Pratt - Cross

1   Q.  And did you hear Mr. Dye testify on April 17 that he counts

2   records as compliant even when he doesn't look at the last two

3   visits?

4   A.  Again, if I was here, I heard that.  And I'm not exactly

5   sure what time frames he was talking about.                10:07AM

6   Q.  And is his practice compliant with the Court's order?

7   A.  To my knowledge, yes.

8   Q.  Have you guys gone back and recalculated performance

9   measure, any of the mental health performance measures in light

10  of this order about what every X days means?                10:08AM

11  A.  Not that I know of, no.

12  Q.  Okay.  So we were talking a little while ago about

13  Performance Measure 95, which is about taking people off

14  suicide watch.  And I was wondering if you could look at your

15  chart for Performance Measure 95, on Page 59 of the document.  10:08AM

16  Could you look at the line for Douglas and tell me what you

17  see?

18  A.  N/A.

19  Q.  How many?

20  A.  Across the board.                                        10:08AM

21  Q.  Do you see any scores other than an N/A?

22  A.  I do not.

23  Q.  How about May 2016?

24  A.  Oh.  I apologize.  A zero percent.  I missed that.

25  Q.  So your position is that in an institution that has 23 N/As  10:09AM

```
 1   and the only time they were scored got zero percent is

 2   compliant with the stipulation?

 3   A.  Yes.

 4   Q.  Okay.  If you could flip to the next page on your chart for

 5   Performance Measure 99.                                          10:09AM

 6   A.  Okay.

 7   Q.  Okay.  And I will just remind both of us, according to your

 8   declaration at Paragraph 33, Performance Measure 99 is, "Peer

 9   reviews shall be conducted as set forth in the mental health

10   technical manual.  And according to your declaration, you state  10:09AM

11   that Eyman, Florence, Lewis, Perryville, Phoenix, Tucson and

12   Yuma are now compliant.

13         So again, you believe that the N/A means that nothing

14   happened that month to be measured or that there was no data

15   provided?                                                        10:10AM

16   A.  It indicates to me that it was not applicable to that

17   facility at that time.  No one fell into the source of record

18   review at that facility during that month.

19   Q.  And this is about doing peer reviews, so it's about

20   reviewing the mental health staff?                               10:10AM

21   A.  Okay.

22   Q.  So peer reviews are normally done annually?

23   A.  They are done sporadically by Corizon.

24   Q.  Under state licensing requirements, aren't they supposed to

25   be done annually?                                                10:11AM
```

May 10, 2017 - Status Hearing Resumed - Pratt - Cross

1   A.  Again, I don't know if they are done all at the same time

2   each month.  It depends on the hire date for the staff and when

3   Corizon chooses to do that peer review.

4   Q.  Okay.  Do you know if Corizon has to do peer reviews of the

5   locum tenens and the temporary people they bring in to help on          10:11AM

6   medical and mental health care?

7   A.  Not that I am aware of.

8   Q.  Could that be part of the reason why there's so many N/As,

9   that there was nobody to review?

10  A.  Possibly, yes.                                                       10:11AM

11  Q.  And back to the Court's orders on -- there's one Docket

12  1831 that he issued on December 14th.

13  A.  Okay.

14  Q.  On Page 2, the very last paragraph, could you read that

15  please?                                                                  10:12AM

16  A.  "The Court hears argument on Performance Measure 100 and

17  101.  Plaintiffs inform the Court that defendants' revisions

18  are sufficient."

19  Q.  Okay.  Now, if you look at your chart for the performance

20  measures, for Performance Measure 100 and 101, do you see a lot         10:12AM

21  of N/As?

22  A.  I do.

23  Q.  Can we take that to mean that you did not go back and

24  recalculate Performance Measures 100 and 101 as the parties

25  agreed and the Court so ordered?                                        10:12AM

1    A.   That's my understanding, yes.

2    Q.   So I have handed you some CQI minutes a little while ago.

3    A.   Okay.

4    Q.   If you can find the Florence one, they are in alphabetical

5    order so it should be the third one after Douglas and Eyman.          10:13AM

6    A.   Okay.

7    Q.   So you found it.  So if you go to Page 3 of that document

8    it's Bates Number ADCM 840265.

9    A.   Got it.

10   Q.   And the very top, it says "Spencer congratulated Dr. Weekly     10:13AM

11   and his team for completing the dental CGARs.  The dental staff

12   is done with being monitored but will still maintain their

13   excellence."

14        Do you know who Spencer is?

15   A.   I believe he's the FHA.                                          10:14AM

16   Q.   Okay.  And if you look at the front page of this document,

17   it states that the meeting was held on February 2nd, 2017.  Is

18   that correct?

19   A.   Correct.

20   Q.   So it appears that Spencer, the Corizon FHA, had already         10:14AM

21   been told by February 2nd that the dental CGARs would no longer

22   be monitored, is that correct?

23   A.   Can you repeat that?

24   Q.   So the date of the document is February 2nd, right?

25   A.   Yes.                                                             10:14AM

1   Q.   So Mr. Spencer Sego, on February 2nd is informing the

2   dental staff that they are done being monitored.  Correct?

3   A.   According to this, that's correct.

4   Q.   Who decided that the dental staff at Florence was no longer

5   going to be monitored?                                              10:15AM

6   A.   Apparently Spencer.

7   Q.   What about Dr. Chu?

8   A.   No.

9   Q.   No?  What do you mean no?

10  A.   This is not a determination that's made by anyone except      10:15AM

11  the -- to quit monitoring is a decision by the Court, not by

12  the Monitoring Bureau or Corizon.

13  Q.   Do you have any idea why the facility health administrator

14  at Florence would think that dental performance measures would

15  no longer be monitored?                                             10:15AM

16  A.   No.  I can only assume.

17  Q.   Okay.  In that stack there is also the Douglas performance

18  measures.  They are in alphabetical order, so it should be at

19  the front.

20  A.   Oh, at the front.  Okay.                                       10:16AM

21  Q.   And so these are the Douglas minutes from February 14,

22  2017.  And if you turn to Page 2 in the section that says

23  Number 2 topics, could you read the last sub bullet point in

24  that section?

25  A.   Are you on Bates 40243?                                        10:16AM

May 10, 2017 - Status Hearing Resumed - Pratt - Cross

1   Q.   Yes, sir.

2   A.   And in the first box is what you want me to read?

3   Q.   Third box down.

4   A.   Third box down.  Topics, multi-disciplinary.

5   Q.   Yeah.  What's the last bullet point to the right?           10:16AM

6   A.   "In March we are projecting that there will only be 10

7   program measures that we will be audited on.  The rest will be

8   dropped."

9   Q.   There are 103 health care measures, correct?

10  A.   Correct.                                                     10:17AM

11  Q.   So it had been decided by February 14 that the monitor was

12  no longer going to monitor 93 performance measures?

13  A.   No.

14  Q.   So who is Vicki Smith?

15  A.   FHA.                                                         10:17AM

16  Q.   The facility health administrator?

17  A.   Yes.

18  Q.   And so Vicki Smith, on February 14th, was telling her staff

19  that only 10 performance measures are going to be monitored

20  starting in March?                                               10:17AM

21  A.   That's what she said, apparently.

22  Q.   Do you have any idea why Ms. Smith would have this idea?

23  A.   I don't.

24  Q.   Did the Douglas monitor tell you that this was what staff

25  were being told?                                                 10:17AM

1    A.  Did not tell me, no.

2    Q.  Did you hear from anyone that works for you that Douglas

3    health care staff are under the impression that they are only

4    going to be audited on 10 performance measures?

5    A.  No.                                                              10:18AM

6    Q.  And could you look the Yuma CQI minutes are also in that

7    stack in alphabetical order?

8    A.  Okay.

9    Q.  If you turn to Page 7 of that document, it's Bates Number

10   ADCM 840338.                                                         10:18AM

11   A.  Okay.

12   Q.  And according to the cover this meeting was held on

13   February 16th?

14   A.  Yes.

15   Q.  And you see the section that's called CGAR CAPs?              10:18AM

16   A.  I do.

17   Q.  And could you read what is written there, please?

18   A.  AFHA Terpening reported that there were four findings for

19   the month.  This is a decrease of one finding from the prior

20   month.  This is an all time low for the complex in the month of  10:19AM

21   March.  Some measures will no longer be tracked for litigation

22   purposes due to substantial compliance.  In March the threshold

23   for compliance will rise to 85 percent.  We continue to monitor

24   measures that are between 80 and 84 percent to ensure they are

25   brought over 85 percent compliance prior to March.               10:19AM

1   Q.  AFHA means assistant facility health administrator?

2   A.  Yes.

3   Q.  And had you told Corizon headquarters or staff at Yuma that

4   they could -- they were no longer going to be audited on

5   certain performance measures?                                    10:19AM

6   A.  No.

7   Q.  And who is Karen Padron?

8   A.  A site monitor.

9   Q.  Is she assigned to Yuma?

10  A.  Well, to -- yes.  I believe she covers Yuma.              10:20AM

11  Q.  Is she a clinical one or a compliance?

12  A.  She -- I'm not sure.  We technically don't really even

13  refer to them as clinical and compliance anymore.  They are all

14  site monitors.

15  Q.  Okay.  And if you look on the front page of the Yuma CQI   10:20AM

16  minutes, Ms. Padron's name is the last one typed on the

17  attendance sheet?

18  A.  Yes.

19  Q.  And it states that she attended via telephone?

20  A.  Yes.                                                       10:20AM

21  Q.  Did Ms. Padron report to you or anyone else at the

22  Monitoring Bureau that the Yuma prison has been told that they

23  are not going to be monitored for some performance measures

24  because of substantial compliance?

25  A.  She didn't report that to me.  She may have reported it to  10:20AM

UNITED STATES DISTRICT COURT

1    her supervisors.

2    Q.  Who are her supervisors?

3    A.  In this case it would have been Vanessa Headstream or Erin

4    Barlund.

5    Q.  Do Ms. Headstream and Ms. Barlund understand that you                    10:21AM

6    cannot stop monitoring until the Court orders you to stop

7    monitoring?

8    A.  Most definitely.

9    Q.  So if either of them have gone and told either of them that

10   would it be your expectation they would come report this to        10:21AM

11   you?

12   A.  Not necessarily.  It would be my expectation that they

13   address the issue in the filed and make sure that folks

14   understand how it works.

15   Q.  Why would they not report it to you?  Isn't this something     10:21AM

16   you would want to know?

17   A.  Not specifically, no.  That's why I don't handle

18   everything.  That's why I have subordinates that do a lot of

19   work.  They address these issues in the field.  That's pretty

20   much basically Kathy Campbell, Vanessa Headstream, Dr. Taylor       10:21AM

21   that address issues.  Things that they believe are seriously

22   important they will bring to my attention.

23   Q.  Have you notified all of the monitors that work in the

24   Monitoring Bureau that they have to continue monitoring in

25   March?                                                              10:22AM

UNITED STATES DISTRICT COURT

**May 10, 2017 - Status Hearing Resumed - Pratt - Cross**

1    A.  That's been made very clear to them, yes.

2    Q.  Who made it clear to them?

3    A.  I did.

4    Q.  How?

5    A.  In our weekly and monthly meetings.                    10:22AM

6    Q.  When was the last time you reminded them of this?

7    A.  About a month ago.

8    Q.  Do you remember what you said to them?

9    A.  Not specifically, but it's never been a question with my

10   bureau that we will continue to monitor exactly as we are right    10:22AM

11   now.

12   Q.  Okay.

13            THE COURT:  Any idea how so many people got a

14   different idea.

15            THE WITNESS:  That's on the Corizon side, Your Honor.    10:22AM

16   I don't know.

17            THE COURT:  Okay.

18   BY MS. KENDRICK:

19   Q.  And you have the Yuma minutes in front of you.  If you

20   could flip up a few pages to Page 4.  In the top box, the    10:22AM

21   second paragraph says MHRN, which I believe stands for mental

22   health registered nurse.  Is that correct?

23   A.  I believe so, yes.

24   Q.  Heglend reported there has been an increase in refusals for

25   mental health.  The new HNR process requires that nursing has    10:23AM

1    an encounter with all patients that submit a mental health

2    related HNR.  Many patients are refusing this encounter with

3    the nurse due to only wanting to see mental health and not

4    wanting to be charged a $4 fee for the nursing appointment.

5              Were you aware of this practice going on at Yuma?        10:23AM

6    A.  Yes.

7    Q.  So this is part of the new sick call process that you guys

8    put in place?

9    A.  Absolutely.

10   Q.  So why does a mental health patient who is filing an HNR      10:23AM

11   asking for a refill of medication need to see a nurse?

12   A.  If it's for a refill of medication, he doesn't necessarily

13   need to see a nurse.

14   Q.  What if they are filing an HNR that says I'm feeling

15   depressed and I would like to speak to my counselor?              10:23AM

16   A.  Well, it's hoped, with this process, that a nurse is going

17   to be able to do an immediate assessment of that patient to

18   determine the acuity of his need.

19   Q.  And isn't it required by ADC policies, which I believe are

20   informed by state law, that persons with both mental health      10:24AM

21   diagnoses and chronic conditions shall not be charged the $4

22   per visit?

23   A.  SMI, that's correct.

24   Q.  So only SMI?

25   A.  Yes.                                                          10:24AM

1    Q.  And chronic medical conditions?

2    A.  Yes.

3    Q.  Does the $4 go to the Department or go to Corizon?

4    A.  Neither.  It goes to the general fund.

5    Q.  Is this being done at all institutions now?                    10:24AM

6    A.  Yes.

7    Q.  So you remember last week, or a couple weeks ago in when I

8    asked you about a policy about being having to be seen twice on

9    a nurse's line before getting referred to a provider?

10   A.  Yes.                                                           10:25AM

11   Q.  Could you read what's highlighted?

12   A.  Provider appointments have been increased and it's

13   difficult for the providers to complete their lines.  Nurses

14   have been reminded that an inmate needs to be seen on the nurse

15   line two times before being referred to the provider to ensure   10:25AM

16   that treatment plans -- all treatment plans that nursing can

17   provide slash explore are exhausted before sending the inmate

18   to the provider.

19   Q.  And I believe Ms. Campbell testified that she's in charge

20   of reviewing the CAPs that come in?                               10:25AM

21   A.  Correct.

22   Q.  So this CAP is labeled as being submitted in October 2016.

23   In the far right corner it says it was approved on October

24   29th.

25   A.  Correct.                                                      10:26AM

1  Q.  So as recently as October 29th, the Department was

2  condoning this policy of making inmates see the nurse twice

3  before they can be referred to a provider?

4  A.  No.  Not to my knowledge.  This has never been condoned by

5  the Department.                                                    10:26AM

6  Q.  Did Ms. Headstream report to you that Corizon submitted a

7  CAP where their method of complying with Performance Measure 39

8  was to require patients be seen twice on nurse's line for the

9  same thing before they get to see the provider?

10 A.  I don't recall discussing the CAP, but I know we have        10:26AM

11 discussed in the past when it was brought to my attention that

12 this was a practice, and this was being rolled out by Corizon,

13 that we immediately put a stop to it as soon as I found out

14 about it.

15 Q.  So this policy will reduce the number of prisoners that are  10:26AM

16 seen on provider line, correct, because they have to run the

17 gauntlets of going through nurse's line twice?

18 A.  This would have, yes.

19 Q.  So there's no way to tell that any improvements in

20 compliance with Performance Measure 39 is due to improved       10:27AM

21 processes versus forcing patients to go to nurse's line

22 multiple times, is there?

23         MR. BOJANOWSKI:  Your Honor, I object.  He already

24 testified that's not the policy or practice that's in place.

25         THE COURT:  Well, we maybe can lay a foundation as to   10:27AM

1    when it was in operation.  How -- what time period was it in

2    operation?

3              THE WITNESS:  Your Honor, it had to have been sometime

4    many, many, many months ago when I heard about it and we

5    brought it to Corizon's attention and said this is not a good          10:27AM

6    practice.  This is -- you can't automatically say that you have

7    to be seen by a nurse twice before you can refer anything.  You

8    have to go on an individual basis for the acuity of the HNR and

9    the need, and some may be immediately referred.  You don't have

10   to be seen twice.                                                       10:28AM

11             THE COURT:  How would we retrospectively be able to

12   determine what months this practice was in place by Corizon?

13             THE WITNESS:  I'm not sure.  I would probably have to

14   rely on Corizon to tell me when they put this correction out to

15   their staff.                                                            10:28AM

16             THE COURT:  And your best recollection as to when it

17   ceased is October of '16?

18             THE WITNESS:  To my knowledge it was before that.

19             THE COURT:  How much farther?

20             THE WITNESS:  Up to a year ago.                               10:28AM

21   BY MS. KENDRICK:

22   Q.  Yet on October 29, Corizon submitted a corrective action

23   plan which was approved by your staff?

24   A.  Obviously.

25   Q.  There's a name listed here of Romy Franklin.  Do you know          10:29AM

1    who that person is?

2    A.  It's a Corizon employee as far as I know.

3    Q.  It's a Corizon person.  So it's not somebody who works for

4    you?

5    A.  No.                                                        10:29AM

6            THE COURT:  Would this be a good place to take a

7    10-minute break?

8            MS. KENDRICK:  Sure.

9            THE COURT:  That's what we'll do.  Thank you.

10           (Recess from 10:29 a.m. until 10:41 a.m.)            10:29AM

11           THE COURT:  You may continue.

12   BY MS. KENDRICK:

13   Q.  So Mr. Pratt, I wanted to talk with you more about the

14   Court's order from November 10, 2016.  It's Docket 1754.

15           THE COURT:  Did you say 2017?  You said 2016, I'm     10:41AM

16   sorry.

17           MS. KENDRICK:  2016.  I'm sorry.

18           THE COURT:  No.  You probably said it right.  Court

19   reporter heard you say 16.

20           MS. KENDRICK:  Thank you.                            10:41AM

21   BY MS. KENDRICK:

22   Q.  I believe this is the order that you all referred to as the

23   community services order?

24   A.  Community resources.

25   Q.  Community resources.  Okay.  I will try to use that      10:41AM

1    language so that we're all on the same page.

2    A.  Do I have a copy have of that docket?

3    Q.  It may not be there.

4    A.  Okay.

5    Q.  But you are aware of it?  That's the important thing.          10:41AM

6    A.  Yes.

7    Q.  Okay.  And tell me every step you have taken to make sure

8    that patients who are not seen in the time frames for those

9    performance measures are seen by a community provider.

10   A.  I don't believe every one of those performance measures       10:41AM

11   actually fully related to the ability to send someone out into

12   the community to solve that issue.  The basic tenet was for the

13   inmates, as far as being seen and requests for an HNR within

14   the 24-hour time frame and the referrals to the providers in a

15   14-day.  Those are really the basic ones that could be handled    10:42AM

16   by a community -- resources in the community, in addition to

17   medications not arriving in a timely fashion, then you would

18   have to -- you could go out into the community and obtain those

19   medications and bring them back.

20   Q.  What about the performance measures involving referrals to    10:42AM

21   a provider and that a provider sees somebody within 14 days of

22   the referral?

23   A.  That's the same, yes.  That one as well, yes.

24   Q.  Okay.  So how many times have you not met the time lines

25   required by those Performance Measures 37 and 39?                  10:43AM

1   A.  I don't know a number of times.  I know they have been --

2   they are not perfect.

3   Q.  Do you have documents that show that?

4   A.  I have my CGAR findings.

5   Q.  But the Court's order doesn't limit itself solely to the          10:43AM

6   files reviewed for CGARs, right?

7   A.  Correct.

8   Q.  So all prisoners, regardless of the 10 whose files are

9   selected, need to be seen by these time frames pursuant to the

10  Court's order, correct?                                               10:43AM

11  A.  Correct.

12  Q.  So how are you keeping track of whether all the other

13  patients besides the 10 whose files are selected in a given

14  month are meeting the time frames of the Court's order?

15  A.  I'm not tracking every patient.                                   10:43AM

16  Q.  So how do you know that you are meeting the timelines if

17  you are not tracking every patient?

18  A.  I'm relying on my random sample.

19  Q.  Of 10 CGARs, for the CGARs?

20  A.  Yes.                                                              10:44AM

21  Q.  And on what occasions have the timelines not been met?

22  A.  There's instances where an inmate may be seen 25 or 26

23  hours after he submitted the HNR.

24  Q.  So were they taken out for outside services?

25  A.  No.                                                               10:44AM

1    Q.  To your knowledge, has there been any instance when a

2    prisoner was taken out of the prison to a community provider to

3    comply with the order?

4    A.  No.

5    Q.  To your knowledge, have there been any instances when          10:44AM

6    outside services have been brought into the prison to comply

7    with the order?

8    A.  I believe some have been seen by telemedicine, yes.

9    Q.  That was when they were close to exceeding time frames?

10   A.  Yes.                                                            10:44AM

11   Q.  And who is overseeing these changes in the process and the

12   policy of how patients are seen on Performance Measures 37 and

13   39?

14   A.  I'm not sure I understand the question.

15   Q.  Well, I'm trying to figure out who is in charge, like whose    10:45AM

16   getting down in the trenches and talking to folks and looking

17   at the numbers and figuring out whether or not everybody is

18   being seen by the time lines?

19   A.  The monitors in the field.

20   Q.  So you delegated it to the individual monitors?                10:45AM

21   A.  Yes.  That's part of their tracking.

22   Q.  Through the CGARs?

23   A.  Yes.

24   Q.  Are they doing any other tracking besides the CGARs?

25   A.  Not to my knowledge, no.                                       10:45AM

1   Q.  Have you asked one of the people who reports directly to

2   you, for example, I think you said Ms. Headstream or Ms.

3   Campbell, are one of them delegating the power of kind of

4   overseeing the implementation of this?

5   A.  As part of the routine duties they follow these performance   10:45AM

6   measures to see if there's overall compliance.

7   Q.  So just as part of the regular duties?

8   A.  Correct, and then to see if there's trends, if things seem

9   to improve or have improved.

10  Q.  So what do they review to figure out if there are trends?   10:46AM

11  A.  The findings from month to month.

12  Q.  The CGAR findings?

13  A.  Correct.

14  Q.  To your knowledge, do they look at any other sources of

15  data to ensure compliance with regard to all patients?   10:46AM

16  A.  Not that I'm aware of, no.

17  Q.  Do you know if there's anybody on the other side at Corizon

18  who is kind of overseeing this project or process of unrolling

19  this new approach to seeing patients on the clinic?

20  A.  It's their clinical leadership and the BPO, Rhonda Almanza,   10:46AM

21  Lynn Cole, their medical providers.  It's the whole group.

22  Q.  Is responsibility diffused to the 10 institutions the way

23  you seem to have described it being diffused with the

24  monitoring side?

25  A.  I'm not sure I understand that.   10:47AM

1   Q.  So you said each monitor is in charge of ensuring that the

2   timelines are met by doing the CGARs.  So I'm trying to figure

3   out on the Corizon side, is it each facility health

4   administrator is responsible for implementing this system?

5   A.  Ultimately.  And I know that Corizon has gone through                10:47AM

6   different changes as far as who is sometimes assigned to

7   oversee a specific performance measure or specific process at

8   each facility.

9   Q.  So to your knowledge, is there anybody at Corizon regional

10  headquarters who is kind of overseeing this initiative?                  10:47AM

11  A.  They have a compliance person in place right now, yes,

12  Chris Tucker.

13  Q.  So he's in charge of making sure that the processes for

14  delivery of nursing care and provider referrals are changed?

15  A.  My understanding, that's part of his duties, yes.                    10:48AM

16  Q.  Do you -- are these changes in the policy and process for

17  nurse's line working?

18  A.  Yes.

19  Q.  On what basis do you say that?

20  A.  CGAR scores.                                                         10:48AM

21  Q.  Do you have any other information you are using to make

22  that conclusion?

23  A.  No.

24  Q.  Are all 10 institutions above 80 percent compliant to your

25  knowledge?                                                               10:48AM

1   A.  I believe so.

2   Q.  I guess we could look at your chart.

3            THE COURT:  Are we talking about 37 now.

4            MS. KENDRICK:  37 and 39, Your Honor.

5            THE COURT:  I gather you are going to address them          10:49AM

6   individually.  I just want to know which one you are turning

7   first.

8            MS. KENDRICK:  37.

9            THE COURT:  Okay.

10  BY MS. KENDRICK:                                                     10:49AM

11  Q.  So it appears from your table that they are in compliance

12  now?

13  A.  Yes.

14  Q.  What about Performance Measure 46 which was also part of

15  the Court's order?                                                   10:49AM

16           THE COURT:  Before you go on to 46, what about 39?

17           MS. KENDRICK:  39?

18           THE COURT:  Right.  You were asking about 37 and 39,

19  right?

20           MS. KENDRICK:  Yeah.                                        10:49AM

21           THE COURT:  And 37, according to Mr. Pratt's chart, is

22  in compliance for the most recent reported date of February 17.

23  Right?

24           MS. KENDRICK:  Yes.

25           THE COURT:  But then if you look at 39, Eyman,            10:50AM

 1    Florence, and Lewis, are not.

 2              THE WITNESS:  Correct.  They continue to struggle.

 3              THE COURT:  Right.  I'm just wondering why you don't

 4    focus on that.  Why were you focusing on 37 where there's

 5    compliance but --                                              10:50AM

 6              MS. KENDRICK:  I was going to look at both of them

 7    together.

 8              THE COURT:  I'm sorry?

 9              MS. KENDRICK:  I was talking about both of them

10    together so I was going to get to that.                       10:50AM

11              THE COURT:  Oh.  You were going to get to that.  I

12    just took it the wrong way when you moved on to 46, whatever

13    number you just said 40 something.  That's why I went back.

14              Go ahead.  Sorry to interrupt.

15              MS. KENDRICK:  It's okay.  Thank you.               10:50AM

16    BY MS. KENDRICK:

17    Q.  So what's going on at Eyman, Florence, and Lewis on

18    Performance Measure 39?

19    A.  39 is the referral.

20    Q.  To providers?                                            10:50AM

21    A.  Providers.  And while they have sometimes indicated a

22    referral to a provider, they may refer that for 30 days.  They

23    may refer it for two weeks, which gets to the cusp of the

24    14-day referral time frame.  And they are not all being seen at

25    this point.  So it's a matter of continuing to educate them on   10:51AM

1  the requirements of the time frames for those referrals.

2  Q.  And on Performance Measure 39, if you could look at

3  Perryville, it appears that from September 2016 going backwards

4  all the way to March 2015, they were never in compliance.

5      Do you agree.                                                    10:51AM

6  A.  Agree.

7  Q.  Okay.  And I showed you that corrective action plan that

8  was dated October 29, 2016, that included in the corrective

9  action plan that they were going to require patients be seen

10 twice on the nursing line before they would get a provider       10:52AM

11 referral.

12 A.  Yes.

13 Q.  And it appears that since October they have been above 80

14 percent.  So how can we tell that that compliance that they are

15 now reporting is not due to the fact that they are requiring     10:52AM

16 the patients to see the nurse twice before they get a referral

17 to a provider?

18     MR. BOJANOWSKI:  Same objection.

19     THE COURT:  Again, I thought that Mr. Pratt said that

20 it ended well before this time period.  And do you have any      10:52AM

21 evidence or any reason to believe that it did not end well

22 before this time period?  Remember, I asked him about October

23 and he said no, it was about a year before now, I think he

24 said.

25     MS. KENDRICK:  Well, the evidence I have is that on          10:52AM

1   October 2016, Corizon submitted a corrective action plan for

2   this performance measure at Perryville and said part of the

3   performance measure is teaching the nurses that they have to

4   see the patients twice.  And Vanessa -- I mean Kathy Campbell

5   approved this corrective action plan.                           10:53AM

6         So my evidence before me indicates that it either was

7   put in place in October, or that it was considered in October

8   at Perryville based on that -- what's written in front of me.

9         THE COURT:  It's true, what plaintiffs' counsel says

10  makes sense, but it's completely contradicted by what you said. 10:53AM

11        THE WITNESS:  Correct.

12        THE COURT:  How sure are you?

13        THE WITNESS:  I'm not 100 percent sure, Your Honor.

14  But I will tell you that with changes in leadership, the

15  changes in FHAs, they may have brought this issue up again,     10:53AM

16  which is why it ended up in a corrective action plan at

17  Perryville.

18        MS. KENDRICK:  Which was approved by Ms. Campbell.  So

19  that's what I'm trying to figure out, is if it was approved by

20  Ms. Campbell, does that mean that this policy was reinstated at 10:54AM

21  Perryville to create compliance with Performance Measure 39?

22        THE COURT:  It seems like an appropriate next step is

23  for the plaintiffs to tender a discovery request to the

24  defendants asking what the time period was that this fee was

25  imposed when it started, when it ended.  Does that make sense?  10:54AM

1          MS. KENDRICK:  Well, about the fact that they had to

2     be seen twice.

3          THE COURT:  Right.

4          MS. KENDRICK:  Correct.

5          THE COURT:  Yes and you are worried the scene twice          10:54AM

6     fee was the deterrent factor, right?

7          MS. KENDRICK:  Well, there's two.

8          THE COURT:  You are right.  It's fair to say that both

9     can be deterrent factors.  So the question is:  When did the

10    policy start that you had to be seen by two nurses before you   10:54AM

11    could take the next step and when did it end?

12         MS. KENDRICK:  And did it become revived again as the

13    written evidence seems to indicate in this corrective action

14    plan that in October 29th --

15         THE COURT:  That would be answered by that question.      10:55AM

16    I mean, if it turns out that it ended in January of 2017, or

17    hasn't ended, that would answer the question.  If it turns out

18    that it ended in July of 2016, that would suggest that the

19    folks at the quality assurance meeting didn't know what they

20    were talking about.                                             10:55AM

21         MS. KENDRICK:  Well, this wasn't a quality assurance

22    meeting, Your Honor.  This was a corrective action plan which

23    are the written reports that the Corizon has to submit to the

24    Monitoring Bureau when they have been found non-compliant.  So

25    this was the written plan submitted by Corizon to ADC as to how  10:55AM

1    they were going to come into compliance with Performance

2    Measure 39.  This isn't just minutes from a meeting.  This is

3    the written corrective action plan that we were provided as

4    part of our monthly discovery.  And in it, it states that

5    Corizon's plan to come into compliance with Performance Measure    10:55AM

6    39 is to remind nurses that they have to make the patients come

7    two separate times to be seen.

8           THE COURT:  All right.  So Mr. Bojanowski, what we'll

9    do is we'll have you all let us know when this policy started,

10   when it was put in place and when it ended.    10:56AM

11          MS. KENDRICK:  And if it's been revived.

12          THE COURT:  If it's been revived.  Fair enough.  To

13   your knowledge it's not in place now.

14          THE WITNESS:  Absolutely not.

15          THE COURT:  He seems clear that absolutely not.  He    10:56AM

16   doesn't know when it ended.  But are we clear, Mr. Bojanowski,

17   what I'm asking about?

18          MR. BOJANOWSKI:  Yes, Your Honor.  I'm just trying to

19   get some notes made here, and we'll be more than happy to

20   supplement.    10:56AM

21          THE COURT:  I didn't know whether you had a question

22   that you weren't clear.

23          MR. BOJANOWSKI:  No, I'm clear as to what the Court is

24   requesting and we'll provide supplemental information per your

25   direction.    10:56AM

1          THE COURT:  Thank you.

2          On 39, Mr. Pratt, I probably should -- you were

3    present, I think, and have heard me say this before, but there

4    is a tension in the stipulation between the fact that it is not

5    a guarantee of absolute provided -- the provision of the                10:57AM

6    promise of the performance measure to every single one of the

7    inmates because there is the different benchmarks that we have

8    been marching through that we're now at 85 percent.

9          And so there is the reality of the agreed-upon

10   contract between the parties that there would be some number of         10:57AM

11   people who would fall out.  Addressing that tension in the past

12   to defense counsel's question on how it seemed unfair to them

13   that they would be in a world of strict compliance, if I

14   required that every patient be seen within the time periods

15   required that I wasn't giving the defendant the benefit of the          10:57AM

16   contract where they had that margin of error that was respected

17   that would be based not only on the percentage but also on the

18   sampling.

19          I explained that in -- that I could not enforce

20   something beyond the provisions of the stipulation, but the             10:58AM

21   stipulation did provide for me to impose remedial measures

22   where I found that the defendants' remedial measures were

23   insufficient.  And I did that with respect to the community

24   resource order that you have called it and said that these

25   people would have to be seen by community resources.  And that          10:58AM

1    I then further explained on the record that if I found that

2    through the subsequent sampling that the benchmark was not

3    being met then I would think that it would be appropriate to

4    say you have been given the opportunity to employ my measure in

5    a way that it is designed to put you into the benchmark.  It          10:59AM

6    didn't put you into the benchmark.  We're going to have to ramp

7    it up and that ramp it up meant that you would see potentially

8    every single one of the people.

9         And so that is, I think, a measure that may well need

10    to be taken here.  And there are steps that I can take to see         10:59AM

11    whether or not that's happening.  One of the things that I have

12    been interested in hearing about is what kind of monitoring is

13    going on to see whether or not there are individuals that are

14    falling below the performance measure irrespective of whether

15    or not that's going to be resulting in a failure to comply with      10:59AM

16    the benchmark.  And I have heard that it seems that it's not

17    ironclad.

18         I think one of the things that I would expect the

19    defendants to do when I have said you need to turn to community

20    resources, that you would be having a much closer handle on          11:00AM

21    whether or not the measures that you were taking were going to

22    expose you to what I had said would be the next step, and that

23    is, saying we're going to ramp it up.  85 percent isn't enough

24    because we're not getting a compliance at the benchmark, so I

25    will say every single one of the people will have to be seen         11:00AM

1    within 14 days.  And that means that you either do it in-house

2    or you do it at an outside provider.  There's no margin of

3    error because you previously were told that you had to ramp it

4    up and the results in the new CGARs don't show that you have

5    done that.                                                    11:00AM

6         And so it would seem to me that in the first instance

7    what you would want to do is you would want to make sure that

8    you had the handle an every single one of the potential people

9    who would demonstrate a failure to comply with that performance

10   measure.  And I don't know whether you have a good sense of how  11:01AM

11   complete that is now.  As I say, it doesn't seem ironclad to

12   me.  I would expect it to be necessarily ironclad.  And maybe

13   one of the things, potentially, that I would do is require you

14   to inform the plaintiffs' counsel and the Court about all of

15   the people who are within coming with, as you described, the  11:01AM

16   cusp that they are getting within their 13 days and they

17   haven't been seen.  I want the names of those people so that I

18   can ask on day 15, were they seen, and get a handle on it that

19   way.

20        But at some point it will require greater control by  11:01AM

21   the Court where we continue to see these departures from the

22   required benchmark.

23        Thank you.

24   BY MS. KENDRICK:

25   Q.  Mr. Pratt, that community resources order also applied to  11:02AM

UNITED STATES DISTRICT COURT

1   Performance Measure 46 at five institutions, and that's the

2   requirement that a provider review the diagnostic reports

3   including pathology reports and act upon reports with abnormal

4   values within five calendar days of receiving the report at the

5   prison.                                                               11:02AM

6           And could you describe for me all the steps that are

7   being taken to ensure compliance with Performance Measure 46?

8   A.  This is being upgraded and updated at the facility level

9   with new reports and additional tracking that's being put into

10  place basically in the last couple of months where any          11:02AM

11  outstanding labs are being reviewed by a specific person at the

12  facility and then they are supposed to be brought to the

13  attention of the provider to take some action on those reports.

14  I think it's a solid action plan that we've got going forward

15  at this point, and much as we discussed even in yesterday's      11:03AM

16  mediation with -- I won't get into that.

17  Q.  We can't talk about the substance of mediation, sir.

18  A.  But I do believe we can agree that there's solid plans in

19  place to address this.

20  Q.  And will this action plan involve hiring providers,          11:03AM

21  additional providers to review diagnostic reports?

22          MR. BOJANOWSKI:  Note an objection.

23          THE WITNESS:  Yes.

24          THE COURT:  I couldn't hear.  You objected?

25  Overruled.                                                        11:04AM

1          THE WITNESS:  In the course of taking care of this and

2     addressing it, yes, additional providers have been hired by

3     Corizon.

4          THE COURT:  What is the current status generally, if

5     you can speak about it, with respect to the ability to fill          11:04AM

6     vacant positions?  I have heard from the plaintiffs in the past

7     that they have identified that as a problem, and we have had

8     some testimony about that.

9          Do you have a general sense about where we stand on

10    making progress on filling vacant positions?          11:04AM

11         THE WITNESS:  I haven't seen a great deal of

12    improvement.  I know we've got a couple providers that are in

13    the loop right now going through clearance for a couple

14    facilities.  We -- overall, I think Corizon is about 92 to 94

15    percent staffed according to the contract.  But we're still          11:04AM

16    missing --

17         THE COURT:  For providers, or --

18         THE WITNESS:  Basically for providers as well it's

19    about 90 percent.  Overall, in the providers, they are -- they

20    actually have more nurse practitioners and PAs than I think are          11:05AM

21    contracted for.  One of the areas where I see a deficiency

22    right now is in the site medical directors, which is a key in

23    doing business at the facilities.  And they are about 50

24    percent staffed on that.

25         THE COURT:  I can't remember whether it was your          11:05AM

1    testimony or the testimony of others from the Department that

2    there are multiple factors associated with the difficulty in

3    filling positions in the prison context.  I remember one being

4    some people just don't like to work in a prison, but I also

5    don't understand some other aspects of what usually is the most      11:05AM

6    important thing to know in our society, because this is a

7    society that is driven by supply and demand, economic curves,

8    things that we learned in economics microeconomics in college,

9    that if you have a reduced supply, you can increase that supply

10   by increasing the wage.  And I wonder if -- I mean, that's -- I      11:06AM

11   will tell you, by virtue of the stipulation, you have said that

12   I can't order you to hire more people.  I can't order you to

13   build more prisons.  I can order you to pay more.  That's

14   something to think about.

15   BY MS. KENDRICK:                                                     11:06AM

16   Q.  I have just handed you the March 2017 monthly staffing

17   report, and it states that there are contracted 10 medical

18   directors.  Is that one medical director per prison?

19   A.  Yes.  That's the position I just mentioned.

20   Q.  Okay.  And only 4.75 of them are filled?                         11:07AM

21   A.  Correct.

22   Q.  Which prisons have medical directors currently to your

23   knowledge?

24   A.  I don't -- I can't tell you off the top.

25   Q.  So this is not 90 percent filled.  This is 48 percent            11:07AM

 1   filled?

 2   A.  As I just said, yes.

 3   Q.  And the next line it says staff physicians, 14 contracted

 4   positions and 7.6 filled for a fill rate of 54 percent?

 5   A.  Correct.                                                     11:07AM

 6   Q.  So there's only seven doctors for the entire State of

 7   Arizona prison system?

 8   A.  Staff physicians, yes.

 9           THE COURT:  And the contract that the State negotiated

10   with Corizon provided for 10 medical directors.  Is that       11:08AM

11   correct?

12           THE WITNESS:  Yes.

13           THE COURT:  And the failure of Corizon to meet that

14   FTE equivalent, is it addressable in the contract?  Is there a

15   remedy for the State when they fail to do that?                11:08AM

16           THE WITNESS:  It is.  There's a certain time frame

17   where if the position goes unfilled then there's an offset in

18   the payment to Corizon for their services.  And to date, I

19   think we have offset them to the -- I can ballpark it at about

20   3.2, 3.3 million.                                              11:08AM

21           THE COURT:  Thank you.

22   BY MS. KENDRICK:

23   Q.  So I just handed you the contract, actually, for Corizon

24   that was off of the state procurement agency's website.  The

25   second document in there, it's dated January 16, 2013.  Do you 11:09AM

1    see that?

2    A.   The second document?

3    Q.   Yeah, after the web page printout that shows where it came

4    from.  It's on Corizon letterhead.

5    A.   Okay.                                                        11:09AM

6    Q.   And it's dated January 16, 2013?

7    A.   Yes.

8    Q.   If you could go to Page 4 of that letter, and it's Section

9    5, and it talks about staffing vacancy offsets.  That's what

10   you have been referring to, right?                              11:09AM

11   A.   Correct.

12   Q.   And last time on April 17, I believe you testified that the

13   Department sanctions Corizon for the fact that they are not 100

14   percent staffed?

15   A.   Any time they are not staffed to the contract limit in     11:10AM

16   accordance with the contract, yes.

17   Q.   So if you read this it refers to staffing for

18   non-management positions, and it says any time below the level

19   of 90 percent.  So it's -- you are not holding them to 100

20   percent filled.  You are holding them to 90 percent filled,     11:10AM

21   correct?

22   A.   Correct.

23   Q.   So it's only when their fill rate drops below 90 percent

24   that they have to start paying these penalties?

25   A.   For an extended amount of time, yes.                       11:10AM

UNITED STATES DISTRICT COURT

1   Q.  How long does the position have to be vacant before they

2   have to start paying?

3   A.  I would have to review this again.  I thought it was 60

4   days.  I'm not sure.  I would have to look back at the contract

5   itself.  That's calculated by someone in my office.          11:11AM

6   Q.  Who is in charge of keeping track of this?

7   A.  I have a person in charge that handles all the financial

8   offsets and reviews the reports and the staffing and determines

9   what the offsets are.

10  Q.  I meant what is that person's name?                       11:11AM

11  A.  Amy Landry.

12  Q.  So if Corizon keeps the positions filled at 91 percent,

13  they don't have to pay any sort of fees, correct?

14  A.  Correct.

15  Q.  So they get to keep the difference between being paid by   11:11AM

16  the State to staff 100 percent and then what they actually have

17  staffed at 91 percent, correct?

18  A.  Correct.

19  Q.  So I want to look back at this staffing report document.

20  On the front page it shows that there's -- if you go down about  11:12AM

21  two-thirds of the way down under dental assistant there's

22  psychiatric director, and that's a .5 position?

23        MR. BOJANOWSKI:  Your Honor, I guess I'm going to

24  object.  I'm not sure what this has to do with methodology for

25  monitoring or the Monitoring Bureau or anything like that.     11:12AM

1          THE COURT:  It has everything to do with the Court's

2    desire to get the stipulation effected.  Overruled.  That's why

3    we're having this hearing.  That's why Mr. Pratt is here so I

4    can better understand this process so that I can solve this

5    problem that is not getting solved by the State.          11:12AM

6          Go ahead.

7          MS. KENDRICK:  Thank you.

8    BY MS. KENDRICK:

9    Q.  The psychiatric director position, is that a state-wide

10   position or is that at one institution?                   11:12AM

11   A.  That's a state-wide position, to my knowledge.

12   Q.  To your knowledge, how long has this position been vacant?

13   A.  I can't tell from this.

14   Q.  Okay.  And it also shows that according to the contract,

15   you are supposed to have 7.5 psychiatrists but Corizon only has  11:13AM

16   five?

17   A.  FTEs, yes.

18   Q.  And 19 psychologist positions but only 9.95 filled?

19   A.  Correct.

20   Q.  And do you know what a recreational therapist is?  That's  11:13AM

21   further down under mental health nurse.

22   A.  I can't give you a specific definition.

23   Q.  That's mental health staff, to your knowledge?

24   A.  Should be, yes.

25   Q.  And there's five of those positions in the contract and one  11:13AM

1   is filled?

2   A.  Correct.

3   Q.  And can I ask you about something further up on here?  The

4   fifth person listed says Assistant Correctional RN Supervisor

5   II.  Says the contract has three positions but Corizon has          11:13AM

6   filled it with 40.  Is that a typo?

7   A.  No.  It's not.

8   Q.  Okay.  And then three lines below it, it says that there

9   are 34 contracted correctional RN supervisor positions and .4

10  filled.  Are these the same people and you have just changed     11:14AM

11  the titles on them?

12  A.  The title and responsibilities for those staff have been

13  adjusted, yeah, and changed.

14  Q.  So by doing that, it looks like it's 1,333 percent filled

15  for that position?                                                11:14AM

16  A.  On paper, yes.  The offsets are based on groups of staff,

17  not by individual position in this contract.  Going forward,

18  that staffing offset issue is being addressed in the new RFP.

19       THE COURT:  Where do you stand on the RFP process

20  going forward?                                                    11:15AM

21       THE WITNESS:  We've got our two bidders.  We are

22  finishing up the review on that, and that questions and

23  clarifications will be going out, Your Honor, probably sometime

24  in the next couple of months.  We hope to be able to make a

25  decision on that sometime even late this fall.  The contract     11:15AM

1  itself, as it stands right now, is supposed to end March of '18

2  and that's when the new contract will take effect.

3         THE COURT:  Thank you.

4         THE WITNESS:  Yep.

5  BY MS. KENDRICK:                                              11:15AM

6  Q.  So in the Corizon contract documents that I gave you, there

7  is an Amendment 9.  It's dated March 25, 2015.

8  A.  Okay.

9  Q.  And this amendment states that the contract is amended as

10 follows, and then it says, "As a result of the settlement of     11:16AM

11 the case of *Parsons v. Ryan*, an expansion of the Rast Unit and

12 the completion of an infirmary unit at Tucson there are

13 programatic changes that require additional staffing."

14         This was the amendment that was done pursuant to our

15 settlement in the case, correct?                              11:16AM

16 A.  Correct.

17 Q.  Has the Department gone back and amended the contract to

18 add additional staff since Amendment 9 was done on March 25,

19 2015?

20 A.  Yes.  These staff were added to the contract.            11:16AM

21 Q.  No, have any more amendments been done adding additional

22 staff?

23 A.  I'm sorry.  I didn't hear you.

24         I don't believe so.  I'm not sure if there was an

25 Amendment 10 or not.  I have would to go back and look.  Yes.   11:17AM

1    There's an Amendment 10 after that.  I'm sorry.

2              THE COURT:  Do you remember what it addressed?  Do you

3    know?  I'm sorry.  I will be quiet.  It seems like plaintiffs'

4    counsel is going to lead us there.

5              Thank you.                                            11:17AM

6    BY MS. KENDRICK:

7    Q.  So on Amendment Number 9, on the second page of the bottom

8    of the page there's a Number 3 that reads, "Both parties agree

9    to conduct quarterly meetings to review staffing levels and

10   patterns.  Adjustments that are agreed upon may be made through 11:17AM

11   subsequent contract amendments."

12             Are you having those quarterly meetings?

13   A.  We meet more than quarterly on staffing.

14   Q.  Okay.  And every quarter, at least every quarter you are

15   meeting on staffing?                                           11:17AM

16   A.  Yes.  It's not a formalized meeting, but I meet with

17   Corizon every month on this at a minimum.

18   Q.  Who at Corizon?

19   A.  Rhonda Almanza, the VPO.  Rhonda.

20   Q.  I'm sorry.  I couldn't hear you.                           11:18AM

21   A.  I apologize.

22   Q.  When was the last time you met with them to discuss

23   staffing levels and patterns?

24   A.  Yesterday.

25   Q.  And what did you talk about?                               11:18AM

764

1    A.  How they are staffed at the facilities, how we're below the

2    contract levels right now.

3    Q.  For what positions?

4    A.  In general.

5    Q.  And also for the provider positions?                           11:18AM

6    A.  Yes.

7    Q.  And for the key management positions?

8    A.  That's the group of physicians, yes.

9    Q.  Who else is it besides providers?  It's higher level

10   providers, correct, that there's the penalty for not being        11:19AM

11   staffed, so like doctors, nurse practitioners?

12   A.  All of the staff are included in one pool or another when

13   they total the hours to come up with a total of hours.

14   Q.  And do you do it institution by institution, or do you

15   average it across the 10 institutions?                            11:19AM

16   A.  It's a total of the 10 institutions.

17   Q.  Okay.

18   A.  It's a state-wide total.

19   Q.  So there could be a situation where you have one prison who

20   that is supposed to have five psychologists and they have zero,   11:19AM

21   but if the other nine institutions are staffed they could pull

22   the average up above 90 percent state-wide?

23   A.  That's correct.

24   Q.  So there would be no repercussions for Corizon for having

25   an institution with zero psychologists?                          11:19AM

1   A.  No monetary effect to them, correct.  Not based on a

2   facility.

3   Q.  The impact would just be on the patients with mental

4   illness?

5   A.  Possibly, yes.                                        11:20AM

6   Q.  Were you talking about specific institutions yesterday with

7   the staffing?  You said you met yesterday and talked about

8   staffing.

9   A.  We talked in general on staffing.

10  Q.  Do you guys go through this 11-page report and look at     11:20AM

11  institution by institution?

12  A.  I do not, no.  No.

13  Q.  Have you asked Corizon to increase the staffing levels or

14  adjust the patterns?

15  A.  Yes.                                                   11:20AM

16  Q.  And what did they say?

17  A.  They are doing the best they can.

18  Q.  Is that a no to you?  If you are asking them to increase

19  staffing and their response is we're doing the best we can, is

20  that a yes or a no?                                        11:20AM

21  A.  I'm not quite sure I understand what you are asking.

22  Q.  Are you asking them to fill the unfilled positions or are

23  you asking them to create new positions?

24  A.  No, I'm asking them to fill the unfilled positions.

25  Q.  But they have never actually even been fully filled,     11:21AM

─── **May 10, 2017 - Status Hearing Resumed - Pratt - Cross** ───

1    correct?

2    A.   In some cases, that's correct, yes.

3    Q.   So you don't even know if they were to be fully filled, if

4    that would be adequate, do you?

5    A.   That's correct.                                           11:21AM

6    Q.   Have you offered Corizon more money to increase staff, the

7    number of staff?

8    A.   Contract Amendment 9 is exactly what we did.

9    Q.   Well, Contract Amendment 9 was as a result of the

10   settlement, correct?                                           11:21AM

11   A.   Yes.

12   Q.   But since then, no?

13   A.   Correct.

14        THE COURT:  Is it possible that they have made the

15   economic decision that they are better off paying the fine than  11:21AM

16   filling these positions?

17        THE WITNESS:  It is.

18   BY MS. KENDRICK:

19   Q.   So I also have Contract Amendments 10 and 11 in that packet

20   which I think you said are the ones that have been subsequent   11:22AM

21   to settlement.

22   A.   Okay.

23   Q.   So Contract Amendment 10, if you can take a look at it, it

24   states that Corizon -- it says, "Potential Year 5 renewal,

25   Corizon agrees to exercise its second annual renewal option for  11:22AM

1    Contract Year 5 if ADC requests a 4.0 percent CPI increase in

2    its annual budget request for Contracts Year 4 and 5 and if the

3    state legislature authorizes the 4.0 CPI increase for Contract

4    Year 4.  This would extend the contract until March 3rd, 2018.

5            What is a 4.0 percent CPI increase?                      11:22AM

6    A.  The CPI is an index of health cost cares, and it's a local

7    index.  And what they are looking for is a 4 percent bump into

8    their costs.

9    Q.  So it's kind of like a cost of inflation sort of thing but

10   for health care?                                                 11:23AM

11   A.  It is, yes.

12   Q.  And were they going to hire more staff because their budget

13   was going up 4 percent?

14   A.  I can't tell you that.  I don't know.

15   Q.  And if you could turn to Page 3, of the Contract Amendment   11:23AM

16   10, on Number 6, it says, "Contract sanctions.  The contract

17   sanctions for performance measures for Year 3 are unchanged.

18   Effective on March 4yh, 2016, the contract sanctions for

19   performance measures are changed from 43 performance measures

20   sanctioned quarterly at a state-wide level to approximately 100  11:24AM

21   performance measures evaluated monthly at each complex."

22            Is that referring to the stipulations requirements?

23   A.  Exactly.

24   Q.  So every month that they are non-compliant now they are

25   assessed a fee?                                                  11:24AM

1    A.  There's an offset if a compliance measure extends the

2    stipulation based upon the, again, the six or seven out of 24

3    and the three in the last 18 months.

4    Q.  But it says evaluated monthly?

5    A.  Yes.                                                          11:24AM

6    Q.  So it says, If Corizon's lack of performance results in an

7    extension of the original time frame specified in the *Parsons*

8    *v. Ryan, et al.* stipulation, Corizon will be assessed $5,000.

9    So that's for each performance measure where you do not stop

10   monitoring?                                                       11:25AM

11   A.  We do not stop monitoring.  It's if the performance measure

12   has not been met, again, more than six times in that first 24

13   months, or three times in a row in the most recent 18 months of

14   that 24-month period that performance measure at that facility

15   will be assessed $5,000.                                          11:25AM

16   Q.  So you keep talking about the six months out of 24.  But

17   doesn't the stipulation say that the Department needs to be in

18   compliance for 18 months out of 24 months?

19   A.  I'm not sure of the wording.

20   Q.  Well, it's significant because if you are counting -- if     11:26AM

21   you are counting not applicables, then you are counting

22   non-applicables as compliance if you are looking at it from the

23   point of view of six non-compliant, is that correct?

24   A.  That's correct.

25   Q.  So you said earlier that you guys have recalculated some of   11:26AM

1    the performance measures in light of the Court's orders at the

2    beginning of your testimony, but you couldn't recall which

3    ones.

4    A.   Correct.

5    Q.   And we ran through a lot of them, and it did not appear     11:26AM

6    that any of those had been recalculated.  Does doing that

7    exercise refresh your memory as to which, if any, were

8    recalculated?

9    A.   No.

10   Q.   So you can't say that any actually were recalculated?      11:27AM

11   A.   I know we have gone back where we have determined that

12   there may have been error or a misinterpretation by a monitor

13   at a facility to relook at those findings.  But as far as

14   generally going back and recalculating, no, I don't believe

15   that's been done.                                                11:27AM

16   Q.   I believe Kathy Campbell had testified that to her

17   knowledge, it was some mental health measures at Winslow that

18   you guys went back and recalculated?

19   A.   That's my understanding, yes.

20   Q.   Are you aware of any other measures besides the Winslow     11:27AM

21   mental health measures?

22   A.   No.

23   Q.   So you testified earlier when I asked you about whether or

24   not the Department was going to terminate monitoring, you said

25   that it wasn't terminating monitoring, correct?  That was your   11:28AM

1    testimony?

2    A.  Yes.

3    Q.  Okay.  The filing that I was reading to you that went with

4    your declaration, it's Docket 2040.  It was titled, "Defendants

5    Notice of Compliance With the Stipulation and Termination of          11:28AM

6    Monitoring Pursuant to Paragraph 10b."

7             It's not in front of you.

8    A.  Okay.

9    Q.  It says at Page 11, Line 19, "Pursuant to Paragraph 10b of

10   the stipulation, defendants' duty to measure and report on the        11:28AM

11   foregoing health care performance measures have terminated and

12   defendants will cease monitoring and reporting them."

13            Are you aware that this was filed with the Court

14   stating this?

15   A.  No.  That just doesn't sound right.                               11:29AM

16   Q.  So have defendants ceased monitoring and reporting them?

17   A.  No.

18            THE COURT:  And you are in charge of that, right?

19            THE WITNESS:  I am.

20            THE COURT:  There's no attorney or anybody else that         11:29AM

21   can intercede your command and authority to the monitoring

22   personnel to cease that monitoring.

23            THE WITNESS:  Definitely not.

24            THE COURT:  And no one who can intercede, and, in

25   fact, if you found out that Corizon on its own had stopped            11:30AM

1    monitoring you, as the contract officer, would say you cannot

2    do that.

3           THE WITNESS:  Yes, sir.  There is absolutely no

4    intention or thought about quitting monitoring these

5    performance measures.                                                    11:30AM

6           THE COURT:  All right.  Thank you.

7           MS. KENDRICK:  Your Honor, in light of the fact that

8    in their filing Docket 2040 defendants assert that they have

9    ceased monitoring and reporting, we would like to ask for an

10   order directing them to continue to monitor all performance              11:30AM

11   measures unless and until they submit a motion to terminate

12   monitoring and the parties have been able to brief it and you

13   have had an opportunity to rule.

14          THE COURT:  Well, have you concluded your examination

15   of this witness?                                                         11:30AM

16          MS. KENDRICK:  Yes.

17          THE COURT:  Thank you.  That motion has been made

18   orally by you.  I will give Mr. Bojanowski, when he takes the

19   lectern now, the opportunity to address that motion and to

20   conduct any redirect examination that he wishes.                         11:31AM

21          MS. KENDRICK:  Thank you.

22          MR. BOJANOWSKI:  Your Honor, we have no redirect of

23   this particular witness.

24          With regard to the notice, it's our understanding that

25   the Court does need to rule.  As Mr. Pratt has testified                 11:31AM

1    perhaps there was some language in the notice which may not

2    have been exactly accurate, but we anticipated that the

3    plaintiffs would respond to the notice in some fashion and then

4    we would reply to that response and the Court would ultimately

5    take it under consideration.                                              11:31AM

6              So because of the nature of the contract and such, we

7    didn't feel that a motion was necessarily appropriate.  We

8    thought a notice was more appropriate vehicle to bring this to

9    the attention of the Court.  So that's really what is

10   underlying this.  If the Court wants us to file a motion, then    11:32AM

11   certainly we will redo this and put it in into a motion format.

12   If the notice is sufficient with a response and reply, we're

13   more than willing to go along with that.

14             THE COURT:  No.  I think the notice is not sufficient

15   because it is contrary to the, I think, plain reading of the      11:32AM

16   stipulation and that is although the monitoring requirement

17   that's specified in the subparagraph does provide for a notice,

18   that notice is entirely dependent upon whether or not there's

19   compliance or not.  So it would clearly be an ultra vires act

20   for the defendants to unilaterally decide to cease monitoring.    11:33AM

21   And that's exactly what Mr. Pratt's impression was, but it's

22   also fair to say that the plaintiffs took what you wrote as the

23   way you saw they did.  They took it to mean that it was a

24   unilateral decision.

25             And so you have now cleared that up, and so we know      11:33AM

1  that it is not that, and that if you seek to be removed from

2  the requirements to monitor that you will file a motion asking

3  for that relief.

4  　　　　MR. BOJANOWSKI:  We will do that forthwith.

5  　　　　THE COURT:  Thank you.                        11:33AM

6  　　　　Mr. Pratt, I told you last time that I had questions.

7  You were kind to allow me to interrupt the examination so that

8  I could ask them and I appreciate that.  I also appreciate the

9  fact that you have been here so consistently.  I am not

10  interested in violating one of the canons that you have         11:33AM

11  articulated to me, and that is, if you know one prison you know

12  one prison.  And I think I have told you that I don't know any

13  prisons but I am trying to do my best because of the

14  stipulation gives me the responsibility to do that.

15  　　　　And so it has been helpful for me to have you here       11:34AM

16  these many days, and it, I think, is also helpful in the future

17  and I may well turn to you with these kinds of questions.  I

18  understand that we are in a hybrid situation where it is a

19  product of a cooperative agreement, a resolution of a lawsuit,

20  but there remain contentious and adversarial issues.  So I will  11:34AM

21  try to be respectful of that fact and allow you to have the

22  benefit of your counsel.

23  　　　　But I do want you to understand that my role here is

24  somewhat removed from the role that you have and the role that

25  the plaintiffs have in that I must honor the stipulation and     11:35AM

1    the enforcement of it free of any kind of extrinsic motivations

2    that could interfere with the effectuation of the intent and of

3    the plain mining of the stipulation.  I have articulated to you

4    in the past that I do have some concerns about that with

5    respect to the position that you are in vis-a-vis the fact that          11:35AM

6    you have a contractor who is delivering a service at a price

7    that is, in some respects, one that you are disinclined to try

8    to fight at some level because of the fact that you don't have

9    complete control over who pays the money.  It's a group of 90

10   people and the government who also play an overall role on that         11:36AM

11   and I understand there can be difficulties in motivations and

12   possibilities of being whipsawed.

13           You have listened to me say that.  I don't mean when I

14   say it to undercut what I think has been apparent to me, and

15   that is you have many times, in good faith, answered my                 11:36AM

16   questions and I have appreciated that.  And I wanted you to

17   know that I will continue to try to do my job to be the neutral

18   applying the stipulation.  But I didn't want you to take from

19   that that I was not appreciative of what you have done to help

20   me better understand this.                                              11:36AM

21           Thank you.  You may step down.

22           THE WITNESS:  Thank you.

23           MS. KENDRICK:  Your Honor.

24           THE COURT:  Yes.

25           MS. KENDRICK:  On the issue of filing a motion to              11:36AM

─ May 10, 2017 - Status Hearing Resumed ─

1    terminate monitoring, plaintiffs' position is that it would be

2    a colossal waste of everybody's time unless and until

3    defendants recalculate their performance measures using the

4    methodology that is in the monitoring guide.  The testimony we

5    got today from Mr. Pratt was that with the exception of some        11:37AM

6    mental health performance measures at Winslow they have not

7    gone back and recalculated any of their findings for either of

8    the methodologies that you have specifically issued orders

9    about or for which the parties had reached agreement and had

10   modified the monitoring guide which is not final yet.               11:37AM

11        THE COURT:  Unfortunately, I have no control over

12   whether one side or the other seeks to undertake a plan or

13   approach that would result in a colossal waste of time.  That's

14   not something that's within my control.

15        I do think that I have made it clear in my previous            11:37AM

16   rulings that an argument that there would be relief from the

17   obligations of the stipulation would require that you were

18   satisfying the stipulation's requirements as interpreted by the

19   Court.  We started out with a stipulation that was uninformed

20   in some aspects with critical components.  The critical             11:38AM

21   components sometimes seem to me to be obvious so that you

22   didn't need to have it spelled out but that there were

23   different views from the different parties.  And in some cases,

24   I have made it plain that it is the interpretation of the Court

25   that the obvious is obvious.  But in other cases it's required      11:38AM

1    interpretation.

2        And so the Court has had to do with what the

3    stipulation empowers me to do, and that is to inform the

4    parties on the correct application of the meaning of the

5    stipulation.                                                    11:38AM

6        I do believe that in order for the defendants to be

7    relieved of the requirements of the stipulation they have to

8    show completion of meeting the performance measures as informed

9    by the current view of the Court of what the stipulation means.

10   And so saying that to everyone, I think, would make it plain     11:39AM

11   that the defendants would in some cases perhaps decide it's

12   best not to ask for relief from the stipulation requirements

13   where they would think that their argument would be met by

14   vociferous response from the plaintiffs that they were not in

15   compliance because of the failure of the defendants to apply     11:39AM

16   the current meaning of the stipulation as informed by the

17   monitoring manual.

18       And so my hope is that that would result in some

19   limitation of what you talk about just by the parties

20   themselves doing it.  But I think that's as far as I can go on    11:39AM

21   that point.  It is true that we still aren't in a point where I

22   have said what the monitoring manual is because the last time

23   we talked about it, you said I think there were just five

24   issues that remained and I -- that's one of the things on the

25   agenda today to talk about, where we are with respect so that     11:40AM

1  we can get it.  Every step we take to making things more

2  definitive is helpful to the entire process.  And so getting

3  that place, that part in place of having the definitive manual

4  is important.

5       And I guess I should ask for an update on that right       11:40AM

6  now since we're talking about it.

7       MS. KENDRICK:  Sure.  So we recently wrote the

8  defendants, and there were three changes that they had made to

9  medical performance measures.  Mr. Fathi will speak about the

10  mental health ones.  We agreed to two of them, and we had       11:40AM

11  questions about some of the language that was put in the third

12  one.  So we just need a response on that one measure.

13       THE COURT:  So there are only three that remain and

14  two have been addressed and one you have questions about?

15       MS. KENDRICK:  Correct.                                    11:41AM

16       THE COURT:  Do you want to add anything, Mr. Fathi?

17       MR. FATHI:  Your Honor, yes, Your Honor.  As we saw at

18  the evidentiary hearing primarily on April 17th, there were a

19  number of performance measures where the defendants are simply

20  not obeying the Court's order.  For example, the Court's order   11:41AM

21  when something has to be done every X days the monitor has to

22  look back at the last two occurrences of that instance of that

23  event and measure the interval between them.  We had very clear

24  testimony that the mental health monitor is not doing that.  We

25  had testimony that the mental health monitor continues to count   11:41AM

UNITED STATES DISTRICT COURT

1    groups for performance measures for which the Court has ruled

2    that is impermissible.

3         So there are, in a sense, two related issues:  One is

4    the language of the monitor manual on which there are still

5    some outstanding issues.  We have asked the defendants their          11:42AM

6    views.  They have not responded.  But then there's a question

7    of whether the existing language needs to be -- the language

8    that we thought was settled needs to be further -- made more

9    specific to foreclose the violations of the Court's orders that

10   we heard about at the evidentiary hearing.                            11:42AM

11        THE COURT:  I do think they are two separate issues

12   and the one that I was addressing now was getting to what was

13   the understanding of the final monitoring manual.  The second

14   issue about whether or not there's a failure to comply with

15   those standards as you believe they should be interpreted, I         11:42AM

16   think, is an ongoing -- perhaps an ongoing issue but is

17   separate from this first one.

18        What kind of timetable do we foresee with respect to

19   the first part of this issue of getting these final questions

20   wrapped up?                                                          11:43AM

21        MR. FATHI:  Well, Your Honor, we wrote to the

22   defendants on Performance Measures 85 and 86 more than a month

23   ago, and they still have not responded.  So I think that

24   question is more appropriately directed to them.

25        But again, to take another example, Performance              11:43AM

1    Measure 95, which is the one that specifies the three followups

2    at specified intervals when someone comes off of suicide watch,

3    the language of the monitor manual is clear that those have to

4    be done and yet we heard at the evidentiary hearing that there

5    are some circumstances in which they are not being done.                    11:43AM

6          So is that simply a matter of compliance with the

7    monitoring manual or does the monitoring manual need to be made

8    more specific in some way to foreclose that non-compliance?

9          THE COURT:  Well, I think the way to frame this second

10   category of disputes is for you to let the Court know where you   11:44AM

11   think that the defendants are not complying with what you

12   understand to be the requirements of the performance manual.

13   They then respond, then you reply and then the Court rules.

14   And so that was contemplated by the evidentiary process that we

15   had over these number of hearing dates as what I referred to as   11:44AM

16   the comeuppance memorandum.

17         MR. FATHI:  Yes.

18         THE COURT:  And you didn't really address that in the

19   memorandum and so I -- that you did file.  And so if you do see

20   that there are these issues with respect to ongoing              11:44AM

21   interpretation where you think that the defendants are

22   interpreting it in a way that's contrary to the performance

23   manual, you need to file a motion for the enforcement of the

24   performance manual and the defendants will respond and after

25   the reply the Court will rule.                                   11:45AM

780

1    So I guess turning now -- who on your side, Mr.

2   Bojanowski, is the one who received this letter and is

3   preparing the response?

4    MR. FATHI:  Your Honor, may I respond first to the

5   Court's last comment?                                              11:45AM

6    THE COURT:  Surely.

7    MR. FATHI:  We did, in our very long filing this last

8   Monday, I believe it was -- I will find the docket number.  But

9   the filing that the Court had directed us to make after the

10  evidentiary hearings, we did lay out all the instances in which   11:45AM

11  we believe that the testimony at the evidentiary hearing showed

12  that monitoring methodology is inconsistent with the Court's

13  order with the monitoring manual or both.

14    So that is in our filing and it was our expectation

15  and hope that defendants will respond and that then the Court     11:45AM

16  will rule so we will get some resolution on that.

17    THE COURT:  I'm sorry.  I'm not able to bring it up

18  right at the moment to make sure that I was recalling the right

19  one.  I don't know why the iPad where I have all these filings

20  placed is unwilling to respond to me but I have got some help.    11:46AM

21    Thank you, Siri.

22    MR. FATHI:  Your Honor, it is Docket Number 2046.

23    THE COURT:  And I have it now in my hand.  Just give

24  me a second.

25    MR. FATHI:  And the portion dealing with the mental    11:46AM

UNITED STATES DISTRICT COURT

— May 10, 2017 - Status Hearing Resumed —

1    health measures begins at about Page 38 of the ECF page

2    numbers.

3             THE COURT:  You are right, and I was recalling the

4    wrong document.  So thank you for that.

5             MR. FATHI:  Thank you, Your Honor.                    11:47AM

6             THE COURT:  Go ahead, Mr. Bojanowski.  The question is

7    how soon can we get a response to the letter that the

8    plaintiffs said trying to get clarification on the remaining

9    issue in the performance manual.

10            MR. BOJANOWSKI:  Right.  We have three measures.  I     11:47AM

11   think it's 61 -- 85 and 86 we can have a response within seven

12   days.

13            THE COURT:  Okay.

14            MR. BOJANOWSKI:  Mr. Fathi, it's 85, 86, right?

15            MR. FATHI:  Yes.  Those are the ones that I wrote to    11:47AM

16   defendants' counsel about, yes.

17            MR. BOJANOWSKI:  Okay.  All right.

18            MS. KENDRICK:  And on the medical side it was

19   Performance Measure 61.

20            MR. BOJANOWSKI:  Okay.                                 11:47AM

21            THE COURT:  I did not, if I did I don't recall,

22   specify how long we could go today.  I'm able to go into the

23   afternoon, but I didn't specify.  And I need to check in with

24   counsel to see where we stand with respect to their

25   availability.  Ms. Kendrick?                                   11:48AM

—May 10, 2017 - Status Hearing Resumed—

1          MS. KENDRICK:  I have an 8:30 flight tonight so I'm

2     all yours.

3          THE COURT:  Mr. Bojanowski on the state side?

4          MR. BOJANOWSKI:  I believe we're good to go.

5          THE COURT:  All right.  Let's take a noon recess and          11:48AM

6     reconvene at 1:15.  Thank you all very much.

7          (Recess from 11:48 a.m. until 1:17 p.m.)

8          THE COURT:  Right before we finished and I had the

9     trouble with the iPad it made me think that I should be more

10    gracious with the lawyers who so often the IT machinery doesn't          01:17PM

11    work in the courtroom.  And I guess I have always assumed it

12    wasn't something apart from what I'm now convinced it is that

13    there is a bad karma in courtrooms with respect to electronic

14    devices.  You bring them in, they work perfectly well every

15    other place.  You practice with it a thousand different times.          01:17PM

16    You bring it into the courtroom and it's something about

17    commitment to doing things the old way, maybe, and it offends

18    the litigation gods to apparently use these mechanical devices.

19    So I will be more tolerant.

20         I thought we would pick up at the agenda that was          01:18PM

21    originally for the February -- not for the February, for the

22    April get-together.  And this is a product of combining the

23    Court's, the plaintiffs', and the defendants' agenda items.

24    But obviously as I work through them if there are issues that

25    you think are related to those matters you can raise them then          01:18PM

May 10, 2017 - Status Hearing Resumed

1  or certainly at the end we'll give everybody the opportunity to

2  address what they want to address that I haven't covered.

3        Turning first to the agenda from the April 17th status

4  hearing that was set forth in the plaintiffs' memorandum, they

5  still raise an issue that I thought was addressed, but I guess          01:18PM

6  they have a concern, and I maybe should ask:  What is the

7  concern that there are max custody inmates still at Tucson and

8  Perryville?  I mean, do you have any reason to think there

9  still are any max custody inmates there?

10        MS. FETTIG:  Your Honor, this is Amy Fettig.  We have            01:19PM

11  no reason to believe that there aren't max custody prisoners at

12  these units because defendants have provided no evidence that

13  they are no longer there.  Contrary to the requirements that

14  the Court put on defendants for Florence Central, which the

15  defendants did have to produce some evidence and, of course,           01:19PM

16  the Court found that much of it was insufficient, we have

17  received no evidence for Tucson or Perryville.  And we would,

18  you know, our complaint here is that there's been a unilateral

19  cessation of monitoring without any real communication or

20  sitting down with the plaintiffs per Paragraph 40 of the               01:19PM

21  stipulation, which clearly requires that any changes in the

22  requirements result from a joint agreement.

23        We would like to see the evidence.  We would like to

24  sit down, but what we don't want is defendants unilaterally

25  deciding that parts of the stipulation no longer apply to them.        01:20PM

1    THE COURT:  And my recollection was there was an

2  unequivocal avowal of counsel that there were no longer any max

3  custody inmates at Tucson and Perryville.  Am I remembering

4  that wrong, Mr. Bojanowski?

5    MS. LOVE:  Your Honor, I can address that point from          01:20PM

6  the max side.

7    There is, as of December of 2016, no more inmates at

8  Perryville classified as max custody.  At Tucson there hasn't

9  been throughout the entirety, if I remember correctly, of the

10  underlying litigation and now.                                  01:20PM

11    There is information that's publicly available on the

12  website as to daily count sheets that shows where max custody

13  inmates are.  As well as plaintiffs' counsel, we have engaged

14  in several conversations in which Carson McWilliams, the

15  division director for offender operations, and Ernie Trujillo   01:21PM

16  who is the northern operations director has avowed that there

17  are no inmates classified as max custody at Perryville any

18  longer and certainly none at Tucson.

19    With respect to the monitoring of close custody

20  inmates, plaintiffs' counsel and with me participating and      01:21PM

21  representatives from ADOC, Carson McWilliams and Ernie Trujillo

22  specifically have engaged in ongoing talks regarding how to,

23  under the Court's order, monitor inmates who are close custody

24  inmates that are not part of the Court's order where it talked

25  about inmates working 20 hours or more.                         01:21PM

1          THE COURT:  Right.

2          MS. LOVE:  And we've had lengthy discussions about

3    that and the difficulties about monitoring because of the

4    different classification status.  The current status of this is

5    that ADC has IT people literally writing programs, computerized      01:22PM

6    programs, and then a pilot program based upon a computer

7    program to determine how to monitor inmates that may fall

8    within that category as defined by the Court.  Because we're in

9    a situation where close custody inmates, because of the

10   different classification, they are not personally escorted out      01:22PM

11   of a cell.  It's just the difference in environment.  When

12   close custody doors open, inmates may go to different

13   activities, and so there isn't that individualized monitoring.

14         So we are -- I talked with Carson McWilliams this

15   morning, and he gave me an ETA as IT people are writing             01:22PM

16   programs for computers that they intend to be at a point of

17   demoing the computerized data to monitor and do a demo process

18   to see if it works hopefully by the end of June of this year.

19         So that's where we're at in developing.  It's not a

20   situation, unfortunately, where we can just monitor the same        01:23PM

21   way that the max custody inmates because of the environment

22   issue.

23         THE COURT:  All right.  Well, I will give Ms. Fettig

24   or whomever I should turn to the opportunity to address that

25   second issue of close custody and arranging or seeing if the        01:23PM

```
 1    parties can come to agreement how to monitor outside of the

 2    cell for work.

 3            But turning to the first issue, the reason that I

 4    asked for the affirmation of the avowal of counsel is I really

 5    do think that there are so many issues that need urgent           01:23PM

 6    attention that where I have an avowal of counsel that there is

 7    an issue that is not needing attention because it doesn't exist

 8    any more, I'm inclined to try to encourage the parties not to

 9    spend much time on that unless, as I first asked, there's

10    evidence that what somebody has said isn't true.                  01:24PM

11            And based upon what Ms. Love has said, I will accept

12    the idea that there's no longer any need to monitor for max

13    custody inmates at these two facilities because there are none

14    there.  Obviously, if it changes, that would mean -- and I'm

15    sure I don't need to say this -- that you would be back in the    01:24PM

16    business of telling us what the performance measures were

17    saying with respect to those inmates if they were back at those

18    facilities.

19            Turning to the second issue, what's plaintiff's view

20    on where you all stand in these negotiations?                     01:24PM

21            MS. FETTIG:  Your Honor, this is Amy Fettig.  If the

22    Court will permit me, I'd like to go back to the issue of close

23    custody.

24            THE COURT:  Okay.

25            MS. FETTIG:  It is very true that when the Court          01:25PM
```

1    looked at close custody at Florence Central after the avowal of

2    counsel that there were no longer max custody at CB-2 and CB-4

3    what was found was a, quote, a distinction without a

4    difference.  Our concern here is it is very easy to relabel

5    prisoners and that does not mean that they no longer fall          01:25PM

6    within the isolation subclass as Your Honor found in the case

7    of Florence Central.

8            So our concern here is that there needs to actually be

9    evidence produced that all the women in Perryville Lumley who

10   used to be protected by the stipulation and, you know, not        01:25PM

11   subject to extreme isolation or at least some sort of

12   amelioration under the terms of stipulation will be left out to

13   dry simply because we haven't done the due diligence to

14   determine the conditions are actually different in close

15   custody as opposed to maximum custody.  So we would request the   01:26PM

16   same process the Court undertook for the men in Central be

17   undertaken for the women in Perryville Lumley as well as the

18   men in Tucson.

19           THE COURT:  Ms. Love, was there a broader

20   reclassification than what would happen in the ordinary course,   01:26PM

21   I imagine one of few cases over a period of time?  Was there

22   any kind of broad reclassification?

23           MS. LOVE:  As they determined at Florence Central CB-2

24   and 4, as with Perryville, there -- it wasn't just a, hey,

25   we're just going to change everybody over.  There was an          01:26PM

1    individualized determination as to whether or not people were

2    appropriate to be classified down to close.

3            THE COURT:  So the people -- so they weren't moved

4    someplace else.  They are still there.  They are just

5    reclassified?                                                    01:27PM

6            MR. BOJANOWSKI:  May we have a moment?

7            THE COURT:  Surely.

8            (Discussion off the record between defense counsel.)

9            MS. LOVE:  With respect to the women at Lumley, they

10   have been -- and it has been and I will tell you the          01:27PM

11   conversations that plaintiffs' counsel have had with division

12   director Carson McWilliams in explaining how is it that all of

13   a sudden all of the women are reclassified down to close

14   custody.  They did it over the course of a month, I believe it

15   was, and they did do an individualized determination.         01:27PM

16           The fact of the matter is that management of a female

17   population and specifically ADC's female population is

18   different than managing male populations.  The female

19   population doesn't have the security risk.  If you look at the

20   statistics they are not engaging in kinds of behavior that    01:28PM

21   would warrant to keep them at max custody such as they were

22   looking specifically at factors, like, do we have -- are the

23   max custody women, are they engaging in serious assaults upon

24   each other?  Are they engaging in assaults upon staff?  They

25   are not doing that kind of behavior that generally in the male  01:28PM

1    population elevates to a max custody level.  So it was also,

2    let's try this.  Let's see if once we look at everybody and

3    make sure that they would be appropriate to be in this setting,

4    is it working.  It is working.

5            But they have not kept all of those who were                    01:28PM

6    previously max custody in Yard 30.  At Perryville Yard 30 was

7    where the max custody women were.  As part of the integration

8    process and the progress at giving the women more opportunity

9    to be out of cell, to program, as far as like group interaction

10   and then also, you know, to progress within the system, they        01:29PM

11   have been integrated into different housing units.  So we don't

12   have all them all contained of, hey, you used to be max and you

13   are Yard 30.  You are still Yard 30 but you are close custody.

14   They have been integrated into the other close custody units at

15   Perryville.                                                          01:29PM

16           THE COURT:  But are they experiencing the same kinds

17   of conditions as the people in those other units or are they

18   experiencing conditions similar to the max custody?

19           MS. LOVE:  No, they are in those units and they are

20   experiencing the exact same conditions as the close custody        01:29PM

21   women before them.  So they have progressed in the out-of-cell

22   time and their environment.  They are getting the close custody

23   environment.  Same for the men that are at CB-2 and 4 at

24   Florence.

25           THE COURT:  So, Ms. Fettig, having heard that, what        01:29PM

1    information would you need to give you the kind of assurance

2    that you think you need beyond that?

3          MS. FETTIG:  Absolutely, Your Honor.  Well, first of

4    all, while I appreciate Ms. Love's statements, they are not

5    evidence.  And when the Court actually looked at the evidence          01:30PM

6    provided by defendants in the context of wholesale

7    reclassification of close custody at Florence Central, you

8    found that that evidence was insufficient to demonstrate that

9    close custody was really any different than max custody.  That

10   is the exact same concern we have for the women at Perryville          01:30PM

11   and the men at Tucson.

12         While it's great to hear from opposing counsel about

13   the conditions what we really need is demonstrated evidence

14   that there is a difference for these individuals, that they

15   should no longer be under the subclass because the protections        01:30PM

16   they have in isolation are life saving.

17         So we would ask that the same process that the Court

18   undertook for the men at Florence Central be undertaken here so

19   that the Court and plaintiffs' counsel can assure themselves

20   that the changes Ms. Love is talking about are real and that          01:30PM

21   they actually are no longer in substantially similar conditions

22   to max custody.

23         THE COURT:  Again, how would you define that?  Are

24   there four questions you could ask that would identify whether

25   or not you think that this has been an end run or in the              01:31PM

—May 10, 2017 - Status Hearing Resumed—

1    opposite as it was described by Ms. Love?

2         MS. FETTIG:  Well, Your Honor, what we need to know is

3    are these women and men actually able to be out of cell for any

4    substantial period of time?  What defendants offered us in the

5    context of Florence Central was 15 hours a week, you know, 15      01:31PM

6    minutes different than 14 hours, and even then that evidence

7    was theoretical.  It was not actual.  We did not know how many

8    people were able to take advantage of out-of-cell time.  It was

9    just merely a theoretical speculation on what might be

10   available.  How real is the group programming?  How many people  01:31PM

11   are in it?  How long?  How many times a week?

12        There are various levels of documentation that should

13   actually be pretty readily available to defendants to

14   demonstrate that what the women in Perryville and men at Tucson

15   are experiencing is indeed different if indeed it is.            01:32PM

16        THE COURT:  Well, you have just identified four or

17   five questions, the answers to which it sounds like would give

18   you the assurance that you wish to have.  Why can't you just

19   send that in a letter to Ms. Love, and Ms. Love, could you

20   respond to that letter?                                          01:32PM

21        MS. LOVE:  Absolutely, Your Honor.

22        THE COURT:  Would that work, Ms. Fettig?

23        MS. FETTIG:  Absolutely, if we find it to be

24   sufficient.  As I mentioned previously, you know, one of our

25   major concerns here is that this was a unilateral decision.      01:32PM

1    Had defendants come to us under Paragraph 40 of the stipulation

2    and said, look, these conditions are changed, here's how they

3    have changed, let's try to renegotiate this, it would have been

4    quite different.  Maybe we wouldn't have had to bring this to

5    the Court.                                                          01:32PM

6          But as it is, the way we found out is that we noticed

7    the CGARs were not being monitored.  So that automatically

8    raises alarm bells and causes us to come to you and ask for

9    both guidance and protection for class members.

10         THE COURT:  All right.  So that's how you will proceed        01:33PM

11   and you will let me know if there is an issue that is revealed

12   by the examination.  With respect to your point about

13   communication, I make this point all the time.  I do think it's

14   much more efficient, and I always am telling you that I'm

15   saddened when I see that there are letters that go for weeks        01:33PM

16   that are not responded to.  I really would encourage the

17   cooperation and the discussion in the time that we were working

18   to try to resolve the case and reach the stipulation.  It did

19   seem to me that the paradigm that was sought after by the

20   plaintiffs was the kind of approachability that they had           01:33PM

21   represented to me they experienced in the California system and

22   that the California defendants had an open door with respect to

23   continuing to try to address issues.  I don't know if that's an

24   accurate representation or the current representation, but it

25   certainly seems a goal worth pursuing.                             01:34PM

—May 10, 2017 - Status Hearing Resumed—

1          So having resolved that first issue, what's the

2   plaintiff's perspective on the status of things with respect to

3   trying to define what is close custody or not in light of these

4   employed inmates?

5          MS. FETTIG:  Well, Your Honor, the reason why we          01:34PM

6   raised this is we haven't made much progress at all on this

7   issue.  I'm encouraged to hear from Ms. Love now that there is

8   a development of software going on, but that is actually the

9   first I have heard of it.  So we would, again, encourage a lot

10  more conversation, a lot more communication, more readily as      01:34PM

11  well as the fact that this has been dragging on since January

12  and we have made no progress.

13         So we would like an actual deadline set in order to

14  start complying with your order.

15         THE COURT:  What I'd like for you to do is in 30 days      01:35PM

16  from today prepare a joint report to the Court on the status of

17  these negotiations with the hope that you would be reporting at

18  that 30-day period that this has been resolved.  If not, that

19  will get my attention, and I will make sure that we do address

20  it.                                                              01:35PM

21         MS. FETTIG:  Thank you, Your Honor.

22         THE COURT:  It's hard for me to tell whether or not

23  the document production issue that was raised in Document 2017

24  at Paragraph 7 has been addressed by what I see on the docket,

25  the recently sealed documents.  Is that resolved, that issue,    01:35PM

─── May 10, 2017 - Status Hearing Resumed ───

1    or does that issue still need to be one that we must address

2    now?

3         MR. FATHI:  This is David Fathi, Your Honor.

4    Unfortunately we do need to address it.

5         THE COURT:  Okay.  What's the status?                    01:36PM

6         MR. FATHI:  All right.  Well, Your Honor, at the last

7    hearing, the Court said that defendants' objections to our

8    document requests were preposterous, and they have not improved

9    with age.  So, for example, we have asked for the written

10   instructions that have been provided to ADC or Corizon staff    01:36PM

11   regarding the Court's orders on monitoring methodology.  And we

12   have identified those orders by docket number.

13        But the defendants continue to object that our request

14   is vague an ambiguous.  Obviously it's nothing of the kind, and

15   we ask that they be directed to produce those documents without  01:36PM

16   further delay.

17        THE COURT:  And defendants' response?

18        MR. BOJANOWSKI:  Is Ms. Rand on the phone?

19        MS. RAND:  I am, Your Honor.

20        THE COURT:  Go ahead.                                     01:36PM

21        MS. RAND:  Well, what we had done is we had asked

22   plaintiffs to clarify their request, because as you know, those

23   orders that they point to are quite lengthy.  So there's about

24   28 pages or so of just general discussions about things.  And

25   basically we asked them more than once, we said hey, you know,   01:37PM

1   there's a lot of information here.  Can you just kind of point

2   us in the right direction?  And they basically reiterated the

3   same exact response that they gave us initially when we asked

4   them to clarify.  So they haven't budged at all.  They haven't

5   tried at all to clarify.  And we actually did produce the          01:37PM

6   documents that we believe that we were advised exist as far as

7   instruction.  So we did produce those documents.

8        Plaintiffs apparently feel that there are more

9   documents that exist, but we have produced what we have been

10  advised exist.                                                     01:37PM

11       THE COURT:  All right.  Well, as I read the objection

12  that you articulated, it really was the reason that I, in the

13  last hearing, expressed some frustration.  Because it seemed to

14  me that the plaintiffs' request was straightforward.  You are

15  now telling me that you are able to understand it to the extent   01:38PM

16  that you believe you produced all the documents required by it,

17  that would be no surprise to me because I understood what it

18  meant.  They wanted to know what kind of instruction that had

19  been provided to the people who were going to be carrying out

20  the Court's orders.  And that didn't seem so hard or vague and    01:38PM

21  ambiguous or even that difficult to discern what it would mean

22  with respect to what was set forth in the orders.

23       So having said that, are you telling me that there are

24  no other communications that are covered by this discovery

25  request that were provided to people who had to follow up on      01:38PM

1    the Court's orders that exist other than what have been

2    produced?

3            MS. RAND:  Well, what I can tell you is that Ms.

4    Orcutt, she summarized the orders, sent them to the people that

5    were responsible for producing the documents and they provided          01:39PM

6    the documents back.  So that's -- the documents that we

7    received we were advised are the documents that exist.

8            THE COURT:  Tell me again what you did to make sure

9    that you were complying with the request?  Who did what?

10           MS. RAND:  Anne Orcutt, she summarized the orders and        01:39PM

11   sent them to the people that we requested the documents from,

12   and they basically returned the documents back based on the

13   summary.  So I don't -- when you say that the orders are

14   straightforward, I haven't been involved in some of the finer

15   points of the litigation and so I didn't know all of the            01:39PM

16   nuances of what has been going on.  And so to assume that I

17   knew, I didn't want to take that on.  And so I asked Anne, I

18   asked for Ms. Orcutt, she was kind enough to take on that task

19   of summarizing the orders and sending them on to the people.

20   And then I received back the documents and I was told those         01:40PM

21   were the documents that were responsive to the requests.

22           THE COURT:  Well, let me describe to you what I think

23   would be an appropriate way to have responded to the

24   plaintiffs' request, and you tell me whether or not you think

25   what you did was in conformity with this.                           01:40PM

1        I would have set forth the subject matters that the

2   Court orders addressed, and I would have asked for all

3   communications that were covered by the subject matters that

4   would be for the purpose of instructing people how to comply

5   with them.  I then would have retrieved all of those documents,     01:40PM

6   and then I would have reviewed them myself to see whether or

7   not they fit within the confines of the plaintiffs' requests or

8   whether there was suggestions by documents that I saw of,

9   perhaps, documents that might exist that weren't given to me.

10        Is there somebody, a lawyer who did that?                     01:40PM

11        MS. RAND:  Well, what we did is we had an actual

12   conference call with Corizon, and we discussed the orders with

13   them over the telephone and we provided them with the orders as

14   well.  And then like I said, Anne went through and provided all

15   the topics that were included, you know, the performance            01:41PM

16   measures and the topics and everything.  So I think what I'm

17   saying is the same thing that you said.

18        THE COURT:  Okay.  All right.

19        And from the plaintiff perspective, why is there

20   reason to think that the documents that you received were           01:41PM

21   incomplete?

22        MR. FATHI:  Well, Your Honor, what they have produced

23   is a total of 25 pages which largely consists of the same memo

24   regarding mental health HNRs produced several times.  It seems

25   implausible that is complete, but if defendants want to             01:41PM

1  represent to the Court today that that is the sum total of all

2  written instructions that had been provided to monitoring staff

3  regarding all of the Court's orders, regarding monitoring of

4  all 103 performance measures, then we will accept that

5  representation.                                                01:42PM

6          THE COURT:  And do you believe that you -- go ahead,

7  Ms. Rand.

8          MS. RAND:  I didn't think that all the orders that

9  plaintiffs provided us covered all 103 performance measures.

10         THE COURT:  Mr. Fathi, do you have in front of you, I   01:42PM

11 don't, but do you have the paragraph in which you asked for

12 these documents?  Can you read it to me?

13         MR. FATHI:  Yes, Your Honor.  It reads as follows,

14 quote, "All written directions or instructions, including all

15 training materials provided to ADC or Corizon staff regarding   01:42PM

16 compliance with the Court's orders on monitoring methodology,

17 including but not limited to Documents 1673, 1745, 1754, 1831,

18 1833, and 1915," end of quote.

19         THE COURT:  So in short form what this is requiring is

20 the defendants to produce all of the instructional materials    01:43PM

21 that were provided to personnel with respect to their

22 monitoring obligations.  Is that a fair summary, Mr. Fathi?

23         MR. FATHI:  Precisely, Your Honor.

24         THE COURT:  All right.

25         MS. RAND:  Your Honor, that's what we asked Corizon     01:43PM

1    for.  We said any training, documentation that you have

2    regarding complying with the Court's orders regarding

3    monitoring.  And what they told us is that they don't typically

4    issue a lot of documentation because they do it in person.

5    They have their staff go out and they have training sessions          01:43PM

6    and they have maybe the pages that -- well, those weren't the

7    only pages.  I mean, we did submit other pages as well.  We

8    have been providing, obviously, the open clinic pages.

9          We provided some I think -- let me see.  I think the

10   open clinic pages and the instructions were the only ones that        01:44PM

11   were provided.  But I don't see, according to what Corizon is

12   saying, they did their training in-house and without handouts.

13   And they didn't do it through e-mail.

14         THE COURT:  And you are assuming that or that's what

15   they have told you?                                                    01:44PM

16         MS. RAND:  That's what they have been telling us is

17   they did them all in person for the most part.

18         MR. FATHI:  Your Honor, just to be clear, I beg your

19   pardon.

20         THE COURT:  Go ahead.                                           01:44PM

21         MR. FATHI:  Our request was not limited to Corizon.

22   It calls for all instructions provided to ADC or Corizon staff.

23   And indeed probably the most important is the instructions that

24   were provided to the ADC monitors about how the Court has said

25   that they need to monitor.                                            01:45PM

—————— **May 10, 2017 - Status Hearing Resumed** ——————

1          MR. BOJANOWSKI:  Your Honor, if I could be heard.

2          MS. RAND:  Actually --

3          MR. BOJANOWSKI:  Maybe I could help out a little bit.

4          THE COURT:  Well, give it a try.

5          MR. BOJANOWSKI:  I will.  As Mr. Pratt testified,          01:45PM

6     there are regular meetings with the monitors at least once a

7     month.  It's during these meetings where these orders are

8     discussed, there are procedures and such that are discussed,

9     monitoring methodology, changes that need to be made are

10    discussed, as well as the incorporation of those changes into  01:45PM

11    the Monitoring Guide.

12         So what ends up happening is the monitors are informed

13    of what happens in court by Mr. Pratt at these regular

14    meetings.  Whatever methodology that needs to be changed is

15    discussed with all of the monitors at this group meeting, and  01:45PM

16    it's not a matter of a memo or a letter or a training material

17    that goes out.  It's a matter of this is what you are going to

18    do from this date forward, and this is how you are going to do

19    it.

20         And then to the extent it needs to be incorporated        01:46PM

21    within the Monitor Guide it is so incorporated so that that

22    written material is something that the plaintiffs would already

23    have.

24         So to the extent that there may be not as much

25    material as the plaintiffs believe there should be, it's        01:46PM

—— May 10, 2017 - Status Hearing Resumed ——

 1    because of the nature of the way the information is given to

 2    the monitors and how they then proceed going forward.

 3              THE COURT:  Other than the Monitoring Guide, are you

 4    saying there is no written material provided in these monthly

 5    meetings?                                                          01:46PM

 6              MR. PRATT:  Can I?

 7              THE COURT:  Yes, Mr. Pratt.

 8              MR. PRATT:  Very little, Your Honor.  Again, these

 9    meetings --

10              THE COURT:  How do we find out what that very little    01:47PM

11    is and where it is and so how it can be produced to the

12    plaintiffs?

13              MR. PRATT:  Well, it's information that's given by me

14    to my staff.  We have it in all staff meetings at least once a

15    month.                                                            01:47PM

16              THE COURT:  So that's what we're looking for.  We're

17    looking for those documents.

18              MR. PRATT:  There are no documents.  This is verbal.

19    This is discussion.  This is to make sure everyone is on

20    exactly the same page and questions are answered and clarified    01:47PM

21    at that meeting when we talk about any changes that are going

22    forward.

23              THE COURT:  With all due respect, you have moved from

24    very little to no documents.  Which is it?

25              MR. PRATT:  No documents.                               01:47PM

1          THE COURT:  Why did you say, "very little"?

2          MR. PRATT:  Unless I have got something on a memo to

3     myself that's handwritten that I have got for a short agenda

4     which I don't maintain.

5          THE COURT:  I see.  So you have in your possession no          01:47PM

6     written documents that were provided to any people associated

7     with this training.

8          MR. PRATT:  That's correct.

9          THE COURT:  So you are in agreement with what Ms. Rand

10    has said, and that is that there are -- well, I guess I can't    01:48PM

11    say that because you don't know what Ms. Rand has produced to

12    the plaintiffs.  But you are saying that at least with respect

13    to your participation in these meetings that there were no

14    handouts.

15         MR. PRATT:  Correct.  There's nothing that's             01:48PM

16    memorialized and handed out or provided to each one of the

17    monitors to tell them specifically these are announcements that

18    are made and discussed and just, again, to make sure that

19    everyone is doing things lockstep in the same fashion.

20         THE COURT:  All right.  Mr. Fathi, that would seem to      01:48PM

21    resolve this issue.

22         MR. FATHI:  Well, Your Honor, I have to say I find it

23    very implausible and, frankly, quite disturbing that there have

24    been no written instructions provided to ADC monitoring staff

25    about how to comply with the Court's orders.  But if that is     01:48PM

————May 10, 2017 - Status Hearing Resumed————

 1    counsel's representation then, as I said, we will accept that.

 2            MR. BOJANOWSKI:  It's incorporated into the manual.

 3    So I don't understand why -- well, it's incorporated into the

 4    manual.

 5            THE COURT:  All right.  Turning to the max custody      01:49PM

 6    guide.

 7            MR. FATHI:  Excuse me, Your Honor.  I beg your pardon.

 8    There is one more document dispute.

 9            THE COURT:  Okay.  Please.

10            MR. FATHI:  As the Court may recall, Performance        01:49PM

11    Measures 94 and 95 have to do with prisoners who are on suicide

12    watch, and they require that certain tasks be accomplished by a

13    licensed mental health staff.  And unfortunately, the

14    defendants have refused to give us a complete list of the

15    mental health staff indicating whether each person is licensed  01:49PM

16    or not.  And obviously, this prevents us from monitoring their

17    compliance.

18            So, for example, a prisoner committed suicide at the

19    Eyman prison on Monday.  He had been on watch for several days

20    and he hanged himself a few hours after he was taken off watch.  01:50PM

21            Looking at his record, we can't tell whether he was

22    seen by licensed staff while he was on watch as required by the

23    stipulation because they won't give us a list telling us who is

24    licensed and who is not.  So we would ask that such a list be

25    produced immediately.                                           01:50PM

─── May 10, 2017 - Status Hearing Resumed ───

1          THE COURT:  Who can respond to that inquiry?

2          MS. RAND:  Your Honor, this is Lucy Rand.

3          I have actually produced a list for, I believe, four

4    consecutive months since December, I believe, of 2016.  What I

5    have been told is that the list that we used to provide to them          01:50PM

6    was in a memo format.  And they, since -- because plaintiffs

7    requested it on a monthly basis, instead of trying to make it

8    into a nice memo format they just kept it into in the Excel

9    spreadsheet.  And I have been forwarding that information to

10   them four months in a row, I believe, December, January,                 01:51PM

11   February, March, actually five months, and April.

12          And they had some questions regarding some people,

13   whether they were licensed or non-licensed and I answered those

14   individual questions to them in a letter, and what I was also

15   told about the list is that it's a list because there is no              01:51PM

16   such list other than the one that they physically made that I

17   have been producing to them.  It's a manual list that somebody

18   goes into Excel and creates.

19          But because there's so many staff members that if they

20   are not a psychologist or psych associate, I believe, they are,         01:51PM

21   in some cases, putting N/A, because the person is not -- their

22   licensing is not necessary for monitoring.  Is that -- Mr.

23   Fathi, is that what you understood from my letter that I said,

24   or is there something that is at issue with that?

25          MR. FATHI:  As Ms. Rand says, Your Honor, the list               01:52PM

1   that we are produced, the majority of the mental health staff

2   under the column that says licensed, simply says N/A.  And I

3   drew this attention, this problem to Ms. Rand's attention.  I

4   asked for a complete list, and she has thus far declined to

5   produce it.                                                    01:52PM

6           And this morning, when I was looking at the medical

7   record of the prisoner who hanged himself on Monday, I was

8   looking at this list trying to determine if the staff members

9   who saw him in the last days of his life were licensed or not.

10  And for several of them on the list, it said N/A.  So again, we  01:52PM

11  can't tell if this person was seen by licensed staff, as

12  required by the stipulation, or not until we get a complete

13  list of mental health staff stating for each person whether

14  they are licensed or not.

15          THE COURT:  And what Ms. Rand said is that they are    01:53PM

16  putting N/A next to it because it's their -- the State's

17  position that they are not required to have such a license for

18  the required monitoring, and what you are saying is you found

19  someone who you think would be satisfying a requirement of the

20  stipulation if they were licensed but it would be a failure to  01:53PM

21  comply if they were not licensed.  Is that what you are saying,

22  Mr. Fathi?

23          MR. FATHI:  Precisely, Your Honor.  I found at least

24  three people who answered that description.

25          THE COURT:  All right.                                 01:53PM

—— May 10, 2017 - Status Hearing Resumed ——

1          MR. FATHI:  Who, in order to know if they are

2   complying with the stipulation, we need to know if they are

3   licensed or not.

4          THE COURT:  Ms. Rand.

5          MS. RAND:  The letter that was provided to us by                01:53PM

6   plaintiffs did not say this.  What they said was some people

7   were listed as N/A, then they went on to ask about three

8   individual people.  Then I gave them the status of those three

9   individual people.  Now, I was not advised that they have a

10  number of people that they are claiming are not listed as       01:54PM

11  licensed.

12          And like I said, I get this spreadsheet from the

13  mental health people and they were the ones that advised me

14  that this was the list that they used for monitoring and is

15  also the list that has the people necessary to determine        01:54PM

16  whether defendants are compliant or not compliant.  If that's

17  not correct I can take a second look at it.  I was just not

18  advised of it until just now in the hearing.

19          THE COURT:  I see.  So if you receive an e-mail from

20  Mr. Fathi saying, I would like to know whether or not these     01:54PM

21  individuals are licensed or not, you would be able to say yes

22  and provide the information related to the license in a pretty

23  quick response e-mail.  Is that right?

24          MS. RAND:  Yes.  That's correct.  In fact, I did

25  provide them their response, I think, in two or three days when  01:55PM

UNITED STATES DISTRICT COURT

—— May 10, 2017 - Status Hearing Resumed ——

1    they asked me.

2         THE COURT:  That would seem to resolve that problem,

3    Mr. Fathi.

4         MR. FATHI:  Well, Your Honor, it's not sufficient or

5    at least it's going to be very inefficient to do it every time    01:55PM

6    I see someone who is -- who needs to be licensed in order to be

7    compliant to send Ms. Rand a separate e-mail.  It would

8    certainly be much more efficient if she would simply provide a

9    comprehensive list that states whether each mental health staff

10   person is licensed or not.  And I have not heard a reason why    01:55PM

11   that's not something she could provide.

12        THE COURT:  How many people are on this list that

13   includes all the N/A people?

14        MS. RAND:  I was just going to look.

15        MR. FATHI:  It's probably between 150 and 200.    01:55PM

16        MS. RAND:  That's about right from my count as well.

17        THE COURT:  And this is a list of people who could

18   possibly be in a position to have the requirement of a license

19   in order to satisfy a requirement of this performance measure.

20   Is that correct, Ms. Rand?    01:56PM

21        MS. RAND:  It is correct.  And actually what I think I

22   will do is I will go back to the person, because I was told

23   that there are some people that are not licensed that are

24   psychology associates and they, however, do not perform the

25   functions that are monitored in the performance measures.  But    01:56PM

UNITED STATES DISTRICT COURT

—— May 10, 2017 - Status Hearing Resumed ——

1    what I will do is I will go back and ask the person if they

2    could list everybody who is a psych associate and psychologist.

3    Are those the only two categories, Mr. Fathi, that you are

4    claiming?

5             MR. FATHI:  Well, I don't know.  Anyone who is going          01:56PM

6    to be performing a function for which a licensed mental health

7    staff member is required, obviously, we need to be able to tell

8    if that person is licensed or not.

9             MS. RAND:  Right.  I believe that's a psych associate

10   and a psychologist.  What I will do is I will go back to this        01:57PM

11   person I get the report from and ask if they would complete it

12   every month for all those people instead of putting N/A.  Even

13   if those people don't perform the function, I will ask them to

14   go ahead and change whether they are licensed or not.  And that

15   way we will have a complete picture.  And once I send that to        01:57PM

16   Mr. Fathi I can let them know if that works for him.

17            THE COURT:  Thank you.

18            MS. RAND:  Is that sufficient?

19            THE COURT:  That's helpful.

20            Does that close out the discovery issues, Mr. Fathi?        01:57PM

21            MR. FATHI:  Unless my co-counsel have any that is all

22   I have at this point, yes.

23            MS. KENDRICK:  No, we don't.

24            THE COURT:  Where do we stand on the max custody guide

25   in its final form?                                                   01:57PM

——— **May 10, 2017 - Status Hearing Resumed** ———

1      MS. FETTIG:  Your Honor, this is Amy Fettig.  I

2  actually just received defendants' response to the draft use of

3  force checklist while we were sitting here.  We will have to

4  take a look at the response, but right now that is the final

5  piece in the Maximum Custody Monitoring Guide.                01:58PM

6      THE COURT:  So we can expect, again, a pretty quick

7  resolution of this?

8      MS. FETTIG:  Your Honor, I'm going to turn this around

9  tomorrow.

10      THE COURT:  All right.                                   01:58PM

11      MS. FETTIG:  I hope so.

12      THE COURT:  Thank you very much.  And I'm sure the

13  State will -- I can see a nod of the head here that they will

14  be acting with equal alacrity.

15      Now I thought I would turn to the performance measures   01:58PM

16  that have been fully briefed.  With respect to the -- just a

17  second, pull up those documents.

18      So in Docket 1977, filed on the 17th of March, 2017,

19  the defendants identified their performance measures that

20  needed to be addressed by, in the first instance, their attempt 01:59PM

21  to try to address it.  The plaintiffs then filed a responsive

22  document in which they made objections that the defendants

23  viewed to be non-specific with respect to they didn't say what

24  was particularly wrong with them.  They just said that they

25  didn't believe that they would accomplish it in general terms  02:00PM

1    in an overall statement.  And they -- plaintiffs asked the

2    Court to find them non-compliant.

3          The defendants then filed a reply noting that they had

4    found that the defendants didn't have particular objections,

5    and they urged the Court to allow an opportunity for these        02:00PM

6    measures that they had proposed to be addressed.

7          What I did is I then took a look at the most recent

8    data that we have, which is the February reporting for these

9    performance measures to see where I should be focusing my

10   attention.  And again, this is perhaps the reason for my rebuke   02:00PM

11   to your objection earlier, Mr. Bojanowski, is again, I'm in a

12   position where the most recent data doesn't suggest any kind of

13   turnaround.

14         Now, to be fair, the measures that you proposed, often

15   times on this filing that was made on, I think, the 17th of       02:01PM

16   March, referred to the imposition of these remedial measures in

17   the last week, or recently.  So I'm sure that I am going to

18   hear from you that they haven't had an opportunity to play out.

19   But I have to tell you, I have heard that before.  It's a song

20   that gets repeated.  And at some point, I think that I just       02:01PM

21   can't accept that anymore when it seems like there are

22   successive failures.

23         So I think we could go through each of these and try

24   to hold your feet to the fire in a more pronounced way so that

25   everybody feels that it's fair to really impose some kind of      02:02PM

1    dramatic measure if we don't see a turnaround.

2            So I can go first to Performance Measure 35 on

3    Document 1998, take a look on Page 3 according to Clerk of

4    Court's docket page, that's Page 2 of the document itself, and

5    I see the reported Eyman for January of 76 but then I see         02:02PM

6    February falling off to 57; and then for Florence, 39 going to

7    55; and Lewis from 24 to 40; and Phoenix, looking good in

8    February at 100, but if you look a little bit in the rear view

9    mirror you do see a fairly recent pattern of non-compliance

10   measures to which, with respect to 35, the defendants tell me    02:03PM

11   that they have made -- or that Corizon has made staffing and

12   management changes and that the LPNs have been re-manipulated

13   in Florence and Lewis and that they have introduced a

14   centralized process at Eyman.  And the training on this will

15   be, I guess it's a future tense, provided.                       02:03PM

16           At the very least, I'm going to leave this

17   conversation on Performance Measure 35 of knowing when you

18   think it's fair for me to point to the transcript of this

19   hearing today and say, it didn't work.

20           MR. BOJANOWSKI:  May I have a moment?                     02:04PM

21           THE COURT:  Surely.

22           And maybe you have March.  I didn't ask you that, Mr.

23   Pratt.  But March is -- we're on the cusp of when we normally

24   hear from you all.  Do you have March in your possession now?

25           MR. BOJANOWSKI:  We don't have final numbers but we       02:04PM

1    may have some preliminary information.

2              MS. KENDRICK:  Your Honor.

3              THE COURT:  Yes.

4              MS. KENDRICK:  I would note that you found them

5    non-compliant at Eyman as well.                                    02:04PM

6              THE COURT:  No.  I did.  You are right.

7              MS. KENDRICK:  And their subsequent remediation plan

8    covered Phoenix -- oh.  There's Eyman.  Excuse me.  Eyman was

9    in Document 1977.

10             THE COURT:  Yeah.  While they are working in the        02:05PM

11   courtroom on this, there's a subject that I can address with

12   the participants on the telephone, that's Ms. Rand and Mr.

13   Fathi, going back to the licensing issue, Ms. Rand, isn't it a

14   matter of public record with respect to the State of who is

15   licensed to perform these functions?  Wouldn't it be very easy  02:06PM

16   for the State to obtain a list of all the people who were

17   licensed who were employed at the Arizona prisons?

18             MS. RAND:  Yes.  In fact, when the list says something

19   other than what I believe, I have to go to the public website

20   for medical providers, depending on which medical provider it   02:06PM

21   is, and I check their license.  And so that's what I have been

22   doing is confirming that information.  Obviously, a list of 200

23   people to check them -- for me personally would be a big task

24   but for the person that is doing it, I'm sure they should be

25   able to do it.  It's just that they were advised that they did  02:06PM

1    not -- they only had to provide the licensing for the people

2    that are being measured by the performance measure.

3           So I looked them up just now and it appears that there

4    are five performance measures that they apply to, and so I am

5    going to make sure that the list complies with all, you know,                    02:07PM

6    has the appropriate people on that pertain to those five

7    performance measures and we'll get this list settled.

8           THE COURT:  Thank you.

9           MS. RAND:  Rather quickly.

10          You're welcome.                                                            02:07PM

11          MR. BOJANOWSKI:  Your Honor.

12          THE COURT:  Yes.

13          MR. BOJANOWSKI:  The short answer is 90 days.

14          THE COURT:  All right.  And what about the interim

15   data?  What does it show for these performance measures for           02:08PM

16   March?

17          MR. BOJANOWSKI:  It's not showing compliance.  At this

18   point the data is not improving.  This is a measure that is

19   measuring --

20          THE COURT:  Whether people who are transferring in are   02:08PM

21   getting their current meds.

22          MR. BOJANOWSKI:  The problem is they move inmates from

23   facility to facility.  They load them on a bus with their

24   property.  So this is an operations security move.  And so the

25   problem is, is are the meds that this guy has got in their           02:08PM

1   property with them, or many times the inmate has moved and his

2   property is shipped later, maybe several days later.  It

3   doesn't show up at the facility.  So the meds then aren't with

4   him and that's where the problem is.  We're mixing the security

5   and medical here, and the security is not assuring that the          02:09PM

6   meds are with them, and that then we've got to try and capture

7   that when they arrive.

8        So it's a situation where we think that by doing some

9   things, by having medical personnel meet the transport bus when

10  it arrives is a potential solution to this to where they can        02:09PM

11  sit there and ask the inmate, do you have your meds?  If not,

12  what are you on?  I mean, it's just a transfer.

13       THE COURT:  Again, I will have to say this.  I mean, I

14  don't deny it's a problem.  But everything about holding people

15  in custody is a problem.  And the problems demand solutions.        02:09PM

16  So when you transport people from one facility to another, you

17  just don't put them on the Greyhound, you get a bus, a secure

18  bus, and you do it.  You figure out a way to do it.

19       It really puzzles me how this can be so unsolvable

20  because it's such a critical issue.  People who are on             02:10PM

21  medication need to be on their medication.  It's been

22  prescribed.  And the ball shouldn't be dropped.  It's a

23  marathon or a relay race where there should be no dropping of

24  the baton at all.  And it seems to me that if there's a failure

25  to comply with it, it has to be something other than the          02:10PM

**May 10, 2017 - Status Hearing Resumed**

1   problem is just too hard.  It's not high math.  It's simply

2   getting to make sure that when people show up, that the second

3   thing you take account of when you say, who is this person, is

4   where is this person's meds?  And it just seems to me it's not

5   hard.                                                            02:10PM

6          So you say 90 days.  That seems way too long to me.

7   It seems like we would know in 30 days.  But the problem is

8   we've got a delay on the reporting, and so I guess since you

9   have got these preliminary numbers that reflect what happened

10  in March, I would expect that the preliminary -- the numbers   02:11PM

11  that we get in April, or we get in June for April, will be the

12  definitive answer on whether or not I should trust your measure

13  here or whether I'm going to have to figure out something else.

14          MS. KENDRICK:  Your Honor.

15          THE COURT:  Yes.                                        02:11PM

16          MS. KENDRICK:  We object to 90 days.  This is getting

17  ridiculous.

18          THE COURT:  You have already won on the 90 days.

19          MS. KENDRICK:  Yeah.  Because if you look at Mr.

20  Pratt's chart that's attached to his declaration that we were   02:11PM

21  looking at earlier, Document 2041, at Page 47, and you look at

22  some of these institutions for 24 months they have never even

23  been close.  This isn't even skating around 68 percent or 74

24  percent.  I mean, we're talking zero percent.  17 percent.  57

25  percent.  16 percent.  13 percent.  And I will be shocked if    02:12PM

1    having somebody walk around the Florence and Lewis facility to

2    analyze why things aren't working is going to make things

3    magically improve when we have 24 months plus what Mr. Pratt

4    just said that the March numbers are not compliant either.

5            And, you know, we have talked to our expert about this      02:12PM

6    issue.  It's not rocket science to transfer medications.

7    There's just certain things that need to be done.  And

8    unfortunately, our objection to the remediation plan is it's a

9    lot of people just walking around talking.  There's no details

10   as to like what day they are going to be in.  Just simple        02:12PM

11   things like some places create transfer sheets at the sending

12   facility that is brought to the nurse.

13           One problem that is possibly happening here is are all

14   inmates that are being brought in first going to the clinic or

15   are they being driven straight to the new cell?  So they can't   02:12PM

16   even stop off at the nurse, show them a sheet of paper and say

17   I'm on Metformin for diabetes.  I'm on psychotropic medication

18   for bipolar disorder.  If they are being driven straight to a

19   housing unit it may be days before a nursing staff catches up

20   to them.                                                         02:13PM

21           There are concrete solutions.  It's done in prison

22   systems across the country.  So it's perplexing to us that they

23   have these proposals to try to figure out what might be the

24   problem and what might we do.  I mean, this is something that

25   happens all the time at prisons across the United States.  This  02:13PM

1    is not something unique or special to Arizona.  I would be

2    willing to wager that the challenges or the causes are very

3    similar to the causes in other jurisdictions.  That's what our

4    expert has told us before in the past.  That's what he's

5    articulated in his expert reports.                          02:13PM

6         So we think this is a lot of rearranging deck chairs

7    on the Titanic rather than just doing the work, implementing

8    simple fixes that our expert has recommended in the past and

9    putting them in place.  Because I, too, am frustrated with

10   every two months being told, oh, the numbers are going to be  02:14PM

11   better.  The numbers are going to be better.  And in the

12   meanwhile we have clients that are transferred.

13        We have a client, our named plaintiff, who came back

14   from the hospital after getting his jaw broken in four places

15   and he did not get pain medication for a day and a half this  02:14PM

16   past weekend.  So I don't know what's going on here, but this

17   is just getting ridiculous.  And we submit to you that 90 days

18   is absurd, and we would ask that you actually order them to

19   start doing something now rather than waiting another month to

20   see, again, non-compliance.                                 02:14PM

21        THE COURT:  All right.

22        MR. BOJANOWSKI:  Your Honor.

23        THE COURT:  Go ahead.

24        MR. BOJANOWSKI:  We agree.  I mean, six out of the 10

25   facilities are compliant with this measure.  We have four    02:14PM

1    facilities that are a problem.  We have invited the plaintiffs

2    and have discussions with them.  If they have a suggestion as

3    to solutions, I'm all ears.  I am very receptive to suggestions

4    by the plaintiffs and would be more than willing to listen to

5    specific proposals that they have that we could look at.          02:15PM

6            So if there's something their expert has that they

7    want to say, hey, why don't you try this, I'd be more than

8    happy to receive that and utilize that information in trying to

9    fix the problem.  We want to fix the problem, too.  We don't

10   want to be in non-compliance.  So it's not a matter of trying   02:15PM

11   to dodge something or moving chairs on a deck.  We want to

12   comply.

13           So if there's information out there that they want to

14   give me and they say well, you are not being specific enough or

15   you should be doing something very specific along these lines,   02:15PM

16   then get it to me.  I will welcome the help.  I think that Ms.

17   Kendrick is well aware of the fact that I'm willing to work

18   with her.  So, you know, we're going to try and get something

19   done and get it done as soon as possible.  But if there's

20   something concrete that they can point to that they are seeing,  02:16PM

21   let me know.

22           THE COURT:  All right.  I would like to have the

23   benefit of that also, because I'd like to be in a position come

24   the next status hearing when we have the benefit of the

25   official numbers that would reflect what happened in March that  02:16PM

——— **May 10, 2017 - Status Hearing Resumed** ———

1    I could take steps at that point.

2          And so if you could provide either citations to where

3    it's already been provided by your expert, or set it forth in

4    some other way, in some other filing, however way you find it

5    easiest to do, inform Mr. Bojanowski and inform me about what          02:16PM

6    possible approaches are to try to address this so that if it

7    turns out that we don't see a turnaround in the early numbers

8    that will be available to us when we meet on the 14th of June,

9    reflecting the April numbers, then I will be able to take quick

10   action then.                                                          02:17PM

11         MS. KENDRICK:  Would you like that just for

12   Performance Measure 35 or for all of the ones at issue?

13         THE COURT:  We'll go through each of these performance

14   measures, and where we think that it makes sense to do it I

15   will be open to that observation.  As we go through them I'm          02:17PM

16   contemplating that we will address individual circumstances.

17         MS. KENDRICK:  Okay.  Thank you, sir.

18         THE COURT:  Next with respect to Performance Measure

19   40, urgent provider referrals are seen by a medical provider

20   within 24 hours, Tucson's reported in Document 1998, for              02:17PM

21   January it's 71 but then Mr. Pratt's spreadsheet shows that

22   it's dropped off to 67 percent for Tucson.  The defendants'

23   internal reports outlining pending urgent referrals were

24   developed to assist clinical staff in managing urgent

25   referrals.  These reports are provided each shift, every              02:18PM

820

─── May 10, 2017 - Status Hearing Resumed ───

1   housing unit.  Nursing supervisors will ensure inmates on these

2   reports are scheduled and providers will confirm all inmates

3   listed in the report were addressed.

4        I read that because this -- that's the wrong one.  I'm

5   sorry.  Forgive me.                                          02:19PM

6        As I read Performance Measure 40 and the defendants'

7   proposal, I don't see any redress for Tucson.

8        MR. BOJANOWSKI:  Doc 2051, Page 4.

9        THE COURT:  Thank you.  2051?

10        MR. BOJANOWSKI:  Page 4.                                02:19PM

11        THE COURT:  Thank you.  What is the title of that

12   document?

13        MR. BOJANOWSKI:  Defendants Reply in Support of Their

14   Remediation Plan.

15        THE COURT:  All right.  So when I go to the cite that   02:20PM

16   you just gave me, I don't see Performance Measure 40 addressed

17   for Tucson.

18        MR. BOJANOWSKI:  It's on Page -- oh, I'm sorry.  Page

19   3 of the document, Page 4 of the docket.

20        THE COURT:  Okay.  Now I see it.  All right.  So        02:20PM

21   that's why I didn't see it before.

22        MR. BOJANOWSKI:  Just as a note, Your Honor, our

23   preliminary data is showing a 100 percent compliance on this

24   measure for March.

25        THE COURT:  All right.  And I apologize, counsel.  I    02:21PM

1   am trying to have my notes have me prepared so I can address

2   this in a quick order.  I still haven't figured out a method to

3   make sure that that happens when I'm here in front of you, and

4   that's why I think I made this mistake.  I had different notes

5   on a different page.  And the notes are what are the numbers          02:21PM

6   for this because of the previous trend.  And now you are

7   telling -- and I think that that's because I was hoping what

8   you would say was true and that I wouldn't have to focus on it.

9   So I'm not going to focus on it.  I will give the plaintiffs

10  opportunity to say anything but I thought I would move on to          02:22PM

11  the others where I have more egregious situations.

12          MS. KENDRICK:  Well, according to the most recent data

13  that we have, Tucson is non-compliant on Performance Measure

14  40.

15          THE COURT:  It's true.  I mean, that's the most recent         02:22PM

16  data.  But I have been told that the March data, the

17  preliminary March data will show that Tucson is at 100 percent.

18  And so again, I see previous compliance rates when the

19  benchmark was lower the 83 would meet it, the 100 met it, the

20  86 would meet it, 91 would meet it and then there's a dropoff        02:22PM

21  of 61 and 67.  Now it looks like maybe we're okay there.

22          MS. KENDRICK:  We'll see.

23          THE COURT:  We'll see.  We'll see.

24          Just a moment more.  Thank you for your patience.

25          So with respect to 44, and on Page 5, defendants              02:24PM

—**May 10, 2017 - Status Hearing Resumed**—

1   representation in Document 1977, going forward, what -- I think

2   I read it already, and I think that that's the only time that I

3   saw in this remedial measure.  Does that mean that all of these

4   measures that are discussed are going to be in place after the

5   17th of March?  Were they put in place before the 17th of          02:25PM

6   March?  The 25th of March?  14th of April?  When is it

7   happening?

8           MR. BOJANOWSKI:  Was that a question directed to us?

9           THE COURT:  Yes.

10           MR. BOJANOWSKI:  I'm sorry.  And you are asking when    02:25PM

11   these plans were put in place?

12           THE COURT:  Well, the reason that I started out

13   reading before is that I noticed that there were times where

14   temporal boundaries were set forth where you told me when you

15   started doing it or when the policy changed that would be       02:25PM

16   reflective of you making a decision that something needed to be

17   fixed.  You have the idea what the fix would be, and you put it

18   in place.

19           When I look here, I see going forward where that can

20   mean any number of things.  And it's -- the other remedial       02:26PM

21   measures that you propose in 44 don't, as I see it, have any

22   temporal limitation on them.  So I'm trying to understand, are

23   you just -- are these aspirational things that you say you are

24   going to have in place?  Have they been in place for a while?

25   Here we are in the middle of May.  Is it fair for me to assume   02:26PM

—— May 10, 2017 - Status Hearing Resumed ——

1   these have been in place since no later than the 17th of March?

2   I'm just trying to understand that.

3         MR. BOJANOWSKI:  They should all be in place now.  To

4   be honest with you, I don't know the exact date that they were

5   put into place.  So maybe going forward in reporting to the        02:26PM

6   Court we can add the date that it was actually put in to help

7   out.

8         THE COURT:  And Performance Measure 40 seems to be

9   another one of those where it just isn't rocket science

10  material.  But it also seems to have a very grave potential for    02:27PM

11  harm.  And so it seems worthwhile to be talking about it.  And

12  with respect to a number of the sites at issue, the performance

13  has been profoundly bad.

14        So I think it's fair to ask what your preliminary

15  numbers are showing for March with respect to Performance         02:27PM

16  Measure 44 at the facilities that are -- let me give you those

17  that are particularly -- Lewis the February number is 22; and

18  Florence and Eyman are at 53 and 58 respectively; and Winslow

19  is at 40.

20        MR. BOJANOWSKI:  So the preliminary numbers are Eyman        02:28PM

21  at 50, Florence at 100, Lewis at 94, and Winslow at 100.

22        THE COURT:  Do you have a sense as to why it is that

23  things have apparently turned around at four of these five but

24  have not at Florence?  Not a at Florence, at Eyman?

25        MR. BOJANOWSKI:  At Eyman?                                   02:28PM

1          THE COURT:  Yeah.

2          MR. BOJANOWSKI:  Not at this time, Your Honor.  I

3     think we're going to probably have to look at that facility and

4     see what's going on out there specifically as to why it is that

5     the plans seem to be working at some facilities but not this          02:29PM

6     particular one.

7          THE COURT:  And plaintiffs, anything for the record on

8     this?

9          MS. KENDRICK:  Well, yes.  Eyman Performance Measure

10    Number 44 this is one regarding people being brought back from       02:29PM

11    the emergency room.  And what has come up in the past when we

12    have toured Eyman and talked about these return from the

13    hospital situation is that the prison is set out geographically

14    such that the units are very separate from one another.  And so

15    again, I think this perhaps would be a situation where the          02:29PM

16    people are being taken straight back to their custody unit.

17         However, since we don't have that kind of information

18    in front of us, we, as plaintiffs, can't analyze and determine

19    if that's the situation but that's kind of my gut response on

20    it.                                                                  02:30PM

21         I think a broader comment that I would want to make,

22    Your Honor, building off of what you said earlier about the

23    kind of lack of time frames is a general objection we have is

24    this -- these plans are very aspirational and they are often

25    like somebody is going to start doing this and start having to      02:30PM

May 10, 2017 - Status Hearing Resumed

1    report.  And we think that in order for them to come into

2    compliance they really need to break this down into the

3    constituent parts and say, you know, here is an example of the

4    form we are going to use.  This is the day that we are going to

5    train people to do this.  And so, you know, everything is          02:30PM

6    written in the subjunctive or in the future tense so it is very

7    hard for us to comment on it because all these wonderful things

8    may or may not happen, but we've got to wait three months see

9    what shows up in the CGARs.

10        So that's kind of a general comment that we would make     02:30PM

11   is to the extent there's actually concrete detail with

12   deadlines, who is accountable, what is going to be done, it

13   would be much easier for us and our experts to evaluate these

14   remedial plans and offer substantive comments because it's very

15   hard to offer substantive comments on things that say, going      02:31PM

16   forward, we'll have a form.  What does that mean?  It's hard

17   for us to provide to you and defendants useful substantive

18   comments when we're given kind of these vague generalities.

19        THE COURT:  Well, I thank you for that comment.  I

20   hope that it's been apparent to everyone that I am, in part        02:31PM

21   because of the education process, now feeling that I am getting

22   closer to a point of being more able to be as engaged with the

23   details with respect to the kinds of things that you address.

24   And so I think at each successive monthly status meeting I hope

25   that I am accomplishing that goal.                                 02:31PM

1        But that's my intention.  And my intention is to

2   become evermore knowledgeable and evermore engaged if

3   necessary.  I don't want to be engaged.  I want to leave the

4   prison management to the people who are in the business of

5   managing prisons.  But if that doesn't work then I will get the   02:32PM

6   kind of detail.  I will be involved to the extent where I have

7   to know exactly whom was identified as the people who are going

8   to perform that job and why is it that they didn't perform the

9   job in the subsequent months.

10       And so that I don't forget this, Mr. Bojanowski, let   02:32PM

11   me tell you this:  I appreciate that you have done something

12   that probably you will think is addressed by the adage no good

13   deed goes unpunished, but you have been gracious in sharing

14   something that you said you didn't have available before and

15   that is these preliminary numbers.  And that's helpful for me.   02:32PM

16   It sometimes helps you.  Sometimes hurts you.

17       But I will say this, that our next meeting is on the

18   14th of June, and I would expect that you would have numbers

19   for all of these areas that would reflect April.  And so that's

20   the two months before.   02:33PM

21       MR. BOJANOWSKI:  Right.  Yes.

22       MS. KENDRICK:  Will you provide them to us before the

23   hearing?

24       MR. BOJANOWSKI:  I will think about it.

25       THE COURT:  If you could, that would be helpful.  If   02:33PM

──── **May 10, 2017 - Status Hearing Resumed** ────

1   you can provide them.  Obviously, if you have got them, it

2   would seem to me that it would be an honorable thing to do to

3   give them to everybody because it will just mean a more

4   efficient practice for us.

5         So on this performance measure, I am going to hope                    02:33PM

6   that the progress in most of these facilities will be emulated

7   at Eyman.  But if not, come next month, then we'll say that I

8   will be much more engaged in the kind of things that Ms.

9   Kendrick has suggested.

10        THE COURT:  Who is the heavy breather on the phone?          02:34PM

11  No disrespect if that's a health issue or something, but it

12  does make it a little bit harder to hear here.

13        MS. KENDRICK:  At least I'm not in Berkeley with the

14  train going by every five minutes, Your Honor.

15        THE COURT:  So then 44.                                                        02:34PM

16        MR. BOJANOWSKI:  I think we just did 44.

17        THE COURT:  Not 44, I'm sorry.  45.  Looks to me like

18  we see Lewis and Tucson really in the dumps and that Florence

19  in February, so I'm hoping that you can tell me that your

20  preliminary numbers for March are showing something different          02:35PM

21  for Tucson and Lewis, Mr. Bojanowski.

22        MR. BOJANOWSKI:  I am showing for Number 45 Lewis, 68.

23  And Tucson?

24        THE COURT:  Yes.

25        MR. BOJANOWSKI:  I am showing 97.                                        02:35PM

1        THE COURT:  So Tucson has gone from 48 to 97.  And

2   what do you show for Florence?

3        MR. BOJANOWSKI:  Florence?

4        THE COURT:  You said Lewis already.

5        MR. BOJANOWSKI:  Yeah, Lewis.                          02:35PM

6        THE COURT:  What about Florence?

7        MR. BOJANOWSKI:  Oh, Florence?

8        THE COURT:  Uh-huh.

9        MR. BOJANOWSKI:  83.

10       THE COURT:  So 45 for Lewis says that all nursing     02:36PM

11  staff will receive additional education and training in

12  mid-March.  So the number here for Lewis, in fairness, may not

13  reflect this mid-March training because of the numbers

14  obviously would not be affected for February for what happened

15  in mid-March.  But the March numbers should have shown        02:36PM

16  something.  We see a dropoff at 1 and so it will turn on next

17  month, which we will report on April.

18       But again, this is not that hard.  I just don't

19  understand.  I have to think that are the diagnostic services

20  encumbered by the fact that the machines are not available, the  02:37PM

21  staff is not available.  What's the rub here with respect to

22  Lewis and accomplishing on-site diagnostic services the same

23  day if ordered stat or urgent or within 14 calendar days if

24  routine?

25       MR. BOJANOWSKI:  Let me see if I can get an answer.    02:37PM

1          THE COURT:  Okay.

2          MR. BOJANOWSKI:  Okay.  I think I'm gathering that

3    it's a personnel issue as far as having the personnel follow

4    the protocols with regard to actually reviewing the diagnostic

5    testing, that the equipment is there, the test is taken, but I          02:38PM

6    think it's an issue of review.  No?  That's not it.  Okay.

7          THE COURT:  It doesn't seem to address the performance

8    measure.

9          MR. BOJANOWSKI:  Staff aren't doing their job concern.

10          MS. KENDRICK:  Your Honor, we're also concerned about          02:39PM

11   Florence with Mr. Pratt's representation that the March number

12   is 83 since the cutoff starting in March is 85, and looking

13   over the history of the institution, it appears that they are

14   below compliance and then pull themselves -- have pulled

15   themselves above 80 percent and then they fall back down out of          02:39PM

16   compliance.

17          THE COURT:  It is obviously a problem.  And so right

18   now, we have the benefit of the, in March, at the end of March,

19   the X-ray techs from Perryville and Yuma travel to Lewis to

20   assist with clearing the X-ray backlog.  Does anybody in the          02:39PM

21   courtroom know whether or not that reduced the backlog, or do

22   we still find ourselves with the same backlog?

23          MR. BOJANOWSKI:  We don't have information on whether

24   it reduced a backlog or not.

25          THE COURT:  Well, here's how people should consider          02:40PM

1   things are going to play out with respect to this measure on

2   Lewis, and that is, that this is the kind of community resource

3   that is available.  There are all sorts of folks out in the

4   private market who can provide this service.  And if I don't

5   see, come next month, an improvement based upon these actions,    02:40PM

6   specific actions that were taken with respect to Lewis, it

7   would seem to me to be completely fair to say that I needed to

8   be informed on a real time basis on what the queue was and what

9   people were doing to get that addressed, including idea that if

10  the queue was going to produce a failure to comply with the      02:41PM

11  performance measure that I would say get these people to an

12  outpatient facility where these services can be provided.

13          For Performance Measure 50, the January number was 55

14  percent; February, 48.  What do you show for March for

15  Florence?                                                        02:41PM

16          MR. BOJANOWSKI:  59.

17          THE COURT:  To increase compliance, internal reporting

18  has been created to assist staff in managing outside consults.

19  The report contains information such as patient name and

20  number, specialty type, provider status and date of order.  The  02:42PM

21  FHA and the CC will monitor this report for scheduled urgent

22  specialty consultation orders.  The CC and scheduler will alert

23  the FHA of any consult not completed within 120 days of the

24  order.  The CC will work closely with community providers in

25  the timeliness of receiving reports and results back from those  02:42PM

─── May 10, 2017 - Status Hearing Resumed ───

1    outside providers.

2         So when did this go into place?

3         MR. BOJANOWSKI:  April.

4         THE COURT:  April when?

5         MR. BOJANOWSKI:  Second or third week.                    02:43PM

6         THE COURT:  I guess I have to ask the question, why

7    did it take to the second or third week of April after the

8    Court was told on the 17th of March that these measures that

9    you could accomplish, I think, just by sending a memorandum out

10   saying start doing this now?  Why did it take so long?        02:43PM

11        MR. BOJANOWSKI:  I don't have information on that,

12   Your Honor.

13        THE COURT:  Plaintiffs wish to say anything?

14        MS. KENDRICK:  Oh, yes.

15        So Performance Measure 50 and 51 go together.  They      02:44PM

16   are both related to specialty consultations, both urgent and

17   routine and getting them done in a timely manner.  And a

18   problem that -- the root cause of the problem, I think, is one

19   that is not addressed in these remedial plans, and that is the

20   fact that Corizon does not have very many specialists and      02:44PM

21   subcontractors for specialties.

22        And so when you look at the fact that you have a

23   process in which the prison provider submits a request saying

24   I'd like to send Mr. Jones to a cardiologist, it goes up to

25   food chain to Corizon headquarters to a group called           02:44PM

—— May 10, 2017 - Status Hearing Resumed ——

1   utilization management which reviews the request and decides

2   whether or not to grant it or deny it.  So that eats up time in

3   the process, in our view.

4          The other problem that they are running into

5   repeatedly is it's extremely difficult for Corizon to find        02:45PM

6   contractors because of a state law that says that specialist

7   contractors who provide services to prisoners may not be paid

8   any more than what is paid under AHCCCS or medicaid.  And so

9   when this state law was passed by the State legislature in, I

10  believe, 2010, or 2011 when the department was still running      02:45PM

11  medical care, the specialists disappeared for the hills.

12         And so Corizon now is having to deal with that problem

13  of this law where they can't find specialists to provide

14  services.  And so when we are going on our prison tours and

15  going and talking to the staff people, the schedulers and the     02:45PM

16  clinical consultants, these are hard working people.  However,

17  they will tell us there's only one infectious disease doctor in

18  the state who will see our clients.  There's only one

19  neurologist.

20         So we're concerned about the fact that while this may       02:46PM

21  speed up the process for the scheduler or the chronic care

22  person, it's not so much these people who are sitting in the

23  prison calling.  They have nobody to call.  There's no

24  subcontractors.  And so, you know, we would like to have the

25  Department really think a little bit more outside the box.         02:46PM

May 10, 2017 - Status Hearing Resumed

1    Perhaps it would involve going to the legislature and

2    explaining that this bill that was passed was very ill thought

3    out and has the effect that it's tying the hands of both the

4    Department and Corizon because they can't find specialists.  So

5    if there's only one specialist in urology or neurology in the            02:46PM

6    state of Arizona that will see prisoners and accept the AHCCCS

7    rate, then it will be very difficult for them ever to come into

8    compliance no matter how hard the schedulers or these clinical

9    coordinators are running around the institutions making calls.

10            THE COURT:  I think a natural follow-up question to              02:47PM

11   your hypothesis is if this problem is true isn't it likely to

12   be a state-wide problem?  And if that's so, why is it that we

13   see a compliance rate of 100 percent for Douglas, 100 percent

14   for Lewis, 100 percent for Phoenix, 100 percent for Safford,

15   100 percent for Winslow, and 100 percent for Yuma and a rate of          02:47PM

16   91 percent for Tucson?

17            MS. KENDRICK:  Well, first of all, we don't know how

18   many urgent and routine consults are being counted to get to

19   these percentages.  You will remember from the testimony of

20   some of the witnesses, I was asking them, did you think only             02:47PM

21   one urgent specialty request for a prison of 5,000 people seem

22   awfully low?  So if they are not making the requests, if

23   there's only two or three going out, then I would hope that

24   they are making 100 percent with that.

25            So I think that's -- you know, and I cannot sit here            02:48PM

1   and tell you exactly why.  I mean, I know anecdotally from

2   speaking with these type of staff on tours it's easier many

3   times for the smaller prisons where they may have relationships

4   with the community specialists and providers.  And so certain

5   specialties are easier than other specialties to get out.        02:48PM

6          But I guess the point being is plaintiffs feel that

7   the problems with this performance measure, the causes are very

8   deep rooted and profound.  And these measures are good that

9   they are proposing in the plan, but again, we're concerned that

10  it really doesn't address systemic underlying causes as to why   02:48PM

11  Corizon is struggling so hard to find subcontractors in these

12  specialties.

13         THE COURT:  Well, the remedy you have suggested of

14  turning to the legislature isn't going to work.  They are about

15  to recess.  That's not a remedial measure.  What else?           02:49PM

16         MS. KENDRICK:  The Supremacy Clause.

17         THE COURT:  What else do you think in terms of --

18         MS. KENDRICK:  Well, I think they really need to make

19  an effort to reach out and find more.  I think that there are

20  other programs, you know.  They could really focus on trying to  02:49PM

21  do e-consults more telemedicine with specialists where they

22  don't have to be in Arizona necessarily.  And our expert has

23  suggested to us a program called rubiconmd.com and other

24  e-consult services that are used for the specialties,

25  especially when it's kind of a difficult specialty, something    02:49PM

— May 10, 2017 - Status Hearing Resumed —

1   like infectious disease or oncology where those doctors are

2   booked up just generally in the community.

3           MR. BOJANOWSKI:  Your Honor.

4           THE COURT:  Yes.

5           MR. BOJANOWSKI:  We have already and Corizon is          02:50PM

6   already undertaking a review of all third party contractors to

7   determine what we have available and what we can do to provide

8   an expanded list of available specialty contacts.  We also have

9   expanded the telemed program, I believe, with the University of

10  Arizona to tap into their specialty groups to assist with this.   02:50PM

11          So although maybe not necessarily reflected in the

12  plans before you, these are things that are being undertaken at

13  this point to alleviate any perceived shortage of consult

14  individuals who are available for us to tap into.  Because it

15  is a good idea to have extra consult sources in the community.   02:50PM

16  Because what ends up happening is sometimes, you know, some

17  urologist may have to shut down their practice for, say, a half

18  day so that they can bring a group of prisoners into their

19  office.  And so sometimes that cannot be scheduled in a timely

20  fashion to meet the measure.                                      02:51PM

21          THE COURT:  Seems like, again, you know, I took a

22  course that George Mason offered, law and economics.  And I

23  learned some important things there that they thought judges

24  often times didn't think about.  And that is how an

25  understanding of economics can assist the Court in its           02:51PM

UNITED STATES DISTRICT COURT

1    understanding of problems and creating solutions for problems.

2    It would seem to me if you have a situation that you just

3    described that it may be that you need to make it worth the

4    providers while saying come in on Saturday and do this and

5    there's an extra thousand dollars involved in the project.                02:52PM

6         MR. BOJANOWSKI:  As plaintiffs' counsel indicated,

7    although conceptually that would be nice, we are bound to

8    AHCCCS rates by state law.  So, you know, that is the billing

9    rate that is allowed for the treatment of prisoners in the

10   community.                                                                 02:52PM

11        THE COURT:  Well, I will offer this, again, borrowing

12   from the plaintiffs' counsel citation to the Supremacy Clause,

13   you couldn't enter into a contract and have one party have the

14   ability to render that contract non-performable because nobody

15   would provide the services because they had changed it so that            02:52PM

16   no one could be paid what would be required to obtain those

17   services.

18        So again, I'm not deciding that issue right now, but

19   that is an issue.  Again, if that is a true limitation, then

20   there become other modalities that the Court has to entertain             02:52PM

21   which are even less attractive, perhaps, for the State because

22   they could cost even more.  If it's simply saying that we can't

23   pay more to someone who is an Arizona provider, maybe there's

24   a -- bus them to California.  I don't know.

25        But again, there are inexpensive ways to do things and               02:53PM

1   expensive ways to do things.  And if you have told me, as you

2   have already said, that I can't order you to hire more people

3   or build more prisons, it leads me down a road to less

4   attractive alternatives and that is always something that we

5   should keep in mind.                                          02:53PM

6         Before we close out on this 51, though, can you tell

7   me what the preliminary numbers are for 51 for March?

8         MR. BOJANOWSKI:  At Eyman?

9         THE COURT:  At Eyman, Florence, and Tucson.

10        MR. BOJANOWSKI:  Okay.  It's 80 percent at Eyman;       02:53PM

11  Florence is 87; and did you say Tucson?

12        THE COURT:  Yes, sir.

13        MR. BOJANOWSKI:  Tucson, 76.

14        THE COURT:  And when did you commence the telemedicine

15  program with the University of Arizona?                       02:54PM

16        MR. BOJANOWSKI:  It has not started yet.

17        THE COURT:  Do you have a start date?

18        MR. BOJANOWSKI:  What's our start date?

19        There's apparently a block schedule for infectious

20  disease right now, and we are discussing with them expanding  02:54PM

21  into other specialty areas.  We have also expanded the telemed

22  internally, Your Honor, so the program with the University of

23  Arizona --

24        THE COURT:  You are using other resources at other

25  facilities of the Arizona Department of Corrections.  Is that 02:55PM

─────── May 10, 2017 - Status Hearing Resumed ───────

1    what you are saying?  Is that what you mean internally.

2              MR. BOJANOWSKI:  Could I have a moment to clarify?

3              THE COURT:  Of course.

4              MR. BOJANOWSKI:  I don't want to mislead the Court.

5    But it was my understanding that there were some additional          02:55PM

6    providers that we've got that Corizon has brought on board to

7    provide some services, and I'm not sure whether it touches upon

8    these measures or not.  I know that that has occurred already,

9    but I'm not quite sure whether it touches these measures.

10             Your Honor, one provider, one mid-level have been         02:56PM

11   brought on.  They will be activated tomorrow.

12             THE COURT:  In what area?  What area of medicine?

13             MR. BOJANOWSKI:  Primary care telemedicine.  So it

14   will impact these measures as well as others.

15             THE COURT:  And that works such that when the inmate      02:56PM

16   comes to the clinic facility there's a telephone or a video

17   conference?  How does it work?

18             MR. BOJANOWSKI:  I believe it's video.  Yeah.  It's a

19   video conference.  And then the doctor has eOMIS access so they

20   can look at the records.  And then they can have the inmate in     02:57PM

21   there.  They put them in a room with a teleconference thing and

22   then they do what they have to do.

23             MS. KENDRICK:  But how would a primary care provider

24   help on a performance measure with access to specialists?

25             MR. BOJANOWSKI:  I'm not sure.  They are reviewing the    02:57PM

1    specialty consultations.

2            THE COURT:  All right.  What we will do is we'll take

3    a 10-minute break.  We'll take a 10-minute break now.  Thank

4    you.

5            (Recess from 2:58 p.m. until 3:13 p.m.)                02:58PM

6            THE COURT:  So I believe we're ready to address 52.

7    And what I have for 52, this is specialty consultation reports

8    will be reviewed and acted upon by a provider within seven

9    calendar days of receiving a report.  For February, Florence

10   56; Perryville, 96; and Tucson, 82.  Can you give us the March    03:13PM

11   heads up?

12           MR. BOJANOWSKI:  For Florence, 52 is 52.  And you said

13   Perryville and Tucson?

14           THE COURT:  Please.

15           MR. BOJANOWSKI:  Perryville is 95.  Tucson is 85.        03:13PM

16           THE COURT:  Okay.  And let's then focus on Florence.

17   It's kind of funny in light of what Ms. Kendrick has said in

18   Florence, "It was discovered."

19           I'm sorry to cast some humor, but that medical was not

20   receiving inmates' reports and they were returned to the         03:14PM

21   facility partly due to challenges in receiving reports.  It was

22   reiterated that you needed to follow the results and do what

23   you were supposed to do.  Says nursing supervisors and medical

24   records staff will review charts of inmates returning from an

25   outside consult to ensure they are seen and that medical has     03:14PM

———— May 10, 2017 - Status Hearing Resumed ————

1    the necessary information and then further describes additional

2    reports and other steps.

3              I need to know when these measures were put in place.

4              MR. BOJANOWSKI:  In April, same time frame.  About the

5    third week of April the processes were put into place.  And          03:15PM

6    then the two providers that I mentioned before the break are on

7    board, have cleared security and background and are starting

8    within a week.

9              THE COURT:  So it's hopeful, perhaps, that because we

10   know that the State knows how to accomplish this performance         03:15PM

11   measure because we have seen progress with respect to it at

12   most of the facilities, perhaps the Florence issue can be

13   addressed.  And so what I would do is I would say we will be

14   looking with earnest to the reporting that would come in from

15   April but I need to obviously give plaintiffs an opportunity to      03:16PM

16   address this issue here now.

17             MS. KENDRICK:  Yes, Your Honor.

18             We're also very concerned about the numbers reported

19   on Mr. Pratt's chart for Eyman which shows that the past seven

20   months they have been non-compliant on Performance Measure 52.       03:16PM

21             THE COURT:  Was that one of the ones addressed in the

22   mediation or no?

23             MS. KENDRICK:  Yes, it was.

24             THE COURT:  All right.

25             MS. KENDRICK:  And we're glad to hear they are hiring       03:16PM

1   two providers but my understanding is that they're not on site,

2   that they are part-time to review these records.  Is that

3   correct, Mr. Bojanowski?

4       MR. BOJANOWSKI:  Correct.  They are not on site, but

5   they are what they refer as a PRN type of provider so it's an          03:17PM

6   as needed.  It's really based on the amount of workload that

7   needs to be addressed.  So if it's a full-time situation, it's

8   a full-time situation to address the compliance measures.  If

9   it's a part-time situation then it's part-time.  So it's really

10  more of an open-ended situation.  They will be utilized as            03:17PM

11  needed to address these issues.

12  Q.  This might be an appropriate segue to address the measures

13  that Judge Bade has communicated in her minute entry of

14  yesterday that should be initiated into the process that we're

15  engaged in with these other performance measures.  She's           03:17PM

16  identified in her minute entry that Performance Measure 87 for

17  Eyman and Performance Measure 35 for Perryville, Performance

18  Measure 44 for Phoenix, Performance Measure 50 for Yuma, and

19  Performance Measure 79 for Tucson as well as Performance

20  Measure 94 for Safford and Douglas and Performance Measure 98        03:18PM

21  for Phoenix and Safford and Performance Measure 103 for Safford

22  should be turned over to the process whereby the Court can make

23  a determination as to whether or not these are in compliance

24  such that it would require the first step of the stipulation

25  for the defendants to promulgate their suggested remedial            03:18PM

1   measures.

2          I gather, and I'm hoping is the case, that there's no

3   dispute that these are out of compliance so we can undertake

4   that process.

5          MS. KENDRICK:  Actually, it's the reverse.  Those are          03:18PM

6   the measures that were disputed between the parties whether or

7   not they are out of compliance because of the definition of

8   what is substantial non-compliance.  And we recently filed a

9   motion for reconsideration of Docket 2030, and so it's based on

10  a dispute between the parties about the interpretation.  And          03:19PM

11  since there's no agreement between the two of us whether they

12  are non-compliant we're moving those along in the process to

13  bring them to you for resolution.

14         THE COURT:  I see.  All right.

15         I have taken a look at the motion for reconsideration,          03:19PM

16  and I'm going to order a response and permit a reply.  How much

17  time do you need for the response?

18         MR. BOJANOWSKI:  Could we have 14 days, Your Honor?

19         THE COURT:  All right.  And then the reply seven days?

20         MS. KENDRICK:  Yes, sir.                                       03:20PM

21         THE COURT:  Okay.  So then Performance Measure 94, all

22  prisoners on suicide or mental health watch shall be seen daily

23  by a licensed mental health clinician or on weekends or

24  holidays by a registered nurse.  February is 93.  What do you

25  show for March for Perryville?                                        03:20PM

—— May 10, 2017 - Status Hearing Resumed ——

1    MR. BOJANOWSKI:  Performance Measure 94 for Perryville

2    is showing 93 percent.

3        THE COURT:  So it's the same exactly as it was in

4    February?

5        You are looking at March?                          03:21PM

6        MR. BOJANOWSKI:  Correct.  Yes.

7        MS. KENDRICK:  Your Honor, I believe Mr. Fathi will

8    speak more to Performance Measure 94, but I just wanted to note

9    that Tucson prison was one of the prisons that you found them

10   non-compliant for Performance Measure 94 in October and they    03:22PM

11   are still showing non-compliance in February.

12       THE COURT:  What do you show in March for February for

13   Tucson?

14       MR. BOJANOWSKI:  For 94?

15       THE COURT:  Yes.                                     03:22PM

16       MR. BOJANOWSKI:  72.

17       THE COURT:  And then the defendants' reply, I think

18   it's the reply, says with respect to Performance Measures 94 at

19   Perryville, that Perryville experienced non-compliant scores

20   during the summer months of 2016.  Upon investigation it was    03:23PM

21   determined that the weekend watches were not being performed by

22   registered nurses.  This communication has been resolved and

23   Perryville arranged for mental health staff to perform these

24   daily checks on weekends as well as their weekend shifts.

25   These measures is returned to compliance and continues to score  03:23PM

─── May 10, 2017 - Status Hearing Resumed ───

1    above threshold.

2         And so you seem to have a mechanism of addressing the

3    problem in dealing with it, but now we find that Tucson has

4    fallen off.  Any observations about that from the defendants?

5         MR. BOJANOWSKI:  My understanding is that the inmates    03:24PM

6    are being seen but it's not been documented appropriately so

7    that when the monitor goes to look to check the documentation

8    it's not meeting the requirements.  And so they are not

9    compliant due to not appropriately documenting the contact that

10   they are having.                                             03:24PM

11        THE COURT:  Well, the reason that I address this

12   obviously is because of the bump up of that -- it's kind of

13   crass words to use -- but the dramatic increase in recent times

14   with respect to suicide.  And I say bump up because it seemed

15   to go beyond just Arizona from what Mr. Pratt said.  But in any  03:24PM

16   event, it highlights a very serious problems because it is

17   obviously completely irrevocable in terms of the Court trying

18   to address problems.

19        And so Ms. Kendrick said Mr. Fathi had more to say.  I

20   will give him a chance to say that now.                       03:25PM

21        MR. FATHI:  Thank you, Your Honor.

22        Could we return to Number 94 at Perryville for a

23   moment?

24        THE COURT:  Yes.

25        MR. FATHI:  The defendants say in Document 2051 that     03:25PM

1    this was just a problem over the summer months of 2016 and it's

2    now been resolved.  That's not quite true because in January of

3    2017 they were at 53 percent.  And even recall that all of

4    their months showing compliance on Number 54 -- or excuse me --

5    Number 94 were calculated counting cell front contacts which       03:25PM

6    the Court has said they can't do.  They were calculated

7    counting the defendants' unilaterally invented partial credit

8    method which the Court has said they cannot do.

9            So all those months of alleged compliance on Number 94

10   are really meaningless because we heard from Mr. Pratt today       03:26PM

11   that they have not gone back and recalculated them in

12   compliance with the Court's order.  But even so, even with all

13   those distortions that falsely inflate their compliance, at

14   Perryville they have still been out of compliance for six of

15   the last 11 months, including 53 percent in January.  So we       03:26PM

16   believe the Court should order a remedy for Number 94 at

17   Perryville.

18           THE COURT:  Well, with respect to focusing the Court's

19   attention on where the energy is needed the most, I have --

20   just a second.  I have too many pieces of paper.  Just a          03:27PM

21   second.  I thought I had it and I don't.  Let me just see where

22   it is.

23           Mr. Fathi, I'm going to ask you to help me out here.

24   I have got Mr. Pratt's 94 list which doesn't include the March

25   dates.  But I just asked for that, and I don't have it off the    03:28PM

1    top of my head.  Can somebody remind me what it is?

2          MR. BOJANOWSKI:  For 94?

3          THE COURT:  Yes.

4          MR. BOJANOWSKI:  I'm sorry, at what facility, Your

5    Honor?                                                    03:28PM

6          THE COURT:  At Perryville.

7          MR. BOJANOWSKI:  Perryville.  March preliminary is 93.

8          THE COURT:  Mr. Fathi, you were just addressing

9    Perryville, right?

10          MR. FATHI:  Yes.  We were just talking about          03:28PM

11    Perryville, correct.

12          THE COURT:  Okay.  So the problem that I have with

13    respect to doing more than what I have done so far, and that is

14    to highlighting the Court's attention here, is that I have in

15    October and in November and in December and February and March,  03:28PM

16    compliance.  And so among those recent months, I have January

17    at 53 percent.  And so I am inclined to decline your

18    suggestion, Mr. Fathi, and say that we will allow the measures

19    that have been identified for Perryville to have another month

20    to see whether or not this additional attention that I have     03:29PM

21    brought to the matter and that the very sad circumstances have

22    also brought to the matter perhaps can have a redressing effect

23    overall with respect to Perryville in this performance measure.

24          MR. FATHI:  That's fine, Your Honor.  Obviously, we

25    accept is the Court's ruling.  I just want to point out again,  03:29PM

May 10, 2017 - Status Hearing Resumed

1  though, that those allegedly compliant numbers from October,

2  November, and December, were calculated using counting cell

3  front encounters which the Court has said is impermissible and

4  applying the partial credit method which the Court has said is

5  impermissible.  So the Court can't really characterize those as       03:30PM

6  compliant unless and until the defendants go back and

7  recalculate them using the correct methodology that the Court

8  has ordered.

9          THE COURT:  In principle you are right.  You are

10 absolutely right.  In the particular maybe your recollection is       03:30PM

11 better than mine.  But I thought this was all fixed in December

12 of '16.

13         MR. BOJANOWSKI:  It was fixed when the order was given

14 so they have been calculated consistent with the Court's order

15 since that order was given.  So Mr. Fathi unfortunately is            03:30PM

16 incorrect in his analysis.

17         THE COURT:  If his analysis is right the last

18 contaminated month potentially is November?

19         MS. KENDRICK:  Mr. Dye testified that he had

20 calculated December 2016 numbers using the methodology that the       03:31PM

21 Court had struck down.  So it seems that December 2016 --

22         MR. BOJANOWSKI:  I thought he said --

23         THE COURT:  Well, okay.  I honestly don't remember.

24 My best recollection was what I just said.  You could be right

25 too.  So I don't know.                                                03:31PM

May 10, 2017 - Status Hearing Resumed

1          All right.  So my belief is that I have identified

2    what I believe to be firmer anchors on the performance measures

3    that the defendants have employed.  And I have taken what they

4    have said, and I have made note of that, and I will make a

5    personal spreadsheet that will include the articulation that    03:31PM

6    was added to what's been filed in the Court but has been

7    provided to me orally.

8          I will also make a notation of what the plaintiff's

9    criticisms were and their fears of what may result next month.

10   When I get to next month, on the 14th of May, I will have that   03:32PM

11   spreadsheet in front of me and I will be able to, I think, as I

12   said, hold feet to the fire if it's necessary to do so.  And

13   that's how I would proceed.  At that point if I find -- and

14   another way of saying what hold feet to the fire means is I

15   come up with additional remedial measures that I need to impose  03:32PM

16   to get the job done.

17         And then on my agenda, the remaining issues that I

18   believe I need to set are matters that the parties have

19   indicated that they would like to have oral argument.  And --

20         MS. KENDRICK:  Your Honor?                                 03:32PM

21         THE COURT:  Yes.

22         MS. KENDRICK:  There actually is one thing on the

23   agenda from April 14th, Docket 2017 at 5, and that was

24   plaintiffs' request that the Court extend its community

25   resources order to Performance Measure 47 and Performance       03:33PM

1    Measure 94.  And this relates to performance measures that you

2    originally found non-compliant on October 7, 2016.

3            THE COURT:  And what is the State presently doing with

4    respect to 47?

5            MR. FATHI:  Your Honor, this is David Fathi.  Looking        03:34PM

6    at Mr. Pratt's chart, Document 2041, we see that on Number 47

7    as of February, they remain out of compliance at Eyman -- Eyman

8    54, Florence 23, Perryville 74, Phoenix 67, Tucson, 67, and

9    Winslow 50.

10           THE COURT:  Well, that is an answer to my question.          03:35PM

11   It's not the question I actually meant, but it is a fair and

12   helpful answer to a good question.  And I guess the next good

13   question is, is for these facilities that are out of compliance

14   as of February, what do they show for March?

15           MR. BOJANOWSKI:  Which facilities are we talking about       03:35PM

16   again?

17           THE COURT:  If we take a look at Performance Measure

18   47 and we see that Eyman is at 54.  I guess we need to see

19   Eyman for March.

20           MR. BOJANOWSKI:  Measure 47 is 47.                           03:36PM

21           THE COURT:  And then for Florence?

22           MR. BOJANOWSKI:  40.

23           THE COURT:  And then for Lewis?

24           MR. BOJANOWSKI:  44.

25           THE COURT:  And then for Perryville?                         03:36PM

───────── May 10, 2017 - Status Hearing Resumed ─────────

1              MR. BOJANOWSKI:  88.

2              THE COURT:  And then Phoenix?

3              MR. BOJANOWSKI:  100.

4              THE COURT:  Safford?

5              MR. BOJANOWSKI:  50.                                03:36PM

6              THE COURT:  Tucson?

7              MR. BOJANOWSKI:  59.

8              THE COURT:  Winslow?

9              MR. BOJANOWSKI:  100.

10             THE COURT:  And Yuma?                                03:36PM

11             MR. BOJANOWSKI:  89.

12             THE COURT:  So we have some very abject failures with

13   respect to Eyman, Florence, Lewis, Phoenix, and Safford.

14   What's going on there?

15             MR. BOJANOWSKI:  One moment, Your Honor.            03:37PM

16             THE COURT:  Sure.

17             (Discussion off the record between counsel.)

18             MR. BOJANOWSKI:  Thank you, Your Honor.  I just had to

19   confer briefly with plaintiffs' counsel.

20             So what we have been doing is this is really not an  03:37PM

21   issue of necessarily patient care but it's about patient

22   communication and communicating to the patient what's going on

23   with their diagnostic studies.  So what we've done is

24   essentially retrained staff regarding the seven calendar day

25   limit.  We have had issues with staff scheduling out of time   03:38PM

UNITED STATES DISTRICT COURT

─────── **May 10, 2017 - Status Hearing Resumed** ───────

1   frame or rescheduling, which may have exceeded the time frames.

2   So what we're going to do is to allow the provider to complete

3   an electronic version of a communique out of eOMIS and forward

4   a copy of that to the inmate communicating the diagnostic test

5   results.  Probably will occur via inmate mail of some sort.          03:38PM

6          Inmate will be scheduled for an appointment with a

7   provider to review any abnormal diagnostic results which are

8   found.  The review of the diagnostic test results with the

9   inmate will not require the co-payment charge, that $4 charge.

10  The facility health administrator or designee is going to          03:39PM

11  oversee this process.

12          THE COURT:  When does it start?

13          MR. BOJANOWSKI:  Good question.

14          Your Honor, we had to reprogram eOMIS to essentially

15  do something new, so that is not yet operational.  But it          03:40PM

16  should be operational within the next couple of weeks.

17          MS. KENDRICK:  Your Honor.

18          THE COURT:  Yes.

19          MS. KENDRICK:  You found them non-compliant on

20  Performance Measures 47, 88 and 94 on October 7, 2016.  And        03:40PM

21  then at the November 9, 2016 status hearing, counsel for

22  defendants avowed that they had already implemented remedial

23  plans earlier in 2016 and asked you for 60 days to show that

24  these plans were working.  And on November 9tg you granted

25  their request and you said, "I hope that in the second week of     03:40PM

UNITED STATES DISTRICT COURT

─── May 10, 2017 - Status Hearing Resumed ───

1    January that we'll have the data and see where we stand."

2          And then at the January 11th, 2017 status hearing,

3    defendants yet again requested and were granted more time to

4    show that their remedial plans were working.  And

5    unfortunately, the numbers clearly show that they are not          03:41PM

6    compliant with Performance Measure 47 at multiple institutions

7    and also Performance Measure 94 at Tucson, which you found them

8    non-compliant in October and is one of the locations where a

9    prisoner committed suicide in the past week.

10          So in which case it's very troubling to hear from Mr.       03:41PM

11    Bojanowski that there's a new remedial plan that might be

12    implemented and it's going to be implemented soon when they

13    represented in November, six months ago, that they had already

14    implemented remedial plans to address these performance

15    measures.                                                         03:41PM

16          MR. BOJANOWSKI:  And sometimes the plans simply don't

17    pan out and work.  We have to readjust and study why these

18    things aren't working.  It's not a process whereby we magically

19    throw a plan out there and it works.  Sometimes we do these

20    plans.  We do a study.  We say we think we've got the issue       03:42PM

21    resolved.  We think we've got a good process in place and it

22    doesn't work.

23          And I know that's frustrating to the Court, I know

24    it's frustrating to the plaintiffs.  It's very frustrating to

25    me as well and to ADC as well.  But it's a process that we        03:42PM

1    continue to work on.  We're not ignoring this situation.  It's

2    one of many processes that we're working on to try and get this

3    system functioning.  This is a matter of getting a communique

4    to an inmate.  So we're hopeful that the newest measures that

5    we're putting into place are actually going to take hold and      03:42PM

6    work.  Sometimes they just simply don't.

7            MR. FATHI:  Your Honor, I would just point out that on

8    Performance Measure 47, Eyman, Florence, Lewis, Perryville,

9    Tucson, and Yuma, have all been non-compliant for 20 or more of

10   the past 24 months.  So the non-compliance is not new.  It       03:43PM

11   should not come as a surprise to defendants.

12           MR. BOJANOWSKI:  It's not a surprise.

13           THE COURT:  All right.  Is the plan that you say will

14   be in place in two weeks going to be used at all of the

15   facilities?                                                       03:43PM

16           MR. BOJANOWSKI:  Yes.

17           THE COURT:  So what's going to happen you say in two

18   weeks is there will be, via inmate mail, a communication of the

19   diagnostic report to the inmate who has received that within

20   seven days of that diagnostic examination being undertaken?      03:43PM

21           MR. BOJANOWSKI:  Correct.  We're trying to work

22   through eOMIS to get this generated.

23           THE COURT:  So 14 days from today, the defendants will

24   file a notice with the Court informing it that it is on line

25   with this measure designed to address the failure with respect   03:44PM

**May 10, 2017 - Status Hearing Resumed**

1   to Performance Measure 47.  If they are not on line they shall

2   explain to the Court why they are not on line, and then before

3   we meet again on the 14th of June, I will have an opportunity

4   to hear from plaintiffs as to what steps I should take in lieu

5   of relying yet again on the defendants.                      03:44PM

6          I mean, it is, again, you were a little bit

7   dismissive, I think, Mr. Bojanowski of this not being a medical

8   issue.  But for someone who is trying to play as much of a role

9   in their own health care, and we expect people to do that even

10  when they are in custody, they want to have that information.   03:44PM

11  And also, often times, people are understandably worried or

12  scared.  And so the idea that people should receive in a timely

13  manner the report of their diagnostics is not something that I

14  think should be readily dismissed.  So that is how we'll

15  proceed on that one.                                         03:45PM

16         And I think I have already addressed 94, Mr. Fathi, on

17  how we'll proceed.

18         MR. FATHI:  Your Honor, I don't think we discussed the

19  three facilities at which you found non-compliance on 94 back

20  in October.  And that's Eyman, Florence, and Tucson.  I don't   03:45PM

21  think we have heard preliminary numbers from defendants on all

22  three of those.

23         THE COURT:  That's a good point.  Mr. Bojanowski, can

24  you fill us in on that?

25         MR. BOJANOWSKI:  Performance Measure 94, Eyman is 97    03:46PM

─── May 10, 2017 - Status Hearing Resumed ───

1   percent.

2           THE COURT:  That's for March again, it happens it's

3   the same as February?

4           MR. BOJANOWSKI:  Correct.  And was it Florence?

5           THE COURT:  Yes.                                    03:46PM

6           MR. BOJANOWSKI:  60.  And Tucson, 72.

7           MR. FATHI:  Well, Your Honor, I beg your pardon.

8           THE COURT:  Go ahead.  I think you are about to say

9   what I'm about to say.

10          MR. FATHI:  That puts both Florence and Tucson      03:46PM

11  non-compliant for three of the past four months.  And as Ms.

12  Kendrick said, Tucson is where there was a suicide just a few

13  days ago, so that is particularly concerning.

14          THE COURT:  Mr. Bojanowski, can you address this?

15          MR. BOJANOWSKI:  I don't have information as to the  03:47PM

16  suicides that have occurred, Your Honor, so I can't really

17  comment on whether this performance measure would have had any

18  effect on that suicide.  So I don't know.

19          THE COURT:  Is there anything that you can say to

20  address those who would be understandably concerned if they had 03:47PM

21  a family member who was suffering a mental illness, that they

22  would know that the Court just didn't hear the report of these

23  kinds of failures on these facilities and didn't get some kind

24  of affirmation that the State was really all over this?

25          MR. BOJANOWSKI:  Your Honor, this has been a situation 03:47PM

1   where the non-compliance is arising out of the fact that they

2   were not appropriately documenting that the inmate who was on

3   the watch was offered to go out of the cell for the encounter.

4   And it's because of that lack of documentation.

5           THE COURT:  But that's the old excuse.  That really          03:48PM

6   can't be the March excuse, can it?

7           Mr. Fathi, am I wrong here?

8           MR. FATHI:  No, Your Honor.  You are completely right.

9   There's a maxim in health care that goes:  Not noted, not done.

10  And that means the excuse that oh, we really did everything we     03:48PM

11  were supposed to do, we just didn't write it down, is not

12  acceptable.

13          And you are quite right, Your Honor.  We have heard

14  this before that it's just the documentation problem.  Number

15  one, if that's -- even if that's true that is a big problem in     03:48PM

16  and of itself because accurate medical records are a

17  fundamental requirement for adequate health care.  And

18  secondly, I don't see how counsel who has no idea which records

19  were non-compliant for the past four months can represent to

20  the Court with any certainty that it's only a documentation       03:49PM

21  problem.

22          So we think this is a life-threatening situation as

23  illustrated by the two suicides in the last week that needs

24  remediation now.

25          MR. BOJANOWSKI:  Your Honor, Dr. Calcote can probably       03:49PM

1    address the reasoning for the non-compliance.  And it is a

2    situation where --

3            THE COURT:  Doctor, you can come forward to the

4    microphone.

5            DR. CALCOTE:  I affirm that everything that I tell you    03:49PM

6    will be the truth to the best of my knowledge.

7            THE COURT:  Thank you, sir.

8            DR. CALCOTE:  Yes, sir.

9            THE COURT:  So what kinds of things have you done to

10   try to give me a level of comfort that would not be suggested    03:49PM

11   by these numbers?

12           DR. CALCOTE:  The -- can I address the situation --

13           THE COURT:  Yes.

14           DR. CALCOTE:  -- at Tucson first.

15       At Tucson, we have -- our staff have gone by and have    03:50PM

16   conducted the suicide watch rounds.  I also know that at Tucson

17   one of the things that happens is that inmates are not always

18   responsive.  And when I say "responsive," they may flip you

19   off, or they may shake their heads.  But in order for us to

20   pass the compliance measure, we need to be able to document    03:50PM

21   that they have refused.  I know that that's part of the

22   situation at Tucson.

23       I'm probably going further than just the narrow

24   parameters there, but the difficulty that I'm responsible for

25   is that despite frequent reminders in several trainings, the    03:51PM

1    documentation by our staff that do the watches has not been

2    sufficient.  It has not -- we have not documented that we

3    offered to take the inmates out of the cell for a confidential

4    setting in every incident.  This is a measure where if we fail

5    to do that on one occasion despite doing it on every other                03:51PM

6    occasion with that offender, then we're out of compliance.

7            The failure here that I accept is that my effort to

8    train everyone that does the watches has not been sufficient to

9    meet this measure.  The things that we are doing that will make

10   a difference that have made a difference in most of the                   03:52PM

11   situations on the suicide watches, we are narrowing the number

12   of people that are actually doing the suicide watches so that I

13   can be assured that those individuals do know they need to

14   offer to bring the inmate out into a confidential setting and

15   that they need to document correctly that inmate's response.              03:53PM

16           We're also having on the weekends only mental health

17   personnel do the watches.  That has proven effective in most

18   situations rather than expecting nurses who do work shift work

19   and there is some variability in their schedules, to be aware

20   of the specifics of the Court's ruling that the inmates need to           03:53PM

21   be offered a confidential setting and that it needs to be

22   documented.

23           I don't know if I have rambled long enough for you to

24   confuse you.

25           THE COURT:  I appreciate what you said.  But one of              03:54PM

1    the things that you said that makes me think that there is,

2    perhaps, a measure that could be taken, and that is you say you

3    have identified or you have limited the number of people who

4    will be responsible for complying with this requirement that

5    they be seen daily, and that you hope to have greater control.    03:54PM

6    I think that I can understand that seems rational to me.  But

7    if it's true that you are reducing the number of people and

8    that these people are responsible, you need to make sure

9    there's a dialogue going back and forth with them so they can

10   report to you that you have asked me to do something that we,    03:54PM

11   as a group, that we cannot do because we cannot see the people

12   given the fewer number of people.  That is one issue that comes

13   to my mind.

14        The second issue that comes to my mind is that if you

15   reduce the number of people and there's a limited group, you    03:54PM

16   could put them in a room tomorrow for five minutes and you

17   could say that I'm going to call you, and I'm going to explain

18   to you exactly what needs to be done.  Because our reporting is

19   indicating that we're not seeing that this is being done

20   sufficient to satisfy the performance measure.    03:55PM

21        So I think that an appropriate step here would be for

22   you to have such a conversation, take those people in each of

23   these facilities that are failing now and say, be in a room,

24   and if they are on shifts do it twice a day or three times

25   whatever you need to do to have these people in the room so    03:55PM

860

1    that you can have a conversation with them explaining to them

2    what needs to be done but also hearing back from them if it's

3    not working on the ground, so to speak.

4         And again, one of the reasons I suggest that I'm

5    worried about that is if you reduce the number of people who          03:55PM

6    are doing it it raises the possibility in a context where I

7    hear often times that there just aren't enough bodies to

8    accomplish the goals.  That would be a problem we need to be

9    sure we hadn't created inadvertently.

10        DR. CALCOTE:  I believe that in terms of the staffing          03:56PM

11   issue, that the suicide watches should be if not the greatest

12   certainly one of our greatest priorities and that there should

13   be clear attention to assure that we do have requisite number

14   of personnel there and we do have sufficient personnel for them

15   to conduct those watches by licensed clinicians.                      03:56PM

16        THE COURT:  So that addresses my first concern.  The

17   second concern of making sure they know what they need to do

18   that they haven't been doing, what about having this additional

19   conversation?

20        DR. CALCOTE:  Given our current state, our current             03:57PM

21   situation, the thing that I will need to promise you is that

22   either I or the associate regional mental health director will

23   personally go to each of the seven corridor facilities and have

24   a conversation with those personnel that are responsible for

25   conducting those watches.                                             03:57PM

UNITED STATES DISTRICT COURT

—— May 10, 2017 - Status Hearing Resumed ——

1          THE COURT:  Thank you.

2          DR. CALCOTE:  Yes, sir.  Thank you.

3          THE COURT:  Mr. Fathi, is there anything else you

4   wanted to say?

5          MR. FATHI:  Yes, Your Honor.  Two things:  First of          03:57PM

6   all, watches occur at all 10 facilities not only at the seven

7   corridor facilities.  So we would ask that that instruction be

8   given at all 10 facilities.  Secondly, we would ask that the

9   Court set a timeline and require a declaration confirming that

10  the instruction that the Court just discussed with Dr. Calcote          03:58PM

11  has been given.

12         THE COURT:  And with respect to all 10, you think that

13  that's -- well, I'm looking at the numbers for the ones that

14  are in compliance.  And you are thinking that that's necessary

15  for those facilities as well?          03:58PM

16         MR. FATHI:  Well, Yuma was -- excuse me -- Douglas was

17  non-compliant in October.  Safford was non-compliant in

18  November.  So yes, Your Honor, we believe that at all 10

19  facilities because that's where watches take place this

20  instruction should be given.          03:58PM

21         DR. CALCOTE:  Your Honor.

22         THE COURT:  Go ahead, sir.

23         DR. CALCOTE:  At the smaller facilities, we typically

24  do not conduct the suicide watches there.  On rare events that

25  does occur.  If I could have your permission, given the          03:59PM

1  geographic location of the three corridor facilities, if it

2  would be permissible for me to have that conversation with them

3  telephonically rather than face-to-face, I would appreciate it.

4         THE COURT:  That seems reasonable to me, but let me

5  ask you this:  When can you complete the task of doing the                03:59PM

6  in-person ones and the telephonic ones?

7         DR. CALCOTE:  I will have it done before we see each

8  other again.

9         THE COURT:  Would you be able to do it even sooner

10  than that, in the next two weeks?                                          03:59PM

11         DR. CALCOTE:  If that's what's required, I will do it.

12         THE COURT:  Okay.  I appreciate that.  And then I

13  would ask when it does happen that the lawyers file a notice

14  with the Court.  I appreciate this very much, sir.

15         DR. CALCOTE:  Yes, sir.  I appreciate it.                           04:00PM

16         THE COURT:  Thank you.

17         So I think the next matter to address is the matters

18  that the parties wish to have oral argument.  And I'm looking

19  for my agenda which I can't blame Ms. Kendrick for filling my

20  desk with paper because I certainly was responsible enough to             04:01PM

21  have kept hers in a separate pile, which I have not done.  And

22  so now I have shuffled everything.  I'm sorry.

23         Why don't you tell me what you want oral argument on.

24         MS. FETTIG:  Your Honor, this is Amy Fettig.  I

25  believe that the Court had indicated it would take oral                   04:01PM

1    argument of the Motion to Enforce the Max Custody Measures.

2         THE COURT:  That's true.  And do you believe that's

3    necessary?

4         MS. FETTIG:  Your Honor, the plaintiffs did not ask

5    for oral argument.  That was the defendants.                    04:01PM

6         THE COURT:  Okay.  Let me hear from Mr. Bojanowski or

7    Ms. Love whether we can go ahead and rule or whether they need

8    to have a chance to say their piece.

9         MS. LOVE:  Your Honor, the parties have fully briefed

10   the motion, so I don't want to sit here and go through just     04:02PM

11   orally everything that we have already argued.  I just wanted

12   to add a couple points that can be explained, I guess, in more

13   detail per oral argument.

14        The overarching issue that defendants have with

15   plaintiffs' motion to enforce on the max custody provisions is  04:03PM

16   an issue of prematurity and not following all the steps that

17   should have been followed before getting to this point per the

18   stipulation.

19        Specifically, as going through the process required in

20   Paragraphs 30 and 31 of the stipulation as to the underlying    04:03PM

21   alternative dispute resolution process before reaching the

22   Court, as to the notice of non-compliance that plaintiff sent

23   via letter in July, which is one of the exhibits to plaintiffs'

24   motion, it's their July 7th letter, July 7, 2016, letter at

25   Exhibit 9, I believe it is, to their motion, there are specific 04:04PM

— May 10, 2017 - Status Hearing Resumed —

1    matters never addressed either in the notice of non-compliance

2    letter or the subsequent mediation before Judge Bade on October

3    26, 2016 that were brought up in plaintiffs' motion.  And those

4    specifically are challenging that the weeks that have been

5    monitored under the stipulation by ADC, their challenge that      04:04PM

6    weeks with holidays were never monitored.  That was not an

7    issue brought up in their notice of non-compliance nor was it

8    addressed at the mediation, and therefore, is not appropriate

9    for a motion to enforce.

10           The same argument applies to plaintiffs' challenges of     04:04PM

11   how out-of-cell time is monitored per the out-of-cell tracking

12   forms as to overlapping times where an out-of-cell tracking

13   form may show an inmate out at out-of-cell time and later at a

14   program and how you calculate that as well as challenges to

15   simply the monitors and the reviewers writing in calculations    04:05PM

16   of time at the bottom of out-of-cell tracking forms.

17           And then also importantly, the challenge that

18   plaintiffs have made as to defendants reporting by complex as

19   to Eyman and Florence versus breaking out reporting compliance

20   numbers at Eyman, parsing it out between Browning and SMU-1 and   04:05PM

21   for Florence parsing it out between Kasson and Central.

22           So those are specific issues that were never brought

23   up below in the notice of non-compliance nor the mediation and

24   therefore are premature.

25           As an overarching theme, however, the mediation that      04:05PM

1   the defendants and the plaintiffs participated in before Judge

2   Bade in October, which has now brought us to this point, was

3   focused mostly on the issue of whether or not -- and was

4   primarily focused on whether or not minors fall under the

5   stipulation as to any minors that are classified as max          04:06PM

6   custody.

7          In the minute entry order that was issued by Judge

8   Bade following that mediation, she stated that as to

9   methodology issues related to the monitoring of max custody

10  that the parties were going to continue to work together.  So   04:06PM

11  in the entire general sense it is the defendants' position that

12  this motion to enforce is premature.

13         Defendants will rest on briefing as to all the other

14  categories of issues except for one that I wanted to discuss

15  further here today.  Plaintiffs' argument is that the last,      04:06PM

16  approximately, at least 15 months or the first 15 months of the

17  monitoring period from the inception of monitoring until July

18  of 2016 should all be completely discounted because defendants

19  were not using random.org such that all four weeks of every

20  single month would be included in the possible months for        04:07PM

21  monitoring.

22         At the outset, it's defendants' position that bringing

23  this issue to the notice of non-compliance in July of last year

24  and then to mediation and to now was delay in that the

25  plaintiffs complain that they were not provided documents        04:07PM

1    sufficient to understand how defendants were monitoring max

2    custody, but per the schedules of document production by at

3    least May of last year, May of 2016, defendants, through the

4    AG's office, had produced 37 books as far as max custody books.

5    So it could have come as no surprise nearly a year and a half          04:08PM

6    later as to how defendants were selecting the months and which

7    months were selected.  So it's defendants' position that it is

8    unreasonable to come this late in the game and challenge the

9    first 15 months of monitoring.

10         But I also wanted to provide the Court, and it is              04:08PM

11   briefed, as to the explanation and a reasonable explanation as

12   to why this occurred.  Leading up to July of 2016 on the max

13   custody side of monitoring, that monitoring was happening live

14   time.  Each month, the results for that month were reported.

15   In addition, as the parties agreed, a monitoring week would be       04:08PM

16   Saturday through Friday.

17         Now, plaintiffs, in their reply, take issue and say

18   that that was never an agreement of the parties that there

19   needed to be a full week of monitoring which was Saturday

20   through a Friday, but plaintiffs' July 7, 2016 notice of             04:09PM

21   non-compliance letter at Footnote 3, as well as plaintiffs'

22   motion to enforce at Footnote 4, acknowledges this very

23   understanding that a monitoring week was a Saturday through

24   Friday.  By common sense, then, if you are monitoring a month's

25   worth of data you need a full entire week from that month in         04:09PM

1    order to monitor.

2         For that first 15- to 16-month period that plaintiffs

3    take issue with, on almost every single month, that knocked out

4    either the first, if you look at a calendar, either the first,

5    you know, row of a first week or a last week of the month                04:09PM

6    because there were only partial days and therefore not a

7    complete week of monitoring to do.

8         With respect to not including weeks with holidays in

9    it, again, that can come as no surprise that those weeks were

10   not being selected due to live time monitoring as well as we            04:10PM

11   have already spoken to the Court about this that there was not

12   programming staff on -- staff to provide programs during that

13   time.  But again, that goes to defendants' objection of waiting

14   until almost, well, waiting until the end practically to the 24

15   months to take issue with that.  That has been now resolved by          04:10PM

16   the Monitoring Guide.

17        But the bigger overarching issue here with objecting

18   to, in the first 15 months, either the second -- the first or

19   second week of the month being that which was monitored is

20   based upon plaintiffs' generalized distrust, concern over                04:10PM

21   whether or not during the other weeks of the month the

22   stipulation provisions were provided to the inmate population.

23   However, it is inequitable and prejudicial to defendants to

24   throw out that first 15 months of monitoring and reporting and

25   results where plaintiffs cannot prove that indeed their                  04:11PM

May 10, 2017 - Status Hearing Resumed

```
1    concerns as to whether or not provisions set forth by the

2    stipulation were provided and those other months not monitored

3    actually occurred.  Absent from this is any evidence such as if

4    that were occurring, you would assume and suspect that during

5    the monitoring tours the plaintiffs would have come forth with       04:11PM

6    declaration upon declaration of inmates saying, hey, look, they

7    only provide our services the first two weeks of the month and

8    they don't provide it at any other time.

9         Plaintiffs have taken tours over the last two years,

10   multiple times of the max custody locations and not during         04:12PM

11   those first two weeks and they have seen that the services are

12   provided.  Again, if during the tours while plaintiffs' counsel

13   are there and interviewing their clients and spending all day

14   most of the days in the units, as they do, going cell front

15   having conversations with your clients, you would expect that       04:12PM

16   during the last two years that the plaintiffs' counsel would

17   have come to this Court and said what we're hearing from our

18   inmate population is that we were here on week three and this

19   was just a staged show.  This never happens to us.  We never

20   get services the second and third week of each month.  And that     04:12PM

21   has not occurred.

22        Based upon the lack of evidence that this was some

23   sort of conspiracy to only monitor a month to provide good

24   results and not have to do it at any point during the rest of

25   the month is without proof and, therefore, is not appropriate       04:13PM
```

UNITED STATES DISTRICT COURT

— May 10, 2017 - Status Hearing Resumed —

1    and is, indeed, highly prejudicial and equitable to throw out

2    15 months of monitoring.

3           In addition to that, if there was a concern that this

4    was occurring, plaintiffs' counsel had the ability during any

5    tour that they were at to ask for monitoring sheets, the                04:13PM

6    out-of-cell tracking forms for the other weeks of the month.

7    Those were available.  Those have never been requested to be

8    reviewed.

9           So if there were concerns during this last two years

10   that that first 15 months was some sort of a ruse where ADC was         04:13PM

11   only providing services either during the first or second month

12   then that should have been addressed further, earlier, of

13   course, at the very outset.  But more importantly also that

14   there's no evidence to support their concern that somehow there

15   was a conspiracy to only provide services during one week.              04:13PM

16          While an additional issue is that while as I stated at

17   the beginning it is not appropriate for the plaintiffs to now

18   challenge the complex reporting for Eyman and Florence versus

19   breaking out by unit SMU 1 and Browning for Eyman and then also

20   breaking out Florence Central and Kasson for the Florence              04:14PM

21   complex, in addition to that never being addressed it shouldn't

22   be sufficient -- or it shouldn't be before the Court at this

23   point.  We would like to point out that the very first CGAR

24   that the plaintiffs ever received and during the last 24 months

25   it has always been reported just like all of the medical               04:14PM

—May 10, 2017 - Status Hearing Resumed—

1    performance measures by complex.  So if this were an issue that

2    they believed that we were acting contrary to the stipulation

3    or contrary to the protocols by reporting on a complex-wide

4    basis where the calculations from both the units go into place

5    that was something that at day one should have been addressed          04:15PM

6    and not now, two years later, such that the entirety of the

7    progress and the very good services and compliance of the

8    stipulation that has been provided is just wholesale cut out.

9         I would like to shortly address two other issues that

10   are briefed but to provide the Court with further explanation          04:15PM

11   are the issue that plaintiffs take with lack of sign-in sheets

12   for programming.  Specifically this impacts Performance Measure

13   8 for the most part.  It can also affect Performance Measure 6

14   with respect to DI-326 programs provided to the inmates.

15        Plaintiffs argue that if there is not a sign-in sheet,           04:16PM

16   which is the computerized generated list of who is to attend

17   the class and then a name next to the inmate showing his or her

18   signature that they attended or a refusal, that if that is not

19   present with respect to performance measures --

20        THE COURT:  Sorry for the interruption.                          04:16PM

21        MS. LOVE:  As to Performance Measures 6 and 8, the

22   lack of a sign-in sheet with a name next to it does not result

23   in automatic noncompliance.  The protocols that are attached as

24   Exhibit E to the stipulation provide for source records.  There

25   are lists of source records for all of the performance               04:17PM

— May 10, 2017 - Status Hearing Resumed —

1    measures.  There is no requirement in the protocols nor the

2    stipulation that the source records are the conjunctive of

3    "and" that to measure compliance, you have to have evidence per

4    every single one of these source documents to find that you are

5    compliant.                                                    04:17PM

6           Now, plaintiffs' position is that it is an "and";

7    defendants' position is that it is not, that any of these

8    source documents can show that an inmate, for instance, was in

9    a program whether it's DI-326 program for Performance Measure

10   6, or SMI program for Performance Measure 8.  Someone from the   04:17PM

11   outside reading this could go either way.  If you can go either

12   way, then it cannot go in plaintiffs' favor that this is a

13   conjunctive.

14          But more importantly, we have to look at this as

15   common sense.  The way that ADC, per the stipulation, tracks    04:18PM

16   whether an inmate is out of their cell for a program whether

17   it's Performance Measure 6 or Performance Measure 8, is looking

18   at an out-of-cell tracking form.  Is it documented that the

19   inmate left their cell.  An added measure to see if this is

20   really occurring versus some sort of conspiracy to fraudulently  04:18PM

21   make out-of-cell tracking forms for people is that you can also

22   cross-reference with a program activity schedule.  The reality

23   is that a program activity schedule is a schedule for a month

24   or more for each complex as to when their programs run.  But

25   that's a schedule just like in any situation where you may be    04:18PM

1    off.  So sometimes a program could be pushed off to later in

2    the day depending on what happens in the facility.  So you are

3    not necessarily always going to match time for time of

4    out-of-cell time for a program but you can still see that it

5    occurs on that day.  So that's an added check to make sure that        04:19PM

6    it occurred.

7            An additional way to check to see if an inmate went to

8    the program is a sign-in sheet, a sign-in sheet where in the

9    beginning, as things ramped up as to how to -- how we were

10   monitoring and how we were showing inmates are where we say          04:19PM

11   they are going to be, there could be sign-in sheets but there

12   may not be a name.  As we did the training, as the ADC and AG's

13   office got together and did the training of how do we show the

14   Court that the inmates are where they say they are, but it's

15   just another added check.  This is because there can also be          04:19PM

16   human error in not writing on an out-of-cell tracking form that

17   I took Inmate Smith out of the cell and he went to a program.

18   Well, that's why we have this double-check source document

19   because it may not show that he went to his program, yet if we

20   pull the program sheets there could be a sign-in sheet with an        04:20PM

21   inmate's name there.

22           So it is a double-check system versus having to have

23   both a sign-in sheet with an inmate name and out-of-cell

24   tracking form and a program activity schedule all matching each

25   other.  So it's defendants' position that in those situations         04:20PM

1    where we can show through documentation that the inmate was

2    where he said he was going to be through any of these source

3    documents that that is sufficient for compliance.

4              As to Performance Measure 8, as you will see in the

5    briefing, defendants went back and we checked what plaintiffs'            04:20PM

6    challenges were to Performance Measure 8, which is the one that

7    provides additional services to the seriously mentally ill max

8    custody inmates.  And we did our own audit based upon

9    plaintiffs' challenges of non-compliance.  You will see in our

10   papers that defendants acknowledged when we went back and we            04:21PM

11   couldn't re-create by the documentation and confirm that an

12   inmate through some manner of source documents was where we say

13   he was going to be, that it was needed to be acknowledged that

14   the percentages were not correct and not compliant and the

15   CGARs will be adjusted.                                                  04:21PM

16             But this does not necessarily mean that plaintiffs'

17   position that defendants are substantially non-compliant

18   wholesale across five different complexes such that there needs

19   to be some sort of remedial measure, it's just not -- it's not

20   accurate, and each one of these are broken out in defendants'           04:21PM

21   motion as to where we can show just by plain looking at the

22   documents and the exhibits as to where the inmates were showing

23   that we were compliant.

24             In closing, the relief that plaintiffs request is

25   notwithstanding the fact that defendants believe that a motion          04:22PM

1    to enforce is premature and should not be granted in this case,

2    the -- as you heard today, we're at the final level of the

3    Monitor Guide.  The Monitor Guide but for the approval which

4    Ms. Fettig and I are both, I believe, individually confident

5    that we're going to reach a resolution on the use-of-force        04:22PM

6    memo, every issue that has come up within the plaintiffs'

7    challenge to compliance has now been dealt with by the Monitor

8    Guide which, for the most part, I would say the majority -- and

9    I didn't write down the statistics -- were things that were by

10   the agreement of the parties, that the max custody team has       04:22PM

11   worked on both sides diligently and together to come up with

12   ways to monitor.  That doesn't mean that defendants were

13   non-compliant or violative of the stipulation to begin with,

14   but to work together and to address the concerns that

15   plaintiffs may not trust the data or there's easier ways to       04:23PM

16   show them the data.  And we have gotten there but for a few

17   orders by the Court and the Court helping us get to the same

18   place.

19          Plaintiffs also requested that an expert be appointed

20   to do some sort of assessment.  Again, this is not necessary      04:23PM

21   because the Monitoring Guide is just in the nth hour of being

22   put into place with some guidance from the authorities and the

23   Court.  The plaintiffs do request that expert be appointed to

24   do an assessment of what they see as a red flag as to refusals

25   for out of time for the inmates and refusals on the out-of-cell   04:23PM

1    tracking forms.  However, as briefed by defendants, this is

2    based upon nothing -- there's no empirical evidence to suggest

3    that ADC has some sort of refusal rate for max custody inmates

4    for time out of cell that's inordinate.  There's no empirical

5    evidence.  The few declarations, I believe there were seven          04:24PM

6    that were submitted by the Court, or submitted by plaintiffs

7    that were from plaintiff, seven out of anywhere from 2,000 to

8    3,000 max custody inmates at any one time over the last two

9    years were largely based upon personal choice as to why they

10   didn't want to go out of their cell.                                 04:24PM

11         The most important issue on requesting expert be

12   appointed to assess alleged skyrocketing or red flag refusals

13   is that the stipulation doesn't address refusals.  The

14   stipulation doesn't require defendants to affirmatively monitor

15   a refusal or assess refusals or study refusals.                      04:24PM

16         What must happen is that defendants offer what is to

17   be provided under the stipulation, offer the time out of cell,

18   offer the incentives under DI-326 and offer programs.  The

19   reality is in the prison environment you cannot force inmates

20   to go out of their cell or participate if they don't want to,       04:25PM

21   and the bottom line is that Mr. Pablo -- or Dr. Pablo Stuart

22   who submitted his declaration does not have empirical evidence

23   to make the comparisons that he makes to the community, to the

24   prison environment, and it's not appropriate for a motion to

25   enforce.                                                             04:25PM

1          As to all other categories, defendants rest on their

2   briefing.

3          THE COURT:  Thank you, Ms. Love.  Plaintiffs wish to

4   respond?

5          MS. FETTIG:  Yes, Your Honor.  This is Amy Fettig.          04:25PM

6          The first thing I want to address is the process

7   issues which we have outlined in our brief extensively and

8   responded to.  There is no question that we followed the

9   stipulation Paragraph 30 and 31.  We gave notice on all of the

10  issues, and I am happy to produce our July 7th notice of          04:26PM

11  non-compliance for the Court if you deem necessary.

12         Indeed, the actual motion to enforce is more narrow

13  than what was originally noticed.  And that is reflected also

14  in the mediation.  Now, I know the Court has specifically said

15  that it will not dive into the intricacies of mediation.  The    04:26PM

16  plain truth is that we went to mediation and Judge Bade

17  recorded in the mediation order what we could agree to.  The

18  vast majority, including the non-compliance from March 2015

19  through September 2016 defendants and plaintiffs could not

20  agree on it, and that is the very reason we went to a motion to  04:26PM

21  enforce.

22         The only expansion is we were able to get additional

23  documentation after the Court interceded that we could look at

24  more of the compliance findings.  And so rather just through

25  June of 2016 we reviewed through September of 2016 the data.     04:27PM

—— May 10, 2017 - Status Hearing Resumed ——

1    And that was for efficiency purposes.  Quite frankly, the

2    process issues and the non-compliance issues we identified were

3    exactly the same.  And that's really what's going on here.  We

4    have a deeply flawed process, deeply flawed documentation and

5    deeply flawed findings.                                    04:27PM

6         I will say also that in terms of the random process

7    problem, we identified that to the defendants.  They fixed it

8    in August 2016.  But that means all of the other findings were

9    not in a random process and we let them know as soon as we

10   realized the problems ourselves.  Defendants do not claim that  04:27PM

11   they indeed were not using a random, you know, they used a

12   non-random process contrary to the clear direction of the

13   stipulation.

14        Dr. Haney, in our recently filed declaration, has

15   underscored the importance of the random findings here.  We've  04:28PM

16   got 10 record draws per housing unit per month.  That's not a

17   lot.  It relies completely on the random nature of that

18   selection.  What we have in the performance measure is a

19   contamination through virtually the entire scope of the life of

20   the stipulation up until September or August 2016.  It was a   04:28PM

21   non-random process.

22        Now it is true that the one thing that plaintiff and

23   defendants agreed upon was that the monitoring week could start

24   on a Saturday.  But it has nothing to do with random selection

25   of weeks.  We had no discussions about that until we realized   04:28PM

— May 10, 2017 - Status Hearing Resumed —

1  that defendants were actually violating the terms of the

2  stipulation with regards to random selection.

3          The other thing I would say is that the Court is very

4  well aware of the long struggle we have had with the max

5  custody documentation.  It has taken literally years to get          04:29PM

6  some of this documentation.  And as we submitted to the Court

7  in Doc Number 2019, we still don't have all of that

8  documentation.  Indeed, Deputy Warden Hackney has submitted a

9  declaration with regard to sign-in sheets that some of them

10 simply don't exist.  And we would point out that the sign-in          04:29PM

11 sheets were always part of the protocol and the source

12 documents were not optional.  There's a reason why there was

13 more than one source document because we needed to help, you

14 know, ensure that this process would actually have some cross

15 checking available.  Simply looking at a tracking sheet is not       04:30PM

16 enough to determine compliance, and that was understood at the

17 very beginning of the stipulation as outlined in Exhibit E.

18 The documents were very, very clear.  They were always

19 required.

20          The unfortunate thing is they were clearly not            04:30PM

21 actually used very often.  And we have outlined that in our

22 brief where we tried to cross-check entries over and over again

23 and found that we were often unable to confirm participation in

24 certain programs.  So it's absolutely critical to have all the

25 source documents.  When we could cross-check them and maybe one     04:30PM

1    document was wrong and the other two were right, we gave the

2    defendants credit.  It's unclear to us whether or not the

3    monitors actually ever engaged in that exercise.  If they did

4    they would have found a great deal more non-compliance.

5        But the defendants have proffered repeatedly about how    04:30PM

6    the institutions are influx and things change, schedules

7    change, and we understand that.  That's why in Exhibit E of the

8    protocol for max custody we make sure that there was more than

9    one source document because we knew that things would change

10   and cross-checking would be absolutely necessary in order to    04:31PM

11   ensure the integrity of the monitoring finding.  So that is

12   certainly one issue that we're extremely concerned about, and

13   we have detailed that in our briefing.

14       In terms of weeks with holidays, that really has been

15   a non-issue.  It was never our understanding those would be    04:31PM

16   excluded from the weeks considered, that that was not clear to

17   us until we went back and realized that all these weeks were in

18   the first or second of the following month.  That was not

19   agreed to and if these defendants wanted to do that they needed

20   to reach out to us and let us know rather than engaging in a    04:32PM

21   non-random process for such a long period of time.

22       I would also like to point out that with regards to

23   maximum custody Performance Measure Number 8, that is the

24   provision for the seriously mentally ill.  Now, we have found a

25   great deal of non-compliance, and as Ms. Love said, the    04:32PM

—May 10, 2017 - Status Hearing Resumed—

1    defendants have admitted to some.  But they also in their

2    response to our motion to enforce produced previously unseen

3    documents right after we actually filed the motion and then the

4    same day, the same day that they filed their response we got

5    documents that we had never seen before.  Now we addressed this    04:32PM

6    in the brief, these 11th hour production of documents.  We have

7    no idea whether the monitors ever looked at them.  It seems

8    highly unlikely given that they were not part of the max

9    custody notebooks.  We have noted these documents in our

10   response to each of defendants' claims that they were actually    04:33PM

11   compliant when we found non-compliance.

12          In the Onka declaration, the second one, Exhibit 4, we

13   go through case by case and refute all of the defendants'

14   claims that they were actually compliant.

15          Finally, in terms of relief, we stand on the relief    04:33PM

16   that we need.  We are happy that we're almost close to

17   finalizing the Monitoring Guide.  We are hopeful that it will

18   actually lead to more credible and reliable monitoring

19   findings.  However, this is completely untested, and that's why

20   we believe we need to reboot here.  It's quite clear from the    04:34PM

21   documentation, from the processes, that what went before was

22   just simply not adequate and didn't follow the requirements of

23   the stipulation.  So that's why we want the new Monitoring

24   Guide, the new more assertive processes to have a chance to

25   really take so that we can rely on the findings that the    04:34PM

1    monitors have given us with regard to max custody.

2         And in terms of the refusals and our request that an

3    outside expert help defendants, when we submitted Dr. Stuart's

4    expert testimony defendants had not rebutted it.  So there is a

5    presumption for that testimony.  And indeed, what Dr. Stuart          04:34PM

6    talks about is something he knows extremely well as a seasoned

7    court expert and decades of experience.  And that is an issue

8    of adherence to treatment.  We were finding 80, 90 percent

9    refusal rate especially with mentally ill.  What Dr. Stuart

10   tells us with great authority, this is expected with the most        04:35PM

11   acute of patients.  They often times don't adhere to treatment

12   and it is the responsibility of the clinician to take action to

13   understand why those refusals are happening.  And that is the

14   most disturbing thing in all of our interchanges with

15   defendants regarding refusals.                                        04:35PM

16        Now, they say there's not anything about refusals in

17   the stipulation and that is true.  But the fact remains that

18   the program is not working because there's such high refusal

19   rates.  So the instinct should be figure out why it's not

20   working, what's going wrong, and seize the responsibility and        04:35PM

21   duty especially with the seriously mentally ill that action be

22   taken.  And because there's been absolutely no action and, in

23   fact, gross indifference that's why we believe that the

24   defendants need some outside assistance to really take a look

25   at this.  It's very alarming that their own clinicians never         04:35PM

1    red flagged it.  Indeed, as Jennifer Onka testified in her

2    second declaration in our response brief we have found

3    absolutely no evidence any ADC official, whether custody or

4    mental health staff or health care staff has ever noted any

5    refusals or taken any action in any of the documentation that      04:36PM

6    we have received.  And that's despite the fact that we have 50,

7    60, 70, 80, 90 percent refusals across the board in most of the

8    facilities.

9           So that's our grave concern.  We urge the Court to

10   take action to protect the interests of the subclass and to      04:36PM

11   grant our motion.

12          THE COURT:  Thank you very much.  I will take the

13   matter under advisement and get a ruling to you straight away

14   or let you know if there's anything additional I need to know.

15          The final matters that I think we need to address are      04:36PM

16   to let you know that I would ask that preparatory to the

17   meeting on June 14th, Flag Day, that if there are issues that

18   you want the Court to address that you communicate them as you

19   have in the past.  I know already on the docket will be

20   consideration of the special master notice that I provided and      04:37PM

21   the briefing will be completed by that point.

22          I should add that I have entertained an additional

23   thought since the last time that we have talked about this, and

24   it was prompted in great part by the testimony today regarding

25   the inability to fill the FTE positions and the concern that I      04:37PM

1    have that it may simply be that insufficient wages are being

2    paid for these positions.  And so I would be considering also

3    the possibility of a court-appointed expert to let me know what

4    the market price is that would be necessary to accomplish the

5    FTEs that are these positions that are wanting, that are to be          04:38PM

6    filled under the contract but apparently are not being filled.

7         Then in addition, with respect to the providing of the

8    CGAR data that I have said is very much appreciated, I think

9    the best way for that to come over to the Court is for you all

10   to file it under seal.  That way it's a part of the record.          04:38PM

11        And speaking of the record, because I'm unaware

12   whether these staffing materials that were presented today and

13   so moving me are in the record previously and because they were

14   provided, I think, as demonstrative exhibits consistent with

15   the method that we had undertaken to preserve the          04:38PM

16   confidentiality of the protective order matters in the case, I

17   will cause those two documents to be made a part of the record

18   in the case docket.

19        Turning to July, we presently are scheduled for, I

20   think, July 12.  That is in the custom of our Wednesday          04:39PM

21   meeting.  But I wonder if in that particular week, counsel

22   would find that it would be possible to move it from Wednesday

23   to Friday and to make it for the 14th of July.

24        MR. FATHI:  This is David Fathi.  No objection here,

25   Your Honor.          04:39PM

884

1          MS. KENDRICK:  That's fine.

2          THE COURT:  Mr. Bojanowski is checking not his palm

3    pilot I'm sure.

4          MR. BOJANOWSKI:  If I can work this thing . . .

5          THE COURT:  You're just doing that to make me feel          04:40PM

6    better.

7          MR. BOJANOWSKI:  I think it's okay, Your Honor.  But I

8    may have a -- I may be on vacation that day and I have got the

9    following week marked out but I could have swore that I was

10   leaving the week before on a Thursday, and it's not showing          04:41PM

11   that.  So to be honest with you, I can't say for sure.  But

12   since there are other people in the firm that can certainly sit

13   in this chair, I would say that --

14         THE COURT:  Okay.  Thank you very much.

15         MR. BOJANOWSKI:  Let's go forward and I'll get          04:41PM

16   somebody to cover.

17         THE COURT:  So we'll move July to the 14th at 9 a.m.

18   then.

19         Anything further from anyone?

20         MS. KENDRICK:  You said you were moving two items into          04:41PM

21   the evidence, the staffing report and what was the second

22   document?

23         THE COURT:  When you presented the staffing report you

24   also presented the contract with the addenda, and those were

25   the two that I thought that I would include.          04:41PM

—— May 10, 2017 - Status Hearing Resumed ——

1          MR. BOJANOWSKI:  Are those being filed under seal?

2          MS. KENDRICK:  The contract with the amendments is on

3   the State of Arizona's website.

4          MR. BOJANOWSKI:  All right.

5          THE COURT:  And the other is the staffing report.          04:42PM

6          MS. KENDRICK:  It's just numbers.

7          MR. BOJANOWSKI:  No problem, Your Honor.

8          THE COURT:  Okay.

9          MR. BOJANOWSKI:  I just wasn't sure whether that was a

10  trade secret thing.          04:42PM

11          THE COURT:  Anything further?

12          MR. BOJANOWSKI:  Nothing further, Your Honor.

13          THE COURT:  Thank you.  I really appreciate your

14  attention over these hours today.  It's been very helpful.

15          MR. FATHI:  Thank you, Your Honor.          04:42PM

16          MS. FETTIG:  Thank you, Your Honor.

17          (Proceeding concluded at 4:42 p.m.)

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1

2

3

4                  C E R T I F I C A T E

5

6          I, LAURIE A. ADAMS, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 22nd day of May, 2017.

15

16                           s/Laurie A. Adams

17                           _____
                             Laurie A. Adams, RMR, CRR

18

19

20

21

22

23

24

25