Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen*
*Swartz, Sonia Rodriguez, Christina Verduzco,*
*Jackie Thomas, Jeremy Smith, Robert Gamez,*
*Maryanne Chisholm, Desiree Licci, Joseph*
*Hefner, Joshua Polson, and Charlotte Wells, on*
*behalf of themselves and all others similarly*
*situated*

**[ADDITIONAL COUNSEL LISTED ON**
**SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
        adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability*
*Law*

**[ADDITIONAL COUNSEL LISTED ON**
**SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-DKD <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' STATEMENT REGARDING EVIDENTIARY HEARINGS ON MONITORING (DOC. 2046)** |

**INTRODUCTION**

Over the course of five hearings spread over a two month period, Defendants had every opportunity to present evidence to the Court about their monitoring methodology. Prior to the first hearing on March 8, 2017, they notified the Court and Plaintiffs of the nine witnesses they planned to call regarding the topics and questions identified by the Court (Doc. 1915) and Plaintiffs (Doc. 1931).   [*See* Declaration of Corene Kendrick ("Kendrick Decl."), filed herewith, Ex. 1 at 1-2]

Now, in an audacious display of temerity, Defendants fault **the Court and Plaintiffs' counsel** for not asking witnesses certain questions, though Defendants had attorneys in the courtroom the entire time who were fully capable of asking questions on direct or redirect, but inexplicably failed to do so.  [*See, e.g.*, Doc. 2068 at 8[1] ("Plaintiffs did not inquire of all of the monitors who testified whether and how they randomize source documents. . ." and "neither Plaintiffs nor the Court asked Ms. Barlund what she meant by 'more haphazard'. . .");[2] *id.* at 11 ("Plaintiffs, did not, however, inquire into the methodology Mr. Dye used in subsequent months. . ."); *id.* at 12 ("If Plaintiffs had inquired about the monitoring methodology employed in later months for the mental health performance measures. . ."); *id.* at 19 ("Plaintiffs did not ask Kathy Campbell about her interactions with Corizon. . .")]

For example, Defendants represented to the Court on March 7, 2017 that Defendant Pratt "will testify regarding training and instructions provided to healthcare monitors regarding monitoring methodology; qualifications for healthcare monitor positions; and how the nurse line and provider line dashboards are created and compiled."  [Kendrick Decl., Ex. 1 at 2]  Yet when it came time for Mr. Pratt to testify on April 17, 2017, defense counsel did not ask a single question of him, and asserted he never planned to call

---

[1]  All citations to the case docket are to the page number assigned by the Court's Electronic Case Filing system, and not to the pages therein.

[2]  Defense counsel did not ask Ms. Barlund any redirect questions.  [4/17/17 Tr. at 622:7]

him as a witness.  [*See* 4/17/17 Tr. at 622:14-22 ("MR. BOJANOWSKI: Your Honor, this is not a witness that we intended to ask any questions of and produced pursuant to plaintiff's request.")]  Mr. Pratt's testimony concluded on May 10, 2017, more than ***two months*** after Defendants first told the Court he would testify on these topics, and after Defendants had had time to review the transcript of the April 17, 2017 hearing, as well as Plaintiffs' statement on the evidentiary hearings.  [Doc. 2046]  Defense counsel still failed to ask Mr. Pratt a single question in redirect.  [5/10/17 Tr. at 771:22-23][3]

Defendants ***never once*** tried to present a witness or piece of evidence that was rejected by the Court.  Defense counsel's baffling failure to prepare, present witnesses or evidence, ask clarifying questions of their witnesses on direct or redirect, or request to recall witnesses, is not the fault of the Court or Plaintiffs' counsel.  If Defendants felt Plaintiffs' or the Court's questions were unfair or incomplete, their passel of attorneys in the courtroom had every chance to clarify the testimony.[4]

---

[3] Defendants apparently had time to review the first page of the Statement that detailed their contumacious behavior towards the Court's past orders, (Doc. 2046 at 3), to the extent that at the May 10, 2017 hearing Mr. Pratt suddenly disavowed the "Notice of Compliance with the Stipulation and Termination of Monitoring Pursuant to Paragraph 10(b)" (Doc. 2040), filed six days earlier, which informed the Court that Defendants had unilaterally ceased monitoring more than 500 performance measures. [*Compare* Doc. 2040 at 11 (declaring that "[p]ursuant to Paragraph 10(b) of the Stipulation, ***Defendants' duty to measure and report on the foregoing HC PMs has terminated***, and ***Defendants will cease monitoring and reporting them***") (emphasis added) *with* 5/10/17 Tr. at 770:9-15 ("Q. It says at Page 11, Line 19, 'Pursuant to Paragraph 10b of the stipulation, defendants' duty to measure and report on the foregoing health care performance measures have terminated and defendants will cease monitoring and reporting them.'  Are you aware that this was filed with the Court stating this?  A. No. That just doesn't sound right."); *see also id.* at 691:17-692:11; 769:23-771:13; 772:14-773:3]

[4] Defendants assert the reason their witnesses were not forthcoming, or some falsely testified they do not know causes of noncompliance, was because Plaintiffs' counsel was intimidating and that the Court did not control the conduct of the hearings. [*See* Doc. 2068 at 18 ("If the evidentiary hearings had been conducted as the Court originally envisioned as an informal, educational process, it is far more likely that the monitors would have been comfortable sharing their impressions with respect to potential causes of non-compliance for the measures they monitor and any suggestions they may have for improvement.  Instead of cultivating a collaborative environment in which the monitors—many of whom are unaccustomed to appearing in court—could have freely contributed their knowledge, Plaintiffs' counsel subjected them to vigorous cross examination and impeachment and questioned their competency and ethics.  It should come as no surprise, then, that many of the monitors were not comfortable expressing

1    Defendants complain that "[Plaintiffs] sought testimony from only a small
2    proportion of the ADC monitors."  [Doc. 2068 at 8]  This statement ignores that Plaintiffs
3    sought additional witnesses beyond those identified in Defendants' March 7, 2017
4    submission to the Court and Plaintiffs (Kendrick Decl., Ex. 1), and Defendants objected.
5    The Court ordered four of Plaintiffs' requested witnesses to appear, but denied Plaintiffs'
6    request for a witness knowledgeable of Corizon's IT reporting capabilities, until it had an
7    opportunity to review the testimony of Defendant Pratt (apparently because counsel for
8    Defendants represented he would testify on this topic).  [*See* Doc. 1976]

9    Yet Defendants now protest:

> 10    Plaintiffs did not seek testimony from Dr. Chu, who monitors
> Smallwood Dental's performance on the dental performance
> 11    measures, or Vanessa Headstream, who supervises a group of
> site monitors and is responsible for monitoring some of the
> 12    medical performance measures, both of whom regularly
> engage in dialogue with the relevant players regarding
> 13    compliance issues and ideas for improvement.  (Exhibit 1:
> Campbell Decl. at ¶ 15.)  Plaintiffs also did not seek testimony
> 14    from most of the site level monitors, many of whom have
> face-to-face out-briefings with the Corizon site-level
> 15    leadership to discuss their findings each month.

16    [Doc. 2068 at 19 (internal citations omitted)]

17    If Defendants now are offering to make available Dr. Chu, Ms. Headstream, and all
18    of the remaining site-level monitors for testimony about how they audit compliance with
19    the Stipulation, Plaintiffs are more than happy to accept.

20
21    **I.    Defendant Pratt's May 10, 2017 Testimony Confirms That Defendants'**
         **Monitoring System is Irremediably Broken.**

22    As noted in their Statement, Plaintiffs believe the hearings led to "the inescapable
23    conclusion that Defendants are incapable of and unwilling to accurately and reliably
24    monitor Corizon's compliance with the Performance Measures."  [Doc. 2046 at 4]
25
26

their ideas during the hearings.")]  To the extent Plaintiffs will dignify this with a
27    response, it is to note the argument is completely meritless, not to mention disrespectful of
both the Court and Plaintiffs' counsel.
28

Additional testimony of Defendant Pratt on May 10, 2017 (after Plaintiffs submitted their Statement) only reinforces that conclusion.

Defendant Pratt repeatedly confirmed Defendants' position that they are substantially compliant with the Stipulation for many performance measures at various institutions, despite Defendants' failure to recalculate any of the performance measures using the Court-ordered or agreed-upon methodology. [*See* 5/10/17 Tr. at 697:17-25 and 768:20-24 (counting "N/A" entries as compliant); 723:16-19 (all mental health PMs other than PM 92 for which Defendants counted group counseling as compliant encounters); 724:5-8 (all mental health PMs for which Defendants counted cell front encounters as compliant); 725:8-11 (all mental health PMs for which Defendants did not review the last two encounters to measure "every X days"); *see also id*. at 706:10-15 (PM 16); 694:22-25 (PM 27); 699:11-22 (PM 35); 700:11-24 (PM 44); 702:21-23 (PM 48); 702:24-703:3 (PM 49); 705:17-20 (PM 61); 706:21-25, 707:18-21 (PM 66); 707:22-708:2 (PM 67); 708:12-14 (PM 89); 708:15-20 (PM 93); 708:21-709:4 (PM 94); 709:5-13 (PM 95); 728:16-729:3 (PMs 100 and 101)] He also confirmed that no performance measures had been recalculated pursuant to the Court's orders or the parties' agreements other than certain mental health measures at ASPC-Winslow. [*Id*. at 769:16-22]

Defendant Pratt also expressed befuddlement and had no explanation why three facility health administrators at three different institutions told their health care staff in February 2017 that ADC would no longer be monitoring them for a variety of performance measures, starting with the March CGARs.[5]  [*See id*. at 728:10-729:6; 729:13-16;  730:6-731:5;  731:12-732:25;  734:13-16;  *see* Kendrick Decl., Ex. 2 at

---

[5]  Defendants assert that statements made by Corizon employees "have not been adopted by, and cannot be attributed to, Defendants." [Doc. 2068 at 4] But Corizon's employees' statements are attributable to ADC.  *See* Fed. R. Evid. 801(d)(2)(D) (a statement is not hearsay if it is "made by the party's agent or employee on a matter within the scope of that relationship and while it existed"); *see also Hoptowit v. Ray*, 682 F.2d 1237, 1262 (9th Cir. 1982), *abrogated on other grounds, Sandin v. Conner*, 515 U.S. 472 (1995) (report by agent of correctional department admissible); *Braggs v. Dunn*, No. 2:14CV601-MHT, 2017 WL 426875, at *3 (M.D. Ala. Jan. 31, 2017) (statements by Corizon employees "about the mental-health needs of prisoners are acting in the regular course of their own business" and are attributable to Alabama Department of Corrections).

1   ADCM840264-65 (Florence); Ex. 3 at ADCM840243 (Douglas); Ex. 4 at ADCM840338

2   (Yuma)]  He also testified he would not "specifically" want to know if Corizon staff were

3   under the impression that monitoring would be terminated.  [5/10/17 Tr. at 733:15-17]

4        Defendant Pratt agreed that the Court's order to utilize outside providers

5   (Doc. 1754) is not limited solely to prisoners whose files are reviewed for the CGARs, but

6   instead applies to all prisoners.  [*Id*. at 741:5-11]  Despite the breadth of the Court's order,

7   ADC does not monitor if all prisoners are seen within timeframes, and instead solely

8   relies upon CGAR results from ten files per yard to determine compliance with the

9   Court's order.  [*Id*. at 741:12-20; 742:20-743:16; 744:21-23]  Mr. Pratt testified that there

10  has not been a single occasion in which a prisoner was taken out of the prison to a

11  community provider to comply with the order.  [*Id*. at 741:24-742:4]  He confirmed he is

12  not overseeing any changes in policy or process that may have been put into place in order

13  to comply with the Court's order.  [*Id*. at 742:15-21; 743:1-6]  After hearing this

14  testimony, the Court reiterated to Defendants that

> One of the things that I have been interested in hearing about is what kind of monitoring is going on to see whether or not there are individuals that are falling below the performance measure irrespective of whether or not that's going to be resulting in a failure to comply with the benchmark.  And I have heard that it seems that it's not ironclad.
>
> I think one of the things that I would expect the defendants to do when I have said you need to turn to community resources, that you would be having a much closer handle on whether or not the measures that you were taking were going to expose you to what I had said would be the next step, and that is, saying we're going to ramp it up.  85 percent isn't enough because we're not getting a compliance at the benchmark, so I will say every single one of the people will have to be seen within 14 days.  And that means that you either do it in-house or you do it at an outside provider.  There's no margin of error because you previously were told that you had to ramp it up and the results in the new CGARs don't show that you have done that.
>
> And so it would seem to me that in the first instance what you would want to do is ***you would want to make sure that you had the handle an every single one of the potential people who would demonstrate a failure to comply with that performance measure***.  And I don't know whether you have a good sense of how complete that is now.  As I say, it doesn't

-5-

seem ironclad to me.  I would expect it to be necessarily ironclad.  And maybe one of the things, potentially, that I would do is require you to inform the plaintiffs' counsel and the Court about all of the people who are within coming with, as you described, the cusp that they are getting within their 13 days and they haven't been seen.  I want the names of those people so that I can ask on day 15, were they seen, and get a handle on it that way.

[*Id*. at 752:11-753:19 (emphasis added)]  The Court should order Defendants to provide information that shows across the board how Defendants are complying with its outside provider order, and not just the ten files randomly selected for the CGARs.

## II.   Defendants' Response Consists Largely of Statements of Counsel Unsupported by Any Evidence

Plaintiffs' Statement exhaustively set out the five broad categories of concerns and problems that came to light in the hearings, supported by the expert declaration of Dr. Craig Haney, J.D., Ph.D., articulating specific problems with the methodology described by the witnesses.  [*See generally* Docs. 2046, 2048]  But the vast majority of the factual assertions in Defendants' Response are statements of counsel unsupported by any testimony, declarations, or other evidence.  *See Barcamerica Int'l USA Trust v. Tyfield Importers, Inc*., 289 F.3d 589, 593 n.4 (9th Cir. 2002) ("the arguments and statements of counsel are not evidence").  Defendants also fail to discuss or contest much of the evidence presented by Plaintiffs.

### A.   Unreliable Randomization of Source Documents

Plaintiffs set out the testimony of Mr. Owens, whose job duties include randomizing source documents, as well as the testimony of other witnesses, about whether and how source documents are randomized.  [*See* Doc. 2046 at 6-12]  Defendants argue it is not necessary for Mr. Owens to know anything about Microsoft Excel or statistics, because "a quick Google search reveals there are numerous online tutorials on the Excel RAND function that anyone, including Mr. Owens, could use to learn the function." [Doc. 2068 at 6]  While it is quite true that there is a plethora of tutorials available, Mr. Owens never testified that he has ever availed himself of such tutorials, nor do

Defendants include a sworn declaration from Mr. Owens stating that he had done so prior to the March 8, 2017 hearing.  Plaintiffs certainly hope that since the hearing, Mr. Owens, and any other ADC staff responsible for randomizing source data, have in fact educated themselves on the process, including how to properly save random numbers as values prior to sorting them.  [*See* Doc. 2046 at 8-9][6]

Defendants argue that "none of the three attorneys who questioned Mr. Owens or the Court actually asked him" specifically if he saved the random numbers as values prior to sorting them from smallest to largest.  [Doc. 2068 at 7]  One of those three attorneys was defense counsel.  *See supra* pages 1-2.  Given this is a critical middle step in the process, which should be done **after** assigning the random numbers, and **prior** to sorting the list, his failure to describe this step, when he was asked on several separate occasions to describe the entire process of what he does, leads to the reasonable and logical conclusion that he fails to perform that step.  "I assign each inmate a random number and then I click randomize and I click sort and it randomizes it. [. . .] I do not know what's done with it after that."  [3/8/17 Tr. at 69:18-23; *see also* 3/8/17 Tr. at 68:14-25; 71:18-72:1; 90:8-13]

Defendants quote the Court's response to a line of questioning of Mr. Owens regarding his training in Excel, in which the Court said that currently it was not concerned about "whether or not the randomization of pushing the right buttons on Excel works or not. I don't think you need any training to do that," as somehow constituting a ringing endorsement of Mr. Owens' competence.  [Doc. 2068 at 6, quoting 3/8/17 Tr. at 85:8-11]  Defendants fail to acknowledge that this was said **before** the Court heard subsequent testimony from a different monitor that called into question whether Mr. Owens was indeed "pushing the right buttons," where the Court observed "the witness that was

_____

[6] Defendants provide a long narrative without citation that is generally correct describing how to properly randomize information using Microsoft Excel's functions. [Doc. 2068 at 7-8]  But that is irrelevant to the question whether their past attempts at randomization resulted in truly random samples, as Mr. Owens did not describe this long process in his testimony, either on direct or cross examination.

proffered with respect to who has responsibility for randomization doesn't seem to have an understanding of the basic mechanism that he uses with Excel." [4/17/17 Tr. at 671:19-22] Defendants contend that Plaintiffs' expert, Dr. Haney, did not explicitly state that Mr. Owens is randomizing incorrectly (Doc. 2068 at 6); however, Mr. Owens' testimony showed clearly that he did not understand why the random numbers should be listed from smallest to largest to show that the table of entries had been randomly sorted. [*See* Doc. 2048 ¶ 10 ("Omission of any of these steps will result in a sample that is not random")][7]

Finally, Defendants fault Plaintiffs' counsel for not asking Defendants' witness Ms. Barlund how source documents were randomized prior to Mr. Owens doing it. [Doc. 2068 at 8] To the extent they offer the *post hoc* declaration of Ms. Campbell ostensibly describing the process, her explanation as to how files were selected actually raises more concerns, because it describes a non-random sample. [Doc. 2068-1 ¶ 19 ("For example, in a given month, the monitors would be instructed to locate the first inmate number on the list ending in an odd number as the starting point and then to select every 10th record until ten records had been selected. The next month, the monitors would be instructed to locate the first inmate number on the list ending an in [sic] even number as the starting point and then to select every 10th record until ten records had been selected. In the next month, the monitors would be instructed to select every 20[th] record.")]

Dr. Haney reviewed this declaration, and observed that "[a]lthough Ms. Campbell refers to this process as "randomizing" the source documents (¶ 18), this is in fact not a random process, and will not yield a sample that is representative of the larger population

---

[7] Defendants insinuate that they do not have to randomize source documents pursuant to the Stipulation. [Doc. 2068 at 6] But, as Dr. Haney explains, "if the purpose of the sample is to allow the parties and the Court to draw general conclusions about the treatment received by the larger prisoner population based upon the treatment received by those in the smaller sample, then the sample itself must be generated using a random selection process, for the reasons I explained in my earlier declaration." Declaration of Craig Haney, J.D., Ph.D., filed herewith ("Haney Decl."), ¶ 2.

from which the sample is drawn." [Declaration of Craig Haney, Ph.D., J.D. ("Haney Decl.") ¶ 3] Dr. Haney explains:

> If one is selecting every 10th record that appears on a list, and does so until ten records have been selected, then only the first 100 or so records on the list have *any* chance of being included in the sample. For example, if the list consists of, say, 200 records, then the last 100 records would have no chance of being included in the sample; if the list consists of 300 records, the last 200 records have no chance of being included in the sample; and so on. Moreover, depending on how the list is organized, selecting every 10th record (rather than a truly random sample) might inadvertently introduce systematic bias into the sample. For example, if the list is organized by ADC number, from lowest to highest, the prisoners toward the beginning of the list, with lower ADC numbers, are likely to be older on average than those toward the end, with higher ADC numbers. Thus, a sample drawn in the way described by Ms. Campbell would be expected to over-represent older prisoners compared to their representation in the population from which the sample is drawn. Likewise, if the list was organized by date (i.e. date of request, renewal, or encounter), then the sample drawn the way Ms. Campbell describes would skew toward those individuals seen earlier in the month. The point is that there are often implicit and non-obvious patterns or periodicities that are built into the way that a list is organized, so that taking every Nth entry inadvertently intersects with those patterns to compromise the randomness of the sample. The use of a random number generator to produce genuinely random number sequences safeguards against that problem.

[*Id.* ¶ 5]

## B.   Source Documents

Defendants do not address the concerns raised by their witnesses' testimony nor the exhaustive recitation in Plaintiffs' Statement regarding what source documents are being used by the monitors, and/or the incomplete information or errors in source documents that are not addressed by the monitors. [Doc. 2046 at 12-21] Defendants offer a straw man argument that "[d]espite the Court's concern that Corizon has an incentive to remove non-compliant charts from logs before providing them to the ADC monitors, there has been absolutely no evidence that this is occurring." [Doc. 2068 at 9] Plaintiffs have not alleged that someone at Corizon is deliberately going through and pulling out these files. However, there are significant questions about how Corizon staff are putting together the

source documents, which is why Plaintiffs requested that Defendants produce a witness or witnesses from Corizon who was most knowledgeable about Corizon's reporting processes, how information is collected, and how it is provided to Defendants' monitoring bureau.   The Court denied Plaintiffs' request based upon Defendants' representation during the emergency telephonic conference with the Court on March 16, 2017 that Defendant Pratt would testify to this topic, but then Defendants presented no testimony from him about it.  [*See supra* pages 1-2; Doc. 1976]

Moreover, Defendants argue that the fact that Plaintiffs agreed to the source documents listed in the Stipulation forecloses Plaintiffs' right to ask about the accuracy, completeness, or integrity of those documents.   [Doc. 2068 at 10]   This argument is absurd, as Plaintiffs' counsel have every right to test and verify the integrity of the source documents as part of their obligation to monitor compliance, and have a duty to insist that accurate and complete source documents are used in the monitoring process.

## C.   Defendants' Idiosyncratic, Inconsistent, and Impermissible Methodology

At the outset, Defendants contend that they "voluntarily created a Monitor Guide" to standardize the monitoring among their staff at the ten institutions.  [Doc. 2068 at 10]  Characterizing this act as "voluntary" elides the reality that the Monitor Guide was created at the insistence of Plaintiffs after a December 2015 meet and confer, its creation was endorsed and encouraged by Magistrate Judge Buttrick in March 2016 when mediating the October 2015 Notice of Noncompliance (Doc. 1561-2 at 3-20) regarding Defendants' broken monitoring system, and its finalization has been supervised and directed by this Court in numerous subsequent orders.  [*See* Doc. 1625 at 6 for a summary of the history of Plaintiffs raising concerns with methodology prior to filing their enforcement motion; *see, e.g.*, Docs. 1673, 1745, 1754, 1831, 1833, 1895, 1907, 1915, 1933, 1951]  Defendants' repeated insistence that this Guide is being done "voluntarily" implies that they believe they can abandon or walk away from it any time.  The Court should disabuse them of any such belief.

Regardless, Defendants' contentions in response to Plaintiffs' detailed recitation of how improper or idiosyncratic methodology leads to unreliable results (Doc. 2046 at 21-31) are without merit.

**1. Failure to comply with the Court's order regarding Performance Measures requiring action "every X days" (PM 73, 77, 80, 81, 82, 83, 84, 87, 88, 89, 90, 92) (Doc. 2046 at 39-41).**

Defendants do not dispute that their monitoring methodology for measures requiring that an action occur "every X days" was noncompliant with the Court's order that "the monitor must look back two visits" (Doc. 1833 at 1), up to and including the December 2016 CGARs. But they assert that everything changed after production of the December 2016 CGARs, and that their methodology is now compliant with the Court's order, claiming "Plaintiffs did not … inquire into the methodology Mr. Dye used in subsequent months." [Doc. 2068 at 11:18-20] This is false. Plaintiffs specifically asked Mr. Dye about the January and February 2017 CGARs, and he clearly testified that the samples for these measures continue to include cases that cannot possibly be found noncompliant:

> Q. Okay. Well, again, Mr. Dye, we can go through all of them but I'm trying to move things along. So I'd like to know if it is the case for every mental health performance measure that requires something to happen every X days. As of December of 2016, your samples were including cases that could not possibly be found non-compliant?
>
> A. Yeah. That's true.
>
> Q. *And as I understand your testimony, even under the new methodology that was adopted in January or February for all of these performance measures, your samples may still include cases that could not possibly be found non-compliant because the person only recently became a 3A or 3B or whatever?*
>
> A. *Right. Now, that's true.*

[4/17/17 Tr. at 470:6-18 (emphasis added)]

Mr. Dye further testified that in 2017 he continues to find cases compliant without looking at the last two contacts, as required by both the Court's order and Defendants' own Monitor Guide:

Q. So you are saying that the February 2017 sample may also include files that cannot possibly be found non-compliant?

A. Well, yeah, *if they are just designated a 3A there would be no reason to look back before that to see if a treatment plan was done. We go by when they were made a 3A, have they been compliant since then.*

[*Id.* at 456:18-23 (emphasis added); *see also* 5/10/17 Tr. at 725:1-7 (Defendant Pratt endorsing this methodology)]

Review of the February and March 2017 CGARs confirms that ADC monitors continue to disregard the Court's order that "the monitor must look back two visits." [Doc. 1833 at 1]  The monitors continue to count records as compliant without measuring the interval between the last two contacts.  [*See* Declaration of Ada Lin ("Lin Decl.") ¶¶ 3-11 and Ex. 1-9 (citing numerous examples)]  Indeed, the monitors continue to count records as compliant *even if there is only a single contact in the entire record.*  [*Id.*]  The Court should immediately take steps to halt Defendants' ongoing disregard of its order on these performance measures.

**2. Continuing to count group contacts for the requirement that a patient be "seen" (PM 73, 74, 76, 80, 81, 82, 83, 84, 85, 86, 88, 90, 91, 94, 95) in violation of the Court's order (Doc. 2046 at 38).**

Defendants admit that they counted group mental health contacts for several months after the Court's September 6, 2016 ruling that they could not; they apparently believe they were free to disregard the Court's order because they had filed a motion for reconsideration.  [Doc. 2068 at 11-12]  They are wrong.  *See Fairbaugh v. Life Ins. Co. of N. Am.*, 872 F. Supp. 2d 174, 181 (D. Conn. 2012) ("[The defendant's] obligation to comply is not excused by the filing of the motions for reconsideration of the order....") (internal quotation marks, citation omitted); *Creative Solutions Group, Inc. v. Pentzer Corp.*, 199 F.R.D. 443, 444 (D. Mass. 2001) (finding that the obligation to comply with an order is not excused by the filing of a motion for reconsideration, noting that a separate motion for stay should be filed, but adding that merely moving for a stay does not effectuate a stay unless and until the stay is granted).  Moreover, Defendants

1    conspicuously fail to assert that they stopped counting groups even after the Court denied

2    their reconsideration motion on February 1, 2017.  [Doc. 1907]

3

4    **3. Continuing to count cellfront contacts as satisfying the requirement that a patient be "seen" (PM 73, 74, 76, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 94, 95) in violation of the Court's order (Doc. 2046 at 38-39).**

5

6    Defendants admit that they counted cellfront contacts as recently as the December

7    2016 CGARs, prepared well after the Court's November 8, 2016 order (Doc. 1745 at 1)

8    ruling that they could not do so.[8]  Their only defense is that Plaintiffs have not proven

9    they did it often enough to make the difference between compliance or noncompliance—

10   as if that excuses the use of a methodology that violates the Court's order.  [*See* Doc. 2068

11   at 4 n.3]  Moreover, as with counting group contacts, Defendants make no claim that they

12   have ceased this practice since the December 2016 CGARs were prepared.

13   **4. Performance Measures 92 and 93 (Doc. 2046 at 25-26)**

14   Defendants entirely fail to respond to Plaintiffs' demonstration that Defendants are

15   violating the Stipulation's requirement that the records evaluated for PM 92 also be

16   evaluated for PM 93 (*see* Doc. 2046 at 25).  The Court should order Defendants to comply

17   with this requirement.

18   As for Defendants' unilateral decision to cease monitoring PM 92 and 93 at Tucson

19   and Perryville on the ground that there are allegedly no longer maximum custody

20   prisoners housed at those institutions, the Court should follow the process it used when

21   Defendants made the identical claim regarding Florence-Central Unit.  At that time, the

22   Court ordered Defendants to provide "competent, admissible evidence demonstrating that

23   (1) the enumerated facilities no longer house maximum custody inmates and (2) the

24   conditions of close custody are substantially different from maximum custody such that

25   close custody inmates would not otherwise qualify for protection under DI-326."

26   [Doc. 1745 at 2]  The Court should require the same of Defendants regarding Perryville

27   ────────────
     [8] The December 2016 CGAR results were input on January 31, 2017.  [Doc. 2046 at 38 n.51]

28

-13-

1  and Tucson, and should order Defendants to continue monitoring PM 92 and 93 at those

2  prisons until the Court has ruled on the adequacy of Defendants' evidence.[9]

### 5. Failure to select the required number of prisoner medical records for Performance Measures 94, 95, and 97 (Doc. 2046 at 28-29)

5  Defendants concede that for these Performance Measures they select a sample of

6  watch incidents or telepsychiatry sessions, not individual prisoner records, and do not

7  dispute that this may result in sampling fewer prisoner records than required by the

8  Stipulation.  [Doc. 2068 at 14]  As Dr. Haney explains, "[b]y reducing the number of

9  different individuals whose records are included in the sample, this method diminishes the

10 representativeness of the sample and its generalizability to the population from which it is

11 drawn."  [Haney Decl. ¶ 7]

12 Defendants assert that "Plaintiffs could have raised this issue two years ago"

13 (Doc. 2068 at 14:22-23), but do not explain how Plaintiffs could have known that

14 Defendants were disregarding the plain language of the Stipulation and indeed their own

15 Monitor Guide, which requires review of a specified "number of charts."  [*See* Doc. 2047-

16 1 at 135]  Defendants correctly point out that the source documents from which the

17 samples for these Performance Measures are drawn are lists of watch incidents and

18 telepsychiatry sessions (*see* Doc. 1185-1 at 34-35), but as Dr. Haney explains, this in no

19 way prevents Defendants from sampling the number of individual prisoner records

20 required by the Stipulation.  [Haney Decl. ¶ 8]  The Court should order Defendants to do

21 so.

### 6. Failure to comply with Performance Measure 95

23 Four ADC prisoners recently died by suicide in a twenty-day period.  [*See*

24 Declaration of Pablo Stewart, M.D. ("Stewart Decl."), filed herewith, ¶ 4]  According to

25 Dr. Stewart, this is "an extraordinary and extremely alarming series of events," and "a

---

[9] In the case of Florence-Central, the Court found that Defendants' evidence "is not sufficient to show that inmates classified as close custody are subject to substantially different conditions than maximum custody inmates."  [Doc. 1833 at 4]

sign of significant deficiencies in ADC's suicide prevention and mental health care more generally." [*Id.*]  One patient hanged himself within hours of being removed from suicide watch—a suicide Dr. Stewart found to be "completely avoidable." [*Id.* ¶¶ 5-6]  This is not an opportune time for Defendants to evade the requirements of PM 95, which is designed precisely to protect patients who have recently been removed from suicide watch.[10]

"Where the language of the contract is clear and unambiguous, it must be given effect as it is written." *Hadley v. Sw. Properties, Inc.*, 116 Ariz. 503, 506 (1977).  PM 95 provides, in pertinent part:

> Any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation of the watch.

[Doc. 1185-1 at 15]  This language is clear and unambiguous.  Accordingly, this is what Defendants must do, and this is what they must monitor and report.

Without consulting Plaintiffs or informing the Court, Defendants have decided that if the patient goes back on suicide watch, they thereafter need not verify the required contacts from the initial watch.  Defendants ask the Court to graft onto PM 95 a provision allowing this practice, but that is an invitation the Court must decline.  "[W]here the provisions of the contract are plain and unambiguous upon their face, they must be applied as written, and the court will not … add something to the contract which the parties have not put there." *D.M.A.F.B. Fed. Credit Union v. Employers Mut. Liab. Ins. Co. of Wis.*, 96 Ariz. 399, 403 (1964).  The Court should order Defendants to comply with the plain language of Performance Measure 95.

Defendants' contention that compliance with PM 95 can simply be presumed if the patient goes back on watch is meritless for multiple reasons.  First, given Defendants'

---

[10] Dr. Stewart also expressed concern about the care provided to other patients who died by suicide in this twenty-day period, and opined that "understaffing directly contributes to ADC's high rate of suicide." [*Id.* ¶¶ 7-9, 12]

continuing noncompliance with PM 94 ("All prisoners on a suicide watch or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays by a registered nurse") at multiple facilities, as shown in the chart below, there is no factual basis for such a presumption:[11]

|  | Dec. 2016 | Jan. 2017 | Feb. 2017 | Mar. 2017 |
|---|---|---|---|---|
| Douglas | 100.00 | 100.00 | 100.00 | 100.00 |
| Eyman | 68.57 | 88.57 | 97.14 | 97.14 |
| Florence | 73.00 | 60.00 | 86.67 | 60.00 |
| Lewis | 85.00 | 84.00 | 95.00 | 100.00 |
| Perryville | 80.00 | 53.33 | 93.33 | 93.33 |
| Phoenix | 60.00 | 13.33 | 60.00 | 73.33 |
| Safford | 100.00 | N/A | 100.00 | N/A |
| Tucson | 68.00 | 84.00 | 76.00 | 72.00 |
| Winslow | 100.00 | 80.00 | 100.00 | 100.00 |
| Yuma | 73.00 | 86.67 | 100.00 | 100.00 |

Second, compliance with PM 94 does not establish compliance with PM 95, as the two measures have different requirements—PM 94 can be satisfied by contact with a registered nurse, while PM 95 requires a psychiatric registered nurse.  [4/17/17 Tr. at 511:12-16]   Finally and most importantly, if a patient goes back on watch, however briefly, Defendants do not verify the required contacts from the initial watch—*even if the patient is no longer on watch by the time those contacts are due.*  [*Id.* at 521:7-522:9] Clearly PM 94 provides no protection whatsoever to a patient in this situation.[12]

---

[11]  The Court found Defendants substantially noncompliant with PM 94 at Eyman, Florence, and Tucson prisons on October 7, 2016, (Doc. 1709), and at Perryville on April 24, 2017.  [Doc. 2030 at 2]  The parties recently completed mediation on May 9, 2017 regarding Defendants' substantial noncompliance with PM 94 at Phoenix and Yuma. [Doc. 2055]

Dr. Stewart's declaration also includes his specific recommendations to the Court regarding additional remedial efforts that Defendants should be ordered to undertake to address the ongoing noncompliance with Performance Measure 94.  Plaintiffs will provide the Court prior to the June 14, 2017 hearing a similar declaration from medical care expert Dr. Todd Wilcox of his recommendations for the numerous medical performance measures that show ongoing noncompliance.

[12] The Court appeared to agree that Defendants' unilateral change to the requirements of PM 95 is impermissible.  [*See* 4/17/17 Tr. at 514:13-25 ("THE COURT: … But the point is a clear one to me.  You are giving somebody a pass on 95 based upon

1

2

**7.  Defendants Include in the Samples Records That Cannot Possibly Be Found Noncompliant (Doc. 2046 at 29-31)**

3      In his previous expert declaration, Dr. Haney explained why it is essential to

4  exclude from the sample all records that cannot possibly be found to be noncompliant

5  with the Performance Measure being monitored.  [*See* Doc. 2048 ¶ 11]  Defendants have

6  not submitted contrary expert testimony, or disputed Dr. Haney's declaration on this point

7  in any way, but they continue to stubbornly insist that it is perfectly acceptable to include

8  such records in the sample.  [Doc. 2068 at 14:3-4][13]  The Court should credit Dr. Haney's

9  uncontradicted expert testimony, and order that Defendants must exclude from the

10  monitoring samples for all Performance Measures those files that cannot possibly be

11  found to be noncompliant.  *See In re Wolverton Assocs.*, 909 F.2d 1286, 1296 (9th Cir.

12  1990) ("the trier of fact may not act arbitrarily in disregarding entirely probable testimony

13  of expert witnesses whose judgments have not been discredited").[14]

14      With respect to PM 85 and 86, for which Defendants continue to include records

15  that cannot possibly be found noncompliant, Dr. Haney outlines a simple procedure for

16  _____

the fact that you are assuming that they are going to be seen under 94.  But there's no
17  verification of that.  So how can you make the determination in 95?  … [T]he witness has
testified that you can make the determination on 95 based upon the assumption that it's
18  going to happen as would be demonstrated in 94, but nobody is checking to see whether it
happened with this inmate.  So there's a determination here made in 95 that's based upon,
19  as we say, facts not in evidence.").

20  [13] Defendants inexplicably misstate Plaintiffs' position, claiming that "Plaintiffs
contend that Defendants must exclude from the sample [for PM 86] any inmates who were
21  seen before 90 days have elapsed."  [Doc. 2068 at 15]  What Dr. Haney's declaration
actually said is that the sample for PM 86 "must exclude cases in which 90 days have not
22  yet elapsed since the patient discontinued medications"—without regard to when, or
whether, the patient was seen.  [Doc. 2048 ¶ 11]

23  [14] The Court clearly understood that such files must be excluded, even if
Defendants do not.  [*See, e.g.*, 4/17/17 Tr. at 469:17-24 ("These people who are that
24  month become subject to this criteria cannot possibly be useful for evaluating that
performance measure because they cannot possibly be found not compliant"); *id.* at
25  494:18-495:1 ("But it's a different question as to whether it's any utility at all with respect
to gauging this performance measure, which is designed to make sure people are seen
26  within 30 days.  For somebody for whom this cannot possibly be a non-compliant record
it does not help us analyze that situation"); 3/21/17 Tr. at 406:14-16 ("Because what you
27  have just said to me makes perfect sense, and that is, I cannot rely upon a performance
measure where it is impossible for 75 percent of them to be failing")]

28

1   drawing a random sample that excludes such records.  [*See* Haney Decl. ¶¶ 10-11]  The

2   Court should order Defendants to adopt that methodology.

3       With regard to PM 25 ("A first responder trained in Basic Life Support responds

4   and adequately provides care within three minutes of an emergency"), Dr. Haney notes

5   that by defining a "first responder" to include correctional officers, the performance

6   measure will always be found 100% compliant because of the circular logic and

7   interpretation, "but this calculation is of no value in assessing the actual level of care

8   received by the patient population."  [*Id*. ¶ 12; *compare with* 5/10/17 Tr. at 714:10-23

9   (five minutes for medical staff to report to suicide by hanging)]  The Court should order

10  Defendants to evaluate PM 25 by looking at the responsiveness of medical staff.

11                  **D. Defendants' Rebuttal Process**

12      Defendants accuse Plaintiffs of mischaracterizing Ms. Campbell's testimony about

13  how she can change the monitors' CGAR findings without a trace or any way to show that

14  the changes had been made, and then proceed to assert what Ms. Campbell specifically

15  testified to, without any citation to her testimony.  [Doc. 2068 at 16:17-23]  This is likely

16  because Ms. Campbell did not in fact offer this degree of specificity in her testimony; for

17  example, she never testified that "[t]he emails she sends to IT include a copy of the

18  CGAR finding that needs to be changed and the new information to be inputted."

19  [*Compare* Doc. 2068 at 16:20-21 *with* 3/8/17 Tr. at 36:18-41:4]  In any event, the fact that

20  Ms. Campbell prints out copies of the before and after versions of the CGARs after she

21  changes a monitor's entry, (*see* Doc. 2068 at 16:21-23), is beside the point, as the

22  "before" versions are not produced to Plaintiffs or the Court, and she admitted under oath

23  that there would be no way to know looking at the face of the CGAR if it had been

24  altered, without comparing it to the rebuttal log she only started maintaining in recent

25  months, or by looking for all of the "tickets" she submitted to IT prior to keeping the log.

26  [3/8/17 Tr. at 38:11-22, 40:13-22]

27      Defendants also admit that there are no written guidelines, instructions, or

28  standards for the rebuttal process other than the Monitor Guide, but protest that it is

1   Plaintiffs' responsibility to create these rebuttal standards for them.  [Doc. 2068 at 17]

2   They also admit that they were making changes to the findings in the name of the monitor,

3   using the original date of the finding, such that the changes are undetectable on the face of

4   the CGAR reports.  [*Id.*]  They assert that the March 2017 CGAR reports will be the first

5   ones in which an addendum will be added that clearly shows when results were changed,

6   (*see id.*), while Ms. Campbell had testified that it would be seen in the February 2017

7   CGARs.  [3/8/17 Tr. at 38:8-10]  Such an audit trail is critical.  [*See* Doc. 2048 ¶¶ 14-15]

8         Defendants also accuse Plaintiffs of making an untrue statement that ADC presents

9   Corizon with only the noncompliant findings for possible rebuttal, (Doc. 2068 at 17) but

10  ignore the fact that Plaintiffs cited to Ms. Campbell's testimony, (Doc. 2046 at 32), which

11  was as follows:

12          THE COURT: So they will walk over with the 10 files for the
            performance measures that they are going to address, and they
13          will say, here's my conclusion on file 1, *or is it only the ones
            where they think that there's non-compliance that they will*
14          *present to Corizon*?

15          THE WITNESS: We do, with the verbal, *unless Corizon asks
            for it, we only give them the ones there was non-compliance*
16          *in*.

17  [3/8/17 Tr. at 42:14-21]

18        Finally, Defendants mischaracterize Plaintiffs' position as demanding Defendants

19  abandon the rebuttal process, (Doc. 2068 at 18), which is not the case.  Plaintiffs are not

20  opposed to the idea of a rebuttal process *per se*, but believe it must be transparent with an

21  audit trail and clear standards.  Defendants' *ad hoc* rebuttal process, premised primarily

22  upon a system of verbal interactions with no documentation of changes, calls the CGAR

23  results into question.

24

25          **E.    Defendants Fail to Identify Root Causes of Noncompliance, to
                    Follow the Court's Orders, or to Hold Corizon Accountable**

26        Defendants attempt to justify many of their witnesses' testimony that they do not

27  think about or investigate the root causes of noncompliance by arguing that Plaintiffs'

28

1   counsel's questioning intimidated them into falsely so testifying, which is an argument

2   completely without merit.[15] [Doc. 2068 at 18; *see supra* n.4]

3          Furthermore, Defendant Pratt's subsequent testimony on May 10 bolsters

4   Plaintiffs' position that Defendants fail to hold their contractor accountable for the failure

5   to abide by the Stipulation requirements, or their failure to make efforts to remediate their

6   performance on Performance Measures for which the Court has found Defendants

7   noncompliant.  As described above in Part I, Defendant Pratt testified he had no idea how

8   three different Corizon Facility Health Administrators could possibly all be under the

9   same impression that ADC was no longer going to monitor them for certain performance

10   measures.  *See supra* pages 4-5.  He also admitted that by the plain language of the

11   contract, Corizon could keep its staffing levels at 91% of required levels, and ADC would

12   not be able to penalize the company for its failure to be staffed at 100%, and that Corizon

13   would pocket the difference between being paid by the State to staff at 100%, and what

14   Corizon has to pay out to be at 91% staffing.[16] [5/10/17 Tr. at 759:12-18]

15          Defendant Pratt again testified to having "general" conversations about staffing

16   levels with Corizon at "a total of the 10 institutions," (*see, e.g.*, *id.* at 764:4, 764:16,

17   765:9), and confirmed that as a result of looking at the data on a statewide level, there

18   could be a situation where Corizon faced no financial penalty for having zero

19

20

---

21          [15] Defendants imply that these witnesses *had* opinions on the root causes of
22   noncompliance, and that they actually *do* investigate the root causes of compliance, but
     that their witnesses falsely testified they had no opinion or don't investigate root causes of
23   noncompliance.  [Doc. 2068 at 18]  If this is the case, and counsel for Defendants since
     determined that their witnesses did not provide complete and accurate testimony, then
24   counsel has an obligation to take "reasonable remedial measures, including if necessary,
     disclosure to the tribunal."  Ariz. Rules of Prof'l Conduct, ER 3.3(a)(3) (eff. 2003); *see
25   also Matter of Ireland*, 146 Ariz. 340, 342 (1985) (attorney is "under an obligation not to
     mislead the court through an intentional omission").

26          [16] Defendant Pratt agreed with the Court's astute question of "[i]s it possible that
27   they have made the economic decision that they are better off paying the fine than filling
     these positions?"  [5/10/17 Tr. at 766:14-17]

28

1   psychologists at an institution if the staffing numbers at other institutions could pull it

2   across the 90% threshold.  [*Id.* at 764:19-765:5][17]

3       **III.**    **Future Review is Necessary of the New and Untested Monitoring Process for the Maximum Custody Performance Measures for the Isolation Subclass**

4

5       It is undisputed that Defendants' chief witness for the monitoring of the Maximum

6   Custody Performance Measures (MC PM) testified that her new role overseeing the

7   process of monitoring began in December 2016.  [3/28/17 Tr. at 12:19-20; 24:5-7; 65:8-9]

8   Plaintiffs are hopeful that this new process will help eliminate many of the monitoring

9   failures of the past, but believe such a new and untested process requires more time to be

10   evaluated and to produce reliable findings.  [*See* Doc. 2046 at 45-46]  Plaintiffs therefore

11   reiterate their request that the Court grant their pending Motion to Enforce and order the

12   relief requested, (Doc. 1944), and that the new monitoring process be given a minimum of

13   six months before another hearing is held so that the actual findings and documentation of

14   this process can be evaluated.  At such a hearing the actual MC PM monitors, the

15   Complex Wardens, should be called to testify.

16   **CONCLUSION**

17       For the reasons set forth above, in their Statement (Doc. 2046), and in the

18   declarations and evidence provided in support of their Statement and Reply, Plaintiffs

19   respectfully request that the Court grant the relief previously sought by Plaintiffs.  [*See*

20   Doc. 2046 at 46-47]  Additionally, Plaintiffs request that the Court:

21

22

23

---

[17] As an additional example, with regard to Defendants' ongoing noncompliance with PM 94, Dr. Stewart concludes, in light of the remedial plans he has reviewed, "I see little evidence that ADC is interested in actually getting to the root of this problem." [Stewart Decl. ¶ 16]  Dr. Stewart was shocked to learn that Defendants' latest remedial plan for PM 94 "consists of Dr. Calcote or a colleague 'go[ing] to each of the seven corridor facilities and hav[ing] a conversation with those personnel that are responsible for conducting those watches.'" [*Id.* ¶ 24]  He concludes that Defendants' persistent failure to provide written training and instruction to mental health staff "is a recipe for inadequate and dangerous patient care that increases the risk of future suicides." [*Id.* ¶ 25]

1    (1)    order Defendants to provide information that shows how Defendants are

2    complying with its outside provider order with regard to all prisoners, and not just the ten

3    files selected each month at each yard;

4    (2)    order Defendants to immediately comply with the Court's past orders

5    regarding (a) how to properly interpret performance measures requiring action "every X

6    days" (PM 73, 77, 80-84, 87-90, 92); (b) not counting group contacts for the requirement

7    that a patient is "seen" (PM 73-74, 76, 80-86, 88, 90-91, 94-95); (c) not counting cellfront

8    contacts for the requirement that a patient is "seen" (PM 73-74, 76, 80-92, 94-95);

9    (3)    order Defendants to immediately comply with the Stipulation and evaluate

10    the same records for PM 92 and 93;

11    (4)    order Defendants to provide competent, admissible evidence demonstrating

12    that (a) ASPC-Tucson and ASPC-Perryville no longer house maximum custody prisoners,

13    and (b) the conditions of close custody at those facilities are substantially different from

14    maximum custody such that close custody prisoners would not otherwise qualify for

15    protection under DI-326;

16    (5)    order Defendants to continue to monitor PM 92 and 93 at Perryville and

17    Tucson until the Court has ruled on the adequacy of Defendants' evidence for (4);

18    (6)    order Defendants to select the number of prisoner medical records specified

19    in the Stipulation, or agreed to by the parties, to evaluate PM 94, 95, and 97;

20    (7)    order Defendants to immediately comply with the plain language of PM 95;

21    (8)    order Defendants to immediately exclude from the monitoring samples for

22    all Performance Measures those records that cannot possibly be found to be noncompliant;

23    (9)    order Defendants to immediately adopt the methodology for PM 85 and 86

24    outlined in the Haney Declaration filed herewith (Haney Decl. ¶¶ 10-11);

25    (10)    order Defendants to evaluate PM 25 by looking at the responsiveness of

26    medical staff, not custody officers.

27    Respectfully submitted,

28

1   Dated:  June 2, 2017                **PRISON LAW OFFICE**

2

3                                 By:   *s/ Corene Kendrick*
                                    Donald Specter (Cal. 83925)*
4                               Alison Hardy (Cal. 135966)*
                               Sara Norman (Cal. 189536)*
5                               Corene Kendrick (Cal. 226642)*
                               Rita K. Lomio (Cal. 254501)*
6                               1917 Fifth Street
                               Berkeley, California 94710
7                               Telephone:  (510) 280-2621
                               Email:    dspecter@prisonlaw.com
8                                          ahardy@prisonlaw.com
                                          snorman@prisonlaw.com
9                                          ckendrick@prisonlaw.com
                                          rlomio@prisonlaw.com
10                             *Admitted pro hac vice*

11                             David C. Fathi (Wash. 24893)*
                               Amy Fettig (D.C. 484883)**
12                               Jamelia N. Morgan (N.Y. 5351176)**
                               Victoria Lopez (Ill. 6275388)*
13                               **ACLU NATIONAL PRISON**
                               **PROJECT**
14                               915 15th Street N.W., 7th Floor
                               Washington, D.C. 20005
15                               Telephone:  (202) 548-6603
                               Email:    dfathi@aclu.org
16                                          afettig@aclu.org
                                          jmorgan@aclu.org
17                                          vlopez@aclu.org

18                             *Admitted pro hac vice.*  Not admitted
                             in DC; practice limited to federal
19                             courts.
                             **Admitted *pro hac vice*
20

21                             Kirstin T. Eidenbach (Bar No. 027341)
                             **EIDENBACH LAW, PLLC**
22                             P. O. Box 91398
                             Tucson, Arizona 85752
23                             Telephone:  (520) 477-1475
                             Email:    kirstin@eidenbachlaw.com
24                             Kathleen E. Brody (Bar No. 026331)
                             **ACLU FOUNDATION OF**
25                             **ARIZONA**
                             3707 North 7th Street, Suite 235
26                             Phoenix, Arizona 85013
                             Telephone:  (602) 650-1854
27                             Email:    kbrody@acluaz.org

28

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
          agerlicher@perkinscoie.com
          jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By: _s/ Maya Abela_
Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email:     skader@azdisabilitylaw.org
             adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:
    rdalyrooney@azdisabilitylaw.org
             jrico@azdisabilitylaw.org
             jross@azdisabilitylaw.org
             mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 2, 2017, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
Kevin R. Hanger
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com
khanger@swlfirm.com

*Attorneys for Defendants*

s/ D. Freouf