1  Kathleen E. Brody (Bar No. 026331)
   **ACLU FOUNDATION OF ARIZONA**
2  3707 North 7th Street, Suite 235
   Phoenix, Arizona 85013
3  Telephone: (602) 650-1854
   Email: kbrody@acluaz.org
4
   *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia*
5  *Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith,*
   *Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner,*
6  *Joshua Polson, and Charlotte Wells, on behalf of themselves and all*
   *others similarly situated*

7  **[ADDITIONAL COUNSEL LISTED BELOW]**

8  Sarah Kader (Bar No. 027147)
   Asim Dietrich (Bar No. 027927)
9  **ARIZONA CENTER FOR DISABILITY LAW**
   5025 East Washington Street, Suite 202
10 Phoenix, Arizona 85034
   Telephone: (602) 274-6287
11 Email: skader@azdisabilitylaw.org
          adietrich@azdisabilitylaw.org
12
   *Attorneys for Plaintiff Arizona Center for Disability Law*

13 **[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-DKD <br><br> **DECLARATION OF CRAIG HANEY, Ph.D., J.D.** |

**I, CRAIG HANEY, Ph.D., J.D., DECLARE:**

1. I am a professor of psychology at the University of California, Santa Cruz. My experience and qualifications have previously been provided to the Court. Doc. 2048, ¶¶ 1-3; Doc. 2048-1. I have been asked by Plaintiffs' counsel to address some specific issues that were discussed in Defendants' Statement Regarding Evidentiary Hearings on Monitoring (Doc. 2068) and the Declaration of Kathleen Campbell (Doc. 2068-1).

**The critical importance of random sampling**

2. At pp. 5-6 of their statement, the defendants seem to say that they are not required to use random sampling for all of the Performance Measures in the Stipulation. Of course it is for the Court to say what the Stipulation does or does not require. But if the purpose of the sample is to allow the parties and the Court to draw general conclusions about the treatment received by the larger prisoner population based upon the treatment received by those in the smaller sample, then the sample itself must be generated using a random selection process, for the reasons I explained in my earlier declaration. Doc. 2048, ¶¶ 5-8.

**Selecting every Nth record**

3. Ms. Campbell's declaration describes a sampling method that she and other monitors have used in this case:

> For example, in a given month, the monitors would be instructed to locate the first inmate number on the list ending in an odd number as the starting point and then to select every 10th record until ten records had been selected. The next month, the monitors would be instructed to locate the first inmate number on the list ending an in [sic] even number as the starting point and then to select every 10th record until ten records had been selected. In the next month, the monitors would be instructed to select every 20th record.

Doc. 2068-1, ¶ 19. Although Ms. Campbell refers to this process as "randomizing" the source documents (¶ 18), this is in fact not a random process, and will not yield a sample that is representative of the larger population from which the sample is drawn.

4. As I explained in my earlier declaration (Doc. 2048), the defining feature of random sampling is that "no one case from the universe of cases has any higher

1  probability or likelihood of being included in the sample than any other" (¶ 5). The
2  method described by Ms. Campbell does not satisfy this essential criterion.

3      5.   If one is selecting every 10th record that appears on a list, and does so until ten
4  records have been selected, then only the first 100 or so records on the list have *any*
5  chance of being included in the sample. For example, if the list consists of, say, 200
6  records, then the last 100 records would have no chance of being included in the sample;
7  if the list consists of 300 records, the last 200 records have no chance of being included in
8  the sample; and so on. Moreover, depending on how the list is organized, selecting every
9  10th record (rather than a truly random sample) might inadvertently introduce systematic
10 bias into the sample. For example, if the list is organized by ADC number, from lowest to
11 highest, the prisoners toward the beginning of the list, with lower ADC numbers, are
12 likely to be older on average than those toward the end, with higher ADC numbers. Thus,
13 a sample drawn in the way described by Ms. Campbell would be expected to over-
14 represent older prisoners compared to their representation in the population from which
15 the sample is drawn. Likewise, if the list was organized by date (i.e. date of request,
16 renewal, or encounter), then the sample drawn the way Ms. Campbell describes would
17 skew toward those individuals seen earlier in the month. The point is that there are often
18 implicit and non-obvious patterns or periodicities that are built into the way that a list is
19 organized, so that taking every Nth entry inadvertently intersects with those patterns to
20 compromise the randomness of the sample. The use of a random number generator to
21 produce genuinely random number sequences safeguards against that problem.

22 **<u>Sampling incidents rather than prisoner records</u>**

23     6.   It is my understanding that for Performance Measures 94 and 95, the monitors
24 sample a specified number of watch incidents, rather than that number of individual
25 patient records.[1] So, for example, a sample of 10 watch incidents may involve only six

---

27 [1] PM 94 states, "All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered
28 nurse." PM 95 states, "Only licensed mental health staff may remove a prisoner from a

different patients, if one of those patients has been on watch five times. It is also my understanding that for Performance Measure 97, the monitors similarly sample a specified number of telepsychiatry sessions, rather than that number of individual patient records.[2] *See* Doc. 2046 at 28-29; Doc. 2068 at 14.

7. By reducing the number of different individuals whose records are included in the sample, this method diminishes the size as well as representativeness of the sample and, therefore, limits its generalizability to the population from which it is drawn. To take an extreme but nevertheless possible example, if a sample is drawn of ten watch incidents and they all involve the same patient, the sample includes information about the care received by only a single prisoner, rather than ten, which care may or may not be representative of that received by the entire population. This is a poor way to glean information about the nature of the care that is being received by the larger population. Sampling for individual patient records provides a more generalizable sample from which inferences about the larger population of prisoners can be drawn.

8. Even if the source document for the sample is a list of watch incidents, it is a simple matter to draw a random sample consisting of the records of ten (or whatever is the required number) different individuals. The monitor begins by drawing a random sample of ten watch incidents. If two or more of those incidents pertain to the same patient, all but the first incident for each patient are discarded from the sample, and additional incidents are randomly drawn until the sample consists of ten incidents involving ten

---

suicide or mental health watch. Any prisoner discontinued from a suicide or mental health watch shall be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation of the watch."

[2] PM 97 states, "A mental health provider treating a prisoner via telepsychiatry shall be provided, in advance of the telepsychiatry session, the prisoner's intake assessment, most recent mental health treatment plan, laboratory reports (if applicable), physician orders, problem list, and progress notes from the prisoner's two most recent contacts with a mental health provider."

different individual patients. *See* Doc. 2048, ¶ 12. This corrects for the possibility that potentially unrepresentative care afforded to a single prisoner or very small sample of particular prisoners will skew the entire sample from which inferences are made.

**<u>Including in the sample records that cannot possibly be found noncompliant</u>**

9. In my earlier declaration, I explained that certain cases "must be excluded from the sample because they cannot possibly be found to be noncompliant, and thus do not test the hypothesis in question—that is, compliance with the relevant Performance Measure. To include such cases in the sample would misleadingly inflate the compliance figures that are calculated based on the sample." Doc. 2048, ¶ 11. Because it appears that the defendants in this case continue to believe that inclusion of such cases is appropriate (Doc. 2068 at 14-16), I will try again to explain why it is not**.** The simplest way to state this rationale is that, in order to evaluate the level of compliance, there must be at least the possibility of non-compliance.

10. Exclusion of such cases from the sample is simple and straightforward. To illustrate, here is an appropriate sampling method for PM 85, which provides that "MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medications:"

> The monitor selects a random sample of ten records from all MH-3D prisoners at a given unit. If any of them discontinued medications less than 30 days previously, that record is excluded from the sample, and another record is randomly drawn. See Doc. 2048 ¶ 12. Once there are ten records of MH-3D prisoners who have discontinued medications more than 30 days ago, those records are assessed to determine whether the patient was seen within 30 days of discontinuing medications.

11. And here is an appropriate sampling method for PM 86, which provides that "MH-3D prisoners shall be seen a minimum of every 90 days by a mental health clinician for a minimum of six months after discontinuing medication:"

> The final sample of ten records used for PM 85 is the starting point for evaluating compliance with PM 86. If any of these prisoners discontinued medications less than 90 days previously, that record is excluded from the sample, and another record is randomly drawn. Once

-4-

there are ten records of MH-3D prisoners who have discontinued medications more than 90 days ago, those records are assessed to determine whether the patient was seen within 90 days of discontinuing medications.

**<u>Defining terms so as to guarantee 100% compliance</u>**

12. A problem very similar to that of including in the sample cases that cannot possibly be found noncompliant is defining the terms of the Performance Measure in a way that guarantees 100% compliance. This problem is illustrated by PM 25, which requires "A first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency." It is my understanding that the defendants consider custody officers to be first responders. They then start the "three-minute clock" from the time the custody officer arrives on the scene. This necessarily results in what appears to be 100% compliance because the officer's arrival (whenever it occurs) is, by definition, "within three minutes of [the] emergency." Doc. 2068 at 15-16. These circular definitions guarantee that this Performance Measure is found to compliant in every single case. But this calculation is of no value in assessing the actual level of care received by the patient population.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of May, 2017.

*/s/ Craig Haney, Ph.D., J.D.*
CRAIG HANEY, Ph.D., J.D.

**ADDITIONAL COUNSEL:**

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Jamelia Natasha Morgan (N.Y. 5351176)**
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email: dfathi@aclu.org
afettig@aclu.org
jmorgan@aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email: dbarr@perkinscoie.com
agerlicher@perkinscoie.com
jhgray@perkinscoie.com

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:  dspecter@prisonlaw.com
        ahardy@prisonlaw.com
        snorman@prisonlaw.com
        ckendrick@prisonlaw.com
        rlomio@prisonlaw.com

*Admitted *pro hac vice*

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, PLLC**
P. O. Box 91398
Tucson, Arizona 85752
Telephone: (520) 477-1475
Email:  kirstin@eidenbachlaw.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:  cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:  jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email:   skader@azdisabilitylaw.org
           adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email:
   rdalyrooney@azdisabilitylaw.org
   jrico@azdisabilitylaw.org
   jross@azdisabilitylaw.org
   mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 2, 2017, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
Kevin R. Hanger
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com
khanger@swlfirm.com

*Attorneys for Defendants*

s/ D. Freouf