Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

No. CV 12-00601-PHX-DKD

**DECLARATION OF PABLO STEWART, M.D.**

**I, PABLO STEWART, M.D., DECLARE:**

1. I am a physician licensed to practice in California and Hawaii and a board-certified psychiatrist, with a specialty in clinical and forensic psychiatry. I have served as an expert consultant to the Plaintiffs in this case since 2012. My experience and background as relevant to my testimony have previously been provided to the Court. *See* Doc. 1538-1 at 3-6 and Ex. 1 thereto. I have personal knowledge of the matters set forth herein, and if called as a witness I could competently so testify.

2. I have been asked by Plaintiffs' counsel to comment on the four recent suicides in the Arizona Department of Corrections (ADC), and on how to improve ADC's compliance with Performance Measures designed to protect patients who are suicidal.

**Four suicides in less than three weeks**

3. Throughout my involvement in this litigation, I have repeatedly expressed my grave concern about ADC's chronically inadequate suicide prevention program, and the high rate of completed suicides in Arizona prisons. *See* Doc. 1104-2 at 53-60. As I have noted in my previous reports, ADC's suicide rate is higher than the national average for state prisons. *See* Doc. 1104-2 at 53-54; Doc. 1104-6 at 7-8, 24-25. I have also repeatedly noted the frequency of avoidable suicides in ADC, including those that ADC's own mortality reviewers found to be avoidable. *See* Doc. 1104-2 at 56-60; Doc. 1104-6 at 8-12, 49-56; Doc. 1538-1 at 17-20, 22-31. In addition, I have specifically expressed concern about inadequate care of patients who are on suicide watch. Doc. 1104-2 at 54-55; Doc. 1104-6 at 8.

4. I have learned that between April 23 and May 13, 2017, four ADC prisoners died by suicide:

https://corrections.az.gov/article/inmate-death-notification-arvizo

https://corrections.az.gov/article/inmate-death-notification-krauss

https://corrections.az.gov/article/inmate-death-notification-gonzalez-0

https://corrections.az.gov/article/inmate-death-notification-mills

This is an extraordinary and extremely alarming series of events. Four suicides in a twenty-day period is a very rare occurrence, and is a sign of significant deficiencies in ADC's suicide prevention and mental health care more generally.

5. I have reviewed the medical records of these four prisoners. Many problems were encountered in the care of Patient 1.[1] He was classified MH-3B, and killed himself less than two months after arriving at ADC. Patient 1 was a monolingual Spanish speaker. Throughout his short stay in the ADC a variety of interpreter services were utilized including the "language line," "health staff," and a "Spanish speaking officer." Of note, the use of a "language line" is not recommended when performing a mental health evaluation and certainly custody staff should never be used as interpreters. He received an extremely cursory mental health evaluation performed by a "MH Midlevel" after he expressed suicidal ideation upon admission. This evaluation was performed via the "language line." For reasons that are not clear from the record, Patient 1 ended up in segregated housing in the Eyman Special Management Unit (SMU).

6. In the days leading up to his death he was on a suicide watch. Although offered opportunities to be seen by mental health staff in a confidential setting, Patient 1 consistently refused. Mental health staff did not appreciate these refusals as worsening symptoms of his underlying mental illness. This is especially bothersome given that staff documented on the last day of his life that Patient 1 was paranoid in that he "felt like his life was being threatened by an officer." Once again, Patient 1 refused to come out of his cell and was noted to have an anxious mood, labile affect and bizarre thought content. Nevertheless, he was taken off suicide watch, and hanged himself a few hours later. He should have never been taken off watch status and should have been removed from segregated housing. At no time during the last week of his life was Patient 1 referred to a psychiatrist even though he was noted to be psychotic. This suicide was completely avoidable.

---

[1] A key identifying these patients is attached to this Declaration as Exhibit 1 and filed under seal.

7. Patient 2's mental condition at the time of his suicide is difficult to ascertain from the medical record due to extremely poor documentation. He was a male with a history of Bipolar Disorder and a number of serious medical problems including a seizure disorder, chronic hepatitis C and asthma. He was classified as MH-3A and Seriously Mentally Ill. At the time of his death he was not prescribed any psychotropic medications. His mental condition at the time of his suicide is difficult to determine in that the last mental health chart entry, four days before his death, by an unlicensed "Mental Health Clerk" stated "I/M was laying down, was alright." The preceding mental health note by the Mental Health Clerk, 11 days prior to his death, also stated "I/M was laying down, said he was good." Patient 2 had also been refusing to attend groups in the week prior to his death as documented one week prior to his death. Of note, no reason was given for his refusing to attend these groups. Finally, a Treatment Plan Review 13 days before his death inexplicably stated both "no psych meds at this time" and "compliant with medications." The care as reflected in the medical record was very poor and likely contributed to his suicide. The severity of his medical problems may have also contributed to his suicide. Chronic medical problems are a known risk factor for suicide.

8. At the time of his death, Patient 3 was a male with multiple serious medical problems including HIV and hepatitis C, reflected in his medical classification as M-4. The chart did not reflect his having a history of mental illness. As with Patient 2, Patient 3's medical problems likely contributed to his suicide. Staff has a duty to evaluate the suicidality of inmates with serious medical problems.

9. The final suicide reviewed was of Patient 4. His medical record stops in November 2015, so I was unable to review the events immediately preceding his suicide. At the time of his death he was a male with multiple medical problems and, at least as of November 2015, an absence of mental health history. His death was similar to Patient 3's in that his medical problems may have played a role in his suicide.

**Chronic and severe understaffing**

10. I have repeatedly expressed my concern about the chronic understaffing in ADC's mental health program. *See* Doc. 1104-2 at 13-20; Doc. 1538-1 at 7-12. This understaffing has continued since the settlement of this case; for example, between April and December 2015, the fill rate for psychologists never exceeded 52%; for mental health nurse practitioners, it never exceeded 49%. Doc. 1538-1 at 11-12. It also appeared that the psychiatric director position had been continuously vacant from the effective date of the Stipulation in February 2015 through December 2015. Doc. 1538-1 at 12.

11. These staffing shortages persist today, and in some respects are even worse. As of March 2017, the fill rate for psychologists was 52%; for psychiatrists, 67%; for recreational therapists, 20%; for the psychiatric director, 0%; and for the mental health RN supervisor, 0%. *See* Doc. 2061 at 82.

12. This understaffing directly contributes to ADC's high rate of suicide. Due to the large caseloads that staff are assigned, they don't have the time to perform adequate visits with the mentally ill patients, especially those in segregated housing. In the suicides of both Patient 1 and Patient 2, the patient had been refusing to come out of his cell prior to his suicide. Given more staff, these patients could have been encouraged to leave their cells and the staff would have been in a better position to evaluate these refusals as symptoms of a possible worsening of their underlying mental illness. Also, with an adequate number of staff, time could be taken to obtain proper interpreter services instead of using the language line or a custody officer.

**Improving compliance with Performance Measure 94**

13. I have been asked to recommend ways of improving ADC's compliance with Performance Measure 94, which requires that "All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse." I understand that the Court has ruled that this Performance Measure requires that the patient be seen in a confidential setting outside the cell, unless (1) the patient has been offered such a confidential meeting and declined, or

(2) the prison is on hard lockdown. The following chart illustrates ADC's compliance with this Measure:

| | | Dec. 2016 | Jan. 2017 | Feb. 2017 | Mar. 2017 |
|---|---|---|---|---|---|
| **PM 94 - Mental Health 22** All prisoners on a suicide watch or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays by a registered nurse. | | | | | |
| Mental Health 22 | Douglas | 100.00 | 100.00 | 100.00 | 100.00 |
| Mental Health 22 | Eyman | 68.57 | 88.57 | 97.14 | 97.14 |
| Mental Health 22 | Florence | 73.00 | 60.00 | 86.67 | 60.00 |
| Mental Health 22 | Lewis | 85.00 | 84.00 | 95.00 | 100.00 |
| Mental Health 22 | Perryville | 80.00 | 53.33 | 93.33 | 93.33 |
| Mental Health 22 | Phoenix | 60.00 | 13.33 | 60.00 | 73.33 |
| Mental Health 22 | Safford | 100.00 | N/A | 100.00 | N/A |
| Mental Health 22 | Tucson | 68.00 | 84.00 | 76.00 | 72.00 |
| Mental Health 22 | Winslow | 100.00 | 80.00 | 100.00 | 100.00 |
| Mental Health 22 | Yuma | 73.00 | 86.67 | 100.00 | 100.00 |

14. At the outset, I must address an excuse that has been offered for ADC's poor performance on this Performance Measure. I understand that ADC's counsel has stated that "the inmates are being seen but it's not been documented appropriately" and that "this has been a situation where the non-compliance is arising out of the fact that they were not appropriately documenting that the inmate who was on the watch was offered to go out of the cell for the encounter." 5/10/17 Tr. at 844:5-6; 855:26-856:4.

15. This excuse is not acceptable. As I have previously stated:

> Accurate, reliable medical records are an essential element of mental health care. The record should be a complete history of the patient's mental health condition, diagnoses, and treatment. The record is also an essential means of communication between mental health providers. This is especially true in a prison setting, in which patients are typically treated by multiple providers and periodically transferred between institutions. For these reasons, health care providers rely upon up to date and accurate medical records. The maxim "not noted, not done,"

> meaning that if something is not contemporaneously noted in the medical record, we assume that it did not occur, is based upon this need for accurate and up to date medical records.

Doc. 1104-2 at 20-21. The medical-legal standard of care in all clinical encounters is to contemporaneously record the visit in the patient's medical record. There are no acceptable exceptions to this rule. I find it very troubling that ADC's counsel would use the excuse of "the patients are being seen but it's not being documented properly." This either implies a complete lack of understanding on counsel's part of the critical importance of accurate records, or an attempt at circumventing the requirements of this Performance Measure.

16. My recommendations for improving compliance with PM 94 are: **Determine the root cause of ongoing noncompliance.** At the risk of stating the obvious, knowing the cause of a problem is very helpful in devising a solution. But in reviewing two of ADC's remedial plans for PM 94 (*see* Doc. 1743 at 15 and Doc. 2051 at 8), I see little evidence that ADC is interested in actually getting to the root of this problem.

17. As shown in the chart above, ADC's noncompliance with PM 94 spans multiple institutions and multiple months. It is simply not credible to blame such noncompliance on a single staff member. But in ADC's first remedial plan (Doc. 1743 at 15), ADC attributes noncompliance at Tucson to the fact that a single mental health clinician was unlicensed, and implies that since she received her license, all is well. This is plainly not the case, as Tucson has been noncompliant for three of the past four months. (*See* paragraph 13 above.)

18. ADC's second remedial plan (Doc. 2051 at 8) attributes noncompliance at Perryville "during the summer months of 2016" to a "miscommunication" that "has been resolved." Again, this is plainly not true, as Perryville scored a failing 53% in January 2017, well after this remedial plan had allegedly been implemented. (*See* paragraph 13 above.)

19. In summary, it appears that ADC is more interested in persuading the Court that everything is fine and that the Court need not intervene, than in determining the actual cause of its ongoing noncompliance.

20. **Increase mental health staffing**. I have previously opined that ADC's noncompliance with PM 94 "results at least in part from the shortage of psychologists discussed above." Doc. 1538-1 at 18. Because half of ADC's psychologist positions remain vacant, it continues to be my opinion that this is a contributing factor to noncompliance with this Performance Measure. I note that ADC itself has attributed its noncompliance with PM 94 to a shortage of mental health staff. *See* Doc. 1538-1 at 10 (Yuma).

21. **Provide meaningful training and written instructions.** Any functioning healthcare system depends on a system of written instructions to ensure that staff provide care in a correct and consistent manner. While oral coaching and feedback can be useful, a system that depends entirely on oral communication of critical patient care instructions is essentially a giant game of "Telephone," where information is predictably lost and distorted in successive transmissions.

22. While written instruction is essential in any healthcare system, it is especially critical in correctional health care, because of the sprawling and decentralized nature of the system (such as Arizona's ten state-run prisons that house approximately 34,000 people); the frequent transfer of prisoners between facilities; and the often high turnover rate and use of locums staff, resulting in large numbers of healthcare personnel who are new to the system and unfamiliar with established procedures.

23. I was astonished to learn that there are virtually no written instructions, either for the healthcare staff who are expected to implement the Stipulation and the Court's orders in this case, or for the monitors who measure ADC's compliance. ADC's counsel stated that "according to what Corizon is saying, they did their training in-house and without handouts." 5/10/17 Tr. at 799:11-12. Mr. Pratt testified, "There are no documents. This is verbal. This is discussion." 5/10/17 Tr. at 801:18-19.

24. I was even more shocked to learn that, after the Court expressed concern about ADC's ongoing noncompliance with PM 94 in the context of the recent suicides, the remedial plan consists of Dr. Calcote or a colleague "go[ing] to each of the seven corridor facilities and hav[ing] a conversation with those personnel that are responsible for conducting those watches." 5/10/17 Tr. at 860:23-25. I have reviewed Dr. Calcote's subsequent declaration regarding these conversations, and it contains no reference to any written instruction. *See* Doc. 2073-1. This is entirely inadequate and very dangerous.

25. I am puzzled by this apparent reluctance to put even very basic and essential instructions to health care staff in writing. I have previously expressed concern about this mystifying and disturbing practice in ADC, which I have not encountered in any other prison system. *See* Doc. 1104-2 at 74-75 (ADC mental health monitor testified that she monitors whether suicides are preventable, but does not write anything down about her conclusions). What I can say with confidence is that it is a recipe for inadequate and dangerous patient care that increases the risk of future suicides.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of May, 2017.

PABLO STEWART, M.D.

**ADDITIONAL COUNSEL:**

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Jamelia Natasha Morgan (N.Y. 5351176)**
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email: dfathi@aclu.org
afettig@aclu.org
jmorgan@aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email: dbarr@perkinscoie.com
agerlicher@perkinscoie.com
jhgray@perkinscoie.com

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org



May 28 2017 7:23PM Pablo Stewart, M.D. 415-753-5479 p.11

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita K. Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email: dspecter@prisonlaw.com
ahardy@prisonlaw.com
snorman@prisonlaw.com
ckendrick@prisonlaw.com
rlomio@prisonlaw.com

*Admitted *pro hac vice*

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, PLLC**
P. O. Box 91398
Tucson, Arizona 85752
Telephone: (520) 477-1475
Email: kirstin@eidenbachlaw.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email: cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email: jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email:
rdalyrooney@azdisabilitylaw.org
jrico@azdisabilitylaw.org
jross@azdisabilitylaw.org
mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 2, 2017, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
Kevin R. Hanger
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com
khanger@swlfirm.com

*Attorneys for Defendants*

s/ D. Freouf