1    Kathleen E. Brody (Bar No. 026331)
     **ACLU FOUNDATION OF ARIZONA**
2    3707 North 7th Street, Suite 235
     Phoenix, Arizona 85013
3    Telephone:  (602) 650-1854
     Email: kbrody@acluaz.org
4
     *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
5    *Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
     *Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
6    *Desiree Licci, Joseph Hefner, Joshua Polson, and*
     *Charlotte Wells, on behalf of themselves and all others*
7    *similarly situated*

     **[ADDITIONAL COUNSEL LISTED BELOW]**
8
     Sarah Kader (Bar No. 027147)
9    Asim Dietrich (Bar No. 027927)
     **ARIZONA CENTER FOR DISABILITY LAW**
10   5025 East Washington Street, Suite 202
     Phoenix, Arizona 85034
11   Telephone:  (602) 274-6287
     Email: skader@azdisabilitylaw.org
12           adietrich@azdisabilitylaw.org

13   *Attorneys for Plaintiff Arizona Center for Disability*
     *Law*

14   **[ADDITIONAL COUNSEL LISTED BELOW]**

15              UNITED STATES DISTRICT COURT

16                  DISTRICT OF ARIZONA

17   Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-DKD
     Dustin Brislan; Sonia Rodriguez; Christina
18   Verduzco; Jackie Thomas; Jeremy Smith; Robert
     Gamez; Maryanne Chisholm; Desiree Licci; Joseph      **DECLARATION OF**
19   Hefner; Joshua Polson; and Charlotte Wells, on       **TODD R. WILCOX,**
     behalf of themselves and all others similarly        **M.D., M.B.A.**
20   situated; and Arizona Center for Disability Law,

21                    Plaintiffs,

22          v.

23   Charles Ryan, Director, Arizona Department of
     Corrections; and Richard Pratt, Interim Division
24   Director, Division of Health Services, Arizona
     Department of Corrections, in their official
25   capacities,

26                    Defendants.

27

28

I, Dr. Todd Wilcox, M.D., M.B.A., declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness I could so competently testify.

2.      I previously submitted to the Court a declaration setting out my assessment of the Defendants' Remediation Plans.  [Doc. 1670 (filed 9/2/16), assessing Docs. 1609-1 and 1665]  My updated curriculum vitae and expert consultation were submitted to the Court at the same time.  [Doc. 1670-1]  Attached as Exhibit 1 is a list of the documents I reviewed in preparation of this declaration.

3.      I have been informed that the Court asked that I provide specific recommendations of reforms that it could order for certain performance measures of the Stipulation where Corizon / ADC are noncompliant.  To be clear, the primary reason for noncompliance is inadequate staffing.  Completing a proper workload-based staffing study to determine minimum staffing levels and an accurate blend of professional employees and then hiring to satisfy those minimums is the single most important endeavor to bring the system into compliance and to remedy the deficiencies in care.  Nonetheless, I offer the following recommendations for tweaks that could possibly impact compliance with the performance measures.  I would be happy to answer any questions the Court may have about these recommendations.

4.      As I noted in my previous report to the Court regarding Defendants' first remediation plans, many of Defendants' proposed efforts were "a series of 'band-aid' measures" that attempted to reduce backlogs and delays by redirecting existing staff, adding duties to already overworked health care staff, and setting arbitrary quotas.  [Doc. 1670, ¶ 7]  In order to have a successful corrective action plan to remediate systemic problems, "the state must first truly understand the reasons for the deficiencies and develop a rational method based on data to meet those needs."  [Doc. 1670, ¶ 11]

5.      It is not adequate to rely solely upon the monthly CGAR scores to determine if remedial plans have succeeded and remedied the entrenched systemic problems that were the root cause of the noncompliance.  While the CGAR reports can serve readily as

the "canary in the coalmine" to provide some type of warnings, they are entirely insufficient to assess the success of a remedial plan or to make any credible statements about the operations of a large complex system like the Arizona Department of Corrections.  Typically when you use sampling techniques to assess large systems, you must ensure that you evaluate enough records to ensure that your conclusions are statistically sound within an acceptable error range.  A 5% sampling of the total population would be the absolute minimum number of records needed to assess to draw any reasonable or defensible conclusions.

6.     The current methodology regarding CGAR reports is mathematically inadequate to provide any reasonable assurance that conclusions drawn on that small sample size are representative of the system.  This is particularly true for "improvements" that might be inferred regarding the system.  Just because there is a two or three chart improvement to pull that small sample size up into an "improved" status does not mean at all that the improvement is generalizable to the entire system.

7.     I reviewed Defendants' more recent remedial plans (Docs. 1729, 1743, 1977 and 2051) submitted in the nine months since my initial report to the Court, and believe that again they are lacking specific detail.  Fundamentally, in many cases they do not indicate that ADC or Corizon made any efforts to identify the root causes of deficiency, and even when they purport that an analysis was done, Defendants do not indicate what the analysis identified as the causes.  From a systems management perspective, these plans also lack the granular detail necessary to ensure that each step of the remedial process is spelled out, with firm dates and deadlines, and with the persons responsible for implementation of the tasks clearly identified.  Rather, they are often aspirational, and do not give dates for discrete tasks to be completed.

8.     I find it impossible to believe that Defendants' contractor Corizon lacks the basic administrative knowledge and skill in their corporation to develop specific and accountable remedial action plans.

**Salaries for Health Care Staff**

9.      Working in a prison as a health care provider[1] is not a glamorous job.  As a result, it is often necessary to pay clinicians more than the prevailing community rates in order to recruit them to work in this challenging environment.  I recommend that the Court order ADC and Corizon to retain the services of a nationally based healthcare consulting firm, of which there are several, to analyze Corizon's current levels of pay for provider-level staff and compare the salaries to comparable provider positions in the State of Arizona.  The compensation assessment needs to take into consideration the actual per-hour rate plus any additional benefits like vacation time, sabbaticals, continuing educational time and expenses, malpractice insurance, retirement plans, healthcare benefits, relocation expenses, and any other forms of compensation.  If, as I suspect, Corizon's current salaries and associated benefits are lower than those in the community, the Court should order ADC to require their contractor pay salaries that exceed the market rate and to offer comparable benefits packages to what is typically seen in healthcare settings.

**The Importance of Writing Things Down**

10.      As a threshold matter, I observe that in their remedial plans, as well as in testimony of ADC monitors that I reviewed, Defendants often assert (without evidence or proof) that they truly are meeting the Stipulation's requirements, but that their failing scores are simply due to health care or other staff not documenting properly that they performed certain tasks.  With respect to the "Trust us, care is getting done," attitude, the real issue, in addition to basic accountability, is with regard to continuity of care and follow-up.  If health care staff don't document what they have done, then how does anybody seeing the patient in the future know what the problem was, and what the prior treatment was, so they can evaluate whether the past treatment worked or not?  As every

---

[1] The term "provider" means a Physician, Nurse Practitioner or Physician's Assistant who provides primary medical care to class members.  A psychiatrist (M.D.) is similarly considered provider-level; a dentist (D.D.S.) similarly is a dental provider.

good pre-med student learns, you have to show your work to get full credit, or in other words, "not documented, not done."  Documentation is of paramount importance.

11.    I also note that in many cases in the remedial plans, Defendants assert that they will remediate noncompliance through training and education of line health care staff.[2]  However, when this is juxtaposed with written reports and testimony that Corizon has high rates of staff turnover (*see*, for example, 4/17/17 Tr. at 646:3-653:13), and recent testimony that ADC and Corizon have no written instructions to health care staff about the requirements of the Stipulation or the court's orders beyond the methodology monitoring guide, (*see*, for example, 5/10/17 Tr. at 799:11-12; 801:18-19, 860:23-25), any plans to educate staff will fail.  For example, attorneys for ADC told the Court in February that noncompliance with PM 39 at Eyman was due to three nurses not documenting information correctly, but they had been retrained.  [2/8/17 Tr. at 20:15-25]  But as demonstrated below at paragraph 23, Defendants' monitoring data for PM 39 still shows ongoing noncompliance at Eyman.

12.    I am flabbergasted to learn that Corizon and ADC do not provide any written instructions or checklists to health care staff about what the Stipulation's requirements and Court's orders say, other than a copy of the Monitoring Guide for ADC monitors.  The failure to codify plans, guidelines, educational steps, assignments, and accountability is either managerial incompetence or willful blurring of any attempt to hold them accountable.

13.    It's basic human nature and pedagogy that people learn and retain information in different ways, and training and education that is all lectures or talking will not stick unless there are other modalities of teaching, such as written materials and checklists, provided to staff to reference in the future in their everyday activities.  Using written checklists and prompts are a standard part of the delivery of medical care:

---

[2]  [*See*, for example, Doc. 1609-1 at 11, 13, 21; Doc. 1665 at 3:7-9, 6:19-20, 10:6-8, 11:1-3, 13:25-27, 15:28-16:2, 16:9-10, 20:13-15; Doc. 1743 at 5:5-7; Doc. 1977 at 5:16-18, 6:4-5, 6:25-27, 8:10-11, 10:1-4, 10:9-11, 10:13-14, 10:22-23, 10:28-11:1, 11:4-9; Doc. 2051 at 4:28-5:2, 5:26-28, 7:24-26]

whether it's using a written checklist of contra-indications of prescriptions, or a nursing encounter treatment workflow sheet; a cornerstone of a functional and safe health care system is written guides.  Health care staff must have written prompts and reminders when treating patients so that they minimize the risk of mistakes and do not inadvertently overlook any required component of treatment.

**Pharmacy Performance Measures**

14.    Performance Measure ("PM") 11 requires "Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT."  [Doc. 1185-1 at 8]  The Court found Defendants substantially noncompliant with this measure on May 20, 2016, at Eyman, Florence, Lewis, Tucson, Winslow, and Yuma prisons.  [Doc. 1583 at 2]  Defendants' CGAR reports show ongoing noncompliance with PM 11.

|          | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar |
|----------|------|------|-----|------|-----|-----|-----|-----|-----|-----|
| Eyman    | 68   | 50   | 66  | 80   | 78  | 86  | 80  | 48  | 76  | 82  |
| Florence | 78   | 70   | 77  | 78   | 88  | 92  | 87  | 93  | 92  | 92  |
| Lewis    | 60   | 63   | 73  | 71   | 56  | 67  | 66  | 73  | 68  | 72  |
| Tucson   | 77   | 76   | 80  | 80   | 88  | 85  | 80  | 82  | 85  | 74  |
| Winslow  | 93   | 90   | 87  | 97   | 93  | 100 | 93  | 93  | 90  | 97  |
| Yuma     | 80   | 93   | 87  | 95   | 92  | 97  | 95  | 100 | 88  | 96  |

15.    PM 13 requires "Chronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication."  [Doc. 1185-1 at 8]  The Court found Defendants substantially noncompliant with this measure on May 20, 2016, at Douglas, Eyman, Florence, Lewis, Perryville, Tucson, and Yuma prisons.  [Doc. 1583 at 2]  Defendants' CGAR reports show ongoing noncompliance with PM 13.

|           | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar |
|-----------|------|------|-----|------|-----|-----|-----|-----|-----|-----|
| Douglas   | 64   | 72   | 93  | 79   | 82  | 89  | 78  | 94  | 85  | 97  |
| Eyman     | 83   | 58   | 86  | 60   | 90  | 84  | 82  | 90  | 42  | 62  |
| Florence  | 70   | 44   | 68  | 65   | 59  | 59  | 73  | 88  | 54  | 51  |
| Lewis     | 56   | 70   | 69  | 67   | 77  | 77  | 76  | 79  | 79  | 72  |
| Perryville| 65   | 51   | 63  | 54   | 53  | 71  | 72  | 84  | 90  | 78  |

|         | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar |
|---------|------|------|-----|------|-----|-----|-----|-----|-----|-----|
| Tucson  | 86   | 92   | 90  | 75   | 86  | 87  | 81  | 79  | 94  | 95  |
| Yuma    | 92   | 82   | 90  | 92   | 91  | 87  | 91  | 94  | 98  | 88  |

16.     PM 35 requires "All inmate medications (KOP and DOT) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption."   [Doc. 1185-1 at 10]   The Court found Defendants substantially noncompliant with this measure on April 24, 2017, at Eyman, Florence, Lewis, Phoenix, and Tucson.  [Doc. 2030 at 2]  Defendants' CGAR reports show ongoing noncompliance with PM 35.

|          | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar |
|----------|------|------|-----|------|-----|-----|-----|-----|-----|-----|
| Eyman    | 76   | 72   | 80  | 86   | 54  | 64  | 56  | 76  | 57  | 19  |
| Florence | 48   | 42   | 43  | 53   | 69  | 63  | 44  | 39  | 55  | 56  |
| Lewis    | 33   | 47   | 35  | 31   | 32  | 32  | 28  | 24  | 40  | 66  |
| Phoenix  | 71   | 43   | 89  | 75   | 44  | 67  | 100 | 80  | 91  | 38  |
| Tucson   | 27   | 19   | 16  | 14   | 10  | 50  | 33  | 25  | 10  | 28  |

17.     Defendants' original remediation plan for PM 11 included the development of multiple logs for tracking purposes.  [Doc. 1609-1 at 4 (citations to page numbers of Court filings is to the page number at the top of the page)]  Their second remediation plan of August 2016 involved creating new files and books after conducting a "SWOT (Strength, Weakness, Opportunity, and Threat) analysis."  [Doc. 1665 at 3]  In November 2016, they reported they had performed "a Failure Mode Effects Analysis (FMEA) of the medication management process" that "identified the factors and procedures that contributed to low performance scores" and that "improvement measures began in July 2016."  [Doc. 1743 at 7]  Notably, they do not indicate what the "factors and procedures" were that contributed to the noncompliant scores.

18.     ADC's remediation plan for PM 13 included a variety of technical and systems fixes that I agree would be helpful, but many of the proposals state that tasks "will be" done or that changes have been requested.  Without dates it is unclear whether or not these changes occurred.  For example, I agree with the June 2016 plan that health

care staff get off-line access to the electronic records system so that nurses passing medication in housing units can document in the Medication Administration Record ("MAR") the delivery of medication at the time it occurs.  [Doc. 1609-1 at 6]  But it is unclear if this has occurred, as Defendants' subsequent remediation plan two months later said that "Corizon is still working with its Electronic Medical Record (EMR) vendor." [Doc. 1665 at 7]

19.     ADC's remediation plan for PM 35 states that Corizon has hired a pharmacy monitor who will tour facilities and vaguely describes that he will "implement successful processes and underperforming facilities."  [Doc. 1977 at 5]  This does not tell you much. More concretely, they propose that at Eyman, Florence, and Lewis, intake nurses will see each incoming prisoner to ensure he has his medications.  [Doc. 1977 at 5, 6]  It is unclear why this isn't already standard practice, and why this isn't being done as a remedial effort at the other noncompliant prisons.  With regard to Phoenix prison, which is the intake center for all adult male prisoners, the remedial plan only appears to address intra-system transfers (i.e. prisoners coming from other Arizona prisons), but prisoners coming in from county jails need continuity in medication as well.

20.     I repeatedly have informed Defendants, to no avail, that the entire structure that Corizon and its subsidiary PharmCorr have put in place for pharmacy services leads to inevitable delays in the provision of prescription medication.   In my April 2016 declaration to the Court, (Doc. 1539, ¶ 127), I stated:

> As a preliminary matter, I have long maintained that, in a prison or jail setting, an automatic refill system for chronic care and psychotropic medications is critical, and I so advised the parties in this action.  ADC's system of requiring patients, some of whom are on psychotropic medications for disabling mental conditions, to file health needs requests to refill their prescriptions practically guarantees they will have gaps in receiving medications.  This is particularly true in a system like ADC's, as the Corizon pharmacy responsible for filling the prescriptions is not local, but in Oklahoma.

21.     My opinion has not changed. In fact, upon reviewing the testimony of Martin Winland, ADC's pharmacist and pharmacy monitor, I believe this even more strongly.  He testified that he is not involved in working with Corizon and PharmCorr to

implement remedial plans to address the systemic failures in the pharmacy performance measures.  [March 21, 2017 testimony at 180:2-9]  It is puzzling that he has failed to get involved in working with ADC's contractor and subcontractor to develop a remedial plan. He also asserted that the ongoing noncompliance, in his opinion, was due to a failure to document properly the administration of prescriptions, but he had not taken efforts to determine if this truly was the cause of the noncompliance.  [*Id.* at 191:13-192:25]  In any event, as explained above in Paragraph 10, if it is not documented that a patient was provided prescription medications, it is as if it was not done.

22.     My recommendations for what ADC and Corizon need to do to come into compliance with the pharmacy performance measures, and to implement a functional pharmacy services system that does not have gaps in the provision of psychotropic and chronic care medications, are as follows:

a.      Stop using a pharmacy located almost 1,000 miles away from the prisons for just-in-time and urgent medications.  It is fine to use a remote pharmacy to handle routine medications and to restock a pharmacy stock room that is located on site, but it is always going to be a failure to utilize it for all your daily needs.  I understand Corizon's financial desire to use their own subsidiary, PharmCorr, but given the timeframes of the Stipulation's requirements, they are setting themselves up for failure because system-wide delays will continue to occur due to basic geography.

b.      Create and operate local stock pharmacies at each prison site. Correctional healthcare formularies are pretty well worked out and predictable, so they should have a 2-3 day supply of all of the common medications utilized in stock so that when disruptions occur to deliveries from the remote pharmacy or when medications are ordered STAT, they can just bridge the patient with the local supply quickly and without fuss.

c.      Implement an automatic refill system for all chronic care and psychotropic medications, and discontinue the practice of requiring patients

to submit a Health Needs Request every time they are close to running out of their supply and need refill.  This concept of requiring patients to submit a Health Needs Request to refill chronic medications is simply illogical and guaranteed to fail given the extreme inefficiency and lack of accountability that exists in the Health Needs Request process.

d.      Identify those medications in the formulary that are chronic care medications and psychotropic medications and change policy and procedure to reflect that these medications are considered "expected to be refilled" so that there is a grace period for the actual renewal instead of just cutting someone off.

e.      Implement an automated "tickler" system that reminds providers of when prescriptions needed to be renewed.  Defendants' June 2016 remedial plan stated that such a system was going to be put into place with regard to PM 13, but it is unclear why or how it is not working.  [Doc. 1609-1 at 5-6]

f.      Change the electronic medical record logic to allow for provider notification of medications that need to be renewed and an easy, quick, ergonomic method for them to do that renewal.  The current methodology is inefficient, clunky, way more work than it should be, and subsequently renewals continue to be a problem.

g.      Engage in a comprehensive review of the prescription medications that are administered via "Watch-Swallow" or DOT (directly observed therapy) to see if some of them can be designated as KOP (Keep on Person) medications.  The focus should be on keeping dangerous medications DOT, but expanding the KOP program as much as possible.  From my experience with ADC, there are many medications managed as DOT that do not necessarily need to be, and this jams up the medication administration process.  This will decrease the workload of nursing staff who must administer the medications cell-front (in higher security units or during

lock-downs) or via a pill line.  This will free up the staff, and reduce the margin for documentation errors.

### Performance Measures Related to Access to Provider-Level Care

23.    PM 39 requires "Routine provider referrals will be addressed by a Medical Provider and referrals requiring a scheduled provider appointment will be seen within fourteen calendar days of the referral."  [Doc. 1185-1 at 10]  The Court found Defendants substantially noncompliant with this measure on May 20, 2016 at Eyman, Florence, Lewis, Perryville, and Tucson; and found Yuma substantially noncompliant on April 24, 2017.   [Doc. 1583; Doc. 2030 at 2]    Defendants' CGAR reports show ongoing noncompliance with PM 39.

|            | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar |
|------------|------|------|-----|------|-----|-----|-----|-----|-----|-----|
| Eyman      | 60   | 59   | 46  | 54   | 58  | 58  | 68  | 52  | 69  | 86  |
| Florence   | 66   | 60   | 41  | 48   | 70  | 75  | 70  | 79  | 68  | 90  |
| Lewis      | 71   | 100  | 75  | 76   | 98  | 98  | 55  | 82  | 69  | 90  |
| Perryville | 66   | 33   | 51  | 71   | 82  | 86  | 84  | 83  | 91  | 76  |
| Tucson     | 58   | 54   | 69  | 81   | 76  | 72  | 79  | 94  | 97  | 95  |
| Yuma       | 51   | 51   | 42  | 47   | 63  | 72  | 88  | 90  | 94  | 86  |

24.    PM 40 requires "Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral."  [Doc. 1185-1 at 10]  The Court found Defendants substantially noncompliant with this measure on April 24, 2017 at Eyman and Tucson prisons.  [Doc. 2030]  Defendants' CGAR reports show ongoing noncompliance with PM 40.

|        | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar |
|--------|------|------|-----|------|-----|-----|-----|-----|-----|-----|
| Eyman  | 34   | 13   | 13  | 83   | 85  | 65  | 100 | 100 | 100 | 46  |
| Tucson | 50   | 0    | 83  | 100  | N/A | 86  | 91  | 71  | 67  | 100 |

25.    Although Defendants' more recent CGAR reports show improvements at some institutions with PM 39, the numbers may overstate compliance.  Richard Pratt testified that he was not aware that Corizon had apparently re-implemented a policy that requires all patients be seen a minimum of two times on Nurse's Line for the same health care complaint before the nurse could make a referral for the patient to see the provider.

[5/10/17 Tr. at 736-739]   However, Corizon proposed in a Corrective Action Plan ("CAP") for PM 39 at Perryville, that ADC approved on October 29, 2016 doing precisely that.  Attached as Exhibit 2 is a copy of that CAP.

26.     Implementing a policy whereby patients have to submit sick call requests twice per problem in order to even qualify to be seen by a provider is just absurd and it represents an unreasonable barrier to access to care.  The entire HNR to nurse to provider cascade that is currently in place is inefficient, slow, and unpredictable.   The entire process needs to be fixed so that it runs properly and fosters appropriate accountability.

27.     I have been informed that Corizon has proposed eliminating Health Needs Requests (HNRs) entirely for accessing healthcare at medium-security and minimum-security prisons.  *See* Exhibit 3.  I oppose this change with the strongest sentiments possible.  This amounts to nothing more than a blatant attempt to avoid accountability and to eliminate the only traceable audit trail of patient requests for care.

28.     This practice would guarantee a decrease in actual access to healthcare within the system, and it would make it virtually impossible to recreate the timeline of care that is critical in many cases for providers (and for monitors) to review.  Indeed, what should be happening is that the HNRs remain the cornerstone of requesting access to care and that the forms be assigned a serial number so that the disposition of those requests can be tracked for timeliness and for completion.

29.     This Corizon policy has the intended effect of reducing the number of referrals made to providers, but this reduction comes at the price of denying patients access to providers.  While reducing the number of referrals potentially decreases delays because of a reduced number of patients waiting to be seen, this means that patients who need to see a provider are not getting to do so because they have to keep coming back to the nurse's line about the same ailment.  This will overestimate and inflate compliance with the timeframe requirements for providers to see patients in PMs 39 and 40, as it suppresses the true number of patients who needed to be seen by the provider.

30.     This requirement that the patient see the nurse twice on the same problem

-11-

1  erects a barrier to care because patients will be charged $4.00 each time they are seen on

2  nurse's line, before seeing the provider. I previously noted ADC's $4.00 copay creates a

3  disincentive for patients to request care.   I wrote in my November 8, 2013 report

4  (Doc. 1104-1 at 246), that

> the existing HNR process imposes a barrier to medical care. Prisoners soon
> recognize that the system is efficient at charging $4 to file HNRs, but not at
> responding to their healthcare needs.   This creates a disincentive for
> prisoners to turn in HNRs: they know they will not get seen by medical staff
> but they do know that they will be charged.  Prisoners delay asking for care
> until they are sicker and sicker, at greater risk of negative outcomes, and far
> more difficult to treat.

9       31.    This is especially true when one considers that ADC prisoners, if they have

10  a job, are paid pennies an hour. Minimum wage for functionally literate Arizona prisoners

11  is 15 cents an hour, and 10 cents an hour if the person is illiterate.  [*See* ADC Department

12  Order 903: Inmate Work Activities §§ 903.02.1.3.1, 903.02.1.3.1.2, 903.02.1.5.1, *at*

13  https://corrections.az.gov/sites/default/files/policies/900/0903-effective_102216.pdf)]  If a

14  person has a job and is earning minimum wage of 15 cents an hour, each nurse's line visit

15  costs the equivalent of 26 hours and 40 minutes of work; a patient would have to work the

16  equivalent of 53 hours and 20 minutes to pay $8, for two nurse's line visits, before he or

17  she would be referred to see a provider—which, of course, would cost another $4, for a

18  total of 80 hours of work for $12, for these three encounters.

19       32.    Defendants' first remedial plan for PM 39 called for requiring providers to

20  see an increased number of patients each day.  [Doc. 1609-1 at 10]  I noted in my previous

21  report to the Court that "assigning additional duties to staff who, in my opinion, were

22  already fully engaged with their existing duties cannot simultaneously build a functional

23  and sustainable healthcare delivery system."   [Doc. 1670, ¶ 10]  Defendants' second

24  remedial plan for PM 39 reiterated the previous plan.  [Doc. 1665 at 11-12]  Defendants'

25  third remedial plan for PM 39 filed in November 2016 reiterated the same.  It said that

26  Corizon's own monitors (who were hired to monitor ADC's monitoring, rather than

27  "favor[ing] front-line physicians who see patients on a daily basis as opposed to adding

28  another layer of administrations," (Doc. 1670 ¶ 9)) "are personally visiting each facility,

speaking to staff, and observing procedures to evaluate the effectiveness of the previous corrective actions, if necessary." [Doc. 1743 at 10]

33.     This passage from the November 2016 remedial plan, like many other elements of the plan, lacks the granular specificity needed to implement sustainable systemic change.  I read that sentence full of bureaucratic words and wonder, among other things:  When are they visiting?  Do they visit on all days of the week and shifts of the day?  Which levels of staff are they speaking to?  What procedures are they observing?  How is "effectiveness" measured?   What are the component parts of the previous corrective actions?  Who is responsible for implementing the previous corrective actions?  What are the deliverables from this group and how do they differ from the current ongoing monitoring?   None of these questions are answered by Defendants' remedial plan.  In March 2017, their fourth remedial plan for PM 39 finally hit on the obvious:  to hire an additional telemedicine provider and additional telemedicine kiosks.  [Doc. 1977 at 6]

34.     My recommendations for ensuring that providers see routine and urgent referrals from nursing line in a timely manner are as follows.  These recommendations apply to Health Needs Requests for medical, mental health, and dental care.

> a.     Perform a face-to-face nursing encounter with any patient submitting a Health Needs Request within 24 hours.

> b.     Complete an appropriate and thorough triage assessment of that patient and assign a triage score to the Health Needs Request.

> c.     Use the triage scores to prioritize who sees the providers and track the aging report for the different levels of triage to determine if additional provider time is needed at a given location.

> d.     Assign a tracking number (serial number) to the Health Needs Request and use that number to track the disposition of the Health Needs Request all the way through the system until final disposition.

> e.     Maintain reports on Health Needs Requests completion using the

1    tracking numbers.

2    35.    Access to care, particularly access to providers, is the single most important

3    element of a system that meets minimum legal requirements.   Anything that impedes

4    access to care or obscures the ability to monitor access to care should be vigorously

5    resisted.  ADC's and Corizon's plans to eliminate Health Needs Requests, or a policy that

6    requires two nursing evaluations prior to seeing a provider, are perfect examples of

7    policies that move this system further away from compliance with minimum standards.

8    **Performance Measures Related to Diagnostic Procedures**

9    36.    Defendants continue to be out of compliance on a variety of performance

10   measures related to timely provision of, and review of, diagnostic tests and procedures.

11   Defendants   are   also   noncompliant   in   reviewing   and   acting   upon   discharge

12   recommendations from hospitals.  Both of these deficiencies place patients at elevated risk

13   for bad outcomes and they need to be solved.   In modern medicine, at least 80% of all

14   diagnoses are based on objective testing and procedures.  As such, the delay in reviewing

15   the results is really tantamount to a delay in diagnosis.   Additionally, when care is

16   elevated to the level of outside hospital and specialist care, that care by definition is

17   critical and medically necessary.  Failure to review and implement the recommendations

18   of outside specialists and care rendered at the hospital multiplies the risks of a bad

19   outcome, because the patient is clearly sick enough to require care beyond what is

20   available in a correctional facility and it is of singular importance to review the

21   recommendations and to continue the care recommended.

22   37.    PM 44 requires "Inmates returning from an inpatient hospital stay or ER

23   transport with discharge recommendations from the hospital shall have the hospital's

24   treatment recommendations reviewed and acted upon by a medical provider within 24

25   hours."  [Doc. 1185-1 at 11]  The Court found Defendants substantially noncompliant on

26   April 24, 2017 with this measure at Eyman, Florence, and Lewis prisons.  [Doc. 2030 at

27   2] Defendants' CGAR reports show ongoing noncompliance with PM 44.

28

|          | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar |
|----------|------|------|-----|------|-----|-----|-----|-----|-----|-----|
| Eyman    | 37   | 44   | 46  | 72   | 85  | 89  | 72  | 50  | 58  | 50  |
| Florence | 60   | 58   | 89  | 84   | 91  | 76  | 67  | 71  | 53  | 100 |
| Lewis    | 80   | 71   | 29  | 48   | 38  | 43  | 50  | 38  | 22  | 94  |

38.    PM 45 requires "On-site diagnostic services will be provided the same day if ordered STAT or urgent, or within 14 calendar days if routine." [Doc. 1185-1 at 11] The Court found Defendants substantially noncompliant on April 24, 2017 with this measure at Lewis and Tucson prisons. [Doc. 2030 at 2] Defendants' CGAR reports show ongoing noncompliance with PM 45.

|        | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar |
|--------|------|------|-----|------|-----|-----|-----|-----|-----|-----|
| Lewis  | 69   | 85   | 78  | 80   | 81  | 69  | 77  | 64  | 69  | 68  |
| Tucson | 71   | 70   | 79  | 79   | 73  | 80  | 84  | 71  | 48  | 97  |

39.    PM 46 requires "A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison." [Doc. 1185-1 at 11] The Court found Defendants substantially noncompliant on May 20, 2016 with this measure at Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma prisons. [Doc. 1583 at 2] Defendants' CGAR reports show ongoing noncompliance with PM 46.

|           | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar |
|-----------|------|------|-----|------|-----|-----|-----|-----|-----|-----|
| Douglas   | 67   | 78   | 78  | 69   | 65  | 80  | 80  | 98  | 98  | 97  |
| Eyman     | 78   | 82   | 82  | 60   | 34  | 70  | 64  | 78  | 74  | 34  |
| Florence  | 47   | 48   | 43  | 55   | 30  | 53  | 60  | 50  | 65  | 12  |
| Lewis     | 76   | 86   | 84  | 76   | 90  | 91  | 90  | 96  | 85  | 49  |
| Perryville| 40   | 32   | 60  | 52   | 28  | 28  | 42  | 50  | 94  | 70  |
| Phoenix   | 82   | 76   | 81  | 93   | 65  | 85  | 72  | 81  | 98  | 90  |
| Tucson    | 51   | 57   | 50  | 50   | 66  | 59  | 63  | 68  | 82  | 73  |
| Yuma      | 82   | 80   | 78  | 84   | 76  | 76  | 74  | 96  | 94  | 86  |

40.    PM 47 requires "A Medical Provider will communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request." [Doc. 1185-1 at 11]   The Court found Defendants substantially noncompliant on October 7, 2016 with this measure at Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, Winslow, and Yuma prisons. [Doc. 1709] Defendants'

CGAR reports show ongoing noncompliance with PM 47.

|           | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar |
|-----------|------|------|-----|------|-----|-----|-----|-----|-----|-----|
| Douglas   | 67   | 88   | 89  | 80   | 44  | 100 | 100 | 100 | 83  | 85  |
| Eyman     | 65   | 32   | 38  | 47   | 55  | 25  | 45  | 55  | 54  | 47  |
| Florence  | 53   | 31   | 49  | 68   | 64  | 41  | 63  | 59  | 23  | 40  |
| Lewis     | 51   | 61   | 56  | 64   | 71  | 78  | 77  | 25  | 83  | 44  |
| Perryville| 43   | 72   | 61  | 47   | 64  | 70  | 79  | 89  | 74  | 88  |
| Phoenix   | 100  | 67   | 100 | 100  | 75  | 0   | N/A | 67  | 67  | 100 |
| Tucson    | 15   | 29   | 6   | 41   | 41  | 45  | 44  | 56  | 67  | 59  |
| Winslow   | 50   | 100  | 50  | 100  | 100 | 100 | N/A | 86  | 50  | 100 |
| Yuma      | 50   | 59   | 66  | 80   | 79  | 55  | 48  | 80  | 83  | 89  |

41.    Defendants' initial remedial plan for PM 44 was submitted in March 2017. [Doc. 1977 at 6-7]  It states that the Facility Health Administrator (FHA) at Eyman will be exclusively responsible for reviewing and acting upon hospital treatment recommendations.  This is a serious problem for two reasons: first, the information contained in those reports is medical treatment, and therefore must be reviewed by a treating provider who is familiar with the patient as opposed to an administrator with no medical training; and second, the Stipulation requires that it be a Provider who reviews the reports, which is as it should be.

42.    Defendants' remedial plan for PM 46 was originally submitted in June 2016. [Doc. 1609-1 at 11]  It was wholly inadequate—it discusses improvements with the electronic medical record with respect to only one facility (Phoenix) when the Court found Defendants noncompliant at seven additional facilities.  It is unclear to me why statewide electronic medical record would contain improvements isolated to one facility. It also again piles more work on providers already stretched thin by requiring them to dedicate an hour a day to nothing but reviewing diagnostic reports.  Additionally, it required site medical directors to sign a written statement acknowledging what they should have already known is among their duties—to hold staff accountable for meeting requirements.

43.    Defendants' second remedial plan for PM 46 was submitted in August 2016. [Doc. 1665 at 12-14]  The proposal included adding nursing staff at Perryville to assist

-16-

providers in reviewing diagnostic reports. While this plan is certainly possible to implement, I think it is poor use of limited nursing time and that improvements in efficiency and data handling would be much more productive in helping achieve compliance. Defendants' third remedial plan was paper thin, acknowledging ongoing noncompliance, and again repeating verbatim the same "plan" as PM 39, as I discussed in paragraph 33 above, of having Corizon's monitors visit facilities and talk to staff.

44.     Defendants' remedial plan for PM 47 consisted of Corizon's monitors visiting facilities and talking to staff. [Doc. 1743 at 11] Clearly, this is not working, given the ongoing noncompliance.

45.     My recommendations for improvements include:

> a.     It should be standard practice that any patient arriving back at a correctional facility be checked in by the nursing staff, including a set of vital signs and an assessment. Any paperwork or orders for care should be reviewed at that time with the doctor on call so that the treatment plans can be implemented in a timely manner.

> b.     All diagnostic tests, including labs, radiology reports, outside records should be reviewed the day they arrive by a provider, preferably the one who ordered the tests or specialty consult. This is a minimum requirement for safe practice.

**Specialty Care Performance Measures**

46.     As I previously have noted, "the provider must be able to refer patients for specialty consultations. … In addition, the specialists who see the prisoners are authorized to recommend treatment, but not to order it. Thus, it is critical that the prison health care system ensures that prison health care providers promptly review the consultant's treatment recommendations and either order the treatment or document why it is not appropriate." [Doc. 1539, ¶ 80]

47.     PM 50 requires "Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the

consultation being requested by the provider."  [Doc. 1185-1 at 11]  The Court found Defendants substantially noncompliant with PM 50 at Florence prison on April 24, 2017. [Doc. 2030 at 2]  Defendants' CGAR reports show ongoing noncompliance with PM 50.

| | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|---|---|---|---|---|
| Florence | 77 | 72 | 76 | 78 | 93 | 71 | 53 | 55 | 48 | 59 |

48.    PM 51 requires "Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider." [Doc. 1185-1 at 11]  The Court found Defendants substantially noncompliant with this measure at Eyman, Florence, and Tucson prisons on April 24, 2017.  [Doc. 2030 at 2] Defendants' CGAR reports show ongoing noncompliance with PM 51.

| | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 82 | 52 | 76 | 89 | 72 | 66 | 68 | 72 | 78 | 80 |
| Florence | 66 | 80 | 82 | 80 | 77 | 81 | 90 | 74 | 52 | 87 |
| Tucson | 70 | 81 | 77 | 84 | 82 | 88 | 59 | 76 | 83 | 76 |

49.    PM 52 requires "Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report."  [Doc. 1185-1 at 11] The Court found Defendants substantially noncompliant with this measure at Florence, Perryville, and Tucson prisons on April 24, 2017.  [Doc. 2030 at 2]  Defendants' CGAR reports show ongoing noncompliance with PM 52.

| | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|---|---|---|---|---|
| Florence | 45 | 50 | 61 | 56 | 71 | 69 | 73 | 76 | 56 | 52 |
| Perryville | 76 | 79 | 70 | 70 | 82 | 71 | 90 | 92 | 96 | 95 |
| Tucson | 43 | 47 | 42 | 39 | 13 | 57 | 57 | 59 | 82 | 85 |

50.    Defendants submitted their remedial plans on March 17, 2017 and May 8, 2017 for these three performance measures.  [Doc. 1977 at 8-11; Doc. 2051 at 6-8]  They describe anecdotally some minor changes of practice that were well intentioned but ultimately do not really address the critical issue of having the results of these appointments reviewed by an appropriate provider in a reasonable amount of time. Specialists' recommendations may be critical to a patient's treatment plan, thus all outside

1    documentation should be reviewed by a registered nurse upon return to the prison.

2    Moreover, the recommendations should be reviewed immediately with the local provider

3    or the on-call provider if it is after hours to ensure orders are implemented in a timely

4    fashion.[3]

5         51.    Defendants' remedial plans refer to "challenges in establishing long-term

6    relationships with community-based specialty service providers." [Doc. 2051 at 6]  That

7    is an understatement.  In 2009, reimbursement rates for specialists contracted with ADC

8    were capped so as to be no higher than those paid by the State's Medicaid program, the

9    Arizona Health Care Cost Containment System.  [Doc. 1, ¶ 63]; Ariz. Rev. Stat. § 41-

10   1608 (2009).  Unsurprisingly, at the time this went into effect, the number of specialists

11   willing to accept ADC prisoners plummeted.

12        52.    This restriction on how much community specialists are paid is, in my

13   opinion, the single biggest cause for the failures in complying with PMs 50 and 51.

14   (According to Defendants' own data, there are more institutions with failing scores than

15   the ones the Court found noncompliant, according to Doc. 2041 at 50-51.)  With certain

16   specialties, Corizon will be lucky to find one or two doctors in the entire state willing to

17   accept Medicaid rates.  Unless and until ADC (or its contractor) can pay higher rates to

18   subcontracted specialists in the community, they will continue to face serious problems in

19   recruiting and retaining specialists.  A basic first step to address this failure is to enlist the

20   State's publicly-funded medical schools and their affiliated practice groups to provide

21   their expertise and assistance, including delivery of specialty care, to persons who are

22   wards of the State.

23        53.    The constant turnover in subcontracted specialists also leads to fragmented

24   and delayed treatment for serious medical conditions, as I recently observed in relation to

25   the delays in treatment of the recurrence of prostate cancer for named plaintiff Shawn

26

27        [3] The Court noted with regard to the remedial plan for PM 50, that it consisted of
     sending a memo to the field, and that it was not until a month after ADC told the Court the
28   memo would be sent that it was actually issued.  [5/10/17 Tr. at 830:13-831:12]

Jensen.  [Doc. 1958-1 at 3-6]   A contributing factor to the delays in his recurrence (besides Corizon's convoluted utilization management process, see below), is that there is no continuity of care because he often is seeing a different urologist or oncologist than the one who saw him previously, and the specialists often do not have copies of past reports.

54.     The second biggest contributing factor to problems around specialty care is Corizon's convoluted Utilization Management process.  In my past experience reviewing hundreds of class members' medical records and the records of prisoners who died in custody, it takes UM weeks to review and approve the provider's request.    The Stipulation's performance measure that looks at the timeliness of Utilization Management review of a request, PM 48, only measures the review for denials, and gives UM 14 days to review and reject a request.[4]  If it is taking UM two or three weeks to review and approve a request, a scheduler hoping to comply with the Stipulation would be running into the 30 day and 60 day deadlines set out by the Stipulation by the time they are directed that the request was approved and that they can go ahead and schedule the appointment.  I noted in a past report to the Court that Corizon's regional medical director testified that he was the only person at the Corizon regional office who reviewed all specialty requests submitted statewide, (*see* Doc. 1104-1 at 274), and I don't know if that has changed.   But clearly having only one or two persons with the authority to decide whether to approve or deny requests will inevitably lead to a delay in reviewing the requests.   My recommendation is that rather than have one person review all requests, Corizon empower more individuals to make these reviews.  This not only has advantages for spreading out the work, but it affords the valuable opportunity for clinicians with

---

[4] PM 48 states, "Documentation, including the reason(s) for the denial, of Utilization Management denials of requests for specialty services will be sent to the requesting Provider in writing within fourteen calendar days, and placed in the patient's medical record."  [Doc. 1185-1 at 11]  For a year and a half, Defendants reported "Not Applicable" in their reviews of PM 48 (and 49), because they took the position that since Corizon labeled denials as "Alternate Treatment Plans," then no review was necessary. [5/10/17 Tr. at 701:1-703:3]  Since they started monitoring these measures correctly, they have shown widespread noncompliance, although apparently the Court has not yet officially found them noncompliant.  [*See* Doc. 2041 at 50]

direct knowledge and access to the prisoner to make the decisions as opposed to a disembodied administrator.   My recommendation would be to empower the facility medical directors to approve these requests.

55.    The Stipulation includes a requirement that ADC and its health care contractors review requests for specialty care using InterQual or another equivalent industry standard utilization management program.  [Doc. 1185, ¶ 11]  Defendants have represented that Corizon is now using InterQual.  If that is the case, then the analysis from InterQual should be available for all to see, so that there is transparency in the decision-making system.   InterQual can be an excellent tool when used as one data point for making evidence-based treatment decisions; I suspect, however, that Corizon staff use the service primarily to justify denying care.

56.    My recommendation is that the Court order ADC and Corizon to include the actual clinical analysis (InterQual or other) on the referral for care so the referral and reasons for whatever disposition is assigned to the referral can be viewed in the same document.  In other words, show your work!

**Chronic Care and Infirmary Care Performance Measures**

57.    Chronic care clinics are a major focus of healthcare in a well-functioning correctional setting.   Regularly scheduled appointments allow providers to track the progress of patients with chronic illnesses and ensure appropriate levels of treatment.   I previously described to the Court the importance of a functioning infirmary/inpatient hospital system, and the horrifying deaths and suffering that class members have experienced due to inadequate care at the infirmaries.  [Doc. 1539, ¶¶ 67-70]

58.    PM 54 requires "Chronic disease inmates will be seen by the provider as specified in the inmate's treatment plan, no less than every 180 days unless the provider documents a reason why a longer time frame can be in place."  [Doc. 1185-1 at 11]  The Court found Defendants substantially noncompliant with this measure on May 20, 2016 at Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma.  [Doc. 1583 at 2]

|  | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 82 | 66 | 86 | 78 | 82 | 74 | 72 | 62 | 46 | 50 |
| Florence | 92 | 92 | 97 | 98 | 92 | 92 | 90 | 80 | 88 | 85 |
| Lewis | 78 | 89 | 84 | 99 | 93 | 89 | 93 | 89 | 91 | 78 |
| Perryville | 94 | 96 | 92 | 92 | 98 | 96 | 96 | 92 | 96 | 94 |
| Phoenix | 100 | 96 | 98 | 97 | 93 | 98 | 95 | 92 | 96 | 98 |
| Tucson | 80 | 69 | 76 | 90 | 87 | 91 | 92 | 79 | 96 | 89 |
| Yuma | 90 | 92 | 98 | 94 | 98 | 92 | 98 | 96 | 98 | 98 |

59.     PM 66 requires that "In an IPC, a Medical Provider encounters will occur at a minimum every 72 hours." [Doc. 1185-1 at 12]   The Court found Defendants substantially noncompliant with this measure on May 20, 2016 at Florence, Lewis, and Tucson prisons. [Doc. 1583 at 2]  Defendants remain shockingly out of compliance with PM 66.

|  | June | July | Aug | Sept[5] | Oct | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|---|---|---|---|---|
| Florence | 70 | 80 | 100 | 100 | 96 | 84 | 40 | 40 | 60 | 10 |
| Lewis | 30 | 60 | 90 | 90 | 90 | 100 | 60 | 90 | 20 | 60 |
| Tucson | 40 | 20 | 20 | 100 | 94 | 98 | 30 | 30 | 80 | 70 |

60.     Defendants' original remedial plan of June 14, 2016 for PM 66 blamed noncompliance on providers' failure to document their rounds. Doc. 1609-1 at 13.  And again, as described above at Paragraph 42, part of the remedial plan was to have site medical directors sign acknowledgments that they are supposed to hold providers accountable, a meaningless remedial plan, in my opinion.  The original remedial plan states that "[a]dditional resources have been provided to all IPC units to ensure that there are enough provider resources to document the rounds being conducted by providers," but it is unclear what "resources" means – more providers? Hand-held tablets? Scribes? Video recorders?  It is a mystery.  Defendants' August 2016 remedial plan for PM 66 reiterates the June 2016 plan. [Doc. 1665 at 15-16]  Patients who are admitted to an inpatient setting are sick—that is the reason they are there.  As such, they should be seen by providers in accordance with their acuity level.  For patients who are acutely sick and

---

[5] I have been informed that in September and October 2016 CGARs, Defendants used a "partial credit" methodology for PM 66, which of course would overstate compliance those months.

1   where IV medication is being utilized, they should be seen daily.  Period.  For patients
2   who are stabilized and completing a course of treatment, they should be seen at least every
3   three days.

4        61.     My recommendation for both PM 54 and PM 66 is that Corizon hire more
5   on-site providers and to implement business practices that make them more efficient.
6   Provider time is precious, and there are things that only they can do – specifically,
7   diagnose and treat. Everything else can be assisted or delegated, including documentation.
8   One of the biggest barriers to provider productivity is the ergonomics of the electronic
9   health record and the inefficiency of the documentation.  If the system were to relieve the
10  documentation burden on the providers, the provider productivity could be significantly
11  enhanced.  The most common techniques for doing this, widely used in private practice,
12  include hiring scribes to follow the clinicians and complete the documentation of the
13  visits, and/or using dictation / transcription services.  Dictation / transcription is my
14  preferred method personally, and it is what we have used in my system for 18 years.  It is
15  fast and reliable, and the quality of the notes is superior to anything a provider types.
16  Additionally, the providers all know how to dictate, and transcription staff are inexpensive
17  compared to provider time.  Dictation / transcription easily increases provider productivity
18  at least by 40% in our internal studies.

19        Executed June  7 , 2017, in Salt Lake City, Utah.

20
21
22                                                    _____
23                                                    Todd R. Wilcox, M.D.
24
25
26
27
28

1   **ADDITIONAL COUNSEL:**

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Rita Lomio (Cal. 254501)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:     dspecter@prisonlaw.com
           ahardy@prisonlaw.com
           snorman@prisonlaw.com
           ckendrick@prisonlaw.com
           rlomio@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Jamelia Morgan (N.Y. 5351176)**
Victoria Lopez (Ill. 6275388)*
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:     dfathi@aclu.org
           afettig@aclu.org
           jmorgan@aclu.org
           vlopez@aclu.org

*Admitted *pro hac vice*.  Not admitted
 in DC; practice limited to federal
 courts.
**Admitted *pro hac vice*

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, PLLC**
P. O. Box 91398
Tucson, Arizona 85752
Telephone:  (520) 477-1475
Email:     kirstin@eidenbachlaw.com

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:     kbrody@acluaz.org

-24-

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
            agerlicher@perkinscoie.com
            jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR
DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email:    skader@azdisabilitylaw.org
            adietrich@azdisabilitylaw.org

Rose A. Daly-Rooney (Bar No. 015690)
J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
Maya Abela (Bar No. 027232)
**ARIZONA CENTER FOR
DISABILITY LAW**
177 North Church Avenue, Suite 800
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:
    rdalyrooney@azdisabilitylaw.org
        jrico@azdisabilitylaw.org
        jross@azdisabilitylaw.org
        mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability
Law*

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that on June 9, 2017, I electronically transmitted the above

3  document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4  Notice of Electronic Filing to the following CM/ECF registrants:

5

6                      Michael E. Gottfried
                        Lucy M. Rand
7              Assistant Arizona Attorneys General
                   Michael.Gottfried@azag.gov
8                     Lucy.Rand@azag.gov

9                      Daniel P. Struck
                      Kathleen L. Wieneke
10                        Rachel Love
                      Timothy J. Bojanowski
11                      Nicholas D. Acedo
                       Ashlee B. Fletcher
12                       Anne M. Orcutt
                         Jacob B. Lee
13                      Kevin R. Hanger
              STRUCK WIENEKE, & LOVE, P.L.C.
14                    dstruck@swlfirm.com
                     kwieneke@swlfirm.com
15                     rlove@swlfirm.com
                   tbojanowski@swlfirm.com
16                    nacedo@swlfirm.com
                     afletcher@swlfirm.com
17                     aorcutt@swlfirm.com
                       jlee@swlfirm.com
18                    khanger@swlfirm.com

19                   *Attorneys for Defendants*

20

21                                s/ D. Freouf

22

23

24

25

26

27

28