**Index of Exhibits to Defendants' Motion to Vacate
Evidentiary Hearing on HNR Boxes**

Exhibit 1      Declaration of Richard Pratt

Exhibit 2      Email correspondence (June 22-23, 2017) regarding HNR issue

Exhibit 3      Email correspondence (June 27, 2017) regarding HNR issue

**EXHIBIT 1**

**EXHIBIT 1**

Arizona Attorney General Mark Brnovich
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
Jacob B. Lee, Bar No. 030371
Kevin R. Hanger, Bar No. 027346
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com
khanger@swlfirm.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>            Plaintiffs,<br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>            Defendants. | NO. 2:12-cv-00601-DKD<br><br><br><br>**DECLARATION OF RICHARD PRATT** |

I, **RICHARD PRATT**, make the following Declaration:

1. I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration.

2. I have been working with the Arizona Department of Corrections ("ADC") since July 2000, not including from October 2009 to July 2011, when I was employed elsewhere.

3. In February 2012, I was appointed Interim Assistant Director of ADC's Health Services Contract Monitoring Bureau ("HSCMB") following Dr. Michael Adu-Tutu's retirement. When Health Services was privatized in July 2012, my title was adjusted to be the Interim Assistant Director of ADC's HSCMB.

4. When Arthur Gross was hired to be the Assistant Director in October 2012, my position changed to Program Evaluation Administrator.

5. I was placed under a temporary special assignment as the Interim Assistant Director on March 1, 2014, when Mr. Gross retired.

6. I was named Assistant Director on August 2, 2014.

7. As Assistant Director, I am responsible for providing managerial oversight and direction to the HSCMB to monitor the contracted vendor's compliance with all aspects of the health services contract. I am also responsible for reviewing and responding to internal and external inquiries pertaining to compliance issues, contract specifications, reports, inspections, staffing levels, and legal mandates of inmate healthcare, mental health care, and dental care services.

8. I am familiar with ADC's policies and practices pertaining to healthcare, including medical care, dental care, and mental health care, the privatization of ADC healthcare, ADC's contract with Corizon, Corizon's responsibilities under that contract, and the HSCMB's monitoring of Corizon's care to ADC inmates.

9. I am personally familiar with the *Parsons* litigation, the resulting Stipulation, and the monitoring and reporting of the health care performance measures (HCPMs) in the Stipulation.

10. As Assistant Director of the HSCMB and a named Defendant in this case, I was closely involved in the negotiations between the parties that ultimately resulted in settlement of the lawsuit through the signing of a Stipulation.

**Monitoring 100% Compliance under the Stipulation**

11. In agreeing to the terms of the Stipulation on behalf of ADC, I understood that the HSCMB would be responsible for monitoring the healthcare performance measures as stated in Exhibit B to the Stipulation using the specific protocols set forth in Exhibit C to the Stipulation.

12. Exhibit C to the Stipulation provides that Defendants monitor a random sample of 10 charts per yard or facility for nearly all of the HCPMs.

13. I did not agree to, nor would I have ever agreed to, a Stipulation that provided the Court with the authority to do away with random sampling and instead require the HSCMB to monitor 100% of applicable inmate charts for any HCPM.

14. I did not agree to, nor would I have ever agreed to, a Stipulation that provided the Court with the authority to require 100% compliance for any HCPM.

15. In agreeing to the terms of the Stipulation on behalf of ADC, I did not intend, expect, or agree for the Court to have the authority to unilaterally modify the Stipulation in any way for any reason. To memorialize that intent, ADC insisted on including the following provision in the Stipulation: "This is an integrated agreement and may not be altered or modified, except by a writing signed by all representatives of all parties at the time of modification."

16. HCPM 13 requires that "[c]hronic care and psychotropic medication renewals will be completed in such a manner that there is no interruption or lapse in medication." Dkt. 1185-1 at 8.

17. The Court's Order applies to HCPM 13 at Perryville.

18. It takes my staff about one hour to review 10 randomly selected applicable charts per yard for HCPM 13 at Perryville as required by the Stipulation protocols.

19. To comply with the Court's Order, my staff will have to review all prescriptions for chronic care and psychotropic medications that are due for renewal at Perryville. In an average month, there are more than 3,500 prescriptions written and approximately 400 to 450 chronic care and psychotropic medications due for renewal at Perryville alone. Reviewing 100% of medications due for renewal could take 40 to 45 hours.

20. HCPM 35 states that "[a]ll inmate medications (KOP and DOT) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption." Dkt. 1185-1 at 8. The Stipulation protocol for this measure provides that Defendants must randomly select and review 10 records per yard per month.

21. Complying with the Court's June 14, 2017 Order for HCPM 35 will require reviewing all intersystem transfers at ADC daily, individually searching for and reviewing each inmate's medical file in eOMIS to determine whether the inmate was prescribed medications, and reviewing eOMIS and paper Medication Administration Records (MARs) to determine if the inmate was provided his or her medications upon transfer.

22. ADC has no centralized report by inmate name and number of all intersystem inmate transfers, so determining the necessary information on transfers to comply with the Court's Order will require obtaining and reviewing daily transfer reports from each individual complex.

23. There are about 90,000 transfers of ADC inmates per year statewide, meaning that in an average month, there will be at least 7,000 to 8,000 inmate transfers. Of these, approximately 1,000 are intersystem transfers (versus intrasystem transfers where an inmate moves within a complex).

24. The Court's Order requires reviewing *all* transfers to Eyman, Florence, Lewis, Perryville, and Tucson, which make up the vast majority of the intersystem transfers throughout the ADC system.

25. I estimate that my staff will have to individually review at least 700 inmate charts in eOMIS to determine which of the transferred inmates were prescribed medications and are therefore applicable for HCPM 35.

26. Under the Stipulation methodology of randomly selecting 10 charts per yard, it takes my staff approximately one hour per yard to monitor HCPM 35 each month. Employing the Stipulation methodology for HCPM 35 at the five facilities subject to the Court's Order—Eyman, Florence, Lewis, Perryville, and Tucson—my staff reviewed 192 applicable charts for the April 2017 CGARs, which took about 20 hours.

27. Monitoring 100% of applicable inmates for HCPM 35 could easily take three times that long.

28. HCPM 45 requires that on-site diagnostic services must be provided the same day if ordered STAT or urgent or within 14 days if routine.

29. The Court's Order applies to HCPM 45 at Lewis and Tucson.

30. It takes my staff about fifteen minutes per yard to monitor 10 randomly selected applicable charts for HCPM 45 in accordance with the Stipulation protocols.

31. In an average month, there are approximately 100 x-rays and 1,350 labs taken on-site at Lewis and Tucson alone. To comply with the Court's Order, my staff would have to review approximately 1,500 diagnostic services at these facilities.

32. HCPM 46 requires that a medical provider review diagnostic reports and act upon reports with abnormal values within five calendar days of receipt.

33. The Court's Order applies to Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, and Tucson, which will receive the vast majority of the diagnostic reports statewide in any given month.

34. It takes my staff about an hour per yard to monitor 10 randomly selected applicable charts for HCPM 46.

35. In a typical month, there are approximately 300 x-rays and 5,000 labs taken at the seven complexes subject to the Court's Order. To comply with the Court's Order,

my staff would have to review more than 5,000 diagnostic reports to determine which have abnormal values and whether a provider acted upon them within five calendar days.

36. HCPM 66 requires that a medical provider conduct rounds a minimum of every 72 hours in an IPC.

37. The Court's Order applies to HCPM 66 at Florence, Tucson, and Lewis.

38. The number of inmates at each IPC will fluctuate from day to day depending on inmate needs, acuity levels, and hospital transfers. The bed capacity is 57 at Florence, 66 at Tucson, and 13 at Lewis.

39. It takes my staff of more than 30 an entire month to complete their monthly CGAR monitoring duties as set out in the Stipulation protocols.

40. If my staff have to monitor 100% of applicable inmates for the nine performance measures subject to the Court's June 14, 2017 Order, they will be unable to complete their regularly monthly monitoring duties, and the CGAR reports will be delayed.

**Open Clinic Process and Health Needs Request (HNR) Boxes**

41. Under the new open clinic concept, inmates in minimum and medium custody units report directly to the health unit with a completed HNR in hand and present it to a nurse. Inmates are seen the same day they submit their HNRs.

42. Under the old process, inmates dropped the HNR in a collection box on their housing units and waited to be seen at a later date.

43. Prior to the open clinic concept, inmates were seen at the earliest the day after submission of an HNR, but frequently were seen up to two days after submission of an HNR.

44. Under the old process, a nurse had to travel around to all of the housing units to collect the HNRs each day, bring them to a centralized location, sort them by discipline, triage the medical HNRs, and schedule inmates, and then security had to print and deliver appointment slips alerting inmates that they would be seen at medical the following day.

45.     Under the old process, inmates were brought to medical as a group and still had to wait to see nursing.

46.     ADC relocated and repurposed the HNR boxes to streamline the process by which inmates seek and receive care. The boxes are now used for medication refill requests, which do not require that an inmate be seen.

47.     Inmates who work have the choice to skip work if they are too sick, or they can go to open sick call outside of work hours. The open clinics have hours to accommodate inmate workers.

48.     Inmates with mobility issues are housed closer to the medical units and are assigned aides who can assist them with going to the medical units during open clinic hours.

49.     Inmates with chronic health conditions, including those with mobility issues, are automatically scheduled for chronic care appointments at set intervals without needing to submit an HNR through the open clinic sick call process.

50.     Inmates experiencing medical emergencies or urgent health concerns can alert security who will initiate an ICS and ensure that the inmate is seen by medical without needing to submit an HNR.

51.     There is nothing in the National Commission on Correctional Health Care (NCCHC) or American Correctional Association (ACA) standards requiring that inmates have access to a collection box to drop off requests for healthcare.

52.     Correctional systems in other states have recently started using open sick call processes similar to ADC's open clinic concept.

**Burden of Presenting Testimony from Nurses**

53.     Providing the level of detail the Court requested regarding open clinic operating hours, procedures for inmates who work, and average wait times will likely require testimony from nurses at each health unit, or at a minimum from each complex.

54.     Each health unit has its own hours of operation, and the average wait times, if any, depend on inmate demand and security issues such as custody levels.

1  55.  If nurses have to travel to Court and wait to testify regarding these issues, nurses lines will have to be cancelled, and ADC inmates will not receive healthcare in the open clinic on the day (or days) of the hearing.

**Security Concerns regarding Transporting Inmates to Testify**

56.  Inmates of different custody levels cannot be transported together or placed in the same holding area while awaiting their turn to testify.

57.  Male and female inmates cannot be transported or held together.

58.  There are additional security concerns for inmates of higher custody levels.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __28TH__ day of June, 2017.

_____
RICHARD PRATT

7