1                  UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3                    _____

4

     Victor Parsons, et al., on    )
5    behalf of themselves and all  )
     others similarly situated;    )
6    and Arizona Center for        )
     Disability Law,               )
7                                  )   No. **CV 12-00601-PHX-DKD**
                  Plaintiff,       )
8                                  )
          vs.                      )   Phoenix, Arizona
9                                  )   June 14, 2017
     Charles Ryan, Director,       )   9:00 a.m.
10   Arizona Department of         )
     Corrections; and Richard      )
11   Pratt, Interim Division       )
     Director, Division of Health  )
12   Services, Arizona Department  )
     of Corrections, in their      )
13   Official capacities,          )
                                   )
14                Defendants.      )
     _____)
15

16

17     BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

18            REPORTER'S TRANSCRIPT OF PROCEEDINGS

19                   (*Status Hearing*)

20

21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc 43
23   Phoenix, Arizona 85003-2151
     (602) 322-7256
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2     **For the Plaintiffs:**

3             EIDENBACH LAW PC
              By: **Kirstin T. Eidenbach, Esq.**
4             P.O. Box 91398
              Tucson, AZ 85752
5
              ACLU - Washington DC
6             By: **David C. Fathi, Esq.**
              By: **Amy Fettig, Esq.**
7             915 15th Street NW
              7th Floor
8             Washington, DC 20005

9             ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
              By: **Maya S. Abela, Esq.**
10            177 N. Church Avenue
              Suite 800
11            Tucson, AZ 85701

12            PRISON LAW OFFICE
              By: **Corene Kendrick, Esq.**
13            1917 5th Street
              Berkeley, CA 94710

14    For the Defendants:

15            STRUCK WIENEKE & LOVE, P.L.C.
16            By: **Timothy J. Bojanowski, Esq.**
              By: **Rachel Love, Esq.**
17            By: **Anne M. Orcutt, Esq.**
              3100 W. Ray Road
18            Suite 300
              Chandler, AZ 85226
19
              OFFICE OF THE ATTORNEY GENERAL - Phoenix
20            By: **Lucy M. Rand, Esq.**
              1275 W. Washington Street
21            Phoenix, AZ 85007

22
      **WITNESS:**              **EXAMINATION BY THE COURT**
23    Dr. Nicole Taylor                52

24

25

UNITED STATES DISTRICT COURT

CV 12-601 - June 14, 2017 - Status Hearing

1            P R O C E E D I N G S

2          THE MAGISTRATE CLERK:  Civil Case Number 12-601,

3    Parsons, et al., versus Ryan, et al., on for a status hearing.

4          THE COURT:  Counsel please state their appearances for

5    the record.                                                    09:00AM

6          MR. FATHI:  Good morning, Your Honor.  David Fathi,

7    Amy Fettig, Corene Kendrick, and Kirsten Eidenbach for the

8    plaintiff class.  And Maya Abela for the Arizona Center for

9    Disability.

10         THE COURT:  Thank you very much.  Good morning.         09:00AM

11         MR. BOJANOWSKI:  Tim Bojanowski, Rachel Love, Ann

12   Orcutt present.  And then on the phone is Lucy Rand.

13         THE COURT:  Thank you very much.  Good morning.

14         Mr. Bojanowski, perhaps the first thing we can do is

15   turn to the performance measures and the April update.        09:00AM

16         MR. BOJANOWSKI:  Okay.  I have two big notebooks.  It

17   will take me --

18         THE COURT:  Fair enough.  I didn't think you had them

19   memorized.

20         Maybe while you are doing that I can say that the        09:02AM

21   first one, perhaps, we could look at is Performance Measure 11:

22   Newly prescribed provider ordered formulary medications will be

23   provided to the inmates within two business days after

24   prescribed or on the same day if prescribed stat.

25         This is why I suggested the last time that it would be   09:03AM

CV 12-601 - June 14, 2017 - Status Hearing

1    helpful if you could provide these numbers to the parties and

2    to the Court in advance of the hearing.  Then we wouldn't have

3    to require you to go through this exercise.  I would have it on

4    my spreadsheet and be able to save you this time.

5            MR. BOJANOWSKI:  Your Honor, you are referring to          09:03AM

6    Docket 2062?

7            THE COURT:  2062?

8            MR. BOJANOWSKI:  Yeah.  That was our notice that we

9    filed with the Court on 5-17-17 giving you the current --

10           THE COURT:  But that had.  March remember we talked --     09:03AM

11           MR. BOJANOWSKI:  Oh, April.  I'm sorry.  I'm sorry,

12   Your Honor.  Okay.  I'm ready to go.

13           THE COURT:  Okay.

14           MR. BOJANOWSKI:  I thought you were talking about

15   March.                                                            09:03AM

16           THE COURT:  No.  No.  Performance Measure 11 for

17   April.

18           MR. BOJANOWSKI:  Okay.  For Number 11, preliminary

19   numbers for April:  Eyman, 68 percent; Florence, 95 percent;

20   Lewis, 79 percent; Tucson, 84 percent; Winslow, 93 percent; and    09:04AM

21   Yuma, 98 percent.

22           THE COURT:  Okay.  Thank you.

23           Performance Measure 13:  Chronic and --

24           MR. BOJANOWSKI:  All right.  13.

25           THE COURT:  Let me just finish this.  Chronic and          09:04AM

1    psychotropic medication renewals will be completed in a manner

2    such that there is no interruption or lapse in medication.

3    Performance Measure 13.

4          MR. BOJANOWSKI:  All right.  Douglas, 100 percent;

5    Eyman, 92 percent; Florence, 80 percent; Lewis, 97 percent;          09:05AM

6    Perryville, 72 percent; Tucson, 86 percent; Yuma, 100 percent.

7          THE COURT:  We saw a dramatic improvement based upon

8    what you just said in Eyman going from 62 to 92 and then also

9    with respect to Florence, going from 51 to, did you say, 80?

10         MR. BOJANOWSKI:  Yes, sir.                                     09:06AM

11         THE COURT:  All right.  And then Lewis going from 72

12   to 97.  And Perryville is still a problem from 78 to 72.

13   What's going on there and what can be done?

14         MR. BOJANOWSKI:  I don't have specifics.  May I have a

15   moment, Your Honor?                                                  09:07AM

16         THE COURT:  Surely.

17         MR. BOJANOWSKI:  Your Honor, what we have done is

18   implemented a plan statewide for all facilities.  I think the

19   issue at Perryville may be related to a change in personnel at

20   the FAH level.  I'm not quite sure.  I don't have specifics on      09:08AM

21   that.  But it's my understanding that the data reporting and

22   utilization reports are now being run on a daily basis, and

23   they are being reviewed by the FAH, the Facility Health

24   Administrator, to assure that this measure is met.  So I'm

25   thinking that maybe the -- as you can see the plan is taking        09:08AM

1    hold here statewide, but it may have been that at Perryville we

2    had that change in top level personnel which may have affected

3    that score.  I don't have specifics, unfortunately, to answer

4    your question.

5         THE COURT:  Well, the problem is that although we had    09:09AM

6    in February a compliance rate that met the performance measure,

7    and same was true for January, that before that there was an

8    abject failure to comply with this performance measure not only

9    at Perryville but everywhere.  And so the suggested remediation

10   measure that you have identified there is one that I heard     09:09AM

11   before and I'm not willing to abide anymore.

12        So effective immediately at Perryville, every single

13   failure to comply with Performance Measure 13 will result in an

14   order to show cause hearing as to why a $1,000 fine should not

15   be imposed.  On July 17th, the State will file a report, a both  09:10AM

16   redacted and under seal version, that would include the name

17   and numbers of the inmates who did not receive the required

18   transfer or the required medication required by Performance

19   Measure 13 in the previous 30 days.

20        And so we'll see what happens at the next month report    09:10AM

21   and see whether or not this gets somebody's attention on that.

22   That's how I'm going to proceed with a number of these if we do

23   hear numbers that are similar to this.  I have just had enough.

24        All right.  Performance Measure 14 all compliant.

25   Well done.                                                     09:10AM

CV 12-601 - June 14, 2017 - Status Hearing

1    Performance Measure 35, please.

2    MS. KENDRICK:  Your Honor?

3    THE COURT:  Yes.

4    MS. KENDRICK:  Performance Measure 14?

5    THE COURT:  Did I miss one?                          09:11AM

6    MR. BOJANOWSKI:  I think we were on 13, Your Honor.

7  14 I can give you the preliminaries.

8    THE COURT:  Yes.  Thank you.  I'm sorry.  Give me just

9  a second.  Yep.  You are right.  I do need to hear those

10 numbers.  Thank you.                                   09:11AM

11    Go ahead.

12    MR. BOJANOWSKI:  Douglas is 100 percent.

13    THE COURT:  Okay.

14    MR. BOJANOWSKI:  Eyman, 98 percent; Florence, 92

15 percent; Lewis, 100 percent; Perryville, 96 percent; Tucson,  09:11AM

16 100 percent; and Yuma, 93 percent.

17    THE COURT:  All right.  So I get to repeat the "well

18 done."  Thank you.

19    Then next to 35.  And 35 is:  All inmate medications

20 will be transferred with and provided to the inmate or       09:12AM

21 otherwise provided at the receiving prison without any

22 interruption.

23    MR. BOJANOWSKI:  Okay.  Eyman, 38 percent; Florence,

24 62 percent; Lewis, 66 percent.  Excuse me.  Lewis is 49

25 percent; Phoenix is 67 percent; Tucson, 73 percent.          09:12AM

CV 12-601 - June 14, 2017 - Status Hearing

1    THE COURT:  Okay.  Well, we have talked about this

2    last month, and I guess I don't understand how this is so

3    difficult.  I have expressed that failure to comprehend how,

4    when you have the responsibility for the person and you are

5    moving that person from one facility to another, how you cannot    09:13AM

6    also make sure that the medication that that person is

7    receiving is transferred with that person.

8        So with Performance Measure 35, effective immediately,

9    for Eyman, Florence, Lewis, Phoenix, and Tucson, the same

10   measure is employed for Performance Measure 13, and that is,    09:13AM

11   you will have an OSC as to why you shouldn't have to pay a

12   $1,000 per failure to comply with this performance measure for

13   every single person who didn't get it.  And I want the names

14   and numbers of those people by the 17th of July, and we'll set

15   the OSC and decide how to proceed.    09:13AM

16       37, the April numbers, please.

17       MR. BOJANOWSKI:  37:  Eyman, 86; Florence, 97; Lewis,

18   87; Tucson, 90; Winslow, 100; Yuma, 100.

19       THE COURT:  Well done.

20       39.  This is a real challenge, my spreadsheet.    09:15AM

21   Routine provider referrals will be addressed by a medical

22   provider.  And the problem is I just can't read the small

23   print.  If somebody has it in front of them and would put it in

24   the record it would be helpful for me.

25       MR. BOJANOWSKI:  Routine provider referrals will be    09:15AM

CV 12-601 - June 14, 2017 - Status Hearing

1    addressed by a medical provider and referrals requiring a

2    scheduled provider appointment will be seen within 14 calendar

3    days of the referral.

4           THE COURT:  Thank you.  I don't know why I just

5    couldn't read that one word.  But thank you for doing that.          09:15AM

6           MR. BOJANOWSKI:  The preliminary numbers are:  Eyman,

7    90 percent; Florence, 85 percent; Lewis, 87 percent;

8    Perryville, 94 percent; Tucson, 97 percent.

9           THE COURT:  I'm pleased to see the increase in

10   Perryville going from the March report of 76 to 94 and the          09:16AM

11   other numbers here.  Thank you.

12          MS. KENDRICK:  Could you give the number for Yuma,

13   please?  Because it was also non-compliant.

14          MR. BOJANOWSKI:  I'm sorry.  I missed one.  You are

15   right.  Yuma is 90 percent.                                          09:16AM

16          THE COURT:  Thank you for minding this.  You have

17   apparently got the sharper eyesight, and I appreciate it.

18          Performance Measure 40:  Urgent care referrals are

19   seen by a medical provider within 24 hours of the referral.

20          MR. BOJANOWSKI:  Eyman, 40; Tucson, 100.                     09:17AM

21          THE COURT:  So if I'm reading this right, Eyman has

22   gone from being, since September, with the exception of

23   November, being in compliance.  The last three months reported

24   December, January, February at 100 percent and now has dropped

25   off to 40.  What's going on -- no.  That's not right.  I            09:17AM

1    misstated.  It's 46 in -- 46 in March.  So we saw no rebound at

2    all.  In fact, I kind of was hopeful that there would be a

3    rebound after three months where you showed you knew how to do

4    it.  But instead we go to 40 from 46.  So what's happening at

5    Eyman?                                                              09:18AM

6            MR. BOJANOWSKI:  It seems as though the problem may be

7    the number of files being pulled.  So what we would like to do

8    and intend to do, I think, is change our source documents to

9    try and increase the sample size.  Under the measure --

10           THE COURT:  Wait a minute.  Why is that a good idea?       09:18AM

11   Are we just going to go fishing more until we get some fish in

12   our bucket so it's filled up?

13           MR. BOJANOWSKI:  I think the problem is when you have,

14   say, four files and you miss two, you are at 50 percent.

15           THE COURT:  I see.  What's the total?                      09:18AM

16           MR. BOJANOWSKI:  I think we had six files, if I recall

17   correctly, that that fell under this.  So we think that the

18   problem may be in trying to gather the data we need to explore

19   other source documents to look to see if maybe we can capture

20   this information in other files that we could then look at to    09:18AM

21   get a better picture of what's actually going on with regard to

22   this measure.

23           THE COURT:  That's frightening in all sorts of ways.

24   For the first it becomes an affront to our randomization

25   criteria which we employ for a good purpose; but two, it also    09:19AM

1    is very concerning because if it's true that we have just six

2    people who have this requirement and you can't get it right

3    with half of them, how hard is that?  What's going on there?

4          MR. BOJANOWSKI:  We also, aside from that, Your Honor,

5    we have got some new plans that we would like to get to the          09:19AM

6    Court if the Court would allow us.  But under this new plan

7    that we've got, the Eyman facility is going to have a provider

8    staffed on each housing unit.  The fully staffed provider model

9    will greatly assist the demand of urgent referrals required to

10   be seen within 24 hours.  Open sick call model will also assist    09:20AM

11   this measure in that inmates with urgent referrals from the

12   nurse line will have the ability to see the provider on that

13   unit during the open sick call process.  So they will see them

14   on the same day.  We're also increasing --

15         THE COURT:  How is that -- the referral time people          09:20AM

16   often times aren't in every day, as I understand it, the

17   referral people aren't.  Are they in every day?

18         MR. BOJANOWSKI:  Who?

19         THE COURT:  These referral people, the medical

20   providers at Eyman, are they there every day?  The people that     09:20AM

21   you can see, are they there every day?

22         MR. BOJANOWSKI:  Yeah.  The provider is there every

23   day, Your Honor.  What's going on, I think, from what I'm being

24   told here, is that the nurse makes the referral over to the

25   provider.  They are not marking it as an urgent referral so        09:21AM

1    they are not getting credit for it.  That's the documentation

2    issue.  But to get the -- instead of -- so each yard will have

3    the provider on it?

4              MR. PRATT:  Yes.

5              MR. BOJANOWSKI:  So each yard will now have the          09:21AM

6    provider there to be able to handle these urgent referrals

7    right away.

8              MS. KENDRICK:  Your Honor, we would like to ask for

9    written proof of it, because based upon the weekly staffing

10   schedules, providers only work Monday through Fridays.  They     09:21AM

11   don't work on holidays and weekends.  So if this change has now

12   occurred where they are on site seven days a week with a

13   provider level person on every single yard, that's great news,

14   but we would like written proof of that.

15             MR. BOJANOWSKI:  They are not there weekends and        09:22AM

16   holidays.

17             THE COURT:  So how do you comply with this performance

18   measure then?  It says 24 hours.  Doesn't say weekends and

19   holidays excepted.  People get sick weekends and holidays.

20             MR. BOJANOWSKI:  It would be by way of either telemed   09:22AM

21   or we would have the provider come in.

22             THE COURT:  But it's not been happening.  I have got

23   it less than 50 percent compliance rate.  And telemed I have

24   been told about and these other remedies I have been told about

25   before, and here we are looking at April.  It's the same story.  09:22AM

CV 12-601 - June 14, 2017 - Status Hearing

1          MR. BOJANOWSKI:  I don't have an answer to that, Your

2     Honor.

3          THE COURT:  What we'll do is we'll put Performance

4     Measure 40 in the same bucket as to you telling me every single

5     one of these six people or however number they are who don't          09:23AM

6     get this in the next 30 days, reporting to me on July 17th and

7     we'll consider an OSC as to why there shouldn't be a $1,000

8     sanction for failure to comply with this performance measure

9     especially in light of the fact that it seems you have been

10    sitting on a situation where I have only heard about the                09:23AM

11    enhanced telemedicine, I think, since December and that this is

12    something that hasn't been fixed since then when telemedicine

13    has been talked about before.  So we'll put 40 into that bucket

14    as well.

15         So Performance Measure 44:  Inmates returning from an              09:23AM

16    inmate hospital stay or ER transport with discharge

17    recommendations from the hospital shall have the hospital's

18    treatment recommendation reviewed and acted upon by a medical

19    provider within 24 hours.

20         MR. BOJANOWSKI:  So Number 44 at Eyman, 15; Florence,             09:24AM

21    100; Lewis, 100.

22         THE COURT:  I'm sorry.  Could you repeat Eyman?

23         MR. BOJANOWSKI:  15.

24         THE COURT:  Did you say 1-5?

25         MR. BOJANOWSKI:  1-5.                                              09:25AM

1          THE COURT:  So what's the explanation there?

2          MR. BOJANOWSKI:  I think it is a matter of procedure

3     of getting the records from the ER sent to the site medical

4     director instead of being sent to the yard.

5          THE COURT:  Are you kidding me?  So somebody is                    09:25AM

6     transferred from a hospital and some prison guard gets the

7     medical record and the healthcare facility doesn't get it?

8          MR. BOJANOWSKI:  No, it's going to each medical site

9     at the yard.  And so it wasn't getting captured.  And so what's

10    happening is it's not getting documented.  So the proposal was    09:25AM

11    to get it to the site medical director for processing so that

12    it's with one person and it's getting acted upon.

13         THE COURT:  Do the plaintiffs, through their

14    observations and monitoring, have any insight as to why this is

15    happening?  Should I be as alarmed as I am or am I missing        09:26AM

16    something?

17         MS. KENDRICK:  We're equally alarmed, Your Honor.  And

18    what we're also very alarmed about, as detailed in our expert

19    Todd Wilcox's declaration, Document 2103 at Paragraph 41, the

20    remedial plan that defendants submitted was not that the          09:26AM

21    medical director reviewed these diagnostic reports but that the

22    facility health administrator would review them, what they call

23    a FAH and those people do not necessarily have medical

24    training.  They are administrators.

25         So as Dr. Wilcox pointed out, it needs to be reviewed        09:26AM

CV 12-601 - June 14, 2017 - Status Hearing

1    by a treating provider familiar with the patient not some

2    administrator.  And also the stipulation by its own language

3    says --

4           THE COURT:  "Medical provider" are the words that are

5    used.  Are you are telling me the State is saying they are          09:27AM

6    compliant, Mr. Bojanowski, because an administrator, somebody

7    who has no medical degree, is looking at this?  This can't be

8    so.  Is that what you really said?

9           MS. KENDRICK:  That's in the remedial plan, sir.

10          THE COURT:  Can you show it to me?  Do you have it          09:27AM

11   handy?

12          MS. KENDRICK:  Docket 1977 at Pages 6 to 7.

13          THE COURT:  Could you print that out, please?

14          MR. BOJANOWSKI:  It's being reviewed by the FAH to see

15   that it's actually done.  The FAH doesn't have the authority       09:27AM

16   to --

17          MS. KENDRICK:  Your Honor, I quote from --

18          THE COURT:  Hold it.  Don't talk over one another,

19   please.

20          MR. BOJANOWSKI:  Maybe there's a problem or maybe          09:27AM

21   there's a mistake in the pleading.  I don't know.  But the

22   bottom line is, is that the FAH reviews it to make sure that

23   it's actually done, okay, not -- they can't do it.  They don't

24   have the authority to do it.  So if that's in the pleading then

25   that's clearly an error.                                           09:28AM

─CV 12-601 - June 14, 2017 - Status Hearing─

1          MS. KENDRICK:  Well, I will quote from the bottom of

2   Page 6 of Docket 1977 for Eyman it says, "Going forward, the

3   facility health administrator will be exclusively responsible

4   for reviewing and acting upon hospital treatment

5   recommendations."  The performance measure clearly says          09:28AM

6   "medical provider."  Their remedial plan such as it is says

7   that the FAH will be doing it.  And the FAH is not a person

8   with medical training.

9          THE COURT:  Well, that clearly is a mistake.  And it's

10  the kind of mistake that you don't get a pass on because I       09:28AM

11  can't have mistakes like that causing the plaintiffs to run

12  down what is an emergent blind alley.  Because if somebody

13  reads that and they think that the performance measure requires

14  a medical provider and you tell them that you are exclusively

15  putting that in the responsibility of an administrator, they     09:29AM

16  are every bit entitled to be running about with extreme

17  concern.

18          And then when you see a compliance of 15 percent, you

19  are struck with how such a mistake could occur because you

20  would think that that would be a ready sign to everybody that    09:29AM

21  the Court was going to be interested in it and that you also

22  should be dramatically interested in it and that you should

23  take extra care to make sure that what you are writing about in

24  the remedial plan is what you are indeed intending to

25  communicate to everyone, except you didn't do that.              09:29AM

1    What you did is you told them that you are going to

2  have someone who is not a medical provider look at this when

3  it's obviously in the stipulation because it matters, that when

4  somebody is in the hospital or they have an emergency room

5  transport with a discharge recommendation, nothing can fall     09:30AM

6  between the cracks.  And this is a huge crack.

7         MS. KENDRICK:  Your Honor, may I say something else?

8         THE COURT:  Yes.

9         MS. KENDRICK:  We're also very -- besides the fact

10  that we're very appalled by these numbers, we're kind of     09:30AM

11  flabbergasted why they cannot come into compliance with this

12  because it is not rocket science.  As our expert pointed out in

13  his report at Paragraph 45, his recommendation was that any

14  patient that arrives back at a facility needs to be checked in

15  by nursing staff, getting vital signs and assessment, and any     09:30AM

16  paperwork or orders should be reviewed at the time with a

17  doctor on call so the treatment plans can be implemented.

18         This isn't creating some new system whole cloth.  It's

19  basic common sense from a correctional healthcare point of

20  view.     09:31AM

21         THE COURT:  Well, I want -- go ahead.

22         MR. BOJANOWSKI:  Part of the problem is that this gets

23  into, quote, unquote, "acted upon" and what does that mean.  So

24  what we found at Eyman and even at other facilities was that

25  the doctors were taking the report that would come from, say,     09:31AM

18

1    the hospital, they would sign off on it, and that's all they

2    would do.  Well, they don't get credit for that, even though

3    they saw the report, they signed the report.

4          THE COURT:  Right.  And we talked about this before

5    and I wanted to have documentation that they acted upon it.    09:31AM

6          MR. BOJANOWSKI:  Exactly.

7          THE COURT:  And if they chose not to follow the course

8    of treatment recommended by the discharging facility, that

9    would have to be documented.

10         MR. BOJANOWSKI:  Right.                                  09:31AM

11         THE COURT:  So the "acted upon" here is something we

12   have talked about before and something that is of significant

13   importance to me.

14         MR. BOJANOWSKI:  Very important to us, too.

15         THE COURT:  You have known about that.                  09:31AM

16         MR. BOJANOWSKI:  So in an effort to try and cure this

17   problem, to force the language to be appropriate, we have been

18   looking at trying to modify that eOMIS program to make it so

19   that the doctor has to do something with it.  He can't just

20   sign off on it.  He's got to put some kind of comment in there 09:32AM

21   to say, yeah, I agree with the recommendation, no I don't, and

22   I want this done.

23         So it's, you know, it's one of those things that, you

24   know, we're getting good compliance at every other facility

25   except this one.  And so it's one that we need to target and   09:32AM

1   certainly address.  But we're taking that kind of action to get

2   that done.

3          THE COURT:  All right.  On the 17th of July, I want

4   you also to submit to the Court a report of the previous 30

5   days of every Eyman person who was returning from an inpatient          09:32AM

6   hospital stay or ER transport with discharge recommendations

7   from the hospital.  And I want you to report to the Court how

8   each of these individuals were reviewed and acted upon by the

9   medical provider within 24 hours.

10         So that's a slightly different remedy than what I have          09:33AM

11  talked about before.  It's not one that's anything but

12  informational.  I'm hopeful that that will be sufficient to

13  address that problem.

14         Performance Measure 45:  On site diagnostic services

15  will be provided the same day if ordered stat or urgent, and          09:33AM

16  within 14 calendar days if routine.

17         MR. BOJANOWSKI:  45:  Lewis, 87 percent; Tucson, 68

18  percent.

19         THE COURT:  So the problem is that 87 percent for

20  Lewis follows a track record where there was only compliance in          09:34AM

21  two months in the last six months and with Tucson falling off

22  to 68 percent from 97, where we had the previous months 48, 71,

23  84, and 80.  Again, this is not the kind of robust trend that

24  gives anybody the idea that you all got your hands on this.  So

25  I'm going to impose the same measure that I imposed for          09:35AM

1   Performance Measure 13, and that is that by the 17th of July

2   that you report the numbers for both Lewis and Tucson with

3   respect to the number of people who did not receive the service

4   and will have an OSC as to why it is that the fine of $1,000

5   should not be imposed for each of those failures to comply.          09:35AM

6   With this fundamental stat or urgent and 14 days of routine,

7   that's not an arduous hurdle.  And again, the numbers

8   demonstrate that for some reason over months and months and

9   months and months, you are not able to fix this on your own.

10          MS. KENDRICK:  Your Honor?                                   09:36AM

11          THE COURT:  Yes.

12          MS. KENDRICK:  On Performance Measure 45 the

13  defendants submitted a remedial plan for Lewis but they did not

14  submit one for Tucson, for what it's worth.

15          The second thing that I just would like to ask is          09:36AM

16  since the parties are going to have our next hearing with you

17  on July 14th, would it be possible to have this information

18  prior to the hearing rather than July 17th?

19          THE COURT:  You know, it's a good point.  And there's

20  no reason why we shouldn't accelerate it.  So it will be the 30     09:36AM

21  days before the hearing, and I will expect those numbers to be

22  reported the day before the hearing in a filing that I have

23  described that identifies the names in both redacted and

24  unredacted version under seal.

25          Well Performance Measure 46, I hope is -- it's:  A          09:36AM

1   medical provider will review the diagnostic report, including

2   pathology reports, and act upon reports with abnormal values

3   within five calendar days of receiving the report at the

4   prison.

5           The numbers were horrid last time.  Where do we stand      09:37AM

6   for April?

7           MR. BOJANOWSKI:  Douglas at 73; Eyman at 22; Florence

8   at 45; Lewis at 58; Perryville at 75; Phoenix at 70; Tucson at

9   64; and Yuma at 92.

10          THE COURT:  So every facility except for Yuma went the     09:38AM

11  wrong direction.  Am I reading that right?

12          MR. BOJANOWSKI:  Florence increased.  Lewis increased.

13          THE COURT:  You are right.  Florence, hardly

14  congratulations there going from 12 to 45.  And the other one

15  you said that was improved was -- no.  I don't see any others.    09:38AM

16          Okay.  So the same measure as Performance Measure 13

17  for all of these facilities except for Yuma.

18          Now, turning to Performance Measure 47, which has been

19  a focus of the Court and representation to the Court that

20  turned out to be wholly untrue, I don't understand how that      09:39AM

21  happened.  I have read the affidavit.  I have read counsel's

22  statement.  It's astonishing to me how I should trust any

23  representation from the contractor here when counsel addressed

24  a question of the contractor's representative here in court

25  where it was plain what I was asking.  And I was told that a     09:39AM

1   system would be up and running in two weeks.  And then I learn

2   in the affidavit that it hadn't even been bid yet.  So how is

3   that possible, Mr. Bojanowski?

4           MR. BOJANOWSKI:  Are you on the notice?

5           THE COURT:  I'm on 47.                                    09:40AM

6           MR. BOJANOWSKI:  Okay.  47.

7           THE COURT:  Right.

8           MR. BOJANOWSKI:  The representation made to me in

9   court based from them was it was their understanding that this

10  was already any the pipeline and it was good to go.  It was    09:40AM

11  wrong.  I represented to you what was given to me.  In going

12  back and checking with them, they then said, well, wait a

13  minute, yeah, that was in the pipeline but it wasn't as high on

14  the priority list as other things were for changes within the

15  system.                                                        09:40AM

16          So what we did was we said, well, this has got to be

17  your number one priority.  We've got to get this in place.  And

18  so they bumped it all the way up.  And it's my understanding

19  this is going to be operational by June 22nd.  So I apologize

20  to the Court.  I think there was a misunderstanding on the part 09:41AM

21  of the representatives from Corizon.  They knew it was being

22  worked on.  They were under the understanding that it was going

23  to be operational within that 14-day time frame, and they were

24  wrong.  I don't know what else I can tell the Court except

25  apologize for that.  We certainly don't want to misrepresent    09:41AM

CV 12-601 - June 14, 2017 - Status Hearing

1  anything to the Court.  We're relying on the best information

2  we've got.

3          THE COURT:  And lawyers are to be commended when they

4  come forward and say that I was wrong.  I said something I

5  didn't understand.  My question and my problem is a little bit          09:41AM

6  broader, and that is that I had the representative of the

7  contractor who heard what I was talking about, heard what I was

8  addressing, and then gave this representation that also turns

9  out to be wrong.

10         What it does is it raises the specter in my mind that          09:41AM

11  a system, which I have already identified, has certain

12  incentives to make sure that accurate information is not --

13  well, that's the wrong way to put it.  It's a system that does

14  not incentivize on an economic term the provision of honest

15  information.  There's no benefit to someone who tells me          09:42AM

16  everything is fine when, in fact, there is a real problem,

17  meaning that if I'm -- if the Court's eyes are blinded to the

18  real problem because of the representation that things are fine

19  or things are being done, then it takes me off my assignment to

20  try to make sure that I'm fixing the real problems.          09:42AM

21         Similarly, where people have an absence of care that

22  allows them to represent something that they don't know for

23  certain is true, it sends us on this errant falling of running

24  down a blind alley that consumes resources and energy and

25  distracts attention.          09:43AM

1    And so there needs to be a ramping up of the care of

2    information that is provided, the representations that are

3    being made to the Court so that I can trust upon the system.

4    Because otherwise it just means a much greater investment of

5    not only my resources but also whenever I wade into an area I        09:43AM

6    see also that will be more expensive for the defendants.

7    And so everybody should be in mind that honest

8    reporting to the Court, honest representations and especially

9    taking care not to over represent.  And that's, sadly,

10   something that without suggesting bad motive is a reality of        09:44AM

11   the case.  I have heard over and over again that this is going

12   to be addressed by a program that employs oftentimes the same

13   words.  We're going to talk to the people.  We're going to make

14   sure that the right person understands what they are supposed

15   to get.  And then subsequent months show the same errant           09:44AM

16   numbers and the same representations are made so you kind of at

17   a certain point start to think people aren't really listening

18   what they are saying and not even believing it themselves.

19   They are just words that are being given that don't seem to

20   have a relationship to the reality.                                 09:44AM

21   So this 47 issue is serious.  You have now -- you said

22   the 22nd of June it will be up?  Is that what you said?

23   MR. BOJANOWSKI:  That's what I said.  Let me given

24   my --

25   THE COURT:  Guess again?                                            09:44AM

1      MR. BOJANOWSKI:  Let me double check, Judge, because I

2  don't want to misrepresent something to the Court.  I really

3  don't.

4      THE COURT:  Boy, this would be something I would want

5  to double check about.  Because once you have stepped off this,      09:45AM

6  you know how it is.

7      MR. BOJANOWSKI:  I know.

8      THE COURT:  I start out with the presumption that -- I

9  mean, as you heard this, I mean, both sides have asked for

10  affidavits back and forth and I have taken lawyers to get the      09:45AM

11  presumption of rectitude and that what they say is not only

12  true to the best of their understanding but also it's just not

13  the result of a simple when is this going to happen?  Oh, it's

14  going to happen in two weeks.  Oh, Judge, it's going to happen

15  in two weeks without saying, how do you know?  How do you know      09:45AM

16  it's going to -- saying to the representative, how do you know

17  it's going to happen in two weeks so you can vet it yourself so

18  that you can make sure that when you stand up and put at risk

19  your credibility to the Court that you have taken care of that

20  and made sure that you are not going to overstep and end up on      09:45AM

21  that branch that crashes to this horrible sound that just seems

22  to echo forever.

23      All right.  So the numbers for 47 then for April.

24      MR. BOJANOWSKI:  I have Douglas at 100; Eyman at 41;

25  Florence at 42; Lewis at 34; Perryville at 77; Phoenix at 86;      09:46AM

1    Safford is a non-applicable; Tucson is 88; Winslow is 100; and

2    Yuma is 63.

3            THE COURT:  And I gather there's no one in the

4    courtroom right now that you can verify this June 22nd date?

5            MR. BOJANOWSKI:  May I have a moment, Your Honor?            09:47AM

6            THE COURT:  Surely.

7            MR. BOJANOWSKI:  All right.  Your Honor, I think I

8    have a better picture here.  They are rolling this out on the

9    22nd.

10            THE COURT:  What's "rolling out" mean?                       09:48AM

11            MR. BOJANOWSKI:  It's going to be put out into the

12   system, so to speak.

13            THE COURT:  Well, does that mean that it will start to

14   happen, that all --

15            MR. BOJANOWSKI:  It will start to happen.                    09:48AM

16            THE COURT:  -- all medical providers will communicate

17   the results of the diagnostic study to the inmate upon request

18   and within seven calendar days of the date of the request?  So

19   that will happen starting on the 22nd?

20            MR. BOJANOWSKI:  Right.  But what ends up happening         09:49AM

21   with these modifications is that they put it into place and

22   then if there's a, say, a glitch or a problem or there is some

23   operational issue that arises, then, you know, they have to

24   tweak it somewhat.  But the idea is, is when you roll this --

25   it's like any new program that you get when you give a person a    09:49AM

1  new computer program, so to speak, it takes some time to get

2  used to it, implement it, get it so that it's fully

3  operational.  But it's going to hit the system on the 22nd.

4          Is that accurate?

5          THE COURT:  And how long does it take for it to become    09:49AM

6  fully operational?

7          MR. BOJANOWSKI:  It's fully -- the computer system

8  itself is fully operational.  It's the other component of the

9  system, the human being who is using it that, you know, when

10  they start to use it, to make sure that what it is intended to   09:50AM

11  do is actually going to occur.

12         THE COURT:  All right.  So on the 30th of June, the

13  defendants will file a notice with the Court informing it about

14  the implementation of this new measure to address the failures

15  to satisfy Performance Measure 47, and that it will give me      09:50AM

16  concrete unquivering statements about whether it's working or

17  it's not.  I don't want to hear rolling out, I don't want to

18  hear moving toward implementation, I don't want -- if it's

19  happening, tell me that.  If it's not happening at that moment,

20  tell me that.  I want to know on the 30th of June exactly where  09:50AM

21  we stand with respect to the efforts to address what is just,

22  again, a shocking failure in a number of these facilities.

23         MS. KENDRICK:  Your Honor?

24         THE COURT:  Yes.

25         MS. KENDRICK:  Plaintiffs have asked the Court            09:51AM

UNITED STATES DISTRICT COURT

CV 12-601 - June 14, 2017 - Status Hearing

```
 1   multiple times for further relief on this performance measure,
 2   and I believe that in our filing on May 31st at Docket 2078, we
 3   proposed a low-tech, again, not rocket science solution that we
 4   would like to ask the Court to order the defendants to
 5   implement in the interim while they are implementing and moving   09:51AM
 6   forward.  And that is the low-tech solution of having a human
 7   being be designated as responsible for handwriting out these
 8   communiques as requested and scanning them to the folder and on
 9   a weekly basis reporting to the Court all communiques that have
10   been done by hand the low-tech way not with some eOMIS rollout     09:51AM
11   implementation, whatever buzz word defendants care to use.
12         THE COURT:  Well, the eOMIS implementation, Mr.
13   Bojanowski, will produce a printout of this report.  It then,
14   as I remember, you said that it would be, at first you said
15   e-mailed, and I said really, the inmates have -- and you said    09:52AM
16   no.  And it sounded like you were telling me somebody would
17   walk it to the person.  Exactly how is that going to happen?
18         MR. BOJANOWSKI:  You are correct, Your Honor.  It gets
19   printed and into the inmate mail.
20         THE COURT:  And the inmate mail, how does that work        09:52AM
21   exactly?
22         MR. BOJANOWSKI:  It's very similar to the way it's
23   done in public.  It's picked up by an officer and then
24   delivered each day.
25         THE COURT:  To the cell?                                   09:53AM
```

CV 12-601 - June 14, 2017 - Status Hearing

1          MR. BOJANOWSKI:  Right.

2          THE COURT:  Okay.  And then the difference with the

3   eOMIS system is that the -- you are cutting out the need for a

4   human to identify the diagnostic studies that need to be

5   communicated.  Those are automatically generated, put in a          09:53AM

6   place, and then they are distributed through the same mail

7   system.  Is that correct?

8          MR. BOJANOWSKI:  Yeah, I think so.

9          THE COURT:  Can you check?

10         MR. BOJANOWSKI:  What was your question again?          09:53AM

11         THE COURT:  What I'm trying to understand is the

12   benefit of eOMIS is that to the extent that this failure to

13   comply with this performance measure has been due to the

14   failure of someone to print out the diagnostic report and to

15   put it into this mail route, the eOMIS system automatically          09:54AM

16   generates the diagnostic report and spits it out at some point

17   at a printer, I gather, and then those reports are then placed

18   into the mail system.  So eOMIS is doing the capturing of these

19   diagnostic reports that need to be communicated.

20         MS. KENDRICK:  Your Honor, they don't actually send          09:54AM

21   the diagnostic test to the prisoners, because the prisoners

22   can't possess their medical records.  What they send them, we

23   see them all the time scanned into prisoners' folders.  They

24   are a handwritten communique that says, Dear Mr. Jones, your

25   lab tests are normal or your lab tests are negative, alarming,          09:54AM

1    whatever, it's a handwritten note from the provider that is

2    sent.

3            THE COURT:  Okay.  That's a good question.  So how

4    does that fit with what the new plan is?  How is it different,

5    the new plan?                                                    09:54AM

6            MR. BOJANOWSKI:  It's similar, but the idea is, is

7    that -- and the goal here, is that instead of just

8    communicating the results of the studies to the inmates upon

9    request, the system, and the way we're going to do it, is all

10   diagnostic studies, whether requested or not, are going to be   09:55AM

11   then sent out in a batch to all the inmates who have had them

12   so that regardless of whether you ask for it or not, you are

13   going to get it.

14           And so that's kind of the eOMIS, the difference

15   between the eOMIS system that we're going to be doing and as    09:56AM

16   was described earlier about having somebody handwrite a note to

17   the inmate and then scan that note into the system so it could

18   then meet this performance measure.  This way we get all of the

19   diagnostic study results out to the inmates so that they have

20   that information.  So it will include anybody that requests it.  09:56AM

21           THE COURT:  So is your expectation that on the 22nd of

22   June, these diagnostic reports will be printed out by a printer

23   at some place and then when they say Inmate Jones, they will be

24   sent in the mail to Inmate Jones and she will receive it at her

25   cell soon thereafter.  Is that what you are thinking?           09:57AM

1      MR. BOJANOWSKI:  Right.

2      THE COURT:  All right.  And so what you will do -- I

3 appreciate plaintiff's suggestion but I'm going to give this a

4 shot because it's imminent, it sounds like, you will start it

5 on the 22nd.  You will report to me on the 30th about whether          09:57AM

6 it's working in the way that you described, and we'll then

7 hopefully be done with this concern.

8      MS. KENDRICK:  Your Honor?

9      THE COURT:  Yes.

10      MS. KENDRICK:  If defendants discover on the 22nd that          09:57AM

11 it's not operational or not being implemented could you order

12 them to notify the parties and the Court sooner than the 30th,

13 or are we going to wait eight days to get a filing that says

14 it's still in process?

15      MR. BOJANOWSKI:  We don't anticipate a delay, but if          09:58AM

16 the Court wants a notice saying that we have rolled it out, I'm

17 willing to do that on the 23rd.

18      THE COURT:  Here's what I'm going to do.  On the 30th

19 you are going to tell me whether it's working or not.  If it's

20 not working, I want to know about that but I want to know what          09:58AM

21 the situation is on the ground in the previous week.  The 22nd

22 to the 30th gives you this time to figure out what's happening.

23 I want to be told, plaintiffs want to know, is it working on

24 not?  And if it's not working I know how before the next

25 hearing to jump in on that and to get you on the phone and          09:58AM

1   figure out what to do or issue an order addressing it.

2        Okay.  Performance Measure 50:  Urgent specialty

3   consultations and urgent specialty diagnostic services will be

4   scheduled and completed within 30 calendar days of the

5   consultation being requested by the provider.  For Florence,        09:59AM

6   last report in March was 59.  Where do we stand in April?

7        MR. BOJANOWSKI:  50, did you say, for Florence?

8        THE COURT:  Yes.

9        MR. BOJANOWSKI:  39.

10       THE COURT:  Okay.  The same measure for 13 here as to       09:59AM

11  50, and that is, you will identify for me each one of the

12  people -- I have heard that these consultation issues are

13  apparently somewhat associated with the inability to get

14  consultations because people won't do it for the amount you are

15  willing to pay, you are going to have to figure out something       09:59AM

16  else.  You are going to have to go to the emergency room.  You

17  are going to have to do something.  But you are going to have

18  to comply with this performance measure.  If you fail to you

19  are going to have to tell me why you shouldn't be fined $1,000

20  for failing to do so in each instance.                              09:59AM

21       Performance Measure 51:  Routine specialty

22  consultations will be scheduled and completed within 60

23  calendar days of the consultation being requested by the

24  provider.  We were on the bubble last month, and see where we

25  are in April.                                                       10:00AM

1          MR. BOJANOWSKI:  For what facilities, Your Honor?

2          THE COURT:  For Eyman, Florence, and Tucson.

3          MR. BOJANOWSKI:  Eyman, is at 94; Florence, is at 87;

4   Tucson, is at 74.

5          THE COURT:  So what are you doing about Tucson?          10:00AM

6   Tucson track record is not great.

7          MR. BOJANOWSKI:  At Tucson, in May they increased

8   their capacity to utilize the telemedicine services.  I'm

9   assuming that's extra, additional units?  They are also

10  utilizing and they have begun to utilize the services of the     10:01AM

11  medical school in Tucson.

12         THE COURT:  And when did that start?  Also in May?

13         MR. BOJANOWSKI:  I'd say end of May.

14         THE COURT:  And when did the telemedicine start?  Was

15  that end of May?  Beginning of May?          10:02AM

16         MR. BOJANOWSKI:  Same time and it was all part of one

17  overall plan.

18         THE COURT:  All right.  We'll watch and see what

19  happens with that measure.

20         Performance Measure 52, specialty consultation reports     10:02AM

21  will be reviewed and acted upon by a provider within seven

22  calendar days of receiving the report.

23         MR. BOJANOWSKI:  Okay.  Florence, 46; Perryville, 95;

24  Tucson, 85.

25         THE COURT:  Okay.  The remedy for Performance Measure     10:03AM

1    13 will be employed for Florence for 52.  That's because we are

2    dropped off from the 52 in March to 46 in April.  And we have a

3    history of never being compliant with this measure.  So we'll

4    employ the mechanism that I have employed for Performance

5    Measure 13.                                                    10:04AM

6           Performance Measure 54:  Chronic disease inmates will

7    be seen by the provider specified in the inmate's treatment

8    plan no less than every 180 days unless the provider documents

9    a reason why a longer time frame can be in place.

10          MR. BOJANOWSKI:  Okay.  54, you said, Your Honor?       10:04AM

11          THE COURT:  Yes, please.

12          MR. BOJANOWSKI:  All right.  Eyman, 60; Florence, 63;

13   Lewis, 86; Perryville, 97; Phoenix, 96; Tucson, 92; Yuma, 100.

14   Excuse me.  Yuma, 90.

15          THE COURT:  Could you repeat those?  I may have gotten  10:05AM

16   confused where I placed them in the columns.

17          MR. BOJANOWSKI:  Eyman, 60; Florence, 63; Lewis, 86;

18   Perryville, 97; Phoenix, 96; Tucson, 92; Yuma, 90.

19          THE COURT:  So Eyman, the 60, is roughly consistent

20   with how it's been performing.  Florence is a dropoff of how   10:06AM

21   it's been performing.  What does the State have to say about

22   that?

23          MR. BOJANOWSKI:  We don't have an answer for what

24   happened at Florence since we just got these numbers.  So I

25   can't really say what happened.  I mean, certainly they have   10:07AM

1   shown compliance for a long period of time, but I don't know

2   what happened in the past month.

3           THE COURT:  How about Eyman?  What kind of specific

4   remedial measure do you have in place there?

5           MR. BOJANOWSKI:  Your Honor, what we've done at Eyman          10:08AM

6   is that there are now three additional providers that have been

7   put into place.  The process to hire them, obviously, takes

8   quite a while.  So it's been in the works for some time since

9   they have to clear background and everything else.

10          They have started within the past week or so, so with         10:08AM

11  the additional, I believe it's three providers, we're certainly

12  hopeful that these numbers will start to climb.  I mean, we

13  showed a little bit of improvement at Eyman over the past few

14  months, but we need to push that up just a little bit further.

15          As far as, like I said, Florence, we simply don't have        10:08AM

16  an answer.  I have to look back and see what was going on

17  there.

18          MS. KENDRICK:  Your Honor, for what it's worth, Eyman

19  Performance Measure 54 was one of the performance measures and

20  institutions that was subject to your November 2016 outside          10:09AM

21  providers order, which this clearly shows that they are not in

22  compliance with the Court's past order.

23          THE COURT:  It just doesn't strike me as anything that

24  is such a huge challenge to make sure that people with chronic

25  disease are being monitored at a six-month interval.  And it --      10:09AM

CV 12-601 - June 14, 2017 - Status Hearing

1    the failure to do so seems like it can be readily redressed,

2    that the failure to do this at Eyman is striking.  The

3    additional providers that you have talked about, again, more

4    people, not a surprise to me as to why that would be necessary

5    to address this kind of problem.                              10:10AM

6            So we'll continue to watch this and expect to have a

7    better explanation next time on Florence if there's a continued

8    departure here, and we'll look to see some result from these

9    additional providers at Eyman.

10           Performance Measure 66:  In an IPC medical provider     10:10AM

11   encounters will occur at a minimum of every 72 hours.  The

12   numbers last time were horrid.

13           MR. BOJANOWSKI:  Florence, 50 percent; Lewis, 100

14   percent; Tucson, 60 percent.

15           THE COURT:  So one wonders why it is that you can       10:11AM

16   solve a problem that was the fact for all three of these in one

17   facility and fail to solve the problem at Florence and do worse

18   in Tucson.

19           MR. BOJANOWSKI:  This is our medical provider

20   encounters occurring at a minimum of every 72 hours for IPC     10:11AM

21   inmates?

22           THE COURT:  Right.

23           MR. BOJANOWSKI:  We found that at the Tucson facility,

24   at least one provider was performing the encounters per the

25   standard but was making the chart entries outside the required  10:12AM

1    time frames.  As a result, they are marked as non-compliant.

2    So what the doctor was doing was doing his rounds and then

3    apparently documenting it outside of the time frame.  So he --

4         THE COURT:  The doctor is charting it outside the time

5    frame or doing it outside the time frame?                          10:12AM

6         MR. BOJANOWSKI:  Charting it outside the time frame.

7    So the eOMIS, what happens with the eOMIS is when the doctor

8    gets into it, it automatically puts a time and date stamp on

9    it.  So he may do -- say it's -- because it's a 72-hour

10   situation, he may be, say, on hour 70, and he does his rounds     10:12AM

11   but doesn't chart it until, say, hour 75.  So what ends up

12   happening is it's non-compliant.

13        THE COURT:  You are saying there was one provider that

14   was doing this.  Do you know whether that's the responsible

15   reason for the 60 percent number for Tucson?  I mean, that        10:13AM

16   doesn't really tell me anything.  It doesn't tell me what you

17   just said, doesn't tell me whether this happened in one

18   instance or whether it happened in a greater number of

19   incidents, happened in a majority number of incidents that

20   could be responsible for this failure.  Do you have any idea      10:13AM

21   about that?

22        MR. BOJANOWSKI:  I don't have any additional

23   information except that we found that there was a provider

24   doing it, and then we corrected that situation, so to make sure

25   that they are putting these entries in per the standard.          10:13AM

1    THE COURT:  So that maybe explains Tucson, but we

2  don't know, really.  We just don't know.  I certainly wouldn't

3  trust in that based upon what you have said because it could be

4  meaningful, it could be meaningless.  I just don't know.

5  Because this is one provider, and I don't know whether that          10:14AM

6  provider didn't do this in one instance or 10 or whether others

7  did or didn't.  But I guess that's not the explanation for

8  Florence.

9    MR. BOJANOWSKI:  I'm trying to nail that down right

10  now, Your Honor.          10:14AM

11    THE COURT:  Okay.  Thank you.

12    MR. BOJANOWSKI:  In order to address the situation at

13  Florence, instead of the rounds being every 72 they are

14  changing it to every 48.  That way it will -- the rounds will

15  get done and it will get documented so we're not running into          10:14AM

16  the 72 hour situation.

17    THE COURT:  And when did that start?

18    MR. BOJANOWSKI:  Good question.

19    That started in May, Your Honor.

20    THE COURT:  When?          10:15AM

21    MR. BOJANOWSKI:  In May.

22    THE COURT:  But when?

23    MR. BOJANOWSKI:  Oh.  End of May, I'm sorry.

24    THE COURT:  So what you are saying is end of May at

25  Florence only or everywhere?          10:15AM

1    MR. BOJANOWSKI:  It's just at Florence at this point.

2    I think we're going to see how it works at Florence.  It may go

3    on beyond that.

4    THE COURT:  So can I understand this exactly a little

5    bit better?  These people are in the in-patient facility,                10:15AM

6    right?  Is that who these people are?

7    MR. BOJANOWSKI:  Correct.

8    THE COURT:  And you are telling me that it's 50

9    percent of the people have not been seen by a medical provider

10   over a 72-hour time frame when they are in the hospital?                  10:16AM

11   MR. BOJANOWSKI:  No.

12   THE COURT:  Okay.  And I'm using that as a rough

13   equivalent.  Obviously if you are sick enough to be outside of

14   your cell and you are in an infirmary kind of situation, that's

15   sort of like the hospital but somebody is pretty sick.  And so           10:16AM

16   I guess it's just amazing to me that there's no indication in

17   the chart that they have been seen by a medical provider over

18   the span of 72 hours in half these cases.

19   MR. BOJANOWSKI:  This is one of those ones, Your

20   Honor, if the inmate is seen, okay, over the course of, say, a           10:17AM

21   month 50 times and they miss one, then the entire chart is

22   non-compliant.  So it's one of those ones where there's no

23   partial credit given to --

24   THE COURT:  So somebody is sick enough to be in the

25   infirmary and you, over the course of 72 hours, there's no               10:17AM

```
 1    charted indication that any medical provider has checked in on

 2    that person.  And that means that you should get a pass on that

 3    person?

 4         MR. BOJANOWSKI:  No, you fail on that person.  That's

 5    my point.                                                      10:17AM

 6         THE COURT:  Yeah, but you just told me there's no

 7    partial credit.  We only missed him for 72 hours.  What could

 8    happen in 72 hours when somebody is in the infirmary?  I don't

 9    think anything bad.  That's preposterous, Mr. Bojanowski.

10         MR. BOJANOWSKI:  I'm not saying that at all.            10:18AM

11         THE COURT:  How else am I supposed to read that?  You

12    said you on get no partial credit for missing somebody over 72

13    hours when they are in your infirmary.

14         MR. BOJANOWSKI:  If you miss that person you should

15    not get credit.                                               10:18AM

16         THE COURT:  Right.

17         MR. BOJANOWSKI:  And they don't.  All right.

18         THE COURT:  Yeah.

19         MR. BOJANOWSKI:  So what I'm saying is --

20         THE COURT:  But you just told me that this is not a     10:18AM

21    big problem, Judge, because we saw them for 50 times over a

22    month and we missed them for 72 hours.  And I just can't fathom

23    how you can run a healthcare facility and have somebody in an

24    inpatient position and not see them for 72 hours.

25         MR. BOJANOWSKI:  The IPCs are staffed 24/7.  Okay.  So   10:18AM
```

1    if --

2          THE COURT:  But there's nothing in the chart that

3    indicates that they were checked in on.

4          MR. BOJANOWSKI:  Well, they are checked by nursing

5    staff all the time.  But, you know, this is where a doctor sees     10:18AM

6    the patient.

7          THE COURT:  You say doctor loosely, but you are always

8    enlarging what that means.  It's dropping pretty low.  I don't

9    mean to denitrate anybody who does anything.  You said doctor.

10   Let's be clear.  We're not talking about doctors.  You want       10:19AM

11   people to qualify as medical providers who are not doctors,

12   right?

13         MR. BOJANOWSKI:  Well, there are by definition other

14   people who --

15         THE COURT:  They are not doctors.  We know what a           10:19AM

16   doctor is.  That's somebody who has an M.D. after a name or

17   D.O. or doctor.  The D means doctor.  So that's what a doctor

18   is.  But you are not saying this is qualified by doctors.  I'm

19   sorry to be hostile about this but I'm a little bit --

20         MR. BOJANOWSKI:  It's okay, Your Honor.                     10:19AM

21         THE COURT:  -- fed up with these loose language when

22   you say a doctor when you and I both know --

23         MR. BOJANOWSKI:  It can be an LPN, too.

24         MS. KENDRICK:  I certainly hope that's not an LPN.

25   That's a licensed practical nurse.                                10:19AM

CV 12-601 - June 14, 2017 - Status Hearing

1    MR. BOJANOWSKI:  Nurse practitioner.  I'm sorry.

2    THE COURT:  Okay.

3    MR. BOJANOWSKI:  Those types of people.  So you are

4  correct, Your Honor.  I don't mean -- I'm not trying to play

5  fast and loose here.  So, you know, I'm trying to get -- I          10:20AM

6  don't want the Court to have the impression that the IPC is not

7  staffed.  That's my point.  I mean, there are people there all

8  the time.  They are people checking on the inmates all the

9  time.  This is one that requires a provider to check in with

10  the inmate.                                                         10:20AM

11    THE COURT:  That's what I'm doing.  If you didn't have

12  the requirement in the performance measure I wouldn't be

13  talking about it.  But you entered into a performance measure

14  that says that a medical provider has to do this.  And it just

15  is astounding to me that if you agree to do it in 50 percent of   10:20AM

16  the cases in April it didn't happen in Florence, and that in 10

17  percent of the cases it happened.  So 90 percent of the cases

18  before that, it happened in 40 percent.  Before that it

19  happened in 40 percent.  No, I misspoke.  For February it

20  happened in 60 percent.  In January it happened in 40 percent,    10:20AM

21  and then in December, 40.  And then in November, 84, and 96 and

22  100 before that.

23    And I can't just, at some point, I cannot just say,

24  looking over this situation, I can ignore the current abject

25  failure because there was a previous demonstration.  One of the   10:21AM

1    reasons that I can't is because you entered into an obligation

2    to do this all the time, not just on episodic like the moon

3    rising and being a full moon a particular day.

4         And also, there is what the plaintiffs have raised a

5    reasonable understanding that in a land of scarce resources,                    10:21AM

6    the robbing Peter to pay Paul situation is real.  And so I have

7    got to stay on top of the situations where there is this

8    dramatic falloff, and it's dramatic.  And so, I mean, my remedy

9    for this, for 66, was if you couldn't see them by a medical

10   provider within the timeline, take them to the hospital so that   10:21AM

11   they can be seen by somebody.  Take them to the emergency room

12   you haven't done that.  And I think I have ordered you to do

13   that.

14        So here I am in June, after having previously told you

15   how this should be addressed, and what I'm hearing is that you    10:22AM

16   really have no idea other than we missed it for 72 hours.  I

17   mean, really, the only explanation you have given me is we

18   didn't get partial credit.  Is there anything else you want to

19   say?  Well, what we'll do -- go ahead.

20        MR. BOJANOWSKI:  We actually did look at the total           10:22AM

21   number of encounters, you know, that occurred and how that, you

22   know, when you talk about the 10 percent, I mean, we actually

23   looked at that and found that there were 399 encounters out of

24   412 needed.  So that's why you see a 10 percent.  I mean, we

25   actually looked at that.  So it's --                              10:23AM

CV 12-601 - June 14, 2017 - Status Hearing

1      THE COURT:  The problem is it's not like a brick wall

2   that over 72 hours it's not going to fall down.  No, it's not.

3   It's been there for 30 years.  It's going to be there for the

4   next 30 years.  But we're talking about people who have been

5   determined that they need to be in an inpatient facility and 72      10:23AM

6   hours is really a huge period of time.  Unfortunately, four

7   minutes is a huge period of time, too, for somebody who is in

8   that kind of situation.

9      MS. KENDRICK:  Your Honor, you have made it crystal

10   clear that they don't get partial credit.  So I think that Mr.      10:23AM

11   Bojanowski talking about that, that's really a red herring.

12   And you previously ordered them to use outside providers for

13   this performance measure which, clearly, they are disregarding

14   your past order given these abject failures.  While it's great

15   Lewis actually finally hit 100 percent they certainly haven't      10:24AM

16   been doing that great in the recent months.

17      So we again reiterate our request that the outside

18   providers order applies to all of them and that they provide

19   documentation as to every single individual in the hospital,

20   not just a random sample of 10.      10:24AM

21      Furthermore, our expert discussed this performance

22   measure at Paragraph 60 and 61.  He critiqued their remedial

23   plan which he described as, quote, "meaningless" and that it

24   used vague language saying that they were going to ensure more

25   resources.  And that was their remedial plan in July and      10:24AM

1    obviously it's not working.

2           Dr. Wilcox offered some creative solutions that they

3    could try implementing to make better use of provider time and

4    to get rid of this excuse that it's just a documentation error

5    including using scribes and dictation services to document that   10:24AM

6    the encounters actually occurred.

7           He also notes that 72 hours is an outside ceiling on

8    things and that people should be seen according to their acuity

9    level.  So some people may be so sick they need to be seen

10   twice a day by a provider, so they shouldn't be having this      10:25AM

11   sort of non-compliance if they are practicing good medicine and

12   seeing people as necessary by their acuity level.

13          MR. BOJANOWSKI:  This is also going to fall under, as

14   I mentioned in the previous situation, there's the change in

15   seeing the inmates from the 72 to a 48.  So we're switching to    10:25AM

16   the 48-hour rotation so that we don't miss things like, you

17   know, maybe part of the problem was weekend coverage or

18   something like that.

19          THE COURT:  But you said you are only doing that at

20   one facility.                                                     10:25AM

21          MR. BOJANOWSKI:  At Florence, yeah, to pick that up.

22          MS. KENDRICK:  Your Honor, we believe that this is

23   such a critical performance measure to the life and safety of

24   our clients that they should implement that at all four

25   institutions including Perryville which you have not yet found    10:25AM

1    them non-compliant.  But it's critical and if that's what it

2    takes they should do it everywhere not just at one institution.

3           THE COURT:  I think a good way for me to incentivize

4    the satisfaction of this performance obligation is to impose

5    the mechanism for Performance Measure 13 for Performance          10:26AM

6    Measure 66 as well.  And I will do so for the three facilities,

7    Florence, Lewis, and Tucson.  Tucson -- I'm sorry, Lewis,

8    although at 100 percent, the previous month it was at 60, and

9    in February, it was at 20.

10          And so you will have to report to me before the next       10:26AM

11   hearing about the number of people who did not receive the

12   medical provider attention required by this performance

13   measure, and then we'll consider whether or not a sanction

14   should be imposed for the failure to comply.  My hope is that

15   the State's articulated measure of changing this 48 to changing  10:27AM

16   for 48 hours for one facility perhaps will be employed at the

17   others or that they will take other measures to make sure that

18   this doesn't happen.

19          I gather, I don't know what kind of arrangement that

20   it is for people to be seen by less expensive methods, but I     10:27AM

21   would suspect that there probably are ways for people to be

22   brought in to review a -- for a medical provider to be brought

23   in to take a look at people to make sure that Performance

24   Measure 66 is complied with that costs less than $1,000 per

25   patient.  So I'm hopeful that that will be an economic           10:27AM

CV 12-601 - June 14, 2017 - Status Hearing

1    incentive that will operate to the favor of seeing compliance

2    with this performance measure.

3           Performance Measure 80:  MH-3A prisoners shall be seen

4    a minimum of every 30 days by a mental health clinician.

5    Hopefully we're still on a good trend here.                    10:28AM

6           MR. BOJANOWSKI:  That would be at Lewis and Tucson?

7           THE COURT:  Yes, sir.

8           MR. BOJANOWSKI:  Lewis is at 92.  Tucson is at 97.

9           THE COURT:  All right.

10          MR. FATHI:  Your Honor?                                 10:28AM

11          THE COURT:  Yes.

12          MR. FATHI:  I would like to point out that for this

13   measure and for many of the ones that remain to be discussed,

14   the defendants are in violation of your orders on the

15   monitoring methodology.  And we have discussed that in our     10:28AM

16   briefs and we have placed it on the agenda for today.

17          THE COURT:  Right.  And we -- I mean, what I

18   understood, and I must say there's a bit of a disconnect on my

19   understanding I thought I cleared those issues up.  And I

20   thought I heard Mr. Bojanowski last month say that they were   10:29AM

21   going to do it.

22          Tell me, Mr. Fathi, what are they not doing here with

23   80 that they should be doing?

24          MR. FATHI:  Well, Your Honor, this is an issue that

25   involves every measure that requires something be done         10:29AM

1   periodically, so every X days.  And the Court said in its order

2   that the defendants have to look back at the last two

3   occurrences and measure the interval.  Were they -- was it done

4   within 30 days or less or 90 days or less.

5          And, in fact, the defendants correctly incorporated          10:29AM

6   the Court's order into their monitor guide.  Their monitor

7   guide is fine.  It says you look at the last two instances and

8   measure the interval.

9          THE COURT:  Okay.  I'm going to cut you off, Mr.

10  Fathi, just for a second.  Part of the problem is that Mr.      10:29AM

11  Bojanowski is still trying to get up to speed on this issue

12  because I can tell he's talking to his expert about this.  And

13  that's not really helpful because he's not hearing what you are

14  saying.  I can't talk and listen at the same time.

15         But I just want to make sure that this issue is fully     10:30AM

16  joined.  So this is a convenient time for us to take a

17  10-minute break.  That's what we'll do.  Let's make it 15

18  minutes.  We'll come back at 10:45.  You will have a chance to

19  do what you need to do but also if during this period of time

20  the two sides would talk and make sure that you are not still    10:30AM

21  at issue on this.  And if you are, things will be better

22  focused.  But we'll come back at 10:45.

23         Thank you.

24         (Recess from 10:30 a.m. until 10:48 a.m.)

25         THE COURT:  Please be seated.                              10:48AM

CV 12-601 - June 14, 2017 - Status Hearing

1          I interrupted you, Mr. Fathi.

2          MR. FATHI:  Quite all right, Your Honor.

3          We were talking about 80 and all the other performance

4    measures that require that something be done every X days.  And

5    the Court's order was very clear saying that for those                          10:48AM

6    performance measures you have to look at the last two

7    occurrences and the interval between.

8          Here's what the defendants are doing.  They are

9    counting records as compliant without measuring that interval.

10   They are counting records as compliant even when there's only         10:48AM

11   one single contact in the person's entire record.  And thirdly,

12   they are counting records as compliant when the record can't

13   possibly be found non-compliant.  We have discussed this issue

14   before.  So, for example, MH-3As have to be seen every 30 days

15   that's Performance Measure 80.                                                      10:49AM

16         If someone has only been an MH-3 for 20 days, that

17   record cannot possibly be found non-compliant but they are

18   including those records in the sample, which as Dr. Haney

19   explains is impermissible and falsely inflates the compliance

20   levels.                                                                              10:49AM

21         Now, defendants did say in their brief that, well,

22   yes, that was true as of the December CGARs about everything is

23   different, but, in fact, Mr. Dye specifically was asked and

24   specifically testified that in January and February CGARs, he

25   was still counting records as compliant without measuring that         10:49AM

1    interval, and he was still including in the sample records that

2    couldn't possibly be found non-compliant.

3           So we looked at the March CGARs which are the most

4    recent ones that any of us have, and those results are set

5    forth in the declaration of Ada Lin, which is Document 2089.          10:50AM

6           So here's what they do:  The person is admitted as a

7    new prisoner to the Arizona Department of Corrections.  As part

8    of that intake process, that person is seen by a mental health

9    clinician and assigned a mental health code.  So let's say,

10   again, it's an MH-3A.  Someone who is MH-3A has to be seen          10:50AM

11   every 30 days.  What they do is they count that same initial

12   contact when the person was made an MH-3A, the only clinician

13   contact in the entire record, and they say that person was seen

14   every 30 days.  That's compliant with the performance measure.

15   And that's just not permissible, Your Honor.                        10:50AM

16          So that's the dispute that we have on not only

17   Performance Measure 80 but on all the measures that require

18   every X days.

19          THE COURT:  Mr. Bojanowski.

20          MR. BOJANOWSKI:  I think Mr. Fathi admitted that the         10:51AM

21   first contact is a contact.  The person is seen.  They are

22   evaluated.  They are given a treatment plan potentially --

23          THE COURT:  How can you answer the question every 30

24   days when there's only been one contact.

25          MR. BOJANOWSKI:  There's one contact within the 30 day       10:51AM

1    period.  Otherwise what you are going to end up having is

2    those -- it disincentivizes Corizon from seeing the person

3    within the 30-day period, say, of intake.  Why would you do

4    that?  Because if that record is not going to be counted

5    compliance-wise, well, then, it would get thrown out.                    10:51AM

6            And I'm not as articulate on this issue as Mr. Fathi

7    is, and I have got Dr. Taylor here who maybe can better explain

8    it to the Court because I'm not as good describing what's going

9    on as she would be.

10           So I'd prefer, frankly, maybe to have her address the     10:52AM

11   issue to you and maybe you could ask the questions of her as

12   opposed to me trying to interpret and it gets lost in the

13   translation.

14           THE COURT:  That's fine.  Go ahead, Doctor.

15           MR. FATHI:  May we have the doctor sworn, Your Honor?    10:52AM

16           MR. BOJANOWSKI:  She's already been sworn, so she can

17   continue.

18           THE COURT:  Please step forward.  The oath works when

19   we're in successive hearings.  But because of the formality of

20   it, it is something that's worth doing.                                  10:52AM

21           (Dr. Taylor was sworn.)

22           THE COURT:  Thank you.

23           Please have a seat in the witness stand.  It's got a

24   handy microphone.

25                         NICOLE TAYLOR,

1   a witness herein, having been first duly sworn by the clerk to

2   speak the truth and nothing but the truth, was examined and

3   testified as follows:

4                    EXAMINATION BY THE COURT

5   Q.  So I know you have heard my previous expressions of doubt          10:53AM

6   about how it can be that something you are supposed to do every

7   X number of days can be ascertained with respect to only

8   looking at one contact.  And Mr. Bojanowski has said that that

9   is okay here; Mr. Fathi said it's not.  And Mr. Bojanowski

10  suggested that you are the person to ask as to why it is that          10:53AM

11  it's okay from the State's perspective.  So please.

12  A.  So strictly adhering to the every two, as I was explaining

13  to Mr. Fathi over the break, would also exclude ones where they

14  have only had one contact and it was outside of time frames.

15  Q.  Wait a minute.  I will ask you to -- I didn't catch what          10:53AM

16  you just said and I'd ask you to say it again so I can try to

17  get it.  Thank you.

18  A.  So strictly adhering to the requirement of two contacts in

19  order to be able to evaluate a record would mean if they only

20  had one contact but it was on the 95th day instead of 90th day        10:54AM

21  we would remove that record also because we wouldn't have two

22  contacts to compare.  And that can put us into a problematic

23  area.

24          I showed one to Mr. Fathi that is from the April audit

25  on my phone that I had and said this is one that's                     10:54AM

1   non-compliant because he became 3B, I think it was, on 2-15-15,

2   didn't have a treatment plan until January of 2017.  There's

3   only one treatment plan.  But it's way overdue and, therefore,

4   non-compliant.  Those were also included in there.  And I

5   shared that with him and said strictly adhering to the every                10:54AM

6   two would require that to be removed.

7   Q.  I guess I don't understand why your example would mean that

8   a person who has been determined to be MH-3 who that

9   determination's been made but the treatment plan hasn't been

10  put in place who hasn't been seen for 90 days why that person    10:55AM

11  doesn't fall out also from being compliant?

12  A.  They are not compliant.  But we would have to remove their

13  record because there weren't two to compare.  So what we had

14  done and implemented in January is provided them start dates.

15  Q.  All right.  So what if we changed the rule so that it said    10:55AM

16  that for people to be -- for compliance to be obtained under

17  these performance measures that require actions within a

18  certain number of days, you are in compliance if going back two

19  months you find that there is a treatment -- there is treatment

20  offered or provided within the X number of days required and    10:56AM

21  you are not in compliance if there has been no such treatment

22  provided.

23  A.  So if I understand you, that would include people who have

24  a 90-day period.

25  Q.  Right.                                                        10:56AM

CV 12-601 - June 14, 2017 - Status Hearing - Examination by The Court

1    A.  For instance and are seen on the 80th day of becoming

2    whatever subcode that is.

3    Q.  That record would be counted as non-compliant?

4    A.  They were seen on the 80th day.  They have 90 days.

5    Q.  Oh.  They have 90 days, right.                          10:56AM

6    A.  So they would be counted as compliant.  And then if they

7    were seen on the 95th day they would be counted as

8    non-compliant.  That's what we have been doing.

9    Q.  Well, no, because for the 90-day, I guess you are switching

10   from 90 to 30 and I'm not so facile at that.  But the example    10:56AM

11   that I'm understanding is that if somebody is supposed to be

12   seen every 30 days and they become MH-3 designated on January

13   10th and they are not seen by February 9th then you know that

14   you have that record as not being compliant.

15        And the problem is that if you look at the end of        10:57AM

16   January and you see that they were seen on January 10th, you

17   determined that they were seen within the period but you have

18   no reference to go back to.  So what I'm saying is you use two

19   approaches simultaneously; one, you see whether or not there

20   has been a possible previous date that you can march forward    10:57AM

21   the requisite number of days, and you use that, and you also

22   apply a mechanism that would allow you to capture as

23   non-compliant the record that you describe under the 90-day

24   scenario.

25   A.  I think I understand what you are saying.  But I personally  10:58AM

CV 12-601 - June 14, 2017 - Status Hearing - Examination by The Court

1   believe that that deflates the scores.

2   Q.  Say why.

3   A.  So if I'm going to ask Corizon to use their resource to see

4   somebody as fast as possible, which is what I ask them to do,

5   and so they are seeing them at the 30th day when they are a        10:58AM

6   90-day person, my preference is that they do that and that that

7   resource is used for that.

8        If those are not files that I review to ensure that

9   they are seen quickly when they come in, when they are changed

10  in subcode, and instead, they are incentivized to wait until      10:58AM

11  day 89, that's difficult for me.  And so I would only be

12  reviewing records that they did the wrong thing and not

13  reviewing the ones they did the right thing and then providing

14  you kind of half the story.

15  Q.  And that seems not to lack virtue, but why does that           10:59AM

16  mechanism mean that I also have to create the problem of

17  deeming as compliant somebody who has only been seen that

18  month, but we have no record of whether or not this is an

19  example of what we're concerned about, and that is somebody

20  whose got an ongoing problem who is supposed to be seen every     10:59AM

21  30 days and we want to make sure we're looking at those records

22  to see if we're capturing those failures.

23  A.  I would only be giving you half the story.  When I'm giving

24  you a percentage of compliance but I'm only looking at ones

25  that are not in compliant and removing any that are compliant     10:59AM

1  I'm only -- I'm not giving you an actual compliance report

2  anymore.

3  Q.  But the measure is designed to report to me about whether

4  or not we're seeing people on a regularized interval.

5          Mr. Fathi, do you want to jump in at this point?        11:00AM

6          MR. FATHI:  Yes, Your Honor.  Dr. Haney explained this

7  twice in his declaration.  If you are trying to test whether

8  the defendants are compliant, you have to have a sample that

9  includes records that at least show the possibility of

10  non-compliance.  It had to be possible for them to be        11:00AM

11  non-compliant.  So if someone has become an MH-3 20 days ago,

12  and they are supposed to be seen every 30 days, that record

13  cannot possibly be non-compliant.  It could be, under the

14  methodology Dr. Taylor explains, it's going to be compliant or

15  if the person isn't seen it's going to drop out of the sample.        11:00AM

16  But it will never be non-compliant.  And if you have a sample

17  that consists entirely of records like that you are guaranteed

18  100 percent compliance.

19          So what you do, and again, Dr. Haney explains this in

20  a declaration that has not been contradicted, you simply        11:01AM

21  exclude from the sample records that, because of the timing,

22  couldn't possibly be found non-compliant.  And if someone is

23  supposed to be seen every 30 days and they have been there for

24  a year and they have only been seen once, obviously that's

25  non-compliant.  I think the Court understands this.        11:01AM

1        But it's just fundamental to sampling methodology you

2   have to exclude all records from the sample that could not

3   possibly be found to be non-compliant.  I think we have a

4   fundamental disagreement on this.  I think the Court's going to

5   have to resolve it.                                          11:01AM

6        THE WITNESS:  I'm sorry.  Could I share one more

7   thing?  Mr. Fathi is suggesting most of them are in the

8   category he is describing and, in fact, most of them are in the

9   category that the start date is when they became that mental

10  health code.  Mental health codes transition with acuity.  So   11:02AM

11  they are doing really well, their mental health subcode

12  decreases.  They start to have more problems, their mental

13  health subcode increases.

14        So a number of the individuals have two contacts

15  within the time frames required.  But we're only looking back   11:02AM

16  to when they became that subcode.  So what I offered to Mr.

17  Fathi was we can remove the start date when they became the

18  subcode.  Because if your concern is an MH-3B being seen every

19  90 days, and I have one contact when they were a D and one

20  contact when they were a B, the answer is yes, they were seen   11:02AM

21  every 90 days.

22        We had included the start date to assist them.  What

23  it's done is create this suggestion that they are not being

24  seen every X but most of the time they are moving within the

25  subcodes and getting the every X through that, if that makes   11:03AM

1    sense.

2    BY THE COURT:

3    Q.  Is there a way to address that particular unfairness?

4    A.  We can remove the start date.  And so the start date was

5    just -- it was to assist us because treatment plans require us      11:03AM

6    to go back two years.  That meant we were going into a lot of

7    paper records and with the three of us that is very

8    challenging.  And so if we were looking back to when they

9    became an MH-3B as opposed to and MH-3 in general, it made it a

10   little bit easier.      11:03AM

11        We may have to include some start dates, because if

12   they became an MH-4, for instance, they need an every 30-day

13   contact.  But when they were a B they only needed an every

14   90-day.  So we would want to indicate that to them when that

15   did transition into every 30 so we know they are looking at      11:03AM

16   every 30 now not every 90.

17        MR. FATHI:  Your Honor, we would strongly object to

18   removing the start dates because it's the inclusion of the

19   start dates that made it possible for us to see they were

20   counting files that could not possibly be non-compliant.  And      11:04AM

21   as we show in the declaration of Ada Lin, these are not people

22   whose score has changed.  These are people who are new into the

23   system and they are counting the one and only contact they have

24   had and saying, oh, that's every 30 days.  That's compliant.

25        So what Dr. Taylor has said has nothing to do with the      11:04AM

59

1    large majority of cases.  If someone is in the MH-3A sample and

2    they have been seen twice and it's within -- those two

3    instances are within 30 days then that's compliant.  Even if

4    the first time they were seen they had a different mental

5    health code, we don't care about that.  What we care about is            11:04AM

6    meeting the requirements of the performance measure for the

7    mental health code they are now.  But it is fundamental that

8    they cannot include files that cannot possibly be found

9    non-compliant.  And as I said, I think we need a ruling from

10   the Court on that.                                                       11:05AM

11            THE COURT:  Okay.  Thank you.

12            Thank you, Dr. Taylor.  I appreciate it.

13            Well, as you all have heard me say before, I do not

14   see how it is that it's helpful for me to have a performance

15   measure defined by something that doesn't give me what that             11:05AM

16   performance measure is supposed to focus on, and that is

17   whether or not there's this regularized performance of a

18   service.  And these measures that require things to be done

19   within a certain number of days are designed exactly to do

20   that.                                                                    11:05AM

21            And so as I have said before, it seems to me, as Dr.

22   Haney has said, that it is appropriate to remove from

23   consideration files that cannot possibly be deemed

24   non-compliant so that I'm making sure that I'm getting a full

25   picture of the ones that could be demonstrating the failure of         11:06AM

1   a performance measure.

2          So I thought I had made that clear before, but I'm

3   making it even clearer now.  And I'd ask, Mr. Fathi, if you

4   would kindly, in a week's time, submit draft language for the

5   monitoring manual.  The only reason I suggest, even though you          11:06AM

6   say I have already done this, that I ask that you do this in

7   this process, is to in a week's time if you would submit that

8   so that the defendants can have a week to try to, given what I

9   have just said, to import into it any additional modification

10  that perhaps might be acceptable to plaintiffs to address what          11:06AM

11  is their concern about removing files that they should get

12  credit for.

13         And so if you would do that, and then on a seven-day

14  and seven-day basis, and then the plaintiffs can have an

15  opportunity to reply in seven days.  And then I will issue a           11:07AM

16  written ruling specifying what it is and we'll know for

17  certain.  But I'd like to do it that way.

18         MR. FATHI:  Thank you, Your Honor.  Just to be clear,

19  this is language about excluding cases that cannot possibly be

20  found to be non-compliant?                                             11:07AM

21         THE COURT:  Correct.  Correct.

22         MR. FATHI:  Thank you.

23         THE COURT:  Yes.  Right.

24         So now are we to Performance Measure 85?  Can you give

25  us the April numbers, please?                                          11:07AM

CV 12-601 - June 14, 2017 - Status Hearing

 1          MR. BOJANOWSKI:  I don't think I gave you --

 2          THE COURT:  80?

 3          MR. BOJANOWSKI:  80.

 4          MR. FATHI:  You did.

 5          THE COURT:  You did.                                    11:07AM

 6          MR. FATHI:  At the risk of being a broken record, Your

 7    Honor --

 8          THE COURT:  I understand that.  Totally understand

 9    that.

10          MR. BOJANOWSKI:  So we're on 85, Your Honor?           11:07AM

11          THE COURT:  Yes.

12          MR. BOJANOWSKI:  Eyman, 100; Florence, 100; Lewis, 96;

13    Perryville, 94; Tucson, 89; and Yuma, 98.

14          THE COURT:  Mr. Bojanowski, have you happened to have

15    run the numbers using the method that you hear me favoring, and  11:08AM

16    that is removing the records that could not possibly be deemed

17    non-compliant?

18          MR. BOJANOWSKI:  Hold on.  Are you just speaking

19    generally for all measures, or are you speaking about this

20    measure?                                                      11:09AM

21          THE COURT:  Well, let's talk about this one first.

22          MR. BOJANOWSKI:  This measure is being measured, as

23    the Court has suggested, so that the start date is the

24    discontinuation date of the med and then they calculate the

25    number of days.                                               11:09AM

1       THE COURT:  All right.  How about the previous one

2   that we were talking about, 80:  Shall be seen a minimum of

3   every 30 days.

4       MR. BOJANOWSKI:  That one includes individuals who are

5   on both sides of it, ones that were seen from the start date    11:10AM

6   within or before the 30 days and then those that were also

7   non-compliant files that were found to be non-compliant outside

8   the 30-day window.

9       MR. FATHI:  Your Honor, if I may, at -- in our opening

10  brief on the methodology, Document 2046 at Page 30, we cite      11:10AM

11  examples from the January 2017 CGARs where the sample for

12  Performance Measure 85 includes patients who discontinued

13  medications that same month in January so, therefore, less than

14  30 days before the sample was taken.

15      Now, if that's changed, that's great news, but again,        11:10AM

16  we would like a declaration to that effect.  Because as of the

17  January 2017 CGARs, they were still including, for Performance

18  Measure 85, files that could not possibly be found to be

19  non-compliant.

20      MR. BOJANOWSKI:  And he's referring to January.  I           11:11AM

21  think that, you know, the February/March -- is there some issue

22  with February or March, Mr. Fathi?

23      THE COURT:  We just want to know when it is that we

24  can know the numbers are as you represented, and that is, they

25  are employing the methodology of excluding records that cannot   11:11AM

1    possible be non-compliant.

2         DR. TAYLOR:  To give you an exact date, I can review

3    the CGARs and give you an exact date.  But it is definitely

4    being implemented as we discussed where they have had to come

5    off meds the month before we're auditing so that they would          11:11AM

6    fall due the month we're auditing.

7         MR. FATHI:  Your Honor, could we get production of the

8    instructions that were given to the monitors to that effect?

9    Because, again, if this is news, we welcome it but we would

10   like some verification.                                              11:12AM

11        DR. TAYLOR:  I do all the MH-3Ds myself.  I'm doing

12   those right now.  So I'm the monitor who is doing that.

13        THE COURT:  And so you are saying that this -- what

14   month can we know for sure that those numbers reflect this

15   method?                                                              11:12AM

16        DR. TAYLOR:  I would need to review the CGARs.  I can

17   do that while we're here in court on my mobile phone.

18        THE COURT:  All right.  Thank you.

19        Performance Measure 92:  MH-3 and above prisoners who

20   are housed in a maximum custody -- in a maximum custody shall        11:12AM

21   be seen by a mental health clinician for a one-on-one or group

22   session a minimum of every 30 days.

23        MR. BOJANOWSKI:  Eyman, 100; Florence, 90; Lewis, 95;

24   Perryville, not applicable; Tucson, not applicable.

25        THE COURT:  All right.  Sorry to interrupt, Dr.                 11:13AM

1    Taylor, what you are working on.  But what about 92?  Do you

2    know what it is the method you are employing there and when?

3              DR. TAYLOR:  So we provide them a start date when they

4    arrive into the max custody facility, and so it would include

5    individuals who have been there less than 30 days but also          11:13AM

6    include ones who have been there longer than 30 days and have

7    not yet been seen.

8              THE COURT:  So all of these numbers that we have

9    currently employed a methodology that is now you know

10   disfavored.                                                          11:14AM

11             DR. TAYLOR:  But again, it does include people who may

12   have had a contact just before they went into max and we

13   didn't -- so they would still potentially have the 30-day

14   contact span but we have not been providing that to you guys

15   and can't is what I'm --                                            11:14AM

16             THE COURT:  That's one of the tweaks that I thought

17   that maybe you could employ to what Mr. Fathi could propose to

18   address that kind of an issue.

19             DR. TAYLOR:  Understood.

20             THE COURT:  Performance Measure 93:  Mental health        11:14AM

21   staff not to include LPNs shall make weekly rounds of all MH-3

22   and above prisoners who are housed in maximum custody.

23             MR. BOJANOWSKI:  Eyman, 95; Florence 100; Lewis 100;

24   Tucson, not applicable.

25             MR. FATHI:  Your Honor, I should point out that there     11:15AM

CV 12-601 - June 14, 2017 - Status Hearing

1   are additional methodological problems with some of these

2   measures.

3           THE COURT:  Are they ones on the agenda?

4           MR. FATHI:  Yeah, so I'm happy to leave those for

5   later.                                                        11:15AM

6           THE COURT:  I have addressed some of those so I will

7   get to that.  But thank you.

8           MR. FATHI:  Thank you, Your Honor.

9           And I gather for 93, those are also subject to your --

10  to the State's previous, well, the State's challenged method of   11:15AM

11  counting.  Is that correct?

12          DR. TAYLOR:  No.  On that one it's a weekly contact

13  and so if they have been there, as per what we discussed, they

14  had to have been there for a full week before we could use

15  them.                                                         11:16AM

16          THE COURT:  Was court reporter able to hear?

17          If you could move closer to a microphone because she

18  is relying upon the microphone with the headsets so et helps to

19  do that, to use microphones.

20          DR. TAYLOR:  I apologize.                             11:16AM

21          THE COURT:  It's all right.  You didn't know.

22          94:  All prisoners on a suicide or mental health watch

23  shall be seen daily by a licensed mental health clinician or on

24  weekends or holidays by a registered nurse.

25          MR. BOJANOWSKI:  Eyman is at 100; Florence at 47;      11:16AM

1    Tucson at 88.

2            MR. FATHI:  And Perryville?

3            MR. BOJANOWSKI:  Perryville at 93.

4            THE COURT:  What about Florence?

5            MR. BOJANOWSKI:  Your Honor, this is the one where          11:17AM

6    there was, I think, problems with regard to documentation that

7    Dr. Calcote went out and did a training on that you had

8    requested.

9            THE COURT:  Right.  Right.

10           MR. BOJANOWSKI:  At the last one.  He has completed          11:18AM

11   that.

12           THE COURT:  He said he was going to do it by the end

13   of May.

14           MR. BOJANOWSKI:  That was completed.  He went to all

15   of the facilities, even those that are not subject to             11:18AM

16   non-compliance and did trainings.  And he submitted an

17   affidavit or declaration, I should say, to that effect,

18   indicating the topics as far as assessments of the need for

19   suicide watches, suicide risk factors, intake assessments,

20   watch assessments, criteria for release from watches, suicide     11:18AM

21   watch follow-ups and treatment planning, clinical treatment of

22   suicidal ideation, inspiring hope and documentation,

23   requirements for compliance with the stipulation for

24   performance measures.  So all of those topics were included in

25   those training sessions that started on May 16th and finished     11:19AM

1    on May 23rd.

2           THE COURT:  Mr. Fathi, I know that your expert is

3    skeptical of this kind of training that doesn't seem to fit

4    within the normal course of training, but in some ways I think

5    it may be better.  I have the person who is in charge telling          11:19AM

6    me that he will go and show up to each of these facilities and

7    tell them in no uncertain terms that this needs to be done.

8    And I would think that would have a more dramatic impact,

9    logically would make me think would have a more logical impact

10   than any other training program.                                       11:19AM

11          So I'm inclined to look to see what the results of the

12   assessing this performance measure are after we have results

13   from when these visits took place.

14          MR. FATHI:  Well, it's not either or, Your Honor.  Dr.

15   Stuart specifically recognized that verbal coaching can be             11:20AM

16   helpful, but it is completely unheard of in a multi-billion

17   dollar government agency in 2017 not to write anything down.

18   And Dr. Stuart explains why that's particularly dangerous in a

19   prison healthcare system where you have a lot of turnover, you

20   have use of locum staff, and so you have constantly coming into        11:20AM

21   the system people who aren't familiar with procedures and

22   protocols.  And that's why you write things down.

23          This is a measure that is specifically to protect

24   people who are suicidal.  And the four suicides that ADC

25   experienced in a 20-day period brings home to us the importance        11:20AM

1    of protecting this particularly vulnerable population.

2         Florence has been non-compliant on this measure for

3    every month since December with a single exception.  And now

4    they have actually dropped from 60 percent to a truly abysmal

5    47 percent.  This is a measure where the Court should not take

6    chances.  We would ask that you extend the Performance Measure

7    17 remedy to Florence on Performance Measure 94.

8         THE COURT:  Well, here's what I'm going to do.  I'm

9    going to ask that the following be provided to Dr. Calcote, and

10   that is that I appreciate the affidavit which demonstrates that

11   he did do what he said he would do; that he did visit the

12   facilities and explain that this performance measure needed to

13   be complied with in every instance.

14        But I also want him to be able to see the lines of the

15   transcript above what I'm saying now in which the plaintiffs'

16   counsel has raised a point articulated by the plaintiffs'

17   expert in which they are concerned that in a system that does

18   have many, many employees and a high level of turnover that

19   this visit be effective; this visit, which I appreciate again,

20   may be ephemeral, and that there be some methods that should be

21   imposed to make sure it's not so ephemeral and that it does

22   have a longevity that can make sure that we do not get into a

23   situation where we are at a compliance rate that has been

24   previously reported and that, perhaps, could have addressed the

25   loss of life that has recently happened.

11:21AM
11:21AM
11:21AM
11:22AM
11:22AM

1     So I would ask that this transcript portion be

2     provided to Dr. Calcote, and that he provide a supplemental

3     affidavit with respect to his view as to what can be done, what

4     the Court should do to make sure that the message that he

5     communicated in person was and will be followed and heard by          11:23AM

6     people who may not have been in the room when he said those

7     words.  Thank you.

8           Is Performance Measure 98 next?  And this is:  Mental

9     health HNRs shall be responded to within time frames set forth

10    in the mental health treatment mental health technical manual       11:23AM

11    Chapter 2, Section 5.0.

12          MR. BOJANOWSKI:  Number 98:  Eyman, 100 percent;

13    Florence, 100 percent; Lewis, 95 percent; Winslow, 70 percent.

14          THE COURT:  State's reaction to the 70 percent to

15    Winslow?                                                            11:24AM

16          MR. BOJANOWSKI:  What happened was the HNRs were

17    submitted in Winslow.  The inmates are transferred to Tucson

18    and then the inmates are put into the queue for being seen.

19    And then they fall outside the 14-day limit because Tucson

20    doesn't pick up on the need to get that person processed           11:24AM

21    quicker.  And then it falls back on to Winslow as being counted

22    against Winslow even though that inmate is no longer there

23    because they were transferred.

24          And there were a total of 10 HNRs that were evaluated,

25    so -- because the population, the mental health population at       11:25AM

—— CV 12-601 - June 14, 2017 - Status Hearing ——

1    Winslow is so small.

2         THE COURT:  Everybody who identifies a problem gets

3    transferred to Tucson, I gather?

4         DR. TAYLOR:  Correct, and they put them in the queue

5    behind the ones they are tracking down at Tucson because they          11:25AM

6    came down later and they started their time frame from then.

7    And they ended up getting seen a couple of days outside of the

8    14 because they put them in the back of their queue.

9         THE COURT:  And it just strikes me that if someone in

10   the medical staff at Winslow has decided that this is such a          11:25AM

11   situation that requires the transfer of the inmate to a

12   facility that has the ability to deal with this particular

13   circumstance, that maybe it's not so great to have that person

14   be at the end of the queue because of the instability that is

15   imposed upon somebody's movement from their home, and the            11:26AM

16   inmates do view their cells as their homes, that can be, I

17   think, a serious issue.

18        So I wonder, is there a way to make sure that we can

19   comply with this performance measure even for these people who

20   are transferred?                                                      11:26AM

21        MR. BOJANOWSKI:  It's a matter of making sure that the

22   facilities are communicating with one another as far as the

23   transfers are concerned.  And I think the issue is when these

24   guys get moved they need to be put in the front of the line

25   instead of the back of the line at Tucson.                           11:26AM

CV 12-601 - June 14, 2017 - Status Hearing

1        THE COURT:  Has anybody taken steps to do that?

2        MR. BOJANOWSKI:  The short answer is yes, but I'm

3    getting a more detailed overview.

4        THE COURT:  Take your time.

5        MR. BOJANOWSKI:  So what they have done now is they          11:27AM

6    have established a person who is at the Corizon Central Office

7    that's is in charge of tracking this to make sure that person

8    is seen within time frames.

9        One of the other things that is a backup kind of plan

10   or may also come into play is some telepsych that can be used          11:28AM

11   to perhaps address it before the actual transfer takes place so

12   if the person has put the HNR in, we could potentially see that

13   person prior to transfer because it does take some time to get

14   a person moved.

15       So those are the things that are being looked at in          11:28AM

16   this instance.  It's a, like I said, it's usually a very small

17   group of individuals that fall into this.  But we do want to

18   make sure that they are seen within time frames and get them

19   into the front of the line upon transfer or into a telepsych

20   before they are actually moved.          11:28AM

21       THE COURT:  Well, I have to really drill down to make

22   sure that I understand what is happening now and what is sort

23   of anticipatory, because there's both things there.  I had

24   asked what steps had been taken to be sure that they are put in

25   the front of the line when they are moved to Tucson.  And your          11:29AM

UNITED STATES DISTRICT COURT

CV 12-601 - June 14, 2017 - Status Hearing

1    first statement was so what they have done now is they have

2    established a person who is in -- who is at the Corizon central

3    office who is in charge of tracking this to make sure that

4    person is seen within the time frames.  That's operational

5    right now?                                                              11:29AM

6              DR. TAYLOR:  Yes.

7              MR. BOJANOWSKI:  Yes.

8              THE COURT:  And you have told me there are other

9    things that are being looked at as a backup and that's a

10   process that's not been implemented yet but it's ongoing?              11:29AM

11             MR. BOJANOWSKI:  It's apparently been used in the

12   past.  Then they stopped doing that, and now they are going to

13   do it again.

14             THE COURT:  The things that have been done in the past

15   are which things?                                                      11:30AM

16             MR. BOJANOWSKI:  I'm speaking as to the telepsych

17   only.

18             THE COURT:  All right.

19             MR. BOJANOWSKI:  So they had a system in place that

20   they had used in the past.  They went away from that, and then        11:30AM

21   they are going to bring that on line again.

22             THE COURT:  When?

23             DR. CALCOTE:  This week.

24             THE COURT:  This week?

25             DR. CALCOTE:  Yes, sir.                                      11:30AM

1          THE COURT:  All right.  And the Corizon oversight

2    process is, you are sure, happening now, that somebody is

3    looking to every person who is transferred for mental health

4    reasons from Winslow to Tucson is being watched to make sure

5    that they will be seen within seven days?                    11:30AM

6          MR. BOJANOWSKI:  Correct.  14 days.

7          THE COURT:  14 days.  Yes.

8          MR. FATHI:  Your Honor, may I respond?

9          THE COURT:  Yes.

10         MR. FATHI:  I am disturbed to hear the defendants       11:31AM

11   repeatedly referring to 14 days.  The requirement imposes

12   different time frames for HNRs of different urgencies.

13         THE COURT:  I don't know because I don't have that

14   manual in front of me, so I appreciate this clarification.

15         MR. FATHI:  Understood, Your Honor.  But given the      11:31AM

16   defendant's history of non-compliance with this measure we are

17   concerned if they are only looking at 14-day HNRs.  We will

18   investigate it and certainly advise the Court if there's a

19   problem.  Some HNRs do need to be responded to immediately;

20   some within 24 hours and so on.                              11:31AM

21         THE COURT:  All right.

22         MR. FATHI:  One additional point is that the

23   defendants, and this is a separate agenda item, propose to

24   eliminate the HNR boxes at a number of facilities, one of which

25   is Winslow.  So their ability to comply with this performance  11:32AM

1    measure would certainly be affected if they were to get rid of

2    the HNR boxes.  And, again, we're happy to discuss that under

3    the separate agenda item.  But I did want to mention that

4    connection for the Court.

5        THE COURT:  It's a nice segue and also amplifies what            11:32AM

6    my original concern is when I saw that, is because there are a

7    number of provisions in the stipulation, or in the performance

8    measures, that are triggered that are put in play by this HNR

9    deposit of a request and that I think the parties are free to

10   modify by agreement how to go forward.  But both sides have       11:32AM

11   been rather strident with me at different times when it's in

12   their favor to say the rules are the rules.

13       And so if it says, the HNR, you can't decide that a

14   performance measure that requires this thing to be monitored by

15   when an HNR is deposited you can't just remove the mailbox          11:33AM

16   unilaterally.  You could bilaterally if you agreed upon it, and

17   it may make sense to do all sorts of things like that in a

18   different area where things change, technology changes.  We

19   have made changes with respect to medical records.

20       But this is a problem for the mechanism that is in              11:33AM

21   place for me to know when an action is triggered when I start

22   the clock.  And I don't have any other way to start the clock.

23   And so I'm -- I need to hear how it is that I have an assurance

24   that the performance measure that was going to let me know

25   whether or not a requirement of the stipulation was being           11:33AM

1    satisfied is going to fail now because a single side has

2    decided to remove the triggering mechanism.

3              So this is an important issue.  It's on the agenda,

4    and maybe we can turn to it now.

5              Mr. Bojanowski.                                    11:34AM

6              MR. BOJANOWSKI:  Your Honor, we're not removing HNRs.

7              THE COURT:  The boxes aren't coming away?

8              MR. BOJANOWSKI:  No, the boxes are gone.  The HNR is

9    still in place.  The inmate takes the HNR right to the medical

10   unit.  The HNR is processed just like it usually is.          11:34AM

11             THE COURT:  So they get docketed in the same way?

12             MR. BOJANOWSKI:  Right.  The only difference is how

13   does the HNR make it from the inmate to medical.

14             THE COURT:  I see.

15             MR. BOJANOWSKI:  Is it picked up by medical each day  11:34AM

16   or is it actually hand delivered by the inmate.  We removed the

17   boxes such that we can process the HNRs immediately.  It's kind

18   of like going to an urgent care clinic.

19             THE COURT:  The immediate problem has been raised by

20   the plaintiffs before.  They say that sometimes the line is so  11:35AM

21   long that somebody just can't possibly do it.  Either they are

22   too sick or they are called away to another obligation or

23   something.  There have been these workability issues that have

24   been raised.  I don't know what's happening on the scene but

25   the plaintiffs may well.  So I just -- I'm sorry to interrupt   11:35AM

1   you, but I wanted to drop a footnote on your use of the word

2   immediately because it seemed to me that the HNR box allowed

3   that to happen for the thing to be date stamped in.  We knew

4   what the time was.  But if somebody shows up with a piece of

5   paper and the line has 50 people in it and you can't get to the    11:35AM

6   person to hand the piece of paper to, then I have got a problem

7   with deciding whether or not it's fair to allow you to modify

8   the mechanism that started the clock.

9          MR. BOJANOWSKI:  That's simply not the way it's

10  functioning.                                                       11:36AM

11         THE COURT:  Okay.

12         MR. BOJANOWSKI:  Okay.  I mean, we don't have people

13  that are not being seen.  Anybody that's in line is going to be

14  seen.  If there's an emergency situation it's handled as it

15  always has been.  There's an emergency declared and the person    11:36AM

16  is taken to medical.

17         As far as people working, the med lines are structured

18  and the work things are structured so that those people have

19  the opportunity to go to medical, in other words, person leaves

20  for work at 6 a.m., they come back at 2, their med line          11:36AM

21  opportunity is from, say, 3 to 6 so they can go after work.

22  Some people work the afternoon shift, so to speak, so they can

23  go in the morning.  But all of that is by facility and unit

24  scheduled and structured so that the availability of getting

25  down to the medical unit is there for people who want to do it.   11:36AM

CV 12-601 - June 14, 2017 - Status Hearing

1          Now, if you choose to go to a programming event

2    instead of going to medical, I don't know how we cure that,

3    okay.  But it's one of those things where there's a certain

4    level of responsibility upon the inmate to say, look, I'm sick

5    or I need something.  I need to go see the medical unit.  And          11:37AM

6    so I can go down there with my letter HNR already filled out

7    and I can see that nurse.  Do I have to wait?  Yes, I may have

8    to wait, or I'm first in line.  I may not have to wait so long.

9    So, you know, but everybody that's in line is seen.  And my

10   information is that we're not having people turned away because     11:37AM

11   they can't be seen.

12          THE COURT:  Okay.

13          MR. BOJANOWSKI:  Medical staff is instructed

14   specifically, you need to see everybody in line.

15          THE COURT:  I don't know that we have heard exactly          11:37AM

16   something contrary to what you have just said but we have heard

17   some sentiments expressed about workability issues that the

18   plaintiffs have observed in their monitoring capacity.  Maybe

19   you can give us an update on that.

20          MS. KENDRICK:  Well, Your Honor, it's not just what we       11:38AM

21   have observed.  Attached to the declaration that's at Docket

22   2106 is a letter that I sent to Mr. Bojanowski on May 17th in

23   response to their unilateral announcement that they were

24   removing these boxes.  And I cited to and included documents

25   from three different institutions where they talked about how       11:38AM

UNITED STATES DISTRICT COURT

1    their little open sick line was affecting people who work.

2            We attempted to resolve the situation with a

3    meet-and-confer telephonic conference before this hearing, and

4    again, we got these avowals of counsel that, oh, don't worry.

5    They are seen before they go to work.  They are seen after they

6    go to work.  We said great, give us schedules.  Well, the

7    schedule's written down.  Nothing is written down.  We were

8    just told, oh, trust us.  They are written down.

9            And we vociferously object to this unilateral

10   modification.  Our expert goes on at length, Dr. Wilcox, how

11   this is used to reduce accountability.  And requiring people to

12   go and sit for 8 or 10 hours in a clinic with 50 other people

13   when they have an HNR that says:  I'm having bad thoughts.  I

14   would like to see my mental health provider or my tooth aches

15   is beyond absurd.  And it's putting so much barrier on

16   accessing care for our clients.

17           He says he doesn't have any proof that people are

18   being turned away.  They have no way to document it because

19   they count the HNRs that are received and processed.  That's

20   why they are suddenly doing so great on Performance Measure 37.

21           THE COURT:  Have you watched during your tours this

22   open line?

23           MS. KENDRICK:  Yeah, we have watched the open clinic.

24   And despite their assurances in open court that they run 7 to

25   7, seven days a week, we went on multiple yards where they said

1   they were a few hours in the morning on one part of the yard

2   and then a few hours in the afternoon on another part of the

3   yard.  We talked to multiple nurses about that.

4         It's very difficult to take any of these vague

5   assurances with any sort of credibility that it's true.        11:40AM

6   There's absolutely no written documentary proof.  And I think

7   at this point, it's a little hard to trust assurances that

8   people are being seen, things are being done.  Nothing is

9   magically being written down.  So again, we object in no

10  uncertain terms to their removal and we ask the Court to order   11:40AM

11  them to put the boxes in all of those yards where they removed

12  them on Monday.

13        THE COURT:  What I'm inclined to do I will give you

14  both a chance to address this at our next hearing, set an

15  evidentiary hearing and ask that I have the people from the      11:40AM

16  floor, so to speak, here.  The nurses who tell me, whether they

17  be nurses or not, but plaintiffs certainly used the word

18  "nurses" so you have apparently spoken to somebody.  So maybe

19  you have an idea of the type of person if not the individual

20  person who would be the right person to have testify in court    11:41AM

21  about what it is that the reality is happening and whether or

22  not it's, as plaintiffs say, people are sitting for eight hours

23  or what I'm getting from defense counsel that that never

24  happens or, on the other hand, in a different subject, whether

25  or not there is this limited number of access hours that are     11:41AM

CV 12-601 - June 14, 2017 - Status Hearing

1    permitted.

2           And so I think we need to understand better about

3    what's happening on the scene.  And so that, to me, is a

4    suggestion that the best way to do that is to have an

5    evidentiary hearing addressing the subject.  But as I say, I          11:41AM

6    will give you each an opportunity to address my proposal.

7           MS. KENDRICK:  That's fine, Your Honor, but we would

8    ask that in the interim you order them to put those boxes back

9    in.  Our office has received a lot of mail recently from

10   prisoners who received this notice that we filed with the Court      11:41AM

11   from Director Ryan going to all prisoners informing them that

12   the boxes are going to be removed.  And our clients are

13   expressing grave concerns about what's going on.  I mean, I

14   read three letters in the past week that said, Ms. Kendrick,

15   what are you going to do about this?                                   11:42AM

16          So we're hearing loud and clear from our clients that

17   they are concerned that this unilateral removal of the boxes is

18   going to impact their access to receive medical, dental, and

19   mental healthcare.

20          THE COURT:  I see.  And these boxes they are talking          11:42AM

21   about have already been removed or are going to be removed?

22          MS. KENDRICK:  Yes, sir.  According to the notice that

23   Mr. Bojanowski sent me on May 15th, it's attached as Exhibit 2

24   to my declaration.  It's Docket 2106-1, electronic case filed

25   page Number 12.  And it says -- it's signed by Charles L. Ryan        11:42AM

1   and it says, "Effective June 12th, 2017, ADC will no longer

2   utilize the HNR box in processing general health needs requests

3   for minimum and medium state-operated units.  Following the

4   removal of the HNR boxes from these areas, inmates seeking

5   medical attention must report to the health unit with a                    11:43AM

6   completed HNR where they shall wait to be seen by a daily

7   nurses' line."

8          THE COURT:  Well, so the people who wrote that letter

9   are all people who are fearful that the new system will be one

10  that will have all the horrors that you described and not one              11:43AM

11  that will have all the benefits and the absence of the horrors

12  that Mr. Bojanowski describes.

13         MS. KENDRICK:  I didn't hear any benefits.

14         THE COURT:  The benefit is you are seen immediately.

15  You are seen that day.                                                      11:43AM

16         MS. KENDRICK:  That's what they represent.  I would

17  say the horrors besides the lack of barrier to care is exactly

18  what you identified, is that so many of these monitoring

19  performance measures are keyed off of HNR submission and wait

20  times.  And our expert, Dr. Wilcox, described the fact that he             11:43AM

21  thinks that this is a blatant attempt to avoid accountability

22  and eliminate the only audit trail that exists about requests

23  for care.  There's no way to show how many times somebody

24  requested care if the only HNRs that are scanned to the records

25  are when they were actually successfully seen.                             11:44AM

1          THE COURT:  Right.  But that -- but, I mean,

2    obviously, I can find out, I think, about whether as a

3    practical matter people are not able to make it to survive the

4    line, so to speak, long enough if the line is so long that they

5    can't possibly be seen.  So I think I can answer that question,        11:44AM

6    because your supposition also assumes that I can't trust the

7    HNR box system itself, that if they are using it as a mechanism

8    to try to escape accountability, why don't they just take all

9    the HNRs and throw them in the trash when they were in the box.

10          So we trust that they don't do that, so we trust here        11:45AM

11   that when people get to the front of the line that they hand

12   the HNR and we have to look and see whether or not it becomes a

13   deterrence to the component that is important upon the parties'

14   agreement, and that is the monitoring of knowing whether

15   something that's triggered by the HNR is no longer able to be        11:45AM

16   gauged because the HNR process or the -- yeah, the HNR process

17   is frustrated.

18          MS. KENDRICK:  Well, Your Honor, again, there's just

19   no audit trail.  There's no way to know who was not seen.  And,

20   you know, Mr. Bojanowski dismissed people who might choose        11:45AM

21   programming over going and sitting in nurses' line for eight

22   hours.  But a lot of prisoners are doing programming that is

23   court-ordered or that will need to be reviewed by a parole

24   board when they are exiting.  We have people working.  Granted

25   they are making 15 cents an hour, but they have jobs.  And they        11:46AM

1    are going to have to not report to work, not report to

2    education, not report to their substance abuse classes because

3    they have to sit and wait.  So we think it's unreasonable to

4    put this requirement on there.

5            The other thing is there are people who do not need to    11:46AM

6    be seen by a nurse to be triaged.  When they use the triage --

7    triage them by paper, if somebody put in an HNR that had to do

8    with mental health or dental, they were not seen a nurses' line

9    and charged $4.  It was referred to the dental department or

10   mental health department who then docketed the individual.  So    11:46AM

11   the triaging occurred on the paper in those cases.  It's not

12   necessary for every single person to come and sit at nurses'

13   line and pay $4 for the pleasure of doing that when they are

14   submitting an HNR that's about mental health or dental care.  A

15   nurse cannot do anything about a toothache or somebody who is    11:46AM

16   feeling depressed and needs to talk to their counselor.

17           THE COURT:  All right.  Go ahead.  I will let you

18   finish, Mr. Bojanowski.

19           MR. BOJANOWSKI:  Like I said, Your Honor, we're not

20   eliminating HNRs.  There is an audit trail.  The HNR is still    11:47AM

21   processed in the same fashion, even with the boxes.  I mean,

22   they are still going to wait in line.  They still have to show

23   up the next day and wait in line to be treated.  So the waiting

24   in line, missing work, whatever, you know, they are going to

25   have to be in the medical line either the day of that they can    11:47AM

1    get treated immediately or the day after, after they are --

2         THE COURT:  But that medical line under the old system

3    is managed.  It's triaged.  You are telling the person when to

4    come back at a particular time so they think they can see that

5    person with the reasonable amount of time.                        11:47AM

6         MR. BOJANOWSKI:  So say it's mental health thing

7    that's not urgent.  Instead of seeing the nurse right away, the

8    person is -- they take the paper and they are not seen within

9    five days.  So, you know, it's a matter of being able to manage

10   the inmate population so that they are seen right away and      11:48AM

11   there is accountability there the idea being that, look, if I

12   have got the HNR I can go there and I can wait for a couple of

13   hours.  I am unaware of anybody waiting eight hours.  I am

14   unaware of anybody not being seen in the line when they go to

15   the line.  And I have not seen anything from plaintiffs that    11:48AM

16   indicate that is the case.

17        We believe that this system is -- it's much quicker to

18   address the needs of the inmate population.  So the audit trail

19   is there.  The accountability is there.  The HNRs are still

20   going to be there.  It's not something where there's a denial   11:49AM

21   of access to care.  It's just more streamlined.  It's just like

22   going, like I say, like going to the urgent care.  If I go to

23   the urgent care I may have to sit there for two hours.  I may

24   have to miss work because I have got to be someplace to see a

25   doctor because I'm sick or I need something or whatever.  I     11:49AM

1    mean, it's the same thing is true inside the facility.  We have

2    very specific schedules put in place so that the people who are

3    working are not impacted, they can still access the care even

4    with their work schedules.  I have got those schedules and I

5    can produce those to the Court.                              11:49AM

6         I'm not objecting to an evidentiary hearing.  If the

7    Court wants to hear from people in the field I'd be more than

8    happy to produce some people from the field so that the Court

9    could hear it and hear how it's functioning and how the system

10   works.                                                       11:49AM

11        MS. KENDRICK:  Your Honor, Mr. Bojanowski keeps making

12   parallels to urgent care centers that we might go to in the

13   community.  But in this case we have lots of individuals who

14   are requesting and needing routine care.  And I don't go to

15   urgent care for a routine procedure.  You arrange it and      11:50AM

16   schedule it.

17        And I guess I understand they want to streamline

18   things, but there's no burden on ADC to keep the boxes so we

19   don't understand why they are moving so aggressively to remove

20   a way for people to access care.  This is creating an         11:50AM

21   unnecessary barrier to care.  And again, the benefit of the

22   boxes was that every single HNR that was in a box was logged

23   and tracked and put into a prisoner's record.  And if we're

24   only going to be using the HNRs of people who sat and waited,

25   whether it's 45 minutes, two hours, six hours, eight hours, and  11:50AM

1   only their HNRs are being seen, we're not getting the entire

2   universe of them.

3          MR. BOJANOWSKI:  What HNRs are missing?

4          MS. KENDRICK:  The people who did not sit for two

5   hours or eight hours, or the people who are requesting to see          11:51AM

6   the dentist and are being told that their HNR won't be received

7   until they wait and see the nurse.

8          MR. BOJANOWSKI:  Do you have instances where this is

9   occurring?  I mean, I don't see any grievances.  I don't get

10  any kind of complaints.  I don't see evidence of what you are          11:51AM

11  saying is occurring.

12         MS. KENDRICK:  Well, there's a couple things we could

13  do, Your Honor.  We could perhaps call some prisoners, class

14  members, to testify as witnesses.  I could review the letters

15  that we got and anonymize what complaints and concerns we get.          11:51AM

16  But at the end of the day, our fundamental question is, why are

17  they doing this?  There's no reason to do this except they want

18  to quote, unquote, "streamline things."

19         And to the extent multiple barriers exist to people

20  accessing care, it seems rather gratuitous and cruel to erect a          11:51AM

21  barrier for no other reason than it, quote, streamlines things

22  with Corizon.

23         MR. BOJANOWSKI:  There's more of a barrier with the

24  box.

25         THE COURT:  Well, the defendants have articulated in          11:52AM

1    the past a reason of why they believe this would be a better

2    system, not just for efficiency purposes, also for treatment

3    purposes having people seen sooner rather than later.  So I do

4    think I need to learn more about it.  I think having an

5    evidentiary hearing makes sense.  Exactly who the witnesses          11:52AM

6    would be, I would ask the two sides to confer about that.  And

7    if you need help from me on deciding what the nature of it

8    should be, get on the phone and call me.  And I will take that

9    up.  But make arrangements to have that happen.

10           MR. FATHI:  Your Honor, will that be at our next              11:52AM

11    scheduled hearing?

12           THE COURT:  Yes.  Yes.

13           Are the boxes, have they already been removed, all of

14    them?

15           MR. BOJANOWSKI:  I'm not really sure whether they have       11:53AM

16    all been removed.  I sought to get confirmation of that

17    yesterday, and I don't have the confirmation.  So I don't want

18    to represent to the Court that they have all been removed.

19    What we -- months ago we implemented the open clinic concept to

20    try and ease into the procedure by which to get inmates instead     11:53AM

21    of going to the box.

22           THE COURT:  Have people been told when they show up

23    with an HNR on the open clinic days, oh, don't put that in the

24    box.  Sit here and wait until we can see you?  Is that what

25    people have been told, so the number of HNRs going into the         11:53AM

1    box, have they already declined?

2         MR. BOJANOWSKI:  I don't think I understood your

3    question, Your Honor.

4         THE COURT:  You are trying to transition.  So you

5    transition to a place where there are no longer boxes.  The          11:53AM

6    people in the old system come in with an HNR, put it in the

7    box, go about their way.  They would get contacted when they

8    have an appointment.  Am I right so far?

9         MR. BOJANOWSKI:  So far.

10        THE COURT:  Then the prison knows they are getting to          11:54AM

11   a point where they are going to be doing away with these boxes

12   so when people come in with the HNR, we say, oh, no, don't put

13   that in the box.  Sit here and wait until we see you

14   personally.  Has that been going on for a while?

15        MR. BOJANOWSKI:  Yeah.  The boxes are on each yard.          11:54AM

16   So we don't know when they drop them off.

17        THE COURT:  I see.  The boxes --

18        MR. BOJANOWSKI:  They are not at the medical.

19        THE COURT:  They are not in the medical facility?

20        MR. BOJANOWSKI:  It's like a mailbox on each yard.          11:54AM

21        THE COURT:  Okay.

22        MR. BOJANOWSKI:  So you might have 10 boxes, say.  And

23   so they would collect them, you know, say at night or whatever

24   and then they collect them all.  And then they go through them,

25   they would look at them, and then they would determine, okay,          11:54AM

1    this guy needs to be seen say here today.  That guy can be seen

2    tomorrow or a couple days from now, and that's the way it was

3    working.

4         THE COURT:  Are these the same boxes that the

5    grievances go in?                                              11:55AM

6         MR. BOJANOWSKI:  No.  No.  It's strictly a medical.

7         MS. KENDRICK:  Your Honor, on that point, our

8    plaintiffs have been asking for months to be provided all of

9    the grievances that are filed regarding healthcare and

10   defendants have steadfastly objected.  But given Mr. Bojanowski   11:55AM

11   has just represented he reads the grievances and hasn't seen

12   any that complain about this, we would like to ask that they

13   produced all the grievances from the past six months to us

14   within the next two weeks so we can prepare for the evidentiary

15   hearing.                                                       11:55AM

16        THE COURT:  So these are the healthcare grievances you

17   are asking for?

18        MS. KENDRICK:  He's representing --

19        MS. RAND:  Your Honor --

20        MS. KENDRICK:  Please let me finish, Lucy.  He's          11:55AM

21   representing to the Court that he has reviewed these grievances

22   and doesn't see this as a problem.  We do not have access for

23   that information so we cannot counter his representation that

24   he has read the grievances and there's nobody complaining about

25   this issue.  Therefore, we reiterate the request we have been  11:56AM

1    making for months in our document requests and they have been

2    refusing to produce it to us that they provide the past six

3    months for grievances.  That would cover the period since the

4    open clinic started and that way we could see if there are

5    grievances about the open clinic and whether the HNRs are being          11:56AM

6    taken or whether people are being told they have to wait and

7    see the nurse before their HNR would be accepted.

8            MR. BOJANOWSKI:  I think she's greatly expanding what

9    I'm saying.  I'm not hearing about any grievances.  I haven't

10   seen any grievances.  I haven't read all the grievances.  It's         11:56AM

11   thousands --

12           MS. KENDRICK:  It's not thousands, Mr. Bojanowski.

13           THE COURT:  This is the first I have ever heard about

14   the grievance issue and the fact that the plaintiffs have been

15   requesting grievances and that hasn't been complied with.  My          11:56AM

16   gut reaction is why wouldn't the plaintiffs be able to see the

17   healthcare grievances?

18           MS. RAND:  Your Honor, this is Lucy Rand.  Plaintiffs

19   requested almost two years worth of grievances be provided

20   regardless of what topic it's regarding.  They are not trying          11:57AM

21   to narrow them down.  And we basically, you know, objected that

22   it's unduly burdensome because of the amount of documentation

23   that must be produced.  And we asked them to, you know, to

24   basically, you know, narrow it down just a little bit.  And

25   they have never responded.  So I don't know that we have been          11:57AM

1    objecting and that they -- I'm sorry.  Go ahead.

2            THE COURT:  Nobody was talking.  But it occurs to me

3    that in trying to identify issues that are associated with

4    compliance with the healthcare stipulation, that one of the

5    best mechanisms of communication would be to have the          11:58AM

6    plaintiffs take a look at the grievances that the class

7    plaintiffs have been submitting to the prison authorities with

8    respect to healthcare issues.

9            So I will order that the last six months of healthcare

10   grievances all be produced no later than two weeks from today   11:58AM

11   to the plaintiffs.

12           MS. KENDRICK:  And just to be clear, Your Honor, you

13   can see this at Docket 2108-1, the declaration of David Fathi.

14   It's Exhibit 2.  It includes our request and it shows that we

15   have been requesting the director's level responses to          11:58AM

16   grievances since February 16th.  And since -- February 16,

17   2016.  And since then they have been saying that it's unduly

18   burdensome and not required to produce under the stipulation.

19   So we're not asking for every single grievance despite their

20   representation.                                                  11:59AM

21           THE COURT:  You want the director's level grievances?

22           MS. KENDRICK:  Our previous request had been

23   director's level but given the fact it takes and months and

24   months to get a director's level response and given the

25   evidentiary hearing coming up, we would actually request that   11:59AM

1    it be all grievances.  But I want to be clear that historically

2    we have not been asking for all grievances only asking for the

3    ones that made it all the way to the director's office.

4           THE COURT:  Let's do this:  Let's have the director's

5    level grievances produced to you, but with respect to preparing      11:59AM

6    for the hearing and understanding that there may be some kind

7    of burden to get them from all the facilities, why don't you

8    pick two facilities where you would like to have all the

9    healthcare grievances for the last six months.

10          MR. BOJANOWSKI:  Could we limit it to grievances            11:59AM

11   concerning access to care?  That's really the issue they are

12   complaining about.

13          MS. KENDRICK:  No.

14          MR. BOJANOWSKI:  There may be a lot of grievances

15   where a guy says, look, I don't think I should have to pay $4      12:00PM

16   for this appointment because I'm indigent.

17          THE COURT:  I'd like to hear about that if those

18   numbers have increased and where I'm now concerned about the

19   fact that the HNR box means everybody is facing an additional

20   $4 and I'm trying to ascertain whether or not that's a            12:00PM

21   deterrent of people talking advantage of healthcare services

22   that's a change in circumstances from when a stipulation was

23   entered.

24          So are there two you could identify?

25          MS. KENDRICK:  Yes, I mean, this is only applicable to     12:00PM

1    minimum and medium security yards, so we could identify a

2    couple of prisons that have them.

3          And I think if Mr. Bojanowski wants to go through and

4    eliminate, it would actually be easier and less of a burden if

5    they just had a cutoff date and just produced all of them and          12:00PM

6    they wouldn't have to go through and try to make a judgment

7    whether or not they think it's relevant to the evidentiary

8    hearing.  They can just do a data dump on us.

9          We would want all of them since the open clinic

10   process started in December.                                          12:01PM

11         THE COURT:  Okay.  So then maybe the first of next

12   week, no later than Wednesday, meet and confer about this, how

13   you want to proceed.  You know at the end of the

14   meet-and-confer you will have the opportunity to get two

15   facilities' grievances on healthcare and you will get all of          12:01PM

16   the director's levels for the last six months.

17         But there do sound to be, perhaps, some better

18   approaches than my broad brush approach if you can agree on

19   that, such as the data dump would be something less of a burden

20   on defendants and more of a burden on plaintiffs.  And          12:01PM

21   plaintiffs, if you want to shoulder that burden, that's fine.

22         With respect to healthcare grievances, I'm concerned

23   that the mechanism, as you know, I'm concerned with the

24   mechanism I have for monitoring is not perfect.  I would like

25   to have somebody more on the ground all the time.  But these          12:02PM

94

1    people who are receiving a care, again, are people whose voices

2    should be heard understanding that in some cases, that it's not

3    going to be particularly helpful.  But the plaintiffs have said

4    they would go through and are willing to shoulder that burden.

5                It's the noon hour.  So what we'll do is we'll take a        12:02PM

6    recess until 1:15 if that works with everybody's schedule.  Is

7    that all right with everybody?

8                MR. BOJANOWSKI:  Yes, Your Honor.

9                MR. FATHI:  That's fine.

10               THE COURT:  Thank you very much.                             12:02PM

11               (Recess from 12:02 p.m. until 1:27 p.m.)

12               THE COURT:  Couple of ruminations over the lunch hour.

13   First, with respect to the issue we were talking about where we

14   have already set the evidentiary hearing for, Mr. Bojanowski,

15   do you know, is there a sign-in sheet for people that show up        01:27PM

16   in the new sick call method?  Do people sign in when they

17   arrive?

18               MR. BOJANOWSKI:  Let me check.

19               Apparently not.

20               THE COURT:  Wouldn't that be a good idea?  Wouldn't        01:27PM

21   that be a good way to give you at least something to counter

22   plaintiff's concerns with?  It would be a trackable document as

23   to when somebody showed up.  Not saying it's ideal.

24               MR. PRATT:  Your Honor, everyone that shows up, they

25   do sign a sheet.  It's a log of them actually coming in.  But        01:27PM

```
1    it's not when they show up that they sign in and they wait to
2    be seen.  And this has to do with the charges, the $4 co-pay.
3    And it's either documented as a no charge or a chargeable item.
4            MR. BOJANOWSKI:  So they don't sign in with a time.
5    Is that what you are saying?                                    01:27PM
6            THE COURT:  Well, I was just wondering if there was
7    something that indicated who showed up for this open line at
8    what time on what day.
9            MR. BOJANOWSKI:  It probably has the date.
10           MR. PRATT:  Yes.                                         01:27PM
11           MR. BOJANOWSKI:  And it has the names.  I don't know
12   if it has a time.
13           MR. FATHI:  Your Honor, it sounds as if the person
14   only signs in if and when she's seen.  If that's incorrect we
15   would like some clarification on that.                          01:27PM
16           THE COURT:  Right.  So it's actually at the end of the
17   line?
18           MR. BOJANOWSKI:  At the point when they submit the HNR
19   to the nurse, they sign a piece of paper saying I'm here.
20           THE COURT:  Okay.  That doesn't address any of the      01:27PM
21   problems we talked about before.  So that rumination is a dead
22   end.
23           The second thing that I thought about with respect to
24   this evidentiary hearing that we've got this issue where I
25   can't exactly tell where the reality is, because the issue is   01:27PM
```

1    the two visits required for a referral, the defendants have

2    told me that there's no policy against this but that the -- or

3    there's no policy that requires this, but that leaves

4    unanswered the question of whether there's a practice.  And

5    that's what plaintiffs are reporting, that there is such a                01:27PM

6    practice.  Is that fair to say?

7          MS. KENDRICK:  Regarding -- you are referring to the

8    Corrective Action Plan?

9          THE COURT:  To referrals.

10          MS. KENDRICK:  Yeah.                                               01:27PM

11          THE COURT:  To visits to get to a referral.

12          MS. KENDRICK:  That is our concern given what was in

13    the writing in the Corrective Action Plan that was submitted to

14    the Court as evidence.  And defendants did submit a notice with

15    declarations from a couple people about this policy, and they              01:27PM

16    only discussed what happened in 2015.  There was no discussion

17    about how this Corrective Action Plan was submitted and

18    approved and if it was actually implemented last fall.

19          THE COURT:  All right.  So we're concerned, though,

20    about whether it's happening right now, right?                            01:27PM

21          MS. KENDRICK:  Correct.

22          THE COURT:  All right.  And I thought we had addressed

23    it in court before, but then we get this subsequent statement

24    from the defendants that it's not a policy.  But it, again,

25    leaves open the question of whether it's happening still.                 01:27PM

1        MR. PRATT:  It is not happening, Your Honor.

2        THE COURT:  Okay.

3        MR. PRATT:  I think the last information that even

4   referred to that was from last October.

5        THE COURT:  Okay.                                    01:27PM

6        MR. PRATT:  And it is not happening.

7        THE COURT:  So there's no operational practice among

8   any of the Corizon people that in order to get to a referral

9   you have to be seen twice before that can happen?

10        MR. PRATT:  Correct.                                01:27PM

11        MS. KENDRICK:  But, Your Honor, the document that we

12   submitted to the Court is from October 2016, and the affidavits

13   that defendants submitted were talking about 2015.  And so

14   that's our concern.

15        THE COURT:  Mr. Pratt just answered the question for  01:27PM

16   currently, right?

17        MS. KENDRICK:  Well, for how long?  Did it ever go

18   into effect in Perryville in 2016?  There's no explanation as

19   to how this CAP could have been submitted and then approved by

20   defendants.                                              01:27PM

21        THE COURT:  And what utility would be running that

22   down right now if it's not something that's happening now?

23        MS. KENDRICK:  Well, we would like to know that

24   because to the extent they have reported compliance with

25   Performance Measure 39 at Perryville in recent months, it would  01:27PM

—— CV 12-601 - June 14, 2017 - Status Hearing ——

1    call those numbers into question.  If they have implemented --

2    if they implemented such a policy, even if it was for a month

3    or two, I'm glad he's saying it's not in effect now, but we

4    need to know that to know whether those numbers previously

5    reported are valid.                                          01:27PM

6         THE COURT:  So what you would like to know is when was

7    it, in December or November or afterwards, depending on when it

8    was that word was communicated that this is not how we're doing

9    things.  Is that getting at it sufficiently?

10        MS. KENDRICK:  Yes, sir.  We're trying to figure out    01:27PM

11   how it came to pass that Corizon submitted a Corrective Action

12   Plan to defendants that their way of coming out of substantial

13   non-compliance with Performance Measure 39 was to implement

14   this policy.  So we need to know, first of all, why that

15   Corrective Action Plan was approved, but second, how long was  01:27PM

16   such a policy in place.  So then we can figure out whether the

17   CGAR data for those months is valid.

18        THE COURT:  I understand the second point, but if I

19   remember Mr. Pratt's testimony from before, it sounded -- my

20   recollection is he said this was something that kind of       01:27PM

21   happened without us understanding it was going to happen, and

22   when we found out about it we stopped it.

23        MS. KENDRICK:  Well, Your Honor, Kathy Campbell

24   testified on March 8 she reviewed and approved all of the

25   Corrective Action Plans and we submitted to the Court at Docket  01:27PM

1    2106 a copy of the October 2016 Corrective Action Plan from

2    Perryville that clearly states nurses have been reminded that

3    an inmate needs to be seen two times before being referred to a

4    provider.  That causes great concern in terms of that how did

5    it come to pass that somebody at ADC thought that was an                    01:27PM

6    acceptable Corrective Action Plan and approved it and that part

7    of the question just was not addressed.

8             THE COURT:  All right.  Mr. Pratt, probably, off the

9    top of his head can't say what date it was, what method it was

10   to communicate that this was not correct.  So I would ask -- I             01:27PM

11   think it's fair to ask this, if you would submit, Mr.

12   Bojanowski, an affidavit that indicates the result of that

13   inquiry, when it was that the information was identified, and

14   the remediation measure that was articulated by Corizon was

15   itself corrected.  Is that clear enough?                                    01:27PM

16            MS. KENDRICK:  Yes, sir.  Thank you.

17            THE COURT:  You understand that, Mr. Bojanowski, too?

18            MR. BOJANOWSKI:  Yes.  I'm trying to make sure my

19   notes are accurate.

20            MS. KENDRICK:  Perhaps a date for the affidavit would            01:27PM

21   be helpful.

22            THE COURT:  The end of the month?  I think I have set

23   a date of the 30th for a number of other things.

24            MR. FATHI:  Your Honor, I believe you may have also

25   not specified a date for the declaration from Dr. Calcote.                01:28PM

CV 12-601 - June 14, 2017 - Status Hearing

1    Would that be June 30th also?

2         THE COURT:  That's a good date as well.  Thank you for

3    that detail.

4         All right.  Before we go on to the additional points

5    of the agenda, I wanted to take one of the items and give you        01:28PM

6    an omnibus view about my perspective on your reactions to what

7    I learned during the hearings on the fact-finding and also your

8    reactions to my preliminary view that I needed some assistance,

9    that I needed to understand better the circumstances; that I

10   had serious concerns but that I had also a concern additionally     01:28PM

11   on my own behalf that I would be able to get on top of these

12   issues in a way to make sure that I understood them all.  And

13   that I really did think that it would be helpful to get some

14   additional support and some learned support by expert, by

15   somebody who is particularly knowledgeable.                          01:29PM

16        And then I had the reactions of both sides.  Neither

17   of you thought that that was a particularly good way to go, and

18   you had a slightly different view about what I could do in lieu

19   thereof.  And so I went back and tried to consider what would

20   be the appropriate way to move forward in an overall               01:29PM

21   circumstance where you have heard my specific targeting earlier

22   today of trying to address particular failures.

23        But that's an overlay, or those particular areas are

24   subject to an overlay that is even more concerning to me, and

25   that is that generally, the process itself is not working as        01:29PM

1    the parties had anticipated.  This is not a stipulation to

2    accomplish goals that have in the main produced the kind of

3    results that I would have expected at this point.

4            And so I am vexed about how best to proceed when I am

5    left with or arrive at what is not a surprising conclusion that          01:30PM

6    I do think it's largely a staffing issue.  I do think it's

7    largely a number of people issue but that the stipulation, as

8    you have heard me say, is read by me to mean that I can't

9    require the defendants to build more prisons or to hire a

10   particular number or type of staff.                                       01:30PM

11           But I have, at the same time, come to learn that there

12   are serious issues with respect to having sufficient number of

13   staff on hand to accomplish the goal.  I have had testimony

14   from witnesses telling me about the difficulties of maintaining

15   people in the employ of a prison setting, perhaps because of              01:31PM

16   the prison setting; perhaps because of compensation issues;

17   perhaps because of the rural settings of many of our prisons.

18           And so I am left with not the desire to do something

19   I'm not permitted to do under the stipulation because I don't

20   even think about that.  I can't order you to hire people.  But            01:31PM

21   I think I can figure out what the problem is with respect to

22   maintaining the people that you think you need because you have

23   had those positions and you can't fill them, or you have been

24   hiring actively and you haven't been able to -- you have been

25   seeking hire people but you haven't been able to fill the                 01:31PM

CV 12-601 - June 14, 2017 - Status Hearing

1    positions.

2         As I have alluded to earlier, part of my training as a

3    judge but also being somebody who is a full participant in our

4    grand capitalistic model, I understand that there's a curve

5    that well illustrates a way to increase the supply of workers          01:32PM

6    to do a particular job, and that is to peg the compensation at

7    a level that assures that necessary supply.

8         I don't know what that particular compensation level

9    is, but there are people who do.  And my view is that the right

10   thing to do is to retain as an expert somebody who can tell me        01:32PM

11   what it is that will be necessary to afford the necessary staff

12   people that the State itself has decided are necessary, and

13   they are simply not able to get into position.

14        Now, the situation is that there's a contractor who

15   obviously does the hiring and sets the wages, but it's also a          01:33PM

16   contractor that's got this incentive that's contrary to doing

17   what is against its best interest and that is to spend more

18   money than it makes.  And so consequently, they have a very

19   strong incentive, perhaps as we have even heard testimony

20   about, to pay the fine that the contract provides rather than          01:33PM

21   provide for the staff.

22        Well, that's not my issue.  What is my issue is

23   compliance with the stipulation and the performance measures.

24   And where I have this, in many areas, a systemic failure I have

25   to look at what the problem is with the system and with the           01:33PM

1   entity that I have before me, and that's the State.

2          And so I need to find out that if it is the

3   circumstance, as I think it is, and would be very surprised to

4   hear anything different than the testimony I have heard

5   already, that the reason that this difficulty exists is --          01:34PM

6   well, or certainly we will learn about that, the reason for the

7   difficulty, but we have heard much about it also.

8          But really what we haven't heard and what we don't

9   know is what it would take to get additional people to decide

10  to stay in those positions, not leave them, to avoid the          01:34PM

11  turnover, and also to get people to line up to want to take the

12  positions.  And I'm imagining that it's a higher level of

13  compensation.

14         And so I'm going to do this.  I'm going to ask you all

15  to meet and confer to try to identify such an expert that the     01:34PM

16  Court could retain, at the defendant's cost, to inform me about

17  what it is about the market situation that would, could be

18  addressed by an order of the Court to provide for the

19  sufficient number of staffing people that the State's already

20  identified are necessary and has itself sought to obtain, and     01:35PM

21  that this expert can guide the Court in crafting more precise

22  measures that are not overly broad and are specifically

23  tailored to try and accomplish the very goal here that the

24  parties have agreed to.  And that is compliance with the

25  stipulation.                                                       01:35PM

CV 12-601 - June 14, 2017 - Status Hearing

1       So if you all can, in two weeks, meet and confer and

2   identify a single expert that you think that the Court should

3   turn to, great.  I'm probably going to be surprised if that

4   happens.  But if it does, great.  If it doesn't, then I would

5   ask you a week later to submit, each of you, two names, and I        01:36PM

6   will take a look at the vitaes of those two names and make a

7   decision after hearing from you all at our next hearing about

8   what you think about that process and where we stand.

9       But I want to get it moving.  I want to get it in

10  place.  Perhaps maybe I will see a sufficient turnaround that I      01:36PM

11  will feel that it won't be necessary to go down that road.  But

12  I don't think that the past experience necessarily gives me

13  great comfort to think that I can count on that.

14      So I want to make sure that I'm taking steps now so

15  that I'm not just deciding to do this a month later and then        01:36PM

16  delaying everything even more.  So that's how we'll proceed

17  with respect to what is an agenda item that is listed, and that

18  is, how am I going to deal with what I have asked you to look

19  into before.  That is the comeuppance of the hearings and the

20  issues that were raised there, and also my entertaining the        01:37PM

21  idea of experts and a special master.

22      MR. BOJANOWSKI:  Your Honor, would we be permitted to

23  brief this issue at all as to the Court's intention to --

24      THE COURT:  Well, what you can do, if in the two-week

25  time that you are not able to get it resolved and in that          01:37PM

1    additional week you can file anything you want in that time

2    period.  But you are not going to set me off of this timetable,

3    because I am earnest to take advantage of the learning that I

4    have done and to not let more time pass.

5            So you can certainly feel free to submit anything you        01:37PM

6    would like and the plaintiffs can respond.  The sooner they

7    respond the better, probably, but you can go ahead and do that.

8    But I'm not going to be inclined to set up a briefing schedule

9    that builds in more time to this.  I will read what you submit.

10   I always do.                                                         01:38PM

11           MR. BOJANOWSKI:  Thank you, Your Honor.

12           MS. KENDRICK:  Your Honor, for what it's worth the

13   parties have already fully briefed this issue, so it's unclear

14   why additional briefing is needed.

15           But just to be clear, you mentioned you wanted an            01:38PM

16   expert who could assist you in identifying the correct salaries

17   and retention status but then I heard you say something about

18   the monitoring?  Or no.

19           THE COURT:  Well, I didn't mean to say anything.

20           MS. KENDRICK:  Okay.                                         01:38PM

21           THE COURT:  About that other than in the preamble

22   where I talked about what the things were that I had considered

23   and what my options were and my evolution in that process and

24   where I am now.  Where I am now is believing that the measures

25   that I employed this morning with respect to the particularly       01:38PM

1   identified performance measure failures may need to be assisted

2   in a broader mechanism, and that is one that addresses what has

3   been a very obvious fact in this case.  And that is the number

4   of people that the State thinks should be in the positions are

5   not in the positions.  And I want to try to fix that so I need          01:39PM

6   an expert to tell me what it is, is there a manager of labor

7   supplies?  What do you do?  What do you need to do to get those

8   people so that they are in the position?

9          I think I have a pretty good idea what is required.

10  You can get anybody to go anywhere to do anything if you pay          01:39PM

11  them the right amount.  And we're in that position where I'm

12  needing to find people to do the work.

13         MS. KENDRICK:  Well, Your Honor, as plaintiffs did

14  fully brief out in our briefing about what you call the

15  comeuppance of the hearings.                                          01:39PM

16         THE COURT:  Right.

17         MS. KENDRICK:  That we believe that the Court needs to

18  appoint a Rule 706 expert with knowledge and expertise in

19  methodology and monitoring and auditing, because the testimony

20  shows that the system that has been used to date is broken.          01:39PM

21         We also, in our briefing on the expert issue,

22  requested that the Court appoint an expert or experts with

23  oversight of medical and mental health care experience in

24  running those sorts of complex systems as well to advise

25  defendants and Corizon.                                               01:40PM

1       THE COURT:  Where I am currently is someplace between

2   your two positions.  I have decided to do this with respect to

3   the failure to maintain in place and to be able to procure the

4   desired employees, but I do need expert testimony about that.

5   I don't know yet whether what you say otherwise is true for        01:40PM

6   certain.  I did have a strong sense that that was where I was,

7   but then in light of the restrictions and the views that have

8   been expressed to me and the briefing associated with that

9   issue, it may made me revisit my position and think, well,

10  those things are true.  But one of the things I can do myself       01:41PM

11  to try to address it is to become more engaged with respect to

12  the monitoring component.

13      And to that point, another rumination that occurred

14  over lunch is that I'd like to go visit and watch one of these

15  open clinic lines.  I think maybe one of the times that would       01:41PM

16  perhaps make sense, because I understand you all seem to

17  schedule things close to our hearings to take advantage of our

18  travel, is maybe the Thursday before the Friday of our July

19  meeting.  Maybe that's a possibility.

20      MS. KENDRICK:  Or if you want to come tomorrow we're            01:41PM

21  going to the prison here in Phoenix.

22      MR. BOJANOWSKI:  They don't have an open clinic there.

23      MS. KENDRICK:  Oh.  All right.

24      THE COURT:  So that, again, what defendants have asked

25  me to do is something that is within -- is worth trying, and       01:42PM

1    that is, can I, by direct further acquiring of knowledge and

2    experience, do something that they want, that they prefer,

3    apparently.  I'm not inclined to think that that's necessarily

4    the right view, but it's what they have said.

5           And so I'm going to give it another full try to see if    01:42PM

6    I can enhance the monitoring component by a greater presence.

7    And to a certain extent I have learned already about a number

8    of the potential systemic vulnerabilities of the monitoring

9    system, so I am poised to be sensitive to those.  But I would

10   have, and do think, the Court could be potentially assisted by   01:42PM

11   a Rule 706 expert in that context.  But I am going to at least

12   give it another personal try.

13          MR. BOJANOWSKI:  Do you have a particular facility in

14   mind?

15          THE COURT:  Well, one of the things that comes to mind    01:43PM

16   is that whenever the president goes to visit some city all the

17   streets get painted.  And so I was wondering if there was a way

18   around that or whether I didn't need to worry about it.  And I

19   actually was on the fence about whether I would share with you

20   this is what I was thinking of doing.  But one of the things     01:43PM

21   that's had me on the fence is how best to address the issue of

22   the street painting, whether it could be the kind of thing I

23   could say I'd like to go visit one on the day before.  I will

24   tell you which one on the day before.

25          MR. BOJANOWSKI:  We think we can accomplish that.  We     01:43PM

1    just need to notify security that a federal judge is going to

2    be on grounds and that we have sufficient staff to provide

3    security to you and whatever staff members you might bring

4    along.  So a day before is fine, and we can make it happen.

5    But please keep in mind that it's at the minimum and medium          01:44PM

6    yards.  If you want a minimum medium yard --

7            MR. FATHI:  Your Honor, to address the Potemkin

8    Village problem that the Court has identified, if tomorrow

9    works for the Court, one of us from plaintiff's team would be

10   happy to accompany you along with, I'm sure, others from the        01:44PM

11   defendants.

12           THE COURT:  I wish it were so.  But I have a

13   settlement conference in the afternoon and a full calendar in

14   the morning, a full calendar that is one partly reflected in

15   the public docket and one partly not reflected in the public       01:44PM

16   docket.

17           MR. FATHI:  Well, Your Honor, we do have local counsel

18   here, so if the goal is to do it with perhaps notice the day

19   before, we can accommodate that with our local counsel.  It

20   doesn't need to wait until out-of-town counsel are here next       01:45PM

21   month.

22           THE COURT:  Okay.  Well, I will coordinate with you

23   all taking a look at my calendar and then checking in with your

24   calendars to see what we can do to give you that kind of

25   notice.                                                            01:45PM

1      MR. FATHI:  Your Honor, if I may, before we move on,

2   Ms. Abela from the Arizona Center for Disability Law, which is

3   a separately represented plaintiff, would like to be heard on

4   the HNR box issue.

5      THE COURT:  All right.  Please.                        01:45PM

6      MS. ABELA:  Thank you, Your Honor.  I just had an

7   additional point and perspective I wanted the Court and also

8   the defendants to take into consideration with regard to

9   removal of the HNR boxes.  It's a principal tenet of serving

10  individuals with disabilities that you provide multiple options  01:45PM

11  to access a program, information, what have you.  We are very

12  concerned that removal of these HNR boxes is going to erect

13  another barrier for those prisoners with disabilities to be

14  able to access the healthcare system that operates in the

15  prisons.                                                  01:46PM

16      It's anecdotal evidence, but I have been on many of

17  these monitoring tours and I have spoken with prisoners that

18  have mobility impairments that make it difficult for them to

19  get around.  Some have expressed to me that it's difficult for

20  them to get to the HNR box to drop the HNR and have relied on  01:46PM

21  aids or their cellmates to do that for them so they can have

22  access to medical.  If they are going to be required to be

23  waiting in line at a health clinic it could be yet another

24  barrier and perhaps prevent them from accessing the care that

25  they need in disproportionate numbers, just sort of a general  01:46PM

1    population.

2         And we just wanted to bring that to the Court's

3    attention, also the defendant's attention to consider when they

4    are evaluating whether eliminating these boxes is, in fact, a

5    streamlining idea that is going to serve the needs of that          01:47PM

6    community.

7         MR. BOJANOWSKI:  Your Honor, we're familiar with that

8    population, and in an effort to care for that population, they

9    are housed closer to the medical unit to provide that access.

10   And those that are limited have aids or helpers that can assist     01:47PM

11   them in getting from one place to another.  So we do take that

12   into account when evaluating and implementing the system.

13        THE COURT:  Well, one of the things that is in my

14   mind, and I have alluded to this before, is that the

15   performance measures do mention these boxes.  And so I do think     01:47PM

16   that the burden is on the defendants to show me how it is that

17   the stipulation's enforcement is not encumbered by the removal

18   of something that is specified in the stipulation.

19        If it looks to me like moving to the new system but

20   then preserving as the fallback position for those who might        01:48PM

21   otherwise find this to be an obstacle, I would be disinclined

22   to grant the relief from what's called for in the stipulation.

23   But I think it makes sense to have a hearing to have of all of

24   these things said so a considered decision can be made about

25   it.                                                                 01:48PM

1        Turning to the three performance measures where you

2   had some issues with respect to the language, and this is in

3   particular Performance Measure 61, where the plaintiffs had

4   proposed the language that drew some issues with the defendant,

5   the language that the plaintiffs have proposed was that in          01:48PM

6   eOMIS check whether a memorandum personally advising the inmate

7   she is able to receive a pap smear every three years, if

8   medically appropriate, is scanned into the inmate's record.  If

9   the memorandum is dated within 90 days prior to the 36-month

10  anniversary of her last pap smear the record is compliant.        01:49PM

11        The defendants raised a concern about refusals.  It

12  seemed to me that could be addressed by adding the following

13  two sentences:  Every 36 months thereafter, a similar

14  memorandum shall be sent to the inmate.  If the subsequent

15  memoranda are dated within the 90 days prior to the 36-month      01:49PM

16  anniversary of the previous memorandum, the record is

17  compliant.

18        It may not be possible for you all to internalize what

19  I just said here, but when you take a look at the transcript if

20  you have issues with it you can raise it the next time.           01:49PM

21        With respect to Performance Measures 85 and 86, there

22  really wasn't a similar substantive objection that I could

23  ferret out to the plaintiffs' proposed language.  And so I

24  would adopt the plaintiffs' language.  And that is, with 85,

25  that the monitor selects a random sample of 10 records from all   01:50PM

1    MH-3D prisoners at a given unit.  If any of them discontinued

2    medications less than 30 days previously, that record is

3    excluded from the sample and another record is randomly drawn.

4    See Document 2048, Paragraph 12.

5            Once these -- once there are 10 records of MH-3D                    01:50PM

6    prisoners that have discontinued medications more than 30 days

7    ago, those records are assessed to determine whether the

8    patient was seen within 30 days of discontinuing medications.

9            And then with respect to Performance Measure 86, the

10   final sample of 10 records used for Performance Measure 85 is          01:50PM

11   the starting point for evaluating compliance with Performance

12   Measure 86.  If any of these prisoners discontinued medications

13   less than 90 days previously, that record is excluded from the

14   sample and another record is randomly drawn.  Once there are 10

15   records of MH-3D prisoners who have discontinued medications           01:51PM

16   more than 90 days ago, those records are assessed to determine

17   whether the patient was seen within 90 days of discontinuing

18   medications.

19           So I think these articulations might help, but again,

20   if there remain further issues you may bring them to my               01:51PM

21   attention next time.

22           MR. FATHI:  Your Honor, may I -- would this be a good

23   time to raise some housekeeping issues?

24           THE COURT:  Yes.

25           MR. FATHI:  It appears that we are going to have a             01:51PM

1   full agenda for the next hearing, and so we wanted to raise the

2   possibility of having that be a two-day or perhaps a one

3   and-a-half day hearing, perhaps the 13th and the 14th,

4   obviously contingent on the Court's availability.

5            THE COURT:  Mr. Bojanowski?                        01:52PM

6            MR. BOJANOWSKI:  If you are going to do a tour on the

7   13th, I mean, if you have to go to say Florence, or --

8            MR. FATHI:  We said that from our perspective the

9   Court can go any time and one of our local counsel can

10  accompany for plaintiffs.                                   01:52PM

11           MR. BOJANOWSKI:  I'm sorry.  I thought the Court

12  said --

13           THE COURT:  It was, Mr. Bojanowski, it's fair.  It was

14  still in play.  But it may still be in play because we could do

15  a more -- a closer facility in the morning and then still do   01:52PM

16  the afternoon.

17           But it probably does make sense to at least start in

18  the afternoon on the -- is that the 13th, Thursday the 13th?

19           MR. FATHI:  Yes, Your Honor.

20           THE COURT:  Is that something that could be possible    01:52PM

21  from the defendants' side?

22           MR. BOJANOWSKI:  That's a good question.

23           THE COURT:  All right.  Take a look.

24           MR. BOJANOWSKI:  I think so, because if I can't be

25  here then I may be able to have someone else from the office be   01:53PM

UNITED STATES DISTRICT COURT

1    here.  Right now it looks okay with me, Judge, if that's what

2    you want to do.

3              THE COURT:  What we may want to do is conduct the

4    evidentiary hearing on the afternoon of the 13th and then leave

5    the Friday.  But if for some reason that doesn't work with                01:53PM

6    respect to witness availability or there's some other reason we

7    could switch it around.  But it seems like a natural way to do

8    it.  Because the summertime is difficult to get people's

9    attention, if we do have that possibility to grab on to a

10   little bit more than the time we have already allocated, it               01:53PM

11   probably does make sense just as a general matter.

12             MR. FATHI:  Thank you, Your Honor.  The next item is

13   that in order to give the defendants the maximum amount of time

14   for production, we have determined that the two facilities for

15   which we would like all of the healthcare grievances for the              01:54PM

16   last six months are Perryville and Lewis.

17             THE COURT:  All right.  Thank you.

18             MR. FATHI:  Thank you.  And finally, Your Honor, I

19   wanted to raise the fact that as the Court may well know,

20   record-breaking heat is forecast for next week with highs                 01:54PM

21   forecast 119 on Monday and 120 on Tuesday for the Phoenix area.

22   The National Weather Service has already issued an extreme heat

23   advisory saying very hot temperature will significantly

24   increase the potential for heat-related illness.  Untreated

25   heat illness can lead to fatal heatstroke.                                01:54PM

1      As you know, Your Honor, the stipulation requires the

2   protection of patients who are taking psychotropic medications

3   from heat injury.  And we are very concerned about our clients,

4   particularly those who are housed in tents at the, for example,

5   at the Florence North Unit.  So we would like to know what the          01:55PM

6   defendants are planning to ensure that people are not -- don't

7   suffer from heat injury and illness and possible death during

8   this upcoming heat wave.

9      MR. BOJANOWSKI:  Mr. Fathi and I discussed this before

10  today's hearing.  I told him that I would express his concern          01:55PM

11  to my clients.  And so, I mean, we always do that.  We don't

12  want people getting sick and dying because of a heat-related

13  illness.

14      THE COURT:  The negotiations that resulted in the

15  stipulation did include a significant amount of time devoted to        01:55PM

16  this issue about the people who were on psychotropic medicines

17  who were, I gather, impaired in their ability to self-regulate

18  temperature or to address extreme -- am I remembering it

19  correctly?

20      MR. FATHI:  That's correct, Your Honor.  And while I              01:56PM

21  appreciate Mr. Bojanowski's offer to convey my concerns, their

22  response should not be contingent on our concerns.  They have

23  access to the same forecast as we do, and they should be

24  planning for this potentially lethal event.  So we would like

25  to know what their plans are.                                          01:56PM

1      THE COURT:  Luckily you have, within earshot, actually

2   within three feet of you, the head of the medical services for

3   the Department of Corrections.  So he's heard that.  So he's,

4   I'm sure, on top of the issue.  And we will trust that they

5   will take what care is necessary to protect the people within      01:56PM

6   their custody knowing that if something bad happens, the

7   transcript of these proceedings will likely become evidence in

8   any such subsequent case.

9      So I gather, because I have no reason to believe other

10  than -- I have no reason to believe that the State won't take      01:56PM

11  due care in this instance based upon this record.  But you are

12  not unwise to make the comment, because we some of us, you are

13  not one of these, Mr. Fathi, but maybe you are.  When it's 90

14  degrees in Washington D.C. and it's 90 percent humidity I don't

15  know how anybody lives.  But here we have become a little bit      01:57PM

16  inured to the extreme temperatures and that's among all of us

17  who have the ability to control the regulation of our

18  temperature and we also are not oftentimes in a tent.

19      And so I would feel like you would probably just --

20  it's a good idea just to make the statement that you have made.    01:57PM

21  So it's been made, so I think that's a good thing.

22      MR. FATHI:  Thank you, Your Honor.

23      THE COURT:  There are two, I think, issues that remain

24  to be addressed in general categories.  I need to follow up on

25  where we stand with respect to max custody and close custody      01:57PM

CV 12-601 - June 14, 2017 - Status Hearing

1    issues.  The minute entry does or doesn't tell me fully whether

2    there are things that happened in the mediation that can affect

3    that.

4         And the second issue that's related to that are these

5    discovery issues.  And I have taken a look at the table that          01:58PM

6    the plaintiffs have prepared, and it looks to me, and I don't

7    know whether this is something that is -- which particular

8    defense counsel is in the position to address it, but it looks

9    to me like a number of the complaints of the requesting party

10   the plaintiffs have made seem to be well taken.  But it also,        01:58PM

11   like every discovery dispute, it requires the judge to get into

12   the weeds and go through one by one.

13        And so I don't know whether it makes sense to have

14   everybody in the room doing that when it's probably one lawyer

15   on each side that's going to be responsible for it.  So what         01:58PM

16   I'm inclined to do on these discovery issues is to see if

17   there's a time among the three of us, one lawyer, I guess, from

18   each side and I to get on the phone next week together to do a

19   telephonic discovery dispute.

20        MR. FATHI:  I beg your pardon, Your Honor?                       01:59PM

21        THE COURT:  What I was saying was I thought it would

22   be most efficient to have me work through these remaining

23   discovery issues in a telephonic discovery hearing that would

24   involve just the lawyers who are involved in that dispute.  And

25   I could do it next week.  I'm sitting in Flagstaff next week         01:59PM

UNITED STATES DISTRICT COURT

1    and that will afford me some time to be available by phone

2    because the calendar is not a full day calendar.  And I raise

3    that as a possibility.

4             MR. FATHI:  That would be fine with us, Your Honor.

5             THE COURT:  Who on your side will be handling this          01:59PM

6    issue?

7             MR. FATHI:  That would be me.

8             THE COURT:  And who on your side, Mr. Bojanowski?

9             MR. BOJANOWSKI:  I believe Ms. Lucy Rand would handle

10   that.                                                              02:00PM

11            THE COURT:  Ms. Rand, are you still on the phone?

12            MS. RAND:  Yes, Your Honor, I am.

13            THE COURT:  What's your availability next week?

14            MS. RAND:  I'm open on the 20th and 21st which is

15   Tuesday and Wednesday, and then I have pretrial on Thursday, so    02:00PM

16   actually, Tuesday, Wednesday, and Friday.

17            THE COURT:  Mr. Fathi, what is your Tuesday like?

18            MR. FATHI:  At this point, Your Honor, my Tuesday is

19   wide open.

20            THE COURT:  And what time would you not like -- it's      02:00PM

21   three hours now off of Washington D.C., right?

22            MR. FATHI:  Correct, Your Honor.  So if we could --

23   obviously I will accommodate the Court, but if we could plan to

24   end by, perhaps, 3:00 Arizona time that would be ideal.

25            THE COURT:  Okay.  Do I have any heads up on what the     02:00PM

CV 12-601 - June 14, 2017 - Status Hearing

1    criminal calendar is on Tuesday?  In custodies are likely to be

2    in the morning but the out of custodies are probably in the

3    afternoon.

4          (Discussion between the courtroom deputy and the

5    judge.)                                                          02:01PM

6          THE COURT:  How about 1:30 p.m. on Tuesday to start?

7          MS. RAND:  That works, Your Honor, for defendants.

8          THE COURT:  All right.  So this telephone call that

9    will be with the Court, if one of you two could figure out how

10   to get you two on the line together and place a call to Judge    02:01PM

11   Fine's chambers in Flagstaff at 1:30 p.m. on Tuesday.

12         MR. FATHI:  I'm sorry, Judge.

13         MS. RAND:  Your Honor, I will take that

14   responsibility.

15         MR. FATHI:  I didn't catch the name of the judge, Your     02:01PM

16   Honor.

17         THE COURT:  Judge Fine.

18         MR. FATHI:  Thank you, Your Honor.

19         THE COURT:  Thank you.  And can we now turn to

20   anything I need to know about where we stand on the max custody  02:02PM

21   and close custody issues?

22         MS. FETTIG:  Yes, Your Honor.  This is Amy Fettig.

23         We wanted to raise the issue of the close custody

24   documentation.  As you may recall this issue has been ongoing

25   for some time starting with your original order in December of   02:02PM

1   2015 through February of 2015 and now.  At the last hearing you

2   asked the parties to do a joint report and you also asked the

3   plaintiffs -- and that joint report relates to close custody

4   units at Florence Central.

5         At the same time you asked the plaintiffs to send a                02:02PM

6   list of documentation and questions to the defendants related

7   to their allegations that Perryville and Tucson units are now

8   close custody as well.  We did that on May 24th, and as you no

9   doubt know we filed a joint report with the defendants on

10  Friday at Document Number 2102.                                          02:03PM

11        I did have an opportunity to talk in much greater

12  length with Ms. Love about the proposed solution that the

13  defendants have come up with for Florence Central related to

14  monitoring of the close custody units, and I do understand that

15  that will take some time.  It is a pilot.  They are not sure if       02:03PM

16  it's going to work.  And, you know, we're pleased with the

17  creative ideas they have come up with and if it does work that

18  is great.

19        What we are concerned about is that they are not going

20  to pilot this until Fall 2017.  And that means we are faced          02:03PM

21  with a whole year that is basically a black hole for Florence

22  Central.  And that's a really, really long time not to have a

23  picture of what's going on in that unit.  And so what we

24  requested of defendants is the same list of information that we

25  sent to them regarding Perryville and Tucson close custody           02:03PM

1   units.

2          Now, the defendants have objected to that information

3   for Florence Central and, you know, we haven't been able to

4   meet and confer to see if there's some other documentation they

5   would be willing to do.  But basically we do need some sort of        02:04PM

6   information between now and a pilot in Fall 2017 that might not

7   even work, some show of good faith and documentation about what

8   the conditions actually are in Florence Central in addition to,

9   of course, our concern about what's happening in Perryville and

10  Tucson units.                                                          02:04PM

11         THE COURT:  Ms. Love.

12         MS. LOVE:  Your Honor, as to information related to

13  Perryville and Tucson, that was addressed at the last status

14  hearing.  And I have advised Ms. Fettig that documents from the

15  Perryville facility, per her request, have been provided.  I'm        02:04PM

16  going through those and I will be providing her with a response

17  back and we have mutually agreed to work on that.

18         Defendants do have an objection to providing

19  information as related to the Tucson complex as to close

20  custody where the Tucson complex has never been part of the           02:05PM

21  stipulation as related to max custody.  This whole issue of

22  monitoring close custody arose out of a situation where

23  traditionally a max custody facility now has some close custody

24  within it.

25         So because Tucson was never part of the mix with max           02:05PM

1    custody, defendants object to providing information related to

2    that complex because we don't have a situation that was ever at

3    play to begin with as far as monitoring a max custody facility.

4    I guess simply put, Tucson was never a max custody facility at

5    issue with the stipulation.  So we object to providing          02:05PM

6    information regarding close custody at that location where it's

7    not contemplated by the stipulation.

8            As to Perryville, again, we are gathering the

9    information and we will provide it to Ms. Fettig.

10           With relation to the document request that plaintiffs    02:05PM

11   assert in our report that we provided to you last Friday, Ms.

12   Fettig is correct in that we received that list and that

13   portion on Friday, and we did not have the opportunity to

14   confer regarding those document requests prior to providing

15   both side's positions to the Court.                             02:06PM

16           But I would like to generally address that while there

17   may be room for compromise here and agreement, it -- we're

18   faced with a situation where when we provided the kinds of

19   documents that plaintiffs are now requesting for Florence for

20   the last six months to the Court when explaining the close      02:06PM

21   custody situation there, plaintiffs came back and said, these

22   documents don't show us actual out-of-cell time for close

23   custody inmates.  That's what the Court focused on in making

24   its ruling.

25           So to now gather the same documents that they said      02:06PM

1    didn't show us what we wanted to know to begin with really

2    doesn't make sense here.  There are certain things that

3    probably after we confer and I confer with my clients could be

4    at issue, like an activity schedule perhaps for the close

5    custody.  There may be some movement on other things.                    02:07PM

6          But for instance, in one of their requests they ask

7    for information as to programming for close custody inmates.

8    And for that, in essence, what would have to be provided for

9    the last six months is program sign-in sheets for the entire

10   close custody population at Florence Central, which now we're         02:07PM

11   again getting broader than the stipulation where we're now

12   providing information as related to every single close custody

13   inmate versus monitoring 10.  So we're still not Catch 22 of

14   how do we monitor a classification that doesn't function like

15   max custody such that we can individually monitor.                        02:07PM

16          So that is where, for many of the requests, we have an

17   objection to providing overall operational information that, in

18   the first instance, wasn't good enough for plaintiffs to show

19   actual out-of-cell time.  So we're getting back into that

20   debate of amount of cell time offered versus actual, which we         02:08PM

21   can't monitor, which is why we have to go to the electronic

22   system.

23          THE COURT:  How big is the burden to you to assemble

24   this information?

25          MS. LOVE:  Well, the biggest burden would be in            02:08PM

1    providing the logs or we call them the journals as to

2    operations at Florence Central.  Because the journals -- and we

3    are going to provide them with a week for Perryville so they

4    will be able to see this.  But the journals are probably

5    double-sided about a stack like this for a week, which requires          02:08PM

6    redaction for security sensitive information.  Because the

7    journals will say, for instance, at 1331 hours, there's so many

8    things maybe happening in that unit, you might have six or

9    seven or eight entries that talk about armory and keys and

10   security issues unrelated to our inmate's able to leave the             02:09PM

11   unit to go to chow or leave the unit to go to programs.

12          So, you know, something like that, the journal is a

13   burden to redact and to provide while at the same time there's

14   activity schedules that can tell you that.

15          So we're in a situation, though at the baseline of             02:09PM

16   it's the same information they said doesn't tell us the picture

17   of what we wanted to see, yet now they want to see that for the

18   last six months.  So I don't understand, I guess, the position

19   for requesting the documents that in the first place they said

20   didn't tell us the full picture of what they wanted.                   02:09PM

21          THE COURT:  Well, without putting words into their

22   mouths, I think what they are trying to do is stay ahead of the

23   situation that's evolving and also one where their knowledge of

24   the system is evolving.  So that is, I think, an ongoing

25   process.  So it's not surprising it could be changing.                 02:09PM

1        I'm most interested, though, in how to overcome this

2   burden issue because you describe a rather sizeable stack that

3   would require a good deal of effort to try to redact.  And so

4   I'm really --

5        MS. FETTIG:  Your Honor, I would like to make a few          02:10PM

6   clarifying points, and I have some ideas about that.

7        First of all, as to the one week of unit logs which is

8   the one form of paperwork we could think of that would get to

9   what's actually happening in this unit in real time, we do have

10  a protective order in this case.  So there's really no reason    02:10PM

11  to redact things.  We handle protected information all the

12  time.  That's why the protective order is in place.

13       As to the nature of the documents, these questions and

14  documents that we have asked for are not things we have asked

15  for before.  They spring from actually the order of this Court   02:10PM

16  finding that the level of documentation that defendants

17  provided for close custody in Florence just really wasn't

18  sufficient to give the kind of picture of how the unit might

19  actually be different than max custody.

20       So we went back and thought through, okay, what types       02:11PM

21  of information beyond what was insufficiently provided in

22  defendants' pleading would actually give us the type of picture

23  we needed.  And we boiled it down to these few points that are

24  in Doc 2102.  That's different information than we've had

25  before.                                                          02:11PM

CV 12-601 - June 14, 2017 - Status Hearing

1          I would also say in terms of Tucson, the issue there

2     was Performance Measure 92 and 93, not the max custody

3     measures.  But the ones related to mental health care the

4     defendants ceased monitoring as of September 2016 because they

5     told us those folks are no longer max custody.  They are in           02:11PM

6     close custody.

7          So again, our reaction is how is that different?  How

8     does that justify the unilateral decision by defendants to stop

9     monitoring individuals in these units?

10         So we have just asked for a fuller picture.  Ms. Love           02:12PM

11    did indicate that she had gotten documents already regarding

12    Perryville and was going through them.  We agreed that because

13    we have so much going on in terms of the mediation this week

14    that we would deal with that next week when we're all back in

15    the office.  And that's absolutely fine.                              02:12PM

16         Our primary concern here is we need a broader picture

17    of what's going on in close custody.  We think we have come up

18    with a pretty limited set of documents, and we're not asking

19    for six months for Florence.  Actually, what I propose is from

20    June 2017 onwards because I know defendants are working on this       02:12PM

21    different plan right now.  I don't want to distract them

22    necessarily from that.

23         But given a shorter period of time, a narrow set of

24    documents, and also the fact that they are not even planning to

25    pilot until fall 2017, I don't know if that means September or       02:12PM

1   November or what ultimately the date will be.  Our urgency here

2   is, as you have said, we need to get ahead of this.  We need to

3   understand.  We cannot wait a full year to ensure that our

4   clients' interests are being served and they are not indeed

5   being harmed.                                          02:13PM

6         MS. LOVE:  Your Honor, I would propose this based upon

7   what Ms. Fettig presented, and perhaps I misunderstood the

8   breadth of the time period she was looking for.  I did go back

9   see she is requesting June forward.

10        I would propose Ms. Fettig and I work together early   02:13PM

11  next week to decide what is the arena of documents that we can

12  agree, yes, we will start to produce and produce throughout

13  this period because I would believe that there are several of

14  these documents that we may not have an agreement on and we can

15  do that.  Let's get that ball rolling.                 02:13PM

16        And then if we have an issue on other categories of

17  documents that we can't work out, then the Court can make a

18  decision on that for us.  But in the meantime, we're not going

19  to be in a situation where we have to go and backtrack because

20  I think we could probably meet in a middle ground here.  02:13PM

21        THE COURT:  Go ahead, Ms. Fettig.

22        MS. FETTIG:  We would be amenable to that.  I'm

23  mindful that your time is taken up a great deal by this case.

24  If we can solve some things before putting them in front of you

25  I would be happy to do that.                           02:14PM

1      THE COURT:  So go ahead and do that, please, with

2   respect to issues that can't be resolved in your additional

3   meet-and-confer, get on the phone together.  Again, you can

4   find me next week in Flagstaff.  I might be available at the

5   time you are available.                                        02:14PM

6      I will just observe, though, that one of the remedies

7   for the burden issue that the State raises with respect to the

8   journal, if you took a week of the journals and made those

9   available in Ms. Love's office for Ms. Fettig to take a look,

10  maybe that would address your security concern.  I understand  02:14PM

11  there's a protective order, but I also know this is at a

12  heightened level of security just based upon what Ms. Love

13  said.  It sounds like that, to me, it is the kind of practices

14  and procedures that go on in a unit that could be information

15  that if even the mails were intercepted or there was a hacking 02:15PM

16  or something of the e-mail that can convey that information the

17  risk could be serious.

18      And so if a person is just looking at it in the office

19  and getting a better understanding of it to answer your

20  questions, and I think we have addressed some of those         02:15PM

21  concerns, so keep that in mind as a possible modality.

22      MS. FETTIG:  Thank you, Your Honor.

23      THE COURT:  All right.  I think I have gone through my

24  list.  So now I need to turn to you all to see what I have

25  omitted.                                                       02:15PM

CV 12-601 - June 14, 2017 - Status Hearing

1         MR. FATHI:  Your Honor, there is the plaintiffs'

2    pending motion for reconsideration.

3         THE COURT:  Yes.  And what I'm going to do is I'm

4    almost done with a written order that I will issue soon,

5    perhaps this week, that will address that.  Thank you.        02:15PM

6         MR. FATHI:  Thank you, Your Honor.

7         And then there were some in our briefing, in the wake

8    of the evidentiary hearing, there were some issues regarding

9    the defendant's non-compliance with the Court's monitoring

10   orders that we would like to address.                          02:16PM

11        THE COURT:  Okay.  Go ahead.  Sorry, Mr. Fathi.  We

12   have reached our expiration date.

13        (Laughter in the courtroom.)

14        MR. FATHI:  We have indeed been going for a long

15   period of time, Your Honor.  I will try to be succinct.        02:16PM

16        MR. FATHI:  First is the issue of counting group

17   contacts as satisfying the stipulation's requirement that a

18   patient be seen.  This Court ruled on September 6 of last year

19   that except for Performance Measure 92, group contacts do not

20   count.  But we learned that at the April hearing that for       02:16PM

21   nearly five months after the Court's order defendants continued

22   to count group contacts, thereby falsely inflating their

23   compliance figures.  And nowhere in their briefing do

24   defendants actually state that they have stopped counting

25   groups even today.  So we need the Court to enforce its earlier 02:17PM

1    order, now nearly nine months old, that groups may not be

2    counted except for Performance Measure 92.

3            THE COURT:  Mr. Bojanowski.

4            MR. BOJANOWSKI:  I will have Dr. Taylor address that

5    because she's the monitor person and has firsthand knowledge.    02:17PM

6            THE COURT:  Thank you.  Go ahead, Dr. Taylor.

7            DR. TAYLOR:  So sometimes when Mr. Fathi refers to

8    dates, he's referring to the date that we're sitting in court

9    such as January, for instance, and it's looking at November

10   data.                                                          02:17PM

11           THE COURT:  Okay.

12           DR. TAYLOR:  So at the point that after we had the

13   initial order, the back and forth, and the final order, there

14   are not any more groups that were counted after that point for

15   use to determine compliance.                                   02:17PM

16           And so I have tried to be very clear with him on that.

17   Additionally, he's indicated that performance measures have

18   used groups that have never used groups.  So that's part of the

19   challenge, is that it's been alleged that we have used groups

20   to count for contacts for, let's say, a woman after having a    02:18PM

21   baby coming back to the prison that we have used groups to

22   count for that.  And we have never done stuff like that.

23           And so at the point that your final order, we were

24   here in court when you said it verbally was the point that we

25   did not, past that point, use groups for contacts.             02:18PM

CV 12-601 - June 14, 2017 - Status Hearing

1      THE COURT:  Any evidence to contest that, Mr. Fathi?

2      MR. FATHI:  Well, I confess I don't understand part of

3    what Dr. Taylor is saying about alleging that groups were

4    counted for certain performance measures.  I didn't say

5    anything about that.                                    02:18PM

6      To be clear, the Court's written ruling was September

7    6 of last year.  Mr. Dye testified on April 17th that in the

8    December CGARs that were prepared on January 31st, he was still

9    counting groups.  And again, we have not had a statement from

10   the defendants until Dr. Taylor's statement right now that they  02:19PM

11   have ceased counting groups as satisfying the requirement that

12   a patient be seen.

13     THE COURT:  Okay.  Glad we have it now.

14     MR. FATHI:  Then there's a similar issue with the

15   issue of counting cell front contacts.  The Court ruled on    02:19PM

16   November 8 that cell front contacts may not be counted except

17   under very limited circumstances.  But here, too, defendants

18   continued counting cell front contacts for at least three more

19   months of CGARs after the Court's order, again, inflating their

20   compliance scores.                                       02:19PM

21     And again, we have not, in defendant's brief or

22   elsewhere, yet had a definitive statement that they have

23   stopped counting cell front contacts as satisfying the

24   requirement that a patient be seen.

25     THE COURT:  Is that you again, Dr. Taylor?            02:20PM

1    DR. TAYLOR:  Yeah.  So again, I was in court when you

2    stated that verbally, and that is the point that we stopped

3    counting auditing-wise, going forward, those contacts.  The

4    problem is that in January you are looking at November stuff.

5    Or in December you are looking at October -- yeah -- October          02:20PM

6    stuff.  And so retroactively we did not go back and fix it.

7    But going forward from your order, if they go cell front and

8    the individual refuses the contact being offered to them then

9    it was being counted.  That's always been the case except for

10   the watches.  That's the only time we allowed cell front          02:20PM

11   contacts were the watches.  That was it.  All other contacts,

12   any time you offered anything you had to offer it out of cell

13   prior to that point, the entire time prior to the stipulation

14   and after.

15       THE COURT:  Okay.          02:20PM

16       MR. FATHI:  Unfortunately, Your Honor, once again,

17   that is not true.  First of all, we have submitted to the Court

18   on multiple occasions now examples where cell front contacts

19   were counted for Performance Measure 80.  And in terms of the

20   timing, the Court's order saying that they may not be counted          02:21PM

21   was on November 8 of last year.  But in the CGARs that were

22   prepared at the end of November, the end of December, and the

23   end of January, they continued to count cell front contacts.

24   That was Mr. Dye's testimony in April.

25       So that is the chronology of past events.  I          02:21PM

CV 12-601 - June 14, 2017 - Status Hearing

1    appreciate the assurance that if that's what it was that cell

2    front contacts are no longer being, finally, at long last, no

3    longer being counted in compliance with the Court's order of

4    November 8th.

5            THE COURT:  So we do have that assurance, Dr. Taylor,      02:21PM

6    that going forward that these are not being counted.

7            DR. TAYLOR:  That is correct, from the dates of your

8    order forward they weren't counted.  And just to clarify,

9    Performance 80 being inmates who are MH-3 and have to be seen

10   every 30 days, when they were on a watch and seen cell front it    02:22PM

11   was counted because they were on watch.  But that is the only

12   time in the past they had been counted.  Otherwise it had to be

13   a refusal for any sort of counting unless we made a human error

14   here or.  There but that has always been our standard.

15           THE COURT:  Thank you.                                     02:22PM

16           MR. FATHI:  Your Honor, the record will speak for

17   itself.  I won't belabor it.

18           The next issue is the sample size for Performance

19   Measures 94, 95, and 97.  Performance Measures 94 and 95

20   pertain to prisoners who either are on or have recently been       02:22PM

21   removed from suicide watch.  Performance Measure 97 pertains to

22   prisoners who are seen via telepsychiatry for mental health

23   treatment.  Now for each of these measures, just like for

24   almost every other measure, the stipulation requires defendants

25   to sample a specified number of patient records.  And that         02:23PM

1    means records of individual patients.

2         However, what we learned from Mr. Dye's testimony in

3    April is that the defendants haven't been doing this.  So, for

4    example, for Performance Measure 94, again, involving prisoners

5    on suicide watch, they will sample 20 instances in which a          02:23PM

6    person was on watch.  But those 20 instances might involve only

7    12 or 15 different individuals if some people were on watch

8    more than once in that month.

9         Now, as Dr. Haney explains, this shrinks the sample in

10   a way that reduces its representativeness and the extent to         02:23PM

11   which the level of compliance that's found in the sample can be

12   generalized to the larger population.  So to comply with the

13   stipulation, if the performance measure requires that 10

14   records be sampled, the defendants have to sample the records

15   of 10 different individuals.  And Dr. Haney explained in his        02:24PM

16   declaration a very simple and straightforward way to do that.

17        DR. TAYLOR:  As the Court may recall, the defendants

18   actually requested that we could review more records in order

19   to ensure we were reviewing around a quarter.  And so we did

20   that on our own from the beginning, and we have always audited      02:24PM

21   the same way.  It's from a log that is based on incidents

22   similar to HNRs.

23        When you are looking at were the HNRs seen within 24

24   hours you are not reviewing every HNR that individual turned

25   in, you are reviewing the HNR in question that randomly fell on     02:24PM

1    the log.  So an individual may fall twice.  Not that likely if

2    it's a large population.  And if it's a small population we're

3    probably auditing all of them.  But it has a start and stop

4    date which is how we sort it.  So they have a start date when

5    they were placed on watch and a stop date in order to ensure          02:25PM

6    that everybody falls into that pool.  The start and stop dates

7    is what we use.

8         We then review all parts of that start and stop date

9    that fell within the audit month based on the entry.  It's the

10   same log we have had since prior to the stipulation.  It's the       02:25PM

11   same log that's been in effect.  That hasn't changed.

12        MR. FATHI:  Your Honor, HNRs is a totally different

13   provision of the stipulation and it uses -- it has different

14   requirements.  That says you sample X number of HNRs.  The

15   measures we're talking about, say you sample X number of             02:25PM

16   records.  And what we're saying is, you have to sample that

17   number of records of different individual patients.

18        THE COURT:  Dr. Taylor has suggested it's not -- the

19   risk is not that grave with this because of the number of

20   people being sampled except for where they have fewer, then          02:26PM

21   they look at all of them.

22        Do you have any sense about that?

23        MR. FATHI:  Well, I do, Your Honor.  First of all, the

24   sample size for Performance Measure 97, which is one of the

25   issues, the measures we're talking about, has not been changed.      02:26PM

1    The sample for Performance Measure 95, I believe, has not been

2    changed at every facility.  But again, whether it's the number

3    that's specifically originally set forth in the stipulation or

4    if it's the larger number that we agreed to with the

5    defendants, it's still that number of different individual        02:26PM

6    records, not that number of instances.

7              THE COURT:  I'm just trying to get a window on whether

8    or not it's doing real damage to my ascertainment function.

9              MR. FATHI:  Well, it certainly has the potential, Your

10   Honor.  As Dr. Haney explains, and this is an entirely possible   02:26PM

11   situation, if you pull 10 instances where somebody was on watch

12   but that only involves five different individuals, you are

13   looking at the care received by five people, not the care

14   received by 10 people.  Or if it involves three different

15   individuals.                                                      02:27PM

16             Now, it may not happen every month, but it has the

17   potential, as Dr. Haney explains, to contract the sample to the

18   point where its representativeness and its generalizability

19   become limited.  And given that it is ridiculously easy, and

20   Dr. Haney explains how, to pick a sample that involves 10         02:27PM

21   different individuals, I have to say I don't understand the

22   resistance.

23             THE COURT:  And what is the disadvantage of caving to

24   plaintiffs' requests on this?

25             DR. TAYLOR:  So if you have an individual that each      02:27PM

1    time that they go on watch there's a certain thing that needs

2    to happen, somebody needs to see them, place them on watch,

3    seen every day, taken off watch.  There are many times where a

4    thing could happen, the note not being placed on watch.  So we

5    review that for the instance that's on the log every single                02:28PM

6    time to look for those things.

7            I get the sense from the plaintiffs that they are

8    wanting to include any time they are on watch in the hopes that

9    the one problem will throw that individual out of compliance

10   because, again, we can't do partial credit.                                02:28PM

11           THE COURT:  I see what you are saying.

12           DR. TAYLOR:  And again, we bumped Eyman from 20 to 35,

13   and so I think they would be hard pressed to show that that

14   isn't 20 different inmates.  In fact, it's very likely around

15   30.  We have bumped up all the facilities to the number that we           02:28PM

16   have increased it to, including on 95 we have requested to bump

17   that up to 20 records from 10.  And so -- for the same reason.

18   And then the telepsych one is 10 per unit.  And the likelihood

19   that somebody is seen twice in a month for telepsych, not very

20   likely.  But we were reviewing between 50 and 80 on each                   02:29PM

21   complex that uses telepsychiatry.

22           So there is no benefit for us to go searching to see

23   if there was possibly another contact in the audit month just

24   to be able to report that when we are already reviewing a large

25   number of records.                                                        02:29PM

1          THE COURT:  It seems to me that the odds are very

2    great that I'm capturing the kind of information I need to

3    capture, but I will take another look at what Dr. Haney wrote

4    and get a ruling out to you.

5          MR. FATHI:  Thank you, Your Honor.  I just want to          02:29PM

6    make clear that what Dr. Taylor said I don't think is

7    responsive to the Court's question.  Dr. Taylor is talking

8    about if you pull a person's file, do you have to look at every

9    single instance that that person was on watch during the month.

10   That's not what we're saying.  We're saying if you pull a          02:29PM

11   sample of 10 watch instances and five of them happen to involve

12   the same person, you throw four of them back and randomly draw

13   new ones until you have a sample of 10 different individuals.

14         THE COURT:  I thought it was responsive because she

15   was telling me what benefit the defendants got out of doing it    02:30PM

16   her way.

17         MR. FATHI:  If the Court found it responsive, that's

18   good enough for me.

19         THE COURT:  That was my question, I think.  And

20   that's the answer I got.  That's what I understood why you         02:30PM

21   thought it was to your benefit to do it that way.

22         DR. TAYLOR:  Right.  And we're attempting to audit the

23   process to make sure it's working over and over again.  So one

24   inmate multiple times or multiple inmates, it's the process of

25   which are you covering the start and stop and everything in        02:30PM

CV 12-601 - June 14, 2017 - Status Hearing

1   between.

2          THE COURT:  All right.

3          MR. FATHI:  The next issue involves Performance

4   Measures 92 and 93.  And this is a distinguish issue from the

5   one raised by Ms. Fettig.  Both of these performance measures    02:30PM

6   involve prisoners who are both classified as MH-3 or higher

7   and, therefore, have significant mental health needs and

8   vulnerabilities and are housed in maximum custody and are

9   therefore housed in highly restrictive settings.

10         Now, the stipulation provides that the same records     02:31PM

11  that are reviewed for Number 92, have to be reviewed for Number

12  93.  But in April Mr. Dye testified that the defendants weren't

13  doing so.  They were reviewing a much larger Number 92 and

14  reviewing a much smaller number for 93.  So we simply ask that

15  the Court order the defendants to follow the plain language of   02:31PM

16  the stipulation, which is that the same records be reviewed for

17  both performance measures.

18         THE COURT:  Mr. Bojanowski or Dr. Taylor?

19         DR. TAYLOR:  So we have asked for an agreement with

20  the plaintiffs regarding we would like to bump up the number of  02:31PM

21  records to 20 per complex.  They had an objection to that

22  because it says per yard, so we asked for an in between that

23  says if there's only one yard on a complex do 20; if there's

24  multiple yards do 10 per yard so you could have 20 or 30.

25         I don't know if we have heard back on that.  But we      02:32PM

1    had bumped up the max custody one to 50 because we had sites

2    that didn't pass.  We wanted to see have you fixed the issue.

3    Specifically Lewis had a problem, and I didn't feel that 10

4    answered that question because I could randomly get maybe 10

5    because they only have the one unit at that whole complex.      02:32PM

6    When we bumped it up to 50 we started so to see there were 4

7    out of 50 out of compliance.  That starts to tell me you have

8    fixed the issue because we have pulled a quarter of the

9    population as opposed to a much smaller portion.  So they

10   weren't failing the rounds and haven't failed the rounds for a  02:32PM

11   very long time.

12        So we have agreed to let's do -- we have asked to be

13   able to do 20 per complex, however that might work out, at

14   least 20, and then we will do the same, exact same records for

15   the rounds.                                                     02:33PM

16        THE COURT:  If it's the same, why is that a problem

17   then?

18        MR. FATHI:  Well, Your Honor, it wasn't the same.

19   That was Mr. Dye's testimony.

20        THE COURT:  Okay.  But what Dr. Taylor has proposed       02:33PM

21   you are okay with?

22        MR. FATHI:  If what Dr. Taylor is saying is that hence

23   forth the same records reviewed for Performance Measure 92 will

24   be reviewed for Performance Measure 93, then yes.  Then we're

25   satisfied with that.                                            02:33PM

1          DR. TAYLOR:  And does that also mean you are okay with

2    the 20 if there's only one yard on the complex or 10 per yard?

3    We're a limited resource and to be able to audit on places that

4    would then mean 40 records instead of 20 would often times be

5    beyond what we could get done in a month.                        02:33PM

6          MR. FATHI:  My responsive letter to Ms. Orcutt on June

7    2nd is filed at Document 2108-1.

8          THE COURT:  And what do you say.

9          MR. FATHI:  I said that increasing the numbers for 92

10   is acceptable with the caveat that the same records must be      02:33PM

11   reviewed for 93.

12         THE COURT:  Okay.

13         DR. TAYLOR:  Perfect.

14         THE COURT:  Thank you.

15         MR. FATHI:  And finally, Your Honor, and this, I          02:34PM

16   think, is really in a different category of importance, is

17   Performance Measure 95.  This is a measure that is specifically

18   designed to protect prisoners who have recently been removed

19   from suicide watch.  And given the extraordinary rash of forced

20   suicides in the recent three-week period, including one man who   02:34PM

21   killed himself hours after being removed from suicide watch,

22   this measure is of surpassing importance.

23         Performance Measure 95 is simple and straightforward.

24   It requires as follows:  Any prisoner discontinued from a

25   suicide or mental health watch shall be seen by a mental health   02:34PM

1   provider, mental health clinician, or psychiatric registered

2   nurse between 24 and 72 hours after discontinuation, between 7

3   and 10 days after discontinuation, and between 21 and 24 days

4   after discontinuation of the watch.

5            But we heard from Mr. Dye at the April hearing that          02:35PM

6   defendants have been routinely counting records as compliant

7   with this performance measure without verifying that these

8   required contacts have happened.  And that is very dangerous

9   and that needs to stop.  The Court should order the defendants

10  to comply with the plain language of Performance Measure 95.    02:35PM

11           THE COURT:  And do you happen to have talked to Mr.

12  Bojanowski about that before?  Has he been apprised of this?

13           MR. FATHI:  Yes, Your Honor.  This was in our opening

14  brief.

15           THE COURT:  Right, but just recently to see whether      02:35PM

16  it's still ongoing or not?

17           MR. FATHI:  I have not, Your Honor.  They defended

18  this practice in their brief, so I didn't think there was any

19  change.

20           DR. TAYLOR:  Your Honor, there's a reason for the        02:35PM

21  watch follow-ups to be progressively far apart.  So the first

22  watch follow-up is 24 to 72 hours.  We want to check if you are

23  going to be stable fairly quickly.  We then push it out to a

24  week and then three weeks.  There's a reason for that follow-up

25  schedule.  We're checking to see if you have become unstable.   02:36PM

1   Somebody who goes back on watch now requires a daily contact

2   because they have shown to be unstable.

3           THE COURT:  Right.

4           DR. TAYLOR:  So I know the plaintiffs brought up their

5   concern that a different level person would be seeing the                    02:36PM

6   individual while on a daily watch, and yes, that is true.  It's

7   a higher level because we don't take inmates off watch on the

8   weekends, so that follow-up would not happen on the weekend.

9   It's going to happen during the week.

10          So then we're already using clinicians, licensed             02:36PM

11  clinicians, in fact, to see them for the watch contacts.  The

12  watch follow-up contacts can be with an unlicensed master level

13  clinician, a psych nurse, or a psychiatrist.  But when they go

14  back on watch we're concerned about their stability.  And they

15  are seen every day and they are seen by a licensed clinician              02:37PM

16  unless it's a weekend or holiday.  Then it can be a registered

17  nurse.

18          So it negates the point of a watch follow-up schedule

19  that progressively gets farther apart that you would go back on

20  watch and we would then want to be checking on you in three               02:37PM

21  weeks to see if now while you are currently on watch are you

22  stable off watch.  So the performance measure says follow-up

23  after watch.  If you are on watch, you are not -- it's not a

24  follow-up after watch.  And it's never been our practice to do

25  that.  And first time they brought it up was actually while we            02:37PM

1    were sitting in here in court.  And they have been reviewing

2    CGARs for quite sometime, two years, and had never said

3    anything about not reviewing them when they went back on watch

4    because that doesn't make sense.

5            THE COURT:  All right.                                    02:37PM

6            MR. FATHI:  Your Honor, we presumed, perhaps naively,

7    that the defendants were complying with the language of the

8    performance measure which requires these three follow-ups and

9    requires them to verify that those follow-ups happened.  The

10   difficulty with simply presuming that because someone is back    02:38PM

11   on watch they are being seen is multi-fold.

12           The fundamental problem is they are not verifying.  If

13   they are verifying, yes, okay.  This person was due to be seen

14   between 7 and 10 days and they are back on watch and they were

15   seen, fine, compliance.  We have no objection to that.           02:38PM

16           THE COURT:  But we'll know about that because if what

17   they are saying is we're counting as compliant a record that we

18   have verified on this -- no?

19           MR. FATHI:  No, Your Honor.  They simply presume that

20   because someone is back on watch they are being seen daily.      02:38PM

21   And their dismal performance on Performance Measure Number 94,

22   which is the one about daily watch checks, simply provides no

23   basis for that.  In fact, the Court --

24           THE COURT:  I see.  That's a reasonable point, but

25   there's got to be a different remedy than this Procrustean       02:38PM

1    adherence to the stepped plan.

2            MR. FATHI:  All they have to do is to check.

3            DR. TAYLOR:  We can do that.  If we have an agreement

4    let's get those out.  If your proposal is us indicating the day

5    they went back on watch, in our reporting we can do that.  They      02:39PM

6    are -- to be placed on watch you have to be seen.  There is no

7    other way to get placed on watch.  You have to be seen by the

8    RN or the clinician.

9            And so we can either indicate that date or the date

10   of, if it was an RN, the first clinician contact if that helps      02:39PM

11   but I have no problem in providing that information.

12           THE COURT:  And it seems to make sense to me that if

13   somebody is in a situation where you are, to use a rough

14   analogy, we have police cars that go around and they check a

15   neighborhood once a week and they have to check them once a          02:39PM

16   week.  But then we also have a rule if there's been a recent

17   burglary they have to go every day.  We're not going to require

18   them to satisfy the every week requirements because we know

19   during this period of time they are there every day.  So that's

20   the analogy that seems to be compelling to me.                       02:40PM

21           MR. FATHI:  Here's the problem, Your Honor.

22   Performance Measure 95 requires these three follow-ups after

23   someone goes off suicide watch.

24           THE COURT:  Right.

25           MR. FATHI:  If they go back on watch in that period,         02:40PM

1    yes, they are supposed to be seen every day.  But what we know

2    from the fact that Florence has been non-compliant for five out

3    of the six past months on Performance Measure 94 --

4            THE COURT:  And we're going to fix that.

5            MR. FATHI:  I hope so, Your Honor.                      02:40PM

6            THE COURT:  Yeah.

7            MR. FATHI:  All we're asking, all we're asking is that

8    they verify that these three required follow-ups actually

9    happened, not presume it, because the person is on watch and

10   they are supposed to be seen but verify that it actually        02:40PM

11   happened.  That's all we're asking.

12           And I think the Court understood this at the last

13   hearing.  The Court said, "You are giving somebody a pass on

14   95 based upon the fact that you were assuming they are going to

15   be seen under 94.  But there's no verification of that.  So how  02:41PM

16   can you make the determination in 95?

17           THE COURT:  But what she's saying is she would be able

18   to verify it on the files that she's pulled to make sure that

19   the person was seen pursuant to the on-watch status.  That's

20   what she just said.                                             02:41PM

21           MR. FATHI:  That's not what I understood.

22           THE COURT:  Isn't that what you said?

23           DR. TAYLOR:  So what I was saying, let's say they have

24   had the first two watch follow-ups occur, the 24 to 72 and the

25   seven day.  Let's say they go on watch on Day 8.  I can         02:41PM

1    indicate on there they are on watch starting on Day 8.  And

2    therefore, that is -- and check to make sure there's a contact.

3            THE COURT:  So you would check to make sure there is a

4    contact.

5            DR. TAYLOR:  On Day 8, thereby it starts the clock          02:41PM

6    back over again because I need them to follow that --

7            THE COURT:  We're not presuming anything.  Not

8    assuming anything.

9            DR. TAYLOR:  Right.

10           THE COURT:  Because in evaluating that pooled record        02:41PM

11   so see whether or not there was somebody being seen much more

12   frequently than required by the stepped out program, you are

13   not just assuming they were seen because you know there's a

14   rule that says they have to be.  In order to determine there's

15   compliance with this performance measure you have checked to       02:42PM

16   see that they did have the visit that happened every day

17   pursuant to them being on watch.  Is that right?

18           DR. TAYLOR:  Right.  What we would not want to end up

19   in is I'm looking for a 20-day contact when they went back on

20   watch on Day 8 because when they come off watch that next time     02:42PM

21   I need them to adhere to that --

22           THE COURT:  I understand.  I want to make sure you are

23   not presuming just because there's a rule that says somebody is

24   on watch, we know the performance measure says there's a

25   significant failure at one institution with respect to meeting     02:42PM

1    this watch obligation.  But that will be revealed in that

2    performance measure evaluation, but you are not going to get a

3    pass in this other performance measure, the stepped out

4    performance evaluation based upon the fact that there's a rule.

5    You are going to get either a compliance or non-compliance with    02:43PM

6    the record based upon the fact you checked to see whether or

7    not this person was seen.  Are we clear about that?

8             DR. TAYLOR:  Just to be clear, I would be looking for

9    the first contact that puts them on watch because they are now

10   in the daily watch.    02:43PM

11            THE COURT:  So you would check to see that they were

12   seen on that watch date, and then you would also want to make

13   sure that if -- well, no.  So what you are asking me is you

14   have to check every single day?

15            DR. TAYLOR:  I would not propose that.    02:43PM

16            THE COURT:  That's what you are asking me about

17   whether or not you have to do.  But again, if you can establish

18   that there has been a visit that satisfies the stepped out

19   program, then I would say that you could say that that record

20   was compliant.  But you cannot deem it compliant based on the    02:43PM

21   fact that there's a rule that says we have to see everybody.

22   You have to actually see whether the person is seen.

23            DR. TAYLOR:  So the challenge comes in a lot of times

24   with the 21 to 24 day.  It's a window.  So they might have gone

25   on watch, come back off watch, and now they are on a more    02:44PM

1  truncated schedule for watch follow-ups.  I need them to follow

2  that one now.

3          THE COURT:  Right.  Right.

4          DR. TAYLOR:  So I wouldn't want to track it through to

5  a 21 to 24 from the original one.                              02:44PM

6          THE COURT:  You start the clock over.

7          DR. TAYLOR:  And that's exactly what we have been

8  doing.

9          MR. FATHI:  Your Honor, the testimony was very clear

10 as cited in our brief, they have been simply presuming from the  02:44PM

11 fact that somebody is on watch and people who are on watch are

12 supposed to be seen, they have been presuming that the person

13 was seen.

14         Allow me to suggest this:  I don't think I fully

15 understand Dr. Taylor's proposal.  If we could get that in      02:44PM

16 writing, if we can work it out, that's fine.  If not we could

17 raise it at next month's hearing.

18         THE COURT:  Would you kindly do that?

19         DR. TAYLOR:  Absolutely.  And just to be clear we

20 wouldn't know they went on watch unless they were seen.  So the  02:45PM

21 only way we know they went on watch is we have to find that

22 contact.  We have been doing that already.  We have no problem

23 putting that into the CGAR.

24         MR. FATHI:  But just to be clear, we are going to get

25 a written proposal.                                            02:45PM

CV 12-601 - June 14, 2017 - Status Hearing

1          THE COURT:  Yep.  On the 30th.  Thank you.

2          Thank you, Dr. Taylor.

3          DR. TAYLOR:  Yeah.  And I did have an update for

4     Performance Measure 85 that you had asked for.

5          THE COURT:  Yes, please.                          02:45PM

6          DR. TAYLOR:  I, on my phone, have access to about half

7     of them, because -- anyway, I only have about half of them.  So

8     I pulled those and starting in December, the audit looking at

9     December, just to be clear, the audit looking at December data

10    that was transitioned where no files were used with a -- where   02:45PM

11    they were taken off meds in the same month they were reviewed

12    so they would automatically be compliant, we transitioned in

13    November they were used; in December they were not.

14          I found one error in Lewis where one was used and a

15    yes was done instead of a zero, an N/A.  It was a human error.   02:46PM

16    The direction was to transition that and the error was made, I

17    believe, by myself, even.  But we did transition that with data

18    looking at December.

19          MR. FATHI:  Your Honor, unfortunately, I regret to say

20    that's not true.  Document 2046, Page 30, we cite January 2017   02:46PM

21    CGAR reports for Perryville where the sample for Performance

22    Measure 85 includes multiple patients who had discontinued

23    medication that same month in January and, therefore, could not

24    be found non-compliant.  So again, it's not true that that

25    practice ended with the December CGARs.                          02:46PM

CV 12-601 - June 14, 2017 - Status Hearing

1      DR. TAYLOR:  So we could produce those if that's

2  helpful.  I believe that's January looking at November data.

3      MR. FATHI:  It's the January 2017 CGARs.

4      THE COURT:  Would you present that to Dr. Taylor at

5  the conclusion of the hearing so that you two can, if Mr.                02:47PM

6  Bojanowski will agree, to stand by for a bit so that you two

7  can take a look at this and figure out who's right.  Okay?

8      MR. FATHI:  Happy to have that consultation, Your

9  Honor.  We don't have the underlying data here.  But they

10  are -- it is in the court record.                                        02:47PM

11      THE COURT:  She'll show you.  She will have to back it

12  up.  And she's got it on her phone.  She can show you that the

13  CGARs -- I think it's what you are looking at, the CGARs,

14  right?

15      DR. TAYLOR:  Correct.                                                02:47PM

16      THE COURT:  She can show it to you and you say it's

17  not true but you can figure that out.  If we had time we would

18  do it right now.  But if it turns out that the issue gets

19  resolved, great.  If it turns out that there is a

20  misrepresentation to the Court, certainly the defendants have            02:47PM

21  to correct that.  And if it turns out that there's something I

22  need to further look into, you will let me know.

23      MR. FATHI:  Thank you, Your Honor.

24      I believe Ms. Kendrick has an issue to address.

25      THE COURT:  Yes.                                                     02:48PM

UNITED STATES DISTRICT COURT

1          MS. KENDRICK:  Not many issues, just one.

2          Among the performance measures that we identified in

3     the hearings that could not be found non-compliant, there was

4     one in particular on the medical side.  That was Performance

5     Measure 25 involving the emergency response.                        02:48PM

6          THE COURT:  Correct.

7          MS. KENDRICK:  As you might recall, Mr. Haldane

8     testified that the moment he starts the clock is at the time

9     the security staff responds.  The security staff in his mind

10    are trained, so therefore, the response is instantaneous it's     02:48PM

11    always 100 percent.

12         THE COURT:  Is the State really going to hold with

13    that position that's exactly what's required by the

14    stipulation?

15         MR. BOJANOWSKI:  Can I have one moment, Your Honor?          02:48PM

16         THE COURT:  Surely.

17         MR. BOJANOWSKI:  I want to get to the performance

18    measure they are talking about because it was my understanding

19    that this performance measure was looking at the -- what's

20    defined as the first responder to an emergency situation.        02:49PM

21    These emergency situations arise in the housing units.  The

22    first responders are the COs on site.

23         THE COURT:  Who are focused on trying to control what

24    they always control, and that's not to their -- not criticizing

25    them -- but that is to control individuals.  We see it in the    02:49PM

CV 12-601 - June 14, 2017 - Status Hearing

1   press all too time.  The police shoot somebody -- again, this

2   is not saying this is what's happening but the police shoot

3   somebody and people stand in aghast as they put handcuffs on

4   the people who have been shot.  That's what police officers are

5   trained to do.  That's their natural reaction.  They just shot          02:49PM

6   somebody.  Rather than tending to them medically, they put

7   handcuffs on them.

8        So I think what this is talking about is making sure

9   the first responder is somebody whose first idea what is the

10  healthcare need here, not about how to subdue somebody.  That's        02:49PM

11  my impression of it.

12       MR. BOJANOWSKI:  Well, the CGAR question is:  Are

13  first responders trained in basic life support, responding and

14  adequately providing care within three minutes of an emergency.

15  So that's what the measure is, is are the people that are             02:50PM

16  there, are they adequately trained and are they providing

17  appropriate care within those first three minutes.  And that's

18  what's being looked at because it's the line officer who is

19  going -- if somebody is bleeding out on the floor it's the line

20  officer that's going to be putting the pressure on the wound to       02:50PM

21  stop the bleeding.  So, you know, that's what we're looking at

22  because medical is going to have to respond from wherever they

23  are at to that location.  And so that's what this measure is

24  all about.

25       MS. KENDRICK:  So, Your Honor, first of all, it                   02:50PM

1    clearly, I guess, is an oversight for all of the parties when

2    we negotiated the stipulation.  We did not actually define what

3    a first responder means.  And so that, I think, is part of the

4    problem, is that the parties clearly had different ideas of

5    what it meant.  There was nothing memorialized in the contract          02:51PM

6    or the stipulation as to what a first responder means.

7            And we are concerned about the situation that you

8    described, I mean, for example, in our original complaint,

9    Docket 1 on this docket, we describe a man who committed

10   suicide by cutting himself with razor blades and the custody           02:51PM

11   officers didn't respond for 30 minutes because they didn't want

12   to wallow in his blood.

13           So this performance measure is based upon situations

14   such as that and other ones that our experts found during

15   litigation.  So the fact that defendants have taken this to            02:51PM

16   refer to custody officer, responds, calls 91 and so within one

17   second they are compliant, I think just moots out the entire

18   purpose of this performance measure.

19           THE COURT:  That's my impression, too.

20           MR. BOJANOWSKI:  Your Honor, the methodology that has           02:52PM

21   been agreed to and in place in the manual and such says that

22   first responders may be either medical or security officers.

23   So you know --

24           THE COURT:  I didn't know about that.

25           MR. BOJANOWSKI:  That's been in the manual since it            02:52PM

1    was drafted.  So it's clearly been the intention of the parties

2    to allow this to be defined as security officers.

3            THE COURT:  Okay.

4            MS. KENDRICK:  Well, I mean, it's what they do, Your

5    Honor.  And it's how they respond.  And unfortunately, over the          02:52PM

6    course of the four or five years of having medical emergencies,

7    deaths, and suicides reviewed by our experts, we do find when

8    you look at underlying documents that there is a delay in

9    getting a response from medical care that calls into question

10   whether or they're responsive.                                           02:52PM

11           The fact that it's in the Monitoring Guide, it's in

12   the Monitoring Guide.  It doesn't necessarily mean we agree to

13   it.  In all honesty, I apologize if that passed by.  That

14   certainly was not our intention to agree to that.  It's a long

15   document.                                                                02:53PM

16           But, you know, I think the fact that we hadn't caught

17   it in the draft Monitoring Guide but it came out explicitly

18   clear in the hearing doesn't mean that defendants can say ha

19   ha, you know, you are going to have to live with it because we

20   wrote it into the Monitoring Guide.                                      02:53PM

21           THE COURT:  Okay.

22           MR. BOJANOWSKI:  It's an NCCHC standard, Your Honor.

23   The NCCHC recognizes first responders as security officers so I

24   can't -- it's a standard.

25           THE COURT:  Well, I will think about it more.                    02:53PM

1           MS. KENDRICK:  Thank you.

2           THE COURT:  Anything you want to say, Mr. Bojanowski?

3           MR. BOJANOWSKI:  Your Honor, I need to be honest.  I'm

4    a little slow on the uptake maybe.  I wanted to get some

5    clarification on your PM 13 order so that I'm absolutely clear          02:53PM

6    as to what it is you are looking for documentation-wise and

7    what's the obligation on the part of the defendants to provide

8    this documentation.

9           So I need to get in my mind, I guess, are you asking

10   us to --                                                               02:54PM

11          THE COURT:  To identify for me and for plaintiffs the

12   name and the number of every person for the previous 30 days

13   before the reporting date who did not receive the care that was

14   called for by the performance measures that I addressed today.

15          MR. BOJANOWSKI:  Okay.                                          02:54PM

16          THE COURT:  Then you would need to be in a position to

17   tell me why you should not pay $1,000 per incident for failure

18   to comply with those performance measures.

19          MR. BOJANOWSKI:  So the 30-day x -- I'm trying to get

20   in my mind what you mean by the 30-day reporting period.  Are        02:54PM

21   you talking about --

22          THE COURT:  So we changed it from what I first said.

23   We changed it so that I would have the advantage of having that

24   information before our hearing.  So the day before the hearing,

25   you are going to let everybody know the names of the people and        02:55PM

1    their numbers who did not receive the called for healthcare

2    that is required by the performance measures that I identified

3    so I know the total number and I know the individuals for whom

4    these services were not provided.

5            MR. BOJANOWSKI:  Is this for all of the inmates, or is      02:55PM

6    this for like the 10 files pulled?

7            THE COURT:  It's for every person that didn't receive

8    this benefit, every person.

9            MR. BOJANOWSKI:  I'm trying to get a handle on how to

10   logistically do this.                                              02:55PM

11           THE COURT:  You will have to double check, make sure

12   every person who was supposed to get those measures in those

13   facilities that I identified, that they got that service.  And

14   if they didn't you have to tell me.

15           MR. BOJANOWSKI:  Okay.  So starting tomorrow?              02:56PM

16           THE COURT:  Yes.

17           MR. BOJANOWSKI:  Is what you are saying.  We have to

18   then monitor 100 percent compliance.

19           THE COURT:  Right.

20           MR. BOJANOWSKI:  For all of those measures for all of      02:56PM

21   those people.

22           THE COURT:  Right.

23           MR. BOJANOWSKI:  And then report that to you?

24           THE COURT:  Right.

25           MR. BOJANOWSKI:  You are just looking for a list?          02:56PM

1          THE COURT:  Yes.  I want the names, the numbers.

2          MR. BOJANOWSKI:  You are not asking for a percentage.

3          THE COURT:  No.

4          MR. BOJANOWSKI:  You are saying everybody?

5          THE COURT:  Yes.                                            02:56PM

6          MR. BOJANOWSKI:  Say, for instance, a person who is in

7    the IPC, say we have 20 guys in the IPC.  You want all 20 guys.

8          THE COURT:  If they didn't get the service that's

9    called for in that performance measure.

10          MR. BOJANOWSKI:  Okay.                                     02:56PM

11          THE COURT:  Going back to the chronic and psychotropic

12    medication renewals will be complete in a manner such that

13    there is no interruption or lapse in medication.  I want to

14    know the names and the numbers of all the people in the next 30

15    days who did not receive that healthcare service.              02:57PM

16          MR. BOJANOWSKI:  At those listed facilities?

17          THE COURT:  Yes, those listed facilities.

18          (Discussion off the record.)

19          THE COURT:  The sample also has told me there's a real

20    problem, so then I have to move beyond the sampling and address  02:57PM

21    the problem.  And the way that I'm going to address the problem

22    is find out how many people didn't receive the service and then

23    tell you why I shouldn't fine you for failing to provide the

24    service to every single one of those people who are entitled to

25    do it.  Because the stipulation doesn't say that you are going  02:57PM

1    to do it for 85 percent of the people.  What the stipulation

2    says is you are going to be governed on whether you do a good

3    enough job to make the 85 percent benchmark.  If you fail to

4    make the benchmark we know that you are not providing the

5    service that you contracted to provide.  So I need to get                02:58PM

6    something in place to make sure that you do that going forward.

7           MR. BOJANOWSKI:  Right.  I just want to make sure that

8    everybody --

9           THE COURT:  Yep.

10           MR. BOJANOWSKI:  -- here understands what it is you          02:58PM

11    are looking for so that we're providing the appropriate

12    information to you.

13           THE COURT:  Yes.

14           MR. BOJANOWSKI:  And now date-wise you want that

15    information provided by July 13th?                                      02:58PM

16           THE COURT:  Yep, the day before the hearing, which is

17    now the 12th.  We can go ahead and say the 13th if we're not

18    going to address this topic on the 12th.

19           MR. BOJANOWSKI:  I thought we were addressing this on

20    the 17th.                                                               02:58PM

21           THE COURT:  No.  Is it -- wait a second.

22           MR. FATHI:  Your Honor, you had initially said the

23    17th.

24           THE COURT:  We said the 17th, but then it was a good

25    suggestion we move it to before the hearing on the 14th.  And I        02:58PM

CV 12-601 - June 14, 2017 - Status Hearing

1    said the day before the 14th.  We then decided that we would

2    actually start the hearing before the 14th on the 13th, which

3    would mean that it would have to be on the 12th.

4            MR. BOJANOWSKI:  Okay.  The evidentiary hearing on the

5    removal of the boxes is what I thought was going to be on the          02:59PM

6    13th.

7            THE COURT:  It could be.  And if that turns out that

8    is what you all decide is the best thing to do, then you can

9    get me that information on the 13th.

10           MR. BOJANOWSKI:  Okay.  Can I have a moment?                    02:59PM

11           THE COURT:  Yep.

12           MR. BOJANOWSKI:  We're trying to figure out how this

13   can be accomplished.

14           THE COURT:  It can be accomplished because you have

15   committed in a contract to do it, to provide the service.  And         03:00PM

16   you have failed repeatedly to provide the service, so we're

17   going to know for whom those people are who are entitled to

18   this benefit who have not received it.  And the way to know

19   that is to know what their names and numbers are.

20           So you will take a look to see who is entitled to the          03:00PM

21   service at those units for the numbers that we enumerated here

22   today, and you will tell me the names and the numbers of the

23   people who haven't received this service.  And maybe that will

24   help you understand how to address the problem better.

25           Thank you all very much.                                       03:00PM

1          We'll see you next month.

2          (Proceeding concluded at 3:00 p.m.)

1

2

3

4

5                          C E R T I F I C A T E

6

7            I, LAURIE A. ADAMS, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10           I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15           DATED at Phoenix, Arizona, this 21st day of June,

16   2017.

17

18                                s/Laurie A. Adams

19                                _____
                                  Laurie A. Adams, RMR, CRR

20

21

22

23

24

25