**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **Victor Parsons, et al., on,** | ) | |
| **behalf of themselves and all** | ) | |
| **others similarly situated;** | ) | |
| **and Arizona Center for** | ) | |
| **Disability Law,** | ) | |
| | ) | No.  **CV-12-00601-PHX-DKD** |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Flagstaff, Arizona |
| | ) | June 20, 2017 |
| **Charles Ryan, Director,** | ) | |
| **Arizona Department of** | ) | |
| **Corrections; and Richard** | ) | |
| **Pratt, Interim Division** | ) | |
| **Services, Arizona Department** | ) | |
| **of Corrections, in their** | ) | |
| **official capacities,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

**TRANSCRIPT OF PROCEEDINGS**

**TELEPHONIC DISCOVERY DISPUTE**

Transcriptionist:
Candy L. Potter
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

1

2                          **T E L E P H O N I C**
                          **A P P E A R A N C E S**
3

4   For the Plaintiffs:
        ACLU – Washington DC
5       By:  **David Cyrus Fathi**, Esq.
        915 15th Street NW, 7th Floor
6       Washington, DC 20005

7   For the Defendants:
        Office of the Attorney General
8       By:  **Lucy Marie Rand**, Esq.
        1275 West Washington Street
9       Phoenix, Arizona 85007

10      Struck Wieneke & Love
        By:  **Timothy James Bojanowski**, Esq.
11           **Rachel Love**, Esq.
        3100 East Ray Road, Suite 300
12      Phoenix, Arizona 85226

13

14

15

16

17

18

19

20

21

22

23

24

25

——— CV-12-00601-PHX-DKD – June 20, 2016 ———

```
1              THE CLERK:  This is case number CV-2012-601, Parsons,

2    et al, v. Ryan.  This is the time set for a discovery dispute

3    hearing.

4              Will all parties please announce?

5              MR. FATHI:  For the plaintiffs, this is David Fathi,

6    and with me is Grace Gohlke, law clerk.

7              THE COURT:  Thank you.

8              MS. RAND:  For defendants, this is Lucy Rand with the

9    Attorney General's Office.  I have Tim Bojanowski and

10   Rachel Love on the line, as well as Scott McPherson.

11             THE COURT:  Thank you very much.

12             Does it make sense to start with the issues that were

13   identified in the June 12th letter, or is there some other

14   efficient place for us to begin?  Anybody want to address that

15   question?

16             MR. FATHI:  Your Honor, this is David Fathi.

17             I would propose simply going through -- well, first of

18   all, Your Honor, do you have our requests and the defendants'

19   response before you?

20             THE COURT:  You mean the table that you prepared?

21             MR. FATHI:  Yes.  The document was actually prepared

22   by Miss Rand, but it's document 2108-1.

23             THE COURT:  Yep, I have it in front of me.

24             MR. FATHI:  All right.  And my second question,

25   Your Honor, are we on the record?
```

1          THE COURT:  Yep.

2          MR. FATHI:  All right.  Very good.

3          Well, I want to assure the Court, we do not plan to go

4   through all of these, but does it make sense to just go through

5   them numerically?  Or I'm happy to do whatever the Court

6   prefers.

7          THE COURT:  Well, the only reason I suggested the

8   June 12th letter is because I did notice that a number of these

9   entries on the table appeared to be satisfied.  But if you

10  think it's better to go through one by one, we will.

11         So number 1 on document 2108, the backlog report

12  described by Dr. Calcote and Dr. Taylor during the Tucson tour,

13  where do we stand on that?

14         MR. FATHI:  Actually, Your Honor, I'm happy to report

15  that that is not on the agenda for today.  The first one will

16  be number --

17         THE COURT:  Okay.

18         MR. FATHI:  -- number 3.

19         THE COURT:  My efforts to try to lead this campaign

20  are not going well.

21         MR. FATHI:  I'm sorry, Your Honor.

22         THE COURT:  Okay.  I'll just abdicate my

23  responsibility and take a passenger seat.

24         Where are we going, counsel?

25         MR. FATHI:  Thank you, Your Honor.

CV-12-00601-PHX-DKD – June 20, 2016

```
1              Before we start with these requests, I did want to ask
2    about the status of the April CGARs.  We are supposed to
3    receive those by the middle of the month.  Today is June 20th.
4    And so I'd like to ask when we can expect those to be produced.
5              MS. RAND:  Mr. Fathi, we're producing doing those
6    today.  As you know, the CAPs and the rebuttals are prepared
7    the 1st through the 15th.  So occasionally the reports don't
8    come out exactly on the 15th because they have to input that
9    data in, and then we have to get them and prepare them.
10             So it's not because we're delaying, you know what I
11   mean, trying to get those reports out, it's just because the
12   CAPs and things have to be input into the system.  So we are
13   expecting to produce those today.
14             THE COURT:  Miss Rand --
15             MR. FATHI:  Okay.
16             THE COURT:  -- just for my edification, were there any
17   variances from what was presented in the court last week as the
18   preliminary numbers and these official numbers?
19             MS. RAND:  I would not be able to speak to that
20   because I think Mr. Bojanowski keeps track of that.
21             Is that correct, Tim?
22             MR. BOJANOWSKI:  That's correct, Your Honor.
23             And frankly, I have not gone through to conduct that
24   comparison.
25             THE COURT:  Okay.  All right.  Go ahead then.
```

1          MR. FATHI:  Thank you, Your Honor.

2          So item 3, which is our request for all directors'

3     level responses dated September 1, 2015, to present, to

4     prisoners' grievances regarding health care; medical, mental

5     health or dental.

6          The Court ordered the defendants at last week's

7     hearing to produce these.  So we don't have a dispute, but

8     there's a clarification.  We've since learned that the

9     grievance process has recently been changed so that the final

10    appeal on healthcare grievance is no longer to the director's

11    office, it's to the facility health administrator at the

12    facility where the prisoner is housed.  So the appeal never

13    leaves that prisoner's facility.

14         So we simply ask that you amend your Order so that we

15    receive the final appeal on all healthcare grievances, whether

16    that appeal went to the director's office or more recently to

17    the facility health administrator.

18         THE COURT:  What you just said makes sense to me.

19         Tell me if there's any good cause not to amend the

20    Order to do that, Miss Rand or Mr. Bojanowski.

21         MS. RAND:  Your Honor, we actually intended to produce

22    them, the responses from the FHA, because we knew what

23    plaintiffs intended, and just because the process changed and

24    the director's no longer in the process -- we actually had

25    intended to produce those.  So we're not objecting to any -- to

CV-12-00601-PHX-DKD – June 20, 2016

1    the change that Mr. Fathi is asking for.

2              THE COURT:  Great.  Thank you.

3              Next item.

4              MR. FATHI:  Next item is number 9, Your Honor.  And

5    this is our request for all documents reflecting or discussing

6    errors, inaccuracies, or inconsistencies in defendants' or

7    Corizon's monitoring of compliance with the Stipulation's

8    Performance Measures.

9              And you may recall, Your Honor, we addressed this

10   dispute some months ago.  And in document 1708 you ordered the

11   parties to work on production of responsive documents from

12   three custodians; that was Richard Pratt, Nicole Taylor, and

13   the procurement officer.

14             Unfortunately all we have received thus far are some

15   of Dr. Taylor's e-mails regarding mental health care.  We've

16   received nothing from Mr. Pratt's e-mail or the procurement

17   officer, and we've received nothing regarding medical care or

18   dental care.

19             So we'd ask that the Court order production of those

20   responsive documents.

21             THE COURT:  Miss Rand?

22             MS. RAND:  Your Honor, we've produced all the

23   documents that were found in response to the search.  We

24   haven't excluded anybody.  So the fact that there may not be a

25   document regarding dental or there may not be a document from

UNITED STATES DISTRICT COURT

1    Mr. Pratt does not mean that we excluded those people.  We have

2    produced all the documentation that's available.

3           And we've explained that to Mr. Fathi and told him

4    that, you know, Mr. Pratt doesn't typically discuss these kind

5    of errors, inaccuracies, and things like that.  He has people

6    that he delegates them to.

7           And also, when they do discuss these things, they are

8    discussed typically in person.  There are no written documents.

9           So what we have produced are the documents that we

10   located.  We're not withholding any documents.  We're not -- we

11   did not fail to search for all the documents requested.  What

12   we've produced are what are -- what are available.

13          THE COURT:  Okay.  Let me ask a follow-up question,

14   please.

15          Your search was based upon my limiting of the scope of

16   that search to doctors -- to Dr. Taylor, to Mr. Pratt, and to

17   the compliance officer, the contracting officer.  I did that

18   because I thought that those would be the people who would

19   likely be receiving any such communications, discussing errors,

20   inaccuracies, or inconsistencies in the defendants' or

21   Corizon's monitoring of compliance.

22          Did I understand you to mean that you didn't subject

23   yourselves to that limitation, that you went ahead and just

24   reviewed for anything that would be within the prison system

25   that addressed these issues of inaccuracies, errors, and

1    inconsistencies?

2            MS. RAND:  Well, I believe that we also asked Corizon

3    for their documents as well.  But --

4            THE COURT:  And what you're saying is that produced no

5    responsive documents.  You say you asked Corizon as well?

6            MS. RAND:  I believe we did.  I apologize that I

7    didn't -- we just got this list of documents that we're

8    supposed to review about an hour ago, so I didn't -- wasn't

9    able to look up every single response.

10           But I believe that we did ask everybody -- and I

11   thought we talked about this with you before as well and told

12   you guys this, that we had produced what we -- told plaintiffs

13   this, that we had produced what we were --

14           THE COURT:  All right.

15           MS. RAND:  I'm sorry.

16           THE COURT:  That's all right.  Go ahead.

17           Mr. Fathi, anything else you wanted to say?

18           MR. FATHI:  Well, yes, Your Honor.

19           First, on the part about getting this an hour ago,

20   this request was made in June of last year, reiterated in March

21   of this year.  I think what Miss Rand is referring to is, as a

22   courtesy I did e-mail her earlier today and say, these are the

23   items that I intend to discuss on the call with the Court

24   today.  So the request itself is certainly not an hour old.

25           Miss Rand has not addressed the procurement officer,

1  who was the third custodian contained in the Court's Order.

2  And again, we have received absolutely nothing from that

3  person.

4          Now, as we said previously, it is very difficult to

5  believe in 2017 that there were no responsive e-mails, either

6  to or from Mr. Pratt or the procurement officer.  But if that's

7  what defendants are representing, then we would like a

8  declaration to that effect that outlines the search that was

9  undertaken, and state that the result was literally no

10 responsive documents, other than the few they've produced for

11 Dr. Taylor.

12         THE COURT:  Miss Rand, are you able to confirm on the

13 phone right now that you have checked with the procurement

14 officer, and that you have checked with Mr. Pratt, and you've

15 checked with Dr. Taylor to make sure that there are no such

16 documents that are responsive to this inquiry?

17         MS. RAND:  I did actually e-mail Dr. Pratt -- Richard

18 Pratt, rather, and Dr. Taylor after Mr. Fathi wrote us the

19 letter and said, you know, we would like you to check on these

20 again.  And we did.

21         And they reiterated that there are -- that anything

22 that was produced are the e-mails, because they just

23 don't -- it's not a habit of them to write to people about

24 these things, they sit down with them in person and go over the

25 issue.

CV-12-00601-PHX-DKD – June 20, 2016

1          The other thing is --

2          THE COURT:  What about -- what about things that

3     they've received from other people?  Did they receive

4     any -- any written documents reflecting these issues that were

5     directed to Dr. Taylor, Mr. Pratt, or the procurement officer?

6          MS. RAND:  From what I understand -- because I

7     personally did not do the actual search itself, but other

8     people did it and forwarded me the results.  From what I

9     understand they did do everything, both forward and backwards,

10    so from them or to them.

11         THE COURT:  All right.

12         MS. RAND:  And as far as to the procurement officer,

13    there would be no reason why the procurement officer would

14    receive this type of documentation, because they receive issues

15    of noncompliance in general, but not necessarily whether or not

16    there were errors, inaccuracies, et cetera.  But they receive

17    it regarding the contract.  So it's not really something that

18    the procurement officers would be involved in.

19         THE COURT:  All right.  Well, I didn't know that.  It

20    just seemed to me to make sense that the procurement officer

21    would be somebody who would be involved.

22         Since you weren't the person who personally did this,

23    would you kindly do what Mr. Fathi has asked for, and that is,

24    submit a declaration indicating what has happened with respect

25    to exhausting the exploration for documents responsive to this

CV-12-00601-PHX-DKD – June 20, 2016

1    inquiry number 9, and produce -- and file that no later than

2    the end of this month?

3              MS. RAND:  Okay.  So no later than the end of the

4    month.  All right.

5              THE COURT:  Thank you.

6              The next item, Mr. Fathi?

7              MR. FATHI:  Thank you, Your Honor.

8              The next item is number 15, which requests all

9    documents reflecting, discussing, or establishing policies

10   and/or practices related to defendants' "open clinic concept."

11   And documents sufficient to show its implementation and

12   compliance with the Court's November 10th, 2016 Order.

13             And the Order referred to there, of course, is what

14   we've been calling the Community Services Order, document 1754.

15             So documents showing the existence or not and

16   compliance or not with the Court's Order of the open clinic

17   concept are particularly important in light of the upcoming

18   evidentiary hearing on the open clinic.

19             The defendants have withheld documents pursuant to a

20   claim of attorney/client privilege and work product protection,

21   but they haven't produced a privilege log.

22             So we would ask, first, that a privilege log be

23   produced and that all documents for -- which privilege is not

24   being claimed be produced.

25             THE COURT:  Miss Rand?

1          My reading of what's been set forth in the request

2    response notes indicates some objections other than the

3    attorney/client privilege and work product immunity objections.

4    I will overrule those other objections.

5          With respect to any assertion of work product immunity

6    or the attorney/client privilege, I would require that you

7    submit, again by the end of this month, a privilege log

8    indicating what documents that are being withheld on the basis

9    of privilege or work product immunity.

10         MS. RAND:  Okay, Your Honor.  I don't believe there

11   are any documents being withheld.  I think that's just a

12   general objection, because most of the time I write these

13   objections before we actually go out and do the search.

14         THE COURT:  Do not ever --

15         MS. RAND:  And so I --

16         THE COURT:  Do not ever do that again.  Do not ever do

17   that again.  I don't want to ever have you filling the space of

18   the world with words that are contingent objections.  If you

19   have an objection, assert it.  If you have the fear of an

20   objection because you don't know what the world will hold,

21   figure out what the world will hold, or say that you can't say

22   at this moment because you haven't completed your review.  But

23   don't ever assert an objection, which I'll call gratuitously,

24   because you don't have a good faith basis to assert it.  If you

25   don't know whether there are attorney/client privileged

1    documents, you can't assert an attorney/client privilege.

2           Don't ever do that again.  Thank you.

3           MR. FATHI:  Thank you, Your Honor.

4           And to the extent -- or if the defendants are claiming

5    that there simply are no responsive documents other than the

6    handful we've been produced, we would again ask for a

7    declaration describing the search and making that statement

8    under oath.

9           THE COURT:  Well, there will have to be a formal

10   response to this discovery -- this discovery request.  If the

11   attorney's personally responsible to -- for it, then I think

12   the attorney can submit an avowal above that attorney's

13   signature to that effect.

14          But if the attorney is relying on information that

15   other people have done and is going to assert that as the

16   basis, then if it's someone other than an attorney, then I

17   would want an affidavit under oath.

18          But I will continue to believe that attorneys will act

19   consistent with their obligations, ethical obligations, and

20   only state matters that they believe to be personally true.

21          All right.  The next item?

22          MR. FATHI:  The next item, Your Honor, is number 18,

23   which is somewhat similar.  This calls for all documents

24   reflecting, discussing, or establishing policies and/or

25   practices related to defendants' compliance with the Court's

15

1    November 10th, 2016 Order, with regard to the nine performance

2    measures to which the Order is applicable, and documents

3    sufficient to show the implementation and compliance with the

4    Order.

5              The defendants' open clinic –– the Court's November

6    10th Order, the Community Resources Order, addressed nine

7    performance measures with which the Court had previously found

8    compliance –– noncompliance.  The open clinic concept applies

9    only to one of those, and that's Performance Measure 37.

10             So this calls for documents that show the defendants'

11   compliance with that Order with respect to the other eight

12   performance measures.

13             And here, once again, documents that appear to have

14   been withheld pursuant to attorney/client privilege, and no

15   privilege log has been produced.

16             THE COURT:  Again, Miss Rand, my ruling here would be,

17   if there are objections other than attorney/client privilege or

18   work product immunity, I will overrule those actions.

19             If there is an assertion of the attorney/client

20   privilege or work product immunity, you need to set that forth

21   in a privilege log by the end of this month.

22             Anything else you want to say, Miss Rand, about that?

23             MS. RAND:  No, Your Honor.

24             THE COURT:  Okay.  Mr. Fathi?

25             MR. FATHI:  And again, Your Honor, we would request

1    the same remedy as with number 15, that there either be a

2    declaration or an avowal by counsel with personal knowledge of

3    the steps that were undertaken, and that there are no

4    responsive documents, if that is indeed the claim.

5              THE COURT:  What Mr. Fathi is asking for in these

6    repeated requests, Miss Rand, just so that everybody's on the

7    same page about this, is he wants to know that the inquiry has

8    been closed out, because he can't tell that now based upon the

9    way that you've objected.

10             And so given that I've overruled the objections, he

11   needs to know that you've taken the additional step to make

12   sure that you've produced everything, that you've conducted a

13   search to find everything, and that the only things that you're

14   withholding are based upon attorney/client privilege or work

15   product immunity for which those documents are identified in a

16   privilege log.

17             Is everybody square on that?  Miss Rand, do you

18   understand what we're talking about here?

19             MS. RAND:  Yes, Your Honor.

20             THE COURT:  Okay.  Thank you.

21             Go ahead, Mr. Fathi.

22             MR. FATHI:  Thank you, Your Honor.

23             The next item is number 19, which seeks all written

24   directions or instructions, including all training materials

25   provided to ADC or Corizon staff regarding compliance with the

CV-12-00601-PHX-DKD – June 20, 2016

1   Court's orders on monitoring methodology.

2           Now, we discussed this at the May 10th hearing, and

3   the defendants were adamant that there were no responsive

4   documents, other than a handful of pages that they had already

5   produced.  That discussion is at pages 794 to 803 of the May

6   10th transcript.

7           And Mr. Pratt even said twice unequivocally that there

8   are no documents.

9           So confronted with that assertion under oath,

10  implausible though it was, the plaintiffs accepted that.  But

11  we've since learned that there are responsive documents that

12  haven't been produced.  We learned this on our tour of the

13  Phoenix facility on June 15th, the day after last week's

14  hearing.

15          We interviewed Dr. Stephanie Leonard, who is the

16  Associate Regional Mental Health Director, who told us that

17  there have been written instructions provided to staff

18  regarding how to conduct contacts with patients who are on

19  suicide watch, as is required by Performance Measure 94.

20          And while we were touring the medical clinic, we saw

21  additional instructions regarding those watches.  On the wall

22  was a sign that read, in large letters, as follows:  Use this

23  exact sentence for writing the setting in a subjective note,

24  quote, offered a confidential setting and inmate refused, close

25  quote.

1      So it's apparent, Your Honor, that there are

2   responsive documents that have not been produced, and we would

3   ask that the Court order defendants to conduct a thorough

4   search and produce these and all other responsive documents.

5           THE COURT:  Miss Rand?

6           MS. RAND:  I was advised that all responsive documents

7   had been produced.  When I was on the site visit I too noticed

8   that sign, and I collected that sign -- or collected a copy of

9   it, rather, and was intending to produce it to plaintiff.

10          But I don't know what additional documents they're

11  referring to, unless they are talking about the documents that

12  we already produced, which were the mental health documents

13  that were instructions.  We did produce those documents.

14          So I don't know if Mr. Fathi is unaware of those

15  documents or if he's referring to other documents that

16  Dr. Leonard is referring to.  But we produced the mental health

17  instructions already.

18          THE COURT:  Well, because you missed this document, it

19  raises the legitimate question about whether or not your

20  original exploration was sufficient.

21          So what plan do you have in place to double check to

22  make sure that you now have a plan and a system in place to

23  capture all of the responsive documents?

24          MS. RAND:  I'm not sure what more to do, other than to

25  go back and ask the people for the documents, because we asked

————— CV-12-00601-PHX-DKD – June 20, 2016 —————

1    the Director of the Mental Health of Corizon, and were provided

2    the documents that we were provided.

3         So --

4         THE COURT:  Well, at the least it would occur to me

5    that what you could do is you could say, we asked you

6    previously for written instructions, you said there were none.

7    We then are on a tour and we see a written instruction.  How is

8    it that you could tell us that there were none?  And see what

9    they have to say.

10        And then maybe as a lawyer you can figure out what the

11   infirmity is in the mechanism that they're using to respond to

12   you, or whether or not notwithstanding their response you have

13   a reason to doubt the response and you have to do your own

14   diligence.

15        I'll tell you that when I was a lawyer and I would ask

16   clients for responsive documents and they would say, we don't

17   have any, and then I would learn that maybe there was a file

18   that had the subject matter, I would say, well, where's that

19   file kept?  And they'd show me, and I'd say, well, pull it out,

20   I want to look through it, all of it.  Then I'd take a look

21   around the file to see if there were other titles around that

22   file that maybe were likely.

23        I mean, the lawyer's got to do that, because sometimes

24   people innocently enough and sometimes not so innocently,

25   because they don't have the obligation that the lawyer has to

CV-12-00601-PHX-DKD – June 20, 2016

1    comply with the obligations of discovery, they may choose to

2    think, well, it's all right if I just sort of cover this up.

3         Well, to a certain extent if you get a hint that

4    there's something imperfect about the process, and we certainly

5    have that hint here, you need to be more diligent about it, and

6    perhaps a little cynical and maybe less trusting.

7         MS. RAND:  Your Honor, actually I have done that once

8    already, and I'll do it again.

9         I just -- because I've already said to them, I've been

10   told there's possibly more documents, please go back and check,

11   and they did.  But I will do it again based on this new

12   information.

13        THE COURT:  Okay.  And report to the plaintiffs and to

14   the Court by the end of the month about what you found out.

15   Okay?

16        MS. RAND:  Yes, Your Honor.

17        THE COURT:  All right.  Thank you.

18        Mr. Fathi?

19        MR. FATHI:  Thank you, Your Honor.

20        Next is number 23, all e-mails between Richard Pratt

21   and Corizon from January 1, 2017, to the present, including but

22   not limited to the "investigate and advise" e-mails described

23   by Mr. Pratt in his May 10th, 2017 testimony.

24        And Miss Rand has actually said in a letter, not in

25   this document but in a subsequent letter, that responsive

1    documents will be produced by June 23rd.  I just wanted a

2    confirmation on the record that that is still the case.

3              THE COURT:  Miss Rand?

4              MS. RAND:  Your Honor, that is still the intent.  That

5    is something that I am personally going to do, is to go down

6    and look at his computer.  So I will be doing that and

7    producing those e-mails by the 23rd.

8              THE COURT:  Thank you very much.

9              Mr. Fathi?

10             MR. FATHI:  Thank you, Your Honor.

11             Next is number 24, the spreadsheet Mr. Pratt maintains

12   regarding advocacy letters sent by plaintiffs' counsel,

13   described by Mr. Pratt in his May 10th, 2017 testimony.

14             And if I may, I'd like to give the Court a little bit

15   of background on this.

16             As plaintiffs' counsel, we will sometimes write a

17   letter to defendants' counsel regarding either an apparent

18   violation of the stipulation or a patient who appears to

19   urgently need medical or mental health treatment.  And at the

20   May 10th hearing, Mr. Pratt testified that he maintains a

21   spreadsheet regarding those letters.  That's at page 713 of the

22   May 10th transcript.

23             And we've requested production of that spreadsheet,

24   and defendants have refused, again asserting the

25   attorney/client privilege.

1          Now, when we send these letters, the only response we

2     get is a boilerplate one-paragraph e-mail from defendants'

3     litigation counsel.  It's identical word for word every single

4     time, except for the patient's name.  And it sometimes comes

5     five minutes after we send our letter.  So there's clearly no

6     investigation or research occurring in that interval.

7          So we need to know and the Court needs to know what

8     action, if any, the defendants are taking when they get these

9     letters alleging violations of the stipulation.  If they're

10    just going into the trash, we need to know that.  If they're

11    taking some remedial action, we need to know that too.

12         So we'd ask that this document be ordered produced.

13         THE COURT:  Miss Rand?

14         MS. RAND:  Well, plaintiffs' counsel is kind of

15    mischaracterizing the responses that defendants are sending.

16    What defendants are sending shortly after we receive their

17    request is a response saying, we've received your request,

18    we're investigating it.  We're not providing an actual response

19    at that time.

20         And we also are advising them that this process does

21    not by-pass the inmate grievance system, because that's what I

22    think a lot of the inmates believe is that they're going to

23    bypass the inmate grievance system by having a letter.

24         The other thing is that we actually asked Mr. Pratt to

25    maintain this list of inmates, so it was made at the direction

1    of counsel.  And I don't see why we need -- we're just logging

2    the complaints of plaintiffs' counsel, whether founded or not

3    founded, and so for us to have to provide them responses

4    just -- I guess what I'm trying to say is that we are using

5    this document as a communication between Mr. Pratt and counsel.

6    So we don't think that we should have to provide it.

7         And if Mr. Fathi feels that he can't get any -- that

8    he needs to have an update on an inmate's medical status, it

9    seems to me that that's what the eOMIS access was for is to

10   provide Mr. Fathi access to go look up individual inmates to

11   find out what kind of care they're receiving.

12        So I don't think it falls on defendant to provide them

13   this document which was made at the direction of counsel.

14        THE COURT:  When did Mr. Pratt start preparing the

15   spreadsheet?

16        MS. RAND:  He started right after the stipulation was

17   effective.  And we -- because in the beginning we received

18   quite a few letters from plaintiffs, a lot of them which were

19   unfounded.  And so we were trying to keep track of them all to

20   make sure that we had investigated them, things like that.

21        But I don't think that this is the type of document

22   that the Court contemplates providing to plaintiffs because it

23   really doesn't -- it's a log of all the different complaints

24   that plaintiffs have made.

25        THE COURT:  If Mr. Pratt had decided to create such a

UNITED STATES DISTRICT COURT

1    log, I would disagree with you because I think that it would be

2    a document that would be relevant to the enforcement of the

3    stipulation.  However, it is possible that it is so infused

4    with the communication between the attorney and the client that

5    it would be subject to the privilege.  It is also possible that

6    it is composed mostly of facts, and those facts themselves

7    would not be subject to the privilege.  But I can't tell.

8          And the way that I can tell is if you will give me the

9    spreadsheets for in camera review as soon as you can get them.

10   I will take a look at them and make a further determination as

11   to whether the attorney/client privilege applies.

12         MS. RAND:  Okay.  Your Honor, we had put aside one

13   spreadsheet based -- because it's regularly updated.  We had

14   put aside one spreadsheet based on the date that plaintiffs

15   made their request.  Would you care to have a more updated one?

16   The most updated, I should ask.

17         THE COURT:  I didn't understand exactly what you were

18   saying about the updated spreadsheet.  Could you tell me again?

19         MS. RAND:  Well, because the spreadsheets contain

20   basically the same information, but they are updated, I was

21   asking:  We had a specific spreadsheet that was, I guess,

22   earmarked, you know, for this request, because of the date that

23   it was -- the request was made.

24         But since we're providing this to the judge in camera,

25   I'm asking you, did you want the one that was -- that is

1    updated to the current date?

2            THE COURT:  Are they both presently in existence?

3            MS. RAND:  Well, they keep updating the same

4    spreadsheet.

5            THE COURT:  That's what I'm not understanding.

6            If there's one document that includes everything that

7    the other includes, other than additional newer information,

8    then I would only need that.  But if there is a document that

9    includes newer information but doesn't include older

10   information, then I would need to have both.

11           MS. RAND:  No, there's only one document.  I'll

12   provide the newer one.

13           THE COURT:  All right.  And is that something that you

14   can e-mail over to my chambers, is that how it will work?

15           MS. RAND:  Yes, Your Honor.

16           THE COURT:  All right.  Thank you.

17           Next item, Mr. Fathi?

18           MR. FATHI:  Thank you, Your Honor.  Next item is

19   number 25, all documents relied upon by Mr. Pratt for his May

20   10th, 2017 testimony that prison suicide rates are increasing

21   nationally.

22           And you see the defendants' response, there are no

23   specific documents responsive to this request.  But then it

24   goes on to identify what appear to be responsive documents.

25           We are confident that Mr. Pratt would not have made

CV-12-00601-PHX-DKD – June 20, 2016

1    such a sweeping and definitive statement without a firm

2    foundation, so we would ask that the documents on which he

3    relied be produced.

4         THE COURT:  Well, it's ambiguous.  The request

5    response notes are ambiguous as to whether or not these

6    documents are documents that Dr. Taylor relied upon or

7    Mr. Pratt relied upon.

8         So can you illuminate and maybe clear up that

9    ambiguity, Miss Rand?

10        MS. RAND:  Okay.  What Mr. Pratt said was that he

11   relied upon the verbal advisement from Dr. Taylor after she

12   returned from the NCCHC.  And then he said he also heard news

13   reports on the subject.  He didn't necessarily say that he read

14   anything, he just said that he heard through news reports,

15   especially during the wake of the high profile suicide of

16   Aaron Hernandez.

17        He told me that there were no actual documents to

18   provide, he had just heard generally about this information

19   through news media.

20        THE COURT:  Okay.

21        MS. RAND:  So I don't have any documents.

22        THE COURT:  Okay.  That clears that up.  There are no

23   documents.

24        Next item, Mr. Fathi?

25        MR. FATHI:  Thank you, Your Honor.

1          The next and last item is number 29.  All documents

2    reflecting any investigation into the suicide of -- and then it

3    lists the four prisoners who died by suicide in the 20-day

4    period in late April and early May.

5          As Dr. Stewart explains, this is a catastrophic

6    failure of a prison mental healthcare system.  And it's

7    particularly concerning in light of the defendants' ongoing

8    noncompliance with the performance measures that are intended

9    to protect patients that are suicidal, Performance Measures 94

10   and 95.

11         So we need to know, and the Court needs to know, what

12   the defendants are doing to understand and resolve this

13   critical problem.  If the answer is nothing, then we need to

14   know that.  But if they are doing something, if they're trying

15   to figure out why they had four suicides in 20 days, and how

16   they can prevent that from happening in the future, we need to

17   know that.  And we need to know if what they're doing is

18   effective, or if it's just more of the same, oh, we'll have a

19   conversation with someone and that will fix it.

20         So we'd ask that these documents be ordered produced.

21         THE COURT:  Miss Rand, I see in the response that you

22   have asserted primarily, I think, a concern with respect to

23   safety and security.  Is that the primary reason that you think

24   that these documents into the investigation cannot be produced,

25   or is there -- tell me -- rather than putting words in your

1  mouth, let me ask you to tell me why it is that this response

2  as set forth at number 29 can't be complied with.

3       MS. RAND:  Well, as to the one inmate, Mills, we said

4  that the prisoner was not at an Arizona State Prison complex,

5  he was at a private prison.  So we are -- the inmate is not

6  subject to the class action, because he's not housed at any

7  Arizona State Prison complex.

8       So we objected, first of all, on that ground for that

9  one inmate.

10       As to the other inmates, we said it was duplicative as

11  well as a security issue, because plaintiffs aren't just

12  asking -- well, we're saying it's duplicative, but what we're

13  also saying is they already are getting the information,

14  because what we provide are -- we provide everything from the

15  medical records of the inmate, the mortality reviews, the

16  autopsies -- the medical examiner autopsies, the corrective

17  action plans, and the CQI minutes, which all discuss what kind

18  of things go on with staff trying to discuss what happened,

19  what occurred, what needs to occur.

20       The investigation reports are mainly security reports,

21  they're basically talking about, you know, what happened

22  security wise.  You know, did so and so go to the cell at this

23  time and check on the -- you know, when he went through his

24  housing rounds, things like that.

25       And so, also because they are part of a criminal

1   investigation report, the ADC will not release them until the

2   investigation is over.  And so that's another issue is, we

3   don't know when they would actually be released, because

4   sometimes the investigation can be protracted.

5           So we were saying there's much better resources to

6   finding out the type of information that plaintiffs really

7   are trying to get at.  Not necessarily just, you know, whether

8   or not we're going to prosecute someone for something and it's

9   a criminal investigation.  But, you know, they're already

10  getting the corrective action plans, they're already getting

11  the CQI minutes where staff discussed what happened, what

12  occurred, what needs to occur, whether -- you know, things like

13  that.

14          I should note that one of the inmates too that

15  committed suicide, he had been in prison a long time, recently

16  got out and violated, and was now in for a very long term of

17  imprisonment.  And I think that that was one of the things is,

18  he just maybe decided that it was too much for him to come back

19  into the system.  So it's not like somebody missed him and he

20  wasn't getting therapy.  I mean, he was just brought back into

21  the system when he committed suicide.

22          And so we're not trying to say that all of these

23  documents are necessarily -- I think what I'm trying to say is

24  that the documents that we provide provide much better

25  information, and we're already providing those documents.  So

CV-12-00601-PHX-DKD – June 20, 2016

1    investigative reports regarding a criminal investigation don't

2    really add that much to it.  And I don't know what plaintiffs

3    think they're going to get out of those documents.

4           And not only that, but they're also -- they contain

5    security sensitive information, have to be redacted, and may

6    not be available for a very long time.

7           THE COURT:  All right.  I'm going to grant in part and

8    deny in part the plaintiffs' request here.

9           I'm going to grant the request for all documents

10   reflecting any investigation into the suicides of prisoners

11   Arvizo, Knauss (sic) and Gonzalez.  And I'm going to require

12   that if there are any documents responsive to this request

13   that you believe contain safety and security information, that

14   you submit those to me in camera for review.  And in that in

15   camera review also include an explanation as to why you

16   specifically believe there are safety and security issues at

17   risk.

18          I'll then evaluate that and determine whether or not

19   those documents should also be produced by defendants to

20   plaintiffs.

21          I'm denying the request with respect to the inmate

22   Mills because I don't have any responsibility over the

23   management of the -- under the stipulation, for a private

24   prison.  And if it occurred in that -- in that environment, it

25   would be outside of the power that I have under the

1    stipulation.

2            Any further comments from counsel on this item?

3            MR. FATHI:  Yes, Your Honor, just briefly.

4            I would just remind the Court that there is and has

5    long been a protective order in place in this case.  And

6    security sensitive information has routinely been produced

7    pursuant to that protective order without redaction.  And

8    there have been no problems certainly that defendants have

9    raised.

10           And I would just like to request a clarification from

11   the Court that, in addition to investigations into the suicides

12   of these three prisoners, what we would also like to know is,

13   is there an investigation into why there was this rash of

14   suicides?

15           And we would just like to reiterate that that is

16   included in our request, and we would hope that's included

17   within the Court's granting in part of our request.

18           THE COURT:  I think a reasonable reading of your

19   request, if it's accurately set forth in the description at

20   29 which states, quote, all documents reflecting any

21   investigation into the suicides of the enumerated prisoners,

22   close quote, would be broad enough to include what you just

23   asked for.

24           Miss Rand --

25           MR. FATHI:  Thank you, Your Honor.

1          THE COURT:  Go ahead.  Miss Rand, is there anything

2     you wanted to add?

3          MS. RAND:  Well, I was wanting to clarify whether

4     you're ordering that an investigation be performed regarding

5     the, quote, unquote, rash of suicides, or whether or not you're

6     just ordering that it be produced if one is performed.

7          THE COURT:  I'm ordering compliance with the discovery

8     request set forth at 29, and that is all documents reflecting

9     any investigation into the suicides of the enumerated

10    prisoners.

11         Does that answer your question?

12         MS. RAND:  Yes, Your Honor.

13         The second question I have is, if the documents are

14    not available due to the ongoing investigation?

15         THE COURT:  Submit a draft.  If there's a document

16    and it's a draft, submit it, produce it to plaintiffs.  Or if

17    there's a security issue, then submit it to me for in camera.

18         But if a document's been prepared, it's been prepared.

19    Whether it's got a final seal on it or it's been signed off, I

20    want to have what it says, all documents reflecting any

21    investigation.

22         All right.  Anything else, Mr. Fathi?

23         MR. FATHI:  Nothing further, Your Honor.  Thank you.

24         THE COURT:  Miss Rand?

25         MS. RAND:  No, Your Honor.

CV-12-00601-PHX-DKD – June 20, 2016

1          THE COURT:  Mr. Bojanowski, Miss Love?

2          MR. BOJANOWSKI:  We have nothing, Your Honor.  Thank

3    you.

4          THE COURT:  Okay.  All right.  Thank you all.  Good

5    afternoon.  And I appreciate the time today.

6

7                              -oOo-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

34

1

2

3

4                      C E R T I F I C A T E

5

6          I, CANDY L. POTTER, court-approved transcriber,

7   certify that the foregoing is a correct transcript from the

8   official electronic sound recording of the proceedings in the

9   above-entitled matter.

10

11         DATED at Phoenix, Arizona, this 30th day of June,

12  2017.

13

14

15

16                              s/Candy L. Potter__
17                              Candy L. Potter

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT