**EXHIBIT 2**

**EXHIBIT 2**

1  Arizona Attorney General Mark Brnovich
   Office of the Attorney General
2  Michael E. Gottfried, Bar No. 010623
   Lucy M. Rand, Bar No. 026919
3  Assistant Attorneys General
   1275 W. Washington Street
4  Phoenix, Arizona 85007-2926
   Telephone: (602) 542-4951
5  Fax: (602) 542-7670
   Michael.Gottfried@azag.gov
6  Lucy.Rand@azag.gov

7  Daniel P. Struck, Bar No. 012377
   Kathleen L. Wieneke, Bar No. 011139
8  Rachel Love, Bar No. 019881
   Timothy J. Bojanowski, Bar No. 022126
9  Nicholas D. Acedo, Bar No. 021644
   Ashlee B. Fletcher, Bar No. 028874
10 Anne M. Orcutt, Bar No. 029387
   Jacob B. Lee, Bar No. 030371
11 Kevin R. Hanger, Bar No. 027346
   STRUCK WIENEKE & LOVE, P.L.C.
12 3100 West Ray Road, Suite 300
   Chandler, Arizona  85226
13 Telephone:  (480) 420-1600
   Fax:  (480) 420-1696
14 dstruck@swlfirm.com
   kwieneke@swlfirm.com
15 rlove@swlfirm.com
   tbojanowski@swlfirm.com
16 nacedo@swlfirm.com
   afletcher@swlfirm.com
17 aorcutt@swlfirm.com
   jlee@swlfirm.com
18 khanger@swlfirm.com
   *Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-DKD<br><br><br>**DECLARATION OF KATHLEEN CAMPBELL, MBA, BSN, RN, CCHP-RN** |

I, **KATHLEEN CAMPBELL**, make the following Declaration:

1. I am over the age of 18 years and have personal knowledge of and am competent to testify to the matters set forth in this Declaration.

2. I am currently the Program Evaluation Administrator (Contract Compliance) with the Health Services Monitoring Bureau for the Arizona Department of Corrections (ADC).

3. I am licensed as a registered nurse in Arizona, Illinois, and Hawaii.

4. I have worked for ADC for approximately nine years, first as a utilization review nurse, then as the statewide Director of Nursing. After healthcare was privatized, I became the clinical lead nurse supervisor and oversaw the audit nurses evaluating contract compliance.

5. In my current position, I supervise six compliance monitors, monitor several statewide performance measures, and provide coverage for other monitors who are out on leave.

6. I was involved with Richard Pratt in the development of the healthcare performance measures included in the Stipulation in the Parsons litigation.

7. In agreeing to the inclusion of performance measure (PM) 25 in the Stipulation, ADC intended for the required action to be performed by corrections officers, who are almost always the first responders on the scene to an emergency.

8. ADC did not intend for the first responders to be medical personnel, except situations in which an emergency occurs in a medical unit with medical personnel present, but these are rare.

9. ADC did not agree to—and would not have agreed to—a performance measure in which first responders are defined as or required to be medical personnel.

10. National Commission on Correctional Health Care (NCCHC) Standard P-C-04 covers emergency response.

11. ADC corrections officers receive emergency response training consistent with the NCCHC standard. This training is called Correctional Analysis and Response to

1

Emergencies (CARE) and occurs at the Correctional Officer Training Academy (COTA) and during annual refresher training at ADC.

12. I have personally monitored PM 25 at several facilities and have instructed the other monitors who monitor this measure on the appropriate methodology.

13. The monitor pulls the sample from the Significant Incident Reports (SIRs), which document any significant events that occurred at a given complex, the Incident Reports (IRs), and the ER transport reports. Activation of the Incident Command System (ICS) is considered a significant event and results in an SIR.

14. There are rarely more than ten emergency events requiring basic life support in a month at a given complex, so the monitors generally review 100% of the applicable events for PM 25.

15. Once the monitor locates an SIR involving an inmate medical emergency requiring basic life support, the monitor reviews the details of the SIR for documentation that the responding officer performed appropriate actions within three minutes. If an ICS is called by healthcare staff, the monitors review the eOMIS record to verify compliance.

16. If there is no documentation that the responding officer performed appropriate actions (i.e., the SIR states that the officer called ICS over the radio and then watched the inmate until medical arrived), the record is found noncompliant.

17. If there is documentation that the responding officer performed appropriate actions but did not do so within three minutes of responding, the record is found noncompliant.

18. While most of the monitors are nurses, there is no requirement for clinical training to monitor this measure.

19. Unless the monitor was physically present during the emergency event, he or she would not be able to evaluate the quality of the emergency care provided. Because monitoring is done after-the-fact on the basis of paper documentation, the monitor is limited to a determination as to whether the actions taken by the first responder were adequate based on the specific emergency situation presented.

20. For example, if the SIR indicates that an inmate was found non-responsive, an adequate response would include performing CPR or using an AED. If the SIR or other documentation does not show that the first responder took either of these actions, the record is found noncompliant. The monitor cannot, however, determine the quality of the CPR administered by the first responder because the monitor was not there to witness it.

21. If a monitor is unsure as to whether a response was adequate for the situation, the monitor can ask me, Vanessa Headstream, or another monitor.

22. I recall being asked questions by Plaintiffs during an early monitoring tour regarding how ADC monitors PM 25 and participating in telephone conferences with Plaintiffs on the monitoring methodology for this measure. During the tour and calls, I recall explaining to Plaintiffs how ADC monitors PM 25.

23. During one of the telephone conferences concerning the Monitor Guide, Plaintiffs asked that ADC revise the Monitor Guide for PM 25 to specifically define basic life support, which we did. We also specifically stated that first responders could be corrections officers or medical.

24. These changes were made in the November 6, 2017 version of the Monitor Guide.

25. Plaintiffs did not object to the changes or propose any further changes to PM 25 until now.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___ day of July, 2017.

*Electronically approved on 07/12/17. Signed copy to be filed upon receipt.

_____
Kathleen Campbell

3