**EXHIBIT 4**

**EXHIBIT 4**

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



November 9, 2016

**BY ELECTRONIC MAIL ONLY**

Timothy J. Bojanowski
Struck, Wieneke & Love, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
tbojanowski@swlfirm.com

> *Re:    Parsons v. Ryan*

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

Dear Counsel:

We write to summarize our telephone call of November 8, 2016, regarding monitoring methodology.

**General**

We established that the parties agree that the only time a cellfront contact will be counted as satisfying the Stipulation's requirement that a patient be "seen" is when (1) the patient refuses to leave her cell for the encounter, or (2) there is a hard lockdown. *See* Doc. 1745. You agreed to add language to the Monitor Guide to this effect.

**PM 13** (Chronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication.)

The methodology as written in the 11/6/16 revision is satisfactory.

**PM 14** (Any refill for a chronic care or psychotropic medication requested by a prisoner between three and seven business days prior to the prescription running out will be completed in a manner such that there is no interruption or lapse in medication.)

Defendants will delete the phrase "…that information may be communicated to the Monitor who shall retain discretion regarding compliance" from the seventh bullet point in the Methodology section.

**PM 16** (Perpetual inventory medication logs will be maintained on each yard.)

Plaintiffs disagree with Defendants' unilateral decision to change the methodology for this measure to break each record down into six components

and to give themselves a pro-rated compliance level, whereas the methodology of monitoring to date has been that if any of the six elements were not present, then the record would be marked as noncompliant.  Furthermore, this approach is incompatible with the methodology (as written as of 11/6/16 version) for PM 17.

The parties are at an impasse regarding the change in methodological approach.

**PM 17** (Medication Administration Record will reflect dose, frequency, start date, and nurse's signature.)

The methodology as written in the 11/6/16 revision is satisfactory.

**PM 19** (Perpetual inventory medications will be signed off on the inmate's individual MAR.)

The methodology as written in the 11/6/16 revision is satisfactory.

**PM 21** (Inmates paroled or released from ASPCs will receive a 30-day supply of all medications currently prescribed by the ADC contracted vendor.)

The revised methodology does not specify that if a prisoner selected from the Release List was not prescribed any medication, that his/her record shall not be reviewed, and another released prisoner's record shall be selected. Defendants agreed to add a sentence to the end of the second bullet point of the Methodology section to make this clear.

**PM 25** (A first responder trained in Basic Life Support responds and adequately provides care within three minutes of an emergency.)

Defendants agreed to add "basic life support" to the Definitions appendix to refer to emergencies in which the use of an AED or performance of CPR is necessary.

**PM 26** (Responses to health care grievances will be completed within 15 working days of receipt (by health care staff) of the grievance.)

Defendants updated the guide to include the references to the security staff grievance logs.  However, Defendants added a second bullet point regarding the monitored month looking at grievances from two months earlier. The parties discussed this at length, and Plaintiffs' position is that if Defendants are reviewing the universe of grievances that needed a response in

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

2

that monitored month, then Defendants only need to go back fifteen business days prior to the start of the month.  Otherwise, going back two months from the monitored month, and then not providing the CGAR until 45 days after the end of the monitored month, means that information will be out-of-date, and not capturing the grievances that actually were due in the monitored month.

You stated that you would review this measure more, and consider our suggested approach, and get back to us.

**PM 27** (Each ASPC facility will conduct monthly CQI meetings, in accordance with NCCHC Standard P A 06.)

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Since we last met, Defendants unilaterally changed the Monitoring Guide to add three new bullet points to the Methodology section.  The fourth bullet point states that since NCCHC P-A-06 only requires "[u]pdates for process and outcome studies and attendance of interdisciplinary team members" to be shown quarterly, those would be compliant.  Plaintiffs' position is that while NCCHC P-A-06 only requires quarterly meetings, the parties specifically bargained in the Stipulation that the Performance Measure would be more stringent, and that CQI meetings that meet the requirements of P-A-06 must be done monthly.  Mr. Pratt and counsel stated that Defendants now interpret this Performance Measure to require that only the meetings be done monthly, but that only one meeting per quarter would need to comply with the requirements of the NCCHC standard and show documentation of attendance of interdisciplinary team members and updates on process and outcome studies, and the institution would be marked compliant.

The parties are at an impasse regarding the change in methodological approach and Defendants' new interpretation of what the Performance Measure requires.

**PM 28** (Every medical provider will undergo peer reviews annually with reviews and recommended actions documented) and **PM 29** (Each ASPC facility Director of Nursing or designee will conduct and document annual clinical performance reviews of nursing staff as recommended by NCCHC standard P C 02.)

The methodology as written in the 11/6/16 revision is satisfactory.

**PM 35** (All inmate medications (KOP and DOT) will be transferred with and provided to the inmate or otherwise provided at the receiving prison without interruption.)

3

Since we last met, Defendants unilaterally added a new sentence to the next-to-last bullet point: "Documentation is reviewed only for the date of transfer."  Plaintiffs' position is that the plain language of the performance measure is not limited to the date of the transfer, and that if a prisoner is on a medication that should be taken every other day, or weekly, and that medication does not transfer with him and he does not receive the required dose the next time the medication is due, subsequent to the transfer, then the record should be marked as noncompliant.

The parties are at an impasse regarding the change in methodological approach and Defendants' new interpretation of what the Performance Measure requires.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

**PM 44** (Inmates returning from an inpatient hospital stay or ER transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours.)

You agree that the parties are at an impasse on this issue, for reasons articulated in past correspondence.

**PM 45** (On-site diagnostic services will be provided the same day if ordered STAT or urgent, or within 14 calendar days if routine.)

Defendants will delete the reference in the next to last bullet point in PM 45 and 46 to "including a private facility or jail" and that the parties agree that any prisoner transferred to a non-ASPC institution will be excluded from review.

**PM 47** (A Medical Provider will communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request.)

The methodology as written in the 11/6/16 revision is satisfactory.

**PM 50** (Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider) and **PM 51** (Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider.)

Plaintiffs object to the bullet point in both Methodology sections that reads "A consult that must be scheduled beyond routine time frames due to

4

lack of consultant's availability shall be excluded from the review." A person on the call (Ms. Campbell?) indicated that the intent was to include the scenario where a provider is specifically requesting a specialty appointment to occur in a time period outside the requirements, for example, a provider requesting a six-month follow up with a specialist. This is analogous to the situation in PM 45 when a provider specifically orders a lab test to be done far into the future. Defendants stated that they would change this bullet point on PM 50 and 51 to mirror the language on PM 45.

**PM 66** (In an IPC, a Medical Provider encounters will occur at a minimum every 72 hours); **PM 67** (In an IPC, Registered nurses will conduct and document an assessment at least once every shift. Graveyard shift assessments can be welfare checks); and **PM 69** (In an IPC, nursing care plans will be reviewed weekly documented with a date and signature.)

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Since we last met, Defendants unilaterally changed their methodology for PMs 66, 67, and 69, which deal with the frequency of provider and nursing encounters for prisoners housed in the infirmary. Rather than marking a medical record as noncompliant if any of these encounters did not occur with the timeliness required by the Measure, Defendants now propose to measure compliance by calculating the number of encounters that should have occurred, and calculating what percent of those encounters happened.

The parties are at an impasse regarding the change in methodological approach.

**PM 77** (Mental health treatment plans shall be updated a minimum of every 90 days for MH-3A, MH-4, and MH-5 prisoners, and a minimum of every 12 months for all other MH-3 prisoners.)

We expressed our position that your sampling methodology is inconsistent with the requirements of the Stipulation, which requires that "An AIMS report will be run for all MH-3 and above prisoners at each Complex." We believe that your methodology (1) over-selects for MH-4 and MH-5 patients, who receive more attention from mental health staff, thereby inflating compliance scores; and (2) excludes MH-3E patients, unless they are either juveniles or in max custody. You agreed to submit proposed language to include MH-3E patients.

**PM 78** (All mental health treatment plan updates shall be done after a face-to-face clinical encounter between the prisoner and the mental health provider or mental health clinician.)

Our position is that the plain language of the Stipulation requires that "[e]ach record that is reviewed for treatment plan compliance will also be reviewed for a face-to-face SOAPE note dated the same date."  You believe you are obligated to count only records in which the treatment plan was updated in the audit month.

The parties are at an impasse.

**PM 83** (MH-3B prisoners who are prescribed psychotropic medications shall be seen a minimum of every 180 days by a mental health provider.  MH-3B prisoners who are prescribed psychotropic medications for psychotic disorders, bipolar disorder, or major depression shall be seen by a mental health provider a minimum of every 90 days.)

In the penultimate bullet in the Methodology for this PM,[1] we suggested changing "all diagnoses from that contact" to "all diagnoses from that document."  You counter-proposed "all diagnoses from that specific date;" we agreed to consider your proposal.

**PM 85** (MH-3D prisoners shall be seen by a mental health provider within 30 days of discontinuing medication.)

We agreed to the proposal set forth in Anne Orcutt's November 5 letter:  "the monitor uses a MH-3D log that shows all inmates whose medications have been discontinued, and a sample of 10 inmates per yard who were due a contact in the monitored month is selected."  We clarified that "due a contact in the monitored month" includes those patients who should have received a contact in a previous month, but have not yet received that contact. You agreed to add this language to the Monitor Guide for PM 85.

**PM 91** (MH-5 prisoners who are actively psychotic or actively suicidal shall be seen by a mental health clinician or mental health provider daily.)

You limit monitoring to prisoners who are on continuous watch, which (1) adds a limitation not found in the Stipulation, and (2) makes PM 91 essentially duplicative of PM 94.

We do not understand your objection that there is "no objective way" to determine whether a patient is actively psychotic or actively suicidal. Obviously any clinical determination involves an element of subjective

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[1] This and all other references to the Monitor Guide for PM 73-99 are to the version dated 11/5/16.

6

judgment.  Given that there are only a small number of MH-5 patients, all of them housed at a single institution, it would be a simple matter to review the files of those MH-5 patients whom a clinician evaluated as being actively psychotic or actively suicidal in the audit month for compliance with this PM. <u>Please state whether you will agree to this.</u>

**PM 98** (Mental health HNRs shall be responded to within the timeframes set forth in the Mental Health Technician Manual (MHTM) (rev. 4/18/14), Chapter 2, Section 5.0.)

You agreed to change "nursing or mental health staff" to "nursing staff, a provider, or a clinician" in the second and third bullets.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

We pointed out that in the fourth bullet, "the triage was completed" has not been changed to "receipt of the HNR," despite Anne's statement in her letter that this change would be made.  You agreed to determine whether this was an oversight.

In the penultimate bullet, we pointed out that "date" should be changed to "date and time," since without noting the time, it cannot be determined whether the patient was seen immediately or within 24 hours, as required by this PM.  You agreed to consider this and respond.

We expressed our concern that the requirement of the Mental Health Technical Manual that "inmates with routine medication issues will be referred to a P/PNP, and seen within fourteen (14) days" does not appear in the Monitor Guide.  You agreed to propose language to address this.

In response to our query, you stated that the seventh bullet ("To determine the nature of the HNR …") applies only to HNRs raising routine issues, not those raising emergency or urgent issues, and agreed to propose language to make that clear.

**PM 89** (MH-5 prisoners shall be seen by a mental health clinician for a 1:1 session a minimum of every seven days); **PM 91** (MH-5 prisoners who are actively psychotic or actively suicidal shall be seen by a mental health clinician or mental health provider daily); **PM 93** (Mental health staff (not to include LPNs) shall make weekly rounds on all MH-3 and above prisoners who are housed in maximum custody); **PM 94** (All prisoners on a suicide or mental health watch shall be seen daily be a licensed mental health clinician or, on weekends or holidays, but a registered nurse); and **PM 95** (Only licensed mental health staff may remove a prisoner from a suicide or mental health watch.  Any prisoner discontinued from a suicide or mental health watch shall

be seen by a mental health provider, mental health clinician, or psychiatric registered nurse between 24 and 72 hours after discontinuation, between seven and ten days after discontinuation, and between 21 and 24 days after discontinuation of the watch.)

We informed you that we do not agree to your unilateral changes to the monitoring methodology for these PMs, nor to your similar changes to the methodology for various medical and isolation performance measures. We will raise this issue with Judge Duncan.

We also discussed the importance of clinicians and other mental health staff maintaining clear records of patient encounters, so that it is clear from eOMIS (1) where the encounter took place (cellfront or in a confidential, out-of-cell setting), and (2) if it took place at cellfront, which of the two preconditions for a cellfront encounter applied. We noted that our November 7 filing contains several examples of encounters that listed the setting as "clinic," but actually took place at cellfront based on the clinician's notes. You stated that you are taking measures to address these concerns.

**Dental Performance Measures**

Mr. Bojanowski indicated that Defendants and counsel still have not spoken with Dr. Chu about the dental performance measures, **PM 100** and **101**. Counsel could provide no update on when this meeting will occur or if Defendants will be able to provide a response prior to the November 15 filing date. See the 10/19/16 letter from Corene Kendrick to Lucy Rand for a summary of Plaintiffs' concerns.

We look forward to receiving your proposed language and other outstanding responses on the PMs discussed above by close of business on Friday, November 11.

Very truly yours,

David C. Fathi

cc:     All counsel

8