UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Victor Antonio Parsons, et al,)
                              )
              Plaintiffs,     )      2:12-cv-00601-DKD
                              )
       vs.                    )      Phoenix, Arizona
                              )      January 11, 2017
Charles L. Ryan, et al,       )         2:01 p.m.
                              )
              Defendants.     )
_____)

BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TELEPHONIC DISCOVERY DISPUTE

Official Court Reporter:
Charlotte A. Powers, RMR, FCRR, CRR, CSR, CMRS
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 40
Phoenix, Arizona  85003-2151
(602) 322-7250

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                        A P P E A R A N C E S

 2


 3    For the Plaintiffs:

 4                   Prison Law Office
                     By: CORENE T. KENDRICK, ESQ. (via telephone)
 5                   1917 5th Street
                     Berkeley, CA 94710
 6
                     ACLU – Washington DC
 7                   By: DAVID CYRUS FATHI, ESQ. (via telephone)
                     915 15th Street NW, 7th Floor
 8                   Washington, DC  20005

 9
      For the Defendants:
10
                     Struck Wieneke & Love, PLC
11                   By: TIMOTHY JAMES BOJANOWSKI, ESQ. (via telephone)
                     3100 W. Ray Road, Suite 300
12                   Chandler, AZ  85226

13
                     Office of the Attorney General – Phoenix
14                   By: LUCY MARIE RAND, ESQ. (via telephone)
                     1275 W. Washington Street
15                   Phoenix, AZ  85007

16

17

18

19

20

21

22

23

24

25
```

UNITED  STATES  DISTRICT  COURT

```
 1                    P R O C E E D I N G S
 2              (Proceedings resume at 2:01 p.m.)
 3         THE COURT:  Please call the case.
 4         COURTROOM DEPUTY:  Civil case number 12-061, Parsons,
 5    et al. versus Ryan, et al. on for telephonic discovery depute
 6    hearing.
 7         THE COURT:  Counsel, please state your appearances for
 8    the record.
 9         MR. FATHI:  Good afternoon, Your Honor.
10         This is Dave Fathi with the National Prison Project,
11    and with me is Grace Gohlke, one of our law clerks.
12         THE COURT:  Thank you.
13         MS. KENDRICK:  Corene Kendrick from the Prison Law
14    Office for prisoner plaintiffs.
15         THE COURT:  Thank you.
16         MR. BOJANOWSKI:  Tim Bojanowski for ADC.
17         THE COURT:  Thank you.
18         MS. RAND:  Lucy Rand for the Attorney General's Office
19    and the Department of Corrections.
20         THE COURT:  Thank you.
21         That's it?
22         COURTROOM DEPUTY:  Maya Abela is also on.
23         THE COURT:  Who is?
24         COURTROOM DEPUTY:  Maya Abela is also on.
25         THE COURT:  Thank you, Ms. Abela.
```

```
 1                      (Pause in proceedings.)

 2          COURTROOM DEPUTY:  Maybe she dropped off.

 3          THE COURT:  Maybe she dropped off.

 4          Okay.  So, I have looked at the July 3 letter from

 5   Mr. Fathi to Ms. Rand, and also the email which is dated

 6   July 3, but it didn't include any attachments to it, so

 7   that's -- that's what I know.

 8          How best should we proceed, Counsel, with the matters

 9   that are presently at issue?

10          MR. FATHI:  Your Honor, this is David Fathi.  I would

11   propose we simply go through the numbered items on my -- if --

12   if that is acceptable to the Court --

13          THE COURT:  All right.  We'll do that.

14          So turning first to request number 3:  All Directors'

15   level responses dated September 1st, 2015 to present to

16   prisoners' grievances regarding healthcare.

17          And I read the paragraph description here.  And it

18   seems to me, though I don't have a transcript of the last

19   telephonic hearing before me, but my recollection is that as

20   described by plaintiffs is what I had intended.

21          MS. RAND:  Your Honor, this is Lucy Rand.  I have --

22   according to the transcript and according to the -- I believe

23   they say two different things.

24          THE COURT:  All right.  Go ahead.  Tell me why.

25          MS. RAND:  I'm just getting up my notes.
```

1          According to the letter, it says we were supposed to

2     provide all Directors' level grievances from all grievances

3     from Lewis and Perryville.

4          From what the Court order says, it's six months of

5     healthcare grievances from two grievants, and Director-level

6     grievances.  But then in the Court transcript, it says for the

7     Director-level grievances, pick two locations.  And so it kind

8     of seems as if it's saying instead of the Director-level

9     grievances from any location, it's saying the Directors' level

10    grievances from two locations.

11         THE COURT:  I thought we were getting Directors' level

12    as modified by the subsequent identifications as which ones

13    would be medically related, that those would be for the --

14    the -- all facilities, but that all of the grievances for these

15    two facilities for a limited period of time.  That was --

16    that's my recollection.

17         MR. FATHI:  That is correct, Your Honor.  If you look

18    at the citations in my letter from the June 14th hearing

19    transcript from the live hearing last month, it's very clear

20    that is what the Court directed.

21         In addition, attached to defendants' June 30th status

22    report, which was not filed but emailed to the Court and

23    counsel, there's declaration from Lynn Calcote, who is the

24    associate vice president of operations for Arizona.  And Mr. --

25    or Ms. Calcote writes as follows:  All FHA level or highest

1  medical grievance level, inmate medical mental health and

2  dental grievances between approximately December 16th, 2016,

3  through June 15th, 2017, end of quote.

4        And then writes:  All responsive documents were

5  provided to the Attorney General's Office on June 27th, 2017.

6        So all of the final level appeals were provided by

7  Corizon to the Attorney General's Office on June 27th.  So it's

8  not clear why two weeks later they have none -- none of them

9  have been produced to plaintiffs.

10        MS. RAND:  That was a mistake because I did not

11  realize it said "all grievances."  We understood it to be for

12  the Directors' level because this is what it says in the

13  Court's transcript:  Let's have the Directors' level grievances

14  produced to you with respect to the hearing.  And understanding

15  that there may be some kind of burden to get them from all the

16  facilities, why don't you pick two facilities where you'd like

17  to have all the healthcare grievants for the last six months.

18        So I'm kind of -- am I misunderstanding that?

19        THE COURT:  All right.  So I've -- I've cleared it up.

20  I've cleared it up what I meant.  What I meant is that for the

21  Directors' level, you would have all of them.  And for the two

22  facilities beyond -- below the Directors' levels, all of the

23  grievances.  Is that clear enough now?

24        MS. RAND:  May I repeat again?  For the Directors'

25  level grievants, we're going to have them from all facilities.

1          THE COURT:  Yes.

2          MS. RAND:  And then from -- for the grievances that

3     are at any level of grievance, we will have both Perryville and

4     Lewis.

5          THE COURT:  Is there any --

6          MS. RAND:  Both of --

7          THE COURT:  Is there any dangers --

8          MR. BOJANOWSKI:  Both of --

9          THE COURT:  Go ahead, Ms. Rand.

10          MS. RAND:  And both of these requests are for the last

11     six months; is that correct?

12          THE COURT:  Correct.

13          MS. KENDRICK:  No.

14          THE COURT:  Ms. Kendrick?

15          MS. KENDRICK:  Your Honor, excuse me.  Our request,

16     and I believe from the hearing, was the discussion was about

17     the fact that we had been requesting these grievances since

18     early 2015.

19          THE COURT:  I do recall there was a discussion about

20     the time period, but I don't have it right in front of me.  So

21     I cannot accurately tell you what the -- if my -- if I came to

22     the resolution about the time period.

23          Can someone give me a citation or read to me what I

24     said then so that I'm acting consistent with that?

25          MR. FATHI:  Your Honor, if I may say this, we do have

1     the grievances in advance of the hearing.  We do have a

2     declaration stating that in the last six months the highest

3     level appeals were turned over to the Attorney General's Office

4     on June 27th.  So we'd appreciate it if the Court would direct

5     that prompt production of that six months' worth where we can

6     discuss the possible production of earlier -- earlier appeals

7     at some later point.

8              THE COURT:  That makes sense to me.

9              Ms. Rand, what do you think about that?

10             MS. RAND:  Well, first of all, we do not have the last

11    six months for all the locations.  The fact that we made --

12    made an error in our declaration does not mean that we actually

13    got the documents, nor do we have them, nor have they provided

14    them to us since.

15             So, going to the transcript of June 14th, it says, you

16    know:  At the end of the meet and confer, you will have the

17    opportunity to get two facilities' grievances on healthcare and

18    you'll get all the Directors' levels for the last since months.

19             So it seems to me that you are ordering the last six

20    months for the grievances.  And so to make us produce the last

21    two years seems excessive.  And I'm not really sure how it's

22    going to help because it -- the most recent -- the figures have

23    changed -- the performance figures have changed throughout.

24    We've improved in different areas throughout.  So having the

25    grievances from when the stipulation was early on in place

1    doesn't seem to be as helpful as something that's happened in

2    the last six months.

3           THE COURT:  With respect to the letter from the

4    Corizon person that Mr. Fathi referenced in the enclosures

5    attached with that, what exactly did you get with that letter?

6           MS. RAND:  I got the Lewis and Perryville.  And by the

7    way, it was my mistake because I actually drafted the -- the

8    declaration and sent it to them, and it was my mistake that I

9    forgot to put the Perryville and Lewis in.  And so it's not

10   Corizon's mistake that they're attesting to something that they

11   did and -- it was my mistake.

12          THE COURT:  I see.  So the recommendation that

13   Mr. Fathi is relying on is actually one that you made that was

14   inaccurate; is that right?

15          MS. RAND:  That's -- that's correct, Your Honor.

16          THE COURT:  All right.  So then with respect to

17   these -- these documents, do you have any in hand now that

18   haven't been produced to the plaintiffs?

19          MS. RAND:  No, Your Honor.

20          THE COURT:  All right.

21          MS. RAND:  We -- when I got Mr. Fathi's letter, and I

22   was able to look at it and figure out and go back to the

23   transcripts, I realized that there was more than what was

24   requested, which was we requested the Directors' level

25   grievances for the last six months from Perryville and Lewis.

```
 1    So once I realized there was more that was requested, I went
 2    back and asked for that, and that was just on Friday, Your
 3    Honor.  And so we have not received anything in hand.
 4            THE COURT:  When do you think you would get those?
 5            MS. RAND:  Well, I asked for them ASAP, so hopefully
 6    that means -- I mean, I told them, you know, basically as soon
 7    as you can feasibly get them to me.  So I would expect to get
 8    them within the next few days.
 9            THE COURT:  So if we can get them tomorrow or the next
10    day, we could provide them to plaintiffs before at least -- do
11    the best you can to get what you've already requested to -- to
12    the plaintiffs as quickly as you can.  And then what we'll do
13    is we'll take up, after -- at the end of this hearing, we'll
14    take -- because I'm going to address such other matters that
15    may be relevant to this.  We'll address Ms. Kendrick's point
16    about the additional scope.
17            MS. RAND:  Okay.
18            THE COURT:  So everybody make a note that we need to
19    drop back into this issue.
20            MR. FATHI:  Your Honor, if I may, just two additional
21    points.
22            THE COURT:  Yes.
23            MR. FATHI:  The statement by Lynn Calcote was not a
24    letter.  It is a declaration under penalty of perjury.  And I
25    think if defendants knew they had submitted a declaration under
```

1  penalty of perjury that said something that is false, it should

2  have been withdrawn.  And I would simply reiterate that we --

3  the Court did order production of these Directors' level

4  appeals nearly one month ago on June 14th.  And we would very

5  much appreciate receiving them in time to use them at the

6  hearing on July 14th.

7          THE COURT:  Right.  I agree with both of your points.

8  The -- the sloppiness that seems apparent more often than I

9  would like in this case is -- is troubling.

10          When one is drafting a declaration for someone, you

11  have to take extraordinary care to make sure that it is

12  accurate.  And it becomes dangerous not only for the person who

13  is making an avow under oath, because it may be that it could

14  be described as just a typographical error and that everybody

15  missed it, but on the other hand, there comes a point where

16  these declarations are not subject to such a note that there

17  are only typographical errors.  And after a while, they can

18  accumulate in a way that can produce a conclusion that one side

19  is not playing fair or one side shouldn't be believed.  And so

20  it is -- it is a difficulty that needs to be kept in mind.

21          Request number 15:  All documents reflecting,

22  discussing, or establishing policies and/or practices related

23  to defendants' open clinic concept.

24          It's alleged that these documents, that they're not --

25  they don't -- they don't exist beyond -- and I guess we need to

1  have you say on the record, Ms. Rand, that that's absolutely

2  true.

3      MS. RAND:  Okay.  Your Honor, just as a note, I did at

4  the last minute on Friday, after I was able to review all of

5  this, I did send a letter, so I'm going to read the response to

6  you that I provided them, is that:  Defendants have started to

7  bring these documents and declarations regarding these --

8  regarding this request, and that we expect to produce the

9  documents already received no later than July 14th.

10      We don't expect to receive every single one we hope

11  for, but what I was trying to do is get them to plaintiffs as

12  soon as possible.

13      THE COURT:  So that -- so from the time that -- from

14  the 3rd of July until now, there has still been assembly of

15  documents that haven't been produced yet with respect to this

16  issue?

17      MS. RAND:  Well, what we did was we made sure that we

18  did what the Court ordered, and we went to every single

19  location, we asked both medical and security staff -- and

20  that's a great deal of a number of people to ask for documents

21  back.  We went to all the monitors, you know.  And so that's

22  really the issue.  There was confusion, I guess, among some of

23  the people that received the request.  They'd been interacting

24  with me to get clarity on the requests, and so we have not

25  received everything back yet.  But we're going to produce as

1    much as we can.

2        THE COURT:  Well, this is -- this is -- really, maybe

3    you can tell that I'm a little bit surprised by this because I

4    had assumed that between then and now, knowing that this was a

5    subject of the hearing this week, that we would be talking

6    about these kinds of things, that you would have all of those

7    documents already.  I guess I'm -- so the last week was a

8    holiday week, so there was a day out of it.  But nevertheless,

9    it just seems to me that there's a lack of alacrity here with

10   getting the documents on the faster schedule that would be

11   necessary in order to be prepared for the hearing.

12        MS. RAND:  Your -- Your Honor?

13        THE COURT:  Go ahead.

14        MS. RAND:  I apologize.  But what I was advised was

15   that there were no additional -- no documents.  When I tried to

16   get people to provide the declaration, that's when I heard that

17   there are additional documents.  So --

18        THE COURT:  Well --

19        MS. RAND:  I've been -- diligently, but I did not know

20   that that was going to be a change of response.

21        THE COURT:  Well, you know, last time we talked, you

22   and I did, Ms. Rand, about the need to really get to the root

23   of -- of -- of making sure that you are obtaining the documents

24   that are required, and I understand that it's a big system.

25   But I also need you to be a field marshal who has capable and

1    equipped lieutenants to get out there and get those documents.

2    And again, this is a further highlight to what I talked about

3    with you last time, and that is where you find yourself hung up

4    by the fact that you ask people, they said no, and then you did

5    additional work, and then you find yes.  Well, I think you need

6    to light a fire under them so that when they do find those

7    documents, they get them right away so that we can have them,

8    and at least limit the prejudice to the process, to the

9    judicial process that occurs when -- when it starts out to be a

10   statement that they don't exist, followed by a recognition that

11   they do, and then followed by a very slow production of those

12   documents.

13          I think that if you get to the second position there

14   where they say, oh, we actually found some that we didn't think

15   existed, you need to make sure that they understand that that

16   has to be produced tomorrow because there's been a

17   representation made they didn't exist, and that is, to me, a

18   clear way to communicate to them that they -- that the people

19   are paying attention to this, and that there will be

20   consequences if -- if discovery is not fulfilled.

21          So what can we do to light a fire here?

22          MS. RAND:  Well, I think that by making it a

23   requirement that everybody that responds to me signs a

24   declaration, I think that's where I've been getting more -- the

25   most results is that people realize if they have to sign a

```
 1   declaration, that they better take a close look.  And so as far
 2   as getting them faster, I've told them ASAP, immediately.
 3   They're already overdue.  I don't know how else to do it.
 4          But as far as getting the actual correct response
 5   versus, you know, a passing of the buck, I think I'm getting
 6   the correct response now by having -- sending out the requests
 7   with the declaration, asking people to sign the declaration and
 8   return it when they return their documents.  And that way it
 9   seems to be getting people to actually take a moment to get
10   those documents versus --
11          THE COURT:  Well, let me drill down -- let me drill
12   down.  How many sources of documents are you awaiting for them
13   to provide to you?
14          MS. RAND:  Well, what I did is I -- I cast a broad
15   net, and I sent them to all the complexes and to all the
16   monitor -- healthcare monitors, and as well as to the persons
17   in leadership because I don't know who they have responsible
18   for getting the documents.  And so I tried to cast a broad net
19   that way.
20          THE COURT:  Yeah, but then you told me that you had
21   responses from people who had originally told you no, and then
22   they said, oh, yes, we do.  How many of those -- how many of
23   those sources are there?
24          MS. RAND:  I only had, I believe -- well, I have one
25   that I specifically recall, and that's when I changed and went
```

UNITED STATES DISTRICT COURT

1    out with the broad net and said, listen, this is what I'm

2    requesting, and everybody has to send me back a declaration.

3    And so that's what I'm getting back.  And that was what was

4    sent out Friday.  And like I said, I'm already getting the

5    responses back from them.  So the --

6            THE COURT:  Okay.  So as soon as you get these

7    responses, get them over to plaintiffs, understanding that we

8    really expect them to be available before the hearings set for

9    Thursday and Friday.

10           MS. RAND:  Okay.  Yes, Your Honor.

11           MR. FATHI:  Your Honor, in Ms. Rand's July 7th letter,

12   which I recognize the Court does not have before it, she writes

13   that defendants have started to receive documents and

14   declarations.  In spite of that fact, they still have not

15   produced a single document in response to request number 15.

16   So we would ask that those documents that are already in

17   counsel's possession be produced immediately.  We have already

18   been prejudiced in our ability to provide for this Friday's

19   hearing.

20           THE COURT:  Is what that letter said true, Ms. Rand;

21   you already have received some that you haven't produced to

22   plaintiffs?

23           MS. RAND:  Yes, and that's what I said initially was

24   that we just started receiving them, so we're trying to get

25   them produced as soon as possible.  But --

1          THE COURT:  But this letter that Mr. Fathi just cited

2  was dated the -- what date?

3          MS. RAND:  July 7th.  Friday.  That's what I said that

4  I sent out Friday evening.

5          THE COURT:  All right.  Okay.  So why didn't you send

6  over in that letter what you'd already received up to that

7  point?

8          MS. RAND:  I didn't have time to produce them, Your

9  Honor.

10          THE COURT:  You couldn't -- how many documents are we

11  talking about?

12          MS. RAND:  I'm not really that clear because I keep

13  getting more documents and more documents, and I don't really

14  know.  I've been putting them into a folder to try to get --

15  basically I'm trying to get -- enlist people to help me review

16  them because I -- I just haven't, Your Honor, had a chance to

17  review them and to get them produced.  But obviously we're

18  trying to work as fast as we can to get them produced.

19          THE COURT:  Well, so --

20          MS. RAND:  Unless you want me to --

21          THE COURT:   -- on Friday when you sent this letter to

22  Mr. Fathi and you had already received some of these documents

23  that -- that you believed were responsive, because that's how

24  you described them in the letter, how many?  How many

25  documents?  How many pieces of paper?

1      MS. RAND:  I don't know, Your Honor.  I get them as

2  digital documents, and I just cut and paste them into the

3  folder.  And when I sent the letter to Mr. Fathi, it was -- I'm

4  trying to find out what time I sent it, but it was not as if I

5  sent it -- it was right at the end of the close of business, I

6  believe, that I finally got -- was able to get this taken care

7  of.  The letter responded to, I mean.

8      THE COURT:  All right.  Well, I'm drilling down on

9  this, Ms. Rand, because I'm trying to see if I can further

10  assist you by providing guidance on how to do things that just

11  seem automatic to me.  And that is, if I were in your position

12  in a case, as I have been in my life many, many times, and I

13  knew that there was an imminent hearing that addressed these

14  documents, and that I had found out that, notwithstanding my

15  earlier efforts on a more timely basis to try to identify the

16  documents, that that effort had been unsuccessful and that

17  subsequent efforts had somehow cracked -- cracked open a safe

18  that I hadn't figured out how to open up before, if I had those

19  documents, I would have done everything I could to get them

20  over immediately.

21      And so this -- this continued delay is -- is troubling

22  to me.  So, again, everything you can do to get these as

23  quickly as possible over to the plaintiffs seems absolutely

24  appropriate for Mr. Fathi to ask for.

25      MS. RAND:  Yes, Your Honor.  And I actually did not

| | |
|---|---|
| 1 | get my letter completed, the responses to him, until 20 of |
| 2 | 7:00.  So at that point, I felt it prudent to go home. |
| 3 | THE COURT:  Well, I understand. |
| 4 | MR. FATHI:  Your Honor? |
| 5 | THE COURT:  I understand that.  And I appreciate the |
| 6 | fact that this -- that the state of Arizona has the benefit |
| 7 | of -- of your services as an Assistant Attorney General in a |
| 8 | way that's not entirely fair, and that is that lawyers are, at |
| 9 | the one hand -- when I have at times in my -- at a time in my |
| 10 | career when I was in public service, I was told by the |
| 11 | Department of Justice that I could not work overtime, that it |
| 12 | was not permitted.  And I don't know whether that kind of rule |
| 13 | exists still, or whether the -- meaning -- I would be paid the |
| 14 | same, no matter what I did.  They simply said "you're not |
| 15 | allowed to work overtime" because they were worried about a |
| 16 | wage and hour violation, I think, and they knew that we |
| 17 | recorded our time.  So it wasn't as if I'd been paid.  I don't |
| 18 | know if that kind of rule exists for a state employee.  And so |
| 19 | to a certain extent, I have some sympathy to that, but I also |
| 20 | have less sympathy because the state has retained private |
| 21 | counsel in this case.  And so, again, judging from my own |
| 22 | experience, I know that there were times where representations |
| 23 | that I had made in a case, if they turned out not to be |
| 24 | accurate, I would do everything in my power to get that |
| 25 | corrected as soon as possible. |

1          And so I'm not talking now just to you, Ms. Rand, but

2     I'm also talking to the -- to the -- the supervisors, I

3     suppose, of those who decide whom to retain as outside counsel

4     in a case.  Again, I'm sympathetic to what you say as a public

5     employee, but not everybody in this case is a public employee.

6          Mr. Fathi, did you want to say something?

7          MR. FATHI:  You took the words right out of my mouth,

8     Your Honor.  The Attorney General's Office is the largest law

9     firm in the state of Arizona.  There is also outside counsel.

10    If Ms. Rand is unable to do everything she needs to do by

11    herself, then the defendants need to allocate additional lawyer

12    staff to this case.

13         THE COURT:  All right.

14         Now, is the same circumstance pertinent to request

15    number 18?  And where do we stand on the documents related to

16    the compliance with the Court's November 10th, 2016, order?

17         MR. FATHI:  Your Honor, I didn't know if that question

18    was addressed to me or Ms. Rand.  But we have received no

19    responsive documents, and we have been told there have --

20    additional documents may exist, but there's no approximate date

21    of production, and we would like a little bit more specificity

22    than that.

23         THE COURT:  The reason I suggested or wondered about

24    the same circumstance applied is it looked like the explanation

25    was similar.

1   But Ms. Rand, go ahead.  Where do we stand with

2   respect to request number 18?

3   MS. RAND:  Well, I would like to lump 18 and 19

4   together because they basically are very similar, pertaining to

5   the same documents, and everybody is responding in the same

6   way.  When I say "everybody," I mean I'm sending out my request

7   because they're the same request, except for one is expanded

8   larger.

9   So as to the -- this request, I have documents that we

10  are aware of from Dr. Leonard.  She is out on annual leave.

11  And until she gets back, which I believe she is supposed to be

12  returning either today or tomorrow, we are supposed to get

13  those documents from her and then produce them.  I'm not aware

14  of any other documents, and I have not received any responses

15  from anybody about these other documents.  And so I'm going to

16  find out what's going on with that.  But I have not received

17  any additional responses that documents exist for these two

18  requests, except for the documents that Ms. Leonard has.

19  MR. FATHI:  Excuse me, Your Honor.  The two requests

20  are quite distinct.  Request number 18 is for documents

21  reflecting defendants' compliance with the Court's

22  November 10th, 2016, order.  That was the community resources

23  order.

24  Request number 19, by contrast, has to do with written

25  instructions or directions to -- provided to ADC or Corizon

1    staff regarding compliance with the Court's order on monitoring

2    methodology.  So they're entirely different, and we would like

3    to discuss them one at a time.

4            THE COURT:  All right.  Well, there's no harm in doing

5    that.

6            Turning first to the community resourcing order, are

7    there -- are the documents you just described applicable to

8    that request, or are applicable to the request set forth in 19,

9    Ms. Rand?

10           MS. RAND:  The documents that I have are applicable to

11   19.

12           The only thing that I can say about 18 is that this

13   open clinic concept, I believe, is -- is included in the

14   community resources request.  At least that's how most people

15   feel it.  So a lot of the documents we'll be producing for the

16   open clinic concept are also, I believe, responsive to the --

17   to the community services -- or request.

18           THE COURT:  So if I understand your position, you've

19   already produced everything that you think is responsive to

20   number 18, and that you believe that there's nothing else out

21   there with respect to 18.  Is that right?

22           MS. RAND:  That's the response that I'm getting, yes.

23   That's what I understand to be true from the documents that

24   I've been getting back in.

25           Again, the open clinic concept, which in my mind does

UNITED STATES DISTRICT COURT

1    kind of cross over into the community service request, I think

2    those will also be responsive to 18.  But, you know, it depends

3    on what your view is on that.  But that's how I viewed it.

4              THE COURT:  Well, I mean --

5              MR. FATHI:  Your Honor --

6              THE COURT:   -- the question is pretty

7    straightforward, and I think what plaintiffs are going to argue

8    is you didn't do anything to turn to outside resources, and

9    they just want to make sure that that's the proof in the case,

10   I gather.  So if -- if you're saying it's limited to the open

11   clinic and that there's nothing else, that gives them the

12   answer they're probably interested in.

13             Mr. Fathi, you were about to say something?

14             MR. FATHI:  Thank you, Your Honor.

15             The Court's community resources order covered nine

16   different performance measures.  The open clinic concept was

17   responsive to only one of those performance measures,

18   performance measure 37.  So what request number 18 asks for is

19   all documents reflecting compliance with the Court's community

20   resource order with regard to the nine performance measures to

21   which the order is applicable.

22             Now, what Ms. Rand said in her July 7th letter was,

23   quote:  Defendants have already requested these documents and

24   related declarations, and will advise once documents are

25   received and the expected date of production is known.

1          End of quote.

2          It sounds like we're now getting a different response,

3     and we'd like to know which one it is.

4          THE COURT:  That's fair.

5          Which is it, Ms. Rand?

6          MS. RAND:  Well, that was my response because I have

7     not received anything back.  But I -- because I don't believe

8     that there's going to be anything returned back.  But I needed

9     to tell him that we were -- we had requested the documents, and

10    once we received anything back, we've let them know.  But I

11    don't expect to receive anything back based on what I

12    understand is going on.  So that's why I said it in that

13    manner, to respond to him to say yes, we are in the process of

14    trying to get this.  But in -- in my mind, I don't believe

15    there's going to be anything returned because I've been waiting

16    and I've been receiving documents on the open clinic, but I've

17    not received a single email response regarding the other

18    request.  And so that, in my mind, says that people don't have

19    documents.  I will confirm it again.  But I'm just saying that

20    right now, without any single response coming from anywhere,

21    seems to me that there will not be any documents.  But if there

22    are, obviously then I would let them know once I receive them

23    and try to get them as soon as possible.  But I just don't feel

24    like they're going to be forth -- there's going to be anything

25    forthcoming.

1          THE COURT:  All right.

2          And then with respect to these documents that you

3     referred to that we now know are related to request number 19

4     that you anticipate getting, when do you anticipate getting

5     those?

6          MS. RAND:  Well, I believe it's either today or

7     tomorrow.  I think it's tomorrow, the 11th.  And I was -- I

8     anticipate getting them on that day.  So I will confirm with

9     her and make sure that I understand which day she is coming

10    back on.  So I'll send her an email today, make sure she is

11    coming back tomorrow.  And that once she gets back, that she

12    provide those documents immediately on the same day, and then I

13    can produce them at that point.

14         THE COURT:  Mr. Fathi, anything else you wanted to say

15    on number 19?

16         MR. FATHI:  Yes, Your Honor.  That's a more

17    fundamental issue on number 19.  This, as I said, is the

18    request for prison instructions provided to ABC or Corizon

19    staff regarding compliance with the Court's orders on

20    monitoring methodology.  And this is the request for which the

21    defendants repeatedly stated that there were no responsive

22    documents.  And then plaintiffs' counsel went on a tour of the

23    Phoenix facility, and we saw a sign in the clinic instructing

24    staff to always write in the record that the patient on suicide

25    watch had been offered a confidential setting and had refused.

1   And we also talked to Dr. Leonard, who told us that additional

2   written instructions regarding suicide watches existed.

3          And so when we discussed this on the last call, Your

4   Honor, the Court told defense counsel that they better look

5   again.  If they missed those documents, they may have missed

6   others.  But the defendants have unfortunately refused to do

7   that.  They have said they'll produce the two documents that we

8   told them about, but they're not willing to make any other

9   inquiry about other responsive documents that may exist.  So

10  are there similar signs on the wall in the clinic in the nine

11  other prisons?  Are there written instructions similar to

12  Dr. Leonard's at nine other prisons?  We don't know because

13  counsel apparently hasn't asked their clients, and they

14  certainly haven't told us or the Court.  So we would ask that

15  they be directed again to not simply produce documents we tell

16  them about, but actually make an inquiry, a meaningful inquiry,

17  as to whether there are responsive documents, and report back

18  to the Court.

19         THE COURT:  Well, Mr. Fathi, you said they told you

20  they wouldn't do -- where did the defendants tell you they

21  wouldn't do that?

22         MR. FATHI:  I'm sorry, Your Honor.  This is in

23  Ms. Rand's July 7th letter.  Let me see if I can find the

24  relevant quotation.

25         Defendants -- quote:  Defendants fully complied with

1    the Court's order, document 2130, as defendants were not

2    required to describe any search made.

3              End of quote.

4              MS. RAND:  Your Honor, may I speak?

5              THE COURT:  Yes, you may.

6              MS. RAND:  Mr. Fathi wrote us a letter that says:  We

7    demand that you describe to us every search that you made, and

8    that your report to the Court on this issue is sufficient.  And

9    what we responded to him is, the words "find out," which are

10   quoted directly from the Court, to find out whether these

11   documents actually exist, did not actually include that we were

12   required to report what kind of search we had provided.  We

13   never said that we did not perform a search.  What we said was,

14   according to Mr. Fathi's demand, that we described every single

15   search that we perform, that we were not required to do that

16   because the Court did not order us to.  We did not say we were

17   requested to perform the search, but we were not deficient in

18   providing the Court what would include a description of every

19   search we performed.

20             THE COURT:  So how did you go about trying to make

21   sure you had uncovered any previously undiscovered

22   instructions?

23             MR. FATHI:  I did what I did in number 15, 18, and 19,

24   which is I sent it out to all the healthcare providers, to all

25   the monitors, to Corizon.  And I said:  According to these

UNITED STATES DISTRICT COURT

1    instructions, we need to know what searches were -- what

2    documents you have.  If you have not already provided them,

3    provide them ASAP.

4            So I did what I did, cast a broad net of trying to get

5    everyone involved, and making sure that people send me back a

6    declaration.  Now, I haven't received the declarations yet, but

7    I will remind them they do need to send them back.  But that's

8    how I did that, by casting that broad net and asking everybody

9    to report back.

10           THE COURT:  So these declarations that you're waiting

11   for, are these declarations that you drafted for them?

12           MS. RAND:  Right.  Well, they're supposed to be

13   customizable, so they have little blanks that say this person

14   on this date either provided me documents or didn't provide me

15   documents.  So I haven't received anything back.

16           THE COURT:  And what language did you use with respect

17   to instructions regarding compliance with the monitoring;

18   what -- how did you say when somebody was -- had told you or

19   indicated to you that they didn't have any responsive

20   documents?  What language did you use to communicate that?

21           MS. RAND:  I'm putting it up right now.  I'm just

22   going to read the relevant part:  The Court has already had

23   production of documents in response to plaintiffs' complaint

24   below.  Please conduct a search to locate any documents for the

25   above documentation.  If you have already provided

UNITED STATES DISTRICT COURT

1    documentation, please search again for documentation not

2    already produced or documentation created since the last time

3    you produced documents.

4         Then number 2 says:  Attached hereto is a draft

5    declaration.  Each person who conducts the search must sign and

6    return the declaration regardless of whether documents are

7    found and returned.  So please make sure your search for these

8    documents is thorough and exhaustive.  Please customize the

9    declaration as necessary.

10         THE COURT:  All right.  And with respect to this, the

11    documents regarding the instructions for monitoring, where

12    would the person receiving that communication from you find

13    what they were required to do?

14         MS. RAND:  In the email itself.

15         THE COURT:  All right.  And can you read that part?

16    Do you have that?  Can you read that to us as well?

17         MS. RAND:  Well, that is -- oh, are you asking for the

18    actual request, you mean?

19         THE COURT:  Right.  So that I'm -- the plaintiffs are

20    requesting all of the instructions that were provided with

21    respect to how to go about monitoring.  And --

22         MS. RAND:  Okay.

23         THE COURT:  -- you will -- that question, I want to

24    know how it was framed to the recipients who are trying to

25    decide whether they have any such documents.

1      MS. RAND:  I went word for word.  So, request for

2   number 18, it says:  Compliance with the Court's orders, all

3   documents reflecting, discussing, or establishing policies

4   and/or practices related to defendants' compliance with the

5   November 10th, 2016, order, with regard to the nine performance

6   measures that the order is applicable, and documents to show

7   implementation and compliance with.

8      And then, like I said, I would confine them together

9   because I thought that they were -- the same people had to have

10  received the same request.  So I said:  Question number 19,

11  compliance with the Court's order, or written instructions or

12  instructions including all training materials provided to ADC

13  or types of staff regarding compliance with the Court's orders

14  in monitoring methodology, including, but not limited to,

15  documents 1673, 1745, 1754, 1831, 1833, and 1915.

16      THE COURT:  That does seem to be complete and to cover

17  the waterfront.  The only observation that I would make is that

18  given that you had learned that that previous request in, I

19  gather -- I'm assuming, in similar language, that had been

20  dispersed to people hadn't produced the -- the poster on the

21  wall that was my written instruction.  So perhaps it might have

22  been helpful to have said in this email:  We uncovered what we

23  found to be inclusive in this response, but had not been

24  previously provided to defense counsel, and give an example of

25  how it was so people can see that it was possible that they

1    would not have included -- because you have evidence, I think,

2    from what it sounds like, it sounds to me, that you could

3    educate the people and better comply with the request by giving

4    them this specific example of a failure to comply.

5           But at least from what you've just read to me it does

6    sound like you have done what -- what -- absent the quibble I

7    just made -- would produce the kind of responsive information

8    that would give the -- the plaintiffs the information that

9    they've requested here.

10          Can we now move on from this issue?

11          MR. FATHI:  Your Honor, may I say something about

12   this?

13          THE COURT:  Yes.

14          MR. FATHI:  First of all, the Court has my July 3rd

15   letter before it.  I -- I think it's fair to say Ms. Rand's

16   characterization is not accurate.  The letter -- the word

17   "demand" does not appear anywhere in my letter.  I will email

18   at the conclusion of this call Ms. Rand's July 7th letter to

19   chambers so the Court will have that before it.  But the search

20   that Ms. Rand describes is entirely inadequate.

21          As the Court pointed out on our last telephonic

22   hearing, sending an email is not sufficient; in particular, the

23   email that Ms. Rand has described that identifies the Court's

24   order by docket number.  The recipients of that email are not

25   going to know what docket number 1833 or docket number 1754

| | |
|---|---|
| 1 | required.  This is an ineffective and, indeed, meaningless |
| 2 | inquiry in an area where we have repeatedly shown that |
| 3 | defendants' representations of no responsive documents are not |
| 4 | true.  So we would ask that the Court direct that a meaningful |
| 5 | and thorough search be made for responsive documents. |
| 6 | THE COURT:  Well, what you've just said, Mr. Fathi, |
| 7 | makes me think I misunderstood what Ms. Rand said.  I didn't |
| 8 | understand that she was trying to incorporate by reference |
| 9 | direction on what to include in -- in the possible responsive |
| 10 | documents a reference only to a docket number and not to this |
| 11 | specific language.  It sounded to me like she read the specific |
| 12 | language of what was required. |
| 13 | Was that something I missed, Ms. Rand? |
| 14 | MS. RAND:  No, Your Honor.  I -- I told them exactly |
| 15 | what to provide.  But I did want to also let you know that |
| 16 | we -- this is also a follow-up to a meeting, a new meeting that |
| 17 | we all held, where we sat down and discussed these orders.  We |
| 18 | had the orders in front of us.  Everybody had the orders.  And |
| 19 | subsequent to that meeting, Struck Wieneke & Love wrote an |
| 20 | order detailing every single order in that list.  So this is in |
| 21 | follow-up to the people that received those requests.  If you'd |
| 22 | like it all incorporated in one email, I can certainly forward |
| 23 | it again with the summary included and attach all the documents |
| 24 | again to it.  But like I said, it was in follow-up to an actual |
| 25 | meeting that we had regarding this, and also an email that |

1    actually listed every single one of those requirements.

2            THE COURT:  Who attended the meeting?

3            MS. RAND:  We had Corizon, I believe -- who was it?

4            Give me one second.

5            It was -- the Department of Corrections monitoring

6    people, it was Struck Wieneke & Love, the Attorney General's

7    Office, and the people at Corizon such as Rhonda Almonta, who

8    is the, I believe -- I don't know what -- her title, but I

9    think she's, like, the regional director; Dr. Lynn Calcote, who

10   is the mental health director.  I think Lynn Calcote was

11   possibly there.  She's one of the -- when I say "director,"

12   I -- let me pull up their actual titles because I don't want to

13   misinform the Court of their titles.

14           THE COURT:  And you say "monitoring people."  What do

15   you mean by that?  Do you mean all the monitors?

16           MS. RAND:  Right.  The monitors -- well, the -- the

17   supervisors.  So we have Vanessa Headstream, Kathy Campbell,

18   Erin Barlund, Dr. Nicole Taylor, we had Richard Pratt, we had

19   different people that were head of the health services

20   monitoring bureau that would ask their people underneath them.

21   So we got to the people that should be the end result.  I mean,

22   we had -- let's see -- Rhonda Almonte, her title is vice

23   president of operations; Lynn Calcote, her title is associate

24   vice president of operations.  And this is for Arizona.  And

25   Dr. Calcote is the regional mental health director.

1          Was there -- does anybody else on defendants' side
2   recall who else was at the meeting?
3          MR. FATHI:  I'm not sure which one you're --
4          MS. RAND:  It was the April 4th.
5          MR. FATHI:  I'm not sure which one you're talking
6   about.
7          MS. RAND:  It was the April 4th meeting.  We held it
8   in their conference room at the Department of Corrections, down
9   at the medical area.
10         You don't recall?
11         Okay.
12         MR. FATHI:  I honestly don't.
13         MS. RAND:  I'm trying to see if I can find --
14         THE COURT:  Well, Mr. Fathi, what are you suggesting
15  would be necessary to make sure that this was closed out; what
16  further steps would you recommend?
17         MR. FATHI:  Well, a couple of things, Your Honor.
18  First of all, if this meeting occurred on April 4th, we
19  discovered these new documents on June 15th.  So clearly there
20  needs to be an additional inquiry about responsive documents
21  that have not previously been identified.  If all of these
22  steps have, in fact, been taken, this is precisely what the
23  Court directed the defendants to report on by June 30th.  And
24  so this should have been included in the defendants' report to
25  the Court on June 30th.

1          What we would like is a detailed declaration that sets

2     forth exactly the inquiries that were made in light of

3     defendants' repeated indirect representation that there were no

4     responsive documents to this request.  And obviously, it's

5     essential to confirm that the people who were asked for

6     responsive documents were provided with the text of the Court's

7     orders and not simply with the docket number that's going to be

8     meaningless to them.

9          THE COURT:  Ms. Rand, would you have any objection of

10    providing to the Court and to Mr. Fathi the email that you sent

11    to the people following up that you've described here on the

12    record here today so that he could see whether or not there was

13    any constructive addition that he would make in argument to me

14    that would be helpful in producing additional documents?

15         MS. RAND:  I don't have any objection to doing that,

16    but I just feel as if Mr. Fathi's objections, if he feels that

17    we didn't provide enough information, I would be more than

18    happy to resend the email to the same people with the actual

19    text of all to -- that we sent previously that discusses all of

20    the different performance measures to them again so that they

21    have it, and to also provide them the actual orders.  I mean,

22    that, to me, seems like it would be the most clear.

23         THE COURT:  All right.  Then why don't you -- why

24    don't you send that first to Mr. Fathi, what you propose to

25    resend to these people.  Send it first to Mr. Fathi so that he

can let you know if he sees some obvious infirmity there that
could perhaps be addressed so that we make sure that we're
communicating to people exactly what we're looking for.

        MS. RAND:  Would you like a copy sent to the Court's
chambers, as well?

        THE COURT:  Surely.  Thank you.

        MS. RAND:  Yes.

        THE COURT:  All right.

        To 24.  This is the spreadsheet, which was submitted
to me for in-camera review.  And I -- I can't say that I've
read all of it because it's very small print, and I used a
magnifying glass to read the part that I did.  But I will say
that I do see there are a number of references that the inquiry
appears to be directly linked to a letter from the -- I'm
gathering the plaintiffs' counsel is initials SWL.  And the --
the problem is that that doesn't really end the inquiry.  It's
because Mr. Pratt's role in his job would seem to me to include
everything that's reported here, that he would have to address
or would necessarily address as part of his role, the
complaints that would be generated and what steps were taken.

        There doesn't seem to be here an independent basis to
conclude that this was attorney-client communication.  Recall
that the rule requires that the principal reason, I think,
needs to be for the purpose of obtaining the advice of counsel,
and it seems to me that someone in Mr. Pratt's role would have

1    the responsibility to do exactly this, to list on it the

2    complaints and what steps were taken related to it.

3            And then with respect to the work product immunity,

4    there is -- there is nothing here that -- that calls, I think,

5    into any kind of question about attorney mental impressions.

6    This is -- these are reportings of facts about what -- what

7    inmates have reported that they think are the basis for

8    complaints about absence of healthcare.

9            And so I -- I guess I need to hear from you, Ms. Rand,

10   as to why this would be subject to either the privilege or the

11   work product immunity.

12           MS. RAND:  Yes.  Because we really -- I'm thinking

13   that the reason why we objected was because it was made on the

14   basis of defense counsel's instructions.  But as to what is

15   inside the document, I haven't had a chance to review the

16   entire document, but it -- but you're correct.  I think that

17   there are mainly facts stating what was done.

18           I think part of the reason why we objected, as well,

19   is because plaintiffs stated that the reason they wanted that

20   is because defense counsel doesn't provide them updates, and we

21   said that they have the ability to look in the eOMIS, just as

22   we do, and it didn't apply -- it didn't actually relate to

23   people who were actually monitored in the monthly CGAR, so

24   that's why we also objected on the basis of relevance and

25   whether or not it was actually necessary to have that document

UNITED STATES DISTRICT COURT

1    in order to monitor -- to monitor defendants' performance.  And

2    I think that's what the stipulation -- the stipulation states

3    that that is the kind of documentation contemplated under the

4    stipulation to provide to plaintiffs, is documentation that can

5    help them with the monitoring.  So that's what we objected to,

6    Your Honor.

7            So if you're saying that it's producible because of no

8    attorney-client privilege, then -- like I said, I haven't had a

9    chance to review the entire documents, but what I've reviewed,

10   it appears to be fact.

11           THE COURT:  So based upon that representation, I find

12   that the plaintiffs haven't -- I'm sorry -- the defendants have

13   not met the burden to restrict from disclosure this spreadsheet

14   that was provided for in-camera review, and I would ask that

15   before the close of business today that you email it over to

16   the plaintiffs.

17           MS. RAND:  Yes, Your Honor.

18           THE COURT:  All right.

19           Request number 29:  All documents reflecting any

20   investigation into the suicides of the prisoners.

21           I read what you said here.  But I guess I'm a little

22   bit puzzled why there -- since we knew that there were drafts

23   and those haven't been produced, I'm a little bit puzzled why

24   there hasn't been anything produced.

25           Ms. Rand?

UNITED STATES DISTRICT COURT

1      MS. RAND:  We have just received the documents on

2  Friday afternoon.  So I -- and I haven't even had a chance to

3  review them.  So once I do, I was going to produce them.  But I

4  think that the judge -- the Court said that if there's

5  something that is particularly sensitive we were allowed to

6  provide that to the Court in camera.

7      THE COURT:  That's true.

8      MS. RAND:  And I haven't had an opportunity yet to

9  determine whether we need to provide it.

10     THE COURT:  Is there some other counsel that can

11 provide this so we can get to this quickly so you can keep your

12 attention to everything, so that everything is getting done so

13 everything doesn't have to fall on your shoulders?  Because it

14 seems to me that that kind of review about whether some part of

15 this needed to be pulled out for in-camera review in the first

16 instance, that could be done by somebody other than you, and we

17 really -- we're having a back-up here on the conveyor belt that

18 we -- I think we need to have more people working the conveyor

19 belt.

20     MS. RAND:  Yes, Your Honor.  Certainly Struck

21 Wieneke & Love can help on that.

22     We're also in the process of getting additional

23 emails, so Struck Wieneke & Love and myself have been doing

24 that.  So there's quite a few discovery things going on at

25 once, and I'll allocate more of it to Struck Wieneke & Love so

UNITED STATES DISTRICT COURT

1   that it can be produced more rapidly.

2           THE COURT:  Mr. Fathi, did you want to say anything

3   about this point?

4           MR. FATHI:  Only this, Your Honor.  I would just point

5   out that all of these suicides occurred more than two months

6   ago, so it is highly implausible that there are no responsive

7   documents, not even in draft.  So we would request that

8   existing documents be produced by a date certain unless they

9   are being submitted for in-camera review.

10          THE COURT:  It would seem to me that -- that by the --

11  that in seven days you would be able to be given a production

12  of what isn't subject to this security review and submitting to

13  me for in-camera review.  So we'll expect that to happen.

14          MS. RAND:  Okay.

15          THE COURT:  Now, the close of business today is also

16  the time when you all were -- if you were going to submit

17  proposed agenda items -- I don't know whether you've already

18  worked through that or that's something we should talk about

19  now, but I see that we've worked through the items on the

20  letter.

21          MR. FATHI:  Your Honor?

22          THE COURT:  Yes.

23          MR. FATHI:  Before we move on, plaintiffs would move

24  for sanctions pursuant to 28 U.S.C. 1927 and pursuant to the

25  Court's inherent power.  If the defendants had obeyed the

1    Court's order, it would not have been necessary to have this

2    correspondence back and forth involving the Court again.  So we

3    would ask that we be awarded our attorney's fees that were

4    necessitated by having to do that.

5              THE COURT:  All right.  I'm going to hold that off for

6    the moment because I want to learn more.  I have to circle back

7    to the first issue that we talked about, and it may not be

8    that.

9              Obviously, Mr. Fathi, the reason I wanted to circle

10   back, because I was hoping that maybe the production of the

11   spreadsheet might be a way to obviate some of the costs and

12   expense that would be imposed upon plaintiffs in trying to get

13   a handle on something I want you all to have a handle on, and

14   that is what is the current status of affairs in the subject

15   with regards to the stipulation.  And so I'm going to hold off

16   on that, as I'm also going to hold off on number 1 because I've

17   made a decision about the spreadsheet, and ask you to take a

18   look at that spreadsheet, whether that helps you get a handle

19   on the information that you think is necessary so that you

20   don't have to, perhaps, impose as much on further inquiry of

21   the defendants with respect to the grievances beyond what we've

22   already talked about.  Take a look at the spreadsheet when you

23   get it.  We'll talk about it again on Thursday or Friday, and

24   I -- we'll put off any consideration of sanctions until we have

25   an opportunity to have that conversation.

1          MR. FATHI:  Thank you, Your Honor.

2          I'm not sure I understand.  The spreadsheet that I

3    believe you were referring to is the spreadsheet maintained by

4    Mr. Pratt regarding advocacy letters sent by plaintiffs'

5    counsel; is that correct?

6          THE COURT:  That's correct.

7          MR. FATHI:  And then the other issue is the production

8    of the final-level grievance appeals.  And what I understood

9    you to be saying is that you -- you will order -- again, you've

10   already ordered -- the production of the last six months, and

11   you will hold in abeyance or defer consideration of whether you

12   will order production of older documents; is that correct?

13         THE COURT:  Yes.

14         MR. FATHI:  All right.

15         Thank you, Your Honor.

16         THE COURT:  My hope is that maybe you see the

17   grievances -- that there's an overlap and that maybe this is a

18   finer way to get a sense of what you feel you need to have.

19         MR. FATHI:  I see.  Thank you, Your Honor.

20         In response to the Court's question, we, plaintiffs,

21   filed our agenda for this week about an hour ago.  It's at

22   docket 2155.  We have not yet seen the defendants'.

23         But speaking of the hearing, Your Honor, there is an

24   additional and somewhat urgent matter that we'd like to

25   address, and I'd ask Ms. Kendrick to discuss that.

1          THE COURT:  All right.

2          MS. KENDRICK:  Yes, Your Honor.

3          My co-counsel, Kirstin Eidenbach, contacted counsel

4   for defendants this morning at 9:30, asking if defense counsel

5   will accept service for the subpoenas for the prisoner

6   witnesses for Friday's hearing on behalf of the wardens of the

7   two prisons, Perryville and Florence.  Apparently the process

8   server, when they tried to serve the subpoenas, were made to go

9   through some sort of background check before they could serve a

10  subpoena at the prison.  That's what we were told, so we've

11  requested that they accept service, but we have not heard back

12  from counsel for defendants yet, and it's been about six hours

13  since we made that request.

14         THE COURT:  Whom was this directed to, this -- who on

15  defendants' side is the person who is on this?

16         MS. KENDRICK:  Mr. Bojanowski.

17         THE COURT:  Mr. Bojanowski, can you comment?

18         MR. BOJANOWSKI:  You know what, Your Honor?  I was at

19  meetings all morning long, and I jumped on this phone call to

20  appear, and I have not, unfortunately, looked at it.  I don't

21  anticipate a problem.  I'm already making arrangements with the

22  wardens to have a transport, so I don't -- I -- I don't think

23  it's going to be an issue, frankly.

24         THE COURT:  Okay.  Good.

25         MS. KENDRICK:  Also, we also join --

UNITED STATES DISTRICT COURT

1          MR. BOJANOWSKI:  And I see the Court has already

2    issued an order anyway.  So I don't know -- if there's an order

3    on a writ, I -- I think we have to transport.

4          THE COURT:  That's what I think too.  But it looks

5    like this is not going to be an issue for you, so that's good.

6          MR. BOJANOWSKI:  Yeah, I don't anticipate any kind of

7    issue because there's an order that I can point to.

8          THE COURT:  Okay.  All right.

9          Well, I haven't, obviously, looked at the agenda

10   matters.  Is there anything else we should talk to today in

11   advance of later this week?

12         MR. FATHI:  Nothing from plaintiffs, Your Honor.

13         THE COURT:  All right.

14         Anything from defendants?

15         MR. BOJANOWSKI:  No, Your Honor.

16         THE COURT:  Okay.  All right.  Thank you all very

17   much.  See you later this week.

18         MR. BOJANOWSKI:  Thank you, Your Honor.

19         MR. FATHI:  Thank you.

20         THE COURT:  Bye-bye.

21            (Proceedings in recess at 3:03 p.m.)

22

23

24

25

1

<u>C E R T I F I C A T E</u>

2

3          I, CHARLOTTE A. POWERS, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 19th day of July,

13   2017.

14

15                                   s/Charlotte A. Powers
                                 Charlotte A. Powers, RMR, FCRR
16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT