1              **UNITED STATES DISTRICT COURT**

2                 **FOR THE DISTRICT OF ARIZONA**

3                    _____

4

   **Victor Parsons, et al., on**   )
5  **behalf of themselves and all** )
   **others similarly situated;**   )
6  **and Arizona Center for**        )
   **Disability Law,**              )
7                                    )   No. **CV 12-00601-PHX-DKD**
             **Plaintiff,**      )
8                                    )
       **vs.**                    )   Phoenix, Arizona
9                                    )   July 13, 2017
   **Charles Ryan, Director,**      )   1:34 p.m.
10 **Arizona Department of**         )
   **Corrections; and Richard**     )
11 **Pratt, Interim Division**       )
   **Director, Division of Health** )
12 **Services, Arizona Department**  )
   **of Corrections, in their**     )
13 **Official capacities,**          )
                     )
14           **Defendants.**     )
   _____)

15

16

17   **BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

18        <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

19                 (*Status Hearing*)

20

21 Official Court Reporter:
   Laurie A. Adams, RMR, CRR
22 Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc 43
23 Phoenix, Arizona 85003-2151
   (602) 322-7256

24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2   For the Plaintiffs:

3           EIDENBACH LAW PC
            By:  **Kirstin T. Eidenbach, Esq.**
4           P.O. Box 91398
            Tucson, AZ 85752
5
            ACLU - Washington DC
6           By:  **David C. Fathi, Esq.**
            915 15th Street NW
7           7th Floor
            Washington, DC 20005
8
            PRISON LAW OFFICE
9           By:  **Donald Specter, Esq.** (Telephonic)
            By:  **Corene Kendrick, Esq.**
10          1917 5th Street
            Berkeley, CA 94710
11
            ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
12          By:  **Maya S. Abela, Esq.**
            177 N. Church Avenue
13          Suite 800
            Tucson, AZ 85701
14

15  For the Defendants:

16          STRUCK WIENEKE & LOVE, P.L.C.
            By: **Timothy J. Bojanowski, Esq.**
17          By: **Anne M. Orcutt, Esq.**
            3100 W. Ray Road
18          Suite 300
            Chandler, AZ 85226
19
            OFFICE OF THE ATTORNEY GENERAL - Phoenix
20          By:  **Lucy M. Rand, Esq.** (Telephonic)
            1275 W. Washington Street
21          Phoenix, AZ 85007

22

23

24

25

─── CV 12-601 - July 13, 2017 - Status Hearing ───

```
1               P R O C E E D I N G S
2           THE COURT:  Thank you.  Sorry for keeping you
3   waiting, but I decided to visit the photocopier on the way into
4   court to provide a copy for everybody -- sorry, I thought I
5   made six, three for each side.  I guess I ran out -- make a      01:34PM
6   copy of my preliminary reactions to the defendants' compliance
7   with the sanction order.  I normally start -- please be seated.
8   Thank you.  And I will get to the calling of the case in just a
9   moment.  Well, I will go ahead and ask the clerk to call the
10  case and then I will resume where I started.                     01:35PM
11          THE COURTROOM DEPUTY:  Civil Case Number 12-601,
12  Parsons, et al., versus Ryan, et al., on for evidentiary
13  hearing.
14          THE COURT:  Please, counsel, announce for the record.
15          MR. FATHI:  Good afternoon, Your Honor.  David Fathi    01:35PM
16  of the ACLU National Prison Project for the plaintiff class.
17          THE COURT:  Thank you.
18          MS. KENDRICK:  Corene Kendrick from the Prison Law
19  Office for the prisoner plaintiff class.
20          THE COURT:  Thank you.                                   01:35PM
21          MS. EIDENBACH:  Kirsten Eidenbach for the prisoner
22  plaintiff class.  And behind me is Maya Abela for the Arizona
23  Center for Disability Law.
24          THE COURT:  Thank you.
25          MR. BOJANOWSKI:  Tim Bojanowski and Ann Orcutt for the  01:35PM
```

CV 12-601 - July 13, 2017 - Status Hearing

1    defendants.

2            THE COURT:  Thank you very much.

3            Who is on the phone?

4            MS. RAND:  Lucy Rand for the defendants.

5            THE COURT:  Thank you.  Anyone else on the phone?                01:35PM

6            MR. SPECTER:  Yes.  Donald Specter for the plaintiffs,

7    Your Honor.

8            THE COURT:  Thank you very much.

9            What I did is I had some preliminary reactions that

10   were really just based on looking at the numbers and coming to          01:36PM

11   what may have been errant conclusions but, nevertheless, were

12   my conclusions.  I usually start these status hearings by

13   asking for the current update of what the latest numbers are,

14   but I think what I may well do in light of the fact that I

15   previously told everyone that these numbers would be required          01:36PM

16   to be produced by the defendants yesterday, the sanctions

17   numbers, and that we would hold off until Friday.  I think it

18   may make sense for me to hold off until Friday what I usually

19   do at the very first instance with respect to getting the

20   current report numbers of where we stand with the compliance          01:36PM

21   with the performance measures until then.

22           But I still wanted to give you my initial reaction

23   just because I thought if you had that you could ingest it

24   overnight, because we have this luxury of being able to meet in

25   two successive days, it might be more constructive.  I have            01:37PM

1  done that.  You don't have to look at it now.  I will ask the

2  clerk of the court to append a copy of this to the minutes that

3  are issued after today's hearing so it becomes part of the

4  record.

5          I have made an agenda.  But, of course, as always,      01:37PM

6  after I work through it I will turn to the respective sides to

7  see what issues need to be addressed in addition.  That's how I

8  would propose to launch.  But I also think it is also wise for

9  me to just pause for a moment to do two things:  One, to thank

10 everybody for the tour this morning.  Mr. Bojanowski, I think,   01:37PM

11 at the last hearing, said he just would need very short notice.

12 You lived up to that.  We gave you that short notice so I

13 appreciate it.

14         And so everybody, both sides and I, toured three units

15 at the Lewis facility this morning primarily to look at the      01:38PM

16 application of the open clinic process.  And so it was

17 dislocating, obviously, to a number of people who had to travel

18 there and dislocating for the people who work there and have a

19 job to do.  But I was greatly informed by what I learned, and I

20 appreciate it very much.                                          01:38PM

21         The second reason to pause is just to make sure that

22 the parties don't want to raise anything with me at the start

23 before I launch on my agenda.

24         Anything from plaintiffs?

25         MS. EIDENBACH:  Your Honor, there is an issue that we    01:38PM

CV 12-601 - July 13, 2017 - Status Hearing

1    would like to bring to your attention before we get going.

2              Earlier this week I was contacted by a local attorney

3    who works with prisoners at Perryville to let us know that the

4    air conditioning was broken at Piestewa unit.  I contacted

5    defense counsel to let them know.  I didn't initially receive a          01:39PM

6    response from them until I followed up.  I happened to see Tim,

7    I think, the following day.  And he said that they are

8    switching out the current unit for a new unit, and so they are

9    having to change some of the venting.

10             But the fact remains that Piestewa unit does not have          01:39PM

11   air conditioning.  When I spoke again to the local attorney who

12   had initially contacted me, she told me that the temporary AC

13   units that they had moved in to cool the housing unit were not

14   working sufficiently and that the temperature readings were

15   still over 100 degrees.                                                   01:39PM

16             And then it just so happened that I had --

17             THE COURT:  There are inmates there who are receiving

18   mental health treatment that implicates this high temperature

19   at that facility?

20             MS. EIDENBACH:  Piestewa is a minimum custody.  There          01:40PM

21   probably are.  It's not a designated SMI.

22             THE COURT:  I'm sorry.  The reason I ask is my

23   jurisdiction, I think, is limited to the enforcement of the

24   performance measures and it's not a general habitability

25   dominion that I have.                                                     01:40PM

1        MS. EIDENBACH:  There is a paragraph in the

2  stipulation which I can find the number for you in just a

3  moment about the general temperature.  Corene is going to find

4  it for me.  But I think your jurisdiction is --

5        THE COURT:  So it's not just limited to -- I think the     01:40PM

6  only time the temperature has ever been raised to me before has

7  been in consideration of the individuals who are on medications

8  that render them especially vulnerable to regulating

9  temperature.

10        MS. EIDENBACH:  It's not just -- it's for prisoners       01:40PM

11  who are taking psychotropic medications which, of course, is

12  mental health but wouldn't be limited to an SMI unit.  So these

13  are folks who are going to be scattered throughout the general

14  population.

15        When Corene and I did legal visits in anticipation of     01:41PM

16  tomorrow's evidentiary hearing, we visited San Pedro and Santa

17  Cruz.  Those air conditioning units are ostensibly working, but

18  both of the people we spoke to told us that temperatures

19  were -- the woman I spoke with told me that temperatures were

20  between 101 and 102.  She's housed in the ADA units where the    01:41PM

21  windows are welded shut and when they are on lockdown and the

22  swamp cooler is running, it's pretty much like a sauna.

23        I spoke again with Mr. Bojanowski today to figure out

24  whether this had been addressed and he said that some of the

25  prisoners have been moved to visitation areas because the       01:41PM

1    temperatures in their housing units cannot be controlled

2    appropriately.  But given that folks taking psychotropic

3    medications are scattered throughout general population, I

4    think that does bring it within the Court's jurisdiction and

5    it's a serious concern because with temperatures over 100 in                01:42PM

6    their housing units, some of our folks are in grave danger in

7    terms of their health and mental health.

8            THE COURT:  Mr. Bojanowski.

9            MR. BOJANOWSKI:  Your Honor.

10           MS. RAND:  Actually, Your Honor, this is Lucy Rand.  I             01:42PM

11   have the report on this.

12           THE COURT:  Okay.

13           MS. RAND:  Okay.  There has only been one inmate that

14   was on psychotropic medication that was affected by this issue.

15   And that was Inmate Anderson.  She apparently reported that             01:42PM

16   she --

17           THE COURT:  Ms. Rand, we're on the record here, so you

18   have to keep in mind that when you do use the name of an inmate

19   with respect to health conditions, it's in general

20   disrespectful but, in particular, probably violative of the             01:42PM

21   federal statute.

22           MS. RAND:  I apologize, Your Honor.  I was just trying

23   to give the Court information.

24           There was one inmate that said that she reported

25   sitting outside and smoking and becoming ill and so they had             01:43PM

```
 1   her moved.  They overrode her down to minimum custody and she
 2   has been moved.  I believe she's also being seen by Corizon
 3   about her medications today.  That's the only inmate that has
 4   been affected by these issues.  I do understand that plaintiffs
 5   feel that the temperatures may be high, or hot, but we have          01:43PM
 6   records of temperatures that have been taken throughout the
 7   prison and they are not showing that the temperatures are as
 8   high as plaintiffs claim and not only that, but the DOC has had
 9   30 air conditioners brought on to San Carlos last week and
10   installed and they are also in the process of replacing the        01:44PM
11   units at Piestewa and Santa Rosa.
12          Again, as the Court mentioned these units are not
13   necessarily covered under the stipulation because they don't
14   necessarily house people that are talking psychotropic
15   medications.  But we wanted to let the Court know that we're       01:44PM
16   taking this issue seriously.  The first time plaintiffs
17   contacted us they just said this is an FYI.  They didn't say
18   please let us know any results so we didn't contact them back
19   to tell them anything.  And the second time when they elevated
20   their concerns then we -- we had somebody looking into it the     01:44PM
21   first time they contacted us, but we had not actually prepared
22   a response until now.
23          So we don't want the Court to think that the
24   Department of Corrections was not aware of the issue or was not
25   taking care of the issue or is not aware that any inmates might    01:44PM
```

CV 12-601 - July 13, 2017 - Status Hearing

1    be affected by the issue.  They were, in fact, aware and we're

2    working diligently to correct the situation.

3              THE COURT:  Ms. Rand, I wonder if it might be helpful

4    for me to offer to plaintiffs' counsel the opportunity to

5    address particular questions that they may have to you since          01:45PM

6    you apparently have the latest news on this.

7              MS. RAND:  Okay.

8              MS. EIDENBACH:  Ms. Rand, the units that you mentioned

9    did not include Santa Cruz or San Pedro, which are the units

10   where Ms. Kendrick and I visited prisoners who told us that the      01:45PM

11   temperature is exceeding 100 degrees.  So could you tell us

12   what is being done to address the temperatures in those units?

13             MS. RAND:  I do have the temperature logs for Santa

14   Cruz, and the temperatures are not running into the areas that

15   plaintiffs claim they are.                                           01:45PM

16             THE COURT:  What are the temperatures?

17             MS. RAND:  The highest temperature that I have seen

18   was on one yard, I believe, 93 is the highest for any of the

19   yards.  Oh.  I'm sorry.  I do see one at 94.  But that was --

20   let me see -- that was at the height of the heat.  Let me see        01:46PM

21   what they are doing.  They currently have swamp coolers that

22   are in San Pedro, Santa Cruz, Lumley, and Santa Maria.  And all

23   of those coolers are working.  Obviously, the summertime is

24   extremely hot and, you know, it's Arizona.  But the people have

25   been working to, again, like I said, install new units on           01:46PM

1    Piestewa.  They are also in the procurement process of getting

2    more AC units for Santa Rosa.

3              THE COURT:  Any other questions?

4              MS. EIDENBACH:  Have any readings been taken in the

5    ADA housing?  Because that's the housing where the windows are      01:47PM

6    welded shut and swamp coolers are not particularly effective

7    when they have no outflow.  So when the prisoners are on

8    lockdown, I'm not sure that much cooling is going on at all.

9              MS. RAND:  And is the ADA the San Pedro unit?

10             MS. EIDENBACH:  No, that's Santa Cruz.  I don't know       01:47PM

11   if there was one on San Pedro, too, but I know there's one on

12   Santa Cruz.

13             MS. RAND:  So the Santa Cruz, that was the unit I was

14   referring to where the highest temperature they had was 94, and

15   that only occurred during the hottest parts of the day.  It        01:47PM

16   looks like that also occurred during the time when the units

17   were not running at optimum.  They were underperforming at some

18   point, but all of them are currently performing now.  But that

19   was the highest they had at the time when the cooling systems

20   were not working to their optimum.  I apologize.  I found one      01:47PM

21   at 95.

22             THE COURT:  So are these measurements that you are

23   looking at taken hourly or just a single time during the day?

24   What kind frequency are you seeing?

25             MS. RAND:  Okay.  The temperatures are being taken       01:48PM

─ **CV 12-601 - July 13, 2017 - Status Hearing** ─

1    throughout the day.  It looks like they are being taken four

2    times a day; one at 10 a.m., one at 5:30 p.m., one at -- trying

3    to convert military to regular clock hours.  So one was taken

4    at --

5              THE COURT:  Just go ahead and tell us the military          01:48PM

6    time.  That's fine.  Make us do the work.

7              MS. RAND:  So I will start over.  1000 hours, 1730

8    hours, 2000 hours, and 2300 hours.

9              THE COURT:  And those temperatures are taken at that

10   time every day?                                                       01:48PM

11             MS. RAND:  Yes.

12             THE COURT:  And with respect to the inquiry about the

13   unit, the ADA unit that has the closed windows, do you know

14   when it's on a lockdown status whether you have any temperature

15   reporting from that?                                                  01:49PM

16             MS. RAND:  I have the temperature recordings that I'm

17   referring to, first of all, let me just tell you which ones we

18   have.  We have San Pedro temperature logs, Santa Cruz, and

19   Piestewa.  Ms. Eidenbach, I believe, said that Santa Cruz is

20   the unit that she's referring to that has the ADA unit, and          01:49PM

21   that was the unit that I was referring to when I said that the

22   temperatures were not -- when the cooling machines were not

23   performing at optimum they were up to 95 degrees.  And that was

24   at one of the hottest times of the day, which is at 5:30, I

25   believe, when they took those temperatures.                          01:49PM

CV 12-601 - July 13, 2017 - Status Hearing

1        MS. EIDENBACH:  Ms. Rand, are there rooms or cells

2   that folks who have ADA issues can be moved to that are ADA

3   accessible and have air conditioning?  Because 95 is a concern

4   to us.  Really we're concerned about temperatures above 90

5   degrees.  And sounds like you are seeing several readings above          01:50PM

6   90 degrees.

7        MS. RAND:  That's correct.  And I don't know, because

8   I don't know the actual yards that they are on.  Let me see if

9   I can read in your e-mail.

10       MS. EIDENBACH:  It's B yard.                                         01:50PM

11       MS. RAND:  I'm sorry?

12       MS. EIDENBACH:  B, as in boy, yard.

13       MS. RAND:  Okay.  The temperatures we are reading are

14  not on B yard.  They were on C yard.  The B yard, I see a

15  temperature of -- because I'm looking at multiple days.  I                01:50PM

16  apologize.  I'm going through the numbers.  But it looks like

17  the highest that I have seen on B yard is 92 so far, and that

18  looks like that was on July 3rd.

19       MS. EIDENBACH:  It would have to be an ADA specific

20  cell, because there are cells on B yard that are actually air            01:51PM

21  conditioned.  But the ADA cells are still swamp coolers, and

22  they are the ones that have the windows welded shut.  We have

23  also gotten reports of high temperatures on D, as in dog, yard

24  in Santa Cruz.

25       MS. RAND:  Let me take a look and see what the most               01:51PM

CV 12-601 - July 13, 2017 - Status Hearing

1    recent figures are because obviously, if those were taken at

2    the time of under-performance it didn't really paint an

3    accurate picture.

4         Looks like D yard is having temperatures as recent as

5    Tuesday, that's the last date I have, of 94 on B yard.  I would    01:51PM

6    need to double check and find out with Warden Currier whether

7    or not they do have areas like that to answer your question,

8    because I don't know off the top of my head.  But like I said,

9    they are trying to get all of the systems, if they are not

10   already -- well, they did actually said they are up and working    01:52PM

11   properly.  So even though they are under-performing, they are

12   up and working.  And this is reported the day after these

13   figures were taken, so I don't have the current figures.  So I

14   don't know what the current figures are.

15        But it was reported yesterday that the systems are            01:52PM

16   back up and running.  And like I said, the figures that I just

17   reported to the Court are during the time when they were

18   under-performing, I believe.

19        MS. EIDENBACH:  Your Honor, we would like to

20   request -- we have previously requested this and defendants        01:52PM

21   have not provided it -- a list of all prisoners who are taking

22   psychotropic medications and their housing assignments so that

23   we can take a look at whether they are being subjected to

24   temperatures above 90 degrees.  The temperatures that Ms. Rand

25   has reported, many of them are above 90 degrees and they would     01:53PM

1    put our clients at serious risk if they are, indeed, taking

2    psychotropic medications.

3          THE COURT:  I have a couple of questions.  The first

4    is I do recall at the time that the stipulation was negotiated

5    there was discussion about a particular threshold temperature.    01:53PM

6    But I don't know that it resulted in that being in the

7    stipulation.  And perhaps I can ask counsel to refresh my

8    recollection about whether there was any discussion about that

9    and what it suggested with respect to specific benchmarks of

10   temperature.                                                      01:53PM

11         MR. FATHI:  Your Honor, there is no threshold for

12   establishing a violation.  However, the stipulation does

13   provide that a prisoner suffering a heat intolerance reaction,

14   if other steps fail to abate it, must be transferred to a

15   housing area where the cell temperature does not exceed 85        01:54PM

16   degrees Farenheit.

17         That was also the threshold ordered by Judge Wake in

18   *Graves versus Arpaio*, the Maricopa County Jail litigation.  He

19   ordered and the Ninth Circuit affirmed a requirement that

20   prisoners taking psychotropic medication be housed in areas       01:54PM

21   where the temperature does not exceed 85 degrees Farenheit.

22         THE COURT:  And is the concern that causes your desire

23   to have the names of the prisoner class members who are taking

24   these drugs because you think they need to be further informed

25   about this risk, or what is the reason that that's necessary?     01:54PM

1    Because obviously, people who may have susceptibility to this

2    problem are not covered by the stipulation until they suffer a

3    consequence of it.  They are physically ill from it and then

4    the stipulation requires that they be treated in accordance

5    with the stipulation.  But some number of people who take these   01:55PM

6    drugs can be exposed, I gather, to the higher temperatures and

7    won't suffer an ill effect.

8         MS. EIDENBACH:  I think our purpose in getting their

9    names would be to reach out to them to educate them and make

10   sure that they aren't suffering the ill effects from the          01:55PM

11   psychotropic medications that they are taking so that they know

12   the symptoms to be aware of before it becomes a

13   life-threatening situation where they are experiencing heat

14   intolerance and it's gotten to a point that it endangers their

15   life.                                                             01:55PM

16        THE COURT:  Can someone tell me why it is the State

17   has objected to this discovery request?

18        MS. RAND:  Your Honor, the reason why we objected to

19   the discovery request is, first of all, we don't have an

20   ability to print such a report.  We would have to go through      01:55PM

21   and do a lot of manual, I guess, connecting of inmates and

22   medications.

23        The other reason why we objected is there are a lot of

24   inmates that are on what plaintiffs term as psychotropic drugs

25   that are not being used for mental health reasons.  They are      01:56PM

1    being used for other reasons.  And so in order to figure out

2    what inmates -- once we -- if we were even able to create,

3    manually create, such a list then we would have to go through

4    again and figure out which inmates were actually taking

5    medications that were being used as mental health medications          01:56PM

6    not for some other purpose.  And so that's the reason why we

7    objected to the list.

8         THE COURT:  Well, the second reason is not so

9    compelling to me because I don't see a downside of providing

10   the plaintiffs an opportunity to communicate with their clients       01:56PM

11   about this issue if they want to.

12        The first issue is really surprising to me, because I

13   just can't imagine that with the adoption of the computerized

14   system now that you can't search for all of the people who are

15   receiving such drugs.  But you are saying you have checked and         01:57PM

16   that really is the case?

17        MS. RAND:  That was what I was advised when I asked

18   for this document, yes.  And I have asked multiple times, and I

19   have been told that we don't have an ability to print such a

20   list, especially because they also want the housing locations         01:57PM

21   too.  So maybe you have an inmate with a certain type of

22   medication but we don't have any housing locations.  So the

23   type -- the information that they are asking for all in one --

24        THE COURT:  Well, plaintiffs could do that.  If you

25   gave them the names of the people who were on the medication          01:57PM

CV 12-601 - July 13, 2017 - Status Hearing

1  they could then check, look those people up on the public

2  computer and find out where they were housed, couldn't they?

3          MS. RAND:  Certainly plaintiffs could, but they have

4  requested that we do it.  And that's why we said we object,

5  because we have not had the ability to make such a report.          01:57PM

6          THE COURT:  What if you parsed it down and you just

7  asked for -- I mean, I understand why it may be that the

8  computer or the medical computer you have may not link up to

9  the housing and you may not be able to provide both of those

10 bits of information, but it would seem that you -- I guess I'm    01:58PM

11 just incredulous that you can't search and see who is receiving

12 that medication.  Maybe it's so, but I would think that maybe

13 just Corizon as a health care provider, one of the things they

14 would want to know is who is getting what because when they

15 meet with their providers of medication they want to know who    01:58PM

16 is getting what on a macro scale so they can accomplish

17 efficiencies in purchasing at the very least.

18          So I guess I would ask you to double check to make

19 sure that it's impossible to identify a run on the computer

20 that would tell you all of the people that are in your custody   01:58PM

21 who are receiving -- can you identify which drugs it is that

22 are of particular concern, plaintiffs?

23          MR. FATHI:  Your Honor, we could probably do that.

24 The term "psychotropic medications" has a well-established

25 meaning.  Again, the order in the *Graves* litigation did not    01:59PM

1   list individual drugs.  It was limited to psychotropic

2   medications, and we are counsel in the *Graves* case.  That has

3   not presented any problems implementing and complying with

4   Judge Wake's order there.

5           MS. EIDENBACH:  Your Honor, just a couple other things   01:59PM

6   to add.  First, we would like to note for the record that the

7   purpose a medication is used for is not relevant to its side

8   effects and whether or not it's going to cause heat

9   intolerance.

10          THE COURT:  That would seem to make sense to me in   01:59PM

11  light of my recollection at the settlement conferences.

12          Go ahead.

13          MS. EIDENBACH:  And the other thing is that

14  plaintiffs' counsel's experience in California is that eOMIS

15  can actually produce a report run by -- out of the pharmacy tab   01:59PM

16  by prescription medications.  So eOMIS should be able to run

17  this report.  And if that's not, in fact, the case then we

18  would like to hear that from Corizon on the record because it

19  should be a report they are able to run.

20          THE COURT:  So Ms. Rand, you have heard it looks like   02:00PM

21  eOMIS can do this in California.  Find out why we're second

22  rate here in Arizona and see if that really is true and in a

23  week's time, by next Thursday, file a report with the Court

24  letting us know what your additional inquiry has produced with

25  respect to the ability to identify these people who are   02:00PM

1   receiving psychotropic drugs and that are potentially the

2   subject of communication from plaintiffs' counsel regarding the

3   alerting them to their increased vulnerability for heat

4   intolerance.

5           MS. RAND:  Your Honor, we do believe that Corizon can          02:00PM

6   print a report with the list of inmates that are taking certain

7   medications.  We would like plaintiff to specify which

8   medications but also like we said in the past, they have not

9   asked for just medications.  They wanted housing locations.

10  They wanted information that just does not print out on the          02:01PM

11  report and that's the sole reason plaintiffs have never have --

12  they have not offered to revise their request or to attempt to

13  cooperate with plaintiffs -- I mean defendants to get a report

14  that could have been printed.  And so that's where the stopping

15  point is, is that they insisted on getting all the information          02:01PM

16  in one report and so we basically told plaintiffs that there's

17  just not that ability.

18          But, yes, we will get that report.  If the judge, if

19  you would be -- defendants ask that the plaintiffs at least

20  give us a list of medications that they would like to see on          02:01PM

21  that list versus just using the term "psychotropic

22  medications."

23          THE COURT:  It seems like that would be the safest

24  thing to do, Mr. Fathi.

25          MR. FATHI:  Your Honor, we're happy to do that but I          02:01PM

1    think there are two different issues.  I have now heard Ms.

2    Rand say two seemingly inconsistent things; first that the

3    system cannot provide such a list and now more recently that it

4    can.  So we would appreciate --

5        THE COURT:  Here's what I heard her to say.  I heard          02:02PM

6    her to say that if you had asked for a list of all the inmates

7    who receive psychotropic medications, they could have run that

8    report.  But you asked for a report that gave those names with

9    the particular housing location that they were in.  She said

10   there's no way for us to do both of those things and that you    02:02PM

11   were unwilling to accept the former.  That's what I heard her

12   say.

13       MR. FATHI:  That is incorrect, Your Honor.  That

14   particular objection was never asserted.  However -- and it is

15   certainly an implausible and somewhat alarming statement that    02:02PM

16   the health care operation cannot produce a list of prisoners

17   who are on psychotropic medication and where they are located.

18   That's obviously important information for the delivery of

19   mental health services.

20       So we would like defendants to file the notice that          02:02PM

21   the Court has requested.

22       THE COURT:  Sounds like it's not necessary anymore

23   because it sounds like if you will tell her what the list of

24   medications are that you want she'll get you a computer run

25   that tells you the names of all of your clients who are on       02:03PM

1   those medications.  She said she will do that.  So we don't

2   need to go through, based upon what she just said, I'm a little

3   bit -- I have to say I looked at the transcript because as Ms.

4   Rand was saying the words it just did seem to sound like the

5   opposite of what she had just told us.  But she more fully          02:03PM

6   explained that it was her belief that you were asking for a

7   combination of two features and that she told you she couldn't

8   produce it with two and that you were unwilling accept the one.

9        I don't really want to unwrap that knot, because I now

10  think I'm in a position where she says she will get you what      02:03PM

11  you want if you will just tell her what medications you want

12  them to pull for.

13       MR. FATHI:  That's fine, Your Honor.  Could we have a

14  time limit?

15       THE COURT:  Sure.  When can you get the list to her?       02:04PM

16       MR. FATHI:  I was more interested in the time elapsed

17  between us producing the list and the production of names.

18       THE COURT:  First step is I will set a date certain if

19  you will give me your first step and then I will ask her how

20  much time she thinks she needs and set a date certain.          02:04PM

21       MR. FATHI:  That's fine, Your Honor.  We would like to

22  have two weeks.

23       THE COURT:  You would like to have two weeks to get

24  the list of medications?

25       MR. FATHI:  Yes, Your Honor.  I will be on vacation       02:04PM

─ **CV 12-601 - July 13, 2017 - Status Hearing** ─

1    next week.

2            THE COURT:  So in two weeks from today, Ms. Rand, you

3    are going to get a list of the medications that they would like

4    run.  How much time do you need to run that computer request?

5            MS. RAND:  Without speaking to Corizon, I believe that          02:04PM

6    we can do it in a week.

7            THE COURT:  Okay.

8            MS. RAND:  Possibly sooner after talking to Corizon.

9            THE COURT:  So let's do it this way.  No later than

10   two weeks from today the plaintiffs will get you the list of          02:04PM

11   medications that they want.  And you will have a week after

12   that to respond with the names of the inmates who are on those

13   medications.  How is that?

14           MS. RAND:  It's good, Your Honor.

15           THE COURT:  All right.  Thank you.  Any other          02:05PM

16   preliminary issues from plaintiffs?

17           MR. FATHI:  Your Honor, we have some issues

18   preliminary to tomorrow's evidentiary hearing.  We're happy to

19   either discuss them now or first thing tomorrow as the Court

20   prefers.          02:05PM

21           THE COURT:  Well, if they are relevant to tomorrow we

22   can put them off until tomorrow.  If there's some utility of

23   addressing them today we could do them today.

24           MR. FATHI:  Your Honor, the one thing that we would

25   like to address today is the order of witness presentation.          02:05PM

1   The Court has stated that the burden is on the defendants in

2   this proceeding, and therefore, we believe that the defendants'

3   witnesses should go first and we would ask the Court for that

4   ruling.

5           THE COURT:  And do the defendants object to that?          02:05PM

6           MR. BOJANOWSKI:  Your Honor, I don't think the burden

7   is on us.

8           THE COURT:  What I said was you were changing the

9   status quo from a situation that had existed when the

10  stipulation was entered.  And so I did tell everyone that I      02:06PM

11  thought you had the burden to show why that was a good idea.

12          MR. BOJANOWSKI:  Okay.  The problem we have is that

13  we're set for an inmate movement from two different facilities

14  to have inmates here at 9 a.m. per the order of the Court.  And

15  as such, we would just ask that, for logistical and security    02:06PM

16  reasons, we get those witnesses taken care of first and then

17  have our witnesses thereafter.  I personally don't see --

18          THE COURT:  So the prejudice that plaintiffs would

19  experience by having the security logistics honored here?

20          MR. FATHI:  I beg your pardon, Your Honor?               02:06PM

21          THE COURT:  I'm wondering what prejudice would enure

22  to plaintiffs based upon respecting the security issues that

23  Mr. Bojanowski just articulated?

24          MR. FATHI:  Your Honor, I don't understand the

25  security issues.  Prisoners are transported to court routinely  02:07PM

1    as the Court surely knows.

2            THE COURT:  Could be something as simply as getting

3    the meals.  It's remarkably difficult to do that in transport

4    for some reason.  So that could be what they are thinking

5    about.  So he is thinking if they are here in the morning they          02:07PM

6    would like to get them done so we could get them back.  And

7    that also means less time that the escorts are engaged in the

8    process.  So there is some intuitive rationale that I can

9    appreciate.

10           MR. BOJANOWSKI:  There's also medication issues that          02:07PM

11   we have to be cognizant of as well.  So we're juggling the

12   needs of the plaintiffs to have their people here with the

13   security issues of just plain moving people from point A to

14   point B and then we've got women and men that we have to keep

15   separate in separate cells.                                           02:08PM

16           And so we've done quite a bit.  A significant amount

17   of time has been spent to set this up so that these people are

18   here at 9:00 and they are good to go and will be put on the

19   witness stand and moved.  I mean, I understand prisoners are

20   brought into court perhaps all the time.  I don't know.  But          02:08PM

21   for us, we have really committed substantial time and resources

22   to get this done.

23           THE COURT:  You can go with your schedule then.

24           MR. BOJANOWSKI:  All right.  Thank you, Your Honor.

25           THE COURT:  Anything else from plaintiffs' side?             02:08PM

1      MR. FATHI:  Nothing that cannot wait until tomorrow,

2   Your Honor.

3      THE COURT:  Anything preliminarily from defendants?

4      MR. BOJANOWSKI:  No, Your Honor.

5      THE COURT:  Okay.  The first thing on my agenda is                02:08PM

6   Performance Measure 25, which is now fully briefed.  And this

7   is the first responder issue.  And as I read it all, I was

8   inclined to accept what plaintiffs had proposed with respect to

9   the changes to the Monitoring Guide.  The only caveat that I

10  would have is the one they mentioned, and that is to make sure       02:09PM

11  that this appendix that they say was produced, I think, in

12  2000 -- a number of years ago, that it hasn't been modified so

13  it makes no sense to incorporate within the Monitoring Guide

14  something from the manual that is no longer pertinent.

15     So that's my preliminary view, but I will give you              02:09PM

16  both a chance to talk about that.  Anything from plaintiffs?

17     MS. KENDRICK:  No, Your Honor.  I think what we

18  spelled out makes sense.  I guess the one concern we have is

19  that in their reply, defendants state that the emergency

20  response orders that were in the 2010 Health Services Technical     02:09PM

21  Manual, which is the most recent compilation that we have of

22  their health services policies are no longer in effect.  But

23  they don't say what is in effect and so that was our position

24  is we're not wedded to what was in the 2010 manual.  We're more

25  than happy to take a look at what currently are the guidelines      02:10PM

1    for medical personnel in responding to emergencies and have the

2    Court review it, too, and see if that seems to be sufficient.

3    But that did not -- apparently wasn't offered what they are

4    using now instead of what we submitted as an attachment.

5         THE COURT:  Is what's being used now different?          02:10PM

6         MS. ORCUTT:  Your Honor, Corizon has their own

7    policies but as far as ADC has, they are not going have to a

8    mental health services technical manual who covers first

9    responders who are, generally speaking, corrections officers.

10   So that was the point of our response was that plaintiffs are   02:10PM

11   doing wholesale rewrite of this measure by saying it can only

12   be performed by medical personnel.

13        THE COURT:  Is there any reason not to use this

14   language?  Is there any reason it's offensive to the

15   defendants?                                                    02:11PM

16        MS. ORCUTT:  Because the defendants' inclusion of this

17   measure in the stipulation was based off the idea it would be

18   corrections officers who would the first responders.  And the

19   way the plaintiffs have rewritten the measure, it no longer

20   allows for that.                                               02:11PM

21        THE COURT:  I don't think so.  If they are qualified,

22   that's not how I read it.

23        MS. KENDRICK:  Yes, it's about the qualifications.  It

24   doesn't specify -- our proposed definitions for first responder

25   doesn't say healthcare or custody.  It just says at Document    02:11PM

1    2149, Page 3, Line 8, the first staff member certified in basic

2    life support on the scene of a medical emergency.

3         And you know, Your Honor, obviously when we were

4    negotiating the stipulation there were many balls up in the

5    air, and you are aware of.  And it has become aware to us since    02:11PM

6    2015 that it was an oversight of both parties to not include

7    some of the definitions of the terms used in this performance

8    measure because there has been confusion.

9         The other thing we would just add is that defendants

10   keep saying this is something we have just suddenly raised.  We   02:12PM

11   have actually raised our concerns about the fact that they

12   don't evaluate both the components of the performance measure.

13   We raised that in October of 2015 in our first notice of

14   compliance.  It is a two-part requirement.  It is not only that

15   they respond in a timely manner but they respond appropriately.  02:12PM

16   So we have been raising that for two years.

17        And also, you know, to the extent they say here's a

18   letter Mr. Fathi sent in so everything is set in stone, as we

19   set out in our past pleadings after the evidentiary hearings,

20   we didn't realize how the monitors were interpreting this        02:12PM

21   performance measure to basically make it nonsensical and null

22   and void where the instant you respond is one and the same.

23   There's no response.  We did have the monitors tell us under

24   oath that they are not assessing the quality of the response.

25        So we do not think that it is untimely that we're           02:12PM

1    bringing this to the Court's attention because we were unable

2    to resolve it with the defendants without court assistance.

3            THE COURT:  Well, I don't think I'm building a new

4    stipulation agreement here, because I think that what I'm

5    applying is a common sense reading of it.  It turns out that          02:13PM

6    the parties didn't focus on what the actual meaning would be

7    but what I'm imposing is, I think, a common sense reaction.  So

8    I guess the next question I have is what about the Appendix E?

9    Is it still active?

10           MR. BOJANOWSKI:  Your Honor, the certification              02:13PM

11   situation is one that is not contemplated under terms of the

12   agreement.  I mean, we have training of these officers.  And

13   what we're -- what the plaintiffs are asking us to do now is to

14   retrain and bump up the level of training to a certification

15   stage.                                                            02:14PM

16           THE COURT:  For the number of people you should have

17   on hand for what we would commonly call first responders --

18           MR. BOJANOWSKI:  If somebody is hanging in a cell,

19   okay, the people who are going to find that are going to be the

20   officers.  They are going to, based on their training, take the     02:14PM

21   person down, administer CPR, if needed.  Those are the things

22   that they are trained to do.  And that's the level of training

23   they are given as opposed to a Red Cross certification where

24   you have to do many weeks of training to reach certification.

25   I think that's what the plaintiffs are looking to have done,        02:14PM

1   and I don't think that's what was contemplated under this

2   particular measure.

3           And as far as assessing the conduct that occurs, that

4   is looked at by the monitors based on the medical records that

5   they've got or the ICS reports that are generated as a result        02:14PM

6   of one of these incidents so that they can then look and say,

7   well, what was done when they found this guy hanging in the

8   cell?  Okay.  You know, they cut him down, they gave him CPR.

9   That's all appropriate so that evaluation is taking place.

10          THE COURT:  I just don't see how you have a measure       02:15PM

11  that's supposed to evaluate whether somebody is receiving

12  emergent medical care and you are not paying attention to

13  whether or not the person who is going to be the starter of the

14  clock is qualified to give that care.

15          MR. BOJANOWSKI:  That's based on the training that        02:15PM

16  they receive as a CO.  They are given that kind of medical

17  training or CPR training, first responder type of training.

18  It's like a police officer in the field.

19          THE COURT:  Well, as I read what plaintiffs had, the

20  CPR training you were talking about would qualify them,             02:15PM

21  wouldn't it not?

22          MR. BOJANOWSKI:  Are they saying our current

23  training --

24          THE COURT:  Well, go ahead Ms. Kendrick.

25          MS. KENDRICK:  We included a definition for basic life    02:16PM

CV 12-601 - July 13, 2017 - Status Hearing

1    support, and that was defined as emergency care performed to

2    sustain life that includes CPR, automated external

3    defibrillation, control, of bleeding, treatment of shock, and

4    stabilization of injuries and wounds.  And I certainly hope

5    that custody officers are trained on these five elements of                    02:16PM

6    responding to an emergency.

7         THE COURT:  Well, it seems if they are they can be

8    counted.  If they are not, they can't be counted.

9         MS. KENDRICK:  Right.

10         THE COURT:  That's where I am on this.  So back to E,            02:16PM

11    what's the status of E?

12         MS. ORCUTT:  There is a more recent manual, but we

13    don't know without having it in front of us whether it has that

14    appendix in it.

15         THE COURT:  Would you send that over the plaintiffs,            02:16PM

16    and you can work with them and see if you can get it,

17    understanding where I'm going on this, and that is unless

18    there's some big difference between the former E and current E

19    I'm on board with this especially as illuminated by what you

20    have heard from plaintiffs' counsel today and what you have            02:16PM

21    heard from me.  If they can do these things that are

22    enumerated, if the DOC guards can do those things, doesn't

23    sound like a Red Cross certification.  Sounds like they have

24    been trained to do these types of things that's going to

25    qualify.                                                                 02:17PM

1      MS. KENDRICK:  And I guess to the extent that

2  defendants feel that the word "certified" in the definition of

3  first responder is some sort of telesomatic word that we have

4  to embrace, I think that's something else that the parties can

5  negotiate.                                                    02:17PM

6      THE COURT:  So "train" could be a substitute word, for

7  example?

8      MS. KENDRICK:  Correct.  Correct.  But we think

9  emergency care is more than just CPR.  It includes bleeding

10  control, stabilization of injuries and wounds.              02:17PM

11      THE COURT:  And being able to run this automatic

12  device.

13      MS. KENDRICK:  Yes, sir.  And just one other thing.  I

14  mean, Mr. Bojanowski said that the monitors testified that they

15  evaluate the adequacy of the response and that's just not true.  02:17PM

16  Mr. Haldane from Perryville testified that he does not look at

17  that element on Performance Measure 25 when he was testifying

18  here.

19      THE COURT:  Okay.  All right.  So if you can't get

20  this resolved, bring it back to me but hopefully you can and we  02:18PM

21  can get it into the Monitoring Guide.

22      What I have next on my agenda is Performance Measure

23  39, the twice in the nurse's line issue.  We have this

24  continuing battle of the affidavits and the later reports from

25  plaintiffs.  I just want to make sure I understand what the    02:18PM

1    latest report time-wise is that plaintiffs believe that this

2    happened.

3         MS. KENDRICK:  Your Honor, we're not quite sure so

4    that's why we put it on the agenda.  It says in the statement,

5    Docket 2144 that defendants filed on June 30th, that it was          02:18PM

6    approved -- it went into effect in October 2016 but it is

7    unclear when it ended.  It doesn't specifically say on Docket

8    2144 when it ended.

9         THE COURT:  We have heard in the Court before they

10   have said that it's, I mean, Mr. Pratt said it's no longer         02:19PM

11   happening as of, I think, did he say December?

12        MS. KENDRICK:  His avowals were with regard to 2015,

13   so this wasn't specific with the CAPs.

14        THE COURT:  But you don't have evidence -- what's your

15   most current evidence of this?                                      02:19PM

16        MS. KENDRICK:  The only evidence we have is in the

17   months subsequent to this their performance on Performance

18   Measure 39 suddenly improved dramatically, which is great if

19   it's accurate.  But we just have no way of knowing whether

20   those numbers are reflective of the fact that they put into        02:19PM

21   this policy that erects a barrier for prisoners to access

22   providers.

23        THE COURT:  But at least I can assume that your

24   clients aren't telling you this is still going on?

25        MS. KENDRICK:  Oh.  No.  Actually, Your Honor,                 02:20PM

1   several -- two of the witnesses that will be testifying

2   tomorrow have told me that.  And we have come across some

3   documentation in the grievances that were produced, well, that

4   are still in the process of being produced to us by defendants.

5           THE COURT:  So you are going to present some evidence       02:20PM

6   tomorrow on this?

7           MS. KENDRICK:  Yes, sir.

8           THE COURT:  So we'll wait then.

9           MS. KENDRICK:  Yes, sir.

10          THE COURT:  All right.  Performance Measure 47 is next      02:20PM

11  on the agenda for me.  This is the eOMIS communiques.  And the

12  defendants have filed an affidavit that indicates that it was

13  live on the 21st or 22nd of June.  And today when I was at one

14  of the yards I asked about this, and it was news to that

15  assistant warden.                                                  02:20PM

16          MR. BOJANOWSKI:  News to me, too.

17          THE COURT:  And so I guess that means there are two

18  questions that remain.  One, is it really happening; and two,

19  even if it is happening, what about the backlog that is

20  reflected in the performance measure failures on this?  Is it     02:21PM

21  thought that this will be used to address the backlog, or are

22  you just sort of stuck with where you were or what are you

23  thinking?

24          MR. BOJANOWSKI:  I'm not sure about the backlog, Your

25  Honor.  It's been my understanding as I have communicated to      02:21PM

1   you before that this was being done by way of the inmate mail

2   system.  I don't know if something is going on out there at

3   Lewis that is different than what I understood to be happening

4   within the system.  So all I can say at this point is I know

5   that I have been told by the Corizon representatives that our          02:22PM

6   live date is July 27th for the eOMIS situation as we filed with

7   the Court, and it's, again, my understanding that those are

8   going to be then delivered to the inmates.  I don't have of any

9   other information.  I was, frankly, surprised by the comments

10  made by the assistant warden at the Lewis facility today              02:22PM

11  because that is not my understanding as to the way this works.

12  And I frankly did not talk to him about it to find out anything

13  further than what his comment was.

14        THE COURT:  Well, the State has offered this as a

15  remedial measure to address a failure in the performance            02:22PM

16  measure that requires this communication.  And so not only does

17  there have to be some statement that it has a rollout, there

18  also has to be some affirmance that it's actually working and

19  that it's happening.

20        MS. KENDRICK:  Your Honor.                                    02:23PM

21        MR. BOJANOWSKI:  I think I misspoke here.

22        MS. KENDRICK:  Yeah.

23        MR. BOJANOWSKI:  I think we went live June 21st.

24        THE COURT:  That's what I said.  You said the 22nd.

25  Actually I said 21st or 22nd because I couldn't remember            02:23PM

CV 12-601 - July 13, 2017 - Status Hearing

1    whether it was one or those two then you said 27th, which

2    wasn't consistent with what I thought the affidavit was.

3            MR. BOJANOWSKI:  I had too much sun today.  Hold on

4    just a second.  May I have a moment, Your Honor?

5            THE COURT:  Surely.                                    02:23PM

6            MS. KENDRICK:  Your Honor.

7            THE COURT:  Actually, can I ask you to wait?

8            MS. KENDRICK:  Sure.

9            THE COURT:  It's not really fair.  I find it difficult

10   to do two things at once, and maybe others are similarly       02:23PM

11   mortal.

12           MR. BOJANOWSKI:  The data I have, Your Honor, is since

13   going live, we have transmitted 5023 communiques system-wide.

14           THE COURT:  And do you have an understanding of how

15   that -- I mean, that was the question I asked today.  How does  02:24PM

16   that work?  How is it that the inmates are receiving these bits

17   of information?  Do you have an understanding of how that

18   works?

19           MR. BOJANOWSKI:  My understanding is it's through the

20   inmate mail system.  The idea was to be able to print something 02:24PM

21   off real quick by the provider.  That was -- that seemed to be

22   the problem was we couldn't get the provider to get the thing

23   written out manually and then sent.  So this way it's just a

24   matter of hitting the button and then it goes out.

25           THE COURT:  Well, maybe plaintiffs could add this to    02:25PM

1    the list of questions for tomorrow.  Maybe you could be --

2    serendipitously somebody could have some competency on this

3    topic.

4             MS. KENDRICK:  Your Honor, Mr. Tucker from Corizon who

5    made the declaration under penalty of perjury that's at Docket      02:25PM

6    2146-1 is actually in the courtroom.  So I think to the extent

7    you may have questions we could have him, perhaps, answer them

8    about the go live and why it wasn't in place over at Lewis

9    today when you were there.

10            I guess that would be my first suggestion.  The other     02:25PM

11   is I know you said we would go through the numbers for all the

12   performance measures tomorrow, but if defendants have the main

13   numbers I would be curious to see if there's any sort of

14   improvement from last month.  But I defer to you obviously.

15            THE COURT:  The main numbers won't tell us anything       02:25PM

16   about the application of this, unfortunately.

17            MS. KENDRICK:  Okay.

18            THE COURT:  Is Mr. Tucker willing to help us

19   understand this?

20            MR. TUCKER:  I am, Your Honor.                            02:26PM

21            THE COURT:  Could you step forward just so that court

22   reporter can hear you a little bit better?

23            MR. TUCKER:  Yes, sir.

24            THE COURT:  So how does this work?  Talk us through

25   it.  How does this mechanism work?                                 02:26PM

UNITED STATES DISTRICT COURT

1      MS. KENDRICK:  Do you want to swear him in, sir?

2      THE COURT:  No.  That's okay.

3      MR. TUCKER:  Your Honor, I can speak to the technical

4   capabilities and availability of the tool.  The operational

5   elements as to how it operates in the field is not necessarily      02:26PM

6   my responsibilities.

7      THE COURT:  So to cut to the quick on that, you really

8   don't know how it works?

9      MR. TUCKER:  On the back end.  Technically I can talk

10  about the eOMIS piece of it, the availability, how it works on      02:26PM

11  the back end mechanically, how it works after it's printed.

12  I'm not an operator or administrator.  I couldn't speak to the

13  technical --

14      THE COURT:  I thought what I heard you say is you

15  don't know how it gets, from the time it leaves the printer to      02:26PM

16  the inmate?

17      MR. TUCKER:  I have an understanding but not firsthand

18  knowledge.

19      THE COURT:  And your understanding is based upon all

20  of the facilities having explored how or just one experience?      02:27PM

21  Tell me a little bit about the basis for your knowledge at this

22  point, this aspect of it.  It's printed on the printer and then

23  it -- some 5,000 of these, we have been told, have been

24  distributed to inmates since the 21st or 22nd of June.

25      MR. TUCKER:  Those are the numbers I have, yes.      02:27PM

1      THE COURT:  So what happens?  Well, how do you know

2  what happens from the printer to the inmate?

3      MR. TUCKER:  Again, Your Honor, I don't have firsthand

4  knowledge of what happens after it's printed.  I was involved

5  in the back end assembly and building and availability of the        02:27PM

6  tool itself.

7      THE COURT:  Your secondhand knowledge, what is it

8  based on?  One person telling you what happened at one yard or

9  what is it?

10     MR. TUCKER:  A general understanding from                          02:27PM

11  communications from folks in the field that do use that tool.

12     THE COURT:  I see.  And what have they told you?

13     MR. TUCKER:  That they have used a couple different

14  methods, one of which is the inmate mail system.  Once the

15  document is printed, it can then be sent via inter-mail system       02:28PM

16  to the inmate.

17     THE COURT:  And do the inmates all have mailboxes or

18  does it just go to their home?

19     MR. TUCKER:  I do not know.

20     THE COURT:  I have to say you really don't.  You are            02:28PM

21  not really helpful to me, so thank you.  I appreciate you

22  coming forward.  But the part I really need to understand is

23  how it works on the ground and you really don't know.

24     MR. TUCKER:  I agree.  Thank you, Your Honor.

25     THE COURT:  Thank you.                                            02:28PM

1          So Mr. Bojanowski, there is your charge there, figure

2     out who knows.  And let me be informed about that because

3     obviously I heard today that it's not working on the ground as

4     you had told me it was working at Lewis.

5          MR. BOJANOWSKI:  I'm going to try and get a                    02:28PM

6     declaration put together and get it to the Court.  I think that

7     probably would be -- I'm going to try and get a declaration,

8     but as the Court is well aware, I have got to check with

9     different facilities to make sure that things are operating

10    consistently.  Because I don't want to sit here and say, yeah,    02:29PM

11    this is the way it's done and then we find out well, it's not

12    done in Yuma that way or something.

13         THE COURT:  Exactly.  Right.  And obviously, I ribbed

14    you a little bit in front of plaintiffs' counsel on the yard

15    today when I mentioned that this was another thing that I heard   02:29PM

16    that sounded sort of the opposite of what you have been telling

17    me.  And the problem is that an enormous amount of the ability

18    of the Court to efficiently manage this problem is dependent

19    upon counsel funneling accurate information to the Court.

20    Because if you don't, to use the metaphor that I used earlier     02:29PM

21    today, I am just strutting and flapping my feathers in a puddle

22    of mud that is sending it everywhere.  And that makes no sense

23    for everybody.

24         The second thing that happens is that after a while

25    when I get continued reports that don't seem to be borne out, I   02:30PM

1    stop trusting them.  And what that means is I look for other

2    sources of information and those other sources of information

3    are potentially more costly, less efficient, and disruptive to

4    the operations of the state Department of Corrections.  And I

5    don't want to be in that situation, but I feel like I'm being          02:30PM

6    funneled into a lane of traffic that is necessary but

7    undesirable.  So I say these words because I think they need to

8    be said, because this is something that should not happen.

9          Defendants placed on their agenda Performance Measure

10   61 but with no explanation as to why we should visit the pap         02:30PM

11   smear issue again.  So I need to ask what that is about.

12         MS. ORCUTT:  And so the issue with 61 is we do agree

13   to the Court's additional language that you added during the

14   last hearing, so we wanted to state that on the record.  But we

15   feel like there's still a problem that addresses the later          02:31PM

16   instances of pap smears after the first round of communiques

17   have already gone out to the entire female population.  But

18   we're concerned there is a group of inmates in the population

19   who have not had a pap smear.  If they don't have one they are

20   going to be automatically non-compliant until another three        02:31PM

21   years from now.  And so there's this pool of inmates who are

22   going to be automatically non-compliant or compliant based on

23   whether they decide to have another pap smear or not.

24         THE COURT:  I don't understand, because I thought you

25   would be able to protect yourself from that situation if you       02:31PM

1    offered it to them and you documented that.  What am I missing?

2          MS. ORCUTT:  We have.  But the way the measure is

3    written, the documentation has to have gone out to the inmate

4    within three months of the 36-year -- 36-month anniversary of

5    the last pap smear.                                          02:32PM

6          THE COURT:  So what you are suggesting that there

7    needs to be an amendment that either within 36 months of the

8    last pap smear or within 36 months of when they entered the

9    system.

10         MS. ORCUTT:  Well, that's in there, but what's         02:32PM

11   happening is you have inmates that have been in the system for

12   longer, haven't had a pap smear.  They have gotten the notice

13   because the entire population has now gotten the notice that we

14   have spoke to the Court about.  But the inmates who had their

15   last pap smear more than three years before that noticed, and  02:32PM

16   don't have another pap smear, are going to continue to be

17   non-compliant.

18         THE COURT:  I'm sorry to be so dense, but I'm just not

19   getting it.  Because it seems to me that if you are providing

20   the offer to everybody every 36 months, then that -- how is    02:32PM

21   there a sample of somebody who is not compliant if you have

22   made that offer and you can document that to all those people?

23         MS. ORCUTT:  If that's good enough, if the fact that

24   they have had the communique is good enough then yes, that

25   would be fine.                                               02:33PM

─ CV 12-601 - July 13, 2017 - Status Hearing ─

1      THE COURT:  I thought we resolved this that there has

2  to be a documented offer.

3      MS. ORCUTT:  Right.  And a communique went out to all

4  the inmates personally addressed, and they had to sign for it.

5  They have come back and they are being scanned in the inmate's          02:33PM

6  file so that they can be searched by the monitor in eOMIS.

7  That's available.

8      THE COURT:  So somebody has been resisting your

9  position.  That somebody is here in the courtroom.  I will hear

10  from them so maybe it will help me understand.                         02:33PM

11      MS. KENDRICK:  Your Honor, we are equally unable to

12  understand defendants' concerns with your language, because we

13  thought that it's pretty clear that the verb in Performance

14  Measure 61 is "offered" and we thought that your proposed

15  language for the methodology made sense and would capture that         02:34PM

16  36 months.  And so unfortunately we are equally perplexed by

17  defendants' concerns because we thought that what you offered

18  did address it all.

19      THE COURT:  Do you understand what Ms. Orcutt is

20  saying with respect to their concern about how they would end          02:34PM

21  up with a non-compliance finding?  Do you even understand what

22  she's saying about that?

23      MS. KENDRICK:  No.

24      THE COURT:  Okay.

25      MS. ORCUTT:  Maybe if I give an example.  If an inmate             02:34PM

1   had her last pap smear five years ago, or came into the system

2   five years ago, has not had a pap smear since.  We gave her the

3   communique, as we did all the inmates, but it wasn't within 36

4   months of her intake or her last pap smear.  She's going to be

5   non-compliant.  That take sus prior to the start date of the       02:34PM

6   stipulation as well.  So that's why our proposed language

7   started with the date for counting the 36 months at the

8   stipulation and therefore, the fact that we've now given out

9   these communiques to all inmates system-wide covers that.

10          THE COURT:  That would seem reasonable.  What do you       02:35PM

11   think about that?

12          MS. KENDRICK:  I don't understand where they are

13   hitting a problem.

14          THE COURT:  Again, do you see any harm what she's just

15   proposed, we don't go back before the time of the stipulation?     02:35PM

16          MS. KENDRICK:  I think they put the notice out to

17   everybody.

18          THE COURT:  So it seems like, all right, that would

19   protect you then.  So we're clear about that, I guess?

20          MS. ORCUTT:  So is defendants' language on that point       02:35PM

21   then okay that we have the start date be --

22          THE COURT:  Which stipulation are you talking about in

23   particular?  Was it in something you filed?

24          MS. ORCUTT:  Uh-huh.  It was in our proposed language

25   for 61.  And we pegged the start date for the 36-month             02:35PM

1    anniversary off the stipulation effective date.

2         THE COURT:  Is this new language or is this language

3    that I originally considered when I addressed this before?

4         MS. ORCUTT:  You have had it for a little while now,

5    so you would have had it before you made your ruling at the          02:35PM

6    last hearing.

7         THE COURT:  All right.  And you think I left out

8    something that gave you this protection, and it sounds like

9    what you have asked for now plaintiffs don't have a problem

10   with.  Is that true?                                                  02:36PM

11        MS. KENDRICK:  Again, we're unclear on -- it seems

12   like it's a solution in search of a problem.  We don't

13   understand where the problem is.

14        THE COURT:  Well, I could understand her example, I

15   think, that somebody is in the system before the date of the         02:36PM

16   stipulation so they didn't receive some period of time and so

17   you need to know we did it within 36 months of the last time

18   that it was offered.  But their 36-month didn't have a start

19   date that was in the stipulation because it was before the time

20   of the stipulation.  And so they never had one offered before        02:36PM

21   because they were around before the stipulation.

22        MS. KENDRICK:  Right.  My memory actually, Your Honor,

23   is at one point when we talked about this, I don't remember

24   which month it was, and we discussed the fact that this uses

25   this magic word "every" which we seem to not be able to put to       02:37PM

1    bed in the mental health performance measures.  And you said

2    you felt this was different because the gap was so long

3    compared to the mental health performance measures.  So

4    plaintiffs thought that you had already decided that we weren't

5    building off the last time the person was in there because you          02:37PM

6    had made that verbal ruling a couple months ago about the word

7    "every" meaning something different with regard to that.

8            THE COURT:  So what defendants want is they want

9    language that will protect them here to make it absolutely

10   clear in the monitoring manual that they don't have to worry          02:37PM

11   about this particular problem.  And it sounds like you need to

12   just take another look at that language.

13           MS. KENDRICK:  Yeah, if they can just tell us the

14   docket number where it's filed we would be glad to take a look

15   at that.          02:37PM

16           THE COURT:  Can you do that?

17           MS. ORCUTT:  Sure.

18           THE COURT:  All right.  Thank you.

19           Next we get to Performance Measures 85 and 86.  And I

20   don't know who listed that on the --          02:38PM

21           MR. FATHI:  It was defendants, Your Honor.

22           THE COURT:  Okay.  Thank you.

23           I guess, again, I thought that we talked about this in

24   a way that resolved it if it's addressing the concern about

25   people -- is this the one where the clock has to start all over          02:38PM

1    because they are now being under a new watch?  Or is that the

2    next one?

3            MR. FATHI:  No, Your Honor.  These two performance

4    measures concern prisoners who have discontinued psychotropic

5    medications.                                                    02:38PM

6            THE COURT:  Okay.

7            MR. FATHI:  85 requires such a person to be seen by a

8    provider within 30 days of discontinuing.  86 requires that

9    person to be seen by a mental health clinician every 90 days

10   after continuing.  And you are correct, Your Honor.  This has   02:39PM

11   been extensively briefed and argued, and the Court has ruled.

12   At the June 14th hearing, the Court directed defendants to

13   adopt new language and actually read the required language into

14   the record.  And we have reproduced that at Document 2160 at

15   Page 4.  So in our view, again, the Court has ruled.  We don't  02:39PM

16   believe there's anything further to discuss.

17           THE COURT:  All right.  Why do we need to discuss it

18   more, defendants?

19           MS. ORCUTT:  Outside the June 14th hearing, you said

20   because you were reading the language you would give us a       02:39PM

21   chance to --

22           THE COURT:  Okay.  I have read it.  And I'm sorry

23   for -- there's another sheet that I use that is the flow sheet

24   that I have talked to you about before.  And unfortunately, for

25   some reason, when you hit control and click on it, it usually   02:40PM

CV 12-601 - July 13, 2017 - Status Hearing

1   comes up and this time it didn't so I came into court without

2   it.  But I now remember that I have read that.  And I have to

3   say, notwithstanding what you and Dr. Taylor said before about

4   this issue -- Dr. Haney, is that the expert?

5          MR. FATHI:  Dr. Haney is plaintiffs' expert, Your          02:40PM

6   Honor.

7          THE COURT:  He's the expert who articulates on this

8   issue as to why the records have to be excluded that are

9   possibly non-compliant.

10         MR. FATHI:  Correct, a position that defendants now        02:40PM

11  concede is correct.

12         THE COURT:  Wasn't that the only thing, Ms. Orcutt,

13  that you said I reserved for further consideration on?

14         MS. ORCUTT:  You read the proposed language for 85 and

15  86 into the record and said we would have an opportunity to     02:40PM

16  address any concerns we had with that language at the next

17  hearing.

18         THE COURT:  Is there more you want to say about it

19  now?

20         MS. ORCUTT:  I'd like Dr. Taylor to address it.  She      02:40PM

21  can address it with --

22         THE COURT:  Go ahead.

23         MR. FATHI:  May we have the doctor sworn, Your Honor?

24         THE COURT:  Since you are going to be giving

25  testimony, you have been doing it before under oath, we'll ask   02:41PM

1    you to be sworn again.

2              (Dr. Taylor was sworn by the Magistrate Clerk.)

3              DR. TAYLOR:  So I did want to share with the Court we

4    had some back and forth about when the transition was made

5    where 85 did not include records that were automatically          02:41PM

6    compliant.  Unfortunately, in the response by the plaintiffs it

7    does kind of misstate the facts.  But they -- it was done

8    December of 2016 and none of the records were used for

9    compliance in 2016 as stated in his response.  So that piece is

10   one of the pieces.                                                02:41PM

11             But the concern we have with the language that you

12   read into at the hearing is just the final piece under 86 where

13   it is if a record is found to not meet the 90-day -- had not

14   been off medications for 90 days and therefore excluded, we are

15   okay with that part of the language.  But the continuing to      02:42PM

16   pull records is inconsistent with the stipulation for -- which

17   most of our performance measures are set up where you have a

18   set of charts that are pulled for one question and then

19   re-reviewed for a second question.  And that's -- a lot of the

20   mental health ones are set up that way.                          02:42PM

21             But adding in the caveat that you then remove that

22   record for the second question and pull another requires an

23   exorbitant amount of additional pulling of records if that's

24   placed into kind of each performance measure.  There was a

25   reason we linked them together when we were negotiating the      02:42PM

1    stipulation, which was to ensure that we knew exactly how many

2    records we were going to need to pull.  And so for the most

3    part, the language that you read in there we were okay with.

4    It's just the -- on the second question, Number 86, removing

5    those records and pulling additional ones require us to then         02:43PM

6    answer other questions related to that file we pulled.

7              THE COURT:  Is it really as enormous as you describe,

8    that task?  Because it doesn't seem to be that it would be that

9    situation.

10             DR. TAYLOR:  It would be, because we then have to           02:43PM

11   answer Performance Measure 77, 78 and 79 off of that record

12   that's being pulled.  And we have gotten --

13             THE COURT:  But you would be able to cull out and know

14   at the get-go whether or not you had a disqualifying record and

15   you could make that your first inquiry and see whether or not a      02:43PM

16   disqualifying record is going to be rejected and that would

17   mean you would have to go and apply this analysis to the other

18   records just to get a good sample.  No?

19             DR. TAYLOR:  Well, you apply a 30-day to Performance

20   85 so the record is included.  And then Performance 86 is a          02:44PM

21   90-day which would then -- you are still using -- you are

22   pulling all 50 for 85, removing half of them, and pulling

23   another 25 for 86, which then makes you answer 77, 78, and 79.

24   And so I was able -- I did not have the Lewis complex completed

25   at the time of your ruling for this question, and so I employed      02:44PM

1    the portions of the way that you read that out there as soon as

2    we got the transcript, all but pulling additional ones.  So I

3    think that it is very representative of exactly what their

4    concerns were that, you know, ensures that we are not including

5    any records who are automatically can be compliant and only          02:44PM

6    including those that have been in the status long enough.

7         And so I employed that at the Lewis facility for May

8    and did their audit, because I hadn't completed that one yet.

9    But if I had had to pull additional, it would have been about

10   30 more records for 86, then having to answer 77, 78, and 79         02:45PM

11   and changing -- we have formulas set up that help us so that we

12   don't have to manually count things.  We would have to create

13   new spreadsheets, create additional ways that we could monitor

14   that and track it so we didn't make mistakes.  And that's where

15   the challenge would come in for us.  And it would not actually       02:45PM

16   equate to any change in compliance.  It's not going to give you

17   a better picture.

18        THE COURT:  Dr. Haney suggested it would.  Why is he

19   wrong?

20        DR. TAYLOR:  Well, because the reality is if I pull             02:45PM

21   less records it actually hurts them.  So that would lean

22   towards non-compliance.  If I'm only pulling 30 records for 86,

23   for instance, and I'm only using people who, by virtue of who

24   they are, have been in that status for long enough to be

25   included, if I only use 30 records and they miss five of them,      02:46PM

1    that hurts them a lot more than using 60 records and missing

2    five of them.  So if it -- if they are not included that

3    doesn't inflate your percentages.  That actually deflates your

4    percentages.  So their concerns over that piece, I have a

5    problem with the way that they state that that's what it would          02:46PM

6    do.  Especially having done Lewis exactly as I'm describing,

7    their results came out still very high, as expected, but

8    pulling more records would have watered down any nos that they

9    had, if that makes sense.

10          THE COURT:  So you are saying that the practical               02:46PM

11   result is one that doesn't, we know for sure, insult the

12   purpose of pursuing additional records.  In fact, you say it

13   will give you better information as a practical matter even

14   though it is an insult to the theory of sampling.

15          What do you have to say about that?                           02:47PM

16          MR. FATHI:  Your Honor, as I said, we think the Court

17   has ruled.

18          THE COURT:  What about this argument which is a

19   legitimate one it sounds like to me?

20          MR. FATHI:  You have to start from the premise.  We           02:47PM

21   have to start with the recognition that the defendants have

22   conceded that records that cannot possibly be found

23   non-compliant have to be excluded from the sample.  They have

24   stated that in their recent filing.  What's happening is that

25   the defendants are conflating two separate steps in the              02:47PM

1  process.  The first step is obtaining the initial sample of

2  records.  Now for some performance measures that initial sample

3  is obtained by drawing a random sample from a larger

4  population.  For others, like Performance Measure 86, you start

5  with the sample that's been used for a different measure, in          02:47PM

6  this case, for 86, you start with the sample that's been used

7  for 85.  But in either case the next step and an essential

8  step, is you have to exclude records that can't possibly be

9  found non-compliant and you have to randomly draw replacement

10  records.  And that's what the defendants are, as I understand       02:48PM

11  it, declining to do.  And I don't understand that, because

12  again, they have conceded in their filings that that's what you

13  have to do.  And we can see what happens when you don't do

14  that.  If you look at -- one moment Your Honor.

15          If you look at Document 2161, which is my declaration,      02:48PM

16  and it appends a couple of examples of Performance Measure 86

17  the way the defendants currently audited.  And you will see

18  that a majority of the records actually cannot be found

19  non-compliant.  And again, for the reasons explained by Dr.

20  Haney and which I don't understand defendants to disagree with,    02:49PM

21  you cannot do that.  You cannot have records in the sample that

22  cannot be found non-compliant.  That's what they are doing.

23  That's what the Court's language would prevent them from doing,

24  and that's why we think the Court should adhere to its ruling.

25          THE COURT:  Anything you want to say, Dr. Taylor, in        02:49PM

1     response to Mr. Fathi?

2           DR. TAYLOR:  Just that what I was explaining agrees

3     with the first portion of what he's saying.  We would exclude

4     those that are automatically compliant if they are used and

5     they were seen.  So those are excluded out of there.  But                02:49PM

6     there's nothing in anything we agreed to that said additional

7     files would be pulled if the ones that you were reviewing for

8     the first one and then reviewing for the second one, if they

9     are not used for the second one you then pull additional ones.

10    That's why we connected them up.                                        02:49PM

11          THE COURT:  But it's a principle of sampling that

12    that's what you do, that you then return and draw another file

13    for one that cannot possibly be non-compliant.

14          DR. TAYLOR:  Except that if that's what our purpose

15    was we would not have tied those two together.  There's no             02:50PM

16    purpose to tie the two performance measures together if you are

17    going to randomly pull people.  What we agreed to was the first

18    question would dictate what files would be pulled and the

19    second question would be answered with those files.  And the

20    plaintiffs are fine with that with the max custody and the             02:50PM

21    rounds.  They have not brought that issue up that we need to

22    pull another question for rounds if that individual didn't need

23    rounds.  They had not brought that concern forward.  They bring

24    it forward only when it's convenient, unfortunately.

25          And so the reality of the situation is we're a limited           02:50PM

1    resource.  There's only so much we can do.  So in the

2    stipulation while we were going through this we said here's

3    what we can do.  I can pull 10 records per unit for 85.  Those

4    that I pull I will also review for 86 because I already have

5    them open, I already have them identified.  I can get that        02:51PM

6    done.  But when you start to say that if some portion of those

7    can't be used for 86, I then have to pull additional ones, that

8    wasn't contemplated when we were discussing it or else we would

9    not have written those to be connected.  There's no purpose to

10   connect them if you are randomly pulling separately.  It is      02:51PM

11   that we would do one random pull and evaluate both of them.

12          But I did remove, when I just did Lewis, I removed any

13   file for 86 who had not been in that status for 90 days.  I did

14   that.  And that's exactly what their main concern was the

15   adding, pulling of additional records only adds to the caseload  02:51PM

16   I'm trying to get done on a monthly basis.  It doesn't help any

17   sort of informing the Court and, in fact, it probably would

18   help us because, again, it would water down any sort of

19   findings you might have.  The more charts you pull, the better.

20   Unfortunately, there's three of us trying to monitor the state   02:51PM

21   month after month and we physically can't get it done.

22          So it's the point that it's just -- it doesn't do

23   anything to inform the Court about what we're trying to answer.

24   It just adds more work on to pulling and removing and pulling

25   and removing and then having us to have to answer other          02:52PM

1   performance measures that are related to that file.

2           THE COURT:  Here's what I will do.  When the

3   transcript of this becomes available I will take a look at 2161

4   and your examples, Mr. Fathi.  I will try to make sure that I

5   completely understand your examples and also the argument that     02:52PM

6   Dr. Taylor is making that she cannot see any way that this

7   could be contrary to the purpose of the sampling for the Court.

8   If I can't answer that question based upon that, I will let you

9   all know and invite you to, perhaps, have Dr. Haney let me know

10  by a further affidavit why this doesn't -- why this argument       02:52PM

11  the defendants raised is still offensive to the principles of

12  sampling.

13          And I must say that just on the fly right now, I

14  cannot comfortably make sure that I'm making a reasoned

15  decision.  So I will do that as soon as the transcript is          02:53PM

16  available and let you know.  I'm sorry to continue this one

17  over and over again.

18          Let's give the court reporter a 15-minute break and

19  we'll come back in.  Thank you.

20          (Recess from 2:53 p.m. until 3:13 p.m.)                     02:53PM

21          MR. FATHI:  Your Honor.

22          THE COURT:  Yes.

23          MR. FATHI:  Just to close out the last discussion, as

24  the Court ponders the issue we just concluded, we would ask

25  that you look at Documents 2160, 2161, and 2176.  And, of          03:12PM

1    course, we are happy to make Dr. Haney available for testimony

2    either telephonically or in person if the Court requires that.

3            THE COURT:  Part of the reason that I was a little bit

4    delayed from when you told me you are were ready is I was still

5    wrestling with this to see if I could give you an answer right      03:13PM

6    now.  And I have to say that part of what Dr. Taylor didn't

7    really make sense to me, so I have to go back and make sure

8    that I do understand what you were saying.  Because I'm not

9    fully appreciating how you say these things are connected.  So

10   I will take a look at these additional documents and do as I       03:13PM

11   said.

12           MR. FATHI:  Thank you, Your Honor.

13           THE COURT:  So then I think it takes us to performance

14   measures that were linked, 94, 95, and 97.  And this is the

15   performance measures I think associated with the suicide watch.    03:13PM

16           MR. FATHI:  The issue with those, Your Honor, is the

17   size and composition of the sample.  The stipulation requires

18   that a certain number of records be sampled for each

19   performance measure, and that means individual patient records.

20   What the defendants are doing for 94, 95, and 97, are they are     03:14PM

21   sampling, in the case of 94 and 95, they are sampling instances

22   when a prisoner was on suicide watch.  For 97 they are sampling

23   instances of a prisoner being seen via telepsychiatry.

24           And the result is that they are in many cases sampling

25   fewer than the required number of records.  So, for example, if    03:14PM

1    you sample 10 instances in the month of May when someone was on

2    watch, those instances may involve only eight or six or four

3    different individuals, so you are not sampling the minimum

4    number of different records required by the measure.

5            THE COURT:  Because you are saying -- what they are          03:15PM

6    saying is that if the same individual is multiple times on that

7    those people don't mean that you have to draw another person.

8    Is that what this is about?

9            MR. FATHI:  It's not so much of drawing another

10   person, Your Honor, it's a question of what the source is.  The    03:15PM

11   source is they are drawing from a list of instances in which

12   people were on suicide watch.  Let's stick with that example.

13           THE COURT:  Okay.

14           MR. FATHI:  So they picked 10 instances that might be

15   10 different individuals or it might be a smaller number.  And     03:15PM

16   the concern is that, as Dr. Haney explains, when you shrink or

17   you contract a sample you are looking at a smaller number of

18   different individuals, and that decreases the

19   representativeness of the sample and the extent to which

20   conclusions can be drawn based on the sample about the larger      03:16PM

21   population.

22           So that's the dispute about those four, if it's

23   sufficient to sample 10 instances of someone being on watch,

24   even if that's only five different people, or do you need to

25   sample 10 instances involving 10 different people.  That's the     03:16PM

CV 12-601 - July 13, 2017 - Status Hearing

1    dispute.

2           THE COURT:  I see Dr. Taylor is teed up to speak to

3    this.

4           DR. TAYLOR:  Yes, Your Honor.  And so when we get to

5    kind of the watch question, the plaintiffs have agreed for us        03:16PM

6    to increase the number of instances in our situation that we

7    review.  So, for instance, now instead of there being 10 we're

8    looking at 15.  And I looked back over the last couple of

9    months, and there are rare instances where it is multiple times

10   where an inmate is pulled because it's a random sample.              03:17PM

11          But as I explained the last time when we were in

12   court, the main question that we consistently want to answer is

13   whether or not the process is working whereby they are placed

14   on watch, they are being seen, they are being seen every day by

15   a licensed individual and/or nurse if it's a weekend, and then      03:17PM

16   they are taken off watch by a licensed person.  That process

17   remains consistent.  I don't care how many people or times that

18   it is.  I want to make sure that that process happens.

19          So that's what the results show.  We are now pulling

20   35 at Eyman, for instance.  And one of the months I looked at I     03:17PM

21   think there were four people who had been pulled twice.  So

22   we're pulling much more than what we had initially agreed to.

23   We asked to pull more and they agreed to that.  But it still

24   equates to more people being reviewed and more instances being

25   reviewed, which is the ultimate goal is that we're getting as       03:18PM

60

1    many times as we can looking at is the process working.  The

2    process is independent.

3            THE COURT:  How is it that more people are being

4    reviewed if you are deciding that a single file pulled that had

5    on/off circumstances multiple times in one month, how do you          03:18PM

6    get more people out of that?

7            DR. TAYLOR:  So our initial agreement had been 20

8    records at Eyman, and the plaintiffs agreed to bumping that up

9    to 25.

10           THE COURT:  So there's nothing about the process that        03:18PM

11    gets you more people.  What Mr. Fathi says is still true, you

12    end up with fewer people if you do count multiple instances for

13    single individuals.

14           DR. TAYLOR:  Correct.  And again, is this going to

15    give us a better representation as to whether or not the             03:18PM

16    process is working?  We have a log.  That's how the log was

17    created way before the stipulation, which is by instance

18    because that's how they track who they have to see, when they

19    have to see them in the watch follow-ups.  So from that, we

20    pull one and the next so we don't end up pulling out of order.      03:19PM

21    We just pull those records, review whether the process worked

22    for that person or not.  And in some cases it's the same

23    person, but it's still whether or not that process is working

24    each and every time it's being employed.

25           And in some cases that's actually hurt them where            03:19PM

1    there's an individual that they are not writing the correct

2    thing in the note because he's not responsive.  And so they are

3    not writing the correct thing and they do it multiple times for

4    two different watches and it hurts them twice.  That's just,

5    sorry, that's the luck of the draw.  Sorry it's the same inmate        03:19PM

6    but you did the wrong thing when you wrote it.  But the

7    question still remains, when we look at a watch, is the process

8    working whereby they are seen every day, the right things are

9    being written, and they are taken off watch the correct way.

10            THE COURT:  This is not like the 85/86 issue, this          03:19PM

11   argument you made about the linkage and about the fact there

12   are two records to be considered for the subsequent one.  This

13   is a single question that fits right within the logic of what

14   Dr. Haney says.  So I do believe that what you need to do is

15   you have to draw individuals.  You can't have an individual          03:20PM

16   that has a bonus of having multiple numbers of incidents in a

17   single month that count toward the total.  So I'm siding with

18   the plaintiffs on this.

19            DR. TAYLOR:  And we, actually, at the last hearing

20   said we were okay with that.  At the last hearing is when the        03:20PM

21   first time they shared that language.  They had been saying

22   that we had to look at any watch day they were on whether it

23   was multiple watch days.  That's the only reason we were in

24   conflict with them initially.  So I had said in the last

25   hearing if that's what you are proposing, we are okay with           03:20PM

1    that.  We haven't heard anything back since that.

2           THE COURT:  Anything you want to say, Mr. Fathi?

3           MR. FATHI:  Your Honor, that's just incorrect.  The

4    transcript will speak for itself.  But we think the Court's

5    ruling is clear.                                           03:20PM

6           DR. TAYLOR:  Thank you.

7           THE COURT:  Let's see.  I had on the agenda the every

8    X number of days, but that's now been fully briefed and I

9    thought maybe I would have a chance to look at it before I came

10   to the bench, but I haven't taken a look at that yet.  I will  03:21PM

11   hold off on that.

12          Where do you all stand on your discussions on max

13   custody?

14          MR. FATHI:  I apologize, Your Honor.  In our internal

15   division of labor that is handled by Ms. Fettig on our side and  03:21PM

16   Ms. Love on the defendants' side, neither of whom is here

17   today.  I can report that there have been some agreements.  I'm

18   afraid I don't have a more granular level of knowledge than

19   that.

20          MR. BOJANOWSKI:  Ms. Love will be here tomorrow and    03:21PM

21   can report to the Court as to the status if the Court wants to

22   hear.

23          THE COURT:  Will Ms. Fettig be here or no?

24          MR. FATHI:  Unfortunately not, Your Honor.  She is in

25   an all-day PREA training.  But one thing we have unfortunately  03:21PM

1    not been able to agree on is the pending motion to enforce.

2    And so that is, as our agenda says, fully briefed.

3              THE COURT:  I didn't know whether some of your

4    discussions would obviate the issues presented there, which I

5    think are ones that I can short circuit by simply determining          03:22PM

6    that you need to come up with a remediation plan.

7              MR. BOJANOWSKI:  I would suggest that we hear from Ms.

8    Love as to the status, Your Honor.  It would bring some clarity

9    even if we don't hear from Ms. Fettig.

10             MR. FATHI:  Your Honor, I have no objection to hearing        03:22PM

11   from Ms. Love.  It's always a pleasure.  But I can assure the

12   Court that motion is fully briefed and ready for decision.

13             THE COURT:  All right.  Fair enough.

14             Next on my agenda is your response to my request that

15   you would see if you could agree on experts to take a look at          03:22PM

16   this problem that I have, and that is that the State's not able

17   to maintain the people that it's decided it needs to have in

18   position to provide for the care.

19             And I have to say, I kind of think both of you have

20   missed the mark on this in terms of being helpful to me.  On           03:23PM

21   the plaintiffs' side, as I read the vitaes that you have

22   suggested, it all looks to me like they are people who are

23   primarily involved in the providing of medical services not the

24   management and procuring of it, the hiring of the people, the

25   market kind of circumstances.  The one individual among the           03:23PM

1    three does seem to have some of that in his vitae but doesn't

2    seem to be terribly strong.  Just doesn't seem to me to be the

3    kind of vitae of a person that I would look to.  That doesn't

4    mean I'm not going to do what I would like to do, and that is,

5    with respect to one of plaintiff's experts, I would like to          03:23PM

6    interview that person and I will arrange for a conference call

7    for that to happen.

8           There's also an opportunity for me to maybe do some of

9    my own exploration to see whether my notion of who might exist

10   in the marketplace of experts in this area.  And if I do have        03:24PM

11   any such contacts with anybody I will invite counsel from both

12   sides to participate in those conversations that I have as

13   well.

14          I found that defendants' suggestion that we don't need

15   to do this because we already have done it unsatisfactory,           03:24PM

16   because although you may have done it, nothing has come of it.

17   And also, the exact project itself didn't seem to be broad

18   enough in the scope.  It doesn't -- at least as I read it, it

19   doesn't address the retention issues.  And you say you are

20   paying market price.  Well, maybe the market price needs to be       03:24PM

21   informed by what it takes to get people into particular

22   positions at particular places.

23          I learned a little bit on the tour today in just

24   conversation with some of the Corizon employees that suggest

25   that there are all sorts of things that are involved in what it      03:25PM

1    takes to get somebody to be employed in the positions that the

2    State has found that it has been unable to procure people for.

3    And so I'm of the mind that I'm going to head forward on this.

4    I'm going to reject the defendants' suggestion that I don't

5    need to do it, but I'm going to proceed, as I said, trying to          03:25PM

6    see if there is a person who can provide this kind of

7    information.  It may well be that the defendants report what

8    Corizon has contracted for could be very useful to the expert

9    because it may be that work's already been done.  But I also,

10   as you know, am not entirely -- I have not been quiet about the        03:25PM

11   sort of mixed motives that are operating here with respect to

12   the contractor.  And we heard some of that today as well.  So I

13   will do that as I say.

14          The only other thing I will comment on about the

15   defendants' submission is that the Ninth Circuit is not happy          03:26PM

16   with the trial courts with respect to how often we allow

17   redacted matters to be filed.  They think we're way too broad.

18   And it struck me that much of what was in the redacted -- I'm

19   sorry -- the sealed portion, I misspoke.  I said redacted when

20   I meant to say sealed.  I guess you could use it both ways.            03:26PM

21   But in any event, the sealed portion, that seemed potentially

22   to be overbroad.

23          And so I'm going to take a look at that again, and I

24   will give you an opportunity to be heard.  But I just wanted to

25   red flag for you that I think there's -- it's the path of least       03:27PM

1    resistance just to file a redacted copy and a sealed copy and

2    for many, many, many years that's what we all did.  We let the

3    lawyers control it.  But the circuit has told us we can't do

4    that.  Court is a public record, so matters that are going to

5    be a basis for decision making for the Court need to be open to        03:27PM

6    the public unless it's a trade secret or a personal privacy

7    issue or some other well-established body of principle or law

8    that allows for the sealing of the records.

9              MS. KENDRICK:  Your Honor.

10             THE COURT:  Yes.                                             03:27PM

11             MS. KENDRICK:  We submitted our three names to you on

12   June 28th.  That was two weeks after the last status hearing.

13   And at the time we had reached out to multiple individuals,

14   including people who had background in recruitment and

15   retention of physicians.  And unfortunately, some of them were        03:28PM

16   either out for vacation or the other stuff and they got back to

17   us more recently in July.  So if you would like, we could

18   submit additional candidates to you.

19             THE COURT:  I would welcome that if you would please

20   provide that.                                                         03:28PM

21             MS. KENDRICK:  Yes, sir.  We will.

22             MR. BOJANOWSKI:  Your Honor, we would like the same

23   opportunity.

24             THE COURT:  And you are welcome to do that as well.

25             MR. BOJANOWSKI:  Thank you, Your Honor.                     03:28PM

1      THE COURT:  It might be that before you all do that

2  you take a look at one another's names again to see if it would

3  obviously be easier and better if we could come to an agreement

4  in advance of me having to have to vet the person and make a

5  decision.                                                          03:28PM

6      MS. KENDRICK:  When would you like us to provide those

7  names?

8      THE COURT:  As soon as you can accomplish these two

9  things, one, have a chance to talk with one another.  So just

10  check in with one another and see when you can do it.  The      03:28PM

11  Ninth Circuit Judicial Conference is next week so I won't be

12  doing work here.  So you've got that time.  And I will be back

13  in the office the week after.

14      MS. KENDRICK:  Thank you.

15      THE COURT:  There's one other thing.  There are          03:29PM

16  actually two other things that I would like to raise, and I'm

17  sure I have omitted things that you will be raising.  But let

18  me just tell you what my additional items are.

19      As I read Dr. Haney's affidavit, it occurred to me

20  that many of these things that he talked about were things that  03:29PM

21  the testimony that we have had from the people from the State

22  who are involved in the process of record collection, that it

23  seemed like they didn't have the benefit of what was described

24  as kind of basic understanding in this area.  And it made me

25  think that perhaps we could address that by including it in the  03:30PM

1    monitoring manual.  And I wonder if those who are working on

2    the monitoring manual have an idea about that, about whether

3    some of these random selection procedures should be explained

4    to people who are doing it so they understand the philosophy.

5           Again, I have to say, I haven't had an opposition to          03:30PM

6    Dr. Haney's affidavit.  I haven't had a countervailing

7    affidavit to it.  And it just seems to make sense to me and

8    also seems to have to kind of background that would suggest

9    that he is speaking from authority.  But I would ask you to, I

10   don't know whether you still are able to return to the drafting   03:30PM

11   notion or the thinking about it in the Monitoring Guide or

12   whether you are past that point where it would be efficient to

13   do it.  But I'm thinking maybe that would make sense.

14          MR. BOJANOWSKI:  Meet and confer would probably be

15   appropriate.  We have done that in the past with regard to the    03:31PM

16   manual and have made numerous changes.  So we could make

17   arrangements to discuss the issue of including maybe something

18   in the introductory section as to sampling methodology, maybe.

19   And if plaintiffs have suggested language, maybe it would be

20   more efficient if they would get it to us first prior to the      03:31PM

21   meet-and-confer.

22          THE COURT:  Okay.  That makes sense if you could do

23   that, see about pursuing that.

24          The plaintiffs have asked for an update on the request

25   for proposal for Corizon.                                          03:31PM

1      MS. KENDRICK:  Yes, Your Honor.  So when Mr. Pratt

2  testified in May in response to some questions you were asking

3  him about the contract, he stated that it was up for renewal

4  and that they were receiving some bids.  And ADC's RFP, request

5  for proposal, went out in September of 2016.  The bids were due      03:32PM

6  in December of 2016.  This is based upon a review of the State

7  of Arizona procurement website.

8      But the information on the bids isn't publicly

9  available.  So that's not available, but the bidders in the

10  process do have the opportunity to refuse or to counter           03:32PM

11  individual requirements in the RFP.  And so our concern is just

12  that over the months we have heard about how the contract has

13  been a barrier to providing certain things that either the

14  Court is suggesting or that we are suggesting.  And so what

15  we're asking for is whether or not we could have some sort of     03:32PM

16  update about what's going on in the process, you know, are

17  there things that were requested in the RFP that are being

18  negotiated away, that sort of thing.

19      THE COURT:  Well, coincidentally at the same time you

20  make this inquiry we also have the request of the intervenor      03:33PM

21  Corizon to participate as amicus in the case.  And I guess it

22  seems to me if they want to participate as an amicus in the

23  case it could go both ways, especially because they have

24  declared their interest in the case as an intervenor.  I gather

25  that intervenor status is terminated by the conclusion of the     03:33PM

1    case and an entering of a stipulated contract between the

2    parties that don't include the intervenor.  So I guess that's

3    why it's necessary -- or at least why Corizon thinks it's

4    appropriate to ask for permission to appear as an amicus.  But

5    I wonder if we -- your particular inquiry is you want to know          03:33PM

6    whether there is some kind of public back and forth with

7    respect to the proposed contracting parties.

8         MS. KENDRICK:  It may be something where such an

9    update would have to be to the Court and to plaintiffs, you

10   know, under some sort of redaction.  I don't know.  The point         03:34PM

11   is is that in 2013 when Corizon took over the contract pretty

12   last minute with Wexford, they negotiated some pretty

13   significant modifications.  And the most profound one is the

14   one that the Court's aware of that says staffing can be at 91

15   percent and there's no penalty so there was that 90 percent           03:34PM

16   cutoff.  The request for proposal actually said fines would

17   kick in if the contractor wasn't staffed at 100 percent.

18        So that was something that was negotiated that is, in

19   our view, adversely affecting our clients.  So what we were

20   hoping for was some sort of update as to as this contractual         03:34PM

21   basis is going on between the State and its two bidders, are

22   there elements that are going to be negotiated upon that's

23   going to lock the Department into something that will adversely

24   affect our clients?  So, for example, something like a

25   modification that says it's not 100 percent you start paying         03:35PM

1    the penalty for not being 100 percent staffed but it's 90

2    percent or some other number.

3              So that's just an example of the contractual

4    modifications that have happened in the past that came to a

5    head in the course of this case and the monitoring.  So we          03:35PM

6    basically don't want that to happen again.

7              THE COURT:  Well, on the one hand you allude to the

8    fact that the Court feels that it is worthwhile to be aware of

9    what the contract provides because it's part of the situation

10   on the ground that I am addressing at many different levels.          03:35PM

11   So that makes sense for me to be involved to know what the

12   contract is.  I don't know whether or not there's an

13   appropriate role for the Court to allow entry into negotiating

14   procedures because fundamentally, I'm not limited by what the

15   State chooses to contract.  The obligations of the stipulation       03:35PM

16   are independent of whether or not they found somebody who can

17   perform these services because it's not Corizon that's on the

18   hook, it's the signatory to the stipulation that's on the hook.

19   So no one could ever say that we can't do this, Judge, because

20   we have entered into a contract with Corizon and that's not          03:36PM

21   part of it.

22             So that seems to suggest that there's a limit to my

23   ability to do what you say.  But I think it is reasonable to

24   ask what the status is with respect to whether or not Corizon

25   is even interested in the process or whether if that's public       03:36PM

1    information.  I don't know whether it is or not.  I don't know

2    anything at all about it.  And we may well have somebody in the

3    courtroom to feels that they can talk about it, or we may not.

4            MR. BOJANOWSKI:  We do not.

5            THE COURT:  Okay.  Thank you.                          03:36PM

6            MS. KENDRICK:  I think to the extent the Court would

7    want us to perhaps articulate this more clearly, you know, we

8    could submit some sort of brief to the Court about more

9    specifically what we're interested in.

10           THE COURT:  Have you talked to Corizon's counsel about  03:37PM

11   this?  They have just changed counsel, right?  Is that right

12   they have new counsel on the case?  We had accompanying on the

13   tour today and I just noticed recently some name changes.  Do

14   you know, Mr. Bojanowski, what is status is?  Is there new

15   counsel for Corizon?                                          03:37PM

16           MR. BOJANOWSKI:  There is.

17           THE COURT:  All right.

18           MR. BOJANOWSKI:  Yes.

19           THE COURT:  And so it may well be that if you haven't

20   had that initial phone call with maybe Mr. Fargotstein, it may  03:37PM

21   be Mr. Kartchner.  There's one other name, I think.

22           MR. BOJANOWSKI:  Mr. Callahan.

23           THE COURT:  I just noticed Mr. Kartchner is here.  So

24   you are counsel for Corizon, but you are not here and you can't

25   speak for them now.  On the one hand you want to be            03:38PM

1    participating as an amicus but when we've got an inquiry you

2    don't want to step up?

3            I thought I recognized you, but when you were silent I

4    thought, well, maybe it's his brother.

5            MR. KARTCHNER:  No, Your Honor, very simply put, until    03:38PM

6    the Court rules on our request to participate as an amicus I

7    don't think it's appropriate for us to take a position on

8    behalf of Corizon.  Once the Court rules on that motion we

9    would be happy to participate as amicus, what we call an active

10   amicus.                                                        03:38PM

11           THE COURT:  Do the plaintiffs have any objection to

12   this amicus role?

13           MS. KENDRICK:  Yes, we do, Your Honor.  First of all,

14   that's not what the role of an amicus is normally.  If Corizon

15   wants to be part of this they should properly file a notice to    03:38PM

16   intervene as a party defendant.

17           THE COURT:  Hold it.  They did.  They did that before,

18   I thought.  Didn't they?  Weren't they in the --

19           MS. KENDRICK:  No.  I think they filed a motion to

20   intervene with regard to a particular briefing motion, so more    03:39PM

21   of an amicus position there.  But obviously we need to brief in

22   response to their motion, and we're not going to lay out our

23   position right now.  But the point is that that is not what an

24   Amicus role normally is.

25           THE COURT:  I agree, but this is not an usual case.    03:39PM

1    This is not an ongoing litigation.  This is a settled case with

2    a stipulation of two parties where you have somebody who is not

3    having to have to worry that there may be a judgment in the

4    case that could adversely affect their interest.  They are

5    worried, perhaps, about some other issues that can arise from          03:39PM

6    time to time.  And the thing that makes me think that this is

7    something worth looking at is that it's been obvious to me, and

8    probably to everybody else here, that Corizon is a big player

9    here because they are providing the healthcare.

10           And so I'm interested in efficiencies and how to cut          03:39PM

11   to the quick on things, so that's what I was talking about

12   today, as you hear this from me a lot.  I'm really interested

13   in efficiencies that occur when people talk with one another.

14   So allowing them to talk in court, I'm not necessarily inclined

15   to allow them to chill any of the witnesses.  I'm concerned          03:40PM

16   about that, obviously.  I mean, I'm a big boy.  I have been

17   around the block.  I know what goes on, and I know that I'm

18   dealing with a contractor where there are contrary interests to

19   the interests of the court and perhaps contrary interests to

20   the state but I also know their interests with the state and         03:40PM

21   contractor are aligned to the interests of the court.  I have

22   seen that.  I have talked about it.

23           So it's a reality in this case.  And there are

24   realities on the ground level, too, with respect to me relying

25   on information that's provided to monitors that are people who        03:40PM

1   have every incentive to not be honest in the whole process.

2   And so I'm very much aware of all of this, and it's not as if

3   I'm inviting somebody into the tent who is then going to, you

4   know, the wolf who will eat all the chickens before dawn.  I

5   know that I have got wolves around.  I have got lots of wolves          03:41PM

6   so I'm paying attention to them.

7           So we'll hold off on this issue until you have a

8   chance to respond to the motion.  We will let the back benchers

9   stay on the back bench for now and see what happens going

10  forward.                                                                03:41PM

11          MS. KENDRICK:  Thank you.

12          THE COURT:  All right.  There's my list.  Plaintiffs,

13  what did I miss?

14          MR. FATHI:  Nothing further, Your Honor.  As I said,

15  we had some preliminary matters regarding the evidentiary               03:41PM

16  hearing, but I think it makes sense to defer those until

17  tomorrow.

18          THE COURT:  Okay.

19          MR. FATHI:  And I will see if Ms. Fettig is able to be

20  available telephonically.                                               03:41PM

21          THE COURT:  If it's possible to work her in so we

22  could do it at the time Ms. Love is giving us her report so we

23  would be able make sure it is in fairness a full presentation

24  of what each side believes the current status is.

25          MR. FATHI:  I will do my best to make that happen.             03:42PM

1      MR. BOJANOWSKI:  If you want us to defer, I mean --

2      MR. FATHI:  I will find out if she can be available.

3  As I said, she is in an all-day training so if she is it would

4  probably be at the lunch hour, for example.  I will then let

5  the defendants know about that, and perhaps we can have both          03:42PM

6  Ms. Fettig and Ms. Love available at the same time.

7      THE COURT:  Again, if it works, great.

8      Mr. Bojanowski.

9      MR. BOJANOWSKI:  We don't have any other issues, Your

10 Honor.                                                              03:42PM

11     THE COURT:  We'll be back tomorrow morning at 9.

12 Thank you all very much.  Appreciate it.

13     (Proceeding concluded at 3:42 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                        C E R T I F I C A T E

6

7          I, LAURIE A. ADAMS, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 19th day of July,

16   2017.

17

18                                  s/Laurie A. Adams

19                                  _____
                                    Laurie A. Adams, RMR, CRR

20

21

22

23

24

25