```
1                UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF ARIZONA

3             _____

4
     Victor Parsons, et al., on    )
5    behalf of themselves and all  )
     others similarly situated;    )
6    and Arizona Center for        )
     Disability Law,               )
7                                  )  No. CV 12-00601-PHX-DKD
                Plaintiffs,        )
8                                  )
          vs.                      )  Phoenix, Arizona
9                                  )  July 14, 2017
     Charles Ryan, Director,       )  9:03 a.m.
10   Arizona Department of         )
     Corrections; and Richard      )
11   Pratt, Interim Division       )
     Director, Division of Health  )
12   Services, Arizona Department   )
     of Corrections, in their      )
13   Official capacities,          )
                                   )
14              Defendants.        )
     _____)
15

16

17   BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

18         REPORTER'S TRANSCRIPT OF PROCEEDINGS

19              (Evidentiary Hearing)

20

21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc 43
23   Phoenix, Arizona 85003-2151
     (602) 322-7256
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription
```

<u>**A P P E A R A N C E S**</u>

**For the Plaintiffs:**

       EIDENBACH LAW PC
       By:  **Kirstin T. Eidenbach, Esq.**
       P.O. Box 91398
       Tucson, AZ 85752

       ACLU - Washington DC
       By:  **David C. Fathi, Esq.**
       915 15th Street NW
       7th Floor
       Washington, DC 20005

       PRISON LAW OFFICE
       By:  **Corene Kendrick, Esq.**
       By:  **Donald Specter, Esq.** (Present telephonically for
       a.m. session only.)
       1917 5th Street
       Berkeley, CA 94710

       ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
       By:  **Maya S. Abela, Esq.**
       177 N. Church Avenue
       Suite 800
       Tucson, AZ 85701

For the Defendants:

       STRUCK WIENEKE & LOVE, P.L.C.
       By: **Timothy J. Bojanowski, Esq.**
       By: **Rachel Love, Esq.**
       By: **Anne M. Orcutt, Esq.**
       3100 W. Ray Road
       Suite 300
       Chandler, AZ 85226

**I N D E X**

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MARK E. BLOCKSOM | | | | |
| By Ms. Eidenbach | 14 | | 48 | |
| By Mr. Bojanowski | | 39 | | |
| | | | | |
| RONALD OYENIK | | | | |
| By Ms. Kendrick | 56 | | 97 | |
| By Mr. Bojanowski | | 87 | | |
| | | | | |
| DOMINIQUE KEYS | | | | |
| By Ms. Eidenbach | 103 | | 167 | |
| By Mr. Bojanowski | | 153 | | |
| | | | | |
| ANGELA ASHWORTH | | | | |
| By Ms. Kendrick | 173 | | | |

**INDEX OF EXHIBITS**

| EXHIBIT | | IDENT | RECEIVED |
|---|---|---|---|
| 1 | Open sick call hours | 65 | 65 |
| 2 | Google map photo | 73 | 73 |
| 3 | HNR Oyenik 3-27-17 | 78 | 78 |
| 4 | HNR Oyenik 7-12-17 | 85 | 85 |
| 5 | HNR Keys 5-6-17 | 151 | 151 |
| 6 | HNR Ashworth 6-5-17 | 191 | 191 |
| 7 | HNR Ashworth 6-6-17 | 195 | 196 |
| 8 | Inmate Letter Ashworth 6-6-17 | 199 | 201 |
| 9 | Inmate Informal Complaint Resolution | 206 | 209 |
| 10 | Six inmate letters | 208 | 209 |
| 11 | Weekend watch notes | 263 | 263 |

```
 1                    P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Civil Case 12-601, Parsons
 3    versus Ryan.  This is the time set for status hearing.
 4              THE COURT:  Would counsel please announce.
 5              MR. FATHI:  Good morning, Your Honor.  David Fathi of     09:03AM
 6    the ACLU National Prison Project for the plaintiff class.
 7              THE COURT:  Thank you.  Good morning.
 8              MS. KENDRICK:  Corene Kendrick, Prison Law Office, for
 9    the plaintiff class.
10              THE COURT:  Good morning.                                09:03AM
11              MS. EIDENBACH:  Kirstin Eidenbach for the prisoner
12    plaintiff class.  And behind me is Maya Abela from the Arizona
13    Center for Disability Law.
14              THE COURT:  She only doesn't get to speak for herself
15    because she doesn't have a microphone handy.                       09:04AM
16              MR. BOJANOWSKI:  Tim Bojanowski, Anne Orcutt, and
17    Rachel Love for the defendants.
18              THE COURT:  Good morning.
19              And anyone on the phone.
20              MR. SPECTER:  Yes.  Donald Specter from the Prison Law    09:04AM
21    Office.
22              THE COURT:  Thank you.  Good morning.
23              MR. SPECTER:  Good morning.
24              THE COURT:  Any preliminary matters, counsel, before
25    we proceed with the evidentiary hearing?                           09:04AM
```

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1      MR. FATHI:  Yes, Your Honor.  We have a couple matters

2  preliminary to the hearing so we would like to raise those now.

3      THE COURT:  Please go ahead.

4      MR. FATHI:  Thank you, Your Honor.  Court-ordered both

5  parties to file their witness list for this hearing on July        09:04AM

6  7th.  Plaintiffs complied with that order.  Defendants did not.

7  They filed their witness list three days late on July 10th.  We

8  had considered making a motion to strike but decided against

9  that because we know the Court wants to hear about the open

10  clinic.  But we would like an explanation from the defendants     09:04AM

11  why they apparently did not feel obligated to comply with the

12  Court's order.

13      THE COURT:  Well, I appreciate that, but I'm going to

14  demur because I want to get on to the matter at hand.  I'm more

15  concerned about issues associated with non compliance with       09:05AM

16  court orders where there's prejudice to the Court but I think I

17  have the witnesses here so the prejudice isn't present.  But as

18  you know, I have got lots of problems with what's happening on

19  the defendants' side of the case and they know about that with

20  respect to compliance with certain aspects of my orders and      09:05AM

21  also facilitating what I think is efficient management of the

22  case.  And you have heard, and defendants' counsel have heard

23  me go over those things.  So I will demur on that one.

24      Go ahead with the next one.

25      MR. FATHI:  We'd also like to update the Court on           09:05AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1    document production as it pertains to today's hearing.  We

2    received about 1800 pages of grievance appeals on Tuesday night

3    but we did not receive any from the Florence, Eyman, or Tucson

4    facilities.  Then Wednesday night at about 10 p.m. we received

5    another 2,600 pages of grievance appeals but still nothing from    09:06AM

6    Tucson which, as the Court may recall, has a disproportionate

7    number of severely ill prisoners.

8            Also late Wednesday night we received about 12,000

9    pages of e-mails and open clinic documents.  Some of these

10   documents were dated as early as November of 2016, so we remain    09:06AM

11   puzzled by the defendant's prior representations that no

12   responsive documents existed.

13           Yesterday just a few minutes before the hearing began

14   we received another 1,400 pages of documents and then late last

15   night a couple of hundred more pages along with notification      09:06AM

16   that the production is still not complete.  I should point out

17   that last night at about 10:45 were the very first grievance

18   appeals we received from the Tucson facility.

19           We greatly appreciate the production of these

20   documents, and we have done our best to review them, but          09:07AM

21   obviously we haven't reviewed the 15,000 pages that we received

22   in the last 36 hours.  And obviously this prejudices, to some

23   extent, our ability both to put on our own case and to

24   effectively cross-examine the defendant's witnesses.

25           So what we would ask, Your Honor, is that the hearing,     09:07AM

**CV 12-601 - July 14, 2017 - Evidentiary Hearing**

1  of course, go forward today but that it be continued to another

2  date to allow admission of additional evidence and also to

3  allow defendants' witnesses to be recalled if necessary for

4  additional cross-examination based on documents that were not

5  timely produced.                                              09:07AM

6       THE COURT:  Well, if your review of these documents

7  demonstrates that you do think there's reason to recall

8  witnesses or to call other witnesses or to present evidence in

9  some way to the Court that would have occurred otherwise today,

10 I will allow you to make what argument to me and we'll consider  09:07AM

11 it.

12      MR. FATHI:  Thank you, Your Honor.

13      And finally, a motion in limine, obviously all of our

14 witnesses today have felony convictions.  And some of those are

15 properly admissible under Rule 609.  But we would ask for an    09:08AM

16 order in limine that only the fact of the conviction come in

17 and that there be no questioning about the facts surrounding

18 the offense for which the prisoner was convicted.

19      And our authority for this is *U.S. versus Rubio*, 727

20 F.2d 786. 797 at Note 5, Ninth Circuit, 1994; and *U.S. versus*  09:08AM

21 *Sine*, S-I-N-E, 493 F.3d 1021, 1036, Note 14, Ninth Circuit

22 2007.

23      THE COURT:  Do you happen to know in those cases who

24 the finder of fact was?  Was it a jury or was it the Court?

25      MR. FATHI:  I do not know offhand, Your Honor.          09:08AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1    THE COURT:  You can imagine why I'm asking that

2    question, because it's no surprise to me that anybody who is

3    responding to my writ of habeas corpus to produce somebody in

4    custody that they are in custody and they are there for a

5    reason.  And I also can instantly, I mean, disregard that fact        09:09AM

6    in a way that is characteristic as we, lawyers, who are

7    professionals in court can understand that fact in some way

8    that maybe members of the jury wouldn't.  They think if

9    somebody is in custody, that means, period, the end, we can

10   never believe them.  And you know that's not something that the      09:09AM

11   lawyers -- so I don't think the motion in limine is necessary

12   when you are presenting evidence to the finder of fact who is

13   the Court.

14   MR. FATHI:  Just to be clear, Your Honor, again, we

15   have no objection to convictions that properly come in under        09:09AM

16   Rule 609, but we simply ask that there be no inquiry into the

17   facts surrounding the underlying offense.  We think that has,

18   given the issues of this case, no probative value.  It's not

19   relevant and it could be in the witness's experience or, in

20   fact, harassing.  So we would ask for that limitation.               09:10AM

21   THE COURT:  Well, if it turns out we get into the

22   harassment sort of situation I will look at that.  But I can't

23   think that, again, the defendants are going to spend much time

24   trying to say that the people you have identified apart from

25   what they talk about with respect to the relevant matters at        09:10AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1    hand here --

2           MR. BOJANOWSKI:  Your Honor, rest assured, I am not

3    going to get into the felony conviction details of the

4    witnesses.

5           THE COURT:  I didn't think so.                    09:10AM

6           MR. BOJANOWSKI:  It's a matter of fact.

7           THE COURT:  Fair enough.

8           MR. BOJANOWSKI:  I am not going to ask them what they

9    have been convicted of.

10          MR. FATHI:  The reason for the motion, Your Honor, was   09:10AM

11   that those questions were asked during the depositions.  So I'm

12   happy to receive Mr. Bojanowski's assurance that they will not

13   be asked today.

14          THE COURT:  I see.  When were the depositions?

15          MR. FATHI:  Primarily 2014 of these witnesses.      09:10AM

16          THE COURT:  All right.  Thank you.

17          Anything else?

18          MR. FATHI:  No, Your Honor.  Those conclude the

19   preliminary matters I wanted to raise.  Thank you.

20          THE COURT:  In light of your comment yesterday        09:11AM

21   regarding the scheduling of matters it raised in my own mind

22   whether you are going to invoke the rule.

23          MR. FATHI:  We are, Your Honor.

24          THE COURT:  Okay.  All right.  Mr. Bojanowski, are the

25   non-in custody witnesses in the courtroom now?           09:11AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1      MR. BOJANOWSKI:  No, they are not.  We would invoke

2  the rule as well.

3      THE COURT:  Okay.  All right.  And counsel, I would

4  ask you to make sure that you explain to the respective

5  witnesses that you have some association with what the meaning      09:11AM

6  of that rule is and that is that they cannot be told by anybody

7  what previous witnesses' testimony was until after their

8  testimony is taken.

9      All right.  So who is the first witness?

10     MR. BOJANOWSKI:  Your Honor, we had one preliminary      09:11AM

11 matter as well.

12     THE COURT:  Yes.  Okay.

13     MR. BOJANOWSKI:  We wanted to make sure that we are

14 very clear, and counsel for the plaintiffs are clear as to the

15 scope of this hearing, that being the removal of HNR collection      09:12AM

16 boxes from housing units participating in the open clinic

17 process.  We had heard that there may be some questioning

18 regarding quality of care, things of that nature, which would

19 require us to then bring other witnesses in, which we are not

20 doing.      09:12AM

21     We're bringing in witnesses specifically to talk about

22 the removal of the boxes and how the open clinic process runs

23 and we want to make sure that the plaintiffs' witnesses are

24 going to be testifying within that scope and not testifying

25 about their personal opinion as to whether they are getting      09:12AM

1    adequate medical treatment or not.

2         THE COURT:  I'm disinclined to give you a decision at

3    this moment about that because depending upon how the

4    examination proceeds, it may produce information that's of

5    interest to me that is in that subject area that is generally          09:13AM

6    defined as quality of care.  Because the HNR issue is one

7    that's not simply whether the box has a title on it HNR as

8    opposed to medical refills.  It's about whether or not it has

9    an effect on the quality of care which is another way to say

10   complies with the stipulation.                                          09:13AM

11        So it may well be that it's broader than just that

12   narrow defined topic of HNRs, but it's certainly easy for that

13   to move over into the broader topic of what you described as

14   quality of care.  So we'll hold off on that until the

15   circumstances present itself.                                           09:13AM

16        MR. BOJANOWSKI:  Should that arise, Your Honor, we

17   would similarly seek additional evidence to along the same

18   lines as the plaintiffs have requested.

19        THE COURT:  In fairness I would give you a chance to

20   argue that.                                                             09:13AM

21        MR. BOJANOWSKI:  Thank you, Your Honor.

22        MR. FATHI:  I beg your pardon, Your Honor.  One more

23   matter.  We would ask that while the first witness is

24   testifying, the first prisoner witness, that one of our counsel

25   be allowed to speak to the other witnesses to prepare them for         09:14AM

**CV 12-601 - July 14, 2017 - Evidentiary Hearing**

1    their testimony.  Is that possible?

2           THE COURT:  You mean just to be absent of the

3    courtroom?

4           MR. FATHI:  Yes.

5           THE COURT:  To talk with your client is what you are          09:14AM

6    saying?

7           MR. FATHI:  Yes, Your Honor.  I believe this would

8    require some facilitation by the marshals to allow Ms. Kendrick

9    access to where the prisoner is being held.

10          THE COURT:  Well, I have no objection to that.          09:14AM

11          MR. FATHI:  Thank you, Your Honor.

12          THE COURT:  So how do we proceed?  How do we get the

13   witnesses into the courtroom?  We're a little bit winged here

14   because, unfortunately --

15          MR. BOJANOWSKI:  I believe they are right through that          09:14AM

16   door.

17          THE COURT:  We don't have anybody who knows.

18          MR. BOJANOWSKI:  If you want I can go in there and

19   look.

20          THE COURT:  We're winged because the courtroom deputy          09:14AM

21   that normally serves here had an emergency, and so we're lucky

22   to have the benefit of a replacement, but there are strange

23   protocols with respect to people who are not transferred to the

24   marshal's custody.  Whom do you want?

25          MS. EIDENBACH:  Mr. Blocksom.          09:15AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1      THE COURT:  Good morning, sir.  If you just would stay

2  there for a second and as we administer the oath.

3      THE WITNESS:  Yes.

4      THE COURTROOM DEPUTY:  State your name for the record,

5  please.                                                    09:16AM

6      THE WITNESS:  Mark E. Blocksom.  Mark Edward Blocksom.

7      (The witness was sworn.)

8      THE COURTROOM DEPUTY:  Thank you.

9      THE COURT:  Mr. Blocksom, if you come over to the

10  witness stand, we're going to do something that I don't want   09:16AM

11  you to do if it's risky here, that is, take the witness stand.

12  With the ankle shackles I don't want you to fall.  So take a

13  look at it.

14      THE WITNESS:  I'm good.

15      THE COURT:  Thank you, sir.                            09:16AM

16      MS. LOVE:  Your Honor, may we wait to start the

17  testimony until Mr. Bojanowski is back?

18      THE COURT:  Mr. Blocksom, we're going to wait for a

19  minute because two of the lawyers are --

20      THE WITNESS:  Can I have some water?                   09:17AM

21      THE COURT:  Surely.

22      MR. BOJANOWSKI:  Thank you, Your Honor.

23      THE COURT:  All right.  You may proceed.

24      MS. EIDENBACH:  I will let Tim sit down.

25      THE COURT:  Okay.                                      09:17AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Direct

1          MS. EIDENBACH:  Ready?

2          MR. BOJANOWSKI:  Yes.

3                    MARK E. BLOCKSOM,

4    a witness herein, having been first duly sworn by the clerk to

5    speak the truth and nothing but the truth, was examined and

6    testified as follows:

7                    DIRECT EXAMINATION

8    BY MS. EIDENBACH:

9    Q.  Good morning, Mr. Blocksom.  How are you?

10   A.  Good morning.  Good.                                    09:17AM

11   Q.  Can you please state your full name and your Arizona

12   Department of Corrections number for the record?

13   A.  Mark Edward Blocksom.  180684.

14   Q.  Can you spell your name for the court reporter, please?

15   A.  B-L -- M-A-R-K, and the Edward, B-L-O-C-K-S-O-M.         09:17AM

16   Q.  Thank you.  Mr. Blocksom, where are you housed within the

17   Department of Corrections?

18   A.  At East Unit Florence.

19   Q.  And how long have you been housed there?

20   A.  Since August 2013.                                      09:18AM

21   Q.  How long have you been in custody?

22   A.  Since March 11th, 2011.

23   Q.  And when did you arrive at the courthouse to testify today?

24   A.  This morning.  It was approximately 8 p.m.

25          THE COURT:  P.M.?                                    09:18AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Direct

1        THE WITNESS:  I'm sorry.  8 a.m.  That would have been

2   interesting, huh.

3   BY MS. EIDENBACH:

4   Q.  And did you have any medications that were due this

5   morning?                                                        09:18AM

6   A.  Yes.

7   Q.  And did you receive those medications?

8   A.  Yes.

9   Q.  At what time?

10  A.  At it was 5:30 a.m.  They went to great pains to make sure  09:18AM

11  I got them.

12  Q.  Good.

13  A.  Normally that wouldn't have happened.

14  Q.  I'm glad to hear it.  Thank you.

15        Can you -- do you have any medical diagnoses?            09:18AM

16  A.  Yes.

17  Q.  Can you tell us what those are?

18  A.  My primary -- I mean, I have some major ones.  I'm HIV

19  positive.  I have Stage 4 Hepatitis C.  I have high blood

20  pressure, diabetes, and chronic pain issues.  Those are the    09:19AM

21  primary -- my primary diagnoses.

22  Q.  And you mentioned earlier that you take medications

23  currently, is that correct?

24  A.  Yes.

25  Q.  Do you know how many people are housed at Florence unit?  I  09:19AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Direct

1  mean at East Unit at Florence?

2  A.  It varies, but it's between 680 and 700.

3  Q.  And what is the security level at East Unit?

4  A.  Medium security level 3.

5  Q.  Is it an open yard?                                          09:19AM

6  A.  Yes.

7  Q.  And can you tell the Court what that means in terms of your

8  ability to move?

9  A.  On an open yard, it's basically once the yard opens -- they

10 close the yard at different times.  When they close it -- I       09:20AM

11 mean when they open it, we have the ability to roam around the

12 yard free of any supervision or anything like that or

13 restraint.  You know, I mean, we can come and go as we please

14 within the gated area.  And, you know, there's nobody to

15 restrict our movement in any way.                                 09:20AM

16 Q.  You mentioned that the yard is closed down at certain times

17 of day.  What times of day are those?

18 A.  Okay.  The yard is opens at 6 a.m., or approximately there,

19 and it closes at 11 a.m. to approximately 12 p.m., or 12 noon,

20 and then again it will close at 3:30 p.m. and open again around   09:20AM

21 4:45 to 5:00 p.m.  And then it closes for the evening at 8:00

22 in the evening until 6:00 in the morning.

23 Q.  And on your yard, have you observed the presence of

24 prisoners using mobility-assisting vehicles like wheelchairs,

25 canes, walkers, those types of things?                            09:21AM

1   A.  Yes.  On East Unit it's a wheelchair accessible yard so

2   there's people with canes, wheelchairs.  There isn't any

3   restricted -- as far as my understanding, you are not

4   restricted from being on that yard if you have a wheelchair or

5   some type of impaired mobility issues.                          09:21AM

6   Q.  You told us earlier that you have several chronic medical

7   conditions.  So as a result of these, have you had to access

8   the medical care on East Unit?

9   A.  Yes, quite frequently.

10  Q.  Are you familiar with a concept called open clinic?        09:22AM

11  A.  Yes.

12  Q.  Can you tell us what your understanding of that is?

13  A.  The open clinic, it's designed to give us access to the --

14  to nurses, what they call the nurse's line, you know.  We have

15  a medical building and people from 7:00 in the morning, the    09:22AM

16  clinic is open from 7:00 in the morning until 4 p.m. in the

17  afternoon.  Those are the posted hours.  Again, you can't go up

18  there during count.

19        But what it provides is you go up there and you talk

20  to the officer who is posted at that station.  You give them   09:22AM

21  your ID, and it's first come, first served and then you are put

22  in a queue to see the nurse.  And it's first come, first

23  served.  And you will, again, according to the officer that's

24  posted at that station, you may or may not be required to wait

25  inside -- be allowed to wait inside or you may be required to   09:23AM

1  wait outside.  But you basically are sitting there and then the

2  nurse will wait to examine you.

3  Q.  Who runs the open clinic at East Unit?  Not names just what

4  positions run it.

5  A.  Corizon.  You mean the Corizon?  Yes.  Corizon.          09:23AM

6  Q.  And do you know -- so a nurse working for Corizon?

7  A.  Yes.

8  Q.  And how many nurses run the open clinic at East Unit?

9  A.  Well, there's only one nurse who is assigned the duty for

10  the clinic per day, and typically, they are there seven days a   09:23AM

11  week but that's subject to their availability to whether they

12  get pulled for other units or there's whatever, you know.

13  It's -- that's the idea but it's not practiced all the time.

14  Q.  And you mentioned that sometimes you are permitted to wait

15  inside and sometimes you are required to wait outside.  Can you  09:24AM

16  tell us what determines where you wait?

17  A.  The officer that's assigned to that post will -- some are

18  more flexible than others, but usually there's not allowed to

19  be more than two, three maximum people waiting inside.  If

20  there are more people on the nurse's line, then those people   09:24AM

21  are required to wait out.  There's areas, sitting areas anyhow

22  outside that you have to wait outside around the medical

23  building in order to -- if you leave the area you risk possibly

24  losing your place in line.  And the way of paging you isn't the

25  most efficient either.                                          09:24AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Direct

1  Q.  Can you describe for us the way that you are paged?

2  A.  Well, they have an intercom system, and if you are not --

3  and they tell you when you come up for nurse's line that you --

4  not to go anywhere, to be in the general area where they can

5  basically open the door and call out and that you will, you                09:25AM

6  know, you will be heard.  But if you are not there, basically

7  if you are not there when the officer comes out to call you,

8  you will be kicked back to the end of the line.

9  Q.  So you have to wait in the area?

10 A.  In the general area.                                                    09:25AM

11 Q.  To make sure --

12 A.  Otherwise you risk, I mean, yeah.

13 Q.  So you told us that when you arrive you hand your ID to an

14 officer, and that's what gets you placed in the queue.  Do you

15 have to sign in anywhere?                                                   09:25AM

16 A.  No.

17 Q.  And you bring an HNR with you, is that correct?

18 A.  Yes.

19 Q.  When do you hand that to the medical personnel?

20 A.  Once you -- when you are being seen.  You keep the HNR on              09:25AM

21 your person until the nurse actually calls you into the nursing

22 area and you give her the HNR at that time.  You don't sign a

23 log book.  You don't -- the officer doesn't track it.

24 There's -- it's just sort of an informal kind of a process.

25 Q.  And about how quickly does the nurse see each patient,                 09:26AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Direct

1    would you say?

2    A.  It's, to be generous, it's, I mean, the most efficient

3    would probably be every 45 minutes to an hour it takes between

4    each person being seen.  I mean, unless it's a real simple

5    issue, maybe a half hour, but no less than that.                09:26AM

6    Q.  So if you arrived with five other people --

7    A.  You are going to be there all day or a good part of the

8    day.

9    Q.  Okay.  And when you wait outside, are you waiting in a

10   covered area or are you exposed?                                09:27AM

11   A.  Well, you are waiting out in the -- I mean, like right now,

12   if you are outside, I mean, you have to wait outside.  There's

13   some shaded areas if you can find them because there's not a

14   lot of seating areas.  But so you go find some shade that's

15   close.  But you are waiting outside in the heat.  And if it's   09:27AM

16   wintertime, it's a little different.  But the summer is, it can

17   be pretty brutal, you know.  I mean, but there's no like

18   enclosed area.  It's all exposed.

19   Q.  Do you remember when the open clinic was instituted at East

20   Unit, approximately?                                            09:27AM

21   A.  Probably sometime around -- it hasn't been any longer than

22   the first of the year I don't think.

23   Q.  Have you personally had to use the open clinic?

24   A.  Yeah.  Many occasions.

25   Q.  And how long do you -- have you had to wait before you were 09:28AM

1  seen?

2  A.  Personally, I'm -- personally about three hours is --

3  three, three and-a-half hours has been the longest I have had

4  to wait personally.

5  Q.  And when you were waiting, did you wait inside or outside?  09:28AM

6  A.  Both.  I have been in both.  I have been outside waiting

7  and then waited until it pared down to where I could actually

8  come inside and wait.

9  Q.  So when you are seen on the nurse's line, tell us what

10  happens once you get in to see the nurse on open clinic?  09:28AM

11  A.  When you go in, I mean, you hand them the HNR.  You hand

12  the nurse the HNR.  She'll take, you know, peruse that, have

13  you sign in.  And then it's just whether they are going to

14  charge you, not charge you, and, you know, it tracks -- I

15  imagine it's for charging you.  But then they take your vitals,  09:29AM

16  your blood pressure, temperature.

17          THE COURT:  Can I interrupt for just a second?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  You said you have to sign in.  Does that

20  happen at the same time you hand your ID?  09:29AM

21          THE WITNESS:  No.

22          THE COURT:  So that's when you are called by the

23  nurse?

24          THE WITNESS:  When the nurse is actually seeing you

25  and it says no charge or charge next to it, and it's just to  09:29AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Direct

1   verify that you are actually seeing the nurse.  But it doesn't

2   have the time or anything like that.

3          THE COURT:  And is that document that you sign one

4   that has your name along with other inmates' names listed on it

5   with their signatures on it, that type of thing?                     09:29AM

6          THE WITNESS:  Yeah.  It's a carbon copy.  It's a

7   formal form.

8          THE COURT:  Carbon copy?

9          THE WITNESS:  It's, you know.

10         THE COURT:  A form.                                           09:29AM

11         THE WITNESS:  A form, yes.

12         THE COURT:  All right.  Thank you.

13  BY MS. EIDENBACH:

14  Q.  So you were telling us that you get in and you have your

15  vitals taken?                                                        09:30AM

16  A.  Okay.

17  Q.  Do you receive treatment when you see the nurse on open

18  clinic?

19  A.  I have personally, in all the times I have seen the nurse,

20  which is -- I can't even count how many times -- I have never       09:30AM

21  actually received treatment from the nurse other than possibly

22  me being given an Ace bandage or something of that nature.

23  Really, the nurse's line, in my experience, has been more for a

24  point of referral in order to see the provider.  They will

25  assess your -- the veracity of your complaints or whatever and      09:30AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Direct

1    whether or not it's deserving to be referred over to the

2    provider.  And really, when you go -- and she'll log in and

3    take notes and note the things that you are relating to her in

4    terms of your symptoms and the things that you are concerned

5    about.  But really it's a point of referral for most people          09:31AM

6    unless it's a traumatic like injury like a cut, you know, or

7    you are having chest pains.  They may do an EKG or something of

8    that nature.  But for the most part, no, I have never received

9    treatment.

10   Q.  Okay.  And you mentioned that this serves as a point of           09:31AM

11   referral.  So in your experience using the open clinic, does

12   this facilitate you getting to see the provider in a more

13   timely fashion?

14   A.  That's not been our experience, my experience, because

15   there's no -- the provider -- first you have to have a provider      09:31AM

16   in order to be referred to one.  We haven't had a provider

17   assigned to our unit for five months that's actually assigned

18   to our unit.  So we have a bunch of providers that are filling

19   in, you know, that come in.  Right now they are only coming in

20   one and-a-half days a week.  So that contributes to a huge           09:32AM

21   backlog of people that haven't been seen.

22           And so a lot of people don't actually get referred who

23   think they are referred.  So it creates this huge backlog and

24   imposes a lot of difficulty in terms of being able to access

25   the provider because we don't have one.  And it just continues      09:32AM

1    to create an issue.

2              THE COURT:  Did you used to have one?

3              THE WITNESS:  Yes.  Five months.  The last actual

4    assigned provider we had was she left the first week of

5    February.                                                      09:32AM

6              THE COURT:  And before she left, how long had she been

7    in that position?

8              THE WITNESS:  11 months.

9              THE COURT:  And before that?

10             THE WITNESS:  We had a provider for one year.  And the   09:32AM

11   whole time that I have been there since 2013, I kept track

12   of -- I keep a journal of all of my medical issues.  We have

13   had 17 different providers in that period, and I have seen

14   almost every one of those providers.  But in that period of

15   time we have had 17 different doctors or nurse practitioners     09:33AM

16   that I have seen.

17             THE COURT:  Up until February when the previous

18   provider that you said was assigned to the unit, how many days

19   a week did that provider appear there?

20             THE WITNESS:  They, again, they are supposed to be     09:33AM

21   there five days a week but that generally -- it is generally

22   about three days a week because they would pull -- they are

23   consistently pulling providers from our unit or other units to

24   fill in at other units because of staff shortages and, you

25   know, I mean, that was a constant complaint not just of us but   09:33AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Direct

1   the nurses and things like that was -- and the providers.  They

2   would complain that they would get consistently being pulled to

3   go do duties at other units because of shortages there to fill

4   in.

5           THE COURT:  So your experience was that with the                09:34AM

6   provider who left in February that she was there three days a

7   week?

8           THE WITNESS:  Yeah.

9           THE COURT:  But since that time, you have had a

10  provider who is in the clinic for a day and a half a week?              09:34AM

11          THE WITNESS:  Right now that's all in the last

12  probably two months, it's been the schedule.

13          THE COURT:  And what, between February and two months

14  ago which would take us to May, what was the schedule?

15          THE WITNESS:  Again, it's just been sort of a                   09:34AM

16  hodgepodge of -- we never knew when they would be there.  It

17  was whoever -- it seemed like whenever they could get somebody

18  to come over and fill in.  But it's probably no more than two

19  days a week has there been a provider on site in the past few

20  months, you know.  I mean, and that's not even a given.  And           09:35AM

21  then a lot of times, it's just like, you know, last week I was

22  scheduled to see the provider.  She didn't get there until --

23  well, she got there at noon and I didn't get seen because she

24  didn't have enough time to see all the people that she had

25  scheduled.                                                             09:35AM

1    THE COURT:  So then what happened?  Were you

2  rescheduled for another day?

3    THE WITNESS:  Well, I was scheduled for yesterday, I

4  came in, and the provider there said that I -- that she didn't

5  feel that she was qualified to address my issues and that I                    09:35AM

6  should see an M.D. because that's what I had requested.

7  Because that was consistently what was happening.  People would

8  say -- the nurse practitioners would say they didn't feel they

9  were in a position to address issues or they would say that

10  they would get back to me and that would never happen.                        09:36AM

11    So in my HNR, I specifically asked for an M.D. and so

12  when I went in yesterday she said, too, she said that was going

13  to be her last day there so it would probably be -- I would be

14  better served if I waited to see the M.D., that she would be

15  there today.  So I am going to be here.                                       09:36AM

16    THE COURT:  So the M.D. would have been there today?

17    THE WITNESS:  Today.  So they said we'll have to try

18  and schedule you for next Friday when she's going to be here.

19    THE COURT:  Thank you.

20  BY MS. EIDENBACH:                                                             09:36AM

21  Q.  So --

22  A.  Sorry, ma'am.

23  Q.  No, it's fine.  This is how these go.  We talked about this

24  being a little bit of a different process.  It's meant to

25  educate the Court.                                                            09:36AM

1    A.  No, it's --

2    Q.  So have you experienced then delays in seeing a provider?

3    A.  All the time.  I mean, seeing a provider as a whole, you

4    know, I'm trying to be really objective, but it's just the most

5    convoluted sort of hit and miss proposition that it doesn't          09:37AM

6    make any sense that why it has to be so difficult.  Well,

7    because we don't have a provider.  So, you know, I get that,

8    that they can't refer people.  But, yeah, it seems like -- I

9    mean, rarely do I -- rarely do you get in to see a provider

10   within, you know, it can be months.  You know.  I was           09:37AM

11   dealing -- up until I was scheduled, it's been over -- it's

12   been a month and a half that I have been waiting to see the

13   provider.  I have put in multiple -- I have seen the nurse at

14   least eight times in the last two months, because I regularly

15   go in and say these are my issues, I want to make sure you          09:37AM

16   document these things, and I want you -- then, you know, I need

17   to see the provider.  And the nurse will say, I will put it in

18   for -- put you on the -- refer you over to the provider.

19         But there's no system in place for me to find out

20   whether or not I have actually been scheduled.  So you wait a          09:38AM

21   week or two to inquire as to whether you are on the provider's

22   line and then -- but nobody knows until the list comes out that

23   day whether you are on it.  There's no way of determining

24   whether you have actually been scheduled.  And then you have to

25   submit another HNR then to talk to see the nurse in order to          09:38AM

1    get confirmation as to whether you have actually been scheduled

2    or accepted to see the provider.  There's no definitive way in

3    order to verify, you know, so you can go for weeks.

4         And a lot of people what they do is -- I mean, I

5    don't -- I bug them, you know.  I'm up there all the time       09:38AM

6    trying to inquire.  But there's no formal process by which you

7    can verify whether or not you are -- you have got a scheduled

8    appointment.  But it's -- and then, too, when you see the

9    provider, it's been a long time since I have seen the provider

10   so then a lot of times there's multiple issues that I have      09:39AM

11   submitted.  And then I will get in to see a provider and then

12   they will say, oh, well we're only addressing this one issue.

13   We're not going to address all of the issues.  You know.  We

14   only have time to address this particular issue.  You will have

15   to be put back on the provider's line to address those other    09:39AM

16   issues.

17        So it's -- you just -- it keeps getting delayed.  I

18   don't want to say that the nurses do it or -- but it's the

19   process of you don't get all of your issues addressed or you

20   get rescheduled so the issues that you maybe wanting to talk to  09:40AM

21   the provider about become compounded.  And therefore, it seems

22   like there's a never-ending process by which you have to get --

23   try and get back in to see them in order to maybe totally

24   explore all the issues that you have, or get something

25   definitive in terms of what the treatment plan is.               09:40AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Direct

1          So in other words, yes, I have had a lot of delays.

2    Q.   Okay.  Prior to the institution of the open clinic did East

3    Unit use HNR boxes?

4    A.   Yes.

5    Q.   Have you noticed any appreciable difference since open          09:40AM

6    clinic has been instituted in your ability to get treated for

7    your medical conditions?  Not just seen, but I'm saying

8    treated.

9    A.   No.  None.  I mean, in terms of -- if I can elaborate.

10   Q.   Yes.  Please.                                                   09:41AM

11   A.   Okay.  It's nice because you can see the nurse quicker

12   through the open clinic.  You don't have -- you have some

13   control.  You can go up there and actually request something.

14   If you are willing to do that, make the effort and sit there

15   and wait, you know you will get seen that day, when as before       09:41AM

16   with an HNR you didn't know when it would be processed and you

17   would be put on the nurse's line.

18          But in terms of actually getting treated, it's really

19   just a different way of -- that clinic could be open 24/7 and I

20   wouldn't be seen by a provider any quicker.  I mean, that's          09:41AM

21   just the reality.  And even when we had a provider I don't

22   think it would have been any more efficient.  It gives us, like

23   I said, it gives the individuals maybe a little bit more -- I

24   prefer the open clinic over the old HNR system but not -- I

25   know not everybody does.  But in terms of actual treatment it        09:42AM

1    hasn't changed anything.  In some ways it seems like it's

2    gotten worse.  I won't attribute that to the clinic but it's

3    just the delays have become more prolonged.  The inability to

4    see the providers, it's gotten worse and there's just no -- it

5    just has hasn't improved.  There's the appearance that a lot is          09:42AM

6    getting done, but nothing substantive is really happening in

7    terms of actually treatment.

8          THE COURT:  The issue that you are addressing now

9    seems to be not entirely related to the competition between the

10   HNR box and the open clinic.                                            09:43AM

11         THE WITNESS:  Uh-huh.

12         THE COURT:  But if we just focus on that issue, which

13   is better, open clinic, HNR, are there any advantages that you

14   saw to the HNR system over the open clinic system with respect

15   to this contact with the nursing line?                                  09:43AM

16         THE WITNESS:  No.  I can't see any real advantages to

17   the HNR box, honestly.  In terms of access, the open clinic is

18   actually better.

19         THE COURT:  If there was a mechanism for you to

20   address what seemed to be the reason for most of your visits,          09:43AM

21   these eight visits that you described recently which were to

22   try to find out whether you had have been scheduled for a

23   provider, if you could submit an HNR that said would you tell

24   me when my provider appointment is and there was a way for that

25   to be responded to, a message coming back from the nursing            09:43AM

1    line, would that be something that you would see as a --

2              THE WITNESS:  I think that would be helpful, yeah.  I

3    mean because there's a lot of times we just don't know and

4    we -- our inquiries are not always received positively like

5    because we are being pests.  But, yeah, if there was some way          09:44AM

6    of notifying us that an appointment was confirmed or that we

7    would be seen within a certain period of time, I think that

8    that would be a definite benefit.

9              THE COURT:  Okay.  Thank you.

10             THE WITNESS:  Improvement.                                    09:44AM

11   BY MS. EIDENBACH:

12   Q.  On that point, has there been a time that you have been on

13   East Unit where you have been mobility impaired or had

14   difficulty getting around on your own?

15   A.  Yes.                                                               09:44AM

16   Q.  And what was that a result of?

17   A.  Well, I have, you know, I normally have an issue with my

18   mobility to a degree but I get around on that.  That really

19   doesn't impede my ability to move.  But I, on May 5th, I had

20   surgery, a hernia surgery.  But it was more than just your            09:45AM

21   little outpatient kind of surgery.  It was an eight-inch

22   incision up my stomach requiring 20 staples.  And I wasn't

23   given any post-op care.  Within an hour of coming out of

24   surgery I was loaded into the van and brought back to the unit.

25   The unit didn't expect me to be back, so they tried to find a        09:45AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Direct

1    bed, an infirmary bed.  And they --

2            MR. BOJANOWSKI:  Your Honor, I will have to object.

3    This is more of a quality of care type testimony.

4            MS. EIDENBACH:  Your Honor, if I could have a little

5    latitude this is going to get directly to the point you just          09:45AM

6    made.

7            THE COURT:  Overruled.  You can continue.

8            THE WITNESS:  So they put me in a wheelchair -- this

9    is what I was getting to.  As a result of not having any other

10   means of -- because they didn't give me that or they put me          09:46AM

11   back in my cubicle and put me in a wheelchair, well, gave me a

12   wheelchair in order to -- so that other inmates could come and

13   wheel me up to medical in order to get my medications.  And so

14   I was in a wheelchair for a week.  Yeah.  That was the time I

15   was relying on the wheelchair.                                        09:46AM

16   BY MS. EIDENBACH:

17   Q.  And during that time, did you have to access the open

18   clinic?

19   A.  Well, I had -- not the open clinic, no, I didn't.  They --

20   actually because of my condition they actually called me up.         09:46AM

21   They had, you know, I didn't have to go up there and go through

22   the formalities.  I was actually just called, you know, they

23   came and got me and said bring him up, you know.

24   Q.  If you had had to access the open clinic while you were in

25   a wheelchair, how would you have gone about that?                    09:47AM

1           MR. BOJANOWSKI:  We'll object, Your Honor.  That calls

2     for speculation.

3           THE COURT:  What are you trying to --

4           MS. EIDENBACH:  I'm trying to get at the fact that

5     while people who are mobile and easily able to walk up to the        09:47AM

6     open clinic may prefer the open clinic, because he experienced

7     being mobility impaired, that may -- I was going to explore

8     whether that changed his mind in terms of preferring the HNR

9     box where other prisoners could go submit the HNR on his behalf

10    and he could be called to the open clinic.  Because that's        09:47AM

11    where, in our experience, we have seen the divergence of

12    opinions among the prisoners in terms of open clinic versus HNR

13    box.  The people who can't easily get to the open clinic or

14    have to rely on other prisoners to get up there often prefer

15    the HNR box because they can have another prisoner submit the      09:47AM

16    HNR for them.

17          So I have just said exactly what I was going to ask

18    him, so we'll move on since I have made the point.

19    BY MS. EIDENBACH:

20    Q.  So in your personal observation, have you seen other          09:48AM

21    prisoners have to wait extended periods of time at open clinic?

22    A.  Yes.

23    Q.  And what's the longest wait you recall seeing someone wait?

24    A.  Seven hours.  I know for a fact because -- seven hours.

25    Q.  Okay.  And was this person waiting inside or outside?         09:48AM

34

1  A.  Most of the time they were outside, the majority of that

2  period of time, probably except for the last hour.  I mean, I

3  have seen multiple people waiting, you know.  They have been --

4  I have gone up there for morning meds, come back for afternoon

5  meds and they are still there waiting.                          09:48AM

6  Q.  And is it hot when you are waiting outside during the

7  summer?

8  A.  It's brutal, yes.  I mean, it's -- well, it's 100 -- even

9  when it's 106 to especially recently in the teens, 115, 114,

10  it's, yeah, it's extremely hot.  Extremely uncomfortable.      09:49AM

11  Q.  Have you ever seen anyone leave the open clinic waiting

12  line because of the heat?

13  A.  All the time.  I see people.  You know, I live right by

14  medical, so I see a lot of the traffic.  So I'm -- it's -- but

15  I see people getting irritated, pissed off, and, you know, just 09:49AM

16  saying to hell with it.  Excuse me.

17  Q.  And does the heat -- have you noticed any other

18  complications that the heat causes in terms of interrupting the

19  open clinic?

20  A.  Well, it's -- I think it dissuades people from, you know,  09:49AM

21  they know it's going to be an ordeal and they just don't want

22  to deal with it.  I mean, we had the same issue with people in

23  line for medications.  They will say, you know, if the line is

24  particularly long it's like I'm not doing this.  I'm not

25  waiting up here in this heat.  Especially we have an older      09:50AM

1   population, large percentage of the population is older and

2   there's no indoor facility.  So everything is geared towards

3   waiting in lines outside.  It's not like some other facilities

4   that have -- are more indoor.  Ours is completely outdoor.

5   Everything is outside.                                        09:50AM

6   Q.  What happens to the open clinic during an ICS?

7   A.  It shuts down completely.  If you are up there in line, if

8   you are waiting outside, it doesn't matter how long you have

9   been waiting.  If an ICS is called you are sent home and told

10  to come back when the yard opens.  If it's a medical ICS that  09:50AM

11  results in the yard shutting down -- well, even if it doesn't

12  result in the yard shutting down, if they bring somebody into

13  the clinic, then all the inmates in there have to step outside

14  and wait outside until they are done dealing with that

15  individual and that individual situation.  And then they will   09:51AM

16  reopen the line.

17        But if you left it will -- your place in line will be

18  determined when you get back up to the unit.  So that depends

19  on your housing location and whether you can hear them page

20  you, you know.  It's, again, so it's a hit and miss            09:51AM

21  proposition.  It closes down the whole line.

22  Q.  Okay.  And in your experience, how often are ICS's called?

23  A.  It's rare that we go -- I mean, that interferes with the

24  line, there's at least -- well, there's an ICS almost every

25  day.  But one that may interfere with the line, it happens a   09:52AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Direct

1    couple times a week, easy.  Easy.

2    Q.  And are there -- does the heat increase the number of ICS's

3    in your opinion?

4    A.  Dramatically.  The heat, I mean, we have people fall out.

5    They have -- when we say fall out, they lose consciousness or        09:52AM

6    they have heat issues where they have to respond.  They bring

7    them up.  It's, yeah, the heat dramatically increases the

8    amount of ICS's.

9           THE COURT:  May I interrupt for a moment?

10           MS. EIDENBACH:  Of course.                                   09:52AM

11           THE COURT:  Under the HNR system, when you submitted

12    an HNR you heard back or you were called back in at a

13    particular time?

14           THE WITNESS:  Yes.

15           THE COURT:  So those people would be affected by an          09:52AM

16    ICS also, I gather.

17           THE WITNESS:  Yeah.  ICS, I don't know how you prevent

18    it.  But it's just a reality, too.  It's like they have to

19    respond, so, yeah, it delays everything.

20           THE COURT:  So the open clinic as competing against         09:53AM

21    the HNR system really isn't any different with respect to the

22    effect of an ICS?

23           THE WITNESS:  Not practically, no.

24    BY MS. EIDENBACH:

25    Q.  Did you have any concerns coming here to testify today?        09:53AM

1           MR. BOJANOWSKI:  Objection.

2           THE COURT:  Overruled.  You can answer.

3           THE WITNESS:  Yeah.  Any time -- I have been around

4    DOC a long time.  I have seen them do -- retaliate against

5    people who take stands against certain things that are in their          09:53AM

6    interests or as opposed to ours and they see you as a potential

7    problem.  You know, I mean, to tell you the truth, at East Unit

8    I didn't have as many concerns because we have a pretty good

9    deputy warden.  And I actually even addressed the issue to

10   them.  I said I'm not going to end up at CB-6 for doing this,          09:54AM

11   am I, which is the whole -- just in a joking way.  But that

12   underlies joking, but in a sense, and then two other inmates

13   saying man, you are not going to be around long if you keep

14   this up, if you keep pursuing this issue or keep helping, you

15   know.                                                                  09:54AM

16          So it fuels a concern.  I mean, there's always -- you

17   are always a little bit reluctant to come forth and put

18   yourself in a place where you might be perceived as a problem

19   because I have seen them.  I have seen them move people that

20   have filed lawsuits.  I have seen them retaliate in a lot of          09:54AM

21   different ways to people who -- especially people who engage in

22   a lot of the legal process, the grievance processes.  If you

23   are perceived as a problem, it's not unusual for people to just

24   all of a sudden be moved to another unit, not necessarily a

25   whole but usually moved to other units.                               09:55AM

---
CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Direct
---

1    BY MS. EIDENBACH:

2    Q.  What made you decide to testify today?

3    A.  Well --

4              MR. BOJANOWSKI:  Same objection.

5              THE COURT:  Overruled.                              09:55AM

6              THE WITNESS:  Well, again, I have a lot of healthcare

7    issues.  And because what I see being done by Corizon and ADC

8    in terms of us as human beings, we're not being treated as

9    human beings when it comes to medical care.  We are being

10   subjected to a process, to me, that is more criminal than      09:55AM

11   anything that any of us in that system have ever done.  And it

12   just infuriates me that they can get away with doing what they

13   are doing under the guise of healthcare.  It is to me the

14   most -- and I'm doing time for something that, you know, if I

15   did half of what they do, I'd be doing life.                   09:56AM

16             I mean, so that's what's motivated me.  It's so long.

17   And, too, I need to stay alive.  It scares the heck out of me

18   to know that for the next seven years my life is in their

19   hands.  And I need -- I'm dependent on them to see freedom

20   again, you know.  And it just, excuse me, it's just really --  09:56AM

21   it has gotten worse.  Over the years it's gotten so bad and

22   scary.  And when you look at it from our perspective, or my

23   perspective, as somebody who, you know, I wish I didn't need to

24   go up there one minute, you know.  I wish I could just put my

25   head down and get out of here and not be -- but it scares me    09:56AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Direct

1    and we're dependent on them.  And I see what they do to -- how

2    it affects a lot of guys, you know.  And they are not bad

3    people.  They are all good people.  I mean, not all of them.

4    There's a lot of bad people.  But, I mean, people that just

5    need treatment.  And it seems like it's being -- they obfuscate        09:57AM

6    the whole process of trying to access.  It's frustrating.

7            MS. EIDENBACH:  All right.  Thank you very much for

8    your testimony.  We appreciate you coming up here today.

9            THE COURT:  Now the attorney for the defendants will

10   have an opportunity to ask you any questions.                          09:57AM

11           Mr. Bojanowski.

12                        CROSS-EXAMINATION

13   BY MR. BOJANOWSKI:

14   Q.  Good morning, Mr. Blocksom.

15   A.  Good morning.

16   Q.  You are very familiar with the HNR system that exists at

17   the East Unit in the Florence facility as you have testified

18   to, is that correct?

19   A.  Yes, sir.

20   Q.  And you have utilized that system over the time you have           09:58AM

21   been incarcerated at the Florence East Unit, is that correct?

22   A.  Yes, sir.

23   Q.  And every time you have filled out that HNR, that HNR has

24   been processed, correct?

25   A.  No, sir.                                                           09:58AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Cross

1   Q.  Have you ever been refused after being -- submitting an HNR

2   being refused treatment?

3   A.  Refused treatment, I haven't received treatment, not

4   refused.  I wouldn't say they have tried to give the appearance

5   they have given me treatment.                                    09:58AM

6   Q.  You go to the clinic.  You are going to the clinic, are you

7   not, sir?

8   A.  Yes, sir.

9   Q.  You are seeing a nurse, are you not?

10  A.  Yes, sir.                                                    09:58AM

11  Q.  And that nurse is doing something to you when you go to the

12  clinic, is that correct?

13  A.  She's engaging, yes.

14  Q.  That's right.  She's talking to you, is that right?

15  A.  Yes, sir.                                                    09:58AM

16  Q.  She's asking you questions, isn't that right?

17  A.  Yes.

18  Q.  And she's asking you how you are feeling, what you are

19  doing, is there pain here, is there pain there, those kinds of

20  questions?                                                       09:59AM

21  A.  Yes.

22  Q.  And your vitals are taken, is that correct?

23  A.  Yes.

24  Q.  And that has happened every single time that you have had

25  an HNR and you have gone down to medical, those kinds of things  09:59AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Cross

1   happen to you every single time, right?

2   A.  Well, when they did the HNR --

3   Q.  My question to you, sir --

4           MS. EIDENBACH:  Objection, Your Honor.

5           THE COURT:  First of all, it is not fair to the court          09:59AM

6   reporter because people are talking over one another so we need

7   to just slow it all down.  So make sure that we don't talk over

8   one another.

9           There's an objection that has been made.  I haven't

10  heard what the basis is for the objection.          09:59AM

11          MS. EIDENBACH:  I just asked him to let the witness

12  finish his answer.  They were interrupting each other.

13          THE WITNESS:  No.

14  BY MR. BOJANOWSKI:

15  Q.  How many times have you been refused treatment, where you          09:59AM

16  have had an HNR, you have submitted it, and nothing happens.

17  You don't get seen, nothing happens?

18  A.  I can't count how many times.

19          MS. EIDENBACH:  Objection, Your Honor.  The question

20  is vague.          10:00AM

21          THE COURT:  Overruled.

22          THE WITNESS:  I can't answer the amount of times but

23  there have been a number of times where I have submitted HNRs

24  and they have never been responded to.

25  BY MR. BOJANOWSKI:          10:00AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Cross

1    Q.  Was this when the HNR boxes were in use?

2    A.  Yes, sir.

3    Q.  Have you ever been refused any kind of treatment during the

4    open clinic process where you show up, has somebody said to you

5    no, we're not going to treat you.  Go away?                          10:00AM

6    A.  They have told me I have had to come back maybe, you know.

7    But they have never out and out refused like I get what you are

8    saying.

9    Q.  All right.  So you like the open clinic concept because you

10   can go up to the medical unit and be seen by somebody right         10:00AM

11   away?

12   A.  Yes.

13   Q.  All right.  And, in fact, that's happened, but it seems as

14   though you have got some issues with regard to seeing a

15   provider, perhaps, as a follow-up.  Is that right?                  10:01AM

16   A.  Not as a follow-up, as a -- that's typically seeing the

17   nurse, that's the reason for seeing the nurse is to see the

18   provider.

19   Q.  Right.  You don't get to look at your medical records,

20   right?                                                              10:01AM

21   A.  Yes, I do, if I submit for them, submit.

22   Q.  You can't look at anybody else's medical records?

23   A.  No.

24   Q.  So you can't talk about delays to, perhaps, other inmates,

25   right?  You don't know because you can't see their records,        10:01AM

1    right?

2    A.  I can't, no.

3    Q.  Have you looked at any other inmates' medical records?

4    A.  No.

5    Q.  All right.                                          10:01AM

6    A.  Doesn't require that to know they have been delayed.

7    Q.  Well, let's talk about this now.  Do you have access to any

8    Corizon records as far as employment is concerned?

9    A.  No.

10   Q.  Schedules?                                          10:01AM

11   A.  No.

12   Q.  You can't -- you don't know how many nurses are scheduled

13   at the Florence facility on any given day, is that right?

14   A.  You mean at East Unit?

15   Q.  At Florence, the Florence facility is my question.  You    10:02AM

16   can't say --

17   A.  No.

18   Q.  -- how many are there?

19        You can't say how many providers are there at the

20   facility either?                                        10:02AM

21   A.  No.

22        MS. EIDENBACH:  Objection, Your Honor.  Relevance.

23        THE COURT:  The answer has been taken.  Overruled.

24   BY MR. BOJANOWSKI:

25   Q.  You don't have any medical training, right?          10:02AM

———— **CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Cross** ————

```
 1    A.   Not -- no.

 2    Q.   You have a job, don't you?

 3    A.   At -- in prison?

 4    Q.   Yes, sir.

 5    A.   Yes, sir.                                              10:02AM

 6    Q.   What's your job?

 7    A.   I'm an ADA porter.

 8    Q.   An ADA porter is the guy that pushes wheelchairs around for

 9    other inmates, right?

10    A.   Or just helps other people.                           10:02AM

11    Q.   Sure.  For people who have limited mobility, your job is to

12    assist them in moving from point A to point B, right?  So you

13    will assist inmates from going from their housing unit over to

14    perhaps a program, right?

15    A.   Yes.                                                   10:02AM

16    Q.   Or perhaps they want to go to the chow hall?

17    A.   Yes.

18    Q.   So that's your job.  How many hours a day do you do that?

19    A.   It probably requires about three hours.

20    Q.   And you are paid?                                     10:03AM

21    A.   In reality.  Yeah, I mean --

22              THE COURT:  I'm sorry to interrupt.  Mr. Bojanowski,

23    between the two of you, you are the one who is more trained

24    that need to be careful about not to over-speak.  So I'm going

25    to besiege you to try to pause more so that you don't create a  10:03AM
```

UNITED STATES DISTRICT COURT

─── **CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Cross** ───

1  difficulty of the court reporter having to have to transcribe

2  simultaneous statements.

3         MR. BOJANOWSKI:  I will put the brakes on.

4  BY MR. BOJANOWSKI:

5  Q.  So we were talking about your job, and you, I think, were          10:03AM

6  indicating that you work three hours a day but it might be a

7  little bit longer.  Right?

8  A.  I'm on call.  You are kind of on call.  Yeah.  In physical

9  activity, probably three hours, yes.

10  Q.  How many days a week do you do that?          10:03AM

11  A.  Seven days a week.

12  Q.  All right.  Now, the medical unit is open seven days a

13  week, right?

14  A.  Yes, sir.

15  Q.  Open clinic is open seven days a week, correct?          10:04AM

16  A.  Yes, sir.

17  Q.  You talked about the longest time that you saw somebody

18  waiting in line was seven hours.  Do you remember that

19  testimony?

20  A.  Yes, sir.          10:04AM

21  Q.  What's the shortest time that you have seen people in line?

22  A.  Maybe 30 minutes.

23  Q.  Okay.  What about the person who is first in line when the

24  clinic opens?  Do they go in right away?

25  A.  Do they see the nurse right away?          10:04AM

1   Q.  Do they go into the clinic right away?

2   A.  Usually, the time between they give their ID to the first

3   person it takes usually 15, 20 minutes.  They usually get

4   started by 7:30.  So if you put your ID in there by 7, within a

5   half hour.                                                        10:05AM

6   Q.  All right.  And you say they take, what, three or four guys

7   in at a time to wait inside?

8   A.  No more than three.  But typically it's about two people

9   who go inside and sit in the chairs and wait.  If you get a

10  particularly liberal CO you might get a third one in there.     10:05AM

11  Q.  You are not in the medical unit every day, right?

12  A.  Yes, I am.

13  Q.  You are there every single day?

14  A.  Yeah.

15  Q.  Seven days a week?                                           10:05AM

16  A.  Yes, sir.  I have to, to get medications.

17  Q.  Oh.  So you are in a pill -- you are in the pill line?

18  A.  Yes.  It's the same thing.

19  Q.  Okay.  Is it at the same place?

20  A.  Yes.                                                         10:05AM

21  Q.  Where they treat --

22  A.  And you have to go inside to actually get your pills and

23  the people who are waiting in the nurse's line are sitting

24  right there.  The pill window is right here.  The nurse's

25  station is right over here.                                      10:06AM

1   Q.  Okay.  So you go into the clinic every day to get your

2   pills.  Do you do it twice a day or just once a day?

3   A.  Three times a day.

4   Q.  Three times a day.  All right.

5          Now, you had indicated that somebody might be waiting          10:06AM

6   seven hours to get into the medical clinic, and you said you

7   saw that.  And I'm wondering how it is that that's possible

8   given the fact that there would be two counts during that time

9   where the yard would be shut down.  As you testified earlier

10  there's a morning count and an afternoon count.  So how is it          10:06AM

11  that you can --

12  A.  When you say wait --

13  Q.  -- watch people?

14  A.  Taking seven hours from the time that they showed up to the

15  time that they were seen, not necessarily -- because they do.          10:06AM

16  They have to go back to their housing locations and then come

17  back.  As a matter of fact, some of them come to my hut in

18  order to wait inside in order to try and avoid some of the heat

19  and things like that.

20  Q.  So they are not actually standing outside for seven hours          10:07AM

21  in a row?

22  A.  Well, rarely.  Yes.

23  Q.  And at that location, there is some shaded areas that they

24  could go to.  They just take the chance that, hey, when that

25  officer calls your name you have got to make sure you get up          10:07AM

1  there, right?

2  A.  Yes.

3  Q.  Okay.

4       MR. BOJANOWSKI:  May I have a moment, Your Honor?

5       Nothing further, Your Honor.                      10:07AM

6       THE COURT:  Thank you.  Any redirect?

7       MS. EIDENBACH:  Yes, Your Honor, just a few questions.

8                    REDIRECT EXAMINATION

9  BY MS. EIDENBACH:

10 Q.  Mr. Blocksom, can you tell us how you were able -- or how   10:08AM

11 you are able to observe the delays that other prisoners

12 experience in getting seen at open clinic?  What are you basing

13 that on?

14 A.  Well, like I said, I live -- my building is right next --

15 within 50 feet of the back door of my building is 50 feet from   10:08AM

16 medical.  I'm out there three times a day.  Plus, I mean, so

17 I'm out -- I go up there a lot plus people who are coming back

18 by to go to medical, I will stand out and talk with them.  I

19 know -- so I'm in that area a lot is all I can say, really.

20 And through conversations with people outside, everybody goes   10:09AM

21 there to go to chow.  We're going three times a day.  I have to

22 go right by medical to go to chow.  It's in my path to go to

23 the store, to go to chow, everything.  Medical is right outside

24 my door.  So I see a lot of the activity as it relates to

25 medical.                                               10:09AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Redirect

1  Q.  And you also are up there three times a day every day,

2  correct?

3  A.  Every day, yes.

4  Q.  Okay.  You mentioned that people either come to your hut or

5  have to go back to their houses during count.  How long does          10:09AM

6  count last?

7  A.  Count typically, average, an hour.  The interval between

8  the yards actually officially being closed and it reopening is

9  average an hour.

10 Q.  Okay.                                                            10:10AM

11 A.  It can be as short as 35 minutes and it can be longer

12 depending on problems with count, whatever.

13 Q.  So if somebody came to your hut to wait out count they

14 would get a 35- to 60-minute reprieve from the heat?

15 A.  They are not going to come to my house during count.           10:10AM

16 Q.  They would go back to their own.

17 A.  They would go back to their house.  But they may come in.

18 They will know, like, they can see like okay, there's one

19 person in front of them.  Maybe they will come over and sit

20 there.  They know they have a half hour.  I mean, the huts are     10:10AM

21 no picnic either right now.  They are 87, 89 degrees in the

22 huts so but it beats being outside.

23 Q.  And Mr. Bojanowski mentioned that there are some shaded

24 areas around medical.  Can you describe the shaded areas?

25 A.  Well, they have attempted to put up some overhang, you         10:11AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom - Redirect

1   know, some like little gazebo-type awnings.  But again, it

2   depends on the time of day whether they are effective because

3   it's bad planning, you know.  But you just find some shaded

4   areas.  There's one tree, there's -- you know, and on this

5   different size of hut that block the sun, you know, sometimes          10:11AM

6   there's no seats there but you just -- you stand in an area

7   where there's -- you can find some shade, you know.  It's

8   not -- there's not like an area with tables or benches or

9   things like that that's always in the shaded area.  Depends on

10  the time of day.                                                        10:12AM

11  Q.  Sometimes the shaded area is sunny?

12  A.  Yes.  Sometimes where the bench is, the sun's right on it

13  so you just -- you have to go on the side of the hut and stand

14  or something like that.

15  Q.  And when it's 110 degrees is it still hot in the shade?             10:12AM

16  A.  Yeah, it is.  It's brutal.

17          MS. EIDENBACH:  No further questions, Your Honor.

18          THE COURT:  As you can tell, I have been focused on

19  the comparison of the HNR system to the open clinic system.  I

20  gather there were waits also associated with the HNR system.            10:12AM

21          THE WITNESS:  Oh, yeah.  Some of the benefits that

22  were open ABOUT other people being able to bring up, I mean,

23  those were -- there were advantages to the HNR system, but I'm

24  speaking from my own personal -- and there's mixed reviews on

25  the yard about it.  But I like it better just because I feel            10:13AM

1    like I have -- I can initiate things and get it at least the

2    appearance of some response quicker.

3            THE COURT:  When you are in the medication line, I

4    don't know whether that means that you have any ability to know

5    why people are in that line, what medications they are taking.      10:13AM

6    But are there any inmates who are on mental health medications?

7            THE WITNESS:  Oh.

8            THE COURT:  Your unit?

9            THE WITNESS:  The yard is probably, I mean, again,

10   this is just a guess but it's -- we've got probably 40 percent    10:13AM

11   of that population that are on that have mental health issues.

12   Severe.  It's gotten populated quite heavily with mental health

13   cases.  It's -- and too, they talk about the meds they are on.

14   Sometimes their behavior is, you know, just clear indication

15   that they are mentally ill.  But they speak about it freely.       10:14AM

16   You see them in line -- I see them in line every day.  I pass

17   them and everybody talks and we, you know, sit around, you

18   know, you hear them talking.

19           THE COURT:  The medical literature contains some

20   information about people who are taking some mental health         10:14AM

21   drugs can have a greater heat intolerance.

22           THE WITNESS:  Yeah.

23           THE COURT:  Have you heard of that before?

24           THE WITNESS:  Yeah.  I mean, I'm not supposed to be

25   out in sunlight with some of my medications and it's indicated     10:14AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom

1   right on the medication.  Unfortunately, those people are

2   probably the most ill-equipped to understand or pay attention

3   to those warnings, you know, about their medications.  But

4   yeah, some of those -- especially Thorazine and some of those,

5   I know they have sun sensitivity.                    10:14AM

6       THE COURT:  And I think that you testified somewhat

7   directed to this inquiry and that is when you said that people

8   fell out?

9       THE WITNESS:  We call it falling out when they have

10  like a sunstroke, heat stroke, or just issues brought on by the   10:15AM

11  heat.

12      THE COURT:  A lot of people work really hard in the

13  sun and are out in the sun all day long and don't suffer any

14  ill effects.

15      THE WITNESS:  No.  We have a group of those guys      10:15AM

16  working on the coolers, working on maintenance, you know, they

17  are hearty.  A lot of times it's the older -- we have, like I

18  said, a large older population, aging population.  And, too,

19  you see it with the mentally ill people having ICS issues on

20  the yard.                                    10:15AM

21      THE COURT:  I need to ask the lawyers whether my

22  questions to you here after they finished means that they want

23  to ask any more questions of you.

24      THE WITNESS:  Okay.

25      MS. EIDENBACH:  I have nothing further, Your Honor.   10:16AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom

1      THE COURT:  Mr. Bojanowski?

2      MR. BOJANOWSKI:  Nothing further, Your Honor.

3      THE COURT:  Couple of things before you leave.  First,

4   be very careful going down the stairs.  There's a way you can

5   hold on to the side and I would ask you to do that because I          10:16AM

6   really don't want you to fall.  And if you feel like you need

7   some assistance getting down, we'll make sure that happens.

8      The second thing is I really don't expect that there

9   will be any retaliation for your testimony here today, but if

10  you perceive that that happens, you let your lawyers know.          10:16AM

11     THE WITNESS:  I definitely will.  I appreciate that,

12  Your Honor.  Thank you.

13     THE COURT:  Thank you, sir.

14     What we'll do is we'll take a 15-minute break until

15  10:30, then we'll take the next witness.  I'm scheduling the          10:16AM

16  break now just because I think it makes sense to do it before

17  we have the next witness.

18     MS. EIDENBACH:  Your Honor, before we go off the

19  record, I have a logistical issue to bring to the Court's

20  attention.  We have one witness who will be testifying, not the          10:16AM

21  next one, so we have a little bit of time, who is in a

22  wheelchair.  And I just -- that may present some logistical

23  difficulties getting her up to the witness box.

24     THE COURT:  The courtroom is designed to make it

25  possible for someone who is in a wheelchair to make it into the          10:17AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom

1    witness box because there's an elevator.  But the truth is in

2    16 years here, I have never seen it used and I have never heard

3    that it's been used.

4              And so consequently, we have that microphone there and

5    if it's all right, what we'll do is we'll just move the            10:17AM

6    microphone right in front of the witness box.  It just seems a

7    safer, better way to do it.  And that's the way I would have

8    done with Mr. Blocksom, too, if we couldn't make it up the

9    stairs.

10             (Recess from 10:17 a.m. until 10:32 a.m.)               10:32AM

11             THE COURT:  There are some judges across the country

12   who have abjured the "all rise" because it does seem sometimes

13   a little bit like a Jack-in-the-Box kind of thing.  But I'm old

14   school, and I think that part of what is helpful in the process

15   is to have the judge be a reminder of the formality of court.    10:35AM

16   It kind of helps modulate what can sometimes be, at the

17   margins, a difficult situation in an adversary setting.

18             So to a certain extent I think it's helpful to follow

19   these old traditions in federal court that help modulate the

20   fight that can happen in the well of the courtroom sometimes,    10:35AM

21   but again, there's some judges who abjure that.  And I'm one of

22   the judges who abjure it with respect to leaving the courtroom.

23   Nobody needs to rise when I leave.  It's kind of the clerk to

24   say that.

25             In any event, we can proceed with the next witness.    10:35AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Blocksom

```
 1            MS. KENDRICK:  The next witness will be Ronald Oyenik.

 2            THE COURT:  Sir, if you please step forward a little

 3   bit so the clerk of the court can administer the oath.

 4            THE MAGISTRATE CLERK:  Please state your name for the

 5   record.                                                          10:36AM

 6            THE WITNESS:  Ronald Oyenik.

 7            THE MAGISTRATE CLERK:  Please spell your last name.

 8            THE WITNESS:  O-Y-E-N-I-K.

 9            THE COURTROOM DEPUTY:  Please raise your right hand.

10   Can you raise your right hand?  Thank you.                       10:36AM

11            (The witness was sworn.)

12            THE COURT:  Mr. Oyenik, if you would please make your

13   way over here to the witness stand.  I'm going to talk to you

14   about the process of getting into the witness stand because

15   there are steps.  And you have ankle shackles on, so I don't     10:36AM

16   want you to fall.

17            I want us to take this really slowly so you can assess

18   whether or not you think you can safely make it up the stairs.

19   If you can't, we've got an alternative.

20            THE WITNESS:  No, I can.                                 10:37AM

21            THE COURT:  Are you okay?

22            THE WITNESS:  Yeah.  I have got a hernia problem.

23            THE COURT:  Is it all right sitting that way?

24            THE WITNESS:  Yes.

25            THE COURT:  You may continue.                            10:37AM
```

1              RONALD OYENIK,

2  a witness herein, having been first duly sworn by the clerk to

3  speak the truth and nothing but the truth, was examined and

4  testified as follows:

5                    DIRECT EXAMINATION

6  BY MS. KENDRICK:

7  Q.  Good morning, Mr. Oyenik.

8  A.  Good morning.

9  Q.  You mentioned you have a hernia problem.  If at any time

10  you need to move or adjust, please tell me or Judge Duncan.  We   10:37AM

11  can take a pause in the proceedings.

12  A.  Okay.

13  Q.  How are you doing today?

14  A.  Good.

15  Q.  Did you get all your medication this morning?   10:37AM

16  A.  Yes, I did.

17  Q.  Okay.  Where are you housed?

18  A.  I'm at Florence complex, South Unit.

19  Q.  What building are you housed in?

20  A.  I'm in 9.   10:38AM

21  Q.  Building 9?

22  A.  Building 9.

23  Q.  And where is that building in relation to the healthcare

24  clinic?

25  A.  It's the farthest one from the healthcare building right   10:38AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct

1    now.

2    Q.  You say "right now," what does that mean?

3    A.  They moved it.

4    Q.  When did they move it?

5    A.  Last week they moved medical off the yard on to a side yard    10:38AM

6    up by administration offices now.

7    Q.  Prior to the move, where was the clinic in relation to

8    where you live?

9    A.  Right back by Building 9 where 7, 8, and 9 are all

10   together.  7 and 8 are a lot of ADAs and all wheelchair.    10:38AM

11   Q.  Okay.  Could you give us a brief description of any current

12   healthcare issues you have going on?  You mentioned the hernia,

13   but anything else?

14   A.  Just the hernia, you know, as far as right now.  They are

15   trying to get -- like to get it repaired.    10:39AM

16   Q.  And did you have any medical issues or surgeries in recent

17   years?

18   A.  Yes.  I had the cancer, and it took a while to get the

19   treatment for that but that finally got done and everything.

20   And after that, I had a total left knee replacement.    10:39AM

21   Q.  Okay.  And when you had the total knee -- how long it did

22   take the knee replaced?

23   A.  It was around six years total from the time I started the

24   process.

25   Q.  Okay.  And prior to getting your knee replaced, did you    10:39AM

─── CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct ───

1    have problems walking and getting around?

2    A.  Yes, I did.  They finally took me out of work and placed me

3    in a wheelchair for almost two years.

4    Q.  And were you placed in what they call the ADA housing at

5    that time?                                                      10:39AM

6    A.  Yes.

7    Q.  What building was that?

8    A.  That was in building 8.  8 A-B.

9    Q.  And are you currently on -- well, what prescriptions are

10   you currently taking?                                           10:40AM

11   A.  I'm taking Tramadol right now for I have got five bulging

12   disks that I do not want to have the surgery here because I'm

13   close to being released.  I'd like to have it done by my

14   mother's doctor on the streets.

15   Q.  With the Tramadol, is that medication where you have to go   10:40AM

16   to pill line to be given the pills?

17   A.  Yes, ma'am, in the morning -- in the a.m. and p.m.

18   Q.  Roughly how many people are housed on the South Unit?

19   A.  I think it's about 1,000 inmates.

20   Q.  What's the security level for the South Unit?               10:40AM

21   A.  It's like a 2 to 3.

22   Q.  Would that be considered a minimum?

23   A.  Yeah, it's the minimum yard that we can go to.

24   Q.  Okay.  And is it an open yard except for when you have the

25   lockdowns for count?                                            10:40AM

**CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct**

1    A.  Yes, ma'am.

2    Q.  So you have an opportunity to be on the yard and observe

3    things going on?

4    A.  Uh-huh.  Sure do.

5    Q.  Okay.  Are you familiar with the open clinic that's going          10:41AM

6    on at South Unit?

7    A.  Yes, I am.

8    Q.  Is that because you have to go to the pill line twice a

9    day?

10   A.  Yeah.                                                              10:41AM

11   Q.  And the pill line is right next to where the clinic is?

12   A.  Yeah.  It's inside now, yes.

13   Q.  And have you also used the open clinic to go and be seen on

14   the nurse's line?

15   A.  Yes, I have.                                                       10:41AM

16   Q.  And what is the typical staffing pattern with the nurses

17   when you have gone to nurse's line?

18          MR. BOJANOWSKI:  Note an objection.

19          THE COURT:  What is the objection?

20          MR. BOJANOWSKI:  Foundation.  She's asking about a              10:41AM

21   staffing pattern, and this witness doesn't have access to

22   Corizon information.

23          THE COURT:  I actually didn't understand what the term

24   "staffing pattern" meant.  Maybe you could rephrase.

25          MS. KENDRICK:  Sure.                                           10:41AM

60

1    BY MS. KENDRICK:

2    Q.   In the times you have gone to nurse's line how many nurses

3    were working?

4    A.   Two most of the time, but they won't help each other if one

5    gets behind in one of those lines.                                    10:42AM

6    Q.   Are each of them running a nurse's line, or is one running

7    the nurse's line and one is doing something else?

8    A.   One will do nurse's line and one will do like the meds and

9    the insulins.

10   Q.   Okay.  So in the times you have gone there's only been one     10:42AM

11   nursing line happening?

12   A.   Yeah, it was only one nurse line.

13   Q.   Okay.  What sort of treatment do the nurses provide?

14   A.   They will evaluate us when we go with an HNR, and then they

15   will just put that they seen us on the bottom of our HNR            10:42AM

16   nurse's line and refer to a provider.  But we don't know what

17   they put on the screen on the computer, as before, our

18   responses, what they would do to us for our treatment, they

19   would put it down on the bottom of the HNRs where we have no

20   record of it what's going on now.                                   10:43AM

21   Q.   Can the nurses prescribe medication for you?

22   A.   It would have to be the provider, I would think.

23   Q.   Okay.  Can the nurses make a diagnosis of any medical

24   problems you are having?

25   A.   Unless it's like people coming with cuts and stuff that        10:43AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct

1    need to be stitched up, obvious things that need to be done

2    right away.

3    Q.  Okay.  How frequently is the provider at the clinic at

4    South Unit?

5            MR. BOJANOWSKI:  Same objection.  Foundation.          10:43AM

6    BY MS. KENDRICK:

7    Q.  In your observations going to the pill line every single

8    day, how frequently per week do you see the provider running

9    provider line?

10           MR. BOJANOWSKI:  Same objection.                       10:43AM

11           THE COURT:  Overruled.

12           THE WITNESS:  It depends on when she gets there.

13   Nursing staff has told me she's supposed to be there at 8.  She

14   comes in at 9 to 9:30 sometimes.  There will be 15 to 20

15   inmates that she will have to see and she might see six or      10:44AM

16   seven that day.

17   BY MS. KENDRICK:

18   Q.  And is she there every day?  How many days a week is she

19   there?

20   A.  It just depends, you know.  We would like to have somebody  10:44AM

21   there all week.

22           THE COURT:  Let's ask some questions about how you

23   know about when the provider is there.  We know that you go to

24   that office twice a day.

25           THE WITNESS:  Yes, sir.                                10:44AM

1          THE COURT:  What times?

2          THE WITNESS:  It's in the morning between 6 to, say,

3     9:30, 10:00.

4          THE COURT:  And then when is the second time?

5          THE WITNESS:  In the afternoons from -- because they          10:44AM

6     just changed the times -- in the afternoons from 5 to 6:45.

7          THE COURT:  And so I guess I'm a little bit concerned

8     that you may not know when the provider is there based upon

9     your personal observation because you could be there before she

10    arrives or there after she's left.          10:44AM

11         THE WITNESS:  Well --

12         THE COURT:  Is there any other way that you know how

13    she's there?

14         THE WITNESS:  Yes.  My housing unit, my window, used

15    to face right at the front of the health unit until they moved          10:45AM

16    it this last Sunday.  So I have had a view of the health unit

17    for the last five or six years right out my window.

18         THE COURT:  So is it fair to say every single day you

19    could pretty much be a person who could have kept a log on

20    whether or not the provider was there or not?          10:45AM

21         THE WITNESS:  Yes.

22         THE COURT:  And did you happen to just sort of

23    mentally do that yourself?  Is it fair for us to rely on you to

24    say I know when the provider is there or not in the time before

25    the unit was moved?          10:45AM

1      THE WITNESS:  Well, I have the staff will make the

2  comments that we're sorry you have got to wait.  She's supposed

3  to be here now.  We don't know when she's going to be here.

4      THE COURT:  But what about times when you are not

5  supposed to see the provider, which are most days.  How do you      10:45AM

6  know that the provider is there or not there on those days?

7      THE WITNESS:  I hear from the ones that are in the

8  line waiting to be seen by the provider and then they would

9  have cancelled.  Because it goes across the yard when you are

10  there, ACI guys are taken off work, missing work all day long      10:46AM

11  to see the provider.  And then she doesn't show up, so it

12  travels pretty quick when you hear about the provider not

13  showing up.

14      THE COURT:  Okay.  I'm sorry.  Thank you.

15      MS. KENDRICK:  Sure.      10:46AM

16  BY MS. KENDRICK:

17  Q.  And what is the process for open clinic at the South Unit?

18  Is it any time it's open anybody can go?

19  A.  No, ma'am.  There's certain hours that you have to go for

20  open clinic.  7, 8, and 9 is between 7 and 8:30.      10:46AM

21  Q.  Okay.  I'm going to show you something.

22  A.  Okay.

23  Q.  Do you recognize this document?

24  A.  Yes.

25  Q.  Is it showing the assignments for open clinic for the      10:47AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct

1   housing units for the housing buildings on South Unit?

2   A.  Yes.  These are them.

3   Q.  Okay.  So you said you were in Housing Unit 9.  So what

4   happens if you were to show up at the clinic at 11 with an HNR?

5   A.  They would tell you to come back the next day, that she was          10:47AM

6   not in your limited -- your time slot for your building to be

7   seen.

8   Q.  Okay.  You had mentioned earlier that the --

9        THE COURT:  Before you go on, were you thinking that

10   you would have this marked and admitted?          10:47AM

11        MS. KENDRICK:  Yeah.  We can.

12        THE COURT:  What we'll do is I will proceed with the

13   court side process, but with respect to the clerk side process

14   we may hold off on that until we get that sorted out.

15        Is there any objection to the admission of this          10:48AM

16   document?

17        MR. BOJANOWSKI:  Your Honor, I'm not sure what it is.

18   There's been no foundation.  I have never seen it before,

19   frankly, so I have no clue.

20        THE COURT:  Could you try to lay a foundation with          10:48AM

21   this witness?  He says he recognized it but could you lay a

22   further foundation?

23        MS. KENDRICK:  Sure.

24   BY MS. KENDRICK:

25   Q.  Is this information posted throughout the South Unit for          10:48AM

UNITED STATES DISTRICT COURT

1    people to see?

2    A.  Yes, it is.  It's taped up on the front window of the

3    health unit.

4    Q.  Okay.  Is it available for other -- in the housing units so

5    people know when they are permitted to go?                    10:48AM

6    A.  Yes.  They have posted them up on the bulletin boards on

7    the yard.

8    Q.  And is a similar sign posted on the bulletin board in

9    Building 9?

10   A.  Yes.                                                       10:48AM

11         THE COURT:  Ms. Kendrick, how did you obtain a copy of

12   it?

13         MS. KENDRICK:  We were sent a copy of it by a prisoner

14   housed on South Unit.

15         THE COURT:  All right.  Any other objection from          10:48AM

16   defendants to the admission of this other than the ones you

17   have already stated?

18         MR. BOJANOWSKI:  No, Your Honor.

19         THE COURT:  The objection is overruled.  What has

20   been -- will be marked as plaintiff's 1 for today's hearing     10:49AM

21   will be received into evidence and placed in the record.

22   BY MS. KENDRICK:

23   Q.  And this is a two-page document.  So if you could turn the

24   page, if you are able to, Mr. Oyenik.  And you had testified

25   earlier that you go for medication in the morning and in the    10:49AM

1    evening.  Does this reflect the schedule that is being used for

2    pill call?

3    A.   Yeah.  This is the new hours for the new health unit since

4    it's been moved.  And Monday and Tuesday, the insulins, because

5    I go with the insulins, and they are supposed to start at 6:15.   10:49AM

6    Well, we had the lieutenant and the sergeant there Monday and

7    Tuesday.  Everything went good.  Wednesday morning we came down

8    there, we didn't start until 6:30 and now it's gradually

9    getting later and later.

10   Q.   And why do you go with the prisoners who take insulin?       10:50AM

11   A.   Because of work in the morning we're supposed to be

12   required to be -- on the construction crew I work for we're

13   supposed to be there at 7 a.m.  And that includes all ready

14   having had chow, given our meds, be ready to work.  So they run

15   us in with the insulins first thing in the morning.              10:50AM

16   Q.   How many hours a day average are you working on the

17   construction crew?

18   A.   I haven't been with this issue with my hernia.  I haven't

19   been doing anything.

20   Q.   How long have you had the hernia?                           10:50AM

21   A.   Tore open on the 20th, on 6-20.

22   Q.   And how much are you paid per hour working construction?

23   A.   15 cents an hour.

24   Q.   You mentioned earlier there were quite a few prisoners with

25   disabilities in Building 7 and 8.                                10:51AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct

```
 1   A.  Yes.
 2   Q.  Can you estimate, based on living there in the past,
 3   approximately how many people with disabilities live in those
 4   buildings?
 5   A.  Building 7 is supposed to be, they say, the ADA run for the   10:51AM
 6   wheelchairs.  And I think that houses a total of 23.  Building
 7   8, Abel Baker only, has so the so-called ADA rungs but they are
 8   not ADA.  And they've got almost all wheelchairs in there right
 9   now.  And they are talking about doing the other side of
10   Building 8, Charlie Dog, into wheelchairs, which it's a          10:51AM
11   hindrance for them, you know, even being in there.  I know.  I
12   was in a wheelchair and I was in one of those rungs.
13   Q.  Are those double bunked?
14   A.  Yeah, they are in the back.  There's four bunks in each run
15   of the very back.                                                10:51AM
16   Q.  Why did you say they are not ADA?  Is it there's not grab
17   bars or enough space to transfer?  What's the problem?
18   A.  Yeah, and some bunks in the back there's barely enough room
19   to get your wheelchair in.  If the wheelchair is a little wide
20   you have to completely leave your wheelchair in the aisle.  I    10:52AM
21   have seen guys have to get help to get in their bed because
22   they had to get out of their wheelchair get into the bed.  They
23   couldn't because the wheelchair wouldn't fit between the bed
24   and the locker.
25   Q.  Right.  Have you observed any people with disabilities,      10:52AM
```

1    whether they are using a wheelchair or a walker, trying to get

2    from Buildings 7 and 8 over to the new clinic?

3    A.  Yes.  I have seen them try to get over there by theirselves

4    now, because they are trying to wait and rely on their

5    wheelchair pushers which just like any job, you have good          10:52AM

6    people who work for and you don't.  So the ones that do have

7    good pushers do get them up there on time.  The other ones they

8    are wheeling theirselves over there by theirself.  And these

9    are, I want to say, elderly, in their 50s and 60s trying to get

10   up there by themselves.                                            10:53AM

11          THE COURT:  Careful.

12          MS. KENDRICK:  Let me show you something.

13   BY MS. KENDRICK:

14   Q.  Mr. Oyenik, I'm showing you a picture that I created from

15   Google Earth of Florence South.  Can you see where you live on   10:53AM

16   that picture?

17   A.  Yes.

18   Q.  Can you show the judge?

19          THE COURT:  Will you circle it?  Can you do that or

20   no?                                                               10:54AM

21          THE WITNESS:  Yeah.

22          MS. KENDRICK:  Could we ask to have one of his hands

23   unlocked so he can write?  Is that possible?

24          THE COURT:  That will require me to go into details

25   about what kind of risk, and I don't think -- if we're able to   10:54AM

1    do it without that.

2            MS. KENDRICK:  Fair enough, sir.

3            THE COURT:  And counsel, feel free, if you would like,

4    to come up and see what he's marked on, you can, both sides.

5            Ms. Kendrick is going to lead you through what you    10:55AM

6    have marked on the map.  I will ask counsel to stay here if

7    they would like so they can see.  Make a good record.

8    BY MS. KENDRICK:

9    Q.  Mr. Oyenik, you have marked in the top left corner a

10   building that's shaped like a cross as Building 9.  Is that    10:55AM

11   correct?

12   A.  Yes.

13   Q.  And immediately to the right of it at the top, there's a

14   rectangular building that you have circled and wrote "old

15   health unit."  Is that correct?    10:55AM

16   A.  Yes.

17   Q.  And directly below that rectangular building is one shaped

18   like an H on its side, and you have labeled it Building 8, is

19   that correct?

20   A.  Yes.    10:56AM

21   Q.  To the right of that is another building shaped like a

22   cross that you have marked as Building 7, is that correct?

23   A.  Yes.

24   Q.  And on the far right bottom corner of the map next to the

25   legend, you have circled a building that is shaped like a    10:56AM

1    pentagon which is blue on two sides and you labeled it "new

2    health unit."  Is that correct?

3    A.  Yes.

4              THE COURT:  Thank you.

5              MS. KENDRICK:  Thank you.                          10:56AM

6    BY MS. KENDRICK:

7    Q.  So you were describing earlier the new clinic is very

8    far -- your Building 9 is now the farthest away from the new

9    health clinic, is that correct?

10   A.  Yes, it is.                                              10:56AM

11   Q.  Can you estimate the distance that it takes, for example,

12   how many football fields would you say it is to walk from

13   Building 9 to the new clinic?

14   A.  It has to be at least four or more football field lengths.

15   Q.  And is the path of travel from Building 7, 8 and 9 over to  10:57AM

16   the new clinic, is it all on smooth pavement or sidewalks?

17   A.  No.  The sidewalks, they are pretty much well chewed up.

18   Q.  And are these sidewalks flat, or are there any sorts of

19   slopes or ruts in the path of travel?

20   A.  Yes.  There's where it's eroded away and the concrete is  10:57AM

21   kind of broke up on the top surface.  And that's -- the

22   wheelchairs is, you know, bad shape because of the sidewalks.

23   Q.  And so you testified earlier that you had observed

24   individuals who use wheelchairs attempting to wheel themselves

25   from the ADA building to the new clinic?                     10:57AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct

1   A.  Yes.

2   Q.  Did they appear to be having great difficulty wheeling

3   themselves?

4   A.  Yes, because there is a little upgrade.  From where

5   building 7 is to the south, it gradually goes up, uphill.  But        10:58AM

6   it's the heat that's really the main thing.

7   Q.  Okay.

8        THE COURT:  Before the health clinic was moved, I

9   gather the people who now find themselves next door neighbors

10  to the health clinic had to travel an equal distance back to        10:58AM

11  the other side where it used to be.

12       THE WITNESS:  Yes, but they didn't have wheelchairs.

13       THE COURT:  That was my next question.  Are the people

14  who are ADA accommodated, are they only in these buildings in

15  the corner, upper left corner?        10:58AM

16       THE WITNESS:  Yes.  Most of them are there and they

17  just put a few in Building 1.

18  BY MS. KENDRICK:

19  Q.  Can you indicate for the judge which building is Building

20  1?        10:59AM

21  A.  This is Building 1.

22       THE COURT:  What I'm going to do is I'm going to see

23  what you marked as Building 1 and I'm going to place a "1" on

24  it and I'm going to ask you whether that is Building 1.

25       THE WITNESS:  Yes, sir.        10:59AM

1      THE COURT:  Show it to counsel so they can see which

2  one you have indicated is Building 1.

3  BY MS. KENDRICK:

4  Q.  Building 1 is the one shaped like an H that's farthest to

5  the right and to the top of three units.  Is that correct, Mr.        10:59AM

6  Oyenik?

7  A.  Yes.

8  Q.  And just above it there's these nine octagonal shapes, is

9  that part of the South Unit, or is that something else?

10 A.  No.  That's Kasson.  That's another unit.                         10:59AM

11 Q.  Okay.  So you said they have moved some of the prisoners

12 with disabilities into Building 1?

13 A.  They are putting -- I don't know if you want to say an

14 overflow, but they kind of went in there and tried to knock

15 down walls and make it accommodated for wheelchairs.  And it's       11:00AM

16 only in, I believe it's Charlie run that they've got the chairs

17 in, wheelchair.

18 Q.  And you testified that you work construction.  Is that the

19 basis for your knowledge about the way that the building is

20 being reconfigured, or how do you know?                              11:00AM

21 A.  Just because of the problems I went through in the

22 wheelchair on that yard.

23 Q.  No, but how do you know they were tearing down the walls in

24 Building 1?  Is that because you were personally working on

25 that crew?  How do you know they tore down the walls?               11:00AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct

```
1   A.  No, they did that a while back.  But then they didn't --

2   for some reason they took all the ADAs out of there.  I don't

3   know.  This has been a while ago.  Now they are putting some

4   overflow in there.

5   Q.  Okay.                                                    11:00AM

6   A.  I think probably because of 7 and 8.

7   Q.  I want to go back to your experience with open clinic

8   nurse's line.  We have established that your building is

9   assigned a certain time slot?

10          THE COURT:  Before you move on, I think since we have  11:01AM

11  taken such care with respect to this document we should also

12  have it become part of the record.

13          MS. KENDRICK:  Sure.

14          THE COURT:  Any objection, Mr. Bojanowski?

15          MR. BOJANOWSKI:  No objection.                       11:01AM

16          THE COURT:  This will be marked and received as

17  plaintiff's Exhibit 2?

18  BY MS. KENDRICK:

19  Q.  So in that time frame you have for your building to go to

20  nurse's line is it first come, first served among Buildings 7,  11:01AM

21  8 and 9?

22  A.  Yes.

23  Q.  And how does it work exactly?  Do you give your ID to

24  somebody when you arrive?

25  A.  Yes.  We're supposed to give our ID to the officer and with  11:01AM
```

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct

1    the HNR, and then he gives it to the nurse that's there doing

2    the sick call.

3    Q.  So that way she knows who is first in line, second in line,

4    et cetera?

5    A.  Yes.                                                    11:02AM

6    Q.  And are you then told to go wait somewhere to be called?

7    A.  Yes.  We're told to go back outside and wait.

8    Q.  And is there any place to sit inside?

9    A.  At the new unit, no.

10   Q.  All my questions will be with regard to this new clinic.   11:02AM

11   A.  Okay.

12   Q.  So there's no place to sit inside?

13   A.  No.

14   Q.  Now, if a person who is in one of these buildings shows up

15   later than at the beginning but he's in a wheelchair, does he   11:02AM

16   get to jump the line and be the next one called?

17   A.  No.  I haven't -- I hadn't seen that.

18   Q.  Okay.  And what sort of seating is there outside of the new

19   clinic for people to wait to be called for nurse's line?

20   A.  There's two just like park benches.  I would say they are   11:03AM

21   about six foot long.

22   Q.  Like picnic benches?

23   A.  Yeah, like just has a back on it and just a bottom.  Just a

24   bench you sit in like a chair but it's like six foot long like

25   in a park.                                                   11:03AM

1  Q.  So how many men could reasonably sit there at the same

2  time?

3  A.  Maybe six if you was, you know, elbow to elbow.

4  Q.  But comfortably?

5  A.  Five.                                                    11:03AM

6  Q.  Is that bench shaded?

7  A.  Excuse me.

8  Q.  Is that bench shaded?  Is there shade or some sort of

9  awning over the bench?

10 A.  Yeah.  There's overhang over this new building.  But it's  11:03AM

11 not far enough out to keep you out of the sun.

12 Q.  So is this bench like against the wall of the new clinic?

13 A.  No.  It's out away from the wall.

14 Q.  Okay.  And are you allowed to kind of go stand somewhere

15 else in the shade?                                          11:04AM

16 A.  Well, we're all -- we all get up in there as close as we

17 can to the window and that's as far as you can get.  But if you

18 are in the a wheelchair there's no getting in closer and stuff.

19 You are out there in the sun.

20 Q.  Are there any trees or other awnings right outside this new  11:04AM

21 clinic where you can seek shade?

22 A.  No, ma'am.

23 Q.  Are there -- is any water made available to the people who

24 are waiting?

25 A.  Yes.  There is a water fountain outside.                11:04AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct

1    Q.  Is the water fountain operating?  Does it work?

2    A.  Yeah.

3    Q.  Do they have misters?

4    A.  No.

5    Q.  So you have to go to nurse's line for everything now?        11:05AM

6    A.  Yes.

7    Q.  You even have to go to nurse's line if you want to find out

8    something about your medication?

9    A.  Yes.

10   Q.  I want to show you something.  Do you recognize this, Mr.    11:05AM

11   Oyenik?

12   A.  Yes, I do.

13   Q.  What is it?

14   A.  It's a HNR that I had turned in asking about my -- the

15   delays in my medication and why they were happening.            11:05AM

16   Q.  And did you have to go to open clinic to submit this HNR?

17   A.  No.  This was in the -- before they did the -- they

18   switched the HNR box, well, they took it away basically.  You

19   only put in for medication now.

20   Q.  Right.  So when did they take out the HNR boxes at South     11:06AM

21   Unit?

22   A.  I want to say a month.  They repainted it a month ago, and

23   it states "med refill."  And then just since they have moved

24   the medical they have taken it off the chow hall and placed it

25   down on the building of this new -- of the new health unit.      11:06AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct

1   Q.  So now if you are requesting a refill of your medication

2   you have to go all the way to the new clinic and put the

3   request in the box?

4   A.  Yes.

5          THE COURT:  So in the old system people who were at          11:06AM

6   the far corner where the new clinic is, they would have to

7   travel all the way over to the box that was where the clinic

8   used to be and put in their -- that was the only place they

9   could put in a request for medical?

10         THE WITNESS:  No, sir.  It was at the old HNR box was      11:07AM

11  at the chow hall.

12         THE COURT:  I see.  So now they took it away from the

13  chow hall?

14         THE WITNESS:  Yes.

15         THE COURT:  And put it out next door to the new          11:07AM

16  location?

17         THE WITNESS:  Uh-huh.  And the reason why it's there

18  along with the mail drop boxes is because when the yard is

19  locked down and we can only go back and forth to the chow hall

20  and no other movement, well then we could still put HNRs in the    11:07AM

21  box along with our letters.  Now if that's going to happen now

22  there's no way you are going to get over here to put anything

23  in it.

24         THE COURT:  I see.

25  BY MS. KENDRICK:                                               11:07AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct

1   Q.  So under the old system, if you had a question about the

2   status of your medication, you could just submit an HNR and

3   they would give it back to you with a response updating you as

4   to the status of the medication?

5   A.  Yes.  Yes.                                            11:08AM

6   Q.  Okay.

7   A.  That way, personally that way I would have a record of some

8   type of response versus just a nurse's line or provider line

9   putting it down on the bottom.

10  Q.  Right.                                                11:08AM

11         MS. KENDRICK:  Your Honor, can we mark that HNR as

12  Exhibit 3?

13         THE COURT:  Any objection?

14         MR. BOJANOWSKI:  No objection.

15         THE COURT:  3 will be marked and received.         11:08AM

16  BY MS. KENDRICK:

17  Q.  Do you recognize this document, Mr. Oyenik?

18  A.  Yes.

19  Q.  What is it?

20  A.  It's the HNR I put in for my hernia on the second time.   11:08AM

21  Q.  And with this HNR requesting the status of the consult, did

22  you have to go to nurse's line?

23  A.  Yes.

24  Q.  And did you have to wait to be seen by the nurse?

25  A.  Yes.                                                  11:09AM

1  Q.  And what did the nurse -- what treatment did the nurse

2  provide you?

3  A.  She said -- she sat me down, took my vitals and stuff.  She

4  pulled up on the computer and she says, it shows all to still

5  be pending.  And she was wondering herself why I hadn't already   11:09AM

6  been seen and had this repaired.

7  Q.  I noticed all she put was, "Seen on nurse line slash

8  provider chart review"?

9  A.  Yes.  That's what she told me she was going to put that and

10  put the provider review on there so that way our nurse   11:09AM

11  practitioner could look at it and maybe find out more about

12  what's going on.

13  Q.  But she didn't actually write a response to your question?

14  A.  No.

15  Q.  She didn't write down what she told you?   11:09AM

16  A.  No.  She was doing it on the computer itself.  So whatever

17  she put in, I don't know what she put down as far as trying to

18  answer this for me.  I don't know.

19  Q.  But you said that you liked the old system because you

20  would have a record of what they had told you or --   11:10AM

21  A.  Yes, ma'am.  That's the way.  They would respond back

22  within the 24-hour period, triage, triage the HNR in a 24-hour

23  period and there would be a response down there.

24       THE COURT:  I'm confused.  That's what this document

25  shows.  There is a response, says "Plan of Action."  It's   11:10AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct

1    written there.

2            THE WITNESS:  Plan of action on the second?

3            THE COURT:  On the first one, the first one you showed

4    what's been marked as 3, the plan of action, it says, "Seen on

5    nurse line provider chart review."                          11:10AM

6            MS. KENDRICK:  That's Exhibit 4, Your Honor.

7            THE COURT:  That's 4.

8            MS. KENDRICK:  Dated 7-12-17.

9            THE COURT:  You are right.  That is 4.

10           So you do have that information here.  I'm confused,   11:10AM

11   because I thought you said under the old system you got

12   something back in writing that told you what the plan was.  And

13   here we see what looks like something in writing about what the

14   plan is.

15           THE WITNESS:  Yes.  Normally under the old way, we     11:11AM

16   could write out here what we needed to know about what was

17   going on as far as approvals or scheduling, and they would

18   write down, back down here on us, to us, and it would say,

19   waiting for schedule to be approved, or you have been approved

20   and you have been scheduled.  Because they couldn't tell us the  11:11AM

21   times when we were going out for outside consults.  But they

22   would tell us down here what was happening with that without

23   even seeing anybody or going up standing in line.  It was just,

24   to me, it seemed more efficient than having everybody go pile

25   down at the health unit like it is right now trying to be seen  11:11AM

1   just over any kind of question.  You have to go to the health

2   unit and go through that new system.

3           THE COURT:  Okay.  Thank you.

4   BY MS. KENDRICK:

5   Q.  And do you prefer the system of when you had the HNR boxes?        11:12AM

6   A.  Yes.

7   Q.  And is that for the reason you just articulated to Judge

8   Duncan?

9   A.  Yes, for our own purposes we could have a record.  Because

10  right now there's no -- they will put nurse's line and provider       11:12AM

11  line on all the HNRs now.  But when we're sitting there and

12  they are putting it on the screen, we don't know what the

13  responses are that they are putting on the screens.  We have no

14  record.

15  Q.  And since the clinic has moved to the new space, are you         11:12AM

16  aware of any medical emergencies or ICS's that have happened on

17  the South Unit yard?

18  A.  No, not right off.  Not since they moved it there.  I mean,

19  they have had seizures, I know, two or three inmates have had

20  seizures and stuff like that.  But they were having them out at      11:13AM

21  the old place because waiting outside in the sun to get their

22  meds, their seizure meds.  I purposely seen one guy go down

23  twice waiting outside in the heat waiting to get his seizure

24  meds.

25  Q.  That's at the old clinic or the new one?                         11:13AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct

1   A.  That's at the old clinic.

2   Q.  Have you seen anything like that since you have had to go

3   to the new clinic for pill line?

4   A.  No, not since they opened it they haven't happened.  But

5   there's no shade for the guys to get out of the heat, which he          11:13AM

6   has epilepsy which I know for a fact.

7   Q.  What happens if you are waiting to be seen on nurse's line

8   and there is an ICS?  Do they shut down the clinic?

9   A.  Yeah.  It depends on who is there.  Sometimes they will

10  shut down insulin if they have to and the pill call and               11:13AM

11  everything else and send everybody home also depending on the

12  severity of the medical ICS.  But now, they don't want to push

13  the gurney from this new unit all the way back to where all the

14  ADAs are in 7 and 8.  So they decided to put a gurney in

15  Building 7 now so they don't have to wheel a gurney the new           11:14AM

16  complex back to the old buildings.

17  Q.  And in the time that --

18          THE COURT:  Ms. Kendrick, did you understand that

19  response?  Am I the only one who missed what you -- the import

20  of what you are talking about the gurney being placed?               11:14AM

21          THE WITNESS:  Yeah.

22          THE COURT:  I didn't follow that.

23          THE WITNESS:  During the medical ICS --

24  BY MS. KENDRICK:

25  Q.  Go ahead.                                                        11:14AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct

 1  A.  During the medical ICS, they normally take a gurney and man

 2  down bag, which is heavy.  They will put it on the gurney and

 3  go out on to the yard wherever the inmate is down or having

 4  problems.  Now they don't want to push the gurney all the way

 5  back to Building 7 and 8 where they were at, so they took an          11:15AM

 6  extra gurney and they've got it in Building 7 in like a little

 7  closet room back there.  So they have a gurney back there

 8  already.

 9          THE COURT:  I see.  I understand.

10          THE WITNESS:  They have two now.                             11:15AM

11          THE COURT:  Thank you.

12  BY MS. KENDRICK:

13  Q.  And have you personally observed people waiting for open

14  clinic just giving up and leaving?

15  A.  Yes.                                                             11:15AM

16  Q.  And when you go to the open clinic, when do they stamp your

17  HNR?  When you are seen by the nurse?

18  A.  Yes.  They are supposed to.

19  Q.  So if you give up and leave, is your HNR stamped as

20  received?                                                           11:15AM

21  A.  No, because they will come out and call your name, and if

22  you are gone they will roll right over to the next person.

23  Q.  And you said that you have observed a person having

24  seizures while waiting in the sun?

25  A.  Uh-huh.  Yes, I have.                                           11:16AM

1   Q.  Do you remember roughly when that was the last time?

2   A.  Two months ago.

3   Q.  So middle of May, roughly?

4   A.  Yes.  Yeah.  That's been two months ago.  That's my best --

5   Q.  And earlier you had said that if a person comes outside of          11:16AM

6   their assigned time that they are turned away.  Have you ever

7   personally observed a prisoner being turned away because it's

8   not his unit's assigned time?  Please do not say this person's

9   name, just yes or no.

10  A.  Yes.                                                                 11:16AM

11  Q.  Do you know this individual?

12  A.  Yes.

13  Q.  Does he have any serious medical conditions?

14  A.  Yes, he does.

15  Q.  What is it?                                                          11:16AM

16  A.  Cancer.

17          THE COURT:  Yesterday we had an opportunity, the

18  lawyers and I, to tour a different yard, Lewis, and three units

19  there.  And the people at the nurse's line clinic there, there

20  was no sign like the kind that you have testified about here           11:17AM

21  today that listed specific hours for different housing units.

22  And, in fact, they told us that if somebody came at any time

23  during the open clinic time, they would be seen that day.

24          THE WITNESS:  Yes.

25          THE COURT:  You are saying that's not the circumstance         11:17AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct

1    in Florence South?

2         THE WITNESS:  Yes.  That's why they posted that time,

3    those times up there.  And not only have I seen Corizon staff

4    do it but I have seen DOC staff turn inmates away because they

5    weren't there in their allotted time limit.                    11:17AM

6         THE COURT:  You may have already testified about this,

7    but I don't remember.  This is a sign that's on the new clinic.

8    Was there a similar sign on the old clinic about these hours?

9         THE WITNESS:  Yes.

10        THE COURT:  And so were they strict then about          11:18AM

11   enforcing these hours?

12        THE WITNESS:  Yes, sir.

13        THE COURT:  And they are strict now?

14        THE WITNESS:  Yes, sir.

15        MS. KENDRICK:  Your Honor, I don't know if we have      11:18AM

16   moved it into evidence.  I'd like to move Exhibit 4 the HNR

17   dated July 12, 2017 into evidence.

18        THE COURT:  Any objection?

19        MR. BOJANOWSKI:  No objection.

20        THE COURT:  4 will be admitted.                         11:18AM

21   BY MS. KENDRICK:

22   Q.  How are you doing?  Are you okay?

23   A.  Yeah.

24   Q.  Okay.  Mr. Oyenik, do you have any concerns about

25   testifying today?                                            11:18AM

1   A.  Yeah, I do, personally for either, you know, my medications

2   that I need that I have had numerous delays over, and I put in

3   numerous grievances on them and I have won them, which still

4   hadn't dealt with that issue.  They still happen.  And then

5   DOC, I mean, I have seen the guys, they will bounce them around          11:19AM

6   the yard and move them, constantly move them around until they

7   will just wind up moving completely off the unit.  We just

8   recently had a guy moved onto our unit that came from SMU-1

9   which is a lockdown because of the allegations he was bringing

10  up about his health care and DOC.                                        11:19AM

11  Q.  Okay.  Given that you have concerns, why did you agree

12  nonetheless to come testify?

13          MR. BOJANOWSKI:  Same objection.

14          THE COURT:  Overruled.

15          THE WITNESS:  Because I have been in such a long time           11:19AM

16  and I have seen, you know, I have seen the good and the bad.

17  And what we're having to go through right now to get care when

18  it's obvious, right in front of your face, it's just -- I don't

19  know.  It's not humane.  It's not humane.  So I get out next

20  year no matter what, so if they are going to do something to          11:19AM

21  me, that's all right.  That's the way I look at it.  But if I

22  can help the rest of the people in the state to get this

23  healthcare thing figured out, that's what I want to do.

24          MS. KENDRICK:  Thank you very much, Mr. Oyenik.

25          THE COURT:  Now the lawyer for the defendants will            11:20AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Direct

1    have an opportunity to ask you any questions.

2              Mr. Bojanowski.

3                         CROSS-EXAMINATION

4    BY MR. BOJANOWSKI:

5    Q.   Mr. Oyenik.  Is it Oyenik?                        11:21AM

6    A.   Oyenik.

7    Q.   Oyenik.  I have a tough last name, too, so I sympathize.

8              Mr. Oyenik, you had testified with regard to a

9    schedule.

10   A.   Yes, sir.                                         11:21AM

11             MR. BOJANOWSKI:  Your Honor, what Exhibit Number?

12             THE COURT:  Exhibit 1, I believe.

13   BY MR. BOJANOWSKI:

14   Q.   Previously marked as Exhibit 1.  And you said that's the

15   schedule for sick call at the clinic, is that right?     11:21AM

16   A.   Yes, sir.

17   Q.   And the hours are broken out into housing units:  7 to 8:30

18   for 7, 8, and 9, is that right?

19   A.   Yes, sir.

20   Q.   And this was the schedule for the old clinic, is that  11:21AM

21   right?

22   A.   Yes, sir.

23   Q.   So the new clinic has the same schedule or a different

24   schedule?

25   A.   Nope, same schedule.                              11:22AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Cross

1   Q.  Same schedule.  All right.  And this schedule requires you

2   to appear at the medical clinic between 7 and 8:30, correct?

3   A.  Yes, for 7, 8 and 9.

4   Q.  Once you appear you will be seen even if it's after 8:30,

5   right?                                                            11:22AM

6   A.  As long as you got there within that time.

7   Q.  Right.  So you need to appear.  You have an hour and a half

8   to get yourself from your housing unit over to the medical

9   clinic, and once you arrive then you will be seen even if you

10  are seen at noon or 2 in the afternoon, right?                    11:22AM

11  A.  I have never seen it go that far.

12  Q.  Okay.  I mean, because they are moving the lines, right?

13  A.  Yeah.

14  Q.  So you usually will appear, you might wait an hour, maybe

15  two, tops, and then you get into be seen, right?                  11:22AM

16         MS. KENDRICK:  Objection.  Assuming facts not in

17  evidence.

18         MR. BOJANOWSKI:  This is cross-examination, Your

19  Honor.

20         THE COURT:  Just a second.                                 11:23AM

21         Overruled.

22         THE WITNESS:  Can you repeat it?

23  BY MR. BOJANOWSKI:

24  Q.  You show up there, say, at 7 in the morning, you arrive at

25  the medical clinic, right?                                        11:23AM

1    A.  Yes.

2    Q.  You are standing there, right?  You give your ID to the

3    officer, correct, which means you are going to be seen there in

4    the medical clinic that morning.  Correct?

5    A.  Yes, if you turned everything in.                          11:23AM

6    Q.  Right.  And that's -- you have your HNR in your hand, and

7    that's the way this works.  You show up, you have your HNR, you

8    give your ID, you are seen.  Correct?

9    A.  Yes.

10   Q.  The only hook is you have got to make sure you are there    11:23AM

11   between 7 and 8:30 in the morning, right?

12   A.  Yes, sir.

13   Q.  If you show up at 9:00 and you are at Housing Unit 7, 8, or

14   9 you are going to get turned away, right?

15   A.  Yes.  They have been doing that.                           11:23AM

16   Q.  That's the rule of how the open clinic runs, right?

17   A.  There, yes.  They want to go off that.

18   Q.  Yeah.  And, in fact, you have shown up at the open clinic

19   on April 19th, you were treated at 12:03 p.m.  Right?

20   A.  April 19th?                                                11:24AM

21   Q.  Yes, sir.  That's what your medical records show.

22   A.  Oh, I can't --

23   Q.  You don't know?

24        MS. KENDRICK:  Objection, Your Honor.

25        THE WITNESS:  I don't.                                    11:24AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Cross

1          THE COURT:  Just a second.  What's the objection,

2    please?

3          MS. KENDRICK:  He's testifying to what's in the

4    medical record without showing it to Mr. Oyenik.

5          THE COURT:  That's because you are having difficulty                11:24AM

6    getting your hand over to it, is that right?

7          THE WITNESS:  Yeah.  I said April.

8          THE COURT:  Which one are you asking about?

9          MR. BOJANOWSKI:  I'm not asking about any exhibit,

10   Your Honor.                                                               11:24AM

11         THE COURT:  Okay.

12         MR. BOJANOWSKI:  I'm asking him, he's the one that's

13   familiar with his medical care and I'm assuming he would know

14   and he has been at the clinic because he seems to have a lot of

15   knowledge about what happens at the clinic.                              11:24AM

16         THE COURT:  Well, if the record makes your point let's

17   use the record to make your point.

18   BY MR. BOJANOWSKI:

19   Q.  Do you recall being at the clinic on 4/19 of this year?

20   A.  No.  I don't recall that, because --                                 11:25AM

21   Q.  Do you recall being at the clinic on June 9th of this year?

22   A.  I have put in for so many times to try to get seen for

23   things.

24   Q.  So generally speaking, if you show up on time, between 7

25   and 8:30 in the morning, you know that you are going to be seen          11:25AM

1  that morning, right, even if it's after 8:30?

2  A.  I would hope so, if something doesn't happen on the yard or

3  whatever.

4  Q.  Right.  An ICS happens or something that might prevent

5  that.  But as a general proposition, as things generally run,      11:25AM

6  you show up between 7 and 8:30, you are seen.  Right?

7  A.  Yes.

8  Q.  Okay.  As far as the movement of the new clinic is

9  concerned, you said, and you have that big map.  Remember the

10 big map that you drew some circles on?  Right?                      11:26AM

11 A.  Yes, sir.

12 Q.  And you were testifying about how the old health unit was

13 up near Building 8 and 9 and now it's down near the admin

14 building, right?

15 A.  Yes.                                                            11:26AM

16 Q.  And you said that there's some overflow people going into

17 Building 1, correct?

18 A.  Yes, ADA.

19 Q.  All right.  You don't have any particular knowledge of how

20 housing assignments are made at the Florence complex, do you?      11:26AM

21 A.  No, other than if you are in a wheelchair, you would only

22 be required to go to certain buildings.

23 Q.  You don't know if there's some kind of plan to move inmates

24 who are ADA into Building 1 at this point, do you?

25 A.  No.  It's -- I have heard about it.                            11:27AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Cross

```
 1   Q.  You just don't know?
 2          MS. KENDRICK:  Objection.  Can he please let the
 3   witness answer the question?
 4          THE COURT:  We do need to be careful about that.
 5          MR. BOJANOWSKI:  I'm trying.  He pauses and I jump in.   11:27AM
 6          THE COURT:  I'm trying to make sure two people aren't
 7   talking at the same time, because the court reporter can't
 8   really do that.
 9   BY MR. BOJANOWSKI:
10   Q.  So you have heard about the fact that there's going to be   11:27AM
11   this movement of inmates who are ADA, out of the 7, 8, and 9
12   area down to the Number 1 area, right?
13   A.  Yes.
14   Q.  Okay.  Now, you were talking about you like the old system
15   of the HNR box because you could put an HNR in there and then   11:27AM
16   you would get some kind of written response.  Correct?
17   A.  Yes, sir.
18   Q.  And you say that you don't get a written response now from
19   the nurse, correct?
20   A.  Yes.                                                        11:28AM
21   Q.  But you have conversations with the nurse, correct?
22   A.  Yes.
23   Q.  Of course, because you are telling the nurse what's wrong
24   with you when you go in there, right?
25   A.  Yes, sir.                                                   11:28AM
```

1   Q.  Your hernia, for instance.  I have got a lot of pain.  I

2   need to have this taken care of, correct?

3   A.  Yes, sir.

4   Q.  And that's during the open clinic situation where you take

5   your HNR in and you talk to the nurse, correct?                    11:28AM

6   A.  Yes.

7   Q.  And they tell you what's going on, correct?

8   A.  They tell me, yeah, they tell me what's going on.

9   Q.  And so if you wanted to keep a medical record as to what is

10  happening you could go back to your housing unit and write down    11:28AM

11  well, the nurse told me this, that, and the other thing today

12  instead of having them write it on an HNR, right?

13  A.  Yeah, but how many people would do that?

14  Q.  Well, I don't know.  I'm just wondering, you know, you

15  don't like the old system because you say that they would write    11:28AM

16  some note, you know, I have referred to the provider or

17  something and somehow --

18      MS. KENDRICK:  Objection.  Mischaracterizing

19  testimony.  He did not say he disliked --

20      THE COURT:  Overruled.  Go ahead.                              11:29AM

21  BY MR. BOJANOWSKI:

22  Q.  So that, to you, is of value so that you know what is

23  happening to your medical condition but, in fact, you are being

24  told what is happening to you, even if it's not written down on

25  an HNR, right?                                                     11:29AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Cross

1    A.  Yeah, but I have been in the system long enough being told

2    one thing and what's being placed on the computer is another

3    thing.

4    Q.  The new place, the new medical unit place, isn't it true

5    that there's a lobby in that unit that can hold up to 20                    11:29AM

6    inmates?

7    A.  Yeah.  It probably could hold 20 inmates but they only

8    allow seven.

9    Q.  All right.

10          THE COURT:  Does that seven include the people there       11:29AM

11   for the pill line as well as the nurse's line, or is it seven

12   for each?

13          THE WITNESS:  No, that's seven for just the pill line.

14   Nurse's line is still you wait outside.

15          THE COURT:  So nobody can wait inside?                    11:30AM

16          THE WITNESS:  Nope.

17          THE COURT:  Do you have any idea why?

18          THE WITNESS:  No, sir, I don't.

19          THE COURT:  Can I ask something just to make sure I'm

20   clear about this?  Have you personally seen people leave the    11:30AM

21   waiting line for open clinic because they were outside and it

22   was too hot to continue to wait?

23          THE WITNESS:  Yes, sir.  I have seen them leave the

24   insulin line, all the lines, and turn around and try to come

25   back later because they have already been waiting out there for  11:31AM

UNITED STATES DISTRICT COURT

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Cross

1    so long.

2    BY MR. BOJANOWSKI:

3    Q.  When you show up to the med line the first thing you do is

4    give your ID to the officer, is that correct?

5    A.  Not for the med line.                                    11:31AM

6    Q.  Not at all?

7    A.  Not at all for the med line.

8    Q.  What about the pill line?

9    A.  Well, that's the same.  Pill line and med line is the same

10   thing, a.m. and p.m.                                         11:31AM

11   Q.  Because I thought you testified earlier that when you go

12   there for open call, you give your ID to the officer so that

13   they know you are there so you can get called out.  Isn't that

14   the procedure to be followed?

15   A.  Yes, for open sick call line but not for med line.       11:31AM

16   Q.  All right.

17        THE COURT:  How is the line made for the med line?

18        THE WITNESS:  The med line, you go in, they only want

19   seven people inside.  That includes the insulins and

20   wheelchairs.  They've got it roped off like a bank would.    11:32AM

21        THE COURT:  I understand.

22        THE WITNESS:  Like a ribbon on the deal.  That's how

23   it's roped up.  There's no place to sit down.  So you go stand

24   in there.  It's first come, first served whenever they decide

25   to start.                                                    11:32AM

1        THE COURT:  So there's seven people allowed to be in

2   the line for the pill line inside and then what about if there

3   are more than seven people who want to receive insulin or

4   receive their pills?  Where do they stand?

5        THE WITNESS:  In the line outside.                    11:32AM

6        THE COURT:  So there's a line that forms outside.

7        THE WITNESS:  Yes.

8        THE COURT:  In order?

9        THE WITNESS:  Yes.

10       THE COURT:  And then when you come to the head part of  11:32AM

11  the line then you present your ID?

12       THE WITNESS:  Yes, sir.

13       MR. BOJANOWSKI:  May I have a moment, Your Honor?

14       THE COURT:  Surely.

15  BY MR. BOJANOWSKI:                                         11:32AM

16  Q.  Sir, you are aware that you are entitled to get a copy of

17  your medical records if you want them, right?

18  A.  No.

19  Q.  You don't know that?

20  A.  No.  I have tried to get a copy of my medical records    11:33AM

21  before.

22  Q.  And they have said no?

23  A.  They said no, unless you are in litigation only and then

24  they will only allow certain things.

25  Q.  Okay.  Was that an HNR request that you made for your     11:33AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Oyenik - Cross

1   records?

2   A.  Yeah.  You put an HNR request in for medical record review.

3   Q.  Okay.  And you say you have done that?

4   A.  Yes.

5   Q.  How many times?                                          11:33AM

6   A.  I think three, three or four times in the last six years.

7   Q.  How many times in the last year?

8   A.  None.

9   Q.  None?

10  A.  No, sir.                                                 11:34AM

11       MR. BOJANOWSKI:  Nothing further, Your Honor.

12       THE COURT:  Thank you.  Any redirect?

13       MS. KENDRICK:  Just a few questions.

14              REDIRECT EXAMINATION

15  BY MS. KENDRICK:                                             11:34AM

16  Q.  I notice you are squirming and grimacing.  Are you okay?

17  A.  Yeah, just trying to get through this.

18  Q.  I will be quick.

19       So Mr. Bojanowski was asking you about the fact that

20  the nurse will actually tell you something of substance about  11:34AM

21  the status of your request.

22  A.  Yes.

23  Q.  But she doesn't write it down on your HNR, correct?

24  A.  Yes.  That's what I was trying to make clear.  They can

25  tell you things, but you don't know what they are putting on   11:34AM

1    your record.

2    Q.  So there's nothing -- you are not getting a substantive

3    response from medical?

4    A.  Yes, just hearsay.

5    Q.  Right.  And he also asked you why don't you just go back to    11:35AM

6    your house and write it all down in a journal, right?

7    A.  Yes.

8    Q.  And in your experience, when it's a prisoner's word against

9    prison staff word, who normally prevails?

10            MR. BOJANOWSKI:  Note an objection.                        11:35AM

11            THE WITNESS:  It's not us.  It's staff.

12            THE COURT:  I didn't hear the objection but I noticed

13    it on the transcript.  The objection is overruled.

14    BY MS. KENDRICK:

15    Q.  And you said that you preferred the old system with the HNR   11:35AM

16    box where you could put in a request or a question and then get

17    on with your life, correct?

18    A.  Yes.

19    Q.  And the point was that you didn't need to stand in line for

20    an hour to ask a question about a status of a specialty consult   11:35AM

21    or medication refill, correct?

22    A.  Yes, sir.  I mean, yes, ma'am.

23    Q.  Okay.  Thank you very much, Mr. Oyenik.

24            MS. KENDRICK:  I have nothing further, Your Honor.

25            THE COURT:  Thank you.  Mr. Oyenik, thank you very        11:35AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

```
 1   much.  Two things:  First, when you step off the witness stand
 2   we're going to be very careful about making sure you have
 3   enough time and also make sure you do understand that if you
 4   think you need help doing it we'll make sure you get that help.
 5   So don't rush it at all because I don't want you to fall.          11:36AM
 6           THE WITNESS:  Yes, sir.  Me either.
 7           THE COURT:  Especially because I see you are in some
 8   discomfort now.  Do you think you can make it off the witness
 9   stand okay?
10           THE WITNESS:  Yes, sir.                                    11:36AM
11           THE COURT:  All right.  The second thing Ms. Kendrick
12   asked some questions about would suggest a concern about
13   retaliation.  I don't think there will be any retaliation for
14   your testimony here in court today because generally I think
15   everybody agrees it's helpful for the Court to have information  11:36AM
16   and, in fact, the compliance with the stipulation does require
17   the Court to make these kinds of inquiries.  But if you
18   experience any such retaliation, let your lawyers know.
19           THE WITNESS:  I will.
20           THE COURT:  Thank you, sir.                               11:36AM
21           THE WITNESS:  Thank you.
22           MR. BOJANOWSKI:  Your Honor, could I have a moment
23   with the officers?
24           THE COURT:  You may.
25           Is the next witness we're going to hear the witness      11:37AM
```

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1    you were referring to earlier?

2         MS. EIDENBACH:  Yes.

3         THE COURT:  And where is that witness?

4         MS. EIDENBACH:  She's upstairs, I believe.

5         MS. KENDRICK:  They don't have the female prisoners        11:37AM

6    with the male prisoners.

7         THE COURT:  I understand.  Okay.

8         MR. BOJANOWSKI:  Your Honor, I was instructing the

9    officers to go ahead and transport them back to the facility is

10   what I was doing.                                               11:38AM

11        THE COURT:  Yes.

12        MR. BOJANOWSKI:  Because we have two different groups,

13   and so I don't see the need have to them here.

14        THE COURT:  You may send them back.

15        MR. BOJANOWSKI:  All right.                                11:38AM

16        THE COURT:  So what we contemplate are two more in

17   custody witnesses, is that correct?

18        MS. EIDENBACH:  Yes, Your Honor.

19        THE COURT:  All right.  And the witness who is going

20   to testify next and the witness who is scheduled to follow --  11:39AM

21        MS. EIDENBACH:  Yes.

22        THE COURT:  -- do you know enough about their health

23   conditions to understand whether there's any implications of

24   whether we hold them over for lunch that that could pose any

25   kind of health complication?  Because my experience is that    11:40AM

1    when DOC transports people to the courthouse there's no

2    provision made for them to have anything to eat during the day.

3    I don't know if that's the case or not.

4         MS. KENDRICK:  I spoke with them before, and they said

5    they had received breakfast but I'm not aware of whether or not   11:40AM

6    they have lunch with them.  It did not appear that they had

7    sack lunches with them.

8         THE COURT:  Unfortunately, that's a reality we have to

9    deal with, especially if there are health issues.  I don't know

10   whether any of them have diabetes that requires them to eat on   11:40AM

11   a more regular schedule.

12        MS. EIDENBACH:  I don't think either of them have any

13   issues specifically related to eating.

14        THE COURT:  And they came to the courthouse around 8

15   in the morning, I think, so they had breakfast as opposed to   11:40AM

16   people who come from the federal -- I'm sorry -- CCA, they

17   usually eat at 2 or 3 in the morning for their days.  So that's

18   a long time until now.  So if they had breakfast at a more

19   reasonable time perhaps it's not such a huge imposition.

20        MS. EIDENBACH:  That's our understanding.  So do you   11:41AM

21   want to begin with the first witness now?

22        THE COURT:  If we could.  I thought it would make

23   sense since she's on her way, I think.

24        MS. EIDENBACH:  Yep.

25        MR. BOJANOWSKI:  I think they are here.   11:41AM

1        THE COURT:  You think.  Okay.  Thank you for minding

2   this detail.

3        MS. LOVE:  Your Honor, we were just informed that the

4   next two witnesses did come with sack lunches, so they have a

5   lunch.                                                          11:43AM

6        THE COURT:  Thank you.

7        Good morning.  We're going to ask you to remain there

8   for just a moment while the clerk of the court administers the

9   oath.

10       THE MAGISTRATE CLERK:  Please state your name for the     11:43AM

11  record.

12       THE WITNESS:  Dominique Keys.

13       THE MAGISTRATE CLERK:  Please spell your last name.

14       THE WITNESS:  K-E-Y-S.

15       THE MAGISTRATE CLERK:  Please raise your right hand.       11:43AM

16       (The witness was sworn.)

17       THE COURT:  So what we're going to do is ask you to be

18  next to microphone right over there, please.

19       MS. EIDENBACH:  Can I approach and just get her water

20  and the Kleenex?                                                11:44AM

21       THE COURT:  Surely.

22                   DOMINIQUE KEYS,

23  a witness herein, having been first duly sworn by the clerk to

24  speak the truth and nothing but the truth, was examined and

25  testified as follows:

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

```
 1                      DIRECT EXAMINATION

 2    BY MS. EIDENBACH:

 3    Q.  Good morning, Ms. Keys.

 4    A.  Good morning.

 5    Q.  How are you today?                                    11:44AM

 6    A.  Sore.  I'm okay.

 7            THE COURT:  We'll need to move microphone as close as

 8    we can.  Please don't be offended by the fact we're putting the

 9    microphone so close to your mouth.  It's necessary in the

10    courtroom to be able to hear you in this cavernous space.     11:44AM

11            THE WITNESS:  Okay.  That's good.

12    BY MS. EIDENBACH:

13    Q.  Can you state your name for the record?

14    A.  Dominique Keys.

15    Q.  And what's your Arizona Department of Corrections number?  11:45AM

16    A.  150050.

17    Q.  Thank you.  Will you spell your last name for court

18    reporter?

19    A.  K-E-Y-S.

20    Q.  When did you arrive here this morning?                 11:45AM

21    A.  Oh, my God, I'm not even sure.  I don't have a watch.

22    Q.  Okay.  But it was this morning?

23    A.  Yes.

24    Q.  Okay.  How were you transported?

25    A.  Pardon?  Oh.  In the ADA van.                          11:45AM
```

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    Q.   Okay.  Do you take medications that are due in the morning?

2    A.   Yes.

3    Q.   Did you receive those medications?

4    A.   Yes, I did.

5    Q.   Okay.  Do you have any concerns about testifying today?        11:45AM

6    A.   Some.

7    Q.   Can you tell us about those concerns?

8    A.   Well, I'm a little nervous whether I will have any

9    retaliation when I, you know, get back to the prison.

10   Q.   And why do you fear that?                                      11:46AM

11            MR. BOJANOWSKI:  Same objection.

12            THE COURT:  Overruled.

13   BY MS. EIDENBACH:

14   Q.   You can answer.

15   A.   Oh.  Well, it just goes way back to treatment when I was at    11:46AM

16   Lumley.

17   Q.   Before you were transported this morning, did anything

18   occur?

19   A.   No.

20   Q.   Did you have to pack up your cell?                             11:46AM

21   A.   Last night somewhere around 9:30 or 10:00 everything was --

22   we had to take it outside and then inventory everything.

23   Q.   And what happened to the property after you inventoried it?

24   A.   I don't know.  It should be going to the property room.

25   Q.   And how long will it stay there?                               11:47AM

1   A.  I don't know because it depends on what time I get back

2   whether I will get my property.  If it's after 5:00 if there's

3   nobody there then I will have to wait until Monday to try to

4   get it.

5   Q.  So currently you have no personal property in your cell?    11:47AM

6   A.  Nothing, no.

7   Q.  Do you have a fan?

8   A.  My fan, it died.  It's burned out.

9   Q.  Okay.  So it wasn't one of the things that was packed up

10  this morning?                                                  11:47AM

11  A.  No.

12  Q.  Okay.

13          THE COURT:  I thought you said it was last night.

14          MS. EIDENBACH:  I'm sorry.  Last night.  I misspoke.

15          THE COURT:  Are you going to inquire as to why?        11:48AM

16          MS. EIDENBACH:  Yes, I am.

17          THE COURT:  Okay.

18  BY MS. EIDENBACH:

19  Q.  Do you know why your property was packed up last night?

20  A.  I have no idea.  I couldn't get any answers.  I asked the  11:48AM

21  officers.

22  Q.  Is that customary for when you are transported off site?

23  A.  Not for just a day.  If it's 24 hours or more then they

24  call it rollup, roll up your belongings.

25  Q.  But not just for a single day?                             11:48AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1   A.  No.  It's like when you go to medical off site.  They don't

2   judge your property.  You just come back to your room.  That's

3   it.

4   Q.  And who did the inventory?

5   A.  Mr. -- Officer Hughes.                                      11:48AM

6   Q.  And do you get a copy of that inventory, or does the

7   officer keep it?

8   A.  No.  It's in one of the bags.

9   Q.  Okay.

10          THE COURT:  This process that you have described as a    11:49AM

11   rollup, how often has that happened to you?

12          THE WITNESS:  I have had several rollups in the past

13   with hospital and whatnot.

14          THE COURT:  So when you go to the hospital and you are

15   an in-patient in the hospital there's a rollup?               11:49AM

16          THE WITNESS:  Yes.

17          THE COURT:  Any other time you have experienced a

18   rollup?

19          THE WITNESS:  No, only for hospital.

20          THE COURT:  Okay.  Mr. Bojanowski, do you know         11:49AM

21   anything about this?

22          MR. BOJANOWSKI:  I do not.  We're trying to check into

23   it.  I don't know if she's subject to some kind of move.  I

24   just don't know.  This is the first we're hearing about it.

25          MS. LOVE:  Your Honor, I'm literally on my phone right  11:49AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    now trying to find out information about this.

2           THE COURT:  Okay.  Thank you.

3           MS. EIDENBACH:  Your Honor, just as we have been

4    conversing here I'm noticing it's very difficult for you to

5    communicate with Ms. Keys.  Can I readjust her chair to be sort    11:49AM

6    of an angle?

7           THE COURT:  I was being more favorable of counsel's

8    ability to observe the witness, but if you would like to do

9    that, to find some compromised position that's comfortable for

10   everybody, that's fine with me.  I'm all right with how it is.    11:50AM

11   I was going to ask Ms. Keys to not feel she had to turn her

12   head.

13          THE WITNESS:  It's hard for me to turn.  I have a

14   steel cage in my neck.

15          MS. EIDENBACH:  She has spinal and shoulder issues.       11:50AM

16          THE COURT:  Are you okay talking to me without looking

17   at me?

18          THE WITNESS:  It's kind of rude.

19          THE COURT:  I know, but I'm telling you it's okay.

20   You keep doing it.  If you can't resist.                         11:50AM

21          THE WITNESS:  All right.  It's just a little rude.

22          THE COURT:  Perhaps what we could do is move it just a

23   little bit.

24          MS. EIDENBACH:  I will turn it perhaps at an angle.

25          THE WITNESS:  That's better.                              11:51AM

1          THE COURT:  Thank you everybody.

2    BY MS. EIDENBACH:

3    Q.  Where are you currently housed?

4    A.  I'm housed on Santa Cruz unit and I'm on B yard in B-4108.

5    Q.  And is that an ADA yard?                                    11:51AM

6    A.  It's, yes, it's -- I'm in the ADA pod.

7    Q.  Is your cell ADA?  Does it have all of the necessary ADA

8    accommodations?

9    A.  Not all I would say.  It has a couple of bars over the

10   toilet and a high rise toilet seat.                            11:52AM

11   Q.  And does your wheelchair fit in there and are you able to

12   move around?

13   A.  When I take the legs off.  I can't turn unless I have the

14   legs off.

15   Q.  And you have to take them off yourself?                     11:52AM

16   A.  Yes.

17   Q.  Do you have an ADA aide who helps you?

18   A.  No.  Dr. Rodriguez some years back suggested that I have an

19   aide, especially when I came out of the hospital, and it was

20   denied.                                                        11:52AM

21   Q.  And you have remained without an aide?

22   A.  Yes, in this very yard.  Because there's a steep ramp

23   two-level ramp, and I can't push the chair up.  I have only got

24   one use of one arm, and I can't get up the ramp.

25   Q.  So if you can't wheel yourself, how do you get up?          11:53AM

1    A.  I don't.  I usually -- the officers know me.  I usually

2    stay in the cell.  I have to ask one of the girls usually that

3    live in that pod if they would mind pushing me up.  And if they

4    do mind they will tell me so.

5    Q.  Okay.  So you are pretty much confined to your pod?                    11:53AM

6    A.  Yes.

7    Q.  Because you don't have an aide?

8    A.  I'm confined pretty much to my cell.

9    Q.  To your cell?

10   A.  Uh-huh.                                                                11:53AM

11   Q.  Does your cell have a cooling unit in it?

12   A.  It does.

13   Q.  Is it an air conditioner or a swamp cooler?

14   A.  It's a swamp cooler.  And when it hits 100 degrees, it

15   stops, doesn't work.  It remains just humid like a swamp in       11:53AM

16   there.

17   Q.  Do you have a window in your unit that you could open?

18   A.  A couple years ago, they took all the lower run and they

19   welded our windows shut, so we can't open them.

20   Q.  So during count and other times where the yard is locked      11:54AM

21   down and your door is closed, you have no air coming in or out?

22   A.  No.  No, we don't.

23   Q.  And what does it feel like when you are inside your cell

24   when it's over 100 degrees?

25   A.  It feels like being trapped inside a bottle with a cork and    11:54AM

1    I can hardly breathe.  But I do.  And my cellmate is a younger

2    woman and a couple weeks ago she collapsed and had a seizure in

3    the room.  And I was trapped by the desk, so I had to hit on

4    the wall with a cane to get the ladies next door to get one of

5    the officers.  And they had what they call an ICS.  That's an          11:54AM

6    emergency.  And they took her to complex medical.  So I was

7    really worried about her because she's been not feeling well.

8    Q.  Do you know how high the temperatures get in your cell?

9    Have you ever seen a reading?

10          MR. BOJANOWSKI:  Your Honor, I guess I'm going to              11:55AM

11    object.  I mean, this hearing is supposed to be about HNR boxes

12    and access.  Now we're talking about temperatures and welded

13    windows.

14          THE COURT:  These are extremely relevant with respect

15    to the patients or the inmates who are particularly susceptible      11:55AM

16    to heat intolerance, and I have been very interested in this

17    subject since I learned that the homes that these people are

18    placed in may be subject to, in effect, no cooling.  And, in

19    fact, I was going to -- I will overrule the objection and ask

20    my own questions.                                                     11:55AM

21          I would need to understand exactly how your cell is

22    cooled.  There is a vent into your cell from the evaporative

23    cooler that blows air in.  Is that correct?

24          THE WITNESS:  There's one vent high up towards the

25    ceiling over one of the bunks.                                        11:56AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1       THE COURT:  And when you are in your cell and it's not

2   a lockdown situation, your door is open.  Is that correct?

3       THE WITNESS:  Yes.  We have to have it open in order

4   to breathe in there.  It's really bad.

5       THE COURT:  And when the door is closed, that door has    11:56AM

6   no openings in it?

7       THE WITNESS:  No.  It's a suffocating feeling in

8   there.

9       THE COURT:  And the door is closed for what

10  circumstances?                                                  11:56AM

11      THE WITNESS:  When we lock down.

12      THE COURT:  That's the only time, whenever it's a

13  lockdown?

14      THE WITNESS:  Yeah.

15      THE COURT:  So at nighttime it's open?                      11:56AM

16      THE WITNESS:  Up until 8:00.

17      THE COURT:  Then it closed?

18      THE WITNESS:  It's closed until 5 in the morning.

19      THE COURT:  How are you cooled then between 8 and 5

20  a.m.?                                                           11:56AM

21      THE WITNESS:  We're not -- after 100 degrees outside,

22  or higher, the cooling system does not produce any cool.

23  There's nothing.

24      THE COURT:  Well, I'm not an expert on this.  But the

25  evaporative cooling is generally thought to be able to reduce   11:57AM

1   the temperature in not humid conditions about 15 degrees.  So

2   if you had it 100 degrees temperature you could cool that air

3   to 85.  And so as the evening progresses, a unit that could

4   work to cool a room could cool it.  But I'm trying to

5   understand how it is that your room gets cool if the air that's          11:57AM

6   coming in has no way to get out, which would cause it to back

7   up just as a matter of -- again, I'm not an expert.  The

8   lawyers are going to have a chance to challenge everything I'm

9   thinking in my head right now.

10          But I'm trying -- when you went to bed the night                  11:57AM

11   before last, because it was a normal night, wasn't the rollup,

12   and they closed the door at 8, up until 8, it was okay to be in

13   your room, I gather?

14          THE WITNESS:  Well, we have no choice, you know.

15          THE COURT:  But temperature-wise.                                 11:58AM

16          THE WITNESS:  It's been hot every night.

17          THE COURT:  So when they close the door at 8 does it

18   get worse?

19          THE WITNESS:  Yes.

20          THE COURT:  Until about when?                                     11:58AM

21          THE WITNESS:  Most of the night.  It's like swamp, you

22   know.  It's very moist and damp.  But there's no cool.

23          THE COURT:  You said that the windows were welded

24   shut.

25          THE WITNESS:  Yes.                                                11:58AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1      THE COURT:  Did you live there before the windows were

2  welded?

3      THE WITNESS:  Yes.  I have been in there just over six

4  years in that cell.

5      THE COURT:  And when the windows were able to be                11:58AM

6  opened, was that completely up to the resident of that cell?

7      THE WITNESS:  Yes.

8      THE COURT:  To open or close the window?

9      THE WITNESS:  Yes.

10     THE COURT:  So did you usually keep the window open.             11:58AM

11     THE WITNESS:  Every now and then, yeah.

12     THE COURT:  What about in the summertime?

13     THE WITNESS:  It depends if somebody was smoking or

14  what in the four pack.

15     THE COURT:  What about after 8 p.m.?  What did you do            11:59AM

16  at night?

17     THE WITNESS:  Sometimes.

18     THE COURT:  But you have told me it's like being in a

19  bottle that's capped.

20     THE WITNESS:  It is.                                             11:59AM

21     THE COURT:  So I guess you also are telling me that

22  when you had the opportunity to uncork the bottle, you didn't

23  always do that.

24     THE WITNESS:  Well, you have to be really careful

25  because the scorpions and things come in.  Because we're level     11:59AM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    with the desert.

2         THE COURT:  So the window is right at ground level?

3         THE WITNESS:  Yes.

4         THE COURT:  There are no screens?

5         THE WITNESS:  No.  So when you look out, if you are          11:59AM

6    laying on your bunk you're level.  You can see the prairie

7    dogs, whatnot.  They come up to the window.

8         THE COURT:  And in your housing unit is there a second

9    floor?

10         THE WITNESS:  Yes.                                          11:59AM

11         THE COURT:  And those second floor cells, are the

12    windows still able to be open?

13         THE WITNESS:  I don't know.  I never knew if they

14    welded those or not.

15         THE COURT:  Thank you.                                      12:00PM

16    BY MS. EIDENBACH:

17    Q.  In your pod or your unit, are there cells that are

18    air-conditioned?

19    A.  Yes.

20    Q.  And are those cells ADA -- fitted with ADA accommodations?   12:00PM

21    A.  No.

22    Q.  But there is air-conditioning in your pod just not in your

23    units?

24    A.  Not in the wing that I'm on, but the other one going --

25    well, I'm in this one.  The one going this way that's hooked up   12:00PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1  to the officer's box, there's four cells down and four cells up

2  that are connected and they are on the A/C.

3          THE COURT:  Who gets to be in there?

4          THE WITNESS:  The lucky one.

5          THE COURT:  Is there any criteria?                12:00PM

6          THE WITNESS:  There should be.

7          THE COURT:  But you don't -- you are unaware of any

8  criteria?

9          THE WITNESS:  I'm unaware of that.

10          THE COURT:  All right.  Thank you.                12:00PM

11  BY MS. EIDENBACH:

12  Q.  Just going back to the question that I asked earlier that

13  elicited an objection, because I don't think we got to the

14  answer, have you ever seen any of the temperature readings from

15  your room?                                               12:01PM

16  A.  Yes, in the past.

17  Q.  How long ago?

18  A.  Well, now they won't tell us what the temperatures are.

19  They refuse.

20  Q.  You have asked?                                      12:01PM

21  A.  But prior, like about a year ago, the same cell I'm in,

22  some of the officers, we can't say who, but they would let us

23  know what the temperature was in there.

24  Q.  And what was it?

25  A.  I have known at like about 6:30 p.m. the temperatures to be  12:01PM

1   like 100, 101 or 2.

2   Q.  Okay.

3         THE COURT:  Ms. Eidenbach, would this be a good time

4   to take a noon recess?

5         MS. EIDENBACH:  Oh, sure.                          12:01PM

6         THE COURT:  Ma'am, we're going to have to take a

7   recess.

8         THE WITNESS:  That's fine.

9         THE COURT:  So I'm going to talk to the lawyers now

10  about when they would like to have everybody come back.  So how   12:01PM

11  much time do you all need for lunch?

12        MR. FATHI:  An hour will be sufficient for us, Your

13  Honor.

14        THE COURT:  Mr. Bojanowski?

15        MR. BOJANOWSKI:  That's fine with me.              12:02PM

16        THE COURT:  Is it all right with you all?

17        We'll come back at 1:10.  1:10 we'll come back.

18        (Recess from 12:02 until 1:08 p.m.)

19        THE COURT:  Thank you all.  Please be seated.  And

20  thank you, Ms. Keys.  Are you all right?               01:14PM

21        THE WITNESS:  Yes.

22        THE COURT:  We'll continue now.

23        MR. BOJANOWSKI:  Your Honor, we have -- before we get

24  started, I know the Court was inquiring with regard to the

25  rollup that occurred.  We did find out what happened.  Ms. Keys   01:14PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1   was marked off as quote, out to court, close quote, and as

2   standard protocol policy is they roll these people up because

3   they are typically sent off to county jail and held there when

4   they are in court.  So I have a feeling what happened is when

5   we set this up, somebody put on her paperwork out to court.      01:14PM

6   That's why they rolled her up.  So it wasn't just that standard

7   operating procedure when somebody is marked out to court.

8           So what we'll do is we'll make sure that she gets her

9   stuff when she returns.

10          MS. LOVE:  And, Your Honor, I have had personal        01:14PM

11  conversations on the telephone with Warden Kim Currier as well

12  as written confirmation of Deputy Warden of Operations Norm

13  Twyford, and they ensure the property will be returned today;

14  won't be tomorrow, won't be Monday.  They will receive their

15  property back upon their are return.                           01:15PM

16          THE COURT:  I'm very pleased about that because I

17  don't want there to be any negative consequence to somebody

18  coming to court to talk to me.  And I understand for people who

19  are incarcerated that your home where you are is your cell.

20          THE WITNESS:  Yes.                                     01:15PM

21          THE COURT:  And people do not like have to their homes

22  changed needlessly.

23          I have also had people tell me in the past that when

24  they have been transported to court, to this court, not to some

25  intermediary courts, to some other court that would, perhaps,  01:15PM

1    involve detention in a state facility or county facility but

2    just brought to the Court here for the day, they are rolled up

3    routinely.  And they tell me the reason that happens is it's

4    part of retaliation for people who bring lawsuits in court.  So

5    I was sensitive to this issue because I have heard people tell            01:16PM

6    me before that they have experienced this.

7          And so we have now heard that you are no different

8    than anybody else.  So on the one hand that's encouraging it

9    wasn't specifically directed toward you because you are coming

10   to talk to me here today; and secondly, I'm very thankful to            01:16PM

11   Ms. Love for making these inquiries and getting it confirmed

12   that even though you had to go through these experiences last

13   night it will be corrected today.  So you will have all of your

14   possessions back.

15         MS. EIDENBACH:  Your Honor, if I might make a few              01:16PM

16   comments.  First, we would like to note for the record this did

17   not happen at Florence so if it's standard operating procedure

18   it is concerning to us it did happen to, as you will hear

19   shortly, both the people coming from Perryville who are on

20   different yards.                                                        01:16PM

21         And the other thing is we would like to ensure not

22   only that they get their property back but they actually get

23   all of their property back.  Because one of the other methods

24   of retaliation is for once you get rolled up specific items of

25   your property go missing.  And so we would like the inventory         01:17PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    sheets that were taken when our clients were rolled up this

2    morning produced to us so we can then communicate with our

3    clients to make sure that they got all their property back

4    today instead of just some of it.  Because that is a concern to

5    us.  Often what go missing are the high ticket items like fans          01:17PM

6    or electronics, things that the prisoners cannot readily

7    replace themselves.

8            THE COURT:  We know the fan is dead on arrival so we

9    don't have to worry about that.

10           MS. EIDENBACH:  I know, for this particular plaintiff.          01:17PM

11           THE COURT:  Sorry to hear about that.  But I think

12    it's unlikely in the circumstances of Ms. Love having spoken to

13    the warden about this issue there would be anything that is

14    amiss.  But if there is, do you know how to contact your

15    lawyers here so that you can let them know?                            01:17PM

16           THE WITNESS:  Yes, Your Honor.

17           THE COURT:  You may continue.

18           MS. EIDENBACH:  Okay.  The other request that we would

19    like to make is that this Court issue an order requiring us to

20    get legal calls with our clients every week for the next six          01:18PM

21    weeks to ensure that retaliation is not occurring.  While this

22    would seem like it's an unnecessary request, we have continued

23    difficulties getting in touch with our clients who are housed

24    at Perryville.  And my interviews in preparation for today's

25    evidentiary hearing revealed that when our clients request           01:18PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    legal calls with us they are told that they can only set those

2    up through legal mail.  We have not been getting our legal mail

3    for issues that apparently have been deemed contraband, and so

4    we have had almost no contact with our clients for the past few

5    months.  And so we would actually like a court order mandating      01:18PM

6    legal calls with the people who have testified today so that we

7    ensure that we can communicate with them and make sure that we

8    are told that there is retaliation as a result of their

9    testimony.  I know this is a lot.

10           THE COURT:  Actually, it's -- you raise a number of         01:19PM

11   issues, but the one that comes foremost to my mind is that if

12   you say that you have been thwarted in your communication with

13   your clients over several months and I'm only hearing about it

14   right now, I have to ask you what kind of explanation do you

15   have for not having let me know about this sooner?                  01:19PM

16           MS. EIDENBACH:  So we have experienced a decrease in

17   the level of mail, and our plan had been to go tour Perryville

18   which we intend on doing shortly.  But I just found out about

19   the legal call issue and the legal mail issue this past week

20   when I was interviewing people in preparation for this.  So we      01:19PM

21   weren't sure whether there were improvements, you know.  We

22   have ebbs and flows in the level of legal mail we get from time

23   to time.  This had been a little perplexing to us.  But before

24   we alerted the Court to the situation we wanted to talk with

25   our clients to find out if there was even an issue.                 01:20PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1      THE COURT:  Because you are not sure.  You have not

2  heard from DOC that your communications have been deemed

3  contraband.  You have heard from some of your clients who have

4  told you that?

5      MS. EIDENBACH:  Right.  So we saw a decrease in mail,          01:20PM

6  and one of the women I spoke with works in the mail room, and

7  she's been instructed that mail from the Prison Law Office and

8  from the ACLU is contraband and it was deemed as such because

9  of a newsletter or an informational mailing that was sent in.

10  And this was the first that we had really heard about this.     01:20PM

11  What's not happening, which I understand is normal procedure

12  when something is deemed contraband, is usually it's returned

13  to the sender.  And we haven't had any of our legal mail

14  returned to us.  But it appears it's not getting through.

15      So we have had a lot of difficulty in scheduling calls     01:20PM

16  and communicating by writing with our clients, and so we just

17  want to ensure that following their testimony here we don't

18  encounter those same issues and we get the calls sort of

19  prescheduled with counsel and the Court's awareness because we

20  are concerned about retaliation, particularly at Perryville.    01:21PM

21      THE COURT:  So what you are asking for is your four

22  witnesses, the four client witnesses today who have testified

23  for there to be a time certain to set up now for you to have a

24  telephone conversation with them?

25      MS. EIDENBACH:  Or not necessarily a time certain,          01:21PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1   Your Honor, but that once a week for the next six weeks they

2   have a legal call scheduled with a member of the prisoner

3   plaintiff's team.

4         THE COURT:  Normally, when a lawyer wants to contact

5   by telephone a client who is in custody in the state system,        01:21PM

6   how does that work?

7         MS. EIDENBACH:  It depends on the complex.  It's

8   different for every complex.  Sometimes you speak with their

9   counselor; sometimes you speak with a CO who is stationed at

10  the particular unit; sometimes you speak with a CO-IV;              01:22PM

11  sometimes you speak with an ADW; sometimes you speak with a DW;

12  sometimes you speak to the admin for the warden.  It just

13  depends.

14        THE COURT:  And is the result of those conversations

15  with the ADOC employees an ultimate conversation with the          01:22PM

16  client?

17        MS. EIDENBACH:  Most of the time, yes.  It's a very,

18  very burdensome process but most of the time it does result in

19  a legal call getting scheduled.  Perryville has been the most

20  difficult because the phones ring to an abyss.  Nobody ever        01:22PM

21  picks up.  So that's why in the past we did request assistance

22  from Ms. Rand which she declined in setting up legal calls with

23  our clients because it's been so difficult.  And now that we

24  know that the mail is an issue, that really cuts off our

25  communication if we can't get legal calls.  The same process is    01:23PM

UNITED STATES DISTRICT COURT

```
 1    used for legal visits at a lot of the units.  Some of them use

 2    visitation officers.

 3           But at this point, particularly with our clients at

 4    Perryville, we have very few methods to effectively communicate

 5    with them.  And that's why we're asking for the Court to          01:23PM

 6    mandate these calls so that we ensure that they actually do

 7    occur.

 8           THE COURT:  How about if I asked defendants' counsel

 9    if they would be willing to facilitate a telephone call

10    arrangement so that you would have an opportunity to talk to      01:23PM

11    these four witnesses, let's say somewhat less than every week

12    for the next six weeks but let's say have the first one in two

13    weeks and the next one four weeks after that.

14           MS. EIDENBACH:  If we could do one a week after just

15    because if there's retaliation tonight or in the days following   01:23PM

16    I would like to know sooner rather than later.  And then we can

17    taper off from there, if that's okay.

18           THE COURT:  So we would set it in a week and then four

19    weeks after that?

20           MS. EIDENBACH:  Three weeks, maybe.                        01:24PM

21           THE COURT:  Would defendants' counsel be willing to do

22    that?

23           MR. BOJANOWSKI:  May I have a moment, Your Honor?

24           THE COURT:  Surely.

25           MR. BOJANOWSKI:  Your Honor, we'll make arrangements       01:24PM
```

1    with plaintiffs' counsel to schedule these calls for the four

2    people that would testify here today.  But we would also ask

3    plaintiffs to identify this person in the mail room that is now

4    saying that somehow communications are being described as

5    contraband.  I would like the opportunity to investigate that        01:24PM

6    allegation since this is the first that we're hearing of it.

7         THE COURT:  I'm not going to compel someone to

8    disclose attorney/client privileged communication.  But

9    obviously plaintiffs' counsel, I think, sees it in their

10   interest to work with you to a certain extent to try to provide     01:25PM

11   as much detail as they feel they comfortably can to try to

12   explore that issue understanding if they insert the sword of

13   the attorney/client privilege they are not going to be able to

14   take full advantage of what that information might produce.

15        MS. EIDENBACH:  That's very true, Your Honor.  And I            01:25PM

16   certainly would not disclose her identity without speaking with

17   her first.  I would like to point out that we have raised this

18   issue with counsel before in a letter following the last

19   Perryville tour.  It has been an ongoing issue with the mail.

20   The legal calls is a new thing.  But we have had issues with        01:25PM

21   the mail.  And in the primary litigation we actually filed a

22   motion because we have had such difficulty with legal mail

23   being intercepted.

24        THE COURT:  Two additional comments:  The first is

25   it's been an often refrain of mine that I really expect there        01:26PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    to be an opportunity for open communication between the

2    plaintiffs' counsel and their clients because that is part of

3    the information process.  The stipulation recognizes that it's

4    the flow of information that comes to the Court in supervising

5    the enforcement of the stipulation.  And so I am very sensitive    01:26PM

6    to issues about that.  So you should raise those with me when

7    they arise in the first instance.

8           And I will make as a second comment the reason that I

9    importune the defendants' counsel to make these arrangements

10   rather than follow your suggestion of ordering the prison to do    01:26PM

11   it is because I understand that certain aspects of my

12   responsibility for enforcing the stipulation require that I

13   intervene in the day-to-day workings of the prison system.  I

14   try to limit those as much as I can, because I understand that

15   there's an associated cost with that.  It can become    01:27PM

16   distracting and counterproductive.

17          The lawyers, on the other hand, know the conduits

18   better.  They know the pipelines that run to the right decision

19   makers better than I do.  So whereas I could issue an order

20   that sounds like it makes a lot of sense, in application on the    01:27PM

21   ground it may be completed wrong headed.  But the defendants

22   are more likely to be aware of the right pathways to the

23   ultimate answer in the most efficient way.  That's why I pursue

24   it.  And I appreciate, Mr. Bojanowski, your willingness to do

25   that.    01:27PM

1      MS. EIDENBACH:  Thank you, Your Honor.  There's one

2  other issue since we're sort of delving into this at the moment

3  that I would like to bring to the Court's attention.  It came

4  up during the interviews, but it's in my notes at the podium.

5  So may I go grab my notes?                                    01:27PM

6      THE COURT:  You may.  But Judge Carroll would require

7  that you call it the lectern.  The podium you stand upon; the

8  lectern holds the book.  In honor of his deceased memory we

9  will recognize that.

10     MS. EIDENBACH:  While I was interviewing potential        01:28PM

11 witnesses for today's hearing at Perryville, the majority of

12 people I spoke with declined to come testify to because they

13 were too afraid of retaliation.  And this was across six

14 different yards.  So I talked to a wide swath of people.

15     The concerns they stated to me were that they would be    01:28PM

16 moved to different housing or put in solitary; more importantly

17 that their medication would be interrupted, discontinued, or

18 changed; that their medical care would be interrupted,

19 discontinued, or changed; that their property would be missing

20 upon their return; that they would face an additional          01:28PM

21 harassment from security and/or medical staff; that their

22 diagnoses would be changed and that they would be brought to

23 and kept in county jail for an extended period of time.

24     Now obviously, several of these thankfully did not

25 come to pass with the two witnesses who did agree to testify   01:29PM

1   today, but it severely limited our ability to present testimony

2   to this Court because people are too afraid.  And when you have

3   a diagnosis of cancer, the thought of your pain medication,

4   your chemotherapy, things that seem simple to you and I, like

5   ice cubes, the thought of those being discontinued, of your          01:29PM

6   SNOs being pulled, was simply too significant of a risk for

7   these women to take for what they see as not necessarily an

8   immediate payoff.

9          And I wanted to bring that to the Court's attention

10   because we, unfortunately, don't have several witnesses here        01:29PM

11   today who do have pertinent information that I think the Court

12   would like to hear because they are too afraid.

13          THE COURT:  Well, if it becomes known to me that there

14   is any retaliation I will certainly be interested in hearing

15   about it and acting upon it if it's warranted to do so.  I will    01:30PM

16   say that I am sensitive to the idea that this does happen

17   because not only what I just mentioned a moment ago with

18   respect to what has been told to me over the years by many

19   people who have been in custody and have appeared here for

20   settlement conferences, and I have heard what the consequence      01:30PM

21   is for them even coming to court for a settlement conference.

22          And I will also say that just in terms of

23   observations, yesterday when we visited the Lewis yard and we

24   arrived somehow people knew that it was a group of people

25   looking into healthcare and the cacophony of voices                01:30PM

1    articulating dissatisfaction with the quality of the medical

2    care as we arrived and walked through the yard to the medical

3    unit was dramatic.  When we left the medical unit, virtually

4    the same number of people were there, the voices were reduced

5    to as best I could tell one.                                  01:30PM

6            So it struck me that perhaps there had been something

7    while we were inside the building communicated to the people in

8    the yard you best not be expressing your views that way.  I

9    don't know that.  That's just conjecture.  But in light of the

10   circumstances of my other experiences with what could happen in 01:31PM

11   light of what's in the prior history of this case not fully

12   developed, because the defendants did assert that they wanted

13   an opportunity to have of a chance to put on evidence, they

14   never followed through on that.  But I will say in fairness

15   that they did not have a day in court but plaintiffs had the   01:31PM

16   day in court and the plaintiffs made a case for what looked to

17   be, to reduce it to the simplest terms, people who talk to you,

18   the lawyers, were written up when they were -- for shirttail

19   violations.  That's what the people told you happened.

20           So it fits with this idea of retaliation, of           01:31PM

21   complaining.  I need to hear the complaints.  And so I'm

22   anxious to hear about them and so I'm equally anxious to make

23   sure that any effort to try to quell those complaints is itself

24   equally quelled.

25           MS. EIDENBACH:  Your Honor, I plan to stay in close    01:32PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    contact with the women that I spoke with, because they actually

2    were concerned that just meeting with me that day was going to

3    result in retaliation.  So if we do hear of any specific

4    reports of retaliation we will bring it to the Court's and

5    defendants' attention.                                        01:32PM

6            THE COURT:  And Ms. Keys, what I have told all the

7    other witnesses at the end of their testimony is that I don't

8    expect that people will be retaliated because I don't think

9    that the lawyers for the defendants in this case would abide

10   that.  I don't think that -- and it could happen when they were  01:32PM

11   unaware of it maybe, but I don't know.

12           THE WITNESS:  I hope not.

13           THE COURT:  Because I don't have omniscience.  But I

14   did tell everybody that I didn't think they would be retaliated

15   for coming here to court, but if they did experience that they  01:33PM

16   needed to tell their lawyer.  So the same I would say to you,

17   if you experience any such retaliation you talk to your lawyers

18   about that.

19           THE WITNESS:  I will.  Thank you, Your Honor.

20           THE COURT:  You may continue.                         01:33PM

21           MS. EIDENBACH:  Okay.

22   BY MS. EIDENBACH:

23   Q.  So when we broke for lunch, we were talking about the heat

24   in your --

25   A.  Okay.                                                     01:33PM

1   Q.  -- living quarters and your cell.  And it occurred to me

2   that just to clarify, the unit that you live on is a split

3   level.  So in order to get to the door of your cell you walk

4   downstairs, and it's almost like sunken.  Is that correct?

5   A.  Right.  It's like a basement I think they call it.  It's          01:33PM

6   down below the ground.

7   Q.  Which is why you look out --

8   A.  Right.  So when I'm on my bed and I look out my eyes, I'm

9   ground level.

10  Q.  Okay.  Thank you.                                                  01:33PM

11          Do you know if any of the medications that you take

12  for your health conditions cause heat sensitivity as a side

13  effect?

14  A.  Yes.

15  Q.  Do you know which?                                                 01:34PM

16  A.  I take four types blood pressure pills.  One is a beta

17  blocker and a nitroglycerin.  And then I have my -- oh, I can't

18  think what they are now.  I have several meds, but I don't have

19  my list with me.

20  Q.  That's okay.  And actually, let's back up and just go             01:34PM

21  through a little bit of background information.

22          Can you briefly describe for us what your medical

23  conditions are?

24  A.  Well, that's a lot.  Where would you like me to start?

25  Q.  Just with maybe what you currently have today.  Because I         01:34PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    know there has been some resolution of some of them.

2    A.  Well, my neck and my spine.  My spine is collapsed.  I have

3    a steel cage in my neck.  I waited six years for a complete

4    shoulder replacement and I finally got that in December of '16,

5    or wait.  Yeah.  December, I believe it was.                     01:35PM

6        And I have of high blood pressure and heart

7    conditions, COPD as well.  I have a concentrator, an oxygen

8    concentrator as well.

9    Q.  Have you been educated about the signs of heat intolerance,

10   heat stroke, heat exhaustion as it relates to the medications   01:35PM

11   you are taking where that's a possible side effect?

12   A.  I have heard about it, you know.

13   Q.  From whom?

14   A.  From the girls, you know, from the girls that live in the

15   pod with me.                                                     01:35PM

16   Q.  Have you ever been educated by anyone at medical?

17   A.  No, I have not.

18   Q.  Have you ever experienced symptoms of heat exhaustion or

19   heat stroke?

20   A.  Yes.  With this heat wave we have had, you know, when it     01:36PM

21   was like 120 some, yeah.  My cellmate, like I said, collapsed,

22   had a seizure.  And I felt like collapsing, too, but I didn't.

23   I was trying to keep it together, but I felt like it many

24   times.

25   Q.  So you're housed at Santa Cruz unit at Perryville.  Is that  01:36PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    correct?

2    A.  Pardon?

3    Q.  You are at Santa Cruz unit?

4    A.  Yes.

5    Q.  How long have you been there?                              01:36PM

6    A.  I have been on Santa Cruz for close to seven years.

7    Q.  And you testified earlier that you are in the same cell,

8    you have been in the same cell for quite sometime?

9    A.  Yes.  I'm in the same cell.

10   Q.  Do you know approximately how many people are housed on    01:36PM

11   Santa Cruz unit?

12   A.  There's approximately 200 people on each yard, so that's 8,

13   800.

14   Q.  Because there are four yards?

15   A.  Yes.                                                       01:37PM

16   Q.  Okay.  What is the security level at Santa Cruz?  Medium or

17   minimum?

18   A.  Oh, that's medium.

19   Q.  Medium.  And how often is the yard open and what does that

20   look like on Santa Cruz?                                       01:37PM

21   A.  What is it what?

22   Q.  What does it look like when the yard is open?  Do you have

23   free movement?

24   A.  Yes.  When they open the doors at 5:00 in the morning it's

25   just open and you can come and go as you please on the yard.   01:37PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    Q.   Okay.

2    A.   Take showers or go sit at the tables or smoke or whatever

3    you do.

4    Q.   Okay.  So because it's an open yard, you are able to kind

5    of observe what's going on in the unit in general?          01:37PM

6    A.   Yes, from my door.  Yeah.

7    Q.   From your door.  Okay.  What are the hours that your yard

8    is locked down, planned lockdowns, I should say?

9    A.   I'm trying to -- 8 to -- I have got to think now.  8:00

10   until 5 in the morning we're locked down.                   01:38PM

11   Q.   And does it get locked down during count?

12   A.   Yeah, during the count times.

13   Q.   And what times does count occur?

14   A.   I'm trying to remember now.  I don't really remember right

15   now --                                                      01:38PM

16   Q.   That's okay.

17   A.   -- the times.  I'm so tired.  Excuse me, Your Honor.

18   Q.   Are you familiar with the open clinic on your complex?

19   A.   Yes.

20   Q.   Do you know -- why don't you describe how the open clinic  01:38PM

21   works for us on Santa Cruz.

22   A.   Well, you no longer can put HNR on your yard in the box.

23   You have to take them to medical and then knock on the door and

24   wait for them to open it.  And then when they do, you put it in

25   the basket that's on the desk at the door.                  01:39PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    Q.  I'm just going to move this.

2         Where do you get HNRs at Santa Cruz?

3    A.  Well, we used to get them on the yard.

4    Q.  Where do you get them now?

5    A.  And we all were -- well, my cellmate gets them for me.  And          01:39PM

6    they told her to get them at the yard office.  And when she

7    went to the yard office, the yard office told her to go to

8    medical to get them.

9    Q.  So they are only available now at medical?

10   A.  As far as I know.                                                    01:39PM

11   Q.  Okay.  And who at medical do you get them from?

12   A.  I really, on that, I don't know.

13   Q.  Do you know what hours the clinic is open on your yard?

14   A.  I know it starts 7:00 in the morning.

15   Q.  And can anybody go to the clinic at any time?                       01:40PM

16   A.  It was supposed to be anyone.

17   Q.  Okay.  Do you know if there are any limitations?

18   A.  Yes.

19   Q.  Can you describe those for us?

20   A.  Well, when I went up to put an HNR in the box inside, the           01:40PM

21   lady told me that -- she first she asked me, she goes, do you

22   work?  And I go no, I don't work.  She goes, well, the only

23   time you can come is 7:00 in the morning and that after 12 is

24   only for working people.

25   Q.  And --                                                              01:40PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

```
 1    A.  So she slipped the HNR back to me and told me to take it,

 2    come back at 7:00 in the morning.

 3    Q.  And what were you seeking treatment for?

 4    A.  Well, I was in a lot of pain.  I have been having recurrent

 5    stones lodged in my track.  They come and go.  And I thought I    01:41PM

 6    would go there to see if they could give me something to

 7    dissolve the stones.  But I was really annoyed with the way I

 8    was treated when I went in there so I never came back at 7 in

 9    the morning.  I just stayed in my cell.  Eventually I did pass

10    the stone.                                                       01:41PM

11    Q.  So you were turned away from the clinic that day?

12    A.  Yes.  Yes, I was.

13    Q.  And was it a custodial staff person who turned you away or

14    medical?

15    A.  There was two officers there, and I don't know who the       01:41PM

16    nurse was but they have several different nurses that come and

17    go.  But a nurse was in there, and the officer.  Both of them

18    said that I had to leave.

19    Q.  Okay.  And --

20    A.  Come back tomorrow.                                          01:41PM

21    Q.  Okay.  And you were handed back your HNR?

22    A.  Yes, I was.  Go take your HNR and bring it back tomorrow at

23    7.

24    Q.  Did you sign any sort of log indicating you had been there

25    seeking treatment?                                               01:42PM
```

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1   A.  No.

2   Q.  So you left no record that you had been there.

3   A.  No.

4   Q.  Okay.  Now, was this the first time that you had ever

5   attempted to use the open clinic?                          01:42PM

6   A.  I have only used it one time prior, probably a month or so

7   back with the same issue.

8   Q.  And were you seen that time?

9   A.  Yes, I was.  I was seen by the nurse.

10  Q.  And did you receive treatment from the nurse for your    01:42PM

11  condition at that time?

12  A.  No.  The only thing she asked me to go back to the cell and

13  bring her back a urine sample for testing.

14  Q.  And did you do that?

15  A.  I did that.  I came back, and she goes, well, it seems    01:42PM

16  fine.  She goes, from what I see, she goes, it probably is a

17  stone and then that was it.

18  Q.  And how long did you wait to be seen that day?

19  A.  Probably a couple hours.

20  Q.  Okay.  And where did you wait?                           01:43PM

21  A.  Outside in my wheelchair.  Outside by the cage, they call

22  it.

23  Q.  And you wait outside the cage because of your wheelchair?

24  A.  Yes.

25  Q.  Are there spots inside where you could have waited?      01:43PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

```
 1    A.  They have a few seats, probably one, two, maybe three seats

 2    inside.

 3    Q.  Did you ask to be seated inside?

 4    A.  No.

 5    Q.  Why not?                                                        01:43PM

 6    A.  The reason being because they don't let us sit inside.

 7    Q.  Okay.  So there was no point in it?

 8    A.  No.  There is no point.

 9    Q.  Okay.  And was it hot the day that you had to wait?

10    A.  Yes.                                                            01:43PM

11    Q.  Have you observed anyone leave the line because of the

12    heat?

13    A.  In the past, yes, I have.  I couldn't tell you who they

14    are.  It's a lot of people.

15    Q.  You don't have to.                                             01:44PM

16    A.  But I have seen people cursing and be mad and leave.

17    Q.  And have you seen other prisoners wait longer than you had

18    to wait that day?

19    A.  I have seen my friend who is doubled up, and she got in a

20    wheelchair and they took her to medical and she was turned        01:44PM

21    away.  Her name --

22    Q.  No.  But when did this occur?

23    A.  Probably a week ago.

24    Q.  Okay.  And she was just returned to her cell?

25    A.  She went up there a second time because she was absolutely    01:44PM
```

1    doubled up in the wheelchair.  She was twice because I talked

2    to her.  I asked her was any other times that she wasn't seen,

3    and she says twice.  And I'm really worried about her.  I hate

4    to say that here, but I'm worried about her because she's been

5    very ill going on for a few months.                        01:45PM

6    Q.  Okay.  We'll follow up with that off the record.

7    A.  Okay.

8    Q.  So in terms of getting to the open clinic, is your house

9    close to medical where they run the open clinic?

10   A.  Well, it's kind of far.  It's quite far.              01:45PM

11   Q.  It's quite far.  Okay.  And when you do need to get over

12   there you testified earlier, I believe, that you ask someone

13   for help, is that right?

14   A.  Well, I have to get up on top of the ramp, get someone to

15   take me up the ramp to get an officer to call a wheelchair   01:45PM

16   pusher.

17   Q.  And in terms of the path leading from your cell to the

18   medical clinic, is it easily navigated by your wheelchair?  Are

19   there potholes?  Is it a smooth surface?

20   A.  There is some large potholes in there.                01:46PM

21   Q.  Are there paved surfaces the entire way?

22   A.  Yes.  They are all paved.

23   Q.  They are?

24   A.  Yeah.  The sidewalk is paved but it's kind of falling

25   apart.                                                    01:46PM

1   Q.  Are there yards that are closer to medical than yours?

2   A.  Not really.

3   Q.  Because it's kind of at the entrance of the complex.  Okay.

4        Is there -- are there ramps that help you get up all

5   of the inclines between your cell and medical?                    01:46PM

6   A.  There's two ramps.  It's like two levels.  You go up one,

7   then it turns, and you go up higher.

8   Q.  Okay.

9   A.  It's quite steep.

10  Q.  Right.  But there are ramps?                                  01:47PM

11  A.  Yes.

12  Q.  Okay.  If your wheelchair -- I should say when your

13  wheelchair was broken, is that something you would need to

14  submit an HNR for?

15  A.  I don't know what I would do, to be honest with you, for a    01:47PM

16  wheelchair because they don't have enough wheelchairs there.

17  If mine broke I don't know what I would do.

18  Q.  Have you ever had a wheelchair break before?

19  A.  Yes.

20  Q.  And what did you do then?                                     01:47PM

21  A.  As for what?

22  Q.  As for getting another one or getting it fixed?

23  A.  Oh.  Well, on that, the medical supplied me this chair.

24  It's kind of dilapidated but it works.

25  Q.  So this is the chair that they used to replace your broken    01:48PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    one?

2    A.   Yeah.

3    Q.   Okay.

4    A.   At least they gave me a chair.

5    Q.   And how did you alert them to the fact that your chair was      01:48PM

6    broken?

7    A.   I went to the DW, Mr. Chu, at the time.

8    Q.   So you did not go to medical or submit an HNR?

9    A.   No, because they will tell you it's not their issue.

10   Q.   Okay.      01:48PM

11   A.   The wheelchairs.

12   Q.   And if you did not have a wheelchair, would you be able to

13   get to the open clinic?

14   A.   No.

15   Q.   You could not walk there?      01:48PM

16   A.   No.

17   Q.   Okay.  So before the open clinic had been instituted, how

18   did you submit HNRs?

19   A.   We used to put them in the box on the yard.

20   Q.   And where was that box located?      01:49PM

21   A.   Over at the kitchen.

22   Q.   By chow?

23   A.   Yeah, the chow hall.

24   Q.   Okay.  And have you -- at the time, did you have any other

25   inmates submit HNRs for you, or are you always able to submit      01:49PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1  them yourself?

2  A.  Sometimes I would either have somebody push me up there and

3  I would put my own in, or I would have the roommate or someone

4  else, one of the girls.

5  Q.  Would you say it's easier to access medical by filling out        01:49PM

6  the HNR in advance and dropping it in the box on the yard or by

7  filling it out and going to the open clinic?  In other words,

8  do you prefer the old way of HNR box?

9  A.  I prefer the old way.

10  Q.  Why?                                                             01:49PM

11  A.  Because it's much easier for me.

12  Q.  To access medical?

13  A.  Yes.

14  Q.  Okay.

15        THE COURT:  Why is that, in particular?                       01:49PM

16        THE WITNESS:  Because it's close.  It's just right

17  across from my pod.  The chow hall is right opposite.

18        THE COURT:  But when you submit the HNR, the purpose

19  of that is to be seen at the medical clinics.

20        THE WITNESS:  Yeah, but they pick them up every day.          01:50PM

21        THE COURT:  Right.  But so you know that that will

22  lead to you having to have to go to the medical clinic so why

23  isn't it just as handy for you to go to the medical clinic with

24  your own HNR and be seen that day?

25        THE WITNESS:  It's just easier for me, sir.                   01:50PM

1    THE COURT:  Can you help me understand why, though?

2    THE WITNESS:  It just is.  It's much easier for me.

3    THE COURT:  So when you submit the HNR, the result of

4    that is you get back a call out to come to the clinic.  Is that

5    what happens?                                                    01:50PM

6    THE WITNESS:  I have only gone once, so I don't really

7    know too much about the open clinic.  I have only --

8    THE COURT:  But in the old system when you would

9    submit an HNR, the result that you would expect would be a

10   callout to come to the clinic at a particular time?             01:51PM

11   THE WITNESS:  Right.  But if you put urgent on it you

12   would get a response quicker.  If something was bad I just put

13   urgent.

14   THE COURT:  And what I think Mr. Bojanowski, the

15   lawyer for the defendants, is going to ask you is what could be  01:51PM

16   quicker than having you go over to the medical clinic with the

17   HNR at the moment that you are having the problem and saying

18   here's my problem, address it now?

19   THE WITNESS:  Well, that's what I did the day that I

20   brought the HNR.                                                 01:51PM

21   THE COURT:  Okay.

22   THE WITNESS:  I was kind of doubled up myself, you

23   know, when I left.  And I just went straight there and then I

24   was turned away because I don't work.

25   THE COURT:  I see.  So if they hadn't turned you away,  01:51PM

1  would it be fair to say it was equivalent, the same thing for

2  you to be able to take your own HNR to the medical clinic as

3  compared to turning in the HNR into the HNR box like it used to

4  exist?

5          THE WITNESS:  No.  It would be quicker to go up there          01:52PM

6  if they would see you, you know.

7          THE COURT:  I see.  Thank you.

8          THE WITNESS:  All right.

9  BY MS. EIDENBACH:

10 Q.  Couple of follow-up questions to what Judge Duncan just          01:52PM

11 asked you.  When you were -- when the yard was using the old

12 system of HNR boxes, did every HNR you submitted require going

13 all the way up to medical, or were there some things that you

14 would turn an HNR in that would not require you to go all the

15 way up?                                                                01:52PM

16 A.  Yes, like for refilling medication you wouldn't have to go.

17 Q.  So under the old system you made fewer trips to medical?

18 A.  Yeah, you make fewer trips.

19 Q.  And it's a shorter trip over to the chow hall than all the

20 way up to medical?                                                     01:52PM

21 A.  I try to do it the shortest way.

22         THE COURT:  Are there any other examples other than

23 medical?  Because medical is equivalent now because you still

24 have that opportunity for medical refills, the refills

25 equivalent now.                                                        01:53PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1          MS. EIDENBACH:  Right.

2          THE COURT:  I think maybe I would ask that.  What I'm

3     asking you is you have told us that when Ms. Eidenbach asked

4     you were there things you thought were better about the older

5     system and then she asked you the additional question about          01:53PM

6     whether there were times that you would submit an HNR and you

7     were not seeking to be seen in the office and you gave the

8     example of when you were refilling a medical prescription.  But

9     under the new system, you can still do that.  You can still put

10    in a piece of paper asking for a medical refill, and that will     01:53PM

11    be handled, I think, as the way that it used to be handled the

12    same.

13          I'm wondering, are there any other circumstances where

14    you would think that you would like to put in an HNR because

15    you don't necessarily believe you need to go to the nurse's        01:53PM

16    line but you want something addressed.

17          THE WITNESS:  Well, like chronos or whatnot.

18          THE COURT:  For what?  I'm sorry.

19          THE WITNESS:  Chronos.

20          THE COURT:  I don't know what that is.                        01:54PM

21          THE WITNESS:  You could put one in when you need a

22    chrono, like to have a wheelchair.

23          MR. BOJANOWSKI:  I think she's talking about a special

24    needs order.

25          MS. EIDENBACH:  It's a SNO.  I didn't want to put            01:54PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1   words in her mouth.  It's a special needs order which is a --

2   you can get them for all kinds of things, shoe inserts, ice.

3           THE COURT:  So if you had a problem that required this

4   chronos request, you would submit the request and you would

5   like it just to be responded and given what you asked for and      01:54PM

6   you don't think you need to make the trip to the nursing line

7   to wait in line to get that.

8           THE WITNESS:  Uh-huh.

9           THE COURT:  I understand.  Thank you.

10  BY MS. EIDENBACH:                                                  01:54PM

11  Q.  I know you have only been to the open clinic once.  But

12  when you went to the open clinic, did you receive treatment

13  from the nurse?

14  A.  No.

15  Q.  Did she say that she was going to refer you to a provider     01:55PM

16  line?

17  A.  No, she did not.

18  Q.  Okay.

19  A.  She just said it sounds like you are either passing a

20  stone, you know, or you have passed one or you have one and       01:55PM

21  that's about it.

22  Q.  Did she schedule you for any follow-up?

23  A.  No.

24          THE COURT:  Did she address the pain that you had in

25  any way?                                                          01:55PM

1          THE WITNESS:  No.

2          THE COURT:  How did you think that --

3          THE WITNESS:  Excuse me.  I just went back to my cell.

4   I was a little annoyed.  I just shut my mouth and just went

5   back.                                                          01:55PM

6          THE COURT:  Did I hear you right to say that the pain

7   was so bad that you were doubled over because of it?

8          THE WITNESS:  It was bad because it doubles you up

9   when you have it.

10          THE COURT:  So you went and when you were with the     01:55PM

11   nurse talking about this were you in that same pain still?

12          THE WITNESS:  I was in pain.  I told her that I did

13   have some pain and she says, well, you are probably going to

14   pass a stone.

15          THE COURT:  So what you took her statement to mean was  01:56PM

16   that if it hurts now it's probably not going to last a long

17   time because you will pass it?

18          THE WITNESS:  Yes.

19          THE COURT:  I have never experienced what you just

20   described.  Do they pass with a short period of time?         01:56PM

21          THE WITNESS:  Sometimes and then sometimes no.

22          THE COURT:  How long can they last when they don't.

23          THE WITNESS:  They can last for weeks if you have a

24   bad one.

25          THE COURT:  I see.                                      01:56PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

```
 1   BY MS. EIDENBACH:
 2   Q.  How long did the --
 3          MR. BOJANOWSKI:  Your Honor, could we get a little
 4   foundation here as to when?  Because, frankly, I'm confused.  I
 5   thought she arrived there and was in pain and was turned away.      01:56PM
 6   Am I --
 7          MS. EIDENBACH:  I can lay foundation.
 8          MR. BOJANOWSKI:  I'm just a little confused.
 9          MS. EIDENBACH:  The problem is there is no foundation
10   for the time she wasn't seen, because there's no sign-in sheet.     01:57PM
11   Her HNR was given back to her so there is no record that she
12   actually showed up that day and it won't appear in her medical
13   record.
14          THE COURT:  Is that not the day that she had this
15   interchange with the nurse?                                          01:57PM
16          MS. EIDENBACH:  She had two interchanges.  Yes.
17          THE COURT:  Okay.
18          I don't know how many copies you have there but if you
19   had an extra one it would be handy for the head of our pro se
20   department.                                                          01:57PM
21          MS. EIDENBACH:  How about I give her mine after I
22   finish.  I only have four.
23          THE COURT:  In the future, if you all could think
24   about that.  Often times we have the benefit of two law clerks
25   here; one law clerk, my law clerk but also the head of our pro      01:57PM
```

1   se office who is assisting on the case.  As you know, she's

2   been assisting on the case since Judge Wake had it.  So that

3   continuity has been helpful so keeping these two individuals

4   involved is helpful in the real time of when we're in court

5   looking at exhibits.                                           01:58PM

6           MS. EIDENBACH:  Absolutely.  We'll make more copies

7   next time.

8   BY MS. EIDENBACH:

9   Q.  Ms. Keys, do you recognize this document?

10  A.  Yes.                                                       01:58PM

11  Q.  Can you tell us the date this was written?

12  A.  May 6.

13  Q.  Of what year?

14  A.  Of 2017.

15  Q.  Do you know who the author of this document is?            01:58PM

16  A.  Myself.

17  Q.  Can you read us what you wrote?

18  A.  I wrote:  I would like to be seen.  I think I have been

19  passing stones over the past couple months and that I may have

20  a bladder infection as well.  I'm in a lot of burning pain.  I  01:58PM

21  would like to have my urine checked for infection, also my

22  blood pressure checked.  Thank you.  And my BP, my blood

23  pressure feels high.  Thank you.  Dominique Keys.

24  Q.  And the resolution below, which is signed by a nurse, can

25  you tell us what the resolution was?  Just read what it says   01:59PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1   below what you wrote.

2   A.  I don't see anything.

3           THE COURT:  Do you see the NL there?

4           THE WITNESS:  Just NL?

5           THE COURT:  Do you know what that means?  We learned     01:59PM

6   yesterday I think it means nursing line.

7           THE WITNESS:  Nursing line.  Okay.

8   BY MS. EIDENBACH:

9   Q.  So this was the first time?

10  A.  That was the first time.                                     01:59PM

11  Q.  And you took a similar HNR up --

12  A.  Yes.

13  Q.  -- the second time?

14  A.  The second time I took one up.

15  Q.  The first time was the incident where you had the exchange   01:59PM

16  with the nurse about --

17  A.  Right.  I had to bring up the urine sample.

18  Q.  And were you given anything to treat your pain at that

19  time?

20  A.  No.                                                          01:59PM

21  Q.  Were you given anything, any other medications or treatment

22  at that time?

23  A.  No.

24  Q.  Were you ever advised of the results of your urinalysis?

25  A.  She said that my urine was fine.                             02:00PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

```
 1   Q.   When did she tell you that?

 2   A.   After she checked it.

 3   Q.   Where did she check it?

 4   A.   They usually have strips, I don't know where.

 5   Q.   So right there?                                        02:00PM

 6   A.   Yeah.

 7   Q.   Okay.  Do you know if she ordered a full urinalysis at that

 8   time?

 9   A.   I couldn't tell you.  I don't know.

10   Q.   So you never knew one way or the other?                02:00PM

11   A.   No.  They usually type in on their computer so I can't see

12   what they are typing in.

13   Q.   And the second interchange when you were turned away, did

14   you talk to the nurse at all?

15   A.   I tried to.                                            02:00PM

16   Q.   And --

17   A.   The second time when I brought the HNR I tried to, and they

18   were just busy, very busy.  And she said to me, you will have

19   to come back tomorrow at 7.  I told you, it's only for workers.

20   Q.   And did you indicate to her at that time that you were in   02:00PM

21   pain?

22   A.   Yes.  I was trying.  I don't know if they were listening to

23   me, but I did tell them that I was having pain and whatnot.

24   Q.   Okay.

25   A.   And they just pushed my HNR back to me.                02:01PM
```

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

```
 1   Q.  So you ended up with all of the copies of the HNR?

 2   A.  Yes.

 3   Q.  I'd like to move to have this admitted as Plaintiffs' 6.

 4   Are we at 6?

 5          THE COURT:  5, I think.                              02:01PM

 6          MS. EIDENBACH:  5.

 7          THE COURT:  Any objection?

 8          MR. BOJANOWSKI:  Is this the HNR?

 9          THE COURT:  Yes, it is.

10          MR. BOJANOWSKI:  No objection.                       02:01PM

11          THE COURT:  It will be received.

12   BY MS. EIDENBACH:

13   Q.  Ms. Keys, do you know where the medication refill box is

14   currently located now?

15   A.  Well, it was new to me but it's in front next to the door. 02:01PM

16   Q.  The door to --

17   A.  To the medical.

18   Q.  So it's no longer by the chow hall?

19   A.  It's a white box and it's just for prescriptions.

20   Q.  Right.  But -- and that used to be by the chow hall, is   02:01PM

21   that right?

22   A.  Well, you would put, normally just put it in by the chow

23   hall, yes.

24   Q.  Okay.

25          MS. EIDENBACH:  Your Honor, can I have just one       02:02PM
```

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    moment?

2              THE COURT:  You may.

3              MS. EIDENBACH:  Thanks.

4    BY MS. EIDENBACH:

5    Q.  Under the old system with HNR boxes, if you were submitting          02:02PM

6    an HNR to see the dentist, would that require you to go up to

7    the nurse's line?

8    A.  No.

9    Q.  If you were submitting an HNR to see mental health, would

10   that require you to go up to see the nurse's line?                        02:02PM

11   A.  No.  It would all go in the box at the chow hall.

12   Q.  If you were receiving test results, would that require you

13   to submit an HNR and go up to nurse's line?

14   A.  Well, I have never asked for test results, so I wouldn't

15   know.                                                                     02:03PM

16   Q.  Okay.  Thank you.

17            And if you wanted to find out the status of a request

18   for specialty care, would you have to submit an HNR and go up

19   to the nurse's line?

20   A.  Yes.  For that you would have to go see the provider.                 02:03PM

21   Q.  The provider or the nurse?

22   A.  No.  The provider for specialty.

23   Q.  And would you first have to see a nurse's line -- would you

24   first have to go to the nurse's line?

25   A.  You are supposed to see a nurse first.                                02:03PM

1   Q.   Okay.

2   A.   And then they make another appointment for you to go see

3   the provider.

4   Q.   Okay.  So you would have to submit an HNR?

5   A.   It's two procedures before you see her.                    02:03PM

6   Q.   Okay.  So you would have to submit an HNR first?

7   A.   Right.

8   Q.   And then go to the nurse's line?

9   A.   Yes.

10  Q.   And then you would be referred to the provider line?       02:03PM

11  A.   Right.  You would have another appointment.

12         MS. EIDENBACH:  I think that's all the questions I

13  have right now, Your Honor.

14         THE COURT:  Thank you very much.

15         Ma'am, the lawyer for the defendants will now have a    02:04PM

16  chance to ask you some questions.

17         THE WITNESS:  Okay.

18         THE COURT:  Mr. Bojanowski.

19                    CROSS-EXAMINATION

20  BY MR. BOJANOWSKI:                                             02:04PM

21  Q.   Ms. Keys, I want to see if I could clarify a few things in

22  your testimony today.  And as I understand it, you have the

23  availability of porters that can assist you in pushing you from

24  point A to point B, is that right?

25  A.   The wheelchair pushers?                                   02:04PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Direct

1    Q.   Wheelchair pushers.

2    A.   They keep them up front at medical.

3    Q.   Pardon me?

4    A.   They are kept up front.

5    Q.   Right.                                                    02:04PM

6    A.   At the medical.

7    Q.   And so if you need to get from your housing unit over to

8    medical, you request a pusher who assists you, right?

9    A.   No.  They don't assist you.  They -- all they do is take

10   you from point A to point B.                                  02:05PM

11   Q.   Right.  They push you.

12   A.   Yes.

13   Q.   All right.

14   A.   But it's very hard to get one.

15   Q.   Okay.  So is that the same as when you want to go to, like,   02:05PM

16   the chow hall or programming or anything like that?  Do you get

17   a pusher?

18   A.   I usually never leave the cell.

19   Q.   Okay.  Is your food brought to you?

20   A.   Yes.                                                     02:05PM

21   Q.   Okay.

22   A.   I have lay-ins, they call them.

23   Q.   You have what?

24   A.   They call them lay-ins.

25          THE COURT:  Mr. Bojanowski, can I interrupt?  I'm      02:05PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Cross

1    confused.  I just want to make sure.

2         When you were first asked about whether or not you

3    could have an aide, you told me that the doctor said you

4    couldn't have an aide.  And I took that to mean that it meant

5    you weren't eligible for a pusher.  But now it sounds like I          02:06PM

6    misunderstood that, that you aren't eligible for a pusher.  Let

7    me ask you that question.  Could you get a pusher to help you

8    where you needed to go?

9         THE WITNESS:  Not really.  Only if it's for medical,

10   library, or to the store.                                            02:06PM

11        THE COURT:  So those three things --

12        THE WITNESS:  Yeah, you have to have appointments.

13        THE COURT:  What if you needed to just put this HNR or

14   refill.

15        THE WITNESS:  That's a good question.  Then it's up to         02:06PM

16   me to get there.

17        THE COURT:  So that's not allowed to use a pusher to

18   take a medical refill slip?

19        THE WITNESS:  No.  To go up to the box, oh, to

20   medical, yes.  But to the one on the yard, no.                      02:06PM

21        THE COURT:  So there still is one on the yard?

22        THE WITNESS:  As far as I know, there used to be a box

23   there.

24        THE COURT:  But if we wanted to just focus on the

25   single question, could you get help to get you up this inclined     02:06PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Cross

1    ramp to get to the medical office or to get to the box to put

2    anything you wanted to put into that box, you would be able to

3    get a pusher for that?

4         THE WITNESS:  It's been really slim trying to get

5    pushers now.  So sometimes you just have to stay and wait.          02:07PM

6         THE COURT:  Really.  Do you know why that is?

7         THE WITNESS:  Because they have a lot of people now

8    that have chronos for wheelchairs.

9         THE COURT:  Special needs?

10        THE WITNESS:  Yes.                                            02:07PM

11        THE COURT:  So those people, the demand for the

12   special needs pushers exceeds the supply?

13        THE WITNESS:  Yes.

14        THE COURT:  Thank you.

15   BY MR. BOJANOWSKI:                                                 02:07PM

16   Q.  You normally get a pusher at some point, though, right?

17   A.  Sometimes I don't.

18   Q.  You talked about your cell for a great deal of time before

19   the lunch hour.  And I understood you to say that there was an

20   intake vent that blew the air into the cell, is that right?        02:07PM

21   A.  Yes.

22   Q.  And there's another vent in the cell as well that is what's

23   called a return?

24   A.  Right.

25   Q.  So there's two vents in your cell, correct?                     02:08PM

UNITED STATES DISTRICT COURT

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Cross

1  A.  Yes.  There's a little one over the toilet and one under

2  the sink.

3  Q.  So the airflow comes in and then goes out under the sink?

4  A.  But the thing is it's never worked properly.

5  Q.  Well, how do you know?                                    02:08PM

6  A.  The officers check them every now and then and the

7  maintenance.

8        THE COURT:  What Mr. Bojanowski raises is a good

9  point, because obviously what my questioning was directed to

10  was the fact that I know from having grown up in Arizona that   02:08PM

11  if you have the evaporative cooler running that's bringing the

12  air from the outside in, you have to have a window open for the

13  air to get out.  And what Mr. Bojanowski has just raised is the

14  idea that there is a vent, actually, you have said, below the

15  sink that allows for the air to get out.  And you have now said   02:09PM

16  that it doesn't work.

17        THE WITNESS:  They are not working properly.

18        THE COURT:  So I want to ask about how you know it

19  doesn't work.  And one of the questions I have that I think

20  might be relevant to that is when the door is closed, does it    02:09PM

21  at that moment change what the temperature in the room is?

22        THE WITNESS:  It's even worse when it's closed.

23        THE COURT:  Okay.  Thank you.  Go ahead.

24  BY MR. BOJANOWSKI:

25  Q.  There's a gap under the door, right?                       02:09PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Cross

1  A.  Some.  Not much.  They have a strip.

2  Q.  About an inch and a half or so gap under the door, right?

3  A.  But they have a strip covering it like a piece of weather

4  stripping.

5  Q.  And does the door fit into a frame or does it slide on the    02:09PM

6  outside?

7  A.  It fits into a frame.

8  Q.  Okay.

9         THE COURT:  Could you slide a magazine under the door?

10        THE WITNESS:  No.                                           02:09PM

11        THE COURT:  The whether stripping stops the magazine?

12        THE WITNESS:  Yes.  There's a stripping outside.

13        THE COURT:  Could you slide an index card under the

14  strip?

15        THE WITNESS:  I'm sure you could.                           02:10PM

16        THE COURT:  So could you slide -- well, how thick of

17  thing could you slide under?  How much of a gap -- is there a

18  gap or would you actually have to force it?

19        THE WITNESS:  There's just a little bit.

20        THE COURT:  You have held up your fingers to show --        02:10PM

21        THE WITNESS:  Just little bit.

22        THE COURT:  If you had a thin magazine you would slide

23  it under the door pretty easily.

24        THE WITNESS:  I have never tried it.  I'm sure you

25  could.                                                            02:10PM

1          THE COURT:  So there's a gap enough for, say -- do you

2     remember a TV Guide?

3          THE WITNESS:  Oh, no.  Those are too thick.

4          THE COURT:  Okay.  Thank you.

5     BY MR. BOJANOWSKI:                                              02:10PM

6     Q.  You mentioned that the window was welded at the bottom?

7     A.  Yes, sir.

8     Q.  Do you know why that was welded?

9     A.  You know, I have no idea.  They just came and did one after

10    the other.  And I was annoyed, because I want my window.        02:10PM

11    Q.  And it's only on the bottom?

12    A.  The bottom run.

13    Q.  Were you aware that they were welded shut because there was

14    some shifting in the building, and as a result you couldn't

15    close them?  Were you aware of that?                            02:11PM

16    A.  My window closed.

17    Q.  I understand that.

18    A.  I had one that would close.

19    Q.  I understand that.  But were you aware that that building

20    had some movement in it?                                        02:11PM

21    A.  No.

22    Q.  And that's why they hd to weld those shut because there

23    were various ones that could not close?

24    A.  I had no idea.

25    Q.  Okay.  Have you ever been treated for heat intolerance?     02:11PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Cross

1   Have you gone to medical to get treatment for it?

2   A.  In the past.  I have been there many years.  I have been

3   heat exhausted, yes.

4   Q.  How many years ago would that be?

5   A.  Oh, God.  Every year I'm heat exhausted.  I usually treat                 02:11PM

6   myself.

7   Q.  Okay.  Are you aware of any procedures or protocols that if

8   certain temperatures are reached in the housing units that

9   inmates are moved from those housing units into areas that have

10  air conditioning?  Are you aware of that?                                     02:12PM

11  A.  I heard probably a year or so ago that they were going to

12  let people bring their mattresses up and lay on the floor of

13  the visitation room.

14  Q.  You are not aware of that happening recently at all?

15  A.  No.                                                                       02:12PM

16  Q.  So you didn't see that happen at your unit?  Is that what

17  you are testifying to?

18  A.  No, not at my yard.  I heard though the Phase 3s on D yard

19  that it was offered to them.

20  Q.  Uh-huh.                                                                   02:12PM

21  A.  But I'm not on that yard.

22  Q.  Okay.  All right.  And do you see the officers coming

23  around about once an hour or so taking temperatures in cells?

24  Do you see that?

25  A.  Sometimes.                                                               02:13PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Cross

1    Q.  Okay.

2    A.  Yeah.

3          THE COURT:  How often a week do they check the

4    temperature in your cell?

5          THE WITNESS:  Not that often.                        02:13PM

6          THE COURT:  Well, is it once a week?  Twice a week?

7          THE WITNESS:  What they will do, Your Honor, they call

8    it a four pack.  If you are in it you are a bed partner with

9    four different cells; the one above you, the one next door, and

10   the one above that.  It's all in one.  They are connected.     02:13PM

11   BY MR. BOJANOWSKI:

12   Q.  So they would take the temperature in one of the cells and

13   it counts for the four because they are on the same ventilation

14   system?

15   A.  They have been taking the lady next door's temperature and  02:13PM

16   they put ours on it.

17         THE COURT:  I see.  How often do they check the lady

18   next door's temperature?

19         THE WITNESS:  A few times.

20         THE COURT:  A day?                                    02:13PM

21         THE WITNESS:  No.  Not that often.  Because they are

22   always hopping around to the other cells.

23         THE COURT:  So is it a few times a week?

24         THE WITNESS:  Maybe.  Maybe two or three times a week.

25   I don't know because I don't see all the time.             02:14PM

UNITED STATES DISTRICT COURT

1        THE COURT:  Okay.  Thank you.

2   BY MR. BOJANOWSKI:

3   Q.  Now, in the area by the medical unit when you have to wait

4   outside, that's all shaded, right?

5   A.  No.                                                          02:14PM

6   Q.  No?

7   A.  In the cage?

8   Q.  Right.  Where you have to wait?

9   A.  I don't wait there.  That's for the walking people.  The

10  wheelchairs wait outside the cage.                             02:14PM

11  Q.  Okay.

12  A.  Where the sun does shine at different points in the day.

13  Q.  Not all the time, though?

14  A.  Not all the time.

15  Q.  Okay.  So depending on what time of day it is --           02:14PM

16  A.  Yes.  Exactly.

17  Q.  -- you might have sun in that area?

18  A.  Right.

19  Q.  But the area itself, at least what I remember, is that

20  it's -- the sidewalk is there and then right above you there's 02:14PM

21  like open ceiling type thing there?

22  A.  Overhang.

23  Q.  Yeah.  It's an overhang.  That's what's there?

24  A.  Yes, they do have that up there.

25  Q.  Okay.  When you were turned away at medical, I didn't see  02:15PM

1    that you filed a grievance concerning that?

2    A.  No.

3    Q.  You did not do that?

4    A.  No, I didn't.

5    Q.  Okay.                                                        02:15PM

6    A.  I didn't want to make any waves.

7    Q.  You understood that you could file a grievance for that,

8    right?

9    A.  Yes.

10   Q.  Okay.                                                        02:15PM

11   A.  I was just quite annoyed so I figured, just let it go.

12   Q.  Okay.  Now, the Exhibit 5, which is that HNR that you

13   looked at, it had to do with the stones.

14   A.  Yes.

15   Q.  Do you remember that?                                        02:15PM

16   A.  Yes.

17   Q.  I think you have a copy there.  You arrived at medical on

18   May 6th and were seen right away, right?

19   A.  I'm trying to remember exactly, but I think maybe a couple

20   hours.  I don't know.                                           02:16PM

21   Q.  I mean, it says you were seen at 9:22 in the morning.  Is

22   that accurate?

23   A.  I'm not sure, sir.

24   Q.  It's on your paper there.

25   A.  I don't have my glasses with me.                            02:16PM

1              Where were you looking, sir?

2    Q.  Here.  Here.

3    A.  I can't see.

4    Q.  It's pretty light?

5    A.  Yeah.  It's real light.                                    02:16PM

6    Q.  That's okay then.  The Court can look at its copy.

7    A.  I usually wear glasses.

8    Q.  So you wrote it up that morning, the HNR, and took it down

9    to medical, right?

10   A.  Well, I took it there -- let's see which one is which.     02:17PM

11   Yes.  It should have been in the morning, I would think.

12   Q.  You took it there and met with the nurse, right?

13   A.  Yeah.

14   Q.  And then you have nurse line here as plan of action, right?

15   NL.  Do you see that?                                          02:17PM

16   A.  Uh-huh.

17   Q.  Is that a yes?

18   A.  Yes.

19   Q.  Okay.  And at that appointment, you were told to return two

20   days later to give the urine sample, right?                    02:17PM

21   A.  No.

22   Q.  You gave the urine sample after?

23   A.  I gave the urine sample and I was told my urine was fine.

24   Q.  On the same day that you were here?

25   A.  Yes.                                                       02:17PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Cross

1    Q.  Okay.

2    A.  Same day.

3    Q.  Same day.  And then you saw the provider a few days later?

4    A.  No, I didn't see a provider.

5    Q.  You did not?                                              02:17PM

6    A.  No.

7    Q.  You didn't see a nurse practitioner?

8    A.  No.

9    Q.  Are you sure?

10   A.  No.                                                       02:17PM

11   Q.  Okay.  Now, when -- before, when you talked about dental,

12   when you were talking about the dental HNRs, you were saying

13   that you used to just put it in the box.

14   A.  Yes.

15   Q.  And then you would have to wait a day or so before you     02:18PM

16   would get called out, right?

17   A.  Usually for dental it took quite a while.

18   Q.  Several days?

19   A.  No.  It can take weeks.

20   Q.  Okay.                                                     02:18PM

21   A.  A month.

22   Q.  So under the new system, you would take your dental HNR

23   down to the clinic and meet with the nurse at that point,

24   right, with your dental HNR?

25   A.  I don't know.  I never --                                 02:18PM

1    Q.  You haven't done it yet?

2    A.  I haven't done that.

3    Q.  Do you know why they would want you to go down to the

4    clinic with your dental HNR the same day that you filled it

5    out?  Do you have any idea why that would be?                    02:19PM

6           MS. EIDENBACH:  Objection, Your Honor.  Foundation.

7    There's no way she can know why they would want her to do

8    something.

9           THE COURT:  It's a foundational question.  Overruled.

10           MS. EIDENBACH:  Can I make a second objection?           02:19PM

11           THE COURT:  Yes.

12           MS. EIDENBACH:  Speculation.  It calls for her

13    speculation.

14           THE COURT:  Overruled.  Again, a foundational

15    question.  Do you have any idea?  Yes or no?                    02:19PM

16           THE WITNESS:  I don't really know.

17    BY MR. BOJANOWSKI:

18    Q.  Okay.  That's fine.

19           So you have no personal knowledge of the processing of

20    dental HNRs under the open clinic concept.  Is that accurate?  02:19PM

21    A.  That is.

22    Q.  That's accurate.  Okay.  And you have only had experience

23    with the open clinic concept one time?

24    A.  Yes.

25    Q.  Okay.                                                       02:19PM

1    MR. BOJANOWSKI:  May I have a moment, Your Honor?

2    THE COURT:  You may.

3    MR. BOJANOWSKI:  Nothing further, Your Honor.

4    THE COURT:  Thank you.  Any redirect?

5    MS. EIDENBACH:  Yes, Your Honor.                           02:21PM

6                    REDIRECT EXAMINATION

7    BY MS. EIDENBACH:

8    Q.  Ms. Keys, have you ever needed a pusher and been unable to

9    get one?

10   A.  Yes.                                                   02:21PM

11   Q.  Can you describe that circumstance to us?

12   A.  Well, like I just said before, there's so many people now

13   using the wheelchairs and the pushers, it leaves some of us out

14   in the cold.

15   Q.  How often would you say that you find yourself unable to   02:21PM

16   procure a pusher?

17   A.  Many times a day.

18   Q.  Many times a day?

19   A.  That's why I stay in my cell.

20   Q.  So maybe five times a day?                             02:21PM

21   A.  Yeah.  We'll figure about four, five.

22   Q.  Every day?

23   A.  Every day.

24   Q.  And what kinds of things are you asking for a pusher for

25   that you are unable to get them?                          02:22PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Cross

```
1    A.  Well, I try to get one of the girls to give me a push down
2    to the shower, because I have one arm that works good.  That's
3    it.  And it's hard for me.  So I will have to ask one of the
4    girls there if they can help me.
5    Q.  So you can't get a pusher to get to the shower daily?        02:22PM
6    A.  The shower, if I want to get up on top, if I want to have
7    rec.  I don't have rec.  So it would be nice to be able to go
8    up on top once in a while for about an hour or so, you know, if
9    I had somebody to get me up there.
10   Q.  Okay.                                                        02:22PM
11           THE COURT:  When you say "up on top" what do you mean.
12           THE WITNESS:  It's like a subbasement where I am
13   living.  It's like --
14           THE COURT:  So you are just saying to get to the
15   surface level.                                                   02:22PM
16           THE WITNESS:  Yes.
17           THE COURT:  It's up on top.
18           THE WITNESS:  There's two levels of the ramp one and
19   then a higher one.  And you would have to be really muscle
20   bound to get up there, you know.                                 02:23PM
21           THE COURT:  Have you ever asked to be housed in a
22   place that doesn't have a ramp access?
23           THE WITNESS:  They don't have any on that yard.
24           THE COURT:  They are all built the same way?
25           THE WITNESS:  Yes.  It would be nice, though.            02:23PM
```

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Redirect

1          THE COURT:  I'm sorry?

2          THE WITNESS:  It would be nice to be on one level.

3   BY MS. EIDENBACH:

4   Q.  Ms. Wells (sic), have you ever been moved because the

5   temperature in your cell was too high?                          02:23PM

6   A.  No.  I have been there, like I said, seven years almost.

7   Q.  Have you ever been offered to go sleep in visitation?

8   A.  No.

9   Q.  If you were offered to sleep in visitation, would you be

10  able to sleep on the floor given your condition?                02:23PM

11  A.  Absolutely not.  I couldn't get down there or get up.

12          THE COURT:  The people who you heard that were offered

13  the opportunity to sleep in visitation, I thought you said they

14  would have to bring their own mattresses.

15          THE WITNESS:  Yes.                                      02:24PM

16          THE COURT:  So the people would have to carry their

17  own mattress?

18          THE WITNESS:  They would have to carry their mattress

19  to visitation with their bedding and then sleep on the floor.

20          THE COURT:  What was the unit where you said that this  02:24PM

21  was offered?

22          THE WITNESS:  On D yard.

23          THE COURT:  Do you have any idea why the D yard people

24  received this offer?

25          THE WITNESS:  Because their level -- what do you call   02:24PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Redirect

1    it -- Phase 3s, they call them.  There's Phase 1, 2, and 3.

2    It's what you earn.

3                THE COURT:  So they had more privileges?

4                THE WITNESS:  Yes.  And I'm a Phase 3 as well but I

5    can't go live down on the yard because there's no ramp or ADA          02:24PM

6    cell or shower.  So they left me behind.  But I am a Phase 3

7    but I live with the 1s.

8                THE COURT:  So are you darned with the ramp and darned

9    without it?

10               THE WITNESS:  You got it.                                    02:24PM

11   BY MS. EIDENBACH:

12   Q.  Why did you not file a grievance when you were turned away

13   from medical.

14   A.  I just didn't want to create any problems.  I was very

15   upset when I came back.  I thought I will just wait and have it        02:25PM

16   pass whenever it's going to pass.  It will pass.  Eventually it

17   did pass.

18   Q.  Have you filed a grievance before ever?

19   A.  No.  Well, my friend who is no longer there has filed

20   grievances in the past.                                                 02:25PM

21   Q.  On your behalf?

22   A.  On my behalf for me.

23   Q.  And did those get resolved, or did you experience any

24   negative results?

25   A.  I honestly -- she handled it, all my paperwork, Laura.             02:25PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Redirect

```
 1   Q.  Okay.  I have given mine away.  On the date that you were

 2   seen, I believe it was May 6th, what time did you arrive that

 3   morning?

 4   A.  You know, I can barely even remember.

 5   Q.  Do you remember whether --                                  02:25PM

 6   A.  I guess it's on here, huh?  I can't see it.

 7   Q.  Do you remember what time you arrived up to medical,

 8   though?

 9   A.  No, I don't.

10   Q.  Was it first thing in the morning?                          02:26PM

11   A.  It should have been in the morning, I would think.  But

12   it's been a while.

13   Q.  But you recall waiting about two, two and-a-half hours, is

14   that correct?

15   A.  Probably so, yes.                                           02:26PM

16   Q.  Okay.  And in terms of your experience with open clinic,

17   just to be accurate, you have actually attempted to use it

18   twice, is that correct?

19   A.  Yes.

20   Q.  And you were only seen one of those times?                 02:26PM

21   A.  Just the first time.

22   Q.  Okay.  I have no further questions.

23           THE COURT:  Ms. Keys, thank you very much for coming.

24           THE WITNESS:  Thank you, Your Honor.

25           THE COURT:  I appreciate your testimony.               02:26PM
```

1      THE WITNESS:  You have a good day.

2      THE COURT:  Thank you.  You too.

3      MR. FATHI:  Your Honor, may I make a procedural

4 suggestion?

5      THE COURT:  You may.                                    02:26PM

6      MR. FATHI:  It's now just about 2:30.  There's still

7 one more plaintiff witness to call.  I know the Court wanted to

8 discuss the order to show cause, and it is overwhelmingly

9 likely that we will want to submit additional evidence after we

10 review the 15,000 some pages of documents that we received.    02:27PM

11     So I would -- we would propose that we continue the

12 hearing to some later date, presumably the next status

13 conference, and proceed to other issues at the close of --

14     THE COURT:  I might be willing to do that with respect

15 to the witnesses who are more mobile.  But with respect to Ms.  02:27PM

16 Ashworth, because she's here, it seems to make sense we should

17 go ahead and hear her testimony today.

18     MR. FATHI:  Yes, Your Honor.  My proposal was to break

19 after Ms. Ashworth.

20     THE COURT:  I understand.  Let's hear from Ms.          02:27PM

21 Ashworth and see where we are at that point.  I understand what

22 you have said.  We do have a lot on the agenda.

23     MR. FATHI:  Thank you, Your Honor.

24     MS. KENDRICK:  Do you want to hear from her now?

25     THE COURT:  Yes.  Our normal course is to take a break  02:28PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Keys - Redirect

1    an hour and a half after we start.  So I thought we would do at

2    quarter till.  Is that all right?

3              Good afternoon.  The clerk of the court will

4    administer the oath.  Would you please raise your right hand.

5              THE MAGISTRATE CLERK:  State your name for the record.    02:28PM

6              THE WITNESS:  Angela Renee Ashworth.

7              THE MAGISTRATE CLERK:  Please spell your last name.

8              THE WITNESS:  A-S-H-W-O-R-T-H.

9              (The witness was sworn.)

10             THE MAGISTRATE CLERK:  Thank you.    02:29PM

11             THE COURT:  Ms. Ashworth, if you would make your way,

12   if you could, over to the witness stand.  I want to talk to you

13   about it.  We've got a little bit of a challenge.  It's up some

14   steps and you have got a mobility restriction at your legs.  I

15   want you to pause at the base of it, and I want you to take a    02:29PM

16   look at it and put your hand where -- and make an assessment

17   yourself whether you think you can do it safely or not.

18             THE WITNESS:  Oh, yeah.

19             THE COURT:  Thank you, ma'am.

20                     ANGELA ASHWORTH,

21   a witness herein, having been first duly sworn by the clerk to

22   speak the truth and nothing but the truth, was examined and

23   testified as follows:

24                     DIRECT EXAMINATION

25   BY MS. KENDRICK:

1   Q.  How are you doing, Ms. Ashworth?

2   A.  Good.  How are you?

3   Q.  Good.  Thank you for waiting.  I know it's been a while.

4   We really appreciate that you are still to testify.

5       Could you state for the record your name and your ADC        02:30PM

6   number?

7   A.  Angela Renee Ashworth.  It's 315041.

8   Q.  And Ms. Ashworth, did you get all your medications this

9   morning?

10  A.  Yes.                                                         02:30PM

11  Q.  And did you get food for breakfast and lunch?

12  A.  Yes.

13  Q.  Did you have any issues being transported here this

14  morning?

15  A.  No.                                                          02:30PM

16  Q.  Do you have any concerns about testifying today?

17  A.  No, just, you know, of course, you kind of -- retaliation

18  or anything like that or anger or anything like that from any

19  of the officers.

20  Q.  Okay.                                                        02:30PM

21  A.  Other than that, no.

22  Q.  Did anything happen to you last night that caused you

23  concern?

24  A.  No.  Huh-uh.

25  Q.  Okay.  Were your belongings rolled up?                       02:30PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1    A.  Yes.

2    Q.  And were they inventoried?

3    A.  Yes, they were inventoried.

4    Q.  Were you given a copy of the inventory slip?

5    A.  Yes.                                                    02:31PM

6           THE COURT:  We have discussed this issue.  It is not

7    something that the Court views favorably that you should have

8    to have your possessions rolled up when you come to testify

9    here to court.

10          THE WITNESS:  Okay.                                  02:31PM

11          THE COURT:  So the defendants' counsel have kindly

12   taken steps to make sure that all of your items will be

13   returned to you today.

14          THE WITNESS:  Okay.

15          THE COURT:  So I want you to know that we have already 02:31PM

16   addressed that but I also want you to know something that I

17   said to every one of the other witnesses who have testified who

18   have been in custody.  I do not anticipate that you would

19   experience any retaliation for coming here to court today

20   because I have confidence that the defendants' lawyers are     02:31PM

21   interested in what is happening here today, and that is for the

22   Court to do its job well needs to hear from people who are

23   inmates.

24          And so it is part of this process, a valid part of

25   this process, for people like you to come and testify and to   02:32PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1   feel comfortable about testifying.  And I think that everybody

2   involved in the system knows that, but if you do experience any

3   retaliation let your lawyers know.

4              THE WITNESS:  Okay.

5              THE COURT:  All right.                          02:32PM

6              THE WITNESS:  All right.  Thank you.

7              MS. KENDRICK:  The other thing is that the attorneys

8   for the defendants have agreed we can have a couple of phone

9   calls with you in the coming weeks.

10             THE WITNESS:  Okay.                             02:32PM

11             THE COURT:  So what will happen is the lawyers will

12  make an arrangement for you to have a phone call with your

13  lawyers in a week's time and then three weeks after that just

14  so that they can check in with you to see whether there has

15  been any retaliation.                                     02:32PM

16             THE WITNESS:  Okay.  Thank you.

17             MS. KENDRICK:  Thank you.

18  BY MS. KENDRICK:

19  Q.  What unit are you housed at?

20  A.  San Pedro B-4112 upper.                               02:32PM

21  Q.  How long have you been in the custody of the Arizona

22  Department of Corrections?

23  A.  Since December 7th of 2016.

24  Q.  And could you describe for us your healthcare diagnoses or

25  issues that you have?                                     02:33PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1   A.  High blood pressure.  There has been some work done as far

2   as cholesterol and diabetes, but we have decided to do

3   continuation on that as far as more blood work to see if the

4   levels went up or down.  I was diagnosed with eye disease.  I

5   can't --                                                          02:33PM

6   Q.  Macular degeneration?

7   A.  Macular.  Yeah.  And that's really been about it.

8   Q.  And what is the treatment for the macular degeneration,

9   your eye problem?

10  A.  It's -- I go and get injections in each eye, and I have     02:33PM

11  gone and had the procedure twice now.

12  Q.  Okay.  Do you have any allergies?

13  A.  Yes.

14  Q.  What are they?

15  A.  I'm allergic to iodine, morphine, latex.  I have got quite   02:33PM

16  a few that I'm allergic to.

17  Q.  And roughly how many people are housed on San Pedro?

18  A.  I think it's about 430, somewhere in there.  400 something.

19  I'm not sure.

20  Q.  And you are split into two yards?                            02:34PM

21  A.  A and B.

22  Q.  And what is the security level?  Is it minimum?

23  A.  Minimum.

24  Q.  So it's normally an open yard?

25  A.  Yes.                                                         02:34PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1   Q.  And what are the hours for lockdown?

2   A.  We go on lockdown 10:45 to noon, and 3:45 to 5, and then 8

3   p.m. to 5 a.m.

4   Q.  And is San Pedro the yard that houses all of the pregnant

5   inmates?                                                                02:34PM

6   A.  Yes, that I'm aware of, yes.

7   Q.  And do you know roughly how many pregnant women are

8   currently housed there with you?

9   A.  I'd say probably well over 20 or 30.  There's quite a few.

10  Q.  Are there women housed on that yard who use wheelchairs or     02:34PM

11  walkers?

12  A.  Yes.

13  Q.  Do you have a rough estimate of how many of those women?

14  A.  I'm going to say probably about four or five.

15  Q.  45?                                                                 02:35PM

16  A.  Four to five.

17  Q.  Four to five.

18  A.  Yeah.

19  Q.  And do you have a prison job?

20  A.  Yes.  I'm a tram driver.                                           02:35PM

21  Q.  What does that mean?

22  A.  I drive the officers from yard to yard.

23  Q.  Do you drive healthcare staff?

24  A.  Yes, some medical, yes.

25  Q.  And what is your normal shift?                                     02:35PM

━━ CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct ━━

 1   A.  12 midnight to 6 a.m.

 2   Q.  How many days a week?

 3   A.  Thursday, Friday, Saturday.

 4   Q.  Did you work before coming here?

 5   A.  No.  They didn't have me work.                              02:35PM

 6   Q.  Okay.  Very good.

 7   A.  Almost.

 8   Q.  What is your salary as a tram driver?

 9   A.  I believe 30 cents an hour.  Not really sure.  30 or 35

10   cents.                                                         02:35PM

11   Q.  Were you a truck driver or something like that before you

12   came into the prison?

13   A.  No.  No.  I put in for tractor is what they -- we assumed

14   that I was going to because I have mechanic background in

15   mechanic shops and such, but I ended up with tram because I    02:36PM

16   have a driver's license.

17   Q.  Okay.

18   A.  Is what I was told.

19   Q.  And Ms. Ashworth, are you familiar with the open clinic

20   system for seeing the nurses?                                  02:36PM

21   A.  Yes.

22   Q.  Is that the only system you have experienced?

23   A.  Yes.

24   Q.  And when you have gone to see the nurses on the open

25   clinic, how many nurses are there, normally?                   02:36PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1   A.  I have been in where there's been one and I have been in

2   where there's been two.

3   Q.  And when there's two, are they both RNs, or is one person

4   in charge of taking blood pressure and the other one runs

5   nursing?                                                                02:36PM

6   A.  I have been in where there's -- when you first walk in

7   there's the person that does your blood pressure and your

8   temperature and everything.  And then there's a nurse but then

9   I have also seen like another nurse in there that's doing like

10  breathing treatments or TB test results, that type of stuff.           02:36PM

11  Q.  Okay.  And how frequently is the provider at the yard?

12          MR. BOJANOWSKI:  Foundation.

13  BY MS. KENDRICK:

14  Q.  Do you know how frequently the provider is on the yard?

15  A.  I'd say probably every day.  I know there's a couple days          02:37PM

16  that she hasn't been there, but every day.

17  Q.  Is she a medical doctor or a nurse practitioner?

18  A.  Nurse practitioner.

19  Q.  Have you ever seen a medical doctor on the yard?

20  A.  No.                                                                02:37PM

21  Q.  Have you ever been told that you needed to see the nurse

22  two or more times for the same thing before you would get a

23  referral to the provider?

24  A.  Yes.

25  Q.  When was that?                                                     02:37PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1    A.  I had like a bronchitis, upper respiratory infection and I

2    saw the nurse.  And I needed to go back and see her again if I

3    wasn't feeling better in a couple days, and then they would

4    schedule an appointment with the provider.

5    Q.  Do you remember roughly when that was?                        02:37PM

6    A.  I would say January or February.

7    Q.  And what's the process for getting seen at the open clinic?

8    A.  You fill in an HNR slip, you go down, they take it.  They

9    take your ID.  You sit outside and you wait.  They will call

10   you.  They will call you for your blood pressure, your          02:38PM

11   temperature, and such, and then you will be called later

12   forward to go in and see the nurse.  And then the nurse

13   determines if you need to see the nurse practitioner from

14   there.

15   Q.  I'm going to break that all down into little pieces if you  02:38PM

16   don't mind.

17   A.  Okay.

18   Q.  So, first of all, you can come any time the clinic is open,

19   or is it certain buildings are assigned certain slots?

20   A.  There's -- any time.  But there's some confusion with that  02:38PM

21   on the yard because you don't -- when I came in the slip said 7

22   a.m. to 7 p.m. Monday through Sunday you had what was called

23   nurse's line.  And I have gone down at 7 in the morning and

24   there's nobody there.  It's not -- there's nobody there and I

25   have gone at 8 and there's not been anybody there.              02:39PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1    Q.  Okay.

2    A.  So there's confusion on the actual hours and what time you

3    can actually turn in an HNR.

4    Q.  Okay.  So you said that when you come up you give your ID

5    to an officer?                                              02:39PM

6    A.  Uh-huh.

7    Q.  And do you also give the officer your HNR?

8    A.  Yes.

9    Q.  And is he in charge of keeping track what order people came

10   in?                                                         02:39PM

11   A.  As far as I know, yes, because they take -- they have a

12   desk and they set your HNR and they set your badge down.  It's

13   broke down; doctor, psych, nurse.

14   Q.  But when you hand the officer your HNR he doesn't stamp it

15   or anything like that?                                      02:39PM

16   A.  Huh-uh.

17   Q.  And you said the next step is that you are briefly called

18   in and they take your vitals?

19   A.  Yes.

20   Q.  So they take your blood pressure?                       02:39PM

21   A.  Temperature, yeah.

22   Q.  And then they tell you to go sit outside?

23   A.  Outside, yeah.

24   Q.  Okay.  Does anybody wait inside?

25   A.  Not that I have ever seen.  I have seen people sitting   02:40PM

UNITED STATES DISTRICT COURT

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1   there doing their breathing treatments, but other than that,

2   no.

3   Q.   But they are receiving medical treatment right?

4   A.   Yeah.

5   Q.   And so where do you wait outside the clinic?                    02:40PM

6   A.   Outside the doors there's like a concrete bench that you

7   sit on both sides of the walkway, basically.

8   Q.   How many people, roughly, could fit on it sitting?

9   A.   Probably, between both sides, 20, 25.

10  Q.   And is that area shaded with an awning or anything like          02:40PM

11  that?

12  A.   The one side is.  The other side is not.

13  Q.   Is it shaded with an awning or just the overhang of the

14  roof?

15  A.   It's the overhang of the building.                              02:40PM

16  Q.   And are there any misters or anything like that?

17  A.   No.

18  Q.   Is water made available to you?

19  A.   There is a thing of water there.  Usually whoever is out

20  there if it gets empty we fill it.                                   02:41PM

21  Q.   So it is not a water fountain, it's a jug?

22  A.   It's a jug, like a three-gallon Igloo.

23  Q.   And you said there's only shade on one side?

24  A.   Yes.

25  Q.   Is it just depending on where the sun is whether or not you     02:41PM

1    are in the shade?

2    A.  Well, the one side is up against the actual building

3    itself.  The other side is up against like the visitation area,

4    so there's no wall or anything.  So there's no shade there at

5    all.                                                      02:41PM

6    Q.  Are there any trees or other buildings that you could go

7    sit under that are nearby to be in the shade?

8    A.  Well, you have visitation that's diagonal, but that's

9    usually locked.

10   Q.  Okay.                                                 02:41PM

11   A.  You can't get in there.

12   Q.  And you said that it doesn't -- you have gone to clinic at

13   7 a.m. and 8 a.m. and it wasn't open.  What time does the

14   clinic close?

15   A.  I know I have gone at 2 in the afternoon and was turned    02:41PM

16   away.  So I don't know what time they are actually closing.  I

17   don't go down that often, but I don't know what time they are

18   actually closing as far as on a day-to-day basis.

19        THE COURT:  When was it that you went at 2 in the

20   afternoon and you were turned away?                        02:42PM

21        THE WITNESS:  On June 5th for my eyes.  I went down at

22   2:00, a little bit after 2:00.  And we were told that I needed

23   to go back, that they weren't accepting HNRs.

24   BY MS. KENDRICK:

25   Q.  And you said there was four or five women on your yard that  02:42PM

1  use wheelchairs or walkers that are disabled.  Have you ever

2  seen them waiting go into the nurse's line clinic?

3  A.  Oh, yes.  Yeah.

4  Q.  They are just waiting out there with the rest of you?

5  A.  Waiting outside, yeah.  There's another time that they go    02:42PM

6  down for meds, so they wait outside for that.  I have seen them

7  go in for meds before, like they will call them in to do their

8  meds inside the building.  But, yeah, they sit outside, too.

9  Q.  And they don't get to skip the queue, the people who are

10  sitting outside in wheelchairs?  They are first come, first    02:43PM

11  served?

12  A.  First come, first served.

13  Q.  What about if a pregnant woman showed up to the clinic?

14  Would she get to jump to the front of the line?

15  A.  No.  Not that I have seen.    02:43PM

16  Q.  And so if you have any problem, whether it's dental, mental

17  health, or medical, you are supposed to go to the nurse's line,

18  is that correct?

19  A.  Yes.

20  Q.  And you have to go there with an HNR filled out?    02:43PM

21  A.  Yes.

22  Q.  And where do you get blank HNR forms?

23  A.  From the bubble, from your officer on the yard at the

24  bubble is where you ask for them and get them.

25  Q.  Could you explain what a bubble is for the people who may    02:43PM

1   not know what a bubble is?

2   A.  Where the officer goes, that's where they are stationed at

3   and you go and ask them for the forms.  And if they have them

4   you get it, and sometimes they don't have them.  That's

5   happened a few times as well.                                    02:43PM

6   Q.  Was it that they were out of the forms or they just refused

7   to give you?

8   A.  Out of them.

9   Q.  Can you go to the clinic and request a blank HNR form?

10  A.  No.  I have asked one time and was told they didn't have     02:44PM

11  them.  You had to get them from the yard.

12  Q.  So had you to get it from the bubble?

13  A.  Yeah.

14  Q.  And have you personally observed people who were outside

15  waiting for the nurse's line just give up and leave?             02:44PM

16  A.  Yes.

17  Q.  Do you remember, roughly, when that was?

18  A.  I would say probably in January or February.  There was

19  quite a few people that were upset.  The one thing that they

20  will do is they will get their badge back and then they will go  02:44PM

21  back to the yard and then they will call them maybe later.  But

22  I have seen several people walk away.

23  Q.  Okay.  And have you seen people suffering adverse effects

24  from the heat while waiting outside?

25  A.  Yes.                                                         02:44PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1   Q.  Can you describe what you saw?

2   A.  Just thirsty, sweating, redness, sunburn depending on what

3   side of the wall they are sitting on.

4   Q.  Have you ever seen anybody waiting who looked like they

5   were in obvious serious pain or, perhaps, had an urgent medical        02:45PM

6   issue?

7   A.  Yes.

8   Q.  Can you describe what you saw?

9   A.  There was a girl a few weeks ago that they had done some

10  blood work on.  She thought it was gallbladder issues.  She was       02:45PM

11  sitting on the ground bending over crying.  She had been up

12  there for probably an hour, 45 minutes, over and hour sitting

13  outside crying.

14  Q.  And did anybody -- was medical staff aware that she was out

15  there?                                                                02:45PM

16  A.  Yes.

17  Q.  Have you ever seen people be turned away?

18  A.  Yes.

19  Q.  Can you describe what you saw?

20  A.  Just a few weeks ago when I was down for a follow-up with        02:45PM

21  mine, there was a girl that came in that was having some

22  stomach issues, and they told her that HNRs were not being

23  accepted, come back between 12 and 1.  And then you heard an

24  ICS call about 20, 25 minutes later.

25  Q.  So you were inside the clinic getting treatment when she         02:46PM

1    showed up?

2    A.   Yeah.  And the comment was made well, we'll just make her

3    sit outside for a while from one of the nurse staff.

4    Q.   And then you said subsequently an ICS was called --

5    A.   Yes.                                                         02:46PM

6    Q.   -- to her unit?

7         What happened when an ICS is called?  Is the clinic

8    shut down and people told to go back to their units?

9    A.   No.

10   Q.   Do they lock the doors?                                     02:46PM

11   A.   No.  I have never seen any of the doors locked or anything

12   like that.  Everybody still sits there and waits.

13   Q.   Is there any medical staff inside the clinic, or are they

14   outside responding to the ICS?

15   A.   I have seen nurses come to the yard and I have seen it      02:46PM

16   where an officer has brought somebody up.  I have seen both

17   scenarios.

18   Q.   Okay.  And you mentioned earlier when Judge Duncan was

19   asking you questions that something happened on June 5th where

20   you were turned away.  So I want to talk about that a little     02:46PM

21   bit now.

22   A.   Okay.

23   Q.   So June 5th, let's start in the morning.  What happened

24   that morning?

25   A.   I went off site medical to get the eye injections, and I    02:47PM

1    had -- at the time I did not realize that they used iodine.

2    I'm allergic to iodine.

3    Q.  What did they use the iodine for?

4    A.  Cleaning of the face and drops in the eye.

5    Q.  Okay.                                                    02:47PM

6    A.  And I did not know -- the first procedure they did not use

7    the iodine.  They knew I was allergic to it and it didn't -- I

8    didn't say anything the second time.  I didn't even think I

9    really needed to.  While I was there I did tell them my eyes

10   were burning and they put some other drops in my eyes.  But on   02:47PM

11   the way back to the yard, my eyes weren't feeling right.  They

12   were feeling -- it just felt different than the first time.

13   When I got into the yard you have to go to medical so that they

14   can evaluate you when you come in.

15   Q.  And what time was that, roughly?                         02:48PM

16   A.  About 8:50, somewhere in there, 8, 9:00.  And I explained

17   to her that my eyes felt different, just didn't feel right.

18   There was something not right.  She gave me Tylenol and sent me

19   back to the yard.  It was a little while later my bunkee is

20   like, what is all over your face?  Come to find out, it was    02:48PM

21   iodine.  My eyes were already swelling, rash, redness.  She

22   filled out an HNR for me and we went down.

23   Q.  Were your -- I mean you said your eyes were swollen and a

24   rash.  Were you able to see?

25   A.  No.  I still was like dilated, so I couldn't really see     02:48PM

—CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct—

1   that well.

2   Q.  Okay.  And when your bunkee told you that?

3   A.  I washed my face off immediately.

4   Q.  Were you locked in your cell for the morning count?

5   A.  No.  We were already done off of that by the time we                02:48PM

6   discovered it was iodine.

7   Q.  And you said the morning count ends around --

8   A.  Noon.

9   Q.  So it was a little bit after noon?

10  A.  Yeah.                                                                02:49PM

11  Q.  Okay.  I'm sorry.  Go on.

12  A.  It's okay.

13  Q.  Your bunkee?

14  A.  She filled out an HNR for me and she took me down to

15  medical.                                                                02:49PM

16  Q.  Why did she fill out the HNR for you?

17  A.  I couldn't really see.  My eyes were burning.  It was like

18  a fire, like my eyes were just on fire.

19  Q.  Okay.

20  A.  And I still was dilated and can't see all that well.  I had        02:49PM

21  the glasses on and everything, but still.  And we got down

22  there and went in.  The nurse said that she didn't really see

23  anything alarming or anything going on and that they weren't

24  accepting HNRs at this time, to go back to the yard.  If this

25  issue arose, if this happened, issue an ICS.                           02:49PM

Q.   Okay.  And do you remember who that nurse was?

A.   There was two of them down there.  And I don't know -- I

don't remember either one of their names.

Q.   Okay.  And when she said we're not accepting HNRs, did she

actually physically hand the HNR back to you and your bunkee?          02:50PM

A.   Yes.

Q.   Okay.  I'm going to show you something.

     Ms. Ashworth, I'm showing you an HNR that's written in

your name that is dated June 5th, 2017.  Do you recognize this

document?          02:50PM

A.   Yes.

Q.   What is it?

A.   It's later what I found out the HNR that Donna, my bunkee,

had filled out when we went down.

Q.   So this is the one your bunkee filled out for you?          02:50PM

A.   Yes.

Q.   And the bottom of it is blank, is that correct?

A.   Yes.

Q.   And it's not stamped as received, is that correct?

A.   Yes.          02:50PM

Q.   And when you went down there, they didn't make a log or any

sort of record that you had been turned away, did they?

A.   No.  She just said that if swelling continued, redness, or

anything like that to issue an ICS.

     MS. KENDRICK:  Your Honor, we would like to admit the          02:51PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1    June 5th HNR as Exhibit 6.

2             THE COURT:  Any objections?

3             MR. BOJANOWSKI:  We'll object to it, Your Honor.  I

4    mean, it's -- there's no way to know that this was actually

5    presented to anybody in the health unit.  The HNR forms can,          02:51PM

6    frankly, be filled out at any time even after this incident.

7    So we have no way of knowing whether this was actually

8    presented or not.

9             MS. KENDRICK:  Your Honor --

10            THE COURT:  The exhibit will be received.                     02:51PM

11            Is now a good time to take a 10-minute break?

12            We're going to impose upon you for 10 minutes to give

13   the court reporter a break.  She's been working since we

14   started.  If you just wait there we'll all leave.  Are you okay

15   waiting?                                                               02:52PM

16            THE WITNESS:  Yeah.  I'm fine.

17            THE COURT:  Thank you.

18            (Recess from 2:52 p.m. until 3:02 p.m.)

19            THE COURT:  Thank you kindly.  Please be seated.  And

20   you may continue.                                                     03:02PM

21            MS. KENDRICK:  Again, I don't know if you ruled on the

22   objection.  I don't remember hearing the ruling.

23            THE COURT:  Transcript says the exhibit will be

24   received.

25            MS. KENDRICK:  I did not hear that.  I apologize.            03:03PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1      THE COURT:  That's all right.

2   BY MS. KENDRICK:

3   Q.  So we were talking about the HNR that was handed back to

4   you and you were told, I believe you testified, that the nurse

5   told you that if you had any problems later in the day to have      03:03PM

6   custody call an ICS?

7   A.  Yes.

8   Q.  So did you go back to your unit at that time?

9   A.  Yes.

10  Q.  And did you continue to have problems?                          03:03PM

11  A.  Yes.

12  Q.  Describe what you were going through?

13  A.  Eyes very swollen, red streaks, blood streaks through my

14  eyes, the whites of my eyes bulging out, redness all through

15  here, burns on my face, a rash down my neck, down the front and     03:04PM

16  just full blown reaction.

17  Q.  So your hands also got affected by this?

18  A.  Just like little bumps when you get a little reaction.

19  Q.  Okay.  And was this painful?

20  A.  Yes.                                                            03:04PM

21  Q.  Were you able to sleep?

22  A.  No.

23  Q.  So what were you doing to try to alleviate the pain?

24  A.  I took allergy tablets to try to counteract the reaction,

25  and we were taking white washcloths, cold, keeping them on my       03:04PM

1    face to try to calm things down.

2    Q.  When you said "we," does that refer to you and your bunkee?

3    A.  My bunkee.

4    Q.  And we'll talk about this more, but did you or your bunkee

5    request an ICS during the evening?                          03:04PM

6    A.  Yes.

7    Q.  Describe how you felt the morning of June 6th.

8    A.  It was -- my eyes were -- it was like on fire.  My face was

9    burning.  Eyes were very swollen.  My whole face was red.  They

10   described it as burns on my face.  I went to medical.  It was   03:05PM

11   almost 8, I think, 7:30, 8:00.  And they had to call another

12   yard to get a doctor to issue the injections to counteract the

13   reaction.

14   Q.  When you went down at, you said, I believe 7:30 or 8?

15   A.  7:30, 8:00.                                              03:05PM

16   Q.  And you had an HNR?

17   A.  Yes, and I filled one out.

18   Q.  Were you seen immediately, or did you have to wait?

19   A.  Actually, I was seen immediately.  As soon as I walked in

20   they did look at me right away.  She told me that I needed to   03:05PM

21   go back to the yard, though, for about a half hour, 45 minutes,

22   while they got orders issued from the doctor to do the

23   injections of the reaction I was having.

24   Q.  Did she say anything else to you when she saw you?

25   A.  No, just that it looked like burns and just go back and    03:06PM

1  when I came back they would have the shots ready.

2  Q.  Was this the same nurse who had sent you away the day

3  before?

4  A.  Yes.

5  Q.  Okay.  I'm going to show you something.                      03:06PM

6          I'm showing you an HNR that is dated June 6th, 2017.

7  Do you recognize this?

8  A.  Yes.

9  Q.  Is this the HNR you took with you the morning of June 6th?

10  A.  Yes.                                                        03:06PM

11  Q.  And did you fill it out?

12  A.  Yes.

13  Q.  And it has NL written on it.  Do you know what that means

14  on the bottom?

15  A.  No.                                                         03:06PM

16  Q.  So you said that the nurse who saw you sent you back to

17  your housing unit because she needed to get permission to do an

18  injection?

19  A.  Yes.

20  Q.  Do you remember the name of the nurse?                      03:07PM

21  A.  I don't.

22  Q.  Okay.  So were you called to come back, or did you just go

23  back 30 minutes later on your own?

24  A.  I went back.  I went back to my room, and then about 40

25  minutes later I came back up and --                             03:07PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1    Q.  Were they ready to give you an injection?

2    A.  They still didn't have everything ready.  It was probably

3    another 45 minutes before they actually gave me the injection.

4    Q.  And who administered the injection?

5    A.  The nurse.  And there was another nurse, and I don't know                03:07PM

6    where she came from.  I got the assumption that she was from

7    the other yard, but I don't know who she was.

8    Q.  Okay.

9          MS. KENDRICK:  Your Honor, I'd like to move this HNR

10   in as Exhibit 7.                                                             03:07PM

11         THE COURT:  Any objection?

12         MR. BOJANOWSKI:  No objection.

13         THE COURT:  This exhibit will be received as well.

14   BY MS. KENDRICK:

15   Q.  And did you receive any other treatment or prescriptions on             03:07PM

16   June 6th?

17   A.  Yes.  They prescribed steroids for the rash and the

18   reaction that I was having.

19   Q.  And did you receive the steroids that day?

20   A.  No, I did not.                                                           03:07PM

21   Q.  When did you receive the steroids?

22   A.  The next afternoon.

23   Q.  So a day and a half later?

24   A.  Yes.

25   Q.  And did the steroids and the injection address everything              03:08PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1   and take care of everything?

2   A.  No, it did not.  They put me on another round of steroids

3   the week after because I was still having the burn, peeling,

4   not as much the swelling.  The swelling had gone down quite a

5   bit but I still had a lot of the redness and burn marks like on        03:08PM

6   my face.

7   Q.  And did this burn to your face and neck peel?

8   A.  Yes.  I am peeling off underneath my eyes right here.

9   Q.  You are still peeling from it?

10  A.  A little bit.                                                       03:08PM

11  Q.  I noticed that you look red.  Is that from being out in the

12  sun or is that from the iodine?

13  A.  I still think it may be from the reaction.  I'm still

14  having problems.  And I still haven't even seen the eye doctor

15  to know what damage is there.                                          03:08PM

16  Q.  Did they give you any sort of ointment or cream or anything

17  like that for your skin?

18  A.  No.

19  Q.  Did you ask about getting any?

20  A.  They did talk about doing something but they said that it          03:09PM

21  would react differently in the sun, and because I am outside

22  and I'm a driver that it probably would do more damage than

23  good.

24  Q.  And you said you haven't gone back to the eye doctor?

25  A.  No.                                                                03:09PM

Q.  Do you know whether the provider requested that you go

back?

A.  They told me they did request it, but I do not know what

has transpired since.

Q.  And when was it that she put in the request?                    03:09PM

A.  When I saw her on, I think it was, the 13th or the 14th

when they put me on the second round of steroids that she said

that they were sending me back to the eye doctor.  And they did

ask me if I had a problem with going back to him and I told

them no.                                                            03:09PM

Q.  You will make sure he knows about the iodine?

A.  Yeah.  I will be sure this time.

Q.  Are you still experiencing problems with your vision?  You

described at the time you couldn't see very well.

A.  Yes.  These lights right here are irritating my eyes.  Like    03:09PM

it's still -- there's still -- they are irritated easily.

Q.  Are you concerned this has caused permanent damage to your

vision?

A.  I'm concerned that something, yeah, that there may be some

damage.                                                             03:10PM

Q.  And were you asked to fill out any sort of paperwork or

statement about what happened?

A.  Yes.  When I took this HNR in, because I did put on

there -- because I didn't know who I was going to be dealing

with when I went down the next morning, was that I did try to      03:10PM

1    submit an HNR the previous day and I was told that they were

2    not taking the HNRs and if it got worse to issue an ICS.  And

3    then I made sure that I put on there that I was denied the two

4    ICS's through the evening.

5    Q.  And did you file a grievance addressed to medical about          03:10PM

6    being turned away?

7    A.  When I went down and I -- when they read this and they were

8    scanning it into the system, the nurse did ask me if I would

9    write a statement out of what happened as far as the denied

10   ICS's the night before.                                             03:11PM

11   Q.  Okay.

12   A.  And if my bunkee would also write a statement and anybody

13   else that may have been in the area write a statement.

14   Q.  Okay.  I'm going to show you something.

15   A.  Okay.                                                           03:11PM

16   Q.  Ms. Ashworth, I have handed you a document that is titled

17   inmate letter form, and it's dated June 6th, 2017 in your name.

18   And it's addressed to medical.

19        Do you recognize this?

20   A.  Yes.                                                            03:11PM

21   Q.  And to take a step back, when a prisoner wants to file a

22   grievance, is the first step to file an inmate letter?

23   A.  Yes.

24   Q.  So this was your first step in trying to exhaust the

25   grievance process regarding your medical care and being turned      03:12PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

 1   away?

 2   A.  Yes.

 3   Q.  Okay.  And it's two pages long?

 4   A.  Yes.

 5   Q.  And then the third page is the response that you received?          03:12PM

 6   A.  Yes.

 7   Q.  And it states that it's from A. Serrillo, S-E-R-R-I-L-L-O

 8   assistant health services administrator?

 9   A.  Yes.

10   Q.  And what does Mr. or Ms. Serrillo tell you is the response          03:12PM

11   regarding being turned away by medical?

12          MR. BOJANOWSKI:  Your Honor, we'll object.  The

13   document is going to speak for itself.

14          THE COURT:  Overruled.

15          MR. BOJANOWSKI:  To be admitted.                                 03:12PM

16          THE COURT:  Overruled.  The reaction to this kind of

17   document is one that suggests very strongly that the mechanism

18   that the defendants have employed, that obstructs the

19   opportunity for inmates to receive medical care such that they

20   are told that if they -- that if they are not seen at your            03:13PM

21   so-called open line, open clinic, that they are supposed to

22   initiate an ICS and then some Department of Corrections officer

23   decides whether or not that's warranted, that's really very

24   troubling.

25          You may continue.                                               03:13PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

```
 1   BY MS. KENDRICK:
 2   Q.  Could you please read the two sentences in the response?
 3   A.  "This is the response to your inmate letter dated 6/6 and
 4   received on 6/9 by Perryville Health Services.  Your primary
 5   area of concern is course of treatment.  Your concern has been    03:13PM
 6   reviewed, and in the case of an urgent or emergent issue a DOC
 7   officer initiates ICS."
 8          MS. KENDRICK:  Your Honor, we would like to move this
 9   into evidence as Exhibit 8.
10          THE COURT:  Any objection?                                 03:13PM
11          MR. BOJANOWSKI:  No objection.
12          THE COURT:  It will be received.
13   BY MS. KENDRICK:
14   Q.  So we have talked about what happened with medical staff
15   and their reaction, or lack thereof, to your medical concerns.    03:14PM
16   I'd like to talk some more about the custody staff concerns.
17   A.  Okay.
18   Q.  You said on the night of June 5th you went back to your
19   housing unit and you were experiencing great pain, swelling,
20   burns on your face?                                               03:14PM
21   A.  Yes.
22   Q.  And did you or anyone else contact custody officers and
23   request that they initiate an ICS?
24   A.  Yes.
25   Q.  Could you tell us about what happened?                        03:14PM
```

1    A.  My bunkee, she went -- Sergeant Coleman was walking across

2    the yards.  In between the two yards you have a walkway.  He

3    was walking towards the track and she ran after him.

4    Q.  What time was this?

5    A.  A little bit after 5.  It was after lockdown.                    03:14PM

6    Q.  So as soon as the doors were unlocked she --

7    A.  Tried to get help.  She went -- she was running to him,

8    calling him, and he asked her first why are you running?  And

9    she told him that I was having a reaction and that I had had a

10   procedure done earlier that day and that I was having a          03:15PM

11   reaction.  He told her to go see the CO that was on the yard,

12   which was the officer on the yard, which was Officer Western.

13   Western came to our room probably about 10 minutes later and

14   asked what the problem was and we told her and explained to

15   her.  She says, well, I don't see anything wrong.  I'm going to   03:15PM

16   call Sergeant Coleman again.  And she came back and said he

17   denied an ICS.

18   Q.  So what time was it that she came back roughly and said

19   Coleman --

20   A.  A little bit after 5, 5:20, somewhere in there.              03:15PM

21   Q.  So from the time your bunkee ran out and saw Sergeant

22   Coleman to the time CO-III Western came back the second time,

23   how long would you say that was, roughly?

24   A.  Probably about 25 minutes.

25   Q.  Okay.  Then what happened?                                   03:15PM

1    A.   Then just it kept -- I mean, it was burning.  It was very

2    painful, especially in the inside of the eye.  It was not even

3    the face, because iodine was all over my face but my eyes were

4    just on fire.  There was other girls next door to us, other

5    inmates that saw, knew, and they went back to western and asked          03:16PM

6    her to please issue an ICS.

7    Q.   And what did she -- do you know what she told them?

8    A.   I don't know what exactly she told them because I was not

9    there but shortly after Coleman, Sergeant Coleman, came to our

10   room, kicked the door open, and didn't even see my face because        03:16PM

11   we had a white washcloth on my face with cold to keep the

12   burning or try to help the swelling and the burning and he

13   asked me if I was breathing and he said yes.  Then he said you

14   can see medical in the morning.  And he walked out and slammed

15   our door.                                                                03:16PM

16   Q.   And were any other -- was that it?  Did he ever come back

17   to check on you again?

18   A.   No.

19   Q.   Did Officer Western ever come back?

20   A.   Western came back, I think, probably about 7, 7:30 and             03:17PM

21   asked how I was doing.  And she said, again, that Sergeant

22   Coleman denied any ICS for me and that I could see medical in

23   the morning.

24   Q.   And you said that was about at 7:30 and lockdown was at 8?

25   A.   8.  Yeah.                                                          03:17PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1   Q.  Did you see any other officer or did any other officer come

2   to your room until the next morning?

3   A.  Nope.  Nobody even bothered to come by and check, say

4   anything, nothing.

5   Q.  Okay.  And so that was the night of June 5.  And then did          03:17PM

6   you decide that you wanted to start the grievance process about

7   not having an ICS called for you?

8   A.  And I wrote this HNR, and then medical had me write out an

9   inmate letter.  But with this inmate letter my concern here is

10  there was like three or four other inmate letters that were          03:17PM

11  turned in with this, because my bunkee had wrote a statement.

12  And there was a few other girls around that also wrote

13  statements that went to medical, and none of those came back to

14  me.  It was just my statement.

15  Q.  Okay.  And how did you get the blank forms to file a              03:18PM

16  grievance about custody staff?

17  A.  As far as the grievance or the inmate letter?

18  Q.  Well, to start the process to file the second grievance?

19  A.  Okay.  I went to my CO-III a few days after all this

20  happened and she gave me the grievance form but she asked me         03:18PM

21  what had happened, what was going on.  And I explained to her

22  and she said, hold on a minute.  She said I'm going to call

23  somebody to have a meeting.  So she called Lieutenant Papworth,

24  and he said that he would see me after we got off lockdown to

25  come to the yard office and talk to him.  So I did go and speak      03:18PM

1    with him, explained what all happened.  He was not aware of any

2    of it, did not know any of this had happened two nights prior.

3    He said that he would address it.  He would handle it and he

4    would take care of it.

5    Q.  When he said I will take care of it, did you tell him          03:19PM

6    anything in response like, okay, I won't file a grievance or

7    anything like that?

8    A.  He did ask me if I was going to file a grievance, and I

9    told him no, I would not if he was going to handle it.  I felt

10   comfortable enough with him that he was going to address the      03:19PM

11   situation.  It was on the 10th the CO-II Western came to our

12   room and I just felt like I was being questioned, like did you

13   file a grievance?  Did you, you know, what has been done about

14   this?  Because she asked if I was okay.  She stayed in our room

15   for quite a few minutes asking questions and I did point blank    03:19PM

16   ask her, did you document what happened the other night

17   anywhere, like on your log book, anything, your communication?

18   And she said no, she didn't log it anywhere, that it was not

19   documented.

20           And I asked her, I said, did you -- have you been         03:20PM

21   questioned or asked about any of it?  She said no, nobody said

22   anything to me.  And that's when I decided to file a grievance.

23   Q.  Okay.  I'm going to show you another document.

24   A.  Okay.

25   Q.  I'm showing you a document that is titled Inmate Informal     03:20PM

1   Complaint Resolution, and it has your name on it.  And it's

2   dated June 12, 2017.

3   A.  Yes.

4   Q.  Do you recognize this?

5   A.  Yes.                                                    03:20PM

6   Q.  Did you write this document on June 12, 2017?

7   A.  Yes.

8   Q.  Was this the first stage in starting the grievance process

9   regarding custody's response?

10  A.  Yes.                                                    03:21PM

11  Q.  And were you able to submit this inmate complaint?

12  A.  No.

13  Q.  Why not?  Who do you submit an inmate complaint to?

14  A.  You submit it to your CO-III, and unfortunately, our

15  CO-IIIs are not on the yard a lot.  They teach classes.  They   03:21PM

16  are doing other activities.  And we're sometimes lucky if we

17  see our CO-III on the yard maybe twice a week, if that.

18  Q.  And are there time frames by which you have to submit this

19  informal complaint to your CO-III?

20  A.  I was told that you had 10 days from the incident.  Now, I   03:21PM

21  don't know if that's 10 days from like business and all that,

22  so I never did get it into her to get it filed.

23  Q.  Because June 15th, 10 days later had come and gone and you

24  still had not seen her?

25  A.  I still had not seen her.                               03:21PM

1    Q.  Okay.

2            THE COURT:  She doesn't have a mailbox?

3            THE WITNESS:  No.  You wait -- when they are in, when

4    they are actually in they have hours posted like 9 to 11 that

5    you can see them.  But you are on lockdown for a lot of that.    03:22PM

6    And then 1:30 to 3 and it's posted.  And then sometimes you

7    will go to the door and it will say closed, or you can't see

8    them because they are on a legal call or something else is

9    going on.  And then there's days that you just basically you

10   stand at the doorway and you wait to be seen.  So there could   03:22PM

11   be three or four people in line.  There could be 10 or 15

12   people in line.  So there's no appointments that you can make

13   or do anything like that.

14           THE COURT:  Okay.

15   BY MS. KENDRICK:                                                03:22PM

16   Q.  And as part of drafting this inmate informal, did you

17   collect statements from other prisoners who were witnesses to

18   what happened with refusal too call an ICS?

19   A.  Yes.

20   Q.  I don't want you to say any of the inmates' names into the  03:22PM

21   record.

22   A.  Okay.

23   Q.  But do you recognize --

24   A.  Yes.

25   Q.  These are six statements written by six different people?   03:23PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1    A.  Yes.

2    Q.  And these were all witnesses to the failure to call an ICS?

3    A.  Yes.

4    Q.  And since you were unable to submit your informal

5    complaint, were you ever able to submit these witness                   03:23PM

6    statements in support of your complaint?

7    A.  No, because when they -- when I initially went down on the

8    6th, they had me fill out -- they wanted me to do an inmate

9    letter.

10   Q.  But that was for the health.  That was separate, right?            03:23PM

11   A.  Yes.  But they had me -- they had my bunkee write a

12   statement and there was a few other girls that wrote

13   statements.

14   Q.  Who is "they"?  Was it medical staff or custody staff?

15   A.  Medical staff had me do this inmate letter here, the                03:24PM

16   original one that I wrote.

17   Q.  The one dated June 6th?

18   A.  Yes.  There was three or four other statements attached to

19   this original one.  These are just other statements that I got

20   later.  And Donna did two of them, because when I did get this          03:24PM

21   back it was just mine attached.  There was no other ones there.

22   Q.  Okay.

23   A.  And there were other ones turned in to them that day.

24   Q.  But the second round of statements, this is what you got?

25   A.  Yes.                                                                03:24PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

```
 1  Q.  Okay.
 2          MS. KENDRICK:  Your Honor, we would like to submit Ms.
 3  Ashworth's June 12 Inmate Complaint Resolution as Exhibit 9 and
 4  others prisoners' statements as Exhibit 10.
 5          THE COURT:  Any objection?                              03:24PM
 6          MR. BOJANOWSKI:  Exhibit 9, no objection.  Exhibit 10
 7  is hearsay.
 8          THE COURT:  The objection is overruled.  Both will be
 9  received.
10          Ms. Kendrick, would you kindly state again the         03:25PM
11  sequencing of which you thought is the June -- the collection
12  of six statements, is that intended to be 9, or which did you
13  intend?
14          MS. KENDRICK:  Ms. Ashworth's statement to be Exhibit
15  9.                                                              03:25PM
16          THE COURT:  And then 10 be --
17          MS. KENDRICK:  The six inmates statements.  And I will
18  give these copies to the clerk.
19          THE COURT:  All right.  Thank you.
20          I wonder if it makes sense in light of two things,     03:25PM
21  one, the passage of time and also Mr. Fathi's earlier statement
22  to ask the witnesses who have been waiting all day to come into
23  the court to tell them that we're going to pursue Mr.
24  Fathi's -- I have to do that.  I understand you are probably
25  going to object.                                               03:26PM
```

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1       MR. BOJANOWSKI:  I would not object to that.  I think

2  that if we're going to finish with this person, I have one of

3  our Corizon people already teed up to let them know that they

4  don't have to wait.

5       THE COURT:  Where are they now?                    03:26PM

6       MR. BOJANOWSKI:  They are in the witness room or the

7  conference room.

8       THE COURT:  Just outside the courtroom?

9       MR. BOJANOWSKI:  Right here in that area.

10      THE COURT:  What I'd like to do is to express my      03:26PM

11  apologies to them personally.

12      MR. BOJANOWSKI:  Oh, all right.  You want me to go get

13  them?

14      THE COURT:  If you wouldn't mind.  Thank you.

15      MR. BOJANOWSKI:  I didn't realize that's where you    03:26PM

16  were going.  I thought it was just a matter of telling them to

17  go home.

18      THE COURT:  Thanks.

19      Well, you are patient people.  I know that already

20  because you haven't burned the courthouse down.  So I thank you  03:27PM

21  for that.  I have asked you to come into the courtroom because

22  I want to apologize to you to say that I am sorry that we have

23  had you here waiting all day.  We don't like -- when I say

24  "we," I mean the Court, the lawyers, none of us ever want to be

25  in a situation where we do what we have done today.  Sadly, we  03:27PM

1    find that we do it pretty regularly.  And that's because we

2    can't, notwithstanding our best efforts, really predict how

3    long things that will necessarily have to happen in advance of

4    your testimony will take.

5           And I have asked you to come into the courtroom at                03:27PM

6    this moment in the middle of testimony because it's become

7    apparent to me we are not going to get to you today.  So I

8    thought we should tell you that and try to make it clear to you

9    that everybody in this courtroom is very thankful and

10   appreciative of the fact that you have waited for no purpose.            03:28PM

11   And I'm sorry about that.  But what's worse is there's worse

12   news yet to come, and that is we're going to ask you to come

13   back.

14          So we'll talk to the lawyers later about exactly when

15   that's going to be.  But I have to say something that I have              03:28PM

16   said to others who have been called off their work, and that's

17   what's happened for you.  You have been called off your work

18   and I know you are asked to do an awful lot and it's not easy

19   on what's going to happen, the consequences you having been off

20   your work.  The in-box continues to accumulate.  And I                   03:28PM

21   appreciate that.

22          But unfortunately, your role, when it ultimately comes

23   of being able to testify here like the other witnesses today,

24   to tell me what happens on the ground, so to speak, is

25   critically important because the parties in this case, the              03:28PM

1    plaintiffs and the defendants, reached a settlement of the case

2    that required me to play a role with respect to enforcing the

3    terms of the settlement.  And that requires me to make some

4    decisions that need to be well-informed.  And they can only be

5    well-informed if I hear from people like you, and that's why we        03:29PM

6    go through this process understanding even that it's an

7    imposition on your schedules and a distraction from what you

8    are doing on the ground.  But I could make things worse if I

9    enter orders that don't reflect what people like you tell me.

10   So that's why it's necessary.                                          03:29PM

11           I thank you for waiting all day today.  You are free

12   to go and begin your weekends or go back to work.  But thank

13   you very much.

14           Thank you, ma'am.

15           MS. KENDRICK:  I just have a couple more questions for         03:29PM

16   you.

17   BY MS. KENDRICK:

18   Q.  So it's now been about a month and a half since these

19   incidents occurred?

20   A.  Yes.                                                               03:29PM

21   Q.  Have you experienced any sort of harassment or retaliation

22   as a result of complaining about your medical care or the

23   response by custody staff?

24   A.  No.  I have just gotten a stare down the other night from

25   Coleman, but nothing's been said or anything.  And medical has        03:30PM

1  been, I mean, they have been pleasant any time I have gone

2  down.

3  Q.  Okay.  And given the fact that at the beginning you said

4  you had some concerns about retaliation for testifying?

5  A.  Yes.                                                      03:30PM

6  Q.  Why did you decide to agree to come and tell your story to

7  Judge Duncan and the others who are here?

8  A.  So that it doesn't happen again to somebody else.  And the

9  fact is you can't change anything if you don't know it's broke.

10 And you don't know how to fix something that's broke if you    03:30PM

11 don't know all the pieces.  And I don't know all the pieces,

12 but it's definitely broke.

13 Q.  Thank you very much.

14 A.  Thank you.

15        THE COURT:  Now the lawyer for the defendants will      03:30PM

16 have an opportunity to ask you questions.

17        Mr. Bojanowski.

18        MR. BOJANOWSKI:  May I have a moment, Your Honor?

19        THE COURT:  You may.

20        MR. BOJANOWSKI:  Your Honor, fortunately for this        03:32PM

21 witness we don't have any questions.

22        THE COURT:  All right.  Thank you.  So you are done.

23 Thank you very much.  I appreciate it.  Now what we need to

24 make sure is you get safely off the stand.  It may be more

25 dangerous than coming up.  Keep in mind to take advantage of    03:32PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing - Ashworth - Direct

1    that part of the bench there.  Thank you.

2           THE WITNESS:  Thank you.  Have a good day.

3           THE COURT:  And thank you to the correction officers

4    for your help today as well.

5           MR. BOJANOWSKI:  Your Honor, we're going to release                03:32PM

6    the witnesses to go back to the facility at this time.

7           THE COURT:  Fair enough.

8           MR. BOJANOWSKI:  Go ahead.

9           THE COURT:  Now we need to change gears.  And what I'd

10   like to do, Mr. Bojanowski, is return to the performance                  03:33PM

11   measures and obtain the preliminary May numbers.

12          When you are ready, you may begin.

13          MR. BOJANOWSKI:  If you could help me out, Judge, I

14   could either read them off or I could have them submitted in

15   writing to the Court, whatever you want to do.                            03:33PM

16          THE COURT:  It would be helpful for us to know.

17          MR. BOJANOWSKI:  Right now?

18          THE COURT:  I think we have done that in the past to

19   good utility, and I think in light of the fact that we're all

20   here together we can have a conversation when you give us this            03:34PM

21   information.

22          MR. BOJANOWSKI:  All right.  You let me know the

23   measure.

24          THE COURT:  Number 11.

25          MR. BOJANOWSKI:  Number 11.                                        03:34PM

1        THE COURT:  And this is newly prescribed provider

2   ordered formulary medicines will be provided to the inmate

3   within two business days.

4        MR. BOJANOWSKI:  Which facilities?

5        THE COURT:  Well, do you have them -- all of them          03:34PM

6   listed there?

7        MR. BOJANOWSKI:  I do.

8        THE COURT:  Why don't you just start at Eyman and go

9   on down.

10        MR. BOJANOWSKI:  Douglas, 90; Eyman, 66; Florence, 87;     03:34PM

11   Lewis, 87; Perryville, 90; Phoenix, 93; Safford, 93; Tucson,

12   83; Winslow, 97; Yuma, 90.

13        THE COURT:  So if I heard correctly, we have one

14   facility that is for May below the benchmark, is that correct?

15        MS. KENDRICK:  There are two.                              03:35PM

16        THE COURT:  I didn't hear correctly.  What is the

17   other one?

18        MR. BOJANOWSKI:  There's two.

19        THE COURT:  Which are the two?

20        MR. BOJANOWSKI:  It would be Eyman at 66 and Tucson is     03:35PM

21   at 83.  The cutoff is 85.

22        THE COURT:  Right.  I wrote it down as 93.  That's my

23   mistake.  I'm sorry.  So Tucson is 83.  Tucson has been

24   hovering for a while at this just sub-compliant status, and

25   Eyman has been worse.  I guess I raise the same question that I  03:35PM

1    have raised before.  Since it appears that you do get it right,

2    you know how to get it right, how come that can't be applied to

3    Eyman and Tucson?

4             MR. BOJANOWSKI:  May I have a moment, Your Honor?

5             THE COURT:  Yes.                                          03:36PM

6             (Discussion off the record.)

7             MR. BOJANOWSKI:  I don't have a definitive answer as

8    to why those two facilities are below.  But certainly, what I'm

9    being told, anyway, is that we're looking at the processes at

10   the other facilities to try and implement those at those two     03:39PM

11   underperforming facilities.

12            MS. KENDRICK:  Your Honor, we would ask that --

13            MR. BOJANOWSKI:  I can't remember what -- go ahead.

14            MS. KENDRICK:  We would just ask that whatever reforms

15   they are implementing at Eyman and Tucson also be implemented     03:39PM

16   at Lewis, because May is the first month in 26 months they have

17   actually been compliant and they are compliant by two points.

18   So we are concerned that that is not any sort of lasting

19   improvement there.

20            MR. BOJANOWSKI:  I think we're going to keep an eye on    03:39PM

21   Eyman.  I mean, that's certainly -- I mean Lewis.

22            THE COURT:  Here's what you have told me.  You have

23   told me that you are going to look to see what procedures have

24   produced the successes at the facilities that are in compliance

25   and that you are going to apply those techniques in Eyman and     03:39PM

1    Tucson and take care to make sure there is no backslide on

2    Lewis.  I think that this is something that is definitely

3    doable.  And when it's within grasp of it, I guess I have to be

4    insistent equally because the stipulation has a benchmark of 85

5    percent, not 80, so these numbers matter with respect to the        03:40PM

6    contract the parties entered.

7         So what we'll do is I have made a note on my

8    spreadsheet of what you have told me about this, and we'll look

9    to see a better situation in June.  I have to say, you are

10   caught in the lag time, because I raise these issues.  And the     03:40PM

11   next report that we're going to get is one where a rating has a

12   lag effect as well.  But to the extent that there's an

13   opportunity for you all to be more aggressive about this, I

14   worry sometimes, or worry is the wrong word, I contemplate but

15   am hesitant to go for more draconian measures where it seems       03:41PM

16   like you just could make this work because you have made it

17   work in other places.

18        And so anything the plaintiffs wanted to add in

19   addition on the record in 11?

20        MS. KENDRICK:  No, Your Honor.  We're just concerned          03:41PM

21   because these -- the Court originally found defendants

22   non-compliant with this performance measure at six institutions

23   on May 20, 2016.  And it's been now 15 months and still we're

24   not seeing improvement.  And so we would urge the Court to

25   order the defendants to take some sort of stronger steps to        03:41PM

1    ensure compliance with this performance measure with regard to

2    all prisoners and not just the 10 whose files may be picked for

3    a CGAR.

4         THE COURT:  Well, it's a fundamental feature of

5    medical care that's reflected by the fact that it's in the          03:42PM

6    performance measures that if a doctor or provider makes a

7    determination that somebody needs a prescription drug

8    medication it's not as if there isn't a need for it straight

9    away.  So it just seems to me that if you are responsible for

10   the care of these people, you can't employ a lag greater than      03:42PM

11   the one provided for.

12        So again, people should understand that the

13   consequence of not bringing these into compliance is the

14   application of the more draconian measures.

15        MS. KENDRICK:  Your Honor I would also just direct the         03:42PM

16   Court's attention to the expert report of Dr. Wilcox we

17   submitted last month where he provided the Court with multiple

18   suggestions of remedial efforts that could be taken by

19   defendants or ordered by the Court with regard to Performance

20   Measure 11, 13, and 35.                                            03:43PM

21        THE COURT:  Okay.  Thank you.  So 13, chronic and

22   psychotropic medication renewals will be completed in a manner

23   such that there is no interruption or lapse in medication.

24        MR. BOJANOWSKI:  Douglas is at 96; Eyman, 86;

25   Florence, 94; Lewis, 90; Perryville, 97; Phoenix, 88; Safford      03:43PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1    100; Tucson, 95; Winslow, 97; Yuma, 100.

2         THE COURT:  All right.  So the chronically

3    non-compliant location of Perryville is now turned around.  So

4    we will look to see these numbers continue to be in compliant

5    status.                                                        03:44PM

6         14.  Any refill for chronic care or psychotropic

7    medication that is requested by a prisoner between three and

8    seven business days prior to the prescription running out will

9    be completed in a manner such that there is no interruption or

10   lapse in medication.                                          03:44PM

11        MR. BOJANOWSKI:  Douglas, 100; Eyman 94; Florence, 95;

12   Lewis, 100; Perryville, 98; Phoenix, 100; Safford, 100; Tucson,

13   92; Winslow, 100; Yuma, 100.

14        THE COURT:  Very good.  Thank you.

15        35.  Any inmate medication will be transferred with      03:45PM

16   and provided to the inmate or otherwise provided at the

17   receiving prison without interruption.  This one included all

18   of the facilities on the chronically non-complying list.  Where

19   do we stand?

20        MR. BOJANOWSKI:  Douglas, 100; Eyman, 23; Florence,       03:45PM

21   50; Lewis, 73; Perryville, 100; Phoenix, 71; Safford, 100;

22   Tucson, 80; Winslow, 100; Yuma, 91.

23        THE COURT:  A chronic problem that has existed in the

24   system for a long time that produced a performance measure

25   requirement that seems to be one that is so profoundly          03:46PM

1    fundamental that the continued abject non-compliance is just

2    really shocking.  So we'll hear more.

3           MR. BOJANOWSKI:  We have undertaken in the past month

4    a complete review of inner system transfers in an effort to try

5    and identify procedures and such to be utilized to assure that          03:46PM

6    the medications are being transported with the prisoners, that

7    they are receiving them before they leave, that they get them

8    when they get there.  I know I have personally participated in,

9    I believe, four of those meetings in an effort to address this

10   situation.  So we have taken an extremely aggressive approach           03:47PM

11   with Corizon and our operations staff, quite frankly, to try

12   and resolve what, as the Court has said, seems to be a rather

13   easy thing to do.

14          THE COURT:  It's an easy thing to do it would seem to

15   me, because you are transporting the body and the possessions          03:47PM

16   of the person in your charge.

17          MR. BOJANOWSKI:  Correct.

18          THE COURT:  And then you have got them under your

19   medical care and you somehow cannot get them to continue the

20   medications that they need in a circumstance where people              03:47PM

21   suffer dire effects from not having continued medication.

22           So this is one of the most potentially expensive

23   avenues for you to go down.  So we're going have to a hearing

24   on an OSC on this issue, and this is probably a big ticket item

25   because it's one of the biggest.                                        03:47PM

1      MR. BOJANOWSKI:  Which is why we're aggressively

2   approaching it and doing the things, quite frankly, to try and

3   get this resolved to identify what the core problem is and to

4   then plug those holes and make this work.  And as I have

5   indicated to the Court, I have been personally involved with          03:48PM

6   the resolution of this particular measure.  So, I mean, it's

7   not, you know, it's not one that we're turning our backs on

8   whatsoever.  So rest assured, I am going to do my best to get

9   this thing fixed.

10      THE COURT:  Okay.                                                  03:48PM

11      MS. KENDRICK:  Your Honor?

12      THE COURT:  Yes.

13      MS. KENDRICK:  Just a couple of observations.  As the

14   Court observed in that document that you gave us yesterday with

15   your preliminary reaction to the notice, defendants listed          03:48PM

16   1,436 applicable transfers and only 299 of them or 21 percent

17   were in compliance.  So that means 1,137 individuals were

18   non-compliant.  They only listed 434 names, and so we would ask

19   that the balance, the other 703 people be identified to

20   plaintiffs so that we can potentially follow up with our           03:49PM

21   clients as to any adverse problems as a result of their failure

22   to comply with the Court's orders.

23      THE COURT:  Well, one of the reasons that I dashed out

24   this preliminary view to you all is that it seemed to me to be

25   obvious there were issues with addition.  And I wanted to give      03:49PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1   the defendants an opportunity to try to address that today.  So

2   far Mr. Bojanowski hasn't chosen to do that, but I have at

3   least given you the suggestion that this is an avenue that you

4   need to run down.  We don't know whether it's -- whether

5   there's some explanation or not.  But it seems to me that what        03:49PM

6   just a quick review of the report provided by the defendants

7   indicates is that there is a huge cast of missing characters

8   here.  If it turns out that there is a huge cast of missing

9   characters and they don't have an explanation for it at the

10  OSC, you can imagine I'm probably going to be inclined to say        03:50PM

11  I'm going to count those people.

12          So I gave it, hoping there might be some advantage to

13  a quick turnaround, but also in fairness I can't expect

14  somebody to necessarily have the ability to do that.  But we're

15  going to have a hearing, and that hearing is not going to           03:50PM

16  happen today but we're going to have a hearing as to why this

17  sanction that I have previously discussed should not be

18  assessed.  And it would be assessed for everyone that I found

19  to have not been in compliance notwithstanding the report that

20  the defendants would make if it turns out that the facts are        03:50PM

21  otherwise.

22          MS. KENDRICK:  Yes, I understand, Your Honor.  What

23  I'm saying, however, is we would like to do our own independent

24  research because it's not broken down.  So we don't know if

25  it's perhaps just two of the five facilities is terrible or,        03:51PM

UNITED STATES DISTRICT COURT

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1    you know, if these individuals who are not listed, what their

2    situation is.

3            So to the extent that we would like to follow up with

4    our clients independent of whatever actions the Court is

5    taking, that's why we're asking that the defendants provide us      03:51PM

6    the balance of the 703 individuals who they did not list.

7            THE COURT:  Are you in a position to do that?

8            MR. BOJANOWSKI:  Your Honor, there aren't 703 people

9    we did not list.  The way this is listed is that one individual

10   may have had five, seven, 10 meds.  Each one of those is a         03:51PM

11   line.  So your total is basically the number of meds that were

12   missing.  So you would then have -- and what the Court wanted

13   was the name and number of the inmate who was found in

14   non-compliance.  Therein lies the difference with regard to

15   these numbers.  So there aren't missing inmates whatsoever,        03:52PM

16   it's just that the report shows this many meds.  And you

17   know --

18           THE COURT:  Well, it would have been nice to know that

19   five minutes ago.

20           MS. KENDRICK:  Or yesterday.                               03:52PM

21           MR. BOJANOWSKI:  I wasn't about to step on Corene's

22   request.

23           THE COURT:  You knew it was something that I was

24   wondering about.

25           MR. BOJANOWSKI:  Well, I didn't realize it was going       03:52PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1    to arise just now.  I didn't know if maybe we were going to

2    talk about it after I was giving numbers.  But since it is --

3            THE COURT:  Is there anything else you want to talk

4    about in response to what I said?  Again, I have told you that

5    you can or you can't.  But is there anything else you would          03:52PM

6    like to tell me about what I observed yesterday?

7            MR. BOJANOWSKI:  Your chart?

8            THE COURT:  Yes.

9            MR. BOJANOWSKI:  I haven't gone through your chart,

10   Your Honor, to be able to specifically address it.  But in a        03:52PM

11   general sense when you see those differences it may be that

12   it's one inmate with, say, like a lab report.  He may have had,

13   in the last month, eight or nine lab reports which is why you

14   would see, okay, the difference in the lab reports may be, I

15   think you said, a couple thousand or something like that.  I        03:53PM

16   can't remember what it was.

17           But that's why that's done.  The data came in as lab

18   reports.  And so a grouping of 8 or 10 lab reports for one guy

19   reporting to the Court that there's your guy, that's in

20   non-compliance.                                                     03:53PM

21           THE COURT:  Certainly it's fair to say that the

22   direction that I gave you when I asked for this information was

23   I wanted to know the individuals.

24           MR. BOJANOWSKI:  Correct.

25           THE COURT:  It would seem fair to do what you did.          03:53PM

UNITED STATES DISTRICT COURT

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1   But I don't know whether the limit of the sanction with respect

2   to enforcing the stipulation is so limited so that if there is,

3   are, multiple violations of the stipulation for individuals in

4   a given period of time, I am not convinced yet that your

5   argument is the right one.  But I think it is a fair response          03:54PM

6   to what I asked for because I wasn't specific.

7            MS. KENDRICK:  I would just add that as we go through

8   if there's others of these if Mr. Bojanowski could clarify at

9   the moment we're talking about it so we're on the same page.

10           THE COURT:  He's told you that he's had not a chance          03:54PM

11   to look at it in depth, but he's also told you in general where

12   he sees discrepancies he believes are associated with

13   individuals who have had multiple violations of the stipulation

14   imposed upon them.

15           MS. KENDRICK:  Okay.                                         03:54PM

16           MR. BOJANOWSKI:  It may be that there were four labs

17   involved in one day, okay, for a particular guy.  So that's why

18   you are seeing the numbers.

19           THE COURT:  I understand.

20           MR. BOJANOWSKI:  And I can only speak generally.            03:54PM

21           THE COURT:  I understand what you are saying.

22           MR. BOJANOWSKI:  Right.

23           THE COURT:  Then 37.  Sick call inmates will be seen

24   by an RN within 24 hours after an HNR is received by or

25   immediately thereafter if an emergent need or the same day if       03:55PM

1    identified as having an urgent need.

2         MR. BOJANOWSKI:  Douglas, 100; Eyman, 96; Florence,

3    93; Lewis, 83; Perryville, 97; Phoenix, 100; Safford 97;

4    Tucson, 96; Winslow, 97; Yuma, 100.

5         THE COURT:  So we have one facility, that's Lewis,          03:55PM

6    that's at 83.

7         MR. BOJANOWSKI:  Correct.  The four months prior they

8    were passing.  I'm not sure why they dropped off this month.

9         THE COURT:  Well, the passing ones followed some

10   pretty awful months.  But again, 83 is something that it's just   03:56PM

11   very difficult to see these kinds of things because I end up

12   shaking my head because I know that the institution generally

13   knows how to accomplish the task of the performance measure

14   because you have demonstrated in the last four months there at

15   that very place you know how to do it.  Before that you didn't.  03:56PM

16   You did something.  But then we don't know whether or not -- do

17   any of your people here in the courtroom have any insight why

18   the falloff here?

19        MR. BOJANOWSKI:  I was just checking on that to see if

20   I could get an answer as to why it just dropped off to below a   03:56PM

21   couple of points below standard.

22        THE COURT:  Go ahead.

23        (Discussion off the record.)

24        MR. BOJANOWSKI:  It seems as though there's new staff

25   at the facility.  It's my understanding there are 14 new nurses  03:57PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1   there, and during the orientation process, there's a certain

2   learning curve for them to get up to speed on how to document

3   this thing.  That's my understanding as to what's going on and

4   why they dropped off for this one month.

5          THE COURT:  So a turnover issue?                          03:58PM

6          MR. BOJANOWSKI:  We brought in new staff, Your Honor.

7          THE COURT:  So additional people?

8          MR. BOJANOWSKI:  We had some turnover, yes, and added

9   additional staff PRN staff.

10         THE COURT:  And anything from the plaintiffs on the      03:58PM

11  record with respect to this?

12         MS. KENDRICK:  Only to note that Lewis is one of the

13  institutions that is clearly subject to your outside services

14  order, and so we would urge defendants that in the coming

15  months they avail themselves of outside services if they are    03:58PM

16  finding themselves non-compliant with this measure.

17         THE COURT:  All right.  39.  Routine provider

18  referrals will be addressed by a medical provider and referral

19  regarding and requiring a scheduled provider appointment will

20  be seen within 14 calendar days of the referral.               03:59PM

21         MR. BOJANOWSKI:  Douglas 100; Eyman 88; Florence, 87;

22  Lewis, 82; Perryville, 90; Phoenix, 94; Safford 100; Tucson 97;

23  Winslow, 93; Yuma, 92.

24         THE COURT:  So for Perryville, so close.

25         MR. BOJANOWSKI:  Lewis.                                  03:59PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

 1          THE COURT:  Lewis.  I'm sorry.

 2          I apologize.  I'm still troubled by the problem that I

 3    haven't been able to get the Excel spreadsheet.  There's a way

 4    to do it.  I haven't had time to teach myself how to get the

 5    print bigger in the landscape feature.  It's hard for me to          04:00PM

 6    read it.  But what we saw is -- let me review this.  So Lewis

 7    last -- the previous in April was 87; was 90 in March; was 68

 8    and then previously a mixed bag.

 9          Do you have any insight as to why the falloff here

10    still off the benchmark?                                            04:00PM

11          (Discussion off the record.)

12          MR. BOJANOWSKI:  I think part of it is, as we

13    mentioned in the last measure, the new staff is the coming up

14    to speed.  And it's my understanding that for a certain period

15    of time during the month the telemed system was down which         04:01PM

16    impacted the timing of the care.

17          THE COURT:  All right.  Anything plaintiffs would like

18    to put on the record?

19          MS. KENDRICK:  Just that we're troubled by the fact

20    that Lewis can't seem to sustain any sort of compliance for        04:01PM

21    more than two months in a row.  So, again, we reiterate our

22    concern and urge defendants that they avail themselves of

23    outside resources pursuant to the Court's order.

24          THE COURT:  Thank you.  40.  Urgent provider referrals

25    are seen by -- I'm sorry -- by medical provider within 24 hours    04:01PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1    of the referral.  And the facility previously identified as

2    being in serious trouble and subject to the Court's additional

3    sanction criteria was Eyman.

4              MR. BOJANOWSKI:  May I have a moment, Your Honor?

5              All right.  40.  Oh, Eyman.                          04:02PM

6              THE COURT:  Yes.

7              MR. BOJANOWSKI:  94 percent.

8              THE COURT:  So 40 was April, and May was 94.

9              MR. BOJANOWSKI:  Correct.

10             THE COURT:  And how about the other facilities?      04:02PM

11             MR. BOJANOWSKI:  Douglas is not applicable; Florence

12   was 100; Lewis was 67; Perryville, 100; Phoenix, 100; Safford,

13   not applicable; Tucson, 100; Winslow, 100; Yuma, 100.

14             THE COURT:  I think the one that is subject to my

15   review presently under the mechanism is Tucson.  So that's the  04:03PM

16   relevant one for me otherwise to hear about.  Anything

17   plaintiffs want to put on the record on 40?

18             MS. KENDRICK:  Well, just in regards to the Court's

19   notice of compliance -- order about compliance with the

20   sanction order that the defendants reported that they only had  04:03PM

21   29 percent compliance in the past 30 days with Performance

22   Measure 40 at Eyman.  So despite the fact that they managed to

23   pull it together in the May CGARs at 94 percent, we're

24   concerned that the current situation on the ground, when you

25   look at the entire universe of applicable files, shows that     04:03PM

1   they have not managed to get a handle on what the problem is

2   here.

3        THE COURT:  Well, whether or not the sanction would be

4   imposed in the environment where the latest reporting period is

5   one that is meeting the benchmark is something that will be                04:04PM

6   reserved to the OSC hearing.

7        44, again, another place where Eyman is at the center.

8   Inmates returning from an in-patient hospital and/or transport

9   from an emergency room with discharge recommendations from the

10  hospital shall have the hospital's treatment recommendations             04:04PM

11  reviewed and acted upon by a medical provider within 24 hours.

12       MR. BOJANOWSKI:  You just want Eyman?

13       THE COURT:  Well, I'd like Eyman and Florence.

14       MR. BOJANOWSKI:  Okay.  Eyman is 80; Florence is 96.

15       THE COURT:  And what are you doing about Eyman still?          04:04PM

16  I mean, again, it's really pretty staggering to me that if you

17  have somebody who is sick enough to be an in-patient or to be

18  in an ER and there's nothing in the record documented to show

19  that they just didn't fall in the cracks, which I think what

20  this performance measure is talking about, you have to have it          04:05PM

21  documented.  I don't understand how, again, that a provider

22  isn't taking a look at this situation when they are taking over

23  care for somebody who has been sick enough to be in the

24  hospital or to be at the emergency room.

25       MS. KENDRICK:  Your Honor, we would also request the          04:05PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1    number for Lewis, because that was subject to a non-compliance

2    order.

3             THE COURT:  It is, you are right.  We should also have

4    Lewis.

5             MR. BOJANOWSKI:  87.                                    04:05PM

6             (Discussion off the record.)

7             MR. BOJANOWSKI:  Your Honor, what has happened here,

8    and you will see at Eyman, we went from 15 percent to 80

9    percent.  And the reason why is there's been a procedure

10   implemented by the medical directors now.  There's a daily     04:06PM

11   telephone conference or meeting with the providers whereby they

12   identify the individuals who are returning from in-patient

13   hospital stays.  They review these recommendations, and then as

14   part of that meeting, the action is taken.

15            So that's why we're seeing, we believe anyway, that     04:06PM

16   that meeting that forces this issue to the fore is having an

17   effect and should increase the numbers because we're addressing

18   it every single day.

19            THE COURT:  When did that start?

20            MR. BOJANOWSKI:  Good question.                         04:07PM

21            About two months.

22            THE COURT:  So that would mean May?

23            MR. BOJANOWSKI:  It was partly in May, Your Honor, and

24   then we're looking at some positive results in a very, very

25   rough sense in June.  So we think it's gaining some traction.   04:07PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1      THE COURT:  Okay.  When it starts in May, and it's May

2   numbers, the explanation as to why the turnover has happened

3   doesn't seem to be all that possible because of the timing.

4      MR. BOJANOWSKI:  I don't -- I guess I don't have

5   anything further.  I don't know.                          04:09PM

6      THE COURT:  All right.  I just raise that because the

7   credibility of that being the reason for the turnaround.

8      MR. BOJANOWSKI:  I'm not --

9      THE COURT:  For the reporting month when it hadn't

10   really happened yet.                                      04:09PM

11      MR. BOJANOWSKI:  I don't know the answer to that, to

12   be honest with you.

13      THE COURT:  Anything for the record from the

14   plaintiffs on 44?

15      MS. KENDRICK:  Just that while it has improved from 15   04:09PM

16   percent, it's still non-compliant.  So we will continue to look

17   at this very closely and, perhaps, seek further orders from the

18   Court.

19      THE COURT:  Thank you.  45.  On-site diagnostic

20   services will be provided the same day if ordered stat or   04:09PM

21   urgent or within 14 calendar days if routine.

22      And we were looking with particular concern with

23   respect to Lewis and Tucson.

24      MR. BOJANOWSKI:  Lewis is at 89; Tucson is at 86.

25      THE COURT:  All right.                                 04:10PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1      I gather plaintiffs don't have anything for the record

2  on 45.

3      MR. FATHI:  Nothing, Your Honor.

4      THE COURT:  Thank you.

5      46.  A medical provider will review the diagnostic                04:10PM

6  report, including pathology reports, and act upon reports with

7  abnormal values within the five calendar days of receiving the

8  report at the prison.  And all but Yuma were in trouble here.

9      MR. BOJANOWSKI:  Douglas at 93; Eyman at 64; Florence

10 at 88; Lewis at 69; Perryville at 80; Phoenix at 66; Safford at   04:10PM

11 83; and Tucson at 81; Winslow at 97; and Yuma at 96.

12     THE COURT:  What do you have to say about the fact

13 that we're still out of compliance in a number of these

14 facilities?

15     MR. BOJANOWSKI:  I think I remember this one now.        04:11PM

16 This is the one where the doctors were not writing in the

17 record what it was that they were doing.  And if they didn't do

18 anything they just didn't write anything.  So they would review

19 the record, and then they wouldn't write any action taken.

20     And so what we've done is retrained all the doctors     04:12PM

21 and are trying to put forward a "no action required" or "no

22 action taken" something like that so that there's some notation

23 in the record that a decision was made that no action needed to

24 be taken.  And so that was the primary problem, was that

25 instead of saying something about not having to take action    04:12PM

1    they were just not putting anything in, because typically

2    that's what you would do.

3              THE COURT:  When did this training take place?

4              (Discussion off the record.)

5              MR. BOJANOWSKI:  All right.  So this has happened          04:13PM

6    within the last 30 or so days, but there's also what we did is

7    developed a new report that we can now run that will identify

8    these reports and we can then look and see what is happening

9    much quicker, so to speak, than our one-month delay in

10   monitoring.  The report is run daily.                              04:13PM

11             And then there are people designated to then contact

12   the site and talk to the providers to say, you know, did you

13   make a comment here, and if not, why not?  And then put in, if

14   you are not going take action, then actually put in there "no

15   action is to be taken."  So it's a daily check, so to speak, as   04:14PM

16   to what's being put into the medical record.

17             THE COURT:  Does that also mean that you have a real

18   time understanding of whether or not the 14th of July there are

19   people who are going without the service required by this

20   performance measure?                                              04:14PM

21             MR. BOJANOWSKI:  It's run on a daily basis.

22             THE COURT:  Do you feel that you now have a much

23   better sense about whether or not, I don't know if it's a

24   current matter on top of this one so we should expect to see

25   from what you have been seeing that things have already turned    04:14PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1    around?

2            MR. BOJANOWSKI:  That's the purpose of the report, so

3    we can get a little more real time and then actually address

4    the issue with the provider.

5            THE COURT:  Well, I mean, it seems to make perfect       04:14PM

6    sense to me on a number of these that you would call -- you

7    wouldn't wait for the sampling because some of them are readily

8    accessible.  You can find out for these people, this particular

9    performance measure seems ideally suited to that so that makes

10   sense to me.                                                      04:15PM

11           MR. BOJANOWSKI:  Right.  It's run daily so that we can

12   address the issue right away.

13           THE COURT:  And, again, that started a couple of weeks

14   ago?

15           (Discussion off the record.)                             04:15PM

16           MR. BOJANOWSKI:  I'd say within the last 14 days that

17   new report has been -- it was developed over some time, of

18   course, but now put into place.

19           THE COURT:  Anything from plaintiffs on the record in

20   this measure?                                                     04:15PM

21           MS. KENDRICK:  Oh, yes.

22           So Your Honor found them non-compliant with this

23   performance measure at eight institutions in May 2016.  They

24   submitted a remedial plan in June 2016 that was completely

25   inadequate and only focused on one institution.  They submitted  04:16PM

1    a second remedial plan in August 2016 that talked about adding

2    nursing staff to read reports to doctors.  As our expert, Dr.

3    Wilcox, has pointed out in his expert report at Docket 2103, he

4    felt that was a poor use of limited nursing time.  I'm glad to

5    hear that they have finally decided to start running these          04:16PM

6    reports and checking daily, but we are extremely troubled that

7    it is now 14 months later and they have now just finally

8    started doing this in the past 14 days.

9            THE COURT:  All right.  Thank you.

10           47.  Medical provider will communicate the results of      04:16PM

11   the diagnostic study to the inmate upon request and within

12   seven calendar days of the date of the request.

13           MR. BOJANOWSKI:  This is our infamous communique

14   issue.  All of the facilities, Your Honor?

15           THE COURT:  Please.                                        04:17PM

16           MR. BOJANOWSKI:  47.  Douglas is at 100; Eyman 40;

17   Florence, 55; Lewis, 32; Perryville, 88; Phoenix, 11; Safford,

18   not applicable; Tucson, 71; Winslow, 100; Yuma, 66.

19           THE COURT:  So as you heard, Mr. Bojanowski, off the

20   record when I was having a meeting, there was no court reporter    04:17PM

21   present but you were present as was plaintiffs' counsel, when

22   we were talking with the assistant warden at Perryville, at the

23   Rast unit, I believe, he didn't have any conception of what you

24   had said would be rolled out on the 21st was in place.

25           MR. BOJANOWSKI:  He probably wouldn't.                     04:18PM

1        THE COURT:  Well, he also -- maybe you didn't hear

2   this part of the conversation.  I was asking about the way that

3   such things could be communicated to prisoners, and it just

4   didn't seem to him that that was something that would work.  So

5   these numbers continue to be bad because you have obviously          04:18PM

6   only just imposed this new mechanism late in June so these

7   numbers don't reflect it.

8        Do you have any insight across the spectrum of the

9   different facilities about whether or not this process from the

10  printer to the inmate is presently working or not?                  04:18PM

11       MR. BOJANOWSKI:  I don't have an accurate sense of it,

12  Your Honor.  Because what I learned on our tour is that maybe I

13  need to look at each individual facility to figure out how they

14  are actually operating this communications system.  I was under

15  the impression that inmate mail was used as a matter of course.     04:19PM

16  That's what I had learned and thought was used at every

17  facility.  I need to confirm that.  I can find out what the

18  preliminary results are if maybe somebody I can speak with here

19  that might be able to add some additional information as to how

20  it's working so far since it's been in place for the past three     04:19PM

21  weeks.

22       THE COURT:  Right.

23       MR. BOJANOWSKI:  Two, three weeks.

24       THE COURT:  We heard yesterday that the person at

25  least in the courtroom yesterday didn't really know anything at     04:19PM

1    all about how this works on the ground.  I think you do need to

2    get a handle on this.  You need to get a handle on it both with

3    respect to what you say about the individual facilities.  I

4    mean, we have heard testimony now that reflects what is really

5    apparent that just checking with one isn't going to give you                    04:20PM

6    the answer about all of them, that everybody seems to be

7    running a different system in certain respects.  And I had

8    appreciated that, I thought, with respect to healthcare that

9    there was a greater centralization and cohesion because there

10   was a single contractor that was engaged in all the provision                   04:20PM

11   of services.  But apparently there are nuances with respect to

12   individual facilities that greatly affect how that care is

13   provided in the individual facilities.  So that clearly means

14   that one check doesn't give the answer across the board.

15         So because we have received in the past, meaning we,                      04:20PM

16   the Court, and the opposing -- the plaintiffs' counsel in the

17   case reports that reflect what may be true in one facility, but

18   then becomes evidently not true at least in one other, we need

19   to, again, implore you to do a better job of maybe making sure

20   what you are presenting to the Court is what's happening across                 04:21PM

21   the board.

22         MR. BOJANOWSKI:  My thinking was that I was going to

23   obtain declarations from each facility that could, perhaps,

24   detail this out and then submit that to the Court to provide

25   additional information for you.                                                  04:21PM

─── CV 12-601 - July 14, 2017 - Evidentiary Hearing ───

1      THE COURT:  I think that makes sense but I also think

2   it makes sense to confer with your client to make sure that

3   your client is all over the topic about whether or not this

4   mechanism is working.  Because if it continues not to work,

5   this is another big ticket item.                                04:21PM

6      MR. BOJANOWSKI:  Yeah.  It's something that we'll meet

7   with operations, because there is a certain aspect of

8   operations if it's an inmate mail system that may be involved.

9   So we want to make sure that that is running smoothly.  And

10  this is one that I will also probably -- well, not probably, I  04:22PM

11  will be involved in assuring that we move the ball forward.

12     THE COURT:  If you are going to put all your eggs in

13  this basket you better make sure the Easter Bunny is visiting

14  all the places.

15     MR. BOJANOWSKI:  Yes.                                        04:22PM

16     MS. KENDRICK:  So, Your Honor, you found them

17  non-compliant on Performance Measure 47 in October of 2016.  We

18  have spent the winter, the spring, and now the summer of

19  monthly hearing Mr. Bojanowski promise that in the next month

20  we're going to see improvements.  And plaintiffs' counsel, we   04:22PM

21  have reached a point where this is just beyond absurd.  I feel

22  like every month we hear that it is going to be fixed; that

23  things run in inmate mail; oh, no, it's going to be different;

24  oh, no, we're going to do this.

25     So we would propose that given the fact that one             04:22PM

UNITED STATES DISTRICT COURT

1   person yesterday was not able to answer any of your questions

2   about how this works operationally that the next time we have a

3   status hearing that defendants produce the person or persons

4   most knowledgeable about how this is working operationally so

5   that they can receive -- provide information to the Court and          04:23PM

6   plaintiffs' counsel and be questioned by both the Court and

7   plaintiffs' counsel.  Declarations alone are inadequate, and we

8   think at this point it has reached the point that the Court,

9   perhaps, needs to have some sort of evidentiary hearing about

10  what the heck is going on here.  Because this is just becoming      04:23PM

11  beyond absurd.

12          THE COURT:  Well, those comments are all fair, and it

13  may well be prudent for defendants to choose to bring such a

14  person.  The affidavits that are contemplated may address the

15  need.                                                              04:23PM

16          I have given you a lot of leeway on this because you

17  have told me about constructive -- not constructive.  That's

18  the wrong word -- actual mechanisms that when described sound

19  as though they will be ready answers to the problem.  And then

20  as plaintiffs' counsel observes, at each step we find out that    04:24PM

21  the promise of this ready solution is illusory.

22          And so it's one of those areas that because it's just

23  gone into place, unless you can show by affidavits or by having

24  somebody at the next status hearing that it really is working,

25  this is going to be one where I am going to be very inclined to   04:24PM

—— CV 12-601 - July 14, 2017 - Evidentiary Hearing ——

1    impose the additional sanction.

2         MR. BOJANOWSKI:  Thank you, Your Honor.

3         THE COURT:  50.  Urgent speciality consultations and

4    urgent specialty diagnostic services will be scheduled and

5    completed within 30 days of the consultation being requested by      04:24PM

6    the provider.  Florence?

7         MR. BOJANOWSKI:  51, Your Honor.

8         THE COURT:  So how do you do that?  How do you go from

9    a course of over the last number of months of being as low as

10   30 -- not 30.  That's previous years year.  As low as 48, 53,      04:25PM

11   and then the most recent month to be at 39 and then to make the

12   real step here?

13        MR. BOJANOWSKI:  After we investigated it, Your Honor,

14   we found that the problem really was not -- the problem lied

15   with not enough transportation.  And so what we have done is we      04:26PM

16   have taken -- Eyman had more transportation vehicles and

17   officers available, and so we have shifted the personnel over

18   from Eyman into Florence to pick up the slack on

19   transportation.

20        THE COURT:  Well, I have to say that such an      04:26PM

21   explanation doesn't seem completely absurd because you have

22   been able to comply with this requirement in other facilities.

23        MR. BOJANOWSKI:  Correct.

24        THE COURT:  And so you have made a conclusion that

25   it's a transportation issue, but again, I have to say on the      04:26PM

1    one hand it does seem credible; but on the other hand, it's

2    about -- it sure seems like there were a lot of vans yesterday,

3    and sure seemed like there was a lot of talk about not having

4    sufficient providers.  So again, I will hear I hear what you

5    say but I am dubious.                                           04:27PM

6         Plaintiffs.

7         MS. KENDRICK:  Yes, Your Honor.  We would just like to

8    observe for the record that according to defendant's CGAR data

9    the Eyman facility was non-compliant on this performance

10   measure with a January score of 77, a February score of 73, a  04:27PM

11   March score of 64, and in April they were 90 percent.  So our

12   concern is if they are moving the vehicles from Eyman over to

13   Florence but they are doing nothing but robbing Peter to pay

14   Paul, and so if it truly is a shortage of vehicles at the

15   Florence facility, that rather than taking away vehicles from   04:27PM

16   Eyman used to transport prisoners and potentially putting Eyman

17   into non-compliance, they should look at, perhaps, getting more

18   vehicles.

19        The last time we were here I believe they were

20   speaking about setting up some telemedicine and other specialty 04:28PM

21   consults using telemedicine with the University of Arizona.  I

22   don't know if there's any substantive update that can be

23   offered to us about how that attack plan is working to address

24   the issue.

25        MR. BOJANOWSKI:  That's still in place.  We're still      04:28PM

1    working on that.  We're trying to coordinate with the

2    University of Arizona as well.

3          As far as the transportation is concerned, it wasn't a

4    matter of not enough vans.  I guess it was a matter of mixing

5    the custody levels.  So we can take -- you know, in the van          04:28PM

6    there's room for, you know, maybe 12 or 15 people, whatever.

7    And so what we're doing is we're taking the same custody level

8    guys, so we'll fill half the van with Eyman guys and a half the

9    van with Florence guys to help boost the amount of

10   transportation available to get them to the outside consults.       04:29PM

11   So that's another thing that we're doing to address the issues.

12         THE COURT:  Well, this performance measure addresses

13   urgent specialty consultations.  We have heard how difficult it

14   seems to be to be able to obtain a consultation, so these

15   people who have vaulted the hurdle to obtain a specialty             04:29PM

16   consultation because the providers decided that it's medically

17   necessary and that it's urgent, that they are not happening

18   because of something within your control that is a motor pool

19   issue and staffing issue, I guess, with respect to correction

20   officers.  You say it's not just vans but it's associated with,     04:29PM

21   I gather, not having the same people together.  But that's the

22   reality.  You have got those people.  You have got to figure

23   out a way to get them or else, I guess is the answer.

24         I mean, again, we're not talking about requirements

25   that don't by their very word suggest a need to be really           04:30PM

1   concerned about this.  We're talking about urgent specialty

2   consultations.  And we're talking about what seems to be a

3   pretty generous leeway, and that's 30 calendar days and you are

4   not meeting that in less than -- in greater than half of the

5   sampled patients.                                              04:30PM

6        Anything additional from plaintiffs on this or do you

7   have your word on -- I see you are conferring.

8        MR. FATHI:  I'm sorry, Your Honor.  Nothing further on

9   this performance measure.

10       THE COURT:  And I misspoke, I think, when I said less     04:31PM

11  than half.  You are right.  I'm just a little bit -- you said

12  51, is that right?

13       MR. BOJANOWSKI:  Correct.

14       THE COURT:  I misspoke.  I'm store sorry about that.

15       51.  Routine specialty consultations will be scheduled    04:31PM

16  and completed within 60 calendar days of the consultation being

17  requested by the provider.  And Tucson is the one that was

18  singled out before on this one but we need to hear about the

19  others, Eyman and Florence, as well.

20       MR. BOJANOWSKI:  I will just go through.                  04:31PM

21       THE COURT:  Okay.

22       MR. BOJANOWSKI:  You want the whole list?

23       THE COURT:  Surely.  Go ahead.

24       MR. BOJANOWSKI:  Okay.  Douglas, 96; Eyman, 74;

25  Florence, 82; Lewis, 85; Perryville, 88; Phoenix, 77; Safford,  04:32PM

 1   93; Tucson, 88; Winslow, 100; and Yuma, 88.

 2          THE COURT:  So any explanation on this different

 3   presentation of these circumstances that seem to be somewhat

 4   related to the last topic?

 5          (Discussion off the record.)                           04:33PM

 6          MR. BOJANOWSKI:  I think Florence is still related to

 7   our transportation discussion.  Eyman has a new clinical

 8   coordinator, so that is part of the reason why the scheduling

 9   needed to be caught up, so to speak.

10          I'm not sure about Phoenix.  Phoenix may be an          04:33PM

11   extremely small sample size because Phoenix is the facility

12   where they come in and then they are usually out.

13          THE COURT:  Where the sample size is larger, can you

14   give me a ballpark idea of how many people are referred for

15   consultations, let's say, from Florence, Tucson, in a given    04:34PM

16   month, ballpark?  When a provider writes an order saying there

17   should be a specialty consultation, how many are we talking

18   about?

19          MR. BOJANOWSKI:  We don't know.

20          THE COURT:  Ballpark.                                   04:34PM

21          MR. BOJANOWSKI:  For the big facilities we don't know.

22   We're trying to look up the Phoenix number.  There's a rough

23   estimate of 40 to 50 a week.

24          THE COURT:  Okay.

25          MR. BOJANOWSKI:  So that would be 200 in a month.       04:35PM

1    THE COURT:  So the reason I'm asking about that is

2  because it suggests the utility of being able to take a look in

3  a real time basis rather than doing sampling that because you

4  run the exposure of having to have a much more egregious

5  situation if you enter into a sanction as opposed to having a          04:35PM

6  situation where you are identifying on a real time basis the

7  people who have had specialty consultations and taken care to

8  make sure that they get that accomplished within the days.

9  Because I think you should understand that I'm left, when we

10  get together at the OSC and I see a situation in the system          04:35PM

11  where you might want to make an argument that a particular unit

12  that I had identified should be excused from the sanctions

13  because it has shown return to progress where I see falloffs in

14  other areas, I'm disinclined to think you should get that

15  benefit there.  Because I think that the penalty should be          04:36PM

16  imposed for the foul that was done rather than any kind of

17  leeway given because you understand that it was an exception.

18  When it doesn't look like an exception, it doesn't get a good

19  argument for any kind of special dispensation.

20    Anything plaintiffs want to say on this one?          04:36PM

21    MS. KENDRICK:  Yes, Your Honor.  Just that these

22  performance measures, it's actually 50, 51 and 52 that deal

23  with specialists are things our expert discussed at length in

24  the report he filed with the Court on June 9th.  I would just

25  add that defendants have, again, been talking about working          04:36PM

1    with the University of Arizona.  And that was one thing that

2    our expert did recommend was working with the state's medical

3    schools and their affiliated groups since there is the state

4    law that restricts how much you can pay subcontractors to work

5    with state universities themselves.                           04:37PM

6            And we think that it would be extremely helpful if we

7    could actually get some specific concrete details with action

8    items about where they are in the process of working with the

9    University of Arizona.  I feel like for the past few months we

10   keep hearing, oh, we're meeting with them.  We're            04:37PM

11   operationalizing things.  Things are just coming.  Like really

12   concrete, like we have five neurologists.  We have four

13   urologists.  Like where are we on this?

14           THE COURT:  You are tired of the anticipatory words.

15   You want to hear action words.  And, in fact, you want to hear 04:37PM

16   past tense words, we did this.

17           MS. KENDRICK:  Yes.

18           THE COURT:  Instead of we're implementing,

19   negotiating, we're talking.  Do you have any insight where

20   those things stand with respect to the University of Arizona  04:37PM

21   right now?

22           MR. BOJANOWSKI:  I don't have an accurate status.  I

23   know there have been meetings.

24           THE COURT:  That's about as weak as it gets.  There

25   have been meetings.                                           04:38PM

1          MR. BOJANOWSKI:  Well, I simply don't know, okay.  I

2     am not trying to be flip here.

3          THE COURT:  No, and I'm being flip because I'm really

4     exasperated.  So I poke fun on it because it really is almost

5     laughable because we have heard it so much.  And it is fair for          04:38PM

6     everybody in this room to wonder when the rubber is going to

7     meet the road on this.

8          MR. BOJANOWSKI:  I know Dr. Faulhout has met with the

9     people from University of Arizona, I believe, this week.  I

10    know there were meetings scheduled last month which were          04:38PM

11    cancelled by the University because they couldn't meet.  They

12    had preliminary meetings back in May.  So it's not something

13    that we're just mouthing here.  I mean, it is actually

14    happening.  I just have not --

15         THE COURT:  Honestly, excuse me for interrupting, but          04:38PM

16    it doesn't really sound that way.  It really sounds like there

17    have been meetings talking about the general concept.  Nothing

18    you have said makes it sound like anybody has come to an

19    understanding or memorandum of understanding how it's going to

20    be done.  So that's a little bit different than I had taken          04:39PM

21    from your previous statements, which was that we were farther

22    down the road on that this and we were looking to it being put

23    in place.  I see you are talking to perhaps the person who

24    knows.

25         MR. BOJANOWSKI:  I'm trying to nail down maybe a          04:39PM

—— CV 12-601 - July 14, 2017 - Evidentiary Hearing ——

1    little more detail.

2            THE COURT:  Please.  I'm not criticizing you for

3    talking to her.  I was stopping to give you a chance to

4    continue that.  So please do.

5            (Discussion off the record.)                    04:40PM

6            MR. BOJANOWSKI:  Best information we have is we have a

7    contract with the University of Arizona.  There are 11

8    speciality areas which we have identified as those that we

9    would like to tap into.  And Dr. Faulhout had meetings as of

10   today, in fact, to address those specialty areas that we would  04:40PM

11   like to tap into.  But they have not talked to her since that

12   meeting and so that's kind of where it's at.

13           THE COURT:  Okay.

14           MS. KENDRICK:  Your Honor, I would just like to add

15   something.  In November of 2015, many of the people in this    04:40PM

16   room were in Sacramento, California for a Ninth Circuit meeting

17   about prison litigation that Judge Pyle from this Court was

18   leading.  And I was present at it, and I remember long

19   discussions about how there was going to be collaboration with

20   the University of Arizona.  And it is profoundly troubling that  04:41PM

21   Mr. Bojanowski continues to use the future tense and the

22   subjunctive tense when talking about these 11 specialities that

23   they would like to tap into.

24           Our understanding, because Ms. Eidenbach has attended

25   some of the subsequent meetings convened by Judge Pyle is that  04:41PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1   mental health is actually only specialty that is anywhere close

2   to being in place.  So again, we reiterate that we would like

3   some sort of detailed information listing the specialties,

4   listing the deadlines, listing exactly what is going on rather

5   than just having people going around and having lots of meeting        04:41PM

6   which they have now been doing for going on two years.

7           THE COURT:  Granted.  Mr. Bojanowski, would you kindly

8   at the next status hearing be prepared to provide a concrete

9   update on where things stand with respect to this telemedicine

10  program with the University of Arizona?                                 04:42PM

11          MR. BOJANOWSKI:  I would be happy to.  I would note

12  for the record we are currently utilizing infectious disease as

13  a subspecialty, so although the other 11 have been identified

14  and such, we are actively utilizing that resource as we speak.

15  So I will be more than happy to provide that update and keep           04:42PM

16  the Court informed.

17          THE COURT:  All right.  So 52.  This is speciality

18  consultation reports will be reviewed and acted upon by a

19  provider within seven calendar days of receiving a report.

20          MR. BOJANOWSKI:  You want all the facilities, Your            04:42PM

21  Honor?

22          THE COURT:  Please.

23          MR. BOJANOWSKI:  This is 52?

24          THE COURT:  Yes.

25          MR. BOJANOWSKI:  Douglas, 100; Eyman 56; Florence, 71;        04:42PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1    Lewis, 66; Perryville, 85; Phoenix, 70; Safford, 95; Tucson,

2    88; Winslow, 100; Yuma, 94.

3              THE COURT:  So we have talked about this issue at

4    length.

5              MR. BOJANOWSKI:  This is part of that new exception    04:43PM

6    report thing that we discussed, I think, a couple measures ago.

7    So it's the same thing.

8              THE COURT:  Anything plaintiffs would like to add?

9              MS. KENDRICK:  Your Honor, just the same as before,

10   that we note that their report on the past 30 days at Florence    04:43PM

11   also shows that they only had 24 percent compliance at that

12   institution with regard to your order.

13             THE COURT:  54.  Chronic disease inmates will be seen

14   by a provider as specified in the inmate's treatment plan no

15   less than every 180 days unless the provider documents a reason    04:44PM

16   why a longer time frame can be in place.

17             And we previously identified Eyman and Florence as

18   being of particular concern with respect to 54.

19             MR. BOJANOWSKI:  I'm sorry, Your Honor, which number?

20             THE COURT:  54.    04:44PM

21             MR. BOJANOWSKI:  54.  Eyman and Florence.  Eyman is

22   33; Florence is 59.

23             THE COURT:  How about the others?

24             MR. BOJANOWSKI:  Douglas is at 90; Lewis at 86;

25   Perryville at 97; Phoenix at 92; Safford at 97; Tucson at 89;    04:45PM

1    Winslow at 100; Yuma at 94.

2            This we think was a provider issue so have we added

3    to --

4            THE COURT:  Provider issue meaning that you can't find

5    anybody to do it?                                          04:45PM

6            MR. BOJANOWSKI:  No.  We have new people that we have

7    hired.  Two new people have been brought on and added

8    telemedicine -- two a day telemedicine clinics have been added.

9            THE COURT:  Who are these -- are these going to

10   providers at other facilities?  Is that who these calls are    04:46PM

11   going to?  Is that the kind of telemedicine you are using or

12   what is it exactly?

13           DR. TAYLOR:  Not at other facilities.

14           THE COURT:  Who are they calling, the telemedicine.

15           MR. BOJANOWSKI:  The telemed is something where the    04:46PM

16   patient shows up in a room --

17           THE COURT:  Right.  I'm wondering who the resource is

18   they are using because we have been talking about telemedicine

19   resources in the University of Arizona.  You have talked in the

20   past about telemedicine resources where the call is received by    04:46PM

21   a provider at another one of the prison institutions.  I'm

22   trying to understand who these calls are going to because you

23   are telling me that you are now using this as a method, and I

24   want to understand it better.

25           MR. BOJANOWSKI:  Corizon providers.  They are in other    04:46PM

1     states, maybe?  They are providers that do telemedicine.

2     That's apparently their business.  And, well, they are Corizon

3     employees.  They are not at another prison.

4          THE COURT:  Have you figured out why it is that these

5     numbers are so bad?  Is it a problem of identifying the need to      04:47PM

6     make sure that's happening within this time period, or was it a

7     problem that you didn't have locally to providers and you

8     turned to this system to do it?  What is the nut of the

9     problem, basis of the problem?

10         MR. BOJANOWSKI:  Eyman was down providers for a period      04:47PM

11    of time, and so that's -- so we boosted them.

12         THE COURT:  This is kind of where the first infliction

13    upon the multiple performance measures because I can imagine

14    people, when they've got fires in front of them but smoldering

15    in, these chronic people are smoldering, really, but they are      04:48PM

16    not acute so they are not fires.  If you don't have enough

17    people to deal with the fires, as we have heard about, I

18    imagine the smoldering people would get the last resource.

19         MR. BOJANOWSKI:  So the two new providers and then the

20    telemed increase.      04:48PM

21         THE COURT:  All right.  Plaintiffs.

22         MS. KENDRICK:  Just a couple observations, Your Honor.

23    First of all, with Performance Measure 54 at Eyman, this is one

24    of the measures and institutions subject to your November 2016

25    outside providers order.  So we, again, would reiterate that we      04:48PM

1   would like defendants to provide some more specificity and

2   detail preferably under penalty of perjury in writing about

3   exactly all steps they have taken with Eyman to achieve

4   compliance, because they have not.

5           We're also concerned to the extent this is attributed          04:49PM

6   to the fact that new providers are not trained.  We would

7   certainly hope that individuals are trained before they start

8   seeing and treating patients.  And finally, to the extent that

9   they are apparently using Corizon contracted providers across

10  the country to see patients via telemedicine that defendants          04:49PM

11  provide, in writing, confirmation that all of these providers

12  who are providing treatment via telemedicine are actually

13  licensed to practice in the State of Arizona.

14          THE COURT:  Well, the monitoring of this performance

15  measure would answer that question, wouldn't it, because the          04:49PM

16  provider, the qualifications of the provider are specified or

17  not?

18          MS. KENDRICK:  We don't know.

19          THE COURT:  Is it a requirement to what you just asked

20  for of the stipulation?                                               04:49PM

21          MS. KENDRICK:  Well, the requirement is under Arizona

22  state law that individuals who are practicing medicine in the

23  State of Arizona have to have a license to practice medicine.

24          MR. BOJANOWSKI:  And they do.

25          THE COURT:  All right.                                        04:50PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1          MS. KENDRICK:  So we would like confirmation of that

2     in writing rather than just the avowal of counsel.

3          THE COURT:  We have just had that avowal, and Mr.

4     Bojanowski is to be taken at his word for that kind of

5     statement because there's no wiggle room there.                    04:50PM

6          MR. BOJANOWSKI:  That's correct.

7          THE COURT:  If we find out obviously then --

8          MR. BOJANOWSKI:  I will get my toothbrush.

9          THE COURT:  Fair enough.  Fair enough.

10          Well, this is one of the measures that I'm going to be    04:50PM

11     considering.  And again, it's one where it becomes pretty easy

12     for me to identify the ones where there hasn't been compliance

13     and sort of understand why it is.  So we will be visiting this

14     issue.

15          66.  In an IPC medical provider encounters will occur     04:50PM

16     at a minimum of every 72 hours.

17          MR. BOJANOWSKI:  You want all the facilities?

18          THE COURT:  Please, with a particular focus, of

19     course, on Florence, Lewis, and Tucson, but all of them please.

20          MR. BOJANOWSKI:  I will go through the facilities that    04:51PM

21     have IPCs because the rest of them are not applicable.

22          THE COURT:  Okay.

23          MR. BOJANOWSKI:  Florence is 50 percent; Lewis is 90

24     percent; and Tucson is -- or excuse me -- Perryville is 100

25     percent; and Tucson is 90 percent.                              04:51PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1          THE COURT:  So what's going on at Florence?

2          MR. BOJANOWSKI:  This is one where I think we

3     structurally changed the rounds to make them shorter so that --

4     because what was happening was they would do -- because it was

5     a 72-hour thing, they were doing the rounds at hour 75 or 76,          04:52PM

6     something like that, I believe.  Yes.  So what we have done is

7     we have shortened the requirement for rounds to --

8          THE COURT:  I think we heard that last month.

9          MR. BOJANOWSKI:  -- to a 48-hour.

10          THE COURT:  So I think if I remember, I should have it          04:52PM

11    in front of me in writing, but I don't.  On this particular one

12    it seemed to me that when you said you were doing that is after

13    the time of even May.

14          MR. BOJANOWSKI:  Right.

15          THE COURT:  Let me ask plaintiffs if they have a          04:52PM

16    better recollection than I do.

17          MS. KENDRICK:  We're actually looking at the

18    transcript, Your Honor.

19          THE COURT:  Okay.  Thank you.

20          MS. KENDRICK:  Your Honor, Mr. Bojanowski told you          04:52PM

21    last month that the every 48 hours rounds had started in May.

22    It's at Line -- Page 38, Line 19.  He said, "It started in May,

23    Your Honor."  You said, "When?"  He said, "In May."  You said,

24    "But when?"  And he said, "End of May."

25          THE COURT:  All right.          04:53PM

**CV 12-601 - July 14, 2017 - Evidentiary Hearing**

1           MR. BOJANOWSKI:  That's correct.

2           THE COURT:  So that's where we were.  You will have to

3  --

4           MS. KENDRICK:  But he also said -- I'm sorry.

5           THE COURT:  Go ahead.                                      04:53PM

6           MS. KENDRICK:  It was only going to happen at

7  Florence.  Did you wind up doing at all of them?

8           MR. BOJANOWSKI:  I think it's a system-wide.

9           THE COURT:  Could you check and ask?

10          MR. BOJANOWSKI:  Yes.  We implemented it system-wide    04:53PM

11 because we didn't want anyone else to fall off.

12          THE COURT:  We'll look to see.  June should be

13 critical on this one.

14          MR. BOJANOWSKI:  We think we'll see some good results

15 in June.                                                           04:53PM

16          THE COURT:  80.  MH-3A prisoners shall be seen a

17 minimum of every 30 days by mental health clinician.

18          MR. BOJANOWSKI:  You want all the facilities, Your

19 Honor?

20          THE COURT:  Please.                                       04:53PM

21          MR. BOJANOWSKI:  Douglas, not applicable; Eyman, 100;

22 Florence, 100; Lewis, 96; Perryville, 93; Phoenix, 100;

23 Safford, not applicable; Tucson, 95; Winslow, not applicable;

24 Yuma, 100.

25          THE COURT:  The world we want to be in.                   04:54PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1      85.  MH-3D prisoners shall be seen by a mental health

2  provider within 30 days of discontinuing medication.

3      MR. BOJANOWSKI:  Douglas, not applicable; Eyman, 100;

4  Florence, 91; Lewis, 93; Perryville, 91; Phoenix, not

5  applicable; Safford, not applicable; Tucson, 92; Winslow, not      04:54PM

6  applicable; Yuma, 94.

7      THE COURT:  Good.  92.  MH-3 and above prisoners who

8  are housed in a maximum custody unit shall be seen by a mental

9  health clinician for a one-to-one or group session a minimum of

10  every 30 days.      04:55PM

11      MR. BOJANOWSKI:  Douglas, not applicable; Eyman, 100;

12  Florence, 95; Lewis, 95; Perryville, not applicable; Phoenix,

13  100; Safford, not applicable; Tucson, not applicable; Winslow,

14  not applicable; Yuma, not applicable.

15      THE COURT:  Again, good.      04:55PM

16      93.  Mental health staff not to include LPNs shall

17  make weekly rounds of all MH-3 and above prisoners who are

18  housed in maximum custody.

19      MR. BOJANOWSKI:  Douglas, not applicable; Eyman, 95;

20  Florence, 100; Lewis, 100; Perryville, not applicable; Phoenix,      04:56PM

21  100; Safford, not applicable; Tucson, not applicable; Winslow,

22  not applicable; Yuma, not applicable.

23      THE COURT:  Okay.  94.  All prisoners on a suicide or

24  mental health watch shall be seen daily by a licensed mental

25  health clinician or on weekends or holidays by a registered      04:56PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1     nurse.

2              MR. BOJANOWSKI:  Douglas, 100; Eyman, 100; Florence,

3     80; Lewis, 90; Perryville, 93; Phoenix, 87; Safford, 100;

4     Tucson, 88; Winslow, 100; Yuma, 80.

5              MR. FATHI:  I'm sorry, Yuma?                        04:57PM

6              MR. BOJANOWSKI:  80.

7              THE COURT:  And what did you have to say with respect

8     to Florence and Yuma?  Not Florence.  What was the other -- it

9     was Florence.  Florence and Yuma then.

10             MR. BOJANOWSKI:  At Florence there were three people   04:57PM

11    out of the 15 pulled that were not seen on a holiday.  Were

12    they not seen altogether?  They were not seen on a holiday.

13    That's why that score is where it is.

14             And Yuma was that there were three people whose charts

15    did not reflect that they were offered the confidential        04:58PM

16    meeting.  So because it wasn't documented that they were

17    offered the confidential setting, they were marked as a fail.

18             THE COURT:  These first three that you describe who

19    completely fell off the map when they are on a mental health or

20    suicide watch. . .                                            04:58PM

21             MR. BOJANOWSKI:  Apparently there was some

22    miscommunication between mental health and nursing.  Nursing

23    thought mental health was doing it.  Mental health thought

24    nursing was doing it.  Now mental health is just doing it.

25             THE COURT:  It is fair to say, Dr. Taylor, you are all  04:59PM

1    over that?  All right.  One of the things that that raises is

2    with respect to the issue that we addressed two times ago, I

3    think, and that was with respect to making sure that there was

4    specific training that the people on suicide watch were getting

5    the services required, that by the stipulation and that we made         04:59PM

6    sure and heard testimony in court that that training had been

7    provided.

8         I wanted to follow up on that just for a brief moment

9    right now and ask what kind of steps have been taken to make

10   sure that when new people come on board who weren't present for        04:59PM

11   that visit, the phone calls, first I asked for phone calls and

12   ended up with personal visits of which I was thankful for, that

13   those other follow-on people who have to do this are getting

14   the word.

15        Please.                                                            05:00PM

16        MR. BOJANOWSKI:  Dr. Calcote, I believe, was doing the

17   training.

18        THE COURT:  Yes.  Thank you, sir.

19        DR. CALCOTE:  We are bringing them in to training when

20   they begin their employment with us, and we are going over that        05:00PM

21   specific training.

22        THE COURT:  So part of the materials that you review

23   with them is focused on this particular issue?

24        DR. CALCOTE:  Yes.

25        THE COURT:  Okay.  Thank you, sir.                                 05:00PM

1          Did I miss any, counsel?

2          MR. FATHI:  There are some additional performance

3    measures, Your Honor, but may I approach before we discuss

4    Number 94?

5          THE COURT:  Yes.                                          05:00PM

6          MR. FATHI:  Your Honor, what I have handed you is a

7    notice that we saw in the clinic at the Phoenix facility during

8    our tour there on June 15th.  And this raises some concerns

9    about the reliability of the numbers we were being given to the

10   extent that staff are being told to write in the record,        05:01PM

11   apparently, regardless of the actual facts, quote, "Offer to

12   confidential setting and the inmate refused," end of quote.

13         THE COURT:  Can I stop you right there?

14         MR. FATHI:  Of course, Your Honor.

15         THE COURT:  We don't know whether or not what you said    05:01PM

16   is true and that this is training a parrot.  It sure looks that

17   way, I have to say, so it's very troubling.  So this kind of

18   statement where you write -- use this bolded in all caps exact

19   sentence for writing the setting in subjective note and then

20   giving the exact words without any mention at all about what    05:02PM

21   would be the exercise of clinical judgment on an individual

22   basis, does seem to suggest what you suggest.  Again, I don't

23   know for sure whether it was -- whether there was some other

24   overlay that would interfere, but I will have to say if I went

25   around and I saw if I expected somebody to do a quality         05:02PM

1    analysis and I saw whenever you are presented with this problem

2    make sure you say these words, I would be troubled about it.

3            MR. FATHI:  And I would also add, Your Honor, as you

4    may recall from our discovery call on Monday that it is

5    defendants' position that other than some notes from Dr.                   05:02PM

6    Leonard, which we have still not been provided, these are

7    literally the only written instructions that have been provided

8    statewide in terms of conducting the watches required by Number

9    94.

10            Secondly, obviously, the risk of suicide doesn't come          05:03PM

11   and go with holidays.  To the extent that this is not happening

12   because it's a holiday, that's very concerning.

13            Finally, Florence has been non-compliant on this

14   measure for five of the last six months.  And so, again, given

15   the critical life and death importance of this measure we're        05:03PM

16   very concerned about the continued non-compliance at Florence

17   in particular.

18            THE COURT:  Defendants' response?

19            MR. BOJANOWSKI:  The exhibit that you were provided,

20   Your Honor, is a reminder to them as to what they are supposed      05:03PM

21   to do, not an automatic entry that's to be put in without the

22   use of clinical judgment.  It's not the way they are trained

23   and that's not what was happening.  The problem we faced was we

24   don't want people getting creative with the entries.  If that's

25   what they are doing out there, we need consistency as far as        05:04PM

1    look, you offer the person a confidential setting.  If they

2    decline then that's noted in the record.  We were having a lot

3    of difficulty in making sure that people were making the offer

4    and then documenting it in the record.  So as a reminder, we

5    posted it on the wall.                                        05:04PM

6        THE COURT:  This particular issue of the presentation

7    of an opportunity to have a confidential conversation and the

8    inmate refused is one that has been implicated previously with

9    respect to some credibility issues with respect to the

10   monitoring.  This doesn't help that.  Because as I look at it,  05:04PM

11   I don't see anything but these words, and this is the reminder.

12   So fix this.  Make it so that if there is a reminder that it

13   says you are required to put forth your honest clinical

14   assessment and make a statement about the situation of whether

15   or not the inmate was offered a confidential setting and the   05:05PM

16   inmate refused.  I really do think that this kind of

17   instruction to use the exact sentence could be taken by people

18   to mean you are to do this no matter what.

19       MR. BOJANOWSKI:  We'll remove them, and then if we

20   need a reminder poster we'll add additional language.          05:05PM

21       MR. FATHI:  Your Honor, I would move the admission of

22   this document as plaintiff's next in order, I believe 10.

23       THE COURT:  I'd like to have this a part of the

24   record.  Is there any foundation objection to it?  Do you admit

25   this is the one that was up?                                   05:06PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1     MR. BOJANOWSKI:  It was a poster that was up in one of

2     the treatment rooms.

3          THE COURT:  It will become part of the record.  Thank

4     you.

5          MR. FATHI:  Last remaining performance measure, I          05:06PM

6     believe, is Number 98.

7          THE COURT:  Thank you.  And the reason I didn't get to

8     it is somehow the last one -- can you read into the record, Mr.

9     Fathi, what 98 is, please?

10         MR. FATHI:  Yes, Your Honor.  Mental health HNRs shall     05:06PM

11    be responded to within time frames set forth in the mental

12    health technical manual revised 4/18/14, Chapter 2 Section 5.

13         THE COURT:  Okay.

14         MR. BOJANOWSKI:  Are you ready, Your Honor?

15         THE COURT:  I am ready.  Please.                           05:07PM

16         MR. BOJANOWSKI:  Douglas, 75; Eyman, 96; Florence, 93;

17    Lewis, 95; Perryville, 85; Phoenix, 86; Safford, 80; Tucson,

18    85; Winslow, 93; Yuma 98.

19         THE COURT:  Douglas and Safford are failing?

20         MR. BOJANOWSKI:  Yes.  It has to do with when -- is it     05:07PM

21    a classification change?  So there were four inmates that we

22    looked at.  And when they get transferred because of the level

23    of care that's available at the small facilities, as soon as

24    there is a need then they are transferred.  And what ends up

25    happening is that when they get transferred, then they are not  05:08PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1    seen within time frames but it's not counted against the place

2    where they are transferred to, it's counted against the place

3    they are transferred from.  So what ends up happening is the

4    smaller facility has somebody that has an acute need.  They get

5    transferred, but the receiving facility may see them too late        05:08PM

6    within time frames and it's counted against the sending

7    facility.  That's why you have the numbers at the two small

8    facilities, Douglas and Safford.

9              THE COURT:  Mr. Fathi, any response?

10             MR. FATHI:  Your Honor, these are not terribly small        05:08PM

11   facilities.  But in any event, it is concerning that they are

12   falling below the compliance threshold.  We will see what

13   happens next month, I guess.

14             THE COURT:  All right.

15             MR. FATHI:  Your Honor, I believe Ms. Kendrick had          05:09PM

16   something to add on Performance Measure 94.

17             THE COURT:  Thank you.

18             MS. KENDRICK:  Your Honor, I was trying to -- I spoke

19   with our named plaintiff, Mr. Swartz, on Wednesday, and he

20   reported to me that on July 3rd when he was in max custody           05:09PM

21   mental health came to his cell and offered to talk to him and

22   he said he only wanted to speak confidentially in a

23   confidential setting, and they told him that they could not do

24   that.

25             So while we were talking, I attempted to pull up his       05:09PM

1    record to see if there was an entry for July 3rd that explained

2    that.  There's no entry for a mental health contact on July 3rd

3    in the max custody.  But I do want to share with the Court that

4    that was what our named plaintiff reported to us two days ago,

5    was that when he requested a confidential encounter he was told     05:09PM

6    it could not be done.  Unfortunately, it's not recorded in his

7    medical record.

8        THE COURT:  We have now given you the opportunity to

9    articulate this concern to the defendants.  I think it's

10   reasonable for this particular incident to be addressed, and so    05:10PM

11   I understand you do have a mechanism whereby you do raise these

12   issues that come up.  So I would ask you to pursue that with

13   the defendants and see what the answer is.

14       MS. KENDRICK:  We shall.

15       THE COURT:  Thank you.  Couple of things:  First, Mr.          05:10PM

16   Fathi, from yesterday, you said that you needed two weeks to

17   get the medications.  Having heard now about how exposed people

18   are to the temperature extremes that seem to be present, is

19   there any possible way that somebody else in your office could

20   get that list of medications to Ms. Rand so we could accelerate    05:10PM

21   this process?

22       MR. FATHI:  Of course, Your Honor.  I appreciate your

23   acknowledgment of the seriousness of this and we will make that

24   happen, shall we say, by next Thursday which would be one week

25   from our discussion.                                               05:10PM

1          THE COURT:  Okay.  And Ms. Rand said she would be able

2     to get that report back to you within a week.  I will hope that

3     that's still the circumstance given that we have accelerated in

4     terms of when it would fall for her responsibility.  If there's

5     some issue with that, you all get on the phone together, give          05:11PM

6     me a call, and I will take it up.

7          Next time that we meet, I wonder -- well, I would ask,

8     please, Mr. Bojanowski if you could give me an update with

9     respect to the status of whether or not the ADA reconstruction

10    that we heard about today that you seem to suggest was               05:11PM

11    happening next door to the new location of the facility.  I am

12    concerned about the impediment to healthcare that is respected

13    in the stipulation with respect to what is now your position

14    the starting point of many of the measures timing-wise, and

15    that is the presentation to the facility.  If it's so far away     05:12PM

16    from where these ADA people are located that would seem to be

17    an issue.  And I would like -- you have suggested to me that

18    maybe it had been moved because all people were going to be

19    moved in closer proximity.  If you could be prepared to address

20    that.                                                               05:12PM

21         I also wanted you to address the issue that we heard

22    today about the placement of the medical refill box to a place

23    so far away from everyone in a place that is inaccessible to

24    them when there's a lockdown as opposed to where it was

25    previously outside the dining hall where people would have        05:12PM

1    access three times a day to it.

2         Then on the temperature issue, have the plaintiffs

3    been receiving these reports Ms. Rand had on her desk, it

4    sounded like yesterday on the telephone call?

5         MR. FATHI:  No, Your Honor.  Just by way of          05:13PM

6    background, during the pre-settlement phase of this case, we

7    requested temperature logs.  The defendants refused.  Judge

8    Wake ultimately compelled their production.  So we have

9    received them in the past, and I can certainly attest to the

10   Court that they showed temperatures, I believe certainly in the   05:13PM

11   90s and in some cases interior temperatures over 100.  But we

12   have not received them recently, and we would ask that we begin

13   to receive them.

14        THE COURT:  Mr. Bojanowski, could you please resume

15   the providing of these reports that are prepared with respect   05:13PM

16   to what the temperatures are?

17        MR. BOJANOWSKI:  Yes.  I will be in contact with Ms.

18   Rand, who is the point person on production of documents, and

19   indicate to her that the Court wants the temperature logs to be

20   provided.                                                 05:13PM

21        THE COURT:  All right.  Thank you.  We won't be able

22   to get to the max custody issue today as we had hoped, and so

23   maybe the next time that we meet we'll have Ms. Love present as

24   well as Ms. --

25        MR. FATHI:  Fettig.                                  05:14PM

1          THE COURT:  Thank you.

2          MR. FATHI:  Just by way of clarification, Your Honor,

3     certainly if you need to hear more we're happy to accommodate

4     that.  From plaintiffs' perspective, the motion that is

5     listed --                                                      05:14PM

6          THE COURT:  I know, but it's also there are parts of

7     that motion that are plainly, to me, I have heard, works in

8     progress and people have made progress.  So I just wanted to

9     make sure that -- I mean, I think I know what the nut of it is,

10    but I also wanted to give, as defendants asked, the opportunity  05:14PM

11    for them to be heard.  We don't have the chance for that to

12    happen today.

13         MR. FATHI:  That's fine, Your Honor.

14         THE COURT:  Now, the next time we're scheduled to be

15    in court is on the 9th of August, and that would be for the    05:14PM

16    normal report for us to be able to hear the June numbers.  I

17    contemplated that it would also be the time that I would set

18    the OSC with respect to the violations that were identified as

19    being subject to the $1,000 violation sanction.  I'm concerned

20    somewhat in light of how long things have taken today as we    05:15PM

21    worked through the performance measures and the arguments that

22    I have heard whether one day would not be enough to accomplish

23    our normal agenda and this topic as well.  But I need to ask

24    counsel's input on that.

25         The alternative is we could schedule some time on the     05:15PM

1    day before, on the 8th of August as well.  But I think

2    otherwise, we're kind of locked into the 9th as the only other

3    available time.

4            MR. FATHI:  Your Honor, just by way of information, I

5    am certainly not indispensable but I am unfortunately not          05:15PM

6    available on either of those days.  Ms. Kendrick is, and

7    therefore if that day works for everyone else we're happy to

8    proceed.

9            THE COURT:  Ms. Kendrick, what's your sense about how

10   much time?  You, between now and then, will have an opportunity    05:16PM

11   to respond to the defendants' report, and they would have an

12   opportunity to reply as well.  We will make sure that that

13   happens.  We'll figure out a schedule for that to happen.

14           But then for the day of the hearing, do you think in

15   light of what your understanding is of the other items that        05:16PM

16   would come up for consideration as agenda topics on our monthly

17   meeting would crowd out that or we could accomplish it all on

18   one day?

19           MS. KENDRICK:  Were you thinking of also having those

20   three witnesses testify?                                           05:16PM

21           THE COURT:  Goodness.  You are right.  That slipped my

22   mind.  That's why I started down thinking about the additional

23   day.  I lost that thought in my mind.  Thank you for reminding

24   me.

25           So we've got three things we need to accomplish.  And      05:17PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1   I wonder if it is just readily apparent that we need more than

2   one day to do that.

3          MS. KENDRICK:  Mr. Bojanowski may have a different

4   idea, but I think if maybe like the afternoon of the 8th we did

5   those three witnesses.                                              05:17PM

6          MR. BOJANOWSKI:  I'm not quite sure based on what was

7   testified to today whether that would be the only witnesses we

8   would bring in given the scope of what they have discussed,

9   because there were issues that were discussed here, quite

10  frankly, that the three witnesses we have would have no          05:17PM

11  knowledge of.  And so as I indicated at the beginning of the

12  hearing, we are going to have to evaluate that and make a

13  determination.

14         THE COURT:  And plaintiffs will also have to evaluate

15  the discovery they receive.                                        05:17PM

16         MR. BOJANOWSKI:  As well as documents.

17         THE COURT:  Are counsel available on the 8th?  I know

18  you are not, Mr. Fathi, but otherwise are counsel available for

19  us to set that day for the resumption of the hearing and then

20  we will turn, as soon as we complete that task, to the other    05:18PM

21  issues that we have understanding that if we can't finish it on

22  one day we have the 9th also available?

23         MS. KENDRICK:  Yes, sir.  I would be available all day

24  on August 8th and August 9th.

25         THE COURT:  Mr. Bojanowski.                                 05:18PM

1          MR. BOJANOWSKI:  I will make myself available.

2          MS. LOVE:  I'm available, Your Honor.

3          THE COURT:  Thank you.

4          MS. KENDRICK:  So were you thinking one of the days

5     would be the continuation of the evidentiary hearing and the          05:18PM

6     other --

7          THE COURT:  I thought we would do it on the 8th at 9,

8     we would resume with the witnesses that weren't heard from

9     today and also hear any other witnesses that are necessary in

10    light of Mr. Bojanowski's point.  If you all can't agree about          05:18PM

11    that get on the phone with me and we'll, together, discuss it.

12    But the idea is that the first order of business on the 8th

13    will be the resumption of these witnesses and possible

14    additional witnesses on these topics that we had addressed

15    today.          05:19PM

16          And then when we finish with that we'll turn next to

17    the status report from June, and then we'll turn to the order

18    to show cause hearing on the sanctions and any other agenda

19    items that parties would want to raise.

20          MR. FATHI:  Your Honor, would the Court establish a          05:19PM

21    briefing schedule for the order to show cause?

22          THE COURT:  Yes.  So you need how much time, do you

23    think, to respond to what the defendants have presented?

24          MR. FATHI:  Well, Your Honor, it was my assumption

25    that the defendants would want to file a brief in response to          05:19PM

1    the order to show cause, and then we would respond.  But

2    obviously --

3         THE COURT:  Well, they have given us a report saying

4    the number of people who are involved.  And it seems to me if

5    you have got issues about the numbers that have been reported          05:20PM

6    you can articulate those in your response and also make any

7    argument you would like to make as to why you think sanctions

8    should be imposed.  And then in the reply, defendants will have

9    the opportunity to rebut any argument that you have made and to

10   also make their argument as to why they think sanctions                05:20PM

11   shouldn't be, understanding that both sides will have the

12   opportunity to tell me in open court their respective

13   positions.

14        MR. FATHI:  So the concept, Your Honor, is that we

15   file a brief responding to their numbers and then they file a         05:20PM

16   brief?

17        THE COURT:  You file a brief responding to their

18   numbers and also, if you wish, asserting as to why you think

19   sanctions should be imposed, and then they will have an

20   opportunity in their reply to address anything you have said.         05:20PM

21        MR. FATHI:  That's fine.

22        THE COURT:  How much time do you need?

23        MR. FATHI:  May we have a moment?

24        THE COURT:  Of course.

25        MR. FATHI:  Your Honor, could we have two weeks?                 05:21PM

**CV 12-601 - July 14, 2017 - Evidentiary Hearing**

1          THE COURT:  So two weeks from today would be the 2nd

2    or 3rd.

3          MR. FATHI:  28th of July, Your Honor.

4          THE COURT:  28th of July.  And then if we gave you --

5    if we gave you to the 7th, Mr. Bojanowski, would that be too          05:21PM

6    tight for you?

7          MR. BOJANOWSKI:  Is that two weeks after?

8          THE COURT:  No, it's not.

9          MR. BOJANOWSKI:  I'm trying to feverishly pull up my

10   calendar.                                                             05:21PM

11         THE COURT:  It's about -- the 28th would be the 10th,

12   and I'm talking about giving you until the 7th.

13         Can we make it 10 days on the plaintiffs' side?

14         MR. FATHI:  I hesitate only because I'm out on

15   vacation next week, Your Honor.                                       05:22PM

16         THE COURT:  All right.

17         MR. FATHI:  Could we split the difference and say July

18   26th?

19         MR. BOJANOWSKI:  Deal.

20         THE COURT:  Sure.  And we will ask you to do it on the          05:22PM

21   26th so that means looks like everybody is getting equal time

22   if the defendants send theirs in on the 7th.  Am I reading

23   right?

24         MR. BOJANOWSKI:  Right.  On the 7th.

25         THE COURT:  Am I reading what I just said to be about           05:22PM

CV 12-601 - July 14, 2017 - Evidentiary Hearing

1    equal time?

2              MR. BOJANOWSKI:  I'm not good at math.

3              MR. FATHI:  I believe it is 12 days for each side,

4    Your Honor.

5              THE COURT:  The numbers are small here on this little      05:23PM

6    calendar before my eyes.

7              All right.  Anything anybody else needs to raise at

8    this moment?

9              MR. FATHI:  Your Honor, we would just ask again for a

10   deadline to disclose witnesses for the resumed evidentiary          05:23PM

11   hearing, and we would ask that the defendants comply with it

12   this time.

13             THE COURT:  Here's what you should do.  Take a look at

14   everything that you think is relevant to your individual

15   considerations as to what you need to do and talk about it.         05:23PM

16   And then with respect to what we learned, I don't know whether

17   there's subpoena issues with respect to the witnesses, but it

18   would seem to me that I would like you all to talk about this

19   issue no later than the 1st of August.  Is that a workday?

20   Yes.                                                                05:24PM

21             If you can't get it resolved by the close of business

22   on the 1st of August, raise it with me on the telephone about

23   what the issues are.  Does that address your concern, Mr.

24   Fathi?

25             MR. FATHI:  Well, what --                                 05:24PM

1    THE COURT:  What they are going to have to tell you by

2    the 1st of August is what it is going to be.  I'm worried that

3    you are all going to have issues.  Maybe you won't.  But if you

4    do, I just want you to know the way we're going to do this I

5    think is if you can't resolve on the 1st because you have heard    05:24PM

6    from them about who they are going to be and then you will know

7    that, and maybe I can ask you, Mr. Bojanowski, on the day

8    before the st of August to let you know who it is and you will

9    have 24 hours to digest it?

10    MR. BOJANOWSKI:  I think we should know by then and    05:24PM

11    can provide a list.

12    THE COURT:  Okay.

13    MR. BOJANOWSKI:  We're going to try and track that

14    down within the next week.  We want to look at the transcript

15    so it might take us a few days depending.    05:25PM

16    THE COURT:  All right.  If you run into issues, let me

17    know.

18    MR. BOJANOWSKI:  Right.

19    THE COURT:  Anything else?

20    MR. BOJANOWSKI:  Nothing further, Your Honor.    05:25PM

21    THE COURT:  Mr. Fathi.

22    MR. FATHI:  Very briefly, Your Honor.  I apologize.  I

23    know the hour is late.  Last month at the June 14th hearing

24    there was some discussion about Performance Measure Number 95.

25    This is the measure that requires that people coming off    05:25PM

 1    suicide watch be seen at specified intervals by mental health

 2    staff.  And there was some disagreement about what defendants'

 3    obligation should be.  The Court asked defendants to provide us

 4    a written proposal.  They unfortunately haven't done so, so we

 5    could would ask that the Court repeat that direction.                     05:25PM

 6         THE COURT:  When could you be able to do that, Mr.

 7    Bojanowski?

 8         MR. BOJANOWSKI:  Next week.  I'm sorry.  I don't

 9    recall that.  I must have missed it.  But I will certainly get

10    something to -- and is this a proposal for language for the                05:26PM

11    manual?  Is that what we're talking about?

12         THE COURT:  Yes.

13         MR. FATHI:  I think it's ultimately proposal for the

14    language for the manual.  I think we need to agree on the

15    concept, try to agree on the concept first.                               05:26PM

16         THE COURT:  So by -- have a phone call, the two of

17    you, to make sure you are on the same page.  When do you leave

18    for your vacation?

19         MR. FATHI:  Tomorrow, Your Honor.

20         THE COURT:  Is there anybody else in your office --               05:26PM

21    well, if Mr. Bojanowski needs help understanding what the

22    homework assignment is here whom should he call?

23         MR. FATHI:  He could call Ms. Fettig.  But again, Your

24    Honor, this was discussed.

25         THE COURT:  I remember.  Mr. Bojanowski doesn't.  He            05:26PM

1    will probably remember.

2           MR. FATHI:  I was going to provide the transcript

3    pages, Pages 150 to 151 of the June.

4           MR. BOJANOWSKI:  I can get through -- I can get

5    something off to him after he returns.                    05:26PM

6           MR. FATHI:  That's fine.

7           THE COURT:  All right.  Good.  Thank you very much.

8    My apologies to court staff and to everybody else for all the

9    time that you took past hours.  And I also have to say my

10   appreciation to the parties and to the counsel who assisted   05:27PM

11   yesterday and today.  Thank you all.

12           (Proceeding recessed at 5:27 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                        C E R T I F I C A T E

5

6          I, LAURIE A. ADAMS, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 20th day of July,

15   2017.

16

17                              s/Laurie A. Adams

18                              _____
                                Laurie A. Adams, RMR, CRR

19

20

21

22

23

24

25