Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: kbrody@acluaz.org

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
*Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
*Jeremy Smith, Robert Gamez, Maryanne Chisholm,*
*Desiree Licci, Joseph Hefner, Joshua Polson, and*
*Charlotte Wells, on behalf of themselves and all others*
*similarly situated*

**[ADDITIONAL COUNSEL LISTED ON**
**SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Dietrich (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
        adietrich@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON**
**SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-DKD <br><br> **PLAINTIFFS' RESPONSE TO JUNE 14, 2017 ORDER RE: ENFORCEMENT OF THE STIPULATION'S PERFORMANCE MEASURES (DOC. 2124)** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 2

    I.    THE COURT'S JUNE 14, 2017 ORDER ............................................................ 2

    II.   DEFENDANTS' OTHER CHRONICALLY NONCOMPLIANT
        PERFORMANCE MEASURES ................................................................... 7

        A.    The Court's May 20, 2016 Finding of Noncompliance
              (Doc. 1583) ........................................................................... 8

        B.    The Court's October 7, 2016 Finding of Noncompliance
              (Doc. 1709) ......................................................................... 10

        C.    The Court's April 24, 2017 Finding of Noncompliance
              (Doc. 2030) ......................................................................... 11

ARGUMENT ................................................................................................................ 12

    I.    LEGAL AND PROCEDURAL REQUIREMENTS FOR CIVIL
        CONTEMPT ............................................................................................. 12

    II.   DEFENDANTS HAVE COMMITTED CIVIL CONTEMPT BY
        KNOWINGLY AND CHRONICALLY VIOLATING THE
        STIPULATION ........................................................................................ 15

        A.    The Stipulation's Performance Measures and the Court's
              Orders Are Specific and Definite. .................................... 15

        B.    Defendants Have Knowledge of the Stipulation's
              Requirements and the Courts Orders and Have Been Given
              Notice of Possible Sanctions for Chronic Noncompliance and
              Multiple Opportunities to Be Heard. ................................ 15

        C.    Defendants Have Failed to Take All Reasonable Steps to
              Comply With the Stipulation and the Court's Orders. ..... 16

    III.  PLAINTIFFS' PROPOSED REMEDY FOR DEFENDANTS'
        CIVIL CONTEMPT ................................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

<u>**CASES**</u>

*Armstrong v. Brown*,
   768 F.3d 975 (9th Cir. 2014) .................................................................. 12-13

*Balla v. Idaho State Bd. of Corr.*,
   869 F.2d 461 (9th Cir. 1989) .................................................................. 13

*Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*,
   289 F.3d 589 (9th Cir. 2002) .................................................................. 3

*Carty v. Turnbull*,
   144 F. Supp. 2d 395 (D.V.I. 2001) ......................................................... 18

*Cole v. U.S. Dist. Ct. for Dist. of Idaho*,
   366 F.3d 813 (9th Cir. 2004) .................................................................. 16

*F.T.C. v. Affordable Media, LLC*,
   179 F.3d 1228 (9th Cir. 1999) ............................................................... 14

*Hook v. State of Ariz.*,
   907 F. Supp. 1326 (D. Ariz. 1995) ......................................................... 14

*In Re Dual-Deck Video Cassette Recorder Antitrust Litig. v. Motion Picture
   Ass'n of Am.*,
   10 F.3d 693 (9th Cir. 1993) ................................................................... 13, 15

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
   512 U.S. 821 (1994) ............................................................................. 13, 14, 15, 19

*Kelly v. Wengler*,
   822 F.3d 1085 (9th Cir. 2016) ............................................................... 13, 16, 19

*Kelly v. Wengler*,
   979 F. Supp. 2d 1104 (D. Idaho 2013), *aff'd*, 822 F.3d 1085 (9th Cir.
   2016) ................................................................................................. 19-20

*Lasar v. Ford Motor Co.*,
   399 F.3d 1101 (9th Cir. 2005) ............................................................... 15

*N.L.R.B. v. Trans Ocean Export Packing, Inc.*,
   473 F.2d 612 (9th Cir. 1973) ................................................................. 14

# TABLE OF AUTHORITIES
## (continued)

Page

**CASES (CONT.)**

*S.E.C. v. Hickey,*
   322 F.3d 1123 (9th Cir. 2003) ...................................................... 14

*Shell Offshore Inc. v. Greenpeace, Inc.,*
   815 F.3d 623 (9th Cir. 2016) ...................................................... 14

*Spallone v. United States,*
   493 U.S. 265 (1990) ...................................................... 12

*Stone v. City & County of San Francisco,*
   968 F.2d 850 (9th Cir. 1992) .............................................. 12, 16

*United States v. Asay,*
   614 F.2d 655 (9th Cir. 1980) ...................................................... 14

*United States v. Ayres,*
   166 F.3d 991 (9th Cir. 1999) ...................................................... 13

*United States v. United Mine Workers of Am.,*
   330 U.S. 258 (1947) .............................................. 14, 19

*Withrow v. Concannon,*
   942 F.2d 1385 (9th Cir. 1991) ...................................................... 15

**STATUTES**

18 U.S.C. § 401(3) ...................................................... 12

**OTHER AUTHORITIES**

11A FED. PRAC. & PROC. CIV. § 2960 (3d ed.) .................................................. 13

-ii-

# INTRODUCTION

Defendants' chronic noncompliance with Court-ordered timelines to provide health care and medication to class members must end.  As the Court noted, it "has provided Defendants over two years to try all of their proposed solutions" for many performance measures, but "[n]othing has worked."  [Doc. 2179 at 2]  The Court has observed that

> I have heard over and over again that this is going to be addressed by a program that employs oftentimes the same words. We're going to talk to the people. We're going to make sure that the right person understands what they are supposed to get. And then subsequent months show the same errant numbers and the same representations are made so you kind of at a certain point start to think people aren't really listening [to] what they are saying and not even believing it themselves. They are just words that are being given that don't seem to have a relationship to the reality.

[6/14/17 Tr. at 24:11-20; *see also* 7/14/17 Tr. at 248:5-7 ("it is fair for everybody in this room to wonder when the rubber is going to meet the road on this.")]

The Stipulation and its performance measures lay out clear timeframes for, among other things, medication renewal and transfer; referral of patients to see a provider; provision of diagnostic procedures and the review of the reports; referral to specialists and review of specialist reports; and provider encounters with patients housed at inpatient hospitals.  [Doc. 1185-1 at 8 (PM 13); 10 (PMs 35, 40); 11 (PMs 45, 46, 50, 52) and 12 (PM 66)]  Defendants' persistent violations of these measures at multiple prisons, (*see* Doc. 2173; *see also* Doc. 2041 at 43, 47-51, 54; Doc. 2082; Doc. 2115), result in delays in and outright denials of health care that place class members at risk of serious harm.

This Court can and should notify and order Defendants that every single failure to comply with these and *all other* chronically noncompliant performance measures will result in the assessment of a $1,000 monetary fine per violation that may ultimately be avoided through compliance.  The Court should order Defendants to provide monthly reporting regarding their compliance with these measures, and set the matter for hearing on November 15, 2017.  At that hearing the Court will be in a position to evaluate whether the threat of substantial financial penalties has had its intended effect of ensuring

1  compliance.  The Court can then decide whether to (1) hold Defendants in contempt and

2  impose the fines that have been assessed, or (2) reduce or eliminate the coercive penalties

3  if there has been a greater degree of compliance.  In addition, the Court should impose a

4  nominal penalty of $10 as compensatory damages to be paid to each individual for each

5  instance in which he or she did not receive the care required by the performance measures.

6  Plaintiffs' proposed process, as detailed below, complies with the law and

7  Defendants' due process rights, and is mindful of the Court's desire to end Defendants'

8  ongoing and chronic noncompliance and constitutional violations, while avoiding

9  micromanagement of Defendants' operations.

10  **FACTUAL BACKGROUND**

11  Under the Stipulation, Defendants must audit and report, on a monthly basis, their

12  compliance with 103 health care performance measures ("PMs") at the ten state-run

13  prisons.  [Doc. 1185, ¶ 9]  The Stipulation sets forth a seven-step process to obtain judicial

14  enforcement of the Stipulation after "Defendants have failed to substantially comply" with

15  its provisions.  [*Id*., ¶¶ 30, 31, 36]

16  **I.  THE COURT'S JUNE 14, 2017 ORDER**

17  On June 14, 2017, the Court issued both verbal and written orders notifying

18  Defendants that it would hold an Order to Show Cause ("OSC") hearing in the future as to

19  certain performance measures at specific institutions, if there were no improvements in

20  compliance in the next 30 days.  [Doc. 2124 at 1-3, 5; 6/14/17 Tr. at 6:12-19; 8:8-15;

21  13:3-14; 19:19-20:9; 20:25-21:17; 32:5-20; 33:25-24:5; 46:3-47:2][1]  These measures and

22  ───────────────

    [1] The Court's order for **PM 44** at **Eyman** was for Defendants to "submit to the
23  Court a report of the previous 30 days of every Eyman inmate who was returning from an
    inpatient hospital stay or ER transport with discharge recommendations from the hospital
24  and how each of these individuals were reviewed and acted upon by the medical provider
    within 24 hours as required by this Performance Measure."  [Doc. 2124 at 2; *see also*
25  6/14/17 Tr. at 19:3-13]  Defendants reported that 29 of 30 off-site returns during the
    reporting period of June 14-July 11, 2017 were compliant.  [Doc. 2173 at 18]  The May
26  CGAR score for PM 44 at Eyman was 80%, which is below the 85% threshold.
    [Doc. 2211 at 5]

27  The Court stated it "will monitor for improvement at **Tucson**" with **PM 51**,
    (Doc. 2124 at 2 (emphasis added); *see also* 6/14/17 Tr. at 33:5-19), and "[a]s to
28  **Performance Measure 54**, the Court will continue to monitor for improvement at **Eyman**

1  institutions were all previously found to be substantially noncompliant by the Court, in

2  some cases more than a year ago.

3  **PM 13:** *Chronic care and psychotropic medication renewals will be completed in*

4  *a manner such that there is no interruption or lapse in medication.* (**Perryville**)

5  The Court's June 14, 2017 Order notified Defendants of the potential for fines for

6  chronic noncompliance with this measure at Perryville. [Doc. 2124 at 1]  The Court

7  found Defendants substantially noncompliant at Perryville on May 20, 2016. [Doc. 1583

8  at 2]  Due to Defendants' continued failure to achieve substantial compliance with this

9  measure, Perryville was one of the prisons included in the Court's November 10, 2016

10 Order directing Defendants to utilize outside resources in order to achieve compliance.

11 [Doc. 1754] Defendants' CGAR scores for the past year are listed below:

| | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Perryville | 65 | 51 | 63 | 54 | 53 | 71 | 72 | 84 | 90 | 78 | 72 | 97 |

14 Defendants' response to the Court's June 14, 2017 Order avowed that 1,443 of

15 1,444 (or 99%) medications due for renewal for the reporting period of June 15-July 11,

16 2017 were compliant.  [Doc. 2173 at 2][2]  Assuming this is accurate, the incident of

17 noncompliance could subject Defendants to a fine of $1,000.

18 **PM 35:** *All inmate medications (KOP and DOT) will be transferred with and*

19 *provided to the inmate or otherwise provided at the receiving prison without interruption.*

20 (**Eyman, Florence, Lewis, Phoenix, Tucson**)

21 The Court's June 14, 2017 Order notified Defendants of the potential for fines for

22 chronic noncompliance with this measure at Eyman, Florence, Lewis, Phoenix, and

---

24 and expects to have a better explanation for **Florence** if there is a continued departure."
[Doc. 2124 at 3 (emphasis added); *see also* 6/14/17 Tr. at 34:10-36:9]  Defendants' May

25 CGAR score for PM 51 at Tucson was 88% (but Eyman had dropped to 74% and Florence
to 82%); and for PM 54, Eyman had a May score of 33%, and Florence was at 59%.
[7/14/17 Tr. at 244:15-245:1; 251:13-22]

27  [2] No underlying documentation or reports were provided in support of the
statement. *See Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 593

28 n.4 (9th Cir. 2002) ("the arguments and statements of counsel are not evidence").

Tucson. [Doc. 2124 at 1] The Court found Defendants substantially noncompliant at these five institutions on April 24, 2017. [Doc. 2030 at 2] Defendants' CGAR scores for the past year are listed below:

| | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 76 | 72 | 80 | 86 | 54 | 64 | 56 | 76 | 57 | 19 | 38 | 23 |
| Florence | 48 | 42 | 43 | 53 | 69 | 63 | 44 | 39 | 55 | 56 | 62 | 50 |
| Lewis | 33 | 47 | 35 | 31 | 32 | 32 | 28 | 24 | 40 | 66 | 49 | 73 |
| Phoenix | 71 | 43 | 89 | 75 | 44 | 67 | 100 | 80 | 91 | 38 | 67 | 71 |
| Tucson | 27 | 19 | 16 | 14 | 10 | 50 | 33 | 25 | 10 | 28 | 73 | 80 |

Defendants' response to the Court's June 14, 2017 Order avowed that 317 out of 1,450 (or 22%) were compliant. [Doc. 2187 at 2] Assuming this is accurate, the 1,133 incidents of noncompliance could subject Defendants to a fine of $1,133,000.

**PM 40:** *Urgent provider referrals are seen by a Medical Provider within 24 hours of the referral.* (**Eyman**)

The Court's June 14, 2017 Order notified Defendants of the potential for fines for chronic noncompliance with this measure at Eyman. [Doc. 2124 at 1] The Court found Defendants substantially noncompliant at Eyman on April 24, 2017. [Doc. 2030 at 2] Defendants' CGAR scores for the past year are listed below:

| | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 34 | 13 | 13 | 83 | 85 | 65 | 100 | 100 | 100 | 46 | 40 | 94 |

Defendants' response to the Court's June 14, 2017 Order avowed that 4 of 14 (or 29%) urgent referrals for the reporting period of June 15-July 11, 2017 were compliant. [Doc. 2173 at 18] Assuming this is accurate, the incidents of noncompliance could subject Defendants to a fine of $10,000.

**PM 45**: *On-site diagnostic services will be provided the same day if ordered STAT or urgent, or within 14 calendar days if routine.* (**Lewis, Tucson**)

The Court's June 14, 2017 Order notified Defendants of the potential for fines for chronic noncompliance with this measure at Lewis and Tucson. [Doc. 2124 at 2] The Court found Defendants substantially noncompliant at Lewis and Tucson on April 24, 2017. [Doc. 2030 at 2] Defendants' CGAR scores for the past year are listed below:

| | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lewis | 69 | 85 | 78 | 80 | 81 | 69 | 77 | 64 | 69 | 68 | 87 | 89 |
| Tucson | 71 | 70 | 79 | 79 | 73 | 80 | 84 | 71 | 48 | 97 | 68 | 86 |

Defendants' response to the Court's June 14, 2017 Order avowed that 1,461 of 1,479 (or 99%) of diagnostic services for the reporting period of June 15-July 11, 2017 were compliant. [Doc. 2173 at 19] Assuming this is accurate, the incidents of noncompliance could subject Defendants to a fine of $18,000.

**PM 46:** *A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison.* (**Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Tucson**)

The Court's June 14, 2017 Order notified Defendants of the potential for fines for chronic noncompliance with this measure at Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, and Tucson. [Doc. 2124 at 2] The Court found Defendants substantially noncompliant at these institutions on May 20, 2016. [Doc. 1583 at 2] Due to Defendants' continued failure to achieve substantial compliance with this measure, Douglas, Florence, Perryville, Tucson, and Yuma were included in the Court's November 10, 2016 Order directing Defendants to utilize outside resources in order to achieve compliance. [Doc. 1754] Defendants' CGAR scores for the past year are listed below:

| | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Douglas | 67 | 78 | 78 | 69 | 65 | 80 | 80 | 98 | 98 | 97 | 73 | 93 |
| Eyman | 78 | 82 | 82 | 60 | 34 | 70 | 64 | 78 | 74 | 34 | 22 | 64 |
| Florence | 47 | 48 | 43 | 55 | 30 | 53 | 60 | 50 | 65 | 12 | 45 | 88 |
| Lewis | 76 | 86 | 84 | 76 | 90 | 91 | 90 | 96 | 85 | 49 | 58 | 69 |
| Perryville | 40 | 32 | 60 | 52 | 28 | 28 | 42 | 50 | 94 | 70 | 75 | 80 |
| Phoenix | 82 | 76 | 81 | 93 | 65 | 85 | 72 | 81 | 98 | 90 | 70 | 66 |
| Tucson | 51 | 57 | 50 | 50 | 66 | 59 | 63 | 68 | 82 | 73 | 64 | 81 |

Defendants' response to the Court's June 14, 2017 Order avowed that 4,059 of 4,778 (or 85%) of diagnostic reports for the reporting period of June 15-July 11, 2017

were reviewed in a compliant time frame.  [Doc. 2173 at 20]  Assuming this is accurate, the incidents of noncompliance could subject Defendants to a fine of $719,000.

**PM 50:**  *Urgent specialty consultations and urgent specialty diagnostic services will be scheduled and completed within 30 calendar days of the consultation being requested by the provider.*  (**Florence**)

The Court's June 14, 2017 Order notified Defendants of the potential for fines for chronic noncompliance with this measure at Florence.  [Doc. 2124 at 2]  The Court found Defendants substantially noncompliant at Florence on April 24, 2017. [Doc. 2030 at 2] Defendants' CGAR scores for the past year are listed below:

|          | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|----------|------|------|-----|------|-----|-----|-----|-----|-----|-----|-----|-----|
| Florence | 77   | 72   | 76  | 78   | 93  | 71  | 53  | 55  | 48  | 59  | 39  | 51  |

Defendants' response to the Court's June 14, 2017 Order avowed that 28 of 59 (or 47%) of urgent specialty consults for the reporting period of June 15-July 11, 2017 were compliant.  [Doc. 2173 at 27]  Assuming this is accurate, the incidents of noncompliance could subject Defendants to a fine of $31,000.

**PM 52:**  *Specialty consultation reports will be reviewed and acted on by a Provider within seven calendar days of receiving the report.*  (**Florence**)

The Court's June 14, 2017 Order notified Defendants of the potential for fines for chronic noncompliance with this measure at Florence.  [Doc. 2124 at 2]  The Court found Defendants substantially noncompliant at Florence on April 24, 2017.  [Doc. 2030 at 2] Defendants' CGAR scores for the past year are listed below:

|          | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|----------|------|------|-----|------|-----|-----|-----|-----|-----|-----|-----|-----|
| Florence | 45   | 50   | 61  | 56   | 71  | 69  | 73  | 76  | 56  | 52  | 46  | 71  |

Defendants' response to the Court's June 14, 2017 Order avowed that 45 of 184 (or 24%) of specialty consultation reports were reviewed in a timely manner for the reporting period of June 15-July 11, 2017 and were compliant.  [Doc. 2173 at 28]  Assuming this is accurate, the incidents of noncompliance could subject Defendants to a fine of $139,000.

**PM 66**: *In an IPC, a Medical Provider encounters will occur at a minimum every 72 hours.* (**Florence, Lewis, Tucson**)

The Court's June 14, 2017 Order notified Defendants of the potential for fines for chronic noncompliance with this measure at Florence, Lewis, and Tucson. [Doc. 2124 at 3] The Court found Defendants substantially noncompliant at these institutions on May 20, 2016. [Doc. 1583 at 2] Due to Defendants' continued failure to achieve substantial compliance with this measure, Tucson was included in the Court's November 10, 2016 Order directing Defendants to utilize outside resources in order to achieve compliance. [Doc. 1754] Defendants' CGAR scores for the past year are listed below:

|          | June | July | Aug | Sept | Oct[3] | Nov | Dec | Jan | Feb | Mar | Apr | May |
|----------|------|------|-----|------|--------|-----|-----|-----|-----|-----|-----|-----|
| Florence | 70   | 80   | 100 | 100  | 96     | 84  | 40  | 40  | 60  | 10  | 50  | 50  |
| Lewis    | 30   | 60   | 90  | 90   | 90     | 100 | 60  | 90  | 20  | 60  | 100 | 90  |
| Tucson   | 40   | 20   | 20  | 100  | 94     | 98  | 30  | 30  | 80  | 70  | 60  | 90  |

Defendants' response to the Court's June 14, 2017 Order avowed that 1,038 of 1,114 (or 93%) of provider encounters for the reporting period of June 15-July 11, 2017 were compliant. [Doc. 2173 at 32] Assuming this is accurate, the incidents of noncompliance could subject Defendants to a fine of $76,000.

In total, the cumulative amount of contempt fines the Court could assess against Defendants for their noncompliance from June 14, 2017 to July 11, 2017 is $2,127,000.

## II. DEFENDANTS' OTHER CHRONICALLY NONCOMPLIANT PERFORMANCE MEASURES

The Court's June 14, 2017 Order did not encompass all of Defendants' chronically noncompliant performance measures. Defendants continue to show failure for multiple

---

[3] Defendants utilized a methodology of giving themselves partial credit for the October and November 2016 CGARs, thus inflating their scores in those months. [Doc. 1755 at 7-8; 12-3; Doc. 1816 at 2-3] The Court ordered Defendants to not use that methodology for PM 66 (among others) on December 14, 2016, and reiterated its instruction on January 26, 2017. [Doc. 1831 at 1-2; Doc. 1915 at 2] Defendant Pratt testified on May 10, 2017 that Defendants have not recalculated PM 66 for those months using the correct methodology. [5/10/17 Tr. at 707:18-21]

other performance measures for which the Court found them noncompliant months ago, and there has been no sustained improvement in the CGAR scores reported to date.

**A.     The Court's May 20, 2016 Finding of Noncompliance (Doc. 1583)**

In addition to the performance measures detailed above (PM 13 at Perryville; PM 46 at Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Tucson; PM 66 at Florence, Lewis, Tucson), there are other performance measures for which the Court found Defendants noncompliant 14 months ago, and for which Defendants continue to show chronic noncompliance.

**PM 11:**   *Newly prescribed provider-ordered formulary medications will be provided to the inmate within 2 business days after prescribed, or on the same day, if prescribed STAT.*  (**Eyman, Lewis, Tucson**)

The Court found Defendants substantially noncompliant with this measure at these three institutions (along with Florence, Winslow, and Yuma) on May 20, 2016. [Doc. 1583 at 2]  Due to Defendants' continued failure to achieve substantial compliance with this PM in 2016, Eyman, Florence, and Lewis were included in the Court's November 10, 2016 Order directing Defendants to utilize outside resources in order to achieve compliance.  [Doc. 1754]  Defendants continue to be chronically noncompliant with this measure at Eyman, Lewis, and Tucson, and their CGAR scores are listed below:

|         | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---------|------|------|-----|------|-----|-----|-----|-----|-----|-----|-----|-----|
| Eyman   | 68   | 50   | 66  | 80   | 78  | 86  | 80  | 48  | 76  | 82  | 68  | 66  |
| Lewis   | 60   | 63   | 73  | 71   | 56  | 67  | 66  | 73  | 68  | 72  | 79  | 87[4] |
| Tucson  | 77   | 76   | 80  | 80   | 88  | 85  | 80  | 82  | 85  | 74  | 84  | 83  |

**PM 13:**  *Chronic care and psychotropic medication renewals will be completed in a manner such that there is no interruption or lapse in medication.*  (**Eyman**, **Florence**)

The Court found Defendants substantially noncompliant with this measure at these institutions (along with Douglas, Lewis, Perryville, Tucson, and Yuma) on May 20, 2016. [Doc. 1583 at 2]  Due to Defendants' continued failure to achieve substantial compliance

---

[4]  May 2017 was the first time in 26 months that Lewis was above the threshold.

with this PM in 2016, Florence was one of the prisons included in the Court's November 10, 2016 Order directing Defendants to utilize outside resources in order to achieve compliance.  [Doc. 1754]  Defendants' CGAR scores for Eyman and Florence show chronic or fluctuating noncompliance with this measure, and are listed below:

|  | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 83 | 58 | 86 | 60 | 90 | 84 | 82 | 90 | 42 | 62 | 92 | 86 |
| Florence | 70 | 44 | 68 | 65 | 59 | 59 | 73 | 88 | 54 | 51 | 80 | 94 |

**PM 46:**  *A Medical Provider will review the diagnostic report, including pathology reports, and act upon reports with abnormal values within five calendar days of receiving the report at the prison.*  (**Eyman, Florence, Lewis, Perryville, Phoenix, Tucson**)

The Court found Defendants substantially noncompliant with this measure at these institutions (along with Douglas and Yuma) on May 20, 2016.  [Doc. 1583 at 2]  Due to Defendants' continued failure to achieve substantial compliance with this PM in 2016, Douglas, Florence, Perryville, Tucson, and Yuma were included in the Court's November 10, 2016 Order directing Defendants to utilize outside resources in order to achieve compliance.  [Doc. 1754]  Defendants' CGAR scores for Eyman, Florence, Lewis, Perryville, Phoenix, and Tucson show ongoing and chronic noncompliance with this measure, and are listed below:

|  | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 78 | 82 | 82 | 60 | 34 | 70 | 64 | 78 | 74 | 34 | 22 | 64 |
| Florence | 47 | 48 | 43 | 55 | 30 | 53 | 60 | 50 | 65 | 12 | 45 | 88 |
| Lewis | 76 | 86 | 84 | 76 | 90 | 91 | 90 | 96 | 85 | 49 | 58 | 69 |
| Perryville | 40 | 32 | 60 | 52 | 28 | 28 | 42 | 50 | 94 | 70 | 75 | 80 |
| Phoenix | 82 | 76 | 81 | 93 | 65 | 85 | 72 | 81 | 98 | 90 | 70 | 66 |
| Tucson | 51 | 57 | 50 | 50 | 66 | 59 | 63 | 68 | 82 | 73 | 64 | 81 |

**PM 54:**  *Chronic disease inmates will be seen by the provider as specified in the inmate's treatment plan, no less than every 180 days unless the provider documents a reason why a longer time frame can be in place.*  (**Eyman**)

The Court found Defendants substantially noncompliant with this measure at Eyman (along with Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma) on May 20,

2016.  [Doc. 1583 at 2]   Due to Defendants' continued failure to achieve substantial compliance with this PM in 2016, Eyman and Tucson were included in the Court's November 10, 2016 Order directing Defendants to utilize outside resources in order to achieve compliance.  [Doc. 1754]   Defendants are chronically noncompliant with this measure at Eyman, and their CGAR scores are listed below:

|  | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 82 | 66 | 86 | 78 | 82 | 74 | 72 | 62 | 46 | 50 | 60 | 33 |

**B.     The Court's October 7, 2016 Finding of Noncompliance (Doc. 1709)**

The Court found Defendants noncompliant in October 2016 with two measures for which Defendants continue show chronic noncompliance.[5]

**PM 47:**  *A Medical Provider will communicate the results of the diagnostic study to the inmate upon request and within seven calendar days of the date of the request.* (**Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, Yuma**)

The Court found Defendants substantially noncompliant with this measure at all ten prisons on October 7, 2016.  [Doc. 1709 at 1]   Defendants continue to be chronically noncompliant with this measure at Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma, and their CGAR scores are listed below:

|  | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Eyman | 65 | 32 | 38 | 47 | 55 | 25 | 45 | 55 | 54 | 47 | 41 | 40 |
| Florence | 53 | 31 | 49 | 68 | 64 | 41 | 63 | 59 | 23 | 40 | 42 | 55 |
| Lewis | 51 | 61 | 56 | 64 | 71 | 78 | 77 | 25 | 83 | 44 | 34 | 32 |
| Perryville | 43 | 72 | 61 | 47 | 64 | 70 | 79 | 89 | 74 | 88 | 77 | 88 |
| Phoenix | 100 | 67 | 100 | 100 | 75 | 0 | N/A[6] | 67 | 67 | 100 | 86 | 11 |
| Tucson | 15 | 29 | 6 | 41 | 41 | 45 | 44 | 56 | 67 | 59 | 88 | 71 |
| Yuma | 50 | 59 | 66 | 80 | 79 | 55 | 48 | 80 | 83 | 89 | 63 | 66 |

---

[5]   On March 30, 2017, Plaintiffs moved to have the Court's November 10, 2016 outside resources Order extended to these two measures, but the Court did not rule on the motion.  [*See* Doc. 1998 at 10-11]

[6]   Given that ASPC-Phoenix houses the inpatient mental health unit for the most seriously mentally ill class members, the finding that there were no newly prescribed medications the entire month of December is difficult to believe.

**PM 94:** *All prisoners on a suicide or mental health watch shall be seen daily by a licensed mental health clinician or, on weekends or holidays, by a registered nurse.* (**Florence, Tucson**)

The Court found Defendants substantially noncompliant with this measure at Eyman, Florence, and Tucson on October 7, 2016. [Doc. 1709 at 1] Defendants continue to be noncompliant with this measure at Florence and Tucson, and their CGAR scores are listed below:

|  | June | July | Aug | Sept | Oct[7] | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Florence | 100 | 100 | 80 | 100 | 91 | 87 | 73 | 60 | 87 | 60 | 47 | 80 |
| Tucson | 30 | 100 | 100 | 100 | 86 | 84 | 68 | 84 | 76 | 72 | 88 | 88 |

**C.    The Court's April 24, 2017 Finding of Noncompliance (Doc. 2030)**

In addition to the performance measures detailed above in Part I, (PM 35 at Eyman, Florence, Lewis, Phoenix, Tucson; PM 40 at Eyman; PM 45 at Lewis, Tucson; PM 50 at Florence; PM 52 at Florence), there are other performance measures for which the Court found Defendants substantially noncompliant on April 24, 2017, and for which Defendants continue to show chronic noncompliance.

**PM 44:** *Inmates returning from an inpatient hospital stay or ER transport with discharge recommendations from the hospital shall have the hospital's treatment recommendations reviewed and acted upon by a medical provider within 24 hours.* (**Eyman**)

The Court found Defendants substantially noncompliant at Eyman, Florence, and Lewis for this measure. [Doc. 2030 at 2] They are chronically noncompliant with this measure at Eyman, as shown below:

---

[7] Defendants utilized a methodology of giving themselves partial credit for the October and November 2016 CGARs, thus inflating their scores in those months. [Doc. 1755 at 7-8; 12-3; Doc. 1816 at 2-3] The Court ordered Defendants to not use that methodology for PM 94 (among others) on December 14, 2016, and reiterated its instruction on January 26, 2017. [Doc. 1831 at 1-2; Doc. 1915 at 2] Defendant Pratt testified on May 10, 2017 that Defendants have not recalculated PM 94 for those months using the correct methodology. [5/10/17 Tr. at 706:2-9, 708:21-709:4]

|         | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---------|------|------|-----|------|-----|-----|-----|-----|-----|-----|-----|-----|
| Eyman   | 37   | 44   | 46  | 72   | 85  | 89  | 72  | 50  | 58  | 50  | 15  | 80  |

**PM 51:** *Routine specialty consultations will be scheduled and completed within 60 calendar days of the consultation being requested by the provider.* (**Eyman, Florence, Tucson**)

The Court found Defendants substantially noncompliant at Eyman, Florence, and Tucson for this measure. [Doc. 2030 at 2] They are chronically noncompliant with this measure at all three institutions, as shown below:

|          | June | July | Aug | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|----------|------|------|-----|------|-----|-----|-----|-----|-----|-----|-----|-----|
| Eyman    | 82   | 52   | 76  | 89   | 72  | 66  | 68  | 72  | 78  | 80  | 94  | 74  |
| Florence | 66   | 80   | 82  | 80   | 77  | 81  | 90  | 74  | 52  | 87  | 87  | 82  |
| Tucson   | 70   | 81   | 77  | 84   | 82  | 88  | 59  | 76  | 83  | 76  | 74  | 88  |

## ARGUMENT

## I.    LEGAL AND PROCEDURAL REQUIREMENTS FOR CIVIL CONTEMPT

The Court has the power to enforce compliance with the Constitution and its previous court orders, including the Stipulation's requirements regarding timely provision of health care services, through civil contempt proceedings. *See* 18 U.S.C. § 401(3) ("A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as [. . .] [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command."); *Spallone v. United States*, 493 U.S. 265, 276 (1990) ("[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt") (quotation marks and citation omitted); *Stone v. City & County of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992) (court has "wide latitude" to determine if a party has defied an order and is in contempt of court.) (citations omitted).

Deference to a court's finding of contempt is heightened when—as in this case— the court has overseen litigation against a large, public institution for a significant period of time. *Stone*, 968 F.2d at 856; *see also Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir.

2014) ("The ongoing, intractable nature of this litigation affords the district court considerable discretion in fashioning relief.").[8]  "When persons already are subject to the jurisdiction of the court, no new process is required to subject them to contempt charges; thus parties of record to a decree, upon appropriate notice of the contempt proceeding, may be held in contempt for noncompliance with the decree . . . since the civil-contempt charges are a continuation of the original proceedings."  11A FED. PRAC. & PROC. CIV. § 2960 (3d ed.).

Prior to holding a party in civil contempt, a court must find by clear and convincing evidence that:

(1)     a valid court order exists that is "specific and definite" (*Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989));

(2)     the party had knowledge of the order, and notice of and an opportunity to be heard about the alleged noncompliance (*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *United States v. Ayres*, 166 F.3d 991, 995 (9th Cir. 1999)); and

(3)     the party failed to take "*all* reasonable steps to comply with the order." *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (emphasis in original).

The contempt "need not be willful, and there is no good faith exception to the requirement of obedience to a court order."  *In Re Dual-Deck Video Cassette Recorder Antitrust Litig. v. Motion Picture Ass'n of Am.*, 10 F.3d 693, 695 (9th Cir. 1993) (internal

---

[8]  Defendants argued in their Motion for Reconsideration of the Court's Order that the Court does not have the power to make a finding of civil contempt because the issuance of contempt is a modification of the Stipulation.  [Doc. 2135 at 4]   This is absurd; taken to its logical conclusion, Defendants' argument renders the Court powerless. The Stipulation clearly states that "[t]he parties consent to the reservation and exercise of jurisdiction by the District Court over all disputes between and among the parties arising out of this Stipulation. [. . .] [T]he Court *shall retain the power to enforce* this Stipulation *through all remedies provided by law*, except that the Court shall not have the authority to order Defendants to construct a new prison or to hire a specific number or type of staff . . ."  [Doc. 1185, ¶¶ 35-36 (emphasis added)]   Other than these two limits on the Court's enforcement power, this Court retains all of its inherent equitable Article III authority, which includes its power to find a party in contempt of court and assess monetary sanctions, as authorized under 18 U.S.C. § 401(3) and a wide swath of U.S. Supreme Court and Ninth Circuit federal caselaw dating back over a century.

quotation marks and citation omitted).  Should a party seek to defend against a contempt finding by arguing inability to comply, it must show "categorically and in detail" why it is unable to comply.  *N.L.R.B. v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612, 616 (9th Cir. 1973).  Moreover, impossibility is not a valid defense if the party is "responsible for the inability to comply."  *United States v. Asay*, 614 F.2d 655, 660 (9th Cir. 1980) (quotation marks and citation omitted); *see also F.T.C. v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999) (suggesting that impossibility is not a defense if the inability to comply is self-induced).

Once a defendant has been found in civil contempt, a court has "broad equitable power to order appropriate relief in civil contempt proceedings."  *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003).  When considering a sanction to make a defendant comply with a court order, the court should consider "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired."  *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947).

The relief granted in civil contempt proceedings can be either coercive or compensatory.  *United Mine Workers*, 330 U.S. at 303-04; *Hook v. State of Ariz.*, 907 F. Supp. 1326, 1340 (D. Ariz. 1995).  The Court has the authority to issue monetary sanctions if it determines that such sanctions are necessary to coerce compliance by Defendants or to compensate Plaintiffs for their losses and injuries.  *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) ("A court may wield its civil contempt powers for two separate and independent purposes: (1) 'to coerce the defendant into compliance with the court's order'; and (2) 'to compensate the complainant for losses sustained.'") (quoting *United Mine Workers*, 330 U.S. at 303-04); *see also Bagwell*, 512 U.S. at 829 (explaining that one of the paradigmatic civil contempt sanctions "is a per diem fine imposed for each day a contemnor fails to comply with an affirmative court order").  Should the Court decide to impose non-compensatory coercive civil contempt

1  fines, however, it must afford Defendants an opportunity to reduce or avoid any proposed
2  fine through compliance. *Bagwell*, 512 U.S. at 829.

3  **II.   DEFENDANTS HAVE COMMITTED CIVIL CONTEMPT BY
       KNOWINGLY AND CHRONICALLY VIOLATING THE STIPULATION**
4
5       **A.   The Stipulation's Performance Measures and the Court's Orders Are
             Specific and Definite.**

6       Paragraph 8 of the Stipulation provides "Defendants shall comply with the health
7  care performance measures set forth in Exhibit B."  [Doc. 1185, ¶ 8]  The measures in
8  Exhibit B are written in simple, unambiguous, and declarative sentences, and provide no
9  language authorizing anything less than full compliance.  Doc. 1185-1 at 7-15; *Withrow v.*
10 *Concannon*, 942 F.2d 1385, 1387 (9th Cir. 1991) (holding that language that states "that a
11 decision 'shall' or 'must' be made within the specified number of days" is "unequivocal").
12 Here, the relevant performance measures are clear, specific, and definite, as are the
13 Court's orders on substantial noncompliance and remedial measures.  *See Dual-Deck,*
14 10 F.3d at 695 (for contempt to issue, the court order in question must be "specific and
15 definite").

16      **B.   Defendants Have Knowledge of the Stipulation's Requirements and the
             Courts Orders and Have Been Given Notice of Possible Sanctions for
17           Chronic Noncompliance and Multiple Opportunities to Be Heard.**

18      Due process requires that a party have knowledge of a court order, as well as notice
19 and an opportunity to be heard, prior to imposition of sanctions for contempt of a court
20 order.  *Bagwell*, 512 U.S. at 827; *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1109-110 (9th
21 Cir. 2005).   These requirements are met here.   Defendants are well aware of the
22 Stipulation's requirements, as they have been monitoring their compliance with it for
23 more than two years.  They also have complete knowledge of the Court's orders finding
24 noncompliance, (Docs. 1583, 1709, 2030), and the Court's November 10, 2016 order
25 directing them to take all reasonable steps to utilize outside service providers in order to
26 achieve compliance.  [Doc. 1754]

27      The Court gave Defendants notice both verbally and in writing on June 14, 2017
28 regarding the possibility of a finding of civil contempt, and potential monetary sanctions.

[Doc. 2124; 6/14/17 Tr. at 6:12-19; 8:8-15; 13:3-14; 19:19-20:9; 20:25-21:17; 32:5-20; 33:25-24:5; 46:3-47:2]  The Court put Defendants on clear notice of what sanctions may result from failure to comply with the performance measures at these institutions.  *See Cole v. U.S. Dist. Ct. for Dist. of Idaho*, 366 F.3d 813, 821 (9th Cir. 2004) ("It is axiomatic that procedural due process requires notice of the grounds for, and possible types of, sanctions").

### C.   Defendants Have Failed to Take All Reasonable Steps to Comply With the Stipulation and the Court's Orders.

"This Circuit's rule with regard to contempt has long been whether the defendants have performed 'all reasonable steps within their power to insure compliance' with the court's orders." *Stone*, 968 F.2d at 856 (quoting *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 404 (9th Cir. 1976)).  Defendants have the burden to show they took all reasonable steps to ensure compliance. *Id*. at 856 n.9; *Kelly*, 822 F.3d at 1096.

Here, Defendants have not taken all necessary steps to ensure compliance.  Most fundamentally, both the Court and Plaintiffs' experts repeatedly identified Defendants' failure to fully staff health care positions, or to hire additional staff, as a root cause of Defendants' chronic noncompliance with the Stipulation.  [*See, e.g.*, Doc. 1538-1, ¶¶ 17-25; Doc. 1539, ¶¶ 9-12; Doc. 1576 at 32-33; Doc. 2091, ¶¶ 10-12; Doc. 2103, ¶ 3; 11/9/16 Tr. at 60:23-24 ("staffing[] seems to be manifestly what is the cause" of noncompliance)]

Despite these statements from experts and the Court, Defendants stubbornly have refused to direct their vendor Corizon to fully staff positions at the contracted levels, let alone direct Corizon to conduct a staffing analysis or to create and fill additional positions beyond those in the contract.  Defendant Pratt testified he does not know whether, if existing vacancies were filled, staffing would be adequate.  [5/10/17 Tr. at 766:3-5]  He also testified he does not know if Corizon has conducted a staffing study, and that he has not asked Corizon to conduct one because "[my] assumption is that they are doing that." [4/17/17 Tr. at 651:23-24; *see also* 652:3-22 (first testifying that only Corizon has the power to raise salaries but then conceding that contract is silent on the matter)]  Mr. Pratt

later agreed with the Court that Corizon may "have made the economic decision that [it is] better off paying the fine than filling [staff] positions[.]"  [5/10/17 Tr. at 766:14-17]  It is therefore apparent Defendants have failed to meaningfully address staffing deficiencies on their own, or to direct their contractor to do so. Defendants' willful ignorance and bureaucratic incapacity shows they have taken virtually no "reasonable steps" to come into compliance, let alone "all reasonable steps."

Similarly, the Court has noted repeatedly that Defendants' remedial plans offered for many of these chronically noncompliant performance measures are inadequate and incomplete.  [*See* 6/24/16 Tr. at 4:9-10, 5:13-14 (expressing its "disappointment" that "each page of the proposed [plan] includes generalized statements . . . ranging from the absurd . ." and noting that the plan "lacks a sense of persuadability on its own standing"); *see also id*. at 5:8-12 ("And when I read this, it makes me think that you don't understand what the problem is, and that, therefore, why should I think that you have your hands on it grasped firm enough to be able to move forward in a constructive way?")]  The Court previously has noted Defendants "are dramatically out of compliance" and that they gave "just conclusory statements about almost aspirational goals," instead of "a plan to fix something that's broken."  [*Id*. at 5:19, 7:6-8; *see also* 9/8/16 Tr. at 6:9-10 (noting that the Court's "great skepticism" regarding Defendants' remediation plan "seems to be mostly borne out")]  Dr. Wilcox's report of June 9, 2017 outlined for the Court (and Defendants) the limitations of many of the Defendants' more recent remedial plans.  [*See generally* Doc. 2103]  The manifest inadequacy and actual failure of Defendants' remedial plans further demonstrates they have not taken all reasonable steps to ensure compliance with the Stipulation and the Court's orders.

1

2    **III.    PLAINTIFFS' PROPOSED REMEDY FOR DEFENDANTS' CIVIL
          CONTEMPT**

3

4           Plaintiffs agree with the Court that the most effective remedy for chronic

5    substantial noncompliance with the Stipulation's requirements at this point in time is

6    monetary sanctions.  Plaintiffs recommend that the Court issue an order setting forth a

7    framework involving monthly reporting of the chronically noncompliant performance

8    measures and institutions detailed above at pages 3-12, and prospective, presumptive fines

9    that may ultimately be avoided through compliance, along with awarding class members

10   who did not receive the required care a nominal amount of $10 in compensatory damages

11   per incident of noncompliance.  Plaintiffs' proposal balances the Court's and Plaintiffs'

12   interest in a durable remedy with Defendants' due process rights under the law governing

13   civil contempt sanctions.

14          Under Plaintiffs' recommended proposal, the Court's enforcement order should

15   require Defendants to provide to Plaintiffs and the Court, on or before the 15th day of

16   each month, a report listing each incident of noncompliance and each affected class

17   member at the specified prisons for the chronically noncompliant performance measures

18   at those institutions for the previous month.  This reporting mechanism will allow the

19   Court to determine if Defendants are remediating their chronic substantial noncompliance.

20   *See, e.g. Carty v. Turnbull*, 144 F. Supp. 2d 395, 398 (D.V.I. 2001) (noting that, as part of

21   ongoing contempt proceedings, defendants were required to provide monthly

22   documentation related to their compliance with a settlement agreement).   Requiring

23   Defendants to list every individual impacted by the noncompliance will also ensure that

24   the proposed framework does not create a perverse incentive for Defendants to refrain

25   from, for example, prescribing medications, requesting specialty referrals, or placing

26   persons on suicide watch.  At the time of this submission, Defendants may also file sworn

27   declarations setting forth all steps taken to comply with the performance measures.

28

The Court's order should make clear that Defendants may be fined up to $1,000 for each incident of noncompliance in a given month's reporting period. Any such fine should then be held in abeyance until November 15, 2017, pending an assessment of Defendants' compliance and further proceedings on the appropriateness of such a monetary sanction, in accordance with the Supreme Court's warning that Defendants must be given an opportunity to cure, or purge, their noncompliance before the issuance of coercive monetary sanctions. *Bagwell*, 512 U.S. at 829.

Assuming Defendants are not fully compliant with these performance measures by November 15, 2017, the Court should hold a hearing on that date. At this hearing, Defendants should be required to show that they have taken "*all* reasonable steps" to comply with the Stipulation's requirements and the Court's orders, (*Kelly*, 822 F.3d at 1096 (emphasis in original)); at that point, the Court should order the payment of some or all of the accumulated fines, and/or, if appropriate, find that Defendants remain in contempt. In advance of the hearing, the parties should be ordered to submit statements and any further declarations addressing whether Defendants are in contempt, including any explanations for noncompliance, and the appropriateness of any monetary sanctions or alternative sanctions in light of the record.

By affording Defendants the opportunity to file sworn declarations, submit status conference statements, and appear for an in-person hearing, the Court will provide Defendants ample opportunity to be heard and to show if they have taken all reasonable steps to comply with the Stipulation and the Court's orders. By providing Defendants with five months before any penalties are imposed, the Court will (1) give Defendants multiple opportunities to purge (*Bagwell*, 512 U.S. at 829); (2) maximize the "probable effectiveness" of monetary sanctions; and (3) minimize "the harm threatened by continued contumacy." *United Mine Workers*, 330 U.S. at 304; *see also Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1117 n.27 (D. Idaho 2013) (noting that a prospective fine schedule is not punitive because the purpose is to "*prevent* the fine from reaching millions because Defendants will fix their behavior and begin living up to their promise in the Settlement

1    Agreement.    If a *prospective* fine leads to $2.4 million in penalties, [Defendant

2    Corrections Corporation of America] has no one to blame but itself.") (emphasis in

3    original), *aff'd*, 822 F.3d 1085 (9th Cir. 2016).

4        Finally, if any fines are paid, some portion of the fines should be paid as

5    compensatory damages to each prisoner for each incident in which he or she did not

6    receive a health care service pursuant to the relevant performance measure.  Plaintiffs

7    propose a nominal payment of $10 for each incident of noncompliance that affected the

8    person.  The parties should file briefs within 14 days of the first payment indicating their

9    positions on what use the Court should make of funds remaining after payment of

10    compensatory damages to the individual prisoners.

11        A proposed order is lodged concurrently herewith.

12        Respectfully submitted,

13    Dated:  July 26, 2017          **PRISON LAW OFFICE**

14

15            By:   *s/ Corene Kendrick*
              Donald Specter (Cal. 83925)*

16               Alison Hardy (Cal. 135966)*
              Sara Norman (Cal. 189536)*

17               Corene Kendrick (Cal. 226642)*
              Rita K. Lomio (Cal. 254501)*

18               **PRISON LAW OFFICE**
              1917 Fifth Street

19               Berkeley, California 94710
              Telephone:  (510) 280-2621

20               Email:    dspecter@prisonlaw.com
                     ahardy@prisonlaw.com

21                      snorman@prisonlaw.com
                     ckendrick@prisonlaw.com

22                      rlomio@prisonlaw.com

23             *Admitted *pro hac vice*

24

25

26

27

28

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Victoria Lopez (Ill. 6275388)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:     dfathi@aclu.org
             afettig@aclu.org
             vlopez@aclu.org

*Admitted *pro hac vice*.  Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Kirstin T. Eidenbach (Bar No. 027341)
**EIDENBACH LAW, PLLC**
P. O. Box 91398
Tucson, Arizona 85752
Telephone:  (520) 477-1475
Email:    kirstin@eidenbachlaw.com

Kathleen E. Brody (Bar No. 026331)
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    kbrody@acluaz.org

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
John H. Gray (Bar No. 028107)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
             agerlicher@perkinscoie.com
             jhgray@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:    jlwilkes@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;*
*Stephen Swartz; Sonia Rodriguez; Christina*
*Verduzco; Jackie Thomas; Jeremy Smith;*
*Robert Gamez; Maryanne Chisholm;*
*Desiree Licci; Joseph Hefner; Joshua*
*Polson; and Charlotte Wells, on behalf of*
*themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**


By:   s/ Maya Abela
      Sarah Kader (Bar No. 027147)
      Asim Dietrich (Bar No. 027927)
      5025 East Washington Street, Suite 202
      Phoenix, Arizona 85034
      Telephone: (602) 274-6287
      Email:    skader@azdisabilitylaw.org
                adietrich@azdisabilitylaw.org

      Rose A. Daly-Rooney (Bar No. 015690)
      J.J. Rico (Bar No. 021292)
      Jessica Jansepar Ross (Bar No. 030553)
      Maya Abela (Bar No. 027232)
      **ARIZONA CENTER FOR DISABILITY LAW**
      177 North Church Avenue, Suite 800
      Tucson, Arizona 85701
      Telephone: (520) 327-9547
      Email:
          rdalyrooney@azdisabilitylaw.org
                jrico@azdisabilitylaw.org
                jross@azdisabilitylaw.org
                mabela@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that on July 26, 2017, I electronically transmitted the above

3  document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4  Notice of Electronic Filing to the following CM/ECF registrants:

5

6                          Michael E. Gottfried
                              Lucy M. Rand
7                    Assistant Arizona Attorneys General
                       Michael.Gottfried@azag.gov
8                        Lucy.Rand@azag.gov

9                          Daniel P. Struck
                         Kathleen L. Wieneke
10                           Rachel Love
                         Timothy J. Bojanowski
11                         Nicholas D. Acedo
                          Ashlee B. Fletcher
12                          Anne M. Orcutt
                             Jacob B. Lee
13                         Kevin R. Hanger
                   STRUCK WIENEKE, & LOVE, P.L.C.
14                       dstruck@swlfirm.com
                        kwieneke@swlfirm.com
15                        rlove@swlfirm.com
                      tbojanowski@swlfirm.com
16                        nacedo@swlfirm.com
                        afletcher@swlfirm.com
17                       aorcutt@swlfirm.com
                          jlee@swlfirm.com
18                       khanger@swlfirm.com

19                       *Attorneys for Defendants*

20

21                                    s/ D. Freouf

22

23

24

25

26

27

28