1              **UNITED STATES DISTRICT COURT**

2              **FOR THE DISTRICT OF ARIZONA**

3                   _____

4

5    **Victor Parsons, et al., on**      )
     **behalf of themselves and all**    )
6    **others similarly situated;**      )
     **and Arizona Center for**          )
     **Disability Law,**                 )
7                                        )    No. **CV 12-00601-PHX-DKD**
                 Plaintiffs,             )
8                                        )
          vs.                            )    Phoenix, Arizona
9                                        )    July 21, 2017
     **Charles Ryan, Director,**         )    3:24 p.m.
10   **Arizona Department of**           )
     **Corrections; and Richard**        )
11   **Pratt, Interim Division**         )
     **Director, Division of Health**    )
12   **Services, Arizona Department**    )
     **of Corrections, in their**        )
13   **Official capacities,**            )
                                         )
14               Defendants.             )
     _____    )
15

16

17       **BEFORE:   THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

         <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>
18
             (***Emergency Telephonic Status Hearing***)
19

20

21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc 43
23   Phoenix, Arizona 85003-2151
     (602) 322-7256

24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

1                      **A P P E A R A N C E S**

2  **For the Plaintiffs:**
              EIDENBACH LAW PC
3             By:  **Kirstin T. Eidenbach, Esq.**
              P.O. Box 91398
4             Tucson, AZ 85752

5             ARIZONA CENTER FOR DISABILITY LAW - Tucson, AZ
              By:  **Maya S. Abela, Esq.**
6             177 N. Church Avenue
              Suite 800
7             Tucson, AZ 85701

8             PRISON LAW OFFICE
              By:  **Donald Specter, Esq.**
9             By:  **Corene Kendrick, Esq.**
              1917 5th Street
10            Berkeley, CA 94710

11 For the Defendants:
              STRUCK WIENEKE & LOVE, P.L.C.
12            By: **Rachel Love, Esq.**
              By: **Ashlee B. Fletcher, Esq.**
13            3100 W. Ray Road
              Suite 300
14            Chandler, AZ 85226

15            OFFICE OF THE ATTORNEY GENERAL - Phoenix
              By:  **Lucy M. Rand, Esq.**
16            By:  **Michael Gottfried, Esq.**
              1275 W. Washington Street
17            Phoenix, AZ 85007

18 Also Present from Arizona DOC:
              **Charles Ryan**
19            **Carson McWilliams**
              **Greg Lauchner**
20            **Brad Keogh, Esq.**
              **Norm Twyford**
21            **Elizabeth Oros**

22            **Ernie Trujillo**
              **Jeff Van Winkle**
23            **John Mattos**
              **Kevin Curran**
24            **Joe Profiri**
              **Kim Currier**

25

```
1                      P R O C E E D I N G S

2            THE MAGISTRATE CLERK:  Civil Case Number 12-601,

3     Parsons, et al., versus Ryan, et al., on for emergency

4     telephonic status hearing.

5            THE COURT:  We are on the record.  Although the court    03:24PM

6     reporter or the recording device is occurring in Phoenix, we're

7     all telephonically on the record.  I am in the circuit

8     headquarters in San Francisco on a conference call.  But I

9     would ask that each side announce for the record.  And because

10    the defendants have taken the care to have such a great number  03:24PM

11    of potential participants in the phone call available, I would

12    ask that we recognize that by asking you, Ms. Love, to also

13    introduce them for the record.

14           MS. LOVE:  I will, Your Honor.

15           THE COURT:  Plaintiff may announce first.              03:24PM

16           MR. SPECTER:  Donald Specter and Corene Kendrick from

17    the Prison Law Office for the plaintiffs.

18           MS. EIDENBACH:  This is Kirsten Eidenbach, attorney

19    for the prisoner plaintiff class.

20           MS. ABELA:  Maya Abela for the Arizona Center for       03:25PM

21    Disability Law.

22           MS. LOVE:  And for defendants as to defense counsel we

23    have Rachel Love, Ashlee Fletcher, Mike Gottfried, and Lucy

24    Rand as counsel for defendants.

25              Also present and available to participate and testify 03:25PM
```

1    as needed in this hearing are the following representatives

2    from the Arizona Department of Corrections:  Ernie Trujillo,

3    Northern Region Operations Director; Warden Kevin Curran, ASPC

4    Florence; Deputy Warden of Operations Jeff Van Winkle for the

5    Florence complex; Deputy Warden for the Florence South Unit,                03:25PM

6    John Mattos; from ASPC Perryville we have Warden Kim Currier,

7    Deputy Warden of Operations Norm Twyford, Deputy Warden

8    Elizabeth Oros.  We also have Joe Profiri, the Southern Region

9    Operations Director for the Arizona Department of Corrections.

10           Also in attendance to listen to the proceedings are        03:26PM

11   Director Charles Ryan, Arizona Department of Corrections; Greg

12   Lauchner, Interim Deputy Director for the Arizona Department of

13   Corrections; Carson McWilliams, Division Director, Offender

14   Operations for the Arizona Department of Corrections; and Brad

15   Keogh, counsel for Arizona Department of Corrections.                       03:26PM

16           THE COURT:  Anyone else on the phone?

17           First, let me say that I appreciate that the

18   defendants have arranged for such a large number of people who

19   have line authority, including the director himself, and that

20   this was uninvited by the Court but very welcome.  It is                    03:26PM

21   welcome because as I think counsel know, this is an issue that

22   is a particular concern to me.  I have only now what I have

23   been presented by the plaintiffs in their emergency motion and

24   I have read that.  But I have not read anything in response

25   from the defendants.                                                        03:27PM

1          But as counsel for both sides know, this is an issue

2    that is very important to me.  The specter of retaliation

3    against class members who have provided information to and

4    assisted the Court in its obligation to obtain honest

5    information about what is happening on the yard regarding the          03:27PM

6    parties' compliance with the stipulation is critical to the

7    Court's role in enforcing the stipulation.

8          The record in this case suggests that the specter of

9    retaliation is more than a mere ghost, and that is because we

10   had an earlier incident in which when plaintiff counsel were          03:27PM

11   interviewing their clients, they believed that there was

12   retaliation against those inmates who had communicated with

13   them, and there was an emergency telephonic hearing that

14   addressed that.

15         And what I learned in that hearing is that people who          03:28PM

16   had spoken to plaintiffs' counsel were immediately ticketed for

17   having their shirttails out, and that this was viewed by people

18   on the scene and by the plaintiffs' lawyers as retaliation.

19   Defendants objected to this characterization and asked for an

20   opportunity for an evidentiary hearing, which I, of course,          03:28PM

21   granted.  But defendants never followed up on that despite

22   repeated invitations from the Court to note that we have not

23   progressed to that evidentiary hearing.

24         Last week when four witnesses testified in court, each

25   of them testified that they believed that they had a real fear          03:28PM

1    of retaliation, but it did not appear that it had occurred

2    until I learned, during the hearing, that two of the witnesses

3    had been rolled up.  And I should take a moment to explain on

4    the record perhaps what I understand that to mean to give the

5    parties an opportunity to challenge my understanding but also    03:29PM

6    to make sure the record is clear about this.

7         My understanding of what it means to be rolled up is

8    that an inmate's housing assignment will be terminated upon

9    that inmate's appearance or departure from the prison facility

10   for a court appearance.  And so the image is of the rolling up   03:29PM

11   of the mattress and the removal of all of the inmate's

12   possessions from that inmate's cell and then the specter that

13   the inmate would return to some other facility, some other

14   assignment, or even to the same assignment but in a different

15   cell.                                                            03:29PM

16        This is significant to inmates, because, quite

17   understandably, in their life, their cell is their home, and

18   their home is in a neighborhood.  And it matters who their

19   neighbors are, and it matters who their cellmate is, and it

20   matters where their possessions are.  Because anybody that has   03:30PM

21   presided in any cases in federal court for any length of time

22   knows that any time that sometimes things are boxed up, those

23   things seem to disappear.  It just seems to happen.

24        I also have told you in the past on the record that

25   inmates in settlement conferences have told me that they         03:30PM

believe the rollup practice is retaliatory for people who are

participating in the judicial system, that if they come to

court for a settlement conference, it's a day appearance.  They

come to the Court in the morning and return back to the custody

of the Department of Corrections, they tell me they are rolled

up and they are reassigned.  There's no explanation for that

that I can fathom other than the suggestion that it's

retaliatory because they are gone for a day.  And I don't

understand how anybody could think that was wise or

appropriate.  And even if there was a good argument that could

be made, it would seem to run straight into the face of the

Court's concern that it was obstruction of justice.  It was to

deny people their opportunity to feel free to come to court.

        So last week with each of the four witnesses and after

Ms. Love was on top of the issue in a way that I was very

appreciative of, she was making contact with Department of

Corrections officials to make sure that these rollups were

undone and that the possessions that were taken were returned.

I need to drop a footnote that I should have made a bigger

point last week, that is, defense counsel referred to getting

the inmates back their stuff.  I don't remember whether "their"

was in the court or not, but stuff was.  The transcript will

reflect what really was said.  But this isn't just somebody's

stuff.  This is all they have.  They are inmates in a world

where we hope that sometime invite them back into our world.

1  But for now they are in a world where they have their home,

2  their neighborhood, their possessions.  It's not just their

3  stuff.

4       So I was troubled by that, and I told each of the

5  witnesses that I did not expect that there would be          03:32PM

6  retaliation, because I had faith and confidence in the lawyers

7  that they would communicate to everybody involved that there

8  should be no retaliation for anyone who had come to court.

9       Then the plaintiffs filed the emergency motion which

10  tells me that it appears that in close proximity to the       03:32PM

11  testimony of these witnesses, two of them suffered things that

12  they viewed to be adverse changes in their conditions.  And

13  what this suggests to me is the specter of retaliation.  And it

14  is something that I do not want present in this case.  Because

15  I cannot perform the role that the parties have given me to    03:32PM

16  supervise and to enforce the stipulation if I cannot rely upon

17  the communication mechanism that is part of the stipulation,

18  and that is contact between the inmates, the class members, and

19  their lawyers in a free and open exchange where they feel

20  comfortable sharing what their view is, and the opportunity for  03:33PM

21  the Court to make its direct observations, either in a court

22  visit to the facility or in court where testimony is taken.  I

23  need to be able to know that there is no chilling effect.

24       And so I believe I communicated previously that

25  actions taken with respect to an inmate status close in time to  03:33PM

1   when they testified would be very suspect.  And so I find now

2   based upon the one side that I have heard that there appears to

3   have been changes in status that were close in proximal time to

4   the testimony that was taken.  So I am very anxious to hear

5   from the defendants about the response to the plaintiffs'          03:34PM

6   petition.

7           Ms. Love.

8           MS. LOVE:  Your Honor, this is Rachel Love.  In the

9   papers that were submitted by plaintiffs' counsel yesterday

10  there was a response as to our pre-filing before plaintiffs       03:34PM

11  filed their pleadings asking defendants' response to these

12  allegations.  It was submitted, I believe, as Exhibit Number 3

13  to plaintiffs' brief and it has my e-mail communications that I

14  provided to Corene Kendrick yesterday at 12:13 p.m.

15          Later in the day they did file their pleadings, and      03:34PM

16  yes, you are correct, Your Honor, we have not filed a pleading

17  since because we were presented with their pleading yesterday.

18  So indeed we were not able to, before this hearing time,

19  present pleadings.  And that is why we have a litany of

20  witnesses ready to be sworn in and testify and to explain the    03:35PM

21  circumstances.

22          But as an overview as to what the evidence will show

23  you, Your Honor, I'd like to explain the circumstances.  And

24  defendants' position is that these allegations made by

25  plaintiffs are false and are the rest of the story, which you    03:35PM

will hear, is evidence that these are normal prison operations.

And I understand that the Court is always concerned about

proximity in time.  However, the fact is that the prison

operations has to continue whether or not somebody testifies.

And in the case of both inmates there is the rest of the story,

the actual and true story as to what happened in the normal

course of prison operations.

As to first I will take what the evidence will show

you as to Mr. Oyenik.  And forgive me if I have stated or

pronounced his name incorrectly.  I must first, Your Honor,

explain to you that your understanding of what is rollup is

wrong.  A rollup, that was a term that was used by the

plaintiff.  At Perryville, what occurs, and what Mr. Bojanowski

explained, is that in the normal course of operations, if an

inmate is going to go out to court, their property is taken and

stored for the simple reason that especially with Ms. Ashworth

and Ms. Keys, they live on an open yard.  If they are gone for

the day from court, their property could be tampered with,

stolen, or otherwise used or taken by other inmates.  There is

no retaliatory malicious motive for storing the property of

somebody who is gone.

THE COURT:  Ms. Love, may I interrupt for a second?

What happens with the inmates when they go to work every day?

They are out of their cell for all of those hours, and you

don't roll them up to protect their possessions.  Why is court

1    different?

2         MS. LOVE:  Well, it's because of, Your Honor, what

3    happens in the normal course of prison life is that the inmates

4    are still around.  They may be told by other inmates if their

5    property is being tampered with.  And the other issue is that            03:37PM

6    for court runs, it is not always known whether or not the

7    inmate will return.  And the other point that I must make --

8         THE COURT:  Excuse me.  How is it that somebody is not

9    going to return when they come to my courtroom to testify?

10        MS. LOVE:  Well, that --                                            03:37PM

11        THE COURT:  I don't think that argument has any weight

12   at all on this point.  But tell me why I'm wrong about that.

13        MS. LOVE:  Well, in this case there was not

14   information, unfortunately by human error, not by any

15   maliciousness or retaliation, to inform that the inmates were            03:38PM

16   expected to come back that same day.  That did happen at

17   Florence, and that's why at Florence we didn't have a situation

18   where the inmates were going to be gone to court longer than

19   one day.  But there is also the aspect that each complex has

20   discretion to be able to vary their operations.                         03:38PM

21        THE COURT:  No, Ms. Love, they don't.  In this case,

22   you have had the responsibility to make sure that my order was

23   implemented that there would be nothing that could be deemed

24   retaliatory.  Two witnesses came to my court and testified and

25   they were rolled up.  And that is viewed legitimately as                03:38PM

1    retaliatory and you knew that that would not be permissive.

2    You knew that you were in trouble in my courtroom when you

3    immediately took care to try to address that issue

4    instantaneously.  Before you even left counsel table in my

5    courtroom you knew it was a problem.  And the fact that you did          03:38PM

6    not take steps preemptively to make sure that witnesses would

7    come to the Court in a way so that there would be no perception

8    on the yard that anything adverse would occur to these people

9    was, in my opinion, a deprivation of the duty that you knew

10   that you should have carried out to further the purposes of          03:39PM

11   this case.  So that argument that you have made, you hear very

12   clearly, is getting nowhere with me.

13            MS. LOVE:  Your Honor, for the record, I must say and

14   so that our record is preserved, that when we are treating

15   inmates and their property is preserved while there are out at          03:39PM

16   court at the Perryville complex, which every single inmate is

17   subject to, that is not treating them differently and it's not

18   treating to them to retaliation.

19            In addition, Your Honor, as these allegations are made

20   by inmates in the courtroom subjecting my clients to          03:39PM

21   allegations, false allegations of retaliation, I have to

22   address that in my time.  And because you are looking at me for

23   an answer because I can tell that you are concerned, I am going

24   to do that and get you answers so that at the break it is not a

25   situation that you are looking to me for answers and I cannot          03:40PM

```
 1    give you specifics as to what's occurring with that particular

 2    inmate.  So that is what we have been talking about this entire

 3    case it seems.  Plaintiffs always say trust and verify.  I was

 4    verifying the information so I could present you with the

 5    answers to what obviously was going to become questions that          03:40PM

 6    you had for us.

 7          So there was not a situation where I thought something

 8    had been done wrong or wrongly.  And again, obviously, the

 9    Court disagrees with defendants, but we're not subjecting the

10    plaintiffs or anybody who is testifying to different treatment.       03:40PM

11    When they are at Perryville they are subject to the same

12    treatment as any other inmate going out to court.

13          THE COURT:  Well, we're not talking about allegations.

14    We're talking about two things that we know occurred, and we'll

15    address these two things that we know occurred.  I want to make       03:40PM

16    it as clear as I possibly can to you:  There will be no change

17    in status of any kind, unless you can demonstrate to me that

18    there is a danger to people on the prison yard or some other

19    very convincing reason, that you take any action within the

20    facility that changes the status of somebody who comes to my         03:41PM

21    court to testify.  You do not roll them up.  You do not take

22    their possessions.  You do not do anything that would be viewed

23    on the yard as an adverse step with respect to their status in

24    the prison close in time to when they are testifying in my

25    court or providing information to the plaintiffs.                     03:41PM
```

1           If you say that there's a good reason that you have to

2    do it for prison safety, for a reason that is particularly

3    compelling, I will listen to it.  But to tell me that it's the

4    normal procedure when I made it clear to you that I didn't want

5    any change in status for anybody who has communicated.  And I          03:41PM

6    think I have to emphasize what is critical to me, and that is,

7    we have a common interest, the plaintiffs, the Court, the

8    defendants, in making sure that I get true information about

9    what is going on.  I have given you every opportunity to

10   cross-examine, to ask for a hearing, to challenge any                  03:42PM

11   allegations of retaliation.

12          And what I have to do is I have, at the end of that

13   process, to make sure that I have a client that exists in the

14   prison in which inmates feel completely safe in communicating

15   their views to the Court.  Their views may not be right.  Their        03:42PM

16   views may be wrong.  Their views may be lies.  But I have to

17   have the opportunity to hear what those views are.  You will

18   have the chance to cross-examine and to present contrary

19   evidence.  But I need to make sure there is nothing happening

20   in the process such that people have a fear that there will be         03:42PM

21   retaliation for what they have done.

22          And when you change their status with respect to a

23   rollup or taking their possessions, when you cannot demonstrate

24   to me that there's a good reason to do so, then I think that it

25   is fair to call it intimidating and chilling, and I can't even        03:43PM

1  have that.  I can't even be close it to.  We have to err on the

2  side of making sure that we don't chill this kind of contact.

3  I think I told you, or maybe, it may have been Mr. Bojanowski

4  or may have been Mr. Struck, I don't recall.  But in the

5  shirttail incident, I essentially said somebody gets a gold          03:43PM

6  pass or a freedom of being written up for a shirttail or any

7  other similar minor infraction close in time to when they

8  communicate to the plaintiffs or they communicate to me.  They

9  get a free pass on that.  If it doesn't interfere with safety,

10 if it's just this kind of infraction imposed for the discipline    03:43PM

11 of the prison, which I understand on any given day you are free

12 to do that, but you are not free to do that close in time to

13 when I have taken testimony or close in time to when they have

14 spoken to plaintiffs.  I thought I made that very clear to you,

15 and this kind of conduct falls into that.                          03:44PM

16        I am going to move on now to the other situation so

17 that you can address the woman who testified in my court and

18 then finds that she's relocated, gets a new bunkee.  I want to

19 understand why that happened as well.

20        MS. LOVE:  Your Honor, I would request clarification       03:44PM

21 as to your order, because a change in circumstance, that's in

22 the eye of the beholder as to the inmate.  I don't know what

23 they are going to think is a change of circumstances.

24        THE COURT:  I think we can settle on some things that

25 you and I don't have a disagreement about what a change in         03:44PM

1   circumstance is.  If you leave for court in the morning and you

2   are in Cell A and your possessions are all in Cell A, and you

3   come back from court later that afternoon and you are now in

4   Cell B with a new roommate, and your possessions are someplace

5   else, that's a change in circumstance.  And I don't want that          03:44PM

6   to happen, period.

7            MS. LOVE:  And that is a change in circumstance, Your

8   Honor, that did not occur in this case.  And with all due

9   respect, you are incorrect as to what a rollup is.  And that

10  was testimony, again, from an inmate not from ADC officials.           03:45PM

11  And when an inmate is transferred out to court for the day they

12  are not coming back to a new housing location.  If they are out

13  for an extended period of court, out of county court for three

14  weeks of trial, they may be subject to a housing change when

15  they come back.  But that is absolutely false that an inmate          03:45PM

16  who goes out to court for the day is going to come back to a

17  different housing location unless there's some sort of

18  extenuating circumstances, and in this case it did not occur.

19           My other concern, Your Honor, is when you talk

20  about -- and I understand you just clarified you are talking           03:45PM

21  about property being taken during the day to prevent, from our

22  side, other people tampering with the property.  But close in

23  time, if you are talking about other, quote, unquote, changes

24  in circumstance that we don't know what that means from the

25  eyes of the beholder of the plaintiff, what does close in time        03:45PM

1    mean?  Does it mean two hours?  Two days?  27 days?  67 days?

2    Because again, the allegation of retaliation is in the eye of

3    the plaintiff who has that opinion.  We cannot see day-to-day

4    prison operations that are dictated by any member of situations

5    to know when is close in time.  And a perfect example here is          03:46PM

6    Inmate Ashworth and her housing change.  She didn't come back

7    to a different housing change.  She didn't come back to a

8    different cellmate.  This is something that occurred on a

9    Wednesday after a Friday hearing.  So close in time, that is

10   not something that is inconceivably even something that we              03:46PM

11   could reasonably understand what the Court, the plaintiffs, or

12   anybody else means by close in time.

13        THE COURT:  Well, I will tell you this:  I will

14   probably know it when I see it, and I'm going to be paying

15   attention to it.  I'm going to be watching very closely.  I'm          03:46PM

16   hearing from you now.  I'm going to hear from the plaintiffs

17   about why it is that somebody who testifies on a Friday has

18   their whole situation undone on a Wednesday, and that is

19   suspect to me.  I will evaluate it.  I will evaluate every

20   single one of these.  I will pay attention to every single            03:47PM

21   person who testifies in my court.  I will follow what happens

22   to every single person, and I will decide whether or not it is

23   close in time or not.

24        MS. LOVE:  As to Ms. Ashworth, her whole situation did

25   not change.  Her property was returned, and it was confirmed by       03:47PM

1   communications to me from the warden that approximately between

2   5 and 6 I got communication that her property had been returned

3   to her after she came back.  She returned to her same cell.

4   Her cellmate was subject to a room change, and she got a new

5   cellmate on Wednesday.  No inmate in any prison in the United          03:47PM

6   States of America has a constitutional right to the prison

7   location, yard, unit, cell, or cellmate of their choice.

8           THE COURT:  Let me interrupt you.

9           MS. LOVE:  It is not just one move that's made that

10  day.                                                                  03:48PM

11          THE COURT:  Ms. Love, I must direct you.  I don't need

12  to hear about a constitutional right that we both understand

13  does not exist for someone to have the selection of where they

14  would like to live in prison.  What we're talking about is the

15  Court's authority to make sure that its role in the stipulation       03:48PM

16  is preserved, and the chilling effect of transferring someone

17  so close in time is not something will elude the close, very

18  close scrutiny of this Court.

19          So it's not a question of whether they have a right or

20  not, it's a question of whether or not you can satisfy the            03:48PM

21  judge that this happened in a way that does not appear to be

22  retaliatory in any way.

23          So I want to understand why it is that this roommate

24  was transferred close in time to my testimony.  Why did that

25  happen, and how long, also, had she been a roommate of Ms.            03:48PM

1    Ashworth?

2         MS. LOVE:  That information I will have to get for you

3    as to how long she had been her cellmate.  But on Wednesday of

4    this week, there were two inmates on the same yard, on the B

5    yard, who had notified prison officials that they were having          03:49PM

6    problems living with their cellmates.  So after that occurs and

7    they look into whether or not there should be a move, the

8    cellmate Alvarez, who was a pregnant inmate, who was moved to

9    Ms. Ashworth's cell, she was having a problem with her

10   cellmate.  There was a decision made from the security side a       03:49PM

11   to whether to accommodate that move keeping everybody on the

12   same yard.

13        The cellmate that was moved out of the -- Ms.

14   Ashworth's cell was not moved to a different yard which that

15   maybe you could look at like, oh, they are trying to get this        03:49PM

16   cellmate away from her, which was Ms. Shied, that did not

17   occur.  They stayed on the same yard.  They merely moved their

18   cells.  So Ms. Shied and Ms. Ashworth are free all day long on

19   that open yard to still communicate.  So right there there's no

20   evidence there's a retaliative motive to get them away from        03:50PM

21   each other.  They can talk to each other and interact with each

22   other all day long.

23        THE COURT:  Ms. Love.  Excuse me.  I'm sorry to have

24   to interrupt you but I need to move this along because my time

25   is limited here.  I have a plane to catch and I have got to        03:50PM

1    address a number of issues.

2        Let me make it clear.  You have told me that you used

3    the roommate of the testifying witness in my case to address a

4    problem that you had in the yard.  I am telling you you cannot

5    do that.  You cannot use the roommate of someone who has                03:50PM

6    testified, changing her situation to address some other

7    problem.  The witness who testifies in my case, any change in

8    circumstance that is not able to be supported by a compelling

9    safety reason, probably, I'm not closing the door to hearing

10   other arguments, but what you have told me is not sufficient.           03:50PM

11   But people who testify in my court are off limits with respect

12   to your decision on the yard of how to deal with other problems

13   you have.  You cannot, and you will not, have that freedom

14   during the time that I am supervising this case because you

15   chill the opportunity that I have to get testimony.  That is my         03:51PM

16   ruling.

17       MS. LOVE:  Your Honor, for clarification, it is your

18   ruling that Ms. Shied will not be moved from Ms. Ashworth's

19   cell for the entirety of this stipulation which could continue

20   for years?  Is that your ruling?                                        03:51PM

21       THE COURT:  That is a preposterous argument because I

22   have made it very clear to you that we are talking about

23   temporal proximity such that a reasonable observer on the yard

24   could see a couple of things.  A woman came to my court and

25   testified on Friday.  On Wednesday, she suffered a major change         03:51PM

1    in the circumstance of her confinement.  That close proximity

2    is very suggestive of retaliation.  A month later, if there was

3    a need to make an arrangement, and that it was usual on the

4    yard for such rearrangements to occur, I would not have that

5    problem.  And I think that any reasonable person would have

6    come to that conclusion without what I view the preposterous

7    statement that you just made.

8         And so I will tell you that I will look at every

9    single change that happens in close proximity to when someone

10   testifies in my court or when they talk to the plaintiffs.  As

11   time passes, and the greater time grows between the testimony

12   or the providing of the information, the burden that plaintiffs

13   would have to show that there is retaliation would become

14   greater; the presumption that retaliation had occurred would

15   become less.

16        So I want to see what we can do to get immediately

17   this Ms. Ashworth returned to the status that she was in when

18   she left to come testify to my court.  If you want to change

19   circumstances after that, meaning in some period of time, that

20   will be something that I will be equally looking at closely,

21   the standard that I just articulated to you is the one that I

22   will apply.  But in this circumstance, I want her returned.  I

23   want the roommate returned.  I want her back in the situation

24   she was in when she testified to me.

25        MS. LOVE:  Your Honor, defendants need clarification

as to what you mean by temporal in time.  We need a cutoff.

Because otherwise you are now forcing the Arizona Department of

Corrections -- I guess as defense counsel I have to daily

monitor whether there's a cell move.  I don't know what you

mean by temporal.  Because in the world of corrections temporal          03:53PM

can mean based on emergency circumstances, based upon whatever

is happening, is that a week?  A month?  Two months?

THE COURT:  In the first instance, I will trust to

counsel's judgment, counsel, looking at the circumstances and

thinking, can this pass the straight-faced test.  You have                03:53PM

heard more from me today that helps you understand what is

likely to be impermissibly passing of the straight-faced test,

and that is if someone testifies on Friday and they suffer a

major change in their status on a Wednesday, absent some

compelling reason, that will be presumptively, think, suspect            03:54PM

and presumptively not permitted.  In fact, in this case I have

given you the clear ruling that it is inappropriate and will be

undone.

With respect to anything beyond that you are talking

about gradations of decision making, decision making that is in          03:54PM

the first instance the role of the lawyer.  Because you will

have to be in a situation overseeing your clients understanding

that they may have a different view of how the world works with

respect to the single issue that they are looking at, and that

is, how do we best run a prison.                                          03:54PM

1           Unfortunately, because of the stipulation and my role

2    in it, I am interjecting myself into that role.  The parties

3    agreed to interject the Court into that role.  And as I told

4    the deputy warden when I was there last week, I am not happy

5    about the imposition I have imposed upon their ability to do        03:55PM

6    the best jobs they can, and I'm sensitive to that imposition.

7    But that also gets weighed against the reality, and that is, I

8    cannot do my job unless I assure everyone on the yard that when

9    they come to testify in my court they will suffer no adverse

10   consequence.  And when there's a change in status close in time    03:55PM

11   to when somebody testifies that has a chilling effect and I'm

12   not going to permit it.

13          So I will watch, to a certain extent, every case.  And

14   that will mean that you will have to do more work on that

15   point, you are right.  But also think about in the history of      03:55PM

16   this case, how many witnesses have there been?  There may be

17   more in the future, so you may have more you will have to pay

18   attention to, and there may be more I have to pay attention to.

19   But it doesn't seem to be an overwhelming burden to have to

20   focus on these limited number of witnesses to make sure that in    03:55PM

21   no close proximity to their testimony, admittedly undefined but

22   not such a big burden to have it undefined, because you can

23   make a judgment about whether or not you think you can make an

24   argument to me considering all the various factors.

25          So I'm going to leave it at that.  That is what you          03:56PM

1    are going to have to do.  You are not going to get any more

2    guidance from me, but I think it's enough.  You have enough.

3            MS. LOVE:  Your Honor, for the record, defendants

4    request a full evidentiary hearing on the allegations of

5    retaliation, because you are making rulings, Your Honor,                03:56PM

6    without defendants having the opportunity through declarations,

7    briefing, or actual witnesses testifying as to what occurred in

8    this case.  And with Mr. Oyenik, he has suffered no alleged

9    change in his circumstances.

10           In addition, Your Honor, what I'm hearing from you is         03:56PM

11   that we have to look at housing locations, cellmate, and

12   property as to change in conditions.  I cannot predict what an

13   inmate may think is a different change in his conditions of

14   confinement that would allegedly result in retaliation.  What

15   you are effectively asking me to do as defense counsel is to          03:57PM

16   monitor the daily activities of any inmate who testifies on a

17   daily basis, for counsel to try to anticipate what that inmate,

18   beyond a housing location change, a cellmate change, or a

19   property issue, is going to be a condition of confinement

20   change.  And that is not an order that can reasonably be              03:57PM

21   complied with, and it constitutes micromanaging a prison

22   operation.

23           THE COURT:  Well, first of all, Ms. Love, I think you

24   are making the problem into a much bigger one than it deserves

25   to be.  I'm not asking you to anticipate what an inmate's view        03:57PM

1    will be about what a changed circumstance is.  I'm asking you

2    to anticipate what my view will be, and that's a much easier

3    task to do.  Secondly, if I have to micro manage to make sure

4    that the stipulation is complied with, that's my job.  You gave

5    me that job.  And I can't do the job by being a flyover judge.    03:58PM

6    I learned that last week.  I learned that when I told Mr.

7    Bojanowski, that I had learned yet another thing that was the

8    opposite of what you had told me in court when I spoke to a

9    deputy warden.

10            And so I will micromanage.  I will be there in the       03:58PM

11   weeds dealing with this, especially in the area where it is the

12   conduit of information to the Court.  I can think of plenty of

13   areas where I will do everything in my power to not

14   micromanage.  But I cannot think of an area where it is more

15   imperative for me to micromanage than this.  I need to make      03:58PM

16   absolutely sure that all of the class members feel completely

17   safe, completely comfortable coming to testify to the Court.

18   And when they suffer, what they deem to be adverse actions as

19   confirmed by me in my view of them, then I believe there is a

20   chilling effect and I cannot permit that to happen.              03:59PM

21            So I will grant you the wish of the evidentiary

22   hearing.  I have always told you that I would give that to you

23   in every case, so I will hear full testimony.  But before we

24   get to that hearing, I want you to return to the status quo of

25   Ms. Ashworth, what she was in at the time when she testified.    03:59PM

1          Now, I believe I have given you a chance to say

2    everything you wanted to say that addressed the two issues that

3    get us to the next step, Ms. Love, and that is you will get

4    your evidentiary hearing.  But I need to turn to plaintiffs and

5    see if there's anything else we need to address now.                    03:59PM

6          MS. KENDRICK:  Yes, Your Honor.  This is Corene

7    Kendrick from the Prison Law Office.  There's just a couple

8    things I want to note for the record.  While Ms. Shied, who is

9    Ms. Ashworth's cellmate, did not come and testify before you,

10   she was one of the Perryville prisoners who submitted written          03:59PM

11   statements regarding what they had witnessed on June 5th at the

12   yard.  And so we would ask that your order to defendants to not

13   take these sorts of adverse actions extend to the women who

14   submitted those written statements that you admitted as Exhibit

15   10 during the hearing last week.                                        04:00PM

16         Also, we just want to note for the record a couple of

17   other items.  Ms. Love keeps saying that the rollups are

18   routine when people go out to court.  However, our two

19   witnesses from Florence prison were not rolled up before coming

20   to testify before you last week.  As noted in my declaration,          04:00PM

21   Mr. Oyenik was confused when he was asked about his property

22   because he had not been rolled up.  And he lives in a dorm

23   setting, whereas these two women actually live in cells.

24         And in the case of Ms. Ashworth, you asked about what

25   happens when they work.  She actually leaves the unit, and she         04:00PM

1    drives the tram between the administrative building and the

2    other units.  So it's clear that her property is left in her

3    cell at those times, and Ms. Love's explanation that this was

4    somehow done to protect the two testifying witnesses holds no

5    water when you consider the fact that they are housed in cells    04:01PM

6    and the subpoena that you signed telling them to come to court

7    said that they were coming for the day to testify.

8           THE COURT:  Ms. Kendrick, with respect to your first

9    point about the affiant, I view them to be within the

10   protective scope of my concern.  Whether they testify in court   04:01PM

11   or whether they provide affidavits or whether they speak to

12   you, that is the communication function that is required by the

13   stipulation, and I will do everything I can to protect and

14   preserve that function and to render every class member -- to

15   provide as much assurance as I can to every class member that    04:01PM

16   that is a safe practice, that they can safely communicate to

17   the Court and to their counsel the circumstances that are

18   relevant to the enforcement of the stipulation.

19          I will enter a written order with respect to the

20   matters at hand today, and I will do that as soon as I can.  I   04:02PM

21   will ask counsel to meet and confer about when you believe that

22   you can be ready for this evidentiary hearing that the

23   defendants would like to have and we'll put it on the calendar

24   as soon as there's an availability to do so on the Court's

25   calendar and on counsel's and the witnesses' counsel.            04:02PM

1          The essential point that I want to be taken from this

2    hearing, and I, again, appreciate the fact that the director

3    and deputy wardens and regional directors are present is I

4    appreciate your appearance.  I appreciate what you do on a

5    day-to-day basis.  And I appreciate also that I am interjecting          04:02PM

6    myself in a world where you know more often times than I do.  I

7    am endeavoring to learn as much as I can, but in truth, there

8    are limitations to that and I'm not a professional and you all

9    are.

10         But there is one area where I am a professional, and          04:03PM

11   that is the taking of testimony.  I know what kind of factors

12   affect the taking of testimony.  And I am fearful that what has

13   been presented to me has a chilling effect.  And it may well be

14   that the defendants believe that the evidence that support each

15   of these allegations may fall short.  But it is also true that          04:03PM

16   the allegations themselves raise enough of a specter that I

17   think it has a potential chilling effect.

18         So the consequence is that I will be so guarding of

19   the need to keep this communication line open that I will take

20   steps or even if it is only the appearance that there will be a          04:03PM

21   chilling effect.  There may not be because of other reasons,

22   such as standard procedure at the prison.  You may be able to

23   make an argument to me that this was just a standard procedure,

24   that on the 14th of the month, this automatically would happen

25   that somebody would be rotated out.  But if it happens close in          04:04PM

```
 1    time to when somebody has testified in my court, that standard
 2    procedure can't happen because it would be viewed on the yard
 3    as, perhaps, an adverse consequence.  And it may be that in an
 4    individual circumstances my hypothetical doesn't play out.  But
 5    I am trying to communicate to you the message.  The message is          04:04PM
 6    that I have, just as you do, a number of different goals.  I
 7    have to prioritize those goals.  In my own view, there's hardly
 8    anything that has a higher priority than preserving this
 9    communication link.  So some other goals will suffer because of
10    my allegiance to this goal, and I believe it's necessary.               04:04PM
11         Ms. Love, I didn't give you an opportunity to respond
12    to Ms. Kendrick, so you can have the last word before we
13    conclude.  I meant Ms. Love.
14         MS. LOVE:  Your Honor, as to Ms. Kendrick's
15    characterization of what I have communicated to the Court               04:05PM
16    regarding at Perryville and standard operations, as I
17    specifically said earlier, it's standard operations at the
18    Perryville complex based upon that facility's operations.  As
19    to the allegation that nothing could have ever happened to her
20    property, Ms. Ashworth, while she was out at court, that holds          04:05PM
21    no weight.  Where she is on an open yard, we know that her
22    cellmate was back at the complex that day, who could have her
23    cell door open all day long and we can't monitor the comings
24    and goings of what happens in that cell.  So that argument by
25    Ms. Kendrick falls flat.                                                04:05PM
```

1        As to the Court's ruling, it has now been expanded to

2   any inmate who submits any form of evidence as to any other

3   inmate's allegation, and as to Ms. Ashworth which I don't

4   recall off the top of my head, but it was four or five inmates

5   who submitted letters.  And it has now been expanded to any                04:06PM

6   inmate that the plaintiffs' counsel speaks to.  That is unduly

7   burdensome, unreasonable, and an order made without any actual

8   evidence of actual retaliation that has not been proven.  You

9   have been talking about appearance of, but there's no actual

10  evidence.  That is overbroad and overburdensome for us to now              04:06PM

11  have to monitor property, change in housing, and change in

12  cellmate for any inmate that the plaintiffs' counsel ever

13  speaks to.  That could be 33,000 people that Rachel Love has to

14  now monitor on a daily basis whether their housing has been

15  changed, where something happened to their property, and                   04:06PM

16  whether they have a new cellmate.  That is absolutely unduly

17  burdensome, unreasonable, and not warranted by just allegations

18  without evidence.

19        THE COURT:  Ms. Love, your hyperbole is extreme and

20  unpersuasive.  There are 33,000 prisoners.  There are between 5            04:06PM

21  and 10 plaintiffs' lawyers.  If they started to talk to every

22  single one of them, which you know is not going to happen, and

23  you know over the course of this case that issue has arisen

24  just a couple of times.  So the specter that you raise about

25  33,000 people that you have to watch is, again, preposterous.              04:07PM

1    So the hyperbole does not advance the argument.

2         But what I want to make clear to you, that if you see

3    a case, a court filing from the plaintiffs that includes an

4    affidavit in it from an inmate in which they are telling me

5    something that I think is useful in the case, you need to be          04:07PM

6    mindful of whether or not that person has suffered any kind of

7    close in time proximal change in circumstance.  Now, I think as

8    a practical matter this is not going to be as grave as you

9    suggest.  And that's why I say that you have entered into a

10   hyperbolic argument.  It is this:  We haven't seen very many         04:07PM

11   affidavits over time.  We have seen some number of them but not

12   a great number.  We also understand that there is a dialogue

13   that does occur with respect to plaintiffs and their clients

14   when they visit, and that kind of conduct has, I think,

15   happened on a regular basis during prison visits, and only once     04:08PM

16   in the history of this case, have plaintiffs ever presented to

17   me that they believed that there was retaliation such that it

18   was brought to a level of attention of the Court.

19        There may be other instances, and if there have been

20   other instances and they haven't been reported to me, what I        04:08PM

21   hope is clear from you today, is that you are right.  This is

22   going to be work on your desk.  It's going to be work on my

23   desk.  Because I'm going to be watching this to make sure that

24   people who communicate with the plaintiffs, communicate with

25   the Court, do not feel that they are intimidated.  So there may     04:08PM

1    be some case-by-case determinations that will require extra

2    work, but that's part of our jobs and we are going to do it.

3           So thank you very much for your time today.  I

4    appreciate it very much.  We'll issue the written order.  We'll

5    wait to hear back from you as to when we can set the hearing.          04:09PM

6           Anything else on an emergent basis that we need to

7    hear?

8           MR. SPECTER:  No, Your Honor.

9           THE COURT:  All right.  Thank you.

10           (Proceeding concluded at 4:09 p.m.)          04:09PM

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                       C E R T I F I C A T E

5

6           I, LAURIE A. ADAMS, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9           I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 27th day of July,

15   2017.

16

17                                 s/Laurie A. Adams

18                                 _____
                                   Laurie A. Adams, RMR, CRR

19

20

21

22

23

24

25