CV-12-00601-PHX-DKD, August 9, 2017

1          UNITED STATES DISTRICT COURT                    08:59:29

2          FOR THE DISTRICT OF ARIZONA

3          _____

4

5  Victor Antonio Parsons, et al., on )              08:59:29
   behalf of themselves and all others)
   similarly situated; and Arizona    )
6  Center for Disability Law,         )
                                      )
7           Plaintiffs,     )  CV-12-00601-PHX-DKD
                            )
8           vs.             )  Phoenix, Arizona
                            )
9                           )  August 9, 2017
   Charles L. Ryan, et al., Director, )  9:01 A.M.
10 Arizona Department of Corrections; )              08:59:29
   and Richard Pratt, Interim Division)
11 Director, Division of Health       )
   Services, Arizona Department of    )
12 Corrections, in their Official     )
   capacities,                        )
13                           )
            Defendants.     )
14 _____ )

15                                                     08:59:29

16 BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE

17          TRANSCRIPT OF PROCEEDINGS

18     EVIDENTIARY HEARING AND STATUS HEARING

19

20                                                     08:59:29

21 Official Court Reporter:
   **Elaine M. Cropper, RDR, CRR, CRC**
22 Sandra Day O'Connor U.S. Courthouse
   401 West Washington Street, SPC 35
23 Phoenix, Arizona  85003-2150
   602.322.7245/(fax) 602.322.7253
24
   Proceedings Recorded by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription  08:59:29

United States District Court

2

CV-12-00601-PHX-DKD, August 9, 2017

<u>**I N D E X**</u>

**TESTIMONY**

| WITNESS | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| HENRIETTA WESTERN | 5 | 29 | | |
| ROBIN COLEMAN | 39 | 53 | | 59 |

<u>**E X H I B I T S**</u>

| Number | | Ident | Rec'd |
|---|---|---|---|
| 11 | Information Report | 26 | 28 |
| 12 | Information Report provided by Sergeant Coleman | 51 | 53 |

<u>**RECESSES**</u>

| | Page | Line |
|---|---|---|
| (Recess at 10:28; resumed at 10:47.) | 61 | 7 |
| (Recess at 12:02; resumed at 1:15.) | 104 | 16 |
| (Recess at 2:45; resumed at 3:01.) | 154 | 12 |

United States District Court

CV-12-00601-PHX-DKD, August 9, 2017

**<u>APPEARANCES</u>**

08:59:29

For the Plaintiffs:

      **CORENE T. KENDRICK, ESQ.**
      **DONALD SPECTER, ESQ.**
      Prison Law Office
      1917 5th St.
      Berkeley, CA  94710
      510.280.2621/(fax) 510.280.2704

08:59:29

      **KIRSTIN T. EIDENBACH, ESQ.**
      Eidenbach Law, P.C.
      P.O. Box 91398
      Tucson, AZ  85752
      520.477.1475

      **MAYA STOCK ABELA, ESQ.**
      Arizona Center for Disability Law - Tucson, AZ
      177 N. Church Ave., Ste. 800
      Tucson, AZ  85701
      520.327.9547/(fax) 520.884.0992

08:59:29

For the Defendants:
      **DANIEL P. STRUCK, ESQ.**
      **TIMOTHY J. BOJANOWSKI, ESQ.**
      **RACHEL LOVE, ESQ.**
      **ANNE M. ORCUTT, ESQ,**
      **KEVIN R. HANGER, ESQ.**
      Struck, Weineke & Love, P.L.C.
      3100 W. Ray Rd., Ste. 300
      Chandler, AZ  85226
      480.420.1600/(fax) 480.420.1695

08:59:29

      **LUCY M. RAND, ESQ.** (Present telephonically)
      Office of the Attorney General
      15 South 15th Avenue
      Phoenix, AZ  85007
      602.542.7683/(fax) 602.542.7670

08:59:29

Also Present:

      Ms. Jennifer Finger, Corizon

United States District Court

CV-12-00601-PHX-DKD, August 9, 2017

1                            **P R O C E E D I N G S**                        08:59:29

2        (Court was called to order by the courtroom deputy.)

3        (Present telephonically are Ms. Jennifer Finger, Corizon,

4   and Ms. Lucy Rand, Office of the Attorney General.)

5        (Proceedings begin at 9:01.)                                         09:01:28

6            THE COURT:  Thank you.  Please be seated.  Good

7   morning.

8            COURTROOM DEPUTY:  Civil case number 12-601, *Parsons,*

9   *et al. v. Ryan, et al.*, on for continuation of evidentiary

10  hearing and status hearing.                                              09:01:47

11           THE COURT:  And can we have counsel's announcements,

12  please.

13           MR. SPECTER:  Donald Specter and Corene Kendrick,

14  Prison Law Office, for the plaintiffs.  Good morning.

15           THE COURT:  Thank you.  Good morning.                           09:01:58

16           MS. EIDENBACH:  Kirstin Eidenbach for the prison

17  plaintiff class.  And behind me is Maya Abela from the Arizona

18  Center for Disability Law.

19           THE COURT:  Thank you.

20           MR. BOJANOWSKI:  Tim Bojanowksi, Rachel Love, Anne       09:02:08

21  Orcutt, Kevin Hanger, and Mr. Struck will be arriving in about

22  an hour, so I figured I would announce him now.

23           THE COURT:  Okay.  We'll make a note of the record

24  when he arrives.

25           And anyone on the phone?                                        09:02:22

United States District Court

HENRIETTA WESTERN - Direct

| | | |
|---|---|---|
| 1 | MS. RAND:  Lucy Rand from the Attorney General's | 09:02:25 |
| 2 | Office for the defendant. | |
| 3 | THE COURT:  Thank you.  Good morning. | |
| 4 | All right.  Are we ready to pick up where we left | |
| 5 | off? | 09:02:32 |
| 6 | MS. LOVE:  Yes, Your Honor.  Defendants call | |
| 7 | Officer Western. | |
| 8 | THE COURT:  Please step forward to the clerk of the | |
| 9 | court here in the well to be sworn. | |
| 10 | MS. EIDENBACH:  Your Honor, plaintiffs would like to | 09:02:42 |
| 11 | invoke the rule. | |
| 12 | THE COURT:  And are there any witnesses that are | |
| 13 | still in the courtroom? | |
| 14 | MS. LOVE:  No, Your Honor. | |
| 15 | THE COURT:  All right.  Thank you.  Right here is | 09:02:49 |
| 16 | fine. | |
| 17 | (HENRIETTA WESTERN, a witness herein, was duly sworn or | |
| 18 | affirmed.) | |
| 19 | **DIRECT EXAMINATION** | |
| 20 | BY MS. LOVE: | 09:03:15 |
| 21 | Q.   Would you please state your name for the record? | |
| 22 | A.   The full name or just the last name? | |
| 23 | Q.   Full name. | |
| 24 | A.   Henrietta Western. | |
| 25 | Q.   And who is your employer? | 09:03:24 |

United States District Court

HENRIETTA WESTERN - Direct

1    A.    Department of Corrections in Arizona.                    09:03:27

2    Q.    How long have you worked for the Department of

3    Corrections?

4    A.    Two years.

5    Q.    And what is your position currently with the Arizona    09:03:33

6    Department of Corrections?

7    A.    I'm a CO II, correctional officer.

8    Q.    Can you describe for us what are the duties of a CO II, a

9    correctional officer?

10   A.    We provide for accountability of inmates.  We provide for   09:03:46

11   security of public as well as the inmates and we protect state

12   property and we provide for any needs of the institution that

13   we have been trained to perform.

14   Q.    And you can pull the microphone closer to you so you don't

15   have to bend over and talk into it.  Is that better?           09:04:12

16   A.    Yes.

17   Q.    Are you currently assigned to the Perryville complex?

18   A.    Yes, ma'am.

19   Q.    Do you work in a particular location at the Perryville

20   complex currently?                                              09:04:24

21   A.    Currently I work for Complex and until about a month ago I

22   worked at San Pedro Unit.

23   Q.    What does it mean to work for Complex?

24   A.    That is the unit that I currently work for.  There's

25   units.  One of them is Complex.                                 09:04:41

United States District Court

HENRIETTA WESTERN - Direct

1   Q.   During the two years that you have worked for the Arizona          09:04:43
2   Department of Corrections, have you always worked at the
3   Perryville complex?
4   A.   Yes, ma'am.
5   Q.   And as you -- before you started as a correctional               09:04:51
6   officer, did you go through an academy?
7   A.   Yes, I did.
8   Q.   How long was that academy?
9   A.   It was six weeks.  The seventh week was the type of a
10  training week so I could say seven.  Excuse me.                      09:05:06
11  Q.   After the academy, did you receive on-the-job training at
12  the Perryville complex?
13  A.   Yes, I did.
14  Q.   How long was that on-the-job training?
15  A.   I believe we did a week of what we call OJT, on the unit,        09:05:19
16  on a different unit, not the one that I worked at.
17  Q.   When you went through the academy prior to being on duty
18  at the Perryville complex, did you receive training in ICS?
19  A.   In the academy we did, yes.
20  Q.   What does the term ICS mean to you?                              09:05:40
21  A.   Incident Command System.  Emergency, for emergencies.
22  Q.   Can you describe for us what kind of training you received
23  at the academy regarding ICS?
24  A.   We received a reassignment and there was a classroom
25  setting with a group of other cadets and our Sergeant.  There        09:06:00

United States District Court

HENRIETTA WESTERN - Direct

1  was a situation described and we played roles of -- a group of          09:06:09

2  cadets would play roles of officers and the other cadets would

3  be inmates and we were to respond to different situations and

4  observe the responses of the cadets that were involved in the

5  exercise.  And we would all have opportunity to participate in    09:06:32

6  the exercise.

7  Q.   Since your assignment at Perryville as a CO II, have you

8  been involved in activating an ICS as a correctional officer?

9  A.   Yes, ma'am, several, many ICSs, yes.

10  Q.   Can you describe for us the kinds of circumstances where      09:06:51

11  you were personally involved over the last two years in

12  activating an ICS?

13  A.   Seizure-like symptoms, bleeding from the skull of an

14  inmate, another ICS, labor pains, falls, self harm as well as

15  PREA and several others.                                          09:07:23

16  Q.   As a correctional officer, do you yourself have the

17  authority to activate an ICS if you believe the situation

18  warrants it?

19  A.   Yes, absolutely.  I am.

20  Q.   Do you have to seek approval from a supervisor in order to    09:07:36

21  activate an ICS?

22  A.   No.

23  Q.   Can an ICS be activated for situations other than medical?

24  A.   I am not sure what you're referring to.

25  Q.   Well, you've told us about activating an ICS related to       09:07:54

United States District Court

HENRIETTA WESTERN - Direct

1    medical incidents?                                                    09:07:58

2    A.    Yes.

3    Q.    Is the ICS system used for response to other circumstances

4    besides medical, based on your own experience?

5    A.    I'm trying to answer your question.  I mean any kind of         09:08:13

6    emergency.  If there was a fire, I would initiate ICS.  It's

7    for emergencies.

8    Q.    If you -- if there's a circumstance that presents on the

9    medical side with respect to an inmate where an ICS may need to

10   be activated, are you trained to look for certain medical           09:08:31

11   situations, certain medical symptoms in order to determine

12   whether an ICS should be activated or not?

13   A.    We do not receive medical training as such.  We receive

14   care training as part of our annual training as well while we

15   work.  But we do look for -- if somebody is in a seizure state     09:08:51

16   having seize sure symptoms, we immediately initiate.  If

17   someone is having abdominal pains, labor pains or just

18   abdominal pains on its own, we immediately initiate.  If I

19   witness fall, just to check for back injuries, we'll initiate

20   cell ham.  We immediately initiate PREA.                            09:09:18

21   Q.    What is PREA?

22   A.    And also if somebody has difficulty breathing, we will

23   also initiate immediately and -- yes.  That's what I can

24   remember.

25   Q.    You used the term "PREA."  What does PREA mean?              09:09:37

United States District Court

HENRIETTA WESTERN - Direct

1  A.   It's -- we are trying to prevent rape in prison so rape

2  prevention in prisons.                                              09:09:46

3  Q.   If you were to -- based upon your training and experience,

4  if you yourself were personally to initiate an ICS, describe

5  for us, how would that happen?  Is there somebody that you         09:10:01

6  call?  Is there certain action you take?  And let's constrain

7  it to a situation that involves a medical event.

8  A.   Also, this is in addition to initiating ICS inmate

9  so-and-so is having seizure-like symptoms.  I need supervisor,

10 medical, and a man-down bag and I'm at the B yard in wing four,     09:10:25

11 such and such cell.

12 Q.   And you --

13 A.   I need immediate response.

14 Q.   And you make a communication -- do you make a

15 communication over the radio that you have on you?                  09:10:38

16 A.   Yes.  I push the button on radio and use it to

17 communicate, I'll say, "This is CO II Western to control."

18 Control is going to repeat what I just said so that everybody

19 else can hear it one more time.  And we don't use codes when

20 there's ICS.  We use plain English.  And then I have -- just        09:10:53

21 continue describing what is happening.  If the inmate is still

22 having a seizure, I'll state and say, "The inmate at this time

23 is having a seizure and a man is on the ground.  This is what's

24 happening."

25 Q.   At that time, after you make your radio call, do medical       09:11:09

United States District Court

HENRIETTA WESTERN - Direct

1  personnel then respond to your location and come to you?                    09:11:12

2  A.   Yes.  If I request them to come, they will come.  If we

3  have a wheelchair on site and I can have supervisor escort the

4  inmate to medical in a wheelchair, since medical not on the

5  yard.  It's located off the yard, I'll state thin my ICS and     09:11:30

6  say the -- I do have a wheelchair on site.  If the situation

7  was where inmate is, let's say, able to sit down in a

8  wheelchair, then the inmate will be escorted once the resources

9  come on site which is another officer and -- or supervisor

10  first and another officer.                                       09:11:50

11  Q.   And you stated earlier, and correct me if I'm wrong me, if

12  I heard you wrong, but I believe that you stated that you do

13  not have to seek authorization or permission from a supervisor

14  to activate ICS.  You can do that on your own; is that correct?

15  A.   Yes.  I can do that on my own.  If I feel that that is      09:12:04

16  emergency per my training, I see -- I am in emergency

17  situation, there's a need for the ICS, I'll immediately

18  initiate.  There is no time for trying to decide or per

19  supervisor in that case.

20  Q.   If you yourself have a question as to whether a medical     09:12:25

21  situation does warrant an ICS or not, do you have the

22  opportunity to call a supervisor and talk the situation through

23  with a supervisor in order to decide whether there should be an

24  ICS?

25  A.   Yes.  We have been trained if in doubt of anything with     09:12:40

HENRIETTA WESTERN - Direct

1  regards to the situation, call the supervisor.                        09:12:46

2  Q.   I want to turn your attention now to June 5 of 2016 at the

3  San Pedro yard.  Oh June 5 of 2016 on the San Pedro yard, did

4  you have an encounter with inmate Angela Ashworth in which she

5  made some complaints to you regarding medical conditions?           09:13:07

6  A.   Yes.

7  Q.   What do you recall about the first interaction with

8  Ms. Ashworth on that day?

9  A.   I arrived on the yard.  The shift officer gave me

10  briefing, left the control room.  I entered the control room        09:13:28

11  and picked up my journal at about 1455.  I was about to write

12  in it when Inmate Ashworth arrived to the window to the control

13  room of my control room in the wheelchair.  She was pushed over

14  there by another inmate.  I'm not sure who the inmate was and

15  she stated, "She needs to go to medical.  She might be having      09:13:56

16  allergic reaction due to the eye procedure that was done

17  earlier that day."

18  Q.   Let me stop you there and we'll take this in small steps.

19  Did Ms. Ashworth explain to you what procedure she had had

20  earlier in the day?                                                  09:14:16

21  A.   No, ma'am.  She did not.  To this day I don't know what

22  procedure Ms. Ashworth had done to her eye here.

23  Q.   When you had that initial conversation with Ms. Ashworth,

24  were you able to see her face?

25  A.   She was wearing black glasses.  They were non-see-through      09:14:34

HENRIETTA WESTERN - Direct

1  glasses and I told her, "Go ahead, go to medical," and she was       09:14:40
2  pushed to medical by the other inmate.
3  Q.   Did you notice anything that concerned you about her
4  physical appearance when she was talking to you?
5  A.    Initially when she came over to the box, we call the box,     09:14:52
6  bubble, my control room, no, I didn't.  I did not notice
7  anything other than the glasses other than her appearance but
8  she stated she might be having allergic reaction and she asked
9  to go to medical and I said, "Go ahead and go."
10  Q.   At the time that you told her to go ahead and go to           09:15:18
11  medical, do you know whether or not that was normal operation
12  hours of the open nurse line for medical?
13  A.   It was 1455 approximately.  Their HNR hours are from 12:30
14  until 2.  So it was almost cutoff for the -- to submit an HNR
15  while going over there and get seen using an HNR.                   09:15:42
16  Q.   Based upon the conversation and the presentation of
17  Ms. Ashworth at that time, did you believe that there were
18  circumstances warranting activation of an ICS?
19  A.   I didn't observe anything on Ms. Ashworth's face.  She was
20  referring to the face but -- no.  I didn't see anything there      09:16:02
21  but I told her to go to medical.
22  Q.   Did Ms. Ashworth ask you to activate an ICS or for medical
23  to come to her at that time?
24  A.    No.  She did not.  She asked to go and see medical and I
25  told her that was more than okay with me.  She can go ahead and     09:16:27

14

HENRIETTA WESTERN - Direct

1   see medical right now.                                                09:16:30

2   Q.   Do you recall anything about Ms. Ashworth's demeanor at

3   that time such as did she appear to you to be angry?  Was she

4   crying?  Was she using a loud voice?

5   A.   No.  At that time when she came to the box, she was      09:16:45

6   talking in a normal voice.  Her voice was normal.  Her

7   communication with me was completely normal.  And she just

8   asked to go in a normal tone of voice just like when I'm

9   speaking now and there was our communication at that time.

10  Q.   So you told her that she could go ahead and go to medical;  09:17:02

11  correct?

12  A.   Yes.

13  Q.   And you said she was in a wheelchair at that time?

14  A.   Yes.

15  Q.   And did she have another inmate that was there pushing her  09:17:10

16  or did she have to wheel herself?

17  A.   She had another inmate push her to medical.

18  Q.   And did you permit that other inmate to push her down to

19  medical at that time?

20  A.   Yes, I did.  Inmate agreed to push her and we do that if   09:17:23

21  they agree to help.  We have wheelchair pushers that are

22  specified if someone has a Chrono for a wheelchair pusher; but

23  if she agreed, we let them.

24  Q.   So at that point, then, did you have any further

25  interaction with Ms. Ashworth that day after you gave her      09:17:45

United States District Court

HENRIETTA WESTERN - Direct

1  permission to go down to medical?                           09:17:48

2  A.   Yes.  She returned from medical at about 1415 and she told

3  me they sent her back.  They told her to put in an HNR and that

4  she will be seen with an HNR next morning.  And afterwards,

5  after that interaction, Ms. Ashworth went back to her assigned   09:18:09

6  housing, 4212 upper at B yard, because I went to see her

7  several times after so I remember that.

8  Q.   Let me stop you there.  At the point that Ms. Ashworth

9  comes back and she tells you that medical has told her to put

10 in an HNR the next day, do you remember location-wise where you  09:18:28

11 were when this conversation happened?

12 A.   No.  I can't exactly recall if we were still standing

13 there or where we were standing, where we were exactly.  We

14 were on the B yard but at that moment when we spoke about the

15 fact that she -- that she would be put in HNR and be seen the    09:18:48

16 next morning, I don't remember her exact location at that

17 point.

18 Q.   When Ms. Ashworth advised you that medical had told her to

19 put in an HNR the next day, did she ask you for any additional

20 assistance at that time?                                         09:19:03

21 A.   Not at that present moment no, she just informed me.

22 Q.   Did you have additional interaction with Ms. Ashworth?

23 A.   Yes.  My job is to do security checks at the yard which

24 should be within 40 minutes or, basically, less than 40 minutes

25 I should go ahead and check all the housing locations, all the   09:19:26

United States District Court

16
HENRIETTA WESTERN - Direct

1   cells.  So I started with wing four, went to 4112, which is the        09:19:28
2   first cell on the bottom run, and Ms. Ashworth was sitting
3   on -- at this point I think she was sitting in the chair.  I
4   can't exactly recall whether she was sitting down.  She said --
5   she still -- I asked her how she was doing.  How was she doing        09:19:55
6   and how was she feeling.  Is anything changed?  She said, "I
7   think I still might be having allergic reaction," and she said,
8   "I want you to initiate ICS."
9   Q.   At that point when she asked you to initiate ICS, did you
10  take any action?                                                       09:20:25
11  A.   I asked her to remove the glasses.  She had -- I said, "If
12  it's okay with you, I see part of your face but I don't see the
13  whole face.  I'm not sure -- obviously I'm not medical staff
14  and such, what the glasses are for and such, so I'm not telling
15  you you have to remove them but would you be okay doing so?"          09:20:41
16         She said, "Yes, that is fine."  And she took them off
17  and I saw her whole face.  She was slightly flushed.  It was
18  hot that day.  It was pretty warm in the cell as well so she
19  was looking at me and she looked the way I look today except
20  she was slightly flushed in her face.                                  09:21:11
21  Q.   Did Ms. Ashworth point out anything on her body to say,
22  you know, "Look here," or, "Look here, I'm having an allergic
23  reaction"?
24  A.   She was talking about her face.  She said her face.  She
25  said, "My face."                                                       09:21:29

United States District Court

17

HENRIETTA WESTERN - Direct

1    Q.    Did you take a look at her eyes?                              09:21:30

2    A.    I did.  I was looking straight at her.  I didn't see

3    anything with her eyes the whole time.  I thought, you know --

4    I didn't think anything really.  I had no thoughts.  I was

5    looking at her face so that I can -- since she asked for ICS, I   09:21:46

6    was trying to see, just a verbalization I'll put over the radio

7    if I was to initiate something to see.  So what am I saying

8    when I initiate such as -- and I didn't see anything.

9    Q.    Did her eyes look swollen to you?

10   A.    No.                                                          09:22:08

11   Q.    Did they look red?

12   A.    No.

13   Q.    What was Ms. Ashworth's demeanor?  Was she -- was she --

14   did she appear to be upset?  Was she crying?  Was she --

15   A.    No.  She wasn't crying or she wasn't upset but she was      09:22:20

16   very dissatisfied when she said, "You need to initiate ICS."

17   Q.    Did she complain of any trouble breathing?

18   A.    No.

19   Q.    Chest pain?

20   A.    We were talking the whole time, me and her.  We were        09:22:40

21   communicating.  It was a two-way communication with no

22   breathing difficulties whatsoever.

23   Q.    What did you do based upon the conversation that you had

24   with Ms. Ashworth at that point?

25   A.    I said I was going to go ahead and contact my supervisor    09:22:54

United States District Court

HENRIETTA WESTERN - Direct

1   immediately and tell him about the situation and that I will --   09:22:58

2   with regard to the ICS, I will ask him and see.  But I need his

3   advice because I told her I'm unsure about the decision on

4   this.  I would like to go ahead and contact my supervisor and

5   I'll do that now, ma'am.   09:23:26

6   Q.   And did you contact a supervisor?

7   A.   Yes.

8   Q.   Who did you contact?

9   A.   Sergeant Coleman who was my supervisor on duty that day.

10  Q.   Did you have a conversation with Sergeant Coleman   09:23:34

11  regarding Ms. Ashworth?

12  A.   Yes.  On the phone, yes.

13  Q.   Please tell us about that conversation.

14  A.   I basically told him that Ms. Ashworth is concerned about

15  having a possible allergic reaction, that she did go up to   09:23:51

16  medical as soon as I got on site.  She returned because she was

17  sent back after I authorized her to go ahead and go and she was

18  told to put in HNR and she'll be seen the following morning.

19  But then when I spoke to her again, she said she still might be

20  having allergic reaction, that I fully looked at her and I   09:24:16

21  don't see anything that she's referring to her face.  And I

22  don't see anything but can he please come down and Ms. Ashworth

23  is not happy is what I said to him.

24  Q.   Did Sergeant Coleman come down?

25  A.   He did.  But I spoke to him -- it was about 3 o'clock by   09:24:46

United States District Court

HENRIETTA WESTERN - Direct

| | |
|---|---|
| 1 | the time we spoke with the security check and me speaking to | 09:24:50 |
| 2 | her.  After speaking to her, he did come down but it was at 5 | |
| 3 | o'clock.  But I spoke to him more than once.  I spoke to him | |
| 4 | again before five o'clock came because every security check | |
| 5 | that I did, I went to see Ms. Ashworth as well as everybody | 09:25:03 |
| 6 | else, all the rest of the population on my yard as well.  Of | |
| 7 | course I did security check on everyone but when I went there | |
| 8 | the following time, I informed her, I said, "I spoke to my | |
| 9 | supervisor.  He said he was going to come here." | |
| 10 | She goes, "Well, I still feel the same," and she was | 09:25:22 |
| 11 | at that point on her bed, which was the upper bunk, and sitting | |
| 12 | up.  She had a white washcloth.  It was sort of like this on | |
| 13 | her face and then she took it off and she was talking to me. | |
| 14 | She said, "You know, I still feel the same.  You know, you need | |
| 15 | to initiate ICS." | 09:25:46 |
| 16 | I said, "I would like for my supervisor to come here. | |
| 17 | I did ask him.  In fact, I'll go and talk to him again, I'll | |
| 18 | ask him to come." | |
| 19 | Q.   At that point, did you have the opportunity to look at | |
| 20 | Ms. Ashworth's full face? | 09:26:01 |
| 21 | A.   Yes. | |
| 22 | Q.   Did you see any change in her face as compared to the | |
| 23 | prior time you saw her? | |
| 24 | A.   No.  There was no change and so I called Sergeant Coleman | |
| 25 | again and I told him, "Well, you do need to come down here. | 09:26:15 |

United States District Court

HENRIETTA WESTERN - Direct

1   Ms. Ashworth is not happy.  I'm going to need your assistance,    09:26:18

2   and I said, "I don't see anything still but she's implementing

3   (sic) the ICS needs to be initiated."

4           And then Ms. Ashworth went outside in between my

5   checks before Sergeant Coleman came.  I saw her go outside.    09:26:38

6   She was using the phone for quite a long while.  She still had

7   her washcloth.  She was sitting out there.  It was still very

8   bright outside.  It was really sunny.  It was really hot.

9   There isn't a cover over the phones.  She was there for quite a

10  while.    09:27:00

11          I was just being aware of where she was because in

12  any case, just wanted to make sure how she is doing although I

13  don't see anything; but if anything changed or while she's

14  sitting out there, I -- you know, situation might change so I

15  just wanted to observe how the situation was going.    09:27:20

16  Q.   Between the time that you see her, Ms. Ashworth, go out to

17  use the telephone and Sergeant -- and then you talked to

18  Sergeant Coleman in person, did you see Ms. Ashworth on any

19  other security walks or any other time?

20  A.   No.  By the time Sergeant Coleman was there, she was out    09:27:41

21  there for a while on the phone so it wasn't long after when he

22  came but it was at 5 o'clock.

23  Q.   Do you know whether or not Sergeant Coleman personally

24  talked to Ms. Ashworth?

25  A.   He did because when he came at 5 o'clock, he walked in to    09:27:53

United States District Court

HENRIETTA WESTERN - Direct

1   my control room and he signed my journal and I said, "Well,          09:27:58

2   will you please go ahead and talk to Ms. Ashworth?  She's

3   waiting to be talked to by you."

4        So he went down there to her cell.

5   Q.   Do you know -- do you recall how many conversations you          09:28:13

6   had with Sergeant Coleman between the first time that you

7   called them and then when he physically comes down to the unit?

8   A.   I don't know exactly how many conversations.  More than

9   one.  More than one on the phone and then in the box before he

10  went to see her again there was another conversation and then     09:28:30

11  he came back to the box and we spoke again.

12  Q.   During any of the telephone conversations that you had

13  with Sergeant Coleman, did he provide you any direction or

14  instruction on if you had more interaction with Ms. Ashworth,

15  if there was anything in particular you needed to look for,        09:28:49

16  additional signs and symptoms, anything like that?

17  A.   No.  He said he was going to come down there.  He was

18  going to talk to her.  He will.  As far as the direction goes,

19  no.  I just informed him about -- on my own without asking what

20  Ms. Ashworth's appearance was and what was going on because I      09:29:14

21  was informing him.  I basically wanted him to come down there

22  because I told him I'm more than happy to initiate ICS.  I

23  said, "If it needs to be, we can go ahead with it.  It's

24  absolutely fine with me."

25  Q.   Between the time that you see Ms. Ashworth on the              09:29:32

United States District Court

HENRIETTA WESTERN - Direct

1  telephone and Sergeant Coleman comes down, did you have any        09:29:34

2  additional personal interaction with Ms. Ashworth?

3  A.   No.   But when he returned from seeing her, I asked him

4  again, I said, "What is the outcome?   Are we initiating ICS?

5  Ms. Ashworth asked for the ICS."        09:29:59

6          He said, "I don't see anything, just she's going to

7  put in HNR and she'll be seen with her HNR," and I asked him if

8  I need to write information report about the situation.   He

9  said it wasn't necessary.

10  Q.   Between the time you see Ms. Ashworth on the telephone and     09:30:27

11  the end of your shift, did you have any other personal

12  interaction with Ms. Ashworth?

13  A.   No, I don't think -- Ms. Ashworth wasn't interested in

14  having interaction with me, but I did go there and did my

15  security check every -- within 40 minutes, another one for the    09:30:43

16  rest of the day.

17  Q.   And all of the security checks that you performed during

18  the rest of your shift, did you go by Ms. Ashworth's cell

19  specifically?

20  A.   Yes.   I went to all the cells and hers, yes.        09:30:56

21  Q.   Did you -- during the additional security checks you

22  performed during that shift, on June 5, did you -- when you

23  would go to her cell, would you ask her, "Are you feeling okay.

24  Are you okay?"   Or would you just look in?

25  A.   Observe her.   I can go inside and look at the person.        09:31:13

United States District Court

HENRIETTA WESTERN - Direct

1  Even when they were sleeping, I can go close to the location          09:31:16
2  and look at them.
3  Q.   And did you do that with respect to Ms. Ashworth?
4  A.   Yes.   Yeah because when they are sleeping or anything,
5  it's good to be sure they are moving while they are sleeping as        09:31:27
6  well and what they look like and what their coloring is for any
7  inmate, to make sure they are living, breathing flesh.   That's
8  the priority of the job.   I have to be sure that they are
9  living, breathing flesh because if anything -- anything that
10 is -- I would have to account for them and make sure they are          09:31:50
11 alive.
12 Q.   When you did your additional security checks that during
13 your shift, did you go in and make it a point to look at
14 Ms. Ashworth's face to see if there had been any change?
15 A.   Yes.   Because I -- there's 216 inmates on the yard where I       09:32:04
16 was.   There's 216 inmates on the A yard.   If anything should
17 change about any inmate medically, if anything, if somebody
18 becomes emergency, not just per my training but also I need to
19 make sure everybody is accounted for and that I provide
20 sufficient supervision for them.                                       09:32:33
21       Someone who would need medical attention, I know I
22 need to immediately initiate ICS because I need that person to
23 get their medical attention.   There is another 215 inmates that
24 I need to make sure about.   So it's necessary for these
25 inmates, since I'm not medical staff, or any inmate to be seen         09:32:54

HENRIETTA WESTERN - Direct

1   by medical so they can get their medical attention.  There is      09:32:57

2   no -- no reason for me to not provide for the inmate to be seen

3   if it's emergency.  No reason for me to keep the inmate on the

4   yard at all.  So, yes, I would check because it's my job and --

5   yeah, I need to complete the job and I want to keep it.          09:33:29

6   Q.   Did you see any exchange in Ms. Ashworth's physical

7   appearance during those additional security checks you

8   performed on your shift?

9   A.    No.   Otherwise, if there was any exchanges, if anything

10   became emergency or if there was any changes, if it was         09:33:47

11   emergency, it would be ICS.

12   Q.   And you would have initiated an ICS if you saw any change?

13   A.   Yes.  Later on that day and I usually have more than one

14   ICS or whenever there was more than one a day.  One of -- there

15   was 19 pregnant inmates at the time, inmates that do have       09:34:09

16   seizures that I know of that might have one.  There was a lady

17   that had chest pain.  She said, "I am having chest pain."

18   Q.   And that was that same shift?

19   A.   Yes.

20   Q.   Did you activate an ICS?                                    09:34:32

21   A.   Yes.  She was taken to complex medical, which is off the

22   unit, because the medical staff leaves our unit at 7 and it was

23   after hours of the medical staff that is on San Pedro and in

24   fact, she got to complex and she refused medical, that

25   particular lady did, and it was documented and she returned to   09:34:53

HENRIETTA WESTERN - Direct

1  San Pedro.  But she told me she was having chest pains and I      09:34:58
2  initiated ICS and she --
3  Q.   If Ms. Ashworth had provided you just verbally additional
4  information, if she was just talking to you and what she was
5  complaining of changed based upon the information that she had    09:35:14
6  given you previously, would you have considered initiating an
7  ICS because information she was providing you had changed?
8  A.   When I saw Ms. Ashworth, I -- training and previous ICSs
9  and just the experience that I have had there on the yard, I
10 was looking for some kind of distress.  I was looking for         09:35:40
11 distress, whether it's either with breathing or with her
12 appearance or emotional distress or any kind of distress, so I
13 was also listening to her and communicating with her and that
14 helps with seeing the distress the way someone communicates.  I
15 would be looking for distress of some kind.                       09:36:04
16 Q.   And did you in any manner observe any signs of distress,
17 whether through the spoken word or through Ms. Ashworth's
18 physical presentation, that caused you to conclude that she was
19 in distress to the extent that you should activate an ICS?
20 A.   No, but she was not happy with me.  She did ask for ICS      09:36:31
21 and she was not happy that it wasn't initiated.  She was not
22 happy.  She was angry with me.
23 Q.   Since June 5 of 2017, have you prepared a report regarding
24 the circumstances of that evening with Ms. Ashworth?
25 A.   Yes.  I was asked to by Deputy Warden Lee.  I spoke with     09:36:58

HENRIETTA WESTERN - Direct

1   her over the phone.  She asked about that situation and she          09:37:09

2   asked me to go ahead and asked me if I can please write the

3   report.

4   Q.   And the information that you have provided us today, did

5   you provide that information to the deputy warden that you          09:37:24

6   spoke to?

7   A.   Yes.  My report that I wrote to her was the way we write

8   reports, it's the information with all the facts.  We provide

9   facts.  When the supervisor receives it or the deputy warden,

10  they can ask for additional facts.  There's several different      09:37:44

11  ways that they can ask for more facts.  There was facts in

12  there, yes.

13          MS. LOVE:  Your Honor, may I approach?

14          THE COURT:  You may.

15  BY MS. LOVE:                                                        09:38:15

16  Q.   Officer Western, will you please take a look at the

17  document that is in the folder marked as Defendant's Exhibit

18  Number 11 for identification and take a look at the document

19  and please tell me if you recognize this document?

20  A.   Yes, I do.  I recognize this document.                        09:38:33

21  Q.   What is this document?

22  A.   This is an information report that I wrote when I was

23  asked to by Deputy Warden Lee the 14th of July which is weeks

24  after the incident, but that's when I was asked to write one.

25  Q.   And does this report bear your signature?                     09:38:50

United States District Court

HENRIETTA WESTERN - Direct

1   A.   Yes, it does.                                             09:38:56

2   Q.   And what is the date of the report?

3   A.   14th of July.

4   Q.   And is this the report that you authored in conjunction

5   with the direction from the deputy warden to write a report    09:39:11

6   regarding June 5 of 2017?

7   A.   Yes.

8   Q.   Does the contents -- have you had a chance to review the

9   contents of your report prior to today?

10  A.   I saved it on the computer but I'm just looking at this    09:39:34

11  one that I've signed to be sure that it's still the same thing

12  that I wrote.

13  Q.   Why don't you take a moment and take whatever time you

14  need to make sure that this is the report that you wrote?

15  A.   I saved it before it went onto the books.  It gets filed   09:39:48

16  and then it's filed and that is that.

17  Q.   So this is the actual one that was filed on that day?

18  A.   Yes, that's my report.

19  Q.   And does this fairly and accurately depict the

20  circumstances of the evening that we just spoke about and your  09:40:49

21  encounters with Ms. Ashworth on June 5 of 2017?

22  A.   Yes.

23  Q.   And this is a report that you wrote in the normal course

24  of your duties as a correctional officer with the Arizona

25  Department of Corrections?                                      09:41:02

United States District Court

28

HENRIETTA WESTERN - Direct

1  A.   Yes.   I was on site and I was on duty that day when I          09:41:03

2  wrote this report.

3              MS. LOVE:  Defendants move for admission of Exhibit

4  Number 11.

5              THE COURT:  Any objection?                                09:41:10

6              MS. KENDRICK:  No objection, Your Honor.

7              THE COURT:   11 will be received.

8         (Exhibit Number 11 was admitted into evidence.)

9  BY MS. LOVE:

10 Q.   Since June 5 of 2017, have you had any conversations with        09:41:17

11 Ms. Ashworth about June 5 of 2017?

12 A.    No.   Ms. Ashworth is a member of the population on the B

13 yard in San Pedro just like the rest of the inmates.  I don't

14 even recall having any kind of every detailed conversation with

15 Ms. Ashworth until the day when she informed me she might be         09:41:45

16 having allergic reaction and this situation was happening.   I

17 never had any issues with Ms. Ashworth as an inmate or any

18 difficulties because I don't recall Inmate Ashworth as a

19 specific inmate up until that day that I could remember other

20 than doing security checks as with the rest of them.                 09:42:12

21 Q.   Thank you.  Those are all the questions that I have.

22 A.   You're welcome.

23             THE COURT:  Any cross-examination?

24             MS. EIDENBACH:  Yes, Your Honor.

25

HENRIETTA WESTERN - Cross

**CROSS - EXAMINATION**                                        09:42:37

BY MS. EIDENBACH:

Q.   Good morning.

A.   Good morning.

Q.   Officer Western, you seem like you were very concerned    09:42:54

about Ms. Ashworth the day and evening of June 5.  You kept

checking in on her.  We didn't hear anything about whether you

assessed whether she was in pain.  So was that something that

factored into your assessment of her when you were determining

whether to initiate an ICS?                                    09:43:19

A.   Ms. Ashworth didn't state she was in pain when we were

communicating.

Q.   You were concerned she was in distress, though; right?

A.   I was communicating with her to see if I can see distress

when she asked for ICS and I did not initiate and I said I was  09:43:37

going to contact my supervisor, she was not happy with my

decision at that present moment.

Q.   And did she communicate to you why she was not happy with

your decision?

A.   Ms. Ashworth stated she might be having allergic reaction   09:43:56

due to the procedure that was done.

Q.   And she believed that that warranted the initiation of an

ICS because she was concerned for her health?

A.   She stated she might be having allergic reaction and she

requested ICS, yes.                                             09:44:13

HENRIETTA WESTERN - Cross

1   Q.   Do you have any specific training in assessing whether          09:44:17

2   someone is having an allergic reaction or not?

3   A.   No.   I just go by when it comes to what I see or the other

4   key words that I mentioned.

5   Q.   Okay.   And when you're confronted with a situation on ICS      09:44:28

6   for which you have no specific medical training, wouldn't it

7   make the most sense to err on the side of calling an ICS?

8   A.   If I observed any kind of distress, I can initiate ICS.   I

9   am free to initiate ICS.   I'm not obstructed by anything if I

10  observe distress, difficulty breathing, abdominal pain and          09:44:53

11  labor pains, seizure-like symptoms, chest pains.

12  Q.   My question is just a little bit different, though.

13  A.   That's what I felt so that's why I mentioned it.

14  Q.   My question is, when you're confronted with a prisoner

15  that is telling you that they have a condition that you are not     09:45:14

16  familiar with and you have no training to assess, wouldn't it

17  make the most sense to err on the side of calling an ICS and

18  have a medical provider or nurse make the assessment since you

19  have no ability to make that assessment on your own?

20  A.   I have been trained to contact my supervisor when per DOC      09:45:35

21  in my training when they have trained me if in doubt.   I do get

22  approached by inmates about different concerns that they have.

23  I'm the only officer on the yard so I get approached all day

24  long.   My job is also to determine what is immediate emergency

25  per my training and what is not.   That is my job as well as --     09:46:09

HENRIETTA WESTERN - Cross

1   since I'm just one person there and there is 216 of them so I    09:46:16

2   have to determine what emergency is.  ICS is in system for

3   emergencies.

4   Q.    Is there any reason, though, when you're not certain of a

5   situation, that you would not call an ICS?  For example, do you    09:46:30

6   get in trouble if you call an ICS and it's --

7   A.    No.  I can be asked questions, additional questions, by my

8   supervisor for any ICS or what my decision might have making

9   was on something when it's already cleared.  I can be asked

10  questions about what happened, yes.    09:46:49

11  Q.    You mentioned earlier that you had wanted to write an

12  information report at the time of the incident and that

13  Sergeant Coleman told you not to; isn't that right?

14  A.    I asked him if he needed me to write an information report

15  and he stated it wasn't necessary.  I asked, yes.    09:47:08

16  Q.    Did you feel it was necessary?

17  A.    I prefer to write information report.  I followed my

18  training and trusted my supervisor on anything it wasn't

19  necessary, but I prefer -- it's a good practice because --

20  document, but it's not -- it's not a requirement but it's a    09:47:37

21  good practice.

22  Q.    But part of your training is to follow the direction and

23  instructions of your supervisor and not question them; is that

24  right?

25  A.    Yes.  Yes, because of the nature of the job, yes.    09:47:50

United States District Court

HENRIETTA WESTERN - Cross

1          THE COURT:  You mentioned this is log.  Tell me about          09:47:59

2  the log that you wrote in at the time of the incident.

3          THE WITNESS:  Are you talking about the -- my daily

4  log with the security checks?

5          THE COURT:  Yes.                                                09:48:13

6          THE WITNESS:  That is what we do every day.  We write

7  security checks there.

8          THE COURT:  So when you had the initial encounter

9  with Ms. Ashworth in which she asked you to call an ICS, did

10  you log that?                                                          09:48:26

11          THE WITNESS:  I don't think I did.  I can't 100

12  percent recall what I logged that day unless you pulled the log

13  and look at it.

14          THE COURT:  And what is the log called so that if we

15  wanted to pull it, we would know what to call it?                     09:48:39

16          THE WITNESS:  Correctional service log.

17          THE COURT:  And is it in the control station for this

18  yard, that's an individual log just for that control station?

19          THE WITNESS:  Yes.  And when the log gets filled, it

20  gets filed and a new log starts?                                      09:48:54

21          THE COURT:  On a daily basis?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Thank you.

24  BY MS. EIDENBACH:

25  Q.   You told us a little earlier that you haven't spoken with        09:49:04

United States District Court

HENRIETTA WESTERN - Cross

1   Ms. Ashworth again -- about the June 5 incident; is that          09:49:06
2   correct?
3   A.   Yes.
4   Q.   So you don't recall having a conversation with her on June
5   10 about the June 5 incident?                                      09:49:15
6   A.   No.
7   Q.   Are you familiar with Donna Scheid?  She's also an inmate
8   at San Pedro.  She lives with Ms. Ashworth.
9   A.   Yes.  I think she might.  She's either tram assistant or a
10  tram driver, one of those.  Because it's my job to check them     09:49:34
11  in through the VIGA (phonetic).
12  Q.   And do you recall having a conversation with her on July
13  14 during which you told her that you and Sergeant Coleman had
14  not seen anything relating to Ms. Ashworth's condition the
15  night before?                                                     09:49:50
16  A.   No.  I don't recall the conversation, no.
17  Q.   Have you spoken to Ms. Sheid about the June 5 --
18  A.   No.
19  Q.   If you can let me finish my question, that would be great.
20       -- about the June 5 incident?                                09:50:04
21  A.   No, ma'am.
22  Q.   Okay.  Thank you.
23       The report that your counsel just moved in, the
24  information report that you ultimately wrote about the June 5
25  incident, you wrote that on July 14; is that correct?            09:50:29

United States District Court

34

HENRIETTA WESTERN - Cross

1    A.    Yes, ma'am.                                                  09:50:32

2    Q.    Is that common for you to be asked to prepare a report so

3    long after an incident occurred?

4    A.    Yes.   They can ask me to write report anytime about any

5    kind of incident.                                                 09:50:45

6    Q.    You also testified about Ms. Ashworth when she was out

7    talking on the phone?

8    A.    M'hum, yes.

9    Q.    And then you said that she spoke with Sergeant Coleman.

10   A.    Yes.                                                         09:51:01

11   Q.    Did you observe that interaction with Sergeant Coleman?

12   A.    No.   I was in the box and he came in to sign my log and I

13   said, "Ms. Ashworth, she still would like to speak with him."

14   She's been informed that I spoke to him and he'll be coming and

15   he went down to her cell.   My control box is located by wing     09:51:22

16   four but the cells are down the staircase with a lower and

17   upper on her cell -- her cell is on the low run and he went all

18   the way there alone.

19   Q.    So when she was on the phone, could you see her from your

20   control box?                                                      09:51:47

21   A.    Yes.

22   Q.    Yes.   Okay.   So the interaction didn't necessarily take

23   place while she was out by the phones?

24   A.    No.   She was -- he went to her cell.

25   Q.    He went to --                                               09:51:57

United States District Court

HENRIETTA WESTERN - Cross

1    A.    The interaction was there.                                09:51:59

2    Q.    Did he speak to you about his interaction with her after?

3    A.    No.   I asked him my question only to him because I'm more

4    than happy to initiate ICS.   Ms. Ashworth is requesting ICS.   I

5    even asked him, "Did you see anything?   What is the decision on   09:52:16

6    this?   What will I be doing?"

7              He said, "No, I don't see anything.   She's going to

8    put in HNR."

9    Q.    Are you aware that Ms. Ashworth was actually diagnosed

10   with an allergic reaction and had to receive treatment after    09:52:30

11   June 5?

12   A.    I believe medical staff, to be completely honest with you,

13   which wasn't -- at the time the report was written or at the

14   time of the incident, might have been couple weeks ago, some

15   member of medical staff at complex mentioned that the following   09:52:55

16   day she had some allergic reaction.   If I'm going to be with

17   people, document work, I don't know who it was but you asked if

18   I'm aware of it, no, I wasn't at the time of any of these, but

19   I'm just telling you the truth about what I heard someone

20   mention.                                                         09:53:18

21   Q.    Of course.

22              And so they told you that she had an allergic

23   reaction the following day but not on June 5?

24   A.    With someone speaking, yes, um.

25   Q.    Okay.   Thank you very much.                               09:53:32

United States District Court

HENRIETTA WESTERN - Cross

1       MS. EIDENBACH:  I have no further questions.          09:53:34

2       THE COURT:  I have a couple of questions, Officer.

3  When you first encountered Ms. Ashworth and she asked you to

4  call an ICS and she explained the reason for her request, you

5  testified that it was because of an allergic reaction and that   09:53:47

6  you also didn't really know what the circumstances were of it.

7       THE WITNESS:  I still don't.

8       THE COURT:  Well, did she tell you that she had had

9  treatment to her eye?

10      THE WITNESS:  I think she might have mentioned about   09:54:07

11  procedure she had done to her eyes and she's having allergic

12  reaction on her face.

13      THE COURT:  All right.

14      THE WITNESS:  She thinks she might be having.  That's

15  how she said it.                                          09:54:16

16      THE COURT:  And when you visited her cell later in

17  your security checks in the evening, did she still have the

18  towel on her face?

19      THE WITNESS:  The time when she sat on her bed, the

20  second time and I spoke to her in the cell, that's when she had   09:54:32

21  it on and then when she was on the phone but she moved it for

22  me and she spoke to me when I came in.  The first time she had

23  those glasses on, she took those off for me and I talked to my

24  supervisor.  Then that following check where she was sitting on

25  her bed and she had a towel on, she started talking to me, she   09:54:50

United States District Court

HENRIETTA WESTERN - Cross

1   moved it.  She was talking to me without it but she was holding    09:54:54

2   it.

3           THE COURT:  But you said when you checked later to

4   see that she was still breathing, did she still have the towel

5   on her face then?                                                  09:55:02

6           THE WITNESS:  No, sir, not that I recall, no, because

7   I can't see her if she has a towel.

8           THE COURT:  So you couldn't see her head because of

9   the darkness of the cell?

10          THE WITNESS:  No.  You can see -- I have a                 09:55:11

11  flashlight.

12          THE COURT:  Well, when I asked you whether she still

13  had the towel on her face --

14          THE WITNESS:  She didn't have a towel.  I don't

15  recall her having a towel.  I mean, I can only recall what I       09:55:19

16  recall, what I remember.  I don't recall the towel on her head,

17  no.

18          THE COURT:  So when she went to bed, you don't know

19  whether she still had the towel on her head?

20          THE WITNESS:  I don't recall her having a towel on         09:55:33

21  her head when she went to bed and I can see in the cell because

22  I can use a flashlight.

23          THE COURT:  But I gather you can't see her eye if her

24  eyelid is closed when she's asleep?

25          THE WITNESS:  I can't see that, no.                        09:55:48

United States District Court

| | | |
|---|---|---|
| 1 | THE COURT:  But you did know that she was having an | 09:55:50 |
| 2 | allergic reaction that was focused on her eye treatment at the | |
| 3 | time? | |
| 4 | THE WITNESS:  She said she had procedure to her eyes | |
| 5 | and she might be having allergic reaction on her face to her | 09:56:02 |
| 6 | eyes I think. | |
| 7 | THE COURT:  Thank you. | |
| 8 | Any redirect? | |
| 9 | MS. LOVE:  No, Your Honor.  Thank you. | |
| 10 | THE COURT:  Any questions engendered by my questions, | 09:56:11 |
| 11 | Ms. Eidenbach? | |
| 12 | MS. EIDENBACH:  No, Your Honor. | |
| 13 | THE COURT:  Okay.  Thank you very much.  I really | |
| 14 | appreciate you coming in today and talking with us.  Have a | |
| 15 | good day. | 09:56:23 |
| 16 | THE WITNESS:  You, too. | |
| 17 | (Witness excused.) | |
| 18 | MS. LOVE:  Defendants next call Sergeant Coleman. | |
| 19 | THE COURT:  Thank you. | |
| 20 | Good morning, Sergeant Coleman.  Please step forward | 09:57:02 |
| 21 | to the clerk of the Court so that she may administer the oath. | |
| 22 | COURTROOM DEPUTY:  Please raise your right hand. | |
| 23 | (ROBIN COLEMAN, a witness herein, was duly sworn or | |
| 24 | affirmed.) | |
| 25 | COURTROOM DEPUTY:  Thank you.  Please have a seat. | 09:57:26 |

United States District Court

ROBIN COLEMAN - Direct

**DIRECT EXAMINATION**                                        09:57:28

BY MS. LOVE:

Q.    Would you please state your full name for the record?

A.    Robin Coleman.

Q.    Who is your employer?                                  09:57:35

A.    Arizona Department of Corrections.

Q.    How long have you been employed by the Arizona Department

of Corrections?

A.    Almost 11 years, ma'am.

Q.    What is your current position?                         09:57:44

A.    I'm a Sergeant Supervisor at San Pedro Unit.

Q.    Where is the San Pedro Unit located.  Which complex?

A.    On Perryville complex.

Q.    How long have you held the position of Sergeant at the San

Pedro Unit?                                                  09:57:58

A.    About a year and a half now.

Q.    Can you take us through the different positions that you

have held while you have been employed with the Arizona

Department of Corrections?

A.    Yes, ma'am.  I have been a correctional officer.  I have   09:58:09

been a kitchen officer.  I have been a visitation officer.   I

have been mail and property.  I've had almost every position a

CO could have.

Q.    Prior to being assigned a Sergeant at the San Pedro Unit,

did you serve as a Sergeant at any location?                 09:58:26

ROBIN COLEMAN - Direct

1    A.    No, ma'am.                                                          09:58:32

2    Q.    Describe for us, Sergeant, what are your duties as a

3    Sergeant?

4    A.    My duties are as a supervisor, I supervise up to eight to

5    ten COs per day and supervise about 250 inmates per day. I do    09:58:39

6    paperwork, make sure everybody is on time, and I hand -- just

7    different duties.  I don't remember everything as of right now.

8    Q.    Prior to your career with Arizona Department of

9    Corrections, did you serve in the military?

10   A.    Yes, ma'am.                                                         09:59:05

11   Q.    Which branch?

12   A.    United States Marines.

13   Q.    For how long?

14   A.    13 and a half years.

15   Q.    And were you honorably discharged?                                  09:59:10

16   A.    Yes, ma'am.

17   Q.    Based upon your training and experience with the Arizona

18   Department of Corrections, are you familiar with a term called

19   ICS?

20   A.    Yes, ma'am.                                                         09:59:24

21   Q.    What is ICS?

22   A.    The Incident Command System.

23   Q.    And can you please describe for us what is the Incident

24   Command System?

25   A.    The Incident Command System is used in case of             09:59:33

United States District Court

ROBIN COLEMAN - Direct

1    emergencies, any emergency or out of the ordinary issues that          09:59:36
2    may arise.
3    Q.   And what happens with an ICS?
4    A.   When we initiate ICS, we ask for responders or anybody
5    that we need, responders that we need for that emergency.               09:59:52
6    Q.   What kind of events would necessitate calling an ICS?
7    A.   We would have medical emergencies, escape, fights, riots,
8    sometimes weather initiates an ICS.  Sometimes if we can't find
9    an inmate, we may initiate an ICS.  If I'm short-staffed, I may
10   initiate an ICS.                                                        10:00:23
11   Q.   If an ICS is initiated, are there certain designated
12   personnel that would respond to an ICS?
13   A.   Yes, ma'am.
14   Q.   And the persons that would respond to an ICS, is that
15   dependent on what is the nature of the emergency at hand, like          10:00:37
16   a riot versus a medical emergency, or is it the same people who
17   would respond no matter what?
18   A.   We would ask for some of the same people.  No matter
19   what -- we have designated responders, we have our A team.  We
20   have our B team.  We have the supervisor.  That's for every ICS         10:00:55
21   and then depending if it's a medical emergency, we may ask for
22   medical.  If it's a fire, we may ask for fire department.  If
23   an inmate is in progress of having a baby, at that time I may
24   not wait for medical.  I might ask for an ambulance.
25   Q.   As a Sergeant, are you automatically assigned to an ICS            10:01:15

United States District Court

ROBIN COLEMAN - Direct

1    team for the San Pedro Unit?                                             10:01:21

2    A.   No, ma'am.  It depends how many supervisors are on at that

3    day.

4    Q.   So if you come on shift -- do you work today?  Are you

5    going back on shift today?                                               10:01:31

6    A.   No, ma'am.

7    Q.   Okay.  So are you on shift tomorrow?

8    A.   Yes.

9    Q.   Tomorrow when, for example, when you come on shift

10   tomorrow, if there is more than one sergeant on duty at the San          10:01:39

11   Pedro Unit, when you come on shift, would you know whether or

12   not you would be part of the ICS team?  Is it designated when

13   you come on shift?

14   A.   Yes, ma'am.  We do schedule and we do a briefing and when

15   we come on, we designate the A team, the B team, and usually            10:01:56

16   between the supervisors, one of us will be the A team

17   supervisor.  One of us will be the B team supervisor.  It's

18   already in our roster which one of us is going to do which job.

19   Q.   So on the San Pedro Unit, each shift there would be two

20   ICS teams assigned?                                                      10:02:15

21   A.   Yes.  Or there's supposed to be a C team and other

22   responders.  We have a type five response, type four response

23   all the way down to a type two response.

24   Q.   And what do the different types indicate?

25   A.   What entity we would call.  A type five response would            10:02:29

United States District Court

43

ROBIN COLEMAN - Direct

1  mean just people on the yard.  A type four would mean I would          10:02:33
2  need to call outside resources.  Type three response, you start
3  getting into CIU and the warden and other people to respond.
4  Q.   On the most basic type of response, was that the five?
5  A.   Yes, ma'am.                                                        10:02:50
6  Q.   What kinds of personnel and numbers would be assigned to a
7  type five response team?
8  A.   Depending on how many personnel I have would be the
9  numbers.  But it would be a basic responder, which is usually
10  my yard officer, and they would usually -- when asked, the             10:03:08
11  person would ask for a type five response.  So anybody that
12  I've designated as a type five response would respond.  If I
13  only have one yard officer, he would respond.  If I have a
14  medical officer, they would respond along with the medical
15  nurses and then a supervisor.                                          10:03:27
16  Q.   How long have you been Sergeant at San Pedro again?
17  A.   A year and a half.
18  Q.   In the year and a half that you have worked as a
19  Sergeant at San Pedro unit, have you yourself been personally
20  involved in ICS activations related to inmate medical related         10:03:47
21  events?
22  A.   Yes, ma'am.
23  Q.   As for the ICS process, is that something that you receive
24  training on through Arizona Department of Corrections?
25  A.   Yes, ma'am.                                                       10:04:09

United States District Court

44

ROBIN COLEMAN - Direct

1    Q.    And how did you receive the training?  In what realm?        10:04:09

2    A.    During the academy we have classes on ICS and we have a

3    class every year.  We go to training, once a year.

4    Q.    When it comes to ICSs related to an inmate medical related

5    event, do you receive training on what the factors that would      10:04:26

6    determine whether or not an ICS should be initiated?

7    A.    Some of them, yes, ma'am.

8    Q.    Please explain for us what you have been trained upon.

9    A.    We have been trained on key words and I would said visual

10   factors.  If an inmate is in duress, some of the key words         10:04:45

11   would be chest pains, difficulty breathing, visual, might be

12   excruciating pain, blood, or if just one of us thinks that

13   there's something more out of the ordinary, we could initiate

14   the ICS.

15   Q.    Does a correctional officer -- take, for instance, a yard     10:05:06

16   officer -- have the discretion and authority to initiate an ICS

17   without getting permission from somebody above such as you as a

18   supervisor?

19   A.    Yes, ma'am.  That would be the case if an inmate walked up

20   and said they were having chest pains, they are authorized         10:05:25

21   immediately ICS, difficulty breathing.  If I have a pregnant

22   inmate that is saying something -- they feel something is

23   wrong, they have the discretion to call the ICS.  If they see

24   blood, an inmate in pain, they do have that discretion to call

25   the ICS, yes, ma'am.                                               10:05:42

45

ROBIN COLEMAN - Direct

1  Q.   Are there any circumstances related to an inmate's medical          10:05:44
2  condition where an officer is required to seek your authority
3  as a Sergeant in order to initiate an ICS?
4  A.   Yes, ma'am.  If it does not seem as the inmate -- if we
5  visually -- I'm saying "we," we as when I was a CO, does not          10:06:01
6  seem that the inmate is in extreme duress, then -- or it's a
7  normal every day occurrence, an inmate walks up and says, "Hey,
8  I just have a headache," the CO would then call the supervisor
9  who would tell them to initiate the ICS or walk them through
10 what steps they need to take.                                          10:06:24
11 Q.   On June 5 of 2011, were you on duty at the San Pedro unit
12 in your capacity as a Sergeant?
13 A.   Yes, ma'am.
14 Q.   Do you recall weren't whether or not you had any
15 interaction with Inmate Angela Ashworth when you were on shift        10:06:39
16 on June 5 of 2017?
17 A.   Yes, ma'am.
18 Q.   Please tell us what your first encounter was with
19 Ms. Ashworth on that day.
20 A.   Would I go back to the beginning of the incident or just         10:06:58
21 when I had my encounter with the inmate?
22 Q.   Why don't you go back to the beginning?  Let's start
23 there.
24 A.   CO II Western had given me a call and stated Inmate
25 Ashworth stated she thought she was having an allergic reaction       10:07:10

United States District Court

ROBIN COLEMAN - Direct

1  to iodine in her eyes.  She had just had a procedure done on                     10:07:15

2  her eyes.  Because we were just coming on shift, it was before,

3  a little bit before 2 o'clock.  I told Western to send Inmate

4  Ashworth up to medical.  Western sent Ashworth up to medical.

5  We continued to do our duties.                                                  10:07:32

6      Approximately about I think about 1500 Western called

7  me back and said Ashworth still wasn't feeling good.  I said,

8  "Hold on.  Let me go to medical and find out what happened."

9  So I went over to medical and asked the nurses, "Hey, what's

10  going on with Ashworth?  You just saw her for her eyes."          10:07:49

11      The nurses told me there was -- "There's nothing we

12  can do for her.  She needs to come back.  We told her she needs

13  to come back tomorrow to see a provider with an HNR."

14  Q.  Let me stop you there.  Was this a face-to-face

15  conversation that you had with the nurse down at the medical       10:08:06

16  unit on the yard?

17  A.  She wasn't on the yard.  She was in the medical office,

18  yes, ma'am.

19  Q.  But it's the medical unit that's located on that housing

20  yard versus somewhere else?                                         10:08:16

21  A.  On San Pedro, yes, ma'am is.

22  Q.  Do you remember the name of the nurse that you spoke to?

23  A.  I do not, ma'am.  There were three nurses in there and I

24  could not tell you which one I was actually speaking to or that

25  had given my the answer.                                            10:08:39

United States District Court

47

ROBIN COLEMAN - Direct

1    Q.    And so the information that was provided by the nurse to

2    you was that they had seen her?                                    10:08:43

3    A.    Yes, ma'am.

4    Q.    And that they had -- they told you that she needed to come

5    back the next day?                                                 10:08:51

6    A.    Yes, ma'am.

7    Q.    Did they provide you any information as to what the

8    medical complaint or issue was?

9    A.    We don't ask that, ma'am, because of the HIPAA law.  We

10   don't ask what diagnosis.  We don't ask what's wrong with the    10:09:05

11   inmate.  When the inmate -- what the inmate tells us is what we

12   pass on to them and at that point, we leave it alone.

13   Q.    Was any information provided to you by the nurse that

14   Inmate Ashworth was complaining of an allergic reaction?

15   A.    They did say that she was complaining of an allergic        10:09:28

16   reaction in her eyes.  They said there was nothing they could

17   do but they did tell me that if I saw or the CO saw any visible

18   signs of change, we were to call the ICS and send her back up.

19   Q.    Did the nurse give you any specifics of what "visible sign

20   of change" meant in the context of Ms. Ashworth's complaints?    10:09:49

21   A.    Yes, ma'am.  They told me redness around the eyes or

22   puffiness.

23   Q.    And what did you do next after you talked to the nurse in

24   medical?

25   A.    At that time I pick up the phone, I called CO II Western    10:10:05

United States District Court

48
ROBIN COLEMAN - Direct

1    and I relayed the information that they relayed to me.  I also      10:10:08
2    told her to look at Ashworth, if she's got any puffiness or
3    redness of the eyes, don't hesitate to call the ICS.
4    Q.   Did you have any additional conversations with
5    Officer Western besides -- on the telephone besides the two      10:10:28
6    that you've told us about so far?
7    A.   Yes, ma'am.  On my second tour of the unit, Western came
8    back and said Ashworth was still complaining.  At that time I
9    said, "Okay, let me go and talk to Ashworth."
10          I then went into her room.  She was laying on her      10:10:45
11   bunk.  She had a towel over her eyes, okay.  I went over.  I
12   said, "Ashworth, what's going on?"  She gave me a statement.
13   She still felt that something was going on.
14          I said, "Let me see your eyes."  When she took the
15   towel off, there was no puffiness.  There was no redness around   10:11:02
16   her eyes so I relayed to her the same information that was
17   given to me, the same information that Western had relayed to
18   her, that we had talked to medical.  Medical said it was not an
19   emergency and there was nothing that we could do at that time.
20   She would have to go back the next day with an HNR to see a      10:11:18
21   provider.
22   Q.   When you were able to talk to Ms. Ashworth and visually
23   look at her eyes, did she make any other complaints about her
24   physical condition such as she was having difficulty breathing
25   or was in pain, anything like that?      10:11:38

United States District Court

ROBIN COLEMAN - Direct

1    A.   No, ma'am.  She never said pain.  She said it was                10:11:42

2    discomfort.  She could feel her eyes.  I listened to her voice

3    to see if there was pain, if she was crying or any other

4    symptoms.

5    Q.   Was she crying?                                                  10:11:56

6    A.   No.

7    Q.   What was her demeanor like?  Was she calm?  Was she

8    frustrated?  Was she angry?  Was she --

9    A.   She was calm.  She just kept stating that she was in

10   discomfort.                                                           10:12:10

11   Q.   When you advised Ms. Ashworth that you had spoken to

12   medical and medical said that she was to do an HNR the next

13   day, did Ms. Ashworth have any verbal response to that

14   information you relayed to her?

15   A.   She just said, "Okay, Sergeant."                                10:12:28

16   Q.   Did you have any other personal face-to-face interaction

17   with Ms. Ashworth during your shift?

18   A.   No, ma'am.

19   Q.   What time would you have ended your shift on June 5?

20   A.   I would have ended at 2115, 9:15.                               10:12:48

21   Q.   And when you end your shift, do you do any sort of

22   briefing or passing of information to the next supervisor?

23   A.   Yes, ma'am.  I did pass the incident that happened.  I

24   asked him to keep an eye on her, have his officers keep an eye

25   on her.  I also relayed the information that medical relayed,        10:13:04

ROBIN COLEMAN - Direct

1   that if she started to have any reaction, any visible signs of          10:13:08

2   an allergic reaction, either puffiness or the redness, to call

3   the ICS and send her to medical.

4   Q.   After you personally spoke to Ms. Ashworth, did you have

5   any further conversations, face to face or on the phone or            10:13:29

6   otherwise, with Officer Western?

7   A.   I went back to Western.  I said, "I spoke to Ashworth."  I

8   relayed the same information.  I said the same thing, "If you

9   see any visible change, don't hesitate to call the ICS."

10  Q.   Did you, on June 5 of 2017, write any sort of report          10:13:47

11  regarding Ms. Ashworth's request for an ICS and your

12  interaction with medical?

13  A.   No, ma'am.

14  Q.   Is there a reason whether or not why a report wasn't

15  written?                                                               10:14:05

16  A.   We do not write a report when an inmate walks up and tells

17  us to call ICS unless something happens.  We usually don't

18  write the report.  We just keep an eye on the inmate.

19  Q.   Do you recall whether or not Officer Western asked you if

20  she should write a report?                                             10:14:22

21  A.   Yes, she did.

22  Q.   And did you provide her any directive or response?

23  A.   I told her she did not have to since we did our job and we

24  sent her to medical.

25  Q.   Since June 5 of 2017 up until as we sit here today, have        10:14:34

United States District Court

ROBIN COLEMAN - Direct

1   you, in fact, written a report regarding the occurrences of

2   June 5?

3   A.   Yes, ma'am.

4   Q.   Do you remember on or about when that report was written?

5   A.   No, ma'am, I don't remember what day.

6   Q.   What were the circumstances that prompted you to later

7   write a report when, on June 5, you had determined that there

8   was not a need for a report at that time?

9   A.   I was called in to the deputy warden's office.  I was

10  asked to relay the information on what happened that day and

11  then I was given information about Ms. Ashworth coming to Court

12  and they needed me to write the report that day.

13            MS. LOVE:  Your Honor, may I approach?

14            THE COURT:  You may.

15  BY MS. LOVE:

16  Q.   Sergeant,I would like for you to look at the document that

17  is contained in defendant's Exhibit Number 12 and after you've

18  had the opportunity to look at this document for as long as you

19  would like, can you tell me whether or not you recognize what

20  it is?

21  A.   Yes, ma'am.  I do.

22  Q.   What is this?

23  A.   This is the information report that I provided to my

24  deputy warden?

25  Q.   Does this information report contain your signature?

10:14:40
10:14:49
10:15:05
10:15:36
10:15:48
10:15:54

United States District Court

ROBIN COLEMAN - Direct

1   A.   Yes, ma'am.                                                  10:15:57

2   Q.   On the last page or the second page?

3   A.   Yes, ma'am.

4   Q.   And what is the date that you wrote this report?

5   A.   7-19-2017.                                                   10:16:07

6   Q.   And is the report wherein in the normal course of your

7   duties as directed for you to do so by the deputy warden?

8   A.   I don't understand you.

9   Q.   Did you write the report in the normal course of your

10  duties as a Sergeant?                                            10:16:22

11  A.   Yes, ma'am.

12  Q.   And as a result of the deputy warden asking you to

13  memorialize the events on June 5 of 2017?

14  A.   Yes, ma'am.

15  Q.   Have you had, prior to today, an opportunity to review the  10:16:35

16  information that is contained in the summary portion of your

17  report?

18  A.   I have not looked at this since I gave it to Ms. Ybarros

19  (phonetic).

20  Q.   Why don't you take a moment to review the report, take      10:16:50

21  whatever time you need to read it, and then I'm going to ask

22  you a question or two.

23  A.   Yes, ma'am.

24  Q.   As you have read now through the text of the summary

25  portion of your report, is there anything that you find in this  10:17:29

United States District Court

ROBIN COLEMAN - Cross

1   report that is incorrect or inaccurate as compared to the                10:17:31
2   testimony that you've provided today?
3   A.    No, ma'am.
4           MS. LOVE:  Defendants move for admission of Exhibit
5   Number 12.                                                                10:17:41
6           THE COURT:  Any objection?
7           MS. EIDENBACH:  No, Your Honor.
8           THE COURT:  12 is received.
9       (Exhibit Number 12 was admitted into evidence.)
10  BY MS. LOVE:                                                              10:17:50
11  Q.    Have you had any discussions with Inmate Ashworth since
12  June 5, 2017, regarding the events of that evening?
13  A.    No, ma'am.
14  Q.    Those are all the questions I have.  Thank you, Sergeant.
15          THE COURT:  Thank you.                                            10:18:03
16          Ms. Eidenbach?
17                    **CROSS - EXAMINATION**
18  BY MS. EIDENBACH:
19  Q.    Good morning, Sergeant.
20  A.    Good morning, ma'am.                                                10:18:26
21  Q.    You have training on the symptoms or presentation of an
22  allergic reaction; is that right?
23  A.    Only training that we do have is rash, hives, and
24  difficulty breathing.
25  Q.    Okay.  But nothing specific to allergic reactions?              10:18:39

United States District Court

ROBIN COLEMAN - Cross

1    A.    No, ma'am.                                                          10:18:42

2    Q.    I'm sorry, did you say something?

3    A.    No, ma'am.

4    Q.    And when you give an officer an order, you expect that

5    officer to follow it; correct?                                           10:18:54

6    A.    Yes, ma'am.

7    Q.    And they don't have the discretion to not follow your

8    order without risking their job; is that correct?

9    A.    Yes, ma'am.

10   Q.    Do you normally write information reports six weeks after          10:19:07

11   the incident occurred?

12   A.    It depends on the incident, ma'am.  There are things that

13   supervisors have the discretion to say, "No, we do not need an

14   information report," and then our superiors will come back and

15   say, "We need an information report," and ask it to be written.          10:19:20

16   Q.    What information did you refer to in order to write that

17   report six weeks after the incident?

18   A.    I recalled from memory, ma'am.

19   Q.    So it was pure from your memory?

20   A.    Yes, ma'am.                                                        10:19:34

21   Q.    You didn't review any documents to assist you?

22   A.    No, ma'am.

23   Q.    When is the last time that the deputy warden called you in

24   to write a report six weeks after an incident?

25   A.    I have never been called to write a report six weeks after         10:19:47

ROBIN COLEMAN - Cross

1   an incident.                                                            10:19:50

2   Q.   So it was a little out of the ordinary?

3   A.   Yes, and no, ma'am.

4   Q.   In the report that Ms. Love just admitted into evidence,

5   there's no mention in there of any redness or flush on           10:20:07

6   Ms. Ashworth's face.  Is there a reason you didn't include that

7   in your report?

8   A.   The issue was there was nothing red and she was not -- her

9   eyes were not puffy when I saw her.

10  Q.   So you observed no redness or flushing in her face.          10:20:23

11  A.   Yes, ma'am.

12  Q.   Okay.

13            MS. EIDENBACH:  I have no further questions, Your

14  Honor.

15            THE COURT:  Sergeant Coleman?                           10:20:28

16            THE WITNESS:  Yes, ma'am -- I am sorry.  Yes, sir.

17            THE COURT:  That's all right.

18            You wrote in your report that, if I can quote it for

19  you, that after Ms. Ashworth had presented to CO II Western

20  that, quote, at that time, I had the inmate sent up to San        10:20:47

21  Pedro medical, close quote.  So is that a representation that

22  you believe that CO II Western called you and asked for

23  permission to have Ms. Ashworth transported to medical?

24            THE WITNESS:  Not transported, sir, to be sent.

25            THE COURT:  To be sent?                                 10:21:08

United States District Court

ROBIN COLEMAN - Cross

1            THE WITNESS:  Yes, sir.                              10:21:09

2            THE COURT:  So CO II Western called you and said,

3    "Can we send her over to medical?"  And you told her that she

4    could?

5            THE WITNESS:  Yes.                                   10:21:19

6            THE COURT:  You're sure about that?

7            THE WITNESS:  Yes, sir.

8            THE COURT:  Okay.  And then when you spoke to the

9    people at the medical office before you went to see

10   Ms. Ashworth, you said that they told you to look for any      10:21:33

11   changes but you wouldn't be able to know of any changes because

12   you hadn't seen her before; is that right?

13           THE WITNESS:  Yes, sir.

14           THE COURT:  And did it strike you -- well, let me ask

15   you this:  The report also says that they -- let me quote again  10:21:48

16   from it.

17           Quote, I even stated that Western was getting ready

18   to initiate the ICS and she stated:  Were just going to send

19   her back again.

20           THE WITNESS:  Yes, sir.                              10:22:13

21           THE COURT:  And that's what they told you?

22           THE WITNESS:  Yes, sir.

23           THE COURT:  Did it strike you as odd that the medical

24   people who are the ones who had seen her before who would be

25   able to tell whether there was any change that had occurred     10:22:20

United States District Court

ROBIN COLEMAN - Cross

1  were asking you to make that evaluation when you had no                    10:22:25

2  baseline?  You hadn't seen her originally.  And you're

3  reporting that she's indicating that she's having continuing

4  issues and then they are telling you, "Well, you go tell us

5  whether there's a change."  Did that seem odd to you?          10:22:38

6          THE WITNESS:  Odd, no, sir.  It has happened before.

7  They will say that they have seen an inmate and then relate to

8  us, "If you see this, then call the ICS," or, "Send an inmate

9  back."

10          THE COURT:  But the inmate is the one who has          10:22:55

11  reported to you that she's continuing to have difficulty so

12  you've gone through this process of coming in and instead of

13  saying, "Well, let us take a look at her again to see if

14  there's been any change," they are asking you to determine

15  whether there's been any change.                              10:23:08

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Even though you couldn't tell whether

18  there had been any change because you didn't see her

19  originally; right?

20          THE WITNESS:  Well, they told me what to look for,     10:23:17

21  the puffiness and the redness, and that's what I looked for,

22  sir.

23          THE COURT:  Ms. Ashworth testified when she was

24  sitting where you're sitting that she was told by medical that

25  if the swelling continued, redness or anything like that, to   10:23:36

58

ROBIN COLEMAN - Cross

1   issue an ICS.  Did the medical staff people tell you that they          10:23:39
2   had told her that?

3           THE WITNESS:  No, sir, they did not.

4           MS. KENDRICK:  And when you spoke to Ms. Ashworth,
5   did she tell you that medical had told her to call an ICS if --          10:23:55

6           THE WITNESS:  No.  I'm sorry, no, sir, she did not.

7           THE COURT:  And then you mentioned discomfort could
8   be a reason for calling an ICS.

9           THE WITNESS:  Yes.

10          THE COURT:  I gather Ms. Ashworth told you that she          10:24:11
11  was in discomfort?

12          THE WITNESS:  Depends on the discomfort, sir.  We
13  have four hundred some odd inmates that come up every day in
14  discomfort.  What we look for is more serious signs of
15  discomfort.  If the inmate is doubled over in pain.  If the          10:24:28
16  inmate is crying.  If she had been crying, not speaking to me
17  normal, yes, sir, I would have sent her up.

18          THE COURT:  Did she tell you she was in pain?

19          THE WITNESS:  No.  She just told me she was in
20  discomfort.          10:24:43

21          THE COURT:  She used the word "discomfort"?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  And you're sure she used the word
24  "discomfort"?

25          THE WITNESS:  Yes, sir.          10:24:50

United States District Court

ROBIN COLEMAN - Recross

 1          THE COURT:  How can you recall that so clearly so          10:24:51

 2    many weeks after the incident?

 3          THE WITNESS:  Because different situations happen

 4    differently and if I'm having -- if I'm having a discussion

 5    with an officer about an inmate over something, sometimes we     10:25:03

 6    tend to remember that.

 7          THE COURT:  And I just reread your report.  You don't

 8    mention that she told you she was in discomfort.

 9          THE WITNESS:  I asked her -- I said -- I looked at

10    her, okay, and she said, "I don't feel good."  Well, she didn't  10:25:23

11    say "pain," sir.

12          THE COURT:  All right.

13          Any further examination engendered by my questioning?

14          MS. LOVE:  No, Your Honor.

15          MR. SPECTER:  One moment, Your Honor?                      10:25:38

16          THE COURT:  Surely.

17          MS. EIDENBACH:  We do have a couple of questions.

18          THE COURT:  You may proceed.

19                     **RECROSS - EXAMINATION**

20    BY MS. EIDENBACH:                                                10:26:20

21    Q.   Sergeant Coleman, in the report that you wrote six weeks

22    after the incident, which is closer in time to the incident

23    than we are today, you made no note of being told by medical to

24    look for redness or puffiness.  So I'm just curious how you

25    remember that today but you didn't remember it at the time that  10:26:37

ROBIN COLEMAN - Recross

1   you wrote the report.                                                    10:26:39

2   A.   I told that to my deputy warden, what was said.  I also

3   told CO II Western on that day.

4   Q.   Why isn't it in your report then?

5   A.   On that day, I was -- on that day, I was told there was a    10:26:53

6   lot more things that were going on, okay, and I was told

7   something differently than what was said, okay.  So I don't

8   know why I didn't put it in the report, but I do know that that

9   was what was said to me.

10  Q.   Okay.  Thank you.                                              10:27:11

11          THE COURT:  I'm pausing, Sergeant Coleman, because I

12  was just not sure whether I understood what your last answer

13  was.  As the court reporter has indicated in the unofficial

14  transcript, you said that I was told something differently than

15  what was said, okay.  So I don't know why I didn't put in the    10:27:39

16  report, but I do know that that was what was said to me.

17          What do you mean by "I was told something differently

18  than what was said"?

19          THE WITNESS:  When the deputy warden was talking to

20  me about the issue, they told me that medical stated they told   10:27:55

21  me if Ashworth said -- said that she did not feel good, to send

22  her up and that is not what they told me.  They told me if

23  there was any visible change, okay, or any visible signs to

24  send her up and what they told me the visible signs were,

25  puffiness and redness.                                            10:28:21

United States District Court

1    THE COURT:  Okay.  Thank you very much, sir.  I          10:28:24

2  appreciate your time today.

3    You may step down.

4    (Witness excused.)

5    THE COURT:  We'll take a 15-minute break and be back     10:28:29

6  at 10:45.  Thank you.

7    (Recess at 10:28; resumed at 10:47.)

8    (Court was called to order by the courtroom deputy.)

9    THE COURT:  Thank you.  Please be seated.

10    Now I understand we're going to hear from Mr. Pratt     10:47:16

11  again?  Is that the idea or something different,

12  Mr. Bojanowksi?

13    MR. BOJANOWSKI:  Your Honor, as I mentioned

14  yesterday, myself and Ms. Kendrick were going to actually ask

15  the Court to set another day because I've had the nurses here  10:47:29

16  again and so I would like to get a date certain that they will

17  show up and actually testify.  And so we had discussed the

18  potential of utilizing September 11, 12, and 13 are what we're

19  envisioning as days that we hope the Court would be available

20  whereby we could start on the 11th with the continuation of the  10:47:55

21  evidentiary hearing and wrap that up and then proceed into the

22  retaliation issues right after that and then --

23    Can I have a moment, Your Honor?

24    THE COURT:  Of course.

25    MR. BOJANOWSKI:  I always get these monkey wrenches     10:48:31

United States District Court

1    that are thrown into these beautiful plans that I come up with.   10:48:34

2         MR. STRUCK:  While they are conferring, Your Honor, I

3    did want to, I guess, clear the record based upon some of the

4    comments that you made yesterday with respect to the

5    December -- allegations of retaliation in December down in   10:48:56

6    Tucson.  And perhaps my recollection is wrong but I recall you

7    saying that defendants' lawyers did nothing to be respond to

8    those allegations and I wanted to point the Court out to a

9    January 4 response the plaintiffs' motion for contempt that was

10   filed along with declarations from witnesses to controvert the   10:49:20

11   plaintiffs' allegations.

12        THE COURT:  What I was referring to is the fact that

13   you had asked for an evidentiary hearing and I repeatedly

14   re-offered that opportunity.  You never once told me you didn't

15   want to take up that opportunity and so we had what you -- we   10:49:37

16   had what you talk about here, but the focus I think fairly was

17   on the expected evidentiary hearing and that's why it continued

18   to be on the agenda from month to month and I continued to

19   raise it and you never said, "No, we think we're satisfied

20   resting on the record we've submitted to you."  So I was   10:50:01

21   expecting that there would be an evidentiary hearing so that

22   this issue which was, obviously, in your view, something viewed

23   by different people who had different views and so I can't

24   resolve that kind of dispute without the mechanism that we use

25   in court and that is examination and cross-examination of --   10:50:24

1    battling affidavits aren't going to be able to enable me to                10:50:26

2    resolve that.

3            And so I believed, and continue to believe, that if

4    you really wanted to make your case and to have your day in

5    court, you would actually have to take steps to have your day            10:50:40

6    in Court and you never did.

7            MR. STRUCK:  Okay.  I misunderstood what your

8    comments were.  It sounded to me like we were telling the

9    director that the defendants' lawyers did nothing.  And so I

10   wanted -- I didn't know if the Court recalled that we actually           10:50:53

11   did respond.

12           THE COURT:  Well, my focus yesterday, and I can take

13   a look at what I said, yesterday my focus was exactly what it

14   had been throughout and that is giving you the opportunity for

15   the evidentiary hearing that you asked for, and you never               10:51:14

16   sought to perfect that and make it happen, even though I did

17   everything that I could to give that you opportunity.  Thank

18   you.

19           MR. STRUCK:  All right.  Thank you.

20           THE COURT:  Surely.                                             10:51:27

21           Mr. Bojanowksi?

22           MR. BOJANOWSKI:  After conferring with everyone, I

23   guess as an initial matter, what we need to know is, is the

24   Court available on the 11th, 12th, and 13th?

25           THE COURT:  Yes, I took a look at the 11th because I            10:51:38

United States District Court

64

1   had heard about these rumblings available.  I have a matter on          10:51:40
2   the 12th.  I think I can change that so that we can do the
3   resumption of the witnesses on the 11th, proceed then to the
4   retaliation issues and then conduct our normal monthly status
5   hearing on the tail.                                                     10:51:53

6          MR. BOJANOWSKI:  What we are going to do, wrongly,
7   Your Honor, is probably do the retaliation.  We might do the
8   status and then we may finish up with the witnesses.

9          Ms. Kendrick and I, we're going to work that out as
10  to the exact situation.  We just want to confirm that those             10:52:10
11  three days are available and then we will submit a
12  communication to the Court laying out what we've agreed to.
13  Right now tentatively I would say that we'll do the retaliation
14  on the 11th, the status issues on the 12th, and finalize the
15  medical witnesses on the 13th.                                          10:52:32

16         MS. KENDRICK:  We have no preference on the timing,
17  Your Honor, so whatever works for the Court and the defendants'
18  witnesses.

19         THE COURT:  And perhaps as you've come to understand
20  by now, I am very much in favor of you all taking the initial           10:52:49
21  crack at making the map of how we'll proceed because you know
22  best of what your witnesses' availabilities are and I don't
23  have any pro-christy and requirements that we do it in a
24  certain order.  So you have that block of time and I'll wait to
25  hear from you on how you would like to allocate it.  Just with          10:53:08

United States District Court

1    respect to any exhibits, though, do try to follow what I said          10:53:11

2    yesterday and coordinate with the clerk of the Court in

3    advance.

4              MR. BOJANOWSKI:  Yes, sir.

5              MS. KENDRICK:  Yes, sir.                                       10:53:20

6              THE COURT:  So Mr. Bojanowksi, does that mean that we

7    are concluded with witnesses today and we can now proceed to

8    the status hearing?

9              MR. BOJANOWSKI:  Correct, Your Honor.

10             THE COURT:  Mr. Specter, the first issue that I              10:53:28

11   wanted to turn to was the item that I had set previously with

12   respect to addressing how best to proceed with my view that a

13   $1,000 penalty should be imposed for the violations that I

14   previously described.  I've read the briefing that you both

15   have submitted and find that both lawyers -- both sides think    10:53:50

16   that I'm on a course that I can't take.  It's because from the

17   plaintiffs' perspective, it's because you think that this is an

18   exercise of the Court's contempt authority and so the

19   plaintiffs say I have that power but I have to do it in a

20   procedurally proper way.                                            10:54:16

21             Defendants say they don't think I have such a

22   contempt authority and it's not warranted in this case.  But

23   what I have to tell both of you is I wasn't ever thinking of

24   contempt.  That was not what I was intending to employ as my

25   mechanism to try to adopt a measure that would cause us to have   10:54:31

1   a chance at accomplishing something that every other thing that      10:54:41

2   the defendants have tried and everything that I have tried has

3   either not been done, has been appealed or hasn't produced any

4   other -- any favorable results of the kind that come close to

5   accomplishing the goal of getting compliance with the              10:54:59

6   performance measures.

7          And so I was, as you've heard, over time I have

8   frequently addressed with you all and addressed with the

9   witnesses my sense that there are economic currents that are

10  dramatically affecting the ability of the performance measures    10:55:16

11  to be met and in particular, I think those are, in large part,

12  because the State of Arizona has contracted with a contractor

13  who has a contract price and that the contractor then decides

14  what it will do to try to satisfy that contract, understanding

15  that the contract has been amended at a point to address what     10:55:40

16  seems to be, and very clear told me, the result of most of the

17  performance measure failures and that is staffing question.

18         And the stipulation precludes me from requiring the

19  defendants to build new prisons or to hire a different number

20  or type of staff unless the defendants agree to do that as part   10:56:07

21  of a performance measure.

22         And so given what, as I've told you repeatedly, that

23  you've taken off the table the most effective tool that I would

24  have and that is if you have an in box that can't get addressed

25  because there's not enough labor units to do it, you get more     10:56:25

1    labor units to do it.  That seems to be the obvious measure,          10:56:30
2    but it's not one that the defendants had been able to employ
3    because they continue to be dramatically understaffed with
4    respect to the requirements of the Corizon contract.  And every
5    month there is a penalty of being paid of $90,000 we heard for      10:56:45
6    failure of the contractor to fill these empty spots.

7         And as we've heard testimony in this case before, it
8    is possible that the reason for that is that the contractor has
9    decided that it is economically beneficial for it to fail to
10   fill the spots and pay the penalty than to simply fill the          10:57:09
11   spots which would go, in my view, a long way toward enabling to
12   us to satisfy the performance measures.

13        And so given that you've removed this most
14   efficacious tool to me, I've looked for others.  It seemed to
15   me from my training and experience in life, that in this great      10:57:32
16   capitalistic society of ours, that the money motivator is the
17   thing to do.  And if there's something pooling out of this
18   model that the state has adopted with respect to providing
19   health care through a contractor that is interfering with the
20   ability of the stipulation to accomplish its -- to be              10:57:49
21   satisfied, then I should use economic measures to try to
22   supplant that counter-veiling, as I described it to Director
23   Ryan, cross-current that frustrates this performance -- the
24   satisfaction of the stipulation.  And so it seems to me that
25   the dollar figure so that the State of Arizona would be             10:58:13

United States District Court

1   confronted with a reality, that it would have to pay money as a          10:58:16

2   penalty for not having met the performance measures, that there

3   was the right tool available to me yet.  And I didn't think of

4   it as a measure of the Court's contempt power.  Instead, I

5   thought of it as a term of the Court's power acting in equity         10:58:44

6   to respect the performance of a contract.

7        The damages possibility that is raised by the

8   defendants briefing is something that I hadn't thought about

9   but I will tell you when you briefed this to me, I then did

10  think more broadly about it and wondered where I could find in       10:59:09

11  the doctrine of law a mechanism that I could use this economic

12  measure to try to redress the harm because I thought that the

13  economic measure would be the best tool that I had remaining

14  available to me.

15       So I didn't go to the next step of thinking about          10:59:23

16  whether it would be an appropriate compensatory amount,

17  understanding, just I'll observe as a footnote, that that is a

18  very difficult thing to try to ascertain, what the cost is of

19  the failure to meet this performance measure because that is

20  proving up some great many thousands of incidences and damages      10:59:39

21  caused by it.

22       So when the plaintiffs and defendants are both

23  talking about contempt and there's a citation to a case that

24  suggests that the application of this kind of economic measure,

25  this economic penalty, is the rough equivalent, it's contempt       11:00:02

United States District Court

power by another name, that it would necessarily mean that I      11:00:07
would have to follow the requirements for contempt and that is
a specific court order and an opportunity to cure and an
opportunity to be heard.  And so that plaintiffs proposed a
mechanism by which I could do that.                               11:00:25

          I will say this:  My intention now is to give you
this back so that if any party wants to brief the issue about
whether there remains some legal power for me aside from
contempt to use this mechanism that I previously announced, and
that is the thousand dollar fine, then the defendants would      11:00:54
have to show cause as to why it should not be imposed, one of
the items on the agenda, that they would agree to submit that
to me and I would consider it because it's contrary or it's
perhaps news to you that I am thinking of this not within the
realm of contempt authority of the Court.                        11:01:13

          The second thing that I'll do is I'll embark
immediately upon the measure that the plaintiffs recommend and
that is as a stop-gap measure in case there's no briefing that
can give me a comfort level that what I contemplated as
permissible.  I'll do what the plaintiffs suggested and that is  11:01:35
I'll issue an order that will be an order of the Court to
comply with the performance measures that I have found to have
not been met and that I will warn in that order that the
contempt authority of the Court will be exercised and that a
penalty will be imposed until it is cured.  I'll give the time   11:01:58

United States District Court

1   that plaintiffs recommend through November 15 for the          11:02:01

2   defendants to have an opportunity to cure and give them an

3   opportunity to be heard as to why sanctions should not be

4   imposed.

5          The third thing that I'm going to do, I'm going to      11:02:16

6   press ahead quickly with the retention of an expert to advise

7   the Court on what I think is the imbibing problem here, is

8   there is an inadequacy of staffing even at the level that

9   defendants have determined is appropriate, so I want to retain

10  an expert who can tell me what I need to tell the State of     11:02:35

11  Arizona to do in order to make sure that these positions that

12  they have identified as being necessary and decisions to hire

13  that they have made already, so I'm not ordering anybody to

14  hire anybody.  I simply am going to tell you what you need to

15  do to make sure that you get those positions filled that you've 11:02:53

16  already decided that you want to fill.

17         And so I asked you all last time or not last time we

18  were in Court but the last time we had a status hearing, I

19  asked you all to confer again about possible experts because as

20  I read the vitaes that had been suggested to me, they didn't   11:03:09

21  seem to be the right hammer for the nail that I had.  And then

22  I had the subsequent suggestion of someone who does, by his

23  vitae, seem to be much more in line with what I was talking

24  about and that he has past experience with corrections and

25  staffing issues and corrections and that he does seem to be the 11:03:35

1  kind of person who would understand what you would need to do          11:03:39

2  to enable our economy to deliver the staffing people that we

3  have in a situation where, for whatever reason, and I imagine

4  it perhaps is associated with how much is being paid but I

5  don't want to prejudge it but that's, again, why I would          11:03:55

6  think -- because I've learned enough in my life to know that

7  every job can be filled if you pay enough.

8          But in any event, as I look at Mr. Miller's vitae, it

9  does seem to me to be more pertinent to the matters at hand so

10  I'm going to ask the defendants to give me an update on what          11:04:15

11  has been reported in the correspondence between plaintiffs'

12  counsel and defendants' counsel and that is the defendants

13  haven't yet decided whether they would be agreeable to the

14  appointment of Mr. Miller.

15          MR. STRUCK:  Yes, Your Honor.  We're -- we have been          11:04:32

16  in the process of doing our due diligence with regard to

17  Mr. Miller.  I had heard of him but never had him on a case and

18  we're having trouble finding anybody who actually has had

19  Mr. Miller on a case.

20          I spoke with Mr. Specter today and he's agreed -- we          11:04:50

21  hadn't contacted Mr. Miller ourselves because we didn't want to

22  do anything inappropriate.  Mr. Specter actually said he had no

23  problem with us contacting Mr. Miller so we would like to

24  contact him.  We may very well agree that this is the

25  appropriate person for what the Court envisions.          11:05:11

United States District Court

1          We would like at least at the end of next week to

2    report back to the Court and plaintiffs with respect to whether

3    or not whether or not we agree Mr. Miller would be the

4    appropriate person to do what the Court envisions.

5          THE COURT:  Could you all in a position, plaintiffs

6    counsel and defense counsel, to give me a phone call around 5

7    o'clock next Friday and give me your view of where we stand so

8    that I can decide whether I want to talk with -- I want to

9    consider what your thoughts are to give you a chance to inform

10   me as to why you think he might not be good assuming that that

11   is what you decide to do, understanding that you may well

12   decide -- as I read his vitae, it looks like it shouldn't be

13   that hard because it suggests that he was -- played an active

14   role in a Maricopa County Health Care case and I can't imagine

15   such a thing happened and you didn't know about it.

16         MR. STRUCK:  I didn't.  That's probably why I heard

17   his name but I haven't been able to find anybody over there

18   that actually worked with him.

19         THE COURT:  Okay.

20         So on Friday, and if the close of the day doesn't

21   happen to work with your schedules, contact my JA but sometime

22   Friday if you would arrange for a call, I know that I am

23   otherwise available at the close of business that day so I

24   would be able to do that.

25         But if that doesn't happen to work for you at that

United States District Court

11:05:15

11:05:24

11:05:42

11:05:58

11:06:09

11:06:25

1    hour, agree among yourselves at a different time that you can          11:06:28

2    contact me and we'll decide what the next step will be.   If

3    you're in agreement, then we'll go ahead and set a time where

4    we can try to have an appointment on the telephone, perhaps

5    even see if how long would it take to get Mr. Miller here so      11:06:45

6    that he can get a better sense of what the work assignment

7    would be so that we would hear from him, more particularly,

8    whether he thinks he could be of assistance to the Court or

9    not.

10          MR. STRUCK:   That won't be a problem.   And just to        11:06:59

11   make sure I understand, you're talking about not this Friday

12   but the following Friday?

13          THE COURT:   Yes.   A week from Friday.

14          MR. STRUCK:   That would be no problem.

15          THE COURT:   And then while you're standing there, let      11:07:07

16   me ask you whether there's anything you wanted to say in

17   response to what I otherwise said and that is that I am going

18   to issue a written order setting forth the timetable.   If you

19   want to be heard on argument on that beyond what you've

20   submitted in your brief, I'll give that you chance to do so.       11:07:23

21          MR. STRUCK:   I think we do.   Actually, I probably

22   want to read the transcripts and think about what you said

23   because you said a lot with respect to that issue and I believe

24   we probably will want to because the focus of our briefing

25   was -- I don't think is what it was -- what it was what you        11:07:41

United States District Court

1    were looking for, but we would probably like to at least submit    11:07:46

2    a briefing and argue about it because of the import of what you

3    are suggesting.

4              THE COURT:  All right.

5              Well, why don't I do this as well, ask you in the    11:07:53

6    next week before we talk on the Friday, a week from Friday,

7    submit anything in writing that you would like to address and

8    as I -- as I understand what I think what that means for you is

9    you should address both.  I mean I don't think you will be -- I

10   think it's possible plaintiffs might be addressing the first    11:08:19

11   point but you might as well and that is whether or not there is

12   some other area of authority other than contempt by which I

13   could employ this sanction which you don't favor.  So, I mean,

14   I well expect that you will probably think that there's not

15   such a thing, but you could emphasize that if you want.  And    11:08:38

16   then the second point, you could address I think what you did

17   have a chance to address and that is plaintiffs' proposal.

18   They went first and said that they laid out this timetable with

19   the November 15, so you did file a brief after that so I did

20   think you did have a chance to address it in briefing.    11:08:54

21             But if you want to say anything more to me about

22   this, do so before we talk next Friday.

23             MR. STRUCK:  And I think we probably will be

24   responding to the first point certainly because I don't think

25   we really addressed that in our brief.    11:09:05

United States District Court

1          THE COURT:  Okay.  All right.                    11:09:07

2          MR. STRUCK:  But we may want to add to -- we did

3   address some of the issues with respect to the plaintiffs'

4   proposed procedures.  So we may want to add to that.

5          THE COURT:  Okay.  Fair enough.                  11:09:21

6          Mr. Specter, anything that you wanted to say on these

7   points now?

8          MR. SPECTER:  Just, well, first of all, I wanted to

9   say that we agree with all the theory that you just articulated

10  very well about why it's necessary to invoke economic sanctions   11:09:44

11  in order to have the contractor here do what everybody wants

12  them to do, so we will take a hard look at whether there are

13  other avenues to do that.  I'm not sure I have any off the top

14  of my head or else I would have probably raised them with you

15  before this.  But it's an interesting thought that we will       11:10:11

16  think about.

17          In terms of the contempt, Your Honor, I don't know

18  what more there is to say.  We filed our proposed procedure.

19  They filed their response.  I think it's pretty clear that the

20  elements of contempt have been satisfied.  I know --             11:10:32

21          THE COURT:  Well, I think the defendants have a

22  point.  I don't know who drafted the brief.  But I think they

23  have a point that is -- and I'm not sure that you disagree with

24  it and that is that you do need an order of the Court and it

25  would be clearer.  And I obviously think you would have          11:10:53

                    United States District Court

1    embarked upon this.  If I am going to use my contempt                    11:10:57

2    authority, you are also more comfortable with the Court issuing

3    an order saying that you are not in compliance based upon the

4    Court's previous orders and you are directed to come into

5    compliance rather than just relying upon the stipulations           11:11:09

6    requirements.

7              MR. SPECTER:  Yes.  We do agree with that.  We had

8    been working under the assumption, just to be candid with you,

9    that your minute order dated June 14 --

10             THE COURT:  Would accomplish that.                          11:11:21

11             MR. SPECTER:  -- accomplishes that fact because it

12   does give them notice that they have to pay this fine if they

13   are not into compliance.  Obviously if you were going to issue

14   an order in the very near future which sets out -- you know, is

15   more formal, orders to show cause re contempt.                       11:11:37

16             THE COURT:  Well, we're also in the situation --

17   sorry to interrupt -- in the passage of time, we're about to

18   hear from Mr. Bojanowksi the June numbers.  So if the June

19   numbers show something either worse or better, I think I should

20   probably reflect that in how I proceed because you obviously        11:11:54

21   know that I did, in some cases, see failure to comply but

22   didn't employ this more serious measure.  And I would think

23   that that continued sensitivity would make -- which should be

24   applied going forward so that we do have -- and, in fact, you

25   made the point as well in your briefing that there were areas       11:12:14

United States District Court

1    that I omitted that since that time continued to show                    11:12:17

2    deterioration or continued failures, that those should be

3    included as well and I think I should do that.

4             MR. SPECTER:  I agree.

5             And we point that out in our brief I think, so we              11:12:31

6    want a comprehensive order.

7             So all things considered, I think it's better if you

8    issued an order to show cause re contempt and set out

9    everything clearly so if this gets appealed, there's -- as some

10   of the other matters have gotten appealed, we followed the            11:12:49

11   procedures to the letter and the courts can deal with the

12   substance.

13            THE COURT:  Yep.  And that's how I will proceed.

14   I'll read what you all submit, if anything, a week from Friday

15   and if you and your consultation with Mr. Williston find              11:13:00

16   something that seems to fit with this idea of contract

17   enforcement, because the stipulation does say that I can employ

18   any remedial measure that is provided, all remedies provided by

19   law, and so I guess I would need to make sure there is a law.

20            MR. SPECTER:  Yes, and the defendants have been               11:13:34

21   saying for years now that -- which I don't agree with but their

22   position is that the stipulation is nothing more than a

23   contract and so what you're suggesting is there are certain

24   contract principles that might come into play.

25            So we'll think about that.                                    11:13:50

                        United States District Court

1          THE COURT:  Do you disagree that it is something --

2   do you disagree that it's a contract?                              11:13:52

3          MR. SPECTER:  I think it's something -- a contract

4   plus an order to fulfill the contract under supervision of the

5   federal judiciary.  So that's why --                              11:14:03

6          THE COURT:  So if there's some other element that

7   fills in, and I don't disagree with what you've essentially

8   said, but I think the foundation that I start from is that I do

9   need to find some remedy recognized in law, whether it's in

10  Mr. Williston's treatise or not, or whether it's in some case     11:14:23

11  someplace that would seem to counter the case that has been

12  presented to me that suggests that this measure that I've

13  employed, although I didn't think of it as contempt, to anybody

14  looking at it, it would be an application of the contempt

15  authority of the Court and that I need to follow those rules.     11:14:41

16         MR. SPECTER:  Yes, sir.  We will do that.  Thank you.

17         THE COURT:  So is it your role, Mr. Bojanowksi, today

18  as before to tell us where we stand in June?

19         MR. BOJANOWSKI:  That's always my role, Your Honor.

20  So I am ready to go.  Whenever the Court is ready, we can run      11:14:56

21  through all of the measures.

22         THE COURT:  So Performance Measure 1, any refill for

23  a chronic care or psychotropic medication that is requested by

24  a prisoner between three and seven business days prior to the

25  prescription running out will be completed in a manner such       11:15:17

United States District Court

```
 1   that there is no interruption or lapse in medication.                 11:15:19
 2            MS. KENDRICK:  Your Honor, did you say 11 or one?
 3            THE COURT:  I should have said 14.
 4            MS. KENDRICK:  Well, the Performance Measure 11, you
 5   found them noncompliant at six prisons in May 2016 so I think    11:15:33
 6   that's normally where we start.
 7            THE COURT:  All right.
 8            MS. KENDRICK:  Unless you were starting with the
 9   thousand dollar fine ones.
10            THE COURT:  I have the wrong playbook so I'll take     11:15:58
11   advantage of Ms. Kendrick's prompting here from the little box
12   and you have the schedule from last month.  I don't have -- I
13   don't happen to have that.
14            Do you, Mr. Bojanowksi, so you'll cover them?
15            MR. BOJANOWSKI:  Right.                                 11:16:16
16            THE COURT:  Would you do what I do, then, and just so
17   that everybody understands what page we're on, and I think the
18   words continue to have some resonance, announce what the
19   performance measure is and what is required and then give us
20   the June numbers?                                                11:16:29
21            MR. BOJANOWSKI:  Correct.
22            THE COURT:  Thank you.
23            MR. BOJANOWSKI:  Yes.
24            We start with Performance Measure number 11, which
25   is:  Are newly prescribed provider-ordered formulary            11:16:47
```

1    medications provided to the inmate within two business days                11:16:52

2    after prescribed or on the same day if prescribed stat?  The

3    facilities at issue are Eyman, Florence, Lewis, Tucson,

4    Winslow, and Yuma.

5             Eyman preliminary June is 62; Florence, 85; Lewis,              11:17:30

6    74; Tucson, 87; Winslow, 97; Yuma, 86.

7             THE COURT:  All right.  Thank you, Mr. Bojanowksi.

8    As I told you, I have the wrong playbook.  The right play book

9    is in my chambers.  I like to keep the continuity straight so

10   can you all hold on a second while I go back and get it?  Thank         11:18:11

11   you.

12        (Short recess taken.)

13             THE COURT:  You don't need to stand.  I only get one

14   a day.  Thank you very much.

15             The playbook is in the Excel spreadsheet and the              11:21:34

16   spreadsheet is one that I print out and I also use on my

17   computer.  But when I printed it out, sometimes the type size,

18   as you've seen before, I've struggled with it, is so small and

19   so I was trying to just quickly print it out again so that I

20   would have the bigger print size and I couldn't successfully do        11:21:54

21   it.

22             My law clerk is presently printing it in a larger

23   format.  She'll bring to it me.  We're going to then,

24   therefore, stop what we're talking about now and jump to some

25   other issue that we can address.  There seem to be a number so        11:22:12

United States District Court

1    if it makes sense, I think I'll turn to these discovery issues          11:22:16
2    that were identified in plaintiffs' agenda, some of which seem
3    to be matters that were perhaps going to be resolved by
4    subsequent meet and confers after the letters that you've
5    submitted.                                                              11:22:40
6            So I wonder who would be the best person to speak
7    about what these issues are with respect to agreements on your
8    meet and confers about changes in the monitoring manual,
9    whether you have been able to resolve those, whether you have
10   been able to resolve the issues associated with receiving the          11:23:03
11   documents related to the temperature assessments at the cell
12   blocks.  I'm looking in the first instance at the
13   correspondence, both sides, attached -- well, that the
14   plaintiffs attached the correspondence between the two sides in
15   Attachment A to the plaintiffs' proposed agenda.                        11:23:23
16           And so who would be the right person to talk to?
17           MS. KENDRICK:  I would.
18           THE COURT:  Please.
19           MS. KENDRICK:  Did you want to talk about the
20   document request or the methodology issues?                             11:23:35
21           THE COURT:  You can talk about both.
22           MS. KENDRICK:  Okay.  So on the methodology issues,
23   as stated in our proposed agenda, we still have not received a
24   current version of -- the most current version of the, quote
25   unquote, Appendix E, that sets out emergency responses that             11:23:53

United States District Court

1    nurses are supposed to engage in.

2            I spoke with Ms. Orcutt during the break and she said

3    that she is still trying to get a copy of the more current

4    version and that she would like to set up a time early next

5    week to have a conference call with me to figure out if we

6    could resolve Performance Measure 25 with that.

7            With regard to -- I believe as reflected in our

8    correspondence, we have agreed to Performance Measure 61, the

9    language that they wanted to clarify regarding the timing of

10   the pap smears so that one is concluded.

11           Since Mr. Fathi is not here, he will also be joining

12   us on the call early next week to discuss the remaining issues

13   with the mental health performance measures.

14           THE COURT:  With 95?

15           MS. KENDRICK:  Yes, sir.

16           THE COURT:  So I did see that you had written that in

17   the letter so we won't address that any further.

18           How about the temperature logs?

19           MS. KENDRICK:  Well, in the middle of the night I

20   received three emails from Lucy Rand that purported to have

21   responsive documents to past requests.  However, I was trying

22   to sleep and prepare for this hearing so I haven't had an

23   opportunity to look at what actually she sent us.

24           THE COURT:  Well, let me know if you, through a meet

25   and confer, can't resolve that issue and that you need my

83

```
 1    assistance in trying to get it addressed.                    11:25:34

 2              MS. KENDRICK:  Yes, sir, we will.

 3              MS. RAND:  Your Honor?

 4              THE COURT:  Yes.  Ms. Rand.

 5              MS. RAND:  I had a question for you about these    11:25:45

 6    requests because I was not at the hearing where these were --

 7    the temperature logs were ordered.  And from what I understand,

 8    Ms. Fathi requested the temperature logs based on the

 9    production that we had previously provided.  And in the past,

10    we've only provided for three complexes for two periods and it  11:26:02

11    was Tucson, Eyman, and Florence I believe.

12              So I wanted to clarify which complexes we are

13    required to provide and for how long because we only provided

14    them for a short period previously and we weren't providing

15    them on a regular basis.  It was on a per request basis and it  11:26:25

16    was only -- we only provided it once.

17              MS. KENDRICK:  Can I clarify?

18              THE COURT:  Have you looked at the hearing, the

19    transcript, that you didn't attend?

20              MS. RAND:  I have and it doesn't clarify that.  It  11:26:39

21    just basically says what Mr. Fathi said was that we had them

22    produced in the past and so you said okay.  Why don't you

23    produce them.  So that is when I said are we supposed to

24    produce the three complexes that we provided earlier or are we

25    supposed to produce different complexes?                       11:26:56
```

United States District Court

1      THE COURT:  Okay.  Thank you for that answer.          11:26:59

2      MS. KENDRICK:  So, Your Honor, just to clarify.  What

3  she is referring to is that prior to settlement in litigation,

4  we did receive some limited temperature logs in response to

5  Request for Production of Documents so that's been several   11:27:11

6  years ago.

7      Ms. Rand also was not on the telephone call that we

8  had with counsel for defendants on the third but Mr. -- we

9  explained to Mr. Bojanowksi that we interpreted your order to

10 refer to all institutions and we asked that they produce them  11:27:26

11 since the date of June 1 and Mr. Bojanowksi stated that he

12 would convey that to Ms. Rand.

13     MS. RAND:  Your Honor, according to --

14     THE COURT:  Go ahead, sir -- ma'am.

15     MS. RAND:  I'm sorry.  Thank you.              11:27:47

16     According to the instructions that I received, it was

17 not for all complexes.  It was only for corridor complexes and

18 so that's why I also thought I should clarify with the Court

19 what was intended, because we now have three different accounts

20 of what was ordered and so if --                  11:28:03

21     THE COURT:  Well, the reason that the Court has an

22 interest in this under the stipulation is because of the

23 inmates who are subject to difficulty in dealing with heat

24 because of an intolerance induced by certain psychotropic

25 medications.  So any yard where there are inmates who receive   11:28:28

United States District Court

11:28:34
1   such medication from June 1 to the present, those reports will

2   be provided to the plaintiffs.

3            Does that answer the question?

4            MR. BOJANOWSKI:  Your Honor, if I may.

5            MS. RAND:  Yes.
11:28:47

6            MR. BOJANOWSKI:  Inmates subject to the stipulation

7   are only housed at what we call the corridor facilities.  So

8   somebody who is perhaps at Winslow or Safford who would then be

9   re-classed to need additional mental health care would be

10  transferred to one of the corridor facilities.
11:29:05

11           So temperature readings at non-corridor facilities

12  really would be a waste.

13           THE COURT:  Well, are there any inmates receiving

14  those medications at those non-corridor facilities?

15           MS. KENDRICK:  Yes.  Yes, there are, sir.  We
11:29:22

16  submitted the list of medications to them to create that

17  report.  You can remember that discussion.

18           THE COURT:  I do.

19           MS. KENDRICK:  And we did receive a report and

20  Ms. Eidenbach is pulling it up right now, but my memory was
11:29:36

21  that it included other institutions.  It wasn't just the six

22  big ones.  So she'll confirm for us what the documents reflect

23  that has those medications.

24           THE COURT:  Well, if there are inmates who are

25  receiving these medications that are subject to the concern,
11:29:55

United States District Court

86

1    then those temperature reports will have to be submitted.          11:29:57

2          MS. KENDRICK:  It may take her a few minutes.

3          THE COURT:  Well, I think what Ms. Rand was asking

4    for is clarification.  If you can show that the numbers the --

5    the medications that defendants -- rather the inmates the        11:30:13

6    defendants have responded to your list of medications with,

7    show that these people are housed at facilities other than the

8    corridor facilities, then those temperatures will have to be

9    provided as well.

10         MS. KENDRICK:  Okay.  There's another issue related        11:30:33

11   to document production, sir and this is laid out in the letter

12   that was attached to the agenda.  It's Exhibit 5.  It's at

13   docket number 2227-1 at page 24 and that was with regard to the

14   evidentiary hearing that defendants want to do about

15   retaliation.                                                      11:30:57

16         In our letter we requested certain communications and

17   discovery be produced no later than two weeks prior to the

18   hearing because we don't want to be in the same situation we

19   were in last month where we were getting documents dumped on us

20   the night before the hearing in order to accurately and         11:31:14

21   thoroughly cross-examine the witnesses that they may offer.  So

22   that page sets out what we've asked them for.  We have received

23   no response but, again, we request that we get these documents

24   so that we can prepare prior to the date of the evidentiary

25   hearing.                                                         11:31:37

United States District Court

1     MS. LOVE:  Your Honor, this is not an issue that has        11:31:39

2  come up yet in a meet and confer.  Defendants are assessing

3  plaintiffs' request and this is an item and a subject matter

4  that should be tossed between the parties as to the scope of

5  the document request, whether there's documents responsive and   11:31:51

6  what it's going to entail to see if these documents exist prior

7  to the Court issuing an order.

8         So I believe that this would be a subject matter ripe

9  for counsel to have a discussion next week, meet and confer and

10  then if we do not come to agreement, then we can perhaps        11:32:10

11  request a telephonic hearing with the Court and get this

12  settled.  But I understand the request that they want documents

13  prior to the hearing.

14         THE COURT:  Okay.  So I agree in the next week, meet

15  and confer.  If plaintiffs are unsatisfied with what that        11:32:26

16  process produces, then raise it with me when we're on the

17  telephone a week from Friday.

18         MS. KENDRICK:  Yes, sir.

19         THE COURT:  Anything else?

20         MS. KENDRICK:  Not on discovery.        11:32:36

21         THE COURT:  All right.  Thank you.

22         And I appreciate your tolerance of my mistake here.

23  If we can now -- give me just a second to pull up this and

24  write it in in my traditional fashion so that I can have it

25  here.        11:32:57

United States District Court

11:33:27

1            Well, I'll just have to praise Court staff for a

2    second, in particular my law clerk who is working remotely in a

3    different hemisphere.  She has been ably assisting me remotely

4    working, probably to my chagrin, because I now it seem have

5    24/7 law clerks.  I'm hit by this one and the other in the

6    other hemisphere as well and even between the time me talking

7    to you and asking for this to be printed out, she's already

8    penned in the numbers that you just gave Mr. Bojanowksi.

9            So what they show is continued serious problem with

10   Eyman and a drop-off at Lewis before below compliance, so I'll

11   ask for your response to that problem.

12           MR. BOJANOWSKI:  I think it's still part of the

13   establishment of the new DOM at Eyman getting things

14   established there to make sure that we're getting this

15   documented and done.  And then at Lewis I believe we're still

16   having some problems with this issue of correctional officers

17   delivering KOP meds and then failing to input the information

18   in in a timely fashion because it's a paperwork coming from the

19   housing unit back to the medical in untimely fashion which is

20   triggering our noncompliance.

21           So we're in that situation where I know that this

22   Court has heard before that the meds are getting to the inmate

23   because they are not being sent back, they are not being

24   disposed of.  It's just a matter of making sure that these

25   people are putting into the record that, in fact, the inmate

11:33:48

11:34:12

11:34:41

11:35:08

11:35:26

 1   received it.  We do have and one of the things I would like to          11:35:28

 2   ask the Court is going forward on some of these measures is

 3   that we've got substantial compliance at Florence, Tucson,

 4   Winslow, and Yuma and I would ask the Court -- well, excuse me,

 5   not at Tucson but at Winslow, Yuma, and Florence and I would        11:35:47

 6   ask the Court to release defendants from a finding of

 7   substantial noncompliance at this point at those facilities.

 8           THE COURT:  As I've told you before, what I'll do,

 9   when you have such a desire to make that request, file a motion

10   so that the plaintiffs can have an opportunity to, in writing,    11:36:05

11   oppose it.  That is also the opportunity in the motion and the

12   response and the reply for me to address what I've told you

13   that I would address if there were circumstances that warranted

14   special consideration such as if the plaintiffs thought that

15   there was a failure in the monitoring method or if you felt       11:36:26

16   that there was such a dramatic increase that you should be

17   released early, it would give everybody a chance to fully brief

18   that.  So I won't hear it orally but you can file a motion at

19   any time to seek to have the declaration made that the

20   monitoring required by the stipulation is no longer necessary    11:36:43

21   for specific facilities and specific performance measures.

22           MR. BOJANOWSKI:  We'll proceed accordingly, Your

23   Honor.

24           THE COURT:  The funny thing about your response to

25   these issues with these two facilities is when you say you've    11:36:59

United States District Court

| | |
|---|---|
| 1 | heard it before, and the truth of it is we all have heard it | 11:37:03 |
| 2 | before, that the recapitulation of the excuses that is given | |
| 3 | over time is essentially the same and so it causes one to | |
| 4 | wonder, is there really serious attention being paid to this | |
| 5 | because I know you say to me that the meds are being delivered | 11:37:23 |
| 6 | because they are not being returned, but that's not the way | |
| 7 | that the parties agreed to ascertain whether or not this | |
| 8 | performance measure was being met.  It was, as is not | |
| 9 | surprising in a medical record, that if it isn't documented, it | |
| 10 | didn't happen.  So the documentation is what everybody relies | 11:37:41 |
| 11 | on. | |
| 12 | And so I just -- before I give Ms. Kendrick an | |
| 13 | opportunity to say whatever she wants to say, I just wanted to | |
| 14 | add that preliminary view. | |
| 15 | MR. BOJANOWSKI:  I did want to supplement my comments | 11:37:54 |
| 16 | with one other piece of information so that the Court and | |
| 17 | plaintiffs understand.  At the Eyman facility there has been an | |
| 18 | increase in what we call the inventory control employees who | |
| 19 | will assist with the distribution of meds.  And this increase | |
| 20 | one will be assigned to each yard. | 11:38:17 |
| 21 | So medications will be delivered to each of the | |
| 22 | inventory control employees after yard processed and get ready | |
| 23 | for distribution to the patients.  We hope that this structural | |
| 24 | change will assist Eyman in coming into compliance. | |
| 25 | THE COURT:  Here's my standard question that follows | 11:38:40 |

United States District Court

```
 1   anytime you say what the new measure is.  When?  When did it          11:38:42
 2   start or when is it started?
 3              MR. BOJANOWSKI:  Last week.
 4              THE COURT:  So last week there was an additional
 5   person assigned?                                                       11:39:04
 6              MR. BOJANOWSKI:  Correct.  It's an FTE increase.
 7              THE COURT:  FTE of one?
 8              MR. BOJANOWSKI:  From three to four.  So it is not,
 9   it's full-time equivalent.
10              THE COURT:  Okay.                                           11:39:23
11         Ms. Kendrick?
12              MS. KENDRICK:  First off, if it's an increase of FTE,
13   is that just an increase in the contract amount or that has
14   that position actually been filled?
15              MR. BOJANOWSKI:  It's a filled position.                    11:39:41
16              THE COURT:  So last week a new body went -- so we
17   have a group of four people doing this instead of a group of
18   three?
19              MR. BOJANOWSKI:  Correct.
20              THE COURT:  Okay.                                           11:39:50
21              MS. KENDRICK:  Just, Your Honor, on Performance
22   Measure 11, we would just observe for the Court that the Eyman
23   and Lewis facilities in particular were amongst those included
24   in your November 10, 2016, outside consultation order.
25              Also in our proposed mechanism for moving forward          11:40:07
```

United States District Court

1    with sustained and chronic noncompliance, we did identify for          11:40:09
2    Performance Measure 11 Eyman, Lewis, and Tucson as being
3    chronically noncompliant.  Lewis in particular is especially
4    egregious in the now 27 months that we've had data.  They have
5    been above compliance a grand total of one month which was May       11:40:31
6    last month.
7              And Tucson pulled above 85 in June but the previous
8    three months they were substantially noncompliant.
9              MR. BOJANOWSKI:  I would mention that the previous
10   seven months they were compliant.                                      11:40:52
11             THE COURT:  Has there been any augmenting of staff at
12   the Lewis facility?
13             MR. BOJANOWSKI:  No, Your Honor.
14             THE COURT:  Because we certainly cannot disagree with
15   what Ms. Kendrick has said about the long history of failure at       11:41:13
16   Lewis and then to see that we really can't rely upon the May
17   bump up to compliance because we then fall off to 74 for June.
18   I would suggest that perhaps that is an appropriate remedial
19   measure there as well.
20             The next performance measure that is on your list,          11:41:43
21   Mr. Bojanowksi, please.
22             MR. BOJANOWSKI:  It is number 13, Your Honor.
23   Chronic care and psychotropic medications renewals completed in
24   a manner such that there is no interruption or lapse in
25   medication.                                                            11:41:59

United States District Court

| | | |
|---|---|---|
| 1 | And I have the Douglas, Eyman, Florence, Lewis, | 11:42:02 |

1      And I have the Douglas, Eyman, Florence, Lewis,

2  Perryville, Tucson, and Yuma facilities for this one.  So we

3  have Douglas at 100 percent; we have Eyman at 96 percent;

4  Florence at 86 percent; Lewis at 92 percent; Perryville at 92

5  percent; Tucson at 86 percent; and Yuma at 94 percent.    11:42:32

6           THE COURT:  Well done.

7           Ms. Kendrick?

8           MS. KENDRICK:  Just that we certainly hope that with

9  some of the facilities that have been chronically noncompliant,

10 that they can keep this going.                             11:42:52

11          THE COURT:  True enough.

12          The next measure, please.

13          MR. BOJANOWSKI:  That would be number 14, Your Honor.

14 Are refills for chronic care or requested by a prisoner between

15 three and seven business days prior to the prescription running 11:43:05

16 out completed in a timely manner such that there is no

17 interruption or lapse in medication.  The facilities involved

18 are Douglas, Eyman, Florence, Lewis, Perryville, Tucson, and

19 Yuma.

20          At Douglas, there's is a not applicable; at Eyman, 89  11:43:34

21 percent; at Florence, 93 percent; Lewis, 100 percent; at

22 Perryville, 98 percent; Tucson, 100 percent; Yuma, 100 percent.

23          THE COURT:  Excellent.  Do you have any comment?

24          MS. KENDRICK:  Just an observation that Douglas is a

25 very large prison and so we're somewhat concerned that there  11:44:10

United States District Court

11:44:12
11:44:31
11:45:11
11:45:29
11:45:48
11:46:11

1   would be a finding of not applicable that not a single chronic

2   care or psychotropic medication was refilled for a single

3   prisoner in the entire month of June.

4           MR. BOJANOWSKI:  There are no psychotropic

5   medications being dispensed at that facilities.

6           THE COURT:  Chronic care?

7           MS. KENDRICK:  Chronic care.

8           MR. BOJANOWSKI:  I'm understanding that it's an M2,

9   medical two, which -- I'm sorry, Your Honor, I'm not sure what

10  they are telling me because I can't hear.

11          Can I have a moment?

12          THE COURT:  Yes.  Take a moment because this is very

13  important, obviously.  It seems hard to believe that there are

14  no inmates at that facility who do not have a chronic illness.

15          MS. KENDRICK:  Your Honor, for what it's worth,

16  Ms. Eidenbach was able to pull up that report about the

17  psychotropic and heat medications and it does show -- first of

18  all, it shows that all ten complexes house people that are

19  prescribed medications that cause heat reactions.  Secondly,

20  without going into any identifying detail, this shows as of

21  August 1 there were individuals at Douglas complex that were on

22  Elavil, Tegretol, Cymbalta, Neurontin, Pamelor, Paxil, which

23  are all psychotropic medications that induce heat reactions.

24          So, again, we do not understand how they could have a

25  finding of nonapplicable and it calls into question the

United States District Court

1    methodology of the monitoring of this performance measure at          11:46:16

2    that institution.

3         MR. BOJANOWSKI:  It's because those medications are

4    not prescribed as a psychotropic.  They are prescribed for pain

5    for medical purposes, not for mental health purposes.             11:46:26

6         MS. KENDRICK:  The performance measure does not refer

7    to the purpose of the medication.  It simply says a chronic

8    care or psychotropic medication and with regard to the heat

9    reaction.  And the report that they provided us, you have a

10   heat reaction if you're on the medication whether or not it's     11:46:45

11   prescribed because you have depression or because you have

12   neuropathy, regardless, the medication causes the heat

13   reaction.

14        THE COURT:  And I don't disagree with that point and

15   that's why you're going to get the temperature reports.  But      11:46:59

16   what about this issue of non-applicability for Douglas, again,

17   how can it be that there are no chronic care inmates there?

18   There are no diabetics there?

19        MR. BOJANOWSKI:  Your Honor, we're going to have to

20   look at it again.  Maybe we can supplement the record with some   11:47:25

21   kind of information for the Court but we just don't have an

22   answer right now.  We're going to have to go back and pull the

23   CGAR, the data from the CGAR, and have a look and see what

24   happened.  I can only report to you what the preliminary

25   finding is.  I don't know what that underlying data is, so I      11:47:45

United States District Court

can't -- I'm in a position to where I simply can't answer the        11:47:48

Court.  I can't provide you the information today.

          THE COURT:  Okay.

          Well, one of the problems that is endemic here is

that is the folks that suffer the consequence of failure to          11:48:04

meet the performance obligations are the people who are also

engaged in the monitoring, so this is the old governmental

watching the hens kind of situation potential.  And I don't

mean to impugn the integrity of any of the monitors because

I've heard many witnesses here, monitors, whose integrity I          11:48:28

could never impugn based upon how they appeared in front of me

as witnesses.  However, as I shared with you in the past, I do

understand that there are strong political and economic

pressures and operation in this case that cause one to have a

healthy questioning at all times about this in-house monitoring     11:48:53

program.  And I am always concerned when there are any

suggestions that there are issues associated with trust and so

I guess I cannot emphasize -- well, I suppose I better try.

I've tried to emphasize it in the past, how much the Court

depends upon the integrity of this monitoring system and            11:49:27

depends upon the lawyers to guard the conveyance of that

information with great care.

          In the past when we've had issues arise, I've told

you that you run the risk of just pulling all of the wind out

of the sails that could do you well with respect to when you        11:49:41

1    tell me that you have over 90 percent compliance on every one          11:49:44

2    of the performance measures in the previous two or one that

3    still is compliant but just below 90 and you run the risk of

4    having that washed away because I can't trust it unless I do

5    something else to make sure that it is trustworthy.  And I know        11:50:01

6    you have an enormous operation designed to comply with this

7    composed of people who are diligent, but I also have to

8    recognize the reality of the situation that there are pressures

9    that exist that push back on giving full and accurate reporting

10   because the consequence of the failure is one that is becoming        11:50:25

11   every day clearer to the State of Arizona with respect to what

12   it may cost on this case.

13          MR. BOJANOWSKI:  Your Honor, because it's a

14   preliminary finding, I'll certainly run down and make sure that

15   whatever we've got is accurate and report that to the Court.          11:50:42

16          So we're certainly willing to look into it.

17          THE COURT:  Well, best you do.

18          So next performance measure?

19          MR. BOJANOWSKI:  Is 35.  This is the transportation

20   one.  For interstate -- inter-system transfers, complex to            11:51:07

21   complex, are all inmate medications, KOP, and DOT, transferred

22   with and provided with the inmate or otherwise provided at the

23   receiving prison out interruption?  And the facilities at issue

24   here are Eyman, Florence, Lewis, Phoenix, and Tucson.

25          Eyman is at 48; Florence, 64; Lewis, 47; Phoenix, 89;          11:51:41

United States District Court

1  Tucson, 72.  Yeah, that's it.                                     11:51:59

2          THE COURT:  Well, with one exception you, failed

3  abysmally on this and I just don't understand it.  You have the

4  responsibility for transporting inmates whose care you are

5  entrusted with their health care and somehow you can transfer   11:52:18

6  the body, the person, but you can't transfer their medications.

7  I don't understand how this is so unreachable by you and I'll

8  tell you that when I'm looking to the day that may come when

9  I'm considering about the imposition of economic sanctions,

10 this is one where I just think that the message has to be        11:52:35

11 conveyed to you.

12          If you are thinking about transferring people, think

13 about the cost of a thousand dollars every time additionally

14 you do that because that's one of the things between now and

15 then you should be thinking about because if you can't transfer  11:52:52

16 somebody and make sure that they get their medications

17 accompanying with them, then maybe you shouldn't transfer them

18 or maybe you decide you can pay the money.  But this is just

19 unacceptable.  I cannot -- I've emphasized this repeatedly.

20 It's not as if it's attractive to me because it's the simplest   11:53:10

21 one.  That's part of it.  It just is so obvious to me that you

22 ought to be able to do this.  But the second part of it that is

23 important to me is we're talking about people who are on

24 medications where cessation of medications is a big deal; and

25 if you can't safely transfer somebody so that they get their     11:53:27

United States District Court

1    medications, don't transfer them until you figured out a system          11:53:30

2    that you can do this.

3          Ms. Kendrick?

4          MS. KENDRICK:  Well, first off, Your Honor, we would

5    note that you have already put them on notice with Performance          11:53:38

6    Measure 35 at the six institutions because they were covered in

7    your June 14 order to show cause and in response in their

8    filing docket 2173 covering the period from June 14 to July 13,

9    they had 16 pages listing all of the individuals who were

10   adversely affected and there was a total of 1,133 separate          11:54:02

11   incidents in that one-month period of medications not being

12   transferred which would put them potentially on the hook for

13   1.1 -- more than $1.1 million if you were to impose that

14   thousand dollar fine just for that one month period.  We

15   equally share the Court's frustration.  We do not understand          11:54:26

16   why they can not come into compliance with it because it

17   doesn't seem like this is a difficult one to make sure the

18   medication accompanies the person and his or her property when

19   they are going between institutions and we strongly urge the

20   Court to continue defendants to require to report on a monthly          11:54:46

21   basis all incidents at these institutions of noncompliance and

22   the potential of a one thousand dollar fine for the sustained

23   noncompliance.

24         THE COURT:  Mr. Bojanowksi, anything you wanted to

25   say on measures that you've taken when you first realized that          11:55:00

1    June would be as bad as everything else in the past with the
2    exception of Phoenix?

3              MR. BOJANOWSKI:  Your Honor, as I indicated before, I
4    have, and counsel has taken and become involved in trying to
5    work through the issues with regard to this particular measure.
6    Most recently a comprehensive meeting was conducted with both
7    Corizon and ADC representatives, operations, attorneys, et
8    cetera, whereby we met for an extended period of time to work
9    through procedures to make sure that these medications are
10   transferred.  There are a variety of the different flowcharts
11   and such that are now in development to try and address this
12   issue.  We're taking it very seriously.  We're meeting very
13   regularly to try and nail this down.

14             So it's not a matter of us ignoring the situation.  I
15   mean we are working diligently to get this resolved and are
16   trying to address the issues both at an operational level and
17   at the medical level to make sure that when the inmate goes
18   from point A to point B, they have got not only their KOP meds
19   but they have been either administered their medication DOT or
20   get it on arrival.  As a result of these meetings, we had
21   identified various issues that seemed to hinder compliance.
22   I'll give you an example.  As an inmate arrives at a particular
23   facility, they are assigned a unit.  The medications, DOT are
24   transferred to that unit.  The inmate then refuses to house and
25   so then because he refuses to house, he's put into a different

11:55:04

11:55:17

11:55:43

11:56:09

11:56:35

11:56:59

1   unit.                                                                        11:57:02

2          Well, his medication is at one unit but he's housed

3   in another unit and so the medication's got to go from Unit

4   A to Unit B.  And by the time it gets there, it's outside the

5   time frames.  And so, you know, we've got to cure that problem,   11:57:15

6   okay, problem, okay?  How is it that we can make sure that

7   those meds are transferred with that guy when he hits the

8   facility from Unit A to Unit B.  So we're working on various

9   fixes to maybe give the medication before the guy goes to the

10  unit would seem to be the obvious answer.  And so are those      11:57:37

11  kinds of solutions are being discussed and implemented.

12         In addition to that, various policy changes have to

13  be implemented by the department.  In other words, the

14  transportation policy has to be redrafted and changed to say

15  things such as, okay, we will now, instead of rolling up the     11:58:00

16  property of the inmate and including their medications within

17  the rolled-up property, you're no longer allowed to do that.

18         You now have to remove all of the medication,

19  document the medication, make sure that the inmate has his KOPs

20  on his person when he boards the bus and make sure that the      11:58:20

21  DOT is administered either before he leaves or after he gets

22  there.  So these policy changes and structural changes that are

23  being implemented are taking some time to get put into place

24  and the results aren't going to, you know, be immediately or

25  readily apparent.  But rest assured that both the department     11:58:41

United States District Court

1   and Corizon are working very hard to get this resolved because          11:58:44

2   it is a serious situation and we want to make sure that we get

3   it right.

4           MS. KENDRICK:  Your Honor, may I say something in

5   response to this proposed plan?                                         11:58:57

6           THE COURT:  Surely.

7           MS. KENDRICK:  Well, first of all, with regard to the

8   medication that is DOT, which direct observed therapy, also

9   known as watched, swallow, the department's own policies say

10  that people should go to the clinic for -- upon reception so we          11:59:11

11  don't understand why they can't just follow the existing policy

12  versus going off on this Rube Goldberg exercise of creating a

13  whole new mechanism of policies.

14          With regard to the KOP, or keep on person,

15  medications, again, this seems pretty simple and in other                11:59:32

16  prison systems where we have worked where people are

17  transferred, it's a pretty simple proposition.  You put the

18  person's KOP meds in a sealed manila envelope and it goes on

19  the bus with the individual because that way -- and the same as

20  if the guy had a cane.  You know, there are certain things that          11:59:49

21  a person needs to keep on their person.  So a manila envelope

22  with the pills in it and the cane, same idea so there shouldn't

23  be a reason at all that the KOP medications are getting lost in

24  the shuffle.  And it's very disturbing to hear that they roll

25  up KOP meds and put them in the property because it often takes          12:00:09

1    people days to get their property when they come to a new          12:00:13

2    facility.  So we think just following the policy and then just

3    using good common sense would address the problems with both

4    the DOT, direct observed medication, and the keep-on-person

5    medication.                                                        12:00:27

6           THE COURT:  Well, I don't disagree with anything that

7    you've said.

8           But I would further say this, Mr. Bojanowksi, you

9    tell me about the refusal to house example, you spent time

10   talking about that.  I can't imagine that that is a                12:00:43

11   circumstance that affects any great number of these thousand or

12   1100 people that are transferred every month.  People that show

13   up and say, "I refuse to house."  Again, I don't spend the time

14   on the yard to know but it just doesn't seem that that is

15   probably something that is a predominant issue.                    12:01:00

16          Secondly, what Ms. Kendrick says, why don't I go to

17   Woolworth's and buy a box that I lock and I take envelopes and

18   of every single one of the people who are in the van or the bus

19   that is transferring somebody, put that locked box up with the

20   guard by the driver.                                               12:01:20

21          When they arrive, then make sure that when that

22   person is being walked to that person's new place that that

23   person is also having somebody who is taking that envelope with

24   the medication, whether it's DOT or KOP.  Again, if you look at

25   your numbers from June of 2016 and you look at them today,         12:01:38

1    there's essentially no difference.  So we've had this course of          12:01:43

2    a year where I've talked about it monthly, maybe not talked

3    about it monthly but talked about it at least a half to a dozen

4    times with the same kind of exasperated voice that just seems

5    to be.                                                                    12:01:57

6          It is incomprehensible to me because on the one hand,

7    it's such a simple problem, it makes me think of all of the

8    problems that we have, if the simplest one is so beyond your

9    ability to address, can I trust it when you're telling me that

10   you are meeting the ones that are more difficult?  And do I               12:02:13

11   have any hope that you'll ever figure it out on your own or

12   have the motivation to do it on your own?

13          So we're at the noon hour.  We'll break and come back

14   at 1:15.  Thank you very much.

15          MS. KENDRICK:  Thank you.                                          12:02:32

16      (Recess at 12:02; resumed at 1:15.)

17      (Court was called to order by the courtroom deputy.)

18          THE COURT:  Thank you.  Please be seated.

19          Any clarification on Douglas over the noon hour, Mr.

20   Bojanowski?                                                               01:15:37

21          MR. BOJANOWSKI:  Yes, Your Honor.  If I could help

22   the Court out a little bit.  I think part of our confusion is

23   that I didn't accurately read the measure at issue.  The

24   measure at issue is this:  Any refill for a chronic care or

25   psychotropic medication that is requested by a prisoner between          01:15:55

United States District Court

1    three and seven business days prior to the prescription running          01:15:59

2    out will be completed in a manner such that there is no

3    interruption or lapse in medication.

4          So this is measuring a request by an inmate for a

5    refill of a medication that is due to run out between three and          01:16:16

6    seven business days prior to expiration.

7          At the Douglas facility, there were no inmates that

8    made such a request during the reporting period.  That is why

9    it was marked as an NA.  To give the Court maybe a little more

10   context on this measure at that facility, there were a total of          01:16:38

11   three inmates that made such a request in May and another three

12   in April.  So it's a very small group that falls into this

13   particular measure and that is why you get a large swing in

14   maybe a compliance score, because you're dealing with maybe

15   five people that make such a request at most.  So that's what          01:17:04

16   has occurred and that is what happened here and that is why

17   it's an NA.

18          THE COURT:  Okay.  Thank you.

19          Anything you wanted to add, Ms. Kendrick?

20          MS. KENDRICK:  I would just note if three people          01:17:22

21   requested refills in May and April it begs the request why

22   three people didn't make request refills in June if it's the

23   same three people.  Nonetheless, I guess we're just going to

24   have to take Mr. Bojanowksi at his word here on the cause.

25          THE COURT:  For chronic care, what is the period of          01:17:37

United States District Court

1    time that somebody is allowed to obtain medication for?  So          01:17:42

2    when you need to have a rebill, the prescription that you have,

3    when does that need to be refilled?

4              MR. BOJANOWSKI:  I think it's based on what the

5    provider orders.  I mean, I know that -- well, from my own           01:17:55

6    experience --

7              THE COURT:  Well, that's not helpful.  I'm interested

8    about what happens at Douglas.  Is it a 30-day period of time

9    such that we would be seeing a red flag if we didn't see

10   something that would come up in June that had a previous report      01:18:10

11   of three and three in two previous months?

12             MR. BOJANOWSKI:  Let me check.

13             It's usually a 30-day time frame.

14             THE COURT:  That's exactly what I was asking about.

15             MR. BOJANOWSKI:  It's typically a 30-daytime frame.        01:18:39

16             THE COURT:  And so why would there be zero people in

17   June do you think?

18             MR. BOJANOWSKI:  I know that a unit was shut down at

19   that facility so the population was decreased.  I don't know if

20   those people were in that unit or not, to be honest with you,       01:18:58

21   but I believe that the Papago Unit was shut down so it may be

22   that those people were in that unit.  I simply don't know the

23   answer to that, Your Honor.

24             THE COURT:  All right.

25             MS. KENDRICK:  Your Honor, I would just observe that       01:19:10

1    going back to that report that we received showing people

2    prescribed psychotropic medication or other medication that

3    causes heat reactions, that is current as of August 1 was 25

4    separate individuals at Douglas complex who are prescribed

5    these medications.

6           So, again, it kind of bewilders me that if they are

7    all on a 30-day refill cycle, how none of the 25 put in a

8    request in the month of June if there are 25 of them here now

9    in August after moving a bunch of people out as he just

10   represented.

11          THE COURT:  Let me give the defendants a chance to

12   digest this 25 number.  That does seem to raise the exact

13   question that you ask.

14          MR. BOJANOWSKI:  Your Honor, this is a measure that

15   measures when an inmate makes a request for the refill.  They

16   don't have to make a request for the refill.  There may be 25

17   people there that are receiving a medication that made no such

18   request and so it wouldn't be picked up on this measure.

19          THE COURT:  Can I ask you to double-check?  Hearing

20   that there are 25 and then we suddenly have zero, can you

21   double-check?

22          MS. KENDRICK:  And I would add, Your Honor, that 11

23   of these 25, if I'm counting correctly, are on Neurontin which

24   is also known as gabapentin which is a pain medication.  In my

25   experience in dealing with people who are on this medication,

01:19:11

01:19:27

01:19:45

01:20:00

01:20:19

01:20:36

1    they have very, very serious side effects if they abruptly                01:20:39

2    discontinued the gabapentin.  Same with Cymbalta and Paxil.  So

3    I would be shocked if none of these 25 people, or whatever

4    number who are on the medications, did not request a refill.

5    And it makes me wonder how they are tracking the request for              01:20:55

6    refill, what sort of source document they are using.  If they

7    are just going off of HNRs that say refill my medication.

8            So this, to us, calls into question the methodology

9    and what the source document would be that they are using of

10   all of the refill requests that they received in the month of            01:21:12

11   June in order to select the random sample.

12           THE COURT:  Do you happen to have a visit upcoming to

13   Douglas?

14           MS. KENDRICK:  No, we don't, but this is kind of

15   making us -- we might to go there sooner rather than later.              01:21:27

16           THE COURT:  Okay.  Thank you.

17           37 then.

18           MR. BOJANOWSKI:  37 is sick call inmates will be seen

19   with an RN within 24 hours after an HNR is received or

20   immediately if identified with an emergent need or on the same           01:22:01

21   day if identified as having an urgent need.  The facilities at

22   issue are Eyman, Florence, Lewis, Tucson, Winslow, and Yuma.

23           Eyman, 88 percent; Florence, 98 percent; Lewis, 92

24   percent; Tucson, 96 percent; Winslow, 93 percent; and Yuma, 100

25   percent.                                                                 01:22:49

United States District Court

1          THE COURT:  And based upon yesterday's testimony with     01:22:52

2    respect to the places where the open clinic nurses line is in

3    place, how are you determining or planning to determine when it

4    is that the HNR would be received?

5          MR. BOJANOWSKI:  Well, it's received when the inmate     01:23:13

6    brings it into the medical unit.

7          THE COURT:  So is that the time that the HNR is

8    presented to the person that creates this informal log or

9    worksheet if you will and that those are recorded?  Because

10   we've had raised this issue about people who find that they     01:23:28

11   cannot make it work being able to see someone on the nurses'

12   line, waiting for it, and we've heard about people who withdraw

13   their identification and then step away from the list.  And I'm

14   wondering whether you have given any thought to exploring the

15   use of these logs or worksheets that we heard about yesterday.     01:23:52

16         MR. BOJANOWSKI:  I don't believe that's what's being

17   looked at.  I think it's when the HNR is actually given to the

18   nursing staff.  That's when it's received because that's when

19   it's time-stamped in as being received in the medical unit and

20   then that would be the time frame that would then trigger the     01:24:13

21   application of this measure.  So it's when it's received in the

22   medical unit.

23         THE COURT:  All right.

24         Ms. Kendrick?

25         MS. KENDRICK:  Well, Your Honor, I think that both     01:24:23

United States District Court

1    the oral testimony and many of the written exhibits and                01:24:25

2    documents confirm what Mr. Bojanowksi has just said and what he

3    has represented in previous hearings which is the HNRs are not

4    logged until the person is actually coming and seeing the

5    nurse.  So it does not capture the universe of people who walk          01:24:41

6    away or people who are turned away or people who go when it's

7    not their building's time.  I think the other thing to note is,

8    you know, we think that the failure to keep a log of all HNRs

9    calls into question the accuracy of the numbers and that needs

10   to be something that they need to start doing.                          01:25:02

11        It still, however, would not address all of the

12   concerns that we have with the open clinic process which

13   includes also the literal and physical access to care,

14   especially for the prisoners with disabilities and others who

15   are dissuaded from having to wait for long periods of time.             01:25:15

16        THE COURT:  All right.  It is one of the issues we'll

17   be working through and looking at after we come to the

18   conclusion of all the testimony on the HNR issue.

19        Performance Measure 39?

20        MR. BOJANOWSKI:  39, routine provider referrals will               01:25:33

21   be addressed by a medical provider and referrals requiring a

22   scheduled provider appointment will be seen within 14 days of

23   the referral.  Facilities at issue are Eyman, Florence, Lewis,

24   Perryville, Tucson, and Yuma.

25        Eyman is at 90 percent; Florence, 74; Lewis, 83;                   01:26:11

1    Perryville, 93; Tucson, 99; and Yuma, 88.                           01:26:19

2         THE COURT:  With respect to Florence and Lewis, what

3    do you have to say?

4         MR. BOJANOWSKI:  May I have a moment, Your Honor.

5         THE COURT:  You may.                                           01:26:55

6         MR. BOJANOWSKI:  I have several pages of notes here.

7         THE COURT:  I'll say, for the record, that Florence

8    has a fairly described history on this point that is unable to

9    seemingly budge from sort of this meddling range.

10        MR. BOJANOWSKI:  Florence we had compliance 90            01:27:41

11   percent, 85 percent, 87 percent, it then dropped off to 74

12   percent.  I think that was as a result of a loss of provider.

13   In order to plug that gap, we did increase the use of

14   Tele-Medicine there to pick up the slack on that until that is

15   brought back up to the level.                                      01:28:05

16        THE COURT:  So that's ongoing and started in June or

17   when did that start?

18        MR. BOJANOWSKI:  Yes, Your Honor.

19        THE COURT:  And information about Lewis?

20        MR. BOJANOWSKI:  May I have a moment, Your Honor?        01:28:52

21        THE COURT:  You may.

22        MR. BOJANOWSKI:  My notes don't seem to . . .

23        At Lewis, Your Honor, what occurred, they hired 10

24   new nurses there and apparently, as a result of training to get

25   them to appropriately schedule the patients within the            01:29:39

United States District Court

1    14-daytime period, that seemed to be the issue with regard to          01:29:42

2    them dropping off from their -- from the compliance level.

3              THE COURT:  And these new nurses that didn't seem to

4    understand how to do it started when?

5              MR. BOJANOWSKI:  It was in June, Your Honor.                  01:30:44

6              THE COURT:  Ms. Kendrick?

7              MS. KENDRICK:  Your Honor, first of all, with regard

8    to Florence prison and Mr. Bojanowksi talking about the fact

9    that they were compliant in March, April, and May, in light of

10   the grievance that we submitted as Plaintiffs' Exhibit 21         01:31:08

11   yesterday in which the response to the prisoners' grievance was

12   that the policy at Florence was you needed to be seen three

13   times on nurses' line before being referred to the provider, to

14   us, that calls into question the accuracy of the numbers since

15   that has the impact of artificially deflating the pool of         01:31:29

16   people who have pending provider referrals.

17             With regard to Lewis prison, he states that it's

18   because new nurses were not doing what they were instructed to

19   do.  That inspires a couple of responses.  First of all, it

20   makes me question what the training is, if any, that they are     01:31:49

21   providing these people before putting them on the job so that

22   they would know that that is their responsibility.  And I also

23   find it a little hard to believe, just knowing human nature,

24   that you would be hired for a job, be trained on it, start

25   doing it and then immediately refuse to do what you had been      01:32:07

United States District Court

1    instructed and trained to do.                                          01:32:10

2            So the explanation seems a little disingenuous in

3    blaming the nurses for something when perhaps they are not

4    doing it but the reason why I seriously doubt is because they

5    refuse to do it at a brand new job.                                    01:32:25

6            THE COURT:   And this is a provider referral so it's

7    not like a nurse referral?

8            MS. KENDRICK:   No.   Excuse me.   I'm sorry.   These are

9    the referrals from the nurses' line to the provider.

10           THE COURT:   Right.                                            01:32:38

11           MS. KENDRICK:   So the nurse is the one who makes the

12   referral.   So with Florence, if a nurse is told, "You can't

13   make a referral until you see somebody three times," that --

14   which is the policy at Florence according to Exhibit 21, that

15   would artificially deflate the number of people being referred   01:32:53

16   so it does not reflect reality.

17           To the extent that they are saying that the nurses

18   are refusing to do what they were instructed to do with the

19   timelines for referrals, to me that either indicates, one, they

20   are not training them properly or, two, that is just not true.   01:33:10

21   Because I can't imagine somebody starting a brand new job and

22   immediately refusing to do what they were just told they needed

23   to do as matter of their job.

24           THE COURT:   Well, I don't disagree with anything that

25   you said.   My comment was not to suggest that there was          01:33:28

                        United States District Court

1    anything wrong with what he had said previously.  It was to                    01:33:30

2    also add the observation that previously with respect to this

3    measure, it has been, one, identified with an absence of

4    providers so here we have an increase in nurses who can make

5    the referrals.  It -- not only did it seem to not address the                   01:33:44

6    problem but that also to me seems to be not surprising because

7    it would seem if you add 10 new people to make referrals and

8    there's nobody to make the referral to, that could explain this

9    kind of situation.  And I think that we have been told that in

10   the past and we're not being told that presently.                               01:34:01

11         MS. KENDRICK:  Yes, Your Honor.  Well, according to

12   the June staffing report, which we submitted as Exhibit 40, in

13   the month of June at Florence, the Corizon contract called for

14   2.5 staff physicians and 1.0 position was filled so that was a

15   40 percent fill rate.  They did have three nurse practitioners                   01:34:21

16   at that time but still, obviously, having four -- a grand total

17   of four provider level people, one physician and three nurse

18   practitioners, is not enough for the Florence prison which

19   holds several thousand class members.

20         The Lewis prison, similarly, in June had 2.5 staff                        01:34:44

21   physician positions of which only 1.0 was filled so, again, a

22   40 percent fill rate for physicians.  They also had four nurse

23   practitioners, contracted for three.  So they were actually

24   ahead so they had a grand total of five providers documented at

25   Lewis in the month of June.  Again, as you recently visited                     01:35:07

 1    Lewis, I'm sure you saw that it has seven or eight separate          01:35:11
 2    yards and over 5,000 prisoners housed there.  So five providers
 3    clearly may be part of the problem and not enough to see people
 4    in a timely manner.
 5              THE COURT:  All right.  Performance Measure 40.           01:35:33
 6              MR. BOJANOWSKI:  40 is urgent provider referrals are
 7    seen by a medical provider within 24 hours of the referral.
 8    Facilities at issue are Eyman and Tucson.  Eyman is at 100
 9    percent.  Tucson is at 100 percent.
10              THE COURT:  Okay.  Ms. Kendrick, anything you want to     01:36:01
11    add anything for the record?
12              MS. KENDRICK:  I'm just curious what the sample size
13    was.  How many urgent referrals were there?
14              MR. BOJANOWSKI:  I don't have that information.
15              MS. KENDRICK:  Okay.                                      01:36:15
16              THE COURT:  In the monthly reports that information
17    isn't also included but do you receive it, Ms. Kendrick?
18              MS. KENDRICK:  The actual CGAR reports that have the
19    color coding it does show the sample size, the number
20    compliant, and how it gets to that percentage.                     01:36:34
21              THE COURT:  So you're keeping an eye on those?
22              MS. KENDRICK:  Yes.
23              THE COURT:  So I'm sensitive now to things that are
24    obvious points of inquiry that are raised by the data and so
25    I'm glad to know that since we had this experience causing us      01:36:50

                         United States District Court

1    to wonder about Douglas, whether there are other incidences                01:36:56

2    where you would see a number that didn't seem to make sense.

3    And I'm glad to see that raw data that you get included that

4    because I don't see that.

5            MS. KENDRICK:  Yeah.  And with the numbers especially              01:37:10

6    with, like, the urgent referrals that has been sometimes a

7    concern about for us about the source documents because, you

8    know, to the extent there might have been just two or three

9    urgent referrals in the entire month, yet at the same time

10   we're looking at a different document that shows 35 people went             01:37:25

11   off to a hospital, it does start to raise questions about

12   record-keeping accuracy and methodology.  But that's a deeper

13   question than the numbers.

14           THE COURT:  Okay.

15           44?                                                                 01:37:40

16           MR. BOJANOWSKI:  44 is -- the measure is, inmates

17   returning from an inpatient hospital stay or ER transport with

18   discharge recommendations from the hospital shall have the

19   hospital's treatment recommendations reviewed and acted upon by

20   a medical provider within 24 hours.  The facilities at issue               01:38:01

21   are Eyman, Florence, Lewis.

22           At Eyman, we have 96 percent; at Florence, 84

23   percent; and at Lewis, 95 percent.

24           THE COURT:  So this is the second month that Florence

25   has been below the benchmark?                                              01:38:35

United States District Court

1              MR. BOJANOWSKI:  No, Your Honor.                                          01:38:39

2              THE COURT:  No?

3              MR. BOJANOWSKI:  Last month Florence was at 96

4    percent, the previous month 100, and the previous month to that

5    100.                                                                                01:38:47

6              THE COURT:  On 44?

7              MR. BOJANOWSKI:  Yes, Your Honor.

8              THE COURT:  Well, let me just check --

9              MR. BOJANOWSKI:  You said Florence; right?

10             THE COURT:  I did.                                                        01:38:56

11             MR. BOJANOWSKI:  Yes.

12             THE COURT:  And I show May at 83.  Oh, and that is my

13   mistake actually because May it was compliant.  My mistake

14   because it's a 75 percent benchmark then.  Thank you.

15             Ms. Kendrick, anything on 44?                                             01:39:15

16             MS. KENDRICK:  Just for the record, Your Honor, we're

17   glad to see that Eyman is at 96 percent but it's the first time

18   in seven months that it has been above the compliance level and

19   we did include this institution and performance measure in our

20   proposed mechanism for further enforcement.                                         01:39:29

21             THE COURT:  All right.

22             45?

23             MR. BOJANOWSKI:  45 is on-site diagnostic services

24   will be provided the same day if ordered stat or urgent or

25   within 14 calendar days if routine.  The facilities at issue                       01:39:46

United States District Court

1   are Lewis and Tucson.

2          Lewis was at 91 percent, Tucson at 87 percent.

3          THE COURT:  Thank you.  And just pause for a moment

4   if you will while I double-check something.

5          I've got one of those features in my brain, you

6   probably have it, too, once in a while.  It enters an automatic

7   loop that plays back something that you just said that

8   thankfully points out an error and the error that I made on the

9   record a moment ago was when I started down the wrong road of

10  suggesting that there was not compliance on the previous

11  performance measure with Florence and I cited the fact that the

12  previous month was at a different benchmark, that was wrong.

13  What I had done is I had flipped inadvertently back to May of

14  2015 and so that -- I correct that mistake but it had no effect

15  because what I said in my conclusion was true and that is that

16  you were compliant.  Let me -- before I say that, let me make

17  sure I get that exactly right.  Yes, that you were compliant at

18  Florence for both May and June.  Thank you.

19         MS. KENDRICK:  For May and April, Your Honor.  June

20  they are 84.

21         THE COURT:  Well, thank you.

22         MR. BOJANOWSKI:  On 44 and she's correct, Your Honor.

23         THE COURT:  And I'm yet again wrong so let me just

24  try to figure out how I made that mistake.

25         So for 44 for May, what do you all show for Florence?

                United States District Court

01:39:56
01:40:43
01:40:57
01:41:18
01:41:42
01:42:12

```
 1          MR. BOJANOWSKI:  I show 96 percent.          01:42:18

 2          THE COURT:  Okay.  And then when you corrected me

 3     with the 84 percent --

 4          MR. BOJANOWSKI:  84 is the June preliminary number

 5     for Florence.                                    01:42:33

 6          THE COURT:  Okay.  Thank you.  And what I've done is

 7     I've written 85 and now I put 84.  Okay.  Thank you.

 8          MR. BOJANOWSKI:  46 is, a medical provider will

 9     review the diagnostic report, including pathology reports, and

10     act upon reports with abnormal values within five calendar days  01:42:55

11     of receiving the report at the prison.  And the facilities at

12     issue are Douglas, Eyman, Florence, Lewis, Perryville, Phoenix,

13     Tucson, and Yuma.

14          Douglas is at 97 percent; Eyman is at 46; Florence is

15     at 80; Lewis is at 59; Perryville at 78; Phoenix, 78; Tucson,   01:43:30

16     88; and Yuma, 94.

17          THE COURT:  So some serious back-sliding here first

18     with respect to Eyman.

19          MR. BOJANOWSKI:  Correct, Your Honor.  This was the

20     issue, as we have discussed in the past, where there was        01:44:09

21     providers who would receive the diagnostic report.  They did

22     not feel any action needed to be taken so, therefore, they

23     would not document the fact that no action needed to be taken

24     because the report perhaps showed normal values.

25          And so what was ending up happening is because they        01:44:37
```

United States District Court

1    did not put down no further action was required, they were                    01:44:40

2    found to be noncompliant.

3           So we implemented a new procedure in mid-June

4    basically to have providers that are charting their responses

5    to note in the chart that no further action is required.  We    01:45:06

6    did do a spot-check on that here recently to try and look to

7    see how it was looking and whether our action is taking hold.

8    And since implementation of the new procedures, we believe that

9    this new requirement is actually going to take hold and turn

10   these numbers around pretty substantially.                       01:45:39

11          THE COURT:  Are you doing the same thing at Lewis,

12   Perryville, and Phoenix?

13          MR. BOJANOWSKI:  It's system-wide, Your Honor.  This

14   was a system-wide change that was implemented and we believe

15   that the next round of numbers are going to show some           01:45:58

16   improvement here.

17          THE COURT:  Is it fair to summarize the system-wide

18   improvement as telling the providers then that they have to

19   chart if they are taking no action?  Is that what it is or is

20   it something different than that?                               01:46:14

21          MR. BOJANOWSKI:  What we're doing is we're running a

22   daily report at each facility and checking it and if it's not

23   complete, we're telling the provider to look at that report and

24   make whatever notation is needed based upon whatever treatment

25   regimen is in place.                                            01:46:41

                    United States District Court

1    THE COURT:  So the report is pulling in all of those    01:46:43

2  people for whom there's been a diagnostic report and seeing

3  whether or not they have either taken action or documented that

4  no action is necessary?

5    MR. STRUCK:  Correct.    01:46:56

6    THE COURT:  So for everybody starting in mid-June,

7  we're double-checking to make sure that this is happening?

8    MR. BOJANOWSKI:  Correct.

9    THE COURT:  Ms. Kendrick?

10    MS. KENDRICK:  Well, Your Honor, looking at the June    01:47:09

11  14 transcript, at that hearing, Mr. Bojanowksi reported to the

12  Court that in the past 30 days the providers had been trained

13  on this and that we should see improvements.  So it is

14  disturbing, to say the least, that it's not showing up yet.  We

15  would also note that the Court did include Performance Measure    01:47:26

16  46 in its order to show cause.  And in the report that the

17  defendants provided covering the institutions of Douglas,

18  Eyman, Florence, Lewis, Perryville, Phoenix, and Tucson, there

19  were 719 separate incidents of noncompliance in the one month

20  period between June 15 and July 16.    01:47:51

21    So that would have subjected them to a potential fine

22  of up to $719,000.  Again, you know, I don't want to sound like

23  a broken record every month saying the same thing but our

24  expert has repeatedly offered proposed solutions and clearly

25  part of the problem is there just are not enough providers to    01:48:12

United States District Court

1   review this.                                                          01:48:15

2          In the past, Mr. Bojanowksi has also said that

3   Tele-Medicine would be utilized to review these diagnostic

4   reports to help them.  It doesn't appear that it's helping them

5   with their statistics, not to mention our expert, Dr. Wilcox,       01:48:27

6   does not feel that using Tele-Medicine is the best practice.

7   You generally want the provider who requested the diagnostic

8   test to review the diagnostic results, so you have an unbroken

9   chain.  But to the extent they were going to utilize

10  Tele-Medicine, it's not showing in the numbers here, Your           01:48:46

11  Honor.

12          THE COURT:  46?

13          MS. KENDRICK:  That was 46.

14          THE COURT:  That was 46.  Thank you.

15          47?                                                          01:49:03

16          MR. BOJANOWSKI:  47 would be our next one which is, a

17  medical provider will communicate the results of the diagnostic

18  study to the inmate upon request and within seven calendars

19  date of the date of the request.

20          The facilities at issue are Douglas, Eyman, Florence,        01:49:23

21  Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma.

22          Douglas is at 100 percent; Eyman, 27; Florence, 54;

23  Lewis, 45; Perryville, 73; Phoenix, 56; Safford, not

24  applicable; Tucson, 80; Winslow, 100; and Yuma, 87.

25          This is the communique issue, Your Honor, that we are        01:50:10

                    United States District Court

1    working on.  This measure is one that really -- one where it            01:50:16

2    was set up so that an inmate could make a request.  They would

3    get the result of their labs.  So what we're doing now is we're

4    not sending out just those that are requested by the inmate.

5    We're going to be sending out -- we've expanded the               01:50:42

6    communication procedure that I had described before and

7    Mr. Tucker had described to include all labs coming in so that

8    all labs coming in are going to be done -- sent to the inmate

9    population.

10        And I said to the Court last time, that I was            01:51:14

11   setting -- contacting all of the facilities to try and find out

12   exactly what the procedures are.

13        I have made that contact and I am -- I need just a

14   few more days to get some more answers from some of the

15   outlying facilities; but generally speaking, the way it's going   01:51:35

16   to work is that the medical unit prints off the report, goes

17   into an envelope.  The envelope then goes in to the mail system

18   and each facility, as I'm seeing, has a different mail system

19   and how they actually operate it and I'm going to set that out.

20   I've got kind of a chart here that I can supply to the Court.     01:52:06

21        But it generally goes from the medical unit to

22   operations and each unit has got like a mail person and then

23   that mail goes to that person and then is distributed to each

24   one of the individual inmates in the facility.  So in a rough

25   sense, that's the way it works.  And like I said, I've got the    01:52:34

United States District Court

1    information here as to how that is going to work.  Like I say,                    01:52:42

2    different facilities do different things.  It may be a CNA that

3    does it at one facility.  It may be, you know, a nurse that

4    does it at another facility.  But like I said, generally

5    speaking, they are put into an envelope, addressed by medical          01:52:57

6    staff, and then they are put into the mail system to get

7    delivered to the inmate.

8              And like I said, Corizon, instead of just doing it

9    upon request, they are just going to do it for everything.

10             THE COURT:  And that's what I think I heard you say          01:53:16

11   to me that was different the time before.

12             So who -- who is on the phone?

13             COURTROOM DEPUTY:  Nobody.  That's what happens when

14   they hang up.

15             THE COURT:  I see.  All right.                                01:53:33

16             So the thing that was different today is that you

17   said it was no longer going to be done upon inmate request but,

18   nevertheless, the June numbers report where it was done with

19   just people who asked about it.  And so if you can't do it with

20   the people who had asked about it, why do you think a            01:53:46

21   correction that increases the number of instances where you

22   have to perform this function will provide for an increased

23   success rate at that function?

24             MR. BOJANOWSKI:  Let me check on that, Your Honor.

25             Your Honor, it's my understanding that the measure         01:55:07

United States District Court

1   had an extremely small sample size, not a lot of inmates were          01:55:13

2   making the request for diagnostic reports.  So as a result,

3   your numbers, you know, if you miss.  But regardless, all of --

4   you're correct.  All of the labs now are going to be sent out

5   and then they are taking and they are specifically pulling HNRs   01:55:35

6   that make the request to ensure that those are -- it's

7   essentially double-checked to make sure that those are captured

8   as well as it's Corizon's intention to send every single one

9   out to the inmate population.  That's what they want to do as a

10  matter of practice.                                                01:56:00

11        THE COURT:  And did you say that there is a

12  verification process in place now?

13        MR. BOJANOWSKI:  It's one of the computer reports

14  that was developed a few weeks ago to actually pull those out

15  as a double-check of making sure that the ones that request get   01:56:33

16  those.

17        THE COURT:  So as of today, for all of these

18  facilities, everybody who has obtained a diagnostic or has had

19  a diagnostic study conducted on them is going to have their

20  record checked to see whether or not the results of that          01:56:59

21  diagnostic study have been communicated to the inmate.  Is that

22  what you're saying?

23        MR. BOJANOWSKI:  No.  It's just the ones -- the

24  double-check is for the ones that make -- the inmate who makes

25  the request for the report.                                        01:57:16

United States District Court

1          THE COURT:  I see.                                          01:57:18

2          MR. BOJANOWSKI:  That's the ones that are going to be

3    double-checked.  As a matter of practice, Corizon wants to send

4    out all of them to the inmate population.  But the report is

5    just to pull out those inmates who made the request to          01:57:29

6    double-check and make sure they are getting them.

7          THE COURT:  So is it true to say that as of today,

8    all of the inmates who request a copy of their diagnostic

9    report are having their records verified, double-checked by

10   Corizon to make sure that they have received that diagnostic    01:57:47

11   report?

12         MR. BOJANOWSKI:  It's being pulled off a log where a

13   nurse is logging that an inmate has made the request for their

14   diagnostic study and that's what's being put into the report.

15         So the central office then compiles that report.          01:58:25

16   They contact the facility and they say to the person at the

17   facility, "Make sure that this report is sent out to the

18   inmate."

19         THE COURT:  Well, that's, again, not exactly what I

20   thought I stood you were saying.  I guess my question to you    01:58:38

21   produced a long answer when I really expected just a yes or no.

22   And maybe we can start off by getting a yes or no.

23         Is it the practice as of this moment that everybody

24   at the facilities who request a copy of their diagnostic study

25   that there is somebody in Corizon that is verifying that that   01:58:58

1   has been provided to that inmate?                          01:59:03

2           MR. BOJANOWSKI:  Yes.

3           THE COURT:  Okay.  Thank you.

4           Ms. Kendrick?

5           MS. KENDRICK:  As an initial matter, Your Honor, I   01:59:10

6   would note Mr. Bojanowksi assured us and you at the July 14

7   hearing that within two weeks, potentially up to three, he

8   would provide a detailed report to all of us for all ten

9   institutions explaining exactly how they are doing this because

10  we had hoped that one individual could answer your questions   01:59:28

11  and was unable to.

12          The Court ordered him to do that at the hearing and

13  it's also memorialized in your minute order.

14          Mr. Bojanowksi has not provided any information to

15  the Court or to us.  He states that he still is waiting for   01:59:44

16  declarations from outlying areas which would tend to show that

17  perhaps he does have information for some institutions which

18  begs the question why he did not provide this information to

19  the Court and to plaintiffs on a rolling basis.

20          That aside, we would note that this is a performance   02:00:04

21  measure where you found them noncompliant at nine different

22  institutions in October.  Earlier this spring, we had asked you

23  to extend your outside services order to include this

24  performance measure at many of the institutions because of the

25  chronic noncompliance.  They are still chronically             02:00:22

United States District Court

1    noncompliant.  The defendants are not providing very much                    02:00:26

2    detailed information here beyond saying what they said at the

3    June and May hearings.

4          And in our proposed methodology for dealing with

5    chronic noncompliance, we had proposed that Performance Measure    02:00:41

6    47 at seven institutions -- Eyman, Florence, Lewis, Perryville,

7    Phoenix, Tucson, and Yuma -- be included in the monitoring that

8    involves looking at all incidents and a potential of a $1,000

9    fine.  So we reiterate that request and strongly urge the Court

10   to incorporate it into your future order.                          02:01:07

11         Finally, Mr. Bojanowksi said that these performance

12   measures are adversely affected because there is a sample size

13   and not many prisoners are asking for diagnostic test results.

14   And I can tell the Court that based upon reading the mailer

15   that I get from the Arizona prisons, and I probably read about     02:01:25

16   50 letters a week, that oftentimes people are saying that they

17   had a biopsy, they had a test and they don't know the results.

18   And I always write them back and tell them put in an HNR or a

19   kite and ask for the results precisely because Performance

20   Measure 47 requires that they respond within seven calendar        02:01:46

21   days.

22         So to the extent that they are saying that only two

23   or three people at an institution, especially institutions like

24   Eyman or Florence or Lewis or Perryville that have five to

25   6,000 prisoners, to the extent they are going to try to say        02:02:02

1    that only three or four prisoners requested the results just          02:02:05

2    doesn't seem to make sense under basic common sense and,

3    therefore, for me, it calls into question what their monitors

4    are using as a source document, how the monitors or Corizon is

5    tracking all of these requests that may be coming in asking,          02:02:22

6    "Do I have cancer?  What's the result of my biopsy?"  If there

7    truly is such a small sample size, it does beg the question as

8    to how they are tracking all of the requests that would be

9    coming in.

10           THE COURT:  Well, it is something to keep an eye on.          02:02:40

11   I'll say this, in two performance measures today, I've heard

12   something that I have not heard before and that is the

13   commitment of the defendant to -- well, communicating the

14   commitment of the contractor and so this is a representation

15   that has been made to the Court by the defendants that the            02:02:57

16   contractor is actually verifying that the compliance has

17   occurred on a realtime basis.

18           And so for this measure, if we have any that are

19   pooled after today's date, certainly we know that the month of

20   September is completely safe of any kind of risk that it was          02:03:16

21   before the activation of this measure.  If it's not 100

22   percent, then you would have a very strong argument as to

23   question the entire process.

24           But, again, I think one of the things that I am

25   pleased about is that when you have abject failures in a              02:03:41

United States District Court

1   performance measure like this one, it does call out on a                    02:03:45

2   realtime basis to make sure that as every day closes, did we

3   communicate within seven days the people who seven days before

4   asked us for our diagnostic reports?  So we look for everybody

5   who has requested a diagnostic report.  We see if seven days       02:04:03

6   have passed and we look to make sure that we have communicated

7   those results.  That sounds like what it is that they are doing

8   right now.

9          Is that true, Mr. Bojanowksi?

10          MR. BOJANOWSKI:  Yes, sir, every day.                       02:04:20

11          THE COURT:  Okay.  It should have been done a long

12   time ago but it's being done now.  If that's being done now, we

13   hope to see those results.  If we don't, there will be a lot of

14   explaining to do.

15          MS. KENDRICK:  Your Honor, just one other thing.  It        02:04:31

16   seems that Mr. Bojanowksi has difficulty articulating how the

17   operations of this works and hopefully the declarations that he

18   promises to provide the Court and to plaintiffs will clarify

19   this.  But to the extent that they raise questions or

20   confusing, we do reiterate the request we've made before that     02:04:49

21   defendants produce the persons most knowledgeable at the

22   department.  I have no idea who they would be from an

23   operations side but who can explain how these reports, once

24   generated by Corizon, it's no longer Corizon that is involved.

25   It's operations.  And so what is happening to get the report      02:05:08

United States District Court

1    from the clinic to the prisoner.                                          02:05:12

2           THE COURT:  So your concern is that we would be

3    getting a report that would reflect only what had happened with

4    respect to the communication of the diagnostic report from the

5    point that the -- the analogy I've used before which exits the   02:05:29

6    printer at the medical office, then, as Mr. Bojanowksi says, it

7    goes into an envelope and then gets communicated.

8           You're concerned that the check-off here will be

9    something that is only really testable by checking in with the

10   people who are responsible for seeing it to the end process of  02:05:50

11   the delivery to the inmate.  Is that what you're saying?

12          MS. KENDRICK:  Yes.  That is part of it, sir.  Part

13   of it also is just the fact that each month we hear a slightly

14   different account --

15          THE COURT:  That's certainly true.  That is -- and I    02:06:06

16   raised last month and so Mr. Bojanowksi says he's gone to

17   school to try to figure this out and the school is not quite

18   done yet.  And he's told us he'll get this table or flowchart

19   that tells us how it works and have an intimate understanding

20   of exactly how it works.                                        02:06:24

21          I think the plaintiffs do need to be in a position of

22   being able to see whether or not what the methodology is for

23   testing this to see fit works.  And it is different from many

24   of the other performance measures because the monitors are

25   going beyond what I think would be satisfactory knowledge to    02:06:42

United States District Court

1   document knowledge with the measure.  And I imagine there is          02:06:49

2   probably nothing in the medical record that verifies the

3   delivery to the inmate and so we would have to have you

4   checking to see that this process really does work, especially

5   because when I was on the tour and I asked about mail from a          02:07:03

6   medical office to inmates, and this was after Mr. Bojanowksi

7   told me that this plan was in process, he said, "No, there's

8   nothing like that," the warden told me, "Nothing like that

9   works that way."

10          So I do think Mr. Bojanowksi does need to let you             02:07:19

11  know who these people are so that when you do your tours, you

12  can ask them and verify that it is happening.

13          MS. KENDRICK:  Right.  Step one is getting the

14  reports or the communiques generated.  We just don't want them

15  all going into a black hole.                                          02:07:36

16          THE COURT:  Understood, understood, yeah, especially

17  because it seems like it's a novel process and so with a novel

18  process, you would want to make sure that it is being taken to

19  fruition.  Okay.

20          MR. BOJANOWSKI:  Measure 50, Your Honor.                      02:08:04

21          THE COURT:  Please.

22          MR. BOJANOWSKI:  Is urgent specialty consultations

23  and urgent specialty diagnostic services will be scheduled and

24  completed within 30 calendar days of the consultation being

25  requested by the provider.                                            02:08:16

United States District Court

```
1              The facility at issue is Florence, it is at 53      02:08:19
2     percent.  Were investigated this failure and found that there
3     appears to be a transportation issue at Florence.
4     Transportation units at Florence were -- well, once we found
5     out that --                                                  02:08:56
6              THE COURT:  Is this a -- is this something that I
7     heard last month?
8              MR. BOJANOWSKI:  I think it is the shortage of vans
9     and staff, so they were combined to then see that we could get
10    these guys out to these appointments.                        02:09:16
11             We now have assigned one sergeant to oversee this
12    particular transportation for both facilities.  We also, since
13    our last meeting, ADOC has implemented a statewide
14    transportation coordinator.  It is a person who is now going to
15    be tasked with evaluating the transportation needs for the    02:09:39
16    facilities to address whatever bottlenecks or other failures
17    that are leading to what is happening at this facility.
18             THE COURT:  MS. Kendrick, did I do my job last month
19    to tie Mr. Bojanowksi as to a date that this transportation
20    issue became identified as the cause and when remedial steps  02:10:10
21    were taken?  I can't pull that up as quickly as I would like.
22    Maybe you can.
23             MS. KENDRICK:  Ms. Eidenbach is searching right now.
24    I have only a hard copy so it might be easier for her to
25    search.                                                       02:10:24
```

United States District Court

```
 1              THE COURT:  Enter your stall game.                02:10:24

 2              MS. LOVE:  Your Honor, we just received notification

 3    that those that were on the telephone line while they are still

 4    on the line they are not hearing the audio.

 5              THE COURT:  And that's just Ms. Rand?  Is there       02:10:34

 6    anyone else?

 7              MS. LOVE:  Jennifer Finger from Corizon.

 8              THE COURT:  Oh.  Okay.  Did we know she was on the

 9    phone?  Okay.  That's fine.  So is there a way that we can do

10    that?                                                          02:10:49

11              COURTROOM DEPUTY:  That is what all of that music

12    was, that they had hung up.

13              MS. LOVE:  I was just advised that Ms. Finger can

14    hear Lucy on the line but neither of them can hear in here into

15    the courtroom.                                                 02:11:00

16              THE COURT:  It's possible that the bridge collapsed

17    so we'll take a moment.  That's well-timed for you.

18              MS. KENDRICK:  Your Honor, we would also request the

19    numbers for Tucson because in the last three months, it has

20    been noncompliant on this performance measure as well.         02:11:18

21              THE COURT:  Do you have that, Mr. Bojanowksi?

22              MR. BOJANOWSKI:  Tucson is at 86 percent but it's not

23    subject to a noncompliance finding.

24              THE COURT:  I understand.

25              MR. BOJANOWSKI:  I also had some additional           02:11:43
```

information on Performance Measure 50.  What we're trying to do

or what we are doing is having the site scheduler schedule the

appointments sooner, on the soonest date provided by the

specialist, in an effort to try and make sure that we get in

under the 30-day timeline.

The start date with regard to the sergeant who will

work directly with the schedulers at both sites to ensure that

appointments are met is 8-7-2017.

THE COURT:  All right.  So apparently we have

everybody back on the phone and you haven't been able to track

that down or do you have anything else that you want to say?

MS. KENDRICK:  It appears that we did not ask them

what the date was that they started using these fans.

THE COURT:  Okay.  Thank you.

MS. KENDRICK:  Just a couple of other things with

regard to Performance Measure 50 and Florence.  First of all,

this was amongst the performance measures and institutions in

your June order and according to defendants' report for the

time period between June 15 and July 11, docket 2173, they

reported 31 separate incidents of noncompliance in that time

period at the Florence prison.

The other thing I would add is that yesterday at the

evidentiary hearing at Exhibit 37 we included an email that was

from the Florence Anthem Hospital describing that they were no

longer taking elective nonemergency specialist referrals from

United States District Court

1    Corizon because of Corizon's failure to pay outstanding medical      02:14:06
2    bills of more than $1.2 million.  And yesterday Mr. Pratt
3    testified that there had been another incident of nonpayment
4    but he couldn't remember the details.  And so to the extent
5    that Corizon's failure to pay outside hospitals is adversely     02:14:20
6    affecting their ability to have a pool of available
7    specialists, we are concerned that this back-sliding will
8    continue until further efforts are made by defendants.
9              THE COURT:  Thank you.
10             Performance Measure 51?                                02:14:44
11             MR. BOJANOWSKI:  51 is routine specialty
12   consultations will be scheduled and completed within 60
13   calendar days of the consultation being requested by the
14   provider.  The facilities at issue are Eyman, Florence, and
15   Tucson.                                                          02:15:04
16             Eyman is at 43, Florence is at 73 and Tucson is at
17   68.
18             THE COURT:  And your observations as to why?
19             MR. BOJANOWSKI:  This is part of the slow-down in
20   processing due to the utilization management process where      02:15:37
21   clinical coordinators are having to load information in and it
22   then goes up to the utilization management team for review and
23   recommendation, then comes back down to the clinical
24   coordinator for ultimate scheduling to try and get it within
25   the time frame and it's just taking too much time in the        02:16:02

United States District Court

1    administrative process to get these things done.                      02:16:08

2           So Corizon is presently hosting -- this is another

3    one of these measures where we're taking a daily call with

4    providers at 3:30 each day to address these issues at these

5    facilities in an effort to try and streamline and speed up the    02:16:26

6    processing of these specialty consultations to meet the

7    timelines.

8           THE COURT:  What happens with these daily 3:30

9    telephone calls?  Is anybody in the present -- is there anybody

10   in the courtroom present on that 3:30 phone call?                  02:16:57

11          MR. BOJANOWSKI:  Dr. Fallhowe and Dr. Babbage with

12   Corizon are the ones that lead that phone call.

13          THE COURT:  And whom are they calling?  Who is on the

14   call?

15          MR. BOJANOWSKI:  I'm checking --                            02:17:27

16          THE COURT:  Go ahead.

17          MR. BOJANOWSKI:  -- to find out how it actually works

18   because my notes talk about the daily call but -- you know, as

19   far as the detail on the call.  I know it's the clinical

20   coordinators at the facilities and then . . .                     02:17:40

21          So they are running a daily report.  They work with

22   the clinical coordinator.

23          THE COURT:  Stop right there.  So a daily report

24   saying words to the effect we are on the imminent deadline of

25   60 days?                                                           02:18:11

                    United States District Court

1          MR. BOJANOWSKI:  Correct.                                02:18:12

2          THE COURT:  How many days in advance of the deadline

3    names are included?

4          MR. BOJANOWSKI:  What's the lead time?

5          THE COURT:  Every day you get a new report.  That       02:18:23

6    report is telling you what is happening in how many days, when

7    the period closes.

8          MR. BOJANOWSKI:  Every referral that has been put in

9    is reported so they can look at a comprehensive list of who is

10   coming up close to being meeting the deadline, so you would    02:18:46

11   have a list of people and then you would have, I'm assuming, a

12   deadline in there, right, that shows the time, yeah.

13         And so they are using that report to then say to the

14   people in the field, "Look, this guy has to be seen within the

15   next ten days," or whatever it would be.                       02:19:09

16         THE COURT:  So every day at 3:30 these two doctors

17   you mentioned are getting on the phone with whom else?

18         MR. BOJANOWSKI:  The clinical coordinators at the

19   facilities.

20         THE COURT:  So this clinical coordinator for Eyman,      02:19:28

21   Florence and Tucson, these people are on the phone with these

22   two doctors.  So every day at 3:30 there's a conference call

23   among these five people and what they all have in common is a

24   printout that lists all of the people for whom a specialty

25   consultation has been ordered and has not yet been scheduled?  02:19:44

                     United States District Court

```
 1              MR. BOJANOWSKI:  Correct.                        02:19:48

 2              THE COURT:  And so then they presumably look at the

 3    ones that are close to the expiration date of 60 days and the

 4    leader of the conference call raises with the clinical

 5    specialist at the facility the imminency of this deadline and  02:20:00

 6    asks, "What are you doing about it?"

 7              MR. BOJANOWSKI:  Correct.  And if they need help to

 8    get somebody scheduled, then the help is provided.

 9              THE COURT:  So my next question is:  Is there -- as

10    part of this 3:30 conference call -- any verification that     02:20:20

11    takes place on a realtime basis with respect to whether this

12    performance measure is being satisfied?

13              MR. BOJANOWSKI:  The way I understand it is that the

14    report shows the time frames that are at issue.  The people who

15    are seen fall off that report and are no longer in play so to   02:21:04

16    speak.  So as far as verifying whether they have been seen or

17    not, they are off the report if they have been seen.

18              THE COURT:  So the report that is before these

19    doctors every day at 3:30 includes some number of names, I

20    gather, for whom the next day will be the 60 days?            02:21:30

21              MR. BOJANOWSKI:  You're trying to get an idea of the

22    time frames.

23              THE COURT:  I'm trying to micromanage here.  I'm

24    trying to understand -- I'm serious.  I'm trying to understand

25    exactly how this is working so that I can see whether it's     02:22:02
```

United States District Court

1   likely to be efficacious or not, so I need to understand all of          02:22:05

2   the particular details about it and that is why I am asking all

3   of this.

4           MR. BOJANOWSKI:  No.  And I'm trying to understand

5   but I'm having a bit of a disconnect because I haven't seen the          02:22:15

6   report, so I'm having trouble visualizing in my mind what this

7   report looks like.

8           THE COURT:  Well, does the person you are talking to

9   know whether or not -- first of all, when did you start the

10  3:30 conference calls?  When did this process start.                     02:22:30

11          MR. BOJANOWSKI:  About a week and a half ago?

12          THE COURT:  All right.  And in that week and a half,

13  you've obviously addressed this problem as we've described.

14          I am assuming that there have to be some number of

15  inmates for whom the time has passed because I know you fail           02:22:56

16  most of the time on this measure.  And so you would think that

17  even before you could get to the ones that are imminently

18  falling through the timetable, you would have to address this

19  backlog.  I guess I'm just trying to understand.  It just

20  doesn't --                                                              02:23:12

21          MS. ALMANZA:  Your Honor, what we've started is the

22  referral process.  Once the provider puts in the referral, it

23  goes into our system.  So we're looking at from the minute it's

24  been put in and the time frame of how long it takes to get

25  approval and then for -- from the time of approval until the           02:23:31

United States District Court

1 time the appointment is actually completed.  So they are 02:23:35

2 looking every day at everybody.  They are not looking to see,

3 oh, tomorrow these people are due.  You know, they are going to

4 be past.  They are looking at the whole process.

5     So when they are doing it, if they are seeing 02:23:49

6 somebody who may be coming up on the time frame or there's

7 something that we feel like it's more critical, then the

8 doctors will call a provider and say, "Hey, we have this guy.

9 We really need to get him in," so we're working from that way,

10 too. 02:24:07

11     THE COURT:  And do you participate in this phone

12 call?

13     MS. ALMANZA:  I have not yet, no, but I work closely

14 with Dr. Fallhowe and Dr. Babbage who are.

15     THE COURT:  So what you've just told me is a little 02:24:18

16 bit different than what Dr. Bojanowksi told me, because this

17 isn't a verification process of what's happening.  It's part of

18 what I think has been an ongoing process that you've had to try

19 to get people to the specialists who have been referred to a

20 specialist and this is just the process how it works.  It's not 02:24:38

21 one that's designed to try to identify and correct on a

22 realtime basis people who are going to fall off of the time

23 plate.

24     MS. ALMANZA:  No.  It is, sir.  Because when -- they

25 are looking at from when it very first goes in and then they 02:24:56

United States District Court

 1    are talking with these people every day.  "Have you got this                    02:25:00

 2    scheduled?  What's the problem?"  So they are looking at it

 3    every day, the whole list, and it can be a pretty lengthy list.

 4            THE COURT:  Right.  But then when the time passes,

 5    when 60 days have passed and somebody hasn't been seen, they                     02:25:13

 6    stay on the list; right?

 7            MS. ALMANZA:  Right.  But, you know, we are working

 8    to try and get that done before they fall off the list.  That

 9    is why we basically started the call, because to try and ensure

10    to get these done timely, within the time frame.                                02:25:29

11            THE COURT:  And what do you think the stumbling block

12    is to getting them done?  Is it the procedural problem that

13    Mr. Bojanowksi described in house with respect to getting the

14    paper up to the upstairs and then to the downstairs and signed

15    or is it finding a willing and able provider that you can                       02:25:45

16    schedule with?

17            MS. ALMANZA:  I don't think it's the providers

18    because we do have a pretty large list of providers and one of

19    the things that we did is we looked statewide at all the

20    urologists, all the different specialties, and we grouped them                  02:26:01

21    in, like, A, B, and C.

22            So if I'm in a facility and I should always use the

23    closest providers to me are A.  That is who I am going to look

24    to first.  If they can't get me in the time frame, then they

25    move on to list B and C to try -- you know, to get into the                     02:26:17

                            United States District Court

 1   time frame.                                                      02:26:22

 2          There are some specialties that we just can't get in

 3   within 60 days and that is in the community, too.  So we do --

 4   so that's how -- that process.

 5          The other thing that has -- we've identified and        02:26:38

 6   that's one of the things that we're working on is once the

 7   referral goes in, if there's any questions of, you know, do we

 8   need to have this test before the referral, those types of

 9   things, we have people looking to say, "Do we have everything

10   we need to make this referral productive?"  We want to send     02:26:54

11   these patients to the doctor and have the stuff he needs to --

12   you know, before they go there.  So they are looking at that

13   kind of information.  And we have identified that that has

14   been, you know, a little bit of a problem -- I mean, it has

15   been a problem.  So that's one of the things that really        02:27:12

16   spurred this call, too, is to make sure that we're getting

17   those answered so they can get them scheduled.

18          THE COURT:  In the week and a half that this has been

19   in place and these lists of names have been prepared for each

20   of these calls, have you seen any of those lists?  Do you help  02:27:28

21   prepare them?

22          MS. ALMANZA:  No.  The list comes from our corporate.

23   They can go in and run a report of who had a referral placed

24   yesterday.  Everybody that is referrals went or they can run

25   the report to say who is on day 10 from referral to this date.  02:27:45

                    United States District Court

1    THE COURT:  But there is no common referral list that          02:27:50

2    is routinely prepared specifically for this conference call?

3    It sounds like the participants can call up whatever report

4    they want on their own command.  It's not like there's an

5    agenda for a meeting.  We have a conference call at 3:30.         02:28:07

6    Here's the email agenda and on the agenda are all of these

7    names.

8    MS. ALMANZA:  Actually, Dr. Fallhowe and Dr. Babbage

9    have that list, too, and they are the ones going down.  Okay,

10   Florence where are you at -- where is this patient.  What's       02:28:20

11   going on here?  They are kind of leading that.  They have the

12   list and they are the ones asking the questions.  They are not

13   waiting for the sites to ask the questions.  They are doing

14   that to move this process.

15   THE COURT:  So one of these doctors generates this              02:28:36

16   list; is that right?

17   MS. ALMANZA:  Yes.

18   THE COURT:  And is that list shared with the other

19   people on the conference call or do they have to develop their

20   own -- do they have to put in the criteria for the list and      02:28:46

21   then get that on the computer screen?

22   MS. ALMANZA:  All of the clinical coordinators have

23   access to run reports.

24   THE COURT:  So everybody who is on the call has to

25   run their own report?                                            02:28:57

United States District Court

1    MS. ALMANZA:  I believe that Dr. Fallhowe and Babbage    02:28:58

2  run the report for the whole state.

3    THE COURT:  And then how does he communicate that to

4  the people on the conference call?

5    MS. ALMANZA:  Go down the list and they are looking    02:29:07

6  at people that kind of stand out.  "Oh, here, this is getting

7  close.  Why hasn't that been scheduled?"  You know, "What are

8  we waiting on," that type of thing.

9    THE COURT:  Do you know whether when this phone call

10  happens and -- Dr. Babbage you said?    02:29:19

11    MS. ALMANZA:  M'hum.

12    THE COURT:  When Dr. Babbage comes to a name and he

13  sees David Duncan on his list, do the others -- the person who

14  is the coordinator at that facility where David Duncan is, does

15  that person then have to put in that person's name and call it    02:29:34

16  up or is it already on a list that they have in front of them?

17  Do you know the answer to that question?

18    MS. ALMANZA:  I don't because I haven't been on the

19  call but I -- you know, I would assume when everybody is on the

20  call is everybody has all of that stuff in front of them so    02:29:47

21  they can answer the question.

22    THE COURT:  But as far as you know, there is no email

23  that goes out in advance saying, "Here's an attachment of the

24  list that we're going to be talking about"?

25    MS. ALMANZA:  No, I don't believe so.    02:29:58

United States District Court

1    THE COURT:  And have you ever run this report or seen                02:29:59
2  this report yourself in the last week and a half?

3    MS. ALMANZA:  I won't say -- because I haven't seen
4  the exact one she uses.  I run a report.  I can run a report
5  that I am looking just at numbers type of thing and facilities        02:30:11
6  and the providers really look at that stuff.  So I haven't seen
7  the exact report that they work off of.

8    THE COURT:  So do you have any idea for the meeting
9  that is going to happen today what the sort of rough number is
10 of inmates who are on that list?                                      02:30:27

11   MS. ALMANZA:  I do not.

12   THE COURT:  Okay.  Thank you.

13   Anything you wanted to add, Mr. Bojanowksi?

14   MR. BOJANOWSKI:  No, Your Honor.

15   THE COURT:  Ms. Kendrick?                                           02:30:39

16   MS. KENDRICK:  Did we identify this individual?

17   THE COURT:  No.  That's a good point.  Ma'am, can we
18 have your name for the record, please.

19   MS. ALMANZA:  It's Rhonda Almanza.

20   THE COURT:  Could you spell the last name, please.                  02:30:48

21   MS. ALMANZA:  A-L-M-A-N-Z-A.

22   THE COURT:  And your position?

23   MS. ALMANZA:  I'm the Vice President of Operations
24 for Corizon.

25   THE COURT:  Thank you.                                              02:30:58

United States District Court

1          MS. KENDRICK:  Additional kind of housekeeping thing,      02:31:01

2     the parties did a mediation about a month and a half ago with

3     regard to this performance measure at the Douglas, Perryville,

4     and Yuma prisons and we were assured that we would see

5     improvement by June.  So I request that Mr. Bojanowksi provide    02:31:14

6     us those preliminary numbers right now.

7          THE COURT:  Do you have those, sir?

8          MR. BOJANOWSKI:  For what facilities?

9          MS. KENDRICK:  Douglas, Perryville, and Yuma.

10         MR. BOJANOWSKI:  Douglas is at 97 percent; Perryville      02:31:31

11    is at 95 percent; Yuma is at 95 percent.

12         MS. KENDRICK:  Your Honor, I think you are quite

13    familiar with plaintiffs' position on this issue and I think we

14    previously discussed it on Performance Measure 50.  I would

15    just request that the Court order defendants to provide under    02:31:53

16    seal an exemplar of this report that Mrs. Almanza just

17    described and perhaps it would answer questions that I have and

18    that you may have upon reflection.

19         THE COURT:  I agree, that would be helpful.

20         Would you kindly do that, Mr. Bojanowksi?                  02:32:14

21         MR. BOJANOWSKI:  Yes, Your Honor.

22         THE COURT:  So Performance 52, specialty consultation

23    reports will be reviewed and acted on by a provider within

24    seven calendar days of receiving the report.

25         MR. BOJANOWSKI:  Yes.  52 is accurately described by       02:32:40

United States District Court

```
 1   the Court.  The facilities at issue are Florence, Perryville,    02:32:43
 2   and Tucson.  Florence is at 48; Perryville at 97; Tucson at 78.
 3              THE COURT:  What's going on here?
 4              MR. BOJANOWSKI:  This is similar to 46 where it has
 5   to do with entering the proper comments into the report that no  02:33:20
 6   further action may be needed.
 7              May I have a moment, Your Honor?
 8              THE COURT:  Yes.  Is Corizon engaged in the
 9   verification procedure with this measure as well?
10              MR. BOJANOWSKI:  They are checking this one multiple  02:34:15
11   times per week to see where it's at.
12              THE COURT:  When did they start that?
13              MR. BOJANOWSKI:  The reports are generated several
14   times a week and then -- at the main office and then are sent
15   out to the field to the facility health administrators for       02:35:05
16   further handling at the site level to make sure that these
17   records are acted upon in a timely fashion.
18              THE COURT:  I think I need to ask the court reporter
19   to read the question back.  I'm getting a little bit snide.
20   The question is, when did they start that?                       02:35:32
21              MR. BOJANOWSKI:  I'm sorry.  Three weeks ago, Your
22   Honor.
23              THE COURT:  So it's not 100 percent verification like
24   we learned with respect to the other issue that you told us
25   about that people who were supposed to chart whether they had    02:35:48
```

United States District Court

```
 1   taken action or not taken action.  You're not doing that.        02:35:52
 2   You're just pulling random files for every single one that has
 3   had a consultation report?  How is it working?
 4        MR. BOJANOWSKI:  I'm being told that it really is a
 5   100 percent check.                                                02:36:08
 6        THE COURT:  Okay.  All right.
 7        Ms. Kendrick?
 8        MS. KENDRICK:  Just, again, for this performance
 9   measure, the parties did have a mediation last month with
10   regard to Eyman which has been chronically noncompliant so we     02:36:20
11   were told June would show an improvement.  I request the June
12   number for Eyman.
13        THE COURT:  Okay.
14        MR. BOJANOWSKI:  55.
15        THE COURT:  And what was it previously, Ms. Kendrick?        02:36:38
16        MS. KENDRICK:  It was 56 in May, 31 in April, 32 in
17   March, and then all the way -- at least back to July of 2016,
18   that's how far back my chart goes.
19        THE COURT:  All right.  Is this remedial measure that
20   you described for Tucson also being employed at Eyman.            02:36:56
21        MR. BOJANOWSKI:  Yes.  It's system-wide.
22        THE COURT:  So system-wide everybody who has had a
23   specialty consultation report, somebody is pulling that record
24   to see whether they have had a provider review it and act on
25   it?                                                               02:37:19
```

United States District Court

1          MR. BOJANOWSKI:  That is true.                          02:37:20

2          THE COURT:  Okay.

3          MS. KENDRICK:  Your Honor?

4          THE COURT:  Yes.

5          MS. KENDRICK:  Also, just one thing Mr. Bojanowksi      02:37:23

6   said when you asked him when this went into place and he

7   started talking about the FHAs is at one point their proposed

8   remedial plan was to have the non-medically trained

9   administrative facility health administrators, or the FHAs,

10  review these reports and he just now said something about the  02:37:44

11  FHAs reviewing and acting upon them and so I just want to make

12  crystal clear that the performance measure refers to providers

13  who are doing the reviewing and the acting upon and not the

14  facility health administrators.  It was unclear from what he

15  said in answer to your question whether the FHAs were taking   02:38:07

16  that role.

17          THE COURT:  That's a good catch.  Let's ask about it.

18          MR. BOJANOWSKI:  I am certain they are not practicing

19  medicine.  They are checking with the provider to assure that

20  they are acting upon it.                                       02:38:24

21          THE COURT:  But they are the ones who are making sure

22  that the provider is charting that that provider has taken an

23  action, so this is an amanuensis who is providing a reminder

24  function at best.  Is that fair to say?

25          MR. BOJANOWSKI:  Yes.                                  02:38:39

                    United States District Court

 1                MS. KENDRICK:  And just one other note, sir, is that

 2   in your June order to show cause, you did issue it for

 3   Performance Measure 52 with regard to Florence and defendants'

 4   report for that period from June 15 to July 11 indicated that

 5   there was 139 separate instances of noncompliance in that time

 6   period at that one institution which could subject them

 7   potentially to $139,000 in fines.

 8                THE COURT:  Thank you.

 9                Performance Measure 53.

10                MR. BOJANOWSKI:  53 is, treatment plans will be

11   developed and documented in the medical record by a provider

12   within 30 calendar days of identification of that inmate's

13   chronic disease.  Excuse me.  53 is not at issue.

14                THE COURT:  Did I say 53?  I'm sorry.  54.  I

15   apologize.

16                MR. BOJANOWSKI:  There we go.

17                THE COURT:  Thank you.

18                MR. BOJANOWSKI:  I'll start again.

19                THE COURT:  I did say 53 and it was a mistake.  I'm

20   sorry.

21                MR. BOJANOWSKI:  And I'm just following right along.

22                So 54 is, chronic disease inmates will be seen by the

23   provider as specified in the inmate's treatment plan no less

24   than every 180 days unless the provider documents a reason why

25   a longer time frame can be in place.  And this is at Eyman,

                      United States District Court

152

```
1    Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma.        02:40:12

2            54 at Eyman is 46; Florence is 93; Lewis, 89;

3    Perryville, 100; Phoenix, 92; Tucson, 94; and Yuma, 98.

4            THE COURT:  So what's happening in Eyman or not

5    happening in Eyman?                                            02:41:01

6            MR. BOJANOWSKI:  They had a vacancy with their

7    provider at Eyman which led to the drop and a build-up of a

8    backlog so we have now a provider on every yard.  We've also

9    increased -- the Tele-Medicine has been doubled at that

10   facility to make sure that we get caught up.  And there's also  02:41:52

11   some consideration that they are going to start scheduling the

12   chronic care visits at the 150th day so that the visit doesn't

13   get rescheduled outside the 180-day time frame.

14           THE COURT:  And the vacancy with the provider was

15   filled when?                                                   02:42:22

16           MR. BOJANOWSKI:  They have been there between a month

17   and a month and a half at this point.

18           THE COURT:  And the Tele-Medicine approach was

19   doubled when?

20           MR. BOJANOWSKI:  It's been approximately a month.      02:42:50

21           THE COURT:  Ms. Kendrick?

22           MS. KENDRICK:  Well, we were just reviewing the

23   transcript from the July hearing and this was the one where you

24   make the comment about smoldering fires and at that point, we

25   were told that the problem at Eyman was due to the lack of     02:43:09
```

1   providers and that in the past month, aka, in the month of          02:43:13

2   June, providers and Tele-Medicine had been hired so we're

3   extremely disappointed that the June numbers have not improved

4   significantly here.

5           We would also note for the record that Performance          02:43:27

6   Measure 54 at Eyman was one of the ones that Your Honor

7   included in the November 26 order to utilize outside providers.

8   So it still appears that they are having difficulties complying

9   with that order.

10          And, finally, in plaintiffs' proposed methodology for        02:43:43

11  addressing chronic noncompliance, we did propose that

12  Performance Measure 54 at Eyman be included in the Court's

13  order because of the just absolute complete failure to come

14  into compliance whereas it appears that at the other

15  institutions they have managed to get a handle on whatever the     02:44:05

16  problem is.

17          THE COURT:  Is there something about a chronic

18  disease provider that's different than provider generally with

19  respect to the workings?  No.

20          So it's the same.                                           02:44:25

21          MS. KENDRICK:  It's the same person.

22          THE COURT:  Okay.  All right.

23          And this new person that was brought on board a

24  month, month and a half ago, is that the same person that was

25  likely referred to in last month or is that a new additional       02:44:36

United States District Court

1    person?                                                              02:44:41

2             MS. ALMANZA:  We had more than one vacancy.  We have

3    had more than one vacancy.  We get one filled and then have to

4    fill another one so it probably is not the same one from last

5    month.  It's probably a new one.                                     02:44:55

6             THE COURT:  I see.  So it's a pretty routine problem

7    of keeping these posts filled I gather?  I'm sorry.

8             MS. ALMANZA:  I said it can be, yes.

9             THE COURT:  Okay.  Thank you.

10            All right.  It's time for the break.  I will come           02:45:08

11   back at 3 o'clock.  Thank you.

12        (Recess at 2:45; resumed at 3:01.)

13        (Court was called to order by the courtroom deputy.)

14            THE COURT:  Thank you very much.

15            Please be seated.                                           03:02:10

16            MR. BOJANOWSKI:  I think we're at 66, Your Honor.

17            THE COURT:  Please.

18            MR. BOJANOWSKI:  66 is in an IPC, a medical provider

19   encounter will occur at a minimum every 72 hours.  And that is

20   at -- the facilities involved are Florence, Lewis, Tucson.          03:02:47

21            Florence, 90 percent; Lewis, 80 percent; Tucson, 100

22   percent.

23            THE COURT:  And is there some reason for the

24   back-slide at Lewis after two months of doing well?

25            MR. BOJANOWSKI:  It I think has to do -- I mean, we         03:03:13

                      United States District Court

155

1    changed this to the 48-hour requirement for rounds but this is          03:03:15
2    one of the ones with the partial credit situation where they
3    hit about 98 percent of their contacts.  But the way it scored,
4    the whole file is then rejected so it dropped to an 80 percent.
5              THE COURT:  Are you taking any steps to bring it back          03:03:40
6    in compliance?
7              MR. BOJANOWSKI:  Pardon me?
8              THE COURT:  Any steps to bring it back into
9    compliance?
10             MR. BOJANOWSKI:  Yes.  We are -- this is one of those          03:03:46
11   ones that we're doing another one that we're doing kind of a
12   live time monitoring of by the central office who are looking
13   at it every day and then verifying with the facility to make
14   sure that compliance is occurring.  And the data that I
15   received as far as Lewis is concerned, they are hitting their          03:04:15
16   mark based on the data even as of today that I was looking at.
17   So . . .
18             THE COURT:  Good.
19             Ms. Kendrick?
20             MR. BOJANOWSKI:  I think the change is procedure is          03:04:34
21   really.
22             THE COURT:  Again, if somebody is looking in realtime
23   to see that's being done and you're telling me that they are
24   reporting now that it is being done, I'm happy to hear about
25   that.  But I'm really also encouraged when I hear about the          03:04:44

United States District Court

1    realtime reporting because I imagine it's frustrating that the          03:04:48
2    lag is for me in the time from the incident to the reporting of
3    it, it is frustrating also for the people who are dealing with
4    it on the scene believing that, quite understandably, that you
5    can probably address something more readily when you're dealing         03:05:04
6    with it closer in time to when it's happening.

7              Ms. Kendrick?

8              MS. KENDRICK:  Just, Your Honor, again, plaintiffs
9    have made clear we feel this is a critical performance measure.
10   We were thankful that you included it in your June order which          03:05:17
11   showed 76 separate incidents of noncompliance at the three
12   institutions.  We're pleased that Florence has finally made it
13   above 85 percent and concerned about Lewis and hope that next
14   month will be improved as well.

15             THE COURT:  All right.  Thank you.                            03:05:35

16             80?

17             MR. BOJANOWSKI:  80 is MH-3A prisoners shall be seen
18   a minimum of every 30 days by a mental health clinician.  The
19   facilities at issue are Lewis and Tucson.

20             Lewis is at 95 percent.  Tucson is at 92 percent.            03:05:56

21             THE COURT:  Thank you.

22             Ms. Kendrick?

23             MS. KENDRICK:  I have nothing, Your Honor.

24             THE COURT:  All right.  Thank you.

25             MR. BOJANOWSKI:  The next measure is 85.                      03:06:09

                          United States District Court

```
 1              MS. KENDRICK:  81.                              03:06:11

 2              MR. BOJANOWSKI:  I don't have 81.  I have 85.

 3              MS. KENDRICK:  81 at Lewis in Tucson, found

 4    noncompliant on October 7, 2016.

 5              MR. BOJANOWSKI:  I'm checking, Your Honor.  I have a   03:06:36

 6    gap in my handy, dandy cheat sheet here.

 7              What were the facilities, Corene?

 8              MS. KENDRICK:  Lewis and Tucson.

 9              MR. BOJANOWSKI:  81 is MH-3A prisoners who are

10    prescribed psychotropic medications shall be seen a minimum of   03:07:00

11    every 90 days by a mental health provider.  Lewis, 98 percent;

12    Tucson, 92 percent.

13              THE COURT:  Thank you.

14              MR. BOJANOWSKI:  85, MH-3D prisoners shall be seen by

15    a mental health provider within 30 days of discontinuing   03:07:28

16    medications and the facilities at issue are Douglas, Eyman,

17    Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow,

18    and Yuma.

19              Douglas, not applicable; Eyman, 94; Florence, 89;

20    Lewis, 91; Perryville, 90; Phoenix, not applicable; Safford,   03:08:09

21    not applicable; Tucson, 95; Winslow, not applicable; Yuma, 96.

22              THE COURT:  Good.

23              Ms. Kendrick?

24              MS. KENDRICK:  Nothing, Your Honor.

25              THE COURT:  Thank you.                          03:08:33
```

United States District Court

03:08:34

1           96.

2           MR. BOJANOWSKI:  MH-3D prisoners shall be seen a

3   minimum of every 90 days by a mental health clinician for a

4   minimum of six months after discontinuing medication.

5   Facilities at issue, Douglas, Eyman -- what --         03:08:49

6           Excuse me, Your Honor.  I'm just trying to confirm

7   the facilities at issue.

8           THE COURT:  Go ahead.  Go ahead.

9           MR. BOJANOWSKI:  Facilities at issue, Douglas, Eyman,

10  Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow   03:09:25

11  and Yuma.

12          Douglas, not applicable; Eyman, 100; Florence, 100;

13  Lewis, 100; Perryville, 100; Phoenix, not applicable; Safford,

14  not applicable; Tucson, 97; Winslow, not applicable; Yuma, 92.

15          THE COURT:  And Ms. Kendrick?         03:10:03

16          MS. KENDRICK:  Nothing, Your Honor.

17          THE COURT:  Thank you.

18          Mr. Bojanowksi?

19          MR. BOJANOWSKI:  92.  MH-3 and above prisoners who

20  are housed in maximum custody shall be seen by a mental health   03:10:15

21  clinician for a one-on-one or group session -- session a

22  minimum of every 30 days.  Facilities at issue are Eyman,

23  Florence, Lewis, Perryville, and Tucson.

24          Eyman, 95; Florence, 85; Lewis, 100; Perryville, not

25  applicable; Tucson, not applicable.         03:10:59

```
1          THE COURT:  Give me just a moment, please, to catch       03:11:14
2   up.
3          Anything for the record, Ms. Kendrick?
4          MS. KENDRICK:  No, sir.
5          THE COURT:  All right, sir.                                03:11:34
6          MR. BOJANOWSKI:  93, mental health staff, not to
7   include LPNs, shall make weekly rounds on all MH-3 and above
8   prisoners who are housed in maximum custody.  Facilities at
9   issue, Eyman, Florence, Lewis, and Tucson.
10         Eyman, 90 percent; Florence, 100 percent; Lewis, 100       03:11:59
11  percent; Tucson, not applicable.
12         THE COURT:  All right.
13         Ms. Kendrick?
14         MS. KENDRICK:  Yes, Your Honor.  At lunchtime we were
15  contacted by the family members of a person housed in maximum    03:12:17
16  custody at Eyman who committed suicide Monday night.  He is the
17  fifth individual in less than four months to commit suicide.
18  The family expressed concerns that over the weekend he had been
19  extremely agitated and paranoid and was trying to get in touch
20  with his family.  We briefly reviewed his medical records after  03:12:40
21  they contacted us.  This individual was MH-3B so he is an
22  MH-3 prisoner, and we are concerned because his record showed
23  multiple violations of Performance Measure 93 at the end of
24  July, the end of June, and May.
25         The gap between his visits by the mental health staff      03:13:06
```

United States District Court

1   was a 9-day in July, 10-day gap in June and a 9-day gap in May.   03:13:11

2   And so we are extremely concerned about this.  His record also

3   showed that he was seen hours before he committed suicide by a

4   psych associate.  He told the psych associate that he was

5   having increased paranoia and auditory hallucinations.  He   03:13:30

6   asked to see the psychiatrist to adjust and evaluate his

7   medications.  He reported that he was not being allowed calls

8   and that he was getting paranoid about this.  The psych

9   associate indicated that he was not a danger to himself or

10  others.  He was not placed on suicide watch and he committed   03:13:48

11  suicide about seven hours later.

12       THE COURT:  I have read about the death and it is

13  certainly very troubling that you recite a record that includes

14  a failure to comply with the performance measure with respect

15  to this particular inmate.  Of course the stipulation doesn't   03:14:17

16  require 100 percent compliance but it's a good reminder that

17  when we talk about these numbers, that they are not just

18  numbers, that behind each one of them is a life or, in this

19  case very sadly, a death.  Thank you.

20       MS. KENDRICK:  Thank you, Your Honor.   03:14:39

21       THE COURT:  94?

22       MR. BOJANOWSKI:  Your Honor, a question was raised as

23  to the comment made by the plaintiffs that we were out of

24  compliance somehow.

25       THE COURT:  What they did is rereviewed and they saw   03:15:11

United States District Court

1    that the performance measure that requires that someone in his    03:15:13

2    circumstance be seen every seven days and that they reported

3    gaps of -- gaps based upon the medical record that indicated

4    that there were periods of time between the visits of nine

5    days, 10 days and nine days.    03:15:30

6            DR. TAYLOR:  The rounds are required to be done once

7    a week.  They are not required to be done every seven days so

8    that's not actually a compliance issue.  They have to be done

9    once a week and so that is actually in compliance.

10           MS. KENDRICK:  That's actually inaccurate, Your    03:15:47

11   Honor.  The exact language of the performance measure says that

12   medical staff, not to include LPNs, shall make weekly rounds of

13   all MH-3 and above prisoners who are housed in maximum custody.

14   I would be more than happy to take a break and look up on the

15   dictionary what the word "weekly" means but I think the common    03:16:05

16   sense definition of the word "weekly" is that it means once a

17   week or every seven days.

18           So for Dr. Taylor to state that this somehow is not

19   out of compliance because nine days means that it was the week

20   before and the week after I think is disingenuous at best and,    03:16:24

21   frankly, it's insulting to this individual who was obviously

22   troubled, committed suicide and, as you put it, shows that

23   there are actual human beings behind these numbers.

24           DR. TAYLOR:  Your Honor, through the development of

25   the monitoring, Mr. Fathi has very clearly approved the method    03:16:47

United States District Court

1    by which we monitor that.  He has stated that he is okay with        03:16:51

2    the week being looked at from a Sunday to a Saturday on a

3    calendar basis and that it needs to occur one time in each week

4    throughout the month.  That is something that was developed

5    along with Mr. Fathi and he has been in complete agreement with     03:17:06

6    that and this is the first time that that has been a suggestion

7    of seven days, which does apply up at Phoenix, which is why it

8    specifically states no more than seven days at the Phoenix

9    location.  But for the max custody for that question, we've all

10   been on the same page that it's each week there needs to be a       03:17:26

11   contact, from a Sunday to Saturday, and that is clearly stated

12   in the monitoring guide.

13          THE COURT:  Well, since Mr. Fathi is not here, we

14   can't really address it any further at this point.

15          MS. KENDRICK:  Well, I would just add that as she            03:17:39

16   mischaracterized my co-counsel's words, that I am actually

17   reading an email sent by Mr. Fathi sent about an hour ago

18   saying that this nine days, ten days, is a violation of

19   Performance Measure 93.

20          So her representation that Mr. Fathi was fine with           03:17:54

21   this sort of counting, I do not give any credence to her

22   representation of my co-counsel's position when I am looking at

23   something that my co-counsel has sent me saying that this is a

24   violation of Performance Measure 93.

25          And in any event, the man is dead so I don't think           03:18:13

United States District Court

1    arguing over whether seven days or nine days is going to bring          03:18:16

2    him back to life.

3              THE COURT:  Well, it's certainly not but it certainly

4    remains our task to honor the people who are still subject to

5    the care of the stipulation to make sure that there's a common         03:18:28

6    understanding between the parties and that the monitoring

7    manual does respect what is that common understanding.  And we

8    have had a representation here made that there was an

9    understanding that was perceived on the defendants' side to be

10   common.  I don't have the email from Mr. Fathi but this is             03:18:53

11   certainly a subject that needs to be addressed if it's at

12   issue.  And so if you -- if we are continuing to work on the

13   monitoring manual and with respect to this timing issue, I

14   think it is no disrespect to someone who has died.

15             I think that it is legitimate to say that when the          03:19:17

16   parties agreed to a Performance Measure that said that somebody

17   should have weekly rounds, that that would have to be defined

18   so that people did understand what it meant.

19             To me when I read that, as I initially reacted, what

20   it would mean is that it would be what a week is and that is          03:19:43

21   every week.  But I have heard that the defendants are under the

22   understanding that there had been an agreement to that.

23   Otherwise, when we have both of the people who are involved in

24   that discussion present in front of the Court, we'll take it

25   up.                                                                    03:20:01

United States District Court

1          MS. KENDRICK:  Thank you, Your Honor.                03:20:02

2          MR. BOJANOWSKI:  Your Honor, I'll just make one last

3    comment to this.

4          THE COURT:  Yes.

5          MR. BOJANOWSKI:  The monitoring manual is specific as   03:20:07

6    to what is to be considered compliant, and I'll quote:  In

7    order to be compliant, there needs to be one contact for each

8    calendar week, Sunday through Saturday, for every full week

9    that the inmate was in maximum custody.  That's the language

10   that has been in place for quite some time and I just wanted   03:20:28

11   the record to be clear that the monitoring manual is specific

12   as to the meaning of what is being discussed here by the

13   parties.

14         THE COURT:  Okay.  Thank you.

15         MR. BOJANOWSKI:  All right.  Number 94 is:  All   03:20:43

16   prisoners on a suicide or mental health watch shall be seen

17   daily by a licensed mental health clinician or on weekends or

18   holidays by a registered nurse.  The facilities at issue are

19   Eyman, Florence, Perryville, and Tucson.

20         Eyman, 94 percent; Florence, 100 percent; Lewis --   03:21:17

21   excuse me, Perryville -- yes, Perryville, 87 percent; and

22   Tucson, 88 percent.

23         THE COURT:  Ms. Kendrick?

24         MS. KENDRICK:  Yes, Your Honor.  Last month the

25   parties did engage in a complete mediation with this   03:21:49

1   performance measure with regard to Phoenix and Yuma, so I just          03:21:54

2   request that we can get these preliminary June numbers for

3   those two institutions.

4           THE COURT:  Of course.

5           MR. BOJANOWSKI:  Phoenix is at 93.  Yuma is at 73.            03:22:05

6           THE COURT:  Okay.  Is there something that that you

7   are doing to address this problem with 73 at Tucson -- I'm

8   sorry, Yuma rather?

9           MR. BOJANOWSKI:  Yuma, Your Honor.  Yeah, the problem

10  at Yuma stems from the fact that the facility lead had a             03:22:30

11  medical issue involving a collapsed lung and was out for six

12  weeks.  The inmates were seen as required but the staff failed

13  to adequately describe the encounters in their notes.

14  Fortunately, the Yuma lead is back at the facility and the

15  staffing level was increased .6 FTEs at the Yuma complex.            03:22:56

16          THE COURT:  But when you refer to the lead, is that

17  the mental health clinician?

18          MR. BOJANOWSKI:  Mental health clinician, Your Honor.

19          THE COURT:  Pardon me?

20          MR. BOJANOWSKI:  Yes.  The mental health clinician.          03:23:11

21          THE COURT:  So if this person was out, how did you

22  handle the responsibilities of this lead?

23          MR. BOJANOWSKI:  He's the lead of the mental health

24  department.

25          THE COURT:  I see.  So that meant that you were down         03:23:20

                        United States District Court

1    a body but you had other people there who were doing it.  And          03:23:22

2    what you're telling me is that those people were able to cover

3    all of the responsibilities associated with 94.  They just

4    weren't able to document it.  Is that what you were saying?

5            MR. BOJANOWSKI:  Correct.  Well, I have to talk to          03:23:37

6    Dr. Calcote.

7            THE COURT:  Well, I'm trying to understand whether --

8    the 73 is a number -- I mean, this is a critical area,

9    obviously, of people who are on suicide or mental health watch.

10   If the 73 means that people were not being seen pursuant to          03:23:54

11   this performance measure, that is much more serious than if

12   there is a reason to be confident that they were seen but that

13   there was a failure in the documentation.

14           MR. BOJANOWSKI:  It would be probably more efficient

15   to have Dr. Taylor tell me.          03:24:17

16           THE COURT:  Go ahead.  Dr. Taylor.

17           DR. TAYLOR:  Yes, Your Honor.  I reviewed the

18   findings there.  There were four findings.  Unfortunately, when

19   the lead went to the hospital, in his stead, the psych nurse

20   went and saw the watches that day on a Wednesday to help cover,          03:24:29

21   knowing that those contacts don't count as -- because she's not

22   a clinician.  They would count if it was a weekend but it was a

23   Wednesday.  She did the watches to ensure that the individual

24   was seen.  And so she was two of the four findings.

25           So we wanted -- she wanted to make sure that the          03:24:45

United States District Court

1    individuals were seen because that's important for sure.  But    03:24:48

2    understanding that that is separate from a compliance issue but

3    much more important to the fact that they need to be seen.  And

4    so she covered for him, had them seen that day, and that is

5    part of the findings.  They recognize that those would be    03:25:03

6    findings but they wanted to make sure that the individuals were

7    seen each day.

8           THE COURT:  And in Yuma, how many mental health

9    clinicians are there?

10          DR. TAYLOR:  There's a total of five or four    03:25:15

11   clinicians.  Four mental health clinician and a psych nurse.

12          THE COURT:  I see.  All right.  Thank you.

13          Ms. Kendrick?

14          MS. KENDRICK:  We would just observe that it's

15   troubling that if one person going out on leave or, for    03:25:27

16   example, one person quitting the job would put it into such a

17   tail spin and that they were not able to cover the shifts.  So

18   we certainly hope that it improves next month so we don't have

19   to bring an enforcement motion on this measure.

20          THE COURT:  Thank you.    03:25:49

21          All right.  So we've completed I believe the

22   performance measure portion of our status hearing.

23          MS. KENDRICK:  98, Your Honor.

24          MR. BOJANOWSKI:  Number 98.

25          THE COURT:  I'm sorry.    03:26:07

United States District Court

1          MR. BOJANOWSKI:  Is the last one.  It is mental          03:26:07

2     health HNRs shall be responded to within the time frames set

3     forth in the Mental Health Technical Manual, edition, April 18,

4     2014.  And the facilities at issue are Eyman, Florence, Lewis,

5     and Winslow.                                                   03:26:34

6          Eyman at 96 percent; Florence at 95; Lewis at 97; and

7     Winslow at 100.

8          THE COURT:  Thank you.

9          Ms. Kendrick?

10         MS. KENDRICK:  Just Douglas is also one that we have     03:26:57

11    completed mediation on and we were told to look at the June

12    numbers.

13         MR. BOJANOWSKI:  Douglas is at 90.

14         THE COURT:  All right.  Thank you.

15         So now if I can pick up with the plaintiffs' agenda       03:27:19

16    and looking to see the subjects that have not been addressed

17    either today or yesterday, it looks like we are at item number

18    six, defendants' update regarding the implementation of the

19    onus communication to remediate common compliance with 47.

20    There was some issue still with respect to information that was 03:27:42

21    provided.  Is what has been given today satisfactory to

22    plaintiffs on that?

23         MS. KENDRICK:  No, it wasn't but we had asked that we

24    get the declarations and potentially have a PMK.  So we already

25    discussed it.                                                  03:27:59

```
 1              THE COURT:  All right.  Thank you.                    03:28:00
 2          Then with seven with respect to the proposed
 3   Tele-Medicine program with the University of Arizona, is there
 4   a further update that the defendants can give?
 5              MR. BOJANOWSKI:  There's a very -- there's not much   03:28:11
 6   of an update.  I know that Dr. Fallhowe was meeting with them
 7   today for further discussions.  That's the only information I
 8   have and I just don't have --
 9              THE COURT:  Will you report to plaintiffs on what
10   happened after you've had a chance to confer with the doctor   03:28:32
11   about what transpired?
12              MR. BOJANOWSKI:  Yes, Your Honor.
13              THE COURT:  Thank you.
14          We heard yesterday about the construction at ASPC
15   Florence South and we're addressing the medication refill boxes  03:28:49
16   generally.  That would seem to mean that eight has been
17   addressed.
18              MS. KENDRICK:  Yes.
19              THE COURT:  All right.
20          And then the update on the proposal, we heard some of    03:28:59
21   that from Mr. Pratt yesterday.  It would seem like that's also
22   been addressed.
23              MS. KENDRICK:  Unless they have more information they
24   would like to share with us.
25              MR. BOJANOWSKI:  We do not.                           03:29:14
```

United States District Court

1    THE COURT:  And then it takes me then to the max          03:29:15

2    custody issue and I have -- it seems like I'm always on the

3    cusp of ruling on this and it's for the last three months I

4    think I have reread everything.

5        And what continues to strike me, although Mr. Fathi      03:29:31

6    tells me that it's ready to rule, is that it seems like so much

7    of the original motion was based upon the failure to get the

8    max custody notebooks and to really know what was going on.

9    And also my reaction that I need to hear from plaintiffs, a

10   response to, is if there's some doubt that you have about      03:29:54

11   whether or not the reporting is accurate with respect to

12   whether the inmates are really giving a knowing and

13   understanding decision to remain in their cells and not

14   participate in these programs, isn't the best way to address

15   that by asking them when you tour?  "Were you offered a chance   03:30:12

16   to leave the cell to go do X?  And they tell us you said you

17   didn't want to go.  Is that true?"

18       MS. EIDENBACH:  Yes, Your Honor, and we have done

19   that in the past and that is part of what prompted our concern.

20       THE COURT:  All right.                                  03:30:36

21       MS. EIDENBACH:  So we agree with you.

22       THE COURT:  Okay.  So you think that the remedy

23   then -- what is the workable remedy?  How do I fix that or look

24   into it further to see whether or not there's some disconnect

25   between the desires and intentions of your client and what has   03:30:54

United States District Court

1    been reported about the desires and intentions?                    03:30:59

2         MS. EIDENBACH:  It's unfortunate that Ms. Fathi is

3    not here because of course she is much more the expert on this

4    than I am.  But I think perhaps a stop-gap, we're planning to

5    go to Perryville in the very near future and do a couple of      03:31:15

6    other tours as the temperatures decline in the early fall

7    months and we'll use those -- I know.  I know.  It's wishful

8    thinking.  I can't help it.

9         THE COURT:  The last time I checked, it starts to

10   cool in November in Phoenix.  I feel badly.  Mentioned in Court  03:31:32

11   to the director about my hearing aid but I didn't say what I

12   really felt I should have said at that time, and that is in

13   that room where my hearing aid was destroyed because of my

14   profuse sweating because it was so warm, the Corizon employee

15   there asked me, "Could you get me a fan?"                        03:31:53

16        And I have some people in this room now who maybe

17   could get her a fan, that fan that would alleviate the heat

18   that she experiences but also the people that are coming to get

19   her care who are in that room where it's too hot.

20        So I felt badly that I mentioned my personal loss but       03:32:13

21   didn't mention the issue that had also been communicated to me

22   in that same moment.

23        So if you are going to do that, if are you going to

24   visit again, I wonder if there's something you can do to -- I

25   looked at your proposed form of order, for instance, and it      03:32:31

                      United States District Court

1    just didn't seem to be something that was addressing what was          03:32:34

2    the issue.  And I guess I would like to have the -- I don't

3    disagree with many of the things that plaintiffs assert there

4    with respect to what you should be entitled to have and we've

5    worked through this process in a long-term basis with respect       03:32:54

6    to getting this information in these books and, nevertheless,

7    there's still a desire from the plaintiffs that I enter an

8    order based upon failures associated with a time measured when

9    you didn't have this complete information.  And I just wonder

10   if there's something that could be done to refresh this, press       03:33:14

11   the refresh button on this motion so that what I'm doing or

12   what I'm asked to do and what I'm being -- what I should be

13   doing and that is actively engaged in things that can be the

14   most constructive.

15        So does it make sense to ask you to reconsider and              03:33:29

16   maybe even to put it this way as a way to step forward:

17   Provide another proposed form of order that would, you think,

18   lead me down a path that would address some of my concerns?

19        MS. EIDENBACH:  We're happy to do that, Your Honor,

20   and we'll also report to you -- hopefully by the September          03:33:50

21   hearing we will have completed one tour for sure by then and

22   will report to you on findings that we gather during that tour.

23   But we're happy to provide you with an additional form of

24   order.

25        THE COURT:  Thank you.                                         03:34:07

United States District Court

1          Now, that is my review of the list from plaintiffs.    03:34:08

2    Is there anything else that plaintiffs want to raise?

3          MR. SPECTER:  Yes.

4          THE COURT:  We have this design defect in our

5    courtroom and that is if you remain seated, the microphone can    03:34:28

6    hear you but we have a tradition in federal court that we don't

7    remain seated so we lure you into this thing.  It's our

8    hometown version of trying to get you into trouble.

9          So I would ask you to remain seated so that the court

10   reporter can hear you.  Thank you.    03:34:44

11         MR. SPECTER:  Well, Your Honor, I've often thought I

12   had been trapped in federal court but never so explicitly.

13   Thank you for that.

14         THE COURT:  Transparency is the hallmark of this

15   case.    03:34:56

16         MR. SPECTER:  On the housekeeping matter about the

17   phone call for next Friday, I discussed this with Mr. Struck

18   while we were taking a break and we both had different ideas

19   about what was going to happen.

20         So we know one thing that is going to happen.  We're    03:35:17

21   going to talk about Mr. Miller.  The second thing was I thought

22   we were going to also talk about whether there's another

23   alternative to the contempt issues.

24         THE COURT:  You don't have to meet and confer about

25   that.    03:35:35

United States District Court

1           MR. SPECTER:  No.  On the phone with you.                    03:35:38

2           THE COURT:  Okay.  I understand.

3           MR. SPECTER:  And I was thinking that if the parties

4   were going to file a brief, it would need to be filed before

5   the phone call so that you could read it and we could respond    03:35:50

6   to each other.  But Mr. Struck had a different view of that, so

7   I wondered what you had in mind.

8           THE COURT:  Is there a problem, Mr. Struck, with

9   providing the writing that you would want to provide in advance

10  of -- oh, he's not here.                                          03:36:08

11          MS. LOVE:  Your Honor, I spoke to Mr. Struck and he

12  communicated the conversation that he and Mr. Specter had.  Due

13  to the importance of this issue, we would request additional

14  time to file.  And to be candid, our attorney who will be

15  writing the brief is literally on call in a sense of whatever    03:36:25

16  that is of being -- well, of being on call but his wife is

17  about to have twins at any moment.  So it could be very well

18  that during the next seven days his wife has twins.

19          So on that basis as well, we would request sufficient

20  time to brief but outside of a one-week window.                  03:36:45

21          THE COURT:  Let me just think about how best to

22  proceed.

23          MR. SPECTER:  Well, our request is that you proceed

24  with the OSC and if there's some modification of that, then --

25  I don't want to let that go too far down the road.               03:37:16

                        United States District Court

1          THE COURT:  No.  What I am wanting to do is I'm

2    thinking in my own mind because I explained to you that I would

3    be pursuing these two tracks and that I didn't want to cut off

4    the opportunity for the two sides to tell me anything more that

5    they wished to tell me, having heard today that I have this --

6    I had this view that it was not the exercise of contempt

7    authority.

8          And so my thought was that I would get that briefing

9    from you.  But it would not interfere with what I intend to do

10    otherwise and that is to set the gears in motion and to file

11    the order that starts the process on the order to show cause.

12    If it turns out that I can -- that I am presented with case law

13    that provides for me to do what I originally intended to do,

14    I'm inclined to do that.  But nevertheless, I think what we can

15    do is we can give the expectant parents the relief of a couple

16    of weeks because I don't think it's going to -- that won't

17    delay anything.

18          So I would ask you to get what you need to get to me

19    in two weeks' time.  That sounds awfully horrible to say really

20    but I just -- at some point I have to -- I look at your

21    letterhead and you've got lots of lawyers there.

22          MS. LOVE:  Two weeks is acceptable, Your Honor.

23    Thank you.

24          THE COURT:  And so then on Friday what I would like

25    to hear from -- is about whether or not the parties have

United States District Court

176

1    additional views on the expert.                                    03:38:54

2         MR. SPECTER:  Okay.  Very good, Your Honor.

3         The second issue is about compliance with the

4    performance measures that we've just discussed for many hours

5    and I was just thinking about it, not having been involved in   03:39:07

6    these detailed discussions for several months or maybe more and

7    listening to the process that goes on, I was just -- I had some

8    thoughts that I thought might help you resolve these issues in

9    a more effective way.

10        So my idea is that a lot of the issues are                  03:39:29

11   noncompliance with various performance measures over a

12   relatively long period of time that don't seem to get resolved

13   despite promises or despite the promises or even the

14   implementation of new procedures.  And it's very hard for us,

15   and I imagine for you to evaluate the effectiveness of those    03:39:55

16   procedures both from the standpoint of whether they are really

17   cutting through the barriers that exist or are they just a

18   function of the fact that -- are the failures a function of the

19   fact that there's inadequate staffing?  My guess is that it's

20   probably a combination of the two.                              03:40:18

21        But in order to address the issue of the failures

22   from a process standpoint and all of the changes that the

23   defendants have provided or informed the Court about, it's

24   difficult for us at least, and I imagine for you, to assess

25   whether they are really effective because we don't really know  03:40:40

1    what the actual barriers are because we're here and the                    03:40:43

2    barriers exist in the prisons.

3            So this is somewhat inflexible to me because Corizon

4    operates nationally in a lot of different jurisdictions and the

5    performance measures that are at issue here are pretty standard          03:41:01

6    policies and procedures that go through most of what should be

7    at least prison and jail operations.

8            So given the fact that it's difficult to imagine why

9    they can't run a system which complies with these performance

10   measures over the last couple of years, I thought one of the             03:41:25

11   more effective ways to get a better handle on that is to have

12   somebody who has both experience in running a correctional

13   health care system and is somewhat more objective and who can

14   actually be on the ground, determine for themselves what the

15   barriers are and what the proposed remedies are and actually             03:41:51

16   provide some advice to the defendants about how best to remedy

17   some of these failures.  And those recommendations would be

18   hopefully considered by the defendants and Corizon.  And if

19   they weren't accepted, we could talk about that at the status

20   conference as to why they were a crazy idea, were they too               03:42:21

21   burdensome and the like.

22           And also I thought that that person could also inform

23   the Court not only whether there's a process barrier but

24   whether there's a staffing -- it's staffing is the barrier as

25   well and it's not necessarily -- we understand your position             03:42:38

1    and your rulings that staffing increases are off the table as      03:42:46

2    far as your Court orders are concerned, but at least it would

3    be to know what the issue is so that we don't waste time every

4    month and telling you that they are doing something different

5    or they are telling you that they are doing the same thing but   03:43:02

6    they are not getting any effect.

7         So I thought that might be more effective, might give

8    you some more knowledge and it might cut down on the time that

9    you have to spend in these hearings going through these

10   performance measures and we could get really to the root of      03:43:21

11   some of these problems faster than we have been in the recent

12   past.

13        THE COURT:  Well, what you propose and I think I

14   proposed and then your co-counsel told me I couldn't because

15   that looked like a monitor.                                       03:43:36

16        MR. SPECTER:  No.  I don't think so, Your Honor.  I

17   think a monitor is somebody who reports on the compliance.  And

18   what I'm suggesting is another variation of a 706 expert who

19   could provide expertise and advise and recommendations on, I

20   think that would be perfectly appropriate if it's right within   03:44:05

21   the 706 framework.  We've had other cases where experts,

22   including health care experts, have been appointed by the

23   courts to do similar things in cases such as this case.

24        THE COURT:  Well, I appreciate your comments.  Again,

25   I was put off the scent of this by your co-counsel.              03:44:37

                      United States District Court

| | | |
|---|---|---|
| 1 | MR. SPECTER:  I don't think so.  We said you could | 03:44:42 |
| 2 | appoint a special master but it would be at the Court's expense | |
| 3 | and it would have -- the pay is also regulated such that it | |
| 4 | would be difficult to find somebody who could do that. | |
| 5 | There's no such limitations for a 706 expert. | 03:44:58 |
| 6 | THE COURT:  If there are examples of other federal | |
| 7 | courts applying a case that originates subject to the PLRA | |
| 8 | where there are the kinds of activities that you describe, then | |
| 9 | I would like to hear about that.  But the impression that I | |
| 10 | gleaned and moved forward with was that having somebody who was | 03:45:38 |
| 11 | on the ground so to speak to be the ears and making | |
| 12 | recommendations to me was sufficiently within the realm of how | |
| 13 | the statute defines a monitor and prohibits that. | |
| 14 | MR. SPECTER:  It's not prohibited; it's just | |
| 15 | constrained.  But practically speaking, yes, it makes it very | 03:46:01 |
| 16 | difficult. | |
| 17 | THE COURT:  All right. | |
| 18 | Thank you. | |
| 19 | MR. SPECTER:  You're welcome. | |
| 20 | THE COURT:  Anything from the defendants' side? | 03:46:09 |
| 21 | MR. BOJANOWSKI:  Your Honor, there was one item, item | |
| 22 | number four.  Corizon's motion to participate as -- | |
| 23 | THE COURT:  Right.  I told you yesterday there's a | |
| 24 | written order that is going to issue on that.  You don't get | |
| 25 | to -- | 03:46:20 |

United States District Court

1      MR. BOJANOWSKI:  All right.  I have just wanted to      03:46:21

2  touch base with you as to that item which had not been

3  mentioned.

4      THE COURT:  No.  That's because I addressed it

5  yesterday.  There isn't any doubt about that.      03:46:28

6      MR. BOJANOWSKI:  No.  That's the only thing that was

7  on the list that was not mentioned.

8      THE COURT:  All right.  Thank you very much.

9      All right.  Well, thank you, all, very much for your

10  time yesterday and today.      03:46:38

11      You know, I used the word "micromanage" a bit ago and

12  that's because I really do want you all to understand that that

13  is not a poisoned word in this courtroom.  That is because,

14  unfortunately, you've left me with that responsibility and the

15  way you get me out of that business is to comply with the      03:46:57

16  performance measures and there will be no micromanaging.  But I

17  cannot do what I'm required to do, especially with respect to

18  the limitation that I just described without me getting into

19  the weeds on this and trying to understand as much as I can.

20      And so that means intelligent micro-designing --      03:47:12

21  micromanaging -- intelligent micro-designing -- I could use

22  that help maybe.

23      In any event, it does mean that I need to do that and

24  so I am not scared of that word and do think that for me to be

25  frightened of it is an abdication of my responsibility to do.      03:47:34

United States District Court

1    But if it remains frightening to anybody, I hope it remains      03:47:38

2    frightening to the defendants because the smart thing here is

3    to get me out of this, to meet the performance measures and to

4    have this thing be a conclusion in the past.

5            As the State considers how best to proceed, it needs      03:47:52

6    to understand that as you evaluate what the contract price is

7    in your negotiations, there is a healthy cost here that is

8    imposed by the presence in this case.  I see all of these

9    people in the courtroom.  And I think not only because the

10   lawyers billing, but the people not in their offices doing what  03:48:14

11   they are supposed to be doing.  And I don't like that and that

12   is a cost to everybody, but I can't sherk from imposing the

13   cost because of the responsibility that I have.

14           So what that means is the future holds much more of

15   this, much more expense, much more distraction from the primary  03:48:29

16   mission unless you can satisfy these performance measures

17   which, as I said to Director Ryan, seemed to me in the offing

18   of the settlement to be something that I really expected people

19   to straightforwardly be able to accomplish and they haven't

20   been able to do that.  So that's where we are.                   03:48:50

21           Thank you, all.

22           MR. SPECTER:  Thank you, Your Honor.

23           MR. BOJANOWSKI:  Thank you.

24       (Whereupon, these proceedings recessed at 3:48 p.m.)

25


                    United States District Court

```
 1                    C E R T I F I C A T E                        03:48:56

 2

 3          I, ELAINE M. CROPPER, do hereby certify that I am

 4  duly appointed and qualified to act as Official Court Reporter

 5  for the United States District Court for the District of       03:48:56

 6  Arizona.

 7

 8          I FURTHER CERTIFY that the foregoing pages constitute

 9  a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled    03:48:56

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control, and to the best of

13  my ability.

14

15          DATED at Phoenix, Arizona, this 14th day of August,    03:48:56

16  2017.

17

18

19

20                           s/Elaine M. Cropper                   03:48:56

21                     _____

22                       Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                 03:48:56


                    United States District Court
```